No. 23-30445

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

STATE OF MISSOURI; STATE OF LOUISIANA; AARON KHERIATY; MARTIN KULLDORFF; JIM HOFT; JAYANTA BHATTACHARYA; JILL HINES,

Plaintiffs-Appellees,

v.

JOSEPH R. BIDEN, JR.; VIVEK H. MURTHY; XAVIER BECERRA; DEPARTMENT OF HEALTH & HUMAN SERVICES; ANTHONY FAUCI, et al.,

Defendants-Appellants.

On Appeal from the United States District Court
for the Western District of Louisiana

## EMERGENCY MOTION UNDER CIRCUIT RULE 27.3
## FOR A STAY PENDING APPEAL

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

BRANDON BONAPARTE BROWN
*United States Attorney*

DANIEL TENNY
DANIEL WINIK
SIMON BREWER
*Attorneys, Appellate Staff*
*Civil Division, Room 7245*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 305-8849*

## CERTIFICATE OF INTERESTED PERSONS

*Missouri v. Biden*

A certificate of interested persons is not required under Fifth Circuit Rule 28.2.1 as appellants are all governmental parties.

*/s/ Daniel Winik*
Daniel Winik

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY ................................................................1

STATEMENT ............................................................................................3

ARGUMENT .............................................................................................7

I.    The Government Is Likely To Succeed On The Merits...........................7

    A.    Plaintiffs Lack Standing ..............................................................7

    B.    Plaintiffs Failed To Show A First Amendment Violation .........10

II.    The Equitable Factors Heavily Favor A Stay .................................... 15

    A.    The Injunction Is Unnecessary To Prevent Irreparable Harm To Plaintiffs..............................................................................16

    B.    The Injunction Sweeps More Broadly Than Necessary To Remedy Plaintiffs' Asserted Injuries ...........................................17

    C.    The Injunction Lacks The Required Specificity.........................18

    D.    Unless Stayed, The Preliminary Injunction Will Irreparably Harm The Government And Undermine The Public Interest...........................20

CONCLUSION ........................................................................................ 22

CERTIFICATE OF COMPLIANCE

ADDENDUM

The government respectfully requests a stay pending appeal of the district court's preliminary injunction. We further request an immediate administrative stay to permit the orderly resolution of this motion, and in any event request relief by July 24, 2023. If the Court declines to grant a longer stay, it should at a minimum stay the injunction for ten days to permit the Supreme Court to consider an application for a stay, should the Solicitor General elect to file one. Plaintiffs oppose this motion.

## INTRODUCTION AND SUMMARY

One of the central prerogatives of the President and Executive Branch officials is to speak to members of the American public—including American companies—about how they can help mitigate threats to the Nation. From President Kennedy's exhortation for steel companies to lower their prices to President Trump's efforts to encourage companies to keep American jobs onshore, presidents and other officials have long exercised the power of persuasion to advance their vision of the public good. While the government may not coerce private parties to act on its behalf to achieve indirectly what it could not do directly, courts have set a high threshold for finding such coercion to give the government sufficient latitude to "advocate and defend its own policies." *Board of Regents of the Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 229 (2000).

Here, however, the district court issued a universal injunction with sweeping language that could be read to prohibit (among other things) virtually any government communication directed at social-media platforms regarding content moderation. The

court's belief that the injunction forbids only unconstitutional conduct, while protecting the government's lawful prerogatives, rested on a fundamentally erroneous conception of the First Amendment, and the court's effort to tailor the injunction through a series of carveouts cured neither the injunction's overbreadth nor its vagueness.

Consider, for example, the injunction's prohibition against "urging, encouraging, pressuring, or inducing" social-media platforms "in any manner" to moderate their content, A159. May federal officials respond to a false story on influential social-media accounts with a public statement, or a statement to the platforms hosting the accounts, refuting the story? May they urge the public to trust neither the story nor the platforms that disseminate it? May they answer unsolicited questions from platforms about whether the story is false if the platforms' policies call for the removal of falsehoods? No plausible interpretation of the First Amendment would prevent the government from taking such actions, but the injunction could be read to do so.

Or consider how that prohibition might apply to law-enforcement officials, who routinely notify social-media companies of threats or other criminal activity on their platforms. The injunction states that the government may "inform[] social-media companies of postings involving criminal activity or criminal conspiracies," A160, but what if, in an investigation's early stages, officials lack certainty whether a post rises to the level of criminal activity?

Or consider a possible White House Press Secretary statement, made shortly after a natural disaster, that urges social-media platforms to act responsibly by

disseminating only accurate information about the disaster because misinformation circulating online could impede relief and response efforts. Would that statement be prohibited, or does it fall within the allowance for "permissible public government speech promoting government policies or views on matters of public concern," A161?

The injunction threatens to chill this wholly lawful conduct, and to place the Judiciary in the untenable position of superintending the Executive Branch's communications. It raises grave separation-of-powers concerns.

The injunction reflects numerous legal errors. The district court adopted a theory of state *parens patriae* standing that the Supreme Court has repeatedly rejected, including as recently as last month. The court's conclusion that the individual plaintiffs have standing rests on a handful of past episodes of content moderation by private actors, without any showing that any government action will cause future harm to plaintiffs. The court's merits analysis reflects an insupportably broad view of what interactions can make the government responsible for private parties' actions. And the injunction vastly exceeds the court's equitable powers. It forbids conduct having nothing to do with plaintiffs, cannot be regarded as necessary to prevent irreparable harm, lacks the requisite specificity, and will significantly and irreparably harm the government and the public. This Court should stay it.

## STATEMENT

1.    Social-media platforms allow billions of people to share content instantaneously around the globe. The unprecedented scope and speed of social-media

communications has afforded many benefits.  It has also presented significant hazards, including the spread of harmful misinformation.  Platforms have sought to address these hazards, and thereby preserve the value of their products, by maintaining and enforcing content-moderation policies.  In March 2020, for example, Twitter amended its content-moderation policies in response to the COVID-19 pandemic "to address content that goes directly against guidance from authoritative sources of global and local public health information."  A908-915.  Twitter "is no longer enforcing" its "COVID-19 misleading information policy" as of November 2022.  A908.

The federal government also has sought to mitigate these hazards, including by calling attention to them so that the platforms can apply their own content-moderation policies.  For example, the FBI routinely shares with platforms intelligence regarding accounts that appear to be used by foreign malign actors to influence the American public, or by foreign terrorist organizations to recruit supporters.  A938-939, 945.

Senior government officials have spoken publicly about the harms that can arise from the rapid spread of falsehoods through social media.  In May 2021, for example, the White House Press Secretary expressed the President's view regarding social-media platforms' "responsibility" to "stop amplifying untrustworthy content, disinformation, and misinformation, especially related to COVID-19, vaccinations, and elections."  The White House, *Press Briefing by Press Secretary Jen Psaki and Secretary of Agriculture Tom Vilsack* (May 5, 2021), https://perma.cc/4ZGE-N9QL.  But she emphasized that the President "believe[s] in First Amendment rights" and that "social media platforms need to

make" "the decisions" regarding "how they address … disinformation" and "misinfor-

mation." *Id.*

2.    Plaintiffs—Missouri, Louisiana, and several individuals—claim that these

efforts to mitigate harms perpetuated online violated the First Amendment. The dis-

trict court allowed plaintiffs to take extensive discovery in support of their preliminary-

injunction motion. This Court twice intervened to stay depositions of high-level offi-

cials that the district court had authorized without the requisite showing of necessity.

Order, *In re Murthy*, No. 22-30697 (5th Cir. Jan. 5, 2023); Order, *In re Murthy*, No. 22-

30697 (5th Cir. Nov. 21, 2022).

3.    On July 4, the district court entered a preliminary injunction, concluding

that seven groups of defendants coerced or significantly encouraged social-media plat-

forms to suppress speech, and "jointly participated" in the suppression of speech, in

violation of the First Amendment. A95-116. The court held that the plaintiff States

have standing principally on a *parens patriae* theory, predicated on the States' assertion

of "two quasi-sovereign interests." A122-123. The court additionally relied on the

application of content-moderation policies to a handful of posts made (or ostensibly

made) by state entities. A125. The court held that the individual plaintiffs have standing

on the theory that they had been subject to content moderation by platforms. A127-

128. The court identified no evidence that any federal official communicated with so-

cial-media platforms about any of plaintiffs' content in particular.

The court determined that plaintiffs had satisfied the irreparable-injury require-ment, based largely on its conclusion that plaintiffs had demonstrated standing and their claims were not moot.  A139-144.  It devoted just two paragraphs to the balance-of-equities and public-interest factors and concluded, without discussing the injunction's terms, that its injunction could be sufficiently specific and tailored.  A144-145.

The district court enjoined defendants (other than a handful against whom plain-tiffs declined to seek preliminary relief) from engaging in ten types of communications with social-media companies regarding their content-moderation policies and the ap-plication of those policies.  A159-160.  The injunction prohibits defendants from, among other things, "engaging in any communication of any kind with social-media companies urging, encouraging, pressuring, or inducing in any manner" the "removal, deletion, suppression, or reduction of content"; "urging" those companies "to change their guidelines for removing" content; "flagging content or posts" for potential re-moval or reduction; and "requesting content reports" from those companies. *Id.* These prohibitions apply to "protected free speech." A159.

The order states that the injunction does not prohibit defendants from informing social-media companies of postings involving criminal activity or conspiracies; "na-tional security threats, extortion, or other threats posted on [their] platforms"; or certain other categories of content. A160-161.  The order also states that the injunction does not prohibit "exercising permissible public government speech promoting government

policies or views on matters of public concern," but it leaves those terms undefined. A161.

Earlier today, the district court denied the government's motion for a stay pending appeal, A1995-2007, and stated that the injunction was revised to redefine "protected free speech" as "speech which is protected by the Free Speech Clause … in accordance with the jurisprudence of the United States Supreme Court," A2008.

## ARGUMENT

A motion for stay pending appeal is governed by the four-factor test in *Nken v. Holder*, 556 U.S. 418, 426 (2009). Each factor supports the government here.

## I.   The Government Is Likely To Succeed On The Merits

### A.   Plaintiffs Lack Standing

The district court determined that the plaintiff States have standing principally on a *parens patriae* theory. A122-123. The court asserted that in *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592 (1982), the "Supreme Court determined that Puerto Rico had *parens patriae* standing to sue the federal government to safeguard its quasi-sovereign interests." A122. But *Snapp* stands for the opposite proposition. The Court explained that "[a] State does not have standing as *parens patriae* to bring an action against the Federal Government," a principle inapplicable in *Snapp* itself only because that case was filed "against private defendants." 458 U.S. at 610 n.16. The Supreme Court recently reaffirmed that States cannot bring *parens patriae* actions against the federal government. *Haaland v. Brackeen*, 143 S. Ct. 1609, 1640 (2023).

The district court reasoned that that rule does not apply to "'quasi-sovereign-interest suits.'"  A137.  But the Supreme Court has rejected suits based on the "two quasi-sovereign interests" the district court identified.  A123.  The States' asserted "interest in safeguarding the free-speech rights of a significant portion of their respective populations," *id.*, resembles the interest held insufficient in *Brackeen*—a State's interest in safeguarding the constitutional rights of "non-Indian families," 143 S. Ct. at 1640 n.11.  The Supreme Court described reliance on that interest as "a thinly veiled attempt to circumvent the limits on *parens patriae* standing."  *Id.*

The States' asserted "interest in ensuring that they receive the benefits from participating in the federal system" equally conflicts with the Supreme Court's decisions in *Brackeen* and in *United States v. Texas*, 599 U.S. __, 2023 WL 4139000 (June 23, 2023).  In *Brackeen*, the Court rejected Texas's reliance on a perceived threat to its "'promise to its citizens that it will be colorblind in child-custody proceedings.'"  143 S. Ct. at 1640.  And in *Texas*, the Court rejected Texas's similar theory that it could bring suit "'to assure [its] residents that they [would] have the full benefit of federal laws designed to address' the problems caused by criminal aliens that Congress has ordered detained," Brief for Respondents at 23, *United States v. Texas*, No. 22-58, 2022 WL 12591050 (U.S. Oct. 18, 2022).  In any event, the States never explain how the conduct challenged here—federal government communications with private parties—even implicates their "participati[on] in the federal system."

The district court found that several individual posts—one by a state agency and several (allegedly) by a sub-State entity in 2021, and another by an individual state legislator at some unspecified time—had been subjected to content moderation. The court identified no evidence tying those episodes to any federal intervention. And in any event, a handful of years-old past injuries cannot confer standing to seek sweeping forward-looking relief. "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief"; a plaintiff must show a "real and immediate threat of repeated injury," *O'Shea v. Littleton*, 414 U.S. 488, 495-496 (1974), and the court identified no such threat. *See also City of Los Angeles v. Lyons*, 461 U.S. 95, 101-108 (1983).

The district court likewise erred in holding that the individual plaintiffs established standing by showing "a combination of past and ongoing censorship." A127. Plaintiffs largely assert harm from content-moderation actions taken by social-media platforms in 2020 and 2021 based on policies that predated most of the government actions at issue here. And all three plaintiffs who suggested that their social-media accounts had been suspended now appear to have active accounts. *See* A929.

Even if plaintiffs could surmount those problems, the prospect of future content-moderation actions against them could not support jurisdiction for the district court to forbid a wide range of government agencies (including those having no interest in the subjects about which plaintiffs sought to speak) from communicating with a wide range of platforms (including those on which plaintiffs do not participate) about a wide

range of topics (including speakers and subject matter other than plaintiffs and their speech). *See infra* pt. II.B.

### B.    Plaintiffs Failed To Show A First Amendment Violation

The district court likewise erred in holding that plaintiffs are likely to succeed on the merits of their First Amendment claim.

The government is entitled to "advocate and defend its own policies." *Board of Regents*, 529 U.S. at 229. Government officials can express views about the world—including about whether expressive communications are false and harmful. Restricting such expression would undermine the separation of powers and would impede First Amendment values, rather than promoting them, by removing the government's voice from the marketplace of ideas.

Courts have therefore recognized "that government officials do not violate the First Amendment when they request that a private intermediary not carry a third party's speech so long as the officials do not threaten adverse consequences if the intermediary refuses to comply." *O'Handley v. Weber*, 62 F.4th 1145, 1158 (9th Cir. 2023). And courts have "drawn a sharp distinction between attempts to convince and attempts to coerce," allowing the former though not the latter. *Id.*; *see Louisiana Div. Sons of Confederate Veterans v. City of Natchitoches*, 821 F. App'x 317, 320 (5th Cir. 2020) (per curiam) (embracing this distinction); *see also, e.g.*, *Peery v. Chicago Hous. Auth.*, 791 F.3d 788, 790 (7th Cir. 2015). Legitimate attempts to persuade can include "forceful[]" criticism using "strong rhetoric." *Kennedy v. Warren*, 66 F.4th 1199, 1208 (9th Cir. 2023); *see also VDARE Found. v.*

*City of Colorado Springs*, 11 F.4th 1151, 1164 (10th Cir. 2021); *X-Men Sec., Inc. v. Pataki*, 196 F.3d 56, 68-72 (2d Cir. 1999); *Penthouse Int'l, Ltd. v. Meese*, 939 F.2d 1011, 1015-1016 (D.C. Cir. 1991).

A different result may obtain when the government "has exercised coercive power or has provided such significant encouragement, either overt or covert," over a private decision "that the choice must in law be deemed to be that of the [government]." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982).  That may be true, as the district court recognized, if "the comments of a governmental official can reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request." A90.  Thus, for example, the Supreme Court held in *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963), that an agency could not identify certain books as "objectionable" in a notice to distributors that emphasized the agency's "duty to recommend … prosecution of purveyors of obscenity" and then follow up by having a police officer visit to see what action was taken.  *Id.* at 61-63.

But generalized pressure is insufficient; the government must compel "the *specific* conduct of which the plaintiff complains."  *Blum*, 457 U.S. at 1004 (emphasis added). In *Blum*, for example, even though "nursing homes in [the State were] extensively regulated," *id.*, and even though state regulations placed pressure on nursing homes to discharge patients or transfer them to lower levels of care, the Supreme Court declined to hold the State responsible for nursing homes' specific "decision[s] to discharge or

transfer particular patients" because they "ultimately turn[ed] on medical judgments made by private parties." *Id.* at 1008.

The district court misapplied these precedents. As to coercion, the court deemed the government's actions unconstitutional even absent any threat of government sanction. For example, the court credited plaintiffs' claim against the Centers for Disease Control and Prevention (CDC) merely because social-media companies treated the CDC's views on scientific matters as authoritative, without identifying any threat of sanction. A104-105.

The only potential actions the district court identified as transforming the government's requests into coercive threats were potential efforts to amend Section 230 of the Communications Decency Act or to take antitrust action against social-media companies. But the potential for the government to take measures that might harm the social-media companies' interests is unremarkable: Virtually every company in America could be benefited or harmed by actions the government might take. General statements about possible government actions—here, about Executive Branch support for legislative enactments or for "better privacy protections and a robust anti-trust program," A22—cannot transform every request that any government actor makes into a coercive threat.

Similarly, none of the twenty-two "examples of coercion" that the court cobbled together from various statements from White House officials, plucked out of context, makes any threat. A97-99. The government may gather information and express policy

views, and it is not unconstitutional to ask private companies questions (such as, "How many times can someone show false COVID-19 claims before being removed?") or to express significant concerns about business decisions (for example, "We are gravely concerned that your service is one of the top drivers of vaccine hesitancy[.]"). A98-99.

Nor is it impermissible to request that particular posts or accounts be removed, provided that the requests are not backed by threats of sanctions. The government can call a social-media company's attention to a doctored video "mak[ing] it sound as if the First Lady were profanely heckling children," A25, or "dispute a note added by Twitter to one of President Biden's tweets about gas prices," A27, just as the White House press office (like the press office of any private corporation) can call a newspaper reporter to question a story's accuracy. The district court identified no evidence suggesting that a threat accompanied any request for the removal of content. Indeed, the order denying the stay—presumably highlighting the ostensibly strongest evidence—referred to "a series of public media statements" and a refusal to comment on a news story. A1999-2000. Nor does the record suggest that the platforms felt they had no choice but to comply with all governmental requests. *See, e.g.,* A916-928 (emails from platforms declining to moderate non-violative content).

As to "significant encouragement," the district court misunderstood that phrase from *Blum* to mean any action by the government that made the platform more likely to engage in content moderation. By stating that private action becomes government action whether brought about by "coerci[on]" or by "significant encouragement," *Blum*,

457 U.S. at 1004, the Supreme Court did not make "significant encouragement" a lesser alternative to coercion; it merely recognized that offers of "positive incentives" (significant encouragement), just like threats of negative consequences (coercion), could overwhelm a private party's independent judgment. *O'Handley*, 62 F.4th at 1157-1158. The government did neither here.

Finally, the district court erred in invoking the doctrine of joint participation, which requires a governmental action that "enhanced the power of the harm-causing individual actor." *NCAA v. Tarkanian*, 488 U.S. 179, 192 (1988). There was no such governmental action here; the government merely "flagged" misinformation just as any member of the public could have done. *Cf. Howard Gault Co. v. Texas Rural Legal Aid, Inc.*, 848 F.2d 544, 555 (5th Cir. 1988) (joint action where public officials supplied "resources would not have been available to litigants operating in a purely private capacity"). The Cybersecurity and Infrastructure Security Agency (CISA), for example, merely shared with social-media companies information that state or local election officials (including officials from plaintiffs Louisiana and Missouri) had flagged as "disinformation aimed at their jurisdiction," A68. That cannot plausibly be regarded as transforming any actions that the platforms take into governmental actions, thus subjecting the platforms' private conduct to First Amendment scrutiny. The Ninth Circuit reached that natural conclusion in *O'Handley*, holding that there was no joint participation when Twitter gave the State of California access to a "Partner Support Portal" used to "flag[] for Twitter's review posts that potentially violated the company's content-moderation

policy." 62 F.4th at 1160. As the court explained—in logic that applies equally here—the State merely "supplied] Twitter with information," which Twitter could "decide[] how to utilize." *Id.*

The implications of the district court's contrary holding are startling. Although the court purported not to decide "whether the social-media platforms are government actors," A88, its decision was premised on the notion that the platforms' content-moderation decisions were coerced by the government and thus qualify as state action. *See* A88-93 (relying on decisions involving suits brought against private entities alleged to have been state actors). Were that true, plaintiffs could have secured injunctions compelling platforms to restore misinformation or other content that the platforms chose to delete. The Supreme Court recently warned against expansive state-action theories that would "eviscerate certain private entities' rights to exercise editorial control over speech and speakers on their properties or platforms" by subjecting those choices "to the constraints of the First Amendment." *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1932-1933 (2019). But the district court did not even acknowledge, much less attempt to justify, the profoundly disruptive implications of its holding.

## II.    The Equitable Factors Heavily Favor A Stay

Independent of the merits, the district court abused its equitable discretion in several respects.

A.    **The Injunction Is Unnecessary To Prevent Irreparable Harm To Plaintiffs**

Although First Amendment injuries may be irreparable when they occur, *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion), the "invocation of the First Amendment cannot substitute for the presence of an imminent, non-speculative irreparable injury," *Google, Inc. v. Hood*, 822 F.3d 212, 228 (5th Cir. 2016). A preliminary injunction is appropriate only when "First Amendment interests are either threatened or in fact being impaired at the time relief is sought." *Id.* (quotation marks omitted).

The district court failed to substantiate any finding that plaintiffs face ongoing or imminent injury. Rather, the district court's discussion of irreparable harm focused on the voluntary-cessation exception to mootness and on two cases addressing Article III standing. A140-142. That confuses jurisdiction with the irreparable-harm inquiry. The court opined that plaintiffs' fear of future injury is "not imaginary or speculative," A142, but even if that were correct, a preliminary injunction must be premised on a *likelihood* of future injury and not merely a non-speculative risk of one, *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The court also relied on "allegations" in "[t]he Complaint (and its amendments)," A143-144, rather than requiring plaintiffs to make a showing with evidence, as required at the preliminary-injunction stage, *see PCI Transp., Inc. v. Fort Worth & W. R.R. Co.*, 418 F.3d 535, 546 (5th Cir. 2005).

The district court identified no evidence to support a finding that plaintiffs are likely to face irreparable harm in the absence of an injunction, nor did it render such a

finding.  Instead, the court merely opined that, although "some of the alleged conduct" has "stop[ped]" in light of the new phase of the national response to the pandemic, A140, the government would "likely" continue to seek to influence social-media companies on other subjects.  A143-144.  But that is not a finding that *these plaintiffs* are likely to suffer harm:  There is no reason to believe that plaintiffs face a threat of imminent injury from any effort the government might hypothetically make to address social-media content concerning "gas prices," "climate change," "gender," or "abortion," *id.*

### B.     The Injunction Sweeps More Broadly Than Necessary To Remedy Plaintiffs' Asserted Injuries

The district court compounded its error by failing to explain why an injunction of such sweeping breadth would be necessary to remedy plaintiffs' harms.

Article III requires that "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury."  *Gill v. Whitford*, 138 S. Ct. 1016, 1933-1934 (2018).  Principles of equity reinforce that jurisdictional limitation:  Injunctive relief may "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see Texas*, 599 U.S. at __, 2023 WL 4139000, at *12-13 (Gorsuch, J., concurring in the judgment).

The injunction here flouts these principles.  It indiscriminately targets defendant agencies and their employees; for example, it covers the entire Department of Homeland Security and Department of Health and Human Services even though the court found a constitutional violation only with respect to one DHS component (CISA) and

purported to deny the injunction as to the Food and Drug Administration within HHS, A161. And it covers communications with all social-media platforms and communications regarding all posts by anybody (not just plaintiffs) on all topics.

The district court did not even attempt to justify that breathtaking scope of relief, except to suggest in denying a stay that including entire agencies was appropriate even if some subcomponents had nothing to do with the challenged conduct because agencies could otherwise "simply instruct a sub-agency to perform the prohibited acts and avoid the consequences of an injunction." A2006. That abuse of discretion alone justifies a stay. At a minimum, this Court should stay the injunction to the extent it extends beyond government action specifically targeting content posted by plaintiffs themselves. An injunction so limited would largely or entirely eliminate any irreparable harm that plaintiffs might face without burdening a vast universe of government actions lacking any connection to plaintiffs.

## C.    The Injunction Lacks The Required Specificity

The injunction equally fails to satisfy Federal Rule of Civil Procedure 65(d)'s requirement that an injunctive order "state its terms specifically" and "describe in reasonable detail … the act or acts restrained or required." "'[A]n ordinary person reading the court's order should be able to ascertain from the document itself exactly what conduct is proscribed.'" *Louisiana v. Biden*, 45 F.4th 841, 846 (5th Cir. 2022).

This injunction fails that test in numerous respects. For example, suppose the CDC notices that influential social-media accounts are posting a false story that the

measles vaccine causes cancer.  Can the CDC issue a public statement refuting the story, or would that be "urging, encouraging, pressuring, or inducing" the platforms to moderate the content, A159?  Can it even answer unsolicited questions from platforms about whether the story is false, or would an affirmative answer to that question be "inducing" the removal of the story if the platforms' policies call for the removal of falsehoods?

The injunction's carveouts exacerbate its vagueness.  For example, the district court apparently recognized (though it did not explain) that the government must engage with social-media companies to protect "public safety" and "national security" and that the government is entitled to speak on matters of public concern.  But the court left those carveouts' essential terms undefined—along with numerous other key terms, such as "permissible" government speech, "criminal" activity, and "malicious cyber activity."  And the carveouts are even less clear in light of the opinion.  The court held, for example, that CISA violated the First Amendment when it conveyed to social-media companies information that state or local election officials had flagged as "disinformation aimed at their jurisdiction," A68.  But the injunction purports to allow communications "informing social-media companies of postings intending to mislead voters about voting requirements and procedures."  A161.  An official subject to the injunction could not possibly reconcile those statements.

### D.  Unless Stayed, The Preliminary Injunction Will Irreparably Harm The Government And Undermine The Public Interest

Finally, the injunction will cause the government and thus the public to suffer irreparable injury.  *See Nken*, 556 U.S. at 435 (harms to government and public "merge").

As discussed, one of the central constitutional duties and prerogatives of the President and his senior officials is to speak about harms in the world and ways of addressing those harms, and Executive Branch officials must have latitude to do so forcefully at times.  But the injunction subjects many such communications to a risk of contempt.  Consider, for example, a hypothetical statement from the White House podium that the President denounces misinformation about a recent natural disaster circulating online and urges platforms not to disseminate those falsehoods.  That statement might be seen to "encourag[e] … social-media companies to change their guidelines for" content moderation, or "pressur[e]" them to moderate content, A159.  Even the potential for the injunction to be construed as limiting the communication of the President's views regarding issues of public consequence raises grave separation-of-powers concerns, thereby inflicting irreparable harm on a coordinate Branch.  *See INS v. Legalization Assistance Project of the L.A. Cty. Fed'n of Labor*, 510 U.S. 1301, 1305-1306 (1993) (O'Connor, J., in chambers); *cf. Maryland v. King*, 567 U.S. 1301, 1303 (2012) (barring a sovereign from "employ[ing] a duly enacted statute to help prevent … injuries constitutes irreparable harm").

The injunction's more mundane effects are also harmful. The district court appeared to contemplate that the CDC could no longer answer inquiries from platforms about scientific matters to allow platforms to make informed content-moderation decisions. Federal law-enforcement agencies would likewise need to tread carefully in their interactions with social-media companies, potentially eschewing communications that protect national security, public safety (*e.g.*, communications about the fentanyl crisis), or the security of federal elections, lest they fall outside the injunction's exceptions. For example, particularly in the early stages of an investigation, federal law enforcement officials may need additional information to determine whether a social media post involves unprotected criminal activity (such as a true threat). But the injunction leaves them guessing what quantum of certainty they must possess before they can inform social-media companies about the post, potentially leading to disastrous delays.

Even when a district court has concluded that plaintiffs are likely to establish a constitutional violation, it cannot enjoin governmental conduct without considering the injunction's countervailing harms to the public interest. *Winter*, 555 U.S. at 32; *Defense Distributed v. U.S. Dep't of State*, 838 F.3d 451 (5th Cir. 2016) (affirming denial of a preliminary injunction based on balance of harms). The court abused its discretion by failing to conduct that balancing, and it would equally have abused its discretion had it determined that the profound harms this injunction will cause to the government and the public interest would be outweighed by its benefit to plaintiffs.

# CONCLUSION

The preliminary injunction should be stayed pending appeal. At a minimum, the Court should stay the injunction to the extent it extends beyond actions specifically targeting content posted by plaintiffs. This Court should also grant an immediate administrative stay to permit the orderly briefing and disposition of this motion. And if the Court declines to grant a longer stay, it should at a minimum stay the injunction for ten days to permit the Supreme Court to consider an application for a stay, should the Solicitor General elect to file one.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney
General*

BRANDON BONAPARTE BROWN
*United States Attorney*

MARK R. FREEMAN
DANIEL TENNY

*/s/ Daniel Winik*
DANIEL WINIK
SIMON BREWER
*Attorneys, Appellate Staff
Civil Division, Room 7245
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 305-8849
Daniel.L.Winik@usdoj.gov*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 32(g), I certify that this motion complies with Federal Rule of Appellate Procedure 27(d)(1)(E) because it has been prepared in 14-point Garamond, a proportionally spaced font, and that it complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,199 words, according to Microsoft Word.

I further certify that this emergency motion complies with the requirements of Fifth Circuit Rules 27.3 and 27.4 because it was preceded by telephone calls to the Clerk's Office and to the offices of opposing counsel, advising of our intent to file it. Plaintiffs intend to file an opposition. I further certify that the facts supporting emergency consideration of this motion are true and complete.

*/s/ Daniel Winik*
Daniel Winik