No. 23-30445

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

STATE OF MISSOURI; STATE OF LOUISIANA; AARON KHERIATY; MARTIN KULLDORFF; JIM HOFT; JAYANTA BHATTACHARYA; JILL HINES,

Plaintiffs-Appellees,

v.

JOSEPH R. BIDEN, JR.; VIVEK H. MURTHY; XAVIER BECERRA; DEPARTMENT OF HEALTH & HUMAN SERVICES; ANTHONY FAUCI, et al.,

Defendants-Appellants.

On Appeal from the United States District Court
for the Western District of Louisiana

## EXHIBITS TO APPELLANTS' EMERGENCY MOTION UNDER
## CIRCUIT RULE 27.3 FOR A STAY PENDING APPEAL

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney
  General*

BRANDON BONAPARTE BROWN
  *United States Attorney*

DANIEL TENNY
DANIEL WINIK
SIMON BREWER
  *Attorneys, Appellate Staff
  Civil Division, Room 7245
  U.S. Department of Justice
  950 Pennsylvania Avenue NW
  Washington, DC 20530
  (202) 305-8849*

# TABLE OF CONTENTS

1. Memorandum Ruling on Request for Preliminary Injunction
   (July 4, 2023), Dkt. 293 ................................................................... A1

2. Judgment (July 4, 2023), Dkt. 294 ........................................................... A156

3. Plaintiffs' Motion for Preliminary Injunction (June 14, 2022), Dkt. 10 ............. A163

4. Plaintiffs' Supplemental Brief in Support of Motion for
   Preliminary Injunction (March 7, 2023), Dkt. 214 ................................. A168

5. Plaintiffs' Proposed Findings of Fact in Support of Their Motion
   for Preliminary Injunction (March 7, 2023), Dkt. 214-1 ....................... A248

6. Defendants' Opposition to Plaintiffs' Motion for Preliminary
   Injunction (May 3, 2023), Dkt. 266 ....................................................... A611

7. Exhibits to Defendants' Opposition to Plaintiffs' Motion for Preliminary
   Injunction (May 3, 2023) (excerpts), Dkts. 266-3, 266-5, 266-6 .......... A908

8. Defendants' Responses to Plaintiffs' Proposed Findings of Fact
   in Support of Their Motion for Preliminary Injunction
   (May 3, 2023), Dkt. 266-8 ...................................................................... A955

9. Third Amended Complaint (May 5, 2023), Dkt. 268 ........................................ A1678

10. Plaintiffs' Reply Memorandum in Support of Motion for Preliminary
    Injunction (May 22, 2023), Dkt. 276 ................................................... A1845

11. Defendants' Notice of Supplemental Authority Regarding
    U.S. Supreme Court Decisions of June 15 and June 23, 2023
    (June 26, 2023), Dkt. 289 ....................................................................... A1970

12. Plaintiffs' Response to Defendants' Notice of Supplemental Authority
    Regarding Recent Supreme Court Decisions (June 28, 2023), Dkt. 291 .......... A1974

13. Defendants' Reply in Support of Their Notice of Supplemental Authority
    (June 29, 2023), Dkt. 292 ....................................................................... A1984

14. Memorandum Ruling on Motion to Stay (July 10, 2023), Dkt. 301 .................. A1995

15. Judgment on Motion to Stay (July 10, 2023), Dkt. 302 ...................................... A2008

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**MONROE DIVISION**

**STATE OF MISSOURI, ET AL.**               **CASE NO.  3:22-CV-01213**

**VERSUS**                                  **JUDGE TERRY A. DOUGHTY**

**JOSEPH R. BIDEN JR., ET AL.**             **MAG. JUDGE KAYLA D. MCCLUSKY**

<u>**MEMORANDUM RULING ON REQUEST**
**FOR PRELIMINARY INJUNCTION**</u>

At issue before the Court is a Motion for Preliminary Injunction [Doc. No. 10] filed by Plaintiffs.[1] The Defendants[2] oppose the Motion [Doc. No. 266]. Plaintiffs have filed a reply to the opposition [Doc. No. 276]. The Court heard oral arguments on this Motion on May 26, 2023 [Doc. No. 288]. Amicus Curiae briefs have been filed in this proceeding on behalf of Alliance Defending Freedom,[3] the Buckeye Institute,[4] and Children's Health Defense.[5]

---

[1] Plaintiffs consist of the State of Missouri, the State of Louisiana, Dr. Aaron Kheriaty ("Kheriaty"), Dr. Martin Kulldorff ("Kulldorff"), Jim Hoft ("Hoft"), Dr. Jayanta Bhattacharya ("Bhattacharya"), and Jill Hines ("Hines").

[2] Defendants consist of President Joseph R Biden ("President Biden"), Jr, Karine Jean-Pierre ("Jean-Pierre"), Vivek H Murthy ("Murthy"), Xavier Becerra ("Becerra"), Dept of Health & Human Services ("HHS"), Dr. Hugh Auchincloss ("Auchincloss"), National Institute of Allergy & Infectious Diseases ("NIAID"), Centers for Disease Control & Prevention ("CDC"), Alejandro Mayorkas ("Mayorkas"), Dept of Homeland Security ("DHS"), Jen Easterly ("Easterly"), Cybersecurity & Infrastructure Security Agency ("CISA"), Carol Crawford ("Crawford"), United States Census Bureau ("Census Bureau"), U. S. Dept of Commerce ("Commerce"), Robert Silvers ("Silvers"), Samantha Vinograd ("Vinograd"), Ali Zaidi ("Zaidi"), Rob Flaherty ("Flaherty"), Dori Salcido ("Salcido"), Stuart F. Delery ("Delery"), Aisha Shah ("Shah"), Sarah Beran ("Beran"), Mina Hsiang ("Hsiang"), U. S. Dept of Justice ("DOJ"), Federal Bureau of Investigation ("FBI"), Laura Dehmlow ("Dehmlow"), Elvis M. Chan ("Chan"), Jay Dempsey ("Dempsey"), Kate Galatas ("Galatas"), Katharine Dealy ("Dealy"), Yolanda Byrd ("Byrd"), Christy Choi ("Choi"), Ashley Morse ("Morse"), Joshua Peck ("Peck"), Kym Wyman ("Wyman"), Lauren Protentis ("Protentis"), Geoffrey Hale ("Hale"), Allison Snell ("Snell"), Brian Scully ("Scully"), Jennifer Shopkorn ("Shopkorn"), U. S. Food & Drug Administration ("FDA"), Erica Jefferson ("Jefferson"), Michael Murray ("Murray"), Brad Kimberly ("Kimberly"), U. S. Dept of State ("State"), Leah Bray ("Bray"), Alexis Frisbie ("Frisbie"), Daniel Kimmage ("Kimmage"), U. S. Dept of Treasury ("Treasury"), Wally Adeyemo ("Adeyemo"), U. S. Election Assistance Commission ("EAC"), Steven Frid ("Frid"), and Kristen Muthig ("Muthig").

[3] [Doc. No. 252]

[4] [Doc. No. 256]

[5] [Doc. No. 262]

## I.    INTRODUCTION

> I may disapprove of what you say, but I would defend to the death
> your right to say it.
>
> Evelyn Beatrice Hill, 1906, *The Friends of Voltaire*

This case is about the Free Speech Clause in the First Amendment to the United States Constitution. The explosion of social-media platforms has resulted in unique free speech issues— this is especially true in light of the COVID-19 pandemic. If the allegations made by Plaintiffs are true, the present case arguably involves the most massive attack against free speech in United States' history. In their attempts to suppress alleged disinformation, the Federal Government, and particularly the Defendants named here, are alleged to have blatantly ignored the First Amendment's right to free speech.

Although the censorship alleged in this case almost exclusively targeted conservative speech, the issues raised herein go beyond party lines. The right to free speech is not a member of any political party and does not hold any political ideology. It is the purpose of the Free Speech Clause of the First Amendment to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail, rather than to countenance monopolization of the market, whether it be by government itself or private licensee. *Red Lion Broadcasting Co., v. F.C.C.*, 89 S. Ct. 1794, 1806 (1969).

Plaintiffs allege that Defendants, through public pressure campaigns, private meetings, and other forms of direct communication, regarding what Defendants described as "disinformation," "misinformation," and "malinformation," have colluded with and/or coerced social-media platforms to suppress disfavored speakers, viewpoints, and content on social-media platforms. Plaintiffs also allege that the suppression constitutes government action, and that it is a violation

of Plaintiffs' freedom of speech under the First Amendment to the United States Constitution. The

First Amendment states:

> Congress shall make no law respecting an establishment of religion
> or prohibiting the free exercise thereof: **or abridging the freedom
> of speech**, or of the press; or the right of the people peaceably to
> assemble, and to petition the Government for a redress of
> grievances. (emphasis added).

First Amendment, U.S. Const. amend. I.

The principal function of free speech under the United States' system of government is to

invite dispute; it may indeed best serve its high purpose when it induces a condition of unrest,

creates dissatisfaction with conditions as they are, or even stirs people to anger. *Texas v. Johnson*,

109 S. Ct. 2533, 2542–43 (1989). Freedom of speech and press is the indispensable condition of

nearly every other form of freedom. *Curtis Pub. Co. v. Butts*, 87 S. Ct. 1975, 1986 (1967).

The following quotes reveal the Founding Fathers' thoughts on freedom of speech:

> For if men are to be precluded from offering their sentiments on a
> matter, which may involve the most serious and alarming
> consequences, that can invite the consideration of mankind, reason
> is of no use to us; the freedom of speech may be taken away, and
> dumb and silent we may be led, like sheep, to the slaughter.

George Washington, March 15, 1783.

> Whoever would overthrow the liberty of a nation must begin by
> subduing the free acts of speech.

Benjamin Franklin, *Letters of Silence Dogwood*.

> Reason and free inquiry are the only effectual agents against error.

Thomas Jefferson.

The question does not concern whether speech is conservative, moderate, liberal,

progressive, or somewhere in between. What matters is that Americans, despite their views,

will not be censored or suppressed by the Government. Other than well-known exceptions

to the Free Speech Clause, all political views and content are protected free speech.

The issues presented to this Court are important and deeply intertwined in the daily lives of the citizens of this country.

## II.    FACTUAL BACKGROUND

In this case, Plaintiffs allege that Defendants suppressed conservative-leaning free speech, such as: (1) suppressing the Hunter Biden laptop story prior to the 2020 Presidential election; (2) suppressing speech about the lab-leak theory of COVID-19's origin; (3) suppressing speech about the efficiency of masks and COVID-19 lockdowns; (4) suppressing speech about the efficiency of COVID-19 vaccines; (5) suppressing speech about election integrity in the 2020 presidential election; (6) suppressing speech about the security of voting by mail; (7) suppressing parody content about Defendants; (8) suppressing negative posts about the economy; and (9) suppressing negative posts about President Biden.

Plaintiffs Bhattacharya and Kulldorff are infectious disease epidemiologists and co-authors of The Great Barrington Declaration ("GBD"). The GBD was published on October 4, 2020.  The GBD criticized lockdown policies and expressed concern about the damaging physical and mental health impacts of lockdowns. They allege that shortly after being published, the GBD was censored on social media by Google, Facebook, Twitter, and others. Bhattacharya and Kulldorff further allege on October 8, 2020 (four days after publishing the GBD), Dr. Frances Collins, Dr. Fauci, and Cliff Lane proposed together a "take down" of the GBD and followed up with an organized campaign to discredit it.[6]

Dr. Kulldorff additionally alleges he was censored by Twitter on several occasions because of his tweets with content such as "thinking everyone must be vaccinated is scientifically flawed,"

---

[6] [Doc. No. 10-3 and 10-4]

that masks would not protect people from COVID-19, and other "anti-mask" tweets.[7] Dr. Kulldorff

(and Dr. Bhattacharya[8]) further alleges that YouTube removed a March 18, 2021 roundtable

discussion in Florida where he and others questioned the appropriateness of requiring young

children to wear facemasks.[9] Dr. Kulldorff also alleges that LinkedIn censored him when he

reposted a post of a colleague from Iceland on vaccines, for stating that vaccine mandates were

dangerous, for posting that natural immunity is stronger than vaccine immunity, and for posting

that health care facilities should hire, not fire, nurses.[10]

Plaintiff Jill Hines is Co-Director of Health Freedom Louisiana, a consumer and human

rights advocacy organization. Hines alleges she was censored by Defendants because she

advocated against the use of masks mandates on young children. She launched an effort called

"Reopen Louisiana" on April 16, 2020, to expand Health Freedom Louisiana's reach on social

media. Hines alleges Health Freedom Louisiana's social-media page began receiving warnings

from Facebook. Hines was suspended on Facebook in January 2022 for sharing a display board

that contained Pfizer's preclinical trial data.[11] Additionally, posts about the safety of masking and

adverse events from vaccinations, including VAERS data and posts encouraging people to contact

their legislature to end the Government's mask mandate, were censored on Facebook and other

social-media platforms.  Hines alleges that because of the censorship, the reach of Health Freedom

Louisiana was reduced from 1.4 million engagements per month to approximately 98,000. Hines

also alleges that her personal Facebook page has been censored and restricted for posting content

---

[7] [Doc. No. 10-4]
[8] [Doc. No. 10-3]
[9] [Id.]
[10] [Id.]
[11] [Doc. No. 10-12]

that is protected free speech. Additionally, Hines alleges that two of their Facebook groups, HFL Group and North Shore HFL, were de-platformed for posting content protected as free speech.[12]

Plaintiff Dr. Kheriaty is a psychiatrist who has taught at several universities and written numerous articles. He had approximately 158,000 Twitter followers in December 2021 and approximately 1,333 LinkedIn connections. Dr. Kheriaty alleges he began experiencing censorship on Twitter and LinkedIn after posting content opposing COVID-19 lockdowns and vaccine mandates. Dr. Kheriaty also alleges that his posts were "shadow banned," meaning that his tweets did not appear in his follower's Twitter feeds. Additionally, a video of an interview of Dr. Kheriaty on the ethics of vaccine mandates was removed from YouTube.[13]

Plaintiff Jim Hoft is the owner and operator of The Gateway Pundit ("GP"), a news website located in St. Louis, Missouri. In connection with the GP, Hoft operates the GP's social-media accounts with Twitter, Facebook, YouTube, and Instagram. The GP's Twitter account previously had over 400,000 followers, the Facebook account had over 650,000 followers, the Instagram account had over 200,000 followers, and the YouTube account had over 98,000 followers.

The GP's Twitter account was suspended on January 2, 2021, again on January 29, 2021, and permanently suspended from Twitter on February 6, 2021. The first suspension was in response to a negative post Hoft made about Dr. Fauci's statement that the COVID-19 vaccine will only block symptoms and not block the infection. The second suspension was because of a post Hoft made about changes to election law in Virginia that allowed late mail-in ballots without postmarks to be counted. Finally, Twitter issued the permanent ban after the GP Twitter account posted video footage from security cameras in Detroit, Michigan from election night 2020, which showed two delivery vans driving to a building at 3:30 a.m. with boxes, which were alleged to

---

[12] [Id.]
[13] [Doc. No. 10-7]

contain election ballots. Hoft also alleges repeated instances of censorship by Facebook, including warning labels and other restrictions for posts involving COVID-19 and/or election integrity issues during 2020 and 2021.

Hoft further alleges that YouTube censored the GP's videos. YouTube removed a May 14, 2022 video that discussed voter integrity issues in the 2020 election. Hoft has attached as exhibits copies of numerous GP posts censored and/or fact checked. All of the attached examples involve posts relating to COVID-19 or the 2020 election.

In addition to the allegations of the Individual Plaintiffs, the States of Missouri and Louisiana allege extensive censorship by Defendants. The States allege that they have a sovereign and proprietary interest in receiving the free flow of information in public discourse on social-media platforms and in using social-media to inform their citizens of public policy decisions. The States also claim that they have a sovereign interest in protecting their own constitutions, ensuring their citizen's fundamental rights are not subverted by the federal government, and that they have a quasi-sovereign interest in protecting the free-speech rights of their citizens. The States allege that the Defendants have caused harm to the states of Missouri and Louisiana by suppressing and/or censoring the free speech of Missouri, Louisiana, and their citizens.

The Complaint,[14] Amended Complaint,[15] Second Amended Complaint,[16] and Third Amended Complaint[17] allege a total of five counts. They are:

> Count One – Violation of the First Amendment against all Defendants.
>
> Count Two – Action in Excess of Statutory Authority against all Defendants.

---

[14] [Doc. No. 1]
[15] [Doc. No. 45]
[16] [Doc. No. 84]
[17] [Doc. No. 268]

> Count Three – Violation of the Administrative Procedure Act against HHS, NIAID, CDC, FDA, Peck, Becerra, Murthy, Crawford, Fauci, Galatas, Waldo, Byrd, Choi, Lambert, Dempsey, Muhammed, Jefferson, Murry, and Kimberly.
>
> Count Four – Violation of the Administrative Procedure Act against DHS, CISA, Mayorkas, Easterly, Silvers, Vinograd, Jankowicz, Masterson, Protentis,  Hale, Snell, Wyman, and Scully.
>
> Count Five – Violation of the Administrative Procedure Act against the Department of Commerce, Census Bureau, Shopkorn, Schwartz, Molina-Irizarry, and Galemore.

Plaintiffs also ask for this case to be certified as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2). For the reasons discussed herein, it is only necessary to address Count One and the Plaintiffs' request for class action certification in this ruling.

The following facts are pertinent to the analysis of whether or not Plaintiffs are entitled to the granting of an injunction.[18]

Plaintiffs assert that since 2018, federal officials, including Defendants, have made public statements and demands to social-media platforms in an effort to induce them to censor disfavored speech and speakers. Beyond that, Plaintiffs argue that Defendants have threatened adverse consequences to social-media companies, such as reform of Section 230 immunity under the Communications Decency Act, antitrust scrutiny/enforcement, increased regulations, and other measures, if those companies refuse to increase censorship. Section 230 of the Communications Decency Act shields social-media companies from liability for actions taken on their websites, and Plaintiffs argue that the threat of repealing Section 230 motivates the social-media companies to comply with Defendants' censorship requests. Plaintiffs also note that Mark Zuckerberg

---

[18] The Factual Background is this Court's interpretation of the evidence. The Defendants filed a 723-page Response to Findings of Fact [Doc. No. 266-8] which contested the Plaintiffs' interpretation or characterizations of the evidence. At oral argument, the Defendants conceded that they did not dispute the validity or authenticity of the evidence presented.

("Zuckerberg"), the owner of Facebook, has publicly stated that the threat of antitrust enforcement is "an existential threat" to his platform.[19]

### A. White House Defendants[20]

Plaintiffs assert that by using emails, public and private messages, public and private meetings, and other means, the White House Defendants have "significantly encouraged" and "coerced" social-media platforms to suppress protected free speech posted on social-media platforms.

(1)     On January 23, 2021, three days after President Biden took office, Clarke Humphrey ("Humphrey"), who at the time was the Digital Director for the COVID-19 Response Team, emailed Twitter and requested the removal of an anti-COVID-19 vaccine tweet by Robert F. Kennedy, Jr.[21] Humphrey sent a copy of the email to Rob Flaherty ("Flaherty"), former Deputy Assistant to the President and Director of Digital Strategy, on the email and asked if "we can keep an eye out for tweets that fall in this same genre." The email read, "Hey folks-Wanted to flag the below tweet and am wondering if we can get moving on the process of having it removed ASAP."[22]

(2)     On February 6, 2021, Flaherty requested Twitter to remove a parody account linked to Finnegan Biden, Hunter Biden's daughter and President Biden's granddaughter. The request stated, "Cannot stress the degree to which this needs to be resolved immediately," and "Please remove this account immediately."[23] Twitter suspended the parody account within forty-five minutes of Flaherty's request.

---

[19] [Doc. No. 212-3, citing Doc. No. 10-1, at 202]
[20] White House Defendants consists of President Joseph R. Biden ("President Biden"), White House Press Secretary Karine Jean-Pierre ("Jean-Pierre"), Ashley Morse ("Morse"), Deputy Assistant to the President and Director of Digital Strategy Rob Flaherty ("Flaherty"), Dori Salcido ("Salcido"), Aisha Shah ("Shah"), Sarah Beran ("Beran"), Stuart F. Delery ("Delery"), Mina Hsiang ("Hsiang"), and Dr. Hugh Auchincloss (Dr. Auchincloss")
[21] [Doc. No. 174-1, Exh. A. at 1]
[22] [Id. at 2]
[23] [Doc. No. 174-1, Exh. A. at 4]

(3)    On February 7, 2021, Twitter sent Flaherty a "Twitter's Partner Support Portal" for expedited review of flagging content for censorship. Twitter recommended that Flaherty designate a list of authorized White House staff to enroll in Twitter's Partner Support Portal and explained that when authorized reporters submit a "ticket" using the portal, the requests are "prioritized" automatically. Twitter also stated that it had been "recently bombarded" with censorship requests from the White House and would prefer to have a streamlined process. Twitter noted that "[i]n a given day last week for example, we had more than four different people within the White House reaching out for issues."[24]

(4)    On February 8, 2021, Facebook emailed Flaherty, and Humphrey to explain how it had recently expanded its COVID-19 censorship policy to promote authoritative COVID-19 vaccine information and expanded its efforts to remove false claims on Facebook and Instagram about COVID-19, COVID-19 vaccines, and vaccines in general. Flaherty responded within nineteen minutes questioning how many times someone can share false COVID-19 claims before being removed, how many accounts are being flagged versus removed, and how Facebook handles "dubious," but not "provably false," claims.[25] Flaherty demanded more information from Facebook on the new policy that allows Facebook to remove posts that repeatedly share these debunked claims.

(5)    On February 9, 2021, Flaherty followed up with Facebook in regard to its COVID-19 policy, accusing Facebook of causing "political violence" spurred by Facebook groups by failing to censor false COVID-19 claims, and suggested having an oral meeting to discuss their policies.[26] Facebook responded the same day and stated that "vaccine-skeptical" content does not

---

[24] [Doc. No. 174-1 at 3]
[25] [Id. at 5–8]
[26] [Id. at 6–8]

violate Facebook's policies.[27] However, Facebook stated that it will have the content's "distribution reduced" and strong warning labels added, "so fewer people will see the post."[28] In other words, even though "vaccine-skeptical" content did not violate Facebook's policy, the content's distribution was still being reduced by Facebook.

Facebook also informed Flaherty that it was working to censor content that does not violate Facebook's policy in other ways by "preventing posts discouraging vaccines from going viral on our platform" and by using information labels and preventing recommendations for Groups, Pages, and Instagram accounts pushing content discouraging vaccines. Facebook also informed Flaherty that it was relying on the advice of "public health authorities" to determine its COVID-19 censorship policies.[29] Claims that have been "debunked" by public health authorities would be removed from Facebook. Facebook further promised Flaherty it would aggressively enforce the new censorship policies and requested a meeting with Flaherty to speak to Facebook's misinformation team representatives about the latest censorship policies.[30] Facebook also referenced "previous meetings" between the White House and Facebook representatives during the "transition period" (likely referencing the Biden Administration transition). [31]

(6)    On February 24, 2021, Facebook emailed Flaherty about "Misinfo Themes" to follow up on his request for COVID and vaccine misinformation themes on Facebook. Some of the misinformation themes Facebook reported seeing were claims of vaccine toxicity, claims about the side effects of vaccines, claims comparing the COVID vaccine to the flu vaccine, and claims downplaying the severity of COVID-19. Flaherty responded by asking for details about

---

[27] [Id.]
[28] [Id.]
[29] [Id.]
[30] [Id. at 6]
[31] [Id. at 5]

Facebook's actual enforcement practices and for a report on misinformation that was not censored. Specifically, his email read, "Can you give us a sense of volume on these, and some metrics around the scale of removal for each? Can you also give us a sense of misinformation that might be falling outside your removal policies?"[32] Facebook responded that at their upcoming meeting, they "can definitely go into detail on content that doesn't violate like below, but could 'contribute to vaccine hesitancy.'"[33]

(7)     On March 1, 2021, Flaherty and Humphrey (along with Joshua Peck ("Peck"), the Health and Human Services' ("HHS") Deputy Assistant Secretary) participated in a meeting with Twitter about misinformation. After the meeting, Twitter emailed those officials to assure the White House that Twitter would increase censorship of "misleading information" on Twitter, stating "[t]hanks again for meeting with us today. As we discussed, we are building on 'our' continued efforts to remove the most harmful COVID-19 'misleading information' from the service."[34]

(8)     From May 28, 2021, to July 10, 2021, a senior Meta executive reportedly copied Andrew Slavitt ("Slavitt"), former White House Senior COVID-19 Advisor, on his emails to Surgeon General Murthy ("Murthy"), alerting them that Meta was engaging in censorship of COVID-19 misinformation according to the White House's "requests" and indicating "expanded penalties" for individual Facebook accounts that share misinformation.[35] Meta also stated, "We think there is considerably more we can do in '*partnership*' with you and your team to drive behavior."[36]

---

[32] [Doc. No. 214-9 at 2–3]
[33] [Id.]
[34] [Doc. No. 214-10 at 2, Jones Declaration, #10, Exh. H] SEALED DOCUMENT
[35] [Doc. No. 71-4 at 6–11]
[36] [Id. at 10] (emphasis added)

(9)     On March 12, 2021, Facebook emailed Flaherty stating, "Hopefully, this format works for the various teams and audiences within the White House/HHS that may find this data valuable."[37] This email also provided a detailed report and summary regarding survey data on vaccine uptake from January 10 to February 27, 2021.[38]

(10)     On March 15, 2021, Flaherty acknowledged receiving Facebook's detailed report and demanded a report from Facebook on a recent Washington Post article that accused Facebook of allowing the spread of information leading to vaccine hesitancy. Flaherty emailed the Washington Post article to Facebook the day before, with the subject line: "You are hiding the ball," and stated "I've been asking you guys pretty directly, over a series of conversations, for a clear accounting of the biggest issues you are seeing on your platform when it comes to vaccine hesitancy and the degree to which borderline content as you define it – is playing a role."[39]

After Facebook denied "hiding the ball," Flaherty followed up by making clear that the White House was seeking more aggressive action on "borderline content."[40] Flaherty referred to a series of meetings with Facebook that were held in response to concerns over "borderline content" and accused Facebook of deceiving the White House about Facebook's "borderline policies."[41] Flaherty also accused Facebook of being the "top driver of vaccine hesitancy."[42] Specifically, his email stated:

> I am not trying to play 'gotcha' with you.  We are gravely concerned that your service is one of the top drivers of vaccine hesitancy-period. I will also be the first to acknowledge that borderline content offers no easy solutions. But we want to know that you're trying, we want to know how we can help, and we want to know that you're not playing a shell game with us when we ask you what is going on.

---

[37] [Doc. No. 174-1 at 9]
[38] [Id.]
[39] [Id. at 11]
[40] [Id. at 11–12]
[41] [Id.]
[42] [Id. at 11]

This would all be a lot easier if you would just be straight with us.[43]

In response to Flaherty's email, Facebook responded, stating: "We obviously have work to do to gain your trust…We are also working to get you useful information that's on the level. That's my job and I take it seriously – I'll continue to do it to the best of my ability, and I'll expect you to hold me accountable."[44]

Slavitt, who was copied on Facebook's email, responded, accusing Facebook of not being straightforward, and added more pressure by stating, "internally, we have been considering our options on what to do about it."[45]

(11)   On March 19, 2021, Facebook had an in-person meeting with White House officials, including Flaherty and Slavitt.[46] Facebook followed up on Sunday, March 21, 2021, noting that the White House had demanded a consistent point of contact with Facebook, additional data from Facebook, "Levers for Tackling Vaccine Hesitancy Content," and censorship policies for Meta's platform WhatsApp.[47] Facebook noted that in response to White House demands, it was censoring, removing, and reducing the virality of content discouraging vaccines "that does not contain actionable misinformation."[48] Facebook also provided a report for the White House on the requested information on WhatsApp policies:

> You asked us about our levers for reducing virality of vaccine hesitancy content. In addition to policies previously discussed, these include the additional changes that were approved last week and that we will be implementing over the coming weeks. As you know, in addition to removing vaccine misinformation, we have been focused on reducing the virality of content discouraging vaccines that do not contain actionable misinformation.[49]

---

[43] [Id. at 11]
[44] [Id. at 11]
[45] [Id. at 10]
[46] [Id. at 15]
[47] [Id.]
[48] [Id. at 15]
[49] [Id. at 15]

On March 22, 2021, Flaherty responded to this email, demanding more detailed information and a plan from Facebook to censor the spread of "vaccine hesitancy" on Facebook.[50] Flaherty also requested more information about and demanded greater censorship by Facebook of "sensational," "vaccine skeptical" content.[51] He also requested more information about WhatsApp regarding vaccine hesitancy.[52] Further, Flaherty seemingly spoke on behalf of the White House and stated that the White House was hoping they (presumably the White House and Facebook) could be "partners here, even if it hasn't worked so far."[53] A meeting was scheduled the following Wednesday between Facebook and White House officials to discuss these issues.

On April 9, 2021, Facebook responded to a long series of detailed questions from Flaherty about how WhatsApp was censoring COVID-19 misinformation. Facebook stated it was "reducing viral activity on our platform" through message-forward limits and other speech-blocking techniques.[54] Facebook also noted it bans accounts that engage in those that seek to exploit COVID-19 misinformation.[55]

Flaherty responded, "I care mostly about what actions and changes you are making to ensure you're not making our country's vaccine hesitancy problem worse," accusing Facebook of being responsible for the Capitol riot on January 6, 2021, and indicating that Facebook would be similarly responsible for COVID-related deaths if it did not censor more information.[56] "You only

---

[50] [Id.]
[51] [Id.]
[52] [Id.]
[53] [Id. at 14]
[54] [Id. at 17]
[55] [Id. at 17]
[56] [Id. at 17–21]

did this, however, after an election that you helped increase skepticism in, and an insurrection which was plotted, in large part, on your platform."[57]

(12)    On April 14, 2021, Flaherty demanded the censorship of Fox News hosts Tucker Carlson and Tomi Lahren because the top post about vaccines that day was "Tucker Carlson saying vaccines don't work and Tomi Lahren stating she won't take a vaccine."[58] Flaherty stated, "This is exactly why I want to know what 'Reduction' actually looks like – if 'reduction' means 'pumping our most vaccine hesitant audience with Tucker Carlson saying it does not work'… then…I'm not sure it's reduction!"[59]

Facebook promised the White House a report by the end of the week.[60]

(13)    On April 13, 2021, after the temporary halt of the Johnson & Johnson vaccine, the White House was seemingly concerned about the effect this would have on vaccine hesitancy. Flaherty sent to Facebook a series of detailed requests about how Facebook could "amplify" various messages that would help reduce any effects this may have on vaccine hesitancy.[61]

Flaherty also requested that Facebook monitor "misinformation" relating to the Johnson & Johnson pause and demanded from Facebook a detailed report within twenty-four hours. Facebook provided the detailed report the same day.[62] Facebook responded, "Re the J & J news, we're keen to amplify any messaging you want us to project about what this means for people."[63]

(14)    Facebook responded to a telephone call from Rowe about how it was censoring information with a six-page report on censorship with explanations and screen shots of sample posts of content that it does and does not censor. The report noted that vaccine hesitancy content

---

[57] [Id. at 17]
[58] [Id. at 22]
[59] [Id. at 22]
[60] [Id. at 23]
[61] [Id. at 30–31]
[62] [Id. at 31]
[63] [Id. at 31–32]

does not violate Facebook's content-moderation policies, but indicated that Facebook still censors this content by suppressing it in news feeds and algorithms.[64] Other content that Facebook admitted did not violate its policy but may contribute to vaccine hesitancy are: a) sensational or alarmist vaccine misrepresentation; b) disparaging others based on the choice to or not to vaccinate; c) true but shocking claims or personal anecdotes; d) discussing the choice to vaccinate in terms of personal or civil liberties; and e) concerns related to mistrust in institutions or individuals.[65] Facebook noted it censors such content through a "spectrum of levers" that includes concealing the content from other users, "de-boosting" the content, and preventing sharing through "friction."[66] Facebook also mentioned looking forward to tomorrow's meeting "and how we can hopefully partner together."[67]

Other examples of posts that did not violate Facebook's policies but would nonetheless be suppressed included content that originated from the Children's Health Defense, a nonprofit activist group headed by Robert F. Kennedy, Jr. (labeled by Defendants as one of the "Disinformation Dozen").[68]

(15)    On April 14, 2021, Slavitt emailed Facebook executive Nick Clegg ("Clegg") with a message expressing displeasure with Facebook's failure to censor Tucker Carlson. Slavitt stated, "Not for nothing but the last time we did this dance, it ended in an insurrection."[69] The subject line was "Tucker Carlson anti-vax message."[70] Clegg responded the same day with a detailed report about the Tucker Carlson post, stating that the post did not qualify for removal under Facebook

---

[64] [Id. at 24–25]
[65] [Id.]
[66] [Id. at 24–25]
[67] [Id. at 24]
[68] [Id. at 25–27]
[69] [Id. at 34]
[70] Id. at 33]

policy but that the video was being labeled with a pointer to authoritative COVID-19 information, not being recommended to people, and that the video was being "*demoted*."[71]

After Brian Rice ("Rice") of Facebook forwarded the same report on the Tucker Carlson post to Flaherty on April 14, 2021, Flaherty responded to Rice wanting a more detailed explanation of why Facebook had not removed the Tucker Carlson video and questioning how the video had been "demoted" since there were 40,000 shares.[72] Flaherty followed up six minutes later alleging Facebook provided incorrect information through Crowd Tangle.[73]

Two days later, on April 16, 2021, Flaherty demanded immediate answers from Facebook regarding the Tucker Carlson video.[74] Facebook promised to get something to him that night. Facebook followed up on April 21, 2021, with an additional response in regard to an apparent call from Flaherty ("thanks for catching up earlier").[75] Facebook reported the Tucker Carlson content had not violated Facebook's policy, but Facebook gave the video a 50% demotion for seven days and stated that it would continue to demote the video.[76]

(16)    On April 21, 2021, Flaherty, Slavitt, and other HHS officials, met with Twitter officials about "Twitter Vaccine Misinfo Briefing." The invite stated the White House would be briefed by Twitter on vaccine information, trends seen generally about vaccine information, the tangible effects seen from recent policy changes, what interventions were being implemented, previous policy changes, and ways the White House could "partner" in product work.[77]

---

[71] [Id. at 36]
[72] [Id. at 33–34]
[73] [Id.]
[74] [Id. at 33]
[75] [Id.]
[76] [Id. at 33, 36]
[77] [Doc. No. 71-7 at 86].

Twitter discovery responses indicated that during the meeting, White House officials wanted to know why Alex Berenson ("Berenson") had not been "kicked off" Twitter.[78] Slavitt suggested Berenson was "the epicenter of disinfo that radiated outwards to the persuadable public."[79] Berenson was suspended thereafter on July 16, 2021, and was permanently de-platformed on August 28, 2021.[80]

(17)     Also on April 21, 2021, Flaherty, Slavitt, and Fitzpatrick had a meeting with several YouTube officials. The invitation stated the purpose of this meeting was for the White House to be briefed by YouTube on general trends seen around vaccine misinformation, the effects of YouTube's efforts to combat misinformation, interventions YouTube was trying, and ways the White House can "partner" in product work.[81]

In an April 22, 2021, email, Flaherty provided a recap of the meeting and stated his concern that misinformation on YouTube was "shared at the highest (and I mean the highest) levels of the White House."[82] Flaherty indicated that the White House remains concerned that YouTube is "funneling people into hesitancy and intensifying people's vaccine hesitancy."[83] Flaherty further shared that "we" want to make sure YouTube has a handle on vaccine hesitancy and is working toward making the problem better.[84] Flaherty again noted vaccine hesitancy was a concern that is shared by the highest ("and I mean the highest") levels of the White House.[85]

Flaherty further indicated that the White House was coordinating with the Stanford Internet Observatory (which was operating the Virality Project): "Stanford" has mentioned that it's recently

---

[78] [Doc. No. 212-14 at 2–5]
[79] [Id.]
[80] [Doc. No. 212-14, Exh. J, at 2–5]
[81] [Doc. No. 212-15, Exh. K, at 1–4] SEALED DOCUMENT
[82] [Doc. No. 174-1 at 39-40]
[83] [Id.]
[84] [Id.]
[85] [Doc. No. 174-1 at 39–40]

Vaccine Passports and J&J pause-related stuff, but I'm not sure if that reflects what you're seeing."[86] Flaherty praised YouTube for reducing distribution of content: "I believe you said you reduced watch time by 70% on borderline content, which is impressive."[87] However, Flaherty followed up with additional demands for more information from YouTube. Flaherty emphasized that the White House wanted to make sure YouTube's work extends to the broader problem of people viewing "vaccine-hesitant content."[88] Flaherty also suggested regular meetings with YouTube ("Perhaps bi-weekly") as they have done with other "platform partners."[89]

(18)    On April 23, 2021, Flaherty sent Facebook an email including a document entitled "Facebook COVID-19 Vaccine Misinformation Brief" ("the Brief"), which indicated that Facebook plays a major role in the spread of COVID vaccine misinformation and found that Facebook's policy and enforcement gaps enable misinformation to spread.[90] The Brief recommended much more aggressive censorship of Facebook's enforcement policies and called for progressively severe penalties. The Brief further recommended Facebook stop distributing anti-vaccine content in News Feed or in group recommendations. The Brief also called for "warning screens" before linking to domains known to promote vaccine misinformation.[91] Flaherty noted sending this Brief was not a White House endorsement of it, but "this is circulating around the building and informing thinking."[92]

On May 1, 2021, Facebook's Clegg sent an email to Slavitt indicating Facebook and the White House met recently to "share research work."[93] Clegg apologized for not catching and

---

[86] [Id. at 39]
[87] [Id.]
[88] [Doc. No. 214-1 at 39–40]
[89] [Id. at 39–40]
[90] [Doc. No. 214-14 at 2–3]
[91] [Id.]
[92] [Doc. No. 214-14 at 2–3, Jones Declaration]
[93] [Doc. No. 214-1]

censoring three pieces of vaccine content that went viral and promised to censor such content more aggressively in the future:

> I wanted to send you a quick note on the three pieces of vaccine content that were seen by a high number of people before we demoted them. Although they don't violate our community standards, we should have demoted them before they went viral, and this has exposed gaps in our operational and technical process.

Notably, these three pieces of information did not violate Facebook's policies. Clegg told Slavitt that Facebook teams had spent the past twenty-four hours analyzing gaps in Facebook and were making several changes next week.[94]

Clegg listed—in bold—demands that the White House had made in a recent meeting and provided a response to each. The demands were: a) address Non-English mis/disinformation circulating without moderation; b) do not distribute or amplify vaccine hesitancy, and Facebook should end group recommendations for groups with a history of COVID-19 or vaccine misinformation; c) monitor events that host anti-vaccine and COVID disinformation; and d) address twelve accounts that were responsible for 73% of vaccine misinformation.[95] Facebook noted that it was scrutinizing these accounts and censoring them whenever it could, but that most of the content did not violate Facebook's policies.[96] Facebook referred to its new policy as their "Dedicated Vaccine Discouraging Entities."[97] Facebook even suggested that too much censorship might be counterproductive and drive vaccine hesitancy: "Among experts we have consulted, there is a general sense that deleting more expressions of vaccine hesitancy might be more

---

[94] [Doc. No. 214-1 at ¶ 116].
[95] [Doc. No. 174-1 at 41–42]
[96] [Doc. No. 174-1 at 41–42].
[97] [Id.]

counterproductive to the goal of vaccine uptake because it could prevent hesitant people from talking through their concerns and potentially reinforce the notion that there's a 'cover-up.'"[98]

(19)    On May 5, 2021, then-White House Press Secretary Jen Psaki ("Psaki") publicly began pushing Facebook and other social-media platforms to censor COVID-19 misinformation. At a White House Press Conference, Psaki publicly reminded Facebook and other social-media platforms of the threat of "legal consequences" if they do not censor misinformation more aggressively. Psaki further stated: "The President's view is that the major platforms have a responsibility related to the health and safety of all Americans to stop amplifying untrustworthy content, disinformation, and misinformation, especially related to COVID-19 vaccinations and elections."[99] Psaki linked the threat of a "robust anti-trust program" with the White House's censorship demand. "He also supports better privacy protections and a robust anti-trust program. So, his view is that there's more that needs to be done to ensure that this type of misinformation; disinformation; damaging, sometime life-threatening information, is not going out to the American public."[100]

The next day, Flaherty followed up with another email to Facebook and chastised Facebook for not catching various COVID-19 misinformation. Flaherty demanded more information about Facebook's efforts to demote borderline content, stating, "Not to sound like a broken record, but how much content is being demoted, and how effective are you at mitigating reach, and how quicky?"[101] Flaherty also criticized Facebook's efforts to censor the "Disinformation Dozen":

---

[98] [Id. at 42]
[99] [Doc. No. 266-6 at 374]
[100] [Id.]
[101] [Doc. No. 174-1 at 41]

"Seems like your 'dedicated vaccine hesitancy' policy isn't stopping the disinfo-dozen – they're being deemed as not dedicated – so it feels like that problem likely coming over to groups."[102]

Things apparently became tense between the White House and Facebook after that, culminating in Flaherty's July 15, 2021 email to Facebook, in which Flaherty stated: "Are you guys fucking serious? I want an answer on what happened here and I want it today."[103]

(20)    On July 15, 2021, things became even more tense between the White House, Facebook, and other social-media platforms. At a joint press conference between Psaki and Surgeon General Murthy to announce the Surgeon General's "Health Advisory on Misinformation,"[104] Psaki announced that Surgeon General Murthy had published an advisory on health misinformation as an urgent public health crisis.[105] Murthy announced: "Fourth, we're saying we expect more from our technology companies. We're asking them to operate with greater transparency and accountability. We're asking them to monitor misinformation more closely. We're asking them to consistently take action against misinformation super-spreaders on their platforms."[106]Psaki further stated, "We are in regular touch with these social-media platforms, and those engagements typically happen through members of our senior staff, but also members of our COVID-19 team," and "We're flagging problematic posts for Facebook that spread disinformation."[107]

Psaki followed up by stating that the White House's "asks" include four key steps by which social-media companies should: 1) measure and publicly share the impact of misinformation on

---

[102] [Id.]
[103] [Id. at 55]
[104] [Doc. No. 210-1 at 16 (Waldo Depo, Exh. 10)]
[105] [Id. at 162]
[106] [Doc. No. 10-1 at 370]
[107] [Id. at 376–77]

their platforms; 2) create a robust enforcement strategy; 3) take faster action against harmful posts; and 4) promote quality information sources in their feed algorithms.[108]

The next day, on July 16, 2021, President Biden, after being asked what his message was to social-media platforms when it came to COVID-19, stated, "[T]hey're killing people."[109] Specifically, he stated "Look, the only pandemic we have is among the unvaccinated, and that they're killing people."[110] Psaki stated the actions of censorship Facebook had already conducted were "clearly not sufficient."[111]

Four days later, on July 20, 2021, at a White House Press Conference, White House Communications Director Kate Bedingfield ("Bedingfield") stated that the White House would be announcing whether social-media platforms are legally liable for misinformation spread on their platforms and examining how misinformation fits into the liability protection granted by Section 230 of the Communications Decency Act (which shields social-media platforms from being responsible for posts by third parties on their sites).[112] Bedingfield further stated the administration was reviewing policies that could include amending the Communication Decency Act and that the social-media platforms "should be held accountable."[113]

(21)    The public and private pressure from the White House apparently had its intended effect. All twelve members of the "Disinformation Dozen" were censored, and pages, groups, and accounts linked to the Disinformation Dozen were removed.[114]

---

[108] [Id. at 377–78]
[109] [Doc. No. 10-1 at 370]
[110] [Id. at 436–37]
[111] [Doc. No. 10-1 at 446]
[112] [Doc. No. 10-1 at 477–78]
[113] [Id.]
[114] [Doc. No. 10-1 at 483–85]

Twitter suspended Berenson's account within a few hours of President Biden's July 16, 2021 comments. [115] On July 17, 2021, a Facebook official sent an email to Anita B. Dunn ("Dunn"), Senior Advisor to the President, asking for ways to "get back into the White House's good graces" and stated Facebook and the White House were "100% on the same team here in fighting this."[116]

(22)    On November 30, 2021, the White House's Christian Tom ("Tom") emailed Twitter requesting that Twitter watch a video of First Lady Jill Biden that had been edited to make it sound as if the First Lady were profanely heckling children while reading to them.[117] Twitter responded within six minutes, agreeing to "escalate with the team for further review."[118] Twitter advised users that the video had been edited for comedic effect. Tom then requested Twitter apply a "Manipulated Media" disclaimer to the video.[119] After Twitter told Tom the video was not subject to labeling under its policy, Tom disputed Twitter's interpretation of its own policy and added Michael LaRosa ("LaRosa"), the First Lady's Press Secretary, into the conversation.[120] Further efforts by Tom and LaRosa to censor the video on December 9, 13, and 17 finally resulted in the video's removal in December 2021.[121]

(23)    In January 2022, Facebook reported to Rowe, Murthy, Flaherty, and Slavitt that it had "labeled and demoted" vaccine humor posts whose content could discourage vaccination.[122] Facebook also reported to the White House that it "labeled and 'demoted' posts suggesting natural immunity to a COVID-19 infection is superior to vaccine immunity."[123] In January 2022, Jesse

---

[115] [Doc. No. 214-12 at 2–5]
[116] [Doc. No. 174-1 at 49]
[117] [Doc. No. 174-1 at 59–67]
[118] [Id.]
[119] [Id.]
[120] [Id.]
[121] [Id. at 59–67]
[122] [Doc. No. 71-3 at 10–11]
[123] [Doc. No. 71-3 at 10–11]

Lee ("Lee") of the White House sent an email accusing Twitter of calling the President a liar in regard to a Presidential tweet.[124]

At a February 1, 2022, White House press conference, Psaki stated that the White House wanted every social-media platform to do more to call out misinformation and disinformation, and to uplift accurate information.[125]

At an April 25, 2022, White House press conference, after being asked to respond to news that Elon Musk may buy Twitter, Psaki again mentioned the threat to social-media companies to amend Section 230 of the Communications Decency Act, linking these threats to social-media platforms' failure to censor misinformation and disinformation.[126]

On June 13, 2022, Flaherty demanded Meta continue to produce periodic COVID-19 insight reports to track COVID-19 misinformation, and he expressed a concern about misinformation regarding the upcoming authorization of COVID-19 vaccines for children under five years of age. Meta agreed to do so on June 22, 2022.[127]

(24)    In addition to misinformation regarding COVID-19, the White House also asked social-media companies to censor misinformation regarding climate change, gender discussions, abortion, and economic policy. At an Axios event entitled "A Conversation on Battling Misinformation," held on June 14, 2022, the White House National Climate Advisor Gina McCarthy ("McCarthy") blamed social-media companies for allowing misinformation and disinformation about climate change to spread and explicitly tied these censorship demands with threats of adverse legislation regarding the Communications Decency Act.[128]

---

[124] [Doc. No. 174-1 at 69]
[125] [Doc. No. 10-1 at 501–2]
[126] [Id. at 62–63, ¶¶ 193–197]
[127] [Doc. No. 71-3 at 5–6]
[128] [Doc. No. 214-15]

On June 16, 2022, the White House announced a new task force to target "general misinformation" and disinformation campaigns targeted at women and LBGTQI individuals who are public and political figures, government and civic leaders, activists, and journalists.[129] The June 16, 2022, Memorandum discussed the creation of a task force to reel in "online harassment and abuse" and to develop programs targeting such disinformation campaigns.[130] The Memorandum also called for the Task Force to confer with technology experts and again threatened social-media platforms with adverse legal consequences if the platforms did not censor aggressively enough.[131]

On July 8, 2022, President Biden signed an Executive Order on protecting access to abortion. Section 4(b)(iv) of the order required the Attorney General, the Secretary of HHS, and the Chair of the Federal Trade Commission to address deceptive or fraudulent practices relating to reproductive healthcare services, including those online, and to protect access to accurate information.[132]

On August 11, 2022, Flaherty emailed Twitter to dispute a note added by Twitter to one of President Biden's tweets about gas prices.[133]

(25)    On August 23, 2021, Flaherty emailed Facebook requesting a report on how Facebook intended to promote the FDA approval of the Pfizer vaccine. He also stated that the White House would appreciate a "push" and provided suggested language.[134]

---

[129] [Doc. No. 214-15[
[130] [Id.]
[131] [Doc. No. 214-16]
[132] [Doc. No. 214-18]
[133] [Doc. No. 174-1 at 68]
[134] [Id.]

### B.  Surgeon General Defendants[135]

Surgeon General Murthy is the Surgeon General of the United States. Eric Waldo ("Waldo") is the Senior Advisor to the Surgeon General and was formerly Chief Engagement Officer for the Surgeon General's office. Waldo's Deposition was taken as part of the allowed Preliminary Injunction-related discovery in this matter.[136]

(1)    Waldo was responsible for maintaining the contacts and relationships with representatives of social-media platforms. Waldo did pre-rollout calls with Twitter, Facebook, and Google/YouTube before the Surgeon General's health advisory on misinformation was published on July 15, 2021.[137] Waldo admitted that Murthy used his office to directly advocate for social-media platforms to take stronger actions against health "misinformation" and that those actions involved putting pressure on social-media platforms to reduce the dissemination of health misinformation.[138] Surgeon General Murthy's message was given to social-media platforms both publicly and privately.[139]

(2)    At a July 15, 2021 joint press conference between Psaki and Murthy, the two made the comments mentioned previously in II A(19), which publicly called for social-media platforms "to do more" to take action against misinformation super-spreaders.[140] Murthy was directly involved in editing and approving the final work product for the July 15, 2021 health advisory on misinformation.[141] Waldo also admitted that Murthy used his "bully pulpit" to talk about health misinformation and to put public pressure on social-media platforms.[142]

---

[135] Surgeon General Defendants consists of Dr. Vivek H. Murthy ("Murthy") and Katharine Dealy ("Dealy").
[136] [Doc. No. 210]
[137] [Doc. No. 210 at 11, 20]
[138] [Id. at 25, 28]
[139] [Id. at 11, 20, 25, 28]
[140] [Id. at 33–35]
[141] [Waldo depo at 14–17]
[142] [Id. at 29]

(3)    Waldo's initial rollout with Facebook was negatively affected because of the public attacks by the White House and Office of the Surgeon General towards Facebook for allowing misinformation to spread.[143] Clegg of Facebook reached out to attempt to request "de-escalation" and "working together" instead of the public pressure.[144] In the call between Clegg and Murthy, Murthy told Clegg he wanted Facebook to do more to censor misinformation on its platforms. Murthy also requested Facebook share data with external researchers about the scope and reach of misinformation on Facebook's platforms to better understand how to have external researchers validate the spread of misinformation.[145] "Data about misinformation" was the topic of conversation in this call; DJ Patil, chief data scientist in the Obama Administration, Murthy, Waldo, and Clegg all participated on the call. The purpose of the call was to demand more information from Facebook about monitoring the spread of misinformation.[146]

(4)    One of the "external researchers" that the Office of Surgeon General likely had in mind was Renee DiResta ("DiResta") from the Stanford Internet Observatory, a leading organization of the Virality Project.[147] The Virality Project hosted a "rollout event" for Murthy's July 15, 2021 press conference.[148]

There was coordination between the Office of the Surgeon General and the Virality Project on the launch of Murthy's health advisory.[149] Kyla Fullenwider ("Fullenwider") is the Office of the Surgeon General's key subject-matter expert who worked on the health advisory on misinformation. Fullenwider works for a non-profit contractor, United States' Digital Response.[150]

---

[143] [Id. at 91–94]
[144] [Doc. No. 210 at 95–98]
[145] [Id.]
[146] [Doc. No. 210 at 95–98]
[147] The Virality Project will be discussed later in greater detail.
[148] [Id. at 36–38]
[149] [Id. at 38]
[150] [Id. at 39, 59, 85]

Waldo, Fullenwider, and DiResta were involved in a conference call after the July 15, 2021 press conference where they discussed misinformation.[151] The Office of the Surgeon General anticipated that social-media platforms would feel pressured by the Surgeon General's health advisory.[152]

(5)    Waldo and the Office of the Surgeon General received a briefing from the Center for Countering Digital Hate ("CCDH") about the "Disinformation Dozen." CCDH gave a presentation about the Disinformation Dozen and how CCDH measured and determined that the Disinformation Dozen were primarily responsible for a significant amount of online misinformation.[153]

(6)    In his deposition, Waldo discussed various phone calls and communications between Defendants and Facebook. In August of 2021, Waldo joined a call with Flaherty and Brian Rice of Facebook.[154] The call was an update by Facebook about the internal action it was taking regarding censorship.[155] Waldo was aware of at least one call between Murthy and Facebook in the period between President Biden's election and assuming office, and he testified that the call was about misinformation.[156] Waldo was also aware of other emails and at least one phone call where Flaherty communicated with Facebook.[157]

(7)    The first meeting between the Office of the Surgeon General and social-media platforms occurred on May 25, 2021, between Clegg, Murthy, and Slavitt. The purpose of this call was to introduce Murthy to Clegg. Clegg emailed Murthy with a report of misinformation on Facebook on May 28, 2021.[158]

---

[151] [Id.]
[152] [Id. at 39, 59, 85]
[153] [Id. at 43, 47]
[154] [Id. at 66, 124–25]
[155] [Id. at 66, 124–25]
[156] [Id. at 55–56]
[157] [Id. at 64–65]
[158] [Doc. No. 210-4]

Policy updates about increasing censorship were announced by Facebook on May 27, 2021.[159] The Office of the Surgeon General had a pre-rollout (i.e., before the rollout of the Surgeon General's health advisory on misinformation) call with Twitter and YouTube on July 12 and July 14, 2021.[160] The Office of the Surgeon General had a rollout call with Facebook on July 16, 2021. The July 16 call with Facebook was right after President Biden had made his "[T]hey're killing people" comment (II A (19), above), and it was an "awkward call" according to Waldo.[161]

Another call took place on July 23, 2021, between Murthy, Waldo, DJ Patil, Clegg, and Rice. Clegg shared more about the spread of information and disinformation on Facebook after the meeting. At the meeting, Murthy raised the issue of wanting to have a better understanding of the reach of misinformation and disinformation as it relates to health on Facebook; Murthy often referred to health misinformation in these meetings as "poison."[162] The Surgeon General's health advisory explicitly called for social-media platforms to do more to control the reach of misinformation.[163]

On July 30, 2021, Waldo had a meeting with Google and YouTube representatives.  At the meeting, Google and YouTube reported to the Office of the Surgeon General what actions they were taking following the Surgeon General's health advisory on misinformation.[164]

On August 10, 2021, Waldo and Flaherty had a call with Rice calling for Facebook to report to federal officials as to Facebook's actions to remove "disinformation" and to provide details regarding a vaccine misinformation operation Facebook had uncovered.[165]

---

[159] [Id. at 78, Exh. 3]
[160] [Id. at 85]
[161] [Id.]
[162] [Id. at 95–98, 101, 105]
[163] [Id. at 107–08]
[164] [Doc. No. 210-4 at 33]
[165] [Id.]

Another meeting took place between Google/YouTube, Waldo, and Flaherty on September 14, 2021, to discuss a new policy YouTube was working on and to provide the federal officials with an update on YouTube's efforts to combat harmful COVID-19 misinformation on its platform.[166]

(8)    After the meetings with social-media platforms, the platforms seemingly fell in line with the Office of Surgeon General's and White House's requests. Facebook announced policy updates about censoring misinformation on May 27, 2021, two days after the meeting.[167] As promised, Clegg provided an update on misinformation to the Office of Surgeon General on May 28, 2021, three days after the meeting[168] and began sending bi-weekly COVID content reports on June 14, 2021.[169]

On July 6, 2021, Waldo emailed Twitter to set up the rollout call for the Office of the Surgeon General's health advisory on misinformation and told Twitter that Murthy had been thinking about how to stop the spread of health misinformation; that he knew Twitter's teams were working hard and thinking deeply about the issue; and that he would like to chat over Zoom to discuss.[170] Twitter ultimately publicly endorsed the Office of the Surgeon General's call for greater censorship of health misinformation.[171]

Waldo sent an email to YouTube on July 6, 2021, to set up the rollout call and to state that the Office of the Surgeon General's purpose was to stop the spread of misinformation on social-media platforms.[172] YouTube eventually adopted a new policy on combatting COVID-19

---

[166] [Id. at 129]
[167] [Doc. No. 210-1 at 138]
[168] [Doc. No. 210-5 at 1–2]
[169] [Doc. No. 210-6]
[170] [Doc. No. 210-7 at 145–46]
[171] [Id.]
[172] [Doc. No. 210-8]

misinformation and began providing federal officials with updates on YouTube's efforts to combat the misinformation.[173]

(9)    At the July 15, 2021 press conference, Murthy described health misinformation as one of the biggest obstacles to ending the pandemic; insisted that his advisory was on an urgent public health threat; and stated that misinformation poses an imminent threat to the nation's health and takes away the freedom to make informed decisions.[174] Murthy further stated that health disinformation is false, inaccurate, or misleading, based upon the best evidence at the time.[175]

Murthy also stated that people who question mask mandates and decline vaccinations are following misinformation, which results in illnesses and death.[176] Murthy placed specific blame on social-media platforms for allowing "poison" to spread and further called for an "all-of-society approach" to fight health misinformation.[177] Murthy called upon social-media platforms to operate with greater transparency and accountability, to monitor information more clearly, and to "consistently take action against misinformation super-spreaders on their platforms."[178] Notably, Waldo agreed in his deposition that the word "accountable" carries with it the threat of consequences.[179] Murthy further demanded social-media platforms do "much, much, more" and take "aggressive action" against misinformation because the failure to do so is "costing people their lives."[180]

(10)    Murthy's July 15, 2021 health advisory on misinformation blamed social-media platforms for the spread of misinformation at an unprecedented speed, and it blamed social-media

---

[173] [Doc. No. 210-8].
[174] [Doc. No. 210-11]
[175] [Doc. No. 210-11]
[176] [Doc. No. 210-11]
[177] [Id.]
[178] [Id.]
[179] [Id.]
[180] [Id.]

features and algorithms for furthering the spread.[181]  The health advisory further called for social-media platforms to enact policy changes to reduce the spread of misinformation, including appropriate legal and regulatory measures.[182]

Under a heading entitled "What Technology Platforms Can Do," the health advisory called for platforms to take a series of steps to increase and enable greater social-media censorship of misinformation, including product changes, changing algorithms to avoid amplifying misinformation, building in "frictions" to reduce the sharing of misinformation, and practicing the early detection of misinformation super-spreaders, along with other measures.[183]  The consequences for misinformation would include flagging problematic posts, suppressing the spread of the information, suspension, and permanent de-platforming.[184]

(11)    The Office of the Surgeon General collaborated and partnered with the Stanford University Internet Observatory and the Virality Project. Murthy participated in a January 15, 2021 launch of the Virality Project. In his comments, Murthy told the group, "We're asking technology companies to operate with great transparency and accountability so that misinformation does not continue to poison our sharing platforms and we knew the government can play an important role, too."[185]

Murthy expressly mentioned his coordination with DiResta at the Virality Project and expressed his intention to maintain that collaboration. He claimed that he had learned a lot from the Virality Project's work and thanked the Virality Project for being such a great "partner."[186]

---

[181] [Doc. No. 210-11]
[182] [Id.]
[183] [Id.]
[184] [Id.]
[185] [Doc. No. 210-13, Doc. No. 210, at 206–07].
[186] [Doc. No. 210-1 at 213]

Murthy also stated that the Office of the Surgeon General had been "partnered with" the Stanford Internet Observatory for many months.[187]

(12)    After President Biden's "[T]hey're killing people" comment on July 16, 2021, Facebook representatives had "sad faces" according to Waldo. On July 21, 2021, Facebook emailed Waldo and Fullenwider with CrowdTangle data and with "interventions" that created "frictions" with regard to COVID misinformation. The interventions also included limiting forwarding of WhatsApp messages, placing warning labels on fact-checked content, and creating "friction" when someone tries to share these posts on Facebook. Facebook also reported other censorship policy and actions, including censoring content that contributes to the risk of imminent physical harm, permanently banning pages, groups, and accounts that repeatedly broke Facebook's COVID-19 misinformation rules, and reducing the reach of posts, pages, groups, and accounts that share other false claims "that do not violate our policies but may present misleading or sensationalized information about COVID-19 and vaccines."[188]

On July 16, 2021, Clegg emailed Murthy and stated, "I know our teams met today to better understand the scope of what the White House expects of us on misinformation going forward."[189]On July 18, 2021, Clegg messaged Murthy stating "I imagine you and your team are feeling a little aggrieved—as is the [Facebook] team, it's not great to be accused of killing people—but as I said by email, I'm keen to find a way to deescalate and work together collaboratively. I am available to meet/speak whenever suits."[190] As a result of this communication, a meeting was scheduled for July 23, 2021.[191]

---

[187] [Doc. No. 210-1 at 213]
[188] [Doc. No. 210-15]
[189] [Doc. No. 210-16]
[190] [Doc. No. 210-17]
[191] [Doc. No. 210-18]

At the July 23, 2021 meeting, the Office of the Surgeon General officials were concerned about understanding the reach of Facebook's data.[192] Clegg even sent a follow-up email after the meeting to make sure Murthy saw the steps Facebook had been taking to adjust policies with respect to misinformation and to further address the "disinfo-dozen."[193] Clegg also reported that Facebook had "expanded the group of false claims that we remove, to keep up with recent trends of misinformation that we are seeing."[194] Further, Facebook also agreed to "do more" to censor COVID misinformation, to make its internal data on misinformation available to federal officials, to report back to the Office of the Surgeon General, and to "strive to do all we can to meet our 'shared' goals."[195]

Evidently, the promised information had not been sent to the Office of the Surgeon General by August 6, 2021, so the Office requested the information in a report "within two weeks."[196] The information entitled "How We're Taking Action Against Vaccine Misinformation Superspreaders" was later sent to the Office of the Surgeon General. It detailed a list of censorship actions taken against the "Disinformation Dozen."[197] Clegg followed up with an August 20, 2021 email with a section entitled "Limiting Potentially Harmful Misinformation," which detailed more efforts to censor COVID-19 Misinformation.[198] Facebook continued to report back to Waldo and Flaherty with updates on September 19 and 29 of 2021.[199]

(13)    Waldo asked for similar updates from Twitter, Instagram, and Google/YouTube.[200]

---

[192] [Id.]
[193] [Id. at 4–5]
[194] [Id.]
[195] [Id.]
[196] [Doc. No. 210-22 at 1–3]
[197] [Doc. No. 210-21]
[198] [Doc. No. 210-22 at 2]
[199] [Doc. No. 210, Waldo depo. Exh 30, 31]
[200] [Doc. No. 210, Waldo depo. at 257–58]

(14)    The Office of the Surgeon General also collaborated with the Democratic National

Committee. Flaherty emailed Murthy on July 19, 2021, to put Murthy in touch with Jiore Craig

("Craig") from the Democratic National Committee who worked on misinformation and

disinformation issues.[201] Craig and Murthy set up a Zoom meeting for July 22, 2021.

(15)    After an October 28, 2021 Washington Post article stated that Facebook researchers

had deep knowledge about how COVID-19 and vaccine misinformation ran through Facebook's

apps, Murthy issued a series of tweets from his official Twitter account indicating he was "deeply

disappointed" to read this story, that health misinformation had harmed people's health and cost

lives, and that "we must demand Facebook and the rest of the social-media ecosystems take

responsibility for stopping health misinformation on their platforms."[202] Murthy further tweeted

that "we need transparency and accountability now."[203]

(16)    On October 29, 2021, Facebook asked federal officials to provide a "federal health

contract" to dictate "what content would be censored on Facebook's platforms."[204] Federal

officials informed Facebook that the federal health authority that could dictate what content could

be censored as misinformation was the CDC.[205]

(17)    Murthy continued to publicly chastise social-media platforms for allowing health

misinformation to be spread on their platforms. Murthy made statements on the following

platforms: a December 21, 2021 podcast threatening to hold social-media platforms accountable

for not censoring misinformation;[206] a January 3, 2022 podcast with Alyssa Milano stating that

"platformers need to step up to be accountable for making their spaces safer";[207] and a February

---

[201] [Doc. No. 210, Exh. 22]
[202] [Doc. No. 210, Exh. 31]
[203] [Id.]
[204] [Doc. No. 210, Exh. 33]
[205] [Id.]
[206] [Doc. No. 210, Exh. 38, Audio Transcript, at 7]
[207] [Doc. No. 210–33]

14, 2022 panel discussion hosted by the Rockefeller Foundation, wherein they discussed that technology platforms enabled the speed, scale, and sophistication with which this misinformation was spreading.[208]

On March 3, 2022, the Office of the Surgeon General issued a formal Request for Information ("RFI"), published in the Federal Register, seeking information from social-media platforms and others about the spread of misinformation.[209] The RFI indicated that the Office of the Surgeon General was expanding attempts to control the spread of misinformation on social media and other technology platforms.[210] The RFI also sought information about censorship policies, how they were enforced, and information about disfavored speakers.[211]The RFI was sent to Facebook, Google/YouTube, LinkedIn, Twitter, and Microsoft[212] by Max Lesko ("Lesko"), Murthy's Chief of Staff, requesting responses from these social-media platforms.[213]Murthy again restated social-media platforms' responsibility to reduce the spread of misinformation in an interview with GQ Magazine.[214] Murthy also specifically called upon Spotify to censor health information.[215]

### C. CDC Defendants[216]

(1)    Crawford is the Director for The Division of Digital Media within the CDC Office of the Associate Director for Communications. Her deposition was taken pursuant to preliminary-

---

[208] [Doc. No. 210–34]
[209] [Doc. No. 32. Ex. 42, 87 Fed. Reg. 12712]
[210] [Id.]
[211] [Id.]
[212] [Id. Exh. 46, 47, 48, 49, 50, 51]
[213] [Id.]
[214] [Id. Exh. 51]
[215] [Exh. 52]
[216] The CDC Defendants consist of the Centers for Disease Control & Prevention, Carol Crawford ("Crawford"), Jay Dempsey ("Dempsey"), Kate Galatas ("Galatas"), United States Census Bureau ("Census Bureau"), Jennifer Shopkorn ("Shopkorn"), the Department of Health and Human Services ("HHS"), Xavier Becerra ("Becerra"), Yolanda Byrd ("Byrd"), Christy Choi ("Choi"), Ashley Morse ("Morse"), and Joshua Peck ("Peck").

injunction related discovery here.[217] The CDC is a component of the Department of Health and Human Services ("HHS"); Xavier Becerra ("Becerra") is the Secretary of HHS.[218] Crawford's division provides leadership for CDC's web presence, and Crawford, as director, determines strategy and objectives and oversees its general work.[219] Crawford was the main point of contact for communications between the CDC and social-media platforms.[220]

Prior to the COVID-19 pandemic, Crawford only had limited contact with social-media platforms, but she began having regular contact post-pandemic, beginning in February and March of 2020.[221] Crawford communicated with these platforms via email, phone, and meetings.[222]

(2)    Facebook emailed State Department officials on February 6, 2020, that it had taken proactive and reactive steps to control information and misinformation related to COVID-19. The email was forwarded to Crawford, who reforwarded to her contacts on Facebook.[223] Facebook proposed to Crawford that it would create a Coronavirus page that would give information from trusted sources including the CDC. Crawford accepted Facebook's proposal on February 7, 2020, and suggested the CDC may want to address "widespread myths" on the platform.[224]

Facebook began sending Crawford CrowdTangle reports on January 25, 2021. CrowdTangle is a social-media listening tool for Meta, which shows themes of discussion on social-media channels. These reported on "top engaged COVID and vaccine-related content overall across Pages and Groups."[225] This CrowdTangle report was sent by Facebook to Crawford

---

[217] [Doc. No. 205-1]
[218] [Doc. No. 266-5 at 57–61]
[219] [Doc. No. 205-1 at 11]
[220] [Id. at 249]
[221] [Id. at 16–18]
[222] [Id. at 20]
[223] [Doc. 205-3 at 3]
[224] [Id. at 1–2]
[225] [Id. at 49–52]

in response to a prior conversation with Crawford.[226] The CDC had privileged access to
CrowdTangle since early 2020.[227]

Facebook emailed Crawford on March 3, 2020, that it intended to support the Government
in its response to the Coronavirus, including a goal to remove certain information.[228] Crawford
and Facebook began having discussions about misinformation with Facebook in the Fall of 2020,
including discussions of how to combat misinformation.[229]

The CDC used CrowdTangle, along with Meltwater reports (used for all platforms), to
monitor social media's themes of discussion across platforms.[230] Crawford recalls generally
discussing misinformation with Facebook.[231] Crawford added Census Bureau officials to the
distribution list for CrowdTangle reports because the Census Bureau was going to begin working
with the CDC on misinformation issues.[232]

(3)    On January 27, 2021, Facebook sent Crawford a recurring invite to a "Facebook
weekly sync with CDC."[233] A number of Facebook and CDC officials were included in the invite,
and the CDC could invite other agencies as needed.[234] The CDC had weekly meetings with
Facebook.[235]

(4)    On March 10, 2021, Crawford sent Facebook an email seeking information about
"Themes that have been removed for misinfo."[236] The CDC questioned if Facebook had info on
the types of posts that were removed. Crawford was aware that the White House and the HHS

---

[226] [Doc. No. 205-1, Exh. 6 at 2]
[227] [Id. at 49–52, 146–47]
[228] [Doc. No. 205-4 at 1–2]
[229] [Doc. No. 205-7 at 1–2]
[230] [Doc. No. 205-1 at 154–55]
[231] [Id. at 58]
[232] [Id.]
[233] [Doc. No. 205-1 at 226]
[234] [Doc. No. 205-36]
[235] Doc. No. 205-1 at 226]
[236] [Doc. No. 205-44 at 2–3]

were also receiving similar information from Facebook.[237] The HHS was present at meetings with

social-media companies on March 1, 2021,[238] and on April 21, 2021.[239]

(5)    On March 25, 2021, Crawford and other CDC officials met with Facebook. In an

email by Facebook prior to that meeting, Facebook stated it would present on COVID-19

misinformation and have various persons present, including a Misinformation Manager and a

Content-Manager official (Liz Lagone).[240] Crawford responded, attaching a PowerPoint slide

deck, stating "This is a deck Census would like to discuss and we'd also like to fit in a discussion

of topic types removed from Facebook."[241] Crawford also indicated two Census Bureau officials,

Schwartz and Shopkorn, would be present, as well as two Census Bureau contractors, Sam Huxley

and Christopher Lewitzke.[242]

The "deck" the Census Bureau wanted to discuss contained an overview of

"Misinformation Topics" and included "concerns about infertility, misinformation about side

effects, and claims about vaccines leading to deaths."[243] For each topic, the deck included sample

slides and a statement from the CDC debunking the allegedly erroneous claim.[244]

(6)    Crawford admits she began engaging in weekly meetings with Facebook,[245] and

emails verify that the CDC and Facebook were repeatedly discussing misinformation back and

forth.[246] The weekly meetings involved Facebook's content-mediation teams. Crawford mainly

inquired about how Facebook was censoring COVID-19 misinformation in these meetings.[247]

---

[237] [Doc. No. 205-1 at 258–61]
[238] Twitter with White House
[239] Twitter with White House
[240] [Doc. No. 205-1 at 103]
[241] [Id.]
[242] [Doc. No. 205-34 at 3]
[243] [Id. at 4]
[244] [Id. at 6–14]
[245] [Doc. No. 205-1 at 68–69]
[246] [Doc. No. 205-9 at 1–4]
[247] [Doc. No. 205-1 at 68–69]

(7)     The CDC entered into an Intra-Agency Agreement ("IAA") with the Census Bureau to help advise on misinformation. The IAA required that the Census Bureau provide reports to the CDC on misinformation that the Census Bureau tracked on social media.[248] To aid in this endeavor, Crawford asked Facebook to allow the Census Bureau to be added to CrowdTangle.[249]

(8)     After the March 2021 weekly meetings between Facebook, the CDC, and Census Bureau began, Crawford began to press Facebook on removing and/or suppressing misinformation. In particular, she stated, "The CDC would like to have more info… about what is being done on the amplification-side," and the CDC "is still interested in more info on how you view or analyze the data on removals, etc."[250] Further, Crawford noted, "It looks like the posts from last week's deck about infertility and side effects have all been removed. Were these evaluated by the moderation team or taken down for another reason?"[251] Crawford also questioned Facebook about the CrowdTangle report showing local news coverage of deaths after receiving the vaccine and questioned what Facebook's approach is for "adding labels" to those stories.[252]

On April 13, 2021, Facebook emailed Crawford to propose enrolling CDC and Census Bureau officials in a special misinformation reporting channel; this would include five CDC officials and four Census Bureau officials. The portal was only provided to federal officials.[253]

On April 23, 2021, and again on April 28, 2021, Crawford emailed Facebook about a Wyoming Department of Health report noting that the algorithms that Facebook and other social-media networks are using to "screen out postings of sources of vaccine misinformation" were also screening out valid public health messages.[254]

---

[248] [Doc. No. 205-1 at 71–72, 110]
[249] [Doc. No. 205-9 at 1]
[250] [Doc. No. 205-9 at 2]
[251] [Id.]
[252] [Doc. No. 205-9 at 1]
[253] [Doc. No. 205-11 at 2]
[254] [Doc. No. 205-38 at 2]

On May 6, 2021, Crawford emailed Facebook a table containing a list of sixteen specific postings on Facebook and Instagram that contained misinformation.[255] Crawford stated in her deposition that she knew when she "flagged" content for Facebook, they would evaluate and possibly censor the content.[256] Crawford stated CDC's goal in flagging information for Facebook was "to be sure that people have credible health information so that they can make the correct health decisions."[257] Crawford continued to "flag" and send misinformation posts to Facebook, and on May 19, 2021,[258] Crawford provided Facebook with twelve specific claims.

(9)    Facebook began to rely on Crawford and the CDC to determine whether claims were true or false. Crawford began providing the CDC with "scientific information" for Facebook to use to determine whether to "remove or reduce and inform."[259] Facebook was relying on the CDC's "scientific information" to determine whether statements made on its platform were true or false.[260] The CDC would respond to "debunk" claims if it had an answer.[261] These included issues like whether COVID-19 had a 99.96% survival rate, whether COVID-19 vaccines cause bells' palsy, and whether people who are receiving COVID-19 vaccines are subject to medical experiments.[262]

Facebook content-mediation officials would contact Crawford to determine whether statements made on Facebook were true or false.[263] Because Facebook's content-moderation policy called for Facebook to remove claims that are false and can lead to harm, Facebook would

---

[255] [Doc. No. 205-10 at 1–3]
[256] [Doc. No. 205-1 at 88]
[257] [Id.]
[258] [Doc. No. 205-12 at 1]
[259] [Id. at 2]
[260] [Doc. No. 205-1 at 106]
[261] [Id.]
[262] [Doc. No. 205-12 at 1–2]
[263] [Doc. No. 205-12 at 2]

remove and/or censor claims the CDC itself said were false.[264] Questions by Facebook to the CDC related to this content-moderation included whether spike proteins in COVID-19 vaccines are dangerous and whether Guillain-Barre Syndrome or heart inflammation is a possible side effect of the COVID-19 vaccine.[265] Crawford normally referred Facebook to CDC subject-matter experts or responded with the CDC's view on these scientific questions.[266]

(10)    Facebook continued to send the CDC biweekly CrowdTangle content insight reports, which included trending topics such as Door-to-Door Vaccines, Vaccine Side Effects, Vaccine Refusal, Vaccination Lawsuits, Proof of Vaccination Requirement, COVID-19 and Unvaccinated Individuals, COVID-19 Mandates, Vaccinating Children, and Allowing People to Return to Religious Services.[267]

(11)    On August 19, 2021, Facebook asked Crawford for a Vaccine Adverse Event Reporting System ("VAERS") meeting for the CDC to give Facebook guidance on how to address VAERS-related "misinformation."[268] The CDC was concerned about VAERS-related misinformation because users were citing VAERS data and reports to raise concerns about the safety of vaccines in ways the CDC found to be "misleading."[269] Crawford and the CDC followed up by providing written materials for Facebook to use.[270] The CDC eventually had a meeting with Facebook about VAERS-related misinformation and provided two experts for this issue.[271]

(12)    On November 2, 2021, a Facebook content-moderation official reached out to the CDC to obtain clarity on whether the COVID-19 vaccine was harmful to children. This was

---

[264] [Doc. No. 205-26 at 1–4]
[265] [Doc. No. 205-18]
[266] [Doc. No. 205-1 at 140]
[267] [Doc. No. 205-20 at 205–20]
[268] [Doc. No. 205-21]
[269] [Doc. No. 205-22]
[270] [Doc. No. 205-21]
[271] [Doc. No. 205-1 at 151–52]

following the FDA's emergency use authorization ("EUA") related to the COVID-19 vaccine.[272] In addition to the EUA issue for children, Facebook identified other claims it sought clarity on regarding childhood vaccines and vaccine refusals.[273]

The following Monday, November 8, 2021, Crawford followed up with a response from the CDC, which addressed seven of the ten claims Facebook had asked the CDC to evaluate. The CDC rated six of the claims "False" and stated that any of these false claims could cause vaccine refusal.[274]

The questions the CDC rated as "false" were:

1) COVID-19 vaccines weaken the immune system;
2) COVID-19 vaccines cause auto-immune diseases;
3) Antibody-dependent enhancement ("ADE") is a side effect of COVID-19 vaccines;
4) COVID-19 vaccines cause acquired immunodeficiency syndrome (AIDS);
5) Breast milk from a vaccinated parent is harmful to babies/children; and
6) COVID-19 vaccines cause multi-system inflammatory syndrome in children (MIS-C).

(13)    On February 3, 2022, Facebook again asked the CDC for clarification on whether a list of claims were "false" and whether the claims, if believed, could contribute to vaccine refusals.[275] The list included whether COVID-19 vaccines cause ulcers or neurodegenerative diseases such as Huntington's and Parkinson's disease; the FDA's possible future issuance of an EUA to children six months to four years of age; and questions about whether the COVID-19 vaccine causes death, heart attacks, autism, birth defects, and many others.[276]

(14)    In addition to its communications with Facebook, the CDC and Census Bureau also had involvement with Google/YouTube. On March 18, 2021, Crawford emailed Google, with the

---

[272] [Doc. 205-23 at 1–2]
[273] [Id.]
[274] [Doc. No. 205–24]
[275] [Doc. No. 205-26 at 1]
[276] [Id. at 1–4]

subject line "COVID Misinfo Project." Crawford informed Google that the CDC was now working with the Census Bureau (who had been meeting with Google regularly) and wanted to set up a time to talk and discuss the "COVID Misinfo Project."[277] According to Crawford, the previous Census project referred to the Census' work on combating 2020 Census misinformation.[278]

On March 23, 2021, Crawford sent a calendar invite for a March 24, 2021 meeting, which included Crawford and five other CDC employees, four Census Bureau employees, and six Google/YouTube officials.[279] At the March 24, 2021 meeting, Crawford presented a slide deck similar to the one prepared for the Facebook meeting. The slide deck was entitled "COVID Vaccine Misinformation: Issue Overview" and included issues like infertility, side effects, and deaths. The CDC and the Census Bureau denied that COVID-19 vaccines resulted in infertility, caused serious side effects, or resulted in deaths. [280]

(15)　　On March 29, 2021, Crawford followed up with Google about using their "regular 4 p.m. meetings" to go over things with the Census.[281] Crawford recalled that the Census was asking for regular meetings with platforms, specifically focused on misinformation.[282] Crawford also noted that the reference to the "4 p.m. meeting" refers to regular biweekly meetings with Google, which "continues to the present day."[283] Crawford also testified she had similar regular meetings with Meta and Twitter, and previously had regular meetings with Pinterest. Crawford stated these meetings were mostly about things other than misinformation, but misinformation was discussed at the meetings.[284]

---

[277] [Doc. No. 205-28]
[278] [Doc. No. 205-1 at 175]
[279] [Doc. No. 214-22 Jones Dec. Exh. T] SEALED DOCUMENT
[280] [Id.] SEALED DOCUMENT
[281] [Doc. No. 205-1 at 179–82]
[282] [Doc. No. 205-1 at 184–85]
[283] [Doc. No. 205-1 at 180]
[284] [Id. at 181]

(16)    On May 10, 2021, Crawford emailed Facebook to establish "COVID BOLO" ("Be on The Lookout") meetings. Google and YouTube were included.[285] Crawford ran the BOLO meetings, and the Census Bureau official arranged the meetings and prepared the slide deck for each meeting.[286]

The first BOLO meeting was held on May 14, 2021; the slide deck for the meeting was entitled "COVID Vaccine Misinformation: Hot Topics" and included five "hot topics" with a BOLO note for each topic. The five topics were: the vaccines caused "shedding"; a report made on VAERS that a two-year old child died from the vaccine; other alleged misleading information on VAERS reports; statements that vaccines were bioweapons, part of a depopulation scheme, or contain microchips; and misinformation about the eligibility of twelve to fifteen year old children for the vaccine.[287] All were labeled as "false" by the CDC, and the potential impact on the public was a reduction of vaccine acceptance.

The second BOLO meeting was held on May 28, 2021. The second meeting also contained a slide deck with a list of three "hot topics" to BOLO: that the Moderna vaccine was unsafe; that vaccine ingredients can cause people to become magnetic; and that the vaccines cause infertility or fertility-related issues in men. All were labeled as false by the CDC, and possibly impacted reduced vaccine acceptance.[288]

A third BOLO meeting scheduled for June 18, 2021, was cancelled due to the new Juneteenth holiday. However, Crawford sent the slide deck for the meeting.  The hot topics for this meeting were: that vaccine particles accumulate in ovaries causing fertility; that vaccines contain

---

[285] [Doc. No. 205-40]
[286] [Doc. No. 205-1 at 246, 265–66]
[287] [Doc. No. 214-23 at 4–5] SEALED DOCUMENT
[288] [Doc. No. 214-24 at 3–7] SEALED DOCUMENT

microchips; and because of the risk of blood clots to vaccinated persons, airlines were discussing a ban. All were labeled as false.[289]

The goal of the BOLO meetings was to be sure credible information was out there and to flag information the CDC thought was not credible for potential removal.[290]

On September 2, 2021, Crawford emailed Facebook and informed them of a BOLO for a small but growing area of misinformation: one of the CDC's lab alerts was misinterpreted and shared via social media.[291]

(17)    The CDC Defendants also had meetings and/or communications with Twitter. On April 8, 2021, Crawford sent an email stating she was "looking forward to setting up regular chats" and asked for examples of misinformation. Twitter responded.[292]

On April 14, 2021, Crawford sent an email to Twitter giving examples of misinformation topics, including that vaccines were not FDA approved, fraudulent cures, VAERS data taken out of context, and infertility. The list was put together by the Census Bureau team.[293]

On May 10, 2021, Crawford emailed Twitter to print out two areas of misinformation, which included copies of twelve tweets.[294] Crawford informed Twitter about the May 14, 2021 BOLO meeting and invited Twitter to participate. The examples of misinformation given at the meeting included: vaccine shedding; that vaccines would reduce the population; abnormal bleeding; miscarriages for women; and that the Government was lying about vaccines. In a

---

[289] [Doc. No. 214-25 at 2–7] SEALED DOCUMENT
[290] [Doc. No. 205-1 at 266]
[291] [Doc. No. 205-22]
[292] [Doc. No. 205-1 at 197, 205–33]
[293] [Doc. No. 205-33]
[294] [Doc. No. 205-34]

response, Twitter stated that at least some of the examples had been "reviewed and actioned."[295] Crawford understood that she was flagging posts for Twitter for possible censorship.[296]

Twitter additionally offered to enroll CDC officials in its "Partner Support Portal" to provide expedited review of content flagged for censorship.[297] Crawford asked for instructions of how to enroll in the Partnership Support Portal and provided her personal Twitter account to enroll. Crawford was fully enrolled on May 27, 2021.[298] Census Bureau contractor Christopher Lewitzke ("Lewitzke") also requested to enroll in the Partner Support Portal.[299]

Crawford also sent Twitter a BOLO for the alleged misinterpretation of a CDC lab report.[300]

(18)    Crawford testified in her deposition that the CDC has a strong interest in tracking what its constituents are saying on social media.[301] Crawford also expressed concern that if content were censored and removed from social-media platforms, government communicators would not know what the citizen's "true concerns" were.[302]

### D.  NIAID Defendants[303]

The NIAID is a federal agency under HHS. Dr. Fauci was previously the Director of NIAID. Dr. Fauci's deposition was taken as a part of the limited preliminary injunction discovery in this matter.[304]

---

[295] [Id.]
[296] [Doc. No. 205-1 at 211]
[297] [Id. at 211–12]
[298] [Id. at 211–18]
[299] [Doc. No. 201-34 at 2]
[300] [Doc. No. 201-35]
[301] [Doc. No. 201-1 at 57–58]
[302] [Id. at 75]
[303] The NIAD Defendants consist of the National Institute of Allergy and Infectious Disease and Dr. Hugh Auchincloss ("Dr. Auchincloss").
[304] [Doc. No. 206]

1)    Dr. Fauci had been the director of the NIAID for over thirty-eight years and became Chief Medical Advisor to the President in early 2021.[305] Dr. Fauci retired December 31, 2022.

**1. Lab-Leak Theory**

Plaintiffs set forth arguments that because NIAID had funded "gain-of-function"[306] research at Dr. Fauci's direction at the Wuhan Institute of Virology ("Wuhan lab") in Wuhan, China, Dr. Fauci sought to suppress theories that the SARS-CoV2 virus leaked from the Wuhan lab.[307]

(1)    Plaintiffs allege that Dr. Fauci's motive for suppressing the lab-leak theory was a fear that Dr. Fauci and NIAID could be blamed for funding gain-of-function research that created the COVID-19 pandemic. Plaintiffs allege Dr. Fauci participated in a secret call with other scientists on February 1, 2020, and convinced the scientists (who were proponents of the lab-leak theory) to change their minds and advocate for the theory that the COVID-19 virus originated naturally.[308] A few days after the February 1, 2020 call, a paper entitled "The Proximal Origin of COVID-19" was published by Nature Medicine on March 17, 2020. The article concludes that SARS-CoV2 was not created in a lab but rather was naturally occurring.

On February 2, 2020, Dr. Fauci told the other scientists that "given the concerns of so many people and the threat of further distortions on social media it is essential that we move quickly. Hopefully, we can get the WHO to convene."[309] Dr. Fauci emailed Dr. Tedros of the WHO and two senior WHO officials, urging WHO to quickly establish a working group to address the lab-leak theory. Dr. Fauci stated they should "appreciate the urgency and importance of this issue

---

[305] [Doc. No. 206-1 at 10 (Deposition of Dr. Anthony S. Fauci)]
[306] "Gain-of-function" research involves creating a potentially dangerous virus in a laboratory.
[307] [Doc. No. 212-3 at 151–85]
[308] [Id. at 165]
[309] [Doc. No. 206-9 at 2]

given the gathering internet evident in the science literature and in mainstream and social media to the question of the origin of this virus." Dr. Fauci also stated WHO needed to "get ahead of …the narrative of this and not reacting to reports which could be very damaging."[310] Numerous drafts of "The Proximal Origin of COVID-19" were sent to Dr. Fauci to review prior to the article being published in Nature Medicine.[311]

     (2)     On February 9, 2020, in a joint podcast with Dr. Peter Daszak of the Eco Health Alliance,[312] both Drs. Fauci and Daszak discredited the lab-leak theory, calling it a "conspiracy theory."[313]

     (3)     Three authors of "The Proximal Origins of SARS-CoV2," Robert Garry, Kristian Anderson, and Ian Lipkin, received grants from NIH in recent years.[314]

     (4)     After "The Proximal Origins of SARS-CoV2" was completed and published in Nature Medicine, Dr. Fauci began discrediting the lab-leak theory. "This study leaves little room to refute a natural original for COVID-19." "It's a shining object (lab-leak theory) that will go away in times."[315]

     At an April 17, 2020 press conference, when asked about the possibility of a lab-leak, Dr. Fauci stated, "There was a study recently that we can make available to you, where a group of highly qualified evolutionary virologists looked at the sequences there and the sequences in bats as they evolve. And the mutations that it took to get to the point where it is now is totally consistent

---

[310] [Doc. No. 206-9 at 1]
[311] [Doc. No. 206-13 at 1, 7-8; 206-11 at 2–3; and 206–20]
[312] [Doc. No. 206-16 at 1]
[313] [Doc. No. 206-16 at 1; 206-17 at 1]
[314] [Doc. No. 214-30]
[315] [Doc. No. 206-27 at 3–4]

with jump of a species from animal to a human."[316] "The Proximal Origin of SARS-CoV2" has since become one of the most widely read papers in the history of science.[317]

(5)      Twitter and Facebook censored the lab-leak theory of COVID-19.[318] However, Dr. Fauci claims he is not aware of any suppression of speech about the lab-leak theory on social media, and he claims he does not have a Twitter or Facebook account.[319]

(6)      On March 15, 2020, Zuckerberg sent Dr. Fauci an email asking for coordination between Dr. Fauci and Facebook on COVID-19 messaging. Zuckerberg asked Dr. Fauci to create a video to be used on Facebook's Coronavirus Information Hub, with Dr. Fauci answering COVID-19 health questions, and for Dr. Fauci to recommend a "point person" for the United States Government "to get its message out over the platform."[320]

Dr. Fauci responded the next day to Zuckerberg saying, "Mark your idea and proposal sounds terrific," "would be happy to do a video for your hub," and "your idea about PSAs is very exciting." Dr. Fauci did three live stream Facebook Q&A's about COVID-19 with Zuckerberg.[321]

## 2.  Hydroxychloroquine

Plaintiffs further allege the NIAID and Dept. of HHS Defendants suppressed speech on hydroxychloroquine. On May 22, 2020, The Lancet published an online article entitled "Hydroxychloroquine or chloroquine with or without a macrolide for treatment of COVID-19: a multi-national registry analysis."[322] The article purported to analyze 96,032 patients to compare persons who did and did not receive this treatment. The study concluded that hydroxychloroquine

---

[316] (Video of April 17, 2020, White House Coronavirus Task Force Briefing, at https://www.youtube.com/watch?v=brbArPX8=6I)
[317] [Doc. No. 214-30]
[318] [Doc. No. 206-32 at 1–2; Doc. No. 206-33 at 3]
[319] [Doc. No. 206-1 at 210]
[320] [Doc. No. 206-24 at 3]
[321] [Doc. No. 201-1 at 177]
[322] [Doc. No. 206-36 at 1]

and chloroquine were associated with decreased in-hospital survival and an increased frequency of ventricular arrhythmias when used for treatment of COVID-19.[323]

Dr. Fauci publicly cited this study to claim that "hydroxychloroquine is not effective against coronavirus."[324] He then publicly began to discredit COVID-19 treatment with hydroxychloroquine and stated whether the treatment of COVID-19 by hydroxychloroquine was effective could only be judged by rigorous, randomized, double-blind, placebo-based studies. He testified the same on July 31, 2020, before the House Select Subcommittee on Coronavirus Crisis.[325]

(2)     When America's Frontline Doctors held a press conference criticizing the Government's response to the COVID-19 pandemic and spouting the benefits of hydroxychloroquine in treating the coronavirus,[326] Dr. Fauci made statements on Good Morning America[327] and on Andrea Mitchell Reports[328] that hydroxychloroquine is not effective in treating the coronavirus. Social-media platforms censored the America's Frontline Doctors videos. Facebook, Twitter, and YouTube removed the video.[329] Dr. Fauci does not deny that he or his staff at NIAID may have communicated with social-media platforms, but he does not specifically recall it.[330]

### 3.   The Great Barrington Declaration

(1)     The GBD was published online on October 4, 2020. The GBD was published by Plaintiffs Dr. Bhattacharja of Stanford and Dr. Kulldorff of Harvard, along with Dr. Gupta of

---

[323] [Id.]
[324] [Doc. No. 206-35 at 1]
[325] https://www.youtube.com/watch?v=RUNCSOQD2UE
[326] [Doc. No. 207-2 at 5]
[327] [Doc. No. 207-1 at 2]
[328] [Doc. No. 207-1 at 2–3]
[329] [Doc. No. 207-2 at 6]
[330] [Doc. No. 206-1 at 238]

Oxford. The GBD is a one-page treatise opposing reliance on lockdowns and advocating for an approach to COVID-19 called "focused protection."[331] It criticized the social distancing and lockdown approaches endorsed by government experts. The authors expressed grave concerns about physical and mental health impacts of current government COVID-19 lockdown policies and called for an end to lockdowns.[332]

(2)    On October 8, 2020, Dr. Francis Collins emailed Dr. Fauci (and Cliff Lane) stating:

> Hi Tony and Cliff, See https://gbdeclaration.org/. This proposal from the three fringe epidemiologists who met with the Secretary seems to be getting a lot of attention – and even a co-signature from Nobel Prize winner Mike Leavitt at Stanford. There needs to be a quick and devastating published take down of its premises. I don't see anything like that online yet- is it underway? Francis.[333]

The same day, Dr. Fauci wrote back to Dr. Collins stating, "Francis: I am pasting in below a piece from Wired that debunks this theory. Best, Tony."[334]

Dr. Fauci and Dr. Collins followed up with a series of public media statements attacking the GBD. In a Washington Post story run on October 14, 2020, Dr. Collins described the GBD and its authors as "fringe" and "dangerous."[335] Dr. Fauci consulted with Dr. Collins before he talked to the Washington Post.[336] Dr. Fauci also endorsed these comments in an email to Dr. Collins, stating "what you said was entirely correct."[337]

On October 15, 2020, Dr. Fauci called the GBD "nonsense" and "dangerous."[338] Dr. Fauci specifically stated, "Quite frankly that is nonsense, and anybody who knows anything about

---

[331] [Doc. No. 207-5 at 3]
[332] [Id.]
[333] [Doc. No. 207-6]
[334] [Doc. No. 207-7]
[335] [Doc. No. 207-9]
[336] [Doc. No. 206-1 at 272]
[337] [Doc. No. 207-10]
[338] [Doc. No. 207-11 at 1]

epidemiology will tell you that is nonsense and very dangerous."[339] Dr. Fauci testified "it's possible that" he coordinated with Dr. Collins on his public statements attacking the GBD.[340]

(3)     Social-media platforms began censoring the GBD shortly thereafter. In October 2020, Google de-boosted the search results for the GBD so that when Google users googled "Great Barrington Declaration," they would be diverted to articles critical of the GBD, and not to the GBD itself.[341] Reddit removed links to the GBD.[342] YouTube updated its terms of service regarding medical "misinformation," to prohibit content about vaccines that contradicted consensus from health authorities.[343] Because the GBD went against a consensus from health authorities, its content was removed from YouTube. Facebook adopted the same policies on misinformation based upon public health authority recommendations.[344] Dr. Fauci testified that he could not recall anything about his involvement in seeking to squelch the GBD.[345]

(4)     NIAID and NIH staff sent several messages to social-media platforms asking them to remove content lampooning or criticizing Dr. Fauci. When a Twitter employee reached out to CDC officials asking if a particular account associated with Dr. Fauci was "real or not,"[346] Scott Prince of NIH responded, "Fake/Imposter handle.  PLEASE REMOVE!!!"[347] An HHS official then asked Twitter if it could "block" similar parody accounts: "Is there anything else you can also do to block other variations of his (Dr. Fauci's) name from impersonation so we don't have this

---

[339] [Id. at 3]
[340] [Doc. No. 206-1 at 279]
[341] [Doc. No. 207-12 at 4]
[342] [Id. at 4–5]
[343] [Doc. No. 207-13 at 4–5]
[344] [Doc. No. 207-15]
[345] [Doc. No. 206-1 at 251–52, 255–58]
[346] [Doc. No. 207-17 at 2]
[347] [Id.]

occur again?"[348] Twitter replied, "We'll freeze this @handle and some other variations so no one can hop on them."[349]

On April 21, 2020, Judith Lavelle of NIAID emailed Facebook, copying Scott Prince of NIH and Jennifer Routh ("Routh"), and stated, "We wanted to flag a few more fake Dr. Fauci accounts on FB and IG for you I have reported them from NIAID and my personal FB account."[350] Both Lavelle and Routh are members of Dr. Fauci's communications staff.[351] Six of the eight accounts listed were removed by Facebook on the same day.[352]

(5)      On October 30, 2020, a NIAID staffer wrote an email connecting Google/YouTube with Routh, "so that NIAID and the 'Google team' could connect on vaccine communications-specifically misinformation.'"[353] Courtney Billet ("Billet"), director of the Office of Communications and Government Relations of NIAID, was added by Routh, along with two other NIAID officials, to a communications chain with YouTube.[354] Twitter disclosed that Dina Perry ("Perry"), a Public Affairs Specialist for NIAID, communicates or has communicated with Twitter about misinformation and censorship.[355]

(6)      Dr. Fauci testified that he has never contacted a social-media company and asked them to remove misinformation from one of their platforms.[356]

**4. Ivermectin**

(8)      On September 13, 2021, Facebook emailed Carol Crawford of the CDC to ask whether the claim that "Ivermectin is effective in treating COVID is false, and if believed, could

---

[348] [Id. at 1]
[349] [Id.]
[350] [Doc. No. 207-19 at 3]
[351] [Doc. No. 206-1 at 308]
[352] [Doc. No. 207-19 at 3]
[353] [Doc. No. 207-20 at 1]
[354] [Id.]
[355] [Doc. No. 214-8 at 1]
[356] [Doc. No. 206-1 at 151]

contribute to people refusing the vaccine or self-medicating."[357] The CDC responded the next day and advised Facebook that the claim that Ivermectin is effective in treating COVID is "NOT ACCURATE."[358] The CDC cited the NIH's treatment guidelines for authority that the claims were not accurate.[359]

### 5. Mask Mandates

(9)    Plaintiffs maintain that Dr. Fauci initially did not believe masks worked, but he changed his stance. A February 4, 2020 email, in which Dr. Fauci responded to an email from Sylvia Burwell, stated, "the typical mask you buy in a drugstore is not really effective in keeping out the virus, which is small enough to pass through mankind."[360] Dr. Fauci stated that, at that time, there were "no studies" on the efficacy of masking to stop the spread.[361] On March 31, 2020, Dr. Fauci forwarded studies showing that masking is ineffective.[362]

Plaintiffs allege that Dr. Fauci's position on masking changed dramatically on April 3, 2020, when he became an advocate for universal mask mandates.[363] Dr. Fauci testified his position changed in part because "evidence began accumulating that masks actually work in preventing acquisition and transmission,"[364] although Dr. Fauci could not identify those studies.[365]

---

[357] [Doc. No. 207-22 at 2]
[358] [Id. at 1]
[359] [Id.]
[360] [Doc. No. 206-1 at 314]
[361] [Id. at 316]
[362] [Id. at 318]
[363] [Id. at 317]
[364] [Id.]
[365] [Id. at 318]

### 6.  Alex Berenson

Alex Berenson ("Berenson") was a former New York Times Science reporter and critic of government messaging about COVID-19 vaccines.  He was de-platformed from Twitter on August 28, 2021.[366]

Dr. Fauci had previously sought to discredit Berenson publicly during an interview with CNN.[367] Dr. Fauci does not deny that he may have discussed Berenson with White House or federal officials, but does not recall specifically whether he did so.[368]

### E.    FBI Defendants[369]

(1)    The deposition of Elvis Chan ("Chan") was taken on November 29, 2021.[370] Chan is the Assistant Special Agent in charge of the Cyber Branch for the San Francisco Division of the FBI.[371] In this role, Chan was one of the primary people communicating with social-media platforms about disinformation on behalf of the FBI. There are also other agents on different cyber squads, along with the FBI's private sector engagement squad, who relay information to social-media platforms.[372]

Chan graduated from the Naval Postgraduate School in 2020 with a M.A. in Homeland Security Studies.[373] His thesis was entitled, "Fighting Bears and Trolls. An Analysis of Social Media Companies and U.S. Government Efforts to Combat Russian Influence Campaigns During the 2020 U.S. Elections."[374] His thesis focuses on information sharing between the FBI, Facebook,

---

[366] [Doc. No. 207-23 at 4]
[367] [Doc. No. 207-24 at 1–2]
[368] [Doc. No. 206-1 at 341–43]
[369] FBI Defendants include Elvis Chan ("Chan"), the Federal Bureau of Investigation ("FBI"), Lauren Dehmlow ("Dehmlow"), and the U.S. Department of Justice ("DOJ").
[370] [Doc. No. 204-1]
[371] [Id. at 8]
[372] [Id. at 105]
[373] [Id. at 10]
[374] [Doc. No. 204-2 at 1]

Google, and Twitter.[375] Chan relied on research performed by persons and entities comprising the Election Integrity Partnership, including Graphika,[376] and DiResta of the Stanford Internet Observatory. Chan communicated directly with DiResta about Russian disinformation.[377]

Chan also knows Alex Stamos ("Stamos"), the head of the Stanford Internet Observatory, from when Stamos worked for Facebook.[378] Chan and Stamos worked together on "malign-foreign-influence activities, on Facebook."[379]

(2)    Chan stated that the FBI engages in "information sharing" with social-media companies about content posted on their platforms, which includes both "strategic-level information" and "tactical information."[380]

(3)    The FBI, along with Facebook, Twitter, Google/YouTube, Microsoft, Yahoo!, Wikimedia Foundation, and Reddit, participate in a Cybersecurity and Infrastructure Security Agency ("CISA") "industry working group."[381] Representatives of CISA, the Department of Homeland Security's Intelligence & Analysis Division ("I&A"), the Office of Director of National Intelligence ("ODNI"), the FBI's FITF, the Dept. of Justice National Security Division, and Chan participate in these industry working groups.[382]

Chan participates in the meetings because most social-media platforms are headquartered in San Francisco, and the FBI field offices are responsible for maintaining day-to-day relationships with the companies headquartered in its area of responsibility.[383]

---

[375] [Id. at 18]
[376] [Doc. No. 204-1 at 145]
[377] [Doc. No. 204-1 at 51–52, 85]
[378] [Id. at 54]
[379] [Id at 55]
[380] [Id. at 16–19]
[381] [Id. at 18, 23–24]
[382] [Id. at 24, 171]
[383] [Id. at 24]

Matt Masterson ("Masterson") was the primary facilitator in the meetings for the 2022 election cycle, and Brian Scully ("Scully") was the primary facilitator ahead of the 2022 election.[384] At the USG-Industry ("the Industry") meetings, social-media companies shared disinformation content, providing a strategic overview of the type of disinformation they were seeing. The FBI would then provide strategic, unclassified overviews of things they were seeing from Russian actors.[385]

The Industry meetings were "continuing" at the time Chan's deposition was taken on November 23, 2022, and Chan assumes the meetings will continue through the 2024 election cycle.[386]

(4)     Chan also hosted bilateral meetings between FBI and Facebook, Twitter, Google/YouTube, Yahoo!/Verizon, Microsoft/LinkedIn, Wikimedia Foundation and Reddit,[387] and the Foreign Influence Task Force.[388] In the Industry meetings, the FBI raised concerns about the possibility of "hack and dump" operations during the 2020 election cycle.[389] The bilateral meetings are continuing, occurring quarterly, but will increase to monthly and weekly nearer the elections.[390]

In the Industry meetings, FBI officials meet with senior social-media platforms in the "trust and safety or site integrity role." These are the persons in charge of enforcing terms of service and content-moderation policies.[391] These meetings began as early as 2017.[392] At the Industry

---

[384] [Id. at 25–26]
[385] [Id. at 156–57]
[386] [Id. at 285–86]
[387] [Id. at 23–24]
[388] [Id. at 39]
[389] [Id.]
[390] [Id. at 40]
[391] [Id. at 43–44]
[392] [Id. at 87–89]

meetings, in addition to Chan and Laura Dehmlow ("Dehmlow"), head of the FITF, between three and ten FITF officials and as high as a dozen FBI agents are present.[393]

(5)     On September 4, 2019, Facebook, Google, Microsoft, and Twitter along with the FITF, ODNI, and CISA held a meeting to discuss election issues. Chan attended, along with Director Krebs, Masterson, and Scully. Social media's trust and safety on content-moderation teams were also present. The focus of the meeting was to discuss with the social-media companies the spread of "disinformation."[394]

(6)     Discovery obtained from LinkedIn contained 121 pages of emails between Chan, other FBI officials, and LinkedIn officials.[395] Chan testified he has a similar set of communications with other social-media platforms.[396]

(7)     The FBI communicated with social-media platforms using two alternative, encrypted channels, Signal and Teleporter.[397]

(8)     For each election cycle, during the days immediately preceding and through election days, the FBI maintains a command center around the clock to receive and forward reports of "disinformation" and "misinformation." The FBI requests that social-media platforms have people available to receive and process the reports at all times.[398]

(9)     Before the Hunter Biden Laptop story breaking prior to the 2020 election on October 14, 2020, the FBI and other federal officials repeatedly warned industry participants to be alert for "hack and dump" or "hack and leak" operations.[399]

---

[393] [Id. at 109–10]
[394] [Id. at 151]
[395] [Doc. No. 204-3]
[396] Doc. No. 204-1 at 288]
[397] [Id. at 295–296]
[398] [Id. at 301]
[399] [Doc. No. 204-1 at 172, 232–34]

Dehmlow also mentioned the possibility of "hack and dump" operations.[400] Additionally, the prospect of "hack and dump" operations was repeatedly raised at the FBI-led meetings with FITF and the social-media companies, in addition to the Industry meetings.[401]

Social-media platforms updated their policies in 2020 to provide that posting "hacked materials" would violate their policies. According to Chan, the impetus for these changes was the repeated concern about a 2016-style "hack-and-leak" operation.[402] Although Chan denies that the FBI urged the social-media platforms to change their policies on hacked material, Chan did admit that the FBI repeatedly asked the social-media companies whether they had changed their policies with regard to hacked materials[403] because the FBI wanted to know what the companies would do if they received such materials.[404]

(10)    Yoel Roth ("Roth"), the then-Head of Site Integrity at Twitter, provided a formal declaration on December 17, 2020, to the Federal Election Commission containing a contemporaneous account of the "hack-leak-operations" at the meetings between the FBI, other natural-security agencies, and social-media platforms.[405] Roth's declaration stated:

> Since 2018, I have had regular meetings with the Office of the Director of National Intelligence, the Department of Homeland Security, the FBI, and industry peers regarding election security. During these weekly meetings, the federal law enforcement agencies communicated that they expected "hack-and-leak" operations by state actors might occur during the period shortly before the 2020 presidential election, likely in October. I was told in these meetings that the intelligence community expected that individuals associated with political campaigns would be subject to hacking attacks and that material obtained through those hacking attacks would likely be disseminated over social-media platforms, including Twitter. These expectations of hack-and-leak operations

---

[400] [Id. at 175]
[401] [Id. at 177–78]
[402] [Id. at 205]
[403] [Id. at 206]
[404] [Id. at 249]
[405] [Doc. No. 204-5, ¶¶ 10-11, at 2–3]

were discussed through 2020. *I also learned in these meetings that there were rumors that a hack-and-leak operation would involve Hunter Biden.*[406]

Chan testified that, in his recollection, Hunter Biden was not referred to in any of the CISA Industry meetings.[407] The mention of "hack-and-leak" operations involving Hunter Biden is significant because the FBI previously received Hunter Biden's laptop on December 9, 2019, and knew that the later-released story about Hunter Biden's laptop was not Russian disinformation.[408]

In Scully's deposition,[409] he did not dispute Roth's version of events.[410]

Zuckerberg testified before Congress on October 28, 2020, stating that the FBI conveyed a strong risk or expectation of a foreign "hack-and-leak" operation shortly before the 2020 election and that the social-media companies should be on high alert. The FBI also indicated that if a trove of documents appeared, they should be viewed with suspicion.[411]

(11)   After the Hunter Biden laptop story broke on October 14, 2020, Dehmlow refused to comment on the status of the Hunter Biden laptop in response to a direct inquiry from Facebook, although the FBI had the laptop in its possession since December 2019.[412]

The Hunter Biden laptop story was censored on social media, including Facebook and Twitter.[413] Twitter blocked users from sharing links to the New York Post story and prevented users who had previously sent tweets sharing the story from sending new tweets until they deleted

---

[406] (emphasis added)
[407] [Doc. No. 204-1 at 213, 227–28].
[408] [Doc. No. 106-3 at 5–11]
[409] [Doc. No. 209]
[410] [Id. at 247]
[411] [Doc. 204-6 at 56]
[412] [Doc. No. 204-1 at 215]
[413] [Doc. No. Doc 204-5 at ¶ 17]

the previous tweet.[414] Further, Facebook began reducing the story's distribution on the platform pending a third-party fact-check.[415]

(12)    Chan further testified that during the 2020 election cycle, the United States Government and social-media companies effectively limited foreign influence companies through information sharing and account takedowns.[416] Chan's thesis also recommended standardized information sharing and the establishment of a national coordination center.

According to Chan, the FBI shares this information with social-media platforms as it relates to information the FBI believes should be censored.[417] Chan testified that the purpose and predictable effect of the tactical information sharing was that social-media platforms would take action against the content in accordance with their policies.[418] Additionally, Chan admits that during the 2020 election cycle, the United States Government engaged in information sharing with social-media companies.[419] The FBI also shared "indicators" with state and local government officials.[420]

Chan's thesis includes examples of alleged Russian disinformation, which had a number of reactions and comments from Facebook users, including an anti-Hillary Clinton post, a secure-border post, a Black Lives Matter post, and a pro-Second Amendment post.[421]

Chan also identified Russian-aligned websites on which articles were written by freelance journalists. A website called NADB, alleged to be Russian-generated, was also identified by the FBI, and suppressed by social-media platforms, despite such content being drafted and written by

---

[414] [Id.]
[415] [Doc. No. 204-6 at 2]
[416] [Doc. No. 204-2 at 3]
[417] [Id.]
[418] [Id. at 32–33]
[419] [Id. at 19]
[420] [Id. at 50]
[421] [Id.]

American users on that site.[422] The FBI identified this site to the social-media companies that took

action to suppress it.[423]

(13)    "Domestic disinformation" was also flagged by the FBI for social-media platforms.

Just before the 2020 election, information would be passed from other field offices to the FBI 2020

election command post in San Francisco. The information sent would then be relayed to the social-

media platforms where the accounts were detected.[424] The FBI made no attempt to distinguish

whether those reports of election disinformation were American or foreign.[425]

Chan testified the FBI had about a 50% success rate in having alleged election

disinformation taken down or censored by social-media platforms.[426] Chan further testified that

although the FBI did not tell the social-media companies to modify their terms of service, the FBI

would "probe" the platforms to ask for details about the algorithms they were using[427] and what

their terms of service were.[428]

(14)    Chan further testified the FBI identifies specific social-media accounts and URLs

to be evaluated "one to five times a month"[429] and at quarterly meetings.[430] The FBI would notify

the social-media platforms by sending an email with a secure transfer application within the FBI

called a "Teleporter." The Teleporter email contains a link for them to securely download the files

from the FBI.[431] The emails would contain "different types of indicators," including specific

---

[422] [Id. at 144–46]
[423] [Doc. No. 204-1 at 141-43]
[424] [Id. at 162]
[425] [Id. at 163]
[426] [Id. at 167]
[427] [Id. at 88]
[428] [Id. at 92]
[429] [Id. at 96]
[430] [Id. at 98]
[431] [Id.]

social-media accounts, websites, URLs, email accounts, and the like, that the FBI wanted the

platforms to evaluate under their content-moderation policies.[432]

Most of the time, the emails flagging the misinformation would go to seven social-media

platforms. During 2020, Chan estimated he sent out these emails from one to six times per month

and in 2022, one to four times per month. Each email would flag a number that ranged from one

to dozens of indicators.[433] When the FBI sent these emails, it would request that the social-media

platforms report back on the specific actions taken as to these indicators and would also follow up

at the quarterly meetings.[434]

(15)    At least eight FBI agents at the San Francisco office, including Chan, are involved

in reporting disinformation to social-media platforms.[435] In addition to FBI agents, a significant

number of FBI officials from the FBI's Foreign Influence Task Force also participate in regular

meetings with social-media platforms about disinformation.[436]

Chan testified that the FBI uses its criminal-investigation authority, national-security

authority, the Foreign Intelligence Surveillance Act, the PATRIOT Act, and Executive Order

12333 to gather national security intelligence to investigate content on social media.[437]

Chan believes with a high degree of confidence that the FBI's identification of "tactical

information" was accurate and did not misidentify accounts operated by American citizens.[438]

However, Plaintiffs identified tweets and trends on Twitter, such as #ReleasetheMemo in 2019,

and indicated that 929,000 tweets were political speech by American citizens.[439]

---

[432] [Id. at 99]
[433] [Id. at 100–01]
[434] [Id. at 102–03]
[435] [Id. at 105–08]
[436] [Id. at 108]
[437] [Id. at 111–12]
[438] [Id. at 112]
[439] [Doc. No. 204-2 at 71]

(16)    Chan testified that he believed social-media platforms were far more aggressive in taking down disfavored accounts and content in the 2018 and 2020 election cycles.[440] Chan further thinks that pressure from Congress, specifically the House Permanent Select Committee on Intelligence and the Senate Select Committee on Intelligence, resulted in more aggressive censorship policies.[441] Chan also stated that congressional hearings placed pressure on the social-media platforms.[442]

Chan further testified that Congressional staffers have had meetings with Facebook, Google/YouTube, and Twitter and have discussed potential legislation.[443] Chan spoke directly with Roth of Twitter, Steven Slagle of Facebook, and Richard Salgado of Google, all of whom participated in such meetings.[444]

(17)    Chan testified that 3,613 Twitter accounts and 825 Facebook accounts were taken down in 2018. Chan testified Twitter took down 422 accounts involving 929,000 tweets in 2019.[445]

(18)    Chan testified that the FBI is continuing its efforts to report disinformation to social-media companies to evaluate for suppression and/or censorship.[446] "Post-2020, we've never stopped…as soon as November 3 happened in 2020, we just pretty much rolled into preparing for 2022."[447]

---

[440] [Id. at 115–16]
[441] [Id. at 116]
[442] [Id. at 117–18]
[443] [Id. at 118]
[444] [Id. at 123–26]
[445] [Id. at 133–34, 149–50]
[446] [Doc. No. 204-8 at 2–3]
[447] [Doc. No. 204-8 at 2]

### E. CISA Defendants[448]

The deposition of Brian Scully was taken on January 12, 2023, as part of the injunction-related discovery in this matter.

(1)     The CISA regularly meets with social-media platforms in several types of standing meetings. Scully is the chief of CISA's Mis, Dis and Malinformation Team ("MDM Team"). Prior to President Biden taking office, the MDM Team was known as the "Countering Foreign Influence Task Force ("CFITF").[449] Protentis is the "Engagements Lead" for the MDM Team, and she is in charge of outreach and engagement to key stakeholders, interagency partners, and private sector partners, which includes social-media platforms. Scully performed Protentis's duties while she was on maternity leave.[450] Both Scully and Protentis have done extended detail at the National Security Council, where they work on misinformation and disinformation issues.[451]

(2)     Scully testified that during 2020, the MDM Team did "switchboard work" on behalf of election officials. "Switchboarding" is a disinformation-reporting system provided by CISA that allows state and local election officials to identify something on social media they deem to be disinformation aimed at their jurisdiction. The officials would then forward the information to CISA, which would in turn share the information with the social-media companies.[452]

The main idea, according to Scully, is that the information would be forwarded to social-media platforms, which would make decisions on the content based on their policies.[453] Scully further testified he decided in late April or early May 2022 not to perform switchboarding in 2022.

---

[448] CISA Defendants consist of the Cybersecurity and Infrastructure Security Agency ("CISA"), Jen Easterly ("Easterly"), Kim Wyman ("Wyman"), Lauren Protentis ("Protentis"), Geoffrey Hale ("Hale"), Allison Snell ("Snell"), Brian Scully ("Scully"), the Department of Homeland Security ("DHS"), Alejandro Mayorkas ("Mayorkas"), Robert Silvers ("Silvers"), and Samantha Vinograd ("Vinograd").
[449] [Doc. No. 209-1 at 12]
[450] [Id. at 18–20]
[451] [Id. at 19]
[452] [Id. at 16–17]
[453] [Id. at 17]

However, the CISA website states the MDM Team serves as a "switchboard for routing disinformation concerns to social-media platforms."[454] The switchboarding activities began in 2018.[455]

(3)    The MDM Team continues to communicate regularly with social-media platforms in two different ways. The first way is called "Industry" meetings. The Industry meetings are regular sync meetings between government and industry, including social-media platforms.[456] The second type of communication involves the MDM Team reviewing regular reports from social-media platforms about changes to their censorship policies or to their enforcement actions on censorship.[457]

(4)    The Industry meetings began in 2018 and continue to this day. These meetings increase in frequency as each election nears. In 2022, the Industry meetings were monthly but increased to biweekly in October 2022.[458]

Government participants in the USG-Industry meetings are CISA, the Department of Justice ("DOJ"), ODNI, and the Department of Homeland Security ("DHS"). CISA is typically represented by Scully and Hale. Scully's role is to oversee and facilitate the meetings.[459] Wyman, Snell, and Protentis also participate in the meetings on behalf of CISA.[460] On behalf of the FBI, FITF Chief Dehmlow, Chan, and others from different parts of the FBI participate.[461]

In addition to the Industry meetings, CISA hosts at least two "planning meetings:" one between CISA and Facebook and an interagency meeting between CISA and other participating

---

[454] [Doc. No. 209-19 at 3]
[455] [Id.]
[456] [Doc. No. 209-1 at 21]
[457] [Id.]
[458] [Id. at 24]
[459] [Id. at 25]
[460] [Id. at 28]
[461] [Id. at 29]

federal agencies.[462] The social-media platforms attending the industry meetings include Facebook, Twitter, Microsoft, Google/YouTube, Reddit, LinkedIn, and sometimes the Wikipedia Foundation.[463] At the Industry meetings, participants discuss concerns about misinformation and disinformation. The federal officials report their concerns over the spread of disinformation. The social-media platforms in turn report to federal officials about disinformation trends, share high-level trend information, and repot the actions they are taking.[464] Scully testified that the specific discussion of foreign-originating information is ultimately targeted at preventing domestic actors from engaging in this information.[465]

(5)    CISA has established relationships with researchers at Stanford University, the University of Washington, and Graphika.[466] All three are involved in the Election Integrity Partnership ("EIP").[467]

When the EIP was starting up, CISA interns came up with the idea of having some communications with the EIP. CISA began having communications with the EIP, and CISA connected the EIP with the Center for Internet Security ("CIS"). The CIS is a CISA-funded, non-profit that channels reports of disinformation from state and local government officials to social-media platforms. The CISA interns who originated the idea of working with the EIP also worked for the Stanford Internet Observatory, another part of the EIP. CISA had meetings with Stanford Internet Observatory officials, and eventually both sides decided to work together.[468] The "gap"

---

[462] [Id. at 36–37]
[463] [Id. at 39]
[464] [Id. at 39–41]
[465] [Id. at 41]
[466] [Id. at 46, 48]
[467] [Id. at 48]
[468] [Id. at 49–52]

that the EIP was designed to fill concerned state and local officials' lack of resources to monitor and report on disinformation that affects their jurisdictions.[469]

(6)     The EIP continued to operate during the 2022 election cycle. At the beginning of the election cycle, the EIP gave Scully and Hale, on behalf of CISA, a briefing in May or June of 2022.[470] In the briefing, DiResta walked through what the plans were for 2022 and some lessons learned from 2020. The EIP was going to support state and local election officials in 2022.

(7)     The CIS is a non-profit that oversees the Multi-State Information Sharing and Analysis Center ("MS-ISAC") and the Election Infrastructure Information Sharing and Analysis Center ("EI-ISAC"). Both MS-ISAC and EI-ISAC are organizations of state and/or local government officials created for the purpose of information sharing.[471]

CISA funds the CIS through a series of grants. CISA also directs state and local officials to the CIS as an alternative route to "switchboarding."[472] CISA connected the CIS with the EIP because the EIP was working on the same mission,[473] and it wanted to make sure they were all connected. Therefore, CISA originated and set up collaborations between local government officials and CIS and between the EIP and CIS.

(8)     CIS worked closely with CISA in reporting misinformation to social-media platforms. CIS would receive the reports directly from election officials and would forward this information to CISA. CISA would then forward the information to the applicable social-media platforms. CIS later began to report the misinformation directly to social-media platforms.[474]

---

[469] [Id. at 57]
[470] [Id. at 53–54]
[471] [Id. at 59–61]
[472] [Id. at 61–62]
[473] [Id. at 62–63]
[474] [Id. at 63–64]

The EIP also reported misinformation to social-media platforms. CISA served as a mediating role between CIS and EIP to coordinate their efforts in reporting misinformation to the platforms. There were also direct email communications between the EIP and CISA about reporting misinformation.[475] When CISA reported misinformation to social-media platforms, CISA would generally copy the CIS, who, as stated above, was coordinating with the EIP.[476]

(9)     Stamos and DiResta of the Stanford Internet Observatory briefed Scully about the EIP report, "The Long Fuse,"[477] in late Spring or early Summer of 2021. Scully also reviewed copies of that report. Stamos and DiResta also have roles in CISA: DiResta serves as "Subject Matter Expert" for CISA's Cybersecurity Advisory Committee, MDM Subcommittee, and Stamos serves on the CISA Cybersecurity Advisory Committee, as does Kate Starbird ("Starbird") of the University of Washington.[478] Stamos identified the EIP's "partners in government" as CISA, DHS, and state and local officials.[479] Also, according to Stamos, the EIP targeted "large following political partisans who were spreading misinformation intentionally."[480]

(10)    CISA's Masterson was also involved in communicating with the EIP.[481] Masterson and Scully questioned EIP about their statements on election-related information. Sanderson left CISA in January 2021, was a fellow at the Stanford Internet Observatory, and began working for Microsoft in early 2022.[482]

---

[475] [Id. at 63–66]
[476] [Id. at 67–68]
[477] [Doc. 209-2]
[478] [Doc. No. 209-1, at 72, 361; Doc. No. 212-36 at 4 (Jones Deposition-SEALED DOCUMENT)]
[479] [Doc. No. 209-4 at 4]
[480] [Scully depo. Exh. at l7]
[481] [Doc. No. 209-1 at 76]
[482] [Id. at 88–89]

(11)     CISA received misinformation principally from two sources: the CIS directly from state and local election officials; and information sent directly to a CISA employee.[483] CISA shared information with the EIP and the CIS.[484]

(12)     CISA did not do an analysis to determine what percentage of misinformation was "foreign derived." Therefore, CISA forwards reports of information to social-media platforms without determining whether they originated from foreign or domestic sources.[485]

(13)     The Virality Project was created by the Stanford Internet Observatory to mimic the EIP for COVID.[486] As previously stated, Stamos and DiResta of the Stanford Internet Observatory were involved in the Virality Project. Stamos gave Scully an overview of what they planned to do with the Virality Project, similar to what they did with the EIP.[487] Scully also had conversations with DiResta about the Virality Project.[488] DiResta noted the Virality Project was established on the heels of the EIP, following its success in order to support government health officials' efforts to combat misinformation targeting COVID-19 vaccines.[489]

(14)     According to DiResta, the EIP was designed to "get around unclear legal authorities, including very real First Amendment questions" that would arise if CISA or other government agencies were to monitor and flag information for censorship on social media.[490]

(15)     The CIS coordinated with the EIP regarding online misinformation and reported it to CISA. The EIP was using a "ticketing system" to track misinformation.[491] Scully asked the social-media platforms to report back on how they were handling reports of misinformation and

---

[483] [Id. at 119–20]
[484] [Id. at 120–21]
[485] [Id. at 122–23]
[486] [Id. at 134]
[487] [Id. at 134–36]
[488] [Id. at 139]
[489] [Doc. No. 209-5 at 7]
[490] [Id. at 4]
[491] [Doc. No. 209-1 at 159]

disinformation received from CISA.[492] CISA maintained a "tracking spreadsheet" of its misinformation reports to social-media platforms during the 2020 election cycle.[493]

(16)    At least six members of the MDM team, including Scully, "took shifts" in the "switchboarding" operation reporting disinformation to social-media platforms; the others were Chad Josiah ("Josiah"), Rob Schaul ("Schaul"), Alex Zaheer ("Zaheer"), John Stafford ("Stafford"), and Pierce Lowary ("Lowary"). Lowary and Zaheer were simultaneously serving as interns for CISA and working for the Stanford Internet Observatory, which was the operating the EIP.[494] Therefore, Zaheer and Lowary were simultaneously engaged in reporting misinformation to social-media platforms on behalf of both CISA and the EIP.[495] Zaheer and Lowary were also two of the four Stanford interns who came up with the idea for the EIP.[496]

(17)    The CISA switchboarding operation ramped up as the election drew near. Those working on the switchboarding operation worked tirelessly on election night.[497] They would also "monitor their phones" for disinformation reports even during off hours so that they could forward disinformation to the social-media platforms.[498]

(18)    As an example, Zaheer, when switchboarding for CISA, forwarded supposed misinformation to CISA's reporting system because the user had claimed "mail-in voting is insecure" and that "conspiracy theories about election fraud are hard to discount."[499]

CISA's tracking spreadsheet contains at least eleven entries of switchboarding reports of misinformation that CISA received "directly from EIP" and forwarded to social-media platforms

---

[492] [Doc. No. 209-6 at 11]
[493] [Doc. No. 209-1 at 165–66]
[494] [Id. at 166–68, 183]
[495] [Id.]
[496] [Id. at 171, 184–85]
[497] [Id. at 174–75]
[498] [Id. at 75]
[499] [Doc. No. 209-6 at 61–62]

to review under their policies.[500] One of these reports was reported to Twitter for censorship because EIP "saw an article on the Gateway Pundit" run by Plaintiff Jim Hoft.[501]

(19)    Scully admitted that CISA engaged in "informal fact checking" to determine whether a claim was true or not.[502] CISA would do its own research and relay statements from public officials to help debunk postings for social-media platforms. In debunking information, CISA apparently always assumed the government official was a reliable source; CISA would not do further research to determine whether the private citizen posting the information was correct or not.[503]

(20)    CISA's switchboarding activities reported private and public postings.[504] Social-media platforms responded swiftly to CISA's reports of misinformation.[505]

(21)    CISA, in its interrogatory responses, disclosed five sets of recurring meetings with social-media platforms that involved discussions of misinformation, disinformation, and/or censorship of speech on social media.[506] CISA also had bilateral meetings between CISA and the social-media companies.[507]

(22)    Scully does not recall whether "hack and leak" or "hack and dump" operations were raised at the Industry meetings, but does not deny it either.[508] However, several emails confirm that "hack and leak" operations were on the agenda for the Industry meeting on September 15, 2020,[509] and July 15, 2020.[510]

---

[500] [Doc. No. 214-35 at 5–6, Column C]
[501] [Id. at 4–5, Column F, Line 94]
[502] CISA also became the "ministry of truth."
[503] [Doc. No. 209-1 at 220–22]
[504] [Doc. No. 209-7 at 45–46]
[505] [Doc. No. 209-1 at 291–94; 209–49]
[506] [Doc. No. 209-9 at 38–40]
[507] [Doc. No. 209-1 at 241]
[508] [Id. at 236–37]
[509] [Doc. No. 209-13 at 1]
[510] [Doc. No. 209-14 at 16]

(23)   In the spring and summer of 2022, CISA's Protentis requested that social-media platforms prepare a "one-page" document that sets forth their content-moderation rules[511] that could then be shared with election officials—and which also included "steps for flagging or escalating MDM content" and how to report misinformation.[512] Protentis referred to the working group (which included Facebook and CISA's Hale) as "Team CISA."[513]

(24)   The Center for Internet Security continued to report misinformation to social-media platforms during the 2022 election cycle.[514]

(25)   CISA has teamed up directly with the State Department's Global Engagement Center ("GEC") to seek review of social-media content.[515] CISA also flagged for review parody and joke accounts.[516] Social-media platforms report to CISA when they update their content-moderation policies to make them more restrictive.[517] CISA publicly stated that it is expanding its efforts to fight disinformation-hacking in the 2024 election cycle.[518]

(26)   A draft copy of the DHS's "Quadrennial Homeland Security Review," which outlines the department's strategy and priorities in upcoming years, states that the department plans to target "inaccurate information" on a wide range of topics, including the origins of the COVID-19 pandemic, the efficacy of COVID-19 vaccines, racial justice, the United States' withdrawal from Afghanistan, and the nature of the United States' support of Ukraine.[519]

---

[511] [Doc. No. 209-14]
[512] [Doc. No. 209-15 at 41, 44–45]
[513] [Doc. No. 209-15 at 39]
[514] [Doc. No. 209-1 at 266]
[515] [Doc. No. 209-15 at 1–2]
[516] [Id. at 11–12]
[517] [Id. at 9]
[518] [Doc. No. 209-20 at 1–2]
[519] [Doc. No. 209-23 at 1–4]

(27)     Scully also testified that CISA engages with the CDC and DHS to help them in their efforts to stop the spread of disinformation. The examples given were about the origins of the COVID-19 pandemic and Russia's invasion of Ukraine.[520]

(28)     On November 21, 2021, CISA Director Easterly reported that CISA is "beefing up its misinformation and disinformation team in wake of a diverse presidential election a proliferation of misleading information online."[521] Easterly stated she was going to "grow and strengthen" CISA's misinformation and disinformation team. She further stated, "We live in a world where people talk about alternative facts, post-truth, which I think is really, really dangerous if people get to pick their own facts."[522]

Easterly also views the word "infrastructure" very expansively, stating, "[W]e're in the business of protecting critical infrastructure, and the most critical is our 'cognitive infrastructure.'"[523] Scully agrees with the assessment that CISA has an expansive mandate to address all kinds of misinformation that may affect control and that could indirectly cause national security concerns.[524]

On June 22, 2022, CISA's cybersecurity Advisory Committee issued a Draft Report to the Director, which broadened "infrastructure" to include "the spread of false and misleading information because it poses a significant risk to critical function, like elections, public health, financial services and emergency responses."[525]

---

[520] [Doc. No. 209-1 at 323–25]
[521] [Doc. No. 209-1 at 335–36]
[522] [Doc. No. 209-18 at 1–2]
[523] [Id.]
[524] [Doc. No. 209-1 at 341]
[525] [Doc. No. 209-25 at 1]

(29)    In September 2022, the CIS was working on a "portal" for government officials to report election-related misinformation to social-media platforms.[526] That work continues today.[527]

## F. State Department Defendants[528]

### 1. The GEC

(1)    Daniel Kimmage is the Principal Deputy Coordinator of the State Department's Global Engagement Center ("GEC").[529] The GEC's front office and senior leadership meets with social-media platforms every few months, sometimes quarterly.[530] The meetings focus on the "tools and techniques" of stopping the spread of disinformation on social media, but they rarely discuss specific content that is posted.[531] Additionally, GEC has a "Technology Engagement Team" ("TET") that also meets with social-media companies. The TET meets more frequently than the GEC.[532]

(2)    Kimmage recalls two meetings with Twitter. At these meetings, the GEC would bring between five and ten people including Kimmage, one or more deputy coordinators, and team chiefs from the GEC and working-level staff with relevant subject-matter expertise.[533] The GEC staff would meet with Twitter's content-mediation teams, and the GEC would provide an overview of what it was seeing in terms of foreign propaganda and information. Twitter would then discuss similar topics.[534]

---

[526] [Doc. No. 210-22]
[527] [Id.]
[528] The State Department Defendants consist of the United States Department of State, Leah Bray ("Bray"), Daniel Kimmage ("Kimmage'), and Alex Frisbie ("Frisbie").
[529] Kimmage's deposition was taken and filed as [Doc. No. 208-1].
[530] [Doc. No. 208-1 at 29, 32]
[531] [Id. at 30]
[532] [Id. at 37]
[533] [Id. at 130–31]
[534] [Id. at 133–36]

(3)    The GEC's senior leadership also had similar meetings with Facebook and Google. Similar numbers of people were brought to these meetings by GEC, and similar topics were discussed. Facebook and Google also brought their content-moderator teams.[535]

(4)    Samaruddin Stewart ("Stewart") was the GEC's Senior Advisor who was a permanent liaison in Silicon Valley for the purpose of meeting with social-media platforms about disinformation. Stewart set up a series of meetings with LinkedIn to discuss "countering disinformation" and to explore shared interests and alignment of mutual goals regarding the challenge.[536]

(5)    The GEC also coordinated with CISA and the EIP.  Kimmage testified that the GEC had a "general engagement" with the EIP.[537]

(6)    On October 17, 2022, at an event at Stanford University, Secretary of State Anthony Blinken mentioned the GEC and stated that the State Department was "engaging in collaboration and building partnerships" with institutions like Stanford to combat the spread of propaganda.[538] Specifically, he stated, "We have something called the Global Engagement Center that's working on this every single day."[539]

(7)    Like CISA, the GEC works through the CISA-funded EI-ISAC and works closely with the Stanford Internet Observatory and the Virality Project.

---

[535] [Id. at 141–43]
[536] [Id. at 159–60]
[537] [Id. at 214–215]. The details surrounding the EIP are described in II 6(5)(6)(7)(8)(9)(10)(15) and (16). Scully Ex. 1 details EIPS work carried out during the 2020 election.
[538] [Doc. No. 208-17 at 5]
[539] [Id.]

### 2.    The EIP

(8)    The EIP is partially-funded by the United States National Science Foundation through grants.[540] Like its work with CISA, the EIP, according to DiResta, was designed to "get around unclear legal authorities, including very real First Amendment questions" that would arise if CISA or other government agencies were to monitor and flag information for censorship on social media.[541]

The EIP's focus was on understanding misinformation and disinformation in the social-media landscape, and it successfully pushed social-media platforms to adopt more restrictive policies about election-related speech in 2020.[542]

The government agencies that work with and submit alleged disinformation to the EIP are CISA, the State Department Global Engagement Center, and the Elections Infrastructure Information Sharing and Analysis Center.[543]

(9)    The EIP report further states that the EIP used a tiered model based on "tickets" collected internally and from stakeholders. The tickets also related to domestic speech by American citizens,[544] including accounts belonging to media outlets, social-media influencers, and political figures.[545] The EIP further emphasized that it wanted greater access to social-media platform's internal data and recommended that the platforms increase their enforcement of censorship policies.[546]

---

[540] [Id. at 17]
[541] [Doc. No. 209-5 at 4]
[542] [Doc. No. 209-5, Exh. 1; Ex. 4 at 7, Audio Tr. 4]
[543] [Doc. No. 209-2 at 30]
[544] [Id. at 11]
[545] [Id. at 12]
[546] [Id. at 14]

The EIP was formed on July 26, 2020, 100 days before the November 2020 election.[547] On

July 9, 2020, the Stanford Internet Observatory presented the EIP concept to CISA. The EIP team

was led by Research Manager DiResta, Director Stamos and the University of Washington's

Starbird.[548]

(10)    EIP's managers both report misinformation to platforms and communicate with

government partners about their misinformation reports.[549] EIP team members were divided into

tiers of on-call shifts. Each shift was four hours long and led by one on-call manager. The shifts

ranged from five to twenty people. Normal scheduled shifts ran from 8:00 a.m. to 8:00 p.m.,

ramping up to sixteen to twenty hours a day during the week of the election.[550]

(11)    Social-media platforms that participated in the EIP were Facebook, Instagram,

Google/YouTube, Twitter, TikTok, Reddit, Nextdoor, Discord, and Pinterest.[551]

(12)    In the 2020 election cycle, the EIP processed 639 "tickets," 72% of which were

related to delegitimizing the election results.[552] Overall, social-media platforms took action on

35% of the URLs reported to them.[553] One "ticket" could include an entire idea or narrative and

was not always just one post.[554] Less than 1% of the tickets related to "foreign interference."[555]

(13)    The EIP found that the Gateway Pundit was one of the top misinformation websites,

allegedly involving the "exaggeration" of the input of an issue in the election process. The EIP did

---

[547] [Id. at 20]
[548] [Id.]
[549] [Id. at 27–28]
[550] [Id. at 28]
[551] [Id. at 35]
[552] [Id. at 45]
[553] [Id. at 58]
[554] [Id. at 27]
[555] [Id. at 53]

not say that the information was false.[556] The EIP Report cites The Gateway Pundit forty-seven times.[557]

(14)     The GEC was engaging with the EIP and submitted "tickets."[558]

(15)     The tickets and URLs encompassed millions of social-media posts, with almost twenty-two million posts on Twitter alone.[559] The EIP sometimes treats as "misinformation" truthful reports that the EIP believes "lack broader context."[560]

(16)     The EIP stated "influential accounts on the political right…were responsible for the most widely spread of false or misleading information in our data set."[561] Further, the EIP stated the twenty-one most prominent report spreaders on Twitter include political figures and organizations, partisan media outlets, and social-media stars. Specifically, the EIP stated, "All 21 of the repeat spreaders were associated with conservative or right-wing political views and support of President Trump."[562] The Gateway Pundit was listed as the second-ranked "Repeat Spreader of Election Misinformation" on Twitter. During the 2020 election cycle, the EIP flagged The Gateway Pundit in twenty-five incidents with over 200,000 retweets.[563] The Gateway Pundit ranked above Donald Trump, Eric Trump, Breitbart News, and Sean Hannity.[564]

The Gateway Pundit's website was listed as the domain cited in the most "incidents"; its website content was tweeted by others in 29,209 original tweets and 840,740 retweets.[565] The Gateway Pundit ranked above Fox News, the New York Post, the New York Times, and the

---

[556] [Id. at 51]
[557] [Id. at 51, 74, 76, 101, 103, 110, 112, 145, 150–51, 153, 155–56, 172, 175, 183, 194–95, 206–09, 211–12, 214–16, and 226]
[558] [Id. at 60]
[559] [Id. at 201]
[560] [Id. at 202]
[561] [Id. at 204–05]
[562] [Id. at 204–05]
[563] [Id.]
[564] [Id. at 246]
[565] [Id. at 207]

Washington Post.[566] The EIP report also notes that Twitter suspended The Gateway Pundit's

account on February 6, 2021, and it was later de-platformed entirely.[567]

(17)    The EIP notes that "during the 2020 election, all of the major platforms made

significant changes to election integrity policies—policies that attempted to slow the spread of

specific narratives and tactics that could 'potentially mislead or deceive the public.'"[568] The EIP

was not targeting foreign disinformation, but rather "domestic speakers."[569] The EIP also indicated

it would continue its work in future elections.[570]

(18)    The EIP also called for expansive censorship of social-media speech into other

areas such as "public health."[571]

(19)    The EIP stated that it "united government, academic, civil society, and industry,

analyzing across platforms to address misinformation in real time."[572]

(20)    When asked whether the targeted information was domestic, Stamos answered, "It

is all domestic, and the second point on the domestic, a huge part of the problem is well-known

influences… you… have a relatively small number of people with very large followings who have

the ability to go and find a narrative somewhere, pick it out of obscurity and … harden it into these

narratives."[573]

Stamos further stated:

> We have set up this thing called the Election Integrity Partnership,
> so we went and hired a bunch of students. We're working with the
> University of Washington, Graphika, and DFR Lab and the vast,
> vast majority we see we believe is domestic. And so, I think a much
> bigger issue for the platforms is elite disinformation. The staff that

---

[566] [Id.]
[567] [Id. at 224]
[568] [Id. at 229]
[569] [Id. at 243–44]
[570] [Id. at 243–44]
[571] [Id. at 251]
[572] [Id. at 259]
[573] [Doc. No. 276-1 at 12]

is being driven by people who are verified that are Americans who are using their real identities.[574]

(21)    Starbird of the University of Washington, who is on a CISA subcommittee and an

EIP participant, also verified the EIP was targeting domestic speakers, stating:

> Now fast forward to 2020, we saw a very different story around disinformation in the U.S. election. It was largely domestic coming from inside the United States… Most of the accounts perpetrating this…. they're authentic accounts.  They were often blue check and verified accounts. They were pundits on cable television shows that were who they said they were … a lot of major spreaders were blue check accounts, and it wasn't entirely coordinated, but instead, it was largely sort of cultivated and even organic in places with everyday people creating and spreading disinformation about the election.[575]

### 3.  The Virality Project

(22)    The Virality Project targeted domestic speakers' alleged disinformation relating to

the COVID-19 vaccines.[576] The Virality Project's final report, dated April 26, 2022, lists DiResta

as principal Executive Director and lists Starbird and Masterson as contributors.[577]

According to the Virality Project, "vaccine mis-and disinformation was largely driven by

a cast of recuring [sic] actors including long-standing anti-vaccine influencers and activists,

wellness and lifestyle influence, pseudo medical influencers, conspiracy theory influencers, right-

leaning political influencers, and medical freedom influencers."[578]

The Virality Project admits the speech it targets is primarily domestic, stating "Foreign …

actor's reach appeared to be far less than that of domestic actors."[579] The Virality Project also calls

for more aggressive censorship of COVID-19 misinformation, calls for more federal agencies to

---

[574] [Id.]
[575] [Doc. No. 276-1 at 42]
[576] [Doc. No. 209-3]; Memes, Magnets, Microchips, Narrative Dynamics Around COVID-19 Vaccines.
[577] [Doc. No. 209-3 at 4]
[578] [Id. at 9]
[579] [Id.]

be involved through "cross-agency collaboration,"[580] and calls for a "whole-of-society response."[581] Just like the EIP, the Virality Project states that it is "multistakeholder collaboration" that includes "government entities" among its key stakeholders.[582] The Virality Project targets tactics that are not necessarily false, including hard-to-verify content, alleged authorization sources, organized outrage, and sensationalized/misleading headlines.[583]

(23)    Plaintiff Hines of the Health Freedom Louisiana was flagged by the Virality Project to be a "medical freedom influencer" who engages in the "tactic" of "organized outrage" because she created events or in-person gatherings to oppose mask and vaccine mandates in Louisiana.[584]

(24)    The Virality Project also acknowledges that government "stakeholders," such as "federal health agencies" and "state and local public health officials," were among those that "provided tips" and "requests to access specific incidents and narratives."[585]

(25)    The Virality Project also targeted the alleged COVID-19 misinformation for censorship before it could go viral. "Tickets also enabled analysts to qualify tag platform or health sector partners to ensure their situational awareness of high-engagement material that appeared to be going viral, so that those partners could determine whether something might merit a rapid public or on-platform response."[586]

(26)    The Virality Project flagged the following persons and/or organizations as spreaders of misinformation:

    i.    Jill Hines and Health Freedom of Louisiana;[587]
    ii.   One America News;[588]

---

[580] [Id. at 12]
[581] [Id.]
[582] [Id. at 17]
[583] [Id. at 19]
[584] [Id. at 9, 19]
[585] [Id. at 24]
[586] [Id. at 37]
[587] [Id. at 59]
[588] [Id. at 60]

    iii.    Breitbart News;[589]
    iv.    Alex Berenson;[590]
    v.    Tucker Carlson;[591]
    vi.    Fox News;[592]
    vii.    Candace Owens;[593]
    viii.    The Daily Wire;[594]
    ix.    Robert F. Kennedy, Jr.;[595]
    x.    Dr. Simone Gold and America's Frontline Doctors; and[596]
    xi.    Dr. Joyce Mercula.[597]

(27)    The Virality Project recommends that the federal government implement a Misinformation and Disinformation Center of Excellence, housed within the federal government, which would centralize expertise on mis/disinformation within the federal government at CISA.[598]

### III.    LAW AND ANALYSIS

### A. Preliminary Injunction Standard

An injunction is an extraordinary remedy never awarded of right. *Benisek v. Lamone*, 138 U.S. 1942, 1943 (2018). In each case, the courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U. S. 7, 24, 129 S. Ct. 365 (2008).

The standard for an injunction requires a movant to show: (1) the substantial likelihood of success on the merits; (2) that he is likely to suffer irreparable harm in the absence of an injunction; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest. *Benisek*, 138 U.S. at 1944. The party seeking relief must satisfy a cumulative burden of proving

---

[589] [Id.]
[590] [Id. at 54, 57, 49, 50]
[591] [Id. at 57]
[592] [Id. at 91]
[593] [Id. at 86, 92]
[594] [Id.]
[595] [Id.]
[596] [Id. at 87–88]
[597] [Id. at 87]
[598] [Id. at 150]

each of the four elements enumerated before an injunction can be granted. *Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987). None of the four prerequisites has a quantitative value. *State of Tex. v. Seatrain Int'l, S.A.*, 518 F.2d 175, 180 (5th Cir. 1975).

**B.  Analysis**

As noted above, Plaintiffs move for a preliminary injunction against Defendants' alleged violations of the Free Speech Clause of the First Amendment. Plaintiffs assert that they are likely to succeed on the merits of their First Amendment claims because Defendants have significantly encouraged and/or coerced social-media companies into removing protected speech from social-media platforms. Plaintiffs also argue that failure to grant a preliminary injunction will result in irreparable harm because the alleged First Amendment violations are continuing and/or there is a substantial risk that future harm is likely to occur. Further, Plaintiffs maintain that the equitable factors and public interest weigh in favor of protecting their First Amendment rights to freedom of speech. Finally, Plaintiffs move for class certification under Federal Rule of Civil Procedure 23.

In response, Defendants maintain that Plaintiffs are unlikely to succeed on the merits for a myriad of reasons. Defendants also maintain that Plaintiffs lack Article III standing to bring the claims levied herein, that Plaintiffs have failed to show irreparable harm because the risk of future injury is low, and that the equitable factors and public interests weigh in favor of allowing Defendants to continue enjoying permissible government speech.

Each argument will be addressed in turn below.

**1.  Plaintiffs' Likelihood of Success on the Merits**

For the reasons explained herein, the Plaintiffs are likely to succeed on the merits of their First Amendment claim against the White House Defendants, Surgeon General Defendants, CDC Defendants, FBI Defendants, NIAID Defendants, CISA Defendants, and State Department

Defendants. In ruling on a motion for Preliminary Injunction, it is not necessary that the applicant demonstrate an absolute right to relief. It need only establish a probable right. *West Virginia Highlands Conservancy v. Island Creek Coal Co.*, 441 F.2d 232 (4th Cir. 1971). The Court finds that Plaintiffs here have done so.

### a.  Plaintiffs' First Amendment Claims

The Free Speech Clause prohibits only governmental abridgment of speech. It does not prohibit private abridgment of speech. *Manhattan Community Access Corporation v. Halleck*, 139 S. Ct. 1921, 1928 (2019). The First Amendment, subject only to narrow and well-understood exceptions, does not countenance governmental control over the content of messages expressed by private individuals. *Turner Broadcasting System, Inc. v. F.C.C.*, 512 U.S. 622, 641 (1994). At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence. *Id.* Government action, aimed at the suppression of particular views on a subject that discriminates on the basis of viewpoint, is presumptively unconstitutional. The First Amendment guards against government action "targeted at specific subject matter," a form of speech suppression known as "content-based discrimination." *National Rifle Association of America v. Cuomo*, 350 F. Supp. 3d 94, 112 (N.D. N.Y. 2018). The private party, social-media platforms are not defendants in the instant suit, so the issue here is not whether the social-media platforms are government actors,[599] but whether the government can be held responsible for the private platforms' decisions.

Viewpoint discrimination is an especially egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the perspective of the speaker is the rationale for the restriction. *Rosenberger v. Rectors and Visitors*

---

[599] This is a standard that requires the private action to be "fairly attributable to the state." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982).

*of University of Virginia*, 515 U.S. 819, 829 (1995). Strict scrutiny is applied to viewpoint discrimination. *Simon & Schuster, Inc. v. Members of the New York State Crime Victim's Board*, 505 U.S. 105 (1991). The government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views. *Police Department of Chicago v. Moseley*, 408 U.S. 92, 96 (1972).

If there is a bedrock principal underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable. *Matal v. Tam*, 137 S. Ct. 1744, 1763 (2017); *see also R.A.V. v. City of St. Paul*, 505 U.S. 377 (1996). The benefit of any doubt must go to protecting rather than stifling speech. *Citizens United v. Federal Election Commission*, 130 S. Ct. 876, 891 (2010).

### i. Significant Encouragement and Coercion

To determine whether Plaintiffs are substantially likely to succeed on the merits of their First Amendment free speech claim, Plaintiffs must prove that the Federal Defendants either exercised coercive power or exercised such significant encouragement that the private parties' choice must be deemed to be that of the government. Additionally, Plaintiffs must prove the speech suppressed was "protected speech." The Court, after examining the facts, has determined that some of the Defendants either exercised coercive power or provided significant encouragement, which resulted in the possible suppression of Plaintiffs' speech.

The State (i.e., the Government) can be held responsible for a private decision only when it has exercised coercive power or has provided such "significant encouragement," either overt or covert, that the choice must be deemed to be that of the State. Mere approval or acquiescence in the actions of a private party is not sufficient to hold the state responsible for those actions. *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982); *Rendell-Baker v. Kohn*, 457 U.S. 830, 1004–05 (1982);

*National Broadcasting Co. Inc v. Communications Workers of America*, Afl-Cio, 860 F.2d 1022 (11th Cir. 1988); *Focus on the Family v. Pinellas Suncoast Transit Authority*, 344 F.3d 1213 (11th Cir. 2003); *Brown v. Millard County*, 47 Fed. Appx. 882 (10th Cir. 2002).

In evaluating "significant encouragement," a state may not induce, encourage, or promote private persons to accomplish what it is constitutionally forbidden to accomplish. *Norwood v. Harrison*, 413 U.S. at 465. Additionally, when the government has so involved itself in the private party's conduct, it cannot claim the conduct occurred as a result of private choice, even if the private party would have acted independently. *Peterson v. City of Greenville*, 373 U.S. at 247–48. Further, oral, or written statements made by public officials could give rise to a valid First Amendment claim where the comments of a governmental official can reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request. *National Rifle Association of America*, 350 F. Supp. 3d at 114. Additionally, a public official's threat to stifle protected speech is actionable under the First Amendment and can be enjoined, even if the threat turns out to be empty. *Backpage.com, LLC v. Dart*, 807 F. 3d at 230–31.

The Defendants argue that the "significant encouragement" test for government action has been interpreted to require a higher standard since the Supreme Court's ruling in *Blum v. Yaretsky*, 457 U.S. 991 (1982). Defendants also argue that Plaintiffs are unable to meet the test to show Defendants "significantly encouraged" social-media platforms to suppress free speech. Defendants further maintain Plaintiffs have failed to show "coercion" by Defendants to force social-media companies suppress protected free speech. Defendants also argue they made no threats but rather sought to "persuade" the social-media companies. Finally, Defendants maintain the private social-media companies made independent decisions to suppress certain postings.

In *Blum*, the Supreme Court held the Government "can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice in law must be deemed to be that of the state." *Blum*, 457 U.S. at 1004. Defendants argue that the bar for "significant encouragement" to convert private conduct into state action is high. Defendants maintain that *Blum*'s language does not mean that the Government is responsible for private conduct whenever the Government does more than adopt a passive position toward it. *Skinner v. Ry. Labor Execs. Ass'n.*, 489 U.S. 602, 615 (1989).

Defendants point out this is a question of degree: whether a private party should be deemed an agent or instrument of the Government necessarily turns on the "degree" of the Government's participation in the private party's activities. 489 U.S. at 614. The dispositive question is "whether the State has exercised coercive power or has provided such significant encouragement that the choice must in law be deemed to be that of the State." *VDARE Fund v. City of Colo. Springs*, 11 F.4th 1151, 1161 (10th Cir. 2021).

The Supreme Court found there was not enough "significant encouragement" by the Government in *American Manufacturers Mutual Ins. Co. v. Sullivan*, 526 U.S. 40 (1999). This case involved the constitutionality of a Pennsylvania worker's compensation statute that authorized, but did not require, insurers to withhold payments for the treatment of work-related injuries pending a "utilization" review of whether the treatment was reasonable and necessary. The plaintiffs' argument was that by amending the statute to grant the utilization review (an option they previously did not have), the State purposely encouraged insurers to withhold payments for disputed medical treatment. The Supreme Court found this type of encouragement was not enough for state action.

The United States Court of Appeal for the Fifth Circuit has also addressed the issue of government coercion or encouragement. For example, in *La. Div. Sons of Confederate Veterans v. City of Natchitoches*, 821 F. App'x 317 (5th Cir. 2020), the Sons of Confederate Veterans applied to march in a city parade that was coordinated by a private business association. The Mayor sent a letter asking the private business to prohibit the display of the Confederate battle flag. After the plaintiff's request to march in the parade was denied, the plaintiff filed suit and argued the Mayor's letter was "significant encouragement" to warrant state action. The Fifth Circuit found the letter was not "significant encouragement."

In determining whether the Government's words or actions could reasonably be interpreted as an implied threat, courts examine a number of factors, including: (1) the Defendant's regulatory or other decision-making authority over the targeted entities; (2) whether the government actors actually exercised regulatory authority over the targeted entities; (3) whether the language of the alleged threatening statements could reasonably be perceived as a threat; and (4) whether any of the targeted entities reacted in a manner evincing the perception of implicit threat. *Id.* at 114. As noted above, a public official's threat to stifle protected speech is actionable under the First Amendment and can be enjoined, even if the threat turns out to be empty. *Backpage.com, LLC v. Dart*, 807 F.3d 229, 230-31 (7th Cir. 2015); *Okwedy v. Molinari*, 333 F.3d 339, 340-41 (2d. Cir. 2003).

The closest factual case to the present situation is *O'Handley v. Weber*, 62 F.4th 1145 (9th Cir. 2023). In *O'Handley*, the plaintiff maintained that a California agency was responsible for the moderation of his posted content. The plaintiff pointed to the agency's mission to prioritize working closely with social-media companies to be "proactive" about misinformation and the flagging of one of his Twitter posts as "disinformation." The Ninth Circuit rejected the argument

that the agency had provided "significant encouragement" to Twitter to suppress speech. In rejecting this argument, the Ninth Circuit stated the "critical question" in evaluating the "significant encouragement" theory is "whether the government's encouragement is so significant that we should attribute the private party's choice to the State…" *Id.* at 1158.

Defendants cited many cases in support of their argument that Plaintiffs have not shown significant coercion or encouragement. *See VDARE Found v. City of Colo. Springs*, 11 F.4th 1151 (10th Cir. 2021), *cert. denied*, 142 S. Ct. 1208 (2022) (city's decision not to provide "support or resources" to plaintiff's event was not "such significant encouragement" to transform a private venue's decision to cancel the event into state action); *S.H.A.R.K. v. Metro Park Serving Summit Cnty.*, 499 F.3d 553 (6th Cir. 2007) (government officials' requests were "not the type of significant encouragement" that would render agreeing to those requests to be state action); *Campbell v. PMI Food Equip, Grp., Inc.*, 509 F.3d 776 (6th Cir. 2007) (no state action where government entities did nothing more than authorize and approve a contract that provided tax benefits or incentives conditioned on the company opening a local plant); *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442 (10th Cir. 1995) (payments under government contracts and the receipt of government grants and tax benefits are insufficient to establish a symbiotic relationship between the government and a private entity). Ultimately, Defendants contend that Plaintiffs have not shown that the choice to suppress free speech must in law be deemed to be that of the Government. This Court disagrees.

The Plaintiffs are likely to succeed on the merits on their claim that the United States Government, through the White House and numerous federal agencies, pressured and encouraged social-media companies to suppress free speech. Defendants used meetings and communications with social-media companies to pressure those companies to take down, reduce, and suppress the

free speech of American citizens. They flagged posts and provided information on the type of posts they wanted suppressed. They also followed up with directives to the social-media companies to provide them with information as to action the company had taken with regard to the flagged post. This seemingly unrelenting pressure by Defendants had the intended result of suppressing millions of protected free speech postings by American citizens. In response to Defendants' arguments, the Court points out that this case has much more government involvement than any of the cases cited by Defendants, as clearly indicated by the extensive facts detailed above. If there were ever a case where the "significant encouragement" theory should apply, this is it.

What is really telling is that virtually all of the free speech suppressed was "conservative" free speech. Using the 2016 election and the COVID-19 pandemic, the Government apparently engaged in a massive effort to suppress disfavored conservative speech. The targeting of conservative speech indicates that Defendants may have engaged in "viewpoint discrimination," to which strict scrutiny applies. *See Simon & Schuster, Inc.*, 505 U.S. 105 (1991).

In addition to the "significant encouragement" theory, the Government may also be held responsible for private conduct if the Government exercises coercive power over the private party in question. *Blum*, 457 U.S. at 1004. Here, Defendants argue that not only must there be coercion, but the coercion must be targeted at specific actions that harmed Plaintiffs. *Bantam Books v. Sullivan*, 372 U.S. 58 (1963) (where a state agency threatened prosecution if a distributor did not remove certain designated books or magazines it distributed that the state agency had declared objectionable); *see also Backpage.com, LLC v. Dart*, 807 F.3d 229 (7th Cir. 2015) (where a sheriff's letter demanded that two credit card issuers prohibit the use of their credit cards to purchase any ads on a particular website containing advertisements for adult services); *Okwedy v.*

*Molinari*, 333 F.3d 339 (2d Cir. 2003) (per curium) (where a municipal official allegedly pressured

a billboard company to take down a particular series of signs he found offensive).

The Defendants further argue they only made requests to the social-media companies, and

that the decision to modify or suppress content was each social-media company's independent

decision. However, when a state has so involved itself in the private party's conduct, it cannot

claim the conduct occurred as a result of private choice, even if the private party would have acted

independently. *Peterson v. City of Greenville*, 373 U.S. 244, 247–248 (1963).

Therefore, the question is not what decision the social-media company would have made,

but whether the Government "so involved itself in the private party's conduct" that the decision is

essentially that of the Government. As exhaustedly listed above, Defendants "significantly

encouraged" the social-media companies to such extent that the decision should be deemed to be

the decisions of the Government. The White House Defendants and the Surgeon General

Defendants additionally engaged in coercion of social-media companies to such extent that the

decisions of the social-media companies should be deemed that of the Government. It simply

makes no difference what decision the social-media companies would have made independently

of government involvement, where the evidence demonstrates the wide-scale involvement seen

here.

### (1) White House Defendants

The Plaintiffs allege that by use of emails, public and private messages, public and private

meetings, and other means, White House Defendants have "significantly encouraged" and

"coerced" social-media platforms to suppress protected free speech on their platforms.

The White House Defendants acknowledged at oral arguments that they did not dispute the authenticity or the content of the emails Plaintiffs submitted in support of their claims.[600] However, they allege that the emails do not show that the White House Defendants either coerced or significantly encouraged social-media platforms to suppress content of social-media postings. White House Defendants argue instead that they were speaking with social-media companies about promoting more accurate COVID-19 information and to better understand what action the companies were taking to curb the spread of COVID-19 misinformation.

White House Defendants further argue they never demanded the social-media companies to suppress postings or to change policies, and the changes were due to the social-media companies' own independent decisions. They assert that they did not make specific demands via the White House's public statements and four "asks"[601] of social-media companies.[602] Defendants contend the four "asks" were "recommendations," not demands. Additionally, Defendants argue President Biden's July 16, 2021 "they're killing people" comment was clarified on July 19, 2021, to reflect that President Biden was talking about the "Disinformation Dozen," not the social-media companies.

Although admitting White House employee Flaherty expressed frustration at times with social-media companies, White House Defendants contend Flaherty sought to better understand the companies' policies with respect to addressing the spread of misinformation and hoped to find out what the Government could do to help. Defendants contend Flaherty felt such frustration

---

[600] [Doc. No. 288 at 164–65]
[601] The White House four "asks" are: (1) measure and publicly share the impact of misinformation on their platform; (2) create a robust enforcement strategy; (3) take faster action against harmful posts; and (4) promote quality information sources in their feed algorithm.
[602] [Doc. No. 10-1 at 377–78]

because some of the things the social-media-companies told him were inconsistent with what others told him, compounded with the urgency of the COVID-19 pandemic.

Explicit threats are an obvious form of coercion, but not all coercion need be explicit. The following illustrative specific actions by Defendants are examples of coercion exercised by the White House Defendants:

(a)  "Cannot stress the degree to which this needs to be resolved immediately.  Please remove this account immediately."[603]

(b)  Accused Facebook of causing "political violence" by failing to censor false COVID-19 claims.[604]

(c)  "You are hiding the ball."[605]

(d)  "Internally we have been considering our options on what to do about it."[606]

(e)  "I care mostly about what actions and changes you are making to ensure you're not making our country's vaccine hesitancy problem worse."[607]

(f)  "This is exactly why I want to know what "Reduction" actually looks like – if "reduction" means pumping our most vaccine hesitance audience with Tucker Carlson saying it does not work… then… I'm not sure it's reduction."[608]

(g)  Questioning how the Tucker Carlson video had been "demoted" since there were 40,000 shares.[609]

(h)  Wanting to know why Alex Berenson had not been kicked off Twitter because Berenson was the epicenter of disinformation that radiated outward to the persuadable public.[610] "We want to make sure YouTube has a handle on vaccine hesitancy and is working toward making the problem better. Noted that vaccine hesitancy was a concern. That is shared by the highest ('and I mean the highest') levels of the White House."[611]

---

[603] [II. A.]
[604] [Id. A. (5)]
[605] [Id. A. (10)]
[606] [Id.]
[607] [Id. A. (11)]
[608] [Id. A. (12)]
[609] [Id. A. (15)]
[610] [Id. A. (16)]
[611] [Id. A. (17)]

(i)     After sending to Facebook a document entitled "Facebook COVID-19 Vaccine
        Misinformation Brief, which recommends much more aggressive censorship by
        Facebook.  Flaherty told Facebook sending the Brief was not a White House
        endorsement of it, but "this is circulating around the building and informing
        thinking."[612]

(j)     Flaherty stated: "Not to sound like a broken record, but how much content is being
        demoted, and how effective are you at mitigating reach and how quickly?"[613]

(k)     Flaherty told Facebook: "Are you guys fucking serious" I want an answer on what
        happened here and I want it today."[614]

(l)     Surgeon General Murthy stated: "We expect more from our technology companies.
        We're asking them to operate with greater transparency and accountability. We're
        asking them to monitor information more closely. We're asking them to
        consistently take action against misinformation super-spreaders on their
        platforms."[615]

(m)     White House Press Secretary Psaki stated: "we are in regular touch with these
        social-media platforms, and those engagements typically happen through members
        of our senior staff, but also members of our COVID-19 team. We're flagging
        problematic posts for Facebook that spread disinformation.  Psaki also stated one
        of the White House's "asks" of social-media companies was to "create a robust
        enforcement strategy."[616]

(n)     When asked about what his message was to social-media platforms when it came
        to COVID-19, President Biden stated: "they're killing people. Look, the only
        pandemic we have is among the unvaccinated and that – they're killing people."[617]

(o)     Psaki stated at the February 1, 2022, White House Press Conference that the White
        House wanted every social-media platform to do more to call out misinformation
        and disinformation and to uplift accurate information.[618]

(p)     "Hey folks, wanted to flag the below tweet and am wondering if we can get moving
        on the process of having it removed. ASAP"[619]

(q)     "How many times can someone show false COVID-19 claims before being
        removed?"

---

[612] [Id.]
[613] [Id at A. (19)]
[614] [Id.]
[615] [Id.]
[616] [Id.]
[617] [Id.]
[618] [Id. at A. (24)]
[619] [Doc. No. 174-1 at 1]

(r)     "I've been asking you guys pretty directly over a series of conversations if the biggest issues you are seeing on your platform when it comes to vaccine hesitancy and the degree to which borderline content- as you define it, is playing a role."[620]

(s)     "I am not trying to play 'gotcha' with you. We are gravely concerned that your service is one of the top drivers of vaccine hesitancy-period."[621]

(t)     "You only did this, however after an election that you helped increase skepticism in and an insurrection which was plotted, in large part, on your platform."[622]

(u)     "Seems like your 'dedicated vaccine hesitancy' policy isn't stopping the disinfo dozen." [623]

(v)     White House Communications Director, Kate Bedingfield's announcement that "the White House is assessing whether social-media platforms are legally liable for misinformation spread on their platforms, and examining how misinformation fits into the liability protection process by Section 230 of The Communication Decency Act."[624]

These actions are just a few examples of the unrelenting pressure the Defendants exerted against social-media companies. This Court finds the above examples demonstrate that Plaintiffs can likely prove that White House Defendants engaged in coercion to induce social-media companies to suppress free speech.

With respect to 47 U.S.C. § 230, Defendants argue that there can be no coercion for threatening to revoke and/or amend Section 230 because the call to amend it has been bipartisan. However, Defendants combined their threats to amend Section 230 with the power to do so by holding a majority in both the House of Representatives and the Senate, and in holding the Presidency. They also combined their threats to amend Section 230 with emails, meetings, press conferences, and intense pressure by the White House, as well as the Surgeon General Defendants. Regardless, the fact that the threats to amend Section 230 were bipartisan makes it even more

---

[620] [Id. at 11]
[621] [Id.]
[622] [Doc. No. 174-1 at 17–20]
[623] [Id. at 41]
[624] [Doc. No. 10-1 at 477–78]

likely that Defendants had the power to amend Section 230. All that is required is that the government's words or actions "could reasonably be interpreted as an implied threat." *Cuomo*, 350 F. Supp. 3d at 114. With the Supreme Court recently making clear that Section 230 shields social-media platforms from legal responsibility for what their users post, *Gonzalez v. Google*, 143 S. Ct. 1191 (2023), Section 230 is even more valuable to these social-media platforms. These actions could reasonably be interpreted as an implied threat by the Defendants, amounting to coercion.

Specifically, the White House Defendants also allegedly exercised significant encouragement such that the actions of the social-media companies should be deemed to be that of the government. The White House Defendants used emails, private portals, meetings, and other means to involve itself as "partners" with social-media platforms. Many emails between the White House and social-media companies referred to themselves as "partners." Twitter even sent the White House a "Partner Support Portal" for expedited review of the White House's requests. Both the White House and the social-media companies referred to themselves as "partners" and "on the same team" in their efforts to censor disinformation, such as their efforts to censor "vaccine hesitancy" spread. The White House and the social-media companies also demonstrated that they were "partners" by suppressing information that did not even violate the social-media companies' own policies.

Further, White House Defendants constantly "flagged" for Facebook and other social-media platforms posts the White House Defendants considered misinformation. The White House demanded updates and reports of the results of their efforts to suppress alleged disinformation, and the social-media companies complied with these demands. The White House scheduled numerous Zoom and in-person meetings with social-media officials to keep each other informed about the companies' efforts to suppress disinformation.

The White House Defendants made it very clear to social-media companies what they wanted suppressed and what they wanted amplified. Faced with unrelenting pressure from the most powerful office in the world, the social-media companies apparently complied. The Court finds that this amounts to coercion or encouragement sufficient to attribute the White House's actions to the social-media companies, such that Plaintiffs are likely to succeed on the merits against the White House Defendants.

### (2) Surgeon General Defendants

Plaintiffs allege that Surgeon General Murthy and his office engaged in a pressure campaign parallel to, and often overlapping with, the White House Defendants' campaign directed at social-media platforms. Plaintiffs further allege the Surgeon General Defendants engaged in numerous meetings and communications with social-media companies to have those companies suppress alleged disinformation and misinformation posted on their platforms.

The Surgeon General Defendants argue that the Surgeon General's role is primarily to draw attention to public health matters affecting the nation. The SG took two official actions in 2021 and in 2022. In July 2021, the Surgeon General issued a "Surgeon General's Advisory." In March 2022, the Surgeon General issued a Request For Information ("RFI"). Surgeon General Defendants argue that the Surgeon General's Advisory did not require social-media companies to censor information or make changes in their policies. Surgeon General Defendants further assert that the RFI was voluntary and did not require the social-media companies to answer.

Additionally, the Surgeon General Defendants contend they only held courtesy meetings with social-media companies, did not flag posts for censorship, and never worked with social-media companies to moderate their policies. Surgeon General Defendants also deny that they were involved with the Virality Project.

As with the White House Defendants, this Court finds that Plaintiffs are likely to succeed on the merits of their First Amendment free speech claim against the Surgeon General Defendants. Through public statements, internal emails, and meetings, the Surgeon General Defendants exercised coercion and significant encouragement such that the decisions of the social-media platforms and their actions suppressing health disinformation should be deemed to be the decisions of the government. Importantly, the suppression of this information was also likely prohibited content and/or viewpoint discrimination, entitling Plaintiffs to strict scrutiny.

The Surgeon General Defendants did pre-rollout calls with numerous social-media companies prior to publication of the Health Advisory on Misinformation. The Advisory publicly called on social-media companies "to do more" against COVID misinformation Superspreaders. Numerous calls and meetings took place between Surgeon General Defendants and private social-media companies. The "misinformation" to be suppressed was whatever the government deemed misinformation.

The problem with labeling certain discussions about COVID-19 treatment as "health misinformation" was that the Surgeon General Defendants suppressed alternative views to those promoted by the government. One of the purposes of free speech is to allow discussion about various topics so the public may make informed decisions. Health information was suppressed, and the government's view of the proper treatment for COVID-19 became labeled as "the truth." Differing views about whether COVID-19 vaccines worked, whether taking the COVID-19 vaccine was safe, whether mask mandates were necessary, whether schools and businesses should have been closed, whether vaccine mandates were necessary, and a host of other topics were suppressed. Without a free debate about these issues, each person is unable to decide for himself or herself the proper decision regarding their health. Each United States citizen has the right to

decide for himself or herself what is true and what is false. The Government and/or the OSG does not have the right to determine the truth.

The Surgeon General Defendants also engaged in a pressure campaign with the White House Defendants to pressure social-media companies to suppress health information contrary to the Surgeon General Defendants' views. After the Surgeon General's press conference on July 15, 2021, the Surgeon General Defendants kept the pressure on social-media platforms via emails, private meetings, and by requiring social-media platforms to report on actions taken against health disinformation.

The RFI by the Surgeon General Defendants also put additional pressure on social-media companies to comply with the requests to suppress free speech. The RFI sought information from private social-media companies to provide information about the spread of misinformation. The RFI stated that the office of the Surgeon General was expanding attempts to control the spread of misinformation on social-media platforms. The RFI also sought information about social-media censorship policies, how they were enforced, and information about disfavored speakers.

Taking all of this evidence together, this Court finds the Surgeon General Defendants likely engaged in both coercion and significant encouragement to such an extent that the decisions of private social-media companies should be deemed that of the Surgeon General Defendants. The Surgeon General Defendants did much more than engage in Government speech: they kept pressure on social-media companies with pre-rollout meetings, follow-up meetings, and RFI. Thus, Plaintiffs are likely to succeed on the merits of their First Amendment claim against these Defendants.

### (3) CDC Defendants

Plaintiffs allege that the CDC Defendants have engaged in a censorship campaign, together with the White House and other federal agencies, to have free speech suppressed on social-media platforms. Plaintiffs allege that working closely with the Census Bureau, the CDC flagged supposed "misinformation" for censorship on the platforms. Plaintiffs further allege that by using the acronym "BOLO," the CDC Defendants told social-media platforms what health claims should be censored as misinformation.

In opposition, Defendants assert that the CDC's mission is to protect the public's health. Although the CDC Defendants admit to meeting with and sending emails to social-media companies, the CDC Defendants argue they were responding to requests by the companies for science-based public health information, proactively alerting the social-media companies about disinformation, or advising the companies where to find accurate information. The Census Bureau argues the Interagency Agreement, entered into with the CDC in regard to COVID-19 misinformation, has expired, and that it is no longer participating with the CDC on COVID-19 misinformation issues. The CDC Defendants further deny that they directed any social-media companies to remove posts or to change their policies.

Like the White House Defendants and Surgeon General Defendants, the Plaintiffs are likely to succeed on the merits of Plaintiffs' First Amendment free speech claim against the CDC Defendants. The CDC Defendants through emails, meetings, and other communications, seemingly exercised pressure and gave significant encouragement such that the decisions of the social-media platforms to suppress information should be deemed to be the decisions of the Government. The CDC Defendants coordinated meetings with social-media companies, provided examples of alleged disinformation to be suppressed, questioned the social-media companies about

how it was censoring misinformation, required reports from social-media companies about disinformation, told the social-media companies whether content was true or false, provided BOLO information, and used a Partner Support Portal to report disinformation. Much like the other Defendants, described above, the CDC Defendants became "partners" with social-media platforms, flagging and reporting statements on social media Defendants deemed false. Although the CDC Defendants did not exercise coercion to the same extent as the White House and Surgeon General Defendants, their actions still likely resulted in "significant encouragement" by the government to suppress free speech about COVID-19 vaccines and other related issues.

Various social-media platforms changed their content-moderation policies to require suppression of content that was deemed false by CDC and led to vaccine hesitancy. The CDC became the "determiner of truth" for social-media platforms, deciding whether COVID-19 statements made on social media were true or false. And the CDC was aware it had become the "determiner of truth" for social-media platforms.  If the CDC said a statement on social media was false, it was suppressed, in spite of alternative views. By telling social-media companies that posted content was false, the CDC Defendants knew the social-media company was going to suppress the posted content. The CDC Defendants thus likely "significantly encouraged" social-media companies to suppress free speech.

Based on the foregoing examples of significant encouragement and coercion by the CDC Defendants, the Court finds that Plaintiffs are likely to succeed on the merits of their First Amendment claim against the CDC Defendants.

### (4) NIAID Defendants

Plaintiffs allege that NIAID Defendants engaged in a series of campaigns to discredit and procure the censorship of disfavored viewpoints on social media. Plaintiffs allege that Dr. Fauci

engaged in a series of campaigns to suppress speech regarding the Lab-Leak theory of COVID-19's origin, treatment using hydroxychloroquine, the GBD, the treatment of COVID-19 with Ivermectin, the effectiveness of mask mandates, and the speech of Alex Berenson.

In opposition, Defendants assert that the NIAID Defendants simply supports research to better understand, treat, and prevent infectious, immunologic, and allergic diseases and is responsible for responding to emergency public health threats. The NIAID Defendants argue that they had limited involvement with social-media platforms and did not meet with or contact the platforms to change their content or policies. The NIAID Defendants further argue that the videos, press conferences, and public statements by Dr. Fauci and other employees of NIAID was government speech.

This Court agrees that much of what the NIAID Defendants did was government speech. However, various emails show Plaintiffs are likely to succeed on the merits through evidence that the motivation of the NIAID Defendants was a "take down" of protected free speech. Dr. Francis Collins, in an email to Dr. Fauci[625] told Fauci there needed to be a "quick and devastating take down" of the GBD—the result was exactly that. Other email discussions show the motivations of the NIAID were to have social-media companies suppress these alternative medical theories. Taken together, the evidence shows that Plaintiffs are likely to succeed on the merits against the NIAID Defendants as well.

### (5) FBI Defendants

Plaintiffs allege that the FBI Defendants also suppressed free speech on social-media platforms, with the FBI and FBI's FITF playing a key role in these censorship efforts.

---

[625] [Doc. No. 207-6]

In opposition, Defendants assert that the FBI Defendants' specific job duties relate to foreign influence operations, including attempts by foreign governments to influence U.S. elections. Based on the alleged foreign interference in the 2016 U.S. Presidential election, the FBI Defendants argue that, through their meetings and emails with social-media companies, they were attempting to prevent foreign influence in the 2020 Presidential election. The FBI Defendants deny any attempt to suppress and/or change the social-media companies' policies with regard to domestic speech. They further deny that they mentioned Hunter Biden or a "hack and leak" foreign operation involving Hunter Biden.

According to the Plaintiffs' allegations detailed above, the FBI had a 50% success rate regarding social media's suppression of alleged misinformation, and it did no investigation to determine whether the alleged disinformation was foreign or by U.S. citizens. The FBI's failure to alert social-media companies that the Hunter Biden laptop story was real, and not mere Russian disinformation, is particularly troubling. The FBI had the laptop in their possession since December 2019 and had warned social-media companies to look out for a "hack and dump" operation by the Russians prior to the 2020 election. Even after Facebook specifically asked whether the Hunter Biden laptop story was Russian disinformation, Dehmlow of the FBI refused to comment, resulting in the social-media companies' suppression of the story. As a result, millions of U.S. citizens did not hear the story prior to the November 3, 2020 election. Additionally, the FBI was included in Industry meetings and bilateral meetings, received and forwarded alleged misinformation to social-media companies, and actually mislead social-media companies in regard to the Hunter Biden laptop story. The Court finds this evidence demonstrative of significant encouragement by the FBI Defendants.

Defendants also argue that Plaintiffs are attempting to create a "deception" theory of government involvement with regards to the FBI Defendants. Plaintiffs allege the FBI told the social-media companies to watch out for Russian disinformation prior to the 2020 Presidential election and then failed to tell the companies that the Hunter Biden laptop was not Russian disinformation. The Plaintiffs further allege Dr. Fauci colluded with others to cover up the Government's involvement in "gain of function" research at the Wuhan lab in China, which may have resulted in the creation of the COVID-19 pandemic.

Although this Court agrees there is no specified "deception" test for government action, a state may not induce private persons to accomplish what it is constitutionally forbidden to accomplish. *Norwood*, 413 U.S. at 455. It follows, then, that the government may not deceive a private party either—it is just another form of coercion. The Court has evaluated Defendants' conduct under the "coercion" and/or "significant encouragement" theories of government action, and finds that the FBI Defendants likely exercised "significant encouragement" over social-media companies.

Through meetings, emails, and in-person contacts, the FBI intrinsically involved itself in requesting social-media companies to take action regarding content the FBI considered to be misinformation. The FBI additionally likely misled social-media companies into believing the Hunter Biden laptop story was Russian disinformation, which resulted in suppression of the story a few weeks prior to the 2020 Presidential election. Thus, Plaintiffs are likely to succeed in their claims that the FBI exercised "significant encouragement" over social-media platforms such that the choices of the companies must be deemed to be that of the Government.

### (5) CISA Defendants

Plaintiffs allege the CISA Defendants served as a "nerve center" for federal censorship efforts by meeting routinely with social-media platforms to increase censorship of speech disfavored by federal officials, and by acting as a "switchboard" to route disinformation concerns to social-media platforms.

In response, the CISA Defendants maintain that CISA has a mandate to coordinate with federal and non-federal entities to carry out cybersecurity and critical infrastructure activities. CISA previously designated election infrastructure as a critical infrastructure subsector. CISA also collaborates with state and local election officials; as part of its duties, CISA coordinates with the EIS-GCC, which is comprised of state, local, and federal governmental departments and agencies. The EI-SSC is comprised of owners or operators with significant business or operations in U.S. election infrastructure systems or services. After the 2020 election, the EI-SCC and EIS-GCC launched a Joint Managing Mis/Disinformation Group to coordinate election infrastructure security efforts. The CISA Defendants argue CISA supports the Joint Managing Mis-Disinformation Group but does not coordinate with the EIP or the CIS. Despite DHS providing financial assistance to the CIS through a series of cooperative agreement awards managed by CISA, the CISA Defendants assert that the work scope funded by DHS has not involved the CIS performing disinformation-related tasks.

Although the CISA Defendants admit to being involved in "switchboarding" work during the 2020 election cycle, CISA maintains it simply referred the alleged disinformation to the social-media companies, who made their own decisions to suppress content. CISA maintains it included a notice with each referral to the companies, which stated that CISA was not demanding censorship. CISA further maintains it discontinued its switchboarding work after the 2020 election

cycle and has no intention to engage in switchboarding for the next election.[626] CISA further argues that even though it was involved with USG-Industry meetings with other federal agencies and social-media companies, they did not attempt to "push" social-media companies to suppress content or to change policies.

The Court finds that Plaintiffs are likely to succeed on the merits of their First Amendment claim against the CISA Defendants. The CISA Defendants have likely exercised "significant encouragement" with social-media platforms such that the choices of the social-media companies must be deemed to be that of the government. Like many of the other Defendants, the evidence shows that the CISA Defendants met with social-media companies to both inform and pressure them to censor content protected by the First Amendment. They also apparently encouraged and pressured social-media companies to change their content-moderation policies and flag disfavored content.

But the CISA Defendants went even further. CISA expanded the word "infrastructure" in its terminology to include "cognitive" infrastructure, so as to create authority to monitor and suppress protected free speech posted on social media. The word "cognitive" is an adjective that means "relating to cognition." "Cognition" means the mental action or process of acquiring knowledge and understanding through thought, experiences, and the senses.[627] The Plaintiffs are likely to succeed on the merits on its claim that the CISA Defendants believe they had a mandate to control the process of acquiring knowledge. The CISA Defendants engaged with Stanford University and the University of Washington to form the EIP, whose purpose was to allow state and local officials to report alleged election misinformation so it could be forwarded to the social-

---

[626] However, at oral argument, CISA attorneys were unable to verify whether or not CISA would be involved in switchboarding during the 2024 election. [Doc. No. 288 at 122]
[627] Google English Dictionary

media platforms to review. CISA used a CISA-funded non-profit organization, the CIS, to perform the same actions. CISA used interns who worked for the Stanford Internal Observatory, which is part of the EIP, to address alleged election disinformation. All of these worked together to forward alleged election misinformation to social-media companies to view for censorship. They also worked together to ensure the social-media platforms reported back to them on what actions the platforms had taken. And in this process, no investigation was made to determine whether the censored information was foreign or produced by U.S. citizens.

According to DiResta, head of EIP, the EIP was designed "to get around unclear legal authorities, including very real First Amendment questions that would arise if CISA or the other government agencies were to monitor and flag information for censorship on social media."[628] Therefore, the CISA Defendants aligned themselves with and partnered with an organization that was designed to avoid Government involvement with free speech in monitoring and flagging content for censorship on social-media platforms.

At oral arguments on May 26, 2023, Defendants argued that the EIP operated independently of any government agency. The evidence shows otherwise: the EIP was started when CISA interns came up with the idea; CISA connected the EIP with the CIS, which is a CISA-funded non-profit that channeled reports of misinformation from state and local government officials to social-media companies; CISA had meetings with Stanford Internet Observatory officials (a part of the EIP), and both agreed to "work together"; the EIP gave briefings to CISA; and  the CIS (which CISA funds) oversaw the Multi-State Information Sharing and Analysis Center ("MS-ISAC") and the Election Infrastructure Information Sharing and Analysis Center

---

[628] [Doc. No. 209-5 at 4]

("EI-ISAC"), both of which are organizations of state and local governments that report alleged election misinformation.

CISA directs state and local officials to CIS and connected the CIS with the EIP because they were working on the same mission and wanted to be sure they were all connected. CISA served as a mediating role between CIS and EIP to coordinate their efforts in reporting misinformation to social-media platforms, and there were direct email communications about reporting misinformation between EIP and CISA. Stamos and DiResta of the EIP also have roles in CISA on CISA advisory committees. EIP identifies CISA as a "partner in government." The CIS coordinated with EIP regarding online misinformation. The EIP publication, "The Long Fuse,"[629] states the EIP has a focus on election misinformation originating from "domestic" sources across the United States.[630] EIP further stated that the primary repeat spreaders of false and misleading narratives were "verified blue-checked accounts belonging to partisan media outlets, social-media influencers, and political figures, including President Trump and his family."[631] The EIP further disclosed it held its first meeting with CISA to present the EIP concept on July 9, 2020, and EIP was officially formed on July 26, 2020, "in consultation with CISA."[632] The Government was listed as one of EIP's Four Major Stakeholder Groups, which included CISA, the GEC, and ISAC.[633]

As explained, the CISA Defendants set up a "switchboarding" operation, primarily consisting of college students, to allow immediate reporting to social-media platforms of alleged election disinformation. The "partners" were so successful with suppressing election

---

[629] [Doc. No. 209-2]
[630] [Id. at 9]
[631] [Id. at 12]
[632] [Id. at 20–21]
[633] [Id. at 30]

disinformation, they later formed the Virality Project, to do the same thing with COVID-19 misinformation that the EIP was doing for election disinformation. CISA and the EIP were completely intertwined. Several emails from the switchboarding operation sent by intern Pierce Lowary shows Lowary directly flagging posted content and sending it to social-media companies. Lowary identified himself as "working for CISA" on the emails.[634]

On November 21, 2021, CISA Director Easterly stated: "We live in a world where people talk about alternative facts, post-truth, which I think is really, really dangerous if people get to pick their own facts." The Free Speech Clause was enacted to prohibit just what Director Easterly is wanting to do: allow the government to pick what is true and what is false. The Plaintiffs are likely to succeed on the merits of their First Amendment claim against the CISA Defendants for "significantly encouraging" social-media companies to suppress protected free speech.

### (5) State Department Defendants

Plaintiffs allege the State Department Defendants, through the State Department's GEC, were also involved in suppressing protected speech on social-media platforms.

In response, the State Department Defendants argue that they, along with the GEC, play a critical role in coordinating the U.S. government efforts to respond to foreign influence. The State Department Defendants argue that they did not flag specific content for social-media companies and did not give the company any directives. The State Department Defendants also argue that they do not coordinate with or work with the EIP or the CIS.

The Court finds that Plaintiffs are also likely to succeed on the merits regarding their First Amendment Free Speech Clause against the State Department Defendants. For many of the same reasons the Court reached its conclusion as to the CISA Defendants, the State Department

---

[634] [Doc. No. 227-2 at 15, 23, 42, 65 & 78]

Defendants have exercised "significant encouragement" with social-media platforms, such that the choices of the social-media companies should be deemed to be that of the government. As discussed previously, both CISA and the GEC were intertwined with the VP, EIP, and Stanford Internet Observatory.

The VP, EIP, and Stanford Internet Observatory are not defendants in this proceeding. However, their actions are relevant because government agencies have chosen to associate, collaborate, and partner with these organizations, whose goals are to suppress protected free speech of American citizens. The State Department Defendants and CISA Defendants both partnered with organizations whose goals were to "get around" First Amendment issues.[635] In partnership with these non-governmental organizations, the State Department Defendants flagged and reported postings of protected free speech to the social-media companies for suppression. The flagged content was almost entirely from political figures, political organizations, alleged partisan media outlets, and social-media all-stars associated with right-wing or conservative political views, demonstrating likely "viewpoint discrimination." Since only conservative viewpoints were allegedly suppressed, this leads naturally to the conclusion that Defendants intended to suppress only political views they did not believe in. Based on this evidentiary showing, Plaintiffs are likely to succeed on the merits of their First Amendment claims against the State Department Defendants.

### (6) Other Defendants

Other Defendants in this proceeding are the U.S. Food and Drug Administration, U. S. Department of Treasury, U.S. Election Assistance Commission, U. S. Department of Commerce, and employees Erica Jefferson, Michael Murray, Wally Adeyemo, Steven Frid, Brad Kimberly, and Kristen Muthig. Plaintiffs confirmed at oral argument that they are not seeking a preliminary

---

[635] [Doc. No. 209-5 at 4]

injunction against these Defendants. Additionally, Plaintiffs assert claims against the Disinformation Governance Board ("DGB") and its Director Nina Jankowicz. Defendants have provided evidence that the DGB has been disbanded, so any claims against these Defendants are moot. Thus, this Court will not address the issuance of an injunction against any of these Defendants.

### ii.  Joint Participation

The Plaintiffs contend that the Defendants are not only accountable for private conduct that they coerced or significantly encouraged, but also for private conduct in which they actively participated as "joint participants." *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 725 (1961). Although most often "joint participation" occurs through a conspiracy or collusive behavior, *Hobbs v. Hawkins*, 968 F.2d 471, 480 (5th Cir. 1992), even without a conspiracy, when a plaintiff establishes the government is responsible for private action arising out of "pervasive entwinement of public institutions and public officials in the private entity's composition and workings." *Brentwood Academy. v. Tennessee Secondary Sch. Athletic Ass'n.*, 531 U. S. 288, 298 (2001).

Under the "joint action" test, the Government must have played an indispensable role in the mechanism leading to the disputed action. *Frazier v. Bd. Of Trs. Of N.W. Miss. Reg.'l Med. Ctr.*, 765 F.2d 1278, 1287-88 (5th Cir.), *amended*, 777 F.2d 329 (5th Cir. 1985). When a plaintiff establishes "the existence of a conspiracy involving state action," the government becomes responsible for all constitutional violations committed in furtherance of the conspiracy by a party to the conspiracy. *Armstrong v. Ashley*, 60 F.4th 262, (5th Cir. 2023). Conspiracy can be charged as the legal mechanism through which to impose liability on each and all of the defendants without

regard to the person doing the particular act that deprives the plaintiff of federal rights. *Pfannstiel v. City of Marion*, 918 F.2d 1178, 1187 (5th Cir. 1990).

Much like conspiracy and collusion, joint activity occurs whenever the government has "so far insinuated itself" into private affairs as to blur the line between public and private action. *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 357 (1974). To become "pervasively entwined" in a private entity's workings, the government need only "significantly involve itself in the private entity's actions and decision-making"; it is not necessary to establish that "state actors … literally 'overrode' the private entity's independent judgment." R*awson v. Recovery Innovations, Inc.*, 975 F.3d 742, 751, 753 (9th Cir. 2020). "Pervasive intertwinement" exists even if the private party is exercising independent judgment. *West v. Atkins*, 487 U.S. 42, 52, n.10 (1988); *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1454 (10th Cir. 1995) (holding that a "substantial degree of cooperative action" can constitute joint action).

For the same reasons as this Court has found Plaintiffs met their burden to show "significant encouragement" by the White House Defendants, the Surgeon General Defendants, the CDC Defendants, the FBI Defendants, the NIAID Defendants, the CISA Defendants, and the State Department Defendants, this Court finds the Plaintiffs are likely to succeed on the merits that these Defendants "jointly participated" in the actions of the private social-media companies as well, by insinuating themselves into the social-media companies' private affairs and blurring the line between public and private action.[636]

However, this Court finds Plaintiffs are not likely to succeed on the merits that the "joint participation" occurred as a result of a conspiracy with the social-media companies. The evidence

---

[636] It is not necessary to repeat the details discussed in the "significant encouragement" analysis in order to find Plaintiffs have met their initial burden.

thus far shows that the social-media companies cooperated due to coercion, not because of a conspiracy.

This Court finds the White House Defendants, the Surgeon General Defendants, the CDC Defendants, the NIAID Defendants, the FBI Defendants, the CISA Defendants, and the State Department Defendants likely "jointly participated" with the social-media companies to such an extent that said Defendants have become "pervasively entwined" in the private companies' workings to such an extent as to blur the line between public and private action. Therefore, Plaintiffs are likely to succeed on the merits that the government Defendants are responsible for the private social-media companies' decisions to censor protected content on social-media platforms.

### iii.  Other Arguments

While not admitting any fault in the suppression of free speech, Defendants blame the Russians, COVID-19, and capitalism for any suppression of free speech by social-media companies. Defendants argue the Russian social-media postings prior to the 2016 Presidential election caused social-media companies to change their rules with regard to alleged misinformation. The Defendants argue the Federal Government promoted necessary and responsible actions to protect public health, safety, and security when confronted by a deadly pandemic and hostile foreign assaults on critical election infrastructure. They further contend that the COVID-19 pandemic resulted in social-media companies changing their rules in order to fight related disinformation. Finally, Defendants argue the social-media companies' desire to make money from advertisers resulted in change to their efforts to combat disinformation. In other words, Defendants maintain they had nothing to do with Plaintiffs' censored speech and blamed any suppression of free speech on the Russians, COVID-19, and the companies' desire to make

money. The social-media platforms and the Russians are of course not defendants in this proceeding, and neither are they bound by the First Amendment. The only focus here is on the actions of the Defendants themselves.

Although the COVID-19 pandemic was a terrible tragedy, Plaintiffs assert that it is still not a reason to lessen civil liberties guaranteed by our Constitution. "If human nature and history teaches anything, it is that civil liberties face grave risks when governments proclaim indefinite states of emergency." *Does 1-3 v. Mills*, 142 S. Ct. 17, 20–21 (2021) (Gorsuch, J., dissenting). The "grave risk" here is arguably the most massive attack against free speech in United States history.

Another argument of Defendants is that the previous Administration took the same actions as Defendants. Although the "switchboarding" by CISA started in 2018, there is no indication or evidence yet produced in this litigation that the Trump Administration had anything to do with it. Additionally, whether the previous Administration suppressed free speech on social media is not an issue before this Court and would not be a defense to Defendants even if it were true.

Defendants also argue that a preliminary injunction would restrict the Defendants' right to government speech and would transform government speech into government action whenever the Government comments on public policy matters. The Court finds, however, that a preliminary injunction here would not prohibit government speech. The traditional test used to differentiate government speech from private speech discusses three relevant factors: (1) whether the medium at issue has historically been used to communicate messages from the government; (2) whether the public reasonably interprets the government to be the speaker; and (3) whether the government maintains editorial control over the speech. *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 465–80 (2009). A government entity has the right to speak for itself and is entitled to say what it wishes and express the views it wishes to express. The Free Speech Clause restricts government

regulation of private speech; it does not regulate government speech. *Pleasant Grove City, Utah*,

555 U.S. at 468.

The Defendants argue that by making public statements, this is nothing but government
speech. However, it was not the public statements that were the problem. It was the alleged use of
government agencies and employees to coerce and/or significantly encourage social-media
platforms to suppress free speech on those platforms. Plaintiffs point specifically to the various
meetings, emails, follow-up contacts, and the threat of amending Section 230 of the
Communication Decency Act. Plaintiffs have produced evidence that Defendants did not just use
public statements to coerce and/or encourage social-media platforms to suppress free speech, but
rather used meetings, emails, phone calls, follow-up meetings, and the power of the government
to pressure social-media platforms to change their policies and to suppress free speech. Content
was seemingly suppressed even if it did not violate social-media policies. It is the alleged coercion
and/or significant encouragement that likely violates the Free Speech Clause, not government
speech, and thus, the Court is not persuaded by Defendants' arguments here.

### b. Standing

The United States Constitution, via Article III, limits federal courts' jurisdiction to "cases"
and "controversies." *Sample v. Morrison*, 406 F.3d 310, 312 (5th Cir. 2005) (*citing* U.S. Const.
art. III, § 2). The "law of Article III standing, which is built on separation-of-powers principles,
serves to prevent the judicial process from being used to usurp the powers of the political
branches." *Town of Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433, 435 (2017) (citation omitted).
Thus, "the standing question is whether the plaintiff has alleged such a personal stake in the
outcome of the controversy as to warrant [its] invocation of federal-court jurisdiction and to justify
exercise of the court's remedial powers on his behalf." *Warth v. Seldin*, 422 U.S. 490, 498-99

(1975) (citation and internal quotation marks omitted). The Article III standing requirements apply to claims for injunctive and declaratory relief. *See Seals v. McBee*, 898 F.3d 587, 591 (5th Cir. 2018), *as revised* (Aug. 9, 2018); *Lawson v. Callahan*, 111 F.3d 403, 405 (5th Cir. 1997).

Article III standing is comprised of three essential elements. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016) (citation omitted). "The plaintiff must have (1) suffered an injury-in-fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements." *Id.* (internal citations omitted). Furthermore, "[a] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Town of Chester, N.Y.*, 581 U.S. at 439 (citations omitted). However, the presence of one party with standing "is sufficient to satisfy Article III's case-or-controversy requirement." *Texas*, 809 F.3d 134 (*citing Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006)).

In the context of a preliminary injunction, it has been established that "the 'merits' required for the plaintiff to demonstrate a likelihood of success include not only substantive theories but also the establishment of jurisdiction." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015). In order to establish standing, the plaintiff must demonstrate that they have encountered or suffered an injury attributable to the defendant's challenged conduct and that such injury is likely to be resolved through a favorable decision. *Lujan v. Def. of Wildlife*, 504 U.S. 555, 560–61 (1992). Further, during the preliminary injunction stage, the movant is only required to demonstrate a likelihood of proving standing. *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020). Defendants raise challenges to each essential element of standing for both the Private Plaintiffs and the States. Each argument will be addressed in turn below. For the reasons stated

herein, the Court finds that the Plaintiffs have demonstrated a likelihood of satisfying Article III's standing requirements.

### i.    Injury-in-fact

Plaintiffs seeking to establish injury-in-fact must show that they suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Spokeo*, 578 U.S. at 339 (citations and internal quotation marks omitted). For an injury to be "particularized," it must "affect the plaintiff in a personal and individual way." *Id.* (citations and internal quotation marks omitted).

Plaintiffs argue that that they have asserted violations of their First Amendment right to speak and listen freely without government interference.[637] In response, Defendants contend that Plaintiffs' allegations rest on dated declarations that focus on long-past conduct, making Plaintiffs' fears of imminent injury entirely speculative.[638] The Court will first address whether the Plaintiff States are likely to prove an injury-in-fact. Then the court will examine whether the Individual Plaintiffs are likely to prove an injury-in-fact. For the reasons explained below, both the Plaintiff States and Individual Plaintiffs are likely to prove an injury-in-fact.

### (1) Plaintiff States

In denying Defendants' Motion to Dismiss,[639] this Court previously found that the Plaintiff States had sufficiently alleged injury-in-fact to satisfy Article III standing under either a direct injury or *parens patriae* theory of standing and that the States were entitled to special solicitude in the standing analysis.[640] At the preliminary injunction stage, the issue becomes whether the Plaintiffs are likely to prove standing. *See Speech First, Inc.*, 979 F.3d, at 330. The evidence

---

[637] *See* [Doc. No. 214, at 66]
[638] *See* [Doc. No. 266, at 151]
[639] [Doc. No. 128]
[640] [Doc. No. 224, at 20–33]

produced thus far through discovery shows that the Plaintiff States are likely to establish an injury-in-fact through either a *parens patriae* or direct injury theory of standing.

*Parens patriae*, which translates to "parent of the country," traditionally refers to the state's role as a sovereign and guardian for individuals with legal disabilities. *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 600 n.8 (1982) (*quoting* Black's Law Dictionary 1003 (5th ed. 1979)). The term "*parens patriae* lawsuit" has two meanings: it can denote a lawsuit brought by the state on behalf of individuals unable to represent themselves, or a lawsuit initiated by the state to protect its "quasi-sovereign" interests. *Id.* at 600; *see also Kentucky v. Biden*, 23 F.4th 585, 596–98 (6th Cir. 2022); *Chapman v. Tristar Prod., Inc.*, 940 F.3d 299, 305 (6th Cir. 2019). A lawsuit based on the former meaning is known as a "third-party" *parens patriae* lawsuit, and it is clearly established law that states cannot bring such lawsuits against the federal government. *Kentucky*, 23 F.4th at 596. Thus, to have *parens patriae* standing, the Plaintiff States must show a likelihood of establishing an injury to one or more of their quasi-sovereign interests.

In *Snapp*, the United States Supreme Court determined that Puerto Rico had *parens patriae* standing to sue the federal government to safeguard its quasi-sovereign interests. *Snapp*, 458 U.S. at 608. The Court identified two types of injuries to a state's quasi-sovereign interests: one is an injury to a significant portion of the state's population, and the other is the exclusion of the state and its residents from benefiting from participation in the federal system. *Id.* at 607–608. The Court did not establish definitive limits on the proportion of the population that must be affected but suggested that an indication could be whether the injury is something the state would address through its sovereign lawmaking powers. *Id.* at 607. Based on the injuries alleged by Puerto Rico, the Court found that the state had sufficiently demonstrated harm to its quasi-sovereign interests and had *parens patriae* standing to sue the federal government. *Id.* at 609–10.

In *Massachusetts v. E.P.A.*, 549 U.S. 497 (2007), the United States Supreme Court further

clarified the distinction between third-party and quasi-sovereign *parens patriae* lawsuits. There,

the Court concluded that Massachusetts had standing to sue the EPA to protect its quasi-sovereign

interests. The Court emphasized the distinction between allowing a state to protect its citizens from

federal statutes (which is prohibited) and permitting a state to assert its rights under federal law

(which it has standing to do). *Massachusetts*, 549 U.S. at 520 n.17. Because Massachusetts sought

to assert its rights under a federal statute rather than challenge its application to its citizens, the

Court determined that the state had *parens patriae* standing to sue the EPA.

Here, the Plaintiff States alleged and have provided ample evidence to support injury to

two quasi-sovereign interests: the interest in safeguarding the free-speech rights of a significant

portion of their respective populations and the interest in ensuring that they receive the benefits

from participating in the federal system. Defendants argue that this theory of injury is too

attenuated and that Plaintiffs are unlikely to prove any direct harm to the States' sovereign or quasi-

sovereign interests, but the Court does not find this argument persuasive.

Plaintiffs have put forth ample evidence regarding extensive federal censorship that

restricts the free flow of information on social-media platforms used by millions of Missourians

and Louisianians, and very substantial segments of the populations of Missouri, Louisiana, and

every other State.[641] The Complaint provides detailed accounts of how this alleged censorship

harms "enormous segments of [the States'] populations." Additionally, the fact that such extensive

examples of suppression have been uncovered through limited discovery suggests that the

---

[641] *See supra*, pp. 8–94 (detailing the extent and magnitude of Defendants' pressure and coercion tactics with social-media companies); *See also* [Doc. No. 214-1, at ¶¶ 1348 (noting that Berenson had nationwide audiences and over 200,000 followers when he was de-platformed on Twitter), 1387 (noting that the Gateway Pundit had more than 1.3 million followers across its social-media accounts before it was suspended), 1397–1409 (noting that Hines has approximately 13,000 followers each on her Health Freedom Louisiana and Reopen Louisiana Facebook pages, approximately 2,000 followers on two other Health Freedom Group Louisiana pages, and that the former Facebook pages have faced increasing censorship penalties and that the latter pages were de-platformed completely), etc.]

censorship explained above could merely be a representative sample of more extensive suppressions inflicted by Defendants on countless similarly situated speakers and audiences, including audiences in Missouri and Louisiana. The examples of censorship produced thus far cut against Defendants' characterization of Plaintiffs' fear of imminent future harm as "entirely speculative" and their description of the Plaintiff States' injuries as "overly broad and generalized grievance[s]."[642] The Plaintiffs have outlined a federal regime of mass censorship, presented specific examples of how such censorship has harmed the States' quasi-sovereign interests in protecting their residents' freedom of expression, and demonstrated numerous injuries to significant segments of the Plaintiff States' populations.

Moreover, the materials produced thus far suggest that the Plaintiff States, along with a substantial segment of their populations, are likely to show that they are being excluded from the benefits intended to arise from participation in the federal system. The U.S. Constitution, like the Missouri and Louisiana Constitutions, guarantees the right of freedom of expression, encompassing both the right to speak and the right to listen. U.S. Const. amend. I; *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 756–57 (1976). The United States Supreme Court has acknowledged the freedom of expression as one of the most significant benefits conferred by the federal Constitution. *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion."). Plaintiffs have demonstrated that they are likely to prove that federal agencies, actors, and officials in their official capacity are excluding the Plaintiff States

---

[642] [Doc. No. 266, at 151]

and their residents from this crucial benefit that is meant to flow from participation in the federal system. *See Snapp*, 458 U.S. at 608.

Accordingly, the Court finds that the States have alleged injuries under a *parens patriae* theory of standing because they are likely to prove injuries to the States' quasi-sovereign interests in protecting the constitutionally bestowed rights of their citizens.

Further, Plaintiffs have demonstrated direct censorship injuries that satisfy the requirements of Article III as injuries in fact.[643] Specifically, the Plaintiffs contend that Louisiana's Department of Justice, which encompasses the office of its Attorney General, faced direct censorship on YouTube for sharing video footage wherein Louisianans criticized mask mandates and COVID-19 lockdown measures on August 18, 2021, immediately following the federal Defendants' strong advocacy for COVID-related "misinformation" censorship.[644] Moreover, a Louisiana state legislator experienced censorship on Facebook when he posted content addressing the vaccination of children against COVID-19.[645] Similarly, during public meetings concerning proposed county-wide mask mandates held by St. Louis County, a political subdivision of Missouri, certain citizens openly expressed their opposition to mask mandates. However, YouTube censored the entire videos of four public meetings, removing the content because some citizens expressed the view that masks are ineffective.[646] Therefore, this Court finds that the Plaintiff States have also demonstrated a likelihood of establishing an injury-in-fact under a theory of direct injury sufficient to satisfy Article III.

---

[643] [Doc. No. 214-1, at ¶¶1428–1430]
[644] [Id. at ¶1428]
[645] [Id. at ¶1429]
[646] [Id. at ¶ 1430]

Accordingly, for the reasons stated above and explained in this Court's ruling on the Motion to Dismiss,[647] the Plaintiff States are likely to succeed on establishing an injury-in-fact under Article III.

### (2) Individual Plaintiffs

In *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) ("*SBA List*"), the Supreme Court held that an allegation of future injury may satisfy the Article III injury-in-fact requirement if there is a "substantial risk" of harm occurring. (*quoting Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). In *SBA List*, the petitioner challenged a statute that prohibited making false statements during political campaigns. *Id.* at 151–52. The Court considered the justiciability of the pre-enforcement challenge and whether it alleged a sufficiently imminent injury under Article III. It noted that pre-enforcement review is warranted when the threatened enforcement is "sufficiently imminent." *Id.* at 159. The Court further emphasized that past enforcement is indicative that the threat of enforcement is not "chimerical." *Id.* at 164 (*quoting Steffel v. Thompson*, 415 U.S. 452, 459 (1974)).

Likewise, in *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 302 (1979), the Supreme Court found that the plaintiffs satisfied Article III's injury-in-fact requirement because the fear of future injury was not "imaginary or wholly speculative." There, the Court considered a pre-enforcement challenge to a statute that deemed it an unfair labor practice to encourage consumer boycotts through deceptive publicity. *Id.* at 301. Because the plaintiffs had engaged in past consumer publicity campaigns and intended to continue those campaigns in the future, the Court found their challenge to the consumer publicity provision satisfied Article III. *Id.* at 302. Similar pre-enforcement review was recognized in *Virginia v. Am. Booksellers Ass'n, Inc.*, 484

---

[647] [Doc. No. 214, at 20–33]

U.S. 383, 386 (1988), where the Supreme Court held that booksellers could seek review of a law criminalizing the knowing display of "harmful to juveniles" material for commercial purposes, as defined by the statute. *Virginia*, 484 U.S. at 386 (*certified question answered sub nom. Commonwealth v. Am. Booksellers Ass'n, Inc.*, 236 Va. 168 (1988)).

Here, each of the Individual Plaintiffs are likely to demonstrate an injury-in-fact through a combination of past and ongoing censorship. Bhattacharya, for instance, is the apparent victim of an ongoing "campaign" of social-media censorship, which indicates that he is likely to experience future acts of censorship.[648] Similarly, Kulldorff attests to a coordinated federal censorship campaign against the Great Barrington Declaration, which implies future censorship.[649] Kulldorff's ongoing censorship experiences on his personal social-media accounts provide evidence of ongoing harm and support the expectation of imminent future harm.[650] Kheriaty also affirms ongoing and anticipated future injuries, noting that the issue of "shadow banning" his social-media posts has intensified since 2022.[651]

Hoft and Hines present similar accounts of past, ongoing, and anticipated future censorship injuries. Defendants even appear to be currently involved in an ongoing project that encourages and engages in censorship activities specifically targeting Hoft's website.[652] Hines, too, recounts past and ongoing censorship injuries, stating that her personal Facebook page, as well as the pages

---

[648] *See* [Doc. No. 214-1, ¶787 (an email from Dr. Francis Collins to Dr. Fauci and Cliff Lane which read: "Hi [Dr. Fauci] and Cliff, See https://gbdeclaration.org. This proposal from the three fringe epidemiologists who met with the Secretary seems to be getting a lot of attention – and even a co-signature from Nobel Prize winner Mike Leavitt at Stanford. There needs to be a quick and devastating published take down of its premises. I don't see anything like that online yet – is it underway?"), ¶¶1368–1372 (describing the covert and ongoing censorship campaign against him)]

[649] *See* [Id. at ¶¶1373–1380 (where Kulldorff explains an ongoing campaign of censorship against his personal social-media accounts, including censored tweets, censored posts criticizing mask mandates, removal of LinkedIn posts, and the ongoing permanent suspension of his LinkedIn account)]

[650] [Id.]

[651] [Id. at ¶¶1383–1386]

[652] *See* [Id. at ¶¶1387–1396 (describing the past and ongoing campaign against his website, the Gateway Pundit, which resulted in censorship on Facebook, Twitter, Instagram, and YouTube)]

of Health Freedom Louisiana and Reopen Louisiana, are constantly at risk of being completely de-platformed.[653] At the time of her declaration, Hines' personal Facebook account was under an ongoing ninety-day restriction. She further asserts, and the evidence supplied in support of the preliminary injunction strongly implies, that these restrictions can be directly traced back to federal officials.

Each of the Private Plaintiffs alleges a combination of past, ongoing, and anticipated future censorship injuries. Their allegations go beyond mere complaints about past grievances. Moreover, they easily satisfy the substantial risk standard. The threat of future censorship is significant, and the history of past censorship provides strong evidence that the threat of further censorship is not illusory or speculative. Plaintiffs' request for an injunction is not solely aimed at addressing the initial imposition of the censorship penalties but rather at preventing any continued maintenance and enforcement of such penalties. Therefore, the Court concludes that the Private Plaintiffs have fulfilled the injury-in-fact requirement of Article III.

Based on the reasons outlined above, the Court determines that both the States and Private Plaintiffs have satisfied the injury-in-fact requirement of Article III.

### ii.     Traceability

To establish traceability, or "causation" in this context, a plaintiff must demonstrate a "direct relation between the injury asserted and the injurious conduct alleged." *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992). Therefore, courts examining this element of standing must assess the remoteness, if any, between the plaintiff's injury and the defendant's actions. As explained in *Ass'n of Am. Physicians & Surgeons v. Schiff*, the plaintiff must establish that it is "'substantially probable that the challenged acts of the defendant, not of some absent third party'

---

[653] *See* [Id. at ¶¶1397–1411]

caused or will cause the injury alleged." 518 F. Supp. 3d 505, 513 (D.D.C. 2021), *aff'd sub nom.*

*Ass'n of Am. Physicians & Surgeons, Inc. v. Schiff*, 23 F.4th 1028 (D.C. Cir. 2022) ("*AAPS II*")

(quoting Fla. Audubon Soc. v. Bentsen, 94 F.3d 658, 663 (D.C. Cir. 1996)).

Plaintiffs argue that they are likely to prove that their injuries are fairly traceable to

Defendants' actions of inducing and jointly participating in the social-media companies'

viewpoint-based censorship under a theory of "but-for" causation, conspiracy, or aiding and

abetting.[654] In support, they cite the above-mentioned examples of switchboarding and other

pressure tactics employed by Defendants.[655] In response, Defendants assert that there is no basis

upon which this Court can conclude that the social-media platforms made the disputed content-

moderation decisions because of government pressure.[656] For the reasons explained below, the

Court finds that Plaintiffs are likely to prove that their injuries are fairly traceable to the conduct

of the Defendants.

In *Duke Power Co. v. Carolina Envt. Study Grp.*, the United States Supreme Court found

that a plaintiff's injury was fairly traceable to a statute under a theory of "but-for" causation. 438

U.S. 59 (1978). The plaintiffs, who were comprised in part of individuals living near the proposed

sites for nuclear plants, challenged a statute that limited the aggregate liability for a single nuclear

accident under the theory that, but for the passing of the statute, the nuclear plants would not have

been constructed. *Id.* at 64–65. The Supreme Court agreed with the district court's finding that

---

[654] [Doc. No. 204, at 67–68]

[655] [Id. at 69–71 (*citing* Doc. No. 214-1, ¶¶57, 64 "(promising the White House that Facebook would censor "often-true" but "sensationalized" content)"; ¶ 73 "(imposing forward limits on non-violative speech on WhatsApp)"; ¶¶ 89-92 "(assuring the White House that Facebook will use a "spectrum of levers" to censor content that "do[es] not violate our Misinformation and Harm policy, including "true but shocking claims or personal anecdotes, or discussing the choice to vaccinate in terms of personal and civil liberties")"; ¶¶ 93-100 "(agreeing to censor Tucker Carlson's content at the White House's behest, even though it did not violate platform policies)", ¶¶ 103-104 "(Twitter deplatforming Alex Berenson at White House pressure)"; ¶ 171 "(Facebook deplatformed the Disinformation Dozen immediately after these comments). Facebook officials scrambled to get back into the White House's good graces. Id. ¶¶ 172, 224 (pleading for "de-escalation" and "working together").")]

[656] [Doc. No. 266, at 131–136]

there was a "substantial likelihood" that the nuclear plants would have been neither completed nor operated absent the passage of the nuclear-friendly statute. *Id.* at 75.

In *Duke Power Co.*, the defendants essentially argued that the statute was not the "but-for" cause of the injuries claimed by the plaintiffs because if Congress had not passed the statute, the Government would have developed nuclear power independently, and the plaintiffs would have likely suffered the same injuries from government-operated plants as they would have from privately operated ones. *Id.* In rejecting that argument, the Supreme Court stated:

> Whatever the ultimate accuracy of this speculation, it is not responsive to the simple proposition that private power companies now do in fact operate the nuclear-powered generating plants injuring [the plaintiffs], and that their participation would not have occurred but for the enactment and implementation of the Price-Anderson Act. Nothing in our prior cases requires a party seeking to invoke federal jurisdiction to negate the kind of speculative and hypothetical possibilities suggested in order to demonstrate the likely effectiveness of judicial relief.

*Id.* at 77–78. The Supreme Court's reluctancy to follow the defendants down a rabbit-hole of speculation and "what-ifs" is highly instructive.

Here, Defendants heavily rely upon the premise that social-media companies would have censored Plaintiffs and/or modified their content moderation policies even without any alleged encouragement and coercion from Defendants or other Government officials. This argument is wholly unpersuasive. Unlike previous cases that left ample room to question whether public officials' calls for censorship were fairly traceable to the Government; the instant case paints a full picture.[657] A drastic increase in censorship, deboosting, shadow-banning, and account suspensions directly coincided with Defendants' public calls for censorship and private demands for

---

[657] *See* [Doc. No. 204, at 41-44 (where this Court distinguished this case from cases that "left gaps" in the pleadings)]

censorship.[658] Specific instances of censorship substantially likely to be the direct result of Government involvement are too numerous to fully detail, but a birds-eye view shows a clear connection between Defendants' actions and Plaintiffs injuries.

The Plaintiffs' theory of but-for causation is easy to follow and demonstrates a high likelihood of success as to establishing Article III traceability. Government officials began publicly threatening social-media companies with adverse legislation as early as 2018.[659] In the wake of COVID-19 and the 2020 election, the threats intensified and became more direct.[660] Around this same time, Defendants began having extensive contact with social-media companies via emails, phone calls, and in-person meetings.[661] This contact, paired with the public threats and tense relations between the Biden administration and social-media companies, seemingly resulted in an efficient report-and-censor relationship between Defendants and social-media companies.[662] Against this backdrop, it is insincere to describe the likelihood of proving a causal connection between Defendants' actions and Plaintiffs' injuries as too attenuated or purely hypothetical.

The evidence presented thus goes far beyond mere generalizations or conjecture: Plaintiffs have demonstrated that they are likely to prevail and establish a causal and temporal link between

---

[658] *See, e.g.*, [Doc. No. 241-1, ¶¶1, 7, 17, 164 (examples of Government officials threatening adverse legislation against social-media companies if they do not increase censorship efforts); ¶¶ 51, 119, 133, 366, 424, 519 (examples of social-media companies, typically following up after an in-person meeting or phone call, ensuring Defendants that they would increase censorship efforts)]

[659] [Doc. No. 214-1, ¶1]

[660] *See, e.g.*, [Id. at ¶ 156 (Psaki reinforcing President Biden's "They're killing people" comment); ¶166 (media outlets reporting tense relations between the Biden administration and social-media companies)]

[661] *See, e.g.*, [Doc. No. 174-1, at 3 (Twitter employees setting up a more streamlined process for censorship requests because the company had been "recently bombarded" with censorship requests from the White House)]

[662] *See, e.g.*, [Doc. Nos. 174-1, at 3 (Twitter employees setting up a more streamlined process for censorship requests because the company had been "recently bombarded" with censorship requests from the White House); at 4 (Twitter suspending a Jill Biden parody account within 45 minutes of a White House official requesting twitter to "remove this account immediately"); 214-1, at ¶799 (Drs. Bhattacharya and Kuldorff began experienced extensive censorship on social media shortly after Dr. Collins emailed Dr. Fauci seeking a "quick and devastating take down" of the GBD.); ¶1081 (Twitter removing tweets within two minutes of Scully reporting them for censorship.); ¶¶1266-1365 (Explaining how the Virality Project targeted Hines and health-freedom groups.); 214-9, at 2-3 (Twitter ensuring the White House that it would increase censorship of "misleading information" following a meeting between White House officials and Twitter employees.); etc.]

Defendants' actions and the social-media companies' censorship decisions. Accordingly, this Court finds that there is a substantial likelihood that Plaintiffs would not have been the victims of viewpoint discrimination but for the coercion and significant encouragement of Defendants towards social-media companies to increase their online censorship efforts.[663]

For the reasons stated above, as well as those set forth in this Court's previous ruling on the Motion to Dismiss,[664] the Court finds that Plaintiffs are likely to succeed in establishing the traceability element of Article III standing.

### iii.    Redressability

The redressability element of the standing analysis requires that the alleged injury is "likely to be redressed by a favorable decision." *Lujan*, 504 U.S. at 560–61. "To determine whether an injury is redressable, a court will consider the relationship between 'the judicial relief requested' and the 'injury' suffered." *California v. Texas*, 141 S. Ct. 2104, 2115, 210 L. Ed. 2d 230 (2021) (*quoting Allen v. Wright*, 468 U.S. 737, 753 n.19 (1984), *abrogated by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014)). Additionally, courts typically find that where an injury is traceable to a defendant's conduct, it is usually redressable as well. *See, e.g.*, *Scenic Am., Inc. v. United States Dep't of Transportation*, 836 F.3d 42, 54 (D.C. Cir. 2016) ("[C]ausation and redressability are closely related, and can be viewed as two facets of a single requirement."); *Toll Bros. v. Twp. of Readington*, 555 F.3d 131, 142 (3d Cir. 2009) ("Redressability . . . is closely related to traceability, and the two prongs often overlap."); *El Paso Cnty. v. Trump*, 408 F. Supp. 3d 840, 852 (W.D. Tex. 2019).

---

[663] Because this Court finds that Plaintiffs have successfully shown a likelihood of success under a "but for" theory of causation, it will not address Plaintiffs arguments as to other theories of causation. However, the Court does note that caselaw from outside of the Fifth Circuit supports a more lenient theory of causation for purposes of establishing traceability. *See, e.g.*, *Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65, 71 (2d Cir. 2019); *Parsons v. U.S. Dep't of Justice*, 801 F.3d 701, 714 (6th Cir. 2015).
[664] [Doc. No. 204, at 67–71]

Plaintiffs argue that they are likely to prove that a favorable decision would redress their injuries because they have provided ample evidence that their injuries are imminent and ongoing.[665] In response, Defendants contend that any threat of future injury is merely speculative because Plaintiffs rely on dated declarations and focus on long-past conduct of Defendants and social-media companies.[666] For the reasons explained below, the Court finds that Plaintiffs are likely to prove that their injuries would be redressed by a favorable decision.

As this Court previously noted,[667] a plaintiff's standing is evaluated at the time of filing of the initial complaint in which they joined. *Lynch v. Leis*, 382 F.3d 642, 647 (6th Cir. 2004); *Davis v. F.E.C.*, 554 F.3d 724, 734 (2008); *S. Utah Wilderness All. v. Palma*, 707 F.3d 1143, 1153 (10th Cir. 2013). The State Plaintiffs filed suit on May 5, 2022,[668] and the individual Plaintiffs joined on August 2, 2022.[669] Both groups are likely to prove that threat of future injury is more than merely speculative.

Plaintiff States have produced sufficient evidence to demonstrate a likelihood of proving ongoing injuries as of the time the Complaint was filed. For instance, on June 13, 2023, Flaherty still wanted to "get a sense of what [Facebook was] planning" and denied the company's request for permission to stop submitting its biweekly "Covid Insights Report" to the White House.[670] Specifically, Flaherty wanted to monitor Facebook's suppression of COVID-19 misinformation "as we start to ramp up [vaccines for children under the age of five]."[671] The CDC also remained in collaboration with Facebook in June of 2022 and even delayed implementing policy changes

---

[665] [Doc. No. 214, at 71–74]
[666] [Doc. No. 266, at 152–157]
[667] [Doc. No. 204, at 62–65]
[668] [Doc. No. 1]
[669] [Doc. No. 45]
[670] [Doc. No. 214-1, at ¶425]
[671] [Id.]

"until [it got] the final word from [the CDC]."[672] After coordinating with the CDC and White House, Facebook informed the White House of its new and government-approved policy, stating: "As of today, [June 22, 2022], all COVID-19 vaccine related misinformation and harm policies on Facebook and Instagram apply to people 6 months or older."[673]

Likewise, the individual Plaintiffs are likely to demonstrate that their injuries were imminent and ongoing as of August 2, 2022. Evidence obtained thus far indicates that Defendants have plans to continue the alleged censorship activities. For example, preliminary discovery revealed CISA's expanding efforts in combating misinformation, with a focus on the 2022 elections.[674] As of August 12, 2022, Easterly was directing the "mission of Rumor Control" for the 2022 midterm elections,[675] and CISA candidly reported to be "bee[fing] up [its] efforts to fight falsehoods[]" in preparation for the 2024 election cycle.[676] Chan of the FBI also testified at his deposition that online disinformation continues to be discussed between the federal agencies and social-media companies at the USG Industry meetings, and Chan assumes that this will continue through the 2024 election cycle.[677] All of this suggests that Plaintiffs are likely to prove that risk of future censorship injuries is more than merely speculative. Additionally, past decisions to suppress speech result in ongoing injury as long as the speech remains suppressed, and the past censorship experienced by individual Plaintiffs continues to inhibit their speech in the present. These injuries are also affecting the rights of the Plaintiffs' audience members, including those in Plaintiff States, who have the First Amendment right to receive information free from Government interference.

---

[672] [Doc. Nos. 71-7, at 6; 214-1, ¶424]
[673] [Doc. Nos. 71-7, at 6; 71-3, at 5; 214-1, ¶¶424–425]
[674] [Doc. No. 71-8, at 2; Doc. 86-7, at 14]
[675] [Doc. No. 86-7, at 14]
[676] [Doc. No. 214-1, at ¶1106 (*see also* [Doc. No. 71-8, at 2 (CISA "wants to ensure that it is set up to extract lessons learned from 2022 and apply them to the agency's work in 2024.")]
[677] [Id. at ¶ 866]

Accordingly, and for the reasons stated above, the Court finds that Plaintiffs are likely to prove that a favorable decision would redress their injuries because those injuries are ongoing and substantially likely to reoccur.

### iv.    Recent United States Supreme Court cases of *Texas* and *Haaland*

Defendants cite to two recent cases from the Supreme Court of the United States which they claim undermine this Court's previous ruling about the Plaintiff States' likelihood of proving Article III standing.

First, Defendants argue that *United States v. Texas*, No. 22-58, 2023 WL 4139000 (U.S. June 23, 2023), undermines the States' Article III standing. In *Texas*, Texas and Louisiana sued the Department of Homeland Security (the "Department"), as well as other federal agencies, claiming that the recently promulgated "Guidelines for the Enforcement of Civil Immigration Law" contravened two federal statutes. *Id.* at *2. The Supreme Court held that the states lacked Article III standing because "a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution." The Court further noted that the case was "categorically different" from other standing decisions "because it implicates only one discrete aspect of the executive power—namely, the Executive Branch's traditional discretion over whether to take enforcement actions against violators of federal law." *Id.* at *2, *8 (citations omitted).

Here, the Plaintiff States are not asserting a theory that the Defendants *failed* to act in conformity with the Constitution. To the contrary, the Plaintiff States assert that Defendants have affirmatively violated their First Amendment right to free speech. The Plaintiff States allege and (as extensively detailed above) are likely to prove that the Defendants caused direct injury to the Plaintiff States by significantly encouraging and/or coercing social-media companies to censor

posts made on social-media. Further, as noted in this Court's previous ruling, the Plaintiff States are likely to have Article III standing because a significant portion of the Plaintiff States' population has been prevented from engaging with the posts censored by the Defendants. The Supreme Court noted that "when the Executive Branch elects not to arrest or prosecute, it does not exercise coercive power over an individual's liberty or property, and thus does not infringe upon interests that courts are often called upon to protect." *Id.* at *5. Here, federal officials allegedly did exercise coercive power, and the Plaintiffs are likely to prevail on their claim that the Defendants violated the First Amendment rights of the Plaintiff States, their citizens, and the Individual Plaintiffs.

Defendants contend that the Supreme Court in *Texas* narrowed the application of special solicitude afforded to states because the Supreme Court noted that the standing analysis in *Massachusetts* "d[id] not control" because "[t]he issue there involved a challenge to the denial of a statutorily authorized petition for rulemaking," rather than the exercise of enforcement discretion. *Id.* at *8 n.6. This Court disagrees with Defendants on that point. As noted by Plaintiffs, the majority opinion in *Texas* does not mention special solicitude. Further, this Court noted in its previous analysis of standing that the Plaintiff States could satisfy Article III's standing requirements without special solicitude. Therefore, even to the extent this Court "leaves that idea on the shelf," as suggested in Justice Gorsuch's concurrence, the Court nonetheless finds that the Plaintiff States are likely to prove Article III standing.

Defendants also argue that the Supreme Court's recent ruling in *Haaland v. Brackeen*, No. 21-376, 2023 WL 4002951 (U.S. June 15, 2023), undermines the Plaintiff States' Article III standing. In *Haaland*, the Supreme Court ruled that Texas did not possess standing to challenge the placement provisions of the Indian Child Welfare Act, which prioritizes Indian families in

custody disputes involving Indian children. *Id.* at *19. The Supreme Court reasoned that the states in *Texas* could not "assert equal protection claims on behalf of its citizens because '[a] State does not have standing as *parens patriae* to bring an action against the Federal Government.'" *Id.* (*quoting Snapp*, 458 U.S. at 610 n.16)). The Defendants argue that this statement precludes *parens patriae* standing in the present case.[678] However, in its brief discussion regarding *parens patriae* standing, the *Haaland* Court quoted footnote 16 from *Snapp*, which, in turn, reiterated the "Mellon bar." *Haaland*, 2023 WL 4002951, at *19; *Snapp*, 458 U.S. at 610 n.16 (*quoting Massachusetts v.* 262 U.S. at 485–86.

Plaintiffs correctly note that, although both cases employ broad language, neither *Haaland* nor *Snapp* elaborate on the extent of the "Mellon bar." Moreover, the Supreme Court has clarified in other instances that *parens patriae* suits are permitted against the federal government outside the scope of the Mellon bar. *See Massachusetts v. EPA*, 549 U.S. at 520 n.17, (explaining the "critical difference" between barred *parens patriae* suits by Mellon and allowed *parens patriae* suits against the federal government).

Consistent with *Massachusetts v. EPA*, this Court has previously determined that the Mellon bar applies to "third-party *parens patriae* suits," but not to "quasi-sovereign-interest suits."[679] In *Haaland*, Texas presented a "third-party parens patriae suit," as opposed to a "quasi-sovereign-interest suit," as it asserted the equal protection rights of only a small minority of its population (i.e., non-Indian foster or adoptive parents seeking to foster or adopt Indian children against the objections of relevant Indian tribes), which clearly did not qualify as a quasi-sovereign interest. *See Haaland*, 2023 WL 4002951, at *19 & n.11). Here, however, Louisiana and Missouri advocate for the rights of a significant portion of their populations, specifically the hundreds of

---

[678] [Doc. 289, at 2].
[679] [Doc. 224, at 215–26], *quoting Kentucky v. Biden*, 23 F.4th 585, 598 (6th Cir. 2022).

thousands or millions of citizens who are potential audience members affected by federal social-media speech suppression.

Furthermore, when the *Haaland* Court determined that Texas lacked third-party standing, it stressed that Texas did not have either a "'concrete injury' to the State" or any hindrance to the third party's ability to protect its own interests. *Id.* at *19 n.11 (*quoting Georgia v. McCollum*, 505 U.S. 42, 55–56 (1992)). Here, by contrast, the Plaintiff States have demonstrated a likelihood of succeeding on their claims that they have suffered, and likely will continue to suffer, numerous concrete injuries resulting from federal social-media censorship.[680] Additionally, the ability of the third parties in this case to protect their own interests is hindered because the diffuse First Amendment injury experienced by each individual audience member in Louisiana and Missouri lacks sufficient economic impact to encourage litigation through numerous individual lawsuits. *See Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 64 n.6 (1963).

Defendants further contend that *Haaland* rejected Texas's argument regarding the ICWA's placement provisions requiring Texas to compromise its commitment to being impartial in child-custody proceedings.[681] However, the Supreme Court rejected this argument for a specific reason: "Were it otherwise, a State would always have standing to bring constitutional challenges when it is complicit in enforcing federal law." *Haaland*, 2023 WL 4002951, at *19. By contrast, Missouri and Louisiana do not assert that the federal government mandates their complicity in enforcing federal social-media-censorship regimes. The Plaintiff States instead assert that they, along with a substantial portion of their populations, have been injured by Defendants' actions.

Neither *Texas* nor *Haaland* undermine this Court's previous ruling that the Plaintiff States have Article III standing to sue Defendants in the instant case. Further, the evidence produced thus

---

[680] *See, e.g.*, [Doc. 214-1, ¶¶ 1427–1442]
[681] [Doc. 289, at 3] *quoting Haaland*, 2023 WL 4002951, at *19.

far through limited discovery demonstrates that Plaintiffs are likely to succeed on their First Amendment claims. Accordingly, the Court finds that Plaintiffs are likely to prove all elements of Article III standing, and therefore, are likely to establish that this Court has jurisdiction.

### 2. Irreparable Harm

The second requirement for a Preliminary Injunction is a showing of irreparable injury: plaintiffs must demonstrate "a substantial threat of irreparable injury" if the injunction is not issued. *Texas*, 809 F.3d at 150. For injury to be "irreparable," plaintiffs need only show it cannot be undone through monetary remedies. *Burgess v. Fed. Deposit Inc., Corp.*, 871 F.3d 297, 304 (5th Cir. 2017). Deprivation of a procedural right to protect a party's concrete interests is irreparable injury. *Texas*, 933 F.3d at 447. Additionally, violation of a First Amendment constitutional right, even for a short period of time, is always irreparable injury. *Elrod*, 427 U.S. at 373.

Plaintiffs argue in their memorandum that the First Amendment violations are continuing and/or that there is a substantial risk that future harm is likely to occur. In contrast, Defendants argue that Plaintiffs are unable to show imminent irreparable harm because the alleged conduct occurred in the past, is not presently occurring, and is unlikely to occur in the future. Defendants argue Plaintiffs rely upon actions that occurred approximately one year ago and that it cannot be remedied by any prospective injunctive relief. Further, Defendants argue that there is no "imminent harm" because the COVID-19 pandemic is over and because the elections where the alleged conduct occurred are also over.

The Court finds that Plaintiffs have demonstrated a "significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." *Humana, Inc., v. Jackson*, 804 F.2d 1390, 1394 (5th Cir. 1986). To demonstrate irreparable

harm at the preliminary injunction stage, Plaintiffs must adduce evidence showing that the irreparable injury is likely to occur during the pendency of the litigation. *Justin Indus. Inc.*, v. *Choctaw Secs., L.P.*, 920 F.2d 262, 268 n. 7 (5th Cir. 1990). This Plaintiffs have done.

Defendants argue that the alleged suppression of social-media content occurred in response to the COVID-19 pandemic and attacks on election infrastructure, and therefore, the alleged conduct is no longer occurring. Defendants point out that the alleged conduct occurred between one to three years ago. However, the information submitted by Plaintiffs was at least partially based on preliminary injunction-related discovery[682] and third-party subpoena requests that were submitted to five social-media platforms on or about July 19, 2022.[683] The original Complaint[684] was filed on May 5, 2022, and most of the responses to preliminary injunction-related discovery provided answers to discovery requests that occurred before the Complaint was filed. Since completion of preliminary-injunction related discovery took over six months, most, if not all, of the information obtained would be at least one year old.

Further, the Defendants' decision to stop some of the alleged conduct does not make it any less relevant. A defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the alleged wrongful behavior could not reasonably be expected to recur. *Already, LLC v. Nike*, 568 U.S. 85, 91 (2013). Defendants have not yet met this burden here.

Defendants also argue that, due to the delay in the Plaintiffs seeking relief,[685] the Plaintiffs have not shown "due diligence" in seeking relief. However, this Court finds that Plaintiffs have exercised due diligence. This is a complicated case that required a great deal of discovery in order

---

[682] [Doc. No. 34]
[683] [Doc. No. 37]
[684] [Doc. No. 1]
[685] Plaintiffs allege actions occurring as far back as 2020.

to obtain the necessary evidence to pursue this case. Although it has taken several months to obtain

this evidence, it certainly was not the fault of the Plaintiffs. Most of the information Plaintiffs

needed was unobtainable except through discovery.

Defendants further argue the risk that Plaintiffs will sustain injuries in the future is

speculative and depends upon the action of the social-media platforms. Defendants allege the

Plaintiffs have therefore not shown imminent harm by any of the Defendants.

In *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) ("*SBA List*"), the Supreme

Court held that, for purposes of an Article III injury-in-fact, an allegation of future injury may

suffice if there is "a 'substantial risk' that the harm will occur." (*quoting Clapper v. Amnesty Int'l

USA*, 568 U.S. 398, 408, (2013)). In *SBA List*, a petitioner challenged a statute that prohibited

making certain false statements during the course of a political campaign. *Id.* at 151–52. In

deciding whether the pre-enforcement challenge was justiciable—and in particular, whether it

alleged a sufficiently imminent injury for purposes of Article III—the Court noted that pre-

enforcement review is warranted under circumstances that render the threatened enforcement

"sufficiently imminent." *Id.* at 159. Specifically, the Court noted that past enforcement is "good

evidence that the threat of enforcement is not 'chimerical.'" *Id.* at 164 (*quoting Steffel v.

Thompson*, 415 U.S. 452, 459 (1974)).

Similarly, in *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 302 (1979), the

Supreme Court held that a complaint alleges an Article III injury-in-fact where fear of future injury

is not "imaginary or wholly speculative." In *Babbitt*, the Supreme Court considered a pre-

enforcement challenge to a statute that made it an unfair labor practice to encourage consumers to

boycott using "dishonest, untruthful, and deceptive publicity." *Id.* at 301. Because the plaintiffs

had engaged in consumer publicity campaigns in the past and alleged an intention to continue those

campaigns in the future, the Court held that their challenge to the consumer publicity provision presented an Article III case or controversy. *Id.* at 302; *see also Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 386 (1988) (where the Supreme Court held that booksellers could seek pre-enforcement review of a law making it a crime to "knowingly display for commercial purpose" material that is "harmful to juveniles," as defined by the statute).

Therefore, the question is whether Plaintiffs have alleged a "substantial risk" that harm may occur, which is not "imaginary or wholly speculative." This Court finds that the alleged past actions of Defendants show a substantial risk of harm that is not imaginary or speculative. *SBA List*, 573 U. S. at 164. Defendants apparently continue to have meetings with social-media companies and other contacts.[686]

Although the COVID-19 pandemic is no longer an emergency, it is not imaginary or speculative to believe that in the event of any other real or perceived emergency event, the Defendants would once again use their power over social-media companies to suppress alternative views. And it is certainly not imaginary or speculative to predict that Defendants could use their power over millions of people to suppress alternative views or moderate content they do not agree with in the upcoming 2024 national election. At oral arguments Defendants were not able to state that the "switchboarding" and other election activities of the CISA Defendants and the State Department Defendants would not resume prior to the upcoming 2024 election;[687] in fact, Chan testified post 2020, "we've never stopped."[688] Notably, a draft copy of the DHS's "Quadrennial Homeland Security Review," which outlines the department's strategy and priorities in upcoming years, states that the department plans to target "inaccurate information" on a wide range of topics,

---

[686] [Doc. No. 204-1 at 40]
[687] [Doc. No. 208 at 122]
[688] [Chan depo. at 8–9]

including the origins of the COVID-19 pandemic, the efficacy of COVID-19 vaccines, racial justice, the U.S. withdrawal from Afghanistan, and the return of U.S. Support of Ukraine.[689]

The Plaintiffs are likely to succeed on the merits in their claims that there is a substantial risk that harm will occur, that is not imaginary or speculative. Plaintiffs have shown that not only have the Defendants shown willingness to coerce and/or to give significant encouragement to social-media platforms to suppress free speech with regard to the COVID-19 pandemic and national elections, they have also shown a willingness to do it with regard to other issues, such as gas prices,[690] parody speech,[691] calling the President a liar,[692] climate change,[693] gender,[694] and abortion.[695] On June 14, 2022, White House National Climate Advisor Gina McCarthy, at an Axios event entitled, "A Conversation on Battling Disinformation," was quoted as saying, "We have to get together; we have to get better at communicating, and frankly, the tech companies have to stop allowing specific individuals over and over to spread disinformation."[696]

The Complaint (and its amendments) shows numerous allegations of apparent future harm. Plaintiff Bhattacharya alleges ongoing social-media censorship.[697] Plaintiff Kulldorff alleges an ongoing campaign of censorship against the GBD and his personal social-media accounts.[698] Plaintiff Kheriaty also alleges ongoing and expected future censorship,[699] noting "shadow-banning" his social-media account is increasing and has intensified since 2022.[700] Plaintiffs Hoft

---

[689] [Doc. No. 209-23 at 4]
[690] [Doc. No. 212-3 at 65–66, ¶ 211]
[691] [Id. at 58-60, ¶¶ 180–188]
[692] [Id. at 61, ¶ 190]
[693] [Id. at 63-64, ¶¶ 200–203]
[694] [Id. at 64-64, ¶¶ 204–208]
[695] [Id. at 65, ¶¶ 209–210]
[696] [Doc. No. 214-15]
[697] [Doc. No. 45-3, ¶¶ 15–33]
[698] [Doc. No. 45-4, ¶¶ 14–16]
[699] [Doc. No. 45-7, ¶¶ 12–18]
[700] [Id. at ¶¶ 15]

and Hines also allege ongoing and expected future censorship injuries.[701] It is not imaginary or speculative that the Defendants will continue to use this power. It is likely.

The Court finds that Plaintiffs are likely to succeed on their claim that they have shown irreparable injury sufficient to satisfy the standard for the issuance of a preliminary injunction.

### 3. Equitable Factors and Public Interest

Thus far, Plaintiffs have satisfied the first two elements to obtain a preliminary injunction. The final two elements they must satisfy are that the threatened harm outweighs any harm that may result to the Federal Defendants and that the injunction will not undermine the public interest. *Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1051 (5th Cir. 1997). These two factors overlap considerably. *Texas*, 809 F.3d at 187. In weighing equities, a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). The public interest factor requires the court to consider what public interests may be served by granting or denying a preliminary injunction. *Sierra Club v. U.S. Army Corps of Engineers*, 645 F.3d 978, 997–98 (8th Cir. 2011).

Defendants maintain their interest in being able to report misinformation and warn social-media companies of foreign actors' misinformation campaigns outweighs the Plaintiffs' interest in the right of free speech. This Court disagrees and finds the balance of equities and the public interest strongly favors the issuance of a preliminary injunction. The public interest is served by maintaining the constitutional structure and the First Amendment free speech rights of the Plaintiffs. The right of free speech is a fundamental constitutional right that is vital to the freedom of our nation, and Plaintiffs have produced evidence of a massive effort by Defendants, from the

---

[701] [Doc. No. 45-7 at ¶¶ 12–18]; [Doc. No. 84 at ¶¶ 401–420]; [Doc. No. 45-12 at ¶ 4, 12]

White House to federal agencies, to suppress speech based on its content. Defendants' alleged suppression has potentially resulted in millions of free speech violations. Plaintiffs' free speech rights thus far outweighs the rights of Defendants, and thus, Plaintiffs satisfy the final elements needed to show entitlement to a preliminary injunction.

### 4. Injunction Specificity

Lastly, Defendants argue that Plaintiff's proposed preliminary injunction lacks the specificity required by Federal Rule of Civil Procedure 65 and is impermissibly overbroad. Rule 65(d)(1) requires an injunction to "state its terms specifically" and to "describe in reasonable detail the acts or acts restrained or required." The specificity provisions of Rule 65(d) are designed to prevent uncertainty and confusion on the part of those faced with injunction orders and to avoid possible contempt based upon a decree too vague to be understood. *Atiyeh v. Capps*, 449 U.S. 1312, 1316–17 (1981). An injunction must be narrowly tailored to remedy the specific action that gives rise to the injunction. *Scott v. Schedler*, 826 F.3d 207, 211 (5th Cir. 2016).

This Court believes that an injunction can be narrowly tailored to only affect prohibited activities, while not prohibiting government speech or agency functions. Just because the injunction may be difficult to tailor is not an excuse to allow potential First Amendment violations to continue. Thus, the Court is not persuaded by Defendants arguments here.

Because Plaintiffs have met all the elements necessary to show entitlement to a preliminary injunction, this Court shall issue such injunction against the Defendants described above.

### IV.   CLASS CERTIFICATION

In their Third Amended Complaint, the Individual Plaintiffs purport to bring a class action "on behalf of themselves and two classes of other persons similarly situated to them."[702] Plaintiffs

---

[702] [Doc. No. 268 at ¶489].

go on to describe the two proposed classes, as well as state generally that each requirement for class certification is met.[703] Defendants opposed Plaintiffs' request for class certification in their Response to Plaintiffs' Motion for Class Certification and for Leave to File Third Amended Complaint.[704]

The Court is obligated to analyze whether this litigation should proceed as a class action. *See Castano v. Am. Tobacco Co.*, 84 F.3d 734, 740 (5th Cir. 1996) ("A district court must conduct a rigorous analysis of the rule 23 prerequisites before certifying a class."). Pursuant to this obligation, the Court questioned counsel at the hearing on the preliminary injunction as to the basis for class certification. As explained in further detail below, the Court finds that Plaintiffs failed to meet their burden of proof, and class certification is improper here.

### A.  Class Certification Standard under FRCP 23

"The decision to certify is within the broad discretion of the court, but that discretion must be exercised within the framework of rule 23." *Id.* at 740. "The party seeking certification bears the burden of proof." *Id.*

Federal Rule of Civil Procedure 23(a) lays out the four key prerequisites for a class action. It states:

> One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

---

[703] [Id. at ¶¶490–501].
[704] [Doc. No. 244].

In addition to the enumerated requirements above, Plaintiffs must propose a class that has an objective and precise definition. "The existence of an ascertainable class of persons to be represented by the proposed class representative is an implied prerequisite of Federal Rule of Civil Procedure 23." *John v. Nat'l Sec. Fire & Cas. Co.*, 501 F.3d 443, 445 (5th Cir. 2007).

"In addition to satisfying Rule 23(a)'s prerequisites, parties seeking class certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3)." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 614 (1997). Here, Plaintiffs specifically bring this class action under Rule 23(b)(2), which allows for maintenance of a class action where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b0) (2). "Civil rights cases against parties charged with unlawful, class-based discrimination are prime examples" of Rule 23(b)(2) class actions. *Amchem Prod., Inc.*, 521 U.S. at 614.

Notably, the Fifth Circuit recently held that a standing analysis is necessary before engaging in the class certification analysis. *Angell v. GEICO Advantage Ins. Co*., 67 F.4th 727, 733 (5th Cir. 2023). However, because this Court has already completed multiple standing analyses in this matter, and because the Court ultimately finds that the class should not be certified, the Court will not address which standing test should be applied to this specific issue.

### B. Analysis

In order to certify this matter as a class action, the Court must find that Plaintiffs have established each element of Rule 23(a). *See In re Monumental Life Ins. Co.*, 365 F.3d 408, 414–15 (5th Cir. 2004) ("All classes must satisfy the four baseline requirements of rule 23(a):

numerosity, commonality, typicality, and adequacy of representation."). The Court finds that Plaintiffs failed to meet their burden, and therefore, the Court will not certify the class action.

### 1. Class Definition

Plaintiffs propose two classes to proceed with their litigation as a class action. First, Plaintiffs define Class 1 as follows:

> The class of social-media users who have engaged or will engage in, or who follow, subscribe to, are friends with, or are otherwise connected to the accounts of users who have engaged or will engage in, speech on any social-media company's platform(s) that has been or will be removed; labelled; used as a basis for suspending, deplatforming, issuing strike(s) against, demonetizing, or taking other adverse action against the speaker; downranked; deboosted; concealed; or otherwise suppressed by the platform after Defendants and/or those acting in concert with them flag or flagged the speech to the platform(s) for suppression.[705]

Next, Plaintiffs define Class 2 as follows:

> The class of social-media users who have engaged in or will engage in, or who follow, subscribe to, are friends with, or are otherwise connected to the accounts of users who have engaged in or will engage in, speech on any social-media company's platform(s) that has been or will be removed; labelled; used as a basis for suspending, deplatforming, issuing strike(s) against, demonetizing, or taking other adverse action against the speaker; downranked; deboosted; concealed; or otherwise suppressed by the company pursuant to any change to the company's policies or enforcement practices that Defendants and/or those acting in concert with them have induced or will induce the company to make.[706]

"It is elementary that in order to maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable." *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970). The Court finds that the class definitions provided by Plaintiffs are neither "adequately defined" nor "clearly ascertainable." Simply put, there is no way to tell just how many

---

[705] [Doc. No. 268 at ¶490]
[706] [Id. at ¶491]

people or what type of person would fit into these proposed classes. The proposed class definitions are so broad that almost every person in America, and perhaps in many other countries as well, could fit into the classes. The Court agrees with Defendants that the language used is simply too vague to maintain a class action using these definitions.[707] Where a class definition is, as here, "too broad and ill-defined" to be practicable, the class should not be certified. *See Braidwood Mgmt., Inc. v. Equal Emp. Opportunity Comm'n*, No. 22-10145, 2023 WL 4073826, at *14 (5th Cir. June 20, 2023).

Further, no evidence was produced at the hearing on the motion for preliminary injunction that "would have assisted the district court in more accurately delineating membership in a workable class." *DeBremaecker*, 433 F.2d at 734. The Court questioned Plaintiffs' counsel about the issues with the proposed class definitions, but counsel was unable to provide a solution that would make class certification feasible here. Counsel for Plaintiffs stated that "the class definition is sufficiently precise," but the Court fails to see how that is so, and counsel did not explain any further.[708] Counsel for Plaintiffs focused on the fact that the proposed class action falls under Rule 23(b)(2), providing for broad injunctive relief, and therefore, counsel argued that the Court would not need to "figure out every human being in the United States of American [sic] who was actually adversely affected."[709] Even if the Court does not need to identify every potential class member individually, the Court still needs to be able to state the practical bounds of the class definition— something it cannot do with the loose wording given by Plaintiffs.

---

[707] [Doc. No. 244 at 7]
[708] Hearing Transcript at 181, line 15.
[709] [Id. at lines 16–18]

Without a feasible class definition, the Court cannot certify Plaintiffs' proposed class action. Out of an abundance of caution, however, the Court will address the other enumerated prerequisites of Rule 23(a) below.

### 2. Numerosity

The numerosity requirement mandates that a class be "so large that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "Although the number of members in a proposed class is not determinative of whether joinder is impracticable," classes with a significantly high number of potential members easily satisfy this requirement. *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 624 (5th Cir. 1999) (finding class of 100 to 150 members satisfied the numerosity requirement). Other factors, such as "the geographical dispersion of the class" and "the nature of the action," may also support a finding that the numerosity element has been met. *Id.* at 624–25.

Here, Plaintiffs state that both Class 1 and Class 2 are "sufficiently numerous that joinder of all members is impracticable."[710] Plaintiffs reference the "content of hundreds of users with, collectively, hundreds of thousands or millions of followers" who were affected by Defendants' alleged censorship.[711] Thus, based on a surface-level look at potential class members, it appears that the numerosity requirement would be satisfied because the class members' numbers reach at least into the thousands, if not the millions.

However, the numerosity requirement merely serves to highlight the same issue described above: the potential class is simply too broad to even begin to fathom who would fit into the class. Joinder of all the potential class members is more than impractical—it is impossible. Thus, while the sheer number of potential class members may tend towards class certification, the Court is only

---

[710] [Doc. No. 268 at ¶¶492–93]
[711] [Id. at ¶¶492]

further convinced by Plaintiffs' inability to estimate the vast number of class members that certification is improper here.

### 3. Commonality

The commonality requirement ensures that there are "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "The test for commonality is not demanding and is met 'where there is at least one issue, the resolution of which will affect all or a significant number of the putative class members.'" *Mullen*, 186 F.3d at 625 (*quoting Lightbourn v. County of El Paso*, 118 F.3d 421, 426 (5th Cir. 1997)).

Here, Plaintiffs state that both classes share common questions of law or fact, including "the question whether the government is responsible for a social-media company's suppression of content that the government flags to the company for suppression" for Class 1 and "the question whether the government is responsible for a social-media company's suppression of content pursuant to a policy or enforcement practice that the government induced the company to adopt or enforce" for Class 2.[712] These questions of law are broadly worded and may not properly characterize the specific issues being argued in this case.

At the hearing for the preliminary injunction, Plaintiffs' counsel clarified that the alleged campaign of censorship "involve[es] a whole host of common questions whose resolution are going to determine whether or not there's a First Amendment violation."[713] The Court agrees that there is certainly a common question of First Amendment law that impacts each member of the proposed classes, but notes Defendants' well-reasoned argument that Plaintiffs may be attempting to aggregate too many questions into one class action.[714] The difficulty of providing "a single,

---

[712] [Id. at ¶¶494–95]
[713] Hearing Transcript, at 183, lines 19–21.
[714] [Doc. No. 244 at 10]

class-wide answer," as highlighted by Defendants, further proves to this Court that class

certification is likely not the best way to proceed with this litigation.[715] Although commonality is

a fairly low bar, the Court is not convinced Plaintiffs have met their burden on this element of Rule

23(a).

### 4. Typicality

The typicality requirement mandates that named parties' claims or defenses "are

typical…of the class." Fed. R. Civ. P. 23(a)(3). "Like commonality, the test for typicality is not

demanding." *Mullen*, 186 F.3d at 625. It "focuses on the similarity between the named plaintiffs'

legal and remedial theories and the theories of those whom they purport to represent." *Lightbourn*,

118 F.3d at 426.

Here, Plaintiffs assert that the Individual Plaintiffs' claims are typical of both Class 1 and

Class 2 members' claims because they "all arise from the same course of conduct by

Defendants…namely, the theory that such conduct violates the First Amendment."[716] Further,

Plaintiffs state that the Individual Plaintiffs "are not subject to any affirmative defenses that are

inapplicable to the rest of the class and likely to become a major focus of the case."[717]

While the general claims of each potential class member would arise from the Defendants'

alleged First Amendment violations, the Individual Plaintiffs have not explained how their claims

are typical of each proposed class specifically. For example, Class 2 includes those social-media

users who "follow, subscribe to, are friends with, or are otherwise connected to the accounts of

users" subject to censorship.[718] While the Individual Plaintiffs detail at length their own

censorship, they do not clarify how they have been harmed by the censorship of other users. Again,

---

[715] [Id. at 13]
[716] [Doc. No. 268 at ¶496–97]
[717] [Id.]
[718] [Id. at ¶491]

this confusion highlights the myriad issues with this proposed class action as a result of the ill-defined and over-broad class definitions. The Court cannot make a finding that the Individual Plaintiffs' claims are typical of all class members' claims, simply because the Court cannot identify who would fit in the proposed class. Merely stating that the Rule 23(a) requirements have been met is not enough to persuade this Court that the class should be certified as stated.

### 5. Adequate Representation

The final element of a class certification analysis requires that the class representatives "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "Differences between named plaintiffs and class members render the named plaintiffs' inadequate representatives only if those differences create conflicts between the named plaintiffs' interests and the class members' interests." *Mullen*, 186 F.3d at 626.

On this element, Plaintiffs state that they "are willing and able to take an active role in the case, control the course of litigation, and protect the interest of absentees in both classes."[719] Plaintiff also state that "[n]o conflicts of interest currently exist or are likely to develop" between themselves and the absentees.[720] This element is likely met, without evidence to the contrary.

However, without a working class definition, and with the issues concerning the other Rule 23(a) elements discussed above, the Court finds class certification inappropriate here, regardless of the adequacy of the Individual Plaintiffs' representation. Thus, for the foregoing reasons, the Court declines to certify this matter as a class action.

### V.    CONCLUSION

> Once a government is committed to the principle of silencing the voice of opposition, it has only one place to go, and that is down the path of increasingly repressive measures, until it becomes a source

---

[719] [Id. at ¶498]
[720] [Id.]

of terror to all its citizens and creates a country where everyone lives in fear.

Harry S. Truman

The Plaintiffs are likely to succeed on the merits in establishing that the Government has used its power to silence the opposition.    Opposition to COVID-19 vaccines; opposition to COVID-19 masking and lockdowns; opposition to the lab-leak theory of COVID-19; opposition to the validity of the 2020 election; opposition to President Biden's policies; statements that the Hunter Biden laptop story was true; and opposition to policies of the government officials in power. All were suppressed. It is quite telling that each example or category of suppressed speech was conservative in nature. This targeted suppression of conservative ideas is a perfect example of viewpoint discrimination of political speech. American citizens have the right to engage in free debate about the significant issues affecting the country.

Although this case is still relatively young, and at this stage the Court is only examining it in terms of Plaintiffs' likelihood of success on the merits, the evidence produced thus far depicts an almost dystopian scenario. During the COVID-19 pandemic, a period perhaps best characterized by widespread doubt and uncertainty, the United States Government seems to have assumed a role similar to an Orwellian "Ministry of Truth."[721]

The Plaintiffs have presented substantial evidence in support of their claims that they were the victims of a far-reaching and widespread censorship campaign. This court finds that they are likely to succeed on the merits of their First Amendment free speech claim against the Defendants. Therefore, a preliminary injunction should issue immediately against the Defendants as set out

---

[721] An "Orwellian 'Ministry of Truth'" refers to the concept presented in George Orwell's dystopian novel, '1984.' In the novel, the Ministry of Truth is a governmental institution responsible for altering historical records and disseminating propaganda to manipulate and control public perception.

herein. The Plaintiffs Motion for Preliminary Injunction [Doc. No. 10] is **GRANTED IN PART and DENIED IN PART**.

The Plaintiffs' request to certify this matter as a class action pursuant to Fed. R. Civ. P. Article 23(b)(2) is **DENIED.**

MONROE, LOUISIANA this 4th day of July 2023.

**TERRY A. DOUGHTY**
**UNITED STATES DISTRICT JUDGE**

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**MONROE DIVISION**

**STATE OF MISSOURI, ET AL.**          **CASE NO.  3:22-CV-01213**

**VERSUS**                             **JUDGE TERRY A. DOUGHTY**

**JOSEPH R BIDEN JR., ET AL.**         **MAG. JUDGE KAYLA D. MCCLUSKY**

<u>**JUDGMENT**</u>

  For the reasons set forth in the Memorandum Ruling on the Request for Preliminary

Injunction,

  **IT IS ORDERED, ADJUDGED, AND DECREED** that Plaintiffs' Motion for

Preliminary Injunction [Doc. No. 10] is **GRANTED in part and DENIED in part**.

  **IT IS FURTHER ORDERED** that: the **DEPARTMENT OF HEALTH AND HUMAN**

**SERVICES** ("HHS") and **THE NATIONAL INSTITUTE OF ALLERGY AND**

**INFECTIOUS DISEASES** ("NIAID"), and specifically the following employees of the HHS and

NIAID: **XAVIER BECERRA,**[1] Secretary of HHS; **DR. HUGH AUCHINCLOSS**, Director of

NIAID; **YOLANDA BYRD**, HHS Digital Engagement Team; **CHRISTY CHOI**, HHS Office of

Communications; **ASHLEY MORSE**, HHS Director of Digital Engagement; **JOSHUA PECK**,

HHS Deputy Assistant Secretary, Deputy Digital Director of HHS successor (formerly **JANELL**

**MUHAMMED**); along with their secretaries, directors, administrators and employees;

**SURGEON GENERAL VIVEK H. MURTHY**, **KATHARINE DEALY**, Chief Engagement

Officer for the Surgeon General, along with her secretaries, directors, administrators, and

employees; the **CENTERS FOR DISEASE CONTROL AND PREVENTION** ("CDC"), and

specifically the following employees: **CAROL Y. CRAWFORD**, Chief of the Digital Media

---

[1] All individuals named in this Judgment are being sued in their official capacities.

Branch of the CDC Division of Public Affairs; **JAY DEMPSEY**, Social-media Team Leader, Digital Media Branch, CDC Division of Public Affairs; **KATE GALATAS**, CDC Deputy Communications Director; **UNITED STATES CENSUS BUREAU** ("Census Bureau"), and specifically the following employees: **JENNIFER SHOPKORN**, Census Bureau Senior Advisor for Communications, Division Chief for the Communications Directorate, and Deputy Director of the Census Bureau Office of Faith Based and Neighborhood Partnerships**,** along with their secretaries, directors, administrators and employees; the **FEDERAL BUREAU OF INVESTIGATION** ("FBI"), and specifically the following employees: **LAURA DEHMLOW**, Section Chief, FBI Foreign Influence Task Force; **ELVIS M. CHAN**, Supervisory Special Agent of Squad CY-1 in the FBI San Francisco Division; **THE UNITED STATES DEPARTMENT OF JUSTICE**, along with their secretary, director, administrators, and employees; the following members of the Executive Office of the President of the United States: White House Press Secretary **KARINE JEAN-PIERRE**, Counsel to the President; **STUART F. DELERY**, White House Partnerships Manager; **AISHA SHAH**, Special Assistant to the President; **SARAH BERAN**, **MINA HSIANG**, Administrator of the United States Digital Service within the Office of Management and Budget; **ALI ZAIDI**, White House National Climate Advisor; White House Senior COVID-19 Advisor successor (formerly **ANDREW SLAVITT**); Deputy Assistant to the President and Director of Digital Strategy successor (formerly **ROB FLAHERTY**); **DORI SALCIDO**, White House COVID-19 Director of Strategic Communications and Engagement; White House Digital Director for the COVID-19 Response Team successor (formerly **CLARKE HUMPHREY**); Deputy Director of Strategic Communications and Engagement of the White House COVID-19 Response Team successor (formerly **BENJAMIN WAKANA**); Deputy Director for Strategic Communications and External Engagement for the White House COVID-

19 Response Team successor (formerly **SUBHAN CHEEMA**); White House COVID-19 Supply Coordinator successor (formerly **TIMOTHY W. MANNING**); Chief Medical Advisor to the President, **DR. HUGH AUCHINCLOSS**, along with their directors, administrators and employees; the **CYBERSECURITY AND INFRASTRUCTURE SECURITY AGENCY** ("**CISA**"), and specifically the following employees: **JEN EASTERLY**, Director of CISA; **KIM WYMAN**, Senior Cybersecurity Advisor and Senior Election Security Leader; **LAUREN PROTENTIS**; **GEOFFREY HALE**; **ALLISON SNELL**; **BRIAN SCULLY**, Officials of CISA; the **UNITED STATES DEPARTMENT OF HOMELAND SECURITY** ("DHS"), and specifically the following employees: **ALEJANDRO MAYORKAS**, Secretary of DHS; **ROBERT SILVERS**, Under-Secretary of the Office of Strategy, Policy and Plans; **SAMANTHA VINOGRAD**, Senior Counselor for National Security in the Official of the Secretary for DHS, along with their secretary, directors, administrators, and employees; the **UNITED STATES DEPARTMENT OF STATE** ("State Department"), and specifically the following employees: **LEAH BRAY**, Acting Coordinator of the State Department's Global Engagement Center ("GEC"); **ALEX FRISBIE**, State Department Senior Technical Advisor and member of the Technology Engagement Team at the GEC; **DANIEL KIMMAGE**, Acting Coordinator of the GEC, along with their secretary, directors, administrators, and employees **ARE HEREBY ENJOINED AND RESTRAINED** from taking the following actions as to social-media companies:[2]

---

[2] "Social-media companies" include Facebook/Meta, Twitter, YouTube/Google, WhatsApp, Instagram, WeChat, TikTok, Sina Weibo, QQ, Telegram, Snapchat, Kuaishou, Qzone, Pinterest, Reddit, LinkedIn, Quora, Discord, Twitch, Tumblr, Mastodon, and like companies.

(1)      meeting with social-media companies for the purpose of urging, encouraging, pressuring, or inducing in any manner the removal, deletion, suppression, or reduction of content containing protected free speech posted on social-media platforms;[3]

(2)      specifically flagging content or posts on social-media platforms and/or forwarding such to social-media companies urging, encouraging, pressuring, or inducing in any manner for removal, deletion, suppression, or reduction of content containing protected free speech;

(3)      urging, encouraging, pressuring, or inducing in any manner social-media companies to change their guidelines for removing, deleting, suppressing, or reducing content containing protected free speech;

(4)      emailing, calling, sending letters, texting, or engaging in any communication of any kind with social-media companies urging, encouraging, pressuring, or inducing in any manner for removal, deletion, suppression, or reduction of content containing protected free speech;

(5)      collaborating, coordinating, partnering, switchboarding, and/or jointly working with the Election Integrity Partnership, the Virality Project, the Stanford Internet Observatory, or any like project or group for the purpose of urging, encouraging, pressuring, or inducing in any manner removal, deletion, suppression, or reduction of content posted with social-media companies containing protected free speech;

(6)      threatening, pressuring, or coercing social-media companies in any manner to remove, delete, suppress, or reduce posted content of postings containing protected free speech;

---

[3] "Protected free speech" means speech that is protected by the Free Speech Clause of the First Amendment to the United States Constitution in accordance with jurisprudence of the United States Supreme Court, Courts of Appeal and District Courts.

(7)     taking any action such as urging, encouraging, pressuring, or inducing in any manner social-media companies to remove, delete, suppress, or reduce posted content protected by the Free Speech Clause of the First Amendment to the United States Constitution;

(8)     following up with social-media companies to determine whether the social-media companies removed, deleted, suppressed, or reduced previous social-media postings containing protected free speech;

(9)     requesting content reports from social-media companies detailing actions taken to remove, delete, suppress, or reduce content containing protected free speech; and

(10)     notifying social-media companies to Be on The Lookout ("BOLO") for postings containing protected free speech.

This Preliminary Injunction precludes said named Defendants, their agents, officers, employees, contractors, and all acting in concert with them from the aforementioned conduct. This Preliminary Injunction also precludes said named Defendants, their agents, officers, employees, and contractors from acting in concert with others who are engaged in said conduct.

**IT IS FURTHER ORDERED** that the following actions are **NOT** prohibited by this Preliminary Injunction:

(1)     informing social-media companies of postings involving criminal activity or criminal conspiracies;

(2)     contacting and/or notifying social-media companies of national security threats, extortion, or other threats posted on its platform;

(3)     contacting and/or notifying social-media companies about criminal efforts to suppress voting, to provide illegal campaign contributions, of cyber-attacks against election infrastructure, or foreign attempts to influence elections;

(4)     informing social-media companies of threats that threaten the public safety or security of the United States;

(5)     exercising permissible public government speech promoting government policies or views on matters of public concern;

(6)     informing social-media companies of postings intending to mislead voters about voting requirements and procedures;

(7)     informing or communicating with social-media companies in an effort to detect, prevent, or mitigate malicious cyber activity;

(8)     communicating with social-media companies about deleting, removing, suppressing, or reducing posts on social-media platforms that are not protected free speech by the Free Speech Clause in the First Amendment to the United States Constitution.

**IT IS FURTHER ORDERED** that no security is required to be posted by Plaintiffs under Federal Rule of Civil Procedure 65.

**IT IS FURTHER ORDERED** that this Preliminary Injunction Order shall remain in effect pending the final resolution of this case or until further orders issue from this Court, the United States Court of Appeals for the Fifth Circuit, or the Supreme Court of the United States.

**IT IS FURTHER ORDERD** that the Motion for Preliminary Injunction [Doc. No. 10] is **DENIED** as to the following Defendants: U.S. Food and Drug Administration; U. S. Department of Treasury; U.S. Election Assistance Commission; U. S. Department of Commerce and employees Erica Jefferson, Michael Murray, Wally Adeyemo, Steven Frid, Brad Kimberly, and Kristen Muthig; and Disinformation Governance Board ("DGB") and its Director Nina Jankowicz.

**IT IS FURTHER ORDERED** that no evidentiary hearing is required at this time.

**IT IS FURTHER ORDERED** that Plaintiffs' request for certification of this proceeding as a class action pursuant to Fed. R. Civ. P. Article 23 (b)(2) is **DENIED.**

**THUS, DONE AND SIGNED IN MONROE, LOUISIANA,** this 4th day of July 2023**.**

**TERRY A. DOUGHTY**
**UNITED STATES DISTRICT JUDGE**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF LOUISIANA
# MONROE DIVISION

STATE OF MISSOURI ex rel. ERIC S.
SCHMITT, Attorney General, and

STATE OF LOUISIANA ex rel. JEFFREY
M. LANDRY, Attorney General,

       *Plaintiffs*,

  v.

JOSEPH R. BIDEN, JR., in his official
capacity as President of the United States, *et
al.*,

       *Defendants*.

Case No. 3:22-cv-01213

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

    Plaintiffs, the States of Missouri and Louisiana, by and through their Attorneys General,

Eric S. Schmitt and Jeffrey M. Landry (collectively, "Plaintiffs" or "the States"), respectfully move

this Court to grant a preliminary injunction against Defendants, prohibiting them from demanding,

pressuring, urging, encouraging, or otherwise inducing social-media platforms to censor or

suppress in any manner the speech of speakers, content, and viewpoint that Defendants disfavor.

For the reasons stated in the States' Memorandum in Support of Motion for Preliminary Injunction,

which is filed separately and incorporated by reference herein, the Court should enter a preliminary

injunction to address the grave irreparable harms and to vindicate the public interest in freedom of

speech for Missouri, Louisiana, and their citizens.

    For the reasons stated in the States' Memorandum, Plaintiffs respectfully request that this

Court enter a preliminary injunction in three phases:

1

(1) Immediately enter a preliminary injunction preventing Defendants, and their agents, officers, employees, contractors and all those acting in concert with them, from taking any steps to demand, urge, encourage, pressure, or otherwise induce any social-media company or platform for online speech, or any employee, officer, or agent of any such company or platform, to censor, suppress, remove, de-platform, suspend, shadow-ban, de-boost, restrict access to content, or take any other adverse action against any speaker, content, or viewpoint expressed on social media;

(2) Grant the States' separately filed Motion for Preliminary-Injunction-Related Discovery, and authorize the States to take discovery from Defendants and third parties to identify the details and scope of Defendants' social-media censorship activities, discussed herein; and

(3) After the conclusion of such preliminary-injunction-related discovery, enter more specific preliminary injunctive relief to provide fully effective relief to address the details and scope of the conduct challenged herein.

Dated: June 14, 2022

Respectfully submitted,

**ERIC S. SCHMITT**
**Attorney General of Missouri**

*/s/ D. John Sauer*
D. John Sauer, Mo. Bar No. 58721*
 *Solicitor General*
Justin D. Smith, Mo. Bar No. 63253
 *First Assistant Attorney General*
Todd Scott, Mo. Bar No. 56614
 *Senior Counsel*
Michael E. Talent, Mo. Bar No. 73339*
 *Deputy Solicitor General*
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
Tel: (573) 751-8870
John.Sauer@ago.mo.gov
*Counsel for State of Missouri*

**JEFFREY M. LANDRY**
**Attorney General of Louisiana**

*/s/ Elizabeth B. Murrill*
Elizabeth B. Murrill (La #20685)
 *Solicitor General*
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, Louisiana 70804
Tel: (225) 326-6766
murrille@ag.louisiana.gov
*Counsel for State of Louisiana*

* admitted *pro hac vice*

2

## CERTIFICATE OF SERVICE

I hereby certify that, on June 14, 2022, I caused a true and correct copy of the foregoing to be filed with the Court's electronic filing system, to be served by operation of the Court's electronic filing system on counsel for all parties who have entered in the case.  In addition, on June 14, 2022, I caused a true and correct copy of the foregoing to be sent by certified mail to all Defendants at the following addresses:

U.S. Attorney
Western District of Louisiana
800 Lafayette St #2200
Lafayette, LA 70501-6832

Centers For Disease Control & Prevention
1600 Clifton Road
Atlanta, GA 30329-4027

Attn: Civil Process Clerk
US Attorney General
950 Pennsylvania Ave. NW
Washington, DC 20530-0001

Alejandro Mayorkas
Secretary of Homeland Security
Office of General Counsel
2707 Martin Luther King Jr Ave. SE
Washington, DC 20528

Jen Easterly CISA Agency Stop 0380
Department of Homeland Security
245 Murray Lane
Washington, DC 20528-0380

General Counsel MS 0485
Department of Homeland Security
2707 Martin Luther King Jr. SE
Washington, DC 20528

Jennifer Rene Psaki
The White House
1600 Pennsylvania Ave. NW
Washington, DC 20500

Cybersecurity And Infrastructure Security Agency Stop 0380
Department of Homeland Security
245 Murray Lane
Washington, DC 20528-0380

Vivek H. Murthy
Office of Surgeon General
US Department of Health & Human Services
200 Independence Ave SW
Washington, DC 20201

Nina Jankowicz
c/o Department of Homeland Security
2707 Martin Luther King Jr SE
Washington, DC 20528

Xavier Becerra
US Department of Health and Human Services
200 Independence Ave SW
Washington, DC 20201

Brandon Brown
US Attorney for W.D. Louisiana
300 Fannin Street Suite 3201
Shreveport, LA 71101

Dr. Anthony Fauci
National Institute of Allergy & Infectious Diseases
5601 Fishers Lane MSC 9806
Bethesda MD 20892-8906

Office of General Counsel
Department of Health and Human Services
200 Independence Ave SW
Washington, DC 20201

US Attorney General
Attn: Assistant Attorney General for Administration
950 Pennsylvania Avenue NW
Washington, DC 20530

4

National Institute of Allergy & Infectious Diseases
5601 Fishers Lane MSC 9806
Bethesda, MD 20892-8906

The Honorable Joseph R. Biden, Jr.
President of the United States
The White House
1600 Pennsylvania Ave. NW
Washington, DC 20500

*/s/ D. John Sauer*

5

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA
## MONROE DIVISION

| | |
|---|---|
| STATE OF LOUISIANA, STATE OF MISSOURI, *et al.*<br><br>*Plaintiffs*,<br><br>v.<br><br>JOSEPH R. BIDEN, JR., in his official capacity as President of the United States, *et al.*,<br><br>*Defendants*. | Case No. 3:22-cv-01213-TAD |

## PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................. ii

INTRODUCTION ............................................................................................................ 1

FACTUAL BACKGROUND ............................................................................................ 3

ARGUMENT ................................................................................................................... 3

    I.   Plaintiffs Are Likely to Succeed on the Merits. .................................................. 3

        A. Plaintiffs Are Likely to Succeed on their First Amendment Claim. .............................. 3

            1.  Inducement – Significant Encouragement, Coercion, and Deception........................ 4

              a. Significant Encouragement....................................................................... 5

              b. Coercion. ................................................................................................ 14

              c. Deception. .............................................................................................. 18

            2. Joint Participation – Collusion and Pervasive Entwinement. ................................... 29

              a. Conspiracy and Collusion. ..................................................................... 29

              b. Pervasive Entwinement. ........................................................................ 41

            3.  Defendants' Censorship Activities Violate the First Amendment........................... 51

        B. Plaintiffs Are Likely to Succeed on their APA and *Ultra Vires* Claims. ..................... 53

        C. Plaintiffs Are Likely to Establish Standing. .................................................. 56

            1. Plaintiffs Are Likely to Prove Injury. ......................................................... 56

            2. Plaintiffs Are Likely to Prove Traceability. ................................................. 58

            3.  Plaintiffs Are Likely to Prove Redressability............................................... 62

    II.  The Other Three Equitable Factors Strongly Favor a Preliminary Injunction. .................. 65

    III.  The Court Should Grant Classwide Injunctive Relief Under Rule 23(b)(2). ..................... 66

CONCLUSION................................................................................................................ 67

CERTIFICATE OF SERVICE ......................................................................................... 70

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Adickes v. S.H. Kress& Co,*
 398 U.S. 144 (1970) .......................................................................................... 5

*Al-Amin v. Smith,*
 511 F.3d 1317 (11th Cir. 2008) ...................................................................... 60

*Alfred L. Snapp & Son v. Puerto Rico ex rel. Barez,*
 458 U.S. 592 (1982) ........................................................................................ 66

*Am. Fed. of Lab. & Cong. of Indus. Orgs. v. N.L.R.B.,*
 57 F.4th 1023 (D.C. Cir. 2023) ...................................................................... 55

*Armstrong v. Ashley,*
 --- F.4th ---, 2023 WL 2005263 (5th Cir. 2023) ...................................... 30

*Backpage.com, LLC v. Dart,*
 807 F.3d 229 (7th Cir. 2015) .......................................................................... 14

*Bantam Books, Inc. v. Sullivan,*
 372 U.S. 58 (1963) .................................................................................. 14, 53

*Biden v. Knight First Amendment Inst. at Columbia Univ.,*
 141 S. Ct. 1220 (2021) .............................................................................. 4, 14

*Bland v. Roberts,*
 730 F.3d 368 (4th Cir. 2013) .......................................................................... 36

*Alcarez v. Block,*
 746 F.3d 593 (9th Cir. 1984) .......................................................................... 55

*Blum v. Yaretsky,*
 457 U.S. 991 (1982) ................................................................................ 4, 5, 6

*Brandenburg v. Ohio,*
 395 U.S. 444 (1969) .......................................................................................... 7

*Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n,*
 531 U.S. 288 (2001) .......................................................................... 3, 29, 41

*BST Holdings, L.L.C. v. Occupational Safety & Health Admin., U.S. Dep't of Lab.,*
 17 F.4th 604 (5th Cir. 2021) .......................................................................... 65

*Buckley v. Am. Const. Law Found., Inc.,*
 525 U.S. 182 (1999) .......................................................................................... 51

*Burton v. Wilmington Parking Auth'y*,
   365 U.S. 715 (1961) .................................................................................................. 29

*Carlin Commc'ns, Inc. v. Mountain States Tel. & Tel. Co.*,
   827 F.2d 1291 (9th Cir. 1987) ................................................................................... 4

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971) .................................................................................................. 54

*Citizens United v. F.E.C.*,
   558 U.S. 310 (2010) .................................................................................................. 51

*Croft v. Governor of Tex.*,
   562 F.3d 735 (5th Cir. 2009) ..................................................................................... 57

*Crowe v. Lucas*,
   595 F.2d 985 (5th Cir. 1979) ................................................................................ 29, 30

*Danos v. Jones*,
   652 F.3d 577 (2011) .................................................................................................. 55

*Davis v. F.E.C.*,
   554 F.3d 724 (2008) .................................................................................................. 63

*Davis v. F.E.C.*,
   554 U.S. 724 (2008) .................................................................................................. 62

*DeHoyos v. Allstate Corp.*,
   240 F.R.D. 269 (W.D. Tex. 2007) ............................................................................ 66

*Dennis v. Sparks*,
   449 U.S. 24 (1980) .................................................................................................... 29

*Dossett v. First State Bank*,
   399 F.3d 940 (8th Cir. 2005) ...................................................................................... 6

*Duke Power Co. v. Carolina Envt. Study Grp.*,
   438 U.S. 59 (1978) ............................................................................................... 58, 60

*Dwares v. City of New York*,
   985 F.2d 94 (2d Cir. 1993) ......................................................................................... 7

*Dykes v. Hosemann*,
   743 F.2d 1488 (11th Cir. 1984) ................................................................................ 29

*Elrod v. Burns*,
   427 U.S. 347 (1976) .................................................................................................. 65

*Fla. Dep't of State v. Treasure Salvors, Inc.*,
   458 U.S. 670 (1982) .................................................................................. 55

*Food & Water Watch, Inc. v. Vilsack*,
   808 F.3d 905 (D.C. Cir. 2015) .................................................................. 56

*Frazier v. Bd. of Trs. of Nw. Miss. Reg'l Med. Ctr.*,
   765 F.2d 1278 (5th Cir.) ............................................................................ 5

*Fries v. Barnes*,
   618 F.2d 988 (2d Cir. 1980) ....................................................................... 5

*Gallagher v. Neil Young Freedom Concert*,
   49 F.3d 1442 (10th Cir. 1995) .................................................................. 42

*George v. Edholm*,
   752 F.3d 1206 (9th Cir. 2014) ................................................... 4, 7, 18, 19

*Hatteras v. Sw. Bell Tel. Co.*,
   774 F.2d 1341 (5th Cir. 1985) ................................................................... 5

*Hemphill v. Schott*,
   141 F.3d 412 (2d Cir. 1998) ....................................................................... 7

*Hill v. Colorado*,
   530 U.S. 703 (2000) .................................................................................. 52

*Hobbs v. Hawkins*,
   968 F.2d 471 (5th Cir. 1992) .................................................................... 29

*In re Domestic Airline Travel Antitrust Litig.*,
   221 F. Supp. 3d 46 (D.D.C. 2016) ........................................................... 59

*In re TelexFree Sec. Litig.*,
   --- F. Supp. 3d ---, 2022 WL 3915989 (D. Mass. Aug. 31, 2022) ........... 59

*Int'l Women's Day March Planning Comm. v. City of San Antonio*,
   619 F.3d 346 (5th Cir. 2010) .................................................................... 52

*Jackson v. Metro. Edison Co.*,
   419 U.S. 345 (1974) .................................................................................. 41

*Jones v. City of Chicago*,
   856 F.2d 985 (7th Cir. 1988) .................................................................... 18

*Knight First Amend. Inst. at Columbia Univ. v. Trump*,
   928 F.3d 226 (2d Cir. 2019) ..................................................................... 36

*Ladd v. Livingston,*
    777 F.3d 286 (5th Cir. 2015) ............................................................... 3, 65

*Lujan v. Def. of Wildlife,*
    504 U.S. 555 (1992)................................................................................. 56

*Lynch v. Leis,*
    382 F.3d 642 (6th Cir. 2004) ................................................................... 63

*Manhattan Cmty. Access Corp. v. Halleck,*
    139 S. Ct. 1921 (2019) ............................................................................. 60

*Massachusetts v. E.P.A.,*
    549 U.S. 497 (2007)................................................................................. 65

*Mastafa v. Australian Wheat Bd. Ltd.,*
    No. 07 Civ. 7955(GEL), 2008 WL 4378443 (S.D.N.Y. Sep. 25, 2008)............ 59

*Mathis v. Pac. Gas & Elec. Co.,*
    891 F.2d 1429 (9th Cir. 1989) ................................................................... 4

*McIntyre v. Ohio Elec. Comm'n,*
    514 U.S. 334 (1995)................................................................................. 52

*McNamara v. Moody,*
    606 F.2d 621 (5th Cir. 1979) ................................................................... 57

*Minn. Citizens Concerned for Life, Inc. v. Swanson,*
    692 F.3d 864 (8th Cir. 2012) ................................................................... 65

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins.,*
    463 U.S. 29 (1983)................................................................................... 54

*Near v. Minnesota ex rel. Olson,*
    283 U.S. 697 (1931)................................................................................. 53

*Neb. Press Ass'n v. Stuart,*
    427 U.S. 539 (1976)................................................................................. 53

*Nesmith v. Alford,*
    318 F.2d 110 (5th Cir. 1963) ................................................................... 30

*Norwood v. Harrison,*
    413 U.S. 455 (1973)........................................................................... 4, 6, 19

*Packingham v. North Carolina,*
    137 S. Ct. 1730 (2017)............................................................................. 58

*Parsons v. U.S. Dep't of Justice*,
    801 F.3d 701 (6th Cir. 2015) .................................................... 58

*Peterson v. City of Greenville*,
    373 U.S. 244 (1963) ............................................................... 4

*Pfannstiel v. City of Marion*,
    918 F.2d 1178 (5th Cir. 1990) ................................................ 30

*Pinkerton v. United States*,
    328 U.S. 640 (1946) ............................................................... 30

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*,
    413 U.S. 376 (1973) ............................................................... 66

*Pleasant Grove City v. Summum*,
    555 U.S. 460 (2009) ............................................................... 7

*R.A.V. v. City of St. Paul*,
    505 U.S. 377 (1992) ............................................................... 52

*Rattner v. Netburn*,
    930 F.2d 204 (2d Cir. 1991) .................................................. 14

*Rawson v. Recovery Innovations, Inc.*,
    975 F.3d 742 (9th Cir. 2020) ............................................. 41, 42

*Reitman v. Mulkey*,
    387 U.S. 369 (1967) ............................................................ 4, 5

*Rice v. Paladin Enters., Inc.*,
    128 F.3d 233 (4th Cir. 1997) ................................................. 7

*Rivera v. Rhode Island*,
    402 F.3d 27 (1st Cir. 2005) ................................................... 6

*Roberson v. Dakota Boys & Girls Ranch*,
    42 F.4th 924 (8th Cir. 2022) ............................................. 42, 43

*Robinson v. Hunt County*,
    921 F.3d 440 (5th Cir. 2019) ................................................ 36

*Robinson v. Maruffi*,
    895 F.2d 649 (10th Cir. 1990) .............................................. 18

*Rosemond v. United States*,
    572 U.S. 65 (2014) ................................................................ 6

*Rumsfeld v. Forum for Acad. & Inst'l Rights, Inc.*,
    547 U.S. 47 (2006) .................................................................................. 56

*S. Utah Wilderness All. v. Palma*,
    707 F.3d 1143 (10th Cir. 2013) .............................................................. 63

*Simon v. E. Ky. Welfare Rights Org.*,
    426 U.S. 26 (1976) .................................................................................. 59

*Skinner v. Ry. Lab. Execs. Ass'n*,
    489 U.S. 602 (1989) .................................................................................. 5

*Speech First, Inc. v. Fenves*,
    979 F.3d 319 (5th Cir. 2020) .................................................................. 56

*Stringer v. Whitley*,
    942 F.3d 715 (5th Cir. 2019) .................................................................. 62

*Texans for Free Enter. v. Tex. Ethics Comm'n*,
    732 F.3d 535 (5th Cir. 2013) .................................................................. 66

*Texas v. United States*,
    40 F.4th 205 (5th Cir. 2022) .................................................................. 55

*Tweed-New Haven Airport Auth. v. Tong*,
    930 F.3d 65 (2d Cir. 2019) ...................................................................... 58

*United States v. Baker*,
    923 F.3d 390 (5th Cir. 2019) .................................................................. 30

*United States v. Buttorff*,
    572 F.2d 619 (8th Cir. 1978) .................................................................... 7

*United States v. Curran*,
    20 F.3d 560 (3d Cir. 1994) ...................................................................... 18

*United States v. Mekjian*,
    505 F.2d 1320 (5th Cir. 1975) .................................................................. 6

*United States v. Rahman*,
    189 F.3d 88 (2d Cir. 1999) ........................................................................ 7

*United States v. Rashwan*,
    328 F.3d 160 (4th Cir. 2003) .................................................................. 18

*United States v. Williams*,
    553 U.S. 285 (2008) .................................................................................. 7

*Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*,
   425 U.S. 748 (1976) .................................................................................................... 56

*Warner v. Grand Cnty.*,
   57 F.3d 962 (10th Cir. 1995) .......................................................................................... 5

*Webb ex rel. K.S. v. Smith*,
   936 F.3d 808 (8th Cir. 2019) ........................................................................................ 58

*West v. Atkins*,
   487 U.S. 42 (1988) ................................................................................................. 41, 42

*West Virginia State Board of Education v.Barnette*,
   319 U.S. 624 (1943) .................................................................................................... 52

*Wittner v. Banner Health*,
   720 F.3d 770 (10th Cir. 2013) ..................................................................................... 41

**Statutes**

5 U.S.C. § 500 .................................................................................................................. 53

5 U.S.C. § 706(2) ............................................................................................................. 54

5 U.S.C. §§ 702 and 704 ............................................................................................ 53, 54

18 U.S.C. § 2(b) ............................................................................................................... 18

42 U.S.C. § 1983 ........................................................................................................ 30, 57

**Rules**

Fed. R. Civ. P. 23(b)(2) ................................................................................................... 66

**Other Authorities**

Restatement (Third) of Torts: Liability for Economic Harm § 28 (Am. L. Inst. 2022) ... 58

Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 27 (Am. L.
   Inst. 2022) ............................................................................................................. 58, 59

## INTRODUCTION

This case involves some of the most egregious First Amendment violations in American history.  Federal officials from the White House and multiple agencies use pressure, threats, coercion, cajoling, collusion, demands, and trickery and deceit to induce social-media platforms to censor speakers and viewpoints on social media that the federal officials disfavor.  The proof of this sprawling federal "Censorship Enterprise" is voluminous and overwhelming.  Plaintiffs summarize key points of the evidence in 1,442 numbered paragraphs with specific citations of the record for each point.  *See* Plaintiffs' Proposed Findings of Fact, attached as Exhibit 1.  This evidence establishes beyond dispute the following unconscionable federal censorship activities.

White House officials like Rob Flaherty, Andrew Slavitt, and Jennifer Psaki have engaged in a relentless pressure campaign, both in public and in private, to coerce platforms into censoring disfavored viewpoints on social media.  *See infra*, at 8-10; Ex. 1, ¶¶ 31-211.  Surgeon General Vivek Murthy and his staff coordinate closely with the White House in this pressure campaign, causing social-media platforms to scramble and assure federal officials that "we hear your call to do more" to censor disfavored viewpoints.  *See infra*, at 8-13; Ex, 1, ¶¶ 212-425.  The CDC flags specific social-media posts for censorship, organizes "BOLO" ("Be On the Lookout") meetings to tell platforms what should be censored, and serves as the ultimate fact-checker with final authority to dictate what speech will be removed from social media.  *See infra*, at 31-34; Ex. 1, ¶¶ 426-595.

Dr. Fauci orchestrated an elaborate campaign of trickery and deception to induce social-media platforms to censor the lab-leak theory and other viewpoints he disfavors.  *See infra*, at 19-27; Ex. 1, ¶¶ 598-852.  The FBI, likewise, deliberately planted false information about "hack-and-leak" operations to deceive social-media platforms into censoring the Hunter Biden laptop story.  *See infra*, at 27-29; Ex. 1, ¶¶ 880-904.  The FBI, CISA, and the GEC collude with social-media

platforms in hundreds of meetings about misinformation, and those agencies repeatedly flag huge quantities of First Amendment-protected speech to platforms for censorship.  *See infra*, at 34-40; Ex. 1, ¶¶ 853-1134.  CISA "switchboards" reports of so-called "misinformation" from state and local governments to platforms for censorship.  *See infra*, at 37-39; Ex. 1, ¶¶ 972-977.

CISA and the GEC are pervasively intertwined with massive public-private censorship enterprises like the Election Integrity Partnership, a collaboration among government, social-media platforms, and activist nonprofits to monitor, track, and censor enormous volumes of Americans' speech on social media.  *See infra*, at 42-48; Ex. 1, ¶¶ 991-1075, 1135-1235.  Federal health officials in the Surgeon General's Office, the CDC, and HHS collaborate in a similar censorship enterprise called the Virality Project, which procures the censorship of enormous quantities of First Amendment-protected speech.  *See infra*, at 48-51; Ex. ¶¶ 1236-1365.  These are just examples of the violations herein.

Altogether, these censorship activities by federal officials and agencies constitute a gargantuan federal "Censorship Enterprise."  This enterprise is highly effective—it has stifled debate and criticism of government policy on social media about some of the most pressing issues of our time.  And its activities are flagrantly unconstitutional.  The Court should enter a preliminary injunction putting a stop to these egregious violations of the First Amendment.

Plaintiffs incorporate by reference their previously filed briefing addressing these issues, including their prior Memorandum in Support of Preliminary Injunction, Doc. 15, and their Response to Defendants' Motion to Dismiss, Doc. 161-1.  Plaintiffs also incorporate by reference the documentary discovery, evidence, and deposition transcripts and exhibits filed in the case, including Docs. 10-1 to 10-15, Docs. 71-1 to 71-13, Docs. 86-2 to 86-10, and Docs. 204-210.

## FACTUAL BACKGROUND

Plaintiffs incorporate by reference the facts set forth in their Proposed Findings of Fact, attached as Exhibit 1 hereto. Plaintiffs also incorporate by reference the facts set forth in the Factual Background section of their prior brief in support of preliminary injunction, Doc. 15, at 8-41. Key facts relevant to each legal standard are also set forth in the Argument section below.

## ARGUMENT

"To be entitled to a preliminary injunction, a movant must establish (1) a likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction will not disserve the public interest." *Ladd v. Livingston*, 777 F.3d 286, 288 (5th Cir. 2015). All four of these factors favor an injunction here.

## I.       Plaintiffs Are Likely to Succeed on the Merits.

First, Plaintiffs are likely to succeed on the merits of their First Amendment claim (Count One) and their APA and *ultra vires* claims (Counts Two to Seven). *See* Doc. 84, at 145-161.

### A.       Plaintiffs Are Likely to Succeed on their First Amendment Claim.

"[T]here is no single test to identify state actions and state actors," and the Supreme Court's "cases have identified a host of facts that can bear on the fairness of such an attribution" of state action. *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 294, 296 (2001). The question of state action is a "necessarily fact-bound inquiry," and "the criteria lack rigid simplicity." *Id.* at 295, 298. When the government induces or jointly participates in conduct that the Constitution prohibits the government from performing, the government is liable as if it had performed the conduct itself. Courts have articulated multiple, overlapping tests for when the government induces or jointly participates in private conduct. Under these tests, Defendants are

liable for viewpoint-based censorship by social-media companies for at least five independent reasons: Defendants are *inducing* the censorship by means of (1) significant encouragement, (2) coercion, and/or (3) deception; and Defendants are *jointly participating* in the censorship through (4) conspiracy or collusion, and/or (5) pervasive entwinement in the censorship process. The evidence in this case satisfies all five of these standards.

### 1.    Inducement – Significant Encouragement, Coercion, and Deception.

As to inducement, it is "axiomatic that a state may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish." *Norwood v. Harrison*, 413 U.S. 455, 465 (1973); *see also Biden v. Knight First Amendment Inst. at Columbia Univ.*, 141 S. Ct. 1220, 1226 (2021) (Thomas, J. concurring) ("The government cannot accomplish through threats of adverse government action what the Constitution prohibits it from doing directly."). As relevant here, such inducement can take the form of coercion (both implied and express), *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982); "significant encouragement," *id.*; or deception, *George v. Edholm*, 752 F.3d 1206, 1215 (9th Cir. 2014). A government official who induces private conduct by any of these means is liable as if he had performed the conduct himself. *See Blum*, 457 U.S. at 1004; *George*, 752 F.3d at 1215.

Moreover, under this standard, it is not required for the government's unlawful conduct to be the but-for cause of the censorship. The Constitution forbids governmental coercion, significant encouragement, and deception—even when the private parties do not resist. *Reitman v. Mulkey*, 387 U.S. 369, 380–81 (1967); *Peterson v. City of Greenville*, 373 U.S. 244, 248 (1963); *Mathis v. Pac. Gas & Elec. Co.*, 891 F.2d 1429, 1434 (9th Cir. 1989); *Carlin Commc'ns, Inc. v. Mountain States Tel. & Tel. Co.*, 827 F.2d 1291, 1295 (9th Cir. 1987).

### a. **Significant Encouragement.**

The Constitution prohibits the government from "significant[ly] encourag[ing]" private conduct that the government itself could not constitutionally undertake. *Blum*, 457 U.S. at 1004. Although outright commands are the most obvious form of government inducement, the government acts unconstitutionally even when it "can be charged with only encouraging, rather than commanding" improper conduct. *Reitman*, 387 U.S. at 375 (quotation marks omitted); *accord Frazier v. Bd. of Trs. of Nw. Miss. Reg'l Med. Ctr.*, 765 F.2d 1278, 1286 (5th Cir.) (government is responsible for private conduct that it "had some affirmative role, albeit one of encouragement short of compulsion," in promoting), *amended on other grounds*, 777 F.2d 329 (5th Cir. 1985) (Mem.).

Significant encouragement takes many forms. Explicit requests are most obvious. *E.g.*, *Hatteras v. Sw. Bell Tel. Co.*, 774 F.2d 1341, 1343 n.4 (5th Cir. 1985) (telephone disconnection at government's request); *Warner v. Grand Cnty.*, 57 F.3d 962, 964 (10th Cir. 1995) (search at government's request); *Fries v. Barnes*, 618 F.2d 988, 990–91 (2d Cir. 1980) (seizure of property at government's request). But subtler, more "covert" forms of encouragement also are significant when designed to induce specific action. *See Skinner v. Ry. Lab. Execs. Ass'n*, 489 U.S. 602, 615 (1989) ("[A] private party should be deemed an agent or instrument of the Government" whenever "the Government did more than adopt a passive position toward the underlying private conduct.").

For example, in *Adickes v. S.H. Kress & Co.*, a restaurant refused to serve a plaintiff "because she was a white person in the company of Negroes." 398 U.S. 144, 152 (1970). The Supreme Court held that the denial of service was government action if a police officer in the restaurant "communicated his disapproval to a [restaurant] employee, thereby influencing the decision not to serve [the plaintiff]." *Id.* at 158. Similarly, in *Dossett v. First State Bank*, public-

school officials contacted the plaintiff's employer, a private bank where the school had an account, to report their displeasure at the plaintiff's remarks during a recent school-board meeting. 399 F.3d 940, 944 (8th Cir. 2005). The bank's president fired the plaintiff, citing the plaintiff's "negative [comments] about our local school board and superintendent." *Id.* at 944-45. Although the president "denied that any of the school board members or the superintendent threatened to remove funds from the Bank or demanded that [the plaintiff] be fired," the court held that the termination constituted government action if the bank and school officials nonetheless "reach[ed] a mutual understanding" that the plaintiff's speech deserved retaliation. *Id.* at 944, 949–50.

The Fifth Circuit has held that even the silent presence of government officials sometimes can transform otherwise private conduct into government action. *See United States v. Mekjian*, 505 F.2d 1320, 1327 (5th Cir. 1975) (stating that a search performed by private parties is attributable to the government if federal officials are "stand[ing] by watching with approval as the search continues"). To be sure, presence alone, without other factors, "is not sufficient." *Blum*, 457 U.S. at 1004–05. But if the facts show that the officials' approving presence "induce[s], encourage[s] or promote[s]" the private parties to act, *Norwood*, 413 U.S. at 465, then that presence amounts to unconstitutional "significant encouragement," *Blum*, 457 U.S. at 1004; *cf. Rivera v. Rhode Island*, 402 F.3d 27, 34 (1st Cir. 2005) (recognizing that a government official's assurance that he will not intervene can make the official responsible for private acts of violence).

Attributing responsibility to the government for "significantly encouraging" private acts makes sense because a party who has lent any "assistance rendered by words, acts, encouragement, support, or presence" is legally an accomplice. *Rosemond v. United States*, 572 U.S. 65, 73 (2014). Although that term applies most often in the criminal context, courts routinely find that the government is an accomplice to private civil misconduct when the government significantly

encourages that conduct. *E.g.*, *George*, 752 F.3d at 1215 ("Police officers may be liable for a private party's search when the police ordered or were complicit in the search."); *Hemphill v. Schott*, 141 F.3d 412, 419 (2d Cir. 1998) (identifying a "Fourteenth Amendment right not to be subjected to the excessive force of a third party who is aided and abetted by a state actor"); *Dwares v. City of New York*, 985 F.2d 94, 98 (2d Cir. 1993) ("[A] state actor may be subject to liability for an action physically undertaken by private actors in violation of the plaintiff's liberty or property rights if the state actor directed or aided and abetted the violation.").

Moreover, Defendants cannot evade responsibility for their actions by appealing to the government-speech doctrine. That doctrine permits the government to express its own opinion without violating the First Amendment. *Pleasant Grove City v. Summum*, 555 U.S. 460, 467–68 (2009). But Defendants are not merely opining in the abstract about disputed policy questions. Instead, they are contacting social-media companies through backchannels and demanding that those companies make specific changes to their content-moderation policies and take concrete censorship action on particular items of speech.

Courts regularly apply the same distinction to private speech. The First Amendment protects advocating criminal conduct in the abstract, *Brandenburg v. Ohio*, 395 U.S. 444, 448–49 (1969), but not "encourag[ing]" a particular person to take a specific criminal action, *e.g.*, *United States v. Rahman*, 189 F.3d 88, 115 (2d Cir. 1999); *Rice v. Paladin Enters., Inc.*, 128 F.3d 233, 243–47 (4th Cir. 1997); *United States v. Buttorff*, 572 F.2d 619, 623–24 (8th Cir. 1978). Thus, the First Amendment protects "abstract advocacy" like "'I believe that child pornography should be legal' or even 'I encourage you to obtain child pornography,'" but it does not protect "the recommendation of a particular piece of purported child pornography." *United States v. Williams*, 553 U.S. 285, 299–300 (2008). So too, even assuming the First Amendment permits the

government to advocate in the abstract for actions that the Constitution bars the government itself from taking, it does not permit the government to engage in specific, significant encouragement of such actions.

Here, there is overwhelming evidence the Defendants significantly encourage social-media censorship, especially the White House and Surgeon General's Office, and others as well.

**The White House, Rob Flaherty, and Jennifer Psaki.**  Beginning in early 2021, and continuing through the present, White House officials such as Rob Flaherty, Andy Slavitt, and Jennifer Psaki, working with others such as Clarke Humphrey, Courtney Rowe, Christian Tom, and Benjamin Wakana, have conducted and continue to conduct an intense pressure campaign against social-media platforms in public and in private to demand greater censorship.  Plaintiffs' Proposed Findings of Fact, Ex. 1, ¶¶ 31-211.

Rob Flaherty spearheads this campaign with a relentless chain of emails, meetings, and communications pressuring the platforms to engage in greater censorship of COVID-related speech.  *Id.*  Flaherty continuously badgers platforms for more detailed information about their censorship practices.  *See, e.g., id.* ¶¶ 43-45, 50, 54, 66-68, 74, 84-85, 112-113, 175.  White House officials ask platforms for reports on specific censorship issues.  *See, e.g., id.* ¶¶ 85-86 (asking for and receiving "a 24 hour report-back" on misinformation about the Johnson & Johnson vaccine); 87, 107 (Flaherty to YouTube, "We'll look out for the top trends that you've seen in terms of misinformation around the vaccine.").  White House officials make very specific demands about how to increase censorship of disfavored speech.  *Id.* ¶¶ 118-121 (demanding that Facebook monitor private events and deplatform the "Disinformation Dozen").

The White House pressures the platforms with accusations and belligerent language.  *See id.* ¶ 55 ("You are hiding the ball."); ¶ 58 ("This would all be a lot easier if you would just be

straight with us."); ¶¶ 69-70, 77 ("Really couldn't care less about … the product safari"); ¶ 99 (snapping, after not receiving a response on the censorship of Tucker Carlson quickly enough for his liking, "[t]hese questions weren't rhetorical."); 126 ("Not to sound like a broken record…."); ¶ 130 ("Hard to take any of this seriously…."); ¶¶ 134-136 ("I don't know why you guys can't figure this out"); ¶ 173 (Flaherty accusing YouTube of providing misleading information); ¶ 178 ("not even sure what to say at this point"); ¶ 186 ("Total Calvinball."). This includes one particularly profane attack by Rob Flaherty against Facebook: "Are you guys f**king serious? I want an answer on what happened here and I want it today." *Id.* ¶ 139. Indeed, Flaherty accuses Facebook of fomenting the January 6, 2021 riot by not censoring enough speech. *Id.* ¶ 78 ("an insurrection which was plotted, in large part, on your platform…. I want some assurances, based in data, that you are not doing the same thing again here."); ¶ 97 ("Not for nothing but last time we did this dance, it ended in an insurrection.").

The encouragement takes other forms as well. White House officials praise the platforms for censoring content that does not violate their policies. *Id.* ¶ 112 (Flaherty praising YouTube for censoring non-violative content: "I believe you said you reduced watch time by 70% on 'borderline' content, which is impressive."); ¶ 174 (YouTube assuring Flaherty that it censors non-violative content). And White House officials demand the removal of *specific* posts and accounts of disfavored speakers, and social-media platforms routinely comply. *Id.* ¶¶ 34-36 (Robert F. Kennedy Jr.); ¶¶ 81-82, 93-94 (Tucker Carlson and Tomi Lahren of Fox News); ¶ 103-104 (demanding and receiving the deplatforming of Alex Berenson); ¶¶ 121, 128 (the "Disinformation Dozen"); ¶ 149 (Psaki calling for the deplatforming of the "Disinformation Dozen"); ¶ 125 (trending posts on Facebook); ¶ 168 (parody or fake account of Dr. Fauci); 1¶¶ 80-187 (a comedic video of Jill Biden).

When aggressive demands do not get quick enough results, the White House resorts to

overt and implied threats. *See, e.g., id.* ¶ 61 ("Internally we have been considering our options on

what to do about it."); ¶ 108 (Flaherty telling YouTube, "This is a concern that is shared at the

highest (and I mean highest) levels of the WH"); ¶¶ 114-115 (referring to a list of policy

recommendations and stating, "spirit of transparency – this is circulating around the building and

informing thinking.").

In addition to private demands, public pressure is a key part of this campaign. The White

House makes detailed public demands for greater censorship, including at the White House press

conferences on May 5, 2021 and July 15, 2021. *Id.* ¶¶ 123-124 (Jennifer Psaki demanding greater

censorship and calling for "a robust anti-trust program"); ¶¶ 146-152 (Jennifer Psaki at the July

15, 2021 press conference making four public demands on platforms, including data-sharing,

creating "a robust enforcement strategy," to "take faster action against harmful posts," and

adjusting their algorithms); ¶¶ 164-165 (White House communications director threatening repeal

of Section 230 if platforms do not censor more speech). President Biden accuses the platforms of

"killing people" by not censoring enough misinformation. *Id.* ¶ 153.

Social-media platforms promptly respond to this pressure campaign by repeatedly

reporting to the White House that they will stiffen their policies and/or take enforcement actions

against disfavored speech. *Id.* ¶¶ 41-42, 45, 64, 75, 131, 177, 187. And platforms dutifully report

to the White House in detail about their censorship practices. *Id.* ¶¶ 86-87, 132-133, 174.

**The Surgeon General and His Office.** Throughout 2021 and 2022, Surgeon General

Vivek Murthy and his Office have and are engaged in a pressure campaign in parallel with, and

often overlapping with, the White House's pressure campaign on social-media platforms. Surgeon

General Murthy and his staff are often included in the same meetings and communications with

White House officials and social-media platforms, and join White House officials pressuring them to increase censorship in public and in private. *See id.* ¶¶ 212-425.

The Surgeon General uses his "bully pulpit" to pressure social-media platforms to censor disfavored viewpoints. *Id.* ¶¶ 218-222. This pressure occurs in public and in private, *id.* ¶¶ 222, 225, 269, including in "closed-door meetings" with platforms, *id.* ¶ 394. The Surgeon General pressures platforms to share data about misinformation and censorship on their platforms to allow the government to monitor disfavored viewpoints on their platforms. *Id.* ¶¶ 236-240, 353. After intense pressure, Facebook ultimately agreed to additional data-sharing demanded by the Surgeon General. *Id.* ¶¶ 359, 363. In private meetings, Dr. Murthy demands that the platforms perform "defensive work" to remove misinformation. *Id.* ¶ 283. In early 2021, Dr. Murthy had a series of "angry" and "tense" meetings with platforms to demand that they remove misinformation. *Id.* ¶¶ 341-344.

Dr. Murthy places great public pressure on the platforms to censor. At his July 15, 2021 press conference with Jennifer Psaki, Dr. Murthy announced a Health Advisory that explicitly demands greater censorship from social-media platforms. *Id.* ¶¶ 293-309. He demanded that platforms do "much, much more" to "address misinformation." *Id.* ¶ 307. His Health Advisory demands that platforms take specific steps to censor disfavored viewpoints on health and share data with government and its partners so they can monitor the spread of disfavored speech on their platforms. *Id.* ¶¶ 324-329. He explicitly calls for prior restraints, *e.g.*, "prioritize the early detection of misinformation 'super-spreaders' and repeat offenders. Impose clear consequences for accounts that repeatedly violate platform policies." *Id.* ¶ 326-329.

This White House-Surgeon General pressure campaign gets results. After the public pressure of July 15 and 16, Facebook provided "a catalog of … both removal of misinformation

and other steps to tamp down mis- and disinformation." *Id.* ¶ 262.  In fact, the Surgeon General's Office asked all platforms to report back on what additional censorship they were imposing as a result of the Surgeon General's Health Advisory. *Id.* ¶¶ 270, 309, 364, 368.  Platforms reported back with new steps taken to increase censorship of disfavored viewpoints. *Id.* ¶¶ 370-377, 395. In response to the Advisory, Facebook reported a series of more aggressive steps against misinformation, including deplatforming the Disinformation Dozen and adopting more restrictive policies. *Id.* ¶ 348, 354-358.  Facebook told the White House and Surgeon General, "we hear your call to do more." *Id.* ¶ 358.  Facebook sought to understand "what the White House expects of us on misinformation going forward." *Id.* ¶ 349.  It asked to "find a way to deescalate and work together collaboratively" on censoring misinformation. *Id.* ¶ 351.  Facebook assured the White House and Surgeon General that it would censor disfavored speech about vaccines for children ages 5-11. *Id.* ¶ 395. The Surgeon General's pressure campaign places both economic and public pressure on platforms. *Id.* ¶¶ 272-273.

Facebook provides biweekly reports on misinformation on its platforms to the Surgeon General and the White House. *Id.* ¶¶ 279, 284-286, 291.  Platforms provide detailed reports on their censorship activities to the Surgeon General and his staff, especially announcing increased censorship policies and enforcement. *See, e.g., id.* ¶¶ 281, 395-398.

In October 2021, the Surgeon General publicly hammered Facebook after a Washington Post report about disinformation on its platforms, pressuring all platforms to increase censorship. *Id.* ¶¶ 386-387.  He stated: "We must demand Facebook and the rest of the social media ecosystem take responsibility for stopping health misinformation on their platforms.  The time for excuses and half measures is long past. We need transparency and accountability now." *Id.* ¶ 387.  The Surgeon General's Office agrees that the Surgeon General was "hitting up Facebook" on the spread

of misinformation on its platforms.  *Id.* ¶ 392.  Dr. Murthy followed up with a series of public statements demanding that the platforms increase censorship of disfavored viewpoints, including "aggressive action" against "superspreaders" and disfavored speakers. *Id.*  ¶¶ 400-409.

The Surgeon General threatens regulation of platforms if they do not increase censorship. The Surgeon General's Health Advisory impliedly threatens regulation by calling for "appropriate legal and regulatory measures that address health misinformation." *Id.* ¶ 325.  Dr. Murthy himself, and the Surgeon General's documents, threaten adverse consequences on the platforms by threatening to hold them "accountable."  *See, e.g.,*  ¶¶ 301-303, 329, 387, 403.  Shortly before issuing a formal Request for Information (RFI) in the Federal Register, Dr. Murthy called for the government to set "safety standards" for misinformation on platforms. *Id.* ¶ 410.  Then, on March 3, 2022, the Surgeon General issued the formal RFI to demand information from platforms about the spread of, and how to track, misinformation on their platforms.  *Id.*  ¶ 411-416.  The RFI requests information about specific disfavored speakers and viewpoints on social media.  *Id.* ¶ 416. The RFI carries an implied threat of regulation against social-media platforms if they do not stop the spread of misinformation.  *Id.* ¶¶ 410-416.  Shortly after the RFI, Dr. Murthy called for the equivalent of "speed limits"—*i.e.*, government-imposed safety standards—for misinformation on platforms. *Id.* ¶ 423.

These pressure campaigns amount to not only unlawful significant encouragement, but also coercion and conspiracy/collusion, as discussed further below.  Moreover, the activities of other agencies such as CISA, the FBI, the CDC, the GEC, and NIAID, discussed in other subsections below, also constitute significant encouragement.

### b. Coercion.

Defendants' conduct also constitutes outright coercion. Coercion includes "actual or threatened imposition of government power or sanction," "even if it turns out to be empty." *Backpage.com, LLC v. Dart*, 807 F.3d 229, 230–31 (7th Cir. 2015); *see also Biden v. Knight First Amendment Inst. at Columbia Univ.*, 141 S. Ct. 1220, 1226 (2021) (Mem.) (Thomas, J. concurring) ("The government cannot accomplish through threats of adverse government action what the Constitution prohibits it from doing directly."). Threats include any "intimati[on]," however "veiled" or "implicit," "that some form of punishment or adverse regulatory action" may follow unless the private actor complies with the government's demands. *Rattner v. Netburn*, 930 F.2d 204, 209–10 (2d Cir. 1991).

*Rattner* is instructive. There, a local chamber of commerce published speech that criticized the local government. *Id.* at 205. A local official wrote to the chamber purportedly on behalf of himself "and [his] neighbors to express [their] concern" that the article was "misleading." *Id.* at 205–06. The official said that the article "raise[d] significant questions and concerns about the objectivity and trust which we are looking for from our business friends" and asked which of the Chamber's members supported the article's publication. *Id.* at 206. The Second Circuit concluded that the letter "may reasonably be viewed as an implicit threat." *Id.* at 210. Further, no amount of verbal disclaimer can eliminate an actual on-the-ground threat. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 68 (1963). "It would be naive to credit the [government's] assertion that [its demands for stricter censorship] are in the nature of mere . . . advice." *Bantam Books*, 372 U.S. at 68.

Defendants' conduct described herein constitutes coercion. This is true of the White House's and Surgeon General's pressure campaigns—interspersed with veiled threats—discussed above. It is also true of the demands of the other agencies discussed herein, such as CISA, the

FBI, the CDC, NIAID, and the GEC, because of the background threats from senior federal officials, including both Defendants and their political allies.

As noted, Defendants' conduct occurs against the backdrop of a steady and ongoing drumbeat of public threats from senior federal officials who demand greater censorship from social-media platforms and threaten adverse legal consequences—such as repeal or reform of Section 230's liability shield, and antitrust enforcement—against the platforms if they do not increase censorship of disfavored viewpoints. Plaintiffs' Proposed Findings of Fact, Ex. 1, ¶¶ 1-30. The threat of Section 230 repeal or reform is a "fearsome cudgel" to platforms because the liability shield is "a hidden subsidy worth billions of dollars," *id.* ¶ 2; and antitrust enforcement is "an existential threat" to the companies, *id.* ¶ 3. These threats include public statements and congressional hearings where social-media CEOs such as Mark Zuckerberg of Facebook, Jack Dorsey of Twitter, and Sundar Pichai of Google are repeatedly raked over the coals, compared to a "slavetocracy," accused of running "hotbeds of misinformation and disinformation," hounded to take "aggressive action … to eliminate misinformation and disinformation," and told that "aggressive and targeted reform" of Section 230 is coming, among others. *Id.* ¶¶ 4-18.

President Biden and his aides lead this charge, making the most vociferous and aggressive threats against platforms to demand greater censorship of disfavored viewpoints. *Id.* ¶¶ 19-30. Among other things, Biden has called for Mark Zuckerberg to face civil liability and even criminal prosecution for not censoring enough speech he disfavors, *id.* ¶¶ 20-21, and publicly stated that social-media platforms are "killing people" by not censoring enough misinformation, *id.* ¶ 27. Likewise, White House Press Secretary Jennifer Psaki and White House Communications Director Kate Bedingfield, among others, have repeatedly threatened Section 230 repeal and antitrust scrutiny against the platforms while demanding more censorship. *Id.* ¶¶ 123-124, 146-152, 156-

162, 164-165, 192-197. And once President Biden was elected with both Houses of Congress under control of his political allies, these threats became all the more menacing.

The Government's own witnesses attest to the coercive power of such pressure from Congress, which was exerted in private meetings as well. FBI agent Elvis Chan observes the platforms became far more aggressive in removing misinformation during the 2020 election cycle than in previous election cycles, and they have remained so. *Id.* ¶ 945. Based on direct observation and experience, Chan attributes this increase in censorship to pressure from Congress. *Id.* ¶¶ 946-961. He observes that "pressure from Congress, specifically HPSCI and SSCI"—the House Permanent Select Committee on Intelligence, and the Senate Select Committee on Intelligence— pushed the platforms to adopt more aggressive censorship policies and enforcement. *Id.* ¶ 946.

This pressure takes two forms. First, Congressional committees force the CEOs of social-media platforms to appear and testify, including "Mark Zuckerberg and Jack Dorsey and Sundar Pichai." *Id.* ¶ 947. Based on discussions with platform employees, Chan concludes that "that kind of scrutiny and public pressure from Congress … motivated them to be more aggressive in the account takedowns." *Id.* ¶ 947. Chan identifies specific hearings that placed public pressure on the platforms and pushed them to increase censorship. *Id.* ¶¶ 948-949.

Second, those Congressional committees sent high-level staffers to Silicon Valley to meet directly with senior officials from the platforms, including Facebook, Google, and Twitter, in non-public meetings. *Id.* ¶¶ 950, 956-957. In these private meetings, employees of the platforms experience the visits from Congressional staffers as exercising a lot of pressure on them. *Id.* ¶ 951. The staffers have presented potential legislation to the platforms in these meetings, effectively threatening them with adverse legal consequences if they did not increase censorship. *Id.* ¶ 952. This pressure from Congress made the platforms more cooperative with the FBI when it seeks

account "takedowns." *Id.* ¶ 953. Chan discussed these meetings both with the staffers and the platform employees who attend them. *Id.* ¶¶ 955-956.

As Chan attests, these tactics place "intense pressure from U.S. lawmakers" on the platforms and cause them to change their policies to be more restrictive, and to adopt more aggressive enforcement of their policies. *Id.* ¶¶ 958-959. This Congressional pressure on platforms is ongoing, as Chan acknowledges there were multiple such hearings during the 2022 election cycle to pressure the platforms to increase censorship. *Id.* ¶ 960. Chan attributes the dramatic increases in censorship on social-media platforms in recent years to such Congressional pressure. *Id.* ¶¶ 961.

Likewise, Alex Stamos of the Election Integrity Partnership agrees with Elvis Chan that "pushing the platforms to do stuff" is easier when they face "huge potential regulatory impact," as in the United States. *Id.* ¶ 1234. And the Virality Project report agrees that government pressure pushes social-media platforms to adopt more aggressive censorship policies, and that "government inquiries" resulted in more restrictive vaccine-related policies. *Id.* ¶ 1270, *see also id.* ¶ 1349.

Especially against the backdrop of these public and private threats of adverse legal consequences – closely linked to demands for greater censorship – the Defendants' conduct rises to the level of coercion, as well as significant encouragement. For example, the White House's pressure campaign detailed above, combined with these threats, is extremely coercive. Indeed, White House officials have resorted to public and private threats to increase the pressure of their "encouragement." So, too, is the Surgeon General's pressure campaign, conducted in close coordination with the White House. Among other things, the Surgeon General has impliedly threatened adverse regulation through his Health Advisory and RFI, along with his public statements. The CDC's close collaboration with the social-media platforms on health-

misinformation censorship, likewise, is enabled by the coercive pressure campaign from the White House and allied federal officials.  The same conclusion applies to the censorship activities of the FBI, CISA, NIAID, and the GEC, all discussed further below.

### c.    Deception.

Government is also responsible for private conduct that it induces by deception.  For example, when government officials "gave false information about [a suspect's] medical condition" to a doctor "with the intent of inducing [the doctor] to perform" a search, the court held the government officials responsible for that search. *George*, 752 F.3d at 1215.  So also, when government officials give false information to social-media platforms with the intent of inducing them to censor disfavored viewpoints, the government officials are responsible for that censorship. *See id.*; *see also Jones v. City of Chicago*, 856 F.2d 985, 994 (7th Cir. 1988) ("[Government officials] cannot hide behind [those] whom they have defrauded.").

As above, holding government officials responsible for private action that they induce by deception is consistent with other areas of law, including federal complicity law.  A defendant who uses deception to induce an innocent person into committing "an act . . . which if directly performed by [the defendant] would be an offense" is liable as if he had committed the act himself. 18 U.S.C. § 2(b); *see, e.g.*, *United States v. Curran*, 20 F.3d 560, 567 (3d Cir. 1994).  Thus, a defendant "cannot insulate himself from punishment by manipulating innocent third parties to perform acts on his behalf that would be illegal if he performed them himself." *United States v. Rashwan*, 328 F.3d 160, 165 (4th Cir. 2003). So too, government officials cannot "avoid responsibility for an unconstitutional [act] by using deception to induce a private party to perform" the act on their behalf. *George*, 752 F.3d at 1220; *cf. Robinson v. Maruffi*, 895 F.2d 649, 656 (10th Cir. 1990) ("[A] police officer who deliberately supplied misleading information that influenced

the decision [to prosecute] . . . cannot escape liability" for malicious prosecution even though it was the prosecutor, not the officer, who filed charges.).   "[I]t is axiomatic that a state may not induce … private persons to accomplish what it is constitutionally forbidden to accomplish," *Norwood*, 413 U.S. at 465—including by tricking or deceiving them into doing it.

Here, the evidence shows Defendants Dr. Fauci, NIAID, NIH, and the FBI engaging in egregious campaigns of deception "with the intent of inducing" platforms to censor speech. *George*, 752 F.3d at 1215.   These actions violate the First Amendment.

**Dr. Fauci, Dr. Collins, NIAID, and NIH.**   Dr. Fauci, collaborating frequently with NIH Director Dr. Francis Collins, orchestrated a series of campaigns of deceit to procure the censorship of viewpoints he disfavored on social media, beginning at latest in early 2020.   Once he became Chief Medical Advisor in the Biden Administration in early 2021, his censorship efforts coordinated with and reinforced those of federal officials in the White House, the Office of the Surgeon General, and the CDC.

*Lab-Leak Theory.* In early months of 2020, Dr. Fauci worked closely with Dr. Collins and Jeremy Farrar of the Wellcome Trust, a predominant British science-funding organization, to orchestrate a deceptive campaign to discredit and suppress the opinion that SARS-CoV-2, the virus that causes COVID-19, leaked from a laboratory at the Wuhan Institute of Virology—an opinion that has recently been confirmed as likely true.   *See* Michael R. Gordon, et al., *Lab Leak Most Likely Origin of Covid-19 Pandemic, Energy Department Now Says*, WALL STREET JOURNAL (Feb. 26, 2023), *at* https://www.wsj.com/articles/covid-origin-china-lab-leak-807b7b0a.

Dr. Fauci had powerful motives to suppress the lab-leak theory: he is a longstanding public advocate for gain-of-function research, which makes viruses more virulent and transmissible; and his agency, NIAID, funded dangerous gain-of-function experiments on bat coronaviruses at the

Wuhan Institute of Virology, the prime suspect for a lab leak.  Plaintiffs' Proposed Findings of

Fact, Ex. 1, ¶¶ 598-630.  If the lab-leak theory were established or widely believed, Dr. Fauci and

his agency could face responsibility for the deaths of millions in a global pandemic, and a crisis of

confidence in the public science-funding enterprise they run.  *Id.*; *see also id.* ¶ 652.

In a call in the evening of Friday, January 31, 2020, Dr. Fauci became aware from Jeremy

Farrar that Dr. Kristian Andersen of Scripps and other virologists had grave concerns that SARS-

CoV-2, the virus that causes COVID-19, "look(s) … engineered."  *Id.* ¶¶ 637, 639.  Shortly before

this call, Dr. Fauci had received a briefing from his staff about NIAID's funding of research on

bat coronaviruses in Wuhan.  *Id.* ¶ 635.

After midnight after the call with Farrar and Andersen, Dr. Fauci sent an urgent, cryptic

email to his confidential deputy, Dr. Hugh Auchincloss, attaching a paper about the "SARS Gain

of Function" research that NIAID had funded in Wuhan, and telling him to "[k]eep your cell phone

on … you will have tasks today that must be done."  *Id.* ¶¶ 640; *see also id.* ¶ 640-647, 653-656.

Dr. Fauci later testified eighteen times that he could not remember anything about this urgent,

cryptic email exchange with his principal deputy.  *Id.* ¶ 642.

In fact, Dr. Fauci's testimony on this email and other points is not credible, and it

contradicts the documentary evidence, including his own contemporaneous emails, on

approximately 37 points.  *Id.* ¶¶ 609, 612, 620, 628, 629, 630, 642, 647, 651, 662, 664, 666, 667,

668, 670, 685, 686, 690, 702, 703, 708, 710, 722, 730, 733, 737, 746, 753, 772, 789, 798, 805,

807, 808, 809, 825, 849.  Further, Dr. Fauci testified that "I do not recall" or similar 174 times in

his deposition, and counting variations on "I don't remember," at least 212 times.  *Id.* ¶ 620.  This

contrasts with his public claims, on some of the very same events that he was asked to testify, that

"I remember it very well."  *Id.*  It also contrasts with his clear, specific recollection of

contemporaneous events that are not directly related to the case. *Id.* ¶¶ 620, 852. Plaintiffs are filing with the Court a video compilation of Dr. Fauci's response stating "I do not recall" so that the Court may assess his credibility by viewing his demeanor. *See* Jones Decl., Ex. 2, ¶ 35.

On February 1, 2020, Dr. Fauci participated in a clandestine conference call with a group of science funders and influential science-funding authorities to discuss the lab-leak possibility. *Id.* ¶¶ 648, 657-666. Farrar insisted that the call was to be "in total confidence." *Id.* ¶ 657. Influential figures with a strong vested interest in avoiding a major scandal about science-funding practices were heavily represented on the call. *Id.* ¶ 659. As science-funding authorities, they also had powerful influence over the scientists on the call. *Id.* Dr. Fauci testified sixteen times that he could not remember details about the call, *id.* ¶ 661, though to the national media, he has proclaimed of the very same call, "I remember it very well," *id.* ¶ 662.

Contemporaneous emails show that the participants on the call—including Dr. Fauci, Dr. Collins, and Farrar himself—were keenly aware that there were powerful arguments in favor of the lab-leak theory of COVID's origins. *Id.* ¶ 680 ("hard time explaining that as an event outside the lab"); *id.* ("70:30 or 60:40" in favor of laboratory origins); *id.* ¶ 681 ("I really can't think of a plausible natural scenario … I just can't figure out how this gets accomplished in nature…. it's stunning."); *id.* ¶ 682 (Farrar: "On a spectrum if 0 is nature and 100 is release – I am honestly at 50!"); *id.* ¶ 694 ("Eddie [Holmes] would be 60:40 lab side. I remain 50:50"); *id.* ¶ 709 ("we have a nightmare of circumstantial evidence to assess").

Immediately after the call, the participants launched a deceitful effort to manufacture the appearance of scientific consensus against the lab-leak theory. Two scientists on the call, Eddie Holmes and Kristian Andersen, began drafting a scientific paper for publication to decisively

refute the lab-leak theory, even though their contemporaneous emails indicated that they were both inclined to believe the lab-leak theory. *Id.* ¶¶ 691-692.

Following the call, Dr. Fauci, Farrar, and Dr. Collins communicated extensively about the plan to discredit the theory. Among other things, they plotted to prod the WHO to establish a panel on the lab-leak theory that they would stack with a "core group" of their own contacts, then "frame the work of the group" and put "pressure on this group from our and your teams" to push it to their preferred result—discrediting the lab-leak theory. *Id.* ¶¶ 701-702.

There is no doubt about the purpose of this conspiracy. Dr. Fauci's, Farrar's, and Dr. Collins's communications at the time repeatedly express concern about preventing the spread of the lab-leak theory on social media. *Id.* ¶¶ 671, 673, 675, 676, 677, 678, 683. Dr. Fauci, in particular, expressed concerns about "the threat of further distortions on social media." *Id.* ¶ 683.

By February 4, 2020—three days after the clandestine conference call—Eddie Holmes sent a draft scientific paper attacking the lab-leak theory to Farrar, who forwarded it to Dr. Fauci. *Id.* ¶ 691. Though the draft purported to refute the lab-leak theory, Holmes noted that he did not "mention" the virus's "other anomalies" that make it look bioengineered "as this will make us look like loons." *Id.* ¶ 691. Dr. Fauci's and Dr. Collins's own emails make clear that they were keenly aware that the virus may have been created through serial passage through tissue of humanized mice in the Wuhan laboratory whose work NIAID was funding. *Id.* ¶ 695.

Farrar sent Dr. Fauci four drafts of the scientific paper to review in the week following the conference call. *Id.* ¶¶ 696-699. These drafts claimed that science "clearly demonstrates" a natural origin for SARS-CoV-2. *Id.* ¶ 698. By February 17, 2020, the scientific paper discrediting the lab-leak theory was accepted in a prestigious journal and was in preprint form, which was forwarded to Dr. Fauci for review (the fifth such draft he received). *Id.* ¶ 711, 716. The papers'

five listed authors were participants in the clandestine February 1, 2020 conference call, and they

all privately acknowledged the plausibility of the lab-leak theory in emails that were shared with

Dr. Fauci.  *Id.* ¶¶ 711-715.  Yet the paper claimed that "SARS-CoV-2 is not a laboratory construct

nor a purposefully manipulated virus."  *Id.* ¶ 715.  Dr. Andersen, the lead author, thanked Dr. Fauci

for his "advice and leadership" in preparing the paper, and sent him a sixth draft to review, seeking

further input from Dr. Fauci.  *Id.* ¶ 718.  The paper was then published in Nature Medicine on

March 17, 2020, as "The Proximal Origin of SARS-CoV-2."  *Id.* ¶ 723.  The final version attacked

the lab-leak theory in unequivocal terms.  *Id.* ¶ 724 ("clearly show … irrefutably show … clearly

shows … we do not believe that any type of laboratory-based scenario is plausible").

Dr. Fauci and Dr. Collins then collaborated on a deceitful campaign to push the article into

prominence, treating it as a scientific consensus created through independent scientific inquiry,

rather than the product of a secret cabal of science-funders bent on suppressing the lab-leak theory

to protect their own reputations.  *Id.* ¶¶ 726-741.  Dr. Collins featured it on NIH's official blog,

citing "The Proximal Origin of SARS-CoV-2" to describe the lab-leak theory as "outrageous" and

"debunk[ed]," leading national media to proclaim, "Sorry, Conspiracy Theorists."  *Id.* ¶¶ 727-729.

When Fox News host Bret Baier still discussed the lab-leak theory, Dr. Collins emailed Dr. Fauci,

noting that he had hoped that "the Nature Medicine article" had "settled" "this very destructive

conspiracy," and asking if there was "[a]nything more we can do?" to discredit the theory.  *Id.*

¶ 731.  Dr. Fauci described the lab-leak theory as a "shiny object that will go away in times," and

the same day, during a White House Coronavirus Task Force briefing, deceptively cited this paper

to proclaim an independent scientific consensus against the lab-leak theory.  *Id.* ¶¶ 732-739.  In

doing so, he pretended to be unfamiliar with the paper's authors, when in fact they had sent him

seven drafts to review and thanked him for his "advice and leadership" in preparing the paper.  *Id.*

Dr. Fauci, Dr. Collins, and Jeremy Farrar, and those acting in concert with them, thus engaged in a deliberately deceptive conspiracy to manufacture the appearance of a scientific consensus refuting the lab-leak theory when none existed, and when the very scientists involved were actively doubting the virus's natural origins. *Id.* ¶¶ 598-740. The stated purpose of this conspiracy was to suppress the lab-leak theory in both "main stream and social media," *id.* ¶¶ 671, 673, 675, 676, 677, 678, 683—or, as Dr. Fauci himself put it at the time, to suppress "the threat of further distortions on social media." *Id.* ¶ 683.

The conspiracy succeeded in its object. "The Proximal Origins of SARS-CoV-2" became "one of the best-read papers in the history of science." *Id.* ¶ 741. It was trumpeted in national media as refuting the lab-leak theory as a racist "conspiracy theory." Social-media platforms followed Dr. Fauci's lead in lockstep and aggressively censored the lab-leak theory well into 2021, and the censorship cabal effectively deflected responsibility for the SARS-CoV-2 for years to come. *Id.* ¶¶ 743-756.

Having succeeded so dramatically in suppressing the lab-leak theory through deception, Dr. Fauci—cooperating often with Dr. Collins, and later with Biden White House officials—continued to the same tactic of deceptively creating a false appearance of scientific consensus to procure the censorship of disfavored viewpoints on social media.

*Hydroxychloroquine.* Soon thereafter, Dr. Fauci engaged in a well-known public campaign against the drug hydroxychloroquine as an effective early treatment for coronavirus. *Id.* ¶¶ 757-776. He publicly declared that the drug was plainly ineffective based on an observational study in The Lancet, which was swiftly retracted for glaring errors. *Id.* ¶¶ 757-76. He proclaimed, based on that flawed observational study, that the evidence was "unequivocal," "that the data are clear right now," and that "[t]he scientific data is really quite evident now about the lack of efficacy."

*Id.* ¶¶ 758, 760. Then, as observational data *supporting* the drug's usage emerged, he dismissed such data because it was not from *randomized* studies (the "gold standard" for scientific evidence)—even though his own proclamation against the drug had itself been based on a (flawed and later retracted) *observational* study. *Id.* ¶¶ 761-766, 770. When dissenting doctors advocated for the drug's usage, he attacked them on national media as "a bunch of people spouting something that isn't true." *Id.* ¶ 769; *see also id.* ¶¶ 768-770.

Social-media platforms, predictably, followed Dr. Fauci's lead and aggressively censored social-media speech advocating for the use of hydroxychloroquine, acting in lockstep with Dr. Fauci and accepting his proclamation of a clear scientific consensus against the drug's usage. *Id.* ¶¶ 771-775. In fact, Dr. Fauci's deceptively manufactured scientific consensus did not exist and never existed – hundreds of studies suggest that the drug is effective for early treatment of COVID-19, and the drug is approved for usage to treat COVID-19 in 41 countries. *Id.* ¶ 776.

*Mask Efficacy.* The same deceptiveness and double standard afflicted Dr. Fauci's positions on mask mandates, which also resulted in widespread social-media censorship. *Id.* ¶¶ 828-839. In private communications in February 2020, Dr. Fauci stated that masks are generally ineffective to prevent the spread of coronavirus: "The typical mask you buy in the drugstore is not really effective in keeping out virus, which is small enough to pass through material. … I do not recommend that you wear a mask…" *Id.* ¶ 829. By early April 2020, however, Dr. Fauci unequivocally endorsed universal masking, launching nationwide mask mandates that would last for years. *Id.* ¶ 833. Dr. Fauci's dizzying change in position could not be justified by "randomized" studies that he insisted were necessary to justify using hydroxychloroquine. *Id.* ¶¶ 836-837.

*The Great Barrington Declaration.* Dr. Fauci and Dr. Collins collaborated to inflict a deceptive "quick and devastating … take down" of the Great Barrington Declaration, co-authored

by Plaintiffs Dr. Bhattacharya and Dr. Kulldorff. *Id.* ¶¶ 777-808. Consistent with principles of pandemic response that were nearly universally accepted before the COVID-19 pandemic, the Great Barrington Declaration called for focused protection of high-risk individuals while reopening society for others, and it was sharply critical of prevailing government policies favoring lockdowns, school shutdowns, and similar restrictions. *Id.* ¶¶ 783-786. Among other things, it described "keeping students out of school" as "a grave injustice." *Id.* ¶ 784.

Since Dr. Cliff Lane's trip to China at Dr. Fauci's direction in February 2020, Dr. Fauci and the government establishment favored the Chinese government's novel tactic of aggressive lockdowns to control the virus's spread, so the Great Barrington Declaration was a grave threat to the credibility of lockdown policies. *Id.* ¶¶ 777-782.

Dr. Fauci and Dr. Collins responded swiftly to the Great Barrington Declaration, following the same tactic of manufacturing the appearance of a false scientific consensus against it to procure its suppression on social media. *Id.* ¶¶ 787-808. Four days after it was published, Dr. Collins emailed Dr. Fauci, asking if a "swift and devastating published take down" of the Declaration was "underway." *Id.* ¶ 787. The two then collaborated in a public campaign to attack the Declaration and proclaim it to be "appall[ing]," "nonsense," "very dangerous," "letting infections rip," "fringe," and "not mainstream science." *Id.* ¶¶ 789-798. The claim that it was "fringe" and "not mainstream science" was deceptive, as focused protection had been scientific orthodoxy for pandemic responses prior to the COVID-19 pandemic. *Id.* ¶ 806. The campaign succeeded once again, as social-media platforms promptly and aggressively censored the Great Barrington Declaration and its authors, acting in lockstep with Dr. Fauci's proclamations. *Id.* ¶¶ 799-805.

*Alex Berenson.* Dr. Fauci also collaborated with the White House to procure the censorship of vaccine critic Alex Berenson. *Id.* ¶¶ 840-851. As part of the White House's ongoing pressure

campaign against Twitter to deplatform Berenson, *see supra*, Dr. Fauci publicly attacked Berenson's positions as "horrifying," "frightening," and not "want[ing] to do something to save your life." *Id.* ¶ 843. These comments were timed just a few days before the White House's public pressure campaign on July 15 and 16, 2021, which led to Berenson's immediate suspension and later permanent deplatforming. *See supra*.

**The FBI and the Hunter Biden Laptop Story**. Similar to Dr. Fauci's campaign of deception to suppress the lab-leak theory, the FBI engaged in a campaign of deception to induce social-media platforms to censor the Hunter Biden laptop story that the New York Post broke on October 14, 2020. Even though the FBI was in possession of Hunter Biden's laptop and knew it was not hacked, the FBI—anticipating the news story—told platforms to expect a hack-and-leak operation possibly involving Hunter Biden, and the FBI pushed the platforms to adopt policies censoring "hacked materials." This deception induced the platforms to censor the story.

In 2020, in its routine bilateral meetings with seven major social-media platforms, the FBI repeatedly raised the concern that a "hack-and-dump" or "hack-and-leak" operation might be forthcoming shortly before the 2020 general election. Plaintiffs' Proposed Findings of Fact, Ex. 1, ¶¶ 868, 883. Both the FBI and CISA repeatedly raised the concern about such "hack-and-dump" operations during the mass "USG-Industry" meetings during 2020 as well. *Id.* ¶¶ 881-882. In addition to the FBI's Elvis Chan and Laura Dehmlow, senior CISA officials Matt Masterson and Brian Scully repeatedly raised the warning about "hack-and-dump" operations during the 2020 USG-Industry meetings. *Id.* ¶¶ 894.

In fact, the FBI had no investigative basis to believe that any hack-and-leak or hack-and-dump operation was underway. *Id.* ¶ 893. Chan admits that "we did not see any similar competing intrusions to what had happened in 2016. …. [F]rom our standpoint we had not seen anything. …

[W]e were not aware of any hack-and-leak operations that were forthcoming or impending," *id.*—yet the FBI repeatedly hammered home the warning about an impending hack-and-leak operation.

Responding to these repeated concerns raised by the FBI and CISA, social-media platforms updated their content-moderation policies in 2020 to provide that they would remove hacked materials from their platforms. *Id.* ¶ 884. The FBI encouraged these changes by repeatedly warning about the expectation of hack-and-leak operations and inquiring of the platforms whether they would censor hacked materials. *Id.* ¶¶ 885-888. Multiple FBI officials raised this same inquiry to the platforms in this time frame. *Id.* ¶ 889.

A formal declaration by Twitter's then-Head of Site Integrity, Yoel Roth—executed in December 2020, close in time to the relevant events—recounts that the FBI and other federal officials repeatedly warned platforms that they "expected" hack-and-leak operations during the 2020 election cycle. *Id.* ¶ 895. Roth also learned in these meetings with federal officials that "there were rumors that a hack-and-leak operation would involve Hunter Biden." *Id.*

Corroborating Roth's account, Mark Zuckerberg testified before Congress in October 2020 that the FBI had warned platforms to be on "high alert and sensitivity" for a hack-and-dump operation shortly before the 2020 election. *Id.* ¶ 902. Likewise, Brian Scully of CISA does not dispute that FBI and CISA raised the concern about hack-and-leak operations to platforms in the USG-Industry meetings during 2020, and he does not dispute Yoel Roth's account of the communications about hack-and-leak operations in his December 2020 declaration. *Id.* ¶¶ 1088-1089. CISA's emails with platforms reflect that the 2020 meetings included discussions of such topics as "preparing for so-called 'hack and leak' operations" and "Deep Dive Topic … Hack/Leak and USG Attribution Speed/Process." *Id.* ¶¶ 1090-1091. Like Chan, Scully was not aware of any pending investigations of hack and leak operations at the time. *Id.* ¶ 1092.

After the Hunter Biden laptop story broke on October 14, 2020, platforms privately asked the FBI to confirm whether the story was credible so they could decide whether it should be censored, but the FBI refused to confirm it. *Id.* ¶ 903. Accordingly, based on the FBI's deceitful information, platforms were left with the clear impression that the Hunter Biden laptop materials were, in fact, hacked materials. After the Hunter Biden story broke, it was widely censored on social media—Twitter even suspended the New York Post's Twitter account for two weeks— pursuant to the very "hacked materials" policies that the FBI had induced platforms to adopt in the preceding months of 2020. *Id.* ¶ 904.

### 2.    Joint Participation – Collusion and Pervasive Entwinement.

Government is responsible not only for private conduct it induces by significant encouragement, deception, or threats but also for private conduct in which it acts as a "joint participant." *Burton v. Wilmington Parking Auth'y*, 365 U.S. 715, 725 (1961). Most often, this occurs through a conspiracy or collusive behavior. *E.g.*, *Dennis v. Sparks*, 449 U.S. 24, 28–29 (1980); *Hobbs v. Hawkins*, 968 F.2d 471, 480 (5th Cir. 1992). But even without a conspiracy, government is responsible for private action arising out of "pervasive entwinement of public institutions and public officials in [the private entity's] composition and workings." *Brentwood Acad.*, 531 U.S. at 298.

### a.  Conspiracy and Collusion.

Government is liable when it "reache[s] an understanding" with private parties to violate a victim's rights. *Dykes v. Hosemann*, 743 F.2d 1488, 1498 (11th Cir. 1984). As the Fifth Circuit has held, this requirement usually is "met by circumstantial evidence" because "conspirators rarely formulate their plans in ways susceptible of proof by direct evidence." *Crowe v. Lucas*, 595 F.2d

985, 993 (5th Cir. 1979).[1]   Plaintiffs need not prove, however, that Defendants "reached an understanding" to censor each particular item of speech—only that Defendants reached an understanding with social media companies to censor in general.  When a plaintiff establishes "the existence of a conspiracy involving state action," the government becomes responsible for *all* constitutional violations committed "in furtherance of the conspiracy by a party to the conspiracy." *Armstrong v. Ashley*, --- F.4th ---, 2023 WL 2005263, at *12 (5th Cir. 2023).  That is because conspiracy can "be charged as the legal mechanism through which to impose liability on each and all of the Defendants *without regard* to the person doing the particular act" that deprives the plaintiff of federal rights.  *Pfannstiel v. City of Marion*, 918 F.2d 1178, 1187 (5th Cir. 1990) (emphasis added) (cited in *Armstrong*, 2023 WL 2005263, at *12).

Likewise, courts hold government responsible for the acts of coconspirators in civil law because the same attribution of responsibility occurs in criminal law.  Liability under § 1983 is based on "more or less traditional principles of agency, partnership, joint venture, and the like." *Nesmith v. Alford*, 318 F.2d 110, 126 (5th Cir. 1963).  And under the traditional principles of partnership in criminal law, "conspirators are criminally liable for substantive crimes committed by other conspirators in furtherance of the conspiracy."  *United States v. Baker*, 923 F.3d 390, 406 (5th Cir. 2019) (citing *Pinkerton v. United States*, 328 U.S. 640 (1946)).

Here, there is overwhelming evidence of collusion and conspiracy between Defendants and social-media platforms to censor speech—including the CDC, the FBI, CISA, and the GEC.  This

---

[1] In *Crowe*, the plaintiff sued state officials under 42 U.S.C. § 1983, alleging that they had arranged for his arrest in furtherance of a conspiracy to deprive him of "his rights to freedom of speech and assembly" after he questioned the integrity of an election. *Id.* at 988–92. Although there was no direct evidence of an agreement among the defendants, "[t]he evidence showed that the defendants had participated in private meetings at which Crowe was discussed." *Id.* at 993. "From this evidence and the testimony regarding the defendants' course of conduct toward Crowe," the Fifth Circuit concluded, "the jury could reasonably have inferred that a conspiracy existed." *Id.*

evidence also amounts to joint participation and coercion, as discussed above, and pervasive entwinement, discussed below.

**The CDC and Census Bureau.**  In addition to the public and private pressure campaigns from the White House and the Surgeon General's Office, the CDC and the Census Bureau are engaged in a long censorship campaign together, enabled by the White House's pressure on platforms to cooperate with the federal government.  Working closely with Census, the CDC flags supposed "misinformation" for censorship on platforms (sometimes using the acronym "BOLO," *i.e.*, "Be On the Lookout"), and exercises full authority to dictate what health claims will be censored on social media platforms.  As discussed herein, the CDC's and Census Bureau's actions constitute significant encouragement, coercion, and conspiracy or collusion.

The CDC has regular meetings with social-media platforms about misinformation, including often weekly meetings.  Plaintiffs' Proposed Findings of Fact, Ex. 1, ¶¶ 431, 434, 438-439, 453-454, 461, 473, 475, 531, 539-540, 544-545, 563.  These meetings routinely include the platforms' content-moderation officers.  *Id.* ¶¶ 453, 459, 463, 487, 531.

The CDC asks platforms to provide reports about censorship on their platforms.  *Id.* ¶¶ 455-457, 463, 472.  These requests include inquiries about whether specific content flagged by the CDC and the Census Bureau has been removed.  *Id.* ¶¶ 470, 475.  The Census Bureau follows up to monitor whether platforms are removing the content that the CDC and Census flag.  *Id.* ¶ 495.

Facebook provides the CDC with regular biweekly "CrowdTangle" reports about misinformation on its platforms.  *Id.* ¶¶ 440-442, 450.  The CDC uses CrowdTangle and other "social media listening tools" to monitor disfavored speech on platforms.  *Id.* ¶ 442-447.  These "listening tools" allow the CDC to "flag" misinformation for censorship.  *Id.* ¶ 485.  Facebook also

gives the CDC privileged access to use CrowdTangle to monitor speech on Facebook's platforms, including in private speech like personal group posts. *Id.* ¶¶ 443, 451. 471.

The CDC works closely with the Census Bureau on censorship on social media pursuant to an Interagency Agreement (IAA), because the Census Bureau engaged in an earlier social-media censorship campaign with platforms during the 2020 census. *Id.* ¶¶ 449, 466-467, 532-533. Census and the CDC, working together, present social-media platforms with series of tables and decks that warn about misinformation themes and provide lists and screenshots of specific posts that they believe should be censored. *Id.* ¶ 460, 481. These include slide decks, *id.* ¶¶ 460, 536-538; tables of dozens of posts, *id.* ¶¶ 481, 567; spreadsheets of "example areas," *id.* ¶ 565; and "BOLO" slides, *id.* ¶¶ 554-556. They also include "BOLO" flags for supposed "misinformation" about the CDC's own content. *Id.* ¶¶ 515, 586-589. The CDC admits that it flags posts for censorship on the platforms, knowing that the platforms may take action to censor those posts and intending that the censorship occur—censorship is the desired result of the flagging. *Id.* ¶¶ 483-484, 521-523, 575-576. Platforms also offer the CDC privileged channels for federal officials to report misinformation on their platforms. *Id.* ¶¶ 476-479 (Facebook's "misinfo reporting channel"); *id.* ¶¶ 577-584 (Twitter's "Partner Support Portal").

The CDC hosted a series of "BOLO" meetings to flag disfavored speech and viewpoints for censorship, where "BOLO" stands for "Be On the Lookout." *Id.* ¶¶ 486, 549. At the BOLO meetings, the CDC and Census presented the platforms with slide decks identifying specific claims they wished to have censored, along with screenshots of specific posts as examples of the types of content to censor, and the CDC's justification for censoring that content. *Id.* ¶¶ 550-558.

Social-media platforms routinely treat the CDC as a privileged fact-checker with authority to dictate what may and may not be posted on their platforms. Facebook does so continuously.

*Id.* ¶¶ 488-499 (asking the CDC to "debunk" specific claims); *id.* ¶¶ 500-506 (asking the CDC to debunk additional specific claims); *id.* ¶¶ 511-514 (asking the CDC for guidance on how to censor speech about VAERS); *id.* ¶¶ 518-519 (content on vaccine refusals and childhood vaccines); *id.* ¶¶ 520-525 (asking for the CDC's position on ten specific claims); *id.* ¶¶ 527-530 (asking the CDC to refute and confirm harmfulness of a long series of medical claims, including relating to vaccines for children under age 5). The CDC regularly provides its definitive determination on such issues. *See id.* The CDC admits that it "know[s] that they're using our scientific information to determine their policy." *Id.* ¶ 529. YouTube also seeks the CDC's determinative guidance on how to enforce its policies, including on health issues other than COVID-19. *Id.* ¶ 541 (requesting input on a "list of common vaccine misinformation claims"); *id.* ¶¶ 547-548 (it "wasn't uncommon" for Google/YouTube to seek input on specific claims); *id.* ¶¶ 559-560 (YouTube seeking the CDC's guidance on claims about childhood vaccines); *id.* ¶¶ 561-562 ("The YouTube Policy team is requesting evidence-based input on the claims below. In the past, the CDC has reviewed COVID information claims and commented TRUE or FALSE + add any additional context needed."). Twitter, too, treats the CDC as an authoritative fact-checker. *Id.* ¶ 563.

Facebook confirms that it updated its censorship policies to address claims on childhood vaccines as a direct result of the CDC's input. *Id.* ¶ 518. It also updated its policies on other topics to render them more restrictive, based on the CDC's input. *Id.* ¶ 526. Facebook routinely asks the CDC to confirm whether particular claims "are false and can lead to harm"; if the CDC so confirms, Facebook censors those claims. *Id.* ¶¶ 501-502, 520-521.

When it comes to misinformation, the CDC's "focus is not solely on COVID. We're focusing on other topics," and communicating with platforms about them, as well. *Id.* ¶ 562.

**The FBI's Collusion.**  FBI agent Elvis Chan and many other FBI agents, especially from the FBI's Foreign Influence Task Force ("FITF"), routinely meet with social media platforms about disinformation, misinformation, and censorship.  Plaintiffs' Proposed Findings of Fact, Ex. 1 ¶¶ 855, 860.  These include regular, CISA-organized mass meetings of federal national-security and law-enforcement agencies (CISA, other DHS components, the FBI, the ODNI, and DOJ's national security division) with at least eight major social-media platforms ("USG-Industry meetings"), at which misinformation is extensively discussed.  *Id.* ¶¶ 861-866.

The FBI also has regular bilateral meetings with at least seven social-media platforms, plus Apple, to discuss disinformation concerns, and these bilateral meetings also continue through the present day.  *Id.* ¶¶ 867-877.  In these meetings, the FBI meets with the platforms' content-moderation officers in particular.  *Id.* ¶¶ 871, 877, 962.  Three to ten agents from FBI's FITF task force participate in these bilateral meetings along with Elvis Chan.  *Id.* ¶ 939.

The FBI also communicates with platforms—including flagging content, accounts, and URLs for censorship—through alternative channels, including the self-deleting app Signal and the encrypted Teleporter service.  *Id.* ¶¶ 878.

Elvis Chan confirms that the FBI cooperates with social-media platforms through "information sharing and *account takedowns*."  Plaintiffs' Proposed Findings of Fact, Ex. 1 ¶ 905 (emphasis added).  In addition to sharing "strategic information" about themes and tactics of putative disinformation, the FBI routinely flags specific content, posts, accounts, and URLs to the platforms for censorship—*i.e.*, "IP addresses, email accounts, social media accounts, … website domain names, and … file hash values." *Id.* ¶ 906.

The intended purpose and predictable effect in flagging specific speakers, content, and accounts to platforms is to induce the platforms to censor those speakers, content, and accounts.

*Id.* ¶¶ 908-911. The purpose of the FBI's "information sharing" with platforms is to "shut down … accounts." *Id.* ¶ 911. And it succeeds on a grand scale.

The FBI also flags specific content, speakers, and accounts to state and local government officials to encourage them to report them to social-media platforms (or to report them to the FBI and CISA, who then flag them to platforms). *Id.* ¶ 912.

Chan estimates that the FBI sends lists of accounts, content, websites, and URLs to social-media platforms for censorship about "one to five times per month." *Id.* ¶ 931. Each time, the FBI sends the platforms an encrypted Teleporter message with a list of "indicators," *i.e.*, specific social-media accounts, web sites, URLs, email accounts, etc., that the FBI wants the platforms to evaluate under their content-moderation policies. *Id.* ¶ 932. The size of each list ranges from a single account to "a whole spreadsheet full of them," sometimes including "hundreds" of specific accounts, websites, URLs, etc. *Id.* ¶ 934. In one occasion in 2020, the FBI sent "a spreadsheet with hundreds of accounts" via Teleporter to the platforms. *Id.* ¶ 941. Such mass-flagging messages were sent during the 2020 and 2022 election cycles with similar frequency. *Id.* ¶¶ 934-935. In general, these mass-flagging messages go to all seven major social-media platforms, but sometimes there are platform-specific mass-flagging messages. *Id.* ¶ 936. At least eight FBI agents in the San Francisco field office participate in flagging content for censorship to the social-media platforms. *Id.* ¶ 938.

The FBI's social-media flagging of supposed "foreign influence" accounts sweeps in massive amounts of domestic, First Amendment-protected speech by ordinary Americans. *Id.* ¶¶ 913-924. For example, the FBI flags supposedly foreign posts (including core political speech) that hundreds of thousands of American have engaged by liking, commenting on, and reposting—

all First Amendment-protected activities.[2]  *Id.* ¶¶ 916-919.  The FBI thus obliterates massive amounts of American speech when it induces platforms to censor such supposedly "foreign" speech.  The FBI also flags for censorship foreign-hosted websites on which American journalists and American speakers post content.  *Id.* ¶¶ 922-923.

In addition, the FBI runs "command centers" around every election that, among other things, flag reported "misinformation" for censorship to social-media platforms.  *Id.* ¶ 879, 925-927.  In doing such flagging, the FBI does not attempt to distinguish whether the speaker is American or foreign; it flags the disfavored content to the platforms for censorship regardless of whether it is foreign or domestic.  *Id.* ¶ 926.

The FBI also probes platforms for details about how they detect supposedly "inauthentic content" and how they enforce their censorship policies.  ¶¶ 929-930.  And the FBI also asks the platforms to report back to it on whether it censors the content it flags.  *Id.* ¶ 937.

The FBI boasts a "50 percent success rate" in getting platforms to censor content that it flags as misinformation.  *Id.* ¶ 928.  Given the sheer volume of the FBI's reports, this comprises the censorship of massive amounts of disfavored speakers and viewpoints.

**CISA Collusion.**   CISA, likewise, engages in extensive collusion with platforms on censorship.

---

[2]  *See, e.g., Robinson v. Hunt County*, 921 F.3d 440, 447 (5th Cir. 2019) (commenting on a Facebook page is First Amendment-protected activity); *Bland v. Roberts*, 730 F.3d 368, 386 (4th Cir. 2013) ("liking" a web page is First Amendment-protected speech); *see also Knight First Amend. Inst. at Columbia Univ. v. Trump*, 928 F.3d 226, 237 (2d Cir. 2019), *cert. granted, judgment vacated as moot sub nom. Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220 (2021) (Mem.) ("Replying, retweeting, and liking are all expressive conduct that blocking inhibits.  Replying and retweeting are messages that a user broadcasts, and, as such, undeniably are speech.").

*Continuous meetings and coordination.* CISA communicates regularly with social-media platforms about misinformation through multiple series of standing meetings. Plaintiffs' Proposed Findings of Fact, Ex. 1, ¶¶ 978-990, 1083-1087. CISA has at least five sets of recurring meetings with social-media platforms about misinformation and disinformation. *Id.* ¶ 1078. CISA also has many bilateral meetings with individual platforms. *Id.* ¶ 1084.

CISA hosts the "USG-Industry" meetings attended by the FBI, CISA, ODNI, DOJ, DHS's I&A, and at least seven or eight major social-media platforms. *Id.* ¶¶ 978, 981, 986, 1086. These "USG-Industry" meetings increase in frequency as each election nears, becoming monthly and then weekly shortly before an election. *Id.* ¶¶ 980, 1087. These meetings have been ongoing for years and are continuing. *Id.* ¶¶ 983, 985. "Concerns about misinformation and disinformation on social media platforms" are discussed at the USG-Industry meetings. *Id.* ¶ 987. Federal officials and platforms report to each other on the trends and topics of misinformation that they perceive on social media. *Id.* ¶¶ 987-988. CISA also has bilateral planning meetings with Facebook before every USG-Industry meeting. *Id.* ¶ 984.

In addition, CISA receives regular reports from social-media platforms about any changes to their content-moderation policies. *Id.* ¶ 979. Platforms report to CISA when they make their policies more restrictive. *Id.* ¶ 1103. CISA also asks platforms to report back on how they acted on reports of misinformation received from CISA, and whether they censored the flagged content. *Id.* ¶ 1061. In the USG-Industry meetings, the platforms report on changes to their content-moderation policies to the federal officials. *Id.* ¶ 1024.

*Flagging content for censorship.* CISA's website proclaims that it "serves as a switchboard for routing disinformation concerns to appropriate social media platforms," and that it has "expanded the breadth of reporting" under this program. *Id.* ¶ 976. CISA "switchboards" reports

of misinformation to social-media platforms for censorship by receiving the reports from state and local government officials and others, and forwarding them to platforms such as Facebook, Twitter, and YouTube to be evaluated for censorship under their content-moderation policies. *Id.* ¶¶ 972, 977. The "idea" of such "switchboarding" is to get the platforms to apply their content-moderation policies to the disfavored content, *i.e.*, to censor them. *Id.* ¶ 973.

CISA receives reports of misinformation both from the nonprofit organization Center for Internet Security (CIS) and directly from state and local government officials. *Id.* ¶ 1030. CISA also directs election officials to the Center for Internet Security, whose EI-ISAC program CISA funds, as an alternative route for reporting misinformation to platforms. *Id.* ¶ 1002. The CISA-funded EI-ISAC, operated by CIS, is a clearinghouse for state and local government officials to report misinformation for censorship. CISA coordinates with the CIS on reporting misinformation to the platforms. *Id.* ¶ 1031. The Center for Internet Security works closely with CISA in reporting misinformation to social-media platforms, and CISA serves as a pass-through for reports from CIS to the platforms. *Id.* ¶ 1005. CISA reports misinformation to the platforms without making any assessment of whether it involves foreign or domestic speakers. *Id.* ¶ 1033.

During the 2020 election cycle, CISA maintained a "tracking spreadsheet" with 146 entries of its "switchboarding" activities. *Id.* ¶ 1062. At least six members of CISA "took shifts" in "switchboarding" misinformation reports to platforms during 2020 election cycle. *Id.* ¶ 1063. Two of these CISA staffers were interns simultaneously working for Stanford Internet Observatory and flagging misinformation to platforms on behalf of the Election Integrity Partnership (discussed below). *Id.* ¶ 1064. These shifts would last until late in the evening as election day approached. *Id.* ¶ 1067. State officials sometimes flagged misinformation for censorship because CISA and the FBI had warned them to be on the lookout for such content. *Id.* ¶ 1072. CIS and EIP also

flagged social-media content to local election officials and invited them to review and report it as misinformation. *Id.* ¶ 1082.

In addition to flagging misinformation to platforms, CISA frequently fact-checks such reports for the platforms. *Id.* ¶¶ 1076-1080. CISA also publishes debunks of social-media narratives, knowing that the platforms will use this information to censor those narratives. *Id.* ¶ 1105. CISA pushed especially hard for the censorship of content that CISA's Director disfavored, including the "Hammer and Scorecard" narrative in 2020. *Id.* ¶ 1105. CISA flags even obvious parody and joke accounts to the platforms for censorship, such as account handles saying "Smoke weed erry day" and "hoes be mad, but this is a parody account." *Id.* ¶ 1102.

Platforms treat CISA as a privileged reporter of misinformation, often responding with great alacrity to reports, even late in the evening, and reporting back when speech reported by CISA has been censored. *Id.* ¶ 1081.

Early in the 2022 election cycle, Lauren Protentis of CISA repeatedly urged the platforms to prepare "one pagers" for state and local government officials that would explain to them how to report misinformation directly to the platforms. *Id.* ¶¶ 1094-1096. The Center for Internet Security, whose EI-ISAC is funded by CISA, continued to flag misinformation to the platforms during the 2022 election cycle. *Id.* ¶ 1098. Like the FBI, CISA runs an "operation center" on election day that engages in reporting misinformation to social-media platforms. *Id.* ¶ 1097.

**Global Engagement Center Collusion.** Likewise, the State Department's Global Engagement Center (GEC) colludes with social-media platforms on censorship. GEC conducts numerous meetings with social-media platforms about disinformation. *Id.* ¶ 1123. These include quarterly meetings involving the GEC's senior leadership and more frequent meetings involving its Technology Engagement Team. *Id.* ¶ 1124-1125. As with the other agencies, the GEC meets

with the platforms' content-moderation officials, *i.e.*, those charged with enforcing censorship policies. *Id.* ¶ 1126-1127. The GEC also maintains at times a permanent liaison in Silicon Valley to connect with social-media platforms, who also meets with the platforms' content-moderation teams. *Id.* ¶ 1130.

**Other Agencies' Collusion.** This collusion extends to other agencies as well. In particular, platforms routinely treat certain federal agencies as privileged fact-checkers with authority to dictate what will and will not be removed. Plaintiffs' Proposed Findings of Fact, Ex. 1 ¶ 46, ¶ 396 (Facebook to White House: "There are several claims we will be able to remove as soon as the CDC debunks them."); *id.* ¶ 397 (asking the Surgeon General to provide a health expert to dictate what claims about child vaccines would be censored on Facebook). As discussed above, platforms treat the CDC, in particular, as a final censorship authority with ultimate authority to dictate what health-related claims will be censored on their platforms.

Other agencies share this privileged-fact-checker role. Under Dr. Fauci's leadership, NIAID staff, working with HHS, NIH, and White House officials, repeatedly flagged posts, content, and accounts for censorship to social-media platforms, including impersonation and/or parody accounts (and even fan pages) of Dr. Fauci himself. *Id.* ¶¶ 809-825. These flaggings include requests such as "PLEASE REMOVE!!!" and "Is there anything else that you can also do to block other variations … so we don't have this happen again?" *Id.* ¶ 810. Dr. Fauci approves of the removal of these accounts from social media because he thinks they are "a bad thing," even though they may include parody accounts. *Id.* ¶¶ 818-820.

NIH, likewise, serves as an authority dictating what speech will be censored on social media. *Id.* ¶¶ 826-827. NIH provided the authority, for example, for the CDC to rate claims about

the efficacy of Ivermectin to treat COVID-19 as "***NOT ACCURATE***" to platforms to procure their censorship on social media. *Id.*

Platforms also coordinate closely with federal officials in controlling messaging on their platforms, including amplifying and subsidizing the government's message to the exclusion of private speakers. *Id.* ¶¶ 83-84 (Facebook collaborating with the White House to amplify government messaging); *id.* ¶ 129 (Facebook noting that it has "provided more than $30 million in ad credits to help governments … reach people"); *id.* ¶ 379 (White House telling Facebook it would "appreciate a push" to promote the FDA approval of the Pfizer vaccine).

### b.   Pervasive Entwinement.

In addition to conspiracy and collusion, joint activity occurs whenever the government has "so far insinuated itself" into private affairs as to blur the line between public and private action. *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 357 (1974). This manifests itself in "pervasive entwinement of public institutions and public officials in [the private entity's] composition and workings." *Brentwood Acad.*, 531 U.S. at 298; *see also Wittner v. Banner Health*, 720 F.3d 770, 777–78 (10th Cir. 2013). To become pervasively entwined in a private entity's workings, government need only "significantly involve[] itself in the private [entity's] actions and decisionmaking"; it is not necessary to establish that "state actors . . . literally 'overrode' [the private entity's] independent judgment." *Rawson v. Recovery Innovations, Inc.*, 975 F.3d 742, 751, 753 (9th Cir. 2020).

Pervasive entwinement exists even if the private party is exercising independent judgment. The Supreme Court has explicitly rejected "the proposition that no person acts under color of state law where he is exercising independent professional judgment." *West v. Atkins*, 487 U.S. 42, 52 n.10 (1988). "A finding that individual state actors . . . literally 'overrode' a nominally private

[actor's] independent judgment might very well provide relevant information.  But it is a mistake to focus too narrowly on this question."  *Rawson*, 975 F.3d at 751; *accord West*, 487 U.S. at 52 n.10 ("The exercise of independent professional judgment is not . . . the primary test." (cleaned up)).  "[S]ustained and routine cooperation between" government officials and private actors can constitute joint participation even if the private actors exercise independent judgment, especially if the purpose of the cooperation is "to further [the government's] interest."  *Rawson*, 975 F.3d at 750, 754; *see also Roberson v. Dakota Boys & Girls Ranch*, 42 F.4th 924, 935 (8th Cir. 2022) ("In *West*, the doctor's use of professional . . . judgment did not preclude him from being a state actor. Rather, the salient fact was that his relationship with [government officials] was *cooperative*." (internal citation and quotation marks omitted)); *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1454 (10th Cir. 1995) (indicating that a "substantial degree of cooperative action" can constitute "joint action").

Here, social-media companies work hand-in-glove with Defendants and their partners in state and local government, the Election Integrity Partnership, and the Virality Project to censor speech expressing viewpoints that Defendants disfavor.  This conduct constitutes significant encouragement, coercion, and conspiracy and collusion as well.

**The Election Integrity Partnership.**  The Election Integrity Partnership is a collaboration among four anti-disinformation nonprofits—Stanford Internet Observatory, the University of Washington's Center for an Informed Public, Graphika, and the Atlantic Council's Digital Forensic Lab—with government and social-media platforms.  *Id.* ¶ 1144.

The EIP lists three government agencies—CISA, the CISA-funded EI-ISAC, and the GEC—as "major stakeholders." *Id.* ¶ 1153, 1180.  The EIP lists them as providing information into the EIP's "Intake Queue," *i.e.*, reporting misinformation for censorship.  *Id.* ¶ 1151.  These

government agencies, as "trusted external stakeholders," submit "tickets" to the EIP to flag content and themes on social media for censorship.  *Id.* ¶¶ 1152, 1153, 1175.

The EIP was created "in consultation with" CISA.  ¶ *Id.*  1138.  CISA interns originated the idea of the EIP, *id.* ¶ 1139, and then CISA officials helped create it.  The EIP's "Operational Timeline" includes a July 9, 2020, "Meeting with CISA to present EIP concept."  *Id.* ¶ 1169.

The EIP successfully lobbied social-media platforms to adopt more restrictive policies about election-related speech during the late summer and early fall of 2020.  *Id.* ¶¶ 1148-1150, 1149, 1217-1220.  The EIP then aggressively reported misinformation to the platforms to be censored under those new policies that it pushed them to adopt.  *Id.* ¶¶ 1148-1150.

Through its "ticketing" system, the EIP flagged, not just posts, but entire themes and narratives on social media to platforms for censorship, encompassing potentially millions of posts in 2020 alone.  *Id.* ¶¶ 1157, 1174-1176.  The EIP used teams of researchers working long days to monitor Americans' speech on social-media platforms and report disfavored speech to platforms for censorship.  *Id.* ¶ 1178.  The EIP created "established relationships with social media platforms to facilitate flagging of incidents for evaluation" under their content-moderation policies.  *Id.* ¶ 1182.  The EIP coordinated closely with virtually all major platforms, as well as government agencies, in reporting misinformation.  *Id.* ¶ 1183-1185.

The EIP boasts that its flagging for censorship had a high success rate: "35% of the URLs we shared with Facebook, Instagram, Twitter, TikTok, and YouTube were either labeled, removed, or soft blocked. … the four major platforms we worked with all had high response rates to our tickets."  *Id.* ¶ 1187.

The CISA-funded Center for Internet Security was a major source for EIP tickets. *Id.* ¶ 1188. The GEC also reported misinformation to the EIP. *Id.* ¶ 1197 ("Groups that reported tickets include the State Department's Global Engagement Center…").

The EIP admits that the speech it targets for censorship is not foreign but domestic, grassroots speech by American citizens. *Id.* ¶ 1158, 1195, 1199. This includes the speech of highly visible figures with hundreds of thousands or millions of social-media followers, such as Plaintiff Jim Hoft, President Trump, Fox News host Sean Hannity, and Breitbart News. *Id.* ¶ 1159, 1208.

The EIP is partly funded by the federal government, both through a grant from the U.S. National Science Foundation and from federal funding for the Atlantic Council. *Id.* ¶¶ 1164-1165.

Numerous current and former CISA personnel also have or had roles in the EIP. *Id.* ¶ 1163. Likewise, key EIP personnel such as Alex Stamos, Renee DiResta, and Kate Starbird also have formal roles in CISA. *See id.* ¶¶ 1179-1171.

The EIP "flag[s] policy violations for platforms." *Id.* ¶ 1172; *see also id.* ¶ 1177. The reach of the EIP's monitoring and reporting is enormous; its "tickets" encompassed almost 22 million posts on Twitter alone. *Id.* ¶ 1202; *see also id.* ¶ 1201. These disfavored tweets were identified by monitoring 859 million tweets over three months. *Id.* ¶ 1203.

The EIP was given privileged access to the internal data of some platforms to monitor Americans' social-media speech, *id.* ¶ 1203, but it expressed frustration about not having access to better internal data from Facebook, *id.* ¶ 1204.

The EIP targets truthful speech and core political speech that expresses viewpoints disfavored by the government and the EIP. *Id.* ¶ 1205-1206. The EIP's public report indicates that it flagged Plaintiff Jim Hoft's content for censorship repeatedly; the report mentions Hoft's

website 47 times, identifies him as the #2 "superspreader" of election-related misinformation on Twitter, and devotes an entire subsection of the report to his website and social-media accounts. *Id.* ¶¶ 1156, 1192-1194, 1207-1216. The EIP indicates that it monitored and targeted Hoft's content in 29,207 original tweets and over 840,000 retweets. *Id.* ¶ 1210.

The EIP indicates that it plans to remain active in the future. *Id.* ¶ 1222-1224. In fact, the EIP reformed itself as the "Virality Project" during 2021. *Id.* ¶ 1223.

**The EIP's Pervasive Entwinement with CISA and the GEC.** CISA has established relationships with researchers at the Stanford Internet Observatory, the University of Washington, and Graphika—three of the four entities comprising the "Election Integrity Partnership" ("EIP"). *Id.* ¶ 991-992. Brian Scully admits that CISA has an "established relationship" with the EIP and the Stanford Internet Observatory personnel involved. *Id.* ¶ 1000. He also admits that CISA collaborated with the EIP. *Id.* ¶ 1028.

As noted, CISA interns originated the idea of the EIP. *Id.* ¶ 993. The EIP is designed to address a CISA-perceived problem of a "gap" that Brian Scully communicated to the CISA interns. *Id.* ¶¶ 995-996. The "gap" is the lack of resources that prevents state and local officials from identifying and flagging social-media misinformation that affects their jurisdictions. *Id.* ¶ 995. The EIP is designed to fill that "gap," *i.e.*, to do the work of monitoring and censoring speech that government lacks the resources to do effectively.

CISA received briefings from the EIP on its work. *Id.* ¶ 993. These "conversations" happened "throughout" the EIP's work during the 2020 election cycle. *Id.* ¶ 997. CISA also reviewed and relied on the EIP's public reports on social-media misinformation. *Id.* ¶ 999.

CISA had communications with the EIP's founders, including Alex Stamos and Renee DiResta of the Stanford Internet Observatory, as the EIP was starting up and they were "trying to

figure out what the gap was." *Id.* ¶ 993. CISA briefed the EIP's founders on what the "gap" is that needed to be filled. *Id.* ¶ 997. CISA "had conversations with Stanford about the gap" as the EIP was being launched. *Id.* ¶¶ 1013, 1019. The EIP's leaders, Alex Stamos and Renee DiResta, also briefed CISA on the EIP in spring or summer 2021. *Id.* ¶ 1010.

CISA connected the EIP to the Center for Internet Security (CIS), a nonprofit the runs the CISA-funded "EI-ISAC," a clearinghouse through which state and local government officials report misinformation to CIS and CISA to be flagged to the platforms. *Id.* ¶¶ 993, 997, 1001-1002, 1027. CISA connected the EIP to the CIS so that they could coordinate directly on flagging misinformation. *Id.* ¶ 1024. As a result of CISA's connection, the CIS and the EIP had a relationship and shared information. *Id.* ¶ 1032. CISA also connected the EIP to organizations of state and local officials who report misinformation, including the National Association of Secretaries of State (NASS) and the National Association of State Election Directors (NASED). *Id.* ¶¶ 993, 1024-1025.

CISA connected the Center for Internet Security with the EIP because "the EIP was working on the same mission," so "we wanted to make sure that they were all connected." *Id.* ¶ 1004. Thus, CISA originated and set up the collaborations between local government officials and the CIS, and between the EIP and the CIS. *Id.*

Two of the interns who originated the idea of the EIP worked simultaneously for CISA and for Stanford Internet Observatory during the 2020 election cycle, and they flagged misinformation to the platforms on behalf of both CISA and the EIP during the same time. *Id.* ¶¶ 994, 1064-1066.

CISA served a mediating role between the CIS, the EIP, and the platforms, to coordinate their efforts in reporting misinformation to the platforms. *Id.* ¶ 1007, 1073. CISA also had direct email communications with the EIP about misinformation reporting. *Id.* ¶ 1008.

As noted above, CISA coordinated closely with the Center for Internet Security on misinformation reports, and CIS coordinated closely with the EIP, creating a triangle of collaboration. *Id.* ¶ 1006, 1009.

There is substantial overlap of personnel between CISA and the EIP. As noted above, two interns worked simultaneously for CISA and EIP in flagging misinformation to platforms on behalf of both entities. *Id.* ¶¶ 994, 1064-1066. Alex Stamos, Renee DiResta, and Kate Starbird of the University of Washington—all key players in the EIP—also have formal roles in CISA. *Id.* ¶¶ 1011-1012. CISA Director Krebs went into business with Alex Stamos after he left government, and Matt Masterson became a fellow at the Stanford Internet Observatory when he left; both participated in meetings with the EIP while they were at CISA. *Id.* ¶¶ 1014-1016, 1018, 1021. Masterson spoke to Stanford about "clarifying the gap" when they were originating the EIP. *Id.* ¶ 1018. Masterson was at the meeting with Alex Stamos where the idea of the EIP was first discussed. *Id.* ¶ 1020.

The EIP was formulated as a means to accomplish what the government is forbidden to do under the First Amendment. Alex Stamos has publicly stated that the EIP was formed in part because of the government "lacked … legal authorizations" to engage in the EIP's work. *Id.* ¶ 1048. The EIP tries to "to fill the gap of the things that the government cannot do themselves." *Id.* ¶¶ 1049, 1054. Renee DiResta also admits that the EIP was designed to get around the problem of "very real First Amendment questions" that would arise if federal officials did the EIP's monitoring and censorship work directly. *Id.* ¶ 1055.

The EIP and CIS coordinated directly on specific misinformation reports to platforms, including instances where CIS reported misinformation under EIP tracking numbers. *Id.* ¶ 1058. CISA then forwarded EIP-ticketed reports received from CIS to the platforms. *Id.* ¶ 1060.

Forwarding misinformation reports received from the EIP to platforms was CISA's "standard practice." *Id.* ¶ 1069. CISA's "tracking spreadsheet" of "switchboarding" communications contains at least 13 entries that originated from the EIP, including one flagging Plaintiff Jim Hoft's content. *Id.* ¶¶ 1069, 1075. CIS simultaneously forwarded reports of misinformation to both CISA and the EIP. *Id.* ¶ 1070. State and local officials simultaneously forwarded reports of misinformation to CIS, CISA, and the EIP. *Id.* ¶ 1071.

The GEC, likewise, coordinated directly with the EIP by "engaging with the [Election Integrity] partnership." *Id.* ¶ 1132. As noted above, the GEC reported misinformation to the EIP.

**The Virality Project.** After the 2020 election cycle, the EIP continued and expanded the same work under the moniker "Virality Project" (VP), continuing to collaborate closely with federal officials and turning its attention to so-called "misinformation" about COVID-19 vaccines. *Id.* ¶¶ 1236, 1257, 1260. The same four entities were involved in the Virality Project, including Stanford Internet Observatory and many former CISA officials; new nonprofits were added as well. *Id.* ¶¶ 1237-1238.

Like the EIP, the VP targets First Amendment-protected domestic speech by American citizens. *Id.* ¶¶ 1241, 1256. Like the EIP, the VP seeks the censorship of speech that is truthful but does not support the government's preferred narratives on COVID vaccines, including religious claims and core political speech like "*Liberty*: … no government or employer should be able to tell people what to put in their bodies." *Id.* ¶¶ 1264-1265, 1268, 1269.

The VP specifically targets speech by "health freedom" groups, such as Plaintiff Jill Hines' group "Health Freedom Louisiana." *Id.* ¶¶ 1266-1268, 1316-1323, 1331. The VP devotes an entire section of its report to such groups, noting that it targets their speech nationwide. *Id.* ¶ 1317. It discusses such groups almost 100 times. *Id.* ¶ 1331. In targeting such groups, the VP focuses

not only on misinformation about vaccines, but political speech and political organizing against vaccine passports and vaccine mandates—areas where Hines experienced particularly invidious censorship. *Id.* ¶ 1321. The VP targets such groups "across all 50 states" including "at a messaging and *organizing* level." *Id.* ¶¶ 1343-1345 (emphasis added). Like the EIP, the VP also specifically flags Plaintiff Jim Hoft's content as misinformation. *Id.* ¶ 1324.

Like the EIP, the VP pushes platforms to adopt more restrictive content-moderation policies and to engage in more aggressive enforcement of such policies. *Id.* ¶¶ 1242, 1248, 1270. Like the EIP, the VP allows "government partners" to share "tips," *i.e.*, to flag so-called "misinformation" for censorship. *Id.* ¶¶ 1244, 1276. The VP's "stakeholders provided tips … and requests to assess specific incidents and narratives." *Id.* ¶ 1276. These "stakeholders" include "federal health agencies" and "state and local public health officials." *Id.* ¶ 1277.

Six major social-media platforms (Facebook/Instagram, Twitter, Google/YouTube, TikTok, Medium, and Pinterest) cooperated in the VP, "acknowledging content flagged for review and acting on it in accordance with their policies" and providing feedback on "the reach of narratives previously flagged by VP." *Id.* ¶ 1280.

Like the EIP, the VP targets speech by influential speakers with large audiences, affecting audiences of millions of people. *Id.* ¶¶ 1255 (video censored after "tens of millions of views"); *id.* ¶ 1297 (targeting "recurring actors" that create "viral" incidents); *id.* ¶¶ 1313-1314, 1344-1348 (Alex Berenson and Tucker Carlson); *id.* ¶ 1325 (Breitbart News and One America News Network); *id.* ¶¶ 1334-1341 (Fox News, The Daily Wire, Candace Owens, Robert F. Kennedy Jr. (considered "especially pernicious" because of his large audience), America's Frontline Doctors, Simone Gold, Dr. Joseph Mercola, and others).

Like the EIP, the VP engages in monitoring of Americans' speech on social media on a massive scale. *Id.* ¶¶ 1272-1276. The VP "systematically monitored activity across social media platforms" for seven months. *Id.* ¶ 1288. The VP monitored about 6.7 million social-media "engagements" per week, over 200 million over seven months. *Id.* ¶ 1294. The VP reported 174 "tickets" tracking vaccine-related narratives and themes to platforms for censorship. *Id.* ¶ 1291. The vast majority of speech flagged and tracked by the VP was not false or incorrect speech. *Id.* ¶¶ 1295, 1303-1313.

Federal officials are pervasively entwined with the Virality Project. The Surgeon General pushes platforms to share information with the Virality Project. *Id.* ¶¶ 226-227. His Office coordinated with the Virality Project on the Surgeon General's Health Advisory and "brainstorm[ed]" with the Virality Project. *Id.* ¶ 228, 231. The Surgeon General repeatedly echoes the key messaging of the Virality Project. *Id.* ¶ 319. The Surgeon General launched his Health Advisory on Misinformation in an event hosted by Stanford Internet Observatory, which leada the Virality Project. *Id.* ¶¶ 330-337. Dr. Murthy admitted that his Office had been "partnered with" SIO for "many months." *Id.* ¶ 337.

The VP notes its coordination with "federal government agencies," touting its "strong ties with several federal government agencies, most notably the Office of the Surgeon General (OSG) and the CDC," which involved flagging vaccine-related content on social media ("situational awareness around emerging narratives"). *Id.* ¶ 1279. The VP and the Surgeon General's office collaborated closely, as the VP boasts that "the Office of the Surgeon General incorporated VP's research and perspectives into its own vaccine misinformation strategy," including its Health Advisory on Misinformation. *Id.* ¶ 1249. The VP repeatedly cites the work of Surgeon General Murthy. *Id.* ¶ 1359.

The VP "directly informed counter-messaging efforts by … public health officials," and "provided strategic insights to government entities such as the OSG, CDC, and the Department of Health and Human Services." *Id.* ¶ 1284. As noted, the VP even hosted Surgeon General Murthy for an event announcing his Health Advisory. *Id.* ¶ 1285.

The VP matches the Surgeon General's messaging on social-media misinformation verbatim, calling for "transparency," "accountability" and a "whole-of-society" effort to address misinformation. *Id.* ¶¶ 1247, 1251, 1353-1355. This includes demanding data-sharing from the platforms, a key demand of the White House and Surgeon General directly echoed by the VP. *Id.* ¶ 1293. It also includes the "recommendations" for platforms to increase censorship in the VP's report and the Surgeon General's Health Advisory, including demands for data-sharing. *Id.* ¶¶ 1363-1364.

For all these reasons, Plaintiffs are likely to establish that Defendants' conduct involves government action—it involves significant encouragement, coercion, deception, conspiracy/collusion, and pervasive entwinement. Most of the conduct of the federal agencies and officials discussed herein, moreover, falls into multiple such categories.

### 3.    Defendants' Censorship Activities Violate the First Amendment.

Given a finding of government action for all these activities, Defendants' social-media censorship activities violate the First Amendment. In fact, the censorship here is particularly egregious because it unites three forms of government action considered most offensive to the First Amendment: viewpoint discrimination, targeting core political speech, and prior restraints.

First, the Court has held that First Amendment protection is "at its zenith" when the government attempts to restrict "core political speech." *Buckley v. Am. Const. Law Found., Inc.*, 525 U.S. 182, 186–87 (1999); *see also Citizens United v. F.E.C.*, 558 U.S. 310, 485 (2010)

(Thomas, J., concurring in part and dissenting in part) (describing "core political speech" as the "primary object of First Amendment protection").  Although it includes speech about elections, "core political speech need not center on a candidate for office" but encompasses any "advocacy of a politically controversial viewpoint."  *McIntyre v. Ohio Elec. Comm'n*, 514 U.S. 334, 347 (1995). "No form of speech is entitled to greater constitutional protection than" core political speech.  *Id.*  Here, virtually all the election-related speech targeted by CISA, the GEC, the FBI, and the Election Integrity Partnership is core political speech.  So too is the great majority of the health-related speech, as it focuses on politically sensitive topics like the safety and efficacy of COVID vaccines, mask mandates, and similar topics.  Each of these topics is highly "politically controversial."  *Id*.

Second, "viewpoint-based" regulation is especially "obnoxious" to the First Amendment. *Hill v. Colorado*, 530 U.S. 703, 723 (2000). Indeed, the "rationale of the general prohibition" against *content*-based regulation "is that content discrimination raises the specter that the Government may effectively drive certain ideas or *viewpoints* from the marketplace." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 387 (1992) (emphasis added and quotation marks omitted). Accordingly, courts are even more skeptical of viewpoint-based restrictions on speech than they are of content-based restrictions. *See, e.g.*, *Int'l Women's Day March Planning Comm. v. City of San Antonio*, 619 F.3d 346, 359 (5th Cir. 2010) ("[C]ontent-based burdens on speech in a public forum are subject to strict scrutiny, while viewpoint-based burdens are [absolutely] unconstitutional."). As the Supreme Court famously wrote in *West Virginia State Board of Education v. Barnette*, "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein."  319 U.S.

624, 642 (1943).  Here, virtually all of Defendants' requests for censorship is viewpoint-based.

Defendants have not procured the censorship of *all* speech about elections and COVID-19

vaccines; they have only sought to censor the *views* about such topics that contradict the

government's preferred narratives.  This is quintessential viewpoint discrimination.

Third, prior restraints are "the most serious and least tolerable infringement on First

Amendment rights." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976).  Although the

quintessential prior restraint is a law requiring government approval prior to publication, *see* 4

WILLIAM BLACKSTONE, COMMENTARIES *152, the Supreme Court treats as a *de facto* prior

restraint any government restriction on speech whose "object . . . is not punishment but

suppression." *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 703, 711–12 (1931) (treating a

statute as an unconstitutional prior restraint even though it was enforced against the defendants

only after they had circulated the offending publication); *see also Bantam Books*, 372 U.S. at 60–

70 (treating agency pressure to stop the circulation of "books which have for sometime been widely

distributed" as a *de facto* regime of prior restraint).  Here, Defendants' censorship seeks not to

impose consequences on disfavored viewpoints, but to silence disfavored viewpoints on social

media.  This is a massive system of *de facto* prior restraints.

Because Defendants' conduct violates three of the most fundamental precepts of the First

Amendment, it is egregiously unconstitutional.  Plaintiffs are likely to succeed on their First

Amendment claim.

**B.     Plaintiffs Are Likely to Succeed on their APA and *Ultra Vires* Claims.**

Plaintiffs are also likely to succeed on the merits of their claims under the Administrative

Procedure Act (APA), 5 U.S.C. § 500 et seq, as well as their statutory *ultra vires* claim.  Plaintiffs

explained in their Response to Defendants' Motion to Dismiss why 5 U.S.C. §§ 702 and 704

provide a cause of action and a waiver of sovereign immunity for their APA claims.  Doc. 161-1, at 51–56.  Plaintiffs also explained why they do not need a waiver of sovereign immunity for their *ultra vires* claim and why, even if they did, 5 U.S.C. § 702 provides one.  *Id.* at 50–51.  Plaintiffs incorporate by reference those explanations here.

The APA directs a reviewing court to "hold unlawful and set aside agency action" that the court concludes is "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law."  5 U.S.C. § 706(2).  Agency Defendants' censorship program meets each of these conditions.

To decide whether agency action was "arbitrary, capricious, [or] an abuse of discretion," § 706(2)(A), "the court the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). If the agency "relied on factors which Congress has not intended it to consider" or "entirely failed to consider an important aspect of the problem," then its action was arbitrary and capricious.  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins.*, 463 U.S. 29, 43 (1983).  Here, Agency Defendants entirely failed to consider many important facts about their censorship program, including (1) that it targets core political speech for suppression, (2) that it is viewpoint discriminatory, and (3) that it subjects speech to *de facto* prior restraint. And Defendants' decision to proceed with the program despite its manifest unconstitutionality was "a clear error of judgment."  *Overton Park*, 401 U.S. at 416.

Plaintiffs have already explained why Agency Defendants' censorship program is "contrary to constitutional right" and "in excess of statutory . . . authority." § 706(2)(B)–(C).

Finally, Agency Defendants launched their censorship program "without observance of procedure required by law," § 706(2)(D), because they failed to provide the public with notice and an opportunity to comment.  The APA exempts "interpretative rules," "general statements of policy," and "rules of agency organization, procedure, or practice" from notice and comment. § 553(b)(A).  But these exceptions "must be narrowly construed," *Texas v. United States*, 40 F.4th 205, 228 (5th Cir. 2022).  And even broadly construed, they would not encompass Defendants' censorship program.  Because the program does more than "clarify or explain existing law or regulations," it is no mere "interpretative rule[]." *Alcarez v. Block*, 746 F.3d 593, 613 (9th Cir. 1984).  Because the program does not "advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power," it is no mere "general statement of policy." *Texas*, 40 F.4th at 228 (alteration omitted).  And because the program "encodes . . . substantive value judgment[s]" and "trenches on substantial private rights or interests," it is no more "rule[] of agency organization, procedure, or practice." *Am. Fed. of Lab. & Cong. of Indus. Orgs. v. N.L.R.B.*, 57 F.4th 1023, 1034–35 (D.C. Cir. 2023) (cleaned up) (limiting this exception to "internal house-keeping measures").

In addition, Plaintiffs are likely to prevail on the merits of their *ultra vires* claim because no statute provides "any colorable basis" on which Defendants could claim the authority to implement their censorship program.  *Danos v. Jones*, 652 F.3d 577, 583 (2011) (quotation mark omitted).  Defendants have failed to identify a single statute that they are prepared to argue gives them the authority for their mass-censorship program.  Nor could they: the censorship program is "plainly invalid," *Fla. Dep't of State v. Treasure Salvors, Inc.*, 458 U.S. 670, 716 (1982) (White, J., concurring in the judgment in part and dissenting in part).

### C.    Plaintiffs Are Likely to Establish Standing.

In the context of a preliminary injunction, "the 'merits' on which plaintiff must show a

likelihood of success encompass not only substantive theories but also establishment of

jurisdiction." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015).  To have

standing, a plaintiff must face or have suffered an injury traceable to the challenged conduct of the

defendant and likely to be redressed by a favorable decision.  *Lujan v. Def. of Wildlife*, 504 U.S.

555, 560–61 (1992).  At the preliminary-injunction stage, a movant need only show that he likely

to prove that he has standing.  *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020).

Because Plaintiff States and the individual Plaintiffs seek the same relief, Plaintiffs need only show

that they are likely to prove that at least one Plaintiff has standing.  *See Rumsfeld v. Forum for*

*Acad. & Inst'l Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006).  In fact, all Plaintiffs have standing.

Plaintiffs incorporate by reference their prior briefing on standing in response to Defendants'

motion to dismiss.  Doc. 161-1, at 5-49.

### 1.    Plaintiffs Are Likely to Prove Injury.

Plaintiffs' Proposed Findings of Fact set forth the facts underlying the imminent, ongoing

injuries to both the individual Plaintiffs, Ex. 1, ¶¶ 1367-1411, and to the State Plaintiffs, *id.* ¶¶

1427-1442.  They also describe the injuries to other, similarly situated speakers and listeners of

social-media speech.  *Id.* ¶¶ 1412-1426.

The individual Plaintiffs assert violations of their First Amendment right to speak and listen

freely without government interference.  *See Va. State Bd. of Pharm. v. Va. Citizens Consumer*

*Council, Inc.*, 425 U.S. 748, 757 (1976) (holding that government "censorship equally infringe[s]"

the speaker's rights and "the rights of [the audience] to whom the [speech] was addressed").  A

personal loss of First Amendment rights is "unquestionably" an injury that supports standing.

*Croft v. Governor of Tex.*, 562 F.3d 735, 745 (5th Cir. 2009); *see also McNamara v. Moody*, 606 F.2d 621 (5th Cir. 1979) (affirming a nominal-damages award under 42 U.S.C. § 1983 for a First Amendment free-speech violation absent any other injury).

The State Plaintiffs, moreover, assert seven specific imminent, ongoing injuries. *See* Doc. 161-1, at 14-29. Among other things, Defendants' own witness, Carol Crawford of the CDC, attests to the significance of the States' injury to their interest in being able to read and follow the uncensored speech and opinions of their constituents on social media. Plaintiffs' Proposed Findings of Fact, Ex. 1, ¶¶ 1435-1437. The CDC agrees with the States that government agencies have a strong interest in reading and following the *uncensored* speech and opinions of their constituents. *Id.* ¶¶ 590-595. The CDC admits that "it does help … for communicators to know what conversations occurs on social media because it helps us identify gaps in knowledge, or confusion, or things that we're not communicating effectively that we need to adjust." *Id.* ¶ 591. Having a "full picture" of what people are saying on social media allows the government agency to "adjust communication materials" to address their actual thoughts and concerns. *Id.* ¶ 594.

The evidence also demonstrates the imminent and ongoing nature of Plaintiffs' injuries. Plaintiffs both experience ongoing injury from censorship and face the imminent prospect of further censorship in the future, as all Defendants are continuing and expanding their censorship efforts. For example, the White House continues its censorship campaign throughout 2022 without relenting. *Id.* ¶¶ 188-199. The White House also continues to expand the topics of its social-media censorship campaign, to include new topics such as "climate disinformation," abortion-related speech, "gendered disinformation," and economic policy. *Id.* ¶¶ 200-211. Likewise, when it comes to misinformation, the CDC's "focus is not solely on COVID. We're focusing on other topics" as well, and the CDC colludes with social-media platforms about emerging topics like

medication abortion. *Id.* ¶ 562. CISA and its Director Jen Easterly have made a series of public statement indicating that they intend to expand their anti-disinformation efforts in the future. *Id.* ¶¶ 1106, 1112-1114, 1118. Recent DHS document indicate that DHS intends to target misinformation on new topics like "the origins of the COVID-19 pandemic," "the U.S. withdrawal from Afghanistan," "racial justice," and "the nature of U.S. support for Ukraine." *Id.* ¶ 1110. CISA has already been involved in an initiative against so-called misinformation about the U.S.'s involvement in Ukraine. *Id.* ¶ 1111. CISA is also working with Treasury on an initiative to address "misinformation" about the financial-services industry. *Id.* ¶¶ 1115-1116. The EIP continues to operate through the 2022 election cycle. *Id.* ¶ 998. At every turn, Defendants' censorship enterprise is expanding its efforts to dictate and control what Americans may say on social media, the "modern public square." *Packingham v. North Carolina*, 137 S. Ct. 1730 (2017).

### 2. Plaintiffs Are Likely to Prove Traceability.

Plaintiffs are likely to prove that their injuries are fairly traceable to Defendants' actions of inducing and jointly participating in social-media companies' viewpoint-based censorship. But-for causation is sufficient for traceability. *Duke Power Co. v. Carolina Envt. Study Grp.*, 438 U.S. 59, 74–75 (1978). But it is not necessary. *Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65, 71 (2d Cir. 2019); *Parsons v. U.S. Dep't of Justice*, 801 F.3d 701, 714 (6th Cir. 2015). On the contrary, "the fairly-traceable inquiry is much more forgiving than the . . . tort-causation inquiry," *Webb ex rel. K.S. v. Smith*, 936 F.3d 808, 814 (8th Cir. 2019), and even the tort-causation inquiry does not require but-for causation, RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM § 27 (Am. L. Inst. 2022). For example, a defendant who aided and abetted a tort is liable for it, RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR ECONOMIC HARM § 28 (Am. L. Inst. 2022), even if his act of aiding and abetting was not a but-for cause of the tort, *id.* cmt. e.

Likewise, a party to a conspiracy is liable for torts committed in furtherance of the conspiracy by his coconspirators, *id.* § 27, even if his own conduct was not a but-for cause of the torts, *id.* rptr. note c. *A fortiori*, "injuries resulting from [a third party's acts] are . . . 'fairly traceable' to" the defendant if the defendant "aided or abetted their commission," *Mastafa v. Australian Wheat Bd. Ltd.*, No. 07 Civ. 7955(GEL), 2008 WL 4378443, at *2 (S.D.N.Y. Sep. 25, 2008), or the third party committed the acts in furtherance of a conspiracy to which the defendant was a party, *see In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 55 (D.D.C. 2016).

Under these principles, Plaintiffs are likely to prove that the injuries they assert are fairly traceable to the challenged actions of Defendants. Plaintiffs are likely to prove that Defendants' acts of inducing and jointly participating in social-media companies' viewpoint-based censorship are but-for causes of that censorship, including censorship that has affected the individual Plaintiffs and Plaintiff States' citizens as speakers or audience members. Plaintiffs are also likely to prove that Defendants aided and abetted the censorship and that the social-media companies committed the censorship in furtherance of a conspiracy with Defendants to suppress speech. Each of these grounds—but-for causation, aiding and abetting, and conspiracy—is individually sufficient to establish that the injuries to Plaintiffs' and Plaintiff States' citizens' ability to speak and listen are fairly traceable to the challenged actions of Defendants.

To be sure, "injury that results from the independent action of some third party not before the court" is not fairly traceable to the defendant. *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976). But acts of a third party "are not 'independent' of steps taken to aid and abet those acts." *Mustafa*, 2008 WL 4378443, at *2; *accord In re TelexFree Sec. Litig.*, --- F. Supp. 3d ---, 2022 WL 3915989, at *13 (D. Mass. Aug. 31, 2022). Nor are acts in furtherance of a conspiracy to which the defendant is a party. *See Domestic Airline Travel Antitrust Litig.*, 221 F.

Supp. 3d at 55, 57 (drawing a contrast between "independent decision[s]" and a coconspirator's acts in furtherance of the conspiracy).  Here, Defendants conduct falls into the latter categories.

Moreover, even assuming the connection between Defendants' conduct and Plaintiffs' other injuries were too attenuated to support standing (which it is not), the injuries to the individual Plaintiffs' First Amendment rights and to Plaintiff States' quasi-sovereign interests would still be fairly traceable to Defendants' conduct.  All Plaintiffs are suffering censorship, which is an injury no matter who is responsible for it.  But for both the individual Plaintiffs and Plaintiff States' citizens, censorship *at the hands of the government* is a distinct injury insofar as it is an invasion of their constitutional rights.  *See Al-Amin v. Smith*, 511 F.3d 1317, 1333–35 (11th Cir. 2008) (holding that like being deprived of due process, being deprived of First Amendment rights is *per se* a cognizable injury, independently of "any actual injury" that it entails). Without Defendants' involvement, social-media censorship by private companies would not violate constitutional rights. *See Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1930 (2019).  Therefore, the violation of the individual Plaintiffs' and Plaintiff States' citizens' constitutional rights is traceable to Defendants even assuming (contrary to fact) that the other injuries Plaintiffs assert are not.  *See Duke Power*, 438 U.S. at 74-75 (recognizing that but-for causation is sufficient for traceability).

In any event, here, as discussed further above, there is overwhelming evidence that Defendants' actions are the direct and but-for cause of the censorship that injures Plaintiffs.  For example, White House officials repeatedly and successfully press for censorship of so-called "borderline" content that *does not violate platform policies*, and thus would not be censored but for federal pressure.  *See, e.g.,* Plaintiffs' Proposed Findings of Fact, Ex. 1, ¶¶ 57, 64 (promising the White House that Facebook would censor "often-true" but "sensationalized" content); ¶ 73

(imposing forward limits on non-violative speech on WhatsApp); ¶¶ 89-92 (assuring the White

House that Facebook will use a "spectrum of levers" to censor content that "do[es] not violate our

Misinformation and Harm policy, including "true but shocking claims or personal anecdotes, or

discussing the choice to vaccinate in terms of personal and civil liberties"); ¶¶ 93-100 (agreeing to

censor Tucker Carlson's content at the White House's behest, even though it did not violate

platform policies), ¶¶ 103-104 (Twitter deplatforming Alex Berenson at White House pressure);

¶ 171 (Facebook deplatformed the Disinformation Dozen immediately after these comments).

Facebook officials scrambled to get back into the White House's good graces.  *Id.* ¶¶ 172, 224

(pleading for "de-escalation" and "working together").

      The facts demonstrate a clear pattern of platforms responding to White House pressure by

agreeing to greater and greater censorship, including of non-violative speech.  This is strikingly

clear in the platforms' response to the one-two punch of Jennifer Psaki's and Surgeon General

Murthy's public comments on July 15, 2021, followed by President Biden's accusation that the

platforms are "killing people" on July 16.  *Id.*  ¶¶ 141-162.  Twitter suspended Alex Berenson

within hours of the President's statement, and later deplatformed him.  *Id.* ¶ 163.  Facebook took

prompt action against the Disinformation Dozen.  *Id.* ¶ 170.  YouTube immediately assured the

White House that it was aggressively censoring non-violative content.  *Id.* ¶ 174.

      As another example, virtually all the "flagging" activity—by the White House, the CDC,

NIAID, CISA, the FBI, the GEC, the EIP, and the Virality Project—obviously results in censorship

that the platforms would not impose *but for* Defendants' actions.  The whole point of "flagging"

content for censorship is to *call the platforms' attention to content that they have not censored*, in

order to get them to censor it.  The fact that content is flagged means that the platforms have not

censored it, and federal officials think that they should.  "Flagging" would make no sense if it were

not the but-for cause of censorship.  The Government's witnesses effectively admit this.  For example, Brian Scully acknowledges that CISA's "switchboarding" activity causes speech to be censored that otherwise would not have been censored, because Scully agrees that "if it hadn't been brought to their attention [by CISA's flagging] then they obviously wouldn't have moderated it." *Id.* ¶ 974.

In addition, the social-media censorship traceable to Defendants' conduct includes many specific examples of Defendants' inducing the censorship of Plaintiffs' social-media content in particular.  Both CISA and the Election Integrity Project repeatedly flagged Plaintiff Jim Hoft's content for censorship, the latter on a massive scale.  The Virality Project, working in collaboration with the Surgeon General's Office, particularly targeted "health freedom" groups like Plaintiff Jill Hines's "Health Freedom Louisiana."   The Great Barrington Declaration was censored immediately after Dr. Fauci's campaign to suppress it.  The YouTube video of Dr. Bhattacharya and Dr. Kulldorff's roundtable with Governor DeSantis was censored pursuant to a policy change that YouTube adopted at Dr. Fauci's instigation.  And so forth.  All Plaintiffs' censored content falls within the scope of Defendants' censorship campaign.  Plaintiffs are likely to prove traceability.

### 3.    Plaintiffs Are Likely to Prove Redressability.

Finally, Plaintiffs are likely to prove that a favorable decision would redress their injuries. Because past injury is not redressable by injunctive or declaratory relief, *Stringer v. Whitley*, 942 F.3d 715, 720 (5th Cir. 2019), Plaintiffs must prove that, at least as of when they filed suit, their injuries were ongoing, or new injuries were imminent, but would likely be stopped by injunctive or declaratory relief against Defendants, *see Davis v. F.E.C.*, 554 U.S. 724, 734 (2008) ("While

. . . the suit proceeds, the standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed.").

A plaintiff's standing is assessed as of the filing of the first complaint that the plaintiff joined. *Lynch v. Leis*, 382 F.3d 642, 647 (6th Cir. 2004); *see also Davis v. F.E.C.*, 554 F.3d 724, 734 (2008) ("While . . . the suit proceeds, the standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed."); *S. Utah Wilderness All. v. Palma*, 707 F.3d 1143, 1153 (10th Cir. 2013) ("[S]tanding . . . is assessed at the time of the original complaint, even if the complaint is later amended."). The State Plaintiffs filed suit on May 5, 2022, *see* Doc. 1, and the individual Plaintiffs joined on August 2, 2022, *see* Doc. 45.

The State Plaintiffs already have more than enough evidence to prove that their injuries were ongoing as of May 5, 2022. For example, preliminary discovery has revealed that Defendant CDC was working with Facebook in June 2022 to expand Facebook's censorship policies to encompass skepticism about COVID-19 vaccines for children. On June 7, Facebook notified CDC officials that Facebook's censorship policies for claims about childhood COVID-19 vaccines would wait for government approval. Doc. 71-7, at 6 ("We'll hold on our policy changes until we get the final word from you."). On June 22, the new and expanded policy that Facebook adopted under Defendants' supervision took effect. Doc. 71-3, at 5 ("As of today[, June 22, 2022], all COVID-19 vaccine related misinformation and harm policies on Facebook and Instagram apply to people 6 months or older . . . . We expanded these policies in coordination with the CDC and ensured that we also included false claims that might be connected to children . . . ."). Defendant Robert Flaherty was involved in the effort too. *See id.* (email about the new policy addressed to "Rob and Team"). On June 13, Flaherty denied Facebook's request for permission to stop

submitting its biweekly "Covid Insights Report" to the White House, because he wanted to monitor Facebook's suppression of COVID-19 misinformation "as we start to ramp up under 5 vaccines." Doc. 71-3, at 6.  Facebook had previously informed Defendants Flaherty, Courtney Rowe, and Eric Waldo that it "expect[ed] the approval of COVID vaccines for kids ages 5-11 w[ould] be another significant peak in new misinformation claims."  Doc. 86-5, at 4.  The rollout of vaccines for children under age five undoubtedly prompted another "peak" in content to be censored.  *Id.*

Similarly, the individual Plaintiffs are likely to show that their injuries were both imminent and ongoing as of August 2, 2022.  The documents Plaintiffs obtained indicate that Defendants are planning to continue their censorship activities into the future, well beyond August 2.  For example, preliminary discovery revealed that Defendant CISA "has a burgeoning MDM [Mis-, Dis-, and Mal-Information] effort" that includes "directly engaging with social media companies to flag MDM," with focus in calendar year 2022 on the midterm elections in November.  Doc. 71-8, at 2. Spearheading this effort is an "MDM Subcommittee," which was working under Defendant Jennifer Easterly's direction to "continu[e]/refin[e] the mission of Rumor Control" for the 2022 midterm elections.  Doc. 86-7, at 14.  CISA "wants to insure that it is set up to extract lessons learned from 2022 and apply them to the agency's work in 2024."  Doc. 71-8, at 2.  Accordingly, the "MDM Subcommittee" is working under Easterly's direction to perfect its "mission of Rumor Control" in time for the 2024 elections.  Doc. 86-7, at 14.  All of this indicates that Plaintiffs are likely to show that each Plaintiff has been affected by *new* incidents of censorship occurring at Defendants' behest after that Plaintiff filed or joined this lawsuit.  And *past* decisions to suppress speech expressed by or addressed to Plaintiffs or Plaintiff States' citizens also impose ongoing injury on Plaintiffs insofar as the speech remains suppressed.  Furthermore, the censorship that the individual Plaintiffs have experienced in the past continues to chill their speech in the present.

This chilling effect also violates the rights of the individual Plaintiffs' audience members, including many in Plaintiff States.

For similar reasons, Plaintiffs have standing to assert their procedural APA claim.  *See Massachusetts v. E.P.A.*, 549 U.S. 497, 518 (2007) ("When a litigant is vested with a procedural right, that litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant.").  Here, there is at least "some possibility" that calling the agencies' attention to the grave constitutional problems with their censorship activities will prompt them to reconsider this censorship enterprise.

## II.    The Other Three Equitable Factors Strongly Favor a Preliminary Injunction.

In addition to showing a likelihood of success on the merits, Plaintiffs must show that "a substantial threat of irreparable injury" exists, "that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted," and "that the grant of an injunction will not disserve the public interest."  *Ladd*, 777 F.3d at 288.

Where, as here, "a plaintiff has shown a likely violation of his or her First Amendment rights, the other requirements for obtaining a preliminary injunction are generally deemed to have been satisfied."  *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 870 (8th Cir. 2012) (en banc).  "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373 (1976).  Defendants have no cognizable interest in maintaining an unconstitutional program of *de facto* prior restraint, *see BST Holdings, L.L.C. v. Occupational Safety & Health Admin., U.S. Dep't of Lab.*, 17 F.4th 604, 618 (5th Cir. 2021) ("Any interest [an agency] may claim in enforcing an unlawful (and likely unconstitutional) [regulation] is illegitimate."); whereas Plaintiffs have an overriding interest in protecting the First Amendment freedoms of individual Plaintiffs, the

millions of similarly situated speakers and listeners, and the millions of citizens Plaintiff States represent as *parentes patriae*, *see Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*, 413 U.S. 376, 381 (1973) ("[T]he freedoms of speech and of the press rank among our most cherished liberties."). "Injunctions protecting First Amendment freedoms are always in the public interest." *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013).

## III.    The Court Should Grant Classwide Injunctive Relief Under Rule 23(b)(2).

To make preliminary injunctive relief as fully effective as possible, the Court should grant classwide preliminary injunctive relief under Rule 23(b)(2).  To that end, Plaintiffs will shortly file a motion for leave to amend the Complaint to include class allegations and a motion for certification of an injunctive class under Rule 23(b)(2) at the conclusion of expedited preliminary-injunction-related discovery.  The Court should grant class certification and grant classwide preliminary injunctive relief.  Rule 23(b)(2) was designed precisely for cases like this, where a plaintiff alleges large-scale civil-rights violations targeting entire classes of people.  *See, e.g.*, *DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 284 (W.D. Tex. 2007) ("Rule 23(b)(2) was promulgated essentially as a tool for facilitating civil rights class actions." (cleaned up)).  Because Defendants are acting "on grounds that apply generally to the class" by targeting everyone who expresses the views they disfavor, "injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).

Classwide injunctive relief is particularly appropriate here, because a classwide injunction is required to protect Plaintiff States' quasi-sovereign interest in the ability of their citizens to engage in free exchange of ideas on social media.  This is an interest that each Plaintiff "State has in the well-being of its populace" as a whole, not merely an interest in the well-being of handful of individual residents. *Alfred L. Snapp & Son v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 602–

07 (1982). Each Plaintiff State has millions of citizens who use social media and have a right to hear and listen to other users, both inside and outside of Plaintiff States. Only an injunction that protects the entire forum of social media from Defendants' censorship is sufficient to redress the injuries to Plaintiff States' populace as a whole.

Furthermore, classwide injunctive relief is necessary to provide adequate redress for the injuries that the individual Plaintiffs and the Plaintiff States are suffering directly. One of the ways Defendants are injuring Plaintiff States directly is by compromising their "ability to follow, measure, and understand the nature and degree of" their citizens' views and concerns on matters of public importance. Doc. 10-6, ¶ 6; Doc. 10-13, ¶ 6. Classwide relief that protects the rights of social-media users as a whole is necessary to remediate this injury. Likewise, the individual Plaintiffs closely follow the accounts of other social-media users, many of whom are experiencing or are at risk of experiencing censorship by social-media companies with the encouragement or joint participation of Defendants. An injunction that protects only their rights as speakers, but not the rights of other speakers, would not remediate the injuries they experience daily as *audience* members participating in ongoing dialog on social media.

## CONCLUSION

For the reasons stated, the Court should enter the preliminary injunction requested in Plaintiffs' Motion for Preliminary Injunction, Doc. 10, at 1, with the following modifications in light of the evidence. The Court should enter a preliminary injunction preventing Defendants, and their agents, officers, employees, contractors and all those acting in concert with them, from taking any steps to demand, urge, encourage, pressure, coerce, deceive, collude with, or otherwise induce any social-media company or platform for online speech, or any employee, officer, or agent of any such company or platform, to censor, suppress, remove, de-platform, suspend, shadow-ban, de-

boost, deamplify, issue strikes against, restrict access to, demonetize, or take any similar adverse action against any speaker, content, or viewpoint expressed on social media.  The Court should also preliminarily enjoin Defendants from acting in concert with any others, including but not limited to persons and entities associated with the Center for Internet Security, the Election Integrity Partnership, and the Virality Project, to engage in the aforementioned conduct, and from acting in concert with any such others who are engaged in any of the aforementioned conduct.

The injunction should extend to the White House Defendants (White House Press Secretary, Rob Flaherty, Andrew Slavitt, Clarke Humphrey, Courtney Rowe, Benjamin Wakana, Gina McCarthy, and their official successors and those acting in concert with them); the Surgeon General Defendants (Dr. Vivek H. Murthy, HHS, Eric Waldo, and their official successors and those acting in concert with them); the CDC Defendants (Centers for Disease Control, HHS, Carol Crawford, Kate Galatas, Jay Dempsey, and their official successors and those acting in concert with them); the Census Defendants (U.S. Census Bureau, Jennifer Shopkorn, Zachary Henry Schwartz, and their official successors and those acting in concert with them); the NIAID Defendants (NIAID, HHS, Dr. Anthony Fauci, and his official successor and those acting in concert with them); the FBI Defendants (FBI, DOJ, Laura Dehmlow, Elvis Chan, and their official successors and those acting in concert with them); the CISA Defendants (Cybersecurity and Infrastructure Security Agency, DHS, Director Jen Easterly, Brian Scully, Matthew Masterson, Lauren Protentis, Geoffrey Hale, Allison Snell, Kim Wyman, and their official successors and those acting in concert with them); and the GEC Defendants (State Department, Leah Bray, Daniel Kimmage, Samaruddin K. Stewart, Alexis Frisbie, and their official successors and those acting in concert with them).

Dated: March 6, 2023

Respectfully submitted,

**ANDREW BAILEY**
**Attorney General of Missouri**

*/s/ Charles F. Capps*
Joshua M. Divine, Mo. Bar No. 69875*
 *Solicitor General*
Charles F. Capps, Mo. Bar No. 72734*
 *Deputy Solicitor General*
Todd A. Scott, Mo. Bar No. 56614*
 *Senior Counsel*
Kenneth C. Capps, Mo. Bar No. 70908*
 *Assistant Attorney General*
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
Tel: (573) 751-8870
charles.capps@ago.mo.gov
*Counsel for State of Missouri*

**JEFFREY M. LANDRY**
**Attorney General of Louisiana**

*/s/ D. John Sauer*
Elizabeth B. Murrill (La #20685)
 *Solicitor General*
Tracy Short (La #23940)
 *Assistant Attorney General*
D. John Sauer (Mo #58721)*
 *Special Assistant Attorney General*
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, Louisiana
Tel: (225) 326-6766
murrille@ag.louisiana.gov
*Counsel for State of Louisiana*

*/s/ Jenin Younes*
Jenin Younes *
John J. Vecchione *
New Civil Liberties Alliance
1225 19th Street N.W., Suite 450
Washington, DC 20036
Direct: (202) 918-6905
E-mail: jenin.younes@ncla.legal
*Counsel for Plaintiffs Dr. Jayanta*
*Bhattacharya,*
*Dr. Martin Kulldorff, Dr. Aaron Kheriaty,*
*and Jill Hines*

*/s/ John C. Burns*
John C. Burns
Burns Law Firm
P.O. Box 191250
St. Louis, Missouri 63119
P: 314-329-5040
E-mail: john@burns-law-firm.com
*Counsel for Plaintiff Jim Hoft*

\*  admitted *pro hac vice*

## CERTIFICATE OF SERVICE

I hereby certify that, on March 6, 2023, I caused a true and correct copy of the foregoing to be filed by the Court's electronic filing system, to be served by operation of the Court's electronic filing system on counsel for all parties who have entered in the case.

*/s/ D. John Sauer*

# E  HIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA
## MONROE DIVISION

| | |
|---|---|
| STATE OF LOUISIANA, STATE OF MISSOURI, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> JOSEPH R. BIDEN, JR., in his official capacity as President of the United States, *et al.*, <br><br> *Defendants*. | Case No. 3:22-cv-01213 |

## PLAINTIFFS' PROPOSED FINDINGS OF FACT IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION

**PLAINTIFFS' PROPOSED FINDINGS OF FACT**

Plaintiffs respectfully submit the following Proposed Findings of Fact as Exhibit 1 to their supplemental brief in support of a preliminary injunction. Plaintiffs incorporate by reference the evidence, documents, and exhibits previously filed in this case; where cited herein, they are cited by docket number (e.g. "Doc. 174-1, at 31" is page 31 of ECF No. 174-1). The deposition transcripts and exhibits to depositions are filed separately; they are cited herein as "[Witness Last Name] Dep. Page:Line," *e.g.*, "Fauci Dep. 1:3-5" is lines 3-5 of page 1 of Dr. Fauci's deposition, and "Scully Dep. 10:22-11:5" is page 10, line 22 through page 11, line 5 of Brian Scully's deposition. Plaintiffs are also filing the video recordings of the depositions with the Court so that the Court may view the testimony of the Government's witnesses and assess the witnesses' credibility for itself. The Declaration of Jasimiel Jones, submitting supplemental exhibits in addition to the deposition and transcript and attached as Exhibit 2, is cited herein as "Jones Decl. Ex. __, at __" *e.g.*, pages 1-3 of Exhibit A to the Jones Declaration is "Jones Decl. Ex. A, at 1-3." Plaintiffs' previously filed exhibits attached to the Declaration of Tammy Glenn, Doc. 10-1, are cited as "Glenn Decl. Ex. __, at __; Doc. 10-1, at __." In addition, these Findings regularly refer to the company formerly known as Facebook, now known as Meta, which owns Facebook, Instagram, WhatsApp, and other platforms, as "Facebook," consistent with common usage in documents.

I.    **The Campaign Of Public Threats Against Social-Media Platforms To Pressure Them To Censor More Speech on Social Media.**

1. Federal officials, including Defendants, have made a long series of public statements since at least 2018 demanding that social-media platforms increase their censorship of speech and speakers disfavored by these officials, and threatening adverse consequences – such as repeal or

reform of Section 230 immunity under the Communications Decency Act, antitrust scrutiny or enforcement, increased regulation, and other measures – if the platforms do not increase censorship.   The private communications between government officials and social-media platforms addressing disinformation, misinformation, and censorship set forth herein were made against the backdrop of these public threats.

2.   The immunity provided by Section 230 of the Communications Decency Act is extremely valuable for social-media platforms, so threatening to amend or repeal that immunity is highly motivating to them.   One commentator has aptly described Section 230 immunity as "a hidden subsidy worth billions of dollars," stating: "Digital platforms enjoy a hidden subsidy worth billions of dollars by being exempted from any liability for most of the speech on their platforms (Section 230)."   Glenn Decl. Ex. 11, Doc. 10-1 at 140.   Another commentator has observed, "imperiling Section 230 is a fearsome cudgel against ever untouchable companies."   Glenn Decl. Ex. 13, Doc. 10-1 at 206.

3.   The threat of antitrust scrutiny or enforcement is also a major motivator to social-media platforms. For example, Facebook CEO Mark Zuckerberg has stated that the threat of antitrust enforcement is "an 'existential' threat" to his platform.   Glenn Decl. Ex. 12, Doc. 10-1 at 202.

**A. Threats From Federal Elected Officials Pressuring Platforms to Censor Speech.**

4.   Then-Speaker of the House Nancy Pelosi stated on April 12, 2019: "I do think that for the privilege of 230, there has to be a bigger sense of responsibility on it.   And it is not out of the question that that could be removed."   Glenn Decl. Ex. 13, Doc. 10-1, at 205 ("When asked about Section 230, Pelosi referred to the law as a 'gift' to tech companies that have leaned heavily on the law to grow their business…. 'It is a gift to them and I don't think that they are treating it with the respect that they should, and so I think that that could be a question mark and in jeopardy… I

do think that for the privilege of 230, there has to be a bigger sense of responsibility on it.  And it is not out of the question that that could be removed.'").

5.   Senator Richard Blumenthal stated on Nov. 17, 2020: "I have urged, in fact, a breakup of tech giants.  Because they've misused their bigness and power. …  And indeed Section 230 reform, meaningful reform, including even possible repeal in large part because their immunity is way too broad and victims of their harms deserve a day in court."  Glenn Decl. Ex. 16, at 1; Doc. 10-1, at 225.

6.   Senator Mazie Hirono tweeted on Feb. 5, 2021: "Sec 230 was supposed to incentivize internet platforms to police harmful content by users.  Instead, the law acts as a shield allowing them to turn a blind eye. The SAFE TECH ACT brings 230 into the modern age and makes platforms accountable for the harm they cause."  Glenn Decl. Ex. 55, at 1; Doc. 10-1, at 723.

7.   Defendants' political allies have repeatedly used congressional hearings as forums to advance these threats of adverse legislation if social-media platforms do not increase censorship of speakers, speech, content, and viewpoints they disfavor.  They have repeatedly used such hearings to berate social-media firm leaders, such as Mark Zuckerberg of Facebook, Jack Dorsey of Twitter, and Sundar Pichai of Google and YouTube, and to make threats of adverse legal consequences if censorship is not increased.  Such hearings include, but are not limited to, an antitrust hearing before the House Judiciary Committee on July 29, 2020; a Senate Judiciary Committee hearing on November 17, 2020; and a House Energy and Commerce Hearing on March 25, 2021.

8.   The March 25, 2021 Joint Hearing of the Communications and Technology Subcommittee with the Subcommittee on Consumer Protection and Commerce, the Joint Statement of Democratic Committee Chairs stated: "This hearing will continue the Committee's work of holding online

platforms accountable for the growing rise of misinformation and disinformation. ... For far too long, big tech has failed to acknowledge the role they've played in fomenting and elevating blatantly false information to its online audiences.  Industry self-regulation has failed.  We must begin the work of changing incentives driving social media companies to allow and even promote misinformation and disinformation."  Glenn Decl. Ex. 17, at 1-2; Doc. 10-1, at 228-29.

9.  At the same hearing, entitled "Disinformation Nation: Social Media's Role in Promoting Extremism and Misinformation," Representative Schakowsky stated: "[S]elf-regulation has come to the end of its road…. [Congress] is preparing to move forward with regulation and legislation. The regulation we seek … must hold platforms accountable when they are used to … spread misinformation….  All three of the companies that are here today run platforms that are hotbeds of misinformation and disinformation."  Jones Decl., Ex. A, at 1, 5.  She also stated: "Self-regulation has not worked.  They must be held accountable for allowing misinformation and disinformation to spread."  *Id.* at 7.

10.  At the same hearing, Representative Doyle stated: "despite repeated promises to tackle this crisis, Facebook, Google, and Twitter instead routinely make minor changes in response to the public relations crisis of the day. … It is now painfully clear that neither the market nor public pressure will force these social media companies to take the aggressive action they need to take to eliminate disinformation and extremism from their platforms.  And therefore, it is time for Congress and this committee to legislate and realign these companies' incentives. … I question whether existing liability protections [*i.e.*, Section 230] should apply … That is why you are here today, Mr. Zuckerberg, Mr. Pichai, and Mr. Dorsey…. Your business model itself has become the problem."  *Id.* at 10-11.

11. At the same hearing, Representative Rush accused the platforms of allowing "[m]isinformation, outlandish conspiracy theories, and incendiary content" to spread, and stated to the three CEOs of Google, Facebook, and Twitter: "There is only one comparison that remotely approaches the avarice and moral discrepancy of your companies, and that is the slavetocracy burden of our Nation's shameful and inhumane and most difficult dark days in the past." *Id.* at 13. He also stated to Jack Dorsey, "I can't wait until we come up with legislation that will deal with you and your cohorts in a very, very effective way." *Id.* at 14.

12. At the same hearing, Representative Upton stated: "we are going to see some changes in Section 230." *Id.* at 15.

13. At the same hearing, Representative Eshoo demanded of Jack Dorsey, "why haven't you banned the 12 accounts that are spewing its deadly COVID misinformation?" *Id.* at 17.

14. At a hearing of the Antitrust subcommittee of the House Judiciary Committee on July 29, 2020, Representative Cicilline said to Mark Zuckerberg: "Mr. Zuckerberg.  When a television station runs a false political advertisement, they're held liable for that.  Why should Facebook or any other platform be different?  … It's hard to understand why Facebook shouldn't be responsible for those business decisions. … Facebook gets away with it because you're the only game in town. There's no competition forcing you to police your own platform.  Allowing this misinformation to spread can lead to violence.  And frankly, I believe it strikes at the very heart of American democracy. … American democracy has always been at war against monopoly power. … These companies, as exist today, have monopoly power.  Some need to be broken up, all need to be properly regulated and held accountable. … The names have changed, but the story is the same. Today, the men are named Zuckerberg, Pichai, Cook, and Bezos." Jones Decl., Ex. B, at 9-11.

15. On November 17, 2020, at a hearing of the Senate Judiciary Committee, Senator Blumenthal stated: "Now, Mr. Zuckerberg and Mr. Dorsey, you have built terrifying tools of persuasion and manipulation with power far exceeding the robber barons of the last Gilded Age. You have profited hugely by … promoting hate speech and voter suppression. … The destructive incendiary misinformation is still a scourge on both your platforms and on others. … [W]hat appears on your platform … is voter suppression and incendiary malicious misinformation. … [A] series of hearings on big tech is long overdue on antitrust issues … and Section 230.  I have urged, in fact, a breakup of the tech giants because they've misused their bigness and power.  Breaking off, for example, WhatsApp and Instagram [both Meta platforms]…. And indeed Section 230 reform, meaningful reform, including even possible repeal in large part because their immunity is way too broad…. [F]oreign disinformation campaigns intended to interfere in our democracy…. What we've seen here are fighting words and hate speech that certainly deserve no free expression protection. … Change is going to come, no question.  Change is on the way and I intend to bring aggressive and targeted reform to Section 230."  Jones Decl., Ex. C, at 2-3.  Soon thereafter, he demanded that Mark Zuckerberg (who was testifying before the committee) "commit to … robust contend modification playbook in this coming election, including fact-checking, labelling, reducing the spread of misinformation" to "tak[e] action against dangerous disinformation" and "malign tactics."  *Id.* at 4; *see also, e.g., id.* at 9 (Senator Coons demanding that Jack Dorsey explain why "you don't have a standalone climate change misinformation policy")

16. On March 11, 2022, Representative Ro Khanna, the Chairman of the House Oversight and Reform Committee who is leading "an investigation of oil industry 'misinformation' and held two days of hearings on the oil industry, tweeted: "Facebook is preventing us from taking action on climate change by allowing climate misinformation to spread. Congress must step up and hold

them accountable." Jones Decl., Ex. D. He also tweeted: "Misinformation being spread on social media is undermining our efforts to tackle climate change. As chair of the House Oversight Environment Subcommittee, I will be holding a hearing to hold social media companies accountable." *Id.*

17. On April 20, 2022, twenty-two Democratic members of Congress sent a letter to Mark Zuckerberg of Facebook (n/k/a "Meta Platforms, Inc."), demanding that Facebook increase censorship of "Spanish-language disinformation across its platforms" and threatening Congressional action if Facebook did not do so. The letter claimed that "disinformation" was a threat to democracy, and it made explicit threats of adverse legislative action if Facebook/Meta did not increase censorship: "The spread of these narratives demonstrate that Meta does not see the problem of Spanish-language disinformation in the United States as a critical priority for the health of our democracy. The lack of Meta's action to swiftly address Spanish-language misinformation globally demonstrates the need for Congress to act to ensure Spanish-speaking communities have fair access to trustworthy information." Glenn Decl. Ex. 18; Doc. 10-1, at 244-46.

18. Comments from two Members of the House of Representatives summarize this campaign of pressure and threats: "In April 2019, Louisiana Rep. Cedric Richmond warned Facebook and Google that they had 'better' restrict what he and his colleagues saw as harmful content or face regulation: 'We're going to make it swift, we're going to make it strong, and we're going to hold them very accountable.' New York Rep. Jerrold Nadler added: 'Let's see what happens by just pressuring them.'" Glenn Decl. Ex. 14, at 2-3; Doc. 10-1, at 218-19.

**B. Public Threats from President Biden and His Aides Pressuring Platforms to Censor.**

19. Then-candidate and now-President Biden has led this charge.  He has tripled down on these threats of adverse official action from his colleagues and allies in senior federal-government positions.  His threats of adverse government action have been among the most vociferous, and among the most clearly linked to calls for more aggressive censorship of disfavored speakers and speech by social-media companies.

20. For example, on January 17, 2020, then-candidate Biden stated, in an interview with the New York Times editorial board, that Section 230 of the CDA should be "revoked" because social-media companies like Facebook did not do enough to censor supposedly false information in the form of political ads criticizing him  *i.e.*, core political speech.  He stated: "The idea that it's a tech company is that Section 230 should be revoked, immediately should be revoked, number one.  For Zuckerberg and other platforms."  He also stated, "And it should be revoked.  It should be revoked because it is not merely an internet company.  It is propagating falsehoods they know to be false.... There is no editorial impact at all on Facebook. None. None whatsoever. It's irresponsible. It's totally irresponsible."  Glenn Decl. Ex. 19, at 27; Doc. 10-1, at 275.

21. Candidate Biden also threatened that Facebook CEO Mark Zuckerberg should be subject to civil liability and even *criminal prosecution* for not censoring such core political speech: "He should be submitted to civil liability and his company to civil liability…. Whether he engaged in something and amounted to collusion that in fact caused harm that would in fact be equal to a criminal offense, that's a different issue. That's possible. That's possible it could happen."  *Id.*  In other words, Biden's message—not long before he became President of the United States—was that if Facebook did not censor political ads against him, Zuckerberg should go to prison.  These two threats echoed the same threats made by numerous political allies of the President since 2019, cited above.

22. During the presidential campaign, now-Vice President Harris made similar threats against social-media firms to pressure them to engage in more aggressive censorship of speakers, content, and viewpoints she disfavors.  For example, in addition to the statements cited above, she stated in 2019: "We will hold social media platforms responsible for the hate infiltrating their platforms, because they have a responsibility to help fight against this threat to our democracy. And if you profit off of hate—if you act as a megaphone for misinformation or cyberwarfare, if you don't police your platforms—we are going to hold you accountable as a community."  Glenn Decl. Ex. 20, at 1; Doc. 10-1, at 284.

23. In or around June 2020, the Biden campaign published an open letter and online petition (ironically, on Facebook) calling for Facebook to engage in more aggressive censorship of core political speech and viewpoints that then-Candidate Biden disfavored.  The open letter complained that Facebook "continues to allow Donald Trump to say anything — and to pay to ensure that his wild claims reach millions of voters.  Super PACs and other dark money groups are following his example.  Trump and his allies have used Facebook to spread fear and misleading information about voting…. We call for Facebook to proactively stem the tide of false information by no longer amplifying untrustworthy content and promptly fact-checking election-related material that goes viral.  We call for Facebook to stop allowing politicians to hide behind paid misinformation in the hope that the truth will catch up only after Election Day.  There should be a two-week pre-election period during which **all** political advertisements must be fact-checked before they are permitted to run on Facebook. … Anything less will render Facebook a tool of misinformation that corrodes our democracy."  Glenn Decl. Ex. 23, at 1; Doc. 10-1, at 299.

24. The online petition demanded that Facebook "[p]romote real news, not fake news," "[q]uickly remove viral misinformation," and "[e]nforce voter suppression rules against

everyone—even the President [Trump]."  Glenn Decl. Ex. 24, at 2; Doc. 10-1, at 304.  The petition

complained that Facebook "continues to amplify misinformation and lets candidates pay to target

and confuse voters with lies." *Id.* at 304.  It demanded that Facebook "promote authoritative and

trustworthy sources of election information, rather than rants of bad actors and conspiracy

theorists," "promptly remove false, viral information," and "prevent political candidates and PACs

from using paid advertising to spread lies and misinformation – especially within two weeks of

election day." *Id.* at 305.

25. On September 28, 2020, the Biden-Harris campaign sent a letter to Facebook accusing it

of propagating a "storm of disinformation" by failing to censor the Trump campaign's political

speech, including social-media political ads.  Glenn Decl. Ex. 25, at 3; Doc. 10-1, at 312. The letter

accused Facebook of allowing "hyper-partisan" and "fantastical" speech to reach millions of

people, and it demanded "more aggressive" censorship of Trump.  *Id.*

26. On December 2, 2020—during the presidential transition—Biden's former chief of staff

and top technical advisor, Bruce Reed, publicly stated that "it's long past time to hold the social

media companies accountable for what's published on their platforms."  Glenn Decl. Ex. 26, at 1;

Doc. 10-1, at 314-15.  This comment specifically referred to the amendment or repeal of Section

230 of the Communications Decency Act.  *See id.*  He also wrote: "Washington would be better

off throwing out Section 230 and starting over." *Id.*

27. On July 16, 2021, President Biden stated that social-media companies are "killing people"

by not censoring enough misinformation.  Waldo Ex. 14, at 1.

28. On January 3, 2022, an audio clip of President Biden played on Alyssa Milano's podcast

stated: "The unvaccinated are responsible for their own choices, but those choices had been shulled

[sic] by dangerous misinformation on cable TV and social media. You know, these companies …

are making money by ped[dling] lies and allowing misinformation that can kill their own customers and their own supporters. It's wrong. It's immoral. I call on the purveyors of these lies and misinformation to stop it. Stop it now."  Waldo Ex. 39, at 5 (Audio Tr. 4).

29. In September of 2022, the White House convened the "United We Stand" summit at which the President put social media companies on notice that Section 230 protections were at risk. "Tech platforms currently have special legal protections under Section 230 of the Communications Decency Act that broadly shield them from liability. This immunity extends beyond what the First Amendment requires and what newspapers and other media receive. It also effectively permits hate-fueled content mobilizing users to violence to be amplified on large tech platforms.  President Biden has long urged fundamental reforms to Section 230, and …he reiterates his call for Congress to fundamentally reform Section 230."  Jones Decl., Ex. E, at 9.

30. President Biden also stated in the same document: "Americans deserve to know how the algorithms that drive large tech platforms may amplify divisions and contribute to hate-fueled violence, among other critical harms.  Consistent with those same principles for accountability, President Biden supports *requiring* platform transparency sufficient to allow the public and researchers to understand how and why such decisions are made, their potential effects on users, and the very real dangers these decisions may pose."  *Id.* (emphasis added).

## II.    The White House's Public and Private Pressure Campaign on Platforms.

31.    Many White House officials are involved in communicating with social-media platforms about misinformation, disinformation, and censorship.  In response to a third-party subpoena, Facebook/Meta identified at least the following White House officials as engaged in such communications: Special Assistant to the President Laura Rosenberger, White House Partnerships Manager Aisha Shah, White House Counsel Dana Remus, and White House officials

Andy Slavitt, Rob Flaherty, and Clarke Humphrey. Doc. 84, ¶ 379. Defendants' discovery reveals many others. *See infra.*

32.    In response to a third-party subpoena, YouTube identified White House officials Benjamin Wakana and Rob Flaherty as engaged in such communications, and Defendants' discovery reveals others. Doc. 84, ¶ 380. Defendants' discovery reveals others. *See infra.*

33.    In response to a third-party subpoena, Twitter has disclosed the following White House officials as engaged in such communications: Deputy Assistant to the President and Director of Digital Strategy Rob Flaherty, White House Senior Advisor Andrew Slavitt, NSC staffer Katy E. Colas, Deputy Assistant to the President Joshua Geltzer, White House Digital Director Clarke Humphrey, Deputy Director of the Office of Digital Strategy Tericka Lambert, Press Secretary for the First Lady Michael LaRosa, NSC Director of Counterterrorism John Picarelli, Chief of Staff for the Office of Digital Strategy Hoor Qureshi, Director of Strategic Communications and Engagement Courtney Rowe, White House Associate Counsel Michael Posada, Associate Director for Communications Marissa Sanchez-Velasco, Deputy Director of Digital Strategy Christian Tom, and Strategic Director of Digital Communications Benjamin Wakana. Jones Decl., Ex. F, at 1. Defendants' discovery has revealed others. *See infra.*

**A. Pressure in Private from Rob Flaherty, Andy Slavitt, and White House Officials.**

34.    The Biden White House's demands for censorship began almost immediately upon taking office. On January 23, 2021, three days after Inauguration Day, at 1:04 a.m., Clarke Humphrey of the White House emailed Twitter, copying Rob Flaherty, with the subject line: "Flagging Hank Aaron misinfo." Doc. 174-1, at 1. The email stated: "Hey folks – Wanted to flag the below tweet and am wondering if we can get moving on the process for having it removed ASAP." *Id.* Humphrey then linked to a Tweet by anti-vaccine activist Robert F. Kennedy Jr., who

is also a principal target of the Virality Project and a member of the so-called "Disinformation Dozen." *Id.* Humphrey added: "And then if we can keep an eye out for tweets that fall in this same ~genre that would be great." *Id.*

35.     "Flagging Hank Aaron misinfo" refers to the claim by anti-vaccine speakers that COVID-19 vaccines may have contributed to baseball legend Hank Aaron's death.   *See, e.g.,* https://www.usatoday.com/story/news/factcheck/2021/01/26/fact-check-hank-aaron-death-unlikely-result-covid-19-vaccine/6699577002/.

36.     Twitter responded to Humphrey within 4 minutes, at 1:08 a.m. on January 23, 2021, stating: "Thanks.  We recently escalated this."  Doc. 174-1, at 2.

37.     The White House's demands for censorship continued relentlessly, and their tone was arrogant, demanding, and peremptory.  On Saturday night, February 6, 2021, at 9:45 p.m., Rob Flaherty emailed Twitter to demand the immediate removal of a parody or impostor account linked to Finnegan Biden, Hunter Biden's adult daughter.  Doc. 174-1, at 4.  He stated: "Please remove this account immediately."  *Id.*  He also stated: "I have tried using your form three times and it won't work—it is also ridiculous that I need to upload my id to a form [to] prove that I am an authorized representative of Finnegan Biden."  *Id.*

38.     Two minutes later, at 9:47 p.m., Twitter responded, "Thanks for sending this over. We'll escalate for further review from here."  *Id.*  Flaherty shot back, the same minute, "Cannot stress the degree to which this needs to be resolved immediately."  *Id.*  Forty-five minutes later, at 10:32 p.m., Twitter responded, "Update for you – account is now suspended."  *Id.* at 3-4.

39.     The next day, Sunday, Feb. 7, 2021, Twitter emailed Flaherty and described steps he could take to "streamline the process" for the White House's demands for Twitter censorship. *Id.* at 3.  Twitter offered to enroll White House officials in Twitter's Partner Support Portal for

expedited review of flagging content for censorship, recommending that Flaherty "**Designate a list of authorized White House staff for Twitter's Partner Support Portal**." *Id.* (bold in original). Twitter stated: "We sent over instructions about this on January 28th and also discussed this with Christian [Tom] during our call on February 4th. This is the same system we had in place for the previous two administrations for their support issues, *as well as the transition and campaign teams*. Once you assign and we enroll these authorized reporters, whenever they submit a ticket through the Help Center it will be prioritized automatically, without having to contact our team, and you won't need to add your personal information. To enroll your designated reporters to the Partner Support Portal, we simply need the list of @usernames (up to 10) that are registered with a White House email address." *Id.* at 3 (italics added; underlines omitted).

40.    Twitter noted that it had been recently bombarded with such requests for censorship from the White House: "we would prefer to have a streamlined process strictly with your team as the internal liaison. That is the most efficient and effective way to ensure we are prioritizing requests. In a given day last week for example, we had more than four different people within the White House reaching out for issues." *Id.* at 3.

41.    The next day, Monday, February 8, 2021, Facebook emailed Rob Flaherty, Courtney Rowe, and Clarke Humphrey of the White House to explain how it had recently expanded its COVID-19 censorship policies. Doc. 174-1, at 7-8. Facebook stated: "We wanted to make sure you saw our announcements today about running the largest worldwide campaign to promote authoritative COVID-19 vaccine information and expanding our efforts to remove false claims on Facebook and Instagram about COVID-19, COVID-19 vaccines and vaccines in general during the pandemic." *Id.*

42.     Under the heading "**Combating Vaccine Misinformation**," Facebook provided a detailed list of expanded censorship policies: "We are expanding our efforts to remove false claims on Facebook and Instagram about COVID-19, COVID-19 vaccines and vaccines in general during the pandemic. Since December [*i.e.* during the Biden transition], we've removed false claims about COVID-19 vaccines that have been debunked by public health experts. … [W]e are expanding the list of false claims we will remove to include additional debunked claims about the coronavirus and vaccines. … Groups, Pages and accounts on Facebook and Instagram that repeatedly share these debunked claims may be removed altogether. We are also requiring some admins for groups with admins or members who have violated our COVID-19 policies to temporarily approve all posts within their group. …. On Instagram, in addition to surfacing authoritative results in Search, in the coming weeks we're making it harder to find accounts in search that discourage people from getting vaccinated…." *Id.* at 7-8 (bold in original).

43.     This was not nearly enough for the White House.  Within 19 minutes of receiving this email, Flaherty responded, pressing Facebook for more information about how strict the new policies are.  *Id.* at 7.  Quoting Facebook's email in italics, he wrote: "This line, of course, stands out: *that repeatedly share these debunked claims may be removed altogether*. Can you share more about your framework here? May, of course, is very different than 'will.'  Is there a strike policy, ala Youtube? Does the severity of the claims matter?" *Id.* at 7.  He also asked for specific data on the application of the censorship policies: "And as far as your removal of claims, do you have data on the actual number of claims - related posts you've removed?  Do you have a sense of how many are being flagged versus how many are being removed? Are there actions (downranking, etc) that sit before removal? How are you handling things that are dubious, but not provably false?" *Id.*

44.     The next day, February 9, 2021, Flaherty followed up with Facebook with a demand for more information and an accusation (to be repeated) that Facebook's failure to censor speech on its platforms causes "political violence": "All, especially given the Journal's reporting on your internal work on political violence spurred by Facebook groups, I am also curious about the new rules as part of the 'overhaul.'  I am seeing that you will no longer promote civic and health related groups, but I am wondering if the reforms here extend further? Are there other growth vectors you are controlling for?"  *Id.* at 6.  Flaherty suggested an oral meeting to discuss: "Happy to put time on the calendar to discuss further."  *Id.*

45.     Facebook responded on February 9, 2021, with a detailed answer to each of Flaherty's questions about the enforcement of its new policies.  *Id.* at 5-6.  Facebook also noted that "We are happy to discuss these and additional questions as per your recent note."  *Id.* at 5. Among other things, Facebook reported that it would "suspend the entire Page, Group, or account" in case of repeat violations; that it "will begin enforcing this policy immediately," *id.* at 5; that for vaccine-skeptical content that does not violate Facebook's policies, Facebook will "reduce its distribution and add strong warning labels with more context, so fewer people see the post," *id.* at 6; and that Facebook was working to censor content that does not violate its policies in other ways by "prevent[ing] posts discouraging vaccines from going viral on our platforms; address[ing] content that experts believe dissuades people from getting the vaccine, but does not violate our misinformation policies, through the use of information labels; and prevent[ing] recommendations for Groups, Pages, and Instagram accounts that repeatedly push content discouraging vaccines," *id.* at 6.

46.     Facebook advised Flaherty that it was relying on advice of "public health authorities" to determine its censorship policies: "In consultation with leading health

organizations, we continuously expand the list of false claims that we remove about COVID-19 and vaccines during the pandemic. We remove claims *public health authorities* tell us have been debunked or are unsupported by evidence." *Id.* at 6 (emphasis added).

47.    Facebook also promised Flaherty that it would aggressively enforce the new censorship policies: "We will begin enforcing this policy immediately, with a particular focus on Pages, Groups and accounts that violate these rules, and we'll continue to expand our enforcement over the coming weeks." *Id.* at 5.

48.    Facebook then followed up to "see when you would like to have a meeting arranged to speak to our misinformation team reps about the latest updates. They also have a more detailed misinformation analysis prepared based on the discussions/questions from the previous meetings during the transition time period." *Id.* at 5.

49.    This email makes clear that Flaherty, as part of the Biden transition team, had already engaged in "previous meetings" and "discussions/questions" with Facebook about censorship of COVID-19 misinformation on its platforms during the Presidential transition period from November 2020 to January 2021. *Id.*

50.    On February 24, 2021, Facebook emailed Rob Flaherty with the subject "Misinfo Themes," stating: "Following up on your request for COVID-19 misinfo themes we are seeing. All the below claims violate our updated Covid and vaccine misinformation policies that we announced earlier this month, and we are removing these claims from our platforms," and she identified "Vaccine Toxicity," "False Claims About Side Effects of Vaccines," "Comparing the Covid Vaccine to the Flu Vaccine," and "Downplaying Severity of COVID-19." Jones Decl. Ex. G, at 1-2. Flaherty responded by inquiring for details about Facebook's actual enforcement practices and for a report on misinformation that was not censored: "Can you give us a sense of

volume on these, and some metrics around the scale of removal for each?  Can you also give us a sense of misinformation that might be falling outside your removal policies?  Goes without saying, just because it's on your list for removal hasn't historically meant that it was removed, so I want to get a sense of the state of play here!"  *Id.* at 1.  Facebook promised to discuss this at an upcoming oral meeting: "Hope to cover a lot of that on Monday … Can definitely go into detail on content that doesn't violate like below but could contribute to vaccine hesitancy."  *Id.*

51.     On March 1, 2021, White House officials Rob Flaherty and Clarke Humphrey, along with Joshua Peck of HHS, participated in a meeting with Twitter about misinformation. Jones Decl., Ex. H, at 1.  The same day, after the meeting, Twitter emailed these officials and assured the White House that it would increase censorship of "misleading information" on Twitter: "Thanks again for meeting with us today.  As we discussed, we are building on our continued efforts to remove the most harmful COVID-19 misleading information from the service …. We have also introduced a strike system that determines when further enforcement is necessary. … As we said, we are committed to working with stakeholders in the public, private and non-profit sectors to address the reliability of covid information online and look forward to continued dialogue about joint efforts."  *Id.* at 1.

52.     From at least May 28, 2021 to July 10, 2021, a senior Meta executive repeatedly copied Slavitt on his emails to Surgeon General Murthy in which he assured the Surgeon General and the White House that Meta was engaging in censorship of COVID-19 misinformation according to the White House's demands. Doc. 71-4. Among other things, the Meta executive insisted that "We've expanded penalties for individual Facebook accounts that share misinformation." *Id.* at 9.

53.     On March 12, 2021, referring to previous oral communications with the White House and HHS, Facebook emailed Flaherty "[f]ollowing up on our commitment to share our survey data on vaccine uptake." Doc. 174-1, at 9.  Facebook provided the White House with a detailed report and summary on the topic, and noted that the information had evidently been requested by or on behalf of "White House / HHS" officials: "Hopefully, this format works for the various teams and audiences within the White House / HHS that may find this data valuable."  *Id.*

54.     On March 15, 2021, at 3:20 a.m., Flaherty sent an email to Facebook acknowledging, "[g]ood insights here," but then immediately pivoted to demand more and different data, linking a recent Washington Post article accusing Facebook of allowing the spread of information about vaccine hesitancy and QAnon, stating: "I'm more interested in the data that was              outlined              in              the              Washington              Post (https//www.washingtonpost.com/technology/202l/03/l4/facebook-vaccine-hesistancy-qanon) And what interventions you are testing/their effectiveness."  *Id.* at 9.  This would become a standard tactic of the White House – linking to articles critical of Facebook in the press, and then demanding more information or actions based on those articles.

55.     The day before, Sunday, March 14, 2021, at 11:13 p.m., Flaherty had emailed a link to the same article to Facebook ("https://www.washingtonpost.com/technology/2021/03/14/facebook-vaccine-hesistancy-qanon"), copying White House COVID-19 official Andrew Slavitt, with no more text in the email and the subject line: "You are hiding the ball."  *Id.* at 12.

56.     The next morning, Facebook responded by stating, "there is a misunderstanding on what this story is covering with respect to research that's happening – I will call to clear up. Certainly not hiding the ball."  *Id.* at 11-12.

57.     Flaherty responded in accusatory fashion, referring to a series of at least three previous oral conversations in which the White House had demanded more information from Facebook about its censorship policies. *Id.* at 11. Flaherty made clear that the White House was seeking more aggressive action on "borderline" content—*i.e.*, content that *does not clearly violate Facebook's own censorship policies* but the White House demands action against anyway. Flaherty wrote: "I don't think this is a misunderstanding … I've been asking you guys pretty directly, over a series of conversations, for a clear accounting of the biggest issues you are seeing on your platform when it comes to vaccine hesitancy, and the degree to which borderline content--as you define it-- is playing a role." *Id.* at 11. Flaherty also referred to a series of meetings, including one-on-one meetings with Facebook ("1:1"): "I've also been asking for what actions you have been taking to mitigate it as part of your 'lockdown' - which in our first conversation, was said to be in response to concerns over borderline content, in our 1:1 convo you said was not out of any kind of concern over borderline content, and in our third conversation never even came up." *Id.*

58.     Flaherty followed with a series of accusations that Facebook was deceiving and prevaricating with the White House about its "borderline" (*i.e. not* violative) content: "You said you would commit to us that you'd level with us. I am seeing in the press that you have data on the impact of borderline content, and its overlap with various communities. I have asked for this point blank, and got, instead, an overview of how the algorithm works, with a pivot to a conversation about profile frames, and a 45-minute meeting that seemed to provide you with more insights than it provided us." *Id.* He accused Facebook of being the "top driver[] of vaccine hesitancy," demanded action against "borderline" content, and stated that the White House wanted to be directly involved in those efforts: "I am not trying to play 'gotcha' with you. We are gravely

concerned that your service is one of the top drivers of vaccine hesitancy- period.  I will also be the first to acknowledge that borderline content offers no easy solutions. But we want to know that you're trying, we want to know how we can help, and we want to know that you're not playing a shell game with us when we ask you what is going on. This would all be a lot easier if you would just be straight with us." *Id.*

59.    Facebook responded on March 15, respectfully disputing the Washington Post's reporting, but then saying to Flaherty: "We obviously have work to do to gain your trust. You mention that you are not trying to play 'gotcha' with us—I appreciate the approach you are taking to continued discussions. We are also working to get you useful information that's on the level. That's my job and I take it seriously--I'll continue to do it to the best of my ability, and I'll expect you to hold me accountable." *Id.* at 10-11.

60.    The same day, March 15, 2021, Andrew Slavitt (who was copied on these exchanges between Facebook and Flaherty) weighed in, once again accusing Facebook of dishonesty in a series of oral meetings: "It would [be] nice to establish trust. I do feel like relative to others, interactions with Facebook are not straightforward and the problems are worse – like you are trying to meet a minimum hurdle instead of trying to solve the problem and we have to ask you precise questions and even then we get highly scrubbed party line answers. We have urgency and don't sense it from you all.  100% of the questions I asked have never been answered and weeks have gone by." *Id.* at 10.

61.    Slavitt then made an ominous statement threatening unspecified Executive action against Facebook in retaliation for Facebook's perceived lack of cooperation with the White House's demands on censorship of "borderline" (*non-violative*) content: "*Internally we have been considering our options on what to do about it.*" *Id.* at 10 (emphasis added).

62. On March 16, 2021, Facebook responded to Slavitt, again disputing the Washington Post's reporting and respectfully explaining its position, but also promising to share information about vaccine hesitancy in "real time": "We are absolutely invested in getting you the specific information needed to successfully manage the vaccine roll out." *Id.* Facebook promised to increase information-sharing and proposed a detailed oral meeting on the topic: "But I understand your point regarding how we communicate, and that we need to share information with you in a way that prioritizes what we are seeing in as close to real time as possible. I'd like to set up a conversation with our research leads to walk your team through ongoing research we are currently conducting and our approach; and then we can prioritize sharing results as quickly as possible." *Id.* Facebook also offered to speak to Slavitt by phone at any time. *Id.*

63. On March 19, 2021, Facebook had an oral meeting with White House officials, including Flaherty and Slavitt. Doc. 174-1, at 15. On Sunday, Facebook sent a follow-up summary of the meeting to Andrew Slavitt ("Thanks for taking the time to connect on Friday"), which noted that the White House (1) demanded a "Consistent Product Team [Point of Contact]" at Facebook, (2) demanded "Sharing Additional Data" from Facebook, (3) had asked about "Levers for Tackling Vaccine Hesitancy Content," and (4) asked about censorship policies for the Meta platform WhatsApp. *Id.*.

64. In the follow-up email, Facebook noted that, in direct response to White House demands, it was censoring, removing, and reducing the spread of content that did not violate its policies: "You also asked us about our levers for reducing virality of vaccine hesitancy content. In addition to policies previously discussed, these include *the additional changes that were approved late last week* and that we'll be implementing over the coming weeks. As you know, in addition to removing vaccine misinformation, we have been focused on reducing the virality of content

discouraging vaccines *that does not contain actionable misinformation*. This is *often-true content* ... but it can be framed as sensation, alarmist, or shocking. *We ll remove these Groups, Pages, and Accounts when they are disproportionately promoting this sensationalized content*." *Id.* at 15 (emphases added).

65.    Facebook also provided the White House with a detailed report on its censorship policies on WhatsApp: "WhatsApp's approach to misinformation focuses on limiting the virality of messages, preventing coordinated abuse, and empowering users to seek out reliable sources of information both in and out of the product. Our product includes features to limit the spread of viral content, such as forward limits and labels, privacy settings to help users decide who can add them to groups, and simple ways for users to block accounts and make reports to WhatsApp if they encounter problematic messages. Additional limitations we placed in April 2020 on forwarding of messages that have been forwarded many times reduced these kinds of messages by over 70%." *Id.*

66.    On March 22, 2021, Flaherty responded to Facebook, demanding much more detailed information and action about "sensationalized" content on its platforms. *Id.* at 14. Flaherty noted that White House officials were demanding a plan from Facebook to censor non-violative content, *i.e.*, "looking out for your game plan on tackling vaccine hesitancy spread on your platform." *Id.*

67.    In this email, Flaherty badgered Facebook with a series of detailed requests for information about this issue of censoring vaccine-skeptical content that does not violate Facebook's content-moderation policies, such as truthful but "sensational" content: "Again, as I've said, what we are looking for is the universe and scale of the problem. You noted that there is a level below sensational stories that get down-ranked, which took the form of general skepticism.

… [T]he problem does not sit in 'microchips'-land, and … it seems plausible that the things that drive the most actual hesitancy sit in 'sensational' and 'skeptical.'" *Id.*. Flaherty demanded more information and greater censorship of such non-violative "sensational" and "skeptical" content: "If you're down ranking sensational stuff—great—but I want to know how effective you've seen that be from a market research perspective.  And then, what interventions are being taken on 'skepticism?' … [W]hat are you trying here, and again, how effective have you seen it be. And *critically*, what amount of content is falling into all of these buckets? Is there wider scale of skepticism than sensationalism? I assume given the Carnegie data and the studies I've seen in the press that you have this. … As I've said: this is not to play gotcha. It is to get a sense of what you are doing to manage this." *Id.* (italics in original).

68.    Flaherty also badgered Facebook for more information on Meta's censorship policies on the WhatsApp platform, pushing for greater censorship there: "On whatsapp, which I may seem like I'm playing gotcha, but I guess I'm confused about how you're measuring reduction of harm. If you can't see the message, I'm genuinely curious—how do you know what kinds of messages you've cut down on? Assuming you've got a good mousetrap here, that's the kind of info we're looking for above: what interventions you've taken, and what you've found to work and not work? And how effective are you seeing the good information on Whatapp be? Are you doing cross platform campaign work to try to reduce people's exposure on whatsapp?" *Id.* at 14.

69.    Flaherty concluded with an accusation of past dishonesty against Facebook and proposed frequent oral meetings to address the White House's issues: "You've given us a commitment to honest, transparent conversations about this. We're looking for that, and hoping we can be partners here, even if it hasn't worked so far. I know Andy [Slavitt] is willing to get on

the phone with [a Facebook official] a couple of times per week if its necessary to get all of this."
*Id.*

70.     Flaherty's statement that the White House is "hoping we can be partners here, even

if it hasn't worked so far," reinforced Slavitt's previous implied threat that the White House would

take some unspecified action against Facebook if it did not cooperate with the White House's

demands on censorship of vaccine-hesitant content, especially *non-violative* content, on

Facebook's platforms.  *Id.*

71.     Facebook then agreed with Flaherty and Slavitt to schedule a meeting that

Wednesday at 4:00 pm to discuss these issues.  *Id.* at 13.

72.     On April 9, 2021, Facebook sent Flaherty an email to respond to a long series of

detailed questions from Flaherty about how the Meta platform WhatsApp was censoring COVID-

19 misinformation.  Doc. 174-1, at 17-21.  All Flaherty's questions were designed to probe and

pressure Facebook toward more aggressive censorship.  *See id.*  Facebook began by "noting some

of the key differences between a private messaging app like WhatsApp, and social media like

Facebook and Instagram. Approximately 90 percent of the messages sent on WhatsApp are one-

to-one, and the majority of group chats include fewer than ten people. WhatsApp does not promote

content, and users do not build audiences or discover new people as they would on social media."

*Id.* at 18.  Flaherty responded to this: "Very aware. [Smiley face]."  In other words, the White

House was demanding information about speech on a *private* messaging app used for one-to-one

private communication, and demanding greater censorship of speech on that app—and it was "very

aware" that it was doing so.  *Id.*

73.     Facebook noted that "WhatsApp seeks to control the spread of misinformation and

inform users through deliberate, content-agnostic product interventions -- things like labeling and

limiting message forwards." *Id.* at 18.  Facebook noted that the message-forwarding limits are "intended" to censor COVID misinformation, and that they actually reduced such speech by 70 percent, and Facebook admitted that these are "somewhat blunt tools" that prevent its users from sending many other forms of speech as well: "The forward limits … are intended to reduce their spread. As mentioned in my earlier note, when WhatsApp rolled out the limitation for highly forwarded messages to one chat at a time in April 2020, this resulted in a 70% reduction of those messages globally.  Of course, not all forwards are misinformation, so these are by nature somewhat blunt tools, but they are important ones -- and ones that many other messaging services don't provide." *Id.*

74.     After presenting Facebook with a series of questions (presented in bold and in red type in the email, *see id.* at 18-20), Flaherty summed up by demanding insight into Facebook's internal information: "I guess I have the same question here as I do on Facebook on Instagram. Do you guys think you have this under control? You're obviously going to say yes to that, so I guess the real question is, as ever: how are you measuring success? Reduction in forwarding? Measured impact across Facebook properties?" *Id.* at 20.

75.     Facebook responded by emphasizing that it was "reducing viral activity on our platform" through message-forward limits and other speech-blocking techniques as well: "On WhatsApp, reduction in forwards is just one of the signals that we use to measure how well we are doing in reducing viral activity on our platform. We also ban accounts that engage in mass marketing or scam behaviors - including those that seek to exploit COVID-19 misinformation. Our efforts in this space are more comprehensive than anything that our peers in private messaging or SMS do, and we are constantly innovating to stay ahead of future challenges." *Id.* at 20.

76.    Facebook also offered to meet with the White House "Monday or anytime next week" to discuss its censorship efforts, to which Flaherty responded, "Hoor should be trying to land a time." *Id.* at 17.

77.    Flaherty responded to Facebook's long, detailed account of its censorship efforts on WhatsApp by expressing dissatisfaction with the response and demanding ever-more detailed information, stating that he "couldn't care less" about Facebook's "product safari": "Will say I'm really mostly interested in what effects the interventions and products you've tested have had on increasing vaccine interest within hesitant communities, and which ones have shown promise. Really couldn't care less about products unless they're having measurable impact. And while the product safari has been interesting, at the end of the day, *I care mostly about what actions and changes you re making to ensure sure you re not making our country s vaccine hesitancy problem worse*. I definitely have what I believe to be a non-comprehensive list of products you're building but I still don't have a good, empirical answer on how effective you've been at reducing the spread of vaccine-skeptical content and misinformation to vaccine fence sitters in the now-folded 'lockdown.'" *Id.* at 17 (emphasis added).

78.    Flaherty then accused Facebook of being responsible for the riot at the Capitol on January 6, 2021, by not censoring enough speech online, and suggested that Facebook would be similarly responsible for COVID-related deaths if it did not engage in more online censorship here: "In the electoral context, you tested and deployed an algorithmic shift that promoted quality news and information about the election. This was reported in the New York Times and also readily apparent to anyone with cursory social listening tools. You only did this, however, after *an election that you helped increase skepticism in, and an insurrection which was plotted, in large part, on*

*your platform.* And then you turned it back off.  *I want some assurances, based in data, that you are not doing the same thing again here*." *Id.* (emphases added).

79.     Facebook responded by promising ever-more-detailed information to the White House's demands: "Understood. I thought we were doing a better job [of] responding to this – and we are working to get the data that will more clearly show the universe of the Covid content that's highest in distribution with a clear picture of what percentage of that content is vax hesitancy content, and how we are addressing it. I know [a Facebook official] told Andy [Slavitt] that would take a bit of time to nail down and we are working on that universe of data. I will make sure we're more clearly responding to your questions below." *Id.* at 17.

80.     The meeting that Facebook offered with the White House on Monday, April 12 or thereafter occurred on Wednesday, April 14, because Flaherty emailed Facebook that day stating: "Since we've been on the phone…" *Id.* at 22.

81.     In this Wednesday, April 14, 2021 email, with the subject line "tucker," Flaherty noted that the White House was tracking COVID-related content in real time, and he demanded the censorship of currently-trending posts of content from two prominent Fox News hosts, Tucker Carlson and Tomi Lahren: "Since we've been on the phone – the top post about vaccines today is tucker Carlson saying they don't work. Yesterday was Tomi Lehren [*sic*] saying she won't take one.  This is exactly why I want to know what 'Reduction' actually looks like – if 'reduction' means 'pumping our most vaccine hesitant audience with tucker Carlson saying it doesn't work' then ... I'm not sure it's reduction!" *Id.* at 22.  Facebook responded: "Thanks—I saw the same thing when we hung up.  Running this down now." *Id.*  In a separate email chain to Flaherty and Courtney Rowe the same day, Facebook also assured the White House, "running down the question on Tucker and working on getting you report by end of week." *Id.* at 23.

82.    Tucker Carlson has 1.2 million followers on his personal Facebook account and 3.8 million followers on his show's account, Jones Decl., Ex. I, at 1-2, so censoring Carlson's content would affect the free-speech rights of millions of people in a single stroke.

83.    In the meantime, Facebook was offering to cooperate closely with the White House to "amplify" its preferred messages.  On April 13, 2021, Facebook emailed Andy Slavitt about the temporary halt of the Johnson & Johnson vaccine, stating: "Re the J+J [*i.e.*, Johnson & Johnson] news, we're keen to amplify any messaging you want us to project about what this means for people – it obviously has the risk of exacerbating vaccine hesitancy, so we're keen to get ahead of the knock-on effect.  Don't hesitate to tell me – or via your teams – how we can help to provide clarity/reassurance via Facebook."  Doc. 174-1, at 31-32.  Facebook then forwarded the same offer to Courtney Rowe and Rob Flaherty of the White House digital communications team.  *Id.* at 31.

84.    Flaherty responded the same day, April 13, with a series of detailed requests about how Facebook could amplify the White House's preferred messages, including: "Some kind of thing that puts the news in context if folks have seen it (like your current 'COVID news' panel) that has 3-4 pieces of info (eg: Adverse events are very rare – 6 cases out of nearly 7 million, the FDA and CDC are reviewing so it health care providers know how to treat any of the rare events, this does not affect pfzier or moderna, which vaccinate via a different mechanism)"; "CDC is working through an FAQ that we'd love to have amplified in whatever way possible – maybe through the COVID info panel"; and "[a] commitment from you guys to make sure that a favorable review reaches as many people as the pause, either through hard product interventions or algorithmic amplification."  *Id.* at 30-31.  Flaherty also block-quoted a White-House-approved message on the vaccine pause for Facebook to amplify.  *Id.* at 31.

85.    Flaherty then concluded by demanding that Facebook monitor any "misinformation" relating to the Johnson & Johnson vaccine pause, and asking Facebook to provide a detailed report to the White House within 24 hours of how it was doing so: "More broadly: we share [Facebook's] concern about knock-on effects and are curious to get a read from your CMU data about what you're seeing and with whom. *Moreover, I want to make sure you have eyes on what might be spinning off the back end of this    that the news about J&J doesn t spin off misinformation. Would be great to get a     hour report-back on what behavior you re seeing*." *Id.* at 31 (emphasis added).

86.    The same day, April 13, 2021, Facebook responded with a detailed report on misinformation on its platforms about this issue.  Doc. 174-1, at 24-30.  Facebook noted that there was an oral meeting about misinformation with the White House scheduled the next day: "I'm looking forward to the meeting tomorrow [*i.e.*, Wednesday, April 14] and hoping we can spend some time responding to Rob's feedback from last week as well as further discussing the J&J news and how we can hopefully partner together." *Id.* at 24.

87.    Facebook also noted that it had recently had a telephone call with Courtney Rowe about how it was censoring misinformation, and had agreed to provide a detailed report on its relevant censorship enforcement policies: "Courtney – as we discussed, we also wanted to send over some examples of content we see on our platform that we remove (misinformation & harm) as well as content we take other actions on, but do not remove (vaccine hesitancy). I have included some examples at the bottom of this email and happy to setup time to talk through this more with you as well, if helpful." *Id.* at 24.  Facebook then provided a six-page report on censorship with explanations and screen shots of sample posts of content that it censors and does not censor. *Id.* at 24-30.

88.     First, Facebook responded to Flaherty's request for government-message-amplification by agreeing to cooperate with the White House on those demands.  *Id.* at 24. Regarding Flaherty's demand that Facebook monitor and report on "misinformation" related to the Johnson & Johnson vaccine pause, Facebook agreed to both monitor and report to the White House: "We will look to get you insights as soon as we have them. We are going to be watching to see how this plays out over the next couple of days. [A Facebook official] is joining [the call] tomorrow and plans to share a couple things we are seeing emerge from the CMU survey and what we are going to be watching over the next few days. Also, we are proactively monitoring and seeing what themes emerge from content on-platform and happy to share out when we have stuff collected." *Id.* at 24-25.

89.     Facebook then provided a detailed report to Courtney Rowe's request for specific examples of posts that are censored on its platforms.  First, as to "VACCINE HESITANCY" content, Facebook explained that this content does not violate Facebook's content-moderation policies, but Facebook assured the White House that Facebook still censors such non-violative content by suppressing it in news feeds and algorithms.  *Id.* at 25.  Facebook admitted that such content is often "true" and sometimes involves core political speech or advocacy (*e.g.*, "discussing choice to vaccinate in terms of personal and civil liberties"): "The following examples of content are those that *do not violate our Misinformation and Harm policy*, but may contribute to vaccine hesitancy or present a barrier to vaccination. This includes, for example, content that contains sensational or alarmist vaccine misrepresentation, disparaging others based on the choice to or to not vaccinate, *true but shocking claims or personal anecdotes*, or *discussing the choice to vaccinate in terms of personal and civil liberties* or concerns related to mistrust in institutions or individuals." *Id.* at 25 (emphases added).

90.      Facebook assured the White House that it censors such true, political, non-violative content through "a spectrum of levers" that includes concealing the content from other users, deboosting the content, and preventing sharing through "friction": "We utilize a spectrum of levers for this kind of content…. Actions may include reducing the posts' distribution, not suggesting the posts to users, limiting their discoverability in Search, and applying Inform Labels and/or reshare friction to the posts." *Id.* Facebook then provided the White House with a series of sample posts, all of which content originated from Children's Health Defense, the anti-vaccine organization headed by Robert F. Kennedy Jr. (who would soon be identified as one of the so-called "Disinformation Dozen"). *Id.* at 25-27.

91.      Next, under the heading "Examples of Content Removed for Violating our Misinformation & Harm Policy," Facebook provided the White House with "examples of posts we have removed for violation of our Misinformation & Harm Policy." *Id.* at 27. Facebook then provided a list of screen shots of posts it had removed from the platform entirely, again all of which originated from Children's Health Defense, Robert F. Kennedy Jr.'s group. *Id.* at 28-30.

92.      As noted below, Facebook's explanation that it was removing violative posts by Children's Health Defense and censoring even its posts that did not violate Facebook's policies turned out to be not nearly enough to satisfy the White House.

93.      Separately from Flaherty's demands about Tucker Carlson, on April 14, 2021, Andy Slavitt also emailed a high-level Facebook executive—Facebook's President of Global Affairs, former Deputy Prime Minister of the United Kingdom Nick Clegg—with a sarcastic message expressing the White House's displeasure both with Facebook's failure to censor Tucker Carlson and with Facebook's perceived failure to allow the White House to micromanage its censorship policies: "Number one of Facebook. Sigh. Big reveal call with FB and WH today. No

progress since we spoke. Sigh." Doc. 174-1, at 35. Clegg promptly responded to Slavitt with an

apology and promise to immediately address the censorship of Tucker Carlson: "OK – sorry to

hear about call today, will dig in now." *Id.* The subject line of Slavitt's email, reproduced in the

"Re:" line of later messages, was "Tucker Carlson anti-vax message." *Id.* at 34.

94.    Late evening of the same day, April 14, 2021, at 10:51 p.m., Nick Clegg provided

Slavitt with a detailed report about the Tucker Carlson post, explaining that Tucker Carlson's

content did not violate Facebook policies (due to the federal government's own information about

its accuracy) but assuring the White House that Facebook would censor it anyway. *Id.* at 34. Clegg

denied that Carlson's content was the top post on Facebook, but then stated, "Regardless of

popularity, the Tucker Carlson video does not qualify for removal under our policies. Following

the government's decision yesterday, we are allowing claims that the Johnson and Johnson vaccine

causes blood clots…. That said, the video is being labeled with a pointer to authoritative COVID

information, it's not being recommended to people, and it is being demoted." *Id.* at 34.

95.    Clegg also stated that Facebook was "v[ery] keen" to provide a more detailed report

on its censorship practices in response to White House demands: "I'm v keen that we follow up as

we'd agreed, and I can assure you the teams here are on it." *Id.*

96.    Brian Rice of Facebook then forwarded the same report on the Tucker Carlson post

to Rob Flaherty. *Id.* ("Making sure you receive--").

97.    Less than twenty minutes later, at 11:29 p.m. on April 14, 2021, Flaherty responded

to Rice with a sarcastic response badgering Facebook for a more detailed explanation of why it

had not removed Tucker Carlson's content outright, demanding greater censorship, and accusing

Facebook of causing an "insurrection" by not censoring enough speech on its platforms: "I guess

this is a good example of your rules in practice then – and  a chance to dive in on questions as

they're applied. How was this [*i.e.* Tucker Carlson' post] not violative?  The second half of the segment is raising conspiracy theories about the government hiding that all vaccines aren't effective. It's not about just J&J. What exactly is the rule for removal vs demoting? Moreover: you say reduced and demoted. What does that mean? There's 40,000 shares on the video. Who is seeing it now? How many? How effective is that? And we've gone a million rounds on this in other contexts so pardon what may seem like deja vu – but on what basis is 'visit the covid-19 information center for vaccine resources' the best thing to tag to a video that says the vaccine doesn't work?"  Doc. 174-1, at 33.  Flaherty concluded ominously by reiterating his accusation that Facebook had caused the January 6 riot by not censoring enough speech on its platforms: "Not for nothing but last time we did this dance, it ended in an insurrection."  *Id.* at 34.

98.     Six minutes later, at 11:35 p.m. on April 14, Flaherty followed up with another email accusing Facebook of providing incorrect information through CrowdTangle and demanding an explanation: "And sorry – if this was not one of the most popular posts about the vaccine on Facebook today, then what good is crowdtangle? [A Facebook official] said that Tomis [*i.e.*, Tomi Lahren's] video was the most popular yesterday based on your data, which reflected what CT [*i.e.*, CrowdTangle] was showing. Tuckers video was top on CT today. What is different about this video, then?" *Id.* at 33.

99.     On Friday, April 16, Flaherty then sent an email expressing his displeasure with the timing of Facebook's response and demanding immediate answers, snapping at Rice: "These questions weren't rhetorical." *Id.* at 33.  Facebook apologized and promised an immediate response: "Hey Rob – understood and sorry for the delay.  The team has been heads-down since our conversation to produce the report we discussed on Wednesday afternoon. We are aiming to

get you something tonight ahead of the weekend." *Id.* Facebook then proposed another oral meeting: "schedule a call to discuss. Would that work?" *Id.*

100. On Tuesday, April 21, 2021, Facebook sent an additional response to the same email chain, indicating that there had been a phone call with Flaherty ("thanks for catching up earlier") and providing another, more detailed report on its censorship of Tucker Carlson in response to each of Flaherty's queries question-by-question. *Id.* at 36. Facebook again reported that Tucker Carlson's content had not violated its policies, stating that "we reviewed this content in detail and it does not violate those policies," but reported that Facebook had been censoring it anyway and would continue to censor it even though no fact-check had reported it false: "The video received 50% demotion for seven days while in the queue to be fact checked, and *will continue to be demoted even though it was not ultimately fact checked*." *Id.* (emphasis added). These circumstances raise a compelling inference that Facebook continued to demote Tucker Carlson' content, in violation of its own policies and practices, due to the White House's pressure.

101. In the same time frame, the White House was exerting similar pressure on other major social-media platforms. It had meetings with YouTube and Twitter about misinformation on April 21, 2021 as well.

102. On April 21, Rob Flaherty, Andy Slavitt, and Kelsey Fitzpatrick of the White House, along with an official at HHS, participated in a meeting with several Twitter officials. Doc. 71-7, at 86. The meeting's subject was "Twitter Vaccine Misinfo Briefing." *Id.* The meeting invite noted: "White House Staff will be briefed by Twitter on vaccine misinfo. Twitter to cover trends seen generally around vaccine misinformation, *the tangible effects seen from recent policy changes*, what interventions are currently being implemented *in addition to previous policy*

*changes*, and ways the White House (and our COVID experts) can *partner* in product work." *Id.* (emphases added).

103.    The next day, April 22, Twitter employees noted in internal communications that the White House officials, during this meeting, had posed "one really tough question about why Alex Berenson hasn't been kicked off the platform."  Jones Decl., Ex. J, at 2-3.  The Twitter employee noted that the White House's questions were "pointed" and "mercifully we had answers." *Id.*  Another internal Twitter communication noted that the White House "really wanted to know about Alex Berenson.  Andy Slavitt suggested they had seen data viz that had showed he was the epicenter of disinfo that radiated outwards to the persuadable public." *Id.*

104.    Later, on July 16, 2021, Twitter suspended Alex Berenson for the first time. *Id.* On August 28, 2021, Twitter permanently deplatformed Berenson. *Id.*

105.    On April 21, 2021, Flaherty, Andy Slavitt, Kelsey Fitzpatrick of the White House, and Jessica Scruggs of HHS had a similar meeting with YouTube, to which at least six YouTube officials were invited.  Jones Decl., Ex. K, at 1.  The calendar invite stated that the purpose of the meeting was: "White House staff to get briefed by YouTube on general trends seen around vaccine misinformation.  As well as, the empirical effects of YouTube's efforts to combat misinfo, what interventions YouTube is currently trying, and ways the White House (and or COVID experts) can partner in product work." *Id.*

106.    Just after midnight on April 22, 2021, Rob Flaherty emailed a list of Google officials about YouTube, copying Andy Slavitt, Clarke Humphrey, and Kelsey Fitzpatrick of the White House.  Doc. 174-1, at 39.  He began by referring to the oral meeting with Google/YouTube officials on April 21: "Thanks again for the conversation today." *Id.*  Flaherty also referred to an earlier, "first conversation," indicating that there had been multiple meetings with YouTube. *Id.*

107.    Flaherty then noted that the White House had asked YouTube (like Facebook) to monitor and report on the speech on its platforms, stating that the White House expected a report from them: "We'll look out for the top trends that you've seen in terms of misinformation around the vaccine." *Id.*

108.    Flaherty then provided a "recap" of their oral conversation, stating that concern about misinformation on YouTube was "shared at the highest (and I mean highest) levels of the [White House]": "To recap: … we remain concerned that Youtube is 'funneling' people into hesitance and intensifying people's hesitancy…. we want to be sure that you have a handle on vaccine hesitancy generally and are working toward making the problem better. *This is a concern that is shared at the highest  and I mean highest  levels of the WH*, so we'd like to continue a good-faith dialogue about what is going on under the hood here. I'm the on the hook for reporting out." *Id.* (emphasis added).

109.    Citing an article "highlighting the Youtube misinformation that is spreading through the Vietnamese community," Flaherty stated: "Clearly, more work to be done here. Would love to get some insights from you on how you are tackling this problem across all languages." *Id.*

110.    Flaherty then stated, "A couple of other things it would be good to have from you all," and provided a five-bullet list of detailed demands for YouTube's internal data about the spread of misinformation on its platform, including: "the top trends that you're seeing in terms of misinformation/hesitance inducing content," and "[a] deeper dive on reduction and its effectiveness," among others.  *Id.*

111.    Flaherty indicated that the White House was coordinating with the Stanford Internet Observatory, which was then operating the Virality Project, discussed in detail below, noting in

the first bullet point: "Stanford has mentioned that it's recently Vaccine Passports and J&J pause-related stuff, but I'm not sure if that reflects what you're seeing." *Id.* This reference raises the inference that the White House's "COVID experts" ("our COVID experts") mentioned in the calendar invite for the meeting, Jones Decl., Ex. K, at 1, are, in fact, "Stanford" personnel associated with the Virality Project, and that the White House was working with "Stanford" to "partner with" platforms "on product work."

112.    As with Facebook, many of Flaherty's demands related to so-called "borderline" content, *i.e.*, often-truthful content that does not violate platform policies but that the White House disfavors. *See* Doc. 174-1, at 39. Among other things, he praised YouTube for reducing distribution of such content: "I believe you said you reduced watch time by 70% on 'borderline' content, which is impressive." *Id.* But then, again, he followed up with a long series of demands for more information: "How does that track with vaccine-related content specifically…? What has the comparative reduction in watch time on 'borderline' vaccine topics been after your interventions? And what has the increase in watch time been on authoritative information?... Related to the second bullet: to what extent have your ranking interventions been effective there? And, perhaps more critically, to what degree is content from people who have been given a 'strike' still being recommended and shown in prominent search positions? … [H]ow did you arrive on info-panels as the best intervention? And to what extent are people clicking through after exposure to vaccine-hesitant content? …  What are the general vectors by which people see the 'borderline' content – or really just vaccine-skeptical content? Is it largely through recommendations? Search?" *Id.* Notably, Flaherty's "most critical[]" question implied that YouTube should be censoring more content from disfavored *speakers*, *i.e.*, those who have been given a "strike" for previous anti-vaccine content. *Id.*

113.    Flaherty emphasized that the White House wanted to make sure YouTube's "work extends to the broader problem" of people viewing vaccine-hesitant content.  *Id.* at 39-40.  And he proposed regular meetings to push YouTube to disclose its "internal data" to the White House: "We've worked with a number of platform partners to track down similar information based on internal data, including partners of similar scale. I am feeling a bit like I don't have a full sense of the picture here. We speak with other platforms on a semi-regular basis. We'd love to get in this habit with you. Perhaps bi-weekly? Looking forward to more conversation."  *Id.* at 40.

114.    On April 23, 2021, Flaherty sent Facebook an email that included a document entitled "Facebook COVID-19 Vaccine Misinformation Brief" prepared by an unidentified third party.  Jones Decl., Ex. L, at 1.  The "Brief" had two major headings with several bullet points under each: "Facebook plays a major role in the spread of COVID vaccine misinformation," and "Facebook's policy and enforcement gaps enable misinformation's spread."  *Id.*  The "Brief" recommended much more aggressive censorship of Facebook's platforms, calling for "progressively severe penalties … and comprehensive enforcement for pages, accounts, and groups that repeatedly post COVID vaccine misinformation," and stating that "[b]ans for COVID-19 misinformation should be cross-platform and enforced at the entity-level, not the account level." *Id.*  It called for Facebook to stop distributing even non-violative anti-vaccine content "in News Feed or in group recommendations" to "significantly reduce the reach of low-quality domains," and it stated that "[v]accine misinformation monitoring and enforcement must adjust as disinformers evade enforcement…."  *Id.* at 1-2.  And it called for specific censorship of disfavored speakers: "Warning screens before linking to domains known to promote vaccine misinformation would dissuade users from following links to of-platform misinformation and hurt the vaccine-misinformation business model Facebook enables."  *Id.* at 2.

115.    Reproducing this pro-censorship "Brief" in the text of his email to Facebook, Flaherty wrote: "Here's the crux of their recs.  Don't read this as White House endorsement of these suggestions (or, also, as the upper bound of what our thoughts may be).  But – spirit of transparency – this is circulating around the building and informing thinking."  *Id.* at 1.

116.    On May 1, 2021, Nick Clegg of Facebook sent an email to Andy Slavitt indicating that the White House had recently met with Facebook to "share research work" and make more demands, stating: "Thanks to your team for sharing the research work with us…."  *Id.* at 41.  At the beginning of the email, Clegg apologized to the White House for not catching and censoring three pieces of vaccine content that went viral, even though the content did not violate Facebook's policies, and promising to censor such non-violative content more aggressively in the future: "I wanted to send you a quick note on the three pieces of vaccine content that were seen by a high number of people before we demoted them. Although they don't violate our community standards, we should have demoted them before they went viral and this has exposed gaps in our operational and technical process."  *Id.* at 42.

117.    Clegg then promised to be more vigilant and censor such non-violative content to prevent it from going viral in the future, and offered to report back to the White House in detail about its efforts to do so: "The teams have spent the last 24 hrs analysing these gaps and are making a number of changes starting next week, including setting up more dedicated monitoring for Covid vaccine content on the cusp of going viral, applying stronger demotions to a broader set of content, and setting up daily review and analysis so that we have a better real-time view of what is being seen by lots of people. I will be checking on this closely to make sure that these additional steps show results - the stronger demotions in particular should deliver real impact.  Please let me know if you'd like to discuss any of this in more detail."  *Id.*

118.    Clegg then listed in bold the demands that the White House had made in its recent meeting, with a detailed response to each.  *Id.* at 42.  First, the White House had demanded that Facebook address "**Non-English mis/disinformation circulating without moderation**," and Facebook promised to take steps to do so.  *Id.* (bold in original).

119.    Second, the White House had commanded Facebook: "**Do not distribute or amplify vaccine hesitancy, and Facebook should end group recommendations for groups with a history of COVID-19 or vaccine misinformation**."  *Id.* (bold in original).  Facebook assured the White House that it was taking strong steps to censor such content, and promised to increase its efforts to do so in the future: "Much of the research you shared called on us to ensure that our systems don't amplify vaccine hesitancy content and this is top of mind for us. In addition to the changes I mentioned above, we have already removed all health groups from our recommendation feature on Facebook, and on Instagram we filter vaccine-related accounts from our 'accounts you may follow feature'. We also remove accounts that may discourage vaccination from search features. We currently enforce on hash tags we know are shared to promote vaccine hesitancy content and are working to improve our automated systems here."  *Id.*

120.    Third, the White House had demanded that Facebook "**Monitor[] events that host anti-vaccine and COVID disinformation**."  *Id.* (bold in original).  Facebook promised to monitor social-media "events" on its platforms more closely and take more aggressive action to censor them: "we are working to improve automatic detection for events hosting anti-vaccine and COVID content. Our viral monitoring efforts will also help us detect events that are gaining views on Facebook, and we do remove events coordinating in-person gatherings that involve or encourage people who have COVID-19 to join."  *Id.*

121.   Fourth, the White House had demanded censorship of the so-called "Disinformation Dozen" in the private meeting with Facebook, raising the concern that "**12 accounts are responsible for 73% of vaccine misinformation**." *Id.* (bold in original). Facebook responded that it was scrutinizing those speakers and censoring them whenever it could, but that most if their content did not violate Facebook's policies: "we continue to review accounts associated with the 12 individuals identified in the CCDH 'Disinformation Dozen' report, but many of those either do not violate our policies or have ceased posting violating content. Our 'Dedicated Vaccine Discouraging Entity' policy is designed to remove groups and pages that are dedicated to sharing vaccine discouraging content and we continue to review and enforce on these where we become aware of them." *Id.*

122.   Clegg then noted that he realized the White House would not be satisfied with these answers and was demanding greater censorship: "I realise that our position on this continues to be a particular concern for you." *Id.* Clegg then suggested that too much censorship might be counterproductive and might drive vaccine hesitancy: "Among experts we have consulted, there is a general sense that deleting more expressions of vaccine hesitancy might be more counterproductive to the goal of vaccine uptake because it could prevent hesitant people from talking through their concerns and potentially reinforce the notion that there's a cover-up." *Id.* Brian Rice also forwarded Nick Clegg's email to Rob Flaherty. *Id.* at 41.

**B.     Public Pressure and Threats From Press Secretary Jennifer Psaki.**

123.   The White House was evidently quite unhappy with this response and the results of its pressure campaign behind closed doors. A few days later, the White House took its pressure campaign public. On May 5, 2021, Jen Psaki publicly reminded Facebook and the other platforms of the threat of legal consequences hanging over its head if it did not censor misinformation more

aggressively.  At the May 5, 2021 White House Press Briefing, Jen Psaki stated about social-media censorship: "The President's view is that the major platforms have a responsibility related to the health and safety of all Americans to stop amplifying untrustworthy content, disinformation, and misinformation, especially related to COVID-19, vaccinations, and elections. And we've seen that over the past several months, broadly speaking."  Glenn Decl. Ex. 29, at 15, Doc. 10-1, at 353.

124.    Psaki also stated that President Biden "also supports better privacy protections and a robust anti-trust program.  So his view is that there's more that needs to be done to ensure that this type of misinformation; disinformation; damaging, sometimes life-threatening information is not going out to the American public."  *Id.*  She thus linked the threat of a "robust anti-trust program" to the White House's demand that "more … needs to be done" by "the major platforms" to prevent "misinformation" and "disinformation" from "going out to the American public," *i.e.*, its demand for censorship.  *Id.*

125.    The next day, May 6, 2021, Flaherty privately responded to Facebook's most recent email, badgering Facebook again for more explanations about why it was not censoring more aggressively.  Regarding Nick Clegg's apology for not catching and censoring three viral posts earlier, Flaherty linked to one and noted: "For one, it's still up and seems to have gotten pretty far. And it's got 365k shares with four comments. We've talked about this in a different context, but how does something like that happen? The top post, the one from the Wisconsin news station, has 2.1 million comments."  Doc. 174-1, at 41.

126.    Flaherty also demanded more information about Facebook's efforts to demote "borderline" content: "Won't come as a shock to you that we're particularly interested in your demotion efforts, which I don't think we have a good handle on (and, based on the below, it doesn't

seem like you do either). Not to sound like a broken record, but how much content is being demoted, and how effective are you at mitigating reach, and how quickly?" *Id.*

127.    Flaherty then criticized Facebook's censorship efforts for vaccine-related posts in Facebook groups related to other topics: "Also, health groups: sure. But it seems more likely that anti-vax stuff is moving in groups that are not about health but are ... mom centric, or other spaces. Strikes me as the issue here is less from single-use anti-vaccine accounts and more about people who ... do other things and are also vaccine hesitant." *Id.* (ellipses in original).

128.    Flaherty tied this criticism to his criticism of Facebook's failure to censor the "Disinformation Dozen": "Seems like your 'dedicated vaccine hesitancy' policy isn't stopping the disinfo dozen - they're being deemed as not dedicated – so it feels like that problem likely carries over to groups." *Id.*

129.    On May 10, 2021, Facebook sent an email to Rob Flaherty and Courtney Rowe of the White House digital team, touting its efforts to promote vaccination on its platforms.  Doc. 174-1, at 46.  Among other things, Facebook reported that "Since January, we've provided more than $30 million in ad credits to help governments, NGOs and other organizations reach people with COVID-19 vaccine information and other important messages." *Id.*

130.    The next day, May 11, 2021, Flaherty responded with a one-line, snarky email stating: "Hard to take any of this seriously when you're actively promoting anti-vaccine pages in search." *Id.*  He included a link to a news report about this topic on Twitter.  *Id.*

131.    The next day, May 12, 2021, Facebook responded, assuring Flaherty that it had censored the accounts mentioned in the news reports: "Thanks Rob - both of the accounts featured in the tweet have been removed from Instagram entirely…. We're looking into what happened." *Id.* at 45.

132.    Facebook then assured Flaherty it was working on processes to suppress disfavored speech from search results on its platforms and remove anti-vaccine accounts: "We are continuing to develop technology to improve the quality of search results at scale across Instagram - this is a continual process built on new technology to address adversarial accounts…. We also remove accounts that may discourage vaccination from search by developing and using this new technology to find accounts on Instagram that discourage vaccines, and remove these accounts from search altogether. We've also removed accounts that primarily discourage vaccination from appearing where we recommend new accounts to follow, such as accounts you may like, and suggested accounts." *Id.*

133.    Facebook acknowledged that its censorship efforts were not enough and promised the White House they would increase them: "We clearly still have work to do to [sic], but wanted to ensure you were aware of the authoritative resources we're pointing people to first as we continue investing in removing accounts from search that may discourage vaccination." *Id.*

134.    The same day, May 12, 2021, Flaherty responded sarcastically, indicating that promoting pro-vaccine speech was not enough for the White House, which demanded the removal or deboosting of anti-vaccine speech: "Sure. They're first connected to authoritative information, but then you, as of last night, were presenting an anti-vaccine account with less than 1000 followers alongside, at level, with those pinned accounts!" *Id.* at 45.

135.    Flaherty then accused Facebook of not doing enough to censor anti-vaccine content in search results and dissembling to deceive the White House: "'[R]emoving bad information from search' is one of the easy, low-bar things you guys do to make people like me think you're taking action.  If you're not getting *that* right, it raises even more questions about the higher bar stuff." *Id.* at 45.  Flaherty continued, accusing Facebook of dishonesty: "You say in your note that you

remove accounts that discourage vaccination from appearing in recommendations (even though you're using 'primarily' to give yourself wiggle room). You also said you don't promote those accounts in search. Not sure what else there is to say." *Id.*

136.    Flaherty then compared Facebook unfavorably to other platforms to pressure them to suppress anti-vaccine content in search results: "Youtube, for their warts, has done pretty well at promoting authoritative info in search results while keeping the bad stuff off of those surfaces. Pinterest doesn't even show you any results other than official information when you search for 'vaccines.' I don't know why you guys can't figure this out." *Id.*

137.    On May 28, 2021, a senior executive of Meta sent an email to Slavitt and Murthy reporting that Facebook had expanded its censorship policies, evidently to satisfy federal officials' demands made at a recent oral meeting.  The email stated that a "key point" was that "We're expanding penalties for individual Facebook accounts that share misinformation."  Doc. 71-4, at 9.

**C. Flaherty's Profane Attack: "Are You Guys F\*\*king Serious?"**

138.    At some time prior to July 15, 2021, the White House's Facebook account experienced an issue that slowed its growth in followers.  Doc. 174-1, at 56.  On July 15, 2021, Facebook emailed a White House staffer and reported that "the technical issues that had been affecting follower growth on @potus have been resolved…. you should start to see your numbers trend back upwards…. Thanks for your patience as we investigated this." *Id.*  The White House staffer asked Facebook, "Could you tell me more about the technical issues affecting audience growth?" *Id.* at 55.  Facebook responded, "from what we understand it was an internal technical issue that we can't get into, but it's now resolved and should not happen again." *Id.*  The White House staffer then simply added Rob Flaherty to the email chain without further comment. *Id.*

139.    The same minute he was added to the email chain, 3:29 p.m. on July 15, 2021, Flaherty exploded at Facebook: "Are you guys fucking serious? I want an answer on what happened here and I want it today."  *Id.* at 55.

140.    Facebook immediately raced to placate Flaherty, assuring him that the problem was from a "bug in our recommendation surface" that had been resolved two months earlier.  *Id.* at 55. Facebook followed up with a longer explanation stating that the President's account had been affected because Facebook "take[s] aggressive steps to reduce the spread of vaccine hesitancy and vaccine misinformation on our platforms and we deploy technology to do so. As part of our efforts on Instagram, we have measures to help ensure we don't recommend people follow accounts that promote vaccine hesitancy at scale. For two weeks in April (April 14-28) this measure was impacted by over-enforcement on a signal we used …." *Id.* at 54.  In other words, the White House's Instagram account had been inadvertently swept into the net of censorship that it had insisted that Facebook impose on private speakers' accounts.  Evidently the White House is not amused when its own accounts are subject to the same treatment that it demands the platforms impose on thousands of ordinary Americans whose viewpoint the White House disfavors.

**D.    President Biden on Social-Media Platforms: "They're Killing People."**

141.    That same day, July 15, 2021, the White House held a joint press conference with Jen Psaki and Surgeon General Murthy.  Dr. Murthy participated in the White House press conference with White House Press Secretary Jennifer Psaki to announce the Surgeon General's Health Advisory on Misinformation.  Waldo Ex. 10.  Psaki announced of Dr. Murthy that "[t]oday, he published an advisory on health misinformation as an urgent public health crisis."  *Id.* at 1.

142.    Among other things, Dr. Murthy stated that "Modern technology companies have enabled misinformation to poison our information environment with little accountability to their users." *Id.* at 2.

143.    Dr. Murthy announced: "we expect more from our technology companies. We're asking them to operate with greater transparency and accountability. We're asking them to monitor misinformation more closely. We're asking them to consistently take action against misinformation super-spreaders on their platforms." *Id.* at 3.

144.    At the July 15 press conference, Dr. Murthy also demanded that the platforms do "much, much more" and "take aggressive action" against misinformation. Waldo Ex. 10, at 5.

145.    Dr. Murthy also stated that platforms "have to do more to reduce the misinformation that's out there …." *Id.* at 6.

146.    At the same press conference on July 15, 2021, Jennifer Psaki stated: "we are in regular touch with these social media platforms, and those engagements typically happen through members of our senior staff, but also members of our COVID-19 team." Waldo Ex. 10, at 10.

147.    Psaki stated: "We've increased disinformation research and tracking within the Surgeon General's office. We're flagging problematic posts for Facebook that spread disinformation." *Id.* at 10.

148.    Regarding the Administration's "asks" to social-media platforms, Psaki stated: "There are also proposed changes that we have made to social media platforms, including Facebook, and those specifically are four key steps: One, that they measure and publicly share the impact of misinformation on their platform. Facebook should provide, publicly and transparently, data on the reach of COVID-19 — COVID vaccine misinformation. Not just engagement, but the reach of the misinformation and the audience that it's reaching." *Id.* at 11.

149.    Psaki also stated: "Second, that we have recommended — proposed that they create
a robust enforcement strategy that bridges their properties and provides transparency about the
rules. So, about — I think this was a question asked before — there's about 12 people who are
producing 65 percent of anti-vaccine misinformation on social media platforms. All of them
remain active on Facebook, despite some even being banned on other platforms, including
Facebook — ones that Facebook owns."  Waldo Ex. 10, at 11.

150.    Psaki stated: "Third, it's important to take faster action against harmful posts. As
you all know, information travels quite quickly on social media platforms; sometimes it's not
accurate. And Facebook needs to move more quickly to remove harmful, violative posts — posts
that will be within their policies for removal often remain up for days. That's too long. The
information spreads too quickly."  *Id.* at 11.

151.    And Psaki stated, publicly criticizing Facebook: "Finally, we have proposed they
promote quality information sources in their feed algorithm. Facebook has repeatedly shown that
they have the levers to promote quality information. We've seen them effectively do this in their
algorithm over low-quality information and they've chosen not to use it in this case. And that's
certainly an area that would have an impact."  Waldo Ex. 10, at 11.

152.    Psaki concluded: "So, these are certainly the proposals. We engage with them
regularly and they certainly understand what our asks are."  *Id.* at 11.

153.    The next day, July 16, 2021, President Biden stated of Facebook and other
platforms that "they're killing people" by failing to censor enough misinformation: "Mr. Biden
was asked what his message was to social media platforms when it came to Covid-19
disinformation. 'They're killing people,' he said. 'Look, the only pandemic we have is among the

unvaccinated, and that — and they're killing people.'"  Glenn Decl. Ex. 33, at 1; Doc. 10-1, at 436.

154.    President Biden's statement came after "weeks" of pressuring Facebook to give federal officials access to Facebook's internal data: "White House officials … singled out social media companies for allowing false information to proliferate. That came after weeks of failed attempts to get Facebook to turn over information detailing what mechanisms were in place to combat misinformation about the vaccine, according to a person familiar with the matter."  *Id.*

155.    Surgeon General Murthy had been directly involved in those meetings with Facebook, including "tense" meetings and a meeting where he "angrily" demanded that Facebook do more to censor misinformation.  *Id.* at 437.

156.    When the President stated, "They're killing people," Psaki reinforced the same message: "'Our point is that there is information that is leading to people not taking the vaccine, and people are dying as a result,' Jen Psaki, the White House press secretary, said before Mr. Biden made his comments. 'And we have responsibility as a public health matter to raise that issue.'"  *Id.* at 436.

157.    That same day, July 16, 2021, at a White House press conference, Psaki stated that "we're in regular touch with social media platforms … about areas where we have concern. … [W]e are … regularly making sure social media platforms are aware of the latest narratives dangerous to public health that we and many other Americans seeing — are seeing across all of social and traditional media.  And we work to engage with them to better understand the enforcement of social media platform policies."  Glenn Decl. Ex. 34, at 6; Doc. 10-1, at 444.

158.    Psaki then described a "false narrative that remains active  … flowing on the internet quite a bit, in other places as well," and stated, "we want to know that the social media

platforms are taking steps to address it. That is inaccurate, false information… And that is an example of the kind of information that we are flagging or raising." Glenn Decl. Ex. 34, at 7; Doc. 10-1, at 445.

159.    Psaki also demanded additional "steps" "for Facebook or other platforms," including "to measure and publicly share the impact of misinformation on their platform and the audience it's reaching, also with the public." *Id*.

160.    She called on the platforms "to create robust enforcement strategies that bridge their properties and provide transparency about rules." *Id*.  She stated that platforms should coordinate on censoring disfavored speakers: "You shouldn't be banned from one platform and not others if you — for providing misinformation out there." *Id.*

161.    Psaki also stated that the platforms should be "[t]aking faster action against harmful posts. As you all know, information travels quite quickly. If it's up there for days and days and days when people see it, you know, there's — it's hard to put that back in a box."  Glenn Decl. Ex. 34, at 8; Doc. 10-1, at 446.

162.    Psaki was asked whether the censorship Facebook was already doing, which included "remov[ing] 18 million pieces of COVID misinformation" and "connect[ing] more than 2 billion people to reliable information," was "sufficient," and she responded, "Clearly not, because we're talking about additional steps that should be taken."  *Id*.

163.    "[A] few hours after Biden's comment" that social-media platforms are "killing people" by not censoring misinformation, "Twitter suspended [Alex Berenson's] account for the first time." Jones Decl., Ex. J, at 3.  Later, on August 28, 2021, Twitter permanently deplatformed Berenson.  *Id.*

164.    Four days later, July 20, 2021, the White House explicitly threatened to amend or

repeal the liability protections of § 230 of the Communications Decency Act if social-media

companies did not increase censorship of disfavored speakers and viewpoints.  Glenn Decl. Ex.

35; Doc. 10-1, at 474-75  -   *They Should Be Held Accountable' White House Reviews Platforms'*

*Misinformation      Liability*,      USA      TODAY      (July      20,      2021),      *at*

https://www.usatoday.com/story/news/politics/2021/07/20/white-house-reviews-section-230-

protections-covid-misinformation/8024210002/.    The White House communications director,

Kate Bedingfield, announced that "[t]he White House is assessing whether social media platforms

are legally liable for misinformation spread on their platforms."  *Id.*  "We're reviewing that, and

certainly, they should be held accountable," she said.  *Id.*

165.    The White House communications director "specified the White House is

examining how misinformation fits into the liability protections granted by Section 230 of the

Communications Decency Act, which shields online platforms from being responsible for what is

posted by third parties on their sites."  *Id.*

166.    Media reported that, in connection with this threat, "Relations are tense between

the Biden administration and social media platforms, specifically Facebook, over the spread of

misinformation online."  *Id.*; *see also, e.g.,* Glenn Decl. Ex. 36; Doc. 10-1, at 477-81: *White House*

*says social media networks should be held accountable for spreading misinformation*, CNBC.com

(July  20,  2021),  *at*  https://www.cnbc.com/2021/07/20/white-house-social-networks-should-be-

held-accountable-for-spreading-misinfo.html.

167.    When "asked … whether these companies should be held liable for publishing false

information that causes people harm, Kate Bedingfield said the administration is reviewing

policies. That could include amending the Communications Decency Act, or Section 230 of the

act.  'We're reviewing that and certainly they should be held accountable,' Bedingfield said.  'And I think you heard the president speak very aggressively about this.  He understands that this is an important piece of the ecosystem.'"  *Id.* at 478.

168.    The same day, Tuesday, July 20, 2021, Clarke Humphrey of the White House communications office emailed Facebook asking for the removal of an Instagram account associated with Dr. Fauci, saying it "is not actually one of ours."  Fauci Ex. 57, at 1-2.  Facebook responded one minute later, stating, "Yep, on it!"  Fauci Ex. 57, at 1.  The next day, Facebook responded again, stating, "This account has been removed.  Thank you for flagging!"  *Id.*

**E. The Social-Media Platforms Are Cowed into Collusion on Censorship.**

169.    The threats and public pressure on July 15 and 16—including the President's comment, "they're killing people"—got immediate results, as Facebook scrambled to assuage the White House's wrath and accede to all its censorship demands.

170.    After this series of public statements, responding to "White House pressure," Facebook censored the accounts of the 12 specific disfavored speakers whom Psaki accused of spreading health misinformation.  Glenn Decl. Ex. 37; Doc. 10-1, at 483-85: *Facebook takes action against disinformation dozen' after White House pressure*, CNN.com (Aug. 18, 2021), *at* https://www.cnn.com/2021/08/18/tech/facebook-disinformation-dozen/index.html.   Psaki had "hammered the platform in July for allowing the people identified in the report to remain on its platform."  *Id.* at 483.  After they were singled out for censorship by the White House, Facebook "removed over three dozen Pages, groups and Facebook or Instagram accounts linked to these 12 people, including at least one linked to each of the 12 people, for violating our policies."  *Id.*

171.    Other platforms responded to the pressure as well, as Twitter suspended Alex Berenson within a few hours of President Biden's July 16 comments and deplatformed him Berenson on August 28, 2021.  Jones Decl., Ex. J, at 3.

172.    On July 17, 2021, another Facebook official sent an email to Anita B. Dunn, the political strategist and Senior Advisor to the President in the White House, begging for assistance in getting back into the White House's good graces.  Doc. 174-1, at 49.  The Facebook official, who evidently had a prior relationship with Dunn, wrote: "Would love to connect with you on the President's comments on Covid misinfo and our work there. Really could use your advice and counsel on how we get back to a good place here. … As I hope you know, we've been doing a significant amount of work to … fight the misinfo … Obviously, yesterday things were pretty heated, and I'd love to find a way to get back to pushing together on this - we are 100% on the same team here in fighting this and I could really use your advice."  *Id.*  Dunn looped in Rob Flaherty to schedule a call.  *Id.* at 48.  Facebook then wrote: "Thanks Anita, and thanks Rob. I appreciate the willingness to discuss. We'd love to find a way to get things back to a productive conversation."  *Id.*  Facebook also noted, with a similarly conciliatory tone: "We had a conversation with the Surgeon General's office yesterday to discuss the advisory in more detail and hope to continue to work to address concerns."  *Id.*

173.    The next Monday, July 19, 2021, YouTube emailed Flaherty to announce "a few new ways in which we are making it easier for people to find authoritative information on health topics on YouTube."  *Id.* at 51-2.  On July 20, 2021, Flaherty responded, linking to a Tweet of "borderline" content and stating, "I'm curious: Saw this tweet. [Linking the Tweet].  I think we had a pretty extensive back and forth about the degree to which you all are recommending anti-

vaccination content. You were pretty emphatic that you are not. This seems to indicate that you are. What is going on here?" *Id.* at 51.

174.    YouTube responded by assuring Flaherty that it "reduce[s]" the recommendation of anti-vaccine speech even when it does not violate YouTube's policies: "it is important to keep in mind that borderline content accounts for a fraction of 1% of what is watched on YouTube in the United States. We use machine learning to reduce the recommendations of this type of content, including potentially harmful misinformation. In January 2019, we announced changes to our recommendations systems to limit the spread of this type of content which resulted in a 70% drop in watchtime on non-subscribed recommended content in the U.S. and our goal is to have views of nonsubscribed, recommended borderline content below 0.5%." *Id.* at 51.

175.    This was not enough for Flaherty, who demanded more information: "I see that's your goal - what is the actual number right now?" *Id.* at 50.  YouTube responded that it would check for more information, and stated: "Per our COVID-19 medical misinformation policy, we will remove any content that contradicts local health authorities' or the World Health Organization's (WHO) medical information about COVID-19. To date, approximately 89% of videos removed for violations of this policy were removed with 100 views or less. With regards to the specific videos you referenced, the content was not in violation of our community guidelines." *Id.* at 50.

176.    Flaherty responded, expressing surprise that YouTube was not censoring the disfavored content: "So this actually gets at a good question - the content [that the Tweet] points out isn't defined as 'borderline' and therefore isn't subject to recommendation limitations?" *Id.*

177.    YouTube, like Facebook before it, assured Flaherty that it would "limit the visibility" and "reduce the spread" such content, even though it does not violate YouTube's

policies: "the content was not in violation of our policies and therefore not subject to removal. But for all content on YouTube, we apply our 4R framework we have previously described to raise authoritative voices while reducing visibility on borderline content. External evaluators use these guidelines which are then used to inform our machine learning systems that limits the spread of borderline content." *Id.* at 50.

178.    On October 28, 2021, the same day as a Washington Post article about Facebook employee Frances Haugen's allegations about misinformation on Facebook, Rob Flaherty emailed Brian Rice of Facebook a hyperlink to the article.  The only text in the email was the subject line, which stated: "not even sure what to say at this point."  Waldo Ex. 35, at 1-2; *see also infra.*

179.    On November 4, 2021, Meta reported to Rowe, Flaherty, and other White House officials that "we updated our misinformation policies for COVID-19 vaccines to make clear that they apply to claims about children…." Doc. 71-3, at 15.

180.    On November 30, 2021, Christian Tom of the White House emailed Twitter stating, "Would you mind looking at this video and helping us with next steps to put a label or remove it?" Doc. 174-1, at 65.  He included a link to a Tweet of an unflattering, comedic video of First Lady Jill Biden reading to children, which had been clearly edited to make it sound as if she was profanely heckled while reading to them.  *Id.*  The subject line of the message was "Doctored video on Twitter of the First Lady."  *Id.*  Twitter responded within six minutes: "Happy to escalate with the team for further review from here."  *Id.*

181.    That evening, Twitter emailed back, stating, "Update for you - The team was able to create this event page for more context and details."  *Id.* at 64.  The "event page" explained the context of the parody video but did not censor it; it alerted users that the video had been edited for "comedic" effect.  *See A video of first lady Jill Biden reading to children was manipulated to*

*include   profanity,   according   to   fact-checkers*, TWITTER   (Nov.   30,   2021), https://twitter.com/i/events/1465769009073123330.

182.    Christian Tom promptly emailed back, asking that Twitter actually censor the comedic video, not just provide an event page explaining that it was comedic: "Will you apply the 'Manipulated Media' disclaimer to the video asset itself?"  Doc. 174-1, at 64.

183.    The next morning, December 1, 2021, Tom emailed Twitter again, arguing that Twitter should apply a label to the video under its content-moderation policies: "Just wanted to follow-up here.  It looks like from the rubric that this fits the first two criteria, which means it is 'likely' to be labeled:" and linking Twitter's "manipulated media" policy.  *Id.* at 63-4.

184.    Twitter wrote back the same morning, explaining that the comic, parody video of Jill Biden was not subject to labeling under its policy because it was not likely to cause harm, but noting again that Twitter had created a special page to explain that the video was edited: "After escalating this to our team, the Tweet and video referenced will not be labeled under our synthetic and manipulated media policy. Although it has been significantly altered, the team has not found it to cause harm or impact public safety.  The team was able to create this Twitter Moment (here) and event page for more context and details." *Id.* at 63.

185.    The same day, Christian Tom emailed back, disputing Twitter's interpretation of its own content-moderation policy and looping in Michael DeRosa, the First Lady's press secretary.  *Id.*  Michael DeRosa then emailed as well, disputing and demanding information about Twitter's application of its own policy.  *Id.* at 62.  Tom and DeRosa continued to press Twitter for further explanation and action on December 9, 13, and 17.  *Id.* at 60-61.  Twitter provided another, more detailed explanation of its decision on December 17.  *Id.* at 59-60.  Tom emailed back the

same day, again disputing Twitter's application of its own policy and pressing Twitter again on the issue. *Id.* at 58-59. He added Rob Flaherty to the email chain for the first time. *Id.* at 58.

186.    Nine minutes later, on December 17, 2021, Flaherty wrote to Twitter, angrily accusing Twitter of dishonestly misapplying its own policies: "New to the thread here, but this all reads to me like you all are bending over backwards to say that this isn't causing confusion on public issues. If the AP deems it confusing enough to write a fact check, and you deem it confusing enough to create an event for it, how on earth is it not confusing enough for it to at least have a label? Total Calvinball." *Id.* at 58. ("Calvinball" refers to a game in the cartoon "Calvin and Hobbes" where the participants make up the rules of the game as they go along.)

187.    A senior-level Twitter executive then emailed Flaherty proposing to resolve the matter by phone. *Id.* After that phone conversation, it appears that the Tweet that prompted the exchange is no longer available. *See id.* at 65 (linking to https://twitter.com/ArtValley818_/status/1465442266810486787?s=20, which is no longer available).

**F.    White House Pressure and Collusion Continue Throughout 2022.**

188.    During January 2022, Facebook reported to Rowe, Manning, Flaherty, and Slavitt that it has "labeled and demoted" "vaccine humor posts whose content could discourage vaccination." It also reported to the White House that it "labeled and demoted" posts "suggesting natural immunity to COVID-19 infection is superior to immunity by the COVID-19 vaccine." Doc. 71-3, at 10-11.

189.    Twitter emailed back within an hour and offered to discuss, to which Flaherty responded: "Happy to talk through it but if your product is appending misinformation to our tweets that seems like a pretty fundamental issue." *Id.*

190.    Separately, Jesse Lee of the White House emailed Twitter in response to the same report, accusing Twitter of "calling the President a liar" and offering to talk by phone to resolve the complaint: "this note is factually inaccurate. This is a very technical question but you don't have it right, and you are in effect calling the President a liar when his tweet is actually accurate. I'm happy to discuss this with whoever is the right person," and providing his cell phone number. *Id.* at 69.  Twitter then reached out by phone to resolve it.  *Id.*

191.    On September 18, 2021, regarding a story in the Wall Street Journal about COVID-19 "misinformation" circulating on Facebook, Flaherty demanded that Meta provide an explanation "as we have long asked for, [of] how big the problem is, what solutions you're implementing, and how effective they've been."  Doc. 71-3, at 24.

192.    On February 1, 2022, Psaki was asked at a White House press conference whether the Administration was satisfied with Spotify's decision to affix advisory warnings to Joe Rogan's immensely popular podcast, which featured speakers that contradicted the Administration's messaging about COVID-19 and vaccines, or whether the government "think[s] that companies like Spotify should go further than just, you know, putting a label on" disfavored viewpoints and speakers.  Psaki responded by demanding that Spotify and other platforms "do[] more" to block disfavored speech: "[O]ur hope is that all major tech platforms … be vigilant to ensure the American people have access to accurate information on something as significant as COVID-19…. So, this disclaimer – it's a positive step.  But we want every platform to continue *doing more* to call out … mis- and disinformation while also uplifting accurate information."  Glenn Decl. Ex. 38, at 15-16; Doc. 10-1, at 501-2 (emphasis added). She stated that Spotify's advisory warnings are "a good step, it's a positive step, but *there's more that can be done*."  *Id.* at 502 (emphasis added).

193.    On April 25, 2022, Psaki was asked at a White House press briefing to respond to the news that Elon Musk would acquire Twitter, and asked "does the White House have any concern that this new agreement might have President Trump back on the platform?"  Glenn Decl. Ex. 40; Doc. 10-1, at 528.

194.    Psaki responded by reiterating the threats of adverse legal consequences to Twitter and other social media platforms, specifically referencing antitrust enforcement and Section 230 repeal: "No matter who owns or runs Twitter, the President has long been concerned about the power of large social media platforms … [and] has long argued that tech platforms must be held accountable for the harms they cause.  He has been a strong supporter of fundamental reforms to achieve that goal, including reforms to Section 230, enacting antitrust reforms, requiring more transparency, and more.  And he's encouraged that there's bipartisan interest in Congress."  *Id.* at 528-29.

195.    At the same press briefing, Psaki was asked: "Are you concerned about the kind of purveyors of election misinformation, disinformation, health falsehoods, sort of, having more of an opportunity to speak there on Twitter?"  She responded by specifically linking the legal threats to the social-media platforms' failure to more aggressively censor free speech: "I would say our concerns are not new.  We've long talked about and the President has long talked about his concerns about the power of social media platforms, including Twitter and others, to spread misinformation, disinformation; the need for these platforms to be held accountable."  *Id.* at 534.

196.    Psaki was then asked a question that noted that "the Surgeon General has said that misinformation about COVID amounts to a public health crisis," and then queried, "would the White House be interested in working with Twitter like it has in the past to continue to combat this

kind of misinformation?   Or are we in a different part of the pandemic where that kind of partnership is no longer necessary?"  *Id.* at 549.

197.    Psaki responded by reaffirming that senior officials within the White House and/or the Administration are continuing to coordinate directly with social-media platforms to censor disfavored speakers and content on social media, and directly linking these efforts to the repeated threat of adverse legal action: "we engage regularly with all social media platforms about steps that can be taken that has continued, and I'm sure it will continue.  But there are also reforms that we think Congress could take and we would support taking, including reforming Section 230, enacting antitrust reforms, requiring more transparency.  And the President is encouraged by the bipartisan support for — or engagement in those efforts." *Id.*

198.    On June 13, 2022, Flaherty demanded that Meta continue to produce periodic "COVID-19 insights reports" to track so-called "misinformation" regarding COVID-19 on Meta's social-media platforms, expressing the specific concern that COVID vaccines for children under 5 would soon be authorized.  Doc. 71-3, at 6.

199.    Meta got the message.  It agreed to continue sending its censorship-tracking reports, and on June 22, 2022, Meta assured Flaherty that it was expanding its censorship of COVID-19 "misinformation" to ensure that speech critical or skeptical of COVID-19 vaccines for children under 5 years old—a highly controversial topic—would be censored.  Doc. 71-3, at 5.

**G.      Pressure to Expand the Topics of Social-Media Censorship.**

200.    Since this lawsuit was filed, Defendants have expanded their social-media censorship activities and pressured social-media platforms for censorship in new areas of online discourse, including areas such as climate change, gender, abortion, and economic policy.

201.    For example, on June 14, 2022, White House National Climate Advisor Gina McCarthy spoke at an Axios event titled "A conversation on battling misinformation." Jones Decl. Ex. M, at 1.

202.    During the event, "McCarthy skewered Big Tech companies for 'allowing' disinformation and cheered Congress for 'taking action' to enact more censorship last Thursday." *Id.* at 2. "Axios political reporter Alexi McCammond asked McCarthy how so-called 'rampant mis-and-disinformation around climate change online and in other platforms' has 'made your job harder?'" *Id.* "McCarthy responded by slamming social media companies: 'We have to get tighter, we have to get better at communicating, and frankly, *the tech companies have to stop allowing specific individuals over and over again to spread disinformation*.'" *Id.* (emphasis added). "She suggested further that 'we have to be smarter than that and *we need the tech companies to really jump in*.'" *Id.* at 3 (emphasis added). "McCammond responded by asking: 'Isn't misinformation and disinfo around climate a threat to public health itself?' McCarthy asserted that it 'absolutely' is: 'Oh, absolutely.'" *Id.*

203.    Like Psaki and others, McCarthy explicitly tied these demands for censorship of climate-change-related speech to threats of adverse legislation: "McCarthy also praised Congress directly for pushing social media companies to censor Americans: 'We do see Congress taking action on these issues, we do see them trying to tackle the misinformation that's out there, trying to hold companies accountable.'" *Id.* at 4.

204.    On June 16, 2022, the White House announced a new task force to address, among other things, "gendered disinformation" and "disinformation campaigns targeting women and LGBTQI+ individuals who are public and political figures, government and civic leaders, activists, and journalists." Jones Decl., Ex. N, at 1.

205.    The June 16 Memorandum decries "online harassment and abuse"—vague terms that, on information and belief, are deliberately adopted to sweep in constitutionally protected speech.  *Id.*  In particular, the Memorandum defines "online harassment and abuse" to include "gendered disinformation," a deliberately broad and open-ended term.  *Id.* § 1.  The Memorandum announces plans to target such "gendered disinformation" directed at public officials and public figures, including "women and LGBTQI+ political leaders, public figures, activists, and journalists."  *Id.*  The Memorandum creates a Task Force co-chaired by the Assistant to the President for National Security Affairs, which includes the Secretary of Defense, the Attorney General, and the Secretary of Homeland Security, among others.  *Id.*

206.    The Task Force is charged with "developing programs and policies to address … *disinformation campaigns* targeting women and LGBTQI+ individuals who are public and political figures, government and civic leaders, activists, and journalists in the United States and globally."  *Id.* § 4(a)(iv) (emphasis added).  The Memorandum calls for the Task Force to consult and coordinate with "technology experts" and "industry stakeholders," *i.e.*, social-media firms, to achieve "the objectives of this memorandum," *id.* § 4(b).  Those "objectives," of course, include suppressing so-called "disinformation campaigns" against "public and political figures."  *Id.* § 4(a)(iv).

207.    The Memorandum again threatens social-media platforms with adverse legal consequences if they do not censor aggressively enough to suit federal officials: "the Task Force shall … submit periodic recommendations to the President on *policies, regulatory actions, and legislation on technology sector accountability* to address systemic harms to people affected by online harassment and abuse."  *Id.* § 5(c) (emphasis added).

208.    Relatedly, on May 27, 2022, HHS Assistant Secretary Rachel Levine demanded
that social-media platforms censor "misinformation" about "gender-affirming care."  Jones Decl.,
Ex. O, at 1.  In a public address to health officials, Levine "spoke about the need for government
to 'address health information directly' and specified that includes encouraging Big Tech to
combat health misinformation 'beyond COVID-19.'"  *Id.*  Levine stated: "So I'd like to just talk
briefly about another area of substantial misinformation that is directly impacting health equity in
our nation, and that is the health equity of sexual and gender minorities. There is substantial
misinformation about gender-affirming care for transgender and gender diverse individuals… The
positive value of gender-affirming care for youth and adults is not in scientific or medical dispute
… And we need to use our clinicians' voice to collectively advocate for our tech companies to
create a healthier, cleaner information environment."  *Id.* at 1-2.

209.    On July 8, 2022, the President signed an Executive Order on protecting access to
abortion.  Jones Decl., Ex. P, at 1.

210.    Section 4(b)(iv) of the order states: "The Secretary of Health and Human Services
shall, in consultation with the Attorney General and the Chair of the FTC, consider options to
address deceptive or fraudulent practices related to reproductive healthcare services, including
online, and to protect access to accurate information."  *Id.*  This is a plain reference to the online
advertising practices of pro-life pregnancy resources centers, which the President's political allies
were then attacking.  Jones Decl., Ex. Q, at 1-2.

211.    On August 11, 2022, Flaherty emailed Twitter to dispute a note added by Twitter
to one of President Biden's tweets.  Doc. 174-1, at 68.  The subject line of Flaherty's email was a
link to a Tweet criticizing Twitter's note: "Joe Weisenthal on Twitter: 'Wow, this note that twitter
added to Biden's tweet is pure gibberish. Imagine adding this, and thinking this is helpful to the

public's understanding in any way.'" *Id.* Linking to a tweet about gas prices, Flaherty wrote:

"Happy to connect you with some economists who can explain the basics to you guys." *Id.*

Flaherty copied Jesse Lee, Senior Advisor to the National Economic Council at the White House,

on the email. *Id.*

### III.    The Pressure Campaign from Surgeon General Murthy and His Office.

212.    Throughout 2021 and 2022, Surgeon General Vivek Murthy and his Office engaged

in a pressure campaign in parallel with, and often overlapping with, the White House's pressure

campaign on social-media platforms.  Surgeon General Murthy and his staff were often included

in the same meetings and communications with White House officials and social-media platforms,

and joined White House officials pressuring them to increase censorship in public and in private.

#### A.  The Surgeon General: Using the "Bully Pulpit" to Pressure Platforms.

213.    Eric Waldo is the Senior Advisor to the Surgeon General of the United States,

Vivek Murthy, and was formerly a Chief Engagement Officer in the Office of the Surgeon General

("OSG").  Waldo Dep. 11:15-12:2.

214.    As "the engagement team leader" for OSG, Waldo was "the one in charge of

maintaining the contacts and the relationships with representatives of social media platforms." *Id.*

at 51:11-17.

215.    Dr. Murthy was directly involved in editing and approving the final work product

of the Surgeon General's Office, including the Surgeon General's July 15, 2021 health advisory

on misinformation and the Surgeon General's March 3, 2022 RFI to social-media platforms. *Id.*

at 14:20-22, 15:16-19, 16:9-10, 17:1-6, 187:24-188:3.

216.    Calling for an "all-of-society approach" to misinformation was a pervasive theme

of the Surgeon General's communications, including the health advisory and the RFI. *Id.* at 19:25,

26:8, 88:9, 89:13, 101:2, 117:13, 122:15, 211:22, 246:25, 251:9, 332:22.  This theme echoes the repeated call for an "all-of-society approach" in the Virality Project's public report.  *See infra.*

217.    Before the Surgeon General's health advisory on misinformation was published on July 15, 2021, OSG and Waldo "did pre-rollout calls with Twitter, Facebook, [and] Google/YouTube." *Id.* at 20:7-11.

218.    The Surgeon General uses his "bully pulpit" to call for censorship of health misinformation: "Dr. Murthy continued from a communications perspective to talk about health misinformation using his bully pulpit." *Id.* at 25:23-25.

219.    Waldo admits that the Surgeon General is directly advocating to social-media platforms to take stronger actions against health "misinformation": "[T]he Surgeon General has the ability … to talk to the relevant stakeholders and say we want you to be aware of this issue and that we think you have a role to play to improve the health outcomes, yes." *Id.* 28:10-14.  As part of this role, the Surgeon General "call[s] out social media platforms in the [health] advisory." *Id.* at 28:18-19.

220.    The Surgeon General's "bully pulpit," Waldo agrees, involves putting public pressure on social-media platforms: "I think the bully pulpit … is really the fact that he commands attention, including being able to …  speak with the press, speak with the public, and … we think of the Surgeon General as the nation's doctor." *Id.* at 29:9-15.

221.    A goal of the Surgeon General's use of the "bully pulpit" includes to "reduce the dissemination of health misinformation." *Id.* at 30:5-10.  This includes making "recommendations of specific steps the social media platforms are … called out to take to reduce the spread of misinformation on the platforms." *Id.* at 31:3-8.

222.    OSG reinforces its public "message of calling out the social media platforms to take steps to reduce the spread of misinformation on their platforms" through private communications with platforms: "[W]hat we're saying publicly, we're also … said that privately to them as well." *Id.* at 32:5-8, 12-14.  This includes during "rollout calls."  *Id.* at 32:19-20.

**B. Surgeon General Works in Tandem with the White House and Virality Project.**

223.    On the day of the health misinformation advisory rollout, July 15, 2021, "Press Secretary … Jen Psaki had already made remarks specifically about Facebook, and then," the next day, "President Biden made his remarks that social media and Facebook were killing people."  *Id.* at 33:19-25.  "Facebook … was upset about how the rollout had gone."  *Id.* at 33:6-8.  Waldo's initial rollout call with Facebook, as a result, was affected by the Administration's public attacks on Facebook: "I wouldn't call it the most productive call."  *Id.* at 34:4-6.

224.    After this public pressure, Facebook's senior executive, Nick Clegg, reached out to request "deescalat[ion]" and "work[ing] together" as a direct result of that public pressure on Facebook: "Then later, with our call, we had a call with Nick Clegg from Facebook, and at his request, and … his intentions were to sort of I think deescalate and just find ways that we could work together, given how Facebook … was treated in that rollout day."  *Id.* at 34:7-13.

225.    In the call with Nick Clegg, Surgeon General Murthy reiterated his demand for Facebook to do more to censor "misinformation" on its platforms: "[O] n the call with Nick Clegg, the Surgeon General did … reiterate the idea that, you know, as we described in the advisory, that we think there's more … that Facebook and other social media companies can do, and … we reiterated that."  *Id.* at 35:7-12.

226.    Murthy also asked Clegg and Facebook specific questions about requiring Facebook to share data with outside researchers about the scope and reach of misinformation on

its platforms, again echoing the key recommendation of the Virality Project: "[T]he most specific questions were about understanding the data around the spread of misinformation and how we were measuring that, and … how we could have external researchers validate the spread of misinformation and -- and helping us as a field understand the depth of the problem." *Id.* at 35:20-36:2.

227.    One such "external researcher" that OSG had in mind was "Renee DiResta, from the Stanford Internet Observatory," a leading organization of the Virality Project, which hosted a "rollout event" for the advisory featuring Dr. Murthy on the day the advisory was announced. *Id.* at 36:19-23.

228.    Waldo admits that there was "coordination" between OSG and Renee DiResta of the Virality Project on the launch of the Surgeon General's health advisory: "I know there was coordination with [DiResta] with respect to the launch … there was a panel, a public sort of virtual town hall that we hosted -- with the Sanford [sic] Internet Observatory that Dr. Murthy spoke at, and that was part of the launch day. So certainly there would have been coordination … with her." *Id.* at 38:1-7.

229.    Kyla Fullenwider is the OSG's key "subject matter expert" who "worked on the advisory" and had significant substantive input on both the Surgeon General's July 15, 2021 health advisory on misinformation, and the Surgeon General's March 3, 2022 RFI to social-media platforms on the spread of misinformation. *Id.* at 39:1-4, 59:16-23. Kyla Fullenwider is not a direct employee of the OSG, but works for a non-profit contractor named "US Digital Response," Waldo Dep. 85:13-15.

230.    Kyla Fullenwider "did a follow-up call with Renee DiResta" about the health advisory. *Id.* at 38:25-39:4.

231.    After the launch of the health advisory, Waldo and Fullenwider "did a call" with Renee DiResta "that was more of a brainstorm around … public-facing events that we could do to talk about this issue" of stopping health misinformation.  *Id.* at 40:13-17.

232.    Fullenwider and DiResta "most likely" discussed misinformation in these calls. *Id.* at 41:4-6.

233.    Waldo and OSG also received a briefing from the Center for Countering Digital Hate about the so-called "Disinformation Dozen."  *Id.* at 43:1-48:1.  CCDH gave "a presentation about the Disinformation Dozen and sort of how they were measuring … that those were the folks primarily responsible for a lot of misinformation online."  *Id.* at 47:2-5.

234.    Rafael Campos of OSG "helped create the event with … the Stanford Internet Observatory for the launch," and likely had communications with Stanford and Professor DiResta in the lead-up to the event.  *Id.* at 48:12-14, 49:1-2.

235.    The OSG anticipated that the social-media platforms would feel pressured by the advisory: "we didn't think they would be happy about this -- you know, the content of the advisory."  *Id.* at 54:24-55:1.

236.    Waldo is aware of "at least one call … that the Surgeon General [Murthy] had with Facebook during the transition," i.e., between President Biden's election and his assuming office. *Id.* at 55:8-10.  The call involved a "Facebook individual": "Dr. Murthy had mentioned that he had been on a call with that person [from Facebook] during the transition."  *Id.* at 79:11-18, 56:5-6. Waldo identified the individual as "a data person from the Facebook team."  *Id.* at 56:10.  The purpose of that call was "again, about that issue of trying to understand the reach of the mis- and disinformation and understanding … how far it was spreading."  *Id.* at 56:15-19.

237.   "Data about misinformation" was "a topic of conversation" in that call, and the participants discussed "Facebook" being "un[]clear" or "unable to present … the depth or reach of the misinformation, that they didn't have that data." *Id.* at 80:1-15.

238.   DJ Patil may have participated in that transitional call. Patil was the "chief data scientist in the Obama administration, and he was a special government employee at the White House for part of the first year" of the Biden Administration. *Id.* at 81:6-13. Patil was also "on the call with Dr. Murthy and [Waldo] and Nick Clegg … in his capacity as a White House official." *Id.* at 81:24-82:3.

239.   Waldo "connected [Patil] to another research data person … a Facebook data person." *Id.* at 82:13-16.

240.   The purpose of this follow-up was to demand more information from Facebook about monitoring the spread of misinformation on its platforms: "[T]he problem was we were still in this piece of not understanding the reach and depth … of the misinformation … on Facebook. And … this person was going to try to explain to [Patil] the data challenges in doing so." *Id.* at 83:4-9.

241.   Kyla Fullenwider is the "main" or key staffer for the OSG on misinformation and disinformation. *Id.* at 58:21-24. Ann Kim is listed on the OSG's org chart, Waldo Ex. 2, as the person who "[d]irects mis- and dis-information engagement," Waldo Ex. 2, but that is solely "because Kyla Fullenwider reported up to Ann Kim. And since Kyla, I think, was our main subject matter expert or continued to do work on mis- and disinformation, maybe that was why that was put under Anne's list of duties." Waldo Dep. 58:20-24. Fullenwider, therefore, is the OSG's "main subject matter expert" on "mis- and disinformation," who "directs mis- and dis-information engagement" for the OSG. *Id.* at 58:13-59:7.

242.   Fullenwider works for the nonprofit U.S. Digital Response, and is not directly employed by the OSG, though she was acting in an official capacity on behalf of OSG.  Waldo Ex. 3, at 32; Waldo Dep. 85:10-86:8.

243.   U.S. Digital Response is not a government agency but a non-profit organization: "U.S. Digital Response (USDR) is a nonprofit, nonpartisan organization that helps governments, nonprofits, and public entities respond quickly to critical public needs."  *About U.S. Digital Response*,   U.S.   Digital   Response   (last   visited   Feb.   17,   2023), https://www.usdigitalresponse.org/about.

244.   Ann Kim has no direct involvement in mis- and disinformation.  Waldo Dep. 58:25-59:3.  But Kyla Fullenwider "was definitely working on mis- and disinformation."  *Id.* at 59:6-7. Fullenwider "was working with Daniel [Tartakovsky] on the design of … the advisory. And then … Kyla was continuing to help us think about were there additional ways we might engage."  *Id.* at 59:12-15.  Further, "Kyla … was the principal designer of options around follow-up with respect to data."  *Id.* at 59:16-18.  And when "the Surgeon General's office put out an RFI around misinformation data" on March 3, 2022, "Kyla worked on that."  *Id.* at 59:18-22.  Kyla "was the subject matter expert who was chiefly creating options for the Surgeon General …  to consider how we would continue to … talk about mis- and disinformation with respect to data."  *Id.* at 60:6-10.

245.   Kyla Fullenwider also participated in the "rollout calls" to the social-media platforms announcing the Surgeon General's health advisory on misinformation.  *Id.* at 62:24-63:4.

246.   Waldo was also "on some e-mails and at least one call with Rob Flaherty" when he "would communicate with Facebook."  *Id.* at 64:9-11.  This included a call with Rob Flaherty and

the OSG: "[B]efore our call with Nick Clegg, ... I had a call with Rob." *Id.* at 65:1-2. By then,

Flaherty had been "separately communicating with Facebook," and he was "giving us a heads-up

on his experiences ... in communicating with ... Facebook." *Id.* at 65:4-9.

247.    In August 2021, Waldo joined a call with Rob Flaherty and Brian Rice of Facebook,

who was in charge of Facebook's relationship with federal officials. *Id.* at 66:10-14, 124:24-125:2.

248.    In that August 2021 call, "Brian Rice from Facebook had requested a call to give

us an update on some sort of internal action they were doing. ... Facebook had either found

something or removed something and was letting us know about it." *Id.* at 66:16-23.

249.    Andy Slavitt of the White House also communicated with Nick Clegg. *Id.* at 67:14-

21. When Andy Slavitt left the White House, he offered Surgeon General Murthy as a direct

contact for Nick Clegg. *Id.* at 68:4-7.

250.    In addition, "Dr. Murthy has certainly had conversations with Dr. Fauci." *Id.* at

69:21-22. Waldo claims that he does not know the nature of those conversations. *Id.* at 69:23-25.

"Dr. Murthy would have directly communicated with Dr. Fauci, to my knowledge." *Id.* at 70:13-

15.

251.    Waldo is "certain that Dr. Murthy has connected" with Dr. Francis Collins. *Id.* at

71:2-9.

252.    Waldo was involved in collecting information to respond to Plaintiffs'

interrogatories on behalf of OSG. *Id.* at 73:19-74:11.

**C.    The Surgeon General Pressures Social-Media Platforms in Private.**

253.    The first meeting with social-media platforms relating to misinformation that OSG

identified in response to interrogatories was a brief introductory call with Nick Clegg on May 25,

2021: "On May 25, 2021, from 4:30 to 5:00 pm ET, Dr. Vivek Murthy from OSG and Andy Slavitt

from the White House met remotely with Nick Clegg from Facebook. The purpose of the call was to introduce Dr. Murthy to Mr. Clegg." Waldo Ex. 3, at 32; *see also* Waldo Dep. 78:24-79:10. The next meeting disclosed was the first "rollout call" relating to the advisory on July 12, 2021. Waldo Ex. 3, at 32. As noted below, this interrogatory response failed to disclose several previous meetings between Dr. Murthy and Facebook.

254.    OSG had pre-rollout calls with Twitter and YouTube on July 12 and July 14, 2021, and a rollout call with Facebook the day after the rollout on July 16, 2021. *Id.* at 32; Waldo Dep. 85:10-90:5.

255.    Kyla Fullenwider handled the substantive communications with the social-media platforms in the rollout calls; Waldo's role was to "connect them to our subject matter expert." Waldo Dep. 86:24-25.

256.    The July 16 call with Facebook was "the same day" that President Biden stated of Facebook that "They're killing people" by not censoring enough misinformation. *Id.* at 90:24, 93:3-5.

257.    At that July 16 call, Kyla Fullenwider "was able, at a high level, to walk over the … recommendations section for … technology companies," which demand greater censorship of misinformation. *Id.* at 91:14-16.

258.    The Facebook call "was definitely a slightly awkward call" because "President Biden made his comment about social media companies and Facebook killing people … right before, or even potentially during the call," and Waldo observed that "the Facebook team looked a little sad." *Id.* at 92:24-93:6.

259.    On July 23, 2021, Waldo, Dr. Murthy, and DJ Patil of the White House had a call with Nick Clegg and Brian Rice of Facebook. Waldo Ex. 3, at 32-33. Nick Clegg requested the

meeting "to deescalate" and "reset the tone" because the "Facebook team were feeling … that they

had been uniquely called out."  Waldo Dep. 95:4-13.

260.    After the meeting, Nick Clegg "did share definitely over e-mail more information

about what they were doing to reduce mis- and disinformation, COVID mis- and disinformation

on the platform."  *Id.* at 96:13-17.

261.    There was also "a follow-up e-mail sometime the next couple of weeks where …

Nick or Brian shared … here's additional work we're doing, here's how we're responding to the

advisory."  *Id.* at 97:7-11.

262.    This follow-up email provided "a catalog of … both removal of misinformation

and other steps to tamp down mis- and disinformation."  *Id.* at 97:16-22.

263.    Waldo believes that these were "new steps that they had taken in the week or so

since … they felt uniquely called out on July 15th and 16th."  *Id.* at 97:23-98:3.  The email was in

response to a request from OSG "asking for, can you let us know, like, what you're doing in

addition" to combat misinformation, "and so this was responding to that." *Id.* at 98:5-7.

264.    On the July 23 call with Facebook, "Dr. Murthy raised the issue of wanting to have

a better understanding of the reach of the mis- and disinformation on … the social media platform."

*Id.* at 98:19-22.

265.    Waldo likens the problem of mis- and disinformation on social media to "eating,

like, a piece of uranium," and compares misinformation to "cancer."  *Id.* at 99:1-101:8.

266.    The OSG's health advisory advances the view that the spread of misinformation is

"very harmful."  *Id.* at 101:24-102:7.

267.    Waldo agrees that the health advisory "provides specific examples to technology companies what they could do more of to reduce the spread of health mis- and disinformation." *Id.* at 104:16-18.

268.    Waldo uses the word "poison" to describe health misinformation, as did Dr. Murthy in announcing the Health Advisory. *Id.* at 105:4; Waldo Ex. 10, at 2.

269.    In the July 23, 2021 call with Nick Clegg, Dr. Murthy "didn't retreat … from the message of the advisory, which explicitly calls for social media platforms to do more to control the reach of misinformation on their platforms," and "continued … to discuss that message." Waldo Dep. 107:21-108:5.

270.    In addition, in that call, the OSG asked Facebook to report back on "what they were doing in response to the advisory, if they were taking any actions." *Id.* at 109:2-4.

271.    In addition, Patil was "also asking the data impact questions." *Id.* at 109:24.

272.    OSG perceived that OSG's and the White House's public statements criticizing Facebook put economic pressure on Facebook, and that Facebook was engaging with Dr. Murthy to "keep Dr. Murthy from saying … any other things that might be viewed as bad for their business." *Id.* at 113:13-15.

273.    Waldo agrees that the events of July 15 and July 16 put unique pressure on Facebook: "when you add the press conference remarks plus President Biden's remarks, it made it seem as though … there was more attention on Facebook." *Id.* at 116:2-5.

274.    The OSG's "subject matter experts" – Kyla Fullenwider, Daniel Tartakovsky, and DJ Patil of the White House – believed that misinformation "was a problem across multiple platforms." *Id.* at 116:15-16.

275.    On July 30, 2022, Waldo had a meeting with Google and YouTube representatives,
in which the representatives reported to OSG on what actions they were taking that were consistent
with or in response to the health advisory: "The topics discussed included YouTube/Google
following up on the announcement of the OSG Advisory to share more of the work it was doing
around health mis- and disinformation."  Waldo Ex. 3, at 33.

276.    When the OSG's health advisory issued, Twitter's policy handle publicly endorsed
the OSG's call for greater censorship of health misinformation: "[T]he Twitter policy handle …
either retweeted or quote tweeted and said something like, we agree. … [W]e do need an all-society
approach, and here's what we're doing."  Waldo Dep. 122:11-16.

277.    On August 10, 2021, Waldo and Rob Flaherty had a call with Facebook in which
Facebook reported back to federal officials on its actions to remove misinformation, including the
details of "an operation [Facebook] uncovered that is related to vaccine misinformation."  Waldo
Ex. 3, at 33 (alteration in original).  According to Waldo, "Brian Rice had requested a call with me
and Rob [Flaherty] and, during the call, flagged that Facebook … had done some sort of internal
operation where … they discovered some misinformation pieces happening and had taken some
corrective action."  Waldo Dep. 124:13-21.

278.    Brian Rice was Facebook's "main … staff level liaison" with the federal officials.
*Id.* at 125:2-3.

279.    Facebook emailed Waldo and Flaherty "a COVID report list that had … some sort
of report from Facebook on a biweekly basis."  *Id.* at 126:11-16.

280.    On September 14, 2021, Waldo had another meeting with Google/YouTube
representatives, "to discuss a new policy we [YouTube] are working on as well as provide an
update on our overall efforts to combat harmful COVID-19 misinformation on the platform."

Waldo Ex. 3, at 33.  This was the "second update by [Google/Youtube] to [OSG] following the health advisory of stuff they're doing to combat harmful COVID-19 misinformation through YouTube."  Waldo Dep. 129:7-12.

281.    On May 28, 2021, a few days after meeting with Andy Slavitt and Dr. Murthy for the first time (and almost two months before OSG issued the Health Advisory and had the related meetings with Waldo and others), Nick Clegg emailed Dr. Murthy and stated that, "[a]s promised," he was sending a report of misinformation on Facebook.  Waldo Ex. 4, at 1.  Clegg also "highlighted a few policy updates we announced yesterday regarding repeat misinformation," including "expand[ing] penalties for individual Facebook accounts that share misinformation," "add[ing] more context about pages that repeatedly share false claims," and "redesign[ing] notifications when they share content that a fact-checker later rates."  *Id.*

282.    These "policy updates" about increasing censorship were announced on May 27, 2021, two days after Nick Clegg's meeting with Dr. Murthy and Andy Slavitt on May 25, 2021.  Waldo Dep. 138:2-7.

283.    Clegg plainly indicated that there had been prior conversations in which Slavitt and Dr. Murthy had demanded "defensive work" to remove misinformation: "We're . . . committed to addressing the defensive work around misinformation that you've called on us to address."  Waldo Ex. 4, at 2.  These prior conversations were not disclosed in OSG's responses to interrogatories, which noted the first meeting with Dr. Murthy was a mere introductory meeting with Clegg on May 25, 2021.  Waldo Ex. 3, at 32.

284.    On June 14, 2021, Nick Clegg emailed Dr. Murthy another ("the latest") "Facebook bi-weekly covid content report," which he indicated was "as promised/discussed," and offered

"[a]s always" to "jump on a call at any point … to delve into any further details as needed." Waldo Ex. 5, at 1.

285.    The "Facebook bi-weekly covid content report," *id.*, contained a report of "the most engaged posts … with respect to both accurate and inaccurate information." Waldo Dep. 140:8-10. Rob Flaherty of the White House also received these reports. *Id.* at 140:21-24.

286.    Waldo admits that Facebook sending these biweekly reports to Dr. Murthy and Flaherty "had preexisted" and "predates the meeting" on May 25, 2021 – further indicating that OSG failed to disclose key meetings between Dr. Murthy and social media platforms in its interrogatory responses. *Id.* at 142:10-11.

287.    On July 6, 2021, Waldo emailed contacts at Twitter to set up the "rollout call" before the health advisory and stated: "As you know, one of the issues Dr. Murthy has been thinking about is how to help stop the spread of health misinformation as we continue to tackle COVID19 and beyond. I know you and your teams are working hard and thinking deeply about this issue. We'd love to chat over zoom to connect and discuss what's on the horizon for our teams." Waldo Ex. 6, at 2; Waldo Dep. 145:15-146:22.

288.    On July 6, 2021, Waldo sent an identical email to Facebook. Waldo Ex. 7, at 3-4. The purpose of these emails was to set up calls to announce the Surgeon General's forthcoming health advisory on misinformation. Waldo Dep. 149:11-16. Because of scheduling conflicts, the "rollout call" with Facebook was not scheduled until July 16, the day after the advisory was announced and the same day President Biden stated of Facebook that "they're killing people." *Id.* at 149:11-17.

289.    On July 6, 2021, Waldo also sent an email to YouTube with a similar statement to set up a rollout call with YouTube.  Waldo Ex. 8, at 3.  Waldo's emails make clear that OSG's message and purpose was to "stop the spread of misinformation" on social-media platforms.  *Id.*

290.    In these calls, "we had Kyla [Fullenwider] on the call and giving them a high-level update that we're going to have this advisory come out and that we want them to take a look at it."  Waldo Dep. 153:23-154:1.

291.    On July 10, 2021, Nick Clegg emailed Dr. Murthy, attaching another bi-weekly Covid content report, and stated, "I understand ... that my team is meeting with yours next week to delve deeper into our [C]ovid misinformation efforts."  Waldo Ex. 9, at 1.  Waldo understands that this refers to the July 16 rollout meeting.  Waldo Dep. 155:12-18.

292.    In the July 16, 2021 meeting with Facebook, Kyla Fullenwider went over the advisory, and then "asked additional questions … related to Facebook's efforts to combat health misinformation," including "some questions about, again, the research side.… [S]ome questions came up about CrowdTangle, if I recall correctly which was a … data port for … some ways to understand the Facebook, again, impact and research of the misinformation."  *Id.* at 157:21-159:9.

**D.    The Surgeon General's Public Pressure Campaign.**

293.    On July 15, 2021, Dr. Murthy participated in a White House press conference with White House Press Secretary Jennifer Psaki to announce the Surgeon General's Health Advisory on Misinformation.  Waldo Ex. 10.  Psaki announced of Dr. Murthy that "[t]oday, he published an advisory on health misinformation as an urgent public health crisis."  *Id.* at 1.

294.    At the press conference, Dr. Murthy described misinformation as "one of the biggest obstacles that's preventing us from ending this pandemic," and stated: "Today, I issued a Surgeon General's Advisory on the dangers of health misinformation.  Surgeon General

Advisories are reserved for urgent public health threats…. [T]oday we live in a world where

misinformation poses an imminent and insidious threat to our nation's health." *Id.* at 2. He stated

that "misinformation takes away our freedom to make informed decisions about our health and the

health of our loved ones." *Id.* at 2.

295.    Dr. Murthy's definition of "misinformation" incorporates the notion that the

definition changes over time: "Health misinformation is false, inaccurate, or misleading

information about health, according to the best evidence at the time." *Id.* at 2. Waldo agrees that

this definition "contemplate[s] that what constitutes misinformation might change over time," and

that "something that we now think is misinformation may later turn out to be accurate information

… [a]nd vice versa." Waldo Dep. 164:17-165:7.

296.    Dr. Murthy stated that those who question mask mandates and decline vaccination

are following misinformation: "During the COVID 19 pandemic, health misinformation has led

people to resist wearing masks in high-risk settings. It's led them to turn down proven treatments

and to choose not to get vaccinated. This has led to avoidable illnesses and death. Simply put,

health [mis]information has cost us lives." Waldo Ex. 10, at 2.

297.    Dr. Murthy placed specific blame on social-media platforms for the spread of

misinformation: "Now, health misinformation didn't start with COVID-19. What's different now,

though, is the speed and scale at which health misinformation is spreading. Modern technology

companies have enabled misinformation to poison our information environment with little

accountability to their users. They've allowed people who intentionally spread misinformation —

what we call 'disinformation' — to have extraordinary reach." *Id.* at 2. Dr. Murthy described

social-media companies as enabling the spread of "poison" in our "information environment." *Id.*

298.    He blamed the platforms' algorithms and features for the spread as well: "They've designed product features, such as 'Like' buttons, that reward us for sharing emotionally charged content, not accurate content.  And their algorithms tend to give us more of what we click on, pulling us deeper and deeper into a well of misinformation." *Id.*

299.     Echoing the language of the Virality Project, Dr. Murthy stated, "we need an all-of-society approach to fight misinformation." *Id.* at 2.

300.    Dr. Murthy announced: "we're saying we expect more from our technology companies. We're asking them to operate with greater transparency and accountability. We're asking them to monitor misinformation more closely. We're asking them to consistently take action against misinformation super-spreaders on their platforms." *Id.* at 3.  Both the call for "transparency and accountability" and the request for increased monitoring and greater censorship of "super-spreaders" mirror the Virality Project report.  *See infra.*

301.    Both Dr. Murthy's public statements and his health advisory repeatedly use the word "accountable" and "accountability" to refer to the social-media platforms—again, echoing the Virality Project report.  *See id.* at 2, 3, 5; Waldo Ex. 11, at 14, 16.

302.    Waldo agrees that the word "accountable" carries with it the threat of consequences; he concedes that "accountability includes accepting the consequences for when you do something wrong … or inappropriate."  Waldo Dep. 171:4-8.  Thus, the OSG's repeated reference to holding social-media platforms "accountable" entails an implied threat of adverse consequences if the platforms do not censor more health misinformation.  *See id.*

303.    The Surgeon General's use of the word "accountable" also echoes the repeated use of the word "accountable" by elected federal officials, including President Biden and his political allies, to threaten adverse legal consequences against social-media platforms if they do not increase

censorship of disfavored speakers, speech, and viewpoints.  *See, e.g.,* Jones Decl., Ex. R (quoting White House Communications Director Kate Bedingfield: "We're reviewing [amending Section 230 of the Communications Decency Act], and certainly [the social media companies] should be held accountable.  I think you've heard the president speak very aggressively about this.").

304.    Waldo agrees that Murthy's comments entail that "there's an obligation … or certainly an imperative to do more.  So … not only stop but reduce or take some sort of mitigating efforts so that the misinformation and disinformation is not leading to poor health results for people."  Waldo Dep. 172:21-173:1.

305.    Dr. Murthy's call for greater "transparency" is a call for platforms to engage in the kind of data-sharing that Dr. Murthy, Rob Flaherty, DJ Patil, and Kyla Fullenwider, among others, demanded in private meetings with Facebook.  *Id.* at 174:15-23.  Again, this echoes the key recommendation of the Virality Project.

306.    Waldo agrees that Dr. Murthy's call for greater "accountability" includes a demand to "take more proactive steps to stop the spread of misinformation."  *Id.* at 176:1-4.

307.    Dr. Murthy also demanded that the platforms do "much, much more" and "take aggressive action" against misinformation: "We know that the dramatic increase in the speed — speed and scale of spreading misinformation has, in part, been enabled by these platforms. So that's why in this advisory today, we are asking them to step up. We know they have taken some steps to address misinformation, but much, much more has to be done. And we can't wait longer for them to take aggressive action because it's costing people their lives."  Waldo Ex. 10, at 5.

308.    Dr. Murthy also stated that platforms "have to do more to reduce the misinformation that's out there so that the true voices of experts can shine through."  *Id.* at 6.

309.    After the advisory, OSG asked Facebook, Google/YouTube, and Twitter "as a follow-up what actions they might have taken in response to the advisory." Waldo Dep. 181:15-21.

310.    At the same press conference on July 15, 2021, Jennifer Psaki stated: "we are in regular touch with these social media platforms, and those engagements typically happen through members of our senior staff, but also members of our COVID-19 team." Waldo Ex. 10, at 10.

311.    Psaki stated: "We've increased disinformation research and tracking within the Surgeon General's office. We're flagging problematic posts for Facebook that spread disinformation." *Id.*

312.    "Regarding the Administration's "asks" to social-media platforms, Psaki stated: "There are also proposed changes that we have made to social media platforms, including Facebook, and those specifically are four key steps: One, that they measure and publicly share the impact of misinformation on their platform. Facebook should provide, publicly and transparently, data on the reach of COVID-19 — COVID vaccine misinformation. Not just engagement, but the reach of the misinformation and the audience that it's reaching." *Id.* at 11. Again, this echoes the key recommendation of the Virality Project report. It also echoes Dr. Murthy's call for "transparency" and the repeated private demands that Facebook give external researchers like Renee DiResta of the Virality Project access to its internal data. Waldo Dep. 191:17-21.

313.    Psaki also stated: "Second, that we have recommended — proposed that they create a robust enforcement strategy that bridges their properties and provides transparency about the rules. So, about — I think this was a question asked before — there's about 12 people who are producing 65 percent of anti-vaccine misinformation on social media platforms All of them remain

active on Facebook, despite some even being banned on other platforms, including Facebook — ones that Facebook owns."  Waldo Ex. 10, at 11.

314.    Psaki stated: "Third, it's important to take faster action against harmful posts. As you all know, information travels quite quickly on social media platforms; sometimes it's not accurate. And Facebook needs to move more quickly to remove harmful, violative posts — posts that will be within their policies for removal often remain up for days. That's too long. The information spreads too quickly."  *Id.*

315.    Waldo agrees that the Surgeon General's advisory calls for platforms to "move faster" and take "more aggressive" action against supposed misinformation.  Waldo Dep. 194:20-21.

316.    And Psaki stated, publicly criticizing Facebook: "Finally, we have proposed they promote quality information sources in their feed algorithm. Facebook has repeatedly shown that they have the levers to promote quality information. We've seen them effectively do this in their algorithm over low-quality information and they've chosen not to use it in this case. And that's certainly an area that would have an impact."  Waldo Ex. 10, at 11.

317.    Psaki concluded: "So, these are certainly the proposals. We engage with them regularly and they certainly understand what our asks are."  *Id.*

318.    On the same day, July 15, 2021, Surgeon General Murthy issued his advisory, "Confronting Health Misinformation: The U.S. Surgeon General's Advisory on Building a Healthy Information Environment."  Waldo Ex. 11, at 1 (the "Health Advisory"); Waldo Dep. 196:21-197:1.

319.    The Health Advisory describes censorship of health misinformation as a "moral and civic imperative": "Health misinformation is a serious threat to public health. … Limiting the

spread of health misinformation is a moral and civic imperative that will require a whole-of-society effort." Waldo Ex. 11, at 2. The "whole-of-society effort" echoes the language of the Virality Project.

320. The Health Advisory states: "Misinformation has caused confusion and led people to decline COVID-19 vaccines, reject public health measures such as masking and physical distancing, and use unproven treatments." *Id.* at 4.

321. The Health Advisory specifically blames social-media platforms for the spread of misinformation: "In recent years, the rapidly changing information environment has made it easier for misinformation to spread at unprecedented speed and scale, especially on social media and online retail sites, as well as via search engines." *Id.* at 5. According to the Advisory, "misinformation is often framed in a sensational and emotional manner that can connect viscerally, distort memory, align with cognitive biases, and heighten psychological responses such as anxiety. People can feel a sense of urgency to react to and share emotionally charged misinformation with others, enabling it to spread quickly and go 'viral.'" *Id.*

322. In addition, the Advisory blames "product features" of platforms: "[P]roduct features built into technology platforms have contributed to the spread of misinformation. For example, social media platforms incentivize people to share content to get likes, comments, and other positive signals of engagement. These features help connect and inform people but reward engagement rather than accuracy, allowing emotionally charged misinformation to spread more easily than emotionally neutral content." *Id.*

323. The Advisory also faults platforms' "algorithms": "algorithms that determine what users see online often prioritize content based on its popularity or similarity to previously seen

content. As a result, a user exposed to misinformation once could see more and more of it over time, further reinforcing one's misunderstanding." *Id.*

324.    The Health Advisory specifically called for platforms to enact "policy changes" to reduce the spread of misinformation: "**Implement product design and policy changes on technology platforms** to slow the spread of misinformation." *Id.* at 7 (bold in original).

325.    The Health Advisory also explicitly threatened future "legal and regulatory measures" to combat misinformation: "**Convene federal, state, local, territorial, tribal, private, nonprofit, and research partners** to explore the impact of health misinformation, identify best practices  to prevent and address it, issue recommendations, and find common ground on  difficult questions, including *appropriate legal and regulatory measures that address health misinformation* …." *Id.* at 7 (bold in original, italics added).

326.    Under the heading "What Technology Platforms Can Do," the Health Advisory called for platforms to take a series of steps to increase and enable greater social-media censorship of "misinformation," including the following: "[M]ake meaningful long-term investments to address misinformation, including product changes. Redesign recommendation algorithms to avoid amplifying misinformation, build in "frictions" … to reduce the sharing of misinformation, and make it easier for users to report misinformation. Give researchers access to useful data to properly analyze the spread and impact of misinformation. Strengthen the monitoring of misinformation. … [A]ddress misinformation in live streams, which are more difficult to moderate due to their temporary nature and use of audio and video. Prioritize early detection of misinformation 'super-spreaders' and repeat offenders. Impose clear consequences for accounts that repeatedly violate platform policies. Evaluate the effectiveness of internal policies and practices in addressing misinformation and be transparent with findings. Publish standardized

measures of how often users are exposed to misinformation and through what channels, what kinds of misinformation are most prevalent, and what share of misinformation is addressed in a timely manner. Communicate why certain content is flagged, removed, downranked, or left alone." *Id.* at 12.

327.    Waldo agrees that the Advisory calls for platforms to provide "a method for users to flag problematic posts so that they could be reviewed for content modulation, policy violations." Waldo Dep. 200:25-201:5.

328.    Waldo agrees that "clear consequences" for repeat violators include "things like issuing strikes against them, suspensions … and sometimes permanent deplatforming." *Id.* at 205:6-13.

329.    In its conclusion, the Health Advisory states: "We need institutions to recognize that this issue is their moral and civic responsibility, too, and that they are accountable." Waldo Ex. 11, at 16.  Waldo agrees that the word "accountable" is repeated in the Surgeon General's remarks and the Advisory itself.  Waldo Dep. 206:3-11.

**F. The Surgeon General's Collaboration with the Virality Project.**

330.    Also on January 15, 2021, Surgeon General Murthy participated in a separate launch event hosted by Stanford Internet Observatory, which was then operating the Virality Project.  Waldo Ex. 12, at 1; Waldo Dep. 206:12-207:9.

331.    In his public comments with Stanford Internet Observatory, Dr. Murthy stated: "We're asking technology companies to operate with greater transparency and accountability so that misinformation doesn't continue to poison our sharing platforms, and we know the government can play an important role, too."  Waldo Ex. 12, at 8 (Audio Tr. 6).  This reiterates the key words "poison" and "accountability."

332.    Waldo describes government's "important role" as including "bringing stakeholders … together with urgency around a common vision for a healthy information environment … the government can help bring together stakeholders … what I would call the convening power of a bully pulpit." Waldo Dep. 209:15-22.  This would include bringing social-media platforms around to the government's "common vision" for censorship.  *Id.* at 209:24-210:8.

333.    Dr. Murthy was asked, "do you believe a rapid response initiative like the Virality Project could be implemented at the federal level to combat health misinformation on a national scale from the top down?" and he answered that "having a federal organized effort to combat misinformation" is "a really, really interesting idea."  Waldo Ex. 12, at 10 (Audio Tr. 8).

334.    Dr. Murthy stated: "[T]echnology companies have a really important role.  They must step up and play to slow the spread of misinformation on their sites wh[ether] that's by either sharing data with people and researchers about what interventions they're making and the impact that's having or whether it's by changing their algorithms and making other alterations to their platform to identify misinformation early and slow its spread and avoid sending more information of misinformation to people who are consuming it."  *Id.* at 11 (Audio Tr. 9).

335.    Waldo agrees that "the purpose of the data sharing is so that outside people come in and … assess how well they're doing with their own internal policies to combat the spread of misinformation."  Waldo Dep. 211:6-11.

336.    Dr. Murthy expressly stated that he had been coordinating with Renee DiResta and the Virality Project and planned to continue to do so: "Well, thank you, Renee, for those kind words. … I do want to say thank you to you personally because you have been a leader in this effort long before many people recognize[d] what was happening with COVID misinformation. You were there looking at the data, looking at the numbers, speaking out, raising the flags, saying

there's something here we've got to address and do so urgently. I have personally learned a lot from your work and from our conversations together, and so I just want to say thank you to you for everything you've done for being such a great partner for moderating our event today, and just for being a partner in the future, because I know we have lots and lots more that we've got to do together."  Waldo Ex. 12, at 12 (Audio Tr. 10).

337.    Dr. Murthy also stated that his team had been "partnered with" the Stanford Internet Observatory over "many months": "myself, my team, we're committed to working with you, Renee, with others … who we've been … partnered with over the last many months…."  *Id.* at 13 (Audio Tr. 11).

**G. The Surgeon General's "Angry" and "Tense" Meetings With Platforms.**

338.    On July 16, 2021, the New York Times reported that President Biden publicly stated about Facebook, "They're killing people" by allowing misinformation to spread on its platforms.  Waldo Ex. 14, at 1.

339.    The article reported that "this week, White House officials went further and singled out social media companies for allowing false information to proliferate. That came after weeks of failed attempts to get Facebook to turn over information detailing what mechanisms were in place to combat misinformation about the vaccine, according to a person familiar with the matter."  *Id.*

340.    The same article reported that Jennifer Psaki stated, "We raised for them in our direct channels, of which every administration has always had with every social media platform, that we're seeing this trend."  *Id.* at 2.

341.    The article reported that there had been a series of "talks" between Surgeon General Murthy and Facebook "since January" of 2021—none of which were disclosed in OSG's

interrogatory responses: "Since January, senior White House officials, including the surgeon
general, Dr. Vivek Murthy, have been in talks with the social media company to stop the spread
of false stories about vaccination side effects and other harms." *Id.* at 2. In these "talks," federal
officials demanded Facebook's internal data on misinformation on its platforms: "Despite repeated
requests by the White House, Facebook has not shared even basic data on how much vaccine
misinformation exists and if the company's efforts to stop its spread are working, according to the
person familiar with the talks." *Id.* at 2.

342.    "When administration officials presented data from CrowdTangle, a content
tracking tool owned by Facebook, that showed vaccine misinformation was soaring, company
officials dismissed its accuracy." *Id.* at 2.

343.    In one meeting, Dr. Murthy "angrily" demanded that Facebook censor
misinformation instead of just promoting reliable information: "In another meeting with Dr.
Murthy, … Dr. Murthy angrily said that while the company [Facebook] promoted its efforts to
encourage vaccination, it did not do enough to defend against bad information." *Id.* at 2.

344.    In another "tense" meeting in "late spring," Dr. Murthy repeated similar demands:
"In one tense meeting in the late spring, according to the person familiar with the matter, a
Facebook official responded defensively, 'How do you know if your efforts are working?'" *Id.* at
2.

345.    Waldo agrees that this news report "does not accurately describe … that
introductory call between Nick Clegg, Andy Slavitt, and Dr. Murthy on May 25th of 2021," which
is the only meeting involving Dr. Murthy disclosed in OSG's interrogatory responses. Waldo Dep.
219:17-21; 222:14-23. In those responses, OSG did not disclose Dr. Murthy's "tense" and "angry"
meetings with Facebook during the spring of 2021.

**H.      The Surgeon General Leverages Public Pressure to Increase Censorship.**

346.     On July 21, 2021, five days after the July 16 meeting where "the Facebook folks … had sad faces," *id.* at 226:15-16, Facebook emailed Waldo and Kyla Fullenwider, stating: "We wanted to follow up with you on a few questions you asked in the meeting focused on CrowdTangle, data on the online interventions, and Facebook's borderline content policies," Waldo Ex. 16, at 1.  This referred to the July 16 meeting with Waldo and Fullenwider.  Waldo Dep. 227:3-8.

347.     In the email, Facebook reported back to OSG on "interventions that the team mentioned, some of which specifically create frictions in how people consume information." Waldo Ex. 16, at 1.  These include limiting forwarded WhatsApp messages, placing "warning labels on fact checked content," and creating "friction when someone goes to share these posts on Facebook." *Id.*

348.     Facebook also reported to OSG a series of censorship policies and actions, including the following: "We remove COVID-19 content that contributes to the risk of imminent physical harms, including numerous false claims about the COVID-19 vaccine.  We permanently ban pages, groups, and accounts that repeatedly break our rules on COVID-19 misinformation. We also reduce the reach of posts, pages, groups, and accounts that share other false claims that do not violate our policies but may present misleading or sensationalized information about COVID-19 and vaccines."  *Id.* at 1.  Evidently, OSG's inquiry at the July 16 meeting about "borderline content" related to the censorship of such content.  *See id.*  Waldo agrees that Fullenwider asked Facebook to report back about censorship at the July 16 meeting: "The response indicates that it's about COVID policies including removal, banning and reducing the reach." Waldo Dep. 232:9-11, 233:12-234:1.

349.    On July 16, 2021, Nick Clegg emailed Dr. Murthy and stated, "Dear Vivek, Reaching out after what has transpired over the past few days following the publication of the misinformation advisory and culminating today in the President's remarks about us." Waldo Ex. 17, at 1-2.  He then stated, "I know our teams met today to better understand the scope of *what the White House expects of us on misinformation* going forward." *Id.* at 2 (emphasis added).  Facebook understood the purpose of the meetings was to understand the White House's expectations on misinformation. *See id.*

350.    Clegg indicated that there had been a history of prior discussions with Dr. Murthy and the White House in which federal officials demanded greater censorship—both more stringent policies and greater enforcement—which were not disclosed in OSG's interrogatory responses: "Certainly we understand (and have understood for some time) that there is disagreement on some of the policies governing our approach and how they are being enforced." *Id.* at 2.  Clegg asked for a meeting with Dr. Murthy, who did not immediately respond. *Id.* at 1-2.

351.    On July 18, 2021, having received no response to his email requesting a meeting, Clegg texted Dr. Murthy stating, "I imagine you and your team are feeling a little aggrieved – as is the FB team, it's not great to be accused of killing people – but as I said by email I'm keen to find a way to deescalate and work together collaboratively.  I am available to meet/speak whenever suits." Waldo Ex. 18, at 1.

352.    On July 19, Dr. Murthy responded by email and agreed to a meeting, which was scheduled for July 23, 2021.  Waldo Ex. 17, at 1; Waldo Dep. 241:1-14.

353.    At the July 23, 2021 meeting, "Dr. Murthy asked Mr. Clegg about … the research questions about understanding the reach of the data in terms the impact of the … health

misinformation. And … DJ [Patil] had some questions about also on the data side and Nick [Clegg] offered to connect DJ with a data person from Facebook."  Waldo Dep. 242:8-16.

354.    Later on June 23, 2021, after the meeting between Dr. Murthy and Nick Clegg, Clegg sent a follow-up email to Dr. Murthy stating: "Dear Vivek, if I may, thanks again for taking the time to meet earlier today….. I wanted to make sure you saw the steps we took just this past week to adjust policies on what we are removing with respect to misinformation as well as steps taken to further address the 'disinfo dozen'…." Waldo Ex. 19, at 1.

355.    Clegg's reference to "just this past week" refers to the one-week period between this July 23 email and rollout of the Advisory on July 15 and the President's comment "They're killing people" on July 16. *Id.*; Waldo Dep. 244:14-19.

356.    It is evident that Dr. Murthy and federal officials pressured Facebook for specific censorship actions in the July 23 meeting, because the same day as the meeting, Clegg reported back to them a series of new censorship actions and policies.  First, Clegg reported enforcement actions against the "Disinfo Dozen" whom Jennifer Psaki had publicly demanded censorship: "We removed 17 additional Pages, Groups, and Instagram accounts tied to the disinfo dozen (so a total of 39 Profiles, Pages, Groups, and IG accounts deleted thus far, resulting in every member of the disinfo dozen having had at least one such entity removed)."  Waldo Ex. 19, at 1.  Clegg reported that Facebook was secretly censoring accounts associated with the Disinfo Dozen even if they had not violated Facebook's policies: "We are also continuing to make 4 other Pages and Profiles, which have not yet met their removal thresholds, more difficult to find on our platform."  *Id.*

357.    Clegg also reported that Facebook had amended its censorship policies to make them more restrictive: "We also expanded the group of false claims that we remove, to keep up with recent trends of misinformation that we are seeing."  *Id.*

358.    Clegg also committed to "do more" to censor misinformation in response to federal officials' demands: "We hear your call for us to do more and, as I said on the call, we're committed to working toward our shared goal of helping America get on top of this pandemic." *Id.* Dr. Murthy, evidently, demanded that Facebook "do more" against misinformation on it platforms in the July 23 phone call. *See id.*

359.    Clegg further agreed to accede to federal officials' demands that Facebook make its internal data on misinformation available to federal officials and researchers like Renee DiResta of the Virality Project: "We will reach out directly to DJ to schedule a deeper dive on how to best measure Covid related content and how to proceed with respect to the question around data." *Id.* at 1-2.

360.    Clegg also pledged to report back to Dr. Murthy repeatedly so that federal officials could monitor Facebook's "progress" on censoring misinformation: "We'd also like to begin a regular cadence of meetings with your team so that we can continue to update you on our progress. You have identified 4 specific recommendations for improvement and we want to make sure to keep you informed of our work on each." *Id.* at 2. Clegg also promised to continue sending federal officials regular updated reports on the spread of misinformation on Facebook's platforms. *Id.*

361.    Clegg concluded by promising that Facebook would "strive" to meet federal officials' expectations on censorship: "we will strive to do all we can to meet our shared goals." *Id.*; *see also* Waldo Dep. 245:6-247:4.

362.    Waldo agrees that Clegg's statement "We hear your call for us to do more" in the July 23 email is an accurate understanding of the Surgeon General's message from the July 15 press conference, the Health Advisory, and the July 15 rollout at Stanford Internet Observatory: "Yes. I think, as we've established, the advisory and … the remarks, and the event with the Stanford

Internet Observatory, Dr. Murthy is calling on … social media companies to do more to address the problem of health mis- and disinformation."  Waldo Dep. 251:6-12.

363.    After the July 23 email, Waldo connected Brian Rice of Facebook with DJ Patil to discuss data-sharing to monitor social-media misinformation between Facebook and federal officials.  *Id.* at 252:9-19.

364.    Additionally, on the July 23 call with Nick Clegg, the OSG specifically asked Facebook to report back on any additional steps they were taking in response to the Health Advisory to increase censorship of misinformation on their platforms.  Waldo Ex. 21, at 1.  On August 6, 2021, Waldo emailed Brian Rice and Nick Clegg of Facebook and stated, "I know on the call with Dr. Murthy he'd mentioned seeing if you were able to send an update of any new/additional steps you are taking with respect to health misinformation in light of the advisory." *Id.*  Waldo noted that "we are asking all platforms for this type of update." *Id.*  Waldo asked for a report from Facebook within two weeks: "Would you be able to send something over within two weeks?"  *Id.*

365.    In the same email, Waldo connected Facebook with DJ Patil of the White House "on next steps for connecting on data."  *Id.*

366.    Facebook responded that it was planning "additional steps" to increase censorship of misinformation, and promised to report back to the Surgeon General in 2 weeks: "Our teams have been working on additional steps—we will have something back to you within two weeks outlining our approach."  *Id.*  Facebook also followed up with Patil to schedule the meeting about using Facebook's internal data to monitor speech on its platforms.  *Id.*

367.    Waldo admits that, during the July 23 call, "we asked for an update," and that it was probably Dr. Murthy who asked for it.  Waldo Dep. 256:20-23.

368.     Waldo does not dispute that he asked "all platforms" to provide a similar "update" on new or additional steps to censor misinformation in light of the Advisory, and that "all platforms" means "Facebook, Twitter, Instagram, and YouTube, and Google."  *Id.* at 257:10-258:9.

369.     On July 19, 2021, a few days after the President's "They're killing people" comments, Rob Flaherty of the White House emailed Dr. Murthy to put him in touch with an operative for the Democratic National Committee who works on misinformation and disinformation issues.  Waldo Ex. 22, at 3.  Flaherty wrote: "Vivek – wanted to link you with Jiore Craig, who's been a critical leader of the DNC's misinfo work for a long time, but also has been helping us think through mis/dis on the COVID side.  I thought it would be great for you both to connect as OSG charts out next steps."  *Id.*  Eric Waldo followed up to schedule a Zoom meeting on July 22 between Ms. Craig of the DNC and key members of the OSG's staff.  *Id.* at 1.

370.     On August 18, 2021, Facebook again reported back to OSG about additional censorship actions against misinformation "superspreaders."  Waldo Ex. 24, at 1.  Facebook stated, "Eric and DJ – flagging this post for you and for Surgeon General Murthy.  This details how we are approaching content from the disinfo dozen."  *Id.*  Facebook sent the same update to Rob Flaherty of the White House on the same day.  *Id.* at 2.

371.     The post was entitled, "How We're Taking Action Against Vaccine Misinformation Superspreaders."  *Id.* at 1.  The post detailed a long list of censorship actions taken against the "Disinfo Dozen," including removing over three dozen pages, groups and accounts linked with them; imposing additional penalties on another two dozen pages, groups, and accounts linked with them; applying penalties to some of their website domains so that third parties posting their content will be deamplified; and removing the remaining violating content.  *Id.* at 1.

372.    As Waldo acknowledges, this was the "second report that Facebook has sent [OSG]
after that July 23rd meeting where they're reporting back about actions taken against the Disinfo
Dozen." Waldo Dep. 268:12-16.

373.    On August 20, 2021—two weeks after the August 6 email in which Waldo had
requested a report within two weeks on Facebook's new or additional steps to remove
misinformation in light of the Health Advisory—Nick Clegg sent a long, detailed email to Dr.
Murthy, Waldo, and DJ Patil, detailing Facebook's additional censorship actions taken as a result
of the Advisory. Waldo Ex. 25, at 1-3.

374.    In the August 20 email, Clegg noted that Dr. Murthy had "asked for an update on
existing and new steps that Facebook is taking." *Id.* at 1. Clegg noted that Facebook was taking
new steps in response to the pressure from the White House and Surgeon General since July 15
and 16: "In this update, we describe … further policy work to enable stronger action against
persistent distributors of vaccine misinformation." *Id.*

375.    In a lengthy section headed "Limiting Potentially Harmful Misinformation," Clegg
provided five bullet points and four sub-bullet points detailing expanded efforts of censorship by
Facebook taken in response to the Advisory. *Id.* at 2. These included, among others, " expanding
our COVID policies to further reduce the spread of potentially harmful content"; "increasing the
strength of our demotions for COVID and vaccine-related content that third-party fact-checkers
rate as 'Partly False' or 'Missing Context'"; "making it easier to have Pages/Groups/Accounts
demoted for sharing COVID and vaccine-related misinformation"; and "strengthening our existing
demotion penalties for websites that are repeatedly fact-checked for COVID or vaccine
misinformation content shared on our platform." *Id.* at 2. Clegg also included a report of
additional actions taken against the Disinfo Dozen. *Id.* Clegg also reporteded that Facebook

"continue[s] to experiment with signals that we can use … to demote content that we predict will
contain low quality information."  *Id.*

376.     In another long section entitled "Increasing Transparency," Clegg detailed a list of
actions taken by Facebook to share data about the reach of misinformation on its platforms, per
federal demands.  *Id.* at 2-3; *see also*  Waldo Dep. 269:20-277:8 (reviewing the content of the
August 20 email in detail).

377.     Waldo agrees that this email is "a report back to [OSG's] request for report in two
weeks related to actions they took in respect to the advisory."  Waldo Dep. 270:19-23.

378.     Waldo responded to Clegg by stating that "we look forward to continuing to move
forward together with urgency and solutions during these extraordinary times."  Waldo Ex. 25, at
1. The phrase "urgency and solutions" was intended to push Facebook to increase its anti-
misinformation efforts: "I was hoping that Facebook would continue to move. Urgency means,
you know, that they would take this seriously, and solutions means that they would also come with
real solutions to the problems and not just pretend to solve problems."  Waldo Dep. 277:23-278:3.

379.     Three days later, on August 23, 2021, Rob Flaherty of the White House emailed
Facebook, asking for a report on how they intended "to promote" the FDA's approval of the Pfizer
vaccine and noting that the White House "[would] appreciate a push" of the vaccine information
using specific "suggested language from [the White House]."  Waldo Ex. 27, at 2.  Facebook
responded the same day with an additional report on new steps to remove vaccine misinformation:
"We're … updating our misinformation policies to remove the specific claims that 'there are no
FDA-approved vaccines' and 'the Pfizer vaccine is not FDA-approved.'  We'll also continue to
look for claims that are no longer accurate given the approval today."  *Id.* at 1.  Facebook forwarded

this report on increasing censorship to Waldo at OSG as well. *Id.*; *see also* Waldo Dep. 280:1-281:24.

380.    On September 18, 2021, Facebook sent Eric Waldo and Rob Flaherty another bi-weekly report, and also noted that "I'm sure you also saw yesterday's story in the WSJ about the spread of COVID-19 misinformation in comments on Facebook," which Facebook disagreed with and offered to discuss. Waldo Ex. 30, at 1. Flaherty responded, "Happy to talk about it, Brian. Would be interested to see, as we have long asked for, how big the problem is, what solutions you're implementing, and how effective they've been." *Id.* Facebook promised, "we will circle back over the next few days to brief." *Id.*

381.    On September 29, 2021, Google emailed Eric Waldo to "share an update we recently made to YouTube's policies pertaining to vaccine-related misinformation." Google reported: "We just announced that we will be introducing a new policy that prohibits content that includes harmful misinformation about the safety, efficacy, or ingredients for currently administered vaccines…" Waldo Ex. 31, at 1.

382.    On October 19, 2021, Rob Flaherty emailed Facebook, copying several White House officials and Eric Waldo, and asked Facebook to "connect on what the admin's plans are for the 5-11 vaccine rollout." Waldo Ex. 32, at 1. The "5-11 vaccine rollout" refers to the approval of vaccines for children ages 5 to 11 years old. Waldo Dep. 298:20-23.

383.    Flaherty requested that Facebook report on its censorship plans for claims on social media about the authorization of vaccines for children ages 5 to 11: "We'd like to talk about what we're seeing as the biggest headwinds we're going to face, and discuss what you all are planning as we move into this next phase. We remain concerned about mis- and disinformation on feed and

groups, and the wide reach of hesitancy-inducing content across your platform."  Waldo Ex. 32, at 1.

384.    Facebook responded, agreeing to the meeting: "we'd welcome the opportunity. Adding Felicia on our end to help coordinate."  Waldo Ex. 32, at 1.

385.    Waldo states that he does not recall whether this meeting occurred or if he participated, but he agrees that the meeting probably occurred: "Probably.   If they added schedulers, usually those meetings happen."  Waldo Dep. 300:14-23.

**I. The Surgeon General and White House Hammer Facebook.**

386.    On October 28, 2021, the Washington Post ran a story based on information from Frances Haugen reporting that "Facebook researchers had deep knowledge of how coronavirus and vaccine misinformation moved through the company's apps, according to documents disclosed by Facebook whistleblower Frances Haugen."  Waldo Ex. 33, at 1.

387.    In response to the article, on October 29, Surgeon General Murthy issued a series of Tweets from his official Twitter account demanding that Facebook increase censorship and give outside researchers access to its data.  Waldo Ex. 33, at 1.  In the Tweet thread, Dr. Murthy stated: "I was deeply disappointed to read this story. Health misinformation has harmed people's health and cost lives. In the Surgeon General's Advisory on Health Misinformation, I stated clearly that tech platforms have a responsibility to improve our health information ecosystem.  What continues to be lacking from Facebook and other tech companies is transparency and accountability. Only the companies understand the full extent of misinformation's spread and impact – yet they have not yet shared this data with independent researchers and the public. Without this critical data, it is much harder to design the right interventions or hold the platforms accountable. … We must demand Facebook and the rest of the social media ecosystem take responsibility for stopping health

misinformation on their platforms. The time for excuses and half measures is long past. We need transparency and accountability now. The health of our country is at stake." *Id.* Dr. Murthy repeated the mantras "transparency" and "accountability," threatening that the federal government would "hold the platforms accountable" for misinformation. *Id.*

388.    This Tweet thread reflects Dr. Murthy's own words, as he "made the final and substantial edits" to the Tweets. Waldo Dep. 303:25-304:17.

389.    Waldo agrees that the Twitter thread demands "transparency and accountability around health misinformation, especially vis-à-vis the social media organizations," and "demands that Facebook and the other platforms do more" to "stop[] health misinformation." *Id.* at 305:6-22. "Lots of work went into" crafting that message, according to Waldo. *Id.* at 306:7-8.

390.    On October 28, 2021, the same day as the Washington Post article, Rob Flaherty emailed Brian Rice of Facebook a hyperlink to the article. The only text in the email was the subject line, which stated: "not even sure what to say at this point." Waldo Ex. 35, at 1-2.

391.    Facebook responded to Flaherty by stating, "nothing in the story is inconsistent with what we briefed on," and providing its account of the facts underlying the story. *Id.* at 1. Facebook then forwarded this response to Waldo and the OSG, noting that "I saw the Surgeon General's reaction on Twitter," and asking for "a longer conversation next week" about the issue. *Id.*

392.    Waldo describes both the Surgeon General's public Tweet threat, and Rob Flaherty's private email to Facebook, as different ways of "hitting up Facebook" about the Frances Haugen article: "this was one of the most popular articles in all of news that week, so I'm not surprised that people who care a lot about this issue were certainly hitting up Facebook about it." Waldo Dep. 307:13-22.

393.    On October 28, 2021, Nick Clegg also emailed Dr. Murthy and asked for a meeting
to discuss the "intense debate that's been prompted by the documents disclosed by a former
employee." Waldo Ex. 36, at 2. Waldo responded on behalf of the OSG, stating that "we have
seen the recent public reports around Facebook and misinformation. We are certainly concerned
about what we are seeing, given our emphasis on health misinformation in our advisory and the
ongoing conversations our teams have been having. As has been the case, you'll continue to see
us raising the issue of health misinformation in public and in private as a critical public health
issue." *Id.* at 1.

394.    Regarding his reference to "in private," Waldo admits that this refers to "closed-
door meetings" with platforms like Facebook: "in the government, you're not always just doing a
panel that's open press, you're meeting with stakeholders … in closed-door meetings…." Waldo
Dep. 312:13-16. The Surgeon General's Office was continuously pushing for action against health
misinformation "in public and private" meetings with stakeholders: "talking about health mis- and
disinformation was in our talking points of when we talked to stakeholders in public and private."
*Id.* at 313:8-11.

395.    The next day, October 29, 2021, Facebook sent a long email to Rob Flaherty, Eric
Waldo, and several other White House officials referring back to an October 25 meeting about
vaccines for children ages 5-11. Waldo Ex. 37, at 3-4; Waldo Dep. 315:8-316:15. The email
reported to the White House and OSG a "detailed description of [Facebook's] plans" for the
approval of vaccines for children. *Id.* at 4. The plans included immediately updating policies to
censor claims relating to vaccination of children: "As discussed, soon as the EUA is issued, we
will also be able to apply claims from our current misinfo policies for COVID-19 vaccines to
include claims about child vaccinations." *Id.*

396.     Facebook also noted that it was relying directly on the CDC to decide what to censor: "We were able to make this change based on the conversation we had last week with the CDC…. There are several claims we will be able to remove as soon as the CDC debunks them." *Id.*

397.     Facebook then asked federal officials to provide a federal health authority to dictate what content would be censored on Facebook's platforms: "We expect the approval of COVID vaccines for kids aged 5-11 will be another significant peak of new misinformation claims.  Our policy allows us to take action against this content once those claims have been debunked and confirmed harmful by a public health authority.  We're committing to addressing these quickly; to do so effectively, we will need a channel to a health expert with whom we can discuss these claims in real time.  Is this something we could partner on, and if so, would your team be able to connect us with a point person?" *Id.*

398.     On November 4, 2021, Facebook followed up again to OSG and the White House with additional reports of censoring misinformation: "Last Friday, we updated our misinformation policies for COVID-19 vaccines to make clear they apply to claim about children," identifying a list of specific claims. *Id.* at 1.

399.     Facebook made clear that the CDC was serving as the "health expert" who was dictating what could be said on Facebook's platforms "in real time": "We're grateful to our partners at the CDC for helping get these debunked in advance of the announcement, and we look forward to staying connected on emerging COVID misinformation trends." *Id.* at 1, 3.

**J.     The Surgeon General Threatens Regulation to Increase Censorship.**

400.     On December 21, 2021, Dr. Murthy gave a podcast on the Omicron variant in which he again publicly threatened to hold the social-media platforms "accountable" for not censoring

misinformation: "number one, we have to track down where this misinformation is coming from

and understand how to hold platforms accountable, new technology platforms that are driving so

much of the misinformation spread…. [B]y allowing this misinformation to proliferate on their

sites, they're subjecting people in the United States and around the world to extraordinary harm,

and they're doing so with little accountability at this moment and really with very little

transparency. That can't be allowed to continue because it's putting everyone's health at risk."

Waldo Ex. 38, at 4 (Audio Tr. 7).

401.    Dr. Murthy demanded "aggressive action" from the platforms to censor speech: "I

do think that part of what they have to do, the platforms is take aggressive action against people

who are intentionally spreading misinformation." *Id.*

402.    Waldo agrees that this message is "consistent with his previous statements as well

as the content within the advisory itself." Waldo Dep. 321:22-24.

403.    As Waldo concedes, Dr. Murthy's threat to hold platforms "accountable" and his

demand for "aggressive action" to censor misinformation "is consistent with the messaging we've

reviewed all day today of the advisory, the rollout, the public statements" by OSG. *Id.* at 322:22-

24.

404.    On January 3, 2022, Dr. Murthy participated in Alyssa Milano's podcast. Waldo

Ex. 39, at 1. In the podcast, Dr. Murthy stated that the "sophistication with which this

misinformation is spreading is truly unprecedented, and a lot of has been enabled by technology

platforms in the social media which enable the spread, and … the platforms need to do a lot more

is step up, to be accountable for making their spaces safer." *Id.* at 3 (Audio Tr. 2). He also stated,

"finally, I just want to come back to the technology companies for a moment here, because unless

those platforms step up and make their spaces safer and reduce the amount of misinformation on

their site, it's going to be pretty tough to get a full handle on this spread of misinformation." *Id.* at

5 (Audio Tr. 4).

405.     Immediately after these comments, the podcast broadcast public comments by

President Biden, stating: "Joe Biden: The unvaccinated are responsible for their own choices, but

those choices had been shulled [*sic*] by dangerous misinformation on cable TV and social media.

You know, these companies … are making money by ped[dling] lies and allowing misinformation

that can kill their own customers and their own supporters. It's wrong. It's immoral. I call on the

purveyors of these lies and misinformation to stop it. Stop it now." *Id.*

406.     Waldo agrees that this podcast is "aligned with … the advisory and the other public

statements we've seen so far." Waldo Dep. 327:8-10.

407.     Dr. Murthy also called for the platforms to "go after people who are superspreaders

of misinformation on these sites," which Waldo agrees is "entirely consistent … with the messages

that Dr. Murthy was sharing about health mis- and disinformation." *Id.* at 329:23-330:18.

408.     On February 14, 2021, Dr. Murthy participated in a panel discussion hosted by the

Rockefeller Foundation. Waldo Ex. 41. Dr. Murthy stated, "what feels different in this moment

compared to ten years ago or [twenty] years ago is this speed, scale, and sophistication with which

this misinformation is spreading and much of it has been enabled, in fact, by technology platforms,

and we talk to people about where they're encountering misinformation. It's off and on social media

channels and other tech platforms. … We need certainly technology companies to step up and do

more, to help reduce this spread of misinformation, and to be transparent with the public about

how much misinformation is being transacted on their sites and whether their methods of

addressing it are working or not. We do not have enough transparency on that front and that is

hindering us in our response of misinformation." *Id.* a 6-7 (Audio Tr. 9-10).

409.    Waldo agrees that this is "a consistent message with what we've seen in previous public statements, interviews, as well as the advisory itself."  Waldo Dep. 331:23-25.

410.    In the same panel, Dr. Murthy stated that there is a role for government to set "safety standards" when it comes to misinformation, which directly suggests government regulation and foreshadowed the OSG's forthcoming Request for Information (RFI): "And, of course, there's a role for government here as well to set safety standards, to push for transparency and accountability, particularly from platforms."  Waldo Ex. 41, at 8 (Audio Tr. 11).  Dr. Murthy then immediately foreshadowed the OSG's forthcoming Request for Information (RFI) as a step toward government "setting safety standards": "There are steps we are working now that we will be -- you know, have more to say about it in the … coming weeks and months ahead, to try to, in fact, gather even more information about the impact of health misinformation on health professionals of the public and also in the role that technology companies may be playing on that on that front."  *Id.* Less than a month later, the OSG issued a formal RFI for information about misinformation on social media platforms.

411.    On March 3, 2021, the OSG issued a formal RFI in the Federal Register, seeking information from social-media platforms and others about the spread of misinformation on social media.  Waldo Ex. 42 (87 Fed. Reg. 12712).  The RFI is entitled, "Impact of Health Misinformation in the Digital Information Environment in the United States Throughout the COVID–19 Pandemic Request for Information (RFI)."  *Id.* at 1.

412.    "Kyla [Fullenwider] was the primary driver on the RFI from a content expert perspective."  Waldo Dep. 338:22-23.  Though she was employed at U.S. Digital Response, "she was doing work on behalf of the Surgeon General."  *Id.* at 340:8-9.  Kyla Fullenwider is also

responsible for receiving and reviewing the responses to the RFI.  *Id.* at 362:6-10.  "Kyla was the subject matter expert who was guiding this RFI process."  *Id.* at 362:15-17.

413.    The RFI defines "technology platforms" very broadly, indicating that the Surgeon General is expanding its attempts to control the spread of so-called "misinformation": "Technology platforms include the following: General search engines, content sharing platforms, social media platforms, e-commerce platforms, crowd sourced platforms, and instant messaging systems."  Waldo Ex. 42, at 2; *see also* Waldo Dep. 341:14-342:7.

414.    Under the heading "Information About Technology Platforms," the RFI seeks a long series of detailed information about misinformation on such platforms, including "Information about how widespread COVID–19 misinformation is on individual technology platforms," Waldo Ex. 42, at 2; "any aggregate data and analysis on the prevalence of COVID–19 misinformation on individual platforms including exactly how many users saw or may have been exposed to instances of COVID–19 misinformation," *id.* at 2-3; and "[a]ny aggregate data and analysis on how many users were exposed, were potentially exposed, or otherwise engaged with COVID–19 misinformation," *id.* at 3.

415.    The RFI also seeks detailed information about censorship policies and how they are enforced: "Information about COVID–19 misinformation policies on individual technology platforms," and "[a]ny aggregate data and analysis of technology platform COVID–19 misinformation policies including implementation of those policies and evaluations of their effectiveness."  *Id.* at 3.

416.    The RFI also seeks detailed information about disfavored *speakers* on social-media platforms, requesting "[i]nformation about sources of COVID–19 misinformation," including "[i]nformation about the major sources of COVID–19 misinformation associated with exposure."

*Id.* at 3.  The RFI makes clear that "source" refers to *speakers* on platforms: "By source we mean

both specific, public actors that are providing misinformation, as well as components of specific

platforms that are driving exposure to information."  *Id.* at 3.

417.    Especially in light of Dr. Murthy's prior public statements about the government

"setting safety standards" for misinformation, Waldo Ex. 41, at 8 (Audio Tr. 11), the RFI carries

a clear implied threat of future regulation against the social-media and other technology platforms.

418.    Contemporaneous media coverage portrayed the RFI as a "demand" for

information from platforms.  *See, e.g.,* Waldo Ex. 44, at 1 (Brad Dress, *Surgeon General Demands*

*Data on COVID-19 Misinformation from Major Tech Firms*, The Hill (Mar. 3, 2022, 11:24 am)).

419.    Max Lesko, the Surgeon General's Chief of Staff, also sent the RFI to several major

tech platforms with a formal letter requesting that they respond.  Waldo Dep. 348:20-22.  He sent

nearly identical letters to Facebook, Google, LinkedIn, Twitter, YouTube, and Microsoft.  Waldo

Exs. 46, 47, 48, 49, 50, 51.  Each letter was directed to the CEO of the platform over General

Murthy's signature.  *Id.*

420.    Each letter stated, "The proliferation of health misinformation during the pandemic

has been both extensive and dangerous. … It is clear that we must do everything we can to address

this threat."  *Id.*  Each letter referred to the July 15, 2021 Health Advisory, noting that "a large

proportion of health misinformation is spread through technology platforms," and "my Advisory

includes a call for technology companies to join this broader effort to create a safer, healthier

information environment."  *Id.*  Each letter advised the social-media platforms of the RFI, and

formally "request[ed] that your company contribute to the RFI….  Specifically, I am requesting

responses from companies about the extent and spread of COVID-19 misinformation on their

technology platforms, policies to address COVID-19 misinformation and their effectiveness, [and] sources of COVID-19 misinformation…." *Id.*

421.    On May 3, 2022, Facebook notified the White House and OSG that it had "filed a response to the Surgeon General's rfi on Covid misinformation and would be happy to discuss at the appropriate time." Waldo Ex. 54, at 2. To date, the OSG has never made this or any other the responses to its RFI public.

422.    Shortly after the RFI was issued, on March 11, 2022, GQ magazine published an interview with Dr. Murthy. Waldo Ex. 52. In this interview, Dr. Murthy stated, "we all have a responsibility to do everything we can to reduce the spread of misinformation… Whether you have one million followers on social media, or you've got 10 followers, we all have platforms and people in our lives who trust us." *Id.* at 6. He called on platforms like Spotify (which was then being criticized for hosting Joe Rogan's podcast) to censor health misinformation: "If you're running a platform, whether it's a Spotify or another social media platform, you've got to think about, how do I create a healthy information environment here? How do I create rules and a culture that promotes accurate information?" *Id.* He emphasized that "a platform has the ability, the opportunity, and the responsibility to create rules and a culture that supports the dissemination of accurate information and that reduces the spread of misinformation." *Id.* at 7.

423.    Echoing his prior comments about "setting safety standards" by government, Dr. Murthy compared censorship "rules" for misinformation to speed limits: "We have speed limits on the road because we know that sometimes if you drive too fast, that can have an impact on somebody else's health and wellbeing. If we're going to live together in a society, we've got to take steps and observe certain rules to help protect other people. That's true here as well. Platforms

have an opportunity to help shape that environment in their own way. We all do. That's our
responsibility at a time like this." *Id.*

**K. The White House and Surgeon General Continue Oversight of Censorship.**

424.    On June 22, 2022, Facebook again emailed Waldo, Rob Flaherty, and other White
House officials with an update on Facebook's increased censorship.  Waldo Ex. 53, at 1.  In the
email, Facebook stated that it "[w]anted to ensure that you were aware of our policy updates
following the early childhood vaccine approvals.  As of today, all COVID-19 vaccine related
misinformation and harm policies on Facebook and Instagram apply to people 6 months or
older…." *Id.*  Facebook indicated that it had again relied on the CDC to dictate what claims people
can post on Facebook: "We expanded these policies in coordination with the CDC and ensured
that we also included false claims that might be connected to children…." *Id.*

425.    Throughout this period, at the federal officials' request, Facebook continued to send
bi-weekly "Covid Insights Reports" reporting on COVID-19 related misinformation on its
platforms to the White House and OSG.  *See, e.g.,* Waldo Ex. 54, at 2-4.  In the spring of 2022,
Facebook repeatedly asked the federal officials if it could discontinue or reduce the frequency of
these reports, which it had been sending for over a year.  *Id.* at 2.  Finally, on June 13, 2022,
Facebook notified the White House and OSG that "we will plan to discontinue these unless we
hear from you that this information continues to be valuable." *Id.* at 1.  Rob Flaherty responded
the same day, requesting that Facebook continue to send the reports and further asking Facebook
to report on how it would handle misinformation for early-childhood (under age 5) vaccines: "It
would be helpful to continue to get these as we start to ramp up under 5 vaccines.  Obviously, that
has a potential to be just as charged.  Would love to get a sense of what you all are planning here."

*Id.* Facebook continued to send the reports as requested, including two reports on July 17, 2022, and promised to continue sending them. *Id.*

## IV.    The CDC and the Census Bureau: BOLO and Authoritative Fact-Checking.

426.    In addition to the public and private pressure campaigns from the White House and the Surgeon General's Office, the CDC and the Census Bureau have engaged in a long censorship campaign together, enabled by the White House's pressure on platforms to cooperate with the federal government.  Working closely with Census, the CDC flags supposed "misinformation" for censorship on platforms (sometimes using the acronym "BOLO," "Be On the Lookout"), and exercises full authority to dictate what health claims will be censored on social media platforms.

### A.    The CDC's Regular Communication with Social Media Platforms.

427.    Carol Crawford is the division director for the division of Digital Media within the CDC Office of the Associate Director for Communication.  Crawford Depo. 11:7-9.

428.    According to Crawford, her "division provides leadership for CDC's web presence. We provide leadership for CDC's social media presence." *Id.* 11:14-16.  Crawford is "the director of that work. I determine strategy, objectives, oversee work." *Id.* 11:21-22.

429.    Before April 2022, Crawford was "the branch chief of the Digital Media Branch within the Division of Public Affairs, and most of the roles that our division currently performs, web and social media, were in that branch." *Id.* 15:3-6.

430.    Crawford is "the main person that was the CDC point of contact to talk to Facebook, Twitter and the platforms since our job was to lead digital media." *Id.* 249:1-4.

431.    Crawford has regular contact with social-media platforms, especially about COVID-19 issues: "We started regular contact with the [platforms] at the beginning of the COVID

outbreak to exchange information about COVID, and most of the contact since then has been around COVID or other high-priority things, but mostly COVID." *Id.* 16:13-17.

432.    Crawford had only "very occasional" contacts with the platforms before COVID-19, *id.* 17:8-9; but then she and the CDC "started talking to some of them in February and March of 2020," at the beginning of the pandemic. *Id.* 18:5-6.

433.    At this time, CDC leaders were asking Crawford's group if they were in contact with the platforms: "there were a lot of people asking staff, or other staff, are we -- were we in contact with the groups, and do we have any arrangements." *Id.* 18:19-23.

434.    Crawford communicated with platforms by email, phone, and in meetings and calls. *Id.* 20:1-19.  She "had points of contact at several of them, and we would have meetings when we needed to talk.  So we arranged calls." *Id.* 20:17-19.

**B.    CDC's and Census's Pressure and Collusion With Facebook/Meta.**

435.    On February 6, 2020, Facebook emailed State Department officials, noting that "Facebook has taken proactive as well as reactive steps to control information and misinformation related to Corona virus which includes … removal of misinformation."  Crawford Ex. 2, at 4.  The email was forwarded to Crawford, who reforwarded to her contacts at Facebook.  *Id.* at 3. Facebook proposed to Crawford that "Facebook team would create a Coronavirus Page serving up content that exists on other organizations' FB pages including the CDC," and would direct users to "curated content from trusted sources."  *Id.* at 3.

436.    On February 7, 2020, Crawford agreed to the proposals, and she also proposed that "There could be times we might want to address widespread myths like mask use or new issues." *Id.* at 2.  She discussed with Facebook the same day.  *Id.* at 1.

437.    On March 3, 2020, Facebook emailed Crawford and noted that Facebook intended
to "support governments … with their response efforts on COVID-19," including the "goal" to
"remove misinformation."  Crawford Ex. 3, at 1.

438.    Crawford "talked pretty regularly" with Facebook "around this time," *i.e.*, March
2020.  37:7-9.

439.    Crawford recalls having discussions of misinformation with Facebook "in the fall
of 2020."  Crawford Dep. 38:7-8.  These included discussions of how to combat "growing"
misinformation about COVID-19: "I can recall us generally saying things to the effect of …
misinformation is really growing, or … what do you think we could be doing to address it? That
kind of conversation."  *Id.* 38:11-15.

440.    On January 25, 2021, Facebook emailed Crawford the first of an ongoing, biweekly
series of CrowdTangle reports, which report on "top engaged COVID and vaccine-related content
overall across Pages and Groups."  Crawford Ex. 6, at 2.  The email emphasized in bold the anti-
vaccine content listed in the report, including "Reports of healthcare workers refusing the vaccine,"
"Posts about alleged vaccine-related deaths," and "News and reports of severe vaccine side
effects."  *Id.*  Facebook indicated that it was sending this report in response to a prior conversation
with Crawford in which such data was requested: "I am following up on our conversation several
weeks ago about providing more detailed reporting from our CrowdTangle team."  *Id.*

441.    Crawford responded that the report "looks wonderful and much appreciated."  *Id.*
at 1.  She said that she "will be extending our distribution list" for the report.  *Id.* at 1.  She also
noted, "One group we'll be adding" to the distribution list for the CrowdTangle reports "is the
Census group who hopefully will soon start their project with us."  *Id.*  And she stated, "the wide
group of those looking at misinfo will want this."  *Id.*

442.    CrowdTangle is "a social media listening tool for Meta properties … [l]ike Instagram and Facebook." Crawford Dep. 50:3-6.  "[S]ocial media listening reports show themes … of discussion on social media channels." *Id.* 52:10-12.  The CrowdTangle report is "a search of content on social media, and a summary of the higher volume conversations." *Id.* 53:8-10.  It is "a report of the most talked about topics on social media during this time period." *Id.* 54:13-15.

443.    The CrowdTangle reports that Facebook regularly emailed to CDC were only one of two forms of access to CrowdTangle.  Since "March or April 2020," Facebook had also allowed CDC to "directly log into CrowdTangle and run our own reports or searches." *Id.* 77:9-13.

444.    According to Crawford, the CrowdTangle reports "would help us understand what was being discussed on social media about COVID, which helps us look for gaps in information, confusion about facts, things that we might need to adjust our communication materials for." *Id.* 57:24-58:3.

445.    Crawford confirms that the CDC had privileged access to CrowdTangle from early 2020, and government officials used the non-public "social media listening tool" to monitor and track private speech about COVID-19 on social media: "we had access to go in directly to CrowdTangle and run in reports … from early 2020. … And I mentioned that our research team … searched in it and looked in it to create their reports, and I believe other teams did too." *Id.* 147:12-18.

446.    The CDC also used other "social media and listening tools" to monitor Americans' speech on social media: "we did searches in CrowdTangle, the same way we do searches in other social media and listening tools that we have to create, to understand what's being discussed in the environment, to update our communication material." *Id.* 148:11-15.

447.    The CDC's "listening tools" included "Meltwater reports," where "Meltwater is sort of like CrowdTangle but for all the platforms." *Id.* 154:13-16.  But CrowdTangle is superior to Meltwater for monitoring Facebook and Instagram because it provides privileged access to some online speech: "CrowdTangle can see more on the Meta properties.  So it's nicer if you're just looking at Meta properties.  Meltwater gives you social media at large." *Id.* 154:24-155:2.

448.    Related to the bolded categories of supposed misinformation in Facebook's CrowdTangle report, Crawford claims that she does not have specific recollection about the issues, but she admits that "I do recall generally discussing misinformation with Facebook around this time." *Id.* 58:11-13.

449.    Crawford added Census Bureau officials to the distribution list for the CrowdTangle reports because "[t]hey were going to start working with the CDC regarding misinformation." *Id.* 58:19-20; *see also id.* 61:11-12 ("At some point I recall adding Census to the distr[ibution]").

450.    From then on, Facebook regularly sent Crawford biweekly "CrowdTangle content insights report[s]." Crawford Ex. 7, at 1-4.  With each report, Facebook would highlight in bold the high-engagement misinformation-related issues for the CDC from the two-week period. *Id.* In each email, Facebook would introduce these misinformation-related posts by noting something like, "However, posts falling into the following themes also garnered high engagement." *Id.*

451.    The CrowdTangle reports survey content that is not publicly available, such as "personal Group posts." *Id.* at 2.

452.    Crawford is "sure that general discussions" with Facebook addressed "that there was a lot of information on vaccines, which is one of the bolded words [in the CrowdTangle Reports], for example. I am sure that did occur." Crawford Dep. 64:19-22.

453.    On January 27, 2021, Facebook sent Crawford a recurring invite to a "Facebook weekly sync with CDC (CDC to invite other agencies as needed)."  Crawford Ex. 36, at 1.  A large number of Facebook and CDC officials were included on the invite, including Liz Lagone, Facebook's content-moderation officer who communicated with the CDC.  *See Id.*  The agenda for the recurring meeting included "Misinfo collab status."  *Id.*  It also included "CDC needs/questions."  *Id.*

454.    Crawford confirms that CDC frequently had weekly meetings with Facebook: "There were definitely times that we were talking weekly."  Crawford Dep. 226:20-21; *see also, e.g.,* Crawford Ex. 39, at 1 (recurring calendar invite for a meeting with the same agenda and participants on May 6, 2021).

455.    On March 10, 2021, Crawford sent Facebook an email seeking information about "Themes that have been removed for misinfo."  Crawford Ex. 44, at 3.  She stated, "We mentioned this on the call last week and you said you'd be sending something as other had asked – is that available yet by chance?"  *Id.* She clarified: "You mentioned that WH and HHS had asked so you'd get it to us," and responded "Yes" to Facebook's question, "Are you looking for types of COVID-19 misinfo we remove?"  *Id.*

456.    Facebook noted, that "[w]e are setting up a meeting with WH/HHS to discuss more likely later this week or early next.  Perhaps a CDC rep could participate…."  Crawford Ex. 44, at 2.  Crawford noted, "They want to see what you guys proactively have removed that might not be in those [CrowdTangle] reports….  My guess is a short meeting with Lis Wilhelm['s] vaccine confidence team is what is needed if FB is willing to do it."  Crawford Ex. 44, at 2.

457.    In this exchange, CDC was "wondering if [Facebook] had info on the types of posts that were removed and the themes because they were worried that we could only see the live posts

and so we wouldn't know if there was also confusion about other areas that had been removed." Crawford Dep. 258:6-11.  CDC had "asked on the meeting if they had this data, like, because we wanted it. And I think she said, Oh, we did something like this for the White House or HHS." *Id.* 260:6-9.

458.    From this, Crawford understood that HHS and the White House were having similar meetings with Facebook: "I do think that they did have meetings with the agencies." *Id.* 261:10-11.

459.    On March 25, 2021, Crawford and other CDC officials met with Facebook.  Ex. S, at 1.  The day before the meeting, March 24, 2021, Facebook emailed Crawford and noted, "[a]s we discussed last week, we will present on COVID-19 misinformation on this session/meeting and have some of our team that is focused on that workstream provide a briefing on the current policies and approach as well as the current trends we are identifying." *Id.* at 2.  The official also noted that Facebook would have a "Misinformation Manager" and Liz Lagone, a content-moderation official for Facebook who "will be leading from our side on misinformation briefing for your team. They all work on our COVID-19 policies." *Id.* at 1.  Crawford responded, attaching a Powerpoint slide deck and stating, "This is a deck Census would like to discuss and we'd also like to fit in a discussion of topic types removed from Facebook." *Id.*  She also noted that two Census Bureau officials (Zack Schwartz and Jennifer Shopkorn) and two Census Bureau contractors (Sam Huxley and Christopher Lewitzke) would attend the meeting.  *Id.*

460.    The "deck Census would like to discuss" was attached to the email, *id.* at 3-16, and it contained an overview of "Misinformation Topics" including "concerns about infertility, misinformation about side effects, and claims about vaccines leading to deaths." *Id.* at 4.  "These topics were selected due to high volume, continued public discussion, and high-profile coverage,"

according to the slide deck.  *Id.*  For each topic, the deck included sample slides and a statement

from the CDC debunking the supposedly erroneous claim.  *Id.* at 6-14.  The slides were clearly

designed to convince Facebook that such content should be censored.  For example, with respect

to claims of infertility, the deck provided screen shots of six specific posts on Facebook and

Instagram, summarized similar claims, and stated: "According to CDC there is no evidence that

fertility problems are a side effect of any vaccine, including COVID-19 vaccines."  *Id.* at 6-8.  It

also noted that "Several of Facebook's fact check partners have covered this claim."  *Id.* at 6.  The

deck provided a similar debunking treatment for claims about other side effects from COVID

vaccines, *id.* at 9-11, and claims about vaccines leading to deaths, *id.* at 12-14—in each case,

providing six sample posts from real Facebook users as examples of the type of claim, and

providing information designed to ensure that the claim would be censored.  *Id.*

461.    On March 30, 2021, Facebook sent Crawford an email with the subject line, "This

week's meeting."  Crawford Ex. 8, at 3.  Crawford confirms that she was engaging in weekly

meetings with Facebook during this time period, as well as other time periods during the COVID-

19 pandemic: "we were meeting weekly during parts, so I imagine we were."  Crawford Dep. 68:9-

10.

462.    The email indicates that CDC and Facebook were repeatedly discussing

misinformation during these weekly meetings, as Facebook stated to Crawford: "I wanted to

surface any misinfo questions your team may have for the team that I had briefing last time.  They

are available to attend again, but also want to make sure we are answering any of your team's

questions."  Crawford Ex. 8, at 3.

463.    Crawford admits that these weekly meetings involved CDC meeting with

Facebook's *content-moderation* teams: "I do recall [Facebook] bringing in people from their Trust

and Safety or Misinformation teams … to talk to us about misinformation at some weekly meetings." Crawford Dep. 68:24-69:3.

464.    Crawford admits that, in these meetings with Facebook content-moderation team, CDC inquired about how Facebook was censoring COVID-19 misinformation: "we had asked questions about what they were seeing in terms of misinformation and inquired about any activities they were undertaking. And I believe this was an offer to sort of get back to us on any of those questions." *Id.* 69:9-13.

465.    In response, Crawford noted that she was also communicating with Facebook through an alternative channel.  Crawford Ex. 8, at 2 ("I added this part in yellow to our chain on turn.io").  She asked Facebook if they "have thoughts on how we can meet regularly with Census? … am I correct that your team is going to consider how you might want to engage with the CDC/Census team routinely and get back to us?"  *Id.* at 2-3.  She noted to Facebook: "I know you all have experience with Census already."  *Id.* at 3.

466.    At this time, CDC had recently executed an Interagency Agreement with the Census Bureau to assist the CDC in addressing misinformation: "We had entered an IAA with Census to help advise on misinformation."  Crawford Dep. 71:3-4.  Pursuant to this agreement, the Census Bureau provided reports to the CDC on misinformation that the Census Bureau tracked on social media: "they provided reports on misinformation that they were seeing to us."  *Id.* 71:15-17.  "Census did provide [CDC] with the key themes they were seeing around misinformation during the times that they were looking at it."  *Id.* 72:16-19.

467.    An IAA is "an agreement between two agencies to conduct some kind of work between them."  *Id.* 109:23-24.  Under this IAA, CDC was "only engaging" with Census "on COVID misinformation."  *Id.* 110:12-13.  CDC was "learning about how [Census] operated a

general misinformation team." *Id.* 110:13-14.  The IAA "let [CDC] partner with Census to learn

how they handled misinformation and help us with the COVID misinformation. … They seemed

to have more knowledge than we did." *Id.* 111:3-6.

468.    Facebook replied that "it would be great to have questions that may not have been

answered from your team on misinfo.  That team is very busy so it's a good opportunity to di[g]

deeper on that topic and especially if there are areas that are still unclear or the teams have concerns

about." Crawford Ex. 8, at 2.

469.    Crawford responded that CDC "would like to have more info … about what is being

done on the amplification-side," and that CDC "is still interested in more info on how you analyze

the data on removals, etc." *Id.* at 2.  She also noted that Census Bureau was "hoping to go over

the deck they had and discuss how to engage on a more regular basis." *Id.*

470.    Following up, Crawford noted that Census would like to discuss the following

topics: "It looks like the posts from last week's deck about infertility and side effects have all been

removed.  Were those re-evaluated by the moderation team or taken down for another reason?"

*Id.* at 1.  This remark plainly indicates that, in the last week of March 2021, the Census Bureau

was sharing "decks" of posts about COVID-19 misinformation with Facebook, which Facebook

then "removed," and CDC was following up to inquire whether the censorship occurred because

those posts were "re-evaluated by [Facebook's] moderation team" because of Census's flagging,

or for another reason.  Crawford testified that she "cut and pasted" the Census Bureau's inquiries

on these points.  Crawford Dep. 76:10.

471.    Crawford also asked Facebook to give the Census Bureau direct access to log in to

Facebook's CrowdTangle tool: "Can we add the Census Team to CrowdTangle?"  Crawford Ex.

8, at 1.  As Crawford noted, Facebook had "allowed [CDC] to directly log into CrowdTangle and

run our own reports or searches," and she was asking Facebook to let Census "log in to CrowdTangle" as well.  Crawford Dep. 77:4-14.

472.    In the same email, Crawford inquired of Facebook, "One of the main themes we're seeing and from the CrowdTangle report is local news coverage of deaths after receiving the vaccine.  What's the approach for adding labels to those stories?"  Crawford Ex. 8, at 1.  Thus, the CDC inquired of Facebook what its "approach" was to censoring local news stories about vaccine-related deaths.  *Id.*

473.    Crawford asked Facebook "[h]ow should we best engage regularly going forward on the Census/CDC reports."  Crawford Ex. 8, at 1. Crawford notes that Census had already been working with Facebook to address census-related misinformation: "we generally discussed, you know, how we should talk about misinformation because they had already been working with Census, on their own Census misinformation, and I wanted to know what was best for them for engaging on any topics that we might want to discuss."  Crawford Dep. 77:19-24.

474.    Facebook answered that "[w]e are working on a proposal of how to set up a sharing partnership on the misinform[ation] items."  Crawford Ex. 8, at 1.

475.    Crawford also had three-way meetings with Facebook, CDC, and Census about misinformation: "there were meetings where Census, myself and Facebook were on calls," in which they "had general conversations about what were opportunities to address misinformation."  Crawford Dep. 83:6-12.  In those conversations, specific topics like the removal of specific posts discussed in Exhibit 8 "were probably discussed," but Crawford claims she does not "have specific memory of it."  *Id.* 83:12-14.

476.    On April 13, 2021, Facebook followed up by emailing Crawford and proposing to enroll CDC and Census Bureau officials in a special misinformation reporting channel to

Facebook.   Crawford Ex. 10, at 2.   With a subject line "CV19 misinfo reporting channel,"

Facebook wrote, "We're working to get our COVID-19 misinfo channel up for CDC and Census

colleagues," and asked Crawford to confirm "if the below emails are correct for onboarding to the

reporting channel and if there are others you'd like to include." *Id.*  Facebook provided nine

emails, including five CDC officials and four Census officials or contractors, to "onboard" into

the COVID-19 "misinfo reporting channel." *Id.*

477.   The officials who work for Reingold, including Christopher Lewitzke, "were

contractors working with Census."  Crawford Dep. 101:10.

478.   Crawford states that this email refers to the fact that Facebook "has a portal or

reporting channel where you can report misinformation or threats or things from a specific log-in

that I believe they only provide to … federal agencies." *Id.* 91:23-92:2.  The portal allows federal

officials to "log onto Facebook as an administrator, and it's something that they make available to

you as a federal agency." *Id.* 95:17-19.  Crawford understands that this "wasn't something that

was generally available" to the public but was only provided to federal officials. *Id.* 96:15-16.

479.   Crawford recalls that a CDC official logged into this portal and used it to report

"two or three posts." *Id.* 92:17.

480.   On April 23, 2021, Crawford emailed Facebook and stated that the Wyoming

Department of Health had "mentioned … that the algorithms that Facebook and other social media

networks are apparently using to screen out postings by sources of vaccine misinformation are also

apparently screening out valid public health messaging, including WY Health communications."

Crawford Ex. 38, at 2.  When she did not hear back, on April 28, she emailed Facebook again,

"Anything you all can do to help on this?" *Id.*  Facebook then responded and addressed the

problem. *Id.* at 1-2.  The government is not amused when government-induced censorship sweeps in the government's own speech.

481.    On May 6, 2021, Crawford emailed Facebook a table containing a list of 16 specific postings on Facebook and Instagram, with a link and the text of each post. Crawford Ex. 9, at 1-3. Crawford wrote, "As mentioned, here are two issues that we are seeing a great deal of misinfo on that we wanted to flag for you all … These are just some example posts. … Our census team is copied here, has much more info on it if needed."  Crawford Ex. 9, at 1.  Crawford copied Jennifer Shopkorn of the Census Bureau and Christopher Lewitzke, a Census Bureau contractor, on the email. *Id.*

482.    Crawford "flag[ged]" these posts for Facebook "[b]ecause we had had conversations with Facebook about ways that we could address misinformation, and … one suggestion … that came up in that conversation was to let them know if we were seeing major themes that CDC had scientific information on, or had web content that would address."  Crawford Dep. 87:15-21.

483.    When Crawford would "flag" such content for Facebook and other platforms, she knew that they would evaluate and possibly censor the content under the content-moderation policies: "I do know that the platforms have a variety of ways to address misinformation. They might tag it as something that people should look more into.  I think … that they have the ability to control how often some of these things show up in peoples' feeds. And I do know that removing them is an option that they could consider." *Id.* 88:7-14.

484.    CDC's "goal" in flagging misinformation for possible removal from Facebook "is to be sure that people have credible health information so that they can make the correct health decisions…. There were a lot of things circulating that were not accurate information about

COVID. And so we were trying to point out and make the credible information more available to

users." *Id.* 88:25-89:6.

485.    CDC and Census used "the social [media] listening tools," such as CrowdTangle,

to identify misinformation that was "flagged" to Facebook for possible censorship. *Id.* 90:18-23.

Regarding the table of 16 posts she "flagged" in her May 6, 2021 email, she stated, "these probably

came from the social listening tools … that can consolidate examples.  And we provided some

examples of what we meant." *Id.* 90:18-23.

486.    On May 10, 2021, Crawford emailed Facebook with the subject line, "COVID

BOLO Misinformation meetings."  Crawford Ex. 40, at 3.  She wrote: "We would like to establish

COVID BOLO meetings on misinformation and invite all platforms to join the meetings.  We are

aiming for our first one on Friday at noon. … Are there direct POCs on your end I should include

on the invite?  Happy to chat if better.  THANKS!" *Id.*

487.    On May 18, 2021, Facebook emailed Crawford noting that a Facebook official "has

an agenda item" for the "CDC call this week."  Crawford Ex. 11, at 2.  This official, according to

Crawford, is a member of Facebook's "Trust and Safety team, or the Misinformation team."

Crawford Dep. 103:9.

488.    The Facebook official noted that Facebook's "Content Policies … determine what

we may remove or reduce and inform."  Crawford Ex. 11, at 2.  She noted that "we currently

remove false claims about face masks," and wanted to discuss "whether there is still a high risk of

harm from mask misinformation," as well as "false claims about the efficacy of social distancing

or the existence of COVID-19." *Id.*

489.    Crawford admits that the CDC provided "scientific information" that Facebook

would use to decide whether to "remove" or "reduce and inform," *id.*, content under its policies:

"What we did provide was scientific information that I did assume that they might use to do those things," *i.e.*, "remove or reduce and inform." Crawford Dep. 105:17-19.

490.    The next day, May 19, 2021, Facebook emailed Crawford and noted that, for the weekly call that week, "here are some of the COVID content items that [Facebook's content-moderation official] will be flagging for you/CDC team." Crawford Ex. 11, at 1. She then provided a list of twelve specific claims, including such claims as "COVID-19 has a 99.96% survival rate," "COVID-19 vaccines cause bell's palsy," and "[p]eople who are receiving COVID-19 vaccines are subject to medical experiments." Crawford Ex. 11, at 1-2.

491.    Facebook raised these twelve claims to get CDC's guidance on whether they violated Facebook's policies: "They were wanting our feedback on whether these things were true or false statements that they were seeing. Did the CDC have science around this, did we have content on our website." Crawford Dep. 106:10-13. CDC would respond to debunk such claims if it had information: "[I]f we knew, if we had something or we had science on these items, we would point to it or provide them an answer." *Id.* 106:19-21.

492.    In response, Crawford indicated that "Census team members" would join the call, and that she might not be able to address or debunk all 12 claims on the call, because "[t]here may be some facts we have to get back to the group on after the meeting." Crawford Ex. 11, at 1.

493.    On the call referred to in the email, CDC discussed with Facebook these twelve claims and who at CDC might be able to address their veracity. Crawford Dep. 106:23-107-3.

494.    According to Crawford, "Sometimes in these meetings they would ask do we know if this is true or false, which is what they were doing [in Exhibit 11]. And then if we knew, the communicators knew the answer, we would provide it. If not, I would say, we would say, I'll have to get back to you later, we'll talk to our SMEs," *i.e.* subject-matter experts. *Id.* 116:7-12.

495.    Census Bureau officials would follow up to monitor whether Facebook was actually removing the content that federal officials had flagged as misinformation: "Census was at least periodically checking on things that they had flagged, or they had seen come up." *Id.* 117:19-21.

496.    After the meeting, on May 24, Facebook's content-moderation official emailed Crawford, stating, "Thanks so much again for you and team's help in debunking a few COVID-19 and vaccine misinformation claims for us." Crawford Ex. 15, at 2. She then provided a list of the twelve claims with CDC's input on each, noting "Debunked" for each claim that the CDC had debunked in the meeting. *Id.* at 2-3. Among other things, she noted that CDC "[d]ebunked" claims like "Face masks contain … harmful particles," and even plainly evaluative statements like "People who are receiving COVID-19 vaccines are subject to medical experiments." *Id.* at 2-3.

497.    On June 2, 2021, Crawford emailed the Facebook content-moderation official back with further input on the claims from CDC's subject-matter experts. Crawford Ex. 16, at 2. She noted several times that CDC's "web content to debunk is in clearance," meaning that CDC was preparing web content that would debunk those claims. *Id.*

498.    The next day, on June 3, 2021, the Facebook content-moderation official emailed Crawford to clarify that "web content to debunk is in clearance" means that "we should consider these debunked by the CDC now," and Crawford answered that "Yes they are debunked and we will also have content on it soon." Crawford Ex. 16, at 1. As Crawford stated, "We reported to Facebook that they were debunked at this time." Crawford Dep. 135:2-3.

499.    Crawford knew that Facebook would apply its content-moderation policies to claims that the CDC debunked: "I knew that they had options … which is to inform people, to maybe reduce it in the algorithm, or to remove it…. [T]hey probably had other options, but I knew of at least those." *Id.* 138:18-22.

500.    On July 26, 2021, the same Facebook content-moderation official emailed Crawford, asking for CDC to debunk three more COVID-related claims.  The subject line of the email was, "FB Misinformation Claims Help Debuning."  Crawford Ex. 17, at 1.  Crawford understood that "Debuning" was "Debunking" misspelled.  Crawford Dep. 139:1-2.

501.    In this email, Facebook's content moderator wrote to Crawford: "Our Misinformation Policy Team has identified some claims that we were hoping your team could **help us understand if they are false and can lead to harm**?"  Crawford Ex. 17, at 1 (bold in original).

502.    Facebook's content-moderation policy called for it to remove claims that are false and can lead to harm.  *See, e.g.,* Crawford Ex. 26, at 4 (Facebook's content-moderation official, Liz Lagone, noting that "We remove … posts on the grounds that the claim is false and that it is harmful," where "harmful" includes cases where "if people believed it, it might make them less likely to get vaccinated.").  So it was clear that Facebook's "Misinformation Policy Team" was asking CDC to advise whether these claims should be removed under Facebook's content-moderation policy.  Crawford admits that she understood that CDC's guidance would "benefit" Facebook's expansion and application of its censorship "policy" to these claims, acknowledging that Facebook was asking her about these claims "[b]ecause CDC would have credible health information about the claims or scientific information that would benefit their policy making."  Crawford Dep. 140:1-3.

503.    The three claims included: "Spike protein in COVID-19 vaccines is dangerous/cytotoxic," "Guillain-Barre Syndrome (GBS) is a possible side effect of the COVID vaccine," and "Heart inflammation is a possible side effect of all COVID-19 vaccines."  Crawford Ex. 17, at 1.

504.     Facebook also asked Crawford if "your team was aware of any global source of truth/database for vaccine adverse effects including possibly vaccine-related deaths."  Crawford Ex. 17, at 1.

505.     Crawford responded, "Got it, let me get back to you shortly and thank you much for asking!"  Crawford Ex. 17, at 1.

506.     Crawford does not recall her specific response to this inquiry, but she admits that "generally" she referred them to the CDC's subject-matter experts and responded to Facebook with the CDC's view on the scientific questions, as she did with similar requests.  Crawford Dep. 140:16-141:4.

507.     On July 20, 2021, Facebook emailed Crawford another biweekly "CrowdTangle content insights report" on COVID-19.  Crawford Ex. 18, at 1.  One of the misinformation-trending topics that Facebook flagged in bold in the email was "**Door-to-Door Vaccines**," which stated that "The highest interaction Page posts for this topic convey concern from political opponents about the Biden Administration's strategy to ramp up vaccination efforts in communities with low vaccination rates by going 'door-to-door' to educate and encourage more Americans to get vaccinated."  *Id.*  The same topic, in the same time frame, was emphasized in the Virality Project report as a prime example of viral vaccine-related "misinformation," when in fact it involved only expressions of political opinion.  Scully Ex. 2, at 39, 54-55.

508.     The same email also noted posts "expressing skepticism about vaccinating children."  Crawford Ex. 18, at 1.  Earlier CrowdTangle reports in the same email chain had flagged for the CDC highly engaged content about "**Vaccine Side Effects** … especially for children and pregnant women," "**Vaccine Refusal**," and "**Vaccination Lawsuits** … lawsuits over compulsory vaccination related to employment."  *Id.* at 2-3 (bold in original).

509.    Facebook noted that the CrowdTangle reports were confidential and not to be disclosed further: "As always, please do not share." *Id.* at 1.

510.    Facebook continued to send biweekly CrowdTangle reports, which flagged in bold high-engagement topics such as "**Proof of Vaccination Requirement**," "**COVID-19 and Unvaccinated Individuals**" (addressing "concerns that the recent uptick in hospitalizations and deaths is being driven up by unvaccinated individuals"), and "**COVID-19 Mandates**," as well as "allowing people to return to … religious services." Crawford Ex. 19, at 1-3 (bolds in original).

511.    On August 19, 2021, Facebook asked Crawford for a "VAERS Policy Consultation" meeting for the CDC to give Facebook guidance on how to address VAERS-related misinformation: "Our Health Policy folks would like to meet with your VAERS experts for a consultation meeting regarding VAERS and misinformation." Crawford Ex. 20, at 1. Crawford responded, "I'm sure we can do this, and I'm glad you're asking." Crawford Ex. 20, at 1.

512.    "VAERS" is the HHS's Vaccine Adverse Event Reporting System, *see* https://vaers.hhs.gov/. At that time, the CDC was greatly concerned about VAERS-related "misinformation" on social-media, because users cited and discussed VAERS data and reports to raise concerns about the safety of vaccines in ways that the CDC thought misleading, as Crawford recounted: "the topic of VAERS was an area that was widely discussed on social media, and there was a lot of areas of confusion about what VAERS data was. There was myths about VAERS data, and there was misinformation about VAERS data. So it was always one of the things that rose to the top in terms of volume of discussion of people were very confused about VAERS." Crawford Dep. 150:21-151:3. So it is not surprising that Crawford was "glad" Facebook was "asking" for a meeting in which the CDC would give Facebook guidance on how to censor "misinformation" about VAERS. Crawford Ex. 20, at 1.

513.    Crawford also followed up with Facebook by providing written CDC-provided materials for Facebook to use in addressing VAERS-related "misinformation" on its platforms: "If of use, we just published a new video and I've attached some recent talking points that may also inform your efforts."  Crawford Ex. 20, at 1.  Plainly, the "efforts" Crawford wished to "inform" were Facebook's efforts to remove VAERS-related "misinformation" from its platforms.

514.    The CDC also had a meeting with Facebook about VAERS-related misinformation: "We did have a session with the VAERS experts with Facebook."  Crawford Dep. 151:8-9.  In the meeting, the CDC had "two experts for VAERS and a couple of their communication experts on the line with Facebook's team," which consisted of "their misinformation and policy type team" that the content-moderation official "was part of."  *Id.* 151:20-24.  In the meeting, the CDC "offered the [subject-matter expert] just to answer their questions about what VAERS was and what it wasn't.  And my recollection is [Facebook] asked a lot of questions like … who can report something on VAERS and things like that during the session."  *Id.* 152:1-6.

515.    On September 1, 2021, Crawford emailed Facebook and stated: "BOLO for a small but growing area of misinfo.  One of our lab alerts … was misinterpreted and was shared via social media." Crawford Ex. 21, at 1.  ("BOLO" stands for "Be on the lookout."  Crawford Dep. 153:21.).  She explained what the CDC viewed was misinformation, and then stated, "I've attached some example Facebook posts and another document with the facts around the issue."   Crawford Ex. 21, at 1.

516.    Plainly, Crawford was flagging these posts and related posts for possible censorship under Facebook's content-moderation policy.  She admits that the CDC's "BOLO" alerts were provided to "assist" the platforms with their enforcement decisions under their policies: "Similar to all the other BOLOs, we still thought it was good to point out if we had facts around something

that was widely circulating as a cause of misinformation to the platforms to assist them in whatever they were going to do with their policy or not do."  Crawford Dep. 153:23-154:3.

517.    When asked what she "expected [Facebook] to do once they were on the lookout" for the supposed misinformation that the CDC had flagged, Crawford responded: "I knew that they had various options. They could have just used it to inform people. They could have considered it in their algorithm, I believe. I did understand that potentially removing posts was something that they might do."  Crawford Dep. 155:15-20.  So she provided the information knowing it would happen and wanting it to happen.

518.    On November 2, 2021, Facebook's content-moderation official sent Crawford and other CDC officials an email stating, "thanks so much for confirming the ability for the claims in question last week having the risk of causing vaccine refusals."  Crawford Ex. 22, at 1.  Again, that is one of the criteria Facebook used to justify removal of content from its platforms.  Crawford Ex. 26, at 4 ("We remove … posts on the grounds that the claim is false and that it is harmful because if people believed it, it might make them less likely to get vaccinated.").  The content-moderation official also stated, "thank you all so much for your input over the last week on our many questions about vaccine misinformation relative to the EUA."  Crawford Ex. 22, at 1. ("EUA" refers to the FDA's "emergency use authorization to the Pfizer vaccine for children."  *Id.*)

519.    The content-moderation official also stated: "I wanted to share that as a result of our work together, when the FDA gave emergency use authorization to the Pfizer vaccine for children last week, we immediately updated our policies globally to remove additional false claims about the COVID-19 vaccine for children (e.g. 'the COVID vaccine is not safe for kids')."  Crawford Ex. 22, at 1.  She also noted, "We also launched a new feature on Instagram, where accounts that repeatedly post content that violates our policies on COVID-19 or vaccine

misinformation may now lose the ability to be tagged or mentioned or may see pop-ups asking if they'd like to delete certain posts that may violate our policies." Crawford Ex. 22, at 1. Thus, Facebook noted that, "as a result of our work together" with the CDC, Facebook had updated its content-moderation policies to increase censorship of vaccine-related claims in significant ways. *Id.*

520.    The content-moderation official went on to ask the CDC to debunk additional claims: "**we have identified a number of additional claims we would like to get your team's assessment on … Would it at all be possible to get input by Monday, November 8th?**" Crawford Ex. 22, at 1 (bold and underline in original). She requested, "For each of the following new claims, which we've recently identified on the platform, **can you please tell us if: 1. The claim is false; and 2. If believed, could this contribute to vaccine refusals?**" *Id.* (bold in original). Again, these are the two precise criteria that Facebook relied on to remove content from its platforms. Crawford Ex. 26, at 4 ("We remove … posts on the grounds that the claim is false and that it is harmful because if people believed it, it might make them less likely to get vaccinated."). She then included a new list of ten specific claims about the COVID-19 vaccines for the CDC to debunk. Crawford Ex. 22, at 1-2.

521.    Crawford understood, again, that this request was made to "inform their policies," *i.e.*, inform Facebook's application of its content-moderation policies to these claims: "It was still my interpretation that she was asking to inform their policies." Crawford Dep. 159:7-8.

522.    Crawford also admits that she was "happy" when the CDC's information to Facebook caused "less spread of misinformation" on Facebook and other platforms, *i.e.*, that she desired that outcome: "I'm happy that providing the scientific information led to less spread of misinformation." *Id.* 161:23-25.

523.     Crawford also understood that Facebook was, in fact, removing content from its platforms based on the CDC's information: "I understand that she's removing claims … that are not scientifically accurate." *Id.* 162:21-22.

524.     Crawford responded to Facebook, "Thank you so much for the feedback on what you've been able to do.  This is very good to know."  Crawford Ex. 22, at 1.  She also stated, regarding Facebook's request that the CDC debunk the ten new claims, that "I'm going to work on this one …. I hope we can do it by Monday, I will keep you posted."  *Id.*

525.     The following Monday, November 8, 2021, Crawford followed up with a response from the CDC addressing seven of the ten claims Facebook had asked CDC to evaluate.  Crawford Ex. 23, at 1-2.  The CDC rated six of the seven claims "**False**."  *Id.* (bold in original).  Crawford also noted in the response email, without citing any support, that "It appears that any of these could potentially cause vaccine refusal."  Crawford Ex. 23, at 1. Under Facebook's policies, a claim that is both false and could contribute to vaccine refusal was subject to removal.  Crawford Ex. 26, at 4 ("We remove … posts on the grounds that the claim is false and that it is harmful because if people believed it, it might make them less likely to get vaccinated.").

526.     On February 3, 2022, Facebook's content-moderation official sent Crawford another email, stating that she "wanted to **share updates we made as a result of our work together**" and "**ask for your assessment on a few things**."  Crawford Ex. 26, at 1 (bold in original). She described the "updates" as follows: "On February 2nd, we launched several updates to our COVID-19 Misinformation and Harm Policy based on your [*i.e.* CDC's] inputs."  *Id.*  These "updates" included "[r]emoving claims that COVID-19 vaccines cause heart attacks," and "[t]aking steps to reduce the distribution of content that our systems predict likely violates our COVID-19 and vaccine misinformation policies, but has not yet been reviewed by a human; if at

any point this content is confirmed to violate the policy then it will be removed from the platform." Crawford Ex. 26, at 1.  Crawford responded, "the update is very helpful, thank you for including that!" *Id.*

527.    Facebook's content-moderation official also included, under the heading "**NEW: For CDC Input**," another request that "For each of the following new claims, **can you please tell us if: 1. The claim is false; and 2. If believed, could this claim contribute to vaccine refusals**?" Crawford Ex. 26, at 1 (bold and underline in original).  She then provided a long, detailed list of claims and sub-claims about COVID-19 for CDC's input.  *Id.* at 2-4.

528.    Among other things, Facebook asked the CDC to pre-refute claims based on events that had not occurred yet.  Facebook asked Crawford to address "How FDA EUA authorization for children under 5 might impact our policies."  Crawford Ex. 26, at 1.  Facebook noted, "We understand that the FDA is considering giving emergency use authorization for the COVID-19 vaccine for children under five in the coming weeks.  We are considering how our existing policies on COVID-19 vaccines … should apply to claims about children 6 months to 4 years once the vaccine is approved for use.  Can you please assess for each claim whether it is false for children in this age range and if believed, likely to contribute to vaccine hesitancy or refusals?  *Please let us know if it is easiest to set up a time to meet and discuss each one.*"  Crawford Ex. 26, at 2 (italics in original).  There followed a long, detailed list of claims about the vaccines, for which Facebook sought CDC's input on their falsity as to children under 5.  *Id.* at 2-3.

529.    For this long list of claims, Crawford understood that Facebook would use the CDC's input to "determine" Facebook's censorship policy for such claims: "I know that they're using our scientific information to determine their policy."  Crawford Dep. 170:19-20.

530.    Regarding Facebook's request for CDC's input on these many new claims, Crawford responded, "I will talk to the Vaccine program and see what we can do."  Crawford Ex. 27, at 1.  The next day, February 4, 2022, she followed up, stating, "I'm heading out today but do you have a minute to discuss this by chance?  Call anytime," and provided her phone number. Crawford Ex. 27, at 1.  Crawford also changed the subject line of the email to state, "Have 5 minutes to chat? [re]: Vaccine Misinformation Questions for CDC."  *Id.*

**C.**    **CDC's and Census's Pressure and Collusion with Google/YouTube.**

531.    On March 18, 2021, Crawford emailed contacts at Google, stating: "As I believe we discussed previously, CDC is now working with Census to leverage some of their infrastructure to help identify and address COVID vaccine mis-info."  Crawford Ex. 28, at 1.  She went on, "As I understand it from the Census team … when they were doing this for the Census project last year, they meet regularly with a Google/YouTube Trust team."  *Id.*   A "Trust team" is a content-moderation team.  Crawford then asked, "Is it possible for us to start up regular meetings on this topic or maybe use our existing meeting time."  *Id.*   The subject line of this email was "COVID Misinfo Project."  *Id.*   Google and Crawford then set up a time to talk and discuss the project.  *Id.*

532.    Crawford states that this email refers to "the work of the IAA with Census to help consult and work with us on the COVID misinformation…"  Crawford Dep. 175:6-8.  Her reference to Census's infrastructure referred to "the fact that Christopher [Lewitzke, the Census contractor] ran those reports and looked for misinformation on those areas for us."  *Id.* 175:11-13.

533.    Crawford's reference to Census's previous project referred to their work on combating misinformation about the 2020 Census.  *Id.* 175:18-19.

534.    Crawford does not remember the specific call referenced in this email, but she admits that, "This was in 2021.  So we had been meeting pretty regularly with Google by this time." *Id.* 179:5-6.

535.    On March 23, 2021, Crawford sent a calendar invite for a meeting on March 24 that included herself and five other CDC employees, four Census Bureau employees and contractors (including Zachary Schwartz, Christopher Lewitzke, and Jennifer Shopkorn), and six Google/YouTube officials.  Jones Decl., Ex. T, at 1-2.  The subject of the meeting was "COVID Misinformation: CDC/Census/Google."  *Id.* at 1.  The invite stated: "CDC/Census to meet with Google regarding our misinformation efforts."  *Id.*

536.    At the meeting, CDC and Census presented a slide deck similar to the one that Census prepared for the meeting with Facebook on March 25, 2021, discussed above.  *See id.* 3-16.  The slide deck was entitled, "COVID Vaccine Misinformation: Issue Overview."  *Id.* at 3.  As with the Facebook slide decks, this one stated of "Misinformation Topics" that "[t]hese topics were selected due to high volume, continued public discussion, and high-profile coverage."  *Id.* at 4.  It noted that these topics included "infertility, misinformation about side effects, and claims of vaccines leading to deaths."  *Id.*

537.    For each topic, the slide deck included a description of a common claim, specific examples of videos on YouTube and social-media postings making the disfavored claim, and a putative refutation by the CDC.  *Id.* at 6-14.  For infertility, the slide deck stated that "[c]ommon claims about the COVID vaccine's side effects include that it causes infertility in women and men, miscarriages, and stillbirth," and it provide screen shots of specific videos on YouTube and social-media posts making this claim.  *Id.* at 6-8.  The deck asserted that "[a]ccording to CDC there is no evidence that fertility problems are a side effect of any vaccine, including COVID-19 vaccines."

*Id.* at 6.  Regarding supposed misinformation about side effects, the deck stated, "speculation and misinformation about side effects after taking the COVID vaccine have been prevalent on social media since the first vaccines were approved," and it provided screen shots of an example video on YouTube and social-media posts making such claims, along with a putative refutation by the CDC.  *Id.* at 9-11.  Regarding the topic "Death from Vaccines," the slide deck stated that "[v]accine-hesitant groups spreading misinformation and conspiracy theories about alleged vaccine-related deaths erode trust in the COVID-19 vaccine and the public health system," and it provided a sample video on YouTube and social-media posts linking the vaccines to deaths, along with a putative refutation by the CDC: "According to CDC, VAERS has not detected patterns in cause of death that would indicate a safety problem with COVID-19 vaccines."  *Id.* at 12-14.  As with the similar Facebook slide deck, the evident purpose of this presentation was to induce YouTube to censor these claims on its platform.

538.    On March 25, 2021, Kate Galatas of the CDC emailed the group attending the meeting and stated: "Many thanks, again, for the time yesterday.  This is such important shared work we are doing in the mis/dis information space, and we deeply appreciate your contributions.  Please find attached the slide deck referenced during the meeting, and we ask that you treat it close hold and not for further distribution.  We are looking forward to our future collaboration efforts!"  *Id.* at 1.

539.    On March 29, 2021, Crawford followed up with Google, inquiring "Are you all open to using our regular 4pm meetings to go over things with Census or what is preferred?"  Crawford Ex. 29, at 2.  Google responded: "We would like to follow up on our discussion with your colleague, Cynthia, on vaccine information a few months ago.  Specifically, we plan to share a new list of common vaccine misinformation claims and would love it if Cynthia or other vaccine

experts could join." *Id.*  He also stated that "we can save a few minutes … to discuss potential

next steps regarding the Census…" *Id.*  The subject line of this email was "Follow up on mis-info

conversation." *Id.*

540.    Crawford recalls that Census was asking for regular meetings with platforms

specifically focused on misinformation: the statement "is in reference to discussing how to engage

on an ongoing basis about misinformation and the Census suggestion that we have regular

meetings with them just on that topic." Crawford Dep. 184:14-18.  The exchange was "about how

to engage more regularly about misinformation, or … whatever Census had done with Google and

YouTube, should we have a similar structure with CDC." *Id.* 185:11-14.

541.    Regarding the request for input on the "new list of common vaccine misinformation

claims," Crawford responded, "I've arranged for a few SMEs [subject-matter experts] to join the

call, including Cynthia." Crawford Ex. 29, at 2.

542.    A few days later, on April 2, 2021, Google emailed Crawford stating, "Thanks

again for your time this week.  Attached are some of the claims we discussed for your reference."

Crawford Ex. 29, at 1.

543.    Crawford's reference to the "4pm meeting" refers to a regular biweekly meeting

with Google, which still continues to the present day: "I still have a 4:00 p.m. meeting every other

Monday with Google." Crawford Dep. 180:6-7.

544.    Crawford also has "similar regular meetings with … Meta and Twitter." *Id.* 180:11-

16.  She admits that she has ongoing meetings with Google and Facebook/Meta that continue to

the present: "we had regular meetings with Google, and we had regular meetings with Meta….

you know, the frequency changed…. I mean, Google we meet every other week. Right now with

Meta it's more ad hoc." *Id.* 180:16-21.

545.     Crawford also "had a regular meeting with Pinterest for a short period of time, and we had … just more ad hoc meetings on occasion with Twitter." *Id.* 180:23-181:1.

546.     Crawford states that these meetings "were mostly about things other than misinformation; though misinformation was discussed in the meetings." *Id.* 181:22-24.

547.     On April 12, 2021, Google/YouTube followed up with an email to Crawford, stating, "For tomorrow's call, would it be possible to include Cynthia or other COVID-19 treatment SMEs [subject-matter experts] to follow up on some additional questions?" Crawford Ex. 30, at 1. Crawford responded, "Can you give me an idea of what topics we'll be covering? But yes, I'll ask them to attend." *Id.*

548.     Crawford notes that it "wasn't uncommon" for Google/YouTube to ask her to bring subject-matter experts to meetings to go over such topics. Crawford Dep. 188:19-22.

549.     On May 10, 2021, Crawford emailed her Google contacts and invited them to attend in the BOLO meetings: "We would like to establish COVID BOLO meetings on misinformation and invite all platforms to join the meetings. We are aiming for our first one on Friday at noon. We have heard through the grapevine that [an official] at YouTube would want to join. Are there other POCs on your end I should include on the invite?" Crawford Ex. 40, at 1. The subject of the email was "COVID BOLO meetings on misinformation." *Id.*

**D.     CDC's and Census's "BOLO Meetings."**

550.     On May 11, 2021, Crawford followed up with an email stating, "We would like to invite digital platforms to attend a short 'Be On The Lookout' meeting on COVID. Please let us know if you have questions and feel free to forward this message to anyone in your organization that should attend." Crawford Ex. 40, at 2. Google responded by asking that Crawford include

the YouTube official in the meeting, and Crawford noted that she "was going to ask about" him at the 4:00pm recurring meeting.  *Id.*

551.    Crawford testified that she wanted to include YouTube on the BOLO meetings because they hosted the most content: "people from YouTube would occasionally be on our regular meetings, depending on what we talked about. And because YouTube has the most content, like, hosting, … they were a part of the BOLO meetings…"  Crawford  Dep. 244:21-245:1.

552.    The Census officials "were arranging" the BOLO meetings, and "they drafted the slides" for the meetings.  *Id.* 246:12-20.

553.    Crawford ran the BOLO meetings.  *Id.* 265:13.  She "opened up the meeting, introduced myself, gave context for why we were doing the BOLO meeting in brief. And then I believe that Christopher [Lewitzke] went through the slide decks, and I occasionally piped in on them."  *Id.* 265:15-19.

554.    The "slide decks" shown at the meetings were "similar to the table" of 16 Facebook posts that Crawford previously emailed to Facebook, but "they were more like this is a theme, and then there'd be maybe a little info about what the theme was and then maybe a couple of example posts. And then there would be a slide maybe with CDC links or information related to that theme." *Id.* 266:1-6.

555.    The first BOLO meeting was held on May 14, 2021.  Jones Decl., Ex. U, at 1.  The slide deck for that meeting was entitled "COVID Vaccine Misinformation: Hot Topics."  *Id.* at 2-10.  It contained a list of five "Hot Topics" with an "ADVISORY" in red noting that platforms should "**Be On the Lookout**" for "**Potential Misinformation**" on each topic, and provided specific examples of social-media posts for each topic, "Associated Link(s) and Hashtag(s)" for each topic, and the CDC's position on each topic (listed as "**The Facts**").  *Id.* at 4-8.

556.    Crawford also emailed similar slide decks for BOLO meetings scheduled for May 28 and June 18, 2021, though the latter was canceled due to the new Juneteenth holiday.   Jones Decl., Exs. V and W.  In the cover email to the May 28 slides, Crawford requested secrecy: "Please do not share outside your trust and safety teams."  Jones Decl., Ex. V, at 1.  Just like the May 14 BOLO slides, these slides contained lists of "Hot Topics" with an "ADVISORY" in red noting that platforms should "**Be On the Lookout**" for "**Potential Misinformation**" on each topic, and provided specific examples of social-media posts for each topic, "Associated Link(s) and Hashtag(s)" for each topic, and the CDC's position on each topic (listed as "**The Facts**").  Jones Decl., Ex. V, at 4-6; *id.* Ex. W, at 4-6.

557.    In conducting the BOLO meetings, Crawford described CDC's goal as follows: "our goal is to be sure that credible information about COVID was out there. A lot of people seek information on platforms. We thought that by giving the platform scientific information it might help in our goals to being sure that credible information could be found."  Crawford Dep. 266:16-21.   Of course, the BOLO meetings did not address identifying and promoting "credible information," but flagging information that the CDC thinks is *not* credible for potential removal. Crawford effectively admits this; when asked if CDC's goal includes that "incredible information would not be found," she agreed that "I did want the credible information to be found in advance of the uncredible information."  *Id.* 266:22-267:4.

558.    Crawford believes that the third BOLO meeting was cancelled because Juneteenth was declared a new federal holiday, and "that is why we didn't end up having it and we sent the materials out via email."  *Id.* 248:17-22.

559.    On October 28, 2021, Google emailed Crawford stating, "do you have time to connect early next week on anticipated guidance on vaccines for [children ages] 5-11?  It would

be great to connect as the CDC plans communications on authoritative information for pediatric vaccines." Crawford Ex. 42, at 2.

560.    Crawford responded: "Yes, we can discuss pediatric vaccines early next week but let me give you some general info: ACIP is likely to vote on this on Nov 2.  CDC is likely to start posting final information on Nov 3 (possibly late Nov 2), if that helps to know.  There will be many updates so the changes might span over a few days.  We are also looking ahead and misinformation and hope to have a BOLO type meeting later that week with platforms that are interested."  Crawford Ex. 42, at 1.  ("ACIP" is the "Advisory Council for Immunization Practices."  253:21-22.)

561.    On June 29, 2022, Google/YouTube emailed Crawford and her deputy, stating: "The YouTube Policy team is requesting evidence-based input on the claims below.  In the past, the CDC has reviewed COVID information claims and commented TRUE or FALSE + add any additional context needed."  Crawford Ex. 43, at 1.  YouTube then presented two claims, relating to the safety and effectiveness of administering progesterone to reverse chemical abortion.  *Id.* ("**CLAIM**: High doses of progesterone is a **safe** method of reversing chemical abortion … **CLAIM**: High doses of progesterone is an **effective** method of reversing chemical abortion….") (bold in original).  Crawford responded, "I'll check on this but I think I'll probably end up needing to refer you to another agency.  I'll get back to you."  *Id.*

562.    Regarding this exchange, Crawford notes that the CDC's "focus is not solely on COVID.  We're focusing on other topics.  I think [YouTube] thought that we might be able to help with this topic as well."  Crawford Dep. 256:5-8.  Thus, Crawford admits that the CDC is continuing to engage with social-media platforms to provide information that will lead to the

censorship of health-related claims on social media, and that it is willing to expand its focus to other health topics beyond COVID-19.

**E. CDC's and Census's Pressure and Collusion with Twitter.**

563.    On April 8, 2021, Twitter emailed Crawford stating, "I'm looking forward to setting up regular chats; my team has asked for examples of problematic content so we can examine trends.  All examples of misinformation are helpful…."  Crawford Ex. 32, at 1.  The subject line of this email was "Request for problem accounts."  *Id.*  Crawford responded, "Yes, we'll get that to you early next week."  *Id.*

564.    Crawford believes that Twitter sent this email in response to her inquiry, "Is there a good way that we should start engaging on misinformation?"  197:19-20.

565.    Crawford responded on April 14, 2021, "The Census team put this spreadsheet together with four example areas," which included the topics, "Vaccines aren't FDA approved," "Fraudulent cures," "VAERS data taken out of context," and "Infertility."  Crawford Ex. 33, at 1. The attachment was called, "Twitter CDC Examples 4-13-21.xlsx."  *Id.*  The spreadsheet contained a "list [of] things that [Census] saw that were being stated as misinformation."  Crawford Dep. 203:24-204:1.  "Infertility" referred to "people claiming that getting the vaccines led to infertility." *Id.* 204:17-18.

566.    Crawford believes that Twitter "was asking for these examples in this email because he was wondering … what would come up in BOLO meetings, or what we would be discussing."  *Id.* 204:22-24.

567.    On May 10, 2021, Crawford emailed Twitter, stating "We wanted to point out two issues we are seeing a great deal of misinfo about…."  Crawford Ex. 34, at 4.  She then provided

a list of "sample posts" that included 12 Tweets reproduced verbatim. She stated, "Our census team is copied here, has much more info on it if needed." *Id.*

568.    In the same email on May 10, 2021, Crawford wrote, "Also, we are standing up a BOLO COVID misinformation meeting and inviting all tech platforms. We are shooting for 12pm EST on Friday for our first meeting. I'll include you on the invite…." Crawford Ex. 34, at 4.

569.    Crawford agrees that she was "sending this to [Twitter] so that he would be on the lookout for those things appearing on Twitter." Crawford Dep. 208:25-209:3.

570.    Crawford notes that "the BOLO format … was used previously," *id.* 209:12-13, because Census had done "BOLO meetings … for their own work," *id.* 209:23-24. The platforms had done BOLO meetings for Census "in relation to the 2020 census." *Id.* 210:5-9.

571.    Regarding the BOLO meetings, Census officials "explained" to Crawford "how they did it." *Id.* 210: 16. "In fact, they drafted the slide deck" for the CDC BOLO meetings with social-media platforms. *Id.* 210:16-17. Census "drafted it and showed me how they thought that we should do it, and that … we would give examples, we would give the science, and then … people could follow up separately." *Id.* 210:18-22.

572.    Crawford believes that regular meetings with Twitter were not set up, but that "I know they participated in the BOLO meetings." *Id.* 198:15-16.

573.    Regarding the BOLO meetings, Crawford remembers that two occurred and a third one was scheduled but cancelled due to a holiday, and "in lieu of a meeting" she sent "a Powerpoint." *Id.* 198:24-199:1.

574.    Twitter responded to Crawford's May 10, 2021 email flagging 12 specific Twitter posts as examples of trending misinformation, stating: "Thanks for sharing this – agree these are important trends to note; a quick scan shows that at least some of these have been previously

reviewed and actioned." Crawford Ex. 34, at 3.  He then stated: "I will now ask the team to review the others." *Id.*

575.    Crawford understood that "asking the team to review the others" meant referring Crawford's flagged posts and issues to Twitter's content-moderation team for possible censorship: "I interpreted it as Twitter made decisions about the areas of misinformation based on whatever policy they had." Crawford Dep. 211:17-19.

576.    As with Facebook, Crawford understood that her flagging of posts would result in Twitter censoring at least some of these materials in different ways, including removing posts: "similar to Meta that they probably had multiple options. I am sure some were removed. I am sure some … were flagged. I see flags all the time on the Twitter posts. I am sure some were just maybe … maybe they weren't distributed as much on peoples' feeds." *Id.* 212:10-16.

577.    In the same email, Twitter offered to enroll CDC officials in its "Partner Support Portal" to provide expedited review of content flagged for censorship: "Carol, remind me: did you have a chance to enroll in our Partner Support Portal?  In the future, that's the best way to get a spreadsheet like this reviewed." Crawford Ex. 34, at 3.

578.    Crawford understood that Twitter's Partner Support Portal was "similar to what I described for Meta.  It's an offering where you log in and you can report misinformation or threats or problematic posted content in this portal, and it puts it in a system for review." Crawford Dep. 212:3-7.

579.    On May 10, 2021, Twitter noted to Crawford, "I'd be glad to enroll you in our Partner Support Portal, which allows you a special, expedited reporting flow in the Twitter Help Center.  It worked very well with Census colleagues last year." Crawford Ex. 34, at 3.

580.    Crawford responded by asking for instructions on how to enroll in the Partner Support Portal, and Twitter offered to enroll any Twitter accounts she identified.  Crawford Ex. 34, at 3.  Crawford provided her personal Twitter account to enroll.  *Id.*

581.    Then, on May 24, Census Bureau contractor Christopher Lewitzke followed on the same email chain with Twitter, asking about "the partner support portal enrollment for CDC." Crawford Ex. 34, at 2.  Lewitzke indicated that they planned to report COVID misinformation to Twitter using existing Census accounts already enrolled in the portal, not CDC accounts, stating: "would there be any issues or complications stemming from flagging COVID misinformation on the portal using the existing census.gov accounts that have access?  We'll want to have at least some CDC accounts whitelisted, but that backup may be helpful short-term."  *Id.*  He then stated: "Let us know any next steps we can take to make sure CDC is all set with the portal."  *Id.*

582.    Crawford confirms that Census had used similar portals to report misinformation to platforms in the past: "I did know from discussions with them that one technique I think that they used was using portals … for their work to report [mis]information."  Crawford Dep. 213:16-19.

583.    Twitter emailed Crawford on May 27, 2021, noting that she should be fully enrolled.  Crawford Ex. 34, at 1.  A screen shot of the portal proclaims, in very large, bolded type, "**Report any issue to get priority service**."  *Id.* (bold in original, font greatly reduced).

584.    Crawford believes that she attempted to use Twitter's Partner Support Portal "every now and then," but that she never solved technical issues that prevented her from reporting anything.  Crawford Dep. 215:9-22.

585.    Christopher Lewitzke is "a Census contractor."  *Id.* 217:5-6.

586.    On September 2, 2021, Crawford emailed Twitter, stating, "A quick BOLO for a small but growing area of misinfo."  Crawford Ex. 35, at 1.  To Twitter, she claimed that "one of our Lab alerts … was misinterpreted and was shared via social media."  Crawford Ex. 35, at 1.  She stated, "I've attached some example Twitter posts and another document with the facts around the issue."  *Id.*  The subject line of the email was "BOLO: CDC lab alert & misinformation."  *Id.*

587.    This report was very similar to the report Crawford provided Facebook the day before, September 1, 2021.  Crawford Ex. 21, at 1.  "The only difference is this email is going to Twitter."  Crawford Dep. 220:7-8.

588.    By sending these emails to Facebook and Twitter flagging what the CDC believed was a misinterpretation of a CDC lab alert on social media, CDC intended to prevent the disfavored message from spreading on social media: "We saw this confusion about this alert brewing and more posts were going up with confusion, and we thought it would be a good idea to provide the platforms with the facts *before it became something bigger*."  *Id.* 220:13-17 (emphasis added).  In other words, CDC wished to cause the disfavored viewpoint to be censored before it could be viewed or repeated by others—a quintessential prior restraint.

589.    CDC specifically flagged this information to the platforms, knowing that they would evaluate it for potential censorship under their content-moderation policies: Crawford "knew their policy teams or their trust teams or misinfo teams … would evaluate it."  *Id.* 220:21-23.  And Crawford "knew that removal was one of the options that they had, yes."  *Id.* 220:25-221:1.

**F.     CDC Endorses the States' Theory of Standing.**

590.    Crawford admits that government communicators have a strong interest in tracking what their constituents are saying on social media: "It's helpful for communicators to know what is being discussed because it helps improve our communication materials." *Id.* 53:10-12.

591.    Crawford emphasized this point multiple times: "as I mentioned before, it does help … for communicators to know what conversations occurs on social media because it helps us identify gaps in knowledge, or confusion, or things that we're not communicating effectively that we need to adjust." *Id.* 54:15-20.

592.    CrowdTangle reports "would help us understand what was being discussed on social media about COVID, which helps us look for gaps in information, confusion about facts, things that we might need to adjust our communication materials for." *Id.* 57:24-58:3.

593.    Crawford specifically expressed the concern that, if content was censored or removed from social-media platforms, government communicators would not know what the citizens' true concerns were: She "was wondering if they delete the info will we know those myths or information so we could update communication activity. So if they were deleting content would we know what the themes were." *Id.* 75:14-18.    Thus, Crawford was concerned that, if the platforms "were deleting content," she might not know "what the themes were" of "myths or [mis]information," which would prevent her from "updat[ing the CDC's] communication activity" to address those myths and misinformation. *Id.*    Accordingly, Crawford wanted to know, "would [CDC] be able to see in CrowdTangle or other reports … what kind of themes were removed so we would still have the full picture of areas of confusion." *Id.* 75:21-76:1.

594.    Crawford inquired of Facebook "about the data that we could get so we had a full picture on confusion so that we could adjust communication materials, or ways that we were communicating" about COVID-19. *Id.* 81:10-13.    In other words, Crawford wanted to know about

speech that was censored, as well as speech that was left up, on social-media platforms so CDC could get "a full picture" and "adjust communication materials" to address people's actual concerns. *Id.*

595.    The CDC "did searches in CrowdTangle, the same way we do searches in other social media and listening tools that we have to create, to understand what's being discussed in the environment, to update our communication material." *Id.* 148:11-15.

## V.    Dr. Fauci's Campaigns to Censor Disfavored Viewpoints on Social Media.

596.    Dr. Fauci, cooperating frequently with NIH Director Dr. Francis Collins, engaged in a series of campaigns to discredit and procure the censorship of viewpoints he disfavored on social media, beginning at least in early 2020.  Once he became Chief Medical Advisor in the Biden Administration in early 2021, his censorship efforts coordinated with and reinforced those of federal officials in the White House, the Office of the Surgeon General, the CDC, and elsewhere.

597.    Until his recent retirement, Dr. Anthony S. Fauci was the director of the National Institute for Allergy and Infectious Diseases at the National Institutes of Health and the Chief Medical Advisor to President Biden.  Fauci Dep. 10:8-16.  At the time of his deposition, Dr. Fauci had been the director of NIAID for over 38 years.  *Id.* at 10:25-11:1.

## A.    Dr. Fauci's Conspiracy and Campaign to Suppress the Lab-Leak Theory.

598.    First, in early months of 2020, Dr. Fauci worked closely with Dr. Francis Collins and Jeremy Farrar to orchestrate a campaign to discredit and suppress the opinion that SARS-CoV-2, the virus that causes COVID-19, leaked from a laboratory at the Wuhan Institute of Virology—an opinion that has recently been confirmed as likely true.  Early in the pandemic, Dr. Fauci was aware that NIAID, under his direction, had funded dangerous gain-of-function research on coronaviruses at that laboratory, and he sought to discredit and suppress the lab-leak theory to

deflect the scandal and blame associated with potential responsibility for the deaths of millions in the ensuing pandemic. He engaged in a campaign of deception to discredit the theory, and as a result of his efforts, the lab-leak theory was heavily censored on social media.

599. On December 30, 2011, Dr. Fauci co-authored an op-ed with Dr. Francis S. Collins in the Washington Post entitled *A Flu Virus Risk Worth Taking*. Fauci Ex. 1, Fauci Dep. 13:13-20.

600. In this op-ed, Dr. Fauci and Dr. Collins advocated for creating potentially dangerous viruses in laboratories, writing that "important information and insights can come from generating a potentially dangerous virus in a laboratory." Fauci Ex. 1, at 1. According to Fauci and Collins, "[u]nderstanding the biology of … virus transmission has implications for outbreak prediction, prevention and treatment," and "[i]dentifying threatening viruses can also facilitate the early stages of manufacturing vaccines that protect against such a virus in advance of an outbreak." *Id.* at 2. They further argued that "identifying the molecular Achilles heel of these viruses can allow scientists to identify novel antiviral drug targets that could be used to prevent infection … or better treat those who become infected." *Id.*

601. Dr. Fauci and Dr. Collins acknowledged the significant risks associated with such research, writing that "[s]afeguarding against the potential accidental release or deliberate misuse of laboratory pathogens is imperative." *Id.* But they believed that those risks were contained, writing that "engineered viruses … are maintained in high-security laboratories." They further state that "scientists, journal editors, and funding agencies involved are working together to ensure that access to specific information that could be used to create dangerous pathogens is limited to those with an established and legitimate need to know." *Id.*

602.     Thus, long before the COVID-19 pandemic, Dr. Fauci and Dr. Collins were highly

visible, public advocates for laboratory experiments that involve "generating a potentially

dangerous virus in a laboratory." *Id.* at 1.

603.     Such research of "generating a potentially dangerous virus in a laboratory" is

commonly called "gain-of-function" research.  Dr. Fauci testified that "[g]ain of function is a very

potentially misleading terminology, and that was one of the reasons why several years ago outside

groups, not the NIH … did away with the terminology 'gain of function' because it can often be

very confusing and misleading."  Fauci Dep. 16:3-10.  But Dr. Fauci confirms that "the NIH" did

not "d[o] away" with that terminology, *id.*, and Dr. Fauci's own internal email uses the phrase

"SARS Gain of Function" to describe the research on bat coronaviruses that was conducted by Dr.

Shi Zhengli and others at the Wuhan Institute of Virology, partly funded by Dr. Fauci's NIAID

through the subgrants from the EcoHealth Alliance, discussed below, *see* Fauci Ex. 6, at 8.

604.     On June 1, 2014, Dr. Fauci's NIAID funded a grant to the EcoHealth Alliance for

the five-year period June 1, 2014, to May 31, 2019.  Fauci Ex. 2, at 2.  The title of the project was

"Understanding the Risk of Bat Coronavirus Emergence."  *Id.* at 1.  The project's Abstract stated,

"This project will examine the risk of future coronavirus (CoV) emergence from wildlife using in-

depth field investigations across the human-wildlife interface in China, molecular characterization

of novel CoVs and host receptor binding domain genes, mathematical models of transmission and

evolution, and in vitro and in vivo laboratory studies of host range."  *Id.*

605.     The Abstract noted that one of the project's "three specific aims" would be to

"[t]est predictions of CoV inter-species transmission" by engaging in two forms of research to

enhance the bat coronaviruses' transmissibility to humans: "reverse genetics," *i.e.*, genetic

manipulation of the viruses to render them more transmissible; and "virus infection experiments"

using "humanized mice," *i.e.*, repeatedly infecting humanized mice with bat coronaviruses to provoke mutations that render them more infectious to human cells (a process known as "serial passage," *see* https://en.wikipedia.org/wiki/Serial_passage). *Id.* at 1. Specifically, the Abstract stated: "Predictive models of host range (i.e.[,] emergence potential) will be tested experimentally using *reverse genetics*, pseudovirus and receptor binding assays, and *virus infection experiments across a range of cell cultures* from different species and humanized mice." *Id.* (emphases added).

606. Dr. Fauci attempted to argue that "reverse genetics" is so vague that it might not refer to gain-of-function research. *See* Fauci Dep. 23:18-20 ("I'm not really quite sure what they're referring to. Reverse genetics can mean many things."). But Dr. Fauci admits that "reverse genetics" means "[m]anipulation of a virus, recombination, things like that." *Id.* at 23:19-21. In 2015, in an article reporting on research performed pursuant to this grant, Dr. Ralph Baric and Dr. Shi Zhengli wrote that they used "reverse genetics" to "generate[] and characterize[] a chimeric virus" that was more infectious and more virulent in humans. Fauci Ex. 4, at 1. Dr. Fauci's own internal email describes that article as addressing "SARS Gain of Function." Fauci Ex. 6, at 8.

607. Dr. Fauci admits that "EcoHealth has a subaward from their original grant that goes to Shi Zhengli at the Wuhan Institute of Virology." Fauci Dep. 36:4-6. He agrees that EcoHealth and Shi Zhengli of the Wuhan Institute of Virology "work together on research that's directly funded by NIAID." Fauci Dep. 36:7-13.

608. Dr. Fauci also attests that Dr. Peter Daszak likely has access to the genetic sequences of chimeric viruses that Shi Zhengli created during her research funded by EcoHealth using NIAID funds: "I don't know absolutely for sure, but I would imagine that if Peter Daszak is collaborating scientifically with Shi Zhengli, that it is likely, given the norms of scientific

collaboration, that he would have access to data," and "they are collaborators, since he has a subaward to the Wuhan Institute that I believe goes to Dr. Shi." Fauci Dep. 37:1-13. Daszak, therefore, is likely in possession of genetic evidence demonstrating whether SARS-CoV-2 originated from NIAID-funded research at the Wuhan Institute of Virology.

609.    Dr. Fauci claimed that he had never seen this grant award before his deposition, and that he was only "vaguely" aware of NIAID's funding of EcoHealth Alliance. *Id.* at 18:10-12 ("I'm vaguely familiar with the fact that EcoHealth Alliance has been doing research on trying to understand the bat coronavirus emergence."); *id.* at 19:7-8 ("I have no recollection of the initiation of this grant."). Dr. Fauci admits that "NIAID has funded EcoHealth Alliance," 20:5-6, but he contends that he is completely unfamiliar with this project. *Id.* at 20:8-9 ("[T]his is the first time that I have seen this piece of paper."). But this very grant project was flagged for Dr. Fauci in an email from his subordinate on January 27, 2020, at the beginning of the pandemic. Fauci Ex. 5. Given the public and Congressional scrutiny of this particular project and its relation to the origins of the COVID-19 pandemic, Dr. Fauci's testimony on these points is not credible.

610.    Peter Daszak is listed as the "Contact PI/Project Leader" for the grant award "Understanding the Risk of Bat Coronavirus Emergence." Fauci Ex. 2, at 1. The "Awardee Organization" is the EcoHealth Alliance. *Id.*

611.    Dr. Fauci claims that he is not acquainted with Peter Daszak and does not know how to pronounce Daszak's name, Fauci Dep. 20:13 ("I'm not sure"), and that he "do[es]n't even remember meeting him," *id.* at 21:1-2, but that he has seen a photo of himself with Daszak at a public event as the only evidence that they have met. *Id.* at 21:2-8.

612.    In fact, Dr. Fauci has exchanged cordial emails with Daszak on a first-name basis, and he participated in a podcast with him on February 9, 2020, in which they both sought to

discredit the lab-leak theory of COVID's origins.  Fauci Ex. 15, 16, 30.  Dr. Fauci's attempt to deny or downplay his acquaintance and familiarity with Daszak is not credible.

613.    On October 17, 2014, the U.S. Government entered a "research funding pause" on gain-of-function research on coronaviruses, in a document entitled "U.S. Government Gain-of-Function Deliberative Process and Research Funding Pause on Selected Gain-of-Function Research Involving Influenza, MERS, and SARS Viruses."  Fauci Ex. 3, at 1 (the "GoF Pause" or "Pause").

614.    Contrary to Dr. Fauci's testimony that the "pause" was an occasion to jettison the term "gain-of-function," the Pause provided a simple and clear definition of "gain of function" research, defining "Gain-of-function studies" as "research that improves the ability of a pathogen to cause disease."  Fauci Ex. 3, at 2.  The research on bat coronaviruses described in Fauci Ex. 2 meets this simple definition.

615.    The Pause applied to funding for all "research such as this until a new U.S. Government research policy could be adopted."  Fauci Dep. 27:17-19; Fauci Ex. 3, at 2-3.

616.    The Pause provided an exception in Footnote 1, which stated: "An exception from the research pause may be obtained if the head of the USG funding agency determines that the research is urgently necessary to protect the public health or national security."  Fauci Ex. 3, at 2 n.1.

617.    Dr. Fauci testified that he does not recall whether NIAID ever invoked that exception during the years that the Pause was in place (2014-2017).  Fauci Dep. 28:22-29:3.  He testified that authorization for funding under the exception would "not usually rise up to the office of the director, but is handled at the level of staff and deputy."  *Id.* at 29:1-2.  He testified that such approval for projects "urgently necessary to protect the public health or national security" could

have come from "any of a number of people. It could have been people at the program level. It

could have been my deputy. It could have been program managers and division directors." *Id.* at

30:16-19.

618.    This testimony contradicts the plain language of the exception, which states that

"*the head of the USG funding agency*" must "determine[] that the research is urgently necessary

to protect the public health and national security" to allow continued funding for gain-of-function

research on coronaviruses. Fauci Ex. 3, at 2 n.1. At all relevant times, Dr. Fauci was the "head of

the USG funding agency," *i.e.*, the Director of NIAID, and he was responsible for authorizing

funding for gain-of-function research on the ground that it was "urgently necessary to protect the

public health or national security."

619.    Dr. Fauci states that he does not recall whether NIAID ever authorized continued

funding for Peter Daszak or EcoHealth Alliance pursuant to the exception to the Pause in footnote

1. Fauci Dep. 30:3-12.

620.    In fact, Dr. Fauci testified that "I don't recall" or "I do not recall" 174 times in his

deposition, and testified that he could not recall or remember using variations on that phrase 212

times. *See* Fauci Dep. 22:21-352:17-18. This contrasts sharply with his public statements about

the very same issues that, during his deposition, he professed near-complete loss of memory. *See,*

*e.g.,* Jones Decl., Ex. X, at 1 ("I remember it very well"). It also contrasts sharply with his clear,

specific recollection of unrelated events from the same time frame. *See, e.g.,* Fauci Dep. 353:20-

354:16. Dr. Fauci's repeated claims to not remember or not recall key events and people are not

credible.

621.    Dr. Fauci's chief deputy is Dr. Hugh Auchincloss, who is the Principal Deputy

Director of NIAID. *Id.* at 30:20-25.

622.    In December 2015, during the research "Pause" on gain-of-function funding,
Nature Medicine published an article entitled, "A SARS-like cluster of circulating bat
coronaviruses shows potential for human emergence."  Fauci Ex. 4, at 1.  Dr. Ralph Baric of the
University of North Carolina was listed as the corresponding author, and Dr. Shi Zhengli of the
Wuhan Institute of Virology was listed as a co-author.  *Id.* at 1 & n.8.

623.    The 2015 Nature Medicine article clearly described gain-of-function research on
bat coronaviruses.  The Abstract states: "Here we examine the disease potential of a SARS-like
virus, SHC014-CoV, which is currently circulating in Chinese horseshoe bat populations. Using
the SARS-CoV reverse genetics system, we generated and characterized a chimeric virus
expressing the spike of bat coronavirus SHC014 in a mouse-adapted SARS-CoV backbone."
Fauci Ex. 4, at 1.  Notably, the article uses the same phrase as the EcoHealth grant, "reverse
genetics," to describe creating "a chimeric virus."  *Id.*

624.    The article reports that the "chimeric virus" created from a "SARS-like" bat
coronavirus had become highly transmissible in human tissue: it could "replicate efficiently in
primary human airway cells and achieve *in vitro* titers equivalent to epidemic strains of SARS-
CoV."  *Id.* It had also become more virulent: "Additionally, *in vivo* experiments demonstrate
replication of the chimeric virus in mouse lung with notable pathogenesis."  *Id.*  There were no
available treatments for this lab-created "chimeric" virus: "Evaluation of available SARS-based
immune-therapeutic and prophylactic modalities revealed poor efficacy; both monoclonal
antibody and vaccine approaches failed to neutralize and protect from infection with CoVs using
the novel spike protein."  *Id.*

625.    The article noted that the authors had then "synthetically re-derived an infectious
full-length SHC014 recombinant virus and demonstrate robust viral replication both in vitro and

156

in vivo." *Id.* The article concluded that "[o]ur work suggests a potential risk of SARS-CoV re-emergence from viruses currently circulating in bat populations" – and this conclusion was based on creating a more transmissible (to humans) and more virulent (to humans) SARS-like coronavirus in a lab. *Id.*

626.    The article acknowledged that NIAID was the principal funder of this research, and that it had received funding from the EcoHealth Alliance, Daszak's group: "Research in this manuscript was supported by grants from the National Institute of Allergy & Infectious Disease and the National Institute of Aging of the US National Institutes of Health (NIH) … and by USAID-EPT-PREDICT funding from EcoHealth Alliance." *Id.* at 5.

627.    The article also noted that the NIH had reviewed and approved the research under the GoF Pause: "Experiments with the full-length and chimeric SHC014 recombinant viruses were initiated and performed before the GOF research funding pause and have since been reviewed and approved for continued study by the NIH." *Id.* "GOF" is short for "gain-of-function."

628.    Dr. Fauci testified that he first became aware of this Nature Medicine article "likely … several months" after the outbreak of the COVID-19 pandemic, and that "it was brought to my attention in the context of questions that were raised by members of Congress about experiments that were funded by the NIAID." Fauci Dep. 31:17-20, 32:7-9. In fact, Dr. Fauci attached this article to a confidential midnight email to his principal deputy, Hugh Auchincloss, on January 31, 2020, and directed Auchincloss to read it immediately and take unspecified actions on it on a Saturday morning. Fauci Ex. 6, at 8. Dr. Fauci's testimony on this point is not credible.

629.    Dr. Fauci testified that he does not believe he has ever met Dr. Ralph Baric, the corresponding author of the 2015 Nature Medicine article. Fauci Dep. 32:16-19 ("I know who he is, I doubt I've ever met him. I may have met him at one of the meetings where there are thousands

of scientists saying hi to each other…"); *see also id.* at 33:25-34:1.  In fact, Dr. Fauci's official

calendar shows a one-on-one meeting with Dr. Ralph Baric on February 11, 2020, during the

events described herein.  Fauci Ex. 17, at 1.  A contemporaneous Slack message on February 18,

2020 reports that Dr. Baric "sat in Fauci's office talking about the outbreak and chimeras," *i.e.*,

lab-created chimeric viruses.  Jones Decl., Ex. Y, at 1.  And Dr. Fauci testified that Dr. Baric may

be the source of the phrase "SARS Gain of Function" in the attachment to his midnight email to

Hugh Auchincloss.  Fauci Dep. 57:11-12. Dr. Fauci's testimony on this point is not credible.

630.  Dr. Fauci professed to be ignorant of the identity of Dr. Shi Zhengli, the notorious

"Bat Woman" of the Wuhan Institute of Virology.  When asked if he knows who she is, he stated,

"I'm not a hundred percent certain. I get sometimes confused with Asian names."  *Id.* at 33:9-10,

18-19.  Yet Dr. Shi Zhengli, the so-called "bat woman," is world-renowned as the researcher who

may have caused the COVID-19 pandemic, and has been so since the beginning of the pandemic,

*see, e.g.,* Jones Decl., Ex. Z, at 1, and the name "Shi" is included in the title of the article that Dr.

Fauci forwarded to Dr. Hugh Auchincloss after midnight on February 1, 2020.  Fauci Ex. 6, at 8.

Dr. Fauci's testimony is not credible on this point.

631.  Dr. Fauci testified that he first became aware of the outbreak of COVID-19 either

December 31, 2019 or "the first couple days of 2022."  Fauci Dep. 34:8-11.

632.  Dr. Fauci recounts that he first became aware of concerns that the SARS-CoV-2

virus that causes COVID-19 "might have been genetically engineered or originated in a

laboratory" when "[t]here was a phone call in late January of 2020, I believe, from Jeremy Farrar.

There was one other person on the phone. I believe it was [K]ristian [Andersen], who piped me in

on a three-way call, saying that they looked at the virus and there was some concern about the

molecular configuration or makeup of the virus that made them think there was a possibility that there could have been a manipulation of the virus." *Id.* at 34:12-35:1.

633.    Dr. Fauci states that he does not believe that anyone ever raised the concern to him before that late January call, and he specifically attests that he does not recall Dr. Robert Redfield, then-Director of the CDC, raising the concern to him in mid-January 2020. *Id.* at 35:2-15. Dr. Fauci's recollection conflicts with that of Dr. Redfield, who specifically recalls raising this issue to Dr. Fauci earlier in January 2020, and having his concerns fall on deaf ears: "Dr. Robert Redfield, a virologist and the director of the Centers for Disease Control and Prevention (CDC), had urged Fauci privately to vigorously investigate both the lab and natural hypotheses. He was then excluded from the ensuing discussions—learning only later that they'd even occurred. 'Their goal was to have a single narrative,' Redfield [said]." Jones Decl., Ex. AA, at 7.

634.    "In mid-January of 2020, … Redfield expressed his concerns in separate phone conversations with three scientific leaders: Fauci; Jeremy Farrar, the director of the U.K.'s Wellcome Trust; and Tedros Adhanom Ghebreyesus, director general of the World Health Organization (WHO). Redfield's message, he says, was simple: 'We had to take the lab-leak hypothesis with extreme seriousness.'" *Id.* at 23. Dr. Fauci disputes this account and states that this conversation did not happen: "To my recollection, no." Fauci Dep. 35:9-12.

635.    On January 27, 2020, Dr. Fauci and several other senior NIAID officials received an email from Greg Folkers, who is his "immediate chief of staff in my office group," *id.* at 38:2-4; the email provided "Talking Points for NIAID Director Dr. Fauci." Fauci Ex. 5. The email stated that "when talking about CoV … we have on our team (Vincent and folks we fund, Peter Daszak, Ralph Baric, Ian Lipkin, etc.) probably the world's experts on non-human coronaviruses. … EcoHealth group (Peter Daszak et al) has for years been among the biggest players in

coronavirus work, also in collaboration Ralph Baric, Ian Lipkin, and others." *Id.* at 1. It also

flagged the ongoing NIAID grant to Daszak and its work with Wuhan Institute of Virology:

"NIAID has funded Peter's group for coronavirus work in China for the past five years through

R01 1R01AI110964: 'Understanding the Risk of Bat Coronavirus Emergence.' That's now been

renewed." *Id.* It noted that "[t]he results of the work to date include … Found SARS-related CoVs

that can bind to human cells (published in *Nature*) and that cause SARS-like disease in humanized

mouse models"—a clear reference to the 2015 *Nature Medicine* article. *Id.* Three days later, Dr.

Fauci would attach that *Nature Medicine* article to a midnight email to Hugh Auchincloss. Fauci

Ex. 6, at 8.

636.    Like so many other things, Dr. Fauci testifies that he does not recall receiving this

email. Fauci Dep. 40:5-6.

637.    Dr. Fauci states that he first became aware of the concern that the virus might be

bioengineered and lab-created in a call with Dr. Kristian Andersen of Scripps and Jeremy Farrar

of the Wellcome Trust on January 31, 2020. Fauci Dep. 43:17-25. In that call, according to Dr.

Fauci, "Jeremy and [K]ristian said they had looked at -- or at least [K]ristian did, possibly Jeremy

-- and maybe one other scientist -- and said that it is possible that there may have been a

manipulation because it was an unusual virus." Fauci Dep. 44:3-9. A phone call was arranged for

the next day, Saturday, February 1, 2020, to discuss the possibility. *Id.* at 44:15-17.

638.    According to contemporaneous emails, Eddie Holmes and Bob Garry were

involved in this call with Dr. Fauci and Kristian Andersen as well. Fauci Ex. 7, at 2. Eddie

Holmes, who was then raising serious concerns that the virus had leaked from a lab, would go on

to be the lead drafter of a key article discrediting the lab-leak theory.

639.     After the January 31 call with Farrar and Andersen, in the evening of the same day, Dr. Fauci forwarded them an article that was skeptical of the lab-leak theory, stating that "it is of interest to the current discussion."  Ex. 6, at 1.  Andersen responded, stating that he was not convinced by the article because "one has to look really closely at all the sequences to see that some of the features look (potentially) engineered," and that "after discussion earlier today, Eddie [Holmes], Bob [Garry], Mike [Laribee], and myself *all find the genome inconsistent with expectations from evolutionary theory*." *Id.* (emphasis added); *see also* Fauci Dep. 51:3-8.

640.     A few hours later, shortly after midnight, at 12:29 a.m. on February 1, 2020, Dr. Fauci sent an email to his principal deputy, Hugh Auchincloss.  Fauci Ex. 6, at 8.  The subject line of the email said "IMPORTANT."  *Id.*  The email stated: "Hugh: It is essential that we speak this AM.  Keep your cell phone on. … Read this paper as well as the e-mail that I will forward to you now.  You will have tasks today that must be done.  Thanks, Tony."  *Id.*

641.     The "this paper" that was attached to the email was the 2015 *Nature Medicine* article entitled "A SARS-like cluster of circulating bat coronaviruses shows potential for human emergence," Fauci Ex. 4, co-authored by Dr. Ralph Baric and Dr. Shi Zhengli and funded by NIAID and the EcoHealth Alliance.  Fauci Ex. 6, at 8; Fauci Dep. 55:23-56:25.  As an attachment to Dr. Fauci's email, this article was called "Baric, Shi et al – Nature Medicine – SARS Gain of Function.pdf."  Fauci Ex. 6, at 8.

642.     Dr. Fauci claims that he can recall virtually nothing about sending this urgent, confidential email to his principal deputy in the middle of the night of the day when he found out that highly qualified researchers were concerned that SARS-CoV-2 might have leaked from a laboratory.  *See* Fauci Dep. 55:15-63:21 ("I don't recall … I don't know for sure … I can't say that I recall that in particular … I don't recall.  I'm not sure exactly why those words got in there

… I don't recall … I don't recall … I don't precisely recall … I don't recall if I did … I might have, but I don't recall. … I don't recall. … I don't recall … I don't recall. … I don't recall … I really don't recall … I actually don't recall why I forwarded it to him … I don't recall why I did that … I don't remember … I don't recall speaking to him."). This contrasts starkly with Dr. Fauci's public claim to "remember … very well" key events of the same day. Jones Decl., Ex. X, at 1. Dr. Fauci's claim to an amazing loss of memory about this urgent clandestine email to his confidential deputy is not credible.

643.    Dr. Fauci admits, however, that he wanted Auchincloss to find out what coronavirus research NIAID was funding in China before his call later that afternoon with scientists about the lab-leak concerns raised by Andersen and Farrar: "And at my recollection, I brought to Hugh's attention, saying, 'We have to speak in the morning, because I want to find out what the scope of what it is that we are funding so I'll know what we're talking about.'" Fauci Dep. 58:1-5. In particular, Dr. Fauci wanted to find out what EcoHealth Alliance was doing: "this was the first that I had heard about specifics of what EcoHealth and what other people were doing, and I wanted my staff to say get me up to date. So that's what I meant by you have work to do." *Id.* at 58:6-12.

644.    Regarding the "tasks that must be done," Dr. Fauci admits that "I wanted to be briefed on the scope of what our collaborations were and the kind of work that we were funding in China. I wanted to know what the nature of that work was." *Id.* at 59:12-15.

645.    The tone of the email and Dr. Fauci's own testimony strongly support the inference that Dr. Fauci sent the email to Auchincloss because he was concerned that NIAID, under his leadership, was funding research in China that might have led to the creation and leak of SARS-CoV-2, and he wanted to know the full extent of NIAID's exposure before his call later that day with scientists and funding authorities. *See also* Fauci Dep. 58:18-25. If it became public that

NIAID had funded the creation of SARS-CoV-2, Dr. Fauci and his agency potentially faced an enormous crisis of public credibility and accountability.

646.    Immediately after sending Auchincloss the 2015 *Nature Medicine* article, Dr. Fauci also forwarded Auchincloss another article about the possibility that SARS-CoV-2 had leaked from a lab—the Jon Cohen article that he had sent to Kristian Andersen and Jeremy Farrar earlier that evening. Fauci Ex. 6, at 9. This email confirms that Dr. Fauci was deeply concerned about the prospect that NIAID, under his watch, might have funded the creation of the virus causing the global pandemic.

647.    Dr. Fauci denies that, when he sent this email to Auchincloss, he was then concerned that NIAID might have funded the creation of the virus that caused the COVID-19 pandemic. When asked, "Were you concerned at that time that the work that you had funded in China might have led to the creation of the coronavirus?" Dr. Fauci responded: "I wasn't concerned that it might have." Fauci Dep. 59:16-19. In light of the tone and content of his emails at the time, and Dr. Fauci's other testimony, this statement is plainly not credible.

648.    According to Dr. Fauci, when he participated in the secret call with the scientists and funding authorities later that afternoon on Saturday, Feb. 1, 2020, he did not share with them that NIAID had been funding "SARS Gain of Function" research in China leading to the outbreak of COVID-19. Fauci Dep. 63:22 ("I don't believe I did.").

649.    In fact, once again, Dr. Fauci claims that he does not recall what he said on the clandestine February 1, 2020 phone call. *Id.* at 64:17 ("I don't recall").

650.    At 1:19 p.m. on Saturday, Feb. 1 – about forty minutes before the secret conference call to discuss the lab-leak concern – Dr. Fauci also forwarded the "Baric, Shi et al – Nature Medicine – SARS Gain of Function" article to Lawrence Tabak of the NIH, saying only "Here it

is." Fauci Ex. 6, at 15. Lawrence Tabak was then "the deputy director of the National Institutes

of Health," the principal deputy to then-NIH Director Dr. Francis Collins. Fauci Dep. 65:8-11.

651.    Dr. Fauci testified that "I don't recall why" he sent the 2015 *Nature Medicine* article

to Lawrence Tabak, but he admits that it was likely to get it into the hands of Dr. Francis Collins,

who was about to participate in the 2:00 p.m. secret conference call with Dr. Fauci and the other

scientists. *Id.* at 66:15-17. Dr. Fauci claims that this was "to make sure *everyone* was aware of

what the discussions were," *id.* at 66:13-15, but that is not credible in light of his testimony that he

did not alert any of the *other* scientists on the call to the concern that NIAID was funding "SARS

Gain of Function" research in China. *Id.* at 63:22.

652.    The more compelling inference is that Dr. Fauci wanted Dr. Collins to know that

NIAID and NIH faced enormous exposure if the lab-leak theory turned out to be true or publicly

accepted. Dr. Collins, along with Dr. Fauci, had publicly championed gain-of-function research

since at least 2011, and NIH had jointly funded Dr. Shi Zhengli's work at the Wuhan Institute of

Virology through NIAID and the National Institute of Aging. Fauci Ex. 4, at 5 (referring to "grants

from the National Institute of Allergy & Infectious Disease and the National Institute of Aging of

the US National Institutes of Health (NIH)").

653.    On Saturday, Feb. 1, 2020, at 11:47 a.m., Hugh Auchincloss emailed Dr. Fauci in

response to his 12:29 a.m. email. The subject line stated only "Continued." Auchincloss stated:

"The paper you sent me [*i.e.*, the 2015 *Nature Medicine* article on 'SARS Gain of Function'] says

the experiments were performed before the gain of function pause but have since been reviewed

and approved by NIH. Not sure what this means since Emily is sure that no Coronavirus work has

gone through the P3 framework. She will try to determine if we have any distant ties to this work

abroad." Fauci Ex. 6, at 16. At 5:51 p.m., Dr. Fauci responded: "OK. Stay tuned." *Id.*

654.    "Emily" in Auchincloss's email "is Emily Erbelding, the Director of the Division of Microbiology and Infectious Diseases at NIAID," who "would have been the one who was closest to the ground in understanding what we were doing in funding China." Fauci Dep. 70:14-18.  The "P3 framework" refers to the special approval process required for funding of gain-of-function research on coronaviruses that may cause pandemics, as "P3" stands for "potential pandemic pathogens."  *See* National Institutes of Health, Office of Science Policy, *Gain of Function Research*, at https://osp.od.nih.gov/policies/national-science-advisory-board-for-biosecurity-nsabb/gain-of-function-research/ ("Certain gain-of-function studies with the potential to enhance the pathogenicity or transmissibility of potential pandemic pathogens (PPPs) have raised biosafety and biosecurity concerns…").  Thus, Auchincloss and Dr. Fauci had evidently discussed the concern that NIAID had funded the creation of "potential pandemic pathogens" at the Wuhan Institute of Virology, and Dr. Fauci was concerned about NIAID's "ties to this work abroad."  Fauci Ex. 6, at 16.

655.    Dr. Fauci admits that this email confirms that he "wanted to be briefed as to the extent of our involvement with funding in China," Fauci Dep. 71:2-4—in particular, NIAID's funding of the Wuhan Institute of Virology, as a global SARS-like pandemic emerged from Wuhan.

656.    Dr. Fauci also admits that he may have raised the concern with Auchincloss that Dr. Baric's and Dr. Shi Zhengli's research reflected in the 2015 *Nature Medicine* article may have been illegally funded in violation of the GoF Pause in effect from 2014 to 2017.  Fauci Dep. 71:14-20 ("Q: Did you raise a specific concern with Hugh that the research reflected in the Baric, Shi Nature Medicine paper may have been inconsistent with the pause on -- gain-of-function funding research?  A. That is possible.").

657.    On Saturday, Feb. 1, 2020, Jeremy Farrar sent an email organizing a secret conference call at 2:00 pm EST to a group of scientists and science-funding authorities.  Fauci Ex. 6, at 17-18.  The first thing that Farrar noted in the email, in bold, was "**Information and discussion is shared in total confidence and not to be shared until agreement on next steps.**" *Id.* at 17 (bold in original).

658.    Separately, Farrar sent just Dr. Fauci an email on the morning of Feb. 1 to ensure that he could join the call, stating "Could you join?"  Fauci Ex. 7, at 12.  In that email, Farrar listed the participants and stated, "My preference is to keep this a really tight group. … Obviously ask everyone to treat in total confidence." *Id.*  He also stated that the purpose of the call was "To listen to the work of Eddie, Bob and Kristian have done.  Question it.  And think through next steps." *Id.*

659.    Dr. Fauci described the call as an open debate about the lab-leak theory among "a larger group of evolutionary virologists," Fauci Dep. 58:19-20, but in fact the call included a heavy representation of international government and science-funding authorities—including Dr. Fauci, Director of NIAID; Dr. Francis Collins, Director of NIH; Jeremy Farrar, head of the Wellcome Trust, the United Kingdom's "predominant" science-funding authority; Paul Schreier, the Chief Operating Officer of the Wellcome Trust who is responsible for "research funding" there; and Sir Patrick Vallance, the chief medical advisor to the U.K. government.  Fauci Ex. 6, at 18; *see also* Fauci Dep. 75:11-76:15.  All these people had a strong vested interest in avoiding a major scandal about international science-funding practices—such as the concern that Western governments may have funded the creation of a deadly virus that escaped from a lab and infected millions of people.  As funding authorities who control the distribution of massive amounts of research funding, they also had powerful influence over the research scientists on the call.

660.　　Dr. Fauci took steps to ensure that Dr. Francis Collins would be included on the call "since he's the director of NIH." Fauci Dep. 75:4-6. Dr. Fauci evidently spoke with Dr. Collins before the call, as he emailed Farrar before the call stating, "Jeremy: Francis will be on the call. He is trying to phone you." Fauci Ex. 7, at 17. Farrar then emailed Dr. Collins stating, "Francis Call me on [redacted]." Fauci Ex. 7, at 19.

661.　　Like the 12:29 a.m. email to Auchincloss, Dr. Fauci repeatedly claimed that he could not recall virtually any details about the 2:00 p.m. secret conference call with scientists and funding authorities about the lab-leak theory. Fauci Dep. 63:19-67:11 ("I don't recall bringing this up … I don't recall … I don't recall … I don't recall when it was … I don't recall … I don't believe that Larry was, but he could have been … I don't recall"); Fauci Dep. 73:20-74:14 ("I don't recall a discussion about confidentiality or not … I may have. I don't recall."); Fauci Dep. 77:13-15 ("Do you remember anything that anybody said on the call? A: No."); Fauci Dep. 78:10-83:10 ("I don't recall whether that was discussed … I don't recall anything from that phone call that said that … I'm not sure if I discussed it … I have a vague recollection that there was a concern … It is certainly possible, but I don't specifically remember … I don't specifically recall.").

662.　　This testimony to near-complete lack of memory about the call stands in stark contrast to Dr. Fauci's public statements a year and a half after the call occurred, when FOIA releases of Dr. Fauci's emails finally revealed to the public that this secret call had occurred. Then, Dr. Fauci stated, "I remember it very well." Jones Decl., Ex. X, at 1. Dr. Fauci's testimony about lack of recall is not credible.

663.　　Notwithstanding his repeated testimony that he cannot recall specifically what was said on the call, Dr. Fauci provided a self-justifying and innocent account of the call, describing it as a good-faith discussion among scientists trying to get to the truth without any preconceived

biases.  *See, e.g.,* Fauci Dep. 77:16-18 ("[T]here was what appeared to me to be good faith

discussion back and forth between people who knew each other"); Fauci Dep. 79:23-80:1 ("I think

the general feeling among the participants on the call is that they wanted to get down to the truth

and not wild speculation about things."); Fauci Dep. 80:9-10 ("I don't think there was any other

concern than sticking with the truth and sticking with data").

664.    Dr. Fauci thus seeks to have his cake and eat it too—he claims both to remember

little or nothing of what was said on the call, and to clearly remember that the entire discussion

was done in good faith and without any bias.  In any event, subsequent communications and events

make clear that Dr. Fauci's testimony on this point is not credible, as discussed in detail below, as

an aggressive plot to discredit the lab-leak theory commenced immediately after the call.

665.    Almost an hour into the 2:00 pm call, at 2:56 p.m., Jeremy Farrar sent a cryptic

email to Fauci, Collins, Vallance (all science funders) and Mike Ferguson, stating, "Can I suggest

we shut down the call and then redial in?  Just for 5-10 mins?"  Dr. Fauci responded, "Yes."  Fauci

Ex. 7, at 26.  Dr. Fauci claims he cannot recall whether this occurred.  Fauci Dep. 92:1-93:6.

666.    Dr. Fauci testified that the call participants concluded that they needed more time

to take a much closer look at the biology of the virus and genetic sequences before coming to a

conclusion about the virus's origins, and they planned to take more time to continue their inquiry

afterward.  *See* Fauci Dep. 78:3-9 ("The ten[or] of it ended that we need more time … they said

we need some time to more carefully look at this to see if we can come to a sound conclusion

based on further examination of the sequences."); Fauci Dep. 80:24-25 ("The plan was to go and

spend more time carefully looking at it.").  In fact, Eddie Holmes and Kristian Andersen began

drafting an article concluding that the lab-leak hypothesis was baseless and rooted in animus

immediately after the call ended, and Dr. Fauci received an initial draft of this article by the next

Tuesday morning. *See infra.* Dr. Fauci's testimony on this point is not credible.

667.    Dr. Fauci testified that his next interaction with the call's participants was when

Kristian Andersen sent him a preprint of that article attacking the lab-leak theory. Fauci Dep.

82:19-83:1. In fact, before the preprint, Holmes and Farrar had sent Dr. Fauci at least *four* drafts

of the article to review. *See infra.* Dr. Fauci's testimony is not credible on this point.

668.    Dr. Fauci states that he cannot remember if he had further discussions with Jeremy

Farrar, Francis Collins, and Patrick Vallance surrounding this call on Feb. 1, 2020. Fauci Dep.

83:2-10; 85:8-23, 90:25-91:15, 92:1-21. In fact, Dr. Fauci sent Jeremy Farrar a lengthy email that

is entirely redacted at 12:38 a.m. on Saturday, Feb. 1, 2020, Fauci Ex. 7, at 1; Farrar emailed Fauci

on Jan. 30 stating "Tony Perfect timing – thank you. Great to catch up," and provided Sir Patrick

Vallance's phone number, Fauci Ex. 7, at 4; Fauci emailed Farrar and Vallance on Jan. 30, stating

"Thanks, Jeremy. Great chatting with you and Patrick. Will stay in close touch," Fauci Ex. 7, at

4; Jeremy Farrar sent Dr. Fauci an email on Friday, Jan. 31, stating "Tony  Really would like to

speak with you this evening  It is 10pm now UK  Can you phone me on [redacted]," Fauci Ex. 7,

at 3; Farrar and Sir Patrick Vallance had a three-way call with Dr. Fauci on Jan. 30, 2020, Fauci

Ex. 7, at 4; Farrar emailed Fauci and Collins after the call referring to "Conversations with you

and Tony, and Patrick and others," Fauci Ex. 7, at 34; among others. Dr. Fauci had extensive

discussions with Jeremy Farrar, Francis Collins, and Patrick Vallance surrounding the 2:00 p.m.

February 1, 2020 secret conference call, and his testimony to the contrary is not credible.

669.    After the call, Francis Collins emailed Farrar and stated, "Hi Jeremy, I can make

myself available at any time 24/7 for the call with Tedros. Just let me know. Thanks for your

leadership on this critical and sensitive issue." Fauci Ex. 7, at 34. Farrar responded, "We are

altogether as you know!"  Fauci then chimed it: "Thanks, Jeremy.  We really appreciate what you are doing here."  Fauci Ex. 7, at 34.  "Tedros" refers to the director of the World Health Organization.  Fauci Dep. 95:6-7.

670.     After the call, Dr. Fauci described the scientists as engaging in a careful investigation of the virus: "[K]ristian and a few of the others carefully got together and looked at it and examined the pros and the cons and the ups and downs, and came to the conclusion that their initial concern about the molecular basis of the concern was unwarranted and that what they saw was quite compatible and, in fact, suggestive of a natural evolution."  Fauci Dep. 81:8-15.  In fact, Eddie Holmes and Kristian Andersen immediately began drafting an article attacking the lab-leak theory with no further investigation, which was sent to Dr. Fauci in less than three days.  *See infra.*  Dr. Fauci's testimony on this point is not credible.

671.     Farrar emailed Dr. Tedros of the World Health Organization and two senior WHO officials, along with Dr. Fauci and Dr. Collins, indicating that he had just spoken to the senior WHO officials and "[f]ully agree with your summary."  Fauci Ex. 8, at 1.  Farrar emphasized the "urgency and importance" of the lab-leak question because of the "[g]athering interest evident in the scientific literature and in mainstream and social media to the question of the origin of this virus," and thus it was "[c]ritical" to "get ahead of the science and the narrative of this" instead of "reacting to reports which could be very damaging."  Fauci Ex. 8, at 1.  He also wrote, "I am sure I speak for Francis [Collins] and Tony [Fauci] when I say we are here and ready to play any constructive role in this," as they "[d]o think this is an urgent matter to address."  *Id.*

672.     Thus, Farrar, joined by Fauci and Collins, sent a message to the WHO that they wanted to "get ahead" of potentially damaging "narrative[s]" that might emerge "in mainstream and social media" about the origins of the virus.  *Id.*

673.   Later that day, on Feb. 2, Farrar separately emailed Fauci and Collins, stating "Tedros and Bernhard have apparently gone into conclave…they need to decide today in my view. If they do prevaricate, I would appreciate a call with you later tonight or tomorrow to think how we might take forward."  Fauci. Ex. 8, at 2.  He also stated, "Meanwhile…." and linked to an online article speculating about the lab-leak origins of the virus—again indicating that Fauci, Farrar, and Collins were concerned about controlling online discourse about the lab-leak theory. *Id.*

674.   The day after the conference all, Sunday, Feb. 2, Dr. Fauci, Jeremy Farrar, and Dr. Collins shared a series of emails (1) acknowledging that there were very serious arguments in favor of the lab-leak theory, and (2) repeatedly expressing concern about the lab-leak theory's involvement on "social media."  The group, including Dr. Fauci, repeatedly expressed concern about postings about the lab-leak theory on social media.  *See* Fauci Ex. 8.

675.   First, after the Feb. 1 call, still on Feb. 1, Farrar sent an email to the group expressing concern that "[t]here will be media interest and there is already chat on Twitter/WeChat" about the lab-leak theory, and stating: "In order to stay ahead of the conspiracy theories and social media I do think there is an urgency for a body to convene" to address the lab-leak question.  Fauci Ex. 8, at 9.

676.   The next day, Feb. 2, Farrar then expressed concern that "these questions are being asked by politicians, starting in the scientific literature, [and] certainly on social and main stream media.  If, and I stress if, this does spread further, pressure and tensions will rise.  [I] fear these questions will get louder and more polarised and people will start to look to who to blame. … I am concerned if this is not done quite quickly it will be reacting to what may be lurid claims."  Fauci Ex. 8, at 7.

677.    Another call participant then agreed that "this needs to be discussed urgently," in part "because of the lurid claims on Twitter."  Fauci Ex. 8, at 6.  He also noted that "if the evolutionary origins of the epidemic were to be discussed, I think the only people with sufficient information or access to samples to address it would be the teams working in Wuhan."  *Id.*

678.    The same day, Farrar acknowledged "this is a very complex issue," and again expressed concern about "social and main stream media": "As discussed on the phone this discussion is not limited to those on this email, it is happening wider in the scientific, social and main stream media."  Fauci Ex. 8, at 5.

679.    Dr. Collins then responded to Farrar and Dr. Fauci only, stating that "a confidence-inspiring framework … is needed, or the voices of conspiracy will quickly dominate, doing great potential harm to science and international harmony."  Fauci Ex. 8, at 5.

680.    Farrar then shared notes with Fauci, Collins and Tabak (Collins' deputy) from "Mike Farzan (discoverer of SARS receptor)," which stated that Farzan "is bothered by the furin cleavage site [a virus feature that looks bioengineered] and has a hard time explaining that as an event outside the lab," and that "acquisition of the furin site would be highly compatible with the idea of continued passage of virus in tissue culture," *i.e.*, serial passage.  Fauci Ex. 8, at 4.  Farzan suggested that "a likely explanation" of the virus was serial passage of SARS-like coronaviruses in human cell lines, and he stated that "I am 70:30 or 60:40" in favor of laboratory origins.  Fauci Ex. 8, at 3-4.

681.    Farrar also shared notes from "Bob" [Garry] that he had "aligned" the new virus "with the 96% bat CoV sequenced at WIV [Wuhan Institute of Virology]," and viewed the lab-origin theory as highly likely: "I really can't think of a plausible natural scenario … I just can't

figure out how this gets accomplished in nature.  Do the alignment of the spikes at the amino acid level – it's stunning."  Fauci Ex. 8, at 4.

682.    Having shared these notes, Farrar noted, "On a spectrum if 0 is nature and 100 is release – I am honestly at 50!  My guess is that this will remain grey, unless there is access to the Wuhan lab – and I suspect that is unlikely!"  Fauci Ex. 8, at 3.  Both Farrar and Collins expressed concerns that the WHO might move too slowly for their liking.  *Id.*

683.    Then, still on February 2, 2020, Dr. Fauci wrote to Farrar, Collins, and Lawrence Tabak (Dr. Collins' principal deputy), stating: "Like all of us, I do not know how this evolved, but given the concerns of so many people and *the threat of further distortions on social media*, it is essential that we move quickly.  Hopefully, we can get the WHO to convene."  Fauci Ex. 8, at 2 (emphasis added).

684.    Dr. Fauci claimed that he is completely dissociated from social media, stating: "I don't do social media so I'm not familiar with them," Fauci Dep. 98:15-16; and "You know, I'm so dissociated from social media. I don't have a Twitter account. I don't do Facebook. I don't do any of that, so I'm not familiar with that," Fauci Dep. 99:5-8; *see also, e.g.,* Fauci Dep. 103:12-14; 210:3-8; 213:10-16; 241:6-9; 241:21-242:1; 301:10-11 ("I don't pay attention to things related to social media accounts."); *id.* at 312:7-9 ("I can repeat it for the hundredth time, I really don't get involved in social media issues."); *id.* at 356:15-16 ("I'm not a social media person.").

685.    In fact, Dr. Fauci's daughter was then a software engineer at Twitter, Fauci Dep. 99:23-100:15; Dr. Fauci has done numerous podcasts and interviews on social media, including with Mark Zuckerberg, Fauci Dep. 99:16-19, 101:1-6; Dr. Fauci had specifically expressed concern about "the threat of further distortions on social media" about the lab-leak theory in his contemporaneous email, Fauci Ex. 8, at 2; and Dr. Fauci's communications staff had repeatedly

emailed Twitter to try to remove postings critical of Dr. Fauci, *see infra*. Dr. Fauci's professed ignorance of social media is not credible. His communications and conduct make clear that he is keenly aware and deeply concerned about what he believes are "distortions on social media." Fauci Ex. 8, at 2.

686. Dr. Fauci also testified that "I don't recall anything about social media" in his discussions with Farrar about the origins of the virus. Fauci Dep. 102:17-18. In light of the contemporaneous emails repeatedly raising concerns about discussions of the lab-leak theory on social media, this claim is not credible.

687. Dr. Fauci admits that he was "concerned about … there being misinformation or disinformation that would interfere with our trying to save the lives of people throughout the world, which happens when people spread false claims." Fauci Dep. 103:18-22. He states that "misinformation and/or disinformation can lead to loss of life … and that troubles me." Fauci Dep. 104:15-17. This includes the spread of misinformation and disinformation on social media, because "that's part of the way information is disseminated." Fauci Dep. 104:22-23.

688. After Dr. Fauci's email about "the threat of further distortions on social media," Farrar emailed back indicating that the WHO might not move quickly to address the lab-leak theory, and stating to Fauci and Collins: "they need to decide today in my view. If they do prevaricate, I would appreciate a call with you later tonight or tomorrow to think how we might take forward." Fauci Ex. 8, at 2. He also stated: "Meanwhile…." and linked to an online posting expressing concerns about the lab-leak theory – indicating his dominant concern about online speech discussing the lab-leak theory. *Id.*

689. Soon thereafter, Farrar emailed Dr. Tedros of the WHO and two senior WHO officials, copying Fauci and Collins. Fauci Ex. 8, at 1. Farrar urged the WHO to quickly establish

a working group to address the lab-leak theory, and reiterated that they should "[a]ppreciate the urgency and importance of this issue," given the "[g]athering interest evident in the science literature and in mainstream and social media to the question of the origin of this virus," and pressing them to "get ahead of … the narrative of this and not reacting to reports which could be very damaging." Fauci Ex. 8, at 1.

690.    Fauci claims that he does not believe there was any further communication between him and Farrar about this issue, despite Farrar's urgent request for a follow-up call if the WHO did not act immediately. Fauci Ex. 8, at 2; Fauci Dep. 109:22-110:7. In light of their subsequent communications, this testimony is not credible.

691.    By the early morning of February 4, 2020, Eddie Holmes had already sent a draft research paper attacking the lab-leak theory to Jeremy Farrar. Fauci Ex. 9, at 1. Holmes noted to Farrar that, in the draft, he "[d]id not mention [the virus's] other anomalies as this will make us look like loons." Fauci Ex. 9, at 1. To complete the draft between the afternoon of Saturday, Feb. 1, and the early morning of Tuesday, Feb. 4, Holmes must have started working on it almost immediately after the Feb. 1 conference call.

692.    Farrar forwarded this draft to Fauci and Collins at 2:01 a.m. on Tuesday morning, February 4, 2020, in an attachment called "Summary." Fauci Ex. 10, at 3. He noted, "Please treat in confidence – a very rough first draft from Eddie and team – they will send on the edited, cleaner version later." *Id.*; *see also* Fauci Ex. 12, at 1.

693.    Dr. Collins responded: "I note that Eddie is now arguing against the idea that this is the product of intentional human engineering," Fauci Ex. 10, at 3, a dramatic reversal of Holmes's position a few days earlier that Holmes and Andersen "find the genome inconsistent with expectations from evolutionary theory." Fauci Ex. 6, at 1. The paper's conclusion was also

profoundly at odds with Holmes's statement, in the email sending the draft paper itself, that they would "look like loons" if the paper discussed the virus's other "anomalies" that strongly suggested a lab origin. Fauci Ex. 9, at 1.

694.    Collins also noted that Holmes had not ruled out the possibility of a lab-created virus through serial passage. Fauci Ex. 10, at 3. Farrar responded, stating "Eddie would be 60:40 lab side. I remain 50:50." *Id.* Eddie, however, had already drafted a paper that *refuted* the lab-leak theory, even though he evidently still believed was the better explanation. *See id.*

695.    Regarding the possibility of serial passage, Dr. Fauci noted that "Serial passage in ACE2-transgenic mice" was a possibility for the virus's origin, Fauci Ex. 10, at 2— notably, serial passage in humanized mice as was used in the 2015 *Nature Medicine* study. (Like so many other things, Dr. Fauci claims he does not recall this statement that he wrote. Fauci Dep. 115:22-116:12.) Collins responded, "Surely that wouldn't be done in a BSL-2 lab?" and Farrar answered, "Wild West…." Fauci Ex. 10, at 2. This exchange indicates that that Fauci, Farrar, and Collins were concerned that the coronavirus had been created in Wuhan by serial passage through humanized mice in a low-security [BSL-2] lab and then escaped from that low-security lab—*i.e.*, the precise concerns surrounding the NIAID-funded research at WIV. *Id.*; *see also, e.g.,* Jones Decl., Ex. BB< at 14 ("In the above exchange, the health officials [Fauci, Farrar, and Collins] seem to be contemplating the possibility that the repeated passage of a coronavirus through genetically modified mice in an insufficiently secure lab could have resulted in the accidental emergence and release of SARS-CoV-2.").

696.    Later in the evening of the same day, Tuesday, Feb. 4, Farrar sent Fauci and Collins a second version of draft, entitled "Summary," with the note "Tidied up." Fauci Ex. 12, at 7. Dr. Fauci claims he does not remember receiving these drafts. Fauci Dep. 127:4-10.

697.     The next day, February 5, 2020, Farrar sent Fauci and Collins a third version of the draft, still entitled "Summary," with a note: "Tony and Francis The revised draft from Eddie, copied here." Fauci Ex. 12, at 8.

698.     Two days later, on February 7, 2020, Farrar sent Fauci and Collins a fourth version of the same draft, entitled "Summary.Feb7.pdf," with the note in the subject line, "Revised draft." Fauci Ex. 11, at 2.  This draft made clear that Holmes and his co-authors planned to aggressively discredit the lab-leak theory.  It stated in bold in the beginning "Overview" section: "**Analysis of the virus genome sequences clearly demonstrates that the virus is not a laboratory construct or experimentally manipulated virus**."  Fauci Ex. 11, at 3 (bold in original).

699.     This was the *fourth* updated draft that Farrar sent to Fauci and Collins of the paper discrediting the lab-leak theory in the first week since the Feb. 1 secret conference call.  The draft advocated that genetic evidence "clearly demonstrates" that the lab-leak theory is false.  *Id.*

700.     Dr. Fauci claims that he did not have any involvement in Farrar's efforts to push the WHO to assemble a working group to address the lab-leak theory.  Fauci Dep. 110:4-7 ("So I really would doubt that there was any further communication between me and the WHO about this. This was fundamentally Jeremy's lane, if you want to call it that."); *id.* at 125:17-19 ("I didn't have any direct involvement with the WHO, not to my recollection."); *id.* at 131:14-15 ("This was mostly a Jeremy-led thing").  But in fact, Dr. Fauci sent multiple emails to Farrar urging for the inclusion of a long list of specific scientists in the WHO's working group.  Fauci Ex. 13, at 1-2, 6.

701.     On Feb. 5, 2020, Farrar emailed Fauci and Collins, stating that he believed that the WHO would assemble a working group to address the lab-leak theory, and urging Fauci and Collins to provide names of scientists to participate in the group.  Fauci Ex. 13, at 7.  Farrar stated that the WHO "have asked for names to sit on that Group – please do send any names."  *Id.*  He

then stated, "We can have a call this week with a core group of that *to frame the work of the Group*

including – if you could join?"  *Id.* (emphasis added).  And then he stated, "With names to be put

forward into the Group from us and *pressure on this group from your and our teams* next week."

*Id.* (emphasis added).  Plainly, Farrar intended, with Fauci and Collins' assistance, to stack the

WHO's group with their hand-picked scientists, have an advance call "to frame the work of the

Group," and to put "pressure on this group from [Fauci's and Collins'] and our teams next week,"

*id.*—to influence and control the outcome of the WHO Group's deliberations.

702.    Fauci and Collins did not dispute this plan.  On the contrary, Fauci responded by

providing Farrar with a detailed list of eight scientists to include in the WHO's group "in addition

to the individuals who were on the call with us last Saturday."  Fauci Ex. 13, at 2, 6.  Fauci then

followed up to his own email with an additional scientist, stating she is "an important name for the

coronavirus evolution working group.  Please include her."  *Id.* at 1.  Fauci's attempts to downplay

his involvement with the plan to create and control a WHO working group on COVID-19's origins

to discredit the lab-leak theory, therefore, are not credible.

703.    Dr. Fauci testified that he, Farrar, and Collins "wanted to get them [the WHO]

involved because we wanted to make sure that this was an open and transparent discussion," Fauci

Dep. 126:9-12, is not credible in light of the contemporaneous email from Farrar to Fauci and

Collins plotting to "frame the work of the Group" and put "pressure on this group from your and

our teams next week."  Fauci Ex. 13, at 3.

704.    Dr. Fauci claims he does not recall any discussions about framing the work of the

Group, or putting pressure on the Group.  Fauci Dep. 137:1-21.

705.    On February 9, 2020, Dr. Fauci participated in a joint podcast with Dr. Peter Daszak

of the EcoHealth Alliance to discuss the outbreak of COVID-19.  Fauci Ex. 15, at 1.

706.    Peter Daszak was then involved in organizing a statement for the Lancet seeking to discredit the lab-leak theory, similar to the article then being drafted by Eddie Holmes, of which Dr. Fauci had received four drafts the previous week.  *See* Jones Decl., Ex. CC, at 1.  Just a few days later, The Lancet would publish a statement of scientists organized and co-signed by Daszak and Jeremy Farrar, which stated: "We stand together to strongly condemn conspiracy theories suggesting that COVID-19 does not have a natural origin."  *Id.*  Thus, at that time, Daszak was working in parallel with Dr. Fauci, and together with Jeremy Farrar, to produce a published article discrediting the lab-leak theory.  *Id.*

707.    During the podcast, both Dr. Fauci and Daszak made comments seeking to discredit the lab-leak theory.  Fauci Ex. 16, at 1.  Fauci, when asked "Do you have any sense of where [the virus] probably came from?" answered, "Well I think ultimately we know that these things come from an animal reservoir.  I heard these conspiracy theories and like all conspiracy theories … they [are] just conspiracy theories….   I think the things you are hearing are still in the realm of conspiracy theories without any scientific basis for it."  *Id.*  Daszak was asked, "Is it your sense that it's almost certain it came from an animal-to-human transmission?" and he responded: "All the evidence says that is what happened. … It looks to me and to most scientists like it's a bat virus that got into people either in the market or in rural China and just unfortunately has the capacity to spread."  *Id.*

708.    On February 11, 2020, Dr. Fauci had a meeting at NIAID with Dr. Ralph Baric, the corresponding author of the 2015 *Nature Medicine* article about NIAID-funded gain-of-function research in Wuhan that Dr. Fauci sent to Hugh Auchincloss after midnight on Feb. 1.  Fauci Ex. 17, at 1 (Dr. Fauci's official calendar, Feb. 11, 2020, at 2:30 p.m. – "Meeting with Dr. Ralph Baric").  Dr. Fauci does not dispute that he met with Dr. Ralph Baric that day, but (like so many

other things) he claims that he does not recall the meeting or what they discussed. Fauci Dep. 149:9-10, 149:21-23. As noted above, given that Dr. Fauci was deeply concerned about Baric's research at the time, Dr. Fauci's testimony on this point is not credible.

709.    On Feb. 11, 2020, Ian Lipkin wrote an email referring to the draft paper about the origins of COVID-19 stating that, while the paper was "well-reasoned and provides a plausible argument against genetic engineering," it "does not eliminate the possibility of an inadvertent release following adaptation through selection in culture at the institute in Wuhan. Given the scale of the bat CoV research pursued there and the site emergence of the first human cases we have a nightmare of circumstantial evidence to assess." Fauci Ex. 18, at 1. Dr. Fauci states that he does not recall this email but that "it's entirely possible that Ian wrote this to me," because "Ian communicates with me." Fauci Dep. 153:15-17.

710.    Dr. Fauci testified that it is "molecularly" impossible that SARS-CoV-2 originated from NIAID-funded research: "molecularly, that could not have happened." *Id.* at 157:21-22. But separately, he repeatedly testified that molecular virology is not his field, so his certainty on this one key point is not credible. *Id.* at 64:8-9 ("that's not my field, evolutionary virology"); *id.* at 117:19-20 ("I'm hesitant to go there because that's not my area of expertise"); *id.* at 127:12-13 ("it was an area that was not my area of expertise"); *id.* at 160:7-9 ("Did I fully understand the molecular virology of it? Unlikely, because I'm not an evolutionary virologist.").

711.    On February 17, 2020, the preprint version of the paper drafted by Eddie Holmes attacking the lab-leak theory was released. Fauci Ex. 19. The paper was entitled, "The Proximal Origins of SARS-CoV-2." *Id.* at 12. Its listed authors were Kristian Andersen, Andrew Rambaut, Ian Lipkin, Edward Holmes, and Robert Garry. *Id.* All these authors, except possibly Ian Lipkin,

had been participants in the secret phone conference at 2:00 p.m. on Saturday, Feb. 1, 2020.  Fauci Dep. 161:7-10.

712.    These authors had a financial interest in supporting NIH's preferred narrative. "Garry and Andersen have both been recipients of large grants from NIH in recent years, as has another 'Proximal Origin' author, W. Ian Lipkin of Columbia University."  Jones Decl., Ex. BB.

713.    These authors were stunningly recent converts to the theory of natural origin.  On February 11, Ian Lipkin had sent an email about the same paper stating that "we have a nightmare of circumstantial evidence to assess."  Fauci Ex. 18, at 1.  On February 4, Holmes had written to Farrar that he avoided discussing the virus's "other anomalies as this will make us look like loons."  Fauci Ex. 9, at 1.

714.    On February 2, Bob Garry had written to Farrar, "I really can't think of a plausible natural scenario … I just can't figure out how this gets accomplished in nature.  Do the alignment of the spikes at the amino acid level – it's stunning."  Fauci Ex. 8, at 4.  On January 31, Andersen had written to Dr. Fauci that the virus's "features (potentially) look  engineered," and that "after discussion earlier today, Eddie [Holmes], Bob [Garry], … and myself all find the genome inconsistent with expectations from evolutionary theory."  Fauci Ex. 6, at 1.

715.    The preprint version of "The Proximal Origin of SARS-CoV-2" asserted a very different conclusion.  It stated that "this analysis provides evidence that SARS-CoV-2 is not a laboratory construct nor a purposefully manipulated virus."  Fauci Ex. 19, at 2.  It stated that "genomic evidence does not support the idea that SARS-CoV-2 is a laboratory construct."  *Id.* at 6.

716.    Dr. Fauci does not dispute that this preprint was sent to him.  Fauci Dep. 160:3-4 ("It is likely that this was sent to me").  Dr. Fauci admits that he reviewed the preprint when it was

sent to him. *Id.* at 160:7 ("Did I look through it? Yes."). And Dr. Fauci admits that he was aware of what their conclusion was about the lab-leak theory. *Id.* at 162:13-15 ("I am certain that having looked at it, I was aware of what their conclusion was.").

717.    This was the *fifth* version of the paper that was sent to Dr. Fauci to review, after four drafts sent to him on Feb. 4, 5, and 7. *Id.* at 160:13-16.

718.    On March 6, 2020, Kristian Andersen emailed Dr. Fauci, Dr. Collins, and Jeremy Farrar, stating, "Dear Jeremy, Tony, and Francis, Thanks again for your advice and leadership as we have been working through the SARS-CoV-2 'origins' paper. We are happy to say that the paper was just accepted by Nature Medicine and should be published shortly …. To keep you in the loop, I just wanted to share the accepted version with you, as well as a draft press release. We're still waiting for proofs, so please let me know if you have any comments, suggestions, or questions about the paper or the press release." Fauci Ex. 22, at 1. He also wrote: "Tony, thank you for your straight talk on CNN last night – it's being noticed." *Id.*

719.    Thus, Andersen thanked Dr. Fauci, Collins, and Farrar for their "advice and leadership" about the paper, sent them the final draft, and asked for their input both on the draft and on their public messaging about the draft. *Id.*

720.    This was the *sixth* version of the paper that was forwarded to Dr. Fauci for review and input. *Id.*

721.    Dr. Fauci responded: "Kristian: Thanks for your note. Nice job on the paper. Tony." *Id.*

722.    Dr. Fauci denies that he provided "advice and leadership" in the preparation of the paper. Fauci Dep. 171:11-13. In light of the extensive meetings and correspondence detailed above, that testimony is not credible.

723.     On March 17, 2020, *Nature Medicine* published the online version of *The Proximal Origin of COVID-19*.  Fauci Ex. 24, at 3.  The print version appeared in the April 2020 volume of the journal.  *Id.*

724.     The final, published version of the article makes even stronger claims attacking the lab-leak theory than the preprint version.  In its opening, the article states: "Our analyses *clearly show* that SARS-CoV-2 is not a laboratory construct or a purposefully manipulated virus."  Fauci Ex 24, at 1 (emphasis added).  Similarly strong language, leaving no room for doubt, occurs throughout the article: "the genetic data *irrefutably show* that SARS-CoV-2 is not derived from any previously used viral backbone," *id.* at 1 (emphasis added).  "This *clearly shows* that the SARS-CoV-2 spike protein optimized for binding to human-like ACE2 is the result of natural selection," *id.* at 2 (emphasis added).  "[T]he evidence shows that SARS-CoV-2 is not a purposefully manipulated virus," *id.* at 3.  "[W]e do not believe that any type of laboratory-based scenario is plausible."  *Id.* at 3.  "SARS-CoV-2 originated via natural selection."  *Id.* at 3.

725.     Thus, between the preprint version and final version of the article, the article substantially beefed up its conclusion that the lab-leak theory is implausible and should be discredited.  Dr. Fauci claims he does not "recall specific conversations" about that conclusion with the authors, but he admits that he is "sure" that he discussed that conclusion with them: "we read the preprint and, therefore, we knew what the conclusion was, and I'm sure that that conclusion was discussed. So I would not be surprised at all following the initial preprint that I discussed the conclusion of these authors that this is not a laboratory construct or a purposely manipulated virus."  Fauci Dep. 181:3-10; *see also id.* at 181:18-22.  Based on all these circumstances, it is likely that Dr. Fauci encouraged the authors to express a stronger and more unequivocal conclusion against the lab-leak theory than reflected in the preprint.

726.    Once the article "The Proximal Origin of SARS-CoV-2" was released, both Dr. Fauci and Dr. Collins took steps to push it into prominence.  First, on March 26, 2020, Dr. Collins published a blog post on the article on the "NIH Director's Blog" entitled "Genomic Study Points to Natural Origin of COVID-19."  Fauci Ex. 25, at 1.

727.    Dr. Collins used strong language relying on the study to attack and discredit the lab-leak theory as "outrageous" and "debunk[ed]": "Some folks are even making outrageous claims that the new coronavirus causing the pandemic was engineered in a lab and deliberately released to make people sick.  A new study debunks such claims by providing scientific evidence that this novel coronavirus arose naturally."  Fauci Ex. 25, at 2.  Dr. Collins stated that the study shows that "the coronavirus that causes COVID-19 almost certainly originated in nature," and that "this study leaves little room to refute a natural origin for COVID-19."  Fauci Ex. 25, at 3.

728.    In his blog post, Dr. Collins did not disclose that he and Dr. Fauci had been part of the group that organized the study, nor that he and Dr. Fauci had reviewed six versions of the study before it was published.  Fauci Ex. 25.

729.    As was evidently intended, Dr. Collins's blog post immediately fueled media coverage attacking the lab-leak theory as a "conspiracy theory."  For example, the next day, March 27, 2020, ABC News ran a story entitled, "Sorry, conspiracy theorists.  Study concludes COVID-19 'is not a laboratory construct.'"  Fauci Ex. 26.  The article quoted Bob Garry—who on January 31 had found "the genome inconsistent with the expectations of evolutionary theory," Fauci Ex. 6, at 1, and on February 1 had told Farrar that "I just can't figure out how this gets accomplished in nature … it's stunning," Fauci Ex. 8, at 4—as stating that "[t]his study leaves little room to refute a natural origin for COVID-19."  Fauci Ex. 26, at 3-4.

730.     Dr. Fauci testified that he could not remember any contact from Dr. Collins about "The Proximal Origin of SARS-CoV-2" after Dr. Collins' blog post on March 26, 2020.  Fauci Dep. 186:19-187:6.  In light of their subsequent communications and Dr. Fauci's actions, this testimony is not credible.

731.     In fact, Dr. Collins emailed Dr. Fauci about the article on Thursday, April 16, 2020. Fauci Ex. 27.  The email linked to a Fox News piece by Bret Baier alleging that sources were "increasingly confident" that SARS-CoV-2 originated in a lab, and it stated: "Wondering if there is something NIH can do to help put down this very destructive conspiracy, with what seems to be growing momentum."  Fauci Ex. 27, at 1.  Dr. Collins stated, "I hoped the Nature Medicine article on the genomic sequence of SARS-CoV-2 [*i.e.*, "The Proximal Origin of COVID-19] would settle this. … Anything more we can do?"  Fauci Ex. 27, at 1.

732.     Dr. Fauci responded to Dr. Collins at 2:45 a.m. the next day, Friday, April 17, stating only: "Francis: I would not do anything about this right now.  It is a shiny object that will go away in times.  Best, Tony."  Fauci Ex. 27, at 2.

733.     Dr. Fauci testified that he did not take "any steps to increase the visibility of the article after this" email exchange with Dr. Collins.  191:21-22; *see also* 195:10-17.  That testimony is incorrect and not credible.

734.     In fact, that same day, Dr. Fauci took matters into his own hands to make the lab-leak theory "go away."  At the joint press conference on April 17, 2020, with President Trump, Vice President Pence, and Dr. Fauci, a reporter asked, "Mr. President, I wanted to ask Dr. Fauci: Could you address the suggestions or concerns that this virus was somehow manmade, possibly came out of a laboratory in China?"  Fauci Ex. 28, at 2.  Dr. Fauci responded: "There was a study recently that we can make available to you, where a group of highly qualified evolutionary

virologists looked at the sequences there and the sequences in bats as they evolve.  And the mutations that it took to get to the point where it is now is [pause for emphasis] *totally consistent* with a jump of a species from an animal to a human." *Id.*; *see also id.* 199:18-25 (Dr. Fauci conceding that, "when you said that sentence about totally consistent, you pause and use that phrase, 'totally consistent' with emphasis" – "Right."); *see also* Video of April 17, 2020 White House Coronavirus Task Force Briefing, *at* https://www.youtube.com/watch?v=brbArpX8t6I (exchange starting at 1:38:32 of video).

735.    Dr. Fauci then feigned ignorance and unfamiliarity with the authors of the study: "the paper will be available – I don't have the authors right now, but we can make that available to you." Fauci Ex. 28, at 2.  Presenting himself as unconnected with the paper, Dr. Fauci did not reveal (1) that he was part of a group that had launched the paper in a clandestine phone call on Saturday, Feb. 1; (2) that he had extensively corresponded with Jeremy Farrar about the paper and its conclusions; (3) that the authors of the paper had sent six versions to him, Jeremy Farrar, and Dr. Collins to review; (4) that he had likely urged the authors to beef up their conclusion attacking the lab-leak theory between the preprint and published versions of the paper; (5) that the authors had personally thanked him for his "advice and leadership" in drafting the paper; or (6) that Dr. Collins had emailed him the day before to ask him to push the paper publicly or take other steps to discredit the lab-leak theory.

736.    Dr. Fauci does not dispute that he was referring to "The Proximal Origin of SARS-CoV-2" in his public remarks at the April 17, 2020, White House press briefing.  Fauci Dep. 201:2-6 ("I assume it was the Nature Medicine paper…. I think it was.").

737.    Dr. Fauci testified that he did not make that paper available to any reporters after the press conference.  *Id.* at 201:7-9 ("Not to my knowledge.).  That testimony is not credible.

738.     In fact, over the weekend following the press conference, Dr. Fauci personally responded to an inquiry from a reporter specifically asking for the study he had referred to at the April 17, 2020 press conference, and provided a link to "The Proximal Origin of SARS-CoV-2." Fauci Ex. 29, at 1.  On Sunday, April 19, a reporter emailed the White House press office asking, "Dr. Fauci said on Friday he would share a scientific paper with the press on the origin of the coronavirus.  Can you please help me get a copy of that paper?"  *Id.*

739.     Dr. Fauci personally responded to this reporter, stating, "Bill: Here are the links to the scientific papers and a commentary about the scientific basis of the origins of SARS-CoV-2." Fauci Ex. 29, at 1.  He then provided three links.  The first was a link to the online version of "The Proximal Origin of SARS-CoV-2."  The second and third were links to a paper and an online statement by Eddie Holmes, whom Dr. Fauci knew had begun secretly drafting the paper that became "The Proximal Origin of SARS-CoV-2" immediately after the clandestine Feb. 1 conference call with Dr. Fauci, Jeremy Farrar, and others.  Fauci Ex. 29, at 1.  The second link to a paper authored by Holmes was "a commentary on [The Proximal Origin of SARS-CoV-2] in the journal *Cell*."  Fauci Dep. 202:25-203:1; *see also id.* at 203:2-16.

740.     On April 18 and 19, 2020, Dr. Fauci exchange cordial emails with Peter Daszak of the EcoHealth Alliance, who steers NIAID funds to finance bat coronavirus research with Dr. Shi Zhengli at the Wuhan Institute of Virology.   On Saturday, April 18, Daszak emailed Dr. Fauci, calling him "Tony," and stating: "As the PI of the R01 grant publicly targeted by Fox News reporters at the Presidential press briefing last night, I just wanted to say a personal thank you … for standing up and stating that the scientific evidence supports a natural origin for COVID-19 … not a lab release from the Wuhan Institute of Virology."  Fauci Ex. 30, at 1.  Daszak also wrote: "Once this pandemic's over I look forward to thanking you in person and let you know how

important your comments are to us all." *Id.* Dr. Fauci responded on April 19: "Peter: Many thanks for your kind note." *Id.*

741.    Dr. Fauci's and Dr. Collins's efforts to orchestrate and publicize "The Proximal Origin of SARS-CoV-2" as a method of discrediting the lab-leak theory were highly effective. "The Proximal Origin of SARS-CoV-2" became one of the most widely read and most publicized scientific papers in history, with pervasive media coverage using it to discredit the lab-leak theory. "The paper has been accessed online more than 5.7 million times and has been cited by more than 2,000 media outlets. … It became one of the best-read papers in the history of science." Jones Decl., Ex. BB, at 3.

742.    As a direct result of these efforts, speech and speakers advocating for the lab-leak theory of COVID-19's origins were extensively censored on social media platforms.

743.    Twitter took aggressive censorship action against such speech and speakers. For example, on September 16, 2020, Twitter suspended the account of a Chinese virologist who claimed coronavirus was made in a lab. Fauci Ex. 31, at 1. "Twitter has suspended the account of a Chinese scientist who suggested that the novel coronavirus was created in a lab … despite inconclusive evidence." Fauci Ex. 31 at 2.

744.    Facebook, likewise, took aggressive steps to censor the lab-leak theory on social media, even going so far as to formalize this policy as part of its official content-moderation policy. Fauci Ex. 32, at 3 (Facebook announcing that "we are expanding the list of false claims we will remove to include additional debunked claims about the coronavirus and vaccines," including "COVID-19 is man-made or manufactured"). Facebook noted that "we already prohibit these claims in ads," and promised "to take aggressive action against misinformation about COVID-19 and vaccines." *Id.* Facebook promised to "begin enforcing this policy immediately, with a

particular focus on Pages, groups or accounts that violate these rules …. Groups, Pages, and accounts on Facebook that repeatedly share these debunked claims may be removed altogether." *Id.*

745.    Like Twitter, Facebook censored even high-profile speakers who raised questions about the origins of COVID-19 or advanced the lab-leak hypothesis.  For example, Facebook censored an article by award-winning British journalist Ian Birrell who raised "the question of the origins of the Covid-19 virus within Wuhan" and criticized the natural-origin theory of the virus. Fauci Ex. 33, at 1.

746.    Dr. Fauci claims that he is not aware of any suppression of speech about the lab-leak theory on social media: "I'm not aware of suppression of speech on social media to my knowledge…. I don't recall being aware of suppression of anything."  Fauci Dep. 208:10-14.  He claims that this ignorance is because he does not pay any attention to anything said on social media: "This is not something that would be catching my attention because, you know, the social media and Twitter, I told you, I don't have a Twitter account. I don't tweet. I don't do Facebook. I don't do anything. So social media stuff, I don't really pay that much attention to."  *Id.* at 210:3-8.  As noted above, Dr. Fauci's emails and actions reflect extensive concern about what is said on social media, and his attempt to cast himself as someone with no knowledge of social media is not credible.

747.    Further, Dr. Fauci's emails and interrogatory responses show a close relationship with the CEO and founder of Meta (Facebook/Instagram), Mark Zuckerberg.

748.    On February 27, 2020, Mark Zuckerberg emailed Dr. Fauci directly to inquire about the development of the COVID-19 vaccine and offer the assistance of the Chan-Zuckerberg foundation.  Fauci Ex. 23, 1.  Zuckerberg already had Dr. Fauci's email, called Dr. Fauci by his

first name "Tony," and wrote as if he had a preexisting acquaintance with Dr. Fauci. *Id.* Dr. Fauci,

likewise, responded to Zuckerberg on a first-name basis and with the familiar tone of an

acquaintance. Fauci Ex. 23, at 2.

749.    Dr. Fauci claims that he does not recall whether he had already met Mark

Zuckerberg. Fauci Dep. 173:17-174:5 ("I meet thousands of people. I'm not sure I ever met him

in person."). But in fact, Dr. Fauci still refers to Mark Zuckerberg by his first name. *Id.* at 289:9-

16.

750.    On March 15, 2020, Mark Zuckerberg sent Dr. Fauci a lengthy email to offer close

coordination between Dr. Fauci and Facebook on COVID-19 messaging. In the email, Zuckerberg

thanked Dr. Fauci for his leadership, and "share[d] a few ideas of ways to help you get your

message out." Fauci Ex. 23, at 3. Zuckerberg made three proposals: (1) Facebook was about to

launch a "Coronavirus Information Hub" visible at the top of the page to all Facebook users to

"get authoritative information from reliable sources," and Zuckerberg offered to include "a video

from you" as a "central part of the hub," *id.*; (2) Zuckerberg was "doing a series of livestreamed

Q&As from health experts" for his 100 million followers and wanted Dr. Fauci to do one of these

videos, *id.*; and (3) Zuckerberg advised Dr. Fauci that Facebook had "allocated technical resources

and millions of dollars of ad credits for the US government to use for PSAs to get its message out

over the platform," and he wanted Dr. Fauci to recommend "a point person for the government

response," *id.*

751.    Dr. Fauci responded the next day, telling "Mark" that "[y]our idea and proposal

sound terrific," that he "would be happy to do a video for your hub," and that "your idea about

PSAs is very exciting." Fauci Ex. 23, at 4. He copied his Special Assistant to put Zuckerberg in

touch with the right point person for the government to arrange specially subsidized government messaging about COVID-19 on Facebook.  *Id.*

752.    Zuckerberg replied the same day, stating "[w]e'd love to move quickly to help the effort and support getting these messages out."  Fauci Ex. 23, at 6.

753.    Dr. Fauci claims that the U.S. Government did not accept Facebook's offer of free ad credits to support the Government's COVID-19 messaging.  Fauci Dep. 177:22-178:4 ("I don't believe that there was any money that was given from the Zuckerberg to the United States government to do PSAs. It's possible, but it certainly didn't happen to my knowledge. I don't recall money being given for PSAs.").  But at the time, Dr. Fauci described the proposal as "very exciting" and immediately followed up on Zuckerberg's offer.  Fauci Ex. 23, at 4.  Separate emails from Facebook to the White House corroborate these ad credits.  *See, e.g.,* Doc. 174-1, at 46.   Dr. Fauci's testimony on this point is not credible.

754.    Dr. Fauci and Zuckerberg have "interacted on Facebook Zoom-type podcasts." Fauci Dep. 175:17-18.  Dr. Fauci did "[t]hree live stream Facebook-type Q and As" about COVID-19 with Zuckerberg.  Fauci Dep. 177:2-4.

755.    Dr. Fauci's interrogatory responses reveal extensive direct communications between Dr. Fauci and Zuckerberg.  *See* Scully Ex. 12, at 33, 53-54 (identifying 13 communications between Dr. Fauci and Zuckerberg, including emails, phone calls, virtual meetings, and live broadcasts, over a nine-month period in 2020).

756.    Reviewing the foregoing facts about Dr. Fauci's communications with Farrar, Eddie Holmes, and others, former Director of the CDC Robert Redfield "had a dawning realization. He concluded there'd been a concerted effort not just to suppress the lab-leak theory but to manufacture the appearance of a scientific consensus in favor of a natural origin. 'They

made a decision, almost a P.R. decision, that they were going to push one point of view only' and

suppress rigorous debate, said Redfield. 'They argued they did it in defense of science, but it was

antithetical to science.'" Jones Decl., Ex. AA.

**B.      Dr. Fauci's Efforts to Suppress Speech on Hydroxychloroquine.**

757.    On May 22, 2020, The Lancet published an online article entitled

"Hydroxychloroquine or chloroquine with or without a macrolide for treatment of COVID-19: a

multinational registry analysis."  Fauci Ex. 35, at 1.  The article purported to analyze 96,032

patients to compare cohorts who did and did not receive hydroxychloroquine or chloroquine to

treat COVID-19.  *Id.*  The study concluded that hydroxychloroquine and chloroquine were

"associated with decreased in-hospital survival and an increased frequency of ventricular

arrhythmias when used for COVID-19."  *Id.*

758.    On May 27, 2020, Dr. Fauci publicly cited this study to claim that

hydroxychloroquine is "not effective against coronavirus."  Fauci Ex. 34, at 1.  Dr. Fauci "became

the first Trump administration official to say definitively that hydroxychloroquine is not an

effective treatment for the coronavirus." *Id.* at 2.  "'The scientific data is really quite evident now

about the lack of efficacy,' Fauci … said on CNN."  *Id.*

759.    Dr. Fauci's comments were based on the May 22 Lancet study.  *Id.* at 3 ("Fauci's

comments come days after the Lancet published a 96,000-patient observational study that

concluded that hydroxychloroquine had no effect on Covid-19 and may even have caused some

harm.").

760.    The Lancet article was an observational study, not a randomized trial.  At the time,

"[t]here [wa]s no data yet from randomized, controlled clinical trials of hydroxychloroquine – the

gold standard for evaluating potential treatments." Fauci Ex. 34, at 4.  "But Fauci was unequivocal on [May 27, 2022], saying that 'the data are clear right now.'"  *Id.*

761.    Just a few days later, The Lancet retracted the May 22, 2022 study.  Fauci Ex. 35, at 1.  An article reporting on the retraction noted that the study's authors "were unable to confirm that the data set was accurate," that "several concerns were raised with respect to the veracity of the data," the study may have "include[ed] more cases than possible," and that "[a] first-year statistics major could tell you about major flaws in the design of the analysis."  Jones Decl., Ex. DD, at 2-3.

762.    Thus, Dr. Fauci's initial dismissal of hydroxychloroquine was based on a purely *observational* study – not a randomized, controlled trial – and one that was retracted for glaring errors just days later.

763.    Dr. Fauci testified that he did not recall that The Lancet study he cited to discredit the efficacy of hydroxychloroquine had been retracted.  Fauci Dep. 223:7 ("I don't recall it being retracted.").

764.    Dr. Fauci stepped up his public campaign to discredit hydroxychloroquine by insisting that its effectiveness could only be judged by undergoing rigorous, randomized, double-blind, placebo-based studies, notwithstanding his previous reliance on the less-than-rigorous observational study in The Lancet that was subsequently retracted.  On July 31, 2020, Dr. Fauci testified before the House Select Subcommittee on Coronavirus Crisis, during which he stated: "The point that I think is important, because we all want to keep an open mind, any and all of the randomized placebo-controlled trials, which is the gold standard of determining if something is effective, none of them had shown any efficacy by hydroxychloroquine. Having said that, I will state, when I do see a randomized placebo-controlled trial that looks at any aspect of

hydroxychloroquine, either early study, middle study, or late, if that randomized placebo-controlled trial shows efficacy, I would be the first one to admit it and to promote it. But I have not seen yet a randomized placebo-controlled trial that's done that. And in fact, every randomized placebo-controlled trial that has looked at it, has shown no efficacy. So, I just have to go with the data. I don't have any horse in the game one way or the other, I just look at the data." *See* https://www.youtube.com/watch?v=RkNC5OQD2UE.

765.    Despite his insistence before a congressional committee that randomized, placebo-controlled trials were the determining factor for his opinion regarding the effectiveness of hydroxychloroquine in the treatment of COVID-19, Dr. Fauci quietly admitted that such rigorous studies are not actually required to determine the efficacy of a therapeutic drug.  Dr. Fauci was asked, "Do you recall saying in connection with the discussion of hydroxychloroquine that a randomized double blind placebo based study is the gold standard?"  Fauci Dep. 244:8-11.  He replied, "That is the gold standard for everything.  *It isn't always needed*, but for the most part, it's the gold standard."  *Id.* at 244:12-14 (emphasis added).

766.    Dr. Fauci's sudden reversal concerning the critical standards for scientific studies to determine the effectiveness of hydroxychloroquine demonstrated a lack of candor to the House Select Subcommittee on Coronavirus Crisis.  Indeed, Dr. Fauci misled the Committee when he failed to disclose that randomized, double-blind, placebo-based studies are not always needed and that he previously relied on the *observational,* i.e., non-randomized, non-double-blind, non-placebo-based study in The Lancet to form an opinion about that drug's efficacy in the first place.  Dr. Fauci lacks credibility on this point.

767.    Despite mounting evidence against his position, Dr. Fauci testified that his opinion against hydroxychloroquine was based on other studies as well as the retracted article in The

Lancet, but he could not identify any of those studies.  Fauci Dep. 223:12-18 ("I don't recall specifically what those studies are now.").

768.    Dr. Fauci did not retreat from his hard public stance against hydroxychloroquine. On July 26, 2020, a group called "America's Frontline Doctors" held a press conference at the U.S. Capitol criticizing the government's response to the COVID-19 pandemic and touting the benefits of hydroxychloroquine in treating the coronavirus.  Fauci Ex. 38, at 5.

769.    Dr. Fauci responded to this event with highly visible public statements condemning the use of hydroxychloroquine.  For example, he stated on "Good Morning America," that "[t]he overwhelming prevailing clinical trials that have looked at the efficacy of hydroxychloroquine have indicated that it is not effective in coronavirus disease."  Fauci Ex. 36, at 5.  Dr. Fauci made these comments in direct response to the public claims of America's Frontline Doctors.  Fauci Dep. 227:7-228:13.  He also stated on MSNBC's "Andrea Mitchell Reports" that the video of the press conference by America's Frontline Doctors constituted "a video out there from a bunch of people spouting something that isn't true."  Fauci Ex. 37, at 3.

770.    Dr. Fauci also stated that "the cumulative data on trials, clinical trials that were valid, namely clinical trials that were randomized and controlled in a proper way, … showed consistently that Hydroxychloroquine is not effective in the treatment of coronavirus disease or COVID-19."  Fauci Ex. 37, at 3.  But two months earlier, he had said "the data are clear right now" when no such studies existed.  Fauci Ex. 34, at 4.

771.    Social-media platforms reacted by aggressively censoring the video of America's Frontline Doctors.  Facebook removed the video when it was "the top-performing Facebook post in the world," and "had accumulated over 17 million views by the time of its censorship by Facebook."  Fauci Ex. 38, at 3, 4.  Further, "Facebook's decision to censor the livestream was

quickly followed by YouTube, the Google-owned video-sharing platform." *Id.* at 6. "The video

had 80,000 views on YouTube prior to its removal." *Id.* "Following Facebook and YouTube's

removal of the video, Twitter followed suit…." *Id.*; *see also* Fauci Ex. 36, at 3 (noting that "Twitter

… removed the video, saying it was 'in violation of our COVID-19 misinformation policy'").

772.    Dr. Fauci professed to be unaware of whether 17 million views of a video on

Facebook are a large number of views: "I don't know what 17 million views means. What's the

denominator? Is 17 million a large amount? Is it a small amount? I don't go on social media, so I

don't know what 17 million views means." Fauci Dep. 236:7-11. It is common sense that 17

million views are a large number of views. Dr. Fauci's testimony on this point is not credible.

773.    Dr. Fauci does not deny that he or his staff at NIAID may have communicated with

Facebook regarding the censorship of the America's Frontline Doctors video. Instead, he claims

that he does not recall whether they communicated with Facebook about it, and that it is possible

that they did so. Fauci Dep. 238:2-5 ("I don't recall anybody communicating with them about that.

Could have been, but I don't recall anybody -- I don't recall anybody communicating with the social

media people."); *see also id.* at 238:6-10. He also does not deny that other federal officials may

do so, but he claims that "I don't recall any of that" and "it just doesn't ring a bell to me right

now." *Id.* at 238:21-239:7. He claims he doesn't "pay attention" to whether his staff or other

federal officials communicate with social-media platforms about censorship because "I have a

really important day job that I work at." *Id.* at 238:19-20.

774.    Nevertheless, regarding the decision by YouTube and Twitter to follow Facebook

in censoring the video, Dr. Fauci admits that "Yes, I knew of that." *Id.* at 239:8-13.

775.    A few days later, on August 1, 2020, the web host provider for America's Frontline Doctors shut down their website.  *Id.* at 242:14-243:8; Fauci Ex. 39.  Dr. Fauci testifies that he does not recall this occurrence.  Fauci Dep. 243:13-18.

776.    On November 18, 2022, a meta-analysis of 449 studies on the efficacy of hydroxychloroquine considered "449 HCQ COVID-19 studies, 351 peer reviewed, 371 comparing treatment and control groups."  Fauci Ex. 40, at 1.  The meta-analysis concluded that "[l]ate treatment and high dosages may be harmful, while early treatment consistently shows positive results."  *Id.*  It also noted that "[n]egative evaluations" of hydroxychloroquine "typically ignore treatment delay."  *Id.*  And it noted that "HCQ/CQ was adopted for early treatment in all or part of 41 countries."  *Id.*

## C.    Dr. Fauci's "Devastating Takedown" of the Great Barrington Declaration.

777.    Dr. Fauci recommended Dr. Clifford Lane of NIAID to participate in a WHO mission to China in February 2020.  Fauci Dep. 139:15.

778.    On April 3, 2020, the NIH Record wrote a report on Lane's trip entitled "NIAID's Lane Discusses WHO COVID-19 Mission to China.  Fauci Ex. 20, at 1.  Lane praised China's response to the pandemic, especially their reliance on lockdowns and "extreme … social distancing": "The Chinese were managing this in a very structured, organized way,' he explained. 'When we got there, the outbreak was already coming under control in China.  The measures they put in place appeared to be working…. It demonstrated their successful response…. From what I saw in China, we may have to go to as extreme a degree of social distancing to help bring our outbreak under control."  *Id.* at 5-6.

779.    Dr. Fauci discussed this conclusion with Lane when he returned from China: "Dr. Lane was very impressed about how from a clinical public health standpoint, the Chinese were

handling the isolation, the contact tracing, the building of facilities to take care of people, and that's

what I believed he meant when he said were managing this in a very structured, organized way."

Fauci Dep. 165:4-11.

780.    Dr. Fauci admits that Lane "did discuss with me that the Chinese had a very

organized way of trying to contain the spread in Wuhan and elsewhere. … he mentioned that they

had a very organized, well-regimented way of handling the outbreak." *Id.* at 166:1-7.

781.    Dr. Fauci came to agree with Dr. Lane's rosy assessment of China's draconian

response to the outbreak: "Dr. Lane is a very astute clinician, and I have every reason to believe

that his evaluation of the situation was accurate and correct." *Id.* at 166:24-167:1.

782.    On Feb. 22, 2020, Dr. Lane sent an email stating, "China has demonstrated that this

infection can be controlled, albeit at great cost." Fauci Ex. 21, at 1.

783.    On October 4, 2020, Plaintiffs Dr. Jay Bhattacharya of Stanford and Dr. Martin

Kulldorff of Harvard, along with Dr. Sunetra Gupta of Oxford, published online the "Great

Barrington Declaration," which was one-page treatise opposing reliance on lockdowns and

advocating for an approach to COVID-19 called "focused protection." Fauci Ex. 41.

784.    The Great Barrington Declaration criticized the social-distancing and lockdown

approaches to the pandemic endorsed by government experts such as Dr. Fauci and Cliff Lane:

"As infectious disease epidemiologists and public health scientists we have grave concerns about

the damaging physical and mental health impacts of the prevailing COVID-19 policies, and

recommend an approach we call Focused Protection." *Id.*  It was very critical of such government

policies: "Current lockdown policies are producing devastating effects on short and long-term

public health. The results (to name a few) include lower childhood vaccination rates, worsening

cardiovascular disease outcomes, fewer cancer screenings and deteriorating mental health –

leading to greater excess mortality in years to come, with the working class and younger members of society carrying the heaviest burden. Keeping students out of school is a grave injustice. Keeping these measures in place until a vaccine is available will cause irreparable damage, with the underprivileged disproportionately harmed." *Id.* It called for an end to lockdowns: "The most compassionate approach that balances the risks and benefits of reaching herd immunity, is to allow those who are at minimal risk of death to live their lives normally to build up immunity to the virus through natural infection, while better protecting those who are at highest risk. We call this Focused Protection." *Id.*

785.    The Declaration called for an end of government-imposed lockdowns and an immediate return to normal life for those who are low-risk: "Those who are not vulnerable should immediately be allowed to resume life as normal. Simple hygiene measures, such as hand washing and staying home when sick should be practiced by everyone to reduce the herd immunity threshold. Schools and universities should be open for in-person teaching. Extracurricular activities, such as sports, should be resumed. Young low-risk adults should work normally, rather than from home. Restaurants and other businesses should open. Arts, music, sport and other cultural activities should resume. People who are more at risk may participate if they wish, while society as a whole enjoys the protection conferred upon the vulnerable by those who have built up herd immunity." *Id.*

786.    The Declaration was thus highly critical of the lockdown policies defended by Dr. Fauci and Dr. Cliff Lane of NIAID since Dr. Lane's trip to China at the beginning of the pandemic. The Declaration was "going against the global political consensus, which holds that lockdowns are key to minimising mortality to Covid-19." Fauci Ex. 48, at 3.  After it was posted online, it rapidly gathered signatures from doctors and scientists, as well as members of the public.

787.    Four days later, on October 4, 2020, Dr. Francis Collins emailed Dr. Fauci and Cliff Lane, citing the Great Barrington Declaration.  Fauci Ex. 42, at 1.  Dr. Collins stated: "Hi Tony and Cliff, See https://gbdeclaration.org.  This proposal from the three fringe epidemiologists who met with the Secretary seems to be getting a lot of attention – and even a co-signature from Nobel Prize winner Mike Leavitt at Stanford.  There needs to be a quick and devastating published take down of its premises.  I don't see anything like that on line yet – is it underway?  Francis."  *Id.*

788.    This email seeking Dr. Fauci's assistance in a "quick and devastating … take down" of the Great Barrington Declaration" is strikingly similar to Dr. Collins' email to Dr. Fauci on April 16, 2020, asking Dr. Fauci's "help [to] put down this very destructive conspiracy," *i.e.*, the lab-leak hypothesis.  Fauci Ex. 27, at 1.  In both cases, Dr. Collins sought Dr. Fauci's aid in discrediting and silencing an online narrative that federal officials disfavored, and in both cases, Dr. Fauci promptly and effectively complied.

789.    Dr. Collins' question to Dr. Fauci in the email, "Is it underway?" implies that Dr. Collins expected Dr. Fauci to be already working on a "quick and devastating … take down" of the Declaration, or to be aware of others working on one.  Fauci Ex. 42, at 1.  Dr. Fauci denies that Dr. Collins had any reason to think that Dr. Fauci might be working on a refutation of the Great Barrington Declaration, because "[t]his is not something I would be involved in," because "I have a very important day job that is running a $6.4 billion institute."  Fauci Dep. 260:11-20.  Given Dr. Fauci's immediately subsequent attempts to refute and discredit the Great Barrington Declaration, this testimony is not credible.

790.    The same day as Dr. Collins' email, October 8, 2020, Dr. Fauci wrote back to Dr. Collins, stating "Francis: I am pasting in below a piece from *Wired* that debunks this theory.  Best, Tony."  Fauci Ex. 43, at 1.  Dr. Fauci followed up the same day with an email to Dr. Collins linking

to an article by Gregg Gonsalves which Dr. Fauci called "[a]nother refutation of the herd immunity approach." Fauci Ex. 44, at 1.

791.   Dr. Fauci has known Gregg Gonsalves for decades, since the 1980s. Fauci Dep. 265:16-19. Dr. Fauci does not deny that he may have contacted Gregg Gonsalves before Gonsalves wrote this piece attacking the Great Barrington Declaration, but claims he does not recall. *Id.* at 268:8-19 ("I don't recall. I might have.").

792.   Dr. Fauci and Dr. Collins followed up with a series of public media statements attacking the Great Barrington Declaration. On October 14, 2020, the Washington Post ran a story entitled, "Proposal to hasten herd immunity to the coronavirus grabs White House attention but appalls top scientists." Fauci Ex. 45, at 1. In the article, Dr. Collins described the Great Barrington Declaration and its authors as "fringe" and "dangerous": "This is a fringe component of epidemiology. This is not mainstream science. It's dangerous." *Id.* at 3.

793.   Dr. Fauci consulted with Dr. Collins before he told the Washington Post that the Great Barrington Declaration represented a "fringe" and "dangerous" idea. Fauci Dep. 272:4-7.

794.   Dr. Fauci endorsed these comments in an email to Dr. Collins on October 13, 2020, stating, "[w]hat you said was entirely correct." Fauci Ex. 46, at 1.

795.   Dr. Fauci admits that Dr. Collins could have been concerned about the spread of the ideas in the Declaration on social media when he called it "fringe" and "dangerous." Fauci Dep. 274:19-20.

796.   The next day, October 15, 2020, Dr. Fauci echoed Dr. Collins' comments, calling the Declaration "nonsense" and "dangerous." Fauci Ex. 47, at 1. Describing the proposal as "letting infections rip as it were," Dr. Fauci stated: "Quite frankly that is nonsense, and anybody

who knows anything about epidemiology will tell that that is nonsense and very dangerous." *Id.* at 3.

797.    Dr. Fauci testified that "it's possible that" he coordinated with Dr. Collins on their public statements attacking the Great Barrington Declaration.  Fauci Dep. 279:23-24.

798.    Dr. Fauci also testified of himself and Dr. Collins that "that's not our style to be coordinating things."  *Id.* at 279:22-23.  In light of the extensive coordination with Dr. Collins about the lab-leak theory, and the coordination about the Great Barrington Declaration, that testimony is not credible.

799.    Shortly after Dr. Collins' email to Dr. Fauci seeking a "quick and devastating … take down" of the Great Barrington Declaration, the Declaration and its authors, Drs. Bhattacharya and Kulldorff, experienced extensive censorship on social media. *See infra.*  In October 2020, Google deboosted the search results for the Declaration, so that "most users in English-speaking countries, when they google 'Great Barrington Declaration,' will not be directed to the declaration itself but to articles that are critical of the declaration."  Fauci Ex. 48, at 4.

800.    In the same time, "[c]ensorship of the declaration … also spread to Reddit. The two most popular subreddits for discussion of the coronavirus – r/COVID-19 and r/coronavirus – have both removed links to the Great Barrington Declaration. The moderators of r/coronavirus, a forum with 2.3million members, have declared it to be 'spam'."  Fauci Ex. 48, at 4-5.

801.    In October 2020, YouTube updated its terms of service regarding medical "misinformation," reporting "COVID-19 medical misinformation policy updated to prohibit content about vaccines contradicting consensus from health authorities."  Fauci Ex. 49, at 3. "Health authorities" include federal officials like Dr. Fauci and Dr. Collins.  *See id.*  This October 2020 update specifically stated that claims which are "not allowed on YouTube" include "[c]laims

that achieving herd immunity through natural infection is safer than vaccinating the population," which is listed on the same footing as "[c]laims that COVID-19 vaccines contain a microchip or tracking device." Fauci Ex. 50, at 3-4.

802.    Pursuant to this censorship policy of YouTube, the authors of the Great Barrington Declaration had content removed from YouTube, including a video of a roundtable discussion with Governor Ron DeSantis of Florida.  *See infra.*

803.    Facebook, likewise, adopted censorship policies against the Great Barrington Declaration.  Meta's policy on "Misinformation about vaccines" states that: "We remove misinformation primarily about vaccines when *public health authorities* conclude that the information is false and likely to directly contribute to imminent vaccine refusals."  Fauci Ex. 51, at 4 (emphasis added).

804.    Facebook/Meta views Dr. Fauci as a "public health authority" who may dictate what people may post about COVID-19 on its platforms (Facebook and Instagram, among others), because Mark Zuckerberg and Dr. Fauci were collaborating on multiple public appearances and videos for Facebook.  *See supra*; Scully Ex. 12, at 33, 53-54 (identifying 13 communications between Dr. Fauci and Zuckerberg, including emails, phone calls, virtual meetings, and live broadcasts, over a nine-month period in 2020).  Indeed, in his March 15, 2020 email to Dr. Fauci, Mark Zuckerberg described Dr. Fauci as an "expert[]," a "health expert[]" and "reliable source[]" for "authoritative information" about fighting COVID-19.  Fauci Ex. 23, at 3.

805.    Dr. Fauci claims that he would not have paid any attention to the Great Barrington Declaration because he is too busy and important to pay attention to such matters: "this is not something that I would have been paying a lot of attention to.  I was knee deep in trying to do things like develop a vaccine that wound up saving the lives of millions of people. That's what I

was doing at the time." Fauci Dep. 256:13-17. Given Dr. Fauci's direct involvement in publicly

attacking the Great Barrington Declaration and collecting sources for Dr. Collins to "take [it]

down," this statement is not credible. In fact, on November 1, 2020, Greg Folkers, Dr. Fauci's

staffer at NIAID, sent Dr. Fauci a list of articles attacking the Great Barrington Declaration—

including one co-authored by Gregg Gonsalves—with the statement "As discussed. I have

highlighted the three I found the most useful." Fauci Ex. 52, at 1. The list of articles were all

harshly critical of the Declaration—using phrases like "dangerous," "false promise," "ethical

nightmare," and "could kill millions." *Id.* Thus, four weeks after the Declaration was published,

Dr. Fauci and his staffers were still "discuss[ing]" and looking up articles on ways to attack it. *Id.*

806. Dr. Kulldorff points out that, regardless of disagreements over the policy,

describing the Declaration as "fringe" and "nonsense" is fundamentally dishonest, as the

Declaration reflects principles of pandemic preparedness that were widely accepted before

COVID-19: "the Great Barrington Declaration is merely a restatement of the principles of public

health. Lockdown … is a 'terrible experiment' that throws those principles 'out of the window' by

focusing solely on one disease at the expense of all other health problems. 'Most countries in

Europe had a pandemic-preparedness plan that did not recommend lockdowns, but instead

proposed a risk-based strategy to protect those at high risk, which is actually the same as the

focused protection we put forward in the Great Barrington Declaration. What we are proposing is,

therefore, nothing revolutionary', [Kulldorff] said." Fauci Ex. 48, at 6.

807. Regarding the censorship of the Great Barrington Declaration on social media, Dr.

Fauci repeatedly testified that he was oblivious to it: "I don't pay much attention to what goes on

in social media … it is highly unlikely that … I paid any attention to this thing of Google censoring

the Great Barrington Declaration … I would not have paid much attention to it." Fauci Dep.

281:15-282:2, 283:7-10.  In light of his contemporaneous statements and emails, this statement is not credible.

808.    Like so many other topics, Dr. Fauci repeatedly testified that he could not recall virtually anything about his involvement in seeking to squelch the Great Barrington Declaration. He testified at least 33 times that he could not recall his involvement in this matter.  *See* Fauci Dep. 251:11, 252:20, 255:6, 255:9, 256:3, 257:5, 258:12, 263:1, 263:15, 263:21, 264:17, 264:20, 264:22, 265:2, 265:6, 268:10, 268:18, 270:24, 282:19-20, 284:22-23, 290:13, 290:21, 291:13, 291:16, 292:15, 292:24, 293:15, 293:24, 295:9, 295:25, 296:21, 297:2-3, 297:14.  For the reasons discussed above, these claims to almost total loss of memory are not credible.

**D.    NIAID Flags Social-Media Accounts for Censorship Under Dr. Fauci.**

809.    As noted above, Dr. Fauci testified that he is not aware of any NIAID or NIH staff contacting social media platforms to ask them to remove content.  In fact, NIAID and NIH staff—including staffers in Dr. Fauci's senior circle—sent several messages to social-media platforms asking them to remove content lampooning or criticizing Dr. Fauci.  Dr. Fauci's testimony to the contrary is not credible.

810.    On March 14, 2020, a Twitter employee reached out to CDC officials, including Carol Crawford, and asked if a particular account associated with Dr. Fauci is "real or not."  Fauci Ex. 53, at 2.  Scott Prince of NIH responded, "Fake/Impostor handle.  PLEASE REMOVE!!!"  *Id.* Twitter responded that it would take action promptly and "circle back ASAP."  *Id.*  An HHS official then asked if Twitter could pre-block similar parody accounts: "Is there anything else that you can also do to block other variations of [Dr. Fauci's] name from impersonation so we don't have this happen again?"  *Id.* at 1.  Twitter replied: "We'll freeze this @handle and some other variations so no one can hop on them."  *Id.*

811.    Likewise, on April 21, 2020, Judith Lavelle of NIAID emailed Facebook, copying Scott Prince of NIH and Jennifer Routh of Dr. Fauci's communications team, and stated: "We wanted to flag a few more fake Dr. Fauci accounts on FB and IG for you.  I have also reported them from @niaid and my personal FB account."  Fauci Ex. 55, at 3.  She listed eight accounts that she considered fake.  One of these was called "Dr.FauciTheHero," and she stated, "I think this one may be fine as a fan page but could use a reminder to be a bit more clear," *id.* at 4—thus noting that she was seeking the censorship only of speech about Dr. Fauci that the government disfavors, while "a fan page" was fine.

812.    Both Jennifer Routh and Judith Lavelle are members of Dr. Fauci's communications staff.  Fauci Dep. 308:14-21.

813.    The fact that Lavelle stated they were flagging "a few *more*" accounts indicates that NIAID's flagging social-media accounts for censorship was not an isolated incident but an ongoing practice.  Fauci Ex. 55, at 3.

814.    Lavell then followed up flagging yet another account, saying "Apologies one more," and adding Greg Folkers of Dr. Fauci's personal staff to the email chain reporting these accounts to Facebook for censorship.  Fauci Ex. 55, at 3.

815.    The same day, Facebook responded, "Flagged this for the fake accounts team and they have confirmed that all but two accounts were removed for impersonation of Dr. Fauci.  I guess two of the accounts are fan accounts."  Fauci Ex. 55, at 3.

816.    The Facebook employee then added, "Also want to intro you all to [two more Facebook employees] who have been working hard to manage any fake accounts for NIH across the board.  She can work with you directly if anything like this comes up."  Fauci Ex. 55, at 2. Lavelle responded that "our team will be sure to reach out if we identify any more impersonations,"

*id.*, and Facebook answered that Lavelle of NIAID should "feel [free] to flag to us the various imposter accounts," Fauci Ex. 55, at 1.  Again, this response indicates an ongoing and widespread practice of NIH reporting supposedly "fake" accounts for censorship.  *Id.*

817.    Dr. Fauci testifies that he does not remember for certain, but he "likely" asked his communications staff to do something about these impersonation or parody accounts.  Fauci Dep. 302:6-10 ("I vaguely remember somebody mentioning something about an imposter account. … And I likely would have said, 'Well, how can they do that?'").  He also agrees that his communications staff would do so on their own.  *Id.* at 301:1-4 ("I have a communication staff that I'm sure, if they found out it was a false and misleading account, that they would want it to be removed."); *see also id.* at 301:23-25; 304:19-21.

818.    Dr. Fauci believes it is "totally appropriate" for his communications staff to contact social-media platforms and seek the removal of such accounts.  *Id.* at 312:19-21; *see also id.* at 310:14-16.

819.    He thinks so because "impersonating me is a bad thing."  *Id.* at 303:20; *see also id.* at 304:11-13; 309:23-310:1 ("fake accounts are bad things, I believe"); 311:20-21.  Dr. Fauci specifically believes that removing accounts associated with him is "a good thing" because "those accounts are bad."  *Id.* at 329:12-16.

820.    Dr. Fauci does not know whether some of the so-called "fake accounts," which he calls "bad things," that his staff flagged for censorship may actually be parody accounts.  *Id.* at 311:7-9.

821.    Moreover, it was not just NIAID staff, but also White House staff, who flagged content about Dr. Fauci for removal from social-media platforms.  As noted above on Tuesday, July 20, 2021, Clarke Humphrey of the White House communications office emailed Facebook

asking for the removal of an Instagram account associated with Dr. Fauci, saying it "is not actually one of ours."  Fauci Ex. 57, at 1-2.  Facebook responded one minute later, stating, "Yep, on it!"  Fauci Ex. 57, at 1.  Courtney Billet, Dr. Fauci's communications director at NIAID, then weighed in, asking Facebook to disclose whether "there's a federal email address attached to whomever set this account up," so that she could ascertain whether the account was set up by "some federal employee outside our official comms offices."  Fauci Ex. 57, at 1.  The next day, Facebook responded, stating, "This account has been removed.  Thank you for flagging!"  Fauci Ex. 57, at 1.

822.    NIAID's communications with social-media platforms were not limited to flagging impostor or parody accounts.  On October 30, 2020, for example, a NIAID staffer wrote an email connecting Google/YouTube with Jennifer Routh of NIAID's "Office of Communications and Government Relations," so that NIAID and the "Google team" could "connect on vaccine communications – specifically misinformation…."  Fauci Ex. 56, at 2.  Routh then added Courtney Billet ("director of the Office of Communications and Government Relations at NIAID") and two other senior NIAID officials to the communications chain with YouTube.  Fauci Ex. 56, at 1.

823.    Likewise, in response to a third-party subpoena, Twitter has disclosed that Dina Perry, a Public Affairs Specialist for NIAID, communicates or has communicated with Twitter about misinformation and censorship.  Jones Decl., Ex. F, at 1.

824.    NIAID did not disclose Dina Perry in response to interrogatories seeking the identities of NIAID officials who communicate with social-media platforms about misinformation, disinformation, and censorship.  Scully Ex. 12, at 17-18.

825.    Dr. Fauci testified that he has never "contacted a social media company and asked them to remove misinformation from one of their platforms."  Fauci Dep. 151:21-24 ("No, I have

not."). He also testified that no one on his staff at NIAID has "ever reached out to a social media platform to ask them to take content down or to block content in any way. *Id.* at 152:7-15 ("To my knowledge, no."). In light of the repeated attempts of Dr. Fauci's staff to have content related to Dr. Fauci removed from social media, Dr. Fauci's testimony on this point is not credible.

### E.      CDC and NIH Procure the Censorship of Speech on Ivermectin.

826.    On September 13, 2021, Facebook emailed Carol Crawford of the CDC to ask the CDC to identify whether the claim that "Ivermectin is effective in treating COVID" is "false, and if believed, could contribute to people refusing the vaccine or self-medicating," which were the qualifications for censoring that claim on Facebook's platforms. Fauci Ex. 58, at 2. Facebook noted that it was currently rating this claim as "*not false*," *i.e.*, Facebook was *not* censoring the claim that Ivermectin is effective in treating COVID-19, because there was "no consensus" of its efficacy for treatment. *Id.* at 3.

827.    The next day, the CDC responded, advising Facebook that the claim that "Ivermectin is effective in treating COVID" is "***NOT ACCURATE***" (bold and italics in original) and thus should be censored on Facebook's platforms. Fauci Ex. 58, at 1. To support this claim, the CDC cited NIH's "Ivermectin | COVID-19 Treatment Guidelines." *Id.* Thus, the CDC cited the NIH's treatment guidelines for Ivermectin as authority to urge Facebook to censor claims about using Ivermectin to treat COVID-19. *Id.* CDC also cited NIH to call for the censorship of two related claims about Ivermectin, and noted that "[t]hese responses are based on the independent advice of … NIH," which had "opined that there are not data that indicate ivermectin is effective in the ways described above." *Id.*

### F.      Dr. Fauci's Double Standard on Acceptable Speech: Mask Mandates.

828.   "Sylvia Burwell is the former Secretary of the Department of Health and Human Services [under President Obama] and the current president of American University."  Fauci Dep. 313:9-11.  "Sylvia has, over the past couple of years, asked [Dr. Fauci] advice about personal safety during the COVID-19 pandemic."  *Id.* at 313:17-19.

829.   On February 4, 2020, Sylvia Burwell wrote Dr. Fauci an email stating that she was traveling and wondering if she should wear a mask in the airport.  Fauci Dep. 313:21-314:5; *see also* Jones Decl., Ex. EE, at 1.  Dr. Fauci responded, stating: "Masks are really for infected people to prevent them from spreading infection to people who are not infected, rather than protecting uninfected people from acquiring infection.  The typical mask you buy in the drugstore is not really effective in keeping out virus, which is small enough to pass through material. … I do not recommend that you wear a mask…."  Fauci Dep. 314:9-19; *see also* Jones Decl., Ex. EE, at 1.

830.   Dr. Fauci agrees that he "made several statements that are similar to that at that time frame."  Fauci Dep. 315:12-14.

831.   He states that, at that time, there were "no studies" on the efficacy of masking to stop the spread of COVID-19.  *Id.* at 316:8-13.

832.   In fact, on March 31, 2020, Dr. Fauci forwarded studies showing that masking is ineffective.  Fauci Dep. 318:24-319:7.

833.   Dr. Fauci's position on masking dramatically changed by April 3, 2020, when he became an advocate for universal mask mandates.  *Id.* at 317:14-20.

834.   Dr. Fauci states that his position on masking changed in part because "[e]vidence began accumulating that masks actually work in preventing acquisition and transmission."  Fauci Dep. 317:5-6.

835.    Dr. Fauci was asked to identify any studies that were done between February 2020 and April 3, 2020, that supported his change of position on the efficacy of masking, and he could not identify any.  *Id.* at 318:8-10.

836.    Dr. Fauci was asked if there were any "placebo-based, double-blind, randomized studies of the efficacy of masking that were done between February and April 2020," and he could not identify any.  *Id.* at 322:1-5.  In fact, it is obvious that there were none.

837.    Dr. Fauci's position on masking, therefore, directly contradicts his insistence on randomized, double-blind, placebo-based clinical trials for alternative COVID-19 treatments like hydroxychloroquine and ivermectin.  At best, Dr. Fauci's dramatic change in position on masking was based on observational studies—the same kind of studies that he dismissed, in the very same time frame, as inadequate to support the use of hydroxychloroquine to treat COVID-19.  At worst, it was based on no evidence at all—and Dr. Fauci identified none.

838.    Dr. Fauci believes it can be dangerous to give ordinary people access to scientific information: "If information is clearly inadequate and statistically not sound, there can be a danger in people who don't have the ability or the experience of being able to understand that it's a flawed study."  *Id.* at 323:5-9.

839.    Dr. Fauci believes that it is "disturbing" when "unwitting" people believe what he thinks is misinformation: "I think honest debate is important, but when it goes beyond debate and leads people who are unwitting about these things to do things that are clearly detrimental to their life and their safety, I find that disturbing."  *Id.* at 358:13-17.

### G.    Dr. Fauci and the White House Cause the Censorship of Alex Berenson.

840.    Alex Berenson is a former New York Times science reporter and prominent critic of government messaging about COVID-19 vaccines who was deplatformed from Twitter on

August 28, 2021, after months of pressure from White House and federal officials.   Fauci Ex. 59, at 4.

841.    As Berenson notes: "On July 16, 2021, President Biden complained publicly that social media companies were 'killing people' by encouraging vaccine hesitancy.  A few hours after Biden's comment, Twitter suspended by account for the first time." Fauci Ex. 59, at 4.

842.    Dr. Fauci, who was then Chief Medical Advisor to President Biden, played a key role in procuring the censorship of Alex Berenson.  Shortly before President Biden's comments, Dr. Fauci engaged in public attacks on Alex Berenson in attempt to discredit him and silence his government-skeptical opinions.

843.    On July 11, 2021, appearing on CNN's "State of the Union," Dr. Fauci described Alex Berenson's comments on vaccine skepticism as "horrifying." Fauci Ex. 60, at 1.  Responding to applause for a speech given by Berenson at a conference, Dr. Fauci stated: "It's horrifying.  I mean, they are cheering about someone saying that it's a good thing for people not to try and save their lives." *Id.*  In response to Berenson's views, Dr. Fauci stated, "it's almost frightening to say, … we don't want you to do something to save your life." *Id.*  Dr. Fauci also stated, "I don't think that anybody who is thinking clearly can get that." *Id.*

844.    Dr. Fauci's public comments as the President's Chief Medical Advisor specifically criticizing Alex Berenson were made at a time when other White House officials like Andrew Slavitt were *privately* pressuring Twitter to deplatform Berenson since April 21, 2020.  *See, e.g.,* Fauci Ex, 58, at 7 (internal Twitter communications on April 22, 2020, indicating that White House officials "had one really tough question about why Alex Berenson hasn't been kicked off from the platform," and "yes, they really wanted to know about Alex Berenson.  Andy Slavitt suggested

they had seen data vis that had showed he was the epicenter of disinfo that radiated outwards to the persuadable public.").

845.    Dr. Fauci does not deny that he may have discussed Alex Berenson with other White House or federal officials, but claims he does not recall whether he did so.  Fauci Dep. 343:16-23.

846.    Dr. Fauci believes that misinformation and disinformation "contribute to the deaths" of people: "misinformation and disinformation, particularly that encourages people to avoid lifesaving interventions, can certainly result in the unnecessary death of people whose lives would have been saved. So when misinformation and disinformation leads people to avoid a lifesaving intervention, that is equivalent to contributing to the death of that person."  *Id.* at 345:8-15.  "I do feel strongly that misinformation and disinformation, when it leads to people avoiding lifesaving interventions, can be deadly.  *Id.* at 346:1-3.

847.    Dr. Fauci also believes that misinformation and disinformation on social media are "contrary to public health" and "the enemy of public health": "If social media is propagating disinformation that leads to the death of people by encouraging them to avoid lifesaving interventions, I believe that's contrary to public health."  *Id.* at 346:5-7, 346:10-13.

848.    Dr. Fauci admits that it is "certainly possible" that he discussed the view that "disinformation or misinformation on social media platforms are killing people" with others in the federal government, but claims he cannot remember whether he did so.  *Id.* at 345:3-25.

849.    Dr. Fauci testified that the first time he heard of Alex Berenson was when Berenson publicly claimed that the White House demanded that Twitter deplatform him in 2022: "it's the person who says that the White House demanded Twitter ban me months before the company did so. I had never heard of who Alex Berenson was before this … I don't even know who he is."  *Id.*

at 335:1-7.  In light of Dr. Fauci's public attacks on Alex Berenson in 2021, this testimony is not credible.

850.    Former FDA Commissioner Scott Gottlieb also emailed Twitter to pressure them to remove Alex Berenson's content, invoking Dr. Fauci in his email.  Sending Twitter a link to a post by Berenson entitled "The Arrogance of Dr. Fauci," Gottlieb wrote: "This is why Tony needs a security detail," Fauci Ex. 62, at 1—thus implying that Berenson's criticism of Dr. Fauci was endangering Dr. Fauci's life.

851.    Dr. Fauci does not deny that he may have discussed this issue with Gottlieb before Gottlieb sent this email to Twitter, but he claims he does not recall whether he did so.  Fauci Dep. 349:7-19, 352:12-18.

852.    After testifying over 200 times during his deposition that he could not remember or could not recall events related to the case, Dr. Fauci was shown an email chain between him and Dr. Ezekial Emanuel from May 2, 2020 that had no direct connection to issues in the case.  Fauci Ex 63.  Unlike his convenient lack of memory as to case-related communications, Dr. Fauci was immediately able to provide a detailed, specific account of the context and communications with Dr. Emanuel relating to that email chain.  Fauci Dep. 353:20-354:16.

## VI.    The FBI's Censorship Campaign of Pressure and Deception.

853.    In parallel with the censorship of health "misinformation" and related issues achieved by the White House, the CDC, Surgeon General Murthy, Dr. Fauci, and others, *see supra* Parts I-V, federal national-security and law-enforcement agencies flex their considerable muscle to pressure and induce social-media platforms to censor disfavored speech and viewpoints about elections and other topics.  The FBI's Foreign Influence Task Force (FITF) and the Cybersecurity and Infrastructure Security Agency's (CISA) "Mis, Dis, and Malinformation Team" play key roles

in this efforts – in cooperation with non-profit agencies working in close collaboration with the government, such as the CISA-funded "Center for Internet Security" and the formidable censorship cartel calling itself the "Election Integrity Partnership" and the "Virality Project."

854.   Elvis Chan is the Assistant Special Agent in Charge of the Cyber Branch for the San Francisco Division of the Federal Bureau of Investigation.  Chan Dep. 8:11-13.

855.   In this role, Chan is "one of the primary people" who communicates with social-media platforms about disinformation on behalf of the FBI.  *Id.* 105:3-4 ("I would say I'm one of the primary people with pass-through information" for platforms).  There are many other points of contact between the FBI and social-media platforms, however.  *Id.* 105:3-7 ("[W]e have agents on the different cyber squads and our private sector engagement squad who also relay information to the companies.").

856.   Chan graduated from the Naval Postgraduate School in 2021 with an M.A. in Homeland Security Studies.  *Id.* 10:16-17.  In connection with his master's degree, Chan authored a publicly available thesis entitled, "Fighting Bears and Trolls: An Analysis of Social Media Companies and U.S. Government Efforts to Combat Russian Influence Campaigns During the 2020 U.S. Elections."  *Id.* 11:3-16; Chan Ex. 1, at 1.  This thesis overtly relied only on publicly available documents, but it also reflected Chan's personal knowledge and experience of working with social-media platforms during the 2020 elections.  *See id.*

857.   Chan's thesis discussed "hack-and-dump activity," also known as "hack-and-leak" operations, as well as "Russian malign influence … on the social media platforms and on fake news websites that the Russians have created."  Chan Dep. 13:7-21.

858.   Chan's thesis relied on research performed by persons and entities comprising the Election Integrity Partnership, including Graphika, *id.* 145:1-6; and Renee DiResta of the Stanford

Internet Observatory, *id.* 51:20-52:7, 85:4-12.  Chan communicated directly with DiResta "about

Russian disinformation," and had "[a] lot of conversations about Russian disinformation" with

DiResta.  *Id.* 52:5-7, 52:24-25.

859.    Chan also knows Alex Stamos, the head of the Stanford Internet Observatory, from

the time when Stamos participated on behalf of Facebook in the USG-Industry meetings.  *Id.* 54:2-

19.  Chan and Stamos were involved in meetings about "malign-foreign-influence activities" on

Facebook while Stamos was the chief security officer for Facebook.  *Id.*  Chan has also discussed

"protecting platforms from hacking" with Stamos.  *Id.* 55:12-13.  And Chan's "colleagues at FBI

headquarters regularly meet with researchers much more frequently than I do."  *Id.* 57:15-18.

860.    According to Chan, the FBI engages in "information sharing" with social-media

platforms about content posted on their platforms, which includes both "strategic-level

information" and "tactical information."  *Id.* 16:16-19.

**A. FBI's and CISA's Regular "USG-Industry" Disinformation Meetings**

861.    The FBI participates in a CISA-organized "industry working group" with

Facebook, Twitter, and Google/YouTube, as well other social-media platforms.  *Id.* 18:21-24.  The

social-media platforms that participate are Facebook, Microsoft, Google, Twitter, Yahoo! (a.k.a.

Verizon Media), Wikimedia Foundation, and Reddit.  *Id.* 23:24-24:3.  On the U.S. Government

side, the meetings are attended by representatives of CISA, the Department of Homeland

Security's Intelligence & Analysis division ("I&A"), the Office of the Director of National

Intelligence (ODNI), the FBI's Foreign Influence Task Force (FITF), and Elvis Chan on behalf of

FBI-San Francisco when he is available.  *Id.* 24:9-19; *see also* Chan Ex. 6, at 37.  Chan later

confirmed that "DOJ National Security Division" attends these "USG-Industry" meetings as well.

Chan Dep. 171:6-8.

862.    Chan participates in the meetings because most social-media platforms are headquartered in San Francisco, and "FBI field offices are responsible for maintaining day-to-day relationships with the companies that are headquartered in their area of responsibility." *Id.* 24:21-25:4.  As a result, Chan serves as a frequent conduit for communication between federal officials, especially FBI officials but also others, and social-media platforms.  *See id.*

863.    Matt Masterson attended, and Brian Scully attends, the USG-Industry meetings on behalf of CISA.  They are "regular attendees" and "one of them is usually emceeing the meeting." *Id.* 25:15-18.  "For the 2020 election cycle, Mr. Masterson was … primarily the facilitator.  Ahead of the 2022 midterm elections, Mr. Scully has been the primary facilitator."  *Id.* 26:19-22.

864.    Chan also "participate[s] in the preparation meetings" for the USG-Industry meetings.  *Id.* 27:24-25.

865.    At these CISA-led "USG-Industry" meetings, "the disinformation content was shared by the social media companies.  They would provide a strategic overview of the type of disinformation they were seeing on their respective platforms," and the FBI "provided strategic unclassified overviews of the activities that we saw [Russian actors] doing."  *Id.* 156:9-157:1.

866.    The "USG-Industry" meetings "are continuing" at the time of Chan's deposition on November 23, 2022, and Chan assumes that they will continue through the 2024 election cycle. Chan Dep. 284:23-285:6.  Online "disinformation" continues to be discussed between the federal agencies and the social-media platforms at these meetings.  Chan Dep. 285:7-286:16.

**B. The FBI's Regular Bilateral Meetings with Social-Media Platforms.**

867.    The USG-Industry group meetings are not the only censorship-related meetings between the FBI and social-media platforms.  Chan also "hosted … bilateral meetings between each of the companies I mentioned"—*i.e.*, Meta/Facebook, Twitter, Google/YouTube,

Yahoo!/Verizon Media, Microsoft/LinkedIn, Wikimedia Foundation, and Reddit, *see id.* 23:24-24:3—"and the Foreign Influence Task Force." *Id.* 39:4-8.

868.    During these bilateral meetings, the FBI's FITF would also "bring in field offices that had cyber investigations" of "state-sponsored actors that the FBI was investigating that we believe were capable of hack-and-dump campaigns" during the 2020 election cycle. *Id.* 39:10-16. In other words, in the bilateral meetings, the FBI repeatedly raised the concern about the possibility of "hack and dump" operations during the 2020 election cycle during FITF's bilateral meetings with each of at least seven major social-media platforms. *Id.*

869.    These bilateral meetings between FBI and social-media platforms are continuing—they occurred during the 2020 election cycle, and they continued during the 2022 election cycle. *Id.* 39:18-40:1.  "They occur at roughly a quarterly cadence," but "the cadence increase[s] as elections get close," so that the meetings "become monthly as the election nears and then weekly very close to the elections." *Id.* 40:2-20.  These meetings will continue quarterly, monthly, and then weekly leading up to the 2024 election as well. *Id.* 41:5-15. The meetings also occurred "[o]n a quarterly cadence" during the 2018 election cycle. *Id.* 42:18-24.

870.    The companies with which FITF conducts these regular bilateral meetings include "Facebook, Google, Twitter, Yahoo!, Reddit, and LinkedIn," as well as "Apple and Wikimedia Foundation." *Id.* 41:24-42:7.  Apple was "added because they are a cloud infrastructure company; and we believe that tactical information, specifically indicates that we shared with them related to foreign-state-sponsored actors, might pop up on … any screening they do on iCloud." *Id.* 42:12-17.

871.    In these meetings, FBI officials meet with senior social-media platform officials in the "trust and safety or site integrity" role, *i.e.*, those in charge of enforcing terms of service and

content-moderation policies for the platforms.  *Id.* 43:5-44:1.  In other words, the FBI meets with the officials responsible for censoring speakers and content on the platforms—those "directly involved in the enforcement of terms of service for these various platforms," which "includes … content modulation of content on the platforms." *Id.* 49:19-50:2.

872.    The FBI's "quarterly meetings" with social media platforms to "probe" questions about censorship of disinformation began as early as "in the 2017 time frame." *Id.* 87:24-88:14, 89:19-20.

873.    A large number of FBI officials attend each regular bilateral meeting about disinformation with each of those seven social-media platforms.  In addition to Chan and Laura Dehmlow, who is the head of FBI's Foreign Influence Task Force (FITF), "between three to ten" FITF officials attend each meeting, as well as "one field office comprised of two representatives" from each of "one to three field offices." *Id.* 109:21-22, 110:7-14.  Frequently the number of FBI agents attending each meeting "could be as high as a dozen." *Id.* 110:17-18.

874.    Likewise, large numbers of officials from the social-media platforms attend these regular bilateral meetings with the FBI about disinformation.  "[A] similar amount" of people attend each meeting from the platforms, and "for the three larger companies – specifically Google/YouTube, Facebook, and Twitter – it would be equal numbers or higher numbers than the FBI." *Id.* 110:21-25.

875.    In addition to all these meetings, on February 4, 2019, there was a meeting between Facebook, Google, Microsoft, and Twitter and the FBI's FITF, ODNI, and CISA to discuss election issues.  Elvis Chan attended, as did Director Krebs, Matt Masterson, and possibly Brian Scully of CISA.  Representatives of the social-media companies at the meeting included those

from the "trust and safety" or content-modulation teams, and "the social media companies were focused on discussing disinformation." *Id.* 151:9-154:6.

876.   Discovery obtained from LinkedIn contains 121 pages of emails between Elvis Chan and other FBI officials and LinkedIn officials setting up numerous meetings to discuss disinformation issues during the 2020 and 2022 election cycles.  Chan Ex. 2.  Chan confirms that he has a similar set of communications setting up a similar series of meetings with each of "six or seven other social-media platforms as well"—he has "similar types of correspondence" with the others, including Facebook, Twitter, Google/YouTube, etc.  Chan. Dep. 288:4-17.

877.   These emails confirm that Chan and the other FBI officials regularly met with senior officials at social-media platforms with responsibility for *content moderation*.  *See* Chan Ex. 2, at 3; Chan Dep. 292:7-293:8. The FBI meets with "director level and … their direct reports" from the "trust and safety and site integrity" teams.  Chan Dep. 293:4-8.

878.   The FBI communicates with social-media platforms using two alternative, encrypted channels—the self-deleting messaging app Signal, and the encrypted messaging service Teleporter.  Chan Dep. 295:7-296:9.

879.   For each election cycle, during the days immediately preceding and through election day, the FBI maintains a command center around the clock to receive and forward reports of "disinformation" and "misinformation," and the FBI requests that the platforms have people available to receive and process those reports at all times: "FBI headquarters, they just ran 24 hours a day for their command post, I believe from Friday to Tuesday.  FBI San Francisco ran from, I believe, 8:00 o'clock in the morning to perhaps 10:00 o'clock at night every day except the election, when we ran until midnight."  Chan Dep. 301:14-20.  In advance of the elections, the FBI "ask[ed]

the companies when they intended to have personnel on what days monitoring their platform for any threats that they saw." Chan Dep. 301:21-24.

     **C.**    **The FBI's Deceptive Information Censors the Hunter Biden Laptop Story.**

880.    Elvis Chan, other FBI officials, and other federal officials repeatedly warned industry participants to be alert for "hack and dump" or "hack and leak" operations prior to the 2020 election, even though they had no investigative basis to issue such warnings. These warnings provided the justification for the platforms to censor the Hunter Biden laptop story that the New York Post broke on October 14, 2020. *See id.* at 232:1-234:3. These "hack and leak" or "hack and dump" warnings were issued many times, both in the "USG-Industry" meetings and in the FBI's bilateral meetings with social-media platforms.

881.    Hack and leak operations were discussed at the USG-Industry meetings. *Id.* 172:3-5. At the USG-Industry meetings, Elvis Chan and other FBI officials "warned the social media companies about the potential for a 2016-style DNC hack-and-dump operation." *Id.* 172:23-173:1.

882.    During these meetings, Chan "warned the companies about a potential for hack-and-dump operations from the Russians and the Iranians on more than one occasion." *Id.* 175:10-13. Laura Dehmlow, the head of FITF, also "mentioned the possibility of hack-and-dump operations." *Id.* 175:17-20.

883.    The prospect of hack-and-leak operations was also repeatedly raised "[a]t the FBI-led meetings with FITF and the social-media companies." *Id.* 177:24-25. It was also raised at the "CISA-hosted USG-industry" meetings. *Id.* 178:1-6, 180:24-25. "[T]he risk of hack-and-leak operations were raised at both sets of meetings, both at CISA-organized USG-industry meetings and the FITF-organized direct meetings between the FBI and social media platforms." *Id.* 181:6-11. Chan himself raised the warnings "regularly" at the bilateral FITF-platform meetings. *Id.*

185:16-18.  Laura Dehmlow raised the warning at the USG-Industry meetings "that the FBI is concerned about the potential for hack-and-leak or hack-and-dump operations from foreign state-sponsored actors." *Id.* 187:1-4.  And Chan himself "recollect[s] mentioning the potential for hack-and-dump operations during the CISA-hosted USG-industry meetings." *Id.* 189:4-7.  Chan confirms that he raised these concerns "to the social media platforms on multiple occasions in two sets of meetings in 2020," including "the USG-industry meetings organized by CISA" and "the FITF organized meetings with the individual social media platforms." *Id.* 204:2-12.

884.   In the same time frame in 2020, as federal officials were repeatedly raising these concerns about hack-and-leak operations, some social media platforms updated their policies to provide that posting hacked materials would violate their policies and could result in censorship: "some social media companies adjusted or updated their terms of service or their community standards to say that they would not post any hacked materials." *Id.* 205:6-9. According to Chan, the "impetus" for these more restrictive censorship policies was the repeated concern raised by Chan, the FBI, and federal national-security officials about the risk of "a 2016-style hack-and-leak operation: "the impetus was in case there was a 2016-style hack-and-leak operation." *Id.* 205:14-21.  The FBI's repeated warnings, therefore, induced social-media platforms to adopt more restrictive censorship policies on hacked materials, *see id.*, which would then be used to censor the Hunter Biden laptop story.

885.   Chan denies that the FBI urged the platforms to change their terms of service to address hacked materials, but he admits that the FBI repeatedly inquired of the social-media platforms *whether* their policies would allow for or require the censorship of hacked materials. The FBI "wanted to know if they had changed their terms of service or modified it, and we wanted to know what they had changed," and thus the platforms "advise[d]" the FBI that "they had

changed" their policies "to reflect the ability to pull down content that results from hack operations." *Id.* 206:5-13.

886.    Again, Chan testified that, in meeting with platforms like Facebook, the FBI "asked, 'If you receive a whole -- if you see a trove of potentially hacked materials, what are you going to do about it?' Which would be our way of asking them how their terms of service would handle a situation like that." Chan Dep. 247:25-248:4.  The FBI "ask[ed] how they would handle it if potentially hacked materials appeared." Chan Dep. 248:5-8.  Chan believes they asked that question of Twitter, Facebook, and YouTube, and the social-media platforms responded, as he "remember[s] the social media companies having terms-of-service policies to handle this sort of situation." Chan Dep. 248:14-16.  Both Facebook and Twitter, for example, "said that they would remove hacked materials if they were able to validate that it was hacked." Chan Dep. 252:24-253:4.  These conversations happened "ahead of the 2020 elections." Chan Dep. 253:6-7.

887.    The FBI asked the platforms how their policies would handle a hack-and-leak operation at the same time as repeatedly warning them about such operations—thus effectively inducing them to adopt such policies.  Chan Dep. 248:23-249:2.

888.    The FBI inquired about the platforms' hacked-materials policies because "internally we wanted to know what actions that we would need to take, whether we would need to take a legal remedy such as like a seizure warrant" to remove supposedly hacked materials. Chan Dep. 249:17-20.

889.    Chan was not the only FBI official to ask the platforms about their censorship policies for hacked materials.  Instead, this question was posed repeatedly by multiple FBI officials: "I would say we take turns asking. When I say 'we,' I mean either myself or the members of the Foreign Influence Task Force …. Wherever it seemed like an organic follow-up question,

we would ask 'How would your terms of service apply to this situation or that situation?'"  Chan Dep. 250:14-20.

890.    When asked, "did anyone within the FBI discuss or suggest with you that you should raise the prospect of Russian hack-and-leak operations with social media platforms in 2020?" Chan repeatedly responded with a stock answer, "I do not recollect." *Id.* 189:14-23; 189:8-191:21, 203:13-15 ("I cannot recollect." … "I do not recollect." … "I do not recollect." … "I don't recollect." … "I don't recollect." … "I do not recollect.").

891.    These responses are not credible because they are stock responses, and it is facially implausible that Chan does not recall whether other federal officials discussed warning platforms about "hack-and-leak" operations during 2020, especially after the fiasco of censorship of the Hunter Biden laptop story.  These "I do not recollect" responses also contradict Chan's testimony later in the deposition that he "regularly" communicated with FITF and FBI's cyber division about the possibility of a hack-and-leak operation: "I believe that we internally discussed the potential for hack-and-leak operations, and so I regularly was in communication with the cyber division of the FBI as well as with the Foreign Influence Task Force to see if they had heard of anything that I had not heard of.  So I would say that the people that I communicate with, everyone was vigilant, but no one -- I believe that in general people at the FBI were concerned about the potential for hack-and-leak operations, but that we had not seen any investigations that led in that direction or that would lead us in that direction." *Id.* 206:23-207:10.  He specifically admitted that he recalls discussing hack-and-leak operations with FITF officials "Ms. Dehmlow, Mr. Olson, Mr. Cone, and Mr. Giannini." *Id.* 207:19-23.  It is not credible that the *only* aspect of his internal discussions with the FBI about hack-and-leak operations that he does not recall is whether someone from the FBI suggested or directed him to raise the issue with social-media platforms.

892.    Further, as revealed on the video of Chan's deposition, his demeanor in answering questions on this point changes and becomes evasive.  Chan's demeanor when testifying on this point undermines his credibility.

893.    The FBI and other federal officials had no specific investigative basis for these repeated warnings about possible "hack-and-dump" operations. As Chan admits, "[t]hrough our investigations, we did not see any similar competing intrusions to what had happened in 2016. So although from our standpoint we had not seen anything, we specifically, in an abundance of caution, warned the companies in case they saw something that we did not." *Id.* 174:7-13.  As Chan admits, "we were not aware of any hack-and-leak operations that were forthcoming or impending" when he and other federal officials warned about the "risk of hack-and-leak operations, especially before the general election."  *Id.* 192:19-24.

894.    Matt Masterson and Brian Scully of CISA also raised the concern about the threat of hack-and-leak operations in the 2020 election cycle to the social-media platforms during the "USG-Industry" meetings that occurred quarterly, then monthly, then weekly leading up to the 2020 election.  *Id.* 212:3-22.

895.    Yoel Roth, then-Head of Site Integrity at Twitter, provided a formal declaration to the Federal Election Commission containing a contemporaneous account of the discussion of the threat of "hack-and-leak operations" at the meetings between the FBI, other federal law-enforcement and national-security agencies, and the social-media platforms.  His declaration states: "Since 2018, I have had regular meetings with the Office of the Director of National Intelligence, the Department of Homeland Security, the FBI, and industry peers regarding election security.  During these weekly meetings, the federal law enforcement agencies communicated that they expected 'hack-and-leak operations' by state actors [*i.e.*, Russians or other foreign

governments] might occur in the period shortly before the 2020 presidential election, likely in October.  I was told in these meetings that the intelligence community expected that individuals associated with political campaigns would be subject to hacking attacks and that material obtained through those hacking attacks would likely be disseminated over social media platforms, including Twitter. These expectations of hack-and-leak operations were discussed throughout 2020. *I also learned in these meetings that there were rumors that a hack-and-leak operation would involve Hunter Biden*." Chan. Ex. 8, ¶¶ 10-11, at 2-3 (emphasis added).  Yoel Roth executed this declaration on December 17, 2020, shortly after the events described, and submitted it to the Federal Election Commission in a formal enforcement proceeding, so it has the force of a statement under oath. *Id.* at 4.

896.    Chan's account of these meetings largely matches Roth's account, *see, e.g.,* Chan Dep. 218:5-220:15, but there are two key discrepancies between Roth's and Chan's accounts. First, Roth recounts that the FBI and national-security officials communicated to Twitter that they "*expected*" that there would be one or more hack-and-leak operations by Russia or other "state actors." *Id.* at 2.  Chan testified that he believed they used words like "concern" instead of "expected." Chan. Dep. 220:20-24, 224:5-17, 226:5-12, 227:3-6.  Second, Roth specifically recalls that federal officials told him that "there were rumors that a hack-and-leak operation would involve Hunter Biden." Chan Ex. 8, ¶ 11, at 3.  Chan testified that "in my recollection, Hunter Biden was not referred to in any of the CISA USG-Industry meetings." Chan Dep. 213:8-10; *see also id.* 227:24-228:1, 228:21-23, 229:9-11 229:15-20.

897.    On these points, Roth's declaration is more credible than Chan's testimony, for at least four reasons.  First, Roth's declaration was executed much closer in time to the events described—just two months later—while Chan's testimony occurred over two years later.  Indeed,

as noted above, Chan himself admitted that he "could not recollect" key details about the federal officials' course of conduct in warning social-media platforms about a supposed "hack and dump" operation, so there is no reason to think that Chan's recollection is more reliable on these similarly specific details.

898.    Second, Roth had no incentive to color or shade his account of communications from federal officials when he submitted this Declaration to the FEC, while Chan has strong incentives to shade his testimony on these points to deemphasize the FBI's involvement in censoring the Hunter Biden laptop story.  Indeed, if the FBI and other federal officials warned social-media platforms about a hack-and-leak operation *involving Hunter Biden*—when the FBI had received Hunter Biden's laptop from the Delaware repair-shop owner and thus *knew* that it was not hacked, *see* Doc. 106-3, at 5-11 —that raises a compelling inference that the FBI deliberately gave misleading information to social-media platforms to induce them to wrongfully censor the Hunter Biden laptop story.

899.    Third, Chan's testimony on a closely related point—whether Chan was instructed by an FBI official to warn social-media platforms about "hack and leak" operations—is not credible.  Chan's minor disagreements with Roth's account are not credible for similar reasons. For example, Chan claims to have extremely specific recollection of the FBI's word-choice in meetings that occurred over two years earlier—disputing that the FBI used the word "expected," *id.* 220:20-24, 223:12-22, 224:5-17, 226:5-12, 227:3-6, and affirmatively asserting with confidence that "Hunter Biden" was never mentioned, *id.* 213:8-10, 227:24-228:1, 228:21-23, 229:9-11 229:15-20—while at the same time claiming that he could not recollect whether he discussed the same issues with the FBI internally *at all*, *Id.* 189:14-23; 189:8-191:21, 203:13-15.

900.    Fourth, Chan's demeanor while testifying by videotape on this point is evasive and undermines his credibility.

901.    Two additional points support the credibility of Roth's account over Chan's.  First, Brian Scully's testimony, unlike Chan's, did not dispute or quibble with any aspect of Roth's near-contemporaneous account of these conversations—Scully merely contended that he could not remember.  Scully Dep. 247:18-248:2.

902.    Second, Roth's account directly matches the less detailed but even more contemporaneous account provided by Mark Zuckerberg in his testimony before Congress on October 28, 2020.  Zuckerberg's testimony confirms that, as Yoel Roth recounted, the FBI conveyed a strong risk or expectation of a foreign hack-and-leak operation shortly before the 2020 election: "So you had both the public testimony from the FBI and in private meetings alerts that were given to at least our company … that suggested that we be on *high alert and sensitivity* that if a trove of documents appeared that we should view that with suspicion, that it might be part of a foreign manipulation attempt." Chan Ex. 9, at 56 (emphasis added).  Indeed, Chan did not dispute Zuckerberg's account: "I don't remember the exact framing of our discussions with them [*i.e.*, Facebook]."  Chan Dep. 247:14-15.  And again, Chan did not dispute the fundamental details of Zuckerberg's account; he admitted that he "hosted several private meetings with Facebook where the concern about a hack-and-leak operation was raised" in 2020.  Chan Dep. 246:17-20.  Though Chan did state that "I would not have framed it like Mr. Zuckerberg did," Chan essentially concedes the accuracy of Zuckerberg's account.   Chan Dep. 255:14-15.

903.    After the Hunter Biden story broke on October 14, 2020, Laura Dehmlow of the FBI refused to comment on the status of the Hunter Biden laptop in response to a direct inquiry

from Facebook, even though the FBI had the laptop in its possession since late 2019 and knew that

its contents were not hacked.  Chan Dep. 213:11-215:5.

904.    When the Hunter Biden laptop story broke on October 14, 2020, it was widely

censored on social media, including by Twitter and Facebook, pursuant to their hacked-materials

policies.  For example, Twitter's Site Integrity Team "blocked Twitter users from sharing links

over Twitter to the applicable New York Post articles and prevented users who had previously sent

Tweets sharing those articles from sending new Tweets until they deleted the Tweets" sharing the

Hunter Biden laptop story.  Chan Ex. 8, at 3.  "Facebook, according to its policy communications

manager began 'reducing its distribution on the platform,' pending … a third-party fact check.

Twitter went beyond that, blocking all users, including the House Judiciary Committee, from

sharing the article on feeds and through direct messages.  Twitter even locked the New York Post

account entirely, claiming the story included hacked materials and was potentially harmful."  Chan

Ex. 9, at 2.

**D.    The FBI Routinely Flags Speakers and Content for Censorship.**

905.    According to Chan, during the 2020 election cycle, "the U.S. government and social

media companies effectively impeded [foreign] influence campaigns primarily through

information sharing and *account takedowns*, respectively."  Chan Ex. 1, at i (emphasis added).

906.    According to Chan, the FBI's "information sharing" includes both "strategic

information," which "discusses the tools, tactics or processes" used by foreign-influence

campaigns, and "tactical information," which means identifying specific "indicators or selectors,"

which are both "a term of art" that refers to "IP addresses, email accounts, social media accounts,

… website domain names, and … file hash values."  Chan Dep. 29:15-30:7.

907.    In other words, according to Chan, the FBI "shares information" with social-media

platforms that includes information about specific IP addresses, email accounts, social-media

accounts, and website domain names that the FBI believes should be censored, and this sharing of

information leads social-media platforms to engage in "account takedowns" based on the FBI's

information. *See id.* According to Chan, this combination of "information sharing" and "account

takedowns" "effectively impeded [foreign] influence campaigns" during the 2020 election cycle.

Chan Ex. 1, at i.

908.    Chan testified that the FBI shares this information with social-media platforms so

that they can "protect their platforms"—indeed, "protect their platforms" was a stock phrase in

Chan's testimony.  Chan Dep. 32:19, 34:7-12, 35:8-10, 36:25, 87:22-23, 274:14.  As Chan's

testimony makes clear, however, the phrase "protecting their platforms" is a euphemism for

"censoring speech that federal officials disfavor."  For example, Chan admits that "protect their

platforms" means "knocking down accounts or knocking down misinformation content."  Chan

Dep. 273:12-17.  Chan's thesis and testimony make clear that the FBI's purpose in "information

sharing" with social-media platforms is to induce them to censor speech that the FBI dislikes and

wants to see censored.  For example, Chan testified that "my purpose is to share the information

with them so they can protect their platforms as they deem appropriate," but he immediately

admitted that "one way to protect their platforms is to take down these accounts." *Id.* 35:9-14.

Thus, Chan admits that the FBI's "purpose" in "information-sharing" includes "to take down these

accounts" that the FBI believes are Russian-influenced. *Id.*

909.    Chan admits that the purpose and predictable effect of "tactical" information-

sharing—*i.e.*, the FBI flagging specific accounts, websites, URLs, IP addresses, web domain

names, etc., to social-media platforms for censorship—is that the platforms will take action against

such specific content and accounts under their content-moderation policies: "from what I have observed and what they have told me when we have provided them with high confidence of Russian selectors, that they have been able to discover fake Russian accounts and take them down." *Id.* 32:20-24.

910.    According to Chan, the social-media platforms "take the information that we share, they validate it through their own means. And then if they determine that these are accounts being operated by Russian state-sponsored actors, then they have taken them down." *Id.* 33: 12-17.

911.    Chan admits that, during the 2020 election cycle, the U.S. Government engaged in "information sharing with the social media companies to expose Russia's different operations and shut down its accounts." Chan Ex. 1, at xvii. In other words, Chan admits that the purpose of federal officials' "information sharing" was to "shut down … accounts" on social media that the Government disfavored. *Id.*; *see also* Chan Dep. 37:17-38:2.

912.    In addition to social-media platforms, Chan and the FBI also "share indicators" with state and local government election officials, such as "county registrars or county clerk's offices"—who are also state actors subject to the First Amendment. Chan "would share indicators with them," and "share the same type of information that I shared with social media companies," including "IP addresses and domain names, so that they could see if they were popping up anywhere on their networks." *Id.* 50:11-51:6. In other words, the FBI feeds information to state and local election officials so that they can make their own reports of supposed "misinformation" and "disinformation" to social-media platforms, creating a First Amendment feedback loop. The FBI seeds concerns with the state and local election officials, who then identify supposed "disinformation" and "misinformation" based on the FBI's information, and then report it to the social-media platforms through CISA and the FBI.

913.    Chan contends that Russian "state-sponsored actors … have created fake social

media accounts," which "have either generated disinformation themselves or they have amplified

existing content from current users of social media platforms." *Id.* 60:1-7.

914.    These supposedly Russian-controlled accounts "make their own content," such as

"mak[ing] their own Facebook postings," and they "try to find what are the hot-button or current

issues in the news … and then they will try to either generate content themselves related to that or

they will amplify existing content." *Id.* 60:13-22. This is supposedly done with the goal to "sow

discord in the American online environment." *Id.* 61:12-13.

915.    Chan agrees that "the goal there is … they post messages that they anticipate will

be divisive and try and get Americans to engage with them." *Id.* 61:14-18.

916.    As Chan agrees, "engagement" with a social-media posting includes viewing the

content, liking or disliking it, reposting it, commenting on it, and/or reposting it with commentary.

*Id.* 61:19-63:13.  All of these are First Amendment-protected activities.  In this way, according to

Chan, "the Russians are trying to get people to engage on their divisive content." *Id.* 63:19-64:1.

917.    According to Chan, over 126 million Americans "engaged" with Russian-

originated content on Facebook, and 1.4 million Americans engaged with such content on Twitter,

during the 2016 election cycle. *Id.* 66:2-25.  All of this was First Amendment-protected activity.

Chan credits federal government efforts during the 2020 election cycle with preventing the vast

majority of such "engagement" by American citizens with Russian-originate content on social

media during the 2020 election cycle.  Chan Ex. 1, at v ("This thesis finds that the Russians shifted

their tactics from 2016 to 2020. Still, the U.S. government and social media companies effectively

impeded their influence campaigns primarily through information sharing and account takedowns,

respectively.").    Thus, the federal officials' "information sharing" activities prevented an enormous amount of First Amendment-protected activity from occurring.

918.    Chan's thesis and testimony provide clear examples of how supposedly Russian-originated "disinformation" on social media becomes intertwined with, and inseparable from, First Amendment-protected forms of expression by American citizens.    Chan identifies a supposedly Russian-originated political ad on Facebook that features a picture of Hillary Clinton with a black X painted over her face, advertising an event called "Down with Hillary!" and stating, "Hillary Clinton is the co-author of Obama's anti-police and anti-Constitutional propaganda."    Chan Ex. 1, at 29.    None of this is "disinformation" in any meaningful sense—it is actually expression of political opinions.    The posting notes that it received 763 reactions and 78 comments on Facebook, which Chan agrees are "engagements by users."    *See id.*; *see also* Chan Dep. 67:1-68:20.    Chan contends that the underlying ad was "Russian-originated content masquerading as something posted by an American," *id.* 67:6-10—*i.e.*, just the sort of content that the FBI would flag for censorship to social-media platforms through "tactical information-sharing."    But once the FBI induces Facebook to pull down the ad from the platform, the First Amendment-protected "engagements" by Americans—likes, dislikes, re-posts, comments, etc.—are all obliterated as well.    This is the collateral damage to *Americans'* freedom of speech in the FBI's war on so-called Russian "disinformation."

919.    Chan's thesis provides similar examples of supposedly Russian-originated content with heavy engagement by Americans.    For example, it reproduces two supposedly Russian-originated political ads containing a secure-borders message ("Secured Borders: Every man should stand for our borders! Join!") and a pro-Second Amendment message ("Defend the 2nd: The community of 2nd Amendment supporters, gun-lovers & patriots").    Chan Ex. 1, at 32.    Again,

these are expressions of political opinion, not "disinformation" in any meaningful sense. The former posting garnered 134,943 "likes," and the latter posting garnered 96,678 "likes"—each of which is a First Amendment-protected expression of support for the underlying, supposedly Russian-originated, political message. *See id.* Another similar ad, targeting black voters, simply stated "Black Matters: Join us because we care. Black matters!" and it drew 223,799 "likes" from ordinary users. *Id.* at 32; Chan Dep. 80:12-20. Chan admits that these are "high" levels of "engagement" from ordinary users. Chan Dep. 83:21.

920.    Chan also reports that "IRA employees used social media bots, i.e., computer programs which control social media accounts, to amplify existing content." Chan Ex. 1, at 30. To "amplify existing content" means to do "things like liking it or reposting it." Chan Dep. 71:20-24.

921.    Based on research, Chan estimates that "over 100,000 real people had their postings amplified by [Russian]-controlled social media bots." *Id.* 87:2-6.

922.    In addition, the "indicators" that the FBI targeted for censorship included supposedly Russian-aligned websites that hosted First Amendment-protected content posted by Americans. For example, Chan identified a supposedly Russia-generated website called "PeaceData," which "hire[d] unwitting freelance journalists, including Americans, to write articles for the site." *Id.* 141:24-142:3. "[A]t least 20 freelance journalists, which includes Americans, had been duped into writing articles for the site." *Id.* 142:4-9. The FBI identified this site as Russia-generated to the social-media platforms, and as a result, the platforms "identified accounts that were foreign-associated … that were directing users to those platforms" and "t[ook] actions against those accounts." *Id.* 143:10-20. The speech of the American freelance journalists was thus suppressed due to FBI inducement.

923.    Similarly, Chan identified a website called "NAEBC" as a Russia-generated website. According to Chan, the Russians "used various social media accounts to engage with real users and convince them to post on the NAEBC site, which met with some success." *Id.* 144:13-145:2.  Thus, "the NAEBC site also included content drafted and written by real users that had posted on that site." *Id.* 145:3-6.  "The FBI flagged the NAEBC site to social-media platforms as a … Russian-originated source." *Id.* 146:12-15.  On that basis, "the companies were able to discover Russian-controlled accounts that were used to try to redirect users to those websites," and the platforms "said they had taken down those accounts." *Id.* 146:16-147:7.  The FBI thus induced the platforms to censor the speech of "real users" on a supposedly fake Russian website.

924.    Chan admits that "Russia's influence operations" are deeply intertwined with First-Amendment-protected speech by ordinary social-media users, as he describes: "Many factors are at play when trying to measure the effects of Russia's influence operations. First-order effects include real users interacting with inauthentic content, Russian-bot amplification of divisive organic content, and IRA-controlled accounts communicating directly with real users."  Chan Ex. 1, at 94.

925.    During the days surrounding the 2020 election, the FBI's command post also routed reports of domestic "disinformation" to social-media platforms for censorship to social-media.  "During FBI San Francisco's 2020 election command post, which I believe was held from the Friday before the election through election night, that Tuesday at midnight, information would be provided by other field offices and FBI headquarters about disinformation …. These were passed to FBI San Francisco's command post, which I mentioned to you before I was the daytime shift commander, and we would relay this information to the social media platforms where these accounts were detected."  Chan Dep. 162:12-24.

926.    The FBI made no attempt to distinguish whether these reports of "election disinformation" "whether they were American or foreign." *Id.* 163:1-3. "[M]any field offices" of the FBI "relayed this information to us." *Id.* 163:7-11.

927.    "[T]hose reports would come to FBI San Francisco … and then FBI San Francisco would relay them to the various social media platforms where the problematic posts had been made," in order "to alert the social media companies to see if they violated their terms of service…. which may include taking down accounts." *Id.* 165:3-17.

928.    The FBI has about a "50 percent success rate" in getting reported disinformation taken down or censored by the platforms, *i.e.*, "that some action had been taken because it was a terms-of-service violation." *Id.* 167:7-14.

**E.    The FBI Demands Information on Censorship from the Platforms.**

929.    Regarding the algorithms that platforms use to detect inauthentic activity and to censor content, the FBI has "probed them to ask for details" about those algorithms, "so that we could make sure we were sharing the most effective and actionable type of information with them," *id.* 88:5-7, 20-22—in other words, to maximize the chances that disfavored speech would be censored as a result of the FBI's "information sharing."

930.    The FBI "would … ask them what their terms of service or community standards were." *Id.* 90:21-23.  But Chan contends that "we never told the companies to modify their terms of service or community standards." *Id.* 92:5-7.

**F.    The FBI Flags Accounts and URLs for Censorship on a Monthly Basis**

931.    The FBI gives "tactical information" to social-media platforms, where "tactical information includes identifying specific social media accounts and URLs" to be evaluated for censorship. *Id.* 96:24-97:2.  Chan estimates that this occurs "one to five times per month." *Id.*

97:17-18.  This includes such "tactical" information-sharing at most quarterly meetings.  *Id.* 98:18-19.

932.    To flag such specific accounts, URLs, and content to the platforms, Chan "would typically … send an email to the recipients at the companies" notifying them that he would be using "a secure file transfer application within the FBI that is called Teleporter," and "the Teleporter email contains a link for them to securely download the files from the FBI."  *Id.* 98:20-11.  The Teleporter files contain "different types of indicators," *i.e.*, specific social-media accounts, web sites, URLs, email accounts, etc. that the FBI wants the platforms to evaluate under their content-moderation policies.  *Id.* 99:15.

933.    Each such communication may contain any number of such "indicators," ranging "from one account or one selector to many, like a whole spreadsheet full of them."  *Id.* 100:16-17.

934.    Chan "estimate[s] that during 2020 [he] shared information with the companies between one to five or one to six times per month."  *Id.* 100:21-24.  Each such incident of information-sharing included flagging a number of specific "indicators" that ranged anywhere from one to "hundreds" of specific accounts, web sites, URLs, etc...  *Id.* 101:4-7.

935.    During the 2022 election cycle, Chan shared such information with the platforms "one to four times per month."  *Id.* 101:13-14.  Each such incident involved flagging a number of specific "indicators" that ranged anywhere from one to "in the tens, in the dozens" of specific accounts, web sites, URLs, etc.  *Id.* 101:17-19.

936.    "[I]n general" these flagging communications would go to all seven social-media platforms identified above, but sometimes there would be "company-specific information" that would go to a particular company.  *Id.* 102:3-9.  "[M]ost of the time we would share with that list of [seven] companies."  *Id.* 102:14-15.

937.    When it made such communications, the FBI would request that the platforms report back to the FBI their specific actions taken toward the accounts that the FBI specifically flagged for possible censorship. *Id.* 102:18-25. "[A]t every quarterly meeting we try to follow up to ask if information we shared has been relevant if we have not received a response yet." *Id.* 103:5-9. Sometimes, but not always, the platforms report back to the FBI on what accounts they have removed based on the FBI's information, in which case the FBI documents the report to "help[] us fine-tune the information we're sharing." *Id.* 103:14-22.

938.    Including Chan, at least *eight* FBI agents in the San Francisco field office are involved in reporting disinformation to social-media platforms—Chan himself, two GS-14 supervisors who report to Chan, and roughly five FBI field agents in two different squads within the office. *Id.* 105:19-108:18. All these agents share both "strategic" and "tactical" information with social-media platforms about supposed malign-foreign-influence content on platforms, and they are "involved in following up to find out if their tactical information was acted on." *Id.* 108:8-10.

939.    In addition, a significant number of FBI officials from FBI's Foreign Influence Task Force (FITF) also participate in regular meetings with social-media platforms about supposed disinformation. *Id.* 108:19-110:14. These include "three to ten" FITF officials at bilateral meetings with social-media platforms. *Id.* 110:7-8.

940.    The FBI uses both its criminal-investigation authority and its national-security authority to gather information about supposed malign-foreign-influence activities and content on social-media platforms. This specifically includes using "the Foreign Intelligence Surveillance Act … the PATRIOT Act, [and] Executive Order 12333 that allows us to gather national security intelligence" to investigate content on social media. *Id.* 111:13-112:8.

941.    In one case in 2020, for example, a single "Teleporter message was sent" to platform(s) "with a spreadsheet with hundreds of accounts," all of which the FBI was flagging for the platforms as supposed malign-foreign-influence accounts.  *Id.* 112:9-14.

942.    Chan expressed a high degree of confidence that the FBI's identification of "tactical information" (*i.e.*, specific accounts, URLs, sites, etc.) to social-media platforms was always accurate, and that the FBI never misidentified accounts, content, web sites etc. as operated by malign foreign actors when in fact they were operated by American citizens.  He testified that "we only share information that we have a high confidence that is attributed to a foreign-state actor," and that "[i]n my experience, it has always been correct."  *Id.* 112:15-113:16.

943.    But there are substantial reasons to think that Chan is wrong.  For example, Chan reports that the FBI induced Twitter to remove accounts and Tweets related to the #ReleaseTheMemo hashtag in 2019, which supported Congressman Devin Nunes' investigation regarding Russia collusion.  *Id.* 149:13-21; Chan Ex. 1, at 71 (noting that 929,000 Tweets removed by Twitter as supposedly Russian disinformation included thousands of Tweets amplifying the #ReleaseTheMemo hashtag).  In fact, recent reporting indicates that Twitter was aware that the accounts pushing #ReleaseTheMemo were *not* Russian-controlled inauthentic accounts, but core political speech by ordinary American citizens that the FBI conspired to suppress.

944.    The FBI's flagging accounts for censorship often leads to the censorship of additional accounts.  According to Chan, the FBI "may share, for example, one account with them, but then they may find ten connected accounts and take all of them down."  *Id.* 113:23-114:1.

**G.    Pressure from Congress Induces Platforms to Increase Censorship.**

945.    According to Chan, the social-media platforms were far more aggressive in taking down disfavored accounts and content in the 2018 and 2020 election cycles than they were in the 2016 cycle.  *Id.* 115:18-116:6.

946.    Based on his personal observation, experience, and research, Chan concludes that "pressure from Congress, specifically HPSCI and SSCI," induced the social-media platforms to adopt more aggressive censorship policies in 2018 and 2020.  *Id.* 116:1-3.  "HPSCI" stands for the House Permanent Select Committee on Intelligence, and "SSCI" stands for the Senate Select Committee on Intelligence.  *Id.* 116:11-14.

947.    This "pressure from Congress" took multiple forms.  First, those Congressional committees called "the CEOs for the companies … to testify in front of their committees," including "Mark Zuckerberg and Jack Dorsey and Sundar Pichai."  *Id.* 116:20-117:2.  These CEOs were called to testify about disinformation on their platforms "more than once."  *Id.* 117:5-6.  Chan believes that "that kind of scrutiny and public pressure from Congress … motivated them to be more aggressive in the account takedowns."  *Id.* 117:7-14.  Chan believes this based on conversations with social-media platform employees.  *Id.* 117:15-118:2.

948.    Chan identifies specific congressional hearings that placed such pressure on social-media platforms to adopt more restrictive censorship policies: "On April 10–11, 2018, the Senate Commerce Committee and Senate Judiciary Committee held hearings on consecutive days with Mark Zuckerberg to discuss Russia's influence campaigns on Facebook and its countermeasures to combat them…. The Senate committees also used this as an opportunity to hold Facebook accountable for its actions and *exert pressure for positive change*."  Chan Ex. 1, at 50 (emphasis added).  "On July 17, 2018, the House Judiciary Committee held a hearing with senior executives from Facebook, Google, and Twitter so they could provide updates on their companies' efforts for

content filtering to stop foreign influence campaigns on their platforms." *Id.* On September 5, 2018, the Senate Intelligence Committee held a hearing with senior executives from Facebook and Twitter to discuss their companies' efforts to stop foreign influence campaigns and illegal transactions on their platforms." *Id.*

949.    Chan links these Congressional hearings to "constructive change," *i.e.*, more aggressive censorship policies by the platforms: "On October 31, 2017, the Senate Judiciary Committee held a hearing with senior executives from Facebook, Google, and Twitter to discuss the extent of the Russian disinformation campaigns on their respective platforms." Chan Ex. 1, at 48.   "This public hearing … provided politicians with the occasion to exert pressure on the companies to make constructive changes to their platforms." *Id.* at 48-49.   According to Chan, this "constructive change" means the adoption of more restrictive censorship policies.   Chan Dep. 133:9-23.

950.    In addition, Congress put pressure on the platforms to adopt and enforce more aggressive censorship policies and practices by sending high-level congressional staff from HPSCI and SSCI to meet with the social-media platforms directly and threaten them with adverse legislation.   According to Chan, "staffers from both of those committees have visited with … those [social-media] companies," and after these meetings with congressional staffers, employees of the social-media platforms "would indicate that they had to prepare very thoroughly for these types of meetings … and they indicated that it felt like a lot of pressure." *Id.* 117:19-119:2.

951.    The Congressional staffers had such meetings with "Facebook, Google, and Twitter."   Employees from those three companies "experienced these visits from congressional staffers as exercising a lot of pressure on them." *Id.* 118:12-16.

952.    In those meetings, the Congressional staffers discussed potential legislation with the social-media platforms, and before or after they met with those three companies, the Congressional staffers "discussed with [Chan] … legislation that they were thinking about doing." *Id.* 118:17-120:3.

953.    It is Chan's opinion that the social-media platforms' "changes in takedown policies" to make them more restrictive "resulted from that kind of pressure from Congress." *Id.* 118:17-20.

954.    Chan's opinion is the result of discussing these meetings with participants on both sides—both the Congressional staffers and employees of Facebook, Twitter, and Google.  Chan "and FBI San Francisco personnel would meet with the congressional staffers, typically before they met or after they met with the social media companies," because "they wanted an FBI opinion about what they had heard from the social media companies." *Id.* 119:23-120:3.

955.    To the best of Chan's recollection, these meetings between Congressional staffers and social-media platforms were an "annual occurrence" that began in 2017 and recurred annually after 2017.  *Id.* 120:7-8.  "The staffers had separate meetings with each of the companies."  *Id.* 121:4-5.  "[A]fter those meetings, the staffers would come to [Chan] and ask [his] opinion of potential legislation."  *Id.* 121:6-9.

956.    Chan also discussed these meetings with the social-media platform employees who participated, as he "talk[s] with the social media platform personnel regularly," and he understood from them that "the congressional staffers put a lot of pressure on them" in the meetings.  *Id.* 122:18-25.  He spoke directly to the personnel who participated in the meetings.  *Id.* 123:21-24. Senior officials from the social-media platforms, including Yoel Roth of Twitter, Steven Siegel of

Facebook, and Richard Salgado of Google, participated in the meetings with Congressional staffers. *Id.* 123:25-125:7.

957.    The Congressional staffers involved in the meetings were "senior-level staffers," including "a director-level" staffer, "the committee counsel or a senior counsel for the committee," and "one or two other … line-level staffers." *Id.* 123:6-13.

958.    According to Chan, "intense pressure from U.S. lawmakers and the media … eventually force[d] the social media companies to examine what had taken place on their platforms [in 2016] and strive to ensure that it did not happen in the future." *Id.* 127:3-23; Chan Ex. 1, at 42.

959.    These steps included actions by the social-media platforms to take more aggressive enforcement against violations of their terms of service, but also policy changes to the terms of service themselves to make their policies more restrictive: "the policy changes specifically to their terms of service or community standards." Chan Dep. 129:17-19. These involved "more robust or more aggressive content-modulation policies," that "clarify that certain things actually violate their policies and can be taken down." *Id.* 130:4-18.

960.    Chan notes that "Facebook and Twitter faced more Congressional scrutiny … as their senior executives testified before Congress on three separate occasions before the midterm elections," Chan Ex. 1, at 46, and he concludes that "political pressure from Congress was a contributing factor" leading social-media platforms to adopt more restrictive content-moderation policies.  Chan Dep. 132:7-9.  Chan believes that these more restrictive censorship policies that include "account takedowns" are "constructive change," *id.* 133:2-23.

961.    These policy changes, induced by "political pressure from Congress," resulted in a dramatic increase in censorship on social-media platforms, including for example that "zero [Twitter] accounts were taken down during the 2016 cycle but 3,613 Twitter accounts were taken

down during the 2018 cycle." *Id.* 133:24-134:5.  Likewise, 825 accounts were removed from Facebook and Instagram based on publicly available reports, but according to Chan, the actual number was much higher.  *Id.* 147:8-148:18.  In 2019, Twitter announced the takedown of "422 accounts which made 929,000 tweets."  *Id.* 149:9-12.  "[S]ome subset of that amount was due to information [the FBI] provided."  *Id.* 150:12-14.

962.    When meeting with social-media platforms, Chan "typically meet[s] with the trust and safety individuals and then their associated attorneys."  *Id.* 135:16-18.

963.    Samaruddin K. Stewart ("Sam") of the State Department's Global Engagement Center "would meet with social media companies … primarily with policy individuals."  *Id.* 135:2-15.

964.    Sam Stewart would offer "different types of software made by vendors that they would pilot to see if they could detect malign foreign influence on social media platforms."  *Id.* 135:25-136:3.  Chan believed that the Global Engagement Center's products "might accidently pick up U.S. people information."  *Id.* 138:10-12.

965.    Elvis Chan knows and has worked with Peter Strzok and Lisa Page.  *Id.*  234:19-240:5.  He also knows and has worked with James Baker, the former general counsel of the FBI who went on to become deputy general counsel of Twitter and encouraged Twitter to keep censoring the Hunter Biden laptop story.  *Id.*  239:13-16.

**H.    The FBI's Censorship Activities Are Ongoing.**

966.    Chan urges the public to report supposed misinformation on social media directly to the platforms, or else report it to the FBI or DOJ so that they can report it to the platforms, and boasts that the platforms are "very aggressive" in taking down misinformation.  As he stated in a public podcast just before the 2020 election: "If you're also seeing something related to the election

on your social media platform, all of them have portals where you can report that sort of information. They're being very aggressive in trying to take down any disinformation or misinformation, and then, lastly, if they see anything on election day or before election day, you can always report it to FBI.gov or justice.gov … We take all of these very seriously." Chan Ex. 13, at 3, 9:9-19.  FBI San Francisco, when it receives such reports, "would then relay those to social media platforms," so that "the social media platforms will assess those in connection with their terms of service."  Chan Dep. 267:13-23.  Chan characterizes the platforms as "very aggressive" in taking down disinformation because they "[adjusted] their policies to be able to handle foreign-malign-influence operations." *Id.* 270:23-25.

967.    The FBI continues the same efforts in 2022 and later election cycles that it pursued in 2020.  As Chan publicly stated, "post 2020, we've never stopped … as soon as November 3rd happened in 2020, we just pretty much rolled into preparing for 2022."  Chan Ex. 15, at 2, 8:2-4. Chan stated: "[W]e are also really engaged with the technology companies that are out here … We're also working with the social media companies to make sure that any foreign disinformation that's coming out … if we can identify them, we can share that information with them so they can knock down accounts, knock down disinformation content," and he noted that they are "having conversations with all of those organizations as they're building up to November of [2022]."  Chan Ex. 15, at 2-3, 8:15-9:4.

**VII.    CISA's Censorship: Pressure, "Switchboarding," and Working Through Nonprofits.**

968.    CISA, the Cybersecurity and Infrastructure Security Agency within the Department of Homeland Security, serves as a "nerve center" for federal censorship efforts.  CISA meets routinely with social-media platforms about censorship in at least five different sets of standing meetings, CISA pressures platforms to increase censorship of speech that federal officials disfavor,

and CISA serves as a "switchboard" by "routing disinformation concerns to social-media platforms" for censorship. CISA also seeks to evade the First Amendment by outsourcing many of its censorship activities to nonprofit agencies that it collaborates closely with, including the CISA-funded Center for Internet Security and its "EI-ISAC" ("Election Infrastructure – Information Sharing & Analysis Center") for state officials, and the massive censorship cartel calling itself the "Election Integrity Partnership."

969.    Brian Scully is the chief of the so-called "Mis, Dis, and Malinformation Team" or "MDM Team" within the Cybersecurity and Infrastructure Security Agency (CISA) in the Department of Homeland Security (DHS).    Scully Depo. 15:14-20.    Before the Biden Administration, the MDM Team was known as the "Countering Foreign Influence Task Force," or CFITF.

970.    Lauren Protentis is the "Engagements Lead" for the MDM Team, and she is in charge of "outreach and engagement to key stakeholders, interagency partners, [and] private sector partners," including "social media platforms."  Scully Depo. 18:2-18.  During relevant periods in both 2020 and 2022, however, Protentis was on maternity leave, and during those times, Scully performs her role as chief engagement officer for communicating with other federal agencies, private-sector entities, and social-media platforms about misinformation and disinformation. Scully Depo. 18:19-20:10.

971.    Both Scully and Protentis have done or are doing extended details at the National Security Council where they work on misinformation and disinformation issues.  Protentis began a one-year detail at the NSC in January 2023, as soon as she came back from maternity leave, and she will deal with mis- and disinformation issues for the NSC as part of her detail.  Scully Depo. 19:15:20:5.

A.    **CISA "Switchboards" by Flagging Government-Reported "Misinformation."**

972.    Scully admits that, during 2020, the MDM team "did some switchboard work on behalf of election officials." Scully Depo. 16:23-25. "Switchboard work" or "switchboarding" is a disinformation-reporting system that CISA provides that allows state and local election officials (who are government officials subject to the First Amendment) "to identify something on social media they deemed to be disinformation aimed at their jurisdiction. They could forward that to CISA and CISA would share that with the appropriate social media companies." Scully Depo. 17:3-8.

973.    In reporting perceived misinformation to the platforms, CISA and the state and local officials have "an understanding that if the social media platforms were aware of disinformation that they might apply their content moderation policies to it," and "the idea was that they would make decisions on the content that was forwarded to them based on their policies." Scully Depo. 17:15-21.

974.    CISA's "switchboarding" activity causes social-media speech to be censored that otherwise would not have been censored: Scully agrees that "if it hadn't been brought to their attention then they obviously wouldn't have moderated it." Scully Depo. 17:22-18:1.

975.    Scully contends that "we didn't do switchboarding in 2022." Scully Depo. 21:24-25. But he admits that this decision was made in late April or early May 2022. Scully Depo. 22:15-23. This lawsuit was filed, specifically challenging CISA's "switchboarding" activity, on May 5, 2022. Doc. 1.

976.    Throughout the 2022 election cycle and through the present date, CISA continues to publicly state on its website that the MDM Team "serves as a switchboard for routing disinformation concerns to appropriate social media platforms": "The MDM team serves as a

switchboard for routing disinformation concerns to appropriate social media platforms and law enforcement. This activity began in 2018, supporting state and local election officials to mitigate disinformation about the time, place, and manner of voting. For the 2020 election, CISA expanded the breadth of reporting to include other state and local officials and more social media platforms." Scully Ex. 24, at 3; *see also* Cybersecurity and Infrastructure Security Agency, "Mis, Dis, Malinformation," https://www.cisa.gov/mdm (visited Feb. 4, 2023).

977.    According to Scully, "switchboarding is CISA's role in forwarding reporting received from election officials, state/local election officials, to social media platforms."  Scully Depo. 23:24-24:2.

**B.    CISA Organizes the "USG-Industry Meetings" on Misinformation.**

978.    The MDM Team continues to communicate regularly and extensively with social-media platforms about misinformation and disinformation, including during the 2022 election cycle.  These communications include at least "two general types of communications, one, we did regular sync meetings between government and industry, so federal partners and different social media platforms."  Scully Depo. 21:2-6.  This is "a coordinated meeting.  Facebook was the industry lead, so [Scully] would have coordination calls with them prior to the meetings, just to set the agenda for meetings…"  Scully Depo. 21:6-10.  These meetings are described in CISA's interrogatory responses as "USG-Industry" meetings.  Scully Ex. 12, at 38-40.

979.    In addition, the MDM Team received regular reports from social-media platforms about any changes to their censorship policies or their enforcement actions on censorship: "if a platform was putting out a … public report on policies or activities" relating to disinformation and censorship," CISA would "get a briefing on that or at least get an awareness that it was going out." Scully Depo. 21:11-16.

980.    The USG-Industry meetings increase in frequency as each election nears.  In 2022, they were "monthly" as the election approached, and then in October, they became "biweekly," so that there were two "biweekly meetings … prior to the [2022] election."  Scully Depo. 24:16-21.

981.    "DOJ, FBI, ODNI, and … DHS" participate in these meetings on the federal government's side.  Scully Depo. 25:23. DHS's participation includes at least two components: CISA, typically represented by Scully and Geoff Hale, Scully's supervisor; and the Office of Intelligence and Analysis ("I&A").  Scully Depo. 25:11-26:13. Scully's role is to "oversee" and "facilitate the meetings."  Scully Depo. 25:14-16.  On behalf of CISA, Kim Wyman, Allison Snell, and Lauren Protentis also participate in the meetings. Scully Depo. 28:4-13.

982.    On behalf of FBI, FITF Chief Laura Dehmlow and Elvis Chan participate in these "USG-Industry" meetings, and "periodically other people would be on from different parts of FBI," while "Laura [Dehmlow] was usually who [CISA] coordinated through."  Scully Depo. 29:14-30:12.

983.    These "USG-Industry" meetings have been occurring "for years," and "the first meeting we had … between federal and … industry was in 2018."  Scully Depo. 31:10-16.

984.    In addition, prior to each "USG-Industry" meeting, CISA hosts at least two planning meetings before the main meeting: a bilateral planning meeting between CISA and Facebook, and an interagency meeting with the federal agencies that participate.  Scully Depo. 36:21-37:13.

985.    Even though the 2022 meetings were still quite recent at the time of his deposition, Scully professed that "I don't recall specifics, so I'll just say that upfront" about the discussions at these meetings.  Scully Depo. 37:19-20; *see also* Scully Depo. 39:23-25.

986.    The social-media platforms attending these meetings include "Facebook, Twitter, Microsoft, Google, Reddit, … [and] LinkedIn," as well as "others."  Scully Depo. 38:15-20.  For example, Wikimedia Foundation participated in "some."  Scully Depo. 39:2-6.

987.    Scully agrees that "concerns about misinformation and disinformation on social media platforms [were] discussed in these meetings in the 2022 timeframe."  Scully Depo. 39:7-11.  This includes federal officials reporting on disinformation concerns that they believe will affect speech on social media; for example, the "intelligence community" would report on "information operations": "the intelligence community, if their reporting included foreign actors who were potentially going to use information operations, they might mention that in their briefings."  Scully Depo. 39:19-23.

988.    The social-media platforms, likewise, would report back to federal officials about disinformation "trends" on their platforms, and provide additional information to the federal government not included in their public reports about such trends: "the platforms, they might share some high-level trend information from public reporting that they put out.  So a lot of the platforms do their own regular reports on what they're seeing on their platforms and … what actions they're taking. And so the platforms, themselves, would share that type of information…. they would share essentially what they were getting ready to make public or what they had already made public… and then potentially provide some additional context around that."  Scully Depo. 40:4-22.  The government would ask for additional information about their observations of disinformation trends on social media, and the platforms would provide it: "they would share that, and if the government had questions or was looking for additional context they would often talk about that, they would generally talk about any new tactics that they were seeing."  Scully Depo. 41:1-5.

989.    Scully admits that the discussion of foreign-originated misinformation is ultimately targeted at preventing domestic actors' from engaging in certain government-disfavored speech. He states that "my recollections for the time period we're talking about here, from September 2022 to the election in 2022, I recall most of it was foreign based.  But … often what you see overseas essentially makes its way to the United States."  Scully Depo. 41:6-12.

990.    At the various meetings, the platforms discuss misinformation and disinformation as "coordinated inauthentic behavior," which is subject to removal under their terms of service, but Scully admits that "coordinated inauthentic behavior" concerns CISA because it "could lead to mis and disinformation, for sure."  Scully Depo. 42:12-14.

### C.    CISA Is Deeply Embedded in the Election Integrity Partnership.

991.    Scully admits that CISA has established relationships with researchers at "Stanford" and the "University of Washington," as well as "Graphika."  Scully Depo. 46:23, 48:1-4.  CISA's coordination with these researchers has continued since before the 2020 election cycle. Scully Depo. 47:22-25.  Detailed additional information about these entities and their collaboration with CISA in the "Election Integrity Partnership" (or "EIP") is provided below.  *See infra*.

992.    Stanford Internet Observatory, University of Washington, the Atlantic Council, and Graphika are all involved in the EIP.  Scully Depo. 48:1-22.

993.    When EIP was starting up, Scully admits that CISA's "involvement" with the EIP included at least the following collaborations: (1) "a couple of our [CISA] interns came up with the idea and … [CISA] had some communications with" the EIP.  Scully Depo. 49:8-10.  (2) CISA "received some briefings on the work that they were doing."  Scully Depo. 49:13-14.  (3)  CISA "had some communications early on in the process, when they were making decisions, when Stanford was trying to figure out what the gap was."  Scully Depo. 49:18-21.  (4) CISA "connected

them [EIP] with the Center For Internet Security," which is a CISA-funded nonprofit that channels

reports of disinformation from state and local government officials to social-media platforms.

Scully Depo. 50:5-6.  (5) CISA also "connected them [EIP] with some of the election official

groups," *i.e.*, "the National Association of Secretaries of State [NASS] and the National

Association of State Election Directors [NASED]," both of which are groups of state and local

government officials.  Scully Depo. 50:6-10.  (6) And CISA "facilitated some meetings between

those three."  Scully Depo. 50:10-11.

994.    The CISA interns who originated the idea of the EIP "worked for the Stanford

Internet Observatory, as well … which was part of the [Election Integrity] Partnership."  Scully

Depo.  51:7-8, 22-24.

995.    According to Scully, the "gap" that the EIP was designed to fill, was that state and

local election officials lack the resources to monitor and report on disinformation that affects their

jurisdictions: "One of the gaps that we identified from 2018 is, as you know, most election officials

their offices are fairly low staff, low resourced, and so there was no – they didn't have capabilities

to try to identify disinformation targeting their jurisdictions, and so was essentially the gap is that

most election offices throughout the country just didn't have that capacity or capability to be

monitoring so that they could identify anything that would be potentially target their jurisdictions,

so that was the gap."  Scully Depo. 57:6-17.

996.    Scully and other CISA officials identified the "gap" as a problem to CISA interns

who were simultaneously working for the Stanford Internet Observatory: "So we had a

conversation with the interns, and they were asking questions about kind of needs that the election

officials have, generally.  One of the gaps that we identified from 2018 is, as you know, most

election officials their offices are fairly low staff, low resourced, and so … they didn't have the capabilities to try to identify disinformation targeting their jurisdictions." Scully Depo. 57:2-11.

997.    Thus, Scully and other CISA officials were involved in originating and brainstorming about the creation of the EIP in the first place, as they "had some initial conversation with the interns" about this "gap," and then they also "had a conversation with the Stanford Internet Observatory folks about the gap." Scully Depo. 52:3-6. Then, CISA "received a briefing from them [EIP], or two, on kind of what they were putting together." Scully Depo. 52:7-9. Scully and other CISA officials then "facilitated some meetings between Stanford folks, the Center For Internet Security, and election officials, where they had discussions about how they would work together." Scully Depo. 52:10-13. And CISA's involvement did not end there, as Scully admits that "we had some conversations, kind of throughout, when they were -- particularly when they were putting out public reporting about what they were seeing." Scully Depo. 52:14-17. In addition, Scully "wouldn't be surprised if there were some other kind of brief conversations in there." Scully Depo. 52:18-20.

998.    The EIP continued to operate during the 2022 election cycle. Scully Depo. 53:4-5. At the beginning of the 2022 election cycle, the EIP "gave us [CISA] a briefing, early on, about what they were thinking about," which occurred in "May/June of 2022." Scully Depo. 53:14-19. Scully and Geoff Hale of CISA received the briefing from Renee DiResta and another EIP official. Scully Depo. 53:22-54:7. In that briefing, the EIP officials "walked through what their plans were for 2022, [and] some of the lessons learned from 2020." Scully Depo. 54:11-13. Their plans for 2022 were that "they were going to do something similar to what they did in 2020 in terms of trying to support election officials." Scully Depo. 54:16-18. They planned to "work with state and local election officials." Scully Depo. 54:22-25.

999.    CISA followed EIP's public reporting during the 2022 election cycle, and in particular, Scully relied on "at least one public report … that I thought was pretty good," which was "about specific disinformation" and "was basically how to think about whether or not a narrative poses risks." Scully Depo. 56:12-17.

1000.   Scully admits that CISA has "an established relationship" with the EIP and the Stanford Internet Observatory personnel who lead it. Scully Depo. 55:24-25.

1001.   The Center for Internet Security is a "non-profit that oversees the multi-state ISAC and the election infrastructure subsector information sharing and analysis center, that's what ISAC stands for." Scully Depo. 59:13-16.  In other words, CIS oversees the "Multi-State Information Sharing and Analysis Center," or "MS-ISAC," and the "Election Infrastructure Information Sharing and Analysis Center," or "EI-ISAC."   Scully Depo. 60:9-20.   Both of these are organizations of state and/or local government officials, organized for information sharing. Scully Depo. 60:3-11, 60:25-61:6.

1002.   CISA funds the Center for Internet Security in its activity of overseeing the EI-ISAC, which is an organization for information-sharing among state and local government election officials. Scully Depo. 61:9-10, 62:1 ("CISA provides funding for the EI-ISAC").

1003.   CISA directed election officials to the Center for Internet Security, which CISA funds, as an alternative route for reporting misinformation to social-media platforms, because CISA found the "switchboarding" role to be resource-intensive. Scully Depo. 62:16-24.

1004.   CISA connected the Center for Internet Security with the EIP because "the EIP was working on the same mission," so "we wanted to make sure that they were all connected." Scully Depo. 62:24-63:1. Thus, CISA originated and set up the collaborations between local government officials and the CIS, and between the EIP and the CIS.  *Id.*

1005.  The Center for Internet Security worked closely with CISA in reporting misinformation to social-media platforms, as CISA served as a pass-through for reports from CIS to the platforms: CIS officials "were receiving reporting directly from election officials. In the early part of 2020, they would forward what they were receiving election officials to us at CISA, and then we would push that to the social media platform; as 2021 moved along, CIS more frequently provided that directly to the platforms, themselves.  And so I would say early on in the process, the switchboarding generally came through CISA. Later on in the process, it was more of a mixed bag of how the switchboarding worked."  Scully Depo. 63:23-64:10.

1006.  In addition to CIS and CISA, EIP also reported supposed misinformation to social-media platforms.  Scully Depo. 64:13-14.  CISA and CIS coordinated directly with each other on reporting misinformation.  Scully Depo. 64:18-20.

1007.  CISA served a mediating role between CIS and the EIP, and the platforms, to coordinate their efforts in reporting misinformation to the platforms: "There was a point where one of the platforms was concerned about too much kind of duplicate reporting coming in, and so we did have some conversations with EIP and CIS on how to kind of better manage that activity to make sure we weren't overwhelming the platforms."  Scully Depo. 64:21-65:1.

1008.  There was also direct email communication between EIP and CISA about misinformation reporting.  Scully Depo. 66:9-12.

1009.  When CISA reported misinformation to platforms, CISA would "generally copy the Center for Internet Security," which was coordinating with EIP.  Scully Depo. 67:20-68:6.

1010.  Alex Stamos and Renee DiResta of the Stanford Internet Observatory briefed Scully about the EIP's report, "The Long Fuse," in "late spring, early summer 2021."  Scully Depo. 70:1-10.  Scully also reviewed portions of the report.  *See id.*; Scully Ex. 1 (EIP Report).

1011.  Dr. Kate Starbird of the University of Washington, who works with the EIP, is also on the MDM Subcommittee for CISA.  Scully Depo. 72:19-73:4.  Kate Starbird of the University of Washington serves on CISA's CSAC MDM Subcommittee, as well as working with the EIP. Scully Ex. 59, at 1.

1012.  Alex Stamos and Renee DiResta, who quarterback the EIP, also have roles in CISA. Renee DiResta of the Stanford Internet Observatory—a key player in the EIP—also serves as a "Subject Matter Expert (SME)" for the CISA's Cybersecurity Advisory Committee's MDM Subcommittee.  *Id.*; Scully Depo. 361:19-362:6.  Alex Stamos, the director of the Stanford Internet Observatory who launched the EIP, serves on the CISA Cybersecurity Advisory Committee, along with Kate Starbird.  Jones Decl., Ex. FF, at 3, 12-13.

1013.  CISA had extensive communications to coordinate with the EIP when it was starting up during the 2020 election cycle: "we had conversations with Stanford about the gap. They gave us some briefings on what they were doing, how they were doing it.  Prior to the election, we had some conversations with them to facilitate and coordinate meetings, as I mentioned. And then when they put public reporting out, if we had questions about it, we would probably have conversations with them around that, as well."  Scully Depo. 74:17-75:1.

1014.  In addition to Scully, Matt Masterson was involved in communicating with the EIP. Scully Depo. 75:6-11.  In addition, Scully "wouldn't be surprised" if Geoff Hale participated in some conversations with EIP.  Scully Depo. 76:1-2.

1015.  The then-Director of CISA, Director Krebs, "had a relationship with Alex Stamos," the head of the Stanford Internet Observatory, while CISA was coordinating with the EIP, and Director Krebs "may have had conversations in that context" about the EIP.  Scully Depo. 76:8-

10.  In fact, when he left CISA in late 2020, Director Krebs "joined Alex Stamos," and "they started a business together," called the "Krebs/Stamos Group."  Scully Depo. 76:5-23.

1016.  Scully believes that "Director Krebs may have participated in a couple of meetings that I'm aware of, that Stamos was also in."  Scully Depo. 77:20-22, 78:3-11.

1017.  According to Scully, "generally speaking, the reporting that CISA received came through the Center for Internet Security."  Scully Depo. 79:19-21.

1018.  Matt Masterson and Scully presented questions to the EIP about their "public reporting," which consisted of "regular blog posts on what they were seeing" about supposed election-related misinformation.  Scully Depo. 81:19-82:16.  Masterson was also involved in at least one of the initial discussions with the Stanford Internet Observatory about starting up the EIP.  Scully Depo. 81:24-82:4.  Masterson spoke to Stanford about "clarifying the gap that election officials faced for the folks at the Stanford Internet Observatory early on in the process."  Scully Depo. 83:22-25.

1019.  The idea of the "gap" came from Scully and CISA, which he "shared with the interns."  Scully Depo. 84:8-22.

1020.  Matt Masterson "was in the meeting where we talked about the gap with [Alex] Stamos, in particular.  And I believe Stamos mentioned that [*i.e.*, the collaboration that became the Election Integrity Partnership] as an option during that call."  Scully Depo. 85:21-24.

1021.  Matt Masterson left CISA in January 2021.  He started at Microsoft in early 2022.  In the intervening year, immediately after leaving CISA, Masterson "was a fellow at the Stanford Internet Observatory."  Scully Depo. 88:21-89:8.  Thus, both the CISA Director (Krebs) and the political appointee directly involved in the establishment of the EIP (Masterson) went to work with Alex Stamos of Stanford Internet Observatory immediately after the 2020 election cycle.

1022.   Alex Stamos consulted with CISA in part because "he knew he would need us helping him connect with election officials."  Scully Depo. 100:17-18.

1023.   Scully believes that there was at least "a fifth call" between CISA and Alex Stamos in 2020.  Scully Depo. 101:4.

1024.   Scully put Stamos in touch with NASED and NASS, and "facilitated some meetings between … them [EIP] and election officials."  Scully Depo. 101:15-102:10.  Scully "facilitated meetings … some meetings between EIP and CIS" because "they didn't have relationship" and "didn't know each other.  So [CISA] just facilitated getting them together to talk and figure out how they were going to work together."  Scully Depo. 102:14-20.  The purpose of these meetings was "to set up a direct line of communication between CIS and EIP."  Scully Depo. 103:7-10.

1025.   Scully also put EIP in contact and facilitated meetings between EIP (*i.e.*, folks at the Stanford Internet Observatory, which organized EIP) and representatives of NASED and NASS, the organizations of state and local election officials.  Scully Depo. 103:11-104:19.  These occurred in July or August 2020.  Scully Depo. 104:24-25.

1026.   Scully believes that the Center for Internet Security, which CISA funds, "forward[ed] messages that election officials sent them" reporting misinformation "to EIP."  Scully Depo. 106:10-16.

1027.   Scully agrees that "EI-ISAC is a part of CIS and we do fund the EI-ISAC."  Scully Depo. 110:20-23.

1028.   Scully agrees that CISA collaborated with the EIP.  Scully Depo. 111:15-18.

1029.   CISA probably had "between two and four" conversations with the EIP about its public reports on disinformation trends on social media.  Scully Depo. 113:20-24.  "[I]f we had a question about jurisdiction[s] being targeted or a new [disinformation] tactic or things like that,

we would just ask them … questions about that sort of thing."  Scully Depo. 114:17-21.  Scully

"was following the public reports" from the EIP during 2020.  Scully Depo. 115:16-17.

1030.    CISA received misinformation reports principally from three sources: first, from

the Center for Internet Security; and second, "sometimes election officials would send them in to

CISA central, which is CISA's kind of ops center block room type setup.  And then the third way

was they would just send direct to a CISA employee, … often Matt Masterson, who had

relationships with many of the election officials."  Scully Depo 119:7-11, 119:22-120:5.

1031.    CISA coordinated with the Center for Internet Security on reporting misinformation

to platforms: "we would let them know when we reported something to a platform … to avoid

duplication," and "most of the reporting that I recall in 2020 came through CIS. And so we just

wanted to let them know that we were acting on what they sent us.  For reporting that didn't come

through CIS, we would often let them know after we had shared it with the platforms that we had

shared something with the platforms for their arrangement."  Scully Depo. 120:23-121:9.

1032.    CIS and EIP also "had a relationship.  They shared information."  Scully Depo.

121:20-21.

1033.    According to Scully, "CISA does not do attribution.  We didn't do analysis of what

we received from election officials.  So we would not know what percentage" of misinformation

reports "were foreign derived."  Scully Depo. 122:25-123:3.  CISA thus forwards reports of

"misinformation" to social-media platforms "without assessing whether they were originated from

foreign or domestics sources."  CISA would not "take steps to see whether this came from foreign

or domestic sources," but "would just pass it along to the social-media platforms." Scully Depo.

123:4-18.

1034.    Scully was aware that social-media platforms changed their content-moderation policies to be more restrictive of election-related "misinformation" during the 2020 election cycle, because the platforms reported on those changes to federal officials "in our regular sync meetings," *i.e.*, the "USG-Industry" meetings.  Scully Depo. 127:18-19.  In those meetings, "that would be one of their briefing points, that they were making significant changes" to policies for censoring election-related speech.  Scully Depo. 128:4-6.

1035.    During 2020, Matt Masterson was "a senior election security person at CISA," and he was a "political appointee."  Scully Depo. 129:23-130:4.  Masterson was "familiar with the switchboarding work that we were doing."  Scully Depo. 131:8-10.  And "when he would receive emails" reporting misinformation, "he forwarded them to us."  Scully Depo. 131:13-14.

1036.    Scully understands that the Virality Project was "Stanford's attempt to mimic the EIP for COVID."  Scully Depo. 134:10-11.

1037.    The Virality Project "sent [Scully] some of their public reports."  Scully Depo. 134:13-14.

1038.    Scully was aware that Alex Stamos and Renee DiResta of the Stanford Internet Observatory were involved in the Virality Project.  Scully Depo. 134:21-22.

1039.    Scully "did have some conversations where they were … asking me … for any connections I had with HHS or CDC."  Scully Depo. 135:10-12.

1040.    In addition, Scully recalls "some informal … conversations that I may have had with Alex, in particular, and maybe Renée, as well," about the Virality Project. Scully Depo. 136:3-6.

1041.    Alex Stamos gave Scully an "overview what they planned to do in the Virality Project" that "was similar to what they did … with the EIP."  Scully Depo. 136:19-22.

1042.   Scully also had conversations with Renee DiResta about commencing the Virality Project.  Scully Depo. 139:5-14.

1043.   With respect to the EIP, Alex Stamos and Renee DiResta "shared … lessons learned," and "what some of their big takeaways were" with Scully.  Scully Depo. 141:6-8.

1044.   CrowdTangle is a "Facebook-owned social media monitoring service."  Scully Depo. 144:23-24.

1045.   According to the Virality Project report, "as voting-related mis-and disinformation arose in the 2020 presidential election, the Election Infrastructure Information Sharing and Analysis Center (EI-ISAC) served a critical role in sharing information with the Election Integrity Partnership and pushing its rapid response analysis back out to election stakeholders across all states."  Scully Ex. 2, at 150.  Scully understands that this refers to the Center for Internet Security, which operates the EI-ISAC through CISA-provided funding, and that "it was Center for Internet Security" that engaged in direct communications with the EIP and played a critical role in sharing information with the EIP.  Scully Depo. 147:17-25.

1046.   During the summer of 2020, CISA was "piloting a capability that would allow us to monitor narratives online," Scully Depo. 151:13-15—*i.e.*, the work that the EIP eventually did and does.

1047.   In his public statements, Alex Stamos has identified the EIP's "partners in government" as "most particularly those in CISA and DHS, but also in all of the local and state governments with whom we operated with."  Scully Ex. 6, at 4.  Scully agrees that "CISA and DHS were partners of the EIP."  Scully Depo. 369:1-11.

1048.   According to Stamos, "[t]he Election Integrity Partnership started with our team in Stanford sending a group of interns to go work with the cyber security and infrastructure security

agency at the DHS to work election security. And what these interns found is, there's a lot of opportunity for them to contribute to the technical components of election security. They also found that there was a lack of capability around election disinformation. This is not because CISA didn't care about disinformation, but at the time they lacked both kind of the funding and the legal authorizations to go do the kinds of work that would be necessary to truly understand how election disinformation was operated." Scully Ex. 6, at 4.

1049.   Stamos says that the EIP is "a project between four different institutions to try to fill the gap of the things that the government cannot do themselves." Scully Ex. 6, at 4.

1050.   Stamos states that CISA was one of "four major stakeholders" in the EIP: "There are kind of four major stakeholders that we operated with that we worked beside at EIP. Our partners in government, most particularly those in CISA and DHS, but also in all of the local and state governments with whom we operated with." Scully Ex. 6, at 4.

1051.   EIP had access to data for monitoring social-media speech that the federal government does not have:  The EIP "also worked with the major platforms, Facebook, Twitter, YouTube, TikTok, Reddit, NextDoor and the like. … [S]ome of those cases we had agreements for access of data. In other cases, we had to have individual analysts go work with them." Scully Ex. 6, at 5.

1052.   According to Stamos, there was very little foreign disinformation in 2020: "We find very little evidence that there's any foreign involvement at all. In fact, the vast majority of election disinformation in 2020 came from Americans who had verified accounts and very large follower accounts." Scully Ex. 6, at 6.

1053.   According to Stamos, its founder, the EIP targeted "large follower account political partisans who are spreading misinformation intentionally, doing so in a multi-media context. So

they're doing so online, on social media, but they're also doing so on cable news, doing so on the radio, through a variety of different outlets and are able to amplify their message and to motivate their followers to go try find evidence of the incorrect claims that they're making."  Scully Ex. 6, at 7.

1054.   According to Renee DiResta, "in August 2020, students from the Stanford Internet Observatory were doing an internship with CISA and they identified a massive gap in the capability of federal, state, and local governments to become aware of, to analyze, and to rapidly respond to mis and disinformation, both foreign and domestic, targeting the 2020 election."  Scully Ex. 7, at 4.  The EIP was designed to fill that "gap" in the governments' capability to "rapidly respond to mis- and disinformation … targeting the 2020 election."  *Id.*

1055.   As DiResta notes, the EIP was designed to get around "unclear legal authorities, including very real First Amendment questions," that would arise if CISA or other government agencies were to monitor and flag misinformation for censorship on social media.  Scully Ex. 7, at 4.  As she states, "that gap had several components. The federal government wasn't prepared to identify and analyze election mis- and disinfo. …There were unclear legal authorities, including very real First Amendment questions."  *Id.*

1056.   DiResta agrees that "the vast majority of voting related misinformation in the 2020 election was domestic."  Scully Ex. 7, at 6.

1057.   The Virality Project was immediately established on the heels of the EIP: "Following the success of EIP and the certification of the 2020 election, SIO [Stanford Internet Observatory] … almost immediately we recognized the need to ramp back up. This time to support government health officials' efforts to combat misinformation and targeting the COVID-19 vaccines. In February 2021, we formally established the Virality Project drawing on the same

partners from EIP and adding a few more, and much like EIP, it focused on realtime observation, analysis, and understanding of cross platform vaccine-related misinformation." Scully Ex. 7, at 7.

1058.    The CISA-funded Center for Internet Security coordinated with EIP regarding online misinformation and reported it to CISA. For example, on October 1, 2020, CIS emailed Scully about alleged misinformation, noting that "the impact seems to be escalating. Our hope is the platforms can do more to take down the misinformation. The EIP has been tracking this spread under ticket EIP-243 and has more examples." Scully Ex. 9, at 1. Scully forwarded this report to social media platforms. *Id.*

1059.    EIP had advised Scully that it was using a ticketing system to track misinformation narratives. Scully Depo. 159:1-5.

1060.    Scully forwarded this report tracked under EIP-243 to Twitter, as well as Facebook and YouTube, because "people generate traffic … by posting it across platforms," and he "would sometimes share across other platforms that we thought there might be … relevant content showing up on their platforms." Scully Depo. 160:2-5; Scully Ex. 9, at 1, 7, 12.

1061.    Scully asked social-media platforms to report back how they were handling reports of misinformation and disinformation received from CISA. *See* Scully Ex. 9, at 11 (asking Twitter "to see if there's anything you can share about how you're approaching" misinformation reported by CISA). According to Scully, "periodically … we would ask if the decision was made and if we can share back." Scully Depo. 164:15-17.

1062.    CISA maintained a "tracking spreadsheet" of its misinformation reports to social-media platforms during the 2020 election cycle. Scully Depo. 165:14-166:13. After Scully's deposition, CISA produced this "tracking spreadsheet" in response to Plaintiffs' Motion to Compel. Jones Decl., Ex. GG.

1063.   At least six members of the MDM team "took shifts" in reporting supposed misinformation to social-media platforms, including Scully, Chad Josiah, Rob Schaul, Alex Zaheer, John Stafford, and Pierce Lowary.  Scully Depo. 166:9-168:11, 183:14-16.

1064.   At the time, Pierce Lowary and Alex Zaheer were simultaneously serving as interns for CISA and working for the Stanford Internet Observatory, which was then operating the Election Integrity Partnership.  Scully Depo. 168:22-171:16, 183:20-22.  Thus, Zaheer and Lowary were simultaneously engaged in reporting misinformation to social-media platforms on behalf of CISA, and in reporting misinformation to social-media platforms on behalf of the EIP.  *Id.*

1065.   Zaheer and Lowary were also two of the four Stanford interns who originated the idea of the EIP.  Scully Depo. 171:14-16, 184:22-24, 185:12-14.

1066.   Zaheer "was one of the people that were working the ticketing system" for EIP.  Scully Depo. 181:21-23.  Likewise, Lowary "did both SIO and CISA push forwarding" at the same time during the fall of 2020.  Scully Depo. 183:14-16.

1067.   CISA's misinformation reporting to platforms "ramped up as we got closer to the election."  Scully Depo. 174:1-2.  On election night, they "were up until at least midnight," and "if we received anything we would push it forward."  Scully Depo. 175:12-14.  Close to the election, they would "monitor their phones" for disinformation reports even during "off hours."  Scully Depo. 175:16-17.  "[T]he expectation [was] … that they would be responsible for forwarding something" to the platforms. Scully Depo. 175:19-21.

1068.   Alex Zaheer, when switchboarding for CISA, forwarded detailed a report of supposed "misinformation" from the Election Integrity Partnership (EIP) to CISA's reporting system, which called for "swift removal of … posts and continued monitoring of the user's account" because that user had "claimed (1) that mail-in voting is insecure, [and] (2) conspiracy

theories about election fraud are hard to discount."  Scully Ex. 9, at 62.  Scully forwarded this report to Twitter, which reported back that it had taken action pursuant to its civic integrity policy. *Id.* at 61; *see also* Scully Depo. 199:6-200:17.

1069.   According to Scully, forwarding such reports of misinformation from the EIP to social-media platforms "was our standard practice."  Scully Depo. 200:25.  In fact, CISA's tracking spreadsheet contains at least eleven entries of "switchboarded" reports of misinformation that CISA received directly from "EIP" and forwarded to social-media platforms for review under their policies.  Jones Decl., Ex. GG, at 4-5, Column C ("From"), Lines 86-96, 115, 123 (all listing "EIP").  CISA also used EIP tracking numbers for those reports.  *See id.* Column D.  One of these notes that content was reported to Twitter for censorship because "EIP … saw article on The Gateway Pundit."  *Id.* at 4 (Column F, Line 94).

1070.   CIS routinely reported misinformation by sending the notice simultaneously to both CISA and to the EIP, using the EIP's misinformation-reporting email "tips@2020partnership.atlassian.net."  Scully Ex. 9, at 33, 52, 58; Scully Ex. 10, at 1.  Scully Ex. 11, at 1-2 (indicating that "tips@2020partnership.atlassian.net" is the reporting email for the EIP); Scully Depo. 229:18-230:25 (Scully admitting that this email is the EIP reporting email).

1071.   State officials, likewise, simultaneously reported supposed "misinformation" to CISA, CIS, and the EIP.  *See, e.g.,* Scully Ex. 9, at 59 (Colorado state official reporting misinformation to "EI-ISAC, CISA and Stanford Partners").

1072.   State officials sometimes indicated that they were reporting misinformation to platforms for censorship precisely *because* federal officials at FBI and CISA had warned them about it.  *See, e.g.,* Scully Ex. 9, at 59 (noting that Colorado was reporting two Twitter accounts, one with 14 followers and one with 2 followers, because "[t]hese are concerning to us here in

Colorado because of recent FBI/CISA warnings about impersonation accounts spreading false information about the election").

1073.   One platform complained to Scully that it was receiving duplicate reports of misinformation from the EIP and Center for Internet Security, and asked if CISA could be designated reporter for the group: "Hey Brian, can we talk about CIS Misinformation reporting duplicate reports to EIP?  Possible to have just you escalate?"  Scully Ex. 9, at 63.  Scully coordinated with CIS and EIP to set forth a coordinated reporting process involving agreed roles for all three of them—CISA, CIS, and EIP.  *Id.*; Scully Depo. 209:14-212:12.  Scully admits that there was "an agreement for EIP and CIS and CISA to coordinate and let each other know what they were reporting to platforms like Twitter."  Scully Depo. 212:7-12.

1074.   State and local officials reported misinformation to the FBI in parallel with their reports to CIS and CISA.  *See, e.g.,* Scully Ex. 10, at 10.  This is because CISA "tell[s] election officials to report what they saw to either DHS or the FBI, and it would end up where it needed to be."  Scully Depo. 215:8-14.

1075.   The Center for Internet Security, likewise, sometimes used EIP ticket numbers on the misinformation reports it sent to CISA for forwarding to platforms. *See, e.g.*, Scully Ex. 10, at 27 (reporting supposed misinformation in Pennsylvania under ticket number "EIP-664"); Scully Depo. 217:16-218:19.  As noted, CISA's "tracking spreadsheet" used similar EIP ticket numbers at least 13 times for misinformation reports sent to platforms.  Jones Decl., Ex. GG, at 4-5.

**D.    CISA Uses Switchboarding to Pressure Platforms to Censor Speech.**

1076.   CISA and Scully did not just forward misinformation reports to platforms; in addition, they also engaged in fact-checking for the platforms.  For example, regarding a report about election security in Pennsylvania, Facebook asked Scully if he could please "confirm" two

factual aspects of the report, and Scully responded with an explanation of why the government believed that the report was misinformation violating Facebook's terms of service. Scully Depo. 218:22-219:24; Scully Ex. 10, at 25-27; Scully Depo. 222:20-224:20; Scully Ex. 10, at 35-37 (Scully engaging in his own research to debunk an election-integrity claim on Twitter and reporting to Twitter, which relied on his research to label the Tweet).

1077.   Scully admits that CISA commonly engaged in such informal fact-checking for the platforms: "if social media platforms needed additional information from an election official we would try to support that. … "[G]enerally speaking, we would do what we did here, which is if the -- if the jurisdiction made a public statement or if there was additional information the jurisdiction could provide, and the platforms asked for it, that we would try to facilitate getting the information they asked for." Scully Depo. 220:6-20.  CISA would do its own research as well as relaying statements from public officials to help debunk postings for social-media platforms. Scully Depo. 221:1-4 ("If it was a public statement, I'm sure we pulled it ourselves. If there was not a public statement, I would imagine we would go back to the election official."); Scully Depo. 221:23-222:19.

1078.   In presenting such "debunking" information to platforms to urge them to remove content, CISA always assumed—without any independent research—that the *government* official was a reliable source, and that the social-media user was unreliable, even for first-hand accounts: "if there was a public statement that was put out by the jurisdiction, we would … defer to that." Scully Depo. 221:9-12.  CISA would not "take any steps to find out" if the private citizen's account might actually be truthful, and CISA would not "do further research to figure out who was telling the truth," but would simply "relay … the official statement from the jurisdiction" to the platforms for censorship.  Scully Depo. 221:13-22.

1079.   CISA's fact-checking activity included both relaying "debunking" information from state and local officials—always assuming without question that the state and local officials were truthful, not the social-media speakers—and performing its own fact-checking when the claim related to federal activities.   For example, "[t]here was also one time when I believe it was Facebook had a question about DHS immigration and customs enforcement having agents going places where we also provided a response back on a specific piece."  Scully Depo. 220:8-13.

1080.   CIS and CISA's "switchboarding" activities reached, not just public postings, but private postings on social-media platforms.  *See, e.g.,* Scully Ex. 10, at 45-46 (reporting a "post on a private FB page," *i.e.,* a "(private) Facebook post that Trump already won AZ").

1081.   Social-media platforms treated CISA as a privileged reporter of misinformation, frequently responding with great promptness to CISA's reports of misinformation, immediately "escalating" the content for moderation, and reporting back the censorship action taken.  For example, on November 10, 2020, at 7:23 pm, Scully reported offending Tweets, and Twitter responded within two minutes, "Thanks Brian.  We will escalate."  Shortly after midnight the same night, at 12:11 a.m., Twitter followed up with a report on censoring the Tweets.  Scully Ex. 10, at 59.   On November 13, 2020, Scully reported an offending tweet at 11:20 pm, and Twitter responded at 11:21 pm, "Thanks Brian.  We will escalate."  Scully Ex. 18, at 26; Scully Depo. 291:15-294:3.

1082.   CISA's censorship partners also originated their own reports for censorship.  CIS and the EIP sometimes reached out to state and local officials to invite them to debunk and report speech that CIS and EIP had observed on social media.  For example, on December 1, 2020, the Center for Internet Security emailed local government officials stating, "The EI-ISAC, and our partners at the Election Integrity Partnership (EIP), are tracking a social-media post that is gaining

traction very quickly." Scully Ex. 11, at 4. The CIS asked the local officials to debunk the post so

that "we can work with the social media platforms to have the posts removed as misinformation.

Please let us know as soon as possible." *Id.* The local officials responded with information

disputing the posts, and CIS promptly forwarded the dispute to CISA and EIP: "Brian [Scully] and

EIP, misinformation tweet … a [local official] confirmed the misinformation." *Id.* at 2. Scully

then forwarded the report to Twitter, which responded within three hours, "We have labeled the

tweet and are taking steps to limit trending on this." *Id.* at 1; Scully Depo. 228:5-231:7.

### E.    CISA's Many Misinformation Meetings with Platforms.

1083.   In its interrogatory responses, CISA disclosed five sets of recurring meetings with

social-media platforms that involve discussions of misinformation, disinformation, and/or

censorship of speech on social media. Scully Ex. 12, at 38-40.

1084.   Scully provided the information in the interrogatory responses regarding CISA's

meetings with social-media platforms regarding misinformation and censorship. Scully Depo.

232:24-233:3. In doing so, Scully failed to disclose a long series of *bilateral* meetings between

CISA and social-media platforms. *See, e.g.,* Scully Depo. 238:11-13 ("we had some Twitter-only

calls, as well, that [Yoel Roth] participated in"); Scully Depo. 238:21-22 ("we had some briefings

from [Twitter] on some of their public reports" about misinformation); Scully Depo. 239:8-12

(agreeing that there were "briefings in those bilateral meetings with Twitter as relating to

misinformation and disinformation on social media"); Scully Depo. 239:20-240:3 (admitting that

CISA conducted "bilateral meetings with other social media platforms, like this, where

misinformation was discussed"); Scully Depo. 241:4-22 (admitting to a series of bilateral meetings

with social-media platforms beginning in 2018 and continuing through 2020); Scully Depo. 241:7-

14 (testifying that "in 2018 … in our initial stages of trying to build those relationships, we would

go meet with each platform one-on-one"); Scully Depo. 241:20-22 (admitting that, "prior to

starting the switchboarding work, in 2020, we had conversations with each platform individually").

1085.  None of these many bilateral meetings with social-media platforms about

misinformation was disclosed in CISA's interrogatory responses.  Scully Ex. 12, at 38-40; Scully

Depo. 243:6-21.

1086.  In its interrogatory responses, CISA describes the "USG-Industry" meetings as

follows: "A recurring meeting usually entitled USG – Industry meeting, which has generally had

a monthly cadence, and is between government agencies and private industry. Government

participants have included CISA's Election Security and Resilience subdivision, DHS's Office of

Intelligence and Analysis, the FBI's foreign influence task force, the Justice Department's national

security division, and the Office of the Director of National Intelligence. Industry participants

generally include Google, Facebook, Twitter, Reddit, [and] Microsoft but, have also included

Verizon Media, Pinterest, LinkedIn, and the Wikimedia Foundation as well. The topics discussed

include, but are not limited to: information sharing around elections risk, briefs from industry,

threat updates, and highlights and upcoming watch outs."  Scully Ex. 12, at 38-39.

1087.  In fact, the CISA's description of the "USG-Industry" meeting as having "a

monthly cadence" is misleading.  The meetings became biweekly and weekly close to elections,

when they were most needed: "from summer of 2018 … to early 2020 they were quarterly.

Sometime in 2020 they became monthly and then as we got closer to the election in 2020 they

became weekly."  Scully Depo. 234:7-11.

**F.     CISA Worked with FBI to Suppress the Hunter Biden Laptop Story.**

1088.  Scully claims that he does not recall whether or not "hack and leak" or "hack and

dump" operations were raised at the USG-Industry meetings, but he does not dispute that they may

have been raised: "I don't recall a specific incident of that [*i.e.*, discussions of "hack and dump" or

"hack and leak" operations], but it's definitely possible. It's a tactic that had been used in the past."

Scully Depo. 236:6-12.  Scully does not dispute that he may have raised it: "Me, personally, I don't

recall myself raising that, but it's possible."  Scully Depo. 236:15-16.  He does not dispute that

Laura Dehmlow of FBI's FITF may have raised the concern: "Again, I don't know. It was a tactic

that had been used globally, previously.  So it wouldn't surprise me if there was some discussion

of that somewhere in these meetings."  Scully Depo. 236:20-23.   He does not dispute that Elvis

Chan and/or Matt Masterson may have raised the concern.  Scully Depo. 237:10-22.

1089.   Scully also does not dispute Yoel Roth's account of the communications to social-

media platforms from federal officials about hack-and-leak operations and the possibility of a

hack-and-leak operation involving Hunter Biden in Paragraphs 10-11 of Yoel Roth's Declaration

dated December 17, 2020.  Scully Ex. 13, at 2-3; Scully Depo. 245:23-248:11.  Scully does not

dispute that federal officials repeatedly raised the concern that they "expected hack and leak

operations by state actors" in the USG-Industry meetings, Scully Depo. 245:23-247:17 ("it's

certainly possible, because it was a common tactic … I would definitely not be surprised if these

were included in the conversations"); and Scully does not dispute Roth's statement that Roth

learned in these meetings that "there were rumors that a hack and leak operation would involve

Hunter Biden," Scully Depo. 247:18-248:7.

1090.   Contemporaneous emails confirm that CISA officials were warning of "hack and

leak" operations during the USG-Industry and other meetings with social-media platforms during

2020.  For example, on September 16, 2020, Facebook employees emailed Scully and other CISA

officials a draft of a joint industry statement, which stated: "For several years, tech companies have

worked together with … U.S. government agencies … to counter election threats across our

platforms…. At today's meeting, we specifically discussed: … (2) Ways to counter targeted attempts to undermine the election conversation before, during, and after the election. This includes *preparing for so-called 'hack and leak' operations* attempting to use platforms and traditional media for unauthorized information drops." Scully Ex. 16, at 1 (emphasis added). This email confirms that "preparing for so-called 'hack and leak' operations" was discussed at the USG-Industry meeting on Sept. 16, 2020, which included CISA, FBI's FITF, DOJ's National Security Division, ODNI, and Google, Microsoft, Facebook, Twitter, Reddit, Verizon Media, Pinterest, LinkedIn, and Wikimedia Foundation. Scully Ex. 16, at 1; *see also* Scully Depo. 253:14-255:13.

1091. Likewise, the agenda for the July 15, 2020 USG-Industry meeting included, as a "Deep Dive Topic," a 40-minute discussion of "Hack/Leak and USG Attribution Speed/Process." Scully Ex. 17, at 16. According to Scully, "attribution" in this context means identifying the hacker and leaker, and "USG" means "United States Government." Scully Depo. 274:4-275:10.

1092. Like Elvis Chan, Scully was not aware of any "pending investigations, at that time, into possible hack and leak operations." Scully Depo. 255:9-13.

1093. At the USG-Industry meeting, CISA asked platforms to report back on "Themes / narratives / approaches you anticipate for races you think will be targeted." Scully Ex. 15, at 1.

**G.    CISA's Ongoing and Expanding Censorship Efforts.**

1094. In the spring and summer of 2022, Lauren Protentis requested the social-media platforms to prepare "one-pagers" for state and local election officials to address their content moderation rules. *See* Scully Ex. 17, at 1 (including "One-Pager Reminder" on the agenda for the April 2020 USG-Industry meeting); Scully Depo. 260:3-261:11 ("we had asked industry to provide a one-page summary of their content moderation rules that we could share with election officials").

1095.   The purpose of these "one-pagers" was to provide a summary of the platforms' content moderation rules to state and local government officials who would be reporting misinformation to the platforms.  Scully Depo. 260:3-261:11.

1096.   Lauren Protentis of CISA repeatedly lobbied the social-media platforms to include in their "one-pagers" for state and local officials a description of how to report perceived misinformation to the platform for censorship.  *See, e.g.,* Scully Ex. 18, at 41 (Protentis requesting that Facebook update its one-pager to include its "steps for flagging or escalating MDM content" to "make this a comprehensive product on both the critical needs for officials—account security and MDM concerns"); *id.* at 44 (Protentis asking Microsoft to create a one-pager for election officials to "provide steps to … report MDM"); *id.* at 45 (Protentis requesting that Twitter update its one-pager for government officials to include information about "how to report disinformation").  Scully agrees that Protentis was "trying to make sure that election officials have the information they need if they want to report" disinformation.  Scully Depo. 300:23-25.

1097.   CISA also set up an "operation center" on and around Election Day that engaged in "switchboarding" reports of election-day misinformation to platforms: "CISA regularly set up an operation center on election day, around the election. And the platforms and some of the other agencies do the same."  Scully Depo. 262:16-19.  This "operation center" received "switchboard reporting" in 2018 and 2020.  Scully Depo. 263:15-18.  It was also communicating with platforms and other federal agencies, including "connectivity with FBI, DOJ, NEI, I&A."  Scully Depo. 264:18.  When these reports came in, CISA would "perform the same misinformation routing function and pass that along to the platforms."  Scully Depo. 265:1-7.

1098.   The CISA-funded Center for Internet Security continued to report misinformation and disinformation to platforms for censorship in 2022: "CIS was up and running [in 2022]."

Scully Depo. 266:2. Scully understands that "CIS continued to receive disinformation/misinformation reports from state and local election officials during the 2022 election cycle, and relay them directly to social media platforms." Scully Depo. 266:5-13.

1099. Scully also believes that NASS and NASED routed disinformation concerns directly to social-media platforms in 2022. Scully Depo. 268:25-269:3.

1100. Scully agrees that foreign-originated social-media content typically becomes repeated from domestic sources: "We often see what happens overseas send up showing up domestically." Scully Depo. 279:9-11.

1101. CISA has also teamed up directly with the State Department's Global Engagement Center (GEC) to seek removal of social-media content; for example, on one occasion, the GEC enlisted CISA's aid to seek the removal of "a YouTube channel run by Americans falsely claiming" that a certain State Department special envoy was "Patient Zero" for COVID-19. Scully Ex. 18, at 2. Scully forwarded the report to Facebook, which reported within minutes that it had "flagged for our internal teams." Scully Ex. 18, at 1.

1102. CISA flagged obvious parody and joke accounts for censorship, including a Colorado parody account with 56 followers whose handle stated, "dm us your weed store location (hoes be mad, but this is a parody account)," and one with 27 followers whose handle stated, "Smoke weed erry day." Scully Ex. 18, at 11-12. The government official who reported these stated that "these are concerning to us ... because of recent FBI/CISA warnings about impersonation accounts spreading false information about the election." Scully Ex. 18, at 11. In other words, the government official sought to censor these accounts *before* they posted any election-related speech, because (according to "FBI/CISA"), they *might* engage in misleading

election-related speech. *See id.* Scully forwarded these reports to Twitter for censorship. Scully Ex. 18, at 10.

1103. Platforms report to CISA when they update their content-moderation policies to make them more restrictive. On September 10, 2020, for example, Twitter reported to Masterson and Scully that it was "updating our Civic Integrity Policy" to "label or remove false or misleading information intended to undermine public confidence in an election or other civic process." Scully Ex. 18, at 9. This includes censorship of "Disputed claims that could undermine faith in the process itself, e.g. unverified information about election rigging, ballot tampering, vote tallying, or certification of election results." Scully Ex. 18, at 9. The EIP had successfully lobbied platforms to adopt such changes ahead of the 2020 election. *See infra.*

1104. CISA pushed for the censorship of content that CISA's Director particularly disfavored, including supposed disinformation about CISA itself, and about the so-called "Hammer and Scorecard" narrative that attributed election interference to federal intelligence agencies. For example, Scully requested censorship of a "disinfo report about CISA and Director Krebs." Scully Ex. 18, at 19. And on November 10, 2022, Scully reported to platforms that "Director Krebs is particularly concerned about the hammer and scorecard narrative that is making the rounds," and asked for information about their tracking and "amplification" of the narrative. Scully Ex. 18, at 22, 24. Twitter and Facebook promptly reported back on their efforts to censor the narrative. Scully Ex. 18, at 21 (Facebook reporting that "our teams are labelling and downranking the content as identified"); *id.* at 24 (Yoel Roth of Twitter explaining Twitter's attempts to censor the narrative, and asking CISA "Let us know if there are especially high-profile examples of tweets sharing the conspiracy that *haven't* been labeled" so Twitter can censor them). *See also* Scully Depo. 286:3-289:25.

1105.   CISA also purposely debunks online narratives, knowing that the social-media platforms will use its debunks as censorship.  For example, Yoel Roth emailed CISA about the Hammer and Scorecard narrative stating: "We've tracking the Hammer/Scorecard issue closely, particularly since Director Krebs' tweet on the subject (which was pretty unambiguous as far as debunks go)."  Scully Ex. 18, at 24.  Scully admits that CISA was aware that "social-media platforms were following the rumor page posted by CISA and using that as a debunking method for content on their platforms."  Scully Depo. 290:13-17 ("We had a sense they were doing that, yeah.").

1106.   CISA publicly states that it is expanding its efforts to fight disinformation heading into the 2024 election cycle.  Scully Ex. 27, at 1.  On August 12, 2022, Director Easterly was reported to be "beef[ing] up [CISA's] efforts to fight falsehoods," and "has taken several specific steps to fight the problem."  *Id.*

1107.   In January 2022, Director Easterly asked Facebook for a "briefing from us on 2022 election approach."  Scully Ex. 28, at 2.  Easterly responded to an email by Facebook and directed her staff to set up the meeting.  *Id.*  Scully does not know what was discussed at the meeting. Scully Depo. 309:12-19.

1108.   Director Easterly also exchanged text messages with Matt Masterson on February 26, 2022, when he was recently employed by Microsoft.  Scully Ex. 29, at 2-3.  In those texts, referring to a previous unidentified group call, Easterly told Masterson that she is "Just trying to get us in a place where Fed can work with platforms to better understand the mis/dis trends so relevant agencies can try to prebunk/debunk as useful."  Scully Ex. 29, at 2.  She stated that CISA is "looking to play a coord role so not every D/A [*i.e.*, department and agency] is independently reaching out to platforms which could cause a lot of chaos."  Scully Ex. 29, at 2.  Masterson

responded, agreeing with Easterly, and stating, "Platforms have got to get comfortable with gov't. It's really interesting how hesitant they remain."  Scully Ex. 29, at 3.  (Scully notes that "D/A" is "one of our common abbreviations for department and agency."  Scully Depo. 316:23-24.)

1109.   Scully agrees with Director Easterly that, when multiple federal agencies contact platforms independently, "it does create challenges and provides the platforms opportunities to play departments off each other."  Scully Depo. 317:6-9.  For CISA to play a "coordinating" role among the agencies, therefore, allows federal officials to keep better influence and control over the platforms.

1110.   According to a September 2022 leaked draft copy of DHS's "Quadrennial Homeland Security Review, DHS's capstone report outlining the department's strategy and priorities in the coming years, the department plans to target 'inaccurate information' on a wide range of topics, including "the origins of the COVID-19 pandemic and the efficacy of COVID-19 vaccines, racial justice, U.S. withdrawal from Afghanistan, and the nature of U.S. support to Ukraine."  Scully Ex. 30, at 4.

1111.   Scully agrees that DHS has discussions about targeting misinformation regarding the efficacy of COVID-19 vaccines, Scully Depo. 322:9-21 ("our building critical infrastructure help in public health is one of the sectors of critical infrastructure, so we engage with CDC and HHS to help them"); about the origins of the COVID-19 pandemic, Scully Depo. 323:16-17 ("We did some work on the … bio-lab narratives"); and regarding Ukraine, Scully Depo. 324:5-10 ("We saw this with COVID. … We saw this around Ukraine.  And so, again, just helping people understand … these disinformation narratives….").  In particular, CISA participated in a "Unified Coordination Group" regarding Russia's invasion of Ukraine, which addressed misinformation: "there was a … Unified Coordination Group, when Russia invaded Ukraine, to coordinate DHS

activities related to the crisis.  As a part of that there was an MDM component, and a member of the MDM team was detailed to lead the MDM component of the Russian/Ukraine work."  Scully Depo. 325:5-12.  Scully believes that this group communicated with social-media platforms as well (again, not disclosed in CISA's interrogatory responses).  Scully Depo. 327:1-18.

1112.  As of August 12, 2022, DHS's Office of Inspector General continued to call for a more aggressive, not less aggressive, approach to combating disinformation.  Scully Ex. 31, at 1 (OIG calling for DHS to adopt a "Unified Strategy to Counter Disinformation Campaigns").

1113.  DHS's OIG reports that CISA is expanding, not contracting, its efforts to fight disinformation.  OIG reports that CISA's "MDM team focuses on disinformation activities targeting elections and critical infrastructure. According to a CISA official, the MDM team counters all types of disinformation, to be responsive to current events."  Scully Ex. 31, at 9.  "An official from the MDM team stated that, through this work, CISA is building national resilience to MDM, such as COVID-19 vaccine hesitancy and foreign influence activities."  *Id.* at 10.  OIG further reports that, "[a]ccording to selected Intelligence Community officials, the Office of the Director of National Intelligence and the U.S. Department of Justice worked with CISA and I&A to counter disinformation related to the November 2020 elections. For example, according to an Office of the Director of National Intelligence official, prior to the November 2020 elections, CISA and I&A joined in weekly teleconferences to coordinate Intelligence Community activities to counter election-related disinformation. The Office of the Director of National Intelligence official stated the teleconferences continued to occur every 2 weeks after the 2020 elections and were still taking place as of the time of this audit."  *Id.* at 11.  Further, OIG reports that "CISA and I&A also work with the U.S. Department of State's (State Department) Global Engagement Center on countering disinformation."  *Id.* at 11.

1114.    On November 21, 2021, Director Easterly reported that CISA is "beefing up its
misinformation and disinformation team in the wake of a divisive presidential election that saw a
proliferation of misleading information online."  Scully Ex. 23, at 1.  "I am actually going to grow
and strengthen my misinformation and disinformation team," Easterly stated publicly.  *Id.*  She
stated that she "had a meeting with 'six of the nation's experts' in the misinformation and
disinformation space."  *Id.*  And she "stressed her concerns around this being a top threat for CISA
… to confront."  *Id.*  "One could argue that we're in the business of protecting critical
infrastructure, and the most critical infrastructure is our cognitive infrastructure," Easterly said.
*Id.*  "We now live in a world where people talk about alternative facts, post-truth, which I think is
really, really dangerous if people get to pick their own facts," Easterly said.  *Id.* at 2.  Evidently,
Easterly thinks that *government officials* should help Americans "pick their own facts" for them.
*Id.*

1115.    According to Scully, CISA has an expansive mandate to address all kinds of
misinformation that may affect "critical infrastructure" indirectly: "mis, mal-information threatens
critical infrastructure in a number of ways, it could be operational impact, so in the case of the
elections, disrupting election operations …. So a multitude of ways that disinformation could
impact critical infrastructure, like I said … there's financial, there's reputational, there's just a
multitude of ways that this disinformation could affect critical infrastructure."  Scully Depo.
340:10-341:1.  This could include, for example, "misinformation" that undermines confidence in
any kind of national institution, including banks and financial services industry: "from mis, dis
and mal-information, a reputational risk could come about if the integrity or the public confidence
in a particular sector was critical to that sector's functioning.  So I think the financial services
would probably be a good example. So if there's a loss of confidence by the American public in

financial services, financial systems of the United States, that could create national security concerns." Scully Depo. 341:17-342:2. This is a breathtakingly broad—even limitless—interpretation of CISA's mandate to protect "critical infrastructure," which would allow CISA to target virtually any kind of core political speech as "mis, dis and mal-information" that "create national security concerns" by undermining "public confidence in a particular sector." *Id.*

1116. In fact, CISA is "working with Treasury to develop a product to help the financial services sector understand MDM risks to the sector." Scully Depo. 355:22-24.

1117. Scully has publicly stated that CISA is "trying to reduce the amount that Americans engage with disinformation," where "engaging with disinformation" means "amplifying it, re-tweeting it, resending it, things like that." Scully Depo. 346:7-24; Scully Ex. 49.

1118. On June 22, 2022, CISA's Cybersecurity Advisory Committee issued a "Draft Report to the Director" calling for an extremely broad view of CISA's mandate. The report states that "[t]he spread of false and misleading information poses a significant risk to critical functions like elections, public health, financial services, and emergency response." Scully Ex. 46, at 1. "Pervasive MDM diminishes trust in information, in government, and in democratic processes more generally." *Id.* The report states that "CISA should consider MD across the information ecosystem," including "social media platforms of all sizes, mainstream media, cable news, hyper partisan media, talk radio, and other online resources." *Id.* at 2. Scully agrees with this report that CISA is trying to make its "resilience activity … as broad as possible so it's applicable anywhere that someone may come across MDM." Scully Depo. 358:7-11.

1119. In September 2022, the Center for Internet Security is still working on a "portal" for government officials to report election-related misinformation to social-media platforms. Scully Ex. 19, 21. "[W]ork on the online 'portal' for election officials to flag misinformation to

social-media platforms … continues today." Scully Ex. 21, at 4. Scully states that "my understanding is that [CIS] did do something along those lines, I just don't know the extent of it." Scully Depo. 365: 3-6.

1120.    As of January 2023 and today, CISA's website continues to proclaim, "[t]he MDM team serves as a switchboard for routing disinformation concerns to appropriate social media platforms and law enforcement. This activity began in 2018, supporting state and local election officials to mitigate disinformation about the time, place, and manner of voting. For the 2020 election, CISA expanded the breadth of reporting to include other state and local officials and more social media platforms. This activity leverages the rapport the MDM team has with the social media platforms to enable shared situational awareness." Scully Ex. 24, at 3; *see also* www.cisa.gov/mdm (visited Feb. 10, 2023). CISA thus proclaims that it is "expand[ing] the breadth of reporting," not retreating from it. *Id.*

1121.    Regarding misinformation reports, CISA "would generally share whatever we received from the election officials with the FBI, in case there was an ongoing investigation related to whatever it was that we forwarded to them." Scully Depo. 366:17-20.

1122.    CISA engaged in switchboarding and colluding with social-media platforms to promote censorship in other ways as well.

**VIII.    The State Department's Global Engagement Center's Censorship Efforts.**

1123.    The State Department's Global Engagement Center ("GEC") also conducts numerous meetings with social-media platforms about disinformation.

1124.    The GEC's "front office and senior leadership engage with social media companies." Kimmage Dep. 29:12-13. These senior leadership meet with social-media platforms "[e]very few months, can be quarterly, but sometimes less than quarterly." *Id.* at 32:9-10.

According to Daniel Kimmage, Principal Deputy Coordinator of the GEC, these meetings focus on the "tools and techniques" of spreading disinformation on social media, and it "would be rare" for them to discuss specific "content that's posted on social media that might be of concern to the GEC." *Id.* at 30:9-31:3.

1125.   In addition, the GEC's "Technology Engagement Team does engage with social media companies" as well. *Id.* at 29:11-12. The Technology Engagement Team meets with social media companies "[m]ore frequently" than the senior leadership, which meets with them "every few months." *Id.* at 37:9-15.

1126.   Kimmage recalls at least two meetings with Twitter.  *Id.* at 129:22-25.  At such meetings, the GEC would bring "between five and ten" people, including "the acting coordinator, me, in that capacity, then one or more of the deputy coordinators, team chiefs from the Global Engagement Center, and working-level staff with relevant subject matter expertise." *Id.* 130:24-131:13.  These GEC staff meet with the platforms' content-moderation teams, *i.e.*, the people responsible for censorship on the platforms.  *Id.* at 133:1-20, 135:1-11.

1127.   In such a meeting, "the GEC would provide an overview of what it was seeing in terms of foreign propaganda and disinformation. And Twitter would, to the extent that they felt comfortable sharing information, would discuss similar topics."  136:8-13.

1128.   In addition to meeting with Twitter, the GEC's senior leadership had similar meetings with Facebook and Google as well during the same time frames. *Id.* at 139:22-140:6. These meetings were also with Facebook and Google's content-moderation or trust and safety teams, *i.e.*, the people responsible for censoring content on their platforms. *Id.* at 141:17-143:3.

1129.   The GEC brought similar numbers of people to the meetings with Facebook and Google. *Id.* at 143:16-17 ("I believe the lineup would have been similar.").

1130.   In addition to the senior-leadership and TET meetings, the GEC also maintained a Senior Advisor as a permanent liaison in Silicon Valley, Samaruddin K. Stewart, for the purpose of meeting with social-media platforms about disinformation.  *Id.* at 159:24-160:13; Kimmage Ex. 9, at 2.  Stewart set up a series of meetings with LinkedIn to discuss "countering disinformation" and to "explore shared interests and alignment of mutual goals regarding the challenge."  Kimmage Ex. 9, at 2.  Like the senior-leadership meetings, Stewart scheduled these meetings with the head of the trust and safety team, *i.e.*, the person responsible for censorship on the platform.  *See id.* at 7 (meeting with the "Head of Threat Prevention, Trust & Safety" at LinkedIn).  Kimmage confirms that Stewart set up similar meetings with other social-media platforms.  Kimmage Dep. 160:12-13.

1131.   On March 25, 2021, the GEC set an email to Rob Schaul of CISA flagging "a disinfo campaign on YouTube targeting a [diplomatic security] officer" on a "Youtube channel run by Americans."  Kimmage Ex. 11, at 2.  Brian Scully of CISA forwarded the disinformation report to Twitter, Facebook, and YouTube.  *Id.* at 1, 3, 7.  Facebook responded, "Thank you so much for this!  Have flagged for our internal teams."  *Id.* at 1.

1132.   The GEC also coordinated with the Election Integrity Partnership.  George Beebe of the GEC was in contact with the EIP.  Kimmage Dep. 202:10-24.  Kimmage admits that the GEC had "a general engagement with the EIP. … the GEC was engaging with the partnership."  *Id.* at 214:11-19.  In addition to Mr. Beebe, Adele Ruppe, who "liaised on election-related issues," may have engaged with the EIP.  *Id.* 214:23-215:5.

1133.   Kimmage states that the GEC's work against disinformation "equips … technology companies to better understand" disinformation "so that they can take whatever actions they would take to stop the spread."  *Id.* 280:24-281:3.

1134.   On October 17, 2022, at an event at Stanford University, Secretary of State Blinken
was asked, "Stanford is one of the leading institutions to combat misinformation research and
pointing out propaganda narratives and how they spread. How do you envision the cooperation
between the State Department and institutions like Stanford in combatting the spread of
propaganda?" Kimmage Ex. 16, at 5.  Secretary Blinken responded, mentioning the GEC and
noting that State is engaging in "collaborations" and "build[ing] out … partnerships" with
Stanford: "Stanford is doing remarkable work on that, and it's one of the things that we want to
make sure that we're benefitting from, because this is a day-in, day-out battle for us, combating
misinformation and disinformation around the world. We have at the State Department itself a big
focus on this. We have something called the Global Engagement Center that's working on this
every single day. But that work is both inspired by work that's being done in academia, including
here at Stanford, as well as where appropriate collaborations. …So we're trying to build out these
kinds of partnerships to make sure that we're looking at every place that is actually developing
answers, including Stanford, and then integrating that into what we do." *Id.*

IX.    **The Election Integrity Partnership and Virality Project – Federal Collaborators.**

1135.   Federal officials also work through nonprofit organizations to achieve their
censorship goals.  Most notably, federal officials at CISA and the GEC, and state officials through
the CISA-funded EI-ISAC, work in close collaboration with the Stanford Internet Observatory and
other nonprofit organizations to achieve censorship and attempt to evade the First Amendment.
Moreover, the Surgeon General's Office and other federal officials collaborate closely with the
Stanford Internet Observatory and the same entities under the aegis of the "Virality Project."

A.    **The Election Integrity Project Is a Formidable Censorship Cartel.**

1136.    According to its website, "[t]he Election Integrity Partnership (EIP) was formed in

July 2020 as a coalition of research entities focused on supporting real-time information exchange

between the research community, election officials, *government agencies*, civil society

organizations, and *social media platforms*." *The        Election Integrity Partnership*, Election

Integrity Partnership (last visited Feb. 22, 2023) (emphasis added),

https://www.eipartnership.net/2020.  The EIP's "objective was to detect and *mitigate the impact*

of attempts to prevent or deter people from voting or to delegitimize election results."  *Id.*

(emphasis added).  As discussed further herein, "mitigate[ing] the impact" means pushing social-

media platforms to censor supposed "misinformation."

1137.    "In March 2021 [the EIP] published [its] final report. This page displays an archive

of the work carried out by the EIP and its partners during the 2020 U.S. election."  *Id.*  The EIP

report is publicly available, it provides a detailed account of the EIP's activities in the 2020

election, and it is Exhibit 1 to the deposition of Brian Scully.  Scully Ex. 1 (containing Stanford

Internet Observatory et al., Election Integrity P'Ship, *The Long Fuse  Misinformation and the*

*Election*        (v1.3.0        2021),        https://www.eipartnership.net/report

[https://purl.stanford.edu/tr171zs0069]).

1138.    The EIP was created "in consultation with CISA [the Cybersecurity and

Infrastructure Security Agency at the Department of Homeland Security] and other stakeholders."

*Id.* at 20 (2).[1]  After "consultation with CISA," the EIP "assembled" a "coalition … with like-

minded partner institutions."  *Id.*

1139.    CISA interns originated the EIP: "The initial idea for the Partnership came from

four students that the Stanford Internet Observatory (SIO) funded to complete volunteer

---

[1] Citations of this exhibit are formatted "Scully Ex. 1, at [page of exhibit] ([page of report])."

internships at the Cybersecurity and Infrastructure Security Agency (CISA) at the Department of
Homeland Security." *Id.*

1140.   The EIP agrees with Scully that the EIP was formed to fill in a perceived "gap" in
the ability of the government to "monitor and correct" misinformation: "Responsibility for election
information security is divided across government offices: CISA has authority to coordinate on
cybersecurity issues related to the election, the FBI to investigate cyber incidents and enforce
election laws, and intelligence agencies to monitor for foreign interference. Yet, no government
agency in the United States has the explicit mandate to monitor and correct election mis- and
disinformation." *Id.*

1141.   The EIP acknowledges that the federal government directly targeting
misinformation posted Americans would "likely" violate the First Amendment and exceed
agencies' lawful authority: "This is especially true for election disinformation that originates from
within the United States, which would likely be excluded from law enforcement action under the
First Amendment and not appropriate for study by intelligence agencies restricted from operating
inside the United States." *Id.* As noted below, the EIP's founders publicly admit that virtually all
the misinformation targeted by the EIP was domestic in origin, not foreign, and thus subject to the
First Amendment.

1142.   The EIP specifically notes CISA and the FBI in discussing the need to fill this "gap"
in their ability to police "election misinformation originating from domestic sources": "none of
these federal agencies has a focus on, or authority regarding, election misinformation originating
from domestic sources within the United States. This limited federal role reveals a critical gap for
non-governmental entities to fill. Increasingly pervasive mis- and disinformation, both foreign and

domestic, creates an urgent need for collaboration across government, civil society, media, and social media platforms." *Id.* at 9 (v).

1143.   "As a result" of the First Amendment and lack of legal authority, according to the EIP, "during the 2020 election, local and state election officials, who had a strong partner on election-system and overall cybersecurity efforts in CISA, were without a clearinghouse for assessing mis- and disinformation targeting their voting operations." *Id.* at 20 (2).  The EIP was deliberately formed to fill this "gap."

1144.   The EIP "was formed between four of the nation's leading institutions focused on understanding misinformation and disinformation in the social media landscape: the Stanford Internet Observatory, the University of Washington's Center for an Informed Public, Graphika, and the Atlantic Council's Digital Forensic Research Lab." *Id.*

1145.   The EIP makes clear that its "aim" was not just to observe but to "defend[]" the public from misinformation: "With the narrow aim of defending the 2020 election against voting-related mis- and disinformation, it bridged the gap between government and civil society, helped to strengthen platform standards for combating election-related misinformation, and shared its findings with its stakeholders, media, and the American public." *Id.* at 9 (v).

1146.   The EIP's statement that it "helped to strengthen platform standards for combating election-related misinformation" refers to the fact that the EIP successfully pushed virtually all major social-media platforms to adopt or increase censorship policies targeted at election-related "misinformation" during the 2020 election cycle.  *See id.*

1147.   The EIP notes that its efforts to push social-media platforms to adopt more restrictive censorship policies were highly effective, both in procuring changes in policies and censoring speech: "Many platforms expanded their election-related policies during the 2020

election cycle. … Platforms took action against policy violations by suspending users or removing content, downranking or preventing content sharing, and applying informational labels." *Id.* at 12 (viii).

1148.    Alex Stamos, the director of the Stanford Internet Observatory who founded the EIP, has publicly stated that the EIP successfully pushed social-media platforms to adopt more restrictive policies about election-related speech in 2020: "My suggestion, if people want to get the platforms to do stuff is, first, you've got to push for written policies that are specific and that give you predictability; right? And so this is something we started in the summer, in August, is as Kate [Starbird] talked about Carly Miller led a team from all four institutions to look at the detailed policies of the big platforms and to measure them against situations that we expected to happen. Now we're not going to take credit for all of the changes they made, but there -- we had to update this thing, like, eight or nine times; right? And so like putting these people in a grid to say, you're not handling this, you're not handling this, you're not handling this, creates a lot of pressure inside of the companies and forces them to kind of grapple with these issues, because you want specific policies that you can hold them accountable for." Scully Ex. 4, at 7 (Audio Tr. 4).

1149.    Alex Stamos notes that the EIP then pressured the platforms to aggressively enforce the new policies that the EIP had pushed them to adopt: "The second is, when you report stuff to them, report how it's violating those written policies; right? So there's two steps here. Get good policies, and then say, this is how it's violated it." *Id.*

1150.    Other EIP participants have also publicly stated that the EIP induced social-media platforms to adopt much more aggressive censorship policies on election-related speech.  On March 3, 2021, at an EIP-hosted conference on the release of the EIP report, Emerson Brooking of the Atlantic Council's DRFLab, an EIP participant, stated: "I think the EIP really helped push

the envelope with things like just the notion that … this delegitimization of electoral processes that we were seeing in the summer and early fall that this should be against content moderation policies on these platforms, and begin to take proactive steps there….”  Scully Ex. 5, at 6 (Audio Tr. 2). He also stated, “after November 3rd, we saw that market shift where content moderation actions that … we could hardly contemplate a few weeks before began to be taken. There was a much stronger emphasis on cracking down on the sort of content we've been tracking from the beginning.”  *Id.*

1151.   The EIP treats “Government” and Social-Media “Platforms” as two of its “Four Major Stakeholders,” providing input to the EIP and receiving feedback from the EIP.  Scully Ex. 1, at 26 (8) & fig.1.2 (graphic showing “Government” as the EIP’s first “Major Stakeholder,” submitting information to EIP’s “Intake Queue” and receiving feedback on the EIP’s “Mitigation”—*i.e.*, censorship—efforts).

1152.   The EIP organizes its misinformation reports under groups called “tickets,” and it notes that “[t]ickets were submitted by … trusted external stakeholders…”  *Id.* at 26 (8).  “Trusted external stakeholders” include “government”: “External stakeholders included government, civil society, social media companies, and news media entities.”  *Id.* at 30 (12).  Thus, it is clear that “government” submitted “tickets,” *i.e.*, reports of misinformation to be processed for censorship on social media, to the EIP.  *See id.* at 26, 30 (8, 12).

1153.   And it is clear that the “government” partners who submit tips to the EIP are CISA, the State Department’s Global Engagement Center (GEC), and the Elections Infrastructure Information Sharing & Analysis Center (EI-ISAC), an organization of state and local government officials coordinated by the Center for Internet Security (CIS) pursuant to funding from CISA, *see EI-SAC*, Center for Internet Security (last visited Feb. 22, 2023)

("The EI-ISAC is federally funded by CISA."), https://www.cisecurity.org/ei-isac.   Specifically, the "Government" "stakeholders" listed under the EIP's "Four Major Stakeholder Groups" are CISA, GEC, and the EI-ISAC. Scully Ex. 1, at 30 (12).

1154.   These "Government" stakeholders report misinformation to the EIP: "Government and civil society partners could create tickets or send notes to EIP analysts, and they used these procedures to flag incidents or emerging narratives to be assessed by EIP analysts."  *Id.*

1155.   The CISA-funded EI-ISAC and CISA itself worked in collaboration with the EIP to report misinformation to social-media platforms: "[T]he EI-ISAC served as a singular conduit for election officials to report false or misleading information to platforms. By serving as a one-stop reporting interface, the EI-ISAC allowed election officials to focus on detecting and countering election misinformation while CIS and its partners reported content to the proper social media platforms. Additionally, the Countering Foreign Influence Task Force (CFITF), a subcomponent of CISA, aided in the reporting process and in implementing resilience efforts to counter election misinformation."  *Id.* at 31 (13).

1156.   The EIP report mentions *The Gateway Pundit*, the website operated by Plaintiff Jim Hoft, 47 times.  *See id.* at 51, 74, 76, 101, 103, 110, 112, 145, 150-51, 153, 155-56, 172, 175, 183, 194-95, 206-09, 211-12, 214-16, 226-27.[2]

1157.   The EIP boasts that it "used an innovative internal research structure that leveraged the capabilities of the partner organizations through a tiered analysis model based on 'tickets' collected internally and from our external stakeholders. Of the tickets we processed, 72% were related to delegitimization of the election," *i.e.*, core political speech.  *Id.* at 10 (vi).

---

[2] Report pages 33, 56, 58, 83, 85, 92, 94, 127, 132-33, 135, 137-38, 154, 157, 165, 176-77, 188-91, 193-94, 196-98, 208-09.

1158.   The EIP admits that the speech it targets for censorship is domestic, grassroots

speech by American citizens: "The production and spread of misinformation was multidirectional

and participatory. Individuals participated in the creation and spread of narratives. Bottom-up false

and misleading narratives started with individuals identifying real-world or one-off incidents and

posting them to social media. Influencers and hyperpartisan media leveraged this grassroots

content, assembling it into overarching narratives about fraud, and disseminating it across

platforms to their large audiences. Mass media often picked up these stories after they had reached

a critical mass of engagement. Top-down mis- and disinformation moved in the opposite direction,

with claims first made by prominent political operatives and influencers, often on mass media,

which were then discussed and shared by people across social media properties."  *Id.* at 11 (vii).

In other words, virtually everything it targets is quintessential First Amendment-protected political

speech.

1159.   This included censorship of highly visible political figures: "The primary repeat

spreaders of false and misleading narratives were verified, blue-check accounts belonging to

partisan media outlets, social media influencers, and political figures, including President Trump

and his family." *Id.* at 12 (viii).

1160.   One key point that the EIP emphasizes is that it wants greater "access" to platforms'

internal data to achieve greater monitoring of Americans' speech on social media.   The EIP

complains that " *a      tra s are    a d a ess t   lat r  A  s i dered e ter al resear*

*i t t ee e tie ess    lat r   li ies a d i ter e ti   s*." *Id.* (emphasis added). "API" stands

for "Application Programming Interface," so the EIP wants greater direct access to platforms'

internal data about so-called "misinformation" on their platforms.  *See id.*  This directly echoes the

repeated demands from the White House and the Surgeon General that social-media platforms

provide access to their internal data about misinformation on their platforms, both to government and "researchers." The relevant "researchers" include Stanford Internet Observatory and the other constituents of the EIP and the Virality Project, who are working hand-in-glove with federal officials.

1161.   The EIP contends that not enough censorship was achieved during 2020 as a result of their lack of direct access to platforms' APIs: "Many platforms expanded their election-related policies during the 2020 election cycle. However, application of moderation policies was inconsistent or unclear." *Id.*

1162.   The EIP recommends that platforms increase enforcement of censorship policies: "Impose clear consequences for accounts that repeatedly violate platform policies. These accounts could be placed on explicit probationary status, facing a mixture of monitoring and sanctions." *Id.* at 14 (x).

1163.   The EIP report acknowledges the contributions of Alex Stamos, Renee DiResta, Kate Starbird, Matt Masterson, Pierce Lowary, and Alex Zaheer. *Id.* at 16 (xii). All of these individuals have or had formal roles in CISA.

1164.   The EIP is partially funded by the federal government: "Researchers who contributed to the EIP … receive partial support from the U.S. National Science Foundation (grants 1749815 and 1616720)." *Id.* at 17 (xiii).

1165.   In addition, the Atlantic Council, one of the four nonprofit organizations in the EIP, is partially government-funded. Kimmage Dep. 294:8-18.

1166.   "The initial idea for the Partnership came from four students that the Stanford Internet Observatory (SIO) funded to complete volunteer internships at the Cybersecurity and

Infrastructure Security Agency (CISA) at the Department of Homeland Security."  Scully Ex. 1, at 20 (2).

1167.    "The students approached SIO leadership in the early summer, and, in consultation with CISA and other stakeholders, a coalition was assembled with like-minded partner institutions."  *Id.*

1168.    "The Election Integrity Partnership (EIP) was officially formed on July 26, 2020—100 days before the November election—as a coalition of research entities who would focus on supporting real-time information exchange between the research community, election officials, government agencies, civil society organizations, and social media platforms."  *Id.*

1169.    As a key point in its "Operational Timeline," the EIP lists a July 9, 2020, "Meeting with CISA to present EIP concept."  *Id.* at 21 (3).  In other words, the Stanford Internet Observatory "present[ed]" the "EIP concept" to CISA two weeks before the EIP was formed.  *Id.*

1170.    The SIO's EIP team was "led by … Research Manager Renee DiResta … and Director Alex Stamos."  *Id.* at 22 (4).  The University of Washington's "contributing team" was "led by … Kate Starbird."  *Id.*

*11 1.*    Alex Stamos and Kate Starbird are members of CISA's Cybersecurity Advisory Committee.  *See CISA Cybersecurity Advisory Committee*, Cybersecurity & Infrastructure Security Agency (last visited Feb. 24, 2023), https://www.cisa.gov/resources-tools/groups/cisa-cybersecurity-advisory-committee.  Starbird chairs CISA's Subcommittee on "Protecting Critical Infrastructure from Misinformation and Disinformation."  *See* CISA Cybersecurity Advisory Committee, Subcommittee Factsheet 1 (April 13, 2022), https://www.cisa.gov/sites/default/files/publications/CSAC%20Subcommittee%20Factsheet_April%2013%202022.pdf. Renee DiResta gives lectures on behalf of CISA.  *See* CISA, *Cybersecurity*

*Summit 1 Responding to Mis, Dis, and Malinformation*, YouTube (Oct. 27, 2021), https://www.youtube.com/watch?v=yNe4MJ351wU.

1172.    One of the EIP's goals was to "flag policy violations to platforms."  Scully Ex. 1, at 24 (6).

1173.    As noted above, the EIP describes "Government" as one of "four major stakeholders," who both provided input into the "intake queue" for "tickets" (*i.e.*, reporting misinformation) and received feedback on "mitigation" (*i.e.*, censorship). *Id.* at 26 (8).

1174.    The EIP tracked misinformation using "tickets," which tracked "informational event[s]" that could encompass many social-media postings: "The EIP tracked its analysis topics and engaged with outside stakeholder organizations using an internal ticketing workflow management system. Each identified informational event was filed as a unique ticket in the system." *Id.*

1175.    "Tickets were submitted by both trusted external stakeholders (detailed in Section 1.4 on page 11) and internal EIP analysts." *Id.*  "Section 1.4" on pages 11-12 of the report identifies government as a trusted external stakeholder: "Trusted external stakeholders" include "government, civil society, social media companies, and news media entities." *Id.* at 29-30 (11-12).  Page 12 specifically identifies CISA, the EI-ISAC, and the State Department's GEC as the EIP's "Government" stakeholders. *Id.* at 30 (12) fig.1.3.

1176.    A "ticket" could encompass many individual postings: "A single ticket could map to one piece of content, an idea or narrative, or hundreds of URLs pulled in a data dump." *Id.* at 27 (9).

1177.    The EIP's managers both report misinformation to platforms and communicate with government partners about their misinformation reports: "The manager had the ability to tag

platform partners on a ticket for action. They also communicated with the EIP's partners in
government, and could request further information from election officials if necessary," thus
serving as a conduit for a back-and-forth about misinformation reports between government
officials and platforms.  *Id.* at 27-28 (9-10).

1178.   The scope of the EIP's monitoring of Americans' speech on social media is
enormous: "Team members from each of these tiers were divided into on-call shifts. Each shift
was four hours long and led by one on-call manager. It was staffed by a mix of Tier 1 and Tier 2
analysts in a 3:1 ratio, ranging from five to 20 people. Analysts were expected to complete between
two to five shifts per week. The scheduled shifts ran from 8:00 am to 8:00 pm PT for most of the
nine weeks of the partnership, ramping up only in the last week before the election from 12-hour
to 16- to 20-hour days with all 120 analysts on deck."  *Id.* at 28 (10).

1179.   The "Government" stakeholders flag misinformation to the EIP for censorship:
"Government and civil society partners could create tickets or send notes to EIP analysts, and they
used these procedures to flag incidents or emerging narratives to be assessed by EIP analysts."  *Id.*
at 30 (12).

1180.   Of the "Four Major Stakeholder Groups" who participated in the EIP, the first listed
is "Government," which includes three government entities: the Elections Infrastructure ISAC,
CISA, and the State Department's GEC.  *Id.*

1181.   The EIP reports that CISA, CIS, and the EI-ISAC collaborated with the EIP in
reporting misinformation: "In this election cycle, the EI-ISAC served as a singular conduit for
election officials to report false or misleading information to platforms. By serving as a one-stop
reporting interface, the EI-ISAC allowed election officials to focus on detecting and countering
election misinformation while CIS and its partners reported content to the proper social media

platforms. Additionally, the Countering Foreign Influence Task Force (CFITF), a subcomponent of CISA, aided in the reporting process and in implementing resilience efforts to counter election misinformation." *Id.* at 31 (13).

1182.  The EI-ISAC jointly reports misinformation flagged by state and local election officials to CISA and to the EIP: "Content reported by election officials to the EI-ISAC was also routed to the EIP ticketing system. This allowed analysts to find similar content, ascribe individual content pieces to broader narratives, and determine virality and cross-platform spread if applicable. This analysis was then passed back to election officials via the EI-ISAC for their situational awareness, as well as to inform potential counter-narratives. Additionally, if an internally generated EIP ticket targeted a particular region, analysts sent a short write-up to the EI-ISAC to share with the relevant election official. This allowed the state or local official to verify or refute the claim, and enabled analysts to properly assess whether or not the content violated a platform's civic integrity policies. In this way, the EIP demonstrated the upside of using the EI-ISAC coordinating body to connect platforms with authoritative voices to determine truth on the ground and help election officials effectively counter viral falsehoods about election infrastructure." *Id.*

1183.  The EIP created established channels for reporting misinformation to platforms for censorship: "The EIP established relationships with social media platforms to facilitate flagging of incidents for evaluation when content or behavior appeared to violate platform policies." *Id.* at 35 (17).

1184.  The EIP receives real-time reports on censorship actions from the platforms, who communicate directly with EIP managers about censorship through the EIP's system: "Analysts conducted their initial assessment on all tickets, and, if content in a ticket appeared to be a violation of a platform's published content policies, an analyst or manager added the platform representative

to the ticket. If questions arose, a manager communicated with the platform representative in the ticket comments. Analysts put the ticket back in the queue and updated the ticket to note if the content in question received a moderation action." *Id.*

1185.    Virtually all major social-media platforms participate directly in the EIP: "The EIP onboarded the following social media companies: Facebook and Instagram, Google and YouTube, Twitter, TikTok, Reddit, Nextdoor, Discord, and Pinterest."  *Id.*

1186.    In the 2020 election cycle, the EIP "processed 639 in-scope tickets. 72% of these tickets were related to delegitimizing the election results."  *Id.* at 45 (27).

1187.    The EIP had a high level of success in pushing the platforms to censor speech: "35% of the URLs we shared with Facebook, Instagram, Twitter, TikTok, and YouTube were either labeled, removed, or soft blocked."  *Id.*  "In total, we believe the four major platforms we worked with all had high response rates to our tickets."  *Id.* at 55 (37).  "We find, overall, that platforms took action on 35% of URLs that we reported to them."  *Id.* at 58 (40).

1188.    The Center for Internet Security, which runs the EI-ISAC using funding from CISA, is a major reporter of misinformation to the EIP: "16% of tickets were filed by the Center for Internet Security (CIS), an election official community partner, in the form of tips."  *Id.* at 46 (28); *see also* Center for Internet Security, *EI-ISAC* (last visited Feb. 24, 2023), https://www.cisecurity.org/ei-isac.

1189.    The EIP "prioritize[es] … swing states over non-swing states."  Scully Ex. 1, at 46 (28).

1190.    The EIP's "dataset included 639 distinct, in-scope tickets."  *Id.*  A "ticket" could be extremely broad, "map[ping] to" and entire "idea or narrative."  *Id.* at 27 (9).  For example, the "SHARPIEGATE" ticket was submitted on November 4, 2020, to "try and consolidate all the

content" regarding the Sharpiegate story from "a variety of different states across Twitter, FB, TikTok, and Youtube." *Id.* at 47 (29) fig.2.1.

1191.   The EIP includes extensive collaboration with a "government partner" in its Sharpiegate ticket. *Id.* at 48 (30).  Its internal ticket-management software ("Jira") simultaneously allowed the "government partner" to communicate directly with the "platform partner" to debunk the online claim. *Id.* at 48 (30) fig.2.2.

1192.   The EIP reports that it repeatedly flagged *The Gateway Pundit*, Plaintiff Jim Hoft's website, as a purveyor of social-media misinformation: "The top misinformation-spreading websites in our dataset were … thegatewaypundit[.]com, a far-right news website.  65% of these tickets involved an exaggeration of the impact of an issue within the election process." *Id.* at 51 (33) (alteration in original).

1193.   The EIP does not claim that most of *The Gateway Pundit*'s content was false, only that it involved the "exaggeration of the impact of an issue within the election process." *Id.*

1194.   As noted above, the EIP Report cites *The Gateway Pundit* 47 times.  *See supra* paragraph 1156 and accompanying citation.

1195.   The EIP "coded tickets based on whether they … had an element of foreign interference. Interestingly … less than 1% related to foreign interference."  Scully Ex. 1, at 53 (35).  Thus, virtually all the speech targeted for censorship comes from American speakers.

1196.   The EIP targeted speech for censorship or debunking in most tickets: "Of our 639 tickets, 363 tickets tagged an external partner organization to either report the content, provide situational awareness, or suggest a possible need for fact-checking or a counter-narrative." *Id.* at 55 (37).

1197.   "[G]roups that reported tickets include the State Department's Global Engagement Center…" *Id.* at 60 (42).  Daniel Kimmage testified that George Beebe of the GEC was in contact with the EIP.  Kimmage Dep. 202:10-24.  Kimmage attests that the GEC had "a general engagement with the EIP. … the GEC was engaging with the partnership." *Id.* at 214:11-19.  In addition to Mr. Beebe, Adele Ruppe, who "liaised on election-related issues," may have engaged with the EIP. *Id.* 214:23-215:5.

1198.   In addition, left-wing advocacy groups like "MITRE, Common Cause, the DNC, the Defending Digital Democracy Project, and the NAACP" submitted tickets to the EIP.  Scully Ex. 1, at 60 (42).

1199.   The EIP indicates that the "misinformation" it targeted during the 2020 election cycle was core political speech of American citizens protected by the First Amendment: "Our analysis demonstrates that the production and spread of misinformation and disinformation about Election 2020 … was participatory. In other words, these dynamics were not simply top-down from elites to their audiences, but were bottom-up as well, with members of the 'crowd' contributing in diverse ways—from posting raw content, to providing frames for that content, to amplifying aligned messages from both everyday members of the crowd and media (including social media) elites. Repeatedly, our data reveal politically motivated people sincerely introducing content they mistakenly believed demonstrated real issues with election integrity…" *Id.* at 181 (163).  "Well-meaning, though often politically motivated, individuals repeatedly introduced this content into the broader information sphere, often via social media…" *Id.* at 182 (164).

1200.   EIP analysts collected data from Twitter "contemporaneously," and they also have access to "CrowdTangle and Facebook search functionality." *Id.* at 199-200 (181-82).

1201.   The EIP's tickets encompassed almost 5,000 URLs: "Through our live ticketing process, analysts identified social media posts and other web-based content related to each ticket, capturing original URLs (as well as screenshots and URLs to archived content). In total, the EIP processed 639 unique tickets and recorded 4,784 unique original URLs." *Id.* at 200 (182).

1202.   These tickets and URLs encompass millions of social media posts, including almost 22 million posts on Twitter alone: "In total, our incident-related tweet data included 5,888,771 tweets and retweets from ticket status IDs directly, 1,094,115 tweets and retweets collected first from ticket URLs, and 14,914,478 from keyword searches, for a total of 21,897,364 tweets." *Id.* at 201 (183).

1203.   The EIP "collected data from Twitter in real time from August 15 through December 12, 2020," and did so "[u]sing the Twitter Streaming API" to "track[] a variety of election-related terms …. The collection resulted in 859 million total tweets." *Id.* at 200-01 (182-83).  Thus, the EIP had privileged access to Twitter's internal data about speech on its own platform.

1204.   The EIP did not have privileged access to Facebook's internal data, however: "To understand how the information ecosystem looks from the perspective of Facebook and Instagram, we collected public posts through the CrowdTangle API from Facebook Groups, Facebook Pages, Facebook verified profiles and public Instagram accounts." *Id.* at 201 (183).  This explains the White House's and Surgeon General's insistence in 2021 that Facebook grant "researchers" such as Renee Diresta access to Facebook's internal data.

1205.   The EIP treats as "misinformation" truthful reports that the EIP believes "lack[] broader context." *Id.* at 203 (185).

1206.  The EIP admits that it focuses on speech from the "political right" because it

believes that the right spreads misinformation: "Influential accounts on the political right … were

responsible for the most widely spread of false or misleading information in our dataset. Right-

leaning accounts also more frequently augmented their misinformation posts with narrative-related

hashtags … which persisted across multiple incidents and were shared millions of times in our

dataset." *Id.* at 204-05 (186-87).

**B.    The EIP Targets Plaintiff Jim Hoft and *T e  ate  a       dit*.**

1207.  According to the EIP, "[t]he 21 most prominent repeat spreaders on Twitter …

include political figures and organizations, partisan media outlets, and social media all-stars. …

[A]ll 21 of the repeat spreaders were associated with conservative or right-wing political views

and support of President Trump." *Id.* at 205 (187).

1208.  The EIP lists *The Gateway Pundit* as the second-ranked "Repeat Spreader[] of

Election Misinformation" on Twitter, ranking it above Donald Trump, Eric Trump, Breitbart

News, and Sean Hannity. *Id.* at 206 (188) tbl.5.2.  In the 2020 election cycle, the EIP flagged *The*

*Gateway Pundit*'s speech in 25 incidents with over 200,000 retweets. *Id.*

1209.  The EIP claims that "[f]ar-right hyperpartisan media outlets also participated in a

wide range of [Twitter] incidents, including The Gateway Pundit, which ranked #2 in the dataset."

*Id.* at 206 (188).

1210.  In addition, the EIP lists *The Gateway Pundit*'s website as the domain cited in the

most "incidents"—its website content was tweeted by others in 29,207 original tweets and 840,740

retweets. *Id.* at 207 (189) tbl.5.3.  *The Gateway Pundit* ranks above Fox News, the New York

Post, the New York Times, and the Washington Post on this list. *Id.*

1211.   In fact, the EIP dedicates an entire subsection of its report to *The Gateway Pundit*. *Id.* at 214-16 (196-98).   The EIP reports that "The Gateway Pundit was among the most active spreaders of election-related misinformation in our analyses. … It appeared as a top repeat spreader through its website, its Twitter account, its YouTube channel, and its Instagram account."  *Id.* at 214 (196).

1212.   The EIP report notes that "Twitter suspended [*The Gateway Pundit*'s] account on February 6, 2021," indicating that *The Gateway Pundit*'s deplatforming on Twitter was the result of the EIP's efforts.  *Id.*

1213.   The EIP states that "The Gateway Pundit was highly active throughout the election lifecycle, including during the weeks leading up to the election, when it repeatedly spread content—in distinct information incidents—that sought to undermine trust in mail-in voting specifically and the eventual election results more generally."  *Id.*

1214.   According to the EIP, "[o]n Twitter, The Gateway Pundit's account was highly retweeted across 26 different incidents (#2 among repeat spreaders). Evidence from our data suggest that its prominence was due both to production of its own material and to amplification (via original and quote tweets) of other partisan content."  *Id.* at 215 (197).

1215.   According to the EIP, "[o]f all the domains linked to in our Twitter data, The Gateway Pundit's website was connected to the largest number of incidents (46) while also garnering the most related original tweets (29,207) and retweets (840,750). Their YouTube channel appeared in five incidents, and their 13 incident-related videos had more than 4 million views on YouTube."  *Id.* at 215-16 (197-98).

1216.   According to the EIP, "[t]he Gateway Pundit['s] … Instagram account was tied for #2 among repeat spreaders, appearing in 10 incidents for 20 posts that received more than 132,000 engagements." *Id.* at 216 (198).

### C.   The EIP Induces Major Changes in Platform Censorship Policies.

1217.   The EIP notes that "during the 2020 election, all of the major platforms made significant changes to election integrity policies, both as the campaigns kicked off and through the weeks after Election Day—policies that attempted to slow the spread of specific narratives and tactics that could potentially mislead or deceive the public…." *Id.* at 229 (211).

1218.   The EIP notes that "[m]ajor social media platforms such as Facebook, Twitter, YouTube, Pinterest, and TikTok introduced changes to their community standards in the months leading up to the election and in the aftermath." *Id.* at 230 (212).

1219.   In particular, starting just over a month after the EIP launched, in "September 2020," "[a] number of platforms announced the first updates to election-specific policies: making large additions; adding more clarity and specificity; or stating clearly that they will label or remove content that delegitimizes the integrity of the election." *Id.*

1220.   The policy changes reflected that the EIP and the platforms anticipated that they would have to target speech by *domestic* speakers, not supposed "foreign disinformation," during the 2020 election: "[M]uch of the misinformation in the 2020 election was pushed by authentic, domestic actors, and platforms shifted their focus to address downstream harms related to the content itself. As a result, most subsequent updates introduced policies related to specific content categories." *Id.* at 231 (213).

1221.   The EIP lobbies platforms to "remove" so-called "repeat spreaders" like *The Gateway Pundit*, and complains that they are not removed often enough: "Despite what appeared

to be clear policy to penalize or remove repeat spreaders and high-profile disinformation actors, platforms appeared to shy away from using this particular intervention. In some cases, this was a result of a variety of 'newsworthiness' exceptions, which allowed some high-profile repeat spreaders, including politicians, to evade bans. Yet many of the repeat spreaders we saw were not politicians"—including *The Gateway Pundit*, among many others. *Id.* at 233 (215).

1222.   The EIP indicates that it will continue its censorship activities in future elections: "The next election will have its own unique set of misinformation narratives, yet many of the tactics, dynamics, and basic structures of these narratives will likely remain the same." *Id.* at 243-44 (225-26).

1223.   The EIP reinforces this intention by calling for even more aggressive, more expansive censorship of social-media speech, including into other areas such as "public health": "Doing nothing is not an option. … Not pursuing structural policy change will accelerate our country's slide toward extremism, erode our shared national and inclusive identity, and propel yet more individuals toward radicalization via mis- and disinformation. The problem is larger than elections: it spans politics, self-governance, and critical policy areas, including public health." *Id.* at 251 (233).   The EIP acted on this statement promptly by forming the "Virality Project" in 2021. *See infra*.

1224.   The EIP proclaims that the "EIP's novel structure, enabling rapid-response analysis and a multistakeholder reporting infrastructure, could prove effective to many information spaces blighted by pervasive misinformation," in addition to election-related speech. *Id.* at 259 (241).

1225.   The EIP calls for more aggressive penalties to enforce censorship on social media, in language that was copied and parroted by the demands of Jen Psaki and the Surgeon General: "Establish clear consequences for accounts that repeatedly violate platform policies." *Id.* at 256

(238).  "Prioritize quicker action on verified or influential accounts if they have already violated platform policies in the past."  *Id.* at 257 (239).

1226.   The EIP even advocates for an express system of pre-publication approval for disfavored speakers—the ultimate prior restraint: "Consider implementing holding areas for content from high-visibility repeat spreaders, where content can be evaluated against policy before posting."  *Id.*

1227.   The EIP proclaims that it offers "a whole-of-society response," in words parroted by the Surgeon General's Health Advisory.  *Id.* at 259 (241).

1228.   The EIP boasts that "[t]he EIP, in its structure and its operations … *united government, academia, civil society, and industry*, analyzing across platforms, to address misinformation in real time."  *Id.* (emphasis added).

1229.   The EIP states that "[t]he lessons from EIP should be both learned and applied. The fight against misinformation is only beginning. The collective effort must continue."  *Id.* at 259-60 (241-42).

1230.   The EIP specifically advocates for a broader role for CISA in federal efforts to combat election-related "misinformation."  *Id.* at 252-53 (234-35).

1231.   Alex Stamos, the director of the Stanford Internet Observatory who launched the EIP, publicly states that virtually all the speech targeted by the EIP is by domestic speakers engaging in core political speech.  He has publicly stated: "almost all of this is domestic: right? … It is all domestic, and the second point on the domestic, a huge part of the problem is well-known influencers …. you have … a relatively small number of people with very large followings who have the ability to go and find a narrative somewhere, pick it out of obscurity and … harden it into these narratives."  Scully Ex. 4, at 5 (Audio Tr. 2).

1232.   Likewise, on October 3, 2020, at a CISA-hosted cybersecurity conference, Clint Watts of the EIP stated that election misinformation "is overwhelmingly more domestic than foreign this time around in 2020."  Scully Ex. 3, at 4 (Audio Tr. 2).

1233.   At the same conference, Alex Stamos stated: "The bigger issue in 2020, is going to be domestic … we have set up this thing called the [E]lection [I]ntegrity [P]artnership, so we went and hired a bunch of students. We're working with the University of Washington, Graphika, and DFRLab, and the vast, vast majority of the contact we see we believe is domestic. You know, some of it you can't tell, but a lot of it is coming from domestic blue checkmark verified elites; right? And so I think a much bigger issue for the platforms is elite disinformation. The stuff that is being driven by people who are verified that are Americans who are using their real identities."  *Id.* at 5 (Audio Tr. 3).  He also stated, "the truth is, that the vast majority of these problems or the kind of problems in the information environment are domestic problems."  *Id.* at 6 (Audio Tr. 4).

1234.   Alex Stamos has noted that the fear of government regulation pushes the platforms to respond to government pressure and increase censorship. On November 10, 2020, at a conference hosted by the Atlantic Council, Alex Stamos stated: "So, you know, on effectively pushing the platforms to do stuff … they will always be more responsive in the places that are both economically highly important and that have *huge potential regulatory impact*, most notably right now that would be the United States and Europe."  Scully Ex. 4, at 6 (Audio Tr. 3) (emphasis added).

1235.   On November 17, 2021, at a conference hosted by the Digital Publics Symposium, Kate Starbird of CISA's Subcommittee and the University of Washington's Center for an Informed Public, an EIP participant, stated: "Now fast forward to 2020, we saw a very different story around disinformation in the U.S. election. It was largely domestic coming from inside the United States.

… Most of the accounts perpetrating this … they're authentic accounts. They were often blue check and verified accounts. They were pundits on cable television shows that were who they said they were … a lot of the major spreaders were blue check accounts, and it wasn't entirely coordinated, but instead, it was largely sort of cultivated and even organic in places with everyday people creating and spreading disinformation about the election." Scully Ex. 8, at 4 (Audio Tr. 2). She also stated: "So we see this – the disinformation campaign was top down … but this campaign was also bottom up with everyday people sharing their own experiences, their own misperceptions of being disenfranchised or finding what they thought to be evidence of voter fraud." *Id.* at 5 (Audio Tr. 3). These are the voices that the EIP silenced.

### D.    The Virality Project Expands EIP's Censorship Work with Federal Officials.

1236.   Soon after the 2020 election cycle, beginning in early 2021, the same four entities that launched the Election Integrity Partnership established a similar program to address COVID-19-vaccine-related "misinformation" on social media, which they called the "Virality Project." *See* Scully Ex. 2 (containing Stanford Internet Observatory, et al., The Virality Project, *Memes, Magnets, and Microchips  Narrative Dynamics Around COVID-19 Vaccines* (v.1.0.1 2022), https://purl.stanford.edu/mx395xj8490).

1237.   The Virality Project's final report, dated April 26, 2022, lists Renee DiResta as the principal Executive Editor, and lists Renee DiResta, Kate Starbird, and Matt Masterson as contributors.  Scully Ex. 2, at 4 (i).[3]  Current and former CISA interns Jack Cable, Isabella Garcia-Camargo, Pierce Lowary, and Alex Zaheer are listed as "researchers and analysts" who participated in social-media "monitoring" for the project.  *Id.*

---

[3] Citations of this exhibit are formatted "Scully Ex. 2, at [page of exhibit] ([page of report]).

1238.   The same four entities that operated the EIP launched the Virality Project ("VP") in 2021: Stanford Internet Observatory, University of Washington's Center for an Informed Public, Graphika, and the Atlantic Council's Digital Forensics Research lab.  *Id.* at 8-9 (1-2).  Three new nonprofit entities were added as well.  *Id.*

1239.   According to its report, "[t]he VP team developed technology to identify emerging narratives, to understand what communities they appeared within, and to gauge their scope, speed, and spread. In addition, the analysts assessed social media platforms' published policies to understand how (if at all) platforms might limit or action the spread of misleading vaccine-related content." *Id.* at 9 (2).  As discussed below, like the EIP, the VP took action to push "platforms [to] limit or action the spread of misleading vaccine-related content."  *Id.*

1240.   According to the VP, "[v]accine mis- and disinformation was largely driven by a cast of recurring actors," including "long-standing anti-vaccine influencers and activists, wellness and lifestyle influencers, pseudomedical influencers, conspiracy theory influencers, right-leaning political influencers, and medical freedom influencers."  *Id.*

1241.   Like the EIP, the VP admits that the speech it targets is heavily speech by "domestic actors," *i.e.*, American citizens: "Foreign … actors' reach appeared to be far less than that of domestic actors."  *Id.*

1242.   Like the EIP, the VP indicates that it pushes platforms to adopt more aggressive censorship policies on COVID vaccine-related content: "While online platforms have made progress in creating and enforcing vaccine related policies, gaps still exist."  *Id.* at 10 (3).

1243.   Like the EIP, the VP notes that it did not only observe and report on misinformation but took action to stop the spread of misinformation: "Detection, however, was only part of the

work. The Virality Project also sought to relate its findings to the public and to stakeholders in public health, government, and civil society." *Id.*

1244.    The VP indicates that it should increase the efficiency of having "government partners" share "tips" of misinformation with entities like the VP, stating that "[r]esearch institutions" should "[s]treamline a tip line process to make it easy for civil society and government partners to share observations.  Establish a feedback loop to discuss what types of analysis or tips are most relevant." *Id.*

1245.    The VP strives to "[d]evelop and maintain clear channels of communication that enable federal, state, and local agencies to understand and learn from what might be happening in other regions. Federal Information Sharing and Analysis Centers (ISAC) are one path forward." *Id.* at 11 (4).

1246.    The VP recommends that the federal government "[i]mplement a Misinformation and Disinformation Center of Excellence housed within the Cybersecurity and Infrastructure Security Agency." *Id.*

1247.    The VP states that social-media "[p]latforms owe the public *transparency and accountability* as they face the challenges of deciding what to surface, what to curate, and how to minimize the virality of harmful false claims. Tech platform policies against public health misinformation should be clear and precise, and their enforcement should be consistently applied." *Id.* (emphasis added).   The Surgeon General copied this messaging verbatim in his Health Advisory, which he launched at the VP.

1248.    The VP calls for more aggressive censorship of COVID-19 "misinformation," stating: "To these ends, platforms should: Consistently enforce policies, particularly against recurring actors," and "Continue to improve data sharing relationships with researchers." *Id.*  The

emphasis on "data sharing relationships" is directly echoed in the White House's and the Surgeon

General's demands that platforms share their internal data with researchers.

1249.    The VP boasts that the "Office of the Surgeon General incorporated VP's research

and perspectives into its own vaccine misinformation strategy," and specifically cites the Surgeon

General's Health Advisory on this point.  *Id.* at 11 (4) & 13 (6) n.5 (citing Off. U.S. Surgeon Gen.,

*Confronting Health Misinformation  The U.S. Surgeon General's Advisory on Building a Healthy*

*Information  Environment*  (July  15,  2021),  https://hhs.gov.sites.default.files.surgeon.general-

misinformation-advisory.pdf).

1250.    "Over  the  course  of  its  seven  months  of  work,  the  Virality  Project  observed

narratives that questioned the safety, distribution, and effectiveness of the vaccines."  *Id.* at 11 (4).

1251.    Like the EIP, the VP states that "[t]he enormity of the challenge demands a *whole-*

*of-society response*," *id.* at 12 (5) (emphasis added), and calls for more federal agencies to be

involved through "cross-agency collaboration," *id.*  The Surgeon General adopted and echoed the

VP's call for a "whole-of-society" response.

1252.    The VP admits that "it was not always clear what *was* misinformation; in the case

of  the  novel  coronavirus,  it  was  often  simply  not  yet  clear  what  was  true  or  where  scientific

consensus lay," *id.* at 14 (7), and that "[g]round truth about COVID-19 was rapidly evolving, and

even institutional experts were not always aligned on the facts," *id.* at 15 (8).

1253.    According to the VP, "[v]iral posts that claimed to have the answers to the public's

most pressing questions appeared online; fact-checkers struggled to evaluate them, and platforms

wrestled with whether to leave them up or take them down. Social media influencers of varying

backgrounds debated the merits and efficacy of masking, providing detailed breakdowns of their

analyses in public posts."  *Id.*

1254.   The VP attributes opposition to mask mandates and lockdowns to right-wing
political ideology: "In the months before vaccines or treatments emerged, governments worldwide
turned to preventative measures such as masking requirements and lockdowns. In the US, these
measures were quickly framed as affronts to liberty by facets of the US right-wing political
spectrum, turning individual responses to the virus into a function of political identity." *Id.*

1255.   The VP suggests that it flagged for censorship COVID-related posts with enormous
engagement on social media, reporting for example that "[b]efore the major social media platforms
began to take down [one] video—which was in violation of their COVID-19 misinformation
policies—[it] amassed tens of millions of views and was shared into a wide variety of
communities." *Id.* at 16 (9).

1256.   The speech that the VP decries is all quintessential First Amendment–protected
speech. *See, e.g., id.* ("Several prominent anti-vaccine activists began to post regularly about
COVID-19; their followings began to increase, despite prior platform efforts to reduce the spread
of false and misleading claims from anti-vaccine figures. As the possibility of a vaccine became
more of a reality as 2020 progressed, anti-vaccine activists focused on preemptively undermining
uptake.  Several of the vaccines in development used relatively novel mRNA technology, which
afforded an opportunity to present them as untested, unsafe, rushed, or risky, even to audiences
who had taken all previously recommended vaccines.").

1257.   "It was against this backdrop" of widespread First Amendment–protected speech
on social media "that the Virality Project (VP) came together. A collection of research institutions
had previously collaborated through the Election Integrity Partnership (EIP) to identify and
understand the spread of election mis- and disinformation in the US during the 2020 presidential
campaign. In December 2020, these partners jointly observed that the same tactics used to great

effect during the 2020 election were already in use to expand the spread of COVID-19 vaccine mis- and disinformation." *Id.*.  The VP used the same tactics as the EIP to engage in "rapid response" to misinformation: "The Project's broad array of institutions enabled information sharing and *rapid response* when false and misleading information percolated across social platforms." *Id.* (emphasis added).

1258.   The VP was overtly biased against "anti-vaccine" viewpoints from the beginning: "The Project's original framing document articulated the threat: **A surge of anti-vaccine disinformation will pose significant challenges to the rollout and public adoption of COVID-19 vaccines in the United States**." *Id.*  (bold in original).

1259.   Just like the EIP, the VP boasts that it is a "multistakeholder collaboration" that includes "government entities" among its key stakeholders: "The Virality Project adopted *a multistakeholder collaboration with civil society organizations, social media platforms, and government entities* to respond to misand disinformation around the novel vaccines." *Id.* at 17 (10) (emphasis added).

1260.   "The research institutions that comprised the Election Integrity Partnership—the Stanford Internet Observatory, the University of Washington's Center for an Informed Public, the Atlantic Council's Digital Forensic Research Lab, and Graphika—along with new partners the National Conference on Citizenship (NCoC)'s Algorithmic Transparency Institute and New York University's Center for Social Media and Politics and Tandon School of Engineering—all elected to participate in this new initiative: the Virality Project." *Id.*

1261.   The VP report complains that "the internet has no editorial gatekeepers." *Id.* at 18 (11).

1262.   The VP decries the influence of "social media influencers" such as "Doctors" and "Mommy Bloggers."  *Id.* at 19 (12).

1263.   According to the VP, "[t]hese influencers have adopted the best practices of communication in the internet age, and their effectiveness in drawing in online users is made evident by the mass followings they have acquired across social media sites: platforms as varied as Pinterest, Instagram, and YouTube…"  *Id.*

1264.   The VP targets misinformation "tactics" that involve speech that the VP does not contend is false or even falsifiable.  It states that speakers "use tactics that have persisted over time, many of which have been used in service of spreading mis- and disinformation in contexts beyond the vaccine conversation; for example, the Election Integrity Partnership observed several of these tactics during the lead-up to the 2020 US election."  *Id.*

1265.   These "tactics" include such things as "**Hard-to-Verify Content:** Using content that is difficult to fact-check or verify, such as personal anecdotes"; "**Alleged Authoritative Sources:** Using or pointing to information from an alleged public health official, doctor, or other authoritative source"; "**Organized Outrage:** Creating events or in-person gatherings, or using or co-opting hashtags"; and "**Sensationalized/Misleading Headlines:** Using exaggerated, attention-grabbing, or emotionally charged headlines or click-bait."  *Id.* (bold in original). Notably, none of these "tactics" involves false speech, and all are protected by the First Amendment.

**E.      The Virality Project Targets Plaintiff Jill Hines and Health-Freedom Groups.**

1266.   According to the VP report's taxonomy, Plaintiff Jill Hines, the founder of Health Freedom Louisiana, constitutes a "medical freedom influencer[]" who engages in the "tactic" of "**Organized Outrage**" simply because she "create[ed] events or in-person gatherings" to oppose

mask and vaccine mandates in Louisiana.  *See id.* at 9, 19 (2, 12) (bold in original). But this "tactic"
is First Amendment–protected activity.

1267.   Another "tactic" decried by the VP is "**Group super-spreader:** An individual
account sharing posts into multiple online groups."  Id. at 20 (13) (bold in original).  This is also
quintessential First Amendment expression.

1268.   The VP report repeatedly emphasizes the problem of "health freedom" or "medical
freedom influencers" like Plaintiff Jill Hines.  It identifies "Liberty" as a "trope" of social-media
disinformation: "*Liberty*: Individuals have the right to '**health freedom**'; no government or
employer should be able to tell people what to put in their bodies."  *Id.* (italics in original) (bold
added).

1269.   The VP also identifies political and religious opinions—including well-established
and widespread views—as "themes" and "tropes" of anti-vaccine "misinformation," such as:
"*Distrust of industry*: Vaccines are produced by profit-motivated pharmaceutical companies that
have repeatedly concealed harm in pursuit of profit"; "*Religiosity*: Vaccines contain materials that
are objectionable on religious grounds"; and "*Conspiracy*: … Governments have covered up
information proving vaccines are dangerous, [and] Doctors and politicians who advocate for
vaccines have been bought off by 'Big Pharma.'"  *Id.*

1270. Like the EIP, the VP agrees that government pressure pushes social-media
platforms to adopt more aggressive censorship policies: "Platforms had started adapting their
policies to address vaccine misinformation in early 2019, spurred by public outcry, negative press
coverage, and *government inquiries*…"  *Id.* at 21 (14) (emphasis added).

1271.   The VP boasts that its "analysts had to develop a nuanced and nimble understanding of what content constituted policy violations"—evidently because it was flagging content to platforms for censorship in real time.  *Id.* at 21-22 (14-15).

1272.   The VP extensively monitored and tracked Americans' speech about COVID-19 and vaccines on social media: "To surface in-scope content, VP's team of analysts were divided into topical detection teams, referred to as pods…. These pods … enabled analysts to develop and ensure sustained familiarity with how the COVID-19 vaccine conversation was evolving within particular communities on public platforms."  *Id.* at 22 (15).

1273.   This monitoring involved VP analysts reading and searching Americans' social-media accounts in real time: "Analysts in each pod assessed emerging narratives that were within scope … , surfacing content both via qualitative observation of the pages and accounts, and by using lists of common terms associated with vaccine hesitancy and long-standing anti-vaccine rhetoric."  *Id.*

1274.   The VP states that "Anti-vaccine activists and influencers, including those discussed in the Center for Countering Digital Hate's 'Disinformation Dozen' Report … surfaced the greatest amount of content …"  *Id.* at 23 (16).

1275.   This covert monitoring of Americans' online speech about vaccine was extensive, sophisticated, and adaptive: "At the beginning of the project, analysts used broad search terms ("vaccine," "jab") to surface relevant content and incidents (specific events or stories), but gradually began to incorporate a combination of machine learning and hand coding to identify additional recurring narratives relevant to the four in-scope categories. This included terms related to medical freedom under "Vaccine Distribution," or severe adverse effects and death under

"Vaccine Safety," among others. As narratives and new keywords emerged throughout the analysis period, analysts continually refined their searches."  *Id.*

1276.   This mass-social-media-surveillance project included federal agencies as key "stakeholders": "The Virality Project established a nonpartisan, multi-stakeholder model consisting of health sector leaders, federal health agencies, state and local public health officials, social media platforms, and civil society organizations. These stakeholders provided tips, feedback, and requests to assess specific incidents and narratives, and each entity type brought specific expertise to bear on understanding COVID-19 vaccine hesitancy."  *Id.* at 24 (17).

1277.   Thus, the VP's "multi-stakeholder model" included government agencies and officials, including "federal health agencies" and "state and local public health officials," working alongside "social media platforms" to combat vaccine-related "misinformation."  *Id.*

1278.   The government "stakeholders" such as "federal health agencies" and "state and local public health officials" were among those who "provided tips" and "requests to assess specific incidents and narratives," *i.e.*, flagging content for social-media censorship.  *Id.*

1279.   The VP emphasizes the role of "Federal government agencies" in the VP, including the CDC and the Office of Surgeon General: "**Federal government agencies** served as coordinators for national efforts. The Virality Project built strong ties with several federal government agencies, most notably the Office of the Surgeon General (OSG) and the CDC, to facilitate bidirectional situational awareness around emerging narratives. The CDC's biweekly "COVID-19 State of Vaccine Confidence Insights" reports provided visibility into widespread anti-vaccine and vaccine hesitancy narratives observed by other research efforts."  *Id.* (bold in original).

1280.   Social media platforms served as stakeholders alongside federal and state officials:

"**Platforms** were the final stakeholders in the VP effort. Six social media platforms engaged with

VP tickets—Facebook (including Instagram), Twitter, Google (including YouTube), TikTok,

Medium, and Pinterest—*acknowledging content flagged for review and acting on it in accordance*

*with their policies*. On occasion, platforms also provided information on the reach of *narratives*

*previously flagged by VP*, which provided a feedback loop leveraged to inform the Project's

understanding of policies and ongoing research." *Id.* at 25 (18) (bold in original) (italics added).

1281.   Thus, the VP openly proclaims that it "flagged" "content … for review" to

platforms to "act[] on it in accordance with their policies." *Id.* Government officials provided

"tips" to the VP about misinformation on social media, and the VP flagged it for platforms for

censorship.

1282.   The VP emphasizes the importance of federal officials and social-media platforms

in its collaboration on censorship: "As the effort progressed, *input from these partners was crucial*

in defining the VP's output formats and in surfacing where the impacts of vaccine mis- and

disinformation were being felt offline." *Id.*

1283.   The VP engaged in continuous, ongoing communication with federal officials,

platforms, and other stakeholders: "The Virality Project delivered 31 weekly briefings focused on

increasing situational awareness and enabling the stakeholders working on countering vaccine mis-

and disinformation to develop the most effective possible response." *Id.*

1284.   The VP boasts that it "provided strategic insights" to federal officials in combating

misinformation: "Briefings directly informed counter-messaging efforts by public health

stakeholders … and public health officials (for example, the CDPH), and *provided strategic*

*insights to government entities such as the OSG, CDC, and the Department of Health and Human
Services*." *Id.* (emphasis added).

1285.   Further, the "Stanford Internet Observatory and the Virality Project also hosted
Surgeon General Vivek Murthy for a seminar on vaccine mis- and disinformation, including the
rollout of the Surgeon General's advisory on health misinformation." *Id.* at 27 (20).

1286.   Like the EIP, the VP used "tickets" to track social-media narratives, where each
"ticket" could encompass many postings: "As part of the Virality Project, analysts created tickets
documenting URLs of in-scope content. In total, 911 tickets were created, tracking both specific
pieces of misinformation and broader narratives. At the end of the monitoring period, analysts had
created 845 tickets tracking specific vaccine misinformation incidents (events or pieces of content)
and 66 tickets tracking broad narratives." *Id.* at 34 (27).

1287.   The VP aimed, not just to track, but to "respond to" misinformation: "The Virality
Project operated with a team of analysts drawn from across the partner organizations. Workflows
were designed to detect, analyze, and *respond to* incidents of COVID-19 vaccine-related
disinformation in online ecosystems." *Id.* (emphasis added).

1288.   "From February to August 2021, VP analysts *systematically monitored activity
across social media platforms* to document emerging narratives and trends in public discourse
while also tracking the popularity and spread of older content." *Id.* (emphasis added).

1289.   "The [VP] used the Jira Service Desk software to log mis- and disinformation
incidents that were determined to be in scope for specific areas of the public COVID-19-related
conversation. For each single incident of anti-vaccine mis- or disinformation surfaced during
monitoring, an analyst filed a ticket that provided a brief description of the incident, including

engagement numbers at the time of creation and links to relevant social media posts." *Id*. at 35 (28).

1290.   The VP boasts that it targeted online speech for censorship before it could go viral, thus imposing massive prior restraints on the amplification of targeted content: "Tickets also enabled analysts to quickly tag platform or health sector partners to ensure their situational awareness of high-engagement material that appeared to be going viral, so that *these partners could determine whether something might merit a rapid public or on-platform response* (such as a label)." *Id.* at 37 (30) (emphasis added).

1291. The VP reported the content in 174 "tickets" to social-media platforms for censorship: "Managers gave all incident analyses a final review for quality-control purposes, to determine appropriate next steps and to make a final decision about whether tickets should be shared with external stakeholders. *Of the 911 incidents monitored, 1    were referred to platforms for potential action*." *Id.* (emphasis added).

1292. Like the EIP, the VP appears to have had direct access to Twitter's and YouTube's internal data about speech spreading on its platform, but not Facebook's: "The engagement data or video view data for links associated with each ticket was collected differently depending on the social media platform in question: Facebook and Instagram: CrowdTangle API; Twitter: Twitter API…" *Id.* at 38 (31).

1293. Like the Surgeon General and the White House, the VP complains that the platforms must make their internal data more available to VP: "Due to limited transparency from social media platforms, engagement is the closest proxy researchers can use to understand what content users are seeing on social media platforms. Metrics such as impression counts are generally unavailable to outside researchers." *Id.*

1294.   The VP's monitoring tracked content with about 6.7 million engagements on social media per week, or over 200 million over the seven months of the reported project: "Average weekly engagement with content tracked across all Virality Project tickets was 6.7 million."  *Id.* at 39 (32).

1295.   The vast majority of speech flagged and tracked by the VP was not false or incorrect speech: "The most commonly employed tactics were Hard-to-Verify Content and Alleged Authoritative Source."  *Id.* at 41 (34); *see also id.* at 42 (35) fig.2.6 (showing predominance of these two "tactics").

1296.   According to the VP, "[o]f the engagement captured by tickets, more than a third came from content primarily spread by accounts that demonstrated recurring success making content go viral; we refer to them here as 'recurring actors.'"  *Id.* at 41 (34).

1297.   The VP boasts that it induced "platform action" against such "recurring actors" in 2021: "Recurring actors drove a majority of engagement in the first half of the study period, but fell off in importance after that, most likely due to platform action against certain users beginning in the late spring of 2021."  *Id.* at 43 (36).

1298.   Like Jennifer Psaki at the White House, the VP repeatedly cites the Center for Countering Digital Hate's report on the "Disinformation Dozen."  *Id.* at 23 & 32 n.43, 43 & 48 n.7, 111 & 129 n.179.[4]

1299.   "Four distinct weeks during the monitoring period had incidents observed by Virality Project analysts that generated more than 10 million engagements."  *Id.* at 43 (36).

1300.   One of these "Viral Incidents" tracked by the VP was: "In July, posts went viral expressing outrage at attempts by the Biden administration to engage in vaccine outreach."  *Id.* at

---

[4] Report pages 16 & 25 n.43, 36 & 41 n.7, 104 & 122 n.179.

45 (38).  This incident did not involve any vaccine-related misinformation at all, but core political speech: "the Biden administration used the phrase 'door-to-door' to describe a push for on-the-ground community-led efforts to persuade more Americans to get vaccinated. Prominent Republican politicians miscast this as a forced vaccination campaign by 'Needle Nazis' and a prelude to the government knocking on the door to take away guns."  *Id.* at 46 (39).

1301.   The VP boasts that censorship enforcement was effective, especially in "deplatforming" key actors: "The decline of content from recurring actors midway through the monitoring period potentially reflects a policy impact, as deplatforming these actors led to an apparent reduction in false or misleading content."  *Id.* at 47 (40).

1302.   The VP tracked and flagged "Claims that [supposedly] misrepresent … vaccine mandates," not just misinformation about the vaccines.  *Id.* at 50 (43).

1303.   According to the VP, "content" that "leveraged decontextualized statistics from the US Department of Health and Human Services' Vaccine Adverse Event Reporting System (VAERS) database" is misinformation.  *Id.* at 51 (44).

1304.   According to VP, it was also misinformation when true adverse health events from vaccines were "shared absent context": "Rare incidents documenting verified adverse health events, including blood clotting and heart inflammation, were shared absent context, often in an effort to present them as common and significant risks."  *Id.*

1305.   According to the VP, discussing "breakthrough" cases and "natural immunity" was also misinformation: "False and misleading narratives related to efficacy sought to undermine the perceived benefits of vaccines. These narratives included stories of people diagnosed with COVID-19 after being vaccinated—"breakthrough" cases, particularly in the time of the Delta variant—to promote the idea that the vaccines aren't effective. Later, the idea that natural

immunity from infection is superior to immunity from vaccination became a political talking point raised repeatedly by right-leaning political influencers, despite inconclusive scientific evidence." *Id.*

1306. According to VP, misinformation also included "discussions of vaccine passports and mandates (including months before any state or federal officials began advocating for them)." *Id.*

1307. The VP also counts as misinformation "claims that the government was headed toward mandating an unsafe vaccine." *Id.* The government did, of course, eventually mandate the vaccines for most Americans.

1308. The VP also treated Americans' "long-standing mistrust of pharmaceutical companies' profit motives" as part of anti-vaccine misinformation. *Id.*

1309. "Conspiracy Theories" that "assign blame to … government" are also misinformation to be tracked and censored, according to VP. *Id.*

1310. According to VP, "personal anecdotes" about "vaccine injuries and severe side effects—ranging from rashes, to blood clots, to death" are also misinformation." *Id.* at 52 (45).

1311. "Personal anecdotes often made their way into mainstream media coverage after gaining traction online. Distortions of official government statistics—most often from VAERS, described in more depth later in this section—were used both to reinforce the personal anecdotes and for focused misinformation solely discussing the statistics." *Id.*

1312. According to VP, "stripp[ing] both individual stories and official statistics of important context" is misinformation. *Id.*

1313. According to VP, "adverse event stories" were objectionable because they were "employed to push back against vaccine mandates." *Id.* at 52-53 (45-46).

1314.   Like the White House and Dr. Fauci, the VP treats Alex Berenson as a major malefactor in spreading COVID-19 vaccine "misinformation."  *See id.* at 54, 57 (47, 50).

1315.   Like the White House and Rob Flaherty, the VP flagged and tracked Fox News host Tucker Carlson as a spreader of vaccine misinformation: "*In May       1, Tucker Carlson misrepresented VAERS data on his talk show*, decontextualizing it while claiming that 3,362 Americans had died following COVID-19 vaccinations between December 2020 and April 2021, equating to roughly 30 people every day."  *Id.* at 57 (50) (emphasis added).

1316.   Health Freedom groups, like Plaintiff Jill Hines's group Health Freedom Louisiana, are particular targets of the VP's tracking and censorship activities.

1317.   The VP report includes an entire section on such groups: "Section 3.2.2 – Government Overreach and Medical Freedom Narratives."  *Id.* at 59 (52).

1318.   According to the VP, "[o]ne of the primary long-standing themes of anti-vaccine distribution narratives is that mass vaccine distribution constitutes a government overreach. The movement sees vaccine mandates, including, historically, school vaccine requirements, as an assault on 'health freedom' or 'medical freedom.'"  *Id.*

1319.   According to the VP, "[i]n 2020, following the emergence of COVID-19, these same health freedom groups expanded their vaccine protests to social distancing, masks, and other prevention measures."  *Id.*  This includes Plaintiff Jill Hines.

1320.   The VP describes the role of Facebook groups—also employed by Jill Hines—in organizing health freedom groups to oppose vaccine mandates: "groups emerged on platforms such as Facebook during the pandemic, with names specifically related to COVID-19 or mRNA vaccines, to assist in discoverability; some grew their numbers into the tens of thousands."  *Id.*

1321.   The VP focused, not just on misinformation about vaccines, but political speech and political organizing against "vaccine passports and vaccine mandates": "During the VP's period of analysis, narratives about government overreach and medical freedom focused on two areas of controversy: vaccine passports and vaccine mandates." *Id.*

1322.   The VP treats as misinformation political speech and political opinions on these topics: "This amplification hinged upon misleading framing that suggested the implementation of any form of vaccine passport would be compulsory.  In reality, the plans for many programs were entirely optional. Other framing from domestic right-leaning political actors created a portrait of governments as prying or snooping into citizens' private matters." *Id.* at (60) 53.

1323.   The VP views virtually all conservative speech opposing government-imposed COVID mandates as misinformation: "Activists pushed the idea that through a passport system, governments and 'Big Tech' were limiting the public's freedoms—situating the conversation within a larger set of narratives surrounding pandemic public health regulations like mask mandates, lockdowns, and social distancing." *Id.*

1324.   Like the EIP, the VP specifically flagged Jim Hoft's *The Gateway Pundit* as a purveyor of misinformation and COVID "conspiracy theories: "Headlines sometimes hawked conspiracy theories: one Gateway Pundit headline, "The Great Reset: Big Tech and Big Pharma Join Forces to Build Digital COVID Vaccination Passport," was a nod to groups such as QAnon…. The article alleged collusion between Big Tech and Big Pharma that would threaten 'individual rights.'" *Id.* at 60-61 (53-54) & 68 (75) n.49 (citing Joe Hoft, *The Great Reset  Big Tech and Big Pharma Join Forces to Build Digital COVID Vaccination Passport*, Gateway Pundit (January 17, 2021),        https://thegatewaypundit.com/great-reset-big-tech-big-pharma-joining-forces-build-digital-covid-vaccination-passport).

1325.   Other right-leaning speakers flagged by the VP include One America News Network, Breitbart News, and others.  *Id.* at 60 (53).

1326.   The VP attributes political successes such as state-level bans on vaccine passports to such supposed misinformation.  *Id.* at 61 (54).

1327.   The VP attributes opposition to vaccine mandates by employers to such supposed misinformation: "The backlash to COVID-19 vaccine requirements for employment and other activities parallels the conversation about vaccine passports. It, too, relies on and attempts to exacerbate distrust in public health officials and government institutions."  *Id.*

1328.   According to VP, even truthful information about vaccine effects on health that are still being studied constitutes misinformation: "In early 2021, users on Twitter, Facebook, and Reddit reported unverified reproductive side effects, ranging from abnormal menstrual cycles to miscarriages and infertility. … At the time there was no medical consensus on the vaccine's effect on reproductive health, yet anti-vaccine activists presented the theory as fact and evidence of harm. Research is ongoing…."  *Id.* at 66-67 (59-60).

1329.   According to VP, even "videos that appeared to be created satirically" are misinformation when they "were taken seriously."  *Id.* at 68 (61).

1330.   Alex Berenson is mentioned 49 times in the Virality Project report.  *Id.* at 54, 57, 71, 73, 96-97, 122-23, 188-90, 195, 207-08.[5]

1331.   "Health freedom" or "medical freedom" groups are discussed dozens of times in the VP report.  The word "freedom" occurs 100 times, almost always in direct connection with a discussion of "health freedom" or "medical freedom" groups, influencers, or content.  *See id.* at 6,

---

[5] Report pages 47, 50, 64, 66, 89-90, 115-16, 181-83, 188, 200-01.

9, 20, 23, 59-62, 66, 70, 74, 77, 82, 84-86, 93-96, 105, 117-18, 121-22, 130-31, 137-38, 141, 143, 187, 197-98, 201, 204, 210, 220-22.[6]

1332.    The VP defines "Medical freedom influencers" as actors who "are averse to government interference in individuals' personal lives. While they explicitly advocate for "health freedom" or "vaccine choice," these actors often propagate vaccine doubt by contextualizing the choice with misleading claims of vaccines' adverse medical consequences." *Id.* at 82 (75).

1333.    Fox News host Tucker Carlson, who has wide audiences in Missouri and Louisiana, is cited 42 times in the Virality Project report. *See id.* at 57, 73, 87, 91-92, 98, 115, 119-20, 122-23, 193, 201, 208, 215-16, 218.[7]

1334.    In fact, the VP report cites the entire Fox News channel as a source of vaccine misinformation: "Fox News has played a particularly pivotal role in spreading vaccine misinformation and anti-vaccine beliefs during the COVID-19 pandemic…. [B]etween June 28 and July 11, 2021, Fox News ran 129 segments about the COVID-19 vaccine on its cable broadcast; more than half of those segments included unverified claims that undermined vaccination efforts." *Id.* at 91 (84).

1335.    According to VP, "Fox News television host Tucker Carlson has been one of the most prominent and sensationalist spreaders of false or misleading information about vaccines throughout the COVID-19 pandemic." *Id.*; *see also id.* at 91 (describing "Right-wing media personality Tucker Carlson" as part of a "cast of recurring characters" that influenced vaccine hesitancy in Spanish- and Chinese-speaking communities).

---

[6] Report pages iii, 2, 13, 16, 52-55, 59, 63, 67, 70, 75, 77-79, 86-89, 98, 110-11, 114-115, 123-24, 130-31, 134, 136, 180, 190-91, 194, 197, 203, 213-15.

[7] Report pages 50, 66, 80, 84-85, 91, 108, 112-13, 115-16, 186, 194, 201, 208-09, 211.

1336.   The VP also cites Candace Owens and The Daily Wire as purveyors of vaccine misinformation. *See, e.g., id.* at 86, 92 (79, 85).

1337.   The VP cites Robert F. Kennedy, Jr., a well-known anti-vaccine activist with wide followings in Missouri and Louisiana, as one of the most influential purveyors of vaccine misinformation. *Id.* at 83 (76). The VP describes Kennedy as "especially pernicious" because he has a large audience: "RFK Jr.'s activism is especially pernicious because, like other long-standing influencers, he has a large and committed following and has become somewhat of a household name in the US." *Id.*

1338.   The VP also cites America's Frontline Doctors and its founder, Dr. Simone Gold, as a source of vaccine misinformation. *Id.* at 87-88 (80-81).

1339.   The VP notes that "Simone Gold, a licensed emergency room physician, was the second most prominent PMI across Virality Project's tickets. Gold is the leader of America's Frontline Doctors…. Gold has been influential since the summer of 2020, when the White Coat Summit, an event broadcast online in which members of America's Frontline Doctors spoke on the steps of the Supreme Court. The White Coat Summit promoted hydroxychloroquine both as a preventative measure and as a cure for COVID-19." *Id.*

1340.   The VP treats Dr. Joseph Mercola, another anti-vaccine speaker with wide audiences in Missouri and Louisiana, as a purveyor of vaccine misinformation. *Id.* at 87 (80). Again, the VP criticizes Mercola precisely because his speech reaches wide audiences. *Id.*

1341.   The VP asserts that Gold's "false and misleading claims about the COVID-19 vaccine" include core political speech like "encouraging her followers to boycott companies for their vaccine protocols" and "organizing a cross-country tour to fight back against 'censorship, chaos, and the undeniable slide towards communism that lurks beneath the tyrannical lockdowns

for governmental 'public health' policy'." *Id.* at 88 (81). To the VP, political "organizing" to oppose vaccine mandates and lockdowns constitutes a "false and misleading claim[]." *Id.*

1342.   The VP asserts that "the right-leaning media ecosystem differs from the rest of the media environment in ways that make it especially vulnerable to the spread of mis- and disinformation." *Id.* at 91 (84).

1343.   The VP states that "[t]he newest iteration of medical freedom, adapted for COVID-19, challenges the legitimacy of government or corporate vaccine mandates and public health interventions specific to COVID-19, including vaccine passport systems and masking requirements." *Id.* at 93 (86).

1344.   The VP states that "medical freedom" groups spread misinformation "across all 50 states": "Medical freedom influencers (MFIs) active in the anti-COVID-19-vaccine movement were fairly distinct from other categories of influencer in that rather than hinging on a handful of key (and often celebrity-status) individuals, they spread their narratives via a franchise model *across all     states*." *Id.* (emphasis added).

1345.   The VP indicates that it tracked and flagged "medical freedom" groups "at a messaging and organizing level," *i.e.*, the level where Jill Hines was targeted: "As medical freedom activists have fought requirements imposed by states, cities, or private employers, they have learned from each others' successes and failures—at a messaging and an organizing level—and have brought those lessons to their local communities. What one state does, another state will often echo." *Id.* at 94 (87).

1346.   Like Andrew Slavitt, the VP treats Alex Berenson as one of the "most significant influencer[s]" who opposes vaccines: "Alex Berenson is perhaps the most significant influencer who defies categorization. A former New York Times reporter and a bestselling novelist with no

specific anti-vaccine background …, Berenson … over time evolved into a key player in repeatedly spreading false and misleading information about the COVID-19 pandemic and vaccines. He underplayed the danger of the virus and challenged the efficacy of vaccines and masks, even as evidence supported their value as life-saving public health measures." *Id.* at 96 (89) (providing an image of Berenson's tweets).

1347.   The VP disfavors Berenson because he reaches wide audiences and criticizes the government: "Berenson's popular posts on Twitter notably claimed to be "digging up" or "uncovering" information that was hidden from the public about vaccine safety or effectiveness. In one incident in July 2021, Berenson amplified a conspiracy theory from a statement filed with a lawsuit from America's Frontline Doctors stating that the government was covering up more than 45,000 vaccine-related deaths.  Berenson's 17-tweet thread, which received over 16,000 interactions on July 21, 2021, claimed that the CDC had "quietly more than DOUBLED" the number of deaths reported in VAERS, suggesting the CDC had misled the public." *Id.* at 96-97 (89-90).

1348.   The VP notes that Berenson had wide audiences nationwide when he was censored: "Twitter permanently deplatformed Berenson in August 2021 for repeated violations of Twitter's COVID-19 falsehoods policy.  At the time he lost his account, he had more than 200,000 followers." *Id.* at 97 (90).

1349.   The VP states that the government pushed for "accountability" from platforms in successfully pressuring them to adopt vaccine-related censorship policies in the years leading up to COVID-19: "During and after the [2018-19 measles] outbreaks, scientists and congressional leaders sought accountability from the platforms, inquiring about the extent to which vaccine

hesitancy among impacted communities had been exacerbated by misinformation on their products." *Id.* at 131 (124).

1350.   The VP provides a timeline of policy changes becoming more restrictive of vaccine-related misinformation that shows repeated tightening of policies by Facebook, Twitter, and YouTube once President Biden had been elected.  *Id.* at 133 (126) fig.5.1.

1351.   The VP calls for more aggressive censorship policies to target speech that is not false or incorrect and that constitutes core political speech: "While progress has been made since platforms first developed vaccine-related policies in 2019, clear gaps in platform policy exist with respect to moderating vaccine-related content, including posts that employ personalized stories, medical freedom claims, and misleading headlines and statistics." *Id.* at 143 (136).

1352.   The VP also calls for more aggressive action to "suppress content" and "deplatform accounts": "In addition, policies about the actions platforms can take to suppress content, promote trusted voices, and deplatform accounts vary widely from platform to platform and are still not enforced consistently, both within and across platforms."  *Id.*

1353.   Just like the Surgeon General, the VP demands "more transparency" for "external researchers" (like those at the VP, working closely with government) to oversee the platforms' censorship efforts: "It should be noted that understanding the impact of platform policy is limited by what information is publicly available. It is crucial that platforms provide more transparency on each moderation approach and allow external researchers the ability to independently verify the success and impacts of these interventions."  *Id.*

1354.   Like the Surgeon General, the VP argues that "a whole-of-society effort is needed" to stop the spread of so-called misinformation: "[A] whole-of-society effort is needed in which

stakeholders build robust and persistent partnerships to ensure that significant high-harm claims can be addressed as they arise." *Id.* 147 (140).

1355.   This "whole-of-society" effort includes an active role for the government in censoring disfavored speech: "The Virality Project sought to do just that by bringing together four types of stakeholders: (1) research institutions, (2) public health partners, (3) government partners, and (4) platforms. Our recommendations recognize the collective responsibility that all stakeholders have in mitigating the spread of mis- and disinformation…" *Id.*

1356.   According to the VP, "The Virality Project offers an early template for structuring interaction between research institutions and nonacademic stakeholders (including government entities, health practitioners, and private companies)." *Id.*

1357.   According to the VP, it used "ingenuity" to facilitate "the *intake* of tips from … government partners": "An area that required ingenuity was creating a framework for facilitating the *intake* of tips from civil society and government partners….  However, their tips are often highly valuable, so overcoming this challenge is a priority for future efforts."  *Id.* at 148 (141) (emphasis added).

1358.   The VP recommends an even more "streamlined" process for "government partners" to provide "tips" of misinformation to be reported for censorship, and it notes that it received tips through "informal exchanges, such as Zoom meetings or calls with our partners": "Streamline tip line processes for civil society and government partners. Set up an efficient channel for intaking external tips…. The Virality Project often had to leverage informal exchanges, such as Zoom meetings or calls with our partners, to receive the tips verbally or encourage additional reporting. In future projects, external reporting channels should be strengthened via an easier

means of reporting and increased access to the reporting channels, especially for partners on the ground (such as health practitioners or government health officials)." *Id.*

1359.   The VP repeatedly cites the work of Surgeon General Murthy, noting that "[d]uring a July 15, 2021, panel with the Virality Project, US Surgeon General Vivek Murthy discussed the importance of vaccination by sharing his own story about COVID-19 … alongside data around the effectiveness of the vaccines." *Id.* at 149 (142). "In the context of vaccine misinformation specifically, some examples of engagement best practices can be found in the Virality Project's July 15, 2021, hosted discussion with Surgeon General Vivek Murthy…" *Id.* at 150 (143).

1360.   According to VP, "While the federal government (through DHHS, the CDC, and the Surgeon General) has ramped up its engagement and communications, more can be done moving forward. There are several areas where government officials can focus to improve their ongoing response to mis- and disinformation surrounding the COVID-19 vaccines." Id. at 149-50 (142-43).

1361.   These include "real-time response" to misinformation on the model provided by CIS and the EI-ISAC for election speech: "Federal, state, and local government officials should coordinate real-time response to emerging mis- and disinformation. … For example, as voting-related mis- and disinformation arose in the 2020 presidential election, the Election Infrastructure Information Sharing and Analysis Center (EI-ISAC) served a critical role in sharing information with the Election Integrity Partnership and pushing its rapid response analysis back out to election stakeholders across all states… Moving forward, the government should support the establishment of such an information-sharing mechanism." *Id.* at 150 (143).

1362.   The VP recommends that the federal government "[i]mplement a Misinformation and Disinformation Center of Excellence (CoE) housed within the federal government," which

"would centralize expertise on mis- and disinformation within the federal government at the Cybersecurity & Infrastructure Security Agency (CISA) with its existing mis- and disinformation team," *i.e.*, Brian Scully's group.  *Id.*

1363.   The VP's "Recommendations to Platforms" reflect near-verbatim language used by the Surgeon General's Health Advisory: "Consistently enforce policies against recurrent actors. … While many platforms have improved transparency around content moderation, there is still inconsistent enforcement of policies, notably in the case of recurring actors. More consistency and transparency is needed around enforcement practices, particularly when prominent or verified accounts are involved.  While past policy environments have been slower to enforce policies against prominent accounts, these are the accounts with the greatest potential for impact. If anything, they may merit closer scrutiny."  *Id.* at 152 (145).

1364.   Likewise, the VP recommends that platforms "[c]ontinue to prioritize and improve data sharing. The Virality Project's research would not have been possible without access to public platform data. For privacy reasons, some data understandably may be limited, but in general, establishing standardized guidelines about how platforms can share data with research institutions is needed."  *Id.* at 153 (146).

1365.   "Notably, engagement numbers are the closest proxy that researchers have to understand what content users see on social media platforms. However, engagement is not the same thing as impressions, or user views—how many times a piece of content is seen by users. Ideally, access to user impression data would be available, allowing researchers to directly measure when and how content is surfaced to users by social media platforms. Unfortunately, social media platforms often do not make impression data available to researchers; as a result of this chronic

gap, assessing impact and reach, or the dynamics of platform curation, remains a significant challenge." *Id.*

### X.    Federal Censorship Inflicts Grave, Imminent, and Ongoing Injuries on Plaintiffs.

1366.    The foregoing conduct has inflicted and continues to inflict ongoing and imminent injuries on both the private Plaintiffs and the States of Louisiana and Missouri.

#### A.    Defendants Gravely Injure the Individual Plaintiffs.

1367.    The individual Plaintiffs provide undisputed evidence of how they have suffered from federally-induced censorship.  Docs. 10-3 (Declaration of Dr. Jayanta Bhattacharya), 10-4 (Declaration of Dr. Martin Kulldorff), 10-5 (Declaration of Jim Hoft), 10-7 (Declaration of Dr. Aaron Kheriaty), 10-12 (Declaration of Jill Hines).   The Government does not dispute this evidence.

1368.    Dr. Bhattacharya attests that, "Because of my views on COVID-19 restrictions, I have been specifically targeted for censorship by federal government officials."  Doc. 10-3, ¶ 5. He notes that "[t]he Great Barrington Declaration received an immediate backlash from senior government officials who were the architects of the lockdown policies, such as Dr. Anthony Fauci…"  *Id.* ¶ 13.   "Because it contradicted the government's preferred response to COVID-19, the Great Barrington Declaration was immediately targeted for suppression by federal officials." *Id.* ¶ 14. "Instead, what followed was a relentless *covert* campaign of social-media censorship of our dissenting view from the government's preferred message."  *Id.* ¶ 15.

1369.    As a result of this "covert campaign," Dr. Bhattacharya experiences ongoing injuries, including the de-boosting of search results in Google, *id.* ¶16; the removal of links to the Great Barrington Declaration in Reddit discussions, *id.*; the ongoing removal of a YouTube video discussing the Great Barrington Declaration and related issues with Governor DeSantis, *id.* ¶¶ 17-

18; the removal of personal Tweets, *id.* ¶¶ 25-26; the removal of LinkedIn posts, *id.* ¶¶ 28-29; and account termination by LinkedIn, *id.* ¶ 30.

1370.  Dr. Bhattacharya observes that he lacks access to his colleagues' speech and viewpoints as well, because "social-media censorship has not focused solely on the co-authors of the Great Barrington Declaration, but has swept in many other scientists as well: Twitter, LinkedIn, YouTube, Facebook, they have permanently suspended many accounts—including scientists." *Id.* ¶ 31.

1  1.  As Dr. Bhattacharya observers, "[t]hese censorship policies have driven scientists and others to self-censorship, as scientists … restrict what they say on social-media platforms to avoid suspension and other penalties.  *Id.*  1.

1  .  Dr. Bhattacharya attests based on personal experience: "Having observed and lived through the government-driven censorship of the Great Barrington Declaration and its co-authors, it is clear to me that these attacks were politically driven by government actors. … One of the motivations for that was a motivation to create … an illusion of consensus within the public that there was no scientific dissent against lockdowns. [T]he Great Barrington Declaration … posed a political problem for them because they wanted to tell the public that there was no dissent. And so, they had to destroy us. They had to do a devastating takedown.  *Id.* ¶ 32.

1  .  Dr. Kulldorff likewise attests that there is "an organized campaign against the Great Barrington Declaration," Doc. 10-4, ¶ 14.  He notes that the GBD "was censored on social media in an apparent attempt to prevent it from … 'getting a lot of attention,'" *id*. ¶ 15; including Google deboosting search results, *id*., and Facebook removing content related to it, *id.*  1  .

1374.  Dr. Kulldorff also identifies an ongoing campaign of censorship against his personal social-media accounts, including censored personal Tweets on Twitter*, id.*  1  -1

censored posts criticizing mask mandates*, id.    19* ongoing self-censorship to avoid further

censorship penalties*, id.* ¶¶ 20, 27; removal of YouTube content, *id.* ¶ 21; removal of LinkedIn

posts, *id.* ¶¶ 22-25; and the ongoing permanent suspension of his LinkedIn account, *id.* ¶ 26.

1375.  Dr. Kulldorff has experienced direct censorship of his social-media speech in

addition to the Great Barrington Declaration.  For example, his Tweets questioning the efficacy of

masking and criticizing government mask mandates have been censored and caused him to be

suspended from Twitter.  *Id.* ¶¶ 18-19.

1376.  Dr. Kulldorff has also engaged in self-censorship to avoid being suspended or

removed from social media: "Twitter is an important venue for communicating accurate public

health information to the public. Because of the censoring, and the suspension of other scientists,

I have had to self-censor myself on the platform." *Id.* ¶ 20.

1377.  Dr. Bhattacharya and Dr. Kulldorff's roundtable discussion with Governor Ron

DeSantis—which featured all three co-authors of the Great Barrington Declaration—was removed

from YouTube.  The roundtable discussion addressed the Great Barrington Declaration and its

premises in detail.  As Dr. Kulldorff recounts, "On March 18, 2021, I participated in a two-hour

roundtable discussion with Governor Ron DeSantis in Florida, along with Dr. Sunetra Gupta at

Oxford, Dr. Jay Bhattacharya at Stanford and Dr. Scott Atlas at Stanford. In this discussion, we

made remarks critical of COVID-19 restrictions, including mask mandates on children. I stated

that 'children should not wear face masks, no. They don't need it for their own protection, and

they don't need it for protecting other people either.' … Dr. Gupta stated that "to force [children]

to wear masks and distance socially, all of that to me is in direct violation of our social contract.'

In the same roundtable, we also argued against vaccine passports. 'Let's try to argue against that

from the very beginning before it sort of takes off.' Unfortunately, the video of the roundtable was removed by YouTube, which is owned by Google." *Id.* ¶ 21.

1378.  Dr. Kulldorff also experiences ongoing censorship on "LinkedIn, which is a popular communications platform among scientists and other professionals." *Id.* ¶ 22-26.  LinkedIn has blocked and removed his posts opposing vaccine mandates and promoting the benefits of natural immunity.  *Id.*  These included posts in which he and Dr. Bhattacharya "criticized the official Covid-19 response as formulated by Dr. Anthony Fauci." *Id.* ¶ 25.

1379.  Dr. Kulldorff states that he and other scientists engage in self-censorship to avoid being terminated from social-media platforms: "Twitter and LinkedIn are important venues for communicating accurate public health information to other scientists and to the public. Because of the censoring, and the suspension of other scientists, I have had to self-censor myself on both platforms.  Sometimes by not posting important public health information." *Id.* ¶ 27.

1380.  Dr. Kulldorff notes that social-media censorship directly affects him as a *reader* of other scientists' speech on social media, on an ongoing basis, by reducing his access to the thoughts and views of scientists who dissent from the government-mandated orthodoxy: "Social-media censorship has not focused solely on the co-authors of the Great Barrington Declaration but has swept in many other scientists as well. These censorship policies have driven scientists and others to self-censor, as scientists like me restrict what we say on social-media platforms to avoid suspension and other penalties. In fact, the most devastating consequence of censoring is not the actual posts or accounts that are censored or suspended, but the reluctance of scientists to openly express and debate scientific questions using their varied scientific expertise. Without scientific debate, science cannot survive." *Id.* ¶ 28.

1381.  Dr. Kheriaty, also, describes ongoing injuries from social-media censorship of views dissenting from the government-preferred narratives about COVID-19.  He experiences an ongoing pattern of censorship and removals lasting over years: "I have always shared peer-reviewed research findings as well as my own opinions and perspectives on Twitter and LinkedIn. It was not until I began posting information about covid and our covid response policies, however, that I encountered censorship on the Twitter platform. This began in 2020 when I published an article on the adverse mental health consequences of lockdowns. The problem became more pronounced in 2021 when I shared my Wall Street Journal article and other information on ethical issues related to vaccine mandates."  Doc. 10-7, ¶ 11.

1382.  As Dr. Kheriaty notes, "[t]he Twitter censorship took several forms."  *Id.*  He describes suffering artificial limitations on the number of followers on his social-media accounts, *id.* ¶¶ 12-13; "shadow banning" of social-media posts that "challenge[] the federal government's preferred covid policies," *id.* ¶¶ 14-15; self-censorship to avoid further adverse consequences or permanent bans, *id.* ¶ 16; and removal of content from YouTube, *id.* ¶ 17.  Dr. Kheriaty specifically notes that the problem of "shadow banning" his social-media posts is ongoing and increasing, as it "intensified in 2022."  *Id.* ¶ 15.  Further, he notes that "[t]he pattern of content censored on these social media platforms mirrors closely the CDC and Biden administration policies."  *Id.* ¶ 18.

1383.  Dr. Kheriaty describes the ongoing experience of shadow-banning: "I encountered evidence of this shadow-banning in 2021 before I was let go from the University after I started posting on covid topics, and the problem intensified in 2022 following my dismissal, as I continued to post frequently on the ethics of vaccine mandates for competent adults."  *Id.* ¶ 15.

1384.  Dr. Kheriaty also experiences ongoing injury as a *reader* of other speakers' content on social media, as government policies cause censorship and self-censorship of their content as

well: "I have several of my friends and colleagues—including Dr. Peter McCollough and Dr. Robert Malone—who were temporarily (McCollough) or permanently (Malone) banned from Twitter for posing peer-reviewed scientific findings regarding the covid vaccines." *Id.* ¶ 16.

1385.   Dr. Kheriaty also engages in self-censorship to avoid more severe penalties from the platforms: "Even though the ethics of vaccine mandates is among my areas of expertise, and an area that has impacted me personally and professionally, I am extremely careful when posting any information on Twitter related to the vaccines, to avoid getting banned. This self-censorship has limited what I can say publicly on topics where I have specific scientific and ethical expertise and professional experience." *Id.* ¶ 16.

1386.   Dr. Kheriaty observes a close link between this ongoing pattern of social-media censorship and speech that criticizes government policies: "The pattern of content censored on these social media platforms mirrors closely the CDC and Biden administration policies. In my experience using these platforms to discuss covid topics, any content that challenges those federal policies is subject to severe censorship, without explanation, on Twitter and YouTube—even when the information shared is taken straight from peer-reviewed scientific literature." *Id.* ¶ 18.

1387.   Plaintiff Jim Hoft attests both ongoing injuries and the imminent expectation of future injuries. Doc. 10-5. Hoft is the "founder, owner, and operator of the popular news website The Gateway Pundit ('GP'), gatewaypundit.com. … Since its founding in 2004, the Gateway Pundit has grown from a one-man blog to one of the internet's largest destinations for conservative news and commentary. In 2021, The Gateway Pundit was ranked fourth on a list of top ten conservative news websites, ranked by monthly web searches, with over 2 million searches per month." *Id.* ¶ 2. The Gateway Pundit has large social-media followings on multiple platforms: "In particular, GP's Twitter account had over 400,000 followers before it was suspended. GP's

Facebook account has over 650,000 followers. GP's Instagram account has over 205,000 followers. GP's YouTube account has over 98,000 followers." *Id.* ¶ 3.

1388. Hoft notes that The Gateway Pundit's "social media accounts have experienced censorship on all major social-media platforms," which "has followed and reflected the calls for censorship from federal government officials, including in the Biden Administration." *Id.* ¶ 4. These acts of censorship include suspensions from his Twitter account and another personal Twitter account, *id.* ¶¶ 6-7, 10; a permanent ban from his Twitter account, *id.* ¶ 8; labels applied to Twitter posts on personal accounts, *id.* ¶ 9; warning labels imposed on Facebook posts and other restrictions on his Facebook account, *id.* ¶ 12; permanent removal of content posted on Facebook, *id.* ¶ 13; prevention of sharing of Facebook-posted content, *id.*; removal of content from YouTube, *id.* ¶ 14; imposition of sanctions on Mr. Hoft's followers for re-posting or amplifying his speech, *id.* ¶ 15; engaging in self-censorship to avoid permanent bans or other more serious sanctions from the social-media platforms, *id.* ¶ 16; and demonetization by Google, *id.* ¶ 19; *see also id.* ¶¶ 18-20.

1389. Hoft observers that "GP's social media accounts have experienced censorship on all major social-media platforms, including its speech regarding COVID-19 issues and election security. In many instances, we have noticed that this censorship has followed and reflected the calls for censorship from federal government officials, including in the Biden Administration." *Id.* ¶ 4. "For example, the current Administration has repeatedly called for censorship of social media speech regarding election integrity and so-called 'COVID-19 misinformation.' GP has experienced significant social-media censorship regarding its speech on both of those issues, including on Twitter, Facebook, and YouTube." *Id.* ¶ 5.

1390.   Hoft has experienced censorship for COVID speech that is now widely acknowledged to be true, such as a suspension from Twitter for claiming that the vaccines do not prevent infection, and the claim that COVID deaths are overcounted by including deaths from other causes: "On or about January 2, 2021, Twitter suspended GP's Twitter account (@gatewaypundit) after it posted a tweet that stated, "Then It's Not a Vaccine: Crazy Dr. Fauci Says Early COVID Vaccines Will Only Prevent Symptoms and NOT Block the Infection …What?" *Id.* ¶ 6; *see also id.* ¶ 9.

1391.   The Gateway Pundit also experienced censorship under Twitter's "hacked materials" policy by retweeting the contents of Hunter Biden's laptop.  After a GP blogger "tweeted content related to Hunter Biden's laptop," "Twitter suspended the account on the ground that he 'Violat[ed] our rules against posting or sharing privately produced/ distributed intimate media of someone without their express consent.'" *Id.* ¶ 10.

1392.   Hoft also experiences a long list of acts of censorship from Facebook: "Facebook frequently imposed warning labels and other restrictions on our content, particularly content related to election integrity and COVID-19. Facebook's censorship was so aggressive that I was forced to hire an assistant to monitor and address censorship on Facebook." *Id.* ¶ 11; *see also id.* ¶ 12.  Facebook imposes labels on Hoft's content that require the reader, before viewing Hoft's content, to click-through a Facebook-imposed screen that states: "The Gateway Pundit is an American far-right news and opinion website.  The website is known for publishing falsehoods, hoaxes, and conspiracy theories." *Id.* at 12.  It also labels Hoft's postings as "Missing Context" even when their truth is undisputed.  *Id.* at 20-23.  And it labels expressions of core political opinion as "Partly False." *Id.* at 28; *see also id.* 29-58 (many other examples of such labeling and blocking from reposting on Facebook and Twitter).

1393.   As Hoft notes, Facebook also prevents Hoft's audiences from reposting or amplifying his content: "Facebook also [dis]courages (or otherwise outright prohibits) the public from sharing our content with their social networks." *Id.* ¶ 13.   Hoft describes this second-order censorship in detail: "The social-media platforms have extended their censorship policies to our followers as well. We have received numerous reports from followers that they have received temporary suspensions or other adverse actions from social-media platforms (such as seven-day suspensions of their Facebook accounts) for re-posting or amplifying our content. This chills our followers from re-posting, re-tweeting, or otherwise amplifying our content. The risk of being locked out of Facebook for seven days, or suffering other forms of censorship, deters our followers from amplifying our content on social media platforms, which reduces the reach of our message." *Id.* ¶ 15.

1394.   Hoft also describes ongoing self-censorship to avoid more severe penalties on social media: "These social-media censorship policies chill GP's freedom of expression on social media platforms as well. To avoid suspension and other forms of censorship, we frequently avoid posting content that we would otherwise post on social-media platforms, and we frequently alter content to make it less likely to trigger censorship policies." *Id.* ¶ 16.

1395.   Hoft observes that the censorship of his content on social media closely tracks the censorship preferences of federal officials: "Based on my close observation of the patterns of censorship of GP's social-media accounts and related accounts in recent years, I have strong reason to infer that federal government officials are directly involved in the censorship of our speech and content." *Id.* ¶ 17.   Hoft's posts that have faced censorship include posts criticizing the FBI, *id.* at 9; and criticizing the administration of the 2020 election, *id.* at 11;

1396.   Hoft continues to experience censorship, including up to the date he executed his declaration.   For example, he received a strike on YouTube on May 14, 2022, and YouTube removed the video he had posted, for speech regarding election integrity that discussed the problem of election fraud and raised questions about the outcome of the 2020 Presidential election, including money Idaho illegally received from Mark Zuckerberg and other problems relating to voter fraud.  *Id.* ¶ 14.

1397.   Plaintiff Jill Hines is the "Co-Director of Health Freedom Louisiana, a consumer and human rights advocacy organization." Doc. 10-12, ¶ 2.   Hines's "organization engages in public advocacy on behalf of Louisiana citizens on issues of health freedom and fundamental human rights. [Hines] ha[s] testified before the Louisiana legislature approximately 20 times on such issues." *Id.* ¶ 3.  Hines attests that, "Because our organization recognizes the need to educate and inform the public of their rights regarding state and federal laws concerning vaccinations, we have experienced social media censorship of our speech regarding vaccine information."  *Id.* ¶ 2. Hines has "approximately 13,000 followers each on Health Freedom Louisiana and Reopen Louisiana." *Id.* ¶ 2.  Among other things, Hines' organization "advocate[s] against the imposition of mask mandates on children, especially during prolonged periods, as in schools." *Id.* ¶ 4.  Hines also "launched a grassroots effort called Reopen Louisiana on April 16, 2020 to help expand our reach on social media and take on the issues surrounding the continued government shutdown." *Id.* ¶ 6.

1398.   Hines describes continuous and ongoing censorship on social media from pressure wielded by federal officials: "In the last two years, any information that was not positive in nature or conveyed adverse events associated with shutdown or mitigation efforts was deemed 'misinformation.'  Dr. Anthony Fauci has used the term repeatedly and it has been adopted by the

press and media." *Id.* ¶ 5.  Hines continues to suffer ongoing social-media censorship, and the acts

of censorship include application of warnings on Facebook content, *id.* ¶ 8; the reduction of her

reach to audiences on Facebook, *id.*; removal of content and sanctions, including 30-day

suspensions, from Facebook, *id.* ¶ 9; 24-hour suspensions that prevented her from organizing

people to advocate to the Louisiana legislature, *id.* ¶ 10; shadow-banning and dramatically

restricting the reach of her speech to its audiences, id. ¶ 10; and the complete de-platforming of

Facebook groups intended to organize Louisianans to petition their government, id. ¶¶ 13-14.  Ms.

Hines states that "[r]emoving our closed group at such a crucial time effectively stopped our ability

to communicate with our representatives in the state legislature."  Id. ¶ 14.  "To say the cards are

stacked against me is an understatement."  Id. ¶ 16.

1399.  Hines attests that the censorship campaign against her social-media speech is

ongoing, noting that "[p]osts pointing to lack of safety of masking were and are targeted, as well

as articles that mention adverse events of vaccinations, including VAERS data."  Id. ¶ 9.  She

continues to suffer specific, new acts of censorship, including right up to the time when she

executed her Declaration on June 9, 2022: "The most recent restriction [was] in late May 2022."

*Id.*  Ms. Hines notes that "[m]y personal Facebook page, and the Facebook pages of both Health

Freedom Louisiana and Reopen Louisiana, are all under constant threat of being completely

deplatformed.  My personal account is currently restricted for 90 days."  Id. ¶ 12.

1400.  Hines reports that acts of censorship of her COVID-19-related speech have

occurred continuously up to the present: "Over the last year and a half since we noticed social-

media censorship beginning in October 2020, my pages have been hit with numerous 'fact checks'

and 'community standards' violations."  *Id.* ¶ 11.

1401.   Hines has observed a link between the censorship that her groups have experienced and the public demands for censorship from federal officials: "Many similar threats from federal officials followed … especially as covid became a public concern. In the last two years, any information that was not positive in nature or conveyed adverse events associated with shutdown or mitigation efforts was deemed 'misinformation.' Dr. Anthony Fauci has used the term repeatedly and it has been adopted by the press and media."  *Id.* ¶ 5.

1402.   Social-media censorship dramatically reduces the reach of Hines's speech: "our analytics showed that we were reaching approximately 1.4 million people in a month's time on one of our Facebook pages, but after sharing photos of the mouths of children suffering from impetigo from long-term mask use, our page received a warning and our reach was reduced to thousands."  *Id.* ¶ 8.

1403.   Hines experiences an ongoing campaign of social-media censorship that extends to the present, the date she executed her declaration: "This began a long series of attempts to censor our posts on Facebook and other social-media platforms. Posts pointing to lack of safety of masking were and are targeted, as well as articles that mention adverse events of vaccinations, including VAERS data. I was completely restricted from Facebook for 30 days starting in January 2022 for sharing the image of a display board used in a legislative hearing that had Pfizer's preclinical trial data on it. The most recent restriction, in late May 2022, was for re-posting an Epoch Times article that discussed a pre-print study detailing increased emergency calls for teens with myocarditis following covid vaccination."  *Id.* ¶ 9.

1404.   Censorship of Hines's social-media speech directly impairs her efforts to engage in political organization to petition her government to change its policies: "One post in particular that was hit with a 'community standards' warning on October 6, 2020, was a 'call to action' asking

people to contact their legislators to end the governor's mask mandate. On the same day, we were asking people to testify during the Legislature's Second Extraordinary Session regarding a bill … that would prohibit a covid vaccine employee mandate. I was prohibited from posting for 24 hours on all pages, including my own. When I was finally able to post again, our reach was significantly diminished, compared with our 1.4 million per month rate beforehand. Our page engagement was almost non-existent for months. It felt like I was posting in a black hole. Each time you build viewership up, it is knocked back down with each violation. Our current analytics show Reopen Louisiana is reaching around 98,000 in the last month and Health Freedom Louisiana is only reaching 19,000. There are warnings when you search for Health Freedom Louisiana. People that regularly interacted with our page were never heard from again. Some people who did find the page later on, asked us where we went." *Id.* ¶ 10.

1405.  Hines suffers repeated censorship on individual posts as well, including undisputedly truthful information: "Over the last year and a half since we noticed social-media censorship beginning in October 2020, my pages have been hit with numerous 'fact checks' and 'community standards' violations. Articles with health concerns related to mask wearing have been targeted … as well as articles relating to pregnant women being vaccinated. … Data taken directly from VAERS was flagged as misinformation and we received 'fact checks' for that as well, even if it contained a disclaimer about causation." *Id.* ¶ 11.

1406.  Hines attests that she is under current and constant threat of more severe censorship penalties, including deplatforming: "My personal Facebook page, and the Facebook pages of both Health Freedom Louisiana and Reopen Louisiana, are all under constant threat of being completely deplatformed. My personal account is currently restricted for 90 days." *Id.* ¶12.

1407.   Hines engages in self-censorship to avoid more severe penalties: "On many occasions, I have altered the spelling of words, used emoji's, or placed links in comments to avoid censorship." *Id.* ¶ 12.

1408.   Hines's health-freedom groups were completely deplatformed, inflicting a severe and direct injury on her ability to engage in political organization to amplify her message and petition the government: "two of our Facebook groups were completely deplatformed, effectively disbanding a group of more than two thousand people who were organized to engage in direct advocacy to our state legislature, on two separate occasions. There were two groups that were deplatformed: HFL Group and North Shore HFL. … HFL Group had almost 2,000 people, and North Shore HFL had less than 500 before it was taken down." *Id.* ¶ 13.

1409.   This censorship directly interfered with the core political speech and advocacy of Hines and thousands of Louisianans: "The last post I made in our HFL Group on July 13, 2021, was a 'call to action' for the upcoming Veto Session, asking people to contact legislators regarding health freedom legislation. During the regular legislative session, we had two bills that were passed successfully, but both were vetoed by the governor, including a hugely popular bill that prohibited the addition of vaccine information on a state issued driver's license. The other bill provided immunity from liability for businesses that did not impose a covid vaccine mandate. Removing our closed group at such a crucial time effectively stopped our ability to communicate with our representatives in the state legislature." *Id.* ¶ 14.

1410.   To this day, Hines's political message, and those of thousands of Louisianans, is greatly diminished from this censorship: "After North Shore was deplatformed, we looked for alternatives for daily communication. We were to the point of speaking in code on Facebook, so

moving away from traditional social media was the only option. We currently have 80 members in a chat app called GroupMe. We have no statewide reach with that tool." *Id.* ¶ 15.

1411.   Censorship undercuts Hines's ability to "effectively communicate with people," including Louisiana state officials, about her political views: "It has been incredibly frustrating knowing that the government's narrative is going unchallenged and that we have not been able to effectively communicate with people. Knowing that government agencies colluded with Facebook to suppress the messaging of groups like mine while paying exorbitant amounts to promote vaccinations and covid policies has been especially disheartening. To say the cards are stacked against me is an understatement." *Id.*¶ 16.

### B.   Defendants Gravely Injure Similarly Situated Speakers and Listeners.

1412.   Plaintiffs' unrebutted evidence demonstrates that other similarly situated speakers have suffered and are suffering similar, ongoing, and imminent injuries from government-induced censorship on social media.

1413.   For example, Michael Senger had over 112,000 followers on Twitter, including in Missouri and Louisiana; he attests that he was twice suspended from Twitter and then permanently banned for posting Tweets critical of government policies for responding to COVID-19. Doc. 10-2, ¶¶ 4-8.   He was temporarily suspended twice for tweets criticizing the FDA's emergency approval of COVID vaccines and for posting a video document public officials' statements on vaccine effectiveness. *Id.*¶ 4-6.   On March 8, 2022, he was permanently suspended from Twitter for posting a statement of core political opinion criticizing government policy, stating that "every COVID policy—from the lockdowns and masks to the tests, death coding, and vaccine passes— has been one, giant fraud." *Id.*¶ 7-8.   This permanent suspension was inconsistent with Twitter's own policies. *Id.*¶ 10.   Senger attests that the censorship inflicts ongoing harm on him, both

"personally and professionally": "I discovered a gift that I had for writing and developed a network of thousands of intelligent people from all over the world with whom I had a close relationship discussing these and other issues. Now I have been silenced and cut off from all of them, with no viable way of getting that network back or promoting my work, seemingly for the sole crime of being too articulate in vocalizing my beliefs." *Id.* ¶ 13.

1414.   Jeff Allen is the proprietor of "NewsTalkSTL, a popular news talk radio station in the St. Louis, Missouri region," which "enjoys a substantial Missouri audience." Doc. 10-8, ¶¶ 2-3.  His station posts content on YouTube, and he describes how the station "has been targeted by YouTube from the moment of its launch in July 2021" through the present, including flagging the station's first promotional video, and issuing "strikes" for "COVID-related and election-related 'misinformation.'" *Id.* ¶¶ 4-6.  These include removing a video of a show that "featured discussion of timely COVID issues, including testing and vaccines and treatments," and issuing a strike for that posting. *Id.* ¶¶ 9-10.  His station "continued to receive strikes" from YouTube "in the first week of January and into February, 2022" for COVID-related content, *id.* ¶ 12.  On March 14, 2022, Allen's station aired a show on "election integrity" that did not claim any election was stolen, but discussed polling data indicating that many Americans have grave concerns about election integrity. *Id.* ¶¶ 13-14.  On March 21, 2022, YouTube permanently removed the station's channel as a result of that posting. *Id.* ¶ 15.  "In so doing, YouTube deleted all of our content and prevented any more posts, silencing our voice and our expression from the platform entirely." *Id.* ¶ 16.

1415.   Allen has also experienced significant and ongoing censorship from Facebook: "Facebook has also targeted our content, pulling advertisements and issuing temporary suspensions, also for COVID and election-related 'misinformation.'" *Id.* ¶ 18.

1416.   Mark Changizi is a commentator on Twitter with 37,000 followers, including many in Missouri and Louisiana.  Doc. 10-9, ¶ 7, 38.  Changizi experiences longstanding and ongoing censorship on Twitter, including a first suspension on April 20, 2021 "for linking to an article on the safety and efficacy of face masks," *id.* ¶ 18; additional suspension on June 25, 2021, *id.* ¶ 19; having his account secretly "heavily censored and deboosted," meaning that "the user's tweets are de-platformed—they appear in Twitter feeds much less frequently and replies to other posts may be hidden," *id.* ¶ 20; covert loss of followers, much like Dr. Kheriaty, ¶ 21; and a permanent Twitter suspension on December 18, 2021, for tweets comparing the danger of COVID-19 to the flu and promoting the benefits of natural immunity, *id.* ¶ 23.  He experiences similar shadow-banning by YouTube, as his "follower-ships at YouTube also plateaued and reversed despite the fact that [he] was very active," *id.* ¶ 31.  He observes that Twitter is also censoring his *private* direct messages to other Twitter users, *id.* ¶¶ 32-35.  And two of his YouTube videos are also censored with their content removed from YouTube.  *Id.* ¶ 36.

1417.   Changizi engages in self-censorship on social media to avoid more severe penalties, *id.* ¶¶ 39-42, and he has "become very careful about what I say on Twitter and YouTube (and Facebook and Instagram) to avoid suspension."  *Id.* ¶ 39.

1418.   Changizi perceives a link between the censorship he experiences and pressure from federal officials, *id.* ¶¶ 43-47.  He observes: "Twitter notoriously suspends only those who question the wisdom and efficacy of government restrictions, or who cast doubt on the safety or efficacy of the vaccines."  *Id.* ¶ 50.  He also observes the pro-government bias in social-media censorship decisions: "there are no examples of Twitter suspending individuals who have spread misinformation from the other side—by, for example, exaggerating the efficacy of masks or the threat the virus poses to children."  *Id.* ¶ 51.

1419.   Daniel Kotzin observes that his censorship at Twitter began in September 2021,

after which he was suspended by Twitter four times, including a 24-hour suspension, two seven-

day suspensions, and a permanent ban.  Doc. 10-10, ¶¶ 11-12.  He received these penalties for

tweets questioning whether COVID vaccines reduce infection and transmission, referring to

natural immunity, and criticizing government policies on lockdowns and mask mandates.  *Id.* ¶¶

13, 15, 17.  He was permanently suspended on April 29, 2022, for a truthful tweet stating:

"Myocarditis, pericarditis, blood clots, and strokes are known potential side effects of covid

vaccination.  That is not my idea of safe."  *Id.* ¶ 19.

1420.   Kotzin attests that "[p]ermanent expulsion from Twitter has been devastating for

me.  I had spent 2 years building my Twitter following. Two years ago, I had fewer than 100

followers, and at the time of my permanent suspension I had nearly 32,000.  When my account is

suspended, I am unable to communicate with my followers."  *Id.* ¶¶ 21-23.

1421.   Kotzin observes an increase in censorship on Twitter after the Surgeon General's

Request for Information issued on March 3, 2022.  "Based on my observations and extensive

Twitter use, many more accounts than usual have been suspended since the Surgeon General's RFI

on March 3."  *Id.* ¶ 25.  This increase in censorship affected Kotzin directly: "Since the Surgeon

General's Request for "health misinformation" in March [2022] I have been suspended four times

by Twitter, and have now been permanently banned."  *Id.* ¶ 35.

1422.   Kotzin notes that suspension results in loss of one's own prior expression: "When

an account is permanently suspended, everything the person ever wrote is erased and cannot be

accessed by anyone."  *Id.* ¶ 27.

1423. Kotzin describes that he "methodically self-censored" to avoid permanent

suspension: "Since the [Surgeon General's] RFI, many of us who are critical of government covid

policies have been regulating our speech more carefully than ever, because we have noticed that more of us are getting suspended than ever before, and we don't want to risk losing our audience. I considered the possibility of 'permanent suspension' to be such a devastating prospect that I methodically self-censored." *Id.* ¶¶ 28-29; *see also id.* ¶¶ 31-32.

1424.   Kotzin observes a close link between social-media censorship and the federal government's policies and preferred narratives: "Twitter suspends only those who question the wisdom and efficacy of government restrictions, or those who cast doubt on the necessity, safety or efficacy of the vaccines.  If all or almost all suspensions are targeted at critics of the government and government policies, and no or almost no suspensions are targeted at purveyors of factually incorrect information, then it is not 'misinformation' that is being censored, but criticism of the government." *Id.* ¶¶ 34-35.

1425.   Joshua McCollum is a concerned parent in a school district in Missouri.  Doc. 10-14, ¶¶ 1-4.  Like Hines, he has experienced censorship that directly interferes with his ability to organize, associate with like-minded people, and petition his local government: "On or about July 28, 2021, in the midst of discussing with others a recent school board meeting related to masks, and whether FHSD would keep its policy of optional masking versus change their policy to mandatory masking, [McCollum] decided to launch an online petition to encourage the board members to keep their optional masking policy and *not* change to mandatory masking." *Id.* ¶ 9. Through his account on Nextdoor (a Meta/Facebook platform), he posted this petition on change.org, and "[t]he posting of this petition on change.org was the beginning of the shadow-banning and blocking of my Nextdoor account." *Id.* ¶ 11.  Comments were blocked from his Nextdoor account, and then his Nextdoor account was suspended for one month for "spreading misinformation." *Id.*¶¶ 12-14.  This censorship prevented him from organizing, associating with

others, and petitioning his local government, when those on the other side of the issue were allowed to do so: "Subsequently, on August 12, 2021, FHSD decided to reinstate their mandatory masking policy, shortly after the voice of myself and the 280 fellow petition signers was suppressed. There were petitions encouraging reinstatement of mandatory masking, but our contrary petition was suppressed by Nextdoor. I am a parent simply trying to have a voice in my local school district and its policies regarding my own children, but social media has stooped down to censor even my voice within my local community." *Id.*¶¶ 15-17.

1426. Jessica Marie Gulmire is a freelance journalist for the Epoch Times who resides in Missouri, and has readership in Missouri and Louisiana. Doc. 10-15, ¶¶ 1-3. Gulmire has "been censored numerous times by Facebook and Twitter even before I joined The Epoch Times in the summer of 2021," as her "personal posts regarding excessive COVID-19 measures and regarding the election were repeatedly flagged and taken down by Facebook and Twitter." *Id.* ¶¶ 7-8. Her journalism for the Epoch Times has also been censored by Facebook, including an article questioning the evidence for vaccinating pregnant women with COVID-19 vaccines that was later validated by Pfizer documents, *id.* ¶¶ 10-13; and an article in March 2022 for The Federalist about the People's Convoy of truckers in the United States supporting their Canadian counterparts, *id.* 18-19. She has also had eleven articles about "mask mandates, vaccines, lockdowns and mental health" censored on Pinterest, *id.* ¶ 17.

### C.    Defendants Gravely Injure the State Plaintiffs, Louisiana and Missouri.

#### 1.    Fundamental policies favoring freedom of speech for their citizens.

1427. Both Louisiana and Missouri have adopted fundamental policies favoring freedom of speech, without government-induced censorship, for their citizens. LA. CONST. art. I, § 7; MO. CONST. art. I, § 8.

354

### 2.    Direct censorship of the States and their political subdivisions.

1428.   Both Louisiana and Missouri, and their political subdivisions, have experienced direct social-media censorship on COVID and related issues.   For example, Louisiana's Department of Justice—the office of its Attorney General—was directly censored on YouTube for posting video footage of Louisianans criticizing mask mandates and COVID-19 lockdown measures on August 18, 2021—on August 18, 2021, just after the federal Defendants' most vociferous calls for censorship of COVID "misinformation."  Bosch Decl., Doc. 10-13, ¶ 7.

1429.   In addition, a Louisiana state legislator was censored by Facebook when he posted content addressing vaccinating children against COVID-19.  Bosch Decl., Doc. 10-13, ¶ 9.

1430.   St. Louis County, a political subdivision of Missouri, conducted public meetings regarding proposed county-wide mask mandates, at which some citizens made public comments opposing mask mandates. Flesh Decl., Doc. 10-6, ¶ 7.  Missouri's open-meetings law required St. Louis County to post publicly the videos of those meetings, but YouTube censored the entire videos of four public meetings, removing the content, because some citizens publicly expressed views that masks are ineffective.  *Id.*

### 3. The States' interest in following the uncensored discourse of their citizens.

1431.   Patrick Flesch, Director of Constituent Services for the Missouri Attorney General's Office, explains that he is "personally involved in, receiving, reviewing, and responding to thousands of communications from Missouri constituents per year." Doc. 10-6, ¶ 3.  He explains that being able to follow Missourians' uncensored speech on social media is essential for him to do his job effectively, as understanding Missourians' true thoughts and concerns on policy matters like election integrity and COVID-19 is necessary to craft policies and messages that are responsive to constituents' actual concerns.  Doc. 10-6, ¶ 3-4.  This "includes monitoring activity

and mentions on multiple social media platforms, including Facebook, Twitter, and YouTube."
*Id.* "I monitor these sorts of trends *on a daily or even hourly basis* when needed on behalf of the
Office." *Id.* (emphasis added). For example, regarding the censorship of St. Louis County's video
of its public meeting where citizens opposed mask mandates, Flesch notes: "This video is just the
sort of information that is important for me to review, and yet it was unavailable for a critical
period of time due to online censorship of speech questioning the efficacy of mask mandates."
*Id.*¶ 7. Likewise, regarding YouTube censoring Jeff Allen's radio station NewsTalkSTL, and
Nextdoor censoring Joshua McCollum's online petition, Flesch observes: "These examples are
just the sort of online speech by Missourians that it is important for me and the Missouri Attorney
General's Office to be aware of." *Id.* ¶¶ 9.

1432. As Flesch attests, "The kinds of speech discussed above and in the Complaint in
this case—such as speech about the efficacy of COVID-19 restrictions, and speech about issues of
election security and election integrity—are matters of core interest and high importance to me in
my work on behalf of the AGO. When such speech is censored on social media, it makes it much
harder for me to do my job and to understand what Missourians really are concerned about." *Id.*¶
10.

1433. As Mr. Flesch explains in detail: "Issues regarding COVID-19 responses (such as
mask mandates imposed by municipalities and school districts on schoolchildren) and election
security and integrity have been of critical importance to Missourians in recent months and years.
… It is very important for me to have access to free public discourse on social media on these
issues so I can understand what Missourians are actually thinking, feeling, and expressing about
such issues, and so I can communicate effectively with them." *Id.* ¶ 5. "[O]nline censorship of

free public discourse on social-media companies has hampered my ability to follow Missourians' speech on these issues." *Id.* ¶ 6.

1434.   Ashley Bosch, Communications Officer for the Louisiana Department of Justice, attests on behalf of the State of Louisiana: "Part of my job is to gather and synthesize topical subject matters that are important to Louisiana citizens, on behalf of the Department." Doc. 10-13, ¶ 4.  "Understanding what subject matters and issues are important to Louisianans is critical for the Department to formulate policies and messaging that will address the concerns expressed by our constituents." *Id.*  This "includes monitoring activity and mentions on social media platforms, including Facebook, Instagram, Twitter, and YouTube." *Id.*  Doc. 10-13, ¶ 4.  "It is very important for me to have access to free public discourse on social media on these issues so I can understand what our constituents are actually thinking, feeling, and expressing about such issues, and so I can communicate properly with them." *Id.* ¶ 5.  "Online censorship of Louisiana citizens by social media companies interferes with my ability to follow Louisianans' speech on these issues." *Id.* ¶ 6. Bosch notes that it is particularly important for her to follow Louisianan's speech on topics of federally-induced censorship: "For example, mask and vaccine mandates for students have been a very important source of concern and public discussion by Louisiana citizens over the last year." Doc. 10-13, ¶ 5.  "Louisianans' speech about the efficacy of COVID-19 restrictions, and speech about issues of election security and election integrity are matters of great interest and importance to me in my work on behalf of the Louisiana Department of Justice." Doc. 10-13, ¶ 10.

1435.   As noted above, Defendants' witness from the CDC, Carol Crawford, attests to exactly the same government interest in being able to read and follow the true, uncensored opinions of the government's constituents.

1436.   Crawford admits that government communicators have a strong interest in tracking what their constituents are saying on social media: "It's helpful for communicators to know what is being discussed because it helps improve our communication materials." Crawford Dep. 53:10-12.   Crawford emphasized this point multiple times: "as I mentioned before, it does help … for communicators to know what conversations occurs on social media because it helps us identify gaps in knowledge, or confusion, or things that we're not communicating effectively that we need to adjust." *Id.* 54:15-20.

1437.   Crawford said that CrowdTangle reports "would help us understand what was being discussed on social media about COVID, which helps us look for gaps in information, confusion about facts, things that we might need to adjust our communication materials for." *Id.* 57:24-58:3. Crawford specifically expressed the concern that, if content was censored or removed from social-media platforms, government communicators would not know what the citizens' true concerns were: She "was wondering if they delete the info will we know those myths or information so we could update communication activity. So if they were deleting content would we know what the themes were." *Id.* 75:14-18.   Accordingly, Crawford wanted to know, "would [CDC] be able to see in CrowdTangle or other reports … what kind of themes were removed so we would still have the full picture of areas of confusion." *Id.* 75:23-76:1.

**4.      States' interest in fair, unbiased, open processes to petition state government.**

1438.   Social-media censorship directly interferes with the States' interest maintaining fair, even-handed, and open processes for petitioning their own governments and political subdivisions.   When one side of a debate can organize on Facebook or Nextdoor and petition the government, and the other side cannot because of social-media censorship, that means that state officials never receive a fair, unbiased presentation of their constituents' views.

*1   9*.   As noted above, social-media censorship has perverted state and local political processes by artificially restricting access to the channels of advocacy to one side of various issues. For example, social-media censorship prevented Louisiana advocacy groups from organizing effectively to advocate in favor of legislative action on issues of great public import.  Hines Decl., Doc. 10-12, ¶¶ 13-14.   Likewise, social-media censorship prevented a Missouri parent from circulating an online petition to advocate against mandatory masking at his local school district, a political subdivision of the State.  McCollum Decl., Doc. 10-14, ¶¶ 9-17; *see also* Doc. 10-12, ¶¶ 13-14; Doc. 10-14, ¶¶ 9-17; Doc. 10-15, ¶¶ 11-16, 18-19.

*1   .*   Plaintiff Jill Hines explains that "two of our Facebook groups were completely deplatformed, effectively disbanding a group of more than two thousand people who were organized to engage in direct advocacy to our state legislature, on two separate occasions."  Doc. 10-12, ¶ 13.  She attests that "[t]he last post I made in our HFL Group on July 13, 2021, was a 'call to action' for the upcoming Veto Session, asking people to contact legislators regarding health freedom legislation.."  *Id.* ¶ 14.  Suppressing these Facebook groups directly interfered with state officials' ability to receive free and fair communications of their constituents' concerns: "Removing our closed group at such crucial time effectively stopped our ability to communicate with our representatives in the state legislature."  *Id.*

**5. State quasi-sovereign interests.**

*1   1*.   The States also assert quasi-sovereign interests in protecting the freedom of speech of a substantial segment of their population—*i.e.*, their citizens who are both speakers and audiences of speech on social media; and in ensuring that their citizens receive the full benefit of participation in the federal system—which includes, among other benefits, the full protection of the First Amendment.

1442.   Based on the foregoing evidence, social-media censorship afflicts a substantial segment of the populations of both Missouri and Louisiana.

Dated: March 6, 2023

Respectfully submitted,

**ANDREW BAILEY**
**Attorney General of Missouri**

**JEFFREY M. LANDRY**
**Attorney General of Louisiana**

*/s/ Charles F. Capps*
Joshua M. Divine, Mo. Bar No. 69875*
 *Solicitor General*
Charles F. Capps, Mo. Bar No. 72734*
 *Deputy Solicitor General*
Todd A. Scott, Mo. Bar No. 56614*
 *Senior Counsel*
Kenneth C. Capps, Mo. Bar No. 70908*
 *Assistant Attorney General*
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
Tel: (573) 751-8870
charles.capps@ago.mo.gov
*Counsel for State of Missouri*

*/s/ D. John Sauer*
Elizabeth B. Murrill (La #20685)
 *Solicitor General*
Tracy Short (La #23940)
 *Assistant Attorney General*
D. John Sauer, Mo. Bar No. 58721*
 *Special Assistant Attorney General*
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, Louisiana
Tel: (225) 326-6766
murrille@ag.louisiana.gov
*Counsel for State of Louisiana*

*/s/ Jenin Younes*
Jenin Younes *
John J. Vecchione *
New Civil Liberties Alliance
1225 19th Street N.W., Suite 450
Washington, DC 20036
Direct: (202) 918-6905
E-mail: jenin.younes@ncla.legal
*Counsel for Plaintiffs Dr. Jayanta*
*Bhattacharya, Dr. Martin Kulldorff, Dr.*
*Aaron Kheriaty, and Jill Hines*

*/s/ John C. Burns*
John C. Burns
Burns Law Firm
P.O. Box 191250
St. Louis, Missouri 63119
P: 314-329-5040
E-mail: john@burns-law-firm.com
*Counsel for Plaintiff Jim Hoft*

\*  admitted *pro hac vice*

## CERTIFICATE OF SERVICE

I hereby certify that, on March 6, 2023, I caused a true and correct copy of the foregoing to be filed by the Court's electronic filing system, to be served by operation of the Court's electronic filing system on counsel for all parties who have entered in the case.

*/s/ D. John Sauer*

**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA**

STATE OF LOUISIANA, *et al.*,

    *Plaintiffs*,

           v.

JOSEPH R. BIDEN, JR., in his official capacity as President of the United States of America, *et al.,*

    *Defendants*.

Civil Action No. 22-cv-1213

**DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................1

BACKGROUND AND PROPOSED FINDINGS OF FACT ...............................................5

I.      For years, in response to public sentiment, social media companies have sought to identify and contain misinformation on their platforms. ....................................5

      A.      Since their emergence, social media companies have been economically incentivized to moderate content on their platforms. ..............................5

      B.      After the 2016 U.S. presidential election, social media companies took significant steps to combat election-related influence campaigns and misinformation on their platforms. ......................................................9

      C.      As the COVID-19 pandemic emerged, social media companies sought to address health misinformation on their platforms. ...............................13

      D.      Social media companies have long taken actions short of removal against "borderline content" that is not expressly prohibited by their content moderation removal policies. ...........................................................15

      E.      Bipartisan calls to revise or revoke Section 230 have repeatedly arisen over the years. ...................................................................................19

II.     Since 2017, Executive Branch agencies and officials have promoted authoritative information or expressed concerns with the spread of misinformation...........................22

      A.      The White House ...............................................................................23

           1.      White House Public Statements ...............................................25

                a.      White House Press Briefings (Jennifer Psaki)..............................25

                b.      President Biden's Comments ......................................................28

                c.      White House Communications Director Kate Bedingfield's Comments.................................................................................29

           2.      White House Private Statements ...............................................30

                a.      White House Requests for More Data about Misinformation on Facebook ......................................................31

                b.      No White House Demands for Changes to the Companies' Content Moderation Policies or Practices Regarding COVID-19 ...............................................................................36

c.    White House Requests for Action on Fake and Doctored Posts and Accounts ..................................................... 37

B.    The Surgeon General ............................................................. 40

1.    The Advisory, the RFI, and Other Public Statements ............................. 42

2.    Direct Communications with Social Media Companies........................... 45

3.    The Virality Project ................................................................. 49

C.    The Centers for Disease Control and Prevention (CDC) .................................... 51

1.    CDC's Pandemic-Era Meetings with Social Media Companies.............. 53

2.    CDC's Responses to Social Media Companies' Requests for Scientific Information Relating to Claims About COVID-19 or Vaccines ................................................................. 56

3.    CDC Emails Alerting Social Media Companies to Misinformation Themes Observed on Platforms and Providing Relevant Scientific Information .............................................................. 59

4.    CDC's Two "Be on the Lookout Meetings" in May 2021 ...................... 60

5.    A CDC Official's One-Time Use of a Facebook Reporting Channel in 2021 ................................................................. 62

6.    CDC's Receipt of Bi-weekly Facebook COVID-19 Content Reports in 2021 ................................................................. 62

D.    The Census Bureau ................................................................. 63

E.    Dr. Fauci, Former Director of the National Institute of Allergy and Infectious Diseases (NIAID) .............................................................. 64

F.    The Cybersecurity and Infrastructure Security Agency (CISA) ......................... 69

1.    CISA's Mission and General Overview ................................................. 69

2.    The Election Infrastructure Subsector ................................................. 70

3.    The Center for Internet Security........................................................... 72

4.    CISA's Efforts to Build Resilience to Misinformation ........................... 74

a.    CISA's Mis-, Dis-, and Malinformation ("MDM") Team ............ 74

b.      CISA's Switchboarding Work During the 2020 Election
        Cycle ...................................................................................74

c.      CISA's Meetings with Social Media Companies ........................80

d.      CISA's Limited Involvement with the Election Integrity
        Partnership............................................................................84

G.      The State Department's Global Engagement Center (GEC)...............................86

H.      The Federal Bureau of Investigation....................................................91

1.      FBI Efforts as to Foreign Influence and Election Misinformation ..........91

2.      The "Hunter Biden Laptop Story".............................................................97

LEGAL STANDARD .............................................................................................101

ARGUMENT ..........................................................................................................102

I.      Plaintiffs fail to satisfy their burden of demonstrating that irreparable harm would
        result in the absence of a preliminary injunction. .........................................104

A.      Plaintiffs cannot establish imminent, irreparable harm based on social
        media companies' past content moderation decisions. ....................................106

1.      The Individual Plaintiffs' alleged harms stem from long-past
        content moderation decisions..............................................................107

2.      Plaintiff States' alleged harms likewise stem from long-past
        content moderation decisions..............................................................112

B.      Plaintiffs cannot establish imminent, irreparable harm based on alleged
        past actions of federal officials. ........................................................113

1.      Plaintiffs have not made the requisite showing of ongoing or
        imminent irreparable harm as to the White House Defendants. .............115

2.      Plaintiffs have not made the requisite showing of ongoing or
        imminent irreparable harm as to CISA Defendants. .............................116

3.      Plaintiffs have not made the requisite showing of ongoing or
        imminent irreparable harm as to the CDC Defendants..........................118

4.      Plaintiffs have not made the requisite showing of ongoing or
        imminent irreparable harm as to the Census Defendants. .....................120

5.    Plaintiffs have not made the requisite showing of ongoing or
imminent irreparable harm as to Dr. Fauci, in his former capacity
as NIAID Director. ............................................................................121

6.    Plaintiffs have not made the requisite showing of ongoing or
imminent irreparable harm as to the GEC Defendants. .........................121

C.    Plaintiffs' delay in seeking relief shows there is no immediate need for an
injunction. ...................................................................................................126

II.    Plaintiffs fail to show a likelihood of success on the merits. .........................................128

A.    Plaintiffs lack Article III standing to bring any of their claims. .........................128

1.    Plaintiffs fail to establish any injury-in-fact. .........................................130

2.    Plaintiffs fail to establish traceability and redressability. .......................131

B.    Plaintiffs are not likely to prevail on their First Amendment claims. .................136

1.    Plaintiffs are not likely to prevail on their theory that any
Defendant provided "such significant encouragement" as to
convert private conduct into government conduct. ...............................141

a.    Plaintiffs' "significant encouragement" theory rests on a
misunderstanding of Blum and its progeny. ...............................141

b.    Plaintiffs fail to show that the White House has provided
"such significant encouragement" as to render the White
House legally responsible for social media companies'
independent decisions. ...........................................................148

c.    Plaintiffs fail to show that OSG has provided "such
significant encouragement" as to render OSG legally
responsible for social media companies' independent
decisions. ............................................................................160

i.    Surgeon General's Public Statements ...........................165

ii.    OSG's Private Communications ...................................167

iii.    The RFI .....................................................................168

2.    Plaintiffs fail to show "coercion" under Bantam Books. ........................169

a.    Plaintiffs fail to connect purported coercion to specific acts
harming them. .......................................................................170

b.    Defendants made no threats and instead sought to persuade. .....171

c.    Defendants consistently recognized social media companies' authority over their platforms and no evidence shows they engaged in improper "pressure." ............................180

    i.    White House Press Secretary .........................................181

    ii.    White House Digital Director .......................................182

    iii.    The Surgeon General .....................................................183

d.    Officials' remarks about potential § 230 amendments and antitrust enforcement raised legitimate policy questions and had no coercive effect. ............................................................185

    i.    Legislative Remarks and Hearings................................186

    ii.    Executive Branch Remarks and Actions ......................190

3.    Deception is not a freestanding basis for state action and is lacking here. ......................................................................................193

    a.    There is no "deception" test for state action...............................194

    b.    The record contradicts Plaintiffs' allegations of deceit and trickery. ...................................................................................195

    i.    FBI ...............................................................................196

    ii.    Dr. Fauci, in his prior role as the Director of NIAID ......200

4.    Plaintiffs fail to show that any Defendant jointly participated in any particular content moderation decision. ...........................................213

    a.    Plaintiffs fail to show that, by sharing information about COVID-19, CDC or the Census Bureau jointly participated in any content moderation decision. ...........................................216

    b.    The FBI did not participate in "censorship" by sharing information about foreign malign influence efforts or potential election-related misinformation. .................................224

    c.    Plaintiffs fail to establish that CISA worked jointly with social media companies to violate the First Amendment............228

    d.    Plaintiffs fail to identify joint action by the Global Engagement Center and social media companies to remove any social media content. ..........................................................237

e.     No "joint action" transformed the private conduct of the
Election Integrity Partnership or the Virality Project into
state action attributable to Defendants. .....................................239

        i.     EIP ...............................................................................240

        ii.    The Virality Project.......................................................244

f.     Social media companies' voluntary consultation with
agencies for scientific and medical information about
COVID-19 does not support a state action finding relating
to "other agencies.".................................................................248

5.   Even if Plaintiffs could show that any social media content
moderation actions amount to state action, the Court cannot
necessarily conclude that all of those content moderation actions
violate the First Amendment.................................................................250

C.   Plaintiffs are not likely to prevail on their APA and Ultra Vires claims. ...........253

III.   Plaintiffs fail to satisfy the remaining preliminary injunction requirements. .................257

IV.   Plaintiffs' proposed injunction is improper. .................................................................261

A.   Plaintiffs' proposed injunction lacks the specificity required by Federal
Rule of Civil Procedure 65. .............................................................................262

B.   Plaintiffs' proposed injunction is impermissibly overbroad. ............................264

CONCLUSION.....................................................................................................................275

# TABLE OF AUTHORITIES

## CASES

*Abu-Jamal v. Nat'l Pub. Radio*,
  No. 96-cv-0594, 1997 WL 527349 (D.D.C. Aug. 21, 1997), *aff'd*,
  159 F.3d 635 (D.C. Cir. 1998) ........................................................................ 187

*Adickes v. S.H. Kress & Co.*,
  398 U.S. 144 (1970) ...................................................................................... 146

*Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*,
  140 S. Ct. 2082 (2020) ................................................................................. 253

*Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*,
  878 F.2d 806 (5th Cir. 1989) ........................................................................ 101

*Alvarez v. O'Brien*,
  No. 8:21-cv-303, 2022 WL 5209377 (D. Neb. Oct. 5, 2022) ........................ 274, 275

*Am. Civil Liberties Union v. Clapper*,
  785 F.3d 787 (2d Cir. 2015) ......................................................................... 258

*Am. Family Ass'n v. City. & Cnty. of S.F.*,
  277 F.3d 1114 (9th Cir. 2002) ...................................................................... 174, 176

*Am. Mfrs. Ins. Co. v. Sullivan*,
  526 U.S. 40 (1999) .................................................................................... *passim*

*Anderson v. Jackson*,
  556 F.3d 351 (5th Cir. 2009) ........................................................................ 101

*Anderson v. United States*,
  417 U.S. 211 (1974) ...................................................................................... 227

*Appellant's Reply Brief to Cal. Sec'y of State Shirley Weber*,
  --- F.4th ---, 2022 WL 4389216 (9th Cir. Sept. 14, 2022) ............................ 145

*Ark. Project v. Shaw*,
  775 F.3d 641 (5th Cir. 2014) ........................................................................ 104

*Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*,
  997 F.2d 898 (D.C. Cir. 1993) ...................................................................... 255

*Atiyeh v. Capps*,
  449 U.S. 1312 (1981) .................................................................................... 262

*Backpage.com, LLC v. Dart*,
  807 F.3d 229 (7th Cir. 2015) ........................................................ 146, 170, 175, 176

*Bantam Books, Inc. v. Sullivan,*
    372 U.S. 58 (1963) ...................................................................170, 171, 172, 173

*Barber v. Bryant,*
    860 F.3d 345 (5th Cir. 2017) ......................................................................*passim*

*Bass v. Parkwood Hosp.,*
    180 F.3d 234 (5th Cir. 1999) .......................................................... 194, 195, 214

*Bates v. State Bar of Ariz.,*
    433 U.S. 350 (1977) ................................................................................249

*Batterton v. Marshall,*
    648 F.2d 694 (D.C. Cir. 1980) .......................................................................253

*Bd. of Regents of Univ. of Wis. Sys. v. Southworth,*
    529 U.S. 217 (2000) ................................................................................102

*Benisek v. Lamone,*
    138 S. Ct. 1942 (2018) .............................................................................126

*Bennett v. Spear,*
    520 U.S. 154 (1997) .........................................................................113, 255

*Beverly v. United States,*
    468 F.2d 732 (5th Cir. 1972) .......................................................................258

*Block v. Meese,*
    793 F.2d 1303 (D.C. Cir. 1986) .....................................................................176

*Bluefield Water Ass'n v. City of Starkville,*
    577 F.3d 250 (5th Cir. 2009) .......................................................................104

*Blum v. Yaretsky,*
    457 U.S. 991 (1982) ...............................................................................*passim*

*Boire v. Pilot Freight Carriers, Inc.,*
    515 F.2d 1185 (5th Cir. 1975) ......................................................................127

*Bowen v. Georgetown Univ. Hosp.,*
    488 U.S. 204 (1988) ................................................................................253

*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n,*
    531 U.S. 288 (2001) .........................................................................137, 246

*Buckley v. Valeo,*
    424 U.S. 1 (1976) ..................................................................................191

*Buentello v. Boebert*,
    545 F. Supp. 3d 912 (D. Colo. 2021) ...................................................................187

*Burson v. Freeman*,
    504 U.S. 191 (1992) ...........................................................................................252

*Burton v. City of Belle Glade*,
    178 F.3d 1175 (11th Cir. 1999) .........................................................................264

*Califano v. Yamasaki*,
    442 U.S. 682 (1979) ...........................................................................................264

*California v. Texas*,
    141 S. Ct. 2104 (2021) .......................................................................................261

*Campbell v. PMI Food Equip. Grp., Inc.*,
    509 F.3d 776 (6th Cir. 2007) .............................................................................144

*Chambless Enter., LLC v. Redfield*,
    508 F. Supp. 3d 101 (W.D. La. 2020) ................................................................260

*Changizi v. HHS*,
    602 F. Supp. 3d 1031 (S.D. Ohio 2022), *appeal filed*,
    No. 22-3573 (6th Cir. June 6, 2022) .............................................162, 166, 169, 253

*Charlesbank Equity Fund II v. Blinds To Go, Inc.*,
    370 F.3d 151 (1st Cir. 2004) .............................................................................126

*Chrysler Corp. v. Brown*,
    441 U.S. 281 (1979) ...........................................................................................253

*Citibank, N.A, v. Citytrust*,
    756 F.2d 273 (2d Cir. 1985) .......................................................................126, 127

*Commodity Trend Service, Inc. v. CFTC*,
    233 F.3d 981 (7th Cir. 2000) .............................................................................252

*Common Cause v. Nuclear Regul. Comm'n*,
    674 F.2d 921 (D.C. Cir. 1982) ...........................................................................262

*Cornish v. Corr. Servs. Corp.*,
    402 F.3d 545 (5th Cir. 2005) .......................................................................149, 214

*Dalton v. Specter*,
    511 U.S. 462 (1994) ...........................................................................................255

*Daniels v. Alphabet, Inc.*,
    No. 20-cv-04687, 2021 WL 1222166 (N.D. Cal. Mar. 31, 2021) .........................186

*Danos v. Jones*,
   652 F.3d 577 (5th Cir. 2011) ............................................................255

*Davis v. Pension Benefit Guar. Corp.*,
   571 F.3d 1288 (D.C. Cir. 2009) ........................................................257

*Def. Distrib. v. U.S. Dep't of State*,
   838 F.3d 451 (5th Cir. 2016) ............................................................258

*Dep't of the Navy v. Egan*,
   484 U.S. 518 (1988)..........................................................................252

*Doe v. Google*,
   No. 20-cv-07502-BLF, 2021 WL 4864418 (N.D. Cal. Oct. 19, 2021), *aff'd*,
   2022 WL 17077497 (9th Cir. Nov. 18, 2022) ............................ 215, 217

*Doe v. Google LLC*,
   No. 21-16934, 2022 WL 17077497 (9th Cir. Nov. 18, 2022) ........................*passim*

*Donald J. Trump for President, Inc. v. Way*,
   492 F. Supp. 3d 354 (D.N.J. 2020) ...................................................258

*El Paso Cnty. v. Trump*,
   982 F.3d 332 (5th Cir. 2020) ............................................................129

*Elrod v. Burns*,
   427 U.S. 347 (1976)..........................................................................104

*Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*,
   762 F.2d 464 (5th Cir. 1985) ............................................................102

*Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*,
   521 F.3d 1157 (9th Cir. 2008) ............................................................20

*Fairley v. PM Mgmt.-San Antonio AL, LLC*,
   724 F. App'x. 343 (5th Cir. 2018) .....................................................239

*Flagg Bros. v. Brooks*,
   436 U.S. 149 (1978)..........................................................................221

*Flight Training Int'l, Inc. v. Fed. Aviation Admin.*,
   58 F.4th 234 (5th Cir. 2023) ..................................................... 256, 257

*Ford v. NYLCare Health Plans of Gulf Coast, Inc.*,
   301 F.3d 329 (5th Cir. 2002) ............................................................131

*Frazier v. Bd. of Trs. of Nw. Miss. Reg'l Med. Ctr.*,
   765 F.2d 1278 (5th Cir.), *amended*, 777 F.2d 329 (5th Cir. 1985)................214, 216, 217, 218

*Freedom From Religion Found., Inc. v. Obama,*
    641 F.3d 803 (7th Cir. 2011) ............................................................... 147, 269, 270

*FTC v. Facebook, Inc.,*
    581 F. Supp. 3d 34 (D.D.C. 2022) .................................................................. 192

*Gallagher v. Neil Young Freedom Concert,*
    49 F.3d 1442 (10th Cir. 1995) ........................................................................ 144

*Garzes v. Lopez,*
    281 F. App'x 323 (5th Cir. 2008) ................................................................... 133

*George v. Edholm,*
    752 F.3d 1206 (9th Cir. 2014) ............................................................... 194, 195

*Giboney v. Empire Storage & Ice Co.,*
    336 U.S. 490 (1949) ........................................................................................ 251

*Google, Inc. v. Hood,*
    822 F.3d 212 (5th Cir. 2016) ......................................................................... 104

*Guillot v. Garrett,*
    970 F.2d 1320 (4th Cir. 1992) ........................................................................ 252

*H.D. Vest, Inc. v. H.D. Vest Mgmt. & Servs. LLC,*
    No. 3:09-CV-00393, 2009 WL 1766095 (N.D. Tex. June 23, 2009) ........... 126, 127

*Haig v. Agee,*
    453 U.S. 280 (1981) ........................................................................................ 252

*Hammerhead Enters., Inc. v. Brezenoff,*
    707 F.2d 33 (2d Cir. 1983) ....................................................... 174, 178, 180, 185

*Harmon v. Dallas Cnty.,*
    927 F.3d 884 (5th Cir. 2019) ......................................................................... 273

*Hart v. Facebook, Inc.,*
    No. 22-cv-737, 2022 WL 1427507 (N.D. Cal. May 5, 2022) ..................... 161, 162

*Henson v. Santander Consumer USA Inc.,*
    582 U.S. 79 (2017) .......................................................................................... 188

*Holder v. Humanitarian L. Project,*
    561 U.S. 1 (2010) ............................................................................................ 252

*Holmberg v. Armbrecht,*
    327 U.S. 392 (1946) ........................................................................................ 126

*Howard Gault Co. v. Tex. Rural Legal Aid, Inc.*,
    848 F.2d 544 (5th Cir. 1988) ........................................................................*passim*

*Huber v. Biden*,
    No. 21-CV-06580-EMC, 2022 WL 827248 (N.D. Cal. Mar. 18, 2022), *aff'd*,
    2023 WL 17818543 (9th Cir. Dec. 20, 2022) ....................................................215

*Humana, Inc. v. Jackson*,
    804 F.2d 1390 (5th Cir. 1986) ........................................................................104

*Illinois v. Telemarketing Assocs., Inc.*,
    538 U.S. 600 (2003) ........................................................................................251

*Inclusive Cmtys. Project, Inc. v. Dep't of Treasury*,
    946 F.3d 649 (5th Cir. 2019) ..........................................................................131

*Informed Consent Action Network v. YouTube LLC*,
    582 F. Supp. 3d 712 (N.D. Cal. 2022) ............................................................186

*INS v. Chadha*,
    462 U.S. 919 (1983) ........................................................................................186

*INS v. Legalization Assistance Project of L.A. Cnty. Fed'n of Labor*,
    510 U.S. 1301 (1993) ......................................................................................265

*Jackson v. Metro. Edison Co.*,
    419 U.S. 345 (1974) .......................................................................... 137, 214, 221

*Juliana v. United States*,
    947 F.3d 1159 (9th Cir. 2020), *denying reh'g en banc*, 986 F.3d 1295 (9th Cir. 2021) .........261

*Jungels v. Pierce*,
    825 F.2d 1127 (7th Cir. 1987) ........................................................................274

*Justin Indus., Inc. v. Choctaw Secs., L.P.*,
    920 F.2d 262 (5th Cir. 1990) ..........................................................................104

*Keller v. State Bar of Cal.*,
    496 U.S. 1 (1990) ............................................................................................261

*Kentucky v. Biden*,
    23 F.4th 585 (6th Cir. 2022) ..........................................................................113

*La. Div. Sons of Confederate Veterans v. City of Natchitoches*,
    821 F. App'x 317 (5th Cir. 2020) ..................................................................*passim*

*Laird v. Tatum*,
    408 U.S. 1 (1972) ............................................................................................179

*Leach v. Carlile*,
258 U.S. 138 (1922) ...................................................................................252

*Louisiana v. Biden*,
45 F.4th 841 (5th Cir. 2022) ......................................................................263

*Lugar v. Edmondson Oil Co.*,
457 U.S. 922 (1982) ...................................................................................214

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ........................................................................... 129, 133

*M.D. ex rel. Stukenberg v. Abbott*,
907 F.3d 237 (5th Cir. 2018) ......................................................................263

*Maher v. Roe*,
432 U.S. 464 (1977) ........................................................................... 147, 153

*Manhattan Cmty. Access Corp. v. Halleck*,
139 S. Ct. 1921 (2019) ....................................................................... 137, 214

*Martinez v. Mathews*,
544 F.2d 1233 (5th Cir. 1976) ........................................................... 101, 102

*Massachusetts v. Mellon*,
262 U.S. 447 (1923) ...................................................................................113

*Matal v. Tam*,
582 U.S. 218 (2017) .................................................................. 125, 147, 153

*Mayo Found. for Med. Educ. & Rsch. v. BP Am. Prod. Co.*,
447 F. Supp. 3d 522 (N.D. Tex. 2020) .......................................................257

*Mazurek v. Armstrong*,
520 U.S. 968 (1997) ...................................................................................101

*McSurely v. McClellan*,
553 F.2d 1277 (D.C. Cir. 1976) ..................................................................187

*Meyer v. Brown & Root Constr. Co.*,
661 F.2d 369 (5th Cir. 1981) ......................................................................264

*Minnesota Voters Alliance v. Mansky*,
138 S. Ct. 1876 (2018) ...............................................................................266

*Montient Corp. v. Dondero*,
529 F.3d 532 (5th Cir. 2008) ......................................................................103

*Moody v. Farrell*,
   868 F.3d 348 (5th Cir. 2017) ........................................................................*passim*

*Mountain Med. Equip., Inc. v. Healthdyne, Inc.*,
   582 F. Supp. 846 (D. Colo. 1984) ................................................................106

*Multimedia Holdings Corp. v. Cir. Ct. of Fla., St. Johns Cnty.*,
   544 U.S. 1301 (2005) ...........................................................................173, 179

*Nat'l Collegiate Athletic Ass'n v. Tarkanian*,
   488 U.S. 179 (1988) ....................................................................................138

*National Rifle Ass'n of America v. Cuomo*,
   350 F. Supp. 3d 94 (N.D.N.Y. 2018) ...........................................................179

*Nat'l Endowment for the Arts v. Finley*,
   524 U.S. 569 (1998) ....................................................................................102

*Nat'l Rifle Ass'n of Am. v. Vullo*,
   49 F.4th 700 (2d Cir. 2022), *petition for cert. filed*,
   No. 22-842 (U.S. Mar. 6, 2023) ..............................................177, 178, 179, 185

*New York v. Facebook, Inc.*,
   549 F. Supp. 3d 6 (D.D.C. 2021), *aff'd sub nom.*,
   *New York v. Meta Platforms, Inc.*,
   --- F.4th ---, 2023 WL 3102921 (D.C. Cir. Apr. 27, 2023) ...........................192

*Nken v. Holder*,
   556 U.S. 418 (2009) ....................................................................................257

*Norwood v. Harrison*,
   413 U.S. 455 (1973) ....................................................................................193

*O'Handley v. Padilla*,
   579 F Supp. 3d 1163 (N.D. Cal. 2022), *aff'd sub nom.*, *O'Handley v. Weber*,
   62 F.4th 1145 (9th Cir. 2023) ......................................................................215

*O'Handley v. Weber*,
   62 F.4th 1145 (9th Cir. 2023) ..................................................................*passim*

*Okwedy v. Molinari*,
   333 F.3d 339 (2d Cir. 2003) ...........................................................170, 171, 178

*Paez v. Wal-Mart Stores, Tex., LLC*,
   No. EP-20-CV-00321-DCG, 2022 WL 3216343 (W.D. Tex. Aug. 9, 2022).......223

*Payne v. Travenol Lab., Inc.*,
   565 F.2d 895 (5th Cir. 1978) .......................................................................264

*Peery v. Chi. Hous. Auth.*,
  791 F.3d 788 (7th Cir. 2015) ............................................................ 147, 269, 270

*Penthouse Int'l, Ltd. v Meese*,
  939 F.2d 1011 (D.C. Cir. 1991) ....................................................................*passim*

*Penthouse Int'l, Ltd. v. McAuliffe*,
  610 F.2d 1353 (5th Cir. 1980) ....................................................................172

*Peterson v. City of Greenville*,
  373 U.S. 244 (1963) ....................................................................179

*Pham v. Univ. of La. at Monroe*,
  194 F. Supp. 3d 534 (W.D. La. 2016) ........................................................ 106, 108

*Pikaluk v. Horseshow Ent., L.P.*,
  810 F. App'x 243 (5th Cir. 2020) ....................................................................246

*Playboy Enters., Inc. v. Meese*,
  639 F. Supp. 581 (D.D.C. 1986) ....................................................................175

*Pleasant Grove City v. Summum*,
  555 U.S. 460 (2009) ....................................................................*passim*

*R.C. Maxwell Co. v. Borough of New Hope*,
  735 F.2d 85 (3d Cir. 1984) ....................................................174, 179, 185, 190

*Rattner v. Netburn*,
  930 F.2d 204 (2d Cir. 1991) ....................................................................177

*Reilly v. Pinkus*,
  338 U.S. 269 (1949) ....................................................................252

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
  515 U.S. 819 (1995) ....................................................................102

*Roviaro v. United States*,
  353 U.S. 53 (1957) ....................................................................259

*S.H.A.R.K. v. Metro Parks Serving Summit Cnty.*,
  499 F.3d 553 (6th Cir. 2007) ....................................................................144

*Schilling v. Speaker of U.S. House of Representatives*,
  --- F. Supp. 3d ---, 2022 WL 4745988 (D.D.C. Oct. 3, 2002), *appeal filed*,
  No. 22-5290 (D.C. Cir. Nov. 4, 2022) ....................................................................187

*Schmidt v. Lessard*,
  414 U.S. 473 (1974) ....................................................................262

*Scott v. Schedler*,
  826 F.3d 207 (5th Cir. 2016) ...................................................................... 263, 264

*Seals v. McBee*,
  898 F.3d 587 (5th Cir. 2018), *as revised* (Aug. 9, 2018) .............................. 133, 265

*SEC v. First Fin. Group of Tex.*,
  645 F.2d 429 (5th Cir. Unit A 1981) ...................................................................105

*SEC v. Life Partners Holding, Inc.*,
  854 F.3d 765 (5th Cir. 2017) ...................................................................264

*Seila L. LLC v. Consumer Fin. Prot. Bureau*,
  140 S. Ct. 2183 (2020) ...................................................................269

*Shenzhen Tange Li'An E-Com., Co. v. Drone Whirl LLC*,
  No. 1:20-CV-738, 2020 WL 5237267 (W.D. Tex. Sept. 2, 2020).........................126

*Sierra Club v. Peterson*,
  228 F.3d 559 (5th Cir. 2000) ...................................................................256

*Simon v. E. Ky. Welfare Rights Org.*,
  426 U.S. 26 (1976).......................................................................132

*Skinner v. Ry. Labor Execs. Ass'n*,
  489 U.S. 602 (1989) ............................................................... 141, 142

*Smith v. Town of Lake Providence*,
  No. 3:22-CV-01319, 2022 WL 16626762 (W.D. La. Oct. 17, 2022)....................273

*Spiegel v. City of Houston*,
  636 F.2d 997 (5th Cir. Unit A 1981)...................................................................258

*Star Sys. Int'l Ltd. v. Neology, Inc.*,
  No. 4:18-CV-00574, 2019 WL 679138 (E.D. Tex. Feb. 19, 2019).....................211

*Stratton Oakmont, Inc. v. Prodigy Servs. Co.*,
  No. 31063/94, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995)...........................20

*Stringer v. Whitley*,
  942 F.3d 715 (5th Cir. 2019) ...................................................................107

*Tara Enters., Inc. v. Humble*,
  622 F.2d 400 (8th Cir. 1980) ...................................................................274

*Texas v. Rettig*,
  987 F.3d 518 (5th Cir. 2021), *cert. denied sub nom.*,
  *Texas v. Comm'r of Internal Revenue*, 142 S. Ct. 1308 (2022) .............................256

*Town of Chester v. Laroe Ests., Inc.*,
 581 U.S. 433 (2017) .......................................................................................134

*TransUnion LLC v. Ramirez*,
 141 S. Ct. 2190 (2021) .................................................................................114

*Trump v. Hawaii*,
 138 S. Ct. 2392 (2018) .................................................................................191

*Trump v. Mazars USA, LLP*,
 140 S. Ct. 2019 (2020) .................................................................................187

*Trump v. Twitter, Inc.*,
 602 F. Supp. 3d 1213 (N.D. Cal. 2022), *appeal filed*,
 No. 22-15961 (9th Cir. June 28, 2022).......................................................187, 188

*Turner v. Houma Mun. Fire & Police Civil Serv. Bd.*,
 229 F.3d 478 (5th Cir. 2000) .......................................................................273

*Ty, Inc. v. Jones Group, Inc.*,
 237 F.3d 891 (7th Cir. 2001) .......................................................................126

*United States v. Mackey*,
 No. 21-CR-80, 2023 WL 363595 (E.D.N.Y. Jan. 23, 2023)........................265, 266

*United States v. Phillip Morris USA Inc.*,
 566 F.3d 1095 (D.C. Cir. 2009) ...................................................................263

*United States v. Reddick*,
 900 F.3d 636 (5th Cir. 2018) .......................................................................225

*United States v. Scroggins*,
 599 F.3d 433 (5th Cir. 2010) .......................................................................223

*United States v. Stevens*,
 559 U.S. 460 (2010) .............................................................................251, 252

*United States v. Tobin*,
 No. 04-cr-216-01-sm, 2005 WL 3199672 (D.N.H. Nov. 30, 2005) ....................227

*VDARE Found. v. City of Colo. Springs*,
 11 F.4th 1151 (10th Cir. 2021), *cert. denied*, 142 S. Ct. 1208 (2022)............*passim*

*Vote.Org v. Callanen*,
 39 F.4th 297 (5th Cir. 2022) .......................................................................135

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*,
 576 U.S. 200 (2015) ...............................................................102, 138, 176, 250

*Walmart Inc. v. U.S. Dep't of Just.*,
    21 F.4th 300 (5th Cir. 2021) ........................................................................253

*Washington v. Trump*,
    858 F.3d 1168 (9th Cir. 2017) ......................................................................191

*Watts v. Northside Indep. Sch. Dist.*,
    37 F.4th 1094 (5th Cir. 2022) ......................................................................193

*White v. Commc'ns Workers of Am., AFL-CIO, Loc. 1300*,
    370 F.3d 346 (3d Cir. 2004) ................................................................143, 144

*Whitmore v. Arkansas*,
    495 U.S. 149 (1990) ......................................................................................130

*Williams-Yulee v. Fla. Bar*,
    575 U.S. 433 (2015) ......................................................................................252

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ................................................................101, 110, 257, 258

*X-Men Sec., Inc. v. Pataki*,
    196 F.3d 56 (2d Cir. 1999) ...........................................................................176

*Young v. Motion Picture Ass'n of Am., Inc.*,
    299 F.2d 119 (D.C. Cir. 1962) ......................................................................126

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ......................................................................................191

*Zamecnik v. Indian Prairie Sch. Dist.*,
    619 F. Supp. 2d 517 (N.D. Ill. 2007) ...........................................................264

*Zieper v. Metzinger*,
    474 F.3d 60 (2d Cir. 2007) ...................................................................177, 188

*Zimmerman v. City of Austin*,
    881 F.3d 378 (5th Cir. 2018) ........................................................................109

**STATUTES**

5 U.S.C. § 551.................................................................................................255, 256

5 U.S.C. § 553.........................................................................................................256

5 U.S.C. § 702.........................................................................................................255

5 U.S.C. § 704.........................................................................................................255

5 U.S.C. § 706...............................................................................................255

6 U.S.C. § 652..........................................................................................69, 254

18 U.S.C. § 241....................................................................................227, 265

18 U.S.C. § 912.....................................................................38, 68, 157, 249

18 U.S.C. § 1343.........................................................................................252

18 U.S.C. §§ 2251 *et seq.*.......................................................................265

22 U.S.C. § 2656 note........................................................................87, 254

28 U.S.C. § 533.............................................................................................254

42 U.S.C. § 284....................................................................................202, 254

42 U.S.C. § 285f...................................................................................65, 202

42 U.S.C. § 300u.........................................................................................254

47 U.S.C. § 230...........................................................................19, 20, 28

50 U.S.C. §§ 1701 *et seq.*........................................................................92

Telecommunications Act of 1996,
    Pub. L. No. 104-104, 110 Stat. 56 (codified at 47 U.S.C. § 230)...........................19

National Defense Authorization Act for Fiscal Year 2021,
    Pub. L. No. 116-283, 134 Stat. 3388...................................................81

Joint Resolution of Apr. 10, 2023,
    Pub. L. No. 118-3, 137 Stat. 6 ...........................................39, 115

**UNITED STATES CONSTITUTION**

U.S. Const. art. I, § 6...............................................................................188

U.S. Const. art. II, § 3 ...........................................................................191

**RULES**

Fed. R. Civ. P. 25.......................................................................................275

Fed. R. Civ. P. 65...............................................................................5, 262, 263

## REGULATIONS

Reorganization Plan No. 3 of 1966,
    31 Fed. Reg. 8855 (June 25, 2016) .................................................................40, 184

Office of the Assistant Secretary for Health; Statement of Organization, Functions and
    Delegations of Authority,
    52 Fed. Reg. 11,754 (Apr. 10, 1987).......................................................................40

Exec. Order No. 13,848,
    83 Fed. Reg. 46,843 (Sept. 12, 2018)..............................................................93, 197

Continuation of the National Emergency With Respect to Foreign Interference in or
    Undermining Public Confidence in United States Elections,
    84 Fed. Reg. 48,039 (Sept. 10, 2019)...............................................................93, 197

Exec. Order No. 13,925, Preventing Online Censorship,
    85 Fed. Reg. 34,079 (May 28, 2020), rescinded by
    Exec. Order No. 14,029, Revocation of Certain Presidential Actions and Technical
    Amendment, 86 Fed. Reg. 27,025 (May 14, 2021)...................................................21

Declaring a National Emergency Concerning the Novel Coronavirus (COVID-19)
    Outbreak, Proclamation No. 9994,
    85 Fed. Reg. 15,337 (Mar. 13, 2020) ...............................................................13, 116

Continuation of the National Emergency With Respect to Foreign Interference in or
    Undermining Public Confidence in the United States Elections,
    85 Fed. Reg. 56,469 (Sept. 10, 2020)...............................................................93, 197

Exec. Order No. 13,987,
    86 Fed. Reg. 7019 (Jan. 20, 2021) ..........................................................................40

Impact of Health Misinformation in the Digital Information Environment in the
    United States Throughout the COVID-19 Pandemic Request for Information (RFI),
    87 Fed. Reg. 12,712 (May 7, 2022) .................................................................. 44, 169, 184

## OTHER AUTHORITIES

11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and
    Procedure* § 2948.1 (3d ed. 2013) .......................................................................104

## INTRODUCTION

The record in this case shows that the Federal Government promoted necessary and responsible actions to protect public health, safety, and security when confronted by a deadly pandemic and hostile foreign assaults on critical election infrastructure. Among those efforts, various agencies and officials spoke publicly and privately with social media companies to promote the Government's message on issues of public health and safety, identify potential threats to election integrity and security on social media, and call the companies' attention to misinformation spreading on their platforms.

Plaintiffs condemn these efforts as a wide-ranging "Censorship Enterprise" constituting "some of the most egregious First Amendment violations in American history." Pls.' Supp. Prelim. Inj. Br. at 1 (Dkt. 214) ("PI Supp."). To do so, Plaintiffs press a far-ranging conspiracy theory in which dozens of federal agencies and officials, across multiple administrations, have allegedly coerced or colluded with every large-scale social media company to suppress speech and speakers expressing views on COVID-19 and election integrity that are "disfavored" by the current Administration. But Plaintiffs' repetition of the word "censorship" and its equivalents does not cure the significant factual deficiencies in their theory—including that much of the challenged conduct occurred in the previous Administration—or transform sheer speculation into concrete proof. Indeed, despite receiving thousands of pages of documents and deposing multiple federal officials over an eight-month period, Plaintiffs fail to cite any evidence of past or (critically) imminent violations of their First Amendment rights to support their request for extraordinary preliminary relief. And when confronted with evidence that *undermines* their arguments, Plaintiffs urge the Court to simply disregard the facts and adopt Plaintiffs' conclusory allegations and speculations instead. Although the Court accepted Plaintiffs' factual allegations in ruling on

Defendants' motion to dismiss, allegations alone are not enough to justify preliminary injunctive relief. Plaintiffs must now back up their allegations with evidence. Their failure to do so necessarily means that they cannot meet any of the preliminary injunction requirements.

*First*, and most starkly, Plaintiffs cannot establish that they will suffer any ongoing or imminent irreparable harm in the absence of a preliminary injunction. In their more than 500 pages of briefing, Plaintiffs devote just *two sentences* to this dispositive factor. And the only argument Plaintiffs advance is that because they have alleged a First Amendment violation, irreparable harm must be assumed. But even when a First Amendment violation is alleged, a plaintiff still must establish that the allegedly ongoing or imminent harm is *real*. Plaintiffs' stale, nearly year-old declarations pointing to even older content moderation decisions fail to make that showing.

*Second*, Plaintiffs cannot establish a likelihood of success on the merits. To start, Plaintiffs lack Article III standing. They submit no evidence of an impending harm to a legally cognizable interest. Nor do they submit evidence supporting their far-fetched assertion that impending harms—whatever they may be—will result from the Government's alleged coercion of social media companies, rather than the companies' own economic interest in maximizing advertising revenues (the lifeblood of their businesses) and societal influences that inform the companies' content moderation decisions. Absent this type of evidence, Plaintiffs have no basis for concluding that social media companies, which have regulated content on their platforms since the industry's earliest days and which are not parties to this case, will spontaneously cease their content moderation efforts if the Court enjoins the Government from speaking.

Plaintiffs' claims fare no better on the merits. To succeed on their First Amendment claims, Plaintiffs must first make the difficult showing that a particular content moderation decision that harmed them is attributable to a particular Defendant. The Supreme Court has repeatedly held that

the government may be deemed responsible for private conduct only if (1) the government coerced, or significantly encouraged to the point of compelling, the private party into engaging in that conduct, or (2) the government jointly participated in that conduct to such an extent that the private party operated as a government actor. The record here contains no evidence satisfying these demanding standards. Rather, it shows that government officials expressed positions on matters of significant public concern—precisely what the Government is entitled to do, and indeed what the public expects. The Constitution preserves the Government's right to encourage specific private behavior, such as joining a war effort, stopping the sale of cigarettes to children, and—in this case—reducing the spread of misinformation that undermines election security or the nation's efforts to protect the public from the spread of a deadly disease. A social media company's independent decision to follow the Government's urgings does not transform the company's conduct into government action.

Nor does the statutory environment alter the analysis. Plaintiffs make much of the fact that federal officials, including members of a separate branch of government, have advocated for reform to § 230 of the Communications Decency Act. Those calls for reform have come from Members of Congress from both major political parties, federal officials from multiple administrations, and Defendants and non-Defendants alike. That social media companies—like many other important companies—face the potential for legislative reform does not transform each and every suggestion or encouragement from a federal official into a potential constitutional problem. Yet adopting Plaintiffs' legal theory would have precisely that result, thrusting courts into the role of policing every communication from any federal official to or about a social media company, and disabling federal officials from freely advocating in the public interest as to some

of the most critical actors in our society. Neither the state action doctrine nor the First Amendment warrants that result.

In tacit acknowledgement that they cannot satisfy the actual state action standard, Plaintiffs repeatedly urge the Court to water that standard down, or even to adopt Plaintiffs' newly created state action theories (such as "deception" or "collusion") instead. Plaintiffs then repeatedly mischaracterize the evidence to fit those newly fabricated theories. But no matter how Plaintiffs spin the law or the evidence, they fail to satisfy their burden of showing that any single Defendant is *responsible* for any particular content moderation decision under settled state action principles. And in the absence of any such evidence, Plaintiffs' claims do not vindicate any free speech interest. Rather, they simply seek to portray government speech on a range of topics with which Plaintiffs disagree as "censorship" and to invoke the authority of the Court to silence that speech. The First Amendment lends no support to that effort.

Plaintiffs face no greater likelihood of success on their ultra vires and Administrative Procedure Act (APA) claims. Those claims run up against several jurisdictional hurdles. And on the merits, Plaintiffs merely rehash their failed First Amendment claims and advance a claim of procedurally improper rulemaking that is specious on its face.

*Third*, the balance of harms tips sharply in favor of Defendants. Plaintiffs' interests in preventing interference with their First Amendment freedoms may be substantial in the abstract, but on this record, they are entirely speculative, and they are far outweighed by the Government's interest in speaking and taking action to promote the public interest. Plaintiffs' sweeping and vague proposed injunction would effectively muzzle the White House and multiple federal agencies, with dire consequences for law enforcement, national security, and public health interests that Defendants have the power and duty to protect. In particular, as explained in five agency

declarations filed with this brief, Plaintiffs' proposed injunction could prevent the dissemination of vital public health information, communications with social media companies about criminal activity in process on their platforms, and efforts to act on national security threats relating to international terrorism and election security. The resulting harm inflicted on society as a whole is reason enough to deny Plaintiffs' requested preliminary injunction.

Moreover, even if Plaintiffs could satisfy each of the requirements for a preliminary injunction, their proposed injunction should be denied because it fails to satisfy the specificity requirement of Federal Rule of Civil Procedure 65(d). The proposed injunction's numerous vague and undefined terms fail to put Defendants on reasonable notice as to what conduct is enjoined. The injunction is also overbroad, as it would sweep in a host of government conduct that does not implicate any protected First Amendment interest, while obstructing legitimate efforts by the Federal Government to fulfill its critical law enforcement, national security, and public health missions.

The Court should deny Plaintiffs' motion for a preliminary injunction.

## BACKGROUND AND PROPOSED FINDINGS OF FACT

I. **For years, in response to public sentiment, social media companies have sought to identify and contain misinformation on their platforms.**

A. **Since their emergence, social media companies have been economically incentivized to moderate content on their platforms.**

1.    Social media companies, such as Facebook, Twitter, and YouTube, are for-profit companies that allow users and advertisers to post content on their platforms subject to their terms of service. Since the emergence of the first social media companies in the early 2000s, these companies have moderated content uploaded to their platforms. *See, e.g.*, *Making the Internet Safe for Kids: The Role of ISP's and Social Networking Sites: Hearing Before the Subcomm. on Oversight & Investigations of the H. Comm. on Energy & Com.*, 109th Cong. 214-16 (2006)

(statement of Chris Kelly, Chief Privacy Officer, Facebook.com, Inc.); *see also id.* at 219 (statement of Michael Agnus, Executive Vice President & General Counsel, MySpace).[1] For example, as early as 2003, the earliest social media platforms (*e.g.*, Friendster) had terms of service that included content moderation provisions that barred, among other things, false and misleading information. Declaration of Dr. Stuart Gurrea (Gurrea Decl.) ¶¶ 12, 68 (Ex. 1). Over the years as social media companies grew and developed, including periods well before 2020, content moderation by the companies "has responded to evolving concerns, including terrorism, election interference, and public health concerns." *Id.* Today, each major company requires users and advertisers to agree to extensive conditions—including conditions related to content moderation—in exchange for authorization to use its platforms.[2]

2.      As Defendants' expert economist Dr. Stuart Gurrea has explained, social media platforms are intrinsically economically incentivized to moderate content on their platforms because moderation contributes to retaining users and increasing their engagement. Gurrea Decl. ¶¶ 12, 44-46. (Ex. 1).[3] Increased user numbers and engagement, in turn, increases the number of

---

[1] *See* Gurrea Decl. ¶¶ 12-13 (Ex. 1) (explaining that social media companies have moderated content since their emergence).

[2] *See* Gurrea Decl. ¶ 12 (Ex. 1).

[3] Social media platforms are a type of two- (or multi-) sided market where, on one side of the platform, users interact with each other or access content and, on the other side, advertisers target consumers through the platform. Gurrea Decl. ¶ 33 (Ex. 1). Typically, social media platforms attract and maintain a large user base and collect user data—and users derive more value from the platforms as the number of users increase. *Id.* ¶ 34. On the other side of the platform, advertisers target users with specific demographic characteristics or interests, and social media platforms facilitate this targeted advertising by relying on user data. *Id.* ¶ 35. Advertisers on social media platforms want their products displayed on their platform in a manner that enhances the brand reputation of the product, as brand reputation affects consumer decisions. *Id.* ¶ 36. And because social media platforms primarily generate revenue through advertising, it is in their economic interest to attract a large user base and increase user engagement. *Id.* ¶ 39. Consequently, "social media platforms are incentivized economically to moderate content on their platforms because content moderation is a quality-control decision that impacts user engagement and advertising revenue." *Id.* ¶ 42.

people viewing advertisements, thus resulting in an increase in both advertising revenues and platforms' profits. *Id.* ¶¶ 11, 41. In addition, content moderation that preserves or enhances the reputation and value of an advertiser's product directly makes the platform more valuable to the advertiser, and therefore increases advertising revenues and the platform's profits. *Id.* ¶¶ 12, 38, 48. Conversely, inadequate content moderation that is detrimental to user engagement likely will reduce advertising revenue because the value of a platform to advertisers depends on the level of user engagement and the quality of the user experience. *Id.* ¶¶ 12, 38, 45, 54, 62. This is particularly true for Twitter, Facebook, and YouTube, among others, as they operate under "particularly strong economic incentives to moderate content," because they rely on a large user base to attract advertisers and thus focus on retaining the large group of users who may be alienated by more extreme views. *Id.* ¶ 44.

   3.   Consistent with Dr. Gurrea's analysis, the social media companies themselves have commented publicly that they adopt and apply their content moderation policies based on customer and advertiser demands. For example, a former representative from Twitter recently explained in congressional testimony that the company has long seen the "lawful but awful . . . speech of a small number of abusive users drive away countless others." *See* Ex. 2 at 6 (*Protecting Speech from Government Interference and Social Media Bias, Part 1: Twitter's Role in Suppressing the Biden Laptop Story: Hearing Before the H. Comm on Oversight & Accountability*, 118th Cong. (2023)); *see also id.* at 5 (emphasizing the importance of "the health of the conversation"). Twitter's decision to adopt and apply content moderation policies "was based on customer research, advertiser feedback, Twitter's declining revenue, user growth, and stock price." *Id.*

   4.   Other social media platforms similarly have attested to the user and advertiser preferences that have long impelled platform content moderation policies and measures. For

example, a YouTube representative has explained that "advertisers typically do not want to be associated with controversial or sensitive content on YouTube," and so the company allows content creators "the privilege of earning advertiser revenue," or "monetization," of the videos they post, only if those content creators "meet more restrictive criteria, including" certain "Advertiser-friendly Content Guidelines." Declaration of Alexandra N. Veitch ¶¶ 17, 50, *Netchoice, LLC v. Paxton*, No. 21-cv-840 (W.D. Tx. Sept. 30, 2021), ECF No. 8-5 (Ex. 3). And similarly, "advertisers will not advertise on Facebook if they believe it is not effective at removing harmful content or content that violates [its] community standards. Indeed, people and advertisers have stopped using Facebook due to these concerns." Declaration of Neil Potts ¶ 8, *Netchoice, LLC v. Paxton*, No. 21-cv-840 (W.D. Tx. Sept. 30, 2021), ECF No. 8-6 (Ex. 4); *cf. NetChoice, LLC v. Paxton*, 49 F.4th 439 (5th Cir. 2022) (vacating preliminary injunction and remanding), *pet'n for cert. filed*, No. 22-555 (U.S. Dec. 15, 2022).

5.    Platform responses to advertiser concerns stem from real world experience. In 2017, for example, a wave of companies pulled their advertisements from YouTube for fear of association with "offensive or extremist videos," before YouTube bolstered its policies and enforcement. *See* Ex. 84 at 2 (Brett Molina, *Many YouTube creators frustrated by changes in policies, practices*, USA TODAY (Apr. 5, 2018)) ("Major advertisers including AT&T and Verizon started pulling their business from YouTube in March 2017 after discovering their ads were appearing on offensive or extremist videos. YouTube parent company Google said it would start an 'extensive review' of its ad policies."). In 2020, Facebook similarly was forced to address advertiser concerns when "[m]ore than 750 companies including Coca-Cola, Hershey and Unilever . . . temporarily paused their advertising on Facebook and its subsidiary Instagram" upon being "unimpressed with promises to better police hate speech." Ex. 150 (Elizabeth Dwoskin &

Taylor Telford, *Facebook is working to persuade advertisers to abandon their boycott. So far, they aren't impressed.*, Wash. Post (Jul. 3, 2020)).[4]

> **B. After the 2016 U.S. presidential election, social media companies took significant steps to combat election-related influence campaigns and misinformation on their platforms.**

6.      Although social media companies have long moderated content on their platforms, *see* Gurrea Decl. ¶¶ 66-78 (Ex. 1), the 2016 U.S. presidential election marked a turning point for the companies. The U.S. intelligence community,[5] a Department of Justice-appointed special counsel,[6] and bipartisan majorities of the intelligence committees for both houses of Congress all concluded that Russian agents had interfered with the 2016 election, including by conducting an influence campaign on social media. *See, e.g.*, Ex. 7 at 14 (H. Permanent Select Comm. on Intell., Report on Russian Active Measures, H.R. Rep. No. 115-1110 (2018)) (finding that "Russian intelligence leveraged social media in an attempt to sow social discord and to undermine the U.S. electoral process").[7] Among its many findings, the House Permanent Select Committee on

---

[4] Recent events, too, confirm that market forces demand that social media companies adopt and apply content moderation policies. For example, when Elon Musk in 2022 acquired control of Twitter and substantially relaxed its content moderation policies, Twitter lost half of its top advertisers, according to a report by Media Matters for America. *See* Ex. 5 at 2 (Halisia Hubbard, *Twitter has lost 50 of its top 100 advertisers since Elon Musk took over, report says*, Nat'l Public Radio (Nov. 25, 2022)). Twitter also is estimated to lose 32 million users over the next two years, including based on concerns about the proliferation of hate speech because of Mr. Musk's relaxation of Twitter's content moderation policies, according to a forecast by Insider Intelligence. *See* Ex. 6 at 2 (Mark Sweney, *Twitter 'to lose 32m users in two years after Elon Musk Takeover,'* The Guardian (Dec. 13, 2022)).

[5] *See* Ex. 8 (Office of the Director of National Intelligence, Background to "Assessing Russian Activities and Intentions in Recent U.S. Elections": The Analytic Process and Cyber Incident Attribution (2017)).

[6] *See* Special Counsel Robert S. Mueller, III, U.S. Dep't of Justice, Report on the Investigation into Russian Interference in the 2016 Presidential Election (2019) (Redacted version released Apr. 18, 2019).

[7] "Russia's targeting of the 2016 U.S. presidential election was part of a broader, sophisticated, and ongoing information warfare campaign designed to sow discord in American politics and

Intelligence ("Committee") concluded that "[h]acked material," including material from the Democratic National Committee ("DNC"), "was disseminated through [a] myriad network of actors with the objective of undermining the effectiveness of the future administration." Ex. 7 at 12. "This dissemination worked in conjunction with derisive messages posted on social media to undermine confidence in the election and sow fear and division in American society." *Id.* The Committee opined further that, "[a]s a country, it is time for us to reflect, understand what happened, fix the discovered problems, and unify around the common purpose of countering any future influence campaigns by Russia or any other nation." *Id.* at 10.

7.      Demands for action from Congress and the public had a profound impact on the behavior of social media companies. *See* Gurrea Decl. ¶ 73 (Ex. 1) ("[t]rust and safety in the realm of political speech" became a "bigger concern" in the context of the 2016 U.S. presidential election). Congressional committees, for example, repeatedly called social media executives to testify in public hearings about what had gone wrong on their platforms in 2016, and how the companies would adjust their policies.[8]

8.      Twitter understood that it was being "told in no uncertain terms, by the public and by Congress, that [it] had a responsibility to do a better job protecting future elections." Ex. 10 at

---

society." Ex. 9 at 75 (S. Select Comm. on Intelligence, Report, Russian Active Measures Campaigns and Interference in the 2016 U.S. Election, Volume II: Russia's Use of Social Media, S. Rep. No. 116-290 (2020)).

[8] *See, e.g., Extremist Content and Russian Disinformation Online: Working with Tech to Find Solutions: Hearing Before the Subcomm. on Crime & Terrorism of the S. Comm. on the Judiciary*, 115th Cong. (2017); *Russia Investigative Task Force Hearing with Social Media Companies: Hearing before the H. Comm. on Intell.*, 115th Cong. (2017); *Social Media Influence in the 2016 U.S. Election: Hearing Before the S. Comm. on Intell.*, 115th Cong. (2017); *Foreign Influence Operations' Use of Social Media Platforms (Company Witnesses), Hearing Before the S. Comm. on Intell.*, 115th Cong. (2018); *Securing U.S. Election Infrastructure and Protecting Political Discourse: Hearing Before the Subcomm. on Nat'l Sec. of the H. Comm. on Oversight & Reform*, 115th Cong. (2019).

3 (*Protecting Speech from Government Interference and Social Media Bias, Part 1: Twitter's Role in Suppressing the Biden Laptop Story: Hearing Before the H. Comm on Oversight & Accountability*, 118th Cong. (2023) (opening statement of Yoel Roth, Former Head of Trust & Safety, Twitter, Inc.). Moreover, Twitter was "economically incentivized to moderate low-quality content in the sphere of politics because it recognized that user engagement drove the majority of its revenues through advertising." Gurrea Decl. ¶ 74 (Ex. 1). As Twitter explained in its Form 10-K annual report in December 2016, "[i]f people do not perceive our products and services to be useful, reliable and *trustworthy*, we may not be able to attract users or increase the frequency of their engagement with our platform and the ads that we display." *Id.* (emphasis added) (quoting Twitter, Inc., Annual Report (Form 10-K) (Feb. 27, 2017)). To that end, in 2018, Twitter adopted a policy to prevent hacked materials from being placed on its platform, *id.*, and it removed at least 70 million bot (fake) accounts relating to political issues, Gurrea Decl. ¶ 74 (Ex. 1). And before the 2020 election, Twitter "updated [its] civic integrity policy to address misleading or disputed information that undermines confidence in the election, causes voter intimidation or suppression or confusion about how to vote or misrepresents affiliation or election outcomes." Ex. 14 at 4 (*Censorship and the 2020 Election: Hearing Before the S. Comm. on the Judiciary*, 116th Cong. (2020)) (statement of Jack Dorsey, CEO, Twitter, Inc.). In response to calls from the public "to offer additional context to help make potentially misleading information more apparent," Twitter applied labels to over 300,000 tweets concerning the 2020 election between October 27, 2020, and November 11, 2020. *Id.*

9.      Facebook responded to the public's calls as well. On November 18, 2016, Facebook CEO Mark Zuckerberg published an "update" on Facebook in response to "[a] lot" of Facebook users' questions about "what we're doing about misinformation" relating to elections. Ex. 11

(Mark Zuckerberg, Facebook (Nov. 18, 2016)). Mr. Zuckerberg assured the public that Facebook "take[s] misinformation seriously" and would be implementing a host of new measures to crack down on misinformation on the platform. *Id.* On January 4, 2018, Mr. Zuckerberg published a post on Facebook where he recognized that "Facebook has a lot of work to do—whether it's protecting our community from abuse and hate, defending against interference by nation states, or making sure that time spent on Facebook is time well spent." *See* Ex. 12 (Mark Zuckerberg, Facebook (Jan. 4, 2018)). Accordingly, Mr. Zuckerberg explained that his "personal challenge for 2018 is to focus on fixing these important issues" and that "[t]his will be a serious year of self-improvement[.]" *Id.* In October 2019, as the 2020 presidential election approached, Facebook redoubled its efforts, announcing that it was taking "several new measures to help protect the democratic process" in advance of the 2020 elections, including attempts to "[p]revent[] the spread of misinformation" through "clearer fact-checking label*s*[.]" Ex. 13 (Guy Rosen, et al., *Helping to Protect the 2020 US Elections*, Meta (Oct. 21, 2019)). Among other things, Facebook "built sophisticated systems to protect against election interference that combined artificial intelligence, significant human review and partnerships with the intelligence community, law enforcement and other tech platforms." *See* Ex. 14 at 4 (statement of Mark Zuckerberg, CEO, Facebook). Further, Facebook "locked down new political ads in the week before the [2020] election to prevent misleading claims from spreading" and "strengthened [its] enforcement against malicious and conspiracy networks like Qanon"—all with the explanation that "[t]his is what people expect of [Facebook]." *Id.* Put simply, Facebook "heard resoundingly from [its] community that people do not want to see [election-related] misinformation and believe it is a problem." *Id.* at 10.

**C.  As the COVID-19 pandemic emerged, social media companies sought to address health misinformation on their platforms.**

10.    The COVID-19 pandemic marked another turning point for social media companies. In early 2020, the emergence of the pandemic precipitated a public health crisis, loss of life, fear, and economic disruption across the country and the world. To date, more than 103 million Americans have reportedly contracted the virus, resulting in more than 6 million hospitalizations and 1.12 million deaths. Ex. 15 (*COVID Data Tracker*, Ctrs. for Disease Control & Prevention (last updated Apr. 25, 2023)). In January 2020, the Secretary of Health and Human Services ("HHS") declared COVID-19 a public health emergency; in March 2020, then-President Trump declared a national emergency. *See* Declaring a National Emergency Concerning the Novel Coronavirus (COVID-19) Outbreak, Proclamation No. 9994, 85 Fed. Reg. 15,337 (Mar. 13, 2020).

11.    In this pandemic environment, it became immediately apparent to global health authorities that COVID-19 misinformation, especially when it circulated on social media, could lead to death and intensify suffering worldwide. As the United Nations Secretary-General explained in a public statement, "[a]s soon as the virus spread across the globe, inaccurate and even dangerous messages proliferated wildly over social media, leaving people confused, misled, and ill-advised." Ex. 16 (*COVID-19 pandemic: countries urged to take stronger action to stop spread of harmful information*, World Health Org. (Sept. 23, 2020)). The World Health Organization ("WHO"), together with the United Nations and other partners, called upon countries to "take stronger action to stop [the] spread of harmful information" relating to the pandemic. *Id.* In May 2020, WHO member states (including the United States) adopted a resolution recognizing that managing the "infodemic" of COVID-19 misinformation is "a critical part of controlling the COVID-19 pandemic[.]" *Id.* In June 2020, 132 countries (including the United States) signed onto a "cross-regional statement on 'infodemic' in the context of COVID-19" stating, among other

things, that "social media platforms" have "a clear role and responsibility in helping people to deal with the 'infodemic.'" Ex. 17 at 2 (*Cross-Regional Statement on 'Infodemic' in the Context of COVID-19*, U.S. Mission to the United Nations (June 12, 2020)).

12.    Well before these 132 countries called on them to act, social media companies had already begun adopting measures to curb the spread of COVID-19-related misinformation on their platforms. For some companies, including YouTube, Facebook, and Pinterest, this was not their first foray into curbing the spread of public health misinformation. *See* Gurrea Decl. ¶¶ 76-77 (Ex. 1). In a March 2020 blog post, Facebook explained that removing health misinformation from its platform was nothing new: "We've removed harmful [health-related] misinformation since 2018, including false information about the measles in Samoa where it could have furthered an outbreak and rumors about the polio vaccine in Pakistan where it risked harm to health and aid workers." Ex. 18 at 3 (Nick Clegg, *Combating COVID-19 Misinformation Across Our Apps*, Meta (Mar. 25, 2020)). Beginning in January 2020, Facebook "applied this policy to misinformation about COVID-19 to remove posts that make false claims about cures, treatments, the availability of essential services or the location and severity of the outbreak." *Id.* Twitter likewise introduced policies to "address content that goes directly against guidance from authoritative sources of global and local public health information." Ex. 19 at 4 (Vijaya Gadde & Matt Derella, *An update on our continuity strategy during COVID-19*, Twitter Blog (Mar. 16, 2020; updated Apr. 1, 2020)).

13.    These policies resulted in widespread content moderation by social media platforms in early 2020. Twitter reported that, during a two-week period in March 2020 alone, it had "removed more than 1,100 tweets containing misleading and potentially harmful content" and "challenged more than 1.5 million accounts which were targeting discussions around COVID-19 with spammy or manipulative behaviors." *Id.* And Facebook reported in April 2020 that, "during

the month of March [2020], [it] displayed warnings on about 40 million posts related to COVID-19," and had "removed hundreds of thousands of pieces of misinformation that could lead to imminent physical harm," including "theories like physical distancing is ineffective in preventing the disease from spreading." Ex. 20 at 5 (Guy Rosen, *An Update on Our Work to Keep People Informed and Limit Misinformation About COVID-19*, Meta (Apr. 16, 2020)).

14.    As the nation's pandemic response progressed, the companies consulted "guidance from the WHO and other health authorities" when updating their policies. *See* Ex. 18 at 3. For instance, in February 2021, following "consultations with leading health organizations[] including the [WHO]," Facebook expanded "the list of false claims [it would] remove to include additional debunked claims about the coronavirus and vaccines." *See* Ex. 20 at 1-2. And in March 2021, Facebook consulted the "High Level Panel on Vaccine Confidence & Misinformation" (a coalition organized by the London School of Hygiene and Tropical Medicine and others) and the Vaccine Confidence Project (an international research group) about its approach to moderating vaccine-hesitant content. *See* Pls.' Suppl. Br. Ex. A, at 42 (Dkt. 174-1) (email from Facebook executive). In September 2021, Google announced that YouTube would remove content containing false claims about COVID-19 vaccines—a decision that was reached in consultation with "local and international health organizations and experts," including the WHO. Ex. 153 at 1 (YouTube Team, *Managing harmful vaccine content on YouTube*, YouTube Official Blog (Sept. 29, 2021)).

**D. Social media companies have long taken actions short of removal against "borderline content" that is not expressly prohibited by their content moderation removal policies.**

15.    The companies' efforts to limit the spread of misinformation on their platforms have been multifaceted. As one Twitter representative recently testified, "[c]ompanies like Twitter—teams like mine—have to exercise judgment about where to draw the line on [problematic] content and implement that judgment consistently at the scale of hundreds of millions of unique posts per

day." *See* Ex. 10 at 4. One way in which the companies tackle this difficult task is by taking actions short of removal—including downgrading and labeling posts—against "borderline content," or "content that [is] not prohibited" outright by a company's community standards but that "come[s] close to the lines drawn by those policies." Ex. 22 at 21 (Transparency Center, *Content Borderline to Community Standards*, Meta (Sept. 23, 2021)). Since 2018, Facebook, Twitter, and YouTube have each taken steps to discourage and demote borderline content.[9]

16.     In a blog post, Facebook CEO Mark Zuckerberg explained the "basic incentive problem" that prompted the company to moderate borderline content. Ex. 23 at 7. According to Mr. Zuckerberg, "[o]ne of the biggest issues social networks face is that, when left unchecked, people will engage disproportionately with more sensationalist and provocative content." *Id.* Even though users were more likely to engage with borderline content, they consistently reported to Facebook that such content "degrade[s] the quality of [Facebook's] services." *Id.* at 6. As. Dr. Gurrea notes, these reports about "quality" are highly concerning to large platforms like Facebook because "low-quality content" drives advertisers and users away from the platform, *see* Gurrea Decl. ¶¶ 59-64 (Ex. 1)—even if, as Facebook acknowledges, people "engage with [it]," *see* Ex. 23 at 8 ("People consistently tell us these types of content make our services worse—even though they engage with them."). But simply adjusting Facebook's community standards categorically to require removal of more types of low-quality content would not solve the problem, because "no matter where [Facebook] draw[s] the lines for what is allowed, as a piece of content gets close to

---

[9] *See* Ex. 23 at 6-9 (Mark Zuckerberg, *A Blueprint for Content Governance and Enforcement*, Facebook (Nov. 15, 2018), https://perma.cc/ZK5C-ZTSX); Ex. 24 at 2 (YouTube Team, *Continuing our work to improve recommendations on YouTube*, YouTube Official Blog (Jan. 25, 2019), https://perma.cc/FH3M-KL6U); Ex. 25 (Alex Kantrowitz, *Twitter is Going to Limit the Visibility of Tweets from People Behaving Badly*, BuzzFeed News (May 15, 2018), https://perma.cc/RRU8-X4R3) (quoting a statement from Twitter's CEO).

that line, people will engage with it more on average—even when they tell us afterwards they don't like the content." *Id.* at 7. At the time of Mr. Zuckerberg's post in 2018, the most concerning forms of borderline content were "click-bait and misinformation." *Id.* at 8.

17. To address this problem, Mr. Zuckerberg announced that Facebook would address "borderline content so it gets less distribution and engagement." *Id.* The announcement included the following graph:



*Id.* at 7. "By making the distribution curve look like the graph [above] where distribution declines as content gets more sensational," Mr. Zuckerberg explained, "people are disincentivized from creating provocative content that is as close to the line as possible." *Id.* Facebook's goal was to "create a healthier, less polarized discourse where more people feel safe participating." *Id.* at 9. And reducing the distribution of such content would address the consistent concern that Facebook heard from users that "these types of content make [its] services worse." *Id.* at 8.

18. YouTube made a similar announcement in January 2019. *See* Ex. 24. YouTube announced that it was "taking a closer look at how [it could] reduce the spread of content that comes close to—but doesn't quite cross the line of—violating [its] Community Guidelines." *Id.* at 2. And "[t]o that end," YouTube would begin "reducing recommendations of borderline content

and content that could misinform users in harmful ways." *Id.* Specific examples included "videos promoting a phony miracle cure for a serious illness." *Id.*

19.  The companies' approaches to borderline content have been extensively scrutinized— and, at times, criticized—by scholars and observers, in part because of a lack of transparency. As one commentator noted, reducing the visibility of content amorphously described as "approaching the line" means "not having to articulate an explicit policy; this gives platforms the flexibility to intervene around quickly emerging phenomena, go after content designed to elude prohibitions, and curtail content they 'know' is bad but have a hard time articulating why." Ex. 26 at 12 (Tarleton Gillespie, *Reduction/Borderline content/Shadowbanning*, Yale-Wikimedia Initiative on Intermediaries & Info. (July 20, 2022)). These policies thus "avoid[] accountability, . . . and are not—yet—reported as part of the platform[s'] transparency obligations." *Id.*; *see also* Evelyn Douek, *Facebook's "Oversight Board:" Move Fast with Stable Infrastructure and Humility*, 21 N.C. J. L. & Tech. 1, 42-43 (2019) (highlighting ways in which borderline content policies lack transparency).

20.  The companies have moderated COVID-19 content under their borderline content policies, although they have not publicly provided extensive details as to how those policies are applied. In July 2021, Facebook announced that "[s]ince the beginning of the pandemic," it had "labeled and reduced the visibility of more than 167 million pieces of COVID-19 content debunked by our network of fact-checking partners." Ex. 27 at 3 (Guy Rosen, *Moving Past the Finger Pointing*, Meta (July 17, 2021)). And since September 2021, Facebook's borderline content policy page has listed—among other kinds of borderline content—"[c]ontent that does not violate our COVID-19 or vaccine policies, but which shares misleading or sensationalized information about vaccines in a way that would be likely to discourage vaccinations." Ex. 22 at 2. YouTube,

too, has noted that its work to "reduc[e] recommendations of borderline content" has been "foundational [to] ensuring that we limit the spread of COVID-19 related borderline content on our site." Ex. 28 at 2 (*How has YouTube responded to the global COVID-19 crisis?*, YouTube, https://perma.cc/3CCA-SNLE) YouTube. Beyond highlighting their efforts generally, the companies have not catalogued the content that has been removed under their borderline content policies.

### E. Bipartisan calls to revise or revoke Section 230 have repeatedly arisen over the years.

21.    Enacted in 1996, § 509 of the Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56, 138-39 (codified at 47 U.S.C. § 230), commonly known as § 230, has been interpreted to immunize social media companies from liability for their content moderation decisions. In particular, paragraph (c)(1) states: "No provider . . . of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). Paragraph (c)(2) further provides:

> No provider or user of an interactive computer service shall be held liable on account of —
>
> (A)    any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or
>
> (B)    any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph [A].

47 U.S.C. § 230(c)(2). The statute also provides that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." *Id.* § 230(e)(3).

22.    The problem Congress sought to solve in § 230(c) arose from a New York state trial court's ruling that an internet service provider that had voluntarily deleted some messages from an

online message board was then "legally responsible for the content of defamatory messages that it failed to delete." *See Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1162 (9th Cir. 2008) (discussing *Stratton Oakmont, Inc. v. Prodigy Servs. Co.*, No. 31063/94, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995)). Congress responded to that ruling by "immuniz[ing] the removal of user-generated content" through § 230. *Id*. That is, § 230 "provides 'Good Samaritan' protections from civil liability for providers . . . of an interactive computer service for actions to restrict . . . access to objectionable online material." H.R. Rep. No. 104-458, at 194 (1996) (Conf. Rep.), *as reprinted in* 1996 U.S.C.C.A.N. 10. In enacting § 230(c), Congress made findings describing online platforms as offering "a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity." 47 U.S.C. § 230(a)(3). Accordingly, it is established that "the policy of the United States" is "to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation[.]" *Id.* § 230(b).

23.    Bipartisan concerns about § 230 have been expressed for years, and efforts to reform or revoke § 230 have been made for nearly as long. For example, congressional inquiries, including in 2016 and in 2019, explored the concerns of some legislators about allegations of politically biased content moderation by online platforms that have asserted that § 230(c) immunizes them from liability for their content moderation decisions—concerns that then-President Trump echoed in 2019 and 2020.[10] Then-President Trump tweeted: "REVOKE 230!" Ex. 31 at 1 (Donald J. Trump (@realDonaldJTrump), Twitter (May 29, 2020, 11:15 AM)). In October 2021, then-

---

[10] *See*, *e.g.*, Ex. 29 (Letter from Senator John Thune to Mark Zuckerberg, Chairman and Chief Executive Officer, Facebook, Inc. (May 10, 2016)); Ex. 30 (*Stifling Free Speech: Technological Censorship and the Public Discourse: Hearing Before the Subcomm. on the Const. of the S. Comm. on the Judiciary*, 116th Cong. (2019)); Remarks by President Trump at the Presidential Social Media Summit, 2019 WL 3072280, at *15 (July 11, 2019).

Missouri Attorney General Eric Schmitt similarly tweeted: "Get rid of section 230 protections, treat them like common carriers, bust up #BigTech." Ex. 32 at 1 (Eric Schmitt (@Eric_Schmitt) (Oct. 12, 2021, 3:06 PM)). Then-Attorney General William P. Barr observed in February 2020 that "[t]echnology has changed in ways that no one, including the drafters of [§] 230, could have imagined." Ex. 33 at 2 (William P. Barr, Att'y Gen., Opening Remarks at the DOJ Workshop on Section 230: Nurturing Innovation or Fostering Unaccountability? (Feb. 19, 2020)). Four months later, then-Attorney General Barr issued several proposed recommendations to reform § 230 so as to "provide stronger incentives for online platforms to address illicit material on their services while continuing to foster innovation and free speech." Ex. 34 at 1 (Press Release, U.S. Dep't of Just., Justice Department Issues Recommendations for Section 230 Reform (June 17, 2020), https://perma.cc/9S5E-JXLX). Noting that the Department of Justice was "[r]esponding to bipartisan concerns about the scope of 230 immunity," the recommendations "identified a set of concrete reform proposals to provide stronger incentives for online platforms to address illicit material[s] on their services while continuing to foster innovation and free speech." *Id.* Among the recommendations was "to make clear that federal antitrust claims are not, and were never intended to be, covered by Section 230 immunity." *Id.* at 2. In May 2020, former President Trump issued an Executive Order, entitled "Preventing Online Censorship," in which he directed the Federal Government to narrowly construe protections against liability for social media companies in § 230 in light of the purported decisions of those companies to provide "warning label[s]" on the speech of some individuals but not others.[11] For his part, President Biden has also participated in the

---

[11] Exec. Order No. 13,925, Preventing Online Censorship, § 1, 85 Fed. Reg. 34,079, 34,079 (May 28, 2020), rescinded by Exec. Order No. 14,029, Revocation of Certain Presidential Actions and Technical Amendment, § 1, 86 Fed. Reg. 27,025 (May 14, 2021). Similarly, proposed legislation both before and after then-President Trump's issuance of Executive Order 13925 sought to narrow § 230 and explored concerns by Republican legislators about online platforms' "selective

public debate over § 230. *See* Mem. in Supp. of Defs.' MTD at 12 (Dkt. 128-1) ("Defs.' MTD") (quoting 2d. Am. Compl. ¶ 313 (Dkt. 84)).

II.    **Since 2017, Executive Branch agencies and officials have promoted authoritative information or expressed concerns with the spread of misinformation.**

24.    Beginning with the Trump Administration and continuing into the Biden Administration, the White House and Executive Branch agencies have responded in myriad ways to societal concerns over misinformation, particularly on social media platforms, that could endanger public health or threaten the integrity of our electoral processes. For instance, since at least 2017, in the face of revelations about foreign influence targeting the Nation's election infrastructure, agencies such as the Department of Homeland Security ("DHS"), the Federal Bureau of Investigation ("FBI"), and the predecessor agency to Cybersecurity and Infrastructure Security Agency ("CISA") worked with various segments of society—including state and local election officials and technology companies—to share information that could be used to identify and prevent the dissemination of election-related misinformation circulated by foreign adversaries and others. Beginning in 2020, in response to the deadly COVID-19 pandemic, public health authorities such as Centers for Disease Control and Prevention ("CDC") provided science-based, data-driven health information to protect the public against the virus's spread and helped social media companies identify misinformation about COVID-19 circulating on their platforms. The Surgeon General and the White House later used their bully pulpits to call on social media companies to take more aggressive action, consistent with their own corporate policies, against health misinformation on their platforms.

---

censorship" and lack of transparency in moderating content. *Compare* Ending Support for Internet Censorship Act, S. 1914, 116th Cong. (2019), *with* Limiting Section 230 Immunity to Good Samaritans Act, S. 3983, 116th Cong. (2020); Stopping Big Tech's Censorship Act, S. 4062, 116th Cong. (2020); Platform Accountability & Consumer Transparency Act, S. 4066, 116th Cong. (2020).

25.    In this action, Plaintiffs sue a total of 67 Federal agencies and official-capacity Defendants, in a sprawling Complaint that takes aim at numerous public statements and private communications by Executive Branch officials touching on matters of election security and the COVID-19 pandemic. Plaintiffs seek to treat this array of Executive Branch agencies and officials as a monolith, characterizing the disparate and independent actions of 67 different Defendants over multiple administrations as a single "Censorship Enterprise." PI Supp. 1. Plaintiffs provide no factual or legal basis for treating these various actions collectively as part of a single "enterprise," and the Court must consider whether preliminary injunctive relief is appropriate based on each Defendant's alleged conduct. Below, Defendants describe the relevant actions that the White House and each of the federal agency and official-capacity Defendants have or have not taken over the last two administrations, which apparently form the basis of (but do not support) Plaintiffs' request for sweeping and indiscriminate injunctive relief. *See also* Defs.' Resp. to Pls.' Proposed Findings of Fact in Supp. of Mot. for Prelim. Inj. ¶¶ 19-211 ("Defs.' Resp. PFOF") (filed concurrently with this brief).

**A. The White House**

26.    By early 2021, hundreds of thousands of Americans had lost their lives to COVID-19, and the pandemic was still rampant. Indeed, 23,629 COVID-related U.S. deaths were reported during the week of January 6-13, 2021, which still remains the single highest weekly total of reported COVID-19 deaths in the United States.[12]

27.    The Administration viewed social media as a powerful tool for promoting accurate, authoritative COVID-19 information, such as CDC guidance on vaccines, *see* Ex. 37 at 2 (*Press*

---

[12] Ex. 38 (*COVID Data Tracker: Trends in Number of COVID-19 Cases and Deaths in the US Reported to CDC, by State/Territory*, Ctrs. for Disease Control & Prevention (last updated Apr. 28, 2023)).

*Briefing by Press Secretary Jen Psaki*, The White House (July 16, 2021)) (discussing White House efforts to "meet people where they are" on social media), but was also concerned that misinformation relating to COVID-19 vaccines posed a critical threat to public health and contributed to preventable hospitalizations and deaths, *see* Ex. 36 at 19 (Defs.' Supp. Rog. Resp. Related to Robert Flaherty). Accordingly, during the first several months of the Biden Administration, White House officials began speaking with social media companies about promoting more accurate COVID-19 information and to better understand what actions the companies were taking to curb the spread of COVID-19 misinformation. These officials included Andy Slavitt, former Senior Advisor for the COVID-19 Response,[13] and Rob Flaherty, Director of Digital Strategy. Mr. Flaherty was responsible for overseeing the President's engagements on social media and outreach to digital creators, among other things. *See* Ex. 36 at 19.

28.    White House spokespeople—mainly former Press Secretary Jennifer Psaki—have spoken publicly about the President's view that social media companies ought to curb the spread of misinformation related to COVID-19 on their platforms. Other White House officials—mainly Mr. Flaherty—have also had numerous private communications with social media companies on a wide range of topics, including COVID-19 misinformation. The record does not show a single instance in which these individuals threatened legal or regulatory action against companies that chose not to heed the Administration's calls to address the COVID-19 misinformation circulating on their platforms. Nor does the record show that White House officials demanded that the companies change their content moderation policies or take action (regardless of existing policies) to address particular content that they view as potentially harmful COVID-19 misinformation. To

---

[13] Mr. Slavitt served for four months before stepping down in June 2021. Ex. 39 (Maeve Sheehey, *Andy Slavitt stepping down from White House Covid-19 response role*, Politico (June 9, 2021)).

the contrary, although the Administration has long urged the companies to combat misinformation on their platforms and has provided general recommendations to that effect, it has made "crystal clear" its view that "[a]ny decision about platform usage and who should be on the platform is orchestrated and determined by private-sector companies," and "not the federal government." Ex. 37 at 31 (Ms. Psaki July 16, 2021, press briefing statement).

### 1.  White House Public Statements

29.    President Biden and his spokespeople have repeatedly expressed concerns about the spread of potentially harmful misinformation on social media, especially related to COVID-19. In these public statements, Ms. Psaki and others have emphasized that, as private entities, *platforms* bear the responsibility for setting and enforcing their own policies concerning misinformation— policies with which the Government, like members of the public, may or may not agree.

### a.  *White House Press Briefings (Jennifer Psaki)*

30.    In 2021 and 2022, Ms. Psaki was regularly asked during White House press briefings for the President's views on social media companies' content moderation policies, particularly as they related to COVID-19 misinformation and whether the platforms should take action against former President Trump's accounts. Ms. Psaki repeatedly emphasized that, as private actors, social media companies make their own decisions about whether and how to moderate content on their platforms. *See, e.g.*, Ex. 147 at 15 (*Press Briefing by Press Secretary Jen Psaki and Secretary of Agriculture Tom Vilsack*, The White House (May 5, 2021)) (noting that the President "believe[s] in First Amendment rights" and that "social media platforms need to make" "the decisions" regarding "how they address the disinformation [and] "misinformation [that] . . . continue to proliferate on their platforms"); *Press Briefing by Press Secretary Jen Psaki and Director of the National Economic Council Brian Deese*, 2021 WL 2310371, at *9 (June 4, 2021) ("[A]s always,

[whether to moderate content is] a decision for the company to make and any platform to make."); *id.* at *10 ("This is a decision by a private-sector company.").

31.     The topic of COVID-19 misinformation was the focus of a July 15, 2021, joint press briefing with Surgeon General Vivek Murthy. Ex. 40 (*Press Briefing by Press Secretary Jen Psaki and Surgeon General Dr. Vivek H. Murthy*, The White House (July 15, 2021)). In that briefing, Ms. Psaki explained that the White House had been "in regular touch" with the platforms and "flagging . . . for Facebook" "problematic posts . . . that spread disinformation." *Id.* at 10. In the following day's briefing, she clarified that her reference to "flagging . . . problematic posts" was meant simply to reflect the Government's practice of "regularly making sure social media platforms are aware of the latest narratives dangerous to public health" and of "engag[ing] with [platforms] to better understand the enforcement of social media platform policies." Ex. 37 at 6. She emphasized that the Government does not "take anything down" or "block anything" and that platforms themselves, as "private-sector compan[ies]," "make[] decisions about what information should be on their platform[s]." *Id.* at 12. She reiterated this point three days later, on July 19: "It's up to social media platforms to determine what their application is of their own rules and regulations." *Press Briefing by Press Secretary Jen Psaki*, 2021 WL 3030746, at *16 (July 19, 2021).

32.     In the July 15, 2021, Press Briefing, Ms. Psaki also mentioned four "proposed changes" concerning misinformation that the White House had "recommended" to social media companies. Ex. 40 at 10-11. Those recommendations were that (i) the platforms should "measure and publicly share the impact of misinformation on their platform[s]"; (ii) the platforms should "create a robust enforcement strategy that bridges their properties and provides transparency about the rules"; (iii) the platforms should "take faster action" against "harmful, violative posts"—that is, "posts that will be within their policies for removal [but] often remain up for days"; and (iv) the

platforms should "promote quality information sources in their feed algorithm." *Id.* With respect

to "creat[ing] a robust enforcement strategy," Ms. Psaki noted that there are "about 12 people who

are producing 65 percent of anti-vaccine misinformation on social media platforms," and "[a]ll of

them remain active on Facebook" despite being "banned" on other platforms "that Facebook

owns." *Id.* at 10. She did not recommend removing content relating to these twelve people's

accounts; instead, she made a factual statement about those accounts in support of her

recommendation that platforms have strategies for "bridg[ing] their properties"—*i.e.*, applying

consistent rules across multiple platforms owned by the same entity—and "provid[ing]

transparency about the rules." *Id.* These recommendations thus highlighted the need for

transparency, consistency, and efficiency in the companies' enforcement of their existing policies.

And, mindful that the companies were responsible for decision-making regarding misinformation

on their platforms, Ms. Psaki repeatedly noted that these proposals were not demands—they were

"proposed" and "recommended" by the White House. *Id.*

  33. The subject of content moderation on social media platforms continued to come up

periodically during White House press briefings throughout 2021 and 2022, and Ms. Psaki

continued to emphasize that content moderation decisions were the companies' to make. *See, e.g.*,

2021 WL 3030746, at *16 ("It's up to social media platforms to determine what their application

is of their own rules and regulations."); *Press Briefing by Press Secretary Jen Psaki*, 2022 WL

1468470, at *9 (May 10, 2022) ("[I]t's the decision by a private sector company to make on who

will or will not be allowed on their platforms."). When Ms. Psaki was asked whether the

Administration was "considering any regulatory or legal moves to possibly address disinformation

on social media," she responded: "That's up to Congress to determine how they want to proceed

moving forward." 2021 WL 3030746, at *2. In October 2021, Ms. Psaki was asked again about

whether the White House supported policy reforms—specifically, reforms to § 230. *See Press Briefing by Press Secretary Jen Psaki*, 2021 WL 4587211, at \*9 (Oct. 6, 2021). She reaffirmed the President's view that "tech platforms must be held accountable for the harms that they cause" and expressed that the President "has been a strong supporter of fundamental reforms to achieve that goal, . . . includ[ing] Section 230 reforms [and] privacy and antitrust reforms as well as more transparency." *Id.* Reiterating the White House's view that Congress should lead any effort to propose policy reforms relating to misinformation, Ms. Psaki concluded, "[the President] looks forward to working with Congress on these bipartisan issues." *Id.*

34.    At a White House press briefing on April 25, 2022, Ms. Psaki was asked whether the White House was concerned about Twitter's purchase by Elon Musk. Ms. Psaki stated:

> No matter who owns or runs Twitter, the President has long been concerned about the power of large social media platforms, . . . [and] the power they have over our everyday lives; has long argued that tech platforms must be held accountable for the harms they cause. He has been a strong supporter of fundamental reforms to achieve that goal, including reforms to Section 230 [47 U.S.C. § 230], enacting antitrust reforms, requiring more transparency, and more. And he's encouraged that there's bipartisan interest in Congress.

Ex. 42 at 3 (*Press Briefing by Press Secretary Jen Psaki*, The White House (Apr. 25, 2022)). Notably, Ms. Psaki spoke on this occasion about the myriad policy issues raised by the dominance of social media companies; she did not mention COVID-19 or misinformation in particular, nor was she asked about it. *See also* Defs.' Resp. PFOF ¶¶ 123-130, 146-152, 155-162, 310-314.

b.    *President Biden's Comments*

35.    On July 16, 2021, while President Biden was preparing to board Marine One, a reporter asked the President what his "message" was for "platforms like Facebook." Ex. 45 at 2 (Question from Reporter to President Joseph R. Biden, Jr., in Washington, D.C. 2 (July 16, 2021)). The President responded: "They're killing people. Look, the only pandemic we have is among the unvaccinated and they're killing people." *Id.* Three days later, President Biden was asked about

his earlier comment. He explained that he had just read that twelve individuals were responsible for sixty percent of the misinformation regarding COVID 19 circulating on social media—a statistic reported by the non-profit Center for Countering Digital Hate[14]—and clarified that "Facebook isn't killing people. These 12 people are out there giving misinformation. Anyone listening to it is getting hurt by it. It's killing people . . . the outrageous misinformation about the vaccine. That's what I meant." Ex. 43 at 2-3 (Question from Reporter to President Joseph R. Biden, Jr., in Washington, D.C. (July 19, 2021)). He further said, "[m]y hope is that Facebook, instead of taking [the comment] personally, . . . would do something about the misinformation," thus repeating his policy view that social media companies—like every other sector in society—ought to do more to curb the harmful spread of COVID-19 misinformation on their platforms. *Id.* In that same interview, President Biden was asked whether he would "hold [social media companies] accountable if they don't do more to stop the spread." Ex. 43 at 3. He responded: "When you say hold accountable, I just want to – I'm not trying to hold people accountable. I'm trying to make people look at themselves, look in the mirror, think about that misinformation going to your son, your daughter, your relatives, someone you love. That's all I'm asking." *Id.* President Biden did not threaten any legal or regulatory action or make any demands. *See also* Defs.' Resp. PFOF ¶¶ 153-154, 162-163.

c. *White House Communications Director Kate Bedingfield's Comments*

36.   On July 20, 2021, White House Communications Director Kate Bedingfield appeared on the television news program Morning Joe. Ms. Bedingfield was asked what the Biden Administration plans to do about COVID-19 misinformation on social media. Ms. Bedingfield explained that the "most important" thing was for people to obtain information from trusted

---

[14] *See generally* Ex. 44 (Ctr. For Countering Digital Hate, *The Disinformation Dozen, Why Platforms Must Act on Twelve Leading Online Anti-Vaxxers* (Mar. 24, 2021)).

sources like their doctors, but with respect to social media platforms, "we all have a responsibility here," including platforms and "news outlets." Ex. 46 at 4 (Interview by Mika Brzezinski with Kate Bedingfield, Commc'ns Dir., White House, in Washington, D.C. (July 20, 2021)). The interviewer followed up by asking Ms. Bedingfield whether President Biden would support amending § 230 so that the platforms could no longer rely on its legal protection. *Id.* at 5. Ms. Bedingfield demurred by responding, "[w]ell, we're reviewing that," *id.*, before noting that the President had emphasized that "the people creating the content" are responsible for it, *id.* at 6. As Ms. Bedingfield explained, "it is a big and complicated ecosystem, and everybody bears responsibility to ensure that we are not providing people with bad information about a vaccine that will save their lives." *Id.* Ms. Bedingfield did not threaten any legal or regulatory action against, or make any demands of, social media platforms during this interview.

### 2. White House Private Statements

37.    White House aides—mainly, Mr. Flaherty—have had numerous conversations with representatives from Meta, Google, and Twitter about COVID-19 misinformation.[15] In those conversations, Mr. Flaherty sought to better understand (i) the companies' existing policies addressing the spread of misinformation or disinformation on their platforms, (ii) the actions those companies were taking to enforce those policies, and (iii) what the Government could do to assist social media companies in their efforts to address the spread of misinformation on their platforms.

---

[15] Many of Mr. Flaherty's communications with these companies did not concern mis- and disinformation. For example, the Administration has routinely partnered with the companies to promote the President's messages on policy matters, such as when the White House and Instagram arranged for Olivia Rodrigo to visit the White House to encourage young people to get vaccinated against COVID-19, *see* Ex. 47 (MOLA_DEFSPROD_00016809), and when the President hosted a town hall meeting with "creators" on YouTube, *see* Ex. 48 (MOLA_DEFSPROD_00017159). In other communications, White House officials have reported accounts impersonating federal officials—in violation of federal law—and the President's relatives—in violation of social media companies' terms of service. *See infra*.

*See* Ex. 36 at 20. Mr. Flaherty "also encouraged social media companies to be transparent and share data concerning the prevalence of misinformation and disinformation on their platforms." *Id.* At times, he "expressed frustration when he perceived platforms to be applying their policies inconsistently or to not be forthcoming in their assessment of the problems with misinformation and disinformation on their platforms." *Id.*

38.    The record is replete with examples of Mr. Flaherty asking the companies for information about the nature and extent of the COVID-19 misinformation they were seeing on their platforms. *See infra* Defs.' Proposed Findings of Fact ("PFOF") § II.A.2.a. As described further below, when specific proposals for policy changes by social media platforms were raised, Mr. Flaherty explicitly disclaimed that the White House supported them or was asking the companies to adopt them. *See infra* Defs.' PFOF § II.A.2.b. White House officials did flag some content—mainly, imposter accounts—for the social media companies. *See infra* Defs.' PFOF § II.A.2.c. When they did so, the companies reviewed the requests under their existing policies, and the White House neither threatened the companies nor demanded that they override their policies to accommodate the White House's concerns. *See id.*; Defs.' Resp. PFOF ¶¶ 34-122.

a.    *White House Requests for More Data about Misinformation on Facebook*

39.    An illustrative example of the White House's focus on understanding misinformation trends on the platforms is an April 14, 2021, exchange during which Mr. Flaherty and Mr. Slavitt asked their respective contacts at Facebook to explain why a post by then-Fox News anchor Tucker Carlson—in which he discouraged Americans from getting vaccinated against COVID-19—was the most viewed post that day on Facebook.

40.    By April 2021, the White House had already requested information several times from Facebook about the prevalent COVID-19 misinformation themes on its platform. *See, e.g.*, Dkt. 174-1 at 7 (February 8, 2021 email to Facebook: "do you have data on the actual number of

claims-related posts you've removed?"); Pls.' Jones Decl., Ex. G at 1 (Dkt. 214-9) (February 24, 2021 email to Facebook: "Can you give us a sense of volume on these [themes], and some metrics around [t]he scale of removal for each?"); *see also* Ex. 49 (MOLA_DEFSPROD_00017759) (email from Facebook representative to Mr. Flaherty noting that he might not be able to answer Mr. Flaherty's "questions on the data" in an upcoming meeting). For its part, Facebook would occasionally send the White House information from its public announcements about its misinformation policies, sometimes copied and pasted directly from an announcement's text. *See, e.g.*, Dkt. 174-1 at 5-6 (response that included text copied from Facebook's blog); *id.* at 8 (email from Facebook sharing publicly announced policy changes); *id.* at 9 (email from Facebook sharing "survey data on vaccine uptake" that it had published online).

41.    On March 14, 2021, the *Washington Post* published a story about misinformation on Facebook that Mr. Flaherty perceived to be inconsistent with what Facebook had told White House officials previously, which frustrated Mr. Flaherty. According to the *Post*, Facebook was "conducting a vast behind-the-scenes study of doubts expressed by U.S. users about vaccines," which had revealed that "[j]ust 10 out of the 638 population segments [studied] contained 50 percent of all vaccine hesitancy content on the platform."[16] Mr. Flaherty emailed the story to his contact at Facebook and wrote in the subject line: "You are hiding the ball[.]" Dkt. 174-1 at 12. By this he meant, as he later explained in another email, that he felt the *Post* had revealed that Facebook had access to "data on the impact of borderline content"—that is, content that does not violate Facebook's policies for removal, but which Facebook nonetheless moderates[17]—"and its

---

[16] Ex. 50 at 2 (Elizabeth Dwoskin, *Massive Facebook study on users' doubt in vaccines finds a small group appears to play a big role in pushing the skepticism*, Wash. Post (Mar. 14, 2021)).

[17] As Facebook has explained, "Some types of content, although they do not violate the letter of our Community Standards, are sensationalist or provocative and can bring down the overall quality

overlap with various communities," which data Mr. Flaherty had previously asked for and which Facebook had not provided. Dkt. 174-1 at 11.

42.    Mr. Flaherty explained that he was "not trying to play 'gotcha' with [Facebook]," but that the White House was "gravely concerned" about misinformation on Facebook and wanted to better understand how the Administration could be helpful in resolving the problem. *Id.* ("[W]e want to know that you're trying, we want to know how we can help, and we want to know that you're not playing a shell game with us when we ask you what is going on."). In light of the *Post* story, Mr. Flaherty stated that he felt Facebook had not been forthcoming with him in their prior interactions. *Id.* Mr. Slavitt responded to the email thread and echoed Mr. Flaherty's concerns, stating that "100% of the questions I asked have never been answered and weeks have gone by." *Id.* at 10. He added: "Internally we have been considering our options on what to do about it," evidently meaning Facebook's lack of transparency about the trends it was seeing on its platform. *Id.*; *see also* Ex. 40 at 10 (Ms. Psaki calling for companies to "measure and publicly share the impact of misinformation on their platform"). There is no evidence that Mr. Slavitt was referring to (or that the White House actually took) retributive action of any kind, and no evidence that Facebook took action in response to Mr. Slavitt's email.

43.    Facebook responded to these emails on March 16, 2021, by committing to "getting [the White House] the specific information needed to successfully manage" the "rollout" of the new COVID-19 vaccine. Dkt. 174-1 at 10. Facebook explained that the information in the *Post* story was not "vetted internally" and offered to walk the White House through data that Facebook

---

of discourse on our platform, especially because people have frequently told us that they do not like encountering these forms of content." Ex. 22 at 2.

had previously shared with the White House—data that had been published in a public report. *Id.*;
*see also id.* at 9 (email attaching the data referenced in Facebook's email about the *Post* story).

44.    One month later, on April 14, 2021, Mr. Slavitt and Mr. Flaherty had an email
exchange with Facebook regarding Tucker Carlson's post asserting that vaccines are ineffective.
Upon learning (likely through CrowdTangle)[18] that Mr. Carlson's post was the most viewed
vaccine-related post on Facebook that day, Mr. Slavitt and Mr. Flaherty reached out to their
respective contacts at Facebook. Mr. Slavitt wrote: "Number one on Facebook [today]. Sigh." Dkt.
174-1 at 35. Mr. Flaherty wrote: "[T]he top post about vaccines today is [T]ucker Carlson saying
they don't work." *Id.* at 22. He added: "Yesterday was Tomi Lehren [sic] saying she won't take
one. This is exactly why I want to know what 'Reduction' actually looks like—if 'reduction' means
'pumping our most vaccine hesitant audience with [T]ucker Carlson saying it doesn't 'work' then
. . . I'm not sure it's reduction!'"[19] In its response to both White House officials, Facebook explained
that Mr. Carlson's post was "not the most popular post about vaccines on Facebook [that day],"
noting also that "[r]egardless of popularity, the Tucker Carlson video does not qualify for removal
under [its] policies." *Id.* at 34.

45.    Mr. Flaherty responded by asking Facebook to help the White House understand how
it was applying its content moderation policies: "I guess this is a good example of your rules in
practice then—and a chance to dive in on questions as [to how] they're applied," wrote Mr.

---

[18] CrowdTangle is a Facebook tool that allows users to "[m]onitor public information" about the
reach of Facebook posts. Ex. 51 (*CrowdTangle*, Meta, https://perma.cc/L7N2-CSK5). "FEMA has
been a user of CrowdTangle since 2015, and has used it to create real-time displays for their various
regional teams to support their social media situational awareness efforts and help direct needs or
information clarification." Ex. 52 at 3 (MOLA_DEFSPROD_00018060).

[19] "Reduction" is likely a reference to Facebook's borderline content policy, under which
Facebook has pledged since 2018 to combat misinformation by "reducing its distribution and
virality." Ex. 23 at 8.

Flaherty. *Id.* at 33. He went on to ask, among other things: "How was this [the Tucker Carlson

video] not violative? . . . What exactly is the rule for removal vs demoting? Moreover: you say

reduced and demoted. What does that mean?" *Id.* Mr. Flaherty ended his email by remarking:

"[n]ot for nothing but last time we did this dance, it ended in an insurrection." *Id.* at 34. Later that

day, Mr. Flaherty followed up with another question: "And sorry—if this was not one of the most

popular posts about the vaccine on Facebook today, then what good is [C]rowd[T]angle?" *Id.* at

33. When after two days Facebook still had not responded, Mr. Flaherty followed up (in

frustration): "These questions weren't rhetorical[.]" *Id.* Facebook thereafter responded with

answers to Mr. Flaherty's questions, including that Mr. Carlson's post was not violative because

"while [Facebook] remove[d] content that explicitly directs people not to get the vaccine, . . .

[Facebook] reviewed this content in detail and it does not violate those policies." *Id.* at 36.

46.    The aforementioned exchanges demonstrates that, even in a moment of apparent (and

atypical) frustration with Facebook, White House officials remained focused on obtaining

information from social media companies to better understand the important problem of

misinformation, as was true throughout their interactions with Facebook and other platforms. In

the exchange, White House officials sought an explanation as to why a post by an influential figure

that discouraged vaccination was surging in popularity given the company's content moderation

policies (hence Mr. Flaherty's reference to "Reduction"). When Facebook responded that the post

did not violate its community standards, White House officials did not demand (or even request)

that Facebook remove the post or change its policies so that the post would be considered violative.

Instead, the White House officials sought to learn more about how Facebook applied its policies—

such as its little-understood "demoti[on]" policy for borderline content, *see supra* Defs.' PFOF

§ I.D—and how the White House could use Facebook's public-data resource (CrowdTangle) to

understand what Americans were seeing on the platform. Although Mr. Flaherty used strong language at times, this language reflected his frustration over not receiving answers to his repeated requests for information and the urgency of the public health crisis that the Administration was working to tackle—not threats or demands that Facebook change its content moderation policies or how they were enforced. Nor is there any evidence that Facebook subsequently changed its approach to applying its established policies, or took any action against the Tucker Carlson post, or any other post, as a result of the White House's contacts. Defs.' Resp. PFOF ¶¶ 81-82, 93-97.

       b.  *No White House Demands for Changes to the Companies' Content Moderation Policies or Practices Regarding COVID-19*

47.    Indeed, the record contains no evidence that White House officials demanded that social media companies adopt particular changes to their content moderation policies or the manner of their enforcement, or that action be taken against specific posts concerning COVID-19. Mr. Flaherty disclaimed the notion that he (or anyone at the White House) knew how best to combat misinformation on social media. *See, e.g.*, Dkt. 174-1 at 11 ("I will . . . be the first to acknowledge that borderline content offers no easy solutions."). Moreover, on one occasion when Mr. Flaherty shared specific proposals with Facebook—proposals that were developed by third-party researchers—Mr. Flaherty emphasized that the White House was *not* asking Facebook to adopt those recommendations. *See generally* Defs.' Resp. PFOF ¶¶ 34-211.

48.  Specifically, on April 23, 2021, Mr. Flaherty sent Facebook's representative an email with the subject "Research Suggestions." Pls.' Jones Decl., Ex. L at 1 (Dkt. 214-14). An outside group had recently "[b]rief[ed]" the White House on COVID-19 vaccine misinformation on Facebook. *Id.* Mr. Flaherty sent Facebook the outside group's findings, which included specific recommendations, including that "Facebook should direct resources to equal policy enforcement around violative content and networks in non-English languages." *Id.* at 2. In his cover email, Mr.

Flaherty explicitly noted that Facebook should not "read this as White House endorsement of these suggestions (or, also, as the upper bound of what our thoughts on this might be)." *Id.* at 1. He noted that he was sending the recommendations only in the "spirit of transparency" because the findings were "circulating around the building[.]" *Id.* On May 1, Facebook wrote to Mr. Slavitt, thanking "the [White House] team for sharing the research work" and providing "some details on where we're developing work in this space (and where we aren't)." Dkt. 174-1 at 41-42. The White House did not respond to this note with threats or demands to implement the outside group's suggestions. *Id.* at 41. Instead, Mr. Flaherty repeated his typical questions about what Facebook was seeing on its platform. *Id.* ("Not to sound like a broken record, but how much content is being demoted, and how effective are you at mitigating reach, and how quickly?").

      c.   *White House Requests for Action on Fake and Doctored Posts and Accounts*

    49.   At times, White House officials requested that social media companies remove fake accounts from their platforms—such as imposter accounts purporting to belong to members of the President's family, or Dr. Fauci. *See* Ex. 53 at 1 (MOLA_DEFSPROD_00016598) (the President's daughter-in-law); Dkt. 174-1 at 4 (the President's grandchild); Ex. 54 at 1 (MOLA_DEFSPROD_00016939) (Dr. Fauci); Ex. 55 at 1-2 (MOLA_DEFSPROD_00017968) (a "fan account" for the President's son). White House officials also flagged a doctored video of the First Lady. Dkt. 174-1 at 65.

    50.   It is not unusual for members of the public, or the victims themselves, to report imposter accounts or doctored content to social media platforms. Twitter, Facebook, and YouTube each prohibit imposter accounts and provide mechanisms for the public to report violations of their

imposter rules.[20] Indeed, in one instance when the White House flagged a fake account of one of the President's family members, Twitter merely directed the White House to fill out its publicly available imposter form. Ex. 53 at 1. Understandably, however, some companies have a mechanism for the White House to submit expedited requests for removal of such information, since willfully impersonating a federal official is a federal crime, *see* 18 U.S.C. § 912, and could have dangerous consequences for public safety and national security. Those mechanisms, moreover, have been utilized by at least the prior two administrations. *See* Dkt. 174-1 at 3 (noting that Twitter offered the Biden Administration "the same system we had in place for the previous two administrations").

51.     The record demonstrates that the White House requested that the platforms review the above-mentioned incidents, s*ee* Ex. 54 at 2 ("Hi there –any way we can get this pulled down?"); Ex. 53 at 1 ("[This account] is an impersonation – and [the victim] has requested it be taken down."); Dkt. 174-1 at 4 ("Please remove this account immediately"); *id.* at 65 ("[w]ould you mind looking at this video and helping us with next steps to put a label or remove it?"), and that the platforms accordingly evaluated the White House's requests under their existing policies. When the platforms determined that the content was violative, it was removed. *See, e.g.*, Dkt. 174-1 at 4. When the content was not violative—as was the case with a doctored video of the First Lady circulating on Twitter—the platform declined to remove it. *Id.* at 63 ("After escalating this to our team, the [t]weet and video referenced will not be labeled under our synthetic and manipulated media policy."). In the latter instance, the White House did not seek to compel Twitter to change its decision; it asked for "any other info" about why the content did not qualify for labeling, "in

---

[20] *See* Ex. 56 (*Account Integrity & Authentic Identity*, Meta, https://perma.cc/DCR9-9FBY); Ex. 57 (*Authenticity on Twitter*, Twitter Help Ctr., https://perma.cc/6NVT-PS59); Ex. 58 (*Impersonation policy*, YouTube Help, https://perma.cc/R5BD-X6JB).

order to help us understand the Twitter processes best." *Id.* at 61. A White House official also requested the removal of a tweet by Robert F. Kennedy, Jr., regarding COVID-19 vaccines. As discussed further below, *see infra* Defs.' Arg. § II.B.1, the record shows that the tweet had already been escalated for review by Twitter's independent trust and safety team, which—applying its independent judgment—did not remove the tweet.

52.    To be sure, White House officials sometimes used language reflecting urgency or exasperation when engaging with the social media companies about imposter accounts and doctored content. *See, e.g.*, Dkt. 174-1 at 58 (Mr. Flaherty observing that Twitter's explanation was "Total Calvinball"). This language merely reflects the same frustration that Mr. Flaherty expressed when he perceived the platforms to be "applying their policies inconsistently or to not be forthcoming in their assessment of the problems with misinformation and disinformation on their platforms." *See* Ex. 36 at 20. It does not reflect demands or threats of legal or regulatory retaliation.

53.    Since the start of 2023, the landscape of White House COVID-19 efforts has changed dramatically. On April 10, 2023, the President signed into law a resolution terminating the national emergency related to the COVID-19 pandemic. *See* Joint Resolution of Apr. 10, 2023, Pub. L. No. 118-3, 137 Stat. 6. And HHS's public health emergency is likewise due to end on May 11, 2023, in part because, "thanks to the [A]dministration's whole-of-government approach to combating the virus, we are in a better place in our response than we were three years ago, and we can transition away from the emergency phase." Ex. 67 at 1 (*COVID-19 Public Health Emergency (PHE)*, Dep't of Health & Hum. Servs., https://perma.cc/3HZ4-QM3G). Moreover, recognizing that "transitioning out of the emergency phase is the natural evolution of the COVID response," the White House plans to wind down its COVID-19 Response Team later this month. *See* Ex. 59

(Dan Diamond & Taylor Pager, *White House Disbanding its Covid-19 Team in May*, Wash. Post (Mar. 22, 2023)). The COVID-19 Response Team was charged, among other things, with "[o]rganizing the White House to combat COVID-19," Exec. Order No. 13,987, 86 Fed. Reg. 7019, § 2 (Jan. 20, 2021), and included several White House staffers who communicated with social media companies about the spread of COVID-19 misinformation on their platforms, including Mr. Slavitt and other Defendants. *See* Ex. 60 at 1 (MOLA_DEFSPROD_00018067). Winding down the team and ending COVID-19 emergency declarations reflect that the Administration is reaching a new phase of its response to the virus. *See also* Defs.' Resp. PFOF ¶¶ 188-211.

### B. The Surgeon General

54.    The U.S. Surgeon General is commonly referred to as the "Nation's Doctor."[21] The Office of the Surgeon General ("OSG") is housed within HHS, and the Surgeon General reports to the Assistant Secretary for Health.[22] The Surgeon General does not have independent regulatory authority. *See, e.g.*, Reorganization Plan No. 3 of 1966, 31 Fed. Reg. 8855 (June 25, 1966) (transferring the Surgeon General's powers to what is now HHS); Declaration of Max Lesko, Chief of Staff, Off. of the Surgeon Gen. ¶ 3 ("Lesko Decl.") (Ex. 63). Rather, the Surgeon General's role is primarily to draw attention to public health matters affecting the nation.[23] For example, Surgeons General have traditionally issued reports and calls to action on public health issues ranging from

---

[21] *See* Ex. 61 at 1 (*About the Office of the Surgeon General*, U.S. Dep't of Health & Hum. Servs., https://perma.cc/AHX2-KGED).

[22] *See* Office of the Assistant Secretary for Health; Statement of Organization, Functions and Delegations of Authority, 52 Fed. Reg. 11,754, 11,754-55 (Apr. 10, 1987); *see also* Ex. 62 at 1 (*Office of the Assistant Secretary for Health Organizational Chart*, U.S. Dep't of Health & Hum. Servs., https://perma.cc/R5JF-URY9).

[23] *See* Ex. 64 at 1 (*Mission of the Office of the Surgeon General*, U.S. Dep't of Health & Hum. Servs., https://perma.cc/87KA-DMD9); *see also* Waldo Dep. 26:1-11.

health literacy[24] to opioid addiction,[25] to—perhaps most famously—the health risks of smoking cigarettes.[26]

55.    The current Surgeon General, Dr. Vivek Murthy, took two such official actions relating to health misinformation in 2021 and 2022. In July 2021, Dr. Murthy issued a Surgeon General's Advisory ("Advisory") that called attention to the harms caused by the spread of misinformation and offered "recommendations" for various sectors of society, including social media platforms, to address such harms. And in March 2022, Dr. Murthy issued a Request for Information ("RFI"), published in the Federal Register, seeking comments from interested members of the public about health misinformation on social media. In addition to the Advisory and the RFI, Dr. Murthy made public statements reiterating the Advisory's themes at a White House press briefing, at public events, and in interviews. In private, OSG held courtesy meetings with Facebook, Google, and Twitter to inform them of the Advisory's release and its themes, and the Surgeon General held an additional meeting with Facebook on July 23, 2021 (at Facebook's request) at which the Advisory's themes were discussed. OSG has not flagged specific posts for social media companies or demanded particular actions from the companies (let alone any specific company), nor has it worked with the companies to moderate content on their platforms. Lesko Decl. ¶ 8 (Ex. 63). Moreover, OSG was not—and is not—involved in a coalition of researchers known as the "Virality Project." Indeed, following the issuance of the Advisory and the RFI, the

---

[24] *See generally* U.S. Dep't of Health & Hum. Servs., *Proceedings of the Surgeon General's Workshop on Improving Health Literacy* (2006), https://perma.cc/25F7-ABJ2.

[25] *See* Ex. 66 (*U.S. Surgeon General's Advisory on Naloxone and Opioid Overdose*, U.S. Dep't of Health & Hum. Servs., https://perma.cc/W9KJ-QPAW).

[26] *See generally* U.S. Dep't of Health, Education, & Welfare, *Smoking and Health: Report of the Advisory Committee to the Surgeon General of the Public Health Service* (1964), https://perma.cc/Z2WJ-UWEN.

Surgeon General's office has pivoted to "core issues" other than COVID-19-related misinformation. Waldo Dep. 114:6-115:5 (Dkt. 210-1).

### 1. The Advisory, the RFI, and Other Public Statements

56.    Dr. Murthy was confirmed by the Senate on March 23, 2021, *see* 167 Cong. Rec. S1721 (daily ed. Mar. 23, 2021), and sworn into office on March 25. On July 15, 2021, Dr. Murthy published a Surgeon General's Advisory related to COVID-19 misinformation. *See generally* Waldo Ex. 11 (Dkt. 210-12) ("Advisory"). A Surgeon General's Advisory is a "public statement that calls the American people's attention to a public health issue" and provides "recommendations" as to "how that issue should be addressed." *Id.* at 3. A Surgeon General's Advisory does not impose any obligations on private parties.

57.    The July 2021 Advisory states that health misinformation has "sowed confusion, reduced trust in public health measures, and hindered efforts to get Americans vaccinated." *Id.* at 16. The Advisory calls for a "whole-of-society effort" to "curb the spread of harmful misinformation," *id.* at 6-7, and it offers recommendations as to how various sectors can tackle the issue, *id.* at 8-15. For "technology platforms," the Advisory identifies eight recommendations, including "[a]ssess[ing] the benefits and harms of products and platforms and tak[ing] responsibility for addressing the harms," "[g]iv[ing] researchers access to useful data to properly analyze the spread and impact of misinformation," and "[p]rioriti[zing] the early detection of misinformation 'super-spreaders' and repeat offenders." *Id.* at 12. The Advisory does not mention any particular social media post—or any individual responsible for such a post—that the Surgeon General would consider to be harmful misinformation. Nor does the Advisory demand any specific action of social media companies. To the contrary, the Advisory recognizes that "[d]efining 'misinformation' is a challenging task," *id.* at 17, and it encourages platforms to consider how to

"safeguard[] user privacy and free expression" while addressing the spread of health misinformation, *id.* at 6-7. *See also* Defs.' Resp. PFOF ¶¶ 318-329.

58.     On the date of the Advisory's release, July 15, 2021, Dr. Murthy spoke at a virtual event hosted by the Stanford Internet Observatory and a joint press briefing with White House Press Secretary Jennifer Psaki. During the Stanford event, Dr. Murthy advised that "[i]f we want to fight health misinformation, we'll need all parts of society to pull together," which is "why this surgeon general advisory has recommendations for everyone." Waldo Ex. 12 at 7-8 (Dkt. 210-13). He also described the Advisory's recommendations at a high level. *Id.* At the White House briefing later that day, Dr. Murthy reiterated the same points, explaining that "we need an all-of-society approach to fight misinformation" and that the Advisory "has recommendations for everyone." *See* Ex. 40 at 2. In response to journalists' questions, he noted that the Advisory "ask[ed] [social media platforms] to step up" to address misinformation, but made no demands that they take action of any kind, or suggest that the Government would retaliate against them if they did not. *Id.*

59.     After the Advisory's release, Dr. Murthy spoke publicly about the importance of addressing health misinformation—as described in the Advisory—and the need for a "healthy information environment." *See* Ex. 68 (Clay Skipper, *Surgeon General Dr. Vivek Murthy Sees Polarization as a Public Health Issue*, GQ (Mar. 11, 2022)); *see also* Ex. 69 (Rockefeller Foundation, *Building Public Health's Defense Against Disinformation*, https://perma.cc/M5EG-YJKG) (announcing a February 14, 2022, virtual event on misinformation featuring Dr. Murthy). In these remarks, Dr. Murthy did not make demands or threaten legal action, nor did he call out specific social media companies or their users.

60.     In March 2022, OSG published in the Federal Register an RFI seeking "input from interested parties on the impact and prevalence of health misinformation in the digital information

43

environment during the COVID-19 pandemic." Impact of Health Misinformation in the Digital Information Environment in the United States Throughout the COVID-19 Pandemic Request for Information (RFI), 87 Fed. Reg. 12,712, 12,712 (Mar. 7, 2022). The RFI requested any comments by May 2, 2022. It sought information on a broad range of topics, including "[i]nformation about sources of COVID-19 misinformation" on social media and elsewhere, such as "specific, public actors that are providing misinformation" and "components of specific platforms that are driving exposure to information." *Id.* at 12,714. The RFI emphasized, however, that "[a]ll information should be provided at a level of granularity that preserves the privacy of users." *Id.* at 12,713. Like the Surgeon General's Advisory, the RFI imposed no obligations; responses were purely voluntary. *See id.* at 12,712 ("You may respond to some or all of the topic areas covered in the RFI."); *see also* Defs.' Resp. PFOF ¶¶ 411-423.

61.     On April 7, 2023, OSG published the comments it received in response to the RFI. Several social media companies submitted responses, including Twitter, Google, and Meta (Facebook). *See* Ex. 70 (RFI Responses Compiled, Dep't of Health & Hum. Servs (Apr. 7, 2023)).[27] None of these companies' responses indicates that they changed their content moderation policies, or moderated the content of any users, in response to the RFI (or any other action taken by OSG). *See id.* at 1-6 (Twitter); *id.* at 7-14 (Google); *id.* 15-24 (Meta). Twitter's five-page response, for example, simply discusses the content moderation policies that Twitter was at that point applying and includes statistics concerning their enforcement. *Id.* at 1-6. Meta's eight-page submission similarly discusses Facebook's polices that were in place at the time, noting that the

---

[27] In response to the RFI, OSG received more than 7,500 pages of comments from various sectors of society, including from researchers, private firms, public health departments, and many individuals. Those comments are publicly available at https://www.regulations.gov/comment/HHS-OASH-2022-0006-0002. For convenience and feasibility, Defendants' exhibit contains only the responses submitted by Twitter, Google, and Meta (Facebook). *See* Ex. 70.

document offers a "high-level" description of those policies and directing readers to view Meta's website for "[m]ore details around our approach to misinformation." *Id.* at 18. Google's submission takes the same approach; it provides an overview of Google's "efforts in addressing COVID-19 health misinformation and disinformation," including Google's efforts to "provid[e] authoritative content." *Id.* at 13. OSG does not intend to take any formal action with respect to the RFI responses it received. *See* Lesko Decl. ¶ 10 (Ex. 63).

### 2. Direct Communications with Social Media Companies

62.    On May 25, 2021, Dr. Murthy participated in an introductory call with Nick Clegg, President of Global Affairs at Facebook, and Mr. Slavitt. *See* Ex. 187 at 5 (Defs.' Fourth Am. Combined Objections & Resp. to Pl. First Set of Prelim. Inj.-Related Interrogatories. On May 28, Mr. Clegg followed up by sending Dr. Murthy and Mr. Slavitt a biweekly "COVID insights report"—which described Facebook's "most engaged or the most viewed posts," Waldo Dep. 140:15-16—for May 3-15, 2021, Waldo Ex. 4 at 1 (Dkt. 210-5). Mr. Clegg also "highlight[ed] a few policy updates" that Facebook had announced publicly on May 27, and he shared "data [he] mentioned on [the] call" that "point to the positive (if not as publicly discussed) influence [Facebook was] having on attitudes towards vaccines[.]" *Id.*; *see also* Defs.' Resp. PFOF ¶¶ 252, 282-286.

63.    Before the Advisory's July 15, 2021 release, Eric Waldo, then-Chief Engagement Officer for OSG,[28] arranged high-level "stakeholder calls with relevant parties," also known as "rollout calls." Waldo Dep. 18:20-21. The goal of the rollout calls was for OSG to "give [stakeholders] a heads-up that the advisory was going to come out" and to encourage them to

---

[28] Mr. Waldo no longer works at OSG. Katharine Dealy, OSG's Director of Engagement, is his successor. Defs.' Notice Regarding Substitution of Official-Capacity Defendants at 2 ("Defs.' Notice of Substitution") (Dkt. 263).

review the document when it became public. *Id.* at 18:20-21; 87:2-6. Mr. Waldo held rollout calls on July 12 and July 14 with representatives from Twitter and Google/YouTube, respectively. Ex. 187 at 35-36. These were cordial meetings. *See* Waldo Dep. 87:2-6. Indeed, representatives from Google/YouTube expressed agreement as to the importance of combating health misinformation and said they were "excited" to review the Advisory. *Id.* at 89:25-90:2. Due to scheduling conflicts, a rollout call with Facebook did not occur until the day after the Advisory was released, or July 16, 2021. *Id.* at 90:15-19. That meeting occurred on the same day that the President told reporters that persons spreading COVID-19 misinformation on Facebook were "killing people"—a comment that he clarified two days later, *see supra* at 28-29—which made the meeting "slightly awkward." *Id.* at 92:25. Facebook and OSG did not discuss the President's comments or Facebook's sentiment towards it, however. *Id.* at 94:7-10; *see also* Defs.' Resp. PFOF ¶¶ 153, 157, 217, 222, 223, 227, 254-258, 273, 287-292, 348-349.

64.    On July 16, 2021—the same day that OSG and Facebook met to discuss the Advisory—Mr. Clegg reached out to Dr. Murthy to request a call regarding "how we can continue to work toward . . . shared goals" despite "disagreement on some of the policies governing [Facebook's] approach[.]" Waldo Ex. 17 at 2 (Dkt. 210-16); *see also* Waldo Ex. 18 at 1 (Dkt. 210-17) (text message from Mr. Clegg to Dr. Murthy). Mr. Clegg noted that Facebook staff were feeling "a little aggrieved" by the President's comments. Waldo Ex. 18 at 1 (Dkt. 210-17). In his email, Mr. Clegg mentioned that OSG and Facebook had met that day to discuss "the scope of what the White House expect[ed] from" Facebook. Waldo Ex. 17 at 2 (Dkt. 210-16). Mr. Waldo testified, however, that Mr. Clegg misunderstood the nature of OSG's meeting with Facebook, which Mr. Waldo had attended (and Mr. Clegg had not). Waldo Dep. 236:21-25. At the July 16 meeting, OSG

had simply "walk[ed] over the . . . recommendations section" of the Advisory "at a high level." *Id.* 91:7-16.

65.    In addition, on July 17, 2021, Facebook published a document describing actions it was "already tak[ing] . . . on the eight recommendations from the Surgeon General" in the form of measures that Facebook had had in place since April 2020, more than a year prior to the Advisory. *See* Ex. 71 (*Taking action to combat COVID-19 vaccine misinformation*, Facebook (July 17, 2021), https://perma.cc/6R6J-ANNF). The four-page document does not mention a single *new* action that Facebook would begin to take in light of the Surgeon General's Advisory; rather, it describes ways in which Facebook was *already* addressing the Advisory's recommendations. *Id.*

66.    In response to Mr. Clegg's meeting request, Dr. Murthy met virtually with Mr. Clegg on July 23, 2021. Dr. Murthy tried to set a "cordial" tone at the meeting and raised the issue of "wanting to have a better understanding of the reach of the mis- and disinformation" on Facebook. Waldo Dep. 107:1-2, 98:18-22. The "most specific questions were about understanding the data around the spread of misinformation and how we [are] measuring that," *Id.* at 35:20-23, meaning "how we're measuring the harm and the impact," *Id.* at 36:14. He also reiterated that OSG is "asking everyone to do more." *Id.* at 107:13-14. According to Mr. Waldo, someone from OSG's staff (Mr. Waldo could not recall whom) made a request of Facebook to explain "if they would share" what they were doing in response to the Advisory, "if anything." *Id.* at 109:5-17. And an offer was made (again, Mr. Waldo could not recall by whom) to connect DJ Patil, the White House's "data person," with Facebook personnel, so that Dr. Patil could better understand Facebook's data about the spread of misinformation. *Id.* at 112:1-10. Dr. Murthy did not demand specific actions or threaten legal consequences against Facebook if they were not taken. *See id.* at 35:20. *See also* Defs.' Resp. PFOF ¶¶ 259-271, 352-368.

67.    After the July 23, 2021 call, Dr. Murthy did not have further meetings about misinformation with Facebook. *See* Lesko Decl. ¶ 12 (Ex. 63). Nor did OSG request meetings on misinformation with other social media companies.[29] OSG concluded that such meetings "would [not] be a good use of Dr. Murthy's time." Waldo Dep. 115:1, 113:3-15. Mr. Waldo explained why OSG decided to deprioritize these meetings:

> [OSG had] done the work that we intended vis-a-vis the advisory, which is the Surgeon General's role, to raise up the issue, bring attention to it, and then . . . we wanted to move on to other priorities and that, you know, our part of the relay race was over. We had -- we had raised up the flagpole that this is an issue of public importance and that hopefully researchers, nonprofits, citizens, whomever, relative stakeholders would take actions. But we weren't – we're not a regulatory agency. We don't have oversight authority, et cetera. So it wasn't our job then to sort of show up with a clipboard, but rather we were trying to encourage the field to move forward and give permission structure where others might recognize that this is important and want to study it more, want to do more work in this area. But . . . Dr. Murthy wanted to focus on other core issues . . . .

*Id.* at 114:6-115:5.

68.    For its part, Facebook followed up with OSG in several ways. First, Mr. Clegg thanked Dr. Murthy for his time on July 23, 2021, and expressed wanting to "make sure [he] saw the steps [Facebook] took just this past week"—or, since July 16—"to adjust policies on what we are removing with respect to misinformation." Waldo Ex. 19 at 1 (Dkt. 210-18).[30] In that message, Mr. Clegg also expressed interest in "a regular cadence of meetings," which never materialized because OSG "didn't think [such meetings] would be worth [its] time given [OSG's] competing

---

[29] Mr. Waldo participated in three meetings—two with Google in July and September 2021 and one with Facebook in August 10—at the companies' request. Ex. 187 at 35-36. These were courtesy meetings that the companies requested to give OSG advance notice of announcements and work that they were doing on misinformation. *See* Waldo Dep. 66:16-23, 129:1-23.

[30] The record does not indicate clearly what these "steps" were. And, as discussed *infra*, Facebook's announcement with respect to the Surgeon General's Advisory did not describe any *new* action that Facebook would take. *See* Ex. 71. The document highlights ways in which Facebook was *already* following the recommendations laid out in the Advisory.

priorities." Waldo Dep. 254:7-12. Second, Facebook occasionally sent OSG updates on its activities. For example, on August 23, 2021, shortly after the Food and Drug Administration (FDA) approved the Pfizer COVID-19 vaccine, a Facebook representative forwarded Mr. Waldo an email informing the White House that Facebook planned to update its misinformation policies to remove claims that there were no FDA-approved vaccines. Waldo Ex. 27 at 1 (Dkt. 210-23). Third, Facebook continued to send OSG—mainly, Mr. Waldo—its bi-weekly COVID insight reports. *See* Waldo Ex. 54 at 1 (Dkt. 210-46) (Facebook sending Mr. Waldo "the most recent two reports" from June 24 to July 8, 2022). Mr. Waldo did not "spend a lot of time looking at [the] reports," Waldo Dep. 140:14-20, and he was not aware of any action taken by federal officials in response to the reports, *id.* at 141:14-16. As of December 2022, Mr. Waldo did not believe that he was still receiving those reports. *Id.* at 294:1-2. Mr. Waldo no longer works at OSG. *See* Defs.' Notice Regarding Substitution of Official-Capacity Defendants at 2 ("Defs.' Notice of Substitution") (Dkt. 263).

### 3. The Virality Project

69.    One of the Advisory's recommendations for governments is to "[i]nvest in fact-checking and rumor control mechanisms where appropriate." Advisory at 15. In support, the Advisory cites an online article written by individuals at the Stanford Internet Observatory and posted on a website for the "Virality Project." *See id.* at 22 n.62 (citing M. Masterson, A. Zaheer, *et al.*, *Rumor control: A framework for countering vaccine misinformation*, Virality Project Policy Analysis (May 4, 2021) (Ex. 72)). The Virality Project is a "coalition of research entities focused on supporting real-time information exchange" about COVID-19 misinformation "between the disinformation research community, public health officials, civil society organizations, government agencies, and social media platforms." Ex. 73 (*Announcing the Virality Project*,

Virality Project (Feb. 11, 2021), https://perma.cc/9T3J-F2HG). One of the lead entities responsible

for the Virality Project is the Stanford Internet Observatory. *See id.*

70.    The Virality Project issued a "final report" on February 24, 2022, which was later

revised on April 26, 2022. Waldo Ex. 28 at 2 (Dkt. 210-24) ("Virality Project Report"). Among

other things, the report describes a process by which Virality Project analysts "created tickets

documenting URLs" of "both specific pieces of misinformation and broader narratives." Virality

Project Report at 27. According to the report, 174 "incidents" of misinformation were "referred to

platforms for potential action." *Id.* at 30. The Virality Project provided information to social media

platforms, but had no control over content moderation, censorship, or labeling posts. *See* Ex. 74

(*Background on the SIO's Projects on Social Media*, Stanford Internet Observatory (Mar. 17,

2023)) ("SIO Statement"). Rather, social media companies examined any reports sent to them by

the Virality Project to determine if the content violated their policies and did not take action in

cases where companies felt their existing policies were not violated. *Id.* Decisions to remove or

flag tweets were made by the social media companies. *Id.*

71.    The report also notes that the Virality Project "built strong ties" with OSG, Virality

Project Report at 17, and that it "hosted [a] discussion with [Dr.] Murthy" on July 15, 2021, the

day of the Advisory's launch and Dr. Murthy's virtual appearance at the event hosted by the

Stanford Internet Observatory, *id.* at 143. But according to OSG's Chief of Staff, Max Lesko, OSG

"never provided any tip, flag, ticket, report, or other form of notification or input to the Virality

Project concerning posts or accounts on social media." *See* Lesko Decl. ¶ 16 (Ex. 63). Moreover,

OSG did not understand the Stanford event on July 15, 2021, to be a Virality Project event, and it

was not advertised as such. *Id.* ¶ 15; *see also* Waldo Ex. 12 at 1 (Dkt. 210-13) (advertising the July

15, 2021, event as being hosted by the Stanford Internet Observatory). Mr. Waldo, who led OSG's

rollout of the Advisory, testified that he had never heard of the Virality Project. Waldo Dep. 207:10-14. Nor was he aware of any OSG involvement in the Virality Project. *Id.* at 207:18-21. He was not familiar with anyone at OSG or in the Federal Government reporting specific instances of misinformation on social media—referred to in the Virality Project report as "tickets"—to the Virality Project, either. *Id.* at 285:4-10.

72.     The Virality Project has not been active since 2022. Its February 2022 report is self-described as a "final" report. *See* Virality Project Report. The project's most recent "weekly briefing," "policy analysis," and "rapid response" posts—the only three categories of posts available on the Virality Project's website—all occurred in August 2021.[31] The final "weekly briefing" post from August 3, 2021, notes that it will be the project's "last official briefing." *See* Ex. 75 (*Virality Project Weekly Briefing # 32*, Virality Project (Aug. 3, 2021)). And the Virality Project's Twitter account has made no posts since announcing the final report on February 24, 2022. *See* Ex. 76 (Virality Project, Twitter (Feb. 24, 2022, 2:08 PM), https://perma.cc/6ADR-YCW7). To the best of OSG's knowledge, the Virality Project is no longer currently active, and OSG does not currently have any contact with it. Lesko Decl. ¶ 14 (Ex. 63). *See also* Defs.' Resp. PFOF ¶¶ 1236-1265.

### C.  The Centers for Disease Control and Prevention (CDC)

73.     CDC, a component of HHS, is a "science-based, data-driven, service organization that," "[f]or more than 70 years," has worked to "protect[] the public's health." Ex. 77 (*CDC 24/7: Saving Lives, Protecting People*, Ctrs. for Disease Control & Prevention, https://perma.cc/Z53S-9J8S (last updated Aug. 31, 2022)). Its mission is to "work[] 24/7 to protect America from health,

---

[31] *See* Ex. 81 (*Weekly Briefings,* Virality Project, https://perma.cc/W64T-2CXX); Ex. 82 (*Rapid Response*, Virality Project, https://perma.cc/9Z2L-KE5F); Ex. 83 (*Policy Analysis*, Virality Project, https://perma.cc/CZS2-KKSB).

safety and security threats, both foreign and in the U.S." Ex. 78 (*Mission, Role and Pledge*, Ctrs.

for Disease Control & Prevention, https://perma.cc/SU2B-Z6TR (last updated Apr. 29, 2022)). To

accomplish its mission, CDC "conducts critical science and provides health information" to

prevent "expensive and dangerous health threats, and respond[] when [such threats] arise." *Id.*

CDC's Office of Communications supports the agency's mission by "[e]nsur[ing] CDC's work is

accessible, understandable, and actionable," and by "[m]aximiz[ing] public trust in and credibility

of CDC's science, programs, and recommendations." Ex. 79 (*Office of Communications (OC)*,

Ctrs. for Disease Control & Prevention, https://perma.cc/885U-GHJ8 (last updated Apr. 3, 2023)).

74.    Carol Crawford works for the CDC Office of Communications as the head of its

Division of Digital Media. Crawford Dep. 11:7-12 (Dkt. 205-1). In that role, Ms. Crawford

provides leadership for CDC's website and social media accounts. *Id.* at 11:14-19; Declaration of

Carol Crawford, Director of CDC's Division of Digital Media ¶ 3 ("Crawford Decl.") (Ex. 80);

*see also* Ex. 79. That includes convening personnel from across the agency to manage the CDC

website and maintain social media accounts, coordinating CDC's web content management

system, and drafting policies and guidelines in that space. Crawford Decl. ¶ 3 (Ex. 80). Ms.

Crawford has worked for CDC in various capacities for 34 years. *Id.* ¶ 1.

75.    At various times during 2020-2022, CDC communicated regularly with several

social media companies (such as Facebook) and sporadically with others (such as Twitter),

primarily about promoting COVID-19 health information from CDC and also about COVID-19

misinformation on the companies' platforms. When communicating with social media companies,

CDC was either (1) responding to Facebook's requests for science-based public health

information; (2) proactively alerting Facebook, Twitter, and YouTube about false COVID-19

claims the agency observed on the platforms that could adversely affect public health; or

(3) advising the companies where to find accurate information about such claims on CDC's webpage. CDC also received bi-weekly summaries (in what were called "CrowdTangle reports") from Facebook about high-volume COVID-19 content circulating on its platform. CDC did not direct or encourage the development or enforcement of the companies' misinformation policies and did not direct or encourage them to take any particular actions with respect to any particular speakers[32] or claims circulating on their platforms.

### 1.    CDC's Pandemic-Era Meetings with Social Media Companies

76.    Even before the COVID-19 pandemic, Ms. Crawford had occasional contacts with social media companies, primarily for the purpose of managing CDC's own social media accounts. At times, social media companies would reach out to CDC to partner with the agency on special projects such as promoting information about flu vaccines or addressing prescription drug overdoses. *Id.*

77.    Early in the COVID-19 pandemic, Ms. Crawford and others from her office began to communicate regularly with representatives from certain social media companies about COVID-19. Those communications were largely prompted by the companies' efforts to "get[] [CDC's] credible information out to [their] audiences[.]" Crawford Dep. 181:25–182:1. Social media companies began regularly reaching out to CDC to ensure that the information they chose to promote on their platforms remained consistent with the latest CDC guidance on issues such as masking protocols or vaccine recommendations. Crawford Decl. ¶ 5 (Ex. 80). Google, for instance,

---

[32] That includes the Individual Plaintiffs in this case. Crawford Dep. 264:2-18 ("Q: At any of your – in flagging any material for any of the social media issues, themes, facts, whatever you flag, can you say whether or not you flagged any information from the Great Barrington Declaration? A: I don't know what that is. Q: Okay. How about Jay Bhattacharya? Anything from him? A: I don't know who that is. Q: Marty Kulldorff. Anything from him? A: I don't know who that is. Q: Aaron Kheriaty. Anything from him? A: I don't know who that is. Q: Jim Hoft, or Gateway Pundit? A: I don't know who that is. Q: All right. And Jill Hines? A: I don't know who she is.").

would reach out to verify that the CDC web links appearing in its search results were accurate and up-to-date. *Id.* And Facebook reached out for help identifying CDC content that the company wanted to promote in its platform "group" pages. *Id.*

78.     An email from Facebook to Ms. Crawford in early February 2020 illustrates the types of communications the platforms had with CDC. At that time, a representative from Facebook informed Ms. Crawford that the company had "been working to identify how [it] can support efforts to provide users with accurate and timely information about [the] coronavirus," Crawford Ex. 2 at 2 (Dkt. 205-3), and was considering initiatives to "mak[e] it easier" for users to find "CDC-credible information," Crawford Dep. 18:9-15. The same Facebook representative informed CDC that the company was already taking "steps to control information and misinformation related to [COVID-19]," including by "remov[ing] [] misinformation" on its platform and by directing users to the WHO's webpage. Crawford Ex. 2 at 3-4 (Dkt. 205-3). What Facebook was looking to do in February 2020—and the reason it was reaching out to CDC then—was to "get CDC's feedback on a few key initiatives that" the company was "considering launching in the coming days/weeks" to *promote* CDC information. *Id.* at 2. Facebook proposed three initiatives: (1) "proactive messages," called "'Quick Promotions,'" "at the top of the News Feed to users in various countries about how to protect [themselves] from coronavirus," which would point users to "credible websites including the WHO internationally, and the CDC in the US"; (2) a "Coronavirus Page serving up content that exists on other organizations' [Facebook] pages including the CDC," which users could find when they "search for information on coronavirus" on the platform; and (3) "a coronavirus 'hub' which would contain various modules including pages to follow, fundraisers that are happening on the platform related to coronavirus, and potentially a common set of FAQs." *Id.* at 3. The email from Facebook included "design mocks" and asked for CDC's "feedback" on various questions,

including whether CDC thought it "would be beneficial to launch" the "Quick Promotions" "in the
US at this time[.]" *Id.*

79.    Ms. Crawford responded that the agency believed there would be "great value" in
adding "Quick Promotions" to Facebook's newsfeed and suggested that "if we can rotate
messages, there could be times [CDC] might want to address widespread myths like mask use or
new issues." *Id.* at 2. She also stated that CDC thought the two other promotions were "great" and
would "love to be a part of [them]." *Id.* She noted that "[U.S.] users will need information directly
from CDC and other federal/local organizations rather than international organizations," and asked
Facebook to "[l]et us know what you need." *Id.*

80.    Soon, officials from CDC and Facebook began meeting weekly "to exchange
information about COVID." Crawford Dep. 16:13-15. Later in the pandemic, CDC began meeting
regularly with Google. *Id.* at 180:16-17. For a "short period of time," CDC met regularly with
Pinterest as well, *id.* at 180:23-24; and "on occasion," CDC met with Twitter, *id.* at 180:24-25–
181:1. While "misinformation was discussed" in those meetings, the meetings were "by and
large . . . about things other than misinformation,"—in particular, about promoting CDC
information relating to COVID on the social media companies' platforms. *Id.* at 181:22-25. These
regular meetings facilitated conversations about the latest COVID-19 information in the midst of
a pandemic environment where CDC's knowledge and understanding of the novel virus were
evolving. Crawford Decl. ¶ 6 (Ex. 80).

81.    CDC no longer has regular meetings with any social media company except for
Google, and it has no regular or direct communications with any social media company about
misinformation. *Id.* ¶¶ 6-12. The last regular meeting with Facebook personnel took place in the
summer of 2021. *Id.* ¶ 8. It has been well over a year since CDC had a meeting with Twitter or

Pinterest that touched on misinformation. *Id.* ¶¶ 9-10. And while CDC currently meets regularly with Google, there is no evidence that those meetings have related in any way to misinformation since March 2022. *Id.* ¶ 11. Instead, the bi-weekly meetings with Google focus on topics such as the impact of the redesign of the CDC.gov website on search engine results. *Id.*

82.    Moreover, even outside of meetings, CDC does not regularly, or directly, communicate with social media or technology companies about misinformation; nor does it have plans to do so. *Id.* ¶¶ 6-7. However, CDC has some occasional, indirect contact with personnel from social media or technology companies that may relate to misinformation. *Id.* For example, CDC personnel develop periodic "State of Vaccine Confidence Insight" reports, which are publicly available on its website, and which CDC periodically distributes to a wide list of email recipients that may include personnel from social media companies. *Id.* ¶ 7. CDC also funds and attends conferences that discuss misinformation and infodemic management, and personnel from social media companies may attend or speak at those conferences. *Id.* These occasional, indirect interactions concerning misinformation do not involve any requests or demands by CDC for a social media company to moderate any particular content on its platform. *See also* Defs.' Resp. PFOF ¶¶ 434-530 (Facebook), 531-560 (Google), 561-589 (Twitter).

### 2. CDC's Responses to Social Media Companies' Requests for Scientific Information Relating to Claims About COVID-19 or Vaccines

83.    On occasion, some social media companies reached out to Ms. Crawford via email to ask for information responsive to certain claims about COVID-19 or vaccines circulating on their platforms, and Ms. Crawford would respond on CDC's behalf.

84.    For example, at various times in 2021, Facebook emailed Ms. Crawford a list of claims (untethered to any particular post) and asked CDC to indicate whether they had been "debunked," *see* Crawford Ex. 16 at 1 (Dkt. 205-17)—in other words, whether they were "false

and can lead to harm," Crawford Ex. 17 (Dkt. 205-18), or "contribute to vaccine hesitancy or refusals," Crawford Ex. 26 at 2 (Dkt. 206-26). After checking with the relevant subject-matter experts as necessary, Ms. Crawford would respond by indicating whether the claims were false and harmful, and sometimes directing the company to information available on CDC's website that directly responded to the false claim. Crawford Dep. 129:11-22; Crawford Ex. 15 at 2 (Dkt. 205-16) (directing Facebook to CDC's "facts and misses" page for more information in response to one of the false claims); Crawford Ex. 23 (Dkt. 205-24) (sending links to CDC webpages addressing the claims raised by Facebook). Nevertheless, CDC could not always provide conclusive answers to the claims Facebook sent the agency. And where scientific evidence was unavailable at the time, CDC would respond to Facebook's inquiries with "[i]nconclusive." *See, e.g.*, Crawford Ex. 16 at 1 (Dkt. 205-17).

85.    When responding to Facebook, CDC did not instruct the company to remove or take any other action against posts or users promoting claims that CDC concluded were false and hazardous to public health. Crawford Dep. at 138:12-14. Indeed, Ms. Crawford understood that the scientific information CDC provided in its responses might inform Facebook's own "policy making" and content moderation decisions, *id.* at 139:23-25-140:1-4, but that "CDC's role" was never "to determine what" Facebook should or should not "do with the scientific information that [CDC] provided," *id.* at 161:20-23. Nor do any communications between Facebook and Ms. Crawford indicate that she or anyone else from CDC ever told Facebook how to handle misinformation. Instead, Facebook made clear that it was "seeking [the agency's] advice" on various issues to "help [*it*] determine the appropriate action to take on [certain] content[.]" *See* Crawford Ex. 26 at 4 (emphasis added) (Dkt. 205-26). At times, Facebook informed CDC about updates to its policies as a result of information it learned from CDC. *See id.* (noting actions the

company took against certain claims under its "current policy"); *id.* at 1 (informing CDC of "several updates" Facebook had made to its "COVID-19 Misinformation and Harm policy based on [CDC] inputs"). But the record contains no evidence that CDC ever demanded (or even asked) that Facebook implement any specific policy changes or even that Facebook report any such changes to the agency. *See also* Defs.' Resp. PFOF ¶¶ 434-530.

86. Google (which owns YouTube) likewise requested CDC's input on claims about COVID-19 vaccines circulating on YouTube's platform. For instance, in March 2021, Google reached out to CDC to ask if a "vaccine expert[]" from CDC could join a call where Google "plan[ned] to share a new list of . . . vaccine misinformation claims" that the company had compiled. Crawford Ex. 29 at 2 (Dkt. 205-29). Ms. Crawford agreed to "arrange[] for a few [subject matter experts] to join the call[.]" *Id.* And in April of that year, Google again asked CDC if a vaccine expert could join a call "to follow up on some additional questions" from the company. Crawford Ex. 30 at 1 (Dkt. 205-30). Google also reached out with more technical questions, too. As vaccines were becoming available in 2021, Google notified CDC of updates the company planned to implement to its "vaccine general availability banner" as COVID-19 vaccines became available to new groups of people or CDC issued new guidance. *See* Crawford Ex. 42 at 3 (Dkt. 205-42) (Google asking CDC to verify whether Google's "one liner on the latest booster shot guidance from the CDC/Vaccines.gov" was accurate and CDC confirming that it was). As with Facebook, CDC did not demand (or even ask) that Google take any action with respect to content on YouTube or information appearing in Google's own banners. *See also* Defs.' Resp. PFOF ¶¶ 531-549.

87. Most recently, in June 2022, Google requested CDC's "evidence-based input" on health-related claims unrelated to COVID-19 or vaccines. Crawford Ex. 43 (Dkt. 205-43). CDC

did not substantively respond to that request because it concerned information that fell outside CDC's scope. Crawford Dep. 256:9-16. When asked in her deposition why she thought Google sent CDC this request, Ms. Crawford testified that she believed it was because CDC's "focus is not solely on COVID," and so Google likely "thought that [CDC] might be able to help" by providing input on "this [other] topic as well." *Id.* at 256:4-8. Contrary to Plaintiffs' assertion, *see* PI Supp. 33, this email exchange does not show that CDC is communicating with platforms about misinformation on other topics as well.

### 3. CDC Emails Alerting Social Media Companies to Misinformation Themes Observed on Platforms and Providing Relevant Scientific Information

88.     At the same time, CDC occasionally pointed out to, or "flagged" for, Facebook or Twitter "issues" or "themes" about COVID-19 that the agency noticed had been circulating widely on the companies' platforms and referred the companies to information on CDC's website that addressed the claims. Crawford Ex. 9 at 1 (Dkt. 205-10); Crawford Dep. 87:13-25–88:1-2 (explaining that "flagging" meant simply "pointing out"). On occasion, CDC included specific social media posts as examples, to provide context or to clarify what the claims were. *Id.* at 90:14-23 (saying CDC "provided some examples of what we meant"). On May 6, 2021, for instance, Ms. Crawford emailed Facebook to point out "two issues [that] we are seeing a great deal of misinfo" about—"vaccine shedding and microchips"—and provided "some example posts." Crawford Ex. 9 at 1 (Dkt. 205-10). On May 10, 2021, Ms. Crawford sent the same email to Twitter, with example posts from its platforms. Crawford Ex. 34 at 4 (Dkt. 205-34). Ms. Crawford noted in her emails that CDC "plan[ned] to post something shortly to address vaccine shedding and" that she could "send that link soon." Crawford Ex. 9 at 1 (Dkt. 205-10); Crawford Ex. 34 at 4 (Dkt. 205-34). Ms. Crawford testified that, through these alerts, CDC was "trying to point out" to the social media companies the "[in]accurate information" circulating about COVID-19 "and [to] make the credible

information more available to users." Crawford Dep. 88:25-89:6. The "goal," in other words, was "to be sure that people ha[d] credible health information so that they [could] make the correct health decisions for themselves." *Id.*

89.    Ms. Crawford did not "know exactly what [the companies] might do with" the claims and posts flagged by CDC, nor did she ask the companies to take any particular action with respect to the claims or posts. *Id.* at 88:15-18; *see also id.* at 75:19-21. Neither she nor "anyone at CDC" advised a "social media company on how [it] should apply [its] policies to . . . a particular post[.]" *Id.* at 104:22-105:6. And the social media companies did not face any "consequence[s]" if they declined to "do anything with" the items "flagged" or pointed out by CDC. *Id.* at 88:19-22. Ms. Crawford simply believed "it was worth pointing out that" CDC was "going to have" responsive "information up soon" on its website, *id.*, which could assist the social media companies' application of their own policies with respect to claims "widely circulating" on their platforms. *Id.* at 153:23-154:3. Ultimately, the social media companies themselves "made decisions about" how to handle the misinformation circulating on their platforms, "based on whatever policy they had." *Id.* at 211:18-19; *id.* at 103:13-16 (discussing Facebook's options). Ms. Crawford has "never seen [those] policies," *id.*, or had input into their development or enforcement, *id.* at 105:12-19.

### 4.  CDC's Two "Be on the Lookout Meetings" in May 2021

90.    In May 2021, CDC held two meetings—called "Be On the Lookout" or "BOLO" meetings—to discuss misinformation with social media platforms. Crawford Dep. 198:21-24; *id.* at 244:19-245:2; *see also* Crawford Decl. ¶¶ 14-16 (Ex. 80). Facebook, Twitter, and YouTube were invited to participate, Crawford Ex. 34 at 4 (Dkt. 205-34) (Twitter invite); Crawford Ex. 40 at 1 (Dkt. 205-40) (YouTube invite); *id.* at 3 (Facebook invite), and officials from the Census Bureau ("Census") also participated in the meetings, *infra* Defs.' PFOF § II.D.

91.    The BOLO meetings emerged from an Interagency Agreement that CDC entered into with Census in January 2021. Crawford Decl. ¶¶ 13-14 (Ex. 80). The agreement allowed CDC to consult with Census "to learn how th[at agency] handled [online] misinformation" during the 2020 Census, to inform CDC's response to COVID-19 misinformation circulating online. Crawford Dep. 111:1-6, 175:14-19. CDC sought Census' assistance on this issue because CDC was "shorthanded" at the time, and Census "seemed to have more knowledge than [CDC] did." *Id.* at 111:5-6. Census introduced CDC to the idea of BOLO meetings, which would provide a forum for CDC to "give examples" to social media companies of false health information circulating on their platforms and to point the companies to responsive scientific information available from CDC. Crawford Dep. 210:20-22. Participants from social media companies "could [then] follow up separately" with CDC to discuss any of the issues further. *Id.* Ms. Crawford "ran the BOLO meetings," with the help of a Census contractor. *Id.* at 265:11-19. Census "drafted the slide deck," which CDC edited, *id.* at 210:15-25; and Census explained how it "thought [CDC] should" present the information, based on how Census "had done it in the past." *Id.* The PowerPoint slide decks presented COVID-19 misinformation narratives and contained example social media posts as illustrations. Crawford Decl. ¶ 14 (Ex. 80). During these presentations, CDC did not ask, let alone demand, that a company take a particular action with respect to the themes and example posts that were discussed at the BOLO meetings. *See* Defs.' Resp. PFOF ¶¶ 550-562.

92.    Two additional BOLO meetings were scheduled for the summer of 2021 but never occurred. Crawford Decl. ¶ 15 (Ex. 80). The first was cancelled due to a holiday; CDC emailed PowerPoint slides to the companies instead. *Id.*; Crawford Dep. 248:15-22. The second was cancelled because CDC had no information to share. Crawford Decl. ¶ 15 (Ex. 80). There have

been no BOLO meetings of this type since May 28, 2021, and no further meetings are anticipated. *Id.*

### 5. A CDC Official's One-Time Use of a Facebook Reporting Channel in 2021

93.    In the spring of 2021, Facebook and Twitter each separately suggested that CDC register to use the companies' respective "reporting channel" or "portal" set up by the company for entities such as CDC to report "misinformation or threats" that they observed on the platforms. Crawford Dep. 91:9-10; *id.* at 211:24-212:7. Ms. Crawford did not use Twitter's portal and does not recall anyone else from CDC ever being given access to the portal. *Id.* at 213:5-8. Ms. Crawford also did not use the Facebook reporting channel, but one other CDC official used it in the summer of 2021 to report a handful of "posts or threats" in a single submission. *Id.* at 92:3-5, 92:13-18; Crawford Decl. ¶ 18 (Ex. 80). CDC did not demand that Facebook take any particular action with respect to the few posts flagged through the reporting channel in the summer of 2021; and Facebook did not report back to CDC whether it took any action on those posts. Crawford Decl. ¶ 18. Ms. Crawford testified that she is unaware of any CDC official using a reporting channel since the summer of 2021. *Id.*; *see also* Defs.' Resp. PFOF ¶¶ 476-478.

### 6. CDC's Receipt of Bi-weekly Facebook COVID-19 Content Reports in 2021

94.    Additionally, from January to December 2021, Facebook sent CDC bi-weekly reports, called "CrowdTangle COVID content report[s]," Crawford Ex. 6 at 2 (Dkt. 205-7) which provided a "summary of the higher volume conversations" about COVID-19 on the platform, Crawford Dep. 53:7-12, and included "pictures of [] posts" "as examples" of the conversations, *id.* at 149:6-7. These reports could be used by CDC to better "understand what[] [was] being discussed" on social media so that the agency could "update [CDC] communication material" in response. *Id.* at 148:11-15. Facebook personnel included a summary of "[h]ighly engaged . . . content," which was not limited to content considered "misinformation," in the cover

emails to which the reports were attached. *See, e.g.*, Crawford Ex. 7 at 1 (Dkt. 205-8) (including in the summary of highly engaged content "posts . . . about celebrating health care workers" and posts "shar[ing] news that kids over 12 can be vaccinated," with "posts includ[ing] varied stances on support/opposition to the idea"). Ms. Crawford did not "personally do anything . . . with the CrowdTangle reports" aside from passing them along to others. Crawford Dep. 59:14-19; 52:6-10. CDC did not direct Facebook to take any action with respect to any information or example posts contained in the reports. The last CrowdTangle report CDC received from Facebook was in December 2021.[33]

95.     Before it began sending these summary CrowdTangle reports to CDC, Facebook had also allowed CDC, since March or April 2020, to "log into CrowdTangle and run [its] own reports or searches." Crawford Dep. 77:9-13, 147:12-14. Ms. Crawford did not use CrowdTangle to run searches, but other teams from CDC may have done so. *Id.* at 148:11-15. In any event, to the extent anyone did run searches in CrowdTangle, that would not indicate any effort to influence Facebook's applications of its content moderation policies. *See also* Defs.' Resp. PFOF ¶¶ 440-452, 456, 471, 472, 507-10.

**D. The Census Bureau**

96.     Although the Census Bureau worked with CDC on COVID-19 misinformation in the past, CDC has not "work[ed] with Census in quite some time." Crawford Dep. 111:9-10. In particular, pursuant to a now-expired Interagency Agreement, *supra* Defs.' PFOF § II.C.4, Census helped CDC organize the two BOLO meetings CDC hosted in May 2021. Crawford Dep. 210:10-

---

[33] Crawford Ex. 6 at 1-2 (Dkt. 205-7) (first report sent in January 2021); Dkt. 71-2 at 1 (email from Facebook attaching the "last insights report for this series" (emphasis removed)); *id.* 71-2 at 1 (email from Facebook attaching the "last insights report for this series" (emphasis omitted)); *id.* at 2 (email from Facebook noting that the "reports will be discontinued in Jan 2022" (emphasis omitted)); *id.* (Crawford thanking Facebook for sending the reports and stating that she "understand[s] the[y're] ending").

25. To Ms. Crawford's knowledge, CDC's last meetings and communications with Census personnel about misinformation took place in the summer of 2021. Crawford Decl. ¶ 13 (Ex. 80).

97.    Also in 2021, Facebook added Census to the distribution list for its CrowdTangle reports. Crawford Dep. 58:17-20; *id.* Crawford Ex. 6 at 1 (Dkt. 205-7). On one occasion, Ms. Crawford sent Facebook a few questions from Census seeking greater understanding about how the company applied its content moderation policies to certain types of misinformation. In particular, Census wanted to know Facebook's "approach" to "adding labels to" certain stories posted on its platform and why Facebook decided to remove certain posts that had been identified as containing misinformation. Crawford Dep. 76:2-77:1; Crawford Ex. 8 at 2 (Dkt. 205-9). Ms. Crawford testified that she "th[ought] that Census was at least periodically checking on things they had flagged," *id.* at 117:19-21, but there is no evidence that in "periodically checking on things" Census ever demanded or even asked a social media company to take specific action with respect to a particular post.

**E.  Dr. Fauci, Former Director of the National Institute of Allergy and Infectious Diseases (NIAID)**

98.    The National Institute of Allergy and Infectious Diseases ("NIAID") is an agency within the National Institutes of Health ("NIH"), which in turn is a component of HHS. *See* Ex. 85 (*List of Institutes and Centers*, Nat'l Insts. of Health, https://perma.cc/YR83-TJMY); Ex. 86 (*About NIH*, Nat'l Insts. of Health, https://perma.cc/55BG-UDQU). NIAID conducts and supports research to better understand, treat, and prevent infectious, immunologic, and allergic diseases and is responsible for "respond[ing] to emerging public health threats." Ex. 87 (*NIAID Mission*, Nat'l Insts. of Health, https://perma.cc/8GVS-XSWM). To that end, NIAID manages a diverse research portfolio concerning "many of the world's most intractable and widespread diseases," including

"tuberculosis and influenza, HIV/AIDS, biodefense," COVID-19, and others. *Id.*; *see also* 42 U.S.C. § 285f.

99.    From 1984 to 2022, Dr. Fauci was the Director of NIAID, serving under seven Republican and Democratic Presidents in that role. Ex. 88 (*Anthony S. Fauci, M.D., Former NIAID Director*, Nat'l Insts. of Health, https://perma.cc/CSF2-XYNH). During that time, he led the agency in tackling "newly emerging and re-emerging infectious disease threats including HIV/AIDS, West Nile virus, the anthrax attacks, pandemic influenza, various bird influenza threats, Ebola and Zika, among others, and, of course, most recently the COVID-19 pandemic." Ex. 89 (*Statement by Anthony S. Fauci, M.D.*, Nat'l Insts. of Health (Aug. 22, 2022), https://perma.cc/RH8Z-P3X5). In 2008, he was awarded the presidential medal of freedom—the highest honor available to federal civil servants—by President George W. Bush for his work on HIV/AIDS. Ex. 90 (*President Bush Honors Presidential Medal of Freedom Recipients*, The White House (June 19, 2008), https://perma.cc/KE8X-4SPS).

100.    In January 2020, President Trump announced the formation of a Coronavirus Task Force, and named as its members Dr. Fauci and eleven other federal officials (including then-Secretary of Health and Human Services Alex Azar and then-Assistant to the President and Senior Advisor to the Chief of Staff Rob Blair). Ex. 91 (*Statement from the Press Secretary Regarding the President's Coronavirus Task Force*, The White House (Jan. 29, 2020), https://perma.cc/5VFS-LRZC). The task force was "charged . . . with leading the United States Government response to the novel 2019 coronavirus and with keeping [the President] apprised of developments." *Id.* In January 2021, after the change in administrations, Dr. Fauci was named President Biden's Chief Medical Advisor, Fauci Dep. 10:17-22 (Dkt. 206-1), to advise the President on handling the COVID-19 pandemic, Ex. 92 (*Statement from President Joe Biden on*

*the announcement of Dr. Anthony Fauci's Departure from NIAID*, The White House (Aug. 22, 2022), https://perma.cc/4KMA-PWH2). After 50 years as a civil servant (and 38 of those years as Director of NIAID), Dr. Fauci recently retired from government service. Ex. 93 (*Dr. Anthony Fauci to Leave NIAID at the End of December*, Nat'l Insts. of Health (Dec. 7, 2022), https://perma.cc/NLZ6-NY85).[34]

101.   As the nation's leading infectious disease expert, Dr. Fauci assumed a critical role in the pandemic response during the last two presidential administrations, answering difficult questions about unsettled scientific matters in White House press briefings, congressional hearings, cable news programs, and other public platforms. Until his retirement at 82 years old, he worked tirelessly—maintaining 18-hour workdays[35]—at the height of the pandemic. He has garnered numerous awards for leading the nation through an unprecedented public health crisis.[36]

102.  Dr. Fauci had only limited interactions with Facebook during 2020, and no involvement with other social media platforms. In March 2020, Facebook CEO Mark Zuckerberg sent Dr. Fauci an email invitation to participate in a "Facebook Live" event, in which Dr. Fauci answered Mr. Zuckerberg's questions about COVID-19 in a live broadcast on the Facebook platform. *See* Ex. 187 at 58-60; *see also* Fauci Ex. 23 at 2 (Dkt. 206-24). Mr. Zuckerberg began his invitation with a "note of thanks for [Dr. Fauci's] leadership and everything [he was] doing to make our country's response to this outbreak as effective as possible." Fauci Ex. 23 at 3 (Dkt. 206-

---

[34] Dr. Hugh Auchincloss succeeded Dr. Fauci as the Acting Director of NIAID. *See* Defs.' Notice of Substitution at 2.

[35] Ex. 94 (Azmi Haroun, *Dr. Anthony Fauci, the US's top infectious-disease expert, shared a day in his life, and it's exhausting just reading it*, Insider (Dec. 4, 2020), https://perma.cc/ML8H-HSB5).

[36] *See, e.g.*, Ex. 95 (*2021 National Academy of Sciences Public Welfare Medal*, National Academy of Sciences, https://perma.cc/B8CV-T76C); Ex. 96 (*Anthony Fauci Named Recipient of AHA Award of Honor*, American Hospital Association (Apr. 21, 2022), https://perma.cc/M2BL-EGJR).

24). Mr. Zuckerberg continued by explaining that he "wanted to share a few ideas of ways [Facebook] could help . . . get [Dr. Fauci's] message out." *Id.* One idea was connected to Facebook's forthcoming "Coronavirus Information Hub," which would appear "at the top of Facebook for everyone" to help users "get authoritative information from reliable sources and . . . encourage people to practice social distanc[ing.]" *Id.* Mr. Zuckerberg thought that "it would be useful to include a video from [Dr. Fauci]" on this hub, "because people trust and want to hear from experts[.]" *Id.* Another idea was that Dr. Fauci participate in other "livestreamed Q&As" as part of a "series" that Mr. Zuckerberg was creating "with health experts to try to use [his] large following on the platform . . . to get authoritative information out as well." *Id.* Dr. Fauci responded that Mr. Zuckerberg's "idea and proposal sound terrific" and that he "would be happy to do a video for [the] hub." *Id.* at 4. During the video, Dr. Fauci answered "important questions" from Mr. Zuckerberg about COVID-19 "public health measures." Fauci Dep. at 177:2-8. Dr. Fauci has also participated in a small number of other livestreamed discussions with Mr. Zuckerberg to discuss COVID-19. *See* Ex. 187 at 58-60.

103.   Otherwise, Dr. Fauci has had no interactions with any social media company about COVID-19 or misinformation related to COVID-19. Dr. Fauci has never asked a social media company "to remove misinformation from" its platform. Fauci Dep. at 152:21-24. Dr. Fauci does not "pay attention to what social media organizations like Google and YouTube and Twitter . . . do[.]" *Id.* at 239:21-24; *id.* at 241:6-13 ("I do not get involved in any way with social media. I don't have an account, I don't tweet, I don't Facebook, and I don't pay attention to that. . . . I don't pay attention to what gets put up and put down on social media."). He is unfamiliar with the companies' policies. *See id.* at 241:14-25. And he has not been involved in any social media company's decision whether, or how, to moderate particular content. *Id.* at 280:3-7; *id.* at

281:24-282:2. Indeed, Dr. Fauci has testified that rather than "interfering with other people's ability to say what they want to say," his method of "countering false information . . . is to try to [] flood the system with the correct information[.]" *Id.* at 357:8-13. *See also* Defs.' Resp. PFOF ¶¶ 598-808, 840-852.

104.   In April 2020, Dr. Fauci's communications staff alerted Facebook of "fake Dr. Fauci accounts on [Facebook] and [Instagram],"—a federal crime, *see* 18 U.S.C. § 912—including one "particularly troubling" account that was also "selling masks[.]" Fauci Ex. 55 at 3-4 (Dkt. 207-19). "[A]ll but two" of the "accounts were removed for the impersonation of Dr. Fauci." *Id.* at 3. The two that were not removed were apparently "fan accounts[.]" *Id.* Dr. Fauci was not involved in the communications with Facebook about the impersonating accounts and was not aware that the accounts existed.

105.   Plaintiffs misconstrue the record when they assert that Dr. Fauci "approves of the removal of these accounts from social media because he thinks they are 'a bad thing,' even though they may include parody accounts." PI Supp. 40. Links to the accounts to which Plaintiffs refer were included in an email chain that did not include Dr. Fauci, *see* Fauci Ex. 55 (Dkt. 207-19),[37] and Dr. Fauci was shown that email for the first time during his deposition. When asked about the accounts linked in the email, Dr. Fauci stated, "I don't know what these are. I just got a bunch of links to them. I'm not sure what they are." Fauci Dep. 311:7-9. Dr. Fauci speculated that, based on the email, it looked like his communications staff was "trying to get rid of fake accounts" on Facebook "because fake accounts are bad things, I believe." *Id.* at 309:24-310:1. He went on to say: "I'm reading here that there are people that are using my name falsely and creating fake

---

[37] Although Plaintiffs repeatedly suggest the possibility that some accounts were parody accounts, they have introduced no such evidence, and the communications from NIAID staff clearly show that NIAID staff were only seeking the removal of accounts impersonating Dr. Fauci.

accounts which people in the communications staff [are] saying . . . is troubling because they're doing things like selling masks and doing things like that. So I think that it would be kind of appropriate for my communications staff to be concerned when people are falsely impersonating me." *Id.* at 310:8-16. When asked whether he was saying that "bad things," such as impersonating accounts, "should be removed from social media," Dr. Fauci responded, "No. I mean, I think when someone says they're me and they're not me, I think someone should take a close look at that." *Id.* at 311:22-312:1. And when asked whether "someone" should "take a close look at other false statements on social media," Dr. Fauci testified, "That's not my lane. I don't – I never get involved in that, nor do I concentrate on that, so I don't have an opinion on that. Like I've told you . . . now . . . I can repeat it for the hundredth time, I really don't get involved in social media issues." *Id.* at 312:2-9. *See also* Defs.' Resp. PFOF ¶¶ 809-825.

### F.  The Cybersecurity and Infrastructure Security Agency (CISA)

#### 1.  CISA's Mission and General Overview

106.   The Cybersecurity and Infrastructure Security Agency ("CISA"), a component of DHS, has a broad statutory mandate to "coordinate with" Federal and non-Federal entities (including international entities) "to carry out the cybersecurity and critical infrastructure activities of the Agency, as appropriate[.]" 6 U.S.C. § 652(c)(2). To accomplish its mission and manage risks to the nation's election infrastructure, CISA works collaboratively with state and local governments, election officials, federal partners, and private sector partners. Declaration of Geoff Hale, Lead for Election Security and Resilience, Nat'l Risk Mgmt. Ctr., CISA ¶ 6 ("Hale Decl.") (Ex. 97). This includes working in a nonpartisan manner with state and local election officials— among others, officials from Missouri and Louisiana, as discussed below—as the trusted and

expert voices within their communities to equip the American public with accurate information

about the conduct and security of elections. *Id.*[38]

### 2. The Election Infrastructure Subsector

107.  In January 2017, based on the vital role that elections play in the United States, DHS

officially designated election infrastructure as a critical infrastructure subsector. Hale Decl. ¶ 4

(Ex. 97). This designation recognizes that the disruption of U.S. election infrastructure would have

a devastating impact on the country. *Id.* "Election infrastructure" refers to an assembly of systems

and networks, including, among other things, voter registration databases and associated IT

systems, IT infrastructure and systems used to manage elections, voting systems and associated

infrastructure, storage facilities for election and voting system infrastructure, and polling places.

*Id.* ¶ 5. CISA reduces the risk to U.S. critical infrastructure by, among other things, building

resilience to disinformation. *Id.* ¶ 9.

108.  The official designation of election infrastructure as "critical infrastructure" also

resulted in the creation of the "Election Infrastructure Subsector," which builds election

infrastructure resilience by focusing on a wide range of election-related systems and assets, such

as storage facilities, polling places, centralized vote tabulation locations used to support the

election process, and related information and communications technologies. *Id.* ¶ 23. Like all

critical infrastructure sectors, the Election Infrastructure Subsector is supported by two councils:

---

[38] In furtherance of its mission, CISA provides publicly available resources on election security
for both the general public and election officials at all levels. Hale Decl. ¶ 7 (Ex. 97). Examples of
these resources include an Election Infrastructure Insider Threat Mitigation Guide, CISA's
partnership with the FBI to publish election-security-related public service announcements, and
the compilation of a toolkit of free services and tools intended to help state and local government
officials, election officials, and vendors enhance the cybersecurity and cyber resilience of U.S.
election infrastructure. *Id.* In addition, CISA provides numerous voluntary and no-cost election
security services, such as cybersecurity assessments, cyber threat hunting, cyber incident response,
and training and exercises to state and local government officials and private sector election
infrastructure partners. *Id.* ¶ 8.

a government coordinating council ("GCC") and a sector coordinating council ("SCC"). *Id.* ¶¶ 24, 27.

109.    The Election Infrastructure Subsector GCC ("EIS-GCC") is comprised of state, local, and Federal Government departments and agencies, which share information and collaborate on best practices to mitigate and counter threats to election infrastructure. *Id.* ¶ 29. The EIS-GCC Executive Committee is chaired by CISA, and its members include the U.S. Election Assistance Commission Chairperson, the National Association of Secretaries of State ("NASS") President, the National Association of State Election Directors ("NASED") President, and a local government election official. *Id.* ¶ 30. Notably, Louisiana is a member of NASS, and both Louisiana and Missouri are members of NASED. *Id.* ¶ 33. The Louisiana Secretary of State has been a member of the EIS-GCC since May 2018. *Id.* ¶ 31. He served as an EIS-GCC Executive Committee member from the summer of 2021 to the summer of 2022, while he was the NASS President. *Id.* The Missouri Secretary of State served as an alternate member of the EIS-GCC from 2018-2019. *Id.* ¶ 32.

110.    The Election Infrastructure Subsector SCC ("EI-SCC") comprises owners or operators with significant business or operating interests in U.S. election infrastructure systems or services. Its mission is "to advance the physical security, cyber security, and emergency preparedness of the nation's election infrastructure," and it accomplishes this mission through the voluntary actions of the infrastructure owners and operators represented in the EI-SCC. *Id.* ¶ 34. The EI-SCC is governed by a five-member Executive Committee. *Id.* ¶ 35. Although CISA is not a member of the EI-SCC, it serves as the secretariat and provides various administrative functions. *Id.* ¶ 36.

111.  After the 2020 election, the EI-SCC and EIS-GCC launched a Joint Managing Mis/Disinformation Working Group to coordinate infrastructure security efforts across the subsector. *Id.* ¶ 38. The Working Group provides a forum through which the Election Infrastructure Subsector can identify challenges in mitigating the risks posed by disinformation impacting election infrastructure and produce resources for addressing these risks. *Id.* ¶ 39. To date, the Joint Managing Mis/Disinformation Working Group has published two guides to assist state and local election officials and industry providers with preparing for and responding to risks associated with disinformation: (1) the Rumor Control Page Start-Up Guide, which is designed for use by state, local, tribal and territorial government officials and private partners seeking to dispel inaccurate election security-related information by sharing accurate information; and (2) the MDM Planning and Incident Response Guide for Election Officials, which is designed for SLTT election officials and to help them understand, prepare for, and respond to disinformation that may impact the ability to securely conduct elections. *Id.* ¶ 40.

112.  CISA supports the Joint Managing Mis/Disinformation Working Group by providing administrative and substantive support, such as facilitating working group meetings and helping to draft working group products. *Id.* ¶ 41. The Working Group does not engage with social media companies, and it does not flag or report potential disinformation to social media or technology companies. *Id.* ¶ 43.

### 3.  The Center for Internet Security

113.  The Center for Internet Security ("CIS") is a non-profit organization that exists to "make the connected world a safer place by developing, validating, and promoting timely best practice solutions that help people, businesses, and governments protect themselves against pervasive cyber threats." *Id.* ¶ 44; Ex. 98 (*About Us*, Ctr. For Internet Sec., https://perma.cc/456L-TUHD). It is home to the Multi-State Information Sharing and Analysis Center ("MS-ISAC") and

the Elections Infrastructure Information Sharing and Analysis Center ("EI-ISAC"). Hale Decl. ¶ 44 (Ex. 97).

114.   The MS-ISAC serves as a central cybersecurity resource for state, local, tribal and territorial government entities. *Id.* ¶ 45. It is a membership-based organization that includes more than 14,000 organizations and all fifty states, including Plaintiffs Missouri and Louisiana. *Id.* ¶ 46. The MS-ISAC members receive direct access to a suite of cybersecurity services and cybersecurity informational products including, but not limited to, cybersecurity advisories and alerts, vulnerability assessments, incident response support, secure information sharing, tabletop exercises, and malicious domains/internet protocol reports. *Id.* ¶ 47.

115.   The EI-ISAC, which was founded in 2018, is an organization managed by CIS with membership open to all state, local, tribal and territorial organizations that support election officials. *Id.* ¶ 48. Membership in the EI-ISAC is voluntary and free for participants. *Id.* ¶ 49. The EI-ISAC supports the rapidly changing cyber and critical infrastructure security needs of U.S. elections offices and offers a suite of election-focused cyber defense tools, including threat intelligence products, incident response and forensics, threat and vulnerability monitoring, cybersecurity awareness, and training products. *Id.* ¶ 48.

116.   DHS has provided financial assistance to CIS through a series of cooperative agreement awards, managed by CISA, to provide specified cybersecurity services to state, local, tribal, and territorial government organizations through the MS- and EI-ISACs. *Id.* ¶ 50. DHS has limited the use of funds to cybersecurity services intended to detect, prevent, respond to, mitigate, and recover from cyber threats, vulnerabilities and risk. *Id.* DHS approved scope of work for the cooperative agreements has never funded CIS to perform disinformation-related work, including the reporting of potential election-related disinformation to social media platforms. *Id.* ¶ 51.

### 4. CISA's Efforts to Build Resilience to Misinformation

a. *CISA's Mis-, Dis-, and Malinformation ("MDM") Team*

117.   CISA's Mis-, Dis-, and Malinformation ("MDM") Team leads CISA's efforts to build resilience to disinformation targeting critical infrastructure. Scully Dep. 16:4-6 (Dkt. 209-1) The MDM Team, which was formerly known as the Countering Foreign Influence Task Force, was established in 2018 in CISA's predecessor agency. *See* Ex. 187 at 77. CISA builds this resilience through public awareness and engagement and seeks to reduce the impact of disinformation targeting election infrastructure. Scully Dep. 346:15-348:1. In general, CISA develops publications for public awareness and education, as well as publications for key stakeholders to help them understand how disinformation works and the steps they can take to mitigate risks. *Id.* at 16:7-15; Hale Decl. ¶ 14 (Ex. 97) (describing creation of graphic novels focusing on disinformation tactics through fictional stories and development of infographic explaining foreign influence campaigns). CISA also conducts analysis of open-source reporting. Scully Dep. 16:16-25. In addition, CISA engages or has engaged with different stakeholders, including civil society groups, federal partners, and private sector organizations, such as social media and technology companies. *Id.* at 16:16-22; Ex. 187 at 77.

b. *CISA's Switchboarding Work During the 2020 Election Cycle*

118.   "Switchboarding" refers to a process by which CISA forwarded to social media companies election-related information that state and local election officials (or other stakeholders, such as NASS and NASED) had identified as misinformation. Scully Dep. 17:1-14, 23:19-24:2, 303:11-304:5. Those companies then decided how to handle the forwarded content based on their own policies. *Id.* at 17:15-21. During the 2020 election cycle, CISA provided switchboarding services primarily for state and local election officials, but also for other election infrastructure stakeholders. *Id.* at 16:16-25.

119. For the 2020 election cycle, much of the potential election security-related disinformation CISA received from state and local election officials was shared by those officials through CIS. Hale Decl. ¶ 71 (Ex. 97); Scully Dep. 59:9-60:17, 119:5-120:5.[39] When that happened, election officials would email the potential disinformation to CIS, which would then forward the information to CISA and others, including the Election Integrity Partnership ("EIP"), discussed below. Scully Dep. 16:16-25.[40] CISA did not fund CIS or the MS- or EI-ISAC for any of the work they provided in relation to the reporting of potential election security-related disinformation to social media or technology companies during the 2020 election cycle. Hale Decl. ¶ 77 (Ex. 97). In addition, officials in Plaintiff States Louisiana and Missouri were among those who shared potential misinformation with CISA or CIS for purposes of it being sent to social media companies. *Id.* ¶ 70; Ex. 100 (MOLA_DEFSPROD_00007488); Ex. 101 (MOLA_DEFSPROD_00007646); Ex. 102 (MOLA_DEFSPROD_00010719); Ex. 103 (MOLA_DEFSPROD_00008681); Ex. 104 (MOLA_DEFSPROD_00010774); and Ex. 105 (MOLA-DEFSPROD_00008610).

120. Before establishing its switchboarding operation, CISA met with social media companies and reaffirmed its "position" to "never ask [the companies] to take any specific

---

[39] CISA also received potential disinformation in two other ways. Scully Dep. 119:5-120:5. The first was that election and other officials would send information to CISA Central, which is CISA's operations center. *Id.* at 119:5-120:5. The second was that election and other officials would directly contact CISA employees. *Id.* at 119:5-120:5.

[40] In addition, CISA understands that CIS would share reports of potential election security-related disinformation with other organizations with which it had its own independent relationships, such as with the EIP for further analysis and with NASS and NASED for situational awareness. Hale Decl. ¶ 74 (Ex. 97). At a certain point in the 2020 election cycle, CIS began forwarding the potential election security-related disinformation received from state and local election officials directly to the relevant social media or technology companies and would include CISA on the email for situational awareness, as well as others, including the EIP. *Id.* ¶ 75. CISA took no action on these emails sent by CIS, other than frequently recording them in an internal spreadsheet that CISA had created. *Id.*

actions," and to leave it to the companies to "make decisions based on their terms of service."

Scully Dep. 241:23-242:5. Consistent with that position, when CISA transmitted to social media

companies potential misinformation identified by local and state officials, CISA's protocol was to

include the following notice stating that it was not requesting that the social media companies take

any particular action:

> The Cybersecurity and Infrastructure Security Agency (CISA) of the U.S.
> Department of Homeland Security (DHS) is not the originator of this information.
> CISA is forwarding this information, unedited, from its originating source – this
> information has not been originated or generated by CISA. This information may
> also be shared with law enforcement or intelligence agencies.
>
> CISA affirms that it neither has nor seeks the ability to remove or edit what
> information is made available on social media platforms. CISA makes no
> recommendations about how the information it is sharing should be handled or used
> by social media companies. Additionally, CISA will not take any action, favorable
> or unfavorable, toward social media companies based on decisions about how or
> whether to use this information.
>
> In the event that CISA follows up to request further information, such a request is
> not a requirement or demand. Responding to this request is voluntary and CISA
> will not take any action, favorable or unfavorable, based on decisions about whether
> or not to respond to this follow-up request for information.

*See, e.g.*, Ex. 106 at 1 (MOLA_DEFSPROD_00008499); Hale Decl. ¶ 72 (Ex. 97).

121. Normally, CISA would receive a note from a social media company acknowledging

that it had received CISA's email, but CISA often did not receive a similar note reporting what

action was ultimately taken. Scully Dep. 177:7-178:8. If a social media company needed additional

information from an election or other official, CISA tried to facilitate the information sharing. *Id.*

at 219:25-220:13.

122. Consistent with the fact that social media companies independently evaluated

whether certain information violated their terms of service, they from time to time concluded that

forwarded posts did not violate their content moderation policies and therefore took no action. *See,*

*e.g.*, Ex. 105 at 1 (MOLA_DEFSPROD_00008610) (email from Twitter stating that the "[t]weet was not determined to be a violation of our rule"); Ex. 107 at 1 (MOLA_DEFSPROD_00008640) (email from Twitter concluding that certain tweets violated its terms of service while others did not): Ex. 108 at 1 (MOLA_DEFSPROD_00009505) (email from Twitter stating "[t]weet was not in violation of our Civic Integrity Policy"); Ex. 109 at 1 (MOLA_DEFSPROD_00010711) (email from Twitter stating that the tweets were not in violation of their policies and would not be actioned); Ex. 110 at 1 (MOLA_DEFSPROD_00010794) (email from Twitter stating "internal review of account data indicates [the account] is not suspicious"); Ex. 111 at 1 (MOLA_DEFSPROD_00010376) (email from Twitter stating the tweet did not violate its civic integrity policy).

123.    On occasion at the request of election officials, CISA would ask social media companies to report back on how, if at all, they had addressed misinformation CISA had flagged on behalf of those officials. Scully Dep. 163:17-164:17. Over time, however, the companies began reporting directly to the election officials what actions, if any, they took concerning potential misinformation. *Id.* at 164:8-25. *See also* Defs.' Resp. PFOF ¶¶ 972-977, 1076-1082.

124.    CISA discontinued its switchboarding work after the 2020 election cycle and has no intention to engage in switchboarding for the next election. Scully Dep. 21:19-25; 265:13-19; Hale Decl. ¶ 78 (Ex. 97). In April or May 2022, CISA leadership decided that CISA would no longer play a switchboarding role, in part because it was resource intensive. Scully Dep. at 22:1-23; 62:15-22. Although CIS had requested that DHS provide funding for CIS's 2022 switchboarding efforts, DHS declined. Hale Decl. ¶ 79 (Ex. 97). It is CISA's understanding that during the 2022 election, social media companies engaged directly with CIS and election officials with any misinformation concerns. Scully Dep. 265:20-266:13. Although CISA was copied on CIS's communications with

social media companies in 2020, it was not copied on any such communications in 2022. *Id.* at 266:14-16.

125.  Plaintiffs contend, based on a November 10, 2021, "Cyberscoop" article, that CISA intended to expand its disinformation efforts, PI Supp. 58; *see also* Pls.' Proposed Finding of Fact ¶ 1106, ("Pls.' PFOF") (Dkt. 214-1) (referring to "Cyberscoop" article and claiming that "CISA publicly states that it is expanding its efforts to fight disinformation heading into the 2024 election cycle"); Pls.' PFOF ¶ 1114 (citing same November 2021 article where CISA Director Easterly is quoted as saying that CISA is "beefing up its misinformation and disinformation team"). While CISA anticipated and publicly stated that its MDM Team would grow, the size of the team has remained constant and the scope of CISA's disinformation mission has not expanded. Hale Decl. ¶¶ 12-13 (Ex. 97); *see also* Defs.' Resp. PFOF ¶¶ 1094-1122.

126.  Regarding CISA's 2022 election-related work, CISA endeavored to mitigate the risks posed by disinformation by providing updates to CISA's Election Security Rumor vs. Reality webpage, discussed *infra* at 79, and the "Tactics of Disinformation" resilience guide, which highlighted examples of the tactics used by disinformation actors and outlining proactive measures to mitigate the effectiveness of such tactics. Hale Decl. ¶¶ 64, 66 (Ex. 97). CISA also partnered with the FBI to publish a public service announcement on information manipulation tactics related to the 2022 midterm elections. *Id.* ¶ 67; Scully Dep. 303:11-304:5. And CISA sought to amplify the voices of state and local election officials through its social media platforms and other public forums. Hale Decl. ¶ 64 (Ex. 97).[41]

---

[41] Over the past several years, CISA has done a limited amount of disinformation-related work concerning other critical infrastructure sectors, but none of that work has concerned communications with social media companies concerning content on their platforms. Hale Decl. ¶ 16 (Ex. 97). For example, during the COVID-19 pandemic, and in relation to the Healthcare and Public Health Sector, CISA provided support to the sector and produced two public guidance

127. The "Election Security Rumor vs. Reality" webpage was "designed to address common disinformation narratives by providing accurate information related to elections." *See* Ex. 112 (*Election Security Rumor vs. Reality*, CISA (Nov. 4, 2022), https://perma.cc/VV2B-57BT); Hale Decl. ¶ 15 (Ex. 97). CISA developed this website to provide accurate information about false election rumors spreading in the public domain. Scully Dep. 290:18-23. The page was designed to "inform voters and help them build resilience against foreign influence operations and disinformation narratives about election infrastructure." *See* Ex. 112. Although the page was designed for voters, social media companies also have used the rumors page as a source to debunk content on their platforms. Scully Dep. 290:12-17. Notably, both Louisiana and Missouri have similar websites that seek to promote accurate information concerning elections and COVID-19.[42] In fact, the Missouri Secretary of State's election misinformation page expressly links to CISA's resources concerning election misinformation.[43]

---

documents. *Id.* ¶ 17. In addition, in support of the President's Unified Coordination Group for domestic preparedness and response regarding any potential impacts of Russia's invasion of Ukraine on the United States, a group that was in operation from January 2022 to April 2022, CISA personnel provided situational awareness reports based on publicly available third-party reporting and also provided support to build resilience to disinformation related to the crisis for the purpose of being prepared should foreign influence operations increase their targeting of U.S. critical infrastructure. *Id.* ¶ 18. And in relation to the Financial Services Sector, CISA has been working with the Treasury Department on a public guide to help the sector understand disinformation and the risks it poses. *Id.* ¶ 19. That guide is still in development, and work currently is on pause because other, urgent tasks have taken priority. *Id.*

[42] *See* Ex. 113 at 3-8 (*Social Media Resources*, Mo. Dep't of Health & Senior Servs., https://perma.cc/6U4G-Y44L) (providing "rumor control" resources regarding COVID-19); Ex. 114 at 1 (*Election Security*, Mo. Sec'y of State, https://perma.cc/LW4Y-9TLJ); Ex. 115 at 1-2 (*COVID-19 Stay at Home Order*, Off. of the Governor, https://perma.cc/2HMS-RBBU) (providing accurate information concerning Louisiana's COVID-19 stay at home order); Ex. 116 (*Get Election Information: Frequently Asked Questions*, La. Dep't of State, https://perma.cc/F72W-4VMB).

[43] *See* Ex. 114 at 3 (linking to CISA, The War on Pineapple: Understanding Foreign Intelligence in 5 Steps (2019) (Ex. 117)); *id.* (linking to Dep't of Homeland Sec., Social Media Bots Overview (2018) (Ex. 118)).

c. *CISA's Meetings with Social Media Companies*

128.  In furtherance of its mission to improve the security and resiliency of critical infrastructure, CISA participated in meetings with social media companies and others concerning misinformation, including (1) recurring U.S. Government ("USG")-Industry meetings (and preparatory meetings in advance of these meetings); (2) CISA Cybersecurity Advisory Committee ("CSAC") quarterly meetings; (3) CISA CSAC, Protecting Critical Infrastructure from Misinformation and Disinformation subcommittee meetings; and (4) meetings convened by the EIS-GCC and the EI-SCC Joint Managing Mis/Disinformation Working Group. *See* Ex. 187 at 42-44. Contrary to Plaintiffs' insinuation that these meetings "provide[d] avenues for government officials to push for censorship of disfavored viewpoints and speakers online," Pls.' Mem. in Supp. of Mot. for Prelim. Inj. 27, ("PI Br.") (Dkt. 11-1), Plaintiffs have failed to adduce any evidence that any such alleged "push" for censorship occurred during these meetings.

129.  *USG-Industry meetings.* For example, the USG-Industry meetings, which began in 2018 and continued through 2022, included federal agency participants from CISA, DHS, the FBI, the Department of Justice ("DOJ"), and the Office of the Director of National Intelligence ("ODNI"), as well as social media company participants from Google, Facebook, Twitter, Reddit and Microsoft, and on occasion Verizon Media, Pinterest, LinkedIn, and the Wikimedia Foundation. *See* Ex. 187 at 42-43; Scully Dep. 31:10-16. The topics discussed generally included information sharing around election risks, briefs from the industry, threat updates, and highlights and upcoming "watch outs." *Id.* at 43. CISA's role at these meetings generally involved educating social media platforms on how elections function and are administered, as well as potential threats to election security. Scully Dep. 224:22-25:9. Much of the discussion at these meetings involved cybersecurity issues, as well as discussions about then-ongoing physical threats to poll workers. *Id.* at 235:11-22. CISA has not participated in the USG-Industry meetings since the 2022 general

election, *see* Hale Decl. ¶ 69 (Ex. 97), and currently, there is no plan to resume participation in

these meetings. Scully Dep. 32:9-11.

130. Although concerns about misinformation and disinformation were also discussed

during these agency-industry meetings, they did not involve "pushes" to censor misinformation or

disinformation. *Id.* at 39:12-25. For example, CISA discussed the development of informational

products it had created to promote resilience to disinformation, such as a general disinformation

resilience guide highlighting examples of the tactics use by foreign disinformation actors and

outlining proactive measures to mitigate the effectiveness of such tactics entitled the Tactics of

Disinformation. *Id.* at 39:12-18: Hale Decl. ¶ 66 (Ex. 97). Other agencies, including DOJ, FBI,

ODNI, and DHS, would participate and provide unclassified, high-level reviews or strategic

intelligence briefings on these topics. Scully Dep. 25:10-23. The social media companies would

share high-level trend information from public reporting they had released. *Id.* at 40:2-41:15. For

example, members of the intelligence community discussed malign foreign actors who potentially

were going to launch disinformation operations. *Id.* at 39:19-25; *see also* Defs.' Resp. PFOF

¶¶ 861-866, 978-990.

131. *CISA CSAC meetings.* Established under the National Defense Authorization Act for

Fiscal Year 2021, Pub. L. No. 116-283, 134 Stat. 3388 (NDAA), the CISA CSAC operates as a

federal advisory committee, governed by the Federal Advisory Committee Act, to provide

recommendations to CISA on topics related to its cybersecurity mission. *See* Ex. 119 (*CISA

Cybersecurity Advisory Committee*, CISA, https://perma.cc/G6BW-LKDR); Ex. 120 (*CISA

Cybersecurity Advisory Committee (CSAC) Charter*, CISA, https://perma.cc/QU5C-ZT5F). CSAC

includes experts on cybersecurity, technology, risk management, privacy and resilience, and

members employed or previously employed by, among others, social media and technology

companies. Ex. 120 at 2-3. The CSAC quarterly meeting agenda and summaries are available online, Ex. 121 (*CISA Cybersecurity Advisory Committee (CSAC) Meeting Resources*, CISA, https://perma.cc/F6N9-2DF2), and contrary to Plaintiffs' contention, a review of those materials fails to reflect any coercion or attempted censorship by the Federal Government of social media companies. Instead, these materials reflect the creation of a new, congressionally-mandated advisory committee, discussions about how CISA can better accomplish its mission of promoting the security and resilience of critical infrastructure such as by refining the national effort to identify and prioritize the most critical entities and infrastructure, improving efforts to strengthen the nation's cyber workforce, and enhancing public-private communication and collaboration in preventing and responding to cybersecurity incidents. *Id.*

132. *CISA CSAC, Protecting Critical Infrastructure from Misinformation and Disinformation Subcommittee (MDM Subcommittee) meetings*. In addition, the CSAC MDM Subcommittee, which was directed to stand down in December 2022 because it had completed the tasks for which it was created and provided its recommendations to CISA, had nothing to do with attempted censorship of content on social media platforms. *See* Ex. 187 at 43. The MDM Subcommittee did not discuss whether or how social media platforms should moderate content, either in specific cases or more generally. Ex. 122 at 9 (*Addressing false claims and misperceptions of the UW Center for an Informed Public's research*, Univ. of Wash. (Mar. 16, 2023)). Rather, the CSAC established the MDM Subcommittee for the purpose of evaluating and providing recommendations on potentially effective MDM resiliency efforts that fit within CISA's unique capabilities and mission. Ex. 123 (CISA Cybersecurity Advisory Committee, Subcommittee Factsheet and 2022 Cybersecurity Advisory Committee (CSAC) Reports and Recommendations (2023)). Like the CSAC Committee, the MDM Subcommittee operated transparently and details

about the MDM Subcommittee, its membership, reports, and recommendations, are posted on CISA's website. *Id.* Specifically, the MDM Subcommittee recommended that CISA take actions such as "shar[ing] up to date 'best practices' around how to proactively address and counter MDM based on the most recent research[,]" "[s]har[ing] information with state and local election officials[,]" and "[p]rotect[ing] the courts" from becoming the "target of an intensified campaign to undermine public trust in the legitimacy of their processes." Ex. 124 at 1-2 (CISA Cybersecurity Advisory Committee, Report to the Director: Protecting Critical Infrastructure from Misinformation & Disinformation Information Sharing Around Foreign Adversary Threats to Elections (2022)). Nothing in these materials reflects an attempt by CISA to "push" social media companies to censor mis- or disinformation.

133. *EIS-GCC and EI-SCC Joint Managing Mis/Disinformation Working Group meetings.* Finally, as explained above, *see supra* Defs.' PFOF ¶ 111, the EIS-GCC and EI-SCC Joint Mis/Disinformation Working Group, which was launched after the 2020 election, provides a forum through which the Election Infrastructure Subsector can identify challenges in building resilience against disinformation and produce resources to work towards this goal. *See* Ex. 187 at 44. Notably, the Secretary of State Office for Plaintiff Louisiana has been a member of the EIS-GCC since May 2018, and while serving as the NASS President from the summer of 2021 to 2022, the Louisiana Secretary of State served as an EIS-GCC Executive Committee member. Hale Decl. ¶ 31 (Ex. 97). In this capacity, Louisiana received regular briefings (usually every two weeks) on CISA's election security efforts—including briefings on CISA's disinformation resilience work— engaged in security planning activities for the Election Infrastructure Subsector and oversaw the management and activity of EIS-GCC working groups. *Id.* This included the oversight and management of the EI-SCC and EIS-GCC Joint Managing Mis/Disinformation Working Group.

*Id.* The Missouri Secretary of State Office was an alternate member of the EIS-GCC from 2018-19. *Id.* ¶ 32. In this capacity, the Missouri Secretary of State Office attended the EIS-GCC biannual meetings and activity participated in briefings on the Election Infrastructure Subsector's security and resilience efforts. *Id.*

### d. *CISA's Limited Involvement with the Election Integrity Partnership*

134.    The Election Integrity Partnership ("EIP") was a private partnership formed in 2020 that included the Stanford Internet Observatory ("SIO"), the University of Washington, Graphika, and the Atlantic Council's Digital Forensic Research Lab, and whose mission was to better understand the information environment around elections. *See* Scully Ex. 1 at vi (Dkt. 209-2) (The Long Fuse: Misinformation and the 2020 Election). The EIP's "primary goals were to: (1) identify mis- and disinformation before they went viral and during viral outbreaks[;] (2) share clear and accurate counter-messaging[;] and (3) document the specific misinformation actors, transmission pathways, narrative evolutions, and information infrastructures that enabled these narratives to propagate." *Id.* Among other actions, the EIP developed a ticketing system where trusted external stakeholders and internal EIP analysts could flag misinformation that EIP would then analyze and, depending on the nature of the information, could flag for social media companies for their awareness. *Id.* at 8-10; 18-19.

135.    The EIP provided public factual findings to social media platforms, but had no control over content moderation, censorship, or labeling posts. Ex. 74 at 2. Rather, social media platforms examined any reports sent to them by the EIP to determine if the content violated their policies and whether and how to moderate the content. *Id.*; *see* Ex. 122 at 6 (stating that EIP's "researchers made independent decisions about what to pass on to platforms, just as the platforms made their own decisions about what to do with our tips"); Ex. 125 at 3 (*A Statement from the Election Integrity Partnership*, Election Integrity Partnership (Oct. 5, 2022),

84

- A715 -

https://perma.cc/LV9L-CNCR) ("Each [social media] company made their own determinations on how to treat our reports."). Content moderation decisions were independently made by social media platforms, and the EIP did not make recommendations to the platforms about what actions they should take. Ex. 74 at 2.

136.   CISA involvement with the EIP was limited, and it did not found, fund, or have any role in the management or operation of the EIP. Hale Decl. ¶ 52 (Ex. 97); Ex. 122 at 7. During 2020, several Stanford University students interned at CISA on election security matters. Hale Decl. ¶ 53 (Ex. 97).[44] During their internships, CISA personnel and the interns discussed the challenges facing and the needs of election officials. *Id.*; Scully Ex. 1 at 2 (Dkt. 209-2). Based on lessons learned from the 2018 election, CISA employee Brian Scully shared with the interns his view that State and local election officials' resources were insufficient to allow them to identify misinformation that targeted their jurisdictions. Scully Dep. 84:10-22. The interns then presented the lack of resources and challenges facing election officials to officials at the SIO. Hale Decl. ¶ 54 (Ex. 97). CISA personnel subsequently had a conversation with Alex Stamos, who worked for the SIO, and confirmed his understanding that the States were lacking in such resources. Scully Dep. 86:22-87:9; Hale Decl. ¶ 54 (Ex. 97).

137.   In July 2020, the EIP was formed. Scully Ex. 1 at 21(3) (Dkt. 207-2). As the EIP was being stood up, and given its relationships with the election community, CISA connected the EIP with election stakeholders at NASS, NASED, and CIS, which, as discussed earlier, manages the MS-ISAC and the EI-SAC. Hale Decl. ¶ 58 (Ex. 97). And as it would with other nongovernmental organizations in the election community, CISA received a briefing from EIP in May or June 2022,

---

[44] Students who interned at CISA should only have performed CISA work during their internships with the agency, and they should not have performed any CISA work outside of their CISA internship, including while interning at SIO or supporting the EIP. Hale Decl. ¶ 61 (Ex. 97).

during which the EIP shared its plans for the 2022 midterms and lessons learned from the 2020 election. Scully Dep. 54:10-14; Hale Decl. ¶ 60 (Ex. 97).

138.   CISA did not launch the EIP, and the EIP is not a government organization. Hale Decl. ¶ 56 (Ex. 97). CISA does not fund and has never funded the EIP. *Id.* ¶ 57. CISA generally did not share information with the EIP. Scully Dep. 73:25-74:2; 106:3-9. It did not submit tickets flagging potential misinformation to the EIP. Ex. 125 at 2 ("CISA did not send any examples of potential misinformation to EIP" and "EIP did not send any reports of false rumors or disinformation to social media companies on behalf of [DHS] or [CISA]."); Ex. 74 at 3 (stating that the EIP did not receive requests from CISA to eliminate or censor tweets); Ex. 122 at 7 (stating that CISA did not send content to the EIP to analyze, and the EIP did not flag content to social media platforms on behalf of CISA). CISA is not aware of any communications with the EIP about specific disinformation concerns. Scully Dep. 75:2-5. Presently, CISA is not doing any work with the EIP. Hale Decl. ¶ 63 (Ex. 97). *See also* Defs.' Resp. PFOF ¶¶ 991-1075.

### G.  The State Department's Global Engagement Center (GEC)

139.   Disinformation from foreign state and foreign non-state actors is of critical concern to the United States. *See* Declaration of Leah Bray, Deputy Coordinator, Glob. Engagement Ctr., U.S. Dep't of State ¶ 5 (Bray Decl.) (Ex. 142).[45] Indeed, Congress and the Executive Branch recognized before 2020 that private platforms' enforcement of their own terms of service can be important in opposing activities of foreign adversaries, such as the ISIS terrorist organization, that

---

[45] For example, disinformation is one of Russia's most important and far-reaching tools in support of its invasion of Ukraine. Bray Decl. ¶ 5 (Ex 142). Russia has operationalized the concept of perpetual adversarial competition in the information environment by encouraging the development of a disinformation and propaganda ecosystem. *Id.* This ecosystem creates and spreads false narratives to strategically advance Russia's policy goals. *Id.* Russia's intelligence services operate, task, and influence websites that present themselves as news outlets to spread lies and sow discord. *Id.* ¶ 6.

have sought to use social media platforms to disseminate anti-American propaganda.[46] Congress also explicitly recognized the need for government action to counter such dissemination when it mandated that the Department of State's Global Engagement Center (GEC) counter foreign propaganda and disinformation. Kimmage Dep. 26:5-12 (Dkt. 208-1). The GEC's mission is "to direct, lead, synchronize, integrate, and coordinate efforts of the Federal Government to recognize, understand, expose, and counter foreign state and foreign non-state propaganda and disinformation efforts aimed at undermining or influencing the policies, security, or stability of the United States[, its] allies[,] and partner nations." *See* 22 U.S.C. § 2656 note (Global Engagement Center).

140.   The GEC plays a key role in coordinating U.S. government efforts and helping to lead a global response to such foreign malign influence. *See* Bray Decl. ¶ 7 (Ex. 142). A central part of this effort is exposing foreign state and non-state actors' disinformation tactics so that allied governments and partners abroad, including civil society organizations, academia, the press, and the international public, can conduct further analysis of their own and thereby increase collective resilience to disinformation and propaganda. *Id.*

141.   The GEC carries out its statutory mission to counter propaganda and disinformation from foreign state and non-state actors along five lines of effort: (1) analytics and research,

---

[46] *See* Ex. 163 at 13 (*Global Efforts to Defeat ISIS: Hearing Before the S. Comm. on Foreign Rels.*, 114th Cong. (2016) (statement of Brett H. McGurk, Special Presidential Envoy)) (Twitter, Facebook, and YouTube "are . . . removing ISIL-related content from their platforms . . . . [W]e have widely publicized how anyone can report ISIL content on-line, so that platforms can remove it if the content violates a platform's terms of service, which it often does."); Ex. 164 at 3 (*Countering Terrorist Internet Recruitment: Hearing Before the Subcomm. on Investigations of the S. Comm. on Homeland Sec. and Governmental Affs.*, 114th Cong. (2016) (statement of Sen. Rob Portman)) ("[S]ocial media firms including Facebook and Twitter have stepped up their voluntary efforts to police their own terms of service, which prohibit incitements to terrorism. Twitter has closed more than 100,000 ISIS-linked accounts, and Facebook has actively worked to remove offending users while working in various ways to promote content to counter jihadist propaganda. Those actions have helped to degrade ISIS's social media megaphone. . . but its online presence remains strong.").

(2) international partnerships, (3) programs and campaigns, (4) exposure, and (5) technology assessment and engagement. *Id.* ¶ 4; *see also* Kimmage Dep. 26:24-27:19. GEC's Russia, People's Republic of China, Iran, and Counterterrorism teams seek to build societal and institutional resilience against foreign propaganda and disinformation abroad. Bray Decl. ¶ 4 (Ex. 142); Kimmage Dep. 28:5-10. The GEC plays a coordination role in the interagency's public exposure of foreign information influence operations, including the use of proxy sites and social media networks overseas. Ex. 126 (GEC, *About Us*, U.S. Dep't of State, https://perma.cc/6U48-PE8Y). The GEC hosts private sector technology demonstrations, assesses counter-disinformation technologies against specific challenges, and identifies technological solutions through overseas technology challenge programs. Bray Decl. ¶ 4 (Ex. 142). The GEC also has a resources team, an interagency coordination team, a Technology Engagement Team (TET), and a front office. Kimmage Dep. 28:5-19.

142. The GEC's TET holds meetings with social media companies and exchanges information concerning the propaganda and disinformation tools and techniques used by the United States' adversaries. Kimmage Dep. 29:14-30:14. These meetings rarely include discussions about specific content posted on social media because the meetings are at a higher, more conceptual level about what foreign actors are doing, rather than specific content. *Id.* at 30:20-31:3. The TET team also ran the disinfo-cloud, an information sharing platform that contained tools to counter propaganda and misinformation. *Id.* at 169:19-173:17. These tools could identify coordinated inauthentic activity on a social media platform by a foreign disinformation actor. *Id.* at 170:11-18.[47]

---

[47] For a time, the TET had a location in Silicon Valley where one individual, Sam Stewart (named as Defendant Samaruddin K Stewart), was stationed. Kimmage Dep. 153:7-154:21. The purpose of the Silicon Valley location was to facilitate public/private coordination and broker constructive

143.   The GEC front office engages with social media companies, primarily to build relationships with those companies to facilitate better communications at the working level. *Id.* at 31:12-20. The primary topics discussed at these meetings are the tools and techniques used by America's adversaries, including the campaigns being conducted by foreign propaganda actors like Russia, China, Iran, and terrorist organizations, as well as the narratives they are promoting. *Id.* at 32:11-19. The GEC also is in listening mode during these meetings for anything the social media companies want to share, although they typically have little to share. Kimmage Dep. 32:11-33:1. The social media companies have shared high-level information like a foreign disinformation campaign with a narrative, rather than specific content that would be part of that campaign. *Id.* at 33:14-34:2.

144.   The GEC did not flag specific content for social media companies during the meetings between the GEC front office and social media companies and did not give the companies any directives. *Id.* at 34:13-36:5. The GEC's purpose in advising social media companies about disinformation campaigns was not to influence companies' internal decisions regarding content, but to deepen their understanding of the actions of malign actors seeking to undermine U.S. national security, in line with the GEC's congressional mandate. *Id.* at 36:6-37:7. In addition, the purpose of the GEC's liaisons with social media companies is not to stop the spread of online disinformation; rather, the GEC simply shares lessons learned, information about propaganda and disinformation techniques, and the campaigns and narratives of foreign propaganda and

_____

engagements between the government and the tech sector, including social media companies, and academia and research. Kimmage Dep. 155:5-21. Mr. Stewart had conversations with social media companies in which the GEC shared information related to its mission to counter foreign propaganda and disinformation. *Id.* at 155:22-156:11. The social media companies also educated the GEC based on what sorts of propaganda and disinformation they were seeing. *Id.* at 157:11-23. Mr. Stewart no longer works for the GEC, and no one from the TET is currently working from the Silicon Valley location. *Id.* at 154:14-21, 272:17-25.

disinformation actors. *Id.* at 273:12-24. Sharing information can help social media companies to

identify coordinated inauthentic activity or to understand what these actors are trying to achieve,

as well as to understand the types of narratives they are promoting. *Id.* at 279:17-280:4. Providing

this information to social media companies is the first step in social media companies' ability to

address foreign propaganda on their sites, as "[s]olving a problem has to start with understanding

the problem[.]" *Id.* at 280:9-281:3.

145.   However, the GEC does not engage in any activities where the intention is to propose

to social media companies that certain content should not be posted on their platforms. Kimmage

Dep. 37:16-25. Indeed, "[t]he Global Engagement Center does not tee up actions for social media

companies to take," and it "does not seek to influence the decisions of the social media companies."

*Id.* at 38:2-3, 283:9-22; Bray Decl. ¶ 16 (Ex. 142) (explaining that the GEC's practice is not to

request social media companies take any specific actions when sharing information with them).[48]

Nor does the GEC seek to provide information that might inform social media companies'

decisions concerning content moderation, or brief social media companies on their content

---

[48] In rare instances the GEC has flagged a specific post for a social media company when the
circumstances involved potential threats to the safety of State Department personnel. Bray Decl.
¶ 17 (Ex. 142). In 2018, a colleague informed Mr. Kimmage, who was then acting Coordinator of
the GEC, of a security situation in a Middle Eastern country where protestors were using a social
media platform to communicate in ways that raised urgent security concerns, and the State
Department was concerned for the safety of its personnel. *Id.*; Kimmage Dep. 38:12-39:25. Mr.
Kimmage communicated directly with a social media platform and informed it of the State
Department's concern. *Id.* Mr. Kimmage was "very specific" in his interaction with the social
media company that this was a real time situation in which the State Department believed its
personnel were at risk and asked the company to review the activity on these accounts to decide
whether the content in question, which had been posted by foreign actors, violated its terms of
service. *Id.* at 38:12-39:25, 40:1-3. Mr. Kimmage did not ask for anything to be removed from the
site, but he did express concerns about the personal safety of State Department personnel. *Id.* at
38:12-39:25. Mr. Kimmage is unaware of what action, if any, the platform took in response to his
identification of this issue, because it did not report back to him. *Id.* at 40:4-7.

moderation policies. Kimmage Dep. 38:4-11, 285:19-286:1.[49] Rather, whatever actions social media companies may take after receiving information from the GEC is left completely up to those companies. *Id.* at 273:12-274:8; *see also* Defs.' Resp. PFOF ¶¶ 1123-1134.

### H. The Federal Bureau of Investigation

#### 1. FBI Efforts as to Foreign Influence and Election Misinformation

146. "Foreign influence operations," as then-Deputy Assistant Attorney General Adam S. Hickey of the DOJ National Security Division explained in 2018 to the Senate Judiciary Committee, "include covert actions by foreign governments intended to affect U.S. political sentiment and public discourse, sow divisions in our society, or undermine confidence in our democratic institutions to achieve strategic geopolitical objectives." Ex. 127 at 1 (*Election Interference: Ensuring Law Enforcement is Equipped to Target Those Seeking to Do Harm: Hearing Before the S. Comm. on the Judiciary*, 115th Cong. (2018) (statement of Adam Hickey, Deputy Assistant Att'y Gen., Dep't of Just.), 2018 WL 2933298). A prominent example is found in the 2018 federal indictment "of 13 Russian individuals and three entities, including the Internet Research Agency (or IRA), for federal crimes in connection with an effort to interfere in the 2016 Presidential election. The defendants allegedly conducted what they called 'information warfare against the United States,' with the stated goal of 'spread[ing] distrust towards the candidates and the political system in general.'" Ex. 128 at 1 (Adam. S. Hickey, Deputy Assistant Att'y Gen.,

---

[49] When asked at his deposition about any efforts by the GEC to influence social media companies' content moderation decisions, Mr. Kimmage, the acting GEC Coordinator and Principal Deputy Coordinator from 2017 until June 2021, stated that he never had a conversation with social media companies during which he encouraged them to speed up the removal of posts. Kimmage Dep. 42:12-20, 47:16-20. Mr. Kimmage further testified that he is unaware of instances in which other GEC personnel expressed concern about specific content on a platform to a third party on the understanding that the party would convey that concern to the social media company. *Id.* at 55:20-56:8.

Remarks at Misinfo Con (Aug. 6, 2018), 2018 WL 3727551); *see also* Ex. 129 (Press Release, Dep't of Just., Grand Jury Indicts Thirteen Russian Individuals and Three Russian Companies for Scheme to Interfere in the United States Political System (Feb. 16, 2018), 2018 WL 920088) (DOJ news release describing indictment). It was to address such "information warfare" that the FBI in the fall of 2017 established the Foreign Influence Task Force ("FITF"). *See* Ex. 130 at 7 (*Oversight of the Federal Bureau of Investigation: the January 6 Insurrection, Domestic Terrorism, and Other Threats: Hearing Before the S. Comm. on the Judiciary*, 117th Cong. 1 (2021), 2021 WL 808994 (statement of Christopher Wray, Dir., FBI)).

147.   Among the categories of activity by foreign governments that the FITF investigates and seeks to disrupt are "attempts by adversaries—hoping to reach a wide swath of Americans covertly from outside the United States—to use false personas and fabricated stories on social media platforms to discredit U.S. individuals and institutions"; "[t]argeting U.S. officials and other U.S. persons through traditional intelligence tradecraft"; "[c]riminal efforts to suppress voting and provide illegal campaign financing"; and "[c]yber attacks against voting infrastructure, along with computer intrusions targeting elected officials and others." Ex. 131 at 1 (*Combating Foreign Influence*, Fed. Bureau of Investigation, https://perma.cc/M4P7-6KFF); *see* Declaration of Larissa L. Knapp, Exec. Assistant Dir., Nat'l Sec. Branch, FBI ("Knapp Decl.") ¶¶ 10-20 (Ex. 157).

148.   Government concern about foreign influence efforts directed to United States elections has continued beyond the 2016 election into the 2020 election season and beyond, including under the Trump Administration. The International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 *et seq.*, grants the President broad authority to impose economic sanctions on foreign governments that threaten the security of the United States. Invoking that authority, President Trump in 2018 declared an emergency to deal with the unusual and extraordinary threat

presented by "the ability of persons located . . . outside the United States to interfere in or undermine public confidence in United States elections, including through the unauthorized accessing of election and campaign infrastructure *or the covert distribution of propaganda and disinformation*." Exec. Order No. 13,848, 83 Fed. Reg. 46,843, 46,843 (Sept. 12, 2018) (emphasis added). Noting that "foreign powers have historically sought to exploit America's free and open political system," President Trump found that "the proliferation of digital devices and internet-based communications has created significant vulnerabilities and magnified the scope and intensity of the threat of foreign interference." *Id.* The order required, *inter alia*, various national security officials, not later than 45 days after an election, to assess "any information indicating that a foreign government, or any person acting as an agent of or on behalf of a foreign government, has acted with the intent or purpose of interfering in that election." *Id.* at 46,843-44. President Trump continued that emergency finding for the following two years. 84 Fed. Reg. 48,039 (Sept. 10, 2019); *see also* 85 Fed. Reg. 56,469 (Sept. 10, 2020) (President Biden continued that finding for two successive years).

149.  Also, on March 2, 2020, the eve of "Super Tuesday" (when multiple states held primary contests), then-Attorney General Barr joined numerous other officials in a joint statement advising: "We continue to work with all 50 states, U.S. territories, local officials, political parties, and private sector partners to keep elections free from foreign interference." Ex. 132 at 1 (Press Release, Fed. Bureau of Investigation, Joint Statement from DOS, DOJ, DOD, DHS, ODNI, FBI, NSA, and CISA on Preparations for Super Tuesday (Mar. 2, 2020), 2020 WL 996966). "Americans must also remain aware," the joint statement continued, "that foreign actors continue to try to influence public sentiment and shape voter perceptions. They spread false information and propaganda about political processes and candidates on social media in hopes to cause confusion

and create doubt in our system. We remain alert and ready to respond to any efforts to disrupt the 2020 elections." *Id.* Closer to Election Day, FBI and CISA, on September 22, 2020, issued an "announcement to raise awareness of the potential threat posed by attempts to spread disinformation regarding the results of the 2020 elections." Ex. 133 at 1 (Press Release, Fed. Bureau of Investigation, Foreign Actors and Cybercriminals Likely to Spread Disinformation Regarding 2020 Election Results (Sept. 22, 2020)*, 2020 WL 5644950). "Foreign actors and cybercriminals," the announcement continued, "could create new websites, change existing websites, and create or share corresponding social media content to spread false information in an attempt to discredit the electoral process and undermine confidence in U.S. democratic institutions." *Id.* For example, an Iranian hacking group obtained unauthorized access to one local government's computers and, before that intrusion was thwarted, could have displayed false results for the 2020 election on that government's public-facing website. Ex. 134 at 1 (Joseph Menn, *Iran gained access to election results website in 2020, military reveals*, Wash. Post (Apr. 24, 2023)).

150.   Elvis Chan, the Assistant Special Agent in Charge ("ASAC") of the Cyber Branch for the FBI in San Francisco, assisted with FITF efforts by sharing with social media companies information the FBI developed in the course of malign-influence investigations. As a supervisor over FBI San Francisco cyber investigations, he has also shared information with social media companies about cyber investigations, which are different from malign-influence investigations. Chan Dep. 8:11-13, 100:11-12, 105:13-18 (Dkt. 204-1). The companies ASAC Chan met with most frequently were Facebook, Google, Twitter, and Microsoft. *Id.* at 210:19-25.

151. The USG-industry meetings ASAC Chan regularly attended included discussion of "hack-and-dump" (a.k.a. "hack-and-leak") operations. *Id.* at 170:12-15, 171:9-11, 172:3-5.[50] Multiple FBI agents attended the USG-industry meetings, at which, before the 2020 election, the FBI warned social media companies about the potential for 2016-style Russian hack-and-dump operations. *Id.* at 172:17-173:13, 177:7-10. The FBI's warnings, though not based on observed computer intrusions similar to those that occurred in 2016, followed from the assessment that because such a hack-and-dump operation had been deployed before (in 2016), it could be deployed again, given, for example, the skills of the Russian hackers shown in 2016. *Id.* at 173:18-174:13, 208:7-12. The FBI also voiced warnings at FITF-organized bilateral meetings with individual platforms. *Id.* at 181:6-11, 185:19-25, 189:24-190:13; *see also* Defs.' Resp. PFOF ¶¶ 865-879.

152. In general, ASAC Chan met with the platforms' trust and safety personnel monthly in connection with cyber or FITF investigations, although the frequency became weekly as the 2020 election approached. Chan Dep. 40:2-11, 40:44-50. On FITF matters, the FBI shared information with the platforms that was (1) *strategic* (concerning general foreign malign techniques or processes), or (2) *tactical* (describing attributes, or indicators, of particular social media accounts indicating they were being operated by foreign malign actors). FITF shared information about a foreign malign actor's social media activity not based on the content or viewpoint expressed in a post, but rather on the determination that the account is part of a covert

---

[50] The paradigmatic or "best" example of a hack-and-dump or hack-and-leak operation was the one undertaken by members of Russia's GRU military unit when they unlawfully intruded ("hacked") into the computer networks of the Democratic Congressional Campaign Committee, the Democratic National Committee, and the presidential campaign of Hillary Clinton, and thereafter released ("dumped" or "leaked") information stolen from those networks on the internet. Chan Dep. 13:7-15; *see, e.g.*, Ex. 135 at 1 (Press Release, Dep't of Just., Grand Jury Indicts 12 Russian Intelligence Officers for Hacking Offenses Related to the 2016 Election (July 13, 2018), 2018 WL 3425704 (DOJ news release describing indictment charging 12 "Russian nationals for committing federal crimes . . . intended to interfere with the 2016 U.S. presidential election")).

effort by a foreign malign actor. *See* Knapp Decl. ¶¶ 16-20 (Ex. 157). Platforms would use their own means to validate the FBI's views on whether particular accounts were being operated by Russian state-sponsored actors and whether to take them down. Chan Dep. at 29:14-30:10, 32:8-33:17. The FBI only shared information concerning accounts it attributed with *high confidence* to a foreign-state actor, and to date the FBI's attributions have always proven correct. *Id.* at 112:21-113:6. As Yoel Roth, former head of content moderation at Twitter, further explained in 2023 testimony before the House Oversight and Accountability Committee: "The FBI was quite careful and quite consistent to request review of the accounts, but not to cross the line into advocating for Twitter to take any particular action." Ex. 2 at 16. During 2020, ASAC Chan estimated that he shared tactical information with platforms "between one to five or one to six times per month." *Id.* at 100:21-24; *see also* Defs.' Resp. PFOF ¶¶ 905-924, 929-930.

153.    The Russians' 2016 hack-and-leak operation provided an impetus for some platforms to change their service terms to state, among other things, that they would not allow posts of hacked materials because of concerns about the hacking victim's privacy. Chan Dep. 205:4-17, 248:10-16. Although ASAC Chan inquired whether platforms had made changes to their terms of service and what the changes were, he never suggested that any platform change a service term. *Id.* at 206:3-17, 250:17-21, 253:21-254:1. The platforms themselves "were actively looking for hack-and-leak operations" using detection methods that would identify hacked materials "put or uploaded onto their platforms." *Id.* at 204:18-24.

154.    Also as part of its election integrity efforts, the FBI in San Francisco operated a 2020 election command post, starting on the Friday before the election and continuing through election night. The San Francisco Field Office was responsible for relaying to the platforms election-related time, place, or manner disinformation or malign-foreign-influence information on their platforms

as reported by other field offices and after agency review. Chan Dep. 162:10-163:20, 164:23-165:2, 168:10-20. The FBI operated on the ground that it is a potential crime to post false information about the time, place, or manner of an election. *Id.* at 270:2-13; *see* Knapp Decl. ¶¶ 21-24 (Ex. 157). During the 2022 midterm elections the FBI in San Francisco staffed the command post on Election Day only, based on its experience during the 2018 midterm elections, when the "volume of information . . . to be coordinated" was "very low." Chan Dep. at 167:20-168: 9.

155.   The FBI would convey such posts to platforms "to alert" them "to see if" the posts violated the platforms' terms of service, and if the posts did so, the platforms "would follow their own policies, which may [have] include[d] taking down accounts." *Id.* at 165:9-22; *see* Knapp Decl. ¶¶ 21-24 (Ex. 157). Platforms would sometimes reply that they had taken down the posts, while in other cases they would state that the flagged post did not violate platform terms of service. *Id.* at 165:23-167:3-14; *see also* Defs.' Resp. PFOF ¶¶ 878-879, 925-928, 966-967.

### 2.   The "Hunter Biden Laptop Story"

156.   Plaintiffs allege that the FBI is responsible for "censorship" of the *New York Post*'s October 14, 2020, story concerning alleged contents of Hunter Biden's laptop computer. PI Br. 23-24; *see* PI Supp. 27-29.

157.   The evidence reflects that it was Twitter and Facebook, acting on their own initiative, that unilaterally determined what limits to impose on the dissemination of posts involving that story. Following the *New York Post*'s publication on October 14, 2020, Senator Hawley asserted that, "Twitter is blocking all tweets and direct messages that contain the URL for the Post article," while "Facebook has stated that it is 'reducing [the story's] distribution on our platform,' though the specifics of how Facebook will implement this remain opaque." Ex. 136 at 1 (Press Release, Sen. Josh Hawley, Hawley Calls for FEC Investigation of Potential In-Kind Contributions from Twitter and Facebook to Biden Campaign (Oct. 14, 2020), https://perma.cc/A7ST-3KQK) (news

release reprinting Sen. Hawley letter to FEC). Twitter's then-chief executive, Jack Dorsey, later represented to Congress in 2020 that, after the *New York Post*'s release of its article, the platform enforced its 2018 Hacked Materials Policy, which prevented sharing certain links from that newspaper's Twitter account, "publicly or privately," but "[r]eferences to the contents of the materials or discussion about the materials were not restricted under the policy." Ex. 137 at 6 (*Censorship and the 2020 Election: Hearing Before the S. Comm. on the Judiciary*, 116th Cong. (2020), 2020 WL 13568471 (opening statement of Jack Dorsey, CEO, Twitter)). Application of the 2018 policy "prevent[ed] Twitter from being used to spread hacked materials." *Id.* at 5. As a former attorney for Twitter, Vijaya Gadde, represented to Congress in 2023, Twitter initially decided the *New York Post*'s tweets about the story fell within that policy because the tweets contained "embedded images that looked like they may have been obtained through hacking," and the result of Twitter's initial decision was to "block[]" tweets and linked-to articles "embedding those source materials"—which did not prevent other "tweeting [about], reporting, discussing, or describing the contents of" the laptop. Ex. 2 at 5.

158.   But "Twitter then "changed its policy within 24 hours and admitted its initial action was wrong. This policy revision immediately allowed people to tweet the original articles with the embedded source materials." *Id*. Or, as Mr. Dorsey put it, Twitter changed course, and it "quickly updated" its "policy to limit its scope to only cover the removal of materials shared by hackers directly," and subsequently restored the *New York Post*'s account. Ex. 137 at 6. Mr. Dorsey further explained: "We made a quick interpretation, using no other evidence, that the materials in the article were obtained through hacking, and according to our policy we blocked them from being spread." Ex. 14 at 3. And Mr. Dorsey noted that Twitter "admitted this action was wrong and corrected it within 24 hours." *Id.*

159.   As Mr. Roth further testified in 2023 about Russian interference in the 2016 election: "Twitter and the entire social media industry were frankly caught with their pants down in 2016 and missed an opportunity to do the critical work of protecting election security." Ex. 2 at 11. Mr. Roth testified that academics and researchers had reached this judgment after long study of Russian "active measures," and that the most influential part of Russia's campaign was the hack and leak in 2016 targeting John Podesta, Chairman of Hillary Clinton's 2016 presidential campaign. *Id.* The incident involving Mr. Podesta served as "one of the animating concerns" for Twitter's initial decision to limit the distribution of posts about the *New York Post*'s Hunter Biden story. *Id.* That decision was not motivated by coercion or pressure from the Federal Government. *Id.* No one from the Federal Government, the Biden campaign or the DNC directed asked Twitter to remove or take action against content concerning the New York Post story. *Id.* at 11, 25.

160.   Plaintiffs contend that Mr. Roth previously acknowledged in a December 2020 declaration submitted in a Federal Elections Commission ("FEC") proceeding that the Federal Government had informed Twitter of a potential hack and leak operation concerning Hunter Biden. PI Supp. 28. Yet Mr. Roth stated only that, in "regular meetings" he attended with the FBI, other Federal agencies, "and industry peers regarding election security," he had "learned" that "there were rumors that a hack-and-leak operation would involve Hunter Biden." Chan Ex. 8 (Roth Decl.) ¶¶ 10-11 (Dkt. 204-5). But Mr. Roth did not say in his 2020 declaration from whom he heard those rumors, or attribute them to Government personnel. Mr. Roth later clarified, in sworn congressional testimony in February 2023, that he intended to indicate in his FEC declaration that another social media company, not the Federal Government, had raised the possibility of a hack-and-leak operation concerning Hunter Biden. Ex. 2 at 11. Mr. Roth explained that the Federal Government did not share that perspective or provide information to Twitter concerning this issue.

*Id.*; *see id.* at 37 ("My recollection is that a representative of another tech company may have mentioned [the Hunter Biden hack-and-leak operation], but those meetings were several years ago. I truly don't recall."); *id.* at 43 ("I want to be clear that my statement to the FEC does not suggest that the FBI told me it would involve Hunter Biden. That's a popular reading of the declaration but it was not my intent."); *id.* at 46 ("My recollection is it was mentioned by another technology company in one of our joint meetings, but I don't remember who."). Documents that ASAC Chan sent to Twitter the "night before" the *New York Post* story broke "did not relate to Hunter Biden." *Id.* at 12; *see also* Defs.' Resp. PFOF ¶¶ 880-904.

161.   ASAC Chan testified that no one brought anything to do with Hunter Biden's laptop to his attention before the *New York Post*'s publication on October 14, 2020. Chan Dep. 229:21-230:19. At one bilateral meeting between the FBI FITF and Facebook after October 14, 2020, one of Facebook's analysts asked if FBI had any information to share about the Hunter Biden investigation or case, and FBI personnel answered that the FBI had no comment. *Id.* at 213:11-19, 308:14-309:12. Other than the Facebook analyst's inquiry and the FBI's no-comment response, ASAC Chan was not aware of any communications related to the Hunter Biden laptop story between the FBI and Facebook, Chan Dep. 233:22-234:3, Twitter, *id.* at 233:8-21, Apple, Microsoft, *id.* at 234:6-7, or any other platform, *id.* at 234:4-5; *see also id.* at 227:24-228:1, 21-23, 229:6-14 (testifying that he did not recall any Federal Government personnel mentioning Hunter Biden's name during meeting with Twitter). (The FBI is not commenting on the relevant investigation, which is ongoing.) Ex. 138 at 36-37 (*Annual World Wide Threats Hearing with Heads of the Intelligence Committee: Hearing Before H. Select Comm. on Intell.*, 118th Cong. (2023)).

162.    ASAC Chan was not aware (until asked about the Roth Declaration at his deposition) of actions Twitter initially took to limit circulation of certain posts (containing "embedded source materials") about the Post's Hunter Biden laptop story. *Id.* at 232:18-21. As Mr. Roth explained, his "interactions with [ASAC] Chan and with the FBI almost entirely focused on what the FBI called malign[ ] foreign interference, things like Russian troll farms and Iranian involvement in the elections, not on any type of domestic" inquiry. Ex. 2 at 12.

163.    As to Meta, in the October 25, 2022 letter by that company's counsel to this Court, the platform stated that ASAC Chan "at no point in time advised Meta 'to suppress the Hunter Biden laptop story.' Nor did any of his colleagues." Ex. A, Dkt. 96 at 2-3.[51]

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *Anderson v. Jackson*, 556 F.3d 351, 360 (5th Cir. 2009) ("Injunctive relief is an extraordinary and drastic remedy[] and should only be granted when the movant has clearly carried the burden of persuasion."). Plaintiffs must "by a clear showing" establish that (1) they have a substantial likelihood of success on the merits; (2) they will suffer irreparable harm without an injunction; (3) the balance of equities tips in their favor; and (4) preliminary relief serves the public interest. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). Failure to satisfy any one of these requirements precludes injunctive relief, *see Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 809 (5th Cir. 1989), and Plaintiffs bear a heavy burden

---

[51] Mr. Zuckerberg's October 2020 congressional testimony that the FBI put the company on "alert" about a potential hack-and-dump operation does not show that ASAC Chan or the FBI advised Facebook regarding the "Hunter Biden Laptop Story." PI Supp. 28; Pls.' PFOF ¶ 902. ASAC Chan testified that what the FBI would have done was to ask the platform "how their terms of service would handle a situation" involving materials released from such an operation. Chan Dep. 247:22-248:1-4, 250:14-21. Twitter and Facebook said they would remove hacked materials if the platforms *themselves* were able to validate such materials were hacked. *Id.* at 252:24-253:4.

of persuading the district court that all four elements are satisfied, *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985). A plaintiff's burden is even higher where, as here, it seeks a preliminary injunction that would alter the status quo. *See, e.g.*, *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976). Preliminary injunctions that go "well beyond simply maintaining the status quo" are "particularly disfavored[] and should not be issued unless the facts and law clearly favor the moving party." *Id.*

## ARGUMENT

Contrary to Plaintiffs' hyperbole and speculation, the record confirms only that devoted civil servants did what government officials are expected to do: promote government policies, including through discussions with private parties, to help protect the public. *See Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 208 (2015) ("[A]s a general matter, when the government speaks it is entitled to promote a program, to espouse a policy, or to take a position," otherwise "it is not easy to imagine how government would function"); *Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 235 (2000) ("the government" has the right to "speak[] . . . to promote its own policies or to advance a particular idea," and to the extent "the citizenry objects, newly elected officials later could espouse some different or contrary position"); *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 598 (1998) (Scalia, J. concurring) (it is "the very business of government to favor and disfavor points of view on . . . innumerable subjects"); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995) ("when the government" seeks to "promote a particular policy of its own it is entitled to say what it wishes").

The evidence demonstrates that during a pandemic that cost over a million Americans their lives, officials from the White House and OSG promoted an "all of society" effort to overcome this challenge, the likes of which our nation had not experienced in over a century. *See supra* Defs.' PFOF § II.A.-B. Public health officials at CDC and NIAID communicated with social media

companies to help promote accurate health information and address the spread of misinformation that could threaten additional lives. *See supra* Defs.' PFOF § II.C.-E. FBI officials likewise communicated with social media platforms to help identify malign foreign actors seeking to exploit social media to further their objectives and undermine our national security. *See supra* Defs.' PFOF § II.H. Similarly, officials at CISA sought to protect our democratic processes by sharing, with social media companies, reports received from persons of all political stripes, including from Plaintiffs Louisiana and Missouri, regarding election-related misinformation. *See supra* Defs.' PFOF § II.F. None of the evidence demonstrates that any government official coerced or effectively compelled any social media company to take any action regarding content on its platforms. Rather, Defendants, like officials in prior administrations, used the bully pulpit, and other means of communication, to promote public health and safety—again, precisely what government officials are supposed to do. Ultimately, the social media companies—large, independent corporations—decided for themselves what would be carried on their platforms.

These types of government communications with social media companies are not unlawful, and indeed, are beneficial. Although Plaintiffs purport to argue otherwise, they point to no evidence demonstrating the type of coercion that the Supreme Court has held necessary to transform private decisions into state action. Instead, Plaintiffs ask this Court to recognize new legal theories of state action to justify a sweeping injunction that would hamstring, if not cripple, the Government's ability to express its views on matters of critical public concern.

Plaintiffs' motion should therefore be denied on the merits. But even if the Court believes Plaintiffs' legal theories have merit, Plaintiffs cannot establish any irreparable harm to justify a preliminary injunction that would impair the Federal Government's ability to communicate with private companies to promote national security and public safety.

I.    **Plaintiffs fail to satisfy their burden of demonstrating that irreparable harm would result in the absence of a preliminary injunction.**

Plaintiffs have not "clearly carried the burden of persuasion" to show imminent irreparable harm, *Bluefield Water Ass'n v. City of Starkville*, 577 F.3d 250, 253 (5th Cir. 2009) (citation omitted), as "is *required* for injunctive relief." *Montient Corp. v. Dondero*, 529 F.3d 532, 538 (5th Cir. 2008) (emphasis added); 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2948.1 (3d ed. 2013) ("Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered."). To show irreparable harm, Plaintiffs must demonstrate "a *significant threat* of injury from the impending action, that the injury is *imminent*, and that money damages would not fully repair the harm." *Humana, Inc. v. Jackson*, 804 F.2d 1390, 1394 (5th Cir. 1986) (emphases added).

Plaintiffs devote a mere two sentences of their 68-page supplemental brief to this indispensable factor. And they argue only that a preliminary injunction is warranted because they bring a First Amendment claim. PI Supp. 65. But merely asserting a First Amendment violation does not suffice. A First Amendment injury, like any other, must be imminent and non-speculative to satisfy the irreparable injury requirement. *See Google, Inc. v. Hood*, 822 F.3d 212, 227-28 (5th Cir. 2016) ("[I]nvocation of the First Amendment cannot substitute for the presence of an imminent, non-speculative irreparable injury."); *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion) (finding a preliminary injunction appropriate when it was "clear . . . that First Amendment interests were either *threatened or in fact being impaired* at the time relief was sought" (emphasis added)); *Ark. Project v. Shaw*, 775 F.3d 641, 663-64 (5th Cir. 2014) ("Federal courts are not obligated to grant an injunction for every violation of law," and that the "court's

power to order injunctive relief depends" on "whether plaintiffs have established . . . a reasonably certain threat of imminent harm." (citation omitted)).

To demonstrate irreparable harm at the preliminary injunction stage, Plaintiffs must adduce evidence showing that the irreparable injury is likely to occur "*during the pendency of the litigation*." *Justin Indus., Inc. v. Choctaw Secs., L.P.*, 920 F.2d 262, 268 n.7 (5th Cir. 1990) (emphasis added). After all, the very purpose of a preliminary injunction is "simply [to] preserve[] the status quo pending final determination of the action after a full hearing." *SEC v. First Fin. Group of Tex.*, 645 F.2d 429, 435 n.8 (5th Cir. Unit A 1981). Plaintiffs make no effort to meet their heavy burden as to this critical element of the preliminary injunction requirements. In their two-sentence argument, they point to no evidence at all substantiating their irreparable harm claim. *See* PI Supp. 65. And although they allege, elsewhere in their brief, *see id.* at 56-57, vaguely defined harms to their interests as speakers or listeners for standing purposes, those purported harms fall far short of satisfying Article III's requirements of "concrete and particularized" and "actual or imminent" injury. *Infra* Arg. § II.A.1.; *see also* Defs.' MTD 18-31; Defs.' Reply in Supp. of MTD 7-19 ("Defs.' Reply") (Dkt. 199). Much less do they show any *irreparable* injury likely to arise during the pendency of this suit on the merits.

For several reasons, the record undermines Plaintiffs' claimed need for immediate relief. First, Plaintiffs rely on harms arising from social media companies' *past* content moderation decisions, which provide no basis for *forward-looking* injunctive relief, preliminary or otherwise. Plaintiffs' assertion that those past harms are "ongoing" or "imminent" are contradicted by the evidence: Plaintiffs' previously banned accounts have been restored and Plaintiffs point to no recent social-media content that others posted (or wished to post) to which Plaintiffs have been denied access because of a company's content moderation decision. Second, as the Government's

response to the pandemic and attacks on election infrastructure have evolved to meet new challenges and changed circumstances, much of Defendants' conduct that Plaintiffs challenge is no longer occurring, and Plaintiffs have no entitlement to relief, especially preliminary injunctive relief, from conduct that has ceased. Moreover, Plaintiffs' assertion that Defendants are "expanding censorship efforts," PI Supp. 57, is speculative and unfounded. To support that assertion, Plaintiffs point to various policy statements and initiatives on issues relating to climate change, cyber bullying, and other topics unrelated to COVID-19 and election security—matters of public concern on which the Government is entitled to promote awareness as well as its own views on how they should be met. But Plaintiffs offer no evidence that any Defendant has spoken with a social media company about content moderation relating to such topics, or that any social media company moderates content relating to those topics (let alone that it does so at the demand of any Defendant).

Finally, even if Plaintiffs could otherwise show any ongoing or imminent harm, Plaintiffs' delay in seeking relief undermines any conclusion that such harm is irreparable and warrants emergency injunctive relief. The conduct of which Plaintiffs complain began years ago (by their own admission), and yet Plaintiffs waited until last May to bring suit, after which they then sought discovery, which has consequently delayed any relief they could obtain from their preliminary-injunction motion by nearly a year. That delay alone proves the absence of irreparable harm.

### A. Plaintiffs cannot establish imminent, irreparable harm based on social media companies' past content moderation decisions.

To start, Plaintiffs cannot show imminent, irreparable harm based on the alleged past content moderation decisions of social media companies: "[h]arm that has *already* occurred," of course, "cannot be remedied by an injunction." *Pham v. Univ. of La. at Monroe*, 194 F. Supp. 3d 534, 548 (W.D. La. 2016) (quoting *Mountain Med. Equip., Inc. v. Healthdyne, Inc.*, 582 F. Supp.

846, 848 (D. Colo. 1984)) (emphasis added). Plaintiffs acknowledge that "past injury is not redressable by injunctive or declaratory relief." PI Supp. 62 (citing *Stringer v. Whitley*, 942 F.3d 715, 720 (5th Cir. 2019)). Yet they rely almost exclusively on content moderation decisions occurring long ago. The declarations supporting their request for emergency relief are nearly *one year old*—all of them executed in May or June 2022, before the Plaintiff States' initial request for preliminary injunctive relief. Even those declarations point to actions taken by social media companies as long ago February 2021. *Infra* Arg. § I.A.1. Despite nearly one year's time and access to voluminous discovery materials with which to update their declarations, Plaintiffs have adduced no evidence of recent content moderation decisions affecting their speech, or the speech of others with which they seek to engage. In the meantime, the social media accounts of the Individual Plaintiffs who were allegedly "permanently deplatformed" have apparently been restored. As explained further below, the outdated declarations and changed factual circumstances contradict Plaintiffs' conclusory assertions that they are "experienc[ing] ongoing injury from censorship and face the imminent prospect of further censorship." PI Supp. 57.

1. **The Individual Plaintiffs' alleged harms stem from long-past content moderation decisions.**

The Individuals Plaintiffs' declarations allege harms arising from past content moderation decisions affecting posts of their own or of other users they claim to follow. But those decisions primarily occurred between two and three years ago—in *2020* and *2021*. *See* Bhattacharya Decl. ¶¶ 16-18 (Dkt. 10-3) (Google, Redditt, YouTube actions in February and March 2021); Kulldorff Decl. ¶¶ 9-15 (Dkt. 10-4) (Google, Redditt, YouTube actions in February and March 2021); *id.* ¶¶ 17-18 (Twitter and LinkedIn actions in 2021); Hoft Decl. ¶¶ 3, 6-8 (Dkt. 10-5) (Twitter action in January and February 2021); Kheriaty Decl. ¶ 11 (Dkt. 10-7) (Twitter action in 2020-2021); Hines Decl. ¶¶ 7-8 (Dkt. 10-12) (Facebook action in 2020). Even the most recent alleged content

moderation actions occurred, at the latest, in May 2022—roughly *one year* ago. Kulldorff Decl.

¶ 26 (LinkedIn action in January 2022); Hoft Decl. ¶ 14 (YouTube action in May 2022); Kheriaty

Decl. ¶ 15 (Twitter action in 2021 and 2022); Hines Decl. ¶ 9 (Facebook action in January and

May 2022).[52] These actions, all of which had already occurred by "the time [Plaintiffs] brought

this suit," *Pham*, 194 F. Supp.3d at 548, cannot be remedied by any prospective injunctive relief,

*infra* Arg. § II.A., and certainly not by *immediate* injunctive relief.[53] *See generally* Defs.' Resp.

PFOF ¶¶ 1367-1411.

Nor do past content moderation decisions show any "ongoing" or "imminent" harm,

despite Plaintiffs' conclusory assertions. The Individual Plaintiffs attempt to show an ongoing or

imminent injury affecting their own speech on social media in two ways. First, three of the

Individual Plaintiffs (Kulldorff, Hines, and Hoft), *see* Pls.' Mem. Opp'n to Defs.' MTD at 9 ("Pls.'

Opp'n to MTD") (Dkt. 165) suggest that they are experiencing ongoing injury because one of their

social media accounts had been "permanently suspended" or "banned." *See* Hoft Decl. ¶ 8; Pls.'

PFOF ¶ 1369 (referencing the Bhattacharya Declaration's reliance on the alleged termination of

Dr. Kulldorff's LinkedIn account, *see* Bhattacharya Decl. ¶ 30); Pls.' PFOF ¶ 1388 (referencing

the Hoft Declaration's allegation that the Gateway Pundit has been permanently banned from

Twitter, *see* Hoft Decl. ¶ 8); Pls.' PFOF ¶ 1399 (referencing the Hines Declaration's allegation

---

[52] Plaintiffs also reference content moderation decisions occurring at unspecified points in time. *See, e.g.*, Bhattacharya Decl. ¶¶ 25-26 (asserting that Twitter "censored his tweet" and temporarily "locked [him] out of" his account "for three weeks" without specifying a date for either action), *id.* ¶¶ 28-29 (referencing conduct by Twitter at an unspecified past date). Their failure to identify when those decisions occurred necessarily means that they cannot show ongoing or imminent irreparable harm stemming from those decisions.

[53] The non-party declarations attached to the Complaint suffer the same flaw. Changizi Decl. ¶ 18 (Dkt. 10-9) (April 2021 Twitter conduct); *id.* ¶ 19 (June 2021 Twitter conduct); *id.* ¶¶ 20, 23 (December 2021 Twitter conduct); Senger Decl. ¶¶ 4-7 (Dkt. 10-2) (October 2021 and March 2022 Twitter conduct); Kotzin Decl. ¶ 13 (Dkt. 10-10) (September 2021 Twitter conduct); Kitchen Decl. ¶¶ 18, 32 (Dkt. 10-11) (September 2021 Medium conduct).

that Hines' personal account was "restricted for 90 days," *see* Hines Decl. ¶ 12[54]). But as of today,

all three individuals' accounts appear active: Kulldorff has an active LinkedIn page, *see*

Declaration of Jasmine Robinson ¶ 2 (Ex. 139) ("Robinson Decl."), Hines has an active Facebook

page, *id.* ¶ 3, and the Gateway Pundit has an active Twitter account, *id.* ¶ 4.[55] *See also* Defs.' Resp.

PFOF ¶¶ 1369, 1388, 1399.

Second, the Individual Plaintiffs contend that they are experiencing an ongoing injury

because of their choice to "self-censor[] to avoid more severe penalties from the platforms." Pls.'

PFOF ¶ 1385; *see also id.* ¶ 1371 (Dr. Bhattacharya asserting that the companies' "policies have

driven scientists and others to self-censorship," although not stating that he engages in "self-

censorship" of his own speech), *id.* ¶ 1379 ("Dr. Kulldorff states that he and other scientists engage

in self-censorship"), *id.* ¶ 1385 ("Dr. Kheriaty also engages in self-censorship"), *id.* ¶ 1394

("Hoft . . . describes ongoing self-censorship"), *id.* ¶ 1407 ("Hines engages in self-censorship").

Yet Plaintiffs' own decision to limit what they say on social media or how they say it, based on a

generalized fear of how any company might choose to apply its own policy, is a "self-inflicted

injury" that does not confer standing, *Zimmerman v. City of Austin*, 881 F.3d 378, 389 (5th Cir.

2018), and thus does not suffice to show irreparable harm warranting immediate injunctive relief.

Plaintiffs nowhere specify what content they seek to post online that a social media company might

decide to moderate. Even if they had so specified, "the risk that" any content they post

---

[54] Hines also states that Facebook pages for two of her organizations, Health Freedom Louisiana and Reopen Louisiana, are "under constant threat of being completely deplatformed," Hines Decl. ¶ 12, but she offers no evidence to substantiate that claim, and she does not allege that they ever have been "deplatformed."

[55] The same is true of non-party declarants Daniel Kotzin and Amanda J. Kitchen. Kotzin alleged that his Twitter account was permanently suspended, *see* Kotzin Decl. ¶¶ 12, 19, but he now appears to have an active account, Robinson Decl. ¶ 5 (Ex. 139). Kitchen alleged that her Twitter account was "shadowbanned," *see* Kitchen Decl. ¶ 34, but she, too, appears to have an active and publicly viewable account, Robinson Decl. ¶ 6 (Ex. 139).

subsequently will be moderated by a social media company "is speculative and depends . . . on the actions of [those] third-party" companies. *Id.* at 390. That risk is particularly speculative here, where no Plaintiff identifies any content moderation measures applied to any of their posts in the last year. *See, e.g.*, Defs.' Resp. to Pls.' PFOF ¶ 1396 (responding to Hoft's claim to have "experience[d] censorship" up to the date he executed his declaration the year prior, "on May 14, 2022"). Plaintiffs' conclusory and speculative assertions to the contrary do not justify preliminary relief. *Winter*, 555 U.S. at 22 (plaintiffs must show that irreparable harm is "*likely*," not just "possib[le]" "in the absence of an injunction").

Moreover, to the extent the Individual Plaintiffs allege an interest in listening to, reading, or interacting with speech on social media, they fail to establish any ongoing or imminent irreparable harm to that interest either. The Individual Plaintiffs assert their own interest in receiving speech on social media for the first time in their supplemental brief, but they do so in conclusory fashion, citing no evidence that they have been precluded from receiving any particular speech because of a social media company's particular content moderation decision. *See* PI Supp. 56 (arguing that "[t]he individual Plaintiffs assert violation of their First Amendment right to speak and listen freely without government interference," but without specifying how such interests have been harmed). Indeed, the declarations they submitted nearly one year ago make no mention of any harm to their interests as "listeners"[56] as opposed to their interests as speakers. Instead, the Individual Plaintiffs assert an "interest in being able to read and follow the speech and writings that others post on social media" for the first time in their declarations supporting the motion to

---

[56] The declarations generally assert harm to *other* users' right to engage with certain content because of content moderation decisions affecting the *declarants'* own speech. *See, e.g.*, Kheriaty Decl. ¶¶ 9-10, 12, 14 (discussing his number of followers and ways in which they have allegedly been restricted from viewing Kheriaty's posts). But they do not allege any harm to the declarants' own interest in receiving any other users' speech.

amend the complaint and for class certification. *See* 2d Bhattacharya Decl. ¶ 4 (Dkt. 227-5). Even if the Court were to consider those declarations, their contents would not move the Individual Plaintiffs any closer to showing imminent, irreparable harm based on this newly asserted interest.

Like Plaintiffs' allegations of harm to their interest as speakers, the allegations relating to their interest as listeners are entirely conclusory, speculative, and vague. For instance, Dr. Bhattacharya declares that he is "aware of others [he] follow[s] on social media engaging in self-censorship," 2d Bhattacharya Decl. ¶ 6, but he provides no factual details (including any timeframe) supporting that claim. He also asserts that he "frequently read[s] and listen[s] to the speech and writings on social media of other speakers and writers whom federal officials *may* have explicitly targeted for censorship," and lists various names, *id.* ¶ 5 (emphasis added), but he nowhere elaborates how, when, or by whom those speakers may have been "targeted for censorship" and how or when he has actually been prevented from receiving any speech from them on social media.[57] The remaining declarations are similarly vague and conclusory. *See* 2d Kulldorff Decl. ¶ 5 (Dkt. 227-6) (alleging that he "read[s] the writings and/or listen[s] to the speech of others who have been targeted for censorship on social media," without specifying how, when, or by whom those individuals have been "targeted for censorship"); 2d Kheriaty Decl. ¶¶ 5-6 (Dkt. 227-7) (same); 2d Hoft Decl. ¶¶ 6-7 (Dkt. 227-8) (same); 2d Hines Decl. ¶¶ 5-6 (Dkt. 227-9) (same). These assertions, devoid of any factual support, are woefully inadequate to show a likelihood of ongoing or imminent, irreparable harm to the Individual Plaintiffs' interest in receiving speech on social media that can be attributed to any of the Defendants, much less all of them.

---

[57] Other allegations are completely unconnected to the actions of a social media company and are thus irrelevant to the First Amendment claim in this case. *See, e.g.*, 2d Bhattacharya Decl. ¶ 6 (alleging that he has "heard from prominent signatories of the Great Barrington Declaration . . . [that] they have experienced" "retaliation" "*at work* for signing the document[]" (emphasis added)).

In short, none of the Individual Plaintiffs shows irreparable harm stemming from the content moderation decisions of social media companies.

### 2. Plaintiff States' alleged harms likewise stem from long-past content moderation decisions.

Nor do the Plaintiff States show any imminent, irreparable harm based on social media companies' content moderation decisions. Again, for the reasons explained in Defendants' motion to dismiss, none of the States' alleged harms constitutes a cognizable injury-in-fact for Article III standing. *See* Defs.' MTD 18-31. Even assuming they did, they still do not support Plaintiffs' request for preliminary injunctive relief, as they hinge on long-past conduct and thus fall far short of showing any likelihood of imminent, irreparable harm.

First, the Plaintiff States allege two instances of content moderation affecting their interest in speaking on social media. *See* 2d. Am. Compl. ¶ 461; Pls.' Opp'n to MTD 15-16. Those events, however occurred *in 2021*. Pls.' Opp'n to MTD 15-16. The States point to no interference with their own speech for nearly two years, much less interference for which Defendants could be deemed responsible.

Second, the States purport to identify six other "forms of imminent, continuing, irreparable injury." 2d. Am. Compl. ¶ 459.[58] Each of those alleged injuries, however, is derivative of their citizens' interests in speaking or engaging on social media. *See id.* ¶ 460 (alleging an interest in enforcing the free speech rights of their citizens); *id.* ¶ 462 (alleging an interest in receiving their residents' speech); *id.* ¶ 463 (alleging an interest in their residents' ability to use social media to petition the States); *id.* ¶ 464 (alleging an interest in Dr. Bhattacharya having a greater "impact"

---

[58] The Complaint alleges eight total interests, but Plaintiffs States have since abandoned their alleged interest in Dr. Bhattacharya's speech having a greater "impact" on social media, 2d. Am. Compl. ¶ 464. *See* Defs.' Reply 11 n.4; PI Supp. 57 (now asserting "seven specific" injuries, not including injury to Dr. Bhattacharya's speech).

on social media); *id.* ¶¶ 465-66 (alleging quasi-sovereign interests in vindicating the free speech rights of their residents); *id.* ¶ 467 (alleging an interest in vindicating the speech of all "listeners, readers, and audiences of social-media speech"). But even assuming States could establish standing based on asserted injuries to their residents, *contra, e.g.*, *Kentucky v. Biden*, 23 F.4th 585, 596 (6th Cir. 2022) (citing *Massachusetts v. Mellon*, 262 U.S. 447, 486-86 (1923)), the States point to no recent content moderation decision affecting any of these asserted interests. Again, none of the Individual Plaintiffs' (or the non-party social-media users') declarations point to content moderation decisions occurring after May 2022. *See* Pls.' PFOF ¶ 1431-42. The States present declarations from two employees who purport that the performance of their official duties has been impeded because of their inability to "follow" or "monitor" speech on social media, but those declarations likewise point to long-past conduct. Flesch Decl. ¶¶ 7-9 (Dkt. 10-6) (alleging impact from content moderation occurring, at the latest, in March 2022); Bosch Decl. ¶¶ 8-9 (Dkt. 10-13) (not including any details about the timing or circumstances of impact of alleged instances of moderated content).

Just like the Individual Plaintiffs' injuries, the States' alleged injuries based on long-past conduct fall far short of showing any imminent, irreparable harm warranting immediate injunctive relief. *See also* Defs.' Resp. PFOF ¶¶ 1427-1442.

### B. Plaintiffs cannot establish imminent, irreparable harm based on alleged past actions of federal officials.

Nor can Plaintiffs show imminent, irreparable harm based on the past actions of Defendants that they allege caused social media companies to moderate content on their platforms. Plaintiffs, of course, are harmed by *Defendants* only to the extent that *Defendants'* conduct can be said to have compelled social media companies to act with respect to particular content on their platforms that Plaintiffs wished to disseminate or receive. *Bennett v. Spear*, 520 U.S. 154, 169 (1997) (alleged

injuries cannot be "th[e] result [of] the *independent* action of some third party not before the court[]"). Thus, even assuming Plaintiffs could point to any current or imminent harm from a prior or future content moderation decision, they would still need to tie that harm to some ongoing or future conduct of a Defendant.

That means that the prior conduct of Defendants is irrelevant and cannot be the basis of emergency injunctive relief absent any indication that it is likely to recur (and imminently so). For instance, CISA discontinued its switchboarding activities after the 2020 election as non-governmental organizations stepped in to perform that important function, and focused its resources on other initiatives aimed at promoting election integrity. Switchboarding efforts that ceased over two years ago could not compel any social media platform's current or future content moderation decisions concerning election content on their platforms, and thus do not show ongoing or imminent irreparable harm. Yet the majority of the conduct Plaintiffs seek to enjoin is exactly this type of past, completed conduct by Defendants having no ongoing or future effect. A preliminary injunction against that conduct is not only unnecessary, but improper: it would also constitute an improper "advisory opinion" having no real-world effect on Plaintiffs' First Amendment rights. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) ("Under Article III, federal courts do not adjudicate hypothetical or abstract disputes."). When assessing Plaintiffs' need for preliminary injunctive relief, then, the Court must disregard Defendants' past conduct that Plaintiffs have not shown is likely to recur during the pendency of this lawsuit.

The record does not show that the challenged actions of Defendants are occurring or are likely to recur during the pendency of this lawsuit.

**1. Plaintiffs have not made the requisite showing of ongoing or imminent irreparable harm as to the White House Defendants.**

Plaintiffs' claims against White House officials are based almost exclusively on public and private statements that occurred in 2021 at the height of a global pandemic that took more than a million U.S. lives. *See supra* Defs.' PFOF § II.A. The vast majority of White House officials' statements cited by Plaintiffs concerned the critical public health threat posed by mis- and disinformation about COVID-19 vaccines, and vaccine hesitancy more specifically, *see id.*, especially during the initial rollout of the first COVID-19 vaccine. *See, e.g.*, Ex. 140 at 1 (MOLA_DEFSPROD_00018153). The White House shared these concerns with global institutions like the World Health Organization and the United Nations—as well as nearly every country around the world—that acknowledged the "infodemic" of COVID-19 misinformation that was spreading on social media. *See* Ex. 17; *supra* Defs.' PFOF § I.C. To be clear, none of the White House officials' statements about COVID-19 misinformation was unlawful or made the White House responsible for any independent decisions by the social media companies. Urging all sectors of society, including social media companies, to accept their role in the Nation's collective effort to combat the coronavirus was (and remains) an essential element of the Government's duty and responsibility to lead that effort. But even setting the merits question aside, Plaintiffs have set forth no evidence demonstrating that the White House is now so engaged with social media companies about COVID-19 misinformation as to raise even the specter, much less the probability, of imminent irreparable harm.

To the contrary, the record shows that the White House's approach to the COVID-19 pandemic has markedly changed since 2021. In April 2023, President Biden signed a joint resolution into law that terminated the national emergency related to COVID-19, which had been in place since March 2020. *See* 137 Stat. 6. The declaration of national emergency did not merely

serve a signaling purpose, but rather reflected the Administration's view of the pandemic and
enabled the Administration to exercise certain statutory authorities necessary to respond to the
crisis. *See* 85 Fed. Reg. 15,337. HHS's public health emergency is likewise due to end on May 11,
2023. *See* Ex. 67 at 1 ("[T]hanks to the administration's whole-of-government approach to
combatting the virus, we are in a better place in our response than we were three years ago, and
we can transition away from the emergency phase."). And later this month, the White House will
wind down its COVID-19 Response Team, which was the primary coordinator of the
Administration's response to the pandemic and which included several White House officials who
are Defendants in this action and whose communications Plaintiffs cite in support of their motion.
There is, accordingly, no evidence in the record of any current White House engagement with
social media companies concerning COVID-19 misinformation that would support a claim that
injunctive relief against the White House is needed. *See also* Defs.' Resp. PFOF ¶¶ 188-211.

> **2. Plaintiffs have not made the requisite showing of ongoing or imminent
> irreparable harm as to CISA Defendants.**

Plaintiffs' arguments regarding CISA's alleged violation of the First Amendment focus
primarily on its switchboarding activities during the 2020 election cycle. PI Supp. 37-39. As noted
above, CISA has re-focused its important election-security efforts elsewhere. Thus, CISA decided
in April or May 2022 not to provide switchboarding services for the 2022 election cycle and has
no intention of engaging in switchboarding for the next election. Scully Dep. 21:19-22:1-23; Hale
Decl. ¶ 78 (Ex. 97). Indeed, the record shows that in 2022 CISA fulfilled its role of promoting
election integrity through support for the development of two EI-SCC and EIS-GCC Joint
Managing Mis/Disinformation Working Group guides to build resilience to misinformation;
updates to the Rumor vs. Reality webpage; the development of the "Tactics of Disinformation"
guide; Halloween-themed messages on social media to build awareness of the risks posed by

disinformation; a CISA-FBI public service announcement on information manipulation tactics concerning the 2022 midterm elections; and participation in the USG-Industry meetings, *see* Scully Dep. 303:10-304:5; Hale Decl. ¶¶ 64-69 (Ex. 97), but not through switchboarding.

Nonetheless, Plaintiffs insist that CISA continues to engage in switchboarding activities "through the present day," pointing to an outdated statement that previously appeared on CISA's website. PI Supp. 37; Pls.' PFOF ¶¶ 976, 1120. But Mr. Scully explained during his deposition that this statement was inaccurate and should be changed to indicate that CISA's switchboarding efforts are no longer occurring, in addition to stating that CISA did not engage in switchboarding activities in 2022. Scully Dep. 21:19-22:23, 366:21-367; Hale Decl. ¶ 78 (Ex. 97) (explaining that CISA did not engage in switchboarding for the 2022 election cycle and has no intention to engage in switchboarding for the next election). CISA's website subsequently has been updated. *See* Ex. 141 (*Foreign Influence Operations and Disinformation*, CISA, https://perma.cc/F46N-KZDU).

Plaintiffs also point to CISA's alleged "collaboration" with the EIP. PI Supp. 45-47. But CISA's involvement with the EIP was generally limited to connecting it with election stakeholders in advance of the 2020 election, receiving a briefing from EIP in May or June 2022 during which EIP shared its lessons learned from the 2020 election and plans for the 2022 election (which was to work with state and local election officials), and attending public briefings provided by the EIP. Scully Dep. 54:10-25; Hale Decl. ¶¶ 58, 60, 62 (Ex. 97). CISA is not presently conducting any work with the EIP, *see* Hale Decl. ¶ 63 (Ex. 97), and Plaintiffs thus cannot establish any imminent, irreparable harm on this basis.

Finally, even if Plaintiffs contended that CISA's meetings with social media companies in which misinformation generally was discussed violate the First Amendment (and they make no such argument), those meetings have largely ended as well. For example, CISA has not

participated in the USG-Industry meetings since the 2022 general election. Hale Decl. ¶ 69 (Ex. 97).[59] Similarly, the CSAC Protecting Critical Infrastructure from Misinformation and Disinformation Subcommittee was directed to stand down in December 2022 because it had completed its tasking and provided its recommendations to CISA. *See* Ex. 187 at 43. And although the EI-SCC and EIS-GCC Joint Managing Mis/Disinformation Working Group (Working Group) is still ongoing, its relevant work has consisted of the publication of two guides to help state and local election officials and industry providers prepare for and respond to risks of disinformation. Hale Decl. ¶ 40 (Ex. 97) (And, in any event, the Working Group does not engage with social media companies and does not flag or report potential disinformation to those companies, *id.* ¶ 43).

Plaintiffs cannot show any current or "certainly impending" irreparable harm from CISA's past switchboarding activities, any involvement by CISA with the EIP, or CISA's meetings with social media companies, as Plaintiffs have not shown that such activities are occurring or likely to recur during the pendency of this suit. *See also* Defs.' Resp. PFOF ¶¶ 1094-1122.

### 3. Plaintiffs have not made the requisite showing of ongoing or imminent irreparable harm as to the CDC Defendants.

As to CDC as well, Plaintiffs' challenge looks to past actions. First, Plaintiffs point to BOLO meetings involving CDC and social media companies, PI Supp. 32, but the record plainly shows that only two BOLO meetings ever took place, in May 2021, and there is no plan to restart those meetings now, two years later. Crawford Decl. ¶¶ 14-15 (Ex. 80). Second, Plaintiffs complain about "Facebook provid[ing] the CDC with regular biweekly 'CrowdTangle' reports," PI Supp. 31, but Facebook stopped sending those reports to CDC in December 2021, *supra* Defs.' PFOF § II.C.6., and Plaintiffs reference no record evidence showing any intent by Facebook to

---

[59] Plaintiffs' factually unsupported claim that "[t]he MDM Team continues to communicate regularly and extensively with social-media platforms about misinformation and disinformation," Pls.' PFOF ¶ 978, is therefore incorrect. *See* Defs.' Resp. to PFOF ¶ 978.

send them in the future. Third, Plaintiffs refer to questions Facebook posed to CDC about whether certain claims about COVID-19 and vaccines are false and can lead to vaccine hesitancy, because, in response to CDC's responses, Facebook may have chosen to remove certain claims. PI Supp. 32-33. They also point to similar requests from Google and Twitter. *Id.* But the last request about which Plaintiffs complain was made in the summer of 2022. Crawford Decl. ¶ 19 (Ex. 80). In any event, even if any of the above conduct were presently occurring, it would not constitute evidence of irreparable harm to Plaintiffs. None of the above provides evidence that any company is taking or will take action against particular speech (including speech by a Plaintiff) on its platform because it was coerced or effectively compelled by, or acting jointly with, the CDC Defendants.

Additionally, Plaintiffs assert that CDC "has regular meetings with social-media platforms about misinformation." PI Supp. 31. As a threshold matter, although CDC had "regular meetings" with certain platforms for a period of time, misinformation was only occasionally, and not regularly, discussed at those meetings. In any event, with the exception of Google, CDC has not had "regular meetings" with a social media company, about any matter, since 2021, *see* PI Supp. 31 (referencing PFOF paragraphs that cite emails documenting meetings during 2020 and 2021); rather, any meetings now are "more ad hoc." Crawford Dep. 180:16-21; *see also* Crawford Decl. ¶¶ 6-12 (Ex. 80). And even as to CDC's ongoing meetings with Google, there is no evidence that any such meeting has touched on anything relating to misinformation since March 2022, more than one year ago. Crawford Decl. ¶ 11 (Ex. 80).

Finally, as explained, *supra* Arg. § II.C.2., Plaintiffs misstate the record when they argue that CDC is "focusing on other topics" relating to misinformation "and communicating with platforms about" those topics as well. *See* PI Supp. 33. The testimony Plaintiffs cite for this assertion shows the opposite: In June 2022, Google asked for CDC's input on the veracity of health

claims unrelated to COVID-19 and vaccines, but CDC did not substantively answer the inquiry because it concerned a topic that CDC had not "dealt with." Crawford Dep. 256:11-16. Thus, Plaintiffs' counterfactual allegation that CDC is expanding the breadth of topics discussed with social media companies shows no irreparable harm. Regardless, even if CDC were communicating with a social media company about any topic relating to misinformation, that would not be enough on its own to show irreparable harm; again, Plaintiffs cite no evidence that a company is taking or will take action against speech (including speech by a Plaintiff) on its platform because of coercion or effective compulsion by, or joint participation with, the CDC.

In short, Plaintiffs cannot show any current or certainly impending irreparable harm from CDC's past BOLO meetings, CDC's receipt of CrowdTangle reports, actions taken by social media companies in response to CDC's provision of scientific conclusions, or any "regular meetings" between CDC and "social-media platforms about misinformation." While CDC remains committed, in the event of a future public-health emergency such as COVID-19, to promote public understanding of the disease, its dangers, prevention, and treatment, Plaintiffs point to no conduct in which CDC is now engaged, or soon likely to engage, as evidence of ongoing or imminent irreparable harm. The motion for preliminary injunction against CDC should be denied.

### 4. Plaintiffs have not made the requisite showing of ongoing or imminent irreparable harm as to the Census Defendants.

Plaintiffs include Census in their request for preliminary relief for one reason: Census advised and assisted CDC in 2021, pursuant to an Interagency Agreement, in connection with CDC's efforts to address COVID-19 misinformation on social media. PI Supp. 31-32. Specifically, Census helped CDC host the two May 2021 BOLO meetings and worked with CDC to identify examples of misinformation circulating on the platforms. *Supra* Defs.' PFOF § II.D. But Census' past involvement with CDC—nearly two years ago—plainly provides no basis for preliminary

injunctive relief, and Plaintiffs offer no evidence that such involvement is likely to recur during the pendency of this suit. The motion for preliminary injunction against Census should be denied.

### 5. Plaintiffs have not made the requisite showing of ongoing or imminent irreparable harm as to Dr. Fauci, in his former capacity as NIAID Director.

Plaintiffs' requested injunction against NIAID is based solely on alleged past conduct by Dr. Fauci while he was the agency's Director. Dr. Fauci was a leading figure in the Nation's struggle against the coronavirus, and as such frequently used the bully pulpit to educate the American people about the virus and appropriate measures to protect themselves against it. But Dr. Fauci has retired from NIAID. Dr. Fauci cannot engage in any future government conduct on which Plaintiffs may stake their claimed need for preliminary injunctive relief (or any injunctive relief at all). Indeed, Plaintiffs do not even argue that they will likely be subject to imminent irreparable harm absent a preliminary injunction against NIAID. *See* PI Supp. 63-64 (arguing only that CDC, CISA, and White House officials are engaged in present-day conduct that is likely to cause "ongoing" or "imminent" injury). The motion for preliminary injunction against NIAID should be denied.[60]

### 6. Plaintiffs have not made the requisite showing of ongoing or imminent irreparable harm as to the GEC Defendants.

Although their filings are not entirely clear on this point, Plaintiffs appear to allege that the GEC's reporting of misinformation to the EIP during the 2020 election cycle violates the First Amendment. PI Supp. 48. But Plaintiffs fail to explain how they are suffering any imminent, ongoing harm based on conduct that happened more than two years ago.

During the 2020 election cycle, the GEC discovered certain posts and narratives on social

---

[60] Additionally, because Plaintiffs do not allege any conduct by NIAID whatsoever that is independent of Dr. Fauci's conduct while he was the Institute's Director before retiring, it is unclear on what basis NIAID remains a Defendant in this case at all.

media and digital media that originated from, were amplified by, or likely to be amplified by foreign malign influence actors—like Russia, the People's Republic of China, Iran, and their proxies—that sought to spread propaganda or disinformation about the 2020 election. *See* Bray Decl. ¶ 18 (Ex. 142). The GEC flagged these posts and narratives for the EIP on approximately 21 occasions. *Id.* Presently, the GEC is not doing any work with the EIP, *id.* ¶ 19, and there is no evidence that the GEC will do so in the future. Accordingly, Plaintiffs cannot establish any imminent, irreparable harm based on the GEC's submission of a limited number of tickets regarding foreign malign influence to the EIP during the 2020 election cycle.

*   *   *

Perhaps acknowledging the absence of imminent, irreparable injury based on the allegations raised in their Complaint and their preliminary-injunction motion, Plaintiffs assert a new form of imminent harm in their supplemental brief—one stemming from what they describe as an alleged "expan[sion]" by Defendants of "their censorship efforts." PI Supp. 57-58. In support of this conclusory argument, Plaintiffs cite public policy statements or initiatives by various Federal officials (some of whom are no longer in government[61]). *Id.* (alleging that the White House, CDC, CISA, DHS, and the EIP are "expanding" their efforts to "censor[]" speech on social media). But Plaintiffs fail to connect the alleged policy statements or initiatives in any way to any content moderation policies or actions of any social media company. *See id.* (citing various statements by Defendants without pointing to any resulting content moderation decision by a social

---

[61] For instance, Plaintiffs spend several paragraphs in their PFOFs on reported statements by former White House National Climate Advisor Gina McCarthy in June 2022. *See* Pls.' PFOF ¶¶ 201-03. Ms. McCarthy is no longer the White House National Climate Advisor, *see* Defs.' Notice of Substitution at 2, and in any event, these statements were made nearly one year ago and thus show no imminent future harm. Nor do Plaintiffs allege that any social media company has taken action against any particular content as a result of Ms. McCarthy's comments on this single occasion in June 2022.

media company). For that reason alone, Plaintiffs' speculative "expansion" theory should be disregarded. The Government's conduct, of course, can only cause injury to the Plaintiffs and is only relevant to Plaintiffs' First Amendment claims to the extent Plaintiffs allege and prove that it has actually *compelled* a particular content moderation decision *by a social media company*. In other words, mere policy statements or government initiatives do not constitute the First Amendment violation alleged here: the suppression of online content. But choices made by social media companies to moderate content on their platforms become *state* action attributable to Defendants only if Defendants' policy statements, initiatives, or other communications actually *coerce or effectively compel* a social media company into taking such actions. *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982). Plaintiffs' failure to connect the dots between the alleged "expan[ded]" government conduct and the actions of any social media company means they necessarily lack standing, or any First Amendment claim, relating to this conduct, and is *a fortiori* reason enough to dismiss these allegations as not probative of any irreparable harm.

By way of example, Plaintiffs point to the "Memorandum on the Establishment of the White House Task Force to Address Online Harassment and Abuse," issued by the President in June 2022. *See* PI Supp. 57 (citing Pls.' PFOF ¶ 204, in turn citing Pls.' Jones Decl., Ex. N. (Dkt. 214-16) ("Memorandum")). The Memorandum reflects a legitimate exercise of the President's inherent constitutional duty and authority to study matters adversely affecting the public welfare and to recommend appropriate solutions. It establishes a Task Force charged with "lead[ing] an interagency effort to address online harassment and abuse, specifically focused on technology-facilitated gender-based violence, and . . . develop[ing] concrete recommendations to improve prevention, response, and protection efforts through programs and policies in the United States and globally." Memorandum § 1.

Plaintiffs do not articulate what imminent, irreparable harm they face as a result of the Task Force or this nearly year-old Presidential Memorandum. Importantly, they do not assert that a social media company has taken, or plans to take, action against any content on its platform—much less action that would affect *Plaintiffs'* First Amendment interests—because it felt compelled to do so by any directive in the Presidential Memorandum. They do not even point to any language in the Memorandum itself that purports to require social media companies to take any particular action concerning content on their platforms.[62] Plaintiffs reference the Memorandum's directive that the Task Force "submit periodic recommendations to the President on policies, regulatory actions, and legislation on technology sector accountability," *id.* § 5(c), but a general instruction to provide *recommendations* for *potential* regulation, which is undefined and may never be adopted, does not amount to a threat to social media companies to take any specific action. Plaintiffs also fault the Memorandum's use of the phrase "gendered disinformation," but they do not contend that any social media company will imminently moderate content that it deems to be "gendered disinformation." The same is true of Plaintiffs' remaining assertions of imminent harm based on Defendants' alleged "expanding . . . censorship efforts," which take scattershot aim

---

[62] Moreover, Plaintiffs omit from their narrative that the Task Force carrying out the Memorandum's directives issued an initial "blueprint" for implementing the Memorandum, which further undermines Plaintiffs' speculations that they face imminent, irreparable harm. *See* Ex. 143 at 1 (*EXECUTIVE SUMMARY: Initial Blueprint for the White House Task Force to Address Online Harassment and Abuse*, The White House (Mar. 3, 2023)). The blueprint, which was summarized online by the White House on March 3, 2023, does not purport to direct social media companies to remove any category of speech from their platforms. *See id.* Rather, it recommends actions such as "strengthening coordination among Federal, state, Tribal, territorial and local law enforcement agencies to investigate and prosecute cyberstalking, image-based abuse, sextortion, and child sexual exploitation online," among other things. *Id.* There is no obvious connection between Plaintiffs' purported interest in speech on social media and the work initiated by the Memorandum and summarized in the blueprint, and Plaintiffs make no effort to draw such a connection.

at various policies without articulating any connection to the conduct of a social media company. *See* PI Supp. 57-58; Pls.' PFOF ¶¶ 998, 188-211, 1106-16.[63]

Plaintiffs' failure to even attempt to draw such a connection illustrates that what Plaintiffs ultimately seek to enjoin is not the Defendants' purported coercion of social media companies, but instead the Executive's use of its inherent authority to resort to all available channels of communication, including but not limited to the "bully pulpit," to educate the public on the challenges we confront as a Nation and the measures that can and should be taken to overcome them. *See Pleasant Grove City v. Summum*, 555 U.S. 460, 468 (2009). But the First Amendment is not a tool for States, or individuals, to seek to muzzle the President or other Federal officials from generally expressing particular policy views or taking particular actions with which they disagree. The Government is free to "express[] a viewpoint," and "the First Amendment d[oes] not demand that the Government balance [its] message" to "maintain viewpoint neutrality." *Matal v. Tam*, 582 U.S. 218, 234-35 (2017). "When a government entity embarks on a course of action, it necessarily takes a particular viewpoint and rejects others." *Id.* at 234. Plaintiffs cannot show any Article III injury, much less an irreparable one, stemming from government statements and policy initiatives simply because they disagree with them. As none of the "expanded" conduct that Plaintiffs now seek to challenge is alleged to have coerced or otherwise induced any social media company into taking any particular action, much less action that injures any of the Plaintiffs, it cannot be the basis for awarding any injunctive relief.

---

[63] Plaintiffs argue that CDC is also expanding into "other topics," but, as explained, the evidence contradicts Plaintiffs' allegations. *Infra* Defs.' PFOF § II.C.2. Ms. Crawford simply testified that CDC provides public health information on "other topics" beyond COVID-19; however, Plaintiffs cite no evidence showing that CDC has substantively responded to a social media company's request for health information on any "other topics." *See id.*

**C. Plaintiffs' delay in seeking relief shows there is no immediate need for an injunction.**

Even if Plaintiffs could show any ongoing or imminent harm arising from actions occurring as far back as 2020, their substantial delay in seeking relief decisively undermines any assertion that such harms are irreparable. In First Amendment cases, as in any other, the "party requesting a preliminary injunction must generally show reasonable diligence." *Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018) (citing *Holmberg v. Armbrecht*, 327 U.S. 392, 396 (1946)); *id.* at 1945 (finding that, in a First Amendment political retaliation case, the "plaintiffs' unnecessary, years-long delay in asking for preliminary injunctive relief weighed against their request"). "Absent a good explanation, a substantial period of delay militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief." *H.D. Vest, Inc. v. H.D. Vest Mgmt. & Servs. LLC*, No. 3:09-CV-00393, 2009 WL 1766095, at *4 (N.D. Tex. June 23, 2009); *see also Shenzhen Tange Li'An E-Com., Co. v. Drone Whirl LLC*, No. 1:20-CV-738, 2020 WL 5237267, at *4 (W.D. Tex. Sept. 2, 2020) ("Plaintiffs' delay in seeking injunctive relief suggests a lack of urgency[.]"); *Citibank, N.A, v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985) ("Delay in seeking enforcement of [the asserted] rights . . . tends to indicate at least a reduced need for . . . drastic, speedy action."); *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 163 (1st Cir. 2004) ("[D]elay between the institution of an action and the filing of a motion for preliminary injunction, not attributable to intervening events, detracts from the movant's claim of irreparable harm."); *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 903 (7th Cir. 2001) ("Delay in pursuing a preliminary injunction may raise questions regarding the plaintiff's claim that he or she will face irreparable harm if a preliminary injunction is not entered."); *Young v. Motion Picture Ass'n of Am., Inc.*, 299 F.2d 119, 121 (D.C. Cir. 1962) ("The delay in filing this action negatives any finding of urgency necessary to justify the interlocutory relief sought.").

Courts have found that even a delay of "five months" or less "is sufficient to rebut a presumption of irreparable harm." *H.D. Vest, Inc.*, 2009 WL 1766095, at *4; *see also Boire v. Pilot Freight Carriers, Inc.*, 515 F.2d 1185, 1193 (5th Cir. 1975) (finding that a delay of three months cut against granting immediate relief). Even a delay of *ten weeks* may be enough to show an absence of "urgent need for speedy action to protect [a] plaintiffs' rights" through the issuance of a preliminary injunction. *Citibank*, 756 F.2d at 276.

Here, Plaintiffs have not waited mere months before seeking relief—they have waited *years*. Their Complaint alleges that Defendants or their "political allies" have been making threats against social media platforms "since *at least 2018*," *see, e.g.*, Pls.' PFOF ¶ 1 (emphasis added), and that they "expanded" their alleged "efforts" to coerce or collude with social media companies as soon as the Biden Administration took office in January 2021, *see, e.g.*, 2d. Am. Compl. ¶ 203. The Complaint further alleges that social media platforms began "respond[ing] to" such alleged "threats" "[s]tarting in or around *2020, if not before*." *Id.* ¶ 189 (emphasis added). And this past conduct was not newly discovered at the time Plaintiffs filed their Complaint—the vast majority of statements and other conduct at issue (*e.g.*, White House press conferences and Facebook Live events with Dr. Fauci, among other things) was public at the time they occurred. Indeed, since early 2020, Facebook has touted the efforts it has taken to promote accurate content about COVID-19 from global and local health experts, including the WHO and CDC. *See* Ex. 144 at 19-20, 50-49 (Kang-Xing Jin, *Keeping People Safe & Informed About the Coronavirus*, Meta (Dec. 18, 2020), https://perma.cc/2VJL-N2L5) (February 26, 2020 update explaining that Facebook "direct[s] people to information from" CDC and the WHO; April 7, 2020 update discussing work with CDC). Yet Plaintiffs waited until May 2022 to bring this suit, *see* Compl. (Dkt. 1) (filed on May 5, 2022), and then waited another 40 days to move for preliminary relief, *see* PI Mot. (Dkt.

10) (filed on June 14, 2022). The preliminary-injunction motion has now been pending for nearly a year while Plaintiffs have sought voluminous discovery. Plaintiffs' nearly one-year-old request for relief from conduct that has been occurring since at least 2018 is anything but urgent.

Nor have Plaintiffs uncovered any new conduct during the pendency of this suit that arguably could justify their belated request for injunctive relief. Despite receiving thousands of pages of documents and dozens of interrogatory responses and taking the depositions of multiple federal officials, the allegations on which Plaintiffs rest their purported need for preliminary injunctive relief are largely the same as those asserted in their initial Complaint in May 2022 or in their Second Amended Complaint in October 2022. And as to Plaintiffs' conclusory assertion that "Defendants have expanded their social-media censorship activities" "[s]ince this lawsuit was filed," Pls.' PFOF ¶ 200 (*but see supra* Arg. § I.B.), Plaintiffs cite public statements or reports by various officials between June and August 2022, many months in the past.

Even if all of the conduct Plaintiffs challenge remained ongoing, Plaintiffs' failure to seek relief for such a substantial period of time undermines any urgency to grant that relief now, before the case is resolved on the merits. Because Plaintiffs fail to carry their heavy burden of showing irreparable harm—the most important factor for any request for preliminary injunctive relief— their motion for preliminary injunction should be denied.

## II.    Plaintiffs fail to show a likelihood of success on the merits.

### A.  Plaintiffs lack Article III standing to bring any of their claims.

For the reasons explained in Defendants' memorandum in support of their motion to dismiss, Defs.' MTD 16-43, Plaintiffs lack Article III standing to bring any of their claims. Although the Court held, in ruling on that motion, that Plaintiff States and the Individual Plaintiffs plausibly alleged Article III standing, *see* MTD Order 18-48 (Dkt. 224), Defendants respectfully disagree with the Court's analysis for the reasons stated in support of their motion to dismiss, and

hereby incorporate by reference and reassert those arguments in opposition to Plaintiffs' request for preliminary relief.

But even assuming Plaintiffs had alleged standing with sufficient plausibility to withstand a motion to dismiss, they fail to provide the evidence necessary to maintain standing for purposes of obtaining preliminary relief. As the parties invoking this Court's jurisdiction, Plaintiffs "bear the burden of establishing" the elements of Article III standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Since these elements "are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported [] with the manner and degree of evidence required at the successive stages of the litigation." *El Paso Cnty. v. Trump*, 982 F.3d 332, 337–38 (5th Cir. 2020) (quoting *Lujan*, 504 U.S. at 561). And "[b]ecause a preliminary injunction 'may only be awarded upon a clear showing that the plaintiff is entitled to such relief,' the plaintiffs must make a 'clear showing' that they have standing to maintain the preliminary injunction." *Barber v. Bryant*, 860 F.3d 345, 352 (5th Cir. 2017) (citing cases). At this stage, then, Plaintiffs may not rest on "general allegations," *Lujan*, 504 U.S. at 561, but must allege specific facts clearly showing that they likely meet each Article III standing element to sustain their claims on the merits, *Barber*, 860 F.3d at 352.

Plaintiffs fail to make a clear showing that they have Article III standing for purposes of obtaining preliminary relief. They attempt to support their factual allegations with nearly year-old declarations, which make conclusory assertions contradicted by the record. Instead of presenting specific evidence of a current or imminent injury-in-fact fairly traceable to Defendants and likely to be remedied by injunctive relief, Plaintiffs' supplemental brief posits new legal theories in attempts to evade well-established standing requirements. These efforts fail.

### 1. Plaintiffs fail to establish any injury-in-fact.

Plaintiffs raise two new arguments that they have suffered an injury-in-fact. Both lack merit. First, Plaintiffs contend that the deposition testimony by CDC's Director of Digital Media somehow constitutes an endorsement of the Plaintiff States' purported "interest in being able to read and follow the uncensored speech and opinions of their constituents on social media." PI Supp. 57. But even assuming the witness had testified about her views of the States' alleged injuries—and she did not[64]—her personal views would have no bearing on the legal question whether the States have asserted a cognizable injury to a sovereign or quasi-sovereign interest that they may vindicate in litigation against the Federal Government. They have not. As explained in Defendants' motion to dismiss, among the various reasons the States' all-encompassing right-to-receive-speech theory of standing fails, it is an overly broad and generalized grievance—an interest that the Supreme Court has consistently rejected as a basis for constitutional standing. *See* Defs.' MTD 24 (citing, *e.g.*, *Whitmore v. Arkansas*, 495 U.S. 149, 160 (1990)). Second, Plaintiffs assert that they "face the imminent prospect of further" injury because of Defendants' purported "expanding . . . censorship efforts." PI Supp. 57. That argument fails for the reasons stated above. *Supra* Arg. § I.B.

Moreover, these arguments do not shore up the factual deficiencies in Plaintiffs' allegations. As explained, Plaintiffs' allegations of injury rest on dated declarations that focus on long-past conduct of Defendants and social media companies and shows that Plaintiffs' purported fears of imminent injury stemming from a company's content moderation decision are entirely speculative. *Supra* Arg. § I.A-B; *see also* Defs.' Resp. PFOF ¶¶ 1367-1411, 1427-1442. And even if Plaintiffs had submitted any evidence of imminent harm from a social media company's content

---

[64] Rather, the testimony related to CDC's use of Facebook's CrowdTangle tool. *See* Crawford Dep. 53:4-54:20, 57:22-58:3, 75:10-76:1, 81:10-14.

moderation decision, their conclusory assertions fall far short of making the "clear showing," *Barber*, 860 F.3d at 352, required to attribute those decisions to the conduct of any *Defendant*, *infra* Arg. § II.A.2.—particularly when much of Defendants' challenged conduct occurred in the past and is unlikely to recur during the pendency of this litigation, *supra* Arg. § I.B. In short, Plaintiffs' failure to submit any evidence of actual or imminent harm is fatal to their efforts to show injury-in-fact, even assuming the alleged injuries are legally cognizable.

### 2. Plaintiffs fail to establish traceability and redressability.

Plaintiffs also cannot satisfy the causation and redressability requirements. To establish causation, they must show, with evidence, that any content moderation actions that social media companies are taking, or will imminently, take against them will occur as a "consequence of" or "as a result of" the challenged communications by Defendants. *Ford v. NYLCare Health Plans of Gulf Coast, Inc.*, 301 F.3d 329, 333 (5th Cir. 2002). To satisfy this standard, Plaintiffs must show that those content moderation actions would not occur "in the absence of" those communications. *Id.* "Causation" is not established if their alleged "injuries" are "the result of the independent action[s] of . . . third party" social media companies that are "not before the court." *Inclusive Cmtys. Project, Inc. v. Dep't of Treasury*, 946 F.3d 649, 655 (5th Cir. 2019). Plaintiffs thus cannot establish the requisite causal link if the content moderation actions at issue may just as well have occurred "as a result of" factors "unrelated to" Defendants' communications, such as the social media companies' independent judgment that content moderation is inherently valuable and/or economically advantageous. *Ford*, 301 F.3d at 333; *see also generally* Gurrea Decl. (Ex. 1).

Nor can Plaintiffs establish redressability based on mere speculation that an injunction against the challenged conduct would influence platforms' regulation of Plaintiffs' speech. "To satisfy redressability, a plaintiff must show that 'it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Inclusive Cmtys.*, 946 F.3d at 655. If an

injunction against government conduct could "just as easily have no" effect on the content moderation actions social media companies may take against Plaintiffs, *id.* at 660, then Plaintiffs do not have standing.

Plaintiffs raise three new arguments in favor of the Article III causation and redressability requirements. Each is meritless. First, relying on tort and antitrust cases, Plaintiffs contend that they are likely to establish traceability on "aiding and abetting" and "conspiracy" theories. PI Supp. 59. They further contend that, because Defendants have engaged in "aiding and abetting" and "conspiracy," the Court need not concern itself with the maxim that "Article III . . . requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 42-43 (1976). Plaintiffs cannot sidestep applicable Article III requirements merely by invoking concepts of "aiding and abetting" and "conspiracy" and arguing for their application here in novel and abstract ways. The cases on which Plaintiffs rely do not involve requests for injunctive relief, but rather requests for damages, where a monetary recovery from any defendant would redress the plaintiff's injuries, thus largely reducing the standing issue to questions of substantive aiding-and-abetting and conspiracy law.

Second, Plaintiffs argue that "even assuming" that the connection between Defendants' conduct and Plaintiffs' "other injuries" is "too attenuated," "the injuries to the individual Plaintiffs' First Amendment rights and to [the] Plaintiff States' quasi-sovereign interests would still be fairly traceable to Defendants' conduct." PI Supp. 60. Plaintiffs' argument in support of this contention is not a model of clarity. But to the extent Plaintiffs mean to argue that the traceability requirement is *easier* to meet in connection with the asserted First Amendment interests of the individual Plaintiffs and the States' citizens, *see id.,* they are mistaken. Traceability, like injury-in-fact and

redressability, is an essential element of the "'irreducible constitutional minimum of standing,'" which plaintiffs in federal court "always have the burden to establish," *Barber*, 860 F.3d at 352 (quoting *Lujan*, 504 U.S. at 560), even where free-speech interests are at stake. *see, e.g.*, *Garzes v. Lopez*, 281 F. App'x 323, 325-26 (5th Cir. 2008). Indeed, traceability is "substantially *more* difficult to establish" in cases such as this one, where plaintiffs challenge the government's conduct towards third parties. *Defs. of Wildlife*, 504 U.S. at 562 (emphasis added) (citation omitted). Plaintiffs must show, as a factual matter, that any actions taken against them by social media companies are attributable to the allegedly unconstitutional government coercion of those private actors. And to obtain prospective relief in particular, they must show a non-speculative likelihood that future government actions will affect platforms' conduct toward them—a showing they cannot come close to making. Plaintiffs' contention that the traceability requirement is necessarily met here misses the mark.[65]

Finally, Plaintiffs assert that there is "overwhelming evidence" that Defendants' actions are the "direct and but-for cause" of their injuries and that those injuries would be redressed by their proposed injunction, PI Supp. 60, and they purport to provide several supporting "examples." The evidence shows, however, that social media companies took independent action to moderate content on their platforms. *See, e.g.*, *infra* Defs.' Arg. § II.B.1.[66] Plaintiffs fail to point to any

---

[65] Plaintiffs are also wrong to suggest that they are relieved of any Article III standing requirement simply because they assert a First Amendment claim. *See Seals v. McBee*, 898 F.3d 587, 591 (5th Cir. 2018), *as revised* (Aug. 9, 2018) (in the Fifth Circuit, "requirements of standing are relaxed in the First Amendment context . . . but only as relating to the various court-imposed prudential requirements of standing;" plaintiffs "still must show that they satisfy the core Article III requirements of injury, causation, and redressability").

[66] Here, as elsewhere, Plaintiffs emphasize that the White House allegedly "press[ed] for censorship of so-called 'borderline' content that *does not violate platform policies*, and thus would not be censored but for federal pressure." PI Supp. 60. This contention betrays a fundamental misunderstanding of the platforms' policies. The platforms have policies for moderating

evidence that the companies would change their approaches to content moderation in the absence of the Government's conduct. And it is not sufficient for Plaintiffs to point to "examples" of past conduct that allegedly supports standing. "[S]tanding is not dispensed in gross." *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017) (citation omitted). The relevant question is whether Plaintiffs have established a likelihood that they will suffer injury in the absence of an injunction and that an injunction would redress that injury. As Defendants have made clear throughout this litigation, Plaintiffs cannot lump together the conduct of sixty-seven actors, gesture vaguely at untold numbers of unspecified content moderation decisions made by social media companies over several years spanning multiple Administrations, and ipso facto establish a connection between them and a likelihood of redressability by citing a handful of "examples." Plaintiffs must establish that they will suffer cognizable injuries, that each of those injuries is fairly traceable to specific Defendants, and that a Court order is likely to redress those injuries.

Furthermore, on the present record, Plaintiffs' theory of causation cannot succeed in light of Defendants' evidence. In their complaint, Plaintiffs contended that "in the absence of Defendants' campaign for social-media censorship, market forces and other incentives would have restrained and did restrain social-media platforms from engaging in the social-media censorship alleged herein." 2d. Am. Compl. ¶ 478. In denying Defendants' motion to dismiss, the Court relied on this allegation to conclude that Plaintiffs had established that their alleged injuries were traceable to Defendants' claimed conduct. MTD Order 41-42. But even if that conclusion were correct as a matter of pleading, it cannot support Plaintiffs' standing at this stage; plaintiffs cannot obtain a preliminary injunction without supporting their allegations with evidence. *See Barber*,

---

"borderline" content; the reason it is referred to as "borderline" is that it does not violate the platforms' policies for *removal*, but the content does violate the platforms' policies for reduced distribution. *See supra* Defs.' PFOF § I.D.

860 F.3d at 352; *Vote.Org v. Callanen*, 39 F.4th 297, 303-04 (5th Cir. 2022) (holding that plaintiffs could not establish a likelihood of success on the merits for preliminary injunctive relief in the absence of evidence of standing). They have failed to do so.

Contrary to Plaintiffs' factually unsupported conclusion, there is no basis to conclude that platforms made the content moderation decisions in question as a result of government pressure, as opposed to other factors. For example, social media platforms have their own economic reasons for engaging in content moderation actions. Defendants have presented the expert opinions of Dr. Stuart Gurrea, an economist who specializes in industrial organization, economics, and finance. Gurrea Decl. ¶ 7 (Ex. 1). Dr. Gurrea conducted an economic analysis of Plaintiffs' claim that previously market forces "would have and did restrain social-media platforms" from moderating content, and concluded, based on analysis of the platforms' business model and the economic incentives under which they operate, that the claim lacked economic validity. *Id.* ¶¶ 10-13. He observed that platforms have moderated content since the earliest days of social media, and that while the scope of moderation has grown with the platforms' growth, the moderation of content related to both political matters and health matters, including vaccinations, dates back as far as 2016. *Id.* This analysis is supported by the undisputed evidence that nonparties—mainly the public, Congress, and (with respect to COVID-19) the global health community and 132 sovereign governments—asked that social media companies do more to combat the spread of election and COVID-19 misinformation on their platforms. *See supra* Defs.' PFOF § I. The companies even acknowledged that they were responding to that public sentiment. *See, e.g.*, Ex. 10 at 3 ("We were told in no uncertain terms, by the public and by Congress, that we had a responsibility to do a better job protecting future elections."). And as noted throughout this litigation, the particular types of content moderation to which Plaintiffs object preceded much of the Defendants' conduct on

which they premise their claims, underscoring the implausibility of their assertion that the platforms were acting in response to government conduct rather than for other reasons.

And as Dr. Gurrea observed, platforms have a strong incentive to moderate content because doing so is in their economic interests. Gurrea Decl. ¶¶ 43-58 (Ex. 1). Social media companies moderate content because it contributes to establishing, maintaining, and increasing the size and engagement of their user bases. *Id.* ¶ 44. The absence of content moderation can result in a decline of both. *Id.* ¶¶ 45, 48. An increase in user numbers and engagement typically results in an increase in advertising revenue, which in turn increases the platforms' profits. *Id.* ¶¶ 11, 30-42. In addition, content moderation that preserves or even enhances the reputation and value of an advertiser's brand or product directly makes the platform more valuable to the advertiser, and thereby also increases advertising revenues and the platform's profits. *Id.* ¶¶ 38, 61.

Accordingly, Plaintiffs have failed to identify evidence that would support their claim that any content moderation decisions that injured them were traceable to Defendants' conduct, rather than to the companies' independent business decisions driven by their economic interests, strong public sentiment, the opinions of the global health community, or some combination of all three factors (or any other factor not identified in this litigation). And even if they could make that showing regarding some past actions, their claim would still fail because they likewise cannot establish that an injunction would redress any injuries that they have suffered or have a non-speculative likelihood of suffering in the future. At this stage Plaintiffs carry the burden of establishing standing with evidence, and they have failed to do so.

### B.  Plaintiffs are not likely to prevail on their First Amendment claims.

Plaintiffs' First Amendment claims take aim at numerous independent and (most critically) unspecified content moderation decisions that multiple social media companies have made, over a course of years and across Administrations, to prevent the spread of content that the companies

deem to violate their policies concerning COVID-19 and election misinformation. Of course, as Plaintiffs acknowledge, "the Free Speech Clause prohibits only *governmental* abridgment of speech"; it "does not prohibit *private* abridgment of speech." *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019). Thus, in *Halleck*, the Supreme Court recently explained: "[W]hen a private entity provides a forum for speech, the private entity is not ordinarily constrained by the First Amendment because the private entity is not a state actor. The private entity may thus exercise editorial discretion over the speech and speakers in the forum." *Id.* at 1930. After all, the Court commented, "Benjamin Franklin did not have to operate his newspaper as 'a stagecoach, with seats for everyone.'" *Id.* at 1931 (quoting F. Mott, *American Journalism* 55 (3d ed. 1962)).

Private action may be attributable to the Government, and subject to constitutional restraints, "only when [the government] has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Blum*, 457 U.S. at 1004. And a determination of state action must begin "by identifying 'the specific conduct of which the plaintiff complains'"—here, a specific content moderation decision—and tying it to a specific action by a particular government official. *Am. Mfrs. Ins. Co. v. Sullivan*, 526 U.S. 40, 52 (1999) (quoting *Blum*, 457 U.S. at 1004).

This is a high bar. Courts seldom attribute private conduct to the Government, and vice versa, out of respect for the "'essential dichotomy' . . . between public and private acts that [the Supreme Court] ha[s] consistently recognized." *Id.* at 53 (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 349 (1974)). Indeed, the Supreme Court has stressed that courts have an "*obligation*" to "'preserv[e] an area of individual freedom by limiting the reach of federal law' and avoi[d] the imposition of responsibility on [the Government] for conduct it could not control." *Brentwood*

*Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) (emphasis added) (quoting

*Nat'l Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 191 (1988)).

Plaintiffs here fall far short of satisfying the demanding standard that must be met before the Government may be held responsible for private conduct. They cannot demonstrate that any particular content moderation decision that allegedly harmed them "must in law be deemed to be that of" any particular government official, *Blum*, 457 U.S. at 1004, much less demonstrate that any such decision was attributable to the wide swath of government conduct that they challenge. To the contrary, this case demonstrates precisely why the standard for attributing private conduct to the Government is so high. Distilled to its essence, Plaintiffs' argument is that social media companies may have been influenced by government officials expressing positions on matters of significant public concern, or law-enforcement agencies acting in furtherance of the Executive Branch's national security responsibilities, or public health officials promoting science-based information to protect the public welfare as contemplated by federal statutes. The Constitution does not prohibit the government from engaging in such conduct, but rather contemplates that the Executive Branch will take care that the laws are faithfully executed and that, in doing so, the Government, through its officials, "has the right to speak for itself," *Summum*, 555 U.S. at 467 (citation omitted), and the "freedom to select the messages it wishes to convey," *Walker*, 576 U.S. at 207-08.

Plaintiffs cannot transform government officials' efforts to carry out their responsibilities into impermissible coercion of (mostly unspecified) private content moderation by simply affixing conclusory (and inapt) labels to Defendants' alleged conduct, *see, e.g.*, PI Supp. 1 ("pressure, threats, coercion, cajoling, collusion, demands, and trickery and deceit"); *id.* at 4 ("coercion, significant encouragement, and deception"); 2d. Am. Compl. ¶ 498 ("conspiring and colluding"),

or by inventing new state-action tests unsupported by precedent, such as making inapposite analogies to criminal law, *see, e.g.*, PI Supp. 6-7 (analogizing state action to accomplice liability).

Nor can Plaintiffs meet the demanding state-action standard by simply alleging the existence of an alleged "Censorship Enterprise." In addition to using pejorative language to attempt to transform innocuous public statements into First Amendment violations, this formulation endeavors to treat 67 different federal agencies and officials as a single edifice. Plaintiffs' "Censorship Enterprise" theory relies on two erroneous arguments. First, Plaintiffs contend that Defendants' conduct "occurs against the backdrop of . . . public threats from senior federal officials who demand greater censorship from social-media platforms and threaten adverse legal consequences—such as repeal or reform of § 230's liability shield, and antitrust enforcement—against the platforms if they do not increase censorship of disfavored viewpoints.'" PI Supp. 15. Plaintiffs further contend that "President Biden and his aides lead this charge." *Id.* As discussed above, much of the conduct that Plaintiffs challenge consists of policy recommendations by government officials or other public comments that the government is entitled to make. In particular, Plaintiffs' challenge to the President's exercise of his bully pulpit betrays a fundamental misunderstanding of constitutional law and threatens to trample on the President's prerogatives. At the same time, Plaintiffs fail to identify any demands by any Defendants that social media companies take specific actions under the threat of specific consequences.

This first argument—that the challenged conduct by Defendants occurs "against the backdrop" of various statements by federal officials—also suffers from a fatal chronological contradiction. Many of the actions by Defendants challenged in this lawsuit occurred in 2020 (or earlier), during the previous Administration. This includes (1) nearly all of Plaintiffs' challenges to the actions of Dr. Fauci and NIAID concerning COVID-19; (2) the FBI's alleged involvement

in "censoring" the Hunter Biden laptop story, prior to the 2020 election; (3) the FBI's referral of potential misinformation related to the 2020 election; (4) CISA's "switchboarding" activities in advance of the 2020 election; and (5) the Election Integrity Partnership's "ticketing" of potential misinformation for social media companies in advance of the 2020 election. Plaintiffs fail to explain how conduct that occurred before President Biden took office could be part and parcel of a "Censorship Enterprise" operated by the Biden Administration.

Second, Plaintiffs contend that there is "extensive evidence of the interconnected nature of the federal censorship activities," and claim that "[t]he White House's campaign of public threats against platforms demanding greater censorship, reinforced by its political allies in Congress and other senior federal officials, grants coercive force to *all* the censorship efforts of *all* the federal agencies involved." Pls.' Reply in Supp. of Mot. for Class Cert. & Leave to Amend Compl. at 7-8 (Dkt. 250). But they have failed to provide any evidence to support this assertion. Plaintiffs point to circumstances where, for example, the White House and OSG allegedly "collaborated" by participating in a joint press briefing, or where CDC "collaborated" with Census to host a couple of meetings with the social media companies. It is unremarkable for different components of the Executive Branch to work together at times, and certainly not indicative of coordination throughout the Federal Government on a common "censorship" objective. Nor does this mean that the statements or actions of one Defendant have any bearing on the nature of the statements or actions made by the sixty-plus other Defendants in this case.

In short, the Court must separately analyze the challenged actions of each individual Defendant to ascertain which, if any of them, is responsible for the alleged violations of Plaintiffs' rights, and which, if any of them, may properly be enjoined going forward even assuming that they violated Plaintiffs' rights at some point in the past. And, as discussed below, when the proper

analysis is conducted, it is clear that no Defendant has violated Plaintiffs' First Amendment rights, no Defendant is currently violating or about to violate Plaintiffs' First Amendment rights, and no Defendant, therefore, may be subject to an injunction.

**1. Plaintiffs are not likely to prevail on their theory that any Defendant provided "such significant encouragement" as to convert private conduct into government conduct.**

Plaintiffs first argue that the White House and OSG are responsible for the social media companies' content moderation decisions under a watered-down version of the state action test, which Plaintiffs refer to as a "significant encouragement" test. PI Supp. 5-15. In doing so, Plaintiffs ignore the state action requirement established by *Blum* and its progeny, and they further err by misconstruing the record. Neither the White House nor OSG is responsible for any social media company's decisions to take against any particular posts or individuals.

   a.   *Plaintiffs' "significant encouragement" theory rests on a misunderstanding of* Blum *and its progeny.*

Plaintiffs' "significant encouragement" theory purports to originate in *Blum's* pronouncement that the Government "can be held responsible for a private decision only when it has exercised coercive power or has provided *such significant encouragement*, either overt or covert, that the choice must in law be deemed to be that of the State." *Blum*, 457 U.S. at 1004 (emphasis added). Contrary to Plaintiffs' assertion, *Blum*'s reference to "such significant encouragement" as an alternative to coercion does not mean that the Government is responsible for private conduct "whenever 'the Government d[oes] more than adopt a passive position'" toward it. PI Supp. 5 (quoting *Skinner v. Ry. Labor Execs. Ass'n*, 489 U.S. 602, 615 (1989)).[67]

---

[67] Plaintiffs err in contending *Skinner* means that "'[a] private party should be deemed an agent or instrument of the Government' whenever 'the Government did more than adopt a passive position toward the underlying private conduct.'" PI Supp. 5. Rather, *Skinner* teaches that "[w]hether a private party should be deemed an agent or instrument of the Government . . . necessarily turns *on*

Rather, the "dispositive question is always 'whether the State has exercised coercive power or has provided *such* significant encouragement . . . that the choice must *in law be deemed to be that of the State*.'" *VDARE Found. v. City of Colo. Springs*, 11 F.4th 1151, 1161 (10th Cir. 2021) (quoting *Sullivan*, 526 U.S. at 52), *cert. denied*, 142 S. Ct. 1208 (2022).

*Blum* illustrates how high the bar is for "significant encouragement" to convert private conduct into state action. There, the plaintiffs—a class of Medicaid patients—contended that nursing homes violated the Due Process Clause by "discharg[ing] or transfer[ring] patients without notice or an opportunity for a hearing," and the question was "whether the State [could] be held responsible for those decisions." *Blum*, 457 U.S. at 993. The State "extensively" regulated the nursing homes in question, *id.* at 1004, including in ways that bore on the nursing homes' transfer and discharge decisions. For example, State regulations required nursing homes "to make all efforts possible to transfer patients to the appropriate level of care or [to] home as indicated by the patient's medical condition or needs," and "impose[d] a range of penalties on nursing homes that fail[ed] to discharge or transfer patients whose continued stay [was] inappropriate." *Id.* at 1008-09 (citation omitted). The State also had to "approve or disapprove continued payment of Medicaid benefits after a change in the patient's need for services." *Id.* at 1010. In short, the State placed various forms of regulatory pressure on nursing homes to discharge patients or transfer them to

---

*the degree* of the Government's participation in the private party's activities." 489 U.S. at 614 (emphasis added) (citations omitted). It did not hold that state action is present "whenever" the Government participates to *any* degree in private-party conduct, and Plaintiffs tellingly cite no case supporting that interpretation. Also, *Skinner* found a sufficient degree of Government "participation" because the challenged regulations, which authorized employee drug and alcohol testing by private railroads, "removed all legal barriers" to testing by pre-empting contrary state law and collective bargaining agreements, and otherwise "made plain" the Government's "strong preference for testing." *Id.* at 615-16. In sharp contrast, this case involves no law or regulation that similarly requires or encourages particular content moderation decisions by social media companies.

lower levels of care, which "made possible and encouraged" the challenged private conduct. *Id.* at 1008 n.19. Yet the Court held that the plaintiffs had failed to establish state action, because the nursing homes' "decision[s] to discharge or transfer particular patients . . . ultimately turn[ed] on medical judgments made by private parties." *Id.* at 1008.

Similarly, in *American Manufacturers Mutual Insurance Co. v. Sullivan*, the Supreme Court reinforced the teaching that government encouragement of private acts must be "so significant[]. . . as to make the State responsible for it" to satisfy the state action requirement. 526 U.S. at 53. That case concerned the constitutionality of a Pennsylvania workers' compensation statute that authorized (but did not require) insurers to withhold payments for the treatment of work-related injuries pending independent "utilization" review of whether the treatment was "reasonable" and "necessary." *Id.* at 44-47. The Supreme Court held that a private insurer's decision to withhold payment for a disputed medical treatment pending review did not constitute state action. *See id.* at 49-58. The challengers' main argument was that, by amending the statute to grant insurers the "utilization review"—an "option they previously did not have"—"the State purposely 'encouraged' insurers to withhold payments for disputed medical treatment." *Id.* at 53. The Court rejected that argument: "[T]his kind of subtle encouragement is no more significant than that which inheres in the State's creation or modification of any legal remedy. We have never held that the mere availability of a remedy for wrongful conduct, even when the private use of that remedy serves important public interests, so significantly encourages the private activity as to make the State responsible for it." *Id.* "The most that can be said of the statutory scheme," the Court went on to observe, "is that whereas it previously prohibited insurers from withholding payment for disputed medical services, it no longer does so. Such *permission of a private choice* cannot support a finding of state action." *Id.* at 54 (emphasis added); *see also White v. Commc'ns*

143

*Workers of Am., AFL-CIO, Loc. 1300*, 370 F.3d 346, 354 (3d Cir. 2004) (Alito, J.) (*Sullivan* rejected "the notion that the express legislative authorization of an act makes that act state action").

Given these principles, the Fifth Circuit recently held that "[r]esponding agreeably to a request" is not evidence of "sufficiently strong 'encouragement'" under *Blum. La. Div. Sons of Confederate Veterans v. City of Natchitoches*, 821 F. App'x 317, 320 (5th Cir. 2020). The plaintiff, the Sons of Confederate Veterans, applied to march in a city parade coordinated by a private business association. *Id.* at 318-19. In a letter, the Mayor asked the association to "prohibit the display of the Confederate battle flag in that year's parade," and two days later, the association denied the plaintiff's request to march in the parade. *Id.* at 319. The plaintiff argued that the association's decision amounted to "state action," and was thus subject to a First Amendment claim. The Fifth Circuit disagreed, noting that the "Mayor's letter" contained only "a request," and that "the decision to deny the [plaintiff's] parade application rested with the [association], not the City." *Id.* at 320.

The Ninth Circuit, in a case similar to this one, recently joined the chorus of courts that have rejected an overly broad conception of "significant encouragement."[68] In *O'Handley v. Weber*, the plaintiff-appellant argued that a California agency was responsible for Twitter's moderation of his content because the agency's mission included "prioritiz[ing] 'working closely

---

[68] *See also VDARE*, 11 F.4th at 1162 (city's decision not to provide "support or resources" to plaintiff's event was not "such significant encouragement" as to transform a private venue's decision to cancel the event into state action); *S.H.A.R.K. v. Metro Parks Serving Summit Cnty.*, 499 F.3d 553, 565 (6th Cir. 2007) (government officials' requests were "not the type of significant encouragement" that would render agreeing to those requests to be state action); *cf. Campbell v. PMI Food Equip. Grp., Inc.*, 509 F.3d 776, 784 (6th Cir. 2007) (no state action where "government entities . . . did nothing more than authorize and approve a contract that provided tax benefits" or "incentives" "conditioned on [company] opening" local plant); *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1453 (10th Cir. 1995) ("Payments under government contracts and the receipt of government grants and tax benefits are insufficient to establish a symbiotic relationship between the government and a private entity.").

with social media companies to be proactive'" about misinformation, and because it had flagged one of his posts for Twitter as "disinformation." 62 F.4th 1145, 1154 (9th Cir. 2023). Given the state agency's relationship with the companies and its flagging of his post, the plaintiff-appellant argued that the agency had "provided significant encouragement, through its public statements and otherwise, to Twitter" to "suppress speech."[69] In rejecting this argument, the Ninth Circuit explained that the "critical question" when evaluating whether state action exists under a "significant encouragement" theory is "whether the government's encouragement is so significant that we should attribute the private party's choice to the State, out of recognition that there are instances in which the State's use of positive incentives can overwhelm the private party and essentially compel the party to act in a certain way." *Id.*

Applying that standard to the facts before it, the *O'Handley* court held that the state agency had not "essentially compel[led]" Twitter to take any action against the plaintiff-appellant. *Id.* The panel noted that "[t]he [agency] offered Twitter no incentive for taking down the post that it flagged." *Id.* Because the state agency "did nothing more than make a request with no strings attached," and Twitter, in turn, "complied with the request under the terms of its own content moderation policy and using its own independent judgment," appellant's "significant encouragement" argument failed. *Id.*[70]

*Blum*, *Louisiana Division Sons of Confederate Veterans*, *Sullivan*, and *O'Handley* make it clear that "significant encouragement" may only support a finding of state action if the Government's conduct is "so significant" that the State has "essentially compel[ed] the [private]

---

[69] Appellant's Reply Brief to Cal. Sec'y of State Shirley Weber at 13, *O'Handley v. Weber*, 62 F.4th 1145 (9th Cir. 2023) (No. 22-15071), 2022 WL 4389216.

[70] The court's rejection of the Free Speech Clause claim based on lack of state action made it unnecessary to address whether a social media company's decision to remove a post is a "constitutionally protected exercise[] of editorial judgment." *O'Handley*, 42 F.4th at 1156 n.1.

party to act in a certain way." *O'Handley*, 62 F.4th at 1158. The Government can be liable for choices made by private actors only if its conduct shows that the private actors' choices "must in law be deemed to be that of the State." *Blum*, 457 U.S. at 1004. Such governmental conduct can take the form of "coercion"—that is, "actual or threatened imposition of government power or sanction," *Backpage.com, LLC v. Dart*, 807 F.3d 229, 230 (7th Cir. 2015)—or "significant encouragement"—that is, the provision of "positive incentives," *O'Handley*, 62 F.4th at 1158. *Blum* thus accounts for the possibility that the Government can be legally responsible for private choices through positive inducements (encouragement) in addition to negative ones (coercion by threats of sanction). But in any scenario, the private conduct must be "essentially compel[led]" by the Government. *Id.* at 1158. If any less of a showing were enough to satisfy the state action requirement under a "significant encouragement" theory, then no plaintiff would ever need to demonstrate coercion—the threshold for significant encouragement would be lower and easier to satisfy. That reading of *Blum* makes little sense and is unsupported by precedent—it does not appear that another party has ever prevailed on a theory like the one Plaintiffs assert. *See* Defs.' Reply 42 (refuting Plaintiffs' reliance on inapposite cases). Indeed, despite multiple bites at the apple, Plaintiffs are unable to cite a single factually analogous case supporting their position.[71]

---

[71] Plaintiffs' reliance on *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970), is procedurally and substantively inapt. Contrary to Plaintiffs' characterization, *Adickes* did not hold that the store's denial of service to the black plaintiff "was government action if a police officer in the restaurant 'communicated his disapproval'" to a restaurant employee. PI Supp. 5 (quoting *Adickes*, 398 U.S. at 158). Rather, the Court held that evidence of a policeman's presence in the restaurant would "[leave] open to a jury . . . to infer from the circumstances that the policeman and a [defendant] employee had a 'meeting of the minds" before the store refused to serve her, and the policeman took the further step of arresting her. *Adickes*, 398 U.S. at 156-58. For that reason, the Court concluded that a genuine issue of material fact existed and reversed a grant of summary judgment in the defendant's favor. Here, Plaintiffs must establish that they are likely to *prevail* on the merits, not just defeat a motion for summary judgment, and—at least as to "significant encouragement"— they advance a legally unprecedented theory of state action.

Moreover, the stringent standard articulated in *Blum, Sullivan*, and *O'Handley* reflects the law's respect for the "essential dichotomy" between public and private action. *Sullivan*, 526 U.S. at 53. The Government should be entitled to zealously encourage private parties to act on a wide range of matters affecting the public interest without fear of penalty. *See Maher v. Roe*, 432 U.S. 464, 475-76 (1977) ("Constitutional concerns are greatest when the State attempts to impose its will by force of law; the State's power to encourage actions deemed to be in the public interest is necessarily far broader."). Indeed, the government-speech doctrine shields the Government against "paralyzing" restrictions on its ability to "urg[e]" private actors to take actions that it supports. *Matal*, 582 U.S. at 235.[72] For example, "[d]uring the Second World War," the Federal Government "produced and distributed millions of posters . . . urging enlistment, the purchase of war bonds, and the conservation of scarce resources." *Id.* at 234-35. It would be "absurd" to claim that federal encouragement to join the war effort—even significant encouragement—"is the equivalent of forcing people to serve." *Peery v. Chi. Hous. Auth.*, 791 F.3d 788, 790 (7th Cir. 2015). Of course, it remains true today that "[a] President frequently calls on citizens to do things that they prefer not to do—to which, indeed, they may be strongly opposed on political or religious grounds." *Freedom From Religion Found., Inc. v. Obama*, 641 F.3d 803, 806 (7th Cir. 2011). It makes ample sense, then, that courts require more than a generalized showing of "significant encouragement" before government officials may be held liable for the decisions of private parties.

---

[72] In its memorandum opinion denying Defendants' motion to dismiss, the Court quoted *Matal* for the proposition that "[i]f private speech could be passed off as government speech by simply affixing a government seal of approval, government could silence or muffle the expression of disfavored viewpoints." MTD Order 63 (quoting *Matal*, 582 U.S. at 235). That proposition has no bearing on this case. Unlike in *Matal*, which raised the question whether privately held trademarks are "government speech" simply because they are registered by an arm of the Federal Government, it is beyond dispute here that the Federal Defendants' speech is government speech.

Plaintiffs contend that the White House and OSG have provided "such significant encouragement" to social media companies that they are responsible for those companies' content moderation decisions. For the following reasons, Plaintiffs' arguments should be rejected.

  b.  *Plaintiffs fail to show that the White House has provided "such significant encouragement" as to render the White House legally responsible for social media companies' independent decisions.*

Plaintiffs fail to show that White House officials provided "such significant encouragement" as to "essentially compel[]" any social media company to take any particular action. *O'Handley*, 62 F.4th at 1158.

As a threshold matter, Plaintiffs have not shown that the White House offered social media companies *any* "positive incentives" to remove or otherwise moderate users' content on their platforms. *Id.* Plaintiffs' only evidence of "encouragement" from the White House is an email in which Mr. Flaherty told YouTube that its reduction of "watch time" of "borderline content" by 70% was "impressive." PI Supp. 9 (citation omitted). It is not plausible that Mr. Flaherty's comment had any effect on YouTube or transformed the company's conduct into government conduct. Otherwise, Plaintiffs' "significant encouragement" theory relies exclusively on evidence of an alleged "pressure campaign" orchestrated by the White House, which is to say it is nothing more than their "coercion" theory under a different name. *Compare id.* at 8-10 (citing evidence of the White House's "significant encouragement"), *with id.* at 14 (arguing that the White House's "pressure campaign . . . discussed above" "constitutes coercion"). Again, to the extent that *Blum* offers "coerc[ion]" and "such significant encouragement" as distinct ways in which the Government can become "responsible" for private conduct, 457 U.S. at 1004, the latter does not simply encompass efforts to prod that fall short of compulsion, *see* PI Supp. 8 (arguing that Defendants' conduct "rises to the level of coercion, as well as significant encouragement"). Because Plaintiffs have hardly pointed to any evidence of "encouragement"—let alone "such

significant encouragement" that White House officials "essentially compelled" any decisions by the social media companies—the "such significant encouragement" standard is inapplicable here.

It also bears emphasis that "[d]eciding whether a [alleged suppression of speech] is fairly attributable to the [Government] begins by identifying the *specific conduct* of which the plaintiff complains." *Moody v. Farrell*, 868 F.3d 348, 352 (5th Cir. 2017) (emphasis added) (quoting *Cornish v. Corr. Servs. Corp.*, 402 F.3d 545, 550 (5th Cir. 2005)). This "specific conduct" requirement ensures that plaintiffs specify the *particular private action* that they wish to challenge as fairly attributable to the Government. *See Blum*, 457 U.S. at 1004 (the critical question is whether a private "choice" must "in law be deemed to be that of the State"); *Cornish*, 402 F.3d at 550 (explaining that the "specific conduct" at issue was a private employer's termination of the plaintiff). Plaintiffs fail to address this critical step in the state action analysis. They highlight specific examples of White House "pressure," PI Supp. 8, but with few exceptions—namely, Twitter's suspension of Alex Berenson and removal of an imposter account—Plaintiffs make no attempt to connect the White House Defendants' conduct to the specific conduct of any social media company. Simply alleging that the White House engaged in a "pressure campaign" (which it did not) is not enough to establish that the White House is responsible for any private choices; the Plaintiffs must identify which of the social media companies' "choice[s]" the White House is responsible for, and they must explain *how* the White House is responsible for those choices. *Blum*, 457 U.S. at 1004. Those choices, moreover, must have a connection to Plaintiffs' asserted harms.[73]

---

[73] Plaintiffs overlook the fact that some White House communications in evidence have nothing to do with the claims asserted in this case. They make much, for example, of an email in which Flaherty said to Facebook, "Are you guys f**king serious?" *See* PI Supp. 9; Pls.' PFOF ¶ 46 (Heading C., "Flaherty's Profane Attack: "Are You Guys F**king Serious?"). That comment arose in the context of White House officials asking why the White House's own Instagram account was experiencing a decrease in follower growth. Dkt. 174-1 at 55-56. It was not made in connection with any discussions of misinformation on social media. This comment does not make the White

Identifying the "specific conduct" at issue is especially important here, where Plaintiffs argue that numerous content moderation decisions made from 2020 to the present are "fairly attributable" to White House officials who did not take office until 2021. It is beyond dispute that the platforms have been moderating COVID-19 content pursuant to their terms of service, for reasons that include their own economic self-interest and public sentiment, since at least January 2020, well before any of the White House Defendants took office. *See supra* Defs.' PFOF § I.C. And it is also undisputed that some content moderation that occurred in 2021 and 2022 resulted from the enforcement of company policies that predated the Biden Administration. Plaintiffs offer no explanation of which particular actions are attributable to Biden White House officials, as opposed to preexisting content moderation policies—or, for that matter, the other Defendants in this case, whom Plaintiffs separately accuse of influencing the social media companies' decisions.

Even setting these fatal threshold deficiencies aside, Plaintiffs fail to establish that the White House is responsible for any social media company's conduct. Plaintiffs seek to hold White House officials accountable for social media platforms' content moderation decisions by citing public and private statements from these officials that, based on Plaintiffs' allegations, may be divided into three categories: (1) requests for "more detailed information" about the companies' content moderation practices, PI Supp. 8; (2) alleged "very specific demands" about how the platforms should change their policies to "increase censorship of disfavored speech," *id.*; and (3) alleged "demand[s] [for] the removal of specific posts and accounts of disfavored speakers," *id.* at 9. None of this alleged conduct makes the White House legally responsible for any social media company's independent decision-making.

---

House responsible for *any* private conduct that forms the basis of the First Amendment challenges at issue. *See also* Defs.' Resp. PFOF ¶¶ 138-140.

First, Plaintiffs erroneously contend that requests by White House officials—and Mr. Flaherty in particular—for "more detailed information" about COVID-19 misinformation make the White House responsible for companies' content moderation decisions. PI Supp. 8. Plaintiffs rely on requests that Mr. Flaherty made of social media companies for information related to COVID-19 misinformation trends on their platforms and how the companies were enforcing their policies. *See, e.g.*, Dkt. 174-1 at 7 ("Can you share more about your framework here?"); *id.* at 14 ("Again, as I've said, what we are looking for is the universe and scale of the problem."); Dkt. 71-3 at 24 (asking Meta for an explanation, "as we have long asked for, [of] how big the problem is, what solutions you're implementing, and how effective they've been"); *see also* Pls.' PFOF ¶¶ 43-44, 54, 57, 67-68, 112, 126, 175 (mischaracterizing Mr. Flaherty as "demand[ing]" "more information"). But Plaintiffs never demonstrate as a matter of fact, or explain as a matter of simple logic, how those *requests* for *information* from the companies could have so encouraged them to make *decisions* about content on their platforms as to render Mr. Flaherty (or any White House official) responsible for those decisions. Indeed, the Supreme Court has repeatedly rejected the notion that regulations requiring private actors to submit information to the Government are sufficient to render the Government responsible for private decisions. *See Blum*, 457 U.S. at 1006-07 ("We cannot say that the State, by requiring completion of a form, is responsible for the physician's decision."); *Sullivan*, 526 U.S. at 54-55 (same). That principle applies with even greater force here, where White House officials merely *requested* information from social media companies about misinformation on their platforms. *See La. Div. Sons of Confederate Veterans*, 821 F. App'x at 320 ("Responding agreeably to a request and being all but forced by the coercive power of a governmental official are different categories of responses.").

151

In any event, it is inexplicable how Mr. Flaherty's efforts to obtain information about the companies' actions could have "essentially compel[led]" any specific content moderation decisions by the companies, *O'Handley*, 62 F.4th at 1158, and Plaintiffs offer no explanation in support of their position other than their *ipse dixit* characterizations of the facts. The purpose of Mr. Flaherty's requests was to better understand the companies' policies, how they were being enforced, and what the Administration could do to address key issues like vaccine hesitancy. *See* Ex. 36 at 20. The record of requests reflects these objectives; as Mr. Flaherty told YouTube in April 2021, he wanted to continue a dialogue about "what is going on under the hood" because he was "on the hook for reporting out" to others in the White House. Dkt. 174-1 at 39. Absent from the record are requests by Mr. Flaherty that the companies enforce or adjust their policies in specific ways to require "greater" moderation of COVID-19 misinformation, or that they remove or otherwise restrict access to specific posts, or the posts of specific groups or individuals regarding COVID-19 misinformation. *See also* Defs.' Resp. PFOF ¶¶ 34-122.

Second, Plaintiffs contend that White House officials made "very specific demands about how to increase censorship of disfavored speech." PI Supp. 8. They cite no evidence to support this assertion, apart from a single two-page email chain from April 22, 2021 to May 6, 2021, among a Facebook employee, Mr. Slavitt, and Mr. Flaherty (hereinafter "April 2021 email chain"). *Id.* (citing Pls.' PFOF ¶¶ 118-121, which cite Dkt. 174-1 at 41-42). Plaintiffs characterize this chain as evidence of the White House "demanding that Facebook monitor private events and deplatform the 'Disinformation Dozen,'" *id.*, but it does not support their argument. As discussed above, *see supra* Defs.' PFOF § II.A, on April 23, 2021, Mr. Flaherty sent Facebook "research work" about misinformation on social media that had been conducted by an outside group, with the subject line "Research *Suggestions*" and an explicit disclaimer that Facebook should not "read this as White

House endorsement of these suggestions." Pls.' Jones Decl., Ex. L at 1 (Dkt. 214-14) (emphasis added). On May 1, 2021, the Facebook representative provided reactions to the group's findings, noting that it understood the "suggestions" had not come from within the White House. Dkt. 174-1 at 41; *see also* Defs.' Resp. PFOF ¶¶ 118-121.

It bears repeating that the Executive Branch has broad "power" to "encourage" "actions deemed to be in the public interest." *Maher*, 432 U.S. at 475-76; *see also Matal*, 582 U.S. at 235. The spread of COVID-19 related misinformation on social media was a matter of significant public concern—as reflected by the global effort to combat the COVID-19 "infodemic," *see supra* Defs.' PFOF § I.C., and the social media companies' own misinformation polices. Just as the Government has a legitimate public-health interest in mounting an all-of-society effort to combat the spread of COVID-19, it has an interest in urging social media companies to help in that effort by curbing the spread of potentially harmful misinformation on their platforms. The companies, moreover, recognized that they had a role to play in combating the virus long before Mr. Flaherty (or any current Government official) entered office, *see id.*, and they made their own judgments as to how to meet the moment, *id.* Accordingly, even if Mr. Flaherty had sent the aforementioned "Research Suggestions" to Facebook with a note indicating the White House's endorsement of those suggestions, no First Amendment issue would arise, because mere efforts to persuade private actors are "permissible government speech." *O'Handley*, 62 F.4th at 1163.

Furthermore, the April 2021 email chain does not show that the White House was responsible for any action on Facebook's part. Mr. Flaherty made clear that the "suggestions" from the outside group that briefed the White House were not urged—or even *endorsed*—by the White House. *Id.* Moreover, there is no evidence that Facebook engaged in any "specific conduct" as a result of these emails. *Moody*, 868 F.3d at 352. To the extent Plaintiffs argue that the April 2021

email chain renders the White House responsible for actions taken by Facebook against the

Disinformation Dozen, that argument is belied by the record. For example, in response to the

outside group's view that "12 accounts are responsible for 73% of vaccine misinformation,"

Facebook's representative explained that Facebook "continue[s] to review accounts associated

with the [Disinformation Dozen], but many of those either do not violate our policies or have

ceased posting violative content." Dkt. 174-1 at 42. He further noted that Facebook's preexisting

"'Dedicated Vaccine Discouraging Entity' policy is designed to remove groups and pages that are

dedicated to sharing vaccine discouraging content[,] and we continue to review and enforce" the

policy against violative accounts "when we become aware of them." *Id.* Accordingly, not only did

the White House *not* express the view that action should be taken against the Disinformation

Dozen, but the evidence shows that Facebook continued to exercise its own independent judgment

by declining to take any action against those accounts in response to the outside group's

"suggestions." PI Supp. 8.

Third, Plaintiffs contend that White House officials "demand[ed] the removal of specific

posts and accounts of disfavored speakers." *Id.* at 9. In support, Plaintiffs cite the following as

examples: (1) Robert F. Kennedy Jr.; (2) Tucker Carlson and Tomi Lahren; (3) Alex Berenson;

(4) the "Disinformation Dozen;" (5) "trending posts on Facebook;" (6) an imposter account of Dr.

Fauci; and (7) a doctored video of First Lady Jill Biden. *Id.* It is not disputed that the White House

requested the removal of some social media posts and accounts—mainly, imposter accounts. But

none was a post made by or account belonging to any of the *Plaintiffs*. And none of these requests

is sufficient to make White House officials legally responsible for any company's decision

concerning the posts or accounts cited. The social media companies allow any citizen that

encounters objectionable conduct to flag that content for the company and urge that it be removed

or otherwise addressed under the platforms' own policies.[74] It would be remarkable if the
Government were powerless to do the same, even when posts implicate governmental interests or
when the government has unique information that would be helpful to the platforms in applying
their policies. And as discussed immediately below, the record demonstrates that some of these
requests did not even include requests for the removal of posts. Where the White House did request
removal of a post, each request was submitted for the company's consideration "with no strings
attached;" and, in each instance that involved a request from the White House, the relevant social
media company considered the request "under the terms of its own content-moderation policy and
using its own independent judgment." *O'Handley*, 62 F.4th at 1158.

Several of Plaintiffs' purported examples contain no requests—let alone "demand[s]"—
for the removal of content. For example, the White House's emails to Facebook about Tucker
Carlson's Facebook Video (which included a reference to Lahren's post) did not contain requests
to remove posts.[75] *See supra* Defs.' PFOF § II.A. And Plaintiffs' example of "trending posts on
Facebook" is a reference to the April 2021 email chain, in which Mr. Flaherty again did not request
the removal of any particular posts. In both instances, Mr. Flaherty simply asked for more
information—albeit in some instances conveying frustration about the lack thereof—as to why
trending posts did not violate Facebook's policies. *See* Dkt. 174-1 at 22 (Carlson) ("What exactly

---

[74] *See, e.g.*, Ex. 21 (*How do I mark a Facebook post as false news?*, Facebook Help Ctr.,
https://perma.cc/N8HZ-P7R4); Ex. 35 (*Report Violations*, Twitter Help Ctr.,
https://perma.cc/5MXZ-TAAM); Ex. 41 (*Report inappropriate videos, channels, and other
content on YouTube*, YouTube Help, https://perma.cc/34HB-9CHL).

[75] Flaherty instead explained that the Carlson and Lahren examples were "exactly why I want to
know what 'reduction' means." Dkt. 174-1 at 22. As noted above, "[r]eduction" is likely a
reference to Facebook's borderline content policy, adopted in 2018 to "reduc[e] the distribution
and virality" of misinformation. Ex. 23 at 8 (Facebook's 2018 post about borderline content).
Flaherty understandably wanted to know more about it because, as noted above, Facebook's
borderline content policy enforcement is not transparent. *See supra* Defs.' PFOF § I.D.

is the rule for removal vs. demoting?"); *id.* at 41 ("trends") ("[H]ow does something like this happen? . . . What is going on here?").

The record does not support Plaintiffs' argument that any action taken against the "Disinformation Dozen" must "in law be deemed to be that of" the White House. *Blum*, 457 U.S. at 1004. Plaintiffs again cite to the April 2021 email chain, PI Supp. 9, but as discussed above, that chain contains no indication that the White House endorsed the outside group's research findings on those accounts. And in its response, Facebook explained that it had exercised its independent judgment to determine that the twelve accounts at issue were not violating its policies, and so it would not take any action against them. *See* Defs.' Resp. PFOF ¶¶ 114-122. Plaintiffs also cite Ms. Psaki's statement at the July 15, 2021, White House press briefing, but Ms. Psaki did not urge action against the Disinformation Dozen from the podium. *See* Defs. PFOF § II.A. The record shows, moreover, that Facebook not only took action regarding posts by the Disinformation Dozen in July 2021, but it did so again nearly a month later because it "violat[ed] [Facebook's] policies." Ex. 145 at 2 (Monika Bickert, *How We're Taking Action Against Vaccine Misinformation Superspreaders,* Meta (Aug. 18, 2021), https://perma.cc/27UC-N6QV). As Facebook repeatedly noted at that time, when content posted by these twelve individuals did not violate the company's policies—as determined by Facebook alone—it was not removed. *See id.* ("The remaining accounts associated with these individuals are not posting content that breaks our rules."); *see also* Defs.' Resp. PFOF ¶ 170.

Plaintiffs' examples also underscore that, in *every* case of a White House request for action, the White House did so with no "strings attached" (*i.e.,* any form of actual encouragement or threat of sanction) and social media companies simply "complied with the request"—in the limited cases where they did, in fact, comply—"under the terms of [their] own content-moderation policy and

using [their] own independent judgment." *O'Handley*, 62 F.4th at 1158; *see also La. Div. Sons of Confederate Veterans*, 821 F. App'x at 320 ("Responding agreeably to a request and being all but forced by the coercive power of a governmental official are different categories of responses . . . ."). For example, when the White House asked Twitter to remove or label a doctored video of the First Lady, *see supra* Defs.' PFOF § II.A, Twitter declined to do so because the video did not violate Twitter's policies.[76] Dkt. 174-1 at 65. The White House did not seek to compel Twitter to reach a different conclusion; it instead asked for "any other info" about why the content did not qualify for labeling, "in order to help us understand the Twitter processes best." *Id. See also* Defs.' Resp. PFOF ¶¶ 180-187. By contrast, when the White House emailed Facebook in reference to an imposter account for Dr. Fauci—aptly named "AnthonyFauciOfficial"—and asked if there was "any way" to have it removed, Fauci Ex. 57 at 1-2 (Dkt. 207-21), Facebook independently determined that the account violated its existing policies and removed the account accordingly. Indeed, Facebook's community guidelines at the time—which Instagram had incorporated by reference—stated that Facebook "do[es] not allow the use of our services and will disable accounts if you . . . [i]mpersonate others by . . . [c]reating an account assuming to be or speak for another person or entity."[77] And it is against federal law to impersonate a federal official. *See* 18 U.S.C. § 912. This example falls well short of demonstrating that the decision to remove the Dr. Fauci imposter account "must in law be deemed to be that of the [White House]." *Blum*, 457 U.S. at 1004. *See also* Defs.' Resp. PFOF ¶¶ 809-820. And again, it would be surprising if the First

---

[76] For this reason, there is no "specific conduct" to complain of with respect to this social media post—no action was taken, and so there is no "choice" that can be "deemed to be that of" the White House. *Blum*, 457 U.S. at 1004. And in any event, Plaintiffs cannot possibly show a cognizable injury to their First Amendment rights under these circumstances.

[77] Ex. 56 (choose "show older" in dropdown; then choose "Dec. 17. 2020").

Amendment prohibited federal officials from notifying social media platforms about the existence of fraudulent accounts that violate their terms of service, while any private citizen is free to do so.

That leaves two examples involving posts by Robert F. Kennedy Jr. and Alex Berenson on Twitter. In both examples, the White House interacted with Twitter's government affairs staff. *See* Dkt. 174-1 at 2 (Kennedy), *id.* at Dkt. 71-7 at 86. It is not disputed that these employees "did not have any kind of decision-making authority over policy enforcement," Ex. 10 at 5, making the causal link between the government's action and the platforms' content moderation decisions even more attenuated.

With respect to Mr. Kennedy, on January 23, 2021, a White House official emailed Twitter to "flag" a tweet by Mr. Kennedy about the "wave of suspicious deaths among elderly" following their receipt of the COVID-19 vaccine, and to ask if it could be removed. Dkt. 174-1 at 2.[78] Several minutes later, Twitter's government affairs representative responded: "Thanks. We recently escalated this." *Id.* The record does not indicate whether any action was taken against the tweet. In fact, the tweet is currently available for viewing, which strongly suggests that Twitter declined to remove it. *See* Ex. 146. There is, accordingly, no indication of "specific conduct" by Twitter that the White House could be held responsible for in this case. *Blum*, 457 U.S. at 1004. And even if Twitter had taken action against the tweet, Twitter's response to the White House's email request indicates that, before the White House reached out, it had already "escalated" the tweet, meaning (almost certainly) that it had "escalated" the tweet for internal review according to Twitter's

---

[78] The tweet stated: "#HankAaron's tragic death is part of a wave of suspicious deaths among elderly closely following administration of #COVID #vaccines. He received the #Moderna vaccine on Jan. 5 to inspire other Black Americans to get the vaccine. #TheDefender." *See* Ex. 146 at 1 (Robert F. Kennedy Jr. (@RobertKennedyJr), Twitter (Jan. 22, 2021, 5:41 PM), https://perma.cc/8QXJ-H78L).

community standards. This reflects that Twitter made its decision "under the terms of its own content-moderation policy and using its own independent judgment." *O'Handley*, 62 F.4th at 1158.

Plaintiffs fare no better with respect to Mr. Berenson. They cite an April 22, 2021, meeting between White House officials and Twitter representatives as evidence that the White House is responsible for Twitter "suspending Alex Berenson for the first time," notwithstanding that the suspension did not occur until three months later, on July 16, 2021. PI Supp. 9 (citing Pls.' PFOF ¶¶ 102-04, in turn citing Dkt. 71-7 at 86 and Pls.' Jones Decl., Ex. J at 2-3 (Dkt. 214-12)). More specifically, Plaintiffs cite screenshots from an internal Twitter discussion about the meeting, in which Twitter employees allegedly noted that White House officials "had one really tough question about why Alex Berenson hasn't been kicked off the platform." *Id.* at 3. Another Twitter employee allegedly noted in the internal conversation, "I've taken a pretty close look at [Mr. Berenson's] account and I don't think any of it's violative." *Id.*

In his sworn interrogatory responses—which Plaintiffs fail even to acknowledge in their motion or proposed findings of fact—Mr. Flaherty described the April 22 meeting in detail:

> Mr. Flaherty recalls participating in a meeting with Twitter employees on Zoom, in or around the Spring of 2021, at which Alex Berenson was mentioned. Mr. Flaherty recalls Andrew Slavitt also attending that meeting and he believes, but is not sure, that Lauren Culbertson from Twitter attended the meeting. Mr. Flaherty further recalls the meeting was about vaccine hesitancy and Twitter's efforts to combat disinformation and misinformation on the platform. As the meeting was ending, Mr. Flaherty recalls Mr. Slavitt expressing his view that Twitter was not enforcing its content guidelines with respect to Alex Berenson's tweets, and that employees from Twitter disagreed with that view. Mr. Flaherty also recalls that Mr. Slavitt suggested at the end of the meeting that Mr. Flaherty would follow up with Twitter employees about that subject. Mr. Flaherty does not recall following up with Twitter on the subject of Mr. Berenson, but he does recall being later called within probably a week or two by a Twitter employee, who Mr. Flaherty thinks was Todd O'Boyle, who indicated that Twitter would not be removing Mr. Berenson because Mr. Berenson had not violated Twitter policies at that time. That is the last time that Mr. Flaherty recalls discussing Mr. Berenson with employees from Twitter.

Ex. 36 at 57.

This evidence shows that White House officials inquired about Twitter's enforcement of its policies without coercing or "essentially compel[ing]" any action. *O'Handley*, 62 F.4th at 1158. Indeed, it is not disputed that at the time of the April 22, 2021, meeting Twitter believed—and so told the White House—that Mr. Berenson was not violating Twitter's policies. *See* Ex. 36 at 57. That belief provided the sole basis for Twitter's decision not to deplatform Mr. Berenson in April 2021. *Id.* Accordingly, there is no evidence that the White House was responsible for any action by Twitter arising out of the April 2021 meeting, nor is there any evidence supporting Plaintiffs' suggestion that the April 2021 meeting resulted in Twitter's action against Mr. Berenson three months later. *See also* Defs.' Resp. PFOF ¶¶ 102-04.

In short, Plaintiffs have adduced no evidence to support their claim, and therefore have no likelihood of succeeding on their claim, that the White House "so significant[ly] encourage[d]" any social media companies to take action against any posts or accounts (much less *Plaintiffs'* posts or accounts) that the actions taken by those companies "must in law be deemed to be [those] of the [Government]." *Blum*, 457 U.S. at 1004.

> c.  *Plaintiffs fail to show that OSG has provided "such significant encouragement" as to render OSG legally responsible for social media companies' independent decisions.*

Plaintiffs are also unlikely to prevail on their claim that the Surgeon General engaged in "such significant encouragement" that any of their alleged injuries were "essentially compel[led]" by OSG. *O'Handley*, 62 F.4th at 1158. The Surgeon General's mission is to "protect, promote, and advance the health and safety of the United States" by, among other things, "raising awareness about health threats" and "stimulating action nationwide on public health issues." Lesko Decl. ¶ 3 (Ex. 63). The Surgeon General relies on his "bully pulpit"—that is, his "visibility as the Nation's

Doctor"—to carry out that mission. *Id.* OSG possesses no enforcement or regulatory authority over private parties, including social media companies. *Id.*

Plaintiffs' characterizations of OSG's conduct as constituting "demands," "pressure," and "threat[s]" are illustrative of the fundamental flaws in their case. *See* PI Supp. 10-13. Consider, for example, Plaintiffs' assertion that the Surgeon General's Health Misinformation Advisory "explicitly demands greater censorship from social-media platforms." PI Supp. 11. The Advisory itself overwhelmingly refutes that assertion.

The Advisory states in clear terms that it is a "public statement that *calls the American people's attention* to a public health issue and provides *recommendations* for how that issue should be addressed." Advisory at 3 (emphasis added). Its recommendations are framed exclusively in precatory language, rather than mandatory language. It explains what various sectors of society "can" do to address health misinformation, including eight recommendations for "what technology platforms *can* do." *Id.* at 12 (emphasis added). Among the things that the Advisory says "governments can do" is:

> Convene federal, state, local, territorial, tribal, private, nonprofit, and research partners to explore the impact of health misinformation, identify best practices to prevent and address it, issue recommendations, and find common ground on difficult questions, including appropriate legal and regulatory measures that address health misinformation while *protecting user privacy and freedom of expression.*

*Id.* at 7 (emphasis added). In short, the Advisory indicates that it is nonbinding, uses only precatory language, and recommends that stakeholders (including private parties) "[c]onvene" to "find common ground" while accounting for "freedom of expression." And of course, the Advisory is an *advisory*, not an order. *See Hart v. Facebook, Inc.*, No. 22-cv-737, 2022 WL 1427507, at *7 (N.D. Cal. May 5, 2022) ("Surgeon General Murthy's '22-page advisory' document is, well, advisory."). *See also* Defs.' Resp. PFOF ¶¶ 318-329.

It is therefore not true that the Advisory "explicitly demands greater censorship from social-media platforms." PI Supp. 11. Indeed, it is difficult to imagine how OSG could have been clearer about the nonbinding, non-rights-infringing nature of the Advisory. Plaintiffs, for their part, make no effort to grapple with the language in the Advisory that contravenes their argument. Nor do they grapple with the fact that adopting their reading of the Advisory would have the effect of transforming private action into government action whenever a private party decides it will answer the Government's precatory call to action. As one district court explained in this exact context, "vague government advisory documents . . . are issued annually by the thousands and do not secretly transform large swathes of the private sector into state actors." *Hart*, 2022 WL 1427507, at *7. And Plaintiffs fail to cite any analogous cases supporting their argument that the Advisory "provide[s] such significant encouragement" to social media companies that any of their decisions "must in law be deemed to be that of [OSG]." *Blum*, 457 U.S. at 1004. At least two courts have rejected that very argument. *See Hart*, 2022 WL 1427507, at *7 (holding that the Surgeon General's Advisory "do[es] not secretly transform large swathes of the private sector into state actors"); *Changizi v. HHS*, 602 F. Supp. 3d 1031, 1056 (S.D. Ohio 2022) ("[T]o the extent the RFI and July Advisory affect Plaintiffs at all, those effects stem from Twitter's 'independent actions.'" (citation omitted)), *appeal filed*, No. 22-3573 (6th Cir. June 6, 2022). This Court should do the same.

Moreover, as with their arguments about the White House Defendants, Plaintiffs fail again to identify any "specific conduct" that OSG "essentially compel[ed]." *O'Handley*, 62 F.4th at 1158.[79] The only suggestion of specific conduct is Plaintiffs' contention that, "[i]n response to the

---

[79] Plaintiffs contend that Facebook "agreed to additional data-sharing demanded by the Surgeon General." PI Supp. 11. Setting aside the fact that there is no evidence to support the contention that Dr. Murthy "demanded" anything from Facebook, "additional data-sharing" is not complained of

Advisory, Facebook reported a series of more aggressive steps against misinformation, including

deplatforming the Disinformation Dozen and adopting more restrictive policies." PI Supp. 12. That

argument is facially deficient; "[r]esponding agreeably to a request" is not evidence of government

responsibility for private conduct. *La. Div. Sons of Confederate Veterans*, 821 F. App'x at 320.

Were it otherwise, the Government would be severely restricted from expressing its views on

matters of public concern. *See Summum*, 555 U.S. at 467-68.

Even assuming, however, that Facebook's "response" to the Advisory could somehow

satisfy the standard articulated in *Blum*, the evidence here falls short. Plaintiffs cite emails from

Facebook to OSG on July 21 and July 23, 2021. *See* Waldo Exs. 16, 19. In the first email, Facebook

thanked OSG for "providing more context to the ongoing discussion around the Surgeon General's

recent announcement" and followed up about "questions [OSG] asked in the meeting focused on

CrowdTangle, data on online interventions, and Facebook's borderline content policies." Waldo

Ex. 16 at 1 (Dkt. 210-15). Nothing in this email indicates that Facebook took *any* action in response

to the Advisory; Facebook instead followed up with *information* about its *existing* policies. *Id.* at

1-2. In the second email, sent on July 23, a Facebook employee summarizes his understanding of

a meeting with Dr. Murthy earlier that day, including that he "wanted to make sure [Dr. Murthy]

saw the steps [Facebook] took this past week to adjust policies on what we are removing with

respect to misinformation, as well as steps taken to further address the 'disinfo dozen.'" Waldo

Ex. 19 at 1 (Dkt. 210-18). Again, nothing in this email indicates that Facebook took any action *in*

*response* to the Advisory, Facebook's meetings with OSG, or any other conduct by OSG. And it

bears repeating that even if OSG had requested that Facebook make the changes mentioned in that

_____

in this action—it has no conceivable relationship with the content moderation that Plaintiffs accuse
Defendants of conducting. The same is true of Facebook's provision of "biweekly reports on
misinformation" to OSG. *Id.* at 12. In any event, those reports were provided voluntarily.

email (which it did not), nothing in the record indicates that Facebook did anything other than "comply with the request" using "its own independent judgment," *O'Handley*, 62 F.4th at 1158, for reasons related to its own economic interest, *see* Gurrea Decl. ¶¶ 10-81 (Ex. 1); *see also* Defs.' Resp. PFOF ¶¶ 259-261, 346-348.

Any doubt about Facebook's "response" to OSG's private (and public) communications can be put firmly to rest by Facebook's contemporaneous public statements about the Advisory and the Disinformation Dozen. On July 17, 2021—two days after the Advisory was released—Facebook announced that it had "already taken action on all eight of the Surgeon General's recommendations," and it published a four-page document describing policies that Facebook *already had in place* well before the Advisory issued. Ex. 27 (publishing Facebook's response to the Advisory); *see also* Ex. 71 at 1 (Facebook's response to the Advisory). The four-page document does not describe any new actions that Facebook was taking in response to the Advisory; rather, it discusses steps that Facebook had been taking since as far back as April 2020. *See* Ex. 71. Likewise, in August 2021, Facebook posted an update explaining actions taken against the Disinformation Dozen. Ex. 145. The post describes a "debate" among "people" about the Disinformation Dozen, which stemmed from a third-party "report" on the Disinformation Dozen by the Center for Countering Digital Hate, which found that "12 people are responsible for 73% of online vaccine misinformation on Facebook." *Id.* Facebook vigorously disputes that claim, observing that it is "baseless" and that the center relied on an overly narrow sample size. *Id.* The post goes on to note that Facebook has removed misinformation that "violates [its] policies," but "the remaining accounts associated with these individuals are not posting content that breaks our rules . . . or are simply inactive," and so Facebook has not taken action against them. *Id.* These posts underscore that Facebook acted independently in its approach to misinformation, including

its analysis of the third-party "report" about the Disinformation Dozen and the "debate" surrounding that report.

Plaintiffs' erroneous treatment of the Advisory typifies their mischaracterization of other evidence of OSG's conduct in 2021 and 2022. They erroneously represent at least eight times that OSG has "demanded" actions by the social media companies. PI Supp. 10-13. More specifically, in addition to the Advisory, Plaintiffs seek to hold OSG accountable for content moderation by citing OSG's public and private statements and documents, which may be divided into three categories: (1) the Surgeon General's public statements; (2) OSG's private communications with social media companies; and (3) the March 2022 RFI. Like the Advisory, none of this conduct "provide[s] such significant encouragement" to social media companies that any of their decisions "must in law be deemed to be that of [OSG]." *Blum*, 457 U.S. at 1004.

i.     Surgeon General's Public Statements

First, the Surgeon General's public statements fall far short of rendering OSG responsible for any private conduct. To start, Plaintiffs have failed again to identify which "specific conduct" by any social-media company that has injured them could plausibly be attributed to any of the Surgeon General's public statements. *Moody*, 868 F.3d at 352. As discussed above with respect to Plaintiffs' claims against the White House, it is not enough for Plaintiffs to point to disparate statements by the Surgeon General, label them a "pressure campaign," PI Supp. 10, and impliedly assert that years of private conduct must "be deemed to be that of" OSG as a result of that campaign, *Blum*, 457 U.S. at 1004. For the Court (and Defendants) to assess the validity of Plaintiffs' arguments, Plaintiffs must identify which *specific* conduct was "essentially compel[ed]" by OSG. *O'Handley*, 62 F.4th at 1158. They have failed to do so.

Even more fundamentally, the Surgeon General's public statements about health misinformation are paradigmatic examples of government speech on public policy, which does not transform private conduct into state action. "Broad stances like those embraced by the Surgeon General embody" the Government's "right to 'speak for itself[,] . . . say what it wishes,' and to select the views that it wants to express." *Changizi*, 602 F. Supp. 3d at 1054 (quoting *Summum*, 555 U.S. at 467-68). At no point in his public statements has the Surgeon General "demanded" that social media companies do anything—let alone that any specific company take action against any specific content or accounts. Nor has the Surgeon General "offered . . . incentive[s] for taking down [content]" or made "request[s] with . . . strings attached." *O'Handley*, 62 F.4th at 1158. In his role of calling attention to important public health issues, the Surgeon General has chosen to highlight health misinformation as an issue that "we" the public ought to "demand" that everyone—including social media companies—"take responsibility for" resolving. Waldo Ex. 33 at 1 (Dkt. 210-4). If private conduct were transformed into state action whenever the Government urged private action in this way, then the Government would be severely restricted in its ability to comment on public policy matters. *See Summum*, 555 U.S. at 467-68 ("[I]t is not easy to imagine how government could function if it lacked [the] freedom" to "select the views that it wants to express").

Plaintiffs fail to address the government-speech doctrine in the context of the OSG's public statements. Their only comment on the applicability of the government-speech doctrine in this case is to distinguish "opining in the abstract about disputed policy questions," which in their view is protected speech, from "contacting social-media companies through backchannels and demanding . . . specific changes to their content-moderation policies and . . . concrete censorship action on particular items of speech." PI Supp. 7. Assuming for the sake of argument that the line

Plaintiffs have drawn is appropriate, the Surgeon General's public comments on health misinformation fall comfortably on the protected side.

ii.    OSG's Private Communications

Plaintiffs' reliance on OSG's private communications with social media companies suffers from the same flaws. As with the Advisory, Plaintiffs mischaracterize OSG's comments in these meetings as "demands" with no evidentiary support. PI Supp. 11 ("In private meetings, Dr. Murthy demands that the platforms perform 'defensive work' to remove misinformation."). The bulk of OSG's communications with the social media companies, however, involved discussing the Surgeon General's Advisory at a "high level." *See supra* Defs.' PFOF § II.B. OSG staff would tell the companies that they "hope[d]" they would review the Advisory and "would love to hear from [them] after it comes out, if you think there's ways we can collaborate." Waldo Dep. 89:16-19; *see also id.* at 109:1-4 (OSG asked Facebook "whether or not they would share what they were doing in response to the [A]dvisory, if they were taking any actions"). There is nothing about these communications that suggests that OSG is responsible for any social media company's decisions, or that OSG somehow interfered with any company's independent judgment regarding specific content moderation decisions or policies.

Plaintiffs fail to offer any evidence that OSG significantly encouraged any action during its private meeting with Facebook on July 23, 2021, or that Facebook took any action in response. At Facebook's request, Dr. Murthy and OSG staff met with Facebook on July 23. *Id.* at 96:2-8. Dr. Murthy created a "cordial atmosphere," *Id.* at 107:1-2, and "want[ed] to have a better understanding of the reach of the mis- and disinformation" on Facebook, *Id.* at 98:18-22. Mr. Waldo did not recall OSG making any specific asks of Facebook, except that "specific questions were [asked] about understanding the data around the spread of misinformation and how we were

measuring that." *Id.* at 35:20-23. And an offer was made to connect DJ Patil, the White House's "data person," to a person at Facebook, so that Dr. Patil could better understand Facebook's data about the spread of misinformation. *Id.* at 112:1-10. It is inexplicable how this conversation could have rendered OSG responsible for any choices made by Facebook after the meeting.

Throughout this litigation, Plaintiffs have cited a *New York Times* article for the proposition that Dr. Murthy had "a series of 'angry' and 'tense' meetings with platforms to demand that they remove misinformation." PI Supp. 11 (citing Pls.' PFOF ¶¶ 341-344, which in turn cite Zolan Kanno-Youngs & Cecilia Kang, *'They're Killing People': Biden Denounces Social Media for Virus Disinformation*, N.Y. Times (July 16, 2021)). Plaintiffs cited that article as justification for obtaining expedited discovery in support of the instant motion. *See, e.g.*, Pls.' Supp. Br. Addressing Fifth Circuit's Deposition Order at 22 (Dkt. 137). Having now obtained written and deposition discovery from OSG, Plaintiffs can point to *no* evidence that Dr. Murthy ever had an "angry" or "tense" meeting with social media companies. The record demonstrates just the opposite: Mr. Waldo testified that he was "skeptical" of the *Times*'s reporting. *See also* Lesko ¶ 13 (Ex. 63) (stating that there was no meeting where Dr. Murthy "angrily" said anything to Facebook, and "[t]o the extend the article can be read to suggest otherwise, it is wrong"). Unsurprisingly, Plaintiffs fail even to acknowledge this contrary evidence and continue to cite the *Times* article. PI Supp. 11. In this respect, as with every other claim against OSG, Plaintiffs have failed to carry their burden of showing that they are likely to succeed on the merits of their First Amendment claim. *See also* Defs.' Resp. PFOF ¶¶ 253-92.

  iii. <u>The RFI</u>

Plaintiffs argue that the Surgeon General's March 2022 RFI "demand[ed] information from platforms about the spread of, and how to track, misinformation on their platforms." PI Supp. 13.

The RFI did no such thing. The RFI states in clear terms: "The Office of the Surgeon General *requests* input from interested parties on the impact and prevalence of health misinformation in the digital information environment during the COVID-19 Pandemic . . . . Please feel free to respond to as many topics as you choose." 87 Fed. Reg. at 12,712-13 (emphasis added)**.** It also instructs that respondents should not submit their users' "personally identifiable information." *Id.* at 12,713; *see also id.* ("All information should be provided at a level of granularity that preserves the privacy of users."). "Plaintiffs, in other words, have not plausibly established that the RFI is anything other than what it purports to be: a request." *Changizi*, 602 F. Supp. 3d at 1055. *See also* Defs.' Resp. PFOF ¶¶ 411-421.

Moreover, Plaintiffs have not pointed to any specific conduct that has harmed them as a result of the RFI, or is imminently likely to do so. On April 7, 2023, OSG published the responses to the RFI. *See* Ex. 70 (excerpt of RFI responses). Those responses give no indication that the companies took action against any users in response to the RFI. The companies submitted information about the policies they already had in place—policies that were independently devised by the companies—and "metrics" about the enforcement of those policies. Twitter, for example, submitted a five-page document that provides a high-level overview of its actions related to COVID-19, including a description of Twitter's policies since March 2020. Ex. 70 at 1-6. According to Twitter, since 2020, its "enforcement teams . . . challenged 11.7 million accounts, suspended 6,599 accounts and removed over 77,287 pieces of content worldwide." *Id.* at 3. Twitter's submission does not say anything about taking new action, let alone in response to the RFI or OSG's conduct more generally.

### 2.  **Plaintiffs fail to show "coercion" under *Bantam Books*.**

Plaintiffs also contend that the White House and the Surgeon General engaged in "pressure campaigns" against the social media companies that constituted "coercion," and further assert that

"the other agencies discussed herein, such as CISA, the FBI, CDC, NIAID, and the GEC," also engaged in "coercion" akin to that in *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963), "because of the background threats from senior federal officials, including both Defendants and their political allies," either to repeal or reform § 230, or to escalate antitrust enforcement. PI Supp. 14-15. Here, too, they have shown no likelihood of success on the merits of their contention that the content moderation decisions made by social media companies resulted from "exercise[s] [of] coercive power" by Defendants, *Blum*, 457 U.S. at 1004, whether through their public remarks or in private discussions with the companies. Even if certain Defendants asked or urged the companies to do more to address misinformation on their platforms, the record reflects that any ensuing content moderation decisions they made ultimately "rested with" those companies. *See La. Div. Sons of Confederate Veterans*, 821 F. App'x at 320.

> a.  *Plaintiffs fail to connect purported coercion to specific acts harming them.*

Plaintiffs' coercion theory stumbles out of the gate because it improperly attempts to characterize as state action broad swathes of platform conduct covering entire categories of misinformation, instead of concrete applications of platforms' policies to particular social media posts or accounts. But to give rise to state action not only must any purported government "pressure" be sufficiently coercive to render a third party's actions attributable to the government, but such purported "pressure" must also be targeted at the *specific* actions that harmed the plaintiff. *See Bantam Books,* 372 U.S. at 61-62 (Free Speech Clause violation arose from state agency's threats of prosecution if distributor did not remove "*certain designated books or magazines distributed by him* [that] had been reviewed by the [agency] and . . . declared … to be objectionable" (emphasis added)); *Backpage.com*, 807 F.3d at 230, 232 (sheriff's letter demanded that two credit card issuers "prohibit the use of their credit cards to purchase any ads on" a particular website containing advertisements for adult services); *Okwedy v. Molinari*, 333 F.3d

339, 341-42 (2d Cir. 2003) (per curiam) (municipal official allegedly pressured billboard company to take down particular series of signs he found offensive). In all those cases—as in *Bantam Books*, and unlike in *Blum*—government officials had pressured the private entities in question to engage in (or refrain from) "the specific conduct of which the plaintiff complain[ed]." *Blum*, 457 U.S. at 1004.

In any event, Plaintiffs' coercion theory is properly rejected, even assuming they could meet the specific conduct requirement—which they cannot.

### b. *Defendants made no threats and instead sought to persuade.*

Plaintiffs mischaracterize Defendants' statements and communications as coercive, and their argument hinges on a fundamentally mistaken comparison between this case and *Bantam Books*, 372 U.S. 58. Plaintiffs contend that Defendants made "on-the-ground threat[s]" akin to those in *Bantam Books*, and that therefore the Defendants' remarks cannot be characterized as "advice." PI Supp. 14 (quoting *Bantam Books*, 372 U.S. at 68). That comparison is flawed, because it ignores the close connection between the state agency's demands for the removal of particular publications and the threats of actual criminal enforcement at issue in *Bantam Books*. That connection is entirely absent here, where (other than Plaintiffs' conjecture), there is no evidence that any Defendant asserted that the content moderation choices of social media companies would result in criminal (or civil) proceedings, or retaliatory government action of any kind. Plaintiffs therefore fail to recognize that under *Bantam Books* and the cases applying it, neither official reproach of private conduct nor calls for it to cease will give rise to state action so long as government officials do not pair their criticism—even of private speech—with threats of punishment.

*Bantam Books* involved Rhode Island's Commission to Encourage Morality in Youth, empowered by law "to investigate and recommend the prosecution of all violations" of a Rhode

Island indecency law, including by deeming non-obscene publications objectionable for "sale, distribution or display" to persons below age 18. *See Bantam Books*, 372 U.S. at 60-62 & n.1. After deeming a publication "objectionable," the Commission routinely notified the publication's distributor not to carry it, threatening prosecution under the state obscenity law for failure to comply. *Id.* at 61-62. Moreover, the Commission's notices warned recipients that the state attorney general "will act for" the agency "in case of non-compliance." *See id.* at 62 n.5. Following the Commission's notices local police officers conducted inspections to inquire whether the distributor had removed the books and magazines in question from circulation. *Id.* at 63. Typically, distributors would return the materials to the publisher rather than face court action. *See id.*

The Supreme Court held that, although the Commission's notices were not themselves enforceable, compliance was nevertheless effectively compulsory because "[p]eople do not lightly disregard public officers' thinly veiled threats to institute criminal proceedings against them if they do not come around[.]" *Id.* at 68. As the Court observed, the Commission's "notices, phrased virtually as orders, reasonably understood to be such by the distributor, invariably followed up by police visitations, in fact stopped the circulation of the listed publications *ex proprio vigore*." *Id.* (emphasis added). Thus, in *Bantam Books*, the Court determined "that even though the distributors would violate no law if they refused to cooperate with" the state agency, "compliance with the directives was [n]ot voluntary." *Penthouse Int'l, Ltd. v. McAuliffe*, 610 F.2d 1353, 1355-56, 1360 (5th Cir. 1980) (injunction warranted under *Bantam Books* where county attorney used "calculated scheme that included public announcements in the local newspapers, systematic visits to retailers of the magazines in question, and a program of carefully timed warrantless arrests" under state obscenity statute to effectively terminate sale of plaintiffs' magazines within county).

But here, Plaintiffs' bid to extend *Bantam Books* fails, because the record shows Defendants did not "phrase" their statements "virtually as orders," the companies' reactions to Defendants' statements did not show that the companies "reasonably understood" those statements "as orders" ("virtually," or otherwise), and by no means were the statements "followed up" by law enforcement "visitations." The record does not show any Defendant conveyed to any social media company that any exercise of criminal, civil, or regulatory authority against it would result from "non-compliance" with a Defendant's preferences regarding content moderation. There simply is no showing of "threats to institute criminal proceedings," or threats of any kind, akin to those in *Bantam Books*. *Cf. Multimedia Holdings Corp. v. Cir. Ct. of Fla., St. Johns Cnty.*, 544 U.S. 1301, 1305 (2005) (Kennedy, J., in chambers) ("[a]lthough it is true that '[p]eople do not lightly disregard public officers' thinly veiled threats to institute criminal proceedings,' *Bantam Books*, [372 U.S. at 68]," relief was unwarranted from allegedly coercive state court orders purportedly presaging prosecution where, *inter alia*, "there [was] no suggestion that the judge who entered the orders . . . could institute such a proceeding").

Even where officials raise the prospect of government sanctions for disfavored conduct— evidence of which has not been shown here—any such "threats" must be more than fanciful to amount to coercion of a private entity such that private conduct becomes state action constrained by the Free Speech Clause. As the Ninth Circuit noted in rejecting a characterization of YouTube's content moderation decisions as "state action," remarks by government officials that "lack force of law" are "incapable" of sustaining a coercion theory. *Doe v. Google LLC*, No. 21-16934, 2022 WL 17077497, at *2 (9th Cir. Nov. 18, 2022) (unpublished). That is, public officials must remain free in the public interest to criticize the conduct, including the speech, of private parties without

fear of begetting "state action," so long, as here, their remarks are "devoid" of "any enforceable threats." *See VDARE*, 11 F.4th at 1163 (citation omitted).

Although the Fifth Circuit has not had occasion to examine the limits of *Bantam Books* for state action purposes, other circuits have repeatedly rejected efforts to expand its holding. For example, the Tenth Circuit in *VDARE* rejected a state action claim where a mayor had publicly encouraged a resort to "be attentive to the types of events they accept," and the resort then cancelled its contract to host the organizational plaintiff's conference. 11 F.4th at 1156-57, 1163-68, 1171-72 (citation omitted). The Third Circuit in *R.C. Maxwell Co. v. Borough of New Hope*, similarly rejected a claim of state action where a letter from the Borough Council caused a bank to remove the plaintiff's billboards from the bank's property, because in comparison to the threats of criminal prosecution in *Bantam Books*, the Council "could brandish nothing more serious than civil or administrative proceedings under a zoning ordinance *not yet drafted*." 735 F.2d 85, 86 n.2, 88 (3d Cir. 1984) (emphasis added). And the Second Circuit in *Hammerhead Enters., Inc. v. Brezenoff*, similarly rejected an attempted *Bantam Books* analogy, where a municipal official sent letters urging department stores not to sell a disfavored board game, because the official's agency lacked "administrative power" over New York department stores, and "no credible evidence suggest[ed] that any store decided not to carry the board game as a result of [the] letter." 707 F.2d 33, 36-37 & n.2 (2d Cir. 1983). Such decisions show that "*Bantam Books* and its progeny draw a line between coercion and persuasion: The former is unconstitutional intimidation while the latter is permissible government speech." *O'Handley*, 62 F.4th at 1163 (citing *Am. Family Ass'n v. City. & Cnty. of S.F.*, 277 F.3d 1114, 1125 (9th Cir. 2002)). "This line holds even when government officials ask an intermediary not to carry content they find disagreeable." *Id.*

The D.C. Circuit's analysis in *Penthouse International* is also instructive. There, the U.S. Attorney General's Commission on Pornography sent retailers a letter suggesting that if they continued to sell adult magazines, then they would be named in the Commission's public report, and thus associated with promoting child abuse. As a result, one retailer that received the letter stopped selling adult magazines. *Playboy Enters., Inc. v. Meese*, 639 F. Supp. 581, 583-85 (D.D.C. 1986). In litigation brought by publishers of the magazines, the D.C. Circuit concluded that the letter "contained no threat to prosecute, nor intimation of intent to proscribe the distribution of the publications," and therefore did not violate the First Amendment. *Penthouse Int'l, Ltd. v Meese*, 939 F.2d 1011, 1015 (D.C. Cir. 1991). The adult magazine plaintiff's "threat" allegation "*with the rhetoric drawn out* says nothing more than that the Commission threatened to embarrass the [magazine's] distributors publicly," which was insufficient. *Id.* at 1016 (emphasis added). The D.C. Circuit did "not see why government officials may not vigorously criticize a publication for any reason they wish." *Id.* at 1015. Indeed, "[a]s part of the duties of their office, these officials surely must be expected to be free to speak out to criticize practices, *even in a condemnatory fashion*, that they might not have the statutory or even constitutional authority to regulate." *Id.* (emphasis added). Thus, the D.C. Circuit explained, "[a]t least when the government threatens no sanction—criminal or otherwise—we very much doubt that the government's criticism or effort to embarrass the distributor threatens anyone's First Amendment rights." *Id.* at 1016. [80]

---

[80] Plaintiffs err in comparing this case to *Backpage.com, LLC v. Dart*, 807 F.3d 229 (7th Cir. 2015). In *Backpage.com*, the county sheriff sent letters to Visa and MasterCard asking that they "immediately cease and desist from allowing [their] credit cards to be used to place ads on websites like Backpage.com," which had an "adult" section on its classified advertisements forum. *Id.* at 230-31. The letters asserted that Visa and MasterCard had "the legal duty to file 'Suspicious Activity Reports' to authorities in cases of human trafficking and sexual exploitation of minors," and cited the federal money-laundering statute, intimating that the "companies could be prosecuted for processing payments made by purchasers of the ads on Backpage that promote unlawful sexual activity, such as prostitution." *Id.* at 232. The day after the sheriff sent the letters, his spokesperson

In agreement, other courts of appeals have held that "public officials may criticize practices that they would have no constitutional ability to regulate, so long as there is no actual or threatened imposition of government power or sanction." *See, e.g.*, *Am. Family Ass'n*, 277 F.3d at 1120, 1125 (no Free Speech Clause violation where municipal resolution urged "local television stations not to broadcast advertising campaigns aimed at 'converting' homosexuals"); *X-Men Sec., Inc. v. Pataki*, 196 F.3d 56, 68 (2d Cir. 1999) (rejecting Free Speech Clause claim where legislators were alleged to have "made accusations against [a private security company], asked government agencies to conduct investigations into its operations, questioned [the company's] eligibility for an award of a contract supported by public funds, and advocated that [the company] not be retained," and noting that court was "aware of no constitutional right on the part of the plaintiffs to require legislators to refrain from such speech or advocacy"); *see also Walker*, 576 U.S. at 208 ("[W]hen the government speaks[,] it is entitled to promote a program, to espouse a policy, or to take a position. In doing so, it represents its citizens[,] and it carries out its duties on their behalf."); *Block v. Meese*, 793 F.2d 1303, 1314 (D.C. Cir. 1986) (Scalia, J.) ("[C]ontrol of government expression (which would *always* seem to fall in the category of political expression, the most protected form of speech) is no more practicable, and no more appealing, than control of political expression by anyone else.").

---

informed Visa and MasterCard that if they did not "sever ties with Backpage and its imitators," the sheriff would highlight their "*ties to sex trafficking*" at a press conference. *Id.* at 233. The sheriff also "contacted the Inspector General of the United States Postal Service and the FBI, urging them to investigate the lawfulness of alternative payment methods for Backpage's sex ads." *Id.* at 237. Visa and MasterCard thereafter stopped allowing use of their cards to purchase ads on the website. *Id.* at 232. The Seventh Circuit therefore concluded that the sheriff's credible threats and actions had violated the free speech rights of Backpage. *Id.* at 231. In this case, by contrast, there is no evidence that a Defendant "intimat[ed]" to any particular company that criminal proceedings could ensue from its specific content moderation decisions, or even that any Defendant vowed to "urg[e]" law enforcement agencies "to investigate the lawfulness" of such decisions. *Id.* at 232, 237.

Plaintiffs fail to address the circuit decisions that have declined to extend *Bantam Books*. They instead rely (PI Supp. 14) on *Rattner v. Netburn*, 930 F.2d 204, 209-10 (2d Cir. 1991), a decision that also fails to support Plaintiffs. *Rattner* held that a letter from a village official to the local Chamber of Commerce could "*reasonably* be viewed as an *implicit* threat" to boycott local businesses or otherwise retaliate if the Chamber continued to carry statements by the plaintiff in its local newspaper. *Id.* at 210 (emphasis added); *see Zieper v. Metzinger*, 474 F.3d 60, 69 (2d Cir. 2007) (applying *Rattner*). But "consider[ing] the entirety of the defendants' words and actions," *id.* at 66, the evidence in *Rattner* showed that such a boycott "threat was perceived and its impact was demonstrable." 930 F.2d at 210. Here, in contrast, no record evidence shows that social media companies "perceived" remarks by or communications from Defendants as "threats"—let alone that such a perception was objectively "reasonable," or that it had any "impact" on the companies' decisions. In addition, the threat of a commercial boycott in *Rattner* (omitted from Plaintiffs' description of the case) "constituted a more direct economic sanction," *Zieper*, 474 F.3d at 69, than anything like the backdrop of unspecified policy changes to § 230, and antitrust enforcement, that Plaintiffs rely on here. Indeed, none of the factors that the Second Circuit considers when evaluating claims of coercion-based state action—"(1) [officials'] word choice and tone; (2) the existence of regulatory authority; (3) whether the speech was perceived as a threat; and, perhaps most importantly, (4) whether the speech refers to adverse consequences"—supports finding state action in this case. *See Nat'l Rifle Ass'n of Am. v. Vullo*, 49 F.4th 700, 707, 715 (2d Cir. 2022), *petition for cert. filed*, No. 22-842 (U.S. Mar. 6, 2023).

To the contrary, when Defendants' private communications and public statements are viewed in "the[ir] entirety," *Zieper*, 474 F.3d at 66, they manifest Defendants' consistent acknowledgment that social media companies exercise sole control over content moderation on

their own platforms, and cannot be viewed as having "crossed the line between attempts to convince and attempts to coerce." *Vullo*, 49 F.4th at 707 (quoting *Zieper*, 474 F.3d at 66); *see also id.* at 716-19 (rejecting claim of coercion where, *inter alia*, official's request "did not refer to any pending investigations or possible regulatory action" and "did not 'intimat[e] that some form of punishment or adverse regulatory action [would] follow the failure to accede to [it]'") (quoting *Hammerhead*, 707 F.2d at 39). [81]

In denying Defendants' motion to dismiss, this Court remarked that a threat need not "be *enforceable* in order to constitute coercive state action," and that "the government actor making the threat need not possess the *direct* power or decisionmaking authority to enforce [it]." MTD Order 62 & n.206 (emphases added). Although some courts have concluded that the directness of authority is 'not necessarily dispositive," *Okwedy*, 333 F.3d at 343-44, it "is certainly relevant," *id.* at 343. Indeed, it is highly probative of whether a threat is objectively realistic, and not fanciful, and therefore may constitute coercion. And the stringent requirements for state action foreclose the notion that an official's remarks become "coercive" where, as here, they are "'devoid'" of any

---

[81] This case differs from *Okwedy*, even assuming that opinion reflects the Second Circuit's current view of the law. *Cf. Vullo*, 49 F.4th at 716-18. In *Okwedy*, a minister contracted with a billboard company to display two billboards condemning homosexuality. 333 F.3d at 340. The borough president wrote a letter to the company criticizing the billboards and remarking that the company "derive[d] substantial economic benefits" from a "number of billboards" it owned in the borough. *Id.* at 342 (citation omitted). He also directed the company to contact his legal counsel to discuss the issues raised in his letter. *Id.* The company took the signs down that same day. *Id.* at 340. The Second Circuit concluded that between the borough president's references to the "substantial economic benefits" the company received from its business within the borough, and his directive to contact the borough's legal counsel, the company could reasonably fear that the president "intended to use his official power to retaliate against it if it did not respond positively to his entreaties." *Id.* at 344. Here again, although some officials obviously expressed frustration over and dissatisfaction with overall trends in platform content moderation choices, that falls well short of showing that each Defendant manifested an "inten[t] to use his official power to retaliate against," *id.*, any social media company if the company did not engage in any particular act (or acts) of content moderation.

threats even indirectly enforceable. *See VDARE*, 11 F.4th at 1163 (quoting *R.C. Maxwell*, 735 F.2d at 88-89); *Vullo*, 49 F.4th at 716-19; *see also Penthouse Int'l*, 939 F.2d at 1015 (no coercion where "the Advisory Commission had no . . . tie to prosecutorial power" "equivalent" to *Bantam Books*, "nor authority to censor publications," but where instead it leveled "no threat to prosecute, nor intimation of intent to proscribe the distribution of the publications"); *cf. Multimedia Holdings*, 544 U.S. at 1305 (Kennedy, J., in chambers) (rejecting *Bantam Books*-based coercion claim where, *inter alia*, "there is no suggestion that the judge who entered the orders . . . could institute" allegedly feared "prosecution by virtue of the orders"). *VDARE*, *R.C. Maxwell*, *Penthouse International*, and *Vullo*, are the weight of authority on this point. As described above, each of those decisions rejected efforts akin to Plaintiffs' here to expand *Bantam Books* because there was no "actual or threatened imposition of governmental power or sanction . . . 'regulatory, proscriptive, or compulsory in nature.'" *Penthouse Int'l*, 939 F.2d at 1015 (quoting *Laird v. Tatum*, 408 U.S. 1, 11 (1972)).[82]

In painting Defendants as making coercive "threats," Plaintiffs also impermissibly ignore evidence reflecting Defendants' recognition (and the companies' too) that the companies remained firmly in "control" of their platforms, including how to handle specific content. *See O'Handley*, 62 F.4th at 1156-57. Government officials are free to "vigorously criticize" private actions "for any reason they wish." *Penthouse Int'l*, 939 F.2d at 1015. And here, Defendants' remarks, even

---

[82] The other two cases cited in the Court's Rule 12(b) ruling also do not support analogy to *Bantam Books*. *Peterson v. City of Greenville*, 373 U.S. 244 (1963), held that the management of a restaurant engaged in state action when it excluded African-American patrons because municipal law *required* the exclusion. *Id.* at 248. No such enactment purports *to require* the content moderation choices challenged here. In *National Rifle Ass'n of America v. Cuomo*, 350 F. Supp. 3d 94 (N.D.N.Y. 2018), although the District Court denied dismissal because it deemed the coercion allegations facially plausible, at a later stage of that action, the Second Circuit in *Vullo* essentially rejected the District Court's reasoning.

those that ranked at most as "vigorous[] critici[sm]," consistently recognized their own ultimately advisory character: The officials clearly understood that what they said was advisory and "lack[ed] force of law." *See Doe*, 2022 WL 17077497, at *2 ("acts . . . specifically directed at YouTube" that "lack force of law" are "incapable of coercing YouTube to do much of anything"). Thus, none of Defendants' remarks on which Plaintiffs rely attempted to divest or succeeded in divesting any company of its autonomy and discretion to determine for itself which posts contained "misinformation," and, if so, what to do about them.

      c.   *Defendants consistently recognized social media companies' authority over their platforms and no evidence shows they engaged in improper "pressure."*

Defendants address below the particular statements of the White House Press Secretary, the White House Digital Director, and the Surgeon General relied on by Plaintiffs, and then turn to Plaintiffs' contention that "background threats" turned the remaining Defendants' statements and actions into "coercion." As we show, Plaintiffs' attempt to depict remarks by various government personnel as a "pressure campaign" (PI Supp. 14, 18) is predicated on cherry-picking certain statements without regard to the context. That context shows that Defendants repeatedly acknowledged the social media companies' independence and ultimate authority to make decisions regarding their terms of service and their application to particular content and accounts. Moreover, none of the challenged statements and communications threatened, overtly or otherwise, that "some form of punishment or adverse regulatory action [would] follow the failure to accede to" any of the government requests concerning misinformation on the companies' platforms, let alone any specific requests (of which there were none) concerning Plaintiffs or their posts. *Hammerhead*, 707 F.2d at 39. The challenged remarks therefore were not "coercive" for state action purposes.

i.     White House Press Secretary

During Press Secretary Psaki's May 5, 2021, press briefing, she expressed the President's view regarding social media platforms' "responsibility" to "stop amplifying untrustworthy content, disinformation, and misinformation, especially related to COVID-19, vaccinations, and elections." Ex. 147. Yet she also emphasized that the President "believe[s] in First Amendment rights" and that "social media platforms need to make" "the decisions" regarding "how they address the disinformation" and "misinformation" that "continue to proliferate on their platforms." Ex. 147; *see also supra* Defs.' PFOF § II.A.1; Defs.' Resp. PFOF ¶¶ 123-124.

Likewise, during the July 15, 2021 press briefing with the Surgeon General, Ms. Psaki remarked that the Government was "flagging . . . for Facebook" "problematic posts . . . that spread disinformation." Ex. 40. But at the next day's briefing she added that the Government does not "take anything down" or "block anything" and that social media platforms themselves, as "private-sector compan[ies]," "make[] decisions about what information should be on their platform[s]," Ex. 37. Ms. Psaki also reiterated that although government officials urged social media companies to address misinformation, the companies ultimately had to decide which strategies (if any) to adopt. "Any decision about platform usage and who should be on the platform," she explained, "is orchestrated and determined by private-sector companies. Facebook is one of them . . . [a]nd there are a range of media who are—also have their own criteria and rules in place, and they implement them. And that's their decision to do. That is not the federal government doing that." Ex. 37. And when the news media later asked whether the Administration was "considering any regulatory or legal moves to possibly address disinformation on social media," Ms. Psaki responded that it was "up to Congress to determine how they want to proceed moving forward." *Press Briefing by Press Secretary Jen Psaki*, 2021 WL 3030746, at *2; *see also* Defs.' Resp. PFOF ¶¶ 123-124, 141-162.

ii.      White House Digital Director

In a similar vein, Mr. Flaherty's email correspondence with social media companies repeatedly manifests a shared understanding that Facebook and other companies remained fully in command of their content moderation decisions. Thus, when Facebook advised Mr. Flaherty that Tucker Carlson's video discouraging COVID-19 vaccination did not violate its standards, Mr. Flaherty *did not* demand that Facebook nevertheless remove the video, or insist that the company change a policy, or threaten retaliation if Facebook failed to comply. Instead, he sought to better *understand* Facebook's policies, how Facebook applied them, and how the White House could use the company's public-data resource, CrowdTangle, to understand what content Americans were being exposed to on the platform. *See supra* Defs.' PFOF § II.A.2.

Although Mr. Flaherty used strong language at times, such language does not show coercion because it lacked any accompanying assertion that adverse consequences would follow if Facebook did not change its content moderation decisions. And when Mr. Flaherty shared with Facebook specific proposals concerning misinformation developed by third-party researchers, he emphasized that the White House *was not* insisting that Facebook adopt those proposals. *Supra* Defs.' PFOF § II.A.2. The record fails to show that Mr. Flaherty threatened, or even alluded to, adverse consequences if the social media companies did not answer his questions, or if they declined to take action against particular posts or accounts. *See, e.g.*, Dkt. 174-1 at 33 (asking Facebook, without mentioning any possible sanction, "[h]ow" a Tucker Carlson video was "not violative" of Facebook policies, and asking "[w]hat exactly is the rule for removal vs demoting? Moreover: you say reduced and demoted. What does that mean?"). Tellingly, the companies did not respond to Mr. Flaherty's requests in a way indicating that they perceived Mr. Flaherty's questions about COVID-19 misinformation trends on their platforms, and how the companies were

182

enforcing their policies, to be "threats." *See, e.g.*, Dkt. 174-1 at 42 (Facebook employee indicated understanding that the outside researchers' "recommendations/observations" conveyed by Mr. Flaherty on April 23, 2021, had not come from within the White House). And far from instantly removing the "Disinformation Dozen" in the spring of 2021 after receiving the outside research "suggestions," Facebook indicated that it would not do so because those 12 individuals "either d[id] not violate [its] policies or have ceased posting violative content," and said so without any apparent concern that it would suffer any consequences at the Government's hands for failing to remove them. Dkt. 174-1 at 42; *see also* Ex. 145 ("The remaining accounts associated with these individuals are not posting content that breaks our rules."); Defs.' Resp. PFOF ¶¶ 81, 82, 93-100, 116-122.

iii.   <u>The Surgeon General</u>

The Office of the Surgeon General likewise manifested respect for social media companies' control over their own platforms. The Surgeon General's Advisory, for example, proposed a range of potential content moderation measures—including labeling posts that contain misinformation—and cautions that *companies* should assess for themselves whether any measure might have "unintended consequences" or unjustifiably impede "free expression." The Advisory did not purport to make that assessment for the companies, and certainly did not expressly or implicitly threaten the companies with adverse legal consequences if the recommendations were not accepted—indeed, the Surgeon General would lack authority to impose legal consequences. *See* Lesko Decl. ¶ 3 (Ex. 63); *see also* Advisory at 12 (proposing that social media companies might address misinformation by, among other things, "[p]rovid[ing] information from trusted and credible sources"). To the contrary, the Advisory expressly recognized that "[d]efining misinformation is a challenging task, and any definition has limitations." *Id.* at 17. The Surgeon

183

General thus expressly urged social media companies to exercise *their* discretion in a way that "avoid[s] conflating controversial or unorthodox claims with misinformation." *Id. See also* Defs.' Resp. PFOF ¶¶ 318-329.

Nor can the Surgeon General's March 2022 RFI reasonably be characterized as coercive. The RFI merely sought information, including "[i]nformation about sources of COVID-19 misinformation" on social media and elsewhere. 87 Fed. Reg. at 12,713-14. Like the Surgeon General's Advisory, the RFI imposed no obligations; responses were purely voluntary. *See* Lesko Decl. ¶ 6 (Ex. 63). This Court, in ruling on Defendants' motion to dismiss, accepted as valid Plaintiffs' characterization of the RFI as implicitly threatening to impose regulation. MTD Order 61. Whether or not that characterization was facially plausible under Rule 12(b)(6), Plaintiffs have not adduced any evidence that the RFI threatened any regulatory consequence or that such a consequence could have followed. On its face, the RFI states that "HHS will consider the usability, applicability, and rigor of submissions in response to this RFI and share learnings from these responses with the public," and that the "inputs from stakeholders will help inform future pandemic response in the context of an evolving digital information environment." *See* 87 Fed. Reg. at 12,713. Nothing in this RFI either expressly or implicitly threatened future regulation if social media companies failed to adopt content moderation policies and practices preferred by the Government. Indeed, as discussed above, the Surgeon General does not have independent regulatory authority, *see, e.g.*, 31 Fed. Reg. 8855 (transferring the Surgeon General's powers to what is now HHS), and thus cannot issue or enforce binding regulations. The RFI has not resulted in any proposed regulation. For their part, Plaintiffs cite no authority for the extraordinary notion that an agency's publication of a request for information is coercive. Accordingly, Plaintiffs cannot

make a case of government coercion based on the Surgeon General's RFI. *See also* Defs.' Resp. PFOF ¶¶ 411-421.

> d. *Officials' remarks about potential § 230 amendments and antitrust enforcement raised legitimate policy questions and had no coercive effect.*

Plaintiffs seek to overcome the fatal deficiencies in their coercion theory by contending that the Defendants' statements become coercive when viewed "against the backdrop" of alleged "threats" in Congress and from the Executive Branch to repeal or reform § 230, and to intensify antitrust enforcement against the companies. PI Supp. 15 (citing Pls.' PFOF ¶¶ 1-30). That contention is mistaken in several respects.

It bears emphasis from the outset that the record as a whole offers no evidence that certain legislators or Biden Administration officials have said they would refrain from advocating changes to § 230, or pursuing potential remedies under the antitrust laws, if social media companies intensified their content moderation measures as to any individual Plaintiff or particular residents of the Plaintiff States. Nor is there record evidence that a social media company has said that it took a particular content moderation measure because it inferred (let alone reasonably) the existence of a "threat" from any of the statements by Defendants. *See Hammerhead*, 707 F.2d at 37 (no coercion where official's remarks cannot "reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request"); *accord VDARE*, 11 F.4th at 1163-65; *R.C. Maxwell*, 735 F.2d at 88-89; *Penthouse Int'l*, 939 F.2d at 1014-16.

But even considering on their own terms, as we do below, the smattering of legislative and Executive Branch remarks on which Plaintiffs rely, they fail to show that Defendants "coerced" social media companies to do anything (let alone to do anything that violated Plaintiffs' Free

Speech Clause rights). All that occurred was part of a legitimate debate about § 230 and antitrust questions stemming from the economic ascendance of social media companies.

### i.   Legislative Remarks and Hearings

To start with Congress: The purported "backdrop" consists of several statements by individual *nondefendant* Representatives and Senators, but whether Defendants "threatened" or "coerced" entities in an unconstitutional sense "are conclusions and characterizations that must be supported" by evidence as to what Defendants, not nonparties "said and did." *Vullo*, 49 F.4th at 716. Assigning "coercive" effect to legislator remarks would be especially improper because only collective action by Congress, not the views of individual legislators, may alter federal laws. *Cf. INS v. Chadha*, 462 U.S. 919, 951-52 (1983). The Ninth Circuit thus rejected individual legislators' remarks as ground for characterizing YouTube's content moderation as state action. *Doe*, 2022 WL 17077497, at *2-3. The court concluded that (1) "statements by House Speaker Nancy Pelosi on possibly removing the protection provided to social media platforms under" § 230, (2) a "letter by Representative Adam Schiff" "encouraging the curbing of COVID-related misinformation on social media platforms," and (3) "a statement by Speaker Pelosi" at an academic "forum on COVID calling for greater accountability for 'the division and the disinformation proliferating online,'" were insufficient to constitute coercion as a matter of law—including because individual legislators' remarks "lack[ed] force of law, rendering them incapable of coercing YouTube to do much of anything." *See id.* at *2.[83]

---

[83] The Ninth Circuit's rejection of individual legislator remarks as legally sufficient for coercion was presaged by several prior district court decisions. *See Informed Consent Action Network v. YouTube LLC*, 582 F. Supp. 3d 712, 723 (N.D. Cal. 2022) ("publicly expressed views of individual members of Congress—regardless of how influential—do not constitute action on the part of the federal government" (quoting *Daniels v. Alphabet, Inc.*, No. 20-cv-04687, 2021 WL 1222166, at *6 (N.D. Cal. Mar. 31, 2021))); *accord Trump v. Twitter, Inc.*, 602 F. Supp. 3d 1213, 1224 (N.D. Cal. 2022) (rejecting as insufficient to plausibly allege state action "ambiguous and open-ended

Plaintiffs fare no better in attempting to rely on various congressional hearings that the legislators purportedly "used . . . as forums to advance . . . threats of adverse legislation if social-medial platforms do not increase censorship." Pls.' PFOF ¶¶ 4-7 (citing hearings on July 29, 2020; November 17, 2020; and March 25, 2021—the first two of which occurred before the Biden Administration took office). Plaintiffs' characterization of the hearings as "coercive" "overlook[s] Congress's role as an investigatory body," which includes legislative "studies of proposed laws, and 'surveys of defects in our social, economic or political system for the purpose of enabling the Congress to remedy them." *Trump v. Twitter*, 602 F. Supp. 3d at 1224 (quoting *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2031 (2020)). The statements Plaintiffs selectively quote fall "within the normal boundaries of a congressional investigation, as opposed to threats of punitive state action," *id.* at 1224, given the unarguable legitimacy of Congress "conducting investigative hearings on potential legislation," *see Schilling v. Speaker of U.S. House of Representatives*, --- F. Supp. 3d ---, 2022 WL 4745988, at *8 (D.D.C. Oct. 3, 2002) (citing, *inter alia*, *McSurely v. McClellan*, 553 F.2d 1277, 1286 (D.C. Cir. 1976)), *appeal filed*, No. 22-5290 (D.C. Cir. Nov. 4, 2022). The absence of Supreme Court decisions classifying legislative hearings as "coercing" private entities into becoming state actors is unsurprising given the leeway afforded to

---

statements to the effect that 'we may legislate' something unfavorable to Twitter or the social media sector"), *appeal filed*, No. 22-15961 (9th Cir June 28, 2022); *Abu-Jamal v. Nat'l Pub. Radio*, No. 96-cv-0594, 1997 WL 527349, at *6 (D.D.C. Aug. 21, 1997) (radio network's broadcasting decision was not state action where even if "individual members of Congress did call" network "in attempts to pressure it not to air" specified program, "not one of these people has any legal control over [network]'s actions"), *aff'd*, 159 F.3d 635 (D.C. Cir. 1998); *see also Buentello v. Boebert*, 545 F. Supp. 3d 912, 918 (D. Colo. 2021) (rejecting contention that state action doctrine applied to decision by an individual Member of Congress to block a follower of her personal Twitter account, noting that "member of Congress" holds "almost no power to act on behalf of the United States government").

legislators—including via the Speech or Debate Clause, U.S. Const. art. I, § 6, cl. 1—to explore

problems and potentially responsive enactments.

Nor could the legislators' remarks and their comments at hearings reasonably have been

understood by social media companies as "threats," when "consider[ing] the entirety of" their

"words and actions." *Zieper*, 474 F.3d at 66. The companies understand, as do the courts, that

"enacting a bill is rarely fast or easy." *Trump v. Twitter*, 602 F. Supp. 3d at 1224. And although

legislators of both political parties have proposed amendments to § 230 as the economic power

and influence of social media companies has grown sharply in the last decade, no such change has

actually been enacted. *Supra* Defs.' PFOF § I.E.

The statute could perhaps one day be amended in a manner that would "alter the

judgments" Congress "made in the past," to account for "evolution" of social media companies

since the statute became law in 1996. *Cf. Henson v. Santander Consumer USA Inc.*, 582 U.S. 79,

90 (2017) (Court did not "[d]oubt that the evolution of the debt collection business might invite

reasonable disagreements on whether Congress should reenter the field and alter the judgments it

made in the past"). But if the mere possibility of some (vague and unspecified) § 230 amendment

were enough to constitute "coercion" triggering the state action doctrine here, then state action

would be present *everywhere*. That is not the law.

Plaintiffs also err in relying (PI Supp. 16-17) on personal views expressed by FBI Assistant

Special Agent in Charge (ASAC) Elvis Chan in his master's thesis, and his testimony, that certain

social media company employees he talked with felt what he called "pressure" from inquiries made

during congressional hearings, and platform meetings with congressional staff, "after 2016." *See*

Chan Dep. 123:1-3 ("I don't recollect any of them using the specific word 'pressure,' but that was

how I interpreted our conversations."); *id.* at 125:22. No Members of Congress or legislative staff

are defendants here, so even if Plaintiffs' characterization of ASAC Chan's testimony were correct, that would not show that *Defendants* "essentially compel[led]" platform decisions. *O'Handley*, 62 F.4th at 1158. Rather, as discussed above, the Constitution does not prohibit government officials from speaking their mind on matters of public concern, or of expressing their concerns in informal conversations. Rather, government officials may permissibly make public statements and advocate for change: "[O]fficials surely must be expected to be free to speak out to criticize practices, even in a condemnatory fashion," but "[a]t least when the government threatens no sanction," any such "effort to embarrass" a private entity is not an impermissible threat. *See Penthouse Int'l*, 939 F.2d at 1015-16.

Moreover, Plaintiffs offer no evidence that the "pressure" ASAC Chan described came from legislators and staff Plaintiffs characterize as Defendants' "political allies" (PI Supp. 15).[84] And ASAC Chan did not assert that what he called "pressure" was of such moment as to amount to "coercion" under the state action doctrine—that is a fanciful legal characterization Plaintiffs attach to ASAC Chan's testimony. *Cf. Doe*, 2022 WL 17077497, at *2-3 (House Speaker comments "on possibly removing the protection provided to social media platforms" under § 230 among events found insufficient to show "state action" under compulsion or nexus theories).

Also missing is evidence that the so-called "pressure" sought to compel action against specific posts or accounts, or that it was understood by (or acted on) by any company as such. To the contrary: Asked whether social media companies "changed their practices and became more

---

[84] For example, Plaintiffs emphasize (PI Supp. 16) a statement in ASAC Chan's master's thesis (which reflected only his academic views, not the FBI's views) that an October 31, 2017 Senate Judiciary Committee hearing "provided politicians with the occasion to exert pressure on the companies to make constructive changes to their platforms" (Chan Ex. 1 at 48-49 (Dkt. 204-2)), while entirely ignoring that the pertinent Senate committee hearing was chaired by a Republican Senator, because Republicans then held the Senate majority.

active in account takedowns" after the meetings with congressional staffers, ASAC Chan answered: "No. I would not connect those two events." Chan Dep. 125:15-21. The "pressure" ASAC Chan testified about therefore did not have the effect on particular content moderation choices Plaintiffs contend it had. *See also* Defs.' Resp. PFOF ¶¶ 945-961.

ii.     Executive Branch Remarks and Actions

Also misconceived is Plaintiffs' contention that remarks from President Biden or his Administration concerning potential amendments to § 230, or raising the prospect that the growing economic power of social media companies may implicate the antitrust laws, contributed to "coercion." The Defendants here are within the Executive Branch, and could not unilaterally amend § 230, as that of course would require action by both houses of Congress and the President.

Moreover, the remarks Plaintiffs strain to depict as "coercive" did not telegraph that Defendants would press Congress to enact any particular legislation if social media companies did not intensify their content moderation. For example, Ms. Psaki said at an April 2022 news conference that "there are . . . *reforms that we think* Congress *could* take and [that] we would support taking, including *reforming* [§] 230, enacting antitrust reforms, requiring more transparency." Ex. 42 (emphasis added); Pls.' PFOF ¶ 197. But neither Ms. Psaki nor any other Defendant announced actual proposed language for any such amendment. The possibility of § 230 "reform" thus resembles the "zoning ordinance not yet drafted" that the Third Circuit in *R.C. Maxwell* ruled insufficient to support an analogy to the "criminal prosecution under existing statutes" threatened in *Bantam Books*: The mere prospect of "civil or administrative proceedings" under that undrafted ordinance, the court of appeals ruled, was an insufficient "quantum of governmental authority" to constitute "coercion." *R.C. Maxwell*, 735 F.2d at 88. Indeed, the Supreme Court has never held that government officials' references to (unspecified) statutory

"reform" (or even actual proposed legislation sent to Congress for consideration) could be "coercive." Notably, then-Missouri Attorney General tweeted himself: "Get rid of section 230 protections, treat them like common carriers, bust up #BigTech." Ex. 32. That shows Plaintiffs themselves did not behave as though government official calls for statutory reform (or even revocation) were inherently "coercive," but rather were part of a legitimate debate.

It would in any event be extraordinary to prohibit the Executive Branch from identifying concerns about the conduct of businesses within the United States and asserting that a statutory amendment might be appropriate to address those concerns, merely because such statements on matters of public concern might influence the conduct of private actors in a way that affects speech. *Cf.* U.S. Const. art. II, § 3 (the President "shall" recommend to Congress "such Measures as he shall judge necessary and expedient"); *see also Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952) (Recommendations Clause assigns President "function[]" of "recommending . . . laws he thinks wise").[85]

---

[85] The "coercion" claim cannot be sustained by extrinsic statements of Mr. Biden before taking office. This Court's ruling on the motion to dismiss accepted as plausible Plaintiffs' allegations that comments candidate Biden made in January 2020 (about potential criminal or civil liability for Facebook and its executives due to misinformation on that platform) were "coercive." *Compare* MTD Order 62 & n.203 (attributing comments to "President Biden"), *with* 2d. Am. Compl. ¶¶ 191-92 (discussing comments of "candidate" Biden) *and* Pls.' PFOF ¶¶ 20-21 (same). But precedent does not support assigning coercive effect to such candidate comments. The candidate remarks at issue here are no more consequential than those in *Trump v. Hawaii*, 138 S. Ct. 2392 (2018). In assessing an unconstitutional discrimination claim there, the Court considered but ultimately rejected "extrinsic statements—many of which were made before the President took the oath of office," where the statements did not overcome the facial neutrality of the President's rationale for his action when he was in office. *Id.* at 2418-19. Leeway for candidate rhetoric is guaranteed by the Free Speech Clause, which "has its fullest and most urgent application precisely to the conduct of campaigns for political office," *Buckley v. Valeo*, 424 U.S. 1, 15 (1976) (citation omitted). *Cf. Washington v. Trump*, 858 F.3d 1168, 1173-74 (9th Cir. 2017) (Kozinski, J., dissenting) (opining that "[n]o Supreme Court case—indeed no case anywhere that I am aware of—sweeps so widely in probing politicians for unconstitutional motives[,]" and given that "[c]andidates say many things on the campaign trail" that "are often contradictory or inflammatory," reliance on candidate's campaign statements is "unworkable").

Plaintiffs' effort to depict as coercion limitations that could be placed on social media companies under the antitrust laws is similarly incomplete and incorrect. Plaintiffs have failed to show that any decision under the antitrust statutes bears a concrete nexus to Defendants' efforts to address misinformation on social media. Tellingly, Plaintiffs omit evidence of antitrust enforcement measures proposed or taken against social media companies that well predated the tenure of many Defendants and that also predated the misinformation-focused remarks Plaintiffs paint as coercive. For example, during the Trump Administration, then-Attorney General Barr explained in a speech in December 2019: "Concerns about online platforms have come from a wide variety of stakeholders, across the political spectrum. Indeed, almost every State AG is now participating in publicly announced antitrust investigations of Google and Facebook . . . . [W]e have a good cooperative relationship in these efforts." Ex. 148 at 2 (William P. Barr, Att'y Gen., Remarks at the National Association of Attorneys General 2019 Capital Forum (Dec. 10, 2019), 2019 WL 6715208). One example of such parallel federal and state allegations of antitrust violations by an online platform is found in *Federal Trade Commission v. Facebook, Inc.*, No. 20-cv-3590 (D.D.C.) (public redacted version of under-seal complaint filed Jan. 13, 2021, before President Biden entered office). There, the FTC alleged that conduct by Facebook, including acquisition of Instagram and WhatsApp, was harmful to competition. *See FTC v. Facebook, Inc.*, 581 F. Supp. 3d 34 (D.D.C. 2022) (denying motion to dismiss amended complaint). Notably, attorneys general for multiple states, *including the two State Plaintiffs here*, brought their own action predicated on similar antitrust allegations. *See New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 13 (D.D.C. 2021) (dismissing States' action), *aff'd sub nom. New York v. Meta Platforms, Inc.*, --- F.4th ---, 2023 WL 3102921 (D.C. Cir. Apr. 27, 2023). The commencement of the FTC's suit prior to the Biden Administration, and the two Plaintiff States' participation in a multi-state

antitrust action raising similar allegations, undermines Plaintiffs' contention that proposals for antitrust enforcement against platforms are inherently coercive "threats" (whether aimed at platform content moderation choices or anything else).

Additionally, Plaintiffs' mischaracterization of § 230 as an unconstitutional subsidy akin to the one invalidated in *Norwood v. Harrison*, 413 U.S. 455 (1973), PI Supp. 50, rips that case from its context. There is of course no basis for interpreting *Norwood* as somehow dispensing with Plaintiffs' obligation to satisfy the established state action requirements under cases such as *Blum* before the acts of private social media companies can legally be attributed to Defendants. *Cf. Watts v. Northside Indep. Sch. Dist.*, 37 F.4th 1094, 1097-98 (5th Cir. 2022) (citing *Norwood* in the course of applying *Blum* and other state action precedents). The question presented in *Norwood* was not, as here, whether the State could be held responsible for the conduct of private parties. Rather, the question was whether the State's own conduct—furnishing free textbooks to segregated private schools—was itself constitutional. The Court held no, explaining "the Constitution does not permit the State to aid [racial] discrimination even when there is no precise causal relationship between state financial aid to a private school and the continued wellbeing of that school." *Norwood*, 413 U.S. at 465-66. "[T]he constitutional infirmity of the Mississippi textbook program," therefore, was "that it significantly aid[ed] the organization and continuation of a separate system of private schools which . . . may discriminate if they so desire." *Id.* at 467. Here, Defendants do not "operat[e]" or provide "significant[] aid" to private social media platforms in the first place, much less do so contrary to the affirmative constitutional obligation to refrain from racial discrimination. *See id.* at 465. Plaintiffs' reliance on *Norwood* is therefore misplaced.

### 3. Deception is not a freestanding basis for state action and is lacking here.

Next, Plaintiffs advance a newfound "deception" theory that relates only to two distinct allegations: (1) that the FBI is responsible for suppression of the Hunter-Biden laptop story; and

(2) that Dr. Fauci is responsible for suppression of a wide array of content relating to COVID-19. PI Supp. 18-29. These arguments lack merit. At the start, "deception" is not an independent legal basis for attributing a private entity's acts to the Government under the state action doctrine. Instead, it is an invention of Plaintiffs' own making, cut out of whole cloth to fit their allegations of First Amendment violations against the FBI and Dr. Fauci, which are plainly deficient under well-settled state-action doctrine. In any event, Plaintiffs' new deception theory, even if it were legally tenable, is unsupported by the record. On the contrary, the record here squarely *rebuts* Plaintiffs' allegations that the FBI or Dr. Fauci deceived (or attempted to deceive) anyone. Thus, neither the law nor the facts support Plaintiffs' First Amendment claims based on a "deception" state-action theory.

### a.  *There is no "deception" test for state action.*

Neither the Supreme Court nor the Fifth Circuit has ever recognized "deception" as an independent test for "state action." *See, e.g.*, *Bass v. Parkwood Hosp.*, 180 F.3d 234, 241-42 (5th Cir. 1999) (listing "public function," "compulsion (or coercion)," and "nexus or joint action" tests, without identifying "deception" as an independent state action test). Plaintiffs' contention that "deception" is a distinct test for state action hinges on a mischaracterization of the Ninth Circuit's decision in *George v. Edholm*, 752 F.3d 1206 (9th Cir. 2014).

In *George*, the Ninth Circuit denied summary judgment on the "state action" issue based on evidence that two policemen misrepresented the plaintiff's medical condition to a (private) doctor "with the intent of inducing" the doctor to perform an allegedly illegal cavity search of the plaintiff resulting in the discovery of a plastic baggie containing cocaine. *Id.* at 1215. Critically, "there [was] evidence . . . that [two officers] . . . physically assisted [the private party] by turning [the plaintiff] on the table and holding his legs, and that [one officer] emphasized . . . the necessity for prompt action in removing the cocaine." *Id.* at 1216. Thus, the issue for trial was whether the

policemen "provided 'significant encouragement, either overt or covert,' to [the doctor]," and "'induce[d], encourage[d] or promote[d]'" the doctor "to do what he would not otherwise have done," "such that" the doctor's "actions" were "attributable to the state," without suggesting that "deception" was a distinct basis for such a finding. *Id*. Far from analyzing the purported misrepresentations as an adequate or independent test for state action, the Ninth Circuit considered those misrepresentations in applying the same state action tests the Fifth Circuit has identified. *Compare id.* at 1215, *with Bass*, 180 F.3d at 241-42. Indeed, the Ninth Circuit only concluded that the private doctor's conduct "could be attributed to the state" because "a reasonable jury could conclude that [the officers] provided false information, encouragement, *and active physical assistance* to" the doctor. *George*, 752 F.3d at 1216 (emphasis added).

Neither *George* nor any of the other cases Plaintiffs cite suggests that evidence of misrepresentations independently suffices to show state action. To show that any social media content moderation action is attributable to some Defendant, Plaintiffs thus must satisfy one of the tests the Supreme Court *has* recognized, such as the coercion test.

> b. *The record contradicts Plaintiffs' allegations of deceit and trickery.*

In any event, the record rebuts Plaintiffs' assertions that the FBI or Dr. Fauci, on behalf of NIAID, engaged in "deception." Rather than evincing any deceptive conduct, the record shows that dedicated public servants used their knowledge and skill to provide information or other resources to the public as a whole, and private companies in particular, which social media companies may (or may not) have considered when determining whether and how to moderate certain categories of content on their platforms. Plaintiffs' characterization of the government officials' conduct as "deceitful" is, ironically, based on gross mischaracterizations of the evidence.

i.    <u>FBI</u>

Plaintiffs contend that the FBI "engaged in a campaign of deception to induce social-media platforms to censor the Hunter Biden laptop story," a contention built on two mistaken premises— that (1) the FBI "had no investigative basis" for warning platforms about hack-and-leak or hack-and-dump operations by Russian state-sponsored actors ahead of the 2020 election, and (2) platforms took content moderation measures against the "Hunter Biden laptop story" because FBI statements "left" them "with the clear impression that the Hunter Biden laptop materials were, in fact, hacked materials." PI Supp. 27-29.

First, the snippet from ASAC Chan's testimony that Plaintiffs cite, in which he stated that the FBI was "not aware of" hack-and-leak "operations that were forthcoming or impending," when viewed in proper context, neither stated nor implied that the FBI lacked an "investigative basis" for its warnings, as Plaintiffs contend. *Id.* at 27-28 (quoting Pls.' PFOF ¶ 893); *see* Chan Dep. 192:19-24. ASAC Chan testified: "[W]hat we mentioned was that there was the general risk of hack-and-leak operations, especially before the election. However, we were not aware of any hack-and-leak operations that were forthcoming or impending." Chan Dep. 192:19-24. Plaintiffs lack any ground for arguing that the "general risk" ASAC Chan described was an inadequate basis for FBI's general warnings to social media companies about the potential risk of hack-and-leak operations. Nor is there evidence the FBI misstated the basis for its warnings.

"Investigative basis" is an amorphous term Plaintiffs do not attempt to define, but in any event, the FBI did have a factual basis for the 2020 warnings. Start with the indictment the Government obtained in 2018 against 12 members of the GRU, a Russian Federation intelligence agency within the Main Intelligence Directorate of the Russian military, for committing federal crimes intended to interfere with the 2016 U.S. presidential election: Those GRU members

engaged in a well-documented effort to hack into the computer networks of the Democratic Congressional Campaign Committee, the Democratic National Committee, and the presidential campaign of Hillary Clinton, and then released that information on the internet. *See, e.g.*, Ex. 135. Because Russia had pursued a hack-and-dump effort in 2016, the FBI viewed it as "possible" Russia would do so again in 2020. Chan Dep. 221:3. The FBI's warnings reflected an abundance of caution given the skills of the Russian hackers shown in 2016. *Supra* Defs.' PFOF § II.H.1; Chan Dep. 173:18-174:13, 203:16-204:1, 208:7-12. The record does not support Plaintiffs' apparent assumption that the FBI's 2020 warnings were improper because the risk of a repetition was zero or negligible. And Plaintiffs do not even attempt to justify their further assumption that such warnings would *only* have been appropriate if the risk of recurrence of hack-and-dump efforts was so high as to be "*impending*." PI Supp. 37 (emphasis added); *see also* Defs.' Resp. PFOF ¶¶ 880, 893.

Plaintiffs also fail to address (let alone explain), statements during the Trump Administration that place the allegedly improper warnings Chan described in proper context. President Trump in 2018 declared an emergency to deal with the unusual and extraordinary threat presented by "the ability of persons located . . . outside the United States to interfere in or undermine public confidence in United States elections, including through the unauthorized accessing of election and campaign infrastructure *or the covert distribution of propaganda and disinformation*." 83 Fed. Reg. at 46,843 (emphasis added). He repeated that finding twice, including on the eve of the 2020 election. 84 Fed. Reg. 48,039; 85 Fed. Reg. 56,469. "The Russian effort to influence the 2016 presidential election," then Deputy Attorney General Rod J. Rosenstein noted in a July 2018 speech, "is just one tree in a growing forest. Focusing merely on a single election misses the point. As [Director of National Intelligence Dan Coats] made clear, 'these

actions are persistent, they are pervasive, and they are meant to undermine America's democracy on a daily basis, regardless of whether it is election time or not.'" Ex. 149 at 2 (Rod J. Rosenstein, Deputy Att'y Gen., Remarks at the Aspen Security Form (July 19, 2018), 2018 WL 3471764). Multiple Cabinet agencies went on to explicitly state in March 2020 that "foreign actors continue to try to influence public sentiment and shape voter perceptions," and that "[t]hey spread false information and propaganda about political processes and candidates on social media in hopes to cause confusion and create doubt in our system." Ex. 132 (joint statement of Mar. 2, 2020). Another announcement in September 2020 sought to "raise awareness of the potential threat posed by attempts to spread disinformation regarding the results of the 2020 elections." That statement noted that "[f]oreign actors and cybercriminals could create new websites, change existing websites, and create or share corresponding social media content to spread false information in an attempt to discredit the electoral process and undermine confidence in U.S. democratic institutions." Ex. 133 (FBI and CISA announcement of Sept. 22, 2020).

Although those statements did not use the hack-and-dump jargon, they show that FBI and other agencies raised serious concerns about foreign influence operations ahead of and close in time to the 2020 election, further undermining Plaintiffs' notion that the FBI's more particularized warnings to platforms about potential hack-and-dump operations before the 2020 election were somehow improper.

Second, the record shows the FBI did not raise the "Hunter Biden Laptop Story" in its warnings before October 14, 2020, when the *New York Post* "broke" that story. Rather, the record establishes that Twitter made the independent and temporary decision to limit circulation of the *New York Post* story on its platform, and that the decision did not involve the FBI in any way. *Supra* Defs.' PFOF § II.H.2. Other than one inquiry by a Facebook analyst about what the FBI

could "share" about the Hunter Biden investigation after the *New York Post* published its story, and the FBI's "no comment" response, ASAC Chan was not aware of any communications related to the Hunter Biden Laptop Story between the FBI and Facebook, Chan Dep. 233:22-234:3, Twitter, *id.* at 233:8-21, Apple or Microsoft, *id.* at 234:6-7, or any other platform, *id.* at 234:4-5.

Plaintiffs heavily rely on statements made in a declaration that Yoel Roth, Twitter's former Senior Director for Trust and Safety, submitted to the Federal Elections Commission (FEC) in 2020. Plaintiffs emphasize (PI Supp. 38) Mr. Roth stated in that 2020 declaration that, in "regular meetings" he attended with the FBI and other agencies "and industry peers regarding election security," he had "learned" that "there were rumors that a hack-and-leak operation would involve Hunter Biden." Chan Ex. 8 (Roth Decl.) ¶¶ 10-11 (Dkt. 204-5). But Mr. Roth did not say in his 2020 declaration from whom he heard those rumors; much less did he attribute them to Government personnel. And Mr. Roth has clarified, in sworn congressional testimony in 2023, that he intended the declaration to state that another social media company, rather than the Federal Government, mentioned at a meeting that there was the possibility of a hack and leak operation concerning Hunter Biden. Mr. Roth explained that the Federal Government did not share that perspective or provide information to Twitter concerning this issue, emphasizing that his 2020 declaration "does not suggest that the FBI told [him] it would involve Hunter Biden." Ex. 2 at 43; *see also id.* at 37, 46. Similarly, ASAC Chan's testimony that he did not discuss the Hunter Biden Laptop Story with Facebook before October 14, 2020 reinforces the statement in the October 25, 2022 letter by Meta's counsel to this Court that "ASAC Chan at no point in time advised Meta 'to suppress the Hunter Biden laptop story.' Nor did any of his colleagues." Dkt. 96 at 2 (Ex. A).

The recent congressional testimony also refutes Plaintiffs' assertion that the FBI in 2020 "induced" revisions to platform hacked materials policies or the application of those policies to

the "Hunter Biden Laptop Story." PI Supp. 27. Twitter grounded its decisions concerning the *New York Post* story on a 2018 policy that "prevent[ed] Twitter from being used to spread hacked materials," but decided within 24 hours that its initial decision was wrong and removed the restrictions. Ex. 137 at 5-6; Ex. 2 at 5; *see also* Defs.' Resp. PFOF ¶¶ 880-904, 1083-1087.

ii.    <u>Dr. Fauci, in his prior role as the Director of NIAID</u>

As with the FBI, Plaintiffs' arguments regarding Dr. Fauci, in his prior role as Director of NIAID, are legally and factually meritless. Again, "deception" is not a cognizable basis for finding state action. The record is also utterly lacking factual support for Plaintiffs' "deception" theory involving Dr. Fauci.

Plaintiffs assert that Dr. Fauci worked with former NIH Director Dr. Francis Collins or other Biden Administration officials to "orchestrate[] a series of campaigns of deceit to procure the censorship of viewpoints he disfavored on social media." PI Supp. 19. Ultimately, Plaintiffs' allegations amount to nothing more than a disagreement with the correctness of Dr. Fauci's or other scientific experts' conclusions about the origin, treatment, or prevention of COVID-19. They have nothing at all to do with content moderation on social media platforms, let alone violations of the First Amendment.

Indeed, Plaintiffs spend *seven pages* on arguments about (1) Dr. Fauci's involvement in internal discussions among an international group of virologists about the origins of COVID-19, (2) whether Dr. Fauci correctly concluded that hydroxychloroquine is not an effective treatment for COVID-19, (3) Dr. Fauci's views on the efficacy of face masks, (4) Dr. Fauci's criticism of the "focused protection" strategy espoused by the Great Barrington Declaration, and (5) Dr. Fauci's public expression of "horror" at people cheering over refusing a life-saving vaccine. PI Supp. 19-27. Strikingly absent from these discussions is any allegation that Dr. Fauci ever publicly

or privately spoke to any social media company about his views on the above issues—let alone that he did so in a manner that could be considered threatening or coercive (or "deceptive"). In fact, Dr. Fauci testified time and time again that he has never asked a social media company "to remove misinformation from one of [its] platforms," Fauci Dep. 152:21-24, and indeed does not "pay attention to what social media organizations like Google and YouTube and Twitter . . . do," *id.* at 239:21-24.[86] And despite Plaintiffs' voluminous filings, they have provided no evidence to rebut this testimony.

So what is the resulting state action, and First Amendment violation, arising from Dr. Fauci's internal discussions and public comments about COVID-19? According to Plaintiffs: "*[s]ocial media platforms . . . follow[ing]* Dr. Fauci's lead," "accepting [Dr. Fauci's] proclamation[s]" as to the "scientific consensus," and choosing to "censor[]" content on their platforms that ran counter to that consensus. PI Supp. 25 (emphasis added). But the social media companies' decisions to consider the conclusions of Dr. Fauci and other scientific experts when

---

[86] *See also* Fauci Dep. 99:5-9 ("You know, I'm so dissociated from social media. I don't have a Twitter account. I don't do Facebook. I don't do any of that, so I'm not familiar with that. I've never gotten involved in any of that."); *id.* at 210:3-8 ("So social media stuff, I don't really pay that much attention to."); *id.* at 213:13-16 ("Like I said, my association with social media is almost zero. I don't have an account. I don't tweet. I don't pay attention to social media. I wouldn't know how to access a tweet if you paid me."); *id.* at 235:21-22 ("I don't get involved in social media stuff."); *id.* at 241:6-13 ("I do not get involved in any way with social media. I don't have an account, I don't tweet, I don't Facebook, and I don't pay attention to that. . . . I don't pay attention to what gets put up and put down on social media."); *id.* at 241:23-242:1 ("I don't pay attention to social media issues. That's something I don't do. I don't follow it. I don't have an account. I don't follow it."); *id.* at 280:3-7 ("I'm not aware of anything being censored. Like I said multiple times—and I'll repeat it again—I don't follow what goes on social media, censoring or otherwise. That's not something that I pay attention to."); *id.* at 281:24-282:2 ("I don't pay attention to that whole culture of social media censoring or not censoring. I've said that maybe 50 times today. That's not what I do."); *id.* at 312:8-9 ("I really don't get involved in social media issues."); *id.* at 357:8-13 ("My way of countering false information, and I've been on the record multiple times as saying that, is that my approach is to try to [] flood the system with the correct information as opposed to interfering with other people's ability to say what they want to say.").

determining what content to allow on their platforms does not make Dr. Fauci (or any other scientist) legally *responsible* for those decisions, *Blum*, 457 U.S. at 1004, and certainly does not amount to a First Amendment violation. A contrary conclusion would have far-reaching, and dangerous, ramifications. Accepting this theory of state action in the First Amendment context would mean that any time a government official expresses views or gives scientific advice, the official could be in danger of violating the First Amendment if a social media company simply considers those views or advice in its own decision-making process. Yet neither NIAID nor any other agency may presume to control whether or how a social media company, or any other third party, uses the health information that it makes public. To avoid running afoul of the First Amendment, then, NIAID—which is tasked with "advanc[ing] the understanding, diagnosis, and treatment of many of the world's most intractable and widespread diseases," including "tuberculosis and influenza, HIV/AIDS," and COVID-19, *see* Ex. 86—would have to refrain from promoting critical health information that can save lives. It would be precluded from carrying out its statutory purpose to "conduct and support . . . research, training, *health information dissemination*, and" participate in "other programs with respect to" such diseases. 42 U.S.C. § 285f (emphasis added); *see also id.* § 284(b)(1)(F) (granting NIAID authority to "develop, conduct, and support public and professional education and information programs"). Plaintiffs' proposed "deception" theory of state action must be rejected for this reason alone. *See Summum*, 555 U.S. at 467 (a government entity "is entitled to say what it wishes" (citation omitted)).

Indeed, it is worth noting that Plaintiffs seem to have constructed their amorphous deception theory—articulated for the very first time in their supplemental brief, despite Dr. Fauci being named in the original complaint in May 2022—to account for the complete absence of any evidence of communications between Dr. Fauci and social media companies about

misinformation. Earlier in this case, in justifying the deposition of Dr. Fauci, Plaintiffs claimed that "Dr. Fauci is *directly involved* in multiple, far-reaching social-media censorship campaigns against so-called COVID-19 'misinformation.'" Joint Stmt. Regarding Witness Depositions at 5 (Dkt. 86) (emphasis added). In seeking Dr. Fauci's deposition, Plaintiffs expressed skepticism about the accuracy of NIAID's interrogatory responses indicating that Dr. Fauci did not have any direct communications with social-media platforms about "censorship"; Plaintiffs insisted that, contrary to those responses, Dr. Fauci "acted on behalf of others" in procuring "social media censorship." *Id.* at 10. Now, tacitly acknowledging that Dr. Fauci's deposition testimony failed to substantiate those assertions, Plaintiffs abandon them for an invented theory that turns not on Dr. Fauci's interactions with social media companies (or any other relevant facts) but instead on unfounded speculation that Dr. Fauci sought to deceive the public about COVID-19. Yet the very notion that Dr. Fauci, together with highly respected scientists from around the world, orchestrated a "campaign to deceive" anyone—including social media companies—is built on distortions of the evidence and baseless attacks on Dr. Fauci's credibility stemming from his testimony on matters irrelevant to Plaintiffs' First Amendment claim.

§   *The Origins of COVID-19.* Plaintiffs' primary "deception" theory is that Dr. Fauci worked with former NIH Director Dr. Francis Collins[87] and an official from a British research organization (Dr. Jeremy Farrar[88]) to "discredit and suppress the opinion that SARS-CoV-2, the virus that causes COVID-19, leaked from a laboratory at the Wuhan Institute of Virology[.]" PI Supp. 19. According to Plaintiffs, the alleged conspiracy formed during a purportedly "clandestine . . . call" on February 1, 2020, during which the participants allegedly entered into a plan to

---

[87] Dr. Collins stepped down as Director of NIH in December 2021. Ex. 151 at 1 (*A Farewell to Dr. Francis Collins*, Nat'l Insts. of Health (Dec. 16, 2021), https://perma.cc/5Q48-NJAD).

[88] Dr. Farrar does not work for the United States Government and is not a Defendant in this case.

"manufacture the appearance of scientific consensus against the lab-leak theory," *id.* at 21, which

culminated in the publication of a research article by non-federal officials refuting that theory—

all for the "purpose of . . . suppress[ing] the lab leak theory in both 'main stream and social

media,'" *id.* at 24 (citation omitted). Plaintiffs contend that the "conspiracy succeeded" when

social media platforms decided to "aggressively censor[] the lab-leak theory well into 2021." *Id.*[89]

To support this accusation, Plaintiffs misconstrue internal discussions documented in email

exchanges between Dr. Fauci and other scientists in early 2020. That correspondence flatly

contradicts Plaintiffs' deception theory. The record shows that, on February 1, 2020, Dr. Jeremy

Farrar invited a group of international scientists (including Dr. Fauci and Dr. Collins) to participate

in a call later that day. *See* Fauci Ex. 8 at 9-10 (Dkt. 206-9). The invitation stated that the

"[i]nformation and discussion" was to be "shared in total confidence and not to be shared until

agreement on next steps." *Id.* at 10. Contrary to Plaintiffs' characterization of this instruction, it

plainly does not suggest that the call was meant to be "clandestine." PI Supp. 21. On the contrary,

the point was to allow for an initial convening of an "ad hoc group" to "air some thoughts" about

the participants' "current understanding" of the scientific data—while also identifying "the many

gaps in [their] knowledge"—with the aim of obtaining a "broader range of input" going forward.

---

[89] Plaintiffs' use of the phrase "lab-leak theory" implies that there is only one theory concerning how SARS-CoV-2, the virus that causes COVID-19, may have emerged from a laboratory in Wuhan, China. In fact, multiple diverging "lab-leak" theories have emerged. One theory is that SARS-CoV-2 was intentionally engineered in a laboratory and deliberately or accidentally released. Another is that SARS-CoV-2 was inadvertently created in a lab during serial passage experiments and accidently spread beyond the lab. Yet another is that SARS-CoV-2 naturally occurred in the wild, was being studied in a lab, and was accidentally spread beyond the lab by infected researchers. *See* Pls.' Jones Decl. Ex. AA at 6 ("Those suspecting a lab-related incident point to an array of possible scenarios, from inadvertent exposure of a scientist during field research to the accidental release of a natural or manipulated strain during laboratory work."); Ex. 99 (Joel Achenbach, *What we know about covid-19's origins, and what is still a mystery*, Wash. Post (Mar. 1, 2023)) (discussing "versions of the lab leak theory").

Fauci Ex. 8 at 9 (Dkt. 206-9). Thus, the group's next step after the call, according to Dr. Farrar, was to encourage "a body like the WHO . . . to ask or commission a group of scientists from around the world to ask [a] neutral question[:] 'To understand the evolutionary origins of 2019-nCoV[.]" *Id.* at 5. "In other words," the goal was to develop "a completely open minded and neutral question" relating to the origins of COVID-19 and commission "the best minds" to consider it, "under the umbrella of a respected international agency." *Id.* at 10. Doing so was "important for this epidemic and for future risk assessment and understanding of animal/human coronaviruses." *Id.* at 5.

Most participants on the call also believed that a broader group should convene immediately, before the question of COVID-19's origins became "polari[z]ed" and "people . . . start[ed] to look to who to blame"—which could "increase tension and reduce cooperation" necessary for objective inquiry. Fauci Ex. 8 at 7 (Dkt. 206-9). That would undermine the group's shared goal of "really continu[ing] to pursue what actually happened in order to prepare for and prevent similar things from happening in the future." Fauci Dep. 102:13-103:7.[90] For instance, Dr. Farrar noted that, already, "questions [we]re being asked by politicians, . . . in the scientific literature, [and] certainly on social and main stream media." Fauci Ex. 8 at 7 (Dkt. 206-9). Thus, he found it imperative for a group to convene without delay "to consider the evolutionary origins of [the virus], with an open mind, neutral, and in a transparent way[.]" *Id.* In his view, immediate objective analysis might "prevent wild claims being made." *Id.* That was so even if the issue "remain[ed] grey" after a group convened. *Id.* at 3. Dr. Farrar believed that even "grey, from a respected group, under the umbrella of let us say WHO, would in itself help!" *id.*

---

[90] Others identified another reason for urgency in addition to discovering the source of the virus: if the virus did come from a "non-human host, pre-adapted, it [could] threaten control efforts through new zoonotic jumps." Fauci Ex. 8 at 6 (Dkt. 206-9).

After the call, the group continued internal discussions about various theories surrounding COVID-19's origins. Their email exchanges reflect a shared desire for "open minded and neutral" scientific inquiry, *id.* at 10, as several virologists voiced competing initial views on the theories surrounding the origins of the COVID-19 virus. Some opined that "a non-natural origin of 2019-nCoV is highly unlikely at present," *id.* at 7; others stated that they favored the view that the virus originated through events a laboratory, *id.* at 3-4; and others responded that their view "[wa]s completely neutral," *id.* at 7. Dr. Collins, for his part, conveyed that he "hadn't given much consideration to the idea of lab-based evolution by tissue-culture passage" that one scientist presented, and he agreed that the idea "[wa]s worth including on the list of options" to be examined. *Id.* at 3. And as Dr. Kristian Andersen expressed in another email to Dr. Fauci and Dr. Farrar, while "some of the features" of the virus "(potentially) look[ed] engineered" on an initial review of the data, he believed it was important to "look very critically at" the issue and "there [we]re still further analyses" to be done, so "opinions could still change." Fauci Ex. 6 at 1 (Dkt. 206-7). Amidst the uncertainty, what was clear to the participants was that the issue was "very complex," Fauci Ex. 8 at 5 (Dkt. 206-9), that they alone did not have all the answers, *id.* at 9, and that opinions could evolve as new information was considered, *id.*

Dr. Fauci's participation in these discussions was limited. He apparently did not respond at all to the email exchanges involving the entire group on the call or share his thoughts on the origins of COVID-19. Instead, he emailed Dr. Farrar separately on the afternoon of February 2, 2020, to apologize for taking "so long to weigh in on [Dr. Farrar's] e-mails," and to convey only that he agreed with the urgency of convening a broader group. *Id.* at 2 (including Dr. Collins and another NIH employee on the email). "Like all of us," Dr. Fauci wrote, "I do not know how this evolved, but given the concerns of so many people and the threat of further distortions on social

media, it is essential that we move quickly. Hopefully, we can get WHO to convene." *Id.*; *see also* Fauci Dep. 126:13-18 ("[T]he theme of everything that was going on at the time" was to "get WHO moving on getting the convening . . . so that evidence and data could be openly discussed."). That Dr. Fauci did not weigh in on the substantive question of the virus's origin is entirely consistent with his deposition testimony. He testified that, because he is "not an evolutionary virologist," he is "not qualified . . . to make any kind of definitive determination about whether a genome could or could not be a laboratory construct or experimentally manipulative." *Id.* at 121:22-122:2. Accordingly, he "relied, as anyone would, [on] highly qualified, respected evolutionary virologists" to examine the evidence. *Id.* at 122:3-5.

Separately, and around the same time as the February 1, 2020 call, Dr. Andersen and four other expert virologists (two of whom may have been included on Dr. Farrar's invitation to the February 1 call[91]) were looking into the issue further and developing a research paper with their analysis.[92] Their paper, titled "The Proximal Origin of SARS-CoV-2," was eventually published in Nature Medicine, a scientific journal,[93] on March 17, 2020. Fauci Ex. 24 at 3 (Dkt. 206-25) (with link to online publication). The paper stated that "[o]ur analyses clearly show that SARS-CoV-2 is not a laboratory construct or a purposefully manipulated virus." *Id.* at 1.

---

[91] Co-authors Dr. Andrew Rambaut (located in Edinburgh, UK) and Dr. Edward Holmes (in Sydney, Australia) are on the email chain following the February 1 call. Fauci Ex. 6 at 9 (Dkt. 206-7).

[92] Plaintiffs allege that these virologists only began drafting their paper after the February 1 call, PI Supp. 21, but there is no evidence in the record indicating when the authors began their research. The evidence actually suggests that Dr. Andersen and Dr. Holmes were considering the issue and examining the data before the February 1 call. *See* Fauci Ex. 6 at 1 (Dkt. 206-7) (January 31, 2020 email from Dr. Andersen informing Dr. Fauci of his initial impressions in advance of the call, referring to an article that quotes him and Dr. Holmes).

[93] "*Nature Medicine* is a monthly journal publishing original peer-reviewed research in all areas of medicine on the basis of its originality, timeliness, interdisciplinary interest and impact on improving human health. . . . All editorial decisions are made by a team of full-time professional editors." Ex. 152 at 1 (*Journal Information*, Nature Medicine, https://perma.cc/2MD3-H6SV).

Before the article's publication, Dr. Farrar had forwarded several drafts of the paper, which Dr. Holmes had sent to him, to Dr. Fauci and Dr. Collins. As with the email discussions after the February 1 phone call, Dr. Fauci testified that he had "very little input into" those drafts. Fauci Dep. 196:1-8. As Dr. Fauci explained, he would not have had much input because they "involve[d]" issues of "very complicated evolutionary virology of which [he is] not an expert." *Id.* at 124:9-14.[94] Indeed, the record contains no evidence that Dr. Fauci ever responded to Dr. Farrar's emails with any substantive input on the drafts.[95]

These are the facts on which Plaintiffs attempt to build their claim against Dr. Fauci. But the facts contradict Plaintiffs' assertion that there was a "clandestine" call whose participants formed a conspiracy with the "stated purpose" of "suppress[ing] the lab-leak theory" on "social media." PI Supp. 24. On the contrary, the facts show that a group of international virologists sought to urgently and openly investigate "what actually happened" to cause the COVID-19 virus, before politics or the spread of unfounded theories in mainstream media and social media interfered with the objective inquiry needed to properly combat the virus and defend against the risk of future

---

[94] *See also* Fauci Dep. 114:4-15 ("I remember getting a paper and looking at it. I don't believe I had any substantive comments on it, just by reading it. Because that's not my lane, evolutionary virology."); *id.* at 120:10-20 ("My recollection is I really didn't have any meaningful comments on [the draft] because it . . . would be involved in a lot of complicated evolutionary virology that is not my lane."); *id.* at 124:21-24 ("I might have looked at [the draft], but I certainly didn't make any meaningful comments since this is outside of my lane of expertise."); *id.* at 127:10-13 ("Again, I had very little input or even interpretation of the . . . information because it was in an area that is not my area of expertise.").

[95] Plaintiffs assert that Dr. Andersen thanked Dr. Fauci for his "advice and leadership" in an email and suggest that provides evidence that Dr. Fauci played a significant role in the drafting of the paper. PI Supp. 23. But the cited email shows nothing of the sort. The cited email is from Dr. Andersen to Drs. Farrar, Fauci, and Collins. In it, Dr. Andersen thanks all of them for their "advice and leadership as we have been working through the SARS-CoV-2 'origins' paper," and informs them "that the paper was just accepted by Nature Medicine and should be published shortly (not quite sure when)." Fauci Ex. 22 at 1 (Dkt. 206-23). Dr. Andersen also shares "the accepted version" of the paper in order to "keep [them] in the loop[.]" *Id.*

outbreaks. Fauci Dep. 102:22. The facts show no agreement to attempt to "suppress" speech on any medium that promoted any particular theory of the virus's origins.

Importantly, Plaintiffs reference not a single public or private communication by Dr. Fauci or anyone else about the "lab-leak" theory that was directed, publicly or privately, at a social media company. Instead, Plaintiffs pin the culmination of the alleged conspiracy to deceive on the following public and private statements: *First*, roughly one week after the article's publication, Dr. Collins wrote on the "NIH Director's Blog" online that the article refuted "outrageous claims that the new coronavirus causing the pandemic was engineered in a lab and deliberately released to make people sick." *See* Fauci Ex. 25 at 1 (Dkt. 206-26). *Second*, in April 2020, Dr. Fauci responded to an email from Dr. Collins expressing concern about the "growing momentum" of the theory that COVID-19 started in a lab, Fauci Ex. 27 at 1-2 (Dkt. 206-28), with, "I would not do anything about this right now. It is a shiny object that will go away in times." *Id.* at 2. *Third*, and also in April 2020, Dr. Fauci was asked at a White House press conference to address "concerns that th[e] virus was somehow manmade, [and] possibly came out of a laboratory in China," Fauci Ex. 28 at 2 (Dkt. 206-29); he responded by explaining that a recent study by "highly qualified evolutionary virologists" found that the data were "totally consistent with a jump of a species from an animal to a human." *Id.*[96] After the press conference, one member of the press reached out to Dr. Fauci's office to obtain a copy of the study Dr. Fauci was referring to, and Dr. Fauci passed along three "links to the scientific papers and a commentary about the scientific basis of the origins of SARS-CoV-2," including a link to "The Proximal Origin of SARS-CoV-2." Fauci Ex. 29 (Dkt. 206-30).

---

[96] At the press conference, then-President Trump followed up after a brief line of questioning directed at Dr. Fauci by saying that he was "very satisfied with the decision [the Administration] made" to "listen[] to experts" and "many others." Fauci Ex. 28 at 3 (Dkt. 206-29). Had the Administration not done so, the President said, "we could have lost more than 2 million people. I really believe that." *Id.*

These statements, most of which simply promote information, and none of which was directed at a social media company, hardly show any effort to "suppress" the "lab-leak theory" on social media.

This evidence contradicts every premise on which Plaintiffs construct their novel and legally unsupported "conspiracy to deceive" narrative. That narrative is built on fiction, not fact. *See also* Defs.' Resp. PFOF ¶¶ 598-756. Plaintiffs resort to baseless and irrelevant attacks on Dr. Fauci's credibility. Woven throughout their elaborate reconstruction of the events is a request for the to Court disregard Dr. Fauci's testimony as "not credible," and, presumably, to accept Plaintiffs' factually unsupported retelling of the events instead. *See* PI Supp. 20. Plaintiffs' sole argument against Dr. Fauci's credibility—that he, like any other deponent, responded with some variation of "I do not recall" in his deposition when he did not recall the answer to a question, *id.*—is spurious. Plaintiffs obscure the details that Dr. Fauci could not recall by referring, without elaboration, to a long string cite to paragraphs of their proposed findings of fact. *Id.*[97] Following the trail from that string cite to the deposition transcript reveals that the details Dr. Fauci could not recall were irrelevant and trivial matters such as: when and where he met a scientist years ago, Fauci Dep. 32:32-33:3; when he became aware of a particular article in 2020, *id.* at 31:21-32:3; who was copied on an email sent three years ago, *id.* at 55:5-8; whether he recalled, from eight years ago, the initiation of a grant he was not responsible for approving, *id.* at 21:21-22:23; what he remembered saying in a televised interview in July 2021, *id.* at 340:25, 342:13-18; and whether he was aware of communications between social media companies and other federal officials in which Dr. Fauci was not personally involved, *id.* at 328:20-329:7, among other immaterial matters.

---

[97] Elsewhere, Plaintiffs make the same accusation by simply citing nearly *the entire deposition transcript*. PI Supp. 20 (citing Pls.' PFOF ¶ 620, in turn citing Fauci Dep. 22:21-352:18).

That Dr. Fauci—then responsible for running NIAID, with an annual budget of more than $6 billion, 2,000 employees, and 1,300 funded principal investigators—could not remember these irrelevant and trivial details is unremarkable.[98] In any litigation, even as to relevant information, witness "memories fade" "with the passage of time." *Star Sys. Int'l Ltd. v. Neology, Inc.*, No. 4:18-CV-00574, 2019 WL 679138, at *2 (E.D. Tex. Feb. 19, 2019) (citation omitted).

Plaintiffs do not explain how Dr. Fauci's failure to remember such minutiae from between two and eight years ago "contradicts the documentary evidence" or otherwise undermines his credibility. Plaintiffs fail to substantiate their very serious suggestion that Dr. Fauci—who was testifying under oath—was deliberately withholding information. An unadorned string cite to their brief does not suffice. Nor does their submission of a cut and spliced audio-recording of Dr. Fauci's deposition, which removes all context in which to assess his testimony and Plaintiffs' serious accusations against him. If the Court chooses to watch the audiovisual-recording of Dr. Fauci's deposition, Defendants urge the Court to watch the *full* recording—which shows Dr. Fauci making a concerted effort to answer each question as thoroughly as possible, and provide as many details as possible, even where his memory is hazy (despite being repeatedly cut off or instructed to provide *less* information by opposing counsel, *see* Fauci Dep. 47:5-21 ("paus[ing]" Dr. Fauci's answer regarding details of the February 1, 2020 call and asking him "not to go off on . . . a tangent"); *id.* at 127:13-128:8 (interrupting Dr. Fauci's response to counsel's questions relating to the receipt of a draft research paper); *id.* at 134:6-135:12 (interrupting Dr. Fauci's answer "provid[ing] context" about an email he sent to Dr. Farrar).

---

[98] *See also* Defs.' Resp. PFOF ¶¶ 609, 612, 620, 628-630, 636, 642, 647, 651, 662-664, 666-668, 670, 685, 686, 690, 7702, 703, 708, 710, 722, 730, 733, 737, 746, 750, 753, 766, 772, 789, 798, 805, 807-809, 825, 849, 890-892.

In any event, Plaintiffs' baseless attacks on Dr. Fauci's credibility do not fill the gaping holes in their legally unsupported deception theory, which the evidence contradicts.

§ *Other COVID-19-related topics.* The remaining narratives supporting Plaintiffs' deception theory are likewise built on a contortion of the record and have nothing to do with content on social media platforms—and everything to do with Plaintiffs' substantive disagreement with the conclusions and recommendations of Dr. Fauci and other scientific experts, which is irrelevant to their First Amendment claim. Plaintiffs allege that, "[h]aving succeeded so dramatically in suppressing the lab-leak theory through deception, Dr. Fauci," in coordination with others, "continued . . . the same tactic of deceptively creating a false appearance of scientific consensus to procure the censorship of disfavored viewpoints on social media." PI Supp. 24. In support, Plaintiffs lodge a series of complaints about Dr. Fauci's views on issues such as the effectiveness of facemasks or particular treatments for COVID-19, among other things.

But none of Dr. Fauci's publicly or privately expressed views has any connection to speech on social media. Plaintiffs do not allege that Dr. Fauci discussed any of his views with a social media company, or that he demanded any company moderate content opposed to his views. Nor do Plaintiffs allege that a social media company made any particular content moderation decision because of any such demand. Instead, they assert that social media companies' content moderation decisions were consistent with (or "followed") Dr. Fauci's publicly expressed views on various matters. PI Supp. 24-25. Yet the mere fact that social media companies may have considered the public statements of Dr. Fauci (or any other civil servant) in making their own decisions about what content to allow on their platforms does not suggest that Dr. Fauci intended to *deceive* any company into moderating content on its platform in a manner consistent with his views. *See* Defs.' Resp. PFOF ¶¶ 757-776 (regarding efficacy of hydroxychloroquine), 777-808 (regarding the Great

Barrington Declaration), 828-39 (masking), 840-852 (Alex Berenson). That is particularly so considering Dr. Fauci's repeated testimony that he does not "pay attention to social media" Fauci Dep. 213:13-16. Rather, as Dr. Fauci testified, his "approach" to "countering false information," "is to try to [] flood the system with the correct information as opposed to interfering with other people's ability to say what they want to say." *Id.* at 357:8-13. And he is entitled to take that approach. As the former Director of NIAID and Chief Medical Advisor to the President, Dr. Fauci was "entitled to say what [he] wishes . . . and to select the views that [he] want[ed] to express[.]" *Summum*, 555 U.S. at 467-68 (citations omitted). Finding that Dr. Fauci's publicly (or privately) expressed views render him "*responsible* for," *Blum*, 457 U.S. at 1004, the decision of a social media company and thus violates the First Amendment would, ironically, transform the First Amendment into a tool for muzzling routine government speech.

*   *   *

In short, Plaintiffs' attempt to impugn the character of these public servants is built on a distortion of the factual record that, ultimately, is irrelevant to their First Amendment claims. Plaintiffs fail to show any likelihood of success on the merits of their newly constructed "deception" state-action theory, which lacks any factual or legal basis. A preliminary injunction against the FBI or NIAID on this basis is unwarranted.

### 4. Plaintiffs fail to show that any Defendant jointly participated in any particular content moderation decision.

Additionally, Plaintiffs contend that various Defendants acted as "joint participants" with, and both "conspired" and "colluded" with, social media companies, and so those companies content moderation decisions amount to state action. PI Supp. 29. As discussed below, Plaintiffs' supporting facts are unsupported by the record and otherwise do not establish the type of joint action necessary to hold the Government responsible for private conduct.

213

To meet the state action requirement via the joint action test, a plaintiff must show that "the government act[ed] jointly with the private entity." *Manhattan Cmty. Access Corp.*, 139 S. Ct. at 1928 (citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941-42 (1982)). As with every other formulation of the state-action tests, the joint action inquiry "begins by identifying the specific conduct of which the plaintiff complains." *Moody*, 868 F.3d at 352 (quoting *Cornish*, 402 F.3d at 550); *Cornish*, 402 F.3d at 550 (requiring the plaintiff to "establish 'a sufficiently close nexus between the State and *the challenged action*,"—there, the termination of the plaintiff's employment—"of the regulated entity" (quoting *Blum*, 457 U.S. at 1004)). The plaintiff must then show that, as to that particular private action, the Government "so far insinuated itself into a position of interdependence with the [private actor] that it was a joint participant in the enterprise." *Bass*, 180 F.3d at 242 (quoting *Jackson*, 419 U.S. at 357); *see also Howard Gault Co. v. Tex. Rural Legal Aid, Inc.*, 848 F.2d 544, 555 (5th Cir. 1988) (state action found where there was "heavy participation" by the government in private decisions such that the "activities of the State" and the private parties were "interlocking"). In other words, the Government must have played an "indispensab[le]" and "meaningful role in the mechanism leading to the disputed act." *Frazier v. Bd. of Trs. of Nw. Miss. Reg'l Med. Ctr.*, 765 F.2d 1278, 1287-88 (5th Cir.), *amended*, 777 F.2d 329 (5th Cir. 1985). This standard cannot be not satisfied based only on the private party's "generalized relation with the state." *Id.* at 1287. Instead, "the state" must have played an "affirmative role[]" in the particular conduct underlying the plaintiff's "grievance." *Id.* at 1286.

In addition, the plaintiff must show that the joint action flowed from an agreement between a private party and government official to achieve the "specific conduct of which the plaintiff complains." *Moody*, 868 F.3d at 352-54 ("conspiracy or joint action" tests failed where those circumstances were lacking) (citation omitted). Applying that standard here, there is no meeting

of the minds, and thus no state action, where a social media company independently applies its terms of service to moderate content on its platform. *See O'Handley*, 62 F.4th at 1156 (holding that because "Twitter acted in accordance with its own content-moderation policy when it limited other users' access to [plaintiff's] posts and ultimately suspended his account[]," Twitter "did not operate as a state actor"); *Huber v. Biden*, No. 21-CV-06580-EMC, 2022 WL 827248, at *5 (N.D. Cal. Mar. 18, 2022) (dismissing conspiracy claim between the President and Twitter where Twitter suspended plaintiff's account for violating company's terms of service), *aff'd*, 2023 WL 17818543 (9th Cir. Dec. 20, 2022); *Doe v. Google*, No. 20-cv-07502-BLF, 2021 WL 4864418, at *5 (N.D. Cal. Oct. 19, 2021) (rejecting state action claim under joint action theory because there were "no allegations that Defendants invoked state or federal procedure to bring about the suspension of Plaintiffs' accounts"), *aff'd*, 2022 WL 17077497 (9th Cir. Nov. 18, 2022). Plaintiffs cannot satisfy this "meeting of the minds" requirement by referring only to "generalized statements about working together to counteract the dissemination of election misinformation." *O'Handley v. Padilla*, 579 F Supp. 3d 1163, 1184 (N.D. Cal. 2022), *aff'd sub nom.*, *O'Handley v. Weber*, 62 F.4th 1145 (9th Cir. 2023).

The Fifth Circuit has emphasized that the joint participation standard is not easily met. In *Howard Gault Co. v. Texas Rural Legal Aid, Inc.*, the Fifth Circuit held that a group of onion growers were functionally state actors when they pursued a lawsuit and a temporary restraining order to stop a labor strike. 848 F.2d at 555. The court found dispositive that the growers, seizing upon "deep-seated community hostility toward the strike," hired attorneys who were at the same time "criminal district attorneys" and who repeatedly acted in their official capacity to collaborate in the lawsuit with "the Attorney General of the State of Texas" and the County sheriff. *Id.* As the court explained, "[t]he interlocking activities of the State . . . and the growers constituted a joint

effort" such that the growers' conduct, "while not compelled by the state, was so 'significantly

encouraged, both overtly and covertly, that the choice must in law be deemed to be that of the

state." *Id.* (alterations omitted) (quoting *Blum*, 457 U.S. at 1004). The court was careful to

"emphasize that the growers cannot be considered state actors merely because they invoked a state

statute[;]" rather, "[i]t was the *heavy participation* of [the] state and state officials" in the growers'

lawsuit that satisfied the state action requirement. *Id.* (emphasis added).

In addition, the fact that social media companies may act on a large number of posts

identified by a government agency does not demonstrate that the social media companies acted

"jointly" with the Government:

> That Twitter and Facebook allegedly removed 98 percent of the posts flagged by
> [the state] does not suggest that the companies ceded control over their content-
> moderation decisions to the State and thereby became the government's private
> enforcers. It merely shows that these private and state actors were generally aligned
> in their missions to limit the spread of misleading election information. Such
> alignment does not transform private conduct into state action.

*O'Handley*, 62 F.4th at 1156-57.

Here, as a general matter, Plaintiffs' "joint participation" theory fails because regardless of

what Defendants allegedly communicated, the social media companies "retained ultimate control"

over the content allowed on their platforms. *Frazier*, 765 F.2d at 1287-88. Defendants are not

"indispensab[le]" to any "particular" content moderation actions, nor do they have access to the

"mechanism" by which those moderation actions occur (the private platforms' internal technical

systems), much less play a "meaningful role" in that mechanism. *Id.* As explained below,

Plaintiffs' allegations with respect with specific Defendants fail for a number of other reasons.

> a. *Plaintiffs fail to show that, by sharing information about COVID-19, CDC or
>    the Census Bureau jointly participated in any content moderation decision.*

Plaintiffs' allegations against CDC and the Census Bureau do not demonstrate joint

participation between those agencies on the one hand, and social media companies on the other, in

the companies' content moderation decisions. *See* PI Supp. 31-33. The claims against these agencies falter at the outset because Plaintiffs fail to "identif[y] [any] *specific*" content moderation decision by a social media company in which CDC and Census were purportedly heavily involved. *Moody*, 868 F.3d at 352 (emphasis added). Rather, Plaintiffs simply recite a grab bag of past communications between various employees of social media companies and CDC (and, occasionally, employees of Census). PI Supp. 31-33 (referencing various emails and meetings between the agencies and social media company employees). But mere communications between a private company and the Government do not transform the private company into a state actor. Such a theory of state action would yield untenable results—it "would effectively cause companies to cease communicating with" government officials, including "their elected representatives[,] for fear of liability." *Doe*, 2021 WL 4864418, at *4-5 (finding that a "Twitter exchange between Rep. Schiff and YouTube CEO Susan Woj[c]icki" did not support a finding of state action). As with Plaintiffs' other overly broad conceptions of state action, this one, too, must be rejected.

Relying solely on an assortment of communications between social media companies and CDC (and sometimes Census), Plaintiffs ask the Court to infer, without evidence, that social media companies ceded "authority" to CDC and Census "to dictate what may and may not be posted on their platforms." PI Supp. 32. Yet not a single one of the challenged communications comes close to evincing that CDC (or Census) had significant involvement with—much less ultimate authority over—social media companies' content moderation decisions. Rather, the record shows that the companies "retained ultimate control" over content allowed on their platforms. *Frazier*, 765 F.2d at 287-88.

To start, contrary to Plaintiffs' assertions, the mere existence of "regular meetings" with certain social media platforms, *see* PI Supp. 31, does not suffice to show that CDC was

"indispensab[le]" to the companies' content moderation decisions, *Frazier*, 765 F.2d at 1287-88.

Initially, although Plaintiffs characterize past meetings as being "about misinformation," PI Supp.

31, the record shows otherwise. As Ms. Crawford testified, regular meetings with select social

media platforms for a short time in 2021 were initiated for the purpose of *promoting* CDC's

understanding of information about COVID-19. Crawford Dep. 27:13-23, 181:19-182:2. Only

occasionally did those meetings involve any discussions about misinformation. *Id.*; Crawford

Decl. ¶¶ 5-6 (Ex. 80). And to the extent the meetings did touch on misinformation, the focus was

on narratives that the companies or CDC observed circulating on platforms and the information

available from CDC that would respond to those narratives. Crawford Decl. ¶ 6 (Ex. 80). But

regardless of whether and to what extent meetings with social media companies involved

discussions about misinformation narratives, that would not show that CDC had become so

"heavily involved" in a company's decision to moderate any particular content so as to attribute

that content moderation decision to CDC. *Howard Gault*, 848 F.2d at 555. At most, it shows a

"generalized relation" between the companies and CDC, which falls far short of demonstrate state

action. *Frazier*, 765 F.2d at 1286. *See also* Defs.' Resp. PFOF ¶¶ 435-589.

 Nor does CDC's mere receipt of Facebook's CrowdTangle reports, *see* PI Supp. 31-32,

show joint participation in any decision to moderate particular speech. As explained, the

CrowdTangle reports provided summaries of high-engagement COVID-19 content on Facebook's

platform, regardless of whether that content was considered "misinformation." *Supra* Defs.' PFOF

§ II.C.6.; *see also* Crawford Dep. 53:8-10 ("[CrowdTangle is] a search of content on social media,

and a summary of the higher volume conversations."); Crawford Ex. 18 (Dkt. 205-19) (summary

of COVID insight report that listed "news of shifting public health policies allowing people to

return to work, school, and religious services" as among the most "highly engaging content").

CDC did not use the reports to "monitor" speech for the purpose of removing particular posts, contrary to Plaintiffs' unsupported assertions, *see* PI Supp. 31-32. As Ms. Crawford testified, CDC used the reports to understand the public's concerns about COVID-19 and vaccines as expressed on social media and to "improve [its own] communication materials." Crawford Dep. 53:7-12.[99] CrowdTangle is no evidence of joint participation in any particular content moderation decision. *See also* Defs.' Resp. PFOF ¶¶ 440-452, 456, 471, 472, 485, 507-510.

Further, certain social media companies' requests that CDC provide input on the science behind general claims about COVID-19 and vaccines shows no state action. According to Plaintiffs, CDC was doing more than providing input—it was "dictat[ing]" what companies could allow on their platforms. PI Supp. 32. Yet Plaintiffs cite no evidence whatsoever backing up that extravagant claim. The cited emails do not contain any discussions about specific posts and whether such posts should be permitted on the platforms. Rather, they show that Facebook asked CDC whether certain claims in the abstract (for instance that "vaccines caus[e] magnetism," Crawford Ex. 16 at 2 (Dkt. 205-17) had been "debunked" by scientific sources or were "false and can lead to harm," Crawford Ex. 17 (Dkt. 205-18)—or, as put elsewhere, were false and could lead to vaccine hesitancy, Crawford Ex. 26, at 4 (Dkt. 205-26). In response to these requests, CDC did not ask the platform to take any particular action against any particular content. Instead, CDC provided factual information, sometimes stating the claim had been "debunked," other times stating the evidence was "inconclusive," and often times pointing directly to publicly available

---

[99] Plaintiffs' contention that CDC had "privileged access to use CrowdTangle," *see* PI Supp. 32, likely refers to Facebook offering CDC the opportunity to log into the CrowdTangle platform to run its own reports about general categories of content circulating on the platform. *See* Crawford Dep. 77:9-14. Ms. Crawford did not use CrowdTangle for this purpose, but others at CDC may have. *See id.* at 50:1-4. Regardless, there is no evidence that anyone at CDC used CrowdTangle reports to collude with Facebook to remove or otherwise suppress particular posts or accounts.

and responsive information on the agency's website. *See, e.g.*, *id.* at 1; *supra* Arg. § II.C.2. Plaintiffs cite a handful of similar exchanges that CDC had with Google and Twitter. *See* PI Supp. 33. These communications reflect social media companies' independent interest in CDC's understanding of the facts, as opposed to any effort by CDC to "dictate" to the companies what content they should allow on their platforms. *See also* Defs.' Resp. PFOF ¶¶ 435-589.

Plaintiffs find evidence of joint action from the fact that Facebook occasionally informed CDC that it had "updated its policies . . . based on the CDC's input" on the above requests. PI Supp. 33. But Plaintiffs offer no evidence that CDC was given advance notice of or in any way weighed in on Facebook's decisions about whether and how to update its misinformation policies. Those decisions rested entirely with Facebook. Plaintiffs also allege that CDC was aware that, in applying its policies, Facebook may have removed posts from its platform that made "debunked" claims. Pls.' PFOF ¶¶ 523, 525. But CDC's mere awareness that, applying its own policies, Facebook might remove hypothetical posts making claims that contradict CDC's science-based information about COVID-19 and vaccines, does not show that CDC "dictated" Facebook's decision to remove such posts, or that CDC otherwise entered into an agreement with Facebook to remove those posts. Again, as Ms. Crawford testified, it was not "CDC's role . . . to determine what" companies should "do with the scientific information that [CDC] provided." Crawford Dep. 161:20-23. And Plaintiffs cite no authority in support of the surprising proposition that a government entity cannot provide information to a social media platform upon request, regardless of whether the platform might use the information to inform its content moderation decisions.

At most, the evidence shows mere "acquiescence" by CDC in the company's independent decisions to moderate content—including potentially removing content—in reliance on CDC's science-based information. The Supreme Court "has never held that [the government's] mere

acquiescence in a private action converts that action into that of the [government]." *Flagg Bros. v. Brooks*, 436 U.S. 149, 164 (1978). Making that finding here would have especially problematic implications for the functioning of government and for private conduct. It would imply that social media companies are *precluded* by the First Amendment from choosing to rely on certain types of information—solely because it comes from the Federal Government—when determining how to implement their own terms of service. In other words, finding state action based on this conduct would restrict the decisionmaking of social media companies, not subject to constitutional constraints and endowed with First Amendment rights of their own, about the content of the speech that may be carried on their platforms. By the same token, holding CDC responsible for a social media company's independent decision to rely on CDC's information would subject the agency to constitutional liability in a host of unknown circumstances outside of its control. CDC cannot predict whether and how a social media company (or any other private company) may choose to use its information (much of it publicly available on its website) in carrying out the company's own business policies. These are among the reasons that the Supreme Court has cautioned that state-action principles be construed so as to preserve the "'essential dichotomy' [] between public and private acts." *Sullivan*, 526 U.S. at 53 (quoting *Jackson*, 419 U.S. at 349).

Similarly, the two BOLO meetings held in May 2021—in which CDC (with the help of Census) discussed misinformation narratives circulating online and where to find scientific information from CDC, *supra* Defs.' PFOF § II.C.4, shows no joint participation in the companies' content moderation decisions. Plaintiffs misconstrue the record when they assert that CDC and Census provided "lists and screenshots of specific posts that [the agencies'] believe[d] should be censored." PI Supp. 32. In fact, the materials presented focused on misinformation "narratives," Crawford Decl. ¶ 14 (Ex. 80); and while some slides included social media posts as clarifying

"examples," neither CDC nor Census pressed the social media companies to "censor[]," or take any action relating to, those posts or any others. *Id.*; *see also* Defs.' Resp. PFOF ¶¶ 550-562.

Next, Plaintiffs' claim that CDC "asks platforms to provide reports about censorship," PI Supp. 31, is evidentiarily unsupported and, in any event, shows no joint participation in any content moderation decision. Plaintiffs base their allegation on a March 2021 email exchange in which Ms. Crawford asked Facebook whether it could provide more information on the "*themes*" or "*types* of COVID-19 misinfo[rmation]" that Facebook had already removed. Crawford Ex. 44 at 3 (Dkt. 205-44) (emphases added); *see also* Defs.' Resp. PFOF ¶¶ 455-458. Ms. Crawford testified that the reason for this request was to understand whether Facebook's past, independent decisions to remove certain content from its platforms would affect what CDC viewed in the CrowdTangle reports. As she explained, the CDC team responsible for creating reports on "vaccine confidence" was concerned that if only "live posts" on Facebook were reflected in CrowdTangle reports, CDC might be unaware of other areas of confusion about COVID-19 vaccines reflected in removed posts. Crawford Dep. 258:1-11. Thus, CDC's request was aimed at trying to understand the effects of Facebook's decisions, not attempting to compel Facebook to take any particular action with respect to any particular post.

Relatedly, the record lends no support to Plaintiffs' assertion that CDC inquires whether "specific content flagged by CDC and the Census Bureau has been removed," or that Census "follows up to monitor whether platforms are removing" such content. PI Supp. 31. On the contrary, the evidence shows that CDC simply sought to understand *why* Facebook had taken down certain posts. *See* Crawford Ex. 8 at 1 (Dkt. 205-9) (email from CDC asking: "Were those [posts] re-evaluated by the [Facebook] moderation team or taken down for another reason?"). Indeed, Plaintiffs' assertion that Census occasionally "check[ed]" to see whether things they might have

flagged or otherwise observed on Facebook had been removed, Crawford Dep. 117:19-21, confirms that Census did not know what action the company would take with respect to any specific content and was not "heavily involved" in the company's content moderation decisions, *Howard Gault*, 848 F.2d at 555.

Finally, Plaintiffs state that "CDC's and Census Bureau's actions constitute significant encouragement[ and] coercion," in addition to "conspiracy or collusion." PI Supp. 31. Yet Plaintiffs do not "discuss[]" any state-action theories relating to CDC conduct aside from their theory of "conspiracy or collusion." It is Plaintiffs' "obligation . . . to develop [those] arguments." *Paez v. Wal-Mart Stores, Tex., LLC*, No. EP-20-CV-00321-DCG, 2022 WL 3216343, at *2 (W.D. Tex. Aug. 9, 2022). Having failed to do so, they have waived them. *See United States v. Scroggins*, 599 F.3d 433, 446 (5th Cir. 2010) (argument not adequately briefed is waived). In any event, there is no evidence that CDC or Census threatened adverse consequences if a social media company failed to take action concerning any particular post or account, or offered them significant incentives of encouragement to do so, as *Blum* requires. *Supra* Arg. § II.B.1-2. To the contrary, CDC never "instruct[ed]" a social media company "to do anything" with the information that was "debunked." Crawford Dep. 138:12-14. CDC never "advise[d] or help[ed]" a social media company on the "enforce[ment] or appl[ication] of [its] policies to any particular social media post." *Id.* at 105:1-19. CDC never required a social media company to take any particular action with any content the agency flagged as reflecting a misinformation theme that CDC's scientific information could address. *Id.* at 87:13-88:18. The "consequence" to any social media company for failing to take action with respect to any particular content on its platform was "[n]othing." *Id.* at 88:19-22.

In sum, none of the challenged conduct amounts to state action under any theory. Instead, the record confirms that social media platforms have exercised independent decision-making authority about whether and how to moderate content on their platforms, including content about COVID-19. Accordingly, there is no basis for attributing any decision of any social media company to CDC or Census. *See Blum*, 457 U.S. at 993. For all of these reasons, Plaintiffs are unlikely to succeed on the merits of their claims against CDC and Census.

      b.   *The FBI did not participate in "censorship" by sharing information about foreign malign influence efforts or potential election-related misinformation.*

The FBI shared information with platforms regarding particular accounts or websites that FBI had with high likelihood determined to be covertly operated by hostile foreign actors, Knapp Decl. ¶¶ 10-20 (Ex. 157), and, on or near the day of an election, posts (even by domestic sources) that the agency preliminarily had found to contain falsehoods regarding the time, place, and manner of voting in the impending election, *id.* ¶¶ 21-24. When the FBI did so, contrary to Plaintiffs' contention (PI Supp. 34-36), each platform retained sole discretion over all content moderation decisions regarding the account or website at issue. The FBI shared information with "*no strings attached*," such "that the social media companies c[ould] protect their platforms *as they deem[ed] appropriate*." Chan Dep. 32:16-20 (emphasis added). The FBI "d[id] not control what" platforms would "do" with the shared information. *Id.* at 33:2. Because the private platforms never "ceded control" over those decisions to the FBI, Plaintiffs' conspiracy theory of state action as to FBI has no likelihood of success. *O'Handley*, 62 F.4th at 1156. And Plaintiffs also disregard the narrow scope and the serious import to national security and to law enforcement of the information FBI shares with platforms.

In particular, the FBI's Foreign Influence Task Force (FITF) shared information with the platforms that was (1) strategic (concerning techniques or processes through which foreign malign

actors operated), Chan Dep. 29:17-23, or (2) tactical (describing attributes, or "selectors,"

including IP addresses and "hash values," associated with particular social media accounts

indicating their operators were foreign, such as the Russians), *id.* at 29:24-30:7, 30:10; *see* Knapp

Decl. ¶¶ 10-20 (Ex. 157); *cf. United States v. Reddick*, 900 F.3d 636, 639 (5th Cir. 2018) ("hash

value comparison allows law enforcement to identify" contraband "with almost absolute certainty,

since hash values are specific to the makeup of a particular image's data"). Platforms would "take

the information that [FBI] share[d]," and then "validate" it "*through their own means. And then if*

*they determine[d]* that these [were] accounts being operated by Russian state-sponsored actors,

then they [would] take[ ] them down." Chan Dep. 33:13-17 (emphasis added). Or, as Yoel Roth,

formerly head of Twitter's content moderation personnel, testified to Congress in 2023, the "FBI

was quite careful and quite consistent to request review of the accounts, but not to cross the line

into advocating for Twitter to take any particular action." Ex. 10 at 16.

FITF shared information about a foreign malign actor's social media activity *not* based on

the content or viewpoint expressed in a post, but rather on the determination that the account is

part of a covert effort by a foreign malign actor. *See* Knapp Decl. ¶¶ 16-20. That is, FITF would

"only share information" about a particular social media account when the FBI had "high

confidence" that the account "is attributed to a foreign-state actor." Chan Dep. at 112:21-113:6.

Put another way, FITF would only provide account-specific information after "gathering"

appropriate "intelligence" and completing the declassification review. *Id.* at 111:13-112:8. Thus,

when FITF "provided" platforms "with high confidence" information that particular accounts bore

indications of foreign malign activity, the platforms then were "able to discover fake . . . accounts

and take them down." *Id.* at 32:21-24. Hostile foreign entities often exploit such fake online

personas on social media sites created via false representations of the identity or other

characteristics of the account holder, including whether the holder is a person at all rather than a "bot" or automation.[100]

In some instances, the platform's own analytical work would lead the platform to find ten accounts connected to the one account about which FITF shared information, and the platform would then "take all of them down." Platforms would only "sometimes" inform FITF "how many accounts were taken down" following FITF's sharing of information. And when FITF "ask[s] for specifics," platforms "don't necessarily tell" FITF "all the time." Chan Dep. 113:23-114:7; *see also* Defs.' Resp. PFOF ¶¶ 860, 861, 867, 873, 889, 906-909, 918, 931, 938, 939, 942.

Similarly, as part of the FBI's election integrity efforts FBI personnel, on or near the day of an election, would call platforms' attention to accounts posting disinformation about the time, place, or manner of elections in various states. *Id.* at 162:10-163:3; *see* Knapp Decl. ¶¶ 21-24 (Ex. 157). A "hypothetical example" of such a post, which "would probably be flagged," is one that asserted that "Political Party A" would "vote on Tuesday," while "Political party B" would "vote

---

[100] As then-Deputy Attorney General Rod J. Rosenstein explained: "Together, bots and networks of paid trolls operating multiple accounts allow foreign agents to quickly spread disinformation and create the false impression that it is widely accepted." Ex. 149 (Deputy Attorney General remarks of July 19, 2018); *see also* Kimmage Dep. 170:11-18, 279:17-280:4; Ex. 9 at 80 ("The spread of intentionally false information on social media is often exacerbated by automated, or 'bot' accounts."); Ex. 154 at 2 (Press Release, Fed. Bureau of Investigation, 40 Officers of China's National Police Charged in Transnational Repression Schemes Targeting U.S. Residents, (Apr. 17, 2023), 2023 WL 2968014) (describing *United States v. Yunpeng Bai, et al.* (E.D.N.Y. unsealed Apr. 17, 2023), which alleges that Chinese agents "created thousands of fake online personas on social media sites, including Twitter, to target Chinese dissidents through online harassment and threats," and "disseminated . . . government propaganda and narratives to counter the pro-democracy speech of the Chinese dissidents . . . . [Agents] created and maintained the fake social media accounts through temporary email addresses, posted official PRC government content, and interacted with other online users to avoid the appearance that [their] accounts were 'flooding' a given social media platform."); Ex. 155 at 4 (Craig Timberg, *Secret trove offers rare look into Russian cyberwar ambitions*, Wash. Post (Mar. 30, 2023)) (describing documents of Russian defense contractor about "tactics for automating the creation of massive numbers of fake social media accounts for disinformation campaigns.").

on Wednesday." Chan Dep. 265:6-10. In the election security context, the FBI operated on the understanding that it is a potential election crime for a person in the United States (not simply a foreign person) to post deliberately misleading information about the time, place, or manner of casting a ballot. *Id.* at 270:2-13; *see, e.g.*, *Anderson v. United States*, 417 U.S. 211, 225-26 (1974) (upholding 18 U.S.C. § 241 conviction for deceiving voters regarding which candidate was selected on their ballot where accused's casting of fictitious ballots "injure[d] the right of all voters in a federal election to express their choice of a candidate and to have their expressions of choice given full value and effect"); *see also United States v. Mackey*, No. 21-cr-80, Dkt. 115 (E.D.N.Y. Mar. 31, 2023) (conviction for using Twitter to assert, among other things, that supporters of particular Presidential candidate could and should vote by posting specific hashtag on Twitter or Facebook, or by texting candidate's first name to specific telephone text code); *United States v. Tobin*, No. 04-cr-216-01-sm, 2005 WL 3199672 (D.N.H. Nov. 30, 2005) (conviction for disruption of phone lines on election day).

In that regard, in 2020, the FBI San Francisco Field Office at which ASAC Chan works was responsible for relaying time/place/manner disinformation or malign-foreign-influence information to platforms. Chan Dep. 168:10-20. The FBI would convey such posts to platforms "to alert" them "to see if" the posts "violated" the platforms' "terms of service," and if the posts did so, the platforms "would *follow their own policies*, which may include taking down accounts." *Id.* at 165:9-22 (emphasis added). Platforms would sometimes inform the FBI that they had taken down the posts, while in other instances they would state that a post at issue "did not violate" platform "terms of service." *Id.* at 166:2-7; *see also* Defs.' Resp. PFOF ¶¶ 879, 925-928, 966.

In the aftermath of Russian active interference in the 2016 Presidential Election, including via social media, the Senate Select Committee on Intelligence concluded: "Information sharing

between the social media companies and law enforcement must improve, and in both directions." Consistent with that conclusion, the record shows that the FBI shared information with social media companies to counteract foreign malign influence efforts, and to raise platform awareness about posts with deliberately misleading information about the time, place, or manner of voting. But there is no evidence the FBI sought control over platform content moderation decisions, and no evidence the platforms ever ceded such control to the FBI. Plaintiffs' "joint participation" theory thus fails against the FBI.

> c. *Plaintiffs fail to establish that CISA worked jointly with social media companies to violate the First Amendment.*

Plaintiffs next contend that CISA "engages in extensive collusion with platforms on censorship" based primarily on the following activities: (1) "continuous meetings and coordination" between social media companies and CISA; and (2) CISA's "flagging [of] content for censorship," providing additional evidence of misinformation to social-media platforms, and platforms' treatment of CISA as a "privileged reporter of misinformation." PI Supp. 36-39. As discussed below, these activities neither individually nor collectively reflect any joint action depriving Plaintiffs of their constitutional rights.

▪ CISA's Meetings with Social Media Companies. Plaintiffs first contend that CISA's meetings with social media companies regarding general discussions of misinformation concerns support their claim of collusion. PI Supp. 37. Plaintiffs cite no authority to support the conclusion that meetings in which misinformation concerns generally were discussed—as an element of broader election-related security discussions—are sufficient to establish the requisite joint participation necessary for the Government to be responsible for private decisions, and indeed, the law is to the contrary. *See supra* at pp. 213-16.

228

In furtherance of its mission, CISA participated in regular meetings with social media companies about misinformation, including recurring USG-Industry meetings (and preparatory meetings in advance of these meetings); CISA Cybersecurity Advisory Committee (CSAC) quarterly meetings; CISA CSAC, Protecting Critical Infrastructure from Misinformation and Disinformation subcommittee meetings; and meetings convened by the EIS-GCC and the EI-SCC Joint Managing Mis/Disinformation Working Group. *See* Ex. 187 at 42-44. Contrary to Plaintiffs' factually unsupported claim that these meetings "provide avenues for government officials to push for censorship of disfavored viewpoints and speakers online," PI Supp. 27, Plaintiffs have failed to adduce any evidence that such alleged "push[es]" for censorship actually occurred during these meetings.

For example, the USG-Industry meetings, which began in 2018 (during the Trump Administration) and ended in 2022, included federal agency participants from CISA, DHS, the FBI, DOJ, ODNI, as well as technology company participants from Google, Facebook, Twitter, Reddit and Microsoft, and on occasion Verizon Media, Pinterest, LinkedIn, and the Wikimedia Foundation. Ex. 187 at 42-43; Scully Dep. 31:10-16.[101] CISA never flagged or reported potential disinformation for social media or technology companies during or in connection with the USG-Industry meetings. Hale Decl. ¶ 68 (Ex. 97). Rather, the topics discussed generally included information sharing around election risk, briefs from the industry, threat updates, and highlights and upcoming watch outs. Ex. 187 at 43. For example, these meetings generally involved CISA educating social media platforms on how elections function and are administered, as well as potential threats to elections. Scully Dep. 224:22-25:9. Much of the discussions at these meetings

---

[101] Plaintiffs claim that the USG-Industry meetings "have been ongoing for years and are continuing." PI Supp. 37. CISA has not participated in the USG-Industry meetings since the 2022 general election. Hale Dec. ¶ 69 (Ex. 97).

involved cyber security issues, as well as discussions about recurrent physical threats to poll workers. *Id.* at 235:11-22.

Although general concerns about misinformation and disinformation were discussed during these USG-industry meetings, they did not involve "pushes" to censor misinformation or disinformation, either in general or regarding specific individuals, posts, or accounts. *Id.* at 39:12-25. For example, CISA often reported on election infrastructure security, key election timelines, and publications designed to promote resilience to disinformation, such as a general disinformation resilience guide highlighting examples of the tactics use by foreign disinformation actors and outlining proactive measures to mitigate the effectiveness of such tactics entitled the Tactics of Disinformation. *Id.* at 39:12-18; Hale Decl. ¶ 68 (Ex. 97). Other agencies, including DOJ, FBI, ODNI, and DHS, would participate and provide unclassified, high-level reviews or strategic intelligence briefings. Scully Dep. 25:10-23. Members of the intelligence community discussed malign foreign actors who potentially were going to launch disinformation operations. *Id.* at 39:19-25. Industry participants would share high-level trend information from public reporting they had released. *Id.* at 40:2-41:15. In short, Plaintiffs have failed to provide any evidence that CISA or other federal agencies colluded with social media platforms during these meetings to deprive anyone of their constitutional rights, much less the rights of Plaintiffs. *See also* Defs.' Resp. PFOF ¶¶ 861, 866, 978-990.

Similarly, the CISA CSCAC Committee quarterly meeting agenda and summaries, as well as participants, are all available on-line, Ex. 121, and contrary to Plaintiffs' contention, a review of those materials fails to reflect any collusion between CISA and social media companies to deprive Plaintiffs (or anyone) of their constitutional rights through the removal of or other action against specific social media content. Instead, these materials reflect discussions concerning the

creation of a new, congressionally-mandated advisory committee; how CISA can better accomplish its mission of promoting the security and resilience of critical infrastructure such as by refining the national effort to identify and prioritize the most critical entities and infrastructure; improving efforts to strengthen the nation's cyber workforce; and enhancing public-private communication and collaboration in preventing and responding to cybersecurity incidents. *Id.*

In addition, the CSAC Protecting Critical Infrastructure from Misinformation and Disinformation Subcommittee (Subcommittee), which was directed to stand down in December 2022 because it had completed its taskings and provided its recommendations to CISA, did not involve any joint action by CISA and social media companies to remove or take any action concerning any social media content. *See* Ex. 187 at 43; Ex. 122 at 9 (stating that the MDM Subcommittee did not participate in, or recommend for others to participate in, any activities related to social media platform moderation or other activities that could be construed, even broadly, as "censorship"). Rather, CISA had established the Subcommittee for the purpose of evaluating and providing recommendations on potentially effective critical infrastructure-related counter-MDM efforts that fit within CISA's unique capabilities and mission. Ex. 123 at 1. Like the CSAC Committee, the Subcommittee operated transparently, and further details about the Subcommittee, its membership, and reports and recommendations, are posted on CISA's website, *Id.*; and Ex. 119. Specifically, the Subcommittee recommended that CISA take actions such as "shar[ing] up to date 'best practices' around how to proactively address and counter MDM based on the most recent research[,]" "[s]har[ing] information with state and local election officials[,]" and "[p]rotect[ing] the courts" from being the target of "an intensified campaign to undermine public trust in the legitimacy of their processes." Ex. 124 at 1-3. Nothing in these materials reflects an attempt by CISA to "push" social media companies to censor mis- or disinformation or reflects

a conspiracy or collusion to deprive Plaintiffs—or anyone, for that matter—of their constitutional

rights.

Finally, the EIS-GCC EI-SCC Joint MDM Working Group (Working Group), which was

launched after the 2020 election, provides a forum through which the Election Infrastructure

subsector could identify challenges in countering MDM and produce resources for addressing

these challenges. *See* Ex. 187 at 44. CISA supports the Working Group by providing administrative

and substantive support, such as facilitating meetings and helping to draft working group products.

Hale Decl. ¶ 41 (Ex. 97). As noted above, the Louisiana Secretary of State oversaw the

management and activity of the Working Group from the summer of 2021 to the summer of 2022.

*Id.* ¶ 31.[102] To date, the Working Group has published two guides to help state and local election

officials and industry providers prepare for and respond to risks of disinformation. *Id.* ¶ 40.[103] The

Working Group does not engage with social media companies, and it does not flag or report

potential disinformation to social media or technology companies. *Id.* ¶ 43. Again, Plaintiffs have

failed to adduce any evidence that these meetings involved federal agencies attempting to conspire

or collude with social media companies to act on misinformation on their platforms, let alone a

---

[102] The Louisiana Secretary of State has been a member of the EIS-GCC since May 2019, and
while serving as the NASS President from the summer of 2021 to 2022 served as an EIS-GCC
Executive Committee member. Hale Decl. ¶ 31 (Ex. 97). In this capacity, Louisiana received
regular briefings (usually every two weeks) on CISA's election security efforts, including briefings
on CISA's disinformation resilience work, and engaged in security planning activities for the
Election Infrastructure Subsector. *Id.* In addition, the Missouri Secretary of State served as an
alternative member of the EIS-GCC from 2018-2019 and attended the EIS-GCC biannual meetings
and actively participated in briefings on the Election Infrastructure Subsector's security and
resilience efforts. *Id.* at ¶ 32.

[103] These publications include (1) the Rumor Control Page Start-Up Guide, which is designed for
use by state, local, tribal and territorial government officials and private sector partners seeking to
dispel inaccurate election security-related information by sharing accurate information; and (2) the
MDM Planning and Incident Response Guide for Election Officials, which is designed for SLTT
election officials and to help them understand, prepare for, and respond to disinformation that may
impact the ability to securely conduct elections. Hale Decl. ¶ 40 (Ex. 97).

conspiracy to deprive Plaintiffs of their constitutional rights. *See also* Defs.' Resp. PFOF ¶¶ 1011, 1235.

In short, like the allegations rejected by the Ninth Circuit in *O'Handley*, Plaintiffs' "allegations establish, at most, a meeting of the minds to promptly address election misinformation, not a meeting of the minds to violate constitutional rights." 62 F.4th at 1159.

▪ CISA's Switchboarding Activities During the 2020 Election Cycle. Plaintiffs next claim that CISA's conveyance of potential misinformation identified by state and local election officials—including officials from Plaintiffs Missouri and Louisiana, and membership associations in which officials from Missouri and Louisiana are members[104]—to social media companies during the 2020 election cycle evinces a conspiracy to deprive Plaintiffs of their constitutional rights. PI Supp. 37-38. But this also fails to show that CISA was a joint participant in any content moderation action.

As discussed above, during the 2020 election cycle, CISA performed "switchboarding" work on behalf of state and local election officials. Scully Dep. 16:16-25. Switchboarding involved state and local election officials identifying for CISA information on social media that they believed constituted election-related misinformation, and CISA forwarding that information to social media companies for their informational awareness. *Id.* at 17:1-14; 23:19-24:2. Social media companies would then make independent decisions on the content that CISA forwarded to them based on the companies' policies. *Id.* at 17:15-21.

---

[104] *See, e.g.*, Ex. 100; Ex. 101; Ex. 102; Ex. 103; Ex. 104; Ex. 105 and Hale Decl. ¶¶ 33, 70 (Ex. 97) (explaining that officials in Plaintiff States Missouri and Louisiana were among those who transmitted election security-related disinformation to CISA or CIS for the purpose of it being shared with the social media companies, that Louisiana is a member of NASS, and both Louisiana and Missouri are members of NASED).

When CISA set up its switchboarding function it met with social media companies and reaffirmed its "position that [CISA] would never ask them to take any specific actions, [and] that they should make decisions based on their terms of service." *Id.* at 241:23-242:5. Accordingly, when CISA transmitted potential misinformation identified by state and local election officials to social media companies, CISA's protocol was to include a notice stating that it was not requesting that the company take any particular action. *See, e.g.,* Ex. 106; Hale Decl. ¶ 72 (Ex. 97).

On occasion, at the request of election officials, CISA would ask social media companies to report back on how, if at all, they had addressed misinformation CISA flagged for the companies. Scully Dep. 163:17-164:17. Over time, however, the companies would report directly to the election officials about what actions, if any, they took concerning potential misinformation. *Id.* at 164:8-25.

Normally, CISA would receive a note from a social media company acknowledging that they received CISA's email, but CISA often did not receive any kind of notification from a social media company regarding what decision it made concerning potential misinformation. *Id.* at 177:7-178:8. If a social media company needed additional information from an election official in order to make a decision about whether content violated its terms of service, CISA would try to support that effort. *Id.* at 219:25-220:13. For example, if state or local officials had made a public statement about potential misinformation, or could provide additional information about it, and a social media company asked for it, CISA would try to obtain that information for the company. *Id.* at 219:25-220:20.

The record in this case makes clear that social media companies made independent judgments in applying their content moderation polices to information that CISA "switchboarded" to them, and Plaintiffs concede as much. *See* Pls.' PFOF ¶ 973 (quoting Brian Scully's deposition

testimony that "the idea was that [the social media companies] would make decisions on the content that was forwarded to them based on their policies."). For example, when CISA passed along information for social media companies' awareness, the companies at times concluded that certain posts did not violate their content moderation policies and therefore determined that no action would be taken. *See, e.g.,* Ex. 105 at 1 (email from Twitter concluding that "Tweet was not determined to be a violation of our rule"); Ex. 107 at 1 (email from Twitter concluding that certain tweets violated its terms of service while others did not); Ex. 108 at 1 (email from Twitter stating "[t]weet was not in violation of our Civic Integrity Policy"); Ex. 109 at 1 (email from Twitter stating that the "Tweets to not be in violation of our policies" and that Twitter would "not take action on these Tweets"); Ex. 110 at 1 (email from Twitter stating "internal review of account data indicates [the account] is not suspicious"); Ex. 111 at 1 (email from Twitter stating "this tweet was not determined to violate our civic integrity policy"). *See also* Defs.' Resp. PFOF ¶¶ 1076-1082.

Despite Plaintiffs' voluminous preliminary injunction filings, nowhere do they identify facts supporting the notion that the social media companies failed to exercise their independent judgment in applying their content moderation policies. This is fatal to their claim of conspiracy. *See O'Handley*, 62 F.4th at 1158 ("The First Amendment does not interfere with this communication [between the Government and social media companies] so long as the intermediary is free to disagree with the government and to make its own independent judgment about whether to comply with the government's request.").

Furthermore, Plaintiffs fail to explain why CISA's willingness to provide social media companies with additional context about misinformation identified by state and local governments reflects a "meeting of the minds" to deprive Plaintiffs of their constitutional rights. PI Supp. 39. Nothing about these activities negates the fact that social media companies independently applied

their content moderation policies in determining what action, if any, to take regarding potential misinformation.[105]

    d.   *Plaintiffs fail to identify joint action by the Global Engagement Center and social media companies to remove any social media content.*

Plaintiffs also devote a paragraph of their brief to their claim that the State Department's Global Engagement Center (GEC) "colludes with social-media platforms on censorship," solely because it meets with social media companies about disinformation, including with the platforms' content moderation officials. PI Supp. 39-40.

But this too does not establish the type of "joint action" necessary to attribute private conduct to the Government. For example, the GEC's Technology Engagement Team (TET) meets with social media companies and exchanges information concerning the propaganda and disinformation tools and techniques used by the United States' adversaries. Kimmage Dep. 29:14-30:14. These meetings rarely include discussions about specific content posted on social media because the meetings are at a higher, more conceptual level about what foreign actors are doing, rather than specific content. *Id.* at 30:20-31:3.[106]

---

[105] In a last-ditch effort to establish a conspiracy between CISA and social media companies Plaintiffs make two final arguments. First, they note that early in the 2022 election cycle a CISA employee asked social media companies to develop a one-page document that state and local election officials could use to help explain the social media companies' content moderation policies and how to report misinformation to the companies. PI Supp. 39. Second, Plaintiffs note that CISA runs an "operation center" on election day that engages in reporting misinformation to social media platforms. *Id.* Once again, Plaintiffs fail to explain how these activities reflect a deprivation of Plaintiffs' constitutional rights. In addition, nothing about these activities undermines the fact that social media companies independently apply their content moderation policies when potential misinformation was brought to their attention.

[106] Plaintiffs also claim that the fact that the GEC briefly had a liaison in Silicon Valley to connect with social media platforms is evidence of collusion. PI Supp. 39. Not so. For a time, the GEC had a location in Silicon Valley where one individual, Defendant Sam Stewart, was stationed. Kimmage Dep. 153:7-154:21. The purpose of the Silicon Valley location was to facilitate public/private coordination and broker constructive engagements between the Government and the technology sector, including social media companies, academia and research. *Id.* at 155:5-21. Mr.

Similarly, the GEC front office also engages with social media companies, primarily to build relationships with those companies to facilitate better communications at the working level. *Id.* at 31:12-20. The GEC did not flag specific content for social media companies during these meetings and did not give the companies any directives. *Id.* at 34:13-36:5. The GEC's purpose in advising social media companies about disinformation campaigns was not to influence social media companies' internal decisions regarding content, but to deepen their understanding of the actions of malign actors seeking to harm the national security, in line with the GEC's congressional mandate. *Id.* at 36:6-37:7. The GEC simply shared lessons learned, information about propaganda and disinformation techniques, and the campaigns and narratives of foreign propaganda and disinformation actors. *Id.* at 273:12-24. Sharing information can help social media companies identify coordinated inauthentic activity or to understand what these actors are trying to achieve, as well as to understand the types of narratives they are promoting. *Id.* at 279:17-280:4. Providing this information to social media companies is the first step in social media companies' ability to address foreign propaganda on their sites, as "[s]olving a problem has to start with understanding the problem." *Id.* at 280:9-281:3.

However, the GEC does not engage in any activities with the intention of proposing to social media companies that certain content should not be posted on their platforms. *Id.* at 37:16-25. Indeed, "[t]he Global Engagement Center does not tee up actions for social media companies

---

Stewart had conversations with social media companies in which the GEC shared information related to its mission to counter foreign propaganda and disinformation. *Id.* at 155:22-156:11. The social media companies also educated the GEC based on what sorts of propaganda and disinformation they were observing on their platforms. *Id.* at 157:11-23. Mr. Stewart no longer works for the GEC, and no one from the GEC is currently working from the Silicon Valley location. *Id.* at 154:14-21, 272:17-25. Plaintiffs have failed to identify anything collusive about these meetings.

to take," and it "does not seek to influence the decisions of the social media companies."[107] *Id.* at 38:2-3, 283:9-22. Nor does the GEC seek to provide information that might inform or influence social media companies' decisions concerning the moderation of specific content. Kimmage Dep. 38:1-11; Bray Decl. ¶ 16 (Ex. 142) (stating that the GEC's practice is not to request social media companies take any specific actions when sharing information with them).[108] Rather, whatever actions social media companies may take after receiving information from the GEC is left completely up to those companies. Kimmage Dep. at 273:12-274:8. *See also* Defs.' Resp. PFOF ¶¶ 1123-1134.

In short, as with CISA, at most Plaintiffs have established that the GEC and social media companies were "generally aligned in their mission to limit the spread of misleading election

---

[107] In 2018, the GEC flagged a specific post for social media companies, and this involved the safety of State Department personnel. In this incident, a colleague of Mr. Kimmage, who was the then-Acting Coordinator of the GEC, informed him about a security situation in a Middle Eastern country where protestors were using a social media platform to communicate in ways that raised urgent security concerns, and the State Department was concerned for the safety of its personnel. Kimmage Dep. 38:12-39:25; Bray Decl. ¶ 17 (Ex. 142). Mr. Kimmage communicated directly with the social media platform and informed it that this was an ongoing concern. Kimmage Dep. 38:12-39:25. Mr. Kimmage was "very specific" in his interaction with the social media company that this was a real time situation where the State Department believed its personnel were at risk and asked the company to review the activity on these accounts to decide whether this content violated its terms of service. *Id.* at 38:12-39:25. Mr. Kimmage did not ask for anything to be removed from the sites, but he did express security concerns about the safety of State Department personnel. *Id.* at 38:12-39:25. These posts were from foreign actors. *Id.* at 40:1-3. Mr. Kimmage is unaware of what action, if any, social media companies took in response to his identification of this issue, because they did not report back to him. *Id.* at 40:4-7.

[108] When asked at his deposition about any efforts by the GEC to influence social media companies' content moderation decisions, Daniel Kimmage, the acting GEC coordinator and principal deputy coordinator from 2017 until June 2021, stated that he never had a conversation with social media companies where he encouraged them to speed up the removal of posts. Kimmage Dep. 42:12-20, 47:16-20. Mr. Kimmage further testified that he is unaware of instances where someone at the GEC may have gone through a third party on the understanding that the party would convey a concern about content on a social media platform with a social media company. *Id.* at 55:20-56:8. Plaintiffs have failed to identify any evidence to the contrary.

information." *O'Handley*, 62 F.4th at 1157. But such alignment falls far short of establishing that the GEC acted jointly with social media companies in acting against any particular content.

> e.   *No "joint action" transformed the private conduct of the Election Integrity Partnership or the Virality Project into state action attributable to Defendants.*

Plaintiffs next contend that "social-media companies work hand-in-glove with Defendants and their partners in state and local government, the Election Integrity Partnership, and the Virality Project to censor speech expressing viewpoints that Defendants disfavor." PI Supp. 42. More specifically, Plaintiffs allege that certain Defendants are responsible for certain (unspecified) content moderation decisions made by social media companies due to two separate layers of alleged "joint participation": (1) those Defendants allegedly worked jointly with the Election Integrity Partnership (EIP) and the Virality Project (VP) such that the EIP and the VP are state actors; and (2) the EIP and VP in turn worked jointly with social media companies to supposedly target certain content such that the social media companies are state actors.[109] *Id.* Plaintiffs are

---

[109] Plaintiffs contend that the EIP and VP acted as arms of the Federal Government due to the alleged level of involvement in the activities of those private organizations by CISA, the GEC, and the EI-ISAC. Plaintiffs claim that the EI-ISAC is a "government agency," apparently because it receives funding from CISA. PI Supp. 42 (referring to the "CISA-funded EI-ISAC" as a "government agency"). Plaintiffs provide no legal or factual basis for its claim that the EI-ISAC is a government agency. As noted *supra*, at 73, the EI-ISAC is a voluntary organization managed by CIS with membership open to all state, local, tribal, and territorial organizations that support election officials. Hale Decl. ¶ 48 (Ex. 97). Plaintiffs cite no legal support for the proposition that the receipt of federal funding converts a private entity into an arm of the Federal Government. Indeed, Fifth Circuit precedent is to the contrary. *Fairley v. PM Mgmt.-San Antonio AL, LLC*, 724 F. App'x. 343, 344 (5th Cir. 2018) (affirming dismissal of section 1983 claim where plaintiff contended that nursing home's receipt of federal funds converted the nursing home into a state actor). Moreover, the EI-ISAC is overseen by CIS, a non-profit organization, rather than the Federal Government. Scully Dep. 59:9-60:17; Hale Decl. ¶ 44 (Ex. 97). CISA did not fund CIS or the EI-ISAC for any of the work they provided in relation to the reporting of potential election security-related disinformation to social media or technology companies during the 2020 election cycle. *Id.* ¶¶ 50-51. Accordingly, any suggestion that the EI-ISAC is a Federal Government agency, or that its work can be imputed to CISA, lacks merit.

incorrect both as a matter of fact and as a matter of law, and they fail to establish a likelihood of success based on this state-action theory.

> ### i.    EIP

Plaintiffs contend that the EIP is pervasively entwined with CISA and the GEC such that the EIP is a state actor. PI Supp. 45. Plaintiffs are incorrect. To start, Plaintiffs mischaracterize the EIP. The EIP is a private partnership formed in 2020 that included the Stanford Internet Observatory, the University of Washington, Graphika, and the Atlantic Council's Digital Forensic Research Lab to better understand the information environment around elections. *See* Scully Ex. 1 at vi (Dkt. 209-2). The EIP's "primary goals were to: (1) identify mis- and disinformation before they went viral and during viral outbreaks; (2) share clear and accurate counter-messaging; and (3) document the specific misinformation actors, transmission pathways, narrative evolutions, and information infrastructures that enabled these narratives to propagate." *Id*. Among other actions, the EIP developed a "ticketing" system by which trusted external stakeholders and internal EIP analysts could flag misinformation that EIP would then analyze and, depending on the nature of the information, could flag for social media companies for their awareness. *Id.* at 8-10; 18-19.

The record reflects that several Stanford University students who interned at CISA and worked on election security matters came up with the idea for the EIP. *Id.* at 2; Hale Decl. ¶ 53 (Ex. 97). Based on lessons learned from the 2018 election, CISA personnel discussed with the interns a gap that existed in the resources of state and local election officials to identify misinformation that targeted their jurisdictions. Scully Dep. 84:10-22; Hale Decl. ¶ 53 (Ex. 97). Some of the Stanford students who interned at CISA independently made a presentation about this lack of resources to the Stanford Internet Observatory. Hale Decl. ¶ 54 (Ex. 97). Subsequently, CISA personnel had a conversation with Alex Stamos, who worked for the Stanford Internet

Observatory, one of the four organizations that comprised the EIP, and confirmed the existence of the gap in state and local resources. Scully Dep. 86:22-87:9; Hale Decl. ¶ 54 (Ex. 97). The Stanford Internet Observatory thereafter launched the EIP. Hale Decl. ¶ 55 (Ex. 97). CISA personnel's provision of feedback to interns about a gap in state and local election official resources and confirmation of that feedback to Mr. Stamos does not render the EIP a government body.

Furthermore, Plaintiffs do not provide any evidence that CISA or the GEC were entwined in the management or control of the EIP. Rather, Plaintiffs claim only that (1) CISA and the GEC were "major stakeholders" of the EIP; (2) CISA and the GEC provided information into EIP's "Intake Queue"; (3) the EIP receives some funding from a grant from the National Science Foundation and from Federal funding for the Atlantic Council (rather than from CISA or the GEC); and (4) "numerous current and former CISA personnel also have or had roles in the EIP." PI Supp. 42, 44.

Even assuming Plaintiffs were factually correct about each of these activities, which they are not, they have identified no legal authority to support the proposition that this minimal level of involvement rises to the level of management or control of the EIP. As an initial matter, CISA did not found, fund, or otherwise have any role in the management or operation of the EIP. Hale Decl. ¶¶ 52, 56-57 (Ex. 97); Ex. 122 at 7 ("CISA did not found, fund, or otherwise control the EIP."). Moreover, Plaintiffs overstate—and in some cases misstate—the evidence. For example, Plaintiffs contend that CISA and the GEC provided information to the EIP's "Intake Queue" for flagging misinformation for social media companies. But as Mr. Scully explained during his deposition, CISA generally did not share information with EIP, and CISA did not provide tickets flagging potential misinformation for the EIP. Scully Dep. 73:25-74:2; 106:3-9; *see* Scully Ex. 1 at 38 (Dkt. 209-2) (reflecting organizations that tagged alleged misinformation and not including CISA); Ex.

125 at 2 ("CISA did not send any examples of potential misinformation to EIP" and "EIP did not send any reports of false rumors or disinformation to social media companies on behalf of [DHS] or [CISA]."); Ex. 122 (stating that CISA did not send content to the EIP to analyze, and the EIP did not flag content to social media platforms on behalf of CISA); Ex. 74 (stating that EIP did not receive requests from CISA to eliminate or censor tweets).

And with respect to the GEC, during the 2020 election cycle, the GEC discovered certain posts and narratives on social media and digital media that originated from, were amplified by, or likely to be amplified by foreign malign influence actors—like Russia, the People's Republic of China, Iran, and their proxies—that sought to spread propaganda or disinformation about the 2020 election. *See* Bray Decl. ¶ 18 (Ex. 142). The GEC flagged these posts and narratives for the EIP on approximately 21 occasions. *Id.* Plaintiffs fail to explain how the GEC's limited submission of tickets to the EIP concerning foreign malign influence actors transforms the EIP into a state actor.

Furthermore, Plaintiffs fail to explain how funding by entities other than CISA or the GEC, such as a grant from the National Science Foundation and some Federal funding received through the Atlantic Council, reflects substantial entwinement in the EIP by CISA or the GEC. Many entities, such as universities, receive Federal funding and also engage in content moderation (for example, of student and faculty publications), and there is no basis for suggesting that the Federal government somehow becomes responsible for that content moderation under the First Amendment.

Finally, Plaintiffs substantially overstate the extent and relevance of the "roles" that certain CISA personnel have played at the EIP, and vice versa. Plaintiffs contend that "[n]umerous current and former CISA personnel also have or had roles in the EIP," and that "key EIP personnel such as Alex Stamos, Renee DiResta, and Kate Starbird also have formal roles in CISA." PI Supp. 44.

That is an overstatement, at best. First, Plaintiffs rely upon the EIP report's acknowledgement of contributions to the report by Alex Stamos, Renee DiResta, Kate Starbird, Pierce Lowary, Alex Zaheer, and Matthew Masterson, in claiming that CISA was "pervasively entwined" with the EIP. *See* Pls.' PFOF ¶ 1163. As explained in Defendants' response to Plaintiffs' proposed findings of fact, Messrs. Lowary and Zaheer's contributions to the EIP report were in their roles at the Stanford Internet Observatory, and Mr. Masterson, a former CISA employee, was simply thanked by the EIP for his "additional feedback." *See* Defs.' Resp. to Pls.' PFOF ¶ 1163 (citing Scully Ex. 1 at 16 (xii) (Dkt. 209-2)).[110] Second, the "formal roles" Mr. Stamos and Ms. Starbird supposedly had at CISA were as members of CISA's Cybersecurity Advisory Committee, an "independent advisory body" established in June 2021—after the 2020 election—that provides advice, consultation and recommendations to CISA on "the development, refinement, and implementation of policies, programs, and training pertaining to CISA's cybersecurity mission." *See* Ex. 119, at 1. And Plaintiffs identify no involvement of Ms. DiResta with CISA apart from a lecture she gave during a 2021 conference hosted by CISA. *See* Pls.' PFOF ¶ 1171 (citing Cybersecurity Summit 2021: Responding to Mis, Dis, and Malinformation, YouTube (Oct. 27, 2021)). In short, Plaintiffs have failed to establish that CISA or the GEC were entwined in the management or control of the EIP.

At bottom, Plaintiffs have failed to identify any factual or legal basis to establish that CISA or the GEC's involvement with the EIP transformed the EIP into a state actor for purposes of the First Amendment. Plaintiffs accordingly cannot establish a substantial likelihood of success on this First Amendment theory. *See also* Defs.' Resp. PFOF ¶¶ 1136-1235.

---

[110] In addition, Mr. Stamos, Ms. DiRestra, Mr. Lowary, and Mr. Zaheer contributed to the EIP report in their capacity as "students, staff, and researchers" for the Stanford Internet Observatory, and Ms. Starbird contributed to the report in her capacity as an employee of the University of Washington Center for an Informed Public. Defs.' Resp. to Pls.' PFOF ¶ 1163.

ii.     The Virality Project

Plaintiffs next claim that "[f]ederal officials are pervasively entwined with the Virality Project." PI Supp. 50. Plaintiffs argue that this entwinement between the Virality Project and OSG is established by the following six facts: (1) OSG "pushes platforms to share information with the Virality Project"; (2) OSG coordinated with the Virality Project on the Surgeon General's Health Advisory; (3) the Surgeon General "repeatedly echoes the key messaging from the Virality Project"; (4) the Surgeon General launched his Health Advisory on Misinformation at an event hosted by the Stanford Internet Observatory, which is one of the groups that leads the Virality Project; (5) the Virality Project had "strong ties with several federal government agencies," including OSG, and was involved in "flagging vaccine-related content on social media"; and (6) OSG "incorporated [the Virality Project's] research and perspectives into its own vaccine misinformation strategy." *Id.* None of these actions, either individual or collectively, establishes sufficient entwinement between OSG and the Virality Project to convert the private conduct of the Virality Project into state action. And as discussed *infra*, Plaintiffs have failed to establish certain of these alleged "entwinements" to begin with.

First, Plaintiffs have provided no evidence that OSG "pushes platforms to share information with the Virality Project." PI Supp. 50. In support of this claim, Plaintiffs cite a portion of the deposition of Eric Waldo, a former senior advisor to the Surgeon General, where he discussed a conversation the Surgeon General had with an employee of Facebook. During this conversation, the Surgeon General raised the possibility of having external researchers validate the extent to which misinformation spreads on social media platforms. *Id.* at 50 (citing Waldo Dep. 35:20-26:2). But nowhere in this discussion does Mr. Waldo suggest that the Surgeon General asked Facebook to share information with the Virality Project (or any specific individual or entity),

much less that he "pushed" Facebook to do so. There is no evidence that the Virality Project was even mentioned in that conversation; Mr. Waldo, in fact, testified that he had never heard of the Virality Project. Waldo Dep. 207:10-21. (Plaintiffs also fail to explain what a request for Facebook to share information with the Virality Project would have had to do with "censoring" speech on Facebook.)

Second, Plaintiffs' claim that the Surgeon General "coordinated" with the Virality Project on his Health Advisory also is unsupported by the record. For example, Mr. Waldo stated that he did not know who was consulted in the development of the Surgeon General's Health Advisory because that work predated his time in the office. Waldo Dep. 37:13-22. Mr. Waldo explained that OSG coordinated the launch of the Health Advisory with Renee DiResta, who worked for the Stanford Internet Observatory. *Id.* at 37:23-38:8. And while the Stanford Internet Observatory was one of the founders of the Virality Project, Plaintiffs put forward no evidence that Ms. DiResta participated in the rollout of the Health Advisory as part of her work for the Virality Project rather than the Stanford Internet Observatory. *See* Waldo Dep. 283:2-18 (stating he was unaware of any involvement by OSG with the Virality Project but was aware that it had involvement with the Stanford Internet Observatory concerning the announcement of the Health Advisory); Lesko Decl. ¶ 15 (Ex. 63) (stating that OSG did not understand the launch of the Health Advisory to be a Virality Project event).

Third, there is no evidence that OSG "echo[ed] the key messaging from the Virality Project." PI Supp. 50. The Virality Project's final report (released in February 2022) postdated many—if not most—of the Surgeon General's public and private statements on health misinformation that are included in the record, including the Health Misinformation Advisory (released in July 2021). There is no evidence that the Surgeon General was even aware of the

Virality Project's "key messaging." The fact that OSG and the Virality Project shared a view that misinformation related to COVID-19 could potentially be harmful—a view that is widely held, including by 132 countries' governments, *see supra* at 13-14—is not evidence of entwinement of any kind.

Fourth, Plaintiffs have failed to produce any evidence that OSG "flagg[ed] vaccine-related content on social media" to the Virality Project. *See* PI Supp. 50. The only support Plaintiffs identify for this claim is a sentence in a Virality Project report that states: "The Virality Project built strong ties with several federal government agencies, most notably [OSG] and the CDC, to facilitate bidirectional situational awareness around emerging narratives." *See* Scully Ex. 2 at 17 (Dkt. 209-3) (Virality Project Report). Plaintiffs provide no basis to equate facilitation of "bidirectional situational awareness around emerging narratives" with "flagging" "vaccine-related content on social media." To the contrary, the record shows that OSG never provided any "tips, flags, tickets, reports, or other form of notification or input to the Virality Project concerning posts or accounts on social media." Lesko Decl. ¶ 16 (Ex. 63).

More fundamentally, even if Plaintiffs could establish each of these facts, which they cannot, Plaintiffs have identified no evidence that OSG exercised any management or control of the Virality Project, so as to convert its activities into state action. *See Brentwood Acad.*, 531 U.S. at 295. Finally, Plaintiffs do not even attempt to argue that the Virality Project failed to utilize its own independent judgment in conducting its work, or that social media companies that received information from the Virality Project failed to do the same. *See Pikaluk v. Horseshow Ent., L.P.*, 810 F. App'x 243, 247 (5th Cir. 2020).

Accordingly, Plaintiffs have failed to establish a likelihood of success in establishing that the activities of the Virality Project constitute state action attributable to Defendants. *See also* Defs.' Resp. PFOF ¶¶ 1236-1365.

* * * *

Neither the EIP nor the Virality Project is a state actor, and even if Plaintiffs could establish that they are, Plaintiffs have not shown that their actions, in turn, converted the content moderation decisions of any social media company into state action. That is to say, Plaintiffs do not provide any evidence that either of these organizations threatened or pressured any social media company to take action of any kind against particular content, or speakers, when flagging potential misinformation for the companies to independently evaluate under their terms of service.[111] Nor is there any evidence that any social media company regarded (or acted on) communications from the EIP, or the Virality Project, as threats or pressure to "censor" speech. Rather, the evidence is clear that both the EIP and the Virality Project simply flagged information for social media companies so that those companies could apply their independent judgment to determine whether the information violated their terms of service—terms to which all users agree. *See* Waldo Ex. 28 at 17 (Dkt. 210-3) ("Six social media platforms engaged with [Virality Project] tickets— acknowledging content flagged for review and acting on it in accordance with their policies"); Ex. 74 (noting that Twitter "examined any reports sent to it by the Virality Project to determine if the content was violating of its policies and did not take action in cases where Twitter felt its existing policies were not violated"); Scully Ex. 1 at 17 (Dkt. 209-2) ("The EIP established relationships with social media platforms to facilitate flagging of incidents for evaluation when content or

---

[111] Indeed, Plaintiffs' misguided coercion theory is particularly inapt with respect to the EIP, as its activities began before the current Administration.

behavior appeared to violate platform policies[].”); Ex. 125 at 3 (“Social-media platforms, not EIP,

decided which action to take.”); Ex. 74 (stating that the EIP provided public factual findings to

social media platforms, but had no control over content moderation, censorship, or labeling posts);

Ex. 122 (stating that EIP’s “researchers made independent decisions about what to pass on to

platforms, just as the platforms made their own decisions about what to do with our tips”).

Reflective of the fact that social media companies independently applied their terms of

service when they received tips about potential misinformation from these organizations, the EIP

reported that only 35% of the time potential misinformation was shared with companies was the

misinformation “labeled, removed, or soft blocked.” Scully Ex. 1 at 27, 40 (Dkt. 209-2) (“No

action was taken on 65%.”).

Here, Plaintiffs’ claims of state action are even weaker than the ones rejected in *O’Handley*,

discussed *supra* at 214-16. Neither the EIP nor the Virality Project possesses any regulatory

authority—indeed, they are private actors. There is no evidence that either the EIP or the Virality

Project threatened or pressured social media companies when identifying potential misinformation

for their consideration. Rather, the evidence reflects that the EIP and the Virality Project simply

flagged misinformation for social media companies, and those companies then independently

applied their terms of service. Plaintiffs cannot establish state action implicating the First

Amendment under these circumstances.

      f.   *Social media companies’ voluntary consultation with agencies for scientific*
         *and medical information about COVID-19 does not support a state action*
         *finding relating to “other agencies.”*

Finally, Plaintiffs attempt to bring “other agencies” within the reach of their capacious

joint-action theory through a series of meritless arguments that turn on mischaracterizations of the

evidence. *See* PI Supp. 40-41. First, Plaintiffs posit that social media companies “routinely treat

certain federal agencies, and “CDC in particular,” as fact-checkers having “authority to dictate”

what appears on their platforms. *Id.* at 40. As explained above, Arg. § II.B.4.a., that extravagant assertion lacks any evidentiary basis. As support, Plaintiffs point to Facebook's requests for views about COVID-19 and vaccines from various agencies, including CDC and NIAID, when Facebook was assessing the validity of factual claims circulating on its platform. PI Br. at 40. But Plaintiffs point to no precedent teaching that Facebook's (or any other company's) voluntary choice to seek advice regarding available scientific and medical information about the virus and the vaccines can support a state action finding. And the cited correspondence does not indicate that, in voluntarily electing to treat the agencies as reliable sources of scientific information—even as "privileged" sources, as Plaintiffs put it—any company somehow surrendered its "plenary power to reexamine" agencies' views, and "to reject them" when determining whether certain claims constituted "misinformation." *Cf. Nat'l Collegiate Athletic Ass'n*, 488 U.S. at 194-95 (distinguishing *Bates v. State Bar of Ariz.*, 433 U.S. 350, 360 n.12, 362 (1977), in holding that a private association was not a state actor where public university "retained the authority to withdraw from the [private association] and establish its own standards"). There is no evidence that any agency demanded or implored that companies accord any deference to its views, dispositive or otherwise, or that companies take any particular action concerning any particular post.

Plaintiffs also point to a handful of instances in which NIAID communications staff notified a social media company of posts impersonating Dr. Fauci and asked for their removal; and they say that other officials made similar requests. PI Supp. 40. As noted, impersonating a federal official may violate both federal law, 18 U.S.C. § 912, and the social media companies' own content moderation policies, *supra* at 157 (noting Facebook and Twitter mechanisms for the

public to report imposter accounts).[112] But as with the communications over the scientific validity of certain claims, these communications lack any support for Plaintiffs' extraordinary assertion that social media companies have ceded "ultimate authority," PI Supp. 40, to the Government to "dictate" was appears on their platforms.

Next, Plaintiffs assert that social media companies' efforts to amplify the Federal Government's perspectives on the health benefits of COVID-19 vaccines, among other topics, constitutes "collusi[ve]" state action. PI Supp. 41. That argument is also mistaken. The Constitution preserves the Government's leeway to craft and to put forward government views on matters of public import. *See Walker*, 576 U.S. at 207-08. The Government's willingness to have its views about vaccines promoted on social media reflects a commonsense interest in sharing what the Government viewed as important public health information on platforms capable of reaching a large share of the population in the middle of a deadly pandemic. Such a willingness does not reflect "collusion" between the Government and the social media companies to suppress Plaintiffs' preferred views of controversial issues that arose during the pandemic. Plaintiffs thus cannot show any likelihood of success on the merits of their claims against some category of "other agencies" that have supposedly "colluded" with social media companies to violate any Plaintiffs' First Amendment rights.

> **5. Even if Plaintiffs could show that any social media content moderation actions amount to state action, the Court cannot necessarily conclude that all of those content moderation actions violate the First Amendment.**

In addition to suffering from numerous defects on its own terms, the sprawling and imprecise nature of Plaintiffs' legal theory also makes it impossible for them to pinpoint which content moderation decisions are attributable to Defendants, thus precluding the Court from

---

[112] Dr. Fauci was not involved in these requests and did not testify to his views on the removal of "parody" accounts, despite Plaintiffs' contrary assertions, *see* PI Supp. 40. *Supra* PFOF § II.E.

conducting the relevant First Amendment analysis. Plaintiffs presume, incorrectly, that each relevant content moderation decision would be subject to, and would fail, strict scrutiny. But content moderation actions may apply to different forms of speech, some of which merit less protection than others, or even none. And moderation actions against certain content may have critical national security justifications and would survive the highest level of scrutiny. The Court thus cannot assume that all relevant content moderation decisions necessarily violate the First Amendment.

Critically, Plaintiffs do not, and likely cannot, catalogue the types of speech that, allegedly, either currently is or will be subject to social media companies' moderation actions that are attributable to the Government. They identify examples of speech previously subject to moderation actions, but they seek injunctive relief relating to ongoing and future unspecified moderation actions. Given Plaintiffs' failure to submit evidence on the specific speech that is currently or will soon be subject to relevant moderation actions, the Court cannot conduct the analysis necessary to conclude that the moderation actions violate the First Amendment.

To begin with, some categories of speech—even if deemed "core political speech" as Plaintiffs label them—fall outside the protections of the Free Speech Clause. Thus, moderation actions against that speech would not necessarily violate the First Amendment, even if such actions are attributed to the Government (which they are not).

For example, the First Amendment permits "restrictions upon the content of speech in a few limited areas" without triggering scrutiny at all, including the areas of solicitation, aiding and abetting, fraud, conspiracy, and incitement. *United States v. Stevens*, 559 U.S. 460, 468 (2010) (citation omitted); *see, e.g.*, *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949). To take one of those areas: The Free Speech Clause "does not shield fraud." *Illinois v. Telemarketing*

*Assocs., Inc.*, 538 U.S. 600, 612 (2003); *see, e.g.*, *Stevens*, 559 U.S. at 468; *Commodity Trend Service, Inc. v. CFTC*, 233 F.3d 981, 993 (7th Cir. 2000). And a "difference of opinion as to whether a product had any value at all d[oes] not bar a fraud order based on claims of far greater curative powers than the product could actually have." *Reilly v. Pinkus*, 338 U.S. 269, 273 (1949) (discussing *Leach v. Carlile*, 258 U.S. 138, 139 (1922)). So, for example, if a user made a social media post intended to promote potential commercial uses of a drug as a remedy for COVID-19 via a fraudulent statement within the scope of the wire-fraud statute, 18 U.S.C. § 1343, the First Amendment would not protect that post, just as the First Amendment would not bar the Government from prosecuting the fraud.

In any event, even if strict scrutiny were to apply to some of the content moderation episodes, certain, relevant moderation actions may satisfy it. The Supreme Court has observed that although strict scrutiny sets a high bar, cases in which it is met "do arise." *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 444 (2015) (quoting *Burson v. Freeman*, 504 U.S. 191, 211 (1992) (plurality opinion)). As explained below, Arg. §§ III, IV-B, *infra*, certain moderation actions taken by social media platforms concern malign foreign actors, and if Plaintiffs argue that those moderation actions are attributable to the Defendants, the Court would have to weigh whether those actions, with the ensuing national security benefits, satisfy strict scrutiny.

For example, when the speech in question implicates the Government's foreign affairs and national security responsibilities, a Free Speech Clause claim does not automatically triumph over the exercise of those powers. *See Dep't of the Navy v. Egan*, 484 U.S. 518, 527 (1988) (the Government's interest in national security is "compelling"); *Guillot v. Garrett*, 970 F.2d 1320, 1324 (4th Cir. 1992) (Luttig, J.) ("[F]oreign policy [is] the province and responsibility of the Executive." (quoting *Egan*, 484 U.S. at 529; *Haig v. Agee*, 453 U.S. 280, 293-94 (1981))); *Holder*

*v. Humanitarian L. Project*, 561 U.S. 1, 33-34 (2010). Some of the communications with social media companies that Plaintiffs challenge involved agencies, such as the FBI and the State Department, that are statutorily authorized, at a minimum, to address malign foreign-origin misinformation. At least as to the activities of such agencies concerning posts from hostile foreign governments or foreign non-governmental organizations (such as al-Qaida)—entities unable to seek shelter under the Free Speech Clause, *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 140 S. Ct. 2082 (2020)—Plaintiffs have not demonstrated a likelihood of succeeding on their claim under the First Amendment.

### C.  Plaintiffs are not likely to prevail on their APA and Ultra Vires claims.

Plaintiffs argue that the various alleged communications by Defendants—none of which has imposed any legal obligations on any party—are ultra vires because they were not expressly authorized by statute. PI Supp. 53-55. Government officials, however, need no express statutory authorization to simply engage in basic speech.

Although "an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress," *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) (emphasis added), "an agency without legislative rulemaking authority may" still "issue . . . non-binding statements," *Batterton v. Marshall*, 648 F.2d 694, 702 (D.C. Cir. 1980). A "legislative-type rule," or "substantive rule," is one that is "binding" or has the "force of law," and "affect[s] individual rights and obligations." *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 (1979); *see also Walmart Inc. v. U.S. Dep't of Just.*, 21 F.4th 300, 308 (5th Cir. 2021) ("Non-substantive rules" include "non-binding agency policy statements"); *Changizi*, 602 F. Supp. 3d at 1057 ("[A]gencies may issue 'non-binding [policy] statements' on various topics even if they lack 'legislative rulemaking authority' in relation thereto") (citation omitted).

Here, none of the alleged communications at issue is a "legislative" or "substantive" rule that requires Congressional authorization. They are non-binding communications that impose no obligations, and confer no rights, on any person. No person or organization—including any social media platform or social media user—is required to take any action as a result of those communications. And none of those communications imposes any penalty on any party that declines to take any particular action. Those communications amount to routine government speech conveying a policy view, akin to public remarks made by any other government official. Indeed, government officials across multiple administrations have engaged in televised interviews or have held press conferences, and Plaintiffs never suggest all of those activities were expressly authorized by some statute.

Accordingly, Defendants did not require any Congressional authorization before expressing their views on social media practices.[113] In any event, a government official has a right to engage in non-binding speech on matters the official finds important.[114] *See Summum*, 555 U.S.

---

[113] In ruling on Defendants' motion to dismiss, the Court noted that, in its view, Plaintiffs had properly alleged that Defendants imposed a "prior restraint" on social media users, and thus their conduct required statutory authorization. *See* MTD Order 72. But Plaintiffs refer to no statement or action by any Defendant that legally restrained any communications by social media users. Any social media account restrictions are imposed by the platforms themselves, not by any Defendant.

[114] Moreover, many of the Defendant agencies have been given broad, express statutory authority to carry out their respective missions, which would encompass relevant communications with social media companies. *See*, *e.g.*, 6 U.S.C. § 652 (CISA is charged with leading the national effort to understand, manage, and reduce risk to the nation's cyber and physical infrastructure); 28 U.S.C. § 533, (the Attorney General may appoint officials to, inter alia, detect crimes against the United States and to conduct such other investigations regarding official matters under the control of the Department of Justice); 22 U.S.C. § 2656 note (GEC is formed "[t]o direct, lead, synchronize, integrate and coordinate efforts of the Federal Government to recognize, understand, expose, and counter foreign state and foreign non-state propaganda and disinformation efforts aimed at undermining or influencing the policies, security, or stability of the United States and United States allies and partner nations."); 42 U.S.C. § 300u (HHS is authorized to "formulate national goals, and a strategy to achieve such goals, with respect to health information and health promotion . . . and education in the appropriate use of health care"); 42 U.S.C. § 284(b)(1)(F) (NIAID has the

at 467–68 ("A government entity has the right to 'speak for itself'" and it "is entitled to say what it wishes . . . and to select the views that it wants to express," otherwise "it is not easy to imagine how government could function") (citations omitted). Thus, Plaintiffs cannot make a showing of ultra vires conduct based on nothing more than Government speech about, and with, social media companies. An ultra vires claim is valid only if a plaintiff can show that an official acted "without any authority whatever," or without any "colorable basis for the exercise of authority." *See Danos v. Jones*, 652 F.3d 577, 583 (5th Cir. 2011). Finally, Defendants incorporate by reference their argument that Plaintiffs have failed to identify a sovereign immunity waiver for their ultra vires claim. *See* Defs.' Reply 36-39. Plaintiffs' ultra vires claim thus fails.

For similar reasons, Plaintiffs' APA claims fail as well. The APA provides a right to judicial review to persons suffering legal wrong because of, or adversely affected or aggrieved by, "agency action," 5 U.S.C. § 702; *see id.* § 706(2), that is "final," *id.* § 704, *see also Bennett*, 520 U.S. at 175. As shown by Defendants in support of their motion dismiss, Plaintiff have failed to allege—and now to establish—that they are challenging any conduct by Defendants that amounts to "agency action." Defs.' MTD 45-48. [115]

Nor have Plaintiffs met the finality requirement. To constitute "final agency action," the action must be "identifiable" and "specific," and must determine "rights or obligations" from

_____

authority to "develop, conduct, and support public and professional education and information programs").

[115] The APA defines "agency action" as including "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13); *see also id.* § 551(4), (6), (8), (10), (11) (defining "rule," "order," "license," "sanction," and "relief"). Note that the President is not subject to the APA at all. *See Dalton v. Specter*, 511 U.S. 462, 470 (1994) ("The actions of the President . . . are not reviewable under the APA because . . . the President is not an 'agency'") (citation omitted). The President's advisers are not considered agencies either. *Cf. Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898, 905 (D.C. Cir. 1993).

"which legal consequences will flow." *Sierra Club v. Peterson*, 228 F.3d 559, 565 (5th Cir. 2000) (citation omitted). Additionally, the plaintiff "must show some *direct*, final agency action involving the particular plaintiff." *Texas v. Rettig*, 987 F.3d 518, 529 (5th Cir. 2021) (emphasis added), *cert. denied sub nom. Texas v. Comm'r of Internal Revenue*, 142 S. Ct. 1308 (2022). Here, none of the alleged communications by Defendants constitutes "final agency action." As explained above, those communications impose no requirement on any party, and so they do not determine any "rights or obligations." *Peterson*, 228 F.3d at 565 (citation omitted). Nor do any of those communications "direct[ly]" affect any "particular plaintiff." *Rettig*, 987 F.3d at 529 (citation omitted). To the extent they affect Plaintiffs at all, those effects would stem from the independent decisions of private social media companies, each of which is free to ignore Defendants. Thus, Defendants' alleged communications do not constitute "final agency action," and Plaintiffs' APA claims fail for that reason alone.

Additionally, Plaintiffs' APA claims also fail on the merits. Their contentions that Defendants have acted in "arbitrary [and] capricious" fashion and "contrary to constitutional right" all hinge on the flawed assertion underlying their First Amendment claim: that Defendants have imposed some legal restriction on speech. *See* PI Supp. 54. Their argument that Defendants have failed to observe the APA's requirements for notice-and-comment rulemaking, *id.* at 55; *see* 5 U.S.C. § 553(b), is specious. Those requirements apply only to an agency's promulgation of "final, legislative rules." *See Flight Training Int'l, Inc. v. Fed. Aviation Admin.*, 58 F.4th 234, 240 (5th Cir. 2023). Defendants' meetings and e-mails with social media companies, and their public remarks at press briefings, do not constitute APA "rule[s]" to begin with. 5 U.S.C. § 551(4) (defining a "rule" as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy"). Nor

are they "legislative" rules, that is, "rules having the force and effect of law . . . because they are promulgated pursuant to legislative authority delegated to the agency by Congress," and that "modif[y] or add[ ] to a legal norm." *Flight Training Int'l, Inc.*, 58 F.4th at 241 (citations omitted). Defendants' actions meet none of these criteria. Finally, Defendants incorporate by reference the argument that Plaintiffs have also failed to establish that they are challenging any conduct that amounts to discrete "agency action," and therefore that they have not established any waiver of sovereign immunity as to this claim. *See* Defs.' MTD 45-48. Plaintiffs' APA claims thus fail. Plaintiffs' APA claims thus fail.

## III.   Plaintiffs fail to satisfy the remaining preliminary injunction requirements.

An injunction also is not appropriate because the balance of the equities and the public interest tip sharply in Defendants' favor. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (holding that "[t]hese factors merge when the Government is the opposing party"). As an initial matter, given that Plaintiffs cannot establish the first two factors necessary to obtain an injunction, "it is clear they cannot make the corresponding strong showings [on the second two factors] required to tip the balance in their favor." *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1295 (D.C. Cir. 2009); *Mayo Found. for Med. Educ. & Rsch. v. BP Am. Prod. Co.*, 447 F. Supp. 3d 522, 535 (N.D. Tex. 2020) (declining to address the final two *Winter* factors because plaintiff could not establish the first two factors).

But even if Plaintiffs could satisfy one or both of those factors, the remaining *Winter* factors tip decisively in Defendants' favor. Although there is no dispute that protecting First Amendment rights when they are genuinely at risk is in the public interest, the speculative risk of harm to Plaintiffs' asserted interests must be weighed against the substantial, widespread obstruction of legitimate government functions that would result if the Court entered Plaintiffs' proposed injunction—functions that are critical to the public welfare and the integrity of our democratic

processes. *See Winter*, 555 U.S. at 24 ("In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.") (citations omitted).

First, as also shown in the discussion of the proposed injunction's overbreadth, *infra*, Arg. § IV.B, Plaintiffs' proposed injunction would significantly hinder the Federal Government's ability to combat foreign malign influence campaigns, prosecute crimes, protect the national security, and provide accurate information to the public on matters of grave public concern such as health care and election integrity. *See* Knapp Decl. ¶¶ 5-50 (Ex. 157); Declaration of Brandon Wales, Exec. Dir., CISA ("Wales Decl.") ¶¶ 27-30 (Ex. 167); Crawford Decl. ¶¶ 20-23 (Ex. 80); Lesko Decl. ¶¶ 18-19 (Ex. 63); Bray Decl. ¶¶ 12-15 (Ex. 142). These government activities are essential to the nation's welfare and safety, and outweigh the speculative First Amendment interests Plaintiffs assert here. *Def. Distrib. v. U.S. Dep't of State*, 838 F.3d 451, 459 (5th Cir. 2016) (holding that any First Amendment interest by plaintiffs was outweighed by stronger interest of Federal Government in national security); *Am. Civil Liberties Union v. Clapper*, 785 F.3d 787, 826 (2d Cir. 2015) (recognizing maintenance of national security as "public interest of the highest order"); *Donald J. Trump for President, Inc. v. Way*, 492 F. Supp. 3d 354, 375 (D.N.J. 2020) (recognizing "that the public interest favors preserving the integrity of the election process"); *Beverly v. United States*, 468 F.2d 732, 741 n.13 (5th Cir. 1972) (in assessing request for stay pending appeal, court was "particularly mindful that the grant of a stay would be contrary to the public interest in the orderly investigation of criminal activities by a federal grand jury"); *cf. Spiegel v. City of Houston*, 636 F.2d 997, 1002 (5th Cir. Unit A 1981) (reversing preliminary injunction that "by its terms . . . in its overbreadth forbids good faith as well as bad faith law

enforcement activities"); *Roviaro v. United States*, 353 U.S. 53, 59 (1957) (recognizing "the public interest in effective law enforcement").

The FBI, for example, routinely shares intelligence with private sector entities, including social media platforms, so that those entities can use that information to help protect the public. Knapp Decl. ¶ 15 (Ex. 157). Foreign malign actors (like Russia, the People's Republic of China, and Iran) attempt to use social media to sway U.S. voters' preferences and perspectives, shift U.S. policies, increase discord in the United States, and undermine the American people's confidence in democratic institutions and processes. *Id.* ¶¶ 10-12. Across Administrations, the Executive Branch has recognized such operations as a profound threat to national security. *Id.* ¶ 11. Yet the proposed injunction could be understood to prevent the FBI from sharing, with social media platforms, intelligence about which accounts appear to be tools of foreign malign actors— preventing the platforms from taking appropriate action pursuant to their own terms of service.

The injunction also could be understood to prevent the FBI and the GEC from calling platforms' attention to accounts used by foreign terrorist organizations, such as the Islamic State of Iraq and ash-Sham (ISIS) and al Qaeda, to recruit supporters and propagate their ideologies. *Id.* ¶¶ 25-31; Bray Decl. ¶ 14 (Ex. 142). Whereas the promotion of terrorist activities is typically a violation of a social media platform's terms of service, platforms may not be able to identify terrorist content without access to FBI intelligence. Knapp Decl. ¶ 30 (Ex. 157). For example, the FBI is uniquely positioned to identify and share intelligence about code words and symbols being used by terrorist groups. *Id.* ¶ 48. Similarly, the GEC would be unable to flag for social media companies the kinds of propaganda and disinformation spread by foreign terrorist groups or state actors aimed at harming U.S. interests. Bray Decl. ¶ 14 (Ex. 142). As the FBI has explained:

> [T]he Russian, Chinese, and Iranian governments, other foreign malign
> actors individuals or groups intent on preventing qualified voters from

> voting, terrorists, cyber criminals, individuals or groups involved in crimes
> against children, and a wide variety of other criminals would benefit, and
> the American public and victims of crime would be harmed, if the court
> were to issue the proposed PI and if it were interpreted to prevent the FBI
> from communicating with social media platforms about criminal conduct,
> national security threats, and other threats on their platforms.

Knapp Decl. ¶ 5 (Ex. 157).

As this Court previously has recognized, "[i]n balancing the equities and considering the public interest, courts properly decline to second-guess the judgments of public health officials." *Chambless Enter., LLC v. Redfield*, 508 F. Supp. 3d 101, 123 (W.D. La. 2020) (Doughty, J.). But that is precisely what the proposed injunction would do. As CDC has explained, the proposed injunction "could inhibit CDC from performing its essential education function, to the detriment of those whose health and well-being (and perhaps their lives) depend on the availability of accurate information about disease prevention and treatment," Crawford Decl. ¶ 21 (Ex. 80), a function the agency has been faithfully carrying out for nearly 75 years.

Second, the proposed injunction, if granted, could be read to prevent the Government from speaking on issues of significant public concern. Popular rhetoric is a core aspect of the modern presidency. Yet Plaintiffs seek to enjoin Executive Branch officials from using the bully pulpit to express the President's views. For example, Plaintiffs seek to prohibit, as "censorship," public statements made by the White House Press Secretary during press briefings, outreach by the Surgeon General, and even off-the-cuff remarks made by the President to reporters. *See* PI Supp. 10 ("The White House makes detailed public demands for greater censorship, including at the White House press conferences on May 5, 2021 and July 15, 2021."); *id.* (challenging President's public statement that social media companies are "killing people"); *id.* at 11 ("The Surgeon General uses his 'bully pulpit' to pressure social-media platforms to censor disfavored viewpoints."). As the Supreme Court has observed, "If every citizen were to have a right to insist

that no one paid by public funds express a view with which he disagreed, debate over issues of great concern to the public would be limited to those in the private sector, and the process of government as we know it radically transformed." *Summum*, 555 U.S. at 468 (quoting *Keller v. State Bar of Cal.,* 496 U.S. 1, 12–13 (1990)). Plaintiffs' proposed injunction, if granted, would significantly impair the public interest by curtailing the Federal Government's ability to publicly express its views on matters affecting the public welfare and ensure an informed citizenry.

Together, these interests far outweigh Plaintiffs' speculative fears that social media companies, whether under threat by or otherwise compelled by Defendants, will remove or otherwise restrict access to speech that Plaintiffs wish to engage in or with. Moreover, Plaintiffs' overbroad injunction, which would significantly interfere with core Executive Branch functions as explained below, raises serious separation-of-powers concerns. The Supreme Court has repeatedly emphasized that Article III does not "grant unelected judges a general authority to conduct oversight of decisions of the elected branches of Government." *California v. Texas*, 141 S. Ct. 2104, 2116 (2021); *cf. Juliana v. United States*, 947 F.3d 1159, 1171 (9th Cir. 2020) (affirming the dismissal of constitutional claims on redressability grounds because "it is beyond the power of an Article III court to order, design, supervise, or implement the plaintiffs' requested remedial plan"), *denying reh'g en banc*, 986 F.3d 1295 (9th Cir. 2021). It is difficult to imagine a more overly expansive remedy than the broad injunction Plaintiffs propose, the enforcement of which would threaten to encroach on the Executive Branch's prerogatives to speak on matters of public concern. Accordingly, if the Court reaches the balance of the equities and the public interest, it should conclude that those factors weigh heavily against granting the relief Plaintiffs seek.

## IV.    Plaintiffs' proposed injunction is improper.

Plaintiffs' proposed injunction is not only contrary to the public interest but also improper for several reasons. First, the proposed injunction lacks the specificity required by Federal Rule of

Civil Procedure 65(d)(1). Second, the proposed injunction is substantially overbroad because it would needlessly interfere with the performance of lawful Executive Branch activities that protect the public welfare. And it would also needlessly enjoin former and current federal employees sued in their official capacities when Plaintiffs also seek to enjoin the federal agencies where they are or were employed. Accordingly, the Court should reject Plaintiffs' proposed injunction, as further discussed below.

**A. Plaintiffs' proposed injunction lacks the specificity required by Federal Rule of Civil Procedure 65.**

Plaintiffs' proposed injunction is insufficiently precise. Rule 65(d)(1) requires that "[e]very order granting an injunction" must "state its terms specifically," and "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." As the Supreme Court has explained:

> The specificity provisions of Rule 65(d) are no mere technical requirements. The Rule was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood. . . . Since an injunctive order prohibits conduct under threat of judicial punishment, basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed.

*Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) (citations omitted); *Atiyeh v. Capps*, 449 U.S. 1312, 1316-17 (1981) (Rehnquist, J., in chambers) (holding that an injunction requiring prison officials to accomplish a further reduction of the inmate population at three facilities by "at least 250" individuals by a date certain "falls short of [Rule 65's] specificity requirement"); *Common Cause v. Nuclear Regul. Comm'n*, 674 F.2d 921, 926-27 (D.C. Cir. 1982) (holding that an injunction barring the NRC from closing to the public future meetings similar in nature to the meeting that gave rise to the action lacked the requisite specificity under Rule 65). As the Fifth Circuit has explained, an "injunction should not contain broad generalities," but "must describe in reasonable

detail the acts restrained or required" and identify what specific policies are enjoined. *Scott v. Schedler*, 826 F.3d 207, 213-14 (5th Cir. 2016).

Plaintiffs' requested injunction falls far short of the specificity requirement of Rule 65(d). Plaintiffs' proposed, ambiguous injunction seeks to enjoin certain Defendants from "taking any steps" to "demand, urge, encourage, pressure, coerce, deceive, collude with, or otherwise induce any social-media company or platform for online speech" to "censor, suppress, remove, de-platform, suspend, shadow-ban, de-boost, deamplify, issue strikes against, restrict access to, demonetize," or take "any similar adverse action" against "any speaker, content, or viewpoint expressed on social media." PI Supp. 67-68. If Defendants are to understand these undefined terms by reference to the immense swath of conduct that, to Plaintiffs, amounts to coercion, encouragement, or joint participation, those terms could encompass any form of expression, public or private. The line between permissible and impermissible expression would be anyone's guess.

Nor do Plaintiffs define the terms "censor," "suppress," "remove," "de-platform," "suspend," "shadow-ban," "de-boost," "deamplify," "issue strikes against," "restrict access to," or "demonetize," many of which are conclusory labels ("censor," "suppress") or terms of art within the social media industry that the proposed injunction does not define ("shadow-ban," "de-boost," "deamplify"). Compounding those ambiguities is the proposed injunction's attempt to prohibit Defendants from "otherwise induc[ing]" these actions or "any similar adverse action[s]." *See Scott*, 826 F.3d at 207; *M.D. ex rel. Stukenberg v. Abbott*, 907 F.3d 237, 272 (5th Cir. 2018); *Louisiana v. Biden*, 45 F.4th 841, 845-46 (5th Cir. 2022); *United States v. Phillip Morris USA Inc.*, 566 F.3d 1095, 1137 (D.C. Cir. 2009). In addition, the proposed injunction fails to specify the covered "social media compan[ies]" and "platform[s] for online speech," or, if these terms are meant instead to refer to entire categories including companies not yet in existence, then the injunction

does not give them a precise definition. These vague, undefined concepts fail to put the Defendants on reasonable notice of what conduct is proscribed and improperly place Defendants at risk of contempt.[116]

### B. Plaintiffs' proposed injunction is impermissibly overbroad.

Even if Plaintiffs' proposed injunction were sufficiently precise, it is radically overbroad. The proposed injunction would threaten to prevent Executive Branch agencies from performing functions essential to public safety and national security—functions that pose no threat to the First Amendment. Thus, the injunction would defy established principles barring equitable relief that is "more burdensome to the defendant[s] than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *Scott*, 826 F.3d at 211 (an injunction must be "narrowly tailor[ed] . . . to remedy the specific action which gives rise to the order as determined

---

[116] These defects would not be cured by the proposal by amicus Children's Health Defense, which would limit the proposed injunction to a prohibition against federal officials' privately communicating with social media companies for the purpose of inducing them to censor constitutionally protected speech, as such an injunction would still lack the specificity required by Rule 65(d). *See* Br. *Amicus Curiae* of Children's Health Def. 3-6 (Dkt. 262). For example, it is unclear what conduct would amount to "inducement" or what specific speech would be subject to constitutional protection and, therefore, subject to the injunction. *See Zamecnik v. Indian Prairie Sch. Dist.*, 619 F. Supp. 2d 517, 523 (N.D. Ill. 2007) (holding that a request for a preliminary injunction must "establish[] the speech at issue with sufficient specificity"); *Burton v. City of Belle Glade*, 178 F.3d 1175, 1200 (11th Cir. 1999) (holding that an injunction that ordered a City "not to discriminate" in the future lacked sufficient specificity). And an injunction that prevented Defendants from inducing the censorship of "constitutionally protected speech" would also constitute an impermissible "obey-the-law" injunction. *See SEC v. Life Partners Holding, Inc.*, 854 F.3d 765, 784 (5th Cir. 2017) ("Rule 65(d) therefore prohibits 'general injunction[s] which in essence order[] a defendant to obey the law." (quoting *Meyer v. Brown & Root Constr. Co.*, 661 F.2d 369, 373 (5th Cir. 1981))); *Payne v. Travenol Lab., Inc.*, 565 F.2d 895 (5th Cir. 1978) (holding that "[t]he word 'discriminating,' like the word 'monopolizing' . . . is too general" and that "[s]uch 'obey the law' injunctions cannot be sustained" (citations omitted)). In addition, such an injunction would be improper because by focusing on the "purpose" of the communication (*i.e.*, "the purpose of inducing"), compliance with the injunction would turn on the intent behind each Defendants' communication with a social media company—an unworkable standard that would simply result in endless hearings to determine whether Defendants had the requisite intent to violate the injunction in communicating with social media companies.

by the substantive law at issue"); *cf. INS v. Legalization Assistance Project of L.A. Cnty. Fed'n of Labor*, 510 U.S. 1301, 1305-1306 (1993) (O'Connor, J., in chambers) (emphasizing harm from "improper intrusion by a federal court into the workings of a coordinate branch of the Government").

1.    For example, the proposed injunction could be taken to apply to "a range of situations—some of which are completely unrelated to the allegations against the FBI and FBI officials in this lawsuit—in which it would be in the public interest and consistent with the FBI's law enforcement and national security missions for the FBI to notify a social media platform of criminal conduct, national security threats or other threats on its platform." Knapp Decl. ¶ 5 (Ex. 157). Yet the proposed injunction could be read to preclude Defendants from sharing intelligence on the use of online platforms to commit crimes ranging from fraud to the sexual exploitation of children,[117] conduct that is not subject to First Amendment protection. *Id.* ¶¶ 5-50. *See, e.g., Seals*, 898 F.3d at 597 (holding that statute that regulated true threats and extortion did not implicate the First Amendment).

*United States v. Mackey*, No. 21-CR-80, 2023 WL 363595 (E.D.N.Y. Jan. 23, 2023), illustrates the overbreadth of Plaintiffs' requested injunction. In *Mackey*, the United States charged the defendant with a violation of 18 U.S.C. § 241 based on his alleged participation in an online conspiracy to disenfranchise certain Twitter users by, *inter alia*, conducting a coordinated campaign to spread disinformation about voting procedures during the 2016 Presidential election.

---

[117] The proposed injunction could potentially prevent the Government from alerting a social media provider that child sexual abuse material exists on its platform, thus triggering the provider's statutory duties under 18 U.S.C. §§ 2251 *et seq.*, including the removal and reporting of such content. Knapp Decl. ¶ 43 (Ex. 157). Furthermore, the proposed injunction's prohibition on 'acting in concert with others' could potentially prevent the National Center for Missing and Exploited Children ("NCMEC") from working with government agencies and providers to keep child pornography off the internet. *Id.* ¶¶ 43-44.

*Id.* at *1. The district court rejected the defendant's argument that the indictment violated his First Amendment rights, holding that "[t]his case is about conspiracy and injury, not speech." *Id.* at *19. In so concluding the court observed that "[f]alse speech . . . may fall into categories historically exempted from First Amendment protection[,]" *id.*, and took particular note of the Supreme Court's observation in *Minnesota Voters Alliance v. Mansky*, 138 S. Ct. 1876, 1899 n.4 (2018), that the government "may prohibit messages intended to mislead voters about voting requirements and procedures." *Mackey*, 2023 WL 363595, at *22.[118] Yet Plaintiffs' proposed injunction would appear to bar federal law enforcement from alerting social media companies to the presence of such illegal activity on their platforms. Other examples of the proposed injunction's gratuitous intrusions on the FBI's law-enforcement activities are discussed in the declaration of Larissa L. Knapp, *see* Knapp Decl. ¶¶ 10-49 (Ex. 157).

2.    The proposed injunction could similarly interfere with key functions statutorily assigned to CISA, such as the ability to share with platforms information that allows them to detect, prevent, and mitigate malicious cyber activity. Wales Decl. ¶ 26 (Ex. 167). For example, CISA's declaration explains that in March 2023, a cybercriminal compromised a Voice over Internet Protocol (VoIP) company, causing the company unwittingly to distribute an altered version of its software to hundreds of thousands of customers. *Id.* ¶ 28.c. The altered software would initiate a connection to GitHub—a site that allows individual users to develop, host, and

---

[118] The court further explained that "statutes that prohibit falsities in order to 'protect the integrity of government processes' (*e.g.*, perjury statues, laws barring lying to government officials, and those 'prohibit[ing] falsely representing that one is speaking on behalf of the Government') are properly within the government's regulatory authority." *Mackey*, 2023 WL 363595, at *21 (citation omitted). Accordingly, the district court rejected the defendant's First Amendment challenge that characterized his deceptive tweets as "political speech" and concluded that his tweets are "most accurately characterized as a vehicle or means for illegal conduct." *Id.* at *22.

download software and to comment on or contribute to one another's work—to download a file containing Internet addresses that the user's computer would then use to download malware. *Id.* To mitigate the harm caused by this crime, CISA contacted GitHub to learn whether the malicious file remained accessible. *Id.* If that conduct were regarded as encouraging GitHub to remove the file, as plaintiffs' theory would appear to suggest, the proposed injunction would hamper such efforts in the future. *Id.* Other potential harms to CISA should Plaintiffs' broad injunction issue are discussed in the declaration of Brandon Wales. *See* Wales Decl. ¶¶ 28-30 (Ex. 167).

3.    In addition, the proposed injunction could be understood to interfere with important public-health functions. Because so many Americans use social media, the Surgeon General, in exercising his responsibility to promote healthy behavior, would typically ask social media platforms to take steps that help Americans make choices that improve their health. Lesko Decl. ¶ 19 (Ex. 63). The Surgeon General could, for example, ask platforms to take steps to prevent online bullying of children and teenagers, or to limit advertisements for tobacco, alcohol, or dangerous weight-loss products that could be seen by children or teenagers. *Id.* ¶ 20. But the proposed injunction could be understood to forbid that sort of advocacy if it is deemed to "encourage" platforms to take action against the content in question. *Id.*

Notably, Plaintiffs engage in the same type of advocacy with social media companies that their proposed injunction could be construed to prohibit. For example, in October 2019, Louisiana Attorney General Jeff Landry, on behalf of the National Association of Attorneys General, wrote a letter to Facebook, Craigslist and eBay "call[ing] upon you to join us in this shared responsibility to protect our youth, the Constitution and the integrity of the digital marketplace" by, among other things, "review[ing] the current content posted to [your] companies' websites and remove illegal postings for the sales and/or transfer of alcohol products." Ex. 158 at 1 (Press Release, La. Dep't

of Just., Online Alcohol Sales Concern of Republican and Democrat Attorney Generals (Oct. 22, 2019), https://perma.cc/4ZFX-TEP5); Ex. 159 at 1 (Letter from Jeff Landry, La. Att'y Gen., et al., to Scott Schenkel, Interim Chief Exec. Officer, eBay (Oct. 22, 2019)). The letter also invited the companies to help "establish a work[ing] group with stakeholders from industry and government" to "discuss and establish realistic and effective protocols for internet platforms and content providers related to illegal and unlicensed alcohol sales via digital platforms." Ex. 159 at 2.

Similarly, on behalf of 33 other state attorneys general, Attorney General Landry sent a letter to Facebook, eBay, Craigslist, Walmart and Amazon urging them "to more rigorously monitor price gouging practices by online sellers using their services" concerning COVID-19, including a request that the companies "[s]et policies and enforce restrictions on unconscionable price gouging during emergencies" and "[t]rigger price gouging protections prior to an emergency declaration." Ex. 160 at 1 (Press Release, La. Dep't of Just., 33 State Attorneys General Warn Amazon, Facebook, Ebay, Craigslist, Walmart: Online Marketplaces Are Not Exempt from Price Gouging Laws (Mar. 25, 2020), https://perma.cc/X2BY-FHF5). And in April 2021, Attorney General Landry joined a bipartisan letter to Twitter, among others, noting that the platforms were "being used to market and sell blank or fraudulently completed COVID vaccine cards bearing the [CDC] logo," and stating expressing "deep[] concern[] about this use of [their] platforms to spread false and misleading information regarding COVID vaccines." Ex. 161 at 1 (Letter from Nat'l Ass'n of Att'ys Gen., et al., to Jack Dorsey, CEO, Twitter, Inc., et al. (Apr. 1, 2021)). The letter requested that the platforms "take immediate action to prevent [their] platforms from being used as a vehicle to commit these fraudulent and deceptive acts that harm our communities." *Id.* at 2. Among other requests, the letter indicated that platforms should "promptly tak[e] down ads or links identified through that monitoring." *Id.* Plaintiffs' position that they can combat potential

violations of state law on social media platforms through direct communications with those platforms, but that the Federal Government must be enjoined from taking similar action to curtail violations of federal law, highlights why their proposed injunction should be rejected.[119]

4.      Relatedly, Plaintiffs' proposed injunction would preclude the White House and federal agencies from legitimately using the bully pulpit to advance their views on matters of public concern, raising serious separation-of-powers concerns. "A President frequently calls on citizens to do things that they prefer not to do—to which, indeed, they may be strongly opposed on political or religious grounds." *Freedom From Religion Found.*, 641 F.3d at 806. Indeed, popular rhetoric is a core aspect of the modern presidency—a tool that presidents have used to galvanize private actors for more than a century. *See* Jeffrey K. Tulis & Russell Muirhead, *The Rhetorical Presidency* 4 (2017 ed.). But a presidential request is not compulsion where "people are free to ignore the President's call." *Peery*, 791 F.3d at 791.

The same holds true for other Executive Branch officials. Because it would be impossible for the President to administer the entire Executive Branch alone, "the Constitution assumes that lesser executive officers will assist the supreme Magistrate in discharging the duties of his trust." *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2197 (2020) (citation omitted). Limitations on the speech of other senior government officials, including White House staff and Cabinet members, therefore also threaten the President's constitutional prerogatives in administering the Executive Branch and articulating the administration's policy views. The

---

[119] Plaintiffs' proposed inunction also could bar components of the Department of Justice or other agencies from working with social media companies to address dangerous TikTok "challenges," such as the one that recently resulted in the death of a 13-year-old who overdosed on Benadryl. Ex. 162 (Michelle Watson, Carma Hassan, *Benadryl TikTok 'challenge': A 13-year old died in Ohio after participating*, CNN (Apr. 18, 2023)).

Seventh Circuit has thus recognized that it is appropriate for federal officials and agencies generally to use the bully pulpit:

> Government officials and agencies spend a great deal of time urging private persons and firms and other institutions to change their behavior (for example, to adopt healthier diets or use public transit more) without backing up their urging with coercion or the threat of it. Physically fit young men and women are encouraged to enlist in the armed forces, but there is no longer a draft, and so there is no coercion to enlist and it would be absurd to claim that encouraging enlistment is the equivalent of forcing people to serve.

*Peery*, 791 F.3d at 790-91.

Here, Plaintiffs' proposed injunction could be read to preclude the Defendants from "urging" or "encouraging" social media companies to act consistent with an Administration's views of the public interest. Indeed, Plaintiffs' proposed injunction is so broad that it could be read to not only cover direct communications between Defendants and social media companies but could preclude federal officials from giving public speeches or press conferences by government officials where they "encouraged" social media companies to take certain actions, including actions against malign foreign influence actors, people who disseminate child sexual abuse materials, or people who improperly disclose classified documents. *See, e.g.*, Ex. 166 (Brett Samuels, *White House says social media companies have responsibility to manage platforms amid leaked document fallout*, The Hill (Apr. 13, 2023)). Indeed, under Plaintiffs' theory, an Administration's public statement recommending reforms to § 230 could be swept into the proposed injunction if it were deemed to be a veiled threat to social media companies. Plaintiffs have no First Amendment right that entitles them to muzzle such plainly legitimate Government speech. *See Summum*, 555 U.S. at 468 (citizens have no right to prohibit government speech with which they disagree); *Freedom From Religion Found.*, 641 F.3d at 806 ("Those who do not agree

with a President's statement may speak in opposition to it; they are not entitled to silence the speech of which they disapprove.").

5.       Furthermore, Plaintiffs' proposed injunction could conceivably be construed to preclude agencies from publishing election- and health-related information on their websites if a social media company were to rely upon that information in deciding whether information on its platform violated its terms of service. Under Plaintiffs' proposed injunction, such proposed publication on websites could be perceived as "encouraging" platforms to consider this information in applying their terms of service. Indeed, far from being speculative, Plaintiffs improperly challenge this precise conduct. *See, e.g.*, Pls.' PFOF ¶ 729 ("As was evidently intended, Dr. Collins's blog post immediately fueled media coverage attacking the lab-leak theory as a 'conspiracy theory.'"); *id.* ¶ 1105 ("Scully admits that CISA was aware that 'social media platforms were following the rumor page posted by CISA and using that as a debunking method for content on their platforms.").

Putting to one side that such publication via websites is classic government speech, an injunction that could be read to preclude Defendant agencies from publishing information on their websites on which social media companies might rely for purposes of applying their own content moderation policies would substantially obstruct Defendants' performance of their missions. *See* Crawford Decl. ¶ 21 (Ex. 80); Bray Decl. ¶ 14 (Ex. 142); Wales Decl. ¶ 28.a. (Ex. 167). It would leave Defendants in an impossible position where each agency post would risk drawing accusations of contempt depending on the unpredictable choices of social media companies concerning whether and how to act on that information.

For example, CISA developed a Rumors vs. Reality page on its website to provide accurate information about election rumors. Ex. 112; Scully Dep. 290:18-23. The page was "designed to

address common disinformation narratives by providing accurate information related to elections." Ex. 112. The page "seeks to inform voters and help them build resilience against foreign influence operations and disinformation narratives about election infrastructure." *Id.* Tellingly, despite their apparent objection to CISA's maintenance of this website, Plaintiffs Louisiana and Missouri have similar websites that seek to debunk rumor and misinformation concerning both elections and COVID-19. *See* Ex. 113; Ex. 114; Ex. 115; Ex. 116. In fact, contrary to its position in this litigation, the Missouri Secretary of State's election misinformation page expressly links to CISA's resources concerning election misinformation. Ex. 114 (linking to CISA's "The War on Pineapple: Understanding Foreign Intelligence in 5 Steps"; and "Social Media Bots Overview").

Similarly, a "core part of CDC's mission is to promulgate science-based, data-driven information about public health matters." Crawford Decl. ¶ 21 (Ex. 80). Like CISA, social media companies may choose to rely on CDC-published information when determining whether certain posts violate their terms of service. *Id.* Yet, under Plaintiffs' proposed injunction, this could be construed as a "step" to "encourage" a social media company to "suppress" or take "similar adverse action" against information that is counter to CDC-provided information. This is yet another example of the staggering overbreadth of Plaintiffs' proposed injunction.

6.     Plaintiffs' proposed injunction is also overbroad because it seeks to preclude Defendants from "acting in concert" with "any such others who are engaged in the aforementioned conduct." PI Supp. 68. Although it is unclear what conduct Plaintiffs seek to cover with this provision, as written the language could be read to mean that even if a Defendant is unaware that another entity has "engaged in the aforementioned conduct," that Defendant could not "act[] in concert" with that entity for any purpose—even if that interaction has nothing to do with content moderation. This is an absurd and unworkable result, and the Court should reject such an

amorphous injunction that would cause significant harm to Defendants' operational interests. *See, e.g.*, Wales Decl. ¶ 29a-e (Ex. 167); Crawford Decl. ¶ 22 (Ex. 80).[120]

7.      Finally, Plaintiffs' proposed injunction is overbroad because it would not just apply to the Office of the White House Press Secretary and numerous agencies but also would extend to dozens of current and former federal employees sued in their official capacity. *See* PI Supp. 67-68).[121] As the Fifth Circuit has recognized, an official capacity claim is essentially a claim against the agency and the official capacity claims therefore merge with those against the agencies. *Harmon v. Dallas Cnty.*, 927 F.3d 884, 891 (5th Cir. 2019) (citing *Turner v. Houma Mun. Fire & Police Civil Serv. Bd.*, 229 F.3d 478, 485 (5th Cir. 2000)) (observing that when "a defendant government official is sued in his individual and official capacity, and the city or state is also sued" the "official-capacity claims and the claims against the governmental entity essentially merge"); *Smith v. Town of Lake Providence*, No. 3:22-CV-01319, 2022 WL 16626762, at *7 (W.D. La. Oct. 17, 2022) (holding that official capacity claims brought against officers merged with claims against

---

[120] For example, Plaintiffs' overbroad proposed injunction could throw CDC's funding of research and other public health programs into jeopardy, thereby inhibiting CDC from carrying out core elements of its vital public health mission. Crawford Decl. ¶¶ 22-23 (Ex. 80). If a CDC-funded entity publicizes research that runs contrary to a narrative circulating on social media, and a social media company then takes steps consistent with its terms of service to limit that narrative, it is unclear whether CDC would be deemed to be "acting in concert" with "others" "engaged" in the "conduct" of "inducing" a social-media company to "suppress" or take "similar adverse action" against certain content, speakers or viewpoints. *Id.*

[121] As another example of the overbreadth of the proposed injunction, Plaintiffs seek to enjoin DOJ and the State Department in addition to the component offices under their authority. *See* PI Supp. 68. But despite Plaintiffs' voluminous filings, they do not appear to have identified any evidence that these parent agencies have violated the First Amendment. For example, Plaintiffs identify DOJ only twice in their supplemental brief, and in both instances, it is in the context of meetings it attended with other federal departments and agencies, and in which misinformation generally was discussed. *Id.* at 34, 37. And Plaintiffs do not identify *any* conduct of the Department of State, which is only referenced twice in their brief, and, in both circumstances, it is simply to note that State is the parent agency of the GEC. *Id.* at 39, 44. Accordingly, any injunction in this case should not run against these agencies.

town). Indeed, "nothing [is] added by suing the [government official] in his official capacity." *See Jungels v. Pierce*, 825 F.2d 1127, 1129 (7th Cir. 1987).

Plaintiffs fail to explain why an injunction against federal employees sued in their official capacity is necessary when they also seek to enjoin the agencies where these individuals are now or previously were employed. There is nothing added by seeking to enjoin individuals sued in their official capacity where the agencies also would be subject to the proposed injunction. Instead, enjoining those individuals would result in substantial confusion. For example, if the proposed injunction were to extend to individuals sued in their official capacity, when an official capacity Defendant leaves the Government, a successor would need to be identified. But identifying a successor is not always easy or obvious, as employee job descriptions and responsibilities change over time. Sometimes, there may not be a successor given changed agency priorities and organizational structures. Accordingly, given the potential confusion resulting from applying an injunction against a host of individuals and because the official capacity claims merge with the claims against the agencies and the Office of the White House Press Secretary, any injunction in this case should apply only to those agency Defendants.

In addition, Plaintiffs improperly seek to apply the injunction against former Federal Government employees sued in their official capacity and for whom no successor has been named, including: Andrew Slavitt; Clarke Humphrey; and Benjamin Wakana. PI Supp. 68; *see also* Defs.' Notice of Substitution at 4. Any prospective injunctive relief against these former government employees sued in their official capacity is no longer available against them because they have no authority to act. *See Alvarez v. O'Brien*, No. 8:21-cv-303, 2022 WL 5209377, at *2 (D. Neb. Oct. 5, 2022) (citing *Tara Enters., Inc. v. Humble*, 622 F.2d 400, 401 (8th Cir. 1980) (holding that "because monetary damages are not sought nor any other relief which would be operative against

274

these defendants who no longer possess any official power, the action against them is, of course, moot")." Nor are successors automatically substituted for these Defendants pursuant to Fed. R. Civ. P. 25(d), because these Defendants "did not hold an office for which a particular successor can be identified." *Alvarez*, 2022 WL 5209377, at *2 (citations omitted). Accordingly, injunctive relief against former government employees for whom there are no successors is improper.

* * * *

Thus, even if the Court were to conclude that Plaintiffs are likely to prevail on the merits, that Plaintiffs have shown that they would suffer concrete and imminent irreparable harm in the absence of an injunction, and that Plaintiffs' harm outweighs the detriment to the public interest of awarding them a properly drawn injunction, it would be profoundly and unnecessarily harmful to the public interest, and therefore unjustifiable, to impose the overbroad and vague injunction that Plaintiffs have proposed. If any injunction could be appropriate upon a finding that Plaintiffs are likely to prevail and face irreparable harm, it would need to be far more narrowly tailored to prevent the purportedly unlawful conduct that would cause Plaintiffs' asserted injuries.

**CONCLUSION**

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction should be denied. If nevertheless the Court were to enter an injunction, Defendants respectfully request that the injunction be administratively stayed for seven days, to allow Defendants time to consider moving for a stay pending appeal.

Dated:  May 2, 2023                 Respectfully submitted,

                                    BRIAN M. BOYNTON
                                    Principal Deputy Assistant Attorney General

                                    JAMES J. GILLIGAN
                                    Special Litigation Counsel, Federal Programs Branch

                                    JOSHUA E. GARDNER (FL Bar No. 0302820)
                                    Special Counsel, Federal Programs Branch

                                    */s/ Kyla M. Snow*
                                    KYLA M. SNOW (OH Bar No. 96662)
                                    INDRANEEL SUR (D.C. Bar No. 978017)
                                    AMANDA K. CHUZI (D.C. Bar No. 1738545)
                                    KUNTAL CHOLERA (D.C. Bar No. 1031523)
                                    Trial Attorneys
                                    U.S. Department of Justice
                                    Civil Division, Federal Programs Branch
                                    1100 L Street, NW
                                    Washington D.C. 20005
                                    Tel: (202) 514-3259
                                    kyla.snow@usdoj.gov

                                    *Attorneys for Defendants*

 Blog

Back

**Company**

# An update on our continuity strategy during COVID-19

By

<u>Vijaya Gadde</u>

and

<u>Matt Derella</u>

Monday, 16 March 2020

*Effective November 23, 2022, Twitter is no longer enforcing the COVID-19 misleading information policy.*

**To see all of the latest steps Twitter is taking in response to COVID-19, visit covid19.twitter.com** (https://blog.twitter.com/en_us/topics/company/2020/covid-19.html)**.**

*Updated April 1, 2020*

As the entire world faces an unprecedented public health emergency, we want to be open about the challenges we are facing and the contingency measures we're putting in place to serve the public conversation at this critical time. We are regularly working with and looking to trusted partners, including public health authorities, organizations, and governments to inform our approach.

We will keep three blog posts updated on a rolling basis and encourage everyone to consult with them regularly for updates:

- Our contingency strategy to protect the conversation (here)
- Our working guidance (https://blog.twitter.com/en_us/topics/company/2020/keeping-our-employees-and-partners-safe-during-coronavirus.html) to our employees and partners to keep them safe
- Our partnerships (https://blog.twitter.com/en_us/topics/company/2020/stepping-up-our-work-to-protect-the-public-conversation-around-covid-19.html) and public engagement strategies

**Steps we're taking**

As we continue to provide guidance to our employees (https://blog.twitter.com/en_us/topics/company/2020/keeping-our-employees-and-partners-safe-during-coronavirus.html) that they must work from home to support self-distancing efforts to slow the spread of COVID-19, we also need to operationally pivot our core efforts to keep people safe on Twitter.

**Increasing our use of machine learning and automation** to take a wide range of actions on potentially abusive and manipulative content. We want to be clear: while we work to ensure our systems are consistent, they can sometimes lack the context that our teams bring, and this may result in us making mistakes. As a result, we will not permanently suspend any accounts based solely on our automated enforcement systems. Instead, we will continue to look for opportunities to build in human review checks where they will be most impactful. We appreciate your patience as we work to get it right – this is a necessary step to scale our work to protect the conversation on Twitter.

**How are we using automated technology during this time?**

- To help us review reports more efficiently by surfacing content that's most likely to cause harm and should be reviewed first.
- To help us proactively identify rule-breaking content before it's reported. Our systems learn from past decisions by our review teams, so over time, the technology is able to help us rank content or challenge accounts automatically.
- For content that requires additional context, such as misleading information around COVID-19, our teams will continue to review those reports manually.

**What you can expect if you file a report during this time:**

- If you've reported an account or Tweet to us, it will take longer than normal for us to get back to you. We appreciate your patience as we continue to make adjustments.
- Because these automated systems don't have all of the context and insight our team has, we'll make mistakes. If you think we've made a mistake, you can let us know and appeal here (https://help.twitter.com/forms/general).

We appreciate your patience as we work to keep our teams safe, while also making sure we're protecting everyone on Twitter. You can always continue to use hide replies, mute, block, reply filters, and the other tools we offer (https://help.twitter.com/en/a-safer-twitter) you to control conversations on the service.

**Keeping the service running and the Tweets flowing** is one of our top priorities in these difficult times. Our work has never been more critical and our service has never been in higher demand. In the past few weeks, we have seen more and more people turn to Twitter to participate in the public conversation and follow what's happening in real time.

- The global conversation about COVID-19 and ongoing product improvements are driving up total monetizable DAU (mDAU) (https://www.prnewswire.com/news-releases/twitter-withdraws-q1-guidance-due-to-covid-19-impact-301028477.html), with quarter-to-date average total mDAU reaching approximately 164 million, up 23% from 134 million in Q1 2019 and up 8% from 152 million in Q4 2019.
- We've also seen a 45% increase in our curated events page (https://twitter.com/i/events/1219057585707315201?lang=en) usage and a 30% increase in Direct Message (DM) usage since March 6.

While many of our teams are transitioning to working from home (https://blog.twitter.com/en_us/topics/company/2020/keeping-our-employees-and-partners-safe-during-coronavirus.html), some of our infrastructure teams have physical responsibilities that are critical to keeping our data centers, and Twitter, up and running. These teams are operating under the "essential services" provisions dedicated in City, County and State orders to ensure business continuity. We couldn't keep the Tweets flowing without their daily dedication and hard work.

The combination of the new work environment and the increased load on our platform has placed unique stresses on our operations, requiring our engineering teams to work more closely together than ever to respond to new demands, and to

plan for the future. From our IT, Network and Product Engineering teams to our infrastructure and data center teams, we have collectively mobilized to ensure we are able to stay safe and productive under the stress of the new levels of traffic we're seeing on our service.

The effects of COVID-19 on Twitter have already surpassed any event we've seen, and it's possible that as the pandemic continues, we will see additional stress on our service. Beyond Twitter, COVID-19 has also had a far-sweeping impact on our supply chain partners. Whereas normally we'd have months of lead time to add hardware capacity for expected growth, in this case, manufacturing delays in China have compromised the supply chain, resulting in delays in deliveries to our data centers. Our Data Center, SiteOps, Supply Chain, Hardware Engineering and Mission Critical teams continue to manage the physical infrastructure that underlies the service -- expertly innovating to unlock additional capacity in existing supply.

Our teams are actively addressing areas where we need to add capacity to critical services, looking at how we can optimize existing technology to be more performant, and planning for how we might adjust to the way people are using Twitter during this time.

It's critical for Twitter to stay up and running through this global crisis. Our teams are focused, and as we make changes to our systems to meet these new demands, we will communicate openly. We will share what we've done, what we've learned, and if we see incidents, what we will do to recover as quickly as possible. Follow @TwitterEng (http://twitter.com/twittereng) to stay up to date.

**Broadening our definition of harm** to address content that goes directly against guidance from authoritative sources of global and local public health information. Rather than reports, we will enforce this in close coordination with trusted partners, including public health authorities and governments, and continue to use and consult with information from those sources when reviewing content.

- We'll continue to prioritize removing content when it has a clear call to action that could directly pose a risk to people's health or well-being, but we want to make it clear that we will not be able to take enforcement action on every Tweet that contains incomplete or disputed information about COVID-19. This is not meant to limit good faith discussion or expressing hope about ongoing studies related to potential medical interventions that show promise.

- Since introducing these policies on March 18, we have removed more than 1,100 tweets containing misleading and potentially harmful content from Twitter. Additionally, our automated systems have challenged more than 1.5 million accounts which were targeting discussions around COVID-19 with spammy or manipulative behaviors. We will continue to use both technology and our teams to help us identify and stop spammy behavior and accounts.

- We may also apply the public interest notice (https://blog.twitter.com/en_us/topics/company/2019/worldleaders2019.html) in cases where world leaders (https://blog.twitter.com/en_us/topics/company/2019/publicinterest.html) violate the COVID-19 guidelines.

Under this guidance, we will require people to remove tweets that include:

- Denial of global or local health authority recommendations to decrease someone's likelihood of exposure to COVID-19 with the intent to influence people into acting against recommended guidance, such as: "social distancing is not effective", or actively encouraging people to not socially distance themselves in areas known to be impacted by COVID-19 where such measures have been recommended by the relevant authorities.

- Description of alleged cures for. COVID-19, which are not immediately harmful but are known to be ineffective, are not applicable to the COVID-19 context, or are being shared with the intent to mislead others, even if made in jest, such as "coronavirus is not heat-resistant - walking outside is enough to disinfect you" or "use aromatherapy and essential oils to cure COVID-19."

- Description of harmful treatments or protection measures which are known to be ineffective, do not apply to COVID-19, or are being shared out of context to mislead people, even if made in jest, such as "drinking bleach and ingesting colloidal silver will cure COVID-19."

- Denial of established scientific facts about transmission during the incubation period or transmission guidance from global and local health authorities, such as "COVID-19 does not infect children because we haven't seen any cases of children being sick."

- Specific claims around COVID-19 information that intends to manipulate people into certain behavior for the gain of a third party with a call to action within the claim, such as "coronavirus is a fraud and not real - go out and patronize your local bar!!" or "the news about washing your hands is propaganda for soap companies, stop washing your hands".

- Specific and unverified claims that incite people to action and cause widespread panic, social unrest or large-scale disorder, such as "The National Guard just announced that no more shipments of food will be arriving for 2 months - run to the grocery store ASAP and buy everything!"

- Specific and unverified claims made by people impersonating a government or health official or organization such as a parody account of an Italian health official stating that the country's quarantine is over.

- Propagating false or misleading information around COVID-19 diagnostic criteria or procedures such as "if you can hold your breath for 10 seconds, you do not have coronavirus."

- False or misleading claims on how to differentiate between COVID-19 and a different disease, and if that information attempts to definitively diagnose someone, such as "if you have a wet cough, it's not coronavirus - but a dry cough is" or "you'll feel like you're drowning in snot if you have coronavirus - it's not a normal runny nose."

- Claims that specific groups, nationalities are never susceptible to COVID-19, such as "people with dark skin are immune to COVID-19 due to melanin production" or "reading the Quran will make an individual immune to COVID-19."
- Claims that specific groups, nationalities are more susceptible to COVID-19, such as "avoid businesses owned by Chinese people as they are more likely to have COVID-19."

**Building systems that enable our team to continue to enforce our rules remotely around the world.** We're also increasing our employee assistance and wellness support for everyone involved in this critical work, and ensuring people's privacy and security stay a top priority.

**Instituting a global content severity triage system** so we are prioritizing the potential rule violations that present the biggest risk of harm and reducing the burden on people to report them.

**Executing daily quality assurance checks** on our content enforcement processes to ensure we're agile in responding to this rapidly evolving, global disease outbreak.

**Engaging with our partners around the world** to ensure escalation paths remain open and urgent cases can be brought to our attention.

**Continuing to review the Twitter Rules (http://twitter.com/rules) in the context of COVID-19** and considering ways in which they may need to evolve to account for new behaviors.

As we've said on many occasions, our approach to protecting the public conversation is never static. That's particularly relevant in these unprecedented times. We intend to review our thinking daily and will ensure we're sharing updates here on any new clarifications to our rules or major changes to how we're enforcing them.

Finally, we're encouraged that our service is being used around the world to provide free, authoritative health information, and to ensure that everyone has access to the conversations they need to protect themselves and their families. For more, our dedicated COVID-19 Event (https://twitter.com/i/events/1219057585707315201) page has the

latest facts right at the top of your timeline, and we'll continue to share updates @TwitterSafety (https://twitter.com/TwitterSafety) and @TwitterSupport (http://twitter.com/twittersupport).



(https://www.twitter.com/vijaya)

Vijaya Gadde



(https://www.twitter.com/Derella)

Matt Derella

CONFIDENTIAL

| | |
|---|---|
| **From:** | Todd O'Boyle [toboyle@twitter.com] |
| **Sent:** | 11/23/2020 5:10:38 PM |
| **To:** | Scully, Brian [brian.scully1@cisa.dhs.gov] |
| **CC:** | CFITF [cfitf@hq.dhs.gov]; Stacia Cardille [scardille@twitter.com]; Todd O'Boyle [toddboyle@twitter.com] |
| **Subject:** | Re: FW: CIS-MIS000220 - allegations that Georgia is purging voters |

**CAUTION:** This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the sender. Contact your component SOC with questions or concerns.

Hi Brian - this Tweet was not determined to be a violation of our rule

On Mon, Nov 23, 2020 at 11:32 AM Todd O'Boyle <toboyle@twitter.com> wrote:
Thanks Brian - we will escalate.

On Mon, Nov 23, 2020 at 11:31 AM Scully, Brian <brian.scully1@cisa.dhs.gov> wrote:

Stacia and Todd,

Please see the below report from NASED.

Thanks,

Brian


*The Cybersecurity and Infrastructure Security Agency (CISA) of the U.S. Department of Homeland Security (DHS) is not the originator of this information. CISA is forwarding this information, unedited, from its originating source – this information has not been originated or generated by CISA. This information may also be shared with law enforcement or intelligence agencies.*

*CISA affirms that it neither has nor seeks the ability to remove or edit what information is made available on social media platforms. CISA makes no recommendations about how the information it is sharing should be handled or used by social media companies. Additionally, CISA will not take any action, favorable or unfavorable, toward social media companies based on decisions about how or whether to use this information.*

*In the event that CISA follows up to request further information, such a request is not a requirement or demand. Responding to this request is voluntary and CISA will not take any action, favorable or unfavorable, based on decisions about whether or not to respond to this follow-up request for information.*


**From:** Misinformation Reports <misinformation@cisecurity.org>
**Sent:** Monday, November 23, 2020 10:55 AM
**To:** Scully, Brian <brian.scully1@cisa.dhs.gov>; CISA Central <central@cisa.dhs.gov>; CFITF <cfitf@hq.dhs.gov>; tips@2020partnership.atlassian.net; Misinformation Reports <misinformation@cisecurity.org>
**Subject:** CIS-MIS000220 - allegations that Georgia is purging voters

MOLA_DEFSPROD_00008610

**CAUTION:** This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the sender. Contact your component SOC with questions or concerns.

Misinformation Report: Tweet alleging Georgia is purging voters

**From:** Amy Cohen <acohen@nased.org>
**Sent:** Monday, November 23, 2020 10:01 AM
**To:** Misinformation Reports <misinformation@cisecurity.org>
**Subject:** Tweet

https://twitter.com/pattyarquette/status/1330730873445117954?s=21

Georgia is not purging voters. We're within 90 days of the election, so that would be a violation of federal law.

Amy Cohen

Executive Director

National Association of State Election Directors (NASED)

.....

This message and attachments may contain confidential information. If it appears that this message was sent to you by mistake, any retention, dissemination, distribution or copying of this message and attachments is strictly prohibited. Please notify the sender immediately and permanently delete the message and any attachments.

. . . . .

MOLA_DEFSPROD_00008611

CONFIDENTIAL

| | |
|---|---|
| **From:** | Stacia Cardille [scardille@twitter.com] |
| **Sent:** | 11/11/2020 12:11:52 AM |
| **To:** | Scully, Brian [brian.scully1@cisa.dhs.gov] |
| **CC:** | Todd O'Boyle [toddoboyle@twitter.com]; Neema Guliani [nguliani@twitter.com]; Twitter Government & Politics [gov@twitter.com]; CFITF [cfitf@hq.dhs.gov]; Misinformation Reports [misinformation@cisecurity.org] |
| **Subject:** | Re: FW: Case #CIS-MIS000195: allegations of election fraud with Dominion voting equipment in WA state |

**CAUTION:** This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the sender. Contact your component SOC with questions or concerns.

Thank you. All Tweets have been labeled, with the exception of two from @SeattleSuze. Those two Tweets were not found to violate our policies.

Thank you,
Stacia

On Tue, Nov 10, 2020 at 7:25 PM Stacia Cardille <scardille@twitter.com> wrote:
 Thanks, Brian. We will escalate.

 On Tue, Nov 10, 2020 at 7:23 PM Scully, Brian <brian.scully1@cisa.dhs.gov> wrote:
  Good evening Twitter,

  Please see the below report from Washington.

  Thanks,
  Brian

  *The Cybersecurity and Infrastructure Security Agency (CISA) of the U.S. Department of Homeland Security (DHS) is not the originator of this information. CISA is forwarding this information, unedited, from its originating source – this information has not been originated or generated by CISA. This information may also be shared with law enforcement or intelligence agencies.*

  *CISA affirms that it neither has nor seeks the ability to remove or edit what information is made available on social media platforms. CISA makes no recommendations about how the information it is sharing should be handled or used by social media companies. Additionally, CISA will not take any action, favorable or unfavorable, toward social media companies based on decisions about how or whether to use this information.*

  *In the event that CISA follows up to request further information, such a request is not a requirement or demand. Responding to this request is voluntary and CISA will not take any action, favorable or unfavorable, based on decisions about whether or not to respond to this follow-up request for information.*

  **From:** Misinformation Reports <misinformation@cisecurity.org>
  **Sent:** Tuesday, November 10, 2020 7:17 PM

MOLA_DEFSPROD_00008640

CONFIDENTIAL

**To:** Scully, Brian <brian.scully1@cisa.dhs.gov>; CISA Central <central@cisa.dhs.gov>; CFITF <cfitf@hq.dhs.gov>; tips@2020partnership.atlassian.net; Misinformation Reports <misinformation@cisecurity.org>
**Subject:** Case #CIS-MIS000195: allegations of election fraud with Dominion voting equipment in WA state

> **CAUTION:** This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the sender. Contact your component SOC with questions or concerns.

Misinformation report: twelve (12) tweets alleging election fraud with Dominion voting equipment in Washington state.

---

**From:** Jacob, Nick <nick.jacob@sos.wa.gov>
**Sent:** Tuesday, November 10, 2020 7:03 PM
**To:** Misinformation Reports <misinformation@cisecurity.org>
**Cc:** Lori Augino <lori.augino@sos.wa.gov>; Zabel, Kylee <kylee.zabel@sos.wa.gov>; Boyal, Kiran <kiran.boyal@sos.wa.gov>
**Subject:** Misinformation on Twitter

Hello,

I wanted to flag the following tweets that include misinformation and/or false allegations of election fraud. There is no evidence to back any of these claims. There have been no reports or indications of fraudulent activity in Washington state for the 2020 general election.

Franklin County is the only county in Washington state that uses a version of Dominion software and hardware. The system in use has been certified, and we are not aware of any issues.

No counties in Washington state use GEMS.

Additionally, each county conducts post-election audits in the days after the election that are publicly observable, which provides another layer of protection to ensure the results they certify later this month are accurate. At the end of the certification period, each county will publish a reconciliation report that discloses details about all of the ballots issued, received, counted, and rejected during this election.

https://twitter.com/LuvMyCountry7/status/1326303394147921920

https://twitter.com/seattleSuze/status/1326208987348398080

https://twitter.com/seattleSuze/status/1326209828717436928

MOLA_DEFSPROD_00008641

https://twitter.com/MatthewMacphe17/status/1326212450585210880

https://twitter.com/MatthewMacphe17/status/1326211588089470976

https://twitter.com/MatthewMacphe17/status/1326204530543882240

https://twitter.com/MatthewMacphe17/status/1326202866567049216

https://twitter.com/Katrina64718085/status/1326311025738575872

https://twitter.com/Maga2020Rules/status/1326187323566948352

https://twitter.com/lazalere/status/1326082445196681216

https://twitter.com/TerenaHimpel/status/1326006222034665472

https://twitter.com/LolaTwelve/status/1325934941503250433

My name is Nick Jacob, and I'm an Executive Receptionist for the Washington Office of the Secretary of State. I can be reached via this email or the number listed in my signature block below. My cell phone is monitored after hours if I need to be reached urgently.

I am also copying Washington State Elections Director Lori Augino, Office of the Secretary of State Communications Director Kylee Zabel, and our Web and Social Media Coordinator Kiran Boyal.

Please let me know if you have any questions or need additional information.

Thank you.
-Nick

**Nick Jacob**

Office of the Secretary of State

Cell: (425) 772-7204





CONFIDENTIAL

…..

This message and attachments may contain confidential information. If it appears that this message was sent to you by mistake, any retention, dissemination, distribution or copying of this message and attachments is strictly prohibited. Please notify the sender immediately and permanently delete the message and any attachments.

. . . . .

MOLA_DEFSPROD_00008643

CONFIDENTIAL

| | |
|---|---|
| **From:** | Todd O'Boyle [toboyle@twitter.com] |
| **Sent:** | 10/27/2020 4:38:48 PM |
| **To:** | Scully, Brian [brian.scully1@cisa.dhs.gov] |
| **CC:** | Stacia Cardille [scardille@twitter.com]; Todd O'Boyle [toddoboyle@twitter.com]; Neema Guliani [nguliani@twitter.com]; CFITF [cfitf@hq.dhs.gov]; Misinformation Reports [misinformation@cisecurity.org] |
| **Subject:** | Re: FW: Case #CIS-MIS000075: Misinformation tweet regarding re-voting |

CAUTION: This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the sender. Contact your component SOC with questions or concerns.

Update Brian:
Our team concluded that the Tweet was not in violation of our Civic Integrity Policy.
Best.
TO

On Tue, Oct 27, 2020 at 4:09 PM Scully, Brian <brian.scully1@cisa.dhs.gov> wrote:

Please see below report from Washington.

Thanks,

Brian

The Cybersecurity and Infrastructure Security Agency (CISA) of the U.S. Department of Homeland Security (DHS) is not the originator of this information. CISA is forwarding this information, unedited, from its originating source – this information has not been originated or generated by CISA. This information may also be shared with law enforcement or intelligence agencies.

CISA affirms that it neither has nor seeks the ability to remove or edit what information is made available on social media platforms. CISA makes no recommendations about how the information it is sharing should be handled or used by social media companies. Additionally, CISA will not take any action, favorable or unfavorable, toward social media companies based on decisions about how or whether to use this information.

**From:** Misinformation Reports <misinformation@cisecurity.org>
**Sent:** Tuesday, October 27, 2020 4:07 PM
**To:** tips@2020partnership.atlassian.net; Misinformation Reports <misinformation@cisecurity.org>; Scully, Brian <brian.scully1@cisa.dhs.gov>; CFITF <cfitf@hq.dhs.gov>; CISA Central <central@cisa.dhs.gov>
**Subject:** Case #CIS-MIS000075: Misinformation tweet regarding re-voting

CAUTION: This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the sender. Contact your component SOC with questions or concerns.

MOLA_DEFSPROD_00009505

Misinformation tweet regarding re-voting

Begin forwarded message:

**From:** "Augino, Lori" <lori.augino@sos.wa.gov>
**Date:** October 27, 2020 at 4:00:35 PM EDT
**To:** Misinformation Reports <misinformation@cisecurity.org>
**Cc:** "Zabel, Kylee" <kylee.zabel@sos.wa.gov>
**Subject: Misinfo - tweet from President**

In Washington, you cannot change your mind and re-vote.

---

**From:**
[mailto:]
**Sent:** Tuesday, October 27, 2020 12:52 PM
**To:** Elections - Public <elections@sos.wa.gov>
**Subject:** Disinformation

I'm reporting this disinformation about the elections. Please take steps to stop it, and correct it publicly.   Thanks.

Federal Way, WA



.....

This message and attachments may contain confidential information. If it appears that this message was sent to you by mistake, any retention, dissemination, distribution or copying of this message and attachments is strictly prohibited. Please notify the sender immediately and permanently delete the message and any attachments.

. . . . .

MOLA_DEFSPROD_00009506

| | |
|---|---|
| **From**: | Scully, Brian [brian.scully1@cisa.dhs.gov] |
| **Sent**: | 9/26/2020 7:20:22 PM |
| **To**: | Stacia Cardille [scardille@twitter.com] |
| **CC**: | Lisa Roman [lroman@twitter.com] |
| **Subject**: | Re: FW: Reporting Twitter post with misinformation on recent Colorado mailing |

Thanks for quick response Stacia.

Brian

Brian Scully
DHS Countering Foreign Interference Task Force
National Risk Management Center
(202) 450-8046
brian.scully1@cisa.dhs.gov

---

**From:** Stacia Cardille <scardille@twitter.com>
**Sent:** Saturday, September 26, 2020 7:12:37 PM
**To:** Scully, Brian <brian.scully1@cisa.dhs.gov>
**Cc:** Lisa Roman <lroman@twitter.com>
**Subject:** Re: FW: Reporting Twitter post with misinformation on recent Colorado mailing

> **CAUTION:** This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the sender. Contact your component SOC with questions or concerns.

Hi Brian, our enforcement teams reviewed the reports and found the Tweets to not be in violation of our policies. We will not take action on these Tweets. Thank you.

On Sat, Sep 26, 2020 at 4:57 PM Scully, Brian <brian.scully1@cisa.dhs.gov> wrote:

Hi Stacia and Lisa,

Please see the below reporting from the Colorado Secretary of State's Office. Please let me know if you have any questions or if you require any additional information.

Thanks,

Brian

*The Cybersecurity and Infrastructure Security Agency (CISA) of the U.S. Department of Homeland Security (DHS) is not the originator of this information. CISA is forwarding this information, unedited, from its originating source – this information has not been originated or generated by CISA. This information may also be shared with law enforcement or intelligence agencies.*

*CISA affirms that it neither has nor seeks the ability to remove or edit what information is made available on social media platforms. CISA makes no recommendations about how the information it is sharing should be handled or used by social media companies. Additionally, CISA will not take any action, favorable or unfavorable, toward social media companies based on decisions about how or whether to use this information.*

MOLA_DEFSPROD_00010711

**From:** Trevor Timmons <Trevor.Timmons@SOS.STATE.CO.US>
**Sent:** Saturday, September 26, 2020 4:13 PM
**To:** Central Cyber <central.cyber@cisa.dhs.gov>; soc@cisecurity.org; CIAC Security <cdps_ciac_security@state.co.us>
**Cc:** Scully, Brian <brian.scully1@cisa.dhs.gov>; Masterson, Matthew <Matthew.Masterson@cisa.dhs.gov>; Hale, Geoffrey <Geoffrey.Hale@cisa.dhs.gov>; Snell, Allison <Allison.Snell@cisa.dhs.gov>; Ian Rayder <Ian.Rayder@SOS.STATE.CO.US>; Melissa Kessler <Melissa.Kessler@SOS.STATE.CO.US>; Judd Choate <Judd.Choate@SOS.STATE.CO.US>; Hilary Rudy <Hilary.Rudy@SOS.STATE.CO.US>; Nathan Blumenthal <Nathan.Blumenthal@SOS.STATE.CO.US>; Aaron Hayman (Temporary) <Aaron.Hayman@SOS.STATE.CO.US>; Josh Craven <Josh.Craven@SOS.STATE.CO.US>; Craig Buesing <Craig.Buesing@SOS.STATE.CO.US>; Rich Schliep <Rich.Schliep@SOS.STATE.CO.US>; Jeff Oliver <Jeff.Oliver@SOS.STATE.CO.US>; Dwight Shellman <Dwight.Shellman@SOS.STATE.CO.US>
**Subject:** Reporting Twitter post with misinformation on recent Colorado mailing
**Importance:** High

> **CAUTION:** This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the sender. Contact your component SOC with questions or concerns.

Afternoon,

We'd like Twitter to review recent posts from a Denver news channel that contains misinformation about a recent mailing from the Colorado Secretary of State's office:

https://twitter.com/CBSDenver/status/1309652042021912576
https://twitter.com/CBS4Shaun/status/1309660915311079424

The posts have been highlighted as containing false information by personnel from our office, other media sources, and others. At best, we'd suggest they be removed as promoting inaccurate and false information. At a minimum, we'd request they be labeled as "false".

For rapid contact, I'm reachable by text or Signal at 303-917-5880.

- Trevor



**Trevor Timmons**

Chief Information Officer | Department of State

303.860.6946 (direct)

303.894.2200 (office)

trevor.timmons@sos.state.co.us

1700 Broadway, Suite 200

Denver, CO 80290

MOLA_DEFSPROD_00010712

CONFIDENTIAL

| | |
|---|---|
| **From**: | Scully, Brian [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=7CA10604AEE04B1DAB53DC9F884130BD-SCULLY, BRI] |
| **Sent**: | 5/12/2020 9:20:03 AM |
| **To**: | Stacia Cardille [scardille@twitter.com] |
| **CC**: | Lisa Roman [lroman@twitter.com] |
| **Subject**: | RE: FW: Twitter |

Thanks Stacia.

Brian

**From:** Stacia Cardille <scardille@twitter.com>
**Sent:** Tuesday, May 12, 2020 5:06 AM
**To:** Scully, Brian <brian.scully1@cisa.dhs.gov>
**Cc:** Lisa Roman <lroman@twitter.com>
**Subject:** Re: FW: Twitter

**CAUTION:** This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the sender. Contact your component SOC with questions or concerns.

Thank you, Brian. Our internal review of account data indicates it is not suspicious.

Thanks for your help.
Stacia

On Fri, May 8, 2020 at 4:40 PM Stacia Cardille <scardille@twitter.com> wrote:

Thanks, Brian, we will escalate it internally.

Have a great weekend, and look forward to speaking on Monday.

On Fri, May 8, 2020 at 4:39 PM Scully, Brian <brian.scully1@cisa.dhs.gov> wrote:

Hi Lisa and Stacia,

Please see below reporting we received from Dominion Voting. As you know, DHS will not ask you to take any specific action, but simply want to make sure you have awareness and information about possible disinformation or other problems on your platform. Please let me know if you have any questions or comments.

Thanks,

Brian

**From:** Masterson, Matthew <Matthew.Masterson@cisa.dhs.gov>
**Sent:** Friday, May 8, 2020 3:06 PM
**To:** Scully, Brian <brian.scully1@cisa.dhs.gov>
**Cc:** Hale, Geoffrey <Geoffrey.Hale@cisa.dhs.gov>; Snell, Allison <Allison.Snell@cisa.dhs.gov>; McKinnis, Seth <seth.mckinnis@cisa.dhs.gov>
**Subject:** FW: Twitter

MOLA_DEFSPROD_00010794

Brian,

See below from Dominion Voting regarding a suspicious twitter account. They requested that if we hear anything back we please let them know.

Matthew V. Masterson

Senior Cybersecurity Advisor

Department of Homeland Security

Cybersecurity & Infrastructure Security Agency (CISA)

(202)309-1585

Matthew.Masterson@hq.dhs.gov

---

**From:** Kay Stimson <kay.stimson@dominionvoting.com>
**Sent:** Friday, May 8, 2020 2:31 PM
**To:** Hale, Geoffrey <Geoffrey.Hale@cisa.dhs.gov>; Masterson, Matthew <Matthew.Masterson@cisa.dhs.gov>
**Subject:** Twitter

> **CAUTION:** This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the sender. Contact your component SOC with questions or concerns.

Matt and Geoff,

For awareness, Dominion's corporate Twitter account picked up a new follower today who raised an alert: @elbotxi (aka Ziggy Stardust).

https://twitter.com/elbotxi

Due to the Anonymous reference in the profile header complete with Guy Fawkes mask, we are flagging it mainly as a precaution. We noticed Ziggy is also following Scytl.

No unusual IT activity to report.

Regards,

Kay

**KAY STIMSON** | VP, GOVERNMENT AFFAIRS

DOMINION VOTING SYSTEMS

MOLA_DEFSPROD_00010795

CONFIDENTIAL

| | |
|---|---|
| **From**: | Scully, Brian [/O=EXCHANGELABS/OU=EXCHANGE  ADMINISTRATIVE  GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=7CA10604AEE04B1DAB53DC9F884130BD-SCULLY,  BRI] |
| **Sent**: | 11/11/2020 9:57:01 PM |
| **To**: | Todd O'Boyle [toboyle@twitter.com] |
| **CC**: | CFITF [cfitf@hq.dhs.gov]; CISA Central [central@cisa.dhs.gov]; Misinformation Reports [misinformation@cisecurity.org]; Stacia Cardille [scardille@twitter.com]; tips@2020partnership.atlassian.net |
| **Subject**: | RE: CIS-MIS000197 - allegations of election fraud in Kentucky |

Thanks Todd. We'll remove Neema and the Gov't emails from the distro.

Regards,
Brian

**From:** Todd O'Boyle <toboyle@twitter.com>
**Sent:** Wednesday, November 11, 2020 9:56 PM
**To:** Scully, Brian <brian.scully1@cisa.dhs.gov>
**Cc:** CFITF <cfitf@hq.dhs.gov>; CISA Central <central@cisa.dhs.gov>; Misinformation Reports <misinformation@cisecurity.org>; Stacia Cardille <scardille@twitter.com>; tips@2020partnership.atlassian.net
**Subject:** Re: CIS-MIS000197 - allegations of election fraud in Kentucky

> **CAUTION:** This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the sender. Contact your component SOC with questions or concerns.

This tweet was not determined to violate our civic integrity policy.

On Wed, Nov 11, 2020 at 9:30 PM Todd O'Boyle <toboyle@twitter.com> wrote:

Hi Brian -
Thanks for getting in touch, we will escalate this report.

By the way, now that we are through the election week no need to email these reports to gov@twitter. To get the most reliable response email myself and Stacia.

Warmest,
Todd

MOLA_DEFSPROD_00010376

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**

|  |  |
|---|---|
| **The State of Louisiana,**<br>            *et al.,*<br><br>        *Plaintiffs*,<br><br>            v.<br><br>**President Joseph R. Biden, Jr., in his**<br>**official capacity as President of the United**<br>**States of America,**<br>            *et al.,*<br><br>        *Defendants*. | Civil Action No. 22-cv-1213 |

**DECLARATION OF JASMINE ROBINSON**

1.      My name is Jasmine Robinson. I am a paralegal employed by the United States Department of Justice. I am over eighteen years of age and competent to testify to the matters discussed herein.

2.      On April 20, 2023, I went onto LinkedIn and found an active LinkedIn account for Plaintiff Martin Kulldorff. That account can be found here: https://www.linkedin.com/in/martin-kulldorff-8a31a775. *See* Ex. A.

3.      On April 20, 2023, I went onto Facebook and found an active Facebook account for Plaintiff Jill Hines. Her active Facebook account can be found here: https://www.facebook.com/jillhines4freedom/. *See* Ex. B.

4.      On April 20, 2023, I went onto Twitter and found an active Twitter account for the Gateway Pundit, a company founded, owned and operated by Plaintiff Jim Hoft. That account can be found here: https://twitter.com/gatewaypundit. *See* Ex. C.

1

5.      On April 20, 2023, I went onto Twitter and found an active Twitter account for Plaintiff Daniel Kotzin. That account can be found here: https://twitter.com/danielkotzin?ref_src=twsrc%5Egoogle%7Ctwcamp%5Eserp%7Ctwgr%5Eauthor. *See* Ex. D.

6.      On April 20, 2023, I went onto Twitter and found an active Twitter account of Plaintiff Amanda ("A.J.") Kitchen. Her active Twitter account can be found here: https://twitter.com/AJKayWriter?ref_src=twsrc%5Egoogle%7Ctwcamp%5Eserp%7Ctwgr%5Eauthor. *See* Ex. E.

7.      On April 20, 2023, I went onto Twitter and found an active Twitter account for Michael P. Senger, an individual who submitted a declaration in this matter. His active Twitter account can be found here:

https://twitter.com/MichaelPSenger?ref_src=twsrc%5Egoogle%7Ctwcamp%5Eserp%7Ctwgr%5Eauthor. *See* Ex. F.

8.      On April 20, 2023, I went onto Facebook and found an active Facebook account HFL Group. The HFL Group's active Facebook can be found here:

https://www.facebook.com/groups/1240524952709254/. *See* Ex. G.

9.      Attached hereto as Exhibit H is an article from David Klepper and Heather Hollingsworth from AP News entitled "Misinformation at public forums vexes local boards, big tech." (Aug. 16, 2021).

10.     On April 20, 2023, I went onto Twitter and found an active Twitter account for Mark Changizi. Mr. Changizi's Twitter account may be found here:

https://twitter.com/MarkChangizi. *See* Ex. I.

11.     On May 1, 2023, I went onto Twitter and found an active Twitter account for Dr. Robert Malone. Dr. Malone's Twitter account may be found here:

https://twitter.com/RWMaloneMD.  *See* Ex. J.


I swear or affirm, under penalty of perjury, that the foregoing is true and correct to the best of my

knowledge.

Dated:   May 1, 2023   

Signed:

JASMINE ROBINSON

Digitally signed by
JASMINE ROBINSON
Date: 2023.05.01
14:26:59 -04'00'

_____

Jasmine Robinson

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA

The State of Missouri, *et al.*,

    *Plaintiffs*,

        v.

President Joseph R. Biden, Jr., in his official capacity as President of the United States of America, *et al.*,

    *Defendants*.

Civil Action No. 22-cv-1213

## DECLARATION OF LARISSA L. KNAPP
## FEDERAL BUREAU OF INVESTIGATION

I, Larissa L. Knapp, hereby declare as follows, pursuant to 28 U.S.C. § 1746:

1.    I am the Executive Assistant Director (EAD) of the National Security Branch (NSB) of the Federal Bureau of Investigation (FBI) in Washington, D.C. I have held this position since May 2022. As EAD of NSB, I oversee all national security investigative and intelligence operations, including counterintelligence, counterterrorism, and weapons of mass destruction cases, as well as the Terrorist Screening Center

2.    Prior to becoming EAD of NSB, I was EAD of the FBI's Human Resources Branch, which includes the Human Resources, Security, and Training Divisions. While serving as EAD of the Human Resources Branch, I also led the FBI's business functions as the acting Associate Deputy Director. Prior to that, I served in various supervisory capacities in the FBI's Security Division, the Washington Field Office, the Directorate of Intelligence, and the Counterterrorism Division. I began my FBI career in 1997 as a Special Agent in the

1

New York Field Office, where I investigated criminal computer intrusion and intellectual property matters.  In 2003, I transferred to the U.S. Virgin Islands to work multiple threats, including counterterrorism and criminal cases.

2.      The statements contained in this declaration are based upon my personal knowledge, my background, training, and experience related to FBI investigations and operations, and my review and consideration of documents and information available to me in my official capacity.

3.      Through the performance of my official duties, I have been advised of this civil action, in which Plaintiffs allege that the Biden Administration and various government agencies and officials pressure or coerce social media companies into censoring viewpoints and speakers that Defendants disfavor.  I understand that the operative complaint in this matter includes the FBI and two FBI officials as defendants, along with numerous other government agencies and officials, and that the allegations concerning the FBI and FBI officials focus on the FBI's Foreign Influence Task Force.

4.      I am advised that Plaintiffs have filed a Motion for Preliminary Injunction ("PI") that would apply to the FBI and certain other named defendants.  I am submitting this declaration in support of the Government's memorandum of law in opposition to the PI motion, to address the impact of the proposed PI on the FBI's ability to carry out its national security and law enforcement missions.[1]

5.      I am advised that Plaintiffs make the following request regarding the scope of a PI:

> The Court should enter a preliminary injunction preventing Defendants, and their agents, officers, employees, contractors and all those acting in concert with them, from taking any steps to demand, urge, encourage, pressure, coerce, deceive,

---

[1] This declaration only addresses the proposed PI's impact on the FBI's ability to carry out its missions.  It does not attempt to address Plaintiffs' specific allegations regarding the FBI or its personnel.

collude with, or otherwise induce any social-media company or platform for online speech, or any employee, officer, or agent of any such company or platform, to censor, suppress, remove, de-platform, suspend, shadow-ban, de-boost, deamplify, issue strikes against, restrict access to, demonetize, or take any similar adverse action against any speaker, content, or viewpoint expressed on social media. The Court should also preliminarily enjoin Defendants from acting in concert with any others, including but not limited to persons and entities associated with the Center for Internet Security, the Election Integrity Partnership, and the Virality Project, to engage in the aforementioned conduct, and from acting in concert with any such others who are engaged in any of the aforementioned conduct.

As explained below, there is a range of situations—some of which are completely unrelated to the allegations against the FBI and FBI officials in this lawsuit—in which it would be in the public interest and consistent with the FBI's law enforcement and national security missions for the FBI to notify a social media platform of criminal conduct, national security threats, or other threats on its platform. Thus, the Russian, Chinese, and Iranian governments, other foreign malign actors individuals or groups intent on preventing qualified voters from voting, terrorists, cyber criminals, individuals or groups involved in crimes against children, and a wide variety of other criminals would benefit, and the American public and victims of crime would be harmed, if the Court were to issue the proposed PI and if it were interpreted to prevent the FBI from communicating with social media platforms about criminal conduct, national security threats, and other threats on their platforms.

## THE FBI'S ROLES AND RESPONSIBILITIES

6.   The FBI's mission is to protect the American people and uphold the Constitution of the United States. In carrying out that mission, the FBI defends the United States against terrorist and foreign intelligence threats, upholds and enforces the criminal laws of the United States, provides leadership and criminal justice services to federal, state, municipal,

3

and international agencies and partners, and engages in outreach and information-sharing with private sector entities. In order to defend the country from a range of national security and major criminal threats, the FBI uses an intelligence-driven and threat-focused approach, combining its investigative and intelligence operations to be more analytical and preventative, more aware of emerging threats, and better able to stop them before they turn into crimes, including acts of terrorism.

7.     The FBI's top priority is protecting the United States from terrorist attacks. In carrying out the FBI's paramount mission of securing the nation from terrorism, criminal prosecution is just one of several means that the FBI uses to protect national security. Working closely with its partners, the FBI uses its investigative and intelligence capabilities to neutralize terrorist cells and operatives in the United States, to help dismantle extremist networks worldwide, and to cut off financing and other forms of support provided by terrorist sympathizers.

8.     The FBI's second highest priority is to protect the United States against foreign intelligence, espionage, and cyber operations, and it has been given broad authorities in these areas that encompass both its law enforcement and counterintelligence responsibilities. Specifically, the FBI is the primary investigative agency of the federal government and is authorized to investigate all violations of federal laws that are not exclusively assigned to another agency.[2] The FBI has also been specifically designated to

---

[2]  See 28 U.S.C. § 533, which provides that the Attorney General may appoint officials to, *inter alia*, detect crimes against the United States and to conduct such other investigations regarding official matters under the control of the Department of Justice and the Department of State as may be directed by the Attorney General. The Attorney General Guidelines on Domestic FBI Operations, found at https://www.justice.gov/archive/opa/docs/guidelines.pdf, states at p. 5 that as the primary investigative agency of the federal government, the FBI "has the authority and responsibility to investigate all violations of federal law that are not exclusively assigned to another federal agency. The FBI is further vested by law and by Presidential directives with the primary role of carrying out investigations within the United States of threats to the national security. This includes the lead domestic role in investigating terrorist threats

take charge of investigative work in matters relating to espionage, sabotage, subversive activities, and related matters.[3] In addition, Executive Order 12333, as amended, establishes the FBI as the lead counterintelligence agency within the United States, and authorizes the FBI to conduct counterintelligence activities and collect, analyze, produce, and disseminate foreign intelligence and counterintelligence to support national and departmental missions.[4]

9.    The FBI's remaining mission priorities include cyber crime, public corruption, civil rights, transnational criminal enterprises, white collar crime, and violent crime. Various federal statutes authorize the FBI to conduct investigations of federal crimes, make seizures and arrests, and serve warrants, both under national security authorities (title 50 of the U.S. Code) and law enforcement authorities (title 18 of the U.S. Code). For example, as relevant here, except with respect to certain offenses affecting the duties of the United States Secret Service, the FBI has primary investigative authority for all computer network intrusions relating to threats to the national security, including "cases involving espionage, foreign counterintelligence, [and] information protected against unauthorized disclosure for reasons of national defense or foreign relations . . ."[5]

EFFORTS TO COUNTER FOREIGN MALIGN INFLUENCE OPERATIONS

10.    The United States is confronting multifaceted foreign threats seeking to influence our political, economic or national security conditions through subversive, undeclared,

---

to the United States, and in conducting counterintelligence activities to meet foreign entities' espionage and intelligence efforts directed against the United States."

[3] 28 C.F.R. § 0.85(d).

[4] See Executive Order 12333, as amended, § 1.7(g).

[5] 18 U.S.C. § 1030(d)(2).

5

coercive, and criminal actions. Such foreign malign influence operations include foreign

government attempts to sway U.S. voters' preferences and perspectives, shift U.S. policies,

increase discord in the United States, and undermine the American people's confidence in

our democratic institutions and processes.

11.    Foreign malign influence is not a new problem.  As stated in the July 2018 Report of the

Attorney General's Cyber-Digital Task Force:[6]

> Hostile foreign actors have long sought to influence, and subvert, our Nation's
> democratic institutions.  Modern technology—including the Internet and social
> media platforms—has both empowered and emboldened foreign governments and
> their agents in their attempts to affect U.S. attitudes, behaviors, and decisions in
> new and troubling ways. . . . Foreign influence operations include covert actions by
> foreign governments intended to sow division in our society, undermine confidence
> in our democratic institutions, and otherwise affect political sentiment and public
> discourse to achieve strategic geopolitical objectives.  Foreign influence operations
> can pose a threat to national security—and they can violate federal criminal law.

12.    Russia, the People's Republic of China (PRC), and Iran are the most active in foreign

malign influence operations aimed at the United States.  According to the Mueller Report,[7]

the first form of Russian election influence came principally from a Russian organization

called the Internet Research Agency, LLC (IRA), funded by Yevgeniy Viktorovich

Prigozhin and companies he controlled:

> The IRA conducted social media operations targeted at large U.S. audiences with
> the goal of sowing discord in the U.S. political system. . . . The IRA and its
> employees began operations targeting the United States as early as 2014.  Using
> fictitious U.S. persons, IRA employees operated social media accounts and group
> pages designed to attract U.S. audiences.  These groups and accounts, which
> addressed divisive U.S. political and social issues, falsely claimed to be controlled

---

[6] Found at https://www.justice.gov/archives/ag/page/file/1076696/download.  A July 2, 2018, letter from then-Deputy Attorney General Rod J. Rosenstein to then-Attorney General Jefferson B. Sessions III, which prefaces the Cyber-Digital Task Force report, states that in February 2018, Attorney General Sessions directed the formation of a Cyber-Digital Task Force to "undertake a comprehensive assessment of the Department's work in the cyber areas, and to identify how federal law enforcement can even more effectively accomplish its mission in this vital area."

[7] Special Counsel Robert S. Mueller, III's March 2019 Report on the Investigation Into Russian Interference in the 2016 Presidential Election.  Volume I of the Mueller Report is found at https://www.justice.gov/archives/sco/file/1373816/download.

6

by U.S. activists. . . .  By the end of the 2016 U.S. election, the IRA had the ability to reach millions of U.S. persons through their social media accounts.

Mueller Report Vol I, at 14.[8]

13.    Based on the FBI's national security and law enforcement responsibilities cited above, the FBI is the lead federal agency responsible for investigating foreign influence operations.  In the fall of 2017, Director Christopher Wray established the Foreign Influence Task Force (FITF) to identify and counteract malign foreign influence operations targeting the United States.  The FITF is led by the FBI's Counterintelligence Division and is composed of agents, analysts, and professional staff from the Counterintelligence, Cyber, Counterterrorism, and Criminal Investigative Divisions.  It is specifically charged with identifying and combating foreign influence operations targeting democratic institutions and values inside the United States.

14.    Initially, the FITF's efforts to combat foreign malign influence focused solely on the threat posed by Russia. Following the 2018 midterm elections, the FITF broadened its focus to confront malign foreign operations of the PRC, Iran, and other global adversaries. Currently, the PRC is at least as active as Russia in its malign foreign influence operations against the United States.

15.    The FITF's work includes managing operations and field office investigations, and information and intelligence sharing with federal, state, and local government agencies, as well as with U.S. private sector entities.  Specifically, with respect to U.S. social media platforms, the FBI, together with its Intelligence Community partners, may determine through investigation and intelligence gathering that an account that purports to be

---

[8] On February 16, 2018, the IRA, Prigozhin, and others were indicted in connection with their operations to interfere with U.S. elections and political processes.  See *United States v. Internet Research Agency LLC, et al.*, No.18-cr-00032 (D.D.C.).

7

controlled by a U.S. person is, in fact, controlled by a covert foreign malign actor. The operation of a social media account by a foreign malign actor under a false identity is typically a violation of a company's terms of service.[9] In such cases, the FBI may share with social media companies the indicators or selectors regarding that account or that foreign actor, to include IP addresses, email accounts, social media accounts, website domain names, or file hash values, that will enable social media companies to conduct their own independent investigation into whether there is a violation of their terms of service. When that information is shared, it is the FBI's practice to convey to the company that the information is being shared for whatever action the company deems appropriate. The FBI's practice is to not pressure or coerce companies to take any action, and companies do not necessarily disclose to the FBI whether they took any action on a posting or account. But based on the information they do provide, sometimes they take action on a posting or account after receipt of information from the FBI and their own subsequent investigation, and sometimes they do not.[10]

16.   A decision by the FITF to share information with a U.S. social media platform about a foreign malign actor's social media activity is not based upon the content or particular

---

[9] It is my understanding that it may also be a violation of the Foreign Agents Registration Act, 22 U.S.C. § 611 et seq. or other criminal statutes depending on the circumstances, including, but not limited to: 18 U.S.C. § 371 (conspiracy); 18 U.S.C. § 1028A (aggravated identity theft); 18 U.S.C. § 951 (acting in the United States as an agent of a foreign government without prior notification to the Attorney General); 18 U.S.C. § 1030 (computer fraud and abuse); 18 U.S.C. §§ 1343, 1344 (wire fraud and bank fraud) and 52 U.S.C. §§ 30109, 30121 (soliciting or making foreign contributions to influence federal elections, or donations to influence state or local elections).

[10] For examples of a social media platform's reporting on its enforcement of its terms of service, see Meta's November 13, 2018, report "More Information About Last Week's Takedowns" found at https://about.fb.com/news/2018/11/last-weeks-takedowns/; Twitter's October 8, 2020, blog "Disclosing networks to our state-linked information operations archive" found at https://blog.twitter.com/en_us/topics/company/2020/disclosing-removed-networks-to-our-archive-of-state-linked-information; and Meta's May 6, 2021, report "April 2021 Coordinated Inauthentic Behavior Report" found at https://about.fb.com/news/2021/05/april-2021-coordinated-inauthentic-behavior-report/.

viewpoint expressed in a posting but rather on the fact that the account is part of a *covert* effort by a *foreign* malign actor.

17.   While the FBI is responsible for investigating violations of the Foreign Agents Registration Act (FARA), the FITF does not identify for U.S. social media companies postings by hostile foreign actors where the postings are not covert, regardless of the content. For example, the FITF would not identify for a U.S. social media platform a post or account overtly attributed to RT (formerly known as "Russia Today"), which is registered under FARA as an agent of a Russian government entity and maintains accounts on social media, including Facebook and Twitter.

18.   The FITF's efforts to combat foreign malign influence operations are consistent with the findings of the current and prior administrations regarding U.S. national security and foreign policy. On September 12, 2018, President Trump issued Executive Order 13848, which states that the President found "that the ability of persons located, in whole or substantial part, outside the United States to interfere in or undermine public confidence in United States elections including through the unauthorized accessing of election and campaign infrastructure or the covert distribution of propaganda and disinformation constitutes an unusual and extraordinary threat to the national security and foreign policy of the United States." Based in part on this finding, the President declared a national emergency in accordance with section 202(d) of the National Emergencies Act, 50 U.S.C. § 1622(d), with respect to the threat of foreign interference in or undermining public confidence in United States elections. On September 10, 2019, and then again on September 10, 2020, President Trump found that this threat continued and therefore continued the national emergency he previously declared. President Biden also found that

9

this threat continues and therefore continued the national emergency declaration on September 7, 2021, and September 7, 2022.

19.    Consistent with the findings by Presidents Trump and Biden, the media has reported that Yevgeniy Prigozhin—as previously noted, the primary funder of the IRA, who is charged with crimes relating to the IRA's political and electoral interference operations in the United States—stated in 2022 that the Russians will continue to interfere in U.S. elections.[11]

20.    Thus, the Russian, PRC, and Iranian governments, and other foreign malign actors, would benefit, and the United States' national security would be harmed, if the Court were to issue the proposed PI and if it were interpreted to prevent the FBI from notifying a social media company that a particular account on its platform is operated by a covert foreign malign actor. Such a ruling would serve as an open invitation for these foreign malign actors to step up their deceptive efforts to sow division within the United States, undermine our democratic processes and institutions, and steer policy and regulatory decisions in favor of their strategic objectives, and diminish our nation's capacity to defend its interests on the world stage.

ELECTION-RELATED TIME, PLACE, AND MANNER DISINFORMATION

21.    The U.S. Government and the American people have a compelling interest in maintaining the integrity of election procedures, and based on the authorities cited above, the FBI has been given responsibility to investigate three categories of federal election crimes:

---

[11]  For example, see November 7, 2022, Associated Press article "Putin-linked businessman admits to US election meddling" found at https://apnews.com/article/2022-midterm-elections-business-social-media-7fefa7ab0491b653f6094a4d090155fe.

(1) voter/ballot fraud, (2) civil rights violations, and (3) campaign finance offenses. I understand that posting objectively false information on social media concerning the time, place, or manner of elections with the intent to prevent qualified voters from effectively voting may be a violation of 18 U.S.C. § 241, which makes it a crime to conspire to "injure" any person "in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or the laws of the United States."[12] For this reason, separate from the work of the FITF, the FBI and the DOJ work to counter efforts to prevent qualified voters from effectively voting by deceiving them as to the time, place, or manner of an election.

22.    Specifically, in the days immediately preceding a presidential or mid-term election, and on election day itself, the FBI stands up "command posts" at FBI Headquarters and in its field offices across the country. The command posts in the field offices are staffed by FBI Special Agents, analysts, and support personnel, as is the command post at FBI Headquarters, but the latter is also staffed by attorneys from DOJ and the FBI Office of the General Counsel. The command posts facilitate the FBI's and DOJ's ability to address federal election crimes, including but not limited to civil rights violations, which may be occurring.

23.    If an FBI field office is notified—for example, by a state election official—of a posting on a social media platform which contains objectively false information about the time, place, or manner of an election, the field office will conduct an initial review as to whether the posting appears to constitute a violation of 18 U.S.C. § 241 or evidence of such a violation. If so, the field office will relay the information to the FBI Headquarters

---

[12] See January 23, 2023, Memorandum and Order denying defendant's motion to dismiss the indictment in *United States v. Douglass Mackey*, No. 21-cr-00080 (E.D. N.Y.), ECF No. 54.

11

command post, and the FBI and DOJ personnel at the command post will review the report and determine whether the posting appears to constitute a violation of 18 U.S.C. § 241 or evidence of such a violation. If it does, the report is passed to the FBI's San Francisco Division command post, which then relays the information to the social media platform.[13] This relaying is done in an effort to minimize victimization where possible, rather than rely solely on potential prosecution as a means to protect the public. Again, the FBI does not pressure or coerce platforms into taking any action, but rather relies on the platforms to take whatever action they deem appropriate in light of their terms of service.

24.    Thus, individuals or groups intent on deceiving U.S. citizens about the time, place, or manner of elections would benefit, and the public would be harmed, if the Court issues the proposed PI and if the PI were interpreted to prevent the FBI from sharing that information with social media platforms.

## TERRORISTS USING SOCIAL MEDIA PLATFORMS

25.    As noted above, preventing terrorist attacks remains the FBI's top priority. The FBI remains concerned that foreign terrorist organizations, such as Islamic State of Iraq and ash-Sham (ISIS) and al Qaeda and their affiliates, intend to carry out or inspire large-scale attacks in the United States.

26.    Many terrorist organizations use various digital communication platforms, including social media, to reach individuals they believe may be susceptible and sympathetic to violent terrorist messages. Terrorists in ungoverned spaces—both physical and virtual—readily

---

[13] Because most social media platforms are headquartered within the San Francisco Division's geographic area of responsibility, the San Francisco Division is the FBI's primary point of contact with social media platforms regarding election time, place, or manner disinformation.

disseminate propaganda and training materials to attract easily influenced individuals around the world to their cause. With the broad distribution of social media, terrorists can spot, assess, recruit, and radicalize vulnerable persons of all ages across the globe. These efforts are not new—see the attached September 21, 2012, letter from members of Congress to then-FBI Director Mueller about foreign terrorist organizations using Twitter to further their jihadist agendas.[14]

27.     No group has been as successful at drawing people into its perverse ideology as ISIS, which has proven dangerously competent at employing such tools. Despite its loss of physical territory in Iraq and Syria, ISIS remains relentless in its campaign of violence against the United States and our partners.  ISIS uses traditional media platforms as well as widespread social media campaigns to propagate its ideology. Like other foreign terrorist groups, ISIS advocates for lone offender attacks in the United States and Western countries via videos and other English language propaganda that have, at times, specifically advocated for attacks against civilians, the military, law enforcement, and intelligence community personnel.

28.     ISIS and its supporters continue to aggressively promote its hate-fueled rhetoric and attract like-minded violent extremists with a willingness to conduct attacks against the United States and our interests abroad. The message is not tailored solely to those who overtly express signs of radicalization. It is seen by many who use messaging applications and participate in social networks.

29.     Al Qaeda maintains its desire to both conduct and inspire large-scale, spectacular attacks. Because continued pressure has degraded some of the group's senior leadership, the FBI

---

[14] The September 21, 2012, letter is attached hereto as Exhibit 1.

assesses that, in the near term, al Qaeda is more likely to continue to focus on cultivating its international affiliates and supporting small-scale, readily achievable attacks in regions such as East and West Africa. Propaganda from al Qaeda leaders continues to seek to inspire individuals to conduct their own attacks in the United States and other Western nations.

30.    Promotion or facilitation of terrorist activity is typically a violation of a social media platform's terms of service. Therefore, in some circumstances, the FBI provides social media platforms with notice, for whatever action they deem appropriate, that foreign terrorists or those promoting terrorism are using their platforms.[15] The FBI's practice is to not pressure or coerce companies to take any action, and companies do not necessarily disclose to the FBI whether they took any action on a posting or account. However, the FBI's experience is that social media companies share the FBI's and the general public's interest in combatting terrorism and therefore will often (but not always) enforce their terms of service to prevent this activity on their platforms. By way of example, in a February 5, 2016, blog post, Twitter reported that since the middle of 2015, they had suspended over 125,000 accounts for threatening or promoting terrorist acts, primarily related to ISIS.[16]

31.    Thus, ISIS, al Qaeda, and other terrorist groups who use social media to promote their agendas would benefit, and the risk to the American public from terrorism would

---

[15] The FBI may learn of this activity through its national security investigations, from other members of the U.S. Intelligence Community, through foreign partners, or by other means. Social media activity by foreign terrorist organizations may or may not constitute a crime under U.S. law and may or may not be readily accessible to people in the United States—some U.S. social media platforms, like Facebook, are popular across the globe and foreign terrorist organizations or supporters may create Facebook groups in which they post terrorist propaganda in their native languages.

[16] See https://blog.twitter.com/en_us/a/2016/combating-violent-extremism.

increase, if the proposed PI were issued and interpreted to prevent the FBI from notifying social media platforms of terrorist groups' activity on those platforms.

## CYBER CRIMINAL ACTIVITY ON SOCIAL MEDIA PLATFORMS

32. Malicious cyber activity threatens the public's safety and our national and economic security, and over recent years, the FBI has seen a wider-than-ever range of cyber actors threaten Americans' safety, security, and confidence in our digitally connected world. Cyber-criminal syndicates and nation-states keep innovating ways to compromise our networks and maximize the reach and impact of their operations, such as by selling malware as a service or by targeting vendors to access scores of victims by hacking just one provider.

33. The FBI's cyber strategy is to impose risks and consequences on cyber adversaries. Our goal is to change the behavior of criminals and nation-states who believe they can compromise U.S. networks, steal financial and intellectual property, and put critical infrastructure at risk without facing risk themselves. To do this, we use our unique mix of authorities, capabilities, and partnerships to impose consequences on our cyber adversaries.

34. The FBI is the lead federal agency for investigating cyber attacks and intrusions. We collect and share intelligence and engage with victims while working to unmask those committing malicious cyber activities.

35. Social media platforms are frequently used by cyber criminals to commit crimes. For example, platforms typically provide for some type of direct messaging to users, which cyber criminals can use to conduct spear phishing attacks. Spear phishers target select groups of people with something in common—for example, they work at the same

15

company, bank at the same financial institution, attend the same college, or order merchandise from the same website. Using inside information that may have been obtained through hacking or by combing through websites, blogs, or social media platforms, cyber criminals send messages through the social media platform that look like the real thing to targeted victims, offering urgent and legitimate-sounding explanations as to why they need the victim's personal data. Victims are asked to click on a link inside the message that takes them to a phony but realistic-looking website, where they are asked to provide passwords, account numbers, user IDs, access codes, PINs, and alike. Once criminals have the victim's personal data, they can access their bank account, use their credit cards, and create a whole new identity using their information. Spear phishing can also trick the victim into downloading malicious codes or malware after they click on a link embedded in a message, which is an especially useful tool in crimes like economic espionage where sensitive internal communications can be accessed, and trade secrets stolen. Malware can also hijack the victim's computer.

36. Social media is also a ripe platform for "malvertizing," in which cyber criminals post advertisements on social media that either link to fake login pages to steal credentials or have advertisements that end up linking to other pages that deceive victims into downloading malware.

37. As part of the FBI's effort to combat cyber crime, the FBI may in some circumstances notify social media platforms of spear phishing, malvertizing, or other fraud enabling activities on their platforms. These notifications may be about general trends that the FBI is seeing or about particular incidents. The FBI's practice is to not pressure or coerce companies to take any actions, and companies do not necessarily disclose to the FBI

16

whether they took any action on such fraud.  In addition, the FBI has on occasion been contacted by companies when their social media accounts have been taken over by cyber criminals or when cyber criminals have established fraudulent accounts which appear to be operated by those companies and the companies have been unsuccessful in reaching the social media platforms directly to report the incident.  On occasion, the FBI has relayed the incident to the social media platform.

38.    Thus, cyber criminals who use social media platforms to commit their crimes would benefit, and the public would be placed at greater risk from cybercrime, if the Court were to issue the proposed PI and if it were interpreted to prevent the FBI from communicating with social media platforms about cyber criminal activity on their platforms.

## CRIMES AGAINST CHILDREN ON SOCIAL MEDIA PLATFORMS

39.    The FBI plays an important role in the effort to prevent violent crimes against children, to include contact offenses against children (production of child sexual abuse material (CSAM),[17] sextortion, domestic travel to engage in sexual activity with children, and international travel to engage in sexual activity with children); sexual exploitation of children (online networks and enterprises manufacturing, trading, distributing, and/or selling CSAM); and trafficking of CSAM (distribution or possession).  Social media is a major forum for criminals to engage in the heinous sexual exploitation of children and the trafficking of CSAM, and federal law requires electronic service providers, including social

---

[17] The FBI and other entities involved in the prevention of violent crimes against children now use the term "child sexual abuse material" instead of "child pornography."

media platforms, to report certain online child sexual exploitation once the provider obtains actual knowledge of the facts or circumstances.[18]

40.    The mission of the FBI's Crimes Against Children program is to (1) provide a rapid, proactive, and comprehensive ability to counter all threats of abuse and exploitation to children when those crimes fall under the authority of the FBI; (2) identify, locate, and recover child victims: and (3) strengthen relationships between the FBI and federal, state, local, tribal, and international law enforcement partners to identify, prioritize, investigate, and deter individuals and criminal networks exploiting children.

41.    The FBI also works closely with the National Center for Missing & Exploited Children (NCMEC).  NCMEC's CyberTipline receives reports of child sexual exploitation incidents via an online form and maintains a 24-hour hotline.  FBI personnel assigned to the NCMEC review information that is provided to NCMEC's tip line and work to identify individuals suspected of any of the following: possession, manufacture or distribution of CSAM; online enticement of children for sexual acts; child sexual tourism; or other sexual exploitation of children.  Once a potential suspect has been identified, investigators compile information and forward it to the appropriate FBI field office for investigation.

42.    As is indicated on NCMEC's website,[19] NCMEC works closely with electronic service providers, including social media platforms, on voluntary initiatives that many companies choose to engage in to deter and prevent the proliferation of online child sexual exploitation

---

[18] See 18 U.S.C. § 2258A (reporting requirements of providers) and 2258E(6)(defining "provider" for purposes of sections 2258A through 2258E).

[19] https://www.missingkids.org/theissues/csam.

images. Companies also receive notices from NCMEC about suspected CSAM on their servers.[20]

43.     The proposed PI's prohibition on "acting in concert with others" could potentially prevent NCMEC from working with the FBI to keep CSAM and other crimes against children from taking place on social media platforms. In addition, although the FBI does not routinely contact social media platforms directly to flag CSAM and other crimes against children on their platforms, there are situations where that would be warranted in order to prevent imminent or ongoing harm to children. For example, notification to the platform would be warranted if the FBI were aware of live streaming of sexual abuse of a child, a particular user in a chat room grooming children for exploitation, or a particular user committing ongoing sexploitation crimes against children.[21]

44.     The proposed PI could potentially prevent NCMEC and the FBI from alerting a social media platform of CSAM or other crimes against children taking place on its platform. Thus, individuals involved in the production and dissemination of CSAM or involved in other heinous crimes against children taking place on social media would benefit, and children would be placed at greater risk of becoming their victims, if the Court were to issue the proposed PI, and if it were interpreted to apply to the FBI's efforts to prevent crimes against children.

---

[20] Pursuant to 18 U.S.C. § 2258C(a), NCMEC may provide certain information relating to any CyberTipline report, such as hash values or other unique identifiers associated with a specific visual depiction, to a provider in order to permit that provider to stop the online sexual exploitation of children.

[21] In addition, 18 U.S.C. § 2258B(c)(2) requires providers to destroy CSAM images "upon a request from a law enforcement agency."

OTHER CRIMES AND SECURITY THREATS ON SOCIAL MEDIA PLATFORMS

45.    In addition to the contexts discussed above, there may be other situations where it would be in the public interest for the FBI to notify a social media platform of criminal conduct or security threats on its platform.

46.    For example, if properly classified national security information is illegally posted on a social media account and foreign adversaries become aware of it, that posting would reasonably be expected to cause some level of damage to national security.[22]   In such a situation, I expect that the FBI would ask the social media platform to remove the information.[23]   There has also been public reporting that some foreign intelligence services use certain job networking platforms to recruit former government employees to provide classified information,[24] so in some circumstances it may be in the interests of national security for the FBI to notify a platform of that activity. There have also been cases where individuals have posted explicit threats against FBI personnel on social media or posted personal information of FBI personnel and federal judges in order to encourage violence against those individuals. In some circumstances, the FBI has asked platforms to take down

---

[22] Under Executive Order 13526, section 1.2(a), the unauthorized disclosure of Top Secret information is reasonably expected to cause exceptionally grave damage to the national security; unauthorized disclosure of Secret information is reasonably expected to cause serious damage to the national security; and unauthorized disclosure of Confidential information is reasonably expected to cause damage to the national security.

[23] That situation did occur with respect to posting on Twitter, and Twitter removed the posting at the FBI's request. See Government's Sentencing Position, ECF NO. 47, in *United States v. James Robert Schweitzer*, No. SA CR 20-188-JLS (C.D. Cal.), attached hereto as Exhibit 2.

[24] See April 4, 2019, NBC News article titled "How a $230,000 debt and a LinkedIn message led an ex-CIA officer to spy for China" found at https://www.nbcnews.com/politics/national-security/how-230-000-debt-linkedin-message-led-ex-cia-officer-n990691.

those postings.[25]  A situation could also arise where the FBI might notify a social media platform that the sale of dangerous illegal drugs is taking place on the platform.

47.    These are just examples.  Given the broad scope of the FBI's national security and law enforcement missions, the wide range of activity taking place on social media, and the constantly emerging threats from criminals, foreign adversaries, and other hostile actors, it is not possible to predict all the situations that could arise that might prompt the FBI to notify social media platforms of criminal activity or security threats on their platforms.  The terms of the proposed PI appear to be expansive in scope and to lack clear boundaries.  It makes no exception for situations involving criminal activity or security threats on social media platforms, and appears to go far beyond enjoining efforts to unlawfully "pressure" or "coerce" social media platforms to take action.  Thus, it would create a dangerous situation in which the FBI may not be able to communicate with social media platforms in order to protect the national security and targets of crime and security threats.

PRIVATE SECTOR OUTREACH AND INFORMATION SHARING

48.    As previously noted, the FBI's approach to its law enforcement and national security mission is to prevent crimes and mitigate national security threats, where possible, before they do damage.  A critical part of that approach is for the FBI to work with the private sector to enhance the FBI's understanding of the risks it confronts and its needs, and to furnish the private sector with information that will help it, and the people who depend on

---

[25] According to media reports, a similar situation recently occurred with respect to police officers with the Los Angeles Police Department. An individual posted photographs and other information about LAPD officers on a website and offered bounties for the killing of officers. The website was apparently posted on Twitter, and Twitter took down the posting at the request of the police union.  See https://abc7.com/twitter-killercops-account-suspended-los-angeles-police-union-lapd/13031738/.

the services the private sector offers, to avoid becoming victims. With respect to social media platforms, the FBI on occasion provides the platforms with information about general trends in criminal activity or national security threats that might impact their platforms. For example, with respect to cyber crime, the FBI works hard to push important threat information to network defenders. The FBI also shares information about trends in disinformation operations by covert foreign malign actors, and about code words and symbols being used by terrorist groups on social media. The proposed PI is so vague and broad that it could raise a question whether that kind of outreach and information sharing would be covered under the PI, even if no particular social media posting is being flagged.

49.     The proposed PI is so vague and broad that it might also be construed to cover general statements by FBI personnel—not necessarily even direct communications between the FBI and social media platforms—about trends in criminal activity. For example, if a social media platform becomes aware of congressional testimony by an FBI official that there are increasing reports of certain types of cyber crime, that certain terrorist organizations are becoming more active, or that crimes against children continue to be a serious problem, that might be regarded as "encouraging" the platform to be more proactive in policing its platform for terms of service violations. Viewed that way, the FBI could not make any statements or take any action that might influence or "encourage" social media platforms to protect their business and their users from criminal conduct or other conduct that violates their terms of service.

## CONCLUSION

50.     As stated above, the FBI's national security and law enforcement missions include not only the investigation of crimes or threats that have already been carried out, but the prevention

22

of crimes and the protection of intended victims. Moreover, in the context of national security threats and criminal conduct by agents of foreign governments or by other foreign actors, those foreign actors may view themselves as beyond the reach of federal prosecutors, and so the threat of criminal prosecution may be not an effective deterrent. In those and other circumstances, the FBI's law enforcement and national security efforts are most effectively aimed at preventing the criminal conduct or mitigating the national security threat, and this may involve notifying social media platforms of criminal conduct and security threats on their platforms. Thus, to the extent it is applied to the FBI, the proposed PI would be contrary to the interests of the national security, the American public, and victims of crime. Rather, it would benefit the Russian, PRC, and Iranian governments, other foreign malign actors, individuals or groups intent on preventing qualified voters from voting, terrorists, cyber criminals, individuals and groups involved in crimes against children, and a wide variety of other criminals. For the foregoing reasons, I urge the Court to deny the request for a PI with respect to the FBI or any FBI officials.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this <u>1</u> day of May 2023

Larissa L. Knapp
Executive Assistant Director
National Security Branch
Federal Bureau of Investigation

23

## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| STATE OF LOUISIANA, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> JOSEPH R. BIDEN, JR., in his official capacity as President of the United States of America, *et al.*, <br><br> *Defendants*. | Civil Action No. 22-cv-1213 |

## DEFENDANTS' RESPONSES TO PLAINTIFFS' PROPOSED FINDINGS OF FACT IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION

# **TABLE OF CONTENTS**[1]

I.     The Campaign Of Public Threats Against Social-Media Platforms To Pressure Them To Censor More Speech on Social Media. ............................................................1

       A.     Threats From Federal Elected Officials Pressuring Platforms to Censor Speech. ...............................................................................................................4

       B.     Public Threats from President Biden and His Aides Pressuring Platforms to Censor...............................................................................................................19

II.    The White House's Public and Private Pressure Campaign on Platforms. ......................31

       A.     Pressure in Private from Rob Flaherty, Andy Slavitt, and White House Officials. ...........................................................................................................34

       B.     Public Pressure and Threats From Press Secretary Jennifer Psaki. ....................123

       C.     Flaherty's Profane Attack: "Are You Guys F**king Serious?"..........................138

       D.     President Biden on Social-Media Platforms: "They're Killing People."............141

       E.     The Social-Media Platforms Are Cowed into Collusion on Censorship. ...........169

       F.     White House Pressure and Collusion Continue Throughout 2022.....................188

       G.     Pressure to Expand the Topics of Social-Media Censorship.............................200

III.   The Pressure Campaign from Surgeon General Murthy and His Office........................212

       A.     The Surgeon General: Using the "Bully Pulpit" to Pressure Platforms..............213

       B.     Surgeon General Works in Tandem with the White House and Virality Project.............................................................................................................223

       C.     The Surgeon General Pressures Social-Media Platforms in Private...................253

       D.     The Surgeon General's Public Pressure Campaign. ..........................................293

---

[1] This Table of Contents provides the Arabic number of the first response to the proposed finding of fact at the start of each section.

E.     MISSING...........................................................................................................

F.     The Surgeon General's Collaboration with the Virality Project. .......................330

G.     The Surgeon General's "Angry" and "Tense" Meetings With Platforms...........338

H.     The Surgeon General Leverages Public Pressure to Increase Censorship. .........346

I.     The Surgeon General and White House Hammer Facebook.............................386

J.     The Surgeon General Threatens Regulation to Increase Censorship.................400

K.     The White House and Surgeon General Continue Oversight of Censorship. .....424

IV.     The CDC and the Census Bureau: BOLO and Authoritative Fact-Checking.................426

A.     The CDC's Regular Communication with Social Media Platforms...................427

B.     CDC's and Census's Pressure and Collusion With Facebook/Meta. .................435

C.     CDC's and Census's Pressure and Collusion with Google/YouTube. ...............531

D.     CDC's and Census's "BOLO Meetings." ........................................................550

E.     CDC's and Census's Pressure and Collusion with Twitter...............................563

F.     CDC Endorses the States' Theory of Standing.................................................590

V.     Dr. Fauci's Campaigns to Censor Disfavored Viewpoints on Social Media.................596

A.     Dr. Fauci's Conspiracy and Campaign to Suppress the Lab-Leak Theory.........598

B.     Dr. Fauci's Efforts to Suppress Speech on Hydroxychloroquine.......................757

C.     Dr. Fauci's "Devastating Takedown" of the Great Barrington Declaration. ......777

D.     NIAID Flags Social-Media Accounts for Censorship Under Dr. Fauci. ...........809

E.     CDC and NIH Procure the Censorship of Speech on Ivermectin......................826

F.     Dr. Fauci's Double Standard on Acceptable Speech: Mask Mandates...............828

G.     Dr. Fauci and the White House Cause the Censorship of Alex Berenson. .........840

VI.     The FBI's Censorship Campaign of Pressure and Deception.......................................853

A.      FBI's and CISA's Regular "USG-Industry" Disinformation Meetings..............861

B.      The FBI's Regular Bilateral Meetings with Social-Media Platforms.................867

C.      The FBI's Deceptive Information Censors the Hunter Biden Laptop Story.......880

D.      The FBI Routinely Flags Speakers and Content for Censorship........................905

E.      The FBI Demands Information on Censorship from the Platforms....................929

F.      The FBI Flags Accounts and URLs for Censorship on a Monthly Basis ...........931

G.      Pressure from Congress Induces Platforms to Increase Censorship....................945

H.      The FBI's Censorship Activities Are Ongoing. .................................................966

VII.    CISA's Censorship: Pressure, "Switchboarding," and Working Through
        Nonprofits. .......................................................................................................968

A.      CISA "Switchboards" by Flagging Government-Reported
        "Misinformation."...........................................................................................972

B.      CISA Organizes the "USG-Industry Meetings" on Misinformation. ................978

C.      CISA Is Deeply Embedded in the Election Integrity Partnership. .....................991

D.      CISA Uses Switchboarding to Pressure Platforms to Censor Speech. .............1076

E.      CISA's Many Misinformation Meetings with Platforms................................1083

F.      CISA Worked with FBI to Suppress the Hunter Biden Laptop Story. .............1088

G.      CISA's Ongoing and Expanding Censorship Efforts. ....................................1094

VIII.   The State Department's Global Engagement Center's Censorship Efforts.................1123

IX.     The Election Integrity Partnership and Virality Project – Federal Collaborators.........1135

A.      The Election Integrity Project Is a Formidable Censorship Cartel..................1136

B.      The EIP Targets Plaintiff Jim Hoft and *The Gateway Pundit*..........................1207

C.      The EIP Induces Major Changes in Platform Censorship Policies. .................1217

D.      The Virality Project Expands EIP's Censorship Work with Federal
        Officials.........................................................................................................1236

E.      The Virality Project Targets Plaintiff Jill Hines and Health-Freedom Groups. ....................................................................................................... 1266

X.    Federal Censorship Inflicts Grave, Imminent, and Ongoing Injuries on Plaintiffs ....... 1366

    A.      Defendants Gravely Injure the Individual Plaintiffs. ...................................... 1367

    B.      Defendants Gravely Injure Similarly Situated Speakers and Listeners. ........... 1412

    C.      Defendants Gravely Injure the State Plaintiffs, Louisiana and Missouri. .......... 1427

        1.      Fundamental policies favoring freedom of speech for their citizens. ... 1427

        2.      Direct censorship of the States and their political subdivisions ............ 1428

        3.      The States' interest in following the uncensored discourse of their citizens. ............................................................................................ 1431

        4.      States' interest in fair, unbiased, open processes to petition state government ........................................................................................ 1438

        5.      State quasi-sovereign interests. ........................................................ 1441

## DEFENDANTS' OBJECTIONS AND RESPONSES TO PLAINTIFFS' PROPOSED FINDINGS OF FACT

Defendants object to Plaintiffs' attempt to "incorporate by reference the evidence, documents, and exhibits previously filed in this case," Plaintiffs' Proposed Findings of Fact (Pls.' PFOF) at 1, where those materials are not specifically cited in Plaintiffs' Memorandum in Support of Motion for a Preliminary Injunction, Dkt. 15; Plaintiffs' Supplemental Brief in Support of Motion for a Preliminary Injunction, Dkt. 214; and Plaintiffs' Proposed Findings of Fact, Dkt. 214-1. As the Fifth Circuit has recognized, "[j]udges are not like pigs, hunting for truffles buried in the record." *United States v. Del Carpio Frescas*, 932 F.3d 324, 331 (5th Cir. 2019) (quotation omitted). Plaintiffs' suggestion that the Court and Defendants scour the docket in this case to address "evidence, documents and exhibits" not specifically referenced in Plaintiffs' lengthy preliminary injunction filings that may—in their view—bear on preliminary injunction issues is inappropriate. Accordingly, Defendants' response appropriately is focused on the "evidence, documents, and exhibits" Plaintiffs expressly have identified in support of their preliminary injunction motion.[2]

## I.    The Campaign Of Public Threats Against Social-Media Platforms To Pressure Them To Censor More Speech on Social Media.[3]

1.   Federal officials, including Defendants, have made a long series of public statements since at least 2018 demanding that social-media platforms increase their censorship of speech and speakers disfavored by these officials, and threatening adverse consequences – such as repeal or reform of Section 230 immunity under the Communications Decency Act, antitrust scrutiny or enforcement, increased regulation, and other measures – if the platforms do not increase censorship. The private communications between government officials and social-media platforms

---

[2] Defendants object to each of Plaintiffs' PFOFs to the extent that PFOF attributes to a deponent a legal characterization or conclusion contained in a question by counsel for Plaintiffs, on the ground that even when the deponent gave an affirmative response to such a question, any legal characterization or conclusion remained one by Plaintiffs, not testified to as fact by the deponent.

[3] If Plaintiffs intend their headings to be proposed findings of fact, Defendants dispute them because they are argumentative and lack evidentiary support. Defendants respond to Plaintiffs' arguments in their opposition to Plaintiffs' preliminary injunction motion.

addressing disinformation, misinformation, and censorship set forth herein were made against the backdrop of these public threats.

       **RESPONSE:**  Disputed. The proposed finding of fact (PFOF) is argumentative, lacks citation to any evidence, and is contradicted by the record for all the reasons discussed below and in Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction (Opposition), to which the Court is respectfully referred.

    2.   The immunity provided by Section 230 of the Communications Decency Act is extremely valuable for social-media platforms, so threatening to amend or repeal that immunity is highly motivating to them. One commentator has aptly described Section 230 immunity as "a hidden subsidy worth billions of dollars," stating: "Digital platforms enjoy a hidden subsidy worth billions of dollars by being exempted from any liability for most of the speech on their platforms (Section 230)."  Glenn Decl. Ex. 11, Doc. 10-1 at 140. Another commentator has observed, "imperiling Section 230 is a fearsome cudgel against ever untouchable companies."  Glenn Decl. Ex. 13, Doc. 10-1 at 206.

       **RESPONSE:** Dispute the statement that "threatening to amend or repeal [Section 230] is highly motivating" to social-media platforms as a vague characterization for which the PFOF cites no supporting evidence. Undisputed that Glenn Decl. Ex. 11, at 140, is accurately quoted, but note that Plaintiffs cite no evidence of record to support the economic validity of the "commentator's" "descri[ption]" of Section 230's value to social-media companies. Defendants further note that Glenn Ex. 11, Dkt. 10-1 at 51 n.123, cites to a letter signed by State Attorney Generals of both political parties (including the Attorney Generals of Louisiana and Missouri) asking members of Congress to revise Section 230 to impose liability for violations of state criminal law. *Id.* at 51, n.123. The final sentence is disputed because Plaintiffs' partial quotation to an April 12, 2019 article lacks context. The full statement in the article reads as follows: "Whatever the political motivations, imperiling Section 230 is a fearsome cudgel against even tech's most seemingly untouchable companies." Glenn Decl. Ex. 13, Doc. 10-1 at 206. Defendants also note that the cited April 2019 article also observed that both Democratic and Republican legislators had expressed

interest in amending Section 230. *Id.* Finally, note that irrespective of any interest expressed in

Section 230 reform, social media companies, by virtue of their business model, have powerful

economic incentives to moderate content on their platforms to retain users and thereby maximize

advertising revenues, and have been doing so since well before 2020. *See* Declaration of Dr. Stuart

Gurrea at ¶¶ 1-81 ("Gurrea Decl.") (Ex. 1).

3.   The threat of antitrust scrutiny or enforcement is also a major motivator to social-media
platforms. For example, Facebook CEO Mark Zuckerberg has stated that the threat of antitrust
enforcement is "an 'existential' threat" to his platform. Glenn Decl. Ex. 12, Doc. 10-1 at 202.

**RESPONSE:** Disputed. The first sentence lacks citation to or support in the evidence of

record. The second sentence does not accurately reflect Mr. Zuckerberg's statement, lacks

appropriate context, and fails to support the first sentence of the PFOF. The New York Times

article referenced in Glenn Decl. Ex. 12, Dkt. 10-1 at 202, discusses lawsuits brought by the

Federal Trade Commission ("FTC") and "more than 40 states" accusing Facebook of "buying up

its rivals to illegally squash competition" and calling for "the deals to be unwound[.]" Notably,

among the States that brought the antitrust lawsuit were Louisiana and Missouri. *See New York v.*

*Facebook, Inc.*, 549 F. Supp. 3d 6 (D.D.C. 2021) (No. 20-cv-3589), 2020 WL 7348667, at *4

(naming Louisiana and Missouri as plaintiffs). It is in the context of this antitrust lawsuit that Mr.

Zuckerberg is quoted as stating that the breakup of the company is an "existential" threat. Glenn

Decl. Ex. 12, Dkt. 10-1 at 202. This article has nothing to do with any threats of antitrust

enforcement based on Facebook's content moderation policies. Accordingly, this PFOF is

irrelevant to any issue in this case. Note also that irrespective of concerns about antitrust

enforcement, social media companies, by virtue of their business model, have powerful economic

incentives to moderate content on their platforms to retain users and thereby maximize advertising

revenues, and have been doing so since well before 2020. *See* Gurrea Decl. at ¶¶ 1-81 (Ex. 1).

**A. Threats From Federal Elected Officials Pressuring Platforms to Censor Speech.**

4.    Then-Speaker of the House Nancy Pelosi stated on April 12, 2019: "I do think that for the privilege of 230, there has to be a bigger sense of responsibility on it. And it is not out of the question that that could be removed."  Glenn Decl. Ex. 13, Doc. 10-1, at 205 ("When asked about Section 230, Pelosi referred to the law as a 'gift' to tech companies that have leaned heavily on the law to grow their business…. 'It is a gift to them and I don't think that they are treating it with the respect that they should, and so I think that that could be a question mark and in jeopardy… I do think that for the privilege of 230, there has to be a bigger sense of responsibility on it. And it is not out of the question that that could be removed.'").

**RESPONSE:**  Undisputed, but further note that this PFOF is immaterial to any issue in

this case and the concerns about Section 230 were bipartisan, *see* Glenn Decl. Ex. 13, Dkt. 10-1,

at 205 ("In recent months, a handful of Republicans in Congress have [also] taken aim at the law.").

Note also that irrespective of interest expressed in Section 230 reform, social media companies,

by virtue of their business model, have powerful economic incentives to moderate content on their

platforms to retain users and thereby maximize advertising revenues, and have been doing so since

well before 2020. *See* Gurrea Decl. ¶¶ 1-81 (Ex. 1).

5.    Senator Richard Blumenthal stated on Nov. 17, 2020: "I have urged, in fact, a breakup of tech giants. Because they've misused their bigness and power. …  And indeed Section 230 reform, meaningful reform, including even possible repeal in large part because their immunity is way too broad and victims of their harms deserve a day in court."  Glenn Decl. Ex. 16, at 1; Doc. 10-1, at 225.

**RESPONSE:** Undisputed, but further note that this PFOF is immaterial to any issue in this

case and the concerns about Section 230 were bipartisan. The concerns stated by Senator

Blumenthal were widely shared by his Republican colleagues at that November 17, 2020, hearing.

*See* Ex. 14 at 2[4] (*Censorship and the 2020 Election: Hearing Before the S. Comm. on the Judiciary*,

116th Cong. 4 (2020) (Senator Graham: "And I think section 230 has to be changed because we

_____

[4] Throughout this document, citations to "Ex. [number]" that are not preceded by a name are Defendants' exhibits filed concurrently with their Opposition to Plaintiffs' Motion for Preliminary Injunction Motion and the instant Response to Plaintiffs' Proposed Findings of Fact.

can't get there from here without change."); *id.* at 10 (Senator Cornyn: "We'll, I'm glad to hear both of our witnesses today say that section 230, that they are open to reform because I think it's fair to say the internet has outgrown section 230."); *id.* at 19 (Senator Cruz: "At the same time that big tech exercises massive power, it also enjoys massive corporate welfare. Through the effect of section 230, special immunity from liability that nobody else gets, Congress has given big tech, in effect, a subsidy while they become some of the wealthiest corporations on the face of the planet."); *id.* at 45 (Senator Blackburn: "My colleagues and I have ask[ed] you all repeatedly through the years for greater transparency and to accept responsibility you have chosen to do neither so it is going to be up to us to change existing law and to hold you to account on behalf of the American people section 230 the reforms that we are going to put in place will take away this liability shield that you have turned into an opaque wall . . .). Note also that irrespective of interest expressed in Section 230 reform, or any concern about antitrust enforcement, social media companies, by virtue of their business model, have powerful economic incentives to moderate content on their platforms to retain users and thereby maximize advertising revenues, and have been doing so since well before 2020. *See* Gurrea Decl. ¶¶ 1-81 (Ex. 1).

6.   Senator Mazie Hirono tweeted on Feb. 5, 2021: "Sec 230 was supposed to incentivize internet platforms to police harmful content by users. Instead, the law acts as a shield allowing them to turn a blind eye. The SAFE TECH ACT brings 230 into the modern age and makes platforms accountable for the harm they cause."  Glenn Decl. Ex. 55, at 1; Doc. 10-1, at 723.

**RESPONSE:**   Undisputed, but immaterial to any issue in this case. Note also that irrespective of interest expressed in Section 230 reform, social media companies, by virtue of their business model, have powerful economic incentives to moderate content on their platforms to retain users and thereby maximize advertising revenues, and have been doing so since well before 2020. *See* Gurrea Decl. ¶¶ 1-81 (Ex. 1).

7. Defendants' political allies have repeatedly used congressional hearings as forums to advance these threats of adverse legislation if social-media platforms do not increase censorship of speakers, speech, content, and viewpoints they disfavor. They have repeatedly used such hearings to berate social-media firm leaders, such as Mark Zuckerberg of Facebook, Jack Dorsey of Twitter, and Sundar Pichai of Google and YouTube, and to make threats of adverse legal consequences if censorship is not increased. Such hearings include, but are not limited to, an antitrust hearing before the House Judiciary Committee on July 29, 2020; a Senate Judiciary Committee hearing on November 17, 2020; and a House Energy and Commerce Hearing on March 25, 2021.

**RESPONSE:**  Disputed as argumentative characterizations lacking any citation to or support in the evidence of record. Note also that irrespective of interest expressed in Section 230 reform, or any concern about antitrust enforcement, social media companies, by virtue of their business model, have powerful economic incentives to moderate content on their platforms to retain users and thereby maximize advertising revenues, and have been doing so since well before 2020. *See* Gurrea Decl. ¶¶ 1-81 (Ex. 1).

8. The March 25, 2021 Joint Hearing of the Communications and Technology Subcommittee with the Subcommittee on Consumer Protection and Commerce, the Joint Statement of Democratic Committee Chairs stated: "This hearing will continue the Committee's work of holding online platforms accountable for the growing rise of misinformation and disinformation. ... For far too long, big tech has failed to acknowledge the role they've played in fomenting and elevating blatantly false information to its online audiences. Industry self-regulation has failed. We must begin the work of changing incentives driving social media companies to allow and even promote misinformation and disinformation."  Glenn Decl. Ex. 17, at 1-2; Doc. 10-1, at 228-29.

**RESPONSE:** Undisputed, but further note that this PFOF is immaterial to any issue in this case. Defendants further note that interest in holding a hearing on this topic was bipartisan. Ex. 169 at 6 (*Disinformation Nation: Social Media's Role in Promoting Extremism and Misinformation: Hearing before the H. Comm. on Energy & Commerce*, 117th Cong. (2021)) (Ranking Member Bilirakis: "I've been thinking about this hearing since our side first requested this hearing last year," and "[t]he conclusion is my constituents simply don't trust you anymore."). Note also that irrespective of interest expressed in Section 230 reform, or any concern about antitrust enforcement, social media companies, by virtue of their business model, have powerful

economic incentives to moderate content on their platforms to retain users and thereby maximize

advertising revenues, and have been doing so since well before 2020. *See* Gurrea Decl. ¶¶ 1-81

(Ex. 1).

9.   At the same hearing, entitled "Disinformation Nation: Social Media's Role in Promoting
Extremism and Misinformation," Representative Schakowsky stated: "[S]elf-regulation has come
to the end of its road…. [Congress] is preparing to move forward with regulation and legislation.
The regulation we seek … must hold platforms accountable when they are used to … spread
misinformation…. All three of the companies that are here today run platforms that are hotbeds of
misinformation and disinformation."  Jones Decl., Ex. A, at 1, 5. She also stated: "Self-regulation
has not worked. They must be held accountable for allowing misinformation and disinformation
to spread."  *Id.* at 7.

**RESPONSE:**  Disputed to the extent this PFOF selectively quotes from Representative

Schakowsky's statements and takes her statements out of context. This PFOF is also immaterial to

any issue in this case. Defendants refer the Court to the March 25, 2021 hearing transcript for the

complete quote and context of Representative Schakowsky's statement, *see* Ex. 169 at 5, and

further note that the concerns raised by Representative Schakowsky were shared by Republican

committee members, *id.* at 7 (Ranking Member Bilirakis: "The fear you should have coming into

this hearing today isn't that you are going to be [upbraided] by a member of Congress—it's that

our committee knows how to get things done when we come together. We can do this with you or

without you and we will."). Note also that irrespective of interest expressed in Section 230 reform,

or any concern about antitrust enforcement, social media companies, by virtue of their business

model, have powerful economic incentives to moderate content on their platforms to retain users

and thereby maximize advertising revenues, and have been doing so since well before 2020. *See*

Gurrea Decl. ¶¶ 1-81 (Ex. 1).

10. At the same hearing, Representative Doyle stated: "despite repeated promises to tackle this
crisis, Facebook, Google, and Twitter instead routinely make minor changes in response to the
public relations crisis of the day. … It is now painfully clear that neither the market nor public
pressure will force these social media companies to take the aggressive action they need to take to
eliminate disinformation and extremism from their platforms. And therefore, it is time for

Congress and this committee to legislate and realign these companies' incentives. … I question whether existing liability protections [*i.e.*, Section 230] should apply … That is why you are here today, Mr. Zuckerberg, Mr. Pichai, and Mr. Dorsey…. Your business model itself has become the problem." *Id.* at 10-11.

**RESPONSE:** Disputed to the extent this PFOF selectively quotes from Representative

Doyle's statement and takes his comments out of context. This PFOF is also immaterial to any

issue in this case. Defendants refer the Court to the March 25, 2021 hearing transcript for the

compete quote and context of Representative Doyle's statement, Ex. 169 at 7, and further note that

the concerns expressed by Representative Doyle were shared by his Republican colleagues. *Id.* at

8-9 (Ranking Member Rodgers stating that "big tech is a . . . destructive force" and asking the

social media companies in attendance at the hearing "why do you think you still deserve [section

230] protections today?"). Note also that irrespective of interest expressed in Section 230 reform,

or any concern about antitrust enforcement, social media companies, by virtue of their business

model, have powerful economic incentives to moderate content on their platforms to retain users

and thereby maximize advertising revenues, and have been doing so since well before 2020. *See*

Gurrea Decl. ¶¶ 1-81 (Ex. 1).

11. At the same hearing, Representative Rush accused the platforms of allowing "[m]isinformation, outlandish conspiracy theories, and incendiary content" to spread, and stated to the three CEOs of Google, Facebook, and Twitter: "There is only one comparison that remotely approaches the avarice and moral discrepancy of your companies, and that is the slavetocracy burden of our Nation's shameful and inhumane and most difficult dark days in the past." *Id.* at 13. He also stated to Jack Dorsey, "I can't wait until we come up with legislation that will deal with you and your cohorts in a very, very effective way." *Id.* at 14.

**RESPONSE:** Disputed to the extent this PFOF selectively quotes Representative Rush and

takes his comments out of context. This PFOF is also immaterial to any issue in this case.

Defendants refer the Court to the March 25, 2021 hearing transcript for the complete quote and

context for his statements, Ex. 169 at 21, and further note that Representative Rush's concerns

about how social media platforms were handling content on their platforms were shared by his

Republican colleagues, as well as former President Trump. *Id.* at 22 (Representative Upton stating

"it sounds like everybody on both sides of the aisle is not very happy. I think we all believe that

there is a lot of responsibility that should be shared for some of the issues that we've raised today

by the three [witnesses], and I would just offer—or speculate, I guess you could say, that we're

going to see some changes in Section 236—230."); *id.* (Representative Upton noting that former

President Trump vetoed the Defense bill because "he wanted the total repeal" of section 230 and

"didn't get it."). Note also that irrespective of interest expressed in Section 230 reform, or any

concern about antitrust enforcement, social media companies, by virtue of their business model,

have powerful economic incentives to moderate content on their platforms to retain users and

thereby maximize advertising revenues, and have been doing so since well before 2020. *See* Gurrea

Decl. ¶¶ 1-81 (Ex. 1).

12. At the same hearing, Representative Upton stated: "we are going to see some changes in
Section 230." *Id.* at 15.

**RESPONSE:**  Disputed to the extent this PFOF selectively quotes Representative Upton's

statement. This PFOF is also immaterial to any issue in this case. Defendants refer the Court to the

transcript of the March 25, 2021 hearing for Representative Upton's complete comments, in

context. *See* Ex. 169. Note also that irrespective of interest expressed in Section 230 reform, social

media companies, by virtue of their business model, have powerful economic incentives to

moderate content on their platforms to retain users and thereby maximize advertising revenues,

and have been doing so since well before 2020. *See* Gurrea Decl. ¶¶ 1-81 (Ex. 1).

13. At the same hearing, Representative Eshoo demanded of Jack Dorsey, "why haven't you
banned the 12 accounts that are spewing its deadly COVID misinformation?" *Id.* at 17.

**RESPONSE:** Disputed to the extent it mischaracterizes Representative Eshoo's question

as a "demand," and selectively quotes his testimony. Defendants refer the Court to the transcript

of the March 25, 2021 hearing for Representative Eshoo's complete comments. *See* 169.

Defendants further note that in response to Representative Eshoo's question, Twitter's former CEO

Jack Dorsey explained that "we won't take it down because it didn't violate our policy." *Id.* at 24.

In addition, this PFOF is immaterial to any issue in this case. And note also that irrespective of

interest expressed in Section 230 reform, or any concern about antitrust enforcement, social media

companies, by virtue of their business model, have powerful economic incentives to moderate

content on their platforms to retain users and thereby maximize advertising revenues, and have

been doing so since well before 2020. *See* Gurrea Decl. ¶¶ 1-81 (Ex. 1).

    14. At a hearing of the Antitrust subcommittee of the House Judiciary Committee on July 29,
2020, Representative Cicilline said to Mark Zuckerberg: "Mr. Zuckerberg. When a television
station runs a false political advertisement, they're held liable for that. Why should Facebook or
any other platform be different? … It's hard to understand why Facebook shouldn't be responsible
for those business decisions. … Facebook gets away with it because you're the only game in town.
There's no competition forcing you to police your own platform. Allowing this misinformation to
spread can lead to violence. And frankly, I believe it strikes at the very heart of American
democracy. … American democracy has always been at war against monopoly power. … These
companies, as exist today, have monopoly power. Some need to be broken up, all need to be
properly regulated and held accountable. … The names have changed, but the story is the same.
Today, the men are named Zuckerberg, Pichai, Cook, and Bezos."  Jones Decl., Ex. B, at 9-11.

    **RESPONSE:**  Disputed because Plaintiffs' PFOF does not accurately cite to the transcript

of the July 29, 2020, hearing, and misleadingly quotes different questions to suggest a single

statement. This PFOF is also immaterial to any issue in this case. Defendants refer the Court to the

July 29, 2020 hearing transcript for an accurate transcription of the exchange cited in this PFOF.

*See* Ex. 170 at 34, 45 (*Online Platforms and Market Power, Part 6: Examining the Dominance of

Amazon, Facebook, Google, and Apple: Hearing Before the Subcomm. on Antitrust*, *Commercial,

& Administrative Law*, 116th Cong. (2020)). Note also that irrespective of any concern about

antitrust enforcement, social media companies, by virtue of their business model, have powerful

economic incentives to moderate content on their platforms to retain users and thereby maximize

advertising revenues, and have been doing so since well before 2020. *See* Gurrea Decl. ¶¶ 1-81 (Ex. 1).

15. On November 17, 2020, at a hearing of the Senate Judiciary Committee, Senator Blumenthal stated: "Now, Mr. Zuckerberg and Mr. Dorsey, you have built terrifying tools of persuasion and manipulation with power far exceeding the robber barons of the last Gilded Age. You have profited hugely by … promoting hate speech and voter suppression. … The destructive incendiary misinformation is still a scourge on both your platforms and on others. … [W]hat appears on your platform … is voter suppression and incendiary malicious misinformation. … [A] series of hearings on big tech is long overdue on antitrust issues … and Section 230. I have urged, in fact, a breakup of the tech giants because they've misused their bigness and power. Breaking off, for example, WhatsApp and Instagram [both Meta platforms]…. And indeed Section 230 reform, meaningful reform, including even possible repeal in large part because their immunity is way too broad…. [F]oreign disinformation campaigns intended to interfere in our democracy…. What we've seen here are fighting words and hate speech that certainly deserve no free expression protection. … Change is going to come, no question. Change is on the way and I intend to bring aggressive and targeted reform to Section 230." Jones Decl., Ex. C, at 2-3. Soon thereafter, he demanded that Mark Zuckerberg (who was testifying before the committee) "commit to … robust contend modification playbook in this coming election, including fact-checking, labelling, reducing the spread of misinformation" to "tak[e] action against dangerous disinformation" and "malign tactics." *Id.* at 4; *see also, e.g., id.* at 9 (Senator Coons demanding that Jack Dorsey explain why "you don't have a standalone climate change misinformation policy")

**RESPONSE:**  Disputed to the extent Plaintiffs' PFOF selectively quotes from Senator Blumenthal's statements during a November 17, 2020, Senate Judiciary Subcommittee hearing and mischaracterizes his and Senator Coons' questions as "demands."  This PFOF is also immaterial to any issue in this case. Defendants refer the Court to the complete transcript of the November 17, 2020, hearing for an accurate transcription of Senator Blumenthal's statement. *See* Ex. 170. Note also that irrespective of interest expressed in Section 230 reform, or any concern about antitrust enforcement, social media companies, by virtue of their business model, have powerful economic incentives to moderate content on their platforms to retain users and thereby maximize advertising revenues, and have been doing so since well before 2020. *See* Gurrea Decl. ¶¶ 1-81 (Ex. 1).

16. On March 11, 2022, Representative Ro Khanna, the Chairman of the House Oversight and Reform Committee who is leading "an investigation of oil industry 'misinformation' and held two

days of hearings on the oil industry, tweeted: "Facebook is preventing us from taking action on climate change by allowing climate misinformation to spread. Congress must step up and hold them accountable." Jones Decl., Ex. D. He also tweeted: "Misinformation being spread on social media is undermining our efforts to tackle climate change. As chair of the House Oversight Environment Subcommittee, I will be holding a hearing to hold social media companies accountable." *Id.*

**RESPONSE:** Undisputed, but immaterial to any issue in this case. Defendants note that

on May 29, 2020, then-President Trump tweeted "Revoke 230!" Ex. 31 (Trump tweet). Note also

that irrespective of interest expressed in Section 230 reform, social media companies, by virtue of

their business model, have powerful economic incentives to moderate content on their platforms

to retain users and thereby maximize advertising revenues, and have been doing so since well

before 2020. *See* Gurrea Decl. ¶¶ 1-81 (Ex. 1).

17. On April 20, 2022, twenty-two Democratic members of Congress sent a letter to Mark Zuckerberg of Facebook (n/k/a "Meta Platforms, Inc."), demanding that Facebook increase censorship of "Spanish-language disinformation across its platforms" and threatening Congressional action if Facebook did not do so. The letter claimed that "disinformation" was a threat to democracy, and it made explicit threats of adverse legislative action if Facebook/Meta did not increase censorship: "The spread of these narratives demonstrate that Meta does not see the problem of Spanish-language disinformation in the United States as a critical priority for the health of our democracy. The lack of Meta's action to swiftly address Spanish-language misinformation globally demonstrates the need for Congress to act to ensure Spanish-speaking communities have fair access to trustworthy information." Glenn Decl. Ex. 18; Doc. 10-1, at 244-46.

**RESPONSE:** Disputed to the extent this PFOF takes the cited April 20, 2022, letter out

of context, is immaterial to any issue in this case, and is an argumentative characterization rather

than a statement of fact. Specifically, Plaintiffs' PFOF fails to mention that the impetus for the

Senators' concern was Russian propaganda: "[s]ince the beginning of the year, Russian state-

controlled outlets have made a concentrated effort to target Spanish-speaking communities to

spread false-narratives leading up to, and in the aftermath of, the invasion of Ukraine." Glenn Decl.

Ex. 18, Dkt. 10-1 at 244; *id.* ("Kremlin-owned outlets are winning the information war with

Spanish speakers.") *id.* at 245 ("These lies are designed to undermine a resolute global response

necessary to stand against the Russian government's aggression."). Defendants refer the Court to the letter for an accurate statement of its contents. Note also that irrespective of interest expressed in Section 230 reform, or any concern about antitrust enforcement, social media companies, by virtue of their business model, have powerful economic incentives to moderate content on their platforms to retain users and thereby maximize advertising revenues, and have been doing so since well before 2020. *See* Gurrea Decl. ¶¶ 1-81 (Ex. 1).

18. Comments from two Members of the House of Representatives summarize this campaign of pressure and threats: "In April 2019, Louisiana Rep. Cedric Richmond warned Facebook and Google that they had 'better' restrict what he and his colleagues saw as harmful content or face regulation: 'We're going to make it swift, we're going to make it strong, and we're going to hold them very accountable.' New York Rep. Jerrold Nadler added: 'Let's see what happens by just pressuring them.'" Glenn Decl. Ex. 14, at 2-3; Doc. 10-1, at 218-19.

**RESPONSE:** Disputed to the extent Plaintiffs' PFOF is argumentative and relies on hearsay and journalistic characterization contained in an opinion article rather than citing to evidence of record. In addition, this PFOF is immaterial to any issue in this case. Note also that irrespective of interest expressed in Section 230 reform, or any concern about antitrust enforcement, social media companies, by virtue of their business model, have powerful economic incentives to moderate content on their platforms to retain users and thereby maximize advertising revenues, and have been doing so since well before 2020. *See* Gurrea Decl. ¶¶ 1-81 (Ex. 1).

**B. Public Threats from President Biden and His Aides Pressuring Platforms to Censor.**

19. Then-candidate and now-President Biden has led this charge. He has tripled down on these threats of adverse official action from his colleagues and allies in senior federal-government positions. His threats of adverse government action have been among the most vociferous, and among the most clearly linked to calls for more aggressive censorship of disfavored speakers and speech by social-media companies.

**RESPONSE:** Disputed. Plaintiffs' PFOF is an argumentative mischaracterization lacking citation to or support in the evidence of record.

20. For example, on January 17, 2020, then-candidate Biden stated, in an interview with the New York Times editorial board, that Section 230 of the CDA should be "revoked" because social-media companies like Facebook did not do enough to censor supposedly false information in the form of political ads criticizing him—*i.e.*, core political speech. He stated: "The idea that it's a tech company is that Section 230 should be revoked, immediately should be revoked, number one. For Zuckerberg and other platforms." He also stated, "And it should be revoked. It should be revoked because it is not merely an internet company. It is propagating falsehoods they know to be false.... There is no editorial impact at all on Facebook. None. None whatsoever. It's irresponsible. It's totally irresponsible." Glenn Decl. Ex. 19, at 27; Doc. 10-1, at 275.

**RESPONSE:** Disputed to the extent Plaintiffs' PFOF selectively quotes from statements by then-candidate Biden and then improperly mischaracterize those partial quotes. Defendants refer the Court to the entirety of then-candidate Biden's statement concerning Section 230 reform for a full and accurate understanding of its contents. Then-candidate Biden was answering a question concerning a letter his campaign had sent to Facebook "regarding an ad that falsely claimed that [he] blackmailed Ukrainian officials to not investigate [his] son." *See* Glenn Decl. Ex. 19, at 29; Dkt. 10-1, at 275. Then-candidate Biden responded to the question by stating, among other things, that technology companies should be held to the same standards as traditional media and that "we should be setting standards not unlike the Europeans are doing relative to privacy." *Id.* Note also that irrespective of interest expressed in Section 230 reform, social media companies, by virtue of their business model, have powerful economic incentives to moderate content on their platforms to retain users and thereby maximize advertising revenues, and have been doing so since well before 2020. *See* Gurrea Decl. ¶¶ 1-81 (Ex. 1).

21. Candidate Biden also threatened that Facebook CEO Mark Zuckerberg should be subject to civil liability and even *criminal prosecution* for not censoring such core political speech: "He should be submitted to civil liability and his company to civil liability…. Whether he engaged in something and amounted to collusion that in fact caused harm that would in fact be equal to a criminal offense, that's a different issue. That's possible. That's possible it could happen." *Id.* In other words, Biden's message—not long before he became President of the United States—was that if Facebook did not censor political ads against him, Zuckerberg should go to prison. These two threats echoed the same threats made by numerous political allies of the President since 2019, cited above.

**RESPONSE:** Disputed to the extent Plaintiffs' PFOF selectively and misleadingly quotes from then-candidate Biden and improperly seeks to characterize those partial quotes in an argumentative and rhetorical fashion, such as by referring to his comments as "threats" and characterizing statements as "core political speech." Defendants refer the Court to the entirety of then-candidate Biden's statement concerning Section 230 reform. *See* Glenn Decl. Ex. 19, at 29; Dkt. 10-1, at 275. The assertion that Mr. Biden stated "Zuckerberg should go to prison" if in future "Facebook did not censor political ads against him" is unsupported and plainly refuted by the cited excerpt: Mr. Biden stated only that Mr. Zuckerberg "should be submitted to civil liability and his company to civil liability, just like you would be here at The New York Times" for past acts. Mr. Biden stated that whether those past acts "amounted to . . . a criminal offense" was "a different issue," without any reference to Facebook's future handling of negative political ads about Mr. Biden. Note also that irrespective of interest expressed in Section 230 reform, social media companies, by virtue of their business model, have powerful economic incentives to moderate content on their platforms to retain users and thereby maximize advertising revenues, and have been doing so since well before 2020. *See* Gurrea Decl. ¶¶ 1-81 (Ex. 1).

22. During the presidential campaign, now-Vice President Harris made similar threats against social-media firms to pressure them to engage in more aggressive censorship of speakers, content, and viewpoints she disfavors. For example, in addition to the statements cited above, she stated in 2019: "We will hold social media platforms responsible for the hate infiltrating their platforms, because they have a responsibility to help fight against this threat to our democracy. And if you profit off of hate—if you act as a megaphone for misinformation or cyberwarfare, if you don't police your platforms—we are going to hold you accountable as a community." Glenn Decl. Ex. 20, at 1; Doc. 10-1, at 284.

**RESPONSE:** Disputed to the extent Plaintiffs' PFOF reflects argumentative characterization of facts rather than facts, lacks evidentiary support, and is immaterial to the claims in this case. Specifically, Defendants dispute that the quoted statement from then-candidate Kamala Harris constitutes a "threat[] against social-media firms to pressure them to engage in

more aggressive censorship of speakers, content, and viewpoints she disfavors." Defendants

further note that the quoted statement by then-candidate Harris was made in the context of a

discussion about "the growth of domestic terrorism in the United States (and elsewhere), and how

those attackers used or embraced radically violent ideas on social media." Glenn Decl. Ex. 20, at

1; Doc. 10-1, at 284. Defendants refer the Court to the cited statement for a full and accurate

understanding of its contents. Additionally, note that irrespective of interest expressed in Section

230 reform, or any concern about antitrust enforcement, social media companies, by virtue of their

business model, have powerful economic incentives to moderate content on their platforms to

retain users and thereby maximize advertising revenues, and have been doing so since well before

2020. *See* Gurrea Decl. ¶¶ 1-81 (Ex. 1).

23. In or around June 2020, the Biden campaign published an open letter and online petition (ironically, on Facebook) calling for Facebook to engage in more aggressive censorship of core political speech and viewpoints that then-Candidate Biden disfavored. The open letter complained that Facebook "continues to allow Donald Trump to say anything — and to pay to ensure that his wild claims reach millions of voters. Super PACs and other dark money groups are following his example. Trump and his allies have used Facebook to spread fear and misleading information about voting…. We call for Facebook to proactively stem the tide of false information by no longer amplifying untrustworthy content and promptly fact-checking election-related material that goes viral. We call for Facebook to stop allowing politicians to hide behind paid misinformation in the hope that the truth will catch up only after Election Day. There should be a two-week pre-election period during which **all** political advertisements must be fact-checked before they are permitted to run on Facebook. … Anything less will render Facebook a tool of misinformation that corrodes our democracy." Glenn Decl. Ex. 23, at 1; Doc. 10-1, at 299.

**RESPONSE:** The first sentence is disputed. Plaintiffs' PFOF reflects Plaintiffs'

argumentative characterization of facts rather than facts, lacks evidentiary support, and is

immaterial to the claims in this case. Specifically, the assertion that Mr. Biden's campaign

"call[ed] for Facebook to engage in more aggressive censorship" is refuted by the cited portions

of the statement themselves, which referred only to common content moderation measures such as

fact-checking and declining to amplify content found to be untrustworthy. The PFOF is also

refuted by a portion of the petition that Plaintiffs omit, such as the campaign's emphasis that these were intended only as "*recommendations* to fix the problems in Facebook's platform that pose a threat to free and fair elections," Glenn Decl. Ex. 23, at 1; Dkt. 10-1, at 299 (emphasis added). Defendants refer the Court to the cited document for a full and accurate understanding of its contents. In any event, this PFOF is immaterial to the issues presented in this case.

24. The online petition demanded that Facebook "[p]romote real news, not fake news," "[q]uickly remove viral misinformation," and "[e]nforce voter suppression rules against everyone—even the President [Trump]." Glenn Decl. Ex. 24, at 2; Doc. 10-1, at 304. The petition complained that Facebook "continues to amplify misinformation and lets candidates pay to target and confuse voters with lies." *Id.* at 304. It demanded that Facebook "promote authoritative and trustworthy sources of election information, rather than rants of bad actors and conspiracy theorists," "promptly remove false, viral information," and "prevent political candidates and PACs from using paid advertising to spread lies and misinformation – especially within two weeks of election day." *Id.* at 305.

**RESPONSE:** Disputed to the extent Plaintiffs' PFOF argumentatively mischaracterizes the cited statements from the petition as "demand[s]." Additionally, the PFOF is immaterial to any issue in this case. Rather than "demanding" that Facebook take particular action, as reflected in the document, the Biden-Harris campaign "asked Facebook to take action—responsible action, action that is critical to the health of our democracy." Glenn Decl. Ex. 24, at 2; Dkt. 10-1, at 305. Defendants refer the Court to the cited document for a full and accurate understanding of its contents.

25. On September 28, 2020, the Biden-Harris campaign sent a letter to Facebook accusing it of propagating a "storm of disinformation" by failing to censor the Trump campaign's political speech, including social-media political ads. Glenn Decl. Ex. 25, at 3; Doc. 10-1, at 312. The letter accused Facebook of allowing "hyper-partisan" and "fantastical" speech to reach millions of people, and it demanded "more aggressive" censorship of Trump. *Id.*

**RESPONSE:** Disputed because Plaintiffs' PFOF argumentatively mischaracterizes the cited document. The PFOF is also immaterial to any issue in this case. Specifically, the cited document does not "accuse[]" Facebook of "failing to censor the Trump campaign" or "demand[]

'more aggressive' censorship." *See* Glenn Decl. Ex. 25, at 3; Doc. 10-1, at 310-12. Defendants

refer the Court to the cited document for a full and accurate understanding of its contents.

26. On December 2, 2020—during the presidential transition—Biden's former chief of staff and top technical advisor, Bruce Reed, publicly stated that "it's long past time to hold the social media companies accountable for what's published on their platforms." Glenn Decl. Ex. 26, at 1; Doc. 10-1, at 314-15. This comment specifically referred to the amendment or repeal of Section 230 of the Communications Decency Act. *See id.* He also wrote: "Washington would be better off throwing out Section 230 and starting over." *Id.*

**RESPONSE:** Disputed to the extent that Plaintiffs' PFOF is irrelevant to any issue in this

case and is lacking in context. Defendants refer the Court to the cited document for a full and

accurate understanding of its contents. *See* Dkt. 10-1 at 314-15. Note also that irrespective of

interest expressed in Section 230 reform, social media companies, by virtue of their business

model, have powerful economic incentives to moderate content on their platforms to retain users

and thereby maximize advertising revenues, and have been doing so since well before 2020. *See*

Gurrea Decl. ¶¶ 1-81 (Ex. 1).

27. On July 16, 2021, President Biden stated that social-media companies are "killing people" by not censoring enough misinformation. Waldo Ex. 14, at 1.

**RESPONSE:**  Disputed because Plaintiffs' PFOFs fails to include President Biden's full

statement, lacks context, and argumentatively characterizes the statement. In response to the

question "[On COVID misinformation,] what's your message to platforms like Facebook?,"

President Biden responded "They're killing people. I mean, it really—they—look, the only

pandemic we have is among the unvaccinated, and that—and they're killing people." Ex. 45 at 2

(Question from Reporter to President Joseph R. Biden, Jr., in Washington, D.C. 2 (July 16, 2021))

(transcript of exchange). President Biden later explained that he had just read that twelve

individuals were responsible for sixty percent of misinformation concerning COVID-19

vaccines—a statistic advanced by the non-profit Center for Countering Digital Hate—and clarified

that "Facebook isn't killing people. These twelve people are out there giving misinformation. Anyone listening to it is getting hurt by it. *It's* killing people." Ex. 43 at 2-3 (Question from Reporter to President Joseph R. Biden, Jr., in Washington, D.C. 2 (July 19, 2021)) (emphasis added). He further said, "[m]y hope is that Facebook, instead of taking [the comment] personally that somehow I'm saying Facebook is killing people . . . would do something about the misinformation . . . . That's what I meant." *Id.* at 2-3.

28. On January 3, 2022, an audio clip of President Biden played on Alyssa Milano's podcast stated: "The unvaccinated are responsible for their own choices, but those choices had been shulled [sic] by dangerous misinformation on cable TV and social media. You know, these companies … are making money by ped[dling] lies and allowing misinformation that can kill their own customers and their own supporters. It's wrong. It's immoral. I call on the purveyors of these lies and misinformation to stop it. Stop it now."  Waldo Ex. 39, at 5 (Audio Tr. 4).

**RESPONSE:** Undisputed.

29. In September of 2022, the White House convened the "United We Stand" summit at which the President put social media companies on notice that Section 230 protections were at risk. "Tech platforms currently have special legal protections under Section 230 of the Communications Decency Act that broadly shield them from liability. This immunity extends beyond what the First Amendment requires and what newspapers and other media receive. It also effectively permits hate-fueled content mobilizing users to violence to be amplified on large tech platforms. President Biden has long urged fundamental reforms to Section 230, and …he reiterates his call for Congress to fundamentally reform Section 230."  Jones Decl., Ex. E, at 9.

**RESPONSE:** Disputed to the extent the first sentence of Plaintiffs' PFOF reflects argument rather than facts and lacks evidentiary support. Plaintiffs' PFOF is further disputed to the extent it takes statements in this document out of context and is immaterial to any issue in this case. Defendants further note that the summit included, among others, "bipartisan federal, state and local officials" and involved "bipartisan panels and conversations on countering hate-fueled violence, preventing mobilization to violence, and fostering unity." Jones Decl., Ex. E, at 2. Note also that irrespective of interest expressed in Section 230 reform, social media companies, by virtue of their business model, have powerful economic incentives to moderate content on their

platforms to retain users and thereby maximize advertising revenues, and have been doing so since well before 2020. *See* Gurrea Decl. ¶¶ 1-81 (Ex. 1).

30. President Biden also stated in the same document: "Americans deserve to know how the algorithms that drive large tech platforms may amplify divisions and contribute to hate-fueled violence, among other critical harms. Consistent with those same principles for accountability, President Biden supports *requiring* platform transparency sufficient to allow the public and researchers to understand how and why such decisions are made, their potential effects on users, and the very real dangers these decisions may pose." *Id.* (emphasis added).

**RESPONSE:** Undisputed, but note that President Bident's views about platform transparency and Section 230 echo the views of Republican members of Congress. *See, e.g.,* Ex. 14 (*Senate Judiciary Committee Holds Hearing on Censorship and the 2020 Election* (Nov. 17, 2020) at 3 (Senator Graham: "My hope is that we change section 230 to incentivize social media platforms to come up with standards that are transparent and opaque [sic], that will allow us to make judgments about their judgments, that the fact checkers be known, that the community standards, who sets them, what are their biases, and give some direction to these companies because they have almost an impossible task.").

## II.    The White House's Public and Private Pressure Campaign on Platforms.

31.     Many White House officials are involved in communicating with social-media platforms about misinformation, disinformation, and censorship. In response to a third-party subpoena, Facebook/Meta identified at least the following White House officials as engaged in such communications: Special Assistant to the President Laura Rosenberger, White House Partnerships Manager Aisha Shah, White House Counsel Dana Remus, and White House officials Andy Mr. Slavitt, Rob Flaherty, and Clarke Humphrey. Doc. 84, ¶ 379. Defendants' discovery reveals many others. *See infra.*

**RESPONSE:** Disputed to the extent this PFOF mischaracterizes the referenced communications as regarding "censorship." The evidence does not support that characterization.

*See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.[5] Further disputed because this PFOF is unsupported by the evidence; it cites only to the operative Complaint, which alleges that the listed officials "may have" communicated with Facebook/Meta regarding "content moderation." Dkt. 84 ¶ 379.

32.    In response to a third-party subpoena, YouTube identified White House officials Benjamin Wakana and Rob Flaherty as engaged in such communications, and Defendants' discovery reveals others. Doc. 84, ¶ 380. Defendants' discovery reveals others. *See infra*.

**RESPONSE:** Disputed for the same reasons listed in Response to Pls.' PFOF ¶ 31.

33.    In response to a third-party subpoena, Twitter has disclosed the following White House officials as engaged in such communications: Deputy Assistant to the President and Director of Digital Strategy Rob Flaherty, White House Senior Advisor Andrew Mr. Slavitt, NSC staffer Katy E. Colas, Deputy Assistant to the President Joshua Geltzer, White House Digital Director Clarke Humphrey, Deputy Director of the Office of Digital Strategy Tericka Lambert, Press Secretary for the First Lady Michael LaRosa, NSC Director of Counterterrorism John Picarelli, Chief of Staff for the Office of Digital Strategy Hoor Qureshi, Director of Strategic Communications and Engagement Courtney Rowe, White House Associate Counsel Michael Posada, Associate Director for Communications Marissa Sanchez-Velasco, Deputy Director of Digital Strategy Christian Tom, and Strategic Director of Digital Communications Benjamin Wakana. Jones Decl., Ex. F, at 1. Defendants' discovery has revealed others. *See infra*.

**RESPONSE:** Disputed for the same reasons listed in Response to Pls.' PFOF ¶ 31. Further disputed because this PFOF is unsupported by the evidence; the document listing these names is titled "Twitter Final Production Agreement Second Supplemental Response to Request Number 5," but it does not state what "Request Number 5" entailed or include any other context. Jones Decl., Ex. F, at 1.

**A. Pressure in Private from Rob Flaherty, Andy Mr. Slavitt, and White House Officials.**

34.    The Biden White House's demands for censorship began almost immediately upon taking office. On January 23, 2021, three days after Inauguration Day, at 1:04 a.m., Clarke

---

[5] "Defs.' PFOF" refers to Defendants' Proposed Findings of Fact, contained in Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction filed concurrently with these responses. "Defs.' Arg." and "Arg." refer to the Argument section of the same document (Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction).

Humphrey of the White House emailed Twitter, copying Rob Flaherty, with the subject line: "Flagging Hank Aaron misinfo." Doc. 174-1, at 1. The email stated: "Hey folks – Wanted to flag the below tweet and am wondering if we can get moving on the process for having it removed ASAP." *Id.* Humphrey then linked to a Tweet by anti-vaccine activist Robert F. Kennedy Jr., who is also a principal target of the Virality Project and a member of the so-called "Disinformation Dozen." *Id.* Humphrey added: "And then if we can keep an eye out for tweets that fall in this same ~genre that would be great." *Id.*

**RESPONSE:** Disputed to the extent this PFOF argumentatively mischaracterizes the

White House as "demand[ing]" "censorship." The evidence does not support this characterization.

In the cited email Humphrey was "wondering if" the "process" for removal could be instituted.

*See* Doc. 174-1, at 1. Further disputed because the cited email does not support the assertion that

"Robert F. Kennedy Jr., . . . is also a principal target of the Virality Project and a member of the

so-called 'Disinformation Dozen.'" The cited e-mail also contains no evidence of threats or

pressure by the White House to censor speech, or communications that Twitter regarded (or acted

on) as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole.

*See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

35.    "Flagging Hank Aaron misinfo" refers to the claim by anti-vaccine speakers that COVID-19 vaccines may have contributed to baseball legend Hank Aaron's death. *See, e.g.,* https://www.usatoday.com/story/news/factcheck/2021/01/26/fact-check-hank-aaron-death-unlikely-result-covid-19-vaccine/6699577002/.

**RESPONSE:** Undisputed. *But see* Response to PFOF ¶ 34.

36.    Twitter responded to Humphrey within 4 minutes, at 1:08 a.m. on January 23, 2021, stating: "Thanks. We recently escalated this." Doc. 174-1, at 2.

**RESPONSE:** Undisputed. *But see* Response to Pls.' PFOF ¶ 34.

37.    The White House's demands for censorship continued relentlessly, and their tone was arrogant, demanding, and peremptory. On Saturday night, February 6, 2021, at 9:45 p.m., Rob Flaherty emailed Twitter to demand the immediate removal of a parody or impostor account linked to Finnegan Biden, Hunter Biden's adult daughter. Doc. 174-1, at 4. He stated: "Please remove this account immediately." *Id.* He also stated: "I have tried using your form three times and it won't work—it is also ridiculous that I need to upload my id to a form [to] prove that I am an authorized representative of Finnegan Biden." *Id.*

**RESPONSE:** Disputed to the extent that this PFOF mischaracterizes the White House as making "demands for censorship [that] continued relentlessly," and as adopting a "tone [that] was arrogant, demanding, and peremptory." The evidence does not support these characterizations. In the February 6, 2021 email, Mr. Flaherty simply expressed frustration with Twitter's process for reporting impersonation accounts. Doc. 174-1, at 4. The e-mail contains no evidence of threats or pressure by the White House to censor speech, or communications that Twitter regarded (or acted on) as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

38.     Two minutes later, at 9:47 p.m., Twitter responded, "Thanks for sending this over. We'll escalate for further review from here." *Id.* Flaherty shot back, the same minute, "Cannot stress the degree to which this needs to be resolved immediately." *Id.* Forty-five minutes later, at 10:32 p.m., Twitter responded, "Update for you – account is now suspended." *Id.* at 3-4.

**RESPONSE:** Undisputed, except to the extent the statement argumentatively characterizes Mr. Flaherty's response as having been "shot back." Defendants further note that the cited e-mail contains no evidence of threats or pressure by the White House to censor speech, or communications that Twitter regarded (or acted on) as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

39.     The next day, Sunday, Feb. 7, 2021, Twitter emailed Flaherty and described steps he could take to "streamline the process" for the White House's demands for Twitter censorship. *Id.* at 3. Twitter offered to enroll White House officials in Twitter's Partner Support Portal for expedited review of flagging content for censorship, recommending that Flaherty "**Designate a list of authorized White House staff for Twitter's Partner Support Portal**." *Id.* (bold in original). Twitter stated: "We sent over instructions about this on January 28th and also discussed this with Christian [Tom] during our call on February 4th. This is the same system we had in place for the previous two administrations for their support issues, *as well as the transition and campaign teams*. Once you assign and we enroll these authorized reporters, whenever they submit a ticket through the Help Center it will be prioritized automatically, without having to contact our team, and you won't need to add your personal information. To enroll your designated reporters to the Partner Support Portal, we simply need the list of @usernames (up to 10) that are registered with a White House email address." *Id.* at 3 (italics added; underlines omitted).

**RESPONSE:** Disputed to the extent this PFOF argumentatively mischaracterizes Flaherty and/or the White House as making "demands for Twitter censorship" or "flagging content for censorship." The evidence does not support these characterizations. The e-mail chain cited in this PFOF refers to Flaherty's inquiry as a "request" for "expedited help." *See* Dkt. 174-1 at 3. The cited e-mail also contains no evidence of threats or pressure by the White House to censor speech, or communications that Twitter regarded (or acted on) as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

40.    Twitter noted that it had been recently bombarded with such requests for censorship from the White House: "we would prefer to have a streamlined process strictly with your team as the internal liaison. That is the most efficient and effective way to ensure we are prioritizing requests. In a given day last week for example, we had more than four different people within the White House reaching out for issues." *Id.* at 3.

**RESPONSE:** Disputed to the extent this PFOF argumentatively mischaracterizes the White House as "bombard[ing]" Twitter with "requests for censorship." The cited evidence does not support these characterizations. In the cited e-mail, Twitter's representative stated only that multiple White House staff had recently been "reaching out for issues." Dkt. 172-1 at 3. She did not say what those "issues" were. *Id.* The cited e-mail also contains no evidence of threats or pressure by the White House to censor speech, or communications that Twitter regarded (or acted on) as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole.

*See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

41.    The next day, Monday, February 8, 2021, Facebook emailed Rob Flaherty, Courtney Rowe, and Clarke Humphrey of the White House to explain how it had recently expanded its COVID-19 censorship policies. Doc. 174-1, at 7-8. Facebook stated: "We wanted to make sure you saw our announcements today about running the largest worldwide campaign to promote authoritative COVID-19 vaccine information and expanding our efforts to remove false claims on Facebook and Instagram about COVID-19, COVID-19 vaccines and vaccines in general during the pandemic." *Id.*

**RESPONSE:** Disputed to the extent this PFOF mischaracterizes Facebook's announcement as concerning "COVID-19 censorship policies." The cited evidence does not support that characterization. The cited e-mail also contains no evidence of threats or pressure by the White House to censor speech, or communications that Facebook regarded (or acted on) as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

42.    Under the heading "**Combating Vaccine Misinformation**," Facebook provided a detailed list of expanded censorship policies: "We are expanding our efforts to remove false claims on Facebook and Instagram about COVID-19, COVID-19 vaccines and vaccines in general during the pandemic. Since December [*i.e.* during the Biden transition], we've removed false claims about COVID-19 vaccines that have been debunked by public health experts. … [W]e are expanding the list of false claims we will remove to include additional debunked claims about the coronavirus and vaccines. … Groups, Pages and accounts on Facebook and Instagram that repeatedly share these debunked claims may be removed altogether. We are also requiring some admins for groups with admins or members who have violated our COVID-19 policies to temporarily approve all posts within their group. …. On Instagram, in addition to surfacing authoritative results in Search, in the coming weeks we're making it harder to find accounts in search that discourage people from getting vaccinated…." *Id.* at 7-8 (bold in original).

**RESPONSE:** Disputed to the extent this PFOF mischaracterizes Facebook's announcement as concerning "censorship policies." The cited e-mail does not support that characterization, which is lacking critical context. Facebook announced that it was making these changes "following consultations with leading health organizations, including the World Health Organization (WHO)." Dkt. 174-1 at 8. The full announcement is available online. *See* Ex. 173 (*Reaching Billions of People With COVID-19 Vaccine Information*, Meta (Feb. 8, 2021), https://perma.cc/KPC5-7273). The cited e-mail also contains no evidence of threats or pressure by the White House to censor speech, or communications that Facebook regarded (or acted on) as such. In fact, the email shows that Facebook adopted these policies on its own initiative. Dkt. 174-

1 at 8. Any assertion to the contrary is unsupported by to the evidence as a whole. Defs.' PFOF §

II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

43.    This was not nearly enough for the White House. Within 19 minutes of receiving this email, Flaherty responded, pressing Facebook for more information about how strict the new policies are. *Id.* at 7. Quoting Facebook's email in italics, he wrote: "This line, of course, stands out: *that repeatedly share these debunked claims may be removed altogether*. Can you share more about your framework here? May, of course, is very different than 'will.' Is there a strike policy, ala Youtube? Does the severity of the claims matter?" *Id.* at 7. He also asked for specific data on the application of the censorship policies: "And as far as your removal of claims, do you have data on the actual number of claims - related posts you've removed? Do you have a sense of how many are being flagged versus how many are being removed? Are there actions (downranking, etc) that sit before removal? How are you handling things that are dubious, but not provably false?" *Id.*

**RESPONSE:** Disputed to the extent this PFOF argumentatively mischaracterizes Facebook's announcement as "not nearly enough" for the White House, Flaherty as "pressing" Facebook for more information about "how strict the new policies are," and Flaherty asking for data on "the application of the censorship policies." In the quoted email, Flaherty asked if Facebook "[c]an . . . share more about" its content-moderation "framework." The cited e-mail contains no evidence of threats or pressure by the White House to censor speech, or communications that Facebook regarded (or acted on) as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

44.    The next day, February 9, 2021, Flaherty followed up with Facebook with a demand for more information and an accusation (to be repeated) that Facebook's failure to censor speech on its platforms causes "political violence": "All, especially given the Journal's reporting on your internal work on political violence spurred by Facebook groups, I am also curious about the new rules as part of the 'overhaul.' I am seeing that you will no longer promote civic and health related groups, but I am wondering if the reforms here extend further? Are there other growth vectors you are controlling for?" *Id.* at 6. Flaherty suggested an oral meeting to discuss: "Happy to put time on the calendar to discuss further." *Id.*

**RESPONSE:** Disputed to the extent this PFOF mischaracterizes Flaherty's e-mail as a "demand" and an "accusation" regarding a failure to "censor speech." Those characterizations are

not supported by the cited e-mail or the evidence as a whole. Flaherty instead referred to "the

Journal's reporting on [Facebook's] internal work on political violence" and said he was "curious"

to know additional information. Dkt. 172-1 at 6. The cited e-mail contains no evidence of threats

or pressure by the White House to censor speech, or communications that Facebook regarded (or

acted on) as such. Any assertion to that effect is unsupported by and contrary to the evidence as a

whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

45.     Facebook responded on February 9, 2021, with a detailed answer to each of
Flaherty's questions about the enforcement of its new policies. *Id.* at 5-6. Facebook also noted that
"We are happy to discuss these and additional questions as per your recent note." *Id.* at 5.  Among
other things, Facebook reported that it would "suspend the entire Page, Group, or account" in case
of repeat violations; that it "will begin enforcing this policy immediately," *id.* at 5; that for vaccine-
skeptical content that does not violate Facebook's policies, Facebook will "reduce its distribution
and add strong warning labels with more context, so fewer people see the post," *id.* at 6; and that
Facebook was working to censor content that does not violate its policies in other ways by
"prevent[ing] posts discouraging vaccines from going viral on our platforms; address[ing] content
that experts believe dissuades people from getting the vaccine, but does not violate our
misinformation policies, through the use of information labels; and prevent[ing] recommendations
for Groups, Pages, and Instagram accounts that repeatedly push content discouraging vaccines,"
*id.* at 6.

**RESPONSE:** Disputed. This PFOF contains several mischaracterizations and omissions

of critical context from Facebook's e-mail to Flaherty. *See* Dkt. 174-1 at 5-6. Facebook did not

use the word "censor" or indicate that it would act against content that "does not violate its

policies." Rather, Facebook said: "Content which does not qualify for removal may be eligible to

be fact-checked by our network of over 80 fact-checking organizations. ***When one of our***

***independent fact-checking partners debunk a post***, we reduce its distribution and add strong

warning labels with more context, so fewer people see the post. We do not remove the content, but

are focusing on improvement efforts that will help us to better address content that contributes to

unfounded hesitancy towards the COVID-19 vaccine." *Id.* (emphasis added). The cited e-mail

contains  no  evidence  of  threats  or  pressure  by  the  White  House  to  censor  speech,  or

communications that Facebook regarded (or acted on) as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

46. Facebook advised Flaherty that it was relying on advice of "public health authorities" to determine its censorship policies: "In consultation with leading health organizations, we continuously expand the list of false claims that we remove about COVID-19 and vaccines during the pandemic. We remove claims *public health authorities* tell us have been debunked or are unsupported by evidence." *Id.* at 6 (emphasis added).

**RESPONSE:** Disputed to the extent this PFOF mischaracterizes Facebook's policies as "censorship policies." The evidence does not support that characterization. Further, per Facebook's initial announcement, "public health authorities" includes the World Health Organization. *See* Dkt. 174-1 at 8; *see also* Response to Pls.' PFOF ¶ 42. The cited e-mail also contains no evidence of threats or pressure by the White House to censor speech, or communications that Facebook regarded (or acted on) as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

47. Facebook also promised Flaherty that it would aggressively enforce the new censorship policies: "We will begin enforcing this policy immediately, with a particular focus on Pages, Groups and accounts that violate these rules, and we'll continue to expand our enforcement over the coming weeks." *Id.* at 5.

**RESPONSE:** Disputed to the extent that this PFOF mischaracterizes Facebook's message as "promis[ing] Flaherty that it would aggressively enforce the new censorship policies." That characterization is unsupported by the cited e-mail; Facebook was not making a personal promise to Flaherty. Rather, Facebook had already posted identical language on its website one day earlier: "We will begin enforcing this policy immediately, with a particular focus on Pages, groups and accounts that violate these rules, and we'll continue to expand our enforcement over the coming weeks." Ex. 20 (Guy Rosen, *An Update on Our Work to Keep People Informed and Limit*

*Misinformation About COVID-19*, Meta (Apr. 16, 2020) (updated Feb. 8, 2021), https://perma.cc/5GAL-5BSQ). The cited e-mail contains no evidence of threats or pressure by the White House to censor speech, or communications that Facebook regarded (or acted on) as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

48.    Facebook then followed up to "see when you would like to have a meeting arranged to speak to our misinformation team reps about the latest updates. They also have a more detailed misinformation analysis prepared based on the discussions/questions from the previous meetings during the transition time period." *Id.* at 5.

**RESPONSE:** Undisputed. But the cited e-mail contains no evidence of threats or pressure by the White House to censor speech, or communications that Facebook regarded (or acted on) as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

49.    This email makes clear that Flaherty, as part of the Biden transition team, had already engaged in "previous meetings" and "discussions/questions" with Facebook about censorship of COVID-19 misinformation on its platforms during the Presidential transition period from November 2020 to January 2021. *Id.*

**RESPONSE:** Disputed because this PFOF mischaracterizes the cited e-mail. The e-mail does not mention "censorship" or any prior meetings with Flaherty. The cited e-mail contains no evidence of threats or pressure by the White House to censor speech, or communications that Facebook regarded (or acted on) as such. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

50.    On February 24, 2021, Facebook emailed Rob Flaherty with the subject "Misinfo Themes," stating: "Following up on your request for COVID-19 misinfo themes we are seeing. All the below claims violate our updated Covid and vaccine misinformation policies that we announced earlier this month, and we are removing these claims from our platforms," and she identified "Vaccine Toxicity," "False Claims About Side Effects of Vaccines," "Comparing the Covid Vaccine to the Flu Vaccine," and "Downplaying Severity of COVID-19." Jones Decl. Ex. G, at 1-2. Flaherty responded by inquiring for details about Facebook's actual enforcement practices and for a report on misinformation that was not censored: "Can you give us a sense of

volume on these, and some metrics around the scale of removal for each? Can you also give us a sense of misinformation that might be falling outside your removal policies? Goes without saying, just because it's on your list for removal hasn't historically meant that it was removed, so I want to get a sense of the state of play here!" *Id.* at 1. Facebook promised to discuss this at an upcoming oral meeting: "Hope to cover a lot of that on Monday … Can definitely go into detail on content that doesn't violate like below but could contribute to vaccine hesitancy." *Id.*

**RESPONSE:** Disputed to the extent that this PFOF mischaracterizes the cited e-mail.

Flaherty did not ask for "a report," including a "report" about "censor[ed]" information, and

Facebook did not "promise" him anything, as the e-mail states. The PFOF also omits that Facebook

noted: "still working on data we can share, etc,," indicating that Facebook was still deciding what

to share with the White House. Jones Decl. Ex. G, at 1. The cited e-mail contains no evidence of

threats or pressure by the White House to censor speech, or communications that Facebook

regarded (or acted on) as such. Any assertion to that effect is unsupported by and contrary to the

evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

51.    On March 1, 2021, White House officials Rob Flaherty and Clarke Humphrey, along with Joshua Peck of HHS, participated in a meeting with Twitter about misinformation. Jones Decl., Ex. H, at 1. The same day, after the meeting, Twitter emailed these officials and assured the White House that it would increase censorship of "misleading information" on Twitter: "Thanks again for meeting with us today. As we discussed, we are building on our continued efforts to remove the most harmful COVID-19 misleading information from the service …. We have also introduced a strike system that determines when further enforcement is necessary. … As we said, we are committed to working with stakeholders in the public, private and non-profit sectors to address the reliability of covid information online and look forward to continued dialogue about joint efforts." *Id.* at 1.

**RESPONSE:** Disputed to the extent this PFOF (i) omits critical context and (ii) includes

an argumentative mischaracterization that Twitter "assured the White House that it would increase

censorship." Twitter sought this meeting with the White House to provide an "update on our work

to combat covid misinformation while also sharing reliable covid information." See Ex. 174 at 2

(February 2021 email chain (Twitter) (MOLA_DEFSPROD_00017794)). On the same day as the

meeting, Twitter announced updates to its policies. *See* Ex. 175 (Twitter Safety, *Updates to our*

*work on COVID-19 vaccine misinformation*, Twitter Blog (Mar. 1, 2021), https://perma.cc/99TM-QWLD). Twitter's thank you e-mail to the White House includes identical language from the announcement and says "[y]ou can read more about the announcement on our blog." Jones Decl., Ex. H, at 1. The announcement now includes a heading: "Effective November 23, 2022, Twitter is no longer enforcing the COVID-19 misleading information policy." Ex. 175 at 1. The cited e-mail also contains no evidence of threats or pressure by the White House to censor speech, or communications that Twitter regarded (or acted on) as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

52.    From at least May 28, 2021 to July 10, 2021, a senior Meta executive repeatedly copied Mr. Slavitt on his emails to Surgeon General Murthy in which he assured the Surgeon General and the White House that Meta was engaging in censorship of COVID-19 misinformation according to the White House's demands. Doc. 71-4. Among other things, the Meta executive insisted that "We've expanded penalties for individual Facebook accounts that share misinformation." *Id.* at 9.

**RESPONSE:** Disputed on the basis that the cited document does not support the broad generalization that a Meta executive "repeatedly" "assured [Dr. Murthy] and the White House that Meta was engaging in censorship of COVID-19 misinformation to the White House's demands." To the contrary, there is no evidence that the White House or OSG requested or demanded such changes. Meta posted the quoted text online two days before e-mailing the White House, in a post that was unrelated to COVID-19: "**Expanding Penalties For Individual Facebook Accounts.** Since launching our fact-checking program in late 2016, our focus has been on reducing viral misinformation. We've taken stronger action against Pages, Groups, Instagram accounts and domains sharing misinformation and now, we're expanding some of these efforts to include penalties for individual Facebook accounts too." Ex. 176 at 3 (Facebook, *Taking Action Against People Who Repeatedly Share Misinformation*, Meta (May 26, 2021), https://perma.cc/M75G-

YQB8). The cited e-mail also contains no evidence of threats or pressure by the White House to censor speech, or communications that Facebook regarded (or acted on) as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

53.    On March 12, 2021, referring to previous oral communications with the White House and HHS, Facebook emailed Flaherty "[f]ollowing up on our commitment to share our survey data on vaccine uptake." Doc. 174-1, at 9. Facebook provided the White House with a detailed report and summary on the topic, and noted that the information had evidently been requested by or on behalf of "White House / HHS" officials: "Hopefully, this format works for the various teams and audiences within the White House / HHS that may find this data valuable." *Id.*

**RESPONSE:** Disputed to the extent this PFOF omits critical context. Facebook had been conducting a survey on vaccine uptake in partnership with Carnegie Melon since April 2020; Facebook shared the results of that survey, which it also made public, with HHS and White House officials. *See* Ex. 177 (*COVID-19 Symptom Survey*, Meta (Mar. 12, 2021) (MOLA_DEFSPROD_00017641)). The cited e-mail contains no evidence of threats or pressure by the White House to censor speech, or communications that Facebook regarded (or acted on) as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

54.    On March 15, 2021, at 3:20 a.m., Flaherty sent an email to Facebook acknowledging, "[g]ood insights here," but then immediately pivoted to demand more and different data, linking a recent Washington Post article accusing Facebook of allowing the spread of information about vaccine hesitancy and QAnon, stating: "I'm more interested in the data that was outlined in the Washington Post (https//www.washingtonpost.com/technology/202l/03/l4/ facebook-vaccine-hesitancy-qanon) And what interventions you are testing/their effectiveness." *Id.* at 9. This would become a standard tactic of the White House – linking to articles critical of Facebook in the press, and then demanding more information or actions based on those articles.

**RESPONSE:** Disputed to the extent this PFOF argumentatively mischaracterizes Flaherty as "demand[ing]" information or data or that his response reflected a "standard tactic," of "demanding more information or actions" based on press articles. Neither the cited e-mail nor any other evidence supports those characterizations. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b

& II.B.2. Flaherty simply said on this occasion that he was "more interested" in a different kind of information. Dkt. 174-1 at 9. The cited e-mail contains no evidence of threats or pressure by the White House to censor speech, or communications that Facebook regarded (or acted on) as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

55.    The day before, Sunday, March 14, 2021, at 11:13 p.m., Flaherty had emailed a link to the same article to Facebook ("https://www.washingtonpost.com/technology/2021/03/14/facebook-vaccine-hesistancy-qanon"), copying White House COVID-19 official Andrew Mr. Slavitt, with no more text in the email and the subject line: "You are hiding the ball." *Id.* at 12.

**RESPONSE:** Undisputed. However, the cited e-mail contains no evidence of threats or pressure by the White House to censor speech, or communications that Facebook regarded (or acted on) as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

56.    The next morning, Facebook responded by stating, "there is a misunderstanding on what this story is covering with respect to research that's happening – I will call to clear up. Certainly not hiding the ball." *Id.* at 11-12.

**RESPONSE:** Undisputed. However, the cited e-mail contains no evidence of threats or pressure by the White House to censor speech, or communications that Facebook regarded (or acted on) as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

57.    Flaherty responded in accusatory fashion, referring to a series of at least three previous oral conversations in which the White House had demanded more information from Facebook about its censorship policies. *Id.* at 11. Flaherty made clear that the White House was seeking more aggressive action on "borderline" content—*i.e.*, content that *does not clearly violate Facebook's own censorship policies* but the White House demands action against anyway. Flaherty wrote: "I don't think this is a misunderstanding … I've been asking you guys pretty directly, over a series of conversations, for a clear accounting of the biggest issues you are seeing on your platform when it comes to vaccine hesitancy, and the degree to which borderline content--as you define it-- is playing a role." *Id.* at 11. Flaherty also referred to a series of meetings, including one-on-one meetings with Facebook ("1:1"): "I've also been asking for what actions you have been taking to mitigate it as part of your 'lockdown' - which in our first conversation, was

said to be in response to concerns over borderline content, in our 1:1 convo you said was not out of any kind of concern over borderline content, and in our third conversation never even came up." *Id.*

**RESPONSE:** Disputed to the extent that the PFOF mischaracterizes the cited e-mail in multiple ways, including (i) referring to prior "demand[s] [for] more information" or "seeking more aggressive action, regarding "censorship," (ii) using the term "borderline content" to mean content that does not violate Facebook's policies, and (iii) describing Mr. Flaherty's tone as "accusatory." Mr. Flaherty sought clarification regarding information about the "biggest" vaccine hesitancy issues that he "asked" Facebook for, and about which he had received inconsistent answers. *See* Dkt. 174-1 at 11. The cited e-mail contains no evidence of threats or pressure by the White House to censor speech, or communications that Facebook regarded (or acted on) as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

58.     Flaherty followed with a series of accusations that Facebook was deceiving and prevaricating with the White House about its "borderline" (*i.e. not* violative) content: "You said you would commit to us that you'd level with us. I am seeing in the press that you have data on the impact of borderline content, and its overlap with various communities. I have asked for this point blank, and got, instead, an overview of how the algorithm works, with a pivot to a conversation about profile frames, and a 45-minute meeting that seemed to provide you with more insights than it provided us." *Id.* He accused Facebook of being the "top driver[] of vaccine hesitancy," demanded action against "borderline" content, and stated that the White House wanted to be directly involved in those efforts: "I am not trying to play 'gotcha' with you. We are gravely concerned that your service is one of the top drivers of vaccine hesitancy- period. I will also be the first to acknowledge that borderline content offers no easy solutions. But we want to know that you're trying, we want to know how we can help, and we want to know that you're not playing a shell game with us when we ask you what is going on. This would all be a lot easier if you would just be straight with us." *Id.*

**RESPONSE:** Disputed to the extent that this PFOF mischaracterizes Flaherty's e-mail, which principally sought greater information concerning vaccine hesitancy on Facebook, as making "accusations," "demand[ing]" greater action against "borderline" content, and seeking "direct[ ]" White House involvement in Facebook's efforts. Dkt. 174-1 at 11. The cited e-mail

contains no evidence of threats or pressure by the White House to censor speech, or communications that Facebook regarded (or acted on) as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

59.    Facebook responded on March 15, respectfully disputing the Washington Post's reporting, but then saying to Flaherty: "We obviously have work to do to gain your trust. You mention that you are not trying to play 'gotcha' with us—I appreciate the approach you are taking to continued discussions. We are also working to get you useful information that's on the level. That's my job and I take it seriously--I'll continue to do it to the best of my ability, and I'll expect you to hold me accountable." *Id.* at 10-11.

**RESPONSE:** Disputed to the extent that this PFOF omits critical context. Facebook also said: "I understand why you'd read the WaPo piece and come away feeling like we are not leveling with you" and disputed the article's accuracy at length. Dkt. 174 at 11. The cited e-mail contains no evidence of threats or pressure by the White House to censor speech, or communications that Facebook regarded (or acted on) as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

60.    The same day, March 15, 2021, Andrew Mr. Slavitt (who was copied on these exchanges between Facebook and Flaherty) weighed in, once again accusing Facebook of dishonesty in a series of oral meetings: "It would [be] nice to establish trust. I do feel like relative to others, interactions with Facebook are not straightforward and the problems are worse – like you are trying to meet a minimum hurdle instead of trying to solve the problem and we have to ask you precise questions and even then we get highly scrubbed party line answers. We have urgency and don't sense it from you all. 100% of the questions I asked have never been answered and weeks have gone by." *Id.* at 10.

**RESPONSE:** Disputed to the extent this PFOF characterizes Mr. Slavitt of accusing Facebook of "dishonesty" rather than expressing his "feel[ing]" that Facebook had not conveyed information about Facebook's content moderation policies and practices with the level of detail and clarity he had hoped for. Regardless, the cited e-mail contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on)

communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

61.     Mr. Slavitt then made an ominous statement threatening unspecified Executive action against Facebook in retaliation for Facebook's perceived lack of cooperation with the White House's demands on censorship of "borderline" (*non-violative*) content: "*Internally we have been considering our options on what to do about it.*" *Id.* at 10 (emphasis added).

**RESPONSE:** Disputed to the extent this PFOF mischaracterizes Mr. Slavitt's general remark about internal White House consideration of "options" as "ominous," "threatening" or referring to "retaliation" or "Executive action." The reference to "Facebook's perceived lack of cooperation with the White House's demands on censorship of 'borderline' (non-violative) content)," is also disputed as a mischaracterization of the record. In the cited e-mail, Mr. Slavitt was referring to Facebook's perceived lack of transparency about its content moderation practices and policies. The cited e-mail also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

62.     On March 16, 2021, Facebook responded to Mr. Slavitt, again disputing the Washington Post's reporting and respectfully explaining its position, but also promising to share information about vaccine hesitancy in "real time": "We are absolutely invested in getting you the specific information needed to successfully manage the vaccine roll out." *Id.* Facebook promised to increase information-sharing and proposed a detailed oral meeting on the topic: "But I understand your point regarding how we communicate, and that we need to share information with you in a way that prioritizes what we are seeing in as close to real time as possible. I'd like to set up a conversation with our research leads to walk your team through ongoing research we are currently conducting and our approach; and then we can prioritize sharing results as quickly as possible." *Id.* Facebook also offered to speak to Mr. Slavitt by phone at any time. *Id.*

**RESPONSE:** Undisputed, but note that the cited e-mail contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is

unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

63.    On March 19, 2021, Facebook had an oral meeting with White House officials, including Flaherty and Mr. Slavitt. Doc. 174-1, at 15. On Sunday, Facebook sent a follow-up summary of the meeting to Andrew Mr. Slavitt ("Thanks for taking the time to connect on Friday"), which noted that the White House (1) demanded a "Consistent Product Team [Point of Contact]" at Facebook, (2) demanded "Sharing Additional Data" from Facebook, (3) had asked about "Levers for Tackling Vaccine Hesitancy Content," and (4) asked about censorship policies for the Meta platform WhatsApp. *Id.*.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Facebook's email as reflecting "demands" by Flaherty, rather than requests to identify a point of contact from Facebook's Content Product Team or the sharing of additional data. The email (which Plaintiffs do not quote) does not support this characterization. Nor does the cited evidence support the PFOF's characterization of Mr. Slavitt asking about WhatsApp "censorship policies." Rather, the evidence establishes that Mr. Slavitt asked Meta about WhatsApp's content moderation policy, a policy that all users agree to when they sign up for WhatsApp. Regardless, the cited e-mail contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

64.    In the follow-up email, Facebook noted that, in direct response to White House demands, it was censoring, removing, and reducing the spread of content that did not violate its policies: "You also asked us about our levers for reducing virality of vaccine hesitancy content. In addition to policies previously discussed, these include *the additional changes that were approved late last week* and that we'll be implementing over the coming weeks. As you know, in addition to removing vaccine misinformation, we have been focused on reducing the virality of content discouraging vaccines *that does not contain actionable misinformation*. This is *often-true content* … but it can be framed as sensation, alarmist, or shocking. *We'll remove these Groups, Pages, and Accounts when they are disproportionately promoting this sensationalized content*." *Id.* at 15 (emphases added).

**RESPONSE:** Disputed to the extent this PFOF mischaracterizes Facebook's email as reflecting "demands" by the White House, or that Facebook was "censoring" content that "did not violate its policies" in "response" to such "demands." Facebook's email expressly states that "[y]ou asked us about our levers for reducing virality of vaccine hesitancy content," and further states that Facebook was adopting additional policy changes "that were approved late last week and that we'll be implementing over the coming weeks." Dkt. 174-1 at 15. This PFOF also argumentatively characterizes the cited e-mail by emphasizing various phrases. The cited e-mail also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

65.    Facebook also provided the White House with a detailed report on its censorship policies on WhatsApp: "WhatsApp's approach to misinformation focuses on limiting the virality of messages, preventing coordinated abuse, and empowering users to seek out reliable sources of information both in and out of the product. Our product includes features to limit the spread of viral content, such as forward limits and labels, privacy settings to help users decide who can add them to groups, and simple ways for users to block accounts and make reports to WhatsApp if they encounter problematic messages. Additional limitations we placed in April 2020 on forwarding of messages that have been forwarded many times reduced these kinds of messages by over 70%." *Id.*

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes WhatsApp's content moderation policies described above, to which all users agree, as "censorship policies." The cited e-mail also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

66.    On March 22, 2021, Flaherty responded to Facebook, demanding much more detailed information and action about "sensationalized" content on its platforms. *Id.* at 14. Flaherty

noted that White House officials were demanding a plan from Facebook to censor non-violative content, *i.e.*, "looking out for your game plan on tackling vaccine hesitancy spread on your platform." *Id.*

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Mr. Flaherty's request as a "demand" for "much more detailed information and action" about "sensationalized content" or a "plan from Facebook to censor nonviolative content." Mr. Flaherty's email (which in large part Plaintiffs do not quote) does not support this characterization. Rather than "demand" anything, Mr. Flaherty's email reflects that he was asking Facebook about "the universe and scale of the problem" and what Facebook thought "the biggest issue is." Dkt. 174-1 at 14. The cited e-mail also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

67.    In this email, Flaherty badgered Facebook with a series of detailed requests for information about this issue of censoring vaccine-skeptical content that does not violate Facebook's content-moderation policies, such as truthful but "sensational" content: "Again, as I've said, what we are looking for is the universe and scale of the problem. You noted that there is a level below sensational stories that get down-ranked, which took the form of general skepticism. … [T]he problem does not sit in 'microchips'-land, and … it seems plausible that the things that drive the most actual hesitancy sit in 'sensational' and 'skeptical.'" *Id.*. Flaherty demanded more information and greater censorship of such non-violative "sensational" and "skeptical" content: "If you're down ranking sensational stuff—great—but I want to know how effective you've seen that be from a market research perspective. And then, what interventions are being taken on 'skepticism?' … [W]hat are you trying here, and again, how effective have you seen it be. And *critically*, what amount of content is falling into all of these buckets? Is there wider scale of skepticism than sensationalism? I assume given the Carnegie data and the studies I've seen in the press that you have this. … As I've said: this is not to play gotcha. It is to get a sense of what you are doing to manage this." *Id.* (italics in original).

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Flaherty as "badger[ing]" Facebook with a series of detailed requests for information about this issue of censoring vaccine-skeptical content," as inquiring about information concerning "content that does not violate

Facebook's content-moderation policies," and as "demand[ing] . . . greater censorship" of information that does not violate Facebook's content moderation policies. As he stated, Mr. Flaherty was trying to ascertain "the universe and scale of the problem" and "what [Facebook was] doing to manage [it]." The cited e-mail also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

68.     Flaherty also badgered Facebook for more information on Meta's censorship policies on the WhatsApp platform, pushing for greater censorship there: "On whatsapp, which I may seem like I'm playing gotcha, but I guess I'm confused about how you're measuring reduction of harm. If you can't see the message, I'm genuinely curious—how do you know what kinds of messages you've cut down on? Assuming you've got a good mousetrap here, that's the kind of info we're looking for above: what interventions you've taken, and what you've found to work and not work? And how effective are you seeing the good information on Whatapp be? Are you doing cross platform campaign work to try to reduce people's exposure on whatsapp?" *Id.* at 14.

**RESPONSE:** Disputed to the extent the PFOF argumentatively mischaracterizes Mr. Flahery as "badgering" Facebook for information on Meta's "censorship" policies and "pushing" for "more censorship." Mr. Flaherty's email plainly states he is "looking for" more information about "interventions [WhatsApp has] taken," and says nothing about taking additional measures. The cited e-mail also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

69.     Flaherty concluded with an accusation of past dishonesty against Facebook and proposed frequent oral meetings to address the White House's issues: "You've given us a commitment to honest, transparent conversations about this. We're looking for that, and hoping we can be partners here, even if it hasn't worked so far. I know Andy [Mr. Slavitt] is willing to get on the phone with [a Facebook official] a couple of times per week if its necessary to get all of this." *Id.*

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Mr. Flaherty's email as accusing Facebook of "dishonesty." The cited e-mail also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

70.     Flaherty's statement that the White House is "hoping we can be partners here, even if it hasn't worked so far," reinforced Mr. Slavitt's previous implied threat that the White House would take some unspecified action against Facebook if it did not cooperate with the White House's demands on censorship of vaccine-hesitant content, especially *non-violative* content, on Facebook's platforms. *Id.*

**RESPONSE:** Disputed. The PFOF mischaracterizes the quoted remark ("hoping we can be partners . . .") as a threat, mischaracterizes prior statements by Mr. Slavitt as a "previous implied threat" of retaliation, and refers to White House "demands [for] censorship" for which neither this PFOF nor any other provides evidence. The cited e-mail also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

71.     Facebook then agreed with Flaherty and Mr. Slavitt to schedule a meeting that Wednesday at 4:00 pm to discuss these issues. *Id.* at 13.

**RESPONSE:** Undisputed, but note that the cited e-mail contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

72.     On April 9, 2021, Facebook sent Flaherty an email to respond to a long series of detailed questions from Flaherty about how the Meta platform WhatsApp was censoring COVID-19 misinformation. Doc. 174-1, at 17-21. All Flaherty's questions were designed to probe and

pressure Facebook toward more aggressive censorship. *See id.* Facebook began by "noting some of the key differences between a private messaging app like WhatsApp, and social media like Facebook and Instagram. Approximately 90 percent of the messages sent on WhatsApp are one-to-one, and the majority of group chats include fewer than ten people. WhatsApp does not promote content, and users do not build audiences or discover new people as they would on social media." *Id.* at 18. Flaherty responded to this: "Very aware. [Smiley face]."  In other words, the White House was demanding information about speech on a *private* messaging app used for one-to-one private communication, and demanding greater censorship of speech on that app—and it was "very aware" that it was doing so. *Id.*

**RESPONSE:** Disputed. This PFOF mischaracterizes the cited emails by Mr. Flaherty, from which Plaintiffs do not quote (apart from the two words, "Very aware"). The emails include no questions about "censorship," say nothing that could be taken as "prob[ing] [or] pressure[ing] Facebook towards more aggressive censorship," or as demanding "greater censorship of speech on [WhatsApp]." The cited e-mail also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

73.     Facebook noted that "WhatsApp seeks to control the spread of misinformation and inform users through deliberate, content-agnostic product interventions – things like labeling and limiting message forwards." *Id.* at 18. Facebook noted that the message-forwarding limits are "intended" to censor COVID misinformation, and that they actually reduced such speech by 70 percent, and Facebook admitted that these are "somewhat blunt tools" that prevent its users from sending many other forms of speech as well: "The forward limits … are intended to reduce their spread. As mentioned in my earlier note, when WhatsApp rolled out the limitation for highly forwarded messages to one chat at a time in April 2020, this resulted in a 70% reduction of those messages globally. Of course, not all forwards are misinformation, so these are by nature somewhat blunt tools, but they are important ones – and ones that many other messaging services don't provide." *Id.*

**RESPONSE:** Disputed to the extent the PFOF argumentatively mischaracterizes WhatApp's application of its content-moderation policies, to which all users agree, as "intend[ing]" to "censor" information. The cited e-mail also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on)

communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

74.    After presenting Facebook with a series of questions (presented in bold and in red type in the email, *see id.* at 18-20), Flaherty summed up by demanding insight into Facebook's internal information: "I guess I have the same question here as I do on Facebook on Instagram. Do you guys think you have this under control? You're obviously going to say yes to that, so I guess the real question is, as ever: how are you measuring success? Reduction in forwarding? Measured impact across Facebook properties?" *Id.* at 20.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Mr. Flaherty's question as a "demand." The evidence does not support this characterization. The cited e-mail also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

75.    Facebook responded by emphasizing that it was "reducing viral activity on our platform" through message-forward limits and other speech-blocking techniques as well: "On WhatsApp, reduction in forwards is just one of the signals that we use to measure how well we are doing in reducing viral activity on our platform. We also ban accounts that engage in mass marketing or scam behaviors - including those that seek to exploit COVID-19 misinformation. Our efforts in this space are more comprehensive than anything that our peers in private messaging or SMS do, and we are constantly innovating to stay ahead of future challenges." *Id.* at 20.

**RESPONSE:** Disputed to the extent that this PFOF characterizes Facebook's application of its technology as using "speech-blocking techniques." Defendants also note that the cited e-mail contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

76.    Facebook also offered to meet with the White House "Monday or anytime next week" to discuss its censorship efforts, to which Flaherty responded, "Hoor should be trying to land a time." *Id.* at 17.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Facebook's offer to meet with the White as one to "discuss its censorship efforts" as opposed to application of Facebook's content-moderation policies, to which all users agree. The cited e-mail also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

77.    Flaherty responded to Facebook's long, detailed account of its censorship efforts on WhatsApp by expressing dissatisfaction with the response and demanding ever-more detailed information, stating that he "couldn't care less" about Facebook's "product safari": "Will say I'm really mostly interested in what effects the interventions and products you've tested have had on increasing vaccine interest within hesitant communities, and which ones have shown promise. Really couldn't care less about products unless they're having measurable impact. And while the product safari has been interesting, at the end of the day, *I care mostly about what actions and changes you're making to ensure sure you're not making our country's vaccine hesitancy problem worse*. I definitely have what I believe to be a non-comprehensive list of products you're building but I still don't have a good, empirical answer on how effective you've been at reducing the spread of vaccine-skeptical content and misinformation to vaccine fence sitters in the now-folded 'lockdown.'" *Id.* at 17 (emphasis added).

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Facebook's application of WhatsApp's content moderation policies, to which its users agree, as "censorship efforts," argumentatively emphasizes phrased in the cited email, and mischaracterizes Mr. Flaherty as "demanding," rather than asking for additional information about the "effects the interventions and products you've tested have had on increasing vaccine interest within hesitant communities, and which ones have shown promise." Dkt. 174-1 at 17. The cited e-mail also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect

is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

78.    Flaherty then accused Facebook of being responsible for the riot at the Capitol on January 6, 2021, by not censoring enough speech online, and suggested that Facebook would be similarly responsible for COVID-related deaths if it did not engage in more online censorship here: "In the electoral context, you tested and deployed an algorithmic shift that promoted quality news and information about the election. This was reported in the New York Times and also readily apparent to anyone with cursory social listening tools. You only did this, however, after *an election that you helped increase skepticism in, and an insurrection which was plotted, in large part, on your platform*. And then you turned it back off. *I want some assurances, based in data, that you are not doing the same thing again here*." *Id.* (emphases added).

**RESPONSE:** Disputed to the extent that the PFOF mischaracterizes Mr. Flaherty as accusing Facebook of being responsible for the January 6, 2021, insurrection at the Capitol "by not censoring enough speech," and as accusing Facebook of being "similarly responsible" for COVID-19 related deaths if it did not engage in more online "censorship." In addition, the PFOF argumentatively emphasizes various phrases in the cited email. The cited evidence does not support this characterization. The cited e-mail also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

79.    Facebook responded by promising ever-more-detailed information to the White House's demands: "Understood. I thought we were doing a better job [of] responding to this – and we are working to get the data that will more clearly show the universe of the Covid content that's highest in distribution with a clear picture of what percentage of that content is vax hesitancy content, and how we are addressing it. I know [a Facebook official] told Andy [Mr. Slavitt] that would take a bit of time to nail down and we are working on that universe of data. I will make sure we're more clearly responding to your questions below." *Id.* at 17.

**RESPONSE:** Disputed to the extent the PFOF characterizes the request for information from Facebook as a "demand." The cited evidence does not support this characterization. The cited e-mail also contains no evidence that the White House threatened or pressured Facebook to censor

speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

80.    The meeting that Facebook offered with the White House on Monday, April 12 or thereafter occurred on Wednesday, April 14, because Flaherty emailed Facebook that day stating: "Since we've been on the phone…" *Id.* at 22.

**RESPONSE:** Undisputed, but note that the cited e-mail contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

81.    In this Wednesday, April 14, 2021 email, with the subject line "tucker," Flaherty noted that the White House was tracking COVID-related content in real time, and he demanded the censorship of currently-trending posts of content from two prominent Fox News hosts, Tucker Carlson and Tomi Lahren: "Since we've been on the phone – the top post about vaccines today is tucker Carlson saying they don't work. Yesterday was Tomi Lehren [*sic*] saying she won't take one. This is exactly why I want to know what 'Reduction' actually looks like – if 'reduction' means 'pumping our most vaccine hesitant audience with tucker Carlson saying it doesn't work' then ... I'm not sure it's reduction!" *Id.* at 22. Facebook responded: "Thanks—I saw the same thing when we hung up. Running this down now." *Id.* In a separate email chain to Flaherty and Courtney Rowe the same day, Facebook also assured the White House, "running down the question on Tucker and working on getting you report by end of week." *Id.* at 23.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Mr. Flaherty as "demand[ing] the censorship of currently-trending posts of content from two prominent Fox News hosts, Tucker Carlson and Tomi Lahren," rather than seeking information from Facebook about the effectiveness of its content-moderation policies and the effectiveness of the tool (CrowdTangle). The cited e-mail also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications

with the White House as such. Any assertion to that effect is unsupported by and contrary to the

evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

82.    Tucker Carlson has 1.2 million followers on his personal Facebook account and 3.8 million followers on his show's account, Jones Decl., Ex. I, at 1-2, so censoring Carlson's content would affect the free-speech rights of millions of people in a single stroke.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Mr. Flaherty as seeking

to censor Tucker Carlson's account, *see* Response to Pls.' PFOF ¶ 81, above, or the application of

Facebook's content-moderation polices, to which users agree, as censorship. The cited e-mail also

contains no evidence that the White House threatened or pressured Facebook to censor speech, or

that Facebook regarded (or acted on) communications with the White House as such. Any assertion

to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A,

Arg. §§ I.B.1 & II.B.1.b & II.B.2.

83.    In the meantime, Facebook was offering to cooperate closely with the White House to "amplify" its preferred messages. On April 13, 2021, Facebook emailed Andy Mr. Slavitt about the temporary halt of the Johnson & Johnson vaccine, stating: "Re the J+J [*i.e.*, Johnson & Johnson] news, we're keen to amplify any messaging you want us to project about what this means for people – it obviously has the risk of exacerbating vaccine hesitancy, so we're keen to get ahead of the knock-on effect. Don't hesitate to tell me – or via your teams – how we can help to provide clarity/reassurance via Facebook." Doc. 174-1, at 31-32. Facebook then forwarded the same offer to Courtney Rowe and Rob Flaherty of the White House digital communications team. *Id.* at 31.

**RESPONSE:** Disputed to the extent this PFOF refers vaguely to "preferred messages,"

rather than the Johnson & Johnson vaccine that is mentioned in the cited email. Defendants also

note that the cited e-mail contains no evidence that the White House threatened or pressured

Facebook to censor speech, or that Facebook regarded (or acted on) communications with the

White House as such. Any assertion to that effect is unsupported by and contrary to the evidence

as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

84.    Flaherty responded the same day, April 13, with a series of detailed requests about how Facebook could amplify the White House's preferred messages, including: "Some kind of thing that puts the news in context if folks have seen it (like your current 'COVID news' panel)

that has 3-4 pieces of info (eg: Adverse events are very rare – 6 cases out of nearly 7 million, the FDA and CDC are reviewing so it health care providers know how to treat any of the rare events, this does not affect pfzier or moderna, which vaccinate via a different mechanism)"; "CDC is working through an FAQ that we'd love to have amplified in whatever way possible – maybe through the COVID info panel"; and "[a] commitment from you guys to make sure that a favorable review reaches as many people as the pause, either through hard product interventions or algorithmic amplification." *Id.* at 30-31. Flaherty also block-quoted a White-House-approved message on the vaccine pause for Facebook to amplify. *Id.* at 31.

**RESPONSE:** Disputed to the extent this PFOF refers vaguely to "preferred messages," rather than the topics discussed in the cited email. Defendants also note that the cited e-mail contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

85.    Flaherty then concluded by demanding that Facebook monitor any "misinformation" relating to the Johnson & Johnson vaccine pause, and asking Facebook to provide a detailed report to the White House within 24 hours of how it was doing so: "More broadly: we share [Facebook's] concern about knock-on effects and are curious to get a read from your CMU data about what you're seeing and with whom. *Moreover, I want to make sure you have eyes on what might be spinning off the back end of this – that the news about J&J doesn't spin off misinformation. Would be great to get a 24 hour report-back on what behavior you're seeing.*" *Id.* at 31 (emphasis added).

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Mr. Flaherty's request ("would be great to get") as a "demand," mischaracterizes his request for information as a request for a "detailed" report, and argumentatively emphasizes phrases in the cited email. The cited evidence does not support this characterization. The cited e-mail also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

86.     The same day, April 13, 2021, Facebook responded with a detailed report on misinformation on its platforms about this issue. Doc. 174-1, at 24-30. Facebook noted that there was an oral meeting about misinformation with the White House scheduled the next day: "I'm looking forward to the meeting tomorrow [*i.e.*, Wednesday, April 14] and hoping we can spend some time responding to Rob's feedback from last week as well as further discussing the J&J news and how we can hopefully partner together." *Id.* at 24.

**RESPONSE:** Undisputed, but note that the cited e-mail contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

87.     Facebook also noted that it had recently had a telephone call with Courtney Rowe about how it was censoring misinformation, and had agreed to provide a detailed report on its relevant censorship enforcement policies: "Courtney – as we discussed, we also wanted to send over some examples of content we see on our platform that we remove (misinformation & harm) as well as content we take other actions on, but do not remove (vaccine hesitancy). I have included some examples at the bottom of this email and happy to setup time to talk through this more with you as well, if helpful." *Id.* at 24. Facebook then provided a six-page report on censorship with explanations and screen shots of sample posts of content that it censors and does not censor. *Id.* at 24-30.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Ms. Rowe's call with Facebook as concerning "censoring misinformation," that Facebook had agreed to provide a detailed report on its "censorship enforcement policies," or that "Facebook . . . provided a six-page report on censorship" with "sample posts of content that it censors and does not censor." The cited evidence refers to Facebook content-moderation policies, to which all users agree. The cited e-mail also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

88.     First, Facebook responded to Flaherty's request for government-message-amplification by agreeing to cooperate with the White House on those demands. *Id.* at 24. Regarding Flaherty's demand that Facebook monitor and report on "misinformation" related to the Johnson & Johnson vaccine pause, Facebook agreed to both monitor and report to the White House: "We will look to get you insights as soon as we have them. We are going to be watching to see how this plays out over the next couple of days. [A Facebook official] is joining [the call] tomorrow and plans to share a couple things we are seeing emerge from the CMU survey and what we are going to be watching over the next few days. Also, we are proactively monitoring and seeing what themes emerge from content on-platform and happy to share out when we have stuff collected." *Id.* at 24-25.

**RESPONSE**: Disputed to the extent the PFOF mischaracterizes Mr. Flaherty's request as

a "demand," and it mischaracterizes the nature of Mr. Flaherty's request and Facebook's response.

The cited e-mail also contains no evidence that the White House threatened or pressured Facebook

to censor speech, or that Facebook regarded (or acted on) communications with the White House

as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See*

Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

89.     Facebook then provided a detailed report to Courtney Rowe's request for specific examples of posts that are censored on its platforms. First, as to "VACCINE HESITANCY" content, Facebook explained that this content does not violate Facebook's content-moderation policies, but Facebook assured the White House that Facebook still censors such non-violative content by suppressing it in news feeds and algorithms. *Id.* at 25. Facebook admitted that such content is often "true" and sometimes involves core political speech or advocacy (*e.g.*, "discussing choice to vaccinate in terms of personal and civil liberties"): "The following examples of content are those that *do not violate our Misinformation and Harm policy*, but may contribute to vaccine hesitancy or present a barrier to vaccination. This includes, for example, content that contains sensational or alarmist vaccine misrepresentation, disparaging others based on the choice to or to not vaccinate, *true but shocking claims or personal anecdotes*, or *discussing the choice to vaccinate in terms of personal and civil liberties* or concerns related to mistrust in institutions or individuals." *Id.* at 25 (emphases added).

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Ms. Rowe as "request[ing]

. . . specific examples" of "censored" posts, *see* Pls.' PFOF ¶ 88, and Facebook as "censoring"

content or explaining that the content in question did not violate its content-moderation policies.

The cited evidence does not support these characterizations. In fact, Facebook's content-

moderation policies at the time expressly covered misinformation of a "sensationalist" nature as

discussed in this PFOF. *See* Ex. 23 at 6-9 (Mark Zuckerberg, *A Blueprint for Content Governance and Enforcement*, Facebook (Nov. 15, 2018), https://perma.cc/ZK5C-ZTSX). This PFOF also argumentatively emphasizes phrases in the cited e-mail and makes improper legal conclusions about the evidence, to which no response is required. The cited e-mail also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

90.    Facebook assured the White House that it censors such true, political, non-violative content through "a spectrum of levers" that includes concealing the content from other users, deboosting the content, and preventing sharing through "friction": "We utilize a spectrum of levers for this kind of content…. Actions may include reducing the posts' distribution, not suggesting the posts to users, limiting their discoverability in Search, and applying Inform Labels and/or reshare friction to the posts." *Id.* Facebook then provided the White House with a series of sample posts, all of which content originated from Children's Health Defense, the anti-vaccine organization headed by Robert F. Kennedy Jr. (who would soon be identified as one of the so-called "Disinformation Dozen"). *Id.* at 25-27.

**RESPONSE:** Disputed to the extent the PFOF characterizes Facebook's application of its content-moderation policies, to which all users agree, as "censorship." In addition, this PFOF selectively quotes from Facebook's email. The sentence, in full, reads: "We utilize a spectrum of levers for this kind of content *that is both proportionate and also helps our users make informed decisions*." Dkt. 174-1 at 25 (emphasis added). Thus, the cited evidence does not support Plaintiffs' characterization. The cited e-mail also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

91.    Next, under the heading "Examples of Content Removed for Violating our Misinformation & Harm Policy," Facebook provided the White House with "examples of posts

we have removed for violation of our Misinformation & Harm Policy." *Id.* at 27. Facebook then provided a list of screen shots of posts it had removed from the platform entirely, again all of which originated from Children's Health Defense, Robert F. Kennedy Jr.'s group. *Id.* at 28-30.

**RESPONSE:** Undisputed, but note that the cited e-mail contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

92.     As noted below, Facebook's explanation that it was removing violative posts by Children's Health Defense and censoring even its posts that did not violate Facebook's policies turned out to be not nearly enough to satisfy the White House.

**RESPONSE:** Disputed as a mischaracterization, without citation to or support in the record, of the evidence in the preceding PFOFs, and in those that follow, including the assertions that Facebook "censor[ed]" posts or that it took actions on posts that did not violate its policies. As noted in Defendants' responses to Plaintiffs' PFOFs, the evidence cited above, and below, does not support these characterizations. In fact, Facebook's content-moderation policies at the time expressly covered the information discussed in the email discussed in PFOFs ¶¶ 90-91. *See* Ex. 23 at 6-9. The PFOF also contains no evidence, and alludes to none, that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

93.     Separately from Flaherty's demands about Tucker Carlson, on April 14, 2021, Andy Mr. Slavitt also emailed a high-level Facebook executive—Facebook's President of Global Affairs, former Deputy Prime Minister of the United Kingdom Nick Mr. Clegg—with a sarcastic message expressing the White House's displeasure both with Facebook's failure to censor Tucker Carlson and with Facebook's perceived failure to allow the White House to micromanage its censorship policies: "Number one of Facebook. Sigh. Big reveal call with FB and WH today. No progress since we spoke. Sigh." Doc. 174-1, at 35. Mr. Clegg promptly responded to Mr. Slavitt with an apology and promise to immediately address the censorship of Tucker Carlson: "OK –

sorry to hear about call today, will dig in now." *Id.* The subject line of Mr. Slavitt's email, reproduced in the "Re:" line of later messages, was "Tucker Carlson anti-vax message." *Id.* at 34.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Mr. Flaherty's question as a "demand," that Mr. Slavitt expressed "the White House's displeasure both with Facebook's failure to censor Tucker Carlson and with Facebook's perceived failure to allow the White House to micromanage its censorship polices," or that Mr. Clegg promised to address "the censorship of Tucker Carlson." The cited evidence does not support these characterizations. The cited e-mail also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

94.    Late evening of the same day, April 14, 2021, at 10:51 p.m., Nick Mr. Clegg provided Mr. Slavitt with a detailed report about the Tucker Carlson post, explaining that Tucker Carlson's content did not violate Facebook policies (due to the federal government's own information about its accuracy) but assuring the White House that Facebook would censor it anyway. *Id.* at 34. Mr. Clegg denied that Carlson's content was the top post on Facebook, but then stated, "Regardless of popularity, the Tucker Carlson video does not qualify for removal under our policies. Following the government's decision yesterday, we are allowing claims that the Johnson and Johnson vaccine causes blood clots…. That said, the video is being labeled with a pointer to authoritative COVID information, it's not being recommended to people, and it is being demoted." *Id.* at 34.

**RESPONSE:** Disputed to the extent the PFOF is intended to suggest that Facebook agreed to "censor" the Tucker Carlson post or take actions that were inconsistent with its content moderation policies. The cited evidence does not support such a characterization. Facebook emphasized that the post did not qualify for removal under its policies, and the actions it did take regarding the post were, in fact, consistent with its content-moderation policies at the time. *See* Ex. 23 at 6-9. Thus, the cited e-mail contains no evidence that the White House threatened or pressured Facebook to censor speech, including the Tucker Carlson post, or that Facebook

regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

95.    Mr. Clegg also stated that Facebook was "v[ery] keen" to provide a more detailed report on its censorship practices in response to White House demands: "I'm v keen that we follow up as we'd agreed, and I can assure you the teams here are on it." *Id.*

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Mr. Clegg as being interested in discussing "censorship practices" and misleadingly references unspecified "White House demands." The cited evidence does not support this characterization. The cited e-mail also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

96.    Brian Rice of Facebook then forwarded the same report on the Tucker Carlson post to Rob Flaherty. *Id.* ("Making sure you receive--").

**RESPONSE:** Undisputed, but further note that the cited e-mail also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

97.    Less than twenty minutes later, at 11:29 p.m. on April 14, 2021, Flaherty responded to Rice with a sarcastic response badgering Facebook for a more detailed explanation of why it had not removed Tucker Carlson's content outright, demanding greater censorship, and accusing Facebook of causing an "insurrection" by not censoring enough speech on its platforms: "I guess this is a good example of your rules in practice then – and  a chance to dive in on questions as they're applied. How was this [*i.e.* Tucker Carlson' post] not violative?  The second half of the segment is raising conspiracy theories about the government hiding that all vaccines aren't effective. It's not about just J&J. What exactly is the rule for removal vs demoting? Moreover: you say reduced and demoted. What does that mean? There's 40,000 shares on the video. Who is seeing

it now? How many? How effective is that? And we've gone a million rounds on this in other contexts so pardon what may seem like deja vu – but on what basis is 'visit the covid-19 information center for vaccine resources' the best thing to tag to a video that says the vaccine doesn't work?" Doc. 174-1, at 33. Flaherty concluded ominously by reiterating his accusation that Facebook had caused the January 6 riot by not censoring enough speech on its platforms: "Not for nothing but last time we did this dance, it ended in an insurrection." *Id.* at 34.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Mr. Flaherty's inquiries, which concerned the application of Facebook's content-moderation policies, as "badgering" Facebook, "demanding greater censorship," and "ominously" "accusing Facebook of causing an 'insurrection' by not censoring enough speech on its platform." The cited evidence does not support these characterizations. The cited e-mail also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

98.    Six minutes later, at 11:35 p.m. on April 14, Flaherty followed up with another email accusing Facebook of providing incorrect information through CrowdTangle and demanding an explanation: "And sorry – if this was not one of the most popular posts about the vaccine on Facebook today, then what good is crowdtangle? [A Facebook official] said that Tomis [*i.e.*, Tomi Lahren's] video was the most popular yesterday based on your data, which reflected what CT [*i.e.*, CrowdTangle] was showing. Tuckers video was top on CT today. What is different about this video, then?" *Id.* at 33.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Mr. Flaherty's request for clarification of the referenced post's CrowdTangle ranking as accusing Facebook of "providing incorrect information" or "demanding" an explanation. The cited evidence does not support these characterizations. The cited e-mail also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

99.   On Friday, April 16, Flaherty then sent an email expressing his displeasure with the timing of Facebook's response and demanding immediate answers, snapping at Rice: "These questions weren't rhetorical." *Id.* at 33. Facebook apologized and promised an immediate response: "Hey Rob – understood and sorry for the delay. The team has been heads-down since our conversation to produce the report we discussed on Wednesday afternoon. We are aiming to get you something tonight ahead of the weekend." *Id.* Facebook then proposed another oral meeting: "schedule a call to discuss. Would that work?" *Id.*

**RESPONSE:** Disputed to the extent that the PFOF mischaracterizes Mr. Flaherty's follow-up email as "demanding immediate answers" or "snapping." The cited evidence does not support this characterization—Mr. Flaherty waited two days without a response from Facebook before sending his April 16 email. The cited e-mail also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

100.   On Tuesday, April 21, 2021, Facebook sent an additional response to the same email chain, indicating that there had been a phone call with Flaherty ("thanks for catching up earlier") and providing another, more detailed report on its censorship of Tucker Carlson in response to each of Flaherty's queries question-by-question. *Id.* at 36. Facebook again reported that Tucker Carlson's content had not violated its policies, stating that "we reviewed this content in detail and it does not violate those policies," but reported that Facebook had been censoring it anyway and would continue to censor it even though no fact-check had reported it false: "The video received 50% demotion for seven days while in the queue to be fact checked, and *will continue to be demoted even though it was not ultimately fact checked*." *Id.* (emphasis added). These circumstances raise a compelling inference that Facebook continued to demote Tucker Carlson' content, in violation of its own policies and practices, due to the White House's pressure.

**RESPONSE:** Disputed to the extent the PFOF (i) mischaracterizes Facebook's actions concerning the Tucker Carlson post as "censorship" and (ii) asserts that the post did not violate Facebook's content-moderation policies. The cited evidence does not support these characterizations. Rather, Facebook indicated that the post did not violate Facebook's *removal* policy. Dkt. 174-1, at 34 ("[t]he Tucker Carlson video does not qualify for *removal* under our policies.") (emphasis added). Accordingly, Facebook did not remove it. The actions Facebook took

regarding the Tucker Carlson post were entirely consistent with Facebook's other content moderation policies concerning borderline content. *See* Ex. 23 at 6-9. This PFOF is also disputed because it asserts that Facebook demoted the referenced content "due to the White House's pressure." Neither the cited e-mail, nor any cited in the preceding PFOFs, contain evidence that the White House threatened or pressured Facebook to demote the Tucker Carlson post, or that Facebook demoted it for any reason other than its own policies concerning borderline content. Nor does this or any of the preceding PFOFs indicate that the White House threatened or pressured Facebook to censor any other speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

101.    In the same time frame, the White House was exerting similar pressure on other major social-media platforms. It had meetings with YouTube and Twitter about misinformation on April 21, 2021 as well.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the White House, without citation to or support in the record, as "exerting similar pressure" on other social-media platforms. Plaintiffs cite no evidence that the White House threatened or pressured Facebook, YouTube, Twitter, or any other social-media companies to censor speech, or that the companies regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

102.    On April 21, Rob Flaherty, Andy Mr. Slavitt, and Kelsey Fitzpatrick of the White House, along with an official at HHS, participated in a meeting with several Twitter officials. Doc. 71-7, at 86. The meeting's subject was "Twitter Vaccine Misinfo Briefing." *Id.* The meeting invite noted: "White House Staff will be briefed by Twitter on vaccine misinfo. Twitter to cover trends seen generally around vaccine misinformation, *the tangible effects seen from recent policy changes*, what interventions are currently being implemented *in addition to previous policy changes*, and ways the White House (and our COVID experts) can *partner* in product work." *Id.* (emphases added).

**RESPONSE:** Undisputed, but further note that the cited documents, concerning a briefing about misinformation trends, contain no evidence that the referenced "policy changes" were made due to threats or pressure by the White House. The cited documents also contain no evidence that the White House threatened or pressured Twitter to censor speech, or that Twitter regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

103.    The next day, April 22, Twitter employees noted in internal communications that the White House officials, during this meeting, had posed "one really tough question about why Alex Berenson hasn't been kicked off the platform." Jones Decl., Ex. J, at 2-3. The Twitter employee noted that the White House's questions were "pointed" and "mercifully we had answers." *Id.* Another internal Twitter communication noted that the White House "really wanted to know about Alex Berenson. Andy Mr. Slavitt suggested they had seen data viz that had showed he was the epicenter of disinfo that radiated outwards to the persuadable public." *Id.*

**RESPONSE:** Undisputed, but further state that during that meeting Mr. Slavitt expressed his view that Twitter was not enforcing its content guidelines with respect to Alex Berenson's tweets, and Twitter disagreed with that view. *See* Defs.' Supp. Rog. Resp. Related to Robert Flaherty at 57 (Ex. 36). Several weeks later a Twitter employee followed-up with Mr. Flaherty and told him that Twitter would not be removing Mr. Berenson because he had not violated Twitter's policies at that time. *Id.* The cited documents contain no evidence that the White House threatened or pressured Twitter to censor speech, or that Twitter regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

104.    Later, on July 16, 2021, Twitter suspended Alex Berenson for the first time. *Id.* On August 28, 2021, Twitter permanently deplatformed Berenson. *Id.*

**RESPONSE:** Disputed to the extent that Twitter did not permanently deplatform Berenson (and note that Twitter did not take this action until almost three months after the April 22, 2021, meeting with White House officials). As the relied-upon exhibit states, "Twitter restored" Mr. Berenson's account in December 2021." Jones Decl., Ex. J, at 3. In addition, as noted immediately above, Twitter informed Messrs. Mr. Slavitt and Flaherty in April 2021 that it was not going to remove Mr. Berenson from Twitter because he had not violated its terms of service at that time. Ex. 36 at 57 (Flaherty Rog. Resps.). The cited documents also contain no evidence that the White House threatened or pressured Twitter to censor speech, or that Twitter regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

105.    On April 21, 2021, Flaherty, Andy Mr. Slavitt, Kelsey Fitzpatrick of the White House, and Jessica Scruggs of HHS had a similar meeting with YouTube, to which at least six YouTube officials were invited. Jones Decl., Ex. K, at 1. The calendar invite stated that the purpose of the meeting was: "White House staff to get briefed by YouTube on general trends seen around vaccine misinformation. As well as, the empirical effects of YouTube's efforts to combat misinfo, what interventions YouTube is currently trying, and ways the White House (and or COVID experts) can partner in product work." *Id.*

**RESPONSE:** Disputed to the extent this PFOF suggests the meeting with YouTube was similar to the meeting referenced above. Defendants also note that the cited documents contain no evidence that the White House threatened or pressured YouTube to censor speech, or that YouTube regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

106.    Just after midnight on April 22, 2021, Rob Flaherty emailed a list of Google officials about YouTube, copying Andy Mr. Slavitt, Clarke Humphrey, and Kelsey Fitzpatrick of the White House. Doc. 174-1, at 39. He began by referring to the oral meeting with Google/YouTube officials on April 21: "Thanks again for the conversation today." *Id.* Flaherty also referred to an earlier, "first conversation," indicating that there had been multiple meetings with YouTube. *Id.*

**RESPONSE:** Undisputed, but note that the cited documents contain no evidence that the White House threatened or pressured Google/You Tube to censor speech, or that Google/You Tube regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

107.    Flaherty then noted that the White House had asked YouTube (like Facebook) to monitor and report on the speech on its platforms, stating that the White House expected a report from them: "We'll look out for the top trends that you've seen in terms of misinformation around the vaccine." *Id.*

**RESPONSE:** Disputed to the extent that the PFOF mischaracterizes Mr. Flaherty as "expecting" a report from YouTube (or Facebook) or suggests that Flaherty requested YouTube (or Facebook) to "monitor and report" on the substance of all "speech on its platforms." The cited evidence does not support this characterization. The cited document also contains no evidence that the White House threatened or pressured Google/You Tube to censor speech, or that Google/You Tube regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

108.    Flaherty then provided a "recap" of their oral conversation, stating that concern about misinformation on YouTube was "shared at the highest (and I mean highest) levels of the [White House]": "To recap: … we remain concerned that Youtube is 'funneling' people into hesitance and intensifying people's hesitancy…. we want to be sure that you have a handle on vaccine hesitancy generally and are working toward making the problem better. *This is a concern that is shared at the highest (and I mean highest) levels of the WH*, so we'd like to continue a good-faith dialogue about what is going on under the hood here. I'm the on the hook for reporting out." *Id.* (emphasis added).

**RESPONSE:** Disputed to the extent the PFOF selectively quotes and omits portions of Mr. Flaherty's email and argumentatively emphasizes aspects of the email. The omitted sentence states: "We certainly recognize that removing content that is unfavorable to the cause of increasing

vaccine adoption is not realistic—or even good—solution." Dkt. 174-1 at 39. Thus, the cited email

contains no evidence that the White House threatened or pressured Google/You Tube to censor

speech, or that Google/You Tube regarded (or acted on) communications with the White House as

such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See*

Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

109.    Citing an article "highlighting the Youtube misinformation that is spreading through the Vietnamese community," Flaherty stated: "Clearly, more work to be done here. Would love to get some insights from you on how you are tackling this problem across all languages." *Id.*

**RESPONSE:** Disputed to the extent the PFOF selectively quotes and omits portions of

Mr. Flaherty's email. The omitted sentence states: "I think this brings up the question that I had in

our first meeting about your capabilities around misinformation in non-english-speaking

communities." Dkt. 174-1 at 39. Disputed also to the extent the PFOF suggests that Mr. Flaherty's

request for general information about how YouTube was addressing misinformation "across all

languages" constitutes a request of any kind for censorship. The cited document contains no

evidence that the White House threatened or pressured Google/You Tube to censor speech, or that

Google/You Tube regarded (or acted on) communications with the White House as such. Any

assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF

§ II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

110.    Flaherty then stated, "A couple of other things it would be good to have from you all," and provided a five-bullet list of detailed demands for YouTube's internal data about the spread of misinformation on its platform, including: "the top trends that you're seeing in terms of misinformation/hesitance inducing content," and "[a] deeper dive on reduction and its effectiveness," among others. *Id.*

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Mr. Flaherty's requests as

"demands." The cited evidence does not support this characterization. The cited email, concerning

Mr. Flaherty's requests to YouTube for data, also contains no evidence that the White House

threatened or pressured Google/You Tube to censor speech, or that Google/You Tube regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

111.    Flaherty indicated that the White House was coordinating with the Stanford Internet Observatory, which was then operating the Virality Project, discussed in detail below, noting in the first bullet point: "Stanford has mentioned that it's recently Vaccine Passports and J&J pause-related stuff, but I'm not sure if that reflects what you're seeing." *Id.* This reference raises the inference that the White House's "COVID experts" ("our COVID experts") mentioned in the calendar invite for the meeting, Jones Decl., Ex. K, at 1, are, in fact, "Stanford" personnel associated with the Virality Project, and that the White House was working with "Stanford" to "partner with" platforms "on product work."

**RESPONSE:** Disputed to the extent the PFOF characterizes the White House as "coordinating" with the Stanford Internet Observatory, and dispute as well the asserted "inference" that the White House's COVID experts were "Stanford" personnel," or that the White House was working with the Virality Project to "partner with" platforms. The evidence contradicts that characterization. As Mr. Flaherty has explained, he is unaware of any direct involvement by federal agencies or employees in either the Election Integrity Partnership or the Virality Project. *See* Ex. 36 at 32 (Flaherty Rog. Resps.). Rather, Mr. Flaherty specifically recalls a single meeting in or around March 2021 and a follow-up conversation with Renee DiResta, who was involved in the Virality Project, to discuss her research on misinformation and disinformation, including the work of the Virality Project, to address COVID-19-related misinformation and disinformation. *Id.* Ms. DiResta suggested to Mr. Flaherty that the Federal Government create a "Mythbusters" webpage as part of a strategy to address misinformation and disinformation before it had a large impact. *Id.* Ms. DiResta further suggested that the primary role of the Federal Government in combating misinformation and disinformation related to the COVID-19 vaccines was to provide expert information." *Id.* at 32-33. The cited email also contains no evidence that the White House

threatened or pressured Google/YouTube to censor speech, or that Google/YouTube regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

112.    As with Facebook, many of Flaherty's demands related to so-called "borderline" content, *i.e.*, often-truthful content that does not violate platform policies but that the White House disfavors. *See* Doc. 174-1, at 39. Among other things, he praised YouTube for reducing distribution of such content: "I believe you said you reduced watch time by 70% on 'borderline' content, which is impressive." *Id.* But then, again, he followed up with a long series of demands for more information: "How does that track with vaccine-related content specifically…? What has the comparative reduction in watch time on 'borderline' vaccine topics been after your interventions? And what has the increase in watch time been on authoritative information?... Related to the second bullet: to what extent have your ranking interventions been effective there? And, perhaps more critically, to what degree is content from people who have been given a 'strike' still being recommended and shown in prominent search positions? … [H]ow did you arrive on info-panels as the best intervention? And to what extent are people clicking through after exposure to vaccine-hesitant content? …  What are the general vectors by which people see the 'borderline' content – or really just vaccine-skeptical content? Is it largely through recommendations? Search?" *Id.* Notably, Flaherty's "most critical[]" question implied that YouTube should be censoring more content from disfavored *speakers*, *i.e.*, those who have been given a "strike" for previous anti-vaccine content. *Id.*

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Mr. Flaherty as "demanding" anything or as "impl[ying]" that YouTube should "censor" anything. Also disputed to the extent the PFOF suggests that YouTube's policies did not cover "borderline" content. The cited evidence does not support these characterizations. In fact, in January 2019 YouTube announced that it was taking steps to "reduce the spread of content that comes close to—but doesn't quite cross the line of—violating our Community Guidelines. To that end, we'll begin reducing recommendations of borderline content and content that could misinform users in harmful ways—such as videos promoting a phony miracle cure for a serious illness, claiming the earth is flat, or making blatantly false claims about historic events like 9/11." YouTube Team, *Continuing our work to improve recommendations on YouTube*, YouTube Official Blog 2 (Jan.

25, 2019) (Ex. 24). YouTube explained that its change to its content moderation policy "reflects our commitment and sense of responsibility to improve the recommendations experience on YouTube." *Id.* at 3. The cited email also contains no evidence that the White House threatened or pressured Google/You Tube to censor speech, or that Google/YouTube regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

113.    Flaherty emphasized that the White House wanted to make sure YouTube's "work extends to the broader problem" of people viewing vaccine-hesitant content. *Id.* at 39-40. And he proposed regular meetings to push YouTube to disclose its "internal data" to the White House: "We've worked with a number of platform partners to track down similar information based on internal data, including partners of similar scale. I am feeling a bit like I don't have a full sense of the picture here. We speak with other platforms on a semi-regular basis. We'd love to get in this habit with you. Perhaps bi-weekly? Looking forward to more conversation." *Id.* at 40.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Mr. Flaherty's suggestion of further meetings as "push[ing] YouTube to disclose its 'internal data' to the White House." The cited email also contains no evidence that the White House threatened or pressured Google/You Tube to censor speech, or that Google/You Tube regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

114.    On April 23, 2021, Flaherty sent Facebook an email that included a document entitled "Facebook COVID-19 Vaccine Misinformation Brief" prepared by an unidentified third party. Jones Decl., Ex. L, at 1. The "Brief" had two major headings with several bullet points under each: "Facebook plays a major role in the spread of COVID vaccine misinformation," and "Facebook's policy and enforcement gaps enable misinformation's spread." *Id.* The "Brief" recommended much more aggressive censorship of Facebook's platforms, calling for "progressively severe penalties … and comprehensive enforcement for pages, accounts, and groups that repeatedly post COVID vaccine misinformation," and stating that "[b]ans for COVID-19 misinformation should be cross-platform and enforced at the entity-level, not the account level." *Id.* It called for Facebook to stop distributing even non-violative anti-vaccine content "in News Feed or in group recommendations" to "significantly reduce the reach of low-quality domains," and it stated that "[v]accine misinformation monitoring and enforcement must adjust as disinformers evade enforcement…." *Id.* at 1-2. And it called for specific censorship of disfavored speakers: "Warning screens before linking to domains known to promote vaccine misinformation

would dissuade users from following links to of-platform misinformation and hurt the vaccine-misinformation business model Facebook enables." *Id.* at 2.

    **RESPONSE:** Disputed to the extent the PFOF mischaracterizes the "Brief" as recommending "censorship" on Facebook's platforms or calling for Facebook to "stop distributing even non-violative" content about COVID-19. The cited evidence does not support this characterization. In addition, the cited email by Mr. Flaherty expressly states: "Don't read this as White House endorsement of these suggestions[.]" Jones Decl., Ex. L, at 1. The cited email also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

    115.    Reproducing this pro-censorship "Brief" in the text of his email to Facebook, Flaherty wrote: "Here's the crux of their recs. Don't read this as White House endorsement of these suggestions (or, also, as the upper bound of what our thoughts may be). But – spirit of transparency – this is circulating around the building and informing thinking." *Id.* at 1.

    **RESPONSE:** Disputed to the extent the PFOF mischaracterizes the "Brief" as "pro-censorship." The cited evidence does not support this characterization. Rather, the information Mr. Flaherty passed along to Facebook reflected the author's concerns about Facebook's "policy and enforcement gaps," and suggested possible ways to address those gaps. The cited email also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

    116.    On May 1, 2021, Nick Mr. Clegg of Facebook sent an email to Andy Mr. Slavitt indicating that the White House had recently met with Facebook to "share research work" and make more demands, stating: "Thanks to your team for sharing the research work with us…." *Id.* at 41. At the beginning of the email, Mr. Clegg apologized to the White House for not catching

and censoring three pieces of vaccine content that went viral, even though the content did not violate Facebook's policies, and promising to censor such non-violative content more aggressively in the future: "I wanted to send you a quick note on the three pieces of vaccine content that were seen by a high number of people before we demoted them. Although they don't violate our community standards, we should have demoted them before they went viral and this has exposed gaps in our operational and technical process." *Id.* at 42.

    **RESPONSE:** Disputed to the extent the PFOF mischaracterizes the purpose of the

referenced meeting as "mak[ing] more demands," and to the extent it mischaracterizes Mr. Clegg's

email as "apologiz[ing]" for not "censoring" "content [that] did not Facebook's policies," as

"promising to censor non-violative content more aggressively," and as acknowledging that three

pieces of vaccine content did not violate Facebook's "polices." The cited evidence does not support

these characterizations. Facebook has a borderline content policy designed to address materials

that do not violate its Community Standards. *See* Ex. 23 at 6-9. Also dispute any insinuation that

Facebook demoted the three pieces of vaccine content for any reason other than Facebook's own

policy. The cited email contains no evidence that the White House threatened or pressured

Facebook to censor speech, or that Facebook regarded (or acted on) communications with the

White House as such. Any assertion to that effect is unsupported by and contrary to the evidence

as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

    117.   Mr. Clegg then promised to be more vigilant and censor such non-violative content to prevent it from going viral in the future, and offered to report back to the White House in detail about its efforts to do so: "The teams have spent the last 24 hrs analysing these gaps and are making a number of changes starting next week, including setting up more dedicated monitoring for Covid vaccine content on the cusp of going viral, applying stronger demotions to a broader set of content, and setting up daily review and analysis so that we have a better real-time view of what is being seen by lots of people. I will be checking on this closely to make sure that these additional steps show results - the stronger demotions in particular should deliver real impact. Please let me know if you'd like to discuss any of this in more detail." *Id.*

    **RESPONSE:** Disputed to the extent the PFOF mischaracterizes Mr. Clegg as promising

to "censor" "non-violative" content in the future. The cited evidence does not support this

characterization. Facebook has a borderline content policy designed to address materials that do

not violate its Community Standards. *See* Ex. 23 at 6-9. The cited email also contains no evidence that Facebook intended to take the "additional steps" mentioned for reasons other than its own policies. The cited email also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

118.    Mr. Clegg then listed in bold the demands that the White House had made in its recent meeting, with a detailed response to each. *Id.* at 42. First, the White House had demanded that Facebook address "**Non-English mis/disinformation circulating without moderation**," and Facebook promised to take steps to do so. *Id.* (bold in original).

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the document as listing White House "demands" and Mr. Clegg "promis[ing]" anything. The cited evidence does not support this characterization. Rather, the email reflects Mr. Clegg providing information in response to a third-party research report that Mr. Flaherty passed along. Mr. Flaherty emphasized that Facebook should not interpret the third-party report he passed along "as a White House endorsement." Jones Decl. Ex. L, at 1. The cited email also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

119.    Second, the White House had commanded Facebook: "**Do not distribute or amplify vaccine hesitancy, and Facebook should end group recommendations for groups with a history of COVID-19 or vaccine misinformation**." *Id.* (bold in original). Facebook assured the White House that it was taking strong steps to censor such content, and promised to increase its efforts to do so in the future: "Much of the research you shared called on us to ensure that our systems don't amplify vaccine hesitancy content and this is top of mind for us. In addition to the changes I mentioned above, we have already removed all health groups from our recommendation feature on Facebook, and on Instagram we filter vaccine-related accounts from our 'accounts you may follow feature'. We also remove accounts that may discourage vaccination from search features. We currently enforce on hash tags we know are shared to promote vaccine hesitancy content and are working to improve our automated systems here." *Id.*

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the referenced document, which as noted was prepared by a third-party, as a White House "command[]" to Facebook to do anything. Also disputed to the extent the PFOF mischaracterizes Facebook as "assur[ing]" the White House that it would "censor" content, or as "promis[ing]" to do so in the future. The cited evidence does not support this characterization, nor any insinuation that the "changes" Facebook described in the e-mail were taken for any reason other than its own policies. The cited email contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

120.    Third, the White House had demanded that Facebook "**Monitor[] events that host anti-vaccine and COVID disinformation**." *Id.* (bold in original). Facebook promised to monitor social-media "events" on its platforms more closely and take more aggressive action to censor them: "we are working to improve automatic detection for events hosting anti-vaccine and COVID content. Our viral monitoring efforts will also help us detect events that are gaining views on Facebook, and we do remove events coordinating in-person gatherings that involve or encourage people who have COVID-19 to join." *Id.*

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the referenced document, which was prepared by a third-party, as a White House "demand[]" of Facebook, and mischaracterizes Facebook as "promis[ing]" to "censor" content on its platform. The cited evidence does not support this characterization, nor the insinuation that Facebook decided to take the referenced actions for any reason other than its own policies. Further disputed to the extent the PFOF argumentatively mischaracterizes that Facebook "promised to monitor social-media 'events' on its platforms more closely and take more aggressive action to censor them." The cited email speaks for itself. The cited email also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications

with the White House as such. Any assertion to that effect is unsupported by and contrary to the

evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

121.    Fourth, the White House had demanded censorship of the so-called
"Disinformation Dozen" in the private meeting with Facebook, raising the concern that "**12
accounts are responsible for 73% of vaccine misinformation**." *Id.* (bold in original). Facebook
responded that it was scrutinizing those speakers and censoring them whenever it could, but that
most if their content did not violate Facebook's policies: "we continue to review accounts
associated with the 12 individuals identified in the CCDH 'Disinformation Dozen' report, but
many of those either do not violate our policies or have ceased posting violating content. Our
'Dedicated Vaccine Discouraging Entity' policy is designed to remove groups and pages that are
dedicated to sharing vaccine discouraging content and we continue to review and enforce on these
where we become aware of them." *Id.*

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the referenced document,

which was prepared by a third party, as a White House "demand[ ]"for "censorship" of anything

(and that the White House made any "demand" in a "private meeting"), and mischaracterizes

Facebook as "scrutinizing" and "censoring" the "Disinformation Dozen." The cited evidence does

not support these characterizations—it supports only that Facebook would "continue to review"

accounts associated with the 12 individuals identified. The cited email also contains no evidence

that the White House threatened or pressured Facebook to censor speech, or that Facebook

regarded (or acted on) communications with the White House as such. Any assertion to that effect

is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1

& II.B.1.b & II.B.2.

122.    Mr. Clegg then noted that he realized the White House would not be satisfied with
these answers and was demanding greater censorship: "I realise that our position on this continues
to be a particular concern for you." *Id.* Mr. Clegg then suggested that too much censorship might
be counterproductive and might drive vaccine hesitancy: "Among experts we have consulted, there
is a general sense that deleting more expressions of vaccine hesitancy might be more
counterproductive to the goal of vaccine uptake because it could prevent hesitant people from
talking through their concerns and potentially reinforce the notion that there's a cover-up." *Id.*
Brian Rice also forwarded Nick Mr. Clegg's email to Rob Flaherty. *Id.* at 41.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Mr. Clegg's email as suggesting that he believed the White House was "[dis]satisfied" and "demanding greater censorship," or that he considered application of Facebook's content-moderation policies to be "censorship." The cited evidence does not support these characterizations. The cited email also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

**B.    Public Pressure and Threats From Press Secretary Jennifer Psaki.**

123.    The White House was evidently quite unhappy with this response and the results of its pressure campaign behind closed doors. A few days later, the White House took its pressure campaign public. On May 5, 2021, Jen Psaki publicly reminded Facebook and the other platforms of the threat of legal consequences hanging over its head if it did not censor misinformation more aggressively. At the May 5, 2021 White House Press Briefing, Jen Psaki stated about social-media censorship: "The President's view is that the major platforms have a responsibility related to the health and safety of all Americans to stop amplifying untrustworthy content, disinformation, and misinformation, especially related to COVID-19, vaccinations, and elections. And we've seen that over the past several months, broadly speaking."  Glenn Decl. Ex. 29, at 15, Doc. 10-1, at 353.

**RESPONSE:** Disputed to the extent that, beyond the quoted language, the PFOF reflects numerous unsupported mischaracterizations, including (1) that the White House was conducting a "pressure campaign," "behind closed doors" or otherwise; (2) that the White House was "evidently quite unhappy" with Mr. Clegg's May 1, 2021 response to Mr. Slavitt's email; (3) that the White House had engaged and was continuing to engage in a "pressure campaign"; and (4) that the White House was "threatening legal consequences" if social media companies did not "censor misinformation more aggressively." Plaintiffs cite to no record support in this or any other PFOF for these assertions. Plaintiffs also selectively quote from the May 5, 2021 White House Press Conference. Ms. Psaki stated during that press conference "I'm not placing any blame on any

individual or group; we've seen it from a number of sources." Glenn Decl. Ex. 29 at 15. She further

stated that "Well, look, I think we are, of course, a believer in First Amendment rights. I think

what the decisions are that the social media platforms need to make is how they address the

disinformation, misinformation—especially related to life-threatening issues COVID-19 and

vaccinations that are—continue to proliferate on their platforms." *Id.* The cited White House press

conference contains no evidence that the White House threatened or pressured any social media

company to censor speech, or that any social media company regarded (or acted on) the statements

by the White House as such. Any assertion to that effect is unsupported by and contrary to the

evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

124.    Psaki also stated that President Biden "also supports better privacy protections and
a robust anti-trust program. So his view is that there's more that needs to be done to ensure that
this type of misinformation; disinformation; damaging, sometimes life-threatening information is
not going out to the American public." *Id.* She thus linked the threat of a "robust anti-trust
program" to the White House's demand that "more … needs to be done" by "the major platforms"
to prevent "misinformation" and "disinformation" from "going out to the American public," *i.e.*,
its demand for censorship. *Id.*

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Ms. Psaki as "link[ing]"

a "threat" of anti-trust enforcement to any White House "demand" for "censorship." The cited

evidence does not support this characterization. Ms. Psaki stated during the May 5, 2021, White

House press conference that the White House supports First Amendment rights and that "what the

decisions are that the social media platforms need to make is how they address the disinformation,

misinformation—especially related to life-threatening issues like COVID-19 and vaccinations that

are—continue to proliferate on their platforms." Glenn Decl. Ex. 29 at 15. The cited White House

press conference also contains no evidence that the White House threatened or pressured any social

media company to censor speech, or that any social media company regarded (or acted on) the

statements by the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

125.    The next day, May 6, 2021, Flaherty privately responded to Facebook's most recent email, badgering Facebook again for more explanations about why it was not censoring more aggressively. Regarding Nick Mr. Clegg's apology for not catching and censoring three viral posts earlier, Flaherty linked to one and noted: "For one, it's still up and seems to have gotten pretty far. And it's got 365k shares with four comments. We've talked about this in a different context, but how does something like that happen? The top post, the one from the Wisconsin news station, has 2.1 million comments." Doc. 174-1, at 41.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Mr. Flaherty as "badgering" Facebook "again" about why it was not "censoring more aggressively," and characterizes Mr. Clegg statement as an "apology" for not "catching" and "censoring" three viral posts. The cited evidence does not support this characterization. Rather, the cited email reflects that Mr. Flaherty had "two questions," one of which was whether, with respect to one of the three widest reach posts, Mr. Flaherty was "looking at one instance of sharing (so, one of the 365,000 shares) or is this genuinely a post that has been shared nearly 400,000 times but only four people commented on it." Dkt. 174-1 at 41. Mr. Flaherty asked Mr. Clegg for his "assessment of what is going on here[.]" *Id.* The cited email also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

126.    Flaherty also demanded more information about Facebook's efforts to demote "borderline" content: "Won't come as a shock to you that we're particularly interested in your demotion efforts, which I don't think we have a good handle on (and, based on the below, it doesn't seem like you do either). Not to sound like a broken record, but how much content is being demoted, and how effective are you at mitigating reach, and how quickly?" *Id.*

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Mr. Flaherty's request for information about Facebook's content moderation efforts as a "demand[]." The cited evidence

does not support this characterization. The cited email also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

127.    Flaherty then criticized Facebook's censorship efforts for vaccine-related posts in Facebook groups related to other topics: "Also, health groups: sure. But it seems more likely that anti-vax stuff is moving in groups that are not about health but are ... mom centric, or other spaces. Strikes me as the issue here is less from single-use anti-vaccine accounts and more about people who ... do other things and are also vaccine hesitant." *Id.* (ellipses in original).

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Mr. Flaherty as "criticiz[ing] Facebook's censorship efforts." The cited evidence does not support this characterization. Rather, the cited email reflects Mr. Flaherty asking a question about how Facebook's dedicated vaccine hesitancy policy operated. Dkt. 174-1 at 41. The cited email also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

128.    Flaherty tied this criticism to his criticism of Facebook's failure to censor the "Disinformation Dozen": "Seems like your 'dedicated vaccine hesitancy' policy isn't stopping the disinfo dozen - they're being deemed as not dedicated – so it feels like that problem likely carries over to groups." *Id.*

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Mr. Flaherty as criticizing Facebook's "failure to censor" the "Disinformation Dozen." The cited evidence does not support this characterization. Rather, the cited email reflects Mr. Flaherty asking a question about how Facebook's dedicated vaccine hesitancy policy operated. Dkt. 174-1 at 41. The cited email also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion

to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

129.    On May 10, 2021, Facebook sent an email to Rob Flaherty and Courtney Rowe of the White House digital team, touting its efforts to promote vaccination on its platforms. Doc. 174-1, at 46. Among other things, Facebook reported that "Since January, we've provided more than $30 million in ad credits to help governments, NGOs and other organizations reach people with COVID-19 vaccine information and other important messages." *Id.*

**RESPONSE:** Undisputed, except to note that Ms. Rowe was part of the White House COVID-19 Response Team, not the digital team. In addition, the cited email contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

130.    The next day, May 11, 2021, Flaherty responded with a one-line, snarky email stating: "Hard to take any of this seriously when you're actively promoting anti-vaccine pages in search." *Id.* He included a link to a news report about this topic on Twitter. *Id.*

**RESPONSE:** Disputed to the extent the PFOF characterizes Mr. Flaherty's response as "snarky." The cited evidence does not support this characterization. The cited email also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

131.    The next day, May 12, 2021, Facebook responded, assuring Flaherty that it had censored the accounts mentioned in the news reports: "Thanks Rob - both of the accounts featured in the tweet have been removed from Instagram entirely…. We're looking into what happened." *Id.* at 45.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Facebook's response as representing that it had "censored" the accounts mentioned in the news reports, or insinuates that

Facebook removed the account for any reason other than its own policies. The cited evidence does

not support these characterizations. Rather, Facebook explained that both of the accounts featured

in the tweet were removed from Instagram "for breaking our polices." Dkt. 174-1 at 45. The cited

email also contains no evidence that the White House threatened or pressured Facebook to censor

speech, or that Facebook regarded (or acted on) communications with the White House as such.

Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.'

PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

132.    Facebook then assured Flaherty it was working on processes to suppress disfavored
speech from search results on its platforms and remove anti-vaccine accounts: "We are continuing
to develop technology to improve the quality of search results at scale across Instagram - this is a
continual process built on new technology to address adversarial accounts…. We also remove
accounts that may discourage vaccination from search by developing and using this new
technology to find accounts on Instagram that discourage vaccines, and remove these accounts
from search altogether. We've also removed accounts that primarily discourage vaccination from
appearing where we recommend new accounts to follow, such as accounts you may like, and
suggested accounts." *Id.*

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Facebook's statement as

"assuring" Mr. Flaherty that it was working on processes to "suppress disfavored speech." The

cited evidence, concerning application of Facebook content moderation policies to which all users

agree, does not support this characterization. In addition, Plaintiff's omit the following sentence

from their quoted passage: "Our goal is to not recommend accounts likes those shown in the tweet

in the search, which again shouldn't have been on our platform to begin with." Dkt. 174-1 at 45.

The cited email also contains no evidence that the White House threatened or pressured Facebook

to censor speech, or that Facebook regarded (or acted on) communications with the White House

as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See*

Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

133.    Facebook acknowledged that its censorship efforts were not enough and promised
the White House they would increase them: "We clearly still have work to do to [sic], but wanted

to ensure you were aware of the authoritative resources we're pointing people to first as we continue investing in removing accounts from search that may discourage vaccination." *Id.*

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Facebook's actions as "censorship efforts" or that Facebook "promised" the White House anything. The cited evidence, concerning application of Facebook content moderation policies to which all users agree, does not support this characterization. The cited email also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

134.    The same day, May 12, 2021, Flaherty responded sarcastically, indicating that promoting pro-vaccine speech was not enough for the White House, which demanded the removal or deboosting of anti-vaccine speech: "Sure. They're first connected to authoritative information, but then you, as of last night, were presenting an anti-vaccine account with less than 1000 followers alongside, at level, with those pinned accounts!" *Id.* at 45.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Mr. Flaherty as responding "sarcastically," "indicating that promoting pro-vaccine speech was not enough for the White House," or that the White House "demanded" the removal of any content. The cited evidence does not support this characterization. The cited email also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

135.    Flaherty then accused Facebook of not doing enough to censor anti-vaccine content in search results and dissembling to deceive the White House: "'[R]emoving bad information from search' is one of the easy, low-bar things you guys do to make people like me think you're taking action. If you're not getting *that* right, it raises even more questions about the higher bar stuff." *Id.* at 45. Flaherty continued, accusing Facebook of dishonesty: "You say in your note that you remove accounts that discourage vaccination from appearing in recommendations (even though you're

using 'primarily' to give yourself wiggle room). You also said you don't promote those accounts in search. Not sure what else there is to say." *Id.*

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Mr. Flaherty as (1) "accusing" Facebook of "dishonesty," or not doing enough to "censor" anti-vaccine content, or (2) as accusing Facebook of "dissembling" to deceive the White House. The cited evidence does not support this characterization. The cited email also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

136.    Flaherty then compared Facebook unfavorably to other platforms to pressure them to suppress anti-vaccine content in search results: "Youtube, for their warts, has done pretty well at promoting authoritative info in search results while keeping the bad stuff off of those surfaces. Pinterest doesn't even show you any results other than official information when you search for 'vaccines.' I don't know why you guys can't figure this out." *Id.*

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Mr. Flaherty as putting "pressure" on Facebook to "suppress anti-vaccine content." The cited evidence does not support this characterization. Rather, the cited email reflects Mr. Flaherty's frustration that other social media companies were successfully promoting authoritative information in their search results while keeping harmful information off the "surface," and inquiring why Facebook was having challenges doing the same. Dkt. 174-1 at 45. The cited email also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

137.    On May 28, 2021, a senior executive of Meta sent an email to Mr. Slavitt and Murthy reporting that Facebook had expanded its censorship policies, evidently to satisfy federal officials' demands made at a recent oral meeting. The email stated that a "key point" was that

"We're expanding penalties for individual Facebook accounts that share misinformation." Doc. 71-4, at 9.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Facebook as reporting that it had expanded its "censorship" policies. Also disputed that the expansion of Facebook's terms of service was done to satisfy federal officials' "demands" at meetings, an assertion for which the PFOF does not even purport to cite evidence. Rather, the email reflects Facebook sharing with Mr. Slavitt several "policy updates" that it had publicly announced the day before, and there is no suggestion that these changes to Facebook's terms of service, to which all users agree, was done at the urging of anyone in the federal government. Dkt. 71-4 at 9. The cited email also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

**C. Flaherty's Profane Attack: "Are You Guys F\*\*king Serious?"**

138.    At some time prior to July 15, 2021, the White House's Facebook account experienced an issue that slowed its growth in followers. Doc. 174-1, at 56. On July 15, 2021, Facebook emailed a White House staffer and reported that "the technical issues that had been affecting follower growth on @potus have been resolved.... you should start to see your numbers trend back upwards.... Thanks for your patience as we investigated this." *Id.* The White House staffer asked Facebook, "Could you tell me more about the technical issues affecting audience growth?" *Id.* at 55. Facebook responded, "from what we understand it was an internal technical issue that we can't get into, but it's now resolved and should not happen again." *Id.* The White House staffer then simply added Rob Flaherty to the email chain without further comment. *Id.*

**RESPONSE:** Undisputed.

139.    The same minute he was added to the email chain, 3:29 p.m. on July 15, 2021, Flaherty exploded at Facebook: "Are you guys fucking serious? I want an answer on what happened here and I want it today." *Id.* at 55.

**RESPONSE:** Undisputed, but note that the cited email contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on)

communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

140.    Facebook immediately raced to placate Flaherty, assuring him that the problem was from a "bug in our recommendation surface" that had been resolved two months earlier. *Id.* at 55. Facebook followed up with a longer explanation stating that the President's account had been affected because Facebook "take[s] aggressive steps to reduce the spread of vaccine hesitancy and vaccine misinformation on our platforms and we deploy technology to do so. As part of our efforts on Instagram, we have measures to help ensure we don't recommend people follow accounts that promote vaccine hesitancy at scale. For two weeks in April (April 14-28) this measure was impacted by over-enforcement on a signal we used …." *Id.* at 54. In other words, the White House's Instagram account had been inadvertently swept into the net of censorship that it had insisted that Facebook impose on private speakers' accounts. Evidently the White House is not amused when its own accounts are subject to the same treatment that it demands the platforms impose on thousands of ordinary Americans whose viewpoint the White House disfavors.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes (1) Facebook's response to Mr. Flaherty's statement as "racing to placate" him; and (2) the White House as insisting that Facebook "impose" a "net of censorship" on anyone. The cited evidence does not support this characterization. In addition, the last sentence of the PFOF is an argumentative mischaracterization rather than a factual statement. Defendants respond to Plaintiffs' arguments in their opposition to Plaintiffs' preliminary injunction motion. The cited email also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

**D.    President Biden on Social-Media Platforms: "They're Killing People."**

141.    That same day, July 15, 2021, the White House held a joint press conference with Jen Psaki and Surgeon General Murthy. Dr. Murthy participated in the White House press conference with White House Press Secretary Jennifer Psaki to announce the Surgeon General's Health Advisory on Misinformation. Waldo Ex. 10. Psaki announced of Dr. Murthy that "[t]oday, he published an advisory on health misinformation as an urgent public health crisis." *Id.* at 1.

**RESPONSE:** Undisputed.

142.    Among other things, Dr. Murthy stated that "Modern technology companies have enabled misinformation to poison our information environment with little accountability to their users." *Id.* at 2.

**RESPONSE:** Undisputed, but note the cited press briefing contains no evidence that either the White House or the Surgeon General threatened or pressured any social media company to censor speech, or that any social media company regarded (or acted on) statements by the White House, or Dr. Murthy, as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF §§ II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2 (White House); Defs.' PFOF § II.B, Arg. § II.B.1.c & II.B.2 (OSG).

143.    Dr. Murthy announced: "we expect more from our technology companies. We're asking them to operate with greater transparency and accountability. We're asking them to monitor misinformation more closely. We're asking them to consistently take action against misinformation super-spreaders on their platforms." *Id.* at 3.

**RESPONSE:** Undisputed, but note that the cited press briefing contains no evidence that the White House or the Surgeon General threatened or pressured any social media company to censor speech, or that any social media company regarded (or acted on) statements by the White House or Dr. Murthy as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF §§ II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2 (White House); Defs.' PFOF § II.B, Arg. § II.B.1.c & II.B.2 (OSG).

144.    At the July 15 press conference, Dr. Murthy also demanded that the platforms do "much, much more" and "take aggressive action" against misinformation. Waldo Ex. 10, at 5.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Dr. Murthy's request as a "demand." The cited evidence does not support this characterization. Dr. Murthy stated during the press briefing that "we are asking [social media companies] to step up. We know they have taken some steps to address misinformation, but much, much more has to be done. And we can't wait longer for them to take aggressive action because it's costing people their lives." Waldo Ex. 10 at

5. The cited press briefing contains no evidence that the White House or the Surgeon General threatened or pressured any social media company to censor speech, or that any social media company regarded (or acted on) statements by the White House or Dr. Murthy as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF §§ II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2 (White House); Defs.' PFOF § II.B, Arg. § II.B.1.c & II.B.2 (OSG).

145.    Dr. Murthy also stated that platforms "have to do more to reduce the misinformation that's out there …." *Id.* at 6.

**RESPONSE:** Undisputed, but note the cited press briefing contains no evidence that the White House or the Surgeon General threatened or pressured any social media company to censor speech, or that any social media company regarded (or acted on) statements by the White House or Dr. Murthy as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

146.    At the same press conference on July 15, 2021, Jennifer Psaki stated: "we are in regular touch with these social media platforms, and those engagements typically happen through members of our senior staff, but also members of our COVID-19 team."  Waldo Ex. 10, at 10.

**RESPONSE:** Undisputed.

147.    Psaki stated: "We've increased disinformation research and tracking within the Surgeon General's office. We're flagging problematic posts for Facebook that spread disinformation." *Id.* at 10.

**RESPONSE:** Undisputed that Ms. Psaki made this statement during the July 15, 2021 press briefing, but further note that she clarified the next day that her reference to "flagging . . . problematic posts" was meant simply to reflect the Government's practice of "regularly making sure social media platforms are aware of the latest narratives dangerous to public health" and "engag[ing] with them to better understand the enforcement of social media platform policies." Ex. 37 at 6 (*Press Briefing by Press Secretary Jen Psaki*, The White House (July 16, 2021)). She

emphasized that the Government does not "take anything down" or "block anything" and that platforms themselves, as "private-sector compan[ies]," "make[] decisions about what information should be on their platform[s]." *Id.* In addition, the cited press briefing contains no evidence that the White House threatened or pressured any social media company to censor speech, or that any social media company regarded (or acted on) the White House's statements as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

148.    Regarding the Administration's "asks" to social-media platforms, Psaki stated: "There are also proposed changes that we have made to social media platforms, including Facebook, and those specifically are four key steps: One, that they measure and publicly share the impact of misinformation on their platform. Facebook should provide, publicly and transparently, data on the reach of COVID-19 — COVID vaccine misinformation. Not just engagement, but the reach of the misinformation and the audience that it's reaching." *Id.* at 11.

**RESPONSE:** Undisputed, but note that the cited press briefing contains no evidence that the White House threatened or pressured any social media company to censor speech, or that any social media company regarded (or acted on) the White House's statements as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

149.    Psaki also stated: "Second, that we have recommended — proposed that they create a robust enforcement strategy that bridges their properties and provides transparency about the rules. So, about — I think this was a question asked before — there's about 12 people who are producing 65 percent of anti-vaccine misinformation on social media platforms. All of them remain active on Facebook, despite some even being banned on other platforms, including Facebook — ones that Facebook owns." Waldo Ex. 10, at 11.

**RESPONSE:**  Undisputed, but note that the cited press briefing contains no evidence that the White House threatened or pressured any social media company to censor speech, or that any social media company regarded (or acted on) the White House's statements as such. Any assertion

to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

150.    Psaki stated: "Third, it's important to take faster action against harmful posts. As you all know, information travels quite quickly on social media platforms; sometimes it's not accurate. And Facebook needs to move more quickly to remove harmful, violative posts — posts that will be within their policies for removal often remain up for days. That's too long. The information spreads too quickly." *Id.* at 11.

RESPONSE: Undisputed, but note that the cited press briefing contains no evidence that the White House threatened or pressured any social media company to censor speech, or that any social media company regarded (or acted on) the White House's statements as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

151.    And Psaki stated, publicly criticizing Facebook: "Finally, we have proposed they promote quality information sources in their feed algorithm. Facebook has repeatedly shown that they have the levers to promote quality information. We've seen them effectively do this in their algorithm over low-quality information and they've chosen not to use it in this case. And that's certainly an area that would have an impact." Waldo Ex. 10, at 11.

RESPONSE: Disputed to the extent the PFOF mischaracterizes Ms. Psaki's comments as "criticizing" Facebook. The cited evidence does not support this characterization. The cited press briefing contains no evidence that the White House threatened or pressured any social media company to censor speech, or that any social media company regarded (or acted on) the White House's statements as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

152.    Psaki concluded: "So, these are certainly the proposals. We engage with them regularly and they certainly understand what our asks are." *Id.* at 11.

RESPONSE: Undisputed, but note that the cited press briefing contains no evidence that the White House threatened or pressured any social media company to censor speech, or that any social media company regarded (or acted on) the White House's statements as such. Any assertion

to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

153.    The next day, July 16, 2021, President Biden stated of Facebook and other platforms that "they're killing people" by failing to censor enough misinformation: "Mr. Biden was asked what his message was to social media platforms when it came to Covid-19 disinformation. 'They're killing people,' he said. 'Look, the only pandemic we have is among the unvaccinated, and that — and they're killing people.'"  Glenn Decl. Ex. 33, at 1; Doc. 10-1, at 436.

**RESPONSE:** Undisputed that President Biden made the quoted statement on July 16, 2021, in response to a question from a reporter, but dispute that he was referring to a failure by social-media companies "to censor enough misinformation" as unsupported by the cited evidence. Defendants refer the Court to the transcript of this exchange, rather than the journalistic characterizations cited by Plaintiffs. *See* Ex. 45 at 2 (transcript). Further note that President Biden clarified this statement three days later. *See* Ex. 43 (transcript). He explained that he had just read that twelve individuals were responsible for sixty percent of misinformation concerning COVID-19 vaccines—a statistic advanced by the non-profit Center for Countering Digital Hate—and clarified that "Facebook isn't killing people. These twelve people are out there giving misinformation. Anyone listening to it is getting hurt by it. *It's* killing people." *Id.* at 2 (emphasis added). He further said, "[m]y hope is that Facebook, instead of taking [the comment] personally that somehow I'm saying Facebook is killing people . . . would do something about the misinformation," thus repeating his message that social media companies—like every other sector in society—ought to do more to curb the harmful spread of misinformation on their platforms. *Id.* at 2-3. The cited comment from President Biden contains no evidence that he threatened or pressured any social media company to censor speech, or that any social media company regarded (or acted on) his statements as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

154.    President Biden's statement came after "weeks" of pressuring Facebook to give federal officials access to Facebook's internal data: "White House officials … singled out social media companies for allowing false information to proliferate. That came after weeks of failed attempts to get Facebook to turn over information detailing what mechanisms were in place to combat misinformation about the vaccine, according to a person familiar with the matter."  *Id.*

**RESPONSE:** Disputed. The PFOF is contradicted by the evidence. Federal officials did not "pressure" Facebook or any other social media company to do anything. *See* Defs' Resp. to PFOF ¶¶ 33-153; Defs' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2. Even the cited commentary (from a New York Times article) referred to the White House's contacts with Facebook only as "attempts" to obtain more detailed information from the company. This PFOF contains no evidence that the White House threatened or pressured any social media company to censor speech, or that any social media company regarded (or acted on) the White House's statements as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

155.    Surgeon General Murthy had been directly involved in those meetings with Facebook, including "tense" meetings and a meeting where he "angrily" demanded that Facebook do more to censor misinformation. *Id.* at 437.

**RESPONSE:** Disputed. *See* Declaration of Max Lesko, Chief of Staff, Off. of the Surgeon Gen. ¶ 13 ("Lesko Decl.") (Ex. 63). This PFOF contains no evidence that the White House or Dr. Murthy threatened or pressured any social media company to censor speech, or that any social media company regarded (or acted on) statements by the White House or Dr. Murthy as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

156.    When the President stated, "They're killing people," Psaki reinforced the same message: "'Our point is that there is information that is leading to people not taking the vaccine, and people are dying as a result,' Jen Psaki, the White House press secretary, said before Mr. Biden made his comments. 'And we have responsibility as a public health matter to raise that issue.'" *Id.* at 436.

**RESPONSE:** Disputed. The quoted language is accurate, but the PFOF argumentatively

mischaracterizes the President and Ms. Psaki's statements as being related or "reinforc[ing]" a

particular message. Further disputed to the extent that the quoted language omits critical context:

Ms Psaki said, "**We don't take anything down. We don't block anything. Facebook and any

private-sector company makes decisions about what information should be on their

platform.** Our point is that there is information that is leading to people not taking the vaccine,

and people are dying as a result. And we have a responsibility, as a public health matter, to raise

that issue. **The responsibility we all have — the government, media platforms, public

messengers — to give accurate information**." Ex. 37 at 12 (emphasis added). Note also that the

cited article contains no evidence that the White House threatened or pressured any social media

company to censor speech, or that any social media company regarded (or acted on) the White

House's statements as such. Any assertion to that effect is unsupported by and contrary to the

evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

157.    That same day, July 16, 2021, at a White House press conference, Psaki stated that
"we're in regular touch with social media platforms … about areas where we have concern. …
[W]e are … regularly making sure social media platforms are aware of the latest narratives
dangerous to public health that we and many other Americans seeing — are seeing across all of
social and traditional media. And we work to engage with them to better understand the
enforcement of social media platform policies."  Glenn Decl. Ex. 34, at 6; Doc. 10-1, at 444.

**RESPONSE:** Undisputed, but note that the PFOF fails to contain the full quotation for

context. Ms. Psaki stated during the July 16, 2021 press briefing that "Well, I would say first, it

shouldn't come as any surprise that we are in regular touch with social media platforms—just like

we're in regular touch with all of you  and your media outlets—about areas where we have concern,

information that might be useful, information that may or may not be interesting to your viewers."

Glenn Decl. Ex. 34, at 6. She continued: "You all make decisions, just like the social media

platforms make decisions, even though they're a private-sector company and different, but just as

an example." *Id.* The cited press briefing contains no evidence that the White House threatened or

pressured any social media company to censor speech, or that any social media company regarded

(or acted on) the White House's statements as such. Any assertion to that effect is unsupported by

and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

158.   Psaki then described a "false narrative that remains active  … flowing on the
internet quite a bit, in other places as well," and stated, "we want to know that the social media
platforms are taking steps to address it. That is inaccurate, false information… And that is an
example of the kind of information that we are flagging or raising."  Glenn Decl. Ex. 34, at 7; Doc.
10-1, at 445.

**RESPONSE:** Undisputed but note that the PFOF fails to contain the full quotation for

context. Ms. Psaki stated during the July 16, 2021 press briefing that "So let me give you an

example, just to illustrate it a little bit. The false narrative that remains active out there about

COVID-19 vaccines causing infertility—something we've seen out there, flowing on the internet

quite a bit, in other places as well—which has been disproven time and time again. This is

troubling, but a persistent narrative that we and many have seen, and we want to know that the

social media platforms are taking steps to address it. That is inaccurate, false information. If you

are a parent, you would look at that information and then that would naturally raise concerns, but

it's inaccurate. And that is an example of the kind of information that we are flagging or raising."

Glenn Decl. Ex. 34, at 7. The cited press briefing contains no evidence that the White House

threatened or pressured any social media company to censor speech, or that any social media

company regarded (or acted on) the White House's statements as such. Any assertion to that effect

is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1

& II.B.1.b & II.B.2.

159.   Psaki also demanded additional "steps" "for Facebook or other platforms,"
including "to measure and publicly share the impact of misinformation on their platform and the
audience it's reaching, also with the public."  *Id.*

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Ms. Psaki as making "demands" to Facebook or other platforms. The cited evidence does not support this characterization. As reflected in the transcript of the press briefing, Ms. Psaki stated: "Well, I think, as I noted yesterday . . . there are more steps that everyone can take. And I would just note, again, this is a responsibility of officials speaking, of course, on behalf of government; it's the responsibility of members of the media; it's the responsibility of citizens and civic leaders and people who are trusted voices in communities around the country. That has a broad definition. Social media platforms is one of them." Glenn Decl. Ex. 34, at 7. She further stated: "So a couple of the steps that we have—you know, that could be constructive for the public health of the country we are providing for—for Facebook or other platforms to measure and publicly share the impact of misinformation on their platforms and the audience it's reaching, also with the public, with all of you to create robust enforcement strategies that bridge their properties and provide transparency about rules." *Id.* The cited press briefing contains no evidence that the White House threatened or pressured any social media company to censor speech, or that any social media company regarded (or acted on) the White House's statements as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

160.    She called on the platforms "to create robust enforcement strategies that bridge their properties and provide transparency about rules." *Id.* She stated that platforms should coordinate on censoring disfavored speakers: "You shouldn't be banned from one platform and not others if you — for providing misinformation out there." *Id.*

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Ms. Psaki as suggesting that social media platforms should "coordinate on censoring disfavored speakers." The cited evidence does not support this characterization. The cited press briefing contains no evidence that the White House threatened or pressured any social media company to censor speech, or that any social media company regarded (or acted on) the White House's statements as such. Any assertion

to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

161.    Psaki also stated that the platforms should be "[t]aking faster action against harmful posts. As you all know, information travels quite quickly. If it's up there for days and days and days when people see it, you know, there's — it's hard to put that back in a box."   Glenn Decl. Ex. 34, at 8; Doc. 10-1, at 446.

**RESPONSE:** Undisputed but note that the cited press briefing contains no evidence that the White House threatened or pressured any social media company to censor speech, or that any social media company regarded (or acted on) the White House's statements as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

162.    Psaki was asked whether the censorship Facebook was already doing, which included "remov[ing] 18 million pieces of COVID misinformation" and "connect[ing] more than 2 billion people to reliable information," was "sufficient," and she responded, "Clearly not, because we're talking about additional steps that should be taken."   *Id.*

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Facebook's application of its terms of service, to which all users agree, as "censorship." In addition, Ms. Psaki added: "Obviously, those are steps they have taken. They're a private-sector company. They're going to make decisions about additional steps they can take. It's clear there are more that can be taken." Glenn Decl. Ex. 34, at 8; Dkt. 10-1, at 446. The cited press briefing contains no evidence that the White House threatened or pressured any social media company to censor speech, or that any social media company regarded (or acted on) the White House's statements as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

163.    "[A] few hours after Biden's comment" that social-media platforms are "killing people" by not censoring misinformation, "Twitter suspended [Alex Berenson's] account for the first time."   Jones Decl., Ex. J, at 3. Later, on August 28, 2021, Twitter permanently deplatformed Berenson. *Id.*

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes President Biden's statement as accusing social-media platforms of "killing people," *see* Resp. to Pls.' PFOF ¶ 154; mischaracterizes the President's statement as advocating for "censoring" misinformation; and insinuates that Mr. Berenson's temporary suspension from Twitter had anything to do with President Biden's statement. The cited evidence does not support these characterizations and assumptions. In addition, Twitter did not "permanently deplatform[ ]" Mr. Berenson. As he acknowledges in the cited document, Twitter restored his account in December 2021. Jones Decl., Ex. J, at 3. Apart from the timing, there is no record evidence that Twitter suspended his account in response to the President's comments. There is no evidence to support the inferences that (i) those responsible for content moderation at Twitter were aware of the President's statement at the time Twitter suspended Mr. Berenson's account; (ii) Twitter would have reacted to the President's statement about a different platform (Facebook); or (iii) Twitter's reaction would have been to suspend Berenson's account, particularly considering that he was not referenced by the President. To the contrary, the record demonstrates that Twitter's staff responsible for "implementation of [its[ rules" was "cordoned off" from the Twitter staff who would have been made aware of the President's statement or any subsequent communication about it with the White House (which, in any event, is absent from the record). *See* Ex. 10 at 2 (*Protecting Speech from Government Interference & Social Media Bias, Part 1:  Twitter's Role in Suppressing the Biden Laptop Story: Hearings Before the H. Comm. on Oversight & Accountability*, 118th Cong.  (2023) (opening statement of Yoel Roth, Former Head of Trust & Safety, Twitter, Inc.)).

164.    Four days later, July 20, 2021, the White House explicitly threatened to amend or repeal the liability protections of § 230 of the Communications Decency Act if social-media companies did not increase censorship of disfavored speakers and viewpoints. Glenn Decl. Ex. 35; Doc. 10-1, at 474-75  -  *'They Should Be Held Accountable': White House Reviews Platforms' Misinformation Liability*, USA Today (July 20, 2021), *at*  https://www.usatoday.com

/story/news/politics/2021/07/20/white-house-reviews-section-230-protections-covid-misinform
ation/8024210002/. The White House communications director, Kate Bedingfield, announced that
"[t]he White House is assessing whether social media platforms are legally liable for
misinformation spread on their platforms." *Id.* "We're reviewing that, and certainly, they should
be held accountable," she said. *Id.*

   **RESPONSE:** Disputed to the extent the PFOF mischaracterizes the White House as

"explicitly threatening to amend or repeal" Section 230 "if social-media companies did not

increase censorship of disfavored speakers and viewpoints." The cited evidence does not support

that characterization. Ms. Bedingfield was asked on the television news program Morning Joe

what the Biden Administration plans to do about COVID-19 misinformation on social media. Ms.

Bedingfield explained that the "most important" thing was for people to obtain information from

trusted sources like their doctors, but with respect to social media platforms, "we all have a

responsibility here," including platforms and "news outlets." Ex. 46 at 3-5 (Interview by Mika

Brzezinski with Kate Bedingfield, Commc'ns Dir., White House, in Washington, D.C. 4 (July 20,

2021)) (interview transcript). The interviewer followed up by asking Ms. Bedingfield whether

President Biden would support amending Section 230 so that the platforms could no longer rely

on its legal protection. *Id.* Bedingfield answered, "[w]ell, we're reviewing that," before noting that

the President had emphasized that "the people creating the content" are responsible for it. *Id.* at 5-

6. As Ms. Bedingfield explained, "[i]t is a big and complicated ecosystem, and everybody bears

responsibility to ensure that we are not providing people with bad information about a vaccine that

will save their lives." *Id.* at 6. Ms. Bedingfield did not threaten any action or make any demands

during this interview.

   165.   The White House communications director "specified the White House is
examining how misinformation fits into the liability protections granted by Section 230 of the
Communications Decency Act, which shields online platforms from being responsible for what is
posted by third parties on their sites." *Id.*

**RESPONSE:** Undisputed that this PFOF accurately quotes the *USA Today* article, but disputed on the ground that the PFOF relies on hearsay and journalistic characterization of the interview rather than evidence of record. Defendants refer the Court to review the interview transcript, available at Ex. 46, and Defendants' response to PFOF ¶ 164. Defendants further note that the cited article quotes the White House Press Secretary, Jen Psaki, as stating: "The White House has not asked Facebook to take down any individual social media post," and that "[i]t's up to social media platforms to determine what their application is of their own rules and regulations." The cited article contains no evidence that the White House threatened or pressured any social media company to censor speech, or that any social media company regarded (or acted on) the White House's statements as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

166.    Media reported that, in connection with this threat, "Relations are tense between the Biden administration and social media platforms, specifically Facebook, over the spread of misinformation online." *Id.*; *see also, e.g.,* Glenn Decl. Ex. 36; Doc. 10-1, at 477-81: *White House says social media networks should be held accountable for spreading misinformation*, CNBC.com (July 20, 2021), *at* https://www.cnbc.com/2021/07/20/white-house-social-networks-should-be-held-accountable-for-spreading-misinfo.html.

**RESPONSE:** Disputed on the ground that the first sentence is based on hearsay and journalistic characterization rather than evidence of record. Also disputed to the extent the PFOF suggests that any tensions between the Biden Administration and social media companies were caused by an alleged "threat" concerning Section 230. The cited evidence does not support this characterization. First, Ms. Bedingfield did not make any threats concerning section 230. *See* Defs' Resp. to PFOF ¶ 164. Second, the article reports that relations were tense between the Biden Administration and social media platforms over the spread of misinformation online, not because of the Administration's statements concerning Section 230. Glenn Decl. Ex. 36, at 1; Dkt. 10-1 at 477. The cited article contains no evidence that the White House threatened or pressured any social

media company to censor speech, or that any social media company regarded (or acted on) the

White House's statements as such. Any assertion to that effect is unsupported by and contrary to

the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

167.    When "asked … whether these companies should be held liable for publishing false information that causes people harm, Kate Bedingfield said the administration is reviewing policies. That could include amending the Communications Decency Act, or Section 230 of the act. 'We're reviewing that and certainly they should be held accountable,' Bedingfield said. 'And I think you heard the president speak very aggressively about this. He understands that this is an important piece of the ecosystem.'" *Id.* at 478.

**RESPONSE:** Disputed on the ground that this PFOF is based on hearsay and journalistic

characterization rather than evidence of record. Defendants refer the Court to review the transcript

of Ms. Bedingfield's interview, available at Ex. 46. Defendants further note that the cited article

contains no evidence that the White House threatened or pressured any social media company to

censor speech, or that any social media company regarded (or acted on) the White House's

statements as such. Any assertion to that effect is unsupported by and contrary to the evidence as

a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

168.    The same day, Tuesday, July 20, 2021, Clarke Humphrey of the White House communications office emailed Facebook asking for the removal of an Instagram account associated with Dr. Fauci, saying it "is not actually one of ours." Fauci Ex. 57, at 1-2. Facebook responded one minute later, stating, "Yep, on it!" Fauci Ex. 57, at 1. The next day, Facebook responded again, stating, "This account has been removed. Thank you for flagging!" *Id.*

**RESPONSE:** Undisputed, but note that Facebook acknowledged that "[i]t's definitely a

fake account." Fauci Ex. 57, at 1. Fake accounts violate Facebook's terms of service, to which all

users agree. *See* Ex. 56 (*Account Integrity & Authentic Identity*, Meta, https://perma.cc/DCR9-

9FBY). In addition, posts that improperly impersonate federal officials potentially constitute

federal crimes. *See* 18 U.S.C. § 912 ("Whoever falsely assumes or pretends to be an officer or

employee acting under the authroirty of the United States or any department, agency or officer

thereof, and acts as such . . . shall be fined under this title or imprisoned not more than three years,

or both."). Further note that Mr. Humphrey was on the White House COVID-19 Response Team; he was not a member of the Communications Office. Moreover, this PFOF contains no evidence that the White House threatened or pressured any social media company to censor speech, or that any social media company regarded (or acted on) the White House's statements as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

### E. The Social-Media Platforms Are Cowed into Collusion on Censorship.

169.    The threats and public pressure on July 15 and 16—including the President's comment, "they're killing people"—got immediate results, as Facebook scrambled to assuage the White House's wrath and accede to all its censorship demands.

**RESPONSE:** Disputed. This PFOF lacks citation to or support in the evidence of record, including for the claim that "threats" and "public pressure" regarding "censorship demands," of White House "wrath," that Facebook "immediate[ly]" "scrambled to assuage the White House[]" and "accede" to its "demands," or the contention that social media companies took any particular action based on any statement by the White House, or any other Defendants. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

170.    After this series of public statements, responding to "White House pressure," Facebook censored the accounts of the 12 specific disfavored speakers whom Psaki accused of spreading health misinformation. Glenn Decl. Ex. 37; Doc. 10-1, at 483-85: *Facebook takes action against 'disinformation dozen' after White House pressure*, CNN.com (Aug. 18, 2021), *at* https://www.cnn.com/2021/08/18/tech/facebook-disinformation-dozen/index.html. Psaki had "hammered the platform in July for allowing the people identified in the report to remain on its platform." *Id.* at 483. After they were singled out for censorship by the White House, Facebook "removed over three dozen Pages, groups and Facebook or Instagram accounts linked to these 12 people, including at least one linked to each of the 12 people, for violating our policies." *Id.*

**RESPONSE:** Disputed on the ground that this PFOF is based on hearsay and journalistic characterization rather than evidence of record. Also disputed o the extent the PFOF

94

mischaracterizes the White House as "singl[ing] out" "disfavored speakers" for "censorship," or Facebook as "responding to pressure" or "censoring" accounts. The cited evidence does not support these characterizations. Rather, the record reflects that more than a month after the White House press briefings, Facebook removed certain posts for violating its content moderation policies, to which every user agrees as part of the company's terms of service. Facebook explained that "[a]ny amount of COVID-19 vaccine misinformation that violates our policies is too much by our standards—and we have removed over three dozen Pages, groups and Facebook or Instagram accounts linked to these 12 people, including at least one linked to each of the 12 people, for violating our policies." Pls. Decl., Ex. 37 (Dkt. 10-1 at 483). Facebook also explained that it was not completely banning the "Disinformation Dozen" from its platform because the content did not always violate its content moderation policies: "the remaining accounts associated with these individuals are not posting content that breaks our rules[.]" *Id.* The article further notes that the "Disinformation Dozen" was initially identified in March 2021 by the nonprofit Center for Countering Digital Hate, which "called on Facebook to shut down pages operated by these people." *Id.* The cited article contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

171.    Other platforms responded to the pressure as well, as Twitter suspended Alex Berenson within a few hours of President Biden's July 16 comments and deplatformed him Berenson on August 28, 2021. Jones Decl., Ex. J, at 3.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Defendants as "pressuring" anyone, that other platforms "responded" to the alleged pressure, or that Twitter's decision to suspend Mr. Berenson was the result of statements made by Defendants. The cited

evidence does not support that characterization. *See* Defs' Resp. to PFOF ¶ 163. The cited

document contains no evidence that the White House threatened or pressured Twitter to censor

speech, or that Twitter regarded (or acted on) communications with the White House as such. Any

assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF

§ II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

172.    On July 17, 2021, another Facebook official sent an email to Anita B. Dunn, the political strategist and Senior Advisor to the President in the White House, begging for assistance in getting back into the White House's good graces. Doc. 174-1, at 49. The Facebook official, who evidently had a prior relationship with Dunn, wrote: "Would love to connect with you on the President's comments on Covid misinfo and our work there. Really could use your advice and counsel on how we get back to a good place here. … As I hope you know, we've been doing a significant amount of work to … fight the misinfo … Obviously, yesterday things were pretty heated, and I'd love to find a way to get back to pushing together on this - we are 100% on the same team here in fighting this and I could really use your advice."  *Id.* Dunn looped in Rob Flaherty to schedule a call. *Id.* at 48. Facebook then wrote: "Thanks Anita, and thanks Rob. I appreciate the willingness to discuss. We'd love to find a way to get things back to a productive conversation." *Id.* Facebook also noted, with a similarly conciliatory tone: "We had a conversation with the Surgeon General's office yesterday to discuss the advisory in more detail and hope to continue to work to address concerns."  *Id.*

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Facebook as "begging" or

seeking to "get[] back into the White House's good graces." The cited document does not support

that characterization. The cited document contains no evidence that the White House threatened

or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications

with the White House as such. Any assertion to that effect is unsupported by and contrary to the

evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

173.    The next Monday, July 19, 2021, YouTube emailed Flaherty to announce "a few new ways in which we are making it easier for people to find authoritative information on health topics on YouTube."  *Id.* at 51-2. On July 20, 2021, Flaherty responded, linking to a Tweet of "borderline" content and stating, "I'm curious: Saw this tweet. [Linking the Tweet]. I think we had a pretty extensive back and forth about the degree to which you all are recommending anti-vaccination content. You were pretty emphatic that you are not. This seems to indicate that you are. What is going on here?"  *Id.* at 51.

**RESPONSE:** Undisputed but further note that the cited email contains no evidence that the White House threatened or pressured YouTube to censor speech, or that YouTube regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

174.    YouTube responded by assuring Flaherty that it "reduce[s]" the recommendation of anti-vaccine speech even when it does not violate YouTube's policies: "it is important to keep in mind that borderline content accounts for a fraction of 1% of what is watched on YouTube in the United States. We use machine learning to reduce the recommendations of this type of content, including potentially harmful misinformation. In January 2019, we announced changes to our recommendations systems to limit the spread of this type of content which resulted in a 70% drop in watchtime on non-subscribed recommended content in the U.S. and our goal is to have views of nonsubscribed, recommended borderline content below 0.5%." *Id.* at 51.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes YouTube as "assuring" the White House that it reduces recommendations for speech that did not violate its policies. The cited email does not support that characterization. Rather, the YouTube employee expressly mentioned borderline content, Dkt. 174-1, at 51, which is subject to moderation under YouTube's policies, *see* Ex. 24 (announcing, in 2019, that YouTube would start moderating borderline content). The cited email contains no evidence that the White House threatened or pressured YouTube to censor speech, or that YouTube regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

175.    This was not enough for Flaherty, who demanded more information: "I see that's your goal - what is the actual number right now?"  *Id.* at 50. YouTube responded that it would check for more information, and stated: "Per our COVID-19 medical misinformation policy, we will remove any content that contradicts local health authorities' or the World Health Organization's (WHO) medical information about COVID-19. To date, approximately 89% of videos removed for violations of this policy were removed with 100 views or less. With regards to the specific videos you referenced, the content was not in violation of our community guidelines." *Id.* at 50.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Mr. Flaherty's follow-up question as a "demand." The cited email does not support that characterization. The cited email contains no evidence that the White House threatened or pressured YouTube to censor speech, or that YouTube regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

176.    Flaherty responded, expressing surprise that YouTube was not censoring the disfavored content: "So this actually gets at a good question - the content [that the Tweet] points out isn't defined as 'borderline' and therefore isn't subject to recommendation limitations?" *Id.*

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes YouTube (or Facebook) of "assuring" Mr. Flaherty of anything. Neither the cited email nor evidence cited by any other PFOF supports that characterization. Rather, the cited email reflects YouTube's explaining to Mr. Flaherty how its policies and guidelines operate, including those related to borderline content. Dkt. 174-1 at 50. The cited email contains no evidence that the White House threatened or pressured YouTube to censor speech, or that YouTube regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

177.    YouTube, like Facebook before it, assured Flaherty that it would "limit the visibility" and "reduce the spread" such content, even though it does not violate YouTube's policies: "the content was not in violation of our policies and therefore not subject to removal. But for all content on YouTube, we apply our 4R framework we have previously described to raise authoritative voices while reducing visibility on borderline content. External evaluators use these guidelines which are then used to inform our machine learning systems that limits the spread of borderline content." *Id.* at 50.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes YouTube (or Facebook) of "assuring" Mr. Flaherty of anything. Neither the cited email nor evidence cited by any other PFOF supports that characterization. Rather, the cited email reflects YouTube's explaining to Mr.

Flaherty how its policies and guidelines operate, including those related to borderline content. Dkt.

174-1 at 50. The cited email contains no evidence that the White House threatened or pressured

YouTube to censor speech, or that YouTube regarded (or acted on) communications with the

White House as such. Any assertion to that effect is unsupported by and contrary to the evidence

as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

178.    On October 28, 2021, the same day as a Washington Post article about Facebook
employee Frances Haugen's allegations about misinformation on Facebook, Rob Flaherty emailed
Brian Rice of Facebook a hyperlink to the article. The only text in the email was the subject line,
which stated: "not even sure what to say at this point."  Waldo Ex. 35, at 1-2; *see also infra.*

**RESPONSE:** Undisputed but note that the PFOF lacks context. Before the email

referenced in this PFOF, Mr. Flaherty had engaged with Facebook employees to understand their

policies concerning misinformation and disinformation, how those policies are enforced on the

platform. *See* Ex. 36 at 62 (Flaherty Rog. Resps.). For example, Mr. Flaherty had been asking

Facebook employees for more transparent information about their algorithms and how they were

promoting misinformation or disinformation and had raised questions about research from the

Center for Countering Digital Hate (CCDH) indicating that a small number of users were

responsible for a significant percentage of COVID-19 vaccine-related misinformation spreading

on social media platforms, including Facebook. *Id.* In response to Mr. Flaherty's inquiries,

Facebook informed him that although misinformation and disinformation was a problem it was

taking proactive steps to address, Facebook did not share Mr. Flaherty's concerns about the scope

of the problem on Facebook, and it disputed the CCDH research. *Id.* Mr. Flaherty understood the

referenced Washington Post article to indicate that Facebook was doing more intensive internal

research into the problem of misinformation and disinformation than they had revealed in

Facebook's conversations with him, and that this research had confirmed that a small number of

users were responsible for a significant percentage of COVID-19 vaccine-related misinformation

spreading on Facebook. *Id.* The email referenced in this PFOF reflects Mr. Flaherty conveying his frustration to Facebook employees who had reportedly been less than transparent with him and the broader public about their full understanding of the problem of misinformation and disinformation on the platform. *Id.* The cited email contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

179.    On November 4, 2021, Meta reported to Rowe, Flaherty, and other White House officials that "we updated our misinformation policies for COVID-19 vaccines to make clear that they apply to claims about children…."  Doc. 71-3, at 15.

**RESPONSE:** Undisputed but note for context that Meta explained that this update to its misinformation policies concerning children was the result of the FDA and CDC having approved of vaccines for children. Dkt. 71-3 at 15. The cited email contains no evidence that the White House threatened or pressured Meta to censor speech, or that Meta regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

180.    On November 30, 2021, Christian Tom of the White House emailed Twitter stating, "Would you mind looking at this video and helping us with next steps to put a label or remove it?" Doc. 174-1, at 65. He included a link to a Tweet of an unflattering, comedic video of First Lady Jill Biden reading to children, which had been clearly edited to make it sound as if she was profanely heckled while reading to them. *Id.* The subject line of the message was "Doctored video on Twitter of the First Lady."  *Id.* Twitter responded within six minutes: "Happy to escalate with the team for further review from here."  *Id.*

**RESPONSE:** Dispute characterization that the video had been "clearly edited" as unsupported by the cited evidence. Disputed also to the extent this PFOF argumentatively mischaracterizes the video in question as "comedic." Twitter did not indicate in the cited evidence (either the e-mail exchange or the Twitter "event page") that the video was deemed "comedic."

Defendants further note for context that this email chain reflects the White House staffer requesting that Twitter consider the application of its terms of service, to which all users agree, to the doctored video it had identified. Dkt. 174-1 at 58-65. The cited email contains no evidence that the White House threatened or pressured Twitter to censor speech, or that Twitter regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

181.    That evening, Twitter emailed back, stating, "Update for you - The team was able to create this event page for more context and details."  *Id.* at 64. The "event page" explained the context of the parody video but did not censor it; it alerted users that the video had been edited for "comedic" effect. *See A video of first lady Jill Biden reading to children was manipulated to include profanity, according to fact-checkers*, TWITTER (Nov. 30, 2021), https://twitter.com/i/events/1465769009073123330.

**RESPONSE:** Disputed to the extent this PFOF argumentatively mischaracterizes the video in question as "comedic." Twitter did not indicate in the cited evidence (either the e-mail exchange or the Twitter "event page") that the video was deemed "comedic." Further, note that the content that this email chain reflects the White House staffer requesting that Twitter consider the application of its terms of service, to which all users agree, to the doctored video it had identified. Dkt. 174-1 at 58-65. The cited email contains no evidence that the White House threatened or pressured Twitter to censor speech, or that Twitter regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

182.    Christian Tom promptly emailed back, asking that Twitter actually censor the comedic video, not just provide an event page explaining that it was comedic: "Will you apply the 'Manipulated Media' disclaimer to the video asset itself?"  Doc. 174-1, at 64.

**RESPONSE:** Disputed to the extent this PFOF argumentatively mischaracterizes the video in question as "comedic." Twitter did not indicate in the cited evidence (either the e-mail exchange or the Twitter "event page") that the video was deemed "comedic." Further disputed to the extent

the PFOF mischaracterizes Mr. Tom as asking Twitter to "censor" the video. The cited email does

not reflect that characterization. Rather, this email chain reflects the White House staffer

requesting that Twitter consider the application of its terms of service, to which all users agree, to

the doctored video it had identified. Dkt. 174-1 at 58-65. The cited email contains no evidence that

the White House threatened or pressured Twitter to censor speech, or that Twitter regarded (or

acted on) communications with the White House as such. Any assertion to that effect is

unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 &

II.B.1.b & II.B.2.

183.    The next morning, December 1, 2021, Tom emailed Twitter again, arguing that
Twitter should apply a label to the video under its content-moderation policies: "Just wanted to
follow-up here. It looks like from the rubric that this fits the first two criteria, which means it is
'likely' to be labeled:" and linking Twitter's "manipulated media" policy. *Id.* at 63-4.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Mr. Tom as "arguing"

with Twitter to apply its content moderation policy. The cited email does not reflect that

characterization. Rather, this email chain reflects the White House staffer requesting that Twitter

consider the application of its terms of service, to which all users agree, to the doctored video it

had identified. Dkt. 174-1 at 58-65. The cited email contains no evidence that the White House

threatened or pressured Twitter to censor speech, or that Twitter regarded (or acted on)

communications with the White House as such. Any assertion to that effect is unsupported by and

contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

184.    Twitter wrote back the same morning, explaining that the comic, parody video of
Jill Biden was not subject to labeling under its policy because it was not likely to cause harm, but
noting again that Twitter had created a special page to explain that the video was edited: "After
escalating this to our team, the Tweet and video referenced will not be labeled under our synthetic
and manipulated media policy. Although it has been significantly altered, the team has not found
it to cause harm or impact public safety. The team was able to create this Twitter Moment (here)
and event page for more context and details." *Id.* at 63.

**RESPONSE:** Disputed to the extent this PFOF argumentatively mischaracterizes the video in question as "parody" and "comic." Twitter did not indicate in the cited evidence (either the e-mail exchange or the Twitter "event page") that the video was deemed "parody" or "comic" under their rules. Further, note for context that this email chain reflects the White House staffer requesting that Twitter consider the application of its terms of service, to which all users agree, to the doctored video it had identified. Dkt. 174-1 at 58-65. The cited email contains no evidence that the White House threatened or pressured Twitter to censor speech, or that Twitter regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

185.    The same day, Christian Tom emailed back, disputing Twitter's interpretation of its own content-moderation policy and looping in Michael DeRosa, the First Lady's press secretary. *Id.* Michael DeRosa then emailed as well, disputing and demanding information about Twitter's application of its own policy. *Id.* at 62. Tom and DeRosa continued to press Twitter for further explanation and action on December 9, 13, and 17. *Id.* at 60-61. Twitter provided another, more detailed explanation of its decision on December 17. *Id.* at 59-60. Tom emailed back the same day, again disputing Twitter's application of its own policy and pressing Twitter again on the issue. *Id.* at 58-59. He added Rob Flaherty to the email chain for the first time. *Id.* at 58.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Mr. Tom as "disputing" Twitter's interpretation of its content moderation policy rather than simply asking for clarification concerning how Twitter applies its policy. In addition, disputed to the extent the PFOF mischaracterizes Mr. DeRosa as "disputing and demanding" information about Twitter's content moderation policy, and as "press[ing]" Twitter (together with Mr. Tom) for information. The cited email chain does not support those characterizations. The cited email does not reflect that characterization. Rather, this email chain reflects the White House staffer requesting that Twitter consider the application of its terms of service, to which all users agree, to the doctored video it had identified. Dkt. 174-1 at 58-65. The email chain further reflects the White House staffers

asking questions to seek to understand how Twitter applies its content moderation policy. *Id.* The cited email contains no evidence that the White House threatened or pressured Twitter to censor speech, or that Twitter regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

186.   Nine minutes later, on December 17, 2021, Flaherty wrote to Twitter, angrily accusing Twitter of dishonestly misapplying its own policies: "New to the thread here, but this all reads to me like you all are bending over backwards to say that this isn't causing confusion on public issues. If the AP deems it confusing enough to write a fact check, and you deem it confusing enough to create an event for it, how on earth is it not confusing enough for it to at least have a label?  Total Calvinball."  *Id.* at 58. ("Calvinball" refers to a game in the cartoon "Calvin and Hobbes" where the participants make up the rules of the game as they go along.)

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Mr. Flaherty as "angrily accusing Twitter of dishonestly misapplying" its policies. The cited email does not support that characterization. Rather, this email chain reflects the White House requesting that Twitter consider the application of its terms of service, to which all users agree, to the doctored video it had identified. Dkt. 174-1 at 58-65. The email chain further reflects the White House asking questions to seek to understand how Twitter applies its content moderation policy. *Id.* The cited email contains no evidence that the White House threatened or pressured Twitter to censor speech, or that Twitter regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

187.   A senior-level Twitter executive then emailed Flaherty proposing to resolve the matter by phone. *Id.* After that phone conversation, it appears that the Tweet that prompted the exchange is no longer available. *See id.* at 65 (linking to https://twitter.com/ ArtValley818_/status/1465442266810486787?s=20, which is no longer available).

**RESPONSE:** Disputed to the extent the PFOF assumes a phone conversation occurred, or that the Tweet was removed because of any such call or any action by the White House. The PFOF

fails to cite record evidence to support those assumptions. In addition, it appears that the individual's Twitter account was suspended on October 12, 2022—ten months after the email exchange reflected in the PFOF. *See* Ex. 181 at 1 (Art Taking Back (@Arttakingback), Instagram (Oct. 12, 2022)) (stating "[t]his just happened" and posting a screenshot of a notice that a Twitter account, @ArtValley818_, has been suspended). This PFOF contains no evidence that the White House threatened or pressured Twitter to censor speech, or that Twitter regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

### F.    White House Pressure and Collusion Continue Throughout 2022.

188.    During January 2022, Facebook reported to Rowe, Manning, Flaherty, and Mr. Slavitt that it has "labeled and demoted" "vaccine humor posts whose content could discourage vaccination." It also reported to the White House that it "labeled and demoted" posts "suggesting natural immunity to COVID-19 infection is superior to immunity by the COVID-19 vaccine." Doc. 71-3, at 10-11.

**RESPONSE:** Undisputed, but further note that Facebook's actions with respect to these posts is entirely consistent with its borderline content moderation policies, to which all users agree. *See* Ex. 23 at 6-9. The cited email contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

189.    Twitter emailed back within an hour and offered to discuss, to which Flaherty responded: "Happy to talk through it but if your product is appending misinformation to our tweets that seems like a pretty fundamental issue." *Id.*

**RESPONSE:** Disputed. First, this assertion appears to relate to Section II.E of the PFOFs, rather than Section II.F, and does not appear to refer to the document cited, Dkt. 71-3 at 10-11, but instead appears to refer to the document found at Dkt. 174-1 at 68, which is an August 11, 2022,

email chain. It is unclear what the PFOF is referring to when it states that "Twitter emailed back within an hour," because it does not specify "within an hour" of what event. Moreover, the PFOF lacks context. In an August 11, 2022, email chain, a White House staffer had raised a question concerning a note that Twitter added to one of President Biden's tweets because of Twitter's view that it was factually inaccurate. *Id.* at 69. In response to the White House's questions, a representative at Twitter identified its "Birdwatch product feature" and offered a meeting to walk Mr. Flaherty through the product. *Id.* In response to that invitation, Mr. Flaherty stated that he would be "happy to talk through it but if your product is appending misinformation to our tweets that seems like a pretty fundamental issue." *Id.* The cited email contains no evidence that the White House threatened or pressured Twitter to censor speech, or that Twitter regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

190.    Separately, Jesse Lee of the White House emailed Twitter in response to the same report, accusing Twitter of "calling the President a liar" and offering to talk by phone to resolve the complaint: "this note is factually inaccurate. This is a very technical question but you don't have it right, and you are in effect calling the President a liar when his tweet is actually accurate. I'm happy to discuss this with whoever is the right person," and providing his cell phone number. *Id.* at 69. Twitter then reached out by phone to resolve it. *Id.*

**RESPONSE:** See Defendants' response to Pls.' PFOF ¶ 189.

191.    On September 18, 2021, regarding a story in the Wall Street Journal about COVID-19 "misinformation" circulating on Facebook, Flaherty demanded that Meta provide an explanation "as we have long asked for, [of] how big the problem is, what solutions you're implementing, and how effective they've been." Doc. 71-3, at 24.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Mr. Flaherty as "demanding" anything from Meta. The cited exhibit does not support that characterization. In addition, the PFOF lacks context. On September 18, 2021, a representative of Facebook emailed the White House and noted a Wall Street Journal article "about the spread of COVID-19

misinformation in comments on Facebook." Dkt. 71-3 at 24. Facebook stated that the story was "largely based on cherry-picked leaked documents," and "doesn't accurately represent the problem or the solutions we have put in place to make comments or posts about COVID and vaccine safer." *Id.* Facebook offer to schedule a call to discuss this issue, and Mr. Flaherty responded that he would be "[h]appy to talk about it," and "[w]ould be interested to see, as we have long asked for, how big the problem is, what solutions you're implementing, and how effective they've been." *Id.* Note further that the cited exchange about a September 2021 news article furnishes no evidence concerning the White House's response to misinformation "throughout 2022," much less evidence of "pressure" or "collusion." The cited email contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

192.    On February 1, 2022, Psaki was asked at a White House press conference whether the Administration was satisfied with Spotify's decision to affix advisory warnings to Joe Rogan's immensely popular podcast, which featured speakers that contradicted the Administration's messaging about COVID-19 and vaccines, or whether the government "think[s] that companies like Spotify should go further than just, you know, putting a label on" disfavored viewpoints and speakers. Psaki responded by demanding that Spotify and other platforms "do[] more" to block disfavored speech: "[O]ur hope is that all major tech platforms … be vigilant to ensure the American people have access to accurate information on something as significant as COVID-19…. So, this disclaimer – it's a positive step. But we want every platform to continue *doing more* to call out … mis- and disinformation while also uplifting accurate information."  Glenn Decl. Ex. 38, at 15-16; Doc. 10-1, at 501-2 (emphasis added). She stated that Spotify's advisory warnings are "a good step, it's a positive step, but *there's more that can be done*."  *Id.* at 502 (emphasis added).

**RESPONSE:** Disputed to the extent the PFOF states that Joe Rogan's podcast "featured speakers that contradicted the Administration's messaging about COVID-19 and vaccines," because this is not supported by the cited evidence. Further disputed to the extent the PFOF mischaracterizes Ms. Psaki as "demanding" anything or that the concerns she expressed had to do

with "disfavored speech." The cited evidence does not support this characterization. As Ms. Psaki explained during the press conference, "I mean, look at the facts, right? You are 16 times more likely to be hospitalized if you're unvaccinated and 68 times more likely to die than someone who is boosted if you're unvaccinated. That's pretty significant. And we think that is something that unquestionably should be the basis of how people are communicating about it." Glenn Decl. Ex, 38, at 16; Dkt. 10-1 at 502. The cited statements during a White House press conference contain no evidence that the White House threatened or pressured Spotify or any social media platform to censor speech, or that Spotify or any social media company regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2

193.    On April 25, 2022, Psaki was asked at a White House press briefing to respond to the news that Elon Musk would acquire Twitter, and asked "does the White House have any concern that this new agreement might have President Trump back on the platform?" Glenn Decl. Ex. 40; Doc. 10-1, at 528.

**RESPONSE:** Undisputed but note that the PFOF omits that there was more than one question posed at this time. The complete question posed is as follows: "And just a quick one on the breaking news. Twitter agreeing to let Elon Musk purchase—make his—go through with his purchase. Do you have a response to that? And does the White House have any concern that this new agreement might have President Trump back on the platform?" Glenn Decl. Ex. 40; Dkt. 10-1 at 528.

194.    Psaki responded by reiterating the threats of adverse legal consequences to Twitter and other social media platforms, specifically referencing antitrust enforcement and Section 230 repeal: "No matter who owns or runs Twitter, the President has long been concerned about the power of large social media platforms … [and] has long argued that tech platforms must be held accountable for the harms they cause. He has been a strong supporter of fundamental reforms to achieve that goal, including reforms to Section 230, enacting antitrust reforms, requiring more transparency, and more. And he's encouraged that there's bipartisan interest in Congress." *Id.* at 528-29.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Ms. Psaki's response to the reporter's question as a "threat[] of adverse legal consequences." The cited evidence does not support this characterization. In addition, the PFOF selectively quotes Ms. Psaki's response. The complete response to the reporter's question is as follows: "Well, I'm not going to comment on a specific transaction. What I can tell you as a general matter: No matter who owns or runs Twitter, the President has long been concerned about the power of large social media platforms, what they ha--the power they have over our everyday lives; has long argued that tech platforms must be held accountable for the harms they cause. He has been a strong supporter of fundamental reforms to achieve that goal, including reforms to Section 230, enacting antitrust reforms, requiring more transparency, and more. And he's encouraged that there's bipartisan interest in Congress. In terms of what hypothetical policies might happen, I'm just not going to speak to that at this point in time." Glenn Decl. 40, at 3-4; Dkt. 10-1 at 528-29. The cited statements during a White House press conference contains no evidence that the White House threatened or pressured any social media platform to censor speech, or that any social media company regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2

195.    At the same press briefing, Psaki was asked: "Are you concerned about the kind of purveyors of election misinformation, disinformation, health falsehoods, sort of, having more of an opportunity to speak there on Twitter?" She responded by specifically linking the legal threats to the social-media platforms' failure to more aggressively censor free speech: "I would say our concerns are not new. We've long talked about and the President has long talked about his concerns about the power of social media platforms, including Twitter and others, to spread misinformation, disinformation; the need for these platforms to be held accountable." *Id.* at 534.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Ms. Psaki as "specifically linking the legal threats to the social-media platforms' failure to more aggressively censor free speech." The cited evidence does not support that characterization. Nothing in Ms. Psaki's

comments could reasonably be construed as a "legal threat" or requesting that social media companies "censor" speech. Rather, Ms. Psaki conveyed that companies need to be responsible for applying their terms of service, to which all users agree, to ensure that misinformation and disinformation about a deadly pandemic responsible for the deaths of thousands of Americans is properly handled. The cited statements during a White House press conference contain no evidence that the White House threatened or pressured any social media platform to censor speech, or that any social media company regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2

196.    Psaki was then asked a question that noted that "the Surgeon General has said that misinformation about COVID amounts to a public health crisis," and then queried, "would the White House be interested in working with Twitter like it has in the past to continue to combat this kind of misinformation?  Or are we in a different part of the pandemic where that kind of partnership is no longer necessary?"  *Id.* at 549.

**RESPONSE:** Undisputed.

197.    Psaki responded by reaffirming that senior officials within the White House and/or the Administration are continuing to coordinate directly with social-media platforms to censor disfavored speakers and content on social media, and directly linking these efforts to the repeated threat of adverse legal action: "we engage regularly with all social media platforms about steps that can be taken that has continued, and I'm sure it will continue. But there are also reforms that we think Congress could take and we would support taking, including reforming Section 230, enacting antitrust reforms, requiring more transparency. And the President is encouraged by the bipartisan support for — or engagement in those efforts." *Id.*

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Ms. Psaki as suggesting that individuals in the White House and/or the Administration were "coordinat[ing]" with social media companies "to censor disfavored speakers and content on social media," or that she "directly link[ed] these efforts to the repeated threat of adverse legal action." The cited evidence does not support that characterization. The cited statements during a White House press conference contain no evidence that the White House threatened or pressured any social media platform to censor

speech, or that any social media company regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2

198.   On June 13, 2022, Flaherty demanded that Meta continue to produce periodic "COVID-19 insights reports" to track so-called "misinformation" regarding COVID-19 on Meta's social-media platforms, expressing the specific concern that COVID vaccines for children under 5 would soon be authorized. Doc. 71-3, at 6.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Mr. Flaherty as "demanding" anything from Meta. The cited evidence does not support that characterization. In response to a statement by Meta that it would "plan to discontinue" providing its "COVID-19 insight reports" to Mr. Flaherty, Mr. Flaherty stated that "I would normally say we are good to discontinue but it would be helpful to continue to get these as we start to ramp up under 5 vaccines. The cited email contains no evidence that the White House threatened or pressured Meta to censor speech, or that Meta regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2

199.   Meta got the message. It agreed to continue sending its censorship-tracking reports, and on June 22, 2022, Meta assured Flaherty that it was expanding its censorship of COVID-19 "misinformation" to ensure that speech critical or skeptical of COVID-19 vaccines for children under 5 years old—a highly controversial topic—would be censored. Doc. 71-3, at 5.

**RESPONSE:** Dispute the insinuation in the remark, "Meta got the message," that Mr. Flaherty intended or that Meta perceived his request as any kind of pressure or threat. This PFOF is also disputed to the extent the PFOF mischaracterizes Meta's "insight reports" as "censorship-tracking reports," or that Meta "assured" Mr. Flaherty that Meta was "expanding its censorship of COVID-19 'misinformation'" or "ensur[ing]" that speech critical or skeptical COVID-19 vaccines for children under 5 years old . . . would be censored." The cited evidence does not support this

characterization. First, Meta's "insight reports" reflected the results of the application of its content moderation policies, to which all users agree. Second, the cited email reflects that Meta was notifying Mr. Flaherty and others at the White House about its "policy updates" following the early childhood vaccine approvals. Dkt. 71-3 at 5. Meta noted that "[a]s of today, all COVID-19 vaccine related misinformation and harm policies on Facebook and Instagram apply to people 6 months or older (with the exception of the claim that the COVID vaccines have full FDA approval since children have only emergency use."). *Id.* The cited email contains no evidence that the White House threatened or pressured Meta to censor speech or adopt its new policy, or that Meta regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2

### G. Pressure to Expand the Topics of Social-Media Censorship.

200.    Since this lawsuit was filed, Defendants have expanded their social-media censorship activities and pressured social-media platforms for censorship in new areas of online discourse, including areas such as climate change, gender, abortion, and economic policy.

**RESPONSE:** Disputed. This PFOF cites no evidence in support of the assertions made. Neither this PFOF nor any of Plaintiffs' other PFOFs contain evidence that the White House, or any other Defendants, threatened or pressured (or intend to threaten or pressure) social media companies to censor speech, or that the companies regarded (or acted on) communications with the White House, or any other Defendants, as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2

201.    For example, on June 14, 2022, White House National Climate Advisor Gina McCarthy spoke at an Axios event titled "A conversation on battling misinformation." Jones Decl. Ex. M, at 1.

**RESPONSE:** Disputed to the extent the PFOF suggests that this is an "example" of the contentions contained in PFOF ¶ 200. Neither this PFOF nor any of Plaintiffs' other PFOFs contain evidence that the White House, or any other Defendants, threatened or pressured (or intend to threaten or pressure) social media companies to censor speech, or that the companies regarded (or acted on) communications with the White House, or any other Defendants, as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

202.    During the event, "McCarthy skewered Big Tech companies for 'allowing' disinformation and cheered Congress for 'taking action' to enact more censorship last Thursday." *Id.* at 2. "Axios political reporter Alexi McCammond asked McCarthy how so-called 'rampant mis-and-disinformation around climate change online and in other platforms' has 'made your job harder?'" *Id.* "McCarthy responded by slamming social media companies: 'We have to get tighter, we have to get better at communicating, and frankly, *the tech companies have to stop allowing specific individuals over and over again to spread disinformation*.'" *Id.* (emphasis added). "She suggested further that 'we have to be smarter than that and *we need the tech companies to really jump in*.'" *Id.* at 3 (emphasis added). "McCammond responded by asking: 'Isn't misinformation and disinfo around climate a threat to public health itself?' McCarthy asserted that it 'absolutely' is: 'Oh, absolutely.'" *Id.*

**RESPONSE:** Disputed to the extent this PFOF relies upon mischaracterizations of Ms. McCarthy's comments contained in an online news article, rather than on Ms. McCarthy's comments themselves. The cited statements by Ms. McCarthy during an Axios event contain no evidence that the White House threatened or pressured (or intends to threaten or pressure) any social media platform to censor speech, or that any social media company regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2

203.    Like Psaki and others, McCarthy explicitly tied these demands for censorship of climate-change-related speech to threats of adverse legislation: "McCarthy also praised Congress directly for pushing social media companies to censor Americans: 'We do see Congress taking action on these issues, we do see them trying to tackle the misinformation that's out there, trying to hold companies accountable.'" *Id.* at 4.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Ms. Psaki, Ms. McCarthy, or "others" associated with the White House as "explicitly" tying "demands for censorship" to "threats of adverse legislation." The cited evidence, editorial comment contained in an online news article, does not support those characterizations. The cited statements by Ms. McCarthy during an Axios event contain no evidence that the White House threatened or pressured (or intends to threaten or pressure) any social media platform to censor speech, or that any social media company regarded (or acted on) her communications as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2

204.    On June 16, 2022, the White House announced a new task force to address, among other things, "gendered disinformation" and "disinformation campaigns targeting women and LGBTQI+ individuals who are public and political figures, government and civic leaders, activists, and journalists." Jones Decl., Ex. N, at 1.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the cited document and takes selected quotes out of context. On June 16, 2022, President Biden issued a "Memorandum on the Establishment of the White House Task Force to Address Online Harassment and Abuse." Jones Decl., Ex. N, at 1. In discussing White House policy, the memorandum notes that "Online harassment and abuse take many forms, including the non-consensual distribution of intimate digital images; cyberstalking; sextortion; doxing; malicious deep fakes; gendered disinformation; rape and death threats; the online recruitment and exploitation of victims of sex trafficking; and various forms of technology-facilitated intimate partner abuse." *Id.* The memorandum further observes that "[i]n the United States and around the world, women and LGBTQI+ political leaders, public figures, activities, and journalists are especially targeted by sexualized forms of online harassment and abuse, undermining their ability to exercise their human rights and participate in democracy, governance, and civic life." *Id.* Accordingly, the President directed "the Director of the White House Gender Policy Council and the Assistant to the President for National Security

Affairs to lead an interagency effort to address online harassment and abuse, specifically focused on technology-facilitated gender-based violence, and to develop concrete recommendations to improve prevention, response, and protection efforts through programs and policies in the United States and globally." *Id.* at 2. The Memorandum charges the Task Force with "work[ing] across executive departments, agencies, and offices to assess and address online harassment and abuse that constitute technology-facilitated gender-based violence." *Id.* at 3. This PFOF contains no evidence that the White House threatened or pressured (or intends to threaten or pressure) social media companies to censor speech, or that the companies regarded (or acted on) communications with the White House, or any other Defendants, as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2

205.    The June 16 Memorandum decries "online harassment and abuse"—vague terms that, on information and belief, are deliberately adopted to sweep in constitutionally protected speech. *Id.* In particular, the Memorandum defines "online harassment and abuse" to include "gendered disinformation," a deliberately broad and open-ended term. *Id.* § 1. The Memorandum announces plans to target such "gendered disinformation" directed at public officials and public figures, including "women and LGBTQI+ political leaders, public figures, activists, and journalists." *Id.* The Memorandum creates a Task Force co-chaired by the Assistant to the President for National Security Affairs, which includes the Secretary of Defense, the Attorney General, and the Secretary of Homeland Security, among others. *Id.*

**RESPONSE:** Disputed to the extent the PFOF contends "on information and belief" that the phrase "online harassment and abuse" is intended to "sweep in constitutionally protected speech." The PFOF cites to no record evidence to support this "belief." Defendants refer to their response to PFOF ¶ 204, as well as the memo cited in this PFOF, for context as to the scope of the Task Force's mandate to address online harassment and abuse. This PFOF contains no evidence that the White House threatened or pressured (or intends to threaten or pressure) social media companies to censor speech, or that the companies regarded (or acted on) communications with

the White House, or any other Defendants, as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2

206.    The Task Force is charged with "developing programs and policies to address … *disinformation campaigns* targeting women and LGBTQI+ individuals who are public and political figures, government and civic leaders, activists, and journalists in the United States and globally." *Id.* § 4(a)(iv) (emphasis added). The Memorandum calls for the Task Force to consult and coordinate with "technology experts" and "industry stakeholders," *i.e.*, social-media firms, to achieve "the objectives of this memorandum," *id.* § 4(b). Those "objectives," of course, include suppressing so-called "disinformation campaigns" against "public and political figures." *Id.* § 4(a)(iv).

**RESPONSE:** Disputed to the extent the PFOF selectively quotes from the cited Memorandum. Defendants refer to their response to PFOF ¶ 204, as well as the memo cited in this PFOF, for context as to the scope of the Task Force's mandate to address online harassment and abuse. This PFOF contains no evidence that the White House threatened or pressured (or intends to threaten or pressure) social media companies to censor speech, or that the companies regarded (or acted on) communications with the White House, or any other Defendants, as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2

207.    The Memorandum again threatens social-media platforms with adverse legal consequences if they do not censor aggressively enough to suit federal officials: "the Task Force shall … submit periodic recommendations to the President on *policies, regulatory actions, and legislation on technology sector accountability* to address systemic harms to people affected by online harassment and abuse." *Id.* § 5(c) (emphasis added).

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the Memorandum as "threatening" social media platforms with "adverse legal consequences" if they "do not censor aggressively enough." The selected citation to the document does not support that characterization. The Memorandum states: "Prior to issuing its Initial Blueprint and 1-Year Report, the Co-Chairs of the Task Force shall consolidate any input received and submit periodic recommendations to the President on policies, regulatory actions, and legislation on technology sector accountability

to address systemic harms to people affected by online harassment and abuse." Jones Decl., Ex.

N, at § 5(c). Nothing in this statement contains evidence that the White House threatened or

pressured (or intends to threaten or pressure) social media companies to censor speech, or that the

companies regarded (or acted on) communications with the White House, or any other Defendants,

as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See*

Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2

208.    Relatedly, on May 27, 2022, HHS Assistant Secretary Rachel Levine demanded
that social-media platforms censor "misinformation" about "gender-affirming care." Jones Decl.,
Ex. O, at 1. In a public address to health officials, Levine "spoke about the need for government
to 'address health information directly' and specified that includes encouraging Big Tech to
combat health misinformation 'beyond COVID-19.'" *Id.* Levine stated: "So I'd like to just talk
briefly about another area of substantial misinformation that is directly impacting health equity in
our nation, and that is the health equity of sexual and gender minorities. There is substantial
misinformation about gender-affirming care for transgender and gender diverse individuals… The
positive value of gender-affirming care for youth and adults is not in scientific or medical dispute
… And we need to use our clinicians' voice to collectively advocate for our tech companies to
create a healthier, cleaner information environment." *Id.* at 1-2.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Ms. Levine as

"demanding" that social media companies "censor" anything. The cited evidence does not support

that characterization. In addition, this PFOF selectively quotes Ms. Levine's statements as

characterized in a news article, which in turn selectively quotes Ms. Levine and provides editorial

comments concerning her statements. The cited statements by Ms. Levine during an address to the

Federation of State Medical Boards contains no evidence that the White House or any other

Defendants threatened or pressured (or intend to threaten or pressure) any social media platform

to censor speech, or that any social media company regarded (or acted on) communications by the

White House or other Defendants as such. Any assertion to that effect is unsupported by and

contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2

209.    On July 8, 2022, the President signed an Executive Order on protecting access to
abortion. Jones Decl., Ex. P, at 1.

**RESPONSE:** Undisputed but note that, on July 8, 2022, the President signed an Executive Order on protecting access to covers access to "reproductive healthcare services," not just abortions. Jones Decl., Ex. P, at 1. This PFOF contains no evidence that the White House threatened or pressured (or intends to threaten or pressure) social media companies to censor speech, or that the companies regarded (or acted on) communications with the White House, or any other Defendants, as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

210.    Section 4(b)(iv) of the order states: "The Secretary of Health and Human Services shall, in consultation with the Attorney General and the Chair of the FTC, consider options to address deceptive or fraudulent practices related to reproductive healthcare services, including online, and to protect access to accurate information."  *Id.* This is a plain reference to the online advertising practices of pro-life pregnancy resources centers, which the President's political allies were then attacking. Jones Decl., Ex. Q, at 1-2.

**RESPONSE:** Disputed to the extent the PFOF states that the quoted language from the Executive Order is a "plain reference to the online advertising practices of pro-life pregnancy resource centers, which the President's political allies were then attaching." This characterization of the Executive Order and its impetus is unsupported by the cited documents. In addition, the regulation of deceptive and fraudulent commercial speech does not violate the First Amendment, and Plaintiffs do not contend otherwise. Any such argument would be foreclosed by Supreme Court and Fifth Circuit precedent. *Gibson v., Texas Dep't of Ins.-Div. of Workers' Comp.*, 700 F.3d 227, 234-35 (5th Cir. 2012) ("The Supreme Court has stated that laws aimed at prohibiting deceptive commercial speech are unlikely to implicate the prohibition on prior restraints.") (quoting *Friedman v. Rogers*, 440 U.S. 1, 10 (1979)); *Bates v. State Bar of Arizona*, 433 U.S. 350, 383 (1977) ("Advertising that is false, deceptive, or misleading of course is subject to restraint."). This PFOF contains no evidence that the White House threatened or pressured (or intends to

threaten or pressure) social media companies to censor speech, or that the companies regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

211.    On August 11, 2022, Flaherty emailed Twitter to dispute a note added by Twitter to one of President Biden's tweets. Doc. 174-1, at 68. The subject line of Flaherty's email was a link to a Tweet criticizing Twitter's note: "Joe Weisenthal on Twitter: 'Wow, this note that twitter added to Biden's tweet is pure gibberish. Imagine adding this, and thinking this is helpful to the public's understanding in any way.'" *Id.* Linking to a tweet about gas prices, Flaherty wrote: "Happy to connect you with some economists who can explain the basics to you guys." *Id.* Flaherty copied Jesse Lee, Senior Advisor to the National Economic Council at the White House, on the email. *Id.*

**RESPONSE:** Undisputed but note that the PFOF lacks context. The concern expressed by

Mr. Flaherty was that Twitter affixed a "factually inaccurate" note to President Biden's tweet and

wanted Twitter to explain how this had happened. Dkt. 174-1 at 68-69. Also note that Mr. Lee is

the Senior Communications Advisor to the National Economic Council. The cited email contains

no evidence that the White House threatened or pressured (or intends to threaten or pressure)

Twitter to censor speech, or that Twitter regarded (or acted on) the White House's communications

as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See*

Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2

### III.    The Pressure Campaign from Surgeon General Murthy and His Office.

212.    Throughout 2021 and 2022, Surgeon General Vivek Murthy and his Office engaged in a pressure campaign in parallel with, and often overlapping with, the White House's pressure campaign on social-media platforms. Surgeon General Murthy and his staff were often included in the same meetings and communications with White House officials and social-media platforms, and joined White House officials pressuring them to increase censorship in public and in private.

**RESPONSE:** Disputed. Neither this PFOF, or any others, contain evidence that the

Surgeon General, the Office of the Surgeon General (OSG), or the White House, are now or have

ever been engaged, together or separately, in a "pressure campaign" against social-media platforms

to have them "increase censorship." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

**A.    The Surgeon General: Using the "Bully Pulpit" to Pressure Platforms.**

213.    Eric Waldo is the Senior Advisor to the Surgeon General of the United States, Vivek Murthy, and was formerly a Chief Engagement Officer in the Office of the Surgeon General ("OSG"). Waldo Dep. 11:15-12:2.

**RESPONSE:** Disputed. Mr. Waldo left OSG in January 2023. *See* Defs.' Notice

Regarding Substitution of Official-Capacity Defendants at 2 ("Notice of Substitution") (Dkt. 263).

214.    As "the engagement team leader" for OSG, Waldo was "the one in charge of maintaining the contacts and the relationships with representatives of social media platforms." *Id.* at 51:11-17.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that the Surgeon

General's "bully pulpit" was used to threaten or pressure social-media companies to censor speech,

or that the companies regarded (or acted on) communications by OSG as such. Any implicit

assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF

§ II.B, Arg. §§ II.B.1.c & II.B.2.

215.    Dr. Murthy was directly involved in editing and approving the final work product of the Surgeon General's Office, including the Surgeon General's July 15, 2021 health advisory on misinformation and the Surgeon General's March 3, 2022 RFI to social-media platforms. *Id.* at 14:20-22, 15:16-19, 16:9-10, 17:1-6, 187:24-188:3.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that the Surgeon

General's "bully pulpit" was used to threaten or pressure social-media companies to censor speech,

or that the companies regarded (or acted on) communications by OSG as such. Any implicit

assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF

§ II.B, Arg. §§ II.B.1.c & II.B.2.

216.    Calling for an "all-of-society approach" to misinformation was a pervasive theme of the Surgeon General's communications, including the health advisory and the RFI. *Id.* at 19:25,

26:8, 88:9, 89:13, 101:2, 117:13, 122:15, 211:22, 246:25, 251:9, 332:22. This theme echoes the repeated call for an "all-of-society approach" in the Virality Project's public report. *See infra.*

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the Surgeon General as "echo[ing]" the Virality Project's public report. The Surgeon General's Advisory predates the Virality Project's report. *See* Defs.' PFOF § II.B. This PFOF contains no evidence that the Surgeon General's "bully pulpit" was used to threaten or pressure social-media companies to censor speech, or that the companies regarded (or acted on) communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

217.    Before the Surgeon General's health advisory on misinformation was published on July 15, 2021, OSG and Waldo "did pre-rollout calls with Twitter, Facebook, [and] Google/YouTube." *Id.* at 20:7-11.

**RESPONSE:** Disputed. The call with Facebook occurred on July 16, 2021. *See* Waldo Dep. 90:6-19. Moreover, this PFOF contains no evidence that the Surgeon General's "bully pulpit" was used to threaten or pressure social-media companies to censor speech, or that the companies regarded (or acted on) communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

218.    The Surgeon General uses his "bully pulpit" to call for censorship of health misinformation: "Dr. Murthy continued from a communications perspective to talk about health misinformation using his bully pulpit." *Id.* at 25:23-25.

**RESPONSE:** Disputed to the extent that the PFOF mischaracterizes the Surgeon General as "call[ing]" for censorship of health misinformation." Neither the cited testimony nor the evidence as a whole supports the assertion that merely "talk[ing] about health misinformation" constituted a "call for censorship," much less a threat or pressure to censor speech, or that social-media

companies regarded it (or acted on it) as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

219.    Waldo admits that the Surgeon General is directly advocating to social-media platforms to take stronger actions against health "misinformation": "[T]he Surgeon General has the ability … to talk to the relevant stakeholders and say we want you to be aware of this issue and that we think you have a role to play to improve the health outcomes, yes." *Id.* 28:10-14. As part of this role, the Surgeon General "call[s] out social media platforms in the [health] advisory." *Id.* at 28:18-19.

**RESPONSE:** Disputed to the extent that the PFOF mischaracterizes the Surgeon General as "directly advocating to social-media platforms." The evidence does not support that inference; the full extent of Dr. Murthy's direct communications about misinformation with platforms is described at Defs.' PFOF § II.B. As shown therein, the record contains no evidence that the Surgeon General's "bully pulpit" was used to threaten or pressure social-media companies to censor speech, or that the companies regarded (or acted on) communications by OSG as such. *Id.*

220.    The Surgeon General's "bully pulpit," Waldo agrees, involves putting public pressure on social-media platforms: "I think the bully pulpit … is really the fact that he commands attention, including being able to … speak with the press, speak with the public, and … we think of the Surgeon General as the nation's doctor." *Id.* at 29:9-15.

**RESPONSE:** Disputed to the extent that the PFOF mischaracterizes the Surgeon General as "putting public pressure on social-media platforms." Mr. Waldo did not agree with that characterization, *see* Waldo Dep. 29:4-19, and the evidence does not support that inference, or that social-media companies regarded (or acted on) communications by OSG as such. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

221.    A goal of the Surgeon General's use of the "bully pulpit" includes to "reduce the dissemination of health misinformation." *Id.* at 30:5-10. This includes making "recommendations of specific steps the social media platforms are … called out to take to reduce the spread of misinformation on the platforms." *Id.* at 31:3-8.

**RESPONSE:** Disputed to the extent that the PFOF mischaracterizes the Surgeon General's communications as anything more than making non-binding recommendations to social media

platforms. The Advisory is the best evidence of what the Advisory says, and it contains no evidence that it was intended to threaten or pressure social-media companies to censor speech, or that the companies regarded (or acted on) the Advisory as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

222.    OSG reinforces its public "message of calling out the social media platforms to take steps to reduce the spread of misinformation on their platforms" through private communications with platforms: "[W]hat we're saying publicly, we're also … said that privately to them as well." *Id.* at 32:5-8, 12-14. This includes during "rollout calls." *Id.* at 32:19-20.

**RESPONSE:**  This PFOF contains no evidence that OSG threatened or pressured social-media companies to censor speech, or that the companies regarded (or acted on) communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2. The cited testimony indicates only that the Advisory's "message," which is evident from the Advisory and the Surgeon General's public statements, was echoed at a "high level" in private meetings between OSG and the companies. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

**B.    Surgeon General Works in Tandem with the White House and Virality Project.**

223.    On the day of the health misinformation advisory rollout, July 15, 2021, "Press Secretary … Jen Psaki had already made remarks specifically about Facebook, and then," the next day, "President Biden made his remarks that social media and Facebook were killing people." *Id.* at 33:19-25. "Facebook … was upset about how the rollout had gone." *Id.* at 33:6-8. Waldo's initial rollout call with Facebook, as a result, was affected by the Administration's public attacks on Facebook: "I wouldn't call it the most productive call." *Id.* at 34:4-6.

**RESPONSE:** Disputed to the extent this PFOF mischaracterizes the Press Secretary's and the President's remarks as "public attacks" by the Administration "on Facebook." The PFOF also mischaracterizes Mr. Waldo's testimony regarding the July 16, 2021, rollout call between OSG and Facebook. He did not testify (nor is there any other evidence) that the call was not "productive"

because of the Press Secretary's or the President's remarks. *See* Waldo Dep. 113:3-114:5 (OSG "didn't think there was much change" that Facebook would make or that Facebook would be "transparent"). And this PFOF contains no evidence that the Surgeon General's Advisory was used to threaten or pressure social-media companies to censor speech, or that the companies regarded (or acted on) the Advisory or other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

224.    After this public pressure, Facebook's senior executive, Nick Mr. Clegg, reached out to request "deescalat[ion]" and "work[ing] together" as a direct result of that public pressure on Facebook: "Then later, with our call, we had a call with Nick Mr. Clegg from Facebook, and at his request, and … his intentions were to sort of I think deescalate and just find ways that we could work together, given how Facebook … was treated in that rollout day." *Id.* at 34:7-13.

**RESPONSE:** Disputed. This PFOF contains unsupported mischaracterizations about "public pressure" on Facebook and unsupported assertions that Facebook contacted OSG as "a direct result of that public pressure." Mr. Clegg's requests for this meeting are in evidence; that evidence speaks for itself. *See* Waldo Exs. 17, 18; *see also* Defs.' PFOF § II.B. In addition, this PFOF contains no evidence that the Surgeon General's Advisory was used to threaten or pressure Facebook to censor speech, or that Facebook regarded (or acted on) the Advisory or other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

225.    In the call with Nick Mr. Clegg, Surgeon General Murthy reiterated his demand for Facebook to do more to censor "misinformation" on its platforms: "[O] n the call with Nick Mr. Clegg, the Surgeon General did … reiterate the idea that, you know, as we described in the advisory, that we think there's more … that Facebook and other social media companies can do, and … we reiterated that." *Id.* at 35:7-12.

**RESPONSE:** Disputed to the extent that this PFOF mischaracterizes the Surgeon General's reiteration of the Advisory's themes as a "demand" for "censor[ship]."  There is no

evidence to support that characterization; the Advisory provides "recommendations." *See* Defs.'

PFOF § II.B. This PFOF also contains no evidence that the Surgeon General's "bully pulpit" that

Facebook regarded (or acted on) the Surgeon General's remarks as such. Any implicit assertion to

that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg.

§§ II.B.1.c & II.B.2.

226.    Murthy also asked Mr. Clegg and Facebook specific questions about requiring Facebook to share data with outside researchers about the scope and reach of misinformation on its platforms, again echoing the key recommendation of the Virality Project: "[T]he most specific questions were about understanding the data around the spread of misinformation and how we were measuring that, and … how we could have external researchers validate the spread of misinformation and -- and helping us as a field understand the depth of the problem." *Id.* at 35:20-36:2.

**RESPONSE:** Disputed to the extent that this PFOF mischaracterizes (i) the Surgeon

General's Advisory (or any of his communications) as "requiring" anything of companies and (ii)

the Surgeon General as "echoing" the Virality Project. There is no evidence to support those

characterizations. *See* Defs.' Resps. to Pls.' PFOF ¶ 225 (Advisory), ¶ 216 (Virality Project). In

addition, this PFOF contains no evidence that the Surgeon General's inquiries about data sharing

were used to threaten or pressure Facebook to censor speech, or that Facebook regarded (or acted

on) the Surgeon General's inquiries as such. Any implicit assertion to that effect is unsupported

by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

227.    One such "external researcher" that OSG had in mind was "Renee DiResta, from the Stanford Internet Observatory," a leading organization of the Virality Project, which hosted a "rollout event" for the advisory featuring Dr. Murthy on the day the advisory was announced. *Id.* at 36:19-23.

**RESPONSE:** Disputed to the extent that this PFOF mischaracterizes OSG as having Ms.

DiResta "in mind" or knowing at all about the Virality Project. When asked what "external

researchers" meant, Waldo referred to the Advisory, *see* Waldo Dep. 36:7-16, which he was not

involved in crafting, *see* Waldo Dep. 37:2-5. In addition, this PFOF contains no evidence that the

Surgeon General's inquiries about data sharing were used to threaten or pressure Facebook to censor speech, or that Facebook regarded (or acted on) the Surgeon General's inquiries as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

228.   Waldo admits that there was "coordination" between OSG and Renee DiResta of the Virality Project on the launch of the Surgeon General's health advisory: "I know there was coordination with [DiResta] with respect to the launch … there was a panel, a public sort of virtual town hall that we hosted -- with the Sanford [sic] Internet Observatory that Dr. Murthy spoke at, and that was part of the launch day. So certainly there would have been coordination … with her." *Id.* at 38:1-7.

**RESPONSE:** Disputed to the extent that this PFOF mischaracterizes OSG as coordinating with the Virality Project. *See* Response to Pls.' PFOF ¶ 216. This PFOF contains no evidence that the Surgeon General's Advisory was used to threaten or pressure social-media companies to censor speech, or that the companies regarded (or acted on) the Advisory or any other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

229.   Kyla Fullenwider is the OSG's key "subject matter expert" who "worked on the advisory" and had significant substantive input on both the Surgeon General's July 15, 2021 health advisory on misinformation, and the Surgeon General's March 3, 2022 RFI to social-media platforms on the spread of misinformation. *Id.* at 39:1-4, 59:16-23. Kyla Fullenwider is not a direct employee of the OSG, but works for a non-profit contractor named "US Digital Response," Waldo Dep. 85:13-15.

**RESPONSE:** Disputed. Fullenwider is an HHS employee. *See* Lesko Decl. ¶ 17 (Ex. 63). Also dispute the characterization of the Surgeon General's RFI has having been issued "to social media platforms." The RFI, which was published in the Federal Register, was issued to the general public. *See* Waldo Ex. 42.

230.   Kyla Fullenwider "did a follow-up call with Renee DiResta" about the health advisory. *Id.* at 38:25-39:4.

**RESPONSE:** Disputed. Waldo speculated that Fullenwider "maybe did a follow-up call with Renee after the event" at Stanford. Waldo Dep. 39:3-4. In any event, this PFOF contains no evidence that the Surgeon General's Advisory was used to threaten or pressure social-media companies to censor speech, or that the companies regarded (or acted on) the Advisory or any other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

231.    After the launch of the health advisory, Waldo and Fullenwider "did a call" with Renee DiResta "that was more of a brainstorm around … public-facing events that we could do to talk about this issue" of stopping health misinformation. *Id.* at 40:13-17.

**RESPONSE:** Disputed to the extent that this PFOF describes a call that is different from the call in Pls.' PFOF ¶ 230. *See* Waldo Dep. 40:9-17. This PFOF also contains no evidence that the Surgeon General's "bully pulpit" was used to threaten or pressure social-media companies to censor speech, or that the companies regarded (or acted on) communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

232.    Fullenwider and DiResta "most likely" discussed misinformation in these calls. *Id.* at 41:4-6.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that the Surgeon General's "bully pulpit" was used to threaten or pressure social-media companies to censor speech, or that the companies regarded (or acted on) communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

233.    Waldo and OSG also received a briefing from the Center for Countering Digital Hate about the so-called "Disinformation Dozen." *Id.* at 43:1-48:1. CCDH gave "a presentation about the Disinformation Dozen and sort of how they were measuring … that those were the folks primarily responsible for a lot of misinformation online." *Id.* at 47:2-5.

**RESPONSE:** Disputed. Mr. Waldo could not remember the group that gave the presentation, which was given to HHS. Waldo Dep. 45:2-18. In addition, this PFOF contains no evidence that the Surgeon General's "bully pulpit" was used to threaten or pressure social-media companies to censor speech, or that the companies regarded (or acted on) communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

234.    Rafael Campos of OSG "helped create the event with … the Stanford Internet Observatory for the launch," and likely had communications with Stanford and Professor DiResta in the lead-up to the event. *Id.* at 48:12-14, 49:1-2.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that the Surgeon General's "bully pulpit" was used to threaten or pressure social-media companies to censor speech, or that the companies regarded (or acted on) communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

235.    The OSG anticipated that the social-media platforms would feel pressured by the advisory: "we didn't think they would be happy about this -- you know, the content of the advisory." *Id.* at 54:24-55:1.

**RESPONSE:** Disputed to the extent that the PFOF mischaracterizes Mr. Waldo as testifying that OSG "anticipated" that the platforms would "feel pressured" by the Advisory. Neither the cited passage nor any other portion of Mr. Waldo's testimony supports that assertion. Nor does the evidence as a whole support the allegation that the Surgeon General's Advisory was used to threaten or pressure social-media companies to censor speech, or that the companies regarded (or acted on) the Advisory or any other communications by OSG as such. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

236.    Waldo is aware of "at least one call … that the Surgeon General [Murthy] had with Facebook during the transition," i.e., between President Biden's election and his assuming office.

*Id.* at 55:8-10. The call involved a "Facebook individual": "Dr. Murthy had mentioned that he had been on a call with that person [from Facebook] during the transition." *Id.* at 79:11-18, 56:5-6. Waldo identified the individual as "a data person from the Facebook team." *Id.* at 56:10. The purpose of that call was "again, about that issue of trying to understand the reach of the mis- and disinformation and understanding … how far it was spreading." *Id.* at 56:15-19.

**RESPONSE:** Disputed to the extent that the PFOF suggests that Dr. Murthy had more than one call with Facebook during the transition. Mr. Waldo testified that Dr. Murthy had "at least one call" with Facebook before June 20, 2021, and he thought that call occurred during the transition. Waldo Dep. 55:2-17. In addition, this PFOF contains no evidence that the call, which concerned the "reach" and "spread" of mis- and disinformation, was used to threaten or pressure Facebook to censor speech, or that Facebook regarded (or acted on) on this or any other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

237.   "Data about misinformation" was "a topic of conversation" in that call, and the participants discussed "Facebook" being "un[]clear" or "unable to present … the depth or reach of the misinformation, that they didn't have that data." *Id.* at 80:1-15.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that the discussion concerning uncertainty about the "depth or reach of the misinformation" was used to threaten or pressure Facebook to censor speech, or that Facebook regarded (or acted on) on this or any other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

238.   DJ Patil may have participated in that transitional call. Patil was the "chief data scientist in the Obama administration, and he was a special government employee at the White House for part of the first year" of the Biden Administration. *Id.* at 81:6-13. Patil was also "on the call with Dr. Murthy and [Waldo] and Nick Mr. Clegg … in his capacity as a White House official." *Id.* at 81:24-82:3.

**RESPONSE:** Undisputed.

239.   Waldo "connected [Patil] to another research data person … a Facebook data person." *Id.* at 82:13-16.

**RESPONSE:** Undisputed. This occurred after the July 23, 2021 call between OSG and Facebook. *See* Waldo Dep. 82:9-16. Mr. Waldo was "not sure if they ever connected." *Id.*

240.    The purpose of this follow-up was to demand more information from Facebook about monitoring the spread of misinformation on its platforms: "[T]he problem was we were still in this piece of not understanding the reach and depth … of the misinformation … on Facebook. And … this person was going to try to explain to [Patil] the data challenges in doing so." *Id.* at 83:4-9.

**RESPONSE:** Disputed to the extent this PFOF mischaracterizes the follow-up as a "demand" rather than an attempt to "better understand" the "nature of the data," as Mr. Waldo testified. Waldo Dep. 83:1-2. This PFOF also contains no evidence that the follow-up was used to threaten or pressure Facebook to censor speech, or that Facebook regarded (or acted on) this or any other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

241.    Kyla Fullenwider is the "main" or key staffer for the OSG on misinformation and disinformation. *Id.* at 58:21-24. Ann Kim is listed on the OSG's org chart, Waldo Ex. 2, as the person who "[d]irects mis- and dis-information engagement," Waldo Ex. 2, but that is solely "because Kyla Fullenwider reported up to Ann Kim. And since Kyla, I think, was our main subject matter expert or continued to do work on mis- and disinformation, maybe that was why that was put under Anne's list of duties." Waldo Dep. 58:20-24. Fullenwider, therefore, is the OSG's "main subject matter expert" on "mis- and disinformation," who "directs mis- and dis-information engagement" for the OSG. *Id.* at 58:13-59:7.

**RESPONSE:** Disputed. Mr. Waldo testified that he was speculating on these issues, including the currentness of the organizational chart and whether Fullenwider was the "main" subject-matter expert on misinformation. *See* Waldo Dep. 58:17-24.

242.    Fullenwider works for the nonprofit U.S. Digital Response, and is not directly employed by the OSG, though she was acting in an official capacity on behalf of OSG. Waldo Ex. 3, at 32; Waldo Dep. 85:10-86:8.

**RESPONSE:** Disputed. *See* Resp. to Pls.' PFOF ¶ 229.

243.    U.S. Digital Response is not a government agency but a non-profit organization: "U.S. Digital Response (USDR) is a nonprofit, nonpartisan organization that helps governments,

nonprofits, and public entities respond quickly to critical public needs." *About U.S. Digital Response*, U.S. Digital Response (last visited Feb. 17, 2023), https://www.usdigitalresponse.org/about.

**RESPONSE:** Undisputed.

244.    Ann Kim has no direct involvement in mis- and disinformation. Waldo Dep. 58:25-59:3. But Kyla Fullenwider "was definitely working on mis- and disinformation." *Id.* at 59:6-7. Fullenwider "was working with Daniel [Tartakovsky] on the design of … the advisory. And then … Kyla was continuing to help us think about were there additional ways we might engage." *Id.* at 59:12-15. Further, "Kyla … was the principal designer of options around follow-up with respect to data." *Id.* at 59:16-18. And when "the Surgeon General's office put out an RFI around misinformation data" on March 3, 2022, "Kyla worked on that." *Id.* at 59:18-22. Kyla "was the subject matter expert who was chiefly creating options for the Surgeon General …  to consider how we would continue to … talk about mis- and disinformation with respect to data." *Id.* at 60:6-10.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that the Surgeon General's Advisory or RFI was used to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) the Advisory, RFI, or other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

245.    Kyla Fullenwider also participated in the "rollout calls" to the social-media platforms announcing the Surgeon General's health advisory on misinformation. *Id.* at 62:24-63:4.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that the Surgeon General's Advisory or "rollout calls" were used to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) the Advisory, "rollout calls," or other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

246.    Waldo was also "on some e-mails and at least one call with Rob Flaherty" when he "would communicate with Facebook." *Id.* at 64:9-11. This included a call with Rob Flaherty and the OSG: "[B]efore our call with Nick Mr. Clegg, … I had a call with Rob." *Id.* at 65:1-2. By then, Flaherty had been "separately communicating with Facebook," and he was "giving us a heads-up on his experiences … in communicating with … Facebook." *Id.* at 65:4-9.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that these communications were used to threaten or pressure Facebook to censor speech, or that Facebook regarded (or acted on) these or other communications as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

247.    In August 2021, Waldo joined a call with Rob Flaherty and Brian Rice of Facebook, who was in charge of Facebook's relationship with federal officials. *Id.* at 66:10-14, 124:24-125:2.

**RESPONSE:** Disputed to the extent this PFOF mischaracterizes Brian Rice as being "in charge of Facebook's relationship with federal officials." Mr. Waldo testified that Mr. Rice was, "I think, the main sort of like staff level liaison." Waldo Dep. 125:2-3. In any event, this PFOF contains no evidence that this call was used to threaten or pressure Facebook to censor speech, or that Facebook regarded (or acted on) this call or other communications as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

248.    In that August 2021 call, "Brian Rice from Facebook had requested a call to give us an update on some sort of internal action they were doing. … Facebook had either found something or removed something and was letting us know about it." *Id.* at 66:16-23.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that this call was used to threaten or pressure Facebook to censor speech, or that Facebook regarded (or acted on) this call or other communications as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

249.    Andy Mr. Slavitt of the White House also communicated with Nick Mr. Clegg. *Id.* at 67:14-21. When Andy Mr. Slavitt left the White House, he offered Surgeon General Murthy as a direct contact for Nick Mr. Clegg. *Id.* at 68:4-7.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that these contacts were used to threaten or pressure Facebook to censor speech, or that Facebook regarded (or acted

on) these or any other communications as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

250.   In addition, "Dr. Murthy has certainly had conversations with Dr. Fauci." *Id.* at 69:21-22. Waldo claims that he does not know the nature of those conversations. *Id.* at 69:23-25. "Dr. Murthy would have directly communicated with Dr. Fauci, to my knowledge." *Id.* at 70:13-15.

**RESPONSE:** Disputed to the extent the PFOF implies Mr. Waldo did not testify truthfully ("Waldo claims…"). Defendants further note that this PFOF contains no evidence that any conversations between Dr. Murthy and Dr. Fauci had anything to do with misinformation or social media platforms.

251.   Waldo is "certain that Dr. Murthy has connected" with Dr. Francis Collins. *Id.* at 71:2-9.

**RESPONSE:** Undisputed. Defendants further note that this PFOF contains no evidence that any communications between Dr. Murthy and Dr. Collins had anything to do with misinformation or social media platforms.

252.   Waldo was involved in collecting information to respond to Plaintiffs' interrogatories on behalf of OSG. *Id.* at 73:19-74:11.

**RESPONSE:** Undisputed, except to clarify that Mr. Waldo may not have known that the information was being collected specifically to respond to Plaintiffs' interrogatories in this case. *See* Waldo Dep. 73:11-74:1.

### C.   The Surgeon General Pressures Social-Media Platforms in Private.

253.   The first meeting with social-media platforms relating to misinformation that OSG identified in response to interrogatories was a brief introductory call with Nick Mr. Clegg on May 25, 2021: "On May 25, 2021, from 4:30 to 5:00 pm ET, Dr. Vivek Murthy from OSG and Andy Mr. Slavitt from the White House met remotely with Nick Mr. Clegg from Facebook. The purpose of the call was to introduce Dr. Murthy to Mr. Clegg." Waldo Ex. 3, at 32; *see also* Waldo Dep. 78:24-79:10. The next meeting disclosed was the first "rollout call" relating to the advisory on July 12, 2021. Waldo Ex. 3, at 32. As noted below, this interrogatory response failed to disclose several previous meetings between Dr. Murthy and Facebook.

**RESPONSE:** Disputed to the extent that this PFOF suggests that OSG's response to Plaintiffs' interrogatories was incomplete. Neither this PFOF, nor any others, contain any evidence that OSG has failed to identify meetings between *OSG* (including the time Dr. Murthy has served as Surgeon General) and Facebook that fits the parameters of Plaintiffs' discovery requests. *See also* Lesko Decl. ¶ 12 (Ex. 63). And in any event, this PFOF contains no evidence that these meetings were used to threaten or pressure Facebook to censor speech, or that Facebook regarded (or acted on) these meetings or any other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

254.     OSG had pre-rollout calls with Twitter and YouTube on July 12 and July 14, 2021, and a rollout call with Facebook the day after the rollout on July 16, 2021. *Id.* at 32; Waldo Dep. 85:10-90:5.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that these meetings were used to threaten or pressure social media companies to censor speech, or that social media companies regarded these meetings or any other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

255.     Kyla Fullenwider handled the substantive communications with the social-media platforms in the rollout calls; Waldo's role was to "connect them to our subject matter expert." Waldo Dep. 86:24-25.

**RESPONSE:** Undisputed, except to clarify the ambiguous term "substantive communications": Mr. Waldo testified that "Kyla would have walked them through the high-level view" of the Advisory. Waldo Dep. 86:20-21. In any event, this PFOF contains no evidence that these meetings were used to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) these meetings or any other communications by

OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

256.    The July 16 call with Facebook was "the same day" that President Biden stated of Facebook that "They're killing people" by not censoring enough misinformation. *Id.* at 90:24, 93:3-5.

**RESPONSE:** Disputed to the extent that this PFOF mischaracterizes the evidence in adding the phrase "by not censoring enough misinformation." That is not supported by the cited deposition testimony or the quote from President Biden. *See.* Ex 45 at 2 (transcript of President Biden's full quote). In any event, this PFOF contains no evidence that the July 16 meeting was used to threaten or pressure Facebook to censor speech, or that Facebook regarded (or acted on) this meeting or any other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

257.    At that July 16 call, Kyla Fullenwider "was able, at a high level, to walk over the … recommendations section for … technology companies," which demand greater censorship of misinformation. *Id.* at 91:14-16.

**RESPONSE:** Disputed, to the extent that the PFOF mischaracterizes the Advisory's recommendations as "demand[ing] greater censorship of misinformation." The Advisory does no such thing. *See* Waldo Ex. 11 at 13. Moreover, the Advisory does not make "demands"—as the quoted deposition testimony shows, these were "recommendations," and no PFOF (including this one) contains evidence that OSG made non-voluntary "demands" of a social media or technology company. In any event, this PFOF contains no evidence that the July 16 meeting or Advisory was used to threaten or pressure Facebook to censor speech, or that Facebook regarded (or acted on) this meeting or any other communications by OSG as such. Any implicit assertion to that effect is

unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

258.    The Facebook call "was definitely a slightly awkward call" because "President Biden made his comment about social media companies and Facebook killing people … right before, or even potentially during the call," and Waldo observed that "the Facebook team looked a little sad." *Id.* at 92:24-93:6.

**RESPONSE:** Undisputed, with the caveat that Mr. Waldo clarified in his testimony that the President's comment was not discussed during the call. Waldo Dep.93:7-9. He was thus speculating about whether the "Facebook team" was "sad" about the President's comment. In any event, this PFOF contains no evidence that the July 16 meeting was used to threaten or pressure Facebook to censor speech, or that Facebook regarded (or acted on) this meeting or any other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

259.    On July 23, 2021, Waldo, Dr. Murthy, and DJ Patil of the White House had a call with Nick Mr. Clegg and Brian Rice of Facebook. Waldo Ex. 3, at 32-33. Nick Mr. Clegg requested the meeting "to deescalate" and "reset the tone" because the "Facebook team were feeling … that they had been uniquely called out." Waldo Dep. 95:4-13.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that the July 23 meeting was used to threaten or pressure Facebook to censor speech, or that Facebook regarded (or acted on) this meeting or any other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

260.    After the meeting, Nick Mr. Clegg "did share definitely over e-mail more information about what they were doing to reduce mis- and disinformation, COVID mis- and disinformation on the platform." *Id.* at 96:13-17.

**RESPONSE:** Disputed to the extent that the cited deposition testimony does not support the PFOF's characterization that information was shared "[a]fter the meeting." Also disputed to

the extent that Mr. Waldo was recalling the contents of an e-mail that is in the record. *See* Waldo Ex. 19. The e-mail is the best evidence of what the e-mail said. Mr. Waldo was asked about documents in his deposition before being showed those documents; unsurprisingly, in his testimony he may have conflated two different emails. *See* Waldo Ex. 25; Waldo Ex. 21 at 1, 4-5. In any event, this PFOF contains no evidence that the July 23 meeting was used to threaten or pressure Facebook to censor speech, or that Facebook regarded (or acted on) this meeting or any other communications by OSG as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

261.    There was also "a follow-up e-mail sometime the next couple of weeks where … Nick or Brian shared … here's additional work we're doing, here's how we're responding to the advisory." *Id.* at 97:7-11.

**RESPONSE:** Disputed to the extent this PFOF mischaracterizes the evidence by asserting that this "follow-up e-mail" was different from the e-mail described in Plaintiffs' PFOF ¶ 260. Mr. Waldo testified that Nick Mr. Clegg sent one email on July 23, after his meeting with OSG, which was on week after OSG's initial meeting with Facebook. Waldo Dep. 97:1-11. The e-mail, which is in the record, *see* Waldo Ex. 21 at 1, 4-5, is the best evidence of what the e-mail said. In any event, this PFOF contains no evidence that OSG meetings with Facebook were used to threaten or pressure Facebook to censor speech, or that Facebook regarded (or acted on) this meeting or any other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

262.    This follow-up email provided "a catalog of … both removal of misinformation and other steps to tamp down mis- and disinformation." *Id.* at 97:16-22.

**RESPONSE:** Undisputed, but see Defs. Response to PFOF ¶¶ 260-61.

263.    Waldo believes that these were "new steps that they had taken in the week or so since … they felt uniquely called out on July 15th and 16th." *Id.* at 97:23-98:3. The email was in

response to a request from OSG "asking for, can you let us know, like, what you're doing in addition" to combat misinformation, "and so this was responding to that." *Id.* at 98:5-7.

**RESPONSE:** Undisputed that the testimony reads as such. However, as discussed in Defendants' response to PFOF ¶¶ 260-61, the PFOFs and deposition testimony conflate two different emails. *See* Waldo Ex. 25; Waldo Ex. 21 at 1, 4-5. The emails themselves are better evidence than Mr. Waldo's recollection over a year later. In any event, this PFOF contains no evidence that the communications between OSG and Facebook were used to threaten or pressure Facebook to censor speech, or that Facebook regarded (or acted on) these communications or any other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

264.     On the July 23 call with Facebook, "Dr. Murthy raised the issue of wanting to have a better understanding of the reach of the mis- and disinformation on … the social media platform." *Id.* at 98:19-22.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that the July 23 meeting was used to threaten or pressure Facebook to censor speech, or that Facebook regarded (or acted on) this meeting or any other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

265.     Waldo likens the problem of mis- and disinformation on social media to "eating, like, a piece of uranium," and compares misinformation to "cancer." *Id.* at 99:1-101:8.

**RESPONSE:** Disputed as a mischaracterization of the testimony. The testimony, read in full and in context, makes clear that the Surgeon General is "trying to understand not just the harm direction but the harm magnitude" such that the problem of misinformation could be like "eating a cookie or eating []a piece of uranium." Waldo Dep. 99:1-8. Similarly, Mr. Waldo's testimony is agnostic on whether the spread of misinformation is like "cancer": "I mean, again, you might say

spread – you might learn, we don't know, this is why you need research. We don't know – you know, maybe actually there isn't as much harm as we think, maybe the spread is actually not the problem. … I don't know if spread is actually harmful." Waldo Dep. 101:15-23. In any event, this PFOF contains no evidence that OSG threatened or pressured social media companies to censor speech, or that social media companies regarded (or acted on) any communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

266.    The OSG's health advisory advances the view that the spread of misinformation is "very harmful." *Id.* at 101:24-102:7.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that the Advisory was used to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) the Advisory or any other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

267.    Waldo agrees that the health advisory "provides specific examples to technology companies what they could do more of to reduce the spread of health mis- and disinformation." *Id.* at 104:16-18.

**RESPONSE:** Undisputed. However, the Advisory is the best evidence of what the Advisory says. And in any event, this PFOF contains no evidence that the Advisory was used to threaten or pressure technology companies to censor speech, or that technology companies (or acted on) regarded the Advisory or any other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

268.    Waldo uses the word "poison" to describe health misinformation, as did Dr. Murthy in announcing the Health Advisory. *Id.* at 105:4; Waldo Ex. 10, at 2.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that OSG threatened or pressured social media companies to censor speech, or that social media companies regarded (or acted on) any communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

269.    In the July 23, 2021 call with Nick Mr. Clegg, Dr. Murthy "didn't retreat … from the message of the advisory, which explicitly calls for social media platforms to do more to control the reach of misinformation on their platforms," and "continued … to discuss that message." Waldo Dep. 107:21-108:5.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that the July 23 meeting was used to threaten or pressure Facebook to censor speech, or that Facebook regarded (or acted on) this meeting or any other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

270.    In addition, in that call, the OSG asked Facebook to report back on "what they were doing in response to the advisory, if they were taking any actions." *Id.* at 109:2-4.

**RESPONSE:** Disputed as a mischaracterization of the testimony, which states that OSG asked Facebook "whether or not they would share what they were doing in response to the advisory." Waldo Dep. 109:2-4. The fact that OSG did not assume that Facebook would share any information—and indeed, asked "whether" it would do so—affirmatively supports Defendants' assertion that the July 23 meeting was not used to threaten or pressure Facebook to censor speech, and that Facebook did not regard (or acted on) this meeting or any other communications by OSG as such. Plaintiffs' implicit assertion otherwise is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

271.    In addition, Patil was "also asking the data impact questions." *Id.* at 109:24.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that the July 23 meeting was used to threaten or pressure Facebook to censor speech, or that Facebook regarded (or acted on) this meeting or any other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

272.    OSG perceived that OSG's and the White House's public statements criticizing Facebook put economic pressure on Facebook, and that Facebook was engaging with Dr. Murthy to "keep Dr. Murthy from saying … any other things that might be viewed as bad for their business." *Id.* at 113:13-15.

**RESPONSE:** Disputed as a mischaracterization of the testimony. The quoted testimony speaks for itself and does not support Plaintiffs' assertion that OSG "perceived that OSG's and the White House's public statements criticizing Facebook put economic pressure on Facebook." Mr. Waldo testified that OSG declined to have further calls with Facebook because "we thought that it was just more of a PR stunt for them to meet with us to sort of keep Dr. Murthy from saying other – you know, any other things that might be viewed as bad for their business." Waldo Dep. 113:8-15. Mr. Waldo further testified that "there was a recognition that [OSG] didn't think that there was much change that they were going to make in response to the []advisory … and we didn't think they were going to be transparent with us about that." Waldo Dep. 113:24-114:5. That testimony makes clear that Mr. Waldo's point was to explain why *OSG* did not think it was a "good use of Dr. Murthy's time" to engage with Facebook further. In sum, this PFOF contains no evidence that OSG threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

273.    Waldo agrees that the events of July 15 and July 16 put unique pressure on Facebook: "when you add the press conference remarks plus President Biden's remarks, it made it seem as though … there was more attention on Facebook." *Id.* at 116:2-5.

**RESPONSE:** Disputed as a mischaracterization of the testimony. The quoted testimony speaks for itself and does not support Plaintiffs' assertion that "the events of July 15 and July 16 put unique pressure on Facebook." Mr. Waldo was asked whether he knew why there was "a focus on Facebook" in that July time frame. Waldo Dep. 113:19-22. He responded that he thought the "focus on Facebook" resulted from "random luck or bad luck" because Facebook "was raised at the press conference" and "in the President's remarks" (which were made in response to a question about Facebook). Waldo Dep. 116:2-9. Mr. Waldo also testified that the Advisory "didn't call out individual organizations" and that OSG did not believe there was a "problem of misinformation [that] was particularly acute on Facebook as compared to other platforms." Waldo Dep. 116:5-16. He did not testify as to any "unique pressure." This PFOF contains no evidence that OSG threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

274.    The OSG's "subject matter experts" – Kyla Fullenwider, Daniel Tartakovsky, and DJ Patil of the White House – believed that misinformation "was a problem across multiple platforms." *Id.* at 116:15-16.

**RESPONSE:** Undisputed, except to clarify that DJ Patil was not an employee of OSG or one of OSG's "subject mater experts." In any event, this PFOF contains no evidence that OSG threatened or pressured social media companies to censor speech, or that social media companies regarded (or acted on) any communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

275.    On July 30, 2022, Waldo had a meeting with Google and YouTube representatives, in which the representatives reported to OSG on what actions they were taking that were consistent with or in response to the health advisory: "The topics discussed included YouTube/Google following up on the announcement of the OSG Advisory to share more of the work it was doing around health mis- and disinformation."  Waldo Ex. 3, at 33.

**RESPONSE:** Disputed as a mischaracterization of the evidence to the extent Plaintiffs assert "representatives reported to OSG on what actions they were taking that were consistent with or in response to the health advisory." The quoted language, which speaks for itself, does not support that proposition. Moreover, Mr. Waldo testified as follows about the content of the meeting: "I don't recall specifically, but [] the general tone was let us tell you what we're doing about this issue. ***I didn't – I didn't get the impression that it was new things. I got the impression that it was work that they were already doing.***" Waldo Dep. 120:10-15 (emphasis added); *see also* Waldo Dep. 121:15-25 ("I think I would remember [] if it was the something new."). Thus, the evidence directly contradicts Plaintiffs' characterization. In any event, this PFOF contains no evidence that OSG threatened or pressured Google/YouTube to censor speech, or that Google/YouTube regarded (or acted on) any communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

276.    When the OSG's health advisory issued, Twitter's policy handle publicly endorsed the OSG's call for greater censorship of health misinformation: "[T]he Twitter policy handle … either retweeted or quote tweeted and said something like, we agree. … [W]e do need an all-society approach, and here's what we're doing."  Waldo Dep. 122:11-16.

**RESPONSE:** Disputed as a mischaracterization to the extent that Plaintiffs assert "Twitter's policy handle publicly endorsed the OSG's call for greater censorship of health misinformation." The quoted testimony, which speaks for itself, says nothing about a "call for greater censorship," and OSG made no such call "for greater censorship." *See* Waldo Ex. 11 (OSG Advisory, which speaks for itself). Thus, this PFOF contains no evidence that the OSG Advisory

was used to threaten or pressure Twitter to censor speech, or that Twitter regarded (or acted on) the Advisory or any communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

277.    On August 10, 2021, Waldo and Rob Flaherty had a call with Facebook in which Facebook reported back to federal officials on its actions to remove misinformation, including the details of "an operation [Facebook] uncovered that is related to vaccine misinformation." Waldo Ex. 3, at 33 (alteration in original). According to Waldo, "Brian Rice had requested a call with me and Rob [Flaherty] and, during the call, flagged that Facebook … had done some sort of internal operation where … they discovered some misinformation pieces happening and had taken some corrective action." Waldo Dep. 124:13-21.

**RESPONSE:** Disputed as a mischaracterization of the evidence to the extent Plaintiffs assert Facebook "reported back." Neither the quoted language from Defendants' interrogatory responses (Waldo Ex. 3), the underlying email referenced in that response, *see* Ex. 182 (MOLA_DEFSPROD_00007276), nor the deposition testimony supports the proposition that Facebook was "report[ing] back." In any event, this PFOF contains no evidence that OSG threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

278.    Brian Rice was Facebook's "main … staff level liaison" with the federal officials. *Id.* at 125:2-3.

**RESPONSE:** Undisputed.

279.    Facebook emailed Waldo and Flaherty "a COVID report list that had … some sort of report from Facebook on a biweekly basis." *Id.* at 126:11-16.

**RESPONSE:** Undisputed. However, there is no evidence that this report was the result of or reflective of efforts by OSG or other federal officials to threaten or pressure Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG or other federal

officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

280.    On September 14, 2021, Waldo had another meeting with Google/YouTube representatives, "to discuss a new policy we [YouTube] are working on as well as provide an update on our overall efforts to combat harmful COVID-19 misinformation on the platform." Waldo Ex. 3, at 33. This was the "second update by [Google/Youtube] to [OSG] following the health advisory of stuff they're doing to combat harmful COVID-19 misinformation through YouTube." Waldo Dep. 129:7-12.

**RESPONSE:** Disputed as a mischaracterization and incomplete account of the evidence to the extent Plaintiffs imply that "following the health advisory" means *because* of or *in response to* the health advisory. Mr. Waldo testified that he largely did not recall the topic of conversation and that the "new policy" could have been "unrelated" to misinformation. Waldo Dep. 129:24-130:16; *see also* Defs.' Resp. to PFOF ¶ 275 (identifying Plaintiffs' mischaracterization of a previous meeting, which Mr. Waldo explained involved Google/YouTube pre-existent efforts to combat misinformation). In any event, this PFOF contains no evidence that the OSG Advisory was used to threaten or pressure Google/YouTube to censor speech, or that Google/YouTube regarded (or acted on) the Advisory or any communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

281.    On May 28, 2021, a few days after meeting with Andy Mr. Slavitt and Dr. Murthy for the first time (and almost two months before OSG issued the Health Advisory and had the related meetings with Waldo and others), Nick Mr. Clegg emailed Dr. Murthy and stated that, "[a]s promised," he was sending a report of misinformation on Facebook. Waldo Ex. 4, at 1. Mr. Clegg also "highlighted a few policy updates we announced yesterday regarding repeat misinformation," including "expand[ing] penalties for individual Facebook accounts that share misinformation," "add[ing] more context about pages that repeatedly share false claims," and "redesign[ing] notifications when they share content that a fact-checker later rates." *Id.*

**RESPONSE:** Disputed as a mischaracterization of the evidence, to the extent Plaintiffs state that Mr. Clegg was "sending a report of misinformation on Facebook." The email, Waldo Ex.

4, reads: "As promised, I'm sending our latest report that includes topline performing posts for the

weeks of 5/3-5/9 and 5/9-5/15." In any event, this PFOF contains no evidence that OSG threatened

or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any

communications by OSG as such. Any implicit assertion to that effect is unsupported by and

contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

282.    These "policy updates" about increasing censorship were announced on May 27, 2021, two days after Nick Mr. Clegg's meeting with Dr. Murthy and Andy Mr. Slavitt on May 25, 2021. Waldo Dep. 138:2-7.

**RESPONSE:** Disputed to the extent that Plaintiffs characterize the "policy updates" as

pertaining to "increasing censorship." None of the updates, which concerned content moderation

policies to which all Facebook users had to agree, mentions "censorship" or even the removal of

posts. Two of the three updates quoted in Waldo Ex. 4 make clear that content will remain

accessible ("added context" and "redesigned notifications"), and the third is ambiguous as to what

the "expand[ed] penalties" are. Defendants further note that the evidence does not establish that

the policy updates were *created* or *implemented* after May 25, only that they were *announced*

thereafter. The commonsense inference is that Facebook was working on these technical changes

prior to the May 25 call. Moreover, although the Clegg e-mail notes that the policies were

announced on May 27, they were actually announced on May 26, and they were not unique to

health misinformation—Facebook announced cross-substantive policy changes that would address

"false or misleading content about COVID-19 and vaccines, climate change, elections, or other

topics." Facebook, *Taking Action Against People Who Repeatedly Share Misinformation*, Meta

(May 26, 2021), https://perma.cc/M75G-YQB8. Thus, this PFOF contains no evidence that OSG

or other federal officials threatened or pressured Facebook to censor speech, or that Facebook

regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit

assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF

§ II.B, Arg. §§ II.B.1.c & II.B.2.

283.    Mr. Clegg plainly indicated that there had been prior conversations in which Mr. Slavitt and Dr. Murthy had demanded "defensive work" to remove misinformation: "We're . . . committed to addressing the defensive work around misinformation that you've called on us to address." Waldo Ex. 4, at 2. These prior conversations were not disclosed in OSG's responses to interrogatories, which noted the first meeting with Dr. Murthy was a mere introductory meeting with Mr. Clegg on May 25, 2021. Waldo Ex. 3, at 32.

**RESPONSE:** Disputed as a mischaracterization of the evidence to the extent Plaintiffs

assume that "there had been prior conversations in which Mr. Slavitt **and** Dr. Murthy had

demanded 'defensive work' to remove misinformation." (Emphasis added). First, the statement

does not establish that these conversations involved Mr. Slavitt *and* Dr. Murthy. *See* Defs.' Resp.

to PFOF ¶ 249 (making clear that Mr. Slavitt had been in prior contact with Mr. Clegg, and that

he introduced Dr. Murthy as a contact upon leaving the White House). This refutes Plaintiffs'

incorrect suggestion that OSG's responses to Plaintiffs' interrogatories were incomplete. *See also*

Defs. Resp. to PFOF ¶ 253. Second, the cited email from Facebook does not say that Mr. Slavitt

(or any other federal official) "demanded" "defensive work." It says (somewhat confusingly):

"We're also committed to addressing the defensive work around misinformation that you've called

on us to address." Waldo Ex. 4. In any event, this PFOF contains no evidence that OSG or other

federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or

acted on) any communications by OSG or other federal officials as such. Any implicit assertion to

that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg.

§§ II.B.1.c & II.B.2.

284.    On June 14, 2021, Nick Mr. Clegg emailed Dr. Murthy another ("the latest") "Facebook bi-weekly covid content report," which he indicated was "as promised/discussed," and offered "[a]s always" to "jump on a call at any point … to delve into any further details as needed." Waldo Ex. 5, at 1.

**RESPONSE:** Undisputed, except to note that Mr. Clegg's email was dated June 12, 2021. However, there is no evidence that this report was the result of or reflective of efforts by OSG to threaten or pressure Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

285.    The "Facebook bi-weekly covid content report," *id.*, contained a report of "the most engaged posts … with respect to both accurate and inaccurate information."  Waldo Dep. 140:8-10. Rob Flaherty of the White House also received these reports. *Id.* at 140:21-24.

**RESPONSE:** Undisputed. However, there is no evidence that this report was the result of or reflective of efforts by OSG or other federal officials to threaten or pressure Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

286.    Waldo admits that Facebook sending these biweekly reports to Dr. Murthy and Flaherty "had preexisted" and "predates the meeting" on May 25, 2021 – further indicating that OSG failed to disclose key meetings between Dr. Murthy and social media platforms in its interrogatory responses. *Id.* at 142:10-11.

**RESPONSE:** Disputed as a mischaracterization of the evidence. Read in context, it is clear that Mr. Waldo is testifying that the reports *existed* prior to May 25, *not* that they were sent to Dr. Murthy prior to May 25. *See* Waldo Dep. 142:8-11. Mr. Waldo testified "based on just a plain reading" of the email (Waldo Ex. 5), which says nothing about when Mr. Clegg started sending the reports to Dr. Murthy or OSG, but instead just makes clear that the reports are "bi-weekly" (which raises the inference that they were likely in existence more than the couple of weeks between May 25 and June 12, when the email was sent). Again, as explained throughout, Plaintiffs are wrong that OSG's interrogatory responses are incomplete. *See also* Defs.' Resp. to PFOF ¶ 253. In addition, the question asked by Plaintiffs' counsel was ambiguous—for example, it did

not specify that he was asking about when **Dr. Murthy** was sent the reports, as opposed to other federal officials or Mr. Slavitt. And having failed to seek clarification of the witness's answer, Plaintiffs cannot now rely on that answer to support a proposition to which it does not speak. In any event, there is no evidence that these reports were the result of or reflective of efforts by OSG or other federal officials to threaten or pressure Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

287.   On July 6, 2021, Waldo emailed contacts at Twitter to set up the "rollout call" before the health advisory and stated: "As you know, one of the issues Dr. Murthy has been thinking about is how to help stop the spread of health misinformation as we continue to tackle COVID19 and beyond. I know you and your teams are working hard and thinking deeply about this issue. We'd love to chat over zoom to connect and discuss what's on the horizon for our teams." Waldo Ex. 6, at 2; Waldo Dep. 145:15-146:22.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that OSG threatened or pressured Twitter to censor speech, or that Twitter regarded (or acted on) any communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

288.   On July 6, 2021, Waldo sent an identical email to Facebook. Waldo Ex. 7, at 3-4. The purpose of these emails was to set up calls to announce the Surgeon General's forthcoming health advisory on misinformation. Waldo Dep. 149:11-16. Because of scheduling conflicts, the "rollout call" with Facebook was not scheduled until July 16, the day after the advisory was announced and the same day President Biden stated of Facebook that "they're killing people." *Id.* at 149:11-17.

**RESPONSE:** Undisputed, except to the extent that the PFOF mischaracterizes President Biden as "stat[ing] of Facebook that 'they're killing people.'" *See* Defs.' PFOF § II.A; Ex 45 at ; *see also* Ex. 43 at 2-3 (President Biden clarifying his previous comment). However, this PFOF contains no evidence that OSG threatened or pressured Facebook to censor speech, or that

Facebook regarded (or acted on) any communications by OSG as such. Any implicit assertion to

that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg.

§§ II.B.1.c & II.B.2.

289.   On July 6, 2021, Waldo also sent an email to YouTube with a similar statement to
set up a rollout call with YouTube. Waldo Ex. 8, at 3. Waldo's emails make clear that OSG's
message and purpose was to "stop the spread of misinformation" on social-media platforms. *Id.*

**RESPONSE:** Disputed as a mischaracterization of the evidence. First, the purpose of the

email was to "connect[] with people at Google, slash, YouTube." Waldo Dep. 151:7-11. Second,

this email (and the emails cited in previous exhibits), which speaks for itself, did not "make clear

that OSG's message and purpose was to 'stop the spread of misinformation' on social-media

platforms" to the extent Plaintiffs are implying that OSG's message and purpose was demanding

censorship. The email states: "As you know, one of the issues Dr. Murthy has been thinking about

is how to help stop the spread of health misinformation as we continue to tackle COVID19 and

beyond." Waldo Ex. 8 at 3. Mr. Waldo described that call as "giving [Google/YouTube] a high-

level update that we're going to have this advisory come out and that we want them to take a look

at it." Waldo Dep. 153:24-154:1. In any event, this PFOF contains no evidence that OSG

threatened or pressured Google/YouTube to censor speech, or that Google/YouTube regarded (or

acted on) any communications by OSG as such. Any implicit assertion to that effect is unsupported

by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

290.   In these calls, "we had Kyla [Fullenwider] on the call and giving them a high-level
update that we're going to have this advisory come out and that we want them to take a look at it."
Waldo Dep. 153:23-154:1.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that OSG used these

calls to threaten or pressure social media companies to censor speech, or that social media

companies regarded (or acted on) these calls or any other communications by OSG as such. Any

implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

291.   On July 10, 2021, Nick Mr. Clegg emailed Dr. Murthy, attaching another bi-weekly Covid content report, and stated, "I understand ... that my team is meeting with yours next week to delve deeper into our [C]ovid misinformation efforts." Waldo Ex. 9, at 1. Waldo understands that this refers to the July 16 rollout meeting. Waldo Dep. 155:12-18.

**RESPONSE:** Undisputed. Defendants further note that Mr. Clegg's email makes clear that Facebook's "misinformation efforts" were Facebook's ("our") *own*, and that they preceded the Advisory. *See also* Waldo Dep. 157:15-16 (Plaintiffs' counsel understanding the email to refer to "*Facebook's* COVID misinformation efforts" (emphasis added)). Thus, this PFOF contains no evidence that OSG threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

292.   In the July 16, 2021 meeting with Facebook, Kyla Fullenwider went over the advisory, and then "asked additional questions … related to Facebook's efforts to combat health misinformation," including "some questions about, again, the research side.… [S]ome questions came up about CrowdTangle, if I recall correctly which was a … data port for … some ways to understand the Facebook, again, impact and research of the misinformation." *Id.* at 157:21-159:9.

**RESPONSE:** Undisputed, except to note that Mr. Waldo qualified his testimony due to lack of definitive recollection ("I think"; "I'm not exactly positive"). In any event, this PFOF contains no evidence that OSG used the July 16, 2021 meeting to threaten or pressure Facebook to censor speech, or that Facebook regarded (or acted on) this meeting or any other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

### D.      The Surgeon General's Public Pressure Campaign.

293.      On July 15, 2021, Dr. Murthy participated in a White House press conference with
White House Press Secretary Jennifer Psaki to announce the Surgeon General's Health Advisory
on Misinformation. Waldo Ex. 10. Psaki announced of Dr. Murthy that "[t]oday, he published an
advisory on health misinformation as an urgent public health crisis." *Id.* at 1.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that the press

conference or Advisory was used to threaten or pressure social media companies to censor speech,

or that social media companies regarded (or acted on) the press conference, Advisory or any other

communications as such. Any implicit assertion to that effect is unsupported by and contrary to

the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

294.      At the press conference, Dr. Murthy described misinformation as "one of the
biggest obstacles that's preventing us from ending this pandemic," and stated: "Today, I issued a
Surgeon General's Advisory on the dangers of health misinformation. Surgeon General Advisories
are reserved for urgent public health threats…. [T]oday we live in a world where misinformation
poses an imminent and insidious threat to our nation's health." *Id.* at 2. He stated that
"misinformation takes away our freedom to make informed decisions about our health and the
health of our loved ones." *Id.* at 2.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that OSG used this

press conference or the Advisory to threaten or pressure social media companies to censor speech,

or that social media companies regarded (or acted on) the press conference, Advisory, or any other

communications by OSG as such. Any implicit assertion to that effect is unsupported by and

contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

295.      Dr. Murthy's definition of "misinformation" incorporates the notion that the
definition changes over time: "Health misinformation is false, inaccurate, or misleading
information about health, according to the best evidence at the time." *Id.* at 2. Waldo agrees that
this definition "contemplate[s] that what constitutes misinformation might change over time," and
that "something that we now think is misinformation may later turn out to be accurate information
… [a]nd vice versa." Waldo Dep. 164:17-165:7.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that OSG used this

press conference or the Advisory to threaten or pressure social media companies to censor speech,

or that social media companies regarded (or acted on) the press conference, Advisory, or any other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

296.    Dr. Murthy stated that those who question mask mandates and decline vaccination are following misinformation: "During the COVID 19 pandemic, health misinformation has led people to resist wearing masks in high-risk settings. It's led them to turn down proven treatments and to choose not to get vaccinated. This has led to avoidable illnesses and death. Simply put, health [mis]information has cost us lives." Waldo Ex. 10, at 2.

**RESPONSE:** Disputed as a mischaracterization of the evidence. The quoted language, which speaks for itself, does not state that "those who question mask mandates and decline vaccination are following misinformation." In any event, this PFOF contains no evidence that OSG used this press conference or the Advisory to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) the press conference, Advisory, or any other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

297.    Dr. Murthy placed specific blame on social-media platforms for the spread of misinformation: "Now, health misinformation didn't start with COVID-19. What's different now, though, is the speed and scale at which health misinformation is spreading. Modern technology companies have enabled misinformation to poison our information environment with little accountability to their users. They've allowed people who intentionally spread misinformation — what we call 'disinformation' — to have extraordinary reach." *Id.* at 2. Dr. Murthy described social-media companies as enabling the spread of "poison" in our "information environment." *Id.*

**RESPONSE:** Undisputed except to observe that the Advisory and press conference explicitly call for an "all-of-society approach" with "recommendations for everyone," Waldo Ex. 10 at 2, which includes but is not limited to social-media platforms. In any event, this PFOF contains no evidence that OSG used this press conference or the Advisory to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) the press conference, Advisory, or any other communications by OSG as such. Any implicit

assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

298.    He blamed the platforms' algorithms and features for the spread as well: "They've designed product features, such as 'Like' buttons, that reward us for sharing emotionally charged content, not accurate content. And their algorithms tend to give us more of what we click on, pulling us deeper and deeper into a well of misinformation." *Id.*

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that OSG used this press conference or the Advisory to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) the press conference, Advisory, or any other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

299.    Echoing the language of the Virality Project, Dr. Murthy stated, "we need an all-of-society approach to fight misinformation." *Id.* at 2.

**RESPONSE:** Disputed to the extent the Plaintiffs assert that Dr. Murthy's statement "echo[ed] the language of the Virality Project." No evidence is cited for that assertion, and the Virality Project report that Plaintiffs rely on, Waldo Ex. 28, post-dates the press conference by the better part of a year (April 2022 versus July 2021). In any event, this PFOF contains no evidence that OSG used this press conference or the Advisory to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) the press conference, Advisory, or any other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

300.    Dr. Murthy announced: "we're saying we expect more from our technology companies. We're asking them to operate with greater transparency and accountability. We're asking them to monitor misinformation more closely. We're asking them to consistently take action against misinformation super-spreaders on their platforms." *Id.* at 3. Both the call for "transparency and accountability" and the request for increased monitoring and greater censorship of "super-spreaders" mirror the Virality Project report. *See infra.*

**RESPONSE:** Disputed to the extent Plaintiffs assert that Dr. Murthy's statements "mirror the Virality Project report." No evidence is specifically cited for that assertion (Plaintiffs' "infra" cross-reference is insufficiently specific, and any assertions will be addressed in Defendants' responses to the relevant PFOFs), and the Virality Project report that Plaintiffs rely on, Waldo Ex. 28, post-dates the press conference by the better part of a year (April 2022 versus July 2021). Furthermore, the statement, which speaks for itself, does not "request" "greater censorship of 'super-spreaders.'" Defendants further state that the quoted language is only one of six points that Dr. Murthy made at this portion of the press conference; read in context, it is clear that neither Dr. Murthy's press conference statements nor the Advisory are solely focused on technology companies. *See* Waldo Ex. 28 at 3. In any event, this PFOF contains no evidence that OSG used this press conference or the Advisory to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) the press conference, Advisory, or any other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

301.    Both Dr. Murthy's public statements and his health advisory repeatedly use the word "accountable" and "accountability" to refer to the social-media platforms—again, echoing the Virality Project report. *See id.* at 2, 3, 5; Waldo Ex. 11, at 14, 16.

**RESPONSE:** Disputed as a mischaracterization of the evidence. Some of the uses of "accountable" are not references solely (or at all) to social media platforms. *See* Waldo Ex. 10 at 5 ("[A]ll of us have to ask: How we can be more accountable and responsible for the information that we share?"); Waldo Ex. 11 at 16 ("We need institutions to recognize that this issue is their moral and civic responsibility, too, and that they are accountable."). And again, Plaintiffs wrongly assert that the statements and Advisory "echo[] the Virality Project": No evidence is cited for that assertion, and the Virality Project report, Waldo Ex. 28, post-dates the press conference and

Advisory by nearly a year (April 2022 versus July 2021). In any event, this PFOF contains no evidence that OSG used this press conference or the Advisory to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) the press conference, Advisory, or any other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

302.   Waldo agrees that the word "accountable" carries with it the threat of consequences; he concedes that "accountability includes accepting the consequences for when you do something wrong … or inappropriate." Waldo Dep. 171:4-8. Thus, the OSG's repeated reference to holding social-media platforms "accountable" entails an implied threat of adverse consequences if the platforms do not censor more health misinformation. *See id.*

**RESPONSE:** Disputed as a mischaracterization of the testimony. First, Mr. Waldo did not agree that the definition of "accountable" carries any "threat." Second, the quoted definition of "accountable" was supplied by Plaintiffs' counsel, *see* Waldo Dep. 171:4-6 ("Q: Does accountability include accepting the consequences for when you do something wrong or inappropriate?"), and Mr. Waldo responded that "that's a fair and modern use of the word accountable," *id.* at 171:7-8. In the specific context of the Surgeon General's Advisory, however, Mr. Waldo testified to his view that "accountability" means "accountability to the . . . public around this public health emergency." *Id.* at 175:5-11. Thus, this PFOF contains no evidence that OSG threatened or pressured social media companies to censor speech, or that social media companies regarded any communications (or acted on) by OSG as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

303.   The Surgeon General's use of the word "accountable" also echoes the repeated use of the word "accountable" by elected federal officials, including President Biden and his political allies, to threaten adverse legal consequences against social-media platforms if they do not increase censorship of disfavored speakers, speech, and viewpoints. *See, e.g.,* Jones Decl., Ex. R (quoting

White House Communications Director Kate Bedingfield: "We're reviewing [amending Section 230 of the Communications Decency Act], and certainly [the social media companies] should be held accountable. I think you've heard the president speak very aggressively about this.").

**RESPONSE:** Disputed as unsupported by the cited evidence. This PFOF cites to a single instance of a statement by a White House official, not "repeated use of the word 'accountable.'" Moreover, in the cited interview, the White House Communications Director was asked whether the President would support amending Section 230 so as to "hold the [social media companies] accountable in a real way," and she demurred on the Section 230 question while noting that "certainly [the companies] should be held accountable." Ex. 46 at 5. However, on July 19, 2021, President Biden clarified the meaning of "accountable:" "When you say hold accountable, I just want to – I'm not trying to hold people accountable. I'm trying to make people look at themselves, look in the mirror, think about that misinformation going to your son, your daughter, your relatives, someone you love. That's all I'm asking." Ex. 43 at 3. Moreover, this PFOF cites no evidence to support the proposition that the Surgeon General's use of the word "accountable" "echoes" the use of the word by other "elected federal officials," in the sense of intentionally choosing to repeat that word because it has been previously used. In addition, the cited evidence says nothing about OSG (or other federal officials) seeking to have social media platforms "increase censorship of disfavored speakers, speech, and viewpoints." In short, Plaintiffs characterization of written statements—which speak for themselves—is unsupported. Thus, this PFOF contains no evidence that OSG or any other federal official threatened or pressured social media companies to censor speech, or that social media companies regarded (or acted on) any communications by OSG or other federal official as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

304.    Waldo agrees that Murthy's comments entail that "there's an obligation … or certainly an imperative to do more. So … not only stop but reduce or take some sort of mitigating

efforts so that the misinformation and disinformation is not leading to poor health results for people." Waldo Dep. 172:21-173:1.

**RESPONSE:** Disputed to the extent Plaintiffs imply that "obligation" or "imperative," as used in this context, means a legally binding obligation as opposed to a voluntary, but moral, imperative. OSG has no regulatory or enforcement authority, both generally and with respect to social media platforms. Lesko Decl. ¶ 3 (Ex. 63). On its face, the Advisory contains non-binding recommendations for technology companies—and others—that do not constitute an obligation. *See, e.g.*, Waldo Ex. 11 at 12; Waldo Ex. 10 at 2 (Dr. Murthy stating at press conference, "And that's why this advisory that I issued today has recommendations for everyone."). Thus, this PFOF contains no evidence that "Dr. Murthy's comments" threatened or pressured social media companies to censor speech, or that social media companies regarded (or acted on) this or any other statements by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

305.    Dr. Murthy's call for greater "transparency" is a call for platforms to engage in the kind of data-sharing that Dr. Murthy, Rob Flaherty, DJ Patil, and Kyla Fullenwider, among others, demanded in private meetings with Facebook. *Id.* at 174:15-23. Again, this echoes the key recommendation of the Virality Project.

**RESPONSE:** Disputed. First, this PFOF mischaracterizes this testimony to the extent that it states OSG and other federal officials "demanded" data-sharing. Plaintiffs' counsel's own questions belie that characterization: "We're *asking* them to do things" (Waldo Dep. 174:12-13) and "data sharing[] was *raised* in these private calls" (*Id.* at 174:17-18) (emphases added). Second, the PFOF cites no evidence for the proposition that Dr. Murthy's comments "echoes the key recommendation of the Virality Project"; in any event, as explained above, the Virality Project report that Plaintiffs rely on post-dates the Advisory and July press conference by the better part of a year. In short, this PFOF contains no evidence that "Dr. Murthy's call for greater

'transparency'" threatened or pressured social media companies to censor speech, or that social media companies regarded (or acted on) this or any other statements or communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

306.    Waldo agrees that Dr. Murthy's call for greater "accountability" includes a demand to "take more proactive steps to stop the spread of misinformation."  *Id.* at 176:1-4.

**RESPONSE:** Disputed as a mischaracterization of the testimony to the extent it frames Dr. Murthy's statement as a "demand." Plaintiffs' counsel's question reads: "In other words, we're *asking* them to take more proactive steps…" Waldo Dep. 176:1-3 (emphasis added). In any event, this PFOF contains no evidence that "Dr. Murthy's call for greater 'accountability'" threatened or pressured social media companies to censor speech, or that social media companies regarded (or acted on) this or any other statements or communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

307.    Dr. Murthy also demanded that the platforms do "much, much more" and "take aggressive action" against misinformation: "We know that the dramatic increase in the speed — speed and scale of spreading misinformation has, in part, been enabled by these platforms. So that's why in this advisory today, we are asking them to step up. We know they have taken some steps to address misinformation, but much, much more has to be done. And we can't wait longer for them to take aggressive action because it's costing people their lives."  Waldo Ex. 10, at 5.

**RESPONSE:** Disputed as a mischaracterization of the testimony to the extent it frames Dr. Murthy's statement as a "demand." The quoted language, which speaks for itself, says "we are *asking* them to step up" (emphasis added). And the Advisory contains non-binding recommendations, not "demands." *See* Defs.' PFOF § II.B. In any event, this PFOF contains no evidence that OSG used this press conference or the Advisory to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) the press

conference, Advisory, or any other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

308.   Dr. Murthy also stated that platforms "have to do more to reduce the misinformation that's out there so that the true voices of experts can shine through." *Id.* at 6.

**RESPONSE:** Undisputed. In any event, this PFOF contains no evidence that OSG used this press conference or the Advisory to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) the press conference, Advisory, or any other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

309.   After the advisory, OSG asked Facebook, Google/YouTube, and Twitter "as a follow-up what actions they might have taken in response to the advisory." Waldo Dep. 181:15-21.

**RESPONSE:** Undisputed, except to clarify that Mr. Waldo testified "I think [we asked] Facebook and Twitter, maybe Google." Waldo Dep. 181:19-20. However, this PFOF contains no evidence that OSG used the Advisory to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) the Advisory, or any other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

310.   At the same press conference on July 15, 2021, Jennifer Psaki stated: "we are in regular touch with these social media platforms, and those engagements typically happen through members of our senior staff, but also members of our COVID-19 team." Waldo Ex. 10, at 10.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that federal officials pressured or threatened social media companies to censor speech, or that social media companies regarded (or acted on) any communications by federal officials as such. Any implicit assertion to

that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

311.    Psaki stated: "We've increased disinformation research and tracking within the Surgeon General's office. We're flagging problematic posts for Facebook that spread disinformation." *Id.*

**RESPONSE:** Undisputed, with the caveat that Mr. Waldo testified that he did not "know what [Ms. Psaki was] referring to," but it most likely meant the "research done by the policy team in the creation of the advisory." Waldo Dep. 186:5-19. He was "not familiar with any . . . increase in tracking" of "disinformation." *Id.* at 186:18-19. In any event, this PFOF contains no evidence that OSG or other federal officials pressured or threatened social media companies to censor speech, or that social media companies regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2 (White House); Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2 (Surgeon General).

312.    "Regarding the Administration's "asks" to social-media platforms, Psaki stated: "There are also proposed changes that we have made to social media platforms, including Facebook, and those specifically are four key steps: One, that they measure and publicly share the impact of misinformation on their platform. Facebook should provide, publicly and transparently, data on the reach of COVID-19 — COVID vaccine misinformation. Not just engagement, but the reach of the misinformation and the audience that it's reaching." *Id.* at 11. Again, this echoes the key recommendation of the Virality Project report. It also echoes Dr. Murthy's call for "transparency" and the repeated private demands that Facebook give external researchers like Renee DiResta of the Virality Project access to its internal data. Waldo Dep. 191:17-21.

**RESPONSE:** Disputed as a mischaracterization of, and unsupported by, the cited evidence. First, to the extent "echo" implies intentionally repeating a prior statement, the PFOF makes no sense: the Virality Project report post-dated the press conference by the better part of a year (April 2022 vs. July 2021). Second, the cited portion of Mr. Waldo's deposition says nothing about "repeated private demands that Facebook give external researchers like Renee DiResta of

the Virality Project access to its internal data." In short, this PFOF contains no evidence that OSG or other federal officials pressured or threatened Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2 (White House); Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2 (Surgeon General).

313.    Psaki also stated: "Second, that we have recommended — proposed that they create a robust enforcement strategy that bridges their properties and provides transparency about the rules. So, about — I think this was a question asked before — there's about 12 people who are producing 65 percent of anti-vaccine misinformation on social media platforms All of them remain active on Facebook, despite some even being banned on other platforms, including Facebook — ones that Facebook owns."  Waldo Ex. 10, at 11.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that federal officials pressured or threatened social media companies to censor speech, or that social media companies regarded (or acted on) any communications by federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

314.    Psaki stated: "Third, it's important to take faster action against harmful posts. As you all know, information travels quite quickly on social media platforms; sometimes it's not accurate. And Facebook needs to move more quickly to remove harmful, violative posts — posts that will be within their policies for removal often remain up for days. That's too long. The information spreads too quickly."  *Id.*

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that federal officials pressured or threatened social media companies to censor speech, or that social media companies regarded (or acted on) any communications by federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

315.    Waldo agrees that the Surgeon General's advisory calls for platforms to "move faster" and take "more aggressive" action against supposed misinformation. Waldo Dep. 194:20-21.

**RESPONSE:** Disputed to the extent the PFOF says "against supposed misinformation."

Plaintiffs' counsel's question in the deposition referred to "harmful posts" and Mr. Waldo

answered: "I don't recall that level of specificity within the advisory, but the -- certainly the

advisory overall has recommendations for technology companies, including -- I think there's more

vague language of sort of that that says something to the extent of move faster or -- or, you know,

more aggressive, but I don't think it -- this level of specificity." Waldo Dep. 194:14-22. The

Advisory is the best evidence of what the Advisory says; Mr. Waldo's attempt to recall the contents

of a public document that he was not looking at has minimal probative value. In any event, it is

unclear what purpose it serves to cite Mr. Waldo's "agreement" (based on an amorphous

recollection) when the Court can look to the Advisory itself to understand what it does (and does

not) say. In short, this PFOF contains no evidence that OSG used the Advisory to threaten or

pressure social media companies to censor speech, or that social media companies regarded (or

acted on) the Advisory or any other communications by OSG as such. Any implicit assertion to

that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg.

§§ II.B.1.c & II.B.2.

316.    And Psaki stated, publicly criticizing Facebook: "Finally, we have proposed they promote quality information sources in their feed algorithm. Facebook has repeatedly shown that they have the levers to promote quality information. We've seen them effectively do this in their algorithm over low-quality information and they've chosen not to use it in this case. And that's certainly an area that would have an impact." Waldo Ex. 10, at 11.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Ms. Psaki's explanation

of the White House's proposal as a "criticiz[m]" of Facebook. The cited statement does not support

that characterization. In any event, this PFOF contains no evidence that federal officials pressured

or threatened social media companies to censor speech, or that social media companies regarded (or acted on) any communications by federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

317. Psaki concluded: "So, these are certainly the proposals. We engage with them regularly and they certainly understand what our asks are." *Id.*

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that federal officials pressured or threatened social media companies to censor speech, or that social media companies regarded (or acted on) any communications by federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

318. On the same day, July 15, 2021, Surgeon General Murthy issued his advisory, "Confronting Health Misinformation: The U.S. Surgeon General's Advisory on Building a Healthy Information Environment." Waldo Ex. 11, at 1 (the "Health Advisory"); Waldo Dep. 196:21-197:1.

**RESPONSE:** Undisputed.

319. The Health Advisory describes censorship of health misinformation as a "moral and civic imperative": "Health misinformation is a serious threat to public health. … Limiting the spread of health misinformation is a moral and civic imperative that will require a whole-of-society effort." Waldo Ex. 11, at 2. The "whole-of-society effort" echoes the language of the Virality Project.

**RESPONSE:** Disputed to the extent that this PFOF mischaracterizes the evidence. First, the Advisory says nothing about "censorship of health misinformation." Second, Plaintiffs provide no evidence for the last sentence of the PFOF; and as already noted, the Virality Project report post-dates the Advisory by the better part of a year. In any event, this PFOF contains no evidence that OSG used the Advisory to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) the Advisory or any other communications by

OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

320.    The Health Advisory states: "Misinformation has caused confusion and led people to decline COVID-19 vaccines, reject public health measures such as masking and physical distancing, and use unproven treatments." *Id.* at 4.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that OSG used the Advisory to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) the Advisory or any other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

321.    The Health Advisory specifically blames social-media platforms for the spread of misinformation: "In recent years, the rapidly changing information environment has made it easier for misinformation to spread at unprecedented speed and scale, especially on social media and online retail sites, as well as via search engines." *Id.* at 5. According to the Advisory, "misinformation is often framed in a sensational and emotional manner that can connect viscerally, distort memory, align with cognitive biases, and heighten psychological responses such as anxiety. People can feel a sense of urgency to react to and share emotionally charged misinformation with others, enabling it to spread quickly and go 'viral.'" *Id.*

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the Advisory, which speaks for itself (and contradicts the PFOF, as evidenced by the quoted language from the Adivsory). In particular, the Advisory does not "specifically blame social-media platforms," but, as stated in the quoted passage, attributes the "speed and scale" at which misinformation can now spread to the "changing information environment" as a whole. *See, e.g.*, Waldo Ex. 11 at 6 ("each of us has a role to play" in addressing misinformation); *id.* at 12 ("Addressing health misinformation will require a whole-of-society effort."). In any event, this PFOF contains no evidence that OSG used the Advisory to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) the Advisory or any other

communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

322. In addition, the Advisory blames "product features" of platforms: "[P]roduct features built into technology platforms have contributed to the spread of misinformation. For example, social media platforms incentivize people to share content to get likes, comments, and other positive signals of engagement. These features help connect and inform people but reward engagement rather than accuracy, allowing emotionally charged misinformation to spread more easily than emotionally neutral content." *Id.*

**RESPONSE:** Disputed, to the extent the PFOF mischaracterizes the Advisory, which speaks for itself. In the quoted passage, the Advisory does not "blame[]" social-media platforms for the spread of misinformation, but merely identifies certain features of technology platforms as "contribut[ing]" factors. In any event, this PFOF contains no evidence that OSG used the Advisory to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) the Advisory or any other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

323. The Advisory also faults platforms' "algorithms": "algorithms that determine what users see online often prioritize content based on its popularity or similarity to previously seen content. As a result, a user exposed to misinformation once could see more and more of it over time, further reinforcing one's misunderstanding." *Id.*

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the Advisory, which in the quoted passage does not "fault[]" platforms but merely describes the manner in which their content-recommendation algorithms function. In any event, this PFOF contains no evidence that OSG used the Advisory to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) the Advisory or any other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

324.   The Health Advisory specifically called for platforms to enact "policy changes" to reduce the spread of misinformation: "**Implement product design and policy changes on technology platforms** to slow the spread of misinformation." *Id.* at 7 (bold in original).

**RESPONSE:** Undisputed, except to clarify that "called for" does not mean a binding or

non-voluntary demand. The Advisory contains "recommendations." *See* Waldo Ex. 11 at 3 (Dkt.

210-12) ("A Surgeon General's Advisory is a public statement that calls the American people's

attention to a public health issue and provides recommendations for how that issue should be

addressed."). In any event, this PFOF contains no evidence that OSG used the Advisory to threaten

or pressure social media companies to censor speech, or that social media companies regarded (or

acted on) the Advisory or any other communications by OSG as such. Any implicit assertion to

that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg.

§§ II.B.1.c & II.B.2.

325.   The Health Advisory also explicitly threatened future "legal and regulatory measures" to combat misinformation: "**Convene federal, state, local, territorial, tribal, private, nonprofit, and research partners** to explore the impact of health misinformation, identify best practices to prevent and address it, issue recommendations, and find common ground on difficult questions, including *appropriate legal and regulatory measures that address health misinformation* …." *Id.* at 7 (bold in original, italics added).

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the Advisory, which

issued no threats and suggested an "area[] of action" that included "conven[ing]" "*private*"

"partners"—i.e., social media platforms and technology companies—to find "***common ground***"

on possible "legal and regulatory measures." In addition, the omitted section of the quotation

states: "including appropriate legal and regulatory measures that address health misinformation

***while protecting user privacy and freedom of expression***." Waldo Ex. 11 at 7. Moreover, OSG

does not have any regulatory or enforcement authority. Lesko Decl. ¶ 3 (Ex. 63). In short, this

PFOF contains no evidence that OSG used the Advisory to threaten or pressure social media

companies to censor speech, or that social media companies regarded (or acted on) the Advisory

or any other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

326.    Under the heading "What Technology Platforms Can Do," the Health Advisory called for platforms to take a series of steps to increase and enable greater social-media censorship of "misinformation," including the following: "[M]ake meaningful long-term investments to address misinformation, including product changes. Redesign recommendation algorithms to avoid amplifying misinformation, build in "frictions" … to reduce the sharing of misinformation, and make it easier for users to report misinformation. Give researchers access to useful data to properly analyze the spread and impact of misinformation. Strengthen the monitoring of misinformation. … [A]ddress misinformation in live streams, which are more difficult to moderate due to their temporary nature and use of audio and video. Prioritize early detection of misinformation 'super-spreaders' and repeat offenders. Impose clear consequences for accounts that repeatedly violate platform policies. Evaluate the effectiveness of internal policies and practices in addressing misinformation and be transparent with findings. Publish standardized measures of how often users are exposed to misinformation and through what channels, what kinds of misinformation are most prevalent, and what share of misinformation is addressed in a timely manner. Communicate why certain content is flagged, removed, downranked, or left alone." *Id.* at 12.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the Advisory. The Advisory's identification of modifications that platforms voluntarily could make to their content-recommendation algorithms, and additional steps they voluntarily could take to ensure enforcement of their content moderation policies, to which all users must agree, did not constitute a "call" for platforms to "increase and enable greater social-media censorship" There are also minor alterations to the text and missing ellipses that are not reflected in the PFOF. *See* Waldo Ex. 11 at 12. In any event, this PFOF contains no evidence that OSG used the Advisory to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) the Advisory or any other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

327.    Waldo agrees that the Advisory calls for platforms to provide "a method for users to flag problematic posts so that they could be reviewed for content modulation, policy violations." Waldo Dep. 200:25-201:5.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Mr. Waldo as agreeing that the Advisory "call[ed]" on the platforms to do anything. Immediately prior to the quoted language, Mr. Waldo emphasized the voluntary nature of all the items in the Advisory: "[I]t suggests that these are things they can do. … It's a recommendation." Waldo Dep. 200:16-19. In any event, this PFOF contains no evidence that OSG used the Advisory to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) the Advisory or any other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

328.    Waldo agrees that "clear consequences" for repeat violators include "things like issuing strikes against them, suspensions … and sometimes permanent deplatforming." *Id.* at 205:6-13.

**RESPONSE:** Disputed to the extent this PFOF mischaracterizes Mr. Waldo's testimony. Mr. Waldo was asked whether "clear consequences for repeat violator of policies usually includes things like issuing strikes against them, suspensions, . . . and sometimes permanent deplatforming." Waldo Dep. 205:6-10. He answered: "Those are examples of . . . current policies in place by social media companies, correct." Waldo Dep. 205:11-13. He did not testify that the Advisory was recommending any of those particular actions. In any event, this PFOF contains no evidence that OSG used the Advisory to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) the Advisory or any other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

329.    In its conclusion, the Health Advisory states: "We need institutions to recognize that this issue is their moral and civic responsibility, too, and that they are accountable."  Waldo

Ex. 11, at 16. Waldo agrees that the word "accountable" is repeated in the Surgeon General's remarks and the Advisory itself. Waldo Dep. 206:3-11.

**RESPONSE:** Undisputed. Defendants further state that immediately prior to the quoted language the Advisory states: "[A]ll of us, in every sector of society, have a responsibility to act" and "address[ing] misinformation" is also "an individual responsibility." In any event, this PFOF contains no evidence that OSG used the Advisory to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) the Advisory or any other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

### F.   The Surgeon General's Collaboration with the Virality Project.

330.    Also on January 15, 2021, Surgeon General Murthy participated in a separate launch event hosted by Stanford Internet Observatory, which was then operating the Virality Project. Waldo Ex. 12, at 1; Waldo Dep. 206:12-207:9.

**RESPONSE:** Disputed to the extent that the cited evidence does not support the proposition that the Stanford Internet Observatory ("SIO") was "then operating the Virality Project." Furthermore, "January 15" appears to be a typo; it should read "July 15, 2021." Defendants further note that OSG understood the July 15 event to be an event hosted by SIO, not the Virality Project. *See* Lesko Decl. ¶ 15 (Ex. 63). Indeed, the event's public announcement— submitted by Plaintiffs into evidence—does not reflect any affiliation with the Virality Project. *See* Waldo Ex. 12 at 1-2. In any event, this PFOF contains no evidence that OSG used this event to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) the event, or any other statements by OSG, as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

331.   In his public comments with Stanford Internet Observatory, Dr. Murthy stated: "We're asking technology companies to operate with greater transparency and accountability so that misinformation doesn't continue to poison our sharing platforms, and we know the government can play an important role, too."  Waldo Ex. 12, at 8 (Audio Tr. 6). This reiterates the key words "poison" and "accountability."

**RESPONSE:** Disputed to the extent the phrase "[t]his reiterates the key words 'poison'

and 'accountability'" is an argumentative assertion with no cited evidentiary support. Defendants

further state that immediately prior to the quoted language in Waldo Ex. 12, which purports to be

a transcript of some portions of the SIO event, Dr. Murthy emphasizes that "this surgeon general

advisory has recommendations for *everyone*" and goes on to include "clinicians," "educators,"

"researchers" and "journalists" (not just "technology companies"). *Id.* at 8 (emphasis added). In

any event, this PFOF contains no evidence that OSG used this event to threaten or pressure social

media companies to censor speech, or that social media companies regarded (or acted on) the

event, or any other statements by OSG, as such. Any implicit assertion to that effect is unsupported

by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

332.   Waldo describes government's "important role" as including "bringing stakeholders … together with urgency around a common vision for a healthy information environment … the government can help bring together stakeholders … what I would call the convening power of a bully pulpit." Waldo Dep. 209:15-22. This would include bringing social-media platforms around to the government's "common vision" for censorship. *Id.* at 209:24-210:8.

**RESPONSE:** Disputed to the extent that the last sentence of the PFOF is an argumentative

mischaracterization of the cited testimony, which makes no reference to imposing a unilateral

Government "vision" on the platforms about anything, much less "censorship."  Rather, Mr. Waldo

simply agreed to the proposition—as framed by Plaintiffs' counsel in his own question—that

"you'd want them [the platforms] to share the urgency to have a common vision for a health

information environment[.]" Waldo Dep. 210:4-8. In any event, this PFOF contains no evidence

that OSG threatened or pressured social media companies to censor speech, or that social media

companies regarded (or acted on) any other communications by OSG as such. Any implicit

assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF

§ II.B, Arg. §§ II.B.1.c & II.B.2.

333.   Dr. Murthy was asked, "do you believe a rapid response initiative like the Virality
Project could be implemented at the federal level to combat health misinformation on a national
scale from the top down?" and he answered that "having a federal organized effort to combat
misinformation" is "a really, really interesting idea." Waldo Ex. 12, at 10 (Audio Tr. 8).

**RESPONSE:** Disputed as an incomplete account of the cited evidence. In between the

selectively excerpted quotes, the transcript (which purports to be an incomplete transcript of only

portions of the SIO event) contains the following statement ascribed to Dr. Murthy: "Well, that's

a really interesting question, Taylor, and I do think that it could be really interesting to look at the

idea in having . . . a federal organized effort to combat misinformation the way you're talking

about. I think [of it] almost [like] a myth buster's effort to help people bring sort of direct

information [and counter] things they may be hearing that are false[.]" Waldo Ex. 12 at 10

(alterations made to fix numerous errors in the transcript, which includes a note on page 3 that it

"should not be considered verbatim" due to "the quality of the recorded media"). In any event, this

PFOF contains no evidence that OSG used the SIO event to threaten or pressure social media

companies to censor speech, or that social media companies regarded (or acted on) the event, or

any other statements by OSG, as such. Any implicit assertion to that effect is unsupported by and

contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

334.   Dr. Murthy stated: "[T]echnology companies have a really important role. They
must step up and play to slow the spread of misinformation on their sites wh[ether] that's by either
sharing data with people and researchers about what interventions they're making and the impact
that's having or whether it's by changing their algorithms and making other alterations to their
platform to identify misinformation early and slow its spread and avoid sending more information
of misinformation to people who are consuming it." *Id.* at 11 (Audio Tr. 9).

**RESPONSE:** Disputed to the extent that Waldo Ex. 12, which purports to be an incomplete transcript of only portions of the SIO event, contains numerous errors. Defendants state further that the PFOF presents a misleadingly incomplete account of the exhibit, which also ascribes to Dr. Murthy the statements "there are steps all of us can take to address [health misinformation] as individuals" and "[e]ducators and healthcare professionals have a really important role they can play[]." Waldo Ex. 12 at 11. In any event, this PFOF contains no evidence that OSG used the SIO event to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) the event, or any other statements by OSG, as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

335.    Waldo agrees that "the purpose of the data sharing is so that outside people come in and … assess how well they're doing with their own internal policies to combat the spread of misinformation."  Waldo Dep. 211:6-11.

**RESPONSE:** Disputed to the extent this PFOF mischaracterizes the evidence. Mr. Waldo was being asked about what the incomplete transcript of the SIO event says. He was not expressing a view (either for himself or OSG) on "the purpose of data sharing." In any event, this PFOF contains no evidence that OSG threatened or pressured social media companies to censor speech, or that social media companies regarded (or acted on) any communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

336.    Dr. Murthy expressly stated that he had been coordinating with Renee DiResta and the Virality Project and planned to continue to do so: "Well, thank you, Renee, for those kind words. … I do want to say thank you to you personally because you have been a leader in this effort long before many people recognize[d] what was happening with COVID misinformation. You were there looking at the data, looking at the numbers, speaking out, raising the flags, saying there's something here we've got to address and do so urgently. I have personally learned a lot from your work and from our conversations together, and so I just want to say thank you to you for everything you've done for being such a great partner for moderating our event today, and just

for being a partner in the future, because I know we have lots and lots more that we've got to do together." Waldo Ex. 12, at 12 (Audio Tr. 10).

**RESPONSE:** Disputed as a mischaracterization of the evidence, particularly to the extent Plaintiffs assert that Dr. Murthy stated he had been "coordinating with . . . the Virality Project." The exhibit, which purports to be an incomplete transcript of only portions of the SIO event, speaks for itself, and the quoted language does not support Plaintiffs' characterization. In any event, this PFOF contains no evidence that OSG threatened or pressured social media companies to censor speech, or that social media companies regarded (or acted on) any communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

337.   Dr. Murthy also stated that his team had been "partnered with" the Stanford Internet Observatory over "many months": "myself, my team, we're committed to working with you, Renee, with others … who we've been … partnered with over the last many months…." *Id.* at 13 (Audio Tr. 11).

**RESPONSE:** Disputed as a mischaracterization of the evidence. The exhibit, which purports to be an incomplete transcript of only portions of the SIO event, speaks for itself, and it does not support Plaintiffs' characterization. It is unclear whether Dr. Murthy is referring to "Renee" or "others" as those OSG has "partnered with over the last many months," and the transcript does not mention SIO. In any event, this PFOF contains no evidence that OSG threatened or pressured social media companies to censor speech, or that social media companies regarded (or acted on) any communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

G.     **The Surgeon General's "Angry" and "Tense" Meetings With Platforms.**

338.    On July 16, 2021, the New York Times reported that President Biden publicly stated about Facebook, "They're killing people" by allowing misinformation to spread on its platforms. Waldo Ex. 14, at 1.

**RESPONSE:** Disputed inasmuch as the cited article constitutes a combination of unsubstantiated hearsay and journalistic characterization regarding statements and events for which Plaintiffs cite no supporting evidence. In addition, Plaintiffs' PFOFs fails to include President Biden's full statement and lacks context. In response to the question "On COVID misinformation, what's your message to platforms like Facebook?," President Biden responded "They're killing people. I mean, they're really—they—look, the only pandemic we have is among the unvaccinated, and that—and they're killing people." Ex. 45 at 2. President Biden later clarified that "Facebook isn't killing people; these 12 people are out there giving misinformation. Anyone listening to it is getting hurt by it. *It's* killing people . . . the outrageous misinformation about the vaccine. That's what I meant." Ex. 43 at 2-3. He continued, "My hope is that Facebook—instead of taking it personally—that somehow I'm saying Facebook is killing people, that they would do something about the misinformation—the outrageous misinformation about the vaccine. That's what I meant." *Id.* In any event, this PFOF contains no evidence that OSG or any other federal officials threatened or pressured social media companies to censor speech, or that social media companies regarded (or acted on) any communications by OSG or any other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

339.    The article reported that "this week, White House officials went further and singled out social media companies for allowing false information to proliferate. That came after weeks of failed attempts to get Facebook to turn over information detailing what mechanisms were in place to combat misinformation about the vaccine, according to a person familiar with the matter." *Id.*

**RESPONSE:** Undisputed that the cited article reads as such, but note that the article constitutes a combination of unsubstantiated hearsay and journalistic characterization regarding statements and events for which Plaintiffs cite no supporting evidence. In any event, this PFOF contains no evidence that OSG or any other federal officials threatened or pressured social media companies to censor speech, or that social media companies regarded (or acted on) any communications by OSG or any other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

340.    The same article reported that Jennifer Psaki stated, "We raised for them in our direct channels, of which every administration has always had with every social media platform, that we're seeing this trend." *Id.* at 2.

**RESPONSE:** Undisputed, but Defendants note that the quoted statement comes from a publicly available transcript of a White House press briefing that is in evidence. *See* Ex. 37 (July 16, 2021, Press Briefing transcript). During the press briefing Ms. Psaki also stated: "We don't take anything down. We don't block anything. Facebook and any private-sector company makes decisions about what information should be on their platform. Our point is that there is information that is leading to people not taking the vaccine, and people are dying as a result. And we have a responsibility, as a public health matter, to raise that issue. The responsibility we all have — the government, media platforms, public messengers — to give accurate information." *Id.* In any event, this PFOF contains no evidence that OSG or any other federal officials threatened or pressured social media companies to censor speech, or that social media companies regarded (or acted on) any communications by OSG or any other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

341.    The article reported that there had been a series of "talks" between Surgeon General Murthy and Facebook "since January" of 2021—none of which were disclosed in OSG's interrogatory responses: "Since January, senior White House officials, including the surgeon general, Dr. Vivek Murthy, have been in talks with the social media company to stop the spread of false stories about vaccination side effects and other harms." *Id.* at 2. In these "talks," federal officials demanded Facebook's internal data on misinformation on its platforms: "Despite repeated requests by the White House, Facebook has not shared even basic data on how much vaccine misinformation exists and if the company's efforts to stop its spread are working, according to the person familiar with the talks." *Id.* at 2.

**RESPONSE:** Disputed inasmuch as the cited article constitutes a combination of unsubstantiated hearsay and journalistic characterizations of statements and events for which Plaintiffs cite no supporting evidence. Also dispute Plaintiffs' characterization of the article as representing that "officials *demanded* Facebook's internal data on misinformation on its platforms." (emphasis added). The quoted language refers to "requests." Further dispute Plaintiffs' assertion that OSG's interrogatory responses are incomplete. In addition to the article's inherent unreliability, it refers to "senior White House officials" who were allegedly in talks with companies since "January" of 2021. The article does not say specifically that Dr. Murthy—who was only confirmed as Surgeon General in March 2021—was involved in multiple talks with Facebook beginning January 2021. Second, to the extent the article can be read to suggest that meetings took place between OSG personnel and Facebook personnel prior to July 19, 2021 (the date of the article's last update), which meetings were not disclosed in OSG's interrogatory responses, the article is mistaken. *See* Lesko Decl. ¶¶ 12-13 (Ex. 63). In sum, this PFOF contains no evidence that OSG or any other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG or any other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2 (White House); Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2 (Surgeon General).

342.   "When administration officials presented data from CrowdTangle, a content tracking tool owned by Facebook, that showed vaccine misinformation was soaring, company officials dismissed its accuracy." *Id.* at 2.

**RESPONSE:**   Disputed inasmuch as the cited article constitutes a combination of unsubstantiated hearsay and journalistic characterization regarding statements and events for which Plaintiffs cite no supporting evidence. In any event, this PFOF contains no evidence that OSG or any other federal officials threatened or pressured social media companies to censor speech, or that social media companies regarded (or acted on) any communications by OSG or any other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2 (White House); Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2 (Surgeon General).

343.   In one meeting, Dr. Murthy "angrily" demanded that Facebook censor misinformation instead of just promoting reliable information: "In another meeting with Dr. Murthy, … Dr. Murthy angrily said that while the company [Facebook] promoted its efforts to encourage vaccination, it did not do enough to defend against bad information." *Id.* at 2.

**RESPONSE:** Disputed first, inasmuch as the cited article constitutes a combination of unsubstantiated hearsay and journalistic characterization regarding statements and events for which Plaintiffs cite no supporting evidence. Disputed also because the first sentence mischaracterizes the quoted language from the article, which does not state that Dr. Murthy "demanded that Facebook censor misinformation instead of just promoting reliability information." The article on its face is suspect; as Mr. Waldo testified, the exchange it describes does not match Dr. Murthy's character. Waldo Dep. 223:21-224:2 ("[F]rankly, I'm doubtful that . . . I worked with Dr. Murthy for over a year and a half and I've never seen him get angry or even express anger [or] frustration in any way that would be noticeable. So I'm skeptical of this reporting." (cleaned up)); *see also* Lesko Decl. ¶ 13 (Ex. 63) ("I am not aware of any meeting that involved Dr. Murthy 'angrily' stating anything. There is no meeting before July 19, 2021 (the last

date the article was updated), that satisfies both the condition that (i) it involved Dr. Murthy and Facebook employees; and the condition that (ii) it could be characterized as 'tense,' 'defensive[]' or 'angr[y].' I have confirmed my understanding with the Surgeon General. **To the extent the article can be read to suggest otherwise, it is wrong**." (emphasis added)). In all events this PFOF contains no evidence that OSG threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

344.    In another "tense" meeting in "late spring," Dr. Murthy repeated similar demands: "In one tense meeting in the late spring, according to the person familiar with the matter, a Facebook official responded defensively, 'How do you know if your efforts are working?'" *Id.* at 2.

**RESPONSE:** Disputed first inasmuch as the cited article constitutes a combination of unsubstantiated hearsay and journalistic characterization regarding statements and events for which Plaintiffs cite no supporting evidence. Also disputed because the first sentence mischaracterizes the quoted language from the article, which makes no reference to Dr. Murthy making "demands" of any kind, or even suggest that Dr. Murthy attended the particular meeting in question. *See also* Defs.' Resp. to PFOF ¶¶ 341, 343, 344 (citing evidence that refutes the article's suggestion that any "tense" meeting occurred as described in the article). In all events this PFOF contains no evidence that OSG threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

345.    Waldo agrees that this news report "does not accurately describe … that introductory call between Nick Mr. Clegg, Andy Mr. Slavitt, and Dr. Murthy on May 25th of 2021," which is the only meeting involving Dr. Murthy disclosed in OSG's interrogatory

responses. Waldo Dep. 219:17-21; 222:14-23. In those responses, OSG did not disclose Dr. Murthy's "tense" and "angry" meetings with Facebook during the spring of 2021.

**RESPONSE:** Disputed to the extent that Plaintiffs assert that OSG's interrogatory responses failed to disclose meetings involving the Surgeon General and Facebook during Spring 2021. As explained above, *see* Defs.' Resp. to PFOF ¶¶ 341, 343, 344, it appears that either Plaintiffs are misreading the article, the article is mistaken, or both. Indeed, Mr. Waldo testified that he was "skeptical of this reporting," Waldo Dep. 224:1-2, and as Max Lesko, Chief of Staff for OSG, explains in his declaration submitted herewith, the article is inaccurate, Lesko Decl. ¶ 13 (Ex. 63). Defendants further note that OSG's interrogatory responses disclose more than one meeting involving Dr. Murthy, so Plaintiffs assertion that May 25 was "the only meeting involving Dr. Murthy [that was] disclosed" is flatly incorrect. *See* Waldo Ex. 3 at 32-33. In sum, this PFOF contains no evidence that OSG threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

### H.    The Surgeon General Leverages Public Pressure to Increase Censorship.

346.    On July 21, 2021, five days after the July 16 meeting where "the Facebook folks … had sad faces," *id.* at 226:15-16, Facebook emailed Waldo and Kyla Fullenwider, stating: "We wanted to follow up with you on a few questions you asked in the meeting focused on CrowdTangle, data on the online interventions, and Facebook's borderline content policies," Waldo Ex. 16, at 1. This referred to the July 16 meeting with Waldo and Fullenwider. Waldo Dep. 227:3-8.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that OSG threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

347.    In the email, Facebook reported back to OSG on "interventions that the team mentioned, some of which specifically create frictions in how people consume information." Waldo Ex. 16, at 1. These include limiting forwarded WhatsApp messages, placing "warning labels on fact checked content," and creating "friction when someone goes to share these posts on Facebook." *Id.*

**RESPONSE:** Disputed to the extent Plaintiffs mischaracterize the email as "report[ing] back to OSG." Indeed, the email indicates that OSG asked about ***data*** on the online interventions— that is, information about interventions that pre-date the Surgeon General's Advisory. *See* Waldo Ex. 16 at 1 ("Here are some examples of interventions *we have put in place during COVID-19.*" (emphasis added)). In any event, this PFOF contains no evidence that OSG threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

348.    Facebook also reported to OSG a series of censorship policies and actions, including the following: "We remove COVID-19 content that contributes to the risk of imminent physical harms, including numerous false claims about the COVID-19 vaccine. We permanently ban pages, groups, and accounts that repeatedly break our rules on COVID-19 misinformation. We also reduce the reach of posts, pages, groups, and accounts that share other false claims that do not violate our policies but may present misleading or sensationalized information about COVID-19 and vaccines." *Id.* at 1. Evidently, OSG's inquiry at the July 16 meeting about "borderline content" related to the censorship of such content. *See id.* Waldo agrees that Fullenwider asked Facebook to report back about censorship at the July 16 meeting: "The response indicates that it's about COVID policies including removal, banning and reducing the reach." Waldo Dep. 232:9-11, 233:12-234:1.

**RESPONSE:** Disputed as a mischaracterization of the evidence, in several respects. First, Facebook's email referred to various of its content moderation policies and practices, to which all users agree, and makes no reference to "censorship policies and actions." Second, nothing in the e-mail suggests that OSG had inquired about "censorship" of "borderline content," or that OSG had inquired about content moderation of borderline content at all. Third, Mr. Waldo emphatically did not agree that "[Ms.] Fullenwider asked Facebook to report back about censorship," or to report

about anything else. Mr. Waldo specifically testified—in a passage adjacent to the quoted testimony—that he did *not* remember Ms. Fullenwider asking about those topics, Waldo Dep. 232:12-17, and he explained that those topics may have been included "not because [Ms. Fullenwider] asked" but because Facebook was thinking about Ms. Psaki's statements at the press conference, *id.* at 233:3-12. Defendants also note that the email appears to be describing Facebook policies and actions that pre-date the Surgeon General's Advisory. In any event, this PFOF contains no evidence that OSG threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

349.    On July 16, 2021, Nick Mr. Clegg emailed Dr. Murthy and stated, "Dear Vivek, Reaching out after what has transpired over the past few days following the publication of the misinformation advisory and culminating today in the President's remarks about us." Waldo Ex. 17, at 1-2. He then stated, "I know our teams met today to better understand the scope of *what the White House expects of us on misinformation* going forward." *Id.* at 2 (emphasis added). Facebook understood the purpose of the meetings was to understand the White House's expectations on misinformation. *See id.*

**RESPONSE:** Undisputed that the email reads as such. But Mr. Clegg was not involved in that meeting, and Mr. Waldo (who was present at the meeting) specifically testified that Mr. Clegg's understanding was wrong: "Q. Yeah. Was that his under— was that your understanding that the meeting related to what the White House expects from Facebook on misinformation going forward[?] A. No." Waldo Dep. 236:21-25. Mr. Waldo did not know how or why Mr. Clegg had that understanding. *Id.* at 237:1-4. In any event, this PFOF contains no evidence that OSG or other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to

that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg.

§§ II.B.1.c & II.B.2.

350.    Mr. Clegg indicated that there had been a history of prior discussions with Dr. Murthy and the White House in which federal officials demanded greater censorship—both more stringent policies and greater enforcement—which were not disclosed in OSG's interrogatory responses: "Certainly we understand (and have understood for some time) that there is disagreement on some of the policies governing our approach and how they are being enforced." *Id.* at 2. Mr. Clegg asked for a meeting with Dr. Murthy, who did not immediately respond. *Id.* at 1-2.

**RESPONSE:** Disputed as a mischaracterization of the cited evidence. The email does not

refer to a "history of prior discussions with Dr. Murthy," such that (as previously explained)

Plaintiffs' assertion that OSG's interrogatory responses are incomplete is completely unfounded.

*See also* Lesko Decl. ¶¶ 12-13 (Ex. 63). Nor does the cited language support the assertion that Dr.

Murthy or White House officials had "demanded" anything of Facebook, much less "censorship"

of any kind—this is an apparent reference to (and mischaracterization of) Facebook's content

moderation policies, to which all users must agree. It is also unclear what Plaintiffs mean to suggest

by asserting that "Dr. Murthy" "did not immediately respond" to Mr. Clegg's request for a

meeting; he responded on the Monday following Mr. Clegg's Friday evening email. *See* Waldo

Ex. 17 at 1. In any event, this PFOF contains no evidence that OSG or other federal officials

threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any

communications by OSG or other federal officials as such. Any implicit assertion to that effect is

unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c

& II.B.2.

351.    On July 18, 2021, having received no response to his email requesting a meeting, Mr. Clegg texted Dr. Murthy stating, "I imagine you and your team are feeling a little aggrieved – as is the FB team, it's not great to be accused of killing people – but as I said by email I'm keen to find a way to deescalate and work together collaboratively. I am available to meet/speak whenever suits."  Waldo Ex. 18, at 1.

**RESPONSE:** Disputed to the extent that Plaintiffs speculate as to Mr. Clegg's motivations ("having received no response to his email…"). In any event, this PFOF contains no evidence that OSG or other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

352.    On July 19, Dr. Murthy responded by email and agreed to a meeting, which was scheduled for July 23, 2021. Waldo Ex. 17, at 1; Waldo Dep. 241:1-14.

**RESPONSE:** Undisputed.

353.    At the July 23, 2021 meeting, "Dr. Murthy asked Mr. Clegg about … the research questions about understanding the reach of the data in terms the impact of the … health misinformation. And … DJ [Patil] had some questions about also on the data side and Nick [Mr. Clegg] offered to connect DJ with a data person from Facebook." Waldo Dep. 242:8-16.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that OSG or other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

354.    Later on June 23, 2021, after the meeting between Dr. Murthy and Nick Mr. Clegg, Mr. Clegg sent a follow-up email to Dr. Murthy stating: "Dear Vivek, if I may, thanks again for taking the time to meet earlier today….. I wanted to make sure you saw the steps we took just this past week to adjust policies on what we are removing with respect to misinformation as well as steps taken to further address the 'disinfo dozen'…." Waldo Ex. 19, at 1.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that OSG or other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to

that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

355.   Mr. Clegg's reference to "just this past week" refers to the one-week period between this July 23 email and rollout of the Advisory on July 15 and the President's comment "They're killing people" on July 16. *Id.*; Waldo Dep. 244:14-19.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that OSG or other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

356.   It is evident that Dr. Murthy and federal officials pressured Facebook for specific censorship actions in the July 23 meeting, because the same day as the meeting, Mr. Clegg reported back to them a series of new censorship actions and policies. First, Mr. Clegg reported enforcement actions against the "Disinfo Dozen" whom Jennifer Psaki had publicly demanded censorship: "We removed 17 additional Pages, Groups, and Instagram accounts tied to the disinfo dozen (so a total of 39 Profiles, Pages, Groups, and IG accounts deleted thus far, resulting in every member of the disinfo dozen having had at least one such entity removed)." Waldo Ex. 19, at 1. Mr. Clegg reported that Facebook was secretly censoring accounts associated with the Disinfo Dozen even if they had not violated Facebook's policies: "We are also continuing to make 4 other Pages and Profiles, which have not yet met their removal thresholds, more difficult to find on our platform." *Id.*

**RESPONSE:** Disputed as a mischaracterization of and unsupported by the cited evidence. The cited email says nothing to indicate, as Plaintiffs surmise, that Dr. Murthy or other federal officials (including Ms. Psaki), "pressured Facebook" to take the actions reported, none of which involved "censorship" as opposed to decisions by Facebook regarding application of its own content moderation policies, to which all users agree, or "publicly demanded censorship." Furthermore, the quoted language does not indicate that Facebook "was secretly censoring accounts" that "had not violated Facebook's policies" rather than applying its policies intended for "borderline content" that did not meet the standards for complete "removal." *See* Defs. PFOF

§ I.D. In sum, this PFOF contains no evidence that OSG or other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

357.    Mr. Clegg also reported that Facebook had amended its censorship policies to make them more restrictive: "We also expanded the group of false claims that we remove, to keep up with recent trends of misinformation that we are seeing." *Id.*

**RESPONSE:** Disputed to the extent that Plaintiffs mischaracterize Facebook as "amend[ing] its [content moderation] policies to make them more restrictive," rather than merely updating the group of "false claims" to which the policies are applied in light of "recent trends of misinformation" it had observed. In sum, this PFOF contains no evidence that OSG or other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

358.    Mr. Clegg also committed to "do more" to censor misinformation in response to federal officials' demands: "We hear your call for us to do more and, as I said on the call, we're committed to working toward our shared goal of helping America get on top of this pandemic." *Id.* Dr. Murthy, evidently, demanded that Facebook "do more" against misinformation on it platforms in the July 23 phone call. *See id.*

**RESPONSE:** Disputed as a mischaracterization of and unsupported by the evidence. Mr. Clegg's remark about "do[ing] more" makes no reference to "censor[ing]" but is an apparent reference to application of the aforementioned content moderation policies, which are Facebook's own, and to which all Facebook users agree. Plaintiff cites no evidence for its supposition that "Dr. Murthy . . . [had] demanded" that Facebook take the actions to which Mr. Clegg referred. Indeed, that assertion is contradicted by the statements of Plaintiffs' counsel at Mr. Waldo's deposition.

There, counsel described Mr. Clegg's reference to "your call for us to do more" as an allusion to the July 15, 2021, Health Advisory: "Q: All right. He goes on to say: We hear your call for us to do more. Right? And I think we said a moment ago, that's a pretty fair description **of the health advisory,** right, a call for Facebook and others to do more, right? A: Yes." Waldo Dep. 250:24-251:6 (emphasis added). In sum, this PFOF contains no evidence that OSG or other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG or other federal officials as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

359.    Mr. Clegg further agreed to accede to federal officials' demands that Facebook make its internal data on misinformation available to federal officials and researchers like Renee DiResta of the Virality Project: "We will reach out directly to DJ to schedule a deeper dive on how to best measure Covid related content and how to proceed with respect to the question around data." *Id.* at 1-2.

**RESPONSE:** Disputed as a mischaracterization of and unsupported by the evidence. The quoted language does not support Plaintiffs' assertion that "federal officials" had made "demands" of Facebook of any kind, nor that Facebook intended to make, or did make, "internal data" available to the Virality Project, or anyone else. At most, the email indicates Facebook's willingness to have a "deeper" discussion about the "question around data." In any event, this PFOF contains no evidence that OSG or other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. § II.B.1.c & II.B.2.

360.    Mr. Clegg also pledged to report back to Dr. Murthy repeatedly so that federal officials could monitor Facebook's "progress" on censoring misinformation: "We'd also like to begin a regular cadence of meetings with your team so that we can continue to update you on our progress. You have identified 4 specific recommendations for improvement and we want to make

sure to keep you informed of our work on each." *Id.* at 2. Mr. Clegg also promised to continue sending federal officials regular updated reports on the spread of misinformation on Facebook's platforms. *Id.*

**RESPONSE:** Disputed as a mischaracterization of and unsupported by the evidence. As to the first sentence, Mr. Clegg's offer to provide "updates" does not constitute accession to "monitor[ing]" by federal officials. As to the second sentence, the cited evidence does not support Plaintiffs' assertion that "[Mr.] Clegg also promised to continue sending federal officials regular updated reports on the spread of misinformation on Facebook's platforms." Mr. Waldo also testified that it was unclear what "4 specific recommendations" Mr. Clegg is referring to, and whether those came from OSG. *See* Waldo Dep. 253:13-25. In any event, this PFOF contains no evidence that OSG or other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

361.    Mr. Clegg concluded by promising that Facebook would "strive" to meet federal officials' expectations on censorship: "we will strive to do all we can to meet our shared goals." *Id.*; *see also* Waldo Dep. 245:6-247:4.

**RESPONSE:** Disputed as a mischaracterization of the evidence. Neither the email itself, nor the cited deposition testimony, supports Plaintiffs' insinuation that by reference to "striv[ing] to meet our shared goals," Mr. Clegg meant acquiescing to unilateral "expectations" of federal officials regarding "censorship" ("expectations" as to which Plaintiffs also furnish no evidence). This PFOF contains no evidence that OSG or other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

362.     Waldo agrees that Mr. Clegg's statement "We hear your call for us to do more" in the July 23 email is an accurate understanding of the Surgeon General's message from the July 15 press conference, the Health Advisory, and the July 15 rollout at Stanford Internet Observatory: "Yes. I think, as we've established, the advisory and … the remarks, and the event with the Stanford Internet Observatory, Dr. Murthy is calling on … social media companies to do more to address the problem of health mis- and disinformation."  Waldo Dep. 251:6-12.

**RESPONSE:** Undisputed, except to note that Plaintiffs have selectively quoted the testimony, which reads: "Dr. Murthy is calling on – for an all-society approach, including social media companies, to do more to address the problem of health mis- and disinformation during the height of a historic pandemic costing American lives that can be saved." Waldo Dep. 251:9-13. Defendants further note that this PFOF contradicts Plaintiffs' PFOF ¶ 358. In any event, this PFOF contains no evidence that OSG used the July 15 press conference, the Advisory, or the SIO event to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) these, or any other, communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

363.     After the July 23 email, Waldo connected Brian Rice of Facebook with DJ Patil to discuss data-sharing to monitor social-media misinformation between Facebook and federal officials. *Id.* at 252:9-19.

**RESPONSE:** Disputed as a mischaracterization of the cited testimony. Mr. Waldo testified only that "I think I looped [Mr. Rice] with DJ," Waldo Dep. 252:12-13, not that he "connected Brian Rice of Facebook with DJ Patil to discuss data-sharing to monitor social-media misinformation between Facebook and federal officials." In any event, this PFOF contains no evidence that OSG or other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

364.    Additionally, on the July 23 call with Nick Mr. Clegg, the OSG specifically asked Facebook to report back on any additional steps they were taking in response to the Health Advisory to increase censorship of misinformation on their platforms. Waldo Ex. 21, at 1. On August 6, 2021, Waldo emailed Brian Rice and Nick Mr. Clegg of Facebook and stated, "I know on the call with Dr. Murthy he'd mentioned seeing if you were able to send an update of any new/additional steps you are taking with respect to health misinformation in light of the advisory." *Id.* Waldo noted that "we are asking all platforms for this type of update." *Id.* Waldo asked for a report from Facebook within two weeks: "Would you be able to send something over within two weeks?" *Id.*

**RESPONSE:** Disputed as a mischaracterization of and unsupported by the cited email.

Mr. Waldo's inquiry about whether Facebook could send "an update" of "any new/additional

steps" Facebook was taking "with respect to health information" does not constitute a request for

a "report" about "increase[d] censorship of misinformation" on Facebook's platforms. In sum, this

PFOF contains no evidence that OSG used the July 23 call or this August 6 email to threaten or

pressure Facebook to censor speech, or that Facebook regarded (or acted on) these, or any other,

communications by OSG as such. Any implicit assertion to that effect is unsupported by and

contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

365.    In the same email, Waldo connected Facebook with DJ Patil of the White House "on next steps for connecting on data." *Id.*

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that OSG or other

federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or

acted on) any communications by OSG or other federal officials as such. Any implicit assertion to

that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg.

§§ II.B.1.c & II.B.2.

366.    Facebook responded that it was planning "additional steps" to increase censorship of misinformation, and promised to report back to the Surgeon General in 2 weeks: "Our teams have been working on additional steps—we will have something back to you within two weeks outlining our approach." *Id.* Facebook also followed up with Patil to schedule the meeting about using Facebook's internal data to monitor speech on its platforms. *Id.*

**RESPONSE:** Disputed as a mischaracterization of and unsupported by the evidence. The quoted language says nothing about "increas[ing] censorship of misinformation" as opposed to application of Facebook's own content moderation policies, to which all users agree. In addition, the cited email does not show that Facebook followed up with Patil to "schedule [a] meeting about using Facebook's internal data to monitor speech on its platforms" or that such meeting occurred. In any event, this PFOF contains no evidence that OSG or other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

367.    Waldo admits that, during the July 23 call, "we asked for an update," and that it was probably Dr. Murthy who asked for it. Waldo Dep. 256:20-23.

**RESPONSE:** Disputed to the extent Plaintiffs say "probably." Mr. Waldo's deposition testimony reads: "I didn't recall if I asked for it or Dr. Murthy . . . Dr. Murthy perhaps asked for it." Waldo Dep. 256:20-23. However, this PFOF contains no evidence that OSG used the July 23 call to threaten or pressure Facebook to censor speech, or that Facebook regarded (or acted on) this, or any other, communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

368.    Waldo does not dispute that he asked "all platforms" to provide a similar "update" on new or additional steps to censor misinformation in light of the Advisory, and that "all platforms" means "Facebook, Twitter, Instagram, and YouTube, and Google." *Id.* at 257:10-258:9.

**RESPONSE:** Disputed to the extent that neither the email (Waldo Ex. 21) nor the cited testimony supports the assertion that Mr. Waldo asked "all platforms" for updates on steps to "censor misinformation in light of the Advisory," as opposed to updates regarding application of

their own respective content moderation policies, to which all users agree. Furthermore, the

testimony makes clear that Mr. Waldo does not specifically recall whether he sent such a request

to Instagram, Twitter, or YouTube/Google. *See* Waldo Dep. 257:10-258:9. In any event, this PFOF

contains no evidence that OSG threatened or pressured social media companies to censor speech,

or that social media companies regarded (or acted on) any communications by OSG as such. Any

implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See*

Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

369.    On July 19, 2021, a few days after the President's "They're killing people" comments, Rob Flaherty of the White House emailed Dr. Murthy to put him in touch with an operative for the Democratic National Committee who works on misinformation and disinformation issues. Waldo Ex. 22, at 3. Flaherty wrote: "Vivek – wanted to link you with Jiore Craig, who's been a critical leader of the DNC's misinfo work for a long time, but also has been helping us think through mis/dis on the COVID side. I thought it would be great for you both to connect as OSG charts out next steps."  *Id.* Eric Waldo followed up to schedule a Zoom meeting on July 22 between Ms. Craig of the DNC and key members of the OSG's staff. *Id.* at 1.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that OSG or other

federal officials threatened or pressured social media companies to censor speech, or that social

media companies regarded (or acted on) any communications by OSG or other federal officials as

such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a

whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

370.    On August 18, 2021, Facebook again reported back to OSG about additional censorship actions against misinformation "superspreaders."  Waldo Ex. 24, at 1. Facebook stated, "Eric and DJ – flagging this post for you and for Surgeon General Murthy. This details how we are approaching content from the disinfo dozen."  *Id.* Facebook sent the same update to Rob Flaherty of the White House on the same day. *Id.* at 2.

**RESPONSE:** Disputed as a mischaracterization of the evidence. First, the document says

nothing about "censorship actions," but rather describes a range of actions (such as "moving []

posts lower" or "not recommending them," as well as no action at all) taken pursuant to Facebook's

own content moderation policies, to which all users agree. Second, demonstrating Facebook's

exercise of independent judgment in this matter, the bulk of the post from Facebook vigorously

disputes the claim that "12 people are responsible for 73% of online vaccine misinformation on

Facebook"—including by noting that "any amount of COVID-19 vaccine misinformation that

violates **our policies** is too much by **our** standards"—and that it has not removed accounts that

"are not posting content that breaks our rules." Waldo Ex. 24 at 1 (emphases added). In sum, this

PFOF contains no evidence that OSG or other federal officials threatened or pressured Facebook

to censor speech, or that Facebook regarded (or acted on) any communications by OSG or other

federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the

evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

371.    The post was entitled, "How We're Taking Action Against Vaccine
Misinformation Superspreaders." *Id.* at 1. The post detailed a long list of censorship actions taken
against the "Disinfo Dozen," including removing over three dozen pages, groups and accounts
linked with them; imposing additional penalties on another two dozen pages, groups, and accounts
linked with them; applying penalties to some of their website domains so that third parties posting
their content will be deamplified; and removing the remaining violating content. *Id.* at 1.

**RESPONSE:** Disputed as a mischaracterization of the evidence. The email, Waldo Ex. 24,

speaks for itself, and is the best source to consult to understand its contents. *See also* Defs.' Resp.

to PFOF ¶ 370.

372.    As Waldo acknowledges, this was the "second report that Facebook has sent [OSG]
after that July 23rd meeting where they're reporting back about actions taken against the Disinfo
Dozen." Waldo Dep. 268:12-16.

**RESPONSE:** Undisputed that this is an accurate account of the deposition testimony.

However, the e-mail itself does not state that Facebook was "reporting back about actions taken."

Waldo Ex. 24 at 1. To the contrary, the e-mail states that Facebook was "flagging" a public post

from Facebook's website. *Id.* The post itself describes a "debate" among "people" about the

Disinformation Dozen, which stemmed from a "report" that Facebook vigorously disputes in its

post. *Id.* Accordingly, as explained above, *see* Defs.' Resp. to PFOF ¶ 370, this email underscores

that Facebook acted independently in its approach to misinformation, including its analysis of the third-party "report" about the Disinformation Dozen and the "debate" surrounding that report. In sum, this PFOF contains no evidence that OSG or other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

373.    On August 20, 2021—two weeks after the August 6 email in which Waldo had requested a report within two weeks on Facebook's new or additional steps to remove misinformation in light of the Health Advisory—Nick Mr. Clegg sent a long, detailed email to Dr. Murthy, Waldo, and DJ Patil, detailing Facebook's additional censorship actions taken as a result of the Advisory. Waldo Ex. 25, at 1-3.

**RESPONSE:** Disputed as a mischaracterization of the evidence, particularly to the extent that Plaintiffs describe the email as "detailing … censorship actions" as opposed to actions taken by Facebook pursuant to its own content moderation policies, to which all users agree. Furthermore, the bulk of the email does not describe new actions by Facebook but instead "historic actions in these areas," underscoring the independent judgment Facebook exercised in its approach to misinformation. The email also does not appear to have been sent in response to the Advisory, but instead alludes to the White House's "four recommendations." In sum, this PFOF contains no evidence that OSG or other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

374.    In the August 20 email, Mr. Clegg noted that Dr. Murthy had "asked for an update on existing and new steps that Facebook is taking." *Id.* at 1. Mr. Clegg noted that Facebook was taking new steps in response to the pressure from the White House and Surgeon General since July 15 and 16: "In this update, we describe … further policy work to enable stronger action against persistent distributors of vaccine misinformation." *Id.*

**RESPONSE:** Disputed as a mischaracterization of and unsupported by the evidence. The cited email in fact contradicts Plaintiffs' assertion that Facebook took "new steps in response to pressure from the White House and the Surgeon General." The email states the following (without Plaintiffs' selective quotes and omissions): "The White House described four ***recommendations*** to social media platforms in July, which cover access to authoritative information, enforcement and speed of enforcement, and transparency. ***Those are priorities we have shared throughout the COVID-19 pandemic***. In this update, ***we describe both our historic actions in these areas***, as well as new information on boosting access to authoritative information, and further policy work to enable stronger action against persistent distributors of vaccine information." Waldo Ex. 25 at 1 (emphases added.) Thus, the email indicates that Facebook took actions in the "areas" "recommend[ed]" by the White House pursuant its own priorities that it has held "throughout the COVID-19 pandemic," (and makes no reference to the Surgeon General's Advisory at all). Furthermore, the bulk of the email describes "historic actions" or "new information" about pre-July actions, as opposed to "new steps" post-dating the Advisory and press conference. In sum, this PFOF contains no evidence that OSG or other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

375.    In a lengthy section headed "Limiting Potentially Harmful Misinformation," Mr. Clegg provided five bullet points and four sub-bullet points detailing expanded efforts of censorship by Facebook taken in response to the Advisory. *Id.* at 2. These included, among others, " expanding our COVID policies to further reduce the spread of potentially harmful content"; "increasing the strength of our demotions for COVID and vaccine-related content that third-party fact-checkers rate as 'Partly False' or 'Missing Context'"; "making it easier to have Pages/Groups/Accounts demoted for sharing COVID and vaccine-related misinformation"; and "strengthening our existing demotion penalties for websites that are repeatedly fact-checked for COVID or vaccine misinformation content shared on our platform." *Id.* at 2. Mr. Clegg also included a report of additional actions taken against the Disinfo Dozen. *Id.* Mr. Clegg also

reported that Facebook "continue[s] to experiment with signals that we can use … to demote content that we predict will contain low quality information." *Id.*

**RESPONSE:** Disputed as a mischaracterization of and unsupported by the evidence. This particular section—like the entirety of the email—discusses adaptation and application of Facebook's own content moderation policies, to which all users agree, and says nothing about "expanded efforts of censorship," says nothing about the Advisory, nor makes any assertion that Facebook has taken any actions "in response to the Advisory." As explained above, Defs.' Resp. to PFOF ¶ 374, the email as a whole contradicts Plaintiffs' position; indeed, with respect to the Disinformation Dozen, the email specifically notes that Facebook "removed" some of their content "for violating our policies," but "[t]he ***remaining*** accounts associated with these individuals ***are not posting content that breaks our rules***." Waldo. Ex. 25 at 2 (emphasis added). In sum, this PFOF contains no evidence that OSG or other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

376.    In another long section entitled "Increasing Transparency," Mr. Clegg detailed a list of actions taken by Facebook to share data about the reach of misinformation on its platforms, per federal demands. *Id.* at 2-3; *see also* Waldo Dep. 269:20-277:8 (reviewing the content of the August 20 email in detail).

**RESPONSE:** Disputed as a mischaracterization of and unsupported by the evidence. The referenced section of the email says nothing about "federal demands" (of which there is no evidence), and contrary to describing "actions taken by Facebook to share data," the email simply identifies other data sources and/or vaguely remarks that it is "in internal discussions" or "looking at ways" to provide information. In sum, this PFOF contains no evidence that OSG or other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted

on) any communications by OSG or other federal officials as such. Any implicit assertion to that

effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§

II.B.1.c & II.B.2.

377.    Waldo agrees that this email is "a report back to [OSG's] request for report in two

weeks related to actions they took in respect to the advisory."  Waldo Dep. 270:19-23.

**RESPONSE:** Undisputed that this is an accurate account of the deposition testimony.

However, the e-mail itself does not state that Facebook was "reporting back about actions taken,"

nor does it mention the Advisory. Waldo Ex. 24 at 1. T In any event, this PFOF contains no

evidence that OSG or other federal officials threatened or pressured Facebook to censor speech,

or that Facebook regarded (or acted on) any communications by OSG or other federal officials as

such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a

whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

378.    Waldo responded to Mr. Clegg by stating that "we look forward to continuing to
move forward together with urgency and solutions during these extraordinary times."  Waldo Ex.
25, at 1. The phrase "urgency and solutions" was intended to push Facebook to increase its anti-
misinformation efforts: "I was hoping that Facebook would continue to move. Urgency means,
you know, that they would take this seriously, and solutions means that they would also come with
real solutions to the problems and not just pretend to solve problems."  Waldo Dep. 277:23-278:3.

**RESPONSE:** Disputed as a mischaracterization of and unsupported by the evidence. Mr.

Waldo testified that he "hop[ed]" Facebook "would continue to move"—***not*** that he intended to

"push Facebook to increase its anti-misinformation efforts." In sum, this PFOF contains no

evidence that OSG threatened or pressured Facebook to censor speech, or that Facebook regarded

(or acted on) any communications by OSG as such. Any implicit assertion to that effect is

unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c

& II.B.2.

379.    Three days later, on August 23, 2021, Rob Flaherty of the White House emailed
Facebook, asking for a report on how they intended "to promote" the FDA's approval of the Pfizer

vaccine and noting that the White House "[would] appreciate a push" of the vaccine information using specific "suggested language from [the White House]." Waldo Ex. 27, at 2. Facebook responded the same day with an additional report on new steps to remove vaccine misinformation: "We're … updating our misinformation policies to remove the specific claims that 'there are no FDA-approved vaccines' and 'the Pfizer vaccine is not FDA-approved.' We'll also continue to look for claims that are no longer accurate given the approval today." *Id.* at 1. Facebook forwarded this report on increasing censorship to Waldo at OSG as well. *Id.*; *see also* Waldo Dep. 280:1-281:24.

**RESPONSE:** Disputed as a mischaracterization of and unsupported by the evidence. Mr. Flaherty's initial email did not "ask[ ] for a report" but reads: "Now that FDA has approved Pfizer, I'm making the rounds to get a sense from the various platforms how (or if) you guys are planning to promote it in any way." Ex. 27 at 2. Facebook responded, not by agreeing to use the White House's "[s]uggested language," but by informing the White House that it would be "amplify[ying] authoritative partner content" related to the vaccine approval using different language. *Id.* at 1. Moreover, Facebook notes its independent decision to update its misinformation policies, which was not mentioned in the White House's initial email. *Id.* Thus, the email demonstrates Facebook's exercise of independent discretion on how or whether to "promote" FDA approval of the Pfizer vaccine, and how or whether to address misinformation related to that approval. *See id.* ("We'll also continue to look for claims that are no longer accurate given the appropal today."). In any event, this PFOF contains no evidence that OSG or other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

380.    On September 18, 2021, Facebook sent Eric Waldo and Rob Flaherty another bi-weekly report, and also noted that "I'm sure you also saw yesterday's story in the WSJ about the spread of COVID-19 misinformation in comments on Facebook," which Facebook disagreed with and offered to discuss. Waldo Ex. 30, at 1. Flaherty responded, "Happy to talk about it, Brian. Would be interested to see, as we have long asked for, how big the problem is, what solutions

you're implementing, and how effective they've been." *Id.* Facebook promised, "we will circle back over the next few days to brief." *Id.*

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that OSG or other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

381.    On September 29, 2021, Google emailed Eric Waldo to "share an update we recently made to YouTube's policies pertaining to vaccine-related misinformation." Google reported: "We just announced that we will be introducing a new policy that prohibits content that includes harmful misinformation about the safety, efficacy, or ingredients for currently administered vaccines…" Waldo Ex. 31, at 1.

**RESPONSE:** Undisputed, except to clarify that the email may have come from YouTube personnel (not Google personnel) and speaks to YouTube policies (not necessarily Google policies). *See* Waldo Ex. 31 at 1 (signature block of sender indicates he works for YouTube). In any event, this PFOF contains no evidence that OSG threatened or pressured Google/YouTube to censor speech, or that Google/YouTube regarded (or acted on) any communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

382.    On October 19, 2021, Rob Flaherty emailed Facebook, copying several White House officials and Eric Waldo, and asked Facebook to "connect on what the admin's plans are for the 5-11 vaccine rollout." Waldo Ex. 32, at 1. The "5-11 vaccine rollout" refers to the approval of vaccines for children ages 5 to 11 years old. Waldo Dep. 298:20-23.

**RESPONSE:** Undisputed, except to clarify that Mr. Waldo testified that the "5-11 vaccine rollout" refers to authorization (not "approval") of the vaccine for children ages 5 to 11. In any event, this PFOF contains no evidence that OSG or other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG

or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

383.    Flaherty requested that Facebook report on its censorship plans for claims on social media about the authorization of vaccines for children ages 5 to 11: "We'd like to talk about what we're seeing as the biggest headwinds we're going to face, and discuss what you all are planning as we move into this next phase. We remain concerned about mis- and disinformation on feed and groups, and the wide reach of hesitancy-inducing content across your platform."  Waldo Ex. 32, at 1.

**RESPONSE:** Disputed as a mischaracterization of and unsupported by the evidence. The quoted language does not ask Facebook to "report on its censorship plans" but rather alludes to Facebook's own "plan[s]" regarding application of its content moderation policies, to which all users agree, following authorization of COVID-19 vaccines for children aged 5 to 11. In sum, this PFOF contains no evidence that OSG or other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

384.    Facebook responded, agreeing to the meeting: "we'd welcome the opportunity. Adding Felicia on our end to help coordinate."  Waldo Ex. 32, at 1.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that OSG or other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

385.    Waldo states that he does not recall whether this meeting occurred or if he participated, but he agrees that the meeting probably occurred: "Probably. If they added schedulers, usually those meetings happen."  Waldo Dep. 300:14-23.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that OSG or other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

## I.      The Surgeon General and White House Hammer Facebook.

386.    On October 28, 2021, the Washington Post ran a story based on information from Frances Haugen reporting that "Facebook researchers had deep knowledge of how coronavirus and vaccine misinformation moved through the company's apps, according to documents disclosed by Facebook whistleblower Frances Haugen." Waldo Ex. 33, at 1.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that OSG or other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

387.    In response to the article, on October 29, Surgeon General Murthy issued a series of Tweets from his official Twitter account demanding that Facebook increase censorship and give outside researchers access to its data. Waldo Ex. 33, at 1. In the Tweet thread, Dr. Murthy stated: "I was deeply disappointed to read this story. Health misinformation has harmed people's health and cost lives. In the Surgeon General's Advisory on Health Misinformation, I stated clearly that tech platforms have a responsibility to improve our health information ecosystem. What continues to be lacking from Facebook and other tech companies is transparency and accountability. Only the companies understand the full extent of misinformation's spread and impact – yet they have not yet shared this data with independent researchers and the public. Without this critical data, it is much harder to design the right interventions or hold the platforms accountable. … We must demand Facebook and the rest of the social media ecosystem take responsibility for stopping health misinformation on their platforms. The time for excuses and half measures is long past. We need transparency and accountability now. The health of our country is at stake." *Id.* Dr. Murthy repeated the mantras "transparency" and "accountability," threatening that the federal government would "hold the platforms accountable" for misinformation. *Id.*

**RESPONSE:** Disputed as a mischaracterization of and unsupported by the evidence. The quoted tweets, Waldo Ex. 33 at 1, do not support the assertion that Dr. Murthy "demand[ed] that

Facebook increase censorship" or provide access to all internal "data."   Nor do the Tweets "threaten[] that the federal government" would do anything to Facebook or any other platforms. Shorn of Plaintiffs' mischaracterization, this PFOF contains no evidence that OSG or other federal officials threatened or pressured social media companies to censor speech, or that social media companies regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

388.   This Tweet thread reflects Dr. Murthy's own words, as he "made the final and substantial edits" to the Tweets. Waldo Dep. 303:25-304:17.

**RESPONSE:** Undisputed. However, neither this PFOF nor the referenced tweet thread contains no evidence that OSG or other federal officials threatened or pressured social media companies to censor speech, or that social media companies regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

389.   Waldo agrees that the Twitter thread demands "transparency and accountability around health misinformation, especially vis-à-vis the social media organizations," and "demands that Facebook and the other platforms do more" to "stop[] health misinformation."  *Id.* at 305:6-22. "Lots of work went into" crafting that message, according to Waldo. *Id.* at 306:7-8.

**RESPONSE:** Undisputed that Mr. Waldo's deposition testimony is accurately quoted, but note that Mr. Waldo did not agree that the thread "demands" anything; he stated that "the tweet thread speaks for itself." Waldo Dep. 305:4-5. In any event, this PFOF contains no evidence that the Surgeon General used these Tweets to threaten or pressure Facebook or any other social media company to censor speech, or that Facebook or other social media companies regarded (or acted on) these Tweets, or any other communications by the Surgeon General or OSG, as such. Any

implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

390.    On October 28, 2021, the same day as the Washington Post article, Rob Flaherty emailed Brian Rice of Facebook a hyperlink to the article. The only text in the email was the subject line, which stated: "not even sure what to say at this point." Waldo Ex. 35, at 1-2.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that OSG or other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

391.    Facebook responded to Flaherty by stating, "nothing in the story is inconsistent with what we briefed on," and providing its account of the facts underlying the story. *Id.* at 1. Facebook then forwarded this response to Waldo and the OSG, noting that "I saw the Surgeon General's reaction on Twitter," and asking for "a longer conversation next week" about the issue. *Id.*

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that OSG or other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2 (White House); Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2 (Surgeon General).

392.    Waldo describes both the Surgeon General's public Tweet threat, and Rob Flaherty's private email to Facebook, as different ways of "hitting up Facebook" about the Frances Haugen article: "this was one of the most popular articles in all of news that week, so I'm not surprised that people who care a lot about this issue were certainly hitting up Facebook about it." Waldo Dep. 307:13-22.

**RESPONSE:** Disputed as a mischaracterization of deposition testimony. It does not refer to a "public Tweet ***threat***." *See also* Defs.' Resp. to PFOF ¶ 387. In any event, this PFOF contains

no evidence that OSG or other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

393.     On October 28, 2021, Nick Mr. Clegg also emailed Dr. Murthy and asked for a meeting to discuss the "intense debate that's been prompted by the documents disclosed by a former employee." Waldo Ex. 36, at 2. Waldo responded on behalf of the OSG, stating that "we have seen the recent public reports around Facebook and misinformation. We are certainly concerned about what we are seeing, given our emphasis on health misinformation in our advisory and the ongoing conversations our teams have been having. As has been the case, you'll continue to see us raising the issue of health misinformation in public and in private as a critical public health issue." *Id.* at 1.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that OSG threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

394.     Regarding his reference to "in private," Waldo admits that this refers to "closed-door meetings" with platforms like Facebook: "in the government, you're not always just doing a panel that's open press, you're meeting with stakeholders … in closed-door meetings…." Waldo Dep. 312:13-16. The Surgeon General's Office was continuously pushing for action against health misinformation "in public and private" meetings with stakeholders: "talking about health mis- and disinformation was in our talking points of when we talked to stakeholders in public and private." *Id.* at 313:8-11.

**RESPONSE:** Disputed to the extent that Plaintiffs' mischaracterize Mr. Waldo as testifying that "in private" refers to "'closed-door meetings' with platforms like Facebook" and that "[t]he Surgeon General's Office was continuously pushing for action against health misinformation." Mr. Waldo explained that the reference to "in private" meant "nonpublic meetings" with all kinds of stakeholders, such as "the PTA [Parent Teacher Association]," where OSG would speak generally about its work by noting, "[y]ou saw us issue an advisory on health mis- and disinformation. You saw, you know, coming soon, youth mental health, workplace

mental health, clinical burnout, social isolation and loneliness." Waldo Dep. 312:12-313:11. In any event, this PFOF contains no evidence that OSG threatened or pressured social media companies to censor speech, or that social media companies regarded (or acted on) any communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

395.  The next day, October 29, 2021, Facebook sent a long email to Rob Flaherty, Eric Waldo, and several other White House officials referring back to an October 25 meeting about vaccines for children ages 5-11. Waldo Ex. 37, at 3-4; Waldo Dep. 315:8-316:15. The email reported to the White House and OSG a "detailed description of [Facebook's] plans" for the approval of vaccines for children. *Id.* at 4. The plans included immediately updating policies to censor claims relating to vaccination of children: "As discussed, soon as the EUA is issued, we will also be able to apply claims from our current misinfo policies for COVID-19 vaccines to include claims about child vaccinations." *Id.*

**RESPONSE:** Disputed as a mischaracterization of and unsupported by the evidence. The email does not refer to "updating policies to censor claims"; rather, it discusses the application of Facebook's existing "misinfo policies for COVID-19 vaccines," to which all users agree, to claims about newly authorized "child vaccinations." Note also that the email refers to emergency use authorization (not approval) of the vaccine for children. In any event, this PFOF contains no evidence that OSG or other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2 (White House); Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2 (Surgeon General).

396.  Facebook also noted that it was relying directly on the CDC to decide what to censor: "We were able to make this change based on the conversation we had last week with the CDC…. There are several claims we will be able to remove as soon as the CDC debunks them." *Id.*

**RESPONSE:** Disputed as a mischaracterization of and unsupported by the evidence to the

extent this PFOF is intended to suggest that Facebook removed any claims "debunk[ed]" by CDC

without exercising its own judgment regarding application of its content moderation policies. As

discussed below, *see* Defs.' Resp. to Pls.' PFOF ¶¶ 491-92, 502 (among others), Facebook relied

on CDC only to provide scientific information, but Facebook itself determined what its

misinformation policies should be and how to enforce them. Moreover, the email, without

Plaintiffs' selective quotation, states: "We were able to make this change based on the conversation

we had last week with the CDC, expected language from the EUA, and previous conversations

with health authorities." Waldo Ex. 37, at 3. In any event, this PFOF contains no evidence that

OSG, CDC, or other federal officials threatened or pressured Facebook to censor speech, or that

Facebook regarded (or acted on) any communications by OSG, CDC, or other federal officials, as

such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a

whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

397.    Facebook then asked federal officials to provide a federal health authority to dictate
what content would be censored on Facebook's platforms: "We expect the approval of COVID
vaccines for kids aged 5-11 will be another significant peak of new misinformation claims. Our
policy allows us to take action against this content once those claims have been debunked and
confirmed harmful by a public health authority. We're committing to addressing these quickly; to
do so effectively, we will need a channel to a health expert with whom we can discuss these claims
in real time. Is this something we could partner on, and if so, would your team be able to connect
us with a point person?" *Id.*

**RESPONSE:** Disputed as a mischaracterization of and unsupported by the cited email,

which says nothing about requesting a "federal health authority" to "dictate what content would

be censored on Facebook's platforms." Rather, it requests identification of a "health expert" with

whom it "can discuss" claims regarding children's vaccines "in real time" to determine what action

it can take regarding under its own ("[o]ur") policy. In sum, this PFOF contains no evidence that

OSG, CDC, or other federal officials threatened or pressured Facebook to censor speech, or that

Facebook regarded (or acted on) any communications by OSG, CDC, or other federal officials, as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

398.    On November 4, 2021, Facebook followed up again to OSG and the White House with additional reports of censoring misinformation: "Last Friday, we updated our misinformation policies for COVID-19 vaccines to make clear they apply to claim about children," identifying a list of specific claims. *Id.* at 1.

**RESPONSE:** Disputed as a mischaracterization of and unsupported by the cited email, which does not discuss "censoring misinformation" but updating Facebook's "misinformation policies," to which all users agree, to make clear they apply to claims regarding vaccines for children. In sum, this PFOF contains no evidence that OSG, CDC, or other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG, CDC, or other federal officials, as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

399.    Facebook made clear that the CDC was serving as the "health expert" who was dictating what could be said on Facebook's platforms "in real time": "We're grateful to our partners at the CDC for helping get these debunked in advance of the announcement, and we look forward to staying connected on emerging COVID misinformation trends." *Id.* at 1, 3.

**RESPONSE:** Disputed as a mischaracterization of and unsupported by the evidence. The cited email says nothing to suggest that CDC was "dictating what could be said on Facebook's platforms," rather than Facebook's own misinformation policies. The email clearly refers to CDC as a "partner[ ]" providing information that Facebook would take into consideration when making decisions regarding application of its policies. *See* Defs.' Resps. to Pls.' PFOF ¶¶ 397-98. As discussed extensively in connection with Plaintiffs' factual assertions against CDC, *see infra*, Facebook relied on CDC only to provide scientific information—here, information in relation to

claims that "the COVID vaccine gives children Bell's Palsy, causes blood clots in children, and causes multiple sclerosis in children," Waldo Ex. 37—but Facebook itself "decide[s]" what its misinformation policies will be and how to enforce them. In sum, this PFOF contains no evidence that OSG, CDC, or other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG, CDC, or other federal officials, as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

**J.     The Surgeon General Threatens Regulation to Increase Censorship.**

400.    On December 21, 2021, Dr. Murthy gave a podcast on the Omicron variant in which he again publicly threatened to hold the social-media platforms "accountable" for not censoring misinformation: "number one, we have to track down where this misinformation is coming from and understand how to hold platforms accountable, new technology platforms that are driving so much of the misinformation spread…. [B]y allowing this misinformation to proliferate on their sites, they're subjecting people in the United States and around the world to extraordinary harm, and they're doing so with little accountability at this moment and really with very little transparency. That can't be allowed to continue because it's putting everyone's health at risk." Waldo Ex. 38, at 4 (Audio Tr. 7).

**RESPONSE:** Disputed as a mischaracterization of and unsupported by the evidence. The quoted language, which comes from what purports to be a transcript of a portion of an interview with Dr. Murthy, does not constitute a "threat[ ]" by the Surgeon General, who has no regulatory or law-enforcement authority, to do anything, or specify how or by whom technology platforms should be held "accountable" for the proliferation of misinformation on their sites. In sum, this PFOF contains no evidence that the Surgeon General used these podcast remarks to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) these remarks, or any other communications, by the Surgeon General as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

401.   Dr. Murthy demanded "aggressive action" from the platforms to censor speech: "I do think that part of what they have to do, the platforms is take aggressive action against people who are intentionally spreading misinformation." *Id.*

**RESPONSE:** Disputed as a mischaracterization of and unsupported by the evidence. The quoted language, a statement of opinion from what purports to be a transcript of a portion of an interview with Dr. Murthy, does not constitute a "demand[ ]" by Dr. Murthy that platforms take action any kind, aggressive or otherwise, much less that they "censor speech" as opposed to applying their own content moderation policies, to which all users agree. In sum, this PFOF contains no evidence that the Surgeon General used these podcast remarks to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) these remarks, or any other communications, by the Surgeon General as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

402.   Waldo agrees that this message is "consistent with his previous statements as well as the content within the advisory itself." Waldo Dep. 321:22-24.

**RESPONSE:** Undisputed. However, as explained extensively throughout, Plaintiffs have adduced no evidence that these remarks, other remarks, or the Advisory itself, were used to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) any communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

403.   As Waldo concedes, Dr. Murthy's threat to hold platforms "accountable" and his demand for "aggressive action" to censor misinformation "is consistent with the messaging we've reviewed all day today of the advisory, the rollout, the public statements" by OSG. *Id.* at 322:22-24.

**RESPONSE:** Disputed as a mischaracterization of and unsupported by the evidence. Mr. Waldo did not "concede[ ]" that Dr. Murthy had made any "threat" or "demand" of any kind. The deposition transcript states: "Q. And he also says: I do think that part of what they have to do, the platforms, is take aggressive action against people who are intentionally spreading misinformation. Right? A: Yes, that's what he says in this podcast. Q: Okay. And does that reflect kind of the – that kind of reflect or re-emphasize the message in the health advisory? A. I think this is consistent with the messaging we've reviewed all day today." Waldo Dep. 322:19-24. In sum, as explained extensively throughout, Plaintiffs have adduced no evidence that these remarks, other remarks, or the Advisory itself, were used to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) any communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

404.    On January 3, 2022, Dr. Murthy participated in Alyssa Milano's podcast. Waldo Ex. 39, at 1. In the podcast, Dr. Murthy stated that the "sophistication with which this misinformation is spreading is truly unprecedented, and a lot of has been enabled by technology platforms in the social media which enable the spread, and … the platforms need to do a lot more is step up, to be accountable for making their spaces safer." *Id.* at 3 (Audio Tr. 2). He also stated, "finally, I just want to come back to the technology companies for a moment here, because unless those platforms step up and make their spaces safer and reduce the amount of misinformation on their site, it's going to be pretty tough to get a full handle on this spread of misinformation." *Id.* at 5 (Audio Tr. 4).

**RESPONSE:** Undisputed that the exhibit, which purports to be transcript of a portion of an interview with Dr. Murthy, reads as such; however, the exhibit does not establish the date of the interview. Defendants further note that Dr. Murthy also stated, "So we laid out steps that individuals [could] take, that technology companies could take, that healthcare workers, educators, government, and other stakeholders can take because it turns out there's an important role for all of us. Waldo Ex. 39 at 4 (Audo Tr. 3:3-8). In sum, as explained extensively throughout, Plaintiffs

have adduced no evidence that these remarks, other remarks, or the Advisory itself, were used to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) any communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

405.   Immediately after these comments, the podcast broadcast public comments by President Biden, stating: "Joe Biden: The unvaccinated are responsible for their own choices, but those choices had been shulled [*sic*] by dangerous misinformation on cable TV and social media. You know, these companies … are making money by ped[dling] lies and allowing misinformation that can kill their own customers and their own supporters. It's wrong. It's immoral. I call on the purveyors of these lies and misinformation to stop it. Stop it now." *Id.*

**RESPONSE:** Undisputed that the exhibit, which purports to be a transcript of a portion of a podcast involving Dr. Murthy, contains the quoted passage (except the alterations added by Plaintiffs). The full, accurate transcript of the President's remarks—including the context in which they arose—is available on the White House's website. *See* Ex. 156 (Remarks by President Biden on the Fight Against COVID-19, in Washington D.C. (Dec. 21, 2021), https://perma.cc/H94K-WN7Q). In any event, this PFOF contains no evidence that OSG or other federal officials pressured or threatened social media companies to censor speech, or that social media companies regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2 (White House); Defs.' PFOF § II.B, Arg. § II.B.1.c & II.B.2 (Surgeon General).

406.   Waldo agrees that this podcast is "aligned with … the advisory and the other public statements we've seen so far."  Waldo Dep. 327:8-10.

**RESPONSE:** Undisputed, except to clarify that Mr. Waldo stated that *Dr. Murthy*'s statements on the podcast "seem[] aligned with . . . the advisory and the other public statements

we've seen thus far." Waldo Dep. 37:2-10. Mr. Waldo was not asked about the President's comments until after this question was asked. *See id.* at 327:16-22. In any event, as explained extensively throughout, Plaintiffs have adduced no evidence that these remarks, other remarks, or the Advisory itself, were used to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) any communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

407.   Dr. Murthy also called for the platforms to "go after people who are superspreaders of misinformation on these sites," which Waldo agrees is "entirely consistent … with the messages that Dr. Murthy was sharing about health mis- and disinformation." *Id.* at 329:23-330:18.

**RESPONSE:** Undisputed, except to note that the first quote comes from Waldo Ex. 39 at 6, and reads in full: "We're also asking them to go after people who are super spreaders of misinformation on these sites …" (Audio Tr. 5:7-8). In any event, as explained extensively throughout, Plaintiffs have adduced no evidence that these remarks, other remarks, or the Advisory itself, were used to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) any communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

408.   On February 14, 2021, Dr. Murthy participated in a panel discussion hosted by the Rockefeller Foundation. Waldo Ex. 41. Dr. Murthy stated, "what feels different in this moment compared to ten years ago or [twenty] years ago is this speed, scale, and sophistication with which this misinformation is spreading and much of it has been enabled, in fact, by technology platforms, and we talk to people about where they're encountering misinformation. It's off and on social media channels and other tech platforms. … We need certainly technology companies to step up and do more, to help reduce this spread of misinformation, and to be transparent with the public about how much misinformation is being transacted on their sites and whether their methods of addressing it are working or not. We do not have enough transparency on that front and that is hindering us in our response of misinformation." *Id.* a 6-7 (Audio Tr. 9-10).

**RESPONSE:** Undisputed that the exhibit, which purports to be a transcript of a portion of a panel discussion involving Dr. Murthy, reads as such (with minor alterations). However, Dr. Murthy emphasizes that the Advisory "call[s] for a broad all of society response" and outlines steps that others besides platforms can take—"nurses and doctors and others in the healthcare professions," "educators and the education community" and even "we, as individuals …." Waldo Ex. 41 at 7-8 (Audio Tr. 10:23-11:6). In any event, this PFOF contains no evidence that the Surgeon General used the remarks to pressure or threaten social media companies to censor speech, or that social media companies regarded (or acted on) these remarks, or any other communications, by the Surgeon General as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

409.    Waldo agrees that this is "a consistent message with what we've seen in previous public statements, interviews, as well as the advisory itself."  Waldo Dep. 331:23-25.

**RESPONSE:** Undisputed. However, as explained extensively throughout, Plaintiffs have adduced no evidence that these remarks, other remarks, or the Advisory itself, were used to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) any communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

410.    In the same panel, Dr. Murthy stated that there is a role for government to set "safety standards" when it comes to misinformation, which directly suggests government regulation and foreshadowed the OSG's forthcoming Request for Information (RFI): "And, of course, there's a role for government here as well to set safety standards, to push for transparency and accountability, particularly from platforms."  Waldo Ex. 41, at 8 (Audio Tr. 11). Dr. Murthy then immediately foreshadowed the OSG's forthcoming Request for Information (RFI) as a step toward government "setting safety standards": "There are steps we are working now that we will be – you know, have more to say about it in the … coming weeks and months ahead, to try to, in fact, gather even more information about the impact of health misinformation on health professionals of the public and also in the role that technology companies may be playing on that on that front."  *Id.*

Less than a month later, the OSG issued a formal RFI for information about misinformation on social media platforms.

**RESPONSE:** Disputed to the extent the PFOF implies that the establishment of "safety standards" necessarily entails "government regulation," neither of which has ensued from OSG's Request for Information. Note also that OSC has no authority to issue or enforce regulations of any kind. *See* Lesko Decl. ¶ 3 (Ex. 63). In any event, this PFOF contains no evidence that the Surgeon General used the remarks to pressure or threaten social media companies to censor speech, or that social media companies regarded (or acted on) these remarks, or any other communications, by the Surgeon General as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

411.   On March 3, 2021, the OSG issued a formal RFI in the Federal Register, seeking information from social-media platforms and others about the spread of misinformation on social media. Waldo Ex. 42 (87 Fed. Reg. 12712). The RFI is entitled, "Impact of Health Misinformation in the Digital Information Environment in the United States Throughout the COVID–19 Pandemic Request for Information (RFI)." *Id.* at 1.

**RESPONSE:** Disputed to the extent Plaintiffs suggest that the RFI was limited to "seeking information from social-media platforms and others about the spread of misinformation on social media." The RFI, Waldo Ex. 42, seeks information from all "interested parties" about, *inter alia*, "how COVID-19 misinformation has affected quality of patient care during the pandemic" and "how COVID-19 misinformation has impacted individuals and communities." *Id.* In any event, this PFOF contains no evidence that OSG used the RFI to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) the RFI, or any other communications or issuances by OSG, as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

412.    "Kyla [Fullenwider] was the primary driver on the RFI from a content expert perspective."  Waldo Dep. 338:22-23. Though she was employed at U.S. Digital Response, "she was doing work on behalf of the Surgeon General." *Id.* at 340:8-9. Kyla Fullenwider is also responsible for receiving and reviewing the responses to the RFI. *Id.* at 362:6-10. "Kyla was the subject matter expert who was guiding this RFI process." *Id.* at 362:15-17.

**RESPONSE:** Disputed. Ms. Fullendwider was not "employed at U.S. Digital Response" in March 2022; she was employed by OSG. *See* Lesko Decl. ¶ 17 (Ex. 63). And Mr. Waldo testified that he believed Ms. Fullenwider was "the one running point on this," not that she was "responsible for receiving and reviewing the response to the RFI." Waldo Dep. 362:6-10. Otherwise, the PFOF accurately quotes Mr. Waldo's testimony as to *his* understanding of Ms. Fullenwider's role. In any event, this PFOF contains no evidence that OSG used the RFI to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) the RFI, or any other communications or issuances by OSG, as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

413.    The RFI defines "technology platforms" very broadly, indicating that the Surgeon General is expanding its attempts to control the spread of so-called "misinformation": "Technology platforms include the following: General search engines, content sharing platforms, social media platforms, e-commerce platforms, crowd sourced platforms, and instant messaging systems."  Waldo Ex. 42, at 2; *see also* Waldo Dep. 341:14-342:7.

**RESPONSE:** Disputed as an argumentative mischaracterization of the evidence. The quoted language does not "indicat[e] that the Surgeon General is expanding its attempts to control the spread of so-called 'misinformation.'" In any event, this PFOF contains no evidence that OSG used the RFI to threaten or pressure social media or technology companies to censor speech, or that social media or technology companies regarded (or acted on) the RFI, or any other communications or issuances by OSG, as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

414.    Under the heading "Information About Technology Platforms," the RFI seeks a long series of detailed information about misinformation on such platforms, including "Information about how widespread COVID–19 misinformation is on individual technology platforms," Waldo Ex. 42, at 2; "any aggregate data and analysis on the prevalence of COVID–19 misinformation on individual platforms including exactly how many users saw or may have been exposed to instances of COVID–19 misinformation," *id.* at 2-3; and "[a]ny aggregate data and analysis on how many users were exposed, were potentially exposed, or otherwise engaged with COVID–19 misinformation," *id.* at 3.

**RESPONSE:** Undisputed, except to note that Plaintiffs' characterization of the RFI as "seeking a long series of detailed information" is argumentative (not factual), and that responses to the RFI were purely voluntary. *See* Lesko Decl. ¶ 6 (Ex. 63); Waldo Ex. 42 at 2 ("Please feel free to respond to as many topics as you choose."). In any event, this PFOF contains no evidence that OSG used the RFI to threaten or pressure social media or technology companies to censor speech, or that social media or technology companies regarded (or acted on) the RFI, or any other communications or issuances by OSG, as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

415.    The RFI also seeks detailed information about censorship policies and how they are enforced: "Information about COVID–19 misinformation policies on individual technology platforms," and "[a]ny aggregate data and analysis of technology platform COVID–19 misinformation policies including implementation of those policies and evaluations of their effectiveness." *Id.* at 3.

**RESPONSE:** Undisputed except to note that the quoted language sought information about "COVID-19 misinformation policies," not "censorship policies." In any event, this PFOF contains no evidence that OSG used the RFI to threaten or pressure social media or technology companies to censor speech, or that social media or technology companies regarded (or acted on) the RFI, or any other communications or issuances by OSG, as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

416.    The RFI also seeks detailed information about disfavored *speakers* on social-media
platforms, requesting "[i]nformation about sources of COVID–19 misinformation," including
"[i]nformation about the major sources of COVID–19 misinformation associated with exposure."
*Id.* at 3. The RFI makes clear that "source" refers to *speakers* on platforms: "By source we mean
both specific, public actors that are providing misinformation, as well as components of specific
platforms that are driving exposure to information."  *Id.* at 3.

**RESPONSE:** Undisputed except to note that the quoted language sought information

regarding "major sources" of misinformation, and says nothing about information, "detailed" or

otherwise, about "disfavored speakers." Notably, the RFI stressed that "all information should be

provided at a level of granularity that preserves the privacy of users" and that no "personally

identifiable information should be submitted in response to this RFI." Waldo Ex. 42 at 2. In any

event, this PFOF contains no evidence that OSG used the RFI to threaten or pressure social media

or technology companies to censor speech, or that social media or technology companies regarded

(or acted on) the RFI, or any other communications or issuances by OSG, as such. Any implicit

assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF

§ II.B, Arg. §§ II.B.1.c & II.B.2.

417.    Especially in light of Dr. Murthy's prior public statements about the government
"setting safety standards" for misinformation, Waldo Ex. 41, at 8 (Audio Tr. 11), the RFI carries
a clear implied threat of future regulation against the social-media and other technology platforms.

**RESPONSE:** Disputed as argumentative and unsupported by the cited evidence. As noted

above, Defs' Resp. to Pls.' PFOF ¶ 410, Dr. Murthy's passing reference, during a panel discussion,

to the establishment of "safety standards" does not necessarily imply the promulgation of binding

"government regulation[s]," which OSG has no authority to issue or enforce, and which in fact did

not result from the publication of the RFI. In sum, this PFOF contains no evidence that OSG used

the RFI to threaten or pressure social media or technology companies to censor speech, or that

social media or technology companies regarded (or acted on) the RFI, or any other

communications or issuances by OSG, as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

418.   Contemporaneous media coverage portrayed the RFI as a "demand" for information from platforms. *See, e.g.,* Waldo Ex. 44, at 1 (Brad Dress, *Surgeon General Demands Data on COVID-19 Misinformation from Major Tech Firms*, The Hill (Mar. 3, 2022, 11:24 am)).

**RESPONSE:** Dispute as unsupported that any implication that the single news article cited by Plaintiffs is representative of the "media coverage" of the RFI. Undisputed that the headline of the cited article referred to the RFI as a "demand," but that is also irrelevant. The sole pertinent evidence of what the RFI contains is the RFI itself. In any event, the body of the article undercuts its sensationalized headline, stating that "Dr. Murthy has reportedly asked for" and "is requesting" information. In sum, this PFOF contains no evidence that OSG used the RFI to threaten or pressure social media or technology companies to censor speech, or that social media or technology companies regarded (or acted on) the RFI, or any other communications or issuances by OSG, as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

419.   Max Lesko, the Surgeon General's Chief of Staff, also sent the RFI to several major tech platforms with a formal letter requesting that they respond. Waldo Dep. 348:20-22. He sent nearly identical letters to Facebook, Google, LinkedIn, Twitter, YouTube, and Microsoft. Waldo Exs. 46, 47, 48, 49, 50, 51. Each letter was directed to the CEO of the platform over General Murthy's signature. *Id.*

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that OSG used these letters or the RFI to threaten or pressure social media or technology companies to censor speech, or that social media or technology companies regarded (or acted on) the letters, the RFI, or any other communications or issuances by OSG, as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

420.    Each letter stated, "The proliferation of health misinformation during the pandemic has been both extensive and dangerous. … It is clear that we must do everything we can to address this threat." *Id.* Each letter referred to the July 15, 2021 Health Advisory, noting that "a large proportion of health misinformation is spread through technology platforms," and "my Advisory includes a call for technology companies to join this broader effort to create a safer, healthier information environment." *Id.* Each letter advised the social-media platforms of the RFI, and formally "request[ed] that your company contribute to the RFI…. Specifically, I am requesting responses from companies about the extent and spread of COVID-19 misinformation on their technology platforms, policies to address COVID-19 misinformation and their effectiveness, [and] sources of COVID-19 misinformation…." *Id.*

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that OSG used these letters or the RFI to threaten or pressure social media or technology companies to censor speech, or that social media or technology companies regarded (or acted on) the letters, the RFI, or any other communications or issuances by OSG, as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

421.    On May 3, 2022, Facebook notified the White House and OSG that it had "filed a response to the Surgeon General's rfi on Covid misinformation and would be happy to discuss at the appropriate time." Waldo Ex. 54, at 2. To date, the OSG has never made this or any other the responses to its RFI public.

**RESPONSE:** Disputed to the extent that Plaintiffs assert "the OSG has never made this or any other [of] the responses to its RFI public." OSG posted the responses it received, including Facebook's and the responses of the other social media companies that answered the RFI (not all of them did), in April 2023. *See* Lesko Decl. ¶ 6 (Ex. 63). They are available at https://www.regulations.gov/comment/HHS-OASH-2022-0006-0002. *See also* Ex. 70 (RFI Responses Compiled, Dep't of Health & Hum. Servs (Apr. 7, 2023) (excerpt containing Twitter, Google, and YouTube's responses). In any event, this PFOF contains no evidence that OSG used the RFI to threaten or pressure social media or technology companies to censor speech, or that social media or technology companies regarded (or acted on) the RFI, or any other

communications or issuances by OSG, as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

422.    Shortly after the RFI was issued, on March 11, 2022, GQ magazine published an interview with Dr. Murthy. Waldo Ex. 52. In this interview, Dr. Murthy stated, "we all have a responsibility to do everything we can to reduce the spread of misinformation… Whether you have one million followers on social media, or you've got 10 followers, we all have platforms and people in our lives who trust us." *Id.* at 6. He called on platforms like Spotify (which was then being criticized for hosting Joe Rogan's podcast) to censor health misinformation: "If you're running a platform, whether it's a Spotify or another social media platform, you've got to think about, how do I create a healthy information environment here? How do I create rules and a culture that promotes accurate information?" *Id.* He emphasized that "a platform has the ability, the opportunity, and the responsibility to create rules and a culture that supports the dissemination of accurate information and that reduces the spread of misinformation." *Id.* at 7.

**RESPONSE:** Disputed as a mischaracterization of the evidence to the extent that Plaintiffs

assert the Surgeon General "called on platforms like Spotify . . . to censor health misinformation."

The interview says nothing about "censor[ing]" information. Dr. Murthy was asked: "What would

you like to see a company like Spotify do in the case of someone like Joe Rogan, who has a huge

platform, . . . and is sometimes having guests on who offer up COVID misinformation?" Waldo

Ex. 52 at 6. Dr. Murthy responded: "I believe we all have a responsibility to do everything we can

to reduce the spread of misinformation. We all have different abilities, different platforms. So if

you are a parent and you have kids who listen to you, then you have a responsibility to help ensure

that they have access to accurate information. If you're a manager at an office and you've got

people who listen to you and are looking to you for information about workplace health policies,

you've got to make sure you give them information-designed policies that are based on solid

scientific evidence. Whether you have one million followers on social media, or you've got 10

followers, we all have platforms and people in our lives who trust us. That means we all have to

be responsible about how we speak about science and about health, particularly when it comes to

COVID. That's at the heart of this. If you're running a platform, whether it's a Spotify or another

social media platform, you've got to think about, how do I create a healthy information environment here?" *Id.* Dr. Murthy went on to say: "**This is different from censorship. This debate often can go down the pathway of, do you support censorship or not? To me, that misses the mark. In America, we believe in certain rights. One of those is free speech. The rights that we support and honor and cherish in America are one of the many reasons that my parents and generations of immigrants came to this country."** *Id.* at 7 (emphasis added). In any event, this PFOF contains no evidence that the Surgeon General used this interview to threaten or pressure social media companies to censor speech, or that social media companies regard these remarks, or any other communications, by the Surgeon General as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

423.     Echoing his prior comments about "setting safety standards" by government, Dr. Murthy compared censorship "rules" for misinformation to speed limits: "We have speed limits on the road because we know that sometimes if you drive too fast, that can have an impact on somebody else's health and wellbeing. If we're going to live together in a society, we've got to take steps and observe certain rules to help protect other people. That's true here as well. Platforms have an opportunity to help shape that environment in their own way. We all do. That's our responsibility at a time like this." *Id.*

**RESPONSE:** Disputed as an argumentative mischaracterization of the evidence. The quoted language does not refer to "censorship 'rules,'" and in fact, the full passage contradicts Plaintiffs' characterization: "*This is different from censorship*. This debate often can go down the pathway of, do you support censorship or not? To me, that misses the mark. In America, we believe in certain rights. One of those is free speech. The rights that we support and honor and cherish in America are one of the many reasons that my parents and generations of immigrants came to this country. But we also live in a society. That means we need common rules for the common good. We have speed limits …." Waldo Ex. 52 at 7 (emphasis added). In any event, this PFOF contains

no evidence that the Surgeon General used this interview to threaten or pressure social media companies to censor speech, or that social media companies regard these remarks, or any other communications, by the Surgeon General as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

### K.    The White House and Surgeon General Continue Oversight of Censorship..

424.    On June 22, 2022, Facebook again emailed Waldo, Rob Flaherty, and other White House officials with an update on Facebook's increased censorship. Waldo Ex. 53, at 1. In the email, Facebook stated that it "[w]anted to ensure that you were aware of our policy updates following the early childhood vaccine approvals. As of today, all COVID-19 vaccine related misinformation and harm policies on Facebook and Instagram apply to people 6 months or older…." *Id.* Facebook indicated that it had again relied on the CDC to dictate what claims people can post on Facebook: "We expanded these policies in coordination with the CDC and ensured that we also included false claims that might be connected to children…." *Id.*

**RESPONSE:** Disputed as a mischaracterization of the evidence. The email says nothing about "increased censorship," nor does it indicate that Facebook "relied on the CDC to dictate what claims people can post on Facebook." As the quoted language states, the email was providing "updates" on Facebook's and Instagram's "misinformation policies," and explained they were made "in coordination with" CDC to ensure inclusion of "false [vaccine] claims that might be connected to children."  Even more to the point, the email does not refer to, or provide evidence of, any "oversight" by federal officials of Facebook's policies. This PFOF contains no evidence that OSG or other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

425.    Throughout this period, at the federal officials' request, Facebook continued to send bi-weekly "Covid Insights Reports" reporting on COVID-19 related misinformation on its platforms to the White House and OSG. *See, e.g.,* Waldo Ex. 54, at 2-4. In the spring of 2022,

Facebook repeatedly asked the federal officials if it could discontinue or reduce the frequency of these reports, which it had been sending for over a year. *Id.* at 2. Finally, on June 13, 2022, Facebook notified the White House and OSG that "we will plan to discontinue these unless we hear from you that this information continues to be valuable." *Id.* at 1. Rob Flaherty responded the same day, requesting that Facebook continue to send the reports and further asking Facebook to report on how it would handle misinformation for early-childhood (under age 5) vaccines: "It would be helpful to continue to get these as we start to ramp up under 5 vaccines. Obviously, that has a potential to be just as charged. Would love to get a sense of what you all are planning here." *Id.* Facebook continued to send the reports as requested, including two reports on July 17, 2022, and promised to continue sending them. *Id.*

   **RESPONSE:** Disputed as an argumentative mischaracterization of the evidence. It is

unclear what Plaintiffs mean by "throughout this period," and the cited evidence does not support

the assertion that the reports were always initiated at "federal officials' request" or that they had

been sent for "over a year." Furthermore, Plaintiff overstate the nature of Facebook's requests to

"discontinue or reduce the frequency of the report[s]." *See, e.g.*, Waldo Ex. 54 at 2 ("Also flagging

that it would help to hear from you if these reports continue to provide useful context or if you'd

like to follow up with a discussion as to how we can be helpful during this phase of the pandemic.")

Indeed, Mr. Waldo testified that he was not aware that anyone from OSG—or any federal

official—actually did anything with the reports, Waldo Dep. 141:14-16, and for his part he "didn't

spend a lot of time looking at the[] reports," *id.* at 140:18-19. In any event, this PFOF contains no

evidence that OSG or other federal officials threatened or pressured Facebook to censor speech,

or that Facebook regarded (or acted on) any communications by OSG or other federal officials as

such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a

whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

## IV. The CDC and the Census Bureau: BOLO and Authoritative Fact-Checking.

  426. In addition to the public and private pressure campaigns from the White House and the Surgeon General's Office, the CDC and the Census Bureau have engaged in a long censorship campaign together, enabled by the White House's pressure on platforms to cooperate with the federal government. Working closely with Census, the CDC flags supposed "misinformation" for

censorship on platforms (sometimes using the acronym "BOLO," "Be On the Lookout"), and exercises full authority to dictate what health claims will be censored on social media platforms.

**RESPONSE:** Disputed. Neither this PFOF, or any that follow, contain evidence that the CDC and the Bureau of the Census ("Census Bureau") are now or have ever been engaged, together or separately, in a "long censorship campaign" or otherwise have ever "dictated what health claims will be censored on social media platforms." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

### A.    The CDC's Regular Communication with Social Media Platforms.

427.    Carol Crawford is the division director for the division of Digital Media within the CDC Office of the Associate Director for Communication. Crawford Depo. 11:7-9.

**RESPONSE:** Undisputed.

428.    According to Crawford, her "division provides leadership for CDC's web presence. We provide leadership for CDC's social media presence." *Id.* 11:14-16. Crawford is "the director of that work. I determine strategy, objectives, oversee work." *Id.* 11:21-22.

**RESPONSE:** Undisputed.

429.    Before April 2022, Crawford was "the branch chief of the Digital Media Branch within the Division of Public Affairs, and most of the roles that our division currently performs, web and social media, were in that branch." *Id.* 15:3-6.

**RESPONSE:** Undisputed.

430.    Crawford is "the main person that was the CDC point of contact to talk to Facebook, Twitter and the platforms since our job was to lead digital media." *Id.* 249:1-4.

**RESPONSE:** Undisputed.

431.    Crawford has regular contact with social-media platforms, especially about COVID-19 issues: "We started regular contact with the [platforms] at the beginning of the COVID outbreak to exchange information about COVID, and most of the contact since then has been around COVID or other high-priority things, but mostly COVID." *Id.* 16:13-17.

**RESPONSE:** Disputed that the CDC or the Census Bureau "has regular contact with social-media platforms" in the present day. The cited testimony, which concerns only CDC, not

the Census Bureau, relates to regular contact that Crawford and her office had with specific social-media companies between early 2020 to approximately April 2022. Crawford Dep. 16:8-17 (describing contacts in her prior role); *id.* 13:7-15 (describing the role change "in March or April of 2022"). Today, CDC has "regular contact" only with Google, through bi-weekly meetings that largely focus on issues unrelated to COVID-19 or misinformation. Declaration of Carol Crawford, Director of CDC's Division of Digital Media ¶ 11 ("Crawford Decl.") (Ex. 80). Contact with other social media companies is ad hoc. *Id.* Moreover, this PFOF contains no evidence that CDC or the Census Bureau attempted to use these "exchange[s] [of] information about COVID" to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

432.    Crawford had only "very occasional" contacts with the platforms before COVID-19, *id.* 17:8-9; but then she and the CDC "started talking to some of them in February and March of 2020," at the beginning of the pandemic. *Id.* 18:5-6.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that the CDC or the Census Bureau attempted to use these contacts to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

433.    At this time, CDC leaders were asking Crawford's group if they were in contact with the platforms: "there were a lot of people asking staff, or other staff, are we -- were we in contact with the groups, and do we have any arrangements." *Id.* 18:19-23.

**RESPONSE:** Disputed as a mischaracterization of the testimony. Crawford testified that "a lot of people" were asking if CDC was "in contact" with social media companies, but she did not specify whether those people were CDC leaders or anyone else specific. Crawford Dep. 18:16-22. In any event, this PFOF contains no evidence that the CDC or the Census Bureau attempted use contacts with social-media to dictate to, threaten or pressure, collude with, or encourage them to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

434.    Crawford communicated with platforms by email, phone, and in meetings and calls. *Id.* 20:1-19. She "had points of contact at several of them, and we would have meetings when we needed to talk. So we arranged calls." *Id.* 20:17-19.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that the CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

**B.    CDC's and Census's Pressure and Collusion With Facebook/Meta.**

435.    On February 6, 2020, Facebook emailed State Department officials, noting that "Facebook has taken proactive as well as reactive steps to control information and misinformation related to Corona virus which includes … removal of misinformation." Crawford Ex. 2, at 4. The email was forwarded to Crawford, who reforwarded to her contacts at Facebook. *Id.* at 3. Facebook proposed to Crawford that "Facebook team would create a Coronavirus Page serving up content that exists on other organizations' FB pages including the CDC," and would direct users to "curated content from trusted sources." *Id.* at 3.

**RESPONSE:** Undisputed. However, the cited evidence reflects only a proposal by Facebook to make users aware of information from CDC that CDC posted to its own Facebook

page.  It is not evidence that the CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

436.    On February 7, 2020, Crawford agreed to the proposals, and she also proposed that "There could be times we might want to address widespread myths like mask use or new issues." *Id.* at 2. She discussed with Facebook the same day. *Id.* at 1.

**RESPONSE:**  Undisputed, but note that the quoted email exchange concerned the placement of proactive messages at the top of Facebook's News Feed to inform users about how to protect themselves from the coronavirus, Crawford Ex. 2 at 2-3. This PFOF contains no evidence that the CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

437.    On March 3, 2020, Facebook emailed Crawford and noted that Facebook intended to "support governments … with their response efforts on COVID-19," including the "goal" to "remove misinformation."  Crawford Ex. 3, at 1.

**RESPONSE:**  Undisputed, but note that in the quoted email exhibit Facebook informed CDC that it had "just shared [*its*] ongoing work to support governments and non-profits with their response efforts on COVID-19" (with a hyperlink to a live webpage), and that *Facebook's* "goal [was] to . . . remove misinformation." Crawford Ex. 3 at 1. This PFOF contains no evidence that the CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms,

or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

438.    Crawford "talked pretty regularly" with Facebook "around this time," *i.e.*, March 2020. 37:7-9.

**RESPONSE:** Undisputed, except to the extent the PFOF suggests that Crawford talked to Facebook about "remov[ing] misinformation," *see* Pls.' PFOF ¶ 437, which contradicts Crawford's testimony that she didn't "recall . . . discussing misinformation with [Facebook] around this time[.]" Crawford Dep. 37:13-15. The fact that Crawford "talked pretty regularly" with Facebook is not evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) these or any other communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

439.    Crawford recalls having discussions of misinformation with Facebook "in the fall of 2020." Crawford Dep. 38:7-8. These included discussions of how to combat "growing" misinformation about COVID-19: "I can recall us generally saying things to the effect of … misinformation is really growing, or … what do you think we could be doing to address it? That kind of conversation." *Id.* 38:11-15.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that these discussions about "combat[ing] and "address[ing]" misinformation concerned removing or suppressing information, that the CDC attempted in these discussions to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) these or any other communications with CDC or the Census Bureau as such. Any assertion to that effect is

unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

440.    On January 25, 2021, Facebook emailed Crawford the first of an ongoing, biweekly series of CrowdTangle reports, which report on "top engaged COVID and vaccine-related content overall across Pages and Groups." Crawford Ex. 6, at 2. The email emphasized in bold the anti-vaccine content listed in the report, including "Reports of healthcare workers refusing the vaccine," "Posts about alleged vaccine-related deaths," and "News and reports of severe vaccine side effects." *Id.* Facebook indicated that it was sending this report in response to a prior conversation with Crawford in which such data was requested: "I am following up on our conversation several weeks ago about providing more detailed reporting from our CrowdTangle team." *Id.*

**RESPONSE:** Undisputed, except to the extent that the third sentence of the PFOF implies that Facebook prepared the referenced report at Crawford's request. Facebook states in the cover e-mail that it was sending the report as a "follow[] up on our conversation . . . about providing more detailed reporting," *id.*, but not that the more detailed report had been created at Crawford's "request[]." In any event, Facebook's act of sharing its CrowdTangle reports with CDC is not evidence that the CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage Facebook to remove or suppress certain health claims on their platforms, or that Facebook regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

441.    Crawford responded that the report "looks wonderful and much appreciated." *Id.* at 1. She said that she "will be extending our distribution list" for the report. *Id.* at 1. She also noted, "One group we'll be adding" to the distribution list for the CrowdTangle reports "is the Census group who hopefully will soon start their project with us." *Id.* And she stated, "the wide group of those looking at misinfo will want this." *Id.*

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau used  CrowdTangle reports in an attempt to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) communications with CDC or the Census

Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

442.    CrowdTangle is "a social media listening tool for Meta properties … [l]ike Instagram and Facebook." Crawford Dep. 50:3-6. "[S]ocial media listening reports show themes … of discussion on social media channels." *Id.* 52:10-12. The CrowdTangle report is "a search of content on social media, and a summary of the higher volume conversations." *Id.* 53:8-10. It is "a report of the most talked about topics on social media during this time period." *Id.* 54:13-15.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau used  CrowdTangle reports in an attempt to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

443.    The CrowdTangle reports that Facebook regularly emailed to CDC were only one of two forms of access to CrowdTangle. Since "March or April 2020," Facebook had also allowed CDC to "directly log into CrowdTangle and run our own reports or searches." *Id.* 77:9-13.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau used CrowdTangle or CrowdTangle reports in an attempt to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) these or any other communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

444.    According to Crawford, the CrowdTangle reports "would help us understand what was being discussed on social media about COVID, which helps us look for gaps in information, confusion about facts, things that we might need to adjust our communication materials for." *Id.* 57:24-58:3.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC's use of CrowdTangle reports to understand social-media content that it "might need to adjust [its own] communications materials for" had anything to do with dictating to, threatening or pressuring, colluding with, or encouraging social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) these efforts as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

445. Crawford confirms that the CDC had privileged access to CrowdTangle from early 2020, and government officials used the non-public "social media listening tool" to monitor and track private speech about COVID-19 on social media: "we had access to go in directly to CrowdTangle and run in reports … from early 2020. … And I mentioned that our research team … searched in it and looked in it to create their reports, and I believe other teams did too." *Id.* 147:12-18.

**RESPONSE:** Disputed as argumentative and a mischaracterization of the record to the extent the PFOF purports to assert that CDC was using CrowdTangle or other "social media listening tool[s]" to "monitor" or "track" private speech in order to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) these or any other actions by CDC as doing so. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

446. The CDC also used other "social media and listening tools" to monitor Americans' speech on social media: "we did searches in CrowdTangle, the same way we do searches in other social media and listening tools that we have to create, to understand what's being discussed in the environment, to update our communication material." *Id.* 148:11-15.

**RESPONSE:** Disputed as argumentative and a mischaracterization of the record to the extent the PFOF purports to assert that CDC was using CrowdTangle or other "social media listening tools" to "monitor" or "track" private speech to dictate to, threaten or pressure, collude

with, or encourage social-media companies to remove or suppress certain health claims on their

platforms, or that the companies regarded (or acted on) these or any other communications with

CDC (or the Census Bureau) as such. Any assertion to that effect is unsupported by and contrary

to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

447.    The CDC's "listening tools" included "Meltwater reports," where "Meltwater is
sort of like CrowdTangle but for all the platforms." *Id.* 154:13-16. But CrowdTangle is superior
to Meltwater for monitoring Facebook and Instagram because it provides privileged access to some
online speech: "CrowdTangle can see more on the Meta properties. So it's nicer if you're just
looking at Meta properties. Meltwater gives you social media at large." *Id.* 154:24-155:2.

**RESPONSE:** Undisputed, except that the non-quoted portion of the second sentence is

disputed as argumentative and lacking support in the cited testimony. In any event, this PFOF

contains no evidence that CDC or the Census Bureau used Meltwater reports or other social-media

listening tools to attempt to dictate to, threaten or pressure, collude with, or encourage social-media

companies to remove or suppress certain health claims on their platforms, or that the companies

regarded (or acted on) these or any other actions by CDC or the Census Bureau as such. Any

assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF

§ II.C., Arg. § II.B.4.a. & f.

448.    Related to the bolded categories of supposed misinformation in Facebook's
CrowdTangle report, Crawford claims that she does not have specific recollection about the issues,
but she admits that "I do recall generally discussing misinformation with Facebook around this
time." *Id.* 58:11-13.

**RESPONSE:** Undisputed. *See* Crawford Dep. 58:4-11. However, general discussions

about misinformation are not evidence that CDC or the Census Bureau attempted to dictate to,

threaten or pressure, collude with, or encourage social-media companies to remove or suppress

certain health claims on their platforms, or that the companies regarded (or acted on) these or any

other communications with CDC or the Census Bureau as such. Any assertion to that effect is

unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

449.    Crawford added Census Bureau officials to the distribution list for the CrowdTangle reports because "[t]hey were going to start working with the CDC regarding misinformation." *Id.* 58:19-20; *see also id.* 61:11-12 ("At some point I recall adding Census to the distr[ibution]").

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that the Census Bureau's work with CDC "regarding misinformation" involved efforts to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any actions by or communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

450.    From then on, Facebook regularly sent Crawford biweekly "CrowdTangle content insights report[s]."  Crawford Ex. 7, at 1-4. With each report, Facebook would highlight in bold the high-engagement misinformation-related issues for the CDC from the two-week period. *Id.* In each email, Facebook would introduce these misinformation-related posts by noting something like, "However, posts falling into the following themes also garnered high engagement." *Id.*

**RESPONSE:** Defendants dispute the phrase "[f]rom then on" in the first sentence as vague. The record shows that Facebook sent Crawford biweekly CrowdTangle reports beginning in January 2021. Crawford Ex. 6 at 2. Otherwise, dispute as a mischaracterization the implication that the reports were limited to misinformation, *see* Crawford Ex. 7 at 1 (including in the summary of highly engaged content "posts . . . about celebrating health care workers" and posts "shar[ing] news that kids over 12 can be vaccinated," with "posts includ[ing] varied stances on support/opposition to the idea"), and dispute as unsupported the implication that the reports highlighted misinformation issues "for the CDC." This PFOF contains no evidence that Facebook's act of sharing CrowdTangle reports with CDC or CDC's use of those reports had

anything to do with efforts to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any actions by or communications with CDC (or the Census Bureau) as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

451.    The CrowdTangle reports survey content that is not publicly available, such as "personal Group posts."  *Id.* at 2.

**RESPONSE:** Disputed. The cited exhibit does not contain any information about the public or non-public nature of the contents of CrowdTangle reports, including "personal Group posts." Even if accurate, this PFOF contains no evidence that CDC's use of those reports had anything to do with efforts to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any actions by or communications with CDC (or the Census Bureau) as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

452.    Crawford is "sure that general discussions" with Facebook addressed "that there was a lot of information on vaccines, which is one of the bolded words [in the CrowdTangle Reports], for example. I am sure that did occur."  Crawford Dep. 64:19-22.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC's "general discussions" with Facebook about "information on vaccines" involved efforts to dictate to, threaten or pressure, collude with, or encourage Facebook to remove or suppress certain health claims on its platform, or that the company regarded (or acted on) any actions by or communications with CDC (or the Census Bureau) as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

453.    On January 27, 2021, Facebook sent Crawford a recurring invite to a "Facebook weekly sync with CDC (CDC to invite other agencies as needed)."  Crawford Ex. 36, at 1. A large number of Facebook and CDC officials were included on the invite, including Liz Lagone, Facebook's content-moderation officer who communicated with the CDC. *See Id.* The agenda for the recurring meeting included "Misinfo collab status."   *Id.* It also included "CDC needs/questions."  *Id.*

**RESPONSE:** Undisputed. However, neither the number of persons invited to these "weekly sync[s]" nor the agenda item concerning misinformation is evidence that the CDC (or the Census Bureau) attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) these weekly meetings as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

454.    Crawford confirms that CDC frequently had weekly meetings with Facebook: "There were definitely times that we were talking weekly."  Crawford Dep. 226:20-21; *see also, e.g.,* Crawford Ex. 39, at 1 (recurring calendar invite for a meeting with the same agenda and participants on May 6, 2021).

**RESPONSE:** Disputed as a mischaracterization of the cited testimony, which states that CDC "might have" been having "weekly meetings with Facebook" during April 2021, because "[t]here definitely were times that [CDC and Facebook] were talking weekly. Crawford Dep. 226:6-21. Regardless, the frequency of meetings between CDC and Facebook provides no evidence that CDC (or the Census Bureau) attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC (or the Census Bureau) as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

455.    On March 10, 2021, Crawford sent Facebook an email seeking information about "Themes that have been removed for misinfo."  Crawford Ex. 44, at 3. She stated, "We mentioned

this on the call last week and you said you'd be sending something as other had asked – is that available yet by chance?" *Id.* She clarified: "You mentioned that WH and HHS had asked so you'd get it to us," and responded "Yes" to Facebook's question, "Are you looking for types of COVID-19 misinfo we remove?" *Id.*

**RESPONSE:** Undisputed. However, Crawford's inquiry about "[t]hemes" Facebook had

"removed for misinfo" is not evidence that CDC (or the Census Bureau) had attempted to dictate

to, threaten or pressure, collude with, or encourage Facebook to remove or suppress certain health

claims on its platform, or that the company regarded (or acted on) any communications with CDC

(or the Census Bureau) as such. Any assertion to that effect is unsupported by and contrary to the

evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

456.    Facebook noted, that "[w]e are setting up a meeting with WH/HHS to discuss more likely later this week or early next. Perhaps a CDC rep could participate…." Crawford Ex. 44, at 2. Crawford noted, "They want to see what you guys proactively have removed that might not be in those [CrowdTangle] reports…. My guess is a short meeting with Lis Wilhelm['s] vaccine confidence team is what is needed if FB is willing to do it." Crawford Ex. 44, at 2.

**RESPONSE:** Undisputed. However, discussions about "what [Facebook] proactively has

removed" are not evidence that CDC (or the Census Bureau) attempted to dictate to, threaten or

pressure, collude with, or encourage social-media companies to remove or suppress certain health

claims on their platforms, or that the companies regarded (or acted on) any communications with

CDC (or the Census Bureau) as such. Any assertion to that effect is unsupported by and contrary

to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

457.    In this exchange, CDC was "wondering if [Facebook] had info on the types of posts that were removed and the themes because they were worried that we could only see the live posts and so we wouldn't know if there was also confusion about other areas that had been removed." Crawford Dep. 258:6-11. CDC had "asked on the meeting if they had this data, like, because we wanted it. And I think she said, Oh, we did something like this for the White House or HHS." *Id.* 260:6-9.

**RESPONSE:** Undisputed. However, CDC's inquiry about and desire to receive "info" and

data about the types and themes of posts Facebook had proactively removed, *see* Pls.' PFOF ¶ 456,

is not evidence that CDC (or the Census Bureau) attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC (or the Census Bureau) as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

458.    From this, Crawford understood that HHS and the White House were having similar meetings with Facebook: "I do think that they did have meetings with the agencies." *Id.* 261:10-11.

**RESPONSE:** Disputed as a mischaracterization of the testimony, in which Crawford states that she "do[es]n't know" "in relation to this email" whether "Facebook was having the same kinds of meetings CDC was having with them with White House and HHS," but she "th[ought] that [Facebook] did have meetings with the agencies." Regardless, the occurrence of any such meetings is not evidence that CDC (or the Census Bureau, HHS, or the White House) attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any such meetings as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

459.    On March 25, 2021, Crawford and other CDC officials met with Facebook. Ex. S, at 1. The day before the meeting, March 24, 2021, Facebook emailed Crawford and noted, "[a]s we discussed last week, we will present on COVID-19 misinformation on this session/meeting and have some of our team that is focused on that workstream provide a briefing on the current policies and approach as well as the current trends we are identifying." *Id.* at 2. The official also noted that Facebook would have a "Misinformation Manager" and Liz Lagone, a content-moderation official for Facebook who "will be leading from our side on misinformation briefing for your team. They all work on our COVID-19 policies." *Id.* at 1. Crawford responded, attaching a Powerpoint slide deck and stating, "This is a deck Census would like to discuss and we'd also like to fit in a discussion of topic types removed from Facebook." *Id.* She also noted that two Census Bureau officials (Zack Schwartz and Jennifer Shopkorn) and two Census Bureau contractors (Sam Huxley and Christopher Lewitzke) would attend the meeting. *Id.*

**RESPONSE:** Undisputed. In any event, the existence of this meeting is not evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any meetings with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

460.    The "deck Census would like to discuss" was attached to the email, *id.* at 3-16, and it contained an overview of "Misinformation Topics" including "concerns about infertility, misinformation about side effects, and claims about vaccines leading to deaths." *Id.* at 4. "These topics were selected due to high volume, continued public discussion, and high-profile coverage," according to the slide deck. *Id.* For each topic, the deck included sample slides and a statement from the CDC debunking the supposedly erroneous claim. *Id.* at 6-14. The slides were clearly designed to convince Facebook that such content should be censored. For example, with respect to claims of infertility, the deck provided screen shots of six specific posts on Facebook and Instagram, summarized similar claims, and stated: "According to CDC there is no evidence that fertility problems are a side effect of any vaccine, including COVID-19 vaccines." *Id.* at 6-8. It also noted that "Several of Facebook's fact check partners have covered this claim." *Id.* at 6. The deck provided a similar debunking treatment for claims about other side effects from COVID vaccines, *id.* at 9-11, and claims about vaccines leading to deaths, *id.* at 12-14—in each case, providing six sample posts from real Facebook users as examples of the type of claim, and providing information designed to ensure that the claim would be censored. *Id.*

**RESPONSE:** Disputed as a mischaracterization of the evidence to the extent plaintiffs assert the "slides were clearly designed to convince Facebook that such content should be censored" or "provid[ed] information designed to ensure that the claim would be censored," rather than to provide examples of health-related topics on which CDC could provide Facebook information to evaluate or rebut the claims circulating on its platform. Moreover, as Ms. Crawford testified, CDC was aware that social media companies had a range of actions they could take with respect to content on their platforms, including no action at all—and that there was no consequence from CDC for inaction. Crawford Dep. 88:3-22. Moreover, plaintiffs inaccurately describe the precise contents of the slide deck: there are not six sample posts from Facebook for each of the

topics. Ultimately, the contents of this document are not evidence that CDC or the Census Bureau

attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies

to remove or suppress certain health claims on their platforms, or that the companies regarded (or

acted on) any communications with CDC or the Census Bureau as such. Any assertion to that

effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. §

II.B.4.a. & f.

461.    On March 30, 2021, Facebook sent Crawford an email with the subject line, "This week's meeting."  Crawford Ex. 8, at 3.  Crawford confirms that she was engaging in weekly meetings with Facebook during this time period, as well as other time periods during the COVID-19 pandemic: "we were meeting weekly during parts, so I imagine we were."  Crawford Dep. 68:9-10.

**RESPONSE:** Undisputed. However, the occurrence and frequency of these meetings are

not evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude

with, or encourage social-media companies to remove or suppress certain health claims on their

platforms, or that the companies regarded (or acted on) any communications with CDC or the

Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence

as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

462.    The email indicates that CDC and Facebook were repeatedly discussing misinformation during these weekly meetings, as Facebook stated to Crawford: "I wanted to surface any misinfo questions your team may have for the team that I had briefing last time. They are available to attend again, but also want to make sure we are answering any of your team's questions."  Crawford Ex. 8, at 3.

**RESPONSE:** Disputed as a mischaracterization of the evidence. This single exchange

about discussing "misinfo questions that" the CDC might have does not support the assertion that

CDC and Facebook were "repeatedly discussing misinformation during these weekly meetings."

In fact, meetings between CDC and Facebook normally focused on other matters, even though the

topic of misinformation was sometimes discussed as well. Crawford Decl. ¶¶ 5-6, 8 (Ex. 80). In

any event, this communication is not evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

463.    Crawford admits that these weekly meetings involved CDC meeting with Facebook's *content-moderation* teams: "I do recall [Facebook] bringing in people from their Trust and Safety or Misinformation teams … to talk to us about misinformation at some weekly meetings." Crawford Dep. 68:24-69:3.

**RESPONSE:** Disputed as a mischaracterization of the testimony, which (as quoted) states that the meetings involved "Trust and Safety" or "Misinformation" teams—not "*content-moderation* teams." In any event, these meetings are not evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any meetings with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

464.    Crawford admits that, in these meetings with Facebook content-moderation team, CDC inquired about how Facebook was censoring COVID-19 misinformation: "we had asked questions about what they were seeing in terms of misinformation and inquired about any activities they were undertaking. And I believe this was an offer to sort of get back to us on any of those questions." *Id.* 69:9-13.

**RESPONSE:** Disputed as a mischaracterization of the quoted testimony, which does not mention "censoring" or a "content-moderation team," and does not support the assertion that CDC was inquiring about "censoring COVID-19 misinformation." In any event, these meetings are not evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with,

or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any meetings with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

465.    In response, Crawford noted that she was also communicating with Facebook through an alternative channel. Crawford Ex. 8, at 2 ("I added this part in yellow to our chain on turn.io"). She asked Facebook if they "have thoughts on how we can meet regularly with Census? … am I correct that your team is going to consider how you might want to engage with the CDC/Census team routinely and get back to us?" *Id.* at 2-3. She noted to Facebook: "I know you all have experience with Census already." *Id.* at 3.

**RESPONSE:** Disputed to the extent that the PFOF ambiguously and incoherently starts with the phrase "[i]n response" and does not explain what Crawford was "respon[ding]" to. Also disputed because the PFOF mischaracterizes turn.io as "an alternative channel" through which Crawford was communicating with Facebook; in fact, turn.io was simply a "project that [CDC was] working on with WhatsApp," through which people "could look up ZIP codes to find vaccines." *See* Crawford Dep. 70:3-25. The quoted portion of the email exhibit ("I added this part in yellow to our chain on turn.io") references another email chain in which Facebook and CDC were discussing the turn.io project. In any event, this communication is not evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

466.    At this time, CDC had recently executed an Interagency Agreement with the Census Bureau to assist the CDC in addressing misinformation: "We had entered an IAA with Census to help advise on misinformation." Crawford Dep. 71:3-4. Pursuant to this agreement, the Census Bureau provided reports to the CDC on misinformation that the Census Bureau tracked on social media: "they provided reports on misinformation that they were seeing to us." *Id.* 71:15-17.

"Census did provide [CDC] with the key themes they were seeing around misinformation during the times that they were looking at it." *Id.* 72:16-19.

**RESPONSE:** Undisputed. However, the existence of this IAA is not evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

467.    An IAA is "an agreement between two agencies to conduct some kind of work between them." *Id.* 109:23-24. Under this IAA, CDC was "only engaging" with Census "on COVID misinformation." *Id.* 110:12-13. CDC was "learning about how [Census] operated a general misinformation team." *Id.* 110:13-14. The IAA "let [CDC] partner with Census to learn how they handled misinformation and help us with the COVID misinformation. … They seemed to have more knowledge than we did." *Id.* 111:3-6.

**RESPONSE:** Undisputed. However, neither the existence of this IAA, nor the general reference to "handl[ing] misinformation," is evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

468.    Facebook replied that "it would be great to have questions that may not have been answered from your team on misinfo. That team is very busy so it's a good opportunity to di[g] deeper on that topic and especially if there are areas that are still unclear or the teams have concerns about." Crawford Ex. 8, at 2.

**RESPONSE:** Undisputed, except to clarify that Facebook's reply pertains to the language quoted in PFOF ¶ 465. In any event, this communication is not evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion

to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C.,

Arg. § II.B.4.a. & f.

469.    Crawford responded that CDC "would like to have more info … about what is being done on the amplification-side," and that CDC "is still interested in more info on how you analyze the data on removals, etc." *Id.* at 2. She also noted that Census Bureau was "hoping to go over the deck they had and discuss how to engage on a more regular basis." *Id.*

**RESPONSE:** Undisputed. However, this communication is not evidence that CDC or the

Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-

media companies to remove or suppress certain health claims on their platforms, or that the

companies regarded (or acted on) any communications with CDC or the Census Bureau as such.

Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.'

PFOF § II.C., Arg. § II.B.4.a. & f.

470.    Following up, Crawford noted that Census would like to discuss the following topics: "It looks like the posts from last week's deck about infertility and side effects have all been removed. Were those re-evaluated by the moderation team or taken down for another reason?" *Id.* at 1. This remark plainly indicates that, in the last week of March 2021, the Census Bureau was sharing "decks" of posts about COVID-19 misinformation with Facebook, which Facebook then "removed," and CDC was following up to inquire whether the censorship occurred because those posts were "re-evaluated by [Facebook's] moderation team" because of Census's flagging, or for another reason. Crawford testified that she "cut and pasted" the Census Bureau's inquiries on these points. Crawford Dep. 76:10.

**RESPONSE:** Disputed as a mischaracterization of the testimony. The testimony refers to

a single deck—not multiple "decks" as asserted in plaintiffs' mischaracterization. Moreover, Ms.

Crawford testified that she could not recall why this question was asked, Crawford Dep. 76:2-13,

which does not support plaintiffs' assertion that "CDC was following up to inquire whether the

censorship occurred because of Census's flagging." This PFOF also contains no evidence that

CDC asked Facebook to remove the posts; Ms. Crawford's question, "Were those [posts] re-

evaluated by the [Facebook] moderation team or taken down for another reason?" indicates to the

contrary. In any event, this communication is not evidence that CDC or the Census Bureau

attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

471.   Crawford also asked Facebook to give the Census Bureau direct access to log in to Facebook's CrowdTangle tool: "Can we add the Census Team to CrowdTangle?"  Crawford Ex. 8, at 1. As Crawford noted, Facebook had "allowed [CDC] to directly log into CrowdTangle and run our own reports or searches," and she was asking Facebook to let Census "log in to CrowdTangle" as well. Crawford Dep. 77:4-14.

**RESPONSE:** Undisputed. However, this communication is not evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

472.   In the same email, Crawford inquired of Facebook, "One of the main themes we're seeing and from the CrowdTangle report is local news coverage of deaths after receiving the vaccine. What's the approach for adding labels to those stories?"  Crawford Ex. 8, at 1. Thus, the CDC inquired of Facebook what its "approach" was to censoring local news stories about vaccine-related deaths. *Id.*

**RESPONSE:** Disputed as a mischaracterization of the evidence, which says nothing about Facebook "censoring local news stories." In fact, it shows the *opposite*—that Facebook was allowing the news stories to circulate, while potentially (in its independent discretion) deciding to add labels to them: the exhibit explicitly states that one option is "No label." Crawford Ex. 8 at 1; *see also* Crawford Dep. 77:1-2 ("I don't think we were asking them to add labels, from what I'm reading here. We were asking them what their approach for labels [was]."). This communication

is not evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

473.    Crawford asked Facebook "[h]ow should we best engage regularly going forward on the Census/CDC reports." Crawford Ex. 8, at 1. Crawford notes that Census had already been working with Facebook to address census-related misinformation: "we generally discussed, you know, how we should talk about misinformation because they had already been working with Census, on their own Census misinformation, and I wanted to know what was best for them for engaging on any topics that we might want to discuss." Crawford Dep. 77:19-24.

**RESPONSE:** Undisputed. However, this communication is not evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

474.    Facebook answered that "[w]e are working on a proposal of how to set up a sharing partnership on the misinform[ation] items." Crawford Ex. 8, at 1.

**RESPONSE:** Undisputed. However, this communication is not evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

475.    Crawford also had three-way meetings with Facebook, CDC, and Census about misinformation: "there were meetings where Census, myself and Facebook were on calls," in

which they "had general conversations about what were opportunities to address misinformation." Crawford Dep. 83:6-12. In those conversations, specific topics like the removal of specific posts discussed in Exhibit 8 "were probably discussed," but Crawford claims she does not "have specific memory of it." *Id.* 83:12-14.

**RESPONSE:** Disputed as a mischaracterization of the testimony and evidence. Ms. Crawford testified only that "things like in this chain were probably discussed"; that does not equate to testimony that "topics like the removal of specific posts" were discussed. It is unclear what, if any, portion of the topics in Exhibit 8 would have been discussed, and the PFOF's assertion about what was probably discussed in these conversations relies on unfounded speculation from testimony in which Ms. Crawford makes clear she does not have much memory of the conversations. In any event, these conversations are not evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any meetings with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

476.    On April 13, 2021, Facebook followed up by emailing Crawford and proposing to enroll CDC and Census Bureau officials in a special misinformation reporting channel to Facebook. Crawford Ex. 10, at 2. With a subject line "CV19 misinfo reporting channel," Facebook wrote, "We're working to get our COVID-19 misinfo channel up for CDC and Census colleagues," and asked Crawford to confirm "if the below emails are correct for onboarding to the reporting channel and if there are others you'd like to include." *Id.* Facebook provided nine emails, including five CDC officials and four Census officials or contractors, to "onboard" into the COVID-19 "misinfo reporting channel." *Id.*

**RESPONSE:** Disputed to the extent that the PFOF mischaracterizes the document as pertaining to a "special" reporting channel. That term is vague and overstates the importance of the evidence. Moreover, Crawford later clarified: "I guess I can't say I know that" the reporting channel was provided to "official groups" and "I might be wrong." Crawford Dep. 96:12-16. In

any event, the existence of this reporting channel is not evidence that CDC or the Census Bureau

attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies

to remove or suppress certain health claims on their platforms, or that the companies regarded (or

acted on) any contact with CDC or the Census Bureau as such. Any assertion to that effect is

unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a.

& f.

477.    The officials who work for Reingold, including Christopher Lewitzke, "were
contractors working with Census." Crawford Dep. 101:10.

**RESPONSE:** Disputed as a mischaracterization of the testimony. As the quoted language

states, individuals who worked for Reingold were Census "contractors," not "officials."

478.    Crawford states that this email refers to the fact that Facebook "has a portal or
reporting channel where you can report misinformation or threats or things from a specific log-in
that I believe they only provide to … federal agencies." *Id.* 91:23-92:2. The portal allows federal
officials to "log onto Facebook as an administrator, and it's something that they make available to
you as a federal agency." *Id.* 95:17-19. Crawford understands that this "wasn't something that
was generally available" to the public but was only provided to federal officials. *Id.* 96:15-16.

**RESPONSE:** Disputed as an incomplete account of the testimony. Crawford clarified: "I

guess I can't say I know that" it was provided to "official groups" and "I might be wrong."

Crawford Dep. 96:12-16. In any event, the existence of this reporting channel is not evidence that

CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage

social-media companies to remove or suppress certain health claims on their platforms, or that the

companies regarded (or acted on) any contact with CDC or the Census Bureau as such. Any

assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF

§ II.C., Arg. § II.B.4.a. & f.

479.    Crawford recalls that a CDC official logged into this portal and used it to report
"two or three posts." *Id.* 92:17.

**RESPONSE:** Undisputed. Defendants state further that any member of the public can report posts to social media companies. *See* Defs.' PFOF § II.A. This lone instance of a single CDC official reporting two or three posts—as to which there is no evidence of what, if any, action Facebook took—is not evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any contact with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

480.    On April 23, 2021, Crawford emailed Facebook and stated that the Wyoming Department of Health had "mentioned … that the algorithms that Facebook and other social media networks are apparently using to screen out postings by sources of vaccine misinformation are also apparently screening out valid public health messaging, including WY Health communications." Crawford Ex. 38, at 2. When she did not hear back, on April 28, she emailed Facebook again, "Anything you all can do to help on this?"  *Id.* Facebook then responded and addressed the problem. *Id.* at 1-2. The government is not amused when government-induced censorship sweeps in the government's own speech.

**RESPONSE:** Disputed to the extent the final sentence mischaracterizes the evidence. The email makes clear that the algorithms being applied were developed by "Facebook and other social media networks" and were not "government-induced." Furthermore, in vaguely referring to "the government" the last sentence—which is rhetoric meriting no response except as noted herein-- appears to conflate a Wyoming state agency with the federal government. In any event, this exchange is not evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

481.    On May 6, 2021, Crawford emailed Facebook a table containing a list of 16 specific postings on Facebook and Instagram, with a link and the text of each post. Crawford Ex. 9, at 1-3. Crawford wrote, "As mentioned, here are two issues that we are seeing a great deal of misinfo on that we wanted to flag for you all … These are just some example posts. … Our census team is copied here, has much more info on it if needed." Crawford Ex. 9, at 1. Crawford copied Jennifer Shopkorn of the Census Bureau and Christopher Lewitzke, a Census Bureau contractor, on the email. *Id.*

**RESPONSE:** Undisputed. Defendants note that the "two issues" being referenced are "vaccine shedding and microchips." *See* Crawford Ex. 9 at 1. Note further that when Plaintiffs' counsel asked Ms. Crawford in reference to this exhibit, "What was the expectation of what Facebook would do when something was flagged?" Ms. Crawford responded, "I don't recall having a specific recollection of what I thought that they would do" and that the "consequence" was "nothing" if Facebook "didn't do anything with your flagging of these items." Crawford Dep. 88:3-22. Ms. Crawford also added, "I didn't believe we were asking them to remove content specifically." *Id.* at 90:5-12. In any event, this email is not evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

482.    Crawford "flag[ged]" these posts for Facebook "[b]ecause we had had conversations with Facebook about ways that we could address misinformation, and … one suggestion … that came up in that conversation was to let them know if we were seeing major themes that CDC had scientific information on, or had web content that would address." Crawford Dep. 87:15-21.

**RESPONSE:** *See* Response to Pls.' PFOF ¶ 481.

483.    When Crawford would "flag" such content for Facebook and other platforms, she knew that they would evaluate and possibly censor the content under the content-moderation policies: "I do know that the platforms have a variety of ways to address misinformation. They might tag it as something that people should look more into. I think … that they have the ability

to control how often some of these things show up in peoples' feeds. And I do know that removing them is an option that they could consider." *Id.* 88:7-14.

**RESPONSE:** Disputed as a mischaracterization of the testimony. The quoted testimony speaks for itself and does not demonstrate that Ms. Crawford "knew that [the platforms] would evaluate and possibly censor the content under content-moderation policies." Indeed, the quoted testimony is preceded by Ms. Crawford's statement that "I don't recall having a specific recollection of what I thought that they would do." Crawford Dep. 88:5-6. Additionally, note that Ms. Crawford testified that when she "flag[ged]" misinformation themes or example posts for Facebook, she was merely "[p]ointing out" "major themes that CDC" was noticing online "that CDC had scientific information on, or had web content that would address" those themes. *Id.* at 87:13–88:2. In any event, the testimony is not evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

484.    CDC's "goal" in flagging misinformation for possible removal from Facebook "is to be sure that people have credible health information so that they can make the correct health decisions…. There were a lot of things circulating that were not accurate information about COVID. And so we were trying to point out and make the credible information more available to users." *Id.* 88:25-89:6.

**RESPONSE:** Disputed as a mischaracterization of the testimony, to the extent the PFOF asserts that CDC was "flagging information for possible removal from Facebook." The quoted testimony speaks for itself and makes clear that CDC was "flagging these items" in order to "be sure that people have credible health information" and "make the credible information more available to users." Crawford Dep. 88:23-89:6. In any event, the testimony is not evidence that

CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

485.    CDC and Census used "the social [media] listening tools," such as CrowdTangle, to identify misinformation that was "flagged" to Facebook for possible censorship. *Id.* 90:18-23. Regarding the table of 16 posts she "flagged" in her May 6, 2021 email, she stated, "these probably came from the social listening tools … that can consolidate examples. And we provided some examples of what we meant." *Id.* 90:18-23.

**RESPONSE:** Disputed as a mischaracterization of the testimony, to the extent that the PFOF asserts that CDC and Census were flagging information "to Facebook for possible censorship." As explained above, *see* Response to Pls.' PFOF ¶¶ 481-84, the evidence does not support that proposition. In any event, the testimony is not evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

486.    On May 10, 2021, Crawford emailed Facebook with the subject line, "COVID BOLO Misinformation meetings." Crawford Ex. 40, at 3. She wrote: "We would like to establish COVID BOLO meetings on misinformation and invite all platforms to join the meetings. We are aiming for our first one on Friday at noon. … Are there direct POCs on your end I should include on the invite?  Happy to chat if better. THANKS!" *Id.*

**RESPONSE:** Undisputed. However, this email is not evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies

regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion

to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C.,

Arg. § II.B.4.a. & f.

487.     On May 18, 2021, Facebook emailed Crawford noting that a Facebook official "has an agenda item" for the "CDC call this week." Crawford Ex. 11, at 2. This official, according to Crawford, is a member of Facebook's "Trust and Safety team, or the Misinformation team." Crawford Dep. 103:9.

**RESPONSE:** Undisputed. However, this email is not evidence that CDC or the Census

Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media

companies to remove or suppress certain health claims on their platforms, or that the companies

regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion

to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C.,

Arg. § II.B.4.a. & f.

488.     The Facebook official noted that Facebook's "Content Policies … determine what we may remove or reduce and inform." Crawford Ex. 11, at 2. She noted that "we currently remove false claims about face masks," and wanted to discuss "whether there is still a high risk of harm from mask misinformation," as well as "false claims about the efficacy of social distancing or the existence of COVID-19." *Id.*

**RESPONSE:** Undisputed, but this evidence affirmatively demonstrates that Facebook

operated independently of CDC, as it asserts that Facebook was applying its own policies to

"determine what [it] may remove or reduce and inform." Thus, this email is not evidence that CDC

or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage

social-media companies to remove or suppress certain health claims on their platforms, or that the

companies regarded (or acted on) any communications with CDC or the Census Bureau as such.

Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.'

PFOF § II.C., Arg. § II.B.4.a. & f.

489.    Crawford admits that the CDC provided "scientific information" that Facebook
would use to decide whether to "remove" or "reduce and inform," *id.*, content under its policies:
"What we did provide was scientific information that I did assume that they might use to do those
things," *i.e.*, "remove or reduce and inform." Crawford Dep. 105:17-19.

**RESPONSE:** Disputed as a mischaracterization and incomplete account of the testimony.

As the quoted language shows, Ms. Crawford did not "admit" that Facebook "would use"

information provided by CDC; she speculated that Facebook "might" use it. Furthermore, Ms.

Crawford made clear that "[CDC] did not discuss the development of [Facebook's] policies, or the

enforcement of [Facebook's] policies." Crawford Dep. 105:12-17. In any event, this evidence

affirmatively demonstrates that Facebook operated independently of CDC, as it asserts that

Facebook was applying its own policies to "determine what [it] may remove or reduce and inform."

Thus, this testimony is not evidence that CDC or the Census Bureau attempted to dictate to,

threaten or pressure, collude with, or encourage social-media companies to remove or suppress

certain health claims on their platforms, or that the companies regarded (or acted on) any

communications with CDC or the Census Bureau as such. Any assertion to that effect is

unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a.

& f.

490.    The next day, May 19, 2021, Facebook emailed Crawford and noted that, for the
weekly call that week, "here are some of the COVID content items that [Facebook's content-
moderation official] will be flagging for you/CDC team." Crawford Ex. 11, at 1. She then provided
a list of twelve specific claims, including such claims as "COVID-19 has a 99.96% survival rate,"
"COVID-19 vaccines cause bell's palsy," and "[p]eople who are receiving COVID-19 vaccines
are subject to medical experiments." Crawford Ex. 11, at 1-2.

**RESPONSE:** Undisputed. However, this email is not evidence that CDC or the Census

Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media

companies to remove or suppress certain health claims on their platforms, or that the companies

regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion

to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

491.    Facebook raised these twelve claims to get CDC's guidance on whether they violated Facebook's policies: "They were wanting our feedback on whether these things were true or false statements that they were seeing. Did the CDC have science around this, did we have content on our website." Crawford Dep. 106:10-13. CDC would respond to debunk such claims if it had information: "[I]f we knew, if we had something or we had science on these items, we would point to it or provide them an answer." *Id.* 106:19-21.

**RESPONSE:** Disputed as a mischaracterization of the testimony. The quoted language speaks for itself, and it neither establishes that Facebook raised these twelve claims to get CDC's guidance "on whether they violated Facebook's policies," nor does it establish that CDC "would respond to debunk such claims." Ms. Crawford emphasized that "[CDC] did not discuss the development of [Facebook's] policies, or the enforcement of [Facebook's] policies." Crawford Dep. 105:12-17. In any event, the testimony is not evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

492.    In response, Crawford indicated that "Census team members" would join the call, and that she might not be able to address or debunk all 12 claims on the call, because "[t]here may be some facts we have to get back to the group on after the meeting." Crawford Ex. 11, at 1.

**RESPONSE:** Undisputed. Defendants state further that Ms. Crawford emphasized that "[CDC] did not discuss the development of [Facebook's] policies, or the enforcement of [Facebook's] policies." Crawford Dep. 105:12-17. This email is not evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the

companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

493.    On the call referred to in the email, CDC discussed with Facebook these twelve claims and who at CDC might be able to address their veracity. Crawford Dep. 106:23-107-3.

**RESPONSE:** Undisputed. Defendants state further that Ms. Crawford emphasized that "[CDC] did not discuss the development of [Facebook's] policies, or the enforcement of [Facebook's] policies." Crawford Dep. 105:12-17. This testimony is not evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

494.    According to Crawford, "Sometimes in these meetings they would ask do we know if this is true or false, which is what they were doing [in Exhibit 11]. And then if we knew, the communicators knew the answer, we would provide it. If not, I would say, we would say, I'll have to get back to you later, we'll talk to our SMEs," *i.e.* subject-matter experts. *Id.* 116:7-12.

**RESPONSE:** Undisputed. Defendants state further that Ms. Crawford emphasized that "[CDC] did not discuss the development of [Facebook's] policies, or the enforcement of [Facebook's] policies." Crawford Dep. 105:12-17. This testimony is not evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

495.    Census Bureau officials would follow up to monitor whether Facebook was actually removing the content that federal officials had flagged as misinformation: "Census was at least periodically checking on things that they had flagged, or they had seen come up." *Id.* 117:19-21.

**RESPONSE:** Disputed as a mischaracterization of the testimony; the quoted language speaks for itself and does not state "Census Bureau officials would follow up to monitor whether Facebook was actually removing the content that federal officials had flagged as misinformation." In any event, this testimony is not evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

496.    After the meeting, on May 24, Facebook's content-moderation official emailed Crawford, stating, "Thanks so much again for you and team's help in debunking a few COVID-19 and vaccine misinformation claims for us." Crawford Ex. 15, at 2. She then provided a list of the twelve claims with CDC's input on each, noting "Debunked" for each claim that the CDC had debunked in the meeting. *Id.* at 2-3. Among other things, she noted that CDC "[d]ebunked" claims like "Face masks contain … harmful particles," and even plainly evaluative statements like "People who are receiving COVID-19 vaccines are subject to medical experiments." *Id.* at 2-3.

**RESPONSE:** Undisputed, except to note that the PFOF selectively quotes the exhibit; the truncated sentence reads in full, "Face masks contain harmful nano worms or harmful particles." In any event, this email is not evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

497.    On June 2, 2021, Crawford emailed the Facebook content-moderation official back with further input on the claims from CDC's subject-matter experts. Crawford Ex. 16, at 2. She noted several times that CDC's "web content to debunk is in clearance," meaning that CDC was preparing web content that would debunk those claims. *Id.*

**RESPONSE:** Undisputed. However, this email is not evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

498.    The next day, on June 3, 2021, the Facebook content-moderation official emailed Crawford to clarify that "web content to debunk is in clearance" means that "we should consider these debunked by the CDC now," and Crawford answered that "Yes they are debunked and we will also have content on it soon."  Crawford Ex. 16, at 1. As Crawford stated, "We reported to Facebook that they were debunked at this time."  Crawford Dep. 135:2-3.

**RESPONSE:** Undisputed. However, this PFOF does not contain evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

499.    Crawford knew that Facebook would apply its content-moderation policies to claims that the CDC debunked: "I knew that they had options ... which is to inform people, to maybe reduce it in the algorithm, or to remove it…. [T]hey probably had other options, but I knew of at least those." *Id.* 138:18-22.

**RESPONSE:** Disputed as a mischaracterization of the testimony. As the quoted language states, Ms. Crawford "knew that [Facebook] had options," not that she "knew that Facebook *would* apply its content-moderation policies to claims." Again, Ms. Crawford emphasized that "[CDC]

257

did not discuss the development of [Facebook's] policies, or the enforcement of [Facebook's] policies." Crawford Dep. 105:12-17. In any event, this testimony is not evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

500.    On July 26, 2021, the same Facebook content-moderation official emailed Crawford, asking for CDC to debunk three more COVID-related claims. The subject line of the email was, "FB Misinformation Claims Help Debuning."  Crawford Ex. 17, at 1. Crawford understood that "Debuning" was "Debunking" misspelled. Crawford Dep. 139:1-2.

**RESPONSE:** Undisputed. However, this email is not evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

501.    In this email, Facebook's content moderator wrote to Crawford: "Our Misinformation Policy Team has identified some claims that we were hoping your team could **help us understand if they are false and can lead to harm**?"  Crawford Ex. 17, at 1 (bold in original).

**RESPONSE:** Undisputed. However, this email is not evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

502.    Facebook's content-moderation policy called for it to remove claims that are false and can lead to harm. *See, e.g.,* Crawford Ex. 26, at 4 (Facebook's content-moderation official, Liz Lagone, noting that "We remove … posts on the grounds that the claim is false and that it is harmful," where "harmful" includes cases where "if people believed it, it might make them less likely to get vaccinated."). So it was clear that Facebook's "Misinformation Policy Team" was asking CDC to advise whether these claims should be removed under Facebook's content-moderation policy. Crawford admits that she understood that CDC's guidance would "benefit" Facebook's expansion and application of its censorship "policy" to these claims, acknowledging that Facebook was asking her about these claims "[b]ecause CDC would have credible health information about the claims or scientific information that would benefit their policy making." Crawford Dep. 140:1-3.

**RESPONSE:** Disputed. The cited evidence does not support the categorical assertion that "Facebook's content-moderation policy called for it to remove claims that are false and can lead to harm." The selectively quoted language from Crawford Ex. 26, when read in full, pertains to only a specific set of claims (those that "claim that COVID-19 vaccines kill people or lead to death"), and not all posts that are false and can lead to harm. Nor does Crawford Ex. 17 support the argumentative assertion that Facebook was "asking CDC to advise whether the claims should be removed under Facebook's content-moderation policy." Nor does the heavily spliced deposition testimony relate in any way to "Facebook's expansion and application" of—in Plaintiffs' characterization—a "censorship policy." Ms. Crawford testified that "[CDC] did not discuss the development of [Facebook's] policies, or the enforcement of [Facebook's] policies." Crawford Dep. 105:12-17. Further, Facebook exercised its own discretion in deciding how (and whether at all) to deal with claims that violate its own policies, including whether to remove posts, take some other action, or take no action at all. *Id.* at 88:3-22. This PFOF contains no evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such.

Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.'

PFOF § II.C., Arg. § II.B.4.a. & f.

503.     The three claims included: "Spike protein in COVID-19 vaccines is dangerous/cytotoxic," "Guillain-Barre Syndrome (GBS) is a possible side effect of the COVID vaccine," and "Heart inflammation is a possible side effect of all COVID-19 vaccines." Crawford Ex. 17, at 1.

**RESPONSE:** Undisputed that Facebook asked CDC in July 2021 whether the three claims

listed in this PFOF "are false and can lead to harm." However, this PFOF contains no evidence

that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or

encourage social-media companies to remove or suppress certain health claims on their platforms,

or that the companies regarded (or acted on) any communications with CDC or the Census Bureau

as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See*

Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

504.     Facebook also asked Crawford if "your team was aware of any global source of truth/database for vaccine adverse effects including possibly vaccine-related deaths."  Crawford Ex. 17, at 1.

**RESPONSE:** Undisputed, except to note that the quoted language ends with a question

mark, not a period. In any event, this PFOF contains no evidence that CDC or the Census Bureau

attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies

to remove or suppress certain health claims on their platforms, or that the companies regarded (or

acted on) any communications with CDC or the Census Bureau as such. Any assertion to that

effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. §

II.B.4.a. & f.

505.     Crawford responded, "Got it, let me get back to you shortly and thank you much for asking!"  Crawford Ex. 17, at 1.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

506.    Crawford does not recall her specific response to this inquiry, but she admits that "generally" she referred them to the CDC's subject-matter experts and responded to Facebook with the CDC's view on the scientific questions, as she did with similar requests. Crawford Dep. 140:16-141:4.

**RESPONSE:** Undisputed. In any event, this PFOF contains no evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

507.    On July 20, 2021, Facebook emailed Crawford another biweekly "CrowdTangle content insights report" on COVID-19. Crawford Ex. 18, at 1. One of the misinformation-trending topics that Facebook flagged in bold in the email was "**Door-to-Door Vaccines**," which stated that "The highest interaction Page posts for this topic convey concern from political opponents about the Biden Administration's strategy to ramp up vaccination efforts in communities with low vaccination rates by going 'door-to-door' to educate and encourage more Americans to get vaccinated." *Id.* The same topic, in the same time frame, was emphasized in the Virality Project report as a prime example of viral vaccine-related "misinformation," when in fact it involved only expressions of political opinion. Scully Ex. 2, at 39, 54-55.

**RESPONSE:** Disputed as a mischaracterization of the evidence. The CrowdTangle content insight report does not describe the topic of "door-to-door vaccines" as a "misinformation-trending topic," but instead describes it as "highly engaging content." Crawford Ex. 18 at 1. Other "highly engaging content" listed in the same email was "Reopening of Institutions" and "Olympics

and COVID-19." *Id.* The PFOF is also disputed, because Scully Ex. 2 does not support the assertion that "the same topic, in the same time frame, was emphasized in the Virality Project report." Scully Ex. 2 is dated April 26, 2022, while Crawford Ex. 18 is from nearly one year ***prior*** (July 20, 2021). In any event, this PFOF contains no evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

508.    The same email also noted posts "expressing skepticism about vaccinating children." Crawford Ex. 18, at 1. Earlier CrowdTangle reports in the same email chain had flagged for the CDC highly engaged content about "**Vaccine Side Effects** … especially for children and pregnant women," "**Vaccine Refusal**," and "**Vaccination Lawsuits** … lawsuits over compulsory vaccination related to employment." *Id.* at 2-3 (bold in original).

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

509.    Facebook noted that the CrowdTangle reports were confidential and not to be disclosed further: "As always, please do not share." *Id.* at 1.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such.

Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.'

PFOF § II.C., Arg. § II.B.4.a. & f.

510.    Facebook continued to send biweekly CrowdTangle reports, which flagged in bold high-engagement topics such as "**Proof of Vaccination Requirement**," "**COVID-19 and Unvaccinated Individuals**" (addressing "concerns that the recent uptick in hospitalizations and deaths is being driven up by unvaccinated individuals"), and "**COVID-19 Mandates**," as well as "allowing people to return to … religious services." Crawford Ex. 19, at 1-3 (bolds in original).

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.'

PFOF § II.C., Arg. § II.B.4.a. & f.

511.    On August 19, 2021, Facebook asked Crawford for a "VAERS Policy Consultation" meeting for the CDC to give Facebook guidance on how to address VAERS-related misinformation: "Our Health Policy folks would like to meet with your VAERS experts for a consultation meeting regarding VAERS and misinformation." Crawford Ex. 20, at 1. Crawford responded, "I'm sure we can do this, and I'm glad you're asking." Crawford Ex. 20, at 1.

**RESPONSE:** Disputed as a mischaracterization of the evidence. The quoted language from the exhibit—which speaks for itself—does not support plaintiffs' characterization that this was a meeting for the CDC to give Facebook guidance "on how to address" VAERS-related misinformation. In her deposition, Ms. Crawford emphasized that "[CDC] did not discuss the development of [Facebook's] policies, or the enforcement of [Facebook's] policies." Crawford Dep. 105:12-17. In any event, this email is not evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is

unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

512.    "VAERS" is the HHS's Vaccine Adverse Event Reporting System, *see* https://vaers.hhs.gov/. At that time, the CDC was greatly concerned about VAERS-related "misinformation" on social-media, because users cited and discussed VAERS data and reports to raise concerns about the safety of vaccines in ways that the CDC thought misleading, as Crawford recounted: "the topic of VAERS was an area that was widely discussed on social media, and there was a lot of areas of confusion about what VAERS data was. There was myths about VAERS data, and there was misinformation about VAERS data. So it was always one of the things that rose to the top in terms of volume of discussion of people were very confused about VAERS." Crawford Dep. 150:21-151:3. So it is not surprising that Crawford was "glad" Facebook was "asking" for a meeting in which the CDC would give Facebook guidance on how to censor "misinformation" about VAERS. Crawford Ex. 20, at 1.

**RESPONSE:** Disputed as an argumentative mischaracterization of the deposition testimony, which speaks for itself. The testimony does not establish that "CDC would give guidance on how to censor 'misinformation' about VAERS," or that Ms. Crawford was "glad" to give guidance on censoring misinformation about VAERs. In her deposition, Ms. Crawford emphasized that "[CDC] did not discuss the development of [Facebook's] policies, or the enforcement of [Facebook's] policies." Crawford Dep. 105:12-17. In any event, this PFOF contains no evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

513.    Crawford also followed up with Facebook by providing written CDC-provided materials for Facebook to use in addressing VAERS-related "misinformation" on its platforms: "If of use, we just published a new video and I've attached some recent talking points that may also inform your efforts." Crawford Ex. 20, at 1. Plainly, the "efforts" Crawford wished to "inform" were Facebook's efforts to remove VAERS-related "misinformation" from its platforms.

**RESPONSE:** Disputed as an argumentative mischaracterization of the deposition testimony, which speaks for itself. The testimony does not establish that "the 'efforts' Crawford wished to 'inform' were Facebook's efforts to remove VAERS-related 'misinformation' from its platforms." Ms. Crawford emphasized that "[CDC] did not discuss the development of [Facebook's] policies, or the enforcement of [Facebook's] policies." Crawford Dep. 105:12-17. Further, Facebook exercised its own discretion in deciding how (and whether at all) to deal with claims that violate its own policies, including whether to remove posts, take some other action, or take no action at all. *Id.* at 88:3-22. In any event, this PFOF contains no evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

514.    The CDC also had a meeting with Facebook about VAERS-related misinformation: "We did have a session with the VAERS experts with Facebook." Crawford Dep. 151:8-9. In the meeting, the CDC had "two experts for VAERS and a couple of their communication experts on the line with Facebook's team," which consisted of "their misinformation and policy type team" that the content-moderation official "was part of." *Id.* 151:20-24. In the meeting, the CDC "offered the [subject-matter expert] just to answer their questions about what VAERS was and what it wasn't. And my recollection is [Facebook] asked a lot of questions like … who can report something on VAERS and things like that during the session." *Id.* 152:1-6.

**RESPONSE:** Undisputed. However, this meeting is not evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) the meeting with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

515.     On September 1, 2021, Crawford emailed Facebook and stated: "BOLO for a small but growing area of misinfo. One of our lab alerts … was misinterpreted and was shared via social media." Crawford Ex. 21, at 1. ("BOLO" stands for "Be on the lookout." Crawford Dep. 153:21.). She explained what the CDC viewed was misinformation, and then stated, "I've attached some example Facebook posts and another document with the facts around the issue."   Crawford Ex. 21, at 1.

**RESPONSE:** Undisputed. However, this email is not evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

516.     Plainly, Crawford was flagging these posts and related posts for possible censorship under Facebook's content-moderation policy. She admits that the CDC's "BOLO" alerts were provided to "assist" the platforms with their enforcement decisions under their policies: "Similar to all the other BOLOs, we still thought it was good to point out if we had facts around something that was widely circulating as a cause of misinformation to the platforms to assist them in whatever they were going to do with their policy or not do."  Crawford Dep. 153:23-154:3.

**RESPONSE:** Disputed as a mischaracterization of the testimony, which does not support the argumentative assertion that Ms. Crawford was flagging posts for "possible censorship," as opposed to simply "point[ing] out whether [CDC] had facts around something that was widely circulating as a cause of misinformation . . . to assist [the platforms] in whatever they were going to do with their policy or not do." Defendants state further that Ms. Crawford emphasized that "[CDC] did not discuss the development of [Facebook's] policies, or the enforcement of [Facebook's] policies." Crawford Dep. 105:12-17. Further, Facebook exercised its own discretion in deciding how (and whether at all) to deal with claims that violate its own policies, including whether to remove posts, take some other action, or take no action at all. *Id.* at 88:3-22. In any event, this PFOF contains no evidence that CDC or the Census Bureau attempted to dictate to,

threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

517.    When asked what she "expected [Facebook] to do once they were on the lookout" for the supposed misinformation that the CDC had flagged, Crawford responded: "I knew that they had various options. They could have just used it to inform people. They could have considered it in their algorithm, I believe. I did understand that potentially removing posts was something that they might do." Crawford Dep. 155:15-20. So she provided the information knowing it would happen and wanting it to happen.

**RESPONSE:** Disputed as an argumentative mischaracterization, unsupported by and contrary to the cited testimony, to the extent the PFOF is intended to assert that Ms. Crawford knew that Facebook would remove posts and that she wanted certain posts removed. The quoted language, which speaks for itself, shows that Ms. Crawford only knew that Facebook "had various options" for addressing misinformation on its platform, which included simply "inform[ing] people" about additional facts concerning the matter asserted. The quoted language also shows that Ms. Crawford did not know which options Facebook would pursue in response to information shared with it by CDC. Defendants state further that Ms. Crawford emphasized that "[CDC] did not discuss the development of [Facebook's] policies, or the enforcement of [Facebook's] policies." Crawford Dep. 105:12-17. Further, Facebook exercised its own discretion in deciding how (and whether at all) to deal with claims that violate its own policies, including whether to remove posts, take some other action, or take no action at all. *Id.* at 88:3-22. In any event, this PFOF contains no evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with

CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

518.   On November 2, 2021, Facebook's content-moderation official sent Crawford and other CDC officials an email stating, "thanks so much for confirming the ability for the claims in question last week having the risk of causing vaccine refusals." Crawford Ex. 22, at 1. Again, that is one of the criteria Facebook used to justify removal of content from its platforms. Crawford Ex. 26, at 4 ("We remove … posts on the grounds that the claim is false and that it is harmful because if people believed it, it might make them less likely to get vaccinated."). The content-moderation official also stated, "thank you all so much for your input over the last week on our many questions about vaccine misinformation relative to the EUA." Crawford Ex. 22, at 1. ("EUA" refers to the FDA's "emergency use authorization to the Pfizer vaccine for children." *Id.*)

**RESPONSE:** Disputed as a mischaracterization of the cited evidence. Crawford Ex. 26,

which is dated February 2022, pertains to a limited set of claims and Facebook's *then*-current

policy: "Under our current policy, we remove posts that claim that COVID-19 vaccines kill people

or lead to death. We remove these posts on the grounds that the claim is false and that it is harmful

because if people believed it, it might make them less likely to get vaccinated." Crawford Ex. 22,

as stated, dates from four months prior. In any event, this PFOF contains no evidence that CDC or

the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-

media companies to remove or suppress certain health claims on their platforms, or that the

companies regarded (or acted on) any communications with CDC or the Census Bureau as such.

Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.'

PFOF § II.C., Arg. § II.B.4.a. & f.

519.   The content-moderation official also stated: "I wanted to share that as a result of our work together, when the FDA gave emergency use authorization to the Pfizer vaccine for children last week, we immediately updated our policies globally to remove additional false claims about the COVID-19 vaccine for children (e.g. 'the COVID vaccine is not safe for kids')." Crawford Ex. 22, at 1. She also noted, "We also launched a new feature on Instagram, where accounts that repeatedly post content that violates our policies on COVID-19 or vaccine misinformation may now lose the ability to be tagged or mentioned or may see pop-ups asking if they'd like to delete certain posts that may violate our policies." Crawford Ex. 22, at 1. Thus, Facebook noted that, "as a result of our work together" with the CDC, Facebook had updated its

content-moderation policies to increase censorship of vaccine-related claims in significant ways.
*Id.*

      **RESPONSE:** The final sentence is disputed as an argumentative mischaracterization of

the evidence. The email speaks for itself and does not support the assertion that Facebook "updated

its content-moderation policies to increase censorship of vaccine-related claims" on account of

CDC rather than its own independent decision-making. Defendants further state that Ms. Crawford

testified that she "interpret[ed]" the email's statement referring to "our work together" as

referencing "the ongoing work" of CDC "provid[ing] the facts to [Facebook]." Crawford Dep.

160-8-9. *See also id.* at 159:8-10 ("They were looking for CDC, who would have the scientific

facts, to provide them with scientific facts."). In any event, this PFOF contains no evidence that

CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage

social-media companies to remove or suppress certain health claims on their platforms, or that the

companies regarded (or acted on) any communications with CDC or the Census Bureau as such.

Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.'

PFOF § II.C., Arg. § II.B.4.a. & f.

     520.   The content-moderation official went on to ask the CDC to debunk additional
claims: "**we have identified a number of additional claims we would like to get your team's
assessment on … Would it at all be possible to get input by Monday, November 8th?**"
Crawford Ex. 22, at 1 (bold and underline in original). She requested, "For each of the following
new claims, which we've recently identified on the platform, **can you please tell us if: 1. The
claim is false; and 2. If believed, could this contribute to vaccine refusals?**" *Id.* (bold in
original). Again, these are the two precise criteria that Facebook relied on to remove content from
its platforms. Crawford Ex. 26, at 4 ("We remove … posts on the grounds that the claim is false
and that it is harmful because if people believed it, it might make them less likely to get
vaccinated."). She then included a new list of ten specific claims about the COVID-19 vaccines
for the CDC to debunk. Crawford Ex. 22, at 1-2.

      **RESPONSE:** Disputed as a mischaracterization of the cited evidence. Crawford Ex. 26,

which is from February 2022, pertains to a limited set of claims and Facebook's *then*-current

policy: "Under our current policy, we remove posts that claim that COVID-19 vaccines kill people

or lead to death. We remove these posts on the grounds that the claim is false and that it is harmful because if people believed it, it might make them less likely to get vaccinated." Crawford Ex. 22, as stated, dates from four months prior. In any event, this PFOF contains no evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

521.    Crawford understood, again, that this request was made to "inform their policies," *i.e.*, inform Facebook's application of its content-moderation policies to these claims: "It was still my interpretation that she was asking to inform their policies." Crawford Dep. 159:7-8.

**RESPONSE:** Undisputed, but note that regardless of Ms. Crawford's "interpretation" of the reason for Facebook's request, she emphasized that "[CDC] did not discuss the development of [Facebook's] policies, or the enforcement of [Facebook's] policies." Crawford Dep. 105:12-17. Further, Facebook exercised its own discretion in deciding how (and whether at all) to deal with claims that violate its own policies, including whether to remove posts, take some other action, or take no action at all. *Id.* at 88:3-22; *see also id.* at 159:8-10 ("They were looking for CDC, who would have the scientific facts, to provide them with scientific facts."). In any event, this PFOF contains no evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

522.    Crawford also admits that she was "happy" when the CDC's information to Facebook caused "less spread of misinformation" on Facebook and other platforms, *i.e.*, that she

desired that outcome: "I'm happy that providing the scientific information led to less spread of misinformation." *Id.* 161:23-25.

**RESPONSE:** Undisputed, while noting that whatever "outcome" Ms. Crawford may have personally (and unilaterally) "desired" is irrelevant when, as she emphasized, "[CDC] did not discuss the development of [Facebook's] policies, or the enforcement of [Facebook's] policies." Crawford Dep. 105:12-17. Further, Facebook exercised its own discretion in deciding how (and whether at all) to deal with claims that violate its own policies, including whether to remove posts, take some other action, or take no action at all. *Id.* at 88:3-22. Also note that in full the relevant testimony reads: "I never felt that my role, or CDC's role, was to determine what to do with the scientific information that we provided. But I'm happy that providing the scientific information led to less spread of misinformation." *Id.* at 161:20-25. In any event, this PFOF contains no evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

523.   Crawford also understood that Facebook was, in fact, removing content from its platforms based on the CDC's information: "I understand that she's removing claims … that are not scientifically accurate." *Id.* 162:21-22.

**RESPONSE:** Disputed as a mischaracterization of the quoted testimony, which speaks for itself and does not establish that Facebook was removing content "based on the CDC's information," as opposed to a multitude of other (unspecified) factors, including Facebook's independent judgment regarding the application of its established content moderation policies. In any event, this PFOF contains no evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress

certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

524.   Crawford responded to Facebook, "Thank you so much for the feedback on what you've been able to do. This is very good to know."  Crawford Ex. 22, at 1. She also stated, regarding Facebook's request that the CDC debunk the ten new claims, that "I'm going to work on this one …. I hope we can do it by Monday, I will keep you posted."  *Id.*

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

525.   The following Monday, November 8, 2021, Crawford followed up with a response from the CDC addressing seven of the ten claims Facebook had asked CDC to evaluate. Crawford Ex. 23, at 1-2. The CDC rated six of the seven claims "**False**."  *Id.* (bold in original). Crawford also noted in the response email, without citing any support, that "It appears that any of these could potentially cause vaccine refusal."  Crawford Ex. 23, at 1. Under Facebook's policies, a claim that is both false and could contribute to vaccine refusal was subject to removal. Crawford Ex. 26, at 4 ("We remove … posts on the grounds that the claim is false and that it is harmful because if people believed it, it might make them less likely to get vaccinated.").

**RESPONSE:** Undisputed except to note that Crawford Ex. 26, which is from February 2022, pertains to a limited set of claims and Facebook's *then*-current policy: "Under our <u>current policy</u>, we remove posts that claim that COVID-19 vaccines kill people or lead to death. We remove these posts on the grounds that the claim is false and that it is harmful because if people believed it, it might make them less likely to get vaccinated." (Emphasis added). Crawford Ex. 23, as stated, dates from four months prior. In any event, this PFOF contains no evidence that CDC or

the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

526.    On February 3, 2022, Facebook's content-moderation official sent Crawford another email, stating that she "wanted to **share updates we made as a result of our work together**" and "**ask for your assessment on a few things**." Crawford Ex. 26, at 1 (bold in original). She described the "updates" as follows: "On February 2nd, we launched several updates to our COVID-19 Misinformation and Harm Policy based on your [*i.e.* CDC's] inputs." *Id.* These "updates" included "[r]emoving claims that COVID-19 vaccines cause heart attacks," and "[t]aking steps to reduce the distribution of content that our systems predict likely violates our COVID-19 and vaccine misinformation policies, but has not yet been reviewed by a human; if at any point this content is confirmed to violate the policy then it will be removed from the platform." Crawford Ex. 26, at 1. Crawford responded, "the update is very helpful, thank you for including that!" *Id.*

**RESPONSE:** Undisputed. In any event, this PFOF contains no evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

527.    Facebook's content-moderation official also included, under the heading "**NEW: For CDC Input**," another request that "For each of the following new claims, **can you please tell us if: 1. The claim is false; and 2. If believed, could this claim contribute to vaccine refusals**?" Crawford Ex. 26, at 1 (bold and underline in original). She then provided a long, detailed list of claims and sub-claims about COVID-19 for CDC's input. *Id.* at 2-4.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the

companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

528.    Among other things, Facebook asked the CDC to pre-refute claims based on events that had not occurred yet. Facebook asked Crawford to address "How FDA EUA authorization for children under 5 might impact our policies." Crawford Ex. 26, at 1. Facebook noted, "We understand that the FDA is considering giving emergency use authorization for the COVID-19 vaccine for children under five in the coming weeks. We are considering how our existing policies on COVID-19 vaccines … should apply to claims about children 6 months to 4 years once the vaccine is approved for use. Can you please assess for each claim whether it is false for children in this age range and if believed, likely to contribute to vaccine hesitancy or refusals? *Please let us know if it is easiest to set up a time to meet and discuss each one.*" Crawford Ex. 26, at 2 (italics in original). There followed a long, detailed list of claims about the vaccines, for which Facebook sought CDC's input on their falsity as to children under 5. *Id.* at 2-3.

**RESPONSE:** Disputed that "Facebook asked the CDC to 'pre-refute' claims based on events that had not occurred yet." The cited email shows that Facebook was asking whether already extant claims about vaccines that were considered "false" and "if believed, likely to contribute to vaccine hesitancy or refusals"—for example, claims that the vaccine causes "magnetism" or "[a]lter[s] DNA"—would be "false" and "likely to contribute to vaccine hesitancy or refusals" when considered in relation to the upcoming "emergency use authorization for COVID-19 vaccines for children under five." *See* Crawford Ex. 26 at 2-3. In any event, this PFOF contains no evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

529.    For this long list of claims, Crawford understood that Facebook would use the CDC's input to "determine" Facebook's censorship policy for such claims: "I know that they're using our scientific information to determine their policy." Crawford Dep. 170:19-20.

**RESPONSE:** Disputed as a mischaracterization and incomplete account of the testimony. The testimony does not support the assertion that Facebook was using CDC's input to "determine" a so-called "censorship policy" or that Ms. Crawford understood Facebook to be doing so. Rather, Ms. Crawford testified that Facebook was "asking [CDC] about the science" relating to claims that the COVID-19 vaccine "kill[s] people or lead[s] to death" and that Facebook "us[ed] [CDC's] scientific information to determine their policy." Crawford Dep. 170:13-21. Ms. Crawford emphasized that "[CDC] did not discuss the development of [Facebook's] policies, or the enforcement of [Facebook's] policies." *Id.* at 105:12-17. Further, Facebook exercised its own discretion in deciding how (and whether at all) to deal with claims that violate its own policies, including whether to remove posts, take some other action, or take no action at all. *Id.* at 88:3-22; *see also id.* at 159:8-10 ("They were looking for CDC, who would have the scientific facts, to provide them with scientific facts."). In any event, this PFOF contains no evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

530. Regarding Facebook's request for CDC's input on these many new claims, Crawford responded, "I will talk to the Vaccine program and see what we can do." Crawford Ex. 27, at 1. The next day, February 4, 2022, she followed up, stating, "I'm heading out today but do you have a minute to discuss this by chance? Call anytime," and provided her phone number. Crawford Ex. 27, at 1. Crawford also changed the subject line of the email to state, "Have 5 minutes to chat? [re]: Vaccine Misinformation Questions for CDC." *Id.*

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the

companies regarded (or acted on) any communications with CDC or the Census Bureau as such.

Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.'

PFOF § II.C., Arg. § II.B.4.a. & f.

### C.   CDC's and Census's Pressure and Collusion with Google/YouTube.

531.   On March 18, 2021, Crawford emailed contacts at Google, stating: "As I believe we discussed previously, CDC is now working with Census to leverage some of their infrastructure to help identify and address COVID vaccine mis-info." Crawford Ex. 28, at 1. She went on, "As I understand it from the Census team … when they were doing this for the Census project last year, they meet regularly with a Google/YouTube Trust team." *Id.* A "Trust team" is a content-moderation team. Crawford then asked, "Is it possible for us to start up regular meetings on this topic or maybe use our existing meeting time." *Id.* The subject line of this email was "COVID Misinfo Project." *Id.* Google and Crawford then set up a time to talk and discuss the project. *Id.*

**RESPONSE:** Undisputed, except the statement that a "Trust Team" is "a content moderation team," which is unsupported by the record. Regardless, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

532.   Crawford states that this email refers to "the work of the IAA with Census to help consult and work with us on the COVID misinformation…" Crawford Dep. 175:6-8. Her reference to Census's infrastructure referred to "the fact that Christopher [Lewitzke, the Census contractor] ran those reports and looked for misinformation on those areas for us." *Id.* 175:11-13.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is

unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

533.    Crawford's reference to Census's previous project referred to their work on combating misinformation about the 2020 Census. *Id.* 175:18-19.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

534.    Crawford does not remember the specific call referenced in this email, but she admits that, "This was in 2021. So we had been meeting pretty regularly with Google by this time." *Id.* 179:5-6.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

535.    On March 23, 2021, Crawford sent a calendar invite for a meeting on March 24 that included herself and five other CDC employees, four Census Bureau employees and contractors (including Zachary Schwartz, Christopher Lewitzke, and Jennifer Shopkorn), and six Google/YouTube officials. Jones Decl., Ex. T, at 1-2. The subject of the meeting was "COVID Misinformation: CDC/Census/Google." *Id.* at 1. The invite stated: "CDC/Census to meet with Google regarding our misinformation efforts." *Id.*

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies

to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

536.    At the meeting, CDC and Census presented a slide deck similar to the one that Census prepared for the meeting with Facebook on March 25, 2021, discussed above. *See id.* 3-16. The slide deck was entitled, "COVID Vaccine Misinformation: Issue Overview." *Id.* at 3. As with the Facebook slide decks, this one stated of "Misinformation Topics" that "[t]hese topics were selected due to high volume, continued public discussion, and high-profile coverage." *Id.* at 4. It noted that these topics included "infertility, misinformation about side effects, and claims of vaccines leading to deaths." *Id.*

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

537.    For each topic, the slide deck included a description of a common claim, specific examples of videos on YouTube and social-media postings making the disfavored claim, and a putative refutation by the CDC. *Id.* at 6-14. For infertility, the slide deck stated that "[c]ommon claims about the COVID vaccine's side effects include that it causes infertility in women and men, miscarriages, and stillbirth," and it provide screen shots of specific videos on YouTube and social-media posts making this claim. *Id.* at 6-8. The deck asserted that "[a]ccording to CDC there is no evidence that fertility problems are a side effect of any vaccine, including COVID-19 vaccines." *Id.* at 6. Regarding supposed misinformation about side effects, the deck stated, "speculation and misinformation about side effects after taking the COVID vaccine have been prevalent on social media since the first vaccines were approved," and it provided screen shots of an example video on YouTube and social-media posts making such claims, along with a putative refutation by the CDC. *Id.* at 9-11. Regarding the topic "Death from Vaccines," the slide deck stated that "[v]accine-hesitant groups spreading misinformation and conspiracy theories about alleged vaccine-related deaths erode trust in the COVID-19 vaccine and the public health system," and it provided a sample video on YouTube and social-media posts linking the vaccines to deaths, along with a putative refutation by the CDC: "According to CDC, VAERS has not detected patterns in cause of death that would indicate a safety problem with COVID-19 vaccines." *Id.* at 12-14. As with the

similar Facebook slide deck, the evident purpose of this presentation was to induce YouTube to censor these claims on its platform.

**RESPONSE:** Disputed to the extent this PFOF asserts that "[a]s with the similar Facebook slide deck, the evident purpose of this presentation was to induce YouTube to censor these claims on its platform." That is a mischaracterization unsupported by the cited document. This PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

538.    On March 25, 2021, Kate Galatas of the CDC emailed the group attending the meeting and stated: "Many thanks, again, for the time yesterday. This is such important shared work we are doing in the mis/dis information space, and we deeply appreciate your contributions. Please find attached the slide deck referenced during the meeting, and we ask that you treat it close hold and not for further distribution. We are looking forward to our future collaboration efforts!" *Id.* at 1.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

539.    On March 29, 2021, Crawford followed up with Google, inquiring "Are you all open to using our regular 4pm meetings to go over things with Census or what is preferred?" Crawford Ex. 29, at 2. Google responded: "We would like to follow up on our discussion with your colleague, Cynthia, on vaccine information a few months ago. Specifically, we plan to share a new list of common vaccine misinformation claims and would love it if Cynthia or other vaccine experts could join." *Id.* He also stated that "we can save a few minutes … to discuss potential next steps regarding the Census…" *Id.* The subject line of this email was "Follow up on mis-info conversation." *Id.*

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

540.    Crawford recalls that Census was asking for regular meetings with platforms specifically focused on misinformation: the statement "is in reference to discussing how to engage on an ongoing basis about misinformation and the Census suggestion that we have regular meetings with them just on that topic." Crawford Dep. 184:14-18. The exchange was "about how to engage more regularly about misinformation, or … whatever Census had done with Google and YouTube, should we have a similar structure with CDC." *Id.* 185:11-14.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f

541.    Regarding the request for input on the "new list of common vaccine misinformation claims," Crawford responded, "I've arranged for a few SMEs [subject-matter experts] to join the call, including Cynthia." Crawford Ex. 29, at 2.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is

unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

542.    A few days later, on April 2, 2021, Google emailed Crawford stating, "Thanks again for your time this week. Attached are some of the claims we discussed for your reference." Crawford Ex. 29, at 1.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

543.    Crawford's reference to the "4pm meeting" refers to a regular biweekly meeting with Google, which still continues to the present day: "I still have a 4:00 p.m. meeting every other Monday with Google."  Crawford Dep. 180:6-7.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

544.    Crawford also has "similar regular meetings with … Meta and Twitter." *Id.* 180:11-16. She admits that she has ongoing meetings with Google and Facebook/Meta that continue to the present: "we had regular meetings with Google, and we had regular meetings with Meta…. you know, the frequency changed…. I mean, Google we meet every other week. Right now with Meta it's more ad hoc." *Id.* 180:16-21.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies

to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

545.   Crawford also "had a regular meeting with Pinterest for a short period of time, and we had … just more ad hoc meetings on occasion with Twitter." *Id.* 180:23-181:1.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

546.   Crawford states that these meetings "were mostly about things other than misinformation; though misinformation was discussed in the meetings." *Id.* 181:22-24.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

547.   On April 12, 2021, Google/YouTube followed up with an email to Crawford, stating, "For tomorrow's call, would it be possible to include Cynthia or other COVID-19 treatment SMEs [subject-matter experts] to follow up on some additional questions?" Crawford Ex. 30, at 1. Crawford responded, "Can you give me an idea of what topics we'll be covering? But yes, I'll ask them to attend." *Id.*

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

548.    Crawford notes that it "wasn't uncommon" for Google/YouTube to ask her to bring subject-matter experts to meetings to go over such topics. Crawford Dep. 188:19-22.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

549.    On May 10, 2021, Crawford emailed her Google contacts and invited them to attend in the BOLO meetings: "We would like to establish COVID BOLO meetings on misinformation and invite all platforms to join the meetings. We are aiming for our first one on Friday at noon. We have heard through the grapevine that [an official] at YouTube would want to join. Are there other POCs on your end I should include on the invite?" Crawford Ex. 40, at 1. The subject of the email was "COVID BOLO meetings on misinformation." *Id.*

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

### D.     CDC's and Census's "BOLO Meetings."

550.   On May 11, 2021, Crawford followed up with an email stating, "We would like to invite digital platforms to attend a short 'Be On The Lookout' meeting on COVID. Please let us know if you have questions and feel free to forward this message to anyone in your organization that should attend." Crawford Ex. 40, at 2. Google responded by asking that Crawford include the YouTube official in the meeting, and Crawford noted that she "was going to ask about" him at the 4:00pm recurring meeting. *Id.*

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

551.   Crawford testified that she wanted to include YouTube on the BOLO meetings because they hosted the most content: "people from YouTube would occasionally be on our regular meetings, depending on what we talked about. And because YouTube has the most content, like, hosting, … they were a part of the BOLO meetings…" Crawford Dep. 244:21-245:1.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

552.   The Census officials "were arranging" the BOLO meetings, and "they drafted the slides" for the meetings. *Id.* 246:12-20.

**RESPONSE:** Disputed that the cited testimony states that Census Bureau officials were "arranging" the BOLO meetings as opposed to potentially arranging or keeping track of an invite list. Ms. Crawford testified that she did not "remember keeping a list of who attended" the

meetings, but that "Census might have" a list "because this is something they were arranging." Crawford Dep. at 246:11-15. Undisputed that Census Bureau officials "drafted the slides" but note that CDC edited the slides with CDC content. *Id.* at 210:15-25. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

553.    Crawford ran the BOLO meetings. *Id.* 265:13. She "opened up the meeting, introduced myself, gave context for why we were doing the BOLO meeting in brief. And then I believe that Christopher [Lewitzke] went through the slide decks, and I occasionally piped in on them." *Id.* 265:15-19.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

554.    The "slide decks" shown at the meetings were "similar to the table" of 16 Facebook posts that Crawford previously emailed to Facebook, but "they were more like this is a theme, and then there'd be maybe a little info about what the theme was and then maybe a couple of example posts. And then there would be a slide maybe with CDC links or information related to that theme." *Id.* 266:1-6.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is

unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

555.    The first BOLO meeting was held on May 14, 2021. Jones Decl., Ex. U, at 1. The slide deck for that meeting was entitled "COVID Vaccine Misinformation: Hot Topics." *Id.* at 2-10. It contained a list of five "Hot Topics" with an "ADVISORY" in red noting that platforms should "**Be On the Lookout**" for "**Potential Misinformation**" on each topic, and provided specific examples of social-media posts for each topic, "Associated Link(s) and Hashtag(s)" for each topic, and the CDC's position on each topic (listed as "**The Facts**"). *Id.* at 4-8.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

556.    Crawford also emailed similar slide decks for BOLO meetings scheduled for May 28 and June 18, 2021, though the latter was canceled due to the new Juneteenth holiday.  Jones Decl., Exs. V and W. In the cover email to the May 28 slides, Crawford requested secrecy: "Please do not share outside your trust and safety teams."  Jones Decl., Ex. V, at 1. Just like the May 14 BOLO slides, these slides contained lists of "Hot Topics" with an "ADVISORY" in red noting that platforms should "**Be On the Lookout**" for "**Potential Misinformation**" on each topic, and provided specific examples of social-media posts for each topic, "Associated Link(s) and Hashtag(s)" for each topic, and the CDC's position on each topic (listed as "**The Facts**"). Jones Decl., Ex. V, at 4-6; *id.* Ex. W, at 4-6.

**RESPONSE:** Undisputed, except to the statement that the cover email "requested secrecy" is meant to suggest implications that are unspecified and not supported by the cited document. Regardless, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

557.    In conducting the BOLO meetings, Crawford described CDC's goal as follows: "our goal is to be sure that credible information about COVID was out there. A lot of people seek information on platforms. We thought that by giving the platform scientific information it might help in our goals to being sure that credible information could be found."  Crawford Dep. 266:16-21. Of course, the BOLO meetings did not address identifying and promoting "credible information," but flagging information that the CDC thinks is *not* credible for potential removal. Crawford effectively admits this; when asked if CDC's goal includes that "incredible information would not be found," she agreed that "I did want the credible information to be found in advance of the uncredible information."  *Id.* 266:22-267:4.

**RESPONSE:** Disputed as a mischaracterization of the cited evidence, which does not

suggest that CDC's goal was to identify misinformation for "potential removal" but instead that it

was "to be sure that credible information" on topics of misinformation "was out there" and "could

be found."  This PFOF contains no evidence that CDC or the Census Bureau sought to threaten or

pressure, collude with, or encourage social-media companies to remove or suppress information

on their platforms, or that the companies regarded (or acted on) any communications with CDC or

the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the

evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

558.    Crawford believes that the third BOLO meeting was cancelled because Juneteenth was declared a new federal holiday, and "that is why we didn't end up having it and we sent the materials out via email."  *Id.* 248:17-22.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the

Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies

to remove or suppress information on their platforms, or that the companies regarded (or acted on)

any communications with CDC or the Census Bureau as such. Any assertion to that effect is

unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a.

& f.

559.    On October 28, 2021, Google emailed Crawford stating, "do you have time to connect early next week on anticipated guidance on vaccines for [children ages] 5-11?  It would be great to connect as the CDC plans communications on authoritative information for pediatric vaccines."  Crawford Ex. 42, at 2.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

560.   Crawford responded: "Yes, we can discuss pediatric vaccines early next week but let me give you some general info: ACIP is likely to vote on this on Nov 2. CDC is likely to start posting final information on Nov 3 (possibly late Nov 2), if that helps to know. There will be many updates so the changes might span over a few days. We are also looking ahead and misinformation and hope to have a BOLO type meeting later that week with platforms that are interested." Crawford Ex. 42, at 1. ("ACIP" is the "Advisory Council for Immunization Practices." 253:21-22.)

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

561.   On June 29, 2022, Google/YouTube emailed Crawford and her deputy, stating: "The YouTube Policy team is requesting evidence-based input on the claims below. In the past, the CDC has reviewed COVID information claims and commented TRUE or FALSE + add any additional context needed." Crawford Ex. 43, at 1. YouTube then presented two claims, relating to the safety and effectiveness of administering progesterone to reverse chemical abortion. *Id.* ("**CLAIM**: High doses of progesterone is a **safe** method of reversing chemical abortion … **CLAIM**: High doses of progesterone is an **effective** method of reversing chemical abortion….") (bold in original). Crawford responded, "I'll check on this but I think I'll probably end up needing to refer you to another agency. I'll get back to you." *Id.*

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies

to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

562.    Regarding this exchange, Crawford notes that the CDC's "focus is not solely on COVID. We're focusing on other topics. I think [YouTube] thought that we might be able to help with this topic as well." Crawford Dep. 256:5-8. Thus, Crawford admits that the CDC is continuing to engage with social-media platforms to provide information that will lead to the censorship of health-related claims on social media, and that it is willing to expand its focus to other health topics beyond COVID-19.

**RESPONSE:** Disputed to the extent the second sentence is a mischaracterization of and unsupported by the cited testimony. In the cited passage Ms. Crawford merely voiced her impression that YouTube thought CDC "might be able to help with this topic," Crawford Dep. 256:5-8, namely, assessing the truth or falsity of claims about the safety and effectiveness of progesterone to reverse chemical abortions, *see* Pls.' PFOF ¶ 561, and says nothing about promoting "the censorship of health-related claims on social media." As Ms. Crawford also explained at her deposition (but Plaintiffs omit) the request from Google/YouTube concerned a subject that the CDC did not deal with, and she did not think any action was taken on this request. Crawford Dep. 256:9-16. In short, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

**E. CDC's and Census's Pressure and Collusion with Twitter.**

563.    On April 8, 2021, Twitter emailed Crawford stating, "I'm looking forward to setting up regular chats; my team has asked for examples of problematic content so we can examine trends. All examples of misinformation are helpful…." Crawford Ex. 32, at 1. The subject line of this email was "Request for problem accounts." *Id.* Crawford responded, "Yes, we'll get that to you early next week." *Id.*

**RESPONSE:** Undisputed, except to note that the PFOF only selectively quotes from Twitter's email. What the email stated in full was "All examples of misinformation are helpful, but in particular, if you have any examples of fraud—such as fraudulent covid cures, fraudulent vaccine cards, etc, that would be very helpful." Crawford Ex. 32 at 1. Regardless, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

564.    Crawford believes that Twitter sent this email in response to her inquiry, "Is there a good way that we should start engaging on misinformation?" 197:19-20.

**RESPONSE:**  Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

565.    Crawford responded on April 14, 2021, "The Census team put this spreadsheet together with four example areas," which included the topics, "Vaccines aren't FDA approved," "Fraudulent cures," "VAERS data taken out of context," and "Infertility." Crawford Ex. 33, at 1. The attachment was called, "Twitter CDC Examples 4-13-21.xlsx." *Id.* The spreadsheet contained a "list [of] things that [Census] saw that were being stated as misinformation." Crawford Dep. 203:24-204:1. "Infertility" referred to "people claiming that getting the vaccines led to infertility." *Id.* 204:17-18.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

566.    Crawford believes that Twitter "was asking for these examples in this email because he was wondering … what would come up in BOLO meetings, or what we would be discussing." *Id.* 204:22-24.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

567.    On May 10, 2021, Crawford emailed Twitter, stating "We wanted to point out two issues we are seeing a great deal of misinfo about…."  Crawford Ex. 34, at 4. She then provided a list of "sample posts" that included 12 Tweets reproduced verbatim. She stated, "Our census team is copied here, has much more info on it if needed." *Id.*

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

568.    In the same email on May 10, 2021, Crawford wrote, "Also, we are standing up a BOLO COVID misinformation meeting and inviting all tech platforms. We are shooting for 12pm EST on Friday for our first meeting. I'll include you on the invite…."  Crawford Ex. 34, at 4.

**RESPONSE:** Undisputed, except to note that the last sentence states in full: "I'll include you on the invite but if you'd like to propose an alternative approach or would like me to include others, just let me know." Crawford Ex. 34 at 4. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

569.    Crawford agrees that she was "sending this to [Twitter] so that he would be on the lookout for those things appearing on Twitter."  Crawford Dep. 208:25-209:3.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

570.    Crawford notes that "the BOLO format … was used previously," *id.* 209:12-13, because Census had done "BOLO meetings … for their own work," *id.* 209:23-24. The platforms had done BOLO meetings for Census "in relation to the 2020 census."  *Id.* 210:5-9.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is

unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

571.     Regarding the BOLO meetings, Census officials "explained" to Crawford "how they did it." *Id.* 210: 16. "In fact, they drafted the slide deck" for the CDC BOLO meetings with social-media platforms. *Id.* 210:16-17. Census "drafted it and showed me how they thought that we should do it, and that … we would give examples, we would give the science, and then … people could follow up separately." *Id.* 210:18-22.

**RESPONSE:** Undisputed, except to note that Ms. Crawford testified that "I believe we changed some of the format of the PowerPoint, what we did for the CDC of course[.]" Crawford Dep. 210:15-25. In any event, this PFOF contains no evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

572.     Crawford believes that regular meetings with Twitter were not set up, but that "I know they participated in the BOLO meetings." *Id.* 198:15-16.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

573.     Regarding the BOLO meetings, Crawford remembers that two occurred and a third one was scheduled but cancelled due to a holiday, and "in lieu of a meeting" she sent "a Powerpoint." *Id.* 198:24-199:1.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

574.    Twitter responded to Crawford's May 10, 2021 email flagging 12 specific Twitter posts as examples of trending misinformation, stating: "Thanks for sharing this – agree these are important trends to note; a quick scan shows that at least some of these have been previously reviewed and actioned." Crawford Ex. 34, at 3. He then stated: "I will now ask the team to review the others." *Id.*

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

575.    Crawford understood that "asking the team to review the others" meant referring Crawford's flagged posts and issues to Twitter's content-moderation team for possible censorship: "I interpreted it as Twitter made decisions about the areas of misinformation based on whatever policy they had." Crawford Dep. 211:17-19.

**RESPONSE:** Disputed as a mischaracterization of and unsupported by the cited testimony. Ms. Crawford expressed only her belief that Twitter would "ma[ke] decisions" about the "areas of [trending] misinformation" CDC had identified "based on whatever policy [Twitter] had," without reference to specific posts or the nature of the decisions Twitter might make, or apparent familiarity with the specific terms of Twitter's "policy." Also disputed to the extent this PFOF is meant to suggest that the independent decisions of social-media companies to apply their content-

moderation policies, to which all users agree, constitutes "censorship." This PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

576.    As with Facebook, Crawford understood that her flagging of posts would result in Twitter censoring at least some of these materials in different ways, including removing posts: "similar to Meta that they probably had multiple options. I am sure some were removed. I am sure some … were flagged. I see flags all the time on the Twitter posts. I am sure some were just maybe … maybe they weren't distributed as much on peoples' feeds." *Id.* 212:10-16.

**RESPONSE:** Disputed as a mischaracterization of and unsupported by the cited testimony. As reflected therein, Crawford could only speculate which of "multiple options" Twitter might have chosen regarding the flagged posts. Also disputed to the extent this PFOF is meant to suggest that the independent decisions of social-media companies to apply their content-moderation policies, to which all users agree, constitutes "censorship." This PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

577.    In the same email, Twitter offered to enroll CDC officials in its "Partner Support Portal" to provide expedited review of content flagged for censorship: "Carol, remind me: did you have a chance to enroll in our Partner Support Portal?  In the future, that's the best way to get a spreadsheet like this reviewed."  Crawford Ex. 34, at 3.

**RESPONSE:** Undisputed, except to note that Ms. Crawford testified that she never used the "Partner Support Portal." Crawford Dep. 211:24-212:7. However, this PFOF is disputed to the

extent it is meant to suggest that the independent decisions of social-media companies to apply their content-moderation policies, to which all users agree, constitutes "censorship." Regardless, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

578.    Crawford understood that Twitter's Partner Support Portal was "similar to what I described for Meta. It's an offering where you log in and you can report misinformation or threats or problematic posted content in this portal, and it puts it in a system for review." Crawford Dep. 212:3-7.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

579.    On May 10, 2021, Twitter noted to Crawford, "I'd be glad to enroll you in our Partner Support Portal, which allows you a special, expedited reporting flow in the Twitter Help Center. It worked very well with Census colleagues last year." Crawford Ex. 34, at 3.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

580.    Crawford responded by asking for instructions on how to enroll in the Partner Support Portal, and Twitter offered to enroll any Twitter accounts she identified. Crawford Ex. 34, at 3. Crawford provided her personal Twitter account to enroll. *Id.*

**RESPONSE:** Undisputed, except to note that Ms. Crawford testified that she never used the "Partner Support Portal." Crawford Dep. 211:24-212:7. Moreover, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

581.    Then, on May 24, Census Bureau contractor Christopher Lewitzke followed on the same email chain with Twitter, asking about "the partner support portal enrollment for CDC." Crawford Ex. 34, at 2. Lewitzke indicated that they planned to report COVID misinformation to Twitter using existing Census accounts already enrolled in the portal, not CDC accounts, stating: "would there be any issues or complications stemming from flagging COVID misinformation on the portal using the existing census.gov accounts that have access?  We'll want to have at least some CDC accounts whitelisted, but that backup may be helpful short-term."  *Id.* He then stated: "Let us know any next steps we can take to make sure CDC is all set with the portal."  *Id.*

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

582.    Crawford confirms that Census had used similar portals to report misinformation to platforms in the past: "I did know from discussions with them that one technique I think that they used was using portals … for their work to report [mis]information." Crawford Dep. 213:16-19.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

583.   Twitter emailed Crawford on May 27, 2021, noting that she should be fully enrolled. Crawford Ex. 34, at 1. A screen shot of the portal proclaims, in very large, bolded type, "**Report any issue to get priority service**." *Id.* (bold in original, font greatly reduced).

**RESPONSE:** Undisputed, except to note that Ms. Crawford testified that she never used the "Partner Support Portal." Crawford Dep. 211:24-212:7. Moreover, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

584.   Crawford believes that she attempted to use Twitter's Partner Support Portal "every now and then," but that she never solved technical issues that prevented her from reporting anything. Crawford Dep. 215:9-22.

**RESPONSE:** Disputed in part as misleading. Ms. Crawford testified that Twitter's Partner Support Portal "was not a priority for me," and that "I wasn't thinking that we would probably want to use this portal on a regular basis." Crawford Dep. 215:6-15. She explained that she "wanted to look at it and see what it []looked like," so "every now and then I would try to get on it," but she could not log in. *Id.* Ms. Crawford testified that she never used the "Partner Support Portal." Crawford Dep. 211:24-212:7. Regardless, this PFOF contains no evidence that CDC or the Census

Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

585.    Christopher Lewitzke is "a Census contractor." *Id.* 217:5-6.

**RESPONSE:** Undisputed.

586.    On September 2, 2021, Crawford emailed Twitter, stating, "A quick BOLO for a small but growing area of misinfo." Crawford Ex. 35, at 1. To Twitter, she claimed that "one of our Lab alerts … was misinterpreted and was shared via social media." Crawford Ex. 35, at 1. She stated, "I've attached some example Twitter posts and another document with the facts around the issue." *Id.* The subject line of the email was "BOLO: CDC lab alert & misinformation." *Id.*

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

587.    This report was very similar to the report Crawford provided Facebook the day before, September 1, 2021. Crawford Ex. 21, at 1. "The only difference is this email is going to Twitter." Crawford Dep. 220:7-8.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is

unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a.

& f.

588.     By sending these emails to Facebook and Twitter flagging what the CDC believed
was a misinterpretation of a CDC lab alert on social media, CDC intended to prevent the disfavored
message from spreading on social media: "We saw this confusion about this alert brewing and
more posts were going up with confusion, and we thought it would be a good idea to provide the
platforms with the facts *before it became something bigger*." *Id.* 220:13-17 (emphasis added). In
other words, CDC wished to cause the disfavored viewpoint to be censored before it could be
viewed or repeated by others—a quintessential prior restraint.

**RESPONSE:** Disputed as a mischaracterization of and unsupported by the cited testimony.

Ms. Crawford testified only that CDC wished "to provide the platforms with the facts" about

CDC's lab alert, and said nothing about an intent to "prevent the disfavored message from

spreading on social media" or "cause [a] disfavored viewpoint to be censored[.]" This PFOF

contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with,

or encourage social-media companies to remove or suppress information on their platforms, or that

the companies regarded (or acted on) any communications with CDC or the Census Bureau as

such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See*

Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

589.     CDC specifically flagged this information to the platforms, knowing that they
would evaluate it for potential censorship under their content-moderation policies: Crawford
"knew their policy teams or their trust teams or misinfo teams … would evaluate it." *Id.* 220:21-
23. And Crawford "knew that removal was one of the options that they had, yes." *Id.* 220:25-
221:1.

**RESPONSE:** Disputed to the extent this PFOF is meant to suggest that the independent

decisions of social-media companies to apply their content-moderation policies, to which all users

agree, constitutes "censorship." This PFOF contains no evidence that CDC or the Census Bureau

sought to threaten or pressure, collude with, or encourage social-media companies to remove or

suppress information on their platforms, or that the companies regarded (or acted on) any

communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

**F.     CDC Endorses the States' Theory of Standing.**

590.     Crawford admits that government communicators have a strong interest in tracking what their constituents are saying on social media: "It's helpful for communicators to know what is being discussed because it helps improve our communication materials." *Id.* 53:10-12.

**RESPONSE:** Irrelevant. Whether States have a legally cognizable interest in following the discourse of their citizens on social media in order to craft responsive messaging and policies is a question of law, not dependent on the views of an individual government employee. Moreover, the Plaintiff States have not established a concrete and particularized injury to this asserted interest that can fairly be attributed to Defendants' actions. *See* Defs.' Arg. § II.A; Defs.' MTD Br. 16-43, Dkt. 128-1.

591.     Crawford emphasized this point multiple times: "as I mentioned before, it does help … for communicators to know what conversations occurs on social media because it helps us identify gaps in knowledge, or confusion, or things that we're not communicating effectively that we need to adjust." *Id.* 54:15-20.

**RESPONSE:** *See* Response to Pls.' PFOF ¶ 590.

592.     CrowdTangle reports "would help us understand what was being discussed on social media about COVID, which helps us look for gaps in information, confusion about facts, things that we might need to adjust our communication materials for." *Id.* 57:24-58:3.

**RESPONSE:** *See* Response to Pls.' PFOF ¶ 590.

593.     Crawford specifically expressed the concern that, if content was censored or removed from social-media platforms, government communicators would not know what the citizens' true concerns were: She "was wondering if they delete the info will we know those myths or information so we could update communication activity. So if they were deleting content would we know what the themes were." *Id.* 75:14-18. Thus, Crawford was concerned that, if the platforms "were deleting content," she might not know "what the themes were" of "myths or [mis]information," which would prevent her from "updat[ing the CDC's] communication activity" to address those myths and misinformation. *Id.* Accordingly, Crawford wanted to know, "would

[CDC] be able to see in CrowdTangle or other reports … what kind of themes were removed so we would still have the full picture of areas of confusion." *Id.* 75:21-76:1.

**RESPONSE:** *See* Response to Pls.' PFOF ¶ 590.

594.    Crawford inquired of Facebook "about the data that we could get so we had a full picture on confusion so that we could adjust communication materials, or ways that we were communicating" about COVID-19. *Id.* 81:10-13. In other words, Crawford wanted to know about speech that was censored, as well as speech that was left up, on social-media platforms so CDC could get "a full picture" and "adjust communication materials" to address people's actual concerns. *Id.*

**RESPONSE:** *See* Response to Pls.' PFOF ¶ 590.

595.    The CDC "did searches in CrowdTangle, the same way we do searches in other social media and listening tools that we have to create, to understand what's being discussed in the environment, to update our communication material." *Id.* 148:11-15.

**RESPONSE:** *See* Response to Pls.' PFOF ¶ 590.

**V.    Dr. Fauci's Campaigns to Censor Disfavored Viewpoints on Social Media.**

596.    Dr. Fauci, cooperating frequently with NIH Director Dr. Francis Collins, engaged in a series of campaigns to discredit and procure the censorship of viewpoints he disfavored on social media, beginning at least in early 2020. Once he became Chief Medical Advisor in the Biden Administration in early 2021, his censorship efforts coordinated with and reinforced those of federal officials in the White House, the Office of the Surgeon General, the CDC, and elsewhere.

**RESPONSE:** Disputed as an argumentative mischaracterization unsupported by the

evidence and without citation to the record. Neither this PFOF, nor any that follow, contain

evidence that Dr. Fauci attempted to "procure the censorship of viewpoints he disfavored on social

media," whether alone or in cooperation or coordination with others. Any assertion to that effect

is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

597.    Until his recent retirement, Dr. Anthony S. Fauci was the director of the National Institute for Allergy and Infectious Diseases at the National Institutes of Health and the Chief Medical Advisor to President Biden. Fauci Dep. 10:8-16. At the time of his deposition, Dr. Fauci had been the director of NIAID for over 38 years. *Id.* at 10:25-11:1.

**RESPONSE:** Undisputed.

**A.    Dr. Fauci's Conspiracy and Campaign to Suppress the Lab-Leak Theory.**

598.    First, in early months of 2020, Dr. Fauci worked closely with Dr. Francis Collins and Jeremy Farrar to orchestrate a campaign to discredit and suppress the opinion that SARS-CoV-2, the virus that causes COVID-19, leaked from a laboratory at the Wuhan Institute of Virology—an opinion that has recently been confirmed as likely true. Early in the pandemic, Dr. Fauci was aware that NIAID, under his direction, had funded dangerous gain-of-function research on coronaviruses at that laboratory, and he sought to discredit and suppress the lab-leak theory to deflect the scandal and blame associated with potential responsibility for the deaths of millions in the ensuing pandemic. He engaged in a campaign of deception to discredit the theory, and as a result of his efforts, the lab-leak theory was heavily censored on social media.

**RESPONSE:** Disputed as an argumentative mischaracterization unsupported by and without citation to the evidence. Additionally, the use of the phrase "lab-leak theory" in this PFOF and any others throughout this document is disputed as erroneously suggesting that there is only one theory concerning how SARS-CoV-2, the virus that causes COVID-19, may have emerged from a laboratory in Wuhan, China (assuming it did, in fact, emerge from a laboratory rather than in nature). In fact, multiple diverging "lab-leak" theories have emerged. One theory is that SARS-CoV-2 was intentionally engineered in a laboratory and deliberately or accidentally released. Another is that SARS-CoV-2 was inadvertently created in a lab during serial passage experiments and accidently spread beyond the lab. Yet another is that SARS-CoV-2 naturally occurred in the wild, was being studied in a lab, and was accidentally spread beyond the lab by infected researchers. In any event, neither this PFOF, or any that follow, contain evidence that Dr. Fauci "orchestrate[d] a campaign or sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

599.    On December 30, 2011, Dr. Fauci co-authored an op-ed with Dr. Francis S. Collins in the Washington Post entitled *A Flu Virus Risk Worth Taking*. Fauci Ex. 1, Fauci Dep. 13:13-20.

**RESPONSE:** Undisputed. However, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress

any theory on social media. Any assertion to that effect is unsupported by and contrary to the

evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

600.    In this op-ed, Dr. Fauci and Dr. Collins advocated for creating potentially dangerous viruses in laboratories, writing that "important information and insights can come from generating a potentially dangerous virus in a laboratory." Fauci Ex. 1, at 1. According to Fauci and Collins, "[u]nderstanding the biology of … virus transmission has implications for outbreak prediction, prevention and treatment," and "[i]dentifying threatening viruses can also facilitate the early stages of manufacturing vaccines that protect against such a virus in advance of an outbreak." *Id.* at 2. They further argued that "identifying the molecular Achilles heel of these viruses can allow scientists to identify novel antiviral drug targets that could be used to prevent infection … or better treat those who become infected." *Id.*

**RESPONSE:** Disputed as a mischaracterization of the cited op-ed, which discussed

"taking this H5N1 [virus] and studying it in different ways that could potentially make it more

dangerous but only under very strict conditions," Fauci Dep. 14:25–15:5, a risk that Dr. Fauci

testified was "worth taking if the benefit is the protection of the American and global public." *Id.*

15:16-18; *see also* Fauci Ex. 1. Moreover, the second sentence is disputed to the extent it removes

a phrase (as noted by the ellipses) from the quoted portion of the article and thereby misrepresents

its contents; the first quoted portion should read: "Understanding the biology of *influenza* virus

transmission has implications for outbreak prediction, prevention and treatment." Fauci Ex. 1, at

2 (emphasis added to note removed word from Plaintiffs' PFOF). Additionally, the last quoted

sentence of the PFOF should read "*determining* the molecular Achilles heel . . . " (not

"identifying"). *Id.* (emphasis added to note corrected word). Regardless, this PFOF is irrelevant

and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or

otherwise, to censor or suppress any theory on social media. Any assertion to that effect is

unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

601.    Dr. Fauci and Dr. Collins acknowledged the significant risks associated with such research, writing that "[s]afeguarding against the potential accidental release or deliberate misuse of laboratory pathogens is imperative." *Id.* But they believed that those risks were contained, writing that "engineered viruses … are maintained in high-security laboratories." They further

state that "scientists, journal editors, and funding agencies involved are working together to ensure that access to specific information that could be used to create dangerous pathogens is limited to those with an established and legitimate need to know." *Id.*

**RESPONSE:** Disputed as a mischaracterization of the cited op-ed, for the reasons stated in response to Plaintiffs' PFOF ¶ 600. Moreover, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

602.    Thus, long before the COVID-19 pandemic, Dr. Fauci and Dr. Collins were highly visible, public advocates for laboratory experiments that involve "generating a potentially dangerous virus in a laboratory." *Id.* at 1.

**RESPONSE:** Disputed as a mischaracterization of the cited article and the views of Dr. Fauci and Dr. Collins. The cited op-ed is specific to the study of the H5N1 influenza virus and does not "advocate[ ]" generally for laboratory experiments that involve "generating a potentially dangerous virus in a laboratory." *See* Fauci Ex. 1. Indeed, the op-ed itself explains that "[t]he question is whether the benefits of such research outweigh the risks. The answer is not simple." *Id.* at 2. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

603.    Such research of "generating a potentially dangerous virus in a laboratory" is commonly called "gain-of-function" research. Dr. Fauci testified that "[g]ain of function is a very potentially misleading terminology, and that was one of the reasons why several years ago outside groups, not the NIH … did away with the terminology 'gain of function' because it can often be very confusing and misleading." Fauci Dep. 16:3-10. But Dr. Fauci confirms that "the NIH" did not "d[o] away" with that terminology, *id.*, and Dr. Fauci's own internal email uses the phrase "SARS Gain of Function" to describe the research on bat coronaviruses that was conducted by Dr. Shi Zhengli and others at the Wuhan Institute of Virology, partly funded by Dr. Fauci's NIAID through the subgrants from the EcoHealth Alliance, discussed below, *see* Fauci Ex. 6, at 8.

**RESPONSE:** Disputed that Dr. Fauci's email produced on page 8 of Exhibit 6 shows that

Dr. Fauci used the phrase "SARS Gain of Function" to describe any research. The phrase "SARS

Gain of Function" appears only in the filename of an attachment and Dr. Fauci testified that he did

not know who named the file in such a manner. Fauci Dep. 57:1-16. Undisputed as to the remaining

allegations. However, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by

threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on

social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole.

*See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

604.    On June 1, 2014, Dr. Fauci's NIAID funded a grant to the EcoHealth Alliance for
the five-year period June 1, 2014, to May 31, 2019. Fauci Ex. 2, at 2. The title of the project was
"Understanding the Risk of Bat Coronavirus Emergence." *Id.* at 1. The project's Abstract stated,
"This project will examine the risk of future coronavirus (CoV) emergence from wildlife using in-
depth field investigations across the human-wildlife interface in China, molecular characterization
of novel CoVs and host receptor binding domain genes, mathematical models of transmission and
evolution, and in vitro and in vivo laboratory studies of host range." *Id.*

**RESPONSE:** Undisputed. However, this PFOF is irrelevant and contains no evidence that

Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress

any theory on social media. Any assertion to that effect is unsupported by and contrary to the

evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

605.    The Abstract noted that one of the project's "three specific aims" would be to
"[t]est predictions of CoV inter-species transmission" by engaging in two forms of research to
enhance the bat coronaviruses' transmissibility to humans: "reverse genetics," *i.e.*, genetic
manipulation of the viruses to render them more transmissible; and "virus infection experiments"
using "humanized mice," *i.e.*, repeatedly infecting humanized mice with bat coronaviruses to
provoke mutations that render them more infectious to human cells (a process known as "serial
passage," *see* https://en.wikipedia.org/wiki/Serial_passage). *Id.* at 1. Specifically, the Abstract
stated: "Predictive models of host range (i.e.[,] emergence potential) will be tested experimentally
using *reverse genetics*, pseudovirus and receptor binding assays, and *virus infection experiments
across a range of cell cultures* from different species and humanized mice." *Id.* (emphases added).

**RESPONSE:** Disputed as a mischaracterization of the Abstract, which does not cite

Wikipedia, does not state that the research will "enhance the bat coronaviruses' transmissibility to

humans," and does not state that the research will make any virus more transmissible or infectious. In fact, the Abstract states that the "project will examine the risk of future coronavirus (CoV) emergence from wildlife," and "aims to understand what factors increase the risk of the next CoV emerging in people." Fauci Ex. 2 at 1. Defendants also dispute Plaintiffs' purported definitions of "reverse genetics" and "serial passage," which Plaintiffs have apparently obtained from Wikipedia. "Reverse genetics" are not exclusively associated with making viruses more transmissible, and Dr. Fauci testified that "reverse genetics" "is very broad terminology." Fauci Dep. 24:22-25. Dr. Fauci also testified that "serial passage" could be used to "decrease function." Fauci Dep. 116:4-7. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress the lab-leak theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole.

*See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

606.   Dr. Fauci attempted to argue that "reverse genetics" is so vague that it might not refer to gain-of-function research. *See* Fauci Dep. 23:18-20 ("I'm not really quite sure what they're referring to. Reverse genetics can mean many things."). But Dr. Fauci admits that "reverse genetics" means "[m]anipulation of a virus, recombination, things like that." *Id.* at 23:19-21. In 2015, in an article reporting on research performed pursuant to this grant, Dr. Ralph Baric and Dr. Shi Zhengli wrote that they used "reverse genetics" to "generate[] and characterize[] a chimeric virus" that was more infectious and more virulent in humans. Fauci Ex. 4, at 1. Dr. Fauci's own internal email describes that article as addressing "SARS Gain of Function." Fauci Ex. 6, at 8.

**RESPONSE:** Undisputed that Dr. Fauci testified that "reverse genetics" is "is a very broad term that could have multiple applications." Fauci Dep. 24:6-10. Disputed that the cited article described using reverse genetics to make "'a chimeric virus' that was more infections and more virulent in humans." The article speaks for itself, and it does not demonstrate an increased infectivity or virulence in humans. The last sentence is disputed for the reasons stated in response to Plaintiffs' PFOF ¶ 603. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress

any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

607.    Dr. Fauci admits that "EcoHealth has a subaward from their original grant that goes to Shi Zhengli at the Wuhan Institute of Virology." Fauci Dep. 36:4-6. He agrees that EcoHealth and Shi Zhengli of the Wuhan Institute of Virology "work together on research that's directly funded by NIAID." Fauci Dep. 36:7-13.

**RESPONSE:** The first sentence is undisputed. The second sentence is disputed as a mischaracterization of Dr. Fauci's testimony, which provides that "the funding goes to EcoHealth which awards a subaward." Fauci Dep. 36:9-10. Moreover, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

608.    Dr. Fauci also attests that Dr. Peter Daszak likely has access to the genetic sequences of chimeric viruses that Shi Zhengli created during her research funded by EcoHealth using NIAID funds: "I don't know absolutely for sure, but I would imagine that if Peter Daszak is collaborating scientifically with Shi Zhengli, that it is likely, given the norms of scientific collaboration, that he would have access to data," and "they are collaborators, since he has a subaward to the Wuhan Institute that I believe goes to Dr. Shi." Fauci Dep. 37:1-13. Daszak, therefore, is likely in possession of genetic evidence demonstrating whether SARS-CoV-2 originated from NIAID-funded research at the Wuhan Institute of Virology.

**RESPONSE:** Disputed as a mischaracterization of the cited testimony. Dr. Fauci does not testify that Dr. Daszak had access to "genetic sequences of chimeric viruses"; instead, he states that he thought it likely that Dr. Daszak "would have access to data" that is "generated by Shi Zhengli pursuant to their research together." Fauci Dep. 37:1-13. Moreover, Dr. Fauci was asked whether Dr. Daszak would have had access to data, not whether Dr. Daszak currently has possession of certain data. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress

any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

609.    Dr. Fauci claimed that he had never seen this grant award before his deposition, and that he was only "vaguely" aware of NIAID's funding of EcoHealth Alliance. *Id.* at 18:10-12 ("I'm vaguely familiar with the fact that EcoHealth Alliance has been doing research on trying to understand the bat coronavirus emergence."); *id.* at 19:7-8 ("I have no recollection of the initiation of this grant."). Dr. Fauci admits that "NIAID has funded EcoHealth Alliance," 20:5-6, but he contends that he is completely unfamiliar with this project. *Id.* at 20:8-9 ("[T]his is the first time that I have seen this piece of paper."). But this very grant project was flagged for Dr. Fauci in an email from his subordinate on January 27, 2020, at the beginning of the pandemic. Fauci Ex. 5. Given the public and Congressional scrutiny of this particular project and its relation to the origins of the COVID-19 pandemic, Dr. Fauci's testimony on these points is not credible.

**RESPONSE:** Disputed as argumentative and a mischaracterization of the cited testimony.

Dr. Fauci testified that he "d[id] know" in general that "NIAID has funded EcoHealth Alliance,"

Fauci Dep. 20:3-6, but that he had "no recollection of the initiation of th[e] [sub]grant" in question,

*id.* at 18:24-19:8, which is unsurprising since he "d[id] not individually approve grants," *id.*, and

received the cited email three years before his deposition, Fauci Ex. 5. Moreover, the piece of

paper that was shown to Dr. Fauci as Exhibit 2 is not the "grant award."  Rather, it is a summary

of the grant award that is publicly available on reporter.nih.gov, and there is no reason for Dr.

Fauci to be familiar with a printout from the website. Fauci Ex. 2. Regardless, this PFOF is

irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement,

deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that

effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. §

II.B.3.b.

610.    Peter Daszak is listed as the "Contact PI/Project Leader" for the grant award "Understanding the Risk of Bat Coronavirus Emergence."  Fauci Ex. 2, at 1. The "Awardee Organization" is the EcoHealth Alliance. *Id.*

**RESPONSE:** Undisputed. Regardless, this PFOF is irrelevant and contains no evidence

that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or

suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

611.    Dr. Fauci claims that he is not acquainted with Peter Daszak and does not know how to pronounce Daszak's name, Fauci Dep. 20:13 ("I'm not sure"), and that he "do[es]n't even remember meeting him," *id.* at 21:1-2, but that he has seen a photo of himself with Daszak at a public event as the only evidence that they have met. *Id.* at 21:2-8.

**RESPONSE:** Disputed as a mischaracterization of the cited testimony. Dr. Fauci testified that he thought he had "met Daszak once or twice," so he would "not exactly characterize him as an acquaintance," and he could not "remember meeting him," but acknowledged that they had met since they were photographed together. Fauci Dep. 20:15-21:20. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b..

612.    In fact, Dr. Fauci has exchanged cordial emails with Daszak on a first-name basis, and he participated in a podcast with him on February 9, 2020, in which they both sought to discredit the lab-leak theory of COVID's origins. Fauci Ex. 15, 16, 30. Dr. Fauci's attempt to deny or downplay his acquaintance and familiarity with Daszak is not credible.

**RESPONSE:** Disputed as argumentative and a mischaracterization of the cited evidence. The referenced podcast with Dr. Daszak took place nearly three years before Dr. Fauci's deposition, in in February 2020, *see* Fauci Exs. 15, 16, and was one of "many podcasts" in which he has participated, Fauci Dep. 142:1-6. His single cited email exchange with Dr. Daszak occurred in April 2020. Fauci Ex. 30. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

613.    On October 17, 2014, the U.S. Government entered a "research funding pause" on gain-of-function research on coronaviruses, in a document entitled "U.S. Government Gain-of-Function Deliberative Process and Research Funding Pause on Selected Gain-of-Function Research Involving Influenza, MERS, and SARS Viruses."  Fauci Ex. 3, at 1 (the "GoF Pause" or "Pause").

**RESPONSE:** Disputed as a mischaracterization of the cited document to the extent the "research funding pause" applied only to "*selected* gain-of function research involving influenza, MERS, and SARS viruses." Fauci Ex. 3 (emphasis added) (capitalizations removed). Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

614.    Contrary to Dr. Fauci's testimony that the "pause" was an occasion to jettison the term "gain-of-function," the Pause provided a simple and clear definition of "gain of function" research, defining "Gain-of-function studies" as "research that improves the ability of a pathogen to cause disease."  Fauci Ex. 3, at 2. The research on bat coronaviruses described in Fauci Ex. 2 meets this simple definition.

**RESPONSE:** Disputed as argumentative and without support in the cited evidence. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

615.    The Pause applied to funding for all "research such as this until a new U.S. Government research policy could be adopted."  Fauci Dep. 27:17-19; Fauci Ex. 3, at 2-3.

**RESPONSE:** Disputed as a mischaracterization of the cited evidence to the extent Plaintiffs suggest that the purported "pause" covered any "gain-of-function" research not specifically discussed in the cited document. *See* Fauci Dep. 27:10-19; Fauci Ex. 3. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion,

encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

616.    The Pause provided an exception in Footnote 1, which stated: "An exception from the research pause may be obtained if the head of the USG funding agency determines that the research is urgently necessary to protect the public health or national security."  Fauci Ex. 3, at 2 n.1.

**RESPONSE:** Undisputed. However, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

617.    Dr. Fauci testified that he does not recall whether NIAID ever invoked that exception during the years that the Pause was in place (2014-2017). Fauci Dep. 28:22-29:3. He testified that authorization for funding under the exception would "not usually rise up to the office of the director, but is handled at the level of staff and deputy." *Id.* at 29:1-2. He testified that such approval for projects "urgently necessary to protect the public health or national security" could have come from "any of a number of people. It could have been people at the program level. It could have been my deputy. It could have been program managers and division directors."  *Id.* at 30:16-19.

**RESPONSE:** Disputed to the extent the first sentence is contradicted by the record. Dr. Fauci testified that he recalled that "exceptions were given to a couple experiments." Fauci Dep. 28:22-25. Undisputed that Dr. Fauci did not recall personally giving the ultimate sign-off to such exceptions, which would have been "eight years ago." *Id.* at 28:22–29:12. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

618.    This testimony contradicts the plain language of the exception, which states that "*the head of the USG funding agency*" must "determine[] that the research is urgently necessary

to protect the public health and national security" to allow continued funding for gain-of-function research on coronaviruses. Fauci Ex. 3, at 2 n.1. At all relevant times, Dr. Fauci was the "head of the USG funding agency," *i.e.*, the Director of NIAID, and he was responsible for authorizing funding for gain-of-function research on the ground that it was "urgently necessary to protect the public health or national security."

**RESPONSE:** Disputed as argumentative, speculative, and a legal conclusion unsupported by the record. Plaintiffs cite no law or regulation that would have prevented the head of the USG funding agency from delegating this responsibility to one or more subordinate officials, as is common practice in U.S. Government agencies. *See, e.g.*, *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 565 (D.C. Cir. 2004) ("When a statute delegates authority to a federal officer or agency, subdelegation to a subordinate federal officer or agency is presumptively permissible absent affirmative evidence of a contrary congressional intent." (citing cases)). Also disputed that Dr. Fauci was the head of the USG funding agency, since the funding agency was the National Institutes of Health (NIH), and not NIAID. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

619.    Dr. Fauci states that he does not recall whether NIAID ever authorized continued funding for Peter Daszak or EcoHealth Alliance pursuant to the exception to the Pause in footnote 1. Fauci Dep. 30:3-12.

**RESPONSE:** Undisputed. However, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

620.    In fact, Dr. Fauci testified that "I don't recall" or "I do not recall" 174 times in his deposition, and testified that he could not recall or remember using variations on that phrase 212 times. *See* Fauci Dep. 22:21-352:17-18. This contrasts sharply with his public statements about the very same issues that, during his deposition, he professed near-complete loss of memory. *See,*

*e.g.,* Jones Decl., Ex. X, at 1 ("I remember it very well"). It also contrasts sharply with his clear, specific recollection of unrelated events from the same time frame. *See, e.g.,* Fauci Dep. 353:20-354:16. Dr. Fauci's repeated claims to not remember or not recall key events and people are not credible.

**RESPONSE:** Disputed as an argumentative mischaracterization of Dr. Fauci's testimony that is unsupported by the cited evidence. The quoted newspaper article, Jones Decl., Ex. X, reports that Dr. Fauci remembered "very well" that a group of scientists on a February 1, 2020, call decided that the origins of SARS-CoV-2 "really needed to be looked into carefully." That statement does not "contrast[] sharply" with Dr. Fauci's unsurprising inability to remember details about whether a particular person called him in January 2020, *see* Fauci Dep. 35:9-15, whether Dr. Fauci remembers one particular email out of the thousands he received in January 2020 alone, *id.* 40:2-12, who Dr. Fauci copied on an email sent on February 1, 2020, *id.* at 55:5-8; *see also* Fauci Dep. Ex. 6, at 8, what specific day in 2020 he "became aware" of an article, Fauci Dep. 61:1-6, whether anyone expressed concern during a February 1, 2020 phone call about "social media conspiracy theories," *id.* 78:10-24, whether Dr. Fauci recalls receiving a draft article on February 4, 2020, *id.* at 124:9-14, or whether he remembers other details of communications that took place three years ago. Dr. Fauci's inability to recall such minute and irrelevant details during his testimony does not imply any lack of credibility. In any event, his memory of these irrelevant matters is itself irrelevant and furnishes no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

621.    Dr. Fauci's chief deputy is Dr. Hugh Auchincloss, who is the Principal Deputy Director of NIAID. *Id.* at 30:20-25.

**RESPONSE:** Undisputed that at the time of the deposition, Dr. Hugh Auchincloss was Dr. Fauci's chief deputy and the Principal Deputy Director of NIAID. However, this PFOF is

irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

622.    In December 2015, during the research "Pause" on gain-of-function funding, Nature Medicine published an article entitled, "A SARS-like cluster of circulating bat coronaviruses shows potential for human emergence." Fauci Ex. 4, at 1. Dr. Ralph Baric of the University of North Carolina was listed as the corresponding author, and Dr. Shi Zhengli of the Wuhan Institute of Virology was listed as a co-author. *Id.* at 1 & n.8.

**RESPONSE:** Disputed as an incomplete characterization of the "Pause" to the extent the "Pause" applied only to gain-of-function research projects that may be reasonably anticipated to confer attributes to influenza, MERS, or SARS viruses such that the virus would have enhanced pathogenicity and/or transmissibility in mammals via the respiratory route. Fauci Ex. 3. The research funding pause did not apply to characterization or testing of naturally occurring influenza, MERS, and SARS viruses, unless the tests are reasonably anticipated to increase transmissibility and/or pathogenicity. *Id.* Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

623.    The 2015 Nature Medicine article clearly described gain-of-function research on bat coronaviruses. The Abstract states: "Here we examine the disease potential of a SARS-like virus, SHC014-CoV, which is currently circulating in Chinese horseshoe bat populations. Using the SARS-CoV reverse genetics system, we generated and characterized a chimeric virus expressing the spike of bat coronavirus SHC014 in a mouse-adapted SARS-CoV backbone." Fauci Ex. 4, at 1. Notably, the article uses the same phrase as the EcoHealth grant, "reverse genetics," to describe creating "a chimeric virus." *Id.*

**RESPONSE:** Disputed that the 2015 Nature Medicine article describes gain-of-function research. The 2015 Nature Medicine Article speaks for itself. Also disputed as an incomplete

characterization of the "Pause" to the extent the "Pause" applied only to gain-of-function research

projects that may be reasonably anticipated to confer attributes to influenza, MERS, or SARS

viruses such that the virus would have enhanced pathogenicity and/or transmissibility in mammals

via the respiratory route. Fauci Ex. 3. The research funding pause did not apply to characterization

or testing of naturally occurring influenza, MERS, and SARS viruses, unless the tests are

reasonably anticipated to increase transmissibility and/or pathogenicity. *Id*. Moreover, the article

itself clearly explains that "[e]xperiments with the full-length and chimeric SHC014 recombinant

viruses were initiated and performed before the GOF research funding pause…" Fauci Ex. 4 at 5.

Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat,

coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social

media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See*

Defs.' PFOF § II.E., Arg. § II.B.3.b.

624.    The article reports that the "chimeric virus" created from a "SARS-like" bat
coronavirus had become highly transmissible in human tissue: it could "replicate efficiently in
primary human airway cells and achieve *in vitro* titers equivalent to epidemic strains of SARS-
CoV." *Id.* It had also become more virulent: "Additionally, *in vivo* experiments demonstrate
replication of the chimeric virus in mouse lung with notable pathogenesis." *Id.* There were no
available treatments for this lab-created "chimeric" virus: "Evaluation of available SARS-based
immune-therapeutic and prophylactic modalities revealed poor efficacy; both monoclonal
antibody and vaccine approaches failed to neutralize and protect from infection with CoVs using
the novel spike protein." *Id.*

**RESPONSE:** Disputed. The article does not address transmissibility in any way, nor does

it say that the chimeric virus became more virulent. The article speaks for itself. However, this

PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion,

encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any

assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF

§ II.E., Arg. § II.B.3.b.

625.    The article noted that the authors had then "synthetically re-derived an infectious full-length SHC014 recombinant virus and demonstrate robust viral replication both in vitro and in vivo." *Id.* The article concluded that "[o]ur work suggests a potential risk of SARS-CoV re-emergence from viruses currently circulating in bat populations" – and this conclusion was based on creating a more transmissible (to humans) and more virulent (to humans) SARS-like coronavirus in a lab. *Id.*

**RESPONSE:** Disputed. The authors do not state that they created a virus that is more transmissible and virulent in humans. The article speaks for itself. However, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

626.    The article acknowledged that NIAID was the principal funder of this research, and that it had received funding from the EcoHealth Alliance, Daszak's group: "Research in this manuscript was supported by grants from the National Institute of Allergy & Infectious Disease and the National Institute of Aging of the US National Institutes of Health (NIH) … and by USAID-EPT-PREDICT funding from EcoHealth Alliance." *Id.* at 5.

**RESPONSE:** Disputed as a mischaracterization of the cited evidence, which does not support the proposition that NIAID was the "principal funder." The "acknowledgements" section of the article reports that the "[r]esearch in this manuscript was supported by grants from the National Institute of Allergy & Infectious Disease and the National Institute of Aging of the US National Institutes of Health (NIH) under awards U19AI109761 (R.S.B.), U19AI107810 (R.S.B.), AI085524 (W.A.M.), F32AI102561 (V.D.M.) and K99AG049092 (V.D.M.), and by the National Natural Science Foundation of China awards 81290341 (Z.-L.S.) and 31470260 (X.-Y.G.), and by USAID-EPT-PREDICT funding from EcoHealth Alliance (Z.-L.S.)." Fauci Ex. 4 at 5. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. See Defs.' PFOF § II.E., Arg. § II.B.3.b.

627.    The article also noted that the NIH had reviewed and approved the research under the GoF Pause: "Experiments with the full-length and chimeric SHC014 recombinant viruses were initiated and performed before the GOF research funding pause and have since been reviewed and approved for continued study by the NIH." *Id.* "GOF" is short for "gain-of-function."

**RESPONSE:** The quoted text is accurate, but Defendants dispute that the NIH "reviewed and approved the research under the GoF Pause," which assertion is not supported by the quoted text. The text merely states that the research was initiated and performed before the GOF pause but it does not state that the research would have been considered "gain of function" research subject to the pause. However, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

628.    Dr. Fauci testified that he first became aware of this Nature Medicine article "likely … several months" after the outbreak of the COVID-19 pandemic, and that "it was brought to my attention in the context of questions that were raised by members of Congress about experiments that were funded by the NIAID." Fauci Dep. 31:17-20, 32:7-9. In fact, Dr. Fauci attached this article to a confidential midnight email to his principal deputy, Hugh Auchincloss, on January 31, 2020, and directed Auchincloss to read it immediately and take unspecified actions on it on a Saturday morning. Fauci Ex. 6, at 8. Dr. Fauci's testimony on this point is not credible.

**RESPONSE:** The first sentence is undisputed, except to note that Dr. Fauci repeatedly stated that he was only estimating when, roughly two years ago, he believed he became aware of the article but that he was "not a hundred percent certain" when he did in fact become aware of it. *See* Fauci Dep. at 31:15-32:9; *id.* ("Q. When did you first become aware of [the article]? A. I believe – again, I read a lot of articles – I believe it was brought to my attention in the context of questions that were raised by members of Congress about experiments that were funded by the NIAID. Q. So would that have been in and around 2021 time frame, do you know, when you first became aware of it? A. It certainly was after the beginning of the COVID-19 outbreak. Q. How long after the beginning would you estimate? A. I don't recall. Q. Would it have been right at the

beginning of the outbreak or months into it or years into it? A. You know, years is where we are

right now. So it wouldn't have been years. So it likely would have been several months, though

I'm not a hundred percent certain."). The second sentence is undisputed, except to the extent that

Plaintiffs describe communications as "confidential"; that characterization is not supported by the

email, which is not marked "confidential" and does not otherwise indicate that it is to be held in

confidence. The third sentence is disputed as argumentative. That Dr. Fauci could not remember

precisely when or how he learned of an article—among the many articles he read —does not

demonstrate a lack of credibility. Regardless, this PFOF is irrelevant and contains no evidence that

Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress

any theory on social media. Any assertion to that effect is unsupported by and contrary to the

evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

629.    Dr. Fauci testified that he does not believe he has ever met Dr. Ralph Baric, the
corresponding author of the 2015 Nature Medicine article. Fauci Dep. 32:16-19 ("I know who he
is, I doubt I've ever met him. I may have met him at one of the meetings where there are thousands
of scientists saying hi to each other…"); *see also id.* at 33:25-34:1. In fact, Dr. Fauci's official
calendar shows a one-on-one meeting with Dr. Ralph Baric on February 11, 2020, during the
events described herein. Fauci Ex. 17, at 1. A contemporaneous Slack message on February 18,
2020 reports that Dr. Baric "sat in Fauci's office talking about the outbreak and chimeras," *i.e.*,
lab-created chimeric viruses. Jones Decl., Ex. Y, at 1. And Dr. Fauci testified that Dr. Baric may
be the source of the phrase "SARS Gain of Function" in the attachment to his midnight email to
Hugh Auchincloss. Fauci Dep. 57:11-12. Dr. Fauci's testimony on this point is not credible.

**RESPONSE:** The PFOF accurately quotes Dr. Fauci's deposition testimony stating that

he "doubt[s] he ever met" Dr. Ralph Baric. Otherwise, disputed as argumentative and unsupported

by the record. Dr. Fauci's calendar does not show a one-on-one meeting with Dr. Baric; rather,

Fauci Ex. 17 shows a "hold" for a meeting with Dr. Baric but does not indicate all the individuals

who would have attended. Additionally, the February 18, 2020 slack message between Vineet

Menachery and Matt Frieman (and not Dr. Fauci), neither of whom was (or is) a NIAID employee

or is alleged to have attended the alleged February 11 meeting, is hearsay, is not

"contemporaneous" to that meeting or proof that Dr. Fauci met one-on-one with Dr. Baric. Additionally, whether Dr. Baric was the source of a phrase used in the title of a document attached to an email is not probative of whether Dr. Fauci met Dr. Baric. Regardless, even assuming that Dr. Fauci met Dr. Baric one-on-one, that would not render incredible his testimony that he "doubt[s] [he] ever met him." In any event, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

630.    Dr. Fauci professed to be ignorant of the identity of Dr. Shi Zhengli, the notorious "Bat Woman" of the Wuhan Institute of Virology. When asked if he knows who she is, he stated, "I'm not a hundred percent certain. I get sometimes confused with Asian names." *Id.* at 33:9-10, 18-19. Yet Dr. Shi Zhengli, the so-called "bat woman," is world-renowned as the researcher who may have caused the COVID-19 pandemic, and has been so since the beginning of the pandemic, *see, e.g.,* Jones Decl., Ex. Z, at 1, and the name "Shi" is included in the title of the article that Dr. Fauci forwarded to Dr. Hugh Auchincloss after midnight on February 1, 2020. Fauci Ex. 6, at 8. Dr. Fauci's testimony is not credible on this point.

**RESPONSE:** Disputed as argumentative and a mischaracterization of Dr. Fauci's testimony. Dr. Fauci did not "profess to be ignorant of the identity of Dr. Shi Zhenghli." In fact, when asked if he knew who Shi Zhengli was, Dr. Fauci testified: "I believe, if I'm correct, that this is a scientist who is at the Wuhan Institute of Virology, I believe. I'm not a hundred percent certain. I get sometimes confused with Asian names, but I believe this is the person who is a scientist at the Wuhan Institute." Fauci Dep. 33:7-12. In response to the question whether he was "aware generally that there's someone called Shi Zhengli who's described in the media as the bat woman who does research on bat coronaviruses at the Wuhan lab," Dr. Fauci responded, "Yea, is that her? I don't know if that's the same person. Like I said, when you're dealing with Asian names, sometimes the first name is last and the last name is first. So I . . . believe this is the person from Wuhan." *Id.* at 33:13-21. Dr. Fauci's testimony that he believed he knew who Dr. Shi

Zhenghli is but was not "a hundred percent certain" does not show a lack of credibility. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

631.    Dr. Fauci testified that he first became aware of the outbreak of COVID-19 either December 31, 2019 or "the first couple days of 2022." Fauci Dep. 34:8-11.

**RESPONSE:** Disputed. Dr. Fauci testified that he first became aware of the outbreak of COVID-19 either December 31, 2019 or "the first couple days of 2020," not 2022. Fauci Dep. 34:8-11. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

632.    Dr. Fauci recounts that he first became aware of concerns that the SARS-CoV-2 virus that causes COVID-19 "might have been genetically engineered or originated in a laboratory" when "[t]here was a phone call in late January of 2020, I believe, from Jeremy Farrar. There was one other person on the phone. I believe it was [K]ristian [Andersen], who piped me in on a three-way call, saying that they looked at the virus and there was some concern about the molecular configuration or makeup of the virus that made them think there was a possibility that there could have been a manipulation of the virus." *Id.* at 34:12-35:1.

**RESPONSE:** Undisputed. However, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

633.    Dr. Fauci states that he does not believe that anyone ever raised the concern to him before that late January call, and he specifically attests that he does not recall Dr. Robert Redfield, then-Director of the CDC, raising the concern to him in mid-January 2020. *Id.* at 35:2-15. Dr. Fauci's recollection conflicts with that of Dr. Redfield, who specifically recalls raising this issue to Dr. Fauci earlier in January 2020, and having his concerns fall on deaf ears: "Dr. Robert

Redfield, a virologist and the director of the Centers for Disease Control and Prevention (CDC), had urged Fauci privately to vigorously investigate both the lab and natural hypotheses. He was then excluded from the ensuing discussions—learning only later that they'd even occurred. 'Their goal was to have a single narrative,' Redfield [said]."  Jones Decl., Ex. AA, at 7.

**RESPONSE:** The summary of Dr. Fauci's testimony (i.e., the first sentence of the PFOF) is undisputed. The remainder of this PFOF quotes from a *Vanity Fair* article and is disputed as hearsay, speculation, and journalistic characterization unsupported by citation to evidence of record. However, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

634.   "In mid-January of 2020, … Redfield expressed his concerns in separate phone conversations with three scientific leaders: Fauci; Jeremy Farrar, the director of the U.K.'s Wellcome Trust; and Tedros Adhanom Ghebreyesus, director general of the World Health Organization (WHO). Redfield's message, he says, was simple: 'We had to take the lab-leak hypothesis with extreme seriousness.'"  *Id.* at 23. Dr. Fauci disputes this account and states that this conversation did not happen: "To my recollection, no."  Fauci Dep. 35:9-12.

**RESPONSE:** Disputed to the extent the first two sentences of this PFOF quote from a *Vanity Fair* article and contain hearsay, speculation, and journalistic characterization unsupported by citation to evidence of record. The third sentence is disputed to the extent it suggests that Dr. Fauci was asked during his deposition about Dr. Redfield's account as reported by *Vanity Fair*; he was not shown the article or asked about Dr. Redfield's recollection of events. Undisputed that Dr. Fauci testified that "to [his] recollection" Robert Redfield did not "call him in mid January 2020 and raise" a concern about the virus being genetically engineered or originating in a laboratory. However, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social

media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See*

Defs.' PFOF § II.E., Arg. § II.B.3.b.

635.    On January 27, 2020, Dr. Fauci and several other senior NIAID officials received an email from Greg Folkers, who is his "immediate chief of staff in my office group," *id.* at 38:2-4; the email provided "Talking Points for NIAID Director Dr. Fauci." Fauci Ex. 5. The email stated that "when talking about CoV … we have on our team (Vincent and folks we fund, Peter Daszak, Ralph Baric, Ian Lipkin, etc.) probably the world's experts on non-human coronaviruses. … EcoHealth group (Peter Daszak et al) has for years been among the biggest players in coronavirus work, also in collaboration Ralph Baric, Ian Lipkin, and others." *Id.* at 1. It also flagged the ongoing NIAID grant to Daszak and its work with Wuhan Institute of Virology: "NIAID has funded Peter's group for coronavirus work in China for the past five years through R01 1R01AI110964: 'Understanding the Risk of Bat Coronavirus Emergence.' That's now been renewed." *Id.* It noted that "[t]he results of the work to date include … Found SARS-related CoVs that can bind to human cells (published in *Nature*) and that cause SARS-like disease in humanized mouse models"—a clear reference to the 2015 *Nature Medicine* article. *Id.* Three days later, Dr. Fauci would attach that *Nature Medicine* article to a midnight email to Hugh Auchincloss. Fauci Ex. 6, at 8.

**RESPONSE:** Undisputed. However, this PFOF is irrelevant and contains no evidence that

Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress

any theory on social media. Any assertion to that effect is unsupported by and contrary to the

evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

636.    Like so many other things, Dr. Fauci testifies that he does not recall receiving this email. Fauci Dep. 40:5-6.

**RESPONSE:** Disputed to the extent Plaintiffs' editorial remark, "[l]ike so many other

things," is intended to suggest a lack of credibility on Dr. Fauci's part, which is unsupported by

the cited evidence in this or any other of Plaintiffs' PFOFs, for the reasons already discussed above.

Moreover, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat,

coercion, encouragement, deception, or otherwise, to censor or suppress the lab-leak theory on

social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole.

*See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

637.    Dr. Fauci states that he first became aware of the concern that the virus might be bioengineered and lab-created in a call with Dr. Kristian Andersen of Scripps and Jeremy Farrar of the Wellcome Trust on January 31, 2020. Fauci Dep. 43:17-25. In that call, according to Dr. Fauci, "Jeremy and [K]ristian said they had looked at -- or at least [K]ristian did, possibly Jeremy -- and maybe one other scientist -- and said that it is possible that there may have been a manipulation because it was an unusual virus." Fauci Dep. 44:3-9. A phone call was arranged for the next day, Saturday, February 1, 2020, to discuss the possibility. *Id.* at 44:15-17.

**RESPONSE:** Undisputed, and note that the purpose of the February 1 was "bring[ing] together a group of highly qualified international evolutionary virologists to discuss the issue" of the virus's origin, including potential manipulation, "and to see what the way forward would be to try to clarify that." Fauci Dep. 44:9-13. However, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

638.    According to contemporaneous emails, Eddie Holmes and Bob Garry were involved in this call with Dr. Fauci and Kristian Andersen as well. Fauci Ex. 7, at 2. Eddie Holmes, who was then raising serious concerns that the virus had leaked from a lab, would go on to be the lead drafter of a key article discrediting the lab-leak theory.

**RESPONSE:** The first sentence is disputed on the basis that the email is unclear whether Dr. Garry and Dr. Holmes were involved in the call as opposed to discussions about the origins of COVID-19 generally. The second sentence is disputed as unsupported by citation to any evidence of record. However, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

639.    After the January 31 call with Farrar and Andersen, in the evening of the same day, Dr. Fauci forwarded them an article that was skeptical of the lab-leak theory, stating that "it is of interest to the current discussion." Ex. 6, at 1. Andersen responded, stating that he was not convinced by the article because "one has to look really closely at all the sequences to see that some of the features look (potentially) engineered," and that "after discussion earlier today, Eddie

[Holmes], Bob [Garry], Mike [Laribee], and myself *all find the genome inconsistent with expectations from evolutionary theory*." *Id.* (emphasis added); *see also* Fauci Dep. 51:3-8.

**RESPONSE:** Disputed as a mischaracterization of the email. Andersen does not respond by stating that he was "not convinced of the article." Instead, he said that "[i]t's a great article," but goes on to discuss some of the problems with determining the virus's origin. Additionally, Plaintiffs only partially quote various portions of the email. The first partially quoted sentence reads in full: "The unusual features of the virus make up a really small part of the genome (<0.1%) so one has to look really closely at all the sequences to see that some of the features (potentially) look engineered." Fauci Ex. 6 at 1. The final paragraph of the email, which reads in full: "We have a good team lined up to look very critically at this, so we should know much more at the end of the weekend. I should mention that after discussions earlier today, Eddie, Bob, Mike, and myself all find the genome inconsistent with expectations from evolutionary theory. But we have to look at this much more closely and there are still further analyses to be done, so those opinions could still change." *Id.* Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

640.    A few hours later, shortly after midnight, at 12:29 a.m. on February 1, 2020, Dr. Fauci sent an email to his principal deputy, Hugh Auchincloss. Fauci Ex. 6, at 8. The subject line of the email said "IMPORTANT."  *Id.* The email stated: "Hugh: It is essential that we speak this AM. Keep your cell phone on. … Read this paper as well as the e-mail that I will forward to you now. You will have tasks today that must be done. Thanks, Tony."  *Id.*

**RESPONSE:** Undisputed. However, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

641.    The "this paper" that was attached to the email was the 2015 *Nature Medicine* article entitled "A SARS-like cluster of circulating bat coronaviruses shows potential for human emergence," Fauci Ex. 4, co-authored by Dr. Ralph Baric and Dr. Shi Zhengli and funded by NIAID and the EcoHealth Alliance. Fauci Ex. 6, at 8; Fauci Dep. 55:23-56:25. As an attachment to Dr. Fauci's email, this article was called "Baric, Shi et al – Nature Medicine – SARS Gain of Function.pdf." Fauci Ex. 6, at 8.

**RESPONSE:** Undisputed, except to note that NIAID was among many sources of funding for the research summarized by the cited article. *See* Resp. to Pls.' PFOF ¶ 626. However, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

642.    Dr. Fauci claims that he can recall virtually nothing about sending this urgent, confidential email to his principal deputy in the middle of the night of the day when he found out that highly qualified researchers were concerned that SARS-CoV-2 might have leaked from a laboratory. *See* Fauci Dep. 55:15-63:21 ("I don't recall … I don't know for sure … I can't say that I recall that in particular … I don't recall. I'm not sure exactly why those words got in there … I don't recall … I don't recall … I don't precisely recall … I don't recall if I did … I might have, but I don't recall. … I don't recall. … I don't recall … I don't recall. … I don't recall … I really don't recall … I actually don't recall why I forwarded it to him … I don't recall why I did that … I don't remember … I don't recall speaking to him."). This contrasts starkly with Dr. Fauci's public claim to "remember … very well" key events of the same day. Jones Decl., Ex. X, at 1. Dr. Fauci's claim to an amazing loss of memory about this urgent clandestine email to his confidential deputy is not credible.

**RESPONSE:** Disputed as an argumentative misrepresentation of Dr. Fauci's testimony and the nature of the email. Plaintiffs' assertion that Dr. Fauci's testimony is not credible is contradicted by an accurate presentation of the testimony, in which he recalled a number of important details surrounding the email. Dr. Fauci testified "I don't recall, but I believe—and again, I would say I don't precisely recall, but there was some recollection or someone told you that, you know, we do fund research in China, particularly surveillance research—I think you referred to it when you gave me one of the exhibits about the surveillance of what might be out in

the community among bats. And at my recollection, I brought to Hugh's attention, saying, 'We have to speak in the morning, because I want to find out what the scope of what it is that we are funding so I'll know what we're talking about.' And that's what I was referring to when I said you will have tasks today to give me some information because this was the first that I had heard about specifics of what EcoHealth and what other people were doing, and I wanted my staff to say get me up to date. So that's what I meant by you have work to do." Fauci Dep. 57:19-58:12. Further dispute Plaintiffs' mischaracterization of the email as "clandestine," which assertion is unsupported by any record evidence. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

643.    Dr. Fauci admits, however, that he wanted Auchincloss to find out what coronavirus research NIAID was funding in China before his call later that afternoon with scientists about the lab-leak concerns raised by Andersen and Farrar: "And at my recollection, I brought to Hugh's attention, saying, 'We have to speak in the morning, because I want to find out what the scope of what it is that we are funding so I'll know what we're talking about.'" Fauci Dep. 58:1-5. In particular, Dr. Fauci wanted to find out what EcoHealth Alliance was doing: "this was the first that I had heard about specifics of what EcoHealth and what other people were doing, and I wanted my staff to say get me up to date. So that's what I meant by you have work to do." *Id.* at 58:6-12.

**RESPONSE:** Undisputed, but also note that the cited testimony about the email further refutes Plaintiffs' allegation that Dr. Fauci claimed to recall "virtually nothing" about it, Pls.' PFOF ¶ 642. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole.

*See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

644.    Regarding the "tasks that must be done," Dr. Fauci admits that "I wanted to be briefed on the scope of what our collaborations were and the kind of work that we were funding in China. I wanted to know what the nature of that work was." *Id.* at 59:12-15.

**RESPONSE:** Undisputed, but also note that the cited testimony about the email further refutes Plaintiffs' allegation that Dr. Fauci claimed to recall "virtually nothing" about it, Pls.' PFOF ¶ 642. However, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

645.    The tone of the email and Dr. Fauci's own testimony strongly support the inference that Dr. Fauci sent the email to Auchincloss because he was concerned that NIAID, under his leadership, was funding research in China that might have led to the creation and leak of SARS-CoV-2, and he wanted to know the full extent of NIAID's exposure before his call later that day with scientists and funding authorities. *See also* Fauci Dep. 58:18-25. If it became public that NIAID had funded the creation of SARS-CoV-2, Dr. Fauci and his agency potentially faced an enormous crisis of public credibility and accountability.

**RESPONSE:** Disputed as argumentative and without support in the cited evidence. Neither the email nor the cited testimony from Dr. Fauci supports the PFOF's inference. Dr. Fauci testified that "this [was] the first that I had heard of what we may or may not be funding through EcoHealth and others, and I wanted to get a better scope of just what the terrain [was] of what we were doing in collaboration with different scientists[.]" Fauci Dep. 58:18-25. He elaborated, "that's what I was referring to when I said you will have tasks today"; Dr. Fauci said that he was asking for "information," because he "wanted [his] staff to . . . get [him] up to date." *Id.* at 58:6-12. Thus, the PFOF's characterization of the email's "tone" is not supported by this testimony or the contents of the email itself. Defendants further dispute the use of the phrase "funding authorities" to the extent it is meant to suggest that any individual (including Dr. Fauci or Dr. Collins) has the exclusive authority to make determinations about what research should be funded and that they personally made any funding decisions regarding the research at issue. Additionally, the final sentence of the PFOF is disputed as a conclusory and speculative assertion without

support from the record. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

646.    Immediately after sending Auchincloss the 2015 *Nature Medicine* article, Dr. Fauci also forwarded Auchincloss another article about the possibility that SARS-CoV-2 had leaked from a lab—the Jon Cohen article that he had sent to Kristian Andersen and Jeremy Farrar earlier that evening. Fauci Ex. 6, at 9. This email confirms that Dr. Fauci was deeply concerned about the prospect that NIAID, under his watch, might have funded the creation of the virus causing the global pandemic.

**RESPONSE:** Undisputed expect to the extent the second sentence is argumentative, conclusory, and speculative, and without support in the cited evidence. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

647.    Dr. Fauci denies that, when he sent this email to Auchincloss, he was then concerned that NIAID might have funded the creation of the virus that caused the COVID-19 pandemic. When asked, "Were you concerned at that time that the work that you had funded in China might have led to the creation of the coronavirus?"  Dr. Fauci responded: "I wasn't concerned that it might have."  Fauci Dep. 59:16-19. In light of the tone and content of his emails at the time, and Dr. Fauci's other testimony, this statement is plainly not credible.

**RESPONSE:** Undisputed as to the first three sentences. Disputed as to the last sentence, which is an argumentative mischaracterization contradicted by the evidence (as discussed in response to Plaintiffs' earlier unfounded attacks on Dr. Fauci's credibility) and without citation to the record. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on

social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole.

*See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

648.    According to Dr. Fauci, when he participated in the secret call with the scientists and funding authorities later that afternoon on Saturday, Feb. 1, 2020, he did not share with them that NIAID had been funding "SARS Gain of Function" research in China leading to the outbreak of COVID-19. Fauci Dep. 63:22 ("I don't believe I did.").

**RESPONSE:** Disputed as argumentative and as a mischaracterization of the nature of the call—which was not "secret"—and the relevance of NIH-funded research to the matters discussed on the call. The PFOF cites no evidence for the conclusory assertion that the call was "secret," and in fact the evidence shows that the February 1, 2020, call was an initial discussion with the goal of involving "a larger group of evolutionary virologists," Fauci Dep. 58:19-20, in an "open" and "neutral" inquiry into the "evolutionary origins of 2019-nCoV," Fauci Ex. 8, at 5. Further disputed as to the use of the phrase "funding authorities." *See* Resp. to Pls.' PFOF ¶ 645. Also disputed as to the implication that NIAID had been funding "SARS Gain of Function research." Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

649.    In fact, once again, Dr. Fauci claims that he does not recall what he said on the clandestine February 1, 2020 phone call. *Id.* at 64:17 ("I don't recall").

**RESPONSE:** Disputed. The call was not "clandestine." *See* Resp. to Pls.' PFOF ¶ 648. Disputed also as a mischaracterization of Dr. Fauci's testimony. Dr. Fauci explained at length that he was "relatively silent on that call" and "certainly was not one of the people actively engaged in the discussion. I was relatively quiet because I wanted to hear what they had to say." Fauci Dep. 64:17-20. He further testified, again at length: "The only thing I do remember is that there was

what appeared to me to be good faith discussion back and forth between people who knew each other, people who had interacted with each other, so they had mutual respect for each other's opinion. I got that impression in listening and I was in a total listening mode because, as I mentioned, these were evolutionary virologists who were talking about the specifics of what detail made them suspicious that it could have been a manipulation and the other side would counter and show that this is compatible with a natural evolution and they were going back and forth. The tenure of it ended that we need more time and I believe that in one of the e-mails you asked me about a little bit ago that they said we need some time to more carefully look at this to see if we can come to a sound conclusion based on further examination of the sequences." Fauci Dep. 77:11-78:9. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

650.    At 1:19 p.m. on Saturday, Feb. 1 – about forty minutes before the secret conference call to discuss the lab-leak concern – Dr. Fauci also forwarded the "Baric, Shi et al – Nature Medicine – SARS Gain of Function" article to Lawrence Tabak of the NIH, saying only "Here it is."  Fauci Ex. 6, at 15. Lawrence Tabak was then "the deputy director of the National Institutes of Health," the principal deputy to then-NIH Director Dr. Francis Collins. Fauci Dep. 65:8-11.

**RESPONSE:** Disputed as argumentative and as a mischaracterization of the nature of the call, which was not "secret." *See* Resp. to Pls.' PFOF ¶ 648. The remaining allegations are undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

651.    Dr. Fauci testified that "I don't recall why" he sent the 2015 *Nature Medicine* article to Lawrence Tabak, but he admits that it was likely to get it into the hands of Dr. Francis Collins,

who was about to participate in the 2:00 p.m. secret conference call with Dr. Fauci and the other scientists. *Id.* at 66:15-17. Dr. Fauci claims that this was "to make sure *everyone* was aware of what the discussions were," *id.* at 66:13-15, but that is not credible in light of his testimony that he did not alert any of the *other* scientists on the call to the concern that NIAID was funding "SARS Gain of Function" research in China. *Id.* at 63:22.

**RESPONSE:** Disputed as argumentative and as a mischaracterization of the nature of the call, which was not "secret." *See* Resp. to Pls.' PFOF ¶ 648. Further disputed as argumentative and a mischaracterization of Dr. Fauci's testimony, wherein "everyone" clearly refers to relevant NIH leadership and not everyone on the call. Additionally, disputed because the PFOF makes claims about Dr. Fauci's motives and intentions, without supporting evidence. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

652.    The more compelling inference is that Dr. Fauci wanted Dr. Collins to know that NIAID and NIH faced enormous exposure if the lab-leak theory turned out to be true or publicly accepted. Dr. Collins, along with Dr. Fauci, had publicly championed gain-of-function research since at least 2011, and NIH had jointly funded Dr. Shi Zhengli's work at the Wuhan Institute of Virology through NIAID and the National Institute of Aging. Fauci Ex. 4, at 5 (referring to "grants from the National Institute of Allergy & Infectious Disease and the National Institute of Aging of the US National Institutes of Health (NIH)").

**RESPONSE:** Disputed. This entire paragraph makes unsupported arguments, inferences, and speculative assumptions that are contradicted by the evidence, as discussed above. Further disputed that Dr. Collins and Dr. Fauci "publicly championed gain-of-function research since at least 2011." *See* Resp. to Pls.' PFOF ¶ 603. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

653.    On Saturday, Feb. 1, 2020, at 11:47 a.m., Hugh Auchincloss emailed Dr. Fauci in response to his 12:29 a.m. email. The subject line stated only "Continued."  Auchincloss stated: "The paper you sent me [*i.e.*, the 2015 *Nature Medicine* article on 'SARS Gain of Function'] says the experiments were performed before the gain of function pause but have since been reviewed and approved by NIH. Not sure what this means since Emily is sure that no Coronavirus work has gone through the P3 framework. She will try to determine if we have any distant ties to this work abroad."  Fauci Ex. 6, at 16. At 5:51 p.m., Dr. Fauci responded: "OK. Stay tuned." *Id.*

**RESPONSE:** Undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

654.    "Emily" in Auchincloss's email "is Emily Erbelding, the Director of the Division of Microbiology and Infectious Diseases at NIAID," who "would have been the one who was closest to the ground in understanding what we were doing in funding China." Fauci Dep. 70:14-18. The "P3 framework" refers to the special approval process required for funding of gain-of-function research on coronaviruses that may cause pandemics, as "P3" stands for "potential pandemic pathogens."  *See* National Institutes of Health, Office of Science Policy, *Gain of Function Research*, at https://osp.od.nih.gov/policies/national-science-advisory-board-for-biosecurity-nsabb/gain-of-function-research/ ("Certain gain-of-function studies with the potential to enhance the pathogenicity or transmissibility of potential pandemic pathogens (PPPs) have raised biosafety and biosecurity concerns…"). Thus, Auchincloss and Dr. Fauci had evidently discussed the concern that NIAID had funded the creation of "potential pandemic pathogens" at the Wuhan Institute of Virology, and Dr. Fauci was concerned about NIAID's "ties to this work abroad."  Fauci Ex. 6, at 16.

**RESPONSE:** The first two sentences are undisputed. The last sentence is disputed as an assumption about what Drs. Fauci and Auchincloss "evidently discussed" without support in the cited evidence. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

655.    Dr. Fauci admits that this email confirms that he "wanted to be briefed as to the extent of our involvement with funding in China," Fauci Dep. 71:2-4—in particular, NIAID's funding of the Wuhan Institute of Virology, as a global SARS-like pandemic emerged from Wuhan.

**RESPONSE:** Undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

656.    Dr. Fauci also admits that he may have raised the concern with Auchincloss that Dr. Baric's and Dr. Shi Zhengli's research reflected in the 2015 *Nature Medicine* article may have been illegally funded in violation of the GoF Pause in effect from 2014 to 2017. Fauci Dep. 71:14-20 ("Q: Did you raise a specific concern with Hugh that the research reflected in the Baric, Shi Nature Medicine paper may have been inconsistent with the pause on -- gain-of-function funding research?  A. That is possible.").

**RESPONSE:** Disputed. Dr. Fauci was not asked whether he was concerned that research may have been "illegally funded…" As the quoted testimony demonstrates, Dr. Fauci was asked whether he raised a concern that the research was inconsistent with a policy. He stated: "That is possible. As I've said, again, very consistent with what I've been saying, I wanted to make sure I had a good feel for the scope of what we were doing regarding research that we fund in China. Since that was not something that was on my radar screen . . . [as] this is a $120,000 a year grant in a $6.3 billion portfolio." Fauci Dep. 71:20-72:2. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

657.    On Saturday, Feb. 1, 2020, Jeremy Farrar sent an email organizing a secret conference call at 2:00 pm EST to a group of scientists and science-funding authorities. Fauci Ex. 6, at 17-18. The first thing that Farrar noted in the email, in bold, was "**Information and discussion is shared in total confidence and not to be shared until agreement on next steps.**" *Id.* at 17 (bold in original).

**RESPONSE:** Disputed as to Plaintiffs' characterization that the February 1, 2020 conference call was "secret." *See* Response to Pls.' PFOF ¶ 648. Further disputed as a

mischaracterization of the document to the extent the PFOF suggests that the quoted line was uniquely emphasized by Dr. Farrar. In fact, the entirety of the instructions for the call-in, including the date and length of time, was in bolded typeface. *See* Fauci Ex. 6 at 17. Further disputed as to the use of the phrase "funding authorities." *See* Resp. to Pls.' PFOF ¶ 645. The remaining allegations are undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

658.    Separately, Farrar sent just Dr. Fauci an email on the morning of Feb. 1 to ensure that he could join the call, stating "Could you join?" Fauci Ex. 7, at 12. In that email, Farrar listed the participants and stated, "My preference is to keep this a really tight group. … Obviously ask everyone to treat in total confidence." *Id.* He also stated that the purpose of the call was "To listen to the work of Eddie, Bob and Kristian have done. Question it. And think through next steps." *Id.*

**RESPONSE:** Undisputed, except to the extent the PFOF is suggesting that Dr. Farrar would not have moved forward with the call if Dr. Fauci could not join. The email states: "If you cannot make it, we will phone you afterwards to update." Fauci Ex. 7 at 12. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

659.    Dr. Fauci described the call as an open debate about the lab-leak theory among "a larger group of evolutionary virologists," Fauci Dep. 58:19-20, but in fact the call included a heavy representation of international government and science-funding authorities—including Dr. Fauci, Director of NIAID; Dr. Francis Collins, Director of NIH; Jeremy Farrar, head of the Wellcome Trust, the United Kingdom's "predominant" science-funding authority; Paul Schreier, the Chief Operating Officer of the Wellcome Trust who is responsible for "research funding" there; and Sir Patrick Vallance, the chief medical advisor to the U.K. government. Fauci Ex. 6, at 18; *see also* Fauci Dep. 75:11-76:15. All these people had a strong vested interest in avoiding a major scandal about international science-funding practices—such as the concern that Western governments may have funded the creation of a deadly virus that escaped from a lab and infected millions of people.

As funding authorities who control the distribution of massive amounts of research funding, they also had powerful influence over the research scientists on the call.

**RESPONSE:** Disputed in that this paragraph makes inferences and assumptions that are not supported by evidence. That some participants on the call led research agencies and may be involved in funding decisions made by those research agencies does not contradict Dr. Fauci's testimony that the call involved an open debate about the origins of COVID-19 among "a larger group of evolutionary virologists." It would be reasonable for high-level international authorities in science to have a discussion about the origins of COVID. Moreover, the PFOF's assumption about the interests of the participants on the call is conclusory and speculative and lacks any citation to the record. In fact, the record shows an open debate about potential origins of COVID-19 based on the limited information available at the time, and a goal among participants to urge "a body like the [World Health Organization] . . . to ask or commission a group of scientists from around the world to ask the neutral question[:] 'To understand the evolutionary origins of 2019-nCoV, important for this epidemic and for future risk assessment and understanding of animal/human coronaviruses.'" Fauci, Ex. 8, at 5. Further disputed as to the use of the phrase "funding authorities." *See* Resp. to Pls.' PFOF ¶ 645. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

660.    Dr. Fauci took steps to ensure that Dr. Francis Collins would be included on the call "since he's the director of NIH." Fauci Dep. 75:4-6. Dr. Fauci evidently spoke with Dr. Collins before the call, as he emailed Farrar before the call stating, "Jeremy: Francis will be on the call. He is trying to phone you." Fauci Ex. 7, at 17. Farrar then emailed Dr. Collins stating, "Francis Call me on [redacted]." Fauci Ex. 7, at 19.

**RESPONSE:** Disputed that "Dr. Fauci evidently spoke with Dr. Collins before the call."

Dr. Fauci testified: "I believe I sent him an e-mail or somehow connected him with the pending

phone call." Fauci Dep. 75:7-10. The remaining facts are undisputed. Regardless, this PFOF is

irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement,

deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that

effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. §

II.B.3.b.

661.    Like the 12:29 a.m. email to Auchincloss, Dr. Fauci repeatedly claimed that he
could not recall virtually any details about the 2:00 p.m. secret conference call with scientists and
funding authorities about the lab-leak theory. Fauci Dep. 63:19-67:11 ("I don't recall bringing this
up … I don't recall … I don't recall … I don't recall when it was … I don't recall … I don't believe
that Larry was, but he could have been … I don't recall"); Fauci Dep. 73:20-74:14 ("I don't recall
a discussion about confidentiality or not … I may have. I don't recall."); Fauci Dep. 77:13-15 ("Do
you remember anything that anybody said on the call?  A: No."); Fauci Dep. 78:10-83:10 ("I don't
recall whether that was discussed … I don't recall anything from that phone call that said that …
I'm not sure if I discussed it … I have a vague recollection that there was a concern … It is certainly
possible, but I don't specifically remember … I don't specifically recall.").

**RESPONSE:** Disputed as a mischaracterization of Dr. Fauci's testimony, in which Dr.

Fauci recalled quite a bit about this phone call. Dr. Fauci testified: "The only thing I do remember

is that there was what appeared to me to be good faith discussion back and forth between people

who knew each other, people who had interacted with each other, so they had mutual respect for

each other's opinion. I got that impression in listening and I was in a total listening mode because,

as I mentioned, these were evolutionary virologists who were talking about the specifics of what

detail made them suspicious that it could have been a manipulation and the other side would

counter and show that this is compatible with a natural evolution and they were going back and

forth. The ten[or] of it ended that we need more time and I believe that in one of the e-mails you

asked me about a little bit ago that they said we need some time to more carefully look at this to

see if we can come to a sound conclusion based on further examination of the sequences." 77:11-

78:9. Further disputed as a mischaracterization of the nature of the call as "secret." *See* Resp. to

Pls.' PFOF ¶ 648. Also disputed as to the use of the phrase "funding authorities." *See* Resp. to Pls.'

PFOF ¶ 645. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

662.    This testimony to near-complete lack of memory about the call stands in stark contrast to Dr. Fauci's public statements a year and a half after the call occurred, when FOIA releases of Dr. Fauci's emails finally revealed to the public that this secret call had occurred. Then, Dr. Fauci stated, "I remember it very well."  Jones Decl., Ex. X, at 1. Dr. Fauci's testimony about lack of recall is not credible.

**RESPONSE:** Disputed as a mischaracterization of Dr. Fauci's testimony for the reasons stated in response to Plaintiffs' PFOF ¶ 661. Further disputed as a mischaracterization of the nature of the call as "secret." *See* Resp. to Pls.' PFOF ¶ 648. Moreover, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

663.    Notwithstanding his repeated testimony that he cannot recall specifically what was said on the call, Dr. Fauci provided a self-justifying and innocent account of the call, describing it as a good-faith discussion among scientists trying to get to the truth without any preconceived biases. *See, e.g.,* Fauci Dep. 77:16-18 ("[T]here was what appeared to me to be good faith discussion back and forth between people who knew each other"); Fauci Dep. 79:23-80:1 ("I think the general feeling among the participants on the call is that they wanted to get down to the truth and not wild speculation about things."); Fauci Dep. 80:9-10 ("I don't think there was any other concern than sticking with the truth and sticking with data").

**RESPONSE:** Disputed to the extent Plaintiffs suggest that Dr. Fauci's recollection of the call is not credible, for the reasons discussed above. *See* Resps. to Pls.' PFOF ¶¶ 649, 661. Moreover, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

664.    Dr. Fauci thus seeks to have his cake and eat it too—he claims both to remember little or nothing of what was said on the call, and to clearly remember that the entire discussion was done in good faith and without any bias. In any event, subsequent communications and events make clear that Dr. Fauci's testimony on this point is not credible, as discussed in detail below, as an aggressive plot to discredit the lab-leak theory commenced immediately after the call.

**RESPONSE:** Disputed as an argumentative mischaracterization unsupported by the evidence and without citation to the record. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

665.    Almost an hour into the 2:00 pm call, at 2:56 p.m., Jeremy Farrar sent a cryptic email to Fauci, Collins, Vallance (all science funders) and Mike Ferguson, stating, "Can I suggest we shut down the call and then redial in?  Just for 5-10 mins?"  Dr. Fauci responded, "Yes."  Fauci Ex. 7, at 26. Dr. Fauci claims he cannot recall whether this occurred. Fauci Dep. 92:1-93:6.

**RESPONSE:** Disputed as to Plaintiffs' characterization that Jeremy Farrar's email was "cryptic," as the email makes a clear suggestion to "shut down the call and then redial in." The remaining facts are undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

666.    Dr. Fauci testified that the call participants concluded that they needed more time to take a much closer look at the biology of the virus and genetic sequences before coming to a conclusion about the virus's origins, and they planned to take more time to continue their inquiry afterward. *See* Fauci Dep. 78:3-9 ("The ten[or] of it ended that we need more time … they said we need some time to more carefully look at this to see if we can come to a sound conclusion based on further examination of the sequences."); Fauci Dep. 80:24-25 ("The plan was to go and spend more time carefully looking at it."). In fact, Eddie Holmes and Kristian Andersen began drafting an article concluding that the lab-leak hypothesis was baseless and rooted in animus immediately after the call ended, and Dr. Fauci received an initial draft of this article by the next Tuesday morning. *See infra*. Dr. Fauci's testimony on this point is not credible.

**RESPONSE:** The first sentence is undisputed. The second sentence is disputed as Plaintiffs provide no evidence or citation to the record regarding when Eddie Holmes and Kristian Andersen began drafting an article, what the article concluded, or what research or information (perhaps obtained well after the call) the article was based on. The third sentence is disputed as argumentative. Plaintiffs' conclusory assertion that Dr. Fauci's testimony is not credible is unsupported by the speculation and surmise that precedes it. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

667.   Dr. Fauci testified that his next interaction with the call's participants was when Kristian Andersen sent him a preprint of that article attacking the lab-leak theory. Fauci Dep. 82:19-83:1. In fact, before the preprint, Holmes and Farrar had sent Dr. Fauci at least *four* drafts of the article to review. *See infra.* Dr. Fauci's testimony is not credible on this point.

**RESPONSE:** Disputed as argumentative and a mischaracterization of Dr. Fauci's testimony, as Dr. Fauci testified that, while he did not recall what communications he had had in between the call and the preprint, he and Jeremy Farrar "know each other reasonably well" and he would not be surprised if they had additional communications. Fauci Dep. 82:12-3:10. Also disputed to the extent the PFOF characterizes a scientific paper as "attacking" any theory rather than examining the scientific data and adopting a particular hypothesis about the virus's origin based on that data (as would be expected of a scientific research paper). Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

668.    Dr. Fauci states that he cannot remember if he had further discussions with Jeremy Farrar, Francis Collins, and Patrick Vallance surrounding this call on Feb. 1, 2020. Fauci Dep. 83:2-10; 85:8-23, 90:25-91:15, 92:1-21. In fact, Dr. Fauci sent Jeremy Farrar a lengthy email that is entirely redacted at 12:38 a.m. on Saturday, Feb. 1, 2020, Fauci Ex. 7, at 1; Farrar emailed Fauci on Jan. 30 stating "Tony Perfect timing – thank you. Great to catch up," and provided Sir Patrick Vallance's phone number, Fauci Ex. 7, at 4; Fauci emailed Farrar and Vallance on Jan. 30, stating "Thanks, Jeremy. Great chatting with you and Patrick. Will stay in close touch," Fauci Ex. 7, at 4; Jeremy Farrar sent Dr. Fauci an email on Friday, Jan. 31, stating "Tony  Really would like to speak with you this evening  It is 10pm now UK  Can you phone me on [redacted]," Fauci Ex. 7, at 3; Farrar and Sir Patrick Vallance had a three-way call with Dr. Fauci on Jan. 30, 2020, Fauci Ex. 7, at 4; Farrar emailed Fauci and Collins after the call referring to "Conversations with you and Tony, and Patrick and others," Fauci Ex. 7, at 34; among others. Dr. Fauci had extensive discussions with Jeremy Farrar, Francis Collins, and Patrick Vallance surrounding the 2:00 p.m. February 1, 2020 secret conference call, and his testimony to the contrary is not credible.

**RESPONSE:** Disputed as an argumentative mischaracterization of Dr. Fauci's testimony

that is unsupported by the cited evidence. The "further communications" cited by Plaintiffs

actually *pre-date* the 2:00pm February 1, 2020, phone call: an email at 12:38 a.m. on Saturday,

Feb. 1, 2020, Fauci Ex. 7 at 1, emails on January 30 and 31, a phone call on January 30. Moreover,

it is not surprising that Dr. Fauci is unable to recall minute and irrelevant details like an email

stating "Tony Perfect timing – thank you. Great to catch up," nearly three years ago during the

midst of a global pandemic. The PFOF thus does not cast doubt on Dr. Fauci's credibility. Further

disputed as a mischaracterization of the nature of the call as "secret." *See* Resp. to Pls.' PFOF

¶ 648. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat,

coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social

media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See*

Defs.' PFOF § II.E., Arg. § II.B.3.b.

669.    After the call, Francis Collins emailed Farrar and stated, "Hi Jeremy, I can make myself available at any time 24/7 for the call with Tedros. Just let me know. Thanks for your leadership on this critical and sensitive issue."  Fauci Ex. 7, at 34. Farrar responded, "We are altogether as you know!"  Fauci then chimed it: "Thanks, Jeremy. We really appreciate what you are doing here."  Fauci Ex. 7, at 34. "Tedros" refers to the director of the World Health Organization. Fauci Dep. 95:6-7.

**RESPONSE:** Undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

670.    After the call, Dr. Fauci described the scientists as engaging in a careful investigation of the virus: "[K]ristian and a few of the others carefully got together and looked at it and examined the pros and the cons and the ups and downs, and came to the conclusion that their initial concern about the molecular basis of the concern was unwarranted and that what they saw was quite compatible and, in fact, suggestive of a natural evolution." Fauci Dep. 81:8-15. In fact, Eddie Holmes and Kristian Andersen immediately began drafting an article attacking the lab-leak theory with no further investigation, which was sent to Dr. Fauci in less than three days. *See infra.* Dr. Fauci's testimony on this point is not credible.

**RESPONSE:** The first sentence is undisputed. The second sentence is disputed as unsupported by the evidence and lacking any citation to the record regarding when Eddie Holmes and Kristian Andersen began drafting an article, or the type of research or investigation they conducted before drafting it. Moreover, the second sentence is disputed to the extent the PFOF characterizes a scientific paper as "attacking" any theory rather than examining the scientific data and adopting a particular hypothesis about the virus's origin based on that data (as would be expected of a scientific research paper). The third sentence is disputed as argumentative and unsupported by the evidence cited in the PFOF, which does not cast doubt on Dr. Fauci's credibility. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

671.    Farrar emailed Dr. Tedros of the World Health Organization and two senior WHO officials, along with Dr. Fauci and Dr. Collins, indicating that he had just spoken to the senior WHO officials and "[f]ully agree with your summary." Fauci Ex. 8, at 1. Farrar emphasized the "urgency and importance" of the lab-leak question because of the "[g]athering interest evident in the scientific literature and in mainstream and social media to the question of the origin of this

virus," and thus it was "[c]ritical" to "get ahead of the science and the narrative of this" instead of "reacting to reports which could be very damaging." Fauci Ex. 8, at 1. He also wrote, "I am sure I speak for Francis [Collins] and Tony [Fauci] when I say we are here and ready to play any constructive role in this," as they "[d]o think this is an urgent matter to address." *Id.*

**RESPONSE:** Disputed because the PFOF plucks isolated quotations from their context and thus does not accurately portray the email's contents. The email included a list of items summarizing discussions regarding the virus's origins and encouraging the convening of an international body to consider the issue further, including: "Has to be framed as 'To understand the source and evolution of the 2019n-CoV'"; "Appreciate the urgency and importance of this issue in the midst of a very troubling epidemic"; and "Critical that responsible, respected scientists and agencies get ahead of the science and the narrative of this and are not reacting to reports which could be very damaging." Fauci Ex. 8, at 1. As earlier emails stated, delaying looking into the issue further could cause the discussions surrounding the virus's origins to become "more polari[z]ed," with people "try[ing] to deflect issues by blaming someone somewhere," which "may only increase tension and reduce cooperation." *Id.* at 7. Such cooperation, Dr. Fauci testified, was "necessary to really continue to pursue what actually happened in order to prepare for and prevent similar things from happening in the future." Fauci Dep. 102:17-25. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

672.    Thus, Farrar, joined by Fauci and Collins, sent a message to the WHO that they wanted to "get ahead" of potentially damaging "narrative[s]" that might emerge "in mainstream and social media" about the origins of the virus. *Id.*

**RESPONSE:** Disputed as a mischaracterization of the evidence, which is an email from Jeremy Farrar, not Drs. Fauci or Collins. Moreover, the selectively quoted language misconstrues

the email; the quoted portion of the email reads in full: "Critical that responsible, respected scientists and agencies get ahead of the science and the narrative of this and are not reacting to reports which could be very damaging." Fauci Ex. 8 at 1. As earlier emails stated, delaying looking into the issue further could cause the discussions surrounding the virus's origins to become "more polari[z]ed," with people "try[ing] to deflect issues by blaming someone somewhere," which "may only increase tension and reduce cooperation." *Id.* at 7. Such cooperation, Dr. Fauci testified, was "necessary to really continue to pursue what actually happened in order to prepare for and prevent similar things from happening in the future." Fauci Dep. 102:17-25. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

673.    Later that day, on Feb. 2, Farrar separately emailed Fauci and Collins, stating "Tedros and Bernhard have apparently gone into conclave…they need to decide today in my view. If they do prevaricate, I would appreciate a call with you later tonight or tomorrow to think how we might take forward." Fauci. Ex. 8, at 2. He also stated, "Meanwhile…." And linked to an online article speculating about the lab-leak origins of the virus—again indicating that Fauci, Farrar, and Collins were concerned about controlling online discourse about the lab-leak theory. *Id.*

**RESPONSE:** Disputed as a mischaracterization of the evidence, which is an email from Jeremy Farrar, not Drs. Fauci or Collins, which email was sent *earlier* that day, not later. *See* Fauci Ex. 8 at 1-2. Moreover, this short email from Jeremy Farrar does not explicitly or implicitly show that Drs. Farrar, Fauci, or Collins may have been concerned "controlling online discourse about the lab-leak theory," as opposed to ensuring that the question of the virus's origins was analyzed objectively and urgently and was not overwhelmed by uninformed speculation. As earlier emails stated, delaying looking into the issue further could cause the discussions surrounding the virus's

origins to become "more polari[z]ed," with people "try[ing] to deflect issues by blaming someone somewhere," which "may only increase tension and reduce cooperation." *Id.* at 7. Such cooperation, Dr. Fauci testified, was "necessary to really continue to pursue what actually happened in order to prepare for and prevent similar things from happening in the future." Fauci Dep. 102:17-25. The article Dr. Farrar sent appears to report on claims that the "coronavirus contains hiv insertions." Fauci Ex. 2 at 2. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

674.    The day after the conference all, Sunday, Feb. 2, Dr. Fauci, Jeremy Farrar, and Dr. Collins shared a series of emails (1) acknowledging that there were very serious arguments in favor of the lab-leak theory, and (2) repeatedly expressing concern about the lab-leak theory's involvement on "social media." The group, including Dr. Fauci, repeatedly expressed concern about postings about the lab-leak theory on social media. *See* Fauci Ex. 8.

**RESPONSE:** Disputed as a mischaracterization of Fauci Ex. 8, which reflects a back-and-forth discussion among various scientists regarding the potential origins of COVID-19 based on the evidence then-available. Within this chain of emails, a few individuals reference "distortions on social media," without describing what those are (and not referencing a so-called "lab-leak theory"), as a reason to "move quickly," Fauci Ex. 8 at 2, on having "a body like the WHO . . . ask or commission a group of scientists from around the world to ask the neutral question 'To understand the evolutionary origins of 2019-nCoV, important for the epidemic and for future risk assessment and understanding of animal/human coronaviruses,'" *id.* at 5. Dr. Fauci evidently agreed with moving quickly, stating "[l]ike all of us, I do not know how this evolved, but given the concerns of so many people and the threat of further distortions on social media, it is essential that we move quickly. Hopefully, we can get WHO to convene." *Id.* at 2. This is Dr. Fauci's sole

reference to "distortions on social media" or to social media at all in the email chain. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

675.    First, after the Feb. 1 call, still on Feb. 1, Farrar sent an email to the group expressing concern that "[t]here will be media interest and there is already chat on Twitter/WeChat" about the lab-leak theory, and stating: "In order to stay ahead of the conspiracy theories and social media I do think there is an urgency for a body to convene" to address the lab-leak question. Fauci Ex. 8, at 9.

**RESPONSE:** Disputed that Dr. Farrar's email expresses concern about online discussions about a so-called "lab-leak theory" or with a body convening solely for the purpose of "address[ing] the lab-leak question." The first sentence that the PFOF only selectively quotes reads in full: "I do know there are papers being prepared, there will [be] media interest and there is already chat on Twitter/WeChat." Fauci Ex. 8 at 9. The second selectively quoted sentence follows Dr. Farrar's urging that '[w]e on this call are not the only ones with scientific expertise in this area" and that understanding the origins of COVID-19 would "need a broader range of input" and an "expert group to explore this, with a completely open mind." *Id.* Dr. Farrar then states: "In order to stay ahead of the conspiracy theories and social media I do think there is an urgency for a body to convene such a group and commission some work to – (draft) 'To understand the evolutionary origins of 2019-nCoV, important for this epidemic and for future risk assessment and understanding of animal/human coronaviruses.'" *Id.* at 9-10. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

676.    The next day, Feb. 2, Farrar then expressed concern that "these questions are being asked by politicians, starting in the scientific literature, [and] certainly on social and main stream media. If, and I stress if, this does spread further, pressure and tensions will rise. [I] fear these questions will get louder and more polarized and people will start to look to who to blame. … I am concerned if this is not done quite quickly it will be reacting to what may be lurid claims." Fauci Ex. 8, at 7.

**RESPONSE:** Undisputed, except to note that these concerns are immediately preceded by Dr. Farrar's statement that his "view" on the origins of the COVID-19 virus "is completely neutral," and "[t]he evolutionary origins on this virus are clearly important." Fauci Ex. 8 at 7. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

677.    Another call participant then agreed that "this needs to be discussed urgently," in part "because of the lurid claims on Twitter." Fauci Ex. 8, at 6. He also noted that "if the evolutionary origins of the epidemic were to be discussed, I think the only people with sufficient information or access to samples to address it would be the teams working in Wuhan." *Id.*

**RESPONSE:** Disputed as a mischaracterization of the email, which was not focused on Twitter. The participant stated: "Perhaps this needs to be discussed urgently, not only because of the lurid claims on Twitter but because if it is in a non-human host, pre-adapted, it may threaten control efforts through new zoonotic jumps…" Fauci Ex. 8 at 6. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

678.    The same day, Farrar acknowledged "this is a very complex issue," and again expressed concern about "social and main stream media": "As discussed on the phone this discussion is not limited to those on this email, it is happening wider in the scientific, social and main stream media." Fauci Ex. 8, at 5.

**RESPONSE:** Undisputed, but note that Dr. Farrar's same email stated: "I believe the best way forward is for a body like the WHO has to ask or commission a group of scientists from around the world to ask the neutral question 'To understand the evolutionary origins of 2019-nCoV, important for this epidemic and for future risk assessment and understanding of animal/human coronaviruses'; and "That should be done in an open way and quite quickly so that the world can see it is being done, it can respect the report when it is available and I think that will help with the growing interest of this question." Fauci Ex. 8 at 5. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

679.    Dr. Collins then responded to Farrar and Dr. Fauci only, stating that "a confidence-inspiring framework … is needed, or the voices of conspiracy will quickly dominate, doing great potential harm to science and international harmony."  Fauci Ex. 8, at 5.

**RESPONSE:** Undisputed, but note that Dr. Collins' email opened by stating: "Though the arguments from Ron Fouchier and Christian Drosten are presented with more forcefulness than necessary, I am coming around to the view that a natural origin is more likely." Fauci Ex. 8 at 5. Additionally, as Dr. Fauci testified, the concern among participants in the call was that the discussions surrounding the virus's origins might become "more polari[z]ed" over time, with people "try[ing] to deflect issues by blaming someone somewhere," which "may only increase tension and reduce cooperation." *Id.* at 7. Such cooperation, Dr. Fauci testified, was "necessary to really continue to pursue what actually happened in order to prepare for and prevent similar things from happening in the future." Fauci Dep. 102:17-25. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or

otherwise, to censor or suppress any theory on social media. Any assertion to that effect is

unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

680.   Farrar then shared notes with Fauci, Collins and Tabak (Collins' deputy) from "Mike Farzan (discoverer of SARS receptor)," which stated that Farzan "is bothered by the furin cleavage site [a virus feature that looks bioengineered] and has a hard time explaining that as an event outside the lab," and that "acquisition of the furin site would be highly compatible with the idea of continued passage of virus in tissue culture," *i.e.*, serial passage. Fauci Ex. 8, at 4. Farzan suggested that "a likely explanation" of the virus was serial passage of SARS-like coronaviruses in human cell lines, and he stated that "I am 70:30 or 60:40" in favor of laboratory origins. Fauci Ex. 8, at 3-4.

**RESPONSE:** Undisputed. Regardless, this PFOF is irrelevant and contains no evidence

that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or

suppress any theory on social media. Any assertion to that effect is unsupported by and contrary

to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

681.   Farrar also shared notes from "Bob" [Garry] that he had "aligned" the new virus "with the 96% bat CoV sequenced at WIV [Wuhan Institute of Virology]," and viewed the lab-origin theory as highly likely: "I really can't think of a plausible natural scenario … I just can't figure out how this gets accomplished in nature. Do the alignment of the spikes at the amino acid level – it's stunning."  Fauci Ex. 8, at 4.

**RESPONSE:** Undisputed. Regardless, this PFOF is irrelevant and contains no evidence

that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or

suppress any theory on social media. Any assertion to that effect is unsupported by and contrary

to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

682.   Having shared these notes, Farrar noted, "On a spectrum if 0 is nature and 100 is release – I am honestly at 50!  My guess is that this will remain grey, unless there is access to the Wuhan lab – and I suspect that is unlikely!"  Fauci Ex. 8, at 3. Both Farrar and Collins expressed concerns that the WHO might move too slowly for their liking. *Id.*

**RESPONSE:** Undisputed, except the characterization that Drs. Farrar and Collins

expressed concerns that the WHO might move "too slowly for their liking."  That interpretation is

unsupported by the entirety of the email chain, which shows multiple participants expressing

concerns that the issue of COVID-19's origins needed to be addressed by a broader group objectively and urgently, Fauci Ex. 8 at 1-3, 5-6, and to get ahead of polarization that could undermine efforts "to pursue what actually happened in order to prepare for and prevent similar things from happening in the future," Fauci Dep. 102:17-25. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

683.    Then, still on February 2, 2020, Dr. Fauci wrote to Farrar, Collins, and Lawrence Tabak (Dr. Collins' principal deputy), stating: "Like all of us, I do not know how this evolved, but given the concerns of so many people and *the threat of further distortions on social media*, it is essential that we move quickly. Hopefully, we can get the WHO to convene."  Fauci Ex. 8, at 2 (emphasis added).

**RESPONSE:** Undisputed. Regardless, this PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

684.    Dr. Fauci claimed that he is completely dissociated from social media, stating: "I don't do social media so I'm not familiar with them," Fauci Dep. 98:15-16; and "You know, I'm so dissociated from social media. I don't have a Twitter account. I don't do Facebook. I don't do any of that, so I'm not familiar with that," Fauci Dep. 99:5-8; *see also, e.g.,* Fauci Dep. 103:12-14; 210:3-8; 213:10-16; 241:6-9; 241:21-242:1; 301:10-11 ("I don't pay attention to things related to social media accounts."); *id.* at 312:7-9 ("I can repeat it for the hundredth time, I really don't get involved in social media issues."); *id.* at 356:15-16 ("I'm not a social media person.").

**RESPONSE:** Undisputed. Regardless, this PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

685.    In fact, Dr. Fauci's daughter was then a software engineer at Twitter, Fauci Dep. 99:23-100:15; Dr. Fauci has done numerous podcasts and interviews on social media, including

with Mark Zuckerberg, Fauci Dep. 99:16-19, 101:1-6; Dr. Fauci had specifically expressed concern about "the threat of further distortions on social media" about the lab-leak theory in his contemporaneous email, Fauci Ex. 8, at 2; and Dr. Fauci's communications staff had repeatedly emailed Twitter to try to remove postings critical of Dr. Fauci, *see infra*. Dr. Fauci's professed ignorance of social media is not credible. His communications and conduct make clear that he is keenly aware and deeply concerned about what he believes are "distortions on social media." Fauci Ex. 8, at 2.

**RESPONSE:** Disputed that Dr. Fauci's daughter's past employment as a software

engineer at Twitter (*see* Fauci Dep. 100:3-7 (stating that his daughter "used to" work at Twitter)),

his podcasts or interviews that appear on social medial, his one isolated reference to "distortions

on social media," and the work of a handful of staff out of the nearly 2,000 staff employed by Dr.

Fauci in 2020, *see* Nat'l Inst. of Allergy & Infectious Diseases, Congressional Justification FY

2022 (2021) https://perma.cc/L7M4-GLBF, somehow make Dr. Fauci an expert on social media

or show that Dr. Fauci was "keenly aware and deeply concerned about" "distortions on social

media." Further disputed that Dr. Fauci's communications staff "repeatedly emailed Twitter to try

to remove postings critical of Dr. Fauci" rather than occasionally asking Twitter (without Dr.

Fauci's awareness) to remove fake accounts that falsely impersonated Dr. Fauci (which may

violate federal law, *see* 18 U.S.C. § 912). *See* Resp. to Pls.' PFOF ¶¶ 810-11. Regardless, this

PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception,

or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is

unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

686.   Dr. Fauci also testified that "I don't recall anything about social media" in his discussions with Farrar about the origins of the virus. Fauci Dep. 102:17-18. In light of the contemporaneous emails repeatedly raising concerns about discussions of the lab-leak theory on social media, this claim is not credible.

**RESPONSE:** The testimony quoted in the first sentence is undisputed, but otherwise the

PFOF is disputed as an argumentative mischaracterization of the record, unsupported by any

citation. The record does not show "emails" from Dr. Fauci "repeatedly raising concerns about

discussions of the lab-leak theory on social media." That unsupported assertion does not cast doubt on Dr. Fauci's credibility. Regardless, this PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

687.    Dr. Fauci admits that he was "concerned about … there being misinformation or disinformation that would interfere with our trying to save the lives of people throughout the world, which happens when people spread false claims." Fauci Dep. 103:18-22. He states that "misinformation and/or disinformation can lead to loss of life … and that troubles me." Fauci Dep. 104:15-17. This includes the spread of misinformation and disinformation on social media, because "that's part of the way information is disseminated." Fauci Dep. 104:22-23.

**RESPONSE:** Undisputed. However, Dr. Fauci went on to say, "My way of countering false information, and I've been on the record multiple times as saying that, is that my approach is to try [] and flood the system with the correct information as opposed to interfering with other people's ability to say what they want to say." Fauci Dep. 357: 7-18. Regardless, this PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

688.    After Dr. Fauci's email about "the threat of further distortions on social media," Farrar emailed back indicating that the WHO might not move quickly to address the lab-leak theory, and stating to Fauci and Collins: "they need to decide today in my view. If they do prevaricate, I would appreciate a call with you later tonight or tomorrow to think how we might take forward." Fauci Ex. 8, at 2. He also stated: "Meanwhile…." And linked to an online posting expressing concerns about the lab-leak theory – indicating his dominant concern about online speech discussing the lab-leak theory. *Id.*

**RESPONSE:** Disputed to the extent the PFOF is meant to indicate that Dr. Farrar's concern was that the WHO might not move quickly "to address the lab-leak theory." Dr. Farrar repeatedly stated his aim was urging "a body like the WHO . . . to ask or commission a group of scientists from around the world to ask the neutral question 'To understand the evolutionary origins

of 2019-nCoV, important for this epidemic and for future risk assessment and understanding of animal/human coronaviruses.'" Fauci Ex. 8 at 5. Otherwise, undisputed. Regardless, this PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

689.    Soon thereafter, Farrar emailed Dr. Tedros of the WHO and two senior WHO officials, copying Fauci and Collins. Fauci Ex. 8, at 1. Farrar urged the WHO to quickly establish a working group to address the lab-leak theory, and reiterated that they should "[a]ppreciate the urgency and importance of this issue," given the "[g]athering interest evident in the science literature and in mainstream and social media to the question of the origin of this virus," and pressing them to "get ahead of … the narrative of this and not reacting to reports which could be very damaging." Fauci Ex. 8, at 1.

**RESPONSE:** Disputed that Dr. Farrar urged the WHO to establish a working group "to address the lab-leak theory." As the exhibit states, Dr. Farrar sought to urge "a body like the WHO . . . to ask or commission a group of scientists from around the world to ask the neutral question 'To understand the evolutionary origins of 2019-nCoV, important for this epidemic and for future risk assessment and understanding of animal/human coronaviruses.'" Fauci Ex. 8 at 5. Otherwise, undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

690.    Fauci claims that he does not believe there was any further communication between him and Farrar about this issue, despite Farrar's urgent request for a follow-up call if the WHO did not act immediately. Fauci Ex. 8, at 2; Fauci Dep. 109:22-110:7. In light of their subsequent communications, this testimony is not credible.

**RESPONSE:** The first sentence is undisputed. The second sentence is disputed as an argumentative mischaracterization unsupported by the evidence and without citation to the record. The PFOF's unsupported assertion does not cast doubt on the credibility of Dr. Fauci's testimony.

Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat,
coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social
media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See*
Defs.' PFOF § II.E., Arg. § II.B.3.b.

691.    By the early morning of February 4, 2020, Eddie Holmes had already sent a draft
research paper attacking the lab-leak theory to Jeremy Farrar. Fauci Ex. 9, at 1. Holmes noted to
Farrar that, in the draft, he "[d]id not mention [the virus's] other anomalies as this will make us
look like loons." Fauci Ex. 9, at 1. To complete the draft between the afternoon of Saturday, Feb.
1, and the early morning of Tuesday, Feb. 4, Holmes must have started working on it almost
immediately after the Feb. 1 conference call.

**RESPONSE:** Disputed to the extent the PFOF relies on unsupported assumptions
regarding when Eddie Holmes began drafting the referenced article, as Plaintiff's provide no
evidence or citation to the record regarding when Eddie Holmes began drafting. Also disputed to
the extent the PFOF characterizes a scientific paper as "attacking" any theory rather than
examining the scientific data and adopting a particular hypothesis about the virus's origin based
on that data (as scientific would be expected for a scientific research paper to do). Further disputed
to the extent the PFOF is intended to suggest that Dr. Holmes was the sole author of the draft,
which is contradicted by the email stating, "Here's *our* summary so far. Will be edited further."
Fauci Ex. 9 at 1. The quoted text of the email is undisputed, but note also that Dr. Holmes states
that the papers "[a]s it stands . . . is excellent basic science . . . which is a service in itself." *Id.*
Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat,
coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social
media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See*
Defs.' PFOF § II.E., Arg. § II.B.3.b.

692.    Farrar forwarded this draft to Fauci and Collins at 2:01 a.m. on Tuesday morning,
February 4, 2020, in an attachment called "Summary." Fauci Ex. 10, at 3. He noted, "Please treat

in confidence – a very rough first draft from Eddie and team – they will send on the edited, cleaner version later." *Id.*; *see also* Fauci Ex. 12, at 1.

**RESPONSE:** Undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

693.    Dr. Collins responded: "I note that Eddie is now arguing against the idea that this is the product of intentional human engineering," Fauci Ex. 10, at 3, a dramatic reversal of Holmes's position a few days earlier that Holmes and Andersen "find the genome inconsistent with expectations from evolutionary theory." Fauci Ex. 6, at 1. The paper's conclusion was also profoundly at odds with Holmes's statement, in the email sending the draft paper itself, that they would "look like loons" if the paper discussed the virus's other "anomalies" that strongly suggested a lab origin. Fauci Ex. 9, at 1.

**RESPONSE:** Undisputed as to the contents of the cited emails. Disputed to the extent that the PFOF claims there was a "dramatic reversal" of Holmes's position or that the paper was "profoundly at odds" with Holmes's statement. As Dr. Andersen explained in a January 31, 2020 email, he, Holmes, and others tentatively "all find the genome inconsistent with expectations from evolutionary theory. But we have to look at this much more closely and there are still further analyses to be done, so those opinions could still change." Fauci Ex. 6 at 1. It would not be "dramatic," therefore, for opinions to have changed based on further analyses, as Dr. Andersen had indicated might happen. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

694.    Collins also noted that Holmes had not ruled out the possibility of a lab-created virus through serial passage. Fauci Ex. 10, at 3. Farrar responded, stating "Eddie would be 60:40 lab side. I remain 50:50." *Id.* Eddie, however, had already drafted a paper that *refuted* the lab-leak theory, even though he evidently still believed was the better explanation. *See id.*

**RESPONSE:** Disputed as a mischaracterization of the cited emails. Dr. Collins did not note "that Holmes had not ruled out the possibility of a lab-created virus through serial passage." Rather, Dr. Collins noted that "that Eddie is now arguing against the idea that this is the product of *intentional human engineering*. But repeated tissue culture passage is still an option…" Fauci Ex. 10 at 3 (emphasis supplied). Farrar then responded "'Engineered' probably not. Remains very real possibility of accidental lab passage in animals…. Eddie would be 60:40 lab side." It is entirely consistent for Eddie to be 60:40 that there was an accidental lab-leak, while refuting the idea that there was intentional human engineering. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

695.     Regarding the possibility of serial passage, Dr. Fauci noted that "Serial passage in ACE2-transgenic mice" was a possibility for the virus's origin, Fauci Ex. 10, at 2— notably, serial passage in humanized mice as was used in the 2015 *Nature Medicine* study. (Like so many other things, Dr. Fauci claims he does not recall this statement that he wrote. Fauci Dep. 115:22-116:12.) Collins responded, "Surely that wouldn't be done in a BSL-2 lab?" and Farrar answered, "Wild West…." Fauci Ex. 10, at 2. This exchange indicates that that Fauci, Farrar, and Collins were concerned that the coronavirus had been created in Wuhan by serial passage through humanized mice in a low-security [BSL-2] lab and then escaped from that low-security lab—*i.e.*, the precise concerns surrounding the NIAID-funded research at WIV. *Id.*; *see also, e.g.*, Jones Decl., Ex. BB< at 14 ("In the above exchange, the health officials [Fauci, Farrar, and Collins] seem to be contemplating the possibility that the repeated passage of a coronavirus through genetically modified mice in an insufficiently secure lab could have resulted in the accidental emergence and release of SARS-CoV-2.").

**RESPONSE:** Disputed as a mischaracterization of the cited emails. Dr. Fauci's email simply stated "?? Serial passage in ACT2-transgenic mice," Fauci Ex. 10 at 2, and did not express any sort of opinion that it was a possibility for the virus's origin. Moreover, this email exchange does not indicate what Drs. Fauci, Farrar, and Collins may have been contemplating when they wrote those emails. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci

sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any

theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence

as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

696.    Later in the evening of the same day, Tuesday, Feb. 4, Farrar sent Fauci and Collins a second version of draft, entitled "Summary," with the note "Tidied up." Fauci Ex. 12, at 7. Dr. Fauci claims he does not remember receiving these drafts. Fauci Dep. 127:4-10.

**RESPONSE:** Undisputed. Regardless, this PFOF is irrelevant and contains no evidence

that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or

suppress any theory on social media. Any assertion to that effect is unsupported by and contrary

to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

697.    The next day, February 5, 2020, Farrar sent Fauci and Collins a third version of the draft, still entitled "Summary," with a note: "Tony and Francis The revised draft from Eddie, copied here." Fauci Ex. 12, at 8.

**RESPONSE:** Undisputed. Regardless, this PFOF is irrelevant and contains no evidence

that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or

suppress any theory on social media. Any assertion to that effect is unsupported by and contrary

to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

698.    Two days later, on February 7, 2020, Farrar sent Fauci and Collins a fourth version of the same draft, entitled "Summary.Feb7.pdf," with the note in the subject line, "Revised draft." Fauci Ex. 11, at 2. This draft made clear that Holmes and his co-authors planned to aggressively discredit the lab-leak theory. It stated in bold in the beginning "Overview" section: "**Analysis of the virus genome sequences clearly demonstrates that the virus is not a laboratory construct or experimentally manipulated virus.**"  Fauci Ex. 11, at 3 (bold in original).

**RESPONSE:** The first sentence is undisputed. The second sentence is disputed as

argumentative and a mischaracterization of the paper, which was not drafted for the purpose of

"aggressively discredit[ing]" a so-called "lab-leak theory," but instead to present findings on

research into the origins of the COVID-19 virus. The third sentence is undisputed. Regardless, this

PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion,

encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any

assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF

§ II.E., Arg. § II.B.3.b.

699.    This was the *fourth* updated draft that Farrar sent to Fauci and Collins of the paper
discrediting the lab-leak theory in the first week since the Feb. 1 secret conference call. The draft
advocated that genetic evidence "clearly demonstrates" that the lab-leak theory is false. *Id.*

**RESPONSE:** Disputed that the referenced conference call was "secret." *See* Resp. to Pls.'

PFOF ¶ 648. The remaining allegations are undisputed. Notably, Plaintiffs have not cited any

evidence that Drs. Fauci or Collins provided substantive input on the paper, and in fact Dr. Fauci's

testimony confirms that he had "very little input" into the drafts of the paper. Fauci Dep. 196:1-8.

Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat,

coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social

media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See*

Defs.' PFOF § II.E., Arg. § II.B.3.b.

700.    Dr. Fauci claims that he did not have any involvement in Farrar's efforts to push
the WHO to assemble a working group to address the lab-leak theory. Fauci Dep. 110:4-7 ("So I
really would doubt that there was any further communication between me and the WHO about
this. This was fundamentally Jeremy's lane, if you want to call it that."); *id.* at 125:17-19 ("I didn't
have any direct involvement with the WHO, not to my recollection."); *id.* at 131:14-15 ("This was
mostly a Jeremy-led thing"). But in fact, Dr. Fauci sent multiple emails to Farrar urging for the
inclusion of a long list of specific scientists in the WHO's working group. Fauci Ex. 13, at 1-2, 6.

**RESPONSE:** Disputed as a mischaracterization of the testimony and emails. Dr. Fauci did

not testify that he "did not have any involvement" in the effort to convene a WHO working group;

rather, as the quoted testimony shows, Dr. Fauci testified that he "doubt[ed] that there was any

further communication *between me and the WHO* about this," Fauci Dep. 110: 4-7 (emphasis

added), and he did not believe that he had "*direct* involvement with the WHO," *id.* at 125:17-19

(emphasis added). More generally, as to his "involvement" with the WHO, Dr. Fauci testified:

"The context of this email exchange and the theme of the discussion, although I, myself, did not directly get involved in interactions with WHO on this, was that we all felt that given the convening power and the status of the WHO, that we wanted to get them involved because we wanted to make sure that this was an open and transparent discussion that involved international global health authority. So it is perfectly consistent and compatible that I would say we really need to get WHO moving on getting the convening involved because was wanted an open convening so that evidence and data could be openly discussed. That was the theme of everything that was going on at the time." *Id.* at 126:5-18. Also disputed that Dr. Fauci sent multiple emails "urging for the inclusion of a long list of specific scientists" in any working group. Exhibit 13 includes an email from Dr. Fauci stating simply, "I will list below a number of names for potential members of the working group." Fauci Ex. 13 at 2. The list was sent in response to an email from Dr. Farrar stating that the WHO planned to "set up the Group who will 'look at the origins and evolution of 2019n-CoV'" and that the WHO "ha[d] asked for names to sit on that Group – please do send any names." *Id.* at 3. Dr. Fauci then later followed up to say, "Jeremy: I left out an important name of the coronavirus evolution working group. Please include her: Pardis Sabeti at the Broad Institute of MIT and Harvard. Thanks, Tony." *Id.* at 1. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

701.    On Feb. 5, 2020, Farrar emailed Fauci and Collins, stating that he believed that the WHO would assemble a working group to address the lab-leak theory, and urging Fauci and Collins to provide names of scientists to participate in the group. Fauci Ex. 13, at 7. Farrar stated that the WHO "have asked for names to sit on that Group – please do send any names." *Id.* He then stated, "We can have a call this week with a core group of that *to frame the work of the Group* including – if you could join?" *Id.* (emphasis added). And then he stated, "With names to be put forward into the Group from us and *pressure on this group from your and our teams* next week." *Id.* (emphasis added). Plainly, Farrar intended, with Fauci and Collins' assistance, to stack the

WHO's group with their hand-picked scientists, have an advance call "to frame the work of the Group," and to put "pressure on this group from [Fauci's and Collins'] and our teams next week," *id.*—to influence and control the outcome of the WHO Group's deliberations.

**RESPONSE:** Disputed as a mischaracterization of the cited emails, for the reasons stated in response to Plaintiffs' PFOF ¶ 700. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

702.    Fauci and Collins did not dispute this plan. On the contrary, Fauci responded by providing Farrar with a detailed list of eight scientists to include in the WHO's group "in addition to the individuals who were on the call with us last Saturday." Fauci Ex. 13, at 2, 6. Fauci then followed up to his own email with an additional scientist, stating she is "an important name for the coronavirus evolution working group. Please include her." *Id.* at 1. Fauci's attempts to downplay his involvement with the plan to create and control a WHO working group on COVID-19's origins to discredit the lab-leak theory, therefore, are not credible.

**RESPONSE:** Disputed as a mischaracterization of the cited emails, for the reasons stated in response to Plaintiffs' PFOF ¶ 700. The PFOF's unsupported assertions—which are contradicted by the record as a whole—do not cast doubt on the credibility of Dr. Fauci's testimony. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

703.    Dr. Fauci testified that he, Farrar, and Collins "wanted to get them [the WHO] involved because we wanted to make sure that this was an open and transparent discussion," Fauci Dep. 126:9-12, is not credible in light of the contemporaneous email from Farrar to Fauci and Collins plotting to "frame the work of the Group" and put "pressure on this group from your and our teams next week." Fauci Ex. 13, at 3.

**RESPONSE:** Disputed as a mischaracterization of the testimony and cited emails, for the reasons stated in response to Plaintiffs' PFOF ¶ 700. The PFOF's unsupported assertions—which

are contradicted by the record as a whole—do not cast doubt on the credibility of Dr. Fauci's testimony. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

704.    Dr. Fauci claims he does not recall any discussions about framing the work of the Group, or putting pressure on the Group. Fauci Dep. 137:1-21.

**RESPONSE:** Undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

705.    On February 9, 2020, Dr. Fauci participated in a joint podcast with Dr. Peter Daszak of the EcoHealth Alliance to discuss the outbreak of COVID-19. Fauci Ex. 15, at 1.

**RESPONSE:** Undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

706.    Peter Daszak was then involved in organizing a statement for the Lancet seeking to discredit the lab-leak theory, similar to the article then being drafted by Eddie Holmes, of which Dr. Fauci had received four drafts the previous week. *See* Jones Decl., Ex. CC, at 1. Just a few days later, The Lancet would publish a statement of scientists organized and co-signed by Daszak and Jeremy Farrar, which stated: "We stand together to strongly condemn conspiracy theories suggesting that COVID-19 does not have a natural origin." *Id.* Thus, at that time, Daszak was working in parallel with Dr. Fauci, and together with Jeremy Farrar, to produce a published article discrediting the lab-leak theory. *Id.*

**RESPONSE:** Disputed that Dr. Fauci was working with Dr. Daszak to produce the referenced article merely because they participated on a podcast together. Also disputed that the "statement for the Lancet" was "similar" to the "article then being drafted by Eddie Holmes" and

several other virologists. The former is a policy "[s]tatement in support of the scientists, public

health professionals, and medical professionals of China combatting COVID-19," Jones Ex. CC,

at 1, while the latter is a research paper discussing the scientific data supporting a particular

hypothesis of the COVID-19 virus's origins, Fauci Ex. 24. The accuracy of the quoted text of the

policy statement is undisputed. Regardless, this PFOF is irrelevant and contains no evidence that

Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress

any theory on social media. Any assertion to that effect is unsupported by and contrary to the

evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

707.    During the podcast, both Dr. Fauci and Daszak made comments seeking to discredit
the lab-leak theory. Fauci Ex. 16, at 1. Fauci, when asked "Do you have any sense of where [the
virus] probably came from?" answered, "Well I think ultimately we know that these things come
from an animal reservoir. I heard these conspiracy theories and like all conspiracy theories … they
[are] just conspiracy theories…. I think the things you are hearing are still in the realm of
conspiracy theories without any scientific basis for it." *Id.* Daszak was asked, "Is it your sense
that it's almost certain it came from an animal-to-human transmission?" and he responded: "All
the evidence says that is what happened. … It looks to me and to most scientists like it's a bat virus
that got into people either in the market or in rural China and just unfortunately has the capacity
to spread." *Id.*

**RESPONSE:** Undisputed. Regardless, this PFOF is irrelevant and contains no evidence

that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or

suppress any theory on social media. Any assertion to that effect is unsupported by and contrary

to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

708.    On February 11, 2020, Dr. Fauci had a meeting at NIAID with Dr. Ralph Baric, the
corresponding author of the 2015 *Nature Medicine* article about NIAID-funded gain-of-function
research in Wuhan that Dr. Fauci sent to Hugh Auchincloss after midnight on Feb. 1. Fauci Ex.
17, at 1 (Dr. Fauci's official calendar, Feb. 11, 2020, at 2:30 p.m. – "Meeting with Dr. Ralph
Baric"). Dr. Fauci does not dispute that he met with Dr. Ralph Baric that day, but (like so many
other things) he claims that he does not recall the meeting or what they discussed. Fauci Dep.
149:9-10, 149:21-23. As noted above, given that Dr. Fauci was deeply concerned about Baric's
research at the time, Dr. Fauci's testimony on this point is not credible.

**RESPONSE:** Undisputed that Dr. Fauci may have met with Dr. Baric that day, but the remainder of the PFOF is disputed as argumentative and unsupported by the evidence. It is not unreasonable for Dr. Fauci to not specifically remember a meeting that occurred nearly three years earlier during the midst of a global pandemic. Further, the claim that "Dr. Fauci was deeply concerned about Baric's research at the time" is unsupported by any citation to the record, and the conclusory assertion does not cast doubt on Dr. Fauci's credibility. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

709.   On Feb. 11, 2020, Ian Lipkin wrote an email referring to the draft paper about the origins of COVID-19 stating that, while the paper was "well-reasoned and provides a plausible argument against genetic engineering," it "does not eliminate the possibility of an inadvertent release following adaptation through selection in culture at the institute in Wuhan. Given the scale of the bat CoV research pursued there and the site emergence of the first human cases we have a nightmare of circumstantial evidence to assess." Fauci Ex. 18, at 1. Dr. Fauci states that he does not recall this email but that "it's entirely possible that Ian wrote this to me," because "Ian communicates with me." Fauci Dep. 153:15-17.

**RESPONSE:** Disputed that Fauci Ex. 18 is an email, as it appears to be an excerpt from another document and does not contain a To:, From:, cc:, date, or subject lines as one would typically see in an email. It is also unclear whether the statement from Ian Lipkin is in reference to the draft paper that is the subject of this PFOF or something else. Undisputed as to the quoted testimony. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

710.    Dr. Fauci testified that it is "molecularly" impossible that SARS-CoV-2 originated from NIAID-funded research: "molecularly, that could not have happened." *Id.* at 157:21-22. But separately, he repeatedly testified that molecular virology is not his field, so his certainty on this one key point is not credible. *Id.* at 64:8-9 ("that's not my field, evolutionary virology"); *id.* at 117:19-20 ("I'm hesitant to go there because that's not my area of expertise"); *id.* at 127:12-13 ("it was an area that was not my area of expertise"); *id.* at 160:7-9 ("Did I fully understand the molecular virology of it?  Unlikely, because I'm not an evolutionary virologist.").

**RESPONSE:** Undisputed as to the accuracy of the quoted testimony, but disputed as to

the conclusion that Dr. Fauci's opinion is not credible. The quoted pieces of testimony relate to

separate issues. First, Dr. Fauci testified about whether it was possible that the virus could have

developed from research being conducted in a lab in Wuhan, China, that NIAID partially funded.

Fauci Dep. 156:10-157:22. Dr. Fauci testified that it would be "molecularly impossible" for "the

viruses that were studied under the auspices and funding of the subaward to the Wuhan

Institute . . . to become SARS-Cov-2," "even if people tried to manipulate them[.]" *Id.* He

explained: "If you look at the molecular makeup of SARS-CoV-2 and you look at the viruses that

were studied under the auspices and funding of the subaward to the Wuhan Institute, those bat

viruses evaluated *by anyone with even a reasonable acquaintance with evolutionary virology*

would tell you that given those viruses that they worked on, reported on, and published on was so

far removed from SARS-CoV-2, that it would be molecularly impossible, even if people tried to

manipulate them to become SARS-CoV-2 they wouldn't become SARS-CoV-2." *Id.* at 156:16-

157:3 (emphasis added). He explained, in other words, that it did not require "expertise" in

evolutionary virology, only "a reasonable acquaintance," to conclude that NIAID-funded research

did not give rise to COVID-19. Second, Dr. Fauci testified that during the February 1, 2020 call

with a group of international virologist, who were discussing theories relating to the actual origins

of SARS-CoV-2, he was "relatively quiet" because "evolutionary virology" "is not [his] field." *Id.*

at 64:8-9, 19-20. Relatedly, Dr. Fauci testified that he has "very little input" into several

virologists' draft research paper analyzing the virus's origins because that "is not [his] area of expertise." *Id.* at 127:9-13. Thus, he explained that when Dr. Farrar forwarded him a draft of the research paper, he would have "look[ed] through it," but he likely would not have "fully understood the molecular virology of it," because he's "not an evolutionary virologist"; therefore, it is "[u]nlikely" that he would have "ma[d]e any substantive comments on it." *Id.* at 160:7-12. Third, Dr. Fauci was separately asked whether "serial passage in ACE2 transgenic mic [is] generally done at BSL-2," and he answered as to his views "in general," but caveated that he was "hesitant to go there because that's not [his] area of expertise." *Id.* at 117:15-23. In other words, Dr. Fauci did not disclaim all knowledge of evolutionary virology, only that he was not an expert in that field. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole.

*See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

711.    On February 17, 2020, the preprint version of the paper drafted by Eddie Holmes attacking the lab-leak theory was released. Fauci Ex. 19. The paper was entitled, "The Proximal Origins of SARS-CoV-2." *Id.* at 12. Its listed authors were Kristian Andersen, Andrew Rambaut, Ian Lipkin, Edward Holmes, and Robert Garry. *Id.* All these authors, except possibly Ian Lipkin, had been participants in the secret phone conference at 2:00 p.m. on Saturday, Feb. 1, 2020. Fauci Dep. 161:7-10.

**RESPONSE:** Disputed as a mischaracterization of the nature of the call as "secret." *See* Response to Pls.' PFOF ¶ 648. Also disputed that the record clearly shows that all of the listed authors except for potentially Ian Lipkin were on the call, as the email chain regarding the call does not include Robert Garry or Ian Lipkin. Fauci Ex. 6 at 17. Also disputed to the extent the PFOF characterizes a scientific paper as "attacking" any theory rather than examining the scientific data and adopting a particular hypothesis about the virus's origin based on that data (as scientific would be expected for a scientific research paper to do). Undisputed as to the remaining

allegations. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

712.    These authors had a financial interest in supporting NIH's preferred narrative. "Garry and Andersen have both been recipients of large grants from NIH in recent years, as has another 'Proximal Origin' author, W. Ian Lipkin of Columbia University." Jones Decl., Ex. BB.

**RESPONSE:** Disputed in that the PFOF makes inferences and assumptions not supported by the evidence. The NIH does not have a "preferred narrative" regarding the origins of the virus, and Plaintiffs cite no evidence to support their assertion to the contrary. Additionally, NIH does not award grants to individuals. Rather, NIH awards grants to institutions, like universities. The grant supports the research activities carried out by personnel identified by the institution under the scope of the grant. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

713.    These authors were stunningly recent converts to the theory of natural origin. On February 11, Ian Lipkin had sent an email about the same paper stating that "we have a nightmare of circumstantial evidence to assess." Fauci Ex. 18, at 1. On February 4, Holmes had written to Farrar that he avoided discussing the virus's "other anomalies as this will make us look like loons." Fauci Ex. 9, at 1.

**RESPONSE:** Undisputed as to the quoted text of the cited emails. Disputed to the extent that there was a "stunning[]" reversal of anyone's opinion on the origin of the virus. As Dr. Andersen explained in his January 31, 2020, email, he, Dr. Holmes, and others "all find the genome inconsistent with expectations from evolutionary theory. But we have to look at this much more closely and there are still further analyses to be done, so those opinions could still change." Fauci

Ex. 6, at 1. It would not be "stunning," therefore, for opinions to have changed based on further analyses. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole.

*See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

714.    On February 2, Bob Garry had written to Farrar, "I really can't think of a plausible natural scenario … I just can't figure out how this gets accomplished in nature. Do the alignment of the spikes at the amino acid level – it's stunning."  Fauci Ex. 8, at 4. On January 31, Andersen had written to Dr. Fauci that the virus's "features (potentially) look engineered," and that "after discussion earlier today, Eddie [Holmes], Bob [Garry], … and myself all find the genome inconsistent with expectations from evolutionary theory."  Fauci Ex. 6, at 1.

**RESPONSE:** Undisputed as to the quoted text of the cited emails. However, as Dr. Andersen explained in his January 31, 2020, email, he, Dr. Garry, Dr. Holmes, and others "all find the genome inconsistent with expectations from evolutionary theory. But we have to look at this much more closely and there are still further analyses to be done, so those opinions could still change." Fauci Ex. 6 at 1. It would not be unreasonable, therefore, for opinions to have changed based on further analyses. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

715.    The preprint version of "The Proximal Origin of SARS-CoV-2" asserted a very different conclusion. It stated that "this analysis provides evidence that SARS-CoV-2 is not a laboratory construct nor a purposefully manipulated virus."  Fauci Ex. 19, at 2. It stated that "genomic evidence does not support the idea that SARS-CoV-2 is a laboratory construct."  *Id.* at 6.

**RESPONSE:** Undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or

suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

716.    Dr. Fauci does not dispute that this preprint was sent to him. Fauci Dep. 160:3-4 ("It is likely that this was sent to me"). Dr. Fauci admits that he reviewed the preprint when it was sent to him. *Id.* at 160:7 ("Did I look through it?  Yes."). And Dr. Fauci admits that he was aware of what their conclusion was about the lab-leak theory. *Id.* at 162:13-15 ("I am certain that having looked at it, I was aware of what their conclusion was.").

**RESPONSE:** Undisputed. Notably, Plaintiffs have not cited any evidence that Drs. Fauci

or Collins provided substantive input on the paper. Regardless, this PFOF is irrelevant and contains

no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to

censor or suppress any theory on social media. Any assertion to that effect is unsupported by and

contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

717.    This was the *fifth* version of the paper that was sent to Dr. Fauci to review, after four drafts sent to him on Feb. 4, 5, and 7. *Id.* at 160:13-16.

**RESPONSE:** Undisputed that the paper was sent to Dr. Fauci. Notably, Plaintiffs have not

cited any evidence that Drs. Fauci or Collins provided substantive input on the paper. Regardless,

this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion,

encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any

assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF

§ II.E., Arg. § II.B.3.b.

718.    On March 6, 2020, Kristian Andersen emailed Dr. Fauci, Dr. Collins, and Jeremy Farrar, stating, "Dear Jeremy, Tony, and Francis, Thanks again for your advice and leadership as we have been working through the SARS-CoV-2 'origins' paper. We are happy to say that the paper was just accepted by Nature Medicine and should be published shortly …. To keep you in the loop, I just wanted to share the accepted version with you, as well as a draft press release. We're still waiting for proofs, so please let me know if you have any comments, suggestions, or questions about the paper or the press release."  Fauci Ex. 22, at 1. He also wrote: "Tony, thank you for your straight talk on CNN last night – it's being noticed."  *Id.*

**RESPONSE:** Undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

719.    Thus, Andersen thanked Dr. Fauci, Collins, and Farrar for their "advice and leadership" about the paper, sent them the final draft, and asked for their input both on the draft and on their public messaging about the draft. *Id.*

**RESPONSE:** Disputed that Andersen thanks Drs. Fauci and Collins for their advice and leadership on the paper specifically, as opposed to (as the email says) their "advice and leadership *as we have been* working through the SARS-CoV-2 'origins' paper." Fauci Ex. 22 at 1. Dr. Fauci testified that he provided "[v]ery little" input on the paper, Fauci Dep. 196:1-8, that he "did not have substantive input into the paper," and that in thanking him for his advice and leadership "Jeremy is being courteous, as he is wont to be. I mean 'advice' could be—and 'leadership' could be we really got to get information out. Thank you for the effort you've put into it. Advice and leadership, to my recollection, had very little to do with substantive input into the paper." *Id.* at 171:16-22. Also disputed that Dr. Fauci provided "advice and leadership" on "public messaging about the draft," which assertion is unsupported by the record and is contradicted by the testimony from Dr. Fauci cited above. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

720.    This was the *sixth* version of the paper that was forwarded to Dr. Fauci for review and input. *Id.*

**RESPONSE:** Undisputed that the paper was sent to Dr. Fauci. Notably, Plaintiffs have not cited any evidence that Drs. Fauci or Collins provided substantive input on the paper. Regardless,

this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

721.    Dr. Fauci responded: "Kristian: Thanks for your note. Nice job on the paper. Tony." *Id.*

**RESPONSE:** Undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

722.    Dr. Fauci denies that he provided "advice and leadership" in the preparation of the paper. Fauci Dep. 171:11-13. In light of the extensive meetings and correspondence detailed above, that testimony is not credible.

**RESPONSE:** Disputed as argumentative and unsupported by the evidence. Dr. Fauci testified that he provided "[v]ery little" input on the paper, Fauci Dep. 196:1-8, that he "did not have substantive input into the paper," and that in thanking him for his advice and leadership "Jeremy is being courteous, as he is wont to be. I mean 'advice' could be—and 'leadership' could be we really got to get information out. Thank you for the effort you've put into it. Advice and leadership, to my recollection, had very little to do with substantive input into the paper." *Id.* at 171:16-22. None of the cited evidence casts doubt on Dr. Fauci's credibility. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

723. On March 17, 2020, *Nature Medicine* published the online version of *The Proximal Origin of COVID-19*. Fauci Ex. 24, at 3. The print version appeared in the April 2020 volume of the journal. *Id.*

**RESPONSE:** Undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

724. The final, published version of the article makes even stronger claims attacking the lab-leak theory than the preprint version. In its opening, the article states: "Our analyses *clearly show* that SARS-CoV-2 is not a laboratory construct or a purposefully manipulated virus." Fauci Ex 24, at 1 (emphasis added). Similarly strong language, leaving no room for doubt, occurs throughout the article: "the genetic data *irrefutably show* that SARS-CoV-2 is not derived from any previously used viral backbone," *id.* at 1 (emphasis added). "This *clearly shows* that the SARS-CoV-2 spike protein optimized for binding to human-like ACE2 is the result of natural selection," *id.* at 2 (emphasis added). "[T]he evidence shows that SARS-CoV-2 is not a purposefully manipulated virus," *id.* at 3. "[W]e do not believe that any type of laboratory-based scenario is plausible." *Id.* at 3. "SARS-CoV-2 originated via natural selection." *Id.* at 3.

**RESPONSE:** Undisputed, except to the extent that the PFOF characterizes a scientific paper as "attacking" any theory rather than examining the scientific data and adopting a particular hypothesis about the virus's origin based on that data (as scientific would be expected for a scientific research paper to do). Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

725. Thus, between the preprint version and final version of the article, the article substantially beefed up its conclusion that the lab-leak theory is implausible and should be discredited. Dr. Fauci claims he does not "recall specific conversations" about that conclusion with the authors, but he admits that he is "sure" that he discussed that conclusion with them: "we read the preprint and, therefore, we knew what the conclusion was, and I'm sure that that conclusion was discussed. So I would not be surprised at all following the initial preprint that I discussed the conclusion of these authors that this is not a laboratory construct or a purposely manipulated virus." Fauci Dep. 181:3-10; *see also id.* at 181:18-22. Based on all these circumstances, it is likely that

Dr. Fauci encouraged the authors to express a stronger and more unequivocal conclusion against
the lab-leak theory than reflected in the preprint.

**RESPONSE:** The assertion that the final version "substantially beefed up" certain

conclusions is disputed as an argumentative and conclusory assertion without citation to the record.

The accuracy of the quoted testimony is undisputed. The final sentence is disputed as a conclusory

and speculative assertion that is unsupported by any citation to the record and is contradicted by

(1) Dr. Fauci's testimony that he had "very little" input into the drafts, Fauci Dep. 127:10-13, and

(2) the absence of any emails showing that Dr. Fauci provided substantive input into the paper.

Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat,

coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social

media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See*

Defs.' PFOF § II.E., Arg. § II.B.3.b.

726.   Once the article "The Proximal Origin of SARS-CoV-2" was released, both Dr.
Fauci and Dr. Collins took steps to push it into prominence. First, on March 26, 2020, Dr. Collins
published a blog post on the article on the "NIH Director's Blog" entitled "Genomic Study Points
to Natural Origin of COVID-19." Fauci Ex. 25, at 1.

**RESPONSE:** Undisputed that Dr. Collins published the referenced blog post. Regardless,

this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion,

encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any

assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF

§ II.E., Arg. § II.B.3.b.

727.   Dr. Collins used strong language relying on the study to attack and discredit the
lab-leak theory as "outrageous" and "debunk[ed]": "Some folks are even making outrageous
claims that the new coronavirus causing the pandemic was engineered in a lab and deliberately
released to make people sick. A new study debunks such claims by providing scientific evidence
that this novel coronavirus arose naturally." Fauci Ex. 25, at 2. Dr. Collins stated that the study
shows that "the coronavirus that causes COVID-19 almost certainly originated in nature," and that
"this study leaves little room to refute a natural origin for COVID-19." Fauci Ex. 25, at 3.

**RESPONSE:** Undisputed, except to the extent that the PFOF is meant to indicate that Dr. Collins used "strong language" to "discredit" any and all theories regarding the potential that the COVID-19 virus originated in a lab and then leaked, either accidentally or intentionally. Dr. Collins used strong language when expressing his views about the claims that the COVID-19 virus may have been "engineered in a lab and *deliberately released* to make people sick." Fauci Ex. 25 at 2 (emphasis added). Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

728.    In his blog post, Dr. Collins did not disclose that he and Dr. Fauci had been part of the group that organized the study, nor that he and Dr. Fauci had reviewed six versions of the study before it was published. Fauci Ex. 25.

**RESPONSE:** Disputed that Dr. Collins or Dr. Fauci either "organized the study" or reviewed six versions of the study before it was published. As Dr. Fauci testified, Jeremy Farrar and Kristian Anderson organized the study and reached out to Dr. Fauci. Fauci Dep. 43:17-25. Dr. Fauci testified that he provided "[v]ery little" input on the paper, *id.* at 196:1-8, that he "did not have substantive input into the paper," and that in thanking him for his advice and leadership "Jeremy is being courteous, as he is wont to be. I mean 'advice' could be—and 'leadership' could be we really got to get information out. Thank you for the effort you've put into it. Advice and leadership, to my recollection, had very little to do with substantive input into the paper." *Id.* at 171:16-22. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

729.    As was evidently intended, Dr. Collins's blog post immediately fueled media coverage attacking the lab-leak theory as a "conspiracy theory." For example, the next day, March 27, 2020, ABC News ran a story entitled, "Sorry, conspiracy theorists. Study concludes COVID-19 'is not a laboratory construct.'" Fauci Ex. 26. The article quoted Bob Garry—who on January 31 had found "the genome inconsistent with the expectations of evolutionary theory," Fauci Ex. 6, at 1, and on February 1 had told Farrar that "I just can't figure out how this gets accomplished in nature … it's stunning," Fauci Ex. 8, at 4—as stating that "[t]his study leaves little room to refute a natural origin for COVID-19." Fauci Ex. 26, at 3-4.

**RESPONSE:** Undisputed as to the contents of the exhibits. Disputed to the extent that Plaintiffs make inferences about the "evident[ ] inten[t]" of Dr. Collins's post without any support in or citation to the record. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

730.    Dr. Fauci testified that he could not remember any contact from Dr. Collins about "The Proximal Origin of SARS-CoV-2" after Dr. Collins' blog post on March 26, 2020. Fauci Dep. 186:19-187:6. In light of their subsequent communications and Dr. Fauci's actions, this testimony is not credible.

**RESPONSE:** Disputed as argumentative and without citation to or support in the evidence. The PFOF does not specify what "communications" or "actions" it is referring to and thus lends no support for the conclusory assertion that Dr. Fauci's testimony is not credible. Regardless, it would be unsurprising that an individual could not recall specific communications from nearly three years ago regarding a specific article that was published in the midst of a global pandemic. Moreover, Dr. Fauci testified that he would not be surprised if Dr. Collins and Dr. Fauci mentioned the article to the other. Fauci Dep. 187:1-6. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

731.    In fact, Dr. Collins emailed Dr. Fauci about the article on Thursday, April 16, 2020. Fauci Ex. 27. The email linked to a Fox News piece by Bret Baier alleging that sources were "increasingly confident" that SARS-CoV-2 originated in a lab, and it stated: "Wondering if there is something NIH can do to help put down this very destructive conspiracy, with what seems to be growing momentum." Fauci Ex. 27, at 1. Dr. Collins stated, "I hoped the Nature Medicine article on the genomic sequence of SARS-CoV-2 [*i.e.*, "The Proximal Origin of COVID-19] would settle this. … Anything more we can do?" Fauci Ex. 27, at 1.

**RESPONSE:** Undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

732.    Dr. Fauci responded to Dr. Collins at 2:45 a.m. the next day, Friday, April 17, stating only: "Francis: I would not do anything about this right now. It is a shiny object that will go away in times. Best, Tony." Fauci Ex. 27, at 2.

**RESPONSE:** Undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

733.    Dr. Fauci testified that he did not take "any steps to increase the visibility of the article after this" email exchange with Dr. Collins. 191:21-22; *see also* 195:10-17. That testimony is incorrect and not credible.

**RESPONSE:** Undisputed that Dr Fauci testified that he did not recall taking "any steps to increase the visibility of the article after this" email exchange with Dr. Collins, Fauci Dep. 191:21-22, and that he testified that he did not go out of his way to promote the article, *id.* at 195:10-17, but that he did likely discuss the article with people because it was a topic of considerable concern, *id*. Disputed that Dr. Fauci's testimony is incorrect or not credible, as that assertion is wholly conclusory and unsupported by any citation to the record. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or

otherwise, to censor or suppress any theory on social media. Any assertion to that effect is

unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

734.    In fact, that same day, Dr. Fauci took matters into his own hands to make the lab-leak theory "go away."  At the joint press conference on April 17, 2020, with President Trump, Vice President Pence, and Dr. Fauci, a reporter asked, "Mr. President, I wanted to ask Dr. Fauci: Could you address the suggestions or concerns that this virus was somehow manmade, possibly came out of a laboratory in China?"  Fauci Ex. 28, at 2. Dr. Fauci responded: "There was a study recently that we can make available to you, where a group of highly qualified evolutionary virologists looked at the sequences there and the sequences in bats as they evolve. And the mutations that it took to get to the point where it is now is [pause for emphasis] *totally consistent* with a jump of a species from an animal to a human."  *Id.*; *see also id.* 199:18-25 (Dr. Fauci conceding that, "when you said that sentence about totally consistent, you pause and use that phrase, 'totally consistent' with emphasis" – "Right."); *see also* Video of April 17, 2020 White House Coronavirus Task Force Briefing, *at* https://www.youtube.com/watch?v=brbArpX8t6I (exchange starting at 1:38:32 of video).

**RESPONSE:** Disputed that Dr. Fauci responding to a question from the press at a press

conference is somehow taking "matters into his own hands," or that the answer was an attempt to

make the so-called lab-leak theory "go away." On the contrary, Plaintiffs' PFOF shows that Dr.

Fauci did not even mention the article until he was asked about the origins of the virus by a reporter

in a public forum. Also dispute that Dr. Fauci "conced[ed]" that he paused to emphasize the phrase

"totally consistent." Dr. Fauci testified that he did not "remember a pause of a statement [he] made

in one of the dozens and dozens and dozens of press conferences" during which he has spoken.

Fauci Dep. 200:1-5. Undisputed, however, that the quoted statements were made during the press

conference. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by

threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on

social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole.

*See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

735.    Dr. Fauci then feigned ignorance and unfamiliarity with the authors of the study: "the paper will be available – I don't have the authors right now, but we can make that available to you."  Fauci Ex. 28, at 2. Presenting himself as unconnected with the paper, Dr. Fauci did not reveal (1) that he was part of a group that had launched the paper in a clandestine phone call on

Saturday, Feb. 1; (2) that he had extensively corresponded with Jeremy Farrar about the paper and its conclusions; (3) that the authors of the paper had sent six versions to him, Jeremy Farrar, and Dr. Collins to review; (4) that he had likely urged the authors to beef up their conclusion attacking the lab-leak theory between the preprint and published versions of the paper; (5) that the authors had personally thanked him for his "advice and leadership" in drafting the paper; or (6) that Dr. Collins had emailed him the day before to ask him to push the paper publicly or take other steps to discredit the lab-leak theory.

**RESPONSE:** Disputed as argumentative, lacking evidentiary citations, and a mischaracterization of the evidence. As Dr. Fauci testified, Jeremy Farrar and Kristian Anderson organized the study and reached out to Dr. Fauci. Fauci Dep. 43:17-25. Dr. Fauci testified that he provided "[v]ery little" input into the paper, *id.* at 196:1-8, that he "did not have substantive input into the paper," and that in thanking him for his advice and leadership "Jeremy is being courteous, as he is wont to be. I mean 'advice' could be—and 'leadership' could be we really got to get information out. Thank you for the effort you've put into it. Advice and leadership, to my recollection, had very little to do with substantive input into the paper." *Id.* at 171:16-22. Also disputed that Dr. Fauci's answer that he did not have the multiple authors of the paper before him at the moment was somehow intended to "feign ignorance" with any of the authors. Further disputed as a mischaracterization of the nature of the call as "clandestine." *See* Resp. to Pls.' PFOF ¶ 648. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

736.   Dr. Fauci does not dispute that he was referring to "The Proximal Origin of SARS-CoV-2" in his public remarks at the April 17, 2020, White House press briefing. Fauci Dep. 201:2-6 ("I assume it was the Nature Medicine paper…. I think it was.").

**RESPONSE:** Undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or

suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

737.    Dr. Fauci testified that he did not make that paper available to any reporters after the press conference. *Id.* at 201:7-9 ("Not to my knowledge.). That testimony is not credible.

**RESPONSE:** Disputed as argumentative, but the quoted testimony is undisputed. However, the question posed to Dr. Fauci is unclear as to whether it was asking Dr. Fauci whether he personally made the paper available to reporters present for the live press conference before they left the White House, or whether he has ever, since the press conference, provided the paper to a reporter. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

738.    In fact, over the weekend following the press conference, Dr. Fauci personally responded to an inquiry from a reporter specifically asking for the study he had referred to at the April 17, 2020 press conference, and provided a link to "The Proximal Origin of SARS-CoV-2." Fauci Ex. 29, at 1. On Sunday, April 19, a reporter emailed the White House press office asking, "Dr. Fauci said on Friday he would share a scientific paper with the press on the origin of the coronavirus. Can you please help me get a copy of that paper?" *Id.*

**RESPONSE:** Disputed as a mischaracterization of the email exchange. The inquiry was sent not to Dr. Fauci, but to Katie Miller, who works for the Vice President. Fauci Dep. 202:12-14. Ms. Miller then likely forwarded the email to Dr. Fauci and asked him to respond. *Id.* at 202:12-12. It would not be unreasonable for Dr. Fauci to respond to a request from the Vice President's office. Also note that Dr. Fauci provided links to several papers, including the one referenced in the PFOF. *See* Fauci Ex. 29 at 1. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress

any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

739.    Dr. Fauci personally responded to this reporter, stating, "Bill: Here are the links to the scientific papers and a commentary about the scientific basis of the origins of SARS-CoV-2." Fauci Ex. 29, at 1. He then provided three links. The first was a link to the online version of "The Proximal Origin of SARS-CoV-2."  The second and third were links to a paper and an online statement by Eddie Holmes, whom Dr. Fauci knew had begun secretly drafting the paper that became "The Proximal Origin of SARS-CoV-2" immediately after the clandestine Feb. 1 conference call with Dr. Fauci, Jeremy Farrar, and others. Fauci Ex. 29, at 1. The second link to a paper authored by Holmes was "a commentary on [The Proximal Origin of SARS-CoV-2] in the journal *Cell*."  Fauci Dep. 202:25-203:1; *see also id.* at 203:2-16.

**RESPONSE:** Undisputed that Dr. Fauci provided links to the reporter. Disputed as to the nature of the call and efforts to draft the paper—neither was not clandestine or secret, and the PFOF cites no evidence supporting those characterizations. *See also* Resp. to Pls.' PFOF ¶ 648. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

740.    On April 18 and 19, 2020, Dr. Fauci exchange cordial emails with Peter Daszak of the EcoHealth Alliance, who steers NIAID funds to finance bat coronavirus research with Dr. Shi Zhengli at the Wuhan Institute of Virology.  On Saturday, April 18, Daszak emailed Dr. Fauci, calling him "Tony," and stating: "As the PI of the R01 grant publicly targeted by Fox News reporters at the Presidential press briefing last night, I just wanted to say a personal thank you … for standing up and stating that the scientific evidence supports a natural origin for COVID-19 … not a lab release from the Wuhan Institute of Virology."  Fauci Ex. 30, at 1. Daszak also wrote: "Once this pandemic's over I look forward to thanking you in person and let you know how important your comments are to us all."  *Id.* Dr. Fauci responded on April 19: "Peter: Many thanks for your kind note."  *Id.*

**RESPONSE:** Undisputed, but further note that as Dr. Fauci testified, "Many thanks for your kind note" is a standard response. Fauci Dep. 206:20-25 ("That's a very typical response of mine. I can show you 45,000 e-mails that say thank you for your kind note."). Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion,

encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any

assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF

§ II.E., Arg. § II.B.3.b.

741.    Dr. Fauci's and Dr. Collins's efforts to orchestrate and publicize "The Proximal Origin of SARS-CoV-2" as a method of discrediting the lab-leak theory were highly effective. "The Proximal Origin of SARS-CoV-2" became one of the most widely read and most publicized scientific papers in history, with pervasive media coverage using it to discredit the lab-leak theory. "The paper has been accessed online more than 5.7 million times and has been cited by more than 2,000 media outlets. … It became one of the best-read papers in the history of science."  Jones Decl., Ex. BB, at 3.

**RESPONSE:** Disputed that Dr. Fauci and Dr. Collins are responsible for the fact that the

article is widely read, and it is unsurprising that a scientific paper about the origins of a global

pandemic would be widely read during the pandemic. Regardless, this PFOF is irrelevant and

contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or

otherwise, to censor or suppress any theory on social media. Any assertion to that effect is

unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

742.    As a direct result of these efforts, speech and speakers advocating for the lab-leak theory of COVID-19's origins were extensively censored on social media platforms.

**RESPONSE:** Disputed as an argumentative mischaracterization unsupported by the

evidence and without citation to the record. Regardless, this PFOF contains no evidence that Dr.

Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress

any theory on social media, nor evidence that any social media company did so at his instruction,

urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a

whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

743.    Twitter took aggressive censorship action against such speech and speakers. For example, on September 16, 2020, Twitter suspended the account of a Chinese virologist who claimed coronavirus was made in a lab. Fauci Ex. 31, at 1. "Twitter has suspended the account of a Chinese scientist who suggested that the novel coronavirus was created in a lab … despite inconclusive evidence."  Fauci Ex. 31 at 2.

**RESPONSE:** Disputed on the ground that this PFOF is based on a news article containing hearsay and journalistic characterization rather than record evidence. Disputed also that a social media company's application of its own content moderation policies, to which all users agree, constitutes "censorship."  Disputed also that one isolated example of such application supports the allegation that Twitter took "aggressive. . . action against such speech and speakers." In any event, this PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media, nor evidence that any social media company did so at his instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

744.    Facebook, likewise, took aggressive steps to censor the lab-leak theory on social media, even going so far as to formalize this policy as part of its official content-moderation policy. Fauci Ex. 32, at 3 (Facebook announcing that "we are expanding the list of false claims we will remove to include additional debunked claims about the coronavirus and vaccines," including "COVID-19 is man-made or manufactured"). Facebook noted that "we already prohibit these claims in ads," and promised "to take aggressive action against misinformation about COVID-19 and vaccines."   *Id.* Facebook promised to "begin enforcing this policy immediately, with a particular focus on Pages, groups or accounts that violate these rules …. Groups, Pages, and accounts on Facebook that repeatedly share these debunked claims may be removed altogether." *Id.*

**RESPONSE:** Undisputed that on May 26, 2021, Facebook announced that it had updated its policies to expand "the list of false claims" it would "remove" from the platform, which list included claims that "COVID-10 is man-made or manufactured." Fauci Ex. 32 at 3. Disputed also that a social media company's application of its own content moderation policies, to which all users agree, constitutes "censorship." Regardless, this PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media, nor evidence that any social media company did so at his instruction,

urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

745.    Like Twitter, Facebook censored even high-profile speakers who raised questions about the origins of COVID-19 or advanced the lab-leak hypothesis. For example, Facebook censored an article by award-winning British journalist Ian Birrell who raised "the question of the origins of the Covid-19 virus within Wuhan" and criticized the natural-origin theory of the virus. Fauci Ex. 33, at 1.

**RESPONSE:**    Undisputed that the cited news report states that an article by Ian Birrell "was labelled misinformation' by Facebook "for asking questions about China." Fauci Ex. 33 at 1. Disputed, however, on the ground that this PFOF is based on a news article containing hearsay and journalistic characterization rather than record evidence. Disputed also that a social media company's application of its own content moderation policies, to which all users agree, constitutes "censorship." Regardless, this PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media, nor evidence that any social media company did so at his instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

746.    Dr. Fauci claims that he is not aware of any suppression of speech about the lab-leak theory on social media: "I'm not aware of suppression of speech on social media to my knowledge…. I don't recall being aware of suppression of anything." Fauci Dep. 208:10-14. He claims that this ignorance is because he does not pay any attention to anything said on social media: "This is not something that would be catching my attention because, you know, the social media and Twitter, I told you, I don't have a Twitter account. I don't tweet. I don't do Facebook. I don't do anything. So social media stuff, I don't really pay that much attention to." *Id.* at 210:3-8. As noted above, Dr. Fauci's emails and actions reflect extensive concern about what is said on social media, and his attempt to cast himself as someone with no knowledge of social media is not credible.

**RESPONSE:** Disputed that a social media company's application of its own content moderation policies, to which all users agree, constitutes "censorship." Undisputed as to the quoted text of the cited testimony and emails, but disputed as to Plaintiffs characterization of the

testimony and emails as "reflect[ing] extensive concern about what is said on social media." The PFOF does not cite any record evidence for this assertion. The only email cited by earlier PFOFs is one in which Dr. Fauci makes a single reference to "distortions on social media" as one reason to urge the WHO to act quickly on convening a larger group to objectively analyze the origins of COVID-19, *see* Pls.' PFOF ¶¶ 674, 685 (citing Fauci Ex. 8, at 2), which falls far short of illustrating "extensive concern" about anything relating to social media. No none of Plaintiffs' PFOFs points to any evidence of "actions" by Dr. Fauci reflecting a "concern" about anything relating to social media. Accordingly, the record does not cast doubt on the credibility of Dr. Fauci's testimony on this point. Regardless, this PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

747.    Further, Dr. Fauci's emails and interrogatory responses show a close relationship with the CEO and founder of Meta (Facebook/Instagram), Mark Zuckerberg.

**RESPONSE:** Disputed. The PFOF neither cites to nor is supported by evidence of record. Dr. Fauci's emails and NIAID's interrogatory responses show a small amount of contact over a lengthy period of time in 2020, largely about facilitating three public-facing Facebook events to publicize information about COVID-19, *see* Ex. 187 at 58-60, and do not indicate a "close relationship" with Mr. Zuckerberg. Regardless, this PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media, nor evidence that any social media company did so at his instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

748.    On February 27, 2020, Mark Zuckerberg emailed Dr. Fauci directly to inquire about the development of the COVID-19 vaccine and offer the assistance of the Chan-Zuckerberg foundation. Fauci Ex. 23, 1. Zuckerberg already had Dr. Fauci's email, called Dr. Fauci by his first name "Tony," and wrote as if he had a preexisting acquaintance with Dr. Fauci. *Id.* Dr. Fauci, likewise, responded to Zuckerberg on a first-name basis and with the familiar tone of an acquaintance. Fauci Ex. 23, at 2.

**RESPONSE:** Undisputed that Mark Zuckerberg emailed Dr. Fauci on February 27, 2020,

and that Mr. Zuckerberg already had Dr. Fauci's email address, but note that Dr. Fauci's email

address is published on the NIAID website and available to the public. *See* Fauci Dep. 206:7-11,

18-19. Disputed that Dr. Zuckerberg emailed "to inquire about the development of the COVID-19

vaccine." Mr. Zuckerberg states that he was "glad to hear [Dr. Fauci's] statement that the covid-

19 vaccine will be ready for human trials in six weeks" and asks if there are "any resources our

foundation can help provide to potentially accelerate this or at least make sure it stays on track[.]"

Fauci Ex. 23 at 1. Also disputed that Dr. Fauci and Mark Zuckerberg had a preexisting

acquaintance and that referring to each other on a first-name basis suggested a preexisting

acquaintance or any familiarity. Fauci Dep 173:19-20 ("You know, a lot of people call me Tony

who have never even met me before."). Regardless, this PFOF contains no evidence that Dr. Fauci

sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any

theory on social media, nor evidence that any social media company did so at his instruction,

urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a

whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

749.    Dr. Fauci claims that he does not recall whether he had already met Mark Zuckerberg. Fauci Dep. 173:17-174:5 ("I meet thousands of people. I'm not sure I ever met him in person."). But in fact, Dr. Fauci still refers to Mark Zuckerberg by his first name. *Id.* at 289:9-16.

**RESPONSE:** Undisputed. Regardless, this PFOF is irrelevant and contains no evidence

that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or

suppress any theory on social media, nor evidence that any social media company did so at his instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

750.    On March 15, 2020, Mark Zuckerberg sent Dr. Fauci a lengthy email to offer close coordination between Dr. Fauci and Facebook on COVID-19 messaging. In the email, Zuckerberg thanked Dr. Fauci for his leadership, and "share[d] a few ideas of ways to help you get your message out." Fauci Ex. 23, at 3. Zuckerberg made three proposals: (1) Facebook was about to launch a "Coronavirus Information Hub" visible at the top of the page to all Facebook users to "get authoritative information from reliable sources," and Zuckerberg offered to include "a video from you" as a "central part of the hub," *id.*; (2) Zuckerberg was "doing a series of livestreamed Q&As from health experts" for his 100 million followers and wanted Dr. Fauci to do one of these videos, *id.*; and (3) Zuckerberg advised Dr. Fauci that Facebook had "allocated technical resources and millions of dollars of ad credits for the US government to use for PSAs to get its message out over the platform," and he wanted Dr. Fauci to recommend "a point person for the government response," *id.*

**RESPONSE:** The assertion that the email "offer[ed] close coordination" on COVID-19 messaging is disputed as a mischaracterization of the email, which in fact simply offers "a few ideas of ways to help [Dr. Fauci] get [his] message out," and ends by saying, "[a]gain, I know you're incredibly busy, so don't feel the need to respond if this doesn't seem helpful." Fauci Ex. 23 at 3. Otherwise, undisputed. Regardless, this PFOF—which pertains to "get[ting] [Dr. Fauci's] message out" rather than "censoring" anyone else's—contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media, nor evidence that any social media company did so at his instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

751.    Dr. Fauci responded the next day, telling "Mark" that "[y]our idea and proposal sound terrific," that he "would be happy to do a video for your hub," and that "your idea about PSAs is very exciting." Fauci Ex. 23, at 4. He copied his Special Assistant to put Zuckerberg in touch with the right point person for the government to arrange specially subsidized government messaging about COVID-19 on Facebook. *Id.*

**RESPONSE:** The first sentence is undisputed. The second sentence is disputed, because Dr. Fauci in fact copied the "Director of my Communications and Government Relations group," who could "put [Mr. Zuckerberg's] people in contact with the best person who could be the US Government point of contact for the PSAs." Fauci Ex. 23 at 4. (Dr. Fauci also copied his Special Assistant for Mr. Zuckerberg to contact to "arrange for the video." *Id.*). Regardless, this PFOF— which pertains to "get[ting] [Dr. Fauci's] message out" rather than "censoring" anyone else's— contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media, nor evidence that any social media company did so at his instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

752.    Zuckerberg replied the same day, stating "[w]e'd love to move quickly to help the effort and support getting these messages out."  Fauci Ex. 23, at 6.

**RESPONSE:** Undisputed. Regardless, this PFOF—which pertains to "get[ting] [Dr. Fauci's] message out" rather than "censoring" anyone else's—contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media, nor evidence that any social media company did so at his instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

753.    Dr. Fauci claims that the U.S. Government did not accept Facebook's offer of free ad credits to support the Government's COVID-19 messaging. Fauci Dep. 177:22-178:4 ("I don't believe that there was any money that was given from the Zuckerberg to the United States government to do PSAs. It's possible, but it certainly didn't happen to my knowledge. I don't recall money being given for PSAs."). But at the time, Dr. Fauci described the proposal as "very exciting" and immediately followed up on Zuckerberg's offer. Fauci Ex. 23, at 4. Separate emails from Facebook to the White House corroborate these ad credits. *See, e.g.,* Doc. 174-1, at 46.  Dr. Fauci's testimony on this point is not credible.

**RESPONSE:** Undisputed that Dr. Fauci testified that he did not "recall money being given for PSAs." Fauci Dep. 178:1-2. As Dr. Fauci also testified, he did not "have the authority to accept outside money like that. It would have to go through a different channel." *Id.* at 177:19-21. Dr. Fauci's excitement at Zuckerberg's "idea about the PSAs" is not incompatible with the possibility that the Government would ultimately not accept the ad credits and thus does not undermine Dr. Fauci's credibility. Moreover, the document cited does not "corroborate" that ad credits were made to the United States Government. It states that "[s]ince January, [Facebook has] provided more than $30 million in ad credits to help *governments*, NGOs and other organizations reach people with COVID-19 vaccine information and other important messages." Dkt. 174-1, at 45 (emphasis added). Regardless, this PFOF—which pertains to "get[ting] [Dr. Fauci's] message out" rather than "censoring" anyone else's—is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media, nor evidence that any social media company did so at his instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

754.    Dr. Fauci and Zuckerberg have "interacted on Facebook Zoom-type podcasts." Fauci Dep. 175:17-18. Dr. Fauci did "[t]hree live stream Facebook-type Q and As" about COVID-19 with Zuckerberg. Fauci Dep. 177:2-4.

**RESPONSE:** Undisputed. Regardless, this PFOF—which pertains to "get[ting] [Dr. Fauci's] message out" rather than "censoring" anyone else's—contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media, nor evidence that any social media company did so at his instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

755.    Dr. Fauci's interrogatory responses reveal extensive direct communications between Dr. Fauci and Zuckerberg. *See* Scully Ex. 12, at 33, 53-54 (identifying 13 communications between Dr. Fauci and Zuckerberg, including emails, phone calls, virtual meetings, and live broadcasts, over a nine-month period in 2020).

**RESPONSE:** Disputed that 13 "communications" (three of which are publicly available

interviews, and one of which was simply a missed call) over a nine-month period is "extensive

direct communications." *See* Scully Ex. 12 at 53-54. Regardless, this PFOF—which pertains to

"get[ting] [Dr. Fauci's] message out" rather than "censoring" anyone else's—contains no evidence

that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or

suppress any theory on social media, nor evidence that any social media company did so at his

instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the

evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

756.    Reviewing the foregoing facts about Dr. Fauci's communications with Farrar, Eddie Holmes, and others, former Director of the CDC Robert Redfield "had a dawning realization. He concluded there'd been a concerted effort not just to suppress the lab-leak theory but to manufacture the appearance of a scientific consensus in favor of a natural origin. 'They made a decision, almost a P.R. decision, that they were going to push one point of view only' and suppress rigorous debate, said Redfield. 'They argued they did it in defense of science, but it was antithetical to science.'" Jones Decl., Ex. AA.

**RESPONSE:** Disputed on the ground that this PFOF is based on a news article containing

hearsay and journalistic characterization rather than record evidence. Also disputed as a

mischaracterization of the cited article, which states that Dr. Redfield expressed his purported

"dawning realization" after "[r]eading the *Lancet* statement," not upon reading any of the

"communications with Farrar" and others discussed above, and thus Dr. Redfield's opinion is

without foundation in the evidence and is therefore irrelevant. *See* Jones Decl., Ex. AA at 27.

Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat,

coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social

media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

**B.    Dr. Fauci's Efforts to Suppress Speech on Hydroxychloroquine.**

757.   On May 22, 2020, The Lancet published an online article entitled "Hydroxychloroquine or chloroquine with or without a macrolide for treatment of COVID-19: a multinational registry analysis."   Fauci Ex. 35, at 1. The article purported to analyze 96,032 patients to compare cohorts who did and did not receive hydroxychloroquine or chloroquine to treat COVID-19. *Id.* The study concluded that hydroxychloroquine and chloroquine were "associated with decreased in-hospital survival and an increased frequency of ventricular arrhythmias when used for COVID-19." *Id.*

**RESPONSE:** Undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on hydroxychloroquine on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

758.   On May 27, 2020, Dr. Fauci publicly cited this study to claim that hydroxychloroquine is "not effective against coronavirus." Fauci Ex. 34, at 1. Dr. Fauci "became the first Trump administration official to say definitively that hydroxychloroquine is not an effective treatment for the coronavirus." *Id.* at 2. "'The scientific data is really quite evident now about the lack of efficacy,' Fauci … said on CNN." *Id.*

**RESPONSE:** Disputed that Ex. 34 shows that Dr. Fauci publicly cited to the study referenced in Plaintiffs' PFOF ¶ 757, as the article quotes Dr. Fauci stating that "[t]he scientific data is really quite evident now about the lack of efficacy," without referring to any particular study. Fauci Ex. 34 at 2. And as Dr. Fauci testified, "[t]here was information coming from a number of studies, some of which were negative studies that showed it did not work. And others were positive studies to show that it did not work." Fauci Dep. 219:19-220:1. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on hydroxychloroquine on

social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole.

*See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

759.    Dr. Fauci's comments were based on the May 22 Lancet study. *Id.* at 3 ("Fauci's comments come days after the Lancet published a 96,000-patient observational study that concluded that hydroxychloroquine had no effect on Covid-19 and may even have caused some harm.").

**RESPONSE:** Disputed as unsupported on the face of the quoted statement from the cited news article. Note also that the record shows that Dr. Fauci's comments were based on "information coming from a number of studies." Fauci Dep. 219:19-220:1; Resp. to Pls.' PFOF ¶ 758. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on hydroxychloroquine on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

760.    The Lancet article was an observational study, not a randomized trial. At the time, "[t]here [wa]s no data yet from randomized, controlled clinical trials of hydroxychloroquine – the gold standard for evaluating potential treatments." Fauci Ex. 34, at 4. "But Fauci was unequivocal on [May 27, 2022], saying that 'the data are clear right now.'" *Id.*

**RESPONSE:** Undisputed that the PFOF accurately quotes the article from Politico at Fauci Ex. 34, which describes the Lancet article as "a 96,000-patient observational study that concluded that hydroxychloroquine had no effect on COVID-19 and may have even caused some harm." Fauci Ex. 34 at 3. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on hydroxychloroquine on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

761.    Just a few days later, The Lancet retracted the May 22, 2022 study. Fauci Ex. 35, at 1. An article reporting on the retraction noted that the study's authors "were unable to confirm that the data set was accurate," that "several concerns were raised with respect to the veracity of the data," the study may have "include[ed] more cases than possible," and that "[a] first-year

statistics major could tell you about major flaws in the design of the analysis." Jones Decl., Ex. DD, at 2-3.

**RESPONSE:** Undisputed that the PFOF accurately quotes The Lancet's retraction. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on hydroxychloroquine on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

762.    Thus, Dr. Fauci's initial dismissal of hydroxychloroquine was based on a purely *observational* study – not a randomized, controlled trial – and one that was retracted for glaring errors just days later.

**RESPONSE:** Disputed that Dr. Fauci was solely relying on the study in The Lancet. Dr. Fauci testified that "[t]here was information coming from a number of studies, some of which were negative studies that showed it did not work. And others were positive studies to show that it did not work." Fauci Dep. 219:19-220:1. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on hydroxychloroquine on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

763.    Dr. Fauci testified that he did not recall that The Lancet study he cited to discredit the efficacy of hydroxychloroquine had been retracted. Fauci Dep. 223:7 ("I don't recall it being retracted.").

**RESPONSE:** Disputed as a mischaracterization of Dr. Fauci's testimony, which explained that "I don't recall it being retracted. I might have at the time heard that it was retracted, but it wasn't the only paper that was on hydroxychloroquine." Fauci Dep. 223:7-10. Also disputed that the Lancet study, as opposed to "a number of studies," was the source of Dr. Fauci's views about the efficacy of hydroxychloroquine. *See* Resp. to Pls.' PFOF ¶ 758. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement,

deception, or otherwise, to censor or suppress speech on hydroxychloroquine on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

764.    Dr. Fauci stepped up his public campaign to discredit hydroxychloroquine by insisting that its effectiveness could only be judged by undergoing rigorous, randomized, double-blind, placebo-based studies, notwithstanding his previous reliance on the less-than-rigorous observational study in The Lancet that was subsequently retracted. On July 31, 2020, Dr. Fauci testified before the House Select Subcommittee on Coronavirus Crisis, during which he stated: "The point that I think is important, because we all want to keep an open mind, any and all of the randomized placebo-controlled trials, which is the gold standard of determining if something is effective, none of them had shown any efficacy by hydroxychloroquine. Having said that, I will state, when I do see a randomized placebo-controlled trial that looks at any aspect of hydroxychloroquine, either early study, middle study, or late, if that randomized placebo-controlled trial shows efficacy, I would be the first one to admit it and to promote it. But I have not seen yet a randomized placebo-controlled trial that's done that. And in fact, every randomized placebo-controlled trial that has looked at it, has shown no efficacy. So, I just have to go with the data. I don't have any horse in the game one way or the other, I just look at the data." *See* https://www.youtube.com/watch?v=RkNC5OQD2UE.

**RESPONSE:** Disputed that Dr. Fauci's opinion on hydroxychloroquine was solely based on the study in the Lancet, as opposed to "a number of studies." *See* Resp. to Pls.' PFOF ¶ 758. The accuracy of the quoted testimony is undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on hydroxychloroquine on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

765.    Despite his insistence before a congressional committee that randomized, placebo-controlled trials were the determining factor for his opinion regarding the effectiveness of hydroxychloroquine in the treatment of COVID-19, Dr. Fauci quietly admitted that such rigorous studies are not actually required to determine the efficacy of a therapeutic drug. Dr. Fauci was asked, "Do you recall saying in connection with the discussion of hydroxychloroquine that a randomized double blind placebo based study is the gold standard?" Fauci Dep. 244:8-11. He replied, "That is the gold standard for everything. *It isn't always needed*, but for the most part, it's the gold standard." *Id.* at 244:12-14 (emphasis added).

**RESPONSE:** Disputed as a mischaracterization of the quoted testimony. Dr. Fauci did not

testify that randomized, placebo-controlled trials were not required to determine the efficacy of a

therapeutic drug. Dr. Fauci testified that "That is the gold standard for everything. It isn't always

needed, but for the most part, it's the gold standard." Fauci Dep. 244:12-14. When Dr. Fauci

testified that such trials were not always needed, Plaintiffs did not ask Dr. Fauci to explain when

they were not needed or whether they were needed to determine the efficacy of a therapeutic drug,

and there is nothing in the record to indicate that Dr. Fauci was speaking about showing the

efficacy of a therapeutic drug. There is no inconsistency between Dr. Fauci's testimony to the

congressional committee and Dr. Fauci's deposition testimony, both of which said that randomized

placebo-controlled studies were the "gold standard." Regardless, this PFOF is irrelevant and

contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or

otherwise, to censor or suppress speech on hydroxychloroquine on social media. Any assertion to

that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E.,

Arg. § II.B.3.b.

766.    Dr. Fauci's sudden reversal concerning the critical standards for scientific studies
to determine the effectiveness of hydroxychloroquine demonstrated a lack of candor to the House
Select Subcommittee on Coronavirus Crisis. Indeed, Dr. Fauci misled the Committee when he
failed to disclose that randomized, double-blind, placebo-based studies are not always needed and
that he previously relied on the *observational,* i.e., non-randomized, non-double-blind, non-
placebo-based study in The Lancet to form an opinion about that drug's efficacy in the first place.
Dr. Fauci lacks credibility on this point.

**RESPONSE:** Disputed as an argumentative mischaracterization unsupported by the

evidence and without citation to the record. There is no inconsistency between Dr. Fauci's

testimony to the congressional committee and Dr. Fauci's deposition testimony, both of which said

that randomized placebo-controlled studies were the "gold standard." *See* Resp. to Pls.' PFOF

¶ 765. Moreover, Plaintiffs assume without any basis in evidence that Dr. Fauci's opinion on

hydroxychloroquine was based solely on the study in The Lancet when Dr. Fauci testified that: (1) "[t]here was information coming from a number of studies, some of which were negative studies that showed it did not work. And others were positive studies to show that it did not work," Fauci Dep. 219:22-220:1; (2) that the study in The Lancet "wasn't the only paper that was on hydroxychloroquine," *id.* 223:7-10; and (3) that his "opinion on the effect of hydroxychloroquine was based on accumulating data from a number of studies," *id.* at 223:14-18. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on hydroxychloroquine on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

767.    Despite mounting evidence against his position, Dr. Fauci testified that his opinion against hydroxychloroquine was based on other studies as well as the retracted article in The Lancet, but he could not identify any of those studies. Fauci Dep. 223:12-18 ("I don't recall specifically what those studies are now.").

**RESPONSE:** Disputed that there was "mounting evidence" against Dr. Fauci's position. On the contrary, "[t]here was information coming from a number of studies, some of which were negative studies that showed it did not work. And others were positive studies to show that it did not work," Fauci Dep. 219:22-220:1. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on hydroxychloroquine on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

768.    Dr. Fauci did not retreat from his hard public stance against hydroxychloroquine. On July 26, 2020, a group called "America's Frontline Doctors" held a press conference at the U.S. Capitol criticizing the government's response to the COVID-19 pandemic and touting the benefits of hydroxychloroquine in treating the coronavirus. Fauci Ex. 38, at 5.

**RESPONSE:** Undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on hydroxychloroquine on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

769.    Dr. Fauci responded to this event with highly visible public statements condemning the use of hydroxychloroquine. For example, he stated on "Good Morning America," that "[t]he overwhelming prevailing clinical trials that have looked at the efficacy of hydroxychloroquine have indicated that it is not effective in coronavirus disease."  Fauci Ex. 36, at 5. Dr. Fauci made these comments in direct response to the public claims of America's Frontline Doctors. Fauci Dep. 227:7-228:13. He also stated on MSNBC's "Andrea Mitchell Reports" that the video of the press conference by America's Frontline Doctors constituted "a video out there from a bunch of people spouting something that isn't true."  Fauci Ex. 37, at 3.

**RESPONSE:** Undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on hydroxychloroquine on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

770.    Dr. Fauci also stated that "the cumulative data on trials, clinical trials that were valid, namely clinical trials that were randomized and controlled in a proper way, … showed consistently that Hydroxychloroquine is not effective in the treatment of coronavirus disease or COVID-19." Fauci Ex. 37, at 3. But two months earlier, he had said "the data are clear right now" when no such studies existed. Fauci Ex. 34, at 4.

**RESPONSE:** The first sentence is undisputed. The second sentence is disputed to the extent it alleges that "no such studies existed" at the time of Dr. Fauci's statement, which is based only on a news report from Politico rather than evidence of record. In any event, the two statements from Dr. Fauci are not incompatible. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on hydroxychloroquine on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

771.    Social-media platforms reacted by aggressively censoring the video of America's Frontline Doctors. Facebook removed the video when it was "the top-performing Facebook post in the world," and "had accumulated over 17 million views by the time of its censorship by Facebook." Fauci Ex. 38, at 3, 4. Further, "Facebook's decision to censor the livestream was quickly followed by YouTube, the Google-owned video-sharing platform." *Id.* at 6. "The video had 80,000 views on YouTube prior to its removal." *Id.* "Following Facebook and YouTube's removal of the video, Twitter followed suit…." *Id.*; *see also* Fauci Ex. 36, at 3 (noting that "Twitter … removed the video, saying it was 'in violation of our COVID-19 misinformation policy'").

**RESPONSE:** This PFOF is disputed on numerous grounds. First and foremost, Plaintiffs

cite no evidence to support their naked assertion that any action taken by any social media company

regarding the video by America's Frontline Doctors was taken in "react[ion]" to anything stated

by Dr. Fauci. Second, disputed that a social media company's application of its own content

moderation policies, to which all users agree, constitutes "censorship." Third, disputed on the

ground that this PFOF is based on news articles containing hearsay and journalistic

characterization, rather than record evidence. Regardless, this PFOF contains no evidence that Dr.

Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress

speech on hydroxychloroquine on social media, nor evidence that any social media company did

so at his instruction, urging, or request. Any assertion to that effect is unsupported by and contrary

to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

772.    Dr. Fauci professed to be unaware of whether 17 million views of a video on Facebook are a large number of views: "I don't know what 17 million views means. What's the denominator? Is 17 million a large amount? Is it a small amount? I don't go on social media, so I don't know what 17 million views means." Fauci Dep. 236:7-11. It is common sense that 17 million views are a large number of views. Dr. Fauci's testimony on this point is not credible.

**RESPONSE:** Disputed as argumentative and unsupported by the cited testimony, but the

text of the quoted testimony is undisputed. Regardless, this PFOF contains no evidence that Dr.

Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress

speech on hydroxychloroquine on social media, nor evidence that any social media company did

so at his instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

773.    Dr. Fauci does not deny that he or his staff at NIAID may have communicated with Facebook regarding the censorship of the America's Frontline Doctors video. Instead, he claims that he does not recall whether they communicated with Facebook about it, and that it is possible that they did so. Fauci Dep. 238:2-5 ("I don't recall anybody communicating with them about that. Could have been, but I don't recall anybody -- I don't recall anybody communicating with the social media people."); *see also id.* at 238:6-10. He also does not deny that other federal officials may do so, but he claims that "I don't recall any of that" and "it just doesn't ring a bell to me right now." *Id.* at 238:21-239:7. He claims he doesn't "pay attention" to whether his staff or other federal officials communicate with social-media platforms about censorship because "I have a really important day job that I work at." *Id.* at 238:19-20.

**RESPONSE:** Disputed as a mischaracterization of the quoted testimony, in which Dr. Fauci was not asked about him "or his staff at NIAID" communicating with Facebook "regarding censorship" of the video (or any other content). Rather, Dr. Fauci was asked in general whether he "recall[s] anyone at NIAID communicating with social media people," to which he responded: "To my recollection, I don't recall. But I don't know everything that everybody does. But I don't recall anybody communicating with social media." Fauci Dep. 238:6-10. Otherwise, the accuracy of the quoted text of the depositions is undisputed. Regardless, this PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on hydroxychloroquine on social media, nor evidence that any social media company did so at his instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

774.    Nevertheless, regarding the decision by YouTube and Twitter to follow Facebook in censoring the video, Dr. Fauci admits that "Yes, I knew of that." *Id.* at 239:8-13.

**RESPONSE:** Disputed. This testimony was incorrectly transcribed and corrected in Dr. Fauci's errata sheet. The correct quotation, in response to Plaintiffs' counsel asking "Can you turn one page forward in this exhibit, in that first full paragraph that goes all the way across the page.

'Facebook's decision to censor the Livestream was quickly followed by YouTube, the Google-owned video sharing platform'?" was "Yeah, I see that." Disputed also that a social media company's application of its own content moderation policies, to which all users agree, constitutes "censor[ship]." Regardless, this PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on hydroxychloroquine on social media, nor evidence that any social media company did so at his instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

775.    A few days later, on August 1, 2020, the web host provider for America's Frontline Doctors shut down their website. *Id.* at 242:14-243:8; Fauci Ex. 39. Dr. Fauci testifies that he does not recall this occurrence. Fauci Dep. 243:13-18.

**RESPONSE:** Undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on hydroxychloroquine on social media, nor evidence that any social media company did so at his instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

776.    On November 18, 2022, a meta-analysis of 449 studies on the efficacy of hydroxychloroquine considered "449 HCQ COVID-19 studies, 351 peer reviewed, 371 comparing treatment and control groups."  Fauci Ex. 40, at 1. The meta-analysis concluded that "[l]ate treatment and high dosages may be harmful, while early treatment consistently shows positive results."  *Id.* It also noted that "[n]egative evaluations" of hydroxychloroquine "typically ignore treatment delay."  *Id.* And it noted that "HCQ/CQ was adopted for early treatment in all or part of 41 countries."  *Id.*

**RESPONSE:** Undisputed that the PFOF accurately summarizes and quotes the referenced document. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on

hydroxychloroquine on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

**C.    Dr. Fauci's "Devastating Takedown" of the Great Barrington Declaration.**

777.    Dr. Fauci recommended Dr. Clifford Lane of NIAID to participate in a WHO mission to China in February 2020. Fauci Dep. 139:15.

**RESPONSE:** Undisputed.

778.    On April 3, 2020, the NIH Record wrote a report on Lane's trip entitled "NIAID's Lane Discusses WHO COVID-19 Mission to China. Fauci Ex. 20, at 1. Lane praised China's response to the pandemic, especially their reliance on lockdowns and "extreme … social distancing": "The Chinese were managing this in a very structured, organized way,' he explained. 'When we got there, the outbreak was already coming under control in China. The measures they put in place appeared to be working…. It demonstrated their successful response…. From what I saw in China, we may have to go to as extreme a degree of social distancing to help bring our outbreak under control." *Id.* at 5-6.

**RESPONSE:** Undisputed, except to the extent the PFOF asserts that Lane "praised China's response to the pandemic," which is a characterization that is unsupported by the article's reporting of Lane's observations reflected in the quoted text of the article. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech about the Great Barrington Declaration on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

779.    Dr. Fauci discussed this conclusion with Lane when he returned from China: "Dr. Lane was very impressed about how from a clinical public health standpoint, the Chinese were handling the isolation, the contact tracing, the building of facilities to take care of people, and that's what I believed he meant when he said were managing this in a very structured, organized way." Fauci Dep. 165:4-11.

**RESPONSE:** Undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech about the Great Barrington Declaration on social media. Any assertion to that

effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

780.    Dr. Fauci admits that Lane "did discuss with me that the Chinese had a very organized way of trying to contain the spread in Wuhan and elsewhere. … he mentioned that they had a very organized, well-regimented way of handling the outbreak." *Id.* at 166:1-7.

**RESPONSE:** Undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech about the Great Barrington Declaration on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

781.    Dr. Fauci came to agree with Dr. Lane's rosy assessment of China's draconian response to the outbreak: "Dr. Lane is a very astute clinician, and I have every reason to believe that his evaluation of the situation was accurate and correct." *Id.* at 166:24-167:1.

**RESPONSE:** Disputed as the Plaintiffs' characterization that Dr. Lane's assessment was "rosy," which is unsupported by the article reporting on Lane's observations or Dr. Fauci's testimony, but the quoted testimony is accurate. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech about the Great Barrington Declaration on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

782.    On Feb. 22, 2020, Dr. Lane sent an email stating, "China has demonstrated that this infection can be controlled, albeit at great cost."  Fauci Ex. 21, at 1.

**RESPONSE:** Undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech about the Great Barrington Declaration on social media. Any assertion to that

effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

783.    On October 4, 2020, Plaintiffs Dr. Jay Bhattacharya of Stanford and Dr. Martin Kulldorff of Harvard, along with Dr. Sunetra Gupta of Oxford, published online the "Great Barrington Declaration," which was one-page treatise opposing reliance on lockdowns and advocating for an approach to COVID-19 called "focused protection."  Fauci Ex. 41.

**RESPONSE:** Undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech about the Great Barrington Declaration on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

784.    The Great Barrington Declaration criticized the social-distancing and lockdown approaches to the pandemic endorsed by government experts such as Dr. Fauci and Cliff Lane: "As infectious disease epidemiologists and public health scientists we have grave concerns about the damaging physical and mental health impacts of the prevailing COVID-19 policies, and recommend an approach we call Focused Protection."  *Id.* It was very critical of such government policies: "Current lockdown policies are producing devastating effects on short and long-term public health. The results (to name a few) include lower childhood vaccination rates, worsening cardiovascular disease outcomes, fewer cancer screenings and deteriorating mental health – leading to greater excess mortality in years to come, with the working class and younger members of society carrying the heaviest burden. Keeping students out of school is a grave injustice. Keeping these measures in place until a vaccine is available will cause irreparable damage, with the underprivileged disproportionately harmed." *Id.* It called for an end to lockdowns: "The most compassionate approach that balances the risks and benefits of reaching herd immunity, is to allow those who are at minimal risk of death to live their lives normally to build up immunity to the virus through natural infection, while better protecting those who are at highest risk. We call this Focused Protection." *Id.*

**RESPONSE:** Undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech about the Great Barrington Declaration on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

785.    The Declaration called for an end of government-imposed lockdowns and an immediate return to normal life for those who are low-risk: "Those who are not vulnerable should immediately be allowed to resume life as normal. Simple hygiene measures, such as hand washing and staying home when sick should be practiced by everyone to reduce the herd immunity threshold. Schools and universities should be open for in-person teaching. Extracurricular activities, such as sports, should be resumed. Young low-risk adults should work normally, rather than from home. Restaurants and other businesses should open. Arts, music, sport and other cultural activities should resume. People who are more at risk may participate if they wish, while society as a whole enjoys the protection conferred upon the vulnerable by those who have built up herd immunity." *Id.*

**RESPONSE:** Undisputed that the PFOF accurately quotes the Declaration. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech about the Great Barrington Declaration on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

786.    The Declaration was thus highly critical of the lockdown policies defended by Dr. Fauci and Dr. Cliff Lane of NIAID since Dr. Lane's trip to China at the beginning of the pandemic. The Declaration was "going against the global political consensus, which holds that lockdowns are key to minimising mortality to Covid-19." Fauci Ex. 48, at 3. After it was posted online, it rapidly gathered signatures from doctors and scientists, as well as members of the public.

**RESPONSE:** Disputed that Drs. Fauci or Lane "defended" "lockdowns," which term is vague and subject to various interpretations, as opposed to social distancing. As Dr. Fauci testified, in his view "the lockdowns" put in place in China "were the types of lockdowns that were really quite extreme. They would essentially lock people in their homes, which was extreme to do that." *See* Fauci Dep. 168:12-15. He further testified, "It was my opinion that social distancing would be very important…." *Id.* at 168:25-169:3. The last sentence is disputed as without citation to and unsupported by evidence of record. The remaining allegations are undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech about the Great Barrington

Declaration on social media. Any assertion to that effect is unsupported by and contrary to the

evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

787.     Four days later, on October 4, 2020, Dr. Francis Collins emailed Dr. Fauci and Cliff
Lane, citing the Great Barrington Declaration. Fauci Ex. 42, at 1. Dr. Collins stated: "Hi Tony and
Cliff, See https://gbdeclaration.org. This proposal from the three fringe epidemiologists who met
with the Secretary seems to be getting a lot of attention – and even a co-signature from Nobel Prize
winner Mike Leavitt at Stanford. There needs to be a quick and devastating published take down
of its premises. I don't see anything like that on line yet – is it underway?  Francis." *Id.*

**RESPONSE:** Undisputed. Regardless, this PFOF—which pertains to responding to rather

than "censoring" anyone's views regarding COVID-19—is irrelevant and contains no evidence

that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or

suppress speech about the Great Barrington Declaration on social media. Any assertion to that

effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. §

II.B.3.b.

788.     This email seeking Dr. Fauci's assistance in a "quick and devastating … take down"
of the Great Barrington Declaration" is strikingly similar to Dr. Collins' email to Dr. Fauci on
April 16, 2020, asking Dr. Fauci's "help [to] put down this very destructive conspiracy," *i.e.*, the
lab-leak hypothesis. Fauci Ex. 27, at 1. In both cases, Dr. Collins sought Dr. Fauci's aid in
discrediting and silencing an online narrative that federal officials disfavored, and in both cases,
Dr. Fauci promptly and effectively complied.

**RESPONSE:** Disputed that Dr. Collins was attempting to "silenc[e] an online narrative

that federal officials disfavored," and that Dr. Fauci "aid[ed]" in any such effort. That is an

argumentative mischaracterization manifestly contradicted by the cited evidence and unsupported

by any evidence of record. Rather than "silencing" a viewpoint he disagreed with, Dr. Collins was

seeking only to respond to it. In the quoted email at exhibit 42, Dr. Collins does not "seek[]" Dr.

Fauci's assistance in a 'quick and devastating . . . take down'" of the Great Barrington Declaration

but rather states: "There needs to be a quick and devastating published take down of

[Declaration's] premises. I don't see anything like that on line yet – is it underway?" Fauci Ex. 42

at 1. As Dr. Fauci testified about that email: "I don't know specifically what [Dr. Collins] meant. But knowing Francis [Collins], he is a scholar. He's likely talking about writing a scholarly article to contest some of the premise. That's what I would imagine Francis is referring to. That would be his style. That if someone writes an article that he disagrees with, that he would write a counterargument to challenge the premise…" Fauci Dep. 258:18-25. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech about the Great Barrington Declaration on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

789.    Dr. Collins' question to Dr. Fauci in the email, "Is it underway?" implies that Dr. Collins expected Dr. Fauci to be already working on a "quick and devastating … take down" of the Declaration, or to be aware of others working on one. Fauci Ex. 42, at 1. Dr. Fauci denies that Dr. Collins had any reason to think that Dr. Fauci might be working on a refutation of the Great Barrington Declaration, because "[t]his is not something I would be involved in," because "I have a very important day job that is running a $6.4 billion institute." Fauci Dep. 260:11-20. Given Dr. Fauci's immediately subsequent attempts to refute and discredit the Great Barrington Declaration, this testimony is not credible.

**RESPONSE:** Disputed as to Plaintiffs characterization of Dr. Collins' alleged expectation, which is unsupported speculation. Moreover, when asked at his deposition if Dr. Collins "ha[d] any reason to think that [Dr. Fauci] might be working on . . . some kind of refutation of the Great Barrington Declaration," Dr. Fauci said "Absolutely not. . . . No. This is not something I would be involved in." Fauci Dep. 260:11-17. As Dr. Fauci further testified: "I don't know what [Dr. Collins] meant. I think he was just speaking bluntly. I don't think he was specifically pointing to us to have known if there was something online. He scours the online better than we do. He's got an entire staff that does that. So I think it was just a casual comment, 'Hey, you guys. Did you see anything online yet.'" *Id.* at 258:21-259:7. Also dispute the assertion that Dr. Fauci took "immediate[] subsequent attempts to refute and discredit" the Declaration, which is an

argumentative assertion unsupported by any citation to the record and thus does not support the

assertion that Dr. Fauci's testimony is not credible. Regardless, this PFOF is irrelevant and

contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or

otherwise, to censor or suppress speech about the Great Barrington Declaration on social media.

Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.'

PFOF § II.E., Arg. § II.B.3.b.

790.    The same day as Dr. Collins' email, October 8, 2020, Dr. Fauci wrote back to Dr. Collins, stating "Francis: I am pasting in below a piece from *Wired* that debunks this theory. Best, Tony." Fauci Ex. 43, at 1. Dr. Fauci followed up the same day with an email to Dr. Collins linking to an article by Gregg Gonsalves which Dr. Fauci called "[a]nother refutation of the herd immunity approach." Fauci Ex. 44, at 1.

**RESPONSE:** Undisputed. Regardless, this PFOF is irrelevant and contains no evidence

that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or

suppress speech about the Great Barrington Declaration on social media. Any assertion to that

effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. §

II.B.3.b.

791.    Dr. Fauci has known Gregg Gonsalves for decades, since the 1980s. Fauci Dep. 265:16-19. Dr. Fauci does not deny that he may have contacted Gregg Gonsalves before Gonsalves wrote this piece attacking the Great Barrington Declaration, but claims he does not recall. *Id.* at 268:8-19 ("I don't recall. I might have.").

**RESPONSE:** Undisputed. Regardless, this PFOF is irrelevant and contains no evidence

that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or

suppress speech about the Great Barrington Declaration on social media. Any assertion to that

effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. §

II.B.3.b.

792.    Dr. Fauci and Dr. Collins followed up with a series of public media statements attacking the Great Barrington Declaration. On October 14, 2020, the Washington Post ran a story entitled, "Proposal to hasten herd immunity to the coronavirus grabs White House attention but

appalls top scientists." Fauci Ex. 45, at 1. In the article, Dr. Collins described the Great Barrington Declaration and its authors as "fringe" and "dangerous": "This is a fringe component of epidemiology. This is not mainstream science. It's dangerous." *Id.* at 3.

**RESPONSE:** The first sentence of the PFOF is disputed as lacking any record citation; the remainder of the PFOF does not reference any statement by Dr. Fauci that "attack[s] the Great Barrington Declaration," or a "series of public media statements" by either Dr. Fauci or Dr. Collins. The remainder of the PFOF describing the news report of one public statement by Dr. Collins is undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech about the Great Barrington Declaration on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

793.    Dr. Fauci consulted with Dr. Collins before he told the Washington Post that the Great Barrington Declaration represented a "fringe" and "dangerous" idea. Fauci Dep. 272:4-7.

**RESPONSE:** Disputed. As corrected by the errata, *see* Ex. 184 at 11 (Fauci Dep. Errata (Dec. 19, 2022)), Dr. Fauci did not say that he consulted with Dr. Collins on this point. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech about the Great Barrington Declaration on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

794.    Dr. Fauci endorsed these comments in an email to Dr. Collins on October 13, 2020, stating, "[w]hat you said was entirely correct." Fauci Ex. 46, at 1.

**RESPONSE:** Undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech about the Great Barrington Declaration on social media. Any assertion to that

effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

795.    Dr. Fauci admits that Dr. Collins could have been concerned about the spread of the ideas in the Declaration on social media when he called it "fringe" and "dangerous." Fauci Dep. 274:19-20.

**RESPONSE:** Disputed as a mischaracterization of Dr. Fauci's testimony. Dr. Fauci testified that "I don't see a connection here with what he's saying and things being spread on social media, but perhaps, since a lot of things get spread on social media, I'm sure that – I'm not sure, but that could have been something that he was concerned with." Fauci Dep. 274:15-20. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech about the Great Barrington Declaration on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

796.    The next day, October 15, 2020, Dr. Fauci echoed Dr. Collins' comments, calling the Declaration "nonsense" and "dangerous." Fauci Ex. 47, at 1. Describing the proposal as "letting infections rip as it were," Dr. Fauci stated: "Quite frankly that is nonsense, and anybody who knows anything about epidemiology will tell that that is nonsense and very dangerous." *Id.* at 3.

**RESPONSE:** Undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech about the Great Barrington Declaration on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

797.    Dr. Fauci testified that "it's possible that" he coordinated with Dr. Collins on their public statements attacking the Great Barrington Declaration. Fauci Dep. 279:23-24.

**RESPONSE:** Disputed. Dr. Fauci testified that "I don't believe so, but I don't – no, I'm not – that's not our style to be coordinating things. I don't know – it's possible we discussed it,

depending on what your coordination is." Fauci Dep. 279:21-24. Regardless, this PFOF is

irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement,

deception, or otherwise, to censor or suppress speech about the Great Barrington Declaration on

social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole.

*See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

798.     Dr. Fauci also testified of himself and Dr. Collins that "that's not our style to be
coordinating things." *Id.* at 279:22-23. In light of the extensive coordination with Dr. Collins about
the lab-leak theory, and the coordination about the Great Barrington Declaration, that testimony is
not credible.

**RESPONSE:** The quoted testimony is undisputed, but the remainder of the PFOF is

disputed as argumentative and lacking any citation to or support in the record. Regardless, this

PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion,

encouragement, deception, or otherwise, to censor or suppress speech about the Great Barrington

Declaration on social media. Any assertion to that effect is unsupported by and contrary to the

evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

799.     Shortly after Dr. Collins' email to Dr. Fauci seeking a "quick and devastating …
take down" of the Great Barrington Declaration, the Declaration and its authors, Drs. Bhattacharya
and Kulldorff, experienced extensive censorship on social media. *See infra.* In October 2020,
Google deboosted the search results for the Declaration, so that "most users in English-speaking
countries, when they google 'Great Barrington Declaration,' will not be directed to the declaration
itself but to articles that are critical of the declaration."  Fauci Ex. 48, at 4.

**RESPONSE:** The description of Dr. Collins's email as "seeking a 'quick and

devastating . . . take down'" is disputed as a mischaracterization of the email, for the reasons stated

in the response to Plaintiffs' PFOF ¶¶ 788-89. Also disputed that "Drs. Bhattacharya and

Kulldorff[] experienced extensive censorship on social media," which assertion is vague and

unsupported by any citation to the record. Also disputed that social media companies' application

of their own content moderation policies, to which all users agree, constitutes "censorship." The

PFOF's assertions regarding Google's "deboost[ing]" the Declaration are disputed as based on a

news article containing hearsay and journalistic characterization rather than record evidence. U

Also disputed to the extent the PFOF implies that Dr. Collins's email and Google's alleged actions

are somehow related. Regardless, this PFOF contains no evidence that Dr. Fauci sought by threat,

coercion, encouragement, deception, or otherwise, to censor or suppress speech about the Great

Barrington Declaration on social media, nor evidence that any social media company did so at his

instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the

evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

800.    In the same time, "[c]ensorship of the declaration … also spread to Reddit. The two
most popular subreddits for discussion of the coronavirus – r/COVID-19 and r/coronavirus – have
both removed links to the Great Barrington Declaration. The moderators of r/coronavirus, a forum
with 2.3million members, have declared it to be 'spam'." Fauci Ex. 48, at 4-5.

**RESPONSE:** Disputed that a social media company's application of its own content

moderation policies, to which all users agree, constitutes "censorship." The PFOF's assertions

regarding Reddit's actions are disputed as based on a news article containing hearsay and

journalistic characterization rather than record evidence. Regardless, this PFOF contains no

evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to

censor or suppress speech about the Great Barrington Declaration on social media, nor evidence

that any social media company did so at his instruction, urging, or request. Any assertion to that

effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. §

II.B.3.b.

801.    In October 2020, YouTube updated its terms of service regarding medical
"misinformation," reporting "COVID-19 medical misinformation policy updated to prohibit
content about vaccines contradicting consensus from health authorities." Fauci Ex. 49, at 3.
"Health authorities" include federal officials like Dr. Fauci and Dr. Collins. *See id.* This October
2020 update specifically stated that claims which are "not allowed on YouTube" include "[c]laims
that achieving herd immunity through natural infection is safer than vaccinating the population,"

which is listed on the same footing as "[c]laims that COVID-19 vaccines contain a microchip or tracking device." Fauci Ex. 50, at 3-4.

**RESPONSE:** Disputed that Fauci Ex. 49 mentions Dr. Fauci or Dr. Collins. Undisputed as to the remaining allegations. Regardless, this PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech about the Great Barrington Declaration on social media, nor evidence that any social media company did so at his instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

802.    Pursuant to this censorship policy of YouTube, the authors of the Great Barrington Declaration had content removed from YouTube, including a video of a roundtable discussion with Governor Ron DeSantis of Florida. *See infra.*

**RESPONSE:** Disputed as lacking citation to or support by any evidence of record. Disputed also that a social media company's content moderation policies, to which all users agree, are "censorship" policies. Regardless, this PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech about the Great Barrington Declaration on social media, nor evidence that any social media company did so at his instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

803.    Facebook, likewise, adopted censorship policies against the Great Barrington Declaration. Meta's policy on "Misinformation about vaccines" states that: "We remove misinformation primarily about vaccines when *public health authorities* conclude that the information is false and likely to directly contribute to imminent vaccine refusals." Fauci Ex. 51, at 4 (emphasis added).

**RESPONSE:** Disputed that the cited "Misinformation Policy details" at Fauci Exhibit 51 adopts a "censorship polic[y] against the Great Barrington Declaration." Disputed also that a social media company's own content moderation policies, to which all users agree, constitute "censorship" policies. Regardless, this PFOF contains no evidence that Dr. Fauci sought by threat,

coercion, encouragement, deception, or otherwise, to censor or suppress speech about the Great

Barrington Declaration on social media, nor evidence that any social media company did so at his

instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the

evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

804.    Facebook/Meta views Dr. Fauci as a "public health authority" who may dictate
what people may post about COVID-19 on its platforms (Facebook and Instagram, among others),
because Mark Zuckerberg and Dr. Fauci were collaborating on multiple public appearances and
videos for Facebook. *See supra*; Scully Ex. 12, at 33, 53-54 (identifying 13 communications
between Dr. Fauci and Zuckerberg, including emails, phone calls, virtual meetings, and live
broadcasts, over a nine-month period in 2020). Indeed, in his March 15, 2020 email to Dr. Fauci,
Mark Zuckerberg described Dr. Fauci as an "expert[]," a "health expert[]" and "reliable source[]"
for "authoritative information" about fighting COVID-19. Fauci Ex. 23, at 3.

**RESPONSE:** The first sentence is disputed as argumentative, unsupported by the record,

and logically incoherent. Plaintiffs have introduced no evidence that Facebook/Meta has ever

viewed Dr. Fauci as possessing authority to "dictate" what may be posted about COVID-19 on

social media, and certainly no evidence for the bizarre allegation that a sophisticated corporate

entity like Facebook/Meta came to this patently erroneous belief because of so-called collaboration

between Mr. Zuckerberg and Dr. Fauci on three public Facebook videos. Undisputed that the

March 15, 2020 email at Fauci Exhibit 23 is accurately quoted. Regardless, this PFOF contains no

evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to

censor or suppress speech about the Great Barrington Declaration on social media, nor evidence

that any social media company did so at his instruction, urging, or request. Any assertion to that

effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. §

II.B.3.b.

805.    Dr. Fauci claims that he would not have paid any attention to the Great Barrington
Declaration because he is too busy and important to pay attention to such matters: "this is not
something that I would have been paying a lot of attention to. I was knee deep in trying to do things
like develop a vaccine that wound up saving the lives of millions of people. That's what I was
doing at the time." Fauci Dep. 256:13-17. Given Dr. Fauci's direct involvement in publicly

attacking the Great Barrington Declaration and collecting sources for Dr. Collins to "take [it] down," this statement is not credible. In fact, on November 1, 2020, Greg Folkers, Dr. Fauci's staffer at NIAID, sent Dr. Fauci a list of articles attacking the Great Barrington Declaration—including one co-authored by Gregg Gonsalves—with the statement "As discussed. I have highlighted the three I found the most useful." Fauci Ex. 52, at 1. The list of articles were all harshly critical of the Declaration—using phrases like "dangerous," "false promise," "ethical nightmare," and "could kill millions." *Id.* Thus, four weeks after the Declaration was published, Dr. Fauci and his staffers were still "discuss[ing]" and looking up articles on ways to attack it. *Id.*

**RESPONSE:** Disputed as an argumentative mischaracterization of the record to the extent the PFOF asserts that Dr. Fauci claimed he was "too busy and important," or that he was "too busy and important to pay attention to" "the great Barrington Declaration." The quoted testimony concerns Dr. Fauci's recollection of the authors of the Declaration meeting with the former Secretary of HHS. In the quoted testimony, Dr. Fauci is responding to the question, "Do you recall Dr. Bhattacharya, Gupta, and Dr. Kulldorff meeting with Secretary Azar?" Fauci Dep. 256:4-5. Dr. Fauci responds, "You know, I don't. I think after the fact, I would have known because Francis [Collins] said they did," *id.* at 256:6-8, in the October 8, 2020 email from Dr. Collins to Dr. Fauci that Dr. Fauci was shown during his deposition, *id.* at 254:3-14, 255:10-15. Dr. Fauci goes on to say, in relation to the October 8, 2020 email from Dr. Collins: "It is very likely, although I'm not 100 percent sure that the meeting of the . . . authors of the declaration with the Secretary, [that] this was very likely the first time it was brought to my attention, although I can't say for sure. I would imagine – again, getting back to context, this is not something that I would have been paying a lot of attention to. I was knee deep in trying to do things like develop a vaccine that wound up saving the lives of millions of people. That's what I was doing at the time. So an e-mail like this may not have necessarily risen to the top of my awareness and interest." *Id.* at 256:6-20. Further disputed as an argumentative mischaracterization of the record is the assertion that Dr. Fauci was "direct[ly] involve[d] in publicly attacking" the Declaration, which lacks any record citation. Undisputed that Greg Folkers sent Dr. Fauci articles that were critical of the Declaration, but

disputed that the articles were collected "for Dr. Collins," which assertion is unsupported by any

citation showing that Dr. Fauci sent those articles to, or discussed them with, Dr. Collins.

Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat,

coercion, encouragement, deception, or otherwise, to censor or suppress speech about the Great

Barrington Declaration on social media. Any assertion to that effect is unsupported by and contrary

to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

806.    Dr. Kulldorff points out that, regardless of disagreements over the policy,
describing the Declaration as "fringe" and "nonsense" is fundamentally dishonest, as the
Declaration reflects principles of pandemic preparedness that were widely accepted before
COVID-19: "the Great Barrington Declaration is merely a restatement of the principles of public
health. Lockdown … is a 'terrible experiment' that throws those principles 'out of the window' by
focusing solely on one disease at the expense of all other health problems. 'Most countries in
Europe had a pandemic-preparedness plan that did not recommend lockdowns, but instead
proposed a risk-based strategy to protect those at high risk, which is actually the same as the
focused protection we put forward in the Great Barrington Declaration. What we are proposing is,
therefore, nothing revolutionary', [Kulldorff] said."  Fauci Ex. 48, at 6.

**RESPONSE:**  Undisputed that the quoted statements were made by Dr. Kulldorff.

Regardless, this PFOF contains no evidence that Dr. Fauci sought by threat, coercion,

encouragement, deception, or otherwise, to censor or suppress speech about the Great Barrington

Declaration on social media. Any assertion to that effect is unsupported by and contrary to the

evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

807.    Regarding the censorship of the Great Barrington Declaration on social media, Dr.
Fauci repeatedly testified that he was oblivious to it: "I don't pay much attention to what goes on
in social media … it is highly unlikely that … I paid any attention to this thing of Google censoring
the Great Barrington Declaration … I would not have paid much attention to it."  Fauci Dep.
281:15-282:2, 283:7-10. In light of his contemporaneous statements and emails, this statement is
not credible.

**RESPONSE:** Disputed as argumentative and unsupported by citation to or evidence in the

record the assertion that Dr. Fauci's "contemporaneous statements and emails" somehow

undermine the credibility of his testimony that he does not "pay much attention to what goes on in

social media." *See, e.g.*, Resp. to Pls.' PFOF ¶¶ 684, 746, 773, 805. The quoted testimony is undisputed. Regardless, this PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress the Great Barrington Declaration on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

808.    Like so many other topics, Dr. Fauci repeatedly testified that he could not recall virtually anything about his involvement in seeking to squelch the Great Barrington Declaration. He testified at least 33 times that he could not recall his involvement in this matter. *See* Fauci Dep. 251:11, 252:20, 255:6, 255:9, 256:3, 257:5, 258:12, 263:1, 263:15, 263:21, 264:17, 264:20, 264:22, 265:2, 265:6, 268:10, 268:18, 270:24, 282:19-20, 284:22-23, 290:13, 290:21, 291:13, 291:16, 292:15, 292:24, 293:15, 293:24, 295:9, 295:25, 296:21, 297:2-3, 297:14. For the reasons discussed above, these claims to almost total loss of memory are not credible.

**RESPONSE:** Disputed that Dr. Fauci's testimony that he could not recall matters such as "the moment [he] became aware of [The Great Barrington Declaration]," Fauci Dep. 252:19-20; *see also id.* at 251:11, when he first "read the Great Barrington Declaration," *id.* at 255:3-9, receiving one email on October 8, 2020, *id.* at 263:11-22, and other minutia from years ago amounts to a "claim[] to almost total loss of memory," rendering Dr. Fauci's testimony not credible. The PFOF is further disputed because it relies on the counterfactual assumption that Dr. Fauci was part of an effort to "squelch the Great Barrington Declaration," and then implies that he is dishonest for not "recall[ing]" that alleged effort. *But see* Resp. to Pls.' PFOFs ¶¶ 788-89. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech about the Great Barrington Declaration on social media, nor evidence that any social media company did so at his instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

    **D.**    **NIAID Flags Social-Media Accounts for Censorship Under Dr. Fauci.**

809.    As noted above, Dr. Fauci testified that he is not aware of any NIAID or NIH staff contacting social media platforms to ask them to remove content. In fact, NIAID and NIH staff—including staffers in Dr. Fauci's senior circle—sent several messages to social-media platforms asking them to remove content lampooning or criticizing Dr. Fauci. Dr. Fauci's testimony to the contrary is not credible.

**RESPONSE:** Disputed as an argumentative mischaracterization unsupported by the

evidence and without citation to the record.

810.    On March 14, 2020, a Twitter employee reached out to CDC officials, including Carol Crawford, and asked if a particular account associated with Dr. Fauci is "real or not." Fauci Ex. 53, at 2. Scott Prince of NIH responded, "Fake/Impostor handle. PLEASE REMOVE!!!" *Id.* Twitter responded that it would take action promptly and "circle back ASAP." *Id.* An HHS official then asked if Twitter could pre-block similar parody accounts: "Is there anything else that you can also do to block other variations of [Dr. Fauci's] name from impersonation so we don't have this happen again?" *Id.* at 1. Twitter replied: "We'll freeze this @handle and some other variations so no one can hop on them." *Id.*

**RESPONSE:** Undisputed, except as to the assertion that "an HHS official" asked Twitter

to "pre-block similar parody accounts" to the extent that assertion is meant to suggest that the

official asked for anything more than is reflected in the quoted text regarding the impersonating

Dr. Fauci account. Also dispute the characterization of the account in question as a "parody

account," and that HHS asked Twitter to pre-block "parody account[s]," on the basis that it lacks

citation to and support in the record. Additionally note that it is not unusual for members of the

public, or victims themselves, to report imposter accounts or doctored content to social media

platforms. Twitter, Facebook, and YouTube each prohibit imposter accounts and provide

mechanisms for the public to report violations of their imposter rules. *See* Ex. 56 (*Account Integrity*

*& Authentic Identity*, Meta, https://perma.cc/DCR9-9FBY); Ex. 57 (*Authenticity on Twitter*,

Twitter Help Center, https://perma.cc/6NVT-PS59); Ex. 58 (*Impersonation policy*, YouTube Help,

https://perma.cc/R5BD-X6JB). Additionally, willfully impersonating a federal official is a federal

crime. *See* 18 U.S.C. § 912; *see also* Resp. to Pls.' PFOF ¶ 168. This PFOF contains no evidence

that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or

suppress speech on social media, nor evidence that any social media company did so at his instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b. & f.

811.    Likewise, on April 21, 2020, Judith Lavelle of NIAID emailed Facebook, copying Scott Prince of NIH and Jennifer Routh of Dr. Fauci's communications team, and stated: "We wanted to flag a few more fake Dr. Fauci accounts on FB and IG for you. I have also reported them from @niaid and my personal FB account." Fauci Ex. 55, at 3. She listed eight accounts that she considered fake. One of these was called "Dr.FauciTheHero," and she stated, "I think this one may be fine as a fan page but could use a reminder to be a bit more clear," *id.* at 4—thus noting that she was seeking the censorship only of speech about Dr. Fauci that the government disfavors, while "a fan page" was fine.

**RESPONSE:** Disputed that Judith Lavelle "was seeking the censorship only of speech about Dr. Fauci that the government disfavors." As the text quoted by Plaintiffs make clear, Ms. Lavelle was seeking the removal of accounts that were impersonating Dr. Fauci. Ms. Lavelle noted that she thought the account called "Dr.FauciTheHero" might "be fine" because it may have been simply a "fan page" and not an impersonating page. As explained in the response to Plaintiffs' PFOF ¶ 810, the request that a social media company remove impersonating accounts, which may violate federal law, is not unusual. *See also* Resp. to Pls.' PFOF ¶ 168. This PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on social media, nor evidence that any social media company did so at his instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b. & f.

812.    Both Jennifer Routh and Judith Lavelle are members of Dr. Fauci's communications staff. Fauci Dep. 308:14-21.

**RESPONSE:** Undisputed.

813.    The fact that Lavelle stated they were flagging "a few *more*" accounts indicates that NIAID's flagging social-media accounts for censorship was not an isolated incident but an ongoing practice. Fauci Ex. 55, at 3.

**RESPONSE:** Disputed as to Plaintiffs' characterization that this email represents "flagging social-media accounts for censorship" or that this reflects an "ongoing practice" to flag accounts "for censorship." *See* Resp. to Pls.' PFOF ¶ 811. And as explained in the response to Plaintiffs' PFOFs ¶ 810, the request that a social media company remove impersonating accounts, which may violate federal law, is not unusual. *See also* Resp. to Pls.' PFOF ¶ 168. This PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b. & f.

814.    Lavell then followed up flagging yet another account, saying "Apologies one more," and adding Greg Folkers of Dr. Fauci's personal staff to the email chain reporting these accounts to Facebook for censorship. Fauci Ex. 55, at 3.

**RESPONSE:** Disputed as to the characterization of Greg Folkers, a NIAID employee, as a member of Dr. Fauci's "personal staff." Also disputed as to Plaintiffs' characterization that this email represents reporting "accounts . . . for censorship" rather than for removal for impersonating a federal official. *See* Resp. to Pls.' PFOF ¶ 811. As explained in the response to Plaintiffs' PFOFs ¶ 810, the request that a social media company remove impersonating accounts, which may violate federal law, is not unusual. *See also* Resp. to Pls.' PFOF ¶ 168. This PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on social media, nor evidence that any social media company did so at his instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b. & f.

815.    The same day, Facebook responded, "Flagged this for the fake accounts team and they have confirmed that all but two accounts were removed for impersonation of Dr. Fauci. I guess two of the accounts are fan accounts." Fauci Ex. 55, at 3.

**RESPONSE:** Undisputed. This PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on social media, nor evidence that any social media company did so at his instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b. & f.

816.    The Facebook employee then added, "Also want to intro you all to [two more Facebook employees] who have been working hard to manage any fake accounts for NIH across the board. She can work with you directly if anything like this comes up."  Fauci Ex. 55, at 2. Lavelle responded that "our team will be sure to reach out if we identify any more impersonations," *id.*, and Facebook answered that Lavelle of NIAID should "feel [free] to flag to us the various imposter accounts," Fauci Ex. 55, at 1. Again, this response indicates an ongoing and widespread practice of NIH reporting supposedly "fake" accounts for censorship.  *Id.*

**RESPONSE:** Disputed as to Plaintiffs characterization that this email represents an "ongoing and widespread practice" of reporting "accounts for censorship" rather than a discussion about an efficient way to "manage any fake accounts for NIH" impersonating a federal official. *See* Resp. to Pls.' PFOF ¶ 811. As explained in the response to Plaintiffs' PFOF ¶ 810, the request that a social media company remove impersonating accounts, which may violate federal law, is not unusual. *See also* Resp. to Pls.' PFOF ¶ 168. This PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on social media, nor evidence that any social media company did so at his instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b. & f.

817.    Dr. Fauci testifies that he does not remember for certain, but he "likely" asked his communications staff to do something about these impersonation or parody accounts. Fauci Dep. 302:6-10 ("I vaguely remember somebody mentioning something about an imposter account. … And I likely would have said, 'Well, how can they do that?'"). He also agrees that his communications staff would do so on their own. *Id.* at 301:1-4 ("I have a communication staff that I'm sure, if they found out it was a false and misleading account, that they would want it to be removed."); *see also id.* at 301:23-25; 304:19-21.

**RESPONSE:** Disputed as a misrepresentation of the testimony, in which Dr. Fauci does not state that he "'likely' asked his communications staff to do something about" any accounts. Instead, Dr. Fauci testified that if his Courtney Billet from his communications staff "found out that [there] was an imposter handle, . . . she would have asked [Twitter] to take it down herself, possibly without even telling me except to say, 'There's an imposter account on you. We'll take care of it.'" Fauci Dep. 301:23-302:2. Dr. Fauci further testified: "I vaguely remember somebody mentioning something about an imposter account. I didn't even know what an imposter account was. And I likely would have said, 'Well, how can they do that?'" *Id.* at 302:6-10. Further disputed as to the reference to "parody accounts." Although Plaintiffs repeatedly suggest the possibility that some accounts were "parody" accounts, they have introduced no such evidence and the communications from NIAID staff clearly show that NIAID staff were only seeking the removal of accounts impersonating Dr. Fauci. This PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on social media, nor evidence that any social media company did so at his instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b. & f.

818.   Dr. Fauci believes it is "totally appropriate" for his communications staff to contact social-media platforms and seek the removal of such accounts. *Id.* at 312:19-21; *see also id.* at 310:14-16.

**RESPONSE:** Undisputed. This PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on social media, nor evidence that any social media company did so at his instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b. & f.

819.    He thinks so because "impersonating me is a bad thing." *Id.* at 303:20; *see also id.* at 304:11-13; 309:23-310:1 ("fake accounts are bad things, I believe"); 311:20-21. Dr. Fauci specifically believes that removing accounts associated with him is "a good thing" because "those accounts are bad." *Id.* at 329:12-16.

**RESPONSE:** Undisputed that Dr. Fauci testified that impersonating him, a federal official, is a "bad thing." It is also a federal crime. *See* 18 U.S.C. 912 ("Whoever falsely assumes or pretends to be an officer or employee acting under the authority of the United States or any department, agency or officer thereof, and acts as such, or in such pretended character demands or obtains any money, paper, document, or thing of value, shall be fined under this title or imprisoned not more than three years, or both."). *See* Resp. to Pls.' PFOF ¶ 168. Disputed that Dr. Fauci testified that he believes generally "that removing accounts associated with him is 'a good thing.'" He testified: "So they removed a spurious, fake account, which I think was a good thing . . . because those accounts are bad." Fauci Dep. 329:12-16. This PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on social media, nor evidence that any social media company did so at his instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b. & f.

820.    Dr. Fauci does not know whether some of the so-called "fake accounts," which he calls "bad things," that his staff flagged for censorship may actually be parody accounts. *Id.* at 311:7-9.

**RESPONSE:** Disputed as a mischaracterization of the evidence. The record is devoid of any evidence or suggestion that any of the accounts were "parody accounts." Although Plaintiffs repeatedly suggest the possibility that some accounts were parody accounts, they have introduced no such evidence and the communications from NIAID staff clearly show that NIAID staff were only seeking the removal of accounts impersonating Dr. Fauci. Moreover, Dr. Fauci did not testify about the removal of any "parody" accounts but instead testified that, based on the email he was

shown for the first time during his deposition, it looked like his communications staff was "trying

to get rid of fake accounts" on Facebook "because fake accounts are bad things, I believe." Fauci

Dep. 309:24–310:1. This PFOF contains no evidence that Dr. Fauci sought by threat, coercion,

encouragement, deception, or otherwise, to censor or suppress speech on social media, nor

evidence that any social media company did so at his instruction, urging, or request. Any assertion

to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E.,

Arg. § II.B.3.b. & f.

821.    Moreover, it was not just NIAID staff, but also White House staff, who flagged content about Dr. Fauci for removal from social-media platforms. As noted above on Tuesday, July 20, 2021, Clarke Humphrey of the White House communications office emailed Facebook asking for the removal of an Instagram account associated with Dr. Fauci, saying it "is not actually one of ours."  Fauci Ex. 57, at 1-2. Facebook responded one minute later, stating, "Yep, on it!" Fauci Ex. 57, at 1. Courtney Billet, Dr. Fauci's communications director at NIAID, then weighed in, asking Facebook to disclose whether "there's a federal email address attached to whomever set this account up," so that she could ascertain whether the account was set up by "some federal employee outside our official comms offices."  Fauci Ex. 57, at 1. The next day, Facebook responded, stating, "This account has been removed. Thank you for flagging!"  Fauci Ex. 57, at 1.

**RESPONSE:** Disputed that "NIAID staff" and "White House staff" generally "flagged

content about Dr. Fauci for removal from social-media platforms" as argumentative and

unsupported by citation to or evidence in the record. As the cited email chain shows, the White

House flagged an Instagram account for removal because it was "a fake account." Fauci Ex. 57, at

1. Fake accounts violate Facebook's terms of service, to which all users agree, *see* Ex. 56 at 2-3,

and posts that improperly impersonate federal officials potentially constitute federal crimes, *see*

18 U.S.C. § 912. *See* Resp. to Pls.' PFOF ¶ 168. Also note that Clarke Humphrey was a member

of the COVID-19 Response Team, not the White House communications office. Moreover, this

PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception,

or otherwise, to censor or suppress speech on social media, nor evidence that any social media

company did so at his instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b. & f.

822.    NIAID's communications with social-media platforms were not limited to flagging impostor or parody accounts. On October 30, 2020, for example, a NIAID staffer wrote an email connecting Google/YouTube with Jennifer Routh of NIAID's "Office of Communications and Government Relations," so that NIAID and the "Google team" could "connect on vaccine communications – specifically misinformation…." Fauci Ex. 56, at 2. Routh then added Courtney Billet ("director of the Office of Communications and Government Relations at NIAID") and two other senior NIAID officials to the communications chain with YouTube. Fauci Ex. 56, at 1.

**RESPONSE:**  Disputed that these communications indicate that NIAID was communicating with social media companies on misinformation. The first email in the chain cited at Exhibit 56 explicitly notes that Google had reached out to connect on vaccine communications, including on misinformation, and a NIAID employee responded by reaching out to NIAID's Office of Communications and Government Relations to try to point Google in "the right direction HHS Comms team wise"—in other words, to connect Google with someone *outside of NIAID*. Fauci Ex. 56 at 1. Jennifer Routh responded and added other individuals who could connect Google with contacts outside of NIAID, noting "[m]y colleagues may have a better sense of the various leads for various HHS-wide comms efforts focused on vaccine communication." *Id.* This PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on social media, nor evidence that any social media company did so at his instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b. & f.

823.    Likewise, in response to a third-party subpoena, Twitter has disclosed that Dina Perry, a Public Affairs Specialist for NIAID, communicates or has communicated with Twitter about misinformation and censorship. Jones Decl., Ex. F, at 1.

**RESPONSE:** Undisputed that Dina Perry's name appears in Exhibit F and that she was a NIAID employee, but disputed to the extent the PFOF mischaracterizes the response as disclosing

that Dina Perry communicates or has communicated with Twitter about "misinformation and censorship." Exhibit F is a document entitled "Twitter Final Production Agreement Second Supplemental Response to Request Number 5," and it does not disclose the request to which Twitter is responding. Therefore, it is impossible to determine why Twitter disclosed her name, but the document certainly provides no evidence for the assertion that Dina Perry "communicates or has communicated with Twitter about misinformation and censorship." This PFOF also contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on social media, nor evidence that any social media company did so at his instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b. & f.

824.   NIAID did not disclose Dina Perry in response to interrogatories seeking the identities of NIAID officials who communicate with social-media platforms about misinformation, disinformation, and censorship. Scully Ex. 12, at 17-18.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes NIAID's interrogatory responses as not disclosing the identities of NIAID officials who communicate with social-media platforms about "misinformation, disinformation, and censorship." NIAID's interrogatory responses do not support that characterization. *See* Defs' Resp. to PFOF ¶¶ 823, 1083. The cited response was to Plaintiffs' interrogatory requesting disclosure of NIAID officials who are communicating or have communicated with any social media platform "regarding Content Modulation and/or Misinformation." Scully Ex. 12 at 13. NIAID's response referred Plaintiffs "to the documents being produced in response to" specific requests for production, and further identified "the custodians whose e-mails were collected" for purposes of responding to the requests for production. *Id.* at 17-18. While Dina Perry was not identified as a *custodian* whose emails were searched, her name and email address were disclosed in NIAID's production of documents.

825.    Dr. Fauci testified that he has never "contacted a social media company and asked them to remove misinformation from one of their platforms." Fauci Dep. 151:21-24 ("No, I have not."). He also testified that no one on his staff at NIAID has "ever reached out to a social media platform to ask them to take content down or to block content in any way. *Id.* at 152:7-15 ("To my knowledge, no."). In light of the repeated attempts of Dr. Fauci's staff to have content related to Dr. Fauci removed from social media, Dr. Fauci's testimony on this point is not credible.

**RESPONSE:** Disputed as argumentative and lacking citation to or support in the record

for all the reasons discussed above. The quoted testimony, however, is undisputed. When asked

whether anyone on his staff has "ever reached out to a social media platform to ask them to take

content down or to block content in any way," Dr. Fauci responded "To my knowledge, no. But

again, I don't know everything that goes on, but certainly nothing that I was made aware of that

they were doing." Fauci Dep. 152:7-15. The handful of requests from NIAID communications

staff to remove impersonating accounts, and the response to Google's request for a point of contact

to discuss information about vaccines, none of which Dr. Fauci was personally involved in or had

knowledge of, do not cast doubt on the credibility of his testimony. This PFOF contains no

evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to

censor or suppress speech on social media, nor evidence that any social media company did so at

his instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to

the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b. & f.

**E.    CDC and NIH Procure the Censorship of Speech on Ivermectin.**

826.    On September 13, 2021, Facebook emailed Carol Crawford of the CDC to ask the CDC to identify whether the claim that "Ivermectin is effective in treating COVID" is "false, and if believed, could contribute to people refusing the vaccine or self-medicating," which were the qualifications for censoring that claim on Facebook's platforms. Fauci Ex. 58, at 2. Facebook noted that it was currently rating this claim as "*not false*," *i.e.*, Facebook was *not* censoring the claim that Ivermectin is effective in treating COVID-19, because there was "no consensus" of its efficacy for treatment. *Id.* at 3.

**RESPONSE:** Disputed. The email, which speaks for itself, does not support Plaintiffs'

assertion about "the qualifications for censoring that claim on Facebook's platforms" or its

argumentative assertion that "Facebook was *not* censoring the claim that Ivermectin is effective in treating COVID-19, because there was 'no consensus' of its efficacy for treatment." The email contains no information about what Facebook planned to do with CDC's responses to its questions or what "qualifications" the company had in place for moderating content on its platform. Disputed also that a social media company's application of its own content moderation policies, to which all users agree, constitutes "censorship."  This PFOF contains no evidence that Dr. Fauci, CDC, or NIH sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on social media, nor evidence that any social media company did so at their instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b. & f.

827.    The next day, the CDC responded, advising Facebook that the claim that "Ivermectin is effective in treating COVID" is "***NOT ACCURATE***" (bold and italics in original) and thus should be censored on Facebook's platforms. Fauci Ex. 58, at 1. To support this claim, the CDC cited NIH's "Ivermectin | COVID-19 Treatment Guidelines." *Id.* Thus, the CDC cited the NIH's treatment guidelines for Ivermectin as authority to urge Facebook to censor claims about using Ivermectin to treat COVID-19. *Id.* CDC also cited NIH to call for the censorship of two related claims about Ivermectin, and noted that "[t]hese responses are based on the independent advice of … NIH," which had "opined that there are not data that indicate ivermectin is effective in the ways described above." *Id.*

**RESPONSE:** Disputed as an argumentative mischaracterization of the emails. In addition to citing to NIH treatment guidelines, CDC also cited to www.idsociety.org and explained that "These responses are based on the independent advice of two national bodies of infectious diseases SME's expert in the treatment of COVID-19: NIH and the IDSA, which have opined that there are not data that indicate ivermectin is effective in the ways described above." Fauci Ex. 58 at 1. Furthermore, the emails say nothing about whether claims "should be censored on Facebook's platform," nor did they "call for the censorship of two related claims about Ivermectin."  Disputed also that a social media company's application of its own content moderation policies, to which

all users agree, constitutes "censorship."  This PFOF contains no evidence that Dr. Fauci, CDC, or NIH sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on social media, nor evidence that any social media company did so at their instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b. & f.

**F.    Dr. Fauci's Double Standard on Acceptable Speech: Mask Mandates.**

828.    "Sylvia Burwell is the former Secretary of the Department of Health and Human Services [under President Obama] and the current president of American University."  Fauci Dep. 313:9-11. "Sylvia has, over the past couple of years, asked [Dr. Fauci] advice about personal safety during the COVID-19 pandemic." *Id.* at 313:17-19.

**RESPONSE:** Undisputed, but irrelevant to the issues presented in this case.

829.    On February 4, 2020, Sylvia Burwell wrote Dr. Fauci an email stating that she was traveling and wondering if she should wear a mask in the airport. Fauci Dep. 313:21-314:5; *see also* Jones Decl., Ex. EE, at 1. Dr. Fauci responded, stating: "Masks are really for infected people to prevent them from spreading infection to people who are not infected, rather than protecting uninfected people from acquiring infection. The typical mask you buy in the drugstore is not really effective in keeping out virus, which is small enough to pass through material. … I do not recommend that you wear a mask…." Fauci Dep. 314:9-19; *see also* Jones Decl., Ex. EE, at 1.

**RESPONSE:** Undisputed, but irrelevant to the issues presented in this case.

830.    Dr. Fauci agrees that he "made several statements that are similar to that at that time frame." Fauci Dep. 315:12-14.

**RESPONSE:** Undisputed, but note for clarity that the "time frame" referred to is February 2020. Fauci Dep. 315:12-18. Also irrelevant to the issues presented in this case.

831.    He states that, at that time, there were "no studies" on the efficacy of masking to stop the spread of COVID-19. *Id.* at 316:8-13.

**RESPONSE:** Undisputed, but note for clarity that the "time frame" referred to is February 2020. Fauci Dep. 315:12-18. Also irrelevant to the issues presented in this case.

832.    In fact, on March 31, 2020, Dr. Fauci forwarded studies showing that masking is ineffective. Fauci Dep. 318:24-319:7.

**RESPONSE:** Disputed. Plaintiffs do not cite to a specific email and did not introduce the alleged email as an exhibit during the deposition. When asked about the alleged email, Dr. Fauci responded: "Yeah, I don't recall that, so I'm not able to answer that accurately, I believe." Fauci Dep. 319:6-7. Also irrelevant to the issues presented in this case.

833.    Dr. Fauci's position on masking dramatically changed by April 3, 2020, when he became an advocate for universal mask mandates. *Id.* at 317:14-20.

**RESPONSE:** Disputed as to the characterization that any change in position was "dramatic," and to the characterization of the testimony as showing the Dr. Fauci was an advocate for "universal mask mandates," as the meaning of that term is not discussed or defined in the deposition of the PFOF. Also irrelevant to the issues presented in this case.

834.    Dr. Fauci states that his position on masking changed in part because "[e]vidence began accumulating that masks actually work in preventing acquisition and transmission." Fauci Dep. 317:5-6.

**RESPONSE:** Undisputed, but irrelevant to the issues presented in this case. Dr. Fauci was asked to identify any studies that were done between February 2020 and April 3, 2020, that supported his change of position on the efficacy of masking, and he could not identify any. *Id.* at 318:8-10.

835.    Dr. Fauci was asked if there were any "placebo-based, double-blind, randomized studies of the efficacy of masking that were done between February and April 2020," and he could not identify any. *Id.* at 322:1-5. IN fact, it is obvious that there were none.

**RESPONSE:** Disputed as a mischaracterization of the cited testimony. Dr. Fauci was asked during his deposition, "How many studies were done between February of 2020 . . . and April 3 of 2020, what studies were done . . . ," and he responded, "I could find those and – and get them for you, but I don't have them in my fingertips right now." Fauci Dep. 317:21-318:10. Also irrelevant to the issues presented in this case.

836.   Dr. Fauci was asked if there were any "placebo-based, double-blind, randomized studies of the efficacy of masking that were done between February and April 2020," and he could not identify any. *Id.* at 322:1-5. In fact, it is obvious that there were none.

**RESPONSE:** Undisputed that during his deposition, Dr. Fauci could not recall specifically whether any placebo-based, double-blind, randomized studies on the efficacy of masking were conducted between February and April 2020. Dr. Fauci stated: "I'd have to go back and take a close look at the literature. I don't recall." Fauci Dep. 322:4-5. And as noted in response to Plaintiffs' PFOF ¶ 835, although Dr. Fauci did not identify specific studies, Dr. Fauci stated, "I could find those and – and get them for you, but I don't have them in my fingertips right now." Fauci Dep 318:8-10. The second sentence is disputed as an argumentative and conclusory assertion unsupported by the evidence and without citation to the record. The PFOF is also irrelevant to the issues presented in this case.

837.   Dr. Fauci's position on masking, therefore, directly contradicts his insistence on randomized, double-blind, placebo-based clinical trials for alternative COVID-19 treatments like hydroxychloroquine and ivermectin. At best, Dr. Fauci's dramatic change in position on masking was based on observational studies—the same kind of studies that he dismissed, in the very same time frame, as inadequate to support the use of hydroxychloroquine to treat COVID-19. At worst, it was based on no evidence at all—and Dr. Fauci identified none.

**RESPONSE:** Disputed as an argumentative mischaracterization unsupported by the evidence and without citation to the record. Also irrelevant to the issues presented in this case.

838.   Dr. Fauci believes it can be dangerous to give ordinary people access to scientific information: "If information is clearly inadequate and statistically not sound, there can be a danger in people who don't have the ability or the experience of being able to understand that it's a flawed study." *Id.* at 323:5-9.

**RESPONSE:** Disputed as an argumentative mischaracterization of the testimony, in which Dr. Fauci only expresses concern with "people who don't have the ability or the experience of being able to understand" that a study may be "flawed" because the "information is clearly inadequate and statistically not sound." Fauci Dep. 323:5-9. Also irrelevant to the issues presented

in this case. In any event, the PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

839.    Dr. Fauci believes that it is "disturbing" when "unwitting" people believe what he thinks is misinformation: "I think honest debate is important, but when it goes beyond debate and leads people who are unwitting about these things to do things that are clearly detrimental to their life and their safety, I find that disturbing."  *Id.* at 358:13-17.

**RESPONSE:** Disputed as an argumentative mischaracterization of the testimony to the extent the PFOF asserts that Dr. Fauci was opining on people believing "what he thinks is misinformation." the accuracy of the quoted text of the testimony is undisputed. Also irrelevant to the issues presented in this case. In any event, the PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

### G.    Dr. Fauci and the White House Cause the Censorship of Alex Berenson.

840.    Alex Berenson is a former New York Times science reporter and prominent critic of government messaging about COVID-19 vaccines who was deplatformed from Twitter on August 28, 2021, after months of pressure from White House and federal officials.  Fauci Ex. 59, at 4.

**RESPONSE:** Disputed as an argumentative mischaracterization of the evidence. There is no evidence to support the reference to "months of pressure from White House and federal officials," and the cited email does not offer any factual support for that argumentative assertion. This PFOF also relies on a characterization contained in a self-serving opinion article written by Alex Berenson rather than any evidence of record. Additionally, as noted at Resp. to Pls.' PFOF ¶ 103, Twitter informed Messrs. Mr. Slavitt and Flaherty in April 2021 that it was not going to

remove Mr. Berenson from Twitter because he had not violated its terms of service at that time. The document cited by this PFOF contains no evidence that the White House, Dr. Fauci, or any other federal official, threatened or pressured Twitter to censor speech, or that Twitter regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.1.b., II.B.3.b. & f.

841.   As Berenson notes: "On July 16, 2021, President Biden complained publicly that social media companies were 'killing people' by encouraging vaccine hesitancy. A few hours after Biden's comment, Twitter suspended by account for the first time." Fauci Ex. 59, at 4.

**RESPONSE:** Undisputed that the article quoted at Exhibit 59, which is an article written by Alex Berenson, is accurately quoted. However, disputed to the extent the PFOF mischaracterizes President Biden's statement as accusing social-media platforms of "killing people," *see* Resp. to Pls.' PFOF ¶ 154, and insinuates that Mr. Berenson's temporary suspension from Twitter had anything to do with President Biden's statement. The cited article does not support these characterizations and assumptions. *See* Resp. to Pls.' PFOF ¶ 163. Moreover, this PFOF contains no evidence that Dr. Fauci or the White House sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on social media, nor evidence that any social media company did so at their instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.1.b., II.B.3.b. & f.

842.   Dr. Fauci, who was then Chief Medical Advisor to President Biden, played a key role in procuring the censorship of Alex Berenson. Shortly before President Biden's comments, Dr. Fauci engaged in public attacks on Alex Berenson in attempt to discredit him and silence his government-skeptical opinions.

**RESPONSE:** Disputed as an argumentative mischaracterization unsupported by the evidence and without citation to the record. Neither the PFOF nor the article cited above, contains

evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on social media, nor evidence that any social media company did so at their instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.1.b., II.B.3.b. & f.

843.     On July 11, 2021, appearing on CNN's "State of the Union," Dr. Fauci described Alex Berenson's comments on vaccine skepticism as "horrifying." Fauci Ex. 60, at 1. Responding to applause for a speech given by Berenson at a conference, Dr. Fauci stated: "It's horrifying. I mean, they are cheering about someone saying that it's a good thing for people not to try and save their lives." *Id.* In response to Berenson's views, Dr. Fauci stated, "it's almost frightening to say, … we don't want you to do something to save your life." *Id.* Dr. Fauci also stated, "I don't think that anybody who is thinking clearly can get that." *Id.*

**RESPONSE:** Disputed to the extent the PFOF asserts that Dr. Fauci "described Alex Berenson's comments" as horrifying as unsupported by the cited news article, which reports instead that Dr. Fauci said it was "horrifying" that people were "cheering about someone saying that it's a good thing for people not to try and save their lives." Fauci Ex. 60 at 1. Moreover, while the article states that Dr. Fauci "was responding to a clip of conservative author Alex Berenson, who spoke at CPAC on Saturday," the article does not state that Dr. Fauci specifically named Alex Berenson in any of his statements or even that Alex Berenson was identified by name at all during the CNN "State of the Union" interview that was the subject of the news article. *See id.* at 1-2. Further disputed to the extent Plaintiffs' PFOF relies on hearsay and journalistic characterization contained in an opinion article rather citing to evidence of record. However, the PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on social media, nor evidence that any social media company did so at their instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.1.b., II.B.3.b. & f.

844.     Dr. Fauci's public comments as the President's Chief Medical Advisor specifically criticizing Alex Berenson were made at a time when other White House officials like Andrew Mr.

Slavitt were *privately* pressuring Twitter to deplatform Berenson since April 21, 2020. *See, e.g.,* Fauci Ex, 58, at 7 (internal Twitter communications on April 22, 2020, indicating that White House officials "had one really tough question about why Alex Berenson hasn't been kicked off from the platform," and "yes, they really wanted to know about Alex Berenson. Andy Mr. Slavitt suggested they had seen data vis that had showed he was the epicenter of disinfo that radiated outwards to the persuadable public.").

**RESPONSE:** Disputed that Dr. Fauci made public comments "specifically criticizing Alex Berenson" as an argumentative mischaracterization lacking citation to or support from the record. The article cited in the immediately preceding PFOF, at Fauci Ex. 60, states instead that Dr. Fauci found it "horrifying" that people were "cheering about someone saying that it's a good thing for people not to try and save their lives." Fauci Ex. 60 at 1. Moreover, while the article states that Dr. Fauci "was responding to a clip of conservative author Alex Berenson, who spoke at CPAC on Saturday," the article does not state that Dr. Fauci specifically named Alex Berenson in any of his statements or even that Alex Berenson was identified by name at all during the CNN "State of the Union" interview that was the subject of the news article. *See id.* at 1-2. Also disputed as an argumentative mischaracterization of the evidence that "White House officials like Andrew Mr. Slavitt were privately pressuring Twitter to deplatform Berenson" at any point in time. *See* Resp. to Pls.' PFOF ¶ 103 (noting also that several weeks after meeting with Mr. Slavitt and Mr. Flaherty, Twitter informed Mr. Flaherty that it would not be removing Mr. Berenson because he had not violated Twitter's policies at that time). The PFOF also contains typographical errors; the exhibit reflects alleged communications dated April 22, 202*1*. In any event, the PFOF contains no evidence that Dr. Fauci (or the White House) sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on social media, nor evidence that any social media company did so at their instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.1.b., II.B.3.b. & f.

845.   Dr. Fauci does not deny that he may have discussed Alex Berenson with other White House or federal officials, but claims he does not recall whether he did so. Fauci Dep. 343:16-23.

**RESPONSE:** Undisputed. In any event, the PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.1.b., II.B.3.b. & f.

846.   Dr. Fauci believes that misinformation and disinformation "contribute to the deaths" of people: "misinformation and disinformation, particularly that encourages people to avoid lifesaving interventions, can certainly result in the unnecessary death of people whose lives would have been saved. So when misinformation and disinformation leads people to avoid a lifesaving intervention, that is equivalent to contributing to the death of that person." *Id.* at 345:8-15. "I do feel strongly that misinformation and disinformation, when it leads to people avoiding lifesaving interventions, can be deadly. *Id.* at 346:1-3.

**RESPONSE:** Undisputed, except to note that Dr. Fauci was testifying about health-related misinformation and disinformation that "encourages people to avoid lifesaving interventions." Fauci Dep. 345:8-15; *id.* at 346:1-3. In any event, the PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.1.b., II.B.3.b. & f.

847.   Dr. Fauci also believes that misinformation and disinformation on social media are "contrary to public health" and "the enemy of public health": "If social media is propagating disinformation that leads to the death of people by encouraging them to avoid lifesaving interventions, I believe that's contrary to public health." *Id.* at 346:5-7, 346:10-13.

**RESPONSE:** Undisputed, except to note that Dr. Fauci was testifying about health-related misinformation and disinformation that encourages people "to avoid lifesaving interventions." Fauci Dep. 346:10-13. In any event, the PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on social media.

Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.'

PFOF § II.E., Arg. § II.B.1.b., II.B.3.b. & f.

848.    Dr. Fauci admits that it is "certainly possible" that he discussed the view that "disinformation or misinformation on social media platforms are killing people" with others in the federal government, but claims he cannot remember whether he did so. *Id.* at 345:3-25.

**RESPONSE:** Undisputed, but note that Dr. Fauci testified: "You know, when you say 'anyone in the government,' I have often said that misinformation and disinformation is the enemy of public health. Could I have said it to someone in the government? It is certainly possible that I did because I do feel strongly that misinformation and disinformation, when it leads to people avoiding lifesaving interventions, can be deadly." Fauci Dep. 345:21-346:3. In any event, the PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.1.b., II.B.3.b. & f.

849.    Dr. Fauci testified that the first time he heard of Alex Berenson was when Berenson publicly claimed that the White House demanded that Twitter deplatform him in 2022: "it's the person who says that the White House demanded Twitter ban me months before the company did so. I had never heard of who Alex Berenson was before this … I don't even know who he is." *Id.* at 335:1-7. In light of Dr. Fauci's public attacks on Alex Berenson in 2021, this testimony is not credible.

**RESPONSE:** Disputed that Dr. Fauci "public[ly] attack[ed] Alex Berenson" in 2021, for the reasons stated in response to Plaintiffs' PFOF ¶¶ 840-45. Further disputed as an argumentative mischaracterization of the cited testimony. When Dr. Fauci was asked in his deposition if he had "ever heard of Alex Berenson," he responded: "I've heard of him. I'm not sure – *I'm trying to remember what context*, but now you've put this [exhibit] in front of me, . . . it – it's the person who says that the White House demanded Twitter ban . . . [him] months before the company did so. I had never heard of who Alex Berenson was before this, but – I mean, not before this but I had

heard that there was an issue that he was complaining that he was being banned. I don't even know who . . . he is." Fauci Dep. 334:23-335:7 (emphasis added). The exhibit before Dr. Fauci at the time of this testimony was an article written by Alex Berenson asserting that his Twitter account had been removed allegedly because of pressure from the White House. *See* Fauci Ex. 59. That Dr. Fauci did not recall viewing and responding to a clip of Alex Berenson during a July 2021 interview reported about at a different exhibit shown later in his deposition, *see* Fauci Ex. 60, does not undermine the credibility of his testimony. Indeed, when Dr. Fauci was shown the news article at exhibit 60, he stated that the article "does jog my memory to who he is because at the time, they were talking about this CPAC were people were cheering on not taking a lifesaving intervention." Fauci Dep. 340:25, 341:12-24. In any event, the PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.1.b., II.B.3.b. & f.

850.    Former FDA Commissioner Scott Gottlieb also emailed Twitter to pressure them to remove Alex Berenson's content, invoking Dr. Fauci in his email. Sending Twitter a link to a post by Berenson entitled "The Arrogance of Dr. Fauci," Gottlieb wrote: "This is why Tony needs a security detail," Fauci Ex. 62, at 1—thus implying that Berenson's criticism of Dr. Fauci was endangering Dr. Fauci's life.

**RESPONSE:** The first sentence is disputed as an argumentative mischaracterization of the email cited in the article attached at Exhibit 62, in which Scott Gottlieb does not ask or demand that Twitter take any action with respect to any particular content on Twitter but instead sends a link to a Substack article written by Berenson and states, "This is what is promoted on Twitter. This is why Tony needs a security detail." Fauci Ex. 62 at 1. Further disputed as to Plaintiffs' guess at what Dr. Gottlieb may have been "implying." The PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech

on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.1.b., II.B.3.b. & f.

851.    Dr. Fauci does not deny that he may have discussed this issue with Gottlieb before Gottlieb sent this email to Twitter, but he claims he does not recall whether he did so. Fauci Dep. 349:7-19, 352:12-18.

**RESPONSE:** Disputed as a mischaracterization of the testimony, in which Dr. Fauci is not asked about the timing of any discussions he may or may not have had with Gottlieb. Dr. Fauci was asked, "did you ever have discussions with Scott Gottlieb about needing a security detail because of the things that people posted about you on the Internet?" He responded: "I don't recall having discussions with him, but it is possible in a discussion I had with him that – it's no secret that I have a security detail. My life has been threatened multiple times. So I might have discussed that I need a security detail with him, but I –that doesn't ring a bell as something – unless there was a reason for me to – I don't usually talk to people about my security detail." Fauci Dep. 349:7-19. In any event, the PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.1.b., II.B.3.b. & f.

852.    After testifying over 200 times during his deposition that he could not remember or could not recall events related to the case, Dr. Fauci was shown an email chain between him and Dr. Ezekial Emanuel from May 2, 2020 that had no direct connection to issues in the case. Fauci Ex 63. Unlike his convenient lack of memory as to case-related communications, Dr. Fauci was immediately able to provide a detailed, specific account of the context and communications with Dr. Emanuel relating to that email chain. Fauci Dep. 353:20-354:16.

**RESPONSE:** Disputed as an argumentative mischaracterization of the testimony. As explained, *see, e.g.*, Resp. to Pls.' PFOF ¶¶ 684, 746, 773, 805, 807, the issues about which Dr. Fauci testified he could not remember or recall are immaterial to the case and largely concern minutia such as who Dr. Fauci copied on an email or if Dr. Fauci specifically remembered reading

an email several years ago, which are reasonable details for any witness to be unable to recall.

Moreover, Dr. Fauci's testimony relating to the "context" of the exchange between him and Dr.

Emmanuel in May 2020 concerned, broadly, the subject of clinical trials about the effectiveness

of remdesivir, and did not concern details about the dates, times, or other details of Dr. Fauci's

particular communications with Dr. Emanuel about that subject. Fauci Dep. 353:15-354:16.  In

any event, the PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat,

coercion, encouragement, deception, or otherwise, to censor or suppress speech on social media.

Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.'

PFOF § II.E., Arg. § II.B.1.b., II.B.3.b. & f.

### VI.    The FBI's Censorship Campaign of Pressure and Deception.

853.    In parallel with the censorship of health "misinformation" and related issues
achieved by the White House, the CDC, Surgeon General Murthy, Dr. Fauci, and others, *see supra*
Parts I-V, federal national-security and law-enforcement agencies flex their considerable muscle
to pressure and induce social-media platforms to censor disfavored speech and viewpoints about
elections and other topics. The FBI's Foreign Influence Task Force (FITF) and the Cybersecurity
and Infrastructure Security Agency's (CISA) "Mis, Dis, and Malinformation Team" play key roles
in this efforts – in cooperation with non-profit agencies working in close collaboration with the
government, such as the CISA-funded "Center for Internet Security" and the formidable
censorship cartel calling itself the "Election Integrity Partnership" and the "Virality Project."

`    **RESPONSE**: Disputed. The assertions that any Defendant engaged in "censorship," that

any Defendant agency "flexed [its] considerable muscle" and "pressure[d] and induce[d]"

platforms "to censor," and that any Defendant was acting in "cooperation" with any "censorship

cartel," are argumentative mischaracterizations unsupported by and contrary to the record as a

whole. *See generally* Defs.' Arg. § II.B.

854.    Elvis Chan is the Assistant Special Agent in Charge of the Cyber Branch for the
San Francisco Division of the Federal Bureau of Investigation. Chan Dep. 8:11-13.

**RESPONSE:** Undisputed.

855.    In this role, Chan is "one of the primary people" who communicates with social-
media platforms about disinformation on behalf of the FBI. *Id.* 105:3-4 ("I would say I'm one of

the primary people with pass-through information" for platforms). There are many other points of contact between the FBI and social-media platforms, however. *Id.* 105:3-7 ("[W]e have agents on the different cyber squads and our private sector engagement squad who also relay information to the companies.").

**RESPONSE:** Undisputed subject to clarification. The other points of contact that ASAC Chan described do not necessarily communicate with social media platforms about "disinformation." Chan Dep. 105:3-18. And the assertion that there are "many" points of contact in the context of disinformation is a subjective characterization.

856.   Chan graduated from the Naval Postgraduate School in 2021 with an M.A. in Homeland Security Studies. *Id.* 10:16-17. In connection with his master's degree, Chan authored a publicly available thesis entitled, "Fighting Bears and Trolls: An Analysis of Social Media Companies and U.S. Government Efforts to Combat Russian Influence Campaigns During the 2020 U.S. Elections." *Id.* 11:3-16; Chan Ex. 1, at 1. This thesis overtly relied only on publicly available documents, but it also reflected Chan's personal knowledge and experience of working with social-media platforms during the 2020 elections. *See id.*

**RESPONSE:** Disputed. The cited material does not support the statement that the thesis reflected ASAC Chan's "personal knowledge and experience of working with social-media platforms during the 2020 elections." The exhibit cited is Mr. Chan's thesis submitted for postgraduate studies, and expressly states, at page i, that "[t]he views expressed in" it "are those of the author and do not reflect the official policy or position of the Department of Defense, the FBI, or the U.S. Government." ASAC Chan testified that his thesis contained his academic research conclusions, not his personal characterizations. Chan Dep. 151:6-8.

857.   Chan's thesis discussed "hack-and-dump activity," also known as "hack-and-leak" operations, as well as "Russian malign influence … on the social media platforms and on fake news websites that the Russians have created." Chan Dep. 13:7-21.

**RESPONSE:** Undisputed subject to clarification. The exhibit cited is Mr. Chan's thesis submitted for postgraduate studies, and expressly states, at page i, that "[t]he views expressed in" it "are those of the author and do not reflect the official policy or position of the Department of Defense, the FBI, or the U.S. Government."

858.    Chan's thesis relied on research performed by persons and entities comprising the Election Integrity Partnership, including Graphika, *id.* 145:1-6; and Renee DiResta of the Stanford Internet Observatory, *id.* 51:20-52:7, 85:4-12. Chan communicated directly with DiResta "about Russian disinformation," and had "[a] lot of conversations about Russian disinformation" with DiResta. *Id.* 52:5-7, 52:24-25.

**RESPONSE:** Disputed. The assertion that Graphika and other persons and entities on which Chan's thesis relied were part of the Election Integrity Partnership is not supported by the cited material. The exhibit cited is Special Agent Chan's thesis submitted for postgraduate studies, and expressly states, at page i, that "[t]he views expressed in" it "are those of the author and do not reflect the official policy or position of the Department of Defense, the FBI, or the U.S. Government."

859.    Chan also knows Alex Stamos, the head of the Stanford Internet Observatory, from the time when Stamos participated on behalf of Facebook in the USG-Industry meetings. *Id.* 54:2-19. Chan and Stamos were involved in meetings about "malign-foreign-influence activities" on Facebook while Stamos was the chief security officer for Facebook. *Id.* Chan has also discussed "protecting platforms from hacking" with Stamos. *Id.* 55:12-13. And Chan's "colleagues at FBI headquarters regularly meet with researchers much more frequently than I do." *Id.* 57:15-18.

**RESPONSE:** Disputed. The assertion that Chan knows Alex Stamos from Stamos' participation in the USG-Industry meetings (as opposed to bilateral meetings) is not supported by the cited testimony or the record.

860.    According to Chan, the FBI engages in "information sharing" with social-media platforms about content posted on their platforms, which includes both "strategic-level information" and "tactical information." *Id.* 16:16-19.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

**A. FBI's and CISA's Regular "USG-Industry" Disinformation Meetings**

861.    The FBI participates in a CISA-organized "industry working group" with
Facebook, Twitter, and Google/YouTube, as well other social-media platforms. *Id.* 18:21-24. The
social-media platforms that participate are Facebook, Microsoft, Google, Twitter, Yahoo! (a.k.a.
Verizon Media), Wikimedia Foundation, and Reddit. *Id.* 23:24-24:3. On the U.S. Government
side, the meetings are attended by representatives of CISA, the Department of Homeland
Security's Intelligence & Analysis division ("I&A"), the Office of the Director of National
Intelligence (ODNI), the FBI's Foreign Influence Task Force (FITF), and Elvis Chan on behalf of
FBI-San Francisco when he is available. *Id.* 24:9-19; *see also* Chan Ex. 6, at 37. Chan later
confirmed that "DOJ National Security Division" attends these "USG-Industry" meetings as well.
Chan Dep. 171:6-8.

**RESPONSE:** Undisputed subject to clarification. The cited material supports the assertion

that the entities and individuals mentioned have in the past participated in such meetings, not that

they all necessarily continue to participate in all such meetings. This PFOF contains no evidence

that the FBI used pressure or deception to induce social-media companies to remove or suppress

information on their platforms, or that the companies regarded (or acted on) any communications

with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence

as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

862.    Chan participates in the meetings because most social-media platforms are
headquartered in San Francisco, and "FBI field offices are responsible for maintaining day-to-day
relationships with the companies that are headquartered in their area of responsibility." *Id.* 24:21-
25:4. As a result, Chan serves as a frequent conduit for communication between federal officials,
especially FBI officials but also others, and social-media platforms. *See id.*

**RESPONSE:** Disputed. The assertion that ASAC Chan "serves as a frequent conduit for

communications between" social media platforms and federal officials other than FBI officials is

not supported by the cited testimony or the record. This PFOF contains no evidence that the FBI

used pressure or deception to induce social-media companies to remove or suppress information

on their platforms, or that the companies regarded (or acted on) any communications with the FBI

as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See*

Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

863.    Matt Masterson attended, and Brian Scully attends, the USG-Industry meetings on
behalf of CISA. They are "regular attendees" and "one of them is usually emceeing the meeting."

*Id.* 25:15-18. "For the 2020 election cycle, Mr. Masterson was … primarily the facilitator. Ahead of the 2022 midterm elections, Mr. Scully has been the primary facilitator." *Id.* 26:19-22.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

864.   Chan also "participate[s] in the preparation meetings" for the USG-Industry meetings. *Id.* 27:24-25.

**RESPONSE:** Undisputed subject to clarification. ASAC Chan testified that he was not involved in preparing for the meetings, as he did not provide any agenda items. Chan Dep. 27:22-25. This PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

865.   At these CISA-led "USG-Industry" meetings, "the disinformation content was shared by the social media companies. They would provide a strategic overview of the type of disinformation they were seeing on their respective platforms," and the FBI "provided strategic unclassified overviews of the activities that we saw [Russian actors] doing." *Id.* 156:9-157:1.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

866.   The "USG-Industry" meetings "are continuing" at the time of Chan's deposition on November 23, 2022, and Chan assumes that they will continue through the 2024 election cycle. Chan Dep. 284:23-285:6. Online "disinformation" continues to be discussed between the federal agencies and the social-media platforms at these meetings. Chan Dep. 285:7-286:16.

**RESPONSE:** Disputed. The assertion that the election-related meetings "are continuing" is unsupported by the record. ASAC Chan testified that he does not "know . . . for a fact" that the election-related meetings would occur 2024 although he "would assume so." Chan Dep. 285:3-6. In addition, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

### B. The FBI's Regular Bilateral Meetings with Social-Media Platforms.

867.    The USG-Industry group meetings are not the only censorship-related meetings between the FBI and social-media platforms. Chan also "hosted … bilateral meetings between each of the companies I mentioned"—*i.e.*, Meta/Facebook, Twitter, Google/YouTube, Yahoo!/Verizon Media, Microsoft/LinkedIn, Wikimedia Foundation, and Reddit, *see id.* 23:24-24:3—"and the Foreign Influence Task Force." *Id.* 39:4-8.

**RESPONSE:** Dispute the characterization of the USG-Industry group meetings and the bilateral meetings as "censorship-related meetings." That is an argumentative mischaracterization without citation to or support in the record. In addition, while the testimony at Chan Dep. 23:24-24 mentions companies that attended USG-Industry group meetings, a more accurate list of companies that participated in bilateral meetings with the FBI is at Chan Dep. 41:16-42:7. In addition, this PFOF contains no evidence that any of the referenced meetings are or were "censorship-related," and any assertion that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such is unsupported by and contrary to the evidence as a whole. *See* Defs.' § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

868.    During these bilateral meetings, the FBI's FITF would also "bring in field offices that had cyber investigations" of "state-sponsored actors that the FBI was investigating that we believe were capable of hack-and-dump campaigns" during the 2020 election cycle. *Id.* 39:10-16.

In other words, in the bilateral meetings, the FBI repeatedly raised the concern about the possibility of "hack and dump" operations during the 2020 election cycle during FITF's bilateral meetings with each of at least seven major social-media platforms. *Id.*

**RESPONSE:** Disputed. The assertion that the FBI "repeatedly" raised the concern about the possibility of hack and dump operation during the 2020 election cycle "with each of at least" seven major platforms is unsupported by the cited evidence or the record. ASAC Chan "warned the companies on more than one occasion, although" he "cannot recollect how many times." Chan Dep. 175:11-14. In addition, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

869.    These bilateral meetings between FBI and social-media platforms are continuing—they occurred during the 2020 election cycle, and they continued during the 2022 election cycle. *Id.* 39:18-40:1. "They occur at roughly a quarterly cadence," but "the cadence increase[s] as elections get close," so that the meetings "become monthly as the election nears and then weekly very close to the elections."  *Id.* 40:2-20. These meetings will continue quarterly, monthly, and then weekly leading up to the 2024 election as well. *Id.* 41:5-15. The meetings also occurred "[o]n a quarterly cadence" during the 2018 election cycle. *Id.* 42:18-24.

**RESPONSE:** Disputed. The assertions that all "bilateral meetings" concern the "election cycle" and that meetings at which an election may be discussed "are continuing" and that they "will continue quarterly, monthly, and then on a weekly basis leading up to the 2024 election" is unsupported by the record. ASAC Chan testified that he "hosted . . . bilateral meetings between each of the companies" and FITF, including "field offices that had investigations related to malign foreign influence by state-sponsored actors," and "field offices that" were conducting pertinent cyber investigations as to such actors, not that all such bilateral meetings were election-related. Chan Dep. 39:4-12. ASAC Chan testified that he does not "know . . . for a fact" that bilateral meetings at which an election may be discussed would occur 2024 although he "would assume

so." *Id.* at 285:3-6. In addition, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

870.    The companies with which FITF conducts these regular bilateral meetings include "Facebook, Google, Twitter, Yahoo!, Reddit, and LinkedIn," as well as "Apple and Wikimedia Foundation." *Id.* 41:24-42:7. Apple was "added because they are a cloud infrastructure company; and we believe that tactical information, specifically indicates that we shared with them related to foreign-state-sponsored actors, might pop up on … any screening they do on iCloud." *Id.* 42:12-17.

**RESPONSE:** Disputed. The assertion that all "these regular bilateral meetings" concern the "election cycle" is unsupported by the record. ASAC Chan testified that he "hosted . . . bilateral meetings between each of the companies" and FITF, including "field offices that had investigations related to malign foreign influence by state-sponsored actors," and "field offices that" were conducting pertinent cyber investigations as to such actors, not that all such bilateral meetings were election-related. Chan Dep. 39:4-12. The testimony at Chan Dep. 42:12-17 is misquoted, as the transcript reads "specifically indicators" (not "specifically indicates"). In addition, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

871.    In these meetings, FBI officials meet with senior social-media platform officials in the "trust and safety or site integrity" role, *i.e.*, those in charge of enforcing terms of service and content-moderation policies for the platforms. *Id.* 43:5-44:1. In other words, the FBI meets with the officials responsible for censoring speakers and content on the platforms—those "directly involved in the enforcement of terms of service for these various platforms," which "includes … content modulation of content on the platforms." *Id.* 49:19-50:2.

**RESPONSE:** Disputed. The assertion that FBI "meets with the officials responsible for censoring" on platforms is an argumentative mischaracterization unsupported by the record. Rather, the FBI meets, as ASAC Chan testified, with social-media personnel who "will at least inform" the personnel responsible for the companies' content moderation policies—to which all users agree—and their application. Chan Dep. 49:15-18. In addition, it is unclear which meetings this PFOF describes with the phrase "these meetings." In any event, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

872.    The FBI's "quarterly meetings" with social media platforms to "probe" questions about censorship of disinformation began as early as "in the 2017 time frame." *Id.* 87:24-88:14, 89:19-20.

**RESPONSE:** Disputed. The assertion that FBI asks "questions about censorship of disinformation" on social media platforms is an argumentative mischaracterization unsupported by the record. In the testimony cited, ASAC Chan testified that the FBI asked social media companies about the algorithmic tools they use to detect "bots" Russian and other foreign actors use to amplify their influence efforts and that the companies have not disclosed the details of those tools. Chan Dep. 87:2-88:14. In any event, this PFOF contains no evidence that the FBI used pressure or deception to induce social media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

873.    A large number of FBI officials attend each regular bilateral meeting about disinformation with each of those seven social-media platforms. In addition to Chan and Laura Dehmlow, who is the head of FBI's Foreign Influence Task Force (FITF), "between three to ten"

FITF officials attend each meeting, as well as "one field office comprised of two representatives" from each of "one to three field offices." *Id.* 109:21-22, 110:7-14. Frequently the number of FBI agents attending each meeting "could be as high as a dozen." *Id.* 110:17-18.

**RESPONSE:** Disputed. The assertion that the meetings the cited testimony describes are "about disinformation" on platforms is an argumentative mischaracterization unsupported by the record. Those meetings concern foreign malign influence operations, which the FBI is statutorily responsible for investigating, and which include state-sponsored cyber activities as well as disinformation campaigns. *See* Chan Dep. 39:4-16; *see generally* Knapp Decl ¶¶ 10-49 (Ex. 157). In addition, the assertion that "each" bilateral meeting is always attended by all the persons mentioned and that the FBI attendees are all "agents" is unsupported by the record. In any event, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

874.    Likewise, large numbers of officials from the social-media platforms attend these regular bilateral meetings with the FBI about disinformation. "[A] similar amount" of people attend each meeting from the platforms, and "for the three larger companies – specifically Google/YouTube, Facebook, and Twitter – it would be equal numbers or higher numbers than the FBI." *Id.* 110:21-25.

**RESPONSE:** Disputed. The assertion that the meetings the cited testimony describes are "about disinformation" on platforms is an argumentative mischaracterization unsupported by the record. Those meetings concern foreign malign influence operations, which the FBI is statutorily responsible for investigating, and which include state-sponsored cyber activities as well as disinformation campaigns. *See* Chan Dep. 39:4-16; *see generally* Knapp Decl. ¶¶ 10-49 (Ex. 157). The assertion that a similar number of personnel from companies other than Google/YouTube, Facebook, and Twitter attended the meetings is unsupported by the cited testimony or the record. In any event, this PFOF contains no evidence that the FBI used pressure or deception to induce

social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

875.    In addition to all these meetings, on February 4, 2019, there was a meeting between Facebook, Google, Microsoft, and Twitter and the FBI's FITF, ODNI, and CISA to discuss election issues. Elvis Chan attended, as did Director Krebs, Matt Masterson, and possibly Brian Scully of CISA. Representatives of the social-media companies at the meeting included those from the "trust and safety" or content-modulation teams, and "the social media companies were focused on discussing disinformation." *Id.* 151:9-154:6.

**RESPONSE:** Undisputed subject to clarification. The cited testimony states that the meeting was about election "security" and that ASAC Chan believed a representative of FITF attended but he was not completely sure. In any event, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

876.    Discovery obtained from LinkedIn contains 121 pages of emails between Elvis Chan and other FBI officials and LinkedIn officials setting up numerous meetings to discuss disinformation issues during the 2020 and 2022 election cycles. Chan Ex. 2. Chan confirms that he has a similar set of communications setting up a similar series of meetings with each of "six or seven other social-media platforms as well"—he has "similar types of correspondence" with the others, including Facebook, Twitter, Google/YouTube, etc. Chan. Dep. 288:4-17.

**RESPONSE:** Disputed. The assertion that the meetings the cited testimony describes are "about disinformation" on platforms is an argumentative mischaracterization unsupported by the record. Those meetings concern foreign malign influence operations, which the FBI is statutorily responsible for investigating, and which include state-sponsored cyber activities as well as disinformation campaigns. *See* Chan Dep. 39:4-16; *see generally* Knapp Decl. ¶¶ 10-49 (Ex. 157). The record shows that ASAC Chan had (past tense), not "has" (present tense) similar types of

correspondence regarding those meetings. Chan Dep. 288:10-17. In any event, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

877.    These emails confirm that Chan and the other FBI officials regularly met with senior officials at social-media platforms with responsibility for *content moderation*. *See* Chan Ex. 2, at 3; Chan Dep. 292:7-293:8. The FBI meets with "director level and … their direct reports" from the "trust and safety and site integrity" teams. Chan Dep. 293:4-8.

**RESPONSE:** Undisputed. In any event, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

878.    The FBI communicates with social-media platforms using two alternative, encrypted channels—the self-deleting messaging app Signal, and the encrypted messaging service Teleporter. Chan Dep. 295:7-296:9.

**RESPONSE:** Disputed. The assertion that the FBI "communicates" (present tense) with social media platforms using Signal is not supported by the record. Chan Dep. 298:20-21. The testimony this PFOF cites concerns communications from the FBI election command post, not communications in general. *Id.* at 295:7-12. As to Signal communications, the FBI turned off the self-deleting functionality and saved the information. *Id.* at 297:23-298:7. In any event, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

879.    For each election cycle, during the days immediately preceding and through election day, the FBI maintains a command center around the clock to receive and forward reports of "disinformation" and "misinformation," and the FBI requests that the platforms have people available to receive and process those reports at all times: "FBI headquarters, they just ran 24 hours a day for their command post, I believe from Friday to Tuesday. FBI San Francisco ran from, I believe, 8:00 o'clock in the morning to perhaps 10:00 o'clock at night every day except the election, when we ran until midnight."  Chan Dep. 301:14-20. In advance of the elections, the FBI "ask[ed] the companies when they intended to have personnel on what days monitoring their platform for any threats that they saw."  Chan Dep. 301:21-24.

**RESPONSE:** Disputed. The assertion that the FBI "request[ed]" that social media companies have personnel available to receive reports "at all times" is unsupported by the cited testimony or the record. ASAC Chan testified that the FBI simply asked the companies "when" their personnel would be monitoring their platforms. Chan Dep. 301:21-24. In addition, the assertion that the (sole) purpose of the FBI command center is to forward reports of "disinformation and misinformation," and that the stated facts apply to "each" election cycle, is not supported by the cited evidence or the record. The FBI's election command center communications with social media companies concern election-related time, place, and manner disinformation. *See generally* Knapp Decl. ¶¶ 21-24 (Ex. 157). In any event, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

C.      **The FBI's Deceptive Information Censors the Hunter Biden Laptop Story.**

880.    Elvis Chan, other FBI officials, and other federal officials repeatedly warned industry participants to be alert for "hack and dump" or "hack and leak" operations prior to the 2020 election, even though they had no investigative basis to issue such warnings. These warnings provided the justification for the platforms to censor the Hunter Biden laptop story that the New York Post broke on October 14, 2020. *See id.* at 232:1-234:3. These "hack and leak" or "hack and dump" warnings were issued many times, both in the "USG-Industry" meetings and in the FBI's bilateral meetings with social-media platforms.

**RESPONSE:** Disputed. The assertions that FBI "had no investigative basis to issue such warnings," that these warnings "provided the justification" for any action taken by the platforms, and that platforms "censor[ed] the Hunter Biden laptop story," are argumentative mischaracterizations unsupported by the cited testimony or the record. *See* Defs.' Arg. § II.B.3.b.i. FBI did have a factual basis for the 2020 warnings based on the Russian effort to influence the 2016 presidential election and the concerns of multiple officials in the Trump Administration that those efforts were continuing in 2020. *See* Defs.' Arg. § II.B.3.b.i. Neither this PFOF, nor any other, contains evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

881.    Hack and leak operations were discussed at the USG-Industry meetings. *Id.* 172:3-5. At the USG-Industry meetings, Elvis Chan and other FBI officials "warned the social media companies about the potential for a 2016-style DNC hack-and-dump operation." *Id.* 172:23-173:1.

**RESPONSE:** Disputed to the extent that the assertion that FBI officials other than ASAC Chan definitely provided the stated warning is unsupported by the record. *See* Chan Dep. 175:17-20 (Chan recalled other senior officials "likely mentioned the possibility of hack-and-dump operations"). In any event, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

882.    During these meetings, Chan "warned the companies about a potential for hack-and-dump operations from the Russians and the Iranians on more than one occasion." *Id.* 175:10-13. Laura Dehmlow, the head of FITF, also "mentioned the possibility of hack-and-dump operations." *Id.* 175:17-20.

**RESPONSE:** Disputed to the extent that the assertion that Laura Dehmlow definitely mentioned the possibility of hack-and-dump operations is unsupported by the record. *See* Chan Dep. 175:17-20 (Chan recalled other senior officials, "to include Section Chief Dehmlow, likely mentioned the possibility of hack-and-dump operations"). In any event, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

883.    The prospect of hack-and-leak operations was also repeatedly raised "[a]t the FBI-led meetings with FITF and the social-media companies." *Id.* 177:24-25. It was also raised at the "CISA-hosted USG-industry" meetings. *Id.* 178:1-6, 180:24-25. "[T]he risk of hack-and-leak operations were raised at both sets of meetings, both at CISA-organized USG-industry meetings and the FITF-organized direct meetings between the FBI and social media platforms." *Id.* 181:6-11. Chan himself raised the warnings "regularly" at the bilateral FITF-platform meetings. *Id.* 185:16-18. Laura Dehmlow raised the warning at the USG-Industry meetings "that the FBI is concerned about the potential for hack-and-leak or hack-and-dump operations from foreign state-sponsored actors." *Id.* 187:1-4. And Chan himself "recollect[s] mentioning the potential for hack-and-dump operations during the CISA-hosted USG-industry meetings." *Id.* 189:4-7. Chan confirms that he raised these concerns "to the social media platforms on multiple occasions in two sets of meetings in 2020," including "the USG-industry meetings organized by CISA" and "the FITF organized meetings with the individual social media platforms." *Id.* 204:2-12.

**RESPONSE:** Disputed. The assertion that Laura Dehmlow definitely mentioned the possibility of hack-and-dump operations is unsupported by the record. *See* Chan Dep. 175:17-20 (Chan recalled other senior officials, "to include Section Chief Dehmlow, likely mentioned the possibility of hack-and-dump operations"). Although examining counsel sometimes referred to warnings about the "prospect" of hack-and-leak operations, Chan described the warnings to be about the "possibility" or "potential" of a hack-and-leak operation. *Id.* at 178:1-6; 189:2-7; 190:8-13; 192:9-15; 206:20-207:10. In any event, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as

such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See*

Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

884.   In the same time frame in 2020, as federal officials were repeatedly raising these concerns about hack-and-leak operations, some social media platforms updated their policies to provide that posting hacked materials would violate their policies and could result in censorship: "some social media companies adjusted or updated their terms of service or their community standards to say that they would not post any hacked materials." *Id.* 205:6-9. According to Chan, the "impetus" for these more restrictive censorship policies was the repeated concern raised by Chan, the FBI, and federal national-security officials about the risk of "a 2016-style hack-and-leak operation: "the impetus was in case there was a 2016-style hack-and-leak operation." *Id.* 205:14-21. The FBI's repeated warnings, therefore, induced social-media platforms to adopt more restrictive censorship policies on hacked materials, *see id.*, which would then be used to censor the Hunter Biden laptop story.

**RESPONSE:** Disputed. The assertions that FBI conduct was the "'impetus' for . . . more restrictive censorship policies," and that FBI "induced . . . platforms to adopt more restrictive censorship policies," are argumentative mischaracterizations unsupported by the record. Rather, ASAC Chan testified that he "believe[s]" platforms "independently . . . had similar concerns" regarding recurrence of "2016-style" operations. Chan Dep. 205:14-17, 21-22; *see also* Ex. 2 at 11, 25. In addition, the record does not support the assertion that the social media companies updated their policies in 2020. ASAC Chan testified that the updates occurred "before the 2020 elections, but I can't remember when." *Id.* at 205:12-17. The FBI does not pressure or coerce companies into taking any action, but rather relies on the companies to take whatever action they deem appropriate in light of their terms of service. *See, e.g.*, Knapp Decl. ¶¶ 15, 23 (Ex. 157). In any event, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

885.    Chan denies that the FBI urged the platforms to change their terms of service to address hacked materials, but he admits that the FBI repeatedly inquired of the social-media platforms *whether* their policies would allow for or require the censorship of hacked materials. The FBI "wanted to know if they had changed their terms of service or modified it, and we wanted to know what they had changed," and thus the platforms "advise[d]" the FBI that "they had changed" their policies "to reflect the ability to pull down content that results from hack operations." *Id.* 206:5-13.

**RESPONSE:** Disputed. The assertion that the FBI "repeatedly" inquired "whether their policies would allow for or require the censorship of hacked materials" is unsupported by the cited testimony or the record. ASAC Chan testified that in his opinion the rationale for the FBI's inquiry about the terms of service applicable to hack-and-leak activities was to assess what "hypothetical" "legal remedy such as like a seizure warrant or something" might be appropriate to pursue if the social media company did not have its own applicable term of service, but that ASAC Chan "can't ever recollect discussing this because it never came up." Chan Dep. 249:15-21, 250:7. In any event, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

886.    Again, Chan testified that, in meeting with platforms like Facebook, the FBI "asked, 'If you receive a whole -- if you see a trove of potentially hacked materials, what are you going to do about it?' Which would be our way of asking them how their terms of service would handle a situation like that." Chan Dep. 247:25-248:4. The FBI "ask[ed] how they would handle it if potentially hacked materials appeared." Chan Dep. 248:5-8. Chan believes they asked that question of Twitter, Facebook, and YouTube, and the social-media platforms responded, as he "remember[s] the social media companies having terms-of-service policies to handle this sort of situation." Chan Dep. 248:14-16. Both Facebook and Twitter, for example, "said that they would remove hacked materials if they were able to validate that it was hacked." Chan Dep. 252:24-253:4. These conversations happened "ahead of the 2020 elections." Chan Dep. 253:6-7.

**RESPONSE:** Disputed that the FBI actually asked the question stated in the first sentence of this PFOF. ASAC Chan in fact testified that he did not recall "any of us saying" the first sentence of this PFOF, but rather he thought that was "what we would have said." *See* Chan Dep. 247:16-

248:4. In any event, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

887.    The FBI asked the platforms how their policies would handle a hack-and-leak operation at the same time as repeatedly warning them about such operations—thus effectively inducing them to adopt such policies. Chan Dep. 248:23-249:2.

**RESPONSE:** Disputed. The assertion that the FBI's conduct was "effectively inducing" platforms "to adopt. . . policies" is an argumentative mischaracterization unsupported by the record. The FBI does not pressure or coerce companies into taking any action, but rather relies on the companies to take whatever action they deem appropriate in light of their terms of service. *See* Knapp Decl. ¶¶ 15, 23 (Ex. 157). The assertion that social media companies altered their content moderation policies because of FBI "induce[ment]" rather than their own concerns is disputed as unsupported by the record for the reasons set forth in response to Plaintiffs' PFOF ¶ 884. This PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

888.    The FBI inquired about the platforms' hacked-materials policies because "internally we wanted to know what actions that we would need to take, whether we would need to take a legal remedy such as like a seizure warrant" to remove supposedly hacked materials. Chan Dep. 249:17-20.

**RESPONSE:** Disputed. ASAC Chan testified that the quoted statement was "just my personal opinion" concerning a "hypothetical" and that he could not "ever recollect discussing this because it never came up." Chan Dep. 249:15-21, 250:7.

889.     Chan was not the only FBI official to ask the platforms about their censorship policies for hacked materials. Instead, this question was posed repeatedly by multiple FBI officials: "I would say we take turns asking. When I say 'we,' I mean either myself or the members of the Foreign Influence Task Force …. Wherever it seemed like an organic follow-up question, we would ask 'How would your terms of service apply to this situation or that situation?'"  Chan Dep. 250:14-20.

**RESPONSE:** Disputed that a social media company's own content moderation policies for "hacked materials" or other content, and to which all users agree, constitute "censorship policies."  In addition, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

890.     When asked, "did anyone within the FBI discuss or suggest with you that you should raise the prospect of Russian hack-and-leak operations with social media platforms in 2020?" Chan repeatedly responded with a stock answer, "I do not recollect."  *Id.* 189:14-23; 189:8-191:21, 203:13-15 ("I cannot recollect." … "I do not recollect." … "I do not recollect." … "I don't recollect." … "I don't recollect." … "I do not recollect.").

**RESPONSE:** Disputed. The assertion that ASAC Chan's lack of recollection as to particular internal discussions "within the FBI" was a "stock answer" is argumentative mischaracterization unsupported by the cited testimony or the record. ASAC Chan's inability to remember any internal FBI discussions about communicating with social media companies about "the prospect of Russian hack-and-leak operations" more than two years before his deposition is unsurprising given that meeting with social media companies is only one of ASAC Chan's many official responsibilities. ASAC Chan's inability to recall that detail during his testimony does not imply any lack of credibility. ASAC Chan also testified that while he did not initially "recollect any specific person discussing . . . with me" the "prospect of a Russian hack-and-leak operation before the 2020 election," he immediately thereafter testified that "However, based on both my

experience as well as my knowledge of active investigations, I would have believed -- as my own

assessment, I believe that there was the potential for hack-and-leak operations ahead of the 2020

elections." Chan Dep. 203:13-21. In any event, any internal FBI discussions by definition were

not discussions with any social media company and therefore cannot constitute evidence that the

FBI used pressure or deception to induce social-media companies to remove or suppress

information on their platforms, or that the companies regarded (or acted on) any communications

with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence

as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

891.    These responses are not credible because they are stock responses, and it is facially
implausible that Chan does not recall whether other federal officials discussed warning platforms
about "hack-and-leak" operations during 2020, especially after the fiasco of censorship of the
Hunter Biden laptop story. These "I do not recollect" responses also contradict Chan's testimony
later in the deposition that he "regularly" communicated with FITF and FBI's cyber division about
the possibility of a hack-and-leak operation: "I believe that we internally discussed the potential
for hack-and-leak operations, and so I regularly was in communication with the cyber division of
the FBI as well as with the Foreign Influence Task Force to see if they had heard of anything that
I had not heard of. So I would say that the people that I communicate with, everyone was vigilant,
but no one -- I believe that in general people at the FBI were concerned about the potential for
hack-and-leak operations, but that we had not seen any investigations that led in that direction or
that would lead us in that direction." *Id.* 206:23-207:10. He specifically admitted that he recalls
discussing hack-and-leak operations with FITF officials "Ms. Dehmlow, Mr. Olson, Mr. Cone,
and Mr. Giannini." *Id.* 207:19-23. It is not credible that the *only* aspect of his internal discussions
with the FBI about hack-and-leak operations that he does not recall is whether someone from the
FBI suggested or directed him to raise the issue with social-media platforms.

**RESPONSE:** Disputed. The assertions that ASAC Chan's lack of recollection as to

particular internal discussions "within the FBI" consisted of "stock responses" or is "facially

implausible" or "contradict[ed]" by or "not credible" based on other testimony, and that there was

a "fiasco of censorship of the Hunter Biden laptop story," are argumentative mischaracterizations

unsupported by the record. ASAC Chan's inability to remember any internal FBI discussions about

communicating with social media companies about "the prospect of Russian hack-and-leak

operations" more than two years before his deposition is unsurprising given that meeting with

social media companies is only one of ASAC Chan's many official responsibilities. ASAC Chan's

inability to recall that detail during his testimony does not imply any lack of credibility. ASAC

Chan also testified that while he did not initially "recollect any specific person discussing . . . with

me" the "prospect of a Russian hack-and-leak operation before the 2020 election," he immediately

thereafter testified that "However, based on both my experience as well as my knowledge of active

investigations, I would have believed -- as my own assessment, I believe that there was the

potential for hack-and-leak operations ahead of the 2020 elections." Chan Dep. 203:13-21. In any

event, any internal FBI discussions by definition were not discussions with any social media

company and therefore cannot constitute evidence that the FBI used pressure or deception to

induce social-media companies to remove or suppress information on their platforms, or that the

companies regarded (or acted on) any communications with the FBI as such. Any assertion to that

effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg.

§§ II.B.3.b.i & II.B.4.b.

892.    Further, as revealed on the video of Chan's deposition, his demeanor in answering
questions on this point changes and becomes evasive. Chan's demeanor when testifying on this
point undermines his credibility.

**RESPONSE:** Disputed. The assertions that ASAC Chan's "demeanor" in answering

questions as to particular internal discussions "within the FBI" was "evasive" or "undermines his

credibility" are argumentative mischaracterizations lacking specific citation to or support in the

record.

893.    The FBI and other federal officials had no specific investigative basis for these
repeated warnings about possible "hack-and-dump" operations. As Chan admits, "[t]hrough our
investigations, we did not see any similar competing intrusions to what had happened in 2016. So
although from our standpoint we had not seen anything, we specifically, in an abundance of
caution, warned the companies in case they saw something that we did not." *Id.* 174:7-13. As
Chan admits, "we were not aware of any hack-and-leak operations that were forthcoming or
impending" when he and other federal officials warned about the "risk of hack-and-leak
operations, especially before the general election." *Id.* 192:19-24.

**RESPONSE:** Disputed. The assertion that Defendants "had no specific investigative basis for . . . repeated warnings" is an argumentative mischaracterization unsupported by the record. FBI did have a factual basis for the 2020 warnings based on the Russian effort to influence the 2016 presidential election and the concerns of multiple officials in the Trump Administration that those efforts were continuing in 2020. *See* Defs.' Resp. to PFOF ¶ 880. In any event, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

894. Matt Masterson and Brian Scully of CISA also raised the concern about the threat of hack-and-leak operations in the 2020 election cycle to the social-media platforms during the "USG-Industry" meetings that occurred quarterly, then monthly, then weekly leading up to the 2020 election. *Id.* 212:3-22.

**RESPONSE:** Dispute the assertion that Mr. Masterson and Mr. Scully definitely raised "the concern" described in this PFOF or that they raised it at every meeting is unsupported by the record. ASAC Chan testified that he "did not recall any specific situations where" Messrs. Masterson and Scully expressed the concern, although he "believe[s]" that "is something that they may have discussed." Chan Dep. 212:17-19. In any event, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

895. Yoel Roth, then-Head of Site Integrity at Twitter, provided a formal declaration to the Federal Election Commission containing a contemporaneous account of the discussion of the threat of "hack-and-leak operations" at the meetings between the FBI, other federal law-enforcement and national-security agencies, and the social-media platforms. His declaration states: "Since 2018, I have had regular meetings with the Office of the Director of National Intelligence, the Department of Homeland Security, the FBI, and industry peers regarding election security.

During these weekly meetings, the federal law enforcement agencies communicated that they expected 'hack-and-leak operations' by state actors [*i.e.*, Russians or other foreign governments] might occur in the period shortly before the 2020 presidential election, likely in October. I was told in these meetings that the intelligence community expected that individuals associated with political campaigns would be subject to hacking attacks and that material obtained through those hacking attacks would likely be disseminated over social media platforms, including Twitter. These expectations of hack-and-leak operations were discussed throughout 2020. *I also learned in these meetings that there were rumors that a hack-and-leak operation would involve Hunter Biden*." Chan. Ex. 8, ¶¶ 10-11, at 2-3 (emphasis added). Yoel Roth executed this declaration on December 17, 2020, shortly after the events described, and submitted it to the Federal Election Commission in a formal enforcement proceeding, so it has the force of a statement under oath. *Id.* at 4.

**RESPONSE:** Not disputed that Plaintiffs have accurately quoted from Mr. Roth's declaration. Note however, that in February 8, 2023, testimony before the House of Representatives Committee on Oversight and Accountability about the meetings mentioned in Mr. Roth's declaration, Mr. Roth clarified that the FBI was not the source of warnings to Twitter about "a hack-and-leak operation . . . involv[ing] Hunter Biden." *See* Ex. 2 at 37 (*Protecting Speech from Government Interference and Social Media Bias, Part 1: Twitter's Role in Suppressing the Biden Laptop Story: Hearing Before the H. Comm on Oversight & Accountability*, 118th Cong. 1 (2023)) ("My recollection is that a representative of another tech company may have mentioned [the Hunter Biden hack-and-leak operation], but those meetings were several years ago. I truly don't recall."); *id.* at 43 ("I want to be clear that my statement to the FEC does not suggest that the FBI told me it would involve Hunter Biden. That's a popular reading of that declaration, but it was not my intent."); *id.* at 46 ("My recollection is it was mentioned by another technology company in one of our joint meetings, but I don't recall specifically whom.").

896.    Chan's account of these meetings largely matches Roth's account, *see, e.g.,* Chan Dep. 218:5-220:15, but there are two key discrepancies between Roth's and Chan's accounts. First, Roth recounts that the FBI and national-security officials communicated to Twitter that they "*expected*" that there would be one or more hack-and-leak operations by Russia or other "state actors." *Id.* at 2. Chan testified that he believed they used words like "concern" instead of "expected." Chan. Dep. 220:20-24, 224:5-17, 226:5-12, 227:3-6. Second, Roth specifically recalls that federal officials told him that "there were rumors that a hack-and-leak operation would involve Hunter Biden." Chan Ex. 8, ¶ 11, at 3. Chan testified that "in my recollection, Hunter Biden was

not referred to in any of the CISA USG-Industry meetings." Chan Dep. 213:8-10; *see also id.* 227:24-228:1, 228:21-23, 229:9-11 229:15-20.

    **RESPONSE:** Disputed. This PFOF repeatedly mischaracterizes statements from Mr. Roth's December 2020 declaration to give the appearance of discrepancies between his recollection of the meetings and ASAC Chan's. First, Mr. Roth did not state in his declaration that the FBI or other national-security officials told Twitter that they "'*expected*' that there would be" more hack-and-leak operations. As quoted in the preceding PFOF, ¶ 895, Mr. Roth stated that they "expected 'hack-and-leak operations' by state actors *might* occur" (emphasis added), consistent with ASAC Chan's use of the word "concern" to express the tenor of what was communicated to the companies. Second, Mr. Roth did not state in his declaration that he "*specifically recalls that federal officials told him that* 'there were rumors that a hack-and-leak operation would involve Hunter Biden'" (emphasis added). Rather, he stated that he "learned in these meetings *that there were rumors* that a hack-and-leak operation would involve Hunter Biden" (emphasis added), without specifying from whom he heard this rumor, a Government representative or a representative from another social media company. The so-called "discrepancies" are immaterial, in any event, as set forth in response to Plaintiffs' PFOF ¶ 895, as Mr. Roth clarified in his February 2023 congressional testimony that neither the FBI nor other government agencies were the source of warnings to Twitter about "a hack-and-leak operation . . . involv[ing] Hunter Biden." *See* Defs.' Resp. to PFOF ¶ 895. At any rate, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

    897.    On these points, Roth's declaration is more credible than Chan's testimony, for at least four reasons. First, Roth's declaration was executed much closer in time to the events

described—just two months later—while Chan's testimony occurred over two years later. Indeed, as noted above, Chan himself admitted that he "could not recollect" key details about the federal officials' course of conduct in warning social-media platforms about a supposed "hack and dump" operation, so there is no reason to think that Chan's recollection is more reliable on these similarly specific details.

**RESPONSE:** Disputed for the reasons stated in response to Plaintiffs' PFOF ¶ 896. As explained therein, the asserted "discrepancies" between Mr. Roth's declaration and ASAC Chan's testimony are neither substantiated, nor material.

898.    Second, Roth had no incentive to color or shade his account of communications from federal officials when he submitted this Declaration to the FEC, while Chan has strong incentives to shade his testimony on these points to deemphasize the FBI's involvement in censoring the Hunter Biden laptop story. Indeed, if the FBI and other federal officials warned social-media platforms about a hack-and-leak operation *involving Hunter Biden*—when the FBI had received Hunter Biden's laptop from the Delaware repair-shop owner and thus *knew* that it was not hacked, *see* Doc. 106-3, at 5-11 —that raises a compelling inference that the FBI deliberately gave misleading information to social-media platforms to induce them to wrongfully censor the Hunter Biden laptop story.

**RESPONSE:** Disputed. First, the PFOF does not even specify what "incentives" ASAC

Chan supposedly had to "shade" his deposition testimony, much less cite evidence to support a

suggestion that he was anything but truthful. Second, the PFOF's assumption that "the FBI and

other federal officials warned social-media platforms about a hack-and-leak operation *involving*

*Hunter Biden*" is unsupported by the evidence on which Plaintiffs rely, as explained in response

to Plaintiffs' PFOF ¶ 896. Third, in any event, Mr. Chan has no internal knowledge of the relevant

ongoing FBI investigation, Chan Dep. 214:8-16, about which the FBI does not publicly comment.

Therefore, fourth, Plaintiffs cite no evidence, and there is none, "that the FBI deliberately gave

misleading information to social-media platforms to induce them to wrongfully censor the Hunter

Biden laptop story." In short, this PFOF contains no evidence that the FBI used pressure or

deception to induce social-media companies to remove or suppress information on their platforms,

or that the companies regarded (or acted on) any communications with the FBI as such. Any

assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF

§ II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

899.    Third, Chan's testimony on a closely related point—whether Chan was instructed by an FBI official to warn social-media platforms about "hack and leak" operations—is not credible. Chan's minor disagreements with Roth's account are not credible for similar reasons. For example, Chan claims to have extremely specific recollection of the FBI's word-choice in meetings that occurred over two years earlier—disputing that the FBI used the word "expected," *id.* 220:20-24, 223:12-22, 224:5-17, 226:5-12, 227:3-6, and affirmatively asserting with confidence that "Hunter Biden" was never mentioned, *id.* 213:8-10, 227:24-228:1, 228:21-23, 229:9-11 229:15-20—while at the same time claiming that he could not recollect whether he discussed the same issues with the FBI internally *at all*, *Id.* 189:14-23; 189:8-191:21, 203:13-15.

**RESPONSE:** Disputed. First, as explained in response to Plaintiffs' PFOFs ¶¶ 890-91,

ASAC Chan's inability to remember any internal FBI discussions about communicating with

social media companies about "the prospect of Russian hack-and-leak operations" more than two

years before his deposition does not imply any lack of credibility; in any event, any internal FBI

discussions by definition were not discussions with any social media company and therefore

cannot constitute evidence in support of Plaintiffs' claims. Second, the supposed "disagreements"

between Mr. Roth's declaration and ASAC Chan's deposition testimony, in addition to being

immaterial, are based on Plaintiffs' own mischaracterizations of Mr. Roth's statements, as

explained in response to Plaintiffs' PFOF ¶ 896. This PFOF contains no evidence that the FBI used

pressure or deception to induce social-media companies to remove or suppress information on

their platforms, or that the companies regarded (or acted on) any communications with the FBI as

such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See*

Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

900.    Fourth, Chan's demeanor while testifying by videotape on this point is evasive and undermines his credibility.

**RESPONSE:** Disputed. The description of Special Agent Chan's "demeanor" as "evasive" is an argumentative mischaracterization lacking specific citation to or support in the record. This

PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

901.    Two additional points support the credibility of Roth's account over Chan's. First, Brian Scully's testimony, unlike Chan's, did not dispute or quibble with any aspect of Roth's near-contemporaneous account of these conversations—Scully merely contended that he could not remember. Scully Dep. 247:18-248:2.

**RESPONSE:** Disputed. First, the assumption of a disagreement between Mr. Roth's declaration and ASAC Chan's testimony that requires an assessment of "credibility" is itself unsupported by the record, as explained in response to Plaintiffs' PFOF ¶ 896. Second, Mr. Scully's lack of recall regarding a reference to Hunter Biden during the USG-Industry meetings *supports* ASAC Chan's testimony that "in [his] recollection, Hunter Biden was not referred to in any of [those] meetings." Chan Dep. 213:8-10; *see also id.* at 227:7-229:11. This PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

902.    Second, Roth's account directly matches the less detailed but even more contemporaneous account provided by Mark Zuckerberg in his testimony before Congress on October 28, 2020. Zuckerberg's testimony confirms that, as Yoel Roth recounted, the FBI conveyed a strong risk or expectation of a foreign hack-and-leak operation shortly before the 2020 election: "So you had both the public testimony from the FBI and in private meetings alerts that were given to at least our company … that suggested that we be on *high alert and sensitivity* that if a trove of documents appeared that we should view that with suspicion, that it might be part of a foreign manipulation attempt." Chan Ex. 9, at 56 (emphasis added). Indeed, Chan did not dispute Zuckerberg's account: "I don't remember the exact framing of our discussions with them [*i.e.*, Facebook]." Chan Dep. 247:14-15. And again, Chan did not dispute the fundamental details of Zuckerberg's account; he admitted that he "hosted several private meetings with Facebook where the concern about a hack-and-leak operation was raised" in 2020. Chan Dep. 246:17-20. Though Chan did state that "I would not have framed it like Mr. Zuckerberg did," Chan essentially concedes the accuracy of Zuckerberg's account. Chan Dep. 255:14-15.

**RESPONSE:** Disputed. First, Mr. Zuckerberg's testimony makes no reference to an "alert" from the FBI, or any other Government agency, of a hack-and-leak operation *involving Hunter Biden's laptop*, and thus his testimony more closely aligns with ASAC Chan's. Second, Plaintiffs omit from their PFOF Mr. Zuckerberg's further testimony that "one of the threats that the FBI has alerted our companies and the public to, was *the possibility of* a hack and leak operation in the days or weeks leading up to this election," Chan Dep. Ex. 9 at 56, again consistent with Mr. Chan's testimony regarding the nature of the message the Government conveyed in the USG-Industry meetings. *See also* Dkt. 96 at 2 (October 25, 2022 letter by Meta's counsel representing to the Court that "ASAC Chan at no point in time advised Meta 'to suppress the Hunter Biden laptop story.' Nor did any of his colleagues."). This PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

903.    After the Hunter Biden story broke on October 14, 2020, Laura Dehmlow of the FBI refused to comment on the status of the Hunter Biden laptop in response to a direct inquiry from Facebook, even though the FBI had the laptop in its possession since late 2019 and knew that its contents were not hacked. Chan Dep. 213:11-215:5.

**RESPONSE:** Disputed. The cited testimony is that after the *New York Post* story broke, ASAC Chan recalls Ms. Dehmlow saying the FBI had no comment in response to a question from a Facebook analyst whether the FBI had any information they could share about the relevant investigation. The cited testimony does not state that Ms. Dehmlow "refused to comment on the status of the Hunter Biden laptop" or that there was "a direct inquiry" about the laptop (as opposed to a general inquiry prompted by the *New York Post* story). Furthermore, the FBI has consistently declined to comment on or provide details about any relevant investigation. This PFOF contains

no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

904.   When the Hunter Biden laptop story broke on October 14, 2020, it was widely censored on social media, including by Twitter and Facebook, pursuant to their hacked-materials policies. For example, Twitter's Site Integrity Team "blocked Twitter users from sharing links over Twitter to the applicable New York Post articles and prevented users who had previously sent Tweets sharing those articles from sending new Tweets until they deleted the Tweets" sharing the Hunter Biden laptop story. Chan Ex. 8, at 3. "Facebook, according to its policy communications manager began 'reducing its distribution on the platform,' pending … a third-party fact check. Twitter went beyond that, blocking all users, including the House Judiciary Committee, from sharing the article on feeds and through direct messages. Twitter even locked the New York Post account entirely, claiming the story included hacked materials and was potentially harmful." Chan Ex. 9, at 2.

**RESPONSE:** Disputed. Plaintiffs omit Twitter's 2022 and prior representations to Congress about its conduct as to the "Hunter Biden Laptop Story." Plaintiffs' assertions that the "Hunter Biden Laptop Story" "was widely censored on social media" are argumentative mischaracterizations unsupported by the record. Twitter's then-chief executive, Jack Dorsey, represented to Congress in 2020 that, after the *New York Post*'s release of its articles, Twitter enforced its Hacked Materials Policy, which prevented sharing certain links from that newspaper's Twitter account, "publicly or privately," but "[r]eferences to the contents of the materials or discussion about the materials were not restricted under the policy." Ex. 137 at 6 (*Breaking the News: Censorship, Suppression, and the 2020 Election: Hearing Before the S. Comm. on the Judiciary*, 116th Cong. 6 (2020) (statement of Jack Dorsey, CEO, Twitter), 2020 WL 13568471). As a former attorney for Twitter, Vijaya Gadde, represented to Congress in 2023, the New York Post's tweets about the article fell within the Hacked Materials Policy because they contained "embedded images that looked like they may have been obtained through hacking," and the result of Twitter's initial decision was to "block[]" tweets and linked-to articles "embedding those source

materials," which did not prevent other "tweeting [about], reporting, discussing, or describing the contents of" the laptop. Ex. 2 at 5. But "Twitter then "changed its policy within 24 hours and admitted its initial action was wrong. This policy revision immediately allowed people to tweet the original articles with the embedded source materials." *Id*. Thus, Twitter changed tacks, and it "quickly updated our policy to limit its scope to only cover the removal of materials shared by hackers directly," and subsequently restored the New York Post's account. Ex. 137 at 6.

### D.  The FBI Routinely Flags Speakers and Content for Censorship.

905.    According to Chan, during the 2020 election cycle, "the U.S. government and social media companies effectively impeded [foreign] influence campaigns primarily through information sharing and *account takedowns*, respectively."  Chan Ex. 1, at i (emphasis added).

**RESPONSE:** Undisputed subject to clarification. The exhibit cited is ASAC Chan's thesis submitted for postgraduate studies, and expressly states, at page i, that "[t]he views expressed in" it "are those of the author and do not reflect the official policy or position of the Department of Defense, the FBI, or the U.S. Government."

906.    According to Chan, the FBI's "information sharing" includes both "strategic information," which "discusses the tools, tactics or processes" used by foreign-influence campaigns, and "tactical information," which means identifying specific "indicators or selectors," which are both "a term of art" that refers to "IP addresses, email accounts, social media accounts, … website domain names, and … file hash values."  Chan Dep. 29:15-30:7.

**RESPONSE:** Undisputed.

907.    In other words, according to Chan, the FBI "shares information" with social-media platforms that includes information about specific IP addresses, email accounts, social-media accounts, and website domain names that the FBI believes should be censored, and this sharing of information leads social-media platforms to engage in "account takedowns" based on the FBI's information. *See id.* According to Chan, this combination of "information sharing" and "account takedowns" "effectively impeded [foreign] influence campaigns" during the 2020 election cycle. Chan Ex. 1, at i.

**RESPONSE:** Disputed. The assertion that FBI provided foreign influence information to platforms about accounts FBI "believes should be censored" is an argumentative mischaracterization unsupported by the cited testimony or the record. Rather, ASAC Chan testified

that the FBI provided the companies information enabling them to "discover fake Russian accounts" on their platforms, Chan Dep. 32:16-24, "so that they can protect their platforms as they deem appropriate, and they can take whatever actions they deem appropriate without any suggestion or interference from the FBI," *id.* at 34:7-12, including "taking them down," *id.* at 32:24, 33:17. This PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

908.   Chan testified that the FBI shares this information with social-media platforms so that they can "protect their platforms"—indeed, "protect their platforms" was a stock phrase in Chan's testimony. Chan Dep. 32:19, 34:7-12, 35:8-10, 36:25, 87:22-23, 274:14. As Chan's testimony makes clear, however, the phrase "protecting their platforms" is a euphemism for "censoring speech that federal officials disfavor." For example, Chan admits that "protect their platforms" means "knocking down accounts or knocking down misinformation content." Chan Dep. 273:12-17. Chan's thesis and testimony make clear that the FBI's purpose in "information sharing" with social-media platforms is to induce them to censor speech that the FBI dislikes and wants to see censored. For example, Chan testified that "my purpose is to share the information with them so they can protect their platforms as they deem appropriate," but he immediately admitted that "one way to protect their platforms is to take down these accounts." *Id.* 35:9-14. Thus, Chan admits that the FBI's "purpose" in "information-sharing" includes "to take down these accounts" that the FBI believes are Russian-influenced. *Id.*

**RESPONSE:** Disputed as an argumentative mischaracterization and misrepresentation of the cited evidence that is unsupported by the record. Mr. Chan did not testify or in any way suggest "that the FBI's purpose in 'information sharing' with social-media platforms is to induce them to censor speech that the FBI dislikes" or that "federal officials disfavor." First, he explained that the FBI shares technical information with the companies (such as Internet Protocol (IP) addresses and other "selectors") suggesting the presence on their platforms of malign foreign-influence and foreign state-sponsored accounts, principally Russian accounts, *not* information about accounts the Government "disfavor[s]" or "dislikes." *See, e.g.,* Chan Dep. 32:16-24, 33:12-17, 36:9-11,

467

42:12-17. Second, the FBI's purpose was not to induce the companies to "censor" speech but, as noted above, ASAC Chan explained that the FBI shared information about possible malign foreign-influence accounts on their platforms "so that they can protect their platforms as they deem appropriate . . . take whatever actions they deem appropriate without any suggestion or interference from the FBI," *id.* at 34:7-12.

Note further that ASAC Chan's master's thesis also provides no support for the misrepresentations contained in this PFOF. As ASAC Chan explained when questioned about his thesis, "so looking at that sentence [from the thesis] and from my recollection, the FBI part of it is the information sharing portion, and then the social media company portion is to decide if it violates their terms of service. And if it does violate their terms of service, one of the actions they could take is to knock down accounts or to knock down content.' *Id.* at 273:16-274:5; *see also id.* at 274:12-17.

Note still further, as attested in the Declaration of Larissa Knapp, submitted herewith, the Foreign Influence Task Force's sharing of information with social media platforms is not based on the political or other speech of U.S. persons. Knapp Decl. ¶ 16 (Ex. 157). A decision by the FITF to share information with a U.S. social media platform about a foreign malign actor's social media activity is not based upon the content or particular viewpoint expressed in a posting but rather on the fact that the account is part of a covert effort by a foreign malign actor. *Id.* This PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

909.    Chan admits that the purpose and predictable effect of "tactical" information-sharing—*i.e.*, the FBI flagging specific accounts, websites, URLs, IP addresses, web domain

names, etc., to social-media platforms for censorship—is that the platforms will take action against such specific content and accounts under their content-moderation policies: "from what I have observed and what they have told me when we have provided them with high confidence of Russian selectors, that they have been able to discover fake Russian accounts and take them down." *Id.* 32:20-24.

**RESPONSE:** Disputed as an argumentative mischaracterization of the cited evidence. First, ASAC Chan did not "admit[ ]" or even suggest that the FBI has ever "flagg[ed] specific accounts, websites, URLs," and the like "to social-media platforms for censorship." He testified repeatedly and consistently that FBI shares information with social media companies about possible malign foreign-influence accounts so the companies may ascertain for themselves whether the accounts are foreign-based and inauthentic, and, if so, "protect their platforms as they deem appropriate, and . . . take whatever actions they deem appropriate without any suggestion or interference from the FBI." *See* Chan Dep. 31:21-35:10. This PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

910.    According to Chan, the social-media platforms "take the information that we share, they validate it through their own means. And then if they determine that these are accounts being operated by Russian state-sponsored actors, then they have taken them down." *Id.* 33: 12-17.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

911.    Chan admits that, during the 2020 election cycle, the U.S. Government engaged in "information sharing with the social media companies to expose Russia's different operations and shut down its accounts." Chan Ex. 1, at xvii. In other words, Chan admits that the purpose of

federal officials' "information sharing" was to "shut down … accounts" on social media that the Government disfavored. *Id.*; *see also* Chan Dep. 37:17-38:2.

**RESPONSE:** Disputed as an argumentative mischaracterization unsupported by the record, for the reasons stated in response to Plaintiffs' PFOF ¶¶ 907-09. Note further that the FITF's sharing of information with social media platforms is not based on the political or other speech of U.S. persons. A decision by the FITF to share information with a U.S. social media platform about a foreign malign actor's social media activity is not based upon the content or particular viewpoint expressed in a posting but rather on the fact that the account is part of a covert effort by a foreign malign actor. *See* Knapp Decl. ¶ 16 (Ex. 157). This PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

912.   In addition to social-media platforms, Chan and the FBI also "share indicators" with state and local government election officials, such as "county registrars or county clerk's offices"—who are also state actors subject to the First Amendment. Chan "would share indicators with them," and "share the same type of information that I shared with social media companies," including "IP addresses and domain names, so that they could see if they were popping up anywhere on their networks." *Id.* 50:11-51:6. In other words, the FBI feeds information to state and local election officials so that they can make their own reports of supposed "misinformation" and "disinformation" to social-media platforms, creating a First Amendment feedback loop. The FBI seeds concerns with the state and local election officials, who then identify supposed "disinformation" and "misinformation" based on the FBI's information, and then report it to the social-media platforms through CISA and the FBI.

**RESPONSE:** Not disputed that ASAC Chan testified that in 2020 the FBI San Francisco Office provided to registrars and clerk's offices in 16 California counties the same type of information regarding foreign malign actors that it provides to social media companies, "to see if they were popping up anywhere on their [the counties'] networks." Chan Dep. 50:11-51:6. The remainder of this PFOF—including the allegation that the FBI was "seed[ing] concerns" with other

officials, so they would identify "mis-" or "disinformation" to report to social media platforms, and that the FBI "create[ed] a First Amendment feedback loop"—is disputed as argumentative assertions for Plaintiffs cite no evidence whatsoever, and there is none. The FITF's work includes information and intelligence sharing with federal, state, and local government agencies, as well as with U.S. private sector entities. *See* Knapp Decl. ¶¶ 10-20 (Ex. 157). In any event, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

913.    Chan contends that Russian "state-sponsored actors … have created fake social media accounts," which "have either generated disinformation themselves or they have amplified existing content from current users of social media platforms." *Id.* 60:1-7.

**RESPONSE:** Undisputed.

914.    These supposedly Russian-controlled accounts "make their own content," such as "mak[ing] their own Facebook postings," and they "try to find what are the hot-button or current issues in the news … and then they will try to either generate content themselves related to that or they will amplify existing content." *Id.* 60:13-22. This is supposedly done with the goal to "sow discord in the American online environment." *Id.* 61:12-13.

**RESPONSE:** Undisputed subject to clarification. The FBI shares the information only if it has high confidence that the account is attributed to a foreign state actor, not merely if it is "supposedly" attributed to a foreign state actor. Chan Dep. 112:24-113:6.

915.    Chan agrees that "the goal there is … they post messages that they anticipate will be divisive and try and get Americans to engage with them." *Id.* 61:14-18.

**RESPONSE:** Undisputed.

916.    As Chan agrees, "engagement" with a social-media posting includes viewing the content, liking or disliking it, reposting it, commenting on it, and/or reposting it with commentary. *Id.* 61:19-63:13. All of these are First Amendment-protected activities. In this way, according to Chan, "the Russians are trying to get people to engage on their divisive content." *Id.* 63:19-64:1.

**RESPONSE:** Disputed. The assertion that "engagement" with the activity of foreign malign actors is "First Amendment-protected" is an unsupported legal conclusion. Defendants address Plaintiffs' legal conclusion and arguments in their brief in response to Plaintiffs' motion for a preliminary injunction.

917.    According to Chan, over 126 million Americans "engaged" with Russian-originated content on Facebook, and 1.4 million Americans engaged with such content on Twitter, during the 2016 election cycle. *Id.* 66:2-25. All of this was First Amendment-protected activity. Chan credits federal government efforts during the 2020 election cycle with preventing the vast majority of such "engagement" by American citizens with Russian-originate content on social media during the 2020 election cycle. Chan Ex. 1, at v ("This thesis finds that the Russians shifted their tactics from 2016 to 2020. Still, the U.S. government and social media companies effectively impeded their influence campaigns primarily through information sharing and account takedowns, respectively."). Thus, the federal officials' "information sharing" activities prevented an enormous amount of First Amendment-protected activity from occurring.

**RESPONSE:** Disputed. The assertion that "engagement" with the activity of foreign malign actors is "First Amendment-protected" is an unsupported legal conclusion. Defendants address Plaintiffs' legal conclusion and arguments in their brief in response to Plaintiffs' motion for a preliminary injunction. (Note also that the exhibit cited is Special Agent Chan's thesis submitted for postgraduate studies, and expressly states, at page i, that "[t]he views expressed in" it "are those of the author and do not reflect the official policy or position of the Department of Defense, the FBI, or the U.S. Government.") In any event, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

918.    Chan's thesis and testimony provide clear examples of how supposedly Russian-originated "disinformation" on social media becomes intertwined with, and inseparable from, First Amendment-protected forms of expression by American citizens. Chan identifies a supposedly Russian-originated political ad on Facebook that features a picture of Hillary Clinton with a black X painted over her face, advertising an event called "Down with Hillary!" and stating, "Hillary Clinton is the co-author of Obama's anti-police and anti-Constitutional propaganda." Chan Ex. 1,

at 29. None of this is "disinformation" in any meaningful sense—it is actually expression of political opinions. The posting notes that it received 763 reactions and 78 comments on Facebook, which Chan agrees are "engagements by users." *See id.*; *see also* Chan Dep. 67:1-68:20. Chan contends that the underlying ad was "Russian-originated content masquerading as something posted by an American," *id.* 67:6-10—*i.e.*, just the sort of content that the FBI would flag for censorship to social-media platforms through "tactical information-sharing." But once the FBI induces Facebook to pull down the ad from the platform, the First Amendment-protected "engagements" by Americans—likes, dislikes, re-posts, comments, etc.—are all obliterated as well. This is the collateral damage to *Americans'* freedom of speech in the FBI's war on so-called Russian "disinformation."

**RESPONSE:** Disputed. The assertion that "engagement" with the activity of foreign malign actors is "First Amendment-protected" is an unsupported legal conclusion. Defendants address Plaintiffs' legal conclusion and arguments in their brief in response to Plaintiffs' motion for a preliminary injunction. The assertions that the FBI provides foreign influence information to platforms to "flag" content "for censorship" and "induces" any platform to "pull it] down" are disputed as argumentative mischaracterization unsupported by the record for the reasons already stated above. (Note also that the exhibit cited is ASAC Chan's thesis submitted for postgraduate studies, and expressly states, at page i, that "[t]he views expressed in" it "are those of the author and do not reflect the official policy or position of the Department of Defense, the FBI, or the U.S. Government.") In any event, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

919.    Chan's thesis provides similar examples of supposedly Russian-originated content with heavy engagement by Americans. For example, it reproduces two supposedly Russian-originated political ads containing a secure-borders message ("Secured Borders: Every man should stand for our borders! Join!") and a pro-Second Amendment message ("Defend the 2nd: The community of 2nd Amendment supporters, gun-lovers & patriots"). Chan Ex. 1, at 32. Again, these are expressions of political opinion, not "disinformation" in any meaningful sense. The former posting garnered 134,943 "likes," and the latter posting garnered 96,678 "likes"—each of which is a First Amendment-protected expression of support for the underlying, supposedly Russian-

originated, political message. *See id.* Another similar ad, targeting black voters, simply stated "Black Matters: Join us because we care. Black matters!" and it drew 223,799 "likes" from ordinary users. *Id.* at 32; Chan Dep. 80:12-20. Chan admits that these are "high" levels of "engagement" from ordinary users. Chan Dep. 83:21.

**RESPONSE:** Disputed. The assertion that "engagement" with the activity of foreign malign actors is "First Amendment-protected" is an unsupported legal conclusion Defendants address Plaintiffs' legal conclusion and arguments in their brief in response to Plaintiffs' motion for a preliminary injunction. The assertion that the "likes" described in this PFOF are from "ordinary users" is unsupported by the record. (Note also that the exhibit cited is ASAC Chan's thesis submitted for postgraduate studies, and expressly states, at page i, that "[t]he views expressed in" it "are those of the author and do not reflect the official policy or position of the Department of Defense, the FBI, or the U.S. Government.")

920.    Chan also reports that "IRA employees used social media bots, i.e., computer programs which control social media accounts, to amplify existing content." Chan Ex. 1, at 30. To "amplify existing content" means to do "things like liking it or reposting it." Chan Dep. 71:20-24.

**RESPONSE:** Undisputed subject to clarification. The exhibit cited is ASAC Chan's thesis submitted for postgraduate studies, and expressly states, at page i, that "[t]he views expressed in" it "are those of the author and do not reflect the official policy or position of the Department of Defense, the FBI, or the U.S. Government."

921.    Based on research, Chan estimates that "over 100,000 real people had their postings amplified by [Russian]-controlled social media bots." *Id.* 87:2-6.

**RESPONSE:** Undisputed subject to clarification. The exhibit cited is ASAC Chan's thesis submitted for postgraduate studies, and expressly states, at page i, that "[t]he views expressed in" it "are those of the author and do not reflect the official policy or position of the Department of Defense, the FBI, or the U.S. Government."

922.    In addition, the "indicators" that the FBI targeted for censorship included supposedly Russian-aligned websites that hosted First Amendment-protected content posted by

Americans. For example, Chan identified a supposedly Russia-generated website called "PeaceData," which "hire[d] unwitting freelance journalists, including Americans, to write articles for the site." *Id.* 141:24-142:3. "[A]t least 20 freelance journalists, which includes Americans, had been duped into writing articles for the site." *Id.* 142:4-9. The FBI identified this site as Russia-generated to the social-media platforms, and as a result, the platforms "identified accounts that were foreign-associated … that were directing users to those platforms" and "t[ook] actions against those accounts." *Id.* 143:10-20. The speech of the American freelance journalists was thus suppressed due to FBI inducement.

**RESPONSE:** Disputed as argumentative mischaracterization omitting material context from the cited testimony. ASAC Chan explained that the "PeaceData" website was created by the Russian Internet Research Agency, that it was "intended to sow . . . disinformation and discord among . . . left-leaning voters in the United States," and that social media companies did not take it down but instead "discredited" it and identified foreign-associated fake accounts on their platforms that directed users to the "PeaceData" site. *See* Chan Dep. 141:10-144:12; *see also* Ex. 129 (Press Release, Dep't of Just., Grand Jury Indicts Thirteen Russian Individuals and Three Russian Companies for Scheme to Interfere in the United States Political System (Feb. 16, 2018), 2018 WL 920088), explaining that IRA, or Internet Research Agency, is a Russian company indicted for "committing federal crimes while seeking to interfere in the United States political system, including the 2016 Presidential election"). The assertion that social media companies took action as to "PeaceData" "as a result" of the FBI's identification is unsupported by the record. *See* Chan Dep. 143:10-18 ("[w]hat" companies "conveyed to" ASAC Chan "is that they identified accounts that were foreign-associated. . . . Internet Research Agency-associated, that were directing users on those platforms to the PeaceData website" and that the companies took action against certain accounts). The assertions that FBI "targeted" accounts "for censorship" or that FBI "inducement" resulted in "speech" being "suppressed" are argumentative mischaracterizations unsupported by this PFOF or the record as a whole. (Note also that the testimony cited in this PFOF concerned ASAC Chan's thesis submitted for postgraduate studies, and expressly states, at

page i, that "[t]he views expressed in" it "are those of the author and do not reflect the official

policy or position of the Department of Defense, the FBI, or the U.S. Government.") In any event,

this PFOF contains no evidence that the FBI used pressure or deception to induce social-media

companies to remove or suppress information on their platforms, or that the companies regarded

(or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported

by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

923.    Similarly, Chan identified a website called "NAEBC" as a Russia-generated website. According to Chan, the Russians "used various social media accounts to engage with real users and convince them to post on the NAEBC site, which met with some success." *Id.* 144:13-145:2. Thus, "the NAEBC site also included content drafted and written by real users that had posted on that site." *Id.* 145:3-6. "The FBI flagged the NAEBC site to social-media platforms as a … Russian-originated source." *Id.* 146:12-15. On that basis, "the companies were able to discover Russian-controlled accounts that were used to try to redirect users to those websites," and the platforms "said they had taken down those accounts." *Id.* 146:16-147:7. The FBI thus induced the platforms to censor the speech of "real users" on a supposedly fake Russian website.

**RESPONSE:** Disputed. The assertion that FBI "induced the platforms to censor the

speech" is an argumentative mischaracterization unsupported by the cited testimony or the record

as a whole, as explained above. (Note also that the testimony cited in this PFOF concerned ASAC

Chan's thesis submitted for postgraduate studies, and expressly states, at page i, that "[t]he views

expressed in" it "are those of the author and do not reflect the official policy or position of the

Department of Defense, the FBI, or the U.S. Government.")  In any event, this PFOF contains no

evidence that the FBI used pressure or deception to induce social-media companies to remove or

suppress information on their platforms, or that the companies regarded (or acted on) any

communications with the FBI as such. Any assertion to that effect is unsupported by and contrary

to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

924.    Chan admits that "Russia's influence operations" are deeply intertwined with First-Amendment-protected speech by ordinary social-media users, as he describes: "Many factors are at play when trying to measure the effects of Russia's influence operations. First-order effects include real users interacting with inauthentic content, Russian-bot amplification of divisive

organic content, and IRA-controlled accounts communicating directly with real users." Chan Ex. 1, at 94.

**RESPONSE:** Disputed. ASAC Chan did not testify that he "admits that 'Russia's influence operations' are deeply intertwined with First-Amendment protected speech," and the underlying assertion that "engagement" with the activity of foreign malign actors is "First Amendment-protected" is an unsupported legal conclusion. Defendants address Plaintiffs' legal conclusion and arguments in their brief in response to Plaintiffs' motion for a preliminary injunction. (Note also that the exhibit cited is ASAC Chan's thesis submitted for postgraduate studies, and expressly states, at page i, that "[t]he views expressed in" it "are those of the author and do not reflect the official policy or position of the Department of Defense, the FBI, or the U.S. Government.") In any event, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

925.    During the days surrounding the 2020 election, the FBI's command post also routed reports of domestic "disinformation" to social-media platforms for censorship to social-media. "During FBI San Francisco's 2020 election command post, which I believe was held from the Friday before the election through election night, that Tuesday at midnight, information would be provided by other field offices and FBI headquarters about disinformation …. These were passed to FBI San Francisco's command post, which I mentioned to you before I was the daytime shift commander, and we would relay this information to the social media platforms where these accounts were detected." Chan Dep. 162:12-24.

**RESPONSE:** Disputed. The PFOF's assertion that FBI "routed reports . . . for censorship" is argumentative mischaracterization unsupported by the record. The FBI's election command post communications with social media companies concern election-related time, place, and manner disinformation. *See generally* Knapp Decl. ¶¶ 21-24 (Ex. 157). Plaintiffs omit ASAC Chan's testimony that the election command post information sharing concerned posts with

"disinformation, specifically about the time, place or manner of elections in various states."  Chan Dep. 162:12-19. In any event, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

926.    The FBI made no attempt to distinguish whether these reports of "election disinformation" "whether they were American or foreign." *Id.* 163:1-3. "[M]any field offices" of the FBI "relayed this information to us." *Id.* 163:7-11.

**RESPONSE:** Undisputed subject to clarification. Plaintiffs omit ASAC Chan's testimony that the election command post information sharing concerned posts with "disinformation" as to "time, place, or manner of election." Chan Dep. 163:1-3. This PFOF omits the words "type of" from the quotation from Chan Dep. 163:7-11. In any event, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

927.    "[T]hose reports would come to FBI San Francisco … and then FBI San Francisco would relay them to the various social media platforms where the problematic posts had been made," in order "to alert the social media companies to see if they violated their terms of service…. which may include taking down accounts." *Id.* 165:3-17.

**RESPONSE:** Undisputed, except to note language the PFOF omits from the quoted testimony, namely, that if the companies determined the posts violated their terms of service, "*they would follow their own policies*, which may include taking down accounts." Chan Dep. 165:16-17 (emphasis added). The FBI's election command post communications with social media companies concern election-related time, place, and manner disinformation. *See generally* Knapp

Decl. ¶¶ 21-24 (Ex. 157). In any event, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

928.     The FBI has about a "50 percent success rate" in getting reported disinformation taken down or censored by the platforms, *i.e.*, "that some action had been taken because it was a terms-of-service violation." *Id.* 167:7-14.

**RESPONSE:** Disputed. The assertion that the FBI "has about a '50 percent success rate' in getting reported disinformation taken down or censored" by the platform is an argumentative mischaracterization and misrepresentation of the cited testimony unsupported by the record. The testimony at Chan Dep. 167:7-14 concerns disinformation as to the time, place, or manner of an election, and ASAC Chan testified "from my recollection" that about 50 percent of the time a social media platform would take some action on such a post based on the platform's terms of service. This PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

**E.      The FBI Demands Information on Censorship from the Platforms.**

929.     Regarding the algorithms that platforms use to detect inauthentic activity and to censor content, the FBI has "probed them to ask for details" about those algorithms, "so that we could make sure we were sharing the most effective and actionable type of information with them," *id.* 88:5-7, 20-22—in other words, to maximize the chances that disfavored speech would be censored as a result of the FBI's "information sharing."

**RESPONSE:** Disputed. ASAC Chan testified that the FBI "would ask," not demand, that the social media companies share details about their algorithms, noting also that the companies

"would not share any of that information with us." Chan Dep. 88:10-14. In additional testimony that Plaintiffs disregard, ASAC Chan also explained that the FBI "stopped asking" for information about the companies' algorithms "in the 2017 time frame" once it "found that none of them were willing to share" that information. *Id.* at 89:19-23. The assertion that the FBI sought this information (six years ago) "to maximize the chances that disfavored speech would be censored" is not supported by ASAC Chan's testimony, who explained that the purpose was to avoid providing the companies information that "would not be useful" to them in evaluating whether the content in question violated their policies. *Id.* at 89:1-7. In any event, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

930.    The FBI "would … ask them what their terms of service or community standards were." *Id.* 90:21-23. But Chan contends that "we never told the companies to modify their terms of service or community standards." *Id.* 92:5-7.

**RESPONSE:** Undisputed subject to clarification. ASAC Chan testified that FBI "would just broadly ask" platforms "what their terms of service or community standards were." Chan Dep. 90:21-23.

### F.    The FBI Flags Accounts and URLs for Censorship on a Monthly Basis

931.    The FBI gives "tactical information" to social-media platforms, where "tactical information includes identifying specific social media accounts and URLs" to be evaluated for censorship. *Id.* 96:24-97:2. Chan estimates that this occurs "one to five times per month." *Id.* 97:17-18. This includes such "tactical" information-sharing at most quarterly meetings. *Id.* 98:18-19.

**RESPONSE:** Disputed. The assertion that FBI "gives" information "to be evaluated for censorship" is an argumentative mischaracterization unsupported by the record, for the reasons discussed above. *See* Defs*.'* Resp. to Pls.' PFOF ¶¶ 907-09.

932.    To flag such specific accounts, URLs, and content to the platforms, Chan "would typically … send an email to the recipients at the companies" notifying them that he would be using "a secure file transfer application within the FBI that is called Teleporter," and "the Teleporter email contains a link for them to securely download the files from the FBI." *Id.* 98:20-11. The Teleporter files contain "different types of indicators," *i.e.*, specific social-media accounts, web sites, URLs, email accounts, etc. that the FBI wants the platforms to evaluate under their content-moderation policies. *Id.* 99:15.

**RESPONSE:** Disputed. The cited testimony does not mention flagging "content" or "content moderation" policies. The FBI's purpose in sending the information described in this PFOF to the companies is "so that they can protect their platforms as they deem appropriate, and they can take whatever actions they deem appropriate without any suggestion or interference from the FBI." Chan Dep. 34:7-12. *See* Defs.' Resp. to Pls.' PFOF ¶¶ 907-09.

933.    Each such communication may contain any number of such "indicators," ranging "from one account or one selector to many, like a whole spreadsheet full of them." *Id.* 100:16-17.

**RESPONSE:** Undisputed.

934.    Chan "estimate[s] that during 2020 [he] shared information with the companies between one to five or one to six times per month." *Id.* 100:21-24. Each such incident of information-sharing included flagging a number of specific "indicators" that ranged anywhere from one to "hundreds" of specific accounts, web sites, URLs, etc... *Id.* 101:4-7.

**RESPONSE:** Undisputed subject to clarification. ASAC Chan testified that the count of indicators shared at one time in 2020 was "maybe hundreds," not that the information shared concerned "hundreds" of "specific accounts." Chan Dep. 101:4-7.

935.    During the 2022 election cycle, Chan shared such information with the platforms "one to four times per month." *Id.* 101:13-14. Each such incident involved flagging a number of specific "indicators" that ranged anywhere from one to "in the tens, in the dozens" of specific accounts, web sites, URLs, etc. *Id.* 101:17-19.

**RESPONSE:** Undisputed subject to clarification. ASAC Chan testified that the count of indicators shared at one time in 2022 was "in the tens, in the dozens," not that the information shared concerned "specific accounts." Chan Dep. 101:17-19.

936.    "[I]n general" these flagging communications would go to all seven social-media platforms identified above, but sometimes there would be "company-specific information" that

would go to a particular company. *Id.* 102:3-9. "[M]ost of the time we would share with that list of [seven] companies." *Id.* 102:14-15.

**RESPONSE:** Undisputed.

937.    When it made such communications, the FBI would request that the platforms report back to the FBI their specific actions taken toward the accounts that the FBI specifically flagged for possible censorship. *Id.* 102:18-25. "[A]t every quarterly meeting we try to follow up to ask if information we shared has been relevant if we have not received a response yet." *Id.* 103:5-9. Sometimes, but not always, the platforms report back to the FBI on what accounts they have removed based on the FBI's information, in which case the FBI documents the report to "help[] us fine-tune the information we're sharing." *Id.* 103:14-22.

**RESPONSE:** Disputed that the FBI "flagged" accounts "for possible censorship." The FBI

shared the information described in the cited testimony with the companies "so that they c[ould]

protect their platforms as they deem appropriate, and . . . take whatever actions they deem

appropriate without any suggestion or interference from the FBI." Chan Dep. 34:7-12. *See* Defs.'

Resp. to Pls.' PFOF ¶¶ 907-09. In addition, disputed that a social media company's application of

its own content moderation policies, to which all users agree, constitutes "censorship." In any

event, this PFOF contains no evidence that the FBI used pressure or deception to induce social-

media companies to remove or suppress information on their platforms, or that the companies

regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is

unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i

& II.B.4.b.

938.    Including Chan, at least *eight* FBI agents in the San Francisco field office are involved in reporting disinformation to social-media platforms—Chan himself, two GS-14 supervisors who report to Chan, and roughly five FBI field agents in two different squads within the office. *Id.* 105:19-108:18. All these agents share both "strategic" and "tactical" information with social-media platforms about supposed malign-foreign-influence content on platforms, and they are "involved in following up to find out if their tactical information was acted on." *Id.* 108:8-10.

**RESPONSE:** Undisputed subject to clarification. In countering foreign malign influence

operations, the FBI shares information with a social media company only if the FBI, with high

confidence, attributes the pertinent activity observed on the platform to a foreign state actor, not merely if the activity is "supposed" malign foreign influence. Chan Dep. 112:24-113:6. The indicators shared are in the nature of IP addresses, email accounts, social media accounts, website domain names, and file hash values. *Id.* 29:15-30:7.

939.    In addition, a significant number of FBI officials from FBI's Foreign Influence Task Force (FITF) also participate in regular meetings with social-media platforms about supposed disinformation. *Id.* 108:19-110:14. These include "three to ten" FITF officials at bilateral meetings with social-media platforms. *Id.* 110:7-8.

**RESPONSE:** Undisputed that the number of FBI personnel attending the bilateral meetings with social media companies ranged from three to ten. In countering foreign malign influence operations, the FBI shares information with a social media company only if the FBI, with high confidence, attributes the pertinent activity observed on the platform to a foreign state actor, not merely if the activity is "supposed" malign foreign influence. Chan Dep. 112:24-113:6.

940.    The FBI uses both its criminal-investigation authority and its national-security authority to gather information about supposed malign-foreign-influence activities and content on social-media platforms. This specifically includes using "the Foreign Intelligence Surveillance Act … the PATRIOT Act, [and] Executive Order 12333 that allows us to gather national security intelligence" to investigate content on social media. *Id.* 111:13-112:8.

**RESPONSE:** Undisputed subject to clarification. In countering foreign malign influence operations, the FBI shares information with a social media company only if the FBI, with high confidence, attributes the pertinent activity observed on the platform to a foreign state actor, not merely if the activity is "supposed" malign foreign influence. Chan Dep. 112:24-113:6.

941.    In one case in 2020, for example, a single "Teleporter message was sent" to platform(s) "with a spreadsheet with hundreds of accounts," all of which the FBI was flagging for the platforms as supposed malign-foreign-influence accounts. *Id.* 112:9-14.

**RESPONSE:** Undisputed subject to clarification. In countering foreign malign influence operations, the FBI shares information with a social media company only if the FBI, with high

confidence, attributes the pertinent activity observed on the platform to a foreign state actor, not

merely if the activity is "supposed" malign foreign influence. Chan Dep. 112:24-113:6.

942.    Chan expressed a high degree of confidence that the FBI's identification of "tactical information" (*i.e.*, specific accounts, URLs, sites, etc.) to social-media platforms was always accurate, and that the FBI never misidentified accounts, content, web sites etc. as operated by malign foreign actors when in fact they were operated by American citizens. He testified that "we only share information that we have a high confidence that is attributed to a foreign-state actor," and that "[i]n my experience, it has always been correct." *Id.* 112:15-113:16.

**RESPONSE:** Undisputed, with clarification. ASAC Chan did not testify for a fact that the

FBI was "always accurate" and "never misidentified accounts, content, web sites etc. as operated

by malign foreign actors when in fact they were operated by American citizens."  He testified that

"*[i]n [his] experience*, [the FBI] has always been correct." Chan Dep. 112:15-113:12.

943.    But there are substantial reasons to think that Chan is wrong. For example, Chan reports that the FBI induced Twitter to remove accounts and Tweets related to the #ReleaseTheMemo hashtag in 2019, which supported Congressman Devin Nunes' investigation regarding Russia collusion. *Id.* 149:13-21; Chan Ex. 1, at 71 (noting that 929,000 Tweets removed by Twitter as supposedly Russian disinformation included thousands of Tweets amplifying the #ReleaseTheMemo hashtag). In fact, recent reporting indicates that Twitter was aware that the accounts pushing #ReleaseTheMemo were *not* Russian-controlled inauthentic accounts, but core political speech by ordinary American citizens that the FBI conspired to suppress.

**RESPONSE:** Disputed. This PFOF cites no evidence that ASAC Chan was wrong when

he testified that "in [his] experience," the FBI had not erred in identifying accounts as being

operated by malign foreign actors. Chan Dep. 112:15-113:12. The exhibit cited, ASAC Chan's

thesis submitted for postgraduate studies, and the cited testimony did not connect Twitter's

decisions as to any tweets bearing "#ReleaseTheMemo" with any communication from the FBI to

Twitter, nor does the PFOF cite any other evidence that the FBI provided information to Twitter

relating to "#ReleaseTheMemo." Moreover, the PFOF's assertion, that ASAC Chan's testimony

is contradicted by unspecified "recent reporting" about actions that Twitter took concerning

#ReleaseTheMemo, lacks citation to or support in any evidence of record. (Note also that the

exhibit cited, ASAC Chan's thesis, expressly states, at page i, that "[t]he views expressed in" it

"are those of the author and do not reflect the official policy or position of the Department of Defense, the FBI, or the U.S. Government.")

944.    The FBI's flagging accounts for censorship often leads to the censorship of additional accounts. According to Chan, the FBI "may share, for example, one account with them, but then they may find ten connected accounts and take all of them down." *Id.* 113:23-114:1.

**RESPONSE:** Dispute the assertions that the FBI "flagg[ed] accounts for censorship" and that FBI's information sharing "often lead[] to" additional "censorship" by social media companies as argumentative mischaracterizations unsupported by the record for the reasons stated above. *See* Resp. to Pls.' PFOF ¶¶ 907-09. Disputed also that a social media company's application of its own content moderation policies, to which all users agree, constitutes "censorship." In any event, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

### G.    Pressure from Congress Induces Platforms to Increase Censorship.

945.    According to Chan, the social-media platforms were far more aggressive in taking down disfavored accounts and content in the 2018 and 2020 election cycles than they were in the 2016 cycle. *Id.* 115:18-116:6.

**RESPONSE:** Disputed for at least two reasons. First, ASAC Chan did not state that "the social-media platforms were far more aggressive in taking down" accounts in 2018 and 2020. He appeared only to agree with the statement by Plaintiffs' counsel that "in 2018 and 2020 there were many more account takedowns." Chan Dep. 115:18-24. The suggestion that the accounts taken down by the companies were "disfavored" by the FBI or the Government is an argumentative mischaracterization not supported by the record, as explained above in response to Plaintiffs' PFOF ¶ 908. In any event, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that

the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

946.    Based on his personal observation, experience, and research, Chan concludes that "pressure from Congress, specifically HPSCI and SSCI," induced the social-media platforms to adopt more aggressive censorship policies in 2018 and 2020. *Id.* 116:1-3. "HPSCI" stands for the House Permanent Select Committee on Intelligence, and "SSCI" stands for the Senate Select Committee on Intelligence. *Id.* 116:11-14.

**RESPONSE:** Disputed. ASAC Chan did not testify that "'pressure from Congress' . . . induced the social-media platforms to adopt more aggressive [content moderation] policies in 2018 and 2020." Rather, he testified that pressure from congressional committees "*may* have had a part [in] it," and also that the companies may have "felt this"—"this" presumably meaning the presence of malign foreign actor accounts on their platforms—"may have damaged their brands." Chan Dep. 116:1-6 (emphasis added). Moreover, ASAC Chan did not base this testimony "on his personal observation, experience, and research." He repeated three times that he was providing only his "personal opinion." *Id.* at 115:22-24, 116:6, 117:3-4. In any event, this PFOF contains no evidence *that the FBI* used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

947.    This "pressure from Congress" took multiple forms. First, those Congressional committees called "the CEOs for the companies … to testify in front of their committees," including "Mark Zuckerberg and Jack Dorsey and Sundar Pichai." *Id.* 116:20-117:2. These CEOs were called to testify about disinformation on their platforms "more than once." *Id.* 117:5-6. Chan believes that "that kind of scrutiny and public pressure from Congress … motivated them to be more aggressive in the account takedowns." *Id.* 117:7-14. Chan believes this based on conversations with social-media platform employees. *Id.* 117:15-118:2.

**RESPONSE:** Undisputed subject to clarification. First, as noted above, ASAC Chan emphasized that his testimony on this point was "just [his] personal opinion" and "how [he]

interpreted" what he was told during conversations with social-media platform employees. Chan Dep. 117:13-14, 118:16. Second, ASAC Chan did not testify that these employees attributed the companies' greater number of account takedowns to congressional "pressure." To the contrary, he testified that the company employees "would not reveal the types of discussion that they had with . . . House and Senate staffers[.]" *Id.* at 117:22-24. They only "indicate[d] that they had to prepare very thoroughly for these types of meetings and . . . that it felt like a lot of pressure." *Id.* 117:24-118:2. In any event, this PFOF contains no evidence *that the FBI* used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

948.    Chan identifies specific congressional hearings that placed such pressure on social-media platforms to adopt more restrictive censorship policies: "On April 10–11, 2018, the Senate Commerce Committee and Senate Judiciary Committee held hearings on consecutive days with Mark Zuckerberg to discuss Russia's influence campaigns on Facebook and its countermeasures to combat them…. The Senate committees also used this as an opportunity to hold Facebook accountable for its actions and *exert pressure for positive change*." Chan Ex. 1, at 50 (emphasis added). "On July 17, 2018, the House Judiciary Committee held a hearing with senior executives from Facebook, Google, and Twitter so they could provide updates on their companies' efforts for content filtering to stop foreign influence campaigns on their platforms." *Id.* On September 5, 2018, the Senate Intelligence Committee held a hearing with senior executives from Facebook and Twitter to discuss their companies' efforts to stop foreign influence campaigns and illegal transactions on their platforms." *Id.*

**RESPONSE:** Largely undisputed, subject to clarification. The exhibit cited is ASAC Chan's thesis submitted for postgraduate studies, and expressly states, at page i, that "[t]he views expressed in" it "are those of the author and do not reflect the official policy or position of the Department of Defense, the FBI, or the U.S. Government." In addition, the PFOF cites no evidence that social media companies altered their content moderation policies because of the "pressure" exerted by the hearings mentioned in the PFOF. Disputed that a social media company's own

content moderation policies, to which all users agree, constitute "censorship policies." The

assertion that any policies became "more restrictive' is unsupported by the record. In any event,

this PFOF contains no evidence *that the FBI* used pressure or deception to induce social-media

companies to remove or suppress information on their platforms, or that the companies regarded

(or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported

by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

949.    Chan links these Congressional hearings to "constructive change," *i.e.*, more
aggressive censorship policies by the platforms: "On October 31, 2017, the Senate Judiciary
Committee held a hearing with senior executives from Facebook, Google, and Twitter to discuss
the extent of the Russian disinformation campaigns on their respective platforms." Chan Ex. 1, at
48. "This public hearing … provided politicians with the occasion to exert pressure on the
companies to make constructive changes to their platforms." *Id.* at 48-49. According to Chan, this
"constructive change" means the adoption of more restrictive censorship policies. Chan Dep.
133:9-23.

**RESPONSE:** Disputed. In the cited portion of his thesis, which referred only to a July

2017 Senate Judiciary Committee hearing, ASAC Chan did not opine that the hearing had induced

"constructive change," only that it was an "occasion to exert pressure on the companies to makes

constructive changes to their platforms."  Chan Ex. 1 at 48-49. Second, ASAC Chan did not testify

that constructive change "means . . . more restrictive censorship policies."   That is an

argumentative mischaracterization of his testimony. Rather, he testified, "The reason I said it was

constructive was that it appeared the social media companies were able to detect and counter

foreign-malign-influence operations on their platforms[.]"  Chan Dep. 133:14-18  In any event,

this PFOF contains no evidence *that the FBI* used pressure or deception to induce social-media

companies to remove or suppress information on their platforms, or that the companies regarded

(or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported

by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

(Note also that the exhibit cited is ASAC Chan's thesis submitted for postgraduate studies, and

expressly states, at page i, that "[t]he views expressed in" it "are those of the author and do not reflect the official policy or position of the Department of Defense, the FBI, or the U.S. Government.")

950.    In addition, Congress put pressure on the platforms to adopt and enforce more aggressive censorship policies and practices by sending high-level congressional staff from HPSCI and SSCI to meet with the social-media platforms directly and threaten them with adverse legislation.  According to Chan, "staffers from both of those committees have visited in … those [social-media] companies," and after these meetings with congressional staffers, employees of the social-media platforms "would indicate that they had to prepare very thoroughly for these types of meetings … and they indicated that it felt like a lot of pressure." *Id.* 117:19-119:2.

**RESPONSE:** Disputed. The assertion that congressional committee staff "put pressure on the platforms" regarding "more aggressive censorship policies and practices" and "threaten[ed] them with adverse legislation" is an argumentative assertion unsupported by ASAC Chan's testimony or the record as a whole. ASAC Chan testified that social media company employees "would not reveal [to him] the types of discussion that they had" with congressional staff, and would only "indicate that they had to prepare very thoroughly for these types of meetings and . . . that it felt like a lot of pressure." Chan Dep. 117:22-118:2. In any event, this PFOF contains no evidence *that the FBI* used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

951.    The Congressional staffers had such meetings with "Facebook, Google, and Twitter."   Employees from those three companies "experienced these visits from congressional staffers as exercising a lot of pressure on them." *Id.* 118:12-16.

**RESPONSE:** Undisputed, except to the extent that the reference to "such meetings" is intended to mean meetings to "put pressure on the platforms to adopt and enforce more aggressive censorship policies" and to "threaten them with adverse legislation," assertions for which there is no support in the record. *See* Defs.' Resp. to Pls.' PFOF ¶ 950. In any event, this PFOF contains

no evidence *that the FBI* used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

952.    In those meetings, the Congressional staffers discussed potential legislation with the social-media platforms, and before or after they met with those three companies, the Congressional staffers "discussed with [Chan] … legislation that they were thinking about doing." *Id.* 118:17-120:3.

**RESPONSE:** Disputed. ASAC Chan testified that "legislation that" congressional committees "were thinking about doing" is what the committee staff "discussed with" ASAC Chan, Chan Dep. 118:23-119:7, and that he could only "infer[ ]" from his discussions with committee staff that the staff also discussed that legislation when they met (separately) with the social media companies. *Id.* at 119:8-120:1; *see also id.* at 120:9-13, 121:3-5. In any event, this PFOF contains no evidence *that the FBI* used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

953.    It is Chan's opinion that the social-media platforms' "changes in takedown policies" to make them more restrictive "resulted from that kind of pressure from Congress." *Id.* 118:17-20.

**RESPONSE:** Undisputed subject to clarification. ASAC Chan agreed, in his "personal opinion," that "changes in [social media companies'] takedown policies resulted from that kind of pressure from Congress." Chan Dep. 118:17-20. He did not describe the changes as "more restrictive." Note also, that ASAC Chan testified that pressure from congressional committees only "*may* have had a part [in] it," and also that the companies may also have "felt this"—"this" being an evident reference to the presence of malign foreign actor accounts on their platforms—"may

have damaged their brands." *Id.* at 116:1-6 (emphasis added). In any event, this PFOF contains

no evidence *that the FBI* used pressure or deception to induce social-media companies to remove

or suppress information on their platforms, or that the companies regarded (or acted on) any

communications with the FBI as such. Any assertion to that effect is unsupported by and contrary

to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

954.    Chan's opinion is the result of discussing these meetings with participants on both sides—both the Congressional staffers and employees of Facebook, Twitter, and Google. Chan "and FBI San Francisco personnel would meet with the congressional staffers, typically before they met or after they met with the social media companies," because "they wanted an FBI opinion about what they had heard from the social media companies." *Id.* 119:23-120:3.

**RESPONSE:** Undisputed subject to clarification. ASAC Chan made clear that (i) neither

he nor others from the FBI were present when congressional staff met with social media company

employees, rather, the staff met separately with the companies, Chan Dep. 119:23-120:1, 121:3;

*see also id.* at 118:23-25; (ii) that congressional staff did not inform him whether they intended to

discuss potential legislation with the companies' employees, *id.* 120:9-121:2; and (iii) that the

company employees "would not reveal [to him] the types of discussion that they had" with

congressional staff, *id.* at 117:22-24. In any event, this PFOF contains no evidence that the FBI

used pressure or deception to induce social-media companies to remove or suppress information

on their platforms, or that the companies regarded (or acted on) any communications with the FBI

as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See*

Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

955.    To the best of Chan's recollection, these meetings between Congressional staffers and social-media platforms were an "annual occurrence" that began in 2017 and recurred annually after 2017. *Id.* 120:7-8. "The staffers had separate meetings with each of the companies." *Id.* 121:4-5. "[A]fter those meetings, the staffers would come to [Chan] and ask [his] opinion of potential legislation." *Id.* 121:6-9.

**RESPONSE:** Undisputed, *but see* Defs.' Resp. to Pls.' PFOF ¶ 954, above.

956.    Chan also discussed these meetings with the social-media platform employees who participated, as he "talk[s] with the social media platform personnel regularly," and he understood from them that "the congressional staffers put a lot of pressure on them" in the meetings. *Id.* 122:18-25. He spoke directly to the personnel who participated in the meetings. *Id.* 123:21-24. Senior officials from the social-media platforms, including Yoel Roth of Twitter, Steven Siegel of Facebook, and Richard Salgado of Google, participated in the meetings with Congressional staffers. *Id.* 123:25-125:7.

**RESPONSE:** Disputed. ASAC Chan did not testify that "'congressional staffers put a lot of pressure'" on social media company employees "in the meetings." Rather, Plaintiffs' counsel asked him, "they had kind of just made statements to you *that indicated* that they felt that *these meetings, these annual meetings* with congressional staffers put a lot of pressure on them, right?," Chan Dep. 122:20-24 (emphasis added), to which ASAC Chan replied, "That was *my interpretation* of their comments. *I don't recollect any of them using the specific word "pressure,"* but that was how I *interpreted* our conversations," *id*. at 122:25-123:3 (emphasis added). *See also* response to Pls.' PFOF ¶ 954, above. Also clarify that ASAC Chan testified that at Twitter his pertinent discussions were with Yoel Roth or Angela Sherrer. Chan Dep. 124:14-18. In any event, this PFOF contains no evidence *that the FBI* used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

957.    The Congressional staffers involved in the meetings were "senior-level staffers," including "a director-level" staffer, "the committee counsel or a senior counsel for the committee," and "one or two other … line-level staffers." *Id.* 123:6-13.

**RESPONSE:** Undisputed.

958.    According to Chan, "intense pressure from U.S. lawmakers and the media … eventually force[d] the social media companies to examine what had taken place on their platforms [in 2016] and strive to ensure that it did not happen in the future." *Id.* 127:3-23; Chan Ex. 1, at 42.

**RESPONSE:** Undisputed subject to clarification. The exhibit cited is ASAC Chan's thesis submitted for postgraduate studies, and expressly states, at page i, that "[t]he views expressed in"

it "are those of the author and do not reflect the official policy or position of the Department of

Defense, the FBI, or the U.S. Government."

959.    These steps included actions by the social-media platforms to take more aggressive enforcement against violations of their terms of service, but also policy changes to the terms of service themselves to make their policies more restrictive: "the policy changes specifically to their terms of service or community standards."  Chan Dep. 129:17-19. These involved "more robust or more aggressive content-modulation policies," that "clarify that certain things actually violate their policies and can be taken down."  *Id.* 130:4-18.

**RESPONSE:**  Disputed. The assertion that any policies became "more restrictive" is

unsupported by the record. ASAC Chan testified that the "policy changes" mentioned in this PFOF

were made "to address foreign malign influence," as Plaintiffs' counsel noted during the

deposition. Chan Dep. 129:1-4.

960.    Chan notes that "Facebook and Twitter faced more Congressional scrutiny … as their senior executives testified before Congress on three separate occasions before the midterm elections," Chan Ex. 1, at 46, and he concludes that "political pressure from Congress was a contributing factor" leading social-media platforms to adopt more restrictive content-moderation policies. Chan Dep. 132:7-9. Chan believes that these more restrictive censorship policies that include "account takedowns" are "constructive change," *id.* 133:2-23.

**RESPONSE:**  Disputed as an argumentative mischaracterization of the cited testimony.

When asked whether congressional pressure (i.e., testimony at congressional hearings) "*may have*

*led* to [the social media companies] changing *their terms of service* to be more robust and to

prevent certain kinds of content from being posted," Chan Dep. 132:1-5 (emphasis added), ASAC

Chan responded "my personal opinion is that political pressure from Congress was *a contributing*

*factor*," *id.* at 132:7-9. In addition, ASAC Chan did not state that he regards "censorship policies"

as "constructive change."  What he referred to as "constructive change" was political "pressure[ ]

on the social media companies to make changes to their platforms to address malign foreign

influence." *Id.* at 132:21-133:8. The assertion that any policies became "more restrictive" is

unsupported by the record. Note further that the exhibit cited is ASAC Chan's thesis submitted for

postgraduate studies, and expressly states, at page i, that "[t]he views expressed in" it "are those

of the author and do not reflect the official policy or position of the Department of Defense, the FBI, or the U.S. Government." In any event, this PFOF contains no evidence *that the FBI* used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

961.    These policy changes, induced by "political pressure from Congress," resulted in a dramatic increase in censorship on social-media platforms, including for example that "zero [Twitter] accounts were taken down during the 2016 cycle but 3,613 Twitter accounts were taken down during the 2018 cycle." *Id.* 133:24-134:5. Likewise, 825 accounts were removed from Facebook and Instagram based on publicly available reports, but according to Chan, the actual number was much higher. *Id.* 147:8-148:18. In 2019, Twitter announced the takedown of "422 accounts which made 929,000 tweets." *Id.* 149:9-12. "[S]ome subset of that amount was due to information [the FBI] provided." *Id.* 150:12-14.

**RESPONSE:** Disputed that platform "policy changes" were "induced by" political pressure from Congress for all the reasons stated in response to Plaintiffs' PFOF ¶¶ 946-56. Also dispute that social media companies' content moderation policies, to which all users agree, and the application thereof constitute "censorship on social-media platforms." Undisputed that the PFOF quotes accurately from ASAC Chan's thesis regarding publicly reported numbers of accounts removed from Twitter, Facebook, and Instagram, but note that these were malign foreign influence accounts. Chan Dep. 133:24-134:9, 147:8-21; *see* Chan Dep. Ex. 1 at 70 (422 accounts taken down by Twitter were controlled by the IRA, or Internet Research Agency, a Russian company indicted for "committing federal crimes while seeking to interfere in the United States political system, including the 2016 Presidential election," Ex. 129). The assertion that "according to Chan, the actual number" of accounts removed from Facebook and Instagram was "much higher" than 825 is not supported by the cited testimony, in which ASAC Chan testified only that FBI information sharing accounted for just a "subset" of the removed accounts. Chan Dep. 148:19-149:8 (Note also

that the exhibit cited is ASAC Chan's thesis submitted for postgraduate studies, and expressly states, at page i, that "[t]he views expressed in" it "are those of the author and do not reflect the official policy or position of the Department of Defense, the FBI, or the U.S. Government.")  In any event, this PFOF contains no evidence *that the FBI* used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

962.    When meeting with social-media platforms, Chan "typically meet[s] with the trust and safety individuals and then their associated attorneys." *Id.* 135:16-18.

**RESPONSE:** Undisputed.

963.    Samaruddin K. Stewart ("Sam") of the State Department's Global Engagement Center "would meet with social media companies … primarily with policy individuals." *Id.* 135:2-15.

**RESPONSE:** Undisputed.

964.    Sam Stewart would offer "different types of software made by vendors that they would pilot to see if they could detect malign foreign influence on social media platforms." *Id.* 135:25-136:3. Chan believed that the Global Engagement Center's products "might accidently pick up U.S. people information." *Id.* 138:10-12.

**RESPONSE:** Disputed. ASAC Chan clearly testified that he "[did] not think the State Department was providing th[e] vendors' programs to the [social media] companies." Rather, it was hosting "webinars" to "provid[e] a venue where different vendors could show off their products" for "all sort of audiences" including but not limited to social media companies. Chan Dep. 137:5-9, 139:20-140:9. ASAC Chan did not state that he "believed" that type of software "might accidentally pick up U.S. people information," but that he "would be concerned" that it might. *Id.*. 138:10-13. He also made clear that he "do[esn't] know what outside vendors any of the . . . social media companies use." *Id.* at 137:2-4. Moreover, this PFOF is irrelevant and contains

no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

965.    Elvis Chan knows and has worked with Peter Strzok and Lisa Page. *Id.* 234:19-240:5. He also knows and has worked with James Baker, the former general counsel of the FBI who went on to become deputy general counsel of Twitter and encouraged Twitter to keep censoring the Hunter Biden laptop story. *Id.* 239:13-16.

**RESPONSE:** ASAC Chan's professional acquaintances with Mr. Strzok, Mr. Baker, and Ms. Page as described in his testimony, and which have nothing to do with the events alleged in this case, are irrelevant. The assertion that Mr. Baker, as Twitter's General Counsel, "encouraged Twitter to keep censoring the Hunter Biden laptop story" lacks citation to or support in the record and disregards his testimony to Congress to the contrary. Ex. 2 at 4-5.

### H.    The FBI's Censorship Activities Are Ongoing.

966.    Chan urges the public to report supposed misinformation on social media directly to the platforms, or else report it to the FBI or DOJ so that they can report it to the platforms, and boasts that the platforms are "very aggressive" in taking down misinformation. As he stated in a public podcast just before the 2020 election: "If you're also seeing something related to the election on your social media platform, all of them have portals where you can report that sort of information. They're being very aggressive in trying to take down any disinformation or misinformation, and then, lastly, if they see anything on election day or before election day, you can always report it to FBI.gov or justice.gov … We take all of these very seriously." Chan Ex. 13, at 3, 9:9-19. FBI San Francisco, when it receives such reports, "would then relay those to social media platforms," so that "the social media platforms will assess those in connection with their terms of service." Chan Dep. 267:13-23. Chan characterizes the platforms as "very aggressive" in taking down disinformation because they "[adjusted] their policies to be able to handle foreign-malign-influence operations." *Id.* 270:23-25.

**RESPONSE:** Disputed as a misleading juxtaposition of ASAC Chan's October 28, 2020, podcast (Chan Dep. Ex. 13) with his November 29, 2022, deposition testimony more than two years later. ASAC Chan did not testify, as the PFOF insinuates, that the FBI San Francisco Office relays all reports of election-related mis- or disinformation to social media companies. He instead

testified without ambiguity that the election command post in the FBI San Francisco Office—

which is stood up only on the day of or several days preceding an election, Chan Dep. 167:15-

25—relays only those reports of mis- or disinformation about "the time, place, or manner of an

actual election"—such as, for example, "Political Party A vote[s] on Tuesday, Political party B

vote[s] on Wednesday"—and only does so after those reports have been investigated by a local

FBI Field Office and reviewed by officials at FBI Headquarters and the Department of Justice in

Washington, D.C. *See generally id.* at 264:21-270:25. The FBI's ongoing activities regarding mis-

and disinformation on social media platforms are further described in the Declaration of Larissa

L. Knapp (Ex. 157), filed today. In any event, this PFOF contains no evidence that the FBI used

or now uses pressure or deception to induce social-media companies to remove or suppress

information on their platforms, or that the companies regarded (or acted on) any communications

with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence

as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

967.    The FBI continues the same efforts in 2022 and later election cycles that it pursued
in 2020. As Chan publicly stated, "post 2020, we've never stopped … as soon as November 3rd
happened in 2020, we just pretty much rolled into preparing for 2022." Chan Ex. 15, at 2, 8:2-4.
Chan stated: "[W]e are also really engaged with the technology companies that are out here …
We're also working with the social media companies to make sure that any foreign disinformation
that's coming out … if we can identify them, we can share that information with them so they can
knock down accounts, knock down disinformation content," and he noted that they are "having
conversations with all of those organizations as they're building up to November of [2022]." Chan
Ex. 15, at 2-3, 8:15-9:4.

**RESPONSE:** Not disputed that the PFOF quotes accurately from ASAC Chan's June 29,

2022, podcast, in which he principally discussed issues of ransomware, Chan Dep. Ex. 15 at 2:7-

7:19, and threats to and vulnerabilities in election infrastructure, *id.* at 8:11-22, 9:7-10:23.

Regarding his remarks about sharing information with social media companies concerning

election-related disinformation on their platforms, *id.* 8:22-9:4, *see* Resp. to Pls.' PFOF ¶ 966. The

FBI's ongoing activities regarding mis- and disinformation on social media platforms are further

described in the Declaration of Larissa L. Knapp (Ex. 157), filed today. In any event, this PFOF

contains no evidence that the FBI used or now uses pressure or deception to induce social-media

companies to remove or suppress information on their platforms, or that the companies regarded

(or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported

by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

## VII.    CISA's Censorship: Pressure, "Switchboarding," and Working Through Nonprofits.

968.    CISA, the Cybersecurity and Infrastructure Security Agency within the Department of Homeland Security, serves as a "nerve center" for federal censorship efforts. CISA meets routinely with social-media platforms about censorship in at least five different sets of standing meetings, CISA pressures platforms to increase censorship of speech that federal officials disfavor, and CISA serves as a "switchboard" by "routing disinformation concerns to social-media platforms" for censorship. CISA also seeks to evade the First Amendment by outsourcing many of its censorship activities to nonprofit agencies that it collaborates closely with, including the CISA-funded Center for Internet Security and its "EI-ISAC" ("Election Infrastructure – Information Sharing & Analysis Center") for state officials, and the massive censorship cartel calling itself the "Election Integrity Partnership."

**RESPONSE:** Disputed. Neither this PFOF, or any that follow, contain evidence that CISA

functions as a "nerve center for federal censorship efforts," meets with, "pressures," or "rout[es]

disinformation concerns" to social-media companies for purposes related to censorship, "seeks to

evade the First Amendment" "outsourc[es] . . . censorship activities" to non-governmental

organizations, or has ever done so. Any assertion to that effect is unsupported by and contrary to

the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.; *see also* Defs.' Resp. to Pls'

PFOF ¶¶ 969-1122.

969.    Brian Scully is the chief of the so-called "Mis, Dis, and Malinformation Team" or "MDM Team" within the Cybersecurity and Infrastructure Security Agency (CISA) in the Department of Homeland Security (DHS). Scully Depo. 15:14-20. Before the Biden Administration, the MDM Team was known as the "Countering Foreign Influence Task Force," or CFITF.

**RESPONSE:** Undisputed.

970.    Lauren Protentis is the "Engagements Lead" for the MDM Team, and she is in charge of "outreach and engagement to key stakeholders, interagency partners, [and] private sector partners," including "social media platforms." Scully Depo. 18:2-18. During relevant periods in both 2020 and 2022, however, Protentis was on maternity leave, and during those times, Scully performs her role as chief engagement officer for communicating with other federal agencies, private-sector entities, and social-media platforms about misinformation and disinformation. Scully Depo. 18:19-20:10.

**RESPONSE:** Undisputed, except that Ms. Protentis was not on the MDM team in 2020 and was on maternity leave from September 2022 until January 2023; she was not on maternity leave in 2020. *See* Scully Depo. 18:19-25, 75:18-21.

971.    Both Scully and Protentis have done or are doing extended details at the National Security Council where they work on misinformation and disinformation issues. Protentis began a one-year detail at the NSC in January 2023, as soon as she came back from maternity leave, and she will deal with mis- and disinformation issues for the NSC as part of her detail. Scully Depo. 19:15:20:5.

**RESPONSE:** Undisputed.

A.    **CISA "Switchboards" by Flagging Government-Reported "Misinformation."**

972.    Scully admits that, during 2020, the MDM team "did some switchboard work on behalf of election officials." Scully Depo. 16:23-25. "Switchboard work" or "switchboarding" is a disinformation-reporting system that CISA provides that allows state and local election officials (who are government officials subject to the First Amendment) "to identify something on social media they deemed to be disinformation aimed at their jurisdiction. They could forward that to CISA and CISA would share that with the appropriate social media companies." Scully Depo. 17:3-8.

**RESPONSE:** Undisputed, except to clarify that CISA did not perform such work in 2022. Scully Dep. 21:19-25; Hale Decl. ¶ 78 (Ex. 97). However, this PFOF contains no evidence that CISA used "switchboarding" to threaten or pressure social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

973.    In reporting perceived misinformation to the platforms, CISA and the state and local officials have "an understanding that if the social media platforms were aware of

disinformation that they might apply their content moderation policies to it," and "the idea was that they would make decisions on the content that was forwarded to them based on their policies." Scully Depo. 17:15-21.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CISA used "switchboarding" to threaten or pressure social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

974.    CISA's "switchboarding" activity causes social-media speech to be censored that otherwise would not have been censored: Scully agrees that "if it hadn't been brought to their attention then they obviously wouldn't have moderated it."  Scully Depo. 17:22-18:1.

**RESPONSE:**   Disputed as unsupported by, and a mischaracterization of, the cited testimony to the extent this PFOF is meant to imply that CISA used "switchboarding" to threaten or pressure social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. Mr. Scully testified only that where disinformation was brought to the attention of social media companies the companies would "make decision[s] on the content that was forwarded to them based on their policies." Scully Dep. 17:15-18:1.

975.    Scully contends that "we didn't do switchboarding in 2022."  Scully Depo. 21:24-25.  But he admits that this decision was made in late April or early May 2022. Scully Depo. 22:15-23. This lawsuit was filed, specifically challenging CISA's "switchboarding" activity, on May 5, 2022. Doc. 1.

**RESPONSE:** Undisputed.

976.    Throughout the 2022 election cycle and through the present date, CISA continues to publicly state on its website that the MDM Team "serves as a switchboard for routing disinformation concerns to appropriate social media platforms": "The MDM team serves as a switchboard for routing disinformation concerns to appropriate social media platforms and law enforcement. This activity began in 2018, supporting state and local election officials to mitigate

disinformation about the time, place, and manner of voting. For the 2020 election, CISA expanded the breadth of reporting to include other state and local officials and more social media platforms." Scully Ex. 24, at 3; *see also* Cybersecurity and Infrastructure Security Agency, "Mis, Dis, Malinformation," https://www.cisa.gov/mdm (visited Feb. 4, 2023).

**RESPONSE:** Disputed as contradicted by, and a mischaracterization of, the record. Mr. Scully explained during his deposition that this statement was inaccurate and should be changed to indicate that CISA's switchboarding efforts are no longer occurring. Scully Dep. 366:21-367:4. CISA's website subsequently has been updated. *See* Ex. 141 (*Foreign Influence Operations and Disinformation*, Cybersecurity & Infrastructure Sec. Agency, https://perma.cc/F46N-KZDU). CISA did not engage in switchboarding for the 2022 election cycle and has no intention to engage in switchboarding for the next election. Hale Decl. ¶ 78 (Ex. 97).

977.    According to Scully, "switchboarding is CISA's role in forwarding reporting received from election officials, state/local election officials, to social media platforms." Scully Depo. 23:24-24:2.

**RESPONSE:** Undisputed, except to clarify that CISA did not perform such work in 2022. Scully Dep. 21:19-25. However, this PFOF contains no evidence that CISA used "switchboarding" to threaten or pressure social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

**B.      CISA Organizes the "USG-Industry Meetings" on Misinformation.**

978.    The MDM Team continues to communicate regularly and extensively with social-media platforms about misinformation and disinformation, including during the 2022 election cycle. These communications include at least "two general types of communications, one, we did regular sync meetings between government and industry, so federal partners and different social media platforms." Scully Depo. 21:2-6. This is "a coordinated meeting. Facebook was the industry lead, so [Scully] would have coordination calls with them prior to the meetings, just to set the agenda for meetings…" Scully Depo. 21:6-10. These meetings are described in CISA's interrogatory responses as "USG-Industry" meetings. Scully Ex. 12, at 38-40.

**RESPONSE:** Disputed to the extent this PFOF asserts the MDM Team "continues" to communicate regularly and extensively with social media companies because the USG-Industry meetings, which began in 2018, ended in 2022; there is no plan to continue these meetings in 2023. *See* Scully Dep. 32:9-11; Hale Decl. ¶ 69 (Ex. 97). Moreover, this PFOF contains no evidence that CISA used these meetings to threaten or pressure social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F, Arg. § II.B.4.c.

979.    In addition, the MDM Team received regular reports from social-media platforms about any changes to their censorship policies or their enforcement actions on censorship: "if a platform was putting out a … public report on policies or activities" relating to disinformation and censorship," CISA would "get a briefing on that or at least get an awareness that it was going out." Scully Depo. 21:11-16.

**RESPONSE:** Disputed to the extent this PFOF mischaracterizes the cited testimony. Mr. Scully did not testify that CISA received "regular" reports from social media companies about any changes to their "censorship policies" or their "enforcement actions on censorship." *See* Scully Dep. 21:11-16. Moreover, this PFOF contains no evidence that CISA's receipt of these reports had anything to do with threatening or pressuring social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F, Arg. § II.B.4.c.

980.    The USG-Industry meetings increase in frequency as each election nears. In 2022, they were "monthly" as the election approached, and then in October, they became "biweekly," so that there were two "biweekly meetings … prior to the [2022] election." Scully Depo. 24:16-21.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CISA used these meetings to threaten or pressure social-media companies to remove or suppress information on

their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F, Arg. § II.B.4.c.

981.    "DOJ, FBI, ODNI, and … DHS" participate in these meetings on the federal government's side. Scully Depo. 25:23. DHS's participation includes at least two components: CISA, typically represented by Scully and Geoff Hale, Scully's supervisor; and the Office of Intelligence and Analysis ("I&A"). Scully Depo. 25:11-26:13. Scully's role is to "oversee" and "facilitate the meetings." Scully Depo. 25:14-16. On behalf of CISA, Kim Wyman, Allison Snell, and Lauren Protentis also participate in the meetings. Scully Depo. 28:4-13.

**RESPONSE:** Disputed to the extent this PFOF asserts current "participa[tion] in these meetings" by any agency or individual, because the USG-Industry meetings, which began in 2018, ended in 2022; there is no plan to continue these meetings in 2023. *See* Scully Dep. 32:9-11; Hale Decl. ¶ 69 (Ex. 97). Moreover, this PFOF contains no evidence that CISA used these meetings to threaten or pressure social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F, Arg. § II.B.4.c.

982.    On behalf of FBI, FITF Chief Laura Dehmlow and Elvis Chan participate in these "USG-Industry" meetings, and "periodically other people would be on from different parts of FBI," while "Laura [Dehmlow] was usually who [CISA] coordinated through." Scully Depo. 29:14-30:12.

**RESPONSE:** Disputed to the extent this PFOF asserts current "participa[tion] in these meetings" by any agency or individual, because the USG-Industry meetings, which began in 2018, ended in 2022; there is no plan to continue these meetings in 2023. *See* Scully Dep. 32:9-11; Hale Decl. ¶ 69 (Ex. 97). In addition, Special Agent Chan only participated in "some" of these meetings. Scully Dep. 29:22-30:1. Moreover, this PFOF contains no evidence that CISA used these meetings to threaten or pressure social-media companies to remove or suppress information on their

platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F, Arg. § II.B.4.c.

983.    These "USG-Industry" meetings have been occurring "for years," and "the first meeting we had … between federal and … industry was in 2018." Scully Depo. 31:10-16.

**RESPONSE:** Disputed to the extent this PFOF suggests that the meetings are still "occurring," because the meetings, which began in 2018, ended in 2022; there is no plan to continue these meetings in 2023. *See* Scully Dep. 32:9-11; Hale Decl. ¶ 69 (Ex. 97). Moreover, this PFOF contains no evidence that CISA used these meetings to threaten or pressure social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F, Arg. § II.B.4.c.

984.    In addition, prior to each "USG-Industry" meeting, CISA hosts at least two planning meetings before the main meeting: a bilateral planning meeting between CISA and Facebook, and an interagency meeting with the federal agencies that participate. Scully Depo. 36:21-37:13.

**RESPONSE:** Disputed to the extent this PFOF suggests the meetings are still taking place because the USG-Industry meetings, which began in 2018, ended in 2022; there is no plan to continue these meetings in 2023. *See* Scully Dep. 32:9-11; Hale Decl. ¶ 69 (Ex. 97). Moreover, this PFOF contains no evidence that CISA used these meetings to threaten or pressure social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F, Arg. § II.B.4.c.

985.    Even though the 2022 meetings were still quite recent at the time of his deposition, Scully professed that "I don't recall specifics, so I'll just say that upfront" about the discussions at these meetings. Scully Depo. 37:19-20; *see also* Scully Depo. 39:23-25.

**RESPONSE:** Disputed to the extent this PFOF mischaracterizes the record. When Mr.

Scully was asked what ODNI "specifically" said during 2022 meetings, and whether ODNI ever

raised a specific threat advisory, he responded that "I don't recall specifics, so I'll just say that up

front." Scully Dep. 37:14-24. He further explained that "generally speaking . . . it was higher level,

kind of strategic of what a threat actor may be considering or thinking." *Id.* Moreover, this PFOF

contains no evidence that CISA used these meetings to threaten or pressure social-media

companies to remove or suppress information on their platforms, or that the companies regarded

(or acted on) any communications with CISA as such. Any assertion to that effect is unsupported

by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F, Arg. § II.B.4.c.

986.    The social-media platforms attending these meetings include "Facebook, Twitter,
Microsoft, Google, Reddit, … [and] LinkedIn," as well as "others."  Scully Depo. 38:15-20. For
example, Wikimedia Foundation participated in "some."  Scully Depo. 39:2-6.

**RESPONSE:**  Disputed to the extent this PFOF suggests the meetings are still taking place

because the meetings, which began in 2018, ended in 2022; there is no plan to continue these

meetings in 2023. *See* Scully Dep. 32:9-11; Hale Decl. ¶ 69 (Ex. 97). Moreover, this PFOF

contains no evidence that CISA used these meetings to threaten or pressure social-media

companies to remove or suppress information on their platforms, or that the companies regarded

(or acted on) any communications with CISA as such. Any assertion to that effect is unsupported

by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F, Arg. § II.B.4.c.

987.    Scully agrees that "concerns about misinformation and disinformation on social
media platforms [were] discussed in these meetings in the 2022 timeframe."  Scully Depo. 39:7-
11. This includes federal officials reporting on disinformation concerns that they believe will affect
speech on social media; for example, the "intelligence community" would report on "information
operations": "the intelligence community, if their reporting included foreign actors who were
potentially going to use information operations, they might mention that in their briefings."  Scully
Depo. 39:19-23.

**RESPONSE:**  Undisputed, except to the extent the second sentence states "[t]his includes federal officials reporting on disinformation concerns that they believe will affect speech on social media." That vague and ambiguous statement is not supported by the cited portion of Mr. Scully's deposition. Moreover, this PFOF contains no evidence that CISA used these meetings to threaten or pressure social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F, Arg. § II.B.4.c.

988.    The social-media platforms, likewise, would report back to federal officials about disinformation "trends" on their platforms, and provide additional information to the federal government not included in their public reports about such trends: "the platforms, they might share some high-level trend information from public reporting that they put out. So a lot of the platforms do their own regular reports on what they're seeing on their platforms and … what actions they're taking. And so the platforms, themselves, would share that type of information…. they would share essentially what they were getting ready to make public or what they had already made public… and then potentially provide some additional context around that."  Scully Depo. 40:4-22. The government would ask for additional information about their observations of disinformation trends on social media, and the platforms would provide it: "they would share that, and if the government had questions or was looking for additional context they would often talk about that, they would generally talk about any new tactics that they were seeing."  Scully Depo. 41:1-5.

**RESPONSE:** The first sentence is disputed as a mischaracterization of the testimony cited in the balance of the PFOF. Moreover, this PFOF contains no evidence that CISA sought or used the referenced information to threaten or pressure social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F, Arg. § II.B.4.c.

989.    Scully admits that the discussion of foreign-originated misinformation is ultimately targeted at preventing domestic actors' from engaging in certain government-disfavored speech. He states that "my recollections for the time period we're talking about here, from September 2022 to the election in 2022, I recall most of it was foreign based. But … often what you see overseas essentially makes its way to the United States."  Scully Depo. 41:6-12.

**RESPONSE:**  The first sentence is disputed as a mischaracterization of the testimony cited

in the second and third sentences, and as suggesting that the USG-Industry meetings, which ended

in 2022, are still taking place. *See* Scully Dep. 32:9-11. There is no plan to continue these meetings

in 2023. *See id.*; Hale Decl. ¶ 78 (Ex. 97). This PFOF contains no evidence that CISA used these

meetings to threaten or pressure social-media companies to remove or suppress information on

their platforms, or that the companies regarded (or acted on) any communications with CISA as

such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See*

Defs.' PFOF § II.F., Arg. § II.B.4.c.

990.    At the various meetings, the platforms discuss misinformation and disinformation
as "coordinated inauthentic behavior," which is subject to removal under their terms of service,
but Scully admits that "coordinated inauthentic behavior" concerns CISA because it "could lead
to mis and disinformation, for sure."  Scully Depo. 42:12-14.

**RESPONSE:**  Disputed as a mischaracterization of the cited testimony, and as suggesting

that the meetings, which ended in 2022, are still taking place. *See* Scully Dep. 32:9-11. There is

no plan to continue these meetings in 2023. *See id.*; Hale Decl. ¶ 78 (Ex. 97). Mr. Scully testified

that although coordinated inauthentic behavior "could lead to mis or disinformation . . . it's not

always mis or disinformation." Scully Dep. 41:16-42:8. Rather, coordinated inauthentic behavior

"could be an indicator" of mis- or disinformation. *Id.* at 42:15-19. Moreover, this PFOF contains

no evidence that CISA used these meetings to threaten or pressure social-media companies to

remove or suppress information on their platforms, or that the companies regarded (or acted on)

any communications with CISA as such. Any assertion to that effect is unsupported by and

contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

**C.    CISA Is Deeply Embedded in the Election Integrity Partnership.**

991.    Scully admits that CISA has established relationships with researchers at
"Stanford" and the "University of Washington," as well as "Graphika."  Scully Depo. 46:23, 48:1-

4. CISA's coordination with these researchers has continued since before the 2020 election cycle. Scully Depo. 47:22-25. Detailed additional information about these entities and their collaboration with CISA in the "Election Integrity Partnership" (or "EIP") is provided below. *See infra*.

**RESPONSE:** Undisputed. However, neither this PFOF nor those concerning the Election Integrity Partnership (EIP), *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, Pls.' Supplemental Preliminary Injunction Brief at 41 (Dkt. 214) ("PI Supp."); *see also* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

992.    Stanford Internet Observatory, University of Washington, the Atlantic Council, and Graphika are all involved in the EIP. Scully Depo. 48:1-22.

**RESPONSE:** Undisputed.

993.    When EIP was starting up, Scully admits that CISA's "involvement" with the EIP included at least the following collaborations: (1) "a couple of our [CISA] interns came up with the idea and … [CISA] had some communications with" the EIP. Scully Depo. 49:8-10. (2) CISA "received some briefings on the work that they were doing."  Scully Depo. 49:13-14. (3)  CISA "had some communications early on in the process, when they were making decisions, when Stanford was trying to figure out what the gap was."  Scully Depo. 49:18-21. (4) CISA "connected them [EIP] with the Center For Internet Security," which is a CISA-funded nonprofit that channels reports of disinformation from state and local government officials to social-media platforms. Scully Depo. 50:5-6. (5) CISA also "connected them [EIP] with some of the election official groups," *i.e.*, "the National Association of Secretaries of State [NASS] and the National Association of State Election Directors [NASED]," both of which are groups of state and local government officials. Scully Depo. 50:6-10.  (6) And CISA "facilitated some meetings between those three."  Scully Depo. 50:10-11.

**RESPONSE:** Disputed to the extent this PFOF mischaracterizes the cited actions as "collaborations" between CISA and the EIP. The cited evidence does not support that characterization. CISA did not launch the EIP, and it is not a government organization. *See* Hale Decl. ¶ 56 (Ex. 97). In addition, the PFOF mischaracterizes the funding of CIS. DHS has provided financial assistance to CIS through a series of cooperative agreement awards, managed by CISA, to provide certain, specified cybersecurity services to state, local, tribal and territorial governmental organizations through the MS- and EI-SACs. *Id.* ¶ 50. In the approved scope of work for the cooperative agreements, DHS has limited the use of federal funds and any required non-

federal cost-share to cybersecurity services intended to detect, prevent, respond to, mitigate, and

recover from cyber threats, vulnerabilities, and risks. *See id.* The DHS approved scope of work for

the cooperative agreements has never funded CIS to perform disinformation-related work,

including the reporting of potential election security-related disinformation to social media

platforms. *See id.* ¶ 51. Nor did CISA fund CIS or the MS- or the EI-ISAC for any of the work

CISA provided in relation to the reporting of potential election security-related disinformation to

social media or technology companies during the 2020 or election cycle. *See id.* ¶ 77. In addition,

CISA does not now fund and has never funded the EIP. *See id.* ¶ 57. Further, Defendants note that

Louisiana is a member of NASS and both Louisiana and Missouri are members of NASED. *See*

*id.* ¶ 33. Neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains

evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF

§ II.F., Arg. § II.B.4.c. & e.

994.    The CISA interns who originated the idea of the EIP "worked for the Stanford
Internet Observatory, as well … which was part of the [Election Integrity] Partnership."  Scully
Depo. 51:7-8, 22-24.

**RESPONSE:** Undisputed. However, neither this PFOF nor those concerning the EIP,

*infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with

the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

995.    According to Scully, the "gap" that the EIP was designed to fill, was that state and
local election officials lack the resources to monitor and report on disinformation that affects their
jurisdictions: "One of the gaps that we identified from 2018 is, as you know, most election officials
their offices are fairly low staff, low resourced, and so there was no – they didn't have capabilities
to try to identify disinformation targeting their jurisdictions, and so was essentially the gap is that
most election offices throughout the country just didn't have that capacity or capability to be
monitoring so that they could identify anything that would be potentially target their jurisdictions,
so that was the gap."  Scully Depo. 57:6-17.

**RESPONSE:** Undisputed. However, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

996.    Scully and other CISA officials identified the "gap" as a problem to CISA interns who were simultaneously working for the Stanford Internet Observatory: "So we had a conversation with the interns, and they were asking questions about kind of needs that the election officials have, generally. One of the gaps that we identified from 2018 is, as you know, most election officials their offices are fairly low staff, low resourced, and so … they didn't have the capabilities to try to identify disinformation targeting their jurisdictions." Scully Depo. 57:2-11.

**RESPONSE:** Undisputed, except that the cited testimony does not support the statement that the Stanford students interning at CISA "were simultaneously working for the Stanford Internet Observatory" and that Mr. Scully or "other CISA officials" "identified the 'gap.'" *See* Defs.' Resp. to Pls' PFOF ¶ 1019. In addition, any student who interned at CISA should have performed only CISA work during their internship with the Agency, and they should not have performed any CISA work outside of their CISA internship, including while interning at the Stanford Internet Observatory or supporting the EIP. Hale Decl. ¶ 61 (Ex. 97). Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

997.    Thus, Scully and other CISA officials were involved in originating and brainstorming about the creation of the EIP in the first place, as they "had some initial conversation with the interns" about this "gap," and then they also "had a conversation with the Stanford Internet Observatory folks about the gap." Scully Depo. 52:3-6. Then, CISA "received a briefing from them [EIP], or two, on kind of what they were putting together." Scully Depo. 52:7-9. Scully and other CISA officials then "facilitated some meetings between Stanford folks, the Center For Internet Security, and election officials, where they had discussions about how they would work together." Scully Depo. 52:10-13. And CISA's involvement did not end there, as Scully admits that "we had some conversations, kind of throughout, when they were -- particularly when they were putting out public reporting about what they were seeing." Scully Depo. 52:14-17. In addition, Scully "wouldn't be surprised if there were some other kind of brief conversations in there." Scully Depo. 52:18-20.

**RESPONSE:** Undisputed, except to extent the statement that "Scully and other CISA officials were involved in originating and brainstorming about the creation of the EIP in the first place" mischaracterizes the record. Mr. Scully explained that after he identified the "gap" in election officials' resources, "I don't think they were necessarily thinking about more of a partnership." Scully Dep. 57:24-6. Rather, Mr. Scully explained that "I think the conversation was more along the lines of this may be something that the Stanford Internet Observatory could look into, and then I think they went back and talked to their folks at the Stanford Internet Observatory and the idea was formed from there." *Id.* at 57:24-58:12. CISA did not found, fund, or have any role in the management or operations of the EIP. Hale Decl. ¶¶ 52, 56-57 (Ex. 97); Ex. 122 at 7 (University of Washington statement) (noting that "CISA did not found, fund, or otherwise control EIP."). Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

998.    The EIP continued to operate during the 2022 election cycle. Scully Depo. 53:4-5. At the beginning of the 2022 election cycle, the EIP "gave us [CISA] a briefing, early on, about what they were thinking about," which occurred in "May/June of 2022." Scully Depo. 53:14-19. Scully and Geoff Hale of CISA received the briefing from Renee DiResta and another EIP official. Scully Depo. 53:22-54:7. In that briefing, the EIP officials "walked through what their plans were for 2022, [and] some of the lessons learned from 2020." Scully Depo. 54:11-13. Their plans for 2022 were that "they were going to do something similar to what they did in 2020 in terms of trying to support election officials." Scully Depo. 54:16-18. They planned to "work with state and local election officials." Scully Depo. 54:22-25.

**RESPONSE:** Undisputed. However, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

999.    CISA followed EIP's public reporting during the 2022 election cycle, and in particular, Scully relied on "at least one public report … that I thought was pretty good," which was "about specific disinformation" and "was basically how to think about whether or not a narrative poses risks." Scully Depo. 56:12-17.

**RESPONSE:** Undisputed, except that the record does not support that Mr. Scully "relied" on EIP's public report rather than simply reviewed it. Scully Dep. 56:6-21. Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1000.   Scully admits that CISA has "an established relationship" with the EIP and the Stanford Internet Observatory personnel who lead it. Scully Depo. 55:24-25.

**RESPONSE:** Undisputed. Defendants note that CISA did not found, fund, or have any role in the management or operations of the EIP. *See* Hale Decl. ¶¶ 52, 56-57 (Ex. 97); Ex. 122 at 7 (noting that "CISA did not found, fund, or otherwise control EIP."). In addition, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1001.   The Center for Internet Security is a "non-profit that oversees the multi-state ISAC and the election infrastructure subsector information sharing and analysis center, that's what ISAC stands for." Scully Depo. 59:13-16. In other words, CIS oversees the "Multi-State Information Sharing and Analysis Center," or "MS-ISAC," and the "Election Infrastructure Information Sharing and Analysis Center," or "EI-ISAC." Scully Depo. 60:9-20. Both of these are organizations of state and/or local government officials, organized for information sharing. Scully Depo. 60:3-11, 60:25-61:6.

**RESPONSE:** Undisputed, but further note that both Louisiana and Missouri are members of the MS-ISAC. *See* Hale Decl. ¶ 46 (Ex. 97). Neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1002.   CISA funds the Center for Internet Security in its activity of overseeing the EI-ISAC, which is an organization for information-sharing among state and local government election officials. Scully Depo. 61:9-10, 62:1 ("CISA provides funding for the EI-ISAC").

**RESPONSE:** Disputed. CISA does not fund the CIS; rather, DHS has provided financial assistance to CIS through a series of cooperative agreement awards, managed by CISA, to provide certain, specified cybersecurity services to state, local, tribal and territorial governmental organizations through the MS- and EI-SAC. *See* Hale Decl. ¶ 50 (Ex. 97). In the approved scope of work for the cooperative agreements, DHS has limited the use of federal funds and any required non-federal cost-share to cybersecurity services intended to detect, prevent, respond to, mitigate, and recover from cyber threats, vulnerabilities, and risks. *See id.* The DHS approved scope of work for the cooperative agreements has never funded CIS to perform disinformation-related work, including the reporting of potential election security-related disinformation to social media platforms. *See id.* at ¶ 51. Nor did CISA fund CIS or the MS- or the EI-ISAC for any of the work CISA provided in relation to the reporting of potential election security-related disinformation to social media or technology companies during the 2020 or election cycle. *See id.* at ¶ 77. Neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1003. CISA directed election officials to the Center for Internet Security, which CISA funds, as an alternative route for reporting misinformation to social-media platforms, because CISA found the "switchboarding" role to be resource-intensive. Scully Depo. 62:16-24.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes CISA as funding the Center for Internet Security. The record does not support that characterization and it is contradicted by the facts. *See* Defs.' Resp. to PFOF ¶ 1002. In addition, this PFOF mischaracterizes CISA as "direct[ing] election officials to" CIS. The record does not support that characterization; rather, the testimony states that "[election officials] seemed to settle on the [CIS.]" Scully Dep. 62:16-24. Neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence

that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F.,

Arg. § II.B.4.c. & e.

1004.   CISA connected the Center for Internet Security with the EIP because "the EIP was working on the same mission," so "we wanted to make sure that they were all connected." Scully Depo. 62:24-63:1. Thus, CISA originated and set up the collaborations between local government officials and the CIS, and between the EIP and the CIS. *Id.*

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes CISA as "originat[ing]

and set[ting] up the collaborations between local government officials and the CIS." Scully Dep.

62:16-24. The record does not support that characterization and it is contradicted by the facts. As

home to the MS-ISAC and EI-ISAC, CIS had its own independent relationship with state and local

government officials. Hale Decl. ¶ 44 (Ex. 97); *see* Defs.' Resp. to PFOF ¶ 1002**.** Moreover, neither

this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that

CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg.

§ II.B.4.c. & e.

1005. The Center for Internet Security worked closely with CISA in reporting misinformation to social-media platforms, as CISA served as a pass-through for reports from CIS to the platforms: CIS officials "were receiving reporting directly from election officials. In the early part of 2020, they would forward what they were receiving election officials to us at CISA, and then we would push that to the social media platform; as 2021 moved along, CIS more frequently provided that directly to the platforms, themselves. And so I would say early on in the process, the switchboarding generally came through CISA. Later on in the process, it was more of a mixed bag of how the switchboarding worked." Scully Depo. 63:23-64:10.

**RESPONSE:** Disputed to the extent that the PFOF mischaracterizes CIS as "work[ing]

closely with CISA in reporting misinformation," and does not support the implication that "CISA

served as a pass-through for reports from CIS to the platforms" for all reports of misinformation

to social media platforms, throughout the 2020 election or for any of the election cycles that

followed. The cited evidence does not support that characterization. Indeed, as the quoted

testimony of Mr. Scully reflects, as 2021 progressed CIS frequently provided information that it

received from state and local officials directly to social media platforms and did not involve CISA at all. Scull Dep. 63:23-64:10; Hale Decl. ¶ 75 (Ex. 97). Neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1006.   In addition to CIS and CISA, EIP also reported supposed misinformation to social-media platforms. Scully Depo. 64:13-14. CISA and CIS coordinated directly with each other on reporting misinformation. Scully Depo. 64:18-20.

**RESPONSE:** Undisputed, but note that neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1007.   CISA served a mediating role between CIS and the EIP, and the platforms, to coordinate their efforts in reporting misinformation to the platforms: "There was a point where one of the platforms was concerned about too much kind of duplicate reporting coming in, and so we did have some conversations with EIP and CIS on how to kind of better manage that activity to make sure we weren't overwhelming the platforms." Scully Depo. 64:21-65:1.

**RESPONSE:** Disputed to the extent this PFOF mischaracterizes the cited testimony as stating that CISA served in a "mediating role" between the CIS, the EIP, and social media platforms in coordinating the efforts of CIS and EIP. The cited testimony does not support that characterization. Rather, CISA had conversations with CIS to try and avoid providing social media companies with duplicative information. Scully Dep. 66:1-8; Hale Decl. ¶ 76 (Ex. 97). Neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1008.   There was also direct email communication between EIP and CISA about misinformation reporting. Scully Depo. 66:9-12.

**RESPONSE:** Disputed to the extent that this PFOF mischaracterizes the cited testimony as stating that the communications between EIP and CISA were *about* misinformation reporting.

The cited testimony does not support that characterization. Rather, the cited testimony notes that Mr. Scully believed "there was direct e-mail communication between EIP and CISA." Scully Dep. 66:9-12. Neither the deposition question nor the answer specifies the subject or content of conversations between the EIP and CISA. Neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1009.   When CISA reported misinformation to platforms, CISA would "generally copy the Center for Internet Security," which was coordinating with EIP. Scully Depo. 67:20-68:6.

**RESPONSE:** Disputed to the extent that this PFOF mischaracterizes Mr. Scully's testimony as indicating that CISA copied CIS because CISA was coordinating with the EIP. The testimony does not support that characterization. Rather, the testimony states that CISA did not coordinate with CIS if it was reporting something to a social media platform because CIS was coordinating with EIP, but rather, CISA coordinated with CIS because "most of the reporting received from an election official came through CIS." Scully Dep. 68:2-19. Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1010.   Alex Stamos and Renee DiResta of the Stanford Internet Observatory briefed Scully about the EIP's report, "The Long Fuse," in "late spring, early summer 2021." Scully Depo. 70:1-10. Scully also reviewed portions of the report. *See id.*; Scully Ex. 1 (EIP Report).

**RESPONSE.** Undisputed. However, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1011.   Dr. Kate Starbird of the University of Washington, who works with the EIP, is also on the MDM Subcommittee for CISA. Scully Depo. 72:19-73:4. Kate Starbird of the University

of Washington serves on CISA's CSAC MDM Subcommittee, as well as working with the EIP. Scully Ex. 59, at 1.

**RESPONSE:** Disputed to the extent this PFOF indicates that the "MDM Subcommittee for CISA" and "CISA's CSAC MDM Subcommittee" are two distinct groups and to the extent this PFOF indicates that Dr. Starbird continues to serve on the CSAC's MDM Subcommittee. There is no organization or group called "the MDM Subcommittee for CISA." Rather, at one time the CISA Cybersecurity Advisory Committee (CSAC) had a subcommittee known as the Protecting Critical Infrastructure from Misinformation (MDM) Subcommittee. Dr. Starbird served on the CSAC MDM Subcommittee while it was operational; however, the CSAC MDM Subcommittee was directed to stand down in December 2022 because it had completed its work and provided its recommendations to CISA. *See* Ex. 187 at 43. Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1012.   Alex Stamos and Renee DiResta, who quarterback the EIP, also have roles in CISA. Renee DiResta of the Stanford Internet Observatory—a key player in the EIP—also serves as a "Subject Matter Expert (SME)" for the CISA's Cybersecurity Advisory Committee's MDM Subcommittee. *Id.*; Scully Depo. 361:19-362:6. Alex Stamos, the director of the Stanford Internet Observatory who launched the EIP, serves on the CISA Cybersecurity Advisory Committee, along with Kate Starbird. Jones Decl., Ex. FF, at 3, 12-13.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the cited evidence by suggesting that Ms. DiRestra's inclusion on a list of "potential subject matter experts to potentially brief" meant that she had any role, formal or otherwise, at CISA. Scully Dep. 361:3-326:6. The cited evidence does not support this characterization. Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1013.   CISA had extensive communications to coordinate with the EIP when it was starting up during the 2020 election cycle: "we had conversations with Stanford about the gap. They gave us some briefings on what they were doing, how they were doing it. Prior to the election, we had some conversations with them to facilitate and coordinate meetings, as I mentioned. And then when they put public reporting out, if we had questions about it, we would probably have conversations with them around that, as well."  Scully Depo. 74:17-75:1.

**RESPONSE:** Disputed to the extent this PFOF mischaracterizes CISA's handful of conversations with Stanford as "extensive" communications with the EIP. The cited evidence does not support that characterization. Indeed, the cited transcript reflects that CISA only had a handful of meetings with the EIP between 2020 and 2022. Scully Dep. 74:17-75:1; Hale Decl. ¶¶ 52-54, 60, 62 (Ex. 97). Indeed, CISA did not found, fund, or have any role in the management or operations of the EIP. *Id.* ¶¶ 52, 56-57; Ex. 122 at 7. Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1014.   In addition to Scully, Matt Masterson was involved in communicating with the EIP. Scully Depo. 75:6-11. In addition, Scully "wouldn't be surprised" if Geoff Hale participated in some conversations with EIP. Scully Depo. 76:1-2.

**RESPONSE:** Undisputed, but note that neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1015.   The then-Director of CISA, Director Krebs, "had a relationship with Alex Stamos," the head of the Stanford Internet Observatory, while CISA was coordinating with the EIP, and Director Krebs "may have had conversations in that context" about the EIP. Scully Depo. 76:8-10. In fact, when he left CISA in late 2020, Director Krebs "joined Alex Stamos," and "they started a business together," called the "Krebs/Stamos Group."  Scully Depo. 76:5-23.

**RESPONSE:** Disputed to the extent that this PFOF mischaracterizes CISA's communications with EIP as "coordinat[ion]" and mischaracterizes any conversation between former Director Krebs and Mr. Stamos as involving the EIP. The cited evidence does not support

those characterizations. Mr. Scully testified that he did not believe that former Director Krebs and Mr. Stamos "necessarily had conversations in relation to EIP." Scully Dep. 76:5-12. Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1016.   Scully believes that "Director Krebs may have participated in a couple of meetings that I'm aware of, that Stamos was also in."  Scully Depo. 77:20-22, 78:3-11.

**RESPONSE:** Undisputed, but note that those meetings occurred while Mr. Stamos was still working at Facebook, rather than the Stanford Internet Observatory, and the discussion did not involve the Election Integrity Partnership. Scully Dep. 78:1-18. Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1017.   According to Scully, "generally speaking, the reporting that CISA received came through the Center for Internet Security."  Scully Depo. 79:19-21.

**RESPONSE:** Disputed. Mr. Scully testified that CISA generally received reporting in three ways. First, CISA received reports of potential misinformation from the Center for Internet Security. Scully Dep. 118:22-119:15. Second, on occasion election officials would send reports of potential misinformation to CISA Central, which is CISA's operations center. *Id.* at. 119:20-25. Third, election officials would send reports of potential misinformation directly to a CISA employee. *Id.* Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1018.   Matt Masterson and Scully presented questions to the EIP about their "public reporting," which consisted of "regular blog posts on what they were seeing" about supposed

election-related misinformation. Scully Depo. 81:19-82:16. Masterson was also involved in at least one of the initial discussions with the Stanford Internet Observatory about starting up the EIP. Scully Depo. 81:24-82:4. Masterson spoke to Stanford about "clarifying the gap that election officials faced for the folks at the Stanford Internet Observatory early on in the process." Scully Depo. 83:22-25.

**RESPONSE:** Undisputed, but note that neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1019. The idea of the "gap" came from Scully and CISA, which he "shared with the interns." Scully Depo. 84:8-22.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Mr. Scully as coming up with the idea of the "gap." The cited evidence does not support that characterization. Mr. Scully disclaimed that he came up with the idea of the "gap"; rather, the "gap" was identified as part of lessons learned from 2018. Scully Dep. 84:10-18 (stating that "I don't know that I would say that that was . . . something that we came up with on our own."). Mr. Scully shared this lesson learned with the Stanford students. *Id.* 84:19-22. Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1020. Matt Masterson "was in the meeting where we talked about the gap with [Alex] Stamos, in particular. And I believe Stamos mentioned that [*i.e.*, the collaboration that became the Election Integrity Partnership] as an option during that call." Scully Depo. 85:21-24.

**RESPONSE:** Undisputed, but note that neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1021. Matt Masterson left CISA in January 2021. He started at Microsoft in early 2022. In the intervening year, immediately after leaving CISA, Masterson "was a fellow at the Stanford Internet Observatory." Scully Depo. 88:21-89:8. Thus, both the CISA Director (Krebs) and the political appointee directly involved in the establishment of the EIP (Masterson) went to work with Alex Stamos of Stanford Internet Observatory immediately after the 2020 election cycle.

**RESPONSE:** Disputed to the extent that this PFOF mischaracterizes Mr. Masterson as being "directly involved in the establishment of the EIP." The evidence does not support that characterization. Rather, the evidence reflects that Mr. Masterson had extremely limited involvement with Stanford concerning the EIP. Scully Dep. 83:15-25 (stating that Mr. Masterson's role concerning the EIP was simply to clarify for the Stanford Internet Observatory the gap in resources that election officials faced). Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1022.   Alex Stamos consulted with CISA in part because "he knew he would need us helping him connect with election officials."  Scully Depo. 100:17-18.

**RESPONSE:** Disputed to the extent this PFOF mischaracterizes Mr. Scully's understanding as fact when the cited testimony states, "I *think* he knew he would need us helping him connect with election officials." Scully Dep. 100:17-18 (emphasis added). In addition, Mr. Stamos "didn't ask CISA to play any role in the concept he was putting together." *Id.* at 100:13-18. Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1023.   Scully believes that there was at least "a fifth call" between CISA and Alex Stamos in 2020. Scully Depo. 101:4.

**RESPONSE:** Undisputed, but note that neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1024.   Scully put Stamos in touch with NASED and NASS, and "facilitated some meetings between … them [EIP] and election officials."  Scully Depo. 101:15-102:10. Scully "facilitated meetings … some meetings between EIP and CIS" because "they didn't have relationship" and

"didn't know each other. So [CISA] just facilitated getting them together to talk and figure out how they were going to work together." Scully Depo. 102:14-20. The purpose of these meetings was "to set up a direct line of communication between CIS and EIP." Scully Depo. 103:7-10.

**RESPONSE:** Undisputed, but note that Plaintiff Louisiana is a member of the NASS, and

Plaintiffs Missouri and Louisiana are members of the NASED. Hale Decl. ¶ 33 (Ex. 97). Moreover,

neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence

that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F.,

Arg. § II.B.4.c. & e.

1025.  Scully also put EIP in contact and facilitated meetings between EIP (*i.e.*, folks at the Stanford Internet Observatory, which organized EIP) and representatives of NASED and NASS, the organizations of state and local election officials. Scully Depo. 103:11-104:19. These occurred in July or August 2020. Scully Depo. 104:24-25.

**RESPONSE:** Undisputed, but note that Plaintiff Louisiana is a member of the NASS, and

Plaintiffs Missouri and Louisiana are members of the NASED. Hale Decl. ¶ 33 (Ex. 97). Moreover,

neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence

that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. Defs.' PFOF § II.F., Arg.

§ II.B.4.c. & e.

1026.  Scully believes that the Center for Internet Security, which CISA funds, "forward[ed] messages that election officials sent them" reporting misinformation "to EIP." Scully Depo. 106:10-16.

**RESPONSE:** Disputed to the extent that this PFOF mischaracterizes CISA's funding of

CIS. DHS has provided financial assistance to CIS through a series of cooperative agreement

awards, managed by CISA, to provide certain, specified cybersecurity services to state, local, tribal

and territorial governmental organizations through the MS- and EI-SACs. Hale Decl. ¶ 50 (Ex.

97). In the approved scope of work for the cooperative agreements, DHS has limited the use of

federal funds and any required non-federal cost-share to cybersecurity services intended to detect,

prevent, respond to, mitigate, and recover from cyber threats, vulnerabilities, and risks. *Id.* The

DHS approved scope of work for the cooperative agreements has never funded CIS to perform disinformation-related work, including the reporting of potential election security-related disinformation to social media platforms. *Id.* ¶ 51. Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1027.   Scully agrees that "EI-ISAC is a part of CIS and we do fund the EI-ISAC."  Scully Depo. 110:20-23.

**RESPONSE:** Undisputed, but note that neither DHS nor CISA funded CIS or the EI-ISAC for any of the work they provided in relation to the reporting of potential election security-related disinformation to social media or technology companies during the 2020 or 2022 election cycles. Hale Decl. ¶¶ 51, 77-78 (Ex. 97). Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1028.   Scully agrees that CISA collaborated with the EIP. Scully Depo. 111:15-18.

**RESPONSE:** Disputed to the extent that this PFOF mischaracterizes the cited testimony. In response to the question, "[d]id [CISA] have conversations with representatives of the EIP?," Mr. Scully responded: "[y]es. If that's considered collaboration, then I guess we collaborated with the EIP." Scully Dep. 111:11-18. CISA has engaged with the EIP as it does with other nongovernmental organizations in the election community. Hale Decl. ¶ 62 (Ex. 97). Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1029.   CISA probably had "between two and four" conversations with the EIP about its public reports on disinformation trends on social media. Scully Depo. 113:20-24. "[I]f we had a question about jurisdiction[s] being targeted or a new [disinformation] tactic or things like that, we would just ask them … questions about that sort of thing."  Scully Depo. 114:17-21. Scully "was following the public reports" from the EIP during 2020. Scully Depo. 115:16-17.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the cited testimony by omitting portions of that testimony that provide context. The omitted portion of the testimony noted that the referenced conversations "were just fairly brief conversations, based on blog posts." Scully Dep. 114:15-21; Hale Decl. ¶ 60 (Ex. 97) (noting that while the EIP briefed CISA on EIP's plans for the 2022 election cycle, the briefing was at a high-level and did not address if or how the EIP may interact with CIS."). Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1030.   CISA received misinformation reports principally from three sources: first, from the Center for Internet Security; and second, "sometimes election officials would send them in to CISA central, which is CISA's kind of ops center block room type setup. And then the third way was they would just send direct to a CISA employee, … often Matt Masterson, who had relationships with many of the election officials."  Scully Depo 119:7-11, 119:22-120:5.

**RESPONSE:** Undisputed, but note that neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1031.   CISA coordinated with the Center for Internet Security on reporting misinformation to platforms: "we would let them know when we reported something to a platform … to avoid duplication," and "most of the reporting that I recall in 2020 came through CIS. And so we just wanted to let them know that we were acting on what they sent us. For reporting that didn't come through CIS, we would often let them know after we had shared it with the platforms that we had shared something with the platforms for their arrangement."  Scully Depo. 120:23-121:9.

**RESPONSE:** Undisputed, but note that neither this PFOF nor those concerning the EIP, *infr*a, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1032.   CIS and EIP also "had a relationship. They shared information." Scully Depo. 121:20-21.

**RESPONSE:** Undisputed, but note that neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1033.   According to Scully, "CISA does not do attribution. We didn't do analysis of what we received from election officials. So we would not know what percentage" of misinformation reports "were foreign derived."  Scully Depo. 122:25-123:3. CISA thus forwards reports of "misinformation" to social-media platforms "without assessing whether they were originated from foreign or domestics sources."  CISA would not "take steps to see whether this came from foreign or domestic sources," but "would just pass it along to the social-media platforms." Scully Depo. 123:4-18.

**RESPONSE:** Undisputed, but note that this PFOF contains no evidence that CISA threatened or pressured any social media company to censor speech, or that any social media company regarded any communications by CISA as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1034.   Scully was aware that social-media platforms changed their content-moderation policies to be more restrictive of election-related "misinformation" during the 2020 election cycle, because the platforms reported on those changes to federal officials "in our regular sync meetings," *i.e.*, the "USG-Industry" meetings. Scully Depo. 127:18-19. In those meetings, "that would be one of their briefing points, that they were making significant changes" to policies for censoring election-related speech. Scully Depo. 128:4-6.

**RESPONSE:** Disputed to the extent that this PFOF mischaracterizes the cited testimony. Rather than report on all changes to their content moderation policies during the USG-Industry meetings, social media platforms would report on "significant changes." Scully Dep. 127:4-128:7. Mr. Scully explained that this information "wasn't an essential part of the conversation," and that he was unaware of anyone in the federal government asking or encouraging social media companies to change their content moderation policies to address election integrity. *Id.* at 127:4-

128:12. Also disputed to the extent Plaintiffs characterize social-media companies' content moderation policies, to which all users must agree, as "policies for censoring." Moreover, this PFOF contains no evidence that CISA threatened or pressured any social media company to censor speech, or that any social media company regarded any communications by CISA as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1035.   During 2020, Matt Masterson was "a senior election security person at CISA," and he was a "political appointee."  Scully Depo. 129:23-130:4. Masterson was "familiar with the switchboarding work that we were doing." Scully Depo. 131:8-10. And "when he would receive emails" reporting misinformation, "he forwarded them to us." Scully Depo. 131:13-14.

**RESPONSE:** Undisputed, but note that this PFOF contains no evidence that CISA threatened or pressured any social media company to censor speech, or that any social media company regarded any communications by CISA as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1036.   Scully understands that the Virality Project was "Stanford's attempt to mimic the EIP for COVID."  Scully Depo. 134:10-11.

**RESPONSE:** Undisputed, but note that neither this PFOF nor those concerning the Virality Project (VP), *infra*, nor the record as a whole, contains evidence that CISA was pervasively entwined with the VP such that VP's conduct can be regarded as state action. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1037.   The Virality Project "sent [Scully] some of their public reports."  Scully Depo. 134:13-14.

**RESPONSE:** Undisputed, but note that neither this PFOF nor those concerning the VP, *infra*, nor the record as a whole, contains evidence that CISA was pervasively entwined with the

VP such that VP's conduct can be regarded as state action. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1038.  Scully was aware that Alex Stamos and Renee DiResta of the Stanford Internet Observatory were involved in the Virality Project. Scully Depo. 134:21-22.

**RESPONSE:** Undisputed, but note that neither this PFOF nor those concerning the VP, *infra*, nor the record as a whole, contains evidence that CISA was pervasively entwined with the VP such that VP's conduct can be regarded as state action. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1039.  Scully "did have some conversations where they were … asking me … for any connections I had with HHS or CDC." Scully Depo. 135:10-12.

**RESPONSE:** Disputed to the extent that this PFOF mischaracterizes the cited testimony. Mr. Scully testified that he had conversations with someone "associated with the Virality Project" but did not recall who these conversations were with. Scully Dep. 134:17-135:12. Mr. Scully further testified that he did not provide the VP with these connections as he did not have "any relevant point of contact[] to provide them." *Id.* at 135:6-19. Moreover, neither this PFOF nor those concerning the VP, *infra*, nor the record as a whole, contains evidence that CISA was pervasively entwined with the VP such that VP's conduct can be regarded as state action. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1040.  In addition, Scully recalls "some informal … conversations that I may have had with Alex, in particular, and maybe Renée, as well," about the Virality Project. Scully Depo. 136:3-6.

**RESPONSE:** Undisputed, but note that Mr. Scully stated that these conversations were "not substantial," and that Mr. Stamos and Ms. DiResta simply told him generally that the VP was something they were working on. They "did not get into any details" about the VP during these conversations. Scully Dep. 135:20-136:22. Moreover, neither this PFOF nor those concerning the

VP, *infra*, nor the record as a whole, contains evidence that CISA was pervasively entwined with the VP such that VP's conduct can be regarded as state action. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1041.  Alex Stamos gave Scully an "overview what they planned to do in the Virality Project" that "was similar to what they did … with the EIP." Scully Depo. 136:19-22.

**RESPONSE:** Undisputed, but note that neither this PFOF nor those concerning the VP, *infra*, nor the record as a whole, contains evidence that CISA was pervasively entwined with the VP such that VP's conduct can be regarded as state action. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1042.  Scully also had conversations with Renee DiResta about commencing the Virality Project. Scully Depo. 139:5-14.

**RESPONSE:** Undisputed, but note that Mr. Scully testified that this "wasn't a lengthy conversation. It was just, hey, we're doing something here, I believe." Scully Depo. 139:5-14. Moreover, neither this PFOF nor those concerning the VP, *infra*, nor the record as a whole, contains evidence that CISA was pervasively entwined with the VP such that VP's conduct can be regarded as state action. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1043.  With respect to the EIP, Alex Stamos and Renee DiResta "shared … lessons learned," and "what some of their big takeaways were" with Scully. Scully Depo. 141:6-8.

**RESPONSE:** Undisputed, but note that neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1044.  CrowdTangle is a "Facebook-owned social media monitoring service." Scully Depo. 144:23-24.

**RESPONSE:** Undisputed.

1045.  According to the Virality Project report, "as voting-related mis-and disinformation arose in the 2020 presidential election, the Election Infrastructure Information Sharing and

Analysis Center (EI-ISAC) served a critical role in sharing information with the Election Integrity Partnership and pushing its rapid response analysis back out to election stakeholders across all states." Scully Ex. 2, at 150. Scully understands that this refers to the Center for Internet Security, which operates the EI-ISAC through CISA-provided funding, and that "it was Center for Internet Security" that engaged in direct communications with the EIP and played a critical role in sharing information with the EIP. Scully Depo. 147:17-25.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the CIS and EI-ISAC funding mechanism, as well as the EI-ISAC's involvement in the EIP. Regardless of Mr. Scully's "understanding," the cited evidence does not support that characterization. First, DHS has provided financial assistance to CIS through a series of cooperative agreement awards, managed by CISA, to provide certain, specified cybersecurity services to state, local, tribal and territorial governmental organizations through the MS- and EI-SACs. Hale Decl. ¶ 50 (Ex. 97). In the approved scope of work for the cooperative agreements, DHS has limited the use of federal funds and any required non-federal cost-share to cybersecurity services intended to detect, prevent, respond to, mitigate, and recover from cyber threats, vulnerabilities, and risks. *Id.* The DHS approved scope of work for the cooperative agreements has never funded CIS to perform disinformation-related work, including the reporting of potential election security-related disinformation to social media platforms. *Id.* ¶ 51. Second, Mr. Scully testified that he was not aware of whether the EI-ISAC served a role in sharing information with the EIP during 2020. Scully Dep. 147:13-25. Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1046.   During the summer of 2020, CISA was "piloting a capability that would allow us to monitor narratives online," Scully Depo. 151:13-15—*i.e.*, the work that the EIP eventually did and does.

**RESPONSE:** Disputed to the extent the PFOF seeks to assert an equivalence between the work the EIP performed and the pilot project Mr. Scully described, because the PFOF fails to cite

to any record evidence supporting such a comparison. In addition, Mr. Scully explained that the purpose of the pilot project was "to predict the likely impact of narratives on stakeholders." Scully Dep. 151:20-152:9. Mr. Scully explained that "we were trying to understand . . . if we could predict the likely impact of MDM narrative in terms of increasing risks to critical infrastructure by a better understanding [of] the information environment, so the pilot was essentially trying to test that theory out." *Id.* at 151:20-152:14; 153:24-154:8. This pilot project was never operationalized or used by CISA. *Id.* at 155:14-22. Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1047. In his public statements, Alex Stamos has identified the EIP's "partners in government" as "most particularly those in CISA and DHS, but also in all of the local and state governments with whom we operated with." Scully Ex. 6, at 4. Scully agrees that "CISA and DHS were partners of the EIP." Scully Depo. 369:1-11.

**RESPONSE:** Undisputed, but note that Mr. Scully testified that "[CISA] generally describe[s] any external organization that we have a relationship with as a partner." Scully Depo. 396:6-11; Hale Decl. ¶ 62 (Ex. 97) (noting that CISA has engaged with the EIP as it does with other nongovernmental organizations in the election community). Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1048. According to Stamos, "[t]he Election Integrity Partnership started with our team in Stanford sending a group of interns to go work with the cyber security and infrastructure security agency at the DHS to work election security. And what these interns found is, there's a lot of opportunity for them to contribute to the technical components of election security. They also found that there was a lack of capability around election disinformation. This is not because CISA didn't care about disinformation, but at the time they lacked both kind of the funding and the legal authorizations to go do the kinds of work that would be necessary to truly understand how election disinformation was operated." Scully Ex. 6, at 4.

**RESPONSE:** Disputed to the extent Plaintiffs' PFOF relies on the statement of nongovernmental third party for the legal conclusion that CISA lacked the "legal authorizations to go do the kinds of work that would be necessary to truly understand how election disinformation was operated." Defendants address Plaintiffs' legal conclusion and arguments in their brief in response to Plaintiffs' motion for a preliminary injunction. Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1049. Stamos says that the EIP is "a project between four different institutions to try to fill the gap of the things that the government cannot do themselves." Scully Ex. 6, at 4.

**RESPONSE:** *See* Defendants' response to Pls' PFOF ¶ 1048.

1050. Stamos states that CISA was one of "four major stakeholders" in the EIP: "There are kind of four major stakeholders that we operated with that we worked beside at EIP. Our partners in government, most particularly those in CISA and DHS, but also in all of the local and state governments with whom we operated with." Scully Ex. 6, at 4.

**RESPONSE:** Undisputed, but note that Mr. Scully testified that "[CISA] generally describe[s] any external organization that we have a relationship with as a partner." Scully Dep. 396:6-11; Hale Decl. ¶ 62 (Ex. 97) (noting that CISA has engaged with the EIP as it does with other nongovernmental organizations in the election community). Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1051. EIP had access to data for monitoring social-media speech that the federal government does not have: The EIP "also worked with the major platforms, Facebook, Twitter, YouTube, TikTok, Reddit, NextDoor and the like. … [S]ome of those cases we had agreements for access of data. In other cases, we had to have individual analysts go work with them." Scully Ex. 6, at 5.

**RESPONSE:** Disputed because the PFOF's statement that the "EIP had access to data for monitoring social-media speech that the federal government does not have" is not supported by the cited evidence. Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1052.    According to Stamos, there was very little foreign disinformation in 2020: "We find very little evidence that there's any foreign involvement at all. In fact, the vast majority of election disinformation in 2020 came from Americans who had verified accounts and very large follower accounts."  Scully Ex. 6, at 6.

**RESPONSE:** Undisputed to the extent that this was the conclusion that Mr. Stamos reached based on the work performed by the EIP.

1053.    According to Stamos, its founder, the EIP targeted "large follower account political partisans who are spreading misinformation intentionally, doing so in a multi-media context. So they're doing on online, on social media, but they're also doing so on cable news, doing so on the radio, through a variety of different outlets and are able to amplify their message and to motivate their followers to go try find evidence of the incorrect claims that they're making."  Scully Ex. 6, at 7.

**RESPONSE:** Disputed because the PFOF mischaracterizes the cited evidence. Mr. Stamos did not state that the EIP was "target[ing]" anything. Rather, Mr. Stamos simply explained a trend EIP's research had observed and noted that "one of the big changes [from the 2016 election] that we point out in our report is that this information is much less about massive amplification. . . . It's a much more important factor now is that there are large follower account political partisans who are spreading misinformation intentionally, doing so in a multi-media context." Scully Ex. 6 at 7. Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1054.    According to Renee DiResta, "in August 2020, students from the Stanford Internet Observatory were doing an internship with CISA and they identified a massive gap in the

capability of federal, state, and local governments to become aware of, to analyze, and to rapidly respond to mis and disinformation, both foreign and domestic, targeting the 2020 election." Scully Ex. 7, at 4. The EIP was designed to fill that "gap" in the governments' capability to "rapidly respond to mis- and disinformation … targeting the 2020 election." *Id.*

**RESPONSE:** Undisputed, but note that neither this PFOF nor those concerning the EIP,

*infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with

the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1055.   As DiResta notes, the EIP was designed to get around "unclear legal authorities, including very real First Amendment questions," that would arise if CISA or other government agencies were to monitor and flag misinformation for censorship on social media. Scully Ex. 7, at 4. As she states, "that gap had several components. The federal government wasn't prepared to identify and analyze election mis- and disinfo. …There were unclear legal authorities, including very real First Amendment questions." *Id.*

**RESPONSE:** Disputed to the extent the PFOF relies upon a statement by a non-

governmental third-party witness to support a conclusion about CISA's "legal authorities."

Defendants respond to Plaintiffs' legal arguments in their opposition to Plaintiffs' motion for a

preliminary injunction. In addition, Ms. DiResta explained that there were a number of reasons for

the EIP, including that "a trusted nonpartisan partnership with expertise in the way that

misinformation moved on public platforms with analysts capable of understanding public

conversations and a broader ability to explore publicly available data was needed." Scully Ex. 7 at

4-5. Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole,

contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See*

Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1056.   DiResta agrees that "the vast majority of voting related misinformation in the 2020 election was domestic." Scully Ex. 7, at 6.

**RESPONSE:** Undisputed to the extent that this was the conclusion that Ms. DiResta

reached based on the work performed by the EIP. However, neither this PFOF nor those

concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was

"pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1057.   The Virality Project was immediately established on the heels of the EIP: "Following the success of EIP and the certification of the 2020 election, SIO [Stanford Internet Observatory] … almost immediately we recognized the need to ramp back up. This time to support government health officials' efforts to combat misinformation and targeting the COVID-19 vaccines. In February 2021, we formally established the Virality Project drawing on the same partners from EIP and adding a few more, and much like EIP, it focused on realtime observation, analysis, and understanding of cross platform vaccine-related misinformation."  Scully Ex. 7, at 7.

**RESPONSE:** Disputed to the extent the PFOF does not provide the entire quote from Ms. DiResta. The complete first sentence of her statement reads: "Following the success of EIP and the certification of the 2020 election, SIO ramped down its monitoring analysis capability because we thought that we were done with that work." Scully Ex. 7 at 7. Moreover, neither this PFOF nor those concerning the VP, *infra*, nor the record as a whole, contains evidence that CISA was pervasively entwined with the VP such that VP's conduct can be regarded as state action. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1058.   The CISA-funded Center for Internet Security coordinated with EIP regarding online misinformation and reported it to CISA. For example, on October 1, 2020, CIS emailed Scully about alleged misinformation, noting that "the impact seems to be escalating. Our hope is the platforms can do more to take down the misinformation. The EIP has been tracking this spread under ticket EIP-243 and has more examples."  Scully Ex. 9, at 1. Scully forwarded this report to social media platforms. *Id.*

**RESPONSE:** Disputed to the extent the PFOF's characterization of CISA's funding of the CIS is misleading. First, DHS, not CISA, provides funding to CIS. *See* Hale Decl. ¶ 50 (Ex. 97). Second, the DHS approved scope of work for the cooperative agreements has never funded CIS to perform disinformation-related work, including the reporting of potential election security-related disinformation to social media platforms. *Id.* ¶ 51. In fact, DHS expressly rejected CIS's request for government funding to perform that work during the 2022 election cycle. *Id.* ¶ 79. Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence

that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1059.   EIP had advised Scully that it was using a ticketing system to track misinformation narratives. Scully Depo. 159:1-5.

**RESPONSE:** Undisputed, but note that neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1060.   Scully forwarded this report tracked under EIP-243 to Twitter, as well as Facebook and YouTube, because "people generate traffic … by posting it across platforms," and he "would sometimes share across other platforms that we thought there might be … relevant content showing up on their platforms."  Scully Depo. 160:2-5; Scully Ex. 9, at 1, 7, 12.

**RESPONSE:** Disputed to the extent that this PFOF mischaracterizes the cited exhibits as forwarding reports tracked under "EIP-243." The cited documents do not support that characterization. Rather, the emails use a subject line indicating that CIS had an independent case number (Report # CIS-MIS000024) associated with the report it received from the office of the California Secretary of State. Scully Ex. 9 at 1, 7, 12. Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1061.   Scully asked social-media platforms to report back how they were handling reports of misinformation and disinformation received from CISA. *See* Scully Ex. 9, at 11 (asking Twitter "to see if there's anything you can share about how you're approaching" misinformation reported by CISA). According to Scully, "periodically … we would ask if the decision was made and if we can share back."  Scully Depo. 164:15-17.

**RESPONSE:** Disputed to the extent this PFOF mischaracterizes the cited evidence. Mr. Scully testified that CISA would ask social media companies to report back how they had addressed the content reported "if the election official asked," because sometimes the election

officials "wanted to know if a decision was made[.]" Scully Dep. 163:17-164:5. Mr. Scully further

testified that "if the platform was open to sharing if they had made a decision or not, we would

just push [the platform's response] back to the election officials so they were aware … of where

the platform landed. *Id.* at 163:23-164:17. Moreover, this PFOF does not support Plaintiffs'

contention that CISA attempted to dictate to, threaten or pressure, collude with, or encourage

social-media companies to remove or suppress certain election-related claims on their platforms,

or that the companies regarded (or acted on) any communications with CISA as such. Any

assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF

§ II.F., Arg. § II.B.4.c. & e.

    1062.   CISA maintained a "tracking spreadsheet" of its misinformation reports to social-media platforms during the 2020 election cycle. Scully Depo. 165:14-166:13. After Scully's deposition, CISA produced this "tracking spreadsheet" in response to Plaintiffs' Motion to Compel. Jones Decl., Ex. GG.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the cited document. The

"tracking spreadsheet" of approximately 145 items included, among other things, (1) reports from

state, local, tribal and territorial election officials that CISA forwarded to social media platforms;

(2) reports that CISA had been made aware of but had taken no action on, and (3) materials not

reported to social media platforms but instead referred to law enforcement as the underlying

material may have constituted criminal behavior such as threats directed towards election officials

and infrastructure. Jones Decl., Ex. GG. Defendants further dispute the PFOF's characterization

that CISA produced this "tracking spreadsheet" in response to Plaintiffs' Motion to Compel. The

tracking spreadsheet was neither the subject of Plaintiffs' document production requests nor their

motion to compel. *See* Ex. 185 at 1 (E-mail from Joshua E. Gardner to John Sauer (Feb. 14, 2023,

8:11 AM)). Rather, Defendants produced the "tracking spreadsheet" to Plaintiffs in the spirit of

cooperation because they requested it outside of discovery or motions practice. *Id.* Moreover, this

PFOF does not support Plaintiffs' contention that CISA attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain election-related claims on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1063.   At least six members of the MDM team "took shifts" in reporting supposed misinformation to social-media platforms, including Scully, Chad Josiah, Rob Schaul, Alex Zaheer, John Stafford, and Pierce Lowary. Scully Depo. 166:9-168:11, 183:14-16.

**RESPONSE:** Undisputed, but clarify that CISA forwarded reports of potential misinformation that it received from election infrastructure stakeholders, including officials in Plaintiffs states Louisiana and Missouri, *see* Hale Decl. ¶ 70 (Ex. 97); Ex. 100 (MOLA_DEFSPROD_00007488); Ex. 101 (MOLA_DEFSPROD_00007647); Ex. 102 (MOLA_DEFSPROD_00010719); Ex. 103 (MOLA_DEFSPROD_00008681), to social media platforms. Moreover, this PFOF does not support Plaintiffs' contention that CISA attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain election-related claims on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1064.   At the time, Pierce Lowary and Alex Zaheer were simultaneously serving as interns for CISA and working for the Stanford Internet Observatory, which was then operating the Election Integrity Partnership. Scully Depo. 168:22-171:16, 183:20-22. Thus, Zaheer and Lowary were simultaneously engaged in reporting misinformation to social-media platforms on behalf of CISA, and in reporting misinformation to social-media platforms on behalf of the EIP. *Id.*

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the cited evidence. Messrs. Lowary and Zaheer both interned for CISA and were Stanford students associated with the Stanford Internet Observatory (SIO); however, as Mr. Scully explained during this deposition,

"when [the intern] was on duty, he was only working for us." Scully Dep. 168:20-169:2; Hale

Decl. ¶ 61 (Ex. 97). Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the

record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI

Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1065.  Zaheer and Lowary were also two of the four Stanford interns who originated the
idea of the EIP. Scully Depo. 171:14-16, 184:22-24, 185:12-14.

**RESPONSE:** Undisputed, but note that neither this PFOF nor those concerning the EIP,

*infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with

the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1066.  Zaheer "was one of the people that were working the ticketing system" for EIP.
Scully Depo. 181:21-23. Likewise, Lowary "did both SIO and CISA push forwarding" at the same
time during the fall of 2020. Scully Depo. 183:14-16.

**RESPONSE:** Undisputed, but note that neither this PFOF nor those concerning the EIP,

*infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with

the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1067.  CISA's misinformation reporting to platforms "ramped up as we got closer to the
election." Scully Depo. 174:1-2. On election night, they "were up until at least midnight," and "if
we received anything we would push it forward." Scully Depo. 175:12-14. Close to the election,
they would "monitor their phones" for disinformation reports even during "off hours." Scully
Depo. 175:16-17. "[T]he expectation [was] … that they would be responsible for forwarding
something" to the platforms. Scully Depo. 175:19-21.

**RESPONSE:** Undisputed, but clarify that CISA forwarded reported information it

received from election infrastructure stakeholders, including from Plaintiffs Louisiana and

Missouri. Hale Decl. ¶ 70 (Ex. 97); Ex. 100 (MOLA_DEFSPROD_00007488); Ex. 101

(MOLA_DEFSPROD_00007647); Ex. 102 (MOLA_DEFSPROD_00010719); Ex. 103

(MOLA_DEFSPROD_00008681). Moreover, this PFOF does not support Plaintiffs' contention

that CISA attempted to dictate to, threaten or pressure, collude with, or encourage social-media

companies to remove or suppress certain election-related claims on their platforms, or that the

companies regarded (or acted on) any communications with CISA as such. Any assertion to that

effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. §

II.B.4.c. & e.

1068.   Alex Zaheer, when switchboarding for CISA, forwarded detailed a report of
supposed "misinformation" from the Election Integrity Partnership (EIP) to CISA's reporting
system, which called for "swift removal of … posts and continued monitoring of the user's
account" because that user had "claimed (1) that mail-in voting is insecure, [and] (2) conspiracy
theories about election fraud are hard to discount." Scully Ex. 9, at 62. Scully forwarded this report
to Twitter, which reported back that it had taken action pursuant to its civic integrity policy. *Id.* at
61; *see also* Scully Depo. 199:6-200:17.

**RESPONSE:** Disputed to the extent it mischaracterizes the cited evidence. Mr. Zaheer

forwarded to CISA's Countering Foreign Influence Task Force (CFITF), for the CFITF's

situational awareness, a report that the EIP had sent to Twitter. Scully Ex. 9 at 62. That report

noted that a Twitter user had claimed that alleged ballots were being sent to New York City

residents that were pre-filed out in favor of Biden, and that voters were encouraged to turn those

ballots in as-is. *Id.* The EIP report "recommended Twitter remove this post immediately, as it

contains a message that intends to mislead and potentially cast doubt on the legitimacy of mail-in

voting in a critical pre-election period." *Id.* Mr. Scully forwarded this report to Twitter and noted

that there was "[n]o need to respond." *Id.* at 61. Twitter nevertheless responded to Mr. Scully and

informed him that Twitter decided to apply "a contextual label pursuant to our policy on Civic

Integrity." *Id.* at 61. Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the

record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI

Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1069.   According to Scully, forwarding such reports of misinformation from the EIP to
social-media platforms "was our standard practice." Scully Depo. 200:25. In fact, CISA's tracking
spreadsheet contains at least eleven entries of "switchboarded" reports of misinformation that
CISA received directly from "EIP" and forwarded to social-media platforms for review under their

policies. Jones Decl., Ex. GG, at 4-5, Column C ("From"), Lines 86-96, 115, 123 (all listing "EIP"). CISA also used EIP tracking numbers for those reports. *See id.* Column D. One of these notes that content was reported to Twitter for censorship because "EIP … saw article on The Gateway Pundit." *Id.* at 4 (Column F, Line 94).

**RESPONSE:** Disputed to the extent the PFOF mischaracterize the reports sent to Twitter as advocating for "censorship." The cited evidence does not support that characterization. Rather, the evidence reflects that both CISA and EIP flagged information for social media companies so the companies could independently decide whether the information violated their terms of service. In addition, to the extent the PFOF suggests that CISA forwarded each of the "at least eleven entries" it received from the EIP to social media companies, the cited evidence does not support that statement. As reflected in rows 86-96 and 123 of the spreadsheet, these are instances where CISA was notified about EIP reporting to social media platforms, and do not indicate that CISA separately forwarded this information to social media platforms. Jones Decl., Ex. GG at 5-6. Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1070.   CIS routinely reported misinformation by sending the notice simultaneously to both CISA and to the EIP, using the EIP's misinformation-reporting email "tips@2020partnership. atlassian.net." Scully Ex. 9, at 33, 52, 58; Scully Ex. 10, at 1. Scully Ex. 11, at 1-2 (indicating that "tips@2020partnership.atlassian.net" is the reporting email for the EIP); Scully Depo. 229:18-230:25 (Scully admitting that this email is the EIP reporting email).

**RESPONSE:** Disputed to the extent the PFOF's characterization that CIS "routinely" reported misinformation to both CISA and to the EIP is unsupported by the cited evidence. Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1071.  State officials, likewise, simultaneously reported supposed "misinformation" to CISA, CIS, and the EIP. *See, e.g.,* Scully Ex. 9, at 59 (Colorado state official reporting misinformation to "EI-ISAC, CISA and Stanford Partners").

**RESPONSE:** Undisputed, but note that some states, like Louisiana, reported potential misinformation directly to CISA without reporting this information to CIS and the EIP. *See, e.g.,* Ex. 100 (MOLA_DEFSPROD_00007488). Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1072.  State officials sometimes indicated that they were reporting misinformation to platforms for censorship precisely *because* federal officials at FBI and CISA had warned them about it. *See, e.g.,* Scully Ex. 9, at 59 (noting that Colorado was reporting two Twitter accounts, one with 14 followers and one with 2 followers, because "[t]hese are concerning to us here in Colorado because of recent FBI/CISA warnings about impersonation accounts spreading false information about the election").

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes state officials as reporting misinformation to platforms for "censorship." The cited evidence does not support that characterization. Rather, the cited document reflects that an individual from the office of the Colorado Department of State flagged for EI-ISAC, CISA, and "Stanford Partners" two accounts "that could be used to imitate official accounts," and that he "wanted to flag them for consideration." Scully Ex. 9 at 59. The Colorado Department of State expressly stated that it was "not the originator of the above information and is forwarding it, unedited, from its original source. The Department does not seek the ability to remove or edit what information is made available on social media platforms. The Department makes no recommendations about how the information it is sharing should be handled or used by recipients of this email." *Id.* at 60. Accordingly, this PFOF reflects a state official asking Twitter to make the independent judgment as to whether the identified accounts violate Twitter's terms of service—terms to which all users agree. Moreover, this PFOF does not support Plaintiffs' contention that CISA attempted to dictate to, threaten or

pressure, collude with, or encourage social-media companies to remove or suppress certain election-related claims on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1073.   One platform complained to Scully that it was receiving duplicate reports of misinformation from the EIP and Center for Internet Security, and asked if CISA could be designated reporter for the group: "Hey Brian, can we talk about CIS Misinformation reporting duplicate reports to EIP?  Possible to have just you escalate?"  Scully Ex. 9, at 63. Scully coordinated with CIS and EIP to set forth a coordinated reporting process involving agreed roles for all three of them—CISA, CIS, and EIP. *Id.*; Scully Depo. 209:14-212:12. Scully admits that there was "an agreement for EIP and CIS and CISA to coordinate and let each other know what they were reporting to platforms like Twitter." Scully Depo. 212:7-12.

**RESPONSE:** Undisputed, but note that neither this PFOF—which relates to an agreement among CISA, CIS, and EIP to inform one another of the misinformation each *independently* decided to report—nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1074.   State and local officials reported misinformation to the FBI in parallel with their reports to CIS and CISA. *See, e.g.,* Scully Ex. 10, at 10. This is because CISA "tell[s] election officials to report what they saw to either DHS or the FBI, and it would end up where it needed to be." Scully Depo. 215:8-14.

**RESPONSE:** Disputed to the extent the PFOF implies that state and local officials regularly reported misinformation to the FBI in parallel with their reports to CIS or CISA. The evidence cited does not support that implication. For example, the compilation of emails from state and local officials reflected in Scully Ex. 10 contains numerous emails that do not include the FBI. *See generally* Scully Ex. 10. Moreover, this PFOF does not support Plaintiffs' contention that CISA attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain election-related claims on their platforms, or that the

companies regarded (or acted on) any communications with CISA as such. Any assertion to that

effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. §

II.B.4.c. & e.

1075.    The Center for Internet Security, likewise, sometimes used EIP ticket numbers on the misinformation reports it sent to CISA for forwarding to platforms. *See, e.g.*, Scully Ex. 10, at 27 (reporting supposed misinformation in Pennsylvania under ticket number "EIP-664"); Scully Depo. 217:16-218:19. As noted, CISA's "tracking spreadsheet" used similar EIP ticket numbers at least 13 times for misinformation reports sent to platforms. Jones Decl., Ex. GG, at 4-5.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the evidence as suggesting

that CISA sent 13 reports to social media companies that it received from the EIP. *See* Defs' Resp.

to PFOF ¶ 1069. Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the record

as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at

41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

### D.    CISA Uses Switchboarding to Pressure Platforms to Censor Speech.

1076.    CISA and Scully did not just forward misinformation reports to platforms; in addition, they also engaged in fact-checking for the platforms. For example, regarding a report about election security in Pennsylvania, Facebook asked Scully if he could please "confirm" two factual aspects of the report, and Scully responded with an explanation of why the government believed that the report was misinformation violating Facebook's terms of service. Scully Depo. 218:22-219:24; Scully Ex. 10, at 25-27; Scully Depo. 222:20-224:20; Scully Ex. 10, at 35-37 (Scully engaging in his own research to debunk an election-integrity claim on Twitter and reporting to Twitter, which relied on his research to label the Tweet).

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Mr. Scully's actions as

constituting "fact checking." The evidence does not support that characterization. Rather, Mr.

Scully testified that if a social media platform requested additional information *from an election*

*official* CISA would try to support that request. Scully Dep. 219:25-220:13. This typically would

involve CISA either asking a state or local official for a public statement that it could provide to

the social media company or finding the public statement itself and providing it to the social media

company. *Id.* at 219:25-222:15. Moreover, this PFOF does not support Plaintiffs' contention that

CISA attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain election-related claims on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

1077.   Scully admits that CISA commonly engaged in such informal fact-checking for the platforms: "if social media platforms needed additional information from an election official we would try to support that. … "[G]enerally speaking, we would do what we did here, which is if the -- if the jurisdiction made a public statement or if there was additional information the jurisdiction could provide, and the platforms asked for it, that we would try to facilitate getting the information they asked for."   Scully Depo. 220:6-20. CISA would do its own research as well as relaying statements from public officials to help debunk postings for social-media platforms. Scully Depo. 221:1-4 ("If it was a public statement, I'm sure we pulled it ourselves. If there was not a public statement, I would imagine we would go back to the election official."); Scully Depo. 221:23-222:19.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the evidence. Mr. Scully's follow-up inquiries to state or local election officials, or reviews of public statements they had issued upon the requests of social media companies for additional information were neither "common[]" nor did they constitute "informal fact-checking" by CISA. The evidence does not support those characterizations. *See* Defs.' Resp. to PFOF ¶ 1076. Moreover, this PFOF does not support Plaintiffs' contention that CISA attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain election-related claims on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

1078.   In presenting such "debunking" information to platforms to urge them to remove content, CISA always assumed—without any independent research—that the *government* official was a reliable source, and that the social-media user was unreliable, even for first-hand accounts: "if there was a public statement that was put out by the jurisdiction, we would … defer to that." Scully Depo. 221:9-12. CISA would not "take any steps to find out" if the private citizen's account

might actually be truthful, and CISA would not "do further research to figure out who was telling the truth," but would simply "relay … the official statement from the jurisdiction" to the platforms for censorship. Scully Depo. 221:13-22.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Mr. Scully's purpose, in responding to social media companies' request for additional information, as an effort to "urge them to remove content" or to "censor" anyone. Disputed also that Mr. Scully made assumptions about the reliability of any source. The cited evidence does not support those characterizations. Rather, as reflected throughout Scully Ex. 10, CISA would forward information from state and local election officials to social media companies so that those companies could independently determine whether certain content violated their terms of service. *See generally Id.* CISA made no recommendations about how social media companies should handle or use information that it forwarded from state and local election officials. *Id.* Moreover, this PFOF does not support Plaintiffs' contention that CISA attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain election-related claims on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

1079.   CISA's fact-checking activity included both relaying "debunking" information from state and local officials—always assuming without question that the state and local officials were truthful, not the social-media speakers—and performing its own fact-checking when the claim related to federal activities. For example, "[t]here was also one time when I believe it was Facebook had a question about DHS immigration and customs enforcement having agents going places where we also provided a response back on a specific piece." Scully Depo. 220:8-13.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes CISA as acting as a "fact-checker." The cited evidence does not support that characterization. *See* Defs.' Resps. to PFOF ¶¶ 1076-78. CISA did not "perform its own fact-checking." Rather, as Mr. Scully explained, there was "one time" when, in response to a question from Facebook "about DHS immigration and

customs enforcement agents going places," CISA "provided a response back on a specific piece." Scully Depo. Tr. 219:25-220:13. Moreover, this PFOF does not support Plaintiffs' contention that CISA attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain election-related claims on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

1080.   CIS and CISA's "switchboarding" activities reached, not just public postings, but private postings on social-media platforms. *See, e.g.,* Scully Ex. 10, at 45-46 (reporting a "post on a private FB page," *i.e.*, a "(private) Facebook post that Trump already won AZ").

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes CISA's switchboarding activities as reaching private postings on social media. The cited evidence does not support that characterization. Rather, the cited evidence reflects that the Arizona Secretary of State's Office reported to CIS a private Facebook account that indicated that former President Trump had already won Arizona. Scully Ex. 10 at 45-46. CIS forwarded the Arizona Secretary of State's email to CISA for CISA's situational awareness, and CISA did not forward that email to any social media company. *Id.* Moreover, this PFOF does not support Plaintiffs' contention that CISA attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain election-related claims on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

1081.   Social-media platforms treated CISA as a privileged reporter of misinformation, frequently responding with great promptness to CISA's reports of misinformation, immediately "escalating" the content for moderation, and reporting back the censorship action taken. For example, on November 10, 2020, at 7:23 pm, Scully reported offending Tweets, and Twitter responded within two minutes, "Thanks Brian. We will escalate." Shortly after midnight the same night, at 12:11 a.m., Twitter followed up with a report on censoring the Tweets. Scully Ex. 10, at

59. On November 13, 2020, Scully reported an offending tweet at 11:20 pm, and Twitter responded at 11:21 pm, "Thanks Brian. We will escalate."  Scully Ex. 18, at 26; Scully Depo. 291:15-294:3.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes these two exchanges with one platform as establishing that CISA was regularly treated as a "privileged reporter of misinformation" by social media platforms, or that social media companies were engaged in "censorship" when they applied their terms of service—terms to which all users agree. The cited evidence does not support those characterizations. In the first example cited, Twitter made its decision about information CISA flagged from the Washington Secretary of State's Office five hours after CISA had flagged the information, and the cited evidence reflects that Twitter independently applied its content moderation policies and reported that "[a]ll Tweets have been labeled, with the exception of two from @SeattleSuze. Those two Tweets were not found to violate our policies." Scully Ex. 10, at 59. In the second example cited, CISA forwarded to Twitter a report received from Dominion Voting. Scully Ex. 18 at 26. Although Twitter promptly acknowledged receipt of CISA's email, there is no indication in the document about the length of time it took Twitter to apply its terms of service in this circumstance. *Id.* As Mr. Scully testified during his deposition, the social media companies "were prompt in letting me know they had received any e-mail that I sent them[.]" Scully Dep. 293:22-294:3. Moreover, this PFOF does not support Plaintiffs' contention that CISA attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain election-related claims on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

1082.  CISA's censorship partners also originated their own reports for censorship. CIS and the EIP sometimes reached out to state and local officials to invite them to debunk and report speech that CIS and EIP had observed on social media. For example, on December 1, 2020, the

Center for Internet Security emailed local government officials stating, "The EI-ISAC, and our partners at the Election Integrity Partnership (EIP), are tracking a social-media post that is gaining traction very quickly." Scully Ex. 11, at 4. The CIS asked the local officials to debunk the post so that "we can work with the social media platforms to have the posts removed as misinformation. Please let us know as soon as possible." *Id.* The local officials responded with information disputing the posts, and CIS promptly forwarded the dispute to CISA and EIP: "Brian [Scully] and EIP, misinformation tweet … a [local official] confirmed the misinformation." *Id.* at 2. Scully then forwarded the report to Twitter, which responded within three hours, "We have labeled the tweet and are taking steps to limit trending on this." *Id.* at 1; Scully Depo. 228:5-231:7.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes CIS and EIP as

"censorship partners" with CISA. The cited evidence does not support that characterization. When

CIS forwarded information it had received from Gwinnett County, Georgia election officials to

CISA, CISA forwarded the information to Twitter and, in accordance with CISA's protocol, stated

that neither CISA nor DHS was the originator of the information, that CISA had not originated or

generated the information, and that CISA "affirms that it neither has nor seeks the ability to remove

or edit what information is made available on social media platforms. CISA makes no

recommendations about how the information it is sharing should be handled or used by social

media companies. Additionally, CISA will not take any action, favorable or unfavorable, towards

social media companies based on decision about how or whether to use this information." Scully

Ex. 11 at 1. The exhibit reflects that Twitter ultimately independently applied its terms of service—

to which all users agree—to label the Tweet and limit its trending. *Id.* Moreover, neither this PFOF

nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was

"pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

**E.     CISA's Many Misinformation Meetings with Platforms.**

1083.   In its interrogatory responses, CISA disclosed five sets of recurring meetings with social-media platforms that involve discussions of misinformation, disinformation, and/or censorship of speech on social media. Scully Ex. 12, at 38-40.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes CISA's interrogatory responses as identifying meetings in which "censorship" of speech was discussed. CISA's interrogatory responses do not support that characterization. As CISA's interrogatory responses clearly state, CISA identified, "based on a reasonable inquiry under the circumstances of abbreviated, expedited discovery," the "meetings taking place with Social-Media Platforms relating to Misinformation," and further noted that they "include, but are not limited to" five sets of then-recurring meetings. Scully Ex. 12 at 38-40. Moreover, this PFOF contains no evidence that CISA used any meetings or communications with social media platforms to dictate, to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

1084.   Scully provided the information in the interrogatory responses regarding CISA's meetings with social-media platforms regarding misinformation and censorship. Scully Depo. 232:24-233:3. In doing so, Scully failed to disclose a long series of *bilateral* meetings between CISA and social-media platforms. *See, e.g.,* Scully Depo. 238:11-13 ("we had some Twitter-only calls, as well, that [Yoel Roth] participated in"); Scully Depo. 238:21-22 ("we had some briefings from [Twitter] on some of their public reports" about misinformation); Scully Depo. 239:8-12 (agreeing that there were "briefings in those bilateral meetings with Twitter as relating to misinformation and disinformation on social media"); Scully Depo. 239:20-240:3 (admitting that CISA conducted "bilateral meetings with other social media platforms, like this, where misinformation was discussed"); Scully Depo. 241:4-22 (admitting to a series of bilateral meetings with social-media platforms beginning in 2018 and continuing through 2020); Scully Depo. 241:7-14 (testifying that "in 2018 … in our initial stages of trying to build those relationships, we would go meet with each platform one-on-one"); Scully Depo. 241:20-22 (admitting that, "prior to starting the switchboarding work, in 2020, we had conversations with each platform individually").

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes CISA's interrogatory responses as disclosing meetings with social-media platforms regarding "censorship." CISA's interrogatory responses do not support that characterization. *See* Defs.' Resp. to PFOF ¶ 1083. Further disputed to the extent the PFOF mischaracterizes all of the cited contacts with social-media

companies, *e.g.* "some Twitter-only calls," as "a long series of bilateral meetings." The cited

evidence does not support that characterization. Defendants further note that CISA's interrogatory

responses clearly stated that its response CISA was "based on a reasonable inquiry under the

circumstances of abbreviated, expedited discovery," and that the "meetings taking place with

Social-Media Platforms relating to Misinformation . . . include, but are not limited to" the five sets

of then-recurring meetings identified. Scully Ex. 12 at 38-40. Moreover, this PFOF contains no

evidence that CISA used any meetings or communications with social media platforms to dictate,

to threaten or pressure, collude with, or encourage social-media companies to remove or suppress

information on their platforms, or that the companies regarded (or acted on) any communications

with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as

a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

1085.   None of these many bilateral meetings with social-media platforms about misinformation was disclosed in CISA's interrogatory responses. Scully Ex. 12, at 38-40; Scully Depo. 243:6-21.

**RESPONSE:** Disputed. *See* Defs.' Resp. to PFOF ¶ 1084.

1086.   In its interrogatory responses, CISA describes the "USG-Industry" meetings as follows: "A recurring meeting usually entitled USG – Industry meeting, which has generally had a monthly cadence, and is between government agencies and private industry. Government participants have included CISA's Election Security and Resilience subdivision, DHS's Office of Intelligence and Analysis, the FBI's foreign influence task force, the Justice Department's national security division, and the Office of the Director of National Intelligence. Industry participants generally include Google, Facebook, Twitter, Reddit, [and] Microsoft but, have also included Verizon Media, Pinterest, LinkedIn, and the Wikimedia Foundation as well. The topics discussed include, but are not limited to: information sharing around elections risk, briefs from industry, threat updates, and highlights and upcoming watch outs." Scully Ex. 12, at 38-39.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CISA used any

meetings or communications with social media platforms to dictate, to threaten or pressure, collude

with, or encourage social-media companies to remove or suppress information on their platforms,

or that the companies regarded (or acted on) any communications with CISA as such. Any

assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF

§ II.F., Arg. § II.B.4.c.

1087. In fact, the CISA's description of the "USG-Industry" meeting as having "a monthly cadence" is misleading. The meetings became biweekly and weekly close to elections, when they were most needed: "from summer of 2018 … to early 2020 they were quarterly. Sometime in 2020 they became monthly and then as we got closer to the election in 2020 they became weekly." Scully Depo. 234:7-11.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes CISA's interrogatory

response as "misleading." The cited evidence does not support that characterization. CISA's

interrogatory response characterized "the recurring meeting usually entitled USG-Industry

meeting" as "generally" having a monthly cadence. Scully Ex. 12 at 38. As Mr. Scully explained

during his deposition, the weekly "meetings" "were mostly just touch points in case anything kind

of popped up. We didn't have an agenda for those, just an opportunity for folks to share, if they

had any questions or anything like that." Scully Dep. 234:2-19. Mr. Scully further testified that "a

lot of" the weekly "meetings" involved discussions of cybersecurity, as well as "a little bit on any

physical threats that were occurring." *Id.* at 235:11-18. During these weekly "meetings" CISA

would "generally provide updates on any election security-related issues," other agencies would

provide any strategic, unclassified intelligence reporting that they had and thought was relevant,

and platforms likely provided general trends that they were seeing on their platforms. *Id.* at 234:20-

235:10. CISA never flagged or reported potential disinformation for social media or technology

companies during or in connection with these meetings. Hale Decl. ¶ 68 (Ex. 97). Moreover, this

PFOF contains no evidence that CISA used any meetings or communications with social media

platforms to dictate, to threaten or pressure, collude with, or encourage social-media companies to

remove or suppress information on their platforms, or that the companies regarded (or acted on)

any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

### F.    CISA Worked with FBI to Suppress the Hunter Biden Laptop Story.

1088.   Scully claims that he does not recall whether or not "hack and leak" or "hack and dump" operations were raised at the USG-Industry meetings, but he does not dispute that they may have been raised: "I don't recall a specific incident of that [*i.e.*, discussions of "hack and dump" or "hack and leak" operations], but it's definitely possible. It's a tactic that had been used in the past." Scully Depo. 236:6-12. Scully does not dispute that he may have raised it: "Me, personally, I don't recall myself raising that, but it's possible." Scully Depo. 236:15-16. He does not dispute that Laura Dehmlow of FBI's FITF may have raised the concern: "Again, I don't know. It was a tactic that had been used globally, previously. So it wouldn't surprise me if there was some discussion of that somewhere in these meetings." Scully Depo. 236:20-23. He does not dispute that Elvis Chan and/or Matt Masterson may have raised the concern. Scully Depo. 237:10-22.

**RESPONSE:**   Undisputed, but further note that Mr. Scully testified that he had no recollection of hack-and-leak operations being raised by the government during the USG-Industry meetings. Scully Dep. 236:24-237:1. Moreover, this PFOF contains no evidence that CISA used any meetings or communications with social media platforms to dictate, to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

1089.   Scully also does not dispute Yoel Roth's account of the communications to social-media platforms from federal officials about hack-and-leak operations and the possibility of a hack-and-leak operation involving Hunter Biden in Paragraphs 10-11 of Yoel Roth's Declaration dated December 17, 2020. Scully Ex. 13, at 2-3; Scully Depo. 245:23-248:11. Scully does not dispute that federal officials repeatedly raised the concern that they "expected hack and leak operations by state actors" in the USG-Industry meetings, Scully Depo. 245:23-247:17 ("it's certainly possible, because it was a common tactic … I would definitely not be surprised if these were included in the conversations"); and Scully does not dispute Roth's statement that Roth learned in these meetings that "there were rumors that a hack and leak operation would involve Hunter Biden," Scully Depo. 247:18-248:7.

**RESPONSE:** Undisputed, but further note that Mr. Scully testified that he had no recollection of hack-and-leak operations being raised by the government during meetings with social media platforms. Scully Dep. 236:24-237:1. He also testified that he had no recollection of Hunter Biden being mentioned during these meetings. *Id.* at 247:24-248:2. Moreover, this PFOF contains no evidence that CISA used any meetings or communications with social media platforms to dictate, to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

1090.   Contemporaneous emails confirm that CISA officials were warning of "hack and leak" operations during the USG-Industry and other meetings with social-media platforms during 2020. For example, on September 16, 2020, Facebook employees emailed Scully and other CISA officials a draft of a joint industry statement, which stated: "For several years, tech companies have worked together with … U.S. government agencies … to counter election threats across our platforms…. At today's meeting, we specifically discussed: … (2) Ways to counter targeted attempts to undermine the election conversation before, during, and after the election. This includes *preparing for so-called 'hack and leak' operations* attempting to use platforms and traditional media for unauthorized information drops." Scully Ex. 16, at 1 (emphasis added). This email confirms that "preparing for so-called 'hack and leak' operations" was discussed at the USG-Industry meeting on Sept. 16, 2020, which included CISA, FBI's FITF, DOJ's National Security Division, ODNI, and Google, Microsoft, Facebook, Twitter, Reddit, Verizon Media, Pinterest, LinkedIn, and Wikimedia Foundation. Scully Ex. 16, at 1; *see also* Scully Depo. 253:14-255:13.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the cited evidence as reflecting that CISA officials were warning of hack-and-leak operations during the USG-Industry meetings and other meetings. The cited evidence does not support that characterization. The cited email only indicates that "preparing for possible so-called 'hack and leak' operations" was discussed, but it does not indicate who raised this issue. Scully Ex. 16 at 1. Moreover, this PFOF contains no evidence that CISA used any meetings or communications with social media platforms to dictate, to threaten or pressure, collude with, or encourage social-media companies to remove

or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. Defs.' PFOF § II.F., Arg. § II.B.4.c.

1091.   Likewise, the agenda for the July 15, 2020 USG-Industry meeting included, as a "Deep Dive Topic," a 40-minute discussion of "Hack/Leak and USG Attribution Speed/Process." Scully Ex. 17, at 16. According to Scully, "attribution" in this context means identifying the hacker and leaker, and "USG" means "United States Government." Scully Depo. 274:4-275:10.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Mr. Scully's testimony. Mr. Scully testified that he did not know what the term "attribution" was referring to in Scully Ex. 17. Scully Dep. 275:11-20. Defendants further note that the cited exhibit reflects a "proposed agenda" and does not reflect whether a discussion about "Hack/Leak and USG Attribution Speed/Process" actually took place during this or any other meeting. Moreover, this PFOF contains no evidence that CISA used any meetings or communications with social media platforms to dictate, to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

1092.   Like Elvis Chan, Scully was not aware of any "pending investigations, at that time, into possible hack and leak operations." Scully Depo. 255:9-13.

**RESPONSE:** Disputed to the extent the PFOF does not provide any support for Special Agent Chan's state of awareness concerning possible hack and leak operations. Moreover, this PFOF contains no evidence that CISA used any meetings or communications with social media platforms to dictate, to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on)

any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

1093.   At the USG-Industry meeting, CISA asked platforms to report back on "Themes / narratives / approaches you anticipate for races you think will be targeted." Scully Ex. 15, at 1.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the cited evidence as reflecting that CISA asked platforms to report back to it about anything. The cited exhibit is a "tentative agenda" where one of the identified "Industry Prompts" is "[t]hemes/narratives/approaches you anticipate for races that you think will be targeted." Scully Ex. 15 at 1. This exhibit does not reflect whether this topic actually was discussed during a meeting or whether this topic was discussed at the request of CISA. Moreover, this PFOF contains no evidence that CISA used any meetings or communications with social media platforms to dictate, to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

### G.   CISA's Ongoing and Expanding Censorship Efforts.

1094.   In the spring and summer of 2022, Lauren Protentis requested the social-media platforms to prepare "one-pagers" for state and local election officials to address their content moderation rules. *See* Scully Ex. 17, at 1 (including "One-Pager Reminder" on the agenda for the April 2020 USG-Industry meeting); Scully Depo. 260:3-261:11 ("we had asked industry to provide a one-page summary of their content moderation rules that we could share with election officials").

**RESPONSE:** Undisputed, but note that this PFOF contains no evidence that CISA used any meetings or communications with social media platforms to dictate, to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CISA as such.

Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.'

Defs.' PFOF § II.F., Arg. § II.B.4.c.

1095.    The purpose of these "one-pagers" was to provide a summary of the platforms' content moderation rules to state and local government officials who would be reporting misinformation to the platforms. Scully Depo. 260:3-261:11.

**RESPONSE:** Undisputed, but further note that the reason for the one-pagers was that

CISA was receiving substantial numbers of questions from election officials about how different

platforms made decisions about their terms of service. Scully Dep. 260:12-21. The one-pagers

were "a way to help the platforms be more transparent with election officials." *Id.* Moreover, this

PFOF contains no evidence that CISA used any meetings or communications with social media

platforms to dictate, to threaten or pressure, collude with, or encourage social-media companies to

remove or suppress information on their platforms, or that the companies regarded (or acted on)

any communications with CISA as such. Any assertion to that effect is unsupported by and

contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

1096.    Lauren Protentis of CISA repeatedly lobbied the social-media platforms to include in their "one-pagers" for state and local officials a description of how to report perceived misinformation to the platform for censorship. *See, e.g.,* Scully Ex. 18, at 41 (Protentis requesting that Facebook update its one-pager to include its "steps for flagging or escalating MDM content" to "make this a comprehensive product on both the critical needs for officials—account security and MDM concerns"); *id.* at 44 (Protentis asking Microsoft to create a one-pager for election officials to "provide steps to … report MDM"); *id.* at 45 (Protentis requesting that Twitter update its one-pager for government officials to include information about "how to report disinformation"). Scully agrees that Protentis was "trying to make sure that election officials have the information they need if they want to report" disinformation. Scully Depo. 300:23-25.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Ms. Protentis as

"repeatedly lobb[ying]" social-media platforms to include in their one-pagers a description of how

to report misinformation to the platforms for "censorship." The cited evidence does not support

that characterization. The cited evidence reflects that Ms. Protentis asked Facebook, Microsoft and

Twitter *once* each to develop a one-pager describing their content moderation policies. *See* Scully

Ex. 18 at 41, 44, 45. Defendants further note that the platforms' content moderation polices—to which all users agree—are available on each platform's website. Moreover, this PFOF contains no evidence that CISA used any meetings or communications with social media platforms to dictate, to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

1097.   CISA also set up an "operation center" on and around Election Day that engaged in "switchboarding" reports of election-day misinformation to platforms: "CISA regularly set up an operation center on election day, around the election. And the platforms and some of the other agencies do the same."  Scully Depo. 262:16-19. This "operation center" received "switchboard reporting" in 2018 and 2020. Scully Depo. 263:15-18. It was also communicating with platforms and other federal agencies, including "connectivity with FBI, DOJ, NEI, I&A."  Scully Depo. 264:18. When these reports came in, CISA would "perform the same misinformation routing function and pass that along to the platforms."  Scully Depo. 265:1-7.

**RESPONSE:** Undisputed, but further note that most of the operation center's activities on Election Day involved "cyber-related" matters. Scully Dep. 262:23-263:9. Defendants further note that CISA did not perform any switchboard-related activities during the 2022 midterm elections. *Id.* at 265:8-12. Moreover, this PFOF contains no evidence that CISA used any meetings or communications with social media platforms to dictate, to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

1098.   The CISA-funded Center for Internet Security continued to report misinformation and disinformation to platforms for censorship in 2022: "CIS was up and running [in 2022]." Scully Depo. 266:2. Scully understands that "CIS continued to receive disinformation/ misinformation reports from state and local election officials during the 2022 election cycle, and relay them directly to social media platforms."  Scully Depo. 266:5-13.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes CISA's funding of the CIS as relating to efforts to "report misinformation and disinformation" or that the purpose of any such reporting was for "censorship" rather than to allow social-media companies to make independent decisions regarding the application of their own content-moderation policies. The cited evidence does not support that characterization. DHS has provided financial assistance to CIS through a series of cooperative agreement awards, managed by CISA, to provide certain, specified cybersecurity services to state, local, tribal and territorial governmental organizations through the MS- and EI-SACs. Hale Decl. ¶ 50 (Ex. 97). In the approved scope of work for the cooperative agreements, DHS has limited the use of federal funds and any required non-federal cost-share to cybersecurity services intended to detect, prevent, respond to, mitigate, and recover from cyber threats, vulnerabilities, and risks. *Id.* The DHS approved scope of work for the cooperative agreements has never funded CIS to perform disinformation-related work, including the reporting of potential election security-related disinformation to social media platforms. *Id.* ¶ 51. Moreover, this PFOF contains no evidence that CISA used any meetings or communications with social media platforms to dictate, to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

1099.  Scully also believes that NASS and NASED routed disinformation concerns directly to social-media platforms in 2022. Scully Depo. 268:25-269:3.

**RESPONSE:** Disputed. The cited testimony does not support this PFOF. Mr. Scully testified that he did not know for certain whether NASS and NASED routed disinformation concerns directly to social-media platforms in 2022. Scully Dep. 268:25-269:3. Defendants further

observe that Plaintiff Louisiana is a member of the NASS, and that both Plaintiffs Louisiana and

Missouri are members of the NASED. Hale Decl. ¶ 33 (Ex. 97). Moreover, this PFOF contains no

evidence that CISA used any meetings or communications with social media platforms to dictate,

to threaten or pressure, collude with, or encourage social-media companies to remove or suppress

information on their platforms, or that the companies regarded (or acted on) any communications

with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as

a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

    1100.    Scully agrees that foreign-originated social-media content typically becomes
repeated from domestic sources: "We often see what happens overseas send up showing up
domestically."  Scully Depo. 279:9-11.

    **RESPONSE:** Disputed to the extent the PFOF mischaracterizes Mr. Scully's testimony.

Mr. Scully did not testify that foreign-originated social media content typically becomes repeated

domestically. Rather, he testified that CISA often sees tactics used oversees appear in the United

States. Scully Depo. Tr. 279:2-11.

    1101.    CISA has also teamed up directly with the State Department's Global Engagement
Center (GEC) to seek removal of social-media content; for example, on one occasion, the GEC
enlisted CISA's aid to seek the removal of "a YouTube channel run by Americans falsely
claiming" that a certain State Department special envoy was "Patient Zero" for COVID-19. Scully
Ex. 18, at 2. Scully forwarded the report to Facebook, which reported within minutes that it had
"flagged for our internal teams."  Scully Ex. 18, at 1.

    **RESPONSE:** Disputed to the extent the PFOF mischaracterizes CISA and the GEC as

"team[ing] up" or "seek[ing] removal" of social-media content. The cited evidence does not

support that characterization. Rather, the cited email reflects that more than three years ago, on

March 25, 2020, GEC shared with CISA a "disinfo campaign on YouTube targeting a DS Officer,

claiming she brought COVID-19 to [Wuhan, China] during an athletic competition." Scully Ex.

18 at 2. Mr. Scully forwarded the GEC's email to Facebook and noted that "[r]esponding to this

request is voluntary and CISA will not take any action, favorable or unfavorable, based on

discussions about whether or not to respond to this follow-up request for information." *Id.* at 1.

The cited evidence does not indicate what action, if any, Facebook may have taken in connection

with this post. Moreover, this PFOF contains no evidence that CISA used any meetings or

communications with social media platforms to dictate, to threaten or pressure, collude with, or

encourage social-media companies to remove or suppress information on their platforms, or that

the companies regarded (or acted on) any communications with CISA as such. Any assertion to

that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg.

§ II.B.4.c.

    1102.   CISA flagged obvious parody and joke accounts for censorship, including a
Colorado parody account with 56 followers whose handle stated, "dm us your weed store location
(hoes be mad, but this is a parody account)," and one with 27 followers whose handle stated,
"Smoke weed erry day."  Scully Ex. 18, at 11-12. The government official who reported these
stated that "these are concerning to us … because of recent FBI/CISA warnings about
impersonation accounts spreading false information about the election."  Scully Ex. 18, at 11. In
other words, the government official sought to censor these accounts *before* they posted any
election-related speech, because (according to "FBI/CISA"), they *might* engage in misleading
election-related speech. *See id.* Scully forwarded these reports to Twitter for censorship. Scully
Ex. 18, at 10.

    **RESPONSE:** Disputed to the extent the PFOF mischaracterizes CISA as flagging accounts

for "censorship" rather than to allow social media companies to make independent decisions about

the application of their own contend moderation policies, to which all users must agree. The cited

evidence does not support Plaintiffs' characterization. The Colorado Secretary of State's Office

notified CISA of three Twitter accounts that were "impersonating the Colorado state government."

Scully Ex. 18 at 10. CISA then shared this information with Twitter and noted that "it neither has

nor seeks the ability to remove or edit what information is made available on social media

platforms," and that it "makes no recommendations about how the information it is sharing should

be handled or used by social media companies." *Id.* CISA further stated that it "will not take any

action, favorable or unfavorable, toward social media companies based on decisions about how or

whether to use this information." *Id.* Moreover, this PFOF contains no evidence that CISA used any meetings or communications with social media platforms to dictate, to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

1103. Platforms report to CISA when they update their content-moderation policies to make them more restrictive. On September 10, 2020, for example, Twitter reported to Masterson and Scully that it was "updating our Civic Integrity Policy" to "label or remove false or misleading information intended to undermine public confidence in an election or other civic process." Scully Ex. 18, at 9. This includes censorship of "Disputed claims that could undermine faith in the process itself, e.g. unverified information about election rigging, ballot tampering, vote tallying, or certification of election results." Scully Ex. 18, at 9. The EIP had successfully lobbied platforms to adopt such changes ahead of the 2020 election. *See infra.*

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the evidence as reflecting "censorship" or EIP "lobb[ying]" platforms to adopt changes to their policies ahead of the 2020 election cycle. Also disputed to the extent the PFOF implies that social-media companies regularly report policy updates to CISA. The evidence does not support those characterizations. The evidence reflects a single occasion on which just one company, Twitter, informed CISA of an update to its Civic Integrity Policy—a policy to which all users agree—and which Twitter had already publicly announced. Scully Ex. 18 at 9. Plaintiffs' claim that the EIP "had successfully lobbied platforms to adopt such changes ahead of the 2020 election" lacks any record support.

1104. CISA pushed for the censorship of content that CISA's Director particularly disfavored, including supposed disinformation about CISA itself, and about the so-called "Hammer and Scorecard" narrative that attributed election interference to federal intelligence agencies. For example, Scully requested censorship of a "disinfo report about CISA and Director Krebs." Scully Ex. 18, at 19. And on November 10, 2022, Scully reported to platforms that "Director Krebs is particularly concerned about the hammer and scorecard narrative that is making the rounds," and asked for information about their tracking and "amplification" of the narrative. Scully Ex. 18, at 22, 24. Twitter and Facebook promptly reported back on their efforts to censor the narrative. Scully Ex. 18, at 21 (Facebook reporting that "our teams are labelling and

downranking the content as identified"); *id.* at 24 (Yoel Roth of Twitter explaining Twitter's attempts to censor the narrative, and asking CISA "Let us know if there are especially high-profile examples of tweets sharing the conspiracy that *haven't* been labeled" so Twitter can censor them). *See also* Scully Depo. 286:3-289:25.

      **RESPONSE:** Disputed to the extent the PFOF mischaracterizes the evidence as suggesting

that CISA "pushed for censorship of content." The record does not support that characterization.

Rather, the cited evidence reflects that on November 5, 2020, Mr. Scully shared with Facebook a

disinformation report about CISA and Director Krebs. Scully Ex. 18 at 19. Mr. Scully's email

notes that it "affirms that it neither has nor seeks the ability to remove or edit what information is

made available on social media platforms. CISA makes no recommendations about how the

information it is sharing should be handled or used by social media companies. Additionally, CISA

will not take any action, favorable or unfavorable, towards social media companies based on

decisions about how or whether to use this information." *Id.* On November 10, 2020, Facebook

informed CISA that "our teams have confirmed that we have third-party fact checker verification

that the 'Hammer and Scorecard' narrative is false and our system is labeling and downranking

the content as identified." *Id.* at 21. On November 10, 2020, Twitter noted that it "broadly labeled

the conspiracy theory several days ago pursuant to our policies." *Id.* at 24. Twitter further asked

CISA to identify any "especially high-profile examples of tweets sharing the conspiracy that

haven't been labeled," because it had to turn off "the automated labeling" due to attempts by "a

4chan-driven troll campaign" to "reverse engineer" Twitter's labelling logic, resulting in the labels

showing up on unrelated tweets. *Id.* Moreover, this PFOF contains no evidence that CISA used

any meetings or communications with social media platforms to dictate, to threaten or pressure,

collude with, or encourage social-media companies to remove or suppress information on their

platforms, or that the companies regarded (or acted on) any communications with CISA as such.

Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.'

PFOF § II.F., Arg. § II.B.4.c.

1105. CISA also purposely debunks online narratives, knowing that the social-media platforms will use its debunks as censorship. For example, Yoel Roth emailed CISA about the Hammer and Scorecard narrative stating: "We've tracking the Hammer/Scorecard issue closely, particularly since Director Krebs' tweet on the subject (which was pretty unambiguous as far as debunks go)." Scully Ex. 18, at 24. Scully admits that CISA was aware that "social-media platforms were following the rumor page posted by CISA and using that as a debunking method for content on their platforms." Scully Depo. 290:13-17 ("We had a sense they were doing that, yeah.").

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the platforms' actions as

"censorship." The cited evidence does not support that characterization. Rather, the evidence

reflects that Facebook decided to label the "Hammer and Scorecard" narrative as a "conspiracy"

"pursuant to [Facebook's] policies"—policies to which all users agree as part of Facebook's terms

of service. Scully Ex. 18 at 24. With respect to CISA's rumors page, Mr. Scully rejected the claim

that the page was designed to allow social media companies to debunk misinformation; rather, he

explained that the "point of the page is just to provide accurate information about rumors that we

were hearing." Scully Dep. 290:12-23. Notably, like CISA, both Louisiana and Missouri also have

websites that seek to provide factually accurate information about elections. *See* Ex. 114 (Missouri

Secretary of State Election Security Website); Ex. 116 (Louisiana Secretary of State website

posting accurate information about voting and elections). Moreover, this PFOF contains no

evidence that CISA used any meetings or communications with social media platforms to dictate,

to threaten or pressure, collude with, or encourage social-media companies to remove or suppress

information on their platforms, or that the companies regarded (or acted on) any communications

with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as

a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

1106.   CISA publicly states that it is expanding its efforts to fight disinformation heading into the 2024 election cycle. Scully Ex. 27, at 1. On August 12, 2022, Director Easterly was reported to be "beef[ing] up [CISA's] efforts to fight falsehoods," and "has taken several specific steps to fight the problem." *Id.*

**RESPONSE:** Undisputed that an August 12, 2022, article in Cyberscoop reported that CISA was "beef[ing] up its efforts to fight falsehoods that could undermine the democratic process. Scull Ex. 27 at 1. The steps identified in the article included hiring Kim Wyman, former Secretary of State of Washington, to "bolster its election work," as well as another team member to run CISA's information operations team. *Id.* at 2. The article also notes that CISA "is reaching out to secretaries of state to work more closely with local election officials to equip them with tools to beat back disinformation." *Id.* The article purports to quote CISA Director Easterly as saying that "[w]hile it's not CISA's role to police social media . . . her team has 'discussions with platforms, but they're more to understand large trends, not specific tweets.'" *Id.* When shown this article during his deposition, Mr. Scully explained that he was unaware of any current efforts by CISA to expand its efforts to fight election disinformation going into the 2024 election cycle. Scully Dep. 302:17-21. Indeed, CISA anticipated and publicly stated that the MDM Team would grow, the size of the team supporting this mission generally has remained constant, and the scope of the mission has not expanded. Hale Decl. ¶¶ 12-13 (Ex. 97). CISA's current efforts to build resilience to disinformation include providing broad guidance on disinformation tactics, sharing accurate information, and amplifying the voices of state and local election offices on issues of election security through CISA's social media platforms. *Id.* at ¶¶ 12-19.

1107.   In January 2022, Director Easterly asked Facebook for a "briefing from us on 2022 election approach." Scully Ex. 28, at 2. Easterly responded to an email by Facebook and directed her staff to set up the meeting. *Id.* Scully does not know what was discussed at the meeting. Scully Depo. 309:12-19.

**RESPONSE:** Undisputed, but further note that Mr. Scully did not know if "the meeting actually ever occurred." Scully Dep. 309:12-16. Moreover, this PFOF contains no evidence that CISA used any meetings or communications with social media platforms to dictate, to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

1108.   Director Easterly also exchanged text messages with Matt Masterson on February 26, 2022, when he was recently employed by Microsoft. Scully Ex. 29, at 2-3. In those texts, referring to a previous unidentified group call, Easterly told Masterson that she is "Just trying to get us in a place where Fed can work with platforms to better understand the mis/dis trends so relevant agencies can try to prebunk/debunk as useful." Scully Ex. 29, at 2. She stated that CISA is "looking to play a coord role so not every D/A [*i.e.*, department and agency] is independently reaching out to platforms which could cause a lot of chaos." Scully Ex. 29, at 2. Masterson responded, agreeing with Easterly, and stating, "Platforms have got to get comfortable with gov't. It's really interesting how hesitant they remain." Scully Ex. 29, at 3. (Scully notes that "D/A" is "one of our common abbreviations for department and agency." Scully Depo. 316:23-24.)

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CISA used any meetings or communications with social media platforms to dictate, to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

1109.   Scully agrees with Director Easterly that, when multiple federal agencies contact platforms independently, "it does create challenges and provides the platforms opportunities to play departments off each other." Scully Depo. 317:6-9. For CISA to play a "coordinating" role among the agencies, therefore, allows federal officials to keep better influence and control over the platforms.

**RESPONSE:** Disputed to the extent the second sentence of the PFOF is characterization rather than facts and lacks any evidentiary support or citation. As Mr. Scully explained during his

deposition, other than the USG-Industry synch meetings, CISA "didn't attempt to play a

substantial role in terms of coordinating" among federal agencies. Scully Dep. 317:10-19. Mr.

Scully further explained that "it's always up to the platforms what level of engagement they want

to have with us." *Id.* at Tr. 318:3-12.

1110.  According to a September 2022 leaked draft copy of DHS's "Quadrennial
Homeland Security Review, DHS's capstone report outlining the department's strategy and
priorities in the coming years, the department plans to target 'inaccurate information' on a wide
range of topics, including "the origins of the COVID-19 pandemic and the efficacy of COVID-19
vaccines, racial justice, U.S. withdrawal from Afghanistan, and the nature of U.S. support to
Ukraine."  Scully Ex. 30, at 4.

**RESPONSE:** Disputed to the extent the PFOF relies upon an article from The Intercept

that purports to describe a leaked copy of a draft DHS document. Plaintiffs have not identified any

official, final document from DHS that purports to reflect an intention to "target 'inaccurate

information' on a wide range of topics." Nor do Plaintiffs identify any specific efforts to effectuate

this alleged goal. In any event, the final version of the Quadrennial Homeland Security Review

was released in April 2023, and nothing in that document supports Plaintiffs' claim that DHS

"plans to target 'inaccurate information'" on any of these topics. *See* Ex. 186 (Dep't of Homeland

Sec., The Third Quadrennial Homeland Security Review (2023)). Moreover, this PFOF contains

no evidence that DHS used any meetings or communications with social media platforms to

dictate, to threaten or pressure, collude with, or encourage social-media companies to remove or

suppress information on their platforms, or that the companies regarded (or acted on) any

communications with DHS as such. Any assertion to that effect is unsupported by and contrary to

the evidence as a whole.

1111.  Scully agrees that DHS has discussions about targeting misinformation regarding
the efficacy of COVID-19 vaccines, Scully Depo. 322:9-21 ("our building critical infrastructure
help in public health is one of the sectors of critical infrastructure, so we engage with CDC and
HHS to help them"); about the origins of the COVID-19 pandemic, Scully Depo. 323:16-17 ("We
did some work on the … bio-lab narratives"); and regarding Ukraine, Scully Depo. 324:5-10 ("We

saw this with COVID. … We saw this around Ukraine. And so, again, just helping people understand … these disinformation narratives….”). In particular, CISA participated in a “Unified Coordination Group” regarding Russia’s invasion of Ukraine, which addressed misinformation: “there was a … Unified Coordination Group, when Russia invaded Ukraine, to coordinate DHS activities related to the crisis. As a part of that there was an MDM component, and a member of the MDM team was detailed to lead the MDM component of the Russian/Ukraine work.” Scully Depo. 325:5-12. Scully believes that this group communicated with social-media platforms as well (again, not disclosed in CISA’s interrogatory responses). Scully Depo. 327:1-18.

**RESPONSE:** Disputed to the extent the PFOF is not supported by the cited evidence. Mr. Scully testified that he was not aware of discussions anywhere in DHS about addressing misinformation about the origins of the COVID-19 pandemic. Scully Dep. 322:5-8. Mr. Scully further testified that CISA—not DHS—engaged with CDC and HHS to understand trends in spreading health misinformation and put out a product sometime in mid-2020 for infrastructure stakeholders concerning COVID-related misinformation. *Id.* at 322:9-323:8. Mr. Scully described the work CISA did with CDC and HHS as involving “bio-lab narratives, so this is essentially foreign governments,” and helping to build resilience to misinformation by identifying false narratives. *Id.* at 323:9-324:10. This work involved providing support to the Healthcare and Public Health Sector through the production of two public guidance documents: CISA Insights” COVID Disinformation Activity and a COVID-19 Toolkit. Declaration of Geoff Hale, Lead for Election Security and Resilience, Nat’l Risk Mgmt. Ctr., CISA ¶ 17 (“Hale Decl.”) (Ex. 97). Mr. Scully further testified that CISA has not, to his knowledge, done any resilience work related to racial justice misinformation, and further stated that he was unaware of anyone at DHS engaged in such work. *Id.* at 324:11-19. He similarly testified that he was unaware of anyone at CISA or DHS having any involvement in building resilience to misinformation concerning the U.S. withdrawal from Afghanistan. *Id.* at 324:20-325:2. Mr. Scully stated that DHS had stood up a Unified Coordination Group (UCG) when Russian invaded Ukraine, and the purpose of the group was to coordinate DHS activities related to the crisis. *Id.* at 325:3-12. Part of the UCG’s work involved a

misinformation component, and a member of CISA's MDM Team was detailed to lead that component of the work, which involved providing situational awareness reports based on publicly available third-party reporting and support to build resilience to disinformation related to the crisis. *Id.*; Hale Decl. ¶ 18 (Ex. 97). However, that work only last about two months, and the UCG was operational from January 2022 to April 2022. *Id*. Mr. Scully testified that he thought there may have been one call in February 2022 between the UCG and the critical infrastructure community, including social media companies, but he was not sure because he was not involved in that call. Scully Dep. 326:13-328:3. Moreover, this PFOF contains no evidence that DHS or CISA used any meetings or communications with social media platforms to dictate, to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with DHS or CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

1112.   As of August 12, 2022, DHS's Office of Inspector General continued to call for a more aggressive, not less aggressive, approach to combating disinformation. Scully Ex. 31, at 1 (OIG calling for DHS to adopt a "Unified Strategy to Counter Disinformation Campaigns").

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the cited evidence. The August 12, 2022 DHS Office of Inspector General (OIG) report did not call for "a more aggressive" approach to combatting disinformation. Rather, the OIG report called for coordination among DHS components to combat disinformation campaigns. Scully Ex. 31 at 1. Moreover, this PFOF contains no evidence that DHS used any meetings or communications with social media platforms to threaten or pressure social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with DHS as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole.

1113.   DHS's OIG reports that CISA is expanding, not contracting, its efforts to fight disinformation. OIG reports that CISA's "MDM team focuses on disinformation activities targeting elections and critical infrastructure. According to a CISA official, the MDM team counters all types of disinformation, to be responsive to current events."  Scully Ex. 31, at 9. "An official from the MDM team stated that, through this work, CISA is building national resilience to MDM, such as COVID-19 vaccine hesitancy and foreign influence activities."  *Id.* at 10. OIG further reports that, "[a]ccording to selected Intelligence Community officials, the Office of the Director of National Intelligence and the U.S. Department of Justice worked with CISA and I&A to counter disinformation related to the November 2020 elections. For example, according to an Office of the Director of National Intelligence official, prior to the November 2020 elections, CISA and I&A joined in weekly teleconferences to coordinate Intelligence Community activities to counter election-related disinformation. The Office of the Director of National Intelligence official stated the teleconferences continued to occur every 2 weeks after the 2020 elections and were still taking place as of the time of this audit." *Id.* at 11. Further, OIG reports that "CISA and I&A also work with the U.S. Department of State's (State Department) Global Engagement Center on countering disinformation." *Id.* at 11.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the OIG report as noting that CISA is "expanding, not contracting, its efforts to fight disinformation." The cited evidence does not support that characterization. The OIG report notes "the MDM team counters all types of disinformation, to be responsive to current events," and provides two illustrative examples of that work. Scully Ex. 31 at 9. The first example was that "the MDM team developed the COVID-19 Disinformation Toolkit to raise awareness about the pandemic." *Id.* The second example was that in April 2022, CISA released the *Social Media Bots Infographic Set* which "was designed to help Americans understand how automated programs simulate human behavior on social media platforms." *Id.* at 10. Neither of these examples involve communications with social media companies, much less requests that those companies take any particular actions on any particular content on their sites. Notably, although DHS concurred in OIG's recommendation that DHS take a unified approach to addressing misinformation, DHS explained that its concurrence was "subject to the Department's consideration of the ongoing review" the DHS Secretary asked the bipartisan "Homeland Security Advisory Council to conduct in May 2022 of the Department's work to address disinformation that threatens homeland security," with a focus on "how the Department

can most effectively and appropriately address disinformation that poses a threat to our country while protecting free speech, privacy, civil rights, and civil liberties[.]" *Id.* at 21. Accordingly, there is no record evidence that OIG's recommendations have been adopted or implemented. Moreover, this PFOF contains no evidence that DHS used any meetings or communications with social media platforms to dictate, to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with DHS as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole.

1114.   On November 21, 2021, Director Easterly reported that CISA is "beefing up its misinformation and disinformation team in the wake of a divisive presidential election that saw a proliferation of misleading information online." Scully Ex. 23, at 1. "I am actually going to grow and strengthen my misinformation and disinformation team," Easterly stated publicly. *Id.* She stated that she "had a meeting with 'six of the nation's experts' in the misinformation and disinformation space." *Id.* And she "stressed her concerns around this being a top threat for CISA … to confront." *Id.* "One could argue that we're in the business of protecting critical infrastructure, and the most critical infrastructure is our cognitive infrastructure," Easterly said. *Id.* "We now live in a world where people talk about alternative facts, post-truth, which I think is really, really dangerous if people get to pick their own facts," Easterly said. *Id.* at 2. Evidently, Easterly thinks that *government officials* should help Americans "pick their own facts" for them. *Id.*

**RESPONSE:** Disputed to the extent the PFOF states "[e]vidently, Easterly thinks that government officials should help Americans 'pick their own facts' for them," because this is characterization and argument rather than a factual statement supported by the cited evidence. Furthermore, to date CISA has neither increased the size of its MDM Team nor increased its efforts to build resiliency to misinformation. Hale Decl. ¶¶ 12-13 (Ex. 97). Moreover, this PFOF contains no evidence that CISA used any meetings or communications with social media platforms to dictate, to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any

communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

1115.   According to Scully, CISA has an expansive mandate to address all kinds of misinformation that may affect "critical infrastructure" indirectly: "mis, mal-information threatens critical infrastructure in a number of ways, it could be operational impact, so in the case of the elections, disrupting election operations …. So a multitude of ways that disinformation could impact critical infrastructure, like I said … there's financial, there's reputational, there's just a multitude of ways that this disinformation could affect critical infrastructure."   Scully Depo. 340:10-341:1. This could include, for example, "misinformation" that undermines confidence in any kind of national institution, including banks and financial services industry: "from mis, dis and mal-information, a reputational risk could come about if the integrity or the public confidence in a particular sector was critical to that sector's functioning. So I think the financial services would probably be a good example. So if there's a loss of confidence by the American public in financial services, financial systems of the United States, that could create national security concerns." Scully Depo. 341:17-342:2. This is a breathtakingly broad—even limitless—interpretation of CISA's mandate to protect "critical infrastructure," which would allow CISA to target virtually any kind of core political speech as "mis, dis and mal-information" that "create national security concerns" by undermining "public confidence in a particular sector." *Id.*

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the evidence as supporting the proposition that CISA "has an expansive mandate to address all kinds of misinformation that may affect 'critical infrastructure' indirectly." The cited evidence does not support that characterization. Rather, CISA's authority is based upon, *inter alia*, 6 U.S.C. § 652, which charges CISA with leading the national effort to understand, manage, and reduce risk to the nation's cyber and physical infrastructure. Mr. Scully explained during his deposition that when he was discussing the financial services sector, he was engaging in "a lengthy hypothetical" at Plaintiffs' counsel's urging and told the questioning attorney that he did not "like getting into hypotheticals." Scully Dep. 343:23-344:2. In addition, the PFOF's statement that "[t]his is a breathtakingly broad—even limitless—interpretation of CISA's mandate" allowing CISA "to target speech" is characterization and argument rather than a factual statement, and in any event, nothing in this PFOF or any other supports the suggestion that CISA "targets" speech for censorship. Moreover, this PFOF contains no evidence that CISA used any meetings or communications with social

media platforms to dictate, to threaten or pressure, collude with, or encourage social-media

companies to remove or suppress information on their platforms, or that the companies regarded

(or acted on) any communications with CISA as such. Any assertion to that effect is unsupported

by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

1116.   In fact, CISA is "working with Treasury to develop a product to help the financial
services sector understand MDM risks to the sector."  Scully Depo. 355:22-24.

**RESPONSE:** Undisputed, but further note that CISA has been working with the U.S.

Department of Treasury on a guide that would be public to help the Financial Services Sector

understand what disinformation is, how disinformation could impact the sector, and how to

mitigate the risks to the sector. Hale Decl. ¶ 19 (Ex. 97). The guide is still in development, although

work is not currently being done to complete it because other, urgent tasks have taken priority. *Id.*

Furthermore, this PFOF contains no evidence that CISA used any meetings or communications

with social media platforms to dictate, to threaten or pressure, collude with, or encourage social-

media companies to remove or suppress information on their platforms, or that the companies

regarded (or acted on) any communications with CISA as such. Any assertion to that effect is

unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

1117.   Scully has publicly stated that CISA is "trying to reduce the amount that Americans
engage with disinformation," where "engaging with disinformation" means "amplifying it, re-
tweeting it, resending it, things like that."  Scully Depo. 346:7-24; Scully Ex. 49.

**RESPONSE:** Undisputed, but further note that Mr. Scully explained that CISA seeks to

reduce engagement with disinformation through "public awareness and public engagement and

things like that[.]" Scully Dep. 347:22-348:1. Mr. Scully further explained that although some

people believe "the government should be the ones taking things down, or the government should

be asking the platforms to do certain things . . . that's not necessarily the right spot for government

to be." *Id.* at 348:11-25. Moreover, this PFOF contains no evidence that CISA used any meetings

or communications with social media platforms to dictate, to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

1118.   On June 22, 2022, CISA's Cybersecurity Advisory Committee issued a "Draft Report to the Director" calling for an extremely broad view of CISA's mandate. The report states that "[t]he spread of false and misleading information poses a significant risk to critical functions like elections, public health, financial services, and emergency response." Scully Ex. 46, at 1. "Pervasive MDM diminishes trust in information, in government, and in democratic processes more generally." *Id.* The report states that "CISA should consider MD across the information ecosystem," including "social media platforms of all sizes, mainstream media, cable news, hyper partisan media, talk radio, and other online resources." *Id.* at 2. Scully agrees with this report that CISA is trying to make its "resilience activity … as broad as possible so it's applicable anywhere that someone may come across MDM." Scully Depo. 358:7-11.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the cited document as "calling for an extremely broad view of CISA's mandate." The cited evidence does not support that characterization. Moreover, CISA's Cybersecurity Advisory Committee is "an independent advisory body," that "provides strategic and actionable recommendations to the CISA Director on a range of cybersecurity issues, topics and challenges." *See* Ex. 119 at 1 (CISA Cybersecurity Advisor Committee). Plaintiffs have provided no evidence that the Committee's recommendations were actually accepted by CISA. In addition, the PFOF mischaracterizes Mr. Scully's testimony. Mr Scully testified that CISA's resilience work is intended to be useful regardless of medium, whether it be on cable news or the internet. Scully Dep. 358:5-11. It is in this context that Mr. Scully explained that CISA's work is intended to be "as broad as possible," and that CISA is "agnostic of where" the misinformation is coming from; "we just want people to be able to understand where—what it is, how it works, and things they can do to mitigate those risks." *Id.* 358:5-23. Moreover, this PFOF contains no evidence that CISA used any meetings or

communications with social media platforms to dictate, to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

1119. In September 2022, the Center for Internet Security is still working on a "portal" for government officials to report election-related misinformation to social-media platforms. Scully Ex. 19, 21. "[W]ork on the online 'portal' for election officials to flag misinformation to social-media platforms … continues today." Scully Ex. 21, at 4. Scully states that "my understanding is that [CIS] did do something along those lines, I just don't know the extent of it." Scully Depo. 365: 3-6.

**RESPONSE:** Undisputed, but note that this PFOF relates to the work of a nongovernmental third party and CIS's proposed portal was intended for use by "state-level election offices and national associations (NASS, NASED)," rather than the federal government. Scully Ex. 19. Louisiana is a member of NASS and both Louisiana and Missouri are members of the NASED. Hale Decl. ¶ 33 (Ex. 97). In addition, Mr. Scully testified that he did not know whether or when the CIS portal would be completed. Scully Depo. Tr. 364:14-365:9.

1120. As of January 2023 and today, CISA's website continues to proclaim, "[t]he MDM team serves as a switchboard for routing disinformation concerns to appropriate social media platforms and law enforcement. This activity began in 2018, supporting state and local election officials to mitigate disinformation about the time, place, and manner of voting. For the 2020 election, CISA expanded the breadth of reporting to include other state and local officials and more social media platforms. This activity leverages the rapport the MDM team has with the social media platforms to enable shared situational awareness." Scully Ex. 24, at 3; *see also* www.cisa.gov/mdm (visited Feb. 10, 2023). CISA thus proclaims that it is "expand[ing] the breadth of reporting," not retreating from it. *Id.*

**RESPONSE:** Disputed. The webpage to which this PFOF cites has been removed. As Mr. Scully explained during his deposition, the document on CISA's website suggesting that switchboarding work was ongoing was inaccurate and would need to reflect that the work is no longer occurring. Scully Dep. 366:21-367:4. In addition, CISA did not engage in switchboarding

for the 2022 election cycle and has no intention to engage in switchboarding for the next election.

Hale Decl. ¶ 78 (Ex. 97).

1121.  Regarding misinformation reports, CISA "would generally share whatever we received from the election officials with the FBI, in case there was an ongoing investigation related to whatever it was that we forwarded to them."  Scully Depo. 366:17-20.

**RESPONSE:** Undisputed.

1122.  CISA engaged in switchboarding and colluding with social-media platforms to promote censorship in other ways as well.

**RESPONSE:** Disputed because the PFOF is argumentative and lacks any evidentiary support. CISA did not engage in switchboarding or "collude" with social-media companies to "promote censorship" in any way. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

**VIII.   The State Department's Global Engagement Center's Censorship Efforts.**

1123.  The State Department's Global Engagement Center ("GEC") also conducts numerous meetings with social-media platforms about disinformation.

**RESPONSE:** Disputed because this PFOF fails to cite to any evidentiary support and is contrary to the record. *See* Pls.' PFOF ¶ 1124 and Defendants' response thereto. Moreover, this PFOF contains no evidence that the GEC sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the GEC as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.G.

1124.  The GEC's "front office and senior leadership engage with social media companies." Kimmage Dep. 29:12-13. These senior leadership meet with social-media platforms "[e]very few months, can be quarterly, but sometimes less than quarterly." *Id.* at 32:9-10. According to Daniel Kimmage, Principal Deputy Coordinator of the GEC, these meetings focus on the "tools and techniques" of spreading disinformation on social media, and it "would be rare" for them to discuss specific "content that's posted on social media that might be of concern to the GEC." *Id.* at 30:9-31:3.

**RESPONSE:** Undisputed, except to note that the referenced "tools and techniques" focused on "our adversaries. So malign actors like . . . Russia and China, how they are using propaganda and disinformation." Kimmage Dep. 30:9-14. In addition, this PFOF contains no evidence that the GEC attempted to use contacts with social-media companies to threaten or pressure, collude with, or encourage them to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with GEC as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.G.

1125.   In addition, the GEC's "Technology Engagement Team does engage with social media companies" as well. *Id.* at 29:11-12. The Technology Engagement Team meets with social media companies "[m]ore frequently" than the senior leadership, which meets with them "every few months." *Id.* at 37:9-15.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that the GEC attempted to use contacts with social-media companies to threaten or pressure, collude with, or encourage them to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with GEC as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.G.

1126.   Kimmage recalls at least two meetings with Twitter. *Id.* at 129:22-25. At such meetings, the GEC would bring "between five and ten" people, including "the acting coordinator, me, in that capacity, then one or more of the deputy coordinators, team chiefs from the Global Engagement Center, and working-level staff with relevant subject matter expertise." *Id.* 130:24-131:13. These GEC staff meet with the platforms' content-moderation teams, *i.e.*, the people responsible for censorship on the platforms. *Id.* at 133:1-20, 135:1-11.

**RESPONSE:** Undisputed, except to the extent this PFOF mischaracterizes social media companies' content-moderation teams as being responsible for "censorship" on their platforms rather than making independent decisions to apply their terms of service, to which all users agree. In addition, this PFOF contains no evidence that the GEC attempted to use contacts with social-media companies to threaten or pressure, collude with, or encourage them to remove or suppress

information on their platforms, or that the companies regarded (or acted on) any communications with the GEC as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.G.

1127.   In such a meeting, "the GEC would provide an overview of what it was seeing in terms of foreign propaganda and disinformation. And Twitter would, to the extent that they felt comfortable sharing information, would discuss similar topics." 136:8-13.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that the GEC attempted use contacts with social-media companies to threaten or pressure, collude with, or encourage them to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with GEC as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.G.

1128.   In addition to meeting with Twitter, the GEC's senior leadership had similar meetings with Facebook and Google as well during the same time frames. *Id.* at 139:22-140:6. These meetings were also with Facebook and Google's content-moderation or trust and safety teams, *i.e.*, the people responsible for censoring content on their platforms. *Id.* at 141:17-143:3.

**RESPONSE:** Undisputed, except to the extent this PFOF mischaracterizes social media companies' content-moderation teams as being responsible for "censorship" on their platforms rather than independent decisions to apply terms of service, to which all users agree. In addition, this PFOF contains no evidence that the GEC attempted to use contacts with social-media companies to threaten or pressure, collude with, or encourage them to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the GEC as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.G**.**

1129.   The GEC brought similar numbers of people to the meetings with Facebook and Google. *Id.* at 143:16-17 ("I believe the lineup would have been similar.").

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that the GEC attempted to use contacts with social-media companies to threaten or pressure, collude with, or encourage them to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the GEC as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.G.

1130.   In addition to the senior-leadership and TET meetings, the GEC also maintained a Senior Advisor as a permanent liaison in Silicon Valley, Samaruddin K. Stewart, for the purpose of meeting with social-media platforms about disinformation. *Id.* at 159:24-160:13; Kimmage Ex. 9, at 2. Stewart set up a series of meetings with LinkedIn to discuss "countering disinformation" and to "explore shared interests and alignment of mutual goals regarding the challenge." Kimmage Ex. 9, at 2. Like the senior-leadership meetings, Stewart scheduled these meetings with the head of the trust and safety team, *i.e.*, the person responsible for censorship on the platform. *See id.* at 7 (meeting with the "Head of Threat Prevention, Trust & Safety" at LinkedIn). Kimmage confirms that Stewart set up similar meetings with other social-media platforms. Kimmage Dep. 160:12-13.

**RESPONSE:** Undisputed, except to note that (1) Mr. Stuart met with social media companies to discuss countering disinformation by foreign state and non-state actors, such as propaganda from a foreign terrorist organization, Kimmage Dep. 163:16-23; (2) similarly, Mr. Stuart requested to meet with representatives of LinkedIn because he was "tasked with building relationships with technology companies, academia, researchers, media, and interagency in the area with interest in countering disinformation and foreign state and non-state propaganda," Kimmage Ex. 9 at 2, and (3) this PFOF mischaracterizes the head of LinkedIn's trust and safety as being responsible for "censorship" on its platform rather than independent decisions to apply its terms of service, to which all users agree. In addition, this PFOF contains no evidence that the GEC attempted to use contacts with social-media companies to threaten or pressure, collude with, or encourage them to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the GEC as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.G.

1131.   On March 25, 2021, the GEC set an email to Rob Schaul of CISA flagging "a disinfo campaign on YouTube targeting a [diplomatic security] officer" on a "Youtube channel run by Americans." Kimmage Ex. 11, at 2. Brian Scully of CISA forwarded the disinformation report to Twitter, Facebook, and YouTube. *Id.* at 1, 3, 7. Facebook responded, "Thank you so much for this! Have flagged for our internal teams." *Id.* at 1.

**RESPONSE:** Undisputed, with the clarification that when Mr. Scully forwarded the information received from the GEC to Twitter, Facebook, and YouTube he expressly noted that CISA "is not the originator of this information," and "[r]esponding to this request is voluntary and CISA will not take any action, favorable or unfavorable, based on decisions about whether or not to respond to this follow-up request for information." Kimmage Ex. 11 at 3, 5, 7. This PFOF contains no evidence that the GEC attempted use direct or indirect contacts with social-media companies to threaten or pressure, collude with, or encourage them to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the GEC as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.G.

1132.   The GEC also coordinated with the Election Integrity Partnership. George Beebe of the GEC was in contact with the EIP. Kimmage Dep. 202:10-24. Kimmage admits that the GEC had "a general engagement with the EIP. … the GEC was engaging with the partnership." *Id.* at 214:11-19. In addition to Mr. Beebe, Adele Ruppe, who "liaised on election-related issues," may have engaged with the EIP. *Id.* 214:23-215:5.

**RESPONSE:** Disputed to the extent that this PFOF mischaracterizes the cited testimony as evidence that the GEC "coordinated" with the Election Integrity Partnership for any purpose. Rather, the evidence shows that during the 2020 election cycle, the GEC discovered certain posts and narratives on social media and digital media that originated from, were amplified by, or likely to be amplified by foreign malign influence actors—like Russia, the People's Republic of China, Iran, and their proxies—that sought to spread propaganda or disinformation about the 2020 election. Declaration of Leah Bray, Deputy Coordinator, Glob. Engagement Ctr., U.S. Dep't of

State ¶ 5 (Bray Decl.) (Ex. 142). The GEC flagged these posts and narratives for the EIP on

approximately 21 occasions. *Id.* The EIP then made an independent determination as to whether

to send this information to social media companies, and the social media companies in turn would

make a separate independent decision about what actions, if any, to take based on their own

policies and under their respective terms of service with account holders and users on their sites.

*Id.* Moreover, this PFOF contains no evidence that the GEC attempted to use contacts with the EIP

for the purpose of threatening or pressuring, colluding with, or encouraging social-media

companies to remove or suppress information on their platforms, or that the companies regarded

(or acted on) any communications with the GEC as such. Any assertion to that effect is

unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.G**.**

1133. Kimmage states that the GEC's work against disinformation "equips … technology
companies to better understand" disinformation "so that they can take whatever actions they would
take to stop the spread." *Id.* 280:24-281:3.

**RESPONSE:** Disputed to the extent this PFOF mischaracterizes the cited testimony. What

Mr. Kimmage stated was: "The Global Engagement Center has an important function, it's laid out

in its congressional legislation to identify and—and track what foreign propaganda and

disinformation actors are doing, and releasing, for example, a public report on what Russian

propaganda is promoting that doesn't, in and of itself, stop it, but it equips people, it equips, you

know, potentially technology companies to better understand it so that they can take whatever

actions they would take to—to—to stop the spread." Kimmage Dep. 280:9-281:3. This PFOF

contains no evidence that the GEC attempted to use contacts with social-media companies to

threaten or pressure, collude with, or encourage them to remove or suppress information on their

platforms, or that the companies regarded (or acted on) any communications with the GEC as such.

Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.'

PFOF § II.G**.**

1134.   On October 17, 2022, at an event at Stanford University, Secretary of State Blinken was asked, "Stanford is one of the leading institutions to combat misinformation research and pointing out propaganda narratives and how they spread. How do you envision the cooperation between the State Department and institutions like Stanford in combatting the spread of propaganda?"  Kimmage Ex. 16, at 5. Secretary Blinken responded, mentioning the GEC and noting that State is engaging in "collaborations" and "build[ing] out … partnerships" with Stanford: "Stanford is doing remarkable work on that, and it's one of the things that we want to make sure that we're benefitting from, because this is a day-in, day-out battle for us, combating misinformation and disinformation around the world. We have at the State Department itself a big focus on this. We have something called the Global Engagement Center that's working on this every single day. But that work is both inspired by work that's being done in academia, including here at Stanford, as well as where appropriate collaborations. …So we're trying to build out these kinds of partnerships to make sure that we're looking at every place that is actually developing answers, including Stanford, and then integrating that into what we do."  *Id.*

**RESPONSE:** Disputed in part as follows. The question posed to Secretary of State

Blinken, in its entirety, was as follows: "Mr. Secretary, Stanford is one of the leading institutions

to combat misinformation research and pointing out propaganda narratives and how they spread.

How do you envision the cooperation between the State Department and institutions like Stanford

in combating the spread of propaganda, *and how does this fit with the recently released National*

*Security Strategy*?" Kimmage Ex. 16 at 5 (emphasis added). In addition, this PFOF contains no

evidence that the GEC attempted to threaten or pressure, collude with, or encourage social media

companies to remove or suppress information on their platforms, or that the companies regarded

(or acted on) any communications with the GEC as such. Any assertion to that effect is

unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.G**.**

## IX.    The Election Integrity Partnership and Virality Project – Federal Collaborators.

1135.  Federal officials also work through nonprofit organizations to achieve their censorship goals. Most notably, federal officials at CISA and the GEC, and state officials through the CISA-funded EI-ISAC, work in close collaboration with the Stanford Internet Observatory and other nonprofit organizations to achieve censorship and attempt to evade the First Amendment.

Moreover, the Surgeon General's Office and other federal officials collaborate closely with the Stanford Internet Observatory and the same entities under the aegis of the "Virality Project."

**RESPONSE:** Disputed. Plaintiffs have presented no evidence that Defendants now have or have ever harbored "censorship goals" as alleged in this matter. Any such assertion is unsupported by and contrary to the record as a whole. Further disputed Plaintiffs' contention that CISA funded the EI-ISAC for any work concerning election security-related disinformation, as this is contradicted by the record. CISA did not fund the MS- or EI-ISACs for any of the work they provided in relation to the reporting of potential election security-related disinformation to social media or technology companies during the 2020 or 2022 election cycles. Hale Decl. ¶¶ 78-79 (Ex. 97). Also unsupported are the allegations in this PFOF that federal officials "work in close collaboration with" or "collaborate closely" with the Stanford Internet Observatory, the Virality Project, or any other organizations to "achieve censorship and evade the First Amendment," for which the PFOF cites no evidence.

### A.   The Election Integrity Project Is a Formidable Censorship Cartel.

1136.   According to its website, "[t]he Election Integrity Partnership (EIP) was formed in July 2020 as a coalition of research entities focused on supporting real-time information exchange between the research community, election officials, *government agencies*, civil society organizations, and *social media platforms*."  *The 2020 Election Integrity Partnership*, Election Integrity Partnership (last visited Feb. 22, 2023) (emphasis added), https://www.eipartnership.net/2020. The EIP's "objective was to detect and *mitigate the impact* of attempts to prevent or deter people from voting or to delegitimize election results." *Id.* (emphasis added). As discussed further herein, "mitigate[ing] the impact" means pushing social-media platforms to censor supposed "misinformation."

**RESPONSE:** Disputed to the extent that the PFOF mischaracterizes "mitigat[ing] the impact" of attempts to prevent or deter people from voting or to delegitimize election results to mean "pushing social-media platforms to censor supposed 'misinformation.'" That characterization is not supported by any cited evidence. The EIP provided public factual findings to government agencies and social media platforms, but had no control over content moderation,

censorship, or labeling posts. *See* Ex. 74 at 2 (*Background on the SIO's Projects on Social Media*, Stanford Internet Observatory (Mar. 17, 2023)) ("SIO Statement"); Ex. 125 at 3 (*A Statement from the Election Integrity Partnership*, Election Integrity Partnership (Oct. 5, 2022). Content moderation decisions were independently made by social media platforms, and the EIP did not make recommendations to the platforms about what actions they should take. Ex. 74 at 2.

1137.   "In March 2021 [the EIP] published [its] final report. This page displays an archive of the work carried out by the EIP and its partners during the 2020 U.S. election." *Id.* The EIP report is publicly available, it provides a detailed account of the EIP's activities in the 2020 election, and it is Exhibit 1 to the deposition of Brian Scully. Scully Ex. 1 (containing Stanford Internet Observatory et al., Election Integrity P'Ship, *The Long Fuse: Misinformation and the 2020 Election* (v1.3.0 2021), https://www.eipartnership.net/report [https://purl.stanford.edu/tr171 zs0069]).

**RESPONSE:** Undisputed.

1138.   The EIP was created "in consultation with CISA [the Cybersecurity and Infrastructure Security Agency at the Department of Homeland Security] and other stakeholders." *Id.* at 20 (2).[6] After "consultation with CISA," the EIP "assembled" a "coalition … with like-minded partner institutions." *Id.*

**RESPONSE:** Disputed because the PFOF mischaracterizes the cited evidence. The cited

report states that "[t]he initial idea for the [EIP] came from four students that the Stanford Internet

Observatory (SIO) funded to complete volunteer internships at [CISA] at [DHS.]" Scully Ex. 1, at

20 (2). The report further states that the Stanford University students "approached SIO leadership

in the early summer, and in consultation with CISA and other stakeholders, a coalition was

assembled with like-minded partners." Scully Ex. 1 at 20 (2). As Mr. Scully explained during his

deposition, the only "consultation" CISA had concerning the EIP was (1) a discussion with the

Stanford students where he confirmed that a "gap" existed in local and state officials' resources to

identify misinformation targeting their jurisdictions; and (2) a subsequent discussion with Alex

---

[6] Citations of this exhibit are formatted "Scully Ex. 1, at [page of exhibit] ([page of report])."

Stamos, who worked for the SIO and was one of the founders of EIP, where Mr. Scully stated his agreement with the interns that there was a gap in resources. Scully Dep. 84:10-22; 87:16-21; 98-2-8. CISA did not found, fund, or have any role in the management or operations of the EIP. Hale Decl. ¶¶ 52 (Ex. 97); Ex. 122 at 7 (*Addressing false claims and misperceptions of the UW Center for an Informed Public's research*, Univ. of Wash. (Mar. 16, 2023)). Moreover, this PFOF does not contain evidence that CISA collaborated with or was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. Any assertion to that effect is unsupported by and contrary to the record as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1139.   CISA interns originated the EIP: "The initial idea for the Partnership came from four students that the Stanford Internet Observatory (SIO) funded to complete volunteer internships at the Cybersecurity and Infrastructure Security Agency (CISA) at the Department of Homeland Security." *Id.*

**RESPONSE:** Disputed to the extent the evidence does not support the implication that the students originated the idea for the EIP in their role as CISA interns rather than as Stanford students. Moreover, this PFOF does not contain evidence that CISA collaborated with or was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. Any assertion to that effect is unsupported by and contrary to the record as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1140.   The EIP agrees with Scully that the EIP was formed to fill in a perceived "gap" in the ability of the government to "monitor and correct" misinformation: "Responsibility for election information security is divided across government offices: CISA has authority to coordinate on cybersecurity issues related to the election, the FBI to investigate cyber incidents and enforce election laws, and intelligence agencies to monitor for foreign interference. Yet, no government agency in the United States has the explicit mandate to monitor and correct election mis- and disinformation." *Id.*

**RESPONSE:** Disputed. The gap identified by Mr. Scully involved local and state officials' resources to identify misinformation targeting their jurisdictions. Scully Depo. Tr. 84:10-22. When asked about this portion of the EIP report during his deposition, Mr. Scully stated: "To be honest, I don't know what they're referencing, . . . so I don't want to speculate on what they're trying to

say there." Scully Depo. Tr. 91:13-24. And when asked whether Mr. Scully believed "there's a similar gap with respect to the ability of federal government agencies to respond to mis and disinformation on social media," he responded: "I think the federal government certainly would have the capability, if it chose to use it, and had the authority to do it." Scully Dep. 93:18-94:1. And when Mr. Scully was further asked whether "there was a gap in the federal government's ability to, you know, take any kind of action to correct mis and disinformation on social media," he responded "Yeah, I don't know that there's a gap in the federal government's ability to do it." *Id.* at 94:10-18. In any event, this PFOF does not contain evidence that CISA or any Defendant collaborated with or was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. Any assertion to that effect is unsupported by and contrary to the record as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1141. The EIP acknowledges that the federal government directly targeting misinformation posted Americans would "likely" violate the First Amendment and exceed agencies' lawful authority: "This is especially true for election disinformation that originates from within the United States, which would likely be excluded from law enforcement action under the First Amendment and not appropriate for study by intelligence agencies restricted from operating inside the United States." *Id.* As noted below, the EIP's founders publicly admit that virtually all the misinformation targeted by the EIP was domestic in origin, not foreign, and thus subject to the First Amendment.

**RESPONSE:** Disputed. The EIP report did not "acknowledge" that "the federal government directly targeting misinformation posted [by] Americans would 'likely' violate the First Amendment and exceed agencies' lawful authority." Rather, the EIP report stated that "no government agency in the United States has the explicit mandate to monitor and correct election mis- and dis-information. This is especially true for election disinformation that originates from within the United States, which would likely be excluded from law enforcement under the First Amendment and not appropriate for study by intelligence agencies restricted from operating inside the United States." In addition, to the extent the EIP report is offering a legal opinion about CISA's

or any other agency's statutory authorities, Defendants respond to those legal arguments in their brief in opposition to Plaintiffs' preliminary injunction motion. Finally, the last sentence of Plaintiffs' PFOF is legal argument and characterization rather than a statement of fact and is unsupported by any cited evidence.

1142.   The EIP specifically notes CISA and the FBI in discussing the need to fill this "gap" in their ability to police "election misinformation originating from domestic sources": "none of these federal agencies has a focus on, or authority regarding, election misinformation originating from domestic sources within the United States. This limited federal role reveals a critical gap for non-governmental entities to fill. Increasingly pervasive mis- and disinformation, both foreign and domestic, creates an urgent need for collaboration across government, civil society, media, and social media platforms." *Id.* at 9 (v).

**RESPONSE:** Undisputed to the extent this is the conclusion of the EIP. To the extent the EIP report is offering a legal opinion about CISA's or the FBI's statutory authorities, Defendants respond to those legal arguments in their brief in opposition to Plaintiffs' preliminary injunction motion. In addition, this PFOF does not contain evidence that CISA or any Defendant collaborated with or was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. Any assertion to that effect is unsupported by and contrary to the record as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1143.   "As a result" of the First Amendment and lack of legal authority, according to the EIP, "during the 2020 election, local and state election officials, who had a strong partner on election-system and overall cybersecurity efforts in CISA, were without a clearinghouse for assessing mis- and disinformation targeting their voting operations." *Id.* at 20 (2). The EIP was deliberately formed to fill this "gap."

**RESPONSE:** Disputed. The EIP report noted that "as a result" of the EIP's belief that "no government agency in the United States has the explicit mandate to monitor and correct election mis- and dis-information . . . during the 2020 election, local and state election officials, who had a strong partner on election-system and overall cybersecurity efforts in CISA, were without a clearinghouse for assessing misinformation and disinformation targeting their voting operation."

Scully Ex. 1 at 20 (2). To the extent the EIP report is offering a legal opinion about CISA's or any

other agency's statutory authorities, Defendants respond to those legal arguments in their brief in

opposition to Plaintiffs' preliminary injunction motion. In any event, this PFOF does not contain

evidence that CISA or any Defendant collaborated with or was "pervasive[ly] entwine[d]" with

the EIP, PI Supp. at 41. Any assertion to that effect is unsupported by and contrary to the record

as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1144.   The EIP "was formed between four of the nation's leading institutions focused on understanding misinformation and disinformation in the social media landscape: the Stanford Internet Observatory, the University of Washington's Center for an Informed Public, Graphika, and the Atlantic Council's Digital Forensic Research Lab." *Id.*

**RESPONSE:** Undisputed.

1145.   The EIP makes clear that its "aim" was not just to observe but to "defend[]" the public from misinformation: "With the narrow aim of defending the 2020 election against voting-related mis- and disinformation, it bridged the gap between government and civil society, helped to strengthen platform standards for combating election-related misinformation, and shared its findings with its stakeholders, media, and the American public." *Id.* at 9 (v).

**RESPONSE:** Undisputed.

1146.   The EIP's statement that it "helped to strengthen platform standards for combating election-related misinformation" refers to the fact that the EIP successfully pushed virtually all major social-media platforms to adopt or increase censorship policies targeted at election-related "misinformation" during the 2020 election cycle. *See id.*

**RESPONSE:** Disputed to the extent the PFOF refers to social media platforms' terms of

service, to which all users agree, as "censorship policies," and further disputed because the cited

evidence does not support the claim that "the EIP successfully pushed virtually all major social-

media platforms to adopt or increase" their policies.

1147.   The EIP notes that its efforts to push social-media platforms to adopt more restrictive censorship policies were highly effective, both in procuring changes in policies and censoring speech: "Many platforms expanded their election-related policies during the 2020 election cycle. … Platforms took action against policy violations by suspending users or removing content, downranking or preventing content sharing, and applying informational labels." *Id.* at 12 (viii).

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the EIP as "push[ing] social media platforms to adopt "more restrictive censorship policies." The cited evidence does not support that characterization. Nothing in this cited portion of the document suggests that platforms' expansion of their content moderation policies (to which all users agree) during the 2020 election cycle was the result of a "push" by EIP—or anyone else, for that matter.

1148.   Alex Stamos, the director of the Stanford Internet Observatory who founded the EIP, has publicly stated that the EIP successfully pushed social-media platforms to adopt more restrictive policies about election-related speech in 2020: "My suggestion, if people want to get the platforms to do stuff is, first, you've got to push for written policies that are specific and that give you predictability; right? And so this is something we started in the summer, in August, is as Kate [Starbird] talked about Carly Miller led a team from all four institutions to look at the detailed policies of the big platforms and to measure them against situations that we expected to happen. Now we're not going to take credit for all of the changes they made, but there -- we had to update this thing, like, eight or nine times; right? And so like putting these people in a grid to say, you're not handling this, you're not handling this, you're not handling this, creates a lot of pressure inside of the companies and forces them to kind of grapple with these issues, because you want specific policies that you can hold them accountable for." Scully Ex. 4, at 7 (Audio Tr. 4).

**RESPONSE:** Disputed because there is no "Scully Ex. 4," and it is unclear what source the PFOF purports to cite.

1149.   Alex Stamos notes that the EIP then pressured the platforms to aggressively enforce the new policies that the EIP had pushed them to adopt: "The second is, when you report stuff to them, report how it's violating those written policies; right? So there's two steps here. Get good policies, and then say, this is how it's violated it." *Id.*

**RESPONSE:** See Defs.' Resp. to PFOF ¶ 1148.

1150.   Other EIP participants have also publicly stated that the EIP induced social-media platforms to adopt much more aggressive censorship policies on election-related speech. On March 3, 2021, at an EIP-hosted conference on the release of the EIP report, Emerson Brooking of the Atlantic Council's DRFLab, an EIP participant, stated: "I think the EIP really helped push the envelope with things like just the notion that … this delegitimization of electoral processes that we were seeing in the summer and early fall that this should be against content moderation policies on these platforms, and begin to take proactive steps there…." Scully Ex. 5, at 6 (Audio Tr. 2). He also stated, "after November 3rd, we saw that market shift where content moderation actions that … we could hardly contemplate a few weeks before began to be taken. There was a much stronger emphasis on cracking down on the sort of content we've been tracking from the beginning." *Id.*

**RESPONSE:** Disputed because there is no "Scully Ex. 5," and it is unclear what source the PFOF purports to cite.

1151.   The EIP treats "Government" and Social-Media "Platforms" as two of its "Four Major Stakeholders," providing input to the EIP and receiving feedback from the EIP. Scully Ex. 1, at 26 (8) & fig.1.2 (graphic showing "Government" as the EIP's first "Major Stakeholder," submitting information to EIP's "Intake Queue" and receiving feedback on the EIP's "Mitigation"—*i.e.*, censorship—efforts).

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes EIP's mitigation efforts as "censorship." The cited evidence does not support that characterization. The EIP provided public factual findings to government agencies and social media platforms but had no control over content moderation or labeling posts. Ex. 74 at 2; Ex. 125 at 3. Rather, social media platforms examined any reports sent to them by the EIP to determine if the content was violative of their policies and did not act in cases where the platforms determined their existing policies were not violated. Ex. 74 at 2; Ex. 125 at 3; Ex. 122 at 6 (stating that EIP's "researchers made independent decisions about what to pass on to platforms, just as the platforms made their own decisions about what to do with our tips"). Content moderation decisions were independently made by social media platforms, and the EIP did not make recommendations to the platforms about what actions they should take. Ex. 74 at 2; Ex. 122 at 6; Ex. 125 at 3. Defendants further note that the EIP explained what it meant when it referred to the "government" as one of its "four major stakeholder groups" in its report: "Given the decentralized nature of election administration, government entities at the local, state, and federal level are all responsible in some way for election security and thus for countering election-related mis- and disinformation." Scully Ex. 1, at 30 (12). Defendants further note that CISA never submitted any information to EIP's "Intake Queue." *See* Ex. 125 at 2 ("CISA did not send any examples of potential misinformation to EIP"); Ex. 74 at 3 (stating that the EIP did not receive requests from CISA to eliminate or censor tweets); Ex. 122 at 7 ("CISA did not

send content to the EIP to analyze, and the EIP did not flag content to social media companies on behalf of CISA."). In addition, CISA generally did not share information with the EIP and did not have communications with EIP about specific disinformation concerns. Scully Depo. Tr. 73:25-74:2; 75:2-5; 106:3-9. Moreover, this PFOF does not contain evidence that CISA or any Defendant collaborated with or was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1152.   The EIP organizes its misinformation reports under groups called "tickets," and it notes that "[t]ickets were submitted by … trusted external stakeholders…" *Id.* at 26 (8). "Trusted external stakeholders" include "government": "External stakeholders included government, civil society, social media companies, and news media entities." *Id.* at 30 (12). Thus, it is clear that "government" submitted "tickets," *i.e.*, reports of misinformation to be processed for censorship on social media, to the EIP. *See id.* at 26, 30 (8, 12).

**RESPONSE:** Disputed, s*ee* Defs.' Resp. to PFOF ¶ 1151.

1153.   And it is clear that the "government" partners who submit tips to the EIP are CISA, the State Department's Global Engagement Center (GEC), and the Elections Infrastructure Information Sharing & Analysis Center (EI-ISAC), an organization of state and local government officials coordinated by the Center for Internet Security (CIS) pursuant to funding from CISA, *see EI-SAC*, Center for Internet Security (last visited Feb. 22, 2023) ("The EI-ISAC is federally funded by CISA."), https://www.cisecurity.org/ei-isac.   Specifically, the "Government" "stakeholders" listed under the EIP's "Four Major Stakeholder Groups" are CISA, GEC, and the EI-ISAC. Scully Ex. 1, at 30 (12).

**RESPONSE:** Disputed. First, CISA did not send content to the EIP to analyze, and the EIP did not flag content to social media platforms on behalf of CISA. Ex. 122 at 7; Ex. 125 at 2; Ex. 74 at 3 (stating that EIP did not receive requests from CISA to eliminate or censor tweets). Second, the EI-ISAC is not a "government" partner; rather, the EI-ISAC is a voluntary organization managed by CIS with membership open to all state, local, tribal, and territorial organizations and private sector entities that support election officials. Hale Decl. ¶ 48 (Ex. 97). Third, during the 2020 election cycle, the GEC discovered certain posts and narratives on social media and digital media that originated from, were amplified by, or likely to be amplified by

foreign malign influence actors—like Russia, the People's Republic of China, Iran, and their proxies—that sought to spread propaganda or disinformation about the 2020 election. *See* Bray Decl. ¶ 18 (Ex. 142). The GEC flagged these posts and narratives for the EIP on approximately 21 occasions. *Id.* The EIP then made an independent determination as to whether to send this information to social media companies, and social media companies in turn made separate independent decisions about what actions, if any, to take based on their own policies and under their respective terms of service with account holders and users on their sites. *Id.* Fourth, DHS has provided financial assistance to CIS through a series of cooperative agreement awards, managed by CISA, to provide certain, specified cybersecurity services to state, local, tribal and territorial governmental organizations through the MS- and EI-SACs. Hale Decl. ¶ 50 (Ex. 97). In the approved scope of work for the cooperative agreements, DHS has limited the use of federal funds and any required non-federal cost-share to cybersecurity services intended to detect, prevent, respond to, mitigate, and recover from cyber threats, vulnerabilities, and risks. *Id.* The DHS approved scope of work for the cooperative agreements has never funded CIS to perform disinformation-related work, including the reporting of potential election security-related disinformation to social media platforms. *Id.* at ¶ 51. Moreover, this PFOF does not contain evidence that CISA or any Defendant collaborated with or was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1154.   These "Government" stakeholders report misinformation to the EIP: "Government and civil society partners could create tickets or send notes to EIP analysts, and they used these procedures to flag incidents or emerging narratives to be assessed by EIP analysts." *Id.*

**RESPONSE:** Disputed. First, CISA did not send content to the EIP to analyze, and the EIP did not flag content to social media platforms on behalf of CISA. Ex. 122 at 7; Ex. 125 at 2;

Ex. 74 at 3 (stating that EIP did not receive requests from CISA to eliminate or censor tweets).

Second, during the 2020 election cycle, the GEC discovered certain posts and narratives on social

media and digital media that originated from, were amplified by, or likely to be amplified by

foreign malign influence actors—like Russia, the People's Republic of China, Iran, and their

proxies—that sought to spread propaganda or disinformation about the 2020 election. *See* Bray

Decl. ¶ 18 (Ex. 142). The GEC flagged these posts and narratives for the EIP on approximately 21

occasions. *Id.* The EIP then made an independent determination as to whether to send this

information to social media companies, and social media companies in turn made separate

independent decisions about what actions, if any, to take based on their own policies and under

their respective terms of service with account holders and users on their sites. *Id.* Third, the EI-

SAC did not ask the EIP to censor or eliminate social media posts. Ex. 74 at 3. Fourth, the EI-

ISAC is not a government entity. *See* Defs.' Resp. to Pls' PFOF ¶ 1153. Moreover, this PFOF does

not contain evidence that CISA or any Defendant collaborated with or was "pervasive[ly]

entwine[d]" with the EIP, PI Supp. at 41. Any assertion to that effect is unsupported by and

contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

    1155.   The CISA-funded EI-ISAC and CISA itself worked in collaboration with the EIP
to report misinformation to social-media platforms: "[T]he EI-ISAC served as a singular conduit
for election officials to report false or misleading information to platforms. By serving as a one-
stop reporting interface, the EI-ISAC allowed election officials to focus on detecting and
countering election misinformation while CIS and its partners reported content to the proper social
media platforms. Additionally, the Countering Foreign Influence Task Force (CFITF), a
subcomponent of CISA, aided in the reporting process and in implementing resilience efforts to
counter election misinformation." *Id.* at 31 (13).

    **RESPONSE:** Disputed. First, DHS has provided financial assistance to CIS through a

series of cooperative agreement awards, managed by CISA, to provide certain, specified

cybersecurity services to state, local, tribal and territorial governmental organizations through the

MS- and EI-SACs. Hale Decl. ¶ 50 (Ex. 97). In the approved scope of work for the cooperative

agreements, DHS has limited the use of federal funds and any required non-federal cost-share to cybersecurity services intended to detect, prevent, respond to, mitigate, and recover from cyber threats, vulnerabilities, and risks. *Id.* The DHS approved scope of work for the cooperative agreements has never funded CIS to perform disinformation-related work, including the reporting of potential election security-related disinformation to social media platforms. *Id.* at ¶ 51. Second, the EI-SAC did not ask the EIP to censor or eliminate social media posts. Ex. 74 at 3. Third, CISA did not send content to the EIP to analyze, and the EIP did not flag content to social media platforms on behalf of CISA. Ex. Ex. 122 at 7; Ex. 125 at 2; Ex. 74 at 3 (stating that EIP did not receive requests from CISA to eliminate or censor tweets). Moreover, this PFOF does not contain evidence that CISA or any Defendant collaborated with or was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1156.   The EIP report mentions *The Gateway Pundit*, the website operated by Plaintiff Jim Hoft, 47 times. *See id.* at 51, 74, 76, 101, 103, 110, 112, 145, 150-51, 153, 155-56, 172, 175, 183, 194-95, 206-09, 211-12, 214-16, 226-27.[7]

**RESPONSE:** Disputed. The EIP report mentions *The Gateway Pundit* 43 times. *See generally* Scully Ex. 1.

1157.   The EIP boasts that it "used an innovative internal research structure that leveraged the capabilities of the partner organizations through a tiered analysis model based on 'tickets' collected internally and from our external stakeholders. Of the tickets we processed, 72% were related to delegitimization of the election," *i.e.*, core political speech. *Id.* at 10 (vi).

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the phrase "delegitimizing of the election" as equating to "core political speech." The cited evidence, which does not include any of the referenced posts, does not support that characterization, which in any event is a legal

---

[7] Report pages 33, 56, 58, 83, 85, 92, 94, 127, 132-33, 135, 137-38, 154, 157, 165, 176-77, 188-91, 193-94, 196-98, 208-09.

conclusion. Defendants address Plaintiffs' legal arguments in their opposition to Plaintiffs' preliminary injunction motion.

1158.   The EIP admits that the speech it targets for censorship is domestic, grassroots speech by American citizens: "The production and spread of misinformation was multidirectional and participatory. Individuals participated in the creation and spread of narratives. Bottom-up false and misleading narratives started with individuals identifying real-world or one-off incidents and posting them to social media. Influencers and hyperpartisan media leveraged this grassroots content, assembling it into overarching narratives about fraud, and disseminating it across platforms to their large audiences. Mass media often picked up these stories after they had reached a critical mass of engagement. Top-down mis- and disinformation moved in the opposite direction, with claims first made by prominent political operatives and influencers, often on mass media, which were then discussed and shared by people across social media properties." *Id.* at 11 (vii). In other words, virtually everything it targets is quintessential First Amendment-protected political speech.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the EIP as "target[ing]"

speech for "censorship" or that "virtually everything it targets is quintessential First Amendment-

protected speech." The EIP provided public factual findings to government agencies and social

media platforms but had no control over content moderation or labeling posts. Ex. 74 at 2; Ex. 122

at 5-6; Ex. 125 at 3. Rather, social media platforms examined any reports sent to them by the EIP

to determine if the content was violative of their policies and did not act in cases where the

platforms determined their existing policies were not violated. Ex. 74 at 2; Ex. 125 at 3; Ex. 122

at 6 (stating that EIP's "researchers made independent decisions about what to pass on to platforms,

just as the platforms made their own decisions about what to do with our tips"). Content

moderation decisions were independently made by social media platforms, and the EIP did not

make recommendations to the platforms about what actions they should take. Ex. 74 at 2; Ex. 122

at 6; Ex. 125 at 3. Finally, the last sentence is a legal conclusion, and Defendants respond to

Plaintiffs' legal arguments in their response to Plaintiffs' preliminary injunction motion.

1159.   This included censorship of highly visible political figures: "The primary repeat spreaders of false and misleading narratives were verified, blue-check accounts belonging to

partisan media outlets, social media influencers, and political figures, including President Trump and his family." *Id.* at 12 (viii).

**RESPONSE:** Disputed. The EIP did not "censor[]"; the EIP provided public factual findings to government agencies and social media platforms but had no control over content moderation or labeling posts. Ex. 74 at 2; Ex. 122 at 5-6; Ex. 125 at 3. Social media platforms examined any reports sent to them by the EIP to determine if the content was violative of their policies and did not act in cases where the platforms determined their existing policies were not violated. Ex. 74 at 2; Ex. 125 at 3; Ex. 122 at 6 (stating that EIP's "researchers made independent decisions about what to pass on to platforms, just as the platforms made their own decisions about what to do with our tips"). Content moderation decisions were independently made by social media platforms, and the EIP did not make recommendations to the platforms about what actions they should take. Ex. 74 at 2; Ex. 122 at 6; Ex. 125 at 3.

1160.  One key point that the EIP emphasizes is that it wants greater "access" to platforms' internal data to achieve greater monitoring of Americans' speech on social media. The EIP complains that "*Lack of transparency and access to platform APIs hindered external research into the effectiveness of platform policies and interventions.*" *Id.* (emphasis added). "API" stands for "Application Programming Interface," so the EIP wants greater direct access to platforms' internal data about so-called "misinformation" on their platforms. *See id.* This directly echoes the repeated demands from the White House and the Surgeon General that social-media platforms provide access to their internal data about misinformation on their platforms, both to government and "researchers." The relevant "researchers" include Stanford Internet Observatory and the other constituents of the EIP and the Virality Project, who are working hand-in-glove with federal officials.

**RESPONSE:** Disputed. The EIP report does not reflect that "it wants greater 'access' to platforms' internal data." Rather, the EIP report simply lists "[l]ack of transparency and [API] access" as a limitation on the effectiveness of EIP's research. Scully Ex. 1 at 12 (viii). Further disputed that the White House or Surgeon General "demanded" anything from social media platforms, or that the Stanford Internet Observatory worked "hand-in-glove" with federal officials. The PFOF provides no record support for these statements, which are unsupported by the record

as a whole. Moreover, this PFOF does not contain evidence that CISA or any Defendant

collaborated with or was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. Any assertion to

that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg.

§ II.B.4.c. & e.

1161.    The EIP contends that not enough censorship was achieved during 2020 as a result of their lack of direct access to platforms' APIs: "Many platforms expanded their election-related policies during the 2020 election cycle. However, application of moderation policies was inconsistent or unclear." *Id.*

**RESPONSE:**    Disputed to the extent the PFOF mischaracterizes the EIP as "contend[ing]

that not enough censorship was achieved during 2020 as a result of their lack of direct access to

platforms' APIs." The cited evidence does not support that characterization. Rather, the cited

document reflects that one of the EIP report's "key takeways" was the observation that "[m]any

platforms expanded their election-related policies during the 2020 election cycle. However,

application of moderation policies was inconsistent or unclear." Scully Ex. 1 at 12 (viii). Nothing

in the cited exhibit reflects a desire by the EIP to "censor" anything. The EIP provided public

factual findings to government agencies and social media platforms but had no control over content

moderation or labeling posts. Ex. 74 at 2; Ex. 122 at 5-6; Ex. 125 at 3. Rather, social media

platforms examined any reports sent to them by the EIP to determine if the content was violative

of their policies and did not act in cases where the platforms determined their existing policies

were not violated. Ex. 74 at 2; Ex. 125 at 3; Ex. 122 at 6 (stating that EIP's "researchers made

independent decisions about what to pass on to platforms, just as the platforms made their own

decisions about what to do with our tips"). Content moderation decisions were independently made

by social media platforms, and the EIP did not make recommendations to the platforms about what

actions they should take. Ex. 74 at 2; Ex. 122 at 6; Ex. 125 at 3.

1162.   The EIP recommends that platforms increase enforcement of censorship policies: "Impose clear consequences for accounts that repeatedly violate platform policies. These accounts could be placed on explicit probationary status, facing a mixture of monitoring and sanctions." *Id.* at 14 (x).

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes social media platforms' terms of service—to which all users agree—as "censorship policies." The cited evidence does not support that characterization.

1163.   The EIP report acknowledges the contributions of Alex Stamos, Renee DiResta, Kate Starbird, Matt Masterson, Pierce Lowary, and Alex Zaheer. *Id.* at 16 (xii). All of these individuals have or had formal roles in CISA.

**RESPONSE:** Disputed in part. Mr. Stamos, Ms. DiRestra, Mr. Lowary, and Mr. Zaheer contributed to the EIP report in their capacity as "students, staff, and researchers" for the Stanford Internet Observatory, and Ms. Starbird contributed in her capacity as an employee of the University of Washington Center for an Informed Public. *Id.* In addition, Mr. Masterson, who provided "additional feedback" on the EIP report, was not a CISA employee at that time. Scully Ex. 1, at 16 (xii). Finally, the PFOF provides no support for the statement that each of these individuals "have or had formal roles in CISA," or even explains what is meant by a "formal role." Moreover, this PFOF does not contain evidence that CISA or any Defendant collaborated with or was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1164.   The EIP is partially funded by the federal government: "Researchers who contributed to the EIP … receive partial support from the U.S. National Science Foundation (grants 1749815 and 1616720)." *Id.* at 17 (xiii).

**RESPONSE:** Undisputed, but note that CISA does not and has never funded the EIP. Hale Decl. ¶ 57 (Ex. 97). Moreover, this PFOF does not contain evidence that CISA or any Defendant collaborated with or was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. Any assertion to

that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1165.   In addition, the Atlantic Council, one of the four nonprofit organizations in the EIP, is partially government-funded. Kimmage Dep. 294:8-18.

**RESPONSE:** Undisputed, but note that this PFOF does not contain evidence that CISA or any Defendant collaborated with or was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1166.   "The initial idea for the Partnership came from four students that the Stanford Internet Observatory (SIO) funded to complete volunteer internships at the Cybersecurity and Infrastructure Security Agency (CISA) at the Department of Homeland Security."  Scully Ex. 1, at 20 (2).

**RESPONSE:** Undisputed, but note that this PFOF does not contain evidence that CISA or any Defendant collaborated with or was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1167.   "The students approached SIO leadership in the early summer, and, in consultation with CISA and other stakeholders, a coalition was assembled with like-minded partner institutions."  *Id.*

**RESPONSE:** Undisputed that the PFOF accurately quotes a portion of the EIP report, but further note that the "consultation" by CISA was limited to a conversation with the students and a follow-up discussion with Alex Stamos where Mr. Scully verified the students' understanding that there was a gap in local and state election officials' resources to handle election misinformation. Scully Dep. 98:2-8; Hale Decl. ¶¶ 53-54 (Ex. 97). Moreover, this PFOF does not contain evidence that CISA or any Defendant collaborated with or was "pervasive[ly] entwine[d]" with the EIP, PI

Supp. at 41. Any assertion to that effect is unsupported by and contrary to the evidence as a whole.

*See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1168.   "The Election Integrity Partnership (EIP) was officially formed on July 26, 2020—100 days before the November election—as a coalition of research entities who would focus on supporting real-time information exchange between the research community, election officials, government agencies, civil society organizations, and social media platforms." *Id.*

**RESPONSE:** Undisputed.

1169.   As a key point in its "Operational Timeline," the EIP lists a July 9, 2020, "Meeting with CISA to present EIP concept." *Id.* at 21 (3). In other words, the Stanford Internet Observatory "present[ed]" the "EIP concept" to CISA two weeks before the EIP was formed. *Id.*

**RESPONSE:** Undisputed, but note that this PFOF does not contain evidence that CISA or any Defendant collaborated with or was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1170.   The SIO's EIP team was "led by … Research Manager Renee DiResta … and Director Alex Stamos." *Id.* at 22 (4). The University of Washington's "contributing team" was "led by … Kate Starbird." *Id.*

**RESPONSE:** Disputed in part, as the PFOF omits other individuals from SIO and the University of Washington that the EIP report identified as leading the EIP project. Scully Ex. 1, at 22 (4). The other individuals from SIO who "led" the EIP effort included Assistant Director Elena Cryst and CTO David Thiel. *Id.* The other individuals from the University of Washington who contributed to the EIP included Emma Spiro and Jevin West. *Id.*

1171.   Alex Stamos and Kate Starbird are members of CISA's Cybersecurity Advisory Committee. *See CISA Cybersecurity Advisory Committee*, Cybersecurity & Infrastructure Security Agency (last visited Feb. 24, 2023), https://www.cisa.gov/resources-tools/groups/cisa-cybersecurity-advisory-committee. Starbird chairs CISA's Subcommittee on "Protecting Critical Infrastructure from Misinformation and Disinformation." *See* CISA Cybersecurity Advisory Committee, Subcommittee Factsheet 1 (April 13, 2022), https://www.cisa.gov/sites/default/files/publications/CSAC%20Subcommittee%20Factsheet_April%2013%202022.pdf. Renee DiResta gives lectures on behalf of CISA. *See* CISA, *Cybersecurity Summit 2021:*

*Responding to Mis, Dis, and Malinformation*, YouTube (Oct. 27, 2021), https://www.youtube.com/watch?v=yNe4MJ351wU.

**RESPONSE:** Disputed in part. Ms. Starbird does not currently chair the CISA Subcommittee on "Protecting Critical Infrastructure from Misinformation and Disinformation" as the Subcommittee was directed to stand down in December 2020 because it had completed its tasking and provided its recommendations to CISA. Ex. 187 at 43. In addition, the PFOF mischaracterizes Ms. DiResta as someone who "gives lectures on behalf of CISA," as opposed to Ms. DiResta being a speaker at a CISA event. The cited evidence does not support the PFOF's characterization.

1172.   One of the EIP's goals was to "flag policy violations to platforms." Scully Ex. 1, at 24 (6).

**RESPONSE:** Undisputed, but further note that although the EIP provided public factual findings to government agencies and social media platforms but had no control over content moderation or labeling posts. Ex. 74 at 2; Ex. 122 at 5-6; Ex. 125 at 3. Rather, social media platforms examined any reports sent to them by the EIP to determine if the content was violative of their policies and did not act in cases where the platforms determined their existing policies were not violated. Ex. 74 at 2; Ex. 125 at 3; Ex. 122 at 6 (stating that EIP's "researchers made independent decisions about what to pass on to platforms, just as the platforms made their own decisions about what to do with our tips"). Content moderation decisions were independently made by social media platforms, and the EIP did not make recommendations to the platforms about what actions they should take. Ex. 74 at 2; Ex. 122 at 6; Ex. 125 at 3.

1173.   As noted above, the EIP describes "Government" as one of "four major stakeholders," who both provided input into the "intake queue" for "tickets" (*i.e.*, reporting misinformation) and received feedback on "mitigation" (*i.e.*, censorship). *Id.* at 26 (8).

**RESPONSE:** Undisputed, but note that CISA did not send content to the EIP to analyze, and the EIP did not flag content to social media platforms on behalf of CISA. Ex. 122 at 7; Ex. 125 at 2; Ex. 74 at 3 (stating that EIP did not receive requests from CISA to eliminate or censor tweets). CISA generally did not share information with EIP. Scully Depo. Tr. 73:25-74:2; 106:3-9. CISA did not have communications with EIP about specific disinformation concerns. Scully Depo. Tr. 75:2-5. CISA was not aware of when EIP would send reports to social media platforms. Scully Dep. 106:21-107:10. Moreover, the EI-SAC did not ask the EIP to censor or eliminate social media posts. Ex. 74 at 3. Furthermore, during the 2020 election cycle, the GEC discovered certain posts and narratives on social media and digital media that originated from, were amplified by, or likely to be amplified by foreign malign influence actors—like Russia, the People's Republic of China, Iran, and their proxies—that sought to spread propaganda or disinformation about the 2020 election. *See* Bray Decl. ¶ 18 (Ex. 142). The GEC flagged these posts and narratives for the EIP on approximately 21 occasions. *Id.* The EIP then made an independent determination as to whether to send this information to social media companies, and social media companies in turn made separate independent decisions about what actions, if any, to take based on their own policies and under their respective terms of service with account holders and users on their sites. *Id.* In addition, this PFOF does not contain evidence that CISA or any Defendant collaborated with or was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1174.  The EIP tracked misinformation using "tickets," which tracked "informational event[s]" that could encompass many social-media postings: "The EIP tracked its analysis topics and engaged with outside stakeholder organizations using an internal ticketing workflow management system. Each identified informational event was filed as a unique ticket in the system." *Id.*

**RESPONSE:** Undisputed.

1175.  "Tickets were submitted by both trusted external stakeholders (detailed in Section 1.4 on page 11) and internal EIP analysts." *Id.* "Section 1.4" on pages 11-12 of the report identifies government as a trusted external stakeholder: "Trusted external stakeholders" include "government, civil society, social media companies, and news media entities." *Id.* at 29-30 (11-12). Page 12 specifically identifies CISA, the EI-ISAC, and the State Department's GEC as the EIP's "Government" stakeholders. *Id.* at 30 (12) fig.1.3.

**RESPONSE:** Disputed to the extent the PFOF suggests that CISA submitted "tickets" to EIP. CISA did not send content to the EIP to analyze, and the EIP did not flag content to social media platforms on behalf of CISA. Ex. 125 at 2 ("CISA did not send any examples of potential misinformation to EIP"); Ex. 122 ("CISA did not send content to the EIP to analyze, and the EIP did not flag content to social media platforms on behalf of CISA."); Ex. 74 at 3 (stating that EIP did not receive requests from CISA to eliminate or censor tweets). Moreover, the EI-SAC did not ask the EIP to censor or eliminate social media posts. Ex. 74 at 3. Furthermore, during the 2020 election cycle, the GEC discovered certain posts and narratives on social media and digital media that originated from, were amplified by, or likely to be amplified by foreign malign influence actors—like Russia, the People's Republic of China, Iran, and their proxies—that sought to spread propaganda or disinformation about the 2020 election. *See* Bray Decl. ¶ 18 (Ex. 142). The GEC flagged these posts and narratives for the EIP on approximately 21 occasions. *Id.* The EIP then made an independent determination as to whether to send this information to social media companies, and social media companies in turn made separate independent decisions about what actions, if any, to take based on their own policies and under their respective terms of service with account holders and users on their sites. *Id.* This PFOF does not contain evidence that CISA or any Defendant collaborated with or was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1176.    A "ticket" could encompass many individual postings: "A single ticket could map to one piece of content, an idea or narrative, or hundreds of URLs pulled in a data dump." *Id.* at 27 (9).

**RESPONSE:** Undisputed.

1177.    The EIP's managers both report misinformation to platforms and communicate with government partners about their misinformation reports: "The manager had the ability to tag platform partners on a ticket for action. They also communicated with the EIP's partners in government, and could request further information from election officials if necessary," thus serving as a conduit for a back-and-forth about misinformation reports between government officials and platforms. *Id.* at 27-28 (9-10).

**RESPONSE:** Disputed. CISA did not send content to the EIP to analyze, and the EIP did not flag content to social media platforms on behalf of CISA. Ex. 125 at 2 ("CISA did not send any examples of potential misinformation to EIP"); Ex. 122 ("CISA did not send content to the EIP to analyze, and the EIP did not flag content to social media platforms on behalf of CISA."); Ex. 74 at 3 (stating that EIP did not receive requests from CISA to eliminate or censor tweets). CISA generally did not share information with the EIP. Scully Dep. 73:25-74:2; 106:3-9. CISA did not have communications with the EIP about specific disinformation concerns. *Id.* at 75:2-5. CISA generally was not aware of when the EIP would send reports to social media platforms. *Id.* at 106:21-107:10. This PFOF does not contain evidence that CISA or any Defendant collaborated with or was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1178.    The scope of the EIP's monitoring of Americans' speech on social media is enormous: "Team members from each of these tiers were divided into on-call shifts. Each shift was four hours long and led by one on-call manager. It was staffed by a mix of Tier 1 and Tier 2 analysts in a 3:1 ratio, ranging from five to 20 people. Analysts were expected to complete between two to five shifts per week. The scheduled shifts ran from 8:00 am to 8:00 pm PT for most of the nine weeks of the partnership, ramping up only in the last week before the election from 12-hour to 16- to 20-hour days with all 120 analysts on deck." *Id.* at 28 (10).

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the "scope" of EIP's

"monitoring" as "enormous." The cited evidence does not support that characterization.

1179.  The "Government" stakeholders flag misinformation to the EIP for censorship:
"Government and civil society partners could create tickets or send notes to EIP analysts, and they
used these procedures to flag incidents or emerging narratives to be assessed by EIP analysts." *Id.*
at 30 (12).

**RESPONSE:** Disputed.  The PFOF mischaracterizes the purpose of the flagging of

information to the EIP as "censorship." The EIP provided public factual findings to government

agencies and social media platforms but had no control over content moderation or labeling posts.

Ex. 74 at 2. Rather, social media platforms examined any reports sent to them by the EIP to

determine if the content was violative of their policies and did not act in cases where the platforms

determined their existing policies were not violated. *Id.*; Ex. 125 at 3; Ex. 122 at 6 (stating that

EIP's "researchers made independent decisions about what to pass on to platforms, just as the

platforms made their own decisions about what to do with our tips"). Content moderation decisions

were independently made by social media platforms, and the EIP did not make recommendations

to the platforms about what actions they should take. Ex. 74 at 2. Moreover, CISA did not send

content to the EIP to analyze, and the EIP did not flag content to social media platforms on behalf

of CISA. Ex. 125 at 2 ("CISA did not send any examples of potential misinformation to EIP"); Ex.

122 ("CISA did not send content to the EIP to analyze, and the EIP did not flag content to social

media platforms on behalf of CISA."); Ex. 74 at 3 (stating that EIP did not receive requests from

CISA to eliminate or censor tweets). During the 2020 election cycle, the GEC discovered certain

posts and narratives on social media and digital media that originated from, were amplified by, or

likely to be amplified by foreign malign influence actors—like Russia, the People's Republic of

China, Iran, and their proxies—that sought to spread propaganda or disinformation about the 2020

election. *See* Bray Decl. ¶ 18 (Ex. 142). The GEC flagged these posts and narratives for the EIP

on approximately 21 occasions. *Id.* The EIP then made an independent determination as to whether to send this information to social media companies, and social media companies in turn made separate independent decisions about what actions, if any, to take based on their own policies and under their respective terms of service with account holders and users on their sites. *Id.* In short, this PFOF does not contain evidence that CISA or any Defendant collaborated with or was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1180.   Of the "Four Major Stakeholder Groups" who participated in the EIP, the first listed is "Government," which includes three government entities: the Elections Infrastructure ISAC, CISA, and the State Department's GEC. *Id.*

**RESPONSE:** Undisputed that the EIP report lists the Election Infrastructure ISAC, CISA, and the State Department's GEC as "major stakeholders," but dispute that the EI-ISAC is a government entity. *See* Defs.' Resp. to Pls' PFOF ¶ 1153. Further note that CISA did not found, fund, or have any role in the management or operation of the EIP. Hale Decl. ¶ 52 (Ex. 97); Ex. 122 at 7. Moreover, this PFOF does not contain evidence that CISA or any Defendant collaborated with or was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1181.   The EIP reports that CISA, CIS, and the EI-ISAC collaborated with the EIP in reporting misinformation: "In this election cycle, the EI-ISAC served as a singular conduit for election officials to report false or misleading information to platforms. By serving as a one-stop reporting interface, the EI-ISAC allowed election officials to focus on detecting and countering election misinformation while CIS and its partners reported content to the proper social media platforms. Additionally, the Countering Foreign Influence Task Force (CFITF), a subcomponent of CISA, aided in the reporting process and in implementing resilience efforts to counter election misinformation." *Id.* at 31 (13).

**RESPONSE:** Disputed, *see* Defs.' Resp, to PFOF ¶ 1155.

1182.   The EI-ISAC jointly reports misinformation flagged by state and local election officials to CISA and to the EIP: "Content reported by election officials to the EI-ISAC was also routed to the EIP ticketing system. This allowed analysts to find similar content, ascribe individual content pieces to broader narratives, and determine virality and cross-platform spread if applicable. This analysis was then passed back to election officials via the EI-ISAC for their situational awareness, as well as to inform potential counter-narratives. Additionally, if an internally generated EIP ticket targeted a particular region, analysts sent a short write-up to the EI-ISAC to share with the relevant election official. This allowed the state or local official to verify or refute the claim, and enabled analysts to properly assess whether or not the content violated a platform's civic integrity policies. In this way, the EIP demonstrated the upside of using the EI-ISAC coordinating body to connect platforms with authoritative voices to determine truth on the ground and help election officials effectively counter viral falsehoods about election infrastructure." *Id.*

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the cited portion of the EIP report as stating that the EI-ISAC reported misinformation flagged by state and local election officials to CISA. The cited portion of the report does not support that characterization. During the 2020 election cycle, CISA received information regarding state and local election officials concerns about misinformation in three different ways. Scully Dep. 119:5-120:5. The first was from CIS. *Id.* at 119:5-120:5. The second was that election officials would send information to CISA Central, which is CISA's operations center. *Id.* at 119:5-120:5. The third was that election officials would directly email CISA employees. *Id.* at 119:5-120:5. Moreover, this PFOF does not contain evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1183.   The EIP created established channels for reporting misinformation to platforms for censorship: "The EIP established relationships with social media platforms to facilitate flagging of incidents for evaluation when content or behavior appeared to violate platform policies." *Id.* at 35 (17).

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the EIP as establishing channels for reporting misinformation to platforms for "censorship." The cited evidence does not support that characterization. The EIP did not ask social media companies to "censor" anything. Rather, the EIP provided public factual findings to social media platforms, but had no control over

content moderation, censorship, or labeling posts. Ex. 74 at 2. Social media platforms then examined any reports sent to them by the EIP to determine if the content was violative of their policies and did not act in cases where the platforms determined their existing policies were not violated. *Id.*; Ex. 122 at 6 (stating that EIP's "researchers made independent decisions about what to pass on to platforms, just as the platforms made their own decisions about what to do with our tips"). Content moderation decisions were independently made by social media platforms, and the EIP did not make recommendations to the platforms about what actions they should take. Ex. 74 at 2.

1184.   The EIP receives real-time reports on censorship actions from the platforms, who communicate directly with EIP managers about censorship through the EIP's system: "Analysts conducted their initial assessment on all tickets, and, if content in a ticket appeared to be a violation of a platform's published content policies, an analyst or manager added the platform representative to the ticket. If questions arose, a manager communicated with the platform representative in the ticket comments. Analysts put the ticket back in the queue and updated the ticket to note if the content in question received a moderation action." *Id.*

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the EIP as receiving "real-time reports on censorship" from social media platforms. The cited report does not support that characterization. First, the cited portion of the report does not reflect that social media companies provided "real-time" reports to the EIP. Second, the cited report does not reflect that social media platforms engaged in censorship. Rather, social media platforms would examine any reports sent to them by the EIP to determine if the content was violative of their policies, to which all users agree, and did not act in cases where the platforms determined their existing policies were not violated. Ex. 74 at 2; Ex. 125 at 3; Ex. 122 at 6 (stating that EIP's "researchers made independent decisions about what to pass on to platforms, just as the platforms made their own decisions about what to do with our tips"). Content moderation decisions were independently made by social media

platforms, and the EIP did not make recommendations to the platforms about what actions they should take. Ex. 74 at 2.

1185.   Virtually all major social-media platforms participate directly in the EIP: "The EIP onboarded the following social media companies: Facebook and Instagram, Google and YouTube, Twitter, TikTok, Reddit, Nextdoor, Discord, and Pinterest." *Id.*

**RESPONSE:** Undisputed that the PFOF accurately quotes a portion of the report. Plaintiffs' statement that this reflects "[v]irtually all major social-media platforms" is a characterization of fact rather than a factual statement, and the report identifies other social media platforms that the EIP did not work with. Scully Ex. 1 at 35-36 (17-18).

1186.   In the 2020 election cycle, the EIP "processed 639 in-scope tickets. 72% of these tickets were related to delegitimizing the election results." *Id.* at 45 (27).

**RESPONSE:** Undisputed, but note that of the EIP's 639 tickets, only 363 tickets tagged "an external partner organization to either report the content, provide situational awareness, or suggest a possible need for fact-checking or a counter-narrative." Scully Ex. 1 at 55 (37).

1187.   The EIP had a high level of success in pushing the platforms to censor speech: "35% of the URLs we shared with Facebook, Instagram, Twitter, TikTok, and YouTube were either labeled, removed, or soft blocked." *Id.* "In total, we believe the four major platforms we worked with all had high response rates to our tickets." *Id.* at 55 (37). "We find, overall, that platforms took action on 35% of URLs that we reported to them." *Id.* at 58 (40).

**RESPONSE:** Disputed. The record evidence does not support the PFOF's statement that the EIP "push[ed]" platforms to "censor speech." Rather, the EIP provided public factual findings to social media platforms but had no control over content moderation or labeling posts. Ex. 74 at 2. Social media platforms then examined any reports sent to them by the EIP to determine if the content was violative of their policies and did not act in cases where the platforms determined their existing policies were not violated. *Id.*; Ex. 125 at 3; Ex. 122 at 6 (stating that EIP's "researchers made independent decisions about what to pass on to platforms, just as the platforms made their own decisions about what to do with our tips"). Content moderation decisions were independently

made by social media platforms, and the EIP did not make recommendations to the platforms about what actions they should take. Ex. 74 at 2.

1188.   The Center for Internet Security, which runs the EI-ISAC using funding from CISA, is a major reporter of misinformation to the EIP: "16% of tickets were filed by the Center for Internet Security (CIS), an election official community partner, in the form of tips." *Id.* at 46 (28); *see also* Center for Internet Security, *EI-ISAC* (last visited Feb. 24, 2023), https://www.cisecurity.org/ei-isac.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the nature (and limitations on) CIS's funding by DHS or CISA. DHS has provided financial assistance to CIS through a series of cooperative agreement awards, managed by CISA, to provide certain, specified cybersecurity services to state, local, tribal and territorial governmental organizations through the MS- and EI-SACs. Hale Decl. ¶ 50 (Ex. 97). In the approved scope of work for the cooperative agreements, DHS has limited the use of federal funds and any required non-federal cost-share to cybersecurity services intended to detect, prevent, respond to, mitigate, and recover from cyber threats, vulnerabilities, and risks. *Id.* The DHS approved scope of work for the cooperative agreements has never funded CIS to perform disinformation-related work, including the reporting of potential election security-related disinformation to social media platforms. *Id.* ¶ 51. Nor did CISA fund CIS or the MS- or the EI-ISAC for any of the work CISA provided in relation to the reporting of potential election security-related disinformation to social media or technology companies during the 2020 or election cycle. *Id.* ¶ 77. In addition, the PFOF's characterization of CIS as a "major reporter" of misinformation is not supported by the cited portion of the report. Rather, as noted in the cited portion of the report, "[t]ickets were primarily created by members of the four core EIP organizations," and only 16% of tickets received by EIP came from CIS. Scully Ex. 1 at 46 (28). Of those 16% of tickets submitted by CIS, which amounted to 101 tickets, "[m]ost . . . originated from election officials." Scully Ex. 1, at 60 (42). In addition, "the CIS tickets were (1) more likely

to raise reports about fake official election accounts (CIS raised half of the tickets on this topic); (2) more likely to create tickets about Washington, Connecticut, and Ohio, and (3) more likely to raise reports that were about how to vote and the ballot counting process[.]" *Id.* This PFOF contains no evidence that CISA or any Defendant collaborated with or was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1189.    The EIP "prioritize[es] … swing states over non-swing states." Scully Ex. 1, at 46 (28).

**RESPONSE:** Undisputed that during the 2020 election cycle the EIP reported that, due to "finite staff and time," it prioritized "monitoring some content over others," including "prioritization of swing states over non-swing states." Scully Ex. 1 at 45 (28).

1190.    The EIP's "dataset included 639 distinct, in-scope tickets." *Id.* A "ticket" could be extremely broad, "map[ping] to" and entire "idea or narrative." *Id.* at 27 (9). For example, the "SHARPIEGATE" ticket was submitted on November 4, 2020, to "try and consolidate all the content" regarding the Sharpiegate story from "a variety of different states across Twitter, FB, TikTok, and Youtube." *Id.* at 47 (29) fig.2.1.

**RESPONSE:** Undisputed, and further noted that "Sharpiegate" involved allegations that voters were forced to use sharpie markers and that the markers were intentionally meant to make votes ambiguous to sway the election. Scully Ex. 1 at 47 (29) fig. 2.1. As noted in the report, this was not true because the "ballots are designed such that sharpie ink will not comprise the selection." *Id.* Further note that of the EIP's 639 tickets, only 363 tickets tagged "an external partner organization to either report the content, provide situational awareness, or suggest a possible need for fact-checking or a counter-narrative." Scully Ex. 1 at 55 (37).

1191.    The EIP includes extensive collaboration with a "government partner" in its Sharpiegate ticket. *Id.* at 48 (30). Its internal ticket-management software ("Jira") simultaneously allowed the "government partner" to communicate directly with the "platform partner" to debunk the online claim. *Id.* at 48 (30) fig.2.2.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the "government partner's" involvement in the Sharpiegate ticket as "extensive." The cited report does not support that characterization. In addition, although it is unclear whether the report is referring to a state, local, or federal "government partner," in context it appears to refer to an Arizona election official. Scully Ex. 1 at 48 (30) fig. 2.2. Moreover, this PFOF does not contain evidence that CISA or any Defendant collaborated with or was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1192.   The EIP reports that it repeatedly flagged *The Gateway Pundit*, Plaintiff Jim Hoft's website, as a purveyor of social-media misinformation: "The top misinformation-spreading websites in our dataset were … thegatewaypundit[.]com, a far-right news website. 65% of these tickets involved an exaggeration of the impact of an issue within the election process."  *Id.* at 51 (33) (alteration in original).

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the EIP report. The EIP report notes that the "top misinformation-spreading websites" in the EIP dataset were thedonaldwin and thegatewaypundit.com, and that "many of these tickets involved an exaggeration of the impact of an issue within the election process." Scully Ex. 1 at 51 (33).

1193.   The EIP does not claim that most of *The Gateway Pundit*'s content was false, only that it involved the "exaggeration of the impact of an issue within the election process."  *Id.*

**RESPONSE:** Disputed. The EIP report is replete with examples of false information from the Gateway Pundit. *See* Scully Ex. 1 at 74 (56) (describing narrative pushed by Gateway Pundit of incident of discarded mail to sow doubt about mail-in voting and "falsely assigning deliberate intent to purported Biden-supporting USPS workers"); *id.* at 76 (58) (noting that the Gateway Pundit retweeted and quoted an individual and "spread[] the false narrative that this was an intentional dumping of ballots with implications on the 2020 election, and reinforcing the larger narrative that mail-in voting was not secure."); *id.* at 110 (92) (noting that the Gateway Pundit

amplified the false narrative concerning the "disproven theory claiming that the software glitch that caused the erroneous vote count in Michigan was in fact the deliberate work of the 'Hammer and Scorecard' program"); *id.* at 112 (94) (noting that the Gateway Pundit published a story making the false claim that Dominion Voting Systems used the same software as SolarWinds, which had been subject to a cyberattack); *id.* at 214-15 (196-97) (noting that the Gateway Pundit "spread false narratives of election fraud built upon misinterpretations of statistics and was active in spreading the false Dominion conspiracy theory"). Ultimately, based on the Gateway Pundit's repeated violations of its terms of service, Twitter made the independent decision, based on its terms of service, to suspend the account on February 6, 2021. Scully Ex. 1 at 206 (188)

1194.  As noted above, the EIP Report cites *The Gateway Pundit* 47 times. *See supra* paragraph 1156 and accompanying citation.

**RESPONSE:** Disputed. The EIP Report cites The Gateway Pundit 43 times. *See generally* Scully Ex. 1.

1195.  The EIP "coded tickets based on whether they … had an element of foreign interference. Interestingly … less than 1% related to foreign interference."  Scully Ex. 1, at 53 (35). Thus, virtually all the speech targeted for censorship comes from American speakers.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the EIP as "target[ing] speech for "censorship." The cited evidence does not support that characterization. The EIP provided public factual findings to social media platforms, but had no control over content moderation, censorship, or labeling posts. Ex. 74 at 2. Rather, social media platforms examined any reports sent to them by the EIP to determine if the content was violative of their policies and did not act in cases where the platforms determined their existing policies were not violated. Ex. *Id.*; Ex. 125 at 3; Ex. 122 at 6 (stating that EIP's "researchers made independent decisions about what to pass on to platforms, just as the platforms made their own decisions about what to do with our tips"). Content moderation decisions were independently made by social media platforms, and

the EIP did not make recommendations to the platforms about what actions they should take. Ex. 74 at 2.

1196.   The EIP targeted speech for censorship or debunking in most tickets: "Of our 639 tickets, 363 tickets tagged an external partner organization to either report the content, provide situational awareness, or suggest a possible need for fact-checking or a counter-narrative." *Id.* at 55 (37).

**RESPONSE:** Disputed. The EIP did not target speech for censorship, nor did "most" tickets involve flagging information for social media companies. The EIP provided public factual findings to social media platforms, but had no control over content moderation, censorship, or labeling posts. Ex. 74 at 2. Rather, social media platforms examined any reports sent to them by the EIP to determine if the content was violative of their policies and did not act in cases where the platforms determined their existing policies were not violated. Ex. 74 at 2; Ex. 125 at 3; Ex. 122 at 6 (stating that EIP's "researchers made independent decisions about what to pass on to platforms, just as the platforms made their own decisions about what to do with our tips"). Content moderation decisions were independently made by social media platforms, and the EIP did not make recommendations to the platforms about what actions they should take. Ex. 74 at 2. In addition, 363 out of 639 tickets being tagged for an external partner cannot credibly be characterized as "most."

1197.   "[G]roups that reported tickets include the State Department's Global Engagement Center…" *Id.* at 60 (42). Daniel Kimmage testified that George Beebe of the GEC was in contact with the EIP. Kimmage Dep. 202:10-24. Kimmage attests that the GEC had "a general engagement with the EIP. … the GEC was engaging with the partnership." *Id.* at 214:11-19. In addition to Mr. Beebe, Adele Ruppe, who "liaised on election-related issues," may have engaged with the EIP. *Id.* 214:23-215:5.

**RESPONSE:** Undisputed, but note that during the 2020 election cycle, the GEC discovered certain posts and narratives on social media and digital media that originated, or were likely to have originated from, were amplified by, or likely to be amplified by foreign malign

influence actors—like Russia, the People's Republic of China, Iran, and their proxies—that sought

to spread propaganda or disinformation about the 2020 election. *See* Bray Decl. ¶ 18 (Ex. 142).

The GEC flagged these posts and narratives for the EIP on approximately 21 occasions. *Id.* The

EIP then made an independent determination as to whether to send this information to social media

companies, and social media companies in turn made separate independent decisions about what

actions, if any, to take based on their own policies and under their respective terms of service with

account holders and users on their sites. *Id.* Moreover, this PFOF does not contain evidence that

the GEC or any Defendant collaborated with or was "pervasive[ly] entwine[d]" with the EIP, PI

Supp. at 41. Any assertion to that effect is unsupported by and contrary to the evidence as a whole.

*See* Defs.' PFOF § II.G., Arg. § II.B.4.c. & e.

    1198.   In addition, left-wing advocacy groups like "MITRE, Common Cause, the DNC, the Defending Digital Democracy Project, and the NAACP" submitted tickets to the EIP. Scully Ex. 1, at 60 (42).

**RESPONSE:** Disputed to the extent the PFOF characterizes these organizations as "left-

wing advocacy groups." The cited evidence provides no support for that characterization.

Moreover, as the EIP has explained, "[t]he EIP exclusively tracked and reported on false,

misleading, and unsubstantiated claims about election processes and procedures. In 2020, those

claims were far more prominent among supporters of President Trump (and the president himself)

than other political groups." Ex. 122 at 8.

    1199.   The EIP indicates that the "misinformation" it targeted during the 2020 election cycle was core political speech of American citizens protected by the First Amendment: "Our analysis demonstrates that the production and spread of misinformation and disinformation about Election 2020 … was participatory. In other words, these dynamics were not simply top-down from elites to their audiences, but were bottom-up as well, with members of the 'crowd' contributing in diverse ways—from posting raw content, to providing frames for that content, to amplifying aligned messages from both everyday members of the crowd and media (including social media) elites. Repeatedly, our data reveal politically motivated people sincerely introducing content they mistakenly believed demonstrated real issues with election integrity…" *Id.* at 181

(163). "Well-meaning, though often politically motivated, individuals repeatedly introduced this content into the broader information sphere, often via social media…" *Id.* at 182 (164).

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the EIP report as indicating that the misinformation it "targeted during the 2020 election cycle was core political speech of American citizens protected by the First Amendment." The cited portion of the EIP report does not support the characterization that the EIP "targeted" speech (for "censorship" or otherwise). Moreover, the PFOF's characterization is a legal conclusion, and Defendants address legal arguments in their opposition to Plaintiffs' preliminary injunction motion. In addition, the quoted language omits important context: "Our analysis demonstrates that the production and spread of misinformation and disinformation about Election 2020—*including false narratives of a 'stolen election'*—was participatory." (Omitted language is reflected in italics). Scully Ex. 1, at 181 (163).

1200.  EIP analysts collected data from Twitter "contemporaneously," and they also have access to "CrowdTangle and Facebook search functionality." *Id.* at 199-200 (181-82).

**RESPONSE:** Undisputed, but for proper context note that the complete statement reads as follows: "To identify the repeat spreaders, we draw from three complementary views; one from our ticketing and analysis process (described in Chapters 1 and 2); a second through Twitter data EIP partners collected contemporaneously; and a third through CrowdTangle and Facebook search functionality, collected after EIP's realtime analyses ended." Scully Ex. 1 at 199-200 (181-82).

1201.  The EIP's tickets encompassed almost 5,000 URLs: "Through our live ticketing process, analysts identified social media posts and other web-based content related to each ticket, capturing original URLs (as well as screenshots and URLs to archived content). In total, the EIP processed 639 unique tickets and recorded 4,784 unique original URLs." *Id.* at 200 (182).

**RESPONSE:** Undisputed, but note that of the 639 unique tickets processed by the EIP, only 363 tickets "tagged an external partner organization to either report the content, provide

situational awareness, or suggest a possible need for fact-checking or a counter-narrative." Scully Ex. 1 at 55 (37).

1202.   These tickets and URLs encompass millions of social media posts, including almost 22 million posts on Twitter alone: "In total, our incident-related tweet data included 5,888,771 tweets and retweets from ticket status IDs directly, 1,094,115 tweets and retweets collected first from ticket URLs, and 14,914,478 from keyword searches, for a total of 21,897,364 tweets." *Id.* at 201 (183).

**RESPONSE:** See Defs.' Resp. to PFOF ¶ 1201.

1203.   The EIP "collected data from Twitter in real time from August 15 through December 12, 2020," and did so "[u]sing the Twitter Streaming API" to "track[] a variety of election-related terms …. The collection resulted in 859 million total tweets." *Id.* at 200-01 (18283). Thus, the EIP had privileged access to Twitter's internal data about speech on its own platform.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes EIP's access to Twitter's

API as "privileged access." The cited document does not support that characterization. As the EIP

report states: "Facebook, Twitter, Reddit, and Instagram have reasonably accessible APIs that

made it easier for our team to find misinformation on their platforms." Scully Ex. 1 at 51 (33).

1204.   The EIP did not have privileged access to Facebook's internal data, however: "To understand how the information ecosystem looks from the perspective of Facebook and Instagram, we collected public posts through the CrowdTangle API from Facebook Groups, Facebook Pages, Facebook verified profiles and public Instagram accounts." *Id.* at 201 (183). This explains the White House's and Surgeon General's insistence in 2021 that Facebook grant "researchers" such as Renee Diresta access to Facebook's internal data.

**RESPONSE:** The last sentence is disputed because it consists of speculative argument and

characterization lacking any cited record support.

1205.   The EIP treats as "misinformation" truthful reports that the EIP believes "lack[] broader context." *Id.* at 203 (185).

**RESPONSE:** Disputed. The portion of the document referred to in the PFOF discusses

"repeat spreaders of false and misleading narratives," not "misinformation." Scully Ex. 1 at 199

(181). The EIP report provides a table with the ten most prominent incidents (by Twitter spread)

and includes the following incident concerning Pennsylvania poll watchers: "This incident centered on narratives that a GOP-affiliated poll watcher was wrongfully denied entry to a Pennsylvania polling station. This content was then reframed to *falsely* claim that this was evidence of illegal actions taking place in the polling station. While the video does show a poll watcher being denied, it lacked broader context as to the reason for denial, which was not politically motivated." Scully Ex. 1 at 203 (185).

1206.  The EIP admits that it focuses on speech from the "political right" because it believes that the right spreads misinformation: "Influential accounts on the political right … were responsible for the most widely spread of false or misleading information in our dataset. Right-leaning accounts also more frequently augmented their misinformation posts with narrative-related hashtags … which persisted across multiple incidents and were shared millions of times in our dataset." *Id.* at 204-05 (186-87).

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the EIP as "focusing" on speech from the "political right." The cited document does not support that characterization. Rather, the EIP report reflects that it examined both "left-leaning" and "right-leaning" tweets and social media posts. Scully Ex. 1 at 202 (184). The EIP report found that "influential accounts associated with the U.S. right shared more incidents than the left both by absolute number (151 vs, 119 tickets) and by the total number of times there were retweeted in these incidents (17.8 million vs. 1.9 million retweets)." *Id.* Based on this data, the EIP report concluded that "[o]ur analysis suggests that the primary 'influencers' in the online production and dissemination of false and misleading narratives about the 2020 election were verified, blue-check accounts belonging to partisan media outlets, social media influencers, and political figures. Though false narratives occasionally gained traction on the political left, almost all of the most prominent repeat spreaders—i.e., the accounts that seeded and disseminated multiple false claims and narratives— belonged to conservative and/or pro-Trump individuals and organizations. Members of the Trump campaign, including President Trump and his adult sons, played a significant role in the spread of

these narratives, which converged around false and misleading claims of voter fraud and sought to undermine trust in the results of the election." Scully Ex.1 at 222-23 (204-05)

**B.      The EIP Targets Plaintiff Jim Hoft and *The Gateway Pundit*.**

1207.   According to the EIP, "[t]he 21 most prominent repeat spreaders on Twitter … include political figures and organizations, partisan media outlets, and social media all-stars. … [A]ll 21 of the repeat spreaders were associated with conservative or right-wing political views and support of President Trump." *Id.* at 205 (187).

**RESPONSE:** Undisputed, but note that the PFOF omits a portion of the quoted statements.

The first quoted sentence reads in full: "The 21 most prominent repeat spreaders on Twitter— ***accounts that played a significant role in disseminating multiple false or misleading narratives that threaten election integrity***—include political figures and organizations, partisan media outlets, and social media all-stars." Scully Ex. 1 at 205 (187) (emphasis added to reflect the omitted portion of quote). The second quoted sentence reads in full:  "***Perhaps a reflection on both the nature of information threats to election integrity and our process for identifying them (see Chapter 2 for a note on the limitations of our approach,*** all 21 of the repeat spreaders were associated with conservative or right-wing political views and support of President Trump, ***and all featured in the politically 'right' cluster in our network graph in Figure 5.1 on the facing page.***"

*Id.* (emphasis added to reflect the omitted portion of quote).

1208.   The EIP lists *The Gateway Pundit* as the second-ranked "Repeat Spreader[] of Election Misinformation" on Twitter, ranking it above Donald Trump, Eric Trump, Breitbart News, and Sean Hannity. *Id.* at 206 (188) tbl.5.2. In the 2020 election cycle, the EIP flagged *The Gateway Pundit*'s speech in 25 incidents with over 200,000 retweets. *Id.*

**RESPONSE:** Undisputed.

1209.   The EIP claims that "[f]ar-right hyperpartisan media outlets also participated in a wide range of [Twitter] incidents, including The Gateway Pundit, which ranked #2 in the dataset." *Id.* at 206 (188).

**RESPONSE:** Undisputed.

1210.   In addition, the EIP lists *The Gateway Pundit*'s website as the domain cited in the most "incidents"—its website content was tweeted by others in 29,207 original tweets and 840,740 retweets. *Id.* at 207 (189) tbl.5.3. *The Gateway Pundit* ranks above Fox News, the New York Post, the New York Times, and the Washington Post on this list. *Id.*

**RESPONSE:** Undisputed.

1211.   In fact, the EIP dedicates an entire subsection of its report to *The Gateway Pundit*. *Id.* at 214-16 (196-98). The EIP reports that "The Gateway Pundit was among the most active spreaders of election-related misinformation in our analyses. … It appeared as a top repeat spreader through its website, its Twitter account, its YouTube channel, and its Instagram account." *Id.* at 214 (196).

**RESPONSE:** Undisputed.

1212.   The EIP report notes that "Twitter suspended [*The Gateway Pundit*'s] account on February 6, 2021," indicating that *The Gateway Pundit*'s deplatforming on Twitter was the result of the EIP's efforts. *Id.*

**RESPONSE:** Disputed to the extent the PFOF claims that The Gateway Pundit's deplatforming on Twitter "was the result of the EIP's efforts," as the PFOF cites to no record evidence to support that claim. Indeed, the evidence is to the contrary. The EIP report notes that Twitter suspended the Gateway Pundit and supports that statement with a citation to a February 6, 2021, article in Forbes entitled "Twitter suspends 'Gateway Pundit' Jim Hoft." Scully Ex. 1 at 214 (196), 227 (209). The cited Forbes article quotes a spokesperson for Twitter as follows: "The account was permanently suspended for repeated violations of our civic integrity policy." Ex. 165 at 2 (AJ Dellinger, *Twitter suspends 'Gateway Pundit' Jim Hoft*, Forbes (Feb. 6, 2021)). The Forbes article further states that "Hoft and his publication have been widely criticized for spreading false information, including promoting conspiracy theories regarding the outcome of the 2020 presidential election." *Id.*

1213.   The EIP states that "The Gateway Pundit was highly active throughout the election lifecycle, including during the weeks leading up to the election, when it repeatedly spread content—in distinct information incidents—that sought to undermine trust in mail-in voting specifically and the eventual election results more generally." *Id.*

**RESPONSE:** Undisputed, and further note that the EIP report found that the Gateway Pundit "participated in seeding and spreading misleading information about ballots being harvested, chased, dumped, stolen and miscounted. It spread false narratives of election fraud built upon misinterpretations of statistics and was active in spreading the false Dominion conspiracy theory." Scully Ex. 1 at 214-15 (196-97).

1214.   According to the EIP, "[o]n Twitter, The Gateway Pundit's account was highly retweeted across 26 different incidents (#2 among repeat spreaders). Evidence from our data suggest that its prominence was due both to production of its own material and to amplification (via original and quote tweets) of other partisan content." *Id.* at 215 (197).

**RESPONSE:** Undisputed.

1215.   According to the EIP, "[o]f all the domains linked to in our Twitter data, The Gateway Pundit's website was connected to the largest number of incidents (46) while also garnering the most related original tweets (29,207) and retweets (840,750). Their YouTube channel appeared in five incidents, and their 13 incident-related videos had more than 4 million views on YouTube." *Id.* at 215-16 (197-98).

**RESPONSE:** Undisputed.

1216.   According to the EIP, "[t]he Gateway Pundit['s] … Instagram account was tied for #2 among repeat spreaders, appearing in 10 incidents for 20 posts that received more than 132,000 engagements." *Id.* at 216 (198).

**RESPONSE:** Undisputed.

**C.     The EIP Induces Major Changes in Platform Censorship Policies.**

1217.   The EIP notes that "during the 2020 election, all of the major platforms made significant changes to election integrity policies, both as the campaigns kicked off and through the weeks after Election Day—policies that attempted to slow the spread of specific narratives and tactics that could potentially mislead or deceive the public…." *Id.* at 229 (211).

**RESPONSE:** Undisputed, but note that the selectively quoted statement leaves out the reason for the changes to the companies' content moderation policies. The sentence in full reads,

"***Recognizing the heightened rhetoric and the use of mis- and dis-information*** during the 2020 election, all of the major platforms made significant changes to election integrity policies, both as

the campaigns kicked off and through the weeks after Election Day—policies that attempted to

slow the spread of specific narratives and tactics that could potentially mislead or deceive the

public, ***though the efforts were not always successful.***" Scully Ex. 1 at 229 (211) (emphasis added

reflects the omitted portions of the quotation). In addition, the PFOF cites to no evidence to support

the claim that the EIP "induce[d]" these reported changes to platforms' terms of service.

1218.   The EIP notes that "[m]ajor social media platforms such as Facebook, Twitter,
YouTube, Pinterest, and TikTok introduced changes to their community standards in the months
leading up to the election and in the aftermath." *Id.* at 230 (212).

**RESPONSE:** Undisputed, but note that the PFOF cites to no evidence to support the claim

that the EIP "induce[d]" these reported changes to platforms' terms of service.

1219.   In particular, starting just over a month after the EIP launched, in "September
2020," "[a] number of platforms announced the first updates to election-specific policies: making
large additions; adding more clarity and specificity; or stating clearly that they will label or remove
content that delegitimizes the integrity of the election." *Id.*

**RESPONSE:** Undisputed, but note that the PFOF cites to no evidence to support the claim

that the EIP "induce[d]" these reported changes to platforms' terms of service.

1220.   The policy changes reflected that the EIP and the platforms anticipated that they
would have to target speech by *domestic* speakers, not supposed "foreign disinformation," during
the 2020 election: "[M]uch of the misinformation in the 2020 election was pushed by authentic,
domestic actors, and platforms shifted their focus to address downstream harms related to the
content itself. As a result, most subsequent updates introduced policies related to specific content
categories." *Id.* at 231 (213).

**RESPONSE:** Disputed to the extent the PFOF's mischaracterizes the policy changes by

social media companies as reflecting that the EIP anticipated that it would have to "target speech

by *domestic* speakers rather than foreign actors." The cited part of the EIP report does not support

that characterization. The quoted language does not discuss the EIP at all, let alone refer to it as

"targeting" speech by anyone. Nor does the quoted language reflect that social media companies

were "targeting" speech as opposed to applying their terms of service, to which all users agree.

1221.   The EIP lobbies platforms to "remove" so-called "repeat spreaders" like *The Gateway Pundit*, and complains that they are not removed often enough: "Despite what appeared to be clear policy to penalize or remove repeat spreaders and high-profile disinformation actors, platforms appeared to shy away from using this particular intervention. In some cases, this was a result of a variety of 'newsworthiness' exceptions, which allowed some high-profile repeat spreaders, including politicians, to evade bans. Yet many of the repeat spreaders we saw were not politicians"—including *The Gateway Pundit*, among many others. *Id.* at 233 (215).

**RESPONSE:** Disputed. The PFOF's mischaracterization of the EIP "lobbying" platforms to do anything is not supported by the cited portion of the EIP report. Rather, the portion of the report cited in the PFOF simply reflects EIP reporting on the various policies and types of actions social media platforms take to address content and offers no recommendations or judgments about those polices. Scully Ex. 1 at 233 (215).

1222.   The EIP indicates that it will continue its censorship activities in future elections: "The next election will have its own unique set of misinformation narratives, yet many of the tactics, dynamics, and basic structures of these narratives will likely remain the same." *Id.* at 243-44 (225-26).

**RESPONSE:** Disputed. Although the PFOF accurately quotes a sentence from the EIP report, that sentence says nothing about EIP's intentions for future elections. Rather, the section of the EIP report cited in the PFOF concerns "platform policy moving forward." Scully Ex. 1 at 234 (225).

1223.   The EIP reinforces this intention by calling for even more aggressive, more expansive censorship of social-media speech, including into other areas such as "public health": "Doing nothing is not an option. … Not pursuing structural policy change will accelerate our country's slide toward extremism, erode our shared national and inclusive identity, and propel yet more individuals toward radicalization via mis- and disinformation. The problem is larger than elections: it spans politics, self-governance, and critical policy areas, including public health." *Id.* at 251 (233). The EIP acted on this statement promptly by forming the "Virality Project" in 2021. *See infra*.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the EIP as "reinforcing this intention" to "continue its censorship activities in future elections" by "calling for even more aggressive, more expansive censorship of social-media speech." The cited evidence does not

support that characterization. Rather, the quoted language reflects the EIP's recommendation for the pursuit of "structural policy changes" to avoid "our country's slide towards extremism," as exemplified by the role mis- and disinformation played in the "violent insurrection at the United States Capitol on January 6, 2021." Scully Ex. 1 at 251 (233).

1224.   The EIP proclaims that the "EIP's novel structure, enabling rapid-response analysis and a multistakeholder reporting infrastructure, could prove effective to many information spaces blighted by pervasive misinformation," in addition to election-related speech. *Id.* at 259 (241).

**RESPONSE:** Undisputed.

1225.   The EIP calls for more aggressive penalties to enforce censorship on social media, in language that was copied and parroted by the demands of Jen Psaki and the Surgeon General: "Establish clear consequences for accounts that repeatedly violate platform policies." *Id.* at 256 (238). "Prioritize quicker action on verified or influential accounts if they have already violated platform policies in the past." *Id.* at 257 (239).

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the EIP as calling for more "aggressive penalties to enforce censorship on social media," and mischaracterizing Ms. Psaki and the Surgeon General "parroting" the content of this report. The cited report does not support those characterizations. Rather, the EIP report offers a list of "recommendations" for social media companies, including ones relating to "repeat offenders." Nothing about these recommendations suggest "aggressive censorship"; rather, this reflects a recommendation for social media platforms to consistently apply their terms of service, to which all users agree. Furthermore, the PFOF provides no evidence that Ms. Psaki or the Surgeon General's views were taken from the EIP or its report.

1226.   The EIP even advocates for an express system of pre-publication approval for disfavored speakers—the ultimate prior restraint: "Consider implementing holding areas for content from high-visibility repeat spreaders, where content can be evaluated against policy before posting." *Id.*

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes one of the EIP's recommendation as advocating for the "the ultimate prior restraint." The cited evidence does not

support that characterization, which in any event is a legal conclusion rather than a factual statement. Defendants address legal arguments in their opposition to Plaintiffs' preliminary injunction motion. In addition, the recommendation cited in the PFOF simply recommends that social media platforms apply their terms of service, to which all users agree, to "high-visibility repeat spreaders." Scully Ex. 1 at 257 (239).

1227.   The EIP proclaims that it offers "a whole-of-society response," in words parroted by the Surgeon General's Health Advisory. *Id.* at 259 (241).

**RESPONSE:** Undisputed that both the EIP's report and the Surgeon General's advisory urge a "whole-of-society" response, but further note that the PFOF's characterization that the Surgeon General "parroted" the EIP's response is unsupported by the cited evidence.

1228.   The EIP boasts that "[t]he EIP, in its structure and its operations … *united government, academia, civil society, and industry*, analyzing across platforms, to address misinformation in real time." *Id.* (emphasis added).

**RESPONSE:** Undisputed, but note that this PFOF does not contain evidence that any Defendant collaborated with or was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F & G., Arg. § II.B.4.c. & e

1229.   The EIP states that "[t]he lessons from EIP should be both learned and applied. The fight against misinformation is only beginning. The collective effort must continue." *Id.* at 25960 (241-42).

**RESPONSE:** Undisputed.

1230.   The EIP specifically advocates for a broader role for CISA in federal efforts to combat election-related "misinformation." *Id.* at 252-53 (234-35).

**RESPONSE:** Disputed. The EIP did not recommend that CISA have a "broader role" in "efforts to combat election-related 'misinformation.'" Rather, the EIP made three recommendations concerning CISA. Scully Ex. 1 at 252-53 (234-35). First, the EIP recommended

that the Executive Branch "[s]trenghten interagency coordination by elevating election security as a national security priority and reaffirming the critical infrastructure designation for election systems, allowing [CISA] to further prioritize resources and support to state and local officials." *Id.* Second, the EIP recommended that the Executive Branch "[s]olidify clear interagency leadership roles and responsibilities," and that "CISA should remain the lead on domestic vulnerabilities and coordination with state and local election officials." *Id.* The third EIP recommendation concerning CISA was to "[c]reate standards and mechanisms for consistent disclosure of mis- and disinformation from foreign and domestic sources, including via CISA's Rumor Control and joint interagency statements related to foreign-based threats." *Id.* Furthermore, the PFOF cites to no evidence that CISA ever took any action on the EIP recommendation. In addition, this PFOF contains no evidence that CISA or any Defendant collaborated with or was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1231.   Alex Stamos, the director of the Stanford Internet Observatory who launched the EIP, publicly states that virtually all the speech targeted by the EIP is by domestic speakers engaging in core political speech. He has publicly stated: "almost all of this is domestic: right? … It is all domestic, and the second point on the domestic, a huge part of the problem is well-known influencers …. you have … a relatively small number of people with very large followings who have the ability to go and find a narrative somewhere, pick it out of obscurity and … harden it into these narratives."  Scully Ex. 4, at 5 (Audio Tr. 2).

**RESPONSE:** Disputed because there is no "Scully Ex. 4." Accordingly, the PFOF provides no record support for this statement.

1232.   Likewise, on October 3, 2020, at a CISA-hosted cybersecurity conference, Clint Watts of the EIP stated that election misinformation "is overwhelmingly more domestic than foreign this time around in 2020."  Scully Ex. 3, at 4 (Audio Tr. 2).

**RESPONSE:** Disputed because there is no "Scully Ex. 3." Accordingly, the PFOF provides no record support for this statement.

1233.   At the same conference, Alex Stamos stated: "The bigger issue in 2020, is going to be domestic … we have set up this thing called the [E]lection [I]ntegrity [P]artnership, so we went and hired a bunch of students. We're working with the University of Washington, Graphika, and DFRLab, and the vast, vast majority of the contact we see we believe is domestic. You know, some of it you can't tell, but a lot of it is coming from domestic blue checkmark verified elites; right? And so I think a much bigger issue for the platforms is elite disinformation. The stuff that is being driven by people who are verified that are Americans who are using their real identities." *Id.* at 5 (Audio Tr. 3). He also stated, "the truth is, that the vast majority of these problems or the kind of problems in the information environment are domestic problems." *Id.* at 6 (Audio Tr. 4).

**RESPONSE:** *See* Defs.' Resp. to PFOF ¶ 1232.

1234.   Alex Stamos has noted that the fear of government regulation pushes the platforms to respond to government pressure and increase censorship. On November 10, 2020, at a conference hosted by the Atlantic Council, Alex Stamos stated: "So, you know, on effectively pushing the platforms to do stuff … they will always be more responsive in the places that are both economically highly important and that have *huge potential regulatory impact*, most notably right now that would be the United States and Europe." Scully Ex. 4, at 6 (Audio Tr. 3) (emphasis added).

**RESPONSE:** *See* Defs.' Resp. to PFOF ¶ 1231. In addition, disputed to the extent the

PFOF state that Mr. Stamos has "noted that the fear of government regulation pushes the platforms

to respond to government pressure and increase censorship." That characterization is not supported

by the Mr. Stamos' alleged quotation.

1235.   On November 17, 2021, at a conference hosted by the Digital Publics Symposium, Kate Starbird of CISA's Subcommittee and the University of Washington's Center for an Informed Public, an EIP participant, stated: "Now fast forward to 2020, we saw a very different story around disinformation in the U.S. election. It was largely domestic coming from inside the United States. … Most of the accounts perpetrating this … they're authentic accounts. They were often blue check and verified accounts. They were pundits on cable television shows that were who they said they were … a lot of the major spreaders were blue check accounts, and it wasn't entirely coordinated, but instead, it was largely sort of cultivated and even organic in places with everyday people creating and spreading disinformation about the election." Scully Ex. 8, at 4 (Audio Tr. 2). She also stated: "So we see this – the disinformation campaign was top down … but this campaign was also bottom up with everyday people sharing their own experiences, their own misperceptions of being disenfranchised or finding what they thought to be evidence of voter fraud." *Id.* at 5 (Audio Tr. 3). These are the voices that the EIP silenced.

**RESPONSE:** *See* Defs.' Resp. to PFOF ¶ 1231. Further disputed to the extent the PFOF

mischaracterizes Ms. Starbird as a member of CISA's Subcommittee. CISA's Cybersecurity

Advisory Committee (CSAC), a federal advisory committee governed by the Federal Advisory Committee Act, had its inaugural meeting on December 10, 2021, during which the Protecting Critical Infrastructure from Misinformation and Disinformation Subcommittee and other subcommittees were announced. Ex. 65 at 3-4 (CISA Cybersecurity Advisory Committee, December 10, 2021, Meeting Summary (2021)). In addition, CISA's CSAC Protecting Critical Infrastructure from Misinformation and Disinformation Subcommittee disbanded in December 2022 after completing its taskings. Ex. 187 at 43. Further disputed to the extent the PFOF characterizes the EIP as "silenc[ing]" voices. The EIP did no such thing. Rather, the EIP provided public factual findings to social media platforms, and had no control over content moderation, censorship, or labeling posts. Ex. 74 at 2; Ex. 122 at 6; Ex. 125 at 3. Social media platforms then examined any reports sent to them by the EIP to determine if the content was violative of their policies and did not act in cases where the platforms determined their existing policies were not violated. Ex. 74 at 2; Ex. 125 at 3; Ex. 122 at 6 (stating that EIP's "researchers made independent decisions about what to pass on to platforms, just as the platforms made their own decisions about what to do with our tips"). Content moderation decisions were independently made by social media platforms, and the EIP did not make recommendations to the platforms about what actions they should take. Ex. 74 at 2.

### D.    The Virality Project Expands EIP's Censorship Work with Federal Officials.

1236.    Soon after the 2020 election cycle, beginning in early 2021, the same four entities that launched the Election Integrity Partnership established a similar program to address COVID-19-vaccine-related "misinformation" on social media, which they called the "Virality Project." *See* Scully Ex. 2 (containing Stanford Internet Observatory, et al., The Virality Project, *Memes, Magnets, and Microchips: Narrative Dynamics Around COVID-19 Vaccines* (v.1.0.1 2022), https://purl.stanford.edu/mx395xj8490).

**RESPONSE:** Undisputed, except to clarify that in addition to the four entities that founded the Election Integrity Partnership, the Virality Project was co-founded by the National Conference

627

on Citizenship's Algorithmic Transparency Institute and the New York University's Tandon School of Engineering and Center for Social Media and Politics. Scully Ex. 2 at 1-2.

1237.   The Virality Project's final report, dated April 26, 2022, lists Renee DiResta as the principal Executive Editor, and lists Renee DiResta, Kate Starbird, and Matt Masterson as contributors. Scully Ex. 2, at 4 (i).[8] Current and former CISA interns Jack Cable, Isabella Garcia-Camargo, Pierce Lowary, and Alex Zaheer are listed as "researchers and analysts" who participated in social-media "monitoring" for the project. *Id.*

**RESPONSE:** Disputed in part. First, Plaintiffs' claim that Jack Cable, Isabella Garcia-Camargo, Pierce Lowary and Alex Zaheer are "current" CISA interns is contradicted by the record. Mr. Cable worked at CISA as an election security technical advisor from June 2020 to January 2021. Scully Dep. 195:17-21. Ms. Garcia-Camargo was a CISA intern in the summer of 2020. *Id.* at 186:3-9. Messrs. Lowary and Zaheer also interned at CISA in during the 2020 election cycle. *Id.* at 185:12-19. Mr. Zaheer is currently employed by CISA as a junior analyst. *Id.* at 43:14-22. The Virality Project issued its report in 2022, well after these individuals interned at CISA. Scully Ex. 2, at unnumbered pages 2-3. In addition, Matt Masterson was not a CISA employee at the time the Virality Project issued its report. Mr. Masterson left CISA in January 2021, Scully Dep. 88:21-25. Finally, the Virality Project's final report lists three executive editors: Renee DiResta, Elena Cryst, and Lily Meyersohn. Scully Ex. 2, at 4(i).

1238.   The same four entities that operated the EIP launched the Virality Project ("VP") in 2021: Stanford Internet Observatory, University of Washington's Center for an Informed Public, Graphika, and the Atlantic Council's Digital Forensics Research lab. *Id.* at 8-9 (1-2). Three new nonprofit entities were added as well. *Id.*

**RESPONSE:** Undisputed.

1239.   According to its report, "[t]he VP team developed technology to identify emerging narratives, to understand what communities they appeared within, and to gauge their scope, speed, and spread. In addition, the analysts assessed social media platforms' published policies to understand how (if at all) platforms might limit or action the spread of misleading vaccine-related

---

[8] Citations of this exhibit are formatted "Scully Ex. 2, at [page of exhibit] ([page of report]).

content." *Id.* at 9 (2). As discussed below, like the EIP, the VP took action to push "platforms [to] limit or action the spread of misleading vaccine-related content." *Id.*

**RESPONSE:** Disputed in part. Plaintiffs mischaracterize the Virality Project report, which did not discuss actions to "push" social media companies to limit or action the spread of misinformation. Rather, the Virality Project report states that "the analysts assessed social media platforms' published policies to understand how (if at all) platforms might limit the spread of misleading vaccine-related content." Scully Ex. 2 at 9(2); *see also* Ex. 74 at 3-4 (stating that "[r]ather than attempting to censor speech, the VP's goal was to share its analysis of social media trends so that social media platforms and public health officials were prepared to respond to widely shared narratives," and that "[d]ecisions to remove or flag tweets were made by Twitter.").

1240.  According to the VP, "[v]accine mis- and disinformation was largely driven by a cast of recurring actors," including "long-standing anti-vaccine influencers and activists, wellness and lifestyle influencers, pseudomedical influencers, conspiracy theory influencers, right-leaning political influencers, and medical freedom influencers." *Id.*

**RESPONSE:** Undisputed, except to note that the Virality Project report also notes that the recurring actors included "[f]oreign actors in China, Russia, and Iran," which "took a full-spectrum propaganda approach, spanning both media and social media, to influence vaccine conversations in the U.S. and around the world." Scully Ex. 2 at 9(2).

1241.  Like the EIP, the VP admits that the speech it targets is heavily speech by "domestic actors," *i.e.*, American citizens: "Foreign … actors' reach appeared to be far less than that of domestic actors." *Id.*

**RESPONSE:** Disputed. Plaintiffs' characterization of the VP or the EIP as "target[ing]" speech is unsupported by the evidence cited or by the record as a whole.

1242.  Like the EIP, the VP indicates that it pushes platforms to adopt more aggressive censorship policies on COVID vaccine-related content: "While online platforms have made progress in creating and enforcing vaccine related policies, gaps still exist." *Id.* at 10 (3).

**RESPONSE:** Disputed. Plaintiffs statement that either the EIP or the VP "pushes platforms to adopt more aggressive censorship policies on COVID vaccine-related content" is unsupported by the evidence cited and by the record as a whole. The portion of the report Plaintiffs cite to addresses "key takeways" from its project, one of which was that "[w]hile online platforms have made progress in creating and enforcing vaccine-related policies, gaps still exist." Scully Ex. 2 at 10(3).

1243.   Like the EIP, the VP notes that it did not only observe and report on misinformation but took action to stop the spread of misinformation: "Detection, however, was only part of the work. The Virality Project also sought to relate its findings to the public and to stakeholders in public health, government, and civil society."  *Id.*

**RESPONSE:** Disputed. Plaintiffs' statement that "[l]ike the EIP, the VP notes" that it "took action to stop the spread of misinformation" is not supported by the quotation in the cited document or by the record as a whole.

1244.   The VP indicates that it should increase the efficiency of having "government partners" share "tips" of misinformation with entities like the VP, stating that "[r]esearch institutions" should "[s]treamline a tip line process to make it easy for civil society and government partners to share observations. Establish a feedback loop to discuss what types of analysis or tips are most relevant."  *Id.*

**RESPONSE:** Disputed because is mischaracterizes the cited evidence. The Virality Project report recommended that "research institutions that study social media" could "help civil society and government partners better understand the dynamics of emerging narratives through their visibility into public data platforms," including by "[s]treamlin[ing] a tip line process to make it easy for civil society and government partners to share observations." Scully Ex. 2 at 10(3). Regardless, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1245.　The VP strives to "[d]evelop and maintain clear channels of communication that enable federal, state, and local agencies to understand and learn from what might be happening in other regions. Federal Information Sharing and Analysis Centers (ISAC) are one path forward." *Id.* at 11 (4).

**RESPONSE:** Disputed because it mischaracterizes the evidence. The quoted passage does

not relate to what the Virality Project "strives" to do, but rather reflected one of its "key

recommendations" for what "federal, state, and local leaders" should do. Scully Ex. 2 at 11(4).

Regardless, this PFOF contains no evidence that Defendants worked or collaborated with the

Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and

contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1246.　The VP recommends that the federal government "[i]mplement a Misinformation and Disinformation Center of Excellence housed within the Cybersecurity and Infrastructure Security Agency." *Id.*

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that Defendants

worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to

that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1247.　The VP states that social-media "[p]latforms owe the public *transparency and accountability* as they face the challenges of deciding what to surface, what to curate, and how to minimize the virality of harmful false claims. Tech platform policies against public health misinformation should be clear and precise, and their enforcement should be consistently applied." *Id.* (emphasis added). The Surgeon General copied this messaging verbatim in his Health Advisory, which he launched at the VP.

**RESPONSE:** The first sentence is undisputed. The second sentence is disputed, as the

Surgeon General's advisory pre-dates the Virality Project report; he therefore could not have

"copied" it. *See* Waldo Ex. 11 at 1 (Surgeon General's Health Advisory, dated 2021); Scully Ex.

2 at 2 (Virality Project report dated 2022). Furthermore, Dr. Murthy spoke at an event hosted by

the Stanford Internet Observatory in July 2021 in connection with the rollout of the Advisory; the

Office of the Surgeon General did not understand it to be a Virality Project event. Lesko Decl. ¶ 15

(Ex. 63). This PFOF contains no evidence that Defendants worked or collaborated with the Virality

Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary

to the evidence as a whole. See Defs.' Arg. § II.B.4.e.ii.

1248.  The VP calls for more aggressive censorship of COVID-19 "misinformation," stating: "To these ends, platforms should: Consistently enforce policies, particularly against recurring actors," and "Continue to improve data sharing relationships with researchers." *Id.* The emphasis on "data sharing relationships" is directly echoed in the White House's and the Surgeon General's demands that platforms share their internal data with researchers.

**RESPONSE:** Disputed to the extent Plaintiffs characterize the Virality Project's

recommendation as calling for "more aggressive censorship," which is unsupported by the cited

evidence or the record as a whole. Rather, the record reflects that the Virality Project recommends

to social media companies that they "consistently enforce" their content moderation policies, to

which all users agree. Scully Ex. 2 at 11(4). Furthermore, the Virality Project "did not censor or

ask social media platforms to remove any social media content regarding coronavirus side effects."

Ex. 74 at 3. "Decisions to remove or flag tweets were made by Twitter." *Id.* at 4. In addition,

Plaintiffs' claim that the White House and Surgeon General's comments "echo" the Virality

Project has the timing backwards, as the Virality Project's 2022 report post-dates the Surgeon

General's Health Advisory and the White House's comments. *See* Waldo Ex. 11 at 1 (Surgeon

General's Health Advisory, dated 2021); Scully Ex. 2 at 2 (Virality Project report dated 2022).

This PFOF contains no evidence that Defendants worked or collaborated with the Virality Project

to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the

evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1249.  The VP boasts that the "Office of the Surgeon General incorporated VP's research and perspectives into its own vaccine misinformation strategy," and specifically cites the Surgeon General's Health Advisory on this point. *Id.* at 11 (4) & 13 (6) n.5 (citing Off. U.S. Surgeon Gen., *Confronting Health Misinformation: The U.S. Surgeon General's Advisory on Building a Healthy Information Environment* (July 15, 2021), https://hhs.gov.sites.default.files.surgeon.general-misinformation-advisory.pdf).

**RESPONSE:** Undisputed, but note that of the 62 sources cited in the Surgeon General's

Advisory, it cites to the Virality Project's research only once. Waldo Ex. 11 at 22. Moreover, this

PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to

achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the

evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1250.  "Over the course of its seven months of work, the Virality Project observed
narratives that questioned the safety, distribution, and effectiveness of the vaccines." *Id.* at 11 (4).

**RESPONSE:** Undisputed.

1251.  Like the EIP, the VP states that "[t]he enormity of the challenge demands a *whole-
of-society response*," *id.* at 12 (5) (emphasis added), and calls for more federal agencies to be
involved through "cross-agency collaboration," *id.* The Surgeon General adopted and echoed the
VP's call for a "whole-of-society" response.

**RESPONSE:** Disputed in part because it mischaracterizes the record. The Virality Project

report did not call for "more government agencies to be involved." In fact, the Virality Project

recommended that, "[m]oving forward, there is a need for a *non-governmental* independent

research entity to spearhead VP-style collaboration around emerging mis- and disinformation."

Scully Ex. 2 at 12(5) (emphasis added). In addition, Plaintiffs' claim that the Surgeon General

adopted the Virality Project's recommendation for a "whole-of-society" approach has the timing

backwards, as the Virality Project's 2022 report post-dates the Surgeon General's Health

Advisory. *See* Waldo Ex. 11 at 1 (Surgeon General's Health Advisory, dated 2021); Scully Ex. 2

at 2 (Virality Project report dated 2022). Regardless, this PFOF contains no evidence that

Defendants worked or collaborated with the Virality Project to achieve "censorship goals."  Any

assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg.

§ II.B.4.e.ii.

1252.   The VP admits that "it was not always clear what *was* misinformation; in the case of the novel coronavirus, it was often simply not yet clear what was true or where scientific consensus lay," *id.* at 14 (7), and that "[g]round truth about COVID-19 was rapidly evolving, and even institutional experts were not always aligned on the facts," *id.* at 15 (8).

**RESPONSE:** Undisputed, except Plaintiffs' cut off the second of the two sentences they

cite, thereby taking the sentence out of context. The remainder of the cited sentence stated that

"however, communicating the most accurate information possible was critically important because

of the potential significant impact on individual and community health." Scully Ex. 2 at 15(8).

1253.   According to the VP, "[v]iral posts that claimed to have the answers to the public's most pressing questions appeared online; fact-checkers struggled to evaluate them, and platforms wrestled with whether to leave them up or take them down. Social media influencers of varying backgrounds debated the merits and efficacy of masking, providing detailed breakdowns of their analyses in public posts." *Id.*

**RESPONSE:** Undisputed.

1254.   The VP attributes opposition to mask mandates and lockdowns to right-wing political ideology: "In the months before vaccines or treatments emerged, governments worldwide turned to preventative measures such as masking requirements and lockdowns. In the US, these measures were quickly framed as affronts to liberty by facets of the US right-wing political spectrum, turning individual responses to the virus into a function of political identity." *Id.*

**RESPONSE:** Undisputed.

1255.   The VP suggests that it flagged for censorship COVID-related posts with enormous engagement on social media, reporting for example that "[b]efore the major social media platforms began to take down [one] video—which was in violation of their COVID-19 misinformation policies—[it] amassed tens of millions of views and was shared into a wide variety of communities." *Id.* at 16 (9).

**RESPONSE:** Disputed because this PFOF mischaracterizes the record. The Virality

Project report does not state that it "flagged for censorship" or took any action regarding the video

described in the report. Rather, the report simply conveys the fact that "major social media

platforms" took down the video. Scully Ex. 2 at 16(9).

1256.   The speech that the VP decries is all quintessential First Amendment–protected speech. *See, e.g., id.* ("Several prominent anti-vaccine activists began to post regularly about COVID-19; their followings began to increase, despite prior platform efforts to reduce the spread

of false and misleading claims from anti-vaccine figures. As the possibility of a vaccine became more of a reality as 2020 progressed, anti-vaccine activists focused on preemptively undermining uptake. Several of the vaccines in development used relatively novel mRNA technology, which afforded an opportunity to present them as untested, unsafe, rushed, or risky, even to audiences who had taken all previously recommended vaccines.").

**RESPONSE:**  Plaintiffs' proposed finding is legal argument rather than a statement of

fact. Defendants address Plaintiffs' legal arguments in its opposition to Plaintiffs' preliminary

injunction motion.

1257.  "It was against this backdrop" of widespread First Amendment–protected speech on social media "that the Virality Project (VP) came together. A collection of research institutions had previously collaborated through the Election Integrity Partnership (EIP) to identify and understand the spread of election mis- and disinformation in the US during the 2020 presidential campaign. In December 2020, these partners jointly observed that the same tactics used to great effect during the 2020 election were already in use to expand the spread of COVID-19 vaccine mis- and disinformation."  *Id.*. The VP used the same tactics as the EIP to engage in "rapid response" to misinformation: "The Project's broad array of institutions enabled information sharing and *rapid response* when false and misleading information percolated across social platforms." *Id.* (emphasis added).

**RESPONSE:**  Undisputed except the attempt for Plaintiffs' characterization of the Virality

Project using the "same tactics as the EIP," which is not supported by the cited evidence or the

record as a whole.

1258.  The VP was overtly biased against "anti-vaccine" viewpoints from the beginning: "The Project's original framing document articulated the threat: **A surge of anti-vaccine disinformation will pose significant challenges to the rollout and public adoption of COVID-19 vaccines in the United States**." *Id.* (bold in original).

**RESPONSE:**  Undisputed except for the characterization of the Virality Project as being

"overtly biased" against "anti-vaccine" viewpoints, which is not supported by the cited evidence

or the record as a whole.

1259.  Just like the EIP, the VP boasts that it is a "multistakeholder collaboration" that includes "government entities" among its key stakeholders: "The Virality Project adopted *a multistakeholder collaboration with civil society organizations, social media platforms, and government entities* to respond to mis and disinformation around the novel vaccines." *Id.* at 17 (10) (emphasis added).

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1260.  "The research institutions that comprised the Election Integrity Partnership—the Stanford Internet Observatory, the University of Washington's Center for an Informed Public, the Atlantic Council's Digital Forensic Research Lab, and Graphika—along with new partners the National Conference on Citizenship (NCoC)'s Algorithmic Transparency Institute and New York University's Center for Social Media and Politics and Tandon School of Engineering—all elected to participate in this new initiative: the Virality Project." *Id.*

**RESPONSE:** Undisputed.

1261.  The VP report complains that "the internet has no editorial gatekeepers." *Id.* at 18 (11).

**RESPONSE:** Undisputed, except for the characterization of the VP's observation as a complaint, which is unsupported by the cited evidence or the record as a whole.

1262.  The VP decries the influence of "social media influencers" such as "Doctors" and "Mommy Bloggers." *Id.* at 19 (12).

**RESPONSE:** Undisputed, except for Plaintiffs' characterization of the VP's observation as "decry[ing]" certain parties' "influence." In addition, Plaintiffs omit material context. The Virality Project report states that scholars have "documented the unique actors and tactical mechanisms by which anti-vaccine activists have expanded their activities on social media specifically," and that "[t]heir mechanisms rely on a set of social media influencers" that a scholar "divided into five distinct groups," including: "The Doctors, The Celebrity, The Organizers, The 'Mommy Bloggers,' and The Opportunists." Scully Ex. 2 at 19 (12).

1263.  According to the VP, "[t]hese influencers have adopted the best practices of communication in the internet age, and their effectiveness in drawing in online users is made evident by the mass followings they have acquired across social media sites: platforms as varied as Pinterest, Instagram, and YouTube…" *Id.*

**RESPONSE:** Undisputed.

1264.   The VP targets misinformation "tactics" that involve speech that the VP does not contend is false or even falsifiable. It states that speakers "use tactics that have persisted over time, many of which have been used in service of spreading mis- and disinformation in contexts beyond the vaccine conversation; for example, the Election Integrity Partnership observed several of these tactics during the lead-up to the 2020 US election." *Id.*

**RESPONSE:** Undisputed that the VP report contains the quoted language. Dispute

Plaintiffs' insinuation that the Virality Project "targets" for censorship "speech that the VP does

not contend is false or even falsifiable" as a characterization unsupported by the cited evidence or

the record as a whole.

1265.   These "tactics" include such things as "**Hard-to-Verify Content:** Using content that is difficult to fact-check or verify, such as personal anecdotes"; "**Alleged Authoritative Sources:** Using or pointing to information from an alleged public health official, doctor, or other authoritative source"; "**Organized Outrage:** Creating events or in-person gatherings, or using or co-opting hashtags"; and "**Sensationalized/Misleading Headlines:** Using exaggerated, attention-grabbing, or emotionally charged headlines or click-bait." *Id.* (bold in original). Notably, none of these "tactics" involves false speech, and all are protected by the First Amendment.

**RESPONSE:** Undisputed, except as follows. First, Plaintiffs do not provide the full

definition of "Hard-to-Verify Content," which includes "deep fakes, content discussing

information from a 'friend-of-a-friend,' or opaque scientific information or analysis (either

original or doctored in a misleading way." Waldo Ex, 2 at 19 (12). The last sentence is legal

argument rather than a statement of fact. Defendants address Plaintiffs' legal arguments in their

opposition to Plaintiffs' preliminary injunction motion.

### E.   The Virality Project Targets Plaintiff Jill Hines and Health-Freedom Groups.

1266.   According to the VP report's taxonomy, Plaintiff Jill Hines, the founder of Health Freedom Louisiana, constitutes a "medical freedom influencer[]" who engages in the "tactic" of "**Organized Outrage**" simply because she "create[ed] events or in-person gatherings" to oppose mask and vaccine mandates in Louisiana. *See id.* at 9, 19 (2, 12) (bold in original). But this "tactic" is First Amendment–protected activity.

**RESPONSE:** Disputed. The Virality Project report does not mention either Ms. Hines or

Health Freedom Louisiana. If Plaintiffs contend that the Virality Project's general description of

individuals who engage in the tactics of "Organized Outrage" encompasses the conduct of Ms. Hines or Health Freedom Louisiana, this is argument and a characterization of the facts lacking evidentiary support. In addition, the second sentence states a conclusion of law rather than a fact. Defendants address Plaintiffs' legal arguments in their opposition to Plaintiffs' motion for preliminary injunction.

1267.   Another "tactic" decried by the VP is "**Group super-spreader:** An individual account sharing posts into multiple online groups."  Id. at 20 (13) (bold in original). This is also quintessential First Amendment expression.

**RESPONSE:** The first sentence is undisputed except Plaintiffs' characterization that the VP report "decrie[s]" the referenced tactic. That characterization is unsupported by the cited evidence or the record as a whole. The second sentence states a conclusion of law rather than a fact. Defendants address Plaintiffs' legal arguments in their opposition to Plaintiffs' motion for preliminary injunction.

1268.   The VP report repeatedly emphasizes the problem of "health freedom" or "medical freedom influencers" like Plaintiff Jill Hines. It identifies "Liberty" as a "trope" of social-media disinformation: "*Liberty*: Individuals have the right to '**health freedom**'; no government or employer should be able to tell people what to put in their bodies."  *Id.* (italics in original) (bold added).

**RESPONSE:** Disputed to the extent Plaintiffs' PFOF omits context, as the description of "health freedom" is made in the context of a discussion of a 2017 article identifying the types of claims made by the "anti-vaccine movement." Waldo Ex. 28 at 20(13).

1269.   The VP also identifies political and religious opinions—including well-established and widespread views—as "themes" and "tropes" of anti-vaccine "misinformation," such as: "*Distrust of industry*: Vaccines are produced by profit-motivated pharmaceutical companies that have repeatedly concealed harm in pursuit of profit"; "*Religiosity*: Vaccines contain materials that are objectionable on religious grounds"; and "*Conspiracy*: … Governments have covered up information proving vaccines are dangerous, [and] Doctors and politicians who advocate for vaccines have been bought off by 'Big Pharma.'"  *Id.*

**RESPONSE:** Undisputed to the extent that Plaintiffs' PFOF quotes from the VP report. Dispute Plaintiffs' characterizations of the quoted themes as "well-established and widespread views" as unsupported by the cited evidence or the record as a whole. Also note that whether those views are "well-established" or "widespread" is immaterial to this case.

1270. Like the EIP, the VP agrees that government pressure pushes social-media platforms to adopt more aggressive censorship policies: "Platforms had started adapting their policies to address vaccine misinformation in early 2019, spurred by public outcry, negative press coverage, and *government inquiries*…" *Id.* at 21 (14) (emphasis added).

**RESPONSE:** Disputed to the extent Plaintiffs' PFOF characterizes the report's reference to "government inquiries" as "government pressure [that] pushes social-media platforms to adopt more aggressive censorship policies." That characterization is unsupported by the cited evidence or the record as a whole. Plaintiffs also selectively quote the Virality Project report. The complete sentence Plaintiffs quote from is as follows: "Platforms had started adapting their policies to address vaccine misinformation in early 2019, spurred by public outcry, negative press coverage, and government inquires *resulting from measles outbreaks across the world*." Waldo Ex. 28 at 21(14) (emphasis added).

1271. The VP boasts that its "analysts had to develop a nuanced and nimble understanding of what content constituted policy violations"—evidently because it was flagging content to platforms for censorship in real time. *Id.* at 21-22 (14-15).

**RESPONSE:** Disputed to the extent Plaintiffs assert that the Virality Project "evidently" "was flagging content to platforms for censorship in real time." That assertion is unsupported by the cited evidence or the record as a whole. Rather, than "attempting to censor speech, the VP's goal was to share its analysis of social media trends so that social media platforms and public health officials were prepared to respond to widely shared narratives." Ex. 74 at 3-4. "Decisions to remove or flag tweets were made by Twitter." *Id.* at 4.

1272.   The VP extensively monitored and tracked Americans' speech about COVID-19 and vaccines on social media: "To surface in-scope content, VP's team of analysts were divided into topical detection teams, referred to as pods…. These pods … enabled analysts to develop and ensure sustained familiarity with how the COVID-19 vaccine conversation was evolving within particular communities on public platforms." *Id.* at 22 (15).

**RESPONSE:** Dispute Plaintiffs' characterization that the "VP extensively monitored and

tracked Americans' speech about COVID-19 and vaccines on social media." That assertion is

unsupported by the cited evidence or the record as a whole.

1273.   This monitoring involved VP analysts reading and searching Americans' social-media accounts in real time: "Analysts in each pod assessed emerging narratives that were within scope … , surfacing content both via qualitative observation of the pages and accounts, and by using lists of common terms associated with vaccine hesitancy and long-standing anti-vaccine rhetoric." *Id.*

**RESPONSE:** Dispute Plaintiffs' characterization that VP analysts were reading and

searching Americans' (public-facing) social-media accounts "in real time." That assertion is

unsupported by the evidence cited or the record as a whole.

1274.   The VP states that "Anti-vaccine activists and influencers, including those discussed in the Center for Countering Digital Hate's 'Disinformation Dozen' Report … surfaced the greatest amount of content …" *Id.* at 23 (16).

**RESPONSE:** Undisputed.

1275.   This covert monitoring of Americans' online speech about vaccine was extensive, sophisticated, and adaptive: "At the beginning of the project, analysts used broad search terms ("vaccine," "jab") to surface relevant content and incidents (specific events or stories), but gradually began to incorporate a combination of machine learning and hand coding to identify additional recurring narratives relevant to the four in-scope categories. This included terms related to medical freedom under "Vaccine Distribution," or severe adverse effects and death under "Vaccine Safety," among others. As narratives and new keywords emerged throughout the analysis period, analysts continually refined their searches." *Id.*

**RESPONSE:** Dispute Plaintiffs' characterization of searches that VP analysts conducted

of public-facing social-media accounts as "covert monitoring of . . . speech." That characterization

is unsupported by the cited evidence or the record as a whole.

1276.   This mass-social-media-surveillance project included federal agencies as key "stakeholders": "The Virality Project established a nonpartisan, multi-stakeholder model consisting of health sector leaders, federal health agencies, state and local public health officials, social media platforms, and civil society organizations. These stakeholders provided tips, feedback, and requests to assess specific incidents and narratives, and each entity type brought specific expertise to bear on understanding COVID-19 vaccine hesitancy." *Id.* at 24 (17).

**RESPONSE:** Dispute Plaintiffs' insinuation that the Virality Project conducted or that federal agencies participated in a "mass-social-media-surveillance project." That characterization is unsupported by the cited evidence or the record as a whole. In addition, the Office of the Surgeon General never provided any tip, flag, ticket, report, or other form of notification or input to the Virality Project concerning posts or accounts on social media. Lesko Decl. ¶ 16 (Ex. 63). Moreover, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1277.   Thus, the VP's "multi-stakeholder model" included government agencies and officials, including "federal health agencies" and "state and local public health officials," working alongside "social media platforms" to combat vaccine-related "misinformation." *Id.*

**RESPONSE:** Disputed to the extent Plaintiffs' PFOF is intended to suggest that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF Defs.' Arg. § II.B.4.e.ii.

1278.   The government "stakeholders" such as "federal health agencies" and "state and local public health officials" were among those who "provided tips" and "requests to assess specific incidents and narratives," *i.e.*, flagging content for social-media censorship. *Id.*

**RESPONSE:** Disputed to the extent Plaintiffs' PFOF is intended to suggest that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." The Office of the Surgeon General never provided any tip, flag, ticket, report, or other form of notification or input to the Virality Project concerning posts or accounts on social media. Lesko

Decl. ¶ 16 (Ex. 63). Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1279.   The VP emphasizes the role of "Federal government agencies" in the VP, including the CDC and the Office of Surgeon General: "**Federal government agencies** served as coordinators for national efforts. The Virality Project built strong ties with several federal government agencies, most notably the Office of the Surgeon General (OSG) and the CDC, to facilitate bidirectional situational awareness around emerging narratives. The CDC's biweekly "COVID-19 State of Vaccine Confidence Insights" reports provided visibility into widespread anti-vaccine and vaccine hesitancy narratives observed by other research efforts." *Id.* (bold in original).

**RESPONSE:** Undisputed that the PFOF accurately quotes portions of the Virality Project report. However, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1280.   Social media platforms served as stakeholders alongside federal and state officials: "**Platforms** were the final stakeholders in the VP effort. Six social media platforms engaged with VP tickets—Facebook (including Instagram), Twitter, Google (including YouTube), TikTok, Medium, and Pinterest—*acknowledging content flagged for review and acting on it in accordance with their policies*. On occasion, platforms also provided information on the reach of *narratives previously flagged by VP*, which provided a feedback loop leveraged to inform the Project's understanding of policies and ongoing research." *Id.* at 25 (18) (bold in original) (italics added).

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1281.   Thus, the VP openly proclaims that it "flagged" "content … for review" to platforms to "act[] on it in accordance with their policies." *Id.* Government officials provided "tips" to the VP about misinformation on social media, and the VP flagged it for platforms for censorship.

**RESPONSE:** Disputed to the extent Plaintiffs' PFOF is intended to suggest that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any

assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1282.   The VP emphasizes the importance of federal officials and social-media platforms in its collaboration on censorship: "As the effort progressed, *input from these partners was crucial in defining the VP's output formats and in surfacing where the impacts of vaccine mis- and disinformation were being felt offline.*" *Id.*

**RESPONSE:** Disputed to the extent Plaintiffs' PFOF is intended to suggest that Defendants worked with the Virality Project "in [a] collaboration on censorship." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1283.   The VP engaged in continuous, ongoing communication with federal officials, platforms, and other stakeholders: "The Virality Project delivered 31 weekly briefings focused on increasing situational awareness and enabling the stakeholders working on countering vaccine mis- and disinformation to develop the most effective possible response." *Id.*

**RESPONSE:** Disputed that the Virality Project was "engaged in continuous, ongoing communication with federal officials." That assertion is unsupported by the cited evidence or the record as a whole. In addition, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1284.   The VP boasts that it "provided strategic insights" to federal officials in combating misinformation: "Briefings directly informed counter-messaging efforts by public health stakeholders … and public health officials (for example, the CDPH), and *provided strategic insights to government entities such as the OSG, CDC, and the Department of Health and Human Services*." *Id.* (emphasis added).

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1285.   Further, the "Stanford Internet Observatory and the Virality Project also hosted Surgeon General Vivek Murthy for a seminar on vaccine mis- and disinformation, including the rollout of the Surgeon General's advisory on health misinformation." *Id.* at 27 (20).

**RESPONSE:** Disputed to the extent the Office of the Surgeon General did not understand the seminar to be a Virality Project event rather than an event hosted by the Stanford Internet Observatory. Lesko Decl. ¶ 15 (Ex. 63). Moreover, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1286.   Like the EIP, the VP used "tickets" to track social-media narratives, where each "ticket" could encompass many postings: "As part of the Virality Project, analysts created tickets documenting URLs of in-scope content. In total, 911 tickets were created, tracking both specific pieces of misinformation and broader narratives. At the end of the monitoring period, analysts had created 845 tickets tracking specific vaccine misinformation incidents (events or pieces of content) and 66 tickets tracking broad narratives." *Id.* at 34 (27).

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1287.   The VP aimed, not just to track, but to "respond to" misinformation: "The Virality Project operated with a team of analysts drawn from across the partner organizations. Workflows were designed to detect, analyze, and *respond to* incidents of COVID-19 vaccine-related disinformation in online ecosystems." *Id.* (emphasis added).

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1288.   "From February to August 2021, VP analysts *systematically monitored activity across social media platforms* to document emerging narratives and trends in public discourse while also tracking the popularity and spread of older content." *Id.* (emphasis added).

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1289.   "The [VP] used the Jira Service Desk software to log mis- and disinformation incidents that were determined to be in scope for specific areas of the public COVID-19-related conversation. For each single incident of anti-vaccine mis- or disinformation surfaced during monitoring, an analyst filed a ticket that provided a brief description of the incident, including engagement numbers at the time of creation and links to relevant social media posts." *Id.* at 35 (28).

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1290.   The VP boasts that it targeted online speech for censorship before it could go viral, thus imposing massive prior restraints on the amplification of targeted content: "Tickets also enabled analysts to quickly tag platform or health sector partners to ensure their situational awareness of high-engagement material that appeared to be going viral, so that *these partners could determine whether something might merit a rapid public or on-platform response* (such as a label)." *Id.* at 37 (30) (emphasis added).

**RESPONSE:** Undisputed that the Virality Project report contains the quoted statement. Plaintiffs' reference to "prior restraints" constitutes a legal conclusion rather than a factual statement. Defendants respond to Plaintiffs' legal arguments in their opposition to Plaintiffs' preliminary injunction motion. In addition, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1291.   The VP reported the content in 174 "tickets" to social-media platforms for censorship: "Managers gave all incident analyses a final review for quality-control purposes, to determine appropriate next steps and to make a final decision about whether tickets should be shared with external stakeholders. *Of the 911 incidents monitored, 174 were referred to platforms for potential action*." *Id.* (emphasis added).

**RESPONSE:** Dispute Plaintiffs' characterization of the purpose of the Virality Project's reporting as "censorship" rather than the application of social-media companies' own content-moderation policies, to which all users agree. In addition, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1292.   Like the EIP, the VP appears to have had direct access to Twitter's and YouTube's internal data about speech spreading on its platform, but not Facebook's: "The engagement data or video view data for links associated with each ticket was collected differently depending on the social media platform in question: Facebook and Instagram: CrowdTangle API; Twitter: Twitter API…" *Id.* at 38 (31).

**RESPONSE:** Disputed. Plaintiff's assertion that the Virality Project had "direct access to Twitter's and YouTube's internal data" is unsupported by the evidence cited. Moreover, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1293.   Like the Surgeon General and the White House, the VP complains that the platforms must make their internal data more available to VP: "Due to limited transparency from social media platforms, engagement is the closest proxy researchers can use to understand what content users are seeing on social media platforms. Metrics such as impression counts are generally unavailable to outside researchers." *Id.*

**RESPONSE:** Undisputed that the Virality Project report contains the quoted statement. Plaintiffs' characterization of that observation as a "complaint" is unsupported by the cited evidence. In addition, the quoted portion of the Virality Project report does not reflect that the Virality Project "complain[ed]" that social media platforms should make their internal data available to the Virality Project, as opposed to researchers in general. In addition, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve

"censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1294.   The VP's monitoring tracked content with about 6.7 million engagements on social media per week, or over 200 million over the seven months of the reported project: "Average weekly engagement with content tracked across all Virality Project tickets was 6.7 million." *Id.* at 39 (32).

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1295.   The vast majority of speech flagged and tracked by the VP was not false or incorrect speech: "The most commonly employed tactics were Hard-to-Verify Content and Alleged Authoritative Source." *Id.* at 41 (34); *see also id.* at 42 (35) fig.2.6 (showing predominance of these two "tactics").

**RESPONSE:** Disputed as unsupported by the cited evidence. The labels given to the referenced tactics, "Hard-to Verify Content and Alleged Authoritative Source," say nothing about the truth or falsity of the speech in those categories, which in any event is immaterial to this case. Moreover, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1296.   According to the VP, "[o]f the engagement captured by tickets, more than a third came from content primarily spread by accounts that demonstrated recurring success making content go viral; we refer to them here as 'recurring actors.'" *Id.* at 41 (34).

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1297.   The VP boasts that it induced "platform action" against such "recurring actors" in 2021: "Recurring actors drove a majority of engagement in the first half of the study period, but fell off in importance after that, most likely due to platform action against certain users beginning in the late spring of 2021." *Id.* at 43 (36).

**RESPONSE:** Disputed. The quoted statement does not state or support the assertion that the Virality Project "induced" the referenced "platform action." Moreover, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1298.  Like Jennifer Psaki at the White House, the VP repeatedly cites the Center for Countering Digital Hate's report on the "Disinformation Dozen." *Id.* at 23 & 32 n.43, 43 & 48 n.7, 111 & 129 n.179.[9]

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1299.  "Four distinct weeks during the monitoring period had incidents observed by Virality Project analysts that generated more than 10 million engagements." *Id.* at 43 (36).

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1300.  One of these "Viral Incidents" tracked by the VP was: "In July, posts went viral expressing outrage at attempts by the Biden administration to engage in vaccine outreach." *Id.* at 45 (38). This incident did not involve any vaccine-related misinformation at all, but core political speech: "the Biden administration used the phrase 'door-to-door' to describe a push for on-the-ground community-led efforts to persuade more Americans to get vaccinated. Prominent Republican politicians miscast this as a forced vaccination campaign by 'Needle Nazis' and a prelude to the government knocking on the door to take away guns." *Id.* at 46 (39).

**RESPONSE:** Undisputed that the Virality Project report contained the quoted statements. Plaintiffs' assertion that the referenced posts "did not involve any vaccine-related misinformation at all" is unsupported by the cited evidence; the posts in question are not before the Court. In

---

[9] Report pages 16 & 25 n.43, 36 & 41 n.7, 104 & 122 n.179.

addition, Plaintiffs' reference to "core political speech" constitutes a legal conclusion rather than a factual statement. Defendants respond to Plaintiffs' legal arguments in their opposition to Plaintiffs' preliminary injunction motion. This PFOF, concerning certain posts that the Virality Project "tracked," contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1301. The VP boasts that censorship enforcement was effective, especially in "deplatforming" key actors: "The decline of content from recurring actors midway through the monitoring period potentially reflects a policy impact, as deplatforming these actors led to an apparent reduction in false or misleading content." *Id.* at 47 (40).

**RESPONSE:** Disputed that the Virality Project's initiative constituted "censorship enforcement." In addition, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1302. The VP tracked and flagged "Claims that [supposedly] misrepresent … vaccine mandates," not just misinformation about the vaccines. *Id.* at 50 (43).

**RESPONSE:** Disputed. The record reflects only that the Virality Project "followed" claims in this category, not that it "flagged" any of them. Waldo Ex. 28 at 50-51 (43-44). In addition, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1303. According to the VP, "content" that "leveraged decontextualized statistics from the US Department of Health and Human Services' Vaccine Adverse Event Reporting System (VAERS) database" is misinformation. *Id.* at 51 (44).

**RESPONSE:** Disputed because the Virality Project did not label this category as "misinformation," but rather as part of a category "of narratives that have remained prevalent in

vaccine hesitancy conversations over a long period of time[.]" Waldo Ex. 28 at 50-51 (43-44). In

addition, this PFOF contains no evidence that Defendants worked or collaborated with the Virality

Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary

to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1304.   According to VP, it was also misinformation when true adverse health events from vaccines were "shared absent context": "Rare incidents documenting verified adverse health events, including blood clotting and heart inflammation, were shared absent context, often in an effort to present them as common and significant risks."  *Id.*

**RESPONSE:** Disputed because the Virality Project did not label this category as

"misinformation," but rather as part of a category "of narratives that have remained prevalent in

vaccine hesitancy conversations over a long period of time[.]" Waldo Ex. 28 at 50-51 (43-44). In

addition, this PFOF contains no evidence that Defendants worked or collaborated with the Virality

Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary

to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1305.   According to the VP, discussing "breakthrough" cases and "natural immunity" was also misinformation: "False and misleading narratives related to efficacy sought to undermine the perceived benefits of vaccines. These narratives included stories of people diagnosed with COVID-19 after being vaccinated—"breakthrough" cases, particularly in the time of the Delta variant—to promote the idea that the vaccines aren't effective. Later, the idea that natural immunity from infection is superior to immunity from vaccination became a political talking point raised repeatedly by right-leaning political influencers, despite inconclusive scientific evidence." *Id.*

**RESPONSE:** Disputed because the Virality Project did not label this category as

"misinformation," but rather as part of a category "of narratives that have remained prevalent in

vaccine hesitancy conversations over a long period of time[.]" Waldo Ex. 28 at 50-51 (43-44). In

addition, this PFOF contains no evidence that Defendants worked or collaborated with the Virality

Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary

to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1306.   According to VP, misinformation also included "discussions of vaccine passports and mandates (including months before any state or federal officials began advocating for them)." *Id.*

**RESPONSE:** Disputed because the Virality Project did not label this category as "misinformation," but rather as part of a category "of narratives that have remained prevalent in vaccine hesitancy conversations over a long period of time[.]" Waldo Ex. 28 at 50-51 (43-44). In addition, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1307.   The VP also counts as misinformation "claims that the government was headed toward mandating an unsafe vaccine." *Id.* The government did, of course, eventually mandate the vaccines for most Americans.

**RESPONSE:** Disputed because the Virality Project did not label this category as "misinformation," but rather as part of a category "of narratives that have remained prevalent in vaccine hesitancy conversations over a long period of time[.]" Waldo Ex. 28 at 50-51 (43-44). In addition, the second sentence lacks evidentiary support. Nor do Plaintiffs cite evidence to support any suggestion that vaccines mandated by the Government were "unsafe." In addition, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1308.   The VP also treated Americans' "long-standing mistrust of pharmaceutical companies' profit motives" as part of anti-vaccine misinformation. *Id.*

**RESPONSE:** Disputed because the Virality Project did not label this category as "misinformation," but rather as part of a category "of narratives that have remained prevalent in vaccine hesitancy conversations over a long period of time[.]" Waldo Ex. 28 at 50-51 (43-44). In addition, this PFOF contains no evidence that Defendants worked or collaborated with the Virality

Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1309.  "Conspiracy Theories" that "assign blame to … government" are also misinformation to be tracked and censored, according to VP. *Id.*

**RESPONSE:** Disputed because the Virality Project did not label this category as "misinformation," but rather as part of a category "of narratives that have remained prevalent in vaccine hesitancy conversations over a long period of time[.]" Waldo Ex. 28 at 50-51 (43-44). In addition, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1310.  According to VP, "personal anecdotes" about "vaccine injuries and severe side effects—ranging from rashes, to blood clots, to death" are also misinformation." *Id.* at 52 (45).

**RESPONSE:** Disputed because the Virality Project did not label this category as "misinformation," but rather as part of a category "of narratives that have remained prevalent in vaccine hesitancy conversations over a long period of time[.]" Waldo Ex. 28 at 50-51 (43-44). In addition, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1311.  "Personal anecdotes often made their way into mainstream media coverage after gaining traction online. Distortions of official government statistics—most often from VAERS, described in more depth later in this section—were used both to reinforce the personal anecdotes and for focused misinformation solely discussing the statistics." *Id.*

**RESPONSE:** Undisputed.

1312.  According to VP, "652trip[ing] both individual stories and official statistics of important context" is misinformation. *Id.*

**RESPONSE:** Disputed because the Virality Project did not label this category as "misinformation," but rather as part of a category "of narratives that have remained prevalent in vaccine hesitancy conversations over a long period of time[.]" Waldo Ex. 28 at 50-51 (43-44). In addition, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1313.   According to VP, "adverse event stories" were objectionable because they were "employed to push back against vaccine mandates." *Id.* at 52-53 (45-46).

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the VP report as labeling "adverse event stories" as "objectionable." The cited evidence does not support that characterization. Rather, as reflected in the cited report, "individual accounts of adverse events" was one of the "case studies" that "illustrate how persistent narratives that predated COVID-19 vaccines were adapted to the pandemic response, and demonstrates how they formed, spread, and were framed both online and offline." Scully Ex. 2 at 52-53 (45-46). In addition, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1314.   Like the White House and Dr. Fauci, the VP treats Alex Berenson as a major malefactor in spreading COVID-19 vaccine "misinformation." *See id.* at 54, 57 (47, 50).

**RESPONSE:** Disputed. Plaintiffs' PFOF is not supported by the cited report. In addition, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1315.   Like the White House and Rob Flaherty, the VP flagged and tracked Fox News host Tucker Carlson as a spreader of vaccine misinformation: "*In May 2021, Tucker Carlson*

*misrepresented VAERS data on his talk show*, decontextualizing it while claiming that 3,362 Americans had died following COVID-19 vaccinations between December 2020 and April 2021, equating to roughly 30 people every day." *Id.* at 57 (50) (emphasis added).

**RESPONSE:** Disputed. The assertion that the White House, Mr. Flaherty, or the Virality Project "flagged and tracked" Mr. Carlson "as a spreader of vaccine misinformation" is unsupported by the cited statement or by the record as a whole. In addition, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See See* Defs.' Arg. § II.B.4.e.ii.

1316.   Health Freedom groups, like Plaintiff Jill Hines's group Health Freedom Louisiana, are particular targets of the VP's tracking and censorship activities.

**RESPONSE:** Disputed. Plaintiffs' PFOF lacks any evidentiary support.

1317.   The VP report includes an entire section on such groups: "Section 3.2.2 – Government Overreach and Medical Freedom Narratives." *Id.* at 59 (52).

**RESPONSE:** Undisputed, except to the extent Plaintiffs' PFOF suggests that the cited section discusses the work of Plaintiff Jill Hines' group Health Freedom Louisiana, which is not supported by the record.

1318.   According to the VP, "[o]ne of the primary long-standing themes of anti-vaccine distribution narratives is that mass vaccine distribution constitutes a government overreach. The movement sees vaccine mandates, including, historically, school vaccine requirements, as an assault on 'health freedom' or 'medical freedom.'" *Id.*

**RESPONSE:** Undisputed.

1319.   According to the VP, "[i]n 2020, following the emergence of COVID-19, these same health freedom groups expanded their vaccine protests to social distancing, masks, and other prevention measures." *Id.* This includes Plaintiff Jill Hines.

**RESPONSE:** Undisputed, except to the extent Plaintiffs' PFOF contends that Plaintiff Jill Hines was encompassed in this discussion, because that contention is not supported by the record.

1320.   The VP describes the role of Facebook groups—also employed by Jill Hines—in organizing health freedom groups to oppose vaccine mandates: "groups emerged on platforms such as Facebook during the pandemic, with names specifically related to COVID-19 or mRNA vaccines, to assist in discoverability; some grew their numbers into the tens of thousands." *Id.*

**RESPONSE:** Undisputed, except to the extent Plaintiffs' PFOF contends that Plaintiff Jill Hines was encompassed in this discussion, because that contention is not supported by the record.

1321.   The VP focused, not just on misinformation about vaccines, but political speech and political organizing against "vaccine passports and vaccine mandates": "During the VP's period of analysis, narratives about government overreach and medical freedom focused on two areas of controversy: vaccine passports and vaccine mandates." *Id.*

**RESPONSE:** Disputed because the Virality Project did not label this category as "misinformation," but rather as "one of the primary long-standing themes of anti-vaccine distribution narratives[.]" Waldo Ex. 28 at 59 (52). Disputed also because the quoted statement does not support the assertion that the Virality Project "focused" on "political speech and political organizing."

1322.   The VP treats as misinformation political speech and political opinions on these topics: "This amplification hinged upon misleading framing that suggested the implementation of any form of vaccine passport would be compulsory. In reality, the plans for many programs were entirely optional. Other framing from domestic right-leaning political actors created a portrait of governments as prying or snooping into citizens' private matters." *Id.* at (60) 53.

**RESPONSE:** Disputed because the Virality Project did not label this category as "misinformation," but rather as "one of the primary long-standing themes of anti-vaccine distribution narratives[.]" Waldo Ex. 28 at 59 (52). Also disputed because Plaintiffs' PFOF takes the quoted statement out of context because the "amplification" being referred to was "Russian state media outlet RT public[ing] these debates through a series of Facebook posts that called passports into question[.]" *Id.* at 59 (52). In addition, the quoted statement also does not support the assertion that the Virality Project treated "political speech and political opinions" as "misinformation."

1323.  The VP views virtually all conservative speech opposing government-imposed COVID mandates as misinformation: "Activists pushed the idea that through a passport system, governments and 'Big Tech' were limiting the public's freedoms—situating the conversation within a larger set of narratives surrounding pandemic public health regulations like mask mandates, lockdowns, and social distancing." *Id.*

**RESPONSE:** Disputed because Plaintiffs' assertion is unsupported by the quoted statement or the record as a whole.

1324.  Like the EIP, the VP specifically flagged Jim Hoft's *The Gateway Pundit* as a purveyor of misinformation and COVID "conspiracy theories: "Headlines sometimes hawked conspiracy theories: one Gateway Pundit headline, "The Great Reset: Big Tech and Big Pharma Join Forces to Build Digital COVID Vaccination Passport," was a nod to groups such as Qanon…. The article alleged collusion between Big Tech and Big Pharma that would threaten 'individual rights.'" *Id.* at 60-61 (53-54) & 68 (75) n.49 (citing Joe Hoft, *The Great Reset: Big Tech and Big Pharma Join Forces to Build Digital COVID Vaccination Passport*, Gateway Pundit (January 17, 2021), https://thegatewaypundit.com/great-reset-big-tech-big-pharma-joining-forces-build-digital-covid-vaccination-passport).

**RESPONSE:** Disputed. The quoted statement does not support the assertion that the Virality Project "specifically flagged" Mr. Hoft as a "purveyor of misinformation."

1325.  Other right-leaning speakers flagged by the VP include One America News Network, Breitbart News, and others. *Id.* at 60 (53).

**RESPONSE:** Disputed. The cited portion of the Virality Project report does not support the assertion that the Virality Project "flagged" messages by these speakers.

1326.  The VP attributes political successes such as state-level bans on vaccine passports to such supposed misinformation. *Id.* at 61 (54).

**RESPONSE:** Disputed. The cited portion of the Virality Project report does not support the assertion that the Virality Project attributed political success to "misinformation."

1327.  The VP attributes opposition to vaccine mandates by employers to such supposed misinformation: "The backlash to COVID-19 vaccine requirements for employment and other activities parallels the conversation about vaccine passports. It, too, relies on and attempts to exacerbate distrust in public health officials and government institutions." *Id.*

**RESPONSE:** Disputed to the extent that, as discussed above, the record does not support the assertion that the Virality Project characterized the referenced online "conversation[s]" as "misinformation."

1328.   According to VP, even truthful information about vaccine effects on health that are still being studied constitutes misinformation: "In early 2021, users on Twitter, Facebook, and Reddit reported unverified reproductive side effects, ranging from abnormal menstrual cycles to miscarriages and infertility. … At the time there was no medical consensus on the vaccine's effect on reproductive health, yet anti-vaccine activists presented the theory as fact and evidence of harm. Research is ongoing…." *Id.* at 66-67 (59-60).

**RESPONSE:** Disputed. The quoted statement does not support the assertion that the Virality Project described "truthful information about vaccine effects on health" as misinformation; nor does it support the assertion that the reports of "unverified reproductive side effects" were, in fact, accurate.

1329.   According to VP, even "videos that appeared to be created satirically" are misinformation when they "were taken seriously." *Id.* at 68 (61).

**RESPONSE:** Disputed to the extent this assertion mischaracterizes the cited report. The Virality Report stated: "The Magnet Challenge illustrates how novel online tactics like participatory online video 'challenges' [even when satirical] can be combined with ongoing anti-vaccine tropes about strange reactions and dangerous ingredients to successfully spread misinformation online." Waldo Ex. 28 at 68 (61).

1330.   Alex Berenson is mentioned 49 times in the Virality Project report. *Id.* at 54, 57, 71, 73, 96-97, 122-23, 188-90, 195, 207-08.[10]

**RESPONSE:** Undisputed.

1331.   "Health freedom" or "medical freedom" groups are discussed dozens of times in the VP report. The word "freedom" occurs 100 times, almost always in direct connection with a discussion of "health freedom" or "medical freedom" groups, influencers, or content. *See id.* at 6,

_____

[10] Report pages 47, 50, 64, 66, 89-90, 115-16, 181-83, 188, 200-01.

9, 20, 23, 59-62, 66, 70, 74, 77, 82, 84-86, 93-96, 105, 117-18, 121-22, 130-31, 137-38, 141, 143, 187, 197-98, 201, 204, 210, 220-22.[11]

**RESPONSE:** Disputed to the extent the word "freedom" does not occur 100 times in the

Virality Report. Rather, it occurs 92 times, and it does not always occur in connection with a

discussion of "health freedom" or "medical freedom" groups.

1332.    The VP defines "Medical freedom influencers" as actors who "are averse to government interference in individuals' personal lives. While they explicitly advocate for "health freedom" or "vaccine choice," these actors often propagate vaccine doubt by contextualizing the choice with misleading claims of vaccines' adverse medical consequences." *Id.* at 82 (75).

**RESPONSE:** Undisputed.

1333.    Fox News host Tucker Carlson, who has wide audiences in Missouri and Louisiana, is cited 42 times in the Virality Project report. *See id.* at 57, 73, 87, 91-92, 98, 115, 119-20, 122-23, 193, 201, 208, 215-16, 218.[12]

**RESPONSE:** Disputed to the extent Plaintiffs cite to no record support for the alleged

breadth of former Fox News host Tucker Carlson's audiences in Missouri or Louisiana. In

addition, the Virality Project does not appear to cite to Tucker Carson 42 times in its report, but

rather 36 times.

1334.    In fact, the VP report cites the entire Fox News channel as a source of vaccine misinformation: "Fox News has played a particularly pivotal role in spreading vaccine misinformation and anti-vaccine beliefs during the COVID-19 pandemic…. [B]etween June 28 and July 11, 2021, Fox News ran 129 segments about the COVID-19 vaccine on its cable broadcast; more than half of those segments included unverified claims that undermined vaccination efforts." *Id.* at 91 (84).

**RESPONSE:** Undisputed.

1335.    According to VP, "Fox News television host Tucker Carlson has been one of the most prominent and sensationalist spreaders of false or misleading information about vaccines throughout the COVID-19 pandemic." *Id.*; *see also id.* at 91 (describing "Right-wing media

---

[11] Report pages iii, 2, 13, 16, 52-55, 59, 63, 67, 70, 75, 77-79, 86-89, 98, 110-11, 114-115, 123-24, 130-31, 134, 136, 180, 190-91, 194, 197, 203, 213-15.

[12] Report pages 50, 66, 80, 84-85, 91, 108, 112-13, 115-16, 186, 194, 201, 208-09, 211.

personality Tucker Carlson" as part of a "cast of recurring characters" that influenced vaccine hesitancy in Spanish- and Chinese-speaking communities).

**RESPONSE:** Undisputed.

1336.   The VP also cites Candace Owens and The Daily Wire as purveyors of vaccine misinformation. *See, e.g., id.* at 86, 92 (79, 85).

**RESPONSE:** Undisputed.

1337.   The VP cites Robert F. Kennedy, Jr., a well-known anti-vaccine activist with wide followings in Missouri and Louisiana, as one of the most influential purveyors of vaccine misinformation. *Id.* at 83 (76). The VP describes Kennedy as "especially pernicious" because he has a large audience: "RFK Jr.'s activism is especially pernicious because, like other long-standing influencers, he has a large and committed following and has become somewhat of a household name in the US." *Id.*

**RESPONSE:** Disputed to the extent Plaintiffs' claim that Robert Kennedy, Jr. has "wide followings in Missouri and Louisiana" lacks record support.

1338.   The VP also cites America's Frontline Doctors and its founder, Dr. Simone Gold, as a source of vaccine misinformation. *Id.* at 87-88 (80-81).

**RESPONSE:** Undisputed.

1339.   The VP notes that "Simone Gold, a licensed emergency room physician, was the second most prominent PMI across Virality Project's tickets. Gold is the leader of America's Frontline Doctors…. Gold has been influential since the summer of 2020, when the White Coat Summit, an event broadcast online in which members of America's Frontline Doctors spoke on the steps of the Supreme Court. The White Coat Summit promoted hydroxychloroquine both as a preventative measure and as a cure for COVID-19." *Id.*

**RESPONSE:** Disputed to the extent that Plaintiffs fail to provide the full sentence quoted from the Virality Project report, which reads: "The White Coat Summit promoted hydroxychloroquine both as a preventative measure and as a cure for COVID-19; one speaker at the event, Dr. Stella Immanuel, had previously been best known for claiming that gynecological issues are caused by having sex with witches and demons." Waldo Ex. 28 at 88 (81). The Virality Project report further notes that Dr. Gold "persistently amplified false information about the 2020

election and voter fraud and was also arrested for participating in the January 6, 2021, storming of the U.S. Capitol." *Id.*

1340.  The VP treats Dr. Joseph Mercola, another anti-vaccine speaker with wide audiences in Missouri and Louisiana, as a purveyor of vaccine misinformation. *Id.* at 87 (80). Again, the VP criticizes Mercola precisely because his speech reaches wide audiences. *Id.*

**RESPONSE:** Disputed to the extent Plaintiffs cite to no record support for the alleged breadth of Dr. Mercola's audiences in Missouri and Louisiana. Also disputed that the Virality Project report criticizes Dr. Mercola "because" of his audience size. That assertion is unsupported by the cited passages or the report as a whole, to which Defendants refer the Court for a complete and accurate statement of its contents.

1341.  The VP asserts that Gold's "false and misleading claims about the COVID-19 vaccine" include core political speech like "encouraging her followers to boycott companies for their vaccine protocols" and "organizing a cross-country tour to fight back against 'censorship, chaos, and the undeniable slide towards communism that lurks beneath the tyrannical lockdowns for governmental 'public health' policy'." *Id.* at 88 (81). To the VP, political "organizing" to oppose vaccine mandates and lockdowns constitutes a "false and misleading claim[]." *Id.*

**RESPONSE:**  Disputed. Dr. Gold's "false and misleading claims about COVID-19" that the Virality Project referred to in its report was not about "organizing" to oppose vaccine mandates, but the statement she made on Twitter in seeking to organize the boycott: "The founder of Shake Shack says his company will require proof of vaccination for both employees AND their customers. I encourage everyone to boycott this business. No corporation or government has a right to demand to see your private health documents." Scully Ex. 2 at 88 (81), 116, n.47 (109, n.47).

1342.  The VP asserts that "the right-leaning media ecosystem differs from the rest of the media environment in ways that make it especially vulnerable to the spread of mis- and disinformation." *Id.* at 91 (84).

**RESPONSE:** Disputed to the extent Plaintiffs mischaracterize the quoted statement. The statement, in full, states: "Yochai Benkler, co-director of the Berkman Klein Center for Internet

and Society, has joined other scholars in analyzing and documenting these dynamics, describing how the right-leaning media ecosystem differs from the rest of the media environment in ways that make it especially vulnerable to the spread of mis- and disinformation." Waldo Ex. 28 at 91 (84).

1343.   The VP states that "[t]he newest iteration of medical freedom, adapted for COVID-19, challenges the legitimacy of government or corporate vaccine mandates and public health interventions specific to COVID-19, including vaccine passport systems and masking requirements." *Id.* at 93 (86).

**RESPONSE:** Undisputed.

1344.   The VP states that "medical freedom" groups spread misinformation "across all 50 states": "Medical freedom influencers (MFIs) active in the anti-COVID-19-vaccine movement were fairly distinct from other categories of influencer in that rather than hinging on a handful of key (and often celebrity-status) individuals, they spread their narratives via a franchise model *across all 50 states*." *Id.* (emphasis added).

**RESPONSE:** Undisputed.

1345.   The VP indicates that it tracked and flagged "medical freedom" groups "at a messaging and organizing level," *i.e.*, the level where Jill Hines was targeted: "As medical freedom activists have fought requirements imposed by states, cities, or private employers, they have learned from each others' successes and failures—at a messaging and an organizing level—and have brought those lessons to their local communities. What one state does, another state will often echo." *Id.* at 94 (87).

**RESPONSE:** Dispute the assertion that the Virality Project "flagged" "medical freedom groups" as unsupported by the quoted statement or the record as a whole. Also dispute the suggestion that the Virality Project "tracked" or "flagged" Plaintiff Jill Hines or her group as unsupported by the quoted statemen or the record as a whole. Defendants refer the Court to the Virality Project report for a full and accurate statement of its contents.

1346.   Like Andrew Mr. Slavitt, the VP treats Alex Berenson as one of the "most significant influencer[s]" who opposes vaccines: "Alex Berenson is perhaps the most significant influencer who defies categorization. A former New York Times reporter and a bestselling novelist with no specific anti-vaccine background …, Berenson … over time evolved into a key player in repeatedly spreading false and misleading information about the COVID-19 pandemic and vaccines. He underplayed the danger of the virus and challenged the efficacy of vaccines and masks, even as evidence supported their value as life-saving public health measures." *Id.* at 96 (89) (providing an image of Berenson's tweets).

**RESPONSE:** Undisputed, except to the extent that Plaintiffs cite no evidence, in the

quoted statements or elsewhere, for the assertion that Mr. Slavitt "treats Alex Berenson as one of

the 'most significant influencer[s]' who opposes vaccines."

1347.   The VP disfavors Berenson because he reaches wide audiences and criticizes the
government: "Berenson's popular posts on Twitter notably claimed to be "digging up" or
"uncovering" information that was hidden from the public about vaccine safety or effectiveness.
In one incident in July 2021, Berenson amplified a conspiracy theory from a statement filed with
a lawsuit from America's Frontline Doctors stating that the government was covering up more
than 45,000 vaccine-related deaths. Berenson's 17-tweet thread, which received over 16,000
interactions on July 21, 2021, claimed that the CDC had "quietly more than DOUBLED" the
number of deaths reported in VAERS, suggesting the CDC had misled the public." *Id.* at 96-97
(89-90).

**RESPONSE:** Undisputed, except Plaintiff's statement that "[t]he VP disfavors Berenson

*because* he reaches wide audiences and criticizes the government" (emphasis added) is

unsupported by the quoted statements or the record as a whole. Rather, the Virality Project

expressed concerns about Mr. Berenson because he was "a key player in repeatedly spreading false

and misleading information about the COVID-19 pandemic and vaccines." Waldo Ex. 28 at 96

(89).

1348.   The VP notes that Berenson had wide audiences nationwide when he was censored:
"Twitter permanently deplatformed Berenson in August 2021 for repeated violations of Twitter's
COVID-19 falsehoods policy. At the time he lost his account, he had more than 200,000
followers." *Id.* at 97 (90).

**RESPONSE:** Undisputed, except to the extent that Plaintiffs characterize Mr. Berenson's

de-platforming as censorship rather than application of Twitter's terms of service, to which all

users must agree.

1349.   The VP states that the government pushed for "accountability" from platforms in
successfully pressuring them to adopt vaccine-related censorship policies in the years leading up
to COVID-19: "During and after the [2018-19 measles] outbreaks, scientists and congressional
leaders sought accountability from the platforms, inquiring about the extent to which vaccine
hesitancy among impacted communities had been exacerbated by misinformation on their
products." *Id.* at 131 (124).

**RESPONSE:** Undisputed that the Virality Project report contains the quoted statement. Dispute Plaintiffs' characterization of "inquir[ies]" by "congressional leaders" about measles vaccine hesitancy in 2018 and 2019 as "pressuring [social media companies] to adopt vaccine-related censorship policies." Plaintiffs' characterization is unsupported by the quoted statement.

1350.  The VP provides a timeline of policy changes becoming more restrictive of vaccine-related misinformation that shows repeated tightening of policies by Facebook, Twitter, and YouTube once President Biden had been elected. *Id.* at 133 (126) fig.5.1.

**RESPONSE:** Undisputed, except to the extent Plaintiffs mean to suggest that President Biden's election was responsible for social media companies' policy changes reflected in the referenced chart, which is unsupported by the record.

1351.  The VP calls for more aggressive censorship policies to target speech that is not false or incorrect and that constitutes core political speech: "While progress has been made since platforms first developed vaccine-related policies in 2019, clear gaps in platform policy exist with respect to moderating vaccine-related content, including posts that employ personalized stories, medical freedom claims, and misleading headlines and statistics." *Id.* at 143 (136).

**RESPONSE:** Undisputed that the quoted statement appears in the Virality Project report. However, dispute Plaintiffs' characterization of social media platforms' terms of service, to which all users must agree, as "censorship policies." Dispute the characterization of the report's observation about "gaps in platform policy" as a "call[ ] for more aggressive . . . policies" as unsupported by the quoted statement. Also dispute the assertion that the Virality Project sought "to target speech that is not false or incorrect and that constitutes core political speech," as unsupported by the quoted statement, any other statement in the report cited in Plaintiffs' PFOFs above, or the record as a whole.

1352.  The VP also calls for more aggressive action to "suppress content" and "deplatform accounts": "In addition, policies about the actions platforms can take to suppress content, promote trusted voices, and deplatform accounts vary widely from platform to platform and are still not enforced consistently, both within and across platforms." *Id.*

**RESPONSE:** Undisputed, except that Plaintiffs' characterization of the report's observations about the variance in and inconsistent enforcement of platforms' terms of service as a "call[ ] for more aggressive action" is unsupported by the quoted statement or the report as a whole.

1353.   Just like the Surgeon General, the VP demands "more transparency" for "external researchers" (like those at the VP, working closely with government) to oversee the platforms' censorship efforts: "It should be noted that understanding the impact of platform policy is limited by what information is publicly available. It is crucial that platforms provide more transparency on each moderation approach and allow external researchers the ability to independently verify the success and impacts of these interventions." *Id.*

**RESPONSE:** Undisputed that the Virality Project report contains the quoted statement. Dispute the assertions that the Surgeon General made "demands" of social media companies, that the Virality Project "work[ed] closely with [the] government," and that platforms' enforcement of their terms of service, to which all users must agree, constitute "censorship efforts," as unsupported by the quoted statement or any other in the Virality Project's report, or the record as a whole.

1354.   Like the Surgeon General, the VP argues that "a whole-of-society effort is needed" to stop the spread of so-called misinformation: "[A] whole-of-society effort is needed in which stakeholders build robust and persistent partnerships to ensure that significant high-harm claims can be addressed as they arise." *Id.* 147 (140).

**RESPONSE:** Undisputed.

1355.   This "whole-of-society" effort includes an active role for the government in censoring disfavored speech: "The Virality Project sought to do just that by bringing together four types of stakeholders: (1) research institutions, (2) public health partners, (3) government partners, and (4) platforms. Our recommendations recognize the collective responsibility that all stakeholders have in mitigating the spread of mis- and disinformation…" *Id.*

**RESPONSE:** Undisputed, except Plaintiffs' characterization of the Virality Project as advocating for the government to "censor[ ] disfavored speech" is unsupported by the record, as is any assertion that Defendants in fact did so. Moreover, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any

assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg.

§ II.B.4.e.ii.

1356.    According to the VP, "The Virality Project offers an early template for structuring interaction between research institutions and nonacademic stakeholders (including government entities, health practitioners, and private companies)." *Id.*

**RESPONSE:** Undisputed, but note that this PFOF contains no evidence that Defendants

worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to

that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1357.    According to the VP, it used "ingenuity" to facilitate "the *intake* of tips from … government partners": "An area that required ingenuity was creating a framework for facilitating the *intake* of tips from civil society and government partners…. However, their tips are often highly valuable, so overcoming this challenge is a priority for future efforts." *Id.* at 148 (141) (emphasis added).

**RESPONSE:** Disputed. Plaintiffs have mischaracterized the cited portion of the Virality

Project report. The "ingenuity" referred to in the report was "creating a framework for facilitating

the *intake* of tips," because "many civil society organizations are understaffed or unfamiliar with

workflows like task management or ticketing software." Waldo Ex. 28 at 148 (141). Moreover,

the Office of the Surgeon General never provided any tip, flag, ticket, report, or other form of

notification or input to the Virality Project concerning posts or accounts on social media. Lesko

Decl. ¶ 16 (Ex. 63). In addition, this PFOF contains no evidence that Defendants worked or

collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is

unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii

1358.    The VP recommends an even more "streamlined" process for "government partners" to provide "tips" of misinformation to be reported for censorship, and it notes that it received tips through "informal exchanges, such as Zoom meetings or calls with our partners": "Streamline tip line processes for civil society and government partners. Set up an efficient channel for intaking external tips…. The Virality Project often had to leverage informal exchanges, such as Zoom meetings or calls with our partners, to receive the tips verbally or encourage additional reporting. In future projects, external reporting channels should be strengthened via an easier

means of reporting and increased access to the reporting channels, especially for partners on the ground (such as health practitioners or government health officials)." *Id.*

**RESPONSE:** Undisputed, except that Plaintiffs' characterization of the Virality Project as recommending "censorship" is unsupported by the cited statement or the record as a whole. In addition, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1359.   The VP repeatedly cites the work of Surgeon General Murthy, noting that "[d]uring a July 15, 2021, panel with the Virality Project, US Surgeon General Vivek Murthy discussed the importance of vaccination by sharing his own story about COVID-19 … alongside data around the effectiveness of the vaccines." *Id.* at 149 (142). "In the context of vaccine misinformation specifically, some examples of engagement best practices can be found in the Virality Project's July 15, 2021, hosted discussion with Surgeon General Vivek Murthy…" *Id.* at 150 (143).

**RESPONSE:** Disputed to the extent that the Office of Surgeon General did not understand the July 2021 panel to be a Virality Project event; rather, it understood that the event was hosted by the Stanford Internet Observatory. Lesko Decl. ¶ 15 (Ex. 63).

1360.   According to VP, "While the federal government (through DHHS, the CDC, and the Surgeon General) has ramped up its engagement and communications, more can be done moving forward. There are several areas where government officials can focus to improve their ongoing response to mis- and disinformation surrounding the COVID-19 vaccines." Id. at 149-50 (142-43).

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1361.   These include "real-time response" to misinformation on the model provided by CIS and the EI-ISAC for election speech: "Federal, state, and local government officials should coordinate real-time response to emerging mis- and disinformation. … For example, as voting-related mis- and disinformation arose in the 2020 presidential election, the Election Infrastructure Information Sharing and Analysis Center (EI-ISAC) served a critical role in sharing information with the Election Integrity Partnership and pushing its rapid response analysis back out to election stakeholders across all states… Moving forward, the government should support the establishment of such an information-sharing mechanism." *Id.* at 150 (143).

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1362.   The VP recommends that the federal government "[i]mplement a Misinformation and Disinformation Center of Excellence (CoE) housed within the federal government," which "would centralize expertise on mis- and disinformation within the federal government at the Cybersecurity & Infrastructure Security Agency (CISA) with its existing mis- and disinformation team," *i.e.*, Brian Scully's group. *Id.*

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1363.   The VP's "Recommendations to Platforms" reflect near-verbatim language used by the Surgeon General's Health Advisory: "Consistently enforce policies against recurrent actors. … While many platforms have improved transparency around content moderation, there is still inconsistent enforcement of policies, notably in the case of recurring actors. More consistency and transparency is needed around enforcement practices, particularly when prominent or verified accounts are involved. While past policy environments have been slower to enforce policies against prominent accounts, these are the accounts with the greatest potential for impact. If anything, they may merit closer scrutiny." *Id.* at 152 (145).

**RESPONSE:** Undisputed, except Plaintiffs' statement that the Virality Project's "Recommendations to Platforms" reflects "near-verbatim" language used by the Surgeon General's Health Advisory is unsupported by the record. In any event, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1364.   Likewise, the VP recommends that platforms "[c]ontinue to prioritize and improve data sharing. The Virality Project's research would not have been possible without access to public platform data. For privacy reasons, some data understandably may be limited, but in general, establishing standardized guidelines about how platforms can share data with research institutions is needed." *Id.* at 153 (146).

**RESPONSE:** Undisputed.

1365.   "Notably, engagement numbers are the closest proxy that researchers have to understand what content users see on social media platforms. However, engagement is not the same thing as impressions, or user views—how many times a piece of content is seen by users. Ideally, access to user impression data would be available, allowing researchers to directly measure when and how content is surfaced to users by social media platforms. Unfortunately, social media platforms often do not make impression data available to researchers; as a result of this chronic gap, assessing impact and reach, or the dynamics of platform curation, remains a significant challenge." *Id.*

**RESPONSE:** Undisputed that this PFOF accurately quotes a portion of the Virality Project report.

## X.   Federal Censorship Inflicts Grave, Imminent, and Ongoing Injuries on Plaintiffs.

1366.   The foregoing conduct has inflicted and continues to inflict ongoing and imminent injuries on both the private Plaintiffs and the States of Louisiana and Missouri.

**RESPONSE:** Disputed. The assertion that Defendants have engaged in conduct that inflicted or continues to inflict injuries on Plaintiffs is unsupported by any evidence cited by Plaintiffs and is contrary to the record as a whole. In particular, as detailed in the responses below, Plaintiffs rely primarily on stale assertions contained in declarations that are nearly a year old, and thus provide no evidence for the assertion that any of their alleged injuries are "ongoing" or "imminent."

### A.   Defendants Gravely Injure the Individual Plaintiffs.

1367.   The individual Plaintiffs provide undisputed evidence of how they have suffered from federally-induced censorship. Docs. 10-3 (Declaration of Dr. Jayanta Bhattacharya), 10-4 (Declaration of Dr. Martin Kulldorff), 10-5 (Declaration of Jim Hoft), 10-7 (Declaration of Dr. Aaron Kheriaty), 10-12 (Declaration of Jill Hines). The Government does not dispute this evidence.

**RESPONSE:** Disputed. None of the cited evidence—much of which is, in fact, disputed by Defendants, as the following paragraphs make clear—supports the characterization that any of the individual Plaintiffs "have suffered from federally-induced censorship."[13]

1368.  Dr. Bhattacharya attests that, "Because of my views on COVID-19 restrictions, I have been specifically targeted for censorship by federal government officials."  Doc. 10-3, ¶ 5. He notes that "[t]he Great Barrington Declaration received an immediate backlash from senior government officials who were the architects of the lockdown policies, such as Dr. Anthony Fauci…"  *Id.* ¶ 13. "Because it contradicted the government's preferred response to COVID-19, the Great Barrington Declaration was immediately targeted for suppression by federal officials." *Id.* ¶ 14. "Instead, what followed was a relentless *covert* campaign of social-media censorship of our dissenting view from the government's preferred message."  *Id.* ¶ 15.

**RESPONSE:** Undisputed that Dr. Bhattacharya included the quoted statements in the cited declaration. Disputed as to the substance of the quoted statements, all of which are unsupported by the record, and so far as they attribute the alleged acts of "censorship" to "federal government officials," lack apparent basis in Dr. Bhattacharya's personal knowledge. Also disputed to the extent that portions of the PFOF appear to be contradicted by other language in the same declaration, undermining the credibility of each of the contradictory theories. *See* Bhattacharya Dec. ¶ 31 (Dkt. 10-3) (Dr. Bhattacharya endorsing a statement from Dr. Kulldorff, without

---

[13] For reasons explained above in Defendants' introductory objection, *see supra* at 1, Defendants object to the consideration of any evidence other than the evidence that Plaintiffs have expressly identified in support of their preliminary-injunction motion. *See* Plaintiffs' Memorandum in Support of Motion for a Preliminary Injunction, Dkt. 15; Plaintiffs' Supplemental Brief in Support of Motion for a Preliminary Injunction, Dkt. 214; Plaintiffs' Proposed Findings of Fact, Dkt. 214-1. As relevant to Plaintiffs' PFOF ¶¶ 1367-1426, Defendants thus respond only with respect to the evidence cited therein, which primarily consists of a series of witness declarations that were originally submitted as attachments to Dkt. 10. Some of those witnesses, however, recently submitted new, but substantially overlapping declarations as attachments to Plaintiffs' motion for leave to amend to add class-action allegations, Dkt No. 227. Those new and updated declarations are not cited or referenced in any of Plaintiffs' preliminary-injunction filings, including their Proposed Findings of Fact. Accordingly, Defendants object to the consideration of that evidence in connection with Plaintiffs' motion for a preliminary injunction, and these responses do not otherwise address those new declarations. Regardless, none of those new declarations contains evidence of threats or pressure by Defendants to censor speech, or communications that social-media platforms regarded (or acted on) as such.

evidence, that "they sort of kind of randomly select who they censor, what they censor, because they want people to be uncertain about what they can and cannot say").

1369.  As a result of this "covert campaign," Dr. Bhattacharya experiences ongoing injuries, including the de-boosting of search results in Google, *id.* ¶16; the removal of links to the Great Barrington Declaration in Reddit discussions, *id.*; the ongoing removal of a YouTube video discussing the Great Barrington Declaration and related issues with Governor DeSantis, *id.* ¶¶ 17-18; the removal of personal Tweets, *id.* ¶¶ 25-26; the removal of LinkedIn posts, *id.* ¶¶ 28-29; and account termination by LinkedIn, *id.* ¶ 30.

**RESPONSE:** Disputed that Dr. Bhattacharya "experiences ongoing injuries" attributable to any conduct by Defendants, an assertion that is unsupported by the record and about which Dr. Bhattacharya has no evident personal knowledge. The remainder of this PFOF improperly purports to summarize eight paragraphs of Dr. Bhattacharya's Declaration, rather than identifying (let alone substantiating) any particular fact that appears therein. None of the cited language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Dr. Bhattacharya has experienced or imminently will experience censorship as a result of any conduct by Defendants. In addition, Dr. Bhattacharya's description of an "account termination by LinkedIn" appears to be in reference to actions taken by LinkedIn with respect to the LinkedIn account of another individual, Dr. Martin Kulldorff—not with respect to any LinkedIn account maintained by Dr. Bhattacharya. *See* Bhattacharya Dec. ¶ 31 (Dkt. 10-3). Finally, because Dr. Bhattacharya's declaration, executed on June 4, 2022, is nearly a year old, it furnishes no evidence that he continues to suffer any "ongoing" or threatened injury from alleged censorship.

1370.  Dr. Bhattacharya observes that he lacks access to his colleagues' speech and viewpoints as well, because "social-media censorship has not focused solely on the co-authors of the Great Barrington Declaration, but has swept in many other scientists as well: Twitter, LinkedIn, YouTube, Facebook, they have permanently suspended many accounts—including scientists." *Id.* ¶ 31.

**RESPONSE:** Disputed. As the cited paragraph of the declaration makes clear, a portion of the quoted statement that is attributed to Dr. Bhattacharya in Plaintiffs' PFOF in fact is a double-

hearsay statement from another individual, Dr. Martin Kulldorff. That statement is unsupported

by the record. Regardless, none of the quoted language contains evidence of threats or pressure by

Defendants to force social media companies to censor speech, or that Dr. Bhattacharya has

experienced or imminently will experience censorship as a result of any conduct by Defendants.

To the contrary, Plaintiffs' PFOF itself makes clear that it is private social-media companies who

have "permanently suspended many accounts," not Defendants. Finally, because Dr.

Bhattacharya's declaration, executed on June 4, 2022, is nearly a year old, it furnishes no evidence

that he continues to suffer any present or threatened injury from alleged censorship.

1371.   As Dr. Bhattacharya observers, "[t]hese censorship policies have driven scientists
and others to self-censorship, as scientists … restrict what they say on social-media platforms to
avoid suspension and other penalties." *Id. ¶ 31.*

**RESPONSE:** Disputed. As the cited paragraph of the declaration makes clear, the quoted

statement that is attributed to Dr. Bhattacharya in Plaintiffs' PFOF in fact is a double-hearsay

statement from another individual, Dr. Martin Kulldorff, lacking any evident basis in Dr.

Bhattacharya's personal knowledge. That statement is unsupported by any other evidence adduced

by Plaintiffs or the record as a whole. Regardless, none of the quoted language contains evidence

of threats or pressure by Defendants to force social media companies to censor speech, or that Dr.

Bhattacharya has experienced or imminently will experience censorship as a result of any conduct

by Defendants.

1372.   Dr. Bhattacharya attests based on personal experience: "Having observed and lived
through the government-driven censorship of the Great Barrington Declaration and its co-authors,
it is clear to me that these attacks were politically driven by government actors. … One of the
motivations for that was a motivation to create … an illusion of consensus within the public that
there was no scientific dissent against lockdowns. [T]he Great Barrington Declaration … posed a
political problem for them because they wanted to tell the public that there was no dissent. And
so, they had to destroy us. They had to do a devastating takedown." *Id. ¶ 32.*

**RESPONSE:** Disputed. Despite the assertion of "personal experience," as the cited paragraph of the declaration makes clear, in fact, a portion of the quoted statement that is attributed to Dr. Bhattacharya in Plaintiffs' PFOF is a double-hearsay statement from another individual, Dr. Martin Kulldorff. In addition, the assertions that the "censorship of the Great Barrington Declaration and its co-authors" was "government-driven," and "politically driven by government actors" lack any evident basis in Dr. Bhattacharya's personal knowledge. These statements are all unsupported by any other evidence adduced by Plaintiffs or the record as a whole. Regardless, none of the quoted language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Dr. Bhattacharya has experienced or imminently will experience censorship as a result of any conduct by Defendants.

1373.   Dr. Kulldorff likewise attests that there is "an organized campaign against the Great Barrington Declaration," Doc. 10-4, ¶ 14. He notes that the GBD "was censored on social media in an apparent attempt to prevent it from … 'getting a lot of attention,'" *id.* ¶ 15; including Google deboosting search results, *id.*, and Facebook removing content related to it, *id. ¶ 16.*

**RESPONSE:** Undisputed that Dr. Kulldorff made the quoted statements in the cited declaration. Disputed to the extent that what Dr. Kulldorff characterizes as an "organized campaign" of "censorship" in fact represents nothing more than private companies acting to enforce the terms of service of their own private social-media platforms, to which their users agreed as a condition of using those platforms. None of the quoted language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Dr. Kulldorff has experienced or imminently will experience censorship as a result of any conduct by Defendants. To the contrary, Plaintiffs' PFOF itself makes clear that it is Google and Facebook who have "deboost[ed] search results" or "remov[ed] content," not Defendants. Finally, because Dr. Kulldorff's declaration, executed on June 8, 2022, is nearly a year old, it furnishes no evidence that he continues to suffer any present or threatened injury from alleged censorship.

1374.   Dr. Kulldorff also identifies an ongoing campaign of censorship against his personal social-media accounts, including censored personal Tweets on Twitter, *id.* ¶¶ *17-18;* censored posts criticizing mask mandates*, id.* ¶ *19;* ongoing self-censorship to avoid further censorship penalties*, id.* ¶¶ 20, 27; removal of YouTube content, *id.* ¶ 21; removal of LinkedIn posts, *id.* ¶¶ 22-25; and the ongoing permanent suspension of his LinkedIn account, *id.* ¶ 26.

**RESPONSE:** Disputed. This PFOF improperly purports to summarize eleven paragraphs

of Dr. Kulldorff's Declaration, rather than identifying (let alone substantiating) any particular fact

that appears therein. In any event, all of the examples offered by Dr. Kulldorff in the cited portions

of his declaration happened long ago (some as early as March of 2021, and the most recent of

which was January of 2022), and thus offer no support for the characterization of an "ongoing

campaign of censorship." Indeed, the declaration itself does not even attempt to describe any

"ongoing" activities. For example, although Plaintiffs' PFOF describes "the ongoing permanent

suspension of his LinkedIn account," in fact, Dr. Kulldorff's Declaration acknowledges that

"LinkedIn restored [his] account." Kulldorff Decl. ¶ 26 (Dkt. 10-4). As of the date of this filing,

Dr. Kulldorff has a LinkedIn account that is visible to the general public:

https://www.linkedin.com/in/martin-kulldorff-8a31a775. *See* Declaration of Jasmine Robinson

¶ 2 (Ex. 139) ("Robinson Decl."). Regardless, none of the cited language contains evidence of

threats or pressure by Defendants to force social media companies to censor speech, or that Dr.

Kulldorff has experienced or imminently will experience censorship as a result of any conduct by

Defendants. To the contrary, Plaintiffs' PFOF itself makes clear that it is private companies who

have taken the actions that Plaintiffs complain of, not Defendants. Finally, because Dr. Kurlldorff's

declaration, executed on June 8, 2022, is nearly a year old, it furnishes no evidence that he

continues to suffer any present or threatened or "ongoing" injury from alleged censorship.

1375.   Dr. Kulldorff has experienced direct censorship of his social-media speech in addition to the Great Barrington Declaration. For example, his Tweets questioning the efficacy of masking and criticizing government mask mandates have been censored and caused him to be suspended from Twitter. *Id.* ¶¶ 18-19.

**RESPONSE:** Disputed that Dr. Kulldorff "has experienced direct censorship" or that his Tweets "have been censored." In fact, Dr. Kulldorff describes (and the record reflects) nothing more than private companies acting to enforce the terms of service of their own private social-media platforms, to which their users agreed as a condition of using those platforms. Regardless, none of the cited language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Dr. Kulldorff has experienced or imminently will experience censorship as a result of any conduct by Defendants. To the contrary, the declaration makes clear that these decisions were made by Twitter, not by any of the Defendants.

1376.  Dr. Kulldorff has also engaged in self-censorship to avoid being suspended or removed from social media: "Twitter is an important venue for communicating accurate public health information to the public. Because of the censoring, and the suspension of other scientists, I have had to self-censor myself on the platform." *Id.* ¶ 20.

**RESPONSE:** Undisputed that "Twitter is an important venue for communicating accurate public health information to the public" and that Dr. Kulldorff asserts he has chosen to engage in what he describes as "self-censorship." Regardless, none of the cited language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Dr. Kulldorff has experienced or imminently will experience censorship as a result of any conduct by Defendants. To the contrary, the declaration makes clear that, to the extent that Dr. Kulldorff has ever been "censored," he has been "censored by Twitter," rather than Defendants. Kulldorff Decl. ¶ 20 (Dkt. 10-4).

1377.  Dr. Bhattacharya and Dr. Kulldorff's roundtable discussion with Governor Ron DeSantis—which featured all three co-authors of the Great Barrington Declaration—was removed from YouTube. The roundtable discussion addressed the Great Barrington Declaration and its premises in detail. As Dr. Kulldorff recounts, "On March 18, 2021, I participated in a two-hour roundtable discussion with Governor Ron DeSantis in Florida, along with Dr. Sunetra Gupta at Oxford, Dr. Jay Bhattacharya at Stanford and Dr. Scott Atlas at Stanford. In this discussion, we made remarks critical of COVID-19 restrictions, including mask mandates on children. I stated that 'children should not wear face masks, no. They don't need it for their own protection, and

674

- A1633 -

they don't need it for protecting other people either.' … Dr. Gupta stated that "to force [children] to wear masks and distance socially, all of that to me is in direct violation of our social contract.' In the same roundtable, we also argued against vaccine passports. 'Let's try to argue against that from the very beginning before it sort of takes off.' Unfortunately, the video of the roundtable was removed by YouTube, which is owned by Google." *Id.* ¶ 21.

**RESPONSE:** Disputed insofar as this PFOF consists of Dr. Kulldorff's recollections and self-serving characterizations of his remarks at an event that was apparently recorded on video, but for which no transcript or video appears in the record. Regardless, none of the cited language contains evidence of threats or pressure by Defendants to censor speech or to force social media companies to censor speech, or that Dr. Bhattacharya or Dr. Kulldorff have experienced or imminently will experience censorship as a result of any conduct by Defendants. To the contrary, the declaration makes clear that the video in question was not "censored" by the federal government, but in fact was "removed by YouTube," which is "owned by Google," not Defendants. Kulldorff Decl. ¶ 21 (Dkt. 10-4).

1378.   Dr. Kulldorff also experiences ongoing censorship on "LinkedIn, which is a popular communications platform among scientists and other professionals." *Id.* ¶ 22-26. LinkedIn has blocked and removed his posts opposing vaccine mandates and promoting the benefits of natural immunity. *Id.* These included posts in which he and Dr. Bhattacharya "criticized the official Covid-19 response as formulated by Dr. Anthony Fauci." *Id.* ¶ 25.

**RESPONSE:** Disputed, except the statements that "LinkedIn is a popular communications platform" that has "blocked and removed" some of Dr. Kulldorff's posts, including some in which he criticized COVID-19 policies. This PFOF improperly purports to summarize five paragraphs of Dr. Kulldorff's Declaration, rather than identifying (let alone substantiating) any particular fact that appears therein. In any event, all of the examples offered by Dr. Kulldorff in the cited portions of his declaration happened long ago (some as early as 2021, and the most recent of which was January of 2022), and thus offer no support for the characterization of there being any "ongoing censorship." Indeed, because Dr. Kulldorff's declaration, executed on June 8, 2022, is nearly a

year old, it furnishes no evidence that he continues to suffer any present or threatened or "ongoing" injury from alleged censorship. Regardless, none of the cited language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Dr. Kulldorff has experienced or imminently will experience censorship as a result of any conduct by Defendants. To the contrary, the declaration makes clear that all of the actions that Dr. Kulldorff describes as "censorship" were taken by LinkedIn, a private company, rather than Defendants. *See* Kulldorff Decl. ¶ 22 (Dkt. 10-4) ("LinkedIn censored a post . . . ."); *id.* ¶ 23 ("LinkedIn also censored me when . . . ."); *id.* ¶ 24 ("LinkedIn censored a post . . . ."); *id.* ¶ 25 (". . . it was removed by LinkedIn, which is owned by Microsoft.").

1379.   Dr. Kulldorff states that he and other scientists engage in self-censorship to avoid being terminated from social-media platforms: "Twitter and LinkedIn are important venues for communicating accurate public health information to other scientists and to the public. Because of the censoring, and the suspension of other scientists, I have had to self-censor myself on both platforms. Sometimes by not posting important public health information." *Id.* ¶ 27.

**RESPONSE:**  Undisputed that "Twitter and LinkedIn are important venues for communicating accurate public health information to other scientists and to the public" and that Dr. Kulldorff asserts he has chosen to engage in what he describes as "self-censorship." Regardless, none of the cited language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Dr. Kulldorff has experienced or imminently will experience censorship as a result of any conduct by Defendants. Indeed, because Dr. Kulldorff's declaration, executed on June 8, 2022, is nearly a year old, it furnishes no evidence that he continues to suffer any present or threatened injury from alleged censorship, or what he describes as "self-censorship."

1380.   Dr. Kulldorff notes that social-media censorship directly affects him as a *reader* of other scientists' speech on social media, on an ongoing basis, by reducing his access to the thoughts and views of scientists who dissent from the government-mandated orthodoxy: "Social-media censorship has not focused solely on the co-authors of the Great Barrington Declaration but has

swept in many other scientists as well. These censorship policies have driven scientists and others to self-censor, as scientists like me restrict what we say on social-media platforms to avoid suspension and other penalties. In fact, the most devastating consequence of censoring is not the actual posts or accounts that are censored or suspended, but the reluctance of scientists to openly express and debate scientific questions using their varied scientific expertise. Without scientific debate, science cannot survive." *Id.* ¶ 28.

**RESPONSE:** Disputed. There is no portion of the cited declaration in which "Dr. Kulldorff notes that social-media censorship directly affects him as a *reader* of other scientists' speech on social media, on an ongoing basis, by reducing his access to the thoughts and views of scientists who dissent from the government-mandated orthodoxy." As for the quoted statements, they are unsupported by the record and lack any evident basis in Dr. Kulldorff's personal knowledge. Regardless, none of the quoted language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Dr. Kulldorff has experienced or imminently will experience censorship (whether as a reader or otherwise) because of any conduct by Defendants. Indeed, because Dr. Kulldorff's declaration, executed on June 8, 2022, is nearly a year old, it furnishes no evidence that he continues to suffer any present or threatened injury from alleged censorship "on an ongoing basis."

1381. Dr. Kheriaty, also, describes ongoing injuries from social-media censorship of views dissenting from the government-preferred narratives about COVID-19. He experiences an ongoing pattern of censorship and removals lasting over years: "I have always shared peer-reviewed research findings as well as my own opinions and perspectives on Twitter and LinkedIn. It was not until I began posting information about covid and our covid response policies, however, that I encountered censorship on the Twitter platform. This began in 2020 when I published an article on the adverse mental health consequences of lockdowns. The problem became more pronounced in 2021 when I shared my Wall Street Journal article and other information on ethical issues related to vaccine mandates." Doc. 10-7, ¶ 11.

**RESPONSE:** Disputed that Dr. Kheriaty "describes ongoing injuries from social-media censorship." There is no portion of the cited declaration in which Dr. Kheriaty "describes ongoing injuries from social-media censorship" or states that he "experiences an ongoing pattern of censorship." To the contrary, all of the examples offered by Dr. Kheriaty in the cited portions of

his declaration happened long ago (some as early as 2020), and thus offer no support for the

characterization of there being any "ongoing pattern of censorship." Indeed, because Dr.

Kheriaty's declaration was executed on an unknown date no later than August of 2022—the

signature says "3 June 2020," but the declaration purports to describe events occurring after 2020,

and was filed on the docket in August of 2022—it furnishes no evidence that he continues to suffer

any present or threatened injury from alleged censorship. Moreover, Dr. Kheriaty speculates (also

without evidence) that Twitter "may have been walking back some of its censorship tendencies"

around the time "after it was announced that Elon Musk would buy twitter." Kheriaty Decl. ¶ 13

(Dkt. 10-7). Regardless, none of the quoted language contains evidence of threats or pressure by

Defendants to force social media companies to censor speech, or that Dr. Kheriaty has experienced

or imminently will experience censorship as a result of any conduct by Defendants.

1382.  As Dr. Kheriaty notes, "[t]he Twitter censorship took several forms."  *Id.* He
describes suffering artificial limitations on the number of followers on his social-media accounts,
*id.* ¶¶ 12-13; "shadow banning" of social-media posts that "challenge[] the federal government's
preferred covid policies," *id.* ¶¶ 14-15; self-censorship to avoid further adverse consequences or
permanent bans, *id.* ¶ 16; and removal of content from YouTube, *id.* ¶ 17. Dr. Kheriaty specifically
notes that the problem of "shadow banning" his social-media posts is ongoing and increasing, as it
"intensified in 2022."  *Id.* ¶ 15. Further, he notes that "[t]he pattern of content censored on these
social media platforms mirrors closely the CDC and Biden administration policies."  *Id.* ¶ 18.

**RESPONSE:** Disputed. This PFOF improperly purports to summarize seven paragraphs

of Dr. Kheriaty's Declaration, rather than identifying (let alone substantiating) any particular fact

that appears therein. In any event, all of the examples offered by Dr. Kheriaty in the cited portions

of his declaration happened long ago (some as early as 2020), and thus offer no support for the

characterization of there being any "censorship" that is "ongoing and increasing."  Indeed, because

Dr. Kheriaty's declaration was executed on an unknown date no later than August of 2022—the

signature says "3 June 2020," but the declaration purports to describe events occurring after 2020,

and was filed on the docket in August of 2022—it furnishes no evidence that he continues to suffer

any present or threatened injury from alleged censorship, let alone any that is "ongoing and increasing." To the contrary, Dr. Kheriaty speculates (also without evidence) that Twitter "may have been walking back some of its censorship tendencies" around the time "after it was announced that Elon Musk would buy twitter." Kheriaty Decl. ¶ 13 (Dkt. 10-7). Regardless, none of the quoted language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Dr. Kheriaty has experienced or imminently will experience censorship as a result of any conduct by Defendants.

1383.   Dr. Kheriaty describes the ongoing experience of shadow-banning: "I encountered evidence of this shadow-banning in 2021 before I was let go from the University after I started posting on covid topics, and the problem intensified in 2022 following my dismissal, as I continued to post frequently on the ethics of vaccine mandates for competent adults." *Id.* ¶ 15.

**RESPONSE:** Disputed. Dr. Kheriaty does not purport to describe any "ongoing experience of shadow-banning" as he describes no "evidence" of shadow-banning, whether based on his personal knowledge or otherwise. And because Dr. Kheriaty's declaration was executed on an unknown date no later than August of 2022—the signature says "3 June 2020," but the declaration purports to describe events occurring after 2020, and was filed on the docket in August of 2022—it furnishes no evidence that he continues to suffer any present or threatened injury from alleged censorship, or any "ongoing experience" with alleged shadow-banning. Moreover, Dr. Kheriaty speculates in his Declaration (also without evidence) that Twitter "may have been walking back some of its censorship tendencies" around the time "after it was announced that Elon Musk would buy twitter." Kheriaty Decl. ¶ 13 (Dkt. 10-7). Regardless, none of the quoted language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Dr. Kheriaty has experienced or imminently will experience censorship because of any conduct by Defendants.

1384.   Dr. Kheriaty also experiences ongoing injury as a *reader* of other speakers' content on social media, as government policies cause censorship and self-censorship of their content as well: "I have several of my friends and colleagues—including Dr. Peter McCollough and Dr. Robert Malone—who were temporarily (McCollough) or permanently (Malone) banned from Twitter for posing peer-reviewed scientific findings regarding the covid vaccines." *Id.* ¶ 16.

**RESPONSE:** Disputed. Dr. Kheriaty does not describe any "ongoing injury as a *reader*" in the cited passage or elsewhere in his declaration. The only example offered of any "ongoing injury" relates to the fact that, apparently, someone other than Dr. Kheriaty (Dr. Robert Malone) was banned from Twitter "permanently." But in fact, as of the date of this filing, Dr. Malone appears to have an active Twitter account through which he has tweeted more than 12,000 times to his approximately 1 million followers, which is publicly available at the following link: https://twitter.com/RWMaloneMD. *See* Robinson Decl. ¶ 11. Indeed, because Dr. Kheriaty's declaration was executed on an unknown date no later than August of 2022—the signature says "3 June 2020," but the declaration purports to describe events occurring after 2020, and was filed on the docket in August of 2022—it furnishes no evidence that he continues to suffer any present or threatened or "ongoing" injury from alleged censorship. Regardless, none of the quoted language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Dr. Kheriaty has experienced or imminently will experience censorship (whether as a reader or otherwise) as a result of any conduct by Defendants.

1385.   Dr. Kheriaty also engages in self-censorship to avoid more severe penalties from the platforms: "Even though the ethics of vaccine mandates is among my areas of expertise, and an area that has impacted me personally and professionally, I am extremely careful when posting any information on Twitter related to the vaccines, to avoid getting banned. This self-censorship has limited what I can say publicly on topics where I have specific scientific and ethical expertise and professional experience." *Id.* ¶ 16.

**RESPONSE:** Undisputed that Dr. Kheriaty asserts he has chosen to engage in what he describes as "self-censorship." Regardless, none of the quoted language contains evidence of threats or pressure by Defendants to censor speech, or communications that any social-media

platforms regarded (or acted on) as such. To the contrary, the quoted statement confirms that, to the extent that Dr. Kheriaty is engaged in "self-censorship," it is part of an effort "to avoid more severe penalties from the platforms," *i.e.*, private social-media companies—not any of the Defendants. Finally, because Dr. Kheriaty's declaration was executed on an unknown date no later than August of 2022—the signature says "3 June 2020," but the declaration purports to describe events occurring after 2020, and was filed on the docket in August of 2022—it furnishes no evidence that he continues to suffer any present or threatened injury from alleged censorship or self-censorship.

1386.  Dr. Kheriaty observes a close link between this ongoing pattern of social-media censorship and speech that criticizes government policies: "The pattern of content censored on these social media platforms mirrors closely the CDC and Biden administration policies. In my experience using these platforms to discuss covid topics, any content that challenges those federal policies is subject to severe censorship, without explanation, on Twitter and YouTube—even when the information shared is taken straight from peer-reviewed scientific literature." *Id.* ¶ 18.

**RESPONSE:** Undisputed that Dr. Kheriaty "observes" what he believes is a "close link" between these subjects, but the actual existence of such a "link" is disputed, and Dr. Kheriaty's suggestion to the contrary is conclusory and unsupported by any evidence provided elsewhere in his Declaration or the record as a whole. Regardless, none of the quoted language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Dr. Kheriaty has experienced or imminently will experience censorship because of any conduct by Defendants. Finally, because Dr. Kheriaty's declaration was executed on an unknown date no later than August of 2022—the signature says "3 June 2020," but the declaration purports to describe events occurring after 2020, and was filed on the docket in August of 2022—it furnishes no evidence that he continues to suffer any present or threatened injury from alleged censorship, or that any "ongoing pattern of social-media censorship" exists.

1387.   Plaintiff Jim Hoft attests both ongoing injuries and the imminent expectation of future injuries. Doc. 10-5. Hoft is the "founder, owner, and operator of the popular news website The Gateway Pundit ('GP'), gatewaypundit.com. ... Since its founding in 2004, the Gateway Pundit has grown from a one-man blog to one of the internet's largest destinations for conservative news and commentary. In 2021, The Gateway Pundit was ranked fourth on a list of top ten conservative news websites, ranked by monthly web searches, with over 2 million searches per month." *Id.* ¶ 2. The Gateway Pundit has large social-media followings on multiple platforms: "In particular, GP's Twitter account had over 400,000 followers before it was suspended. GP's Facebook account has over 650,000 followers. GP's Instagram account has over 205,000 followers. GP's YouTube account has over 98,000 followers." *Id.* ¶ 3.

**RESPONSE:** Disputed, for the reasons stated in the responses to Plaintiffs' PFOFs that

follow, that Mr. Hoft "attests both ongoing injuries and the imminent expectation of future

injuries." The remainder of this PFOF is undisputed, although Defendants note that neither this

PFOF nor any of those that follow contain evidence of threats or pressure by Defendants to force

social media companies to censor speech, or that Mr. Hoft or The Gateway Pundit has experienced

or imminently will experience censorship because of any conduct by Defendants. Finally, because

Mr. Hoft's declaration, executed on June 6, 2022, is nearly a year old, it furnishes no evidence that

he continues to suffer any "ongoing" or "imminent" injury from alleged censorship.

1388.   Hoft notes that The Gateway Pundit's "social media accounts have experienced censorship on all major social-media platforms," which "has followed and reflected the calls for censorship from federal government officials, including in the Biden Administration." *Id.* ¶ 4. These acts of censorship include suspensions from his Twitter account and another personal Twitter account, *id.* ¶¶ 6-7, 10; a permanent ban from his Twitter account, *id.* ¶ 8; labels applied to Twitter posts on personal accounts, *id.* ¶ 9; warning labels imposed on Facebook posts and other restrictions on his Facebook account, *id.* ¶ 12; permanent removal of content posted on Facebook, *id.* ¶ 13; prevention of sharing of Facebook-posted content, *id.*; removal of content from YouTube, *id.* ¶ 14; imposition of sanctions on Mr. Hoft's followers for re-posting or amplifying his speech, *id.* ¶ 15; engaging in self-censorship to avoid permanent bans or other more serious sanctions from the social-media platforms, *id.* ¶ 16; and demonetization by Google, *id.* ¶ 19; *see also id.* ¶¶ 18-20.

**RESPONSE:** Disputed. This PFOF improperly purports to summarize fourteen paragraphs

of Mr. Hoft's Declaration, rather than identifying (let alone substantiating) any particular fact that

appears therein. For example, Mr. Hoft claims that his Twitter account was "permanently banned,"

when in fact, as of the date of this filing, the Twitter account in question is publicly available at

the following link, where Mr. Hoft appears to tweet (often several times per hour) to over 500,000

followers: https://twitter.com/gatewaypundit. *See* Robinson Decl. ¶ 4. Regardless, none of the

cited language contains evidence of threats or pressure by Defendants to force social media

companies to censor speech, or that Mr. Hoft or The Gateway Pundit has experienced or

imminently will experience censorship as a result of any conduct by Defendants. To the contrary,

the declaration repeatedly makes clear that the conduct of which Mr. Hoft complains was carried

out by private social-media companies, not Defendants. *See, e.g.*, Hoft Decl. ¶ 10 (Dkt. 10-5)

("Twitter suspended the account . . . ."); *id.* ¶ 11 ("Facebook's censorship was so aggressive . . .

."); *id.* ¶ 14 ("YouTube removed a video we had posted."). Finally, because Mr. Hoft's declaration,

executed on June 6, 2022, is nearly a year old, it furnishes no evidence that he continues to suffer

any ongoing or imminent injury from alleged censorship.

1389.   Hoft observers that "GP's social media accounts have experienced censorship on
all major social-media platforms, including its speech regarding COVID-19 issues and election
security. In many instances, we have noticed that this censorship has followed and reflected the
calls for censorship from federal government officials, including in the Biden Administration." *Id.*
¶ 4. "For example, the current Administration has repeatedly called for censorship of social media
speech regarding election integrity and so-called 'COVID-19 misinformation.' GP has
experienced significant social-media censorship regarding its speech on both of those issues,
including on Twitter, Facebook, and YouTube." *Id.* ¶ 5.

**RESPONSE:** Disputed. The quoted statements are unsupported by the record to the extent

that they assert without evidence (other than Mr. Hoft's own characterizations) that there have

been "calls for censorship from federal government officials," or that "the Current Administration

has repeatedly called for censorship." Regardless, none of the cited language contains evidence of

threats or pressure by Defendants to force social media companies to censor speech, or that Mr.

Hoft or The Gateway Pundit has experienced or imminently will experience censorship because

of any conduct by Defendants. Finally, because Mr. Hoft's declaration, executed on June 6, 2022,

is nearly a year old, it furnishes no evidence that he continues to suffer any ongoing or imminent injury from alleged censorship.

1390.  Hoft has experienced censorship for COVID speech that is now widely acknowledged to be true, such as a suspension from Twitter for claiming that the vaccines do not prevent infection, and the claim that COVID deaths are overcounted by including deaths from other causes: "On or about January 2, 2021, Twitter suspended GP's Twitter account (@gatewaypundit) after it posted a tweet that stated, "Then It's Not a Vaccine: Crazy Dr. Fauci Says Early COVID Vaccines Will Only Prevent Symptoms and NOT Block the Infection …What?"  *Id.* ¶ 6; *see also id.* ¶ 9.

**RESPONSE:** Disputed to the extent that Plaintiffs' PFOF appears to mischaracterize the tweet in question, for which Mr. Hoft claims to have received a 12-hour suspension from his Twitter account. *See* Hoft Decl. ¶ 6 (Dkt. 10-5). Regardless, none of the cited or quoted language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Mr. Hoft or The Gateway has experienced or imminently will experience censorship because of any conduct by Defendants.

1391.  The Gateway Pundit also experienced censorship under Twitter's "hacked materials" policy by retweeting the contents of Hunter Biden's laptop. After a GP blogger "tweeted content related to Hunter Biden's laptop," "Twitter suspended the account on the ground that he 'Violat[ed] our rules against posting or sharing privately produced/ distributed intimate media of someone without their express consent.'"  *Id.* ¶ 10.

**RESPONSE:** Undisputed, but immaterial to any issue in this case. None of the cited or quoted language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Mr. Hoft or The Gateway Pundit has experienced or imminently will experience censorship because of any conduct by Defendants. To the contrary, the cited language confirms that the conduct of which Mr. Hoft complains was based upon "Twitter's 'hacked materials' policy," rather than any federal government policy, and that "Twitter suspended the account," rather than Defendants.

1392.  Hoft also experiences a long list of acts of censorship from Facebook: "Facebook frequently imposed warning labels and other restrictions on our content, particularly content

related to election integrity and COVID-19. Facebook's censorship was so aggressive that I was forced to hire an assistant to monitor and address censorship on Facebook." *Id.* ¶ 11; *see also id.* ¶ 12. Facebook imposes labels on Hoft's content that require the reader, before viewing Hoft's content, to click-through a Facebook-imposed screen that states: "The Gateway Pundit is an American far-right news and opinion website. The website is known for publishing falsehoods, hoaxes, and conspiracy theories." *Id.* at 12. It also labels Hoft's postings as "Missing Context" even when their truth is undisputed. *Id.* at 20-23. And it labels expressions of core political opinion as "Partly False." *Id.* at 28; *see also id.* 29-58 (many other examples of such labeling and blocking from reposting on Facebook and Twitter).

**RESPONSE:** Disputed. This PFOF improperly purports to summarize lengthy portions of Mr. Hoft's Declaration, rather than identifying (let alone substantiating) any particular fact that appears therein. In addition, the PFOF purports to cite many paragraphs of the Declaration (up to Paragraph 58) that do not exist—the Declaration contains only 20 numbered paragraphs. Defendants are thus unable to respond meaningfully to this PFOF, given Plaintiffs' failure to adequately identify the evidence on which it is based. Regardless, even if all of the content summarized in Plaintiffs' PFOF appeared in Mr. Hoft's Declaration, none of it contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Mr. Hoft or The Gateway Pundit has experienced or imminently will experience censorship as a result of any conduct by Defendants. To the contrary, Plaintiffs' PFOF itself repeatedly makes clear that the conduct of which Mr. Hoft complains was carried out by private social-media companies, rather than Defendants. *See, e.g.*, *supra* (purporting to describe "a long list of acts of censorship from Facebook"). Finally, because Mr. Hoft's declaration, executed on June 6, 2022, is nearly a year old, it furnishes no evidence that he continues to suffer any ongoing or imminent injury from alleged censorship.

1393. As Hoft notes, Facebook also prevents Hoft's audiences from reposting or amplifying his content: "Facebook also [dis]courages (or otherwise outright prohibits) the public from sharing our content with their social networks." *Id.* ¶ 13. Hoft describes this second-order censorship in detail: "The social-media platforms have extended their censorship policies to our followers as well. We have received numerous reports from followers that they have received temporary suspensions or other adverse actions from social-media platforms (such as seven-day

suspensions of their Facebook accounts) for re-posting or amplifying our content. This chills our followers from re-posting, re-tweeting, or otherwise amplifying our content. The risk of being locked out of Facebook for seven days, or suffering other forms of censorship, deters our followers from amplifying our content on social media platforms, which reduces the reach of our message." *Id.* ¶ 15.

**RESPONSE:** Disputed. Nothing in the cited or quoted portions of Mr. Hoft's declaration shows that "Facebook . . . prevents Hoft's audiences from reposting or amplifying his content," that "followers" of the Gateway Pundit have been "chilled" as a result from "amplifying" its content, or that Mr. Hoft has any personal knowledge of these matters. Regardless, none of the cited or quoted language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Mr. Hoft or The Gateway Pundit has experienced or imminently will experience censorship because of any conduct by Defendants. To the contrary, the PFOF itself repeatedly makes clear that the conduct of which Mr. Hoft complains was carried out by Facebook, not Defendants. Finally, because Mr. Hoft's declaration, executed on June 6, 2022, is nearly a year old, it furnishes no evidence that he continues to suffer any present or threatened injury from alleged censorship.

1394.  Hoft also describes ongoing self-censorship to avoid more severe penalties on social media: "These social-media censorship policies chill GP's freedom of expression on social media platforms as well. To avoid suspension and other forms of censorship, we frequently avoid posting content that we would otherwise post on social-media platforms, and we frequently alter content to make it less likely to trigger censorship policies."  *Id.* ¶ 16.

**RESPONSE:** Disputed. The cited and quoted statements are unsupported by the record. Undisputed that Mr. Hoft asserts he has chosen to engage in what he describes as "self-censorship," but that is immaterial to any issue in this case. None of the cited or quoted language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Mr. Hoft or The Gateway Pundit has experienced or imminently will experience censorship as a result of any conduct by Defendants. Finally, because Mr. Hoft's declaration, executed on

June 6, 2022, is nearly a year old, it furnishes no evidence that he continues to suffer any present or threatened injury from alleged censorship, or engages in any "ongoing self-censorship."

1395.    Hoft observes that the censorship of his content on social media closely tracks the censorship preferences of federal officials: "Based on my close observation of the patterns of censorship of GP's social-media accounts and related accounts in recent years, I have strong reason to infer that federal government officials are directly involved in the censorship of our speech and content." *Id.* ¶ 17. Hoft's posts that have faced censorship include posts criticizing the FBI, *id.* at 9; and criticizing the administration of the 2020 election, *id.* at 11;

**RESPONSE:** Undisputed that Mr. Hoft believes that he "observes" this phenomenon, but disputed that it actually exists; the cited and quoted statements are conclusory and unsupported by any evidence provided elsewhere in Mr. Hoft's Declaration or the record as a whole. None of them shows that any "censorship" of Mr. Hoft's "content on social media closely tracks the censorship preferences of federal officials," nor that federal officials have any "censorship preferences" at all. Moreover, Mr. Hoft provides no factual or evidentiary basis for the statement that he has "strong reason to infer that federal government officials are directly involved in the censorship of our speech and content," which is unsupported by the record. None of the cited or quoted language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Mr. Hoft or The Gateway Pundit has experienced or imminently will experience censorship as a result of any conduct by Defendants.

1396.    Hoft continues to experience censorship, including up to the date he executed his declaration. For example, he received a strike on YouTube on May 14, 2022, and YouTube removed the video he had posted, for speech regarding election integrity that discussed the problem of election fraud and raised questions about the outcome of the 2020 Presidential election, including money Idaho illegally received from Mark Zuckerberg and other problems relating to voter fraud. *Id.* ¶ 14.

**RESPONSE:** Undisputed that Mr. Hoft "received a strike on YouTube on May 14, 2022," and that "YouTube removed the video" in question. The remainder of this PFOF is disputed, including that Mr. Hoft "continues to experience censorship." Indeed, because Mr. Hoft's

declaration is nearly a year old, it furnishes no evidence that he continues to suffer any ongoing or imminent injury from alleged censorship, or that he "continues to experience censorship" in any way. In any event, none of the cited or quoted language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Mr. Hoft or The Gateway Pundit has experienced or imminently will experience censorship because of any conduct by Defendants. To the contrary, the Declaration confirms that "YouTube removed the video he had posted," rather than Defendants.

1397.   Plaintiff Jill Hines is the "Co-Director of Health Freedom Louisiana, a consumer and human rights advocacy organization." Doc. 10-12, ¶ 2. Hines's "organization engages in public advocacy on behalf of Louisiana citizens on issues of health freedom and fundamental human rights. [Hines] ha[s] testified before the Louisiana legislature approximately 20 times on such issues." *Id.* ¶ 3. Hines attests that, "Because our organization recognizes the need to educate and inform the public of their rights regarding state and federal laws concerning vaccinations, we have experienced social media censorship of our speech regarding vaccine information." *Id.* ¶ 2. Hines has "approximately 13,000 followers each on Health Freedom Louisiana and Reopen Louisiana." *Id.* ¶ 2. Among other things, Hines' organization "advocate[s] against the imposition of mask mandates on children, especially during prolonged periods, as in schools." *Id.* ¶ 4. Hines also "launched a grassroots effort called Reopen Louisiana on April 16, 2020 to help expand our reach on social media and take on the issues surrounding the continued government shutdown." *Id.* ¶ 6.

**RESPONSE:** Undisputed, except for the statement that Ms. Hines has "experienced social media censorship," which is conclusory and unsupported by evidence presented elsewhere in Ms. Hines' declaration or the record as a whole. Regardless, none of the cited or quoted language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Ms. Hines has experienced or imminently will experience censorship as a result of any conduct by Defendants.

1398.   Hines describes continuous and ongoing censorship on social media from pressure wielded by federal officials: "In the last two years, any information that was not positive in nature or conveyed adverse events associated with shutdown or mitigation efforts was deemed 'misinformation.' Dr. Anthony Fauci has used the term repeatedly and it has been adopted by the press and media." *Id.* ¶ 5. Hines continues to suffer ongoing social-media censorship, and the acts of censorship include application of warnings on Facebook content, *id.* ¶ 8; the reduction of her

reach to audiences on Facebook, *id.*; removal of content and sanctions, including 30-day suspensions, from Facebook, *id.* ¶ 9; 24-hour suspensions that prevented her from organizing people to advocate to the Louisiana legislature, *id.* ¶ 10; shadow-banning and dramatically restricting the reach of her speech to its audiences, id. ¶ 10; and the complete de-platforming of Facebook groups intended to organize Louisianans to petition their government, id. ¶¶ 13-14. Ms. Hines states that "[r]emoving our closed group at such a crucial time effectively stopped our ability to communicate with our representatives in the state legislature." Id. ¶ 14. "To say the cards are stacked against me is an understatement." Id. ¶ 16.

**RESPONSE:** Disputed. This PFOF improperly purports to summarize lengthy portions of

Ms. Hines's Declaration, rather than identifying (let alone substantiating) any particular fact that

appears therein. In any event, nothing in the declaration shows either "continuous" or "ongoing

censorship on social media," and certainly not as a result of "pressure wielded by federal officials."

Those statements find no factual or evidentiary support in the declaration or the record as a whole.

To the contrary, the Declaration describes a handful of specific incidents dating back to 2020, in

which private companies acted to enforce the terms of service of their own private social-media

platforms, to which their users agreed as a condition of using those platforms. Hines Decl. ¶¶ 8-14

(Dkt. 10-12) Indeed, because Ms. Hines's declaration, executed on June 9, 2022, is nearly a year

old, it furnishes no evidence that she continues to suffer any present or threatened injury from

alleged censorship. None of the cited or quoted statements contains evidence of threats or pressure

by Defendants to force social media companies to censor speech, or that Ms. Hines has experienced

or imminently will experience censorship as a result of any conduct by Defendants. To the

contrary, Ms. Hines's own declaration (and Plaintiffs' mischaracterization of that declaration in

this PFOF) repeatedly make clear that the conduct of which she complains was carried out by

private social-media companies, not Defendants. *See, e.g.*, Pls.' PFOF ¶ 1388 (purporting to

describe "removal of content and sanctions, including 30-day suspensions, from Facebook").

1399. Hines attests that the censorship campaign against her social-media speech is ongoing, noting that "[p]osts pointing to lack of safety of masking were and are targeted, as well as articles that mention adverse events of vaccinations, including VAERS data." Id. ¶ 9. She

continues to suffer specific, new acts of censorship, including right up to the time when she executed her Declaration on June 9, 2022: "The most recent restriction [was] in late May 2022." *Id.* Ms. Hines notes that "[m]y personal Facebook page, and the Facebook pages of both Health Freedom Louisiana and Reopen Louisiana, are all under constant threat of being completely deplatformed. My personal account is currently restricted for 90 days." Id. ¶ 12.

**RESPONSE:** Disputed. The cited statements are unsupported by the record, and none of them show that any "censorship campaign against her social-media speech is ongoing," nor that Ms. Hines "continues to suffer specific, new acts of censorship, including right up to the time when she executed her Declaration." Indeed, because Ms. Hines's declaration, executed on June 9, 2022, is nearly a year old, it furnishes no evidence that she continues to suffer any present or threatened injury from alleged censorship. As of the date of this filing, Ms. Hines and Health Freedom Louisiana each appear to have active Facebook pages. *See* Robinson Decl. ¶¶ 3, 8. In any event, none of the cited or quoted language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Ms. Hines has experienced or imminently will experience censorship because of any conduct by Defendants. To the contrary, the Declaration makes clear that the conduct of which she complains was carried out by private social-media companies, rather than Defendants.

1400.   Hines reports that acts of censorship of her COVID-19-related speech have occurred continuously up to the present: "Over the last year and a half since we noticed social-media censorship beginning in October 2020, my pages have been hit with numerous 'fact checks' and 'community standards' violations." *Id.* ¶ 11.

**RESPONSE:** Disputed. Ms. Hines's declaration does not, in fact, "report[] that acts of censorship of her COVID-19-related speech have occurred continuously up to the present." The cited language refers only to events "beginning in October 2020" and taking place approximately over the next "year and a half since" October of 2020. Indeed, because Ms. Hines's declaration, executed on June 9, 2022, is nearly a year old, it furnishes no evidence that she continues to suffer any present or threatened injury from alleged censorship. Regardless, none of the cited or quoted

language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Ms. Hines has experienced or imminently will experience censorship as a result of any conduct by Defendants.

1401.   Hines has observed a link between the censorship that her groups have experienced and the public demands for censorship from federal officials: "Many similar threats from federal officials followed … especially as covid became a public concern. In the last two years, any information that was not positive in nature or conveyed adverse events associated with shutdown or mitigation efforts was deemed 'misinformation.' Dr. Anthony Fauci has used the term repeatedly and it has been adopted by the press and media." *Id.* ¶ 5.

**RESPONSE:** Disputed. Ms. Hines's declaration does not, in fact, demonstrate "a link between the censorship that her groups have experienced and the public demands for censorship from federal officials"—indeed, it does not even assert the existence of such a link, nor does she claim to have any personal knowledge about why private social-media companies took the actions that she complains of. Nor is there any support in the record for the statement that, "[i]n the last two years, any information that was not positive in nature or conveyed adverse events associated with shutdown or mitigation efforts was deemed 'misinformation,'" or that any such labeling was caused by Dr. Anthony Fauci. None of the cited or quoted language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Ms. Hines has experienced or imminently will experience censorship because of any conduct by Defendants.

1402.   Social-media censorship dramatically reduces the reach of Hines's speech: "our analytics showed that we were reaching approximately 1.4 million people in a month's time on one of our Facebook pages, but after sharing photos of the mouths of children suffering from impetigo from long-term mask use, our page received a warning and our reach was reduced to thousands." *Id.* ¶ 8.

**RESPONSE:** Disputed. Ms. Hines's declaration does not show that "[s]ocial-media censorship dramatically reduces the reach of Hines's speech," nor does it substantiate any of the statistics including in this paragraph, which otherwise find no support in the record. Regardless, none of the cited or quoted language contains evidence of threats or pressure by Defendants to

force social media companies to censor speech, or that Ms. Hines has experienced or imminently will experience censorship as a result of any conduct by Defendants. And because Ms. Hines's declaration, executed on June 9, 2022, is nearly a year old, it furnishes no evidence that she continues to suffer any present or threatened injury from alleged censorship.

1403.   Hines experiences an ongoing campaign of social-media censorship that extends to the present, the date she executed her declaration: "This began a long series of attempts to censor our posts on Facebook and other social-media platforms. Posts pointing to lack of safety of masking were and are targeted, as well as articles that mention adverse events of vaccinations, including VAERS data. I was completely restricted from Facebook for 30 days starting in January 2022 for sharing the image of a display board used in a legislative hearing that had Pfizer's preclinical trial data on it. The most recent restriction, in late May 2022, was for re-posting an Epoch Times article that discussed a pre-print study detailing increased emergency calls for teens with myocarditis following covid vaccination." *Id.* ¶ 9.

**RESPONSE:** Disputed. Ms. Hines's declaration does not show that she "experiences an ongoing campaign of social-media censorship that extends to the present, the date she executed her declaration." That statement is logically incoherent; her declaration cannot be evidence of present injury, as she executed her declaration in June of 2022, which was almost nine months before this assertion was made in Plaintiffs' PFOF in March of 2023. Regardless, none of the quoted language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Ms. Hines has experienced or imminently will experience censorship because of any conduct by Defendants.

1404.   Censorship of Hines's social-media speech directly impairs her efforts to engage in political organization to petition her government to change its policies: "One post in particular that was hit with a 'community standards' warning on October 6, 2020, was a 'call to action' asking people to contact their legislators to end the governor's mask mandate. On the same day, we were asking people to testify during the Legislature's Second Extraordinary Session regarding a bill … that would prohibit a covid vaccine employee mandate. I was prohibited from posting for 24 hours on all pages, including my own. When I was finally able to post again, our reach was significantly diminished, compared with our 1.4 million per month rate beforehand. Our page engagement was almost non-existent for months. It felt like I was posting in a black hole. Each time you build viewership up, it is knocked back down with each violation. Our current analytics show Reopen Louisiana is reaching around 98,000 in the last month and Health Freedom Louisiana is only reaching 19,000. There are warnings when you search for Health Freedom Louisiana. People that

regularly interacted with our page were never heard from again. Some people who did find the page later on, asked us where we went." *Id.* ¶ 10.

    **RESPONSE:** Disputed. Ms. Hines's declaration does not show that "[c]ensorship of Hines's social-media speech directly impairs her efforts to engage in political organization to petition her government to change its policies." Indeed, because Ms. Hines's declaration, executed on June 9, 2022, is nearly a year old, it furnishes no evidence that she continues to suffer any present or threatened injury from alleged censorship. In any event, none of the quoted language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Ms. Hines has experienced or imminently will experience censorship because of any conduct by Defendants.

    1405.  Hines suffers repeated censorship on individual posts as well, including undisputedly truthful information: "Over the last year and a half since we noticed social-media censorship beginning in October 2020, my pages have been hit with numerous 'fact checks' and 'community standards' violations. Articles with health concerns related to mask wearing have been targeted … as well as articles relating to pregnant women being vaccinated. … Data taken directly from VAERS was flagged as misinformation and we received 'fact checks' for that as well, even if it contained a disclaimer about causation." *Id.* ¶ 11.

    **RESPONSE:** Disputed. Ms. Hines's declaration does not establish any "censorship" at all, let alone any "undisputedly truthful information"—only that private companies have acted to enforce the terms of service of their own private social-media platforms, to which their users agreed as a condition of using those platforms. None of the quoted language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Ms. Hines has experienced or imminently will experience censorship as a result of any conduct by Defendants. Indeed, because Ms. Hines's declaration, executed on June 9, 2022, is nearly a year old, it furnishes no evidence that she continues to suffer any present or threatened injury from alleged censorship.

1406.   Hines attests that she is under current and constant threat of more severe censorship penalties, including deplatforming: "My personal Facebook page, and the Facebook pages of both Health Freedom Louisiana and Reopen Louisiana, are all under constant threat of being completely deplatformed. My personal account is currently restricted for 90 days."  *Id.* ¶12.

**RESPONSE:** Disputed. The cited and quoted statements are based on Ms. Hines's

unsupported speculation about how private companies might respond to her future social-media

activity. In addition, Ms. Hines' declaration furnishes no evidence that she is under a "current" or

"constant" threat of de-platforming, or other "penalties," because the declaration was executed

nearly one year ago. (As of the date of this filing, Ms. Hines and Health Freedom Louisiana each

appear to have active Facebook pages. *See* Robinson Decl. ¶¶ 3, 8. Regardless, none of the cited

or quoted language contains evidence of threats or pressure by Defendants to force social media

companies to censor speech, or that Ms. Hines has experienced or imminently will experience

censorship as a result of any conduct by Defendants.

1407.   Hines engages in self-censorship to avoid more severe penalties: "On many occasions, I have altered the spelling of words, used emoji's, or placed links in comments to avoid censorship."  *Id.* ¶ 12.

**RESPONSE:** Undisputed, but what Ms. Hines characterizes as "self-censorship" in

response to the policies of private companies is immaterial to any issue in this case. Moreover, her

declaration, executed nearly one year ago, furnishes no evidence that she currently "engages" in

what she describes as self-censorship, or otherwise suffers any ongoing or imminent injury.

Regardless, none of the quoted language contains evidence of threats or pressure by Defendants to

force social media companies to censor speech, or that Ms. Hines has experienced or imminently

will experience censorship as a result of any conduct by Defendants.

1408.   Hines's health-freedom groups were completely deplatformed, inflicting a severe and direct injury on her ability to engage in political organization to amplify her message and petition the government: "two of our Facebook groups were completely deplatformed, effectively disbanding a group of more than two thousand people who were organized to engage in direct advocacy to our state legislature, on two separate occasions. There were two groups that were

deplatformed: HFL Group and North Shore HFL. … HFL Group had almost 2,000 people, and North Shore HFL had less than 500 before it was taken down." *Id.* ¶ 13.

**RESPONSE:** Disputed that Ms. Hines's health-freedom groups suffered the "severe and direct injury" due to de-platforming asserted in this PFOF, as her statement that the groups were "effectively disbanded" is a characterization of events for which neither Ms. Hines's declaration nor the record as a whole provides any evidence. In addition, Ms. Hines's declaration, executed nearly a year ago, furnishes no evidence that her groups continue to be deplatformed. or suffer any other present or threatened injury. (As of the date of this filing, Ms. Hines and Health Freedom Louisiana each appear to have active Facebook pages. *See* Robinson Decl. ¶¶ 3, 8. Regardless, none of the cited or quoted language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Ms. Hines has experienced or imminently will experience censorship because of any conduct by Defendants. To the contrary, the Declaration describes actions taken only by Facebook, a private social-media company, not Defendants.

1409.   This censorship directly interfered with the core political speech and advocacy of Hines and thousands of Louisianans: "The last post I made in our HFL Group on July 13, 2021, was a 'call to action' for the upcoming Veto Session, asking people to contact legislators regarding health freedom legislation. During the regular legislative session, we had two bills that were passed successfully, but both were vetoed by the governor, including a hugely popular bill that prohibited the addition of vaccine information on a state issued driver's license. The other bill provided immunity from liability for businesses that did not impose a covid vaccine mandate. Removing our closed group at such a crucial time effectively stopped our ability to communicate with our representatives in the state legislature." *Id.* ¶ 14.

**RESPONSE:** Disputed that any "censorship directly interfered with the core political speech and advocacy of Hines and thousands of Louisianans," as Ms. Hines's statement that her closed group was "effectively stopped" from communicating with state legislators is a characterization of events for which neither Ms. Hines's declaration nor the record as a whole provides any evidence. In addition, Ms. Hines's declaration, executed nearly a year ago, furnishes no evidence that her group continues to be removed or suffer any other present or threatened injury.

Regardless, none of the cited or quoted language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Ms. Hines has experienced or imminently will experience censorship because of any conduct by Defendants. To the contrary, the Declaration describes actions taken only by Facebook, a private social-media company, not Defendants.

1410.   To this day, Hines's political message, and those of thousands of Louisianans, is greatly diminished from this censorship: "After North Shore was deplatformed, we looked for alternatives for daily communication. We were to the point of speaking in code on Facebook, so moving away from traditional social media was the only option. We currently have 80 members in a chat app called GroupMe. We have no statewide reach with that tool."  *Id.* ¶ 15.

**RESPONSE:** Disputed. The cited and quoted statements do not support that "[t]o this day, Hines's political message, and those of thousands of Louisianans, is greatly diminished from this censorship." The quoted language says nothing about the unidentified group of "thousands of Louisianans" to which Plaintiffs' PFOF refers, and Ms. Hines's declaration, executed nearly a year ago, furnishes no evidence that her message or others' continues to be "diminished," or that she or other Louisianans suffer any other present injury. Regardless, none of the cited or quoted language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Ms. Hines has experienced or imminently will experience censorship as a result of any conduct by Defendants. Indeed, because Ms. Hines's declaration, executed on June 9, 2022, is nearly a year old, it furnishes no evidence that she continues to suffer any present or threatened injury from alleged censorship.

1411.   Censorship undercuts Hines's ability to "effectively communicate with people," including Louisiana state officials, about her political views: "It has been incredibly frustrating knowing that the government's narrative is going unchallenged and that we have not been able to effectively communicate with people. Knowing that government agencies colluded with Facebook to suppress the messaging of groups like mine while paying exorbitant amounts to promote vaccinations and covid policies has been especially disheartening. To say the cards are stacked against me is an understatement."  *Id.* ¶ 16.

**RESPONSE:** Disputed. The cited and quoted statements do not show that "[c]ensorship undercuts Hines's ability to 'effectively communicate with people,' including Louisiana state officials, about her political views." That is a characterization of events for which neither the cited statements, nor any other evidence in the record, provides support. Also disputed is Ms. Hines's mistaken belief that "government agencies colluded with Facebook to suppress the messaging of groups like mine," for which she provides no evidence and which is contradicted by the record. In addition, Ms. Hines's declaration, executed nearly a year ago, furnishes no evidence that her group continues to be removed or suffer any other present or threatened injury. None of the cited or quoted language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Ms. Hines has experienced or imminently will experience censorship as a result of any conduct by Defendants.

**B.    Defendants Gravely Injure Similarly Situated Speakers and Listeners.**

1412.    Plaintiffs' unrebutted evidence demonstrates that other similarly situated speakers have suffered and are suffering similar, ongoing, and imminent injuries from government-induced censorship on social media.

**RESPONSE:** Disputed that "other" speakers "have suffered and are suffering similar, ongoing, and imminent injuries from government-induced censorship on social media," as Plaintiffs have adduced no evidence of "government-induced censorship" on social media, that they or any other speakers they identify have suffered injury as a result, or that they or any other speakers they identify are currently suffering ongoing or imminent injuries as a result. Neither this PFOF nor any others that precede it or follow provide evidence to the contrary. *See generally* Defs.' PFOF §§ I., II., Arg. §§ I., II. Defendants also note in general that allegations of harm to individuals and organizations not party to this suit are irrelevant to the questions whether Plaintiffs

have suffered, or imminently will suffer, injury in fact or irreparable harm attributable to Defendants' conduct.

1413.   For example, Michael Senger had over 112,000 followers on Twitter, including in Missouri and Louisiana; he attests that he was twice suspended from Twitter and then permanently banned for posting Tweets critical of government policies for responding to COVID-19. Doc. 10-2, ¶¶ 4-8. He was temporarily suspended twice for tweets criticizing the FDA's emergency approval of COVID vaccines and for posting a video document public officials' statements on vaccine effectiveness. *Id.*¶ 4-6. On March 8, 2022, he was permanently suspended from Twitter for posting a statement of core political opinion criticizing government policy, stating that "every COVID policy—from the lockdowns and masks to the tests, death coding, and vaccine passes—has been one, giant fraud."  *Id.*¶ 7-8. This permanent suspension was inconsistent with Twitter's own policies. *Id.*¶ 10. Senger attests that the censorship inflicts ongoing harm on him, both "personally and professionally": "I discovered a gift that I had for writing and developed a network of thousands of intelligent people from all over the world with whom I had a close relationship discussing these and other issues. Now I have been silenced and cut off from all of them, with no viable way of getting that network back or promoting my work, seemingly for the sole crime of being too articulate in vocalizing my beliefs." *Id.* ¶ 13.

**RESPONSE:** Disputed. This PFOF improperly purports to summarize six paragraphs of Mr. Senger's Declaration, rather than identifying (let alone substantiating) any particular fact that appears therein. In any event, none of the cited or quoted statements contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Mr. Senger has experienced or imminently will experience censorship because of any conduct by Defendants. To the contrary, Mr. Senger's own declaration repeatedly makes clear that the conduct of which he complains was carried out by Twitter, a private social-media company, not Defendants. Moreover, the central premise of Plaintiffs' PFOF—that "he was permanently suspended from Twitter for posting a statement of core political opinion criticizing government policy"—is false and is contradicted by the record. As of the date of this filing, Mr. Senger maintains an active Twitter account, where he appears to tweet (often several times per hour) to his more than 148,000 followers. That account is available at the following link: https://twitter.com/MichaelPSenger. *See* Robinson Decl. ¶ 7. Indeed, because Mr. Senger's declaration, executed on May 25, 2022, is nearly

a year old, it furnishes no evidence that he continues to suffer any present or threatened injury

from alleged censorship.

1414.   Jeff Allen is the proprietor of "NewsTalkSTL, a popular news talk radio station in
the St. Louis, Missouri region," which "enjoys a substantial Missouri audience." Doc. 10-8, ¶¶ 2-
3. His station posts content on YouTube, and he describes how the station "has been targeted by
YouTube from the moment of its launch in July 2021" through the present, including flagging the
station's first promotional video, and issuing "strikes" for "COVID-related and election-related
'misinformation.'" *Id.* ¶¶ 4-6. These include removing a video of a show that "featured discussion
of timely COVID issues, including testing and vaccines and treatments," and issuing a strike for
that posting. *Id.* ¶¶ 9-10. His station "continued to receive strikes" from YouTube "in the first week
of January and into February, 2022" for COVID-related content, *id.* ¶ 12. On March 14, 2022,
Allen's station aired a show on "election integrity" that did not claim any election was stolen, but
discussed polling data indicating that many Americans have grave concerns about election
integrity. *Id.* ¶¶ 13-14. On March 21, 2022, YouTube permanently removed the station's channel
as a result of that posting. *Id.* ¶ 15. "In so doing, YouTube deleted all of our content and prevented
any more posts, silencing our voice and our expression from the platform entirely." *Id.* ¶ 16.

**RESPONSE:** Disputed, except that "Jeff Allen is the proprietor of "NewsTalkSTL, a

popular news talk radio station in the St. Louis, Missouri region," which "enjoys a substantial

Missouri audience," and that "[h]is station posts content on YouTube." This PFOF improperly

purports to summarize twelve paragraphs of Mr. Allen's Declaration, rather than identifying (let

alone substantiating) any particular fact that appears therein. In any event, none of the cited or

quoted statements contains evidence of threats or pressure by Defendants to force social media

companies to censor speech, or that Mr. Allen has experienced or imminently will experience

censorship as a result of any conduct by Defendants. To the contrary, Mr. Allen's own declaration

repeatedly makes clear that the conduct of which he complains was carried out by private social-

media platforms, rather than Defendants. *See, e.g.*, *supra* (describing how he has purportedly been

"targeted by YouTube," and asserting that "YouTube deleted all of our content"). In addition,

because Mr. Allen's declaration, executed on June 11, 2022, is nearly a year old, it furnishes no

evidence that he continues to suffer any present or threatened injury from alleged censorship.

1415.  Allen has also experienced significant and ongoing censorship from Facebook: "Facebook has also targeted our content, pulling advertisements and issuing temporary suspensions, also for COVID and election-related 'misinformation.'" *Id.* ¶ 18.

**RESPONSE:** Disputed. Nothing in the cited paragraph of the declaration supports the assertion that "Allen has . . . experienced significant and ongoing censorship from Facebook." Instead, the declaration confirms that Facebook "ha[s] not permanently banned our content." Allen Decl. ¶ 18 (Dkt. 10-8). In any event, none of the cited or quoted statements contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Mr. Allen has experienced or imminently will experience censorship because of any conduct by Defendants. To the contrary, Mr. Allen's own declaration repeatedly makes clear that the conduct of which he complains was carried out by Facebook, a private social-media company, not Defendants. In addition, because Mr. Allen's declaration, executed on June 11, 2022, is nearly a year old, it furnishes no evidence that he continues to suffer any "ongoing" or threatened injury from alleged censorship.

1416.  Mark Changizi is a commentator on Twitter with 37,000 followers, including many in Missouri and Louisiana. Doc. 10-9, ¶ 7, 38. Changizi experiences longstanding and ongoing censorship on Twitter, including a first suspension on April 20, 2021 "for linking to an article on the safety and efficacy of face masks," *id.* ¶ 18; additional suspension on June 25, 2021, *id.* ¶ 19; having his account secretly "heavily censored and deboosted," meaning that "the user's tweets are de-platformed—they appear in Twitter feeds much less frequently and replies to other posts may be hidden," *id.* ¶ 20; covert loss of followers, much like Dr. Kheriaty, ¶ 21; and a permanent Twitter suspension on December 18, 2021, for tweets comparing the danger of COVID-19 to the flu and promoting the benefits of natural immunity, *id.* ¶ 23. He experiences similar shadow-banning by YouTube, as his "follower-ships at YouTube also plateaued and reversed despite the fact that [he] was very active," *id.* ¶ 31. He observes that Twitter is also censoring his *private* direct messages to other Twitter users, *id.* ¶¶ 32-35. And two of his YouTube videos are also censored with their content removed from YouTube. *Id.* ¶ 36.

**RESPONSE:** Disputed, except that "Mark Changizi is a commentator on Twitter," a true statement that itself contradicts later assertions in Plaintiffs' PFOF. This PFOF improperly purports to summarize twelve paragraphs of Mr. Changizi's Declaration, rather than identifying

(let alone substantiating) any particular fact that appears therein. In any event, none of the cited or

quoted statements contains evidence of threats or pressure by Defendants to force social media

companies to censor speech, or that Mr. Changizi has experienced or imminently will experience

censorship as a result of any conduct by Defendants. To the contrary, Mr. Changizi's own

declaration repeatedly makes clear that the conduct of which he complains was carried out by

private social-media companies, not Defendants. *See, e.g.*, *supra* (claiming "Twitter is . . .

censoring his private direct messages to other Twitter users," and that he has experienced "shadow-

banning by YouTube"). Moreover, the central premise of Plaintiffs' PFOF—that Mr. Changizi

received a "permanent Twitter suspension"—is false and is contradicted by the record. As of the

date of this filing, Mr. Changizi maintains an active Twitter account, where he appears to tweet

(often several times per hour) to his more than 52,000 followers, accumulating over 110,000

tweets. That account is available at the following link: https://twitter.com/MarkChangizi. *See*

Robinson Decl. ¶ 10. Indeed because Mr. Changizi's declaration, executed on May 25, 2022, is

nearly a year old, it furnishes no evidence that he presently "experiences longstanding and ongoing

censorship," or any other present or threatened injury from alleged censorship.

1417.   Changizi engages in self-censorship on social media to avoid more severe
penalties, *id.* ¶¶ 39-42, and he has "become very careful about what I say on Twitter and YouTube
(and Facebook and Instagram) to avoid suspension." *Id.* ¶ 39.

**RESPONSE:** Disputed. The quoted statement (and Plaintiffs' characterization of that

statement) is unsupported by the record. Because Mr. Changizi's declaration, executed on May 25,

2022, is nearly a year old, it furnishes no evidence that he continues to "engage[ ] in self-

censorship," or suffer any other present or threatened injury from alleged censorship. Regardless,

none of the quoted language contains evidence of threats or pressure by Defendants to force social

media companies to censor speech, or that Mr. Changizi has experienced or imminently will

experience censorship as a result of any conduct by Defendants. To the contrary, the quoted statement confirms that, to the extent that Mr. Changizi, at the time he signed his declaration, was engaged in what he characterizes as "self-censorship," it was part of an effort "to avoid more severe penalties" from private social-media companies—not from Defendants.

1418.   Changizi perceives a link between the censorship he experiences and pressure from federal officials, *id.*¶¶ 43-47. He observes: "Twitter notoriously suspends only those who question the wisdom and efficacy of government restrictions, or who cast doubt on the safety or efficacy of the vaccines." *Id.*¶ 50. He also observes the pro-government bias in social-media censorship decisions: "there are no examples of Twitter suspending individuals who have spread misinformation from the other side—by, for example, exaggerating the efficacy of masks or the threat the virus poses to children." *Id.*¶ 51.

**RESPONSE:** Undisputed that Mr. Changizi "perceive[d] a link" of the kind he describes, but disputed that there is any such "link," or that any "censorship" by private companies is attributable to any "pressure from federal officials," all of which is contradicted by the record. This PFOF improperly purports to summarize twelve paragraphs of Mr. Changizi's declaration, rather than identifying (let alone substantiating) any particular fact that appears therein. In any event, the quoted statements (and Plaintiffs' characterizations of those statements) are unsupported by the record. Mr. Changizi offers no foundation in personal knowledge (or otherwise) for his assertion that "Twitter . . . suspends only those who question the wisdom and efficacy of government restrictions, or who cast doubt on the safety or efficacy of the vaccines," or his assertion that "there are no examples of Twitter suspending individuals who have spread misinformation from" what Mr. Changizi describes as "the other side." Regardless, none of the quoted or cited language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Mr. Changizi has experienced or imminently will experience censorship because of any conduct by Defendants. To the contrary, the quoted statement confirms that the conduct of

which Mr. Changizi complains was carried out by Twitter, a private social-media company, not Defendants.

1419.   Daniel Kotzin observes that his censorship at Twitter began in September 2021, after which he was suspended by Twitter four times, including a 24-hour suspension, two seven-day suspensions, and a permanent ban. Doc. 10-10, ¶¶ 11-12. He received these penalties for tweets questioning whether COVID vaccines reduce infection and transmission, referring to natural immunity, and criticizing government policies on lockdowns and mask mandates. *Id.* ¶¶ 13, 15, 17. He was permanently suspended on April 29, 2022, for a truthful tweet stating: "Myocarditis, pericarditis, blood clots, and strokes are known potential side effects of covid vaccination. That is not my idea of safe." *Id.* ¶ 19.

**RESPONSE:** Disputed. This PFOF improperly purports to summarize six paragraphs of Mr. Kotzin's Declaration, rather than identifying (let alone substantiating) any particular fact that appears therein. Regardless, none of the quoted or cited language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Mr. Kotzin has experienced or imminently will experience censorship as a result of any conduct by Defendants. To the contrary, the quoted statements confirm that the conduct of which Mr. Kotzin complains was carried out by Twitter, a private social-media company, not Defendants. Moreover, the central premise of Plaintiffs' PFOF—that Mr. Kotzin received a "permanent ban" from Twitter—is contradicted by the record. As of the date of this filing, Mr. Kotzin maintains an active Twitter account, where he appears to tweet very day to his more than 40,000 followers, accumulating over 11,000 tweets. That account is available at the following link: https://twitter.com/danielkotzin. *See* Robinson Decl. ¶ 5. Indeed because Mr. Kotzin's declaration, executed on May 26, 2022, is nearly a year old, it furnishes no evidence that he continues to suffer any present or threatened injury from alleged censorship.

1420.   Kotzin attests that "[p]ermanent expulsion from Twitter has been devastating for me. I had spent 2 years building my Twitter following. Two years ago, I had fewer than 100 followers, and at the time of my permanent suspension I had nearly 32,000. When my account is suspended, I am unable to communicate with my followers." *Id.* ¶¶ 21-23.

**RESPONSE:** Disputed. Mr. Kotzin has not received a "permanent expulsion from Twitter." As of the date of this filing, Mr. Kotzin maintains an active Twitter account, where he appears to tweet almost every day (often many times per day) to his more than 40,000 followers, accumulating over 11,000 tweets. That account is available at the following link: https://twitter.com/danielkotzin. *See* Robinson Decl. ¶ 5. Mr. Kotzin's perception that the loss of his "nearly 32,000" followers was "devasting," is also contradicted by the record, given that he currently has more than 40,000 followers. Indeed because Mr. Kotzin's declaration, executed on May 26, 2022, is nearly a year old, it furnishes no evidence that he continues to suffer any present or threatened injury from alleged censorship. None of the quoted or cited language in this PFOF contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Mr. Kotzin has experienced or imminently will experience censorship as a result of any conduct by Defendants.

1421.   Kotzin observes an increase in censorship on Twitter after the Surgeon General's Request for Information issued on March 3, 2022. "Based on my observations and extensive Twitter use, many more accounts than usual have been suspended since the Surgeon General's RFI on March 3." *Id.* ¶ 25. This increase in censorship affected Kotzin directly: "Since the Surgeon General's Request for "health misinformation" in March [2022] I have been suspended four times by Twitter, and have now been permanently banned." *Id.* ¶ 35.

**RESPONSE:** Disputed. Mr. Kotzin has not been "permanently banned" from Twitter. As of the date of this filing, Mr. Kotzin maintains an active Twitter account, where he appears to tweet almost every day (often many times per day) to his more than 40,000 followers, accumulating over 11,000 tweets. That account is available at the following link: https://twitter.com/danielkotzin. *See* Robinson Decl. ¶ 5. Indeed, because Mr. Kotzin's declaration, executed on May 26, 2022, is nearly a year old, it furnishes no evidence that he continues to suffer any present or threatened injury from alleged censorship. In addition, Mr. Kotzin provides no foundation in personal knowledge or otherwise for his "observations" that "many more accounts than usual have been suspended".

Regardless, the number of accounts that are suspended in a given time period by Twitter, a private company, is immaterial to any issue in this case. None of the quoted or cited language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Mr. Kotzin has experienced or imminently will experience censorship as a result of any conduct by Defendants. To the contrary, the quoted statements confirm that the conduct of which Mr. Kotzin complains was carried out by Twitter, a private social-media company, not Defendants.

1422.   Kotzin notes that suspension results in loss of one's own prior expression: "When an account is permanently suspended, everything the person ever wrote is erased and cannot be accessed by anyone." *Id.* ¶ 27.

**RESPONSE:**   Disputed. Mr. Kotzin has not been "permanently suspended" from Twitter. As of the date of this filing, Mr. Kotzin maintains an active Twitter account, where he appears to tweet almost every day (often many times per day) to his more than 40,000 followers, accumulating over 11,000 tweets. That account is available at the following link: https://twitter.com/danielkotzin. *See* Robinson Decl. ¶ 5. All of the material that Mr. Kotzin claims was permanently "erased and cannot be accessed by anyone" appears to be accessible to anyone with an internet connection, at the following link: https://twitter.com/danielkotzin. None of the quoted or cited language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Mr. Kotzin has experienced or imminently will experience censorship because of any conduct by Defendants. Indeed because Mr. Kotzin's declaration, executed on May 26, 2022, is nearly a year old, it furnishes no evidence that he continues to suffer any present or threatened injury from alleged censorship.

1423.   Kotzin describes that he "methodically self-censored" to avoid permanent suspension: "Since the [Surgeon General's] RFI, many of us who are critical of government covid policies have been regulating our speech more carefully than ever, because we have noticed that more of us are getting suspended than ever before, and we don't want to risk losing our audience. I considered the possibility of 'permanent suspension' to be such a devastating prospect that I methodically self-censored." *Id.* ¶¶ 28-29; *see also id.* ¶¶ 31-32.

**RESPONSE:** Disputed to the extent that Mr. Kotzin asserts that others "self-censored" to avoid permanent suspension, an assertion for which he offers no foundation in personal knowledge or otherwise. Regardless, none of the quoted language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Mr. Kotzin has experienced or imminently will experience censorship because of any conduct by Defendants. To the contrary, the quoted statement confirms that, to the extent that Mr. Kotzin ever engaged in "self-censorship" in the past, it was part of an effort to avoid a "permanent suspension" by Twitter, a private social-media company—not to avoid any adverse action by any of the Defendants. And because Mr. Kotzin's declaration, executed on May 26, 2022, is nearly a year old, it furnishes no evidence that he continues to suffer any present or threatened injury from alleged censorship or self-censorship.

1424.   Kotzin observes a close link between social-media censorship and the federal government's policies and preferred narratives: "Twitter suspends only those who question the wisdom and efficacy of government restrictions, or those who cast doubt on the necessity, safety or efficacy of the vaccines. If all or almost all suspensions are targeted at critics of the government and government policies, and no or almost no suspensions are targeted at purveyors of factually incorrect information, then it is not 'misinformation' that is being censored, but criticism of the government." *Id.* ¶¶ 34-35.

**RESPONSE:** Disputed. Mr. Kotzin offers no foundation in personal knowledge, or otherwise, for these "observ[ations]." Regardless, none of the quoted language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Mr. Kotzin has experienced or imminently will experience censorship as a result of any conduct by Defendants. To the contrary, the quoted statement confirms that the conduct of which Mr. Kotzin complains was carried out by Twitter, a private social-media company, not Defendants.

1425.   Joshua McCollum is a concerned parent in a school district in Missouri. Doc. 10-14, ¶¶ 1-4. Like Hines, he has experienced censorship that directly interferes with his ability to organize, associate with like-minded people, and petition his local government: "On or about July 28, 2021, in the midst of discussing with others a recent school board meeting related to masks, and whether FHSD would keep its policy of optional masking versus change their policy to

mandatory masking, [McCollum] decided to launch an online petition to encourage the board members to keep their optional masking policy and *not* change to mandatory masking." *Id.* ¶ 9. Through his account on Nextdoor (a Meta/Facebook platform), he posted this petition on change.org, and "[t]he posting of this petition on change.org was the beginning of the shadow-banning and blocking of my Nextdoor account." *Id.* ¶ 11. Comments were blocked from his Nextdoor account, and then his Nextdoor account was suspended for one month for "spreading misinformation." *Id.*¶¶ 12-14. This censorship prevented him from organizing, associating with others, and petitioning his local government, when those on the other side of the issue were allowed to do so: "Subsequently, on August 12, 2021, FHSD decided to reinstate their mandatory masking policy, shortly after the voice of myself and the 280 fellow petition signers was suppressed. There were petitions encouraging reinstatement of mandatory masking, but our contrary petition was suppressed by Nextdoor. I am a parent simply trying to have a voice in my local school district and its policies regarding my own children, but social media has stooped down to censor even my voice within my local community." *Id.*¶¶ 15-17.

   **RESPONSE:** Disputed, except that "Joshua McCollum is a concerned parent in a school district in Missouri." This PFOF improperly purports to summarize the entirety of Mr. McCollum's Declaration, rather than identifying (let alone substantiating) any particular fact that appears therein. Regardless, none of the quoted or cited language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Mr. McCollum has experienced or imminently will experience censorship as a result of any conduct by Defendants. To the contrary, the quoted statements confirm that the conduct of which Mr. Kotzin complains was carried out by private social-media platforms, not Defendants. In addition, Mr. McCollum's declaration does not even purport to assert injury of an ongoing nature, and because it was executed on June 8, 2022, nearly one year ago, it cannot furnish evidence that he continues to suffer any present or threatened injury from alleged censorship.

   1426.   Jessica Marie Gulmire is a freelance journalist for the Epoch Times who resides in Missouri, and has readership in Missouri and Louisiana. Doc. 10-15, ¶¶ 1-3. Gulmire has "been censored numerous times by Facebook and Twitter even before I joined The Epoch Times in the summer of 2021," as her "personal posts regarding excessive COVID-19 measures and regarding the election were repeatedly flagged and taken down by Facebook and Twitter." *Id.* ¶¶ 7-8. Her journalism for the Epoch Times has also been censored by Facebook, including an article questioning the evidence for vaccinating pregnant women with COVID-19 vaccines that was later validated by Pfizer documents, *id.* ¶¶ 10-13; and an article in March 2022 for The Federalist about the People's Convoy of truckers in the United States supporting their Canadian counterparts, *id.*

18-19. She has also had eleven articles about "mask mandates, vaccines, lockdowns and mental health" censored on Pinterest, *id.* ¶ 17.

**RESPONSE:** Disputed, except that "Jessica Marie Gulmire is a freelance journalist for the Epoch Times who resides in Missouri, and has readership in Missouri and Louisiana." This PFOF improperly purports to summarize the entirety of Ms. Gulmire's Declaration, rather than identifying (let alone substantiating) any particular fact that appears therein. Regardless, none of the quoted or cited language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Ms. Gulmire has experienced or imminently will experience censorship as a result of any conduct by Defendants. To the contrary, the quoted statements confirm that the conduct of which Ms. Gulmire complains was carried out by private social-media companies, not Defendants. In addition, because Ms. Gulmire's declaration, executed on June 8, 2022, is nearly a year old, it furnishes no evidence that she continues to suffer any present or threatened injury from alleged censorship.

### C.    Defendants Gravely Injure the State Plaintiffs, Louisiana and Missouri.

#### 1.    Fundamental policies favoring freedom of speech for their citizens.

1427.   Both Louisiana and Missouri have adopted fundamental policies favoring freedom of speech, without government-induced censorship, for their citizens. LA. CONST. art. I, § 7; MO. CONST. art. I, § 8.

**RESPONSE:** Undisputed, but immaterial to any issue in this case. This case is governed by the First Amendment to the United States Constitution, which is "the supreme Law of the Land," U.S. Const., art. VI, cl. 2, not by the laws of Louisiana or Missouri. This PFOF contains no evidence of threats or pressure by Defendants to force social media companies to censor speech, or that the Plaintiff States have experienced or imminently will experience censorship as a result of any conduct by Defendants.

#### 2.    Direct censorship of the States and their political subdivisions.

1428.  Both Louisiana and Missouri, and their political subdivisions, have experienced direct social-media censorship on COVID and related issues. For example, Louisiana's Department of Justice—the office of its Attorney General—was directly censored on YouTube for posting video footage of Louisianans criticizing mask mandates and COVID-19 lockdown measures on August 18, 2021—on August 18, 2021, just after the federal Defendants' most vociferous calls for censorship of COVID "misinformation." Bosch Decl., Doc. 10-13, ¶ 7.

**RESPONSE:**  Disputed that Louisiana or Missouri or its political subdivisions "have experienced direct social-media censorship" or were "directly censored" on any issue. Undisputed that YouTube, a private social-media company, concluded that a video posted by employees of the Louisiana Department of Justice "violated YouTube's 'medical misinformation policy,'" and was therefore removed from YouTube, by YouTube. None of the cited language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that the Plaintiff States have experienced or imminently will experience censorship because of any conduct by Defendants. To the contrary, the cited paragraph confirms that the conduct of which Plaintiffs complain was carried out by YouTube, not Defendants, and was an application of a policy created and enforced by YouTube, not Defendants. In addition, because Ms. Bosch's declaration, executed on June 14, 2022, is nearly a year old, it furnishes no evidence that Louisiana continues to suffer any present or threatened injury from alleged censorship.

1429.  In addition, a Louisiana state legislator was censored by Facebook when he posted content addressing vaccinating children against COVID-19. Bosch Decl., Doc. 10-13, ¶ 9.

**RESPONSE:**  Disputed. The cited paragraph of the declaration does not offer any evidence that "a Louisiana state legislator was censored by Facebook," it instead states—without identifying the post in question, or the date on which it was posted—that certain content was apparently "flagged as misleading and de-boosted by Facebook for violating its medical misinformation policy." Bosch Decl. ¶ 9 (Dkt. 10-13). Regardless, none of the cited language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that the

Louisiana has experienced or imminently will experience censorship because of any conduct by Defendants. To the contrary, the cited paragraph confirms that the conduct of which Plaintiffs complain was carried out by Facebook, not Defendants, and was an application of a policy created and enforced by Facebook, not Defendants. In addition, because Ms. Bosch's declaration, executed on June 14, 2022, is nearly a year old, it furnishes no evidence that Louisiana continues to suffer any present or threatened injury from alleged censorship.

1430.   St. Louis County, a political subdivision of Missouri, conducted public meetings regarding proposed county-wide mask mandates, at which some citizens made public comments opposing mask mandates. Flesh Decl., Doc. 10-6, ¶ 7. Missouri's open-meetings law required St. Louis County to post publicly the videos of those meetings, but YouTube censored the entire videos of four public meetings, removing the content, because some citizens publicly expressed views that masks are ineffective. *Id.*

**RESPONSE:** Undisputed that "St. Louis County, a political subdivision of Missouri, conducted public meetings regarding proposed county-wide mask mandates, at which some citizens made public comments opposing mask mandates." The statement that "Missouri's open-meetings law required St. Louis County to post publicly the videos of those meetings," is a statement of law, not of fact, and is unsupported by any citation to any legal authority or any factual assertion in the cited declaration. In any event, that question of Missouri state law is immaterial to any issue in this case, and Plaintiffs do not assert that "Missouri's open-meetings law required St. Louis County to post publicly the videos of those meetings" on YouTube, or on any other particular social-media platform. To the contrary, the cited paragraph of the Flesch Declaration references St. Louis County's decision to "stop using YouTube." Finally, the statement that "YouTube censored the entire videos of four public meetings, removing the content, because some citizens publicly expressed views that masks are ineffective," is disputed, as it is unsupported by the cited Declaration, which describes the relevant video with insufficient specificity to determine whether the characterization in Plaintiffs' PFOF is supported by the record. Regardless, none of the cited

language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that the Missouri has experienced or imminently will experience censorship because of any conduct by Defendants. To the contrary, the cited paragraph confirms that the conduct of which Plaintiffs complain was carried out by YouTube, not Defendants. In addition, because Mr. Flesch's declaration, executed on June 8, 2022, is nearly a year old, it furnishes no evidence that Missouri continues to suffer any present or threatened injury from alleged censorship.

### 3. The States' interest in following the uncensored discourse of their citizens.

1431. Patrick Flesch, Director of Constituent Services for the Missouri Attorney General's Office, explains that he is "personally involved in, receiving, reviewing, and responding to thousands of communications from Missouri constituents per year." Doc. 10-6, ¶ 3. He explains that being able to follow Missourians' uncensored speech on social media is essential for him to do his job effectively, as understanding Missourians' true thoughts and concerns on policy matters like election integrity and COVID-19 is necessary to craft policies and messages that are responsive to constituents' actual concerns. Doc. 10-6, ¶ 3-4. This "includes monitoring activity and mentions on multiple social media platforms, including Facebook, Twitter, and YouTube." *Id.* "I monitor these sorts of trends *on a daily or even hourly basis* when needed on behalf of the Office." *Id.* (emphasis added). For example, regarding the censorship of St. Louis County's video of its public meeting where citizens opposed mask mandates, Flesch notes: "This video is just the sort of information that is important for me to review, and yet it was unavailable for a critical period of time due to online censorship of speech questioning the efficacy of mask mandates." *Id.*¶ 7. Likewise, regarding YouTube censoring Jeff Allen's radio station NewsTalkSTL, and Nextdoor censoring Joshua McCollum's online petition, Flesch observes: "These examples are just the sort of online speech by Missourians that it is important for me and the Missouri Attorney General's Office to be aware of." *Id.* ¶¶ 9.

**RESPONSE:** Disputed, with the exception of the descriptions of Mr. Flesch's job responsibilities, which are undisputed. This PFOF improperly purports to summarize four lengthy paragraphs of Mr. Flesch's Declaration, rather than identifying (let alone substantiating) any particular fact that appears therein. Regardless, none of the cited or quoted language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Missouri has experienced or imminently will experience censorship as a result of any

conduct by Defendants. To the contrary, the declaration confirms that the conduct of which Plaintiffs complain was carried out by private social-media companies, not Defendants. In addition, because Mr. Flesch's declaration, executed on June 8, 2022, is nearly a year old, it furnishes no evidence that Missouri continues to suffer any present or threatened injury from alleged censorship.

1432.   As Flesch attests, "The kinds of speech discussed above and in the Complaint in this case—such as speech about the efficacy of COVID-19 restrictions, and speech about issues of election security and election integrity—are matters of core interest and high importance to me in my work on behalf of the AGO. When such speech is censored on social media, it makes it much harder for me to do my job and to understand what Missourians really are concerned about." *Id.* ¶ 10.

**RESPONSE:** Undisputed, except for Plaintiffs' implication that any of the examples discussed in Mr. Flesch's declaration are examples of speech being "censored," which is disputed, and is unsupported by the record, especially to the extent that the implication of Plaintiffs' PFOF is that anything was "censored" by Defendants. None of the cited or quoted language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Missouri has experienced or imminently will experience censorship because of any conduct by Defendants. To the contrary, the declaration confirms that the conduct of which Plaintiffs complain was carried out by private social-media companies, not Defendants. In addition, because Mr. Flesch's declaration, executed on June 8, 2022, is nearly a year old, it furnishes no evidence that Missouri continues to suffer any present or threatened injury from alleged censorship.

1433.   As Mr. Flesch explains in detail: "Issues regarding COVID-19 responses (such as mask mandates imposed by municipalities and school districts on schoolchildren) and election security and integrity have been of critical importance to Missourians in recent months and years. …  It is very important for me to have access to free public discourse on social media on these issues so I can understand what Missourians are actually thinking, feeling, and expressing about such issues, and so I can communicate effectively with them." *Id.* ¶ 5. "[O]nline censorship of free public discourse on social-media companies has hampered my ability to follow Missourians' speech on these issues." *Id.* ¶ 6.

**RESPONSE:** The language in this PFOF that quotes paragraph 5 of Mr. Flesch's declaration is undisputed. The remainder of this PFOF is disputed. There is no support in the record for the statement in paragraph 6 that "online censorship of free public discourse on social-media companies has hampered [Mr. Flesch's] ability to follow Missourians' speech on these issues," a conclusory assertion for which Mr. Flesch offers no factual substantiation. Regardless, none of the cited or quoted language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Missouri has experienced or imminently will experience censorship because of any conduct by Defendants. To the contrary, the declaration confirms that the conduct of which Plaintiffs complain was carried out by private social-media companies, not Defendants. In addition, because Mr. Flesch's declaration, executed on June 8, 2022, is nearly a year old, it furnishes no evidence that Missouri continues to suffer any present or threatened injury from alleged censorship.

1434.   Ashley Bosch, Communications Officer for the Louisiana Department of Justice, attests on behalf of the State of Louisiana: "Part of my job is to gather and synthesize topical subject matters that are important to Louisiana citizens, on behalf of the Department." Doc. 10-13, ¶ 4. "Understanding what subject matters and issues are important to Louisianans is critical for the Department to formulate policies and messaging that will address the concerns expressed by our constituents." *Id.* This "includes monitoring activity and mentions on social media platforms, including Facebook, Instagram, Twitter, and YouTube." *Id.* Doc. 10-13, ¶ 4. "It is very important for me to have access to free public discourse on social media on these issues so I can understand what our constituents are actually thinking, feeling, and expressing about such issues, and so I can communicate properly with them." *Id.* ¶ 5. "Online censorship of Louisiana citizens by social media companies interferes with my ability to follow Louisianans' speech on these issues." *Id.* ¶ 6. Bosch notes that it is particularly important for her to follow Louisianan's speech on topics of federally-induced censorship: "For example, mask and vaccine mandates for students have been a very important source of concern and public discussion by Louisiana citizens over the last year." Doc. 10-13, ¶ 5. "Louisianans' speech about the efficacy of COVID-19 restrictions, and speech about issues of election security and election integrity are matters of great interest and importance to me in my work on behalf of the Louisiana Department of Justice." Doc. 10-13, ¶ 10.

**RESPONSE:** Undisputed, with the exceptions of (1) the statement that "[o]nline censorship of Louisiana citizens by social media companies interferes with [Ms. Bosch's] ability

to follow Louisianans' speech on these issues," and (2) the unexplained and unsupported reference

to "federally-inducted censorship." The first is a conclusory assertion for which Ms. Bosch's

declaration offers no factual substantiation, and the second is an allegation as to which she has no

evident personal knowledge and that is contradicted by the record. None of the cited or quoted

language contains evidence of threats or pressure by Defendants to force social media companies

to censor speech, or that Louisiana has experienced or imminently will experience censorship as a

result of any conduct by Defendants. To the contrary, the declaration confirms that the conduct of

which Ms. Bosch complains was carried out by private social-media companies, not Defendants.

In addition, because Ms. Bosch's declaration, executed on June 14, 2022, is nearly a year old, it

furnishes no evidence that Louisiana continues to suffer any present or threatened injury from

alleged censorship.

1435.  As noted above, Defendants' witness from the CDC, Carol Crawford, attests to
exactly the same government interest in being able to read and follow the true, uncensored opinions
of the government's constituents.

**RESPONSE:** Disputed. There was no statement to that effect in Ms. Crawford's

deposition testimony, which is presumably why this PFOF contains no citation to Ms. Crawford's

deposition transcript.

1436.  Crawford admits that government communicators have a strong interest in tracking
what their constituents are saying on social media: "It's helpful for communicators to know what
is being discussed because it helps improve our communication materials."  Crawford Dep. 53:10-
12. Crawford emphasized this point multiple times: "as I mentioned before, it does help … for
communicators to know what conversations occurs on social media because it helps us identify
gaps in knowledge, or confusion, or things that we're not communicating effectively that we need
to adjust."  *Id.* 54:15-20.

**RESPONSE:** Disputed. Plaintiffs mischaracterize Ms. Crawford's deposition testimony

in several respects. The quoted testimony is not about "government communicators" in general

(and certainly not about state government officials), it is about Ms. Crawford's experience working

at the CDC with respect to one particular report about social-media usage. In addition, Ms.

Crawford never described a "strong interest" in this topic, let alone "emphasized this point multiple

times."

1437.   Crawford said that CrowdTangle reports "would help us understand what was being discussed on social media about COVID, which helps us look for gaps in information, confusion about facts, things that we might need to adjust our communication materials for." *Id.* 57:24-58:3. Crawford specifically expressed the concern that, if content was censored or removed from social-media platforms, government communicators would not know what the citizens' true concerns were: She "was wondering if they delete the info will we know those myths or information so we could update communication activity. So if they were deleting content would we know what the themes were." *Id.* 75:14-18. Accordingly, Crawford wanted to know, "would [CDC] be able to see in CrowdTangle or other reports … what kind of themes were removed so we would still have the full picture of areas of confusion." *Id.* 75:23-76:1.

**RESPONSE:** The first sentence and the last sentence of this PFOF are undisputed.

Disputed that Ms. Crawford "specifically expressed the concern that, if content was censored or

removed from social-media platforms, government communicators would not know what the

citizens' true concerns were," which is not what the quoted language says (certainly not

"specifically"), and in fact no such statement appears anywhere else in Ms. Crawford's deposition

testimony.

### 4.    States' interest in fair, unbiased, open processes to petition state government.

1438.   Social-media censorship directly interferes with the States' interest maintaining fair, even-handed, and open processes for petitioning their own governments and political subdivisions. When one side of a debate can organize on Facebook or Nextdoor and petition the government, and the other side cannot because of social-media censorship, that means that state officials never receive a fair, unbiased presentation of their constituents' views.

**RESPONSE:** Disputed. Plaintiffs provide no evidentiary support for this PFOF, which is

argument based on hypothetical facts rather than a statement of fact. Defendants address Plaintiffs'

legal arguments in their opposition to Plaintiffs' motion for preliminary injunction.

1439.   As noted above, social-media censorship has perverted state and local political processes by artificially restricting access to the channels of advocacy to one side of various issues. For example, social-media censorship prevented Louisiana advocacy groups from organizing

effectively to advocate in favor of legislative action on issues of great public import. Hines Decl., Doc. 10-12, ¶¶ 13-14. Likewise, social-media censorship prevented a Missouri parent from circulating an online petition to advocate against mandatory masking at his local school district, a political subdivision of the State. McCollum Decl., Doc. 10-14, ¶¶ 9-17; *see also* Doc. 10-12, ¶¶ 13-14; Doc. 10-14, ¶¶ 9-17; Doc. 10-15, ¶¶ 11-16, 18-19.

**RESPONSE:** Disputed. Plaintiffs provide no evidentiary support for this PFOF. To the extent that portions of this PFOF do include assertions of fact, they do so by improperly purporting to summarize the contents of sprawling portions of six different declarations, rather than identifying (let alone substantiating) any particular fact that appears therein. Regardless, none of the cited declarations contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that the Plaintiff States have experienced or imminently will experience censorship because of any conduct by Defendants. To the contrary, the declarations confirm that the conduct of which Plaintiffs complain was carried out by private social-media companies, not Defendants. In addition, to the extent the cited declarations were executed nearly a year ago, they furnish no evidence that the Plaintiff States continue to suffer any present or threatened injury from alleged censorship.

1440.  Plaintiff Jill Hines explains that "two of our Facebook groups were completely deplatformed, effectively disbanding a group of more than two thousand people who were organized to engage in direct advocacy to our state legislature, on two separate occasions."  Doc. 10-12, ¶ 13. She attests that "[t]he last post I made in our HFL Group on July 13, 2021, was a 'call to action' for the upcoming Veto Session, asking people to contact legislators regarding health freedom legislation.."  *Id.* ¶ 14. Suppressing these Facebook groups directly interfered with state officials' ability to receive free and fair communications of their constituents' concerns: "Removing our closed group at such crucial time effectively stopped our ability to communicate with our representatives in the state legislature."  *Id.*

**RESPONSE:** This PFOF essentially repeats Plaintiffs' and Ms. Hines's assertions in Pls.' PFOF ¶¶ 1408 and 1409, above. Defendants incorporate their responses to Pls.' PFOF ¶¶ 1408 and 1409 as if fully set forth herein.

**5. State quasi-sovereign interests.**

1441.   The States also assert quasi-sovereign interests in protecting the freedom of speech of a substantial segment of their population—*i.e.*, their citizens who are both speakers and audiences of speech on social media; and in ensuring that their citizens receive the full benefit of participation in the federal system—which includes, among other benefits, the full protection of the First Amendment.

**RESPONSE:** Undisputed that the States assert the purported interests described. Whether those are judicially cognizable interests that States have standing to assert against the Federal Government is a legal issue addressed in Defendants' brief in opposition to Plaintiffs' motion for preliminary injunctive relief.

1442.   Based on the foregoing evidence, social-media censorship afflicts a substantial segment of the populations of both Missouri and Louisiana.

**RESPONSE:** Disputed. Plaintiffs provide no evidentiary support for this PFOF. In particular, Plaintiffs offer no evidence of threats or pressure by Defendants to force social media companies to censor speech, or that any segments of the populations of Missouri and Louisiana have been or imminently will be "afflict[ed]" by censorship as a result of any conduct by Defendants.

Dated:  May 2, 2023                  Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

JAMES J. GILLIGAN
Special Litigation Counsel, Federal Programs Branch

JOSHUA E. GARDNER (FL Bar No. 0302820)
Special Counsel, Federal Programs Branch

*/s/ Kyla M. Snow*
KYLA M. SNOW (OH Bar No. 96662)
INDRANEEL SUR (D.C. Bar No. 978017)
KUNTAL CHOLERA (D.C. Bar No. 1031523)
AMANDA K. CHUZI (D.C. Bar No. 1738545)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington D.C. 20005
Tel: (202) 514-3259
kyla.snow@usdoj.gov

*Attorneys for Defendants*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF LOUISIANA
# MONROE DIVISION

STATE OF MISSOURI ex rel. ANDREW
BAILEY, Attorney General,

STATE OF LOUISIANA ex rel. JEFFREY
M. LANDRY, Attorney General,

DR. JAYANTA BHATTACHARYA,

JILL HINES,

JIM HOFT,

DR. AARON KHERIATY, and

DR. MARTIN KULLDORFF,

       *Plaintiffs*,

   v.

JOSEPH R. BIDEN, JR., in his official
capacity as President of the United States;

KARINE JEAN-PIERRE, in her official
capacity as White House Press Secretary;

VIVEK H. MURTHY, in his official
capacity of Surgeon General of the United
States;

XAVIER BECERRA, in his official
capacity as Secretary of the Department of
Health and Human Services;

DEPARTMENT OF HEALTH AND
HUMAN SERVICES;

DR. ANTHONY FAUCI, in his official
capacity as Director of the National Institute
of Allergy and Infectious Diseases and as
Chief Medical Advisor to the President;

No. 3:22-cv-01213-TAD-KDM

NATIONAL INSTITUTE OF ALLERGY
AND INFECTIOUS DISEASES;

DR. HUGH AUCHINCLOSS, in his
official capacity as Acting Director of the
National Institute of Allergy and Infectious
Diseases;

CENTERS FOR DISEASE CONTROL
AND PREVENTION;

CAROL Y. CRAWFORD, in her official
capacity as Chief of the Digital Media
Branch of the Division of Public Affairs
within the Centers for Disease Control and
Prevention;

UNITED STATES CENSUS BUREAU,
a.k.a. BUREAU OF THE CENSUS;

JENNIFER SHOPKORN, in her official
capacity as Senior Advisor for
Communications with the U.S. Census
Bureau;

DEPARTMENT OF COMMERCE;

ALEJANDRO MAYORKAS, in his official
capacity as Secretary of the Department of
Homeland Security;

ROBERT SILVERS, in his official capacity
as Under Secretary of the Office of
Strategy, Policy, and Plans, within DHS;

SAMANTHA VINOGRAD, in her official
capacity as Senior Counselor for National
Security in the Office of the Secretary for
DHS;

DEPARTMENT OF HOMELAND
SECURITY;

JEN EASTERLY, in her official capacity as
Director of the Cybersecurity and
Infrastructure Security Agency;

2

CYBERSECURITY AND
INFRASTRUCTURE SECURITY
AGENCY;

GINA McCARTHY, in her official capacity
as White House National Climate Advisor,

NINA JANKOWICZ, in her official
capacity as director of the so-called
"Disinformation Governance Board" within
the Department of Homeland Security,

ANDREW SLAVITT, in his official
capacity as White House Senior COVID-10
Advisor,

ROB FLAHERTY, in his official capacity
as Deputy Assistant to the President and
Director of Digital Strategy at the White
House,

COURTNEY ROWE, in her official
capacity as White House Covid-19 Director
of Strategic Communications and
Engagement,

CLARKE HUMPHREY, in her official
capacity as White House Digital Director
for the Covid-19 Response Team,

BENJAMIN WAKANA, in his official
capacity as the Deputy Director of Strategic
Communications and Engagement at the
White House COVID-19 Response Team,

SUBHAN CHEEMA, in his official
capacity as Deputy Director for Strategic
Communications and External Engagement
for the White House Covid-19 Response
Team,

DORI SALCIDO, in her official capacity as
White House Covid-19 Director of Strategic
Communications and Engagement,

TIMOTHY W. MANNING, in his official
capacity as White House Covid-19 Supply
Coordinator,

DANA REMUS, in her official capacity as
Counsel to the President,

AISHA SHAH, in her official capacity as
White House Partnerships Manager,

LAURA ROSENBERGER, in her official
capacity as Special Assistant to the
President,

MINA HSIANG, in her official capacity as
Administrator of the U.S. Digital Service
within the Office of Management and
Budget in the Executive Office of the
President,

U.S. DEPARTMENT OF JUSTICE,

FEDERAL BUREAU OF
INVESTIGATION,

LAURA DEHMLOW, in her official
capacity as Section Chief for the FBI's
Foreign Influence Task Force,

ELVIS M. CHAN, in his official capacity
as Supervisory Special Agent of Squad CY-
1 in the San Francisco Division of the
Federal Bureau of Investigation,

JAY DEMPSEY, in his official capacity as
Social Media Team Lead, Digital Media
Branch, Division of Public Affairs at the
CDC,

KATE GALATAS, in her official capacity
as Deputy Communications Director at the
CDC,

ERIC WALDO, in his official capacity as
Chief Engagement Officer for the Surgeon
General,

4

YOLANDA BYRD, in her official capacity as a member of the Digital Engagement Team at HHS,

CHRISTY CHOI, in her official capacity as Deputy Director, Office of Communications, HRSA within HHS,

TERICKA LAMBERT, in her official capacity as Director of Digital Engagement at HHS and Deputy Director of the Office of Digital Strategy at the White House,

JOSHUA PECK, in his official capacity as Deputy Assistant Secretary for Public Engagement at HHS,

JANELL MUHAMMED, in her official capacity as Deputy Digital Director at HHS,

MATTHEW MASTERSON, in his official capacity as Senior Cybersecurity Advisory within CISA in the Department of Homeland Security,

LAUREN PROTENTIS, in her official capacity as an official of CISA,

GEOFFREY HALE, in his official capacity as an official of CISA,

ALLISON SNELL, in her official capacity as an official of CISA,

KIM WYMAN, in her official capacity as CISA's Senior Election Security Lead,

BRIAN SCULLY, in his official capacity as an official of DHS and CISA,

ZACHARY HENRY SCHWARTZ, in his official capacity as Division Chief for the Communications Directorate at the U.S. Census Bureau,

LORENA MOLINA-IRIZARRY, in her
official capacity as an official of the Census
Bureau,

KRISTIN GALEMORE, in her official
capacity as Deputy Director of the Office of
Faith Based and Neighborhood Partnerships
at the Census Bureau,

U.S. FOOD AND DRUG
ADMINISTRATION,

ERICA JEFFERSON, in her official
capacity as Associate Commissioner for
External Affairs within the Office of the
Commissioner at the U.S. Food and Drug
Administration,

MICHAEL MURRAY, in his official
capacity as Acquisition Strategy Program
Manager for the Office of Health
Communications and Education at the FDA,

BRAD KIMBERLY, in his official capacity
as Director of Social Media at the FDA,

U.S. DEPARTMENT OF STATE,

LEAH BRAY, in her official capacity as
Acting Coordinator of the State
Department's Global Engagement Center,

SAMARUDDIN K. STEWART, in his
official capacity as Senior Technical
Advisor and/or Senior Advisor for the
Global Engagement Center of the State
Department,

DANIEL KIMMAGE, in his official
capacity as Acting Coordinator for the
Global Engagement Center at the State
Department,

ALEXIS FRISBIE, in her official capacity
as a member of the Technology
Engagement Team at the Global

6

Engagement Center at the State
Department,

U.S. DEPARTMENT OF TREASURY,

WALLY ADEYEMO, in his official
capacity as Deputy Secretary of the
Treasury,

U.S. ELECTION ASSISTANCE
COMMISSION,

MARK A. ROBBINS, in his official
capacity as Interim Executive Director of
the EAC, and

KRISTEN MUTHIG, in her official
capacity as Director of Communications for
the EAC,

*Defendants*.

## THIRD AMENDED COMPLAINT

### NATURE OF THE ACTION

1.    In 1783, George Washington warned that if "the Freedom of Speech may be taken away,"
then "dumb and silent we may be led, like sheep, to the Slaughter."  George Washington, *Address to the Officers of the Army* (March 15, 1783).  The freedom of speech in the United States now faces one of its greatest assaults by federal government officials in the Nation's history.

2.    A private entity violates the First Amendment "if the government coerces or induces it to take action the government itself would not be permitted to do, such as censor expression of a lawful viewpoint."  *Biden v. Knight First Amendment Institute at Columbia Univ.*, 141 S. Ct. 1220, 1226 (2021) (Thomas, J., concurring).  "The government cannot accomplish through threats of adverse government action what the Constitution prohibits it from doing directly."  *Id.*

7

3.   That is exactly what has occurred over the past several years, beginning with express and implied threats from government officials and culminating in the Biden Administration's open and explicit censorship programs.  Having threatened and cajoled social-media platforms for years to censor viewpoints and speakers disfavored by the Left, senior government officials in the Executive Branch have moved into a phase of open collusion with social-media companies to suppress disfavored speakers, viewpoints, and content on social-media platforms under the Orwellian guise of halting so-called "disinformation," "misinformation," and "malinformation."

4.   The aggressive censorship that Defendants have procured constitutes government action for at least five reasons: (1) absent federal intervention, common-law and statutory doctrines, as well as voluntary conduct and natural free-market forces, would have restrained the emergence of censorship and suppression of speech of disfavored speakers, content, and viewpoint on social media; and yet (2) through Section 230 of the Communications Decency Act (CDA) and other actions, the federal government subsidized, fostered, encouraged, and empowered the creation of a small number of massive social-media companies with disproportionate ability to censor and suppress speech on the basis of speaker, content, and viewpoint; (3) such inducements as Section 230 and other legal benefits (such as the absence of antitrust enforcement) constitute an immensely valuable benefit to social-media platforms and incentive to do the bidding of federal officials; (4) federal officials—including, most notably, certain Defendants herein—have repeatedly and aggressively threatened to remove these legal benefits and impose other adverse consequences on social-media platforms if they do not aggressively censor and suppress disfavored speakers, content, and viewpoints on their platforms; and (5) Defendants herein, colluding and coordinating with each other, have also directly coordinated and colluded with social-media platforms to identify disfavored speakers, viewpoints, and content and thus have procured the actual censorship

and suppression of the freedom of speech.  These factors are both individually and collectively sufficient to establish government action in the censorship and suppression of social-media speech, *especially* given the inherent power imbalance: not only do the government actors here have the power to penalize noncompliant companies, but they have threatened to exercise that authority.

5.   Defendants' campaign of censorship includes the recent announcement of the creation of a "Disinformation Governance Board" within the Department of Homeland Security.  "Our constitutional tradition stands against the idea that we need Oceania's Ministry of Truth." *United States v. Alvarez*, 567 U.S. 709, 728 (2012) (plurality op.).  Likewise, our constitutional tradition stands against the idea that we need a "Disinformation Governance Board" within our federal domestic-security apparatus.

6.   Email correspondence between the CDC, the Census Bureau, and major social-media platforms including Twitter, Facebook, and YouTube was released that reveals yet more evidence that Defendants are directing social media censorship.

7.   As a direct result of these actions, there has been an unprecedented rise of censorship and suppression of free speech—including core political speech—on social-media platforms. Many viewpoints and speakers have been unlawfully and unconstitutionally silenced in the modern public square.  These actions gravely threaten the fundamental right of free speech and free discourse for virtually all citizens in Missouri, Louisiana, and America, both on social media and elsewhere.   And they have directly impacted individual Plaintiffs in this case, all of whom have been censored and/or shadowbanned as a result of Defendants' actions.

8.   Under the First Amendment, the federal Government should play no role in policing private speech or picking winners and losers in the marketplace of ideas.  But that is what federal officials are doing, on a massive scale – the full scope and impact of which yet to be determined.

9

9.   Secretary Mayorkas of DHS commented that the federal Government's efforts to police private speech on social media are occurring "across the federal enterprise."  It turns out that this statement is quite literally true.  This case involves a massive, sprawling federal "Censorship Enterprise," which includes dozens of federal officials across at least eleven federal agencies and components, who communicate with social-media platforms about misinformation, disinformation, and the suppression of private speech on social media—all with the intent and effect of pressuring social-media platforms to censor and suppress private speech that federal officials disfavor.

10. This Censorship Enterprise is extremely broad, including officials in the White House, HHS, DHS, CISA, the CDC, NIAID, and the Office of the Surgeon General; as well as the Census Bureau, the FDA, the FBI, the State Department, the Treasury Department, and the U.S. Election Assistance Commission, among others.  And this effort rises to the highest levels of the U.S. Government, including numerous White House officials overseeing the Censorship Enterprise.

## JURISDICTION AND VENUE

11. This Court has subject-matter jurisdiction because the federal claims arise under the Constitution and laws of the United States.

12. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## PARTIES

**A.      Plaintiffs.**

13. Plaintiff State of Missouri is a sovereign State of the United States of America.  Missouri sues to vindicate its sovereign, quasi-sovereign, and proprietary interests.

14. Andrew Bailey is the Attorney General of Missouri.  Under Missouri law, he has authority to bring suit on behalf of the State of Missouri to vindicate the State's sovereign, quasi-sovereign, and proprietary interests, and to protect the constitutional rights of its citizens.  *See, e.g.*, Mo. Rev. Stat. § 27.060.

15. Plaintiff State of Louisiana is a sovereign State of the United States of America.  Louisiana sues to vindicate its sovereign, quasi-sovereign, and proprietary interests.

16. Jeffrey M. Landry is the duly elected Attorney General of Louisiana.  Under Louisiana law, he has authority to bring suit on behalf of the State of Louisiana to vindicate the State's sovereign, quasi-sovereign, and proprietary interests, and to protect the constitutional rights of its citizens.

17. Missouri and Louisiana, and their agencies and officials, have a sovereign and proprietary interest in receiving free flow of information in public discourse on social-media platforms.  This includes an interest in preventing the States, their agencies, and their political subdivisions from suffering direct censorship on social-media platforms when they post their own content.  In addition, Missouri and Louisiana, and their agencies and officials, are constantly engaged in the work of formulating, enacting, advancing and enforcing public policies, and formulating messages and communications related to such policies, and they frequently and necessarily rely on the flow of speech and information on social media to inform public-policy decisions.  Further, information and ideas shared on social media frequently are repeated in, and impact and influence, public discourse outside of social media, which Missouri and Louisiana, and their agencies and officials, also rely upon.

18. Missouri and Louisiana further have a sovereign interest in ensuring that the fundamental values reflected in their own Constitutions and laws, and the fundamental rights guaranteed to their

citizens, are not subverted by the unconstitutional actions of federal officials and those acting in concert with them. Missouri's Constitution provides the highest level of protection for the freedom of speech, protecting it in even more expansive language than that in the First Amendment, and Louisiana's Constitution provides similar protection for free-speech rights. Defendants' unlawful subversion of Missourians' and Louisianans' fundamental rights and liberties under state law violates both the state and federal Constitutions, and it injures Missouri's and Louisiana's sovereign interests in advancing their own fundamental laws and fundamental policies favoring the freedom of speech.

19. In addition, Missouri and Louisiana have a quasi-sovereign interest in protecting the free-speech rights of the vast majority of their citizens, who constitute "a sufficiently substantial segment of its population." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982). This falls within Missouri's and Louisiana's "quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general." *Id.* This injury "suffices to give the State standing to sue as *parens patriae*" because "the injury" to Missourians' and Louisianans' free-speech and free-expression rights "is one that the State … would likely attempt to address"—indeed, Missouri and Louisiana have addressed, *see, e.g.,* Mo. CONST., art. I, § 8; LA. CONST., art. I, § 7—"through [their] sovereign lawmaking powers." *Alfred L. Snapp*, 458 U.S. at 607.

20. Further, Missouri and Louisiana "ha[ve] an interest in securing observance of the terms under which [they] participate[] in the federal system." *Alfred L. Snapp*, 458 U.S. at 607–08. This means bringing suit to "ensur[e] that the State and its residents are not excluded from the benefits that are to flow from participation in the federal system." *Id.* at 608. The rights secured by the First Amendment, and analogous state constitutional provisions, are foremost among the "benefits

that are to flow from participation in the federal system." *Id.* Missouri and Louisiana "have an interest, independent of the benefits that might accrue to any particular individual, in assuring that the benefits of the federal system are not denied to its general population." *Id.* Missouri and Louisiana sue to vindicate all these interests here.

21. Plaintiff Dr. Jayanta Bhattacharya is a former Professor of Medicine and current Professor of Health Policy at Stanford University School of Medicine and a research associate at the National Bureau of Economic Research. He is also Director of Stanford's Center for Demography and Economics of Health and Aging. He holds an M.D. and Ph.D. from Stanford University. He has published 161 scholarly articles in peer-reviewed journals in the fields of medicine, economics, health policy, epidemiology, statistics, law, and public health, among others. His research has been cited in the peer-reviewed scientific literature more than 13,000 times. He was one of the co-authors of the Great Barrington Declaration, a statement criticizing government-mandated COVID restrictions, which was co-signed by over 930,000 people, including over 62,000 scientists and healthcare professionals. Dr. Bhattacharya and his audiences have experienced significant censorship and suppression of his speech on social-media caused by Defendants, as detailed in his previously filed Declaration, ECF No. 10-3, which is attached as Exhibit C and incorporated by reference herein.

22. Plaintiff Dr. Martin Kulldorff is an epidemiologist, a biostatistician and a former Professor of Medicine at Harvard University and Brigham and Women's Hospital, from 2015 to November 2021. Before that, he was Professor of Population Medicine at Harvard University from 2011 to 2015. He holds a Ph.D. from Cornell University. He has published over 200 scholarly articles in peer-reviewed journals in the fields of public health, epidemiology, biostatistics and medicine, among others. His research has been cited in the peer-reviewed scientific literature more than

25,000 times.  He was one of the co-authors of the Great Barrington Declaration, a statement

criticizing government-mandated COVID restrictions, which was co-signed by over 930,000

people, including over 62,000 scientists and healthcare professionals.  Dr. Kulldorff and his

audiences have experienced significant censorship and suppression of his speech on social-media

caused by Defendants, as detailed in his previously filed Declaration, ECF No. 10-4, which is

attached as Exhibit D and incorporated by reference herein.

23. Plaintiff Dr. Aaron Kheriaty earned his M.D. from Georgetown University, and completed

residency training in psychiatry at the University of California Irvine.  For many years, he was a

Professor of Psychiatry at UCI School of Medicine and the Director of the Medical Ethics Program

at UCI Health, where he chaired the ethics committee.  He also chaired the ethics committee at the

California Department of State Hospitals for several years.  He is now a Fellow at the Ethics &

Public Policy Center in Washington, DC, where he directs the program on Bioethics and American

Democracy.  He has authored numerous books and articles for professional and lay audiences on

bioethics, social science, psychiatry, religion, and culture.  His work has been published in the

Wall Street Journal, the Washington Post, Arc Digital, The New Atlantis, Public Discourse, City

Journal, and First Things.  He has conducted print, radio, and television interviews on bioethics

topics with The New York Times, the Los Angeles Times, CNN, Fox News, and NPR.  He

maintains social-media accounts, including the Twitter account @akheriaty, which has over

158,000 followers.  Dr. Kheriaty and his audiences have experienced significant censorship and

suppression of his speech on social-media caused by Defendants, as detailed in his previously filed

Declaration, ECF No. 10-7, which is attached as Exhibit G incorporated by reference herein.

24. Plaintiff Jim Hoft is the founder, owner, and operator of the popular news website The

Gateway Pundit.  He resides in St. Louis, Missouri.  The Gateway Pundit is one of the most popular

conservative news sites in the country, with over 2.5 million web searches per day.  Mr. Hoft maintains and operates The Gateway Pundit's social-media accounts, including a Facebook account with over 650,000 followers, an Instagram account with over 205,000 followers, and (until its recent permanent suspension) a Twitter account with over 400,000 followers.  Mr. Hoft and his audiences have experienced extensive government-induced censorship on social-media platforms, including of his speech on COVID-19 issues and election security issues, as set forth in his Declaration, ECF No. 10-5, which is attached as Exhibit E and incorporated by reference herein.

25. Plaintiff Jill Hines is a resident of Louisiana.  She is the Co-Director of Health Freedom Louisiana, a consumer and human rights advocacy organization.  She also launched, in 2020, a grassroots effort called Reopen Louisiana.  She maintains social-media accounts for both Health Freedom Louisiana and Reopen Louisiana with approximately 13,000 followers.  Ms. Hines and her audiences have experienced extensive government-induced censorship of her speech on social media, including her speech related to COVID-19 restrictions, as set forth in her Declaration, ECF No. 10-12, which is attached as Exhibit L and incorporated by reference herein.

**B.    Defendants.**

26. Defendant Joseph R. Biden, Jr., is President of the United States.  He is sued in his official capacity.

27. Defendant Karine Jean-Pierre is White House Press Secretary.  She is sued in her official capacity.  She is substituted for her predecessor, former White House Press Secretary Jennifer Rene Psaki.

28. Defendant Vivek H. Murthy is Surgeon General of the United States.  He is sued in his official capacity.

29. Defendant Xavier Becerra is Secretary of the Department of Health and Human Services. He is sued in his official capacity.

30. Defendant Department of Health and Human Services (HHS) is a Cabinet-level agency within the Government of the United States.

31. Defendant Anthony Fauci is the former Director of the National Institute of Allergy and Infectious Diseases (NIAID) and Chief Medical Advisor to the President. He is sued in his official capacity.

32. Defendant National Institute of Allergy and Infectious Diseases (NIAID) is a federal agency under the Department of Health and Senior Services.

33. Dr. Hugh Auchincloss is the Acting Director of NIAID, and became Acting Director on or about January 1, 2023. He is sued in his official capacity.

34. Defendant Centers for Disease Control and Prevention (CDC) is a federal agency under the Department of Health and Human Services.

35. Defendant Carol Y. Crawford is Chief of the Digital Media Branch of the Division of Public Affairs within the Centers for Disease Control and Prevention. She is sued in her official capacity.

36. Defendant United States Census Bureau, a.k.a. Bureau of the Census ("Census Bureau"), is an agency of the federal government within the Department of Commerce.

37. Defendant Jennifer Shopkorn is Senior Advisor for Communications with the U.S. Census Bureau. She is sued in her official capacity.

38. Defendant U.S. Department of Commerce is a Cabinet-level agency within the Government of the United States.

16

39. Defendant Alejandro Mayorkas is Secretary of the Department of Homeland Security. He is sued in his official capacity.

40. Defendant Robert Silvers is Under Secretary of the Office of Strategy, Policy, and Plans, within the Department of Homeland Security. He is sued in his official capacity.

41. Defendant Samantha Vinograd is the Senior Counselor for National Security within the Office of the Secretary of DHS. She is sued in her official capacity.

42. Defendant Department of Homeland Security (DHS) is a Cabinet-level agency within the Government of the United States.

43. Defendant Jen Easterly is the Director of the Cybersecurity and Infrastructure Security Agency within the Department of Homeland Security. She is sued in her official capacity.

44. Defendant Cybersecurity and Infrastructure Security Agency (CISA) is an agency within the Department of Homeland Security that is charged with protecting the United States' cybersecurity and physical infrastructure.

45. Defendant Gina McCarthy is the White House National Climate Advisor. She is sued in her official capacity.

46. Defendant Nina Jankowicz is the director of the newly constituted "Disinformation Governance Board" within the Department of Homeland Security. She is sued in her official capacity.

47. At times relevant to this Complaint, Defendant Andrew Slavitt is or was the White House Senior COVID-19 Advisor. He is sued in his official capacity.

48. Defendant Rob Flaherty is Deputy Assistant to the President and Director of Digital Strategy at the White House. He is sued in his official capacity.

49. At times relevant to this Complaint, Defendant Courtney Rowe is or was the White House Covid-19 Director of Strategic Communications and Engagement.  She is sued in her official capacity.

50. Defendant Clarke Humphrey is the White House Digital Director for the Covid-19 Response Team.  She is sued in her official capacity.

51. At times relevant to this Complaint, Defendant Benjamin Wakana is or was the Deputy Director of Strategic Communications and Engagement at the White House COVID-19 Response Team.  He is sued in his official capacity.

52. Defendant Subhan Cheema is Deputy Director for Strategic Communications and External Engagement for the White House Covid-19 Response Team.  He is sued in his official capacity.

53. Defendant Dori Salcido is, on information and belief, the White House Covid-19 Director of Strategic Communications and Engagement.  She is sued in her official capacity.

54. At times relevant to this Complaint, Defendant Timothy W. Manning is or was the White House Covid-19 Supply Coordinator.  He is sued in his official capacity.

55. Defendant Dana Remus was, at times relevant to this Complaint, Counsel to the President, a.k.a. White House Counsel.  She is sued in her official capacity.

56. Defendant Aisha Shah is White House Partnerships Manager.  She is sued in her official capacity.

57. Defendant Laura Rosenberger serves as Special Assistant to the President at the White House.  She has extensive experience in service at the State Department.  She is sued in her official capacity.

58. Defendant Mina Hsiang is Administrator of the U.S. Digital Service within the Office of Management and Budget in the Executive Office of the President. She is sued in her official capacity.

59. Defendant U.S. Department of Justice ("DOJ") is a Cabinet-level agency within the Government of the United States.

60. Defendant Federal Bureau of Investigation ("FBI") is an investigative agency of the federal Government within the U.S. Department of Justice. The Foreign Influence Task Force ("FITF") is a task force within the FBI that purportedly investigates and/or addresses foreign influences within the United States. The FTIF's website states: "The FBI is the lead federal agency responsible for investigating foreign influence operations. In the fall of 2017, Director Christopher Wray established the Foreign Influence Task Force (FITF) to identify and counteract malign foreign influence operations targeting the United States." https://www.fbi.gov/investigate/counterintelligence/foreign-influence.

61. Defendant Laura Dehmlow is the Section Chief for the FBI's Foreign Influence Task Force. She is sued in her official capacity.

62. Defendant Elvis M. Chan is Supervisory Special Agent of Squad CY-1 in the San Francisco Division of the FBI. On information and belief, he has authority over cybersecurity issues for FBI in that geographical region, which includes the headquarters of major social-media platforms, and he plays a critical role for FBI and FITF in coordinating with social-media platforms relating to censorship and suppression of speech on their platforms.

63. Defendant Jay Dempsey is Social Media Team Lead, Digital Media Branch, Division of Public Affairs at the CDC. He is sued in his official capacity.

64. Defendant Kate Galatas is Deputy Communications Director at the CDC. She is sued in her official capacity.

65. Defendant Eric Waldo is Chief Engagement Officer for the Surgeon General. He is sued in his official capacity.

66. Defendant Yolanda Byrd is a member of the Digital Engagement Team at HHS. She is sued in her official capacity.

67. Defendant Christy Choi is Deputy Director, Office of Communications, HRSA within HHS. She is sued in her official capacity.

68. Defendant Tericka Lambert served Director of Digital Engagement at HHS and now serves as Deputy Director of the Office of Digital Strategy at the White House. She is sued in her official capacity.

69. Defendant Joshua Peck is Deputy Assistant Secretary for Public Engagement at HHS. He is sued in his official capacity.

70. At times relevant to this Complaint, Defendant Janell Muhammad is or was Deputy Digital Director at HHS. She is sued in her official capacity.

71. At times relevant to this Complaint, Defendant Matthew Masterson is or was Senior Cybersecurity Advisory within CISA in the Department of Homeland Security. He is sued in his official capacity.

72. Defendant Lauren Protentis is a member of the "Mis, Dis, and Mal-information (MDM) Team" within CISA at DHS. She is sued in her official capacity.

73. Defendant Geoffery Hale is a member of the Mis, Dis, and Mal-information (MDM) Team within CISA at DHS. He is sued in his official capacity.

74. Defendant Allison Snell is a member of the Mis, Dis, and Mal-information (MDM) Team within CISA at DHS.  She is sued in her official capacity.

75. Defendant Kim Wyman is CISA's Senior Election Security Lead.  She is sued in her official capacity.

76. Defendant Brian Scully is a member of DHS's Countering Foreign Influence Task Force, National Risk Management Center, and the Chief of the Mis-, Dis-, Malinformation Team at CISA. He is sued in his official capacity.

77. Defendant Zachary ("Zack") Henry Schwartz is the Division Chief for the Communications Directorate at the U.S. Census Bureau.  He is sued in his official capacity.

78. Defendant Lorena Molina-Irizarry served at times relevant to this Complaint as Director of Operations at Census Open Innovation Labs at the Census Bureau and Senior Advisor on the American Rescue Plan Team at the White House.  She is sued in her official capacity.

79. Defendant Kristin Galemore is Deputy Director of the Office of Faith Based and Neighborhood Partnerships at the Census Bureau.  She is sued in her official capacity.

80. Defendant U.S. Food and Drug Administration ("FDA") is a federal agency within the U.S. Department of Health and Human Services.

81. Defendant Erica Jefferson is the Associate Commissioner for External Affairs within the Office of the Commissioner at the U.S. Food and Drug Administration.  She is sued in her official capacity.

82. Defendant Michael Murray is the Acquisition Strategy Program Manager for the Office of Health Communications and Education at the FDA.  He is sued in his official capacity.

83. Defendant Brad Kimberly is the Director of Social Media at the FDA.  He is sued in his official capacity.

21

84. Defendant U.S. Department of State ("State Department") is a Cabinet-level agency within the Government of the United States.

85. Defendant Leah Bray is the Acting Coordinator of the State Department's Global Engagement Center. She is sued in her official capacity.

86. Defendant Samaruddin K. Stewart is a Senior Technical Advisor and/or Senior Advisor for the Global Engagement Center of the State Department. He is sued in his official capacity.

87. At times relevant to this Complaint, Defendant Daniel Kimmage is or was the Acting Coordinator for the Global Engagement Center at the State Department. He is sued in his official capacity.

88. Defendant Alexis Frisbie is a member of the Technology Engagement Team at the Global Engagement Center at the State Department. She is sued in her official capacity.

89. The State Department operates a "Global Engagement Center" within the State Department that conducts counter-"disinformation" activities. According to the State Department's website, the Global Engagement Center's mission is "[t]o direct, lead, synchronize, integrate, and coordinate efforts of the Federal Government to recognize, understand, expose, and counter foreign state and non-state propaganda and disinformation efforts aimed at undermining or influencing the policies, security, or stability of the United States, its allies, and partner nations." As alleged further herein, the Global Engagement Center is involved in procuring the censorship of private speech on social media, including of U.S. citizens. The State Department also maintains an Office of Cyber Coordinator, a.k.a. Office of the Coordinator for Cyber Issues, that has, on information and belief, also been involved in federal social-media censorship activities.

90. Defendant U.S. Department of the Treasury ("Treasury") is a Cabinet-level agency within the Government of the United States.

91. Defendant Wally Adeyemo is the Deputy Secretary of the Treasury. He is sued in his official capacity.

92. Defendant U.S. Election Assistance Commission ("EAC") is an independent agency within the Government of the United States. According to its website, the EAC "was established by the Help America Vote Act of 2002 (HAVA). The EAC is an independent, bipartisan commission charged with developing guidance to meet HAVA requirements, adopting voluntary voting system guidelines, and serving as a national clearinghouse of information on election administration."

93. Defendant Mark A. Robbins is the Interim Executive Director of the EAC. He is sued in his official capacity.

94. Defendant Kristen Muthig is the Director of Communications for the EAC. According to the EAC's website, Muthig "manages media relations, communications strategy and supports the commissioners and EAC leadership." She is sued in her official capacity.

## GENERAL ALLEGATIONS

**A. Freedom of Speech Is the Bedrock of American Liberty.**

95. The First Amendment of the U.S. Constitution states that "Congress shall make no law … abridging the freedom of speech, or of the press…" U.S. CONST. amend. I.

96. Article I, § 8 of the Missouri Constitution provides "[t]hat no law shall be passed impairing the freedom of speech, no matter by what means communicated: that every person shall be free to say, write or publish, or otherwise communicate whatever he will on any subject, being responsible for all abuses of that liberty…." MO. CONST. art. I, § 8. Article I, § 7 of the Louisiana Constitution provides that "[n]o law shall curtail or restrain the freedom of speech or of the press. Every person may speak, write, and publish his sentiments on any subject, but is responsible for abuse of that

freedom." LA. CONST. art. I, § 7.  All other State Constitutions likewise protect the freedom of speech as a fundamental right of the first order.

97. The freedom of speech and expression guaranteed by the First Amendment is one of the greatest bulwarks of liberty.  These rights are fundamental and must be protected against government interference.

**1.  Government officials lack authority to censor disfavored speakers and viewpoints.**

98. If the President or Congress enacted a law or issued an order requiring the suppression of certain disfavored viewpoints or speakers on social media, or directing social media to demonetize, shadow-ban, or expel certain disfavored speakers, such a law or order would be manifestly unconstitutional under the First Amendment.

99. "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

100.    "[T]he First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002) (quotations omitted).

101.    "In light of the substantial and expansive threats to free expression posed by content-based restrictions," the Supreme "Court has rejected as 'startling and dangerous' a 'free-floating test for First Amendment coverage ... [based on] an *ad hoc* balancing of relative social costs and benefits.'" *United States v. Alvarez*, 567 U.S. 709, 717 (2012) (plurality op.) (quoting *United States v. Stevens*, 559 U.S. 460, 470 (2010)).

**2.  Merely labeling speech "misinformation" or "disinformation" does not strip away First Amendment protections.**

24

102.    Labeling disfavored speech "misinformation" or "disinformation" does not strip it of First Amendment protection.  "Absent from those few categories where the law allows content-based regulation of speech is any general exception to the First Amendment for false statements.  This comports with the common understanding that some false statements are inevitable if there is to be an open and vigorous expression of views in public and private conversation, expression the First Amendment seeks to guarantee."  *Id.* at 718.

103.    The Supreme Court has thus rejected the argument "that false statements, as a general rule, are beyond constitutional protection."  *Id.*

104.    "Permitting the government to decree this speech to be a criminal offense, whether shouted from the rooftops or made in a barely audible whisper, would endorse government authority to compile a list of subjects about which false statements are punishable.   That governmental power has no clear limiting principle.  Our constitutional tradition stands against the idea that we need Oceania's Ministry of Truth."  *Id.* at 723 (citing G. ORWELL, NINETEEN EIGHTY–FOUR (1949) (Centennial ed. 2003)).

105.    "Were the Court to hold that the interest in truthful discourse alone is sufficient to sustain a ban on speech … it would give government a broad censorial power unprecedented in this Court's cases or in our constitutional tradition.  The mere potential for the exercise of that power casts a chill, a chill the First Amendment cannot permit if free speech, thought, and discourse are to remain a foundation of our freedom."  *Id.* at 723.

**3.  Counterspeech, not censorship, is the proper response to supposed "misinformation."**

106.    When the Government believes that speech is false and harmful, "counterspeech," not censorship, must "suffice to achieve its interest."  *Id.* at 726.  The First Amendment presumes that "the dynamics of free speech, of counterspeech, of refutation, can overcome the lie."  *Id.*

25

107.     "The remedy for speech that is false is speech that is true.  This is the ordinary course in a free society.  The response to the unreasoned is the rational; to the uninformed, the enlightened; to the straightout lie, the simple truth." *Id.* at 727.

108.     "The theory of our Constitution is 'that the best test of truth is the power of the thought to get itself accepted in the competition of the market.'" *Id.* at 728 (quoting *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting)).

109.     "The First Amendment itself ensures the right to respond to speech we do not like, and for good reason.  Freedom of speech and thought flows not from the beneficence of the state but from the inalienable rights of the person.  And suppression of speech by the government can make exposure of falsity more difficult, not less so.  Society has the right and civic duty to engage in open, dynamic, rational discourse.  These ends are not well served when the government seeks to orchestrate public discussion through content-based mandates." *Id.* at 728.

**4.  Americans have a First Amendment right to be exposed to a free flow of speech, viewpoints, and content, free from censorship by government officials.**

110.     The First Amendment also protects the right to receive others' thoughts, messages, and viewpoints freely, in a free flow of public discourse.  "[W]here a speaker exists …, the protection afforded is to the communication, to its source and to its recipients both." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 756 (1976).

111.     The right to receive information is "an inherent corollary of the rights to free speech and press that are explicitly, guaranteed by the Constitution," because "the right to receive ideas follows ineluctably from the sender's First Amendment right to send them." *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982). "The dissemination of ideas can accomplish nothing if otherwise willing addressees are not free to receive and consider them.

It would be a barren marketplace of ideas that had only sellers and no buyers." *Lamont v. Postmaster Gen.*, 381 U.S. 301, 308 (1965) (Brennan, J., concurring).

112.    "A fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017).

113.    "[A]ssuring that the public has access to a multiplicity of information sources is a governmental purpose of the highest order, for it promotes values central to the First Amendment." *Turner Broadcasting Sys., Inc. v. FCC*, 512 U.S. 622, 663 (1994). Indeed, "the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public." *United States v. Midwest Video Corp.*, 406 U.S. 649, 668 n.27 (1972) (plurality op.) (quotations omitted).

### 5. Government officials may not circumvent the First Amendment by inducing, threatening, and/or colluding with private entities to suppress protected speech.

114.    It is "axiomatic" that the government may not "induce, encourage, or promote private persons to accomplish what it is constitutionally forbidden to accomplish." *Norwood v. Harrison*, 413 U.S. 455, 465 (1973) (quotations omitted).

115.    A private entity violates the First Amendment "if the government coerces or induces it to take action the government itself would not be permitted to do, such as censor expression of a lawful viewpoint." *Knight First Amendment Institute*, 141 S. Ct. at 1226 (Thomas, J., concurring). "The government cannot accomplish through threats of adverse government action what the Constitution prohibits it from doing directly." *Id.*

116.    Threats of adverse regulatory or legislative action, to induce private actors to censor third parties' speech, violate the First Amendment. *See Hammerhead Enters. v. Brezenoff*, 707 F.2d 33, 39 (2d Cir. 1983) ("Where comments of a government official can reasonably be

27

interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request, a valid claim can be stated."); *see also Bantam Books v. Sullivan*, 372 U.S. 58, 68 (1963) (holding that a veiled threat of prosecution to pressure a private bookseller to stop selling disfavored books could violate the First Amendment).

117.    The unprecedented control over private speech exercised by social-media companies gives government officials an unprecedented opportunity to circumvent the First Amendment and achieve indirect censorship of private speech.  "By virtue of its ownership of the essential pathway," a social media platform "can . . . silence the voice of competing speakers with a mere flick of the switch." *Turner*, 512 U.S. at 656*; see also Knight First Amendment Inst*., 141 S. Ct. at 1224 (Thomas, J., concurring). "The potential for abuse of this private power over a central avenue of communication cannot be overlooked." *Turner*, 512 U.S. at 656.

**B.    The Dominance of Social Media as a Forum for Public Information and Discourse.**

118.    Social media has become, in many ways, "the modern public square." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1737 (2017).  Social media platforms provide "perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard." *Id.*

119.    "Today's digital platforms provide avenues for historically unprecedented amounts of speech, including speech by government actors. Also unprecedented, however, is the concentrated control of so much speech in the hands of a few private parties." *Knight First Amendment Institute*, 141 S. Ct. at 1221.

120.    The "concentration" of power in social media companies "gives some digital platforms enormous control over speech." *Id.* at 1224.  Defendants have not hesitated to exploit this power.

121.    For example, on information and belief, Facebook has close to 3 billion registered users worldwide and over 124 million users in the United States, including millions of Missourians and millions of citizens of other States.

122.    On information and belief, Twitter has more than 340 million users worldwide, including approximately 70 million users in the United States.  Approximately 500 million tweets are posted on Twitter every day, and they are accessible to non-Twitter users on the internet. Moreover, Twitter users include large numbers of politicians, journalists, public figures, and others with a disproportionately large impact on public discourse in other forums, so Twitter's impact on public discourse is even larger than its numbers alone reflect.

123.    On information and belief, YouTube has more than 4 billion hours of video views every month.  Videos on YouTube channels are visible to both YouTube users and to the general public on the internet.  An estimated 500 hours of video content are uploaded to YouTube every minute.

124.    YouTube is extremely popular among politicians and public figures in reaching their audiences.  On information and belief, in 2020, approximately 92 percent of U.S. Senators and 86 percent of U.S. Representatives uploaded content on YouTube.

125.    According to a recent Pew Research study, 66 percent of U.S. adults use Facebook, and 31 percent of U.S. adults say they get news regularly on Facebook.  Walker et al., *News Consumption Across Social Media in 2021*, PEW RESEARCH CENTER (Sept. 20, 2021), *at* https://www.pewresearch.org/journalism/2021/09/20/news-consumption-across-social-media-in-2021/.

126.    According to the same study, 72 percent of U.S. adults say that they use YouTube, and 22 percent of U.S. adults say that they regularly get news on YouTube.  *Id.*

127.     According to the same study, 23 percent of U.S. adults say that they use Twitter, and 13 percent of U.S. adults say they regularly get news on Twitter.  *Id.*  This comprises 55 percent of Twitter users.  *Id.*

128.     According to the same study, 41 percent of U.S. adults say that they use Instagram, and 11 percent of U.S. adults say they regularly get news on Instagram.  *Id.*

129.     The free flow of information and expression on social media directly affects non-users of social media as well.  Social-media users who are exposed to information, ideas, and expression through social media communicate the same information, ideas, and expression with non-social-media users.  News, information, messages, narratives, and storylines that originate on social media are frequently replicated in other forums, such as television, print media, and private discourse.  Further, much content posted on social-media is directly available to non-social-media users.  For example, posts on Twitter are directly accessible on the internet to non-Twitter-users, and content on YouTube is available to the general public on the internet as well.

130.     In the aggregate, these numbers of Americans who (1) use social-media platforms, and (2) regularly use social-media platforms to obtain news and information about matters of public interest, comprise hundreds of millions of Americans, including millions of Missourians and Louisianans, and very substantial segments of the populations of Missouri, Louisiana, and every other State.

131.     There are also many ways for social-media companies to censor or suppress speech on social-media platforms.  Some of these methods are immediately known to the speaker and/or his or her audience, and some are not visible to them.  Censorship, therefore, can occur without the knowledge of the speaker and/or his or her audience.  These methods include, but are not limited to, terminating speakers' accounts, suspending accounts, imposing warnings or strikes

against accounts to chill future disfavored speech, "shadow banning" speakers, demonetizing

content, adjusting algorithms to suppress or de-emphasize speakers or messages, promoting or

demoting content, placing warning labels on content, suppressing content in other users' feeds,

promoting negative comments on disfavored content, and requiring additional click-through(s) to

access content, among many others. Many methods, moreover, have a chilling effect on social-

media speech, as the threat of censorship (such as suspension, demonetization, or banning) drives

speakers to self-censor to avoid making statements that might be deemed to violate the social-

media companies' vague, ever-changing, often-hidden, and inconsistently enforced standards for

censoring and suppressing speech. Collectively herein, all these methods of suppressing and/or

censoring speech on social media are called "censorship" and/or "suppression" of social-media

speech.

132.    The censorship and suppression of free speech on social media functions in most

cases as a prior restraint on speech, both through its direct effect and its chilling effects. A prior

restraint is the most severe form of restriction on freedom of expression.

**C.    Public and Private Attempts to Police "Misinformation" or "Disinformation" on Social Media Have Proven Embarrassingly Inaccurate.**

133.    Yesterday's "misinformation" often becomes today's viable theory and tomorrow's

established fact. "Even where there is a wide scholarly consensus concerning a particular matter,

the truth is served by allowing that consensus to be challenged without fear of reprisal. Today's

accepted wisdom sometimes turns out to be mistaken." *Alvarez*, at 752 (Alito, J., dissenting)

(emphasis added). This prediction has proven true, again and again, when it comes to suppressing

"misinformation" and "disinformation" on social media.

**1.    The Hunter Biden laptop story.**

134.    Perhaps most notoriously, social-media platforms aggressively censored an October 14, 2020 New York Post exposé about the contents of the laptop of (then-Candidate Biden's son) Hunter Biden, which had been abandoned in a Delaware repair shop and contained compromising photos and email communications about corrupt foreign business deals.  As the New York Post reported at the time, "[b]oth Twitter and Facebook took extraordinary censorship measures against The Post on Wednesday over its exposés about Hunter Biden's emails … The Post's primary Twitter account was locked as of 2:20 p.m. Wednesday because its articles about the messages obtained from Biden's laptop broke the social network's rules against 'distribution of hacked material,' according to an email The Post received from Twitter," even though there were "zero claims that [Hunter Biden's] computer had been hacked."  *Twitter, Facebook censor Post over Hunter Biden exposé*, N.Y. POST (Oct. 14, 2020), *at* https://nypost.com/2020/10/14/facebook-twitter-block-the-post-from-posting/.    "Twitter also blocked users from sharing the link to The Post article indicating that Hunter Biden introduced Joe Biden to the Ukrainian businessman, calling the link 'potentially harmful.'" *Id.*

135.    As the Wall Street Journal Editorial Board reported, "nearly all of the media at the time ignored the story or 'fact-checked' it as false.  This … was all the more egregious given other evidence supporting the Post's scoop.  Neither Hunter Biden nor the Biden campaign denied that the laptop was Hunter's.  And Hunter's former business partner, Tony Bobulinski, went public with documents backing up some of the laptop's contents."  Editorial Board, *Hunter Biden's Laptop Is Finally News Fit to Print*, WALL ST. J. (March 18, 2022).

136.    Biden, his allies, and those acting in concert with them falsely attacked the Hunter Biden laptop story as "disinformation."  *Id.*    Fifty "intelligence officials—headlined by former Obama spooks James Clapper and John Brennan—circulated a statement peddling the Russian

'disinformation' line—even as they admitted they had no evidence.  Th[e] result was a blackout of the Hunter news, except in a few places…."  *Id.*  Parroting the Biden campaign's false line, both social media platforms and major news organizations treated the story as "disinformation" and aggressively censored it.

137.     In early 2022—over a year and a half later—major news organizations finally admitted that the Hunter Biden laptop story was truthful and rested on reliable sourcing and information.  *Id.*  The Washington Post and the New York Times quietly acknowledged the truth and reliability of the story "17 months" later, in mid-March 2022.  *Id.*

138.     Free-speech advocate Glenn Reynolds aptly described this embarrassing episode as one that permanently damaged the credibility and reputation for fairness of social-media platforms and major media outlets:  "Twitter and other tech giants banned The Post's reporting, since admitted to be accurate, on Hunter Biden's laptop and the damaging information it contained. Many social-media giants banned any links to the story, and Twitter even went so far as to stop its users from sharing the story one-on-one through direct messages. (CEO Jack Dorsey later admitted that was a 'total mistake.')  Their purpose was to affect the election's outcome in favor of the Democrats, and they probably did."  Glenn H. Reynolds, '*Censorship is free speech' is the establishment's Orwellian line on Elon Musk's Twitter crusade*, N.Y. POST (Apr. 15, 2022), https://nypost.com/2022/04/14/the-establishments-orwellian-line-on-elon-musks-twitter-crusade/.

> **2.     Speech about the lab-leak theory of COVID-19's origins.**

139.     Likewise, beginning in February 2020, social-media platforms censored speech advocating for the lab-leak theory of the origins of SARS-CoV-2, the virus that causes COVID-19.  The lab-leak theory postulates that the virus did not originate naturally in bats or other animals,

but leaked from a biotech laboratory in Wuhan, China, operated by the Wuhan Institute of Virology.

140.     On information and belief, Defendant Dr. Anthony Fauci, a senior federal government official, coordinating with others, orchestrated a campaign to discredit the lab-leak hypothesis in early 2020.  As director of NIAID, Dr. Fauci had funded risky "gain-of-function" research at the Wuhan Institute of Virology through intermediaries such as EcoHealth Alliance, headed by Dr. Peter Daszak.  Thus, if the lab-leak theory were established, Dr. Fauci and Dr. Daszak could be potentially implicated in funding the research on viruses that caused the COVID-19 pandemic and killed millions of people worldwide.

141.     During the same time frame as he was orchestrating a campaign to falsely discredit the lab-leak theory, Dr. Fauci was exchanging emails with Mark Zuckerberg, the CEO of Facebook, regarding public messaging and the dissemination of COVID-19 information on social-media.  On information and belief, Dr. Fauci coordinated directly with Facebook and/or other social-media firms to suppress disfavored speakers and content of speech on social media.

142.     Not surprisingly, social-media platforms like Facebook promptly accepted Dr. Fauci's initiative to discredit the lab-leak theory, and they engaged in an aggressive campaign to censor speech advocating for the lab-leak theory on social media on the ground that it was supposedly disinformation.  Facebook "expand[ed] its content moderation on Covid-19 to include 'false' and 'debunked' claims such as that 'COVID-19 is man-made or manufactured.'"  Editorial Board, *Facebook's Lab-Leak About-Face*, WALL ST. J. (May 27, 2021), https://www.wsj.com/articles/facebooks-lab-leak-about-face-11622154198.  This included suppressing speech by highly credentialed and well-respected writers, such as "science journalist

Nicholas Wade," *id.*, and scientist Alina Chan.  Other social-media platforms likewise censored speech advocating for the lab-leak hypothesis.

143.    By 2021, however, "the circumstantial evidence" favoring the lab-leak theory "finally permeated the insular world of progressive public health," *id.*, and Fauci and other Biden Administration officials were forced to admit the theory's inherent plausibility.  After a long period of censorship, in May 2021, Facebook and other platforms announced that they would no longer censor social-media speech advocating for the lab-leak theory.

144.    The Wall Street Journal noted the close link between government and social-media platforms in censoring this speech: "Facebook acted in lockstep with the government," indicating that "[w]hile a political or scientific claim is disfavored by government authorities, Facebook will limit its reach.  When government reduces its hostility toward an idea, so will Facebook."  *Id.* "Free speech protects the right to challenge government.  But instead of acting as private actors with their own speech rights, the companies are mandating conformity with existing government views."  *Id.*

145.    There had long been credible—even compelling—evidence of the plausibility of the lab-leak theory, long before social-media companies stopped censoring it.  *See, e.g.,* House Foreign Affairs Committee Minority Staff Report, *The Origins of COVID-19: An Investigation of the Wuhan Institute of Virology* (Aug. 2021), https://gop-foreignaffairs.house.gov/wp-content/uploads/2021/08/ORIGINS-OF-COVID-19-REPORT.pdf (detailing evidence available long before censorship lifted); Nicholas Wade, *The origin of COVID: Did people or nature open Pandora's box at Wuhan?*, BULL. ATOMIC SCIENTISTS (May 5, 2021), https://thebulletin.org/2021/05/the-origin-of-covid-did-people-or-nature-open-pandoras-box-at-wuhan/; ALINA CHAN, VIRAL: THE SEARCH FOR THE ORIGIN OF COVID-19 (Sept. 3, 2021).

146.     Facebook's decision to stop censoring the lab-leak theory did not come until "after almost every major media outlet, and … even the British and American security services, finally confirmed that it is a feasible possibility."  Freddie Sayers, *How Facebook censored the lab leak theory*, UNHERD (May 31, 2021), https://unherd.com/2021/05/how-facebook-censored-the-lab-leak-theory/.  Facebook admitted that its decision to end censorship was made "in consultation with" government officials, *i.e.*, "public health experts."  *Id.*

147.     The reach of Facebook's censorship alone (to say nothing of other platforms that censored the lab-leak theory) was enormous.  Facebook "displayed 'warnings'" on such supposed COVID-19-related misinformation, and claimed that "[w]hen people saw those warning labels, 95% of the time they did not go on to view the original content."  *Id.*  "Moreover, if an article is rated 'false' by their 'fact checkers', the network will 'reduce its distribution'.  This means that, while an author or poster is not aware that censorship is taking place, the network could be hiding their content so it is not widely disseminated."  *Id.*

148.     Ironically, while admitting that it had erroneously censored speech on the lab-leak theory for over a year, Facebook announced that it was "now extending its policy of 'shadow-banning' accounts that promote misinformation.  'Starting today, we will reduce the distribution of all posts in News Feed from an individual's Facebook account if they repeatedly share content that has been rated by one of our fact-checking partners.'  So now, if you share something deemed to contain misinformation multiple times, your account could be silenced; you won't be informed, you won't know to what degree your content will be hidden and you won't know how long it will last—all thanks to group of 'fact-checkers' whose authority cannot be questioned."  *Id.*  It is astonishing that "this announcement was made on the very same day as Facebook's admission of error" on the lab-leak theory.  *Id.*

### 3.   Speech about the efficacy of mask mandates and COVID-19 lockdowns.

149.   Social-media platforms also aggressively censored speech questioning the efficacy of masks and lockdowns as COVID-19 mitigation measures.  Yet evidence revealed that concerns about the efficacy of these measures were well-founded.

150.   For example, on information and belief, Twitter's "COVID-19 misleading information policy," as of December 2021, noted that Twitter will censor (label or remove) speech claiming that "face masks … do not work to reduce transmission or to protect against COVID-19," among many other restrictions.  *See* Twitter, *Covid-19 misleading information policy*, https://help.twitter.com/en/rules-and-policies/medical-misinformation-policy.   On information and belief, both Twitter and other social-media platforms have imposed similar policies, imposing censorship on speech questioning the efficacy of masks and the efficacy of lockdowns as COVID-19 mitigation measures.

151.   On April 8, 2021, YouTube "deleted a video in which Florida Gov. Ron DeSantis and a handful of medical experts," including Plaintiffs Bhattacharya and Kulldorff, "questioned the effectiveness of having children wear masks to stop the spread of COVID-19."  *YouTube Purges Ron DeSantis Video Over Claims Children Don't Need to Wear Masks*, THE WRAP (Apr. 8, 2021), https://www.thewrap.com/youtube-purges-florida-governor-video-over-claims-children-dont-need-to-wear-masks/.

152.   On August 10, 2021, "YouTube barred Sen. Rand Paul (R-Ky.) from uploading new videos to the site for seven days, after the ophthalmologist posted a video last week arguing that most masks 'don't work' against the coronavirus." *Rand Paul Suspended from YouTube Over Covid Claims*, FORBES (Aug. 10, 2021), https://www.forbes.com/sites/joewalsh/2021/08/10/rand-paul-suspended-from-youtube-over-covid-claims/?sh=31f1d4e01971.

153.    "When Scott Atlas, a member of the Trump White House's coronavirus task force, questioned the efficacy of masks last year, Twitter removed his tweet.  When eminent scientists from Stanford and Harvard recently told Florida Gov. Ron DeSantis that children should not be forced to wear masks, YouTube removed their video discussion from its platform." *How Facebook uses 'fact-checking' to suppress scientific truth*, N.Y. POST (May 18, 2021), https://nypost.com/2021/05/18/how-facebook-uses-fact-checking-to-suppress-scientific-truth/.

154.    In the same vein, Facebook suppressed a scientist for citing a peer-reviewed study "by a team of researchers in Germany who established an online registry for thousands of parents to report on the impact of masks on their children.  More than half of those who responded said that masks were giving their children headaches and making it difficult for them to concentrate.  More than a third cited other problems, including malaise, impaired learning, drowsiness and fatigue." *Id.*

155.    On November 21, 2020, "[t]wo leading Oxford University academics … accused Facebook of 'censorship' after it claimed an article they wrote on face masks amounted to 'false information'." *Two top Oxford academics accuse Facebook of censorship for branding their article on whether masks work 'false information'*, DAILY MAIL (Nov. 21, 2020) https://www.dailymail.co.uk/news/article-8973631/Two-Oxford-academics-accuse-Facebook-censorship-article-warning.html.

156.    No convincing evidence supported the efficacy of mask mandates, while compelling evidence contradicted it, both before and after their implementation.  Tracking the aggregate case numbers in States with and without mask mandates over the course of the COVID-19 pandemic, in a "natural experiment," demonstrates that mask mandates made "zero difference." John Tierney, *The Failed COVID Policy of Mask Mandates*, CITY J. (April 19, 2022),

https://www.city-journal.org/the-failed-covid-policy-of-mask-mandates.    Both case rates and mortality rates were "virtually identical." *Id.* Indeed, "mask mandates were implemented without scientific justification," and "they failed around the world." *Id.* "In their pre-Covid planning strategies for a pandemic, neither the Centers for Disease Control nor the World Health Organization had recommended masking the public—for good reason. Randomized clinical trials involving flu viruses had shown, contrary to popular wisdom in Japan and other Asian countries, that there was 'no evidence that face masks are effective in reducing transmission,' as the WHO summarized the scientific literature." *Id.* "Anthony Fauci acknowledged this evidence early in the pandemic, both in his public comments ('There's no reason to be walking around with masks,' he told 60 Minutes) and in his private emails ('I do not recommend you wear a mask,' he told a colleague, explaining that masks were too porous to block the small Covid virus)." *Id.* "Instead of carefully analyzing the effects of masks, the CDC repeatedly tried to justify them by misrepresenting short-term trends and hyping badly flawed research, like studies in Arizona and Kansas purporting to show that infections had been dramatically reduced by the mask mandates imposed in some counties. But in each state, … infection rates remained lower in the counties that did not mandate masks." *Id.*; *see also, e.g.,* IAN MILLER, UNMASKED: THE GLOBAL FAILURE OF COVID MASK MANDATES (Jan. 20, 2022).

157.    Ironically, Plaintiff Kulldorff was suspended on Twitter for several weeks for posting that masks endow vulnerable individuals with a false sense of security, because they actually do not work well to protect against viral infection. This exemplifies the danger of government involvement in social media censorship: preventing a world-renowned epidemiologist from conveying to the public that vulnerable people should not rely on masks for protection could indirectly cause great harm.

158.     Likewise, no convincing evidence supported the efficacy of lockdowns.  Quite the

contrary.  In January 2022, a Johns Hopkins meta-analysis reviewed the efficacy of lockdowns as

a COVID-19 mitigation measure and found that they had minimal impact, if any, on COVID-19

mortality rates.  The study reached "the conclusion that lockdowns have had little to no effect on

COVID-19 mortality… [L]ockdowns in Europe and the United States only reduced COVID-19

mortality by 0.2% on average…. While this meta-analysis concludes that lockdowns have had

little to no public health effects, they have imposed enormous economic and social costs where

they have been adopted.  In consequence, lockdown policies are ill-founded and should be rejected

as a pandemic policy instrument."  Herby et al., *A Literature Review and Meta-Analysis of the*

*Effects of Lockdowns on COVID-19 Mortality*, STUDIES IN APPLIED ECONOMICS (Jan. 2022),

*available    at*    https://sites.krieger.jhu.edu/iae/files/2022/01/A-Literature-Review-and-Meta-

Analysis-of-the-Effects-of-Lockdowns-on-COVID-19-Mortality.pdf.

159.     On December 21, 2021, Dr. Leana Wen, a CNN medical commentator and strong

advocate for COVID-19 restrictions, tweeted that "cloth masks are little more than facial

decorations."  *CNN's Leana Wen: 'Cloth Masks Are Little More Than Facial Decorations'*,

REASON, *at* https://reason.com/2021/12/21/leana-wen-cloth-mask-facial-decorations-covid-cdc-

guidance/.  Twitter did not censor this tweet, even though it undermined the efficacy of mask

mandates that permitted the use of cloth masks (*i.e.*, virtually all of them)—undoubtedly because

it was advocating for *more* aggressive mitigation measures (*i.e.*, higher-quality masks than cloth

masks), not less.

160.     "On September 26, 2021, CDC Director Walensky cited an Arizona study to claim

that schools without mask mandates were 3.5 times more likely to experience COVID-19

outbreaks.  However, the study is so flawed that experts have said it 'should not have entered into

the public discourse' and that you 'can't learn anything' about mask rules from the study." March

11, 2022 Letter of U.S. Rep. Cathy McMorris Rodgers, et al., to Surgeon General Murthy, *at*

https://republicans-energycommerce.house.gov/wp-content/uploads/2022/03/3.11.22-Letter-to-

Surgeon-General-Murthy-Final.pdf.   Yet Director Walensky's statement circulated widely on

social media without being censored.

### 4.    Speech about election integrity and the security of voting by mail.

161.    In or around 2020, social-media platforms began aggressively censoring speech

that raised concerns about the security of voting by mail, a major election-security issue.

Notoriously, social-media platforms aggressively censored core political speech by then-President

Trump and the Trump campaign raising concerns about the security of voting by mail in the run-

up to the November 2020 presidential election.

162.    This censorship is ironic because, for many years before 2020, it was a common

left-wing talking point to claim that fraud occurred in voting by mail.   In opposing photo-ID

requirements for in-person voting, Democrats and their allies frequently claimed that photo IDs

for in-person voting were pointless because voting by mail, not in-person voting, presented the

real opportunities for fraud.

163.    These Democratic claims of fraud in voting by mail were widely parroted in

mainstream media for many years.   For example, in 2012, the New York Times wrote that "votes

cast by mail are less likely to be counted, more likely to be compromised and more likely to be

contested than those cast in a voting booth, statistics show," in an article headlined "Error and

Fraud at Issue as Absentee Voting Rises."   https://www.nytimes.com/2012/10/07/us/politics/as-

more-vote-by-mail-faulty-ballots-could-impact-elections.html.   In 2012, The Washington Post

published an articles stating that "[i]t may still be possible to steal an American election, if you

know the right way to go about it," citing a case in which "[c]onspirators allegedly bought off absentee voters" and "faked absentee ballots." https://www.washingtonpost.com/politics/decision2012/selling-votes-is-common-type-of-election-fraud/2012/10/01/f8f5045a-071d-11e2-81ba-ffe35a7b6542_story.html. In 2014, MSNBC claimed: "Indeed, election experts say absentee ballot fraud is the most common form of organized voter fraud, since, because of the secret ballot, there's no way to ensure that an in-person voter is voting for the candidate he promised to." https://www.msnbc.com/msnbc/greg-abbott-bogus-voter-fraud-crusade-msna291356. In 2016, Slate claimed, in a piece titled, "Voter Fraud Exists. Republican Restrictions Won't Stop It," that "[t]he vast majority of voter fraud prosecutions touted by conservative groups like the Heritage Foundation involve absentee ballots that were illegally cast. And the only voting fraud schemes with the potential to actually swing elections involved mail-in ballots." https://slate.com/news-and-politics/2016/09/voter-fraud-exists-through-absentee-ballots-but-republicans-wont-stop-it.html.

164.     Many other authorities confirm the reasonableness of concerns about security of voting by mail. For example, in *Crawford v. Marion County Election Board*, the U.S. Supreme Court held that fraudulent voting "perpetrated using absentee ballots" demonstrates "that not only is the risk of voter fraud real but that it could affect the outcome of a close election." *Crawford v. Marion County Election Bd.*, 553 U.S. 181, 195–96 (2008) (opinion of Stevens, J.) (emphasis added).

165.     The bipartisan Carter-Baker Commission on Federal Election Reform—co-chaired by former President Jimmy Carter and former Secretary of State James A. Baker—determined that "[a]bsentee ballots remain the largest source of potential voter fraud." BUILDING CONFIDENCE IN U.S. ELECTIONS: REPORT OF THE COMMISSION ON FEDERAL ELECTION REFORM, at 46 (Sept. 2005),

at https://www.legislationline.org/download/id/1472/file/3b50795b2d0374cbef5c29766256.pdf.

According to the Carter-Baker Commission, "[a]bsentee balloting is vulnerable to abuse in several

ways." *Id.* "Blank ballots mailed to the wrong address or to large residential buildings might be

intercepted." *Id.* "Citizens who vote at home, at nursing homes, at the workplace, or in church

are more susceptible to pressure, overt and subtle, or to intimidation." *Id.* "Vote buying schemes

are far more difficult to detect when citizens vote by mail." *Id.* Thus, the Commission noted that

"absentee balloting in other states has been a major source of fraud." *Id.* at 35. It emphasized that

voting by mail "increases the risk of fraud." *Id.* And the Commission recommended that "States

… need to do more to prevent … absentee ballot fraud." *Id.* at v.

166.      The U.S. Department of Justice's 2017 Manual on Federal Prosecution of Election

Offenses, published by its Public Integrity Section, states: "Absentee ballots are particularly

susceptible to fraudulent abuse because, by definition, they are marked and cast outside the

presence of election officials and the structured environment of a polling place." U.S. Dep't of

Justice, *Federal Prosecution of Election Offenses* 28 (8th ed. Dec. 2017), at

https://www.justice.gov/criminal/file/1029066/download. This Manual reports that "the more

common ways" that election-fraud "crimes are committed include … [o]btaining and marking

absentee ballots without the active input of the voters involved." *Id.* at 28. And the Manual notes

that "[a]bsentee ballot frauds" committed both with and without the voter's participation are

"common" forms of election fraud. *Id.* at 29.

167.      Thus, social-media censorship that has occurred since 2020 to suppress speech

raising concerns about the security of voting by mail would, if applied even-handedly, suppress

statements about the risks of fraud in mail-in voting by the United States Supreme Court, the

Carter-Baker Commission co-chaired by President Jimmy Carter, and the U.S. Department of

Justice's prosecution manual for election-integrity crimes.  One would not be able to quote Justice Stevens' opinion for the Supreme Court in *Crawford* on social media if it followed its own rules. Raising concerns about election integrity, and questioning the security of voting by mail, became unspeakable on social media only after it became expedient for the Democratic Party and the political Left to suppress these ideas, viewpoints, and concerns.

168.    This censorship of speech, speakers, and viewpoints on such topics and concerns continues to this day, at Defendants' instigation, as alleged further herein.

169.    There is a common theme to all these examples of wrong-headed censorship: Each involved censoring truthful or reliable information that contradicted left-wing political narratives. What led to the censorship was not the fact that the speech was supposedly false, but that the message was politically inconvenient for Democratic officials and government-preferred narratives.  As a result, the ability of politicians and social-media platforms to reliably identify actual "misinformation" and "disinformation" has been proven false, again and again.

**D.    Defendants, Using Their Official Authority, Have Threatened, Cajoled, and Colluded With Social-Media Companies to Silence Disfavored Speakers and Viewpoints.**

170.    On information and belief, the individual Defendants and those acting in concert with them have conspired and colluded to suppress Americans' First Amendment and analogous state-law rights to freedom of expression on social-media platforms, and to be exposed to free expression on such platforms, and they have taken many overt actions to achieve this goal.

**1.    Section 230 of the CDA subsidized, protected, and fostered the creation of speech-censorship policies in a small, concentrated group of social-media firms.**

171.    First, the Defendants did not act in a vacuum.  For decades, the federal government has artificially encouraged, protected, fostered, and subsidized the aggregation of control over

speech, including the specific power of censorship, by a small group of powerful social-media firms.

172.    In particular, Section 230 of the Communications Decency Act (CDA) artificially empowered and subsidized the growth of social-media companies and their censorship policies by effectively immunizing much censorship on social media from liability.  Section 230's unique liability shield fostered the aggregation of power in the field into a concentrated cluster of powerful social-media firms, and it directly fostered, protected, and encouraged the development of speech-censorship policies.  This process was greatly accelerated and enhanced by the social-media platforms' success in convincing courts to adopt ever-broadening interpretations of Section 230 immunity, which stray beyond the statutes' text.

173.    "Historically, at least two legal doctrines limited a company's right to exclude." *Knight First Amendment Institute*, 141 S. Ct. at 1222 (Thomas, J., concurring).  "First, our legal system and its British predecessor have long subjected certain businesses, known as common carriers, to special regulations, including a general requirement to serve all comers." *Id.*  "Second, governments have limited a company's right to exclude when that company is a public accommodation.  This concept—related to common-carrier law—applies to companies that hold themselves out to the public but do not 'carry' freight, passengers, or communications." *Id.*  Absent the artificial immunity created by the overly expansive interpretations of Section 230 immunity, these legal doctrines, and free-market forces, would impose a powerful check on content- and viewpoint-based censorship by social-media platforms.  *See id.*

174.    The CDA was enacted in 1996 for the purpose of promoting the growth of internet commerce and protecting against the transmission of obscene materials to children over the

internet.  It was intended to "offer a forum for a true diversity of political discourse," 47 U.S.C. § 230(a)(3), but in recent years Defendants have exploited it to produce the opposite effect.

175.    Section 230 of the CDA, 47 U.S.C. § 230, provides unique liability protections for internet publishers of information, such as social-media companies, which are not available to other publishers, such as those of printed media.  Section 230(c)(1) provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. § 230(c)(1).  In other words, social-media firms are generally protected from liability for what their users post.

176.    Section 230(c)(2), however, also provides that: "No provider or user of an interactive computer service shall be held liable on account of (A) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or *otherwise objectionable*, *whether or not such material is constitutionally protected*."  47 U.S.C. § 230(c)(2)(A) (emphasis added).  Courts have interpreted Section 230 broadly—beyond its plain textual import—to shield social-media platforms from liability for censoring anything they deem "objectionable," even if it is constitutionally protected speech.

177.    This reading is unreasonable and exceeds what Congress authorized.  Viewpoint and content-based discrimination—now widely practiced by social-media platforms—are the antithesis of "good faith." *Id.*  Moreover, Congress intended the "otherwise objectionable" material in § 230(c)(2)(A) to refer only to content similar to "obscene, lewd, lascivious, filthy, excessively violent, [and] harassing" content referred to in the same list.  *Id.*  But social-media companies have interpreted this liability shield unreasonably broadly, and have convinced courts to adopt overbroad interpretations of Section 230 immunity.  *See, e.g., Malwarebytes, Inc. v. Enigma*

*Software Grp. USA, LLC*, 141 S. Ct. 13, 15 (2020) (statement of Thomas, J., respecting the denial of certiorari) ("[C]ourts have extended the immunity in § 230 far beyond anything that plausibly could have been intended by Congress."); *id.* at 15-18 (discussing and criticizing the overbroad reading of § 230 liability that has shielded social-media firms).

178.     These platforms, therefore, have the best of both worlds: They claim that they are exempt from liability if they leave even atrocious content posted, but they are *also* exempt from liability if they censor anything they deem "objectionable, whether or not such material is constitutionally protected." 47 U.S.C. § 230(c)(2)(A).

179.     Further, Section 230 of the CDA purportedly shields such platforms from liability for colluding with other social-media platforms on how to censor speech: "No provider or user of an interactive computer service shall be held liable on account of … (B) any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1)." 47 U.S.C. § 230(c)(2)(B).  On information and belief, social-media platforms do, in fact, extensively coordinate with one another in censoring social-media speech.

180.     Section 230 also purports to preempt any state law to the contrary: "No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." 47 U.S.C. § 230(e)(3).

181.     On information and belief, the immunity provided by Section 230 of the CDA directly contributed to the rise of a small number of extremely powerful social-media platforms, who have now turned into a "censorship cartel."  The liability shield provided by the federal government artificially subsidized, fostered, and encouraged the viewpoint and content-based censorship policies that those platforms have adopted at Defendants' urging.

182.    On information and belief, social-media firms greatly value the immunity provided by § 230 of the CDA, which continues to provide them with artificial liability protections, and credible threats to amend or repeal that immunity are powerful motivators to those platforms. Defendants are aware of this.

183.    On information and belief, the largest and most powerful social-media firms are also greatly concerned about antitrust liability and enforcement, given their dominance in the social-media market(s), and credible threats to impose antitrust liability and/or enforcement are powerful motivators to those platforms as well.  Defendants are aware of this too.

**2.  The campaign of threats against social-media companies to demand censorship.**

184.    Defendant Biden, his political allies, and those acting in concert with him have a long history of threatening to use official government authority to impose adverse legal consequences against social-media companies if such companies do not increase censorship of speakers and messages disfavored by Biden and his political allies.  Common threats of adverse legal and/or regulatory consequences include the threat of antitrust enforcement or legislation, and the threat of amending or repealing the liability protections of Section 230 of the Communications Decency Act (CDA), among others, if social-media companies fail to engage in more aggressive censorship of viewpoints, content, and speakers disfavored by Defendants.  These threats are effective because they address legal matters of critical concern to dominant social-media firms.

185.    Defendants have leveraged these threats to secure such increased censorship of speakers, content, and viewpoints that they disfavor on social-media platforms; and they have now moved into a phase of open collusion with the threatened companies, cooperating with them directly to censor speech, speakers, and viewpoints that Defendants disfavor.

186.     Threats from Biden, senior government officials in the Biden administration, and those acting in concert with them come in the context of a history of such threats from senior federal officials politically allied with them.  These threats have routinely linked (1) the prospect of official government action in the form of adverse legislation, regulation, or agency action—especially threats of antitrust legislation and/or enforcement and calls to amend or repeal Section 230 of the CDA, among others—with (2) calls for more aggressive censorship and suppression of speakers, viewpoints, and messages that these officials disfavor.  Recent examples include, but are by no means limited to, the following:

- Speaker Nancy Pelosi, April 12, 2019: "I do think that for the privilege of 230, there has to be a bigger sense of responsibility on it.  And it is not out of the question that that could be removed." *Nancy Pelosi warns tech companies that Section 230 is 'in jeopardy'*, TECH CRUCH (April 12, 2019), at https://techcrunch.com/2019/04/12/nancy-pelosi-section-230/. ("When asked about Section 230, Pelosi referred to the law as a 'gift' to tech companies that have leaned heavily on the law to grow their business…. 'It is a gift to them and I don't think that they are treating it with the respect that they should, and so I think that that could be a question mark and in jeopardy… I do think that for the privilege of 230, there has to be a bigger sense of responsibility on it.  And it is not out of the question that that could be removed.'").

- Senator Mark Warner, Oct. 28, 2020: "It saddens me that some of my colleagues have joined in the Trump Administration's cynical and concerted effort to bully platforms into allowing dark money groups, right-wing militias and even the President himself to continue to exploit social media platforms to sow disinformation, engage in targeted harassment, and suppress voter participation.  We can and should have a conversation about Section

49

230—and the ways in which it has enabled platforms to turn a blind eye as their platforms are used to facilitate discrimination and civil rights violations, enable domestic terrorist groups to organize violence in plain sight, assist in stalking and networked harassment campaigns, and enable online frauds targeted at vulnerable users…."  Statement of U.S. Sen. Mark R. Warner on Section 230 Hearing (Oct. 28, 2020), *at* https://www.warner.senate.gov/public/index.cfm/2020/10/statement-of-sen-mark-r-warner-on-facebook-s-decision-to-finally-ban-qanon-from-its-platforms.

- Then-Senator Kamala Harris, Sept. 30, 2019: "Look, let's be honest, Donald Trump's Twitter account should be suspended." *Kamala Harris says Trump's Twitter account should be suspended*, CNN.com (Sept. 30, 2019), *at* https://www.cnn.com/2019/09/30/politics/kamala-harris-trump-twitter-cnntv/index.html; *see also* https://twitter.com/kamalaharris/status/1179810620952207362.

- Then-Senator Kamala Harris, Oct. 2, 2019: "Hey @jack [*i.e.*, Twitter CEO Jack Dorsey]. Time to do something about this," providing picture of a tweet from President Trump. https://twitter.com/kamalaharris/status/1179193225325826050.

- Senator Richard Blumenthal, Nov. 17, 2020: "I have urged, in fact, a breakup of tech giants. Because they've misused their bigness and power. …  And indeed Section 230 reform, meaningful reform, including even possible repeal in large part because their immunity is way too broad and victims of their harms deserve a day in court." *Breaking the News: Censorship, Suppression, and the 2020 Election Before the S. Comm. on Judiciary*, 116th Cong. at 36:10–15 (2020) (statement of Sen. Richard Blumenthal).

- Senator Mazie Hirono, Feb. 5, 2021: "Sec 230 was supposed to incentivize internet platforms to police harmful content by users.  Instead, the law acts as a shield allowing

them to turn a blind eye. The SAFE TECH ACT brings 230 into the modern age and makes

platforms          accountable          for          the          harm          they          cause."

https://twitter.com/maziehirono/status/1357790558606024705?lang=bg.

- March 2021 Joint Hearing of the Communications and Technology Subcommittee, Joint

   Statement of Democratic Committee Chairs: "This hearing will continue the Committee's

   work of holding online platforms accountable for the growing rise of misinformation and

   disinformation. ... For far too long, big tech has failed to acknowledge the role they've

   played in fomenting and elevating blatantly false information to its online audiences.

   Industry self-regulation has failed.  We must begin the work of changing incentives driving

   social media companies to allow and even promote misinformation and disinformation."

   *See* Yaël Eisenstat & Justin Hendrix, *A Dozen Experts with Questions Congress Should*

   *Ask the Tech CEOs—On Disinformation and Extremism*, JUST SECURITY (Mar. 25, 2021),

   https://www.justsecurity.org/75439/questions-congress-should-ask-the-tech-ceos-on-

   disinformation-and-extremism/.

- On April 20, 2022, twenty-two Democratic members of Congress sent a letter to Mark

Zuckerberg of Facebook (n/k/a "Meta Platforms, Inc."), demanding that Facebook increase

censorship of "Spanish-language disinformation across its platforms."  The letter claimed that

"disinformation" was a threat to democracy, and it made explicit threats of adverse legislative

action if Facebook/Meta did not increase censorship: "The spread of these narratives demonstrate

that Meta does not see the problem of Spanish-language disinformation in the United States as a

critical priority for the health of our democracy.  The lack of Meta's action to swiftly address

Spanish-language misinformation globally demonstrates the need for Congress to act to ensure

Spanish-speaking communities have fair access to trustworthy information."  The letter demanded

information about Facebook's censorship policies on election-related speech for the upcoming

elections: "How is Meta preparing to proactively detect and address foreign disinformation

operations targeted at Spanish-speaking communities for future elections within the United States,

including the 2022 primaries and general election? … [W]hat new steps has Meta taken to ensure

the effectiveness of its algorithmic content detection policies to address disinformation and hate-

speech across different languages?"   April 20, 2022 Letter of Rep. Tony Cardenas, et al., at

https://cardenas.house.gov/imo/media/doc/Meta%20RT%20and%20Spanish%20Language%20D

isinformation%20Congressional%20Letter%20Final.pdf.

187.    Comments from two House Members summarize this campaign of pressure and

threats: "In April 2019, Louisiana Rep. Cedric Richmond warned Facebook and Google that they

had 'better' restrict what he and his colleagues saw as harmful content or face regulation: 'We're

going to make it swift, we're going to make it strong, and we're going to hold them very

accountable.' New York Rep. Jerrold Nadler added: 'Let's see what happens by just pressuring

them.'"   Vivek Ramaswamy and Jed Rubenfeld, Editorial, *Save the Constitution from Big Tech:*

*Congressional threats and inducements make Twitter and Facebook censorship a free-speech*

*violation*, WALL ST. J. (Jan. 11, 2021), https://www.wsj.com/articles/save-the-constitution-from-

big-tech-11610387105.

188.    Defendants' political allies have repeatedly used congressional hearings as forums

to advance these threats of adverse legislation if social-media platforms do not increase censorship

of speakers, speech, content, and viewpoints they disfavor.   They have repeatedly used such

hearings to berate social-media firm leaders, such as Mark Zuckerberg of Facebook, Jack Dorsey

of Twitter, and Sundar Pichai of Google and YouTube, and to make threats of adverse legal

consequences if censorship is not increased.   Such hearings include, but are not limited to, those

cited above, as well as an antitrust hearing before the House Judiciary Committee on July 29, 2020;

a Senate Judiciary Committee hearing on November 17, 2020; and a House Energy and Commerce

Hearing on March 25, 2021.

189.     The flip side of such threats, of course, is the implied "carrot" of retaining Section

230 immunity and avoiding antitrust scrutiny, allowing the major social-media platforms to retain

their legally privileged status that is worth billions of dollars of market share.

190.     Starting in or around 2020, if not before, social-media firms have responded to these

threats by engaging in increasingly more aggressive censorship of speakers, messages, and

viewpoints disfavored by Defendants, senior government officials, and the political left.  "With all

the attention paid to online misinformation, it's easy to forget that the big [social-media] platforms

generally refused to remove false content purely because it was false until 2020."  Gilead Edelman*,

*Beware the Never-Ending Disinformation Emergency*, THE WIRED (March 11, 2022), *at*

https://www.wired.com/story/youtube-rigged-election-donald-trump-moderation-

misinformation/.  On information and belief, it was in response to such threats of adverse legal

consequences that social-media companies ramped up censorship in 2020, disproportionately

targeting speakers and viewpoints on the political right.  On information and belief, the examples

of censorship of truthful and reliable speech in 2020, cited above, were motivated in whole or in

part by such threats.

191.     Then-candidate and now-President Biden has led this charge.  He has tripled down

on these threats of adverse official action from his colleagues and allies in senior federal-

government positions.  His threats of adverse government action have been among the most

vociferous, and among the most clearly linked to calls for more aggressive censorship of

disfavored speakers and speech by social-media companies.

192.     For example, on January 17, 2020, then-candidate Biden stated, in an interview with the New York Times editorial board, that Section 230 of the CDA should be "revoked" because social-media companies like Facebook did not do enough to censor supposedly false information in the form of political ads criticizing him—*i.e.*, core political speech.  He stated: "The idea that it's a tech company is that Section 230 should be revoked, immediately should be revoked, number one. For Zuckerberg and other platforms."  He also stated, "It should be revoked because it is not merely an internet company.  It is propagating falsehoods they know to be false.... There is no editorial impact at all on Facebook. None. None whatsoever. It's irresponsible. It's totally irresponsible."    N.Y. Times Editorial Board, *Joe Biden* (Jan. 17, 2020), *at* https://www.nytimes.com/interactive/2020/01/17/opinion/joe-biden-nytimes-interview.html. These claims were specifically linked to Facebook's alleged failure to censor *core political speech*—*i.e.*, political ads on Facebook criticizing candidate Biden.  *Id.*

193.     Candidate Biden also threatened that Facebook CEO Mark Zuckerberg should be subject to civil liability and even *criminal prosecution* for not censoring such core political speech: "He should be submitted to civil liability and his company to civil liability…. Whether he engaged in something and amounted to collusion that in fact caused harm that would in fact be equal to a criminal offense, that's a different issue. That's possible. That's possible it could happen."  *Id.*  In other words, Biden's message—not long before he became President of the United States—was that if Facebook did not censor political ads against him, Zuckerberg should go to prison.  These two threats echoed the same threats made by numerous political allies of the President since 2019, cited above.

194.     During the presidential campaign, now-Vice President Harris made similar threats against social-media firms to pressure them to engage in more aggressive censorship of speakers,

content, and viewpoints she disfavors. For example, in addition to the statements cited above, she stated in 2019: "We will hold social media platforms responsible for the hate infiltrating their platforms, because they have a responsibility to help fight against this threat to our democracy. And if you profit off of hate—if you act as a megaphone for misinformation or cyberwarfare, if you don't police your platforms—we are going to hold you accountable as a community." *Kamala Harris Wants to Be Your Online Censor-in-Chief*, REASON.COM (May 7, 2019), *at* https://reason.com/2019/05/07/kamala-harris-promises-to-pursue-online-censorship-as-president/.

195.     In or around June 2020, the Biden campaign published an open letter and online petition (ironically, on Facebook) calling for Facebook to engage in more aggressive censorship of core political speech and viewpoints that then-Candidate Biden disfavored. The open letter complained that Facebook "continues to allow Donald Trump to say anything — and to pay to ensure that his wild claims reach millions of voters. Super PACs and other dark money groups are following his example. Trump and his allies have used Facebook to spread fear and misleading information about voting…. We call for Facebook to proactively stem the tide of false information by no longer amplifying untrustworthy content and promptly fact-checking election-related material that goes viral. We call for Facebook to stop allowing politicians to hide behind paid misinformation in the hope that the truth will catch up only after Election Day. There should be a two-week pre-election period during which **all** political advertisements must be fact-checked before they are permitted to run on Facebook. … Anything less will render Facebook a tool of misinformation that corrodes our democracy." Biden-Harris, *Our Open Letter to Facebook* (last visited May 5, 2022), https://joebiden.com/2961-2/.

196.    The online petition demanded that Facebook "[p]romote real news, not fake news," "[q]uickly remove viral misinformation," and "[e]nforce voter suppression rules against everyone—even the President [Trump]."  The petition complained that Facebook "continues to amplify misinformation and lets candidates pay to target and confuse voters with lies."  It demanded that Facebook "promote authoritative and trustworthy sources of election information, rather than rants of bad actors and conspiracy theorists," "promptly remove false, viral information," and "prevent political candidates and PACs from using paid advertising to spread lies and misinformation – especially within two weeks of election day."  Biden-Harris, *#Movefastfixit* (last visited May 5, 2022), https://joebiden.com/facebook/.

197.    On September 28, 2020, the Biden-Harris campaign sent a letter to Facebook accusing it of propagating a "storm of disinformation" by failing to censor the Trump campaign's political speech, including social-media political ads.  Sept. 28, 2020 Biden-Harris Letter, *at* https://www.documentcloud.org/documents/7219497-Facebook-Letter-9-28.html.    The letter accused Facebook of allowing "hyper-partisan" and "fantastical" speech to reach millions of people, and it demanded "more aggressive" censorship of Trump.  *Id.*

198.    A federal lawsuit filed in 2021 alleged that "before and after the November, 2020 election," California government officials "contracted with partisan Biden campaign operatives to police speech online.  The secretary of state of California then sent these flagged tweets to Twitter, Instagram, YouTube and other platforms for their removal."  *Harmeet Dhillon: Biden White House 'flags' Big Tech – here's why digital policing is so dangerous*, Fox News (July 16, 2021), *at* https://www.foxnews.com/opinion/biden-white-house-flags-big-tech-digital-policing-harmeet-dhillon. Once in power, Biden and those acting in concert with him would continue this same course of conduct of "flagging" content for censorship by private social-media firms, now using

the authority of the *federal* government to "flag" specific speech and speakers for censorship and suppression.

199.     On December 2, 2020—during the presidential transition—Biden's former chief of staff and top technical advisor, Bruce Reed, publicly stated that "it's long past time to hold the social media companies accountable for what's published on their platforms." *Biden Tech Advisor: Hold Social Media Companies Accountable for What Their Users Post*, CNBC.com (Dec. 2, 2020), *at* https://www.cnbc.com/2020/12/02/biden-advisor-bruce-reed-hints-that-section-230-needs-reform.html.  This comment specifically referred to the amendment or repeal of Section 230 of the Communications Decency Act.  *See id.*  Thus, the threat of adverse legal consequences for social-media companies that did not censor opposing political viewpoints was at the forefront of the incoming Biden Administration's public messaging.

200.     Coming into the new Administration, with now-President Biden's political allies in control of both Houses of Congress, social-media companies were on clear notice that the federal 5government's involvement in social-media censorship was likely to escalate, and their threats of adverse legislation, regulation, and legal action became more ominous.  On information and belief, this caused a chilling effect on speech by prompting social-media companies to ramp up their own censorship programs against disfavored speech and speakers, to preempt the risk of adverse action against them by the Government.

201.     Once in control of the Executive Branch, Defendants promptly capitalized on these threats by pressuring, cajoling, and openly colluding with social-media companies to actively suppress particular disfavored speakers and viewpoints on social media.

202.     Defendants, those acting in concert with them, and those allied with them routinely seek to justify overt censorship of disfavored speakers and viewpoints by wrapping it in the

monikers "misinformation," "disinformation," and/or "malinformation."  Their standard tactic is to label speech that contradicts their preferred political narratives "misinformation," "disinformation," and "malinformation" to justify suppressing it.  Other common buzzwords include calls for a "healthy information ecosystem," "healthy information environment," or "healthy news environment," among others.  This is the Orwellian vocabulary of censorship.  It is deployed aggressively to undermine fundamental First Amendment rights.

203.    As noted above, these labels have proven extremely unreliable.  Defendants' and the political Left's ability to accurately identify "misinformation" and "disinformation" is unreliable because they apply such labels, not based on actual truth or falsity, but based on their current preferred political narrative.  This has resulted, again and again, in the suppression of truthful information under the name of "disinformation" and "misinformation."

**3.  White House and HHS officials collude with social-media firms to suppress speech.**

204.    Before the Biden Administration took office, on information and belief, coordination and collusion between senior HHS officials and social-media companies to censor viewpoints and speakers was already underway.  Once in office, senior officials in the Biden Administration—in the White House, in HHS, and elsewhere—capitalized and greatly expanded on these efforts.

205.    On information and belief, beginning on or around January or February 2020, if not before, Defendant Dr. Anthony Fauci, a senior federal government official, coordinated with social-media firms to police and suppress speech regarding COVID-19 on social media.

206.    Prior to 2020, as head of NIAID, Dr. Fauci had overseen funding of risky gain-of-function research on viruses, including research at the Wuhan Institute of Virology.  This included

research funded through intermediaries such as Dr. Peter Daszak and the EcoHealth Alliance, among others.

207.     In late January and early February 2020, Dr. Fauci received information from colleagues that suggested that the COVID-19 virus may have originated in a laboratory in Wuhan, China.  This revelation threatened to implicate Dr. Fauci in the virus's origins, as he had funded the risky research that, under this theory, led to the virus's origin.  Soon thereafter, Dr. Fauci participated in a conference call with scientists and science-funding authorities intended to discredit and suppress this lab-leak theory.  After the conference call, influential individuals signed public statements that were placed in science journals in attempt to discredit the lab-leak theory.

208.     In the same time frame, Dr. Fauci communicated with Facebook CEO Mark Zuckerberg directly regarding public messaging and the flow of information on social media about the government's COVID-19 response.  For example, in a series of emails produced in response to FOIA requests dated from March 15 to 17, 2020, Zuckerberg invited Fauci to make public statements to be posted for viewing by all Facebook users regarding COVID-19, and also made another proposal that is redacted in FOIA-produced versions but was treated as a high priority by Fauci and NIH staff.

209.     In an email on March 15, 2020, Zuckerberg proposed coordinating with Fauci on COVID-19 messaging to "make sure people can get authoritative information from reliable sources," and suggested including a video message from Fauci because "people trust and want to hear from experts."  Zuckerberg proposed including this content in a "hub" that "we're going to put at the top of Facebook" to reach "200+ million Americans, 2.5 billion people worldwide."

210.     In the same email, Zuckerberg made a three-line proposal to Fauci that was redacted by the federal government before the email was produced in a FOIA request.

211.    The next day, NIH's communications director emailed Fauci and strongly
recommended that he do the videos for Facebook.    Regarding the redacted proposal from
Zuckerberg, she stated: "But an even bigger deal is his offer [REDACTED].    The sooner we get
that offer up the food-chain the better."    She also stated that her staff was "standing by to discuss
this with HHS and WH comms," and requested authority to "determine who the best point of
contact would be so the Administration can take advantage of this officer, soonest."    Fauci
responded that "I will write or call Mark and tell him that I am interested in doing this.    I will then
tell him that you will get for him the name of the USG [on information and belief, shorthand for
"U.S. Government"] point of contact."

212.    Fauci responded by email to Zuckerberg on March 17, 2020, agreeing to the
collaboration that Zuckerberg proposed and describing his redacted proposal as "very exciting."

213.    As alleged above, around the same time frame as the Zuckerberg-Fauci emails,
Facebook and other social-media companies censored and suppressed speakers and speech
advocating for the lab-leak theory of COVID-19's origins, despite the overwhelming
circumstantial evidence favoring that theory.    This censorship directly implemented the plan,
orchestrated by Fauci and others in early 2020, to discredit and suppress the lab-leak theory.

214.    In the same timeframe, Facebook and other social-media companies began an ever-
increasing campaign of monitoring, censorship, and suppression of speech and speakers about
COVID-19 and issues related to COVID-19.    This campaign would dramatically escalate with the
advent of the Biden Administration.

215.    On information and belief, those firms coordinated directly with Fauci, CDC, and
other government officials regarding censorship and suppression of disfavored speech and
speakers.

216.     For example, Facebook's "COVID and Vaccine Policy" states that Facebook "does not allow false claims about the vaccines or vaccination programs which *public health experts have advised us* could lead to COVID-19 vaccine rejection."  Facebook, *COVID-19 and Vaccine Policy Updates & Protections*, https://www.facebook.com/help/230764881494641 (emphasis added).  On information and belief, Fauci and CDC officials are included among those "public health experts" who "advise[]" Facebook on what to censor.  Facebook also censors COVID-19 information as "false," not based on actual truth or falsity, but based on whether the claim contradicts or challenges the pronouncements of Fauci and the CDC.  *Id.*  This includes strongly supported claims such as "[c]laims that wearing a face mask properly does not help prevent the spread of COVID-19," along with an elaborate list of additional disfavored content and viewpoints subject to censorship.  *Id.*

217.     On information and belief, other social-media firms have similar policies and similar practices of coordinating with Fauci and the CDC and with each other, directly or indirectly, on the suppression of disfavored speakers and speech.

218.     Such collusion between HHS officials and social-media companies on the censorship of disfavored speakers and speech accelerated once the Biden Administration took office.

219.     On May 5, 2021, Defendant Psaki gave a White House press conference at which she stated that "[t]he President's view is that the major platforms have a responsibility related to the health and safety of all Americans to stop amplifying untrustworthy content, disinformation, and misinformation, especially related to COVID-19, vaccinations, and elections.  And we've seen that over the past several months, broadly speaking…. we've seen it from a number of sources."  White House, *Press Briefing by Press Secretary Jen Psaki and Secretary of Agriculture Tom*

*Vilsack,    May    5,    2021*,    at    https://www.whitehouse.gov/briefing-room/press-briefings/2021/05/05/press-briefing-by-press-secretary-jen-psaki-and-secretary-of-agriculture-tom-vilsack-may-5-2021/.

220.    Echoing Biden's past threats to social-media firms, Psaki immediately went on to state that President Biden "supports better privacy protections and *a robust anti-trust program*." *Id.* (emphasis added).  She linked the threat of anti-trust enforcement to the demand for more aggressive censorship by social-media platforms, stating that the President's "view is that there's more that needs to be done to ensure that this type of misinformation; disinformation; damaging, sometimes life-threatening information is not going out to the American public." *Id.*

221.    At a White House press briefing with Psaki on July 15, 2021, Surgeon General Vivek Murthy announced that "health misinformation" constitutes an "urgent public health threat," stating that he had "issued a Surgeon General's Advisory on the dangers of health misinformation. Surgeon General Advisories are reserved for urgent public health threats. And while those threats have often been related to what we eat, drink, and smoke, today we live in a world where misinformation poses an imminent and insidious threat to our nation's health."  The White House, *Press Briefing by Press Secretary Jen Psaki and Surgeon General Dr. Vivek H. Murthy, July 15, 2021*,  at  https://www.whitehouse.gov/briefing-room/press-briefings/2021/07/15/press-briefing-by-press-secretary-jen-psaki-and-surgeon-general-dr-vivek-h-murthy-july-15-2021/.

222.    Surgeon General Murthy stated that "[m]odern technology companies have enabled misinformation to poison our information environment with little accountability to their users. They've allowed people who intentionally spread misinformation — what we call 'disinformation' — to have extraordinary reach."  *Id.*  He accused their algorithms of "pulling us deeper and deeper into a well of misinformation."  *Id.*

223.     Surgeon General Murthy explicitly called for more aggressive censorship of social-media speech, stating that "we're saying we expect more from our technology companies. …. We're asking them to monitor misinformation more closely. We're asking them to consistently take action against misinformation super-spreaders on their platforms." *Id.* "

224.     He also stated that "technology companies have a particularly important role" to play in combating "misinformation." He stated: "We know that the dramatic increase in the speed — speed and scale of spreading misinformation has, in part, been enabled by these platforms. So that's why in this advisory today, we are asking them to step up. We know they have taken some steps to address misinformation, but much, much more has to be done. And we can't wait longer for them to take aggressive action because it's costing people their lives." *Id.*

225.     He also stated: "we are asking technology companies to help lift up the voices of credible health authorities…. [T]hey have to do more to reduce the misinformation that's out there so that the true voices of experts can shine through." *Id.*

226.     At the same press briefing, after the Surgeon General spoke, Defendant Psaki stated: "[W]e are in regular touch with these social media platforms, and those engagements *typically happen through members of our senior staff*, but also members of our COVID-19 team, given, as Dr. Murthy conveyed, this is a big issue of misinformation, specifically on the pandemic." *Id.* (emphasis added). She added, "*We're flagging problematic posts for Facebook that spread disinformation*." *Id.* (emphasis added). She stated, "we have recommended—proposed that they create a robust enforcement strategy," *i.e.*, a more aggressive censorship program. *Id.*

227.     Psaki called on social-media companies to censor particular disfavored speakers, stating: "[T]here's about 12 people who are producing 65 percent of anti-vaccine misinformation on social media platforms. All of them remain active on Facebook, despite some even being

63

banned on other platforms, including Facebook — ones that Facebook owns." *Id.* And she called on Facebook and other social-media companies to censor disfavored content and disfavored viewpoints: "[I]t's important to take faster action against harmful posts. As you all know, information travels quite quickly on social media platforms; sometimes it's not accurate. And Facebook needs to move more quickly to remove harmful, violative posts — posts that will be within their policies for removal often remain up for days. That's too long. The information spreads too quickly." *Id.*

228.    She stated that "[w]e engage with them [*i.e.*, social-media companies] regularly and *they certainly understand what our asks are*." *Id.* (emphasis added). She stated that, "we've made a calculation to push back on misinformation," and that "we are working to combat misinformation that's traveling online." *Id.*

229.    The same day, the Surgeon General released his advisory regarding "health misinformation." It defined "health misinformation" as "information that is false, inaccurate, or misleading according to the best available evidence at the time. Misinformation has caused confusion and led people to decline COVID-19 vaccines, reject public health measures such as masking and physical distancing, and use unproven treatments." *Confronting Health Misinformation: The U.S. Surgeon General's Advisory on Building a Healthy Information Environment*, at 4 (July 15, 2021), *at* https://www.hhs.gov/sites/default/files/surgeon-general-misinformation-advisory.pdf.

230.    The Surgeon General's advisory called for social-medial companies to "make meaningful long-term investments to address misinformation, including product changes," to "[r]edesign recommendation algorithms to avoid amplifying misinformation," to "build in 'frictions'— such as suggestions and warnings—to reduce the sharing of misinformation," and to

"make it easier for users to report misinformation." *Id.* at 12. It called on social-media companies to "[s]trengthen the monitoring of misinformation," and to censor disfavored speakers swiftly and aggressively: "Prioritize early detection of misinformation 'super-spreaders' and repeat offenders. Impose clear consequences for accounts that repeatedly violate platform policies." *Id.*

231.    Facebook responded by stating that it was, in fact, aggressively censoring "health misinformation," and *coordinating with the Government to do so*. "A Facebook spokesperson said the company has *partnered with government experts*, health authorities and researchers to take 'aggressive action against misinformation about COVID-19 and vaccines to protect public health.'" *White House Slams Facebook as Conduit for COVID-19 Misinformation*, REUTERS (July 15, 2021), at https://www.reuters.com/world/us/us-surgeon-general-warns-over-covid-19-misinformation-2021-07-15/ (emphasis added). "'So far we've removed more than 18 million pieces of COVID misinformation, [and] removed accounts that repeatedly break these rules…,' the spokesperson added." *Id.*

232.    Facebook stated that it "has introduced rules against making certain false claims about COVID-19 and its vaccines." *Id.*

233.    The next day, July 16, 2021, a reporter asked President Biden what he thought of COVID misinformation on social media, and he responded, referring to platforms like Facebook, by stating: "They're killing people." *They're Killing People: Biden Denounces Social Media for Virus Disinformation*, N.Y. TIMES (July 16, 2021), *at* https://www.nytimes.com/2021/07/16/us/politics/biden-facebook-social-media-covid.html. The New York Times reported that "this week, White House officials went further and singled out social media companies for allowing false information to proliferate. That came after weeks of

failed attempts to get Facebook to turn over information detailing what mechanisms were in place to combat misinformation about the vaccine, according to a person familiar with the matter." *Id.*

234.    The same day, July 16, 2021, Psaki explicitly called for social-media companies to coordinate with *each other* in censoring disfavored speakers, to ensure that such speakers are completely muzzled.  "You shouldn't be banned from one platform and not others … for providing misinformation out there."  White House, Press Briefing by Press Secretary Jen Psaki, July 16, 2021, *at*  https://www.whitehouse.gov/briefing-room/press-briefings/2021/07/16/press-briefing-by-press-secretary-jen-psaki-july-16-2021/.  On information and belief, social-media companies have heeded this demand, and they do, in fact, coordinate extensively with each other in censorship of disfavored speakers, speech, and viewpoints on social media.

235.    Psaki also demanded that social-media companies "create robust enforcement strategies," "tak[e] faster action against harmful posts," and "promot[e] quality information algorithms"—which is a euphemism for algorithms that suppress disfavored messages. *Id.*  When asked whether Facebook's already-aggressive censorship—it claimed to have suppressed 18 million pieces of COVID-19-related "misinformation"—was "sufficient," she responded, "Clearly not, because we're talking about additional steps that should be taken." *Id.*

236.    Four days later, July 20, 2021, the White House explicitly threatened to amend or repeal the liability protections of § 230 of the Communications Decency Act if social-media companies did not increase censorship of disfavored speakers and viewpoints.  *'They Should Be Held Accountable': White House Reviews Platforms' Misinformation Liability*, USA TODAY (July 20, 2021), *at* https://www.usatoday.com/story/news/politics/2021/07/20/white-house-reviews-section-230-protections-covid-misinformation/8024210002/.  The White House communications director announced that "[t]he White House is assessing whether social media platforms are legally

liable for misinformation spread on their platforms." *Id.* "We're reviewing that, and certainly, they should be held accountable," she said. *Id.*

237.   She "specified the White House is examining how misinformation fits into the liability protections granted by Section 230 of the Communications Decency Act, which shields online platforms from being responsible for what is posted by third parties on their sites." *Id.* Media reported that, in connection with this threat, "Relations are tense between the Biden administration and social media platforms, specifically Facebook, over the spread of misinformation online." *Id.*; *see also, e.g., White House says social media networks should be held accountable for spreading misinformation*, CNBC.com (July 20, 2021), *at* https://www.cnbc.com/2021/07/20/white-house-social-networks-should-be-held-accountable-for-spreading-misinfo.html. When asked whether the President is "open to amending 230 when Facebook and Twitter and other social media outlets spread false information that cause Americans harm, shouldn't they be held accountable in a real way?" White House Communications Director Bedingfield responded, "We're reviewing that and certainly they should be held accountable. And I think you heard the president speak very aggressively about this. He understands that this is an important piece of the ecosystem." *Id.*

238.   After this series of public statements, responding to "White House pressure," Facebook censored the accounts of the 12 specific disfavored speakers whom Psaki accused of spreading health misinformation. *Facebook takes action against 'disinformation dozen' after White House pressure*, CNN.com (Aug. 18, 2021), *at* https://www.cnn.com/2021/08/18/tech/facebook-disinformation-dozen/index.html. Psaki had "hammered the platform in July for allowing the people identified in the report to remain on its platform." *Id.* After they were singled out for censorship by the White House, Facebook "removed

over three dozen Pages, groups and Facebook or Instagram accounts linked to these 12 people, including at least one linked to each of the 12 people, for violating our policies." *Id.*

239.     In the same time frame, Twitter permanently suspended the account of prominent lockdown critic Alex Berenson, despite repeated reassurances from high-level Twitter executives that his account was safe, just days after Dr. Fauci singled him out as a danger for suggesting young people might reasonably decline the vaccine.

240.     On October 29, 2021, the Surgeon General tweeted from his *official* account (as opposed to his personal account, which remains active), in a thread: "We must demand Facebook and the rest of the social media ecosystem take responsibility for stopping health misinformation on their platforms.  The time for excuses and half measures is long past.  We need transparency and accountability now.   The health of our country is at stake." *See* https://twitter.com/Surgeon_General/status/1454181191494606854.

241.     Defendants' response to this censorship was to demand still more censorship by social-media platforms, including but not limited to Facebook.  "[A]fter Facebook's action against the 'disinformation dozen,' a White House spokesperson continued to strongly criticize the company." *Id.*  "'In the middle of a pandemic, being honest and transparent about the work that needs to be done to protect public health is absolutely vital, but Facebook still refuses to be straightforward about how much misinformation is circulating—and being actively promoted— on their platform,' a White House spokesperson told CNN Business.  'It's on everyone to get this right so we can make sure the American people are getting accurate information to protect the health of themselves and their loved ones -- which is why the Administration will continue to push leaders, media outlets, and leading sources of information like Facebook to meet those basic expectations,' the spokesperson added." *Id.*

242.    On February 1, 2022, Psaki was asked at a White House press conference whether the Administration was satisfied with Spotify's decision to affix advisory warnings to Joe Rogan's immensely popular podcast, which featured speakers that contradicted the Administration's messaging about COVID-19 and vaccines, or whether the government "think[s] that companies like Spotify should go further than just, you know, putting a label on" disfavored viewpoints and speakers. Psaki responded by demanding that Spotify and other platforms "do[] more" to block disfavored speech: "[O]ur hope is that all major tech platforms … be vigilant to ensure the American people have access to accurate information on something as significant as COVID-19. So, this disclaimer – it's a positive step. But we want every platform to continue *doing more* to call out … mis- and disinformation while also uplifting accurate information." She stated that Spotify's advisory warnings are "a good step, it's a positive step, but *there's more that can be done*." White House, *Press Briefing by Press Secretary Jen Psaki, February 1, 2022* (emphases added), *at* https://www.whitehouse.gov/briefing-room/press-briefings/2022/02/01/press-briefing-by-press-secretary-jen-psaki-february-1-2022/.

243.    On March 3, 2022, the Surgeon General issued a formal "Request for Information" on the "Impact of Health Misinformation" on social media. HHS, *Impact of Health Misinformation in the Digital Information Environment in the United States Throughout the COVID-19 Pandemic Request for Information* (RFI), 87 Fed. Reg. 12,712-12,714 (March 2, 2022).

244.    In the RFI, "[t]he Office of the Surgeon General requests input from interested parties on the impact and prevalence of health misinformation in the digital information environment during the COVID–19 pandemic." *Id.* at 12,712. The RFI states that "the speed, scale, and sophistication with which misinformation has been spread during the COVID-19 pandemic has been unprecedented," and it implies that social-media companies are to blame,

carrying a clear threat of future regulation: "This RFI seeks to understand both the impact of health misinformation during the COVID–19 pandemic and the unique role that technology and social media platforms play in the dissemination of critical health information during a public health emergency." *Id.* at 12,713.

245.    The RFI seeks specific information about health "misinformation" on such social-media platforms: "Information about how widespread COVID–19 misinformation is on individual technology platforms including: General search engines, content sharing platforms, social media platforms, e-commerce platforms, crowd sourced platforms, and instant messaging systems." *Id.*

246.    The RFI seeks: "Any aggregate data and analysis on how many users were exposed, were potentially exposed, or otherwise engaged with COVID–19 misinformation," where "[e]xposure is defined as seeing content in newsfeeds, in search results, or algorithmically nominated content," and "[p]otential exposure is the exposure users would have had if they could see all the content that is eligible to appear within their newsfeeds." *Id.* at 12,714.  It also seeks "[i]nformation about COVID–19 misinformation policies on individual technology platforms," including "[a]ny aggregate data and analysis of technology platform COVID–19 misinformation policies including implementation of those policies and evaluations of their effectiveness." *Id.*

247.    Media reports aptly described Murthy as "demand[ing]" information about the major sources of COVID-19 misinformation by May 2, 2022.  Brad Dress, *Surgeon General Demands Data on COVID-19 Misinformation from Major Tech Firms*, THE HILL (March 3, 2022), *at*    https://thehill.com/policy/healthcare/596709-surgeon-general-demands-data-on-covid-19-misinformation-from-major-tech/.  "In a formal notice, Murthy requested major tech platforms submit information about the prevalence and scale of COVID-19 misinformation on their sites, from social networks, search engines, crowdsourced platforms, e-commerce platforms and instant

messaging systems." *Id.* "In his notice to major tech platforms, Murthy is requesting specific information on demographics affected by misinformation as well as sources of misinformation and 'exactly how many users saw or may have been exposed to instances of Covid-19 misinformation.'" *Id.*

248.    On or around July 27, 2022, a limited number of emails between CDC officials and representatives of social-media platforms from late 2020 and early months of 2021 became publicly available, over a year after they had been requested under FOIA. These newly revealed emails—which are attached as Exhibit A, and incorporated by reference herein—confirm the allegations of collusion between HHS officials and social-media platforms to censor disfavored speech, speakers, and viewpoints, as alleged herein.

249.    These emails indicate that Defendant Carol Y. Crawford of CDC and other CDC officials frequently communicated and coordinated with social-media platforms, including Facebook/Meta, Twitter, Google/YouTube, and Instagram, regarding the censorship of speech on social-media platforms, including flagging specific content for censorship.  During 2021, Crawford organized "Be On the Lookout" or "BOLO" meetings on "misinformation" with representatives of social-media platforms—including Twitter, Facebook/Meta, and Google/YouTube—in which she and other federal officials colluded and/or collude with those platforms about speech to target for suppression.  These meetings include Crawford and other federal officials flagging specific social-media posts for censorship and providing examples of the types of posts to censor.  Crawford emailed "slides" from the "BOLO" meetings to participants afterwards.  These slides included repeated examples of specific posts on social-media platforms flagged for censorship.  The slides called for "all" social-media platforms to "Be On the Lookout"

for such posts.  Crawford cautioned the meeting participants, with respect to these slides, "[p]lease do not share outside your trust and safety teams."

250.    Officials of the Census Bureau participated and/or participate in these BOLO meetings, including Defendant Jennifer Shopkorn and Christopher Lewitzke, who is a Senior Digital Marketing Associate with Reingold, a communications firm that was, on information and belief, acting on behalf of the Census Bureau.  Crawford's emails indicate that the Census Bureau and its officials and agents, such as Lewitzke and Shopkorn, play an important, active, and ongoing role in colluding with social-media platforms to censor disfavored speech.  On March 18, 2021, Crawford emailed Twitter officials and stated that "[w]e are working on a project with Census to leverage their infrastructure to identify and monitor social media for vaccine misinformation," and stated that "[w]e would like the opportunity to work with your trust team on a regular basis to discuss what we are seeing."  She also noted that "I understand that you did this with Census last year as well."  Twitter responded by stating, "With our CEO testifying before Congress this week is tricky," but otherwise agreed to the collusive arrangement.  Likewise, in subsequent emails to Twitter (on May 6) and Facebook (on May 10), Crawford noted to the social-media platform officials that "[o]ur census team," *i.e.*, Lewitzke and Shopkorn, who were cc'ed on the emails, "has much more info on it if needed" regarding "some example posts" of "misinfo" that she flagged for censorship.

251.    Defendants Crawford and others, including the Census officials and agents Lewitzke and Shopkorn, took other steps to procure the censorship of disfavored speech on social media.  For example, on May 10, 2021, Crawford emailed Twitter officials to flag "two issues that we are seeing a great deal of misinfo about," noting that Lewitzke and Shopkorn "ha[ve] much more info on it if needed."  The same email included 13 specific Twitter posts as examples of the

sort of posts to be censored.  On May 6, 2021, Crawford sent a similar email to Meta/Facebook

officials, also copying Lewitzke and Shophorn and stating that they have "much more info" about

the issue; this email included 16 specific posts from Facebook and Instagram as examples of posts

to be targeted for censorship.   On May 12, 2021, Crawford emailed Facebook officials to flag

"some new info on myths your misinfo folks might be interested in," with links to specific issues

of "misinformation" for Facebook to censor.  On April 9, 2021, Crawford agreed with a Twitter

official that CDC would provide "examples of problematic content" posted on Twitter, and the

Twitter official noted that "all examples of misinformation are helpful."  Calendar invites from

early 2021 indicate that Crawford, Jay Dempsey, and other CDC officials participated in

Facebook's "weekly sync with CDC," with "CDC to invite other agencies as needed."

252.    In another exchange of emails, Crawford agreed with Facebook officials that CDC

would participate in a COVID-19 "misinfo reporting channel," and arranged for CDC officials to

have training on the use of Facebook's "misinfo reporting channel."  On information belief,

Crawford's "team" at CDC, as well as Shopkorn and Lewitzke from Census, were "onboarded"

onto Facebook's "misinfo reporting channel."  A calendar invite in May 2021 included Crawford,

Lewitzke, Shopkorn, other CDC officials, and other Reingold employees who were, on

information and belief, acting on behalf of the Census Bureau, to participate in the "onboarding"

onto Facebook's "misinfo reporting channel."

253.    Crawford's communications with Facebook indicate that CDC, the Census Bureau,

and other government agencies collaborate with Facebook to flag speech regarding both COVID-

19 and elections for censorship using "CrowdTangle," which Facebook describes as "a Facebook

tool that tracks how content spreads online."  An email from a Facebook official to Crawford stated

that, using CrowdTangle, "[w]hen health departments flag potential vaccine misinformation on

Facebook and Instagram, we review and remove the content if it violates our policies…  This is similar to how governments and fact-checkers use CrowdTangle ahead of *elections*…." (Emphasis added.)

254.    Additional communications between CDC and social-media platforms reflect an ongoing, close, and continuing collaboration, effectively amounting to a joint enterprise, on censorship of COVID-19 "misinformation" and related issues.  *See* Ex. A.  For example, the communications reflect close coordination on creating and publishing content on behalf of CDC on social-media platforms, and artificially "amplifying" government messaging on social-media to the suppression of private messaging, including a gift of $15 million in Facebook ad credits from Facebook to CDC.  They also reflect close coordination on amplifying CDC's content and other related issues.

**4.  White House and DHS officials collude with social-media firms to suppress speech.**

255.    On information and belief, senior officials in the Biden Administration and the Department of Homeland Security are also colluding with social-media companies to suppress disfavored speakers and viewpoints.  These efforts include censorship of disfavored content and viewpoints about election integrity and COVID-19, among other topics, under the guise of suppressing "misinformation" and "domestic terrorism."  These efforts culminated with the Orwellian announcement of the creation of a "Disinformation Governance Board" within DHS.

256.    A direct forum for government officials to call for social-media censorship of election-related "misinformation" was already in place during the general election cycle of 2020.

257.    In August 2020, social-media firms "met with federal government officials to discuss how to handle misinformation during this month's political conventions and election results this fall."  Ingram et al., *Big Tech met with govt to discuss how to handle election results*,

74

NBC News (Aug. 20, 2022), *at* https://www.nbcnews.com/tech/tech-news/big-tech-met-gov-t-

discuss-how-handle-election-results-n1236555.

258.     This was one of a "series" of meetings between major social-media companies and

government officials about the suppression of election-related "misinformation": "'We held the

latest in a series of meetings with government partners today where we each provided updates on

what we're seeing on our respective platforms and what we expect to see in the coming months,'

companies including Google, Facebook, Twitter and Reddit said in a joint statement after the

meeting." *Id.* "The statement also included Microsoft, Verizon Media, Pinterest, LinkedIn and

the Wikimedia Foundation, which operates Wikipedia and other sites." *Id.*

259.     The discussion was reported as "one in a series of monthly meetings between the

government and tech companies" and involved "back-and-forth conversation on a variety of

topics." *Id.* Neither the "topics" of the "conversation" nor the particular participants on behalf of

the government were disclosed.    *Id.* "According to the industry statement, participants in

Wednesday's meeting also included representatives from the FBI's foreign influence task force,

the Justice Department's national security division, the Office of the Director of National

Intelligence and the Cybersecurity and Infrastructure Security Agency." *Id.* "The companies said

they would continue to meet regularly before the November election." *Id.*

260.     On September 28, 2020, the Biden-Harris campaign sent a letter to Facebook

demanding that Facebook take "more aggressive" action to censor statements by President Trump

and the Trump campaign that raised concerns about election security and the security of voting by

mail.  Sept. 28, 2020 Biden-Harris Letter, https://www.documentcloud.org/documents/7219497-

Facebook-Letter-9-28.html.     The letter accused Facebook of being a "propagator of

disinformation" for refusing to censor the rival campaign's core political speech, thus promoting

"distrust in our democracy" and threatening to "undermine democracy." *Id.* The Biden-Harris campaign described the Trump campaign's political speech as "dangerous claptrap" and argued that "[r]emoving this video should have been the easiest of calls." *Id.* The letter demanded that Facebook "remove Mr. Trump's posts, which violate your policies." *Id.* (underline in original).

261. The same letter complained that Facebook's "algorithm" permitted Trump's political speech to reach millions of people. It complained about the successful reach on Facebook of political speech that it opposed, bemoaning the fact that "a hyperpartisan propaganda organ like the *Daily Wire* is Facebook's top web publisher." *Id.* The Biden-Harris campaign accused Facebook of allowing speech that it favored "to be drowned out by a storm of disinformation." *Id.* And it concluded, "We will be calling out those failures [to censor Trump's political speech] as they occur over the coming 36 days," *i.e.*, until the November 2020 general election. *Id.*

262. On information and belief, responding to prior threats from Defendants and those acting in concert with them, Facebook complied with this demand and did engage in "more aggressive" censorship of the Trump campaign's core political speech from then on, resulting in an aggressive campaign to suppress President Trump and his campaign's political speech, especially on issues related to election security. In the wake of the Biden-Harris letter, Facebook declared that it "won't allow ads with content that seeks to delegitimize the outcome of an election," and it ramped up censorship of Trump's political speech thereafter.

263. As one commentator noted, "It's no surprise that Facebook's policy change happened the same week that the Biden campaign demanded Trump's Facebook posts be censored." Alexander Hall, *Liberal Media Used to Warn Against Mailing Votes; Now Big Tech, Left Are Protecting It* (Oct. 30, 2020), *at* https://www.newsbusters.org/blogs/free-speech/alexander-hall/2020/10/30/liberal-media-used-warn-against-mailing-votes-now-big.

264.    At the same time, "Twitter also modified its rules, stating: 'we may label and reduce the visibility of Tweets containing false or misleading information about civic processes in order to provide additional context' in its Civic integrity policy." *Id.*

265.    Both platforms ramped up censorship of core political speech of President Trump and his campaign, as well as core political speech by others favoring their messages and campaigns, in the critical final month before the 2020 general election, resulting in egregious acts of censorship.  These acts of censorship included suppression of expressions of concern about election security as a result of the massive increase in voting by mail during the 2020 general election.

266.    In perhaps the most notorious example, as noted above, Twitter, Facebook, and other social-media companies censored the New York Post's entirely truthful and carefully sourced article about Hunter Biden's laptop on October 14, 2020, as discussed further above.  This censorship included locking the New York Post's social-media accounts for weeks until after the election.

267.    According to one survey, sixteen percent of Biden voters polled stated that they would have changed their votes if they had known about the Hunter Biden laptop story before the election, which could have changed the outcome of the election.

268.    This censorship required deliberate, aggressive action by social-media firms. "Facebook moderators had to manually intervene to suppress a controversial New York Post story about Hunter Biden, according to leaked moderation guidelines seen by the Guardian." *Facebook leak reveals policies on restricting New York Post's Biden story*, THE GUARDIAN (Oct. 30, 2020), *at*    https://www.theguardian.com/technology/2020/oct/30/facebook-leak-reveals-policies-restricting-new-york-post-biden-story.

269.    At the time, Facebook claimed that the censorship of the Hunter Biden laptop story was "part of our standard process to reduce the spread of misinformation.  We temporarily reduce distribution pending factchecker review." *Id.*  But this was not true.  In fact, Facebook imposed "special treatment" on the New York Post to suppress the story, which included "manually overrid[ing]" Facebook's own guidelines for suppressing so-called "misinformation." *Id.*

270.    On December 10, 2020, nine Democratic House Members in the so-called "Congressional Task Force on Digital Citizenship" (a group of exclusively Democratic members of Congress) sent a letter to President-elect Biden, calling for the incoming Administration to create task forces that would increase censorship of "disinformation and misinformation" on social media.    Dec.    10,    2020    Letter    of    Rep.    Wexton,    et    al.,    *at* https://wexton.house.gov/uploadedfiles/12.10.20_house_democrats_disinformation_roadmap_to _president-elect_biden.pdf.

271.    The letter decried the rise of "news environments online, which report vastly different information and do not offer the same editorial standards to protect against disinformation and misinformation that traditional news media do." *Id.*  It criticized social-media platforms for failing to censor "disinformation" more aggressively: "As social media platforms post record revenues from engagement, they seldom act as responsible information gatekeepers and, in fact, have financial incentives to direct users to posts that are false, misleading, or emotionally manipulative." *Id.*

272.    The letter called on President-elect Biden to "[s]upport collaboration between government and civic organizations to combat dangerous propaganda." *Id.*  The letter acknowledged that "social media platforms have taken some steps to limit the spread of harmful disinformation and misinformation over the past year," but urged that these steps were not nearly

enough, arguing that "we can still see how easily this content is posted and amplified by bad actors and unknowing citizens," that "platforms have financial incentives for engaging posts to reach larger audiences, regardless of the content," and that "computer algorithms still make up a majority of content moderation, and platforms have at times refused to take action against accounts and groups promoting violence and hate speech." *Id.*

273.    The letter called for President-elect Biden to deploy the U.S. Department of Justice and the Department of Homeland Security to combat "disinformation," and it called for more direct government involvement in policing the content of political speech on social media platforms, in order to "build citizen resilience to disinformation and support a healthy information ecosystem"— which is Newspeak for viewpoint- and content-based censorship.

274.    In announcing the letter, its lead signer, Rep. Wexton, openly stated that Americans lack the sophistication to make their own judgments about truth and falsity of online speech, and that government-approved "gatekeepers" of information should be imposed: "In the letter, the Members recognize that, while a growing number of people in the U.S. are getting their news from social media platforms, many Americans are ill-equipped to recognize and sift through false, misleading, or emotionally manipulative posts. Additionally, there exists a lack of effective information gatekeepers to protect against disinformation threats online." *See* Dec. 10, 2020 News Release, https://wexton.house.gov/news/documentsingle.aspx?DocumentID=431.

275.    Consistent with this letter, the Biden Administration launched several initiatives designed to inject the power and authority of federal agencies like DHS into policing "disinformation" and "misinformation" online—which, all too often, means censoring core political speech disfavored by government officials.

276.     On information and belief, DHS and its officials are actively engaged in this project of procuring the censorship of disfavored speakers, content, and viewpoints in speech about election integrity.

277.     On May 3, 2021, it was reported that DHS intended to "partner with private firms," *i.e.*, social-media companies, to monitor disfavored speech online. *Biden team may partner with private firms to monitor extremist chatter online*, CNN.com (May 3, 2021), *at* https://www.cnn.com/2021/05/03/politics/dhs-partner-private-firms-surveil-suspected-domestic-terrorists/index.html. The purpose of these "partnerships" was to evade legal, constitutional, and ethical problems with DHS's direct surveillance of online speech: "The Department of Homeland Security is limited in how it can monitor citizens online without justification and is banned from activities like assuming false identities to gain access to private messaging apps." *Id.* "Instead, federal authorities can only browse through unprotected information on social media sites like Twitter and Facebook and other open online platforms." *Id.* "The plan being discussed inside DHS, according to multiple sources, would, in effect, allow the department to circumvent those limits." *Id.* "Outsourcing some information gathering to outside firms would give DHS the benefit of tactics that it isn't legally able to do in-house, such as using false personas to gain access to private groups used by suspected extremists, sources say." *Id.*

278.     As noted above, on May 5, 2021, Defendant Psaki stated at a White House press conference that "[t]he President's view is that the major platforms have a responsibility related to the health and safety of all Americans to stop amplifying untrustworthy content, disinformation, and misinformation, especially related to COVID-19, vaccinations, and *elections*." White House, Press Briefing by Press Secretary Jen Psaki and Secretary of Agriculture Tom Vilsack, May 5, 2021 (emphasis added), *at* https://www.whitehouse.gov/briefing-room/press-

briefings/2021/05/05/press-briefing-by-press-secretary-jen-psaki-and-secretary-of-agriculture-

tom-vilsack-may-5-2021/.   Psaki immediately went on to state that President Biden "supports

better privacy protections and *a robust anti-trust program*."  *Id.* (emphasis added).  And she stated

that the President's "view is that there's more that needs to be done to ensure that this type of

misinformation; disinformation; damaging, sometimes life-threatening information is not going

out to the American public."  *Id.*

279.     In the same press conference, Psaki notoriously went on to state, "We're flagging

problematic posts for Facebook that spread disinformation."  *Id.*  On information and belief,

especially in light of Psaki's earlier reference to speech about "elections," this statement about

"flagging problematic posts" referred not just to social-media speech about COVID-19, but also

social-media speech about election integrity.  *See, e.g., White House says social media platforms*

*should not amplify 'untrustworthy' content*, REUTERS  (May  5,  2021),  *at*

https://www.reuters.com/article/ctech-us-trump-facebook-biden-idCAKBN2CM1XU-OCATC.

280.     In June 2021, the National Security Council released its "National Strategy for

Countering Domestic Terrorism."  *See* The White House, *National Strategy for Countering*

*Domestic    Terrorism*    (June    2021),    *at*    https://www.whitehouse.gov/wp-

content/uploads/2021/06/National-Strategy-for-Countering-Domestic-Terrorism.pdf.    The

"National Strategy" repeatedly claimed that "disinformation and misinformation" are important

elements of "domestic terrorism."  *Id.* at 9.  It claimed that the "ideologies" of domestic terrorists

"connect  and  intersect  with  conspiracy  theories  and  *other forms of disinformation and*

*misinformation*."  *Id.* (emphasis added).  It stated that such "elements" of domestic terrorism "can

combine and amplify threats to public safety," "*[e]specially on Internet-based communications*

*platforms such as social-media*."  *Id.* (emphasis added).  It stated that DHS and others "are

currently funding and implementing or planning" programs to "strengthen[] user resilience to disinformation and misinformation online for domestic audiences." *Id.* at 20.  The Strategy memo identified, as its "broader priority," the task of "enhancing faith in government and addressing the extreme polarization, *fueled by a crisis of disinformation and misinformation often channeled through social media platforms*, which can tear Americans apart…." *Id.* at 29 (emphasis added). And it called for DHS and others to "accelerat[e] work to contend with an information environment that challenges healthy democratic discourse," and to "find[] ways to counter the influence and impact" of online disinformation.  *Id.*

281.     On July 26, 2021, the Global Internet Forum to Counter Terrorism (GIFCT), an "organization formed by some of the biggest U.S. tech companies including Facebook and Microsoft," which includes DHS on its board of advisors, announced that it is "significantly expanding the types of extremist content shared between firms in a key database," to move from images and videos to content-based speech tracking. *Facebook and tech giants to target attacker manifestos, far-right militias in database*, REUTERS (July 26, 2021), *at* https://www.reuters.com/technology/exclusive-facebook-tech-giants-target-manifestos-militias-database-2021-07-26/.

282.     "GIFCT … was created in 2017 under pressure from U.S. and European governments," and "its database mostly contains digital fingerprints of videos and images related to groups on the U.N. Security Council's consolidated sanctions list and a few specific live-streamed attacks." *Id.*  "Until now, the Global Internet Forum to Counter Terrorism's (GIFCT) database has focused on videos and images from terrorist groups on a United Nations list," but now the group announced that it would move into content-based speech tracking.  *Id.*  On

information and belief, DHS officials including Defendants have access to such database(s) as
tools to advance censorship of online speech.

283.     Shortly thereafter, on August 2, 2021, DHS Secretary Mayorkas announced that
DHS was working directly with social-media companies to censor disfavored speech on social-
media platforms. "On [a] broadcast of MSNBC's 'Andrea Mitchell Reports,' DHS Secretary
Alejandro Mayorkas stated that the department is working with tech companies 'that are the
platform for much of the disinformation that reaches the American public, how they can better use
their terms of use to really strengthen the legitimate use of their very powerful platforms and
prevent harm from occurring.'" *Mayorkas: We're Working with Platforms on 'How They Can
Better Use' Their Terms to 'Prevent Harm' from Misinformation*, BREITBART NEWS (Aug. 2,
2021), *at* https://www.breitbart.com/clips/2021/08/02/mayorkas-were-workgin-with-platforms-
on-how-they-can-better-use-their-terms-to-prevent-harm-from-misinformation/.

284.     Echoing Psaki's comments at the July 15, 2021 news conference with Surgeon
General Murthy, Mayorkas stated: "So, we're working together with them. We're working with
the tech companies that are the platform for much of the disinformation that reaches the American
public, how they can better use their terms of use to really strengthen the legitimate use of their
very powerful platforms and prevent harm from occurring." *Id.* On information and belief, the
reference to "us[ing] their terms of use to really strengthen the legitimate use of their very powerful
platforms and prevent harms from occurring" refers to government-induced censorship of
disfavored viewpoints, speakers, and content.

285.     Mayorkas added that there was a federal-government-wide effort to police speech
on social media, stating: "[T]he connectivity between speech and violence, the connectivity
between active harm and speech is something that we're very focused on, and it's a difficult

challenge. But we're working on it and meeting that challenge, again, because of the great personnel of the Department of Homeland Security and *across the federal enterprise*." *Id.* (emphasis added).

286.    Soon after Mayorkas's August 2, 2021 comments, DHS officials began plotting to create a "Disinformation Governance Board" within DHS. *See* ECF No. 10-1, at 19-23 (Glenn Decl. Ex. 1, at 6-10). On September 13, 2021, senior DHS officials Robert Silvers and Samantha Vinograd sent a memorandum to Secretary Mayorkas recommending the creation of the Disinformation Governance Board. The opening sentence of the Memorandum noted that the Board's purpose would be to combat "[t]he spread of disinformation" regarding "[c]onspiracy theories about the validity and security of elections," including "disinformation surrounding the validity of the 2020 election," and "[d]isinformation related to the origins and effects of COVID-19 vaccines or the efficacy of masks," which "undercut[] public health efforts to combat the pandemic." *Id.* at 19.

287.    The same Memorandum noted that CISA was involved in flagging content for censorship on social-media platforms: "Leading up to the 2020 election, CISA relayed reports of election disinformation from election officials to social media platform operators." *Id.* at 20. The Memorandum called for the Board to perform "partner engagement" with "private sector entities [and] tech platforms." *Id.* at 22.

288.    In a subsequent Memorandum dated January 31, 2022, DHS officials indicated that the Board's activities would oversee extensive *pre-existing* social-media censorship activities by other federal officials and agencies: "The Board will also support and coordinate … MDM work with other departments and agencies, the private sector, and non-government actors." *Id.* at 24. This Memorandum attached the Board's Charter, which stated that its mission was to "guide and

support the Department's efforts to address mis-, dis-, and mal-information." *Id.* at 27.  It also stated that the Board would "harmonize and support coordination with … the private sector." *Id.* The Charter called for the Board to "coordinate, deconflict, and harmonize departmental efforts to address MDM," including between "DHS Components" and "interagency partners," and "serving as the Department's internal and external point of contact for coordination with … the private sector … regarding MDM." *Id.* at 28-29.

289.    Under continuous pressure from federal officials, including Defendants herein, social-media firms have imposed increasingly draconian censorship on core political speech about election integrity.  For example, in March 2022, YouTube imposed a one-week suspension on The Hill, a well-known political publication covering Congress, for posts that included clips of former President Trump's speech at the CPAC conference and interview on Fox News, which included claims that fraud changed the outcome of the 2020 presidential election.  Gilead Edelman*, Beware the Never-Ending Disinformation Emergency*, THE WIRED (March 11, 2022), *at* https://www.wired.com/story/youtube-rigged-election-donald-trump-moderation-misinformation/.  YouTube relied on its "Elections misinformation policy," under which it censors "Content that advances false claims that widespread fraud, errors, or glitches changed the outcome of *select past national elections*, after final election results are officially certified."  YouTube, *Elections Misinformation Policy*, https://support.google.com/youtube/answer/10835034?hl=en.

290.    This policy is openly content- and viewpoint-based—it applies only to "select" past national elections, and "[u]nder the policy, you can only include those claims if you explicitly debunk or condemn them."  Edelman, *supra*.  On information and belief, this policy is also selective in application, as it is not applied to censor widespread, false Democratic claims that supposed "collusion" between the Trump campaign and Russia changed the outcome of the 2016

presidential election. And "by asking news hosts to explicitly denounce any mention of election fraud, YouTube isn't just making its own content decisions; it's injecting itself into the editorial processes of actual media outlets." *Id.*

291.    On November 10, 2021, the Cybersecurity and Infrastructure Security Agency (CISA), an agency within DHS, announced that it was "beefing up its disinformation and misinformation team in the wake of a divisive presidential election that saw a proliferation of misleading information online." *Cyber agency beefing up disinformation, misinformation team*, THE HILL (Nov. 10, 2021), *at* https://thehill.com/policy/cybersecurity/580990-cyber-agency-beefing-up-disinformation-misinformation-team/. "'I am actually going to grow and strengthen my misinformation and disinformation team,' CISA Director Jen Easterly said." *Id.* Defendant Easterly said that so-called "disinformation" and "misinformation" pose "a top threat for CISA, which is charged with securing critical infrastructure, to confront." *Id.*

292.    Indulging in a bit of Newspeak of her own, Easterly claimed that social-media speech is a form of "infrastructure," and that policing speech online by the federal government falls within her agency's mission to protect "infrastructure," stating that CISA is "in the business of critical infrastructure, and the most critical infrastructure is our cognitive infrastructure, so building that resilience to misinformation and disinformation, I think, is incredibly important." *Id.*

293.    Easterly announced that CISA was working directly with unnamed "partners in the private sector" and other government agencies to police online speech: "We are going to work with our partners in the private sector and throughout the rest of the government and at the department to continue to ensure that the American people have the facts that they need to help protect our critical infrastructure." *Id.*

294.    With specific reference to hotly disputed election-integrity issues, which comprise core political speech, Easterly stated that Americans should not be allowed to "pick [their] own facts" and make their own decisions about what is true, especially regarding election security: "We now live in a world where people talk about alternative facts, post-truth, which I think is really, really dangerous if you get to pick your own facts, and it's particularly corrosive when you talk about matters of election security."  *Id.*  Instead, she indicated, federal officials like herself should intervene to help Americans "pick" the right "facts."  *Id.*

295.    CISA appears to be the focus of many of DHS's attempts to police the content of speech and viewpoints on social media.  On information and belief, CISA maintains a number of task forces, working groups, and similar organizations as joint government-private enterprises, which provide avenues for government officials to push for censorship of disfavored viewpoints and speakers online.

296.    In a 2020 document entitled "2020 Election Infrastructure Subsector-Specific Plan," *at* https://www.cisa.gov/sites/default/files/publications/election_infrastructure_subsector_specific_plan.pdf, CISA stated that it had partnered to "promote" interaction between election officials and the Center for Technology and Civic Life, the now-notorious nonprofit funded by Mark Zuckerberg that engaged in egregious election interference by injecting hundreds of millions of private dollars and personnel into local election offices in heavily Democratic-favoring areas.

297.    CISA routinely expands the definitions of "misinformation" and "disinformation" to include "malinformation," *i.e. truthful* information that the government believes is presented out of context to contradict left-wing political narratives.  CISA defines "malinformation" as information that is "based on fact, but used out of context to mislead, harm, or manipulate."  *See,*

*e.g.,* CISA, *We're in This Together.   Disinformation Stops with You.* (last visited May 5, 2022), https://www.cisa.gov/sites/default/files/publications/SLTTCOVIDToolkit_FINAL_508.pdf.

298.     CISA's same publication decries the spreading of "false treatment and prevention measures [for COVID-19], *unsubstantiated rumors regarding the origin of the virus*, and more." *Id.* (emphasis added).  On information and belief, "unsubstantiated rumors regarding the origin of the [COVID-19] virus" refers to the lab-leak theory of COVID-19's origins, which (as noted above) is supported by compelling circumstantial evidence, both scientific and historical.

299.     CISA's "Mis-, Dis-, and Malinformation [MDM] Planning and Incident Response Guide for Election Officials," *at* https://www.cisa.gov/sites/default/files/publications/mdm-incident-response-guide_508.pdf, calls for constant policing of speech regarding election integrity, stating that "election infrastructure related MDM occurs year-round," and "[f]alse narratives erode trust and pose a threat to democratic transitions, especially, but not limited to, narratives around election processes and the validity of election outcomes." *Id.*  The Guide defines MDM to include "[n]arratives or content that delegitimizes election results or sows distrust in the integrity of the process based on false or misleading claims." *Id.*

300.     On February 7, 2022, DHS issued a National Terrorism Advisory Bulletin, available at https://www.dhs.gov/ntas/advisory/national-terrorism-advisory-system-bulletin-february-07-2022.  It begins by stating: "The United States remains in a heightened threat environment fueled by several factors, including an online environment filled with false or misleading narratives and conspiracy theories, and other forms of mis- dis- and mal-information (MDM)." *Id.*  The first critical "factor" contributing to a "heightened threat environment," according to the Bulletin, is "(1) the proliferation of false or misleading narratives, which sow discord or undermine public trust in U.S. government institutions." *Id.*  Again, the first "[k]ey

factor contributing to the current heightened threat environment" identified in the Bulletin is "[t]he proliferation of false or misleading narratives, which sow discord or undermine public trust in U.S. government institutions: For example, there is widespread online proliferation of false or *misleading narratives regarding unsubstantiated widespread election fraud and COVID-19.* Grievances associated with these themes inspired violent extremist attacks during 2021." *Id.* (emphasis added). The Bulletin stated that DHS is directly coordinating with social-media platforms to address so-called "MDM": "DHS is working with public and private sector partners, as well as foreign counterparts, to identify and evaluate MDM, including false or misleading narratives and conspiracy theories spread on social media and other online platforms that endorse or could inspire violence." *Id.* And it specifically stated that CISA likewise "works with public and private sector partners … [to] increase nationwide cybersecurity resilience." *Id.*

301.    This February 7, 2022 Bulletin echoed statements from prior bulletins indicating that so-called COVID-19 "misinformation" and election-related "misinformation" are domestic terror threats. For example, DHS's January 27, 2021 National Terrorism Advisory System Bulletin, available at https://www.dhs.gov/ntas/advisory/national-terrorism-advisory-system-bulletin-january-27-2021, stated that "Domestic Violent Extremists" are "motivated by a range of issues, including anger over COVID-19 restrictions [and] the 2020 election results…." *Id.* Similarly, DHS's August 13, 2021 National Terrorism Advisory System Bulletin, available at https://www.dhs.gov/ntas/advisory/national-terrorism-advisory-system-bulletin-august-13-2021, stated that "violent extremists … may seek to exploit the emergence of COVID-19 variants by viewing the potential re-establishment of public health restrictions across the United States as a rationale to conduct attacks." *Id.* It stated that "domestic threat actors … continue to introduce, amplify, and disseminate narratives online that promote violence," and included therein

"conspiracy theories on perceived election fraud … and responses to anticipated restrictions relating to the increasing COVID cases." *Id.*

302.    On April 12, 2022, CISA published another bulletin announcing that it was coordinating directly with social-media platforms to police "Mis, Dis, Malinformation" (which it calls "MDM"). CISA, *Mis, Dis, Malinformation, at* https://www.cisa.gov/mdm. The bulletin states that, "False or misleading information can evoke a strong emotional reaction that leads people to share it without first looking into the facts for themselves, polluting healthy conversations about the issues and increasing societal divisions." *Id.* CISA reported that its Countering Foreign Influence Task Force's "mission evolved" during the Biden Administration to address the new "information environment," which (on information and belief) is codespeak for ramping up online censorship: "In 2021, the CFITF officially transitioned into CISA's MDM team, and the mission evolved to reflect the changing information environment." *Id.* CISA stated that it coordinates directly with social media firms to address "MDM": "The MDM team continues to work in close coordination with interagency and private sector partners, *social media companies*, academia, and international partners on a variety of projects to build resilience against malicious information activities." *Id.* (emphasis added).

303.    On information and belief, the April 12, 2022, CISA bulletin indicates that CISA works directly with social-media companies to flag content for censorship: "The MDM team serves as a switchboard for routing disinformation concerns to appropriate social media platforms…." *Id.* CISA boasts that it has "expanded the breadth of reporting [MDM] to include … more social media platforms," and that "[t]his activity leverages the rapport the MDM team has with the social media platforms to enable shared situational awareness." *Id.* On information and belief, these statements reflect and express on ongoing practice by government officials of directly

colluding with social-media platforms to suppress disfavored speech, viewpoints, content, and speakers on social media. Again, these statements echo Psaki's statement that the Biden Administration is "flagging problematic posts for Facebook," and Mayorkas's statement that DHS is "working with the tech companies that are the platform for much of the disinformation that reaches the American public" to address so-called misinformation and disinformation.

304.   The same bulletin suggests that CISA is directly involved in such "flagging" related to COVID-19 "misinformation." It states that "COVID-19-related MDM activities seek to undermine public confidence and sow confusion," and claims that "the rapid evolution of accurate information makes older, dated information a potential catalyst of confusion and distrust as well." *Id.* Thus, it claims, "[t]he MDM team supports the interagency and *private sector partners'* COVID-19 response efforts via regular reporting and analysis of key pandemic-related MDM trends." *Id.* On information and belief, these "private sector partners" include social-media firms, and the "reporting and analysis" includes flagging disfavored content for censorship.

305.   On April 27, 2022, Mayorkas announced that DHS was creating a "Disinformation Governance Board" within DHS to combat so-called "misinformation" and "disinformation." *Biden Administration creates 'Disinformation Governance Board' under DHS to fight 'misinformation,'* THE POST MILLENIAL (April 27, 2022), *at* https://thepostmillennial.com/breaking-biden-administration-creates-disinformation-governance-board-under-dhs-to-fight-misinformation. "The Department of Homeland Security is setting up a new board designed to counter misinformation related to homeland security, with a focus specifically on Russia and irregular migration. The board will be called the 'Disinformation Governance Board,' and will be headed by executive director Nina Jankowicz." *Id.* During congressional testimony, Mayorkas described the endeavor as a "just recently constituted

Misinformation/Disinformation Governance Board." *Id.* (video link at 1:40).  He stated: "The goal is to bring the resources of the Department together to address this threat." *Id.*

306.    Jankowicz has called for more aggressive censorship of election-related speech by social-media platforms, and has implied that social-media censorship of election-related speech should never relent or be reduced, stating on Twitter: "Considering the long-term damage these lies do to our democracy, I'm dismayed about this decision [not to censor election-related speech more aggressively].  I say this about foreign disinformation and it applies to domestic disinfo too: Elections aren't an end point.  They're an inflection point.  Policies need to reflect that." *Id.*

307.    On information and belief, DHS's new "Disinformation Governance Board" is intended to be used, and will be used, to increase DHS's efforts to induce and procure the censorship of disfavored content, viewpoints, and speakers on social-media platforms.

308.    From its inception, the DGB was envisioned as an agency for suppressing core political speech about election security and COVID-19 restrictions.  In the internal memo to Secretary Mayorkas advocating for the DGB's creation, the very first two topics of "disinformation" to be targeted were "conspiracies about the validity and security of elections," and "disinformation related to the origins and effects of COVID-19 vaccines or the efficacy of masks."

309.    Internal documents of DHS, provided by whistleblowers to U.S. Senators, indicate that the "Disinformation Governance Board" was formulated to create a stronger bureaucratic structure to federal social-media censorship policies and activities that were already in full force, both within DHS and across other federal agencies.  The whistleblower documents make clear that the DGB's task was not to *establish* a censorship program, but to *oversee* the massive censorship

program against free speech on these topics that already exists—both within DHS, and across the
federal government.

310.    On information and belief, Defendants Robert Silvers and Samantha Vinograd
played and play a central role in DHS's censorship activities, including but not limited to the
formulation and creation of the "Disinformation Governance Board."    The whistleblower
documents cited above strongly support this conclusion.    Silvers and Vinograd co-signed the
September 13, 2021 "Memorandum for the Secretary" re "Organizing DHS Efforts to Counter
Disinformation" that provided an overview of DHS's disinformation activity and recommended
the creation of the DGB.    As noted above, the opening lines of this memo state that "[t]he spread
of disinformation presents serious homeland security risks," especially "[c]onspiracy theories
about the validity and security of elections" and "[d]isinformation related to the origins and effects
of COVID-19 vaccines or the efficacy of masks."    The memo reflects detailed knowledge and
active oversight of DHS's "misinformation" and "disinformation" activities.    Further, Defendant
Silvers authored the January 31, 2022 memo to the Secretary seeking his "approval of the charter
for the Disinformation Governance Board," and he authored a separate memorandum to DHS's
general counsel seeking the same approval.    Silvers also is listed as a participant in the April 28,
2022 meeting with Twitter executives Nick Pickles and Yoel Roth organized by Nina Jankowicz,
discussed below.

311.    On April 28, 2022, Jankowicz arranged for a meeting between Secretary Mayorkas
and/or other senior DHS officials, including Undersecretary Robert Silvers, and "Twitter
executives Nick Pickles, Head of Policy, and Yoel Roth, Head of Site Integrity," to discuss
"public-private partnerships, MDM, and countering DVE.    The meeting is off the record and closed
press."    ECF No. 10-1, at 31 (Glenn Decl. Ex. 1, at 18).    This was to be a cozy meeting: Jankowicz,

who drafted the meeting brief, noted that "Nick and Yoel both know DGB Executive Director Nina Jankowicz." *Id.* The meeting was to be "an opportunity to discuss operationalizing public-private partnerships between DHS and Twitter." *Id.* In the meeting, DHS was to "Propose that Twitter become involved in Disinformation Governance Board Analytic Exchanges on Domestic Violent Extremism (DVE) and Irregular Migration," and to "Thank Twitter for its continued participation in the CISA Analytic Exchange on Election Security." *Id.* DHS was also to "Ask what types of data or information would be useful for Twitter to receive in Analytic Exchanges or other ways the Department could be helpful to Twitter's counter-MDM efforts." *Id.*

**5.  Defendants reinforce their threats and admit further colluding to censor free speech.**

312.     On or around April 25, 2022—two days before DHS announced the creation of its "Disinformation Governance Board"—it was reported that free-speech advocate Elon Musk would acquire Twitter and make it a privately held company. Left-wing commentators widely decried this news on the ground that free speech on Twitter would allow the spread of so-called "misinformation" and "disinformation."

313.     On April 25, 2022, Psaki was asked at a White House press briefing to respond to the news that Elon Musk would acquire Twitter, and asked "does the White House have any concern that this new agreement might have President Trump back on the platform?" White House, *Press Briefing by Press Secretary Jen Psaki, April 25, 2022*, at https://www.whitehouse.gov/briefing-room/press-briefings/2022/04/25/press-briefing-by-press-secretary-jen-psaki-april-25-2022/.

314.     Psaki responded by reiterating the threats of adverse legal consequences to Twitter and other social media platforms, specifically referencing antitrust enforcement and Section 230 repeal: "No matter who owns or runs Twitter, the President has long been concerned about the

power of large social media platforms … [and] has long argued that tech platforms must be held

accountable for the harms they cause.  He has been a strong supporter of fundamental reforms to

achieve that goal, including reforms to Section 230, enacting antitrust reforms, requiring more

transparency, and more.  And he's encouraged that there's bipartisan interest in Congress."  *Id.*

315.    At the same press briefing, Psaki was asked: "Are you concerned about the kind of

purveyors of election misinformation, disinformation, health falsehoods, sort of, having more of

an opportunity to speak there on Twitter?"  She responded by specifically linking the legal threats

to the social-media platforms' failure to more aggressively censor free speech: "We've long talked

about and the President has long talked about his concerns about the power of social media

platforms, including Twitter and others, to spread misinformation, disinformation; the need for

these platforms to be held accountable."

316.    Psaki was then asked a question that noted that "the Surgeon General has said that

misinformation about COVID amounts to a public health crisis," and then queried, "would the

White House be interested in working with Twitter like it has in the past to continue to combat this

kind of misinformation?  Or are we in a different part of the pandemic where that kind of

partnership is no longer necessary?"  *Id.*

317.    Psaki responded by reaffirming that senior officials within the White House and/or

the Administration are continuing to coordinate directly with social-media platforms to censor

disfavored speakers and content on social media, and directly linking these efforts to the repeated

threat of adverse legal action: "we engage regularly with all social media platforms about steps

that can be taken that has continued, and I'm sure it will continue.  But there are also reforms that

we think Congress could take and we would support taking, including reforming Section 230,

enacting antitrust reforms, requiring more transparency.  And the President is encouraged by the bipartisan support for — or engagement in those efforts." *Id.*

**6.  Defendants have successfully procured the censorship of core political speech.**

318.    As a direct result of the conduct alleged herein, Defendants have achieved a great deal of success in procuring the censorship of disfavored speakers, viewpoints, and content on social media, as alleged further herein—including core political speech.

319.    Among other things, they have achieved astonishing success in muzzling public criticism of President Biden.  A recent review by the Media Research Center identified 646 instances over the last two years where social-media firms censored public criticism of then-Candidate and now-President Biden.  *See* Joseph Vasquez and Gabriela Pariseau, *Protecting the President: Big Tech Censors Biden Criticism 646 Times Over Two Years* (April 21, 2022), *at* https://censortrack.org/protecting-president-big-tech-censors-biden-criticism-646-times-over-two-years.

320.    "The Media Research Center found more than 640 examples of bans, deleted content and other speech restrictions placed on those who criticized Biden on social media over the past two years." *Id.*  "MRC Free Speech America tallied 646 cases in its CensorTrack database of pro-Biden censorship between March 10, 2020, and March 10, 2022. The tally included cases from Biden's presidential candidacy to the present day." *Id.*

321.    "The worst cases of censorship involved platforms targeting anyone who dared to speak about any subject related to the *New York Post* bombshell Hunter Biden story. … Big Tech's cancellation of that story helped shift the 2020 election in Biden's favor.  Twitter locked the Post's account for 17 days.  In addition, Twitter slapped a 'warning label' on the GOP House Judiciary Committee's website for linking to the Post story." *Id.*  "CensorTrack logged 140 instances of

users—including lawmakers, organizations, news outlets and media personalities—censored for sharing anything related to the bombshell Hunter Biden laptop story." *Id.*

322.    "Twitter was the most aggressive censor when it came to the Biden laptop story. CensorTrack entries show that users could not tweet the story or pictures of the Post story."

323.    "Big Tech even axed those who blamed the current inflation crisis on Biden.  For example, Facebook censored Heritage Action, the advocacy arm of the conservative Heritage Foundation, on March 15, simply for posting a video quoting Biden's embarrassing statements on energy policy.  Facebook placed an interstitial, or filter, over Heritage Action's video, suppressing the post's reach.  The video showed Biden and officials in his administration explaining how his policies would cause gas prices to rise." *Id.*

324.    "[T]he largest category by far included users who dared to call out Biden's notoriously creepy, touchy-feely behavior around women and children.  The 232 cases of comedic memes, videos, or generic posts about Biden's conduct composed more than one-third of CensorTrack's total instances of users censored for criticizing the president." *Id.*

325.    "Big Tech even went after posts that quoted Biden's own words and made him look awful in retrospect." *Id.*

326.    "The list of censorship targets included an array of prominent influencers on social media: Trump; lawmakers like Sen. Ted Cruz (R-TX) and House Minority Leader Kevin McCarthy (R-CA); news outlets like the New York Post, The Washington Free Beacon and The Federalist; satire site The Babylon Bee; celebrities like Donald Trump Jr. and James Woods, and media personalities like Daily Wire host Candace Owens, Salem radio host Sebastian Gorka and radio host Dana Loesch." *Id.*

327.    Most recently, social-media platforms are beginning to censor criticisms of the Biden Administration's attempt to redefine the word "recession" in light of recent news that the U.S. economy has suffered two consecutive quarters of reduction in GDP.  *See, e.g., Economist slams Facebook for 'absolutely Orwellian' fact-check upholding Biden's recession denial*, Fox News (Aug. 1, 2022), at https://www.foxnews.com/media/economist-slams-facebook-absolutely-orwellian-fact-check-upholding-bidens-recession-denial.

328.    Thus, Defendants' conduct alleged herein has created, with extraordinary efficacy, a situation where Americans seeking to exercise their core free-speech right to criticize the President of the United States are subject to aggressive prior restraint by private companies acting at the bidding of government officials.  This situation is intolerable under the First Amendment.

**7.  Federal officials open new fronts in their war for censorship of disfavored speech.**

329.    Since this lawsuit was filed, federal officials, including Defendants herein, have expanded their social-media censorship activities and opened new fronts in their war against the freedom of speech on social media.  The frontiers of government-induced censorship are thus expanding rapidly.

330.    For example, on June 14, 2022, White House National Climate Advisor Gina McCarthy spoke at an Axios event titled "A conversation on battling misinformation."  *See* Alexander Hall, *Biden climate advisor demands tech companies censor 'disinformation' to promote 'benefits of clean energy'*, Fox News (June 14, 2022), *at* https://www.foxnews.com/media/biden-climate-advisor-tech-companies-censor-disinformation-promote-benefits-clean-energy (video of her comments embedded in link).  McCarthy publicly demanded that social-media platforms engage in censorship and suppression of speech that contradicts federal officials' preferred narratives on climate change.

331.    During the event, "McCarthy skewered Big Tech companies for 'allowing' disinformation and cheered Congress for 'taking action' to enact more censorship last Thursday." *Id.*  "Axios political reporter Alexi McCammond asked McCarthy how so-called 'rampant mis-and-disinformation around climate change online and in other platforms' has 'made your job harder?'"  *Id.*  "McCarthy responded by slamming social media companies: 'We have to get tighter, we have to get better at communicating, and frankly, *the tech companies have to stop allowing specific individuals over and over again to spread disinformation*.'"  *Id.* (emphasis added).  "She suggested further that 'we have to be smarter than that and *we need the tech companies to really jump in*.'"  *Id.* (emphasis added).  "McCammond responded by asking: 'Isn't misinformation and disinfo around climate a threat to public health itself?'  McCarthy asserted that it 'absolutely' is:  'Oh, absolutely.'"  *Id.*

332.    Following the Administration's now-familiar playbook, McCarthy explicitly tied these demands for censorship of climate-change-related speech to threats of adverse legislation:  "McCarthy also praised Congress directly for pushing social media companies to censor Americans: 'We do see Congress taking action on these issues, we do see them trying to tackle the misinformation that's out there, trying to hold companies accountable.'"  *Id.*

333.    Two days later, the White House announced a new task force to address, among other things, "gendered disinformation" and "disinformation campaigns targeting women and LGBTQI+ individuals who are public and political figures, government and civic leaders, activists, and journalists."  White House, *Memorandum on the Establishment of the White House Task Force to Address Online Harassment and Abuse* (June 16, 2022), *at* https://www.whitehouse.gov/briefing-room/presidential-actions/2022/06/16/memorandum-on-the-establishment-of-the-white-house-task-force-to-address-online-harassment-and-abuse/.

334.     The June 16 Memorandum decries "online harassment and abuse"—vague terms that, on information and belief, are deliberately adopted to sweep in constitutionally protected speech.   In particular, the Memorandum defines "online harassment and abuse" to include "gendered disinformation," a deliberately broad and open-ended term.  *Id.* § 1.  The Memorandum announces plans to target such "gendered disinformation" directed at public officials and public figures, including "women and LGBTQI+ political leaders, public figures, activists, and journalists."  *Id.*   The Memorandum creates a Task Force co-chaired by the Assistant to the President for National Security Affairs, which includes the Secretary of Defense, the Attorney General, and the Secretary of Homeland Security, among others.  *Id.*

335.     The Task Force is charged with "developing programs and policies to address … *disinformation campaigns* targeting women and LGBTQI+ individuals who are public and political figures, government and civic leaders, activists, and journalists in the United States and globally."  *Id.* § 4(a)(iv) (emphasis added).  The Memorandum calls for the Task Force to consult and coordinate with "technology experts" and "industry stakeholders," *i.e.*, social-media firms, to achieve "the objectives of this memorandum," *id.* § 4(b).  Those "objectives," of course, include suppressing so-called "disinformation campaigns" against "public and political figures."  *Id.* § 4(a)(iv).

336.     The Memorandum again threatens social-media platforms with adverse legal consequences if they do not censor aggressively enough to suit federal officials: "the Task Force shall … submit periodic recommendations to the President on *policies, regulatory actions, and legislation on technology sector accountability* to address systemic harms to people affected by online harassment and abuse."  *Id.* § 5(c) (emphasis added).

337.     On June 17, 2022, twenty-one Democratic U.S. Senators and Representatives sent a letter to Sundar Pichai, the CEO of Alphabet Inc., which owns Google, demanding that Google censor, suppress, and de-boost search results and Google Maps results for pro-life pregnancy resource centers.   June 17, 2022 Letter of Sen. Mark Warner, et al., available at https://reason.com/wp-content/uploads/2022/06/26F26BB28841042A7931EEC58AC80E08.anti-abortion-letter-to-google-final.pdf.   The letter's co-signers included many of the Members of Congress who have previously made threats of adverse legal consequences if social-media platforms do not increase censorship—such as Senators Mark Warner, Amy Klobuchar, and Richard Blumenthal.   *Id.*   The letter cited "research by the Center for Countering Digital Hate (CCDH)," *id.*—the same organization that Jen Psaki and the White House coordinated with to demand the censorship of the so-called "Disinformation Dozen," and that coordinated the demonetization of Plaintiff Hoft from Google.   The letter describes pro-life pregnancy resource centers as "fake clinics," and demands that Google proactively censor search results, mapping results, and advertisements relating to such clinics.   *Id.*   The letter demands that Google "limit the appearance of anti-abortion fake clinics or so-called 'crisis pregnancy centers' in Google search results, Google Ads, and on Google Maps"; that Google "add user-friendly disclaimers that clearly indicate whether or not a search result does or does not provide abortions"; and that Google take "additional steps to ensure that users are receiving accurate information when they search for health care services like abortion on Google Search and Google Maps."   *Id.*

338.     Defendants swiftly doubled down on this demand for social-media censorship of pro-life pregnancy resource centers.   On July 8, 2022, the President signed an Executive Order "aimed at protecting abortion rights."   Sandhya Raman, *Biden issues executive order responding to abortion ruling*, Roll Call (July 8, 2022), at https://rollcall.com/2022/07/08/biden-issues-

executive-order-responding-to-abortion-ruling/.  The order directs HHS, DOJ, and the FTC "to examine ways to … curb the spread of misinformation related to abortion." *Id.*  The order is entitled "Executive Order on Protecting Access to Reproductive Healthcare Services," available at https://www.whitehouse.gov/briefing-room/presidential-actions/2022/07/08/executive-order-on-protecting-access-to-reproductive-healthcare-services/.  Section 4(b)(iv) of the order states: "The Secretary of Health and Human Services shall, in consultation with the Attorney General and the Chair of the FTC, consider options to address deceptive or fraudulent practices related to reproductive healthcare services, including online, and to protect access to accurate information." *Id.*

### 8.  Discovery reveals a massive federal Censorship Enterprise including all Defendants.

339.    Plaintiffs reassert and incorporate by reference the Exhibits A-O to the First Amended Complaint, Docs. 45-1 to 45-15, and the Exhibits to their Joint Statement on Discovery Disputes, Docs. 71-1 to 71-13, as if set forth fully herein.  For ease of reference, this Second Amended Complaint refers to the exhibits to the First Amended Complaint by the same Exhibit numbers, Exhibits A-O.  Likewise, Docs. 71-1 to 71-13 are incorporated by reference and referred to by their docket number.  In addition, two additional Exhibits, labeled "Exhibit P" and "Exhibit Q," comprising additional documents produced by Defendants in discovery, are attached hereto and incorporated fully by reference herein.

340.    Based on documents produced by Defendants in discovery and other recent public disclosures, senior federal officials have placed intensive oversight and pressure to censor private speech on social-media platforms.  All Defendants have been involved in the actions of this "Censorship Enterprise" in various ways, and these censorship activities continue to the present and continue to directly cause Plaintiffs irreparable harm.  Representative examples of such federal

censorship activities are set forth herein, but these do not identify all the federally induced acts of censorship by any means.

341.    After President Biden publicly stated (about Facebook) on July 16, 2021, that "They're killing people," a very senior executive at Meta (Facebook and Instagram) reached out to Surgeon General Murthy to engage in damage control and appease the President's wrath.  Soon thereafter, the same Meta executive sent a text message to Surgeon General Murthy, noting that "it's not great to be accused of killing people," and expressing that he was "keen to find a way to deescalate and work together collaboratively."

342.    Such "deescalation" and "working together collaboratively," naturally, involved increasing censorship on Meta's platforms.  One week after President Biden's public accusation, on July 23, 2021, that senior Meta executive sent an email to Surgeon General Murthy stating, "I wanted to make sure you saw the steps we took *just this past week* to adjust policies on what we are removing with respect to misinformation, as well as steps taken to further address the 'disinfo dozen': we removed 17 additional Pages, Groups, and Instagram accounts tied to the disinfo dozen...."

343.    Again, on August 20, 2021, the same Meta executive emailed Murthy to assure him that Facebook "will shortly be expanding our COVID policies to further reduce the spread of potentially harmful content on our platform.  These changes will apply across Facebook and Instagram," and they included "increasing the strength of our demotions for COVID and vaccine-related content," and "making it easier to have Pages/Groups/Accounts demoted for sharing COVID and vaccine-related misinformation."

344.    In addition, that senior Meta executive sent a "Facebook bi-weekly covid content report" to Surgeon General Murthy and to White House official Andrew Slavitt, evidently to

reassure these federal officials that Facebook's suppression of COVID-19 "misinformation" was aggressive enough for their preferences.

345.     In another, similar exchange, on October 31, 2021, Deputy Assistant to the President Rob Flaherty emailed a contact at Meta with a link to a Washington Post article complaining about the spread of COVID "misinformation" on Facebook.  The email contained only the link to that story with the subject line, "not even sure what to say at this point."  The Facebook official defended Facebook's practices, and assured Mr. Flaherty that Facebook's internal studies were intended to "improve our defenses against harmful vaccine misinformation," and that Facebook had, in fact, "improved our policies," *i.e.*, increased censorship of online speech. *Id.*

346.     Likewise, Alex Berenson disclosed internal Twitter communications revealing that senior "WH" officials including Andrew Slavitt specifically pressured Twitter to deplatform Berenson, an influential vaccine critic—which Twitter did.  This pressure to deplatform Berenson evidently occurred on April 21, 2021, when four Twitter employees participated in a Zoom meeting with at least three White House officials and one HHS official intended to allow the White House to "partner" with Twitter in censoring COVID-related "misinfo."  The meeting invitation stated: "White House Staff will be briefed by Twitter on vaccine misinfo.  Twitter to cover trends seen generally around vaccine misinformation, *the tangible effects seen from recent policy changes*, what interventions are currently being implemented in addition to previous policy changes, and ways the White House (and our COVID experts) can *partner* in product work." (Emphasis added).

347.     The next day, April 22, Twitter employees noted in internal communications that the White House officials had posed "tough" questions during this meeting, including "one really

tough question about why Alex Berenson hasn't been kicked off the platform."  *See* https://alexberenson.substack.com/p/the-white-house-privately-demanded.

348.    On July 11, 2021, Dr. Fauci publicly described Berenson's public statements on vaccines as "horrifying."  Soon thereafter, after President Biden's subsequent statement that "They're killing people" by not censoring vaccine "misinformation," Twitter caved to federal pressure and permanently suspended Berenson.

349.    Such communications from the White House impose maximal pressure on social-media companies, which clearly yields the sought-after results.  And federal officials are fully aware that such pressure is necessary to induce social-media platforms to increase censorship of views that diverge from the government's.  CISA Director Jen Easterly, for example, texted with Matthew Masterson about "trying to get us in a place where Fed can work with platforms to better understand the mis/dis trends *so relevant agencies can try to prebunk/debunk as useful*," and complained about the Government's need to overcome the social-media platforms' "hesitation" to working with the government: "Platforms have got to get more comfortable with gov't.  It's really interesting how hesitant they remain."

350.    In fact, such pressure from government officials on social-media companies, along with the many public statements alleged in the Complaint, have succeeded on a grand scale.  A veritable army of federal bureaucrats are involved in censorship activities "across the federal enterprise."  There are so many, in fact, that CISA Director Easterly and Matthew Masterson complained in text messages that "chaos" would result if all federal officials were "independently" contacting social-media platforms about so-called misinformation: "Not our mission but was looking to play a coord role so not every D/A is independently reaching out to platforms which could cause a lot of chaos."  On information and belief, as alleged above, the "Disinformation

Governance Board" was created to impose a bureaucratic structure on the enormous censorship activities already occurring involving dozens of federal officials and many federal agencies.

351.     These federal bureaucrats have leveraged their clout and pressure on social-media platforms to become deeply embedded in a joint enterprise with social-media companies to procure the censorship of private citizens' speech on social media.  Officials at HHS, including Defendants herein, routinely flag content for censorship, for example, by organizing weekly "Be On The Lookout" meetings to flag disfavored content; sending lengthy lists of examples of disfavored posts to be censored; serving as privileged "fact checkers" whom social-media platforms consult about censoring private speech; and receiving detailed reports from social-media companies about so-called "misinformation" and "disinformation" activities online; among others.

352.     These efforts go back as far as very early 2020, and they continue through the present day, as evidenced by Facebook employees writing to high-level officials in HHS and the State Department informing them of new attempts to "control information and misinformation related to Corona virus [*sic*] which includes links to WHO page as well as removal of misinformation."

353.     A Facebook employee wrote to Defendants Slavitt, Flaherty, Peck, and Humphrey on March 2, 2021, updating the White House on "vaccine intent" and "shar[ing] survey based data on intent to vaccinate," and relaying the ways that the company was combatting "misinformation." These methods included "improving the effectiveness of our existing enforcement systems (particularly focusing on entities that repeatedly post vaccine misinformation)" and "mitigating viral content that could lead to vaccine hesitancy" while "promoting the vaccine and providing authoritative information."

354.    Upon information and belief, that means ensuring that posts departing from the government's messaging on vaccines are censored and de-amplified through the Facebook algorithm, while those conveying the government's message are amplified.

355.    On March 1, 2021, a Twitter employee wrote to Defendants Slavitt, Flaherty, Peck and Humphrey after a meeting that the company was escalating efforts to remove harmful content about Covid and introducing a strike system—apparently the outcome of the discussion that had just occurred.  This was following an email exchange in February of 2021 in which the same employee had sought to update the four about "additional measure[s] Twitter taking regarding covid [*sic*]."

356.    Likewise, on April 26, 2020, Muhammed wrote to Facebook employees and asked them to take down Facebook pages, and deactivate associated accounts, misrepresenting themselves as Administration for Children and Families Program (ACF).  One of those employees responded, "Absolutely."  *Id.*

357.    Shortly after the inauguration of President Biden, an individual who worked in private sector engagement connected a Facebook employee with Defendants Courtney Rowe and Joshua Peck, and saying that Defendants Flaherty and Humphrey would want to be in touch about misinformation and disinformation.

358.    On February 24, 2021, a different Facebook employee wrote to Defendant Flaherty "Following upon your request for COVID-19 misinfo themes we are seeing," "we are removing these claims from our platforms[.]"  Those themes were Vaccine Toxicity," "False Claims About Side Effects of Vaccine" (including that the vaccines may cause infertility), "Comparing the Covid Vaccine to the Flu Vaccine," and "Downplaying Severity of Covid-19."

359.     Flaherty responded later that day, asking for a "sense of volume on these, and some metrics around the scale of removal for each[]," as well as "misinformation that might be falling outside of your removal policies."  The Facebook employee replied that she could "go into detail on content that doesn't violate like below but could contribute to vaccine hesitancy."

360.     Similarly, on February 19, 2021, Defendant Flaherty, on an email between him, Humphrey, Defendant Courtney Rowe, and Defendant Joshua Peck, and several Facebook employees as well, asked to hear from the company about "mis and dis" and later stated that one of his questions was about "algorithmic productions."  Flaherty also asked if "plans are in the works . . . to replicate the strategy you deployed around lockdowns – the 'stay at home' stickers/promoted Instagram story."  A meeting was apparently held pursuant to Flaherty's request shortly thereafter on March 1, with the subject being "Misinfo & Disinfo."

361.     On May 20, 2021, Mina Hsiang of the Office of Management and Budget wrote to a Google employee, apparently following up on a conversation from the previous day that was "critically helpful for the nationwide vaccination effort."  Hsiang suggested a change to results yielded by a search for "who can get vaccinated now."

362.     The parties continued to collaborate on the subject, and eventually arranged a meeting that was apparently held on May 27, 2021 and scheduled by Defendant Joshua Peck. Defendant Andy Slavitt asked Peck and Hsiang to take his place on the call because he was "slammed."

363.     Sheila Walsh of HHS exchanged emails with employees at YouTube about combating vaccine "misinformation," and arranged a meeting as well.

364.     Defendant Christy Choi, Deputy Director in the Office of Communications within HHS had exchanges with Facebook asking it to change the name of a Facebook page providing

"misleading information about vaccine" "[g]iven the administration's focus on getting more Americans vaccinated."

365.     CISA, likewise, has aggressively embraced its "evolved mission" of screening complaints of social-media disinformation and then "routing disinformation concerns" to social-media platforms.  CISA routinely receives reports of perceived "disinformation," often from state and local government officials, and forwards them to social-media companies for censorship, placing the considerable weight of its authority as a federal national-security agency behind its demands for suppression of private speech.  CISA, therefore, serves as a government clearinghouse for expedited censorship of social-media speech disfavored by government officials.

366.     Moreover, many of these substantive communications from federal officials flagging specific posts and content for censorship also appear to occur through alternative channels of communication.  For example, Facebook trained CDC and Census Bureau officials on how to use a "Facebook misinfo reporting channel."  Twitter offered federal officials a privileged channel for flagging misinformation through a "Partner Support Portal."  YouTube has disclosed that it granted "trusted flagger" status to Census Bureau officials, which allows privileged and expedited consideration of their claims that content should be censored.

367.     As alleged further herein, federal censorship efforts escalated after President Biden assumed office in January 2021.

368.     The individually named White House Defendants and other Defendants were directly involved in communications with social-media platforms about censorship and suppression of speech on social-media.

369.    For example, Humphrey requested that a Meta employee censor an Instagram parody account of Dr. Fauci, and Meta replied, "Yep, on it!"  Soon thereafter, Meta reported that the account had been censored.

370.    As another example, on May 28, 2021, a senior executive of Meta sent an email to Slavitt and Murthy reporting that Facebook had expanded its censorship policies, evidently to satisfy federal officials' demands made at a recent oral meeting.  The email stated that a "key point" was that "We're expanding penalties for individual Facebook accounts that share misinformation."

371.    As recently as June 13, 2022, Flaherty demanded that Meta continue to produce periodic "COVID-19 insights reports" to track so-called "misinformation" regarding COVID-19 on Meta's social-media platforms, expressing the specific concern that COVID vaccines for children under 5 would soon be authorized.

372.    Meta got the message.  It agreed to continue sending its censorship-tracking reports, and on June 23, 2022, Meta assured Flaherty that it was expanding its censorship of COVID-19 "misinformation" to ensure that speech critical or skeptical of COVID-19 vaccines for children under 5 years old—a highly controversial topic—would be censored.  Notably, Pfizer's own data established that the vaccine does not stop infection or transmission in this age group, demonstrating the political nature of this censorship.  *See* https://www.nytimes.com/2022/02/28/health/pfizer-vaccine-kids.html.

373.    The White House Defendants were involved in many other communications regarding censorship as well.  For example, in June and July of 2022, Flaherty, Manning, Salcido, and Cheema were included in the email chain with Meta in which Flaherty demanded that Meta continue providing biweekly "COVID-19 Insights" reports to ensure adequate censorship of

speech on Facebook and Instagram "as we start to ramp up under 5 vaccines"—*i.e.*, as vaccination
of children under 5 for COVID-19 began.  Wakana and Rowe were also involved in similar
communications overseeing Meta's misinformation practices.

374.     Again, for example, Flaherty, Wakana, Humphrey, and Rowe participated in a
"Twitter // COVID Misinfo" meeting with Twitter on or around March 1, 2021.  And on April 21,
2021, Flaherty and Slavitt, along with White House Confidential Assistant Kelsey V. Fitzpatrick,
participated in a meeting with Twitter at which those White House officials demanded greater
censorship on Twitter and specifically demanded the de-platforming of Alex Berenson.  The
meeting invite for that meeting stated that "White House Staff will be briefed by Twitter on vaccine
misinfo.  Twitter to cover trends seen generally around vaccine misinformation, the tangible effects
seen from recent policy changes, … and ways the White House (and our COVID experts) can
partner in product work."

375.     A senior Meta executive repeatedly copied Slavitt on his emails to Surgeon General
Murthy in which he assured the Surgeon General and the White House that Meta was engaging in
censorship of COVID-19 misinformation according to the White House's demands.  Among other
things, the Meta executive insisted that "We've expanded penalties for individual Facebook
accounts that share misinformation."

376.     Likewise, on March 2, 2021, Meta sent an email assuring Slavitt, Flaherty, and
Humphrey that the company is "[c]ombating vaccine misinformation and de-amplifying content
that could contribute to vaccine hesitancy" by "improving the effectiveness of our existing
enforcement systems (particularly focusing on entities that repeatedly post vaccine
misinformation), mitigating viral content that could lead to vaccine hesitancy…."

377.    Among many other reports, Meta reported to Rowe, Manning, Flaherty, and Slavitt that it has "labeled and demoted" "vaccine humor posts whose content could discourage vaccination" during January 2022.  It also reported to the White House that it "labeled and demoted" posts "suggesting natural immunity to COVID-19 infection is superior to immunity by the COVID-19 vaccine."

378.    Likewise, on November 4, 2021, Meta reported to Rowe, Flaherty, and other White House officials that "we updated our misinformation policies for COVID-19 vaccines to make clear that they apply to claims about children…."

379.    On September 18, 2021, regarding a story in the Wall Street Journal about COVID-19 "misinformation" circulating on Facebook, Flaherty demanded that Meta provide an explanation "as we have long asked for, [of] how big the problem is, what solutions you're implementing, and how effective they've been."  Needless to say, the "solutions" evidently referred to policies to censor and suppress more private speech on Meta's platforms, and Meta promised to "brief" the White House on those.

380.    In response to a third-party subpoena, Meta has identified Special Assistant to the President Laura Rosenberger, White House Partnerships Manager Aisha Shah, White House Counsel Dana Remus, and White House officials Slavitt, Flaherty, and Humphrey; HHS officials Waldo, Byrd, Choi, Lambert, Peck, and Muhammed; EAC officials Muthig and Robbins; CDC officials Crawford and Dempsey; DHS officials Masterson, Protentis, Hale, and Snell; and FDA officials Thorpe, Jefferson, Murray, and Kimberly, among others, as federal officials who may have "communicated with Meta regarding content moderation between January 1, 2020 and July 19, 2022 as it relates to: (i) COVID-19 misinformation; (ii) the Department of Homeland Security's proposed Disinformation Governance Board; (iii) the New York Post story from

112

October 14, 2020 about Hunter Biden's laptop computer; and/or (iv) election security, integrity, outcomes, and/or public confidence in election outcomes (not to include issues of foreign interference or related issues)."

381.      In response to a third-party subpoena, YouTube has identified Schwartz, Faught, Molina-Irizarry, Galemore, Wakana, Flaherty, and Waldo, among others, as federal officials likely to have "communicated with the YouTube custodians about misinformation about COVID, the census, or elections."

382.      In response to a third-party subpoena, Twitter has identified Crawford, Flaherty, Frisbie, Kimmage, Lambert, Murthy, Shopkorn, Slavitt, and Waldo as federal officials "with whom [Twitter] has had meetings or discussions between January 20, 2021 and August 4, 2022 about election integrity, vaccine/Covid misinformation, violent extremism, and similar content moderation issues."

383.      On August 26, 2022, Mark Zuckerberg appeared on Joe Rogan's podcast and revealed that Facebook's censorship of the Hunter Biden laptop story had occurred as a result of communications from the FBI.  Zuckerberg stated: "The FBI basically came to us" and told Facebook to be "on high alert" relating to "a lot of Russian propaganda," that the FBI was "on notice" that "there's about to be some kind of dump … that's similar to that, so just be vigilant." Zuckerberg stated: "If the FBI … if they come to us and tell us we need to be on guard about something, then I want to take that seriously."  On information and belief, the FBI's reference to a "dump" of information was a specific reference to the contents of Hunter Biden's laptop, which was already in the FBI's possession.

384.      Joe Rogan asked Zuckerberg if the FBI has flagged the Hunter Biden laptop story as Russian disinformation specifically, and Zuckerberg stated: "I don't remember if it was that

specifically, but [the story] basically fit the pattern" that the FBI had identified. *See* https://www.wptv.com/news/national/fbi-responds-to-mark-zuckerberg-claims-on-joe-rogan-show-about-hunter-bidens-laptop (video commencing around 7:30). This revelation that the FBI had induced Facebook's censorship of the Hunter Biden laptop story was widely recognized as a bombshell revelation of federal law-enforcement influence on social-media censorship.

385.    Pursuant to the third-party subpoena, Meta has identified the FBI's FITF, as supervised by Laura Dehmlow, and Elvis Chan as involved in the communications between the FBI and Meta that led to Facebook's suppression of the Hunter Biden laptop story.

386.    Dehmlow evidently works with CISA on social-media censorship issues. On March 1, 2022, Dehmlow gave a presentation to CISA's Protecting Critical Infrastructure from Misinformation & Disinformation Subcommittee in which Dehmlow indicated that the FBI's FITF "engages … with appropriate partners for information exchange." On information and belief, this "information exchange" includes communications with social-media platforms about censorship and/or suppression of social-media speech.

387.    On information and belief, because major social-media platforms are headquartered in the geographical area of FBI's San Francisco Division, and Elvis Chan is in charge of cyber-related issues for that division, Chan has performed a critical role in communicating with social-media platforms on behalf of the FBI relating to censorship and suppression of speech on social media.

388.    Chan has openly boasted about his official role on behalf of FBI in coordinating with social-media companies. In a recent podcast, he stated, "Our field office, FBI San Francisco, was very involved in helping to protect the US elections in 2020. … [T]he FBI, the US government working in conjunction with *the private sector*, as well as with election officials from every single

state and protectorate, we were really able to do it. … But completely different from 2016 where we did not. Even though foreign actors were trying to interfere in our elections, the FBI, the US government working in conjunction with the private sector, as well as with election officials from every single state and protectorate, we were really able to do it." *See* https://www.banyansecurity.io/resource/get-it-started-get-it-done/ (emphasis added).

389.    Chan's subsequent comments make clear that "government working in conjunction with the private sector" includes the FBI working with social-media companies on censorship and suppression of private speech. Chan indicated that he works closely with Defendant Jen Easterly, stating, "So Jen Easterly, she's the current director for CISA, she's the one who coined that term shields up. She's a Star Trek fan. She's a Trekkie, I am myself." *Id.* Easterly, as alleged herein, quarterbacks CISA's extensive federal government-induced social-media censorship activities.

390.    Chan admits to regular, routine coordination about censorship with social-media platforms, stating of the 2020 election cycle in particular: "we talked with all of these entities I mentioned regularly, at least on a monthly basis. And right before the election, probably on a weekly basis. If they were seeing anything unusual, if we were seeing anything unusual, sharing intelligence with technology companies, *with social media companies*, so that they could protect their own platforms. That's where the FBI and the US government can actually help companies." *Id.* On information and belief, "social media companies" "protect[ing] their own platforms" includes censorship and suppression of speech at the FBI's behest.

391.    Chan bemoaned the fact that there was not a similar level of coordination about censorship between the federal government and social-media companies during the 2016 election cycle: "It seems obvious, but I'm not going to lie, in 2016, there was not that same level of communications between the US government and the private sector." *Id.* Chan called on social-

media platforms to be "more mindful" of federal government warnings on such issues: "But where we in the government are saying, if you are in one of the 17 designated critical infrastructure sectors, of which information technology is one of them, then you need to be more mindful." *Id.*

392.     In a public interview dated October 28, 2020, Chan explicitly encouraged citizens to report "misinformation" or "disinformation" to social-media companies and to the federal government so that such speech could be censored and/or suppressed, stating: "If you are seeing something related to election on your social-media platform, all of them have portals where you can report that sort of information, and *they are being very aggressive in trying to take down any misinformation or disinformation* … [i]f you see anything on election day or before election day, you can always report it to FBI.gov or Justice.gov … *we take all of these very seriously*." *See* https://www.govinfosecurity.com/fbi-on-election-theres-going-to-be-lot-noise-a-15257 (quotes at 7:45-8:48 of video) (emphasis added).  Based on these comments, this includes the FBI "tak[ing] … very seriously" reports of "misinformation" and "disinformation" and inducing social-media companies to censor them.

393.     Documents produced by LinkedIn show Chan repeatedly organizing meetings with representatives of LinkedIn from 2020 through 2022 (the present).  Based on the limited agendas provided, it appears that these meetings included discussions of election-related content and suppression of election-related speech on social media.  On information and belief, Chan organized similar meetings with other major social-media platforms, as in one instance, he notified LinkedIn about a particular proposed time slot for a meeting that another company had already taken that time slot.  Dehmlow was routinely included in these meetings as well.

394.     On information and belief, active coordination between Meta and the FBI on censorship and suppression of speech on social media continues to this day.  For example,

Facebook "now appears to be monitoring *private* messages and suppressing material related to the whistleblower complaint of … FBI special agent Steve Friend."  Miranda Devine, *Facebook 'silencing' activity related to FBI whistleblower Steve Friend*, N.Y. Post (Sept. 25, 2022), at https://nypost.com/2022/09/25/facebook-silencing-activity-related-to-fbi-whistleblower-steve-friend/.

395.    After an FBI whistleblower made public allegations critical of political bias at the FBI, the whistleblower's "wife's Facebook account was suspended after she responded to an offer of support from a local chapter" of a supportive "conservative group that advocates for parental rights." *Id.*  The wife responded to the group with a private message from her Facebook account, stating that "her husband was in the process of obtaining permission from the FBI to speak publicly and asked them to encourage their members to share his whistleblower story on their personal social media accounts." *Id.*  "About 30 minutes later, Mrs. Friend received a notification from Facebook that her account had been suspended because the 'account, or activity on it, doesn't follow our Community Standards.'" *Id.*   At the receiving end, "Mrs. Friend's Facebook message disappeared. In its place was a notification saying, 'Message unavailable.'" *Id.*  Thus, it now appears that Meta/Facebook is policing *private* messages sent on Facebook to censor and suppress any communications that might be critical of the FBI.

396.    Recent, heavily documented reports indicate that both the State Department and CISA have teamed up with a consortium of four private groups in a close collaboration to achieve social-media censorship of election-related speech beginning in 2020, and that this collaboration is continuing to this day.

397.    Pursuant to third-party subpoena, Twitter has identified personnel associated with the State Department's Global Engagement Center, including Alexis Frisbie and Daniel Kimmage,

as likely involved in communications with Twitter about censorship and/or content modulation on issues such as election integrity, vaccine/COVID misinformation, and related subjects.

398.    The State Department reports that "[i]n December 2019, GEC/TET [*i.e.*, State's Global Engagement Center's Technology Engagement Team] established a Silicon Valley location to facilitate public-private coordination and broker constructive engagements between the U.S. government and the tech sector, academia, and research.  The goal is to increase collaboration that results in identifying, exposing, and defending against foreign adversarial propaganda and disinformation."  On information and belief, "collaboration that results in … defending against … disinformation," *id.*, includes censorship of social-media speech.

399.    The Global Engagement Center publishes "Counter Disinformation Dispatches," of which the State Department states: "The Global Engagement Center's Counter Disinformation Dispatches summarize lessons learned about disinformation and how to counter it based on the experiences of frontline counter-disinformation practitioners, for the benefit of those newly engaged in this issue."

400.    The Global Engagement Center provides, as an online "counter-disinfo resource," as link to CISA's website, stating: "An agency of the Department of Homeland Security, the Cybersecurity and Infrastructure Security Agency 'is responsible for protecting the [United States'] critical infrastructure from physical and cyber threats,' including election security."

401.    The State Department has inserted itself in efforts to combat so-called Covid-19 "disinformation."  State provides an online briefing dated January 21, 2022, entitled "COVID-19 Fact Checking: What Journalists Need to Know," which "provides information about fact-checking resources available to journalists to counter COVID-19 and vaccine misinformation, and an overview of counter-misinformation efforts around the world."

402.    According to public reports, "[a]consortium of four private groups worked with the departments of Homeland Security (DHS) and State to censor massive numbers of social media posts they considered misinformation during the 2020 election, and its members then got rewarded with millions of federal dollars from the Biden administration afterwards, according to interviews and documents obtained by [reporters]." *Outsourced censorship: Feds used private entity to target millions of social posts in 2020*, JUST THE NEWS (Sept. 30, 2022), *at* https://justthenews.com/government/federal-agencies/biden-administration-rewarded-private-entities-got-2020-election.

403.    On information and belief, the purpose and effect of this consortium of private non-profit groups is to allow federal officials at CISA and State to evade First Amendment and other legal restrictions while still operating unlawfully to censor the private election-related speech on Americans on social-media.  Its censorship operations continue to this day.  *See id.*

404.    This consortium of private entities, closely collaborating with CISA and the State Department, calls itself "The Election Integrity Partnership."  This collaborative federal-private censorship project "is back in action again for the 2022 midterm elections, raising concerns among civil libertarians that a chilling new form of public-private partnership to evade the First Amendment's prohibition of government censorship may be expanding."  *Id.*

405.    "The consortium is comprised of four member organizations: Stanford Internet Observatory (SIO), the University of Washington's Center for an Informed Public, the Atlantic Council's Digital Forensic Research Lab, and social media analytics firm Graphika."  *Id.*  The consortium "set up a concierge-like service in 2020 that allowed federal agencies like Homeland's Cybersecurity Infrastructure Security Agency (CISA) and State's Global Engagement Center to

file 'tickets' requesting that online story links and social media posts be censored or flagged by Big Tech." *Id.*

406.     "Three liberal groups — the Democratic National Committee, Common Cause and the NAACP — were also empowered like the federal agencies to file tickets seeking censorship of content. A Homeland [*i.e.* DHS]-funded collaboration, the Elections Infrastructure Information Sharing and Analysis Center, also had access." *Id.*

407.     "In its own after-action report on the 2020 election, the consortium boasted it flagged more than 4,800 URLs — shared nearly 22 million times on Twitter alone — for social media platforms. Their staff worked 12-20 hour shifts from September through mid-November 2020, with 'monitoring intensifying significantly' the week before and after Election Day." *Id.* (alterations omitted).

408.     Backed by the authority of the federal government, including DHS, CISA, the State Department, and State's Global Engagement Center, the consortium successfully sought and procured extensive censorship of core political speech by private citizens: "The tickets sought removal, throttling and labeling of content that raised questions about mail-in ballot integrity … and other election integrity issues of concern to conservatives." *Id.*

409.     "The consortium achieved a success rate in 2020 that would be enviable for baseball batters: Platforms took action on 35% of flagged URLs, with 21% labeled, 13% removed and 1% soft-blocked, meaning users had to reject a warning to see them." *Id.*

410.     The consortium's "[p]articipants were acutely aware that federal agencies' role in the effort" raised First Amendment concerns. "For instance, SIO's Renee DiResta said in a CISA Cybersecurity Summit video in 2021 that the operation faced 'unclear legal authorities' and 'very real First Amendment questions.'" *Id.*

411.    One free-speech advocate described the consortium as "the largest federally-sanctioned censorship operation he had ever seen, a precursor to the now-scrapped Disinformation Governance Board and one that is likely to grow in future elections." *Id.* "'If you trace the chronology, you find that there was actually 18 months' worth of institutional work to create this very apparatus that we now know played a significant role in the censorship of millions of posts for the 2020 election and has ambitious sights for 2022 and 2024,' he said." *Id.*

412.    A member of Congress "called the revelations 'stunning' and said the 2020 operation amounted to the federal government sanctioning and outsourcing censorship." *Id.*

413.    "It wasn't just blogs and individual social media users whose content was targeted for removal and throttling as 'repeat spreaders' of misinformation. News and opinion organizations, including the New York Post, Fox News, Just the News and SeanHannity.com were also targeted." *Id.*

414.    "The partnership's members published the 292-page public report in March 2021, though the most recent version is dated June 15, 2021.  The launch webinar featured former CISA Director Christopher Krebs, 'who led the effort to secure electoral infrastructure and the response to mis- and disinformation during the election period.'" *Id.*

415.    "'I think we were pretty effective in getting platforms to act on things they haven't acted on before,' both by *pressuring them to adopt specific censorship policies* and then *reporting violations*, SIO founder and former Facebook Chief Security Officer Alex Stamos told the launch webinar." *Id.* (emphasis added).  "'Platform interventions' [*i.e.*, censorship of specific posts or content] in response to 'delegitimization of election results,' for example, went from uniformly 'non-comprehensive' in August 2020 to 'comprehensive' by Election Day, the report says." *Id.*

416.     "SIO officially launched the partnership 100 days before the election, 'in consultation with CISA and other stakeholders,' the partnership report says.  It attributes the idea to SIO-funded interns at CISA, noting that censorship by that agency and domestic social media monitoring by intelligence agencies would likely be illegal." *Id.* (citing Center for an Informed Public, Digital Forensic Research Lab, Graphika, & Stanford Internet Observatory (2021), *The Long Fuse: Misinformation and the 2020 Election*. Stanford Digital Repository: Election Integrity Partnership. v1.3.0, *at* https://purl.stanford.edu/tr171zs0069 ("EIP Report")).

417.     The EIP Report's executive summary states: "Increasingly pervasive mis- and disinformation, both foreign and domestic, creates an urgent need for collaboration across government, civil society, media, and social media platforms." *Id.*

418.     The consortium was openly biased based on political viewpoint, calling President Trump "the social media Death Star."  "During the launch webinar, the Atlantic Council's Emerson Brooking said they wanted to stop the 'amplification and legitimation' of 'far-right influencers [who] would be doing all they could to try to catch the eye of a Fox News producer,' making it likely that President Trump, 'the social media Death Star,' would see their content." *Id.*

419.     The consortium's work included the direct involvement of government officials in censorship decisions.  "Government entities were involved in real-time chats with the partnership and social media platforms over specific content under review." *Id.*  For example, "[a] chat screenshot in the report shows an unidentified government partner rejecting the Sharpiegate claim that 'sharpies aren't read at all' by ballot-counting machines, and a platform provider responding that it was now reviewing those claims." *Id.*

420.     Notably, consistent with its carrot-stick approach to private entities on social-media censorship, the incoming Biden Administration—including the State Department—richly

rewarded the private-sector partners in this consortium of censorship, lavishing federal largesse upon them. "The [consortium's] partners all received federal grants from the Biden administration in the next two years." *Id.* "The National Science Foundation awarded the Stanford and UW projects $3 million in August 2021 'to study ways to apply collaborative, rapid-response research to mitigate online disinformation.'" *Id.* "UW's press release about the award noted their earlier work on the partnership and praise for the report from ex-CISA director Krebs, who called it 'the seminal report on what happened in 2020, not just the election but also through January 6.'" *Id.* "Graphika, also known as Octant Data, received its first listed federal grant several weeks after the 2020 election: nearly $3 million from the Department of Defense for unspecified 'research on cross-platform detection to counter malign influence.' Nearly $2 million more followed in fall 2021 for 'research on co-citation network mapping,' which tracks sources that are cited together." *Id.* "The Atlantic Council … has received $4.7 million in grants since 2021, all but one from the State Department. That far exceeds the think tank's federal haul in previous years, which hadn't approached $1 million in a single year since 2011." *Id.*

421.    "UW's project, SIO and Graphika also collaborated on the Virality Project, which tracks and analyzes purported 'COVID-19 vaccine misinformation and social media narratives related to vaccine hesitancy.'" *Id.*

422.    The collaboration with CISA on the Election Integrity Project is not the State Department's only involvement in federal social-media censorship activities. Documents produced so far in discovery from Defendants provide glimpses into the State Department's involvement on many fronts.

423.    For example, on February 4, 2020, Samaruddin K. Stewart, then a "Senior Advisor for the Global Engagement Center of the State Department" reached out to LinkedIn and stated

that he was "tasked with building relationships with technology companies … in [Silicon Valley] with interests in countering disinformation," and asked for a meeting.  As the email indicates, Stewart intended to reach out to other social-media platforms as well.

424.     On March 9, 2020, Stewart reached out to LinkedIn again, referring back to their earlier oral meeting, and stated, "I'll send information [to LinkedIn representatives] about gaining access to Disinfo Cloud – which is a GEC [*i.e.* State Department's Global Engagement Center] funded platform that offers stakeholders an opportunity to discovery companies, technology, and tools that can assist with identifying, understanding, and addressing disinformation."  On information and belief, "addressing disinformation" includes the censorship and suppression of private speech.

425.     On July 19, 2021, Stewart organized another meeting with LinkedIn and several State Department colleagues on the topic "countering disinformation."  On information and belief, Stewart engaged in similar meetings and coordination efforts with other social-media platforms as well.

426.     The State Department's Global Engagement Center has worked directly with CISA and FBI to procure the censorship of specific content on social media.  For example, on March 25, 2020, Alex Dempsey of the State Department forwarded to an FBI agent a report about a video on social media making ostensibly false allegations about a State Department officer.  Brian Scully of CISA forwarded the report to Facebook personnel, stating "see the below reporting from our State Department Global Engagement Center colleagues about disinformation … targeting a Diplomatic Security Officer."  Facebook responded, "Have flagged for our internal teams.  As always, we really appreciate the outreach and sharing of this information."  Scully also forwarded the State Department's report to Twitter and Google/YouTube.  In flagging the content for Google,

Scully commented, "It does appear the FBI has been notified, so you may have already heard from them."

427.    The State Department's Global Engagement Center, including Stewart and other State employees, were also involved in organizing a "misinformation and disinformation" workshop for African governments in May 2021. Lauren Protentis of CISA and Joe Parentis, Deputy Coordinator for the State Department's Global Engagement Center, were speakers at the event. The event was moderated by Elizabeth Vish of the State Department's Office of Cyber Coordinator. The agenda for the event included a presentation by Facebook on "How does Facebook work with governments to address misinformation and disinformation?" This included "Fact checking techniques, how to identify disinformation and misinformation," and "Proven techniques to take down these articles. The effectiveness of fake news checkers," "Steps for stopping already-circulating misinformation," and "International takedown requests." On information and belief, these statements reflected the collective experience of CISA and the State Department in working to achieve social-media censorship of domestic speech in America.

428.    CISA officials—including Defendants Easterly, Masterson, Protentis, Hale, Scully, and Snell, among others, have aggressively embraced the role of mediators of federally-induced censorship.

429.    As noted above, CISA states that its mission includes "directly engaging with social media companies to flag MDM," and that it is "working with federal partners to mature a whole-of-government approach to mitigating risks of MDM," which includes "framing which … interventions are appropriate to the threats impacting the information environment." CISA repeatedly and frequently flags posts for censorship on social-media platforms, and continues to do so on an ongoing basis.

430.     CISA officials have flagged for censorship even obvious parody accounts, such as accounts parodying the Colorado government that stated in their mock Twitter handles "dm us your weed store location (hoes be mad, but this is a parody account)," and "Smoke weed erry day." To such reports, Twitter responded, "We will escalate.  Thank you," and "We have actioned these account under our civic integrity policy."

431.     CISA also works closely with the Center for Internet Security ("CIS"), an outside third-party group, to flag content for censorship on social media, including election-related speech. *See* Doc. 71-8.  On information and belief, CIS is or was funded by CISA and works as a joint participant with CISA on federal social-media censorship activities.   As early as June 2020, the Center for Internet Security, working with CISA, was planning a "Reporting Portal" for government officials seeking to suppress election misinformation that would allow "social media companies" to "process reports and provide timely responses, to include the removal of reported misinformation from the platform where possible." Doc. 71-8, at 90.  CIS and CISA work closely to remove so-called "misinformation" by flagging content for removal by social-media companies.

432.     Documents reveal that CISA's authority as a national-security agency within DHS led to prompt responses and swift censorship actions in response to CISA's actions of "flagging" posts for censorship.  *See* Doc. 71-8.  This included many posts on election integrity issues where CISA acted as *de facto* judge of the truthfulness and value of social-media speech.

433.     CISA has also flagged named Plaintiffs' speech for censorship.  For example, in a "disinformation" conference regarding the 2020 election hosted by CISA, one presenter identified the Gateway Pundit, the website hosted by Plaintiff Jim Hoft, as a "repeat spreader" of "false or misleading content about the 2020 election."   The presenter stated that the Gateway Pundit is the second most frequent spreader of election-related disinformation, just above President Trump and

his two sons, Donald Jr. and Eric Trump, who were also described as "prolific spreaders of disinformation." Other supposed "repeat spreaders" of disinformation identified at the CISA-hosted conference included Sean Hannity, Breitbart, James O'Keefe, and Mark Levin. Gateway Pundit was called "one of the most prolific spreaders of misinformation across the entire [2020] election." The presenter emphasized that every account identified as a spreader of disinformation was "ideologically pro-Trump" in its political orientation. *See* Mike Benz, Foundation for Freedom Online, *DHS Encouraged Children to Report Family to Facebook for Challenging US Government Covid Claims*, at foundationforfreedomonline.com. "In the same training session for state and local election officials, DHS's formal partner group then encouraged the mass reporting of US social media posts for censorship…." *Id.*

434.    CISA's "Protecting Critical Infrastructure from Misinformation & Disinformation Subcommittee Meeting" on March 29, 2022, included the following discussion flagging online speech by Jim Hoft's Gateway Pundit as misinformation warranting censorship: "Misinformation: A news release by Gateway Pundit provided factually inaccurate reporting announcing that Maricopa County elections officials held an unannounced meeting at the election and tabulation center," while election officials contended that "[t]his meeting was, in fact, a publicly announced tour with members of the public and legislators from both parties."

435.    On February 17, 2022, Lauren Protentis of CISA emailed contacts at Microsoft and stated: "The Department of Treasury has asked our team for appropriate POCs [*i.e.*, points of contact] to discuss social media and influence matters. We'd like to make a connection to Microsoft if you're amenable? This is somewhat time-sensitive, so thanks in advance to your attention to this matter." The email was forwarded to recent CISA alumnus, now Microsoft employee, Matthew Masterson, who exchanged the text messages with Jen Easterly quoted above.

Masterson responded, "Send em to me.  I will make sure [the other Microsoft contact] is looped in."  Separately, Masterson's colleague at Microsoft responded that "Matt [Masterson] and I can be the primary POCs for the introduction."  Protentis responded, "We're going to pass your info to Treasury.  They will reach-out directly and provide more information about the nature of this request."

436.     On February 17, 2022, Protentis sent a similar email to Yoel Roth of Twitter (Nina Jankowicz's contact who was scheduled to attend the April 2022 meeting with Robert Silvers and senior DHS officials), asking for a Twitter point of contact for Treasury to "discuss social media and influence matters."  After Roth responded, Protentis stated that "Treasury … will reach-out directly to begin the dialogue and provide more information about the nature of this request."

437.     On February 17, 2022, Protentis reached out to a contact at Google, asking that "[t]he Department of Treasury has asked our team for appropriate POCs to discuss social media and influence matters.  We'd like to make the connection to Google if you're amenable?"  Protentis followed up just over an hour later, stating, "Apologies for the second email, this is somewhat time-sensitive, so thank you for your prompt attention to this request!"  When the Google contact responded, Protentis replied, "We're going to pass your info to Treasury.  They will reach-out directly and provide more information about the nature of this request."

438.     On February 17, 2022, Protentis reached out to contacts at Meta/Facebook and stated, "The Deputy Secretary at Treasury [*i.e.*, Defendant Wally Adeyemo] would like to be connected to industry partners to discuss potential influence operations on social media.  We'd like to make the connection to Meta if you're amenable?"  On information and belief, the nearly identically-phrased inquiries to Twitter and Microsoft that Protentis sent on the same day were also sent at Adeyemo's request.

439.    On information and belief, these messages reflect the participation of Treasury and Adeyemo in federal censorship activities.

440.    In response to a third-party subpoena, counsel for Meta identified the EAC's Executive Director Mark Robbins and the EAC's Communications Director Kristen Muthig as officials who may "have communicated with Meta regarding content moderation between January 1, 2020 and July 19, 2022 as it relates to: (i) COVID-19 misinformation; (ii) the Department of Homeland Security's proposed Disinformation Governance Board; (iii) the New York Post story from October 14, 2020 about Hunter Biden's laptop computer; and/or (iv) election security, integrity, outcomes, and/or public confidence in election outcomes (not to include issues of foreign interference or related issues)."

441.    The EIP Report, discussed above, identifies the Election Assistance Commission as a federal agency working on social-media content issues alongside CISA, identified as "the lead on domestic vulnerabilities and coordination with state and local election officials."  The same paragraph states: "The Election Assistance Commission should remain in an amplifying role, pushing best practices and critical information out broadly to the election community."  EIP Report, at 235.  On information and belief, the EAC's "critical information" that is "push[ed] … out broadly" includes federally induced censorship and/or suppression of social-media speech on the basis of content and viewpoint.

442.    In response to a third-party subpoena, Meta has identified Public Affairs Specialist Valerie Thorpe of the FDA; Michael Murray, who is the Acquisition Strategy for the Office of Health Communications and Education at the FDA; Brad Kimberly, who is the Director, Social Media at the FDA; and Erica Jefferson, Associate Commissioner for External Affairs at the FDA, as officials who may "have communicated with Meta regarding content moderation between

January 1, 2020 and July 19, 2022 as it relates to: (i) COVID-19 misinformation; (ii) the Department of Homeland Security's proposed Disinformation Governance Board; (iii) the New York Post story from October 14, 2020 about Hunter Biden's laptop computer; and/or (iv) election security, integrity, outcomes, and/or public confidence in election outcomes (not to include issues of foreign interference or related issues)."

443.     On information and belief, the FDA has participated in federally-induced censorship of private speech on social media about questions of vaccine safety and efficacy, among other subjects.

444.     Pursuant to third-party subpoena, YouTube has identified Census officials Schwartz, Molina-Irizarry, Galemore—as well as Deloitte employees/Census contractors Michael Jaret Saewitz and Caroline Faught—as involved in communications with YouTube about misinformation and content modulation of speech on YouTube.

445.     Census Bureau officials have openly stated that they are working with social-media companies to suppress so-called misinformation and disinformation.  For example, in 2020, Census boasted that Census "has established the government's first ever Trust & Safety Team" in order to "prevent the spread of fake, false and inaccurate information that can negatively influence 2020 Census participation and response."  *Census Partners with Social-Media Platforms, Community Organizations, the Public to Stop Spread of False Information*, at https://www.census.gov/library/stories/2020/02/putting-2020-census-rumors-to-rest.html    (Feb. 10, 2020).  "Trust & Safety Team" is what social-media platforms like Twitter call their censorship teams.

446.     Evidently, "preventing the spread of fake, false and inaccurate information" includes federally-induced censorship of free speech on social media.  Census states that it is

"[w]orking with social media platforms such as Facebook, Microsoft, Nextdoor, Google, and Pinterest to update their policies and terms of service to include census-specific activities," and "[c]oordinating with YouTube and Twitter to create processes enabling us to quickly identify and respond to misinformation and disinformation." *Id.* On information and belief, these activities include government-induced censorship of social-media speech. Census states: "These partnerships will help the Census Bureau counter false information that can lead to an undercount by quickly identifying phony information and respond with factual content."

447.    In addition, Census invites private citizens to report suspected false information to the Census Bureau so that Census can arrange for it to be censored. Census directs the public to: "Report inaccurate, suspicious or fraudulent information to the Census Bureau. If you see or hear something, tell us: Report suspicious information and tips to rumors@census.gov. Reach out to us on our verified social media accounts (@USCensusBureau) to ask questions and flag suspicious information. Call the Census Bureau Customer Service Hotline at 1-800-923-8282 to report suspicious activity." *Id.*

448.    As noted above, it is evident that Census responds to such reports by seeking to censor speech and content that it disfavors. Among other things, YouTube has disclosed that Census officials have been granted "trusted flagger" status to flag content for censorship on social media and receive privileged, expedited treatment for such reports.

449.    Defendant Schwartz was the "operations manager for the Trust & Safety Team and deputy division chief for the Center for New Media and Promotion at the Census Bureau," who authored this report instructing the public to flag disinformation directly to Census.

450.    "Trust & Safety Team" is a euphemism for the authorities within social-media platforms who are in charge of censoring and suppressing disfavored speech, speakers, and

content.  Census's creation of a like-named "Trust & Safety Team" was the creation of a federal censorship agency within Census.

451.    On its website, Census boasts that "the U.S. Census Bureau's Trust & Safety Team protected the 2020 Census from misinformation and disinformation."  Census Bureau, Trust & Safety Team, *at* https://www.census.gov/about/trust-and-safety.html.  This page notes that the "Trust & Safety Team's" censorship work continues today across expanded fronts: "We continue to watch for misinformation being shared online, and we work to share facts instead to help support communications around the Census Bureau's commitment to data quality and transparency around these efforts. The team's role has expanded to also support the American Community Survey (ACS), the Economic Census, and other Census Bureau programs and data products."  *Id.*  The same page continues to instruct the public to report so-called "misinformation" to Census for censorship: "Help the Census Bureau's Trust & Safety team by reporting inaccurate, suspicious, or fraudulent information you read, hear, or spot online, including: A rumor in a message board or group claiming the information you provided to the Census Bureau will be publicly disclosed…. An advertisement on social media sharing fake 2020 Census websites and inaccurate information. No matter what you find, let the Census Bureau know by contacting rumors@census.gov."  *Id.*

452.    The Trust & Safety Team openly states that it coordinates with social-media platforms to censor speech: "Trust & Safety Team coordinates and integrates our efforts with external technology and social media platforms, partner and stakeholder organizations, and cybersecurity officials…. Leveraging best practices from the public and private sectors, the Trust & Safety Team monitors all available channels and open platforms for misinformation and disinformation about the census.  Monitoring allows us to respond quickly to combat potential threats to achieving an accurate count in traditional media, social media and other stakeholder

communications.  As we discover misinformation and disinformation, the team *will coordinate the responses with partners and stakeholders*."   https://www.census.gov/newsroom/blogs/random-samplings/2019/12/why_the_census_burea.html.   "Coordinating the responses with partners and stakeholders," evidently, means working with social-media platforms to censor speech.

453.      In other Census publications, Schwartz and other Census officials claim that they are "harnessing the capabilities of social media platforms such as Facebook, Twitter, YouTube and Instagram … enables the Census Bureau to identify and respond to misinformation swiftly before it spreads."   https://www.census.gov/library/stories/2019/07/hey-siri-why-is-2020-census-important.html.   "The U.S. Census Bureau is partnering with tech giants to … respond to disinformation before it spreads."   https://www.census.gov/library/spotlights/2020/tech.html.

454.      Census also states that it has "partner[ed] with search engines" such as Google to de-boost disfavored content and promote Census-favored content above government-disfavored private content.  https://www.census.gov/library/spotlights/2020/nextdoor.html.

455.      Public reports indicate that Census teamed up with "Data & Society's Disinformation Action Lab" at the "Center for an Informed Public" at the University of Washington in a "behind-the-scenes networked response to mis- and disinformation about the 2020 U.S. Census, an effort that provides a model for future multi-stakeholder collaborations to mitigate the impacts of communication harms."   https://www.cip.uw.edu/2022/05/31/disinformation-action-lab-data-society-census-misinformation/.

456.      Center for an Informed Public's director is Kate Starbird, who also serves on CISA's advisory committee that advises CISA's social-media censorship activities.  According to CIP, "Beyond the Census Counts Campaign, DAL supported other national civil rights groups,

133

local civil society groups, state and city government officials, and worked with *social media companies*, journalists, and *the Census Bureau itself* — all to protect a complete and fair count from mis- and disinformation." *Id.* (emphasis added).

457.    As alleged further herein, Census officials also participate in censorship activities relating to so-called COVID-19 misinformation

458.    On information and belief, as further alleged herein, all Defendants have been and are engaged in federally-induced censorship of private speech on social media, in a manner that directly interferes with and injures the free-speech rights of Plaintiffs and their citizens.

**E.  Defendants' Conduct Has Inflicted and Continues to Inflict Grave Injuries on Plaintiffs, Missourians, Louisianans, and all Americans.**

459.    Defendants' conduct, as alleged herein, has inflicted and continues to inflict grave, ongoing injuries on Plaintiffs, Missourians and Louisianans, and all Americans.  Many of these injuries are detailed in the previously filed Declarations submitted in support of the States' Motion for Preliminary Injunction, ECF Nos. 10-2 to 10-15, which are attached to the First Amended Complaint as Exhibits B to O, and incorporated by reference herein.

**1.  Ongoing injuries inflicted on Plaintiff States.**

460.    First, the Defendants' conduct has inflicted and continues to inflict at least eight forms of imminent, continuing, irreparable injury on the Plaintiff States, Missouri and Louisiana.

461.    *First*, both Missouri and Louisiana have adopted fundamental policies favoring the freedom of speech, including on social media.  Missouri's Constitution provides: "[N]o law shall be passed impairing the freedom of speech, no matter by what means communicated… [E]very person shall be free to say, write or publish, or otherwise communicate whatever he will on any subject…."  Mo. Const. art. I, § 8.  Louisiana's Constitution provides: "No law shall curtail or restrain the freedom of speech or of the press. Every person may speak, write, and publish his

sentiments on any subject, but is responsible for abuse of that freedom." LA. CONST. art. I, § 7. The federal censorship program directly undermines Missouri's and Louisiana's fundamental policies favoring the freedom of speech, and thus it inflicts a clear and direct injury on the States' sovereignty. *See Texas v. United States*, 809 F.3d 134, 153 (5th Cir. 2015).

462.    *Second*, the States and their agencies and political subdivisions have suffered government-induced online censorship directly.  For example, Louisiana's Department of Justice—the office of its Attorney General—was directly censored on YouTube for posting video footage of Louisianans criticizing mask mandates and COVID-19 lockdown measures on August 18, 2021—just after the federal Defendants' most vociferous calls for censorship of COVID "misinformation." Bosch Decl. ¶ 7.  A Louisiana state legislator was censored by Facebook when he posted content addressing vaccinating children against COVID-19.  Bosch Decl. ¶ 9.  St. Louis County, a political subdivision of Missouri, conducted public meetings regarding proposed county-wide mask mandates, at which some citizens made public comments opposing mask mandates. Flesh Decl. ¶ 7.  YouTube censored the entire videos of four public meetings, removing the content, because some citizens publicly expressed views that masks are ineffective. *Id.*

463.    *Third*, State agencies—such as the Offices of the States' Attorneys General—closely track and rely on free speech on social media to understand their citizens' true thoughts and concerns. *See, e.g.,* Flesch Decl. ¶ 4 ("I monitor these trends on a daily or even hourly basis…"); Bosch Decl. ¶ 6.  This allows them to craft messages and public policies that are actually responsive to their citizens' concerns.  Flesch Decl. ¶ 5; Bosch Decl. ¶¶ 4-6.  Censorship of social-media speech directly interferes with this critical state interest, because it "directly interferes with [our] ability to follow, measure, and understand the nature and degree of [constituents'] concerns." Flesh Decl. ¶ 6.

135

464.     *Fourth*, social-media censorship thwarts the States' ability to provide free, fair, and open political processes that allow citizens to petition their government and advocate for policy changes.  Social-media censorship has perverted state and local political processes by artificially restricting access to the channels of advocacy to one side of various issues.  For example, social-media censorship prevented Louisiana advocacy groups from organizing effectively to advocate in favor of legislative action on issues of great public import.  Hines Decl. ¶¶ 13-14.  Likewise, social-media censorship prevented a Missouri parent from circulating an online petition to advocate against mandatory masking at his local school district, a political subdivision of the State.  McCollum Decl. ¶¶ 9-17; Gulmire Decl. ¶¶ 11-16, 18-19.  Such censorship—which directly interferes with citizens' ability to petition their government—thwarts the States' interest in providing fair and open processes to petition state officials.

465.     *Fifth*, federally induced social-media censorship directly affects Missouri, because it has resulted in the extensive censorship of Plaintiff Dr. Bhattacharya, who serves as an expert witness for Missouri in a series of lawsuits challenging mask and vaccine mandates.  *See* Bhattacharya Decl. ¶ 4.  Censorship of Dr. Bhattacharya reduces the message and impact of Missouri's own retained expert witness.  *See id.* ¶¶ 17-32.  Likewise, the Missouri Attorney General's Office relied heavily on the high-quality German survey study of 26,000 schoolchildren, finding that 68 percent reported harms from masking in school, in its lawsuits challenging school mask mandates.  That study was censored on social media as a result of Defendants' campaign, and Missouri was lucky to find it because it is in German and not cited on social media.  "Because online censorship acts as a prior restraint on speech," Missouri "will never know exactly how much speech … on social media never reaches [our] eyes because it is censored in advance, or as soon as it is posted."  Flesch Decl. ¶ 11.

466.     *Sixth*, Missouri and Louisiana have a quasi-sovereign interest in protecting the free-speech rights of "a sufficiently substantial segment of its population," and preventing *ultra vires* actions against those rights. *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982). This falls within Missouri's and Louisiana's "quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general." *Id.* This injury "suffices to give the State standing to sue as *parens patriae*" because "the injury" to Missourians' and Louisianans' free-speech and free-expression rights "is one that the State[s] … would likely attempt to address through [their] sovereign lawmaking powers." *Id.* at 607. Indeed, they have done so. *See, e.g.,* Mo. CONST., art. I, § 8; LA. CONST., art. I, § 7.

467.     *Seventh*, Missouri and Louisiana "ha[ve] an interest in securing observance of the terms under which [they] participate[] in the federal system." *Alfred L. Snapp*, 458 U.S. at 607–08. This means bringing suit to "ensur[e] that the State and its residents are not excluded from the benefits that are to flow from participation in the federal system." *Id.* at 608. Free-speech rights, and protection from *ultra vires* actions destroying them, are foremost among the "benefits that are to flow from participation in the federal system." *Id.* Missouri and Louisiana "have an interest, independent of the benefits that might accrue to any particular individual, in assuring that the benefits of the federal system are not denied to its general population." *Id.*

468.     *Eighth*, Missouri and Louisiana have a unique interest in advancing, protecting, and vindicating the rights of their citizens who are listeners, readers, and audiences of social-media speech. As noted above, the First Amendment protects the rights of the speakers' audiences, such as listeners and readers, to have access to protected speech. *See, e.g., Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982). As a result of Defendants' censorship, the States' many citizens, as readers and followers of social-media speech, suffer an

injury that is individually too diffuse to warrant filing their own lawsuits, yet the injury is all the greater because it is spread among millions of readers. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 64 n.6 (1963) (holding that, where one plaintiff "is not likely to sustain sufficient … injury to induce him to seek judicial vindication of his [First Amendment] rights," a plaintiff with a greater stake may assert them, lest "infringements of freedom of the press may too often go unremedied"). The States have a "close relationship" with their citizens, as readers and listeners of social-media speech, because they are specifically authorized by state law to vindicate those rights. And there is a "hindrance" to their citizens' asserting their own rights, because each individual injury is too diffuse to warrant litigation. *See Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004); *Secretary of State of Md. v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 956-57 (1984).

469.     All these injuries to the State Plaintiffs and their citizens are continuing and ongoing, and they constitute irreparable harm.

**2. Ongoing injuries inflicted on the private Plaintiffs and their social-media followings.**

470.     The private Plaintiffs Bhattacharya, Hines, Hoft, Kheriaty, and Kulldorff, and their social-media audiences and/or potential social-media audiences (*i.e.*, the larger audiences who would hear them if they were not censored)—who include thousands or millions of Missourians and Louisianans—have suffered and are suffering grave and ongoing injuries as well. Identical injuries afflict many similarly situated speakers and audiences who have been affected by the government-induced censorship procured by Defendants as well.

471.     Government-induced online censorship affects the private Plaintiffs and enormous segments of Missouri's and Louisiana's populations. The censorship affects speakers with all sizes of audiences—from small groups of concerned parents seeking to share concerns on neighborhood networking sites, Flesch Decl. ¶ 9; to social-media titans, such as Plaintiff Jim Hoft, who is one of

the most influential online voices in the country, with over a million social-media followers, Hoft

Decl. ¶¶ 2-3.  Censorship affects some of the most highly credentialed physicians in the world,

speaking on matters of core competence, such as Plaintiffs Bhattacharya, Kulldroff, and Kheriaty,

scientists and medical professors at Stanford, Harvard, and the University of California.  *See*

Bhattacharya Decl. ¶¶ 2-5; Kulldorff Decl. ¶¶ 2-6; Kheriaty Decl. ¶¶ 2-5.

472.    This censorship encompasses social-media accounts with hundreds of thousands of

followers, including the private Plaintiffs' accounts, which include many thousands of followers

in Missouri and Louisiana.  *See* Hoft Decl. ¶ 3 (Missouri-based speaker with 400,000 Twitter

followers, 650,000 Facebook followers, 98,000 YouTube subscribers, 205,000 Instagram

followers); Kulldorff Decl. ¶ 7 ("250,800 followers on Twitter and 13,400 contacts and followers

on LinkedIn"); Kheriaty Decl. ¶ 3 (158,000 Twitter followers, even though artificially capped by

Twitter); Allen Decl. ¶ 15 (the entire YouTube channel of a conservative talk-radio station based

in Missouri); Changizi Decl. ¶ 7 (37,000 Twitter followers); Senger Decl. ¶ 3 (112,000 Twitter

followers); Kotzin Decl. ¶¶ 3-4 (31,900 followers); Kitchen Decl. ¶ 32 (over 44,000 Twitter

followers).  These declarants provide only a representative slice of the enormous suppressions

inflicted by Defendants' conduct on countless similarly situated speakers and audiences, including

in Missouri and Louisiana.  *See, e.g.,* Bhattacharya Decl. ¶ 31.

473.    Defendants' censorship squelches Plaintiffs' core political speech on matters of

great public concern.  This includes speech relating to COVID-19 policies—especially speech

criticizing the government's response to COVID-19.  *See, e.g.,* Hoft Decl. ¶¶ 6, 12; Bhattacharya

Decl. ¶¶ 15-31; Kulldorff Decl. ¶¶ 14-30; Kheriaty Decl. ¶¶ 16-17; Hines Decl. ¶¶ 7-14.  It also

extends to speech about election security and integrity, including core political speech.  *See, e.g.,*

Hoft Decl. ¶¶ 7-8, 14; Allen Decl. ¶ 14-15; Flesh Decl. ¶ 8.  And the censorship targets speech simply because it is critical of the President of the United States.  *See, e.g.,* Hoft Decl. ¶ 10.

474.    Government-induced censorship of Plaintiffs' and others' speech is achieved through a wide variety of methods, ranging from complete bans, temporary bans, insidious "shadow bans" (where neither the user nor his audience is notified of the suppression), deboosting, de-platforming, de-monetizing, restricting access to content, imposing warning labels that require click-through to access content, and many other ways.  These include temporary and permanent suspensions of many speakers.  *See, e.g.,* Hoft Decl. ¶¶ 6-8; Kheriaty Decl. ¶ 16; Bhattacharya Decl. ¶ 16; Changizi Decl. ¶¶ 18-23; Allen Decl. ¶ 15; *see also* Bhattacharya Decl. ¶ 31 ("Twitter, LinkedIn, YouTube, Facebook, they have permanently suspended many accounts—including scientists.").  It includes suppressing specific content, such as removing or blocking social-media posts and videos.  *See, e.g.,* Hoft Decl. ¶ 14; Bhattacharya Decl. ¶¶ 17-18; Changizi Decl. ¶ 36.  It includes demonetization by technology firms, *see* Hoft Decl. ¶ 19, and deboosting search results to bury the most relevant results, Bhattacharya Decl. ¶ 16.  It includes suppressing posts in news feeds, and imposing advisory labels and "sensitive content" labels, making it more difficult to access specific content.  *See, e.g.,* Hoft Decl. ¶ 13; Changizi Decl. ¶ 27-28.  It includes insidious methods of censorship like surreptitious de-boosting and "shadow-banning," where the censor does not notify the speaker or the audience of the censorship.  Many speakers discover through circumstantial methods that they have been shadow-banned.  *See, e.g.,* Kheriaty Decl. ¶¶ 14-15.  It includes indirect methods of shadow-banning such as artificially limiting the number of followers of a disfavored account.  Kheriaty Decl. ¶¶ 12-13; Changizi Decl. ¶ 31.  All these forms of censorship directly impact Plaintiffs and their social-media audiences, and they continue to do so.

475.    Such censorship has compounded effects on the freedom of expression, creating

massive distortions in the free marketplace of ideas.  As noted above, much speech is suppressed

in secret, so the speakers and audience never know whether or how much speech was silenced.

*See, e.g.,* Kheriaty Decl. ¶¶ 14-15.  Censorship of the principal speaker, moreover, deters other

speakers from re-tweeting, re-posting, or "amplifying" the content, which suppresses even more

speech and further artificially reduces the speakers' audience.  *See* Hoft Decl. ¶ 15.  And,

perniciously, censorship commonly leads to self-censorship, as online speakers carefully restrict

what they say to avoid the (often financially catastrophic) consequences of a suspension or ban.

*See, e.g.,* Hoft Decl. ¶ 16; Bhattacharya Decl. ¶ 31; Kheriaty Decl. ¶ 16.

476.    Like the injuries to the State Plaintiffs and their citizens, these injuries to the private

Plaintiffs and their audiences are imminent and ongoing, and they constitute irreparable harm.

**3.    Defendants' conduct has directly caused Plaintiffs' injuries.**

477.    For the reasons alleged in greater detail herein, Defendants' conduct has directly

caused and continues to directly cause Plaintiffs' injuries.  By their campaign of threats,

coordination, and collusion, Defendants have successfully induced social-media platforms to

impose acts of censorship that have directly injured all Plaintiffs and their audiences.  These are

acts of censorship that the social-media companies, but for Defendants' unlawful conduct,

otherwise would not have imposed.

478.    Overwhelming evidence supports the conclusion that Defendants have caused

Plaintiffs' injuries, alleged above, by inducing social-media platforms to engage in increased

censorship.  As the allegations herein emphasize, there is powerful support for the conclusion of

direct causation between Defendants' conduct and Plaintiffs' free-speech injuries.  This evidence

includes, but is not limited to, the following:

479.     *First*, as alleged above, in the absence of Defendants' campaign for social-media censorship, market forces and other incentives would have and did restrain social-media platforms from engaging in the social-media censorship alleged herein.  Notably, as noted above, prior to Defendants' campaign of threats and pressure, social-media platforms generally declined to engage in the acts of censorship alleged herein.

480.     *Second*, as alleged above, the campaign of threats of adverse legal consequences from Defendants and their political allies—directly linked to demands for greater censorship—are *highly motivating* to social-media platforms, because they address matters of great import and potential legal vulnerability, such as Section 230 immunity and the prospect of antitrust enforcement.  These threats became even more motivating at the beginning of 2021, when Defendants and their allies took control of the Executive Branch, with all its powerful agencies, and both Houses of Congress, indicating that they had the ability to carry out their threats.  By responding to these threats, social-media platforms are merely "reacting in predictable ways," and their greatly increased censorship is merely "the predictable effect of Government action on the decisions of third parties."  *Department of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019).

481.     *Third*, the *timing* of many censorship decisions—coming immediately after Defendants' demands for increased censorship—strongly supports the conclusion that Defendants' conduct has *caused* the censorship of free speech on social media.  As alleged further herein, there are many examples of censorship crack-downs by social-media platforms that immediately followed demands for censorship from federal officials, including Defendants.  These include, but are not limited to, (1) the *en masse* deplatforming of the "Disinformation Dozen" after Jen Psaki publicly demanded it; (2) the censorship of the Great Barrington Declaration and Plaintiffs Bhattacharya and Kulldorff just after a senior HHS official called for a "quick and devastating …

take-down" of the Declaration, Bhattacharya Decl. ¶¶ 6, 14; *id.* ¶¶ 15-31; and (3) Twitter's deplatforming of Alex Berenson just after the President stated, "They're killing people" and Dr. Fauci publicly singled out Berenson; among many others.

482.    *Fourth*, Defendants have openly admitted that they and other federal officials are directly involved in specific censorship decisions by social-media platforms.  Among other examples, Jen Psaki publicly admits that "we're flagging problematic posts for Facebook" and that "they certainly understand what our asks are."  Secretary Mayorkas states that "we're working together … with the tech companies that are the platform for much of the disinformation that reaches the American public, how they can better use their terms of use to really strengthen the legitimate use of their very powerful platforms and prevent harm from occurring," and that this collaboration is happening "across the federal enterprise."  Easterly states that she works directly "with our partners in the private sector and throughout the rest of the government and at the department to continue to ensure that the American people have the facts that they need to help protect our critical infrastructure."  CISA openly states that its "MDM team serves as a switchboard for routing disinformation concerns to appropriate social media platforms."  And so forth.

483.    *Fifth*, social-media platforms openly admit that they consult with and rely on government officials to identify what content to censor.  For example, Facebook's "COVID and Vaccine Policy Updates and Protections" states that Facebook does "not allow false claims about the vaccines or vaccination programs which *public health experts have advised us* could lead to COVID-19 vaccine rejection."  (emphasis added).  As noted above, "[a] Facebook spokesperson said the company has *partnered with government experts*, health authorities and researchers to take 'aggressive action against misinformation about COVID-19 and vaccines to protect public health.'"  Twitter, likewise, admits that it coordinates with government officials in identifying what

to censor.  For example, its "Civic integrity policy" states that Twitter "will label or remove false or misleading information intended to undermine public confidence in an election or other civic process" and that it "work[s] with select government and civil society partners in these countries to provide additional channels for reporting and expedited review" of so-called "misinformation." Twitter's "COVID-19 misleading information policy" states that it "primarily enforce[s] this policy in close coordination with trusted partners, including public health authorities, NGOs and *governments*, and continue[s] to use and consult with information from those sources when reviewing content."  Similarly, YouTube's "COVID-19 medical misinformation policy" states that "YouTube doesn't allow content that spreads medical misinformation that contradicts local health authorities' or the World Health Organization's medical information about COVID-19. … YouTube's policies on COVID-19 are subject to change in response to changes to global or local health authorities' guidance on the virus."

484.     *Sixth*, the *content* of the censorship decisions evidences Defendants' direct influence on censorship, because those decisions focus on the areas of concern for Defendants and uniformly favor Defendants' preferred narratives.  For example, Dr. Kheriaty notes that "[t]he pattern of content censored on these social media platforms mirrors closely the CDC and Biden administration policies…. [A]ny content that challenges those federal policies is subject to severe censorship, without explanation, on Twitter and YouTube—even when the information shared is taken straight from peer-reviewed scientific literature."  Kheriaty Decl. ¶ 18.  Regarding shadow-banning in particular, he observes that "[t]he posts most subject to this were those that challenged the federal government's preferred covid policies."  Kheriaty Decl. ¶ 15.  Likewise, the censorship of social-media speech about COVID-19 and election security directly reflects the calls for censorship from federal officials.  Hoft Decl. ¶¶ 4, 16.  Censorship of Hoft's speech has focused

144

on topics specifically targeted for censorship by DHS as "domestic terrorism," including in its National Terrorism Advisory System Bulletin from February 7, 2022.  Hoft Decl. ¶ 20; *id.* Ex. 7, at 1.  Further, this censorship is heavily *one-sided* in the government's favor—"Twitter notoriously suspends only those who question the wisdom and efficacy of government restrictions, or who cast doubt on the safety or efficacy of the vaccines," but "there are no examples of Twitter suspending individuals who have spread misinformation from the other side—by, for example, exaggerating the efficacy of masks or the threat the virus poses to children."  Changizi Decl. ¶¶ 50-51; *see also* Kotzin Decl. ¶ 33.  As Dr. Bhattacharya notes, "Having observed and lived through the government-driven censorship of the Great Barrington Declaration and its co-authors, it is clear to me that these attacks were politically driven by government actors."  Bhattacharya Decl. ¶ 32.

485.    *Seventh*, the revelation of recent internal documents—such as the DGB whistleblower documents, and the CDC emails released last week—demonstrate beyond any possible doubt that Defendants are *directly involved* in and are *directing* social-media censorship decisions, both by identifying high-level topics of censorship and by identifying specific posts and types of postings for censorship.  CDC and Census Bureau officials demonstrate that this direct, collusive involvement of federal officials in specific and general censorship decisions happens on a wide scale, and the DGB documents quoted above indicate that such "MDM"-censorship activities are occurring "across the federal enterprise."  The documents revealed in discovery and filed with the Court reflect the same practices among all other Defendants, as alleged further herein.

486.    For all these reasons, among others, it is perfectly clear that Defendants' conduct has *caused* the general and specific censorship policies and decisions alleged herein.

487.    For similar reasons, an order and judgment from this Court preventing the continuation of Defendants' conduct will redress Plaintiffs' ongoing injuries.  Defendants' conduct has caused social-media platforms to engage in the censorship decisions that have injured Plaintiffs, and an order ceasing Defendants' conduct will alleviate those injuries.

488.    Defendants are continuing, and are likely to continue, to engage in the unlawful conduct alleged herein.

## CLASS ALLEGATIONS

489.    Pursuant Federal Rule of Civil Procedure 23(a) and 23(b)(2), Plaintiffs Bhattacharya, Hines, Hoft, Kheriaty, and Kulldorff bring this action on behalf of themselves and two classes of other persons similarly situated to them.

490.    Plaintiffs propose to define the first class ("Class 1") as follows: The class of social-media users who have engaged or will engage in, or who follow, subscribe to, are friends with, or are otherwise connected to the accounts of users who have engaged or will engage in, speech on any social-media company's platform(s) that has been or will be removed; labelled; used as a basis for suspending, deplatforming, issuing strike(s) against, demonetizing, or taking other adverse action against the speaker; downranked; deboosted; concealed; or otherwise suppressed by the platform after Defendants and/or those acting in concert with them flag or flagged the speech to the platform(s) for suppression.

491.    Plaintiffs propose to define the second class ("Class 2") as follows: The class of social-media users who have engaged in or will engage in, or who follow, subscribe to, are friends with, or are otherwise connected to the accounts of users who have engaged in or will engage in, speech on any social-media company's platform(s) that has been or will be removed; labelled; used as a basis for suspending, deplatforming, issuing strike(s) against, demonetizing, or taking

146

other adverse action against the speaker; downranked; deboosted; concealed; or otherwise suppressed by the company pursuant to any change to the company's policies or enforcement practices that Defendants and/or those acting in concert with them have induced or will induce the company to make.

492.    Class 1 is sufficiently numerous that joinder of all members is impracticable. Defendants' conduct, as alleged further herein, involves flagging for suppression the social-media content of hundreds of users with, collectively, hundreds of thousands or millions of followers.

493.    Class 2 is sufficiently numerous that joinder of all members is impracticable.  As alleged further herein, Defendants' conduct has resulted policy and enforcement-practice changes at social-media platforms that have caused censorship affecting thousands if not millions of social-media users as speakers and/or audience members.

494.     Class 1 members' claims share questions of law or fact in common, including the question whether the government is responsible for a social-media company's suppression of content that the government flags to the company for suppression.

495.    Class 2 members' claims share questions of law or fact in common, including the question whether the government is responsible for a social-media company's suppression of content pursuant to a policy or enforcement practice that the government induced the company to adopt or enforce.

496.    The individual Plaintiffs' claims are typical of those of Class 1 members. The claims of the individual Plaintiffs and Class 1 members all arise from the same course of conduct by Defendants, namely, their practice of particular flagging content to social-media companies for suppression, and they are all based on the same legal theory, namely, the theory that such conduct

violates the First Amendment. The individual Plaintiffs are not subject to any affirmative defenses that are inapplicable to the rest of the class and likely to become a major focus of the case.

497.    The individual Plaintiffs' claims are typical of those of Class 2 members. The claims of the individual Plaintiffs and Class 2 members all arise from the same course of conduct by Defendants, namely, their practice of inducing social-media companies to adopt stricter content-moderation policies and enforcement practices, and are all based on the same legal theory, namely, the theory that such conduct violates the First Amendment. The individual Plaintiffs are not subject to any affirmative defenses that are inapplicable to the rest of the class and likely to become a major focus of the case.

498.    The individual Plaintiffs are willing and able to take an active role in the case, control the course of litigation, and protect the interests of absentees in both classes. No conflicts of interest currently exist or are likely to develop between Private Plaintiffs and absentees in either class.

499.    The proposed class counsel are two of the individual Plaintiffs' counsel, John J. Vecchione and John C. Burns. Mr. Vecchione and Mr. Burns have extensive experience litigating class actions and/or First Amendment and other civil-rights cases. Mr. Vecchione and Mr. Burns have the zeal and competence required to provide adequate representation for both classes.

500.    The proposed classes are defined in terms that are objective and precise.

501.    Defendants have acted on grounds that apply generally to both classes in that Defendants have targeted speech expressed by or addressed to members of both classes on the ground that the speech expresses a viewpoint Defendants disfavor. Consequently, injunctive relief and corresponding declaratory relief is appropriate respecting each class as a whole.

### CLAIMS FOR RELIEF

## COUNT ONE – VIOLATION OF THE FIRST AMENDMENT
### Against All Defendants

502.　　　All foregoing Paragraphs are incorporated as if set forth fully herein.

503.　　　The First Amendment prohibits Congress from making laws "abridging the freedom of speech."  U.S. CONST. amend. I.  This prohibition applies to restrictions on speech by all branches of the federal government.  *Matal v. Tam*, 137 S. Ct. 1744, 1757 (2017).

504.　　　The Constitutions of Missouri, Louisiana, and every other State provide similar or more robust protection for free-speech rights.

505.　　　An enormous amount of speech and expression occurs of social media.  Social-media platforms have become, in many ways, "the modern public square."  *Packingham*, 137 S. Ct. at 1737.  Social media platforms provide "perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard."  *Id.*  They also permit private citizens to interact directly with public and elected officials.

506.　　　Social-media platforms are akin to common carriers and/or public accommodations that, under longstanding statutory and common-law doctrines, should be subject to non-discrimination rules in accessing their platforms, which discrimination on the basis of content and viewpoint would violate.

507.　　　"Historically, at least two legal doctrines limited a company's right to exclude." *Knight First Amendment Institute*, 141 S. Ct. at 1222 (Thomas, J., concurring).  "First, our legal system and its British predecessor have long subjected certain businesses, known as common carriers, to special regulations, including a general requirement to serve all comers."  *Id.*  "Second, governments have limited a company's right to exclude when that company is a public accommodation. This concept—related to common-carrier law—applies to companies that hold themselves out to the public but do not 'carry' freight, passengers, or communications."  *Id.*

Absent the artificial immunity created by the overbroad interpretations of Section 230 immunity, these legal doctrines—along with private and free-market forces—would impose a powerful check on content- and viewpoint-based discrimination by social-media platforms.  *See id.*

508.     As alleged further herein, through Section 230 immunity and other actions, the federal government has abrogated these legal restraints on social-media censorship; it has artificially subsidized, encouraged, and enabled the emergence of a small group of immensely powerful social-media companies; and it has conferred on that cartel powerful legal shields protecting its ability to censor and suppress speech on social media based on content and viewpoint with impunity.

509.     As alleged further herein, Defendants have coerced, threatened, and pressured social-media platforms to censor disfavored speakers and viewpoints by using threats of adverse government action, including threats of increased regulation, antitrust enforcement or legislation, and repeal or amendment of Section 230 CDA immunity, among others.

510.     As alleged further herein, Defendants also hold out the "carrot" of continued protection under Section 230 and antitrust law, and thus preserving the legally favored status of social-media platforms.  Commentators have aptly summarized this carrot-stick dynamic: "Section 230 is the carrot, and there's also a stick: Congressional Democrats have repeatedly made explicit threats to social-media giants if they failed to censor speech those lawmakers disfavored."  Vivek Ramaswamy and Jed Rubenfeld, *Save the Constitution from Big Tech: Congressional threats and inducements make Twitter and Facebook censorship a free-speech violation*, WALL STREET JOURNAL (Jan. 11, 2021).  "Facebook and Twitter probably wouldn't have become behemoths without Section 230."  *Id.*  "Either Section 230 or congressional pressure alone might be sufficient to create state action. The combination surely is."  *Id.*

511.    As alleged further herein, as a result of such threats and inducements, Defendants are now directly colluding with social-media platforms to censor disfavored speakers and viewpoints, including by pressuring them to censor certain content and speakers, and "flagging" disfavored content and speakers for censorship.  Defendants have thus engaged in joint action with private parties and acted in concert with private parties to deprive Plaintiffs, Missourians, Louisianans, and Americans of their constitutional rights under the First Amendment and related state-law rights.

512.    Defendants' actions constitute government action for at least five independently sufficient reasons: (1) absent federal intervention, common-law and statutory doctrines, as well as voluntary conduct and natural free-market forces, would have restrained the emergence of censorship and suppression of speech of disfavored speakers, content, and viewpoint on social media; and yet (2) through Section 230 of the CDA and other actions, the federal government subsidized, fostered, encouraged, and empowered the creation of a small number of massive social-media companies with disproportionate ability to censor and suppress speech on the basis of speaker, content, and viewpoint; (3) such inducements as Section 230 and other legal benefits (such as the absence of antitrust enforcement) constitute an immensely valuable benefit to social-media platforms to do the bidding of federal government officials; (4) federal officials—including, most notably, Defendants herein—have repeatedly and aggressively threatened to remove these legal benefits and impose other adverse consequences on social-media platforms if they do not increase censorship and suppression of disfavored speakers, content, and viewpoints; and (5) Defendants herein, conspiring and colluding both with each other and social-media firms, have directly coordinated with social-media platforms to identify disfavored speakers, viewpoints, and content and have procured the actual censorship and suppression of them on social media.  These

factors, considered either individually or collectively, establish that the social-media censorship alleged herein constitutes government action.  These actions have dramatically impacted the fundamental right of free speech in Missouri, Louisiana, and America, both on social media and elsewhere.

513.    As alleged herein, Defendants have acted in concert both with each other, and with others, to violate the First Amendment and state-level free speech rights.

514.    Defendants' actions violate the First Amendment and analogous state constitutional protections.  The First Amendment is violated where, as here, "if the government coerces or induces it to take action the government itself would not be permitted to do, such as censor expression of a lawful viewpoint." *Biden v. Knight First Amendment Institute at Columbia Univ.*, 141 S. Ct. 1220, 1226 (2021) (Thomas, J., concurring).  "The government cannot accomplish through threats of adverse government action what the Constitution prohibits it from doing directly." *Id.*

515.    The censorship and suppression of speech that Defendants have induced social-media platforms to impose on disfavored speakers, content, and viewpoints constitute forms of prior restraints on speech, which are the most severe restrictions and the most difficult to justify under the First Amendment.  "One obvious implication of" the First Amendment's text "is that the government usually may not impose prior restraints on speech." *Houston Cmty. Coll. Sys. v. Wilson*, 142 S. Ct. 1253, 1259 (2022).

516.    These actions have injured and continue to injure Plaintiffs, as well as Missouri's, Louisiana's, and other States' citizens, both speakers and users of social media, and they have injured Missourians, Louisianans, and Americans who do not use social media by their predictable

effect on the availability of information through social-media users, who often repeat or communicate information presented on social media to non-users.

517.    These actions have also injured and continue to injure Plaintiffs, as well as Missouri's, Louisiana's, and other States' citizens, by broadly chilling the exercise of free-speech rights on social-media platforms.  This injures the First Amendment and state-level rights of all citizens, both users and non-users of social media, by reducing the availability of free speech in a free marketplace of ideas.  Much social-media speech is available to non-users of social media on the internet, and social-media users convey speech and information learned on social media platforms to non-users of social media through many other means.  Suppressing speech on social media, therefore, directly impacts the First Amendment rights of non-social media users, as well as users.

518.    Defendants' interference with First Amendment and state free-speech rights of Plaintiffs and virtually all Missourians, Louisianans, and Americans is *per se* unconstitutional, and even if not, it cannot be justified under any level of constitutional scrutiny.

519.    Defendants' interference with First Amendment rights of Plaintiffs and virtually all Missourians and Louisianans also interferes with rights that the States guaranteed to them under their respective state constitutions.  Defendants' interference thus undermines the system of rights the States provided to their citizens, effectively limiting the reach of each State's fundamental law and thwarting the fundamental policies of each sovereign State.

520.    Defendants' conduct inflicts imminent, ongoing, and continuing irreparable injury on Plaintiffs, as alleged further herein.

521.    Subject to the limitation that the Court may grant only declaratory and not injunctive relief against the President in his official capacity, the Court has inherent authority to

declare, enjoin, restrain, enter judgment, and impose penalties on Defendants and other federal actors, and those acting in concert with them, to prevent and restrain violations of federal law, including the First Amendment. "The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327 (2015).

### COUNT TWO – ACTION IN EXCESS OF STATUTORY AUTHORITY
### Against All Defendants

522.    All foregoing Paragraphs are incorporated as if set forth fully herein.

523.    No federal statute authorizes the Defendants' conduct in engaging in censorship, and conspiracy to censor, in violation of Plaintiffs', Missourians', Louisianans', and Americans' free-speech rights.

524.    "An agency's power is no greater than that delegated to it by Congress." *Lyng v. Payne*, 476 U.S. 926, 937 (1986). Agency actions that exceed the agency's statutory authority are *ultra vires* and must be invalidated.

525.    No statute authorizes any Defendants—including but not limited to White House officials, HHS officials, DHS officials, and any other federal officials or agencies—to engage in the course of conduct regarding the censorship and suppression of speech on social media as alleged herein.

526.    No statute authorizes Defendants—including but not limited to White House officials, HHS officials, DHS officials, and any other federal officials or agencies—to identify what constitutes "misinformation," "disinformation," and/or "malinformation" in public discourse on social-media platforms; to direct, pressure, coerce, and encourage social-media companies to censor and suppress such speech; and/or to demand that private companies turn over information

about speech and speakers on their platforms in the interest of investigating "misinformation," "disinformation," and/or "malinformation."

527.     Further, the interpretation of any statute to authorize these actions would violate the non-delegation doctrine, the canon of constitutional avoidance, the major-questions doctrine, the Supreme Court's clear-statement rules, and other applicable principles of interpretation.  No statute may be properly construed to do so.

528.     Defendants and the federal officials acting in concert with them, by adopting the censorship policies and conduct identified herein, have acted and are acting without any lawful authority whatsoever, and without any colorable basis for the exercise of authority.  No federal statute, regulation, constitutional provision, or other legal authority authorizes their social-media-censorship program, and it is wholly *ultra vires*.

529.     Defendants' *ultra vires* actions inflict ongoing irreparable harm on Plaintiffs, as alleged herein.

### COUNT THREE – VIOLATION OF ADMINISTRATIVE PROCEDURE ACT
#### Against the HHS Defendants

530.     All foregoing Paragraphs are incorporated as if set forth fully herein.

531.     Defendants HHS, NIAID, CDC, FDA, Becerra, Murthy, Crawford, Fauci, Galatas, Waldo, Byrd, Choi, Lambert, Peck, Dempsey, Muhammed, Jefferson, Murray, and Kimberly are referred to collectively herein as the "HHS Defendants."

532.     As set forth herein, the HHS Defendants' conduct is unlawful, arbitrary and capricious, an in excess of statutory authority under the Administrative Procedure Act.

533.     The APA authorizes courts to hold unlawful and set aside final agency actions that are found to be: "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of

statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law…."  5 U.S.C. § 706(2)(A)-(D).  The HHS Defendants' conduct violates all of these prohibitions.

534.    Defendants HHS, CDC, and NIAID are "agencies" within the meaning of the APA. Defendants Becerra, Fauci, and Murthy, in their official capacities, are the heads of federal agencies.

535.    The HHS Defendants' conduct alleged herein constitutes "final agency action" because it "marks the consummation of the agency's decisionmaking process." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quotation marks omitted).  Further, it is action from by which "rights or obligations have been determined," and "from which legal consequences will flow."  *Id.* Defendants' campaign of pressuring, threatening, and colluding with social-media platforms to suppress disfavored speakers, content, and speech are final agency actions of this sort.  Such actions reflect the completion of a decisionmaking process with a result that will directly affect Plaintiffs, Missourians, Louisianans, and Americans.  *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992).  The actions of Defendants alleged herein, on information and belief, reflect and result from a specific, discrete, and identifiable decision of Defendants to adopt an unlawful social-media censorship program.

536.    The HHS Defendants' conduct is arbitrary, capricious, and an abuse of discretion because it was not based on any reasoned decisionmaking, ignores critical aspects of the problem, disregards settled reliance interests, rests on pretextual *post hoc* justifications, and overlooks the unlawful nature of the HHS Defendants' conduct, among other reasons.  5 U.S.C. § 706(2)(A).

537.    The HHS Defendants' conduct is "contrary to constitutional right, power, privilege, or immunity" because it violates the First Amendment rights of Plaintiffs and virtually all

Missourians and Louisianans for the reasons discussed herein and in Count One, *supra*. 5 U.S.C. § 706(2)(B).

538.     The HHS Defendants conduct is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," because no statute authorizes any of the conduct alleged herein, as discussed in Count Two, *supra*. 5 U.S.C. § 706(2)(C).

539.     The HHS Defendants' conduct was "without observance of procedure required by law" because it is a substantive policy or series of policies that affect legal rights that require notice and comment, and yet they never engaged in any notice-and-comment process, or other process to obtain input from the public, before engaging in these unlawful agency policies. 5 U.S.C. § 706(2)(D).

540.     The HHS Defendants' conduct is unlawful under the APA and should be set aside.

## COUNT FOUR – VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
### Against the DHS Defendants

541.     All foregoing Paragraphs are incorporated as if set forth fully herein.

542.     Defendants DHS, CISA, Mayorkas, Easterly, Silvers, Vinograd, Jankowicz, Masterson, Protentis, Hale, Snell, Wyman, and Scully, are referred to collectively herein as the "DHS Defendants."

543.     As set forth herein, the DHS Defendants' conduct is unlawful, arbitrary and capricious, an in excess of statutory authority under the Administrative Procedure Act.

544.     The APA authorizes courts to hold unlawful and set aside final agency actions that are found to be: "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance

of procedure required by law….”  5 U.S.C. § 706(2)(A)-(D).  The DHS Defendants’ conduct

violates all of these prohibitions.

545.       Defendants DHS and CISA are “agencies” within the meaning of the APA.

Defendants Mayorkas and Easterly, in their official capacities, are the heads of federal agencies.

546.       The DHS Defendants’ conduct alleged herein constitutes “final agency action”

because it “marks the consummation of the agency’s decisionmaking process.”  *Bennett v. Spear*,

520 U.S. 154, 178 (1997) (quotation marks omitted).  Further, it is action from by which “rights

or obligations have been determined,” and “from which legal consequences will flow.”  *Id.*

Defendants’ campaign of pressuring, threatening, and colluding with social-media platforms to

suppress disfavored speakers, content, and speech are final agency actions of this sort.  Such

actions reflect the completion of a decisionmaking process with a result that will directly affect

Plaintiffs, Missourians, Louisianans, and Americans.  *Franklin v. Massachusetts*, 505 U.S. 788,

797 (1992).  The actions of Defendants alleged herein, on information and belief, reflect and result

from a specific, discrete, and identifiable decision of Defendants to adopt an unlawful social-media

censorship program.

547.       The DHS Defendants’ conduct is arbitrary, capricious, and an abuse of discretion

because it was not based on any reasoned decisionmaking, ignores critical aspects of the problem,

disregards settled reliance interests, rests on pretextual *post hoc* justifications, and overlooks the

unlawful nature of the DHS Defendants’ conduct, among other reasons.  5 U.S.C. § 706(2)(A).

548.       The DHS Defendants’ conduct is “contrary to constitutional right, power, privilege,

or immunity” because it violates the First Amendment and state free-speech rights of Plaintiffs

and virtually all Missourians, Louisianans, and Americans for the reasons discussed herein and in

Count One*, supra*.  5 U.S.C. § 706(2)(B).

549.     The DHS Defendants conduct is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," because no statute authorizes any of the conduct alleged herein, as discussed in Count Two, *supra*.  5 U.S.C. § 706(2)(C).

550.     The DHS Defendants' conduct was "without observance of procedure required by law" because it is a substantive policy or series of policies that affect legal rights that require notice and comment, and yet they never engaged in any notice-and-comment process, or other process to obtain input from the public, before engaging in these unlawful agency policies.  5 U.S.C. § 706(2)(D).

551.     The DHS Defendants' conduct is unlawful under the APA and should be set aside.

### COUNT FIVE – VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
### Against the Census Defendants

552.     All foregoing Paragraphs are incorporated as if set forth fully herein.

553.     Defendants Department of Commerce, Census Bureau, Shopkorn, Schwartz, Molina-Irizarry, and Galemore are referred to collectively herein as the "Census Defendants."

554.     As set forth herein, the Census Defendants' conduct is unlawful, arbitrary and capricious, and in excess of statutory authority under the Administrative Procedure Act.

555.     The APA authorizes courts to hold unlawful and set aside final agency actions that are found to be: "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law…."  5 U.S.C. § 706(2)(A)-(D).  The Census Defendants' conduct violates all of these prohibitions.

556.     Defendants Department of Commerce and Census Bureau are "agencies" within the meaning of the APA.

557.     The Census Defendants' conduct alleged herein constitutes "final agency action" because it "marks the consummation of the agency's decisionmaking process." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quotation marks omitted).  Further, it is action by which "rights or obligations have been determined," and "from which legal consequences will flow."  *Id.* Defendants' campaign of pressuring, threatening, and colluding with social-media platforms to suppress disfavored speakers, content, and speech are final agency actions of this sort.  Such actions reflect the completion of a decisionmaking process with a result that will directly affect Plaintiffs, Missourians, Louisianans, and Americans. *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992).  The actions of Defendants alleged herein, on information and belief, reflect and result from a specific, discrete, and identifiable decision of Defendants to adopt an unlawful social-media censorship program.

558.     The Census Defendants' conduct is arbitrary, capricious, and an abuse of discretion because it was not based on any reasoned decisionmaking, ignores critical aspects of the problem, disregards settled reliance interests, rests on pretextual *post hoc* justifications, and overlooks the unlawful nature of the Census Defendants' conduct, among other reasons.  5 U.S.C. § 706(2)(A).

559.     The Census Defendants' conduct is "contrary to constitutional right, power, privilege, or immunity" because it violates the First Amendment and state free-speech rights of Plaintiffs and virtually all Missourians, Louisianans, and Americans for the reasons discussed herein and in Count One*, supra*.  5 U.S.C. § 706(2)(B).

560.     The Census Defendants conduct is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," because no statute authorizes any of the conduct alleged herein, as discussed in Count Two, *supra*.  5 U.S.C. § 706(2)(C).

561.     The Census Defendants' conduct was "without observance of procedure required by law" because it is a substantive policy or series of policies that affect legal rights that require notice and comment, and yet they never engaged in any notice-and-comment process, or other process to obtain input from the public, before engaging in these unlawful agency policies.  5 U.S.C. § 706(2)(D).

562.     The Census Defendants' conduct is unlawful under the APA and should be set aside.

### COUNT SIX – VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
### Against the FBI Defendants

563.     All foregoing Paragraphs are incorporated as if set forth fully herein.

564.     Defendants U.S. Department of Justice, FBI, Dehmlow, and Chan referred to collectively herein as the "FBI Defendants."

565.     As set forth herein, the FBI Defendants' conduct is unlawful, arbitrary and capricious, and in excess of statutory authority under the Administrative Procedure Act.

566.     The APA authorizes courts to hold unlawful and set aside final agency actions that are found to be: "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law…."  5 U.S.C. § 706(2)(A)-(D).  The FBI Defendants' conduct violates all of these prohibitions.

567.     Defendants DOJ and FBI are "agencies" within the meaning of the APA.

568.     The FBI Defendants' conduct alleged herein constitutes "final agency action" because it "marks the consummation of the agency's decisionmaking process." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quotation marks omitted).  Further, it is action by which "rights or

obligations have been determined," and "from which legal consequences will flow."  *Id.*
Defendants' campaign of pressuring, threatening, and colluding with social-media platforms to suppress disfavored speakers, content, and speech are final agency actions of this sort.  Such actions reflect the completion of a decisionmaking process with a result that will directly affect Plaintiffs, Missourians, Louisianans, and Americans.  *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992).  The actions of Defendants alleged herein, on information and belief, reflect and result from a specific, discrete, and identifiable decision of Defendants to adopt an unlawful social-media censorship program.

569.    The FBI Defendants' conduct is arbitrary, capricious, and an abuse of discretion because it was not based on any reasoned decisionmaking, ignores critical aspects of the problem, disregards settled reliance interests, rests on pretextual *post hoc* justifications, and overlooks the unlawful nature of the FBI Defendants' conduct, among other reasons.  5 U.S.C. § 706(2)(A).

570.    The FBI Defendants' conduct is "contrary to constitutional right, power, privilege, or immunity" because it violates the First Amendment and state free-speech rights of Plaintiffs and virtually all Missourians, Louisianans, and Americans for the reasons discussed herein and in Count One*, supra*.  5 U.S.C. § 706(2)(B).

571.    The FBI Defendants' conduct is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," because no statute authorizes any of the conduct alleged herein, as discussed in Count Two, *supra*.  5 U.S.C. § 706(2)(C).

572.    The FBI Defendants' conduct was "without observance of procedure required by law" because it is a substantive policy or series of policies that affect legal rights that require notice and comment, and yet they never engaged in any notice-and-comment process, or other process to

162

obtain input from the public, before engaging in these unlawful agency policies. 5 U.S.C. § 706(2)(D).

573.      The FBI Defendants' conduct is unlawful under the APA and should be set aside.

### COUNT SEVEN – VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
### Against the State Department Defendants

574.      All foregoing Paragraphs are incorporated as if set forth fully herein.

575.      Defendants Department of State, Bray, Stewart, Kimmage, and Frisbie are referred to collectively herein as the "State Department Defendants."

576.      As set forth herein, the State Department Defendants' conduct is unlawful, arbitrary and capricious, and in excess of statutory authority under the Administrative Procedure Act.

577.      The APA authorizes courts to hold unlawful and set aside final agency actions that are found to be: "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law…." 5 U.S.C. § 706(2)(A)-(D). The State Department Defendants' conduct violates all of these prohibitions.

578.      Defendant U.S State Department is an "agency" within the meaning of the APA.

579.      The State Department Defendants' conduct alleged herein constitutes "final agency action" because it "marks the consummation of the agency's decisionmaking process." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quotation marks omitted). Further, it is action by which "rights or obligations have been determined," and "from which legal consequences will flow." *Id.* Defendants' campaign of pressuring, threatening, and colluding with social-media platforms to suppress disfavored speakers, content, and speech are final agency actions of this sort. Such actions reflect the completion of a decisionmaking process with a result that will directly affect

163

Plaintiffs, Missourians, Louisianans, and Americans. *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992).  The actions of Defendants alleged herein, on information and belief, reflect and result from a specific, discrete, and identifiable decision of Defendants to adopt an unlawful social-media censorship program.

580.     The State Department Defendants' conduct is arbitrary, capricious, and an abuse of discretion because it was not based on any reasoned decisionmaking, ignores critical aspects of the problem, disregards settled reliance interests, rests on pretextual *post hoc* justifications, and overlooks the unlawful nature of the State Department Defendants' conduct, among other reasons. 5 U.S.C. § 706(2)(A).

581.     The State Department Defendants' conduct is "contrary to constitutional right, power, privilege, or immunity" because it violates the First Amendment and state free-speech rights of Plaintiffs and virtually all Missourians, Louisianans, and Americans for the reasons discussed herein and in Count One*, supra*.  5 U.S.C. § 706(2)(B).

582.     The State Department Defendants' conduct is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," because no statute authorizes any of the conduct alleged herein, as discussed in Count Two, *supra*.  5 U.S.C. § 706(2)(C).

583.     The State Department Defendants' conduct was "without observance of procedure required by law" because it is a substantive policy or series of policies that affect legal rights that require notice and comment, and yet they never engaged in any notice-and-comment process, or other process to obtain input from the public, before engaging in these unlawful agency policies. 5 U.S.C. § 706(2)(D).

584.     The State Department Defendants' conduct is unlawful under the APA and should be set aside.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court enter judgment in their favor and grant the following relief:

A.    Certify this case as a class action under Federal Rule of Civil Procedure 23(b)(2), as proposed herein; appoint Plaintiffs Bhattacharya, Hines, Hoft, Kheriaty, and Kulldorff as class representatives; and appoint John J. Vecchione and John C. Burns as class counsel;

B.    Declare that Defendants' conduct violates the First Amendment of the U.S. Constitution and analogous provisions of Missouri's, Louisiana's, and other States' Constitutions;

C.    Declare that Defendants' conduct is *ultra vires* and exceeds their statutory authority;

D.    Declare that Defendants' conduct violates the Administrative Procedure Act and is unlawful, and vacate and set aside such conduct;

E.    Preliminarily and permanently enjoin Defendants (except for President Biden), their officers, officials, agents, servants, employees, attorneys, and all persons acting in concert or participation with them, from continuing to engage in unlawful conduct as alleged herein;

F.    Preliminarily and permanently enjoin Defendants (except for President Biden), their officers, officials, agents, servants, employees, attorneys, and all persons acting in concert or participation with them, from taking any steps to demand, urge, pressure, or otherwise induce any social-media platform to censor, suppress, de-platform, suspend, shadow-ban, de-boost, restrict access to content, or take any other adverse action against any speaker, content or viewpoint expressed on social media; and

G.    Grant such other and further relief as the Court may deem just and proper.

Dated: March 20, 2023                    Respectfully submitted,

**ANDREW BAILEY**                        **JEFFREY M. LANDRY**
**Attorney General of Missouri**         **Attorney General of Louisiana**

*/s/ Charles F. Capps*                   */s/ D. John Sauer*
Joshua M. Divine, Mo. Bar No. 69875*     Elizabeth B. Murrill (La #20685)
  *Solicitor General*                      *Solicitor General*
Charles F. Capps, Mo. Bar No. 72734*     Tracy Short (La #23940)
  *Deputy Solicitor General*               *Assistant Attorney General*
Todd A. Scott, Mo. Bar No. 56614*        D. John Sauer, Mo. Bar No. 58721*
  *Senior Counsel*                         *Special Assistant Attorney General*
Kenneth C. Capps, Mo. Bar No. 70908*     Louisiana Department of Justice
  *Assistant Attorney General*           1885 N. Third Street
Missouri Attorney General's Office       Baton Rouge, Louisiana
Post Office Box 899                      Tel: (225) 326-6766
Jefferson City, MO 65102                 murrille@ag.louisiana.gov
Tel: (573) 751-8870                      *Counsel for State of Louisiana*
charles.capps@ago.mo.gov
*Counsel for State of Missouri*


*/s/ Jenin Younes*                       */s/ John C. Burns*
Jenin Younes*                            John C. Burns
John J. Vecchione*                       Burns Law Firm
New Civil Liberties Alliance             P.O. Box 191250
1225 19th Street N.W., Suite 450         St. Louis, Missouri 63119
Washington, DC 20036                     P: 314-329-5040
Direct: (202) 918-6905                   E-mail: john@burns-law-firm.com
E-mail: jenin.younes@ncla.legal          *Counsel for Plaintiff Jim Hoft*
*Counsel for Plaintiffs Dr. Jayanta*
*Bhattacharya,*
*Dr. Martin Kulldorff, Dr. Aaron Kheriaty,*
*and Jill Hines*


* admitted *pro hac vice*

## CERTIFICATE OF SERVICE

I hereby certify that, on March 20, 2023, I caused a true and correct copy of the foregoing to be filed by the Court's electronic filing system, to be served by operation of the Court's electronic filing system on counsel for all parties who have entered in the case.

*/s/ Charles F. Capps*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF LOUISIANA**
**MONROE DIVISION**

STATE OF LOUISIANA, STATE OF
MISSOURI, *et al.*,

   Plaintiffs,

v.

JOSEPH R. BIDEN, JR.,
in his official capacity as President of the
United States, *et al.*,

   Defendants.

No. 3:22-cv-01213-TAD-KDM

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT**
**OF MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

TABLE OF CONTENTS...................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................... iii

INTRODUCTION ............................................................................................................... 1

RESPONSE TO DEFENDANTS' STATEMENT OF FACTS ........................................... 1

    I.   Defendants' Introduction Is Rife With "Disinformation." ..................................... 1

    II.  Defendants' Proposed Statement of Facts Mischaracterizes the Evidence. ......................... 6

        A.   Platforms are not "economically incentivized" to censor disfavored content. ........... 6

        B.   Federal officials pressured platforms to censor "borderline content." ..................... 11

        C.   Defendants use the calls for Section 230 reform as an explicit threat. .................... 12

    III. Defendants' Agency-Specific Statements of Facts Mischaracterize the Evidence. ........... 15

        A.   The White House Perpetrates an Egregious Pressure Campaign. ............................ 15

        B.   The Surgeon General's Office Joins the White House Pressure Campaign. ............ 31

        C.   The CDC and Census Bureau Conspire with Platforms on Censorship. ................. 40

        D.   Dr. Fauci Perpetrates Campaigns of Deception to Censor Disfavored Viewpoints. ......................................................................................................... 45

        E.   CISA Engages in Extensive, Ongoing Social-Media Censorship Activities. ........... 47

        F.   The FBI Pressures and Colludes With Platforms to Remove Domestic Speech. ......................................................................................................... 58

ARGUMENT ..................................................................................................................... 68

    I.   Plaintiffs Have Demonstrated Immediate Irreparable Injury. ............................ 70

        A.   Plaintiffs Experience Both Ongoing and Imminent Irreparable Injury .................... 70

    II.  The Evidence Demonstrates That State and Private Plaintiffs Have Standing. ................. 80

    III. Plaintiffs Are Likely To Prevail on Their First Amendment Claims. ................................ 82

        A.   There Is Overwhelming Evidence of "Significant Encouragement." ...................... 83

B.    There Is Overwhelming Evidence of Coercion............................................. 88

C.    Deceiving Platforms Into Censoring Speech Constitutes State Action. .................. 95

D.    There Is Overwhelming Evidence of Joint Participation and Conspiracy. ............... 99

IV. Plaintiffs Are Likely to Succeed on Their APA and *Ultra Vires* Claims........................ 111

V.  Plaintiffs' Proposed Injunction Is Sufficiently Precise. .................................... 111

VI. The Proposed Injunction Is Not Overbroad and Does Not Interfere With Legitimate Government Speech or Functions. .................................................... 113

CONCLUSION.................................................................................... 117

CERTIFICATE OF SERVICE ................................................................. 119

# TABLE OF AUTHORITIES

**Cases**                                                                                      **Page(s)**

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez,*
   458 U.S. 592 (1982) ............................................................................................... 73

*Already, LLC v. Nike, Inc.,*
   568 U.S. 85 (2013) ................................................................................................. 75

*Am. Family Ass'n v. City and County of San Francisco,*
   277 F.3d 1114 (9th Cir. 2002) .............................................................................. 92

*Arc of California v. Douglas,*
   757 F.3d 975 (9th Cir. 2014) ................................................................................ 80

*Ashcroft v. ACLU,*
   535 U.S. 564 (2002) ............................................................................................... 16

*Backpage.com, LLC v. Dart,*
   807 F.3d 229, 235 (7th Cir. 2015) ............................................................. 5, 84, 90

*Ballard v. Wall,*
   413 F.3d 510 (5th Cir. 2005) ................................................................................ 99

*Bantam Books, Inc. v. Sullivan,*
   372 U.S. 58 (1963) ........................................................................................... 89, 90

*Changizi v. HHS,*
   602 F. Supp. 3d 1031 (S.D. Ohio 2022) .......................................................... 87, 88

*Cuviello v. City of Vallejo,*
   944 F.3d 816 (9th Cir. 2019) ................................................................................ 80

*Doe v. Google LLC,*
   No. 21-16934, 2022 WL 17077497 (9th Cir. Nov. 18, 2022) ......................... 90, 93

*Elrod v. Burns,*
   427 U.S.347 (1976) ......................................................................................... 70, 79

*Fogel v. Collins,*
   531 F.3d 824 (9th Cir. 2008) .............................................................................. 116

*George v. Edholm,*
   752 F.3d 1206 (9th Cir. 2014) ................................................................... 95, 96, 97

*Hammerhead Enterprises v. Brezenoff,*
   707 F.2d 33 (2d Cir. 1983) .................................................................................... 91

*Hart v. Facebook, Inc.,*
   No. 22-cv-737, 2022 WL 1427507 (N.D. Cal. May 5, 2022) ............................... 87

*Howard Gault Co. v. Texas Rural Legal Aid, Inc.,*
   848 F.2d 544 (5th Cir. 1988) ................................................................. 100, 101, 103

*Jones v. City of Chicago,*
   856 F.2d 985 (7th Cir. 1988) ................................................................................ 96

*La. Div. Sons of Confederate Veterans v. City of Natchitoches*,
    821 F. App'x 317 (5th Cir. 2020) .................................................................. 83

*Matal v. Tam*,
    582 U.S. 218 (2017) ............................................................................ 5, 69

*Moody v. Farrell*,
    868 F.3d 348 (5th Cir. 2017) ............................................................... 85, 99

*Norwood v. Harrison*,
    413 U.S. 455 (1973) ......................................................................... passim

*O'Handley v. Weber*,
    62 F.4th 1145 (9th Cir. 2023) ..................................................................... 84

*Opulent Life Church v. City of Holly Springs, Miss.*,
    697 F.3d 279 (5th Cir. 2012) ....................................................................... 80

*Planned Parenthood of Se. Pennsylvania v. Casey*,
    505 U.S. 833 (1992) ................................................................................ 117

*Playboy Enterprises v. Meese*,
    639 F. Supp. 581 (D.D.C. 1986) ................................................................. 91

*R.C. Maxwell Co. v. Borough of New Hope*,
    735 F.2d 85 (3d Cir. 1984) ........................................................................... 91

*Rattner v. Netburn*,
    930 F.2d 204 (2d Cir. 1991) ........................................................................ 92

*Robinson v. Maruffi*,
    895 F.2d 649 (10th Cir. 1990) ..................................................................... 97

*Ry. Emp. Dep't v. Hanson*,
    351 U.S. 225 (1956) .................................................................................... 95

*Schmidt v. Lessard*,
    414 U.S. 473 (1974) ......................................................................... 111, 112

*Scott v. Schedler*,
    826 F.3d 207 (5th Cir. 2016) ..................................................................... 111

*Skinner v. Railway Labor Execs. Ass'n*,
    489 U.S. 602 (1989) ............................................................................. 94, 95

*Smiddy v. Varney*,
    803 F.2d 1469 (9th Cir. 1986) ..................................................................... 97

*Trump v. Twitter Inc.*,
    602 F. Supp. 3d 1213 (N.D. Cal. 2022) ...................................................... 93

*United States v. Alvarez*,
    567 U.S. 709 (2012) .................................................................... 16, 69, 104

*United States v. Rashwan*,
    328 F.3d 160 (4th Cir. 2003) ...................................................................... 97

*United States v. Stevens*,
   559 U.S. 460 (2010) ................................................................... 16, 69

*VDARE Foundation v. City of Colorado Springs*,
   11 F.4th 1151 (10th Cir. 2021) ................................................. 91

*Virginia v. Black*,
   538 U.S. 343 (2003) ................................................................... 15, 16

*W. Va. State Bd. of Educ. v. Barnette*,
   319 U.S. 624 (1943) ................................................................... 16

*West Virginia v. E.P.A.*,
   142 S. Ct. 2587 (2022) ............................................................. 75

*Young v. Brand Scaffold Servs.*, LLC,
   2009 WL 4674053 (E.D. Texas 2009) ..................................... 7

**Statutes**

5 U.S.C. § 706(2)(A)-(C) ................................................................ 111

18 U.S.C. § 241 ................................................................................ 104

La. Const. Ann. art. I, § 7 .............................................................. 72

Mo. Const. art. I, § 8 ...................................................................... 72

**Regulations**

83 Fed. Reg. 46,843 ....................................................................... 98

87 Fed. Reg. 12713 ......................................................................... 113

## INTRODUCTION

Suppose that the Trump White House, backed by Republicans controlling both Houses of Congress, publicly demanded that all libraries in the United States burn books criticizing the President, and the President made statements implying that the libraries would face ruinous legal consequences if they did not comply, while senior White House officials privately badgered the libraries for detailed lists and reports of such books that they had burned—and the libraries, after months of such pressure, complied with those demands and burned the books.

Suppose that, after four years of pressure from senior congressional staffers in secret meetings threatening the libraries with adverse legislation if they did not cooperate, the FBI started sending all libraries in the United States detailed lists of the books the FBI wanted to burn, requesting that the libraries report back to the FBI by identifying the books that they burned—and the libraries complied by burning about half of those books.

Suppose that a federal national security agency teamed up with private research institutions, backed by enormous resources and federal funding, to establish a mass-surveillance and mass-censorship program that uses sophisticated techniques to review hundreds of millions of American citizens' electronic communications in real time, and works closely with tech platforms to covertly censor millions of them.

The first two hypotheticals are directly analogous to the facts of this case. And the third is not hypothetical at all—it is a description of the Election Integrity Partnership and Virality Project.

## RESPONSE TO DEFENDANTS' STATEMENT OF FACTS

**I.     Defendants' Introduction Is Rife With "Disinformation."**

Defendants' Introduction repeatedly advances factual claims that the evidence contradicts—what one might call "disinformation." This trend persists throughout their brief.

Factually, Defendants' brief goes off the rails in its very first sentence. There, Defendants claim that their censorship activities were designed to prevent "hostile *foreign* assaults on critical election infrastructure." Doc. 266, at 1 (emphasis added). The evidence demonstrates, however, that federal censorship overwhelmingly targets *domestic* speech by American citizens, not "foreign" disinformation. For example, Renee DiResta states that "the vast majority of voting related misinformation in the 2020 election was domestic." Doc. 214-1, ¶ 1056 (quoting Scully Ex. 7, at 6). The EIP Report agrees that supposed election "misinformation" "was pushed by authentic, domestic actors." *Id.* ¶ 1220. Alex Stamos stated that "almost all of this is domestic, right? … It is all domestic," *id.* ¶ 1231, and "the vast, vast majority … is domestic." *Id.* ¶ 1233. Kate Starbird states that the misinformation is "largely domestic coming from inside the United States." *Id.* ¶ 1235. The Virality Project admits that, for supposed COVID misinformation, "[f]oreign … actors' reach appeared to be far less than that of domestic actors." *Id.* ¶ 1241. The FBI's censorship of supposedly "foreign" speech—in just a tiny handful of examples—swept into the censorship net hundreds of thousands of social-media posts and engagements by American citizens, as well as organic content by American freelance journalists. *Id.* ¶¶ 918-922. When CISA reports misinformation for censorship, it does not bother to determine whether the speech is foreign or domestic—CISA does not "take steps to see whether this came from foreign or domestic sources," but "would just pass it along to the social-media platforms." *Id.*, ¶ 1033.

Defendants' second sentence makes a key admission—that "various agencies and officials spoke publicly and privately with social media companies to … call the companies' attention to misinformation spreading on their platforms." Doc. 266, at 1. This sentence admits that Defendants are the but-for cause of the censorship. Until Defendants flagged the disfavored

content, the platforms did not censor it.  As Brian Scully candidly admits, "if it hadn't been brought to their attention then they obviously wouldn't have moderated it."  Doc. 214-1, ¶ 974.

Next, Defendants claim that each federal official and agency should be treated as acting independently from the others.  Doc. 266, at 1; *see also id.* at 23.  On Defendants' view, it is just a stunning coincidence that dozens of federal agencies and officials, all acting in isolation, simultaneously decided to pressure social-media platforms to remove disfavored content. Not so.  The evidence shows extensive coordination among Defendants on social-media censorship.

For example, the White House's pressure campaign is closely integrated with the Office of Surgeon General.  *See, e.g.,* Doc. 214-1, ¶¶ 212, 246, 253, 259, 281, 293, 365, 369.  Likewise, the censorship campaign of the CDC and the Census Bureau draws directly from White House pressure.  *Id.* ¶¶ 395-396, 424, 426, 455-458, 467.  NIAID and NIH censorship efforts are intertwined and reinforced by CDC.  *Id.* ¶ 827.  CISA, FBI, DOJ, ODNI, and other federal agencies are jointly involved in pressuring and colluding with platforms, even participating in the same joint meetings, the same collusive activities, and the same campaigns of pressure and deception.  *Id.* ¶¶ 861-866.  CISA, the FBI, and other federal law-enforcement and national-security agencies colluded on the suppression of the Hunter Biden laptop story.  *Id.* ¶¶ 880-894.  NIAID and NIH, through their directors Dr. Fauci and Dr. Francis Collins, conspired together on a series of censorship campaigns, including relating to the lab-leak theory and the Great Barrington Declaration.  *Id.* ¶¶ 596, 598-756, 777-808. NIAID is embedded in the White House's censorship activities, as Dr. Fauci reinforced the White House's attempts to deplatform Alex Berenson.  *Id.* ¶¶ 596, 840-852.  CISA and the GEC coordinate both with each other and with private entities in a massive surveillance and censorship project, the Election Integrity Partnership.  *Id.* ¶¶ 1132, 1135, 1153-54, 1175, 1197.  OSG, the CDC, and other federal officials coordinate with each other

and with the same private entities as CISA and the GEC through the Virality Project. *Id.* ¶¶ 1279, 1284. High-level congressional staffers coordinate with the FBI on pressuring platforms to increase censorship in secret meetings conducted in Silicon Valley. *Id.* ¶¶ 950-958. The White House's campaign of public threats against platforms demanding greater censorship, reinforced by its political allies in Congress and other senior federal officials, grants coercive force to the censorship efforts of all the federal agencies involved. *Id.* ¶¶ 1-30. Director Easterly's text messages state that CISA wants to "play a coord role" so that relevant agencies can try to prebunk/debunk" the "mis/dis trends," in order to prevent the "chaos" that would result if every federal department and agency "is independently reaching out to platforms." *Id.* ¶ 1108. Indeed, Secretary Mayorkas aptly describes the censorship campaign as occurring "across the federal enterprise." Doc. 268, ¶ 285.

Next, Defendants claim that "much of the challenged conduct occurred in the previous Administration," as if this is somehow a "factual deficienc[y] in their theory." Doc. 266, at 1. It is not clear why Defendants think so. Federal social-media censorship violates the First Amendment regardless of which Administration or political party does it. Moreover, the evidence demonstrates an aggressive acceleration of federal social-media censorship activities, and the direct involvement of the White House, once the Biden Administration took office. Many of the most egregious acts of censorship in 2020—such as Dr. Fauci's campaigns to discredit the lab-leak theory and the Great Barrington Declaration, CISA's launching of the Election Integrity Partnership, CISA's "switchboarding," and the FBI's and CISA's campaign to censor the Hunter Biden laptop story—were achieved without no White House involvement. In fact, when attacking the Great Barrington Declaration, Dr. Collins secretly noted to Dr. Fauci that the White House would disapprove, and Dr. Fauci assured him that they have other things to worry about.

Once the Biden Administration took office, the White House became directly involved in censorship, and the censorship activities dramatically accelerated "across the federal enterprise." Doc. 268, ¶ 285. White House officials started flagging "misinfo" for censorship at 1:04 a.m. on their third day in office. Doc. 214-1, ¶ 34. The White House immediately launched a pressure campaign on social-media platforms to suppress supposed COVID "misinformation." *Id.* ¶¶ 341-344. Federal officials' collaboration with Stanford Internet Observatory and its censorship cartel moved out into the open, as Dr. Murthy launched his signature "disinformation" initiative—the Surgeon General's Health Advisory—at a Virality Project event at the Stanford Internet Observatory. *Id.* ¶¶ 1285, 1359. The President himself publicly pressured the platforms on July 16, 2021, one day after Jennifer Psaki and Dr. Murthy publicly pressured them. *Id.* ¶ 153.

Defendants claim that Plaintiffs' censorship injuries are "far outweighed by the Government's interest in speaking and taking action to promote the public interest." Doc. 266, at 4. This argument turns the First Amendment doctrine on its head. The First Amendment protects private speech, not government speech, so the government's free-speech interest gives way:

> [W]hile the Government may certainly select the messages it wishes to convey, this freedom is limited by the more fundamental principle that a government entity may not employ threats to limit the free speech of private citizens. *See Backpage.com, LLC*, 807 F.3d at 235. Plaintiffs are not, as Defendants argue, seeking a "judicial gag order to prevent the Executive Branch from expressing its views on important matters of public concern." As the Supreme Court explained: "[W]hile the government-speech doctrine is important— indeed, essential—it is a doctrine that is susceptible to dangerous misuse. If private speech could be passed off as government speech by simply affixing a government seal of approval, government could silence or muffle the expression of disfavored viewpoints." *Matal v. Tam*, 582 U.S. 218, 235 (2017). The Complaint alleges more than the exercise of permissible government speech. It alleges extensive and highly effective efforts by government officials to "silence or muffle the expression of disfavored viewpoints." *Id.*

Doc. 224, at 63 (footnote call omitted).

Finally, Defendants claim that an injunction would "prevent the dissemination of vital public health information, communications with social media companies about criminal activity

in process on their platforms, and efforts to act on national security threats relating to international terrorism and election security." Doc. 266, at 5. This is flatly wrong. Plaintiffs' proposed injunction would not prevent Defendants making public statements on policy issues, or prevent the reporting of ongoing criminal and terrorist activity on platforms. *See* Doc. 214, at 67-68. Instead, it would prevent Defendants from pushing platforms to censor other peoples' First Amendment-protected speech. *See id.* Defendants can communicate about public health, ongoing crimes, and national-security threats without violating Americans' freedom of speech.

## II.    Defendants' Proposed Statement of Facts Mischaracterizes the Evidence.

Defendants' Proposed Statement of Facts, Doc. 266, at 5-102, mischaracterizes the evidence and is unconvincing.

### A.    Platforms are not "economically incentivized" to censor disfavored content.

First, citing Dr. Gurrea's declaration, Defendants claim that platforms are "economically incentivized to moderate content on their platforms." Doc. 266, at 5-9. This is unconvincing. Dr. Gurrea argues that social-media platforms have an economic incentive to engage in content-moderation of some *unspecified* amount of "low quality" content, and therefore (he argues) the platforms would have moderated *all the content* that federal officials flagged or demanded anyway, because of "economic incentives." Doc. 266-2, at 42-43, ¶¶ 79-81. This does not follow.

First, no one disputes that social-media platforms have an economic incentive to engage in *some* level of content moderation. But Dr. Gurrea never provides any convincing reason to conclude that economic incentives would have caused the specific content-moderation decisions flagged, demanded, or urged by federal officials in this case. *See id.* This omission is not surprising, because Dr. Gurrea evidently did not review the discovery produced by Defendants in this case. His Exhibit 2 lists the 111 items he reviewed, and it does not include the factual discovery produced by Defendants. *See id.* at 62-71. Dr. Gurrea is thus in no position to opine

that platforms were independently going to moderate all the content that federal officials demanded—he has not reviewed the relevant factual evidence. *See Young v. Brand Scaffold Servs.*, LLC, 2009 WL 4674053 (E.D. Texas 2009) (excluding the opinion of an economic expert because he did not "use any facts or data reflective of" the actual issue an "not sufficiently tied to the facts or supported by other evidence in the record"). As in *Young*, "[h]ere, the gap is an abyss."

Plaintiffs' evidence abounds in examples where it is obvious that platforms would not have moderated content unless federal officials had pressured, colluded, coerced, or tricked them. To list just 19 examples (there are many others):

- Facebook's emails with the White House make clear that it deboosted and suppressed Tucker Carlson's and Tomi Lahren's videos in response to White House demands, *see* Doc. 214-1, ¶¶ 81-82, 93-97, 100;
- Twitter removed a doctored video of Jill Biden, despite concluding that it did not violate its terms of service, after Flaherty accused them of "Calvinball," *id.* ¶¶ 180-187;
- Nick Clegg stated that Facebook would acquiesce to particular White House demands for greater censorship, such as moderating non-English vaccine "misinformation," ending group recommendations for anti-vaccine groups, *id.* ¶¶ 118-121;
- Facebook deplatformed the Disinformation Dozen in direct response to White House pressure, after insisting for months that they did not violate the terms of service, *id.* ¶ 170;
- Twitter suspended Alex Berenson immediately after public pressure on platforms from the White House in July 2021, after declining to so since April 2021, *id.* ¶¶ 103-104, 163, 171;
- Facebook advises Flaherty that they "remove claims public health authorities tell us have been debunked," *id.* ¶ 46;
- Facebook promises to censor speech about vaccines for children at the White House's request, *id.* ¶¶ 198-199;
- YouTube updated Dr. Murthy on new and additional censorship actions that YouTube took as a result of the Surgeon General's Health Advisory, *id.* ¶¶ 280;
- Facebook updated Dr. Murthy on new and additional censorship actions that Facebook took, *id.* ¶¶ 281-282;
- Nick Clegg provided lengthy updates to the Surgeon General's office of additional actions taken to implement "what the White House expects of us on misinformation going forward," *id.* ¶ 349, including censorship of new claims, new enforcement policies, and additional steps against accounts associated with the "Disinformation Dozen," *id.* ¶¶ 354-358, 371, 374-376;
- Nick Clegg provides lists of Facebook's extensive additional censorship actions as a result of Facebook's reaction to White House and OSG pressure that "we hear your call for us to do more," *id.* ¶ 358;
- The CDC noted that Facebook removed all posts flagged in a previous week's "slide deck," *id.* ¶ 470;

- Social-media platforms repeatedly engaged in censorship of content disfavored by Dr. Fauci immediately after Dr. Fauci's public attacks on that content, *id.* ¶¶ 742-745, 771, 801-803;
- Brian Scully admits that "switchboarding" and other flagging by federal officials causes censorship that would not otherwise have occurred: "if it hadn't been brought to their attention then they obviously wouldn't have moderated it." *Id.* ¶ 974;
- Exchanges of "switchboarding" emails repeatedly confirm that platforms took actions in response to flagging communications by federal officials and others, *see, e.g., id.* ¶¶ 1068, 1076, 1081, 1082, 1101, 1104, 1187, 1212;
- The FBI induced the social-media censorship of the Hunter Biden laptop story by pushing the platforms to adopt censorship policies to remove "hacked materials" and then repeatedly providing deceptive warnings to the platforms about an expected "hack and leak" operation without any investigative basis, *id.* ¶ 880-904;
- Elvis Chan claims that the FBI has a "50 percent success rate" in getting reported content taken down or censored by platforms, *id.* ¶ 928;
- Elvis Chan concludes that pressure from federal officials resulted in a dramatic expansion of censorship of election-related speech from 2017 onward, *id.* ¶¶ 946-958;
- The Election Integrity Partnership's founders boast that they successfully pushed platforms to adopt new, more restrictive content-moderation policies for election-related speech in 2020, and then successfully pushed the platforms to enforce those policies against domestic speakers and content, *id.* ¶¶ 1148-1149;
- The Election Integrity Partnership also claims a high censorship success rate, stating that "the four major platforms we worked with all had high response rates to our tickets" and "took action on 35% of URLs that we reported to them," *id.* ¶ 1187.

By contrast, Defendants cite no specific evidence to show that any particular act of censorship or suppression sought by federal officials would have happened anyway.

Likewise, Defendants' own witnesses directly contradict Dr. Gurrea's conclusion. For example, based solely on the companies' public statements, Dr. Gurrea contends that platforms began censoring election-related content in 2018 solely because of economic incentives. But Elvis Chan testifies the opposite. Doc. 214-1, ¶¶ 946-958. This conclusion, unlike Dr. Gurrea's, is based on Chan's direct participation in meetings between federal officials and social-media platforms, and direct conversations with platform employees who admitted that federal officials were putting "a lot of pressure" on them. *Id.* ¶ 956. Likewise, federal officials repeatedly claim that "economic incentives" alone do *not* induce platforms to censor enough disfavored speech. *See, e.g., id.* ¶ 10 (Rep. Doyle threatening adverse legislation because "[i]is now painfully clear

that neither the market nor public pressure will force these social media companies to take the aggressive action they need to take to eliminate disinformation and extremism from their platforms"). Defendants' own evidence reinforces this theme. *See* Doc. 266-2, at 114 (Rep. Cori Bush stating that "Twitter's top priority seems to be to maximize its profit," such that calls for greater censorship "were consistently steamrolled by executives pursuing profit").

Similarly, a main theme of the Surgeon General's Health Advisory is that platforms lack sufficient economic incentives to censor the speech that the Surgeon General disfavors. *See id.* ¶¶ 297-300. President Biden himself contradicts Dr. Gurrea's analysis, publicly claiming that platforms do not have sufficient economic incentive to censor disfavored speech: "these companies are making money by ped[dling] lies and allowing misinformation that can kill their own customers and their own supporters." *Id.* ¶ 28.

Further, Defendants admit that "*[d]emands for action from Congress ... had a profound impact on behavior of social media companies*," and that "Congressional committees … repeatedly called social media executives to testify in public hearings about what had gone wrong on their platforms in 2016, and how the companies would adjust their policies." Doc. 266, at 10 ¶ 7 (emphasis added). As a result, "Twitter understood that *it was being told* in no uncertain terms, by the public and *by Congress*, that it had a responsibility to do a better job protecting future elections." *Id.* ¶ 8 (cleaned up). Even Defendants don't think "economic incentives" did the trick.

So does the testimony of Elvis Chan and the public statements of Alex Stamos and the Virality Project – among others. Chan testified—based on personal observation and conversations with both the congressional staffers and platform officials involved—that "pressure from Congress, specifically HPSCI and SSCI," including *threats of adverse legislative action*, induced platforms to censor election-related speech after 2016. Doc. 214-1, ¶ 946. As Defendants admit

here, Chan testified that this pressure involved public pressure as "the CEOs for the companies"

were called "to testify in front of their committees," including "Mark Zuckerberg and Jack Dorsey

and Sundar Pichai." *Id.* ¶ 947.  It also involved secret meetings in which high-level congressional

staffers flew to Silicon Valley and threatened platforms with adverse legislation if they did not

increase censorship. *Id.* ¶¶ 950-958.  According to Chan, these threatening meetings "put a lot of

pressure on" the platforms to censor more speech.  *Id.* ¶ 956 (quoting Chan Dep. 122:18-25).  Chan

specifically testified that federal pressure *caused* policies to increase censorship of election-related

speech, admitting that "that kind of scrutiny and public pressure from Congress … motivated them

to be more aggressive in the account takedowns." *Id.* ¶ 947 (quoting Chan Dep. 117:7-14).  Chan

testified that "intense pressure from U.S. lawmakers and the media … eventually forced the social

media companies to examine what had taken place on their platforms in 2016 and strive to ensure

that it did not happen in the future."  *Id.* ¶ 958 (quoting Chan Dep. 127:3-23; Chan Ex. 1, at 42).

Defendants argue that Chan's testimony is based on mere personal opinion, but in fact,

Chan personally observed these events take place, directly participated in many meetings between

platforms and federal officials, and discussed these meetings with participants on both sides in

real-time. *See id.*  As a result, when CISA stood up its "switchboarding" activities in 2020, it was

not writing on a blank slate – platforms had been subjected to years of federal-government pressure

to cooperate in such activities, including with the FBI, since 2017. *Id.*  ¶¶ 949, 955.

Alex Stamos, likewise, attributes the platforms' willingness to increase censorship to the

"huge potential regulatory impact" that the platforms face from the government in the United

States.  Doc. 214-1, ¶ 1234.  He states that "pushing the platforms to do stuff" is possible here

because "they will always be more responsive in the places that … have *huge potential regulatory*

*impact*, most notably right now that would be the United States…." *Id.*  The Virality Project

emphasizes that government pressure induced platforms to censor vaccine-related speech, even before COVID-19.  *See* Scully Ex. 2, at 21 (14) (noting that "[p]latforms … started adapting their policies to address vaccine misinformation in 2019, spurred by public outcry, negative press coverage, and *government inquiries*").

When asked on July 16, 2021, whether Facebook's removal of 18 million pieces of COVID misinformation was enough, Jennifer Psaki answered, "Clearly not, because we're talking about additional steps that should be taken."  Doc. 214-1, ¶ 162.  Likewise, responding to the White House's and Surgeon General's joint pressure campaign, Nick Clegg of Facebook responded: "We hear your call for us to do more."  *Id.* ¶ 358.  Clearly, the White House and other Defendants do not believe that "economic incentives" provide enough reason for platforms to censor all the disfavored speech they wish to remove.[1]

Thus, no one—not even the Government itself—actually believes Dr. Gurrea's theory. Most notably, none of the *Defendants* who pressure, deceive, badger, collude, and threaten social-media platforms to censor disfavored viewpoints believe that platforms would do so anyway.

    **B.    Federal officials pressured platforms to censor "borderline content."**

Defendants' discussion of so-called "borderline" content, Doc. 266, at 15-19, ¶¶ 15-20, reinforces the platforms' vulnerability to federal pressure.  Defendants claim that platforms already engage in censorship of borderline content—content that does not violate policies but raises concerns—by deboosting it, to limit the "low quality" content on their sites.  But, once again, the fact that platforms deboost *some* "borderline" content does not prove that they deboost all the

---

[1] The fact that social-media platforms respond to "economic incentives" is part of what makes them susceptible to federal pressure.  *See, e.g.,* Doc. 214-1, ¶ 272 (noting that Eric Waldo admitted that the White House and Surgeon General's public pressure campaign placed economic pressure on Facebook, and that the company was engaging with Dr. Murthy to "keep Dr. Murthy from saying … any other things that might be viewed as bad for their business").

"borderline" content that federal officials want them to—and, in fact, Rob Flaherty's emails vividly demonstrate the opposite. Doc. 174-1. Moreover, according to Defendants, quoting Mark Zuckerberg, platforms have a strong incentive *not* to moderate so-called "borderline" content, because it drives engagement, which drives advertising revenues: "when left unchecked, people will engage disproportionately with more sensationalist and provocative content. … [A]s a piece of content gets close to that line, people will engage with it more on average…." Doc. 266, at 16-17, ¶ 16. Defendants also admit that "[t]he companies' approaches to borderline content have been extensively scrutinized—and, at times, criticized—by scholars and observers, in part because of a lack of transparency." Doc. 266, at 18, ¶ 19. Thus, Defendants portray a situation at the platforms with vague policies, highly engaged content, and strong incentives *not* to moderate "borderline" content—the "perfect storm" of factors to cause federal officials to push hard for greater censorship. And that is exactly what the evidence portrays. *See infra*, Part II.

**C.    Defendants use the calls for Section 230 reform as an explicit threat.**

Defendants contend that there is nothing unlawful about their calls to repeal or reform Section 230, because they point out that "[b]ipartisan concerns about § 230 have been expressed for years." Doc. 266, at 20, ¶ 23. This argument misses the point. To call for reform of Section 230, without more, does not violate the First Amendment. What violates the First Amendment is to *threaten* Section 230 reform as a cudgel to pressure platforms to censor disfavored speech—and that is what Defendants and their political allies have done.

There is a stark contrast between the calls for reform by others that Defendants cite and their own statements about Section 230 reform (and other consequences, like antitrust scrutiny). The public statements of others about Section 230 cited by Defendants *do not involve demands for greater censorship*. For example, Defendants' Exhibit 29 is a letter from Senator John Thune to Facebook accusing Facebook of engaging in *too much* censorship. Doc. 266-3, at 278-280.

Defendants' Exhibit 30 is the transcript of a congressional hearing entitled *Stifling Free Speech:*
*Technological Censorship and the Public Discourse*. Doc. 266-3, at 282-308. Defendants' Exhibit
31 is a tweet by Donald Trump on May 29, 2020 that states, "REVOKE 230!" Doc. 266-3, at 310.
Defendants' Exhibit 32 is a tweet by then-Missouri Attorney General Eric Schmitt stating, "Get
rid of section 230 protections, treat them like common carriers, bust up #Big Tech." Doc. 266-3,
at 312. The other statements cited by Defendants are all in the same vein—they call for reform
because there is *too much* censorship on social media, not too little. *See id.* at 315 (Def. Ex. 33,
calling for Section 230 reform for "citizens … whose speech has been banned or restricted by these
platforms"); *id.* at 319 (Def. Ex. 34, calling for Section 230 reform to "foster innovation and free
speech"); *see also* Doc. 266, at 21-22 n.11 (noting Republican calls for reform to prevent
platforms' "selective censorship" of disfavored viewpoints).

These statements contrast starkly with the statements of Defendants and their allies. *See*
Doc. 214-1, ¶¶ 1-30. These statements constitute threats of Section 230 reform or antitrust
enforcement explicitly linked to demands for greater censorship. Then-Candidate Biden called for
Mark Zuckerberg to face civil liability and even criminal prosecution because Facebook
supposedly does not censor enough speech that Biden disfavors. Doc. 214-1, ¶¶ 20-22 (Biden:
Section 230 "should be revoked … because … [i]t is propagating falsehoods they know to be
false," and criminal prosecution of Mark Zuckerberg for "collusion that in fact caused harm …
That's possible. That's possible – it could happen."). Vice President Harris stated that "[w]e will
hold social media platforms responsible for the hate infiltrating their platforms … if you act as a
megaphone for misinformation …, we are going to hold you accountable…." *Id.* ¶ 22. Biden's
top technical advisor stated during the presidential transition, "it's long past time to hold the social
media companies accountable for what's published on their platforms." *Id.* ¶ 26. President Biden

stated that social-media platforms "are making money by … allowing misinformation that can kill their own customers … It's wrong…. Stop it now." *Id.* ¶ 28.  In September 2022, the White House "reiterate[d] [its] call for Congress to fundamentally reform Section 230," to prevent "hate-fueled content mobilizing users … to be amplified on large tech platforms." *Id.* ¶ 29.  On May 5, 2021, Jennifer Psaki stated that President Biden "supports … a robust anti-trust program" because "there's more that needs to be done to ensure that this type of misinformation; disinformation; damaging, sometimes life-threatening information is not going out to the American public." *Id.* ¶ 124.  Four days after President Biden said that platforms are "killing people" by failing to censor enough misinformation, the White House communications director stated that "[t]he White House is assessing whether social media platforms are legally liable for misinformation spread on their platforms. We're reviewing that, and certainly, they should be held accountable." *Id.* ¶ 164.  She then "specified the White House is examining how misinformation fits into the liability protections granted by Section 230 of the Communications Decency Act, which shields online platforms from being responsible for what is posted by third parties on their sites." *Id.* ¶ 165.  Many other threats from Defendants and their political allies communicate the same overtly threatening message. *See, e.g., id.* ¶ 6 (calling for Section 230 reform to push platforms to "police harmful content by users"), ¶ 8 (calling for Section 230 reform to prevent platforms "elevating blatantly false information to … online audiences" and "allow[ing] … misinformation and disinformation"); ¶ 9 (stating that Congress is "preparing to move forward with regulation and legislation" to "hold platforms accountable when they are used to … spread misinformation," and "[t]hey must be held accountable for allowing misinformation and disinformation to spread"); ¶ 11 (calling tech platforms a "slavetocracy … of our Nation's shameful and inhumane and most difficult dark days" because they allow "misinformation, outlandish conspiracy theories, and incendiary content");

¶ 14 (calling for anti-trust scrutiny of Facebook because "there's no competition forcing you to police your own platform" to remove "misinformation"); *see also id.* ¶¶ 4, 5, 10, 12, 15, 16. As one Member of Congress put it, threatening platforms with such adverse legal consequences to pressure them to censor disfavored viewpoints is a deliberate strategy: "Let's see what happens by just pressuring them." *Id.* ¶ 18. In fact, Defendants' evidence demonstrates that this steady drumbeat of threats from Defendants' political allies continues unabated. *See* Doc. 266-2, at 114 (Rep. Bush threatening government takeover of platforms to force greater censorship).

## III.    Defendants' Agency-Specific Statements of Facts Mischaracterize the Evidence.

Defendants offer their version of facts for specific federal agencies involved. Doc. 266, at 22-102. These statements mischaracterize the evidence.

### A.    The White House Perpetrates an Egregious Pressure Campaign.

Defendants struggle mightily to put a positive spin on the White House's unconstitutional behavior, especially in Rob Flaherty's emails. Doc. 266, at 23-40. These efforts fail.

First, Defendants suggest that censorship of COVID misinformation is necessary and appropriate to save lives during the pandemic. Doc. 266, at 23-24, ¶¶ 26-27. Defendants' implied premise—that censorship makes the public safer—is profoundly wrong. The fundamental premise of the First Amendment is that the free marketplace of ideas, not government command-and-control, is the most powerful engine for truth-seeking; thus, Americans can be trusted to reach their own conclusions about what is true and false on consequential issues. *See, e.g., Virginia v. Black*, 538 U.S. 343, 358 (2003) ("The hallmark of the protection of free speech is to allow 'free trade in ideas'—even ideas that the overwhelming majority of people might find distasteful or discomforting."). Censorship, not free speech, interferes with truth-seeking and harms the public.

In any event, the First Amendment lacks a "pandemic" exception. The Supreme Court has recognized only a tiny list of "well-defined and narrowly limited classes of speech" in "a few

limited areas" that lie outside First Amendment protection, such as "fighting words," inciting "imminent lawless action," and "true threats." *Id.* "Health misinformation" is not such a category. *Id.* Quite the contrary—the Supreme Court instructs that even false statements of fact are protected by the First Amendment. *United States v. Alvarez*, 567 U.S. 709, 717 (2012) (plurality op.). "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). "[T]he First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002) (quotations omitted). "In light of the substantial and expansive threats to free expression posed by content-based restrictions," the Supreme Court "has rejected as 'startling and dangerous' a 'free-floating test for First Amendment coverage ... [based on] an ad hoc balancing of relative social costs and benefits.'" *Alvarez*, 567 U.S. at 717 (quoting *United States v. Stevens*, 559 U.S. 460, 470 (2010)).

Defendants also wrench the evidence from context by separating its discussion of the White House's "public statements" (Doc. 266, at 23-30) from its discussions of the "private statements" (*id.* at 30-40). In fact, the "public" and "private" statements were both part of an integrated pressure campaign that succeeded in crushing the platforms' resistance to White House demands. When private pressure failed to achieve its desired results, the White House pivoted to a public pressure campaign, then followed up the public pressure with batteries of more private demands. *See, e.g.,* Doc. 214-1, ¶¶ 123-125 (Jennifer Psaki states that "there's more that need to be done to ensure that this type of misinformation … is not going out the American public," and raises the threat of a "robust anti-trust program," immediately after Facebook first refused to deplatform the "Disinformation Dozen," and Rob Flaherty follows up the next day with more demands for

16

censorship information); *id.* ¶¶ 139-165 (Flaherty attacks Facebook private, "Are you guys f**king serious?  I want an answer on what happened here and I want it today," the same day that Jennifer Psaki and Surgeon General Murthy publicly attack Facebook and other platforms at the July 15, 2021); *id.* ¶ 163 (Twitter suspends Alex Berenson "a few hours after Biden's comment" that platforms are "killing people"); *id.* ¶ 170 (Facebook deplatforms the "Disinformation Dozen" after the July 15-16 pressure campaign).

     ***The White House's Public Statements.***  Regarding the White House's public statements, Defendants argue that "Ms. Psaki and others have emphasized that, as private entities, *platforms* bear the responsibility for settling and enforcing their own policies concerning misinformation." Doc. 266, at 25, ¶ 29.  But merely acknowledging that "*platforms* bear the responsibility," *id.*, did not stop Psaki and other White House officials from illegally pressuring the platforms to exercise that responsibility to censor disfavored viewpoints.  The White House's public statements convey that (1) platforms must remove more "misinformation" reflecting viewpoints that the White House disfavors; and (2) if platforms do not do so, they could face ruinous legal consequences.

     In her May 5, 2021, press conference, Psaki directly linked the White House's demand that platforms "stop amplifying untrustworthy content, disinformation, and misinformation, especially related to COVID-19, vaccinations, and elections," and that "that there's more that needs to be done to ensure that this type of misinformation; disinformation; damaging, sometimes life-threatening information is not going out to the American public," to the threat of "a robust anti-trust program."  Doc. 214-1, ¶ 123-124.  In the July 15, 2021, press conference, Psaki identified the White House's "asks" to platforms, including that they create "a robust enforcement strategy that bridges their properties," "take faster action against harmful posts," and "move more quickly to remove harmful, violative posts."  *Id.* ¶¶ 148-152.  The next day, President Biden stated,

"They're killing people," *id.* ¶ 153, and immediately afterward, Kate Bedingfield stated that the Administration was "reviewing" Section 230 reform "and certainly [platforms] should be held accountable," and that "you heard the president speak very aggressively about this." *Id.* ¶ 167. In the April 25, 2022, press conference, Psaki called for "fundamental reforms … including reforms to Section 230 [and] antitrust reforms … and he's encouraged that there's bipartisan interest in Congress." *Id.* ¶ 194. She then linked these "concerns" to the allegation that the platforms "spread misinformation," stating that "our concerns are not new. We've long talked about and the President has long talked about his concerns about the power of social media platforms, including Twitter and others, to spread misinformation, disinformation; the need for these platforms to be held accountable." *Id.* ¶ 195. And, as Defendants helpfully note, on October 6, 2021, Psaki "reaffirmed the President's view that 'tech platforms must be held accountable for the harms that they cause' and expressed that the President 'has been a strong supporter of fundamental reforms to achieve that goal, . . . includ[ing] Section 230 reforms [and] privacy and antitrust reforms as well as more transparency.'" Doc. 266, at 28. "Ms. Psaki concluded, '[the President] looks forward to working with Congress on these bipartisan issues.'" *Id.*

With respect to the Disinformation Dozen, Defendants claim that Psaki "did not recommend removing content relating to these twelve people's accounts," but merely "made a factual statement about those accounts in support of her recommendation that platforms have strategies for … applying consistent rules across multiple platforms…." Doc. 266, at 27, ¶ 32. This is pure revisionism. In fact, what Psaki said was:

> [W]e have recommended -- proposed that they create a robust enforcement strategy that bridges their properties and provides transparency about the rules. So … there's about 12 people who are producing 65 percent of anti-vaccine misinformation on social media platforms. All of them remain active on Facebook, despite some even being banned on other platforms, including … ones that Facebook owns.

Doc. 214-1, ¶ 149.  Thus, Psaki's message was clear: The White House has "recommended" that platforms have a "robust enforcement strategy" that would prevent the "12 people who are [supposedly] producing 65 percent of anti-vaccine misinformation on social media platforms" from "remain[ing] active on Facebook, despite some even being banned on other platforms."  *Id.*  Moreover, Psaki's public statement reinforced the private demands that Andy Slavitt had made in meetings with Facebook to deplatform the "Disinformation Dozen."  *Id.* ¶¶ 121-122 (Nick Clegg email to Andy Slavitt responding to the privately voiced concern that "**12 accounts are responsible for 73% of vaccine misinformation,**" and stating that Facebook "realise[s] our position on this [*i.e.*, the Disinfo Dozen] continues to be a particular concern to you"); Doc. 214-14, at 1 (email from Rob Flaherty to Facebook stating that "12 accounts are responsible for 73% of vaccine misinformation on Facebook," and calling for "transparent, progressively severe penalties" for such accounts, and urging that "[b]ans for COVID-19 misinformation should be cross-platform").  Facebook certainly got the message—after Psaki's public statements, it took aggressive action against these twelve speakers whom the White House demanded that it deplatform.  Doc. 214-1, ¶¶ 170, 356 (email from Nick Clegg one week later, assuring the White House and OSG that "[w]e removed 17 additional Pages, Groups, and Instagram accounts tied to the disinfo dozen").

Regarding President Biden's statement that "They're killing people," Defendants argue that Biden clarified three days later—after the damage had been done—that he was referring to the Disinformation Dozen, not Facebook itself.  That contradicts what he said at the time, and no one interpreted it that way—least of all Facebook.  *See* Doc. 71-5, at 1 (July 18, 2021 text message from Nick Clegg to Dr. Murthy stating that "the FB team" was feeling "aggrieved" because "it's not great to be accused of killing people"); Doc. 214-1, ¶ 351.  In any event, Biden's July 18

"clarification" actually reinforced the White House's demand for greater censorship, as Biden stated that Facebook, "instead of taking the comment personally," should "do something about the misinformation" spread by the Dozen.  Doc. 266, at 29, ¶ 35.

Defendants argue that Bedingfield "did not threaten any legal or regulatory action against, or make any demands of, social media platforms" on July 20, 2021.  Doc. 266, at 30, ¶ 36.  The record tells a different story.  Coming just a few days after Psaki's threats at the July 15 press conference and President Biden's statement that "They're killing people," Bedingfield's July 20 comments are carefully calculated to drive home the threat: The Administration was "reviewing" Section 230 reform "and certainly [platforms] should be held accountable," and that "you heard the president speak very aggressively about this."  Doc. 214-1, ¶ 167.

**The White House's Private Communications.**  The Government's principal defense of its private emails to platforms is that they merely sought to "better understand" platform policies, without seeking any action from the platforms or to influence platforms' behavior.  Doc. 266, at 24, ¶ 27; *see also id.* at 30, ¶¶ 37, 42, 46.  Not so.  No rational reader could interpret Flaherty's emails as a mere exercise in armchair philosophy, and the platforms certainly did not do so.  They got the clear message: the White House's demand that they "do more" to censor.  As Nick Clegg stated after months of this pressure: "We hear your call for us to do more."  Doc. 214-1, ¶ 358.

The very first email the White House sent, barely two days into the Biden Administration, demanded not to "better understand," but to *remove* supposed "misinformation."  Citing a post about Hank Aaron's death after taking the COVID vaccine, Clarke Humphry wrote at 1:04 a.m. on January 23, 2021: "Wanted to flag the below tweet and am wondering if we can get moving on the process for having it removed ASAP."  Doc. 214-1, ¶ 34.  She requested ongoing monitoring and enforcement against future posts on the same topic: "And then if we can keep an eye out for

tweets that fall in this same ~genre that would be great." *Id.* Rob Flaherty's first White House email to a platform likewise demanded the immediate removal of content: "Please remove this account immediately. … Cannot stress the degree to which this needs to be resolved immediately." *Id.* ¶¶ 37-38. Twitter responded by noting that it was already being bombarded by such requests from the White House: "In a given day last week for example, we had more than four different people within the White House reaching out for issues." *Id.* ¶ 40.

Shortly thereafter, Flaherty launched his campaign of badgering, harassment, and pressure—all designed toward a single end: to push platforms (especially Facebook) to take more aggressive action against viewpoints disfavored by the White House. When Facebook reported to the White House on steps it was taking to "Combat[] Vaccine Misinformation," Flaherty responded with a barrage of questions seeking detailed information about Facebook's censorship practices, including "How are you handling things that are dubious, but not provably false?" *Id.* ¶¶ 42-43. Like all subsequent questions, the tenor of these questions was not merely to "better understand" Facebook's practices, but to scrutinize and pressure them to take more aggressive action. Flaherty drove this point home by accusing Facebook of fomenting "political violence" by not censoring enough speech: "especially given the Journal's reporting on your internal work on political violence spurred by Facebook groups, I am also curious about the new rules as part of the 'overhaul.'" *Id.* ¶ 44. Facebook, again, got the message—its response explained to Flaherty that it was removing content that the White House disfavored, and it promised to begin "enforcing this new policy immediately." *Id.* ¶ 45.

That exchange is typical of a long series of such exchanges between Flaherty and platforms. In each case, Flaherty badgers the platforms for more detailed information about why they are not taking *more* steps and *more* aggressive action against disfavored speech, and the platforms respond

by assuring him and other White House officials that they *will* do more and censor more disfavored speech. *See, e.g., id.* ¶¶ 50, 51 (Twitter: "As we discussed, we are building on our continued efforts to remove the most harmful COVID-19 misleading information from the service…."); ¶ 52 (Facebook: "We've expanded penalties for individual Facebook accounts that share misinformation."); ¶ 57 (demanding more information on how Facebook is censoring "borderline" content); ¶ 58 (advising Facebook that the White House was demanding information because "[w]e are gravely concerned that your service is one of the top drivers of vaccine hesitancy- period.");

¶ 67 (long series of questions from Flaherty to Facebook about how to reduce "sensational" and "skeptical" content that is truthful); ¶ 68 (long series of questions about how Facebook is censoring misinformation on WhatsApp); ¶ 72 (badgering Facebook for more information about censorship on the private messaging app WhatsApp); ¶ 74 (similar); ¶ 77 (follow-up email badgering Facebook for more information about censoring COVID speech on WhatsApp); ¶ 97 (Flaherty demanding to know how Carlson's video was non-violative, even after Facebook stated that it would label and demote it); ¶ 98 (another, similar battery of questions about the Tucker Carlson and Tomi Lahren videos); ¶ 112-113 (long series of demands for information to YouTube on how they can increase censorship of "borderline" content, and requesting "bi-weekly" meetings to discuss them); ¶¶ 125-128 (barrage of demands to Facebook about borderline content, the "Disinformation Dozen," and other topics); ¶ 175 (Flaherty to YouTube on demoting "borderline" content: "I see that's your goal - what is the actual number right now?"); ¶ 191 (demanding of Facebook, "as we have long asked for, [of] how big the problem is, what solutions you're implementing, and how effective they've been").

Flaherty's barrages of questions are interspersed with abusive, sarcastic, accusatory, and unprofessional language, frequently accusing the platforms of acting in bad faith. Andy Slavitt

does the same. *See, e.g., id.* ¶ 55 ("You are hiding the ball."); ¶ 58 (accusing Facebook of "a shell game" and stating, "This would all be a lot easier if you would just be straight with us"); ¶ 60 (Slavitt accusing Facebook of "highly scrubbed party line answers…. 100% of the questions I asked have never been answered and weeks have gone by"); ¶ 67 ("the problem does not sit in 'microchips'-land"); ¶ 69 (stating that Facebook's "commitment to honest, transparent conversations … hasn't worked so far"); ¶ 77 ("Really couldn't care less about products unless they're having measurable impact. And while the product safari has been interesting…"); ¶ 93 (Slavitt to Nick Clegg, re Tucker Carlson's video: "Number one of Facebook. Sigh. Big reveal call with FB and WH today. No progress since we spoke. Sigh."); ¶ 99 (Flaherty to Facebook, two days after sending an email with a battery of demands: "These questions weren't rhetorical."); ¶ 130 ("Hard to take any of this seriously when you're actively promoting anti-vaccine pages in Search."); ¶ 126 ("Not to sound like a broken record, but how much content is being demoted…?"); ¶ 134 ("Sure." [sarcastically]); ¶ 135 ("If you're not getting *that* right…."); ¶ 135 (accusing Facebook of giving itself "wiggle room" and concluding: "Not sure what else there is to say"); ¶ 136 ("I don't know why you guys can't figure this out."); ¶ 173 (Flaherty to YouTube: "You were pretty emphatic that you are not. This seems to indicate that you are. What is going on here?"); ¶ 178 ("not even sure what to say at this point"); ¶ 186 ("Total Calvinball.").

Flaherty accuses the platforms of fomenting insurrection by not censoring private speech. *Id.* ¶ 97 (Flaherty to Facebook, regarding its failure to completely remove Tucker Carlson's content: "Not for nothing but last time we did this dance, it ended in an insurrection."); ¶ 78 ("You only did this, however, after an election that you helped increase skepticism in, and an insurrection which was plotted, in large part, on your platform. … I want some assurances, based on data, that

you are not doing the same thing again here.").  Flaherty demands, "Are you guys f\*\*king serious?
I want an answer on what happened here and I want it today."  *Id.* ¶ 139.

Quite obviously, none of this verbal abuse is designed solely to "better understand" the
issues.  It is designed to pressure the platforms to censor speech disfavored by the White House.
Flaherty himself says this quite explicitly: "[A]t the end of the day, I care mostly about *what
actions and changes you're making* to ensure sure you're not making our country's vaccine
hesitancy problem worse."  *Id.* ¶ 77 (emphasis added); *see also id.* ¶ 103 (Twitter employees noting
that the White House posed "one really tough question about why Alex Berenson hasn't been
kicked off the platform," and that Andy Slavitt "really wanted to know about Alex Berenson"
because "he was the epicenter of disinfo that radiated outwards to the persuadable public").

To achieve this goal of pressuring the platforms to censor disfavored viewpoints, Flaherty
and Slavitt intersperse their private communications with thinly veiled threats of adverse legal
consequences—echoing the public statements of Psaki, President Biden, and Bedingfield.  *See,
e.g., id.* ¶ 61 ("Internally we have been considering our options on what to do about it."); ¶ 108
(Flaherty asking YouTube to report on how it was preventing "vaccine hesitancy" and "working
toward making the problem better," and warning: "This is a concern that is shared at the highest
(and I mean highest) levels of the WH"); ¶¶ 114-115 (Flaherty sending Facebook a
"Misinformation Brief" calling for "progressively severe penalties," "comprehensive
enforcement," and "cross-platform" bans, and stating, "spirit of transparency – this is circulating
around the building and informing thinking").

Flaherty and other White House officials also demand the censorship of specific speakers
and content, such as posts about Hank Aaron's death, videos of Tucker Carlson and Tomi Lahren,
Alex Berenson, the "Disinformation Dozen," and many others.  *See, e.g., id.* ¶¶ 180-187

24

(demanding the censorship of a comedic video of Jill Biden reading to schoolchildren); ¶ 81 ("[I]f 'reduction' means 'pumping our most vaccine hesitant audience with tucker Carlson saying it doesn't work' then ... I'm not sure it's reduction!"); ¶ 85 (requesting "a 24 hour report-back" to see if "the news about J&J" would "spin off misinformation").

The *platforms* clearly understand that the White House is not engaging in a mere academic exercise to "better understand" misinformation, but demanding that they increase censorship of disfavored viewpoints. They repeatedly respond by assuring the White House that they will, in fact, ratchet up their censorship efforts against COVID "misinformation" on their platforms. *See, e.g., id.* ¶ 64 (in response to the White House "ask[ing] about our levers for reducing virality of vaccine hesitancy content," Facebook assuring Flaherty that "[i]n addition to policies previously discussed, these include the additional changes that were approved late last week and that we'll be implementing over the coming weeks"); *id.* (Facebook assuring the White House that it was taking steps to "reduc[e] the virality of content discouraging vaccines that does not contain actionable misinformation. This is often-true content … but it can be framed as sensation, alarmist, or shocking. We'll remove these Groups, Pages, and Accounts when they are disproportionately promoting this sensationalized content…"); *id.* ¶ 65 (assuring the White House that Facebook was limiting message forwards on the private messaging app WhatsApp to reduce the spread of disfavored messages); *id.* ¶ 86-87 (Facebook giving a detailed report on censorship in response to oral inquiries from Courtney Rowe); *id.* ¶ 88-89 (Facebook assuring the White House it will censor truthful, non-violative content such as "discussing the choice to vaccinate in terms of personal or civil liberties," "true but shocking claims or personal anecdotes," and "concerns related to mistrust in institutions," by using "a spectrum of levers"); *id.* ¶¶ 93-94 (Nick Clegg responding to Andy Slavitt within hours to assure him that, while Tucker Carlson's content was non-violative,

Facebook would label and demote the content); *id.* ¶ 100 (Facebook assuring the White House, in response to their demands about Tucker Carlson's content, that it "will continue to be demoted even though it was not ultimately fact checked"); *id.* ¶ 104 (Twitter suspended Alex Berenson immediately after the President said, "They're killing people"); *id.* ¶¶ 118-121 (Facebook stating that it would follow White House recommendations to censor non-English-language COVID speech, to increase steps to censor content that leads to vaccine hesitancy, to "monitor events that host … COVID disinformation," and to "continue to review" the accounts of the "Disinformation Dozen"); ¶ 131 (Facebook responding, "both of the accounts featured in the tweet [flagged by Flaherty] have been removed from Instagram entirely"); ¶ 132 (Facebook assuring Flaherty it would increase the removal of "accounts on Instagram that discourage vaccines"); ¶ 137 (Facebook assuring the White House that "[w]e're expanding penalties for individual Facebook accounts that share misinformation."); ¶ 177 (YouTube assuring Flaherty that it will "limit the visibility" and "reduce the spread" of "borderline content").

This pressure campaign reached its apogee on July 15-16, 2021, with the "triple punch" of Psaki, Dr. Murthy, and President Biden putting maximal pressure on platforms to censor disfavored viewpoints. Facebook responded by desperately scrambling to assure the White House and OSG that it would censor virtually any piece of COVID speech the White House wanted. Other platforms likewise ramped up censorship of disfavored viewpoints to appease the White House. Facebook immediately deplatformed the "Disinformation Dozen." *Id.* ¶ 170. Twitter suspended Alex Berenson. *Id.* ¶ 171. Nick Clegg assured the Surgeon General that Facebook was "keen to find a way to deescalate and work together collaboratively." *Id.* ¶ 351. Facebook met with the White House and Surgeon General's Office to learn "what the White House expects of us on misinformation going forward." *Id.* ¶ 349. One week after the President's remarks, Clegg

emailed to ensure that the White House and OSG "saw the steps we took just this past week to adjust policies on what we are removing with respect to misinformation as well as steps taken to further address the 'disinfo dozen.'" *Id.* ¶ 354.  Facebook reported to the Government that it "removed 17 additional Pages, Groups, and Instagram accounts tied to the disinfo dozen (so a total of 39 Profiles, Pages, Groups, and IG accounts deleted thus far, resulting in every member of the disinfo dozen having had at least one such entity removed)." *Id.* ¶ 356.  Facebook also "expanded the group of false claims that we remove, to keep up with recent trends of misinformation that we are seeing." *Id.* ¶ 357.  Clegg promised that this was only the beginning of its efforts to remove more COVID "misinformation" at the White House's behest: "We hear your call for us to do more and, as I said on the call, we're committed to working toward our shared goal," and "we will strive to do all we can to meet our shared goals." *Id.* ¶¶ 358, 361.  OSG responded to Facebook by demanding a specific report in two weeks on "any new/additional steps you are taking with respect to health misinformation." *Id.* ¶ 364.  Two weeks later, Facebook provided a detailed report of its "further policy work to enable stronger action against persistent distributors of vaccine misinformation." *Id.* ¶ 374.  Among other things, Facebook reported to the Government that it was "expanding our COVID policies to further reduce the spread of potentially harmful content"; "increasing the strength of our demotions for COVID and vaccine-related content that third-party fact-checkers rate as 'Partly False' or 'Missing Context'"; "making it easier to have Pages/Groups/Accounts demoted for sharing COVID and vaccine-related misinformation"; and "strengthening our existing demotion penalties for websites that are repeatedly fact-checked for COVID or vaccine misinformation content shared on our platform." *Id.* ¶ 375.  Clegg also included a report of additional actions taken against the "Disinformation Dozen." *Id.*  Thereafter, Facebook

and other platforms provided frequent reports to the White House and OSG on additional steps they were taking to censor disfavored viewpoints. *See, e.g., id.* ¶¶ 379, 381, 395, 398.

Defendants' other arguments fare no better. First, Defendants claim that "[t]he record does not show a single instance in which these individuals threatened legal or regulatory action against companies that chose not to heed the Administration's calls to address the COVID-19 misinformation circulating on their platforms." Doc. 266, at 24. This is incorrect. The record shows both public threats from Psaki, Bedingfield, and President Biden; and thinly veiled private threats from Flaherty and Slavitt; and numerous threats from the President's political allies. *See supra*. Defendants argue that the record does not "show that White House officials demanded that the companies change their content moderation policies or take action (regardless of existing policies) to address particular content that they view as potentially harmful COVID-19 misinformation." *Id.* at 24. Again, this is false. The record shows White House officials aggressively pressuring platforms to change their policies and enforcement practices to target and remove disfavored speech, and it shows repeated attempts by the White House to pressure platforms to remove specific disfavored content, accounts, and speakers—such as Alex Berenson, Tucker Carlson and Tomi Lahren, the Disinformation Dozen, the comedic video of Jill Biden, etc.

Defendants argue that Flaherty sought to know "what the Government could do to *assist* social media companies in their efforts to address the spread of misinformation on their platforms." Doc. 266, at 30. That statement virtually admits guilt, as the White House has no business "assisting" private media companies in censoring viewpoints disfavored by the White House. Yet that is what the White House did. *See, e.g.,* Doc. 214-1, ¶ 102 (White House calendar invite to Twitter for Twitter to brief "on vaccine misinfo," including "the tangible effects of recent policy changes, what interventions are currently being implemented in addition to previous policy

changes, and ways the White House (and our COVID experts) can partner in product work"); ¶ 105 (White House meeting with YouTube on "vaccine misinformation" to discuss "the empirical effects of YouTube's efforts to combat misinfo, what interventions YouTube is currently trying, and ways the White House (and or COVID experts) can partner in product work").

Defendants admit that "White House officials did flag some content—mainly, imposter accounts—for social media companies." Doc. 266, at 31. The phrase set off by dashes is woefully misleading. The content the White House flagged was *not* "mainly, imposter accounts"—the White House deliberately flagged the speakers and content that it thought were the *most influential and persuasive voices* expressing viewpoints the White House disfavored. They included Alex Berenson, whom the White House viewed as "the epicenter of disinfo that radiated outwards to the persuadable public," Doc. 214-1, ¶ 103; the top-rated cable news host (and sharp Biden Administration critic) Tucker Carlson, whose content was then the most-viewed post on Facebook that day, *id.* ¶¶ 81, 93-100; another extremely popular cable news host, particularly influential among young people, Tomi Lahren, *id.* ¶ 81; Robert F. Kennedy, Jr., one of the most influential anti-vaccine voices in the nation, *id.* ¶ 34; the "Disinformation Dozen," whom the White House believed were responsible for "73% of vaccine misinformation" on Facebook, *id.* ¶ 121. And what Defendants treat as "imposter accounts" include political parody and satire lampooning the President and his family, *i.e.*, core political speech mocking the heads of government—such as a comedic video of Jill Biden receiving profane heckling while reading to schoolchildren. *See* Doc. 266, at 37, ¶ 49 (including "a doctored video of the First Lady" as an "imposter account").

Defendants argue that "on one occasion when Mr. Flaherty shared specific proposals with Facebook," he "emphasized that the White House was *not* asking Facebook to adopt those recommendations." Doc. 266, at 36 ¶ 47 (discussing Doc. 214-14). In fact, in that email, Flaherty

ominously hinted that the White House could impose *greater* requirements on Facebook than the "specific proposals" he shared. *See* Doc. 214-14. He stated: "Here is the crux of their recs. Don't read this as White House endorsement of these suggestions (*or, also, as the upper bound of what our thoughts on this may be*). But – spirit of transparency – this is circulating around the building informing thinking." *Id.* at 1 (emphasis added). The "recs" included aggressive demands for the censorship of disfavored viewpoints, including express prior restraints for disfavored speakers, monitoring private events "hosting anti-vaccine and COVID disinformation," censoring non-English vaccine speech, censoring the Disinformation Dozen, and imposing "progressively severe penalties" and "comprehensive enforcement for pages, accounts, and groups." *Id.* at 1-2.

Finally, the Government argues that the White House's censorship of COVID speech is old news, and that "[s]ince the start of 2023, the landscape of White House COVID-19 efforts has changed dramatically." Doc. 266, at 39, ¶ 53. Once again, the evidence tells a different story. On the topic of COVID speech, the White House continued to demand ongoing reports from Facebook on "misinformation" on its platforms throughout 2022. *See* Doc. 214-1, ¶¶ 198-199. During June 2022, Flaherty demanded that Facebook continue providing bi-weekly "COVID-19 insights reports" about "misinformation" on its platforms, so that the White House could monitor Facebook's censorship of speech about early childhood vaccines (age 6 months to 5 years). *Id.* Facebook got the message, continued to provide the reports, and assured the White House that it would expand its censorship to include speech expressing doubt about early-childhood COVID vaccines—a highly controversial topic. *Id.*

Moreover, the White House's public statements demonstrate that it is expanding its frontiers to include whole new topics of social-media censorship, such as climate change, "gendered disinformation," abortion, and economic policy. *Id.* ¶¶ 200-211. The White House

Climate Advisor publicly demands that "the tech companies have to stop allowing specific individuals over and over again to spread disinformation," because "misinformation and disinfo around climate" is "a threat to public health itself." *Id.* ¶ 202. She ties this demand to the threat of legislation to "hold companies accountable." *Id.* ¶ 203. The White House creates a task force to address "gendered disinformation" and "disinformation campaigns targeting women and LGBTQI+ individuals who are public and political figures, government and civic leaders, activists, and journalists." *Id.* ¶ 204-206. The task force carries the threat of regulation against platforms; it must submit "periodic recommendations to the President on policies, regulatory actions, and legislation on technology sector accountability to address … online harassment and abuse." *Id.* ¶ 207. The White House employs the same tactics it employed for COVID speech on other topics.

**B.      The Surgeon General's Office Joins the White House Pressure Campaign.**

The Government's discussion of facts regarding the Surgeon General's Office, Doc. 266, at 41-51, distorts the facts and ignores highly probative evidence.

***OSG coordinates closely with the White House.*** First, the Government treats the Surgeon General's activities as if they were conducted in isolation from the White House's pressure campaign, *see id.*, but that is incorrect. Dr. Murthy met jointly with Andy Slavitt of the White House and Nick Clegg of Facebook. Doc. 214-1, ¶ 253. Three days after this meeting, Facebook announced "policy updates" to "expand penalties for individual Facebook accounts that share misinformation." *Id.* ¶ 281. Dr. Murthy and Waldo also met jointly with DJ Patil of the White House and Nick Clegg of Facebook to respond to the Health Advisory. *Id.* ¶ 259. Eric Waldo was routinely included on emails and calls with Rob Flaherty and social-media platforms. *Id.* ¶ 246. Waldo communicated directly with Flaherty "before" speaking with Facebook. *Id.* The Surgeon General launched the Health Advisory in a joint press conference with the White House. *Id.* ¶ 293. OSG connected Facebook with DJ Patil of the White House to discuss giving researchers access

31

to Facebook's internal data on misinformation. *Id.* ¶ 365.  Flaherty connected Dr. Murthy with Jiore Craig, an anti-disinformation operative from the DNC. *Id.* ¶ 369.

Facebook certainly understood that OSG and the White House were working in tandem, because Nick Clegg met with Dr. Murthy to "better understand the scope of what the *White House* expects of us on misinformation going forward." *Id.* ¶ 349 (emphasis added).  When the White House said, "They're killing people," Clegg reached out to the *Surgeon General* to "find a way to deescalate and work together collaboratively." *Id.* ¶ 351.  Following the pressure from Psaki and Biden, Facebook reported to Dr. Murthy and OSG on the additional steps it was taking to censor disfavored viewpoints—such as "adjust[ing] policies" to remove "misinformation," "steps taken to further address the 'disinfo dozen,'" "expand[ing] the group of false claims we remove." *Id.* ¶¶ 354-357.  Clegg also told Dr. Murthy, referring to the White House, "[w]e hear your call for us to do more and … we're committed to working toward our shared goal of helping America get on top of this pandemic." *Id.* ¶ 358.

OSG and White House personnel are routinely included on the same email threads, jointly communicating with platforms about misinformation. *See, e.g., id.* ¶ 370 (Facebook jointly reporting to OSG and White House on additional steps taken against the "Disinformation Dozen"); ¶ 375 (lengthy report from Facebook to both White House and OSG on additional steps taken to increase censorship after the Advisory and the President's comments); *see also id.* ¶¶ 379, 380, 382 (Flaherty copying Waldo while asking platforms to report on plans to censor "misinformation" on childhood vaccines), 391, 395, 421, 424-425.

**The Surgeon General demands specific censorship actions.**  Next, the Government claims that "OSG … has not demanded particular actions from the companies…"  Doc. 266, at 41.  On the contrary, OSG has repeatedly done so, both in public and in private.  First, the Surgeon

General's Health Advisory demands a long series of "particular actions" on censorship from the platforms. The Advisory, and the public attention associated with it, placed economic pressure on the platforms to comply with these demands. Doc. 214-1, ¶ 272. In announcing the Advisory, Dr. Murthy described disfavored viewpoints as "an imminent and insidious threat to our nation's health," *id.* ¶ 294; stated that it "cost[s] us lives," *id.* ¶ 296; and that social-media platforms "poison our information environment," *id.* ¶ 297. He stated, "we expect more from our technology companies. … We're asking them to monitor misinformation more closely. *We're asking them to consistently take action against misinformation super-spreaders on their platforms*." *Id.* ¶ 300 (emphasis added). He stated that "much, much more has to be done" by platforms, "and we can't wait longer for them to take aggressive action because it's costing people their lives." *Id.* ¶ 307.

Having publicly accused platforms of "cost[ing] lives," the Advisory makes a long series of specific demands. It calls misinformation "a serious threat to public health" and states that platforms have a "moral and civic imperative" to stop the spread of misinformation. *Id.* ¶ 319. It blames social-media platforms and their "product features" and "algorithms" for the spread of misinformation. *Id.* ¶¶ 321-323. It calls on platforms to take a series of specific actions, including: "Implement product design and policy changes on technology platforms to slow the spread of misinformation." ¶ 324; "Build in 'frictions' … to reduce the sharing of misinformation," ¶ 326; "[A]ddress misinformation in live streams, which are more difficult to moderate due to their temporary nature and use of audio and video," *id.*; "Prioritize early detection of misinformation 'super-spreaders' and repeat offenders," *id.*; and "Impose clear consequences for accounts that repeatedly violate platform policies," *id.*

The Health Advisory also explicitly threatens regulation and legislation of platforms. It calls for "federal, state, local, territorial, tribal, private, nonprofit, and research partners" to devise

"appropriate *legal and regulatory measures* that address health misinformation." *Id.* ¶ 325 (emphasis added). Dr. Murthy's repeated use of the word "accountable" and "accountability" to apply to platforms carries with it an implied threat of adverse consequences. *Id.* ¶ 302. As Eric Waldo concedes, the word "accountable" carries a threat of legal consequences, because "accountability includes accepting the consequences for when you do something wrong." *Id.*

In private, OSG asked major platforms to report back on what "new" and "additional" steps they were taking to censor disfavored viewpoints in light of the Advisory. Dr. Murthy himself asked Nick Clegg of Facebook to do so: "on the call with Dr. Murthy he'd mentioned seeing if you were able to send an update of any new/additional steps you are taking with respect to health misinformation in light of the advisory." Doc. 214-1, ¶ 364. In fact, Waldo noted, "we are asking all platforms for this type of update," and requested a report within two weeks. *Id.* These requests went to "Facebook, Twitter, Instagram, and YouTube, and Google." *Id.* ¶ 368.

The platforms responded. Two weeks later, Facebook provided a long list of *new* actions taken to crack down on "misinformation." *Id.* ¶¶ 373-376. This included five bullet points and four sub-bullet points listing specific new policies and enforcement actions, as well as detailed new actions taken against the "Disinformation Dozen." *Id.* ¶ 375; *see also id.* ¶ 381 (Google emailing Waldo to report new actions taken against "misinformation"). Facebook also provided a detailed report to OSG and the White House on its policies and actions taken against "misinformation" on childhood vaccines. *Id.* ¶ 395. Facebook continued to report back to OSG on censorship until Defendants produced OSG's documents. *See id.* ¶¶ 424-425.

The Surgeon General constantly reinforced his public message pressuring platforms to comply with his demands. On October 29, 2021, Dr. Murthy issued a series of tweets stating that "tech platforms have a responsibility to improve our health information ecosystem," that "[w]hat

continues to be lacking from Facebook and other tech companies is transparency and accountability," and that "[w]e must *demand* Facebook and the rest of the social media ecosystem take responsibility for stopping health misinformation on their platforms. The time for excuses and half measures is long past. We need transparency and accountability now. The health of our country is at stake." *Id.* ¶ 387 (emphasis added).

>    ***The Surgeon General threatens regulation if platforms do not comply.*** The Government contends that the Surgeon General did not threaten platforms with adverse legal consequences. Doc. 266, at 43, ¶ 59. This is not correct. As noted above, the Health Advisory explicitly raises the threat of future regulation. In the ensuing months, the Surgeon General reinforced this threat, culminating in the March 3, 2022 Request for Information (RFI).

>    After the Advisory, Dr. Murthy's public statements in 2022 continued to call for platforms to take "aggressive action against people who are intentionally spreading misinformation," *id.* ¶ 401, and to "go after people who are superspreaders of misinformation on these sites." *Id.* ¶ 407. Dr. Murthy's public statements in 2022, leading up to the RFI, called for the Government to "set safety standards" for social-media speech, stating that "there's a role for government here to set safety standards," and that "[t]here are steps we are working on now" in that area. *Id.* ¶ 410.

>    Shortly thereafter, Dr. Murthy issued the formal Request for Information. *Id.* ¶ 411. The RFI seeks detailed information from "technology platforms" about their censorship policies and how they are enforced. *Id.* ¶ 415. It also seeks detailed information about disfavored speakers on social media, demanding "[i]nformation about sources of COVID–19 misinformation," including "[i]nformation about the major sources of COVID–19 misinformation associated with exposure," where "source" refers to speakers on platforms, *i.e.*, "specific, public actors that are providing misinformation." *Id.* ¶ 416. The OSG sent a pointed letter signed by Dr. Murthy to at least seven

major social-media platforms requesting that they submit information to the RFI. *Id.* ¶¶ 419-420.

Shortly after the RFI, Dr. Murthy reinforced his reference to the government setting "safety standards" for online speech by describing the issue in terms of "speed limits," *i.e.*, *government-*issued safety standards: "We have speed limits on the road because we know that sometimes if you drive too fast, that can have an impact on somebody else's health and wellbeing. … That's true here as well." *Id.* ¶ 423. Dr. Murthy's message was clear: The RFI is a precursor to "safety standards" or "speed limits" for social-media speech.

   ***The Surgeon General collaborates with the Virality Project.*** The Government contends "OSG was not—and is not—involved in a coalition of researchers known as the 'Virality Project.'" Doc. 266, at 41. This statement is demonstrably incorrect.

   The Virality Project touts its close relationship with the OSG. The Virality Project states that: "**Federal government agencies** served as coordinators for national efforts. The Virality Project built strong ties with several federal government agencies, most notably the *Office of the Surgeon General (OSG)* and the CDC, to facilitate bidirectional situational awareness around emerging narratives." Doc. 214-1, ¶ 1279 (bold in original, italics added). The Virality Project states that it "provided strategic insights to government entities such as the *OSG*, CDC, and the Department of Health and Human Services." *Id.* ¶ 1284 (emphasis added). Contrary to Defendants' representations, the Virality Project claims that it hosted the same-day rollout of the Surgeon General's Advisory: "Stanford Internet Observatory and the *Virality Project* also hosted Surgeon General Vivek Murthy for a seminar on vaccine mis- and disinformation, including the rollout of the Surgeon General's advisory on health misinformation." *Id.* ¶ 1285 (emphasis added). The Surgeon General's messaging echoes verbatim the Virality Project's message of demanding "transparency and accountability" from platforms on censorship, and demanding "data sharing

relationships with researchers" (such as the VP's own researchers). *Id.* ¶¶ 1247, 1248, 1251, 1293, 1353-54. The Virality Project notes that the "Office of the Surgeon General incorporated VP's research and perspectives into its own vaccine misinformation strategy," and it specifically cites the Surgeon General's Health Advisory on this point. *Id.* ¶ 1249. The Virality Project repeatedly cites the work of the Surgeon General in its report, *id.* ¶ 1359, just as the Surgeon General's Health Advisory cites the VP's work, Doc. 266, at 49, ¶ 69.

The Surgeon General's evidence confirms the close coordination between the OSG and the Virality Project. As Defendants admit, "[o]ne of the lead entities responsible for the Virality Project is the Stanford Internet Observatory." Doc. 266, at 50. Dr. Murthy launched the Health Advisory in an event at the Stanford Internet Observatory. Doc. 214-1, ¶ 330. Waldo admits that the OSG coordinated with SIO in launching the Surgeon General's Health Advisory. *Id.* ¶ 228. In Dr. Murthy's remarks, he stated that he had multiple "conversations" with the VP's lead researcher, Renee DiResta, who was "such a great partner" and would continue "being a partner in the future." *Id.* ¶ 336. He stated that the OSG had been "partnered with" the Stanford Internet Observatory "over the last many months" before the rollout of the Health Advisory. *Id.* ¶ 337.

The OSG parrots the phrasing of the Virality Project, using phrases like "all-of-society approach," Doc. 214-1, ¶ 216, and "accountable" and "accountability," *id.* ¶ 301. The OSG's repeated demand for greater data-sharing from Facebook echoes a key demand of the Virality Project. Doc. 214-1, ¶ 226. Renee DiResta of the SIO is one of the "external researcher[s]" that the OSG demanded Facebook give access to its internal data. *Id.* ¶ 228. Moreover, Kyla Fullenwider, the OSG's "subject matter expert" on disinformation, communicated directly with Renee DiResta about the Health Advisory and "misinformation." *Id.* ¶¶ 230-232. Kyla was the chief architect of both of the Surgeon General's major disinformation initiatives—the Health

Advisory and the RFI.  *Id.* ¶ 244, 412.  She was the "primary driver on the RFI from a content expert perspective."  *Id.* ¶ 412.

Defendants contend that "[t]he Virality Project has not been active since 2022."  Doc. 266, at 51, ¶ 72.  This statement is, at best, misleading.  The "Virality Project" is simply another moniker for the ongoing "Election Integrity Project," which is the same consortium of censorship entities (Stanford Internet Observatory, University of Washington's Center for an Informed Public, Graphika, and the Atlantic Council's Digital Research Lab), performing the same censorship activities, cooperating with the same partners, and using the same surveillance and censorship techniques and methods.  *See* Doc. 214-1, ¶¶ 1223, 1236.  This project continues to operate under the "EIP" moniker.  For example, in a July 31, 2022 blog post, the EIP stated that "[t]he EIP is continuing its nonpartisan and collaborative work in the 2022 election cycle."  *See* https://www.eipartnership.net/blog/about-eip-2022.  The EIP briefed Brian Scully in 2022 and indicated that "they were going to do something similar to what they did in 2020…."  Doc. 214-1, ¶ 998.  On July 27, 2022, Renee DiResta gave congressional testimony indicating that the consortium plans to continue its censorship activities into 2024 and beyond:

> Doing nothing is not an option. While the Election Integrity Partnership was intended to meet an immediate need, the conditions that necessitated its creation have not abated, and in fact may have worsened. Academia, tech platforms, civil society, and state and local election officials … must be committed to collaborative models for understanding and responding to rumors and false and misleading claims in the modern information environment.

Written Testimony of Renee DiResta, Committee on House Administration (July 27, 2022), *at* https://fsi-live.s3.us-west-1.amazonaws.com/s3fs-public/2022-07-27_elections-cha_testimony_renee_diresta.pdf.

***Defendants' other arguments lack merit.***  Defendants argue that the Surgeon General cannot threaten regulation because he "does not have independent regulatory authority."  Doc.

266, at 40, ¶ 54.  But the Surgeon General's Office is a department within HHS, which does have regulatory authority.  *Id.*  If OSG gathers information, HHS can use it to regulate.  *Id.*

Defendants rely heavily on the Declaration of Max Lesko, which they submitted for the first time in their response brief.  Doc. 266-4, at 131-138.  In a carefully phrased paragraph, Lesko denies that the OSG "direct[ed] a specific post or user be removed, suppressed, demonetized, or subject to other adverse action" or "made a specific, non-voluntary demand that a particular social-media company change its algorithms or content-moderation policies."  *Id.* at 134.  But there is overwhelming evidence that the OSG repeatedly and publicly demanded that platforms change their algorithms and content-moderation policies, and ramp up enforcement, to target disfavored viewpoints.  *See supra*.  Lesko claims that the OSG never "threatened a social media company with legal action for failure to comply with recommendations or requests from Dr. Murthy or OSG," Doc. 266-4, at 134, but the evidence cited above demonstrates a long series of explicit and implied threats.  *See supra*.  With respect to the Health Advisory rollout at Stanford Internet Observatory, Lesko stretches credulity by stating that "OSG did not understand that to be a Virality Project event," Doc. 266-4, at 136—even Defendants admit that "[o]ne of the lead entities responsible for the Virality Project is the Stanford Internet Observatory."  Doc. 266, at 50.  Suffice to say that the Virality Project said the exact opposite at the time—*i.e.*, that the "Virality Project" hosted Dr. Murthy's Advisory rollout.  Doc. 214-1, ¶ 1285.  Lesko claims that "OSG never provided any tip, flag, ticket, report, or other form of notification or input to the Virality Project concerning posts or accounts on social media."  Doc. 266-4, at 136.  But there is extensive evidence of many other forms of collusion and collaboration between OSG and the Virality Project,

including Dr. Murthy's public statement on July 15, 2021 that the OSG had been "partnered with" the Stanford Internet Observatory "over the last many months."  Doc. 214-1, ¶ 337.[2]

### C.    The CDC and Census Bureau Conspire with Platforms on Censorship.

*The CDC "proactively" flags disfavored speech for censorship.*  First, Defendants admit that the CDC "proactively alert[s] Facebook, Twitter, and YouTube about false COVID-19 claims the agency observed on the platforms that could adversely affect public health."  Doc. 266, at 52. This includes the fact that the CDC "received bi-weekly summaries (in what were called 'CrowdTangle reports') from Facebook about high-volume COVID-19 content circulating on its platform."  *Id.* at 53.  Defendants admit that the CDC repeatedly "flagged" posts for censorship to the CDC, both by identifying trending topics and providing lists of sample posts.  Doc. 266, at 59. And they admit that the "goal" of such "flagging" is to "be sure that people have credible health information," *i.e.*, to suppress the information the CDC views as non-credible.  *Id.* at 59-60.

There is overwhelming evidence of such "flagging" activity.  *See, e.g.,* Doc. 214-1, ¶¶ 459-460 (slide decks prepared by Census); ¶¶ 469-470; ¶¶ 481-483 (topics with lists of 16 sample

---

[2] Defendants (Doc. 266, at 168) dispute the New York Times report of July 16, 2021, stating that Dr. Murthy had a series of "tense" meetings with platforms beginning in January 2021 where Dr. Murthy "angrily" demanded greater censorship and accused Facebook of not "do[ing] enough to defend against bad information."  Doc. 214-1, ¶¶ 338-344.  Defendants claim that there is "*no* evidence" that Dr. Murthy met with social-media platforms prior to the first meeting disclosed in their interrogatory responses—the May 25, 2021 meeting between Nick Clegg, Dr. Murthy, and Andy Slavitt, which was supposedly just a quick introductory meeting.  Doc. 266, at 168.  Yet Nick Clegg's contemporaneous emails plainly refer to meetings with Dr. Murthy that occurred *before* the May 25, 2021 meeting—corroborating the New York Times' reporting and contradicting Defendants' interrogatory responses.  *See* Doc. 214-1, ¶ 283 (Clegg emailing Dr. Murthy on May 27, 2023, and stating that "[w]e're committed to addressing the defensive work that you've called on us to address."); *see also id.* ¶ 350 (Clegg indicating that he has "understood for some time … that there is disagreement on some of our policies").  Against this evidence, Defendants rely on Eric Waldo's statement that he is "skeptical" of the New York Times report, Doc. 266, at 168, based on Waldo's view that Dr. Murthy never "get[s] angry or even express[es] anger."  Waldo Dep. 223:20-224:2.  But Waldo was not employed by the OSG until June 20, 2021, he has no first-hand knowledge whether such meetings occurred at all.  *See* Waldo Dep. 12:5-6.

Facebook posts), ¶ 486 (BOLO meetings); ¶ 515 (BOLO email); ¶¶ 536-537 (Census slide deck to YouTube); ¶¶ 549-557 (BOLO meetings); ¶¶ 555-556 (BOLO slide decks); ¶ 565 (spreadsheet of claims flagged for Twitter); ¶ 567 (list of sample posts to Twitter); ¶¶ 568-573 (BOLO meetings with Twitter); ¶ 586 (BOLO email to Twitter).  In her supplemental declaration, Carol Crawford admits that "a CDC employee used a Facebook reporting portal to identify four Facebook and Instagram posts containing vaccine misinformation."  Doc. 266-5, at 74, ¶ 18.

Defendants argue that the flagging was innocuous because "the social media companies themselves 'made decisions about' how to handle misinformation on their platforms."  Doc. 266, at 60; *see also* Doc. 266-5, at 70.  But the mere fact of "flagging" ensures that something that was not censored may be censored—if the platforms had already censored it, there would be no need to "flag" it for them.  The officials both *intend* and *cause* the censorship.  Moreover, the CDC did not just "flag" disfavored speech—it consistently flagged and *debunked* the disfavored speech, in a manifest attempt to have it taken down.

In doing so, the CDC knew and intended that it was inducing the platforms to censor.  Doc. 214-1, ¶ 484.  Crawford admits that "[w]hat we did provide was scientific information that I did assume that they might use to do those things," *i.e.*, censor speech by removing, deboosting, or labeling it.  *Id.* ¶ 489; *see also id.* ¶ 499 (Crawford admitting that she knew Facebook would apply content-moderation policies to claims the CDC debunked); ¶ 517 (Crawford flagged posts to Facebook "understand[ing] that potentially removing posts was something they might do").  In flagging misinformation, the CDC "knew their policy teams or their trust teams or misinfo teams … would evaluate it," and "knew that removal was one of the options that they had."  *Id.* ¶ 589.

***The CDC serves as a de facto censor on specific health claims.***  "Flagging" is only one of CDC's censorship activities.  The CDC also serves as the platforms' *de facto* censor, with the

final authority dictating what health claims platforms will censor.  Defendants admit that platforms routinely submitted lists of health-related "claims" to the CDC for debunking, and that "[a]fter checking with the relevant subject-matter experts as necessary, Ms. Crawford would respond by indicating whether the claims were false and harmful, and sometimes directing the company to information available on CDC's website that directly responded to the false claim."  Doc. 266, at 57.  Once the CDC stated that a claim was "false and harmful," the platform would censor it.

Both Facebook and YouTube participated in this process with the CDC.  Again and again, Facebook emailed Crawford lists of specific claims for the CDC to debunk, making it perfectly clear that, if the CDC debunked them, they would be censored.  *See, e.g.,* Doc. 214-1, ¶ 490-494, 496-498, 511-514, 520-522, 525-528 (asking the CDC, for a long list of claims, to confirm whether "the claim is false," and "[i]f believed, could this claim contribute to vaccine refusals").  Facebook's content-moderation officer made very clear that she was asking the CDC to provide a definitive answer on the two factors that determine whether Facebook censors something: whether the claims "are false and can lead to harm."  *Id.* ¶ 501; *see also id.* ¶ 502 (Liz Lagone advising the CDC that "[w]e remove … posts on the ground that the claim is false and that it is harmful," where "harmful" includes claims that might induce vaccine hesitancy).  Crawford admits that the CDC's input would guide Facebook's decisions about what specific claims to censor.  *Id.* ¶ 502.

Google participated in this practice through oral meetings.  Defendants admit that "Google (which owns YouTube) likewise requested CDC's input on claims about COVID-19 vaccines circulating on YouTube's platform. For instance, in March 2021, Google reached out to CDC to ask if a "vaccine expert[]" from CDC could join a call where Google "'plan[ned] to share a new list of . . . vaccine misinformation claims' that the company had compiled."  Doc. 266, at 58.  Defendants admit that platforms such as Google continue to consult with the CDC to seek

justification to censor supposedly "misinformation" on other health-related topics. Doc. 266, at 58-59. This *de facto* censorship occurred in oral meetings; for example, Google emailed Crawford stating, "we plan to share a new list of common vaccine misinformation claims and would love it if [a CDC 'subject-matter expert'] or other vaccine experts could join." Doc. 214-1, ¶¶ 539; *see also id.* ¶¶ 541-542, 547-548, 559-560 (evidence of many such meetings where the CDC's experts debunked claims for Google).

Defendants argue that "[w]hen responding to Facebook, CDC did not instruct the company to remove or take any other action against posts or users promoting claims that CDC concluded were false and hazardous to public health." Doc. 266, at 57. But the whole point of these inquiries was for the platform to outsource to the CDC its decision on whether or not to censor specific health claims, and the CDC knew that and embraced the role. For example, Crawford understood, and was "happy," that the CDC's information would cause disfavored viewpoints to be censored: "I'm happy that providing the scientific information led to less spread of misinformation." Doc. 214-1, ¶ 522. Crawford admits that the CDC's input would "determine" how Facebook applied its content-moderation policy: "I know that they're using our scientific information to *determine their policy*." *Id.* ¶ 529 (emphasis added). Facebook openly stated that its decision to censor claims about childhood vaccines was "as a result of our work together" with the CDC. *Id.* ¶ 519. On the "causes harm" prong of Facebook's test for censorship, Crawford simply provided a blanket statement without any support from her "subject-matter experts": "It appears that any of these could potentially cause vaccine refusal." *Id.* ¶ 525. In 2022, Facebook notified Crawford of "updates" to its policies that Facebook made "as a result of our work together." *Id.* ¶ 526.

***The Census Bureau used the platforms' misinformation-reporting portals.*** Defendants contend that no one at the CDC much used Facebook and Twitter's misinformation-reporting

portals, Doc. 266, at 62, and they downplay the Census Bureau's involvement in the CDC's censorship activities, *id.* at 63-64.  Both claims are incorrect.  Facebook evidently gave four Census Bureau employees and contractors access to its "COVID-19 misinfo reporting channel."  *Id.* ¶ 476.  Likewise, Census contractor Christopher Lewitzke emailed Twitter to ask for access to Twitter's misinformation-reporting channel, the "Partner Support Portal," for a long list of Census employees and contractors.  *Id.* ¶ 581.  Using these portals was consistent with Census's past practices with platforms.  *Id.* ¶ 582.  The CDC also asked Facebook to give Census personnel access to CrowdTangle.  *Id.* ¶ 471.  The Census Bureau and its contractors, rather than CDC officials, were submitting reports through the special misinformation reporting portals.

*The CDC continues to engage in censorship of health-related speech.*  Defendants contend that the "CDC no longer has regular meetings with any social media company except for Google, and it has no regular or direct communications with any social media company about misinformation."  Doc. 266, at 55.  But in fact, Defendants admit that the CDC engages in ongoing activities regarding misinformation: "CDC has some occasional, indirect contact with personnel from social media or technology companies that may relate to misinformation. … CDC also funds and attends conferences that discuss misinformation and infodemic management, and personnel from social media companies may attend or speak at those conferences."  *Id.* at 56.  The CDC admits to meeting with Google about "misinformation" in March 2022, shortly before this suit was filed, without explaining nature of the meeting.  Doc. 266-5, at 72, ¶ 11.

Further, the CDC continued to engage in censorship until Defendants produced the CDC's documents.  For example, on June 29, 2022, Google emailed Crawford and sought the CDC's input to debunk and censor claims about the safety and effectiveness of administering progesterone to reverse chemical abortion.  *Id.* ¶ 561.  Crawford responded by offering to assist the agency.  *Id.*

With respect to such censorship requests, Crawford admits that the CDC's "focus is not solely on COVID.  We're focusing on other topics."  *Id.* ¶ 562.  In her supplemental declaration, Crawford admits that the CDC received such requests "in summer 2022."  Doc. 266-5, at 74, ¶ 19.

> **D.     Dr. Fauci Perpetrates Campaigns of Deception to Censor Disfavored Viewpoints.**

Defendants' statement of facts with respect to Dr. Fauci does not dispute the vast majority of Plaintiffs' exhaustively supported Proposed Findings of Fact.  *See* Doc. 266, at 64-68; *contrast* Doc. 214-1, ¶¶ 596-852.  The factual claims they do make are not well-supported.

For example, Defendants claim that "Dr. Fauci had only limited interactions with Facebook during 2020."  Doc. 266, at 66, ¶ 102.  In fact, Defendants' interrogatory responses detail *thirteen* meetings and communications between Dr. Fauci and Mark Zuckerberg over a nine-month period in 2020.  Doc. 214-1, ¶ 755 (citing Scully Ex. 12, at 53-54).  These emails reflect close coordination between Zuckerberg and Fauci.  *See id.* ¶¶ 750-755.  And, in early 2020, Zuckerberg already has Fauci's email address and addresses him by his first name.  *Id.* ¶ 748.

Defendants parrot Dr. Fauci's repeated claims in his deposition that he does not "pay attention to" anything to do with social media and does not have social-media accounts.  Doc. 266, at 67.  This claim is not credible.  In fact, Dr. Fauci's daughter was then a software engineer at Twitter, Fauci Dep. 99:23-100:15; Dr. Fauci has done numerous podcasts and interviews on social media, including with Mark Zuckerberg, Fauci Dep. 99:16-19, 101:1-6; Dr. Fauci had specifically expressed concern about "the threat of further distortions on social media" about the lab-leak theory, *id.* ¶ 683, Fauci Ex. 8, at 2 (emphasis added); and Dr. Fauci's communications staff repeatedly emailed Twitter to try to remove postings critical of Dr. Fauci."  Doc. 214-1, ¶ 685.  Dr. Fauci is keenly attuned to the importance of controlling speech on social media.  As he stated in a private email to co-conspirators plotting to discredit and censor the lab-leak theory, "given … *the*

*threat of further distortions on social media*, it is essential that we move quickly." *Id.* ¶ 683
(emphasis added).  Dr. Fauci's private words and conduct demonstrate a great deal of concern
about what is said on social media, and how federal officials like himself can control it.  *See id.*
¶¶ 742-745 (social-media censorship of the lab-leak theory that Dr. Fauci plotted to discredit);
¶¶ 771-775 (social-media censorship of speech advocating for hydroxychloroquine, which Dr.
Fauci plotted to discredit); ¶¶ 799-804 (social-media censorship of the Great Barrington
Declaration, which Dr. Fauci plotted to discredit); ¶ 841 (social-media censorship of Alex
Berenson, whom Dr. Fauci plotted to discredit).  "When Dr. Fauci spoke, social media censored."
Written Testimony of U.S. Senator Eric S. Schmitt (March 30, 2023), *at*
https://judiciary.house.gov/sites/evo-subsites/republicans-judiciary.house.gov/files/evo-media-
document/schmitt-testimony.pdf.[3]

Defendants point out that Dr. Fauci has retired and been replaced as NIAID Director by
Dr. Hugh Auchincloss.  Doc. 266, at 66 & n.34.  But Dr. Auchincloss, Dr. Fauci's former chief
deputy, worked hand-in-glove with Dr. Fauci on censorship.  Dr. Auchincloss is the man who, at
the beginning of the lab-leak plot, received the email from Dr. Fauci at 12:29 a.m. on a Saturday
morning marked "IMPORTANT," which stated: "Hugh: It is essential that we speak this AM.
Keep your cell phone on … You will have tasks today that must be done." *Id.* ¶ 640.  The email
attached the research paper by Ralph Baric and Shi Zhengli detailing NIAID-funded gain-of-
function research on bat coronaviruses at the Wuhan Institute of Virology.  *Id.* ¶ 641.

---

[3] Further, internal Twitter documents reveal that, in 2021, "Dr. Anthony Fauci did an account
takeover of @WHCovidResponse," the White House's COVID response Twitter account, and
answered 32 user questions with over 4 million impressions. *See*
https://twitter.com/thackerpd/status/1649037545630494720/photo/1.  Dr. Fauci, evidently, is not
quite the social-media neophyte he claims to be.

**E.      CISA Engages in Extensive, Ongoing Social-Media Censorship Activities.**

CISA attempts to downplay its involvement in such censorship activities as the USG-Industry meetings, "switchboarding," and the EIP.  Doc. 266, at 69-86.  These attempts fail.

***Switchboarding.***      Defendants admit that, during 2020, CISA engaged in extensive "switchboarding" activities to flag disfavored content for censorship to platforms.  Doc. 266, at 74-77; *see also* Doc. 214-1, ¶ 972; Doc. 266-5, at 173 (Hale Decl.).  Defendants try to frame CISA's switchboarding as a merely passive activity.  Relying heavily on a preprinted, boilerplate disclaimer in their emails to platforms (which only seems to appear during the Trump Administration), Defendants contend that it would "leave it to the companies to make decisions based on their terms of service."  Doc. 266, at 78.  Even if it had been purely passive, CISA's "switchboarding" would still be the but-for cause of censorship; as Scully admits, "if it hadn't been brought to their attention then they obviously wouldn't have moderated it."  Doc. 214-1, ¶ 974.

Further, CISA's "switchboarding" was not the merely passive exercise that Defendants portray.  It involved active lobbying of platforms to remove disfavored content.  Scully commonly performed such fact-checking for platforms to support CISA's requests for censorship.  *Id.* ¶¶ 1076-1077.  This included both doing open-source research and affirmatively obtaining information from state and local officials to "debunk" social-media claims to platforms.  *Id.* ¶ 1077.  In doing so, CISA always assumed that the government official's account, not the private citizen's account, was accurate.  *Id.* ¶ 1078.  Defendants admit that "CISA would ask social media platforms to report back on how … they had addressed misinformation CISA had flagged on behalf of [state and local] officials."  Doc. 266, at 77.

Switchboarding was extensive.  At least six members of CISA's MDM team "took shifts" in reporting putative "misinformation" to social-media platforms in 2020.  Doc. 214-1, ¶ 1063.

Platforms treated CISA, a federal national-security agency, as a privileged reporter of misinformation, often responding within minutes to reports, even late at night.  *Id.* ¶ 1081.

CISA's flagging included long lists of tweets to remove, and it included obvious parody accounts.  *Id.* ¶ 1102.  CISA also pushed for censorship of content that its Director particularly disfavored.  For example, Scully asked platforms for a detailed report on their censorship of the "Hammer and Scorecard" narrative, because "Director Krebs is particularly concerned about the hammer and scorecard narrative."  *Id.* ¶ 1104.  Twitter responded by inviting CISA to flag "high-profile examples of tweets" on this topic that CISA wanted censored.  *Id.*

Defendants contend that CISA stopped "switchboarding" after the 2020 election cycle.  But Scully testified that CISA's decision to stop "switchboarding" was made in late April or early May 2022, *i.e.*, just after the filing of this lawsuit.  *Id.* ¶ 975.  Thus, CISA suddenly decided to stop "switchboarding" once that practice was challenged in this lawsuit.  *See id.*; *see also* Doc. 266, at 77 (admitting that the decision to stop switchboarding was made in "April or May 2022").  Hale's declaration does not dispute this timeline, and it does not dispute Plaintiffs' longstanding insistence that CISA decided to stop "switchboarding" *because of this lawsuit*.  *See* Doc. 266-5, at 175 (Hale Decl. ¶ 78).  In fact, through the filing of Plaintiffs' supplemental brief in February 2023, CISA continued to proclaim on its website that its "MDM team serves as a switchboard for routing disinformation concerns to appropriate social media platforms."  Doc. 214-1, ¶ 976.

In addition, once CISA stopped "switchboarding," it took careful steps to ensure that the same "flagging" activities would occur through other channels.  In the spring and summer of 2022, Lauren Protentis urged platforms to prepare "one-pagers" for state and local election officials and lobbied the platforms to ensure that they included instructions for how to report misinformation

for censorship, *i.e.*, "steps for flagging or escalating MDM content," "steps to … report MDM,"
and "how to report disinformation."  *Id.* ¶¶ 1094-1096.

> **USG-Industry Meetings and other meetings.**  Defendants contend that CISA's continuous
battery of meetings with platforms about mis- and disinformation are wholly innocuous.  Doc. 266,
at 80-84.  The facts contradict this narrative.  First, the "USG-Industry meetings" are large,
extensive, and ongoing.  Geoff Hale admits that, during 2022, "CISA participated in regular
meetings often referred to as USG-Industry meetings," which "included CISA, DHS, FBI, U.S.
Department of Justice, the Office of the Director of National Intelligence, Google, Facebook,
Twitter, Reddit, Microsoft, and Verizon Media."  Doc. 266-5, ¶ 68.  As Elvis Chan (who attends
the meetings) testified, the meetings are attended by representatives of CISA, the Department of
Homeland Security's Intelligence & Analysis division ("I&A"), the Office of the Director of
National Intelligence (ODNI), the FBI's Foreign Influence Task Force (FITF), as well as DOJ's
National Security Division.  Doc. 214-1, ¶ 861.

CISA is the organizer and plays a leading role in these meetings.  First Matt Masterson,
and now Brian Scully, are "regular attendees" who "usually emcee[]" the USG-Industry meetings.
Doc. 214-1, ¶ 863.  CISA leads a bilateral "coordination call" with Facebook to plan for each USG-
Industry meeting.  *Id.* ¶ 978.  CISA also leads an interagency planning meeting for each USG-
Industry meeting.  *Id.* ¶ 984.  CISA "oversee[s]" and "facilitate[s]" the USG-Industry meetings.
*Id.* ¶ 981.  Both CISA and DHS's Office of Intelligence & Analysis participate in them.  *Id.*

The meetings have occurred regularly since 2018.  *Id.* ¶ 983.  They occurred throughout
the 2022 election cycle.  *Id.* ¶ 987.  "[C]oncerns about misinformation and disinformation on social
media platforms were discussed in these meetings in the 2022 timeframe."  *Id.*  The USG-Industry
meetings are monthly, but they become biweekly and then weekly as election day approaches.  *Id.*

¶ 1087.  The meetings "were continuing" at the time of Elvis Chan's deposition, and he expected that they would continue through the 2024 election cycle.  *Id.* ¶ 866.

Defendants argue that the USG-Industry meetings did not involve pushing platforms to censor speech.  Doc. 266, at 81.  But Defendants then admit that the meetings involve "upcoming 'watch outs,'" *i.e.*, future disinformation topics to be on the lookout for, like the CDC's "BOLO" meetings.  *Id.* at 80.  Elvis Chan admits that the parties discuss "disinformation content" at the USG-Industry meetings.  Doc. 214-1, ¶¶ 865-866.

Moreover, the USG-Industry meetings were used to push the platforms to censor the Hunter Biden laptop story.  At the USG-Industry meetings, FBI and CISA issued baseless warnings about imminent "hack and leak" operations that led to the censorship of the Hunter Biden laptop story.  *Id.* ¶¶ 881-883.  Both Elvis Chan and Laura Dehmlow of the FBI raised such warnings at the USG-Industry meetings.  *Id.* ¶¶ 882-883.  So did other FBI officials.  *Id.* ¶ 889.  Matt Masterson and Brian Scully of CISA also raised warnings about "hack and leak" operations during the USG-Industry meetings.  *Id.* ¶ 894.  As a result of these warnings, some platforms adopted new censorship policies to provide for the censorship of hacked materials.  *Id.* ¶ 884.  The "impetus" for these changes was the repeated warnings from the FBI and CISA about the likelihood of imminent "hack and leak" operations.  *Id.*  In addition to raising warnings, the FBI repeatedly inquired of the platforms whether they "had changed their terms of service" to censor hacked materials, effectively urging them to adopt these policy changes.  *Id.* ¶¶ 885-887.

The FBI had no investigative basis to believe that any "hack and leak" operation was imminent.  *Id.* ¶ 893 ("we were not aware of any hack-and-leak operations that were forthcoming or impending").  Yet CISA's emails planning the USG-Industry meetings in 2020 included agenda items such as "preparing for so-called 'hack and leak' operations attempting to use platforms and

traditional media for unauthorized information drops," *id.* ¶ 1090; and "Deep Dive Topic … Hack/Leak and USG Attribution Speed/Process," *id.* ¶ 1091.

Defendants claim that their other meetings—such as those of the Cybersecurity Advisory Committee and its MDM Subcommittee do not involve pushing for censorship of social-media speech. This is incorrect. For example, on June 22, 2022, CISA's Cybersecurity Advisory Committee issued a "Draft Report to the Director" calling for an extremely broad view of CISA's mandate to expand censorship into new areas. Doc. 214-1, ¶ 1118. The report states that "[t]he spread of false and misleading information poses a significant risk to critical functions like elections, public health, financial services, and emergency response." *Id.* It claims: "Pervasive MDM diminishes trust in information, in government, and in democratic processes more generally." *Id.* The report states that "CISA should consider MD across the information ecosystem," including "social media platforms of all sizes, mainstream media, cable news, hyper partisan media, talk radio, and other online resources." *Id.* Further, CISA also has a long series of *bilateral* meetings with platforms about misinformation that were not disclosed in interrogatory responses and are not addressed in the Government's response brief. *Id.* ¶¶ 1084-1085.

***The Election Integrity Partnership.*** Defendants contend that CISA had "limited involvement with the Election Integrity Partnership." Doc. 266, at 84. On the contrary, CISA's involvement in the EIP included at least the following: (1) the EIP was formed to address a "gap" in the government's surveillance and censorship activities that *CISA* identified to its Stanford-affiliated interns; (2) CISA interns originated the idea for the EIP; (3) CISA had a series of meetings with Alex Stamos and Renée DiResta about forming the EIP before it began, including one meeting listed on the EIP's "Operational Timeline" as "Meeting with CISA to present EIP concept"; (4) CISA connected the EIP with the Center for Internet Security, which runs a CISA-

funded clearinghouse for state and local government officials to communicate about misinformation; (5) CISA connected the EIP directly with NASS and NASED, organizations of state and local government officials, so they could report misinformation to the EIP; (6) CISA had ongoing communications with the EIP about its public reports on misinformation as the EIP operated in 2020; (7) CISA collaborated closely with the Center for Internet Security on flagging misinformation to platforms, while CISA knew that CIS was collaborating with the EIP; (8) CISA flagged misinformation to social-media platforms using EIP tracking numbers; (9) CISA interns, who were working for CISA and the EIP at the same time, flagged "misinformation" to platforms simultaneously on behalf of CISA and on behalf of the EIP; (10) CISA mediated and coordinated between the EIP, CIS, and the platforms on reporting misinformation to address the platforms' concerns about duplicative reports; (11) the EIP debriefed CISA after the 2020 election cycle about its activities and public report; and (12) there is extensive overlap of personnel between CISA and the EIP, including interns working simultaneously for both groups, and key EIP leaders such as Alex Stamos, Renee DiResta, and Kate Starbird having formal roles at CISA.  Further, as discussed below, (13) CISA funds the EI-ISAC, which is a clearinghouse used to report misinformation to the EIP; (14) the EIP's operations were directly financed by federal funding; and (15) federal officials at the Global Engagement Center flagged misinformation directly to the EIP.

When EIP was starting up, CISA's "involvement" included at least the following:

(1) "a couple of our [CISA] interns came up with the idea and … [CISA] had some communications with" the EIP. Scully Depo. 49:8-10. (2) CISA "received some briefings on the work that they were doing." Scully Depo. 49:13-14. (3) CISA "had some communications early on in the process, when they were making decisions, when Stanford was trying to figure out what the gap was." Scully Depo. 49:18-21. (4) CISA "connected them [EIP] with the Center For Internet Security," which is a CISA-funded nonprofit that channels reports of disinformation from state and local government officials to social-media platforms. Scully Depo. 50:5-6. (5) CISA also "connected them [EIP] with some of the election official groups," i.e., "the National Association of Secretaries of State [NASS] and the National Association of State Election Directors [NASED]," both of which are

groups of state and local government officials who would report misinformation through CIS to the EIP. Scully Depo. 50:6-10. (6) And CISA "facilitated some meetings between those three." Scully Depo. 50:10-11.

Doc. 214-1, ¶ 993.  The CISA interns who originated the idea of the EIP "worked for the Stanford Internet Observatory, as well." *Id.* ¶ 994.  Scully identified the "gap," *i.e.*, the problem that federal and state officials lack authority and capacity to monitor and report misinformation to platforms effectively, to the interns, who devised the EIP as a solution to bridge that "gap." *Id.*  ¶¶ 995-996. Scully and other CISA officials "had some initial conversation with the interns" about this "gap," and then they also "had a conversation with the Stanford Internet Observatory folks about the gap." Scully Depo. 52:3-6. Then, CISA "received a briefing from them [EIP], or two, on kind of what they were putting together." Scully Depo. 52:7-9. Scully and other CISA officials then "facilitated some meetings between Stanford folks, the Center For Internet Security, and election officials, where they had discussions about how they would work together." Scully Depo. 52:10-13. As the EIP progressed, CISA "had some conversations, kind of throughout, when they were -- particularly when they were putting out public reporting about what they were seeing." Scully Depo. 52:14-17. In addition, Scully "wouldn't be surprised if there were some other kind of brief conversations in there." *See* Doc. 214-1, ¶ 997.  The EIP continued operating during the 2022 election cycle, and the SIO briefed CISA on the EIP's activities during that cycle. *Id.* ¶ 998.

CISA funds the Center for Internet Security in its activity of overseeing the EI-ISAC, which is an organization for information-sharing among state and local government election officials. Scully Depo. 61:9-10, 62:1 ("CISA provides funding for the EI-ISAC"). *See* Doc. 214-1, ¶ 1002. The EI-ISAC receives reports of misinformation and forwards them to the EIP.  CIS continued to report misinformation and disinformation for censorship during the 2022 election cycle.  *Id.* ¶ 1098.  Defendants contend that DHC does not fund CIS's disinformation work, but they admit

that CISA "has provided financial assistance to CIS through a series of cooperative agreement awards to provide specified cybersecurity services … through the MS- and EI-ISACs." Doc. 266, at 73. In other words, CISA admits that it funds the EI-ISAC, which is the platform through which CIS conducts its disinformation work, in cooperation with the EIP. *Id.*

CISA established a triangular relationship of cooperation on censorship among CISA, CIS, and the EIP. CISA connected the EIP with CIS because "the EIP was working on the same mission," so "we wanted to make sure that they were all connected." Doc. 214-1, ¶ 1004. CISA served a mediating role between CIS, the EIP, and the platforms, to coordinate their efforts in reporting misinformation to the platforms and avoid "duplicate reporting." *Id.* ¶ 1007. There was also direct email communication between EIP and CISA about misinformation reporting. *Id.* ¶ 1008.

Key personnel of the EIP, such as Alex Stamos, Renee DiResta, and Kate Starbird, also have formal roles with CISA. *Id.* ¶¶ 1011-1012, 1170-1171. CISA political appointee Matt Masterson communicated directly with the EIP, and Geoff Hale may have done so as well. *Id.* ¶ 1014. When he left CISA, Masterson did a one-year fellowship at the Stanford Internet Observatory. *Id.* ¶ 1021. CISA Director Christopher Krebs had a relationship with Alex Stamos. *Id.* ¶ 1015. When he left CISA, Krebs started a consulting firm with Stamos called the "Krebs/Stamos Group." *Id.* While he was still CISA Director, Krebs met with Stamos as Stamos was setting up the EIP. *Id.* ¶ 1016. Two CISA interns who "took shifts" in reporting misinformation to platforms on behalf of CISA were also working for the Stanford Internet Observatory and flagging misinformation to platforms on behalf of the EIP. *Id.* ¶¶ 1064, 1066.

Masterson and Scully engaged with the EIP on their "public reporting" about election-related misinformation. *Id.* ¶ 1018. Masterson was also involved in the initial discussions with

Stanford about staring the EIP, including "clarifying the gap … for the folks at the Stanford Internet Observatory early on in the process." *Id.*  CIS and the EIP had a relationship and shared information. *Id.* ¶ 1032.  The Virality Project reports that the EI-ISAC "served a critical role in sharing information with the Election Integrity Partnership." *Id.* ¶ 1045.  CISA's "tracking spreadsheet" for its "switchboarding" reports contains at least 13 entries where CISA flagged misinformation to platforms using EIP ticket numbers.  Doc. 214-35, Lines 86-96, 115, 123.

CISA's involvement was critical to the launching and operation of the EIP.  Alex Stamos consulted with CISA because he needed CISA to connect him with state and local election officials to obtain misinformation reports.  Doc. 214-1, ¶ 1022.  Scully connected the EIP with state and local election officials through NASS and NASED, and "facilitate[d] some meetings between" EIP and local election officials. *Id.* ¶¶ 1024-1025.  Scully also connected the EIP to the Center for Internet Security, which runs the CISA-funded EI-ISAC, and "set up a direct line of communication between CIS and EIP." *Id.* ¶ 1024.  Scully understands that, once this "direct line" was set up, CIS forwarded misinformation reports to EIP. *Id.* ¶ 1026.  Scully testifies that "EI-ISAC is a part of CIS and we do fund the EI-ISAC." *Id.* ¶ 1027.  CIS reported misinformation to CISA and the EIP simultaneously, which CISA would then forward to platforms. *Id.*¶ 1070.  CIS, like CISA, used EIP ticket numbers in its misinformation reports to CISA. *Id.* ¶ 1075.

Geoff Hale contends that "CISA's involvement in the creation and operation of the EIP has been very limited," Doc. 266-5, at 170, but Hale admits that (1) CISA officials told the SIO interns about the "gap," *id.* at 171; (2) "CISA personnel had a conversation with the SIO personnel" about the gap, *i.e.*, that "state and local election officials lacked the resources and capability to identify and respond to potential election security-related disinformation impacting their jurisdictions," after which "SIO … launched the EIP," *id.*; (3) "CISA connected the EIP with election

stakeholders, such as NAASS, NASED, and CIS," *id.*; (4) "both CISA and the EIP received reports of potential election security-related disinformation from state and local election officials through CIS," *id.*; (5) "the EIP briefed CISA regarding EIP's plans for the 2022 election cycle," *id.* at 172; (6) "[c]ertain Stanford University students have interned for CISA and also the SIO, and "[t]hrough their SIO work, I understand they may have supported the EIP," *id.*; and (7) "CISA … has attended public briefings the EIP has provided," *id.*

Hale contends that "CISA has never provided funding to the EIP," Doc. 166-5, ¶ 176, but in fact, the federal government funds the EIP through other sources: "Researchers who contributed to the EIP … receive partial support from the U.S. National Science Foundation (grants 1749815 and 1616720)." Doc. 214-1, ¶ 1164. Further, the Atlantic Council is federally funded. *Id.* ¶ 1165.

The EIP's public report, *The Long Fuse*, confirms CISA's extensive involvement in the launching and operation of the EIP. The EIP states that it was created "in consultation with CISA." Doc. 214-1, ¶ 1138. It agrees that CISA interns originated the EIP to fill a perceived "gap" in government authority to conduct social-media censorship activities. *Id.* ¶¶ 1139-1140, 1166. It admits that federal officials could not conduct the EIP's activities directly, because they "would likely be excluded from law enforcement action under the First Amendment and not appropriate for study by intelligence agencies restricted from operating inside the United States." *Id.* ¶ 1141. The EIP did not just report misinformation; it pushed platforms to adopt more restrictive censorship policies, and pushed for aggressive enforcement of those policies. *Id.* ¶¶ 1148-1151.

The EIP lists "Government" as a "Major Stakeholder," and makes clear that "stakeholders" who could submit "tickets" included "trusted" partners such as CISA, the GEC, and the EI-ISAC. *Id.* ¶¶ 1151-1153. As a key point in its "Operational Timeline," the EIP lists a July 9, 2020, "Meeting with CISA to present EIP concept." *Id.* ¶ 1169. One of the EIP's stated goals was to

"flag policy violations to platforms." *Id.* ¶ 1172. The GEC submitted "tickets" to the EIP to flag misinformation for platforms. *Id.* ¶ 1179, 1197. The CIS was a major reporter of misinformation to the EIP. *Id.* ¶ 1188. The EIP aptly states that "in its structure and its operations," the EIP "*united government, academia, civil society, and industry*." *Id.* ¶ 1228 (emphasis added).

*CISA's Censorship Activities Are Ongoing.* Defendants suggest that CISA no longer engages in censorship activities—for example, by ceasing its "switchboarding" activities and disbanding the "MDM Subcommittee" of the CSAC. These *post-litigation* decisions contrast with CISA's longstanding, publicly avowed stance in favor of expanding its censorship activities.

DHS's Office of Inspector General reported in late 2022 that CISA "counters all types of disinformation, to be responsive to current events." *Id.* ¶ 1113. Leaked DHS documents indicate that CISA is expanding its counter-disinformation efforts to address "the origins of the COVID-19 pandemic and the efficacy of COVID-19 vaccines, racial justice, U.S. withdrawal from Afghanistan, and the nature of U.S. support to Ukraine." *Id.* ¶ 1110. Scully confirms that CISA has initiatives targeting misinformation about COVID-19 vaccines and the war in Ukraine. *Id.* ¶ 1111. Scully believes that the "Unified Coordination Group" about the war in Ukraine, which included a member of CISA's MDM team, communicated with social-media platforms. *Id.* Scully confirms that CISA is working with Department of Treasury to address misinformation that undermines "public confidence" in "financial services" and "financial systems." *Id.* ¶¶ 1115-1116. Hale's declaration confirms that CISA engages in disinformation work regarding COVID-19, the war in Ukraine, and the financial services industry. Doc. 266-5, at 163 (¶¶ 17-19). In late November 2021, Director Easterly stated that "I am actually going to grow and strengthen my misinformation and disinformation team." *Id.* ¶ 1114. Easterly makes clear that she interprets CISA's mandate to protect "infrastructure" to include "cognitive infrastructure," and that it is

"really, really dangerous if people get to pick their own facts." *Id.* On February 26, 2022—two months before this lawsuit was filed—Easterly's private text messages with Matt Masterson state that she believes CISA is "looking to play a coord role so not every [department and agency] is independently reaching out to platforms which could cause a lot of chaos." *Id.* ¶ 1108. Her text messages also state that DHS is planning "to look at potential new areas of confronting MDM, but it doesn't change or impact anything we [CISA] are doing or have already established." Doc. 71-5, at 2. And, on February 26, 2022, she texted that she is "[j]ust trying to get us in a place where Fed can work with platforms to better understand the mis/dis trends so relevant agencies can try to prebunk/debunk as useful." *Id.* at 3. Masterson responded: "We'll get there. … Platforms have got to get more comfortable with gov't." *Id.* at 4.

F.     **The FBI Pressures and Colludes With Platforms to Remove Domestic Speech.**

The FBI contends that, in its censorship activities, it is fighting back against "information warfare" waged by foreign enemies. Doc. 266, at 92. But there is no "information warfare" exception to the First Amendment. The FBI has many lawful tools to fight this "warfare," but it may not employ unconstitutional tools. Yet that is what the FBI does, on a grand scale.

*The FBI's Mass-Flagging Operations.* First, the FBI engages in flagging operations on a massive scale. The FBI admits that it shares "tactical" information with platforms, *i.e.*, "describing attributes, or indicators, of particular social media accounts indicating they were being operated by foreign malign actors." Doc. 266, at 95. In practice, this means bombarding platforms with long lists of specific speakers, accounts, and content, "one to five times per month," that the FBI wants to censor. Doc. 214-1, ¶¶ 905-911. "Tactical information" means "IP addresses, email accounts, social media accounts, website domain names, and file hash values." *Id.* ¶ 906. These are targeted for "account takedowns," *i.e.*, "knocking down accounts" and "knocking down

misinformation content." *Id.* ¶¶ 907-908.  The FBI targets these accounts *because* Americans engage with them on social media, and to prevent Americans from doing so.  *Id.* ¶¶ 915-917.

Using Teleporter, an encrypted messaging service, the FBI sends platforms lists of speakers, accounts, websites, URLs, etc. to be censored about "one to five times per month," and also flags such speakers and content at the regular meetings with platforms.  *Id.* ¶¶ 931-935.  Each flagging communication may include anywhere from "one account or one selector to … a whole spreadsheet full of them."  *Id.* ¶ 933.  Such messages may flag "dozens" or "hundreds of accounts" for censorship.  *Id.* ¶¶ 935, 941.  "In general," these messages go to seven major social-media platforms.  *Id.* ¶ 936.  The FBI then requests that the platforms report back to them on the actions taken on the reported URLs "at every quarterly meeting."  *Id.* ¶ 937.

The FBI treats First Amendment-protected speech by American citizens on core political topics as acceptable collateral damage in its "information war."  *See* Doc. 214-1, ¶¶ 917-924.  For example, the FBI induced platforms to take down a supposedly Russian-originated "Secure the Border" post that had 134,943 "likes," a pro-Second Amendment message that had 96,678 "likes," and a "Black matters" post that had 223,799 "likes."  *Id.* ¶ 919.  Every one of those "likes" was an act of First Amendment-protected expression.  The FBI also induced platforms to block a supposedly Russian-originated website that hosted content from 20 freelance journalists, including Americans, *id.* ¶ 922; and a website to which many ordinary Americans posted content, *id.* ¶ 923.

In addition, the FBI runs a "command post" on and around election day, which flags domestic "disinformation" for platforms in real-time.  *Id.* ¶ 925.  In reporting such supposed "disinformation," the FBI makes no attempt to determine whether it is foreign or domestic in origin.  *Id.* ¶ 926.  The FBI has about a "50 percent success rate" in getting reported content taken down or censored by platforms.  *Id.* ¶ 928.

***The FBI's mass-flagging operations leverage pressure from federal officials.*** Based on personal observation and conversations with both federal officials and social-media platforms, Chan testifies that pressure from federal officials—including threats of adverse legal consequences—forced social-media platforms to censor election-related speech more aggressively between 2017 and 2020. Doc. 214-1, ¶¶ 945-961. Chan testifies that "pressure from Congress, specifically HPSCI and SSCI," induced platforms to adopt more aggressive censorship policies and enforcement. *Id.* ¶ 946. This includes congressional hearings where the CEOs of Twitter, Facebook, and Google were publicly pressured and raked over the coals. *Id.* ¶¶ 947-949. It also includes covert pressure where high-level congressional staffers flew to Silicon Valley to meet privately with platforms and threaten them with adverse legislation in secret meetings. *Id.* ¶¶ 950-961. Chan testifies that the platforms involved viewed these meeting as "exercising a lot of pressure" on them. *Id.* ¶ 951. The platforms' "changes in takedown policies … resulted from that kind of pressure from Congress." *Id.* ¶ 953.

Citing Yoel Roth's congressional testimony, Doc. 266, at 88, the Government argues that the FBI was careful not to cross the line into pressuring Twitter to take specific actions on the accounts it flagged. But the FBI did not need to pressure the platforms to induce them to comply with its requests—the platforms had already been receiving years of public and private pressure from other federal officials to expand their censorship on these very issues. Doc. 214-1, ¶¶ 945-961. Thus, when asked whether Twitter's increased efforts "[b]eginning in 2017" to "invest really heavily in building out an election integrity function" were "driven in part by … concerns raised by Congress and the US government," Yoel Roth answered, "Yes." Doc. 266-2, at 89.

***The FBI's censorship operations continue unabated.*** The FBI's censorship operations are ongoing; as Elvis Chan publicly stated, "post-2020, we've never stopped … as soon as

November 3rd happened in 2020, we just pretty much rolled into preparing for 2022." Doc. 214-
1, ¶ 967. The FBI is "working with social media companies" to ensure "they can knock down
accounts, knock down disinformation content … as they're building up to" election day. *Id.*

   ***The FBI's deception censored of the Hunter Biden laptop story.*** The censorship of the
Hunter Biden laptop story provides a dramatic case-study of the FBI's censorship of private
American political speech. As discussed above, the FBI meets extensively with social-media
platforms about disinformation, both through the USG-Industry meetings and frequent bilateral
meetings. Doc. 214-1, ¶¶ 861-866 (USG-Industry meetings); *id.* ¶¶ 867-877 (FBI's regular
bilateral meetings with at least eight major technology platforms' content-moderation officers); *id.*
¶ 878 (FBI communicates with platforms routinely through encrypted and self-deleting channels
such as Signal and Teleporter). These meetings were the vehicle for the FBI's campaign of
deception to censor the Hunter Biden laptop story.

   As discussed above, during the 2020 election cycle, the FBI repeatedly warned platforms
to expect a possible "hack and dump" or "hack and leak" operation, both in the USG-Industry
meetings and in the FBI's bilateral meetings with seven social-media platforms, and CISA did so
as well. *Id.* ¶¶ 880-883, 894. There was no investigative basis for these warnings, as Chan admits:
"Through our investigations, we did not see any competing intrusions to what had happened in
2016," and the FBI was "not aware of any hack-and-leak operations that were forthcoming or
impending" at the time. *Id.* ¶ 893. The FBI also induced platforms to change their content-
moderation policies in 2020 to specify that they would censor hacked materials, by repeatedly
raising the bogus warning about hack-and-leak operations and then repeatedly inquiring of the
platforms whether they would censor such materials when they emerged. *Id.* ¶¶ 884-889. Thus,
the FBI—which had the laptop in its possession since 2019 and knew that its contents were not

hacked—repeatedly seeded the platforms with false warnings of imminent "hack and leak" operations and pushed the platforms to adopt policies to censor "hacked materials." Then, when the laptop story was published, the FBI refused to confirm whether the laptop was genuine or contained hacked materials, thus dooming the story to censorship. *See* Doc. 266, at 100.

The Government states that "[t]he Russians' 2016 hack-and-leak operation provided an impetus for some platforms to change their service terms" on hacked materials. Doc. 266, at 96 (citing Chan Dep. 205:4-17, 248:10-16). In fact, it was the FBI who "provided" that "impetus." The Government admits that "ASAC Chan testified that what the FBI would have done was to ask the platform 'how their terms of service would handle a situation' involving materials released from such an operation." Doc. 266, at 101 n.51. In fact, the FBI constantly raised the issue, and repeatedly inquired about platforms' hacked-materials policy during 2020, which induced the platforms to change their policies. Doc. 214-1, ¶¶ 884-889. That is why these policy changes were made *in 2020*, when the FBI induced them—not in 2016 when the Russian "hack-and-leak operation" allegedly occurred.

To dispute this account, the Government relies heavily on Yoel Roth's 2023 congressional testimony on February 8, 2023, *see* Doc. 266-2, at 73-119; but in fact, that hearing corroborates virtually every key detail of the FBI's involvement in suppressing the Hunter Biden laptop story. Roth confirms that the FBI conveyed no investigative basis for the warning—the suppression was not based on "any specific information from any government source." *Id.* at 79. The hearing confirms that "the FBI had Hunter Biden's laptop since December of 2019," *id.* at 81, and thus the FBI knew the laptop's contents were not "hacked materials." *See id.* at 106 (noting that the FBI "had it … for a year," and "if anyone knows [it's] real, it's them"). The hearing confirms that the censorship of the story lasted two weeks (not 24 hours, as the Government misleadingly

suggests)—the "New York Post story was down for two weeks, give or take." *Id.* at 86. It confirms

that Roth and others at Twitter "communicate with government officials by means of disappearing

messaging systems like Signal…." *Id.* at 96. It confirms that Twitter collaborates closely with

federal government agencies to suppress so-called foreign disinformation: "There is a considerable

amount of work to address foreign disinformation at Twitter and also at other companies. And this

work was reliant in part on intelligence shared with companies by law enforcement and by the

intelligence community." *Id.* at 99. It confirms that, in 2020, Roth and others at Twitter "were

having regular interactions with national intelligence, Homeland Security and the FBI." *Id.* at 100.

"Twitter met quarterly with the FBI Foreign Interference task force, and we had those meetings

running for a number of years…" *Id.* Roth "had ongoing conversations with the FBI for years…"

*Id.* It confirms that, in 2020, internal Twitter communications referred to "a sustained effort by

the intelligence community to push Twitter," including Elvis Chan. *Id.* at 100. Roth agreed that

Twitter was "following … national security experts on Twitter as a reason to take down the New

York Post story on Hunter Biden's laptop." *Id.* Roth admits that "Twitter met with the FBI, I

would estimate several dozen times over the course of multiple years. These meetings happened

in person in the Twitter office, in the offices of other technology companies, and at times they

happened virtually." *Id.* at 107. These meetings occurred "somewhere between weekly and

monthly." *Id.* at 117. Roth confirms that "[t]he subject of possible hack and leak was raised by a

number of representatives of the FBI," including "Mr. Chan." *Id.* at 114.

     In fact, the only detail of the account that Roth now disputes, over two years after the fact,

is his own December 2020 statement that federal officials warned him that the long-expected hack-

and-leak operation *might involve Hunter Biden*. Even without this detail, the evidence of the FBI's

deceptive interference is compelling.  But in any event, Roth's December 2020 declaration to the

FEC clearly indicates that this warning came *from federal officials*:

> [1] Since 2018, I have had regular meetings with the Office of the Director of National
> Intelligence, the Department of Homeland Security, the FBI, and industry peers regarding
> election security. [2] During these weekly meetings, the federal law enforcement agencies
> communicated that they expected 'hack-and-leak operations' by state actors [i.e., Russians
> or other foreign governments] might occur in the period shortly before the 2020
> presidential election, likely in October. [3] I was told in these meetings that the intelligence
> community expected that individuals associated with political campaigns would be subject
> to hacking attacks and that material obtained through those hacking attacks would likely
> be disseminated over social media platforms, including Twitter.  [4] These expectations of
> hack-and-leak operations were discussed throughout 2020.   [5] I also learned in these
> meetings that there were rumors that a hack-and-leak operation would involve Hunter
> Biden.

Doc. 214-1, ¶ 895 (numbers in square brackets added).  Each sentence of the declaration refers to

something told to Roth *by federal officials*.  The first sentence identifies the federal officials

involved in the meetings—ODNI, DHS, the FBI.  *Id.*  The second sentence explicitly identifies

"the federal law enforcement agencies" as the ones who "communicated" warnings that "they

expected 'hack-and-leak operations' by state actors."  *Id.*  The third sentence switches to passive

voice ("I was told…"), but still makes clear that the speakers were still the federal officials ("I was

told in these meetings that *the intelligence community* expected…").  *Id.* (emphasis added).  The

fourth sentence stays in passive voice but continues to make clear that Roth is describing

communications from federal agencies.  *See id.* ("These expectations of hack-and-leak operations

were discussed throughout 2020.").  And the fifth sentence stays in passive voice, indicating that

Roth is still describing what *federal officials* told him: "I also learned in these meetings that there

were rumors that a hack-and-leak operation would involve Hunter Biden."  *Id.*  No rational reader

could interpret this declaration as stating or implying that *other platforms* said that the hack-and-

leak operation would involve Hunter Biden.  Rather, the text is entirely dedicated to describing

what *federal officials* told Roth.

At the time Roth filed this Declaration, there was no mystery about what this meant.  In fact, *Twitter's own lawyers*, who filed the Roth Declaration with the FEC on December 21, 2020, described Roth's testimony as follows: "Reports **from the law enforcement agencies** even suggested there were rumors that such a hack-and-leak operation would be related to Hunter Biden."  Ex. I to Ex. 1 (Suppl. Glenn Decl. ¶ 30), at 12 (emphasis added).

To be sure, over two years later, in February 2023 congressional testimony, Roth attempted to retreat from his prior testimony by testifying that he believed *other platforms*, not federal officials, may have been the ones who warned that "there were rumors that a hack-and-leak operation would involve Hunter Biden."  *Id.*; *see* Doc. 266-2, at 109.  But this new, revisionist account of the 2020 meetings should be dismissed as less credible, for at least four reasons.  First, when pressed under oath in 2023, Roth admitted that *he actually doesn't remember* who raised the warnings: "Who told you about Hunter Biden in these meetings? ... YOEL ROTH: My recollection is that a representative of another tech company may have mentioned it, but those meetings were several years ago. ***I truly don't recall.***"  Doc. 266-2, at 109 (emphasis added).  Second, Roth's much-later revision emerged only after the significance of this detail was raised and emphasized *in this lawsuit*, which was expressly referenced in the congressional testimony.  *See, e.g.,* Doc. 266-2, at 109 (referring to Roth's Dec. 2020 FEC declaration as raised in "Missouri v. Biden").  Roth, who has described the Trump Administration as "actual Nazis in the White House," *id.* at 81, has every incentive *now* to color or shade his account to protect the FBI officials who were actively sabotaging the Trump campaign.  In 2020, he had no such incentive to color or skew his account of those statements.  Third, Roth's 2020 account was specific and detailed, while his 2023 revision is vague and fails to provide any detail.  *See id.*  Fourth, Roth's revisionist account is implausible on its face—*federal officials* are the natural source to provide intelligence about

investigations into what they perceived as upcoming threats. *Other platforms* would not be the natural source for specific intelligence about upcoming Russian hack-and-leak operations. The Court should treat Roth's detailed, specific, contemporaneous, and credible account, made when he had no incentive to shade his testimony, as more credible than his years-later, vague, admittedly poorly recollected, and facially implausible account of this detail, made when he had obvious incentives to color his testimony.

*The Government's Other Arguments Lack Merit.* First, the Government contends that "[g]overnment concern about foreign influence efforts directed to United States elections has continued beyond the 2016 election into the 2020 election season and beyond." Doc. 266, at 92. On the contrary, the overwhelming majority of speech targeted by federal officials and their co-conspirators for censorship since the 2020 election cycle was *domestic* in origin, not foreign. *See supra*, Introduction; *see also* Doc. 214-1, ¶¶ 1033, 1056, 1220, 1231, 1233, 1235, 1241.

The Government quotes statements by President Trump and Attorney General Barr calling for intelligence agencies to assess whether foreign nationals are attempting to influence U.S. elections, and that Americans should be alert to false information and propaganda disseminated by foreign nationals. Doc. 266, at 93-94. But none of these statements directed intelligence agencies to violate American citizens' First Amendment rights by procuring their censorship on social media; and if they had done so, they would be unconstitutional. *See id.*

Third, the Government contends that the FBI "only shared information concerning accounts it attributed with *high confidence* to a foreign-state actor, and to date the FBI's attributions *have always proven correct*." Doc. 266, at 96 (quoting Chan Dep. at 112:21-113:6) (second emphasis added). But Chan's blithe, self-serving optimism about the FBI's supposed infallibility is obviously baseless; the FBI routinely targets domestic speech for censorship.

The Government relies on Yoel Roth's congressional testimony to bolster Chan's see-no-evil assessment of the FBI's accuracy, but in fact, Roth's testimony directly contradicts it. When asked, "Mr. Roth, Twitter usually found little evidence that the accounts the FBI flagged had ties to foreign influence. Is that correct?" Roth responded: "In part, but we received many reports from the FBI, particularly related to malign foreign interference that were highly credible and were constructive. So I would say *it was a bit of a mixed bag*." Doc. 266-2, at 88 (emphasis added). Thus, on Roth's view, the FBI was correct in "many reports," but there was often "little evidence that the accounts the FBI flagged had ties to foreign influence," so the FBI's accuracy was a "mixed bag." *Id.* Given its huge volume of reporting, this "mixed bag" means that the FBI is routinely flagging huge numbers of domestic, First Amendment-protected speakers and content.

One vivid example from Chan's public statements illustrates that the FBI was not "always proven correct," Doc. 266, at 96, but in fact, was colossally mistaken—with an overt political bias. Chan's master's thesis indicates that the FBI flagged the conservative-oriented "#ReleaseTheMemo" hashtag (supporting Congressman Devin Nunes's investigation regarding Russia collusion) as supposed Russian inauthentic activity, and it suggests that the FBI induced Twitter to remove thousands of Tweets amplifying that hashtag. Doc. 214-1, ¶ 943; *see also* Chan Ex. 1, at 71 (including the hashtag in a pie chart of 929,000 tweets removed as from "IRA-controlled accounts," including "#ReleaseTheMemo"). But at the time, Twitter's Global Policy Communications Chief Emily Horne wrote privately that this hashtag and a related hashtag "appear to be organically trending," and that Twitter "ha[s] not seen any indications that the accounts engaging in this activity for either hashtag are predominately Russian, or that Russian accounts are driving the engagement. The vast majority of what we're seeing here … appears to be organic in nature. Lots of prominent conservative Twitter accounts are using one or both of

these hashtags … This is inspiring a lot of both RTs and organic engagement." *See* Ex. E to Supplemental Declaration of Tammy Glenn, ¶ 26 ("Glenn Supp. Decl.," attached as Exhibit 1). Yoel Roth himself suggested that Twitter could "broadly refute" the "swirl around #releasethememo" suggesting that the hashtag was Russian in origin, which evidently the FBI erroneously bought into. Ex. F to Ex. 1 (Glenn Supp. Decl. ¶ 27). Yoel Roth wrote at the time, "I just reviewed the accounts that posted the first 50 tweets with #releasethememo, and … none of them have any signs of being tied to Russia." Ex. G to Ex. 1 (Glenn Supp. Decl. ¶ 28). Another Twitter executive wrote, "Yoel and the IQ team have been monitoring engagement around both #ReleaseTheMemo and #SchumerShutdown and **engagement appears to be organic/not driven by "Russian bots."** … We investigated, found that engagement was overwhelmingly organic and driven by strong VIT [Very Important Tweeter] engagement (including Wikileaks, DJT Jr., Rep. Steve King, and others)." Ex. H to Ex. 1 (Suppl. Glenn Decl. ¶ 29).

## ARGUMENT

The Government argues that the Court should prioritize protecting the freedom of *government officials* to speak freely to "promote government policies," instead of protecting private citizens' speech from government interference. Doc. 266, at 102. This argument is meritless. The Government's description of its speech as merely "promot[ing] government policies" is manifestly contrary to the evidence. *See supra*; *see also, e.g.,* Doc. 214-1, ¶ 34 (White House to Twitter on Tweet about Hank Aaron's death: "Hey folks – Wanted to flag the below tweet and am wondering if we can get moving on the process for having it removed ASAP."); *id.* ¶¶ 37-38 (White House to Twitter: "Please remove this account immediately…. Cannot stress the degree to which this needs to be resolved immediately."). In fact, all the Government's examples in the following paragraph involve federal officials trying to suppress private citizens' speech, not

express their own messages.  Doc. 266, at 103.  And this Court has rejected the Government's

legal argument: "[W]hile the government-speech doctrine is important—indeed, essential—it is a

doctrine that is susceptible to dangerous misuse.  If private speech could be passed off as

government speech by simply affixing a government seal of approval, government could silence

or muffle the expression of disfavored viewpoints."  Doc. 224, at 63 (quoting *Matal v. Tam*, 582

U.S. 218, 235 (2017)).  Here, the evidence shows much "more than the exercise of permissible

government speech.  It alleges extensive and highly effective efforts by government officials to

'silence or muffle the expression of disfavored viewpoints.'"  *Id.* (quoting *Matal*, 582 U.S. at 235).

The Government also argues that it was combating false or incorrect information "during

a pandemic that cost over a million Americans their lives," Doc. 266, at 102—implying that the

First Amendment was suspended during COVID-19.  That argument is meritless.  The Supreme

Court has made clear that even false or incorrect speech is protected by the First Amendment—

precisely because the Government cannot be trusted to be a fair or accurate arbiter of truth and

falsity, especially when it involves politically controversial questions.  "In light of the substantial

and expansive threats to free expression posed by content-based restrictions," the Supreme "Court

has rejected as 'startling and dangerous' a 'free-floating test for First Amendment coverage ...

[based on] an ad hoc balancing of relative social costs and benefits.'"  *United States v. Alvarez*,

567 U.S. 709, 717 (2012) (plurality op.) (quoting *United States v. Stevens*, 559 U.S. 460, 470

(2010)).  "Our constitutional tradition stands against the idea that we need Oceania's Ministry of

Truth."  *Id.* at 728.  Just two days ago, Justice Gorsuch decried the fact that, "[a]long the way, it

seems federal officials may have pressured social-media companies to suppress information about

pandemic policies with which they disagreed."  *Arizona v. Mayorkas*, No. 22-592, Slip op. 6 (May

18, 2023 (Statement of Gorsuch, J.).

## I.       Plaintiffs Have Demonstrated Immediate Irreparable Injury.

Defendants argue that Plaintiffs have failed to demonstrate ongoing or imminent irreparable injury. This argument fails.

### A.       Plaintiffs Experience Both Ongoing and Imminent Irreparable Injury.

"[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). The evidence shows Plaintiffs are facing both ongoing and imminent irreparable injuries of this kind. *See* Doc. 214-1, ¶¶ 1366-1442.

#### 1.       The Private Plaintiffs face ongoing and imminent irreparable injury.

First, the Private Plaintiffs face ongoing and imminent irreparable injuries. *See* Doc. 214-1, ¶¶ 1367-1411. Every time the private Plaintiffs execute Declarations, they face both ongoing and imminent future acts of censorship. *See* Docs. 10-3 (Bhattacharya Decl.); 10-4 (Kulldorff Decl.); 10-5 (Hoft Decl.); 10-7 (Kheriaty Decl.); 10-12 (Hines Decl.) (Declarations from June 2022). The Court has held that the statements in these Declarations, which the Complaint incorporates, establish both ongoing and imminent irreparable injury. Doc. 224, at 8-13 (detailing the evidence in these Declarations); *id.* at 34 (holding that "the Private Plaintiffs allege a substantial risk of future censorship injuries"); *id.* at 36 (noting that "Private Plaintiffs each allege that they have suffered past *and* ongoing censorship"). This Court held that the course of past censorship "raise[s] an inference that [Bhattacharya] is imminently likely to experience future acts of censorship," and that Kulldorff's Declaration "attests to ongoing injuries and support an expectation of imminent future injuries." *Id.* at 36. Kheriaty, likewise, "attests to ongoing and expected future injuries." *Id.* at 36-37. And "Hoft and Hines attest to similar past, ongoing, and expected future censorship injuries." *Id.* at 37. These Declarations "are more than complaints of past wrongs," and "[t]he threat of future censorship is substantial, and the history of past censorship

is strong evidence that the threat of future censorship is not illusory or merely speculative." *Id.* In addition, "Plaintiffs' request for an injunction does not merely seek to redress the initial imposition of their censorship penalties, but rather their continued maintenance and enforcement." *Id.*; *see also, e.g.,* Docs. 10-2 (Senger Decl.); 10-8 (Allen Decl.); 10-9 (Changizi Decl.); 10-10 (Kotzin Decl.); 10-11 (Kitchen Decl.); 10-14 (McCollum Decl.); 10-15 (Gulmire Decl.).

Further, on March 20, 2023, the Private Plaintiffs filed supplemental declarations attesting to the injuries that they experience, on a continuing and imminent basis, as *audiences* of the speech of others on social media. *See* Docs. 227-5 (Bhattacharya Supp. Decl.); 227-6 (Kulldorff Supp. Decl.); 227-7 (Kheriaty Supp. Decl.); 227-8 (Hoft Supp. Decl.); 227-9 (Hines Supp. Decl.). Moreover, the Private Plaintiffs continue to experience ongoing, active, and imminent future censorship injuries to this day—including extensive injuries that have occurred since Plaintiffs filed their supplemental brief on March 6, 2023, including harms experienced up to the date of this filing. *See* Second Supplemental Declaration of Jill Hines, ¶¶ 6-14 (attached as Exhibit 2); Second Supplemental Declaration of Jim Hoft, ¶¶ 5-14 (attached as Exhibit 3).

**2.    The Plaintiff States face ongoing and imminent future injuries.**

Likewise, the Plaintiff States face ongoing and imminent future injuries. *See* Doc. 214-1, ¶¶ 1427-1442 (detailing injuries to Plaintiff States). The evidence demonstrates "extensive federal censorship limiting the free flow of information on social-media used by 'millions of Missourians and Louisianans, and very substantial segments of the populations of Missouri, Louisiana, and every other State." Doc. 224, at 26. The evidence demonstrates a "federal regime of mass censorship," *id.* at 27, which is ongoing and expanding on every front. *See supra*. The States have every reason to expect that their injuries, and the injuries to their citizens, are both ongoing, imminent, and continuing. This includes ongoing "injuries to the States' sovereign interest in the power to create and enforce a legal code." Doc. 224, at 29. Defendants' "censorship program" is

"a federal assertion of authority to regulate matters that the States seek to control." *Id.* "[B]oth Louisiana and Missouri have adopted fundamental policies favoring the freedom of speech." *Id.* (citing Mo. Const. art. I, § 8 *and* La. Const. Ann. art. I, § 7). The evidence demonstrates "extra-legal, unauthorized action by Defendants" that interferes with these fundamental policies favoring their citizens' freedom of speech. *Id.*

The Declarations of Patrick Flesch, Doc. 10-6, and Ashley Bosch, Doc. 10-13, attest to the States' ongoing and imminent future injuries from large-scale federal censorship. *See also* Doc. 224, at 7. Mr. Flesch and Ms. Bosch explain that large-scale federal censorship obstructs state agencies' ability to access and understand their constituents' true beliefs and thoughts on matters of public concern, which is essential for the States to craft messages and public policies that are responsive to the States' concerns. *See* Doc. 10-6, ¶¶ 4-10; Doc. 10-13, ¶¶ 4-7. The Government's witness, Carol Crawford, attests to the very same injuries—that social-media censorship interferes with a government agency's ability to craft messages that are responsive to its constituents' actual thoughts and concerns. *See* Doc. 214-1, ¶¶ 590-595. She testifies that it is important for government "communicators to know what conversations occurs on social media because it helps us identify gaps in knowledge, or confusion, or things that we're not communicating effectively that we need to adjust." *Id.* ¶ 591. Social-media censorship interferes with this interest because "if they were deleting content we would not know what the themes are," and they could not "update communication activity" to address them. *Id.* ¶ 593.

Likewise, this Court has determined that the States have *parens patriae* standing to defend the diffuse censorship injuries experienced by a "substantial segment" of each States' population— *i.e.*, the millions of Missourians and Louisianans who no longer have access to a free and open public square on social media. *See* Doc. 224, at 22-28. Here, the evidence shows "extensive

federal censorship limiting the free flow of information on social-media platforms used by 'millions of Missourians and Louisianans, and very substantial segments of the populations of Missouri, Louisiana, and every other State," which afflicts "enormous segments of [the States'] populations." *Id.* at 26. Further, while this censorship continues, "the States and a substantial segment of their population are being 'excluded from the benefits that flow from participation in the federal system.'" *Id.* at 27 (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 608 (1982)). The First Amendment is "one of the most important benefits bestowed by the federal Constitution." *Id.* The evidence shows ongoing federal censorship activities, which necessarily "are excluding the States and their residents form an important benefit 'meant to flow from participation in the federal system.'" *Id.* at 27-28 (quoting *Snapp*, 458 U.S. at 608).

### 3.  Defendants' censorship activities are continuing.

There is overwhelming evidence that Defendants' censorship activities are ongoing and will continue unabated, and expand, absent court intervention. These activities present an immediate, present, and imminent threat of future censorship injuries to Plaintiffs and virtually all citizens of Missouri and Louisiana.

Defendants argue that Plaintiffs cannot infer from Defendants' *past* misfeasance that they will continue to inflict future injuries. *See* Doc. 266, at 113-114. This argument is both factually and legally meritless. It is factually meritless because Defendants have engaged in widespread, repeated, and ongoing censorship activities, coupled with numerous public statements and private testimony indicating that they intend to continue and expand their censorship activities. *See, e.g.,* Doc. 214-1, ¶¶ 29-30, 193-197 (public threats from the White House of adverse legal consequences if platforms do not increase censorship of disfavored viewpoints, made throughout 2022); ¶¶ 188-199 (evidence that the White House continued to pressure platforms to censor speech through 2022); ¶¶ 200-211 (public statements from the White House indicating its intent to censor a whole

range of new topics); ¶¶ 424-425 (the Surgeon General's Office continues to pressure platforms into 2022); ¶¶ 561-562 (the CDC continues to engage with platforms on censoring "misinformation" on health-related topics, stating that its "focus is not solely on COVID. We're focusing on other topics" as well); ¶¶ 966-967 (Chan testifies that the FBI "just pretty much rolled into preparing for 2022"); ¶¶ 1094-1122 (extensive evidence that CISA is continuing, and intends to continue, its censorship activities, and expand them to address a wide range of new topics).  This Court has already drawn the compelling inference that these facts raise: "Plaintiffs easily satisfy the substantial risk standard. The threat of future censorship is substantial, and *the history of past censorship is strong evidence that the threat of further censorship is not illusory or merely speculative*."  Doc. 224, at 37 (emphasis added).  Here, the lengthy "history of past censorship," *id.*, that continues right up to the present day, combined with numerous statements of intention to increase and expand these efforts, demonstrates that Defendants pose an imminent threat of future censorship injuries on Plaintiffs.  Moreover, as this Court has also held, "Plaintiffs' request for an injunction does not merely seek to redress the initial imposition of their censorship penalties, but rather their continued maintenance and enforcement." *Id.*

Defendants' argument is also legally meritless, because it relies almost entirely on acts of voluntary cessation that occurred after Defendants were sued, which courts appropriately view with great skepticism.  As their primary example of supposedly long-past conduct, Defendants argue that "CISA discontinued its switchboarding activities after the 2020 election …. Switchboarding efforts that ceased over two years ago … do not show ongoing or imminent irreparable harm."  Doc. 266, at 114.  But, as Scully admitted in his deposition and Geoff Hale's declaration concedes, CISA supposedly discontinued its "switchboarding" activities in "late April or early May 2022," *i.e.*, just after it had been sued in this case challenging its switchboarding

activities.  *See supra*; *see also* Doc. 214-1, ¶ 975; Doc. 266, at 77; Doc. 266-5, at 175.   Further,

the record demonstrates that CISA took careful steps to ensure that its "switchboarding" would

continue through alternative channels, as Lauren Protentis of CISA lobbied the platforms in the

spring and summer of 2022 to provide state and local officials with alternative channels to submit

their misinformation reports.   Doc. 214-1, ¶¶ 1094-1096.   "[A] defendant claiming that its

voluntary compliance moots a case bears the formidable burden of showing that it is *absolutely*

*clear the allegedly wrongful behavior could not reasonably be expected to recur*." *Already, LLC*

*v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (emphasis added).  Defendants cite no evidence that to show

that it is "absolutely clear" that their censorship activities "could not reasonably be expected to

recur," *id.*, and there is a mountain of evidence to the contrary.  *See also, e.g., West Virginia v.*

*E.P.A.*, 142 S. Ct. 2587, 2607 (2022).

Defendants' agency-specific arguments fare no better.   In each case, the evidence

demonstrates that the particular agency is fully committed to its federal censorship activities and

intends to expand them as soon as it can get away with it.

First, Defendants claim that the White House poses no imminent threat of future censorship

because Plaintiffs' claims "are based almost exclusively on public and private statements that

occurred in 2021." Doc. 266, at 115.  This argument fails for two reasons.  First, the evidence of

the White House's COVID-19 censorship is not "based exclusively on … statements that occurred

in 2021," *id.*; it includes extensive evidence of public and private demands for censorship that

continued throughout 2022, up until Defendants made their document production.  *See* Doc. 214-

1, ¶¶ 29-30 (White House statements calling for Section 230 reform unless platforms increase

censorship in September 2022); ¶¶ 192-197 (Psaki making similar public threats in 2022); ¶¶ 198-

199 (Flaherty insisting that platforms continue to send COVID insight reports so that the White

House could monitor their censorship of claims about early-childhood COVID vaccines).  Second,

the evidence of White House censorship is not confined to speech about COVID vaccines.  Tthe

White House has made a long series of recent public statements indicating that they are

aggressively engaged in pushing for social-media censorship on other topics, like abortion, climate

change, "misinformation" about "gender-affirming care," "gendered disinformation,"

"disinformation campaigns targeting women and LGBTQI+ individuals who are public and

political figures, government and civic leaders, activists, and journalists," and so forth.  *See id.*

¶¶ 201-211.  In fact, the Government's brief *avows* that the White House will continue to push

social-media platforms to censor disfavored viewpoints.  *See* Doc. 266, at 115 ("Urging … social

media companies … to accept their role in the Nation's collective effort to combat the coronavirus

was (and remains) an essential element of the Government's duty and responsibility…").  Here,

"[t]he threat of future censorship is substantial, and the history of past censorship is strong evidence

that the threat of further censorship is not illusory or merely speculative."  Doc. 224, at 37.

Next, the Government argues that CISA poses no imminent threat of future censorship

because "CISA decided in April or May 2022 not to provide switchboarding services for the 2022

election cycle and has no intention of engaging in switchboarding for the next election."  Doc 266,

at 116.  Defendants also note that "CISA has not participated in the USG-Industry meetings since

the 2022 general election," *id.* at 118—thus conceding that CISA *did* participate in them during

the most recent election cycle.  And Defendants note that CISA has ordered its unfortunately

named "MDM Subcommittee" to "stand down in December 2022."  *Id.* at 118.  As noted above,

all these are merely evidence of *post-litigation* voluntary cessation.  CISA's *pre-litigation* conduct

and public statements demonstrate an extremely strong commitment and plan to expand its

censorship activities.  *See, e.g.,* Doc. 214-1, ¶¶ 1094-1122 (extensive evidence of CISA's ongoing

commitment to and involvement in social-media censorship); ¶¶ 1094-1096 (Lauren Protentis lobbying platforms to set up an alternative channel for "switchboarding" in 2022); ¶ 1097 (CISA "regularly" sets up an "operation center" each election day that reports supposed "misinformation" to platforms in real time); ¶ 1098 (CISA continues to fund the Center for Internet Security's EI-ISAC, which continues to report election-related "misinformation" to platforms through 2022); ¶ 1114 (Director Easterly stated in November 2021 that CISA is "beefing up its misinformation and disinformation team"); ¶ 1107 (Easterly met with Facebook about the 2022 election cycle in January 2022); ¶ 1108 (Easterly's text messages in February 2022 state that she wants CISA to "play a coord role" on federal censorship "so that not every D/A is independently reaching out to platforms which could cause a lot of chaos," and that "[p]latforms have got to get comfortable with gov't"); ¶ 1110 (leaked copy of September 2022 quadrennial-review document for DHS calls for DHS to target "inaccurate information" on topics like "the origins of the COVID-19 pandemic and the efficacy of COVID-19 vaccines, racial justice, U.S. withdrawal from Afghanistan, and the nature of U.S. support to Ukraine"); ¶¶ 1111, 1115-1116  (Scully's testimony confirming that CISA is, in fact, working on disinformation projects on the efficacy of COVID vaccines, the origins of the COVID virus, the war in Ukraine, and "misinformation" that affects the "financial services industry," since all that "misinformation" supposedly threatens "critical infrastructure"); ¶ 1118 (CISA's Cybersecurity Advisory Committee recommending to Easterly that CISA expand its efforts to stop "the spread of false and misleading information" by "consider[ing] MD across the information ecosystem," including "social media platforms of all sizes, mainstream media, cable news, hyper partisan media, talk radio, and other online resources"). And, as of March 6, 2023, CISA's website continued to proclaim that "[t]he MDM team serves as a switchboard for routing disinformation concerns to appropriate social media platforms." *Id.* ¶ 1120.

As to the CDC, Defendants contend that "Plaintiffs' challenge looks to past actions."  Doc. 266, at 118.  Once again, the evidence tells a different story.  As late as June 29, 2022—shortly before Defendants made their document production—Crawford corresponded with YouTube about finding a government agency to debunk and censor claims about using progesterone to reverse chemical abortion.  Doc. 214-1, ¶ 561.  About this exchange, Crawford testified that the CDC's involvement in censorship is not limited to COVID and did not end with COVID: the CDC's "focus is not solely on COVID.  We're focusing on other topics. … [YouTube] though we might be able to help with this topic as well," *id.* ¶ 562—which Crawford's response indicates that she did.  In response, Defendants point to the Crawford Declaration (Def. Ex. 80) to claim that the CDC has stopped communicating with platforms about misinformation, but that Declaration states: "To the best of my knowledge, since *March 2022*, there has not been a meeting between CDC personnel and personnel from a social media or technology company where misinformation has been discussed…."  Doc. 266-5, at 72 (Crawford Decl. ¶ 12) (emphasis added).  Thus, the CDC continued to meet with platforms about misinformation until just before this lawsuit was filed.

Next, Plaintiffs claim that NIAID poses no threat of future censorship because Dr. Fauci has now retired.  Doc. 266, at 121.  But Dr. Fauci has been replaced by Dr. Hugh Auchincloss, his former chief deputy, who was a key co-conspirator in Dr. Fauci's plots to discredit and suppress disfavored viewpoints through deception.  Dr. Auchincloss was the recipient of Dr. Fauci's notorious email at 12:29 a.m. on February 1, 2020, stating "Hugh: It is essential that we speak this AM.  Keep your cell phone on … You will have tasks today that must be done." Doc. 214-1, ¶ 640.  That email launched Dr. Fauci's conspiracy to censor the lab-leak theory on social media.

As to the GEC, Defendants argue that the GEC is no longer involved in flagging misinformation through the Election Integrity Partnership.  As the EIP report states, "groups that

reported tickets include *the State Department's Global Engagement Center*." Doc. 214-1, ¶ 1197 (emphasis added). Defendants rely on the Declaration of Leah Bray, Doc. 266-6, at 199-206 (Def. Ex. 142), but Bray makes a series of damning admissions that confirm the GEC's heavy involvement in censorship activities, including the EIP, and do nothing to allay the threat of future censorship. Bray states that the GEC intends to "flag for social media companies examples of propaganda and disinformation … aimed at harming U.S. interests." *Id.* at 204. And Bray admits that, "[d]uring the 2020 U.S. election cycle, the GEC discovered certain posts an narratives on social media that originated from, were amplified by, or ***likely to be amplified*** by foreign malign influence actors … that sought to spread propaganda or disinformation about the 2020 election," and "the GEC flagged these posts and narratives for the Election Integrity Partnership (EIP) on ***approximately 21 occasions***." *Id.* at 205 (emphasis added). In other words, the GEC flagged— not just foreign-originated speech—but *domestic* speech, just because the GEC predicted that such domestic content was "likely to be amplified" by malign foreign actors. *Id.* This is a stunning admission. So, too, is Bray's admission that the GEC flagged "posts or *narratives*" to the Election Integrity Partnership on "21 occasions." *Id.* Defendants also contend that the GEC has ceased its censorship activities with the EIP, but actually, Bray makes only one terse statement on this point: "Presently, the GEC is not doing any work with EIP." *Id.* at 206. That statement fails to provide any evidence of any firm commitment to withdraw from such activities in the future.

### 4.    Plaintiffs did not "unreasonably delay" in seeking relief.

Defendants argue that Plaintiffs engaged in "substantial delay in seeking relief" that "undermines any assertion that such harms are irreparable." Doc. 266, at 126. This argument contradicts black-letter law. Ongoing First Amendment violations constitute irreparable injury, regardless of how long the injuries have already been occurring; "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod*

*v. Burns*, 427 U.S. 347, 373 (1976).  In any event, Plaintiffs did not unreasonably delay, but filed suit diligently when public evidence became available of Defendants' censorship activities. Indeed, the Government made this very argument in opposing Plaintiffs' motion for expedited preliminary-injunction-related discovery, Doc. 26, at 15-17, but the Court rejected it, and it is no more persuasive now.  Plaintiffs decisively refuted this argument in their reply in support of the motion for preliminary injunction, Doc. 30, at 12-14, and they incorporate by reference that refutation here.  *See id.* (citing, *inter alia*, *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 297 (5th Cir. 2012); *Arc of California v. Douglas*, 757 F.3d 975, 990–91 (9th Cir. 2014); and *Cuviello v. City of Vallejo*, 944 F.3d 816, 833 (9th Cir. 2019)).

## II.    The Evidence Demonstrates That State and Private Plaintiffs Have Standing.

Defendants admit that their arguments on standing re-hash the lengthy arguments on standing in their motion to dismiss, which the Court has already rejected.  *See* Doc. 266, at 128-129 (acknowledging the Court's ruling on standing and stating that "Defendants respectfully disagree with the Court's analysis … and hereby incorporate by reference and reassert those arguments in opposition to Plaintiffs' request for preliminary relief").  Plaintiffs incorporate by reference their prior briefing on standing, and the Court's thorough, detailed, and well-reasoned analysis of Plaintiffs' standing in its order denying the motion to dismiss.  *See* Doc. 224, at 18-48. On the question of Article III injury, Defendants' additional arguments in their preliminary-injunction response largely rehash their arguments regarding irreparable injury.  Doc. 266, at 130-132.  These arguments are refuted in detail above.  *See supra*.

On both irreparable harm and standing, Defendants argue that Plaintiffs cannot show any link between their injuries and acts of censorship of third parties, such as Tucker Carlson, Tomi Lahren, Alex Berenson, the "Disinformation Dozen," and other speakers that are and continue to be targeted for censorship.  This argument is wrong for at least five reasons.  First, there is

extensive evidence that the Private Plaintiffs, like those other speakers, are directly targeted by federal censors: Drs. Bhattacharya and Kulldorff, as co-authors of the Great Barrington Declaration, were directly targeted by Drs. Fauci and Collins, Doc. 214-1, ¶¶ 783-808; Jim Hoft's *The Gateway Pundit* is constantly targeted by CISA, the Election Integrity Partnership, and the Virality Project, *id.* ¶¶ 1069, 1156, 1192, 1207-1216, 1324; and the Virality Project aggressively targets "health freedom" groups like Jill Hines's "Health Freedom Louisiana," *id.* ¶¶ 1266-1268, 1316-1323; among others.  Second, the Private Plaintiffs also attest that they follow and read the speech of many speakers explicitly targeted by federal censorship, such as Tucker Carlson, Alex Berenson, members of the Disinformation Dozen, dozens mentioned in the EIP and VP reports, and many others.  *See* Doc. 227-5, ¶ 5 (Bhattacharya Supp. Decl.); Doc. 227-6, ¶ 5 (Kulldorff Supp. Decl.); Doc. 227-7, ¶¶ 5-6 (Kheriaty Supp. Decl.); Doc. 227-8, ¶¶ 6-7 (Hoft Supp. Decl.); Doc. 227-8, ¶¶ 5-6 (Hines Supp. Decl.).  The censorship of any of these dozens of speakers by federal officials inflicts ongoing irreparable injury on the Private Plaintiffs as their audience members.  Third, the Court has upheld the *parens patriae* standing of the States to represent the interests of their millions of citizens who read and follow speakers on social media, who receive highly diffuse injuries each time federal officials squelch speakers and content they would otherwise read. Doc. 224, at 22-28. Fourth, the States suffer an ongoing battery of direct injuries from widespread social-media censorship, including direct censorship injuries, the loss of the ability to follow their constituent's views on politically sensitive topics, and the distortion of processes through which citizens petition them for redress of grievances. *See id.* at 7-8 (describing the States' assertion of these injuries).  Fifth, Plaintiffs are likely to succeed in their motion for class certification, Doc. 227, which will result in their class-wide representation of all current and future speakers targeted by federal censorship activities, on an ongoing basis.

On the question of traceability and redressability, Defendants argue that "Plaintiffs must show that those content moderation actions would not occur 'in the absence of' those communications." Doc. 266, at 131. Plaintiffs have established this abundantly, by pointing to undisputed evidence of dozens of instances where it is perfectly clear that the content moderation would not have happened if federal officials had not flagged it or been involved. *See supra*. Finally, Defendants rely again on the woefully unconvincing analysis of Dr. Gurrea. Doc. 266, at 135-136. Dr. Guerra's analysis is refuted in detail above. *See supra*.

## III.    Plaintiffs Are Likely To Prevail on Their First Amendment Claims.

Defendants provide a lengthy discussion of state action that rehashes arguments made in their motion to dismiss on the same points. *See* Doc. 266, at 136-250. This Court has already considered and rejected most of these arguments. *See* Doc. 244, at 56-68.

As both the Supreme Court and this Court have stated, "[i]t is axiomatic that a state may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish." Doc. 224, at 57 (quoting *Norwood v. Harrison*, 413 U.S. 455 (1973)). Defendants argue the exact opposite—that it is perfectly acceptable for federal officials to induce, encourage, and promote private persons to accomplish what they are constitutionally forbidden to accomplish, *i.e.*, the censorship of free speech on social media. That is incorrect.

Defendants argue that President Biden merely "exercise[s] … his bully pulpit" to encourage social-media platforms to censor disfavored viewpoints. But as this Court has noted, President Biden has done much more than that, including threatening the CEO of a major social-media platform with civil liability and criminal prosecution for not censoring disfavored speech. *See* Doc. 224, 62 (noting that, "almost directly on point with the threats in *Carlin* and *Backpage*, that President Biden threatened civil liability and criminal prosecution against Mark Zuckerburg

if Facebook did not increase censorship of political speech"); Doc. 214-1, ¶¶ 20-21 (quoting Biden's public threats).

Defendants argue that Plaintiffs' contention that the federal officials' pressure and collusion occurs "against the backdrop" of such public threats "suffers from a fatal chronological contradiction," because the lawsuit challenges many actions that occurred in 2020. Doc. 266, at 139. This argument is specious. Plaintiffs' evidence includes many such threats occurring in 2019 and before, *see* Doc. 214-1, ¶¶ 1-30—including now-President Biden's threat of civil liability and criminal prosecution for platforms that do not censor enough political speech, which were made in early 2020, which Biden was a candidate. *Id.* ¶ 20. Elvis Chan's testimony reveals a pressure campaign of public and private threats from federal officials against social-media platforms to induce them to censor election-related speech going back to 2017. *Id.* ¶¶ 945-961. Alex Stamos of the EIP, working closely with national-security agencies like CISA, pressured platforms to adopt more aggressive censorship policies in August 2020, *id.* ¶¶ 1147-1149, and attributes success to the fact that platforms (in 2020) feared "huge potential regulatory impact" in "the United States," *id.* ¶ 1234. Defendants' threats accelerated and became more menacing once they controlled the White House and both Houses of Congress in 2021—and censorship then accelerated too.

A.     **There Is Overwhelming Evidence of "Significant Encouragement."**

In its discussion of "significant encouragement," the Government relies on *La. Div. Sons of Confederate Veterans v. City of Natchitoches*, 821 F. App'x 317, 320 (5th Cir. 2020). Doc. 266, at 144. But that case involved only a simple request from a local mayor to a private association to forbid the display of the Confederate battle flag in an annual parade, backed by no threat of legal sanctions or any other factor amounting to "significant encouragement." *See id.* Here, by contrast, the evidence includes "threats, some thinly veiled and some blatant, made by Defendants,"

including "threats that far exceed, in both number and coercive power, the threats at issue," Doc. 224, at 61, in cases like *Louisiana Division of Sons of Confederate Veterans*.

Defendants also rely heavily on the Ninth Circuit's recent decision in *O'Handley v. Weber*, 62 F.4th 1145, 1154 (9th Cir. 2023), which involved a state government office flagging posts to Twitter. *See* Doc. 266, at 143-144. This Court has already addressed *O'Handley* in detail, noting that the Ninth Circuit held that the government did "not threaten adverse consequences" and the plaintiff "failed to allege any threat or attempt at coercion aside from the takedown request." Doc. 224, at 60; *see also id.* at 65 ("[T]he allegations here are distinguishable from those in *O'Handley*."). The opposite is true here, and this case resembles *Backpage.com*, which endorsed "the more fundamental principle that a government entity may not employ threats to limit the free speech of private citizens." Doc. 224, at 63 (citing *Backpage.com*, LLC, 807 F.3d at 235). Thus, even if "significant encouragement" required a showing of "essential compulsion" as the Government contends, Doc. 266, at 145—an argument which would abolish the distinction between significant encouragement and compulsion—Plaintiffs have made a strong showing of "compulsion" here. Defendants claim that "Plaintiffs are unable to cite a single factually analogous case supporting their position," Doc. 266, at 146, but in fact, *Backpage.com*, *Bantam Books*, *Carlin Communications*, and many other cases are directly analogous to Plaintiffs' position—as the Court has already held. Doc. 224, at 62 (holding that the facts here are "almost directly on point with the threats in *Carlin* and *Backpage*").

Defendants also argue that "significant encouragement" can only be established by a showing of "positive incentives." Doc. 266, at 146. The Government cites no case so holding, but even if that were so, it would be satisfied here. As the Court has noted, each of Defendants' threats carries with it an implied reward: "The Defendants' alleged use of Section 230's

immunity—and its obvious financial incentives for social-media companies—as a metaphorical carrot-and-stick *combined* with the alleged back-room meetings, hands-on approach to online censorship, and other factors discussed above transforms Defendants' actions into state action." Doc. 224, at 68; *see also* Doc. 84, ¶ 18 ("The flip side of such threats, of course, is the implied 'carrot' of retaining Section 230 immunity and avoiding antitrust scrutiny, allowing the major social-media platforms to retain their legally privileged status that is worth billions of dollars of market share.") (quoted at Doc. 224, at 5).

### 1.    The White House engages in significant encouragement.

Defendants' arguments that each individual agency's conduct falls short of "significant encouragement" applies an impossibly stringent version of the "significant encouragement" test that lacks support in the case law. *See* Doc. 266, at 148-193. They are factually meritless too.

Defendants argue that, to invoke the "significant encouragement" test, Plaintiffs must identify the "specific conduct of which the plaintiff complains." Doc. 266, at 149 (quoting *Moody v. Farrell*, 868 F.3d 348, 352 (5th Cir. 2017)). Even if that were the standard, Plaintiffs easily satisfy it. They have submitted extensive evidence of specific actions of censorship by social-media platforms that are attributable to government pressure. *See supra*. Defendants argue that "the platforms have been moderating COVID-19 content … since at least January 2020, well before the White House Defendants took office." Doc. 266, at 150. But the evidence shows that, once the White House Defendants took office, the censorship that the platforms imposed on their own was not nearly enough for them, and they aggressively demanded more.

Defendants argue that Flaherty merely "requested information" to "better understand" their policies. Doc. 266, at 151-152. This gravely mischaracterizes the evidence. *See supra*.

Defendants argue that "the Government has … an interest in urging social media companies to help in that effort [against COVID] by curbing the spread of potentially harmful

misinformation on their platforms." Doc. 266, at 153. On the contrary, under the First Amendment, the Government has no valid interest in pressuring private publishers to censor the private speech of American citizens. This is especially true when the Government's "urging" of social-media platforms, *id.*, is backed by "threats, some thinly veiled and some blatant." Doc. 224, at 61. Defendants cite no case holding that the Government's alleged "power" to "encourage … actions deemed to be in the public interest" includes actions that would violate the Constitution if performed by the Government. As *Norwood* stated: "[I]t is axiomatic that a state may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish." *Norwood*, 413 U.S. at 455 (quoted in Doc. 224, at 57).

Defendants argue that private citizens may flag perceived misinformation to social-media platforms, and they contend that "[i]t would be remarkable if the Government would be powerless to do the same." Doc. 266, at 176. Quite the contrary—the Government is bound by the First Amendment, and private citizens acting independently of government are not, so there is nothing "remarkable" about the fact that the Government is held to different standards than private persons.

Defendants argue that the White House requested the removal of posts "with no strings attached," Doc. 266, at 156. On the contrary, the White House's communications with platforms are marked by a long series of express and implied threats, as discussed above. *See supra.*

Defendants' discussion of the suspension and deplatforming of Alex Berenson, Doc. 266, at 159-160, gravely distorts the evidence. As discussed above, the White House pushed Twitter to deplatform Alex Berenson in a private meeting in April 2022, but Twitter declined to do so, since Berenson was not violating their policies. Doc. 214-1, ¶ 103. Then, the White House and Dr. Fauci put coordinated public pressure to deplatform Berenson, and Twitter suspended him for the first time within hours of the culmination of that pressure campaign. *Id.* ¶ 163.

## 2.    The Surgeon General engages in significant encouragement.

Defendants argue that the Surgeon General's Health Advisory cannot be viewed as a threat

because it "uses only precatory language." Doc. 266, at 161.  Even viewed in complete isolation,

the Advisory's urgent demands for greater censorship of disfavored viewpoints violate the First

Amendment.  *See Norwood*, 413 U.S. at 455.  Moreover, the Health Advisory did not occur in

isolation.  It was announced at a press conference where Psaki made public demands against social-

media platforms and Dr. Murthy accused them of "poisoning" and demanded "accountability"

against them; it was closely followed by the President's comment "They're killing people" and a

battery of threats of adverse legal consequences from Psaki and White House Communications

Director Kate Bedingfield; and both preceded and followed by a long campaign of private pressure

and threats in covert meetings between the platforms, the White House, and the Surgeon General

and his staff.  *See supra.*  Defendants rely on the district courts' opinions in *Hart v. Facebook,*

*Inc.*, No. 22-cv-737, 2022 WL 1427507, at *7 (N.D. Cal. May 5, 2022), and *Changizi v. HHS*, 602

F. Supp. 3d 1031, 1056 (S.D. Ohio 2022), *see* Doc. 266, at 161-162, but this Court has already

rejected their reliance on those cases.  Doc. 34, at 7-8; Doc. 224, at 42-43.

Defendants argue that there is no evidence that Facebook took any steps in response to the

Advisory.  Doc. 266, at 163.  The evidence directly contradicts this claim, as it shows that Dr.

Murthy and Eric Waldo specifically requested that Facebook (and other platforms) report back in

two weeks to tell OSG what "new/additional steps you are taking with respect to health information

in light of the advisory," Doc. 214-1, ¶ 364; and, exactly two weeks later, Facebook provided a

long, detailed report on "new steps that Facebook is taking," including "further policy work to

enable stronger action against persistent distributors of vaccine misinformation."  *Id.* ¶¶ 374-377.

Contrary to Defendants' reliance on Facebook's public statements, Doc. 266, at 164-165, this

email to OSG details *additional* steps against the "Disinformation Dozen."  Doc. 214-1, ¶ 375.

Defendants likewise err when they characterize the Surgeon General's statements as mere "broad stances" on policy that merely "embody the Government's right to speak for itself." Doc. 266, at 166 (cleaned up) (quoting *Changizi*, 602 F. Supp. 3d at 1054). The "Government's right to speak for itself" does not extend to demanding and pressuring private parties to silence disfavored viewpoints.

Defendants argue that the Surgeon General's RFI constituted neither a demand nor a threat. Doc. 266, at 167-168. As discussed above, both the plain text of the RFI and its context—coming after a long campaign of joint pressure from the White House and OSG—demonstrate the opposite. *See supra*. In particular, the Surgeon General both preceded and followed the RFI with public statements calling for government "safety standards" and "speed limits" to be imposed on platforms that host misinformation—a clear threat of government regulation, accompanied by a formal RFI that is an ordinary precursor to regulation. Doc. 214-1, ¶ 410, 423. *See also* Doc. 224, at 61 (noting that "the Surgeon General issued a formal 'Request for Information' to social-media platforms as an implied threat of future regulation to pressure them to increase censorship").

### B. There Is Overwhelming Evidence of Coercion.

Defendants argue that the evidence fails to demonstrate coercion under cases like *Bantam Books*. Once again, the Court has already considered and rejected most of their arguments, holding that the facts alleged in the Complaint—which the evidence strongly supports—constitute coercion. *See* Doc. 224, at 62 ("The Court finds that the Complaint alleges significant encouragement and coercion that converts the otherwise private conduct of censorship on social-media platforms into state action, and is unpersuaded by Defendants' arguments to the contrary."); *see also id.* (noting that Plaintiffs have identified "threats that far exceed, in both number and coercive power, the threats at issue" in other cases involving government coercion).

First, Defendants rehash their "specific conduct" argument. Doc. 266, at 170. This argument has no merit. Plaintiffs allege extensive threats—both broad public threats providing the backdrop for the private pressure, and express and implied threats made in private—to induce social-media platforms to censor viewpoints disfavored by federal officials. *See supra*; *see also, e.g.,* Doc. 214-1, ¶¶ 1-30. Each time a federal official or agency pressures, colludes, or cajoles a platform to censor COVID or election-related speech, he or she does so against the backdrop of a clear message from the President, from a battery of senior White House officials, and from their allies in control of Congress: Comply with federal demands for censorship, or else suffer ruinous legal consequences. *See id.* Each specific demand, request, cajoling, or act of flagging draws coercive force from that ceaseless battery of threats.

Defendants argue that they "made no threats and instead sought to persuade." Doc. 266, at 171. But the evidence contains a long series of specific threats of adverse legal consequences. The Court has described the same threats as follows: "Specifically, Plaintiffs allege and link threats of official government action in the form of threats of antitrust legislation and/or enforcement and calls to amend or repeal Section 230 of the CDA with calls for more aggressive censorship and suppression of speakers and viewpoints that government officials disfavor." Doc. 224, at 61-62. The evidence includes "blatant" threats "made by Defendants in an attempt to effectuate [the] censorship program." *Id.* at 61. Defendants claim that *Bantam Books*, 372 U.S. at 60-62, is distinguishable because "there is no evidence that any Defendant asserted that the content moderation choices of social media companies would result in criminal (or civil) proceedings, or retaliatory government action of any kind." Doc. 266, at 171. On the contrary, "President Biden threatened civil liability and criminal prosecution against Mark Zuckerburg if Facebook did not increase censorship of political speech," Doc. 224, at 62; and the evidence "link[s] threats of

official government action in the form of threats of antitrust legislation and/or enforcement and calls to amend or repeal Section 230 of the CDA with calls for more aggressive censorship and suppression of speakers and viewpoints that government officials disfavor." Doc. 224, at 61-62. As *Bantam Books* held, "[p]eople do not lightly disregard public officers' thinly veiled threats to institute criminal proceedings against them if they do not come around." 372 U.S. at 68. So also here, private companies do not "lightly disregard," *id.*, demands and threats coming from "the highest (and I mean highest) levels of the WH." Doc. 214-1, ¶ 108.

Citing the Ninth Circuit's decision in *Doe v. Google LLC*, No. 21-16934, 2022 WL 17077497, at *2 (9th Cir. Nov. 18, 2022) (unpub.), Defendants argue that "remarks by government officials that 'lack force of law' are 'incapable' of sustaining a coercion theory." Doc. 266, at 173. On the contrary, "any suggestion that a threat must be enforceable in order to constitute coercive state action is clearly contradicted by the overwhelming weight of authority." Doc. 224, at 62 (citing numerous cases). As Judge Posner wrote in *Backpage.com*—where Sheriff Dart lacked legal authority to take any action against the credit-card companies that he pressured to stop doing business with Backpage, *see* 807 F.3d at 230—"the fact that a public-official defendant lacks direct regulatory or decisionmaking authority over a plaintiff, or a third party that is publishing or otherwise disseminating the plaintiff's message, is not necessarily dispositive." *Id.* "A public-official defendant who threatens to employ coercive state power to stifle protected speech violates a plaintiff's First Amendment rights, regardless of whether the threatened punishment comes in the form of the use (or, misuse) of the defendant's direct regulatory or decisionmaking authority over the plaintiff, or in some less-direct form." *Id.* at 230-31. "[S]uch a threat is actionable and thus can be enjoined even if it turns out to be empty—the victim ignores it, and the threatener folds his tent. But the victims in this case yielded to the threat." *Id.* at 231.

The facts of this case bear no resemblance to the cases cited by Defendants, which involved little or no evidence of pressure of any kind.  *See* Doc. 266, at 174.  In *VDARE*, as Defendants admit, the mayor had "publicly encouraged a resort to 'be attentive to the types of events they accept,' and the resort then cancelled its contract to host the … plaintiff's conference."  *Id.* (citing *VDARE*, 11 F.4th at 1156-57, 1163-68, 1171-72).  *R.C. Maxwell* involved "a letter from the Borough Council" that "could brandish nothing more serious than civil or administrative proceedings under a zoning ordinance not yet drafted."  *Id.* (quoting *R.C. Maxwell Co. v. Borough of New Hope*, 735 F.2d 85, 86 n.2, 88 (3d Cir. 1984)).  *Hammerhead Enterprises* involved municipal "letters urging department stores not to sell a disfavored board game," where there was "no credible evidence … that any store decided not to carry the board game as a result of [the] letter."  *Id.* (quoting *Hammerhead Enterprises v. Brezenoff*, 707 F.2d 33, 36-37 & n.2 (2d Cir. 1983)).  Here, by contrast, Defendants made repeated, credible threats to strip the platforms of Section 230 liability—a "hidden subsidy worth billions of dollars," and "a fearsome cudgel against ever untouchable companies," Doc. 214-1, ¶ 2; and to impose antitrust liability on them, which (according to Mark Zuckerberg) is an "existential threat" to the platforms, *id.* ¶ 3.

Defendants rely on *Playboy Enterprises v. Meese*, 639 F. Supp. 581, 583-85 (D.D.C. 1986).  In that case, the government did not threaten adverse legal consequences, but merely threatened to engage in *further speech* about the plaintiffs' conduct—*i.e.*, it "sent retailers a letter suggesting that if they continued to sell adult magazines, they would be named in the Commission's public report."  Doc. 266, at 175.  The evidence portrays a very different picture here.  A promise to speak publicly about a corporation's alleged misdeeds is not the same as a threat to impose ruinous legal consequences on a corporation.  The same principle distinguishes the Government's other cases, which Defendants admit involved "no actual or threatened imposition of government power or

sanction." Doc. 266, at 176 (quoting *Am. Family Ass'n*, 277 F.3d at 1120, 1125). Even an implied threat of consequences violates the First Amendment, *see Rattner v. Netburn*, 930 F.2d 204, 209-210 (2d Cir. 1991), while here the threats are "blatant." Doc. 224, at 61.

Defendants suggest that these threats are "fanciful," Doc. 266, at 178. Not so. They lie directly within Defendants' authority: "[T]he threats became more forceful once the Biden Administration took office and gained control of both Houses of Congress, indicating that the Defendants could take such actions with the help of political allies in Congress. Additionally, the Attorney General, a position appointed by and removable by the President, could, through the DOJ, unilaterally institute antitrust actions against social-media companies." Doc. 224, at 62.

Defendants rely on a series of statements from Jennifer Psaki that the platforms are the ones who "make decisions about what information should be on their platforms." Doc. 266, at 181. But the mere fact that the platforms make those decisions is fully consistent with federal officials exercising undue pressure and collusion on platforms to influence how they are made— which is exactly what they did, starting with Psaki herself. *See* Doc. 214-1, ¶¶ 123-124 (Psaki stating that the President "supports … a robust anti-trust program. So his view is that there's more that needs to be done to ensure that this type of misinformation; disinformation; damaging, sometimes life-threatening information is not going out to the American public.").

Defendants contend that federal officials have not "said they would refrain from advocating changes to § 230, or pursuing potential remedies under the antitrust laws, if social media companies intensified their content moderation measures." Doc. 266, at 185. Even if this were relevant, it is incorrect. One threat "warned Facebook and Google that they had 'better' restrict … harmful content or face regulation." Doc. 214-1, ¶ 18. Another threatener aptly summarized the campaign of threats, "Let's see what happens just by pressuring them." *Id.*

Defendants complain that some of the cited threats come from "*nondefendant* Representatives and Senators," Doc. 266, at 186, but those threats from powerful members of Congress, in addition to having their own force, reinforce the Executive Branch's threats—especially because one of the chief threatened consequences, Section 230 reform, requires *joint* action by the President and Congress. Defendants cite the Ninth Circuit's unpublished opinion in *Doe*, but that case challenged only a tiny handful of statements by individual legislators, not a coordinated, sustained campaign of threats from both the Executive Branch and its political allies in Congress. *See Doe*, 2022 WL 17077497, at *2-3.

Defendants claim that statements in congressional hearings cannot be coercive because Congress is an "investigatory body" that "studies … proposed laws" and "surveys defects in our social, economic and political system." Doc. 266, at 187 (quoting *Trump v. Twitter*, 602 F. Supp. 3d at 1224). On the contrary, Defendants' own witness, Elvis Chan, testifies that Congress very effectively pressures social-media platforms to increase censorship by forcing their CEOs to testify and raking them over the coals. *See* Doc. 214-1, ¶¶ 947-949. Chan specifically concludes that "that kind of scrutiny and public pressure from Congress … motivated them to be more aggressive in the account takedowns." *Id.* ¶ 947. Defendants argue that Congress itself may be protected by the Speech and Debate Clause—but no Members of Congress are Defendants here, and Plaintiffs cite the congressional threats as part of an overarching campaign that is ultimately spearheaded by Executive officials, who are Defendants here.

Defendants contend that the congressional statements could not "reasonably have been understood by social media companies as 'threats.'" Doc. 266, at 188. On the contrary, that is the *only* way those statements could reasonably be understood. *See, e.g.*, Doc. 214-1, ¶¶ 8, 9, 10, 11, 14, 15, 16, 18. A couple examples illustrate: "There is only one comparison that remotely

approaches the avarice and moral discrepancy of your companies, and that is the slavetocracy

burden of our Nation's shameful and inhumane and most difficult dark days in the past. … I can't

wait until we come up with legislation that will deal with you and your cohorts in a very, very

effective way." *Id.* ¶ 11.  "Let's see what happens by just pressuring them." *Id.* ¶ 18.

Defendants contend that the Attorneys General of Missouri and Louisiana have participated

in anti-trust enforcement actions against social-media platforms.  Doc. 266, at 192-193.  But anti-

trust enforcement, standing alone, does not violate the First Amendment.  What violates the First

Amendment is leveraging the *threat* of antitrust enforcement to pressure private companies to

censor First Amendment-protected speech.  That is what the federal Defendants have done.

Defendants cite no evidence that the state Attorneys General have done so, and none exists.

Defendants argue that Plaintiffs "mischaracteriz[e] … § 230 as an unconstitutional

subsidy." Doc. 266, at 193.  Defendants mistake the significance of the *de facto* subsidy of Section

230 immunity, which operates in conjunction with the other factors to support a finding of state

action.  As this Court held:

> [S]imilarly to *Skinner* and *Hanson*, several specific factors combine to create state action.
> Section 230 of the CDA purports to preempt state laws to the contrary, thus removing all
> legal barriers to the censorship immunized by Section 230. Federal officials have also made
> plain a strong preference and desire to "share the fruits of such intrusions," showing "clear
> indices of the Government's encouragement, endorsement, and participation" in
> censorship, which "suffice to implicate the [First] Amendment." *Skinner*, 489 U.S. at 615–
> 16. … The Complaint further explicitly alleges subsidization, authorization, and
> preemption through Section 230, stating: "[T]hrough Section 230 of the Communications
> Decency Act (CDA) and other actions, the federal government subsidized, fostered,
> encouraged, and empowered the creation of a small number of massive social-media
> companies with disproportionate ability to censor and suppress speech on the basis of
> speaker, content, and viewpoint."  Section 230 immunity constitutes the type of "tangible
> financial aid," here worth billions of dollars per year, that the Supreme Court identified in
> *Norwood*, 413 U.S. at 466. This immunity also "has a significant tendency to facilitate,
> reinforce, and support private" censorship. *Id.* Combined with other factors such as the
> coercive statements and significant entwinement of federal officials and censorship
> decisions on social-media platforms, as in *Skinner*, this serves as another basis for finding
> government action.

Doc. 224, at 65-66; *see also Skinner v. Ry. Lab. Executives' Ass'n*, 489 U.S. 602, 615 (1989); *Norwood*, 413 U.S. at 466; *Ry. Emp. Dep't v. Hanson*, 351 U.S. 225, 231–32 (1956).

### C.     Deceiving Platforms Into Censoring Speech Constitutes State Action.

Defendants argue that "'deception' is not an independent legal basis" to find state action. Doc. 266, at 194.  Thus, on Defendants' view, government officials are free to trick, deceive, and dupe private parties into violating others' constitutional rights with impunity.  This is incorrect. "It is axiomatic that a state may not induce … private persons to accomplish what it is constitutionally forbidden to accomplish." *Norwood*, 413 U.S. at 455.  Deceiving someone into doing something is a common method of "inducing" them to do it.  Thus, government officials may not *deceive* private parties into violating others' constitutional rights.  *Id.*

That is the reasoning of *George v. Edholm*, 752 F.3d 1206 (9th Cir. 2014), where the Ninth Circuit held that police officers who provide false information to a doctor about an arrestee's medical condition, to fraudulently induce the doctor to perform a body-cavity search, are involved in state action.  *Id.* at 1213.  In *George*, there was evidence that the police officers had knowingly provided false information to the doctor that the plaintiff was suffering from cocaine toxicity and having seizures, to induce the doctor to perform an anal-cavity search for a concealed baggie of cocaine base.  *Id.*  The Ninth Circuit held that this evidence precluded summary judgment in the officers' favor, as the officers' act of deceiving the doctor rendered the doctor's conduct, induced by government deception, state action for which the officers were liable.  *Id.* at 1215.  The Ninth Circuit reasoned that "[a] reasonable jury could conclude that Officers Freeman and Johnson gave false information about George's medical condition to the hospital staff and to Dr. Edholm, with the intent of inducing Edholm to perform an invasive search."  *Id.*  "Based on this evidence, a reasonable jury could find that Freeman and Johnson provided 'significant encouragement, either

overt or covert,' to Dr. Edholm, and that they 'induced, encouraged or promoted' Edholm to do what he would not otherwise have done, such that Edholm's actions are attributable to the state." *Id.* at 1216 (cleaned up) (quoting, *inter alia*, *Norwood*, 413 U.S. at 455).

To be sure, as the Government insists, *George* also noted that the officers had provided "active physical assistance" while the doctor performed the search. *Id.* at 1216. But nothing in *George* suggests that "active physical assistance" is *required* to make state agents responsible for private conduct that they induce by fraud—the Ninth Circuit merely cited it as an additional factor supporting the finding of state action. *See id.*

Judge Posner's opinion in *Jones v. City of Chicago* removes any doubts on this score. 856 F.2d 985, 994 (7th Cir. 1988). *Jones* held that police officers who provided false information to prosecutors to induce them to arrest and prosecute a plainly innocent defendant were liable for the subsequent action of the prosecutors: "[A] prosecutor's decision to charge, a grand jury's decision to indict, a prosecutor's decision not to drop charges but to proceed to trial—none of these decisions will shield a police officer who deliberately supplied misleading information that influenced the decision." *Id.* (emphasis added). Nothing in *Jones* indicates that, to be liable for the subsequent bad-faith prosecution, the officers must also "actively physically assist" the prosecution. *Id.* Rather, as Judge Posner wrote, "[i]f police officers have been instrumental in the plaintiff's continued confinement or prosecution, they cannot escape liability by pointing to the decisions of prosecutors or grand jurors or magistrates to confine or prosecute him. They cannot hide behind the officials whom they have defrauded." *Id.*

This holding, moreover, is rooted in universal principles of agency law, which holds that individuals are responsible for actions that they deceive and manipulate others into performing. As the Fourth Circuit has stated, a person "cannot insulate himself from punishment by

manipulating innocent third parties to perform acts on his behalf that would be illegal if he performed them himself." *United States v. Rashwan*, 328 F.3d 160, 165 (4th Cir. 2003). "Whether or not Rashwan physically produced the false documents himself is irrelevant to his" legal responsibility, when he induced others to do so by providing false information. *Id.* Where third parties' actions "were dependent in that they relied upon the falsified statements and testimony produced by the defendants in making their respective decisions," the defendants are responsible for them. *Robinson v. Maruffi*, 895 F.2d 649, 656 (10th Cir. 1990); *see also Smiddy v. Varney*, 803 F.2d 1469, 1471 (9th Cir. 1986) (holding that "officers [who] knowingly submitted false information" are liable for prosecutorial decisions made in reliance on that false information).

Thus, as expounded in *George*, a federal official who [1] "gave false information" to a private party [2] "with the intent of inducing" the private party to engage in conduct that, if performed by the federal official directly, would violate constitutional rights, is himself responsible for that constitutional violation, and the private party's conduct is government action. *George*, 752 F.3d at 1215. The evidence shows that the FBI, Dr. Fauci, and others satisfy this test.

The Government contends that the FBI's conduct in orchestrating the suppression of the Hunter Biden laptop story was not deceitful. Doc. 266, at 196-200. The evidence regarding the FBI's and CISA's involvement in the deception is discussed in detail above, and it refutes the Government's arguments here. *See supra*. The Government (Doc. 266, at 196) disputes Plaintiffs' claim that the FBI had "no investigative basis" to anticipate a "hack-and-leak" operation, but the Government admits that Chan testified that "we were not aware of any hack-and-leak operations that were forthcoming or impending," *id.*, which is exactly what it means to lack any "investigative basis" for the deceitful warnings. The Government argues that the FBI did have a "factual basis" for the warnings, *id.* at 196-917, but the only factual basis it supplies is the assertion that there had

been a hack-and-leak operation in 2016, *id.*—which was the only factual basis that Chan supplied in his deposition.

The Government argues that the FBI warned only of "possible" hack-and-leak operations from "an abundance of caution," *id.* at 197, but the evidence tells a different story. As Mark Zuckerberg described those warnings in October 2020, shortly after they were made, the FBI "in private meetings … suggested that we be on *high alert and sensitivity* that if a trove of documents appeared that we should view that with suspicion." Doc. 214-1, ¶ 902 (emphasis added). That is a far cry from warning of "possible" hack-and-leak operations from "abundance of caution." Clearly, the platforms were deceptively led to *expect* such an operation, and when the Hunter Biden laptop story appeared, it fit the bill precisely.

The Government argues that "statements during the Trump Administration … place the allegedly improper warning Chan described in proper context." Doc. 266, at 197. But those warnings referred only to "the covert distribution of propaganda or disinformation," *id.* (quoting 83 Fed. Reg. 46,843)—none refers to a supposed "hack and leak" operation involving Hunter Biden, and none calls for censorship of private speech on social media. *See id.* at 197-198.

Finally, the Government relies on Yoel Roth's congressional testimony from February 2023 to dispute his own prior statement from December 2020 that federal officials warned platforms that the hack-and-leak operation "would involve Hunter Biden." Doc. 266, at 199-200. As discussed above, Yoel Roth's contemporaneous account from December 2020 is much more credible. *See supra*. Moreover, that detail, while particularly damning, is not dispositive. Given the undisputed facts that the FBI had the laptop in its possession and knew that the laptop was not "hacked materials," the evidence creates a compelling inference of deliberate deception regardless of whether the bogus "hack-and-leak" warnings mentioned Hunter Biden specifically.

**D.      There Is Overwhelming Evidence of Joint Participation and Conspiracy.**

Defendants argue that Plaintiffs' facts do not support a finding of joint participation or
conspiracy/collusion between federal officials and platforms or third parties that could support a
finding of state action.  Doc. 266, at 213-216.  On the contrary, the evidence demonstrates the
Defendants' conduct satisfies all the factors that the Government cites.

As an initial matter, to the extent that Defendants contend that "conspiracy" with private
parties is not a basis for finding state action, their own case contradicts them: "One way a private
citizen may be a state actor is if she 'is involved in a conspiracy or participates in joint activity
with state actors.'"  *Moody v. Farrell*, 868 F.3d 348, 352 (5th Cir. 2017) (quoting *Ballard*, 413
F.3d at 518).  The record contains extensive evidence of such "conspiracy," or meeting of the
minds between federal officials and platforms to censor disfavored viewpoints.  It also shows the
Government "acting as a joint participant" with platforms and third parties, establishing
"position[s] of interdependence" with platforms and third parties, engaging in "interlocking"
behavior and "heavy participation" with them, and playing a "meaningful role" in the censorship
of private speech.  Doc. 266, at 214.  In Defendants' own words, federal officials "have played an
affirmative role in the particular conduct underlying the plaintiff's grievance."  *Id.*

This Court came to the same conclusion based on the facts alleged in the Complaint, which
the evidence here establishes.  *See* Doc. 224, at 62-68.  As the Court held, those facts "demonstrate
more than an 'arms-length' relationship."  *Id.* at 66.  The evidence shows "a formal government-
created system for federal officials to influence social-media censorship decisions."  *Id.*  "For
example," the evidence shows "that federal officials set up a long series of formal meetings to
discuss censorship, setting up privileged reporting channels to demand censorship, and funding
and establishing federal-private partnership to procure censorship of disfavored viewpoints."  *Id.*
The evidence shows "that Defendants specifically authorized and approved the actions of the

social-media companies" and provides "dozens of examples where Defendants dictated specific censorship decisions to social-media platforms." *Id.* These facts "are a far cry from the complained-of action in *O'Handley*: a single message from an unidentified member of a state agency to Twitter." *Id.*

"Further, similarly to *Skinner* and *Hanson*, several specific factors combine to create state action." *Id.* Among other things, "[t]he Defendants' alleged use of Section 230's immunity—and its obvious financial incentives for social-media companies—as a metaphorical carrot-and-stick *combined* with the alleged back-room meetings, hands-on approach to online censorship, and other factors discussed above transforms Defendants' actions into state action." *Id.* The evidence now shows that "Section 230 … has …become a tool for coercion used to encourage significant joint action between federal agencies and social-media companies." *Id.*

Defendants' legal arguments to dispute these conclusions are meritless. Citing *O'Handley*, Defendants argue that there is no "meeting of the minds" and that each platforms "independently applies its terms of service," free from federal influence. Doc. 266, at 215. The evidence directly contradicts this claim, and this Court has already distinguished *O'Handley* on that basis. Doc. 224, at 66. Defendants argue that Plaintiffs rely only on "generalized statements about working together to counteract the dissemination of election misinformation," Doc. 266, at 215, but the evidence shows "dozens of examples where Defendants dictated specific censorship decisions to social-media platforms." Doc. 224, at 66.

Defendants rely heavily on *Howard Gault Co. v. Texas Rural Legal Aid, Inc*., 848 F.2d 544 (5th Cir. 1988), *see* Doc. 266, at 215-216, but that case strongly supports Plaintiffs. *Howard Gault* found state action in the conduct private growers opposing a strike by onion harvesters, where the private growers worked closely with government attorneys who were simultaneously representing

both the government and private interests. *See id.* at 552.  The Fifth Circuit held that "[b]y acting together with various state officials, who must have been acting in their official capacities, and in obtaining significant aid therefrom, the growers acted under color of state law." *Id.*  The Fifth Circuit cited "the growers' interlocking relationships" with the government officials as "sufficient to characterize the growers as state actors." *Id.*  In so holding, the Fifth Circuit emphasized state action may be found based on unique circumstances that do not "fit neatly" into preexisting tests: "State action can manifest itself in a variety of ways and certain actions may not fit neatly into a particular category. This is a case where the activity simply does not fit squarely within any of the previously drawn categories." *Id.*  The Fifth Circuit held that "[t]he action taken by the growers cannot be viewed in a vacuum." *Id.* at 555.  Rather, "[t]he interlocking activities of the State … and the growers constituted a joint effort which justified the lower court's characterization of the growers as state actors," where there was "heavy participation of state and state officials" in the private conduct. *Id.*

The facts of *Howard Gault* are closely akin to what the evidence shows here—*i.e.*, "interlocking relationships" of federal officials, third parties, and platforms through the Election Integrity Partnership and Virality Project, as well as between the FBI and its endless meetings and flagging with platforms; "heavy participation" of federal officials in content-moderation decisions through the EIP, the VP, CISA, the FBI, and the CDC; federal officials "acting together" with private parties to procure the censorship of speech, extensively through the EIP and VP, the FBI and the CDC; and private parties obtaining "significant aid" from federal officials in such censorship, as when CISA took numerous steps with the Stanford Internet Observatory to launch the Election Integrity Partnership and Virality Project. *Id.*

### 1.      The CDC and Census Bureau engage in joint participation.

Notwithstanding the extensive evidence of serial flagging, "BOLO" meetings, slide decks of disfavored posts, privileged reporting channels, and *de facto* censor status for the CDC, Defendants contend that the CDC and its censorship partner, the Census Bureau, did not engage in any "joint participation" with platforms on censorship.  Doc. 266, at 216-224.  The evidence, as discussed above, contradicts the Government's account.  *See supra*.

Defendants argue that "Plaintiffs fail to identify any *specific* content moderation decision" involving the CDC and Census Bureau.  Doc. 266, at 217.  On the contrary, the evidence includes long lists of specific posts, example posts, and categories of claims that the CDC and the Census Bureau flagged or debunked and induced platforms to censor.

Defendants dispute that platforms effectively "ceded authority" to the CDC over whether claims would be censored.  Doc. 266, at 219.  But the evidence shows that Facebook's content-moderation official notified the CDC that Facebook would remove content that is (1) false, and (2) likely to cause harm or vaccine hesitancy; and then repeatedly asked the CDC to confirm that long lists of claims were (1) false, and (2) likely to cause harm or vaccine hesitancy.  Doc. 214-1, ¶¶ 489-505, 518-530.  Then, when the CDC happily obliged—knowing full well, on Carol Crawford's admission, that its input would necessarily cause the censorship of those claims—Facebook thanked the CDC and reported back that, "as a result of our work together," those claims had been censored.  *Id.* ¶ 519, *see also id.* ¶ 526 (Facebook "shar[ing] updates we made as a result of our work together").  The evidence shows the CDC played a similar role for other platforms. *See id.* ¶¶ 540-542, 547-548.  Defendants contend that the CDC merely "provide[d] input" and "factual information," Doc. 266, at 219, but Crawford admitted that, in fact, "I know that they're using our scientific information *to determine their policy*."  *Id.* ¶ 529 (emphasis added).

Defendants argue that having "regular meetings" and receiving CrowdTangle reports do not show state action, Doc. 266, at 218-219, but as *Howard Gault* held, such "regular meetings" and censorship-related reports "cannot be viewed in a vacuum."  848 F.2d at 555.  Moreover, Defendants effectively admit that those "regular meetings" involved the CDC repeatedly flagging misinformation and debunking it for censorship: "to the extent the meetings did touch on misinformation, the focus was on narratives that the companies or CDC observed circulating on platforms and the information available from CDC that would respond to those narratives."  Doc. 266, at 218.  Such "regular" flagging-and-debunking meetings, even in isolation, far exceed the conduct at issue in *O'Handley*.  Defendants argue that the evidence shows "mere acquiescence" in platforms' censorship decisions, Doc. 266, at 220-221, but that is insupportable.  The evidence shows the CDC and Census Bureau as a close partner, trusted flagger, and *de facto* censorship authority working in close conjunction with platforms over dozens upon dozens of meetings and communications, all geared toward removing disfavored viewpoints from social media.

### 2.    The FBI engages in conspiracy and joint participation.

The FBI, likewise, engages in extensive joint participation with platforms on censorship. This includes nearly endless meetings—including both frequent USG-Industry meetings, and equally frequent bilateral meetings with eight major tech platforms; serial flagging of content for removal, including detailed lists of accounts, URLs, content to be removed "one to five times per month"; real-time flagging operations from "command posts" on election day; frequent demands for reports from platforms on whether they have censored content flagged by the FBI; and a "50 percent success rate" in getting content removed.  *See supra*.

Defendants argue that the platforms never "ceded control" over their content-moderation decisions to the FBI.  Doc. 266, at 224.  Even if that were true, it would make no difference to the conspiracy and joint-participation theories of state action, neither of which requires domination or

"control" by the government actor.  In any event, Elvis Chan attests that the platforms' cooperation in the FBI's ceaseless demands to censor supposed malign foreign influence was a direct result of a coordinated campaign of pressure from federal officials.  Doc. 214-1, ¶¶ 945-961.

Defendants rely heavily on their claim that the FBI reports misinformation about the "time, place, and manner" of voting to platforms.  Doc. 266, at 226-227.  The FBI's interpretation of 18 U.S.C. § 241, which it relies on to justify this flagging, is textually strained, *see* Doc. 266-6, at 458-460 (Knapp Decl. ¶¶ 21-24), and raises grave constitutional questions under *Alvarez*, 567 U.S. at 717.  The Court need not decide these issues, however, because the overwhelming majority of the FBI's flagging activity addresses "tactical indicators," *i.e.*, disfavored speakers, accounts, and content—not information about the time, place, and manner of voting.

Finally, Defendants quote the Senate Select Committee on Intelligence (SSCI) to justify the FBI's joint participation in censorship.  Doc. 266, at 227-228.  Defendants neglect to mention that SSCI was directly involved in pressuring platforms to increase censorship and cooperate with the FBI's requests by threatening them with adverse legislation in a series of covert meetings since 2017.  Doc. 214-1, ¶ 946.  Itself an egregious violator of the First Amendment, SSCI is a poor advocate for Defendants' cause.

### 3.    CISA engages in joint participation and conspiracy.

Defendants argue that the evidence does not show CISA engaging in joint participation or conspiracy/collusion with platforms on censorship.  Doc. 266, at 228-236.  A mountain of evidence contradicts this claim, discussed in detail above.

Defendants admit that CISA engages in "regular meetings with social media companies about misinformation," including at least four different lines of recurring meetings.  Doc. 266, at 231.  But they argue that there is no evidence that federal officials "push for censorship" at such meetings.  *Id.*  The suppression of the Hunter Biden laptop story, orchestrated through the CISA-

led "USG-Industry" meetings, provides a vivid counterexample to this claim. Doc. 214-1, ¶¶ 880-904. Moreover, Defendants admit that these meetings involve "threat updates, and highlights and *upcoming watch outs*," Doc. 266, a 229 (emphasis added)—in other words, flagging content for censorship. Indeed, based on Defendants' description, the whole point of these meetings is for federal officials to lay the groundwork to ensure that social-media content will be censored. *Id.*

With regard to "switchboarding," the Government argues that CISA "include[d] a notice sating that it was not requesting that the company take any particular action." Doc. 266, at 234. But the actual course of conduct ignored that auto-generated boilerplate message in the switchboarding emails, as CISA repeatedly flagged content, debunked content, acted as a trusted flagger, asked for reports back on the censorship of content, and requested specific action on content disfavored by CISA's Director. *See supra*. The Court should give that boilerplate disclaimer no more weight than the participants—both CISA and platforms—did at the time.

Defendants argue that the platforms exercised "independent judgment" in responding to CISA's flagging requests, Doc. 266, at 235, but that is not correct. By 2020, the platforms had been under continuous pressure from federal officials to play ball with CISA's censorship regime for nearly four years. Doc. 214-1, ¶¶ 945-961. It is not surprising that platforms treated CISA as a highly privileged flagger, responding to late-night requests within minutes and repeatedly censoring flagged speech at CISA's requests. *See, e.g., id.* ¶ 1081. In any event, coercion is not required to establish conspiracy or joint participation, as noted above.

### 4.    The GEC engages in joint participation and conspiracy.

Defendants argue that the GEC has not participated in state action. Doc. 266, at 236-239. On the contrary, as discussed above, Defendants' own evidence demonstrates the GEC's involvement in unconstitutional censorship activities. The Declaration of Leah Bray, Doc. 266-6, at 199-206 (Def. Ex. 142), admits that the GEC flagged domestic speech to platforms for removal

merely if the GEC determined that it was "likely to be amplified" by foreign actors, and that "the GEC flagged … posts and *narratives* for the Election Integrity Partnership (EIP) on approximately 21 occasions." *Id.* at 205 (emphasis added). These admissions attest to the GEC's extensive involvement in both its own flagging and in the EIP's censorship consortium. Likewise, the meetings described in the Government's brief, Doc. 266, at 236-237—which involve discussing such things as "disinformation tools and techniques used by the United States' adversaries," and "advising social media companies about disinformation campaigns," *id.*—are geared toward laying groundwork for social-media censorship. Indeed, Defendants admit that censorship is the whole point of this information-sharing: "help[ing] social media companies identify coordinated inauthentic activity" as a "first step in social media companies' ability to address foreign propaganda on their sites." *Id.* at 237.

> **5.    The EIP and VP constitute joint participation, conspiracy, and pervasive entwinement.**

The Election Integrity Partnership/Virality Project—which are just two names for the same ongoing public-private consortium—satisfies the joint participation, conspiracy, and pervasive entwinement tests. Defendants' arguments to the contrary, Doc. 266, at 240-247, have no merit.

As noted above, federal officials' joint participation and entwinement with the EIP included at least the following twelve points: (1) the EIP was formed to address a "gap" in the government's surveillance and censorship activities that CISA identified to its SIO-affiliated interns; (2) CISA interns originated the idea for the EIP; (3) CISA had a series of meetings with Alex Stamos and Renée DiResta about forming the EIP before it began, including one meeting listed on the EIP's "Operational Timeline" as "Meeting with CISA to present EIP concept"; (4) CISA connected the EIP with the Center for Internet Security, which runs a CISA-funded clearinghouse for state and local government officials to communicate about misinformation; (5)

CISA connected the EIP directly with NASS and NASED, organizations of state and local government officials, so they could report misinformation to the EIP; (6) CISA had ongoing communications with the EIP about its public reports on misinformation as the EIP operated in 2020; (7) CISA collaborated closely with the CIS on flagging misinformation to platforms, while the CIS was collaborating with the EIP, setting up a "triangle" of collaboration; (8) CISA repeatedly flagged misinformation to social-media platforms using EIP tracking numbers; (9) CISA interns, who were working for CISA and the Stanford Internet Observatory at the same time, were flagging "misinformation" to platforms simultaneously on behalf of CISA and on behalf of the EIP; (10) CISA mediated and coordinated between the EIP, CIS, and the platforms on reporting misinformation to address the platforms' concerns about duplicative reports; (11) the EIP debriefed CISA after the 2020 election cycle about its activities and public report; and (12) there is extensive overlap of personnel between CISA and the EIP, including interns working simultaneously for both groups, and key EIP leaders such as Alex Stamos, Renee DiResta, and Kate Starbird having formal roles at CISA.  In addition, the Government's brief has now revealed that (13) "[t]he GEC flagged … posts and narratives for the EIP *on approximately 21 occasions*." Doc. 266, at 242 (emphasis added).  Further, as Defendants admit, (14) the EIP's work is partially federally funded, *id.*, and (15) the EIP relies on reports of misinformation from state and local officials through the EI-ISAC, which CISA funds.

Likewise, the entwinement of federal officials with the EIP/VP consortium continued unabated in the Virality Project.  The evidence shows

> the following six facts: (1) OSG "pushes platforms to share information with the Virality Project"; (2) OSG coordinated with the Virality Project on the Surgeon General's Health Advisory; (3) the Surgeon General "repeatedly echoes the key messaging from the Virality Project"; (4) the Surgeon General launched his Health Advisory on Misinformation at an event hosted by the Stanford Internet Observatory, which is one of the groups that leads the Virality Project; (5) the Virality Project had "strong ties with several federal

government agencies," including OSG, and was involved in "flagging vaccine-related content on social media"; and (6) OSG "incorporated [the Virality Project's] research and perspectives into its own vaccine misinformation strategy."

Doc. 266, at 244 (quoting Doc. 214, at 50). And these facts are in addition to the conspiracy and pervasive entwinement of EIP/VP with CISA and the GEC, discussed above.

The Government disputes that the Surgeon General's Office pushed platforms to give "external researchers" access to their internal data on putative "misinformation" on their platforms. Doc. 266, at 245. But the OSG did so on numerous occasions, in both public and private. *See* Doc. 214-1, ¶¶ 226, 326, 334, 359, 387. Moreover, "[o]ne such 'external researcher' that the OSG had in mind was 'Renee DiResta, from the Stanford Internet Observatory,' a leading organization of the Virality Project," which "hosted a 'rollout event' for the advisory featuring Dr. Murthy," about which Kyla Fullenwider "coordinat[ed]" with DiResta. *Id.* ¶¶ 227-228.

Defendants claim that the Surgeon General did not "coordinate" with the Virality Project on his Health Advisory, but Waldo admits that "I know there was coordination with [DiResta] with respect to the launch …. So certainly there would have been coordination … with her." Doc. 214-1, ¶ 228. The Virality Project states that the "Office of Surgeon General incorporated VP's research and perspectives into its own vaccine misinformation strategy," specifically citing the Health Advisory on this point. *Id.* ¶ 1249. And Surgeon General Murthy himself stated, at the launch of the Advisory at Stanford, that the OSG had been "partnered with" DiResta "over the last many months," and that he had "personally learned a lot from [DiResta] … from our conversations together." *Id.* ¶¶ 336-337. He also stated that DiResta would continue to be "a partner in the future, because I know we have lots and lots more that we've got to do together." *Id.* ¶ 336.

Defendants dispute that the OSG flagged misinformation to the Virality Project, Doc. 266, at 246, but they admit that the VP report states that the VP "built strong ties with several federal

government agencies, most notably [OSG] and the CDC, to facilitate bidirectional situational awareness around emerging narratives." *Id.*; *see also* Doc. 214-1, ¶ 1279. "Facilitating bidirectional situational awareness around emerging narratives" means "flagging emerging narratives"—in other words, flagging misinformation at the narrative level. The Lesko Declaration does not dispute that OSG engages in narrative-level flagging—it claims only that the OSG did not "provide[] any tip, flag, ticket, report, or other form of notification or input to the Virality Project concerning *posts or accounts* on social media." Doc. 266-4, at 136 (Lesko Decl. ¶ 16) (emphasis added). Lesko does not deny that OSG flagged "emerging narratives" to VP.

Finally, Defendants contend that, even if the conduct of the Election Integrity Partnership and Virality Project is state action, the content-moderation decisions of social-media platforms would not be state action because EIP/VP supposedly did not "threaten[] or pressure[]" platforms to censor content. Doc. 266, at 247. This is wrong for multiple reasons. First, it misunderstands the fundamental structure of the EIP/VP. The platforms are just as much conspirators and collaborators—*i.e.*, "Major Stakeholders"—with the EIP/VP as are the federal officials, the Stanford Internet Observatory, and the other third-party participators. *See, e.g.,* Doc. 214-1, ¶¶ 1151, 1175, 1259, 1276, 1280. The EIP states that it "established relationships with social media platforms to facilitate flagging of incidents for evaluation when content or behavior appeared to violate platform policies." *Id.* ¶ 1183. "The EIP onboarded the following social media companies: Facebook and Instagram, Google and YouTube, Twitter, TikTok, Reddit, Nextdoor, Discord, and Pinterest." *Id.* ¶ 1185. Platforms engaged with the EIP's analysts about flagging in real-time: "Analysts … added the platform representative to the ticket" and "a manager communicated with the platform representative in the ticket comments." *Id.* ¶ 1184. "The EIP onboarded the following social media companies: Facebook and Instagram, Google and YouTube,

Twitter, TikTok, Reddit, Nextdoor, Discord, and Pinterest." *Id.* ¶ 1185.  At least some platforms, such as Twitter, gave the EIP privileged access to internal data about speech on their platforms: EIP analysts collect data from Twitter "contemporaneously," and they also have access to "CrowdTangle and Facebook search functionality." *Id.* ¶ 1200.  The EIP "collected data from Twitter in real time from August 15 through December 12, 2020," and did so "[u]sing the Twitter Streaming API" to "track[] a variety of election-related terms. … The collection resulted in *859 million total tweets*." *Id.* ¶ 1203 (emphasis added).

Likewise, social media platforms serve as VP "stakeholders" alongside federal and state officials: "**Platforms** were the final stakeholders in the VP effort. Six social media platforms engaged with VP tickets—Facebook (including Instagram), Twitter, Google (including YouTube), TikTok, Medium, and Pinterest—acknowledging content flagged for review and acting on it in accordance with their policies." *Id.* ¶ 1280.  The VP describes itself as "a multistakeholder collaboration with civil society organizations, social media platforms, and government entities to respond to mis- and disinformation…." *Id.* ¶ 1259.  The VP states that it is "bringing together four types of stakeholders: (1) research institutions, (2) public health partners, (3) government partners, and (4) platforms." *Id.* ¶ 1355.  In short, as the EIP states, the EIP/VP "united government, academia, civil society, and industry," *id.* ¶ 1228, into a single mass-surveillance and mass-censorship consortium.

Second, there is strong evidence of pressure on platforms from the EIP as well.  Because the EIP was closely affiliated with CISA, the federal pressure on platforms to censor election speech assuredly influenced platforms to cooperate with the EIP as well.  Alex Stamos and other EIP participants publicly state that the EIP pressured platforms to change their content-moderation policies about election speech.  *Id.* ¶¶ 1148-1150; *see also id.* ¶¶ 1217-1220.  Alex Stamos

explicitly attributes the success of his efforts in "pushing platforms to do stuff" to the threat of adverse regulatory consequences: "So, you know, on effectively pushing the platforms to do stuff … they will always be more responsive in the places … that have huge potential regulatory impact, most notably right now that would be the United States and Europe." *Id.* ¶ 1234.

## IV.    Plaintiffs Are Likely to Succeed on Their APA and *Ultra Vires* Claims.

Defendants argue that Plaintiffs are unlikely to succeed on their APA and *ultra vires* claims. Doc. 266, at 253-257. These arguments fail for the reasons discussed in this Court's prior order. Doc. 224, at 51-54, 70-72. In their response brief, Defendants argue that "Government officials … need no express statutory authorization to simply engage in basic speech," and their challenged "communications amount to routine government speech conveying a policy view, akin to public remarks made by any other government official." Doc. 266, at 253-254. This echoes the argument in their motion to dismiss, which the Court has already rejected. Doc. 224, at 70-72. Here, the evidence shows that "Defendants are engaged in *de facto* prior restraints," *id.* at 71, and "Defendants have not presented a statute that purports to provide any 'colorable basis' for these prior restraints," *id.* at 72—in fact, Defendants openly admit that none exists. The evidence establishes "many instances of discrete agency action and [Plaintiffs] need not demonstrate the 'finality' of those agency actions." *Id.* at 72. And the evidence is "more than sufficient to support the conclusion that Defendants acted 'not in accordance with law,' 'contrary to constitutional right,' and 'in excess of statutory . . . authority.'" *Id.* (quoting 5 U.S.C. § 706(2)(A)-(C)).

## V.    Plaintiffs' Proposed Injunction Is Sufficiently Precise.

Defendants claim that Plaintiffs' proposed injunction is "too vague to be understood." Doc. 266, at 262 (quoting *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974)). Not so. The proposed injunction does not contain "broad generalities," but instead "describe[s] in reasonable detail the acts restrained." *Scott v. Schedler*, 826 F.3d 207, 213 (5th Cir. 2016); *see also* Doc. 214, at 67-68.

First, Defendants contend that the prohibited verbs listed in the injunction are vague.  Doc. 266, at 263.  As Defendants note, the injunction would forbid federal officials to "demand, urge, encourage, pressure, coerce, deceive, collude with, or otherwise induce" social-media platforms to take certain actions.  *Id.*  None of these verbs is "too vague to be understood," *Schmidt*, 414 U.S. at 476; on the contrary, they all have common, easily understandable meanings that are easily found in the dictionary.  In fact, Defendants do not argue that these verbs are vague; instead, they argue that they potentially cover an "immense swath of conduct" that the evidence shows Defendants committing.  Doc. 266, at 263.  That observation reflects not the vagueness of the proposed injunction, but the enormity of the now-proven misconduct it seeks to prohibit.

Next, Defendants argue that the list of actions that the injunction would prevent Defendants from inducing social-media platforms from taking is vague: "censor, suppress, remove, de-platform, suspend, shadow-ban, de-boost, deamplify, issue strikes against, restrict access to, demonetize," or take "any similar adverse action" against disfavored speakers, content, and viewpoints.  Doc. 266, at 263 (quoting Doc. 214, at 67-68).  Again, each of these verbs has an ordinary, common meaning found in the dictionary, and the fact that the injunction includes a careful listing of terms renders it more clear and specific, not vague.  Defendants make no argument at all that most of these verbs are vague, but they make inconsistent objections as to a handful.  First, they argue that the words "censor" and "suppress" are merely "conclusory labels."  Doc. 266, at 263.  Even if that were true—and the dictionary disagrees—Plaintiffs have defined those terms with great specificity in the Second Amended Complaint and all other Complaints.  *See* Doc. 84, ¶ 130.  Defendants then pivot and complain that three other verbs—"shadow ban," "de-boost," and "de-amplify"—are "terms of art within the social media industry."  Doc. 266, at 263.  But the dictionary explains that a "term of art" is "a word or phrase that has *a specific or*

*precise meaning* within a given discipline or field." *Term of Art*, DICTIONARY.COM, at https://www.dictionary.com/browse/term-of-art.   A "term of art" has a "specific or precise meaning," *id.*—the antithesis of a "vague" term.

Defendants contend that the phrases "otherwise induce" and "similar adverse action" are vague.  On the contrary, both those terms come at the end of significant lists of similar verbs, which clarify and constrain their meaning to include only relevantly similar actions to those already listed.  *See* SCALIA & GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS, 195-198 (2012) (the "associated-meaning canon").   Finally, Defendants pretend to be unable to grasp the meaning of the phrases "social media companies" and "platforms for online speech." Doc. 266, at 263.  Because Defendants themselves have provided exhaustive, specific definitions of such terms, *see* 87 Fed. Reg. 12713 (Surgeon General's RFI using the phrase "social media platform" to define "technology platform"), this objection cannot be taken seriously.

## VI.   The Proposed Injunction Is Not Overbroad and Does Not Interfere With Legitimate Government Speech or Functions.

Defendants contend that the proposed injunction is overbroad and would interfere with their ability to communicate with social-media platforms and the public.  Doc. 266, at 258-261, 264-275.  Defendants argue that "Plaintiffs' proposed injunction would significantly hinder the Federal Government's ability to combat foreign malign influence campaigns, prosecute crimes, protect the national security, and provide accurate information to the public on matters of grave public concern such as health care and election integrity."  Doc. 266, at 258 (citing Knapp Decl. ¶¶ 5-50 (Ex. 157); Wales Decl. ¶¶ 27-30 (Ex. 167); Crawford Decl. ¶¶ 20-23 (Ex. 80); Lesko Decl. ¶¶ 18-19 (Ex. 63); Bray Decl. ¶¶ 12-15 (Ex. 142)).  This argument lacks merit.

As an initial matter, Defendants' evidence on this point is at war with itself.  Plaintiffs' proposed injunction would prevent Defendants from pressuring or inducing platforms to remove

First Amendment-protected speech from social media.  Doc. 214, at 67-68.  The Government's declarants first attest that their agencies do *not* do this, and then claim that an injunction preventing them from doing this would create a devastating parade of horribles.  *See, e.g.,* Doc. 266-6, at 456 (Knapp Decl. ¶ 15) (claiming that the FBI does not pressure or coerce platforms to remove content); Doc. 266-4, at 133-135 (Lesko Decl. ¶¶ 7-8, 10-11) (denying that the OSG asks, or has ever asked, any social-media platforms to suppress or take down content); Doc. 266-6, at 205 (Bray Decl. ¶ 16) (asserting that "[t]he GEC's practice is not to request social media companies to take any specific actions when sharing information with them").  Defendants cannot have it both ways.

In any event, Defendants' objections to the injunction's supposed overbreadth do not withstand scrutiny.  They fall into two categories: (1) actions that would not violate the proposed injunction, such as public statements on policy questions not directed to platforms or the suppression of speech; and (2) actions directed at content that is not protected by the First Amendment, such content where the speech itself constitutes criminal activity, including fraud, "malicious cyber activity," live-streamed child sexual abuse, terrorism, and true threats.

First, Defendants speculate that public statements by federal officials on matters of policy, not formulated as requests to suppress speech and not directed to social-media platforms, might violate the proposed injunction if platforms were to use such public statements as grounds to censor speech under their content-moderation policies.  For example, Crawford speculates that the proposed injunction "would prohibit CDC from publicly issuing a statement on a public health issue" that the platform, acting independently of the CDC, then relied on to moderate content.  Doc. 266-5, at 75 (Crawford Decl. ¶ 21).  She also speculates that "if a CDC-funded entity publicizes research that runs contrary to a narrative circulating on social media, and a social media company then takes steps consistent with its terms of service to limit that narrative," that might be

deemed to violate the proposed injunction.  *Id.* at 75-76, ¶ 22.  Max Lesko raises similar concerns about the OSG making public statements about the safety of cigarettes, obesity, and youth mental health.  Doc. 266-4, at 137-138 (Lesko Decl. ¶¶ 19-20).    And Leah Bray raises the concern that "the GEC would be prevented from producing or disseminating reports exposing Russian or PRC malign influence."  Doc. 266-6, at 204 (Bray Decl. ¶ 15).

These objections attempt to manufacture concerns that do not exist.  A federal agency that makes a public statement on a policy issue, without more—specifically, without directing the statement to platforms or crafting the statement to influence the removal of disfavored viewpoints from social media—would not violate the proposed injunction.  The proposed injunction prevents Defendants from taking any steps to "demand, urge, encourage, pressure, coerce, deceive, collude with, or otherwise induce" platforms to censor speech on social media.  Doc. 214, at 67.  Every one of those verbs connotes intentional, deliberate action directed to the platforms.  If the platform makes public statements on policy issues that are not directed to the platforms and not intended to induce censorship of content on social media, those would not violate the terms of the injunction.

Second, Plaintiffs argue that the injunction is supposedly overbroad because it would prevent them from seeking the removal of social-media content where *the content itself is criminal activity* unprotected by the First Amendment.  For example, Larissa Knapp asserts that the FBI sometimes may seek the removal of a range of criminal activity, including "[c]yber-criminal syndicates and nation-states … selling malware as service or … targeting vendors to access scores of victims by hacking just one provider."  Doc. 266-6, at 463, ¶ 32.  She states that "[s]ocial media platforms are frequently used by cyber criminals to commit crimes," such as "spear phishing attacks," "economic espionage," stealing "trade secrets," "steal[ing] credentials," and "deceiv[ing] victims into downloading malware."  *Id.* ¶¶ 35-36.  She states that the FBI (which apparently does

*not* "routinely" seek removal of child pornography from social media, *id.* at 467, ¶ 43), might seek

removal of content depicting child sexual abuse in real time—*i.e.*, "live streaming of sexual abuse

of a child, a particular user in a chat room grooming children for sexual exploitation, or a particular

user committing ongoing sexploitation crimes against children." *Id.* at 467, ¶ 43. She points to

"cases where individuals have posted explicit threats against FBI personnel." *Id.* at 468, ¶ 46. And

she states that the FBI may seek to remove speech by foreign terrorist organizations like ISIS and

al-Qaeda seeking to recruit and organize terrorist attacks, *id.* at 460-463, ¶¶ 25-31.

Brandon Wales raises similar concerns about CISA's requests to remove "malicious cyber

activity," which "include[s] malware, phishing, exploitation of software vulnerabilities." Doc.

266-6, at 555-556 (Wales Decl. ¶¶ 5-6). Wales helpfully notes that this "malicious cyber activity"

is plainly distinct from protected speech: "Malicious cyber activity … relates only to unauthorized

access to information systems and is distinct from the concept of mis-, dis-, and malinformation,

which relates to the veracity and intent behind certain information." *Id.* at 556, ¶ 6. On Wales'

description, "malicious cyber activity" is content that is itself criminal, such as "deliver[ing]

malware or phishing communications," and "send[ing] command-and-control instructions to

victim computers." *Id.* at 561, ¶ 23.

Such concerns have a common thread—they all involve situations where the targeted

content itself involves ongoing criminal activity. As Defendants admit, such content is not

protected by the First Amendment, and thus it would not violate the proposed injunction, which

mandates compliance with the First Amendment. *See* Doc. 214, at 67-68. Likewise, true threats

are both criminal and fall within a well-established First Amendment exception. *Fogel v. Collins*,

531 F.3d 824, 830 (9th Cir. 2008). Moreover, if the Court wished to make more explicit the fact

that the proposed injunction does not include content that falls within well-established First

Amendment exceptions, it could simply insert, after the phrase "any speaker, content, or viewpoint expressed on social media," the phrase "except for content that itself constitutes criminal activity not protected by the First Amendment."

## CONCLUSION

The Government would have this Court believe that federal censorship activities are a thing of the past. On the contrary, the evidence shows that federal officials are deeply enamored with their censorship powers and will continue to suppress disfavored viewpoints at every reasonable opportunity. As Justice Scalia observed, "no government official is 'tempted' to place restraints upon his own freedom of action, which is why Lord Acton did not say 'Power tends to purify.'" *Planned Parenthood of Se. Pennsylvania v. Casey*, 505 U.S. 833, 981 (1992) (Scalia, J., concurring in the judgment in part and dissenting in part), *overruled by Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022). The federal Censorship Enterprise's "temptation is in the quite opposite and more natural direction—towards systematically eliminating checks upon its own power; and it succumbs." *Id.* The Court should grant Plaintiffs' Motion for Preliminary Injunction, Doc. 10, and enter the proposed injunction requested by Plaintiffs, Doc. 214, at 67-68.

Dated: May 20, 2023

**ANDREW BAILEY**
**Attorney General of Missouri**

*/s/ Kenneth C. Capps*
Joshua M. Divine, Mo. Bar No. 69875*
  *Solicitor General*
Todd A. Scott, Mo. Bar No. 56614*
  *Senior Counsel*
Kenneth C. Capps, Mo. Bar No. 70908*
  *Assistant Attorney General*
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
Tel: (573) 751-8870
kenneth.capps@ago.mo.gov
*Counsel for State of Missouri*

*/s/ John J. Vecchione*
John J. Vecchione *
New Civil Liberties Alliance
1225 19th Street N.W., Suite 450
Washington, DC 20036
Direct: (202) 918-6905
E-mail: john.vecchione@ncla.legal
*Counsel for Plaintiffs Dr. Jayanta Bhattacharya,*
*Dr. Martin Kulldorff, Dr. Aaron Kheriaty,*
*and Jill Hines*

Respectfully submitted,

**JEFFREY M. LANDRY**
**Attorney General of Louisiana**

*/s/ D. John Sauer*
Elizabeth B. Murrill (La #20685)
  *Solicitor General*
Tracy Short (La #23940)
  *Assistant Attorney General*
D. John Sauer (Mo #58721)*
  *Special Assistant Attorney General*
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, Louisiana
Tel: (225) 326-6766
murrille@ag.louisiana.gov
*Counsel for State of Louisiana*

*/s/ John C. Burns*
John C. Burns
Burns Law Firm
P.O. Box 191250
St. Louis, Missouri 63119
P: 314-329-5040
E-mail: john@burns-law-firm.com
*Counsel for Plaintiff Jim Hoft*

*  admitted *pro hac vice*

**CERTIFICATE OF SERVICE**

I hereby certify that, on May 20, 2023, I caused a true and correct copy of the foregoing to be filed by the Court's electronic filing system, to be served by operation of the Court's electronic filing system on counsel for all parties who have entered in the case.

*/s/ D. John Sauer*

## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA

STATE OF LOUISIANA, *et al.*,

      *Plaintiffs*,

      v.

JOSEPH R. BIDEN, JR., in his official
capacity as President of the United States of
America, *et al.,*

      *Defendants*.

Civil Action No. 22-cv-1213

### DEFENDANTS' NOTICE OF SUPPLEMENTAL AUTHORITY REGARDING
### U.S. SUPREME COURT DECISIONS OF JUNE 15 AND JUNE 23, 2023

    Defendants respectfully submit this notice of supplemental authority concerning *United States v. Texas*, No. 22-58, 2023 WL 4139000 (U.S. June 23, 2023) (attached as Exhibit 1), and *Haaland v. Brackeen*, No. 21-376, 2023 WL 4002951 (U.S. June 15, 2023) (attached as Exhibit 2). These Supreme Court decisions confirm that the State Plaintiffs here lack standing.

    In *Texas*, the States of Texas and Louisiana challenged immigration-enforcement guidelines issued by the Secretary of Homeland Security as allegedly contrary to law. The Supreme Court held that the States lacked Article III standing. *See Texas*, 2023 WL 4139000, at *2. In *Brackeen*, individual plaintiffs and the State of Texas contended that requirements of the Indian Child Welfare Act (ICWA) violate the Constitution. As relevant here, the Supreme Court rejected various challenges for lack of standing. *See Brackeen*, 2023 WL 4002951, at *5.

    These decisions are relevant to this case for numerous reasons. First, the State Plaintiffs here have argued that they are entitled to "special solicitude" in the standing analysis. The Court accepted that argument at the motion-to-dismiss stage, relying on *Massachusetts v. EPA*, 549 U.S.

497 (2007). *See Missouri*, 2023 WL 2578260, at *11. But in *Texas*, the Supreme Court explained

that the standing analysis in *Massachusetts* "d[id] not control" because "[t]he issue there involved

a challenge to the denial of a statutorily authorized petition for rulemaking," rather than the

exercise of enforcement discretion. *Texas*, 2023 WL 4139000, at *8 n.6. The Supreme Court

emphasized that "federal courts must remain mindful of bedrock Article III constraints in cases

brought by States against an executive agency or officer." *Id.* at *6 n.3. Although "federal policies

frequently generate indirect effects on state revenues or state spending," standing theories

premised on such effects can be "attenuated," and the Supreme Court concluded that no such

theories in *Texas* "overc[a]me[] the fundamental Article III problem with th[e] lawsuit." *Id.* As in

*Texas*, the State Plaintiffs here do not invoke the special, statutorily authorized procedures at issue

in *Massachusetts*, and they cannot satisfy Article III's bedrock requirements for the reasons set out

in Defendants' previous filings.

 Second, *Brackeen* emphasized the "settled rule" that "[a] State does not have standing as

*parens patriae* to bring an action against the Federal Government." 2023 WL 4002951, at *19

(quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U. S. 592, 610 n. 16 (1982)).

That is true even if the States allege an injury "in protecting the constitutionally bestowed rights

of their citizens," as this Court held Missouri and Louisiana had done at the motion-to-dismiss

stage. *See Missouri*, 2023 WL 2578260, at *14. In *Brackeen*, Texas attempted to assert its citizens'

constitutional rights in challenging a Federal statute, but the Supreme Court held that such a theory

of standing was clearly foreclosed. *See* 2023 WL 4002951, at *19 ("[*Snapp*] should make the issue

open and shut."); *see also id.* at *19 n.11 (rejecting a "thinly veiled attempt to circumvent the limits

on *parens patriae* standing" by asserting standing on behalf of a State's citizens).

Finally, both *Texas* and *Brackeen* rejected State plaintiffs' assertions of standing based on the kinds of quasi-sovereign and sovereign interests asserted here, such as "securing observance of the terms under which they participate in the federal system" and "the power to create and enforce a legal code." *Missouri*, 2023 WL 2578260, at *10, 14. In *Brackeen*, the Supreme Court held that no Article III injury arose from a Federal law that allegedly "requir[ed]" Texas "to break its [constitutional] promise to its citizens that it will be colorblind in child-custody proceedings." 2023 WL 4002951, at *19. And in *Texas*, the Supreme Court rejected a theory that Defendants' alleged actions denied them the benefits of the federal system. As Justice Gorsuch's concurrence explained, such a theory improperly seeks to "establish government by lawsuit." *Texas*, 2023 WL 4139000, at *17. Missouri and Louisiana's alleged injury to the "free speech policies" in their State constitutions, *Missouri*, 2023 WL 2578260, is likewise insufficient under Article III.

*     *     *     *     *

*Texas* and *Brackeen* therefore provide further support for Defendants' contentions that Plaintiffs lack Article III standing and that Plaintiffs lack irreparable harm sufficient to support the requested injunctive relief in this action against the Federal Government. *See, e.g.*, Dkt. 266 at 128-36.

Dated:  June 26, 2023

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

JAMES J. GILLIGAN
Special Litigation Counsel, Federal Programs Branch

JOSHUA E. GARDNER (FL Bar No. 0302820)
Special Counsel, Federal Programs Branch

*/s/ Kyla M. Snow*
KYLA M. SNOW (OH Bar No. 96662)
INDRANEEL SUR (D.C. Bar No. 978017)
KUNTAL CHOLERA (D.C. Bar No. 1031523)
AMANDA K. CHUZI (D.C. Bar No. 1738545)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington D.C. 20005
Tel: (202) 514-3259
kyla.snow@usdoj.gov

*Attorneys for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA
## MONROE DIVISION

|  |  |
|---|---|
| STATE OF LOUISIANA, STATE OF MISSOURI, *et al.*<br><br>    *Plaintiffs*,<br><br>   v.<br><br>JOSEPH R. BIDEN, JR., in his official capacity as President of the United States, *et al.*,<br><br>    *Defendants*. | Case No. 3:22-cv-01213-TAD-KDM |

### PLAINTIFFS' RESPONSE TO DEFENDANTS' NOTICE OF SUPPLEMENTAL AUTHORITY REGARDING RECENT SUPREME COURT DECISIONS

Defendants' "Notice of Supplemental Authority Regarding U.S. Supreme Court Decisions of June 15 and June 23, 2023," argues that two recent decisions "confirm that the State Plaintiffs here lack standing." Doc. 289, at 1. Defendants' arguments are meritless.

**A.**     ***United States v. Texas* Confirms That the States Have Standing.**

First, Defendants argue that *United States v. Texas*, No. 22-58, 2023 WL 4139000 (U.S. June 23, 2023), undermines the States' standing. Doc. 289, at 1-3. Defendants are incorrect.

*Texas* addressed two States' challenge to the Department of Homeland Security's guidelines stating that DHS will not arrest criminal aliens whom Congress provided "shall" be arrested. *Texas*, 2023 WL 4139000, at *2. The Supreme Court held that Article III standing was lacking because "a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution." *Id.* (quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973)) (emphasis added).

This holding was based solely on the rule that a party typically lacks standing to compel the arrest and prosecution of another—a rule that has no application in this case. *See id.* The majority emphasized the narrowness of this holding. The Court noted that "[t]he discrete standing question raised by this case rarely arises because federal statutes that purport to *require* the Executive Branch to make arrests or bring prosecutions are rare…. This case therefore involves both a highly unusual provision of federal law and a highly unusual lawsuit." *Id.* at *8. The Court held that "our Article III decision today should in no way be read to suggest or imply that the Executive possesses some freestanding or general constitutional authority to disregard statutes requiring or prohibiting executive action." *Id.* It held that "[t]his case is categorically different" from other standing decisions "because it implicates only one discrete aspect of the executive power—namely, the Executive Branch's traditional discretion over whether to take enforcement actions against violators of federal law." *Id.* It noted that "this case raises only the narrow Article III standing question of whether the Federal Judiciary may in effect order the Executive Branch to take enforcement actions against violators of federal law—here, by making more arrests." *Id.* It emphasized that "[t]he Court's standing decision today is narrow and simply maintains the longstanding jurisprudential status quo." *Id.* at *9 (citing *Linda R.S.*, 410 U.S. at 619). And it described the case as an "extraordinarily unusual lawsuit." *Id.* at *9.

This case, by contrast, does not involve any attempt to compel the arrest or prosecution of anyone, so *Texas* does not undermine standing here. Quite the contrary—*Texas* identified "[s]everal good reasons" supporting its holding, *id.* at *5-6, and all of these support the States' standing here. First, the Supreme Court emphasized that "when the Executive Branch elects *not* to arrest or prosecute, it does not exercise coercive power over an individual's liberty or property, and thus does not infringe upon interests that courts often are called upon to protect." *Id.* at *5.

Here, federal officials *do* "exercise coercive power over an individual's liberty," *id.*, by pressuring social-media platforms with threats to induce censorship.  *See, e.g.,* Doc. 214-1, ¶¶ 1-30.

Second, the *Texas* majority held that judicially mandating arrests and prosecutions would "run up against the Executive's Article II authority to enforce federal law," a core aspect of executive power.  *Id.*  Here, by contrast, federal social-media censorship lies so far afield from any plausible constitutional or statutory authority that it is plainly *ultra vires*.  *See* Doc. 224, at 71-72.

Third, *Texas* stressed the traditional deference due to the Executive Branch in matters relating to immigration policy, which implicates "foreign-policy objectives."  *Id.*  Here, no "foreign-policy objectives" are at issue, where the targeted speech is overwhelmingly *domestic*. *See, e.g.,* Doc. 276, at 2; Doc. 214-1, ¶¶ 918-922, 1033, 1056, 1220, 1231, 1233, 1235, 1241.

Fourth, the *Texas* majority held that "courts generally lack meaningful standards for assessing the propriety of enforcement choices."  *Id.* at *6.  Here, the First Amendment case law provides extensive, well-established "meaningful standards" for assessing the lawfulness of Executive officials' actions.  *See, e.g.,* Doc. 214, at 4-8, 14, 18-19, 29-31, 41-42.

Finally, the *Texas* majority emphasized that "the Executive Branch must balance many factors when devising arrest and prosecution policies."  *Id.* at *6.   Here, the Executive Branch does not need to "balance many factors" when deciding whether to comply with the First Amendment—it has a categorical obligation to do so.

Defendants argue that *Texas* supports them on two points.  First, they claim that *Texas* jettisoned the "special solicitude" granted to States in the standing analysis under *Massachusetts v. EPA*, 549 U.S. 497 (2007).  Doc. 289, at 1-2.  This argument is plainly incorrect, as the *Texas* majority never used the phrase "special solicitude" or addressed it in its analysis.  As Justice Gorsuch noted, "the Court says nothing about 'special solicitude' in this case."  *Texas*, 2023 WL

4139000, at *10 (Gorsuch, J., concurring in the judgment).  Both *Massachusetts v. EPA* and

subsequent Fifth Circuit case law recognizing the doctrine of "special solicitude" remain good law.

*See* Doc. 224, at 21-22 (citing *Texas v. United States*, 809 F.3d 134, 151 (5th Cir. 2015)).  In any

event, as discussed in prior briefs, the States have standing even without "special solicitude."

Second, Defendants argue that "in *Texas*, the Supreme Court rejected a theory that

Defendants' alleged actions denied them the benefits of the federal system."  Doc. 289, at 3.  But

nothing in the *Texas* majority opinion addresses any such theory – which, presumably, is why

Defendants only cite the *concurring* opinion, not the majority opinion, for this point.  *See id.*  In

fact, there is nothing *State-specific* about *Texas*'s holding on standing—it applies equally to private

citizens as well as States.  Notably, the Court held "that *a citizen* lacks standing to contest the

policies of the prosecuting authority when he himself is neither prosecuted nor threatened with

prosecution."  *Id.* at *2 (emphasis added) (quoting *Linda R.S.*, 410 U.S. at 619).

> ### B.     *Haaland v. Brackeen* **Does Not Undermine the States' Standing.**

Defendants' reliance on *Haaland v. Brackeen*, No. 21-376, 2023 WL 4002951 (U.S. June

15, 2023), is likewise misplaced.  In *Haaland*, the Supreme Court held that Texas lacked standing

to challenge the placement provisions of the Indian Child Welfare Act, which give preference to

Indian families in custody disputes involving Indian children.  *Id.* at *19.  *Haaland* held that Texas

"cannot assert equal protection claims on behalf of its citizens because '[a] State does not have

standing as *parens patriae* to bring an action against the Federal Government.'"  *Id.* (quoting *Alfred

L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 610 n.16 (1982)).  Defendants

claim that this statement forecloses *parens patriae* standing here.  Doc. 289, at 2.  Not so.

In its brief discussion of *parens patriae* standing, *Haaland* merely quoted footnote 16 of

*Alfred L. Snapp*, which itself merely restated the so-called "*Mellon* bar."  *See Haaland*, 2023 WL

4002951, at *19; *Alfred L. Snapp*, 458 U.S. at 610 n.16 (quoting *Massachusetts v. Mellon*, 262 U.S. 47, 485-86 (1923)).  Though both cases use admittedly broad language, neither *Haaland* nor *Alfred L. Snapp* expounds the scope of that "*Mellon* bar," and the Supreme Court has made clear elsewhere that *parens patriae* suits are allowed against the federal government outside the *Mellon* bar.  *See Massachusetts v. EPA*, 549 U.S. at 520 n.17 (explaining the "critical difference" between *parens patriae* suits barred by *Mellon* and *parens patriae* suits against the federal government otherwise permitted).  Consistent with *Massachusetts v. EPA*, this Court has already held that the *Mellon* bar applies to "third-party *parens patriae* suits," but not to "quasi-sovereign-interest suits." Doc. 224, at 215-26 (quoting *Kentucky v. Biden*, 23 F.4th 585, 598 (6th Cir. 2022)).  In *Haaland*, Texas asserted a "third-party *parens patriae* suit," rather than a "quasi-sovereign-interest suit," *see id.*, because Texas asserted the equal-protection rights of only a tiny minority of its population (*i.e.*, non-Indian foster or adoptive parents who wish to foster or adopt Indian children over the objections of relevant Indian tribes), which was plainly insufficient to qualify as a quasi-sovereign interest.  *See Haaland*, at *19 & n.11.  Here, by contrast, Louisiana and Missouri each assert the rights of a *very* "substantial segment of its population," *Alfred L. Snapp*, 458 U.S. at 607—*i.e.*, the hundreds of thousands or millions of their citizens who are potential audience members of the social-media speech suppressed by the federal government.

Moreover, in holding that Texas lacked third-party standing, *Haaland* emphasized that Texas lacked either a "'concrete injury' to the State" or "some hindrance to the third party's ability to protect its own interests."  *Haaland*, at *19 n.11 (quoting *Georgia v. McCollum*, 505 U.S. 42, 55-56 (1992)).  Here, by contrast, the States have suffered numerous concrete injuries from federal social-media censorship.  *See, e.g.,* Doc. 214-1, ¶¶ 1427-1442.  And there is clearly "some hindrance to the third party's ability to protect its own interests," because the First Amendment

injury to each individual audience member in Louisiana and Missouri is too diffuse to incentivize litigation through thousands of individual lawsuits.  *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 64 n.6 (1963) (holding that "pragmatic considerations argue strongly for … standing … in cases such as the present one," where a person suffering First Amendment injuries "is not likely to sustain sufficient economic injury to induce him to seek judicial vindication of his rights").

Defendants also argue that *Haaland* rejected Texas's claim that the ICWA's placement provisions required Texas to "break its … promise to its citizens that it will be colorblind in child-custody proceedings."  Doc. 289, at 3 (quoting *Haaland*, 2023 WL 4002951, at *19).  But the Supreme Court rejected this argument for a specific reason: "Were it otherwise, a State would always have standing to bring constitutional challenges when it is complicit in enforcing federal law."  *Haaland*, 2023 WL 4002951, at *19.  Here, Missouri and Louisiana do not claim that the federal government requires them to be "complicit" in "enforcing federal" social-media censorship, *id.*, so *Haaland*'s reasoning has no application here.  Instead, the States argue that federal censorship prevents the States from giving effect to their own laws favoring freedom of speech.  This Court has held that the States assert "injuries to the States' sovereign interest in the power to create and enforce a legal code," and that "Defendants' alleged censorship program would be a federal assertion of authority to regulate matters that the States seek to control."  Doc. 224, at 29 (citing *Texas v. United States*, 809 F.3d 134, 149 (5th Cir. 2015)).  These holdings remain valid.

### C.    Neither *Texas* Nor *Haaland* Affects Private Plaintiffs' Standing or the States' Other Bases for Standing.

Furthermore, only one Plaintiff need have standing. Doc. 224, at 19 (citing *Rumsfeld v. FAIR*, 547 U.S. 47, 52 n.2 (2006)).  Here, Defendants do not contend that *Texas* and *Haaland* have any bearing on the Private Plaintiffs' standing, which this Court has already upheld.  Doc. 224, at

34-38.  Likewise, neither *Texas* nor *Haaland* has any bearing on the multiple *other* injuries asserted by the States—such as (1) the States' direct experience of censorship of their own speech, (2) the States' asserted interest in being able to read their constituents' uncensored thoughts and opinions on social media, and (3) the States' interest in maintaining fair and open processes for petitioning government for redress of grievances.  *See*, *e.g.*, Doc. 214-1, ¶¶ 1428-1440; Doc. 224, at 30-32.

### D.    Recent Authorities Undercut Defendants' Arguments.

Finally, Defendants ignore other recent authorities that undercut their arguments.  For example, on June 23, 2023, the Supreme Court decided *United States v. Hansen*, No. 22-179 (U.S. June 23, 2023) (Slip opinion attached as Exhibit A).  *Hansen* reinforced the longstanding rule that "speech integral to unlawful conduct" is not protected by the First Amendment.  *Id.* at 18.  "Speech intended to bring about a particular unlawful act … is unprotected."  *Id.*

*Hansen* contradicts the Government's heavy reliance on the "government speech" doctrine. *See, e.g.,* Doc. 266, at 1, 3-4, 147.  Under *Hansen*, the First Amendment does not protect *private* "[s]peech intended to bring about a particular unlawful act."  *Hansen*, Slip op. at 18.  *A fortiori*, the doctrine does not protect *government* speech "intended to bring about a particular unlawful act," *id.*—here, the suppression of private speech in violation of the First Amendment.  Second, *Hansen* undermines the Government's extensive complaints about the supposed "overbreadth" of the requested injunction.  Doc. 266, at 5, 258-261, 264-273.  Most of the Government's supposed "overbreadth" constitutes examples of federal officials requesting platforms to remove "speech integral to unlawful conduct" and "speech intended to bring about a particular unlawful act," *Hansen*, Slip op. at 18—such as fraud, malicious cyber activity, live-streamed child sex abuse, terrorism, and true threats.  *See* Doc. 276, at 114-117.  *Hansen* reaffirms that such speech is not

protected by the First Amendment, and an injunction prohibiting federal officials from interfering with First Amendment-protected speech would not apply to such conduct.

In addition, on June 26, 2023, the House Committee on the Judiciary and the Select Subcommittee on the Weaponization of the Federal Government issued a report on the federal censorship activities of Defendant CISA. *See* U.S. House of Representatives, Interim Staff Report of the Committee on the Judiciary and the Select Subcommittee on the Weaponization of the Federal Government, *The Weaponization of CISA: How a "Cybersecurity" Agency Colluded With Big Tech and 'Disinformation' Partners To Censor Americans* (June 26, 2023), *available at* https://judiciary.house.gov/sites/evo-subsites/republicans-judiciary.house.gov/files/evo-media-document/cisa-staff-report6-26-23.pdf (attached as Exhibit B).  Among other things, the report concludes that "CISA has attempted to conceal its unconstitutional activities and remove evidence of wrongdoing." *Id.* at 28.  It concludes that "[f]earing public pressure and legal risks," including this lawsuit, "CISA outsourced its censorship activities to the EI-ISAC." *Id.*  It concludes that CISA's "MDM Subcommittee tried to disguise its recommendations by removing references to surveilling and censorship." *Id.* at 29.  It concludes that "CISA purged its website of references to domestic MDM and its First Amendment violations in response to public pressure." *Id.* at 32.  And it concludes that "[t]he Biden Justice Department interfered with records requests in order to shield CISA from public scrutiny of its unconstitutional practices." *Id.* at 34.  These conclusions contradict the Government's contention that CISA voluntarily ceased censorship activities.

Dated: June 28, 2023

**ANDREW BAILEY**
**Attorney General of Missouri**

*/s/ Todd A. Scott*
Joshua M. Divine, Mo. Bar No. 69875*
  *Solicitor General*
Todd A. Scott, Mo. Bar No. 56614*
  *Senior Counsel*
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
Tel: (573) 751-8870
kenneth.capps@ago.mo.gov
*Counsel for State of Missouri*


*/s/ John J. Vecchione*
John J. Vecchione *
New Civil Liberties Alliance
1225 19th Street N.W., Suite 450
Washington, DC 20036
Direct: (202) 918-6905
E-mail: john.vecchione@ncla.legal
*Counsel for Plaintiffs Dr. Jayanta*
*Bhattacharya,*
*Dr. Martin Kulldorff, Dr. Aaron Kheriaty,*
*and Jill Hines*


  *  admitted *pro hac vice*

Respectfully submitted,

**JEFFREY M. LANDRY**
**Attorney General of Louisiana**

*/s/ D. John Sauer*
Elizabeth B. Murrill (La #20685)
  *Solicitor General*
Tracy Short (La #23940)
  *Assistant Attorney General*
D. John Sauer (Mo #58721)*
  *Special Assistant Attorney General*
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, Louisiana
Tel: (225) 326-6766
murrille@ag.louisiana.gov
*Counsel for State of Louisiana*


*/s/ John C. Burns*
John C. Burns *
Burns Law Firm
P.O. Box 191250
St. Louis, Missouri 63119
P: 314-329-5040
E-mail: john@burns-law-firm.com
*Counsel for Plaintiff Jim Hoft*

## CERTIFICATE OF SERVICE

I hereby certify that, on June 28, 2023, I caused a true and correct copy of the foregoing to be filed by the Court's electronic filing system, to be served by operation of the Court's electronic filing system on counsel for all parties who have entered in the case.

*/s/ D. John Sauer*

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA

STATE OF LOUISIANA, *et al.*,

     *Plaintiffs*,

     v.

JOSEPH R. BIDEN, JR., in his official
capacity as President of the United States of
America, *et al.,*

     *Defendants*.

Civil Action No. 22-cv-1213

DEFENDANTS' REPLY IN SUPPORT OF THEIR
NOTICE OF SUPPLEMENTAL AUTHORITY

**I.**     **The Supreme Court's Recent Decisions Confirm that Plaintiff States Lack Standing.**

As stated in Defendants' Notice of Supplemental Authority ("Notice"), Dkt. 289, *United States v. Texas*, No. 22-58, 2023 WL 4139000 (U.S. June 23, 2023), and *Haaland v. Brackeen*, 143 S. Ct. 1609 (2023), clarify Article III standing principles that foreclose the States' theories in this case. In *Texas*, the Supreme Court explained that the standing analysis in *Massachusetts v. EPA*, 549 U.S. 497 (2007), must be understood in light of the particular claim asserted there: "a challenge to the denial of a statutorily authorized petition for rulemaking[.]" *Texas*, 2023 WL 4139000, at *8 n.6. The Supreme Court also emphasized that standing theories premised on "indirect effects" to States "can become more attenuated" and that, especially when such attenuated theories are at issue, "federal courts must remain mindful of bedrock Article III constraints in cases brought by States against an executive agency or officer." *Id.* at *6 n.3. In *Brackeen*, the Supreme Court reiterated that "[a] State does not have standing as *parens patriae* to bring an action against the Federal Government," 143 S. Ct. at 1640 (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 610 n.16 (1982))), and rejected the State's

"thinly veiled attempt to circumvent the limits on *parens patriae* standing," *id.* at 1640 n.11. As explained in Defendants' Notice, the principles articulated in both decisions confirm that the States lack Article III standing here.

Plaintiffs fail to overcome the import of these recent decisions. *First*, the Plaintiff States assert that *Texas* is inapposite because it involves a failure-to-prosecute claim, and no such claim is asserted here. Pls.' Resp. to Defs.' Notice ("Pls.' Resp.") 2, Dkt. 291. But *Texas* stressed that "bedrock Article III constraints" compel skepticism in *every* case, regardless of the specific claim asserted, in which a State's standing theories turn on the alleged "indirect effects" of federal policies or actions. *Texas*, 2023 WL 4139000, at *6 n.3. Here, as in *Texas*, the States assert attenuated theories of standing that turn on the incidental effects of social media companies' alleged moderation of content posted by certain users of the companies' platforms. *See* Defs.' MTD Reply 11, Dkt. 199; *see also* Notice 2. As in *Texas*, those "indirect effects" are too attenuated to satisfy Article III's requirements that an injury be "concrete" and "particularized." And, as in *Texas*, Plaintiffs have "not cited any precedent, history, or tradition of courts" recognizing Article III standing of the kind Plaintiffs have asserted. 2023 WL 4139000, at *4. Thus, Plaintiffs' discussion of the various other factors the *Texas* Court considered relating to standing in failure-to-prosecute claims, Pls.' Resp. 2-3, are beside the point.

*Second*, the Plaintiff States assert that *Texas* does not undermine their reliance on "special solicitude" because the Supreme Court there did not use the phrase "special solicitude" in its decision. But regardless of whether the Supreme Court used that phrase, it clarified that the case on which Plaintiffs rely in invoking "special solicitude," *Massachusetts v. EPA*, arose from and is confined to a "challenge to the denial of a statutorily authorized petition for rulemaking." *Texas*, 2023 WL 4139000, at *8 n.6. Here, as in *Texas*, where no such challenge is at issue, the States

cannot resort to *Massachusetts v. EPA*'s context-specific reference to "special solicitude" to satisfy or water down Article III's standing requirements. Indeed, as Justice Gorsuch stressed in his concurrence, "special solicitude" has not "played a meaningful role in th[e] Court's decisions in the years since" *Massachusetts v. EPA* was decided, and "it's hard not to think, too, that lower courts should just leave that idea on the shelf in future" cases. *Id.* at *10.

*Third*, the Plaintiff States contend that the "settled rule[]" that States "do not have standing as *parens patriae* to bring an action against the Federal Government" is not as settled as the Supreme Court stated in *Brackeen*, 143 S. Ct. at 1640. Pls.' Resp. 4-5. The States reiterate their meritless argument that *Kentucky v. Biden*, 23 F.4th 585 (6th Cir. 2022), supports their *parens patriae* theory to the extent it is based on the assertion of a quasi-sovereign interest rather than the invocation of third-party interests. Pls.' Resp. 4-5. But *Brackeen* casts serious doubt about *Kentucky*'s validity. In any event, as Defendants explained, *see* MTD Reply 14-15, even accepting the *parens patriae* distinctions articulated in *Kentucky*, the States' efforts to establish standing fail. The States have not plausibly alleged (or documented with evidence) any quasi-sovereign interest that exists apart from their citizens' private interests in free speech; therefore, the States act as nothing more than "nominal part[ies]" whose role is only to support the "[i]nterests of private parties." *Snapp*, 458 U.S. at 592. Moreover, Plaintiffs wrongly suggest that *Brackeen* rejected the State of Texas's standing in *parens patriae* simply because Texas asserted rights belonging to "only a tiny minority of its population." Pls.' Resp. 5. The Court in *Brackeen* nowhere discusses the proportion of the State's population affected by the constitutional claim there, nor otherwise suggests that a State may circumvent the bar against *parens patriae* standing if it brings claims on behalf of enough people. *See Brackeen*, 143 S. Ct. at 1640 n.11 (rejecting Texas's "thinly veiled attempt to circumvent the limits on *parens patriae* standing").

Finally, the Plaintiff States assert that it is irrelevant that *Brackeen* rejected Texas's theory that it was injured because federal law allegedly "required" the State to "break its [constitutional] promise to its citizens that it will be colorblind in child-custody proceedings." Pls.' Resp. at 6; *see Brackeen*, 143 S. Ct. at 1640. But the States' own arguments underscore the relevance of that outcome. As the Plaintiff States emphasize, the Supreme Court rejected that theory of injury because it would mean that a State "*always* ha[s] standing to bring constitutional challenges when it is complicit in enforcing federal law." *Id.* at 6 (emphasis added) (quoting *Brackeen*, 143 S. Ct. at 1640). As the Supreme Court explained, such a broad theory is "not the kind of 'concrete' and 'particularized' 'invasion of a legally protected interest' necessary to demonstrate an 'injury in fact.'" *Brackeen*, 143 S. Ct. at 1640 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (plurality op.)). The same is true here. The States' standing theories are overly broad grievances that, if accepted, would mean that any State has standing based on any alleged interference to an individual citizen's free speech. *See* Defs.' Mot. to Dismiss 24, 27-28, ECF No. 128-1.[1]

## II.    Plaintiffs Inappropriately Attempt to Introduce New Arguments and Evidence That are Unrelated to Article III Standing and That Lack Merit Regardless.

Plaintiffs next contend that the Defendants "ignore other recent authorities that undercut their arguments," citing to the Supreme Court's recent decision in *United States v. Hansen*, No. 22-179, 2023 WL 4138994 (U.S. June 23, 2023), and an Interim Majority Staff Report issued by the Committee on the Judiciary and the Select Subcommittee on the Weaponization of the Federal Government ("Interim Majority Staff Report"). Pls.' Resp. 7. The Court should reject this after-

---

[1] Plaintiffs also assert that "only one Plaintiff need have standing" for the case to proceed. Pls.' Resp. 6. But no Article III precedent permits a single plaintiff who possesses standing to litigate the claims of others who do not, or to seek relief on behalf of others that is unrelated to the redress of that plaintiff's injury. Thus, the States must show that they satisfy each element of Article III standing, independent of injury to any individual Plaintiff. *See* Defs.' MTD 5-6.

the-last-minute attempt by Plaintiffs to supplement the record and refuse to accept the Interim

Majority Staff Report as suitable evidence on which to base preliminary injunctive relief.

As an initial matter, neither of these sources relates to the States' Article III standing, which

was the sole issue addressed in Defendants' Notice. Accordingly, Plaintiffs lack any basis for

accusing Defendants of "ignor[ing]" sources that undercut their arguments relating to Article III

standing. Instead, Plaintiffs present these new sources to bolster their arguments concerning the

scope of their proposed injunction and the merits of their claims. But neither *Hansen* nor the

Interim Majority Staff Report supports Plaintiffs' arguments.

To start, Plaintiffs rely on *Hansen* to rehash their arguments that the broad injunction they

seek would not interfere with legitimate government speech or law enforcement objectives. Pls.'

Resp. 7-8. Their arguments lack merit. In *Hansen*, the Supreme Court concluded that a federal

statute criminalizing the act of "encourag[ing] or induc[ing] an alien to come to, enter, or reside in

the United States, knowing or in reckless disregard of the fact that such [activity] is or will be in

violation of law," was not unconstitutionally overbroad in violation of the First Amendment. 2023

WL 4138994, at *4 (quoting 8 U.S.C. § 1324(a)(1)(A)(iv)). The Supreme Court's holding that this

criminal statute does not violate the First Amendment has no bearing on the state action analysis

or government speech doctrine at issue here. In other words, *Hansen* does not address the

circumstances in which speech by a government official renders private conduct state action for

which the government may be held responsible. Nor does *Hansen* clarify the limits of the

government speech doctrine or otherwise support Plaintiffs' assertion that their requested

injunction is not overly broad.

Indeed, Plaintiffs continue to insist that their requested injunction is not overly broad and

preserves the government's ability to carry out legitimate and important law enforcement activities

without explaining how that is the case. Plaintiffs assert that *Hansen* confirms that speech amounting to "fraud, malicious cyber activity, live-streamed child sex abuse, terrorism, and true threats" "is not protected by the First Amendment." Pls.' Resp. 7-8. Therefore, Plaintiffs contend, "an injunction prohibiting federal officials from interfering with First Amendment-protected speech would not apply to such conduct." *Id.* The problem is that Plaintiffs' challenge to virtually any communication between a government official and social media company, together with their vaguely worded proposed injunction, *would* prohibit government activities designed to prevent these unlawful activities that Plaintiffs agree the First Amendment does not protect. Defendants explained the problems with the scope of Plaintiffs' proposed injunction at length in their briefing and at oral argument. *See* Defs.' PI Resp. 261-75, Dkt. 266.

Next, Plaintiffs' reliance on the Interim Majority Staff Report is likewise misplaced. As an initial matter, the Report does not qualify as "supplemental authority" on which the Court can rely. It is not an "authority" in any sense of the word, but rather reflects interim findings relating to a congressional oversight investigation made by one side of the Committee's staff. And even the findings detailed in the report have no bearing on the facts relating to Plaintiffs' preliminary injunction motion. First, the Interim Majority Staff Report is not a set of final conclusions; it is, as its name indicates, "interim." Moreover, whatever Congress's authority to conduct fact-finding in service of its legislative function—which has long been recognized to require far less than a "precise reconstruction of past events," *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 732 (D.C. Cir. 1974)—Congress has no authority to find facts for an Article III Court. *Cf. Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 225-26 (1995) (holding that statute that instructed federal courts to reopen final judgments violated separation of powers principles); *Gonzales v. Carhart*, 550 U.S. 124, 165, (2007) ("The Court retains an independent constitutional

duty to review factual findings where constitutional rights are at stake"). In addition, a congressional committee is not bound by the Federal Rules of Evidence or Civil Procedure that ordinarily guarantee the trustworthiness of the evidence relied on and the conclusions reached in a judicial proceeding. Indeed, the citations to documents in the Report are unquestionably selective but, even worse, there is no way for the Defendants or for this Court to determine what contrary evidence was left out of the report or, even, in many cases, to review the underlying documents relied upon by the majority staff. The Interim Majority Staff Report is also doubly one-sided: CISA was given no opportunity to respond to it *and* it reflects the work product of only one side of the Committee's partisan divide. These factors, individually and in concert, disqualify the Interim Majority Staff Report as a reliable basis on which to make factual findings in support of Plaintiffs' preliminary injunction motion.[2]

Plaintiffs' contentions would fail as a factual matter even if the Report were sufficiently trustworthy as evidence. Plaintiffs contend that the conclusions in this one-sided report by the majority staff of a House of Representatives Select Subcommittee "contradict the Government's contention that CISA voluntarily ceased censorship activities." Pls.' Resp. 8. Putting to one side that none of Plaintiffs' claimed evidence—including this Interim Majority Staff Report—supports their claim that CISA ever engaged in "censorship activities," this Report certainly does not show

---

[2] For example, the public record shows that Plaintiffs are coordinating with the House Majority Staff in connection with this case. On March 30, 2023, lead counsel for Plaintiffs testified before the Select Subcommittee on the Weaponization of the Federal Government and advanced the same factually unsupported arguments about alleged government censorship that Plaintiffs advance in this lawsuit. *See* Ex. B (testimony of D. John Sauer). And notably, one of Plaintiffs' former counsel recently withdrew from this lawsuit to work for the Weaponization Select Subcommittee on its investigation in this matter. *See* Dkt. 243 (motion to withdraw), Ex. C. This evident coordination between Plaintiffs and the Committee is reason alone to discount any of the factually unsupported conclusions by the Select Subcommittee's Majority staff. In any event, repetition by the Committee majority of Plaintiffs' unsupported characterizations does not add to their weight.

that any of CISA's challenged actions are ongoing. Moreover, by all appearances the Interim Staff

Majority Report does not take into consideration the extensive, uncontradicted and publicly

available record produced by Defendants in this case. To be sure, congressional staff were under

no obligation to address the evidence and record in this case. But that is the point.

For example, Plaintiffs note that the Interim Majority Staff Report concludes that "CISA

has attempted to conceal its unconstitutional activities and remove evidence of wrongdoing." Pls.'

Resp. 8 (citing Interim Majority Staff Report 28). This conclusion is unsupported even by the

evidence cited by the report. The Interim Majority Staff Report cites meeting minutes from the

CISA Cybersecurity Advisory Committee (CSAC) Protecting Critical Infrastructure from

Misinformation and Disinformation Subcommittee Meeting (MDM Subcommittee)[3] in April

2022, where certain subcommittee members discussed the use of CISA to "amplify trusted

information" and discussed designating the EI-ISAC as a clearing house for trusted information.[4]

---

[3] Established under the *National Defense Authorization Act for Fiscal Year 2021*, Pub. L. No. 116-283, 134 Stat. 3388 (NDAA), the CSAC operates as a federal advisory committee governed by the *Federal Advisory Committee Act*. PI Resp. 81 (citing Defs.' Exs. 119 & 120). The CSAC, including its subcommittees, is comprised entirely of non-federal experts who convene to consider, deliberate on, and ultimately deliver non-binding advice and recommendations to CISA. *Id.* (citing Defs' Ex. 120). Contrary to the assertions of Plaintiffs and the Interim Majority Staff Report, CSAC reports and recommendations, not to mention subcommittee deliberative discussions, are not federal policy and do not reflect the position of the U.S. government.

[4] Like the Plaintiffs in this case, the Interim Staff Majority Report claims that the "EI-ISAC is federally funded by CISA." Interim Majority Staff Report 8, 22 ("[t]he CISA-funded EI-ISAC"). That characterization ignores the undisputed evidence presented in Defendants' opposition to Plaintiffs' preliminary injunction motion that "CISA did not fund CIS or the EI-ISAC for any of the work they provided in relation to the reporting of potential election security related disinformation to social media or technology companies during the 2020 election cycle," PI Resp. at 239 n.109 (citing Ex. 97 at ¶¶ 50-51). Nor did DHS fund CIS or the EI-ISAC for any reporting of potential election security-related disinformation to social media or technology companies they may have done during the 2022 election cycle. Defs' Ex. 97 at ¶ 79. Furthermore, it is undisputed that CISA was not involved in any efforts by CIS or the EI-ISAC to report potential election security-related disinformation to social media or technology companies in relation to the 2022 election cycle. *Id.* at ¶ 81. The evidence on which the Interim Majority Staff Report relies are

Interim Majority Staff Report 28. But as Defendants explained in undisputed submissions, rather than attempt to "conceal" its activities, the MDM Subcommittee "operated transparently[,] and details about the MDM Subcommittee, its memberships, reports, and recommendations, are posted on CISA's website." PI Resp. 82-83 (citing Defs' Ex. 123).  More fundamentally, the unrebutted evidence shows that the MDM Subcommittee—which was directed to stand down in December 2022 because it had completed the tasks for which it was created and provided its recommendations to CISA (and therefore cannot be the basis for any alleged ongoing or imminent harm to Plaintiffs)—did not discuss whether or how social media platforms should moderate content, either in specific cases or more generally. *Id.* (citing Ex. 122 at 9). The MDM Subcommittee meeting minutes cited by the Interim Majority Staff Report do not show otherwise; to the contrary, they document a discussion not about "censoring" speech but rather about promoting and amplifying speech. *See* Interim Majority Staff Report 28 (citing April 12, 2022, meeting minutes where "Subcommittee members returned to the recommendation for CISA to amplify trusted information").

Plaintiffs next claim that the Interim Majority Staff Report found that "CISA purged its website of reference to domestic MDM and its First Amendment violations in response to public pressure" and that the website now focuses exclusively on foreign malign influence operations. Pls.' Resp. 8 (citing Interim Majority Staff Report 32). Notably, the Report cites no evidence establishing why CISA updated its website, let alone any evidence that it updated its website "in response to public pressure." *Id.*[5]

---

emails between state and local election officials, CIS, and social media platforms. Notably, CISA is not included on these emails. *See* Interim Majority Staff Report 23-25.

[5] Rather, CISA's website overhaul, which was announced in February 2023, and was the result of several months of development, was based on feedback CISA had received that its website "wasn't organized in a way to easily find resources," and that the reorganization "makes our agency's

Finally, Plaintiffs observe that the Interim Majority Staff Report found that "[t]he Biden Justice Department interfered with records requests in order to shield CISA from public scrutiny of its unconstitutional practices." Pls.' Resp. 8 (citing Interim Majority Staff Report at 34). Putting to one side that this finding has nothing to do with any alleged irreparable harm to Plaintiffs, it also lacks any evidentiary support. The document cited by the Interim Majority Staff Report reflects a request under Washington State's Public Records Act ("PRA") for documents from the University of Washington. After CISA was notified of various PRA requests that potentially implicated CISA equities, CISA, through the Department of Justice, sought the opportunity to review the information intended for release to consider whether any federal law would be implicated by its release. At this time, CISA and the Department have not opposed the release of any documents by the University of Washington.[6] Contrary to its conclusion, nothing in the documents cited in the Interim Majority Staff Report supports "interference" by the Department of Justice with public record requests or an attempt to "shield CISA from public scrutiny of its unconstitutional practices."

For all of these reasons, the Interim Majority Staff Report fails to include reliable evidence supportive of Plaintiffs' request for the extraordinary remedy of a preliminary injunction, and Plaintiffs' implicit request to supplement the record with this report should be denied.

---

resources and tools easier to find." *See* Ex. A (CISA, "It's a new Dawn, It's a New Day, It's a New Website for CISA"). The website overhaul sought to "consolidate[e] all CISA services, tools, and sites into one place [to] make[] it easier for our partners and stakeholders to find what they need" and to "simpl[y] the process of reporting information to us." *Id.* Plaintiffs fail to explain how a revision to CISA's website to include, among other things, an emphasis on CISA's focus on foreign malign influence operations and disinformation possibly supports their claim of irreparable injury justifying the extraordinary remedy of a preliminary injunction.
[6] In certain circumstances, the Washington PRA authorizes a third party objecting to disclosure to file a lawsuit to prevent the release of information. *See* RCW § 42.56.540. CISA and the Department have not initiated a lawsuit to prevent the release of information by the University.

Dated:  June 29, 2023   Respectfully submitted,

        BRIAN M. BOYNTON
        Principal Deputy Assistant Attorney General

        JAMES J. GILLIGAN
        Special Litigation Counsel, Federal Programs Branch

        JOSHUA E. GARDNER (FL Bar No. 0302820)
        Special Counsel, Federal Programs Branch

        */s/ Kyla M. Snow*
        KYLA M. SNOW (OH Bar No. 96662)
        INDRANEEL SUR (D.C. Bar No. 978017)
        KUNTAL CHOLERA (D.C. Bar No. 1031523)
        AMANDA K. CHUZI (D.C. Bar No. 1738545)
        Trial Attorneys
        U.S. Department of Justice
        Civil Division, Federal Programs Branch
        1100 L Street, NW
        Washington D.C. 20005
        Tel: (202) 514-3259
        kyla.snow@usdoj.gov

        *Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### MONROE DIVISION

| | |
|---|---|
| **STATE OF MISSOURI ET AL** | **CIVIL ACTION NO. 3:22-cv-1213** |
| **VERSUS** | **JUDGE TERRY A. DOUGHTY** |
| **JOSEPH R BIDEN JR ET AL** | **MAG. JUDGE KAYLA D. MCCLUSKY** |

## <u>MEMORANDUM RULING ON MOTION TO STAY</u>

Before the Court is a Motion to Stay Preliminary Injunction Pending Appeal and Alternatively, for Administrate Stay [Doc. No. 297] ("Motion to Stay") filed by Defendants.[1] An Opposition [Doc. No. 299] was filed by Plaintiffs.[2]

For the reasons set forth herein, Defendants' Motion to Stay is **DENIED**.

## I.    BACKGROUND

On July 4, 2023, this Court issued a Preliminary Injunction against the Defendants,[3] which prohibited the Defendants from contacting social-media companies and taking specific actions for the purpose of urging, encouraging, pressuring, or inducing in any manner, the removal, deletion,

---

[1] Defendants consist of  President Joseph R Biden ("Jean-Pierre"), Jr, Karine Jean-Pierre ("Jean-Pierre"), Vivek H Murthy ("Murthy"), Xavier Becerra ("Becerra"), Dept of Health & Human Services ("HHS"), Dr. Hugh Auchincloss ("Auchincloss"),  National Institute of Allergy & Infectious Diseases ("NIAID"), Centers for Disease Control & Prevention ("CDC"),  Alejandro Mayorkas ("Mayorkas"), Dept of Homeland Security ("DHS"),  Jen Easterly ("Easterly"), Cybersecurity & Infrastructure Security Agency ("CISA"), Carol Crawford ("Crawford"), United States Census Bureau ("Census Bureau"), U. S. Dept of Commerce ("Commerce"), Robert Silvers ("Silvers"), Samantha Vinograd ("Vinograd"), Ali Zaidi ("Zaidi"), Rob Flaherty ("Flaherty"), Dori Salcido ("Salcido"), Stuart F. Delery ("Delery"),  Aisha Shah ("Shah"),  Sarah Beran ("Beran"),  Mina Hsiang ("Hsiang"), U. S. Dept of Justice ("DOJ"), Federal Bureau of Investigation ("FBI"), Laura Dehmlow ("Dehmlow"), Elvis M. Chan ("Chan"), Jay Dempsey ("Dempsey"),  Kate Galatas ("Galatas"), Katharine Dealy ("Dealy"), Yolanda Byrd ("Byrd"), Christy Choi ("Choi"), Ashley Morse ("Morse"), Joshua Peck ("Peck"), Kym Wyman ("Wyman"), Lauren Protentis ("Protentis"), Geoffrey Hale ("Hale"), Allison Snell ("Snell"), Brian Scully ("Scully"), Jennifer Shopkorn ("Shopkorn"), U. S. Food & Drug Administration ("FDA"), Erica Jefferson ("Jefferson"), Michael Murray ("Murray"), Brad Kimberly ("Kimberly"), U. S. Dept of State ("State"), Leah Bray ("Bray"), Alexis Frisbie ("Frisbie"), Daniel Kimmage ("Kimmage"), U. S. Dept of Treasury ("Treasury"), Wally Adeyemo ("Adeyemo"), U. S. Election Assistance Commission ("EAC"),  Steven Frid ("Frid"), and Kristen Muthig ("Muthig").

[2] Plaintiffs consist of the State of Missouri, the State of Louisiana, Dr. Aaron Kheriaty ("Kheriaty"), Dr. Martin Kulldorff ("Kulldorff"), Jim Hoft ("Hoft"), Dr. Jayanta Bhattacharya ("Bhattacharya"), and Jill Hines ("Hines").

[3] [Doc. No. 294]

suppression, or reduction of content containing protected free speech posted on social-media platforms.[4] The Judgment defined "protected free speech" as "speech that is protected by the Free Speech Clause of the First Amendment to the United States Constitution in accordance with the jurisprudence of the United States Supreme Court, Courts of Appeal and District Courts."[5]

Defendants filed a Notice of Appeal[6] on July 5, 2023. On July 6, 2023, Defendants filed the instant Motion to Stay.[7] In the Motion to Stay, Defendants seek to have the Court Stay the Preliminary Injunction pending appeal, or alternatively to administratively stay the preliminary injunction for seven days.

The Defendants allege that they face irreparable harm with each day the injunction remains in effect, because the injunction's broad scope and ambiguous terms may be read to prevent the Defendants from engaging in a vast range of lawful and responsible conduct, including speaking on matters of public concern, and working with social-media companies on initiatives to prevent grave harm to the American people and the Country's various democratic processes.

**II.    LAW AND ANALYSIS**

In determining whether to grant a stay pending appeal, a court is to consider: (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent  a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies. *Nken v. Holder*, 556 U.S. 418, 426 (2009). In evaluating these factors, courts have refused to apply them in a rigid or mechanical fashion. *United States v. Baylor Univ. Med. Ctr.*, 711 F.2d 38, 39 (5th Cir. 1983).

---

[4] [Id.]
[5] [Id. at 4, n. 3]
[6] [Doc. No. 296]
[7] [Doc. No. 297]

A.      **Success on the Merits**

For all the reasons set forth in the Memorandum Ruling,[8] this Court finds the Plaintiffs

have shown a likelihood of success on the merits and, therefore, that Defendants have failed to

show a likelihood of success on the merits. As discussed in detail in the Memorandum Ruling, all

of the Defendants likely "significantly encouraged" and/or "jointly participated" with the social-

media companies to engage in viewpoint-based suppression of protected free speech. Additionally,

the White House Defendants[9] and the Surgeon General Defendants[10] were found to have likely

engaged in coercion of social-media companies.

The following are a few examples of actions taken by Defendants that demonstrate they

are unlikely to succeed on the merits.

1.      **White House Defendants**

(a)      On January 23, 2021, White House Digital Director for COVID-19 Response Team

Clarke Humphrey emailed Twitter and requested the removal of an anti-COVID-19 vaccine tweet

by Robert F. Kennedy, Jr.[11]

(b)      On April 14, 2021, White House Deputy Assistant to the President and Director of

Digital Strategy Rob Flaherty ("Flaherty") demanded censorship by Facebook of a video of Fox

News hosts Tucker Carlson and Tomi Lahren where Tucker Carlson was saying COVID-19

vaccines don't work and Tomi Lahren was saying she won't take a COVID-19 vaccine.[12] Flaherty

demanded immediate answers from Facebook on April 16, 2021, in relation to the video, and on

---

[8] [Doc. No. 294]
[9] White House Defendants consist of President Joseph R. Biden ("President Biden"), White House Press Secretary
Karine Jean-Pierre ("Jean-Pierre"), Ashley Morse ("Morse"), Deputy Assistant to the President and Director of Digital
Strategy Rob Flaherty ("Flaherty"), Dori Salcido ("Salcido"), Aisha Shah ("Shah"), Sarah Beran ("Beran"), Stuart F.
Delery ("Delery"), Mina Hsiang ("Hsiang"), and Dr. Hugh Auchincloss (Dr. Auchincloss")
[10] Surgeon General Defendants consists of Dr. Vivek H. Murthy ("Murthy") and Katharine Dealy ("Dealy").
[11] [Doc. No. 293 at 9]
[12] [Doc. No. 293 at 16]

April 21, 2021, despite not violating Facebook's policies, Facebook gave the video a 50% reduction for seven days and stated it would continue to demote the video.[13]

### 2.    Surgeon General Defendants

(a)    Senior Advisor to the Surgeon General Eric Waldo ("Waldo") testified that Surgeon General Dr. Vivek H. Murthy ("Murthy") used his office to advocate for social-media platforms to take stronger actions against "health misinformation," which involved putting pressure on social-media platforms to reduce the dissemination of health misinformation. That message was given to social-media platforms both publicly and privately.[14]

(b)    In addition to public statements, Murthy had meetings with social-media companies, called health misinformation "poison," and called for social-media companies to do more to control the reach of health disinformation. When Murthy was calling posts "health disinformation," he was referring to anti-vaccine posts.[15]

### 3.    CDC Defendants[16]

(a)    The CDC Defendants consistently had regular contact with social-media platforms via email, phone, and in-person meetings. The CDC Defendants received CrowdTangle reports from Facebook as to the "top engaged COVID and vaccine related content.[17]

(b)    The CDC Defendants provided PowerPoint slide decks to Facebook, which provided examples of misinformation topics and made recommendations to Facebook as to whether claims were true or false. Some of the items designated as false by the CDC Defendants

---

[13] [Doc. No. 297 at 17-18]
[14] [Doc. No. 293 at 28]
[15] [Doc. No. 293 at 31-33]
[16] The CDC Defendants consist of the Centers for Disease Control & Prevention, Carol Crawford ("Crawford"), Jay Dempsey ("Dempsey"), Kate Galatas ("Galatas"), United States Census Bureau ("Census Bureau"), Jennifer Shopkorn ("Shopkorn"), the Department of Health and Human Services ("HHS"), Xavier Becerra ("Becerra"), Yolanda Byrd ("Byrd"), Christy Choi ("Choi"), Ashley Morse ("Morse"), and Joshua Peck ("Peck").
[17] [Doc. No. 293 at 39]

included medically debatable topics such as whether COVID-19 had a 99.96% survival rate, whether COVID-19 vaccines weaken the immune system, and the safety of COVID-19 vaccines.[18]

### 4.     NIAID Defendants[19]

(a)     Dr. Francis Collins sent an email to Dr. Anthony Fauci on October 8, 2020, which stated that the Great Barrington Declaration[20] needed to have a "quick and devastating take-down."[21]

(b)     Dr. Fauci sent back information to "debunk" The Great Barrington Declaration and both Dr. Collins and Dr. Fauci followed up with a series of public media statements attacking the Great Barrington Declaration. Thereafter the Great Barrington Declaration was censored by social-media platforms.[22]

### 5.     FBI Defendants[23]

(a)     The FBI Defendants, along with numerous social-media platforms, CISA, and the Department of Homeland Security, met consistently at Industry Meetings. The Industry Meetings were used by the FBI Defendants and others to discuss election disinformation.[24]

(b)     Prior to the 2020 Presidential election, the FBI repeatedly warned social-media companies to be alert for "hack and dump" or "hack and leak" operations. The Hunter Biden laptop story was published by the Washington Post on October 14, 2020. After being asked by Facebook whether the Hunter Biden laptop story was Russian disinformation, the FBI's Laura Dehmlow

---

[18] [Doc. No. 293 at 41-44]
[19] The NIAD Defendants consist of the National Institute of Allergy and Infectious Disease and Dr. Hugh Auchincloss ("Dr. Auchincloss").
[20] [Doc. No. 293 at 55]
[21] The Great Barrington Declaration is a one-page treatise opposing the reliance of lockdowns, criticized social distancing, and expressed concerns about physical and mental health impacts of lockdowns.
[22] [Doc. No. 293 at 54]
[23] FBI Defendants include Elvis Chan ("Chan"), the Federal Bureau of Investigation ("FBI"), Lauren Dehmlow ("Dehmlow"), and the U.S. Department of Justice ("DOJ").
[24] [Doc. No. 293 at 54]

refused to comment, leading Facebook to suppress the story. The FBI had had the laptop since December of 2019, and knew that the story was not Russian disinformation.[25]

### 6.    CISA Defendants[26]

(a)    The CISA Defendants regularly met with social-media platforms at several types of meetings. At those meetings, disinformation was discussed as well as reports about social-media companies' changes to censorship policies.[27] CISA had five sets of recurring meetings with social-media platforms that involved discussions of misinformation, disinformation, and/or censorship of protected free speech on social media.[28]

(b)    The CISA Defendants collaborated with the Election Integrity Partnership, working with them in a "switchboarding" operation which reported alleged election misinformation to social-media companies. The alleged election misinformation included claims that "mail-in voting is insecure" and "theories about election fraud are hard to discount."[29]

(c)    CISA Director Jen Easterly views the word "infrastructure" expressively to include our "cognitive infrastructure," which deals with the way people acquire knowledge and understanding.[30]

### 7.    State Department Defendants[31]

(a)    The State Department Defendants worked closely and collaborated with the Election Integrity Partnership and the Virality Project, who forwarded alleged election

---

[25] [Doc. No. 293 at 61-63]
[26] CISA Defendants consist of the Cybersecurity and Infrastructure Security Agency ("CISA"), Jen Easterly ("Easterly"), Kim Wyman ("Wyman"), Lauren Protentis ("Protentis"), Geoffrey Hale ("Hale"), Allison Snell ("Snell"), Brian Scully ("Scully"), the Department of Homeland Security ("DHS"), Alejandro Mayorkas ("Mayorkas"), Robert Silvers ("Silvers"), and Samantha Vinograd ("Vinograd").
[27] [Doc. No. 293 at 68-69]
[28] [Doc. No. 293 at 75]
[29] [Doc. No. 293 at 70-74]
[30] [Doc. No. 293 at 77]
[31] The State Department Defendants consist of the United States Department of State, Leah Bray ("Bray"), Daniel Kimmage ("Kimmage'), and Alex Frisbie ("Frisbie").

misinformation and COVID-19 misinformation to social-media companies.[32] The alleged misinformation related to content by American citizens. The alleged disinformation primarily involved social media posts which delegitimized election results,[33] and posts which involved anti-vaccine content by such personalities as Alex Berenson, Candace Owens, Tucker Carlson, and John F. Kennedy, Jr.[34]

(b)    The Election Integrity Partnership was designed "to get around unclear legal authorities, including very real First Amendment questions" that would arise if government agencies were to monitor and flag information for censorship on social media.[35]

### B.    Standing

Defendants further argue that they will prevail as to establishing that Plaintiffs lack Article III standing. For the reasons set forth previously in the Memorandum Ruling[36] this Court found all of the Plaintiffs are likely to establish all elements of Article III standing. Defendants argue the States of Missouri and Louisiana do not have *parens patriae* standing to bring a claim against the Federal Government. This Court disagrees. In *Massachusetts v. E.P.A.*, 549 U.S. 497 (2007), the United States Supreme Court concluded that *Massachusetts* had standing to sue the E.P.A. to protect its *quasi-sovereign* interests. The court clarified that because *Massachusetts* sought to assert its rights under federal law, rather than challenge the federal law's application for its citizens, the *State of Massachusetts* had standing. Like *Massachusetts*, the States of Missouri and Louisiana are asserting their rights under the First Amendment to the United States Constitution, and also asserting rights under each Plaintiff States' own constitution. The Plaintiff States are likely to

---

[32] [Doc. No. 293 at 79-81]
[33] [Doc. No. 293 at 81]
[34] [Doc. No. 293 at 86]
[35] [Doc. No. 293 at 73].
[36] [Doc. No. 293 at 119-139] (see also [Doc. No. 214] (Memorandum Ruling Denying Defendants' Motion to Dismiss))

prevail on their standing argument because they have adequately alleged (and provided evidence supporting) injuries to their *quasi-sovereign* interest as well as direct censorship injuries on social-media.

There are also individual Plaintiffs in this case. Only one Plaintiff with standing is required to be able to maintain this suit. *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1651 (2017). Defendants argue that the individual Plaintiffs' standing have not shown "irreparable harm." The individual Plaintiffs' standing analysis is set forth in the Memorandum Ruling.[37] The "irreparable harm" element was also specifically discussed in the Memorandum Ruling.[38] Violation of a First Amendment Constitutional right, even for a short period of time, is always irreparable injury. *Elrod v. Burns*., 427 U.S. 347 (1976). Accordingly, for the reasons set forth previously, the Plaintiffs have shown there is a substantial risk that future harm is likely to occur and that they are likely to satisfy the requirements of Article III standing.

### C.    Public Interest and Harm

Defendants further maintain they will be irreparably injured absent a stay, and that the balance of the equities weighs heavily in the Defendants' favor of granting a stay. Again, this Court disagrees. As discussed in the Memorandum Ruling,[39] the First Amendment free speech rights of Plaintiffs by far outweighs the Defendants' interests.

Defendants argue that the injunction may be read to prevent the Defendants from engaging in a vast range of lawful conduct—including speaking on matters of public concern and working with social-media companies on initiatives to prevent grave harm to the American people and our democratic processes. However, the Preliminary Injunction only prohibits what the Defendants

---

[37] [Id. at 126-135]
[38] [Id. at 139-140]
[39] [Id. at 144-45]

have no right to do—urging, encouraging, pressuring, or inducing in any manner the removal, deletion, suppression, or reduction of content containing protected free speech on social-media platforms. The Defendants provide no argument that they are legally allowed to take such action. The Defendants are asking the Court to grant them relief to a Preliminary Injunction that only bars illegal conduct. In other words, the only effect of staying the Preliminary Injunction would be to free Defendants to urge, encourage, pressure, or induce the removal, deletion, suppression, or reduction of content containing protected free speech on social-media platforms.

The Preliminary Injunction also has several exceptions which list things that are **NOT** prohibited. The Preliminary Injunction allows Defendants to exercise permissible public government speech promoting government policies or views on matters of public concern, to inform social-media companies of postings involving criminal activity, criminal conspiracies, national security threats, extortion, other threats, criminal efforts to suppress voting, providing illegal campaign contributions, cyber-attacks against election infrastructure, foreign attempts to influence elections, threats against the public safety or security of the United States, postings intending to mislead voters about voting requirements, procedures, preventing or mitigating malicious cyber activity, and to inform social-media companies about speech not protected by the First Amendment.

Defendants cite no specific action that would be prohibited by this Preliminary Injunction that would provide grave harm to the American people or over democratic processes. In fact, in opposition to the Motion for Preliminary Injunction, Defendants submitted five Declarations[40] that addressed Defendants' concerns. Every one of these concerns was addressed in the Preliminary

---

[40] Leah Bray [Doc. No. 226-6 at 198-296] (foreign propaganda); Larissa Knapp [Doc. No. 266-6 at 448-47] (crimes, threats, national security threats); Brandon Wales [Doc. No. 266-6 at 553-572] (malicious cyber activity); Max Lesko [Doc. No. 266-4 at 130-178] (commission of public health issues); and Carol Crawford [Doc. No. 266-5 at 67-77] (public health information)

Injunction exceptions. An enjoined party must identify a specific concern that the injunction will prohibit. *Regal Knitwear Co. v. N.L.R.B.*, 65 S. Ct. 478, 482 (1945). Defendants have failed to do so. Therefore, the Defendants would not be irreparably harmed, and the balance of equities and harm weighs in favor of Plaintiffs, not Defendants.

### D.    Specificity of Preliminary Injunction

Additionally, Defendants argue that the Preliminary Injunction is sweeping in scope and vague in its terms.[41] A Preliminary Injunction must describe in reasonable detail the act or acts restrained or required. FED. R. CIV. P. 65. An ordinary person reading the Court's order must be able to ascertain from the document itself exactly what conduct is proscribed or prohibited. *Louisiana v. Biden*, 45 F.4th 841, 846 (5th Cir. 2022). Defendants argue that both the prohibited conduct and the conduct that is not prohibited is vague.

Defendants first argue the definition of "protected free speech" is vague because it refers to jurisprudence of the United States Supreme Court, The United States Courts of Appeal, and United States District Courts. Defendants question whether an agency official would be required to research the laws of every federal court to determine what is "protected free speech."

In order to clarify the definition of "protected free speech" in the Preliminary Injunction, this Court will modify the definition of "protected free speech" in n. 3 to read as follows:

> "Protected free speech" means speech which is protected by the Free Speech Clause of the First Amendment to the United States Constitution in accordance with the jurisprudence of the United States Supreme Court.

Although general "obey the law" injunctions are normally too vague to form the basis of an injunction, language in an injunction to prohibit future violations of a statute will be upheld when it relates to the type of acts the Defendants are alleged to have committed. *NLRB. V. Express*

---

[41] [Doc. No. 297-1 at 3]

*Pub. Co.*, 61 S. Ct. 693, 699 (1941); *Interstate Commerce Commission v. Keeshin Motor Exp. Co.*, 134 F.2d 228, 231, (7th Cir. 1943) cert. den. 64 S. Ct. 38 ( 1943).

The Preliminary Injunction at issue prohibits the Defendants from taking the described actions with social-media companies as to "protected free speech," which is defined by jurisprudence of the United States Supreme Court. The actions prohibited are the type of actions the Defendants are alleged to have committed. Therefore, the reference to United States Supreme Court jurisprudence is not vague. Defendant officials can be and should be trained to recognize what speech is protected and what speech is not prior to working with social-media companies to suppress or delete postings. Additionally, the exceptions to the Free Speech Clause of the First Amendment are "well-defined and narrowly limited classes of speech." *United States v. Stevens*, 559 U.S. 460, 468-69 (2010).

Defendants further argue that the exemption in the Preliminary Injunction, which allows the Government to exercise permissible government speech promoting government policies or views on matters of public concern, is vague in light of references in the Memorandum Ruling to government speech by the White House Defendants and the Surgeon General Defendants.[42] It is clear that the Preliminary Injunction does not prohibit government speech. The portion of the Memorandum Ruling addressing Defendants' government speech argument[43] clearly notes that the government speech was not a First Amendment violation. Rather, it was the use of government agencies and employees to coerce and/or significantly encourage social-media platforms to suppress free speech on their platforms. Therefore, the government speech exception in the Preliminary Injunction is not ambiguous or vague.

---

[42] [Doc. No. 294 at 6]
[43] [Doc. No. 293 at 118-119].

Defendants further allege that the injunction is not clear what entities or individuals are covered because the Preliminary Injunction names entire agencies which are composed of many sub-components. Defendants noted that the Preliminary Injunction did not enjoin the Food and Drug Administration ("FDA") but enjoined the Department of Health and Human Services, of whom the FDA is a part.

The Motion for Preliminary Injunction is clearly denied as to the FDA, along with the other entities specifically noted. FED. R. CIV. P. Rule 65 not only prohibits the party Defendants, but also those identified with them in interest, in priority with them, represented by them, or subject to their control. *Regal Knitwear Co. v. N.L.R.B.*, 65 S. Ct. 478, 481 (1945). An injunctive order also binds the party's officers, agents, servants, employees, attorneys, and those persons in active concert with them who receive actual notice of the order. *U.S. v. Hall*, 472 F.2d 261, 267, (5th Cir. 1972). FED R. CIV. P. Rule 65(d) specifically allows an agency's officers, agents, servants, employees, and attorneys to be bound. Therefore, the Preliminary Injunction is not vague or ambiguous as to the entities or individuals who are covered. If Defendants' interpretation was accepted, an agency could simply instruct a sub-agency to perform the prohibited acts and avoid the consequences of an injunction.

## III.    CONCLUSION

Plaintiffs are likely to prove that all of the enjoined Defendants coerced, significantly encouraged, and/or jointly participated social-media companies to suppress social-media posts by American citizens that expressed opinions that were anti-COVID-19 vaccines, anti-COVID-19 lockdowns, posts that delegitimized or questioned the results of the 2020 election, and other content not subject to any exception to the First Amendment. These items are protected free speech

and were seemingly censored because of the viewpoints they expressed. Viewpoint discrimination

is subject to strict scrutiny.

Although this Preliminary Injunction involves numerous agencies, it is not as broad as it

appears. It only prohibits something the Defendants have no legal right to do—contacting social-

media companies for the purpose of urging, encouraging, pressuring, or inducing in any manner,

the removal, deletion, suppression, or reduction of content containing protected free speech posted

on social-media platforms. It also contains numerous exceptions.

Therefore, for the reasons set forth herein,

The Defendants' Motion to Stay [Doc. No. 297] is **DENIED**.

**MONROE, LOUISIANA**, this 10th day of July 2023.

**TERRY A. DOUGHTY**
**UNITED STATES DISTRICT JUDGE**

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**MONROE DIVISION**

**STATE OF MISSOURI ET AL**                    **CIVIL ACTION NO. 3:22-cv-1213**

**VERSUS**                                                  **JUDGE TERRY A. DOUGHTY**

**JOSEPH R BIDEN JR ET AL**                    **MAG. JUDGE KAYLA D. MCCLUSKY**

<u>**JUDGMENT ON MOTION TO STAY**</u>

     For the reasons set forth in the Memorandum Ruling on Motion to Stay,

     **IT IS ORDERED, ADJUDGED, AND DECREED** that the definition of "protected free

speech" in the Memorandum Ruling [Doc. No. 294, at p.4, n.3] shall be amended to read as

follows:

> "Protected free speech" means speech which is protected by the Free
> Speech Clause of the First Amendment of the United States
> Constitution in accordance with the jurisprudence of the United
> States Supreme Court.

     **IT IS FURTHER ORDERED** that the Defendants' Motion to Stay Preliminary Injunction

Pending Appeal, and Alternatively, for Administrative Stay [Doc. No. 297] is **DENIED.**

     **MONROE, LOUISIANA**, this 10th day of July 2023,

 

_____
**TERRY A. DOUGHTY**
**UNITED STATES DISTRICT JUDGE**