**No. 23-30445**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

State of Missouri; State of Louisiana; Aaron Kheriaty; Martin Kulldorff; Jim Hoft; Jayanta Bhattacharya; Jill Hines,

Plaintiffs-Appellees,

v.

Joseph R. Biden, Jr.; Vivek H. Murthy; Xavier Becerra; Department of Health & Human Services; Anthony Fauci; Et al.,

Defendants-Appellants.

_____

On Appeal from the United States District Court
for the Western District of Louisiana

## PLAINTIFFS-APPELLEES' OPPOSITION TO DEFENDANTS-APPELLANTS' EMERGENCY MOTION UNDER CIRCUIT RULE 27.3 FOR A STAY PENDING APPEAL

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

No. 23-30445 – *Missouri, et al., v. Biden, et al.*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case.  These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

Dr. Jayanta Bhattacharya

Dr. Martin Kulldorff

Dr. Aaron Kheriaty

Mr. Jim Hoft

Ms. Jill Hines

*/s/ D. John Sauer*
D. John Sauer
Counsel for State of Louisiana

# **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS ........................................................... i

TABLE OF CONTENTS ........................................................................................... ii

TABLE OF AUTHORITIES ..................................................................................... iii

INTRODUCTION .................................................................................................... 1

FACTUAL BACKGROUND .................................................................................... 4

ARGUMENT ........................................................................................................... 6

    I.   All Plaintiffs Have Standing. ............................................................... 6

        A.  The Individual Plaintiffs Have Standing. .......................................... 6

        B.  The State Plaintiffs Have Standing. .................................................... 9

    II.   Plaintiffs Are Likely to Prevail on the Merits. ....................................... 11

    III.  Staying the Injunction Will Irreparably Injure Plaintiffs. ................... 17

    IV. The Injunction Is Not Overbroad. ....................................................... 21

    V.  The Injunction Is Not Vague. .............................................................. 22

    VI. The Injunction Does Not Interfere With Legitimate Government Speech. ..... 22

CONCLUSION ....................................................................................................... 24

CERTIFICATE OF SERVICE ............................................................................... 26

CERTIFICATE OF COMPLIANCE ..................................................................... 27

# TABLE OF AUTHORITIES

**Cases**                                                              **Page(s)**

*Okwedy v. Molinari,* 333 F.3d 339 (2d Cir. 2003) ..................................................15

*Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963)..............................................15

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez,*
   458 U.S. 592 (1982) .........................................................................................10

*Backpage.com, LLC v. Dart,*
   807 F.3d 229 (7th Cir. 2015).................................................... 14, 15, 16

*Blum v. Yaretksy,*
   457 U.S. 991 (1982) .........................................................................................16

*Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n,*
   531 U.S. 288 (2001) .........................................................................................17

*Brnovich v. CDC,*
   2022 WL 1276141 (W.D. La. Apr. 27, 2022) .......................................21

*Burton v. Wilmington Parking Authority,*
   365 U.S. 715 (1961) .........................................................................................16

*Haaland v. Brackeen,*
   143 S. Ct. 1609 (2023).....................................................................................11

*Justin Indus. Inc., v. Choctaw Secs., L.P.,*
   920 F.2d 262 (5th Cir. 1990)..........................................................................21

*Kennedy v. Warren,*
   66 F.4th 1199 (9th Cir. 2023).........................................................................15

*Kentucky v. Biden,*
   23 F.4th 585 (6th Cir. 2022) ...........................................................................11

*Louisiana Div. Sons of Confederate Veterans v. City of Natchitoches,*
   821 F. App'x 317 (5th Cir. 2020) .........................................................14

*Louisiana v. Becerra,*
   577 F.Supp.3d 483 (W.D. La. 2022)..............................................................21

*Massachusetts v. Mellon,*
    262 U.S. 447 (1923) ...................................................................11

*Matal v. Tam,*
    582 U.S. 218 (2017) ...................................................................12

*Nevada v. U.S. Dep't of Labor,*
    218 F.Supp.3d 520 (E.D. Tex. 2016) ........................................21

*Nken v. Holder,*
    556 U.S. 418 (2009) .....................................................................6

*Norwood v. Harrison,*
    413 U.S. 455 (1973) ...................................................................14

*O'Handley v. Weber,*
    62 F.4th 1145 (9th Cir. 2023) ....................................................14

*Penthouse Int'l, Ltd. v. Meese,*
    939 F.2d 1011 (D.C. Cir. 1991) .................................................15

*Rawson v. Recovery Innovations, Inc.,*
    975 F.3d 742 (9th Cir. 2020) ............................................. 16, 17

*Regal Knitwear Co. v. NLRB,*
    324 U.S. 9 (1945) .......................................................................23

*Scholl v. Mnuchin,*
    494 F.Supp.3d 661 (N.D. Cal. 2020) .........................................21

*United States v. Alvarez,*
    567 U.S. 709 (2012) ...................................................................24

*Utah v. United States,*
    420 U.S. 304 (1975) ...................................................................21

*VDARE Foundation v. City of Colorado Springs,*
    11 F.4th 1151 (10th Cir. 2021) ..................................................14

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,*
    425 U.S. 748 (1976) .....................................................................7

iv

*W. Virginia State Bd. of Educ. v. Barnette*,
   319 U.S. 624 (1943) ..............................................................................24

*X-Men Security, Inc. v. Pataki*,
   196 F.3d 56 (2d Cir. 1999)...................................................................15

# INTRODUCTION

In 82 pages of detailed factual findings—which Defendants-Appellants hardly dispute—the district court found that federal officials have covertly injected themselves into the content-moderation decisions of all major social-media platforms, through a years-long campaign of threats, "unrelenting pressure," collusion, and deceit. Plaintiffs-Appellees' Appendix ("PA"), PA0004-0086. This campaign involves direct pressure to censor specific speakers and content, and Defendants also "pressured social-media companies to change their content-moderation *policies*" so that content disfavored by Defendants could be more quickly suppressed in the future. PA0110 (emphasis added); PA0119.

This campaign targets specific *speakers*—especially influential critics of the Administration's policies and those who organize political opposition to them, such as Tucker Carlson, Tomi Lahren, Sean Hannity, Robert F. Kennedy Jr., Fox News, Breitbart News, Alex Berenson, the so-called "Disinformation Dozen," and Plaintiffs-Appellants ("Plaintiffs") Drs. Bhattacharya, Kulldorff, Kheriaty, Jill Hines, and Jim Hoft—among many others. PA0085-86. It also targets specific *viewpoints* on hotly disputed issues—*e.g.*, concerns about COVID vaccines, mask mandates and lockdowns, the origins of the COVID virus, the security of voting by mail, and other election-integrity issues—among many others. PA0154. "All were suppressed." *Id.*

This federal censorship fundamentally distorts online discourse in America by silencing influential speakers and rendering entire viewpoints—specifically, those *disfavored by federal officials*—unspeakable on social media. In undisputed findings, the district court found, again and again, that federal action *causes* the censorship of these speakers and viewpoints—*i.e.*, absent federal action, the platforms *would not have censored them*. *See, e.g.,* PA0018, PA0019, PA0024, PA0029, PA0032, PA0035, PA0036, PA0045, PA0045, PA0065, PA0080, PA0081, PA0101, PA0107, PA0129-32.

The scope of federal censorship is astonishing. To ensure its reach, federal national-security officials at CISA launched a still-ongoing project—the so-called "Election Integrity Partnership" (EIP) and its COVID-related spin-off, the "Virality Project" (VP)—to establish mass-surveillance of hundreds of millions of social-media posts in real-time, and to procure the censorship of millions. The district court found that federal censorship silences "millions" of Americans, including Plaintiffs and millions of Louisianans and Missourians. PA0137-38, PA0145.

The district court's injunction against "arguably … the most massive attack against free speech in United States' history," PA0002, should not be stayed. Plaintiffs have standing because Defendants' conduct devastates their ability to participate in free and open online discourse. Federal censorship silences Plaintiffs themselves and dozens of similar speakers on social-media to whom Plaintiffs would

otherwise listen and respond—as well as suppressing entire viewpoints on topics of enormous public importance. Federal censorship squelches Plaintiff States' own speech and disrupts the States' ability to hear the voices of their own citizens on great social and political issues—a government interest that Defendants' own witness recognizes as paramount. These censorship injuries continue to this day.

Defendants do not seriously contend that they want to continue "urging, encouraging, pressuring, or inducing" social-media platforms to suppress First Amendment-protected speech. PA0159. Instead, they argue that the injunction will interfere with *legitimate* forms of government speech. But, in the district court, they spent months attempting to identify such concerns and submitted five declarations detailing such concerns from senior federal officials. The district court carefully addressed these concerns by providing eight specific, comprehensive exclusions to the injunction to allow full latitude for legitimate government speech. PA00160-61. Now, instead of relying on those declarations, they raise a tiny handful of new, speculative hypotheticals, none of which poses a legitimate problem of application. In any balance, the government-induced silencing of *millions* of American voices on social media overwhelms this tiny handful of chimerical concerns about the Government's own speech. Defendants' motion should be denied.

## FACTUAL BACKGROUND

The district court made 82 pages of specific factual findings, supported by 577 citations of evidence, which includes hundreds of exhibits drawn from over 18,000 pages of Defendants' own emails and documents, and six full-length depositions of senior federal officials.  PA0004-PA0086, nn.20-597; *see also* PA0265-PA04156. None of these findings is clearly erroneous; Defendants dispute hardly any of them.

The district court found that senior White House officials engaged in a years-long campaign of badgering and pressuring social-media platforms in private to censor speech disfavored by the White House, combined with numerous public and private threats against the platforms if they did not comply with the White House's demands.  PA0009-PA0027; *see also, e.g.,* PA01581-1650, PA04169-PA04223. After resisting for months, "[f]aced with unrelenting pressure from the most powerful office in the world," major platforms "fell in line" with White House demands. PA0032, PA0101.  They assured federal officials that they would comply with "what the White House expects of us on misinformation going forward," PA0035—resulting in extensive federal collusion with platforms thereafter.

The Surgeon General's Office engaged in a similar campaign of public and private pressure and threats against platforms, demanding censorship of disfavored viewpoints, reinforcing the White House's pressure campaign.   PA0028-38. Benefiting from White House pressure, the CDC privately badgered platforms to

remove disfavored viewpoints and so insinuated itself into platforms' content-moderation decisions that it served as *de facto* censor, dictating what Americans can and cannot say on social media about COVID vaccines. PA0038-49.

The FBI meets incessantly with social-media platforms, and demands the censorship of long lists of speakers and accounts every month. The FBI claims that it targets "foreign" social-media speech, but its accuracy in discerning what is "foreign" is highly dubious. PA0066. Furthermore, it targets "foreign" content only after such speech becomes heavily intertwined with *domestic*, First Amendment-protected speech—such as supposedly "foreign" posts that thousands of Americans have liked, commented on, and re-posted; and supposedly "foreign" websites where freelance American journalists have posted content. PA0064.

CISA, likewise, meets constantly with platforms' content-moderation officers to urge them to censor disfavored viewpoints. CISA then "switchboards" requests for censorship from state and local government officials to platforms to censor. PA0068-69. CISA launched the "Election Integrity Partnership" (EIP) and its COVID-related spinoff, the "Virality Project" (VP)—teaming up with private entities to evade "very real First Amendment questions" and establish a mass-surveillance operation that uses cutting-edge technology and huge teams of analysts to review hundreds of millions of Americans' social-media posts in real time, and pushing platforms to censor millions. PA0070-75, PA0080-86, PA0110-14. This

public-private synthesis is complete and effective: "CISA and the EIP were completely intertwined." PA0113.

Defendants contend that social-media companies are simply applying their own terms of service to censor millions of pieces of content. But the district court found that Defendants caused content to be "suppressed even if it did not violate social-media policies." PA0119. The district court also found that Defendants successfully "pressured social-media companies to *change* their content-moderation policies," PA0110 (emphasis added), to censor more disfavored content.

## ARGUMENT

All four equitable-stay factors, *Nken v. Holder*, 556 U.S. 418, 426 (2009), favor Plaintiffs here.

## I.     All Plaintiffs Have Standing.

### A.     The Individual Plaintiffs Have Standing.

The individual Plaintiffs suffer several discrete injuries.   *First*, federal officials and their partners induced platforms to censor Plaintiffs directly.   CISA flagged Jim Hoft's website, *The Gateway Pundit*, to platforms. PA0075. The CISA-launched EIP pressured platforms to censor Hoft's content in dozens of "tickets" and pushed platforms to censor hundreds of thousands of Hoft's posts, including 840,740 tweets and re-tweets of his content in 2020 alone.   PA0081-82.   Hoft was deplatformed from Twitter.   PA0083.   Defendants are "*currently* involved in an

ongoing project that encourages and engages in censorship activities specifically targeting Hoft's website." PA0127 (emphasis added).

Likewise, "Plaintiff [Jill] Hines of the Health Freedom Louisiana was flagged by the Virality Project to be a 'medical freedom influencer' who engages in the 'tactic' of 'organized outrage' because she created events or in-person gatherings to oppose mask and vaccine mandates in Louisiana." PA0085. The NIAID Defendants orchestrated a "quick and devastating … take down" of the Great Barrington Declaration authored by Drs. Bhattacharya and Kulldorff—and "the result was exactly that." PA0106.

*Second*, the First Amendment protects, not just the right to speak, but also the "right to listen." PA0124; *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc*., 425 U.S. 748, 756–57 (1976). Each individual Plaintiff *follows* and engages with many speakers that federal officials pressured platforms to silence. *See, e.g.,* PA04534-35 (Hines identifying 86 speakers she follows who were specifically targeted by federal censors, including Alex Berenson, Robert F. Kennedy Jr., Candace Owens, numerous "medical freedom" speakers, and the entire "Disinformation Dozen"); PA04522 (Bhattacharya follows Alex Berenson, Robert F. Kennedy Jr., Robert Malone, Simone Gold, Tucker Carlson, among 26 censored speakers); PA04525 (Kulldorff follows 10 censored speakers); PA04527 (Kheriaty follows the New York Post, Children's Health Defense, among 24 censored

speakers); PA04531 (Hoft follows 24 censored speakers, including Children's Health Defense, Fox News, One America News Network). These include dozens of speakers that the district court specifically found that federal officials suppressed. PA0017 (Robert F. Kennedy Jr. and Children's Health Defense); PA0017-18, PA0129 (Tucker Carlson and Tomi Lahren); PA0019 (Alex Berenson); PA0024 (the "Disinformation Dozen"); PA0063-64 (the New York Post); PA0084-85 ("medical freedom" groups); PA0085-86 (One America News, Breitbart News, Alex Berenson, Tucker Carlson, Fox News, Candace Owens, The Daily Wire, RFK Jr., Simone Gold, Dr. Mercola). Thus, all the federal agencies included in the injunction—the White House, the Surgeon General, the CDC, NIAID, the FBI, CISA, and State Department Defendants—have directly interfered with Plaintiffs' "right to listen."

*Third*, the individual Plaintiffs also experience censorship caused by federal officials because they express, listen to, and interact with disfavored *viewpoints* on the topics that federal officials pressure platforms to censor. Dr. Kheriaty's content "opposing COVID-19 lockdowns and vaccine mandates" is censored, PA0006; Hines's criticism of the efficacy of Pfizer vaccines and "posts about the safety of masking and adverse events from vaccinations, including VAERS data" are censored, PA0005; Hoft's posts about the efficacy of COVID vaccines, the security of voting by mail, and other election-security issues were censored, PA0006; and so

8

forth.  These are the very topics that federal officials successfully pushed platforms to censor.  PA0154 ("All were suppressed").

In addition, Plaintiffs listen and respond to numerous other speakers who express disfavored viewpoints that federal officials induce platforms to censor. PA04522 (Bhattacharya: "Federally induced censorship thus prevents me from having access to those speakers' and writers' frank and uncensored speech, thoughts, opinions, and ideas."); PA04527 (Kheriaty's 14 examples of censored speakers he follows); PA04531 (Hoft's 12 examples of censored speakers); PA04535-36 (Hines' 14 examples of censored speakers).

### B.    The State Plaintiffs Have Standing.

*First*, Plaintiff States' own social-media posts have been censored due to federal pressure on platforms.  PA0125 (detailing several specific instances of Louisiana and Missouri agencies and officials experiencing social-media censorship).  There is a "causal and temporal link" between federal action and this censorship, which occurred "immediately following the federal Defendants' strong advocacy for COVID-related 'misinformation' censorship."  PA0125, PA0131.

*Second*, the States are prevented from *hearing the voices of their own citizens* on social media.  PA0244-48; PA0261-63.  The district court found "unrelenting pressure by Defendants had the intended result of suppressing *millions* of protected free speech postings by American citizens," including Louisianans and Missourians.

PA0094 (emphasis added). State officials are thus blocked from hearing their constituents' true thoughts and concerns on matters of overwhelming public importance. PA0154.

State officials follow their constituents' social-media speech on political questions "on a daily or even hourly basis," and it is "very important for [them] to have access to free public discourse on social media on these issues so [they] can understand what [Louisianans and] Missourians are actually thinking, feeling, and expressing about such issues, and so [they] can communicate effectively with them." PA0245. Defendants' witness, Carol Crawford, agreed that a state agency "has a strong interest in tracking what its constituents are saying on social media…. [I]f content were censored and removed from social-media platforms, government communicators would not know what the citizen's 'true concerns' were." PA0049. As Missouri's witness attests, "If we do not know what Missourians' true concerns are, how can we craft messages and policies that are responsive to our citizens?" PA0248; *see also* PA0263.

*Third*, each State also has *parens patriae* standing to vindicate its quasi-sovereign interest in the well-being of "a sufficiently substantial segment of its population," and to "ensur[e] that the State and its residents are not excluded from the benefits that are to flow from participation in the federal system." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607-608 (1982);

PA0121-25. Defendants contend that all *parens patriae* lawsuits against the federal government are barred by *Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923), reaffirmed in *Haaland v. Brackeen*, 143 S. Ct. 1609, 1640 (2023). Mot. 7-8. Not so. The so-called "*Mellon* bar"—which *Brackeen* simply reaffirmed—forecloses only "third-party" *parens patriae* actions against the federal government, not "quasi-sovereign" *parens patriae* actions. *Kentucky v. Biden*, 23 F.4th 585, 596-601 (6th Cir. 2022). *Brackeen* did not involve a "quasi-sovereign interest," because Texas asserted the rights of only a *tiny minority* of its population—*i.e.*, non-Indian families who sought to foster and adopt Indian children over the objection of the relevant tribe—not a "substantial segment" thereof. *Brackeen*, 143 S. Ct. at 1625-26. Here, by contrast, federal censorship affects the free-speech rights of "millions" of Missourians and Louisianans, PA0082, PA0094, PA0107, PA0123—a "substantial segment" of each State's population. *Kentucky*, 23 F.4th at 599.

## II.    Plaintiffs Are Likely to Prevail on the Merits.

Defendants' conduct violates the First Amendment. Indeed, in seeking a stay, Defendants do not seriously contend that they want to engage in the principal conduct that the injunction prohibits—"urging, encouraging, pressuring, or inducing" platforms to suppress Americans' protected free speech. PA0159.

Instead, to justify censorship, Defendants emphasize the *government*'s right to speak freely. Mot. 10. Courts have frequently rejected this tactic, because it flips

the First Amendment on its head. When the government's speech squelches the free speech of American citizens, the government's interest gives way. "[T]he government-speech doctrine … is susceptible to dangerous misuse," and must be used with "great caution" to ensure that "government" cannot "silence or muffle the expression of disfavored viewpoints." *Matal v. Tam*, 582 U.S. 218, 235 (2017). That is exactly what is happening here.

The Government contends that the case involves no "threat of government sanction." Mot. 12. That is demonstrably wrong. "Explicit threats are an obvious form of coercion, but not all coercion need be explicit." PA0097. Here, "Government officials began publicly threatening social-media companies with adverse legislation as early as 2018. In the wake of COVID-19 and the 2020 election, the threats intensified and became more direct." PA0131. Federal officials' incessant demands for censorship were made against the backdrop of these relentless threats and "resulted in an efficient report-and-censor relationship between Defendants and social-media companies." PA0131.

The district court found a long series of express and implied threats combined with "unrelenting pressure" for censorship. *See, e.g.,* PA0014 (White House to Facebook: "internally, we are considering our options on what to do about" Facebook's lack of cooperation on censorship); PA0019 (Flaherty's concerns are "shared by the highest (and I mean highest) levels of White House"); PA0022

("Psaki linked the threat of a 'robust anti-trust program' with the White House's censorship demand."); PA0024, PA0098 (White House threatened adverse legal actions to hold platforms "accountable" for not censoring COVID speech); PA0026 (White House "explicitly tied these censorship demands with threats of adverse legislation"); PA0027 (White House "threatened social-media platforms with adverse legal consequences if the platforms did not censor aggressively enough"); PA0033 (Dr. Murthy's threat to hold platforms "accountable" "carries with it the threat of consequences"); PA0097-99 (22 statements from the White House expressing pressure and threats); PA0098 (Flaherty to Facebook: "Are you f*cking serious?  I want an answer on what happened here and I want it today."); PA0131 n.658 (more "examples of Government officials threatening adverse legislation against social-media companies if they do not increase censorship efforts").  "These actions are just a few examples of the unrelenting pressure the Defendants exerted against social-media companies."  PA0099.

Defendants claim that these threats are "unremarkable."  Mot. 12.  Not so.  Defendants did not simply warn that they might take actions adverse to platforms.  Instead, they repeatedly and explicitly *tied* these threats of adverse legal consequences to their demands for greater censorship.  PA0022, PA0024, PA0026, PA0027, PA0067, PA0098.  They "explicitly tied these censorship demands with threats of adverse legislation."  PA0026.  Threatening adverse legal consequences,

in a vacuum, may not violate the First Amendment.  But *leveraging* those threats to pressure companies to *censor private viewpoints* violates the First Amendment.  "It is … axiomatic that a state may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish."  *Norwood v. Harrison*, 413 U.S. 455, 465 (1973).  "The First Amendment forbids a public official to attempt to suppress the protected speech of private persons by threatening that legal sanctions will at his urging be imposed unless there is compliance with his demands."  *Backpage.com, LLC v. Dart*, 807 F.3d 229, 231 (7th Cir. 2015).

Defendants claim that some agencies, like the CDC, did not directly threaten. Mot. 12.  But when platforms are under pressure from the *White House*, there is no need for lower-level agencies like the CDC to pile on.  "Faced with unrelenting pressure from the most powerful office in the world," platforms "fell in line" with federal censorship demands across multiple agencies.  PA0032, PA0101.

The cases cited by Defendants all found that there was no threat whatsoever. *O'Handley v. Weber*, 62 F.4th 1145, 1157-58 (9th Cir. 2023) (government flagged "one of [plaintiff's] tweets" without "threaten[ing] adverse action to coerce"); *Louisiana Div. Sons of Confederate Veterans v. City of Natchitoches*, 821 F. App'x 317, 320 (5th Cir. 2020) (mayor's letter "was simply a request" to which parade organizer "responded agreeably"); *VDARE Foundation v. City of Colorado Springs*, 11 F.4th 1151, 1164 (10th Cir. 2021) ("[N]othing in the City's Statement plausibly

14

threatens the Resort with legal sanctions."); *Kennedy v. Warren*, 66 F.4th 1199, 1209-10 (9th Cir. 2023) (Senator's letter "was intended and received as nothing more than an attempt to persuade"); *X-Men Security, Inc. v. Pataki*, 196 F.3d 56, 71 (2d Cir. 1999) (case involved "advocacy without threats, intimidation, or coercion"); *Penthouse Int'l, Ltd. v. Meese*, 939 F.2d 1011, 1016 (D.C. Cir. 1991) ("[T]he government threatens no sanction—criminal or otherwise").

The threats here are far more coercive, prolonged, and explicit than in cases where coercion *was* found. In *Backpage.com*, the sheriff's letter merely hinted that processing payments for Backpage might violate federal law, which the sheriff had no authority to enforce, and requested a contact person. 807 F.3d at 231-32. In *Okwedy v. Molinari*, the borough president merely sent a letter to the billboard company, criticizing a billboard as "confrontational and offensive," and asking for a contact person for his "legal counsel and Chair of [his] Anti-Bias Task Force" to contact. 333 F.3d 339, 341-42 (2d Cir. 2003). In *Bantam Books, Inc. v. Sullivan*, the anti-obscenity commission issued "notices" to a book distributor that certain books were "objectionable," and sent a police officer to follow up with the distributor "to learn what action he had taken." 372 U.S. 58, 62-63 (1963).

The Government denies that "the platforms felt they had no choice to comply with all government requests." Mot. 13. But the district court found the opposite, based on overwhelming evidence. *See, e.g.,* PA0018, PA0019, PA0024, PA0029,

PA0032, PA0035, PA0036, PA0045, PA0065, PA0080, PA0081, PA0101, PA0107, PA0129-132.  In any event, when it comes to unconstitutional coercion, success is immaterial: "[S]uch a threat is actionable and thus can be enjoined even if it turns out to be empty—the victim ignores it, and the threatener folds his tent." *Backpage.com*, 807 F.3d at 231.

Further, Defendants' conduct constitutes, at the very least, "such significant encouragement, either overt or covert, that the choice in law must be deemed to be that of the state." *Blum v. Yaretksy*, 457 U.S. 991, 1004 (1982).  "If there were ever a case where the 'significant encouragement' theory should apply, this is it." PA0094.  The Government argues that "significant encouragement" is just coercion by another name.  Mot. 14.  This argument contradicts the plain language of *Blum*, which finds state action when the government "has exercised coercive power *or* has provided … significant encouragement." *Blum*, 457 U.S. at 1004 (emphasis added).

Finally, neither coercion nor significant encouragement is required to establish government action where, as here, the government "has so far insinuated" with private parties "that it must be recognized as a joint participant in the challenged activity." *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 725 (1961); PA0116.  State action occurs "when the state significantly involves itself in the private parties' actions and decisionmaking at issue." *Rawson v. Recovery Innovations, Inc.*, 975 F.3d 742, 753 (9th Cir. 2020).

Here, federal officials aggressively "insinuated [themselves]" into platforms' content-moderation decisions. They induced changes to content-moderation policies and dictated the outcome of specific moderation decisions. Federal officials were and are "heavily involved in the decisionmaking process" regarding what Americans can and cannot say on social media. *Rawson*, 975 F.3d at 754.

"[P]ervasive entwinement" is a particularly acute form of "joint participation." *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 298 (2001). Defendants are "pervasively entwined" in platforms' content-moderation policies and decisions. PA0117. Further, CISA, the State Department, the Surgeon General's Office, and the White House are "pervasively entwined" with the ongoing "Election Integrity Partnership" and its COVID-related spinoff, the "Virality Project." PA0113 ("CISA and the EIP were completely intertwined."); PA0070-75, PA0110-PA0113 (detailing CISA's extensive involvement in setting up and operating the EIP and VP); PA0114 ("both CISA and the GEC were intertwined with the VP, EIP, and Stanford Internet Observatory"); PA0019 (finding that "the White House was coordinating with the Stanford Internet Observatory (which was operating the Virality Project)"). Defendants do not challenge these holdings.

## III.    Staying the Injunction Will Irreparably Injure Plaintiffs.

The district court found that Plaintiffs have demonstrated imminent, impending, irreparable injury, PA0139, based on overwhelming evidence, PA0127-

28, PA0139-43.   Among other things, Defendants are "currently involved in an ongoing project that encourages and engages in censorship activities specifically targeting Hoft's website."   PA0127.   "Hines, too, recounts past and ongoing censorship injuries, stating that her [pages] are constantly at risk of being completely de-platformed."   PA0127-28.

When the district court entered its injunction, federal censorship activity was in full swing.   The CDC's "regular biweekly meetings with Google" on disinformation "continue[] to the present day."   PA0046.   The "USG-Industry" meetings on disinformation are "continuing" and "will continue through the 2024 election cycle."   PA0060.   The "bilateral meetings between FBI and [seven platforms] … are continuing" and "will increase to monthly and weekly nearer the elections."   PA0060.   White House officials continued to badger platforms on censorship throughout 2022. PA0026.   "[T]he FBI is continuing its efforts to report disinformation to social-media companies to evaluate for suppression and/or censorship."   PA0067.   The FBI says: "'Post-2020, we've never stopped … we just pretty much rolled into preparing for 2022.'"   PA0067.

CISA's "Industry" meetings to discuss disinformation with platforms "continue to this day," and "increase in frequency as each election nears."   PA0069. CISA still conducts "five sets of recurring meetings with social-media platforms that involved discussions of misinformation, disinformation, and/or censorship of speech

18

on social media." PA0075. "CISA publicly states that it is expanding its efforts to fight disinformation-hacking in the 2024 election cycle." PA0076. This includes expanding its censorship efforts to new topics and viewpoints. PA0076.

The Election Integrity Partnership "continued to operate during the 2022 election cycle," PA0071, and will "continue its work in future elections." PA0083.

Further injuries to Plaintiffs while the case is pending are virtually inevitable. "Bhattacharya, for instance, is the apparent victim of an ongoing "campaign" of social-media censorship, which indicates that he is likely to experience future acts of censorship." PA0127. "Kulldorff's ongoing censorship experiences on his personal social-media accounts provide evidence of ongoing harm and support the expectation of imminent future harm." PA0127. "Kheriaty also affirms ongoing and anticipated future injuries, noting that the issue of 'shadow banning' his social-media posts has intensified since 2022." PA0127. "Hines, too, recounts past and ongoing censorship injuries, stating that her personal Facebook page, as well as the pages of Health Freedom Louisiana and Reopen Louisiana, are constantly at risk of being completely de-platformed." PA0127-28.

Plaintiffs also suffer from ongoing effects of past censorship decisions, which the injunction will remediate. "At the time of her declaration, Hines' personal Facebook account was under an ongoing ninety-day restriction. She further asserts, and the evidence supplied in support of the preliminary injunction strongly implies,

that these restrictions can be directly traced back to federal officials." PA0128. "Plaintiffs' request for an injunction is not solely aimed at addressing the initial imposition of the censorship penalties but rather at preventing any continued maintenance and enforcement of such penalties." PA0128; *see also* PA0134.

In declarations filed May 22, 2023, Hines and Hoft describe new, recent, and ongoing acts of censorship traceable to federal officials. PA04538-41 (Hines' censorship on COVID vaccine injuries, vaccines for children, harms from masking, Tucker Carlson, etc.); PA4544 (Hoft's ongoing self-censorship "particularly on matters relating to COVID-19, vaccination for the same, and the 2020 election," so as "to avoid being permanently banned by Facebook and other platforms"); PA04545 ("Facebook and other social media sites are reducing the visibility of Gateway Pundit's Facebook posts … on an ongoing basis.").

Indeed, when the court asked, "how can I be sure that this is not going to happen again," Defendants' counsel answered, "it is not the government's argument that … this … will never happen again." PA04670.

Thus, "[e]ach of the Private Plaintiffs alleges a combination of past, ongoing, and anticipated future censorship injuries. … The threat of future censorship is significant, and the history of past censorship provides strong evidence that the threat of further censorship is not illusory or speculative." PA0128. Plaintiffs have "adduce[d] evidence showing that the irreparable injury is likely to occur during the

pendency of the litigation." PA0140 (citing *Justin Indus. Inc., v. Choctaw Secs., L.P.*, 920 F.2d 262, 268 n.7 (5th Cir. 1990)).

## IV.    The Injunction Is Not Overbroad.

Defendants claim the district court cannot enjoin entire agencies. Mot. 18. Defendants never raised this objection to the district court, so it is waived. It is also meritless. *See, e.g., Utah v. United States*, 420 U.S. 304 (1975) (enjoining "the United States of America, its departments and agencies"); *Louisiana v. Becerra*, 577 F.Supp.3d 483 (W.D. La. 2022) (enjoining HHS); *Arizona by and through Brnovich v. CDC*, 2022 WL 1276141 (W.D. La. Apr. 27, 2022) (DHS "and all of its subdivisions, agencies, and employees"); *Nevada v. U.S. Dep't of Labor*, 218 F.Supp.3d 520 (E.D. Tex. 2016) (DOL); *Scholl v. Mnuchin*, 494 F.Supp.3d 661 (N.D. Cal. 2020) (Treasury, the IRS, and USA).

Defendants complain the injunction should be limited to "government action specifically targeting content posted by plaintiffs themselves." Mot. 18. This argument ignores overwhelming evidence and fundamentally misunderstands the interconnected nature of online discourse. It overlooks Plaintiffs' asserted interests as listeners who follow and respond to the speech of *others* targeted by federal censors, the banning of entire disfavored viewpoints on critical topics, and the States' interests in being able to hear the voices of their own citizens. *See supra*. Contrary to Defendants' assumption, social-media discourse on great social and political

questions does not occur in single-speaker silos. It requires interaction with thousands of *other* speakers and viewpoints—all muzzled by federal censorship.

## V.     The Injunction Is Not Vague.

Defendants contend that the injunction is vague. Mot. 18-19. Not so. The injunction uses common words whose meanings are readily ascertainable in a dictionary. PA0159-61. The Government argues that words like "criminal" and "malicious cyber activity" are vague. Mot. 19. Thus, the *FBI*, which enforces criminal statutes, contends that it cannot tell what constitutes "criminal" activity. In fact, the FBI itself urged the district court to exclude "criminal conduct" from an injunction, D.Ct. Doc. 266-6, at 451, so if the FBI is baffled by what "criminal" means, it may consult its own declaration. Likewise, "malicious cyber activity" is exhaustively defined in Defendants' declaration from CISA that urged the Court to adopt this exclusion. D.Ct. Doc. 266-6, at 554-72.

## VI.    The Injunction Does Not Interfere With Legitimate Government Speech.

Defendants' claim that the injunction will interfere with legitimate government speech, Mot. 20-21, is speculative and conjectural. In the district court, Defendants spent months attempting to identify areas of legitimate government conduct that such an injunction *might* disrupt. They submitted five declarations identifying their concerns. *See* D.Ct. Doc. 266-4, at 137-38; Doc. 266-5 at 7-9; Doc. 266-6, at 450-70; *id.* at 554-72; *id.* at 203-06. The district court carefully addressed

all those concerns by providing eight clear and specific exclusions to the injunction, which specify areas of legitimate government speech and conduct that the injunction does not prohibit. PA0160-61 (listing conduct that is "NOT prohibited by this Preliminary Injunction"). Defendants now struggle to identify *any* area of legitimate government conduct that the injunction supposedly disrupts. They identify no specific example of *actual* conduct, but instead rely on a tiny handful of hypotheticals and "what if[s]." Mot. 2-3. *See Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 15-16 (1945) (refusing to strike words from an injunction where the enjoined party had not identified any actual conduct that those words would prevent).

Defendants question whether they may "respond to a false story on influential social-media accounts with a public statement … refuting the story," and "urge the public to trust neither the story nor the platforms that disseminate it." Mot. 2. The injunction makes clear that they may do so. It authorizes "public government speech promoting government ... views on matters of public concern," PA0161—provided that Defendants do not "urge, encourage, pressure, or induce" the platforms to *suppress* the speech with which they disagree, PA0159.

Defendants ask "what if, in an investigation's early stages, officials lack certainty whether a post rises to the level of criminal activity?" Mot. 2. The district court answers this question: If the government is *uncertain* that speech is criminal, "[t]he benefit of any doubt must go to protecting rather than stifling speech."

23

PA0089.   Federal law-enforcement agents retain the full range of ordinary law-enforcement capabilities under the injunction, and they are fully capable of discerning whether and when activity constitutes "criminal conduct."  Nothing in the district court's injunction hinders federal agents from taking action to investigate, halt, or prevent criminal activity consistent with commonsense constitutional obligations.

Third, Defendants postulate "a possible White House Press Secretary" who "urges social-media platforms to act responsibly by disseminating only accurate information about [a] disaster because misinformation circulating online could impede relief and response efforts."  Mot. 2-3.  Again, the Press Secretary may disseminate the White House's views on what is accurate, but she cannot demand that platforms censor speech that the White House views as "misinformation."  PA0159-161.  "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion."  *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).  "Our constitutional tradition stands against the idea that we need Oceania's Ministry of Truth."  *United States v. Alvarez*, 567 U.S. 709, 723 (2012) (plurality op.).

## CONCLUSION

Defendants' motion should be denied.

Dated: July 17, 2023

Respectfully Submitted,

**ANDREW BAILEY**
**Attorney General of Missouri**
*/s/ Joshua M. Divine*
Joshua M. Divine
*Solicitor General*
Todd A. Scott
*Senior Counsel*
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
(573) 751-8870
josh.divine@ago.mo.gov
*Counsel for State of Missouri*

**JEFFREY M. LANDRY**
**Attorney General of Louisiana**
*/s/ D. John Sauer*
Elizabeth B. Murrill
*Solicitor General*
Tracy Short
*Assistant Attorney General*
D. John Sauer
*Special Assistant Attorney General*
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, LA 70802
(225) 326-6766
murrille@ag.louisiana.gov
*Counsel for State of Louisiana*

*/s/ John J. Vecchione*
John J. Vecchione
New Civil Liberties Alliance
1225 19th Street N.W., Suite 450
Washington, DC 20036
(202) 918-6905
john.vecchione@ncla.legal
*Counsel for Plaintiffs Dr. Jayanta*
*Bhattacharya, Dr. Martin*
*Kulldorff, Dr. Aaron Kheriaty,*
*and Jill Hines*

*/s/ John C. Burns*
John C. Burns
Burns Law Firm
P.O. Box 191250
St. Louis, MO 63119
(314) 329-5040
john@burns-law-firm.com
*Counsel for Plaintiff Jim Hoft*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on July 17, 2023, I caused a true and correct copy of the foregoing to be filed by the Court's electronic filing system, to be served by operation of the Court's electronic filing system on counsel for all parties who have entered in the case.

*/s/ D. John Sauer*

**<u>CERTIFICATE OF COMPLIANCE</u>**

Pursuant to Federal Rule of Appellate Procedure 32(g), I certify that this motion complies with the type-face, style, and volume requirements of Federal Rules of Appellate Procedure 27(d) and 32(a) because it has been prepared in proportionally-spaced Times New Roman font, 14-point, and because those portions not excluded under Rule 32(f) contain 5,189 words, according to Microsoft Word.

*/s/ D. John Sauer*