**No. 23-30445**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

State of Missouri; State of Louisiana; Aaron Kheriaty; Martin Kulldorff; Jim Hoft; Jayanta Bhattacharya; Jill Hines,

Plaintiffs-Appellees,

v.

Joseph R. Biden, Jr.; Vivek H. Murthy; Xavier Becerra; Department of Health & Human Services; Anthony Fauci; Et al.,

Defendants-Appellants.

_____

On Appeal from the United States District Court
for the Western District of Louisiana

**EXHIBITS TO PLAINTIFF-APPELLEES' OPPOSITION TO
DEFENDANT-APPELLANTS' EMERGENCY MOTION UNDER CIRCUIT
RULE 27.3 FOR A STAY PENDING APPEAL
Volume VIII**

**ELVIS CHAN  11/29/2022**

Page 123

```
 1   comments.  I don't recollect any of them using the
 2   specific word "pressure," but that was how I
 3   interpreted our conversations.
 4       Q.   What congressional staffers were involved
 5   in these meetings?
 6       A.   They would be senior-level staffers.  I'm
 7   sorry.  I can't remember any of their names.  But
 8   typically it would be -- the delegation would
 9   include a senior-level staffer, I think a
10   director-level; and then one of their attorneys,
11   like the committee counsel or a senior counsel for
12   the committee; and then there would be one to two
13   other, like, line-level staffers.
14       Q.   So there would be maybe three to five
15   staffers total who would come to the meetings?
16       A.   That is correct.
17       Q.   Do you know who at the three social media
18   platforms you referred to attended the meetings?
19       A.   So I was told by the staffers that they
20   met with Facebook, Google and Twitter.
21       Q.   But then you actually talked to some
22   people from Facebook, Google and Twitter who were
23   at those meetings, right?
24       A.   Yes.
25       Q.   Who were they for Facebook, for starters?
```

**ELVIS CHAN  11/29/2022**

Page 124

```
 1        A.   For Facebook, I would typically talk to

 2   Steven Siegel.  He's a -- a director on their

 3   attorney side.

 4        Q.   Anyone else at Facebook that was involved

 5   in the meetings with congressional staffers?

 6        A.   He would be the one that I would talk to

 7   about that.

 8        Q.   And he -- for some --

 9        A.   That's what I recollect.

10        Q.   And specifically he was involved in those

11   meetings, right?

12        A.   He led me to believe that he was involved

13   in those meetings.  Probably not just him.

14        Q.   How about -- how about Twitter, what -- do

15   you know who at Twitter was involved in those

16   meetings?

17        A.   I would have discussions with Yoel Roth or

18   Angela Sherrer.

19        Q.   How do you spell "Angela Sherrer"?

20        A.   Angela, common spelling; Sherrer,

21   S-h-e-r-r-e-r.

22        Q.   Anyone else?

23        A.   She is no longer -- she's no longer -- or

24   neither of them are at Twitter anymore.

25        Q.   Okay.  There's some turnover there?
```

**ELVIS CHAN  11/29/2022**

**Page 125**

```
 1     A.   Yes.
 2     Q.   Anyone else at Twitter?
 3     A.   Those would be the two senior officials
 4  that I am aware of.
 5     Q.   How about Google?
 6     A.   I would say in my experience it would be
 7  Richard Salgado.
 8     Q.   Anyone else besides Richard Salgado?
 9     A.   I believe on some occasions Shane Huntley
10  would attend.
11     Q.   Anyone else at Google?
12     A.   I can't recollect at this time, but those
13  would be the two most senior officials attending
14  those types of meetings.
15     Q.   Let me ask you this:  Connecting these two
16  things, did you observe that after those meetings
17  where the congressional staffers came out and met
18  with Facebook, Twitter and YouTube; that Facebook,
19  Twitter and YouTube changed their practices and
20  became more active in account takedowns?
21     A.   No.  I would not connect those two events.
22  What I would say is after 2016 -- at the end of
23  2016 and the beginning of 2017, after those initial
24  congressional hearings, and even prior to those
25  congressional hearings, in my experience, the
```

**ELVIS CHAN  11/29/2022**

Page 126

```
 1   companies did not seem to be aware of the
 2   activities going on on other platforms.  But after
 3   they became aware, they became much more active in
 4   trying to combat it.
 5       Q.   I am going to pull up your thesis again,
 6   and hopefully it won't cause audio problems.  Can
 7   you see that?
 8       A.   Can you let us know what page you're on?
 9       Q.   Yeah.  This is on Page 42.  See down
10   there, that's Page 42?  And then that would be Page
11   66 of the PDF.
12       A.   Okay.  I can see one whole paragraph and
13   parts of two paragraphs.
14       Q.   Can you see here at the top of the page
15   where you refer to the "Internet Research Agency's
16   influence campaign in 2016"?
17       A.   Yes.
18       Q.   And then you say that the "companies
19   allowed the IRA free rein to achieve the relevant
20   elements of the Kartapolov Framework" in 2016,
21   right?
22       A.   Yeah.  That is how I characterize that.
23       Q.   And that's a reference to, you know, "free
24   rein," that is engaging in no takedown activity at
25   all, but letting the Russian inauthentic content be
```

**ELVIS CHAN  11/29/2022**

Page 127

```
 1    freely disseminated on their platforms, right?
 2        A.   That is correct.
 3        Q.   And then you go on to say, "However, later
 4    on, intense pressure from U.S. lawmakers and the
 5    media would eventually force the social media
 6    companies to examine what had taken place on their
 7    platforms and strive to ensure it did not happen in
 8    the future," right?
 9        A.   Yeah.  I wrote that.  And you can see that
10    the footnote says I am referencing the HPSCI
11    "Report on Russian Active Measures."
12        Q.   So you're actually referencing HPSCI, the
13    congressional committee that sent these staffers
14    out to have these meetings that we just talked
15    about, right?
16        A.   That's correct.
17        Q.   Do you still agree with that statement
18    that (as read) "intense pressure from U.S.
19    lawmakers and the media forced the social media
20    companies to examine what had taken place and
21    strive to ensure it did not happen in the future"?
22        A.   Yes.  I wrote that statement, and I agree
23    with it.
24        Q.   That's a consistent approach with the
25    Footnote 185 that cites the congressional reports
```

**ELVIS CHAN  11/29/2022**

```
 1    as well as what you said earlier about, you know,

 2    calling the tech CEOs in to testify in front of

 3    Congress and these meetings out here in San

 4    Francisco, right?

 5        A.    Yes.  That is my personal opinion.

 6        Q.    Okay.  I want to jump ahead to Page 46 of

 7    your thesis.  Can you still hear me?

 8        A.    Yes.

 9        Q.    Okay.  Do you see here on Page 46, Page 70

10    of the PDF?

11        A.    "Facebook stated it took a series of

12    measures"?

13        Q.    All right.

14              (Discussion off the record.)

15              THE WITNESS:  I read the first sentence of

16    the second paragraph.

17        Q.    BY MR. SAUER:  Right.  If I could direct

18    your -- can you hear me now?

19        A.    Yes.

20        Q.    Directing your attention higher up, at the

21    very top of the page, you say, "Facebook and

22    Twitter appeared to be the most detailed in sharing

23    their changes and the most public about account

24    takedowns," right?

25        A.    That is correct.
```

**ELVIS CHAN  11/29/2022**

Page 129

```
1         Q.   And "their changes," what are those?   Is
2    that a reference to substantive actions and policy
3    changes to address malign foreign influence?
4         A.   Yes.
5         Q.   And your footnotes there I think refers to
6    changes that they actually made to their
7    content-modulation policies, right, their terms of
8    service?
9         A.   That is correct.  Whenever --
10             (Discussion off the record.)
11             THE WITNESS:  Okay.  Can you -- can you
12    scroll back to the sentence you were on, Mr. Sauer?
13             Oh, I wanted to clarify that the
14    substantive actions refers to, like, the
15    technology-detection methods, right?  That is one
16    of the substantive actions.
17             And then, as you mentioned, yeah, the
18    policy changes specifically to their terms of
19    service or community standards.
20             (Discussion off the record.)
21             THE WITNESS:  -- and community -- or
22    community standards.
23         Q.   BY MR. SAUER:  Got you.  So the policy
24    changes are changes -- the substantive changes are
25    their using algorithms to detect inauthentic
```

**ELVIS CHAN  11/29/2022**

**Page 130**

1    content, right?

2        A.    Correct.  That is -- that is what I'm

3    referring to.

4        Q.    And then these -- the policy changes are

5    actually changing their terms of service to make

6    things -- to clarify that certain things actually

7    violate their policies and can be taken down,

8    right?

9        A.    Correct.

10       Q.    So those are kind of more robust or more

11   aggressive content-modulation policies that they

12   have adopted in this time frame, right?

13       A.    Yes.

14       Q.    And you go on to say in the next page,

15   "Facebook and Twitter appeared to be the most

16   detailed in sharing their changes and the most

17   public about account takedowns," right?

18       A.    That is correct.

19       Q.    And the changes they shared were they

20   shared that they had both -- well, include the

21   policy changes, the changes to their terms of

22   service, right?

23       A.    Yes.  They were very public in blog posts

24   about the terms-of-service changes --

25             (Discussion off the record.)

**ELVIS CHAN  11/29/2022**

Page 131

```
 1              THE WITNESS:  -- is their term for it --
 2              (Discussion off the record.)
 3              THE WITNESS:  And providing reports of
 4    account takedowns of foreign malign influence.
 5         Q.    BY MR. SAUER:  So in addition to notifying
 6    the FBI that they had taken stuff down, they would
 7    provide a public report saying, "Hey, we took down
 8    all the -- a certain number of accounts in the last
 9    quarter"; is that what they would do?
10         A.    Yes, yes.
11         Q.    Okay.  And you go on to say, "A possible
12    reason could be that Facebook and Twitter faced
13    more Congressional scrutiny than Google as their
14    senior executives testified before Congress on
15    three separate occasions before the midterm
16    elections" --
17         A.    Uh-huh.
18         Q.    -- is that right?
19         A.    Yes.  I do cite a news article.  I --
20    however, I do share the opinion of that article.
21         Q.    And that's consistent with what we just
22    talked about a moment ago, which is that one way
23    that these social media platforms experience
24    pressure was Mark Zuckerberg and Jack Dorsey had to
25    go testify in front of Congress multiple times.
```

**ELVIS CHAN  11/29/2022**

**Page 132**

1   And you infer from that that may have led to their

2   changing their terms of service to be more robust

3   and to prevent certain kinds of content from being

4   posted; fair to say?

5          MR. SUR:  Objection; mischaracterizes the

6   record.

7          THE WITNESS:  My personal opinion is that,

8   yeah, the -- my personal opinion is that political

9   pressure from Congress was a contributing factor.

10     Q.   BY MR. SAUER:  On the next page, Page 47,

11   you talk about there were a significant number of

12   takedowns, right?  "In 2018, Twitter announced the

13   takedown of 3,613 IRA-associated accounts."

14     A.   Yeah.  I see that at the bottom of the

15   first paragraph on that page.

16     Q.   Do you have any way of knowing if all of

17   those were actually IRA-associated or some of them

18   might have been authentic accounts?

19     A.   Well, I only know what Twitter has told

20   us.

21     Q.   Jumping ahead in your thesis to -- a

22   couple pages, to Page 49, you talk about how

23   something "provided politicians with the occasion

24   to exert pressure on the companies to make

25   constructive changes to their platforms," right?

**ELVIS CHAN  11/29/2022**

Page 133

```
 1      A.   Yeah, that was my assessment.
 2      Q.   Yeah.  And in other words, this is, again,
 3  another way of saying something we have been
 4  talking about, that politicians, including members
 5  of Congress, pressured the social media companies
 6  to make changes to their platforms to address
 7  malign foreign influence, correct?
 8      A.   That is correct.
 9      Q.   And you described it as "constructive
10  changes."  So by and large you approve of the
11  policy changes and substantive actions that were
12  taken after 2016, correct?
13           MR. SUR:  Objection; lacks foundation.
14           THE WITNESS:  The reason I said it was
15  constructive was that it appeared the social media
16  companies were able to detect and counter
17  foreign-malign-influence operations on their
18  platforms, which I believe was constructive.
19      Q.   BY MR. SAUER:  And do you think it's
20  constructive that they are better equipped to
21  engage in account takedowns?
22      A.   That is correct.  As compared to 2016 and
23  prior.
24      Q.   And you think it is a positive development
25  between 2016 and 2018 that zero accounts were taken
```

Case 3:22-cv-01213-TAD-KDM   Document 204-1   Filed 03/03/23   Page 134 of 386 PageID #: 10194

**ELVIS CHAN  11/29/2022**

1   down during the 2016 cycle but 3,613 Twitter

2   accounts were taken down in the 2018 cycle,

3   correct?

4       A.   Yeah.  The higher number is better than

5   zero, in my estimation.

6       Q.   Because by and large you believe that

7   malign-foreign-influence accounts should be taken

8   down from Twitter, Facebook, YouTube and so forth?

9       A.   Yes, that is my belief.

10      Q.   In the next paragraph of the thesis, you

11   talk about the Global Engagement Center.  What

12   exactly is that?

13      A.   So as I mentioned, it -- legislation

14   established the Global Engagement Center within the

15   State Department.  And based on my understanding

16   and review of reporting about the GEC, they were

17   primarily focused originally on countering foreign

18   terrorist organizations' propaganda.

19      Q.   Do you -- and then did their mission

20   change to address malign foreign influence?

21      A.   I -- yeah.  I would say it has now -- in

22   my experience, it is now including malign foreign

23   influence as well.

24      Q.   When you say your experience, do you

25   interact with the Global Engagement Center in your

**ELVIS CHAN  11/29/2022**

Page 135

```
 1   professional role?

 2       A.   Yeah, I -- the -- yes.  Ahead of the 2020

 3   elections, I engaged with a regional representative

 4   who was based here in San Francisco.

 5       Q.   Who was that?

 6       A.   His name was Sam Stewart.

 7       Q.   Uh-huh.  Was that Samaradun Kay Stewart?

 8       A.   Yeah.  Yeah, that's his full name.

 9       Q.   What were your interactions with him?

10       A.   I would have periodic phone calls with

11   him.  He would meet with the social media companies

12   separately from me.  And from what he told me, it

13   seemed like he primarily met with policy

14   individuals.  I -- I rarely, if ever, meet with

15   policy individuals.

16            As I mentioned to you before, I typically

17   meet with the trust and safety individuals and then

18   their associated attorneys.

19       Q.   Did he discuss with you the nature of the

20   meetings he had with the policy individuals at

21   social media platforms?

22       A.   I would say only broadly.  He discussed

23   different initiatives that they have.

24       Q.   Would the social media platforms --

25       A.   And these initiatives include different
```

**ELVIS CHAN  11/29/2022**

Page 136

```
 1   types of software made by vendors that they would

 2   pilot to see if they could detect malign foreign

 3   influence on social media platforms.  And then he

 4   would also share information from State Department

 5   employees who were at embassies, you know, boots on

 6   the ground type of information from the embassies

 7   we have around the world.

 8          That is the type of information that he

 9   would share with me and let me know that that was

10   the type of information that he was sharing with

11   the companies.

12      Q.   That first piece of it is kind of

13   interesting because it sounds like that connects to

14   what you said earlier about the substantive actions

15   taken by the social media platforms.  They adopted

16   computer programs or algorithms to try and detect

17   inauthentic foreign activity, correct?

18      A.   Yes.  In my estimation, they use that type

19   of technology to detect and either knock down or

20   flag malign-foreign-influence activity.

21      Q.   It sounds like Mr. Stewart was, based on

22   your description, kind of offering them access to

23   the sorts of tools they might be able to use to

24   detect it, correct?

25          MR. SUR:  Objection; calls for
```

**ELVIS CHAN  11/29/2022**

Page 137

```
 1    speculation, mischaracterizes the record.

 2            THE WITNESS:  So I don't know what outside

 3    vendors any of the companies, any of the social

 4    media companies use.

 5            I do know that the -- Sam Stewart from the

 6    Global Engagement Center, he -- he would provide

 7    webinars to me from these different types of

 8    vendors, and then the vendors would just come in

 9    and share results that they have.

10        Q.    BY MR. SAUER:  When you say "results," are

11    these vendors who prepare computer programs to

12    detect, you know, inauthentic activity on social

13    media platforms?

14        A.    That is my understanding.

15        Q.    And you -- I take it you participated in

16    some of his presentations, or you --

17        A.    I would say I went to two of those

18    webinars just to see what they were like.

19            However, based on my viewing of those two

20    webinars, I did not think it was useful from a law

21    enforcement standpoint.

22        Q.    And would it be more useful -- in other

23    words, a more useful audience would have been the

24    social media platforms who might use such programs?

25            MR. SUR:  Objection; vague.
```

**ELVIS CHAN  11/29/2022**

Page 138

```
 1          THE WITNESS:  I believe that is why Sam
 2    Stewart would share that type of information.  But
 3    the reason I did not find it useful was because, as
 4    a law enforcement agency and a domestic security
 5    service, I am focused on the malign foreign actors
 6    themselves and their activities.  And what these
 7    companies and applications did was just look at
 8    the -- look at the content and activities from a
 9    surface level.
10          So I would be concerned that that sort of
11    application might accidentally pick up U.S. people
12    information, and so that is not something that I
13    think would be useful or relevant to the FBI.
14      Q.   BY MR. SAUER:  And so your concern -- your
15    concern was that the GEC's kind of computer
16    programs that they were making available to social
17    media companies might be overinclusive and
18    misidentify authentic accounts as inauthentic
19    activity?
20          MR. SUR:  Objection; lacks foundation,
21    calls for speculation, and mischaracterizes the
22    record.
23          THE WITNESS:  So if I may -- if I may
24    respond to your question.  So the State Department
25    is primarily a foreign-focus agency.  And so in
```

**ELVIS CHAN  11/29/2022**

**Page 139**

1    their estimation -- I believe that in their

2    estimation their tools would be deployed overseas,

3    where I believe they do not have the same type of

4    legal training that I do specifically about First

5    Amendment protections.  And so, you know, they are

6    overseas in embassies and their analysts are

7    overseas in embassies, and so they don't have the

8    same sorts of concerns that I would working at the

9    FBI is what I -- is my personal opinion.

10       **Q.   BY MR. SAUER:  Okay.  And those concerns**

11   **specifically is that it would raise a First**

12   **Amendment concern if somebody's -- a real user's**

13   **account got accidentally taken down because the**

14   **State Department provided a computer program that**

15   **was overinclusive?**

16           MR. SUR:  Objection; mischaracterizes the

17   record and calls for a legal conclusion.

18       **Q.   BY MR. SAUER:  But if -- yeah, if that**

19   **concern --**

20       A.   So I don't think the State Department was

21   providing these programs to the companies.  I think

22   the State Department was just providing a venue

23   where different vendors could show off their

24   products.  I don't think they endorsed or did not

25   endorse these products, but they provided -- and it

Case 3:22-cv-01213-TAD-KDM   Document 204-1   Filed 03/03/23   Page 140 of 386 PageID #: 10200

**ELVIS CHAN  11/29/2022**

Page 140

```
 1   wasn't just for the social media companies.

 2          They would invite all sorts of audiences,

 3   to include researchers, employees from State

 4   Department counterparts, so typically Ministry of

 5   Foreign Affairs.  They would provide -- these were

 6   open to the general public, but I believe the

 7   audience that they were going for were State

 8   Department-equivalent personnel, social media

 9   companies and researchers.

10          MR. SAUER:  Do you want to go off the

11   record?

12          THE WITNESS:  That's just based on what --

13          THE VIDEOGRAPHER:  Off the record at

14   12:27.

15          (Whereupon the noon recess was

16          taken.)

17                  ---o0o---

18

19

20

21

22

23

24

25
```

**ELVIS CHAN  11/29/2022**

Page 141

```
 1          REMOTE VIA ZOOM, CALIFORNIA, NOVEMBER 29, 2022
 2                     AFTERNOON SESSION
 3                       ---o0o---
 4          THE VIDEOGRAPHER:  We are back on the
 5     record at 1:20 p.m.
 6       Q.    BY MR. SAUER:  Agent Chan, I just want to
 7     direct your attention back to your thesis, Exhibit
 8     1, for a few more questions.  Let me know if you
 9     have difficulty hearing me.
10          Here I am on Page 61 of your thesis, which
11     is Page 85 of the pdf.  In here you discuss the
12     case of PeaceData, which was a website, right?
13       A.    Yes, that is correct.
14       Q.    What exactly was PeaceData?  Was that a
15     Russian-originated website?
16       A.    Yes.  For the 2020 election cycle, that
17     was a website created by the Internet Research
18     Agency.
19       Q.    And it was intended to sow kind of
20     disinformation and discord among kind of
21     left-leaning voters in the United States, right?
22       A.    Yes.
23       Q.    And then here in this sentence that I am
24     highlighting you say "Third, Reuters broke a story
25     about the IRA posing as PeaceData staff to hire
```

Case 3:22-cv-01213-TAD-KDM   Document 204-1   Filed 03/03/23   Page 142 of 386 PageID #: 10202

**ELVIS CHAN  11/29/2022**

Page 142

```
 1    unwitting freelance journalists, including
 2    Americans, to write articles for the site," right?
 3         A.    That is correct, and I cite the articles.
 4         Q.    Right.  And then you go on to say that
 5    "The Carnegie Endowment" "determined that at least
 6    20 freelance journalists," which includes
 7    Americans, "had been duped into writing articles
 8    for the PeaceData outlet," right?
 9         A.    That is correct.
10         Q.    Those articles were posted on that
11    website, right?
12         A.    That is correct.
13         Q.    Then that website, I take it, got taken
14    down as a result of the revelation that it was a
15    Russian mis- -- or Russian-originated site, right?
16         A.    I do not believe it was taken down.  I
17    believe it was just discredited.  It may -- I
18    haven't checked it, but it was up for a while.
19         Q.    And this is one of those sites that you
20    described as achieving fairly low engagement
21    earlier in the deposition; is that right?
22         A.    Right.  That is correct.
23         Q.    Was the FBI involved in the investigation
24    of the PeaceData?
25              MR. SUR:  Objection; vague.
```

**ELVIS CHAN  11/29/2022**

1           THE WITNESS:  So the FBI shared

2    information with the companies that it believed the

3    Internet Research Agency was standing up.  Two

4    websites.  One was PeaceData, and the other was

5    called NAEBC, which is an abbreviation for Newsroom

6    for American- and European-Based Citizens.  So they

7    were supposed to be complementary news websites.

8    But we did tip the social media companies to both

9    of those sites.

10        **Q.   BY MR. SAUER:  Did the social media**

11   **companies, to your knowledge, act on that**

12   **information and take actions to restrict social**

13   **media postings about those -- bombing those sites?**

14        A.   What they conveyed to me is that they

15   identified accounts that were foreign-associated,

16   so Internet Research Agency-associated, that were

17   directing users on those platforms to the PeaceData

18   website as well as the NAEBC website.

19        **Q.   So they identified.  Did they take actions**

20   **against those accounts?**

21        A.   I believe they did.

22        **Q.   Okay.  So this is a situation where the --**

23   **in the 2020 election cycle the tactics have evolved**

24   **and the Russians have now created a website, hired**

25   **Americans to write for the website and post**

**ELVIS CHAN  11/29/2022**

Page 144

```
 1    articles on it, and then are using fake accounts to
 2    direct ordinary users to the content on that
 3    website; is that right?
 4          MR. SUR:  Objection; assumes facts not in
 5    evidence.
 6          THE WITNESS:  Yeah, so you have summarized
 7    one of the shifts that I noticed in my thesis.
 8      Q.   BY MR. SAUER:  Got you.  And the FBI was
 9    the organization that flagged this for social media
10    companies as -- the PeaceData site as a
11    Russian-originating site, correct?
12      A.   Yes, that is my recollection.
13      Q.   Okay.  So in that you talked about the
14    NAEBC site, right?  That's N-A-E-B-C, right?
15      A.   Correct.
16      Q.   And that was a more right-wing site that
17    the Russians originated?
18      A.   Correct.
19      Q.   And just turning two pages ahead in your
20    thesis to Page 63, you have a sentence here about
21    the NAEBC site that begins "Lastly, Graphika
22    determined that the IRA used various social media
23    accounts to engage with real users and convince
24    them to post on the NAEBC site, which met with some
25    success," correct?
```

**ELVIS CHAN  11/29/2022**

Page 145

```
 1      A.   Yes, I wrote that, and I was citing the
 2  Graphika team report.
 3      Q.   So it's your understanding that the NAEBC
 4  site also included content drafted and written by
 5  real users that had posted on that site?
 6      A.   Yes, based on the Graphika report.
 7      Q.   So it is a bit like the PeaceData site
 8  where they had hired freelance journalists,
 9  including Americans, to post on the site.  Here
10  they induced social media users to post their own
11  thoughts on that site, right?
12      A.   That is correct, but we do not know the
13  nationality of the users because it wasn't
14  mentioned in the source that I used.
15      Q.   You don't know today whether those were
16  Americans or foreigners who were posting on that
17  NAEBC site, right?
18      A.   I do not.
19      Q.   But the NAEBC site was designed by the
20  Russians for Americans to read, right, or Americans
21  and Europeans; is that right?
22      A.   That is my assessment.
23      Q.   In fact, NAEBC stands for Newsroom for
24  American- and European-Based Citizens, right?
25      A.   That is correct.
```

**ELVIS CHAN  11/29/2022**

Page 146

```
 1      Q.    Higher on this page you describe these
 2   people who posted on the site as unwitting
 3   co-optees.  Do you see that?
 4      A.    I do see that.
 5      Q.    So you have a situation where there's a
 6   kind of, you know, intermingling or blending of the
 7   inauthentic Russian content with essentially
 8   authentic user-generated content, right?
 9           MR. SUR:  Objection; vague and ambiguous.
10           THE WITNESS:  Yes, I characterize those
11   individuals as unwitting co-optees.
12      Q.    BY MR. SAUER:  And the FBI flagged the
13   NAEBC site for social media platforms as a kind of
14   Russian-originated source as well, right?
15      A.    That is correct.
16      Q.    Did you also flag social media accounts
17   that were engaged in directing people -- or
18   directing people to those sites, both PeaceData and
19   NAEBC, to the social media platforms?
20           MR. SUR:  Objection; vague and ambiguous.
21           THE WITNESS:  No, not to my recollection.
22   From my recollection, we provided those two
23   websites to include the URLs and then the companies
24   were able to discover Russian-controlled accounts
25   that were used to try to redirect users to those
```

**ELVIS CHAN  11/29/2022**

Page 147

```
 1   websites.
 2        Q.    BY MR. SAUER:  And the social media
 3   companies told you that they had found them.  Did
 4   they say they had taken action against those
 5   accounts?
 6        A.    Yes, they said that they had taken down
 7   those accounts.
 8        Q.    Jumping ahead to Page 70 of your thesis,
 9   which is Page 94 of the PDF, Table 5 here you have
10   a summary of Facebook takedowns from 2020, right?
11        A.    Yes.
12        Q.    And you have a grand total of 825 accounts
13   taken down from Facebook and Instagram pages -- or
14   platforms, right?
15        A.    That is correct.
16        Q.    So I think part of your thesis points out
17   that Facebook was much, much more active in the
18   2020 election cycle in removing
19   malign-foreign-influence accounts than it had been
20   in 2016, right?
21        A.    That is my assessment.
22        Q.    And in your thesis, you only cite the four
23   publicly cited in media reports instances where the
24   FBI had flagged stuff to Facebook and other social
25   media platforms, right?
```

**ELVIS CHAN  11/29/2022**

```
 1      A.   That is correct.  Because that was -- I
 2  was writing the thesis for me personally, and I was
 3  not representing -- you know, if you look at the
 4  caveat in the first place, I was representing my
 5  personal views and not necessarily the views of the
 6  FBI regarding the thesis.
 7      Q.   But in your capacity as an FBI agent,
 8  you're aware of a lot more than four instances
 9  where the FBI had flagged accounts, right?
10      A.   You are correct.
11      Q.   In fact, I think you said it was one to
12  five instances per month in 2018 election cycle --
13  sorry, one to five instances per month during the
14  2020 cycle and one to four instances per month in
15  the 2022 cycle, correct?
16      A.   That is correct.  And the reason for that
17  is because that information is not publicly
18  available.  So I could not use it in my thesis.
19      Q.   Understood.  And of those 825 accounts
20  from Facebook, do you have any idea, ballpark, how
21  many of those were the results of takedowns --
22  sorry.  How many of those takedowns were the result
23  of information provided by the FBI?
24      A.   Unfortunately I do not.  I would love to
25  have that statistic, but I do not have that.
```

**ELVIS CHAN  11/29/2022**

1      Q.   You kind of asked them for that and they

2   haven't told you, right?

3      A.   That is correct.

4      Q.   Okay.  But it's some subset of those

5   because you have been told on multiple occasions

6   that they have acted on information that you

7   provided, right?

8      A.   That is my assumption.

9      Q.   Next page you talk about in 2019, Twitter

10  announced two takedowns of 422 accounts which made

11  929,000 tweets, right?

12     A.   That's correct.

13     Q.   Can you look at the figure on that page?

14  Looks like the topics relate to the 2018 midterms,

15  MAGA, ReleaseTheMemo and other subjects; is that

16  right?

17     A.   That is correct.

18     Q.   ReleaseTheMemo is some -- some sort --

19  some trend that's designed to appear -- to appeal

20  to conservative voters, right?

21     A.   Honestly, I can't remember.

22     Q.   In any event, do you know how many of

23  these 422 accounts and 929,000 tweets that were

24  removed were the result of FBI information?

25     A.   I do not.

**ELVIS CHAN  11/29/2022**

Page 150

```
 1        Q.    It is some subset of those, but they
 2   haven't given you the precise numbers; is that fair
 3   to say?
 4        A.    That is -- that would be my assumption.
 5        Q.    And then the next page, again, there's a
 6   reference to Twitter announcing four sets of
 7   takedowns with 1,233 accounts as well.  Same
 8   question:  I take it that some of those are due to
 9   the FBI, but you don't know how many?
10             MR. SUR:  Objection; calls for
11   speculation.
12             THE WITNESS:  I would assume that some
13   subset of that amount was due to information we
14   provided, but I do not know the exact number.
15        Q.    BY MR. SAUER:  And at some level you know
16   that some are because Twitter's told you on at
17   least some occasions, "Yes, we acted on your
18   information and took down problematic accounts,"
19   right?
20        A.    That is correct.
21        Q.    Let's jump ahead to Page 76 of your
22   thesis.  You have a discussion of some meetings
23   here at the bottom of the page.  You see where I
24   am?  On September -- you talk about how the U.S.
25   government was more engaged ahead of the 2020
```

**ELVIS CHAN  11/29/2022**

Page 151

```
 1   elections, right?

 2        A.   I said the government appeared to be more

 3   engaged with social media companies.

 4        Q.   In fact, based on your actual experience,

 5   were you more engaged?

 6        A.   I would personally characterize it as

 7   being more engaged.  However, I cannot discuss that

 8   in a thesis.

 9        Q.   Got you.  This next sentence you say

10   "September 4th, 2019, Facebook hosted an election

11   security meeting with FBI, DHS and ODNI," right?

12        A.   That's correct.

13        Q.   Were you at that meeting?

14        A.   I was at that meeting.

15        Q.   Who else was at that meeting from the FBI?

16        A.   I specifically remember two attorneys

17   being at that meeting, but they are both GS-14

18   attorneys.

19        Q.   Don't tell me their names.  Anyone else

20   from the FBI?

21        A.   No.  I believe I -- yeah, I was the only

22   non-FBI -- I'm trying to remember if any FITF

23   employees came.  Actually, yes, I believe one

24   employee from FITF came, but I am not completely

25   sure.
```

**ELVIS CHAN  11/29/2022**

Page 152

1     Q.    Do you know who it was?

2     A.    Yeah, he's another GS-15.  It would be the

3   unit chief for the Russian unit.

4     Q.    How about from DHS, were those CISA

5   individuals?

6     A.    I definitely remember Matt Masterson being

7   there, but I do not remember if Brian Scully was

8   there.  Oh, I also remember the director of CISA,

9   Mr. Krebs, was there as well.

10    Q.    So Krebs, Masterson and possibly Scully

11  were at that meeting?

12    A.    Krebs and Masterson for sure, and I can't

13  remember if Scully was there.

14    Q.    Okay.  What was discussed at this meeting?

15    A.    It was just an overall meeting to discuss

16  election security, and I think in my opinion,

17  Facebook held the meeting because they wanted all

18  of the relevant federal government components in

19  the same room to share what the federal government

20  agencies intended to do to ensure the safety of the

21  2020 elections.

22    Q.    Okay.  And you go on to the next page to

23  say, "The other companies attending the meeting

24  included Google, Microsoft, and Twitter," right?

25    A.    Yeah.  And you can see from the footnote

**ELVIS CHAN  11/29/2022**

Page 153

```
 1   those were the only companies who were mentioned in
 2   the article.
 3       Q.   Were there other companies there, since
 4   you attended the meeting?
 5       A.   Yes, there were other companies there.
 6       Q.   Which ones?
 7       A.   I specifically remember Yahoo! was there.
 8       Q.   Any others?
 9       A.   Not from my recollection.
10       Q.   Were the individuals from the social media
11   platforms at these -- at this meeting, were these
12   people from the site integrity or trust and safety
13   teams?
14       A.   Yes.
15       Q.   So those are the people on the social
16   media side who have responsibility for enforcing
17   content-modulation decisions and enforcing terms of
18   service?
19       A.   That is --
20            MR. SUR:  Objection; calls for
21   speculation, lacks foundation.
22            THE WITNESS:  That is my understanding.
23       Q.   BY MR. SAUER:  Did you -- what was -- was
24   content modulation discussed at all?  Was
25   disinformation discussed at this meeting?
```

**ELVIS CHAN  11/29/2022**

Page 154

```
1              MR. SUR:  Objection; vague and ambiguous.

2              THE WITNESS:  From my recollection, the

3    social media companies were focused on discussing

4    disinformation, and the FBI was really focused on

5    the actors who were involved, specifically the

6    Internet Research Agency.

7         Q.   BY MR. SAUER:  So this was an information

8    where disinformation was discussed and removing

9    disinformation from platforms?

10        A.   So the social media companies discussed

11   that.  We, the FBI, did not discuss that.

12        Q.   What did CISA discuss at this meeting,

13   Mr. Krebs and Mr. Masterson or Mr. Scully, if he

14   was there?

15        A.   From my recollection, CISA just discussed

16   what their role was and is in securing election

17   infrastructure and supporting election officials.

18        Q.   Did they talk about disinformation?

19        A.   I do not remember them talking about

20   disinformation.

21        Q.   How about ODNI, did they talk about

22   removing disinformation?

23        A.   No, they did not.  ODNI, from my

24   recollection, provided an unclassified overview of

25   three specific nation states that they were
```

**ELVIS CHAN  11/29/2022**

Page 155

```
 1   concerned might try to conduct malign-influence
 2   campaigns against the U.S. elections in 2020.
 3   These include Russia, China and Iran.
 4       Q.   You go on to say, "In August 2020, the New
 5   York Times broke a story revealing that the private
 6   sector companies working with the U.S. government
 7   had expanded to include the Wikimedia Foundation,
 8   Verizon Media, Reddit, Pinterest, and LinkedIn,"
 9   correct?
10       A.   That is correct.
11       Q.   So let me ask you this:  Were there other
12   meetings, other than this one on September 4th,
13   2019, with these other companies?
14       A.   I don't remember another -- oh, outside of
15   the CISA-hosted industry group meetings, I don't
16   remember another meeting that had all of the
17   companies together.
18       Q.   Okay.  So the CISA-hosted meetings, that's
19   the -- I think we talked about at the very
20   beginning of the deposition, the industry -- what
21   does CISA call, the industry-what meeting?
22       A.   I can't remember, but yes, those were the
23   meetings I was -- those were the meetings I was
24   referring to.
25       Q.   So you believe this -- you believe this
```

Case 3:22-cv-01213-TAD-KDM   Document 204-1   Filed 03/03/23   Page 156 of 386 PageID #: 10216

**ELVIS CHAN  11/29/2022**

```
 1    New York Times story that refers to Wikimedia,
 2    Reddit and Pinterest and so forth is a reference to
 3    the CISA-hosted industry meeting that you just
 4    testified about earlier, correct?
 5        A.   That is only my assumption.
 6        Q.   Okay.  Those meetings you attended some
 7    but not all of them, I think you said?
 8        A.   Yes, that is correct.
 9        Q.   Was disinformation discussed at those
10    meetings, the CISA-led industry meetings that
11    included all these social media platforms?
12        A.   Yes, from -- the disinformation content
13    was shared by the social media companies.  They
14    would provide a strategic overview of the type of
15    disinformation they were seeing on their respective
16    platforms.
17        Q.   And then what did the government say in
18    those meetings?
19             MR. SUR:  Objection; vague and ambiguous.
20             THE WITNESS:  As I mentioned before, CISA
21    primarily discussed actual election logistics to
22    include the dates of State primaries, the methods
23    for which ballots were cast.
24             The FBI, we just provided strategic,
25    unclassified overviews of the activities that we
```

**ELVIS CHAN  11/29/2022**

**Page 157**

1   saw the Internet Research Agency doing.

2          ODNI, to my recollection, did not provide

3   any substantive overviews at most of the meetings

4   except for to provide general assessments about

5   nation-state-level threats.

6          **Q.   BY MR. SAUER:  I am going to jump ahead to**

7   **Page 94 of your thesis, and that's on Page 118 of**

8   **the PDF.**

9          A.   So where --

10         **Q.   Up here at the top.**

11         A.   Part B, "Recommendations."

12         **Q.   Right above it.**

13         A.   Okay.

14         **Q.   At the top you say, "Many factors are at**

15   **play when trying to measure the effects of Russia's**

16   **influence operations," right?**

17         A.   Yes.

18         **Q.   You say, "First-order effects include real**

19   **users interacting with inauthentic content," right?**

20         A.   Yes.

21         **Q.   Interacting with inauthentic content, that**

22   **includes reading it, liking it, commenting on it,**

23   **potentially reposting it and reposting it with a**

24   **commentary, correct?**

25         A.   Yes.

**ELVIS CHAN  11/29/2022**

Page 158

1      Q.   Those are all first-order effects of

2   Russia's influence operations, right?

3      A.   That is how I define "first-order

4   effects."

5      Q.   Got you.  "Russian-bot amplification of

6   diverse organic content is what you list in that

7   list, right?

8      A.   Yeah, I also define that as a "first-order

9   effect."

10      Q.   And that refers to the Russian bots

11   basically being used to amplify, that is like or

12   repost or retweet, content that other users have

13   already posted, right?

14      A.   That is correct.

15      Q.   And then a third first-order effect you

16   identify is "IRA-controlled accounts communicating

17   directly with real users," right?

18      A.   That's correct.

19      Q.   They would be directing messages to those

20   users, and those users would be responding to these

21   inauthentic accounts, right?

22      A.   Correct.

23      Q.   Jumping ahead to Page 99, you make a

24   recommendation here for "the U.S. government to

25   establish a National Counter Information Operations

**ELVIS CHAN  11/29/2022**

Page 159

```
1    Center as an interagency fusion center and focal

2    point for countering disinformation campaigns,"

3    right?

4        A.   That is a personal recommendation that I

5    made.  If you look at the footnote, this was one of

6    the recommendations of the U.S. Cyberspace

7    Solarium.

8        Q.   Okay.  So you kind of agree with what they

9    had recommended, right?

10       A.   That is my personal stance, not

11   necessarily the stance of the FBI.

12       Q.   You go on to say, "In April 2021" -- you

13   talk about how that commission, the one whose

14   recommendation you agree with, envisioned a center

15   that would allow the relevant U.S. government

16   elements to work alongside social media companies

17   to combat disinformation, right?

18       A.   That is correct.  But I'm also citing a

19   report.

20       Q.   And combatting disinformation here would

21   include the sort of stuff we're talking about

22   already today, which is flagging inauthentic

23   accounts and having them removed, right?

24           MR. SUR:  Objection; vague and ambiguous,

25   mischaracterizes the record.
```

Case 3:22-cv-01213-TAD-KDM   Document 204-1   Filed 03/03/23   Page 160 of 386 PageID #:
10220

**ELVIS CHAN  11/29/2022**

Page 160

```
 1              THE WITNESS:  Yeah.  So my intent was --
 2   and what the commission also envisioned was closer
 3   to realtime sharing of information.  So right now,
 4   you know, we are limited by the declassification
 5   process, the approval process for us to be able to
 6   get information in a form that can be shared with
 7   the social media companies.
 8              However, if some of the social media
 9   company employees were to carry security
10   clearances, they could be discussed at least on an
11   informal basis at a high level, a higher
12   classification.
13        Q.   BY MR. SAUER:  And I take it that
14   communication could happen much more quickly under
15   this recommendation, right?
16        A.   Yes.
17        Q.   And that could, therefore, result in
18   quicker action being taken by the social media
19   platforms against inauthentic activity on their
20   platforms?
21              MR. SUR:  Objection; calls for
22   speculation.
23              THE WITNESS:  Yes, that would be my
24   opinion.
25        Q.   BY MR. SAUER:  And the next sentence you
```

**ELVIS CHAN  11/29/2022**

Page 161

```
 1    say, "In April of 2021, the" ODNI announced "it was
 2    establishing 'the Foreign Malign Influence
 3    Center'."  Do you know anything about that Foreign
 4    Malign Influence Center other than the public
 5    report that you cite?
 6        A.   Unfortunately I do not.
 7        Q.   So you don't know if they have something
 8    like you're recommending already in place where
 9    people with security clearances on the government
10    side and the social media side can convey
11    information to each other more quickly?
12        A.   So I am not aware of any such sent -- of
13    any such center being housed at ODNI at this point.
14        Q.   Jump ahead -- or I'll jump ahead to Page
15    104.  Here toward the end you commented that
16    "although the focus of this thesis was Russian
17    disinformation campaigns, domestic disinformation
18    operations also featured prominently ahead of the
19    2020 elections," correct?
20        A.   Can you tell me what you highlighted
21    again?
22        Q.   Oh, sorry.  Here I am.  "Although the
23    focus of this thesis was Russian disinformation
24    campaigns, domestic disinformation operations also
25    featured prominently ahead of the 2020 elections."
```

**ELVIS CHAN  11/29/2022**

Page 162

```
 1      A.   Yes, I wrote that, and I was citing a
 2  report from the Atlantic Council.
 3      Q.   Did you have any involvement in looking
 4  for domestic disinformation campaigns in the 2020
 5  election cycle?
 6           MR. SUR:  Objection; vague,
 7  mischaracterizes the record.
 8           THE WITNESS:  In the context of the FITF
 9  meetings, no.
10      Q.   BY MR. SAUER:  All right.  How about in
11  any other context?
12      A.   During FBI San Francisco's 2020 election
13  command post, which I believe was held from the
14  Friday before the election through election night,
15  that Tuesday at midnight, information would be
16  provided by other field offices and FBI
17  headquarters about disinformation, specifically
18  about the time, place or manner of elections in
19  various states.
20           These were passed to FBI San Francisco's
21  command post, which I mentioned to you before I was
22  the daytime shift commander, and we would relay
23  this information to the social media platforms
24  where these accounts were detected.
25           So I do not believe we were able to
```

**ELVIS CHAN  11/29/2022**

Page 163

```
1    determine whether the accounts that were posting

2    time, place or manner of election disinformation,

3    whether they were American or foreign.

4        Q.   But you received reports, I take it, from

5    all over the country about disinformation about

6    time, place and manner of voting, right?

7        A.   That is -- we received them from multiple

8    field offices, and I can't remember.  But I

9    remember many field offices, probably around ten to

10   12 field offices, relayed this type of information

11   to us.

12           And because DOJ had informed us that this

13   type of information was criminal in nature, that it

14   did not matter where the -- who was the source of

15   the information, but that it was criminal in nature

16   and that it should be flagged to the social media

17   companies.  And then the respective field offices

18   were expected to follow up with a legal process to

19   get additional information on the origin and nature

20   of these communications.

21       Q.   So the Department of Justice advised you

22   that it's criminal and there's no First Amendment

23   right to post false information about time, place

24   and manner of voting?

25           MR. SUR:  Objection on the grounds of
```

Case 3:22-cv-01213-TAD-KDM   Document 204-1   Filed 03/03/23   Page 164 of 386 PageID #:
10224

**ELVIS CHAN  11/29/2022**

```
 1   attorney-client privilege --
 2           MR. SAUER:  He just testified --
 3           MR. SUR:  -- and work product issues.
 4           MR. SAUER:  That's waived.  He just told
 5   him what -- he just described what DOJ said, and
 6   I'm asking for specificity.
 7           MR. SUR:  I am putting the objection on
 8   the record.
 9       Q.   BY MR. SAUER:  You may answer.
10       A.   That was my understanding.
11       Q.   And did you, in fact, relay -- let me ask
12   you this.  You say manner of voting.  Were some of
13   these reports related to voting by mail, which was
14   a hot topic back then?
15       A.   From my recollection, some of them did
16   include voting by mail.  Specifically what I can
17   remember is erroneous information about when
18   mail-in ballots could be postmarked because it is
19   different in different jurisdictions.
20           So I would be relying on the local field
21   office to know what were the election laws in their
22   territory and to only flag information for us.
23           Actually, let me provide additional
24   context.  DOJ public integrity attorneys were at
25   the FBI's election command post and headquarters.
```

ELVIS CHAN  11/29/2022

Page 165

```
 1   So I believe that all of those were reviewed before

 2   they got sent to FBI San Francisco.

 3       Q.   So those reports would come to FBI San

 4   Francisco when you were the day commander at this

 5   command post, and then FBI San Francisco would

 6   relay them to the various social media platforms

 7   where the problematic posts had been made, right?

 8       A.   That is correct.

 9       Q.   And then the point there was to alert the

10   social media platforms and see if they could be

11   taken down, right?

12       A.   It was to alert the social media companies

13   to see if they violated their terms of service.

14       Q.   And if they did, then they would be taken

15   down?

16       A.   If they did, they would follow their own

17   policies, which may include taking down accounts.

18       Q.   How about taking down posts as opposed to

19   the entire account?

20       A.   I think it depends on how they interpreted

21   it and what the content was and what the account

22   was.

23       Q.   Do you know what the -- do you know

24   whether some of those posts that you relayed to

25   them were acted on by their content modulators?
```

**ELVIS CHAN  11/29/2022**

Page 166

```
 1              MR. SUR:  Objection; vague and ambiguous.
 2              THE WITNESS:  So from my recollection, we
 3     would receive some responses from the social media
 4     companies.  I remember in some cases they would
 5     relay that they had taken down the posts.  In other
 6     cases, they would say that this did not violate
 7     their terms of service.
 8        Q.   BY MR. SAUER:  What sort of posts were
 9     flagged by you that they concluded did not violate
10     their terms of service?
11        A.   I can't remember off the top of my head.
12        Q.   I mean, I take it they would all have a
13     policy against just posting about the wrong time
14     that the poles opened, right?  Or the wrong date to
15     mail your ballot?
16        A.   That would be my assumption, but I do
17     remember, but I can't remember the specifics as to
18     why.  But I do remember them saying that certain
19     information we shared with them did not result in
20     any actions on their part, but I can't remember the
21     details of those.  They were not frequent, but I do
22     remember that they occurred.
23        Q.   In most cases when you flagged something,
24     it was taken down?
25        A.   In most cases -- let me rephrase that.
```

**ELVIS CHAN  11/29/2022**

Page 167

```
 1          In some cases when we shared information
 2     they would provide a response to us that they had
 3     taken them down.
 4          Q.   Got you.  Same as the -- go ahead.
 5          A.   I would not say it was 100 percent success
 6     rate.  If I had to characterize it, I would say it
 7     was like a 50 percent success rate.  But that's
 8     just from my recollection.
 9          Q.   And the success rate would be the number
10     of times it got taken down based on the number of
11     instances you reported?
12          A.   The success rate would be that some action
13     had been taken because it was a terms-of-service
14     violation.
15          Q.   Got you.  Did this command post, this kind
16     of activity of relaying these reports of
17     election-related disinformation, did that occur
18     through these election command posts in 2022 as
19     well as 2020?
20          A.   Yes.  So to restate, the election command
21     post from 2020, from my recollection, occurred the
22     Friday before the election through Tuesday at
23     midnight.  Then for the midterm elections, we only
24     stood at the command post, I believe, from 8:00
25     a.m. to 10:00 p.m. of election day.
```

**ELVIS CHAN  11/29/2022**

```
 1        Q.    So why was it operating longer in 2020?
 2        A.    Based on our experience in the 2018
 3   midterms, where there was a very low volume of
 4   information that needed to be coordinated, we
 5   assessed that we could do with an actual command
 6   post on Tuesday with people on call on Monday and
 7   on Wednesday who, if needed to, could report and
 8   activate a command post.  This is specifically for
 9   FBI San Francisco.
10        Q.    And this command post was chosen to be --
11   I mean, it addresses nationwide election-related
12   information, right?
13        A.    So every field office, every FBI field
14   office was mandated by headquarters to stand at a
15   command post at least on election day.
16            And FBI San Francisco was responsible for
17   relaying any time, place or manner disinformation
18   or malign-foreign-influence information to the
19   social media companies as well as accepting any
20   referrals from the social media companies.
21        Q.    So FBI San Francisco had the special job
22   of referring concerns to social media companies?
23            MR. SUR:  Objection; vague and ambiguous.
24            THE WITNESS:  Yes, and the reason for that
25   is because the majority of the social media
```

**ELVIS CHAN  11/29/2022**

Page 169

```
 1    companies are headquartered in FBI San Francisco's

 2    territory.

 3       Q.   BY MR. SAUER:  I am going to move to a

 4    different exhibit, I'm sure you'll be happy to

 5    hear.

 6       A.   Well, I spent a lot of time on my thesis.

 7       Q.   Both researching it and testifying about

 8    it today.

 9            Let me -- I am showing you an exhibit --

10            MR. SUR:  Hang on a second.

11            (Reporter marked Exhibit No. 6 for

12             identification.)

13       Q.   BY MR. SAUER:  I am showing you -- can you

14    see this exhibit --

15       A.   Yes.

16       Q.   -- defendants' amended objections and

17    responses on interrogatories?

18            MR. SUR:  Counsel, to clarify, this is

19    Exhibit 6; is that right?

20            MR. SAUER:  Yeah.  We had to go out of

21    order, so I am jumping to Exhibit 6 because they

22    were pre-marked.  I just emailed you this one, but

23    it ought to look familiar.

24       Q.   I just want to jump down to Page 37 of

25    these interrogatory responses.  Down here at the
```

**ELVIS CHAN  11/29/2022**

```
 1    bottom of the page under "DHS," do you see this

 2    here, it begins with a bullet point?

 3        A.   I see a sentence starting with "A

 4    recurring meeting usually entitled USG-industry

 5    meeting."

 6        Q.   Yes, yeah, that paragraphs states "A

 7    recurring meeting usually entitled USG-industry

 8    meeting, which has generally had a monthly cadence,

 9    and is between government agencies and private

10    industry."  Do you see that description?

11        A.   Yes.

12        Q.   The CISA-organized meeting that we have

13    talked about multiple times already, is that

14    usually entitled USG-industry meeting?

15        A.   Based on my recollection, yes.

16        Q.   So this interrogatory response appears to

17    be referring to meetings that we have already

18    talked about today?

19        A.   That is correct, the CISA-facilitated

20    meeting.

21        Q.   It says, "Government participants have

22    included CISA's Election Security and Resilience

23    team, DHS's Office of Intelligence and Analysis,

24    the FBI's foreign influence task force."

25            MR. SUR:  Objection; misstates
```

**ELVIS CHAN  11/29/2022**

Page 171

```
 1   information.
 2        Q.   BY MR. SAUER:  I am asking you if this is
 3   what it says?
 4        A.   This is what it says, and I remember
 5   sharing with you from my memory those were the
 6   participants.  I forgot to mention DOJ National
 7   Security Division, but I do remember that they
 8   sometimes have participants.
 9        Q.   I take it you participated in some of
10   these meetings but not all of them?
11        A.   That is correct.
12        Q.   When did these meetings happen, what
13   years?  Here it just says these monthly cadence
14   meetings occurred.  When did they actually happen?
15             MR. SUR:  Objection; lacks foundation.
16             THE WITNESS:  I can't remember exactly,
17   but I believe they started happening before the
18   2020 election, but I can't remember how far before
19   the 2020 election.
20        Q.   BY MR. SAUER:  So they were -- they -- I
21   guess CISA organized these meetings, I think you
22   said earlier?
23        A.   That is correct, and I was just an
24   attendee.
25        Q.   CISA organized the meetings gearing up
```

**ELVIS CHAN  11/29/2022**

Page 172

```
 1    toward the 2020 election; is that right?
 2        A.    For these USG-industry meetings, yes.
 3        Q.    Were hack-and-dump operations discussed at
 4    these meetings, or hack-and-leak operations?
 5        A.    Yes, they were.
 6        Q.    Tell me what was discussed about them at
 7    these meetings?
 8        A.    The context of hack and dump is what was
 9    the FBI and CISA doing to prevent hack-and-dump
10    operations.  So from the FBI side, I think we
11    already -- I already relayed to you that we had the
12    protective voices initiative.  I can't remember the
13    specifics, but CISA also discussed its
14    cybersecurity awareness efforts as well as grants
15    efforts with the state-, county- and local-level
16    election officials.
17        Q.    Did anyone at these meetings tell the
18    industry participants to expect a Russian
19    hack-and-dump operation or hack-and-leak operation
20    shortly before the 2020 election cycle?
21             MR. SUR:  Objection; lacks foundation.
22             THE WITNESS:  From my recollection, I
23    remember that the FBI warned -- that I or someone
24    from the FBI warned the social media companies
25    about the potential for a 2016-style DNC
```

**ELVIS CHAN  11/29/2022**

Page 173

```
 1   hack-and-dump operation.
 2       Q.    BY MR. SAUER:  What exactly did you say to
 3   the social media companies about that?
 4       A.    Essentially what I just told you.
 5       Q.    You said that there might be a Russian
 6   hack-and-dump operation?
 7       A.    So what I said was although we have not
 8   seen any computer intrusions into national-level
 9   political committees or election officials or
10   presidential candidates at this time, we ask you to
11   remain vigilant about the potential for
12   hack-and-dump operations, or something to that
13   effect.
14       Q.    Did you specifically refer to the 2016
15   hack-and-dump operation that targeted the DCCC and
16   the DNC?
17       A.    I believe I did.
18       Q.    Did you provide any basis to the social
19   media platforms for thinking that such an operation
20   might be coming?
21       A.    The basis was -- my basis was it had
22   happened once, and it could happen again.
23       Q.    Did you have any other specific
24   information other than it had happened four years
25   earlier?
```

**ELVIS CHAN  11/29/2022**

Page 174

```
1             MR. SUR:  Objection in so far as the

2    answer calls for the law enforcement privileged

3    information.

4             You can answer, if you can, without

5    divulging the law enforcement privilege as to any

6    particular investigation.

7             THE WITNESS:  Through our investigations,

8    we did not see any similar competing intrusions to

9    what had happened in 2016.

10            So although from our standpoint we had not

11   seen anything, we specifically, in an abundance of

12   caution, warned the companies in case they saw

13   something that we did not.

14       Q.  BY MR. SAUER:  So did you ask the

15   companies if they had seen any attempts at

16   intrusions or unauthorized access?

17       A.  This is something that we -- that I

18   regularly ask the companies in the course of our

19   meetings.

20       Q.  Did you ask them in these meetings?

21       A.  Not at every meeting, but I believe I

22   asked them at some meetings.

23       Q.  And did you repeatedly warn them at these

24   meetings that you anticipated there might be

25   hack-and-dump operations, Russian-initiated
```

Case 3:22-cv-01213-TAD-KDM    Document 204-1    Filed 03/03/23    Page 175 of 386 PageID #: 10235

**ELVIS CHAN  11/29/2022**

```
 1    hack-and-dump operations?

 2          MR. SUR:  Objection; vague, assumes facts

 3    not on the record.

 4          THE WITNESS:  So repeatedly I would say --

 5    can you -- can you ask your question like -- what

 6    do you mean by "repeatedly"?  Like 100 times, five

 7    times?

 8       Q.   BY MR. SAUER:  Well, did you do it more

 9    than once?

10       A.   I did it more -- yes.  I warned the

11    companies about a potential for hack-and-dump

12    operations from the Russians and the Iranians on

13    more than one occasion, although I cannot recollect

14    how many times.

15       Q.   Did anybody else at the FBI talk about

16    hack-and-dump Russian operations?

17       A.   From my recollection, other senior

18    officials, to include Section Chief Dehmlow, likely

19    mentioned the possibility of hack-and-dump

20    operations.

21       Q.   Do you remember Section Chief Dehmlow

22    mentioning it?

23       A.   I said that I believe she mentioned it on

24    at least one occasion.

25       Q.   What did she say?
```

**ELVIS CHAN  11/29/2022**

```
1        A.    Essentially what I said.  We all said
2   essentially the same thing.
3        Q.    We --
4        A.    Which was --
5        Q.    Go ahead.  Which was?
6        A.    Which was -- which was because the Russian
7   government had hacked a political organization in
8   2016, that if they were able to do so again for the
9   2020 cycle, they would likely do it.
10       Q.    So you had -- you told the social media
11  companies that a hack-and-dump operation was
12  likely?
13            MR. SUR:  Objection; misstates the record.
14            THE WITNESS:  Let me recharacterize it.  I
15  said potentially as opposed to likely.
16       Q.    BY MR. SAUER:  Okay.  Did Ms. Dehmlow say
17  likely?
18       A.    Not to my recollection.  I think she said
19  potentially as well.
20       Q.    You said we all --
21       A.    We all, meaning myself and Ms. Dehmlow.
22       Q.    Were there any other FBI agents at the
23  meeting -- at these meetings?
24       A.    There were.
25       Q.    Who?
```

**ELVIS CHAN  11/29/2022**

Page 177

1      A.    They were GS-14 or under grade employees.

2      **Q.    From the San Francisco office or**

3  **elsewhere?**

4      A.    Both.

5      **Q.    Both, okay.**

6      A.    During -- I'm sorry, let me be more

7  precise.  During the quarterly meetings, there were

8  multiple FBI agents, as I previously mentioned,

9  from both the FBI San Francisco field office as

10  well as other field offices at these meetings.

11      **Q.    Okay.  I think we are talking about two**

12  **different sets of meetings because we started**

13  **talking about the USG-industry meetings, right,**

14  **organized by CISA, correct?**

15      A.    Oh, okay.  You are correct.

16      **Q.    But then there were also the monthly --**

17  **there's quarterly and then monthly and then weekly**

18  **meetings between FBI and social media platforms,**

19  **right?**

20      A.    That's correct.

21      **Q.    And which of those sets of meetings were**

22  **the potentiality for Russian hack-and-dump**

23  **operations discussed?**

24      A.    At the FBI-led meetings with FITF and the

25  social media companies.

Case 3:22-cv-01213-TAD-KDM   Document 204-1   Filed 03/03/23   Page 178 of 386 PageID #: 10238

**ELVIS CHAN  11/29/2022**

Page 178

```
 1        Q.    Okay.  How about at these USG-industry

 2   meetings that were organized by CISA, were

 3   hack-and-dump operations discussed then?

 4        A.    I would say less frequently, but what was

 5   discussed was the potential for Russian

 6   hack-and-dump-style operations.

 7        Q.    Okay.  And who -- was that raised by FBI

 8   or was that raised by others or both?

 9        A.    I can't recollect, but I would say I know

10   at least the FBI mentioned this, specifically in

11   the context of the 2016 DNC hack.

12        Q.    So the FBI, would it be you and

13   Ms. Dehmlow, right?

14        A.    Among others.

15        Q.    So others would have raised that as well

16   at these USG-industry meetings?

17        A.    Others from the FBI attended those

18   meetings.

19        Q.    Did those others raise the issue of

20   Russian hack-and-dump operations?

21        A.    I can't recollect.

22        Q.    Do you know whether they did or didn't?

23        A.    I know that I did.

24             MR. SAUER:  Later, Mr. Sur, I am going to

25   ask for the identities of those participants.  I
```

**ELVIS CHAN  11/29/2022**

1    can ask him now on the record under oath, or you

2    can agree to give them to me in a private -- in a

3    private communication.  Can we agree to do that?

4            MR. SUR:  Just -- just to be clear, are

5    you looking for below the SES level?

6            MR. SAUER:  Yes.  I want the identities of

7    every FBI official who was at the USG-industry

8    meetings referred to in this interrogatory response

9    in 2020.

10           MR. SUR:  Okay.  I will discuss it with

11   the clients obviously.

12           MR. SAUER:  All right.  Then I am asking

13   him now on the record.

14       **Q.   Who was there?  Name the FBI officials who**

15   **were there regardless of their levels?**

16           MR. SUR:  Well, I'm sorry, when you say

17   regardless of the level, can you -- can we provide

18   you part of the name on the record and part of the

19   name off the record?

20           MR. SAUER:  If you're willing to give me

21   the information, which you did not just agree to, I

22   don't have to ask him on the record.  We need the

23   information.  You don't want it on the record.

24   Will you agree to give it to me?  You said, "I have

25   to discuss it with my clients."  I can't reconvene

**ELVIS CHAN  11/29/2022**

Page 180

```
 1   this deposition.  I need the information.  You can

 2   agree to give it to me.  I am going to ask him now

 3   because it is not subject to a protective order.

 4          MR. SUR:  Okay.  If anything, Counsel, a

 5   break would be appropriate.

 6          MR. SAUER:  Okay.

 7          MR. SUR:  So I can -- I'm sorry?

 8          MR. SAUER:  We can go off the record.

 9          MR. SUR:  Okay.

10          THE VIDEOGRAPHER:  Off the record at 2:11

11   p.m.

12             (Whereupon a recess was taken.)

13          THE VIDEOGRAPHER:  Back on the record at

14   2:34 p.m.

15      Q.   BY MR. SAUER:  Back on the record,

16   Mr. Chan, after some discussions off the record.

17             You testified earlier that at these 2020

18   meetings between the FBI and social media platforms

19   where the risk of a Russian hack-and-leak operation

20   was discussed, they were attended by you and

21   Ms. Dehmlow, right?

22      A.   That is correct, on some occasions.  I

23   don't think either of us has attended all of the

24   meetings with the CISA-hosted USG-industry

25   meetings.
```

**ELVIS CHAN  11/29/2022**

Page 181

```
1        Q.   And then there were also the quarterly,
2   monthly, weekly cadence meetings involving just
3   FITF and the social media platforms, right?
4        A.   That is correct, and other FBI field
5   offices to include FBI San Francisco.
6        Q.   And the risk of hack-and-leak operations
7   were raised at both sets of meetings, both at
8   CISA-organized USG-industry meetings and the
9   FITF-organized direct meetings between the FBI and
10  social media platforms, right?
11       A.   Yes.
12       Q.   Okay.  As to the first set of meetings,
13  the CISA-organized USG-industry meetings, other FBI
14  officials besides you and Ms. Dehmlow attended when
15  Russian hack-and-leak operations were discussed,
16  right?
17       A.   That is correct.
18       Q.   Who?
19       A.   So from my recollection, and I don't know
20  who attended which meetings, but I remember being
21  in meetings with the following people:  Brady
22  Olson, William Cone, Judy Chock and Luke Giannini.
23       Q.   Can you say the last name again?
24       A.   Giannini.
25       Q.   Spell it, please.
```

**ELVIS CHAN  11/29/2022**

Page 182

```
 1        A.   I am not sure, but I believe it is
 2   G-i-a-n-n-i-n-i.
 3        Q.   And then the second name was William
 4   Cohen, is that C-o-h-e-n?
 5        A.   Cone, C-o-n-e.
 6        Q.   Like the -- like the shake?
 7        A.   Like an ice cream.
 8        Q.   Any other FBI officials at that set of
 9   meetings where Russian hack-and-leak operations
10   were discussed with social media platforms in 2020?
11        A.   Those are the only people I can remember.
12        Q.   Okay.  Then talk about the other set of
13   meetings, the FITF FBI meetings with social media
14   platforms in -- with the quarterly, then monthly,
15   then weekly cadence, what FBI officials attended
16   those meetings where Russian hack-and-leak
17   operations were discussed?
18        A.   So it's the exact same set of names that I
19   recollect.
20        Q.   Did anyone --
21        A.   I cannot remember what days -- or, you
22   know, which meetings that they attended because
23   William Cone and Wayne Brady both work in the same
24   unit, and I can't remember if they both attended or
25   if one attended or another.  So I can't remember
```

**ELVIS CHAN  11/29/2022**

Page 183

```
 1   when.  I do remember that at some point these
 2   individuals have attended the FBI bilateral
 3   meetings with the social media companies.
 4        Q.   And you said the names are Brady Olson; is
 5   that correct?
 6        A.   Yes.
 7        Q.   Okay.
 8        A.   Olson.
 9        Q.   Is that O-l-s-o-n?
10        A.   Maybe, or it might be s-e-n.  I can't
11   remember.  It's one of those spellings.
12        Q.   William Cone; is that right?
13        A.   Yes.
14        Q.   Judy Chock; is that right?
15        A.   C-o -- I'm sorry, C-h-o-c-k.
16        Q.   And then someone Giannini, right?  What
17   was that person's first name?
18        A.   Luke.
19        Q.   Luke?
20        A.   Luke.
21        Q.   Is that L-u-k-e?
22        A.   I think his full name might be Lucas,
23   L-u-c-a-s, but I refer to him as Luke.
24        Q.   Are all those people from FITF in
25   Washington, D.C.?
```

**ELVIS CHAN  11/29/2022**

Page 184

```
 1      A.   Yes.
 2      Q.   Okay.  What are their -- what are their
 3  titles, do you know?
 4      A.   I do know.  So I believe -- oh, the first
 5  four are unit chiefs, and then Luke is an assistant
 6  section chief.
 7      Q.   What are they unit chiefs of?  Are they
 8  chiefs of like the Russian unit or --
 9      A.   Yeah, correct.
10      Q.   Which one is the section chief, did you
11  say?
12      A.   Assistant section chief.
13      Q.   So that's --
14      A.   Excuse me?
15      Q.   Is that the number two person under
16  Ms. Dehmlow?
17      A.   Yes.
18      Q.   Okay.
19           (Discussion off the record.)
20           THE WITNESS:  Yes, Mr. Luke Giannini is
21  the assistant section chief at the Foreign
22  Influence Task Force.
23      Q.   BY MR. SAUER:  So at FITF, these meetings
24  include, in addition to you, the number one person
25  at FITF, Laura Dehmlow; the number two person at
```

**ELVIS CHAN  11/29/2022**

1  **FITF, Mr. Giannini; and then at least three section**

2  **chiefs at FITF, correct?**

3      A.   No, that's not correct.  Ms. Dehmlow is a

4  section chief.

5      **Q.   Okay.**

6      A.   Mr. Giannini is an assistant section

7  chief, and then the other individuals are unit

8  chiefs.

9      **Q.   Got you.  Did -- did anyone other than you**

10 **or Ms. Dehmlow discuss the possibility or prospect**

11 **of Russian hack-and-leak operations at these**

12 **meetings from the FBI?**

13     A.   I can't recollect if others have said it,

14 but I know that that is something that I would say

15 regularly.

16     **Q.   You said that regularly in these meetings?**

17     A.   Yes.  Not every meeting, but some

18 meetings.

19     **Q.   And does that apply both to the**

20 **USG-industry meetings that had many participants?**

21     A.   I would say for the bilateral FITF

22 meetings, I would have said that because those

23 would have been one of the types of

24 malign-influence campaigns that I would have been

25 focused on.

**ELVIS CHAN  11/29/2022**

Page 186

```
 1              For the DHS USG meetings, I was more of an
 2    attendee and not as active as a speaking
 3    participant.
 4        Q.   Did anyone else at those meetings, the
 5    USG-industry meetings organized by CISA, address
 6    the risk or prospect of Russian hack-and-leak
 7    operations?
 8        A.   I believe they did, but I can't remember
 9    who would have said it.
10        Q.   Would it have been anyone at the FBI?
11        A.   It may have been.
12        Q.   Which one of these people is the head of
13    the Russia unit?
14        A.   Mr. Olson and then after him, Mr. Cone.
15        Q.   Did Mr. Olson or Mr. Cone ever address the
16    risk of a Russian hack-and-leak operation?
17        A.   I don't recollect.
18        Q.   How about Ms. Dehmlow?
19        A.   I don't specifically recollect, but I
20    believe that is something she would have mentioned.
21        Q.   Do you think she raised it at some point
22    in these meetings?
23        A.   Yes.
24        Q.   What did she say about it to your
25    recollection?
```

**ELVIS CHAN  11/29/2022**

Page 187

```
 1        A.    It would have been that the FBI is

 2   concerned about the potential for hack-and-leak or

 3   hack-and-dump operations from foreign

 4   state-sponsored actors, something to that effect.

 5        Q.    Did you discuss within FITF that risk

 6   before you raised it with the social media

 7   platforms?

 8             MR. SUR:  Objection; an internal

 9   deliberation of that sort would be subject to the

10   deliberative process privilege, attorney-client

11   privilege and other privileges.

12        Q.    BY MR. SAUER:  Did anyone at any time

13   discuss that prospect with you or did you raise it

14   on your own?

15             MR. SUR:  Same objection.

16             You can answer insofar as it doesn't

17   involve internal discussions within FITF or

18   discussions with counsel.

19             THE WITNESS:  I would say in general the

20   FBI had internal meetings or discussions or at the

21   very least emails, coordination before the

22   CISA-hosted meetings.

23        Q.    BY MR. SAUER:  So there would be internal

24   discussion within the FBI before the CISA-hosted

25   meetings?
```

**ELVIS CHAN  11/29/2022**

**Page 188**

1    A.   Yes, about what agenda items would be
2    discussed during the meeting.
3         **Q.   In the course of those discussions, did**
4    **anyone suggest to you that you should raise the**
5    **risk of a Russian hack-and-leak operation?**
6         MR. SUR:  Objection; as I said before, it
7    calls for internal deliberations which would be
8    covered by the deliberative process privilege, by
9    the attorney-client privilege and other privileges,
10   including law enforcement.
11        THE WITNESS:  Yeah, I will reiterate in
12   general, we would have internal discussions about
13   what would be discussed in the CISA-hosted meeting.
14        **Q.   BY MR. SAUER:  More specifically, did**
15   **anyone suggest that -- let me ask you this:  You**
16   **raised it at these meetings, right?**
17        A.   I know that I have raised it at the
18   meetings.
19        **Q.   Did you do that on your own accord or did**
20   **anyone else suggest to you that it should be**
21   **raised?**
22        MR. SUR:  Objection; as before, it's
23   covered by multiple privileges, and I am going to
24   instruct the witness not to answer on grounds of
25   deliberative process privilege, attorney-client

**ELVIS CHAN  11/29/2022**

1    privilege, law enforcement privilege, among others.

2       **Q.   BY MR. SAUER:  Are you declining to answer**

3    **the question, sir?**

4       A.   I am reiterating that I recollect

5    mentioning the potential for hack-and-dump

6    operations during the CISA-hosted USG-industry

7    meetings.

8       **Q.   Did you do that solely on your own accord?**

9          MR. SUR:  Same objection as before.

10         MR. SAUER:  That doesn't ask for any

11   communications.  Did he do it solely on his own

12   accord?  Are you instructing him not to answer that

13   question?

14         THE WITNESS:  I cannot recollect.

15      **Q.   BY MR. SAUER:  Okay.  I think we are going**

16   **to make a record on this.**

17         **I am asking you, did anyone within the FBI**

18   **discuss or suggest with you that you should raise**

19   **the prospect of Russian hack-and-leak operations**

20   **with social media platforms in 2020?**

21      A.   I do not recollect.  In the context of the

22   USG-industry CISA-held meetings, I do not

23   recollect.

24      **Q.   How about in the context of the bilateral**

25   **FITF social media platform meetings, in that**

**ELVIS CHAN  11/29/2022**

Page 190

1    context did anyone suggest it to you?

2        A.    So in that context, depending on what was

3    being briefed, without getting into the specific

4    investigations, certain -- as I mentioned

5    previously, certain nation state actors the FBI

6    deemed as potentially being capable of conducting

7    hack-and-leak operations.

8            So at the beginning of the meetings, I

9    would preface and say something to the effect of

10   "We are going to provide you a briefing on this

11   group because they have the potential to conduct

12   hack-and-leak operations like the Russians did in

13   2016."

14       **Q.    Did anyone suggest to you that you should**

15   **raise that concern to the social media platforms at**

16   **any time?**

17       A.    In the context of the FITF meetings with

18   the companies, I flagged that concern because I was

19   generally responsible in coordination with FITF for

20   coming up with the agenda for those meetings with

21   the social media companies.

22       **Q.    So are you saying -- what's your answer to**

23   **my question did anyone -- anyone suggest to you in**

24   **the context of the FITF social media company**

25   **meetings that you should raise the concern about a**

**ELVIS CHAN  11/29/2022**

Page 191

```
 1   Russian hack-and-leak operation?

 2        A.   I do not recollect.  However, I would have

 3   flagged that comment on my own for the reasons I

 4   just stated to you.

 5        Q.   So it is something that you would have

 6   done on your own, but someone might have also

 7   suggested to you to do it; is that fair to say?

 8        A.   They may have, but I don't recollect at

 9   this time.

10        Q.   Returning to the -- returning to the

11   USG-industry CISA-organized meetings, do you recall

12   anyone discussing with you at any time the prospect

13   of Russian hack-and-leak operations in connection

14   with those meetings?

15        A.   Who do you mean?

16        Q.   Anybody.  Did anybody on earth talk to you

17   about raising Russian hack-and-leak operations at

18   those meetings?

19        A.   Do you mean from the social media

20   companies or from the government side?  Because in

21   either case, I don't recollect.

22        Q.   Okay.  How about anyone outside the

23   government, did anyone outside the government

24   discuss the prospect of Russian hack-and-leak

25   operations with you?
```

**ELVIS CHAN  11/29/2022**

**Page 192**

1    A.    I do remember during the CISA-hosted
2    USG-industry meetings that the social media
3    companies would ask the FBI if they were aware of
4    any hack-and-leak operations, and I remember that
5    we would say ahead of the 2020 elections that we
6    were not aware of any hack-and-leak operations, but
7    that there was always the potential for there to be
8    hack-and-leak operations.
9        **Q.    Did the FBI tell the social media**
10   **companies that there would be a specific risk of a**
11   **hack-and-leak operation shortly before the election**
12   **in 2020?**
13       A.    I believe that we did mention that as a
14   possibility shortly before the election, perhaps in
15   the August or October time frame.
16       **Q.    So you mentioned that there -- you**
17   **mentioned that there was a risk that a**
18   **hack-and-leak operation could happen in October?**
19       A.    So to be specific, what we mentioned was
20   that there was the general risk of hack-and-leak
21   operations, especially before the election.
22           However, we were not aware of any
23   hack-and-leak operations that were forthcoming or
24   impending.
25       **Q.    Were you involved in the investigation of**

**ELVIS CHAN  11/29/2022**

Page 193

```
 1    the 2016 DNC hack-and-leak operation?

 2            MR. SUR:  Objection; vague.

 3            THE WITNESS:  What do you mean by

 4    "involved"?

 5       Q.   BY MR. SAUER:  Well, did you have any --

 6    were you in any way involved in that investigation?

 7       A.   Yes.

 8       Q.   What was your involvement?

 9       A.   I was the supervisor for a squad that had

10    an investigation associated with the hack of the

11    DNC and DCCC.

12       Q.   And what was your role in that

13    investigation?  What did your squad do?

14       A.   I was the supervisor for the squad that

15    ran one of the investigations associated with the

16    2016 DNC hack.

17       Q.   What did your squad do in that

18    investigation?

19            MR. SUR:  I am going to object on the law

20    enforcement privilege grounds.  If you can answer

21    the question without discussing any particular

22    investigation or files or contents, you can answer.

23            MR. SAUER:  Before you say that, I am

24    going to read some case law into the record.  The

25    investigative -- the law enforcement privilege
```

**ELVIS CHAN  11/29/2022**

Page 194

```
 1   states, quote, investigative files with ongoing
 2   privilege investigation.  That's from Coughlin
 3   against Lee, 946 F.2d 1152, 1159, Fifth Circuit
 4   1991.  The privilege, quote, is bounded by
 5   relevance and time constraints and it lapses either
 6   at the close of an investigation or at a reasonable
 7   time thereafter based on the particularized
 8   assessment of documents.
 9           We are talking about an investigation that
10   happened six years ago.  Is it your position that
11   you can assert law enforcement privilege with
12   respect to that?  Is my first question.
13           Second one -- I'm not finished yet.
14   Second one is the documents relating to emails
15   relating to his involvement in this investigation
16   are publicly filed in the docket of the case United
17   States against Sussmann.  So there's been a waiver
18   of that by those being publicly filed, in any
19   event.  So now I am going to repeat the question.
20      Q.   What did your squad do when it came to the
21   investigation of the DNC hack-and-leak operation?
22      A.   Can I confer with my counsel before I
23   answer this question?
24      Q.   I want an answer to the question.
25           MR. SUR:  Yeah, so let me just clarify.
```

**ELVIS CHAN  11/29/2022**

Page 195

```
 1    The objection based on law enforcement privilege, I
 2    understand your position about the public
 3    disclosure.  But since you're not limiting your
 4    question to what was in the public record, there
 5    are cases that describe the application of the law
 6    enforcement privilege to techniques that have
 7    future application, including future
 8    investigations.
 9           So I don't think that the mere fact that
10    your question is about a past investigation will
11    overcome the law enforcement privilege concern.
12           MR. SAUER:  Well, why doesn't he answer
13    the question in general terms, and then we'll get
14    into specifics about law enforcement techniques?  I
15    am not really concerned about those.  Can he say it
16    in general terms?
17           THE WITNESS:  Based on the case law you
18    cited, the information I have would be protected
19    under the first.  Because this is an existing and
20    pending -- and active investigation.
21       Q.   BY MR. SAUER:  So you're saying that the
22    2016 DNC server leak investigation is an active
23    criminal investigation?
24       A.   What I am saying is that the investigation
25    of the individuals associated with the DNC hack of
```

**ELVIS CHAN  11/29/2022**

Page 196

```
 1   2016 is an existing and active investigation.
 2       Q.   I thought they were being indicted on
 3   other charges later.  Are you saying that there's
 4   still an active and pending criminal investigation
 5   of the 2016 DNC hack?
 6       A.   I am not saying there is a pending
 7   investigation of the 2016 hack itself.  However,
 8   there is active investigations on the individuals
 9   involved with the 2016 hack.  That case has not
10   been adjudicated.  The individuals have been
11   indicted.  They have not been arrested.  They have
12   not been going through the judicial process.  This
13   is an active investigation.
14              (Reporter marked Exhibit No. 23 for
15              identification.)
16       Q.   BY MR. SAUER:  I am showing you a
17   collective exhibit that we have pre-marked as
18   Exhibit 23.  Do you see this document?
19       A.   Yes.
20       Q.   These are some of your emails that are
21   publicly filed in the case the United States versus
22   Sussmann.  Do you recognize them?
23              MR. SUR:  I'm sorry, may I ask, Counsel,
24   have you sent this to us?
25              MR. SAUER:  Let me email it to you right
```

**ELVIS CHAN  11/29/2022**

Page 197

```
 1   now.  Obviously it wasn't -- we are getting a bit
 2   out of order here.
 3       Q.   Looking at this email, does this refresh
 4   your recollection about what your involvement was
 5   during that investigation?
 6            MR. SUR:  Counsel, may I ask that I
 7   receive the email first so I can pull it up on the
 8   iPad so Mr. Chan can see the exhibit that you are
 9   talking about?
10            MR. SAUER:  Can you see it on the screen
11   share?  The emails were sent to you.
12            MR. SUR:  Okay.  We have this PDF.  May I
13   ask which page you're on?
14            MR. SAUER:  Start on the top page.
15       Q.   Do you see that, the one on the screen
16   share?
17       A.   8:32 a.m. October 4th, yes, I see this
18   email.
19       Q.   And you are being copied on emails lower
20   down from Michael Sussmann at Perkins Coie; is that
21   fair to say?
22       A.   Yes, I have been cc'd.  The email is to
23   another DOJ official.
24       Q.   And then you forward that along to other
25   FBI officials, Patricia Rich and Delynn Hammell.
```

**ELVIS CHAN  11/29/2022**

Page 198

```
 1    Do you see that?
 2        A.   Yes, I see that.
 3        Q.   Do you know why Mr. Sussmann was copying
 4    you on an email about sharing information on a
 5    rolling basis?
 6        A.   Because I was involved with -- I oversaw
 7    the squad that was responsible for one of the
 8    investigations of the 2016 hack of the DNC, and
 9    Mr. Sussmann was their legal representative.
10        Q.   Which squad did you oversee?
11        A.   I oversaw the Russian cyber squad at FBI
12    San Francisco.
13        Q.   And the Russian cyber squad was
14    involved -- was it involved in trying to analyze
15    the DNC server to see how it had been hacked?
16        A.   Yes, that is correct.
17        Q.   And you oversaw that effort?
18        A.   Yes.  I managed the squad responsible for
19    one of the investigations of the DNC hack.
20        Q.   What did that squad -- did that squad
21    investigate the server?
22        A.   We did a triage investigation of the
23    server and then sent it back to headquarters to do
24    a more complete investigation of the server.
25        Q.   What's a triage investigation?
```

**ELVIS CHAN  11/29/2022**

1       A.    Triage in cyber -- cybersecurity context

2    is to try to extract indicators.  As I mentioned

3    before, indicators can be email accounts, IP

4    addresses, other types of electronic indicia that

5    we could serve legal process in order to move our

6    investigation forward.

7       **Q.    Did you find any indicia of that when you**

8    **investigated the server?**

9       A.    I believe we did, but I can't recollect

10   the specific selectors that we discovered.

11      **Q.    Subsequent to -- subsequent to the 2016**

12   **investigation, did you have further communications**

13   **with anyone involved in that investigation about**

14   **the possibility of a recurrence in 2020?**

15      A.    Can you repeat that question?

16      **Q.    Subsequent to the 2016 investigation of**

17   **the hack of the DNC server, did you have any**

18   **communications with anyone involved in that**

19   **investigation about the possibility that a**

20   **hack-and-leak operation could occur before the 2020**

21   **election?**

22            MR. SUR:  Objection; vague.  I also object

23   on the grounds of law enforcement privilege.

24            You can answer to the extent it doesn't

25   implicate any particular investigation.

**ELVIS CHAN  11/29/2022**

**Page 200**

1           THE WITNESS:  Yeah, so I do not remember
2    discussing the potential for a 2020 election with
3    any of the FBI personnel because they had moved on
4    to different roles.
5        Q.   BY MR. SAUER:  How about people outside
6    the FBI?
7        A.   Well, Sean Newell, who is the email
8    recipient on this, is a deputy chief at DOJ
9    National Security Division.  He would have been one
10   of the senior officials I would have consulted
11   with.
12       Q.   Consulted with about what?
13       A.   About potential Russian interference in
14   the 2020 elections.
15       Q.   Did you consult with Sean Newell about the
16   potential for a Russian hack-and-leak operation?
17           MR. SUR:  I am going to renew the
18   objection based on the law enforcement privilege
19   and ask that you not answer insofar as that would
20   disclose the contents of any individual
21   investigation.
22           THE WITNESS:  My recollection was that
23   being the deputy chief at DOJ NSD, Sean Newell
24   would have overview of multiple FBI investigations
25   and would have a broader perspective than my

**ELVIS CHAN  11/29/2022**

Page 201

```
 1    perspective from the field office.

 2           So I would regularly just ask him in

 3    general how things were going and if they were

 4    seeing anything that would be impactful to us at

 5    FBI San Francisco.

 6       Q.    BY MR. SAUER:  So you -- did these

 7    conversations with Sean Newell occur in the lead-up

 8    to the 2020 election?

 9       A.    I don't remember having many conversations

10    with Mr. Newell during the lead-up to the 2020

11    elections.

12       Q.    When did the conversations with Mr. Newell

13    occur?

14       A.    They would have -- I can't recollect

15    specifically.  I regularly have conversations with

16    Mr. Newell outside of the context of Russian

17    disinformation campaigns targeted at the 2020

18    elections.  Because Mr. Newell, as a deputy chief,

19    oversaw all of DOJ's national security cyber

20    investigations.

21       Q.    Did Mr. Newell ever tell you that he

22    expected there might be a Russian hack-and-leak

23    operation before the 2020 election?

24           MR. SUR:  Objection on the grounds of law

25    enforcement privilege, also attorney-client
```

**ELVIS CHAN  11/29/2022**

Page 202

```
 1   privilege, given the functions of Mr. Newell in
 2   this context.  I will ask that the witness answer
 3   only without referring to attorney-client
 4   communications.  For everything in this context you
 5   can't, so...
 6          THE WITNESS:  What I can broadly say is
 7   that we discussed national security cyber
 8   investigations in general, sometimes about Russian
 9   matters, sometimes about other nation state
10   threats.
11      Q.  BY MR. SAUER:  Let me ask the question
12   more specifically.  Prior to the 2020 election
13   cycle, did anyone suggest to you that there would
14   be -- or that there might be a Russian
15   hack-and-leak operation prior to the 2020 election?
16          MR. SUR:  So I am going to object on the
17   grounds of law enforcement privilege and
18   attorney-client and all other privileges.
19          You can answer insofar as it doesn't
20   disclose the contents of any particular
21   investigation.
22      Q.  BY MR. SAUER:  Okay.  I want an answer,
23   and I want to know whether you're withholding
24   information in response to your client's
25   instruction.  He keeps instructing you
```

**ELVIS CHAN  11/29/2022**

```
 1   conditionally, and then you keep providing vague
 2   responses.
 3            I want to know are you, in fact,
 4   withholding information from me in response to my
 5   question as a result of that instruction.  Did
 6   anyone discuss that with you?
 7        A.   I am not --
 8        Q.   That is not going to get into the content
 9   of any -- content of any communications.  I just
10   want to know did anyone discuss with you the
11   prospect of a Russian hack-and-leak operation
12   before the 2020 election?
13        A.   So no, I do not recollect.  The reason for
14   that is I don't recollect any specific person
15   discussing that with me.
16            However, based on both my experience as
17   well as my knowledge of active investigations, I
18   would have believed -- as my own assessment, I
19   believe that there was the potential for
20   hack-and-leak operations ahead of the 2020
21   elections.
22            I believe that there was the potential for
23   hack-and-leak operations ahead of the 2022
24   election, and I believe that there is the potential
25   for Russian hack-and-leak operations ahead of the
```

**ELVIS CHAN  11/29/2022**

**Page 204**

 1    2024 elections.

 2        Q.    In particular, you relayed that belief to

 3    the social media platforms on multiple occasions in

 4    two sets of meetings in 2020, correct?

 5        A.    That is correct.

 6        Q.    And that includes the USG-industry

 7    meetings organized by CISA, correct?

 8        A.    Yes, I believe so.

 9        Q.    And it includes the FITF organized

10    meetings with the individual social media

11    platforms, correct?

12        A.    Yes.

13        Q.    Did any -- did the social media platforms

14    respond to that, your communications that indicate

15    that they were taking any steps with respect to any

16    Russian hack-and-leak operations?

17            MR. SUR:  Objection; vague.

18            THE WITNESS:  So in general, I believe

19    that the companies were actively looking for

20    hack-and-leak operations, and I don't know the

21    types of technology that they use, but I believe

22    they use -- they tried to use detection methods

23    that would find whatever hacked materials were put

24    or uploaded onto their platforms.

25        Q.    BY MR. SAUER:  Did they ever tell you that

**ELVIS CHAN  11/29/2022**

**Page 205**

1  **they were taking any action with respect to any**

2  **content posted on social media because of a concern**

3  **about a hack-and-leak operation?**

4      A.   So from my recollection, I remember -- I

5  can't remember which social media companies, but

6  some social media companies adjusted or updated

7  their terms of service or their community standards

8  to say that they would not post any hacked

9  materials.  I believe the reason would be due to

10  privacy issues of the victim.  But I can't

11  recollect which company said that.

12      Q.   **When did those updates occur, do you**

13  **recall, before the 2020 election?**

14      A.   Before the 2020 elections, but I can't

15  remember when.  I believe -- I believe the impetus

16  was in case there was a 2016-style hack-and-leak

17  operation.

18      Q.   **So is that -- was that a concern that you**

19  **raised to them specifically that there might be a**

20  **recurrence of a 2016 style hack-and-leak operation?**

21      A.   So I have raised that concern, but I

22  believe independently they had similar concerns.

23      Q.   **And in the same time frame that you were**

24  **raising that concern, some of them updated their**

25  **terms of service to prohibit the posting of hacked**

**ELVIS CHAN  11/29/2022**

Page 206

```
 1    materials?

 2         A.   I believe so.

 3         Q.   Did you ever discuss updating their terms

 4    of service with them or suggested it to them?

 5         A.   I never suggested it to them.  The only

 6    context we would bring up terms of service is that

 7    we wanted to know if they had changed their terms

 8    of service or modified it, and we wanted to know

 9    what they had changed.

10         Q.   Did they advise you that they had changed

11    it to reflect the ability to pull down content that

12    results from hack operations?

13         A.   Yes.

14         Q.   And that occurred at some time after you

15    had raised these concerns with them?

16         A.   Some time after 2016, but before 2020.  So

17    unfortunately I can't remember when they would have

18    updated it, but I do remember learning about their

19    terms of service updates.

20         Q.   During 2020 do you recall anyone at the

21    FBI discussing with you the prospect of a

22    hack-and-leak operation?

23         A.   I believe that we internally discussed the

24    potential for hack-and-leak operations, and so I

25    regularly was in communication with the cyber
```

**ELVIS CHAN  11/29/2022**

1   division of the FBI as well as with the Foreign

2   Influence Task Force to see if they had heard of

3   anything that I had not heard of.

4          So I would say that the people that I

5   communicate with, everyone was vigilant, but no

6   one -- I believe that in general people at the FBI

7   were concerned about the potential for

8   hack-and-leak operations, but that we had not seen

9   any investigations that led in that direction or

10  that would lead us in that direction.

11      **Q.   Who are the people at the cybersecurity**

12  **division that you referred to?**

13      A.   So cyber division -- I can't even remember

14  the individuals now.  And the reason for that is

15  they tend to rotate -- they rotate out every 18

16  months.

17      **Q.   How about FITF, who are the individuals at**

18  **FITF that discussed the concern with you?**

19      A.   So it was the three individuals that I

20  mentioned to you -- I'm sorry, the four individuals

21  that I have mentioned to you.  Specifically,

22  Ms. Dehmlow, Mr. Olson, Mr. Cone and then

23  Mr. Giannini.

24      **Q.   And did all of those people express to you**

25  **a concern about the possibility of a Russian**

**ELVIS CHAN   11/29/2022**

**Page 208**

```
 1    hack-and-leak operation?
 2            MR. SUR:  Objection; mischaracterizes his
 3    testimony.
 4            THE WITNESS:  From my recollection, we all
 5    shared the same concern for the potential for there
 6    to be a hack-and-leak operation.
 7       Q.   BY MR. SAUER:  Did you have any basis for
 8    that other than the fact that one had occurred in
 9    2016?
10       A.   My basis for that was the hack-and-dump
11    operation in 2016 as well as our knowledge of the
12    skills of the Russian hackers who were involved.
13       Q.   Any other basis besides that?
14       A.   No.  Those were the two primary reasons
15    driving our concern.
16       Q.   In 2020 did you ever discuss the
17    possible -- or did anyone discuss with you the
18    possibility of a Russian hack-and-leak operation
19    before the 2020 election from outside the FBI other
20    than legal counsel?
21       A.   I believe that the companies would
22    regularly ask if the FBI was aware of any
23    hack-and-leak operations ahead of the 2020
24    elections.  We were not aware of any hack-and-leak
25    operations.
```

**ELVIS CHAN  11/29/2022**

Page 209

```
1              However, as I mentioned, we would provide
2    briefings about nation state groups that
3    potentially had the capability of conducting
4    hack-and-leak operations.
5         Q.   Okay.  Other than the social media
6    platforms, anybody else discuss that with you?
7         A.   Not to my recollection.  Up.  Not to my
8    recollection.
9         Q.   You said "up"?
10        A.   "Up" because we had already mentioned the
11   FBI employees.  We mentioned the social media
12   companies.  The reason I said "up" is because
13   technically Microsoft is not a social media
14   company.
15        Q.   Did Microsoft discuss it with you?
16        A.   During the -- they discussed their concern
17   during the CISA-hosted USG-industry meetings.
18        Q.   What did they say?
19        A.   I think -- I can't recall exactly, but
20   they shared the same sentiment about being
21   concerned for a potential Russian hack-and-leak
22   operation.
23        Q.   Who said that?
24        A.   The individual from Microsoft, his first
25   name is Jan, J-a-n, but I can't remember his last
```

**ELVIS CHAN  11/29/2022**

**Page 210**

1  -- I can't remember how to -- his last name, or

2  even how to spell it.

3      **Q.    Antonaros, something like that?**

4      A.    Maybe.  I definitely remember his first

5  name was Jan, and he had a last name that I am not

6  familiar with.

7      **Q.    Does it begin with an A-n-t?**

8      A.    That doesn't sound familiar.  It feels

9  like it was a Scandinavian name, like Stevrud or

10  something.  I don't remember why, but for some

11  reason I thought it sounded Scandinavian.

12      **Q.    Did any other social media platform**

13  **discuss these things in the USG-industry meetings?**

14          MR. SUR:  Objection; vague.

15      **Q.    BY MR. SAUER:  Did any other social media**

16  **platforms discuss the prospect of having these**

17  **operations, or hack-and-dump operations in the**

18  **USG-industry meetings?**

19      A.    I would say not to my recollection because

20  the primary individuals who spoke from the social

21  media companies were the three companies that I

22  previously referred to you, which is Facebook,

23  Google and Twitter and then Microsoft.  Those were,

24  from my recollection, the four companies that spoke

25  the most frequently.  If individuals or

**ELVIS CHAN  11/29/2022**

1   representatives from the other companies spoke, I

2   don't recall what they said.

3       **Q.   Did Facebook, Twitter or YouTube/Google**

4   **representatives address this issue at all of the**

5   **prospect of hack-and-leak operations?**

6       A.   So during the CISA USG-industry meetings,

7   I believe that those companies regularly flagged

8   this as a concern at each meeting, or at least at

9   most meetings they would ask if the U.S. government

10  had any information about potential hack-and-leak

11  operations.

12      **Q.   How about other government agencies**

13  **outside the FBI at these meetings, the USG-industry**

14  **meetings, did any of them discuss the risk or**

15  **prospect of Russian hack-and-leak or hack-and-dump**

16  **operations?**

17      A.   So from my recollection, CISA would

18  discuss it from the standpoint of cybersecurity.

19  Namely if an organization or individual has good

20  cybersecurity, that will minimize the risk of being

21  hacked.  So that was their standpoint.  So they

22  were focused on cybersecurity and infrastructure

23  protection.

24      **Q.   Who is "they"?  What individuals were**

25  **saying this?**

**ELVIS CHAN  11/29/2022**

Page 212

```
 1      A.   So as I mentioned to you before, the only
 2  individuals I remember who regularly spoke at these
 3  meetings were Mr. Masterson and Mr. Scully.
 4      Q.   And those individuals discussed how to
 5  defend against hacking operations?
 6      A.   Yes.
 7      Q.   Did they specifically say that they
 8  anticipated or there was a risk that there might be
 9  Russian hack-and-leak operations before the 2020
10  election?
11      A.   I don't specifically recall, but that
12  sounds like something that they would have the
13  general -- they would have the same concern or
14  similar concern that I have.
15      Q.   They might -- you believe they expressed
16  that concern in these meetings?
17      A.   I do not recall any specific situations
18  where they did, but that, I believe, is something
19  that they may have discussed.
20      Q.   And that would include both Mr. Masterson
21  and Mr. Scully, to your recollection?
22      A.   Yes.
23      Q.   Were you aware in 2020 that the FBI had
24  Hunter Biden's laptop in its possession?
25           MR. SUR:  Objection; lacks foundation,
```

**ELVIS CHAN  11/29/2022**

Page 213

```
 1   calls for speculation.

 2        Q.   BY MR. SAUER:  Did you know it at the

 3   time?

 4        A.   I was only aware when news media outlets

 5   posted it, or published it.

 6        Q.   Was Hunter Biden referred to in these

 7   meetings in any way?

 8        A.   Hunter Biden was not -- in my

 9   recollection, Hunter Biden was not referred to in

10   any of the CISA USG-industry meetings.

11        Q.   How about the FITF social media company

12   meetings?

13        A.   From my recollection, one meeting with

14   Facebook after the regular agenda had been

15   completed, one of the Facebook analysts asked if

16   the FBI had any information they could share about

17   the Hunter Biden investigation.

18             To that I recall Ms. Dehmlow saying that

19   the FBI had no comment.

20        Q.   Would that have been before or after the

21   big -- the big news story broke on October 14th of

22   2020?

23             MR. SUR:  Objection; lacks foundation.

24             THE WITNESS:  I am not certain, but I

25   believe that it would have had to have been after
```

```
 1   the news story broke because I don't know if it was
 2   publicly known then.
 3       Q.    BY MR. SAUER:  Do you know that in 20- --
 4   so you remember sometime in 2020 a Facebook analyst
 5   asked the FBI to comment on the status of the
 6   Hunter Biden investigation?
 7       A.    That's correct.
 8       Q.    And you believe that this occurred after
 9   there had been, you know, a New York Post article
10   about the contents of the laptop that you referred
11   to -- I think you referred to earlier you finding
12   out about it that way, right?
13       A.    Yeah, I only found out through news media.
14   I have no internal knowledge of that investigation,
15   and yeah, I believe that it was brought up after
16   the news story had broke.
17       Q.    And so the -- what did the Facebook
18   analyst ask Ms. Dehmlow?  Did they ask, you know,
19   "Hey, we have the story.  Can you confirm it," or
20   what did they ask?
21       A.    Yeah, they just -- I can't remember the
22   exact question, but I believe the investigator
23   asked if the FBI could provide any information
24   about the Hunter Biden investigation.
25       Q.    Did they refer to the laptop in particular
```

**ELVIS CHAN  11/29/2022**

**Page 215**

1    that had been the subject of the news stories?

2       A.    I can't recall.

3       **Q.    And what did Ms. Dehmlow respond?**

4       A.    She said no comment.  She said something

5    to the effect that the FBI has no comment on this.

6       **Q.    Did she indicate why the FBI declined to**

7    **comment?**

8       A.    Yes.  It was because -- at the time I do

9    not believe that we had confirmed that it was an

10   active -- we had -- at the time we had not

11   confirmed that the FBI was actually investigating

12   Hunter Biden.  So she did not have the authority to

13   say anything or to comment about it.

14      **Q.    Did she know at the time that the FBI had**

15   **the laptop and that the contents had not been**

16   **hacked?**

17          MR. SUR:  Objection; calls for speculation

18   and gets into law enforcement privilege.

19      **Q.    BY MR. SAUER:  To your knowledge?**

20      A.    I have no idea.  I never asked her, and

21   she never told me.

22      **Q.    Did Hunter Biden come up with any other**

23   **social media platforms during 2020?**

24      A.    Not to my knowledge.

25      **Q.    Do you recall any mention of Hunter Biden**

**ELVIS CHAN  11/29/2022**

```
 1   at any meetings with any social media platforms?

 2        A.    No.  It stood out because that Facebook

 3   meeting was the only one where an individual from

 4   one of the companies even asked about it.

 5        Q.    You're confident that Hunter Biden did not

 6   come up at any other meetings between federal

 7   government officials and social media platforms in

 8   2020?

 9        A.    I was confident that I was not a party to

10   any meeting with social media companies where

11   Hunter Biden was discussed outside of the one

12   incident that I told you about.

13        Q.    That was the one where it was a FITF

14   Facebook meeting where the analyst asked

15   Ms. Dehmlow and she refused to comment, correct?

16        A.    That is correct.  That is correct.

17              MR. SAUER:  I am going to show you a new

18   exhibit, Exhibit 8.

19              Counsel, I just emailed it to you, too.  I

20   will put it up on screen share, and it will be

21   familiar to you.

22                  (Reporter marked Exhibit No. 8 for

23                   identification.)

24        Q.    BY MR. SAUER:  Do you see this document

25   here?
```

**ELVIS CHAN  11/29/2022**

Page 217

```
 1      A.   It says the "Declaration of Yoel Roth."

 2      Q.   Do you know Yoel Roth?

 3      A.   Yes.  I mentioned to you -- mentioned him

 4  to you previously.  He was the head of site

 5  integrity at Twitter.

 6      Q.   And it says that's a trust and safety

 7  department, correct?

 8      A.   Well, it says it is a site integrity team

 9  which assesses content posted to Twitter to

10  determine whether it violates the company's

11  policies.  So in general, that would be construed

12  as a trust and safety role.

13      Q.   So in other words, he is -- has

14  responsibility for content modulation at Twitter,

15  or he at least did at the time of this declaration?

16      A.   Yes, I believe so.

17      Q.   In fact, your committee worked with him in

18  that role, which he had until very, very recently,

19  right?  Just a couple weeks ago, right?

20      A.   Until the day after the election.

21      Q.   I am going to direct your attention to

22  Paragraph 10 in this declaration.  You see where it

23  says in Paragraph 10, "Since 2018, I have had

24  regular meetings with the" ODNI, "the Department of

25  Homeland Security, the FBI and industry peers
```

**ELVIS CHAN  11/29/2022**

Page 218

```
 1    regarding election security"?  Do you see that?
 2         A.   Yeah, Paragraph 11?
 3         Q.   Paragraph 10.
 4         A.   I'm sorry, Paragraph 10.  Yes, I see that.
 5         Q.   Do you know what regular meetings he's
 6    referring to in that paragraph?  Is that the
 7    CISA-organized USG-industry meetings or is there
 8    other meetings as well?
 9         A.   I am not sure, but from my interpretation
10    of this document, it would be in the context of the
11    CISA-hosted USG-industry meeting.  Because I never
12    hosted a meeting with those U.S. government
13    components.
14         Q.   So let me ask you this:  Are you aware of
15    any meetings involving Twitter with ODNI, DHS and
16    the FBI and other social media platforms?
17         A.   Only in the context of the CISA-hosted
18    USG-industry meetings.
19         Q.   So the only meetings that you're aware of
20    that this Paragraph 10 could be referring to are
21    those USG-industry meetings that we have been
22    talking about organized by CISA?
23         A.   That is my belief.
24         Q.   Paragraph 11, "During these weekly
25    meetings, the federal law enforcement agencies
```

**ELVIS CHAN  11/29/2022**

**Page 219**

1  communicated that they expected 'hack-and-leak

2  operations' by state actors might occur in the

3  period shortly before the 2020 presidential

4  election, likely in October."  Do you see that?

5      A.   Yes.

6      Q.   Is that consistent with your recollection

7  that the communications at the 2020 USG-industry

8  meetings organized by CISA, that state actors, I

9  take it he means foreign governments, might

10  perpetrate hack-and-leak operations in a period

11  shortly before the 2020 presidential election?

12      A.   Yeah, so the weekly meetings would have

13  occurred like very shortly before.  Like we did

14  not switch to a weekly cadence until maybe six

15  weeks from the election, around then, maybe six or

16  eight weeks.  It was a very short weekly meeting.

17          I do believe -- as I mentioned previously,

18  I don't remember who.  I do remember myself

19  mentioning a concern for that, but it was mentioned

20  that there was the potential for hack-and-leak

21  operations.

22      Q.   And so that first sentence you agree with

23  basically that people did say that to Twitter in

24  these meetings, that foreign state actors might do

25  a hack-and-leak operation in the period shortly

**ELVIS CHAN  11/29/2022**

**Page 220**

1  before the 2020 presidential election; is that fair
2  to say?
3      A.   Yes.  During the CISA USG-industry
4  meetings.
5      Q.   You're saying those obtained a weekly
6  cadence in the six to eight weeks before that
7  actual election in 2020?
8      A.   Yes.
9      Q.   Okay.  In those meetings, I take it likely
10  in October, was that relayed to Twitter and the
11  other industry participants?
12     A.   I can't remember specifically, but it
13  would have made sense for the meetings to
14  definitely have occurred on a weekly basis in
15  October ahead of the elections in November.
16     Q.   And did the federal officials in those
17  meetings convey that they expected that
18  hack-and-leak operations might occur shortly before
19  the election, likely in October?
20     A.   So I wouldn't have used the word
21  "expected."  I would have used the word "concern"
22  about potential hack-and-leak operations.  The
23  reason I say that is because we were not aware of
24  any hack-and-leak operations that were pending.
25     Q.   Okay.  He goes on to say in the next --

**ELVIS CHAN  11/29/2022**

**Page 221**

1    let me ask you this:  Did you express that concern

2    would be, quote, likely in October?

3        A.   I would say possible in October.

4        Q.   He refers to the federal law enforcement

5    agencies, plural, in that sentence.  Do you see

6    that?

7        A.   Yes.

8        Q.   And other federal law enforcement agencies

9    other than the FBI also convey an expectation or

10   concern that Russian hack-and-leak operations would

11   occur shortly before the 2020 election?

12       A.   Not to my -- not to my knowledge.

13       Q.   So the only agency you recall conveying

14   that information is the FBI?

15       A.   The only federal law enforcement agency I

16   remember conveying our concern was the FBI.

17       Q.   How about any other agency?

18       A.   As I mentioned, I believe CISA would have

19   had the same concern as the FBI.

20       Q.   And that was relayed through Mr. Masterson

21   and Mr. Scully, I think you said, correct?

22       A.   Correct.

23       Q.   Any other agencies or federal officials

24   raise those concerns other than you, Ms. Dehmlow,

25   Mr. Masterson and Mr. Scully?

**ELVIS CHAN  11/29/2022**

**Page 222**

1      A.   I believe that the senior election
2   official from ODNI would also have flagged that as
3   a concern.  Because that was a concern across the
4   entire U.S. government.
5      **Q.   Who is that?**
6      A.   At the time the senior election official
7   was Shelby Pierson.
8      **Q.   What did Mr. -- is that Mr. or Ms.?**
9      A.   Ms., Ms. Pierson.
10      **Q.   What did Ms. Pierson say about that**
11   **concern for the social media platforms in these**
12   **meetings?**
13      A.   I don't recall what she exactly said, but
14   the sentiment would have been similar to what I
15   already conveyed, which is that I was concerned
16   about the potential for hack-and-leak operations.
17   However, we were not aware of any pending
18   hack-and-leak operations.  I believe she would have
19   shared the same sentiment.
20      **Q.   Do you remember anything specific about**
21   **what she said?**
22      A.   I don't.
23      **Q.   Mr. Roth in the affidavit goes on to say,**
24   **"I was told in these meetings that the intelligence**
25   **community expected that individuals associated with**

**ELVIS CHAN  11/29/2022**

**Page 223**

```
 1    political campaigns would be subject to hacking

 2    attacks and that material obtained through those

 3    hacking attacks would likely be disseminated over

 4    social media platforms, including Twitter."  Do you

 5    see that?

 6        A.   Yes.

 7        Q.   Do you remember that occurring, that --

 8    people in the intelligence community relaying that

 9    they expected attacks on individuals associated

10    with political campaigns and that the material

11    obtained would be disseminated over Twitter?

12        A.   So my recollection is different from

13    Mr. Roth's.  Not that the intelligence community

14    expected that individuals associated with political

15    campaigns would be subject to hacking attacks, but

16    that there was the potential for individuals

17    associated with political campaigns.

18             The reason I say that is because I and the

19    individuals I work with at FITF, we were not aware

20    of any successful hacks into any political

21    organizations or campaigns at the same time of

22    these meetings.

23        Q.   How about in the intelligence community?

24    You know, I take it that may refer to ODNI --

25        A.   Yeah.
```

**ELVIS CHAN  11/29/2022**

**Page 224**

```
 1        Q.   -- is Mr. Roth accurately describing what
 2    they said in these meetings?
 3             MR. SUR:  Objection; calls for
 4    speculation.
 5             THE WITNESS:  Yeah, I don't know what
 6    Mr. Roth meant or meant, but what I'm letting you
 7    know is that from my recollection -- I don't
 8    believe we would have worded it so strongly to say
 9    that we expected there to be hacks.  I would have
10    worded it to say that there was the potential for
11    hacks, and I believe that is how anyone from our
12    side would have framed the comment.
13             And the reason I believe that is because I
14    and the FBI, for that matter the U.S. intelligence
15    community, was not aware of any successful hacks
16    against political organizations or political
17    campaigns.
18        Q.   BY MR. SAUER:  You don't think that
19    intelligence officials described it in the way that
20    Mr. Roth does here in this sentence in the
21    affidavit?
22        A.   Yeah, I would not have -- I do not believe
23    that the intelligence community would have expected
24    it.  I said that they would have been concerned
25    about the potential for it.
```

**ELVIS CHAN  11/29/2022**

Page 225

```
 1        Q.    How about the second half of the sentence
 2   here where he says that he was told in these
 3   meetings that material obtained through those
 4   foreign hacking attacks would likely be
 5   disseminated over social media platforms, including
 6   Twitter, do you recall that being discussed in the
 7   meetings?
 8        A.    Yeah, so if you're going to break it up
 9   into two parts like that, if there were a
10   successful hack, that is what the intelligence
11   community and I both think would happen.
12        Q.    Did you relay that to them, that if there
13   were a successful hack, they would likely relay the
14   hacked materials over social media platforms
15   including Twitter?
16        A.    I don't remember if I relayed that, but I
17   do agree with Mr. Roth's statement, that if there
18   was a hack, that that would be a method to
19   disseminate the information.
20        Q.    And that particular concern was relayed to
21   social media platforms in these meetings?
22        A.    Yes, you are correct.
23        Q.    He goes on to say, "These expectations of
24   these hack-and-leak operations were discussed
25   throughout 2020."  Do you see that?
```

**ELVIS CHAN  11/29/2022**

Page 226

```
 1        A.    Yes.

 2        Q.    What -- was that, in fact, true that all

 3   throughout 2020 there were discussions of these

 4   concerns about hack-and-leak operations?

 5        A.    So I would not have used the word

 6   "expectation."  As I characterized it to you

 7   before, we regularly discuss the potential for

 8   nation state actors to conduct hack-and-leak

 9   operations.  And we provided briefings on the

10   specific nation state actors that we believe who

11   were potentially capable of conducting these types

12   of operations.

13        Q.    That would include Russia, I presume?

14        A.    Yes.

15        Q.    And you -- so in the briefings you

16   provided to them, you brief them on your

17   understanding that Russia was capable of conducting

18   those hack-and-leak operations?

19        A.    Yes.

20        Q.    Do you brief them on your concerns that

21   those might occur in the 2020 election cycle in

22   connection with those briefings as well, correct?

23        A.    Yeah, from my recollection, "might" is a

24   more appropriate word than "expected."

25        Q.    So you feel like you said "might," and
```

**ELVIS CHAN  11/29/2022**

Page 227

1   **Mr. Roth feels like he was told they were**

2   **"expected"; is that fair to say?**

3       A.   Well, he wrote that -- well, in this

4   deposition he provided, he said "expected," but I

5   don't remember the language being so strong from --

6   from me or from any FBI officials.

7       **Q.   I want to direct your sentence to the next**

8   **page -- sentence.  He says, "I also learned in**

9   **these meetings that there were rumors" of a**

10  **hack-and-leak -- "that a hack-and-leak operation**

11  **would involve Hunter Biden," right, you see that?**

12      A.   Yes.

13      **Q.   Do you remember -- what's he referring to**

14  **there, to your recollection?**

15      A.   So from my recollection, the social media

16  companies, who include Twitter, would regularly ask

17  us, "Hey, what kind of content do you think the

18  nation state actors, the Russians would post," and

19  then they would provide examples.  Like, "Would it

20  be X" or "Would it be Y" or "Would it be Z."  And

21  then we -- I and then the other FBI officials would

22  say, "We believe that the Russians will take

23  advantage of any hot-button issue."

24           And we -- I do not remember us

25  specifically saying "Hunter Biden" in any meeting

**ELVIS CHAN  11/29/2022**

Page 228

 1    with Twitter.

 2         Q.    Mr. Roth says in his sworn declaration he

 3    learned in these meetings, and I take it we are

 4    still talking about these weekly meetings, USG

 5    industry CISA-organized meetings, he learned in

 6    these meetings that there were rumors that a

 7    hack-and-leak operation would involve Hunter Biden,

 8    right?  That's what he said in his sworn

 9    declaration, right?

10         A.    Yes, I see that's what he said.

11         Q.    And do you have any reason to doubt the

12    veracity of what he said?

13         A.    I would interpret what he said

14    differently.

15         Q.    How would you interpret what he said when

16    he says he learned that there were rumors that a

17    hack-and-leak operation would involve Hunter Biden?

18    What do you think he's referring to?

19              MR. SUR:  Objection; calls for

20    speculation.

21              THE WITNESS:  Yeah, in my estimation, we

22    never discussed Hunter Biden specifically with

23    Twitter.  And so the way I read that is that there

24    are hack-and-leak operations, and then at the

25    time -- at the time I believe he flagged one of the

**ELVIS CHAN  11/29/2022**

Page 229

1  potential current events that were happening ahead

2  of the elections.

3      **Q.    BY MR. SAUER:  You believe that he, Yoel**

4  **Roth, flagged Hunter Biden in one of these**

5  **meetings?**

6      A.    No.  I believe -- I don't believe he

7  flagged it during one of the meetings.  I just

8  think that -- so I don't know.  I cannot read his

9  mind, but my assessment is because I don't remember

10  discussing Hunter Biden at any of the meetings with

11  Twitter, that we didn't discuss it.

12          So this would have been something that he

13  would have just thought of as a hot-button issue on

14  his own that happened in October.

15      **Q.    So you think that where he says he learned**

16  **in the meetings that there were rumors that a**

17  **hack-and-leak operation would involve Hunter Biden,**

18  **you don't recall any basis for that actually being**

19  **discussed in the meetings?**

20      A.    That is correct.

21      **Q.    Paragraph 12 goes on to say that "On**

22  **October 14, 2020, I learned from media coverage**

23  **that the New York Post had posted the articles to**

24  **its website that morning containing emails and**

25  **other personal materials found on a hard drive that**

**ELVIS CHAN  11/29/2022**

Page 230

```
 1     allegedly belonged to Hunter Biden."  Do you see
 2     that?
 3          A.   Yes, Paragraph 12.
 4          Q.   There's that reference to those articles
 5     that you referred to earlier, correct?
 6          A.   Correct.
 7          Q.   It's your testimony that those news
 8     articles are the first time that you became aware
 9     that -- you became aware of Hunter Biden's laptop
10     in any connection?
11          A.   Yes.  I don't remember if it was a New
12     York Post article or if it was another media
13     outlet, but it was on multiple media outlets, and I
14     can't remember which article I read.
15          Q.   And before that day, October 14th, 2020,
16     were you aware -- were you aware of Hunter Biden --
17     had anyone ever mentioned Hunter Biden's laptop to
18     you?
19          A.   No.
20          Q.   The next paragraph Mr. Roth says, "The
21     site integrity team preliminarily determined that
22     the information in the articles," the New York Post
23     articles, "could have been obtained through
24     hacking, based on, among other things, the type of
25     material, the sourcing described in the articles,
```

**ELVIS CHAN  11/29/2022**

Page 231

1   and the information security community's initial

2   reactions."  Do you see that?

3       A.   Yes.

4       Q.   Do you know what he's referring to in that

5   last bit where he talks about the information

6   security community's initial reactions?

7            MR. SUR:  Objection; calls for

8   speculation.

9            THE WITNESS:  I do not know.

10      Q.   BY MR. SAUER:  Do you know -- what is the

11  information security community?

12      A.   So I don't know specifically that

13  reference that he's using, but there is -- you

14  know, I -- my assessment is that he's talking

15  broadly about the American information security

16  industry, but I don't know.

17      Q.   Does that include the FBI?

18           MR. SUR:  Objection; calls for

19  speculation.

20           THE WITNESS:  So I don't know.  However, I

21  do not believe that involves the FBI.  To me when I

22  read that, this is the first time I am reading that

23  paragraph, it sounds like he is talking about the

24  private sector information security community.

25      Q.   BY MR. SAUER:  He goes on to talk about

**ELVIS CHAN  11/29/2022**

Page 232

1    how Twitter ended up essentially blocking the

2    articles from being shared on its platform and

3    suspending the New York Post's Twitter accounts.

4              Generally without getting into the

5    details, are you generally familiar with the fact

6    that Twitter took steps to reduce the distribution

7    of the Hunter Biden laptop story on its platforms?

8        A.   Yeah, yeah, the extent of the information

9    that I learned was exactly what you just described.

10   I have no other knowledge of that.

11       Q.   Okay.  So right here at Paragraph 17 he

12   says, "The Site Integrity Team blocked Twitter

13   users from sharing links over Twitter to the

14   applicable New York Post articles and prevented

15   users who had previously sent tweets sharing those

16   articles from sending new tweets until they deleted

17   the tweets violating Twitter's policies," correct?

18       A.   So that is what he wrote, but I am not

19   aware of the specific details of the actions that

20   they took until you just read that paragraph to me

21   today.

22       Q.   Do you know if anyone at Twitter reached

23   out to anyone at the FBI to check or verify

24   anything about the Hunter Biden story?

25       A.   I am not aware of any communications

**ELVIS CHAN  11/29/2022**

Page 233

```
1    between Yoel Roth and the FBI about this topic.
2         Q.   Are you aware of any communications
3    between anyone at Twitter and anyone in the federal
4    government about the decision to suppress content
5    relating to the Hunter Biden laptop story once the
6    story had broken?
7              MR. SUR:  Objection; lacks foundation.
8              THE WITNESS:  I am not aware of Mr. Roth's
9    discussions with any other federal agency.  As I
10   mentioned, I am not aware of any discussions with
11   any FBI employees about this topic as well.  But I
12   only know who I know.  So I don't -- he may have
13   had these conversations, but I was not aware of it.
14        Q.   BY MR. SAUER:  You mentioned Mr. Roth.
15   How about anyone else at Twitter, did anyone else
16   at Twitter reach out, to your knowledge, to anyone
17   else in the federal government?
18        A.   So I can only answer for the FBI.  To my
19   knowledge, I am not aware of any Twitter employee
20   reaching out to any FBI employee regarding this
21   topic.
22        Q.   How about Facebook, other than that
23   meeting you referred to where an analyst asked the
24   FBI to comment on the Hunter Biden investigation,
25   are you aware of any communications between anyone
```

**ELVIS CHAN  11/29/2022**

Page 234

```
 1   at Facebook and anyone at the FBI related to the
 2   Hunter Biden laptop story?
 3       A.   No.
 4       Q.   How about any other social media platform?
 5       A.   No.
 6       Q.   How about Apple or Microsoft?
 7       A.   No.
 8            MR. SUR:  Counselor, if you have concluded
 9   with this exhibit, may I ask or may I suggest that
10   a break would be appropriate?  We have been in this
11   session now I think for an hour and eight minutes.
12            MR. SAUER:  I'm okay with that.  Want to
13   go off the record?
14            THE VIDEOGRAPHER:  Off the record at 3:43
15   p.m.
16            (Whereupon a recess was taken.)
17            THE VIDEOGRAPHER:  Back on the record at
18   3:57 p.m.
19       Q.   BY MR. SAUER:  Do you know Peter Strzok,
20   S-t-r-z-o-k?
21       A.   Yes, I do.
22       Q.   How do you know him?
23       A.   I know that he was a deputy assistant
24   director at counterintelligence division, and the
25   capacity that I worked with him in was related to
```

**ELVIS CHAN  11/29/2022**

Page 235

```
 1    the Yahoo! hack, which also occurred in 2016, and
 2    our office did the investigation for that hack.
 3         Q.    What was the Yahoo! hack?
 4         A.    At the time the Yahoo! hack was the
 5    largest data breach in American history where 500
 6    million Yahoo! users' credentials were stolen by
 7    Russian intelligence service officers.
 8         Q.    You worked on that investigation with
 9    Peter Strzok?
10         A.    So I oversaw the squad that ran the
11    investigation.  So I oversaw the investigation.
12    Mr. Strzok consulted with me because he was
13    concerned -- he had counterintelligence concerns
14    about the investigation.
15         Q.    What were those concerns generally
16    speaking?  I am not going to ask specifics.
17         A.    Broadly speaking, U.S. government
18    employees, U.S. current government employees as
19    well as other government officials had used Yahoo!
20    and still use Yahoo!, and he was concerned that
21    Russian intelligence officers would be able to
22    figure out the personal Yahoo! -- Yahoo! and AOL
23    accounts for current and former U.S. government
24    officials.
25         Q.    Did you have multiple interactions with
```

**ELVIS CHAN  11/29/2022**

Page 236

```
 1   him during the course of that investigation?
 2        A.   I would say regular -- like maybe once a
 3   month maybe.
 4        Q.   Over the course of how long?
 5        A.   Over the course of about six months.
 6        Q.   Would these be phone calls or did you have
 7   any in-person meetings with him?
 8        A.   These would be via classified Skype or
 9   Link, if you're familiar with that Microsoft
10   product.
11        Q.   So they'd be videoconferences that were in
12   a secured link?
13        A.   They would be voice conference -- there
14   was video capability, but the FBI culture is not to
15   use videoconference.
16        Q.   Have you talked to him since then?
17        A.   I have not.  Yeah, I only spoke to him in
18   the context of the Yahoo! investigation.  So -- and
19   he was interested, you know, in the extent of the
20   damage, you know, like our intrusion investigation
21   to determine if we could tell if Russians were
22   aware which accounts belong to which U.S.
23   government officials.
24        Q.   These interactions with him occurred in
25   the year 2016; is that right?
```

**ELVIS CHAN  11/29/2022**

Page 237

```
 1      A.   Yeah, I would say spanning between 2015 to
 2   2016.
 3      Q.   So this would have been the same time
 4   frame that he's involved in the Crossfire Hurricane
 5   investigation?
 6      A.   I do not know when that investigation took
 7   place exactly, but I would say that I had
 8   engagement with him in the late 2015 to early 2016
 9   time frame.
10      Q.   Do you know anyone associated with the
11   Crossfire Hurricane investigation?
12      A.   No, not to my knowledge.
13      Q.   How about Lisa Page?
14      A.   So Lisa Page is an attorney, an FBI
15   attorney for the Office of General Counsel.  She
16   was on many of the calls.  I don't know if she was
17   on all of the calls, but she was on at least some
18   of the, like, once-a-month calls that I had with
19   Mr. Strzok.
20      Q.   She was on -- so you would talk to
21   Mr. Strzok and Ms. Page at the same time as the
22   Yahoo! investigation?
23      A.   Yes.  My understanding was that she was --
24   I don't know this for a fact, but my understanding
25   was that she was a senior attorney in the
```

**ELVIS CHAN  11/29/2022**

Page 238

```
 1    counterintelligence division and that she would be
 2    privy to the types -- she would need to know about
 3    the types of communications I had with Mr. Strzok
 4    about the extent of the damage.
 5         Q.    Did you have any communications with
 6    Ms. Page after 2016?
 7         A.    Yes, but not while she was working at the
 8    FBI.
 9         Q.    What communications were those?
10         A.    She currently works for a private sector
11    company, and I have regular communications focused
12    on cybersecurity matters with her current company.
13         Q.    What company is that?
14         A.    The company is Twilio.
15         Q.    And you know her now and communicate with
16    her in her work at Twilio?
17         A.    Yes.
18         Q.    And do those communications relate to
19    hacking?
20         A.    Cybersecurity in general and potential
21    hacks against the Twilio platform.
22         Q.    Have you communicated with her recently?
23               MR. SUR:  Objection; vague.
24               THE WITNESS:  I would say the last time I
25    communicated with her was maybe -- I can't recall
```

**ELVIS CHAN  11/29/2022**

Page 239

```
 1   exactly, but maybe two months ago.
 2        Q.    BY MR. SAUER:   How often do you talk to
 3   her?
 4        A.    Maybe on a quarterly basis.
 5        Q.    Have you ever discussed with Mr. Strzok or
 6   Ms. Page the prospect of a Russian hack-and-leak
 7   operation?
 8        A.    No.   The only investigation that I ever
 9   discussed with either of them was the Yahoo! hack
10   investigation.
11        Q.    Do you know anyone else associated with
12   the Crossfire Hurricane investigation?
13        A.    No.   But I do want to add during those
14   meetings that I had with Mr. Strzok, Mr. Jim Baker,
15   who was our general counsel at the time, would
16   attend some of those meetings as well.
17        Q.    Mr. Baker would attend those meetings that
18   you had with Mr. Strzok about the Yahoo! hack?
19        A.    Yes.   At least some of them.
20        Q.    Who else would attend those meetings?
21        A.    Just the three of them.   It would be the
22   three of them getting a status update from -- they
23   would be getting a case update from me.
24        Q.    A case update about the Yahoo!
25   investigation?
```

**ELVIS CHAN  11/29/2022**

```
 1      A.    Correct.

 2      Q.    Did you ever discuss any hacking issues

 3  with Mr. Baker?

 4      A.    Not outside the context of the Yahoo!

 5  hack.

 6      Q.    Do you believe that Russian

 7  malign-foreign-influence activities affected the

 8  outcome of the 2016 presidential election?

 9           MR. SUR:  Objection; calls for

10  speculation.

11           THE WITNESS:  Quite honestly, I don't know

12  if they had an impact.

13      Q.    BY MR. SAUER:  In your thesis you talk

14  about how -- I think on multiple occasions you talk

15  about how that election was decided by about 78,000

16  votes in three key swing states; is that right?

17      A.    That is correct.  So I wanted to highlight

18  that there was the potential, but unfortunately if

19  you read my thesis, I could not conclus -- I could

20  not conclusively say whether it had an impact, but

21  it potentially could have an impact.

22      Q.    So your thesis was -- the conclusion was

23  that potentially Russian malign-foreign-influence

24  operations may have affected the 2016 presidential

25  election?
```

**ELVIS CHAN  11/29/2022**

Page 241

```
 1      A.   Yes, but that we would never know
 2  conclusively.
 3      Q.   I think you also cited statistics
 4  suggesting that something like 59 percent of all
 5  Facebook users had been reached by Russian malign
 6  social media content during that election cycle?
 7      A.   Yeah, I cited that from one of the
 8  reports, that is correct.
 9           MR. SAUER:  I am going to show you a new
10  exhibit.  Just give me a second to email it to your
11  counsel.
12           (Reporter marked Exhibit No. 9 for
13             identification.)
14      Q.   BY MR. SAUER:  Can you see this exhibit
15  that I have labeled Exhibit 9 that I posted on the
16  screen share?
17      A.   I see it on there, but I don't see it on
18  counsel's iPad yet.
19      Q.   Just as a preliminary matter, you see that
20  it is dated October 28, 2020, and it states, "Tech
21  CEOs Senate Testimony Transcript October 28"?
22      A.   Yes, I see that.
23      Q.   And you refer in your thesis to the fact
24  that tech CEOs were called in to testify before
25  Congress shortly before the 2020 election, correct?
```

**ELVIS CHAN  11/29/2022**

Page 242

```
 1      A.    Yes, correct.

 2      Q.    I think you refer to this as one of the

 3   instances where pressure was put on them to take

 4   more aggressive action to -- to keep malign foreign

 5   influence off their platforms, right?

 6      A.    Yes, that was my assessment.

 7            MR. SAUER:  I am going to jump ahead to

 8   Page 56 of this document.  So Indraneel, I don't

 9   know if you're following in the PDF.

10            MR. SUR:  It hasn't arrived yet,

11   unfortunately.

12      Q.    BY MR. SAUER:  If you look here at Page

13   56, there's a question posed to Mark Zuckerberg who

14   is the CEO of Meta or Facebook, correct?

15      A.    Can you highlight the question that you

16   want me to look at?

17      Q.    I actually -- probably just look at what

18   he said.  I don't think the question is that

19   relevant.

20            MR. SUR:  If I may interrupt, the email

21   just arrived, so we'll have it on the screen in a

22   few seconds here.

23            MR. SAUER:  Great.

24      Q.    Can you see there --

25            MR. SUR:  May I ask which page?
```

**ELVIS CHAN  11/29/2022**

**Page 243**

 1          MR. SAUER:  Page 56 of the PDF.

 2      Q.   Do you see there in the middle of the page

 3  it indicates that Mark Zuckerberg is the one

 4  speaking?

 5      A.   I see that at 2:34:35.

 6      Q.   That's the place.  Thanks.  In that answer

 7  he says along the lines of what you mentioned

 8  earlier, "one of the threats the FBI has alerted

 9  our companies and the public to, was the

10  possibility of a hack and leak operation in the

11  days or weeks leading up to this election,"

12  correct?

13      A.   Yeah, I am reading that.

14      Q.   Okay.  And then Mr. Zuckerberg went on to

15  say, "So you had both the public testimony from the

16  FBI and in private meetings alerts that were given

17  to at least our company, I assume the others as

18  well, that suggested that we be on high alert and

19  sensitivity that if a trove of documents appeared

20  that we should view that with suspicion, that it

21  might be part of a foreign manipulation attempt."

22  Do you see that?

23      A.   I do see that.

24      Q.   This testimony is occurring two weeks

25  after the Hunter Biden stories in the New York

**ELVIS CHAN  11/29/2022**

**Page 244**

1    Post, correct, October 28, 2020?

2        A.    Yes, that's what it was dated.

3        **Q.    Okay.  Let's go through his account there.**

4    **Mr. Zuckerberg said "one of the threats that the**

5    **FBI has alerted our companies and the public to,**

6    **was the possibility of a hack-and-leak operations**

7    **in the days" and/"or weeks leading up to this**

8    **election," correct?**

9        A.    Correct.

10       **Q.    Yeah, and he says the FBI has alerted the**

11   **public to that.  Do you recall the FBI doing so?**

12       A.    I believe that we much more frequently

13   than in the 2016 context -- context, "we," meaning

14   the FBI and CISA, would put out advisories about

15   concerns that we had about the elections.  These

16   would be public advisories.

17       **Q.    Would these include public advisories**

18   **saying there might be a hack-and-leak operation**

19   **shortly before the 2020 election?**

20       A.    I can't recollect.  I know there are

21   public advisories, and if you show them to me I

22   would be able to read them and refresh my memory,

23   but I don't recollect at this time.

24       **Q.    Do you know whether such public advisories**

25   **were made, as Mr. Zuckerberg says, relating to**

**ELVIS CHAN  11/29/2022**

Page 245

```
 1    quote, the possibility of a hack-and-leak operation
 2    in the days or weeks leading up to this election?
 3        A.   I can't remember any specific advisories
 4    at this time.
 5        Q.   Were you involved in preparing public
 6    advisories?
 7        A.   No.
 8        Q.   Did you ever suggest that the FBI should
 9    issue a public advisory about a hack-and-leak
10    operation?
11        A.   No, not specifically.  What I did tell our
12    cyber intelligence section was that we, the FBI,
13    should try to be as transparent as possible ahead
14    of the 2020 elections.
15        Q.   In the next sentence Mr. Zuckerberg says,
16    "So you had both the public testimony from the FBI
17    and in private meetings alerts that were given to
18    at least our company, I assume the others as well,
19    that suggested we be on high alert and
20    sensitivity."  Do you see that?
21        A.   Yes, I see that statement.
22        Q.   So do you know what he's referring to
23    about the public testimony from the FBI?
24             MR. SUR:  Objection; calls for
25    speculation.
```

**ELVIS CHAN  11/29/2022**

Page 246

```
 1              THE WITNESS:  I don't know about the
 2   public testimony.  I could assume it is from
 3   direct -- the director, Christopher Wray, or
 4   another senior official, but I am not aware of what
 5   testimony he's talking about.
 6         Q.   BY MR. SAUER:  How about "in private
 7   meetings alerts that were given to at least our
 8   company, I assume others as well," do you know what
 9   private meetings alerts he's referring to?
10              MR. SUR:  Objection; calls for
11   speculation.
12              THE WITNESS:  I don't know what private
13   meetings he meant, but as I've discussed with you,
14   I've hosted several meetings with Facebook ahead of
15   the 2020 elections.  So these may be these private
16   meetings.
17         Q.   BY MR. SAUER:  You hosted several private
18   meetings with Facebook where the concern about a
19   hack-and-leak operation was raised?
20         A.   Yes.
21         Q.   Are you aware of any other private
22   meetings between the FBI and Facebook?
23         A.   I am not aware of any besides the ones
24   I've hosted.
25         Q.   Is it possible that others occurred that
```

**ELVIS CHAN  11/29/2022**

Page 247

```
 1   didn't involve you?
 2      A.   That is possible, but I am not aware of
 3   them.
 4      Q.   And he describes those private meetings
 5   alerts as "suggested that we be on high alert and
 6   sensitivity that if a trove of documents appeared
 7   that we should view that with suspicion, that it
 8   might be part of a foreign manipulation attempt."
 9   Do you see that?
10      A.   Yes.
11      Q.   Was that discussed in your alerts, that if
12   a trove of documents appear, that that should be
13   something viewed with suspicion?
14      A.   I don't remember that exact framing of our
15   discussions with them.
16      Q.   Do you remember saying -- I know you
17   talked about, "Hey, there could be another
18   hack-and-leak operation."  Do you remember saying
19   something like "If you get a whole bunch of
20   documents that suddenly appear, that's something
21   that should be viewed with suspicion"?
22      A.   No, I don't remember any of us saying
23   that.  I think -- I don't remember this for a fact,
24   but I think what we would have said is we would
25   have asked "If you receive a whole -- if you see a
```

**ELVIS CHAN  11/29/2022**

Page 248

```
1    trove of potentially hacked materials, what are you
2    going to do about it?"  Which would be our way of
3    asking them how their terms of service would handle
4    a situation like that.
5        Q.   Do you recall asking them how they would
6    handle it if potentially hacked materials appeared,
7    correct?
8        A.   Yes.
9        Q.   And what did they say?
10       A.   So I believe that they would describe what
11   their policies were for validating the information
12   and handling the information in general.  I can't
13   remember what specific company said exactly what,
14   but in general, I remember the social media
15   companies having terms-of-service policies to
16   handle this sort of situation.
17       Q.   Which social media companies did you ask
18   that of, Twitter, Facebook and YouTube?
19       A.   Yes, I believe we would have asked them
20   that, but I can't recollect when that would have
21   happened, but I believe we would have asked them
22   that at some point.
23       Q.   So you would have cautioned them that
24   there might be a hack-and-leak operation and ask
25   them how their terms of service would address it,
```

**ELVIS CHAN  11/29/2022**

Page 249

1    fair to say?

2        A.    That is fair to say.

3        Q.    Okay.  You specifically asked them how

4    their terms of service would address it?  You

5    wanted to know whether and to what extent the

6    material would be taken down or blocked if it

7    appeared, correct?

8        A.    Yeah, we wanted to know what actions they

9    would take to include the two actions that you

10   described.

11       Q.    Why did you want to know that?  Why did

12   you want to know whether or not the various social

13   media platforms would take down hacked materials if

14   they appeared?

15       A.    So this is just my personal opinion about

16   why we wanted to know was because I think

17   internally we wanted to know what actions that we

18   would need to take, whether we would need to take a

19   legal remedy such as like a seizure warrant or

20   something.  I can't ever recollect discussing this

21   because it never came up.

22            In my assessment, why I would be concerned

23   was -- if there's hacked materials and they stay

24   up, then -- and if the companies do not believe

25   they violate their terms of service, what actions

**ELVIS CHAN  11/29/2022**

**Page 250**

1    could the FBI take.

2          So I mean, these are all hypotheticals.

3    **Q.    And the idea would be the FBI could pursue**

4    **a seizure warrant to have -- basically take -- take**

5    **the materials down through legal process if the**

6    **social media platforms wouldn't do it themselves?**

7    A.    So that was one hypothetical solution.

8    **Q.    And that was one that occurred to you?**

9    A.    Yeah, that was one that occurred to me.  I

10   don't remember discussing it with anyone else.

11   **Q.    The -- who -- who of the FBI asked them,**

12   **the social media platforms, "How are your hacking**

13   **materials policies addressing this?"**

14   A.    I would say we take turns asking.  When I

15   say "we," I mean either myself or the members of

16   the Foreign Influence Task Force I already

17   mentioned to you.  Wherever it seemed like an

18   organic follow-up question, we would ask "How would

19   your terms of service apply to this situation or

20   that situation?"  Just so that we would understand

21   what types of actions that they would take.

22   **Q.    I take it their answers would inform**

23   **potential further actions by the FBI, such as**

24   **potentially pursuing a seizure warrant to remove**

25   **hacked materials?**

**ELVIS CHAN  11/29/2022**

**Page 251**

```
 1      A.   I think we were -- we were dealing in
 2  hypotheticals, so there was no concrete plan.  In
 3  my mind, that would be one way to take down
 4  information.
 5           And the reason I say that is because in a
 6  different situation where the FBI became aware of
 7  Iranian fake news sites, we did pursue a seizure
 8  warrant and got an IIFA/FARA-based search or
 9  seizure warrant to take down over 70 Iranian fake
10  news websites.
11      Q.   Did they take down hacked materials?
12      A.   I don't know the specifics.  I oversaw the
13  squad that executed the seizure warrant.
14      Q.   Do you recall, did Ms. Dehmlow ever
15  discuss what actions might be taken if there was a
16  hack-and-leak operation before the 2020 election to
17  take down materials?
18      A.   No.
19      Q.   Do you recall discussing that with the
20  FBI -- or anyone at the FBI, that is if we knew
21  there was a hack-and-leak operation, how do we get
22  the materials down?
23           MR. SUR:  Objection; calls for
24  deliberative process privilege of internal
25  discussions within the FBI.
```

**ELVIS CHAN  11/29/2022**

Page 252

```
 1              THE WITNESS:  Yeah, we did have internal
 2     discussions.  As I mentioned, the only -- one of
 3     the solutions was potentially to see if we have
 4     enough probable cause to execute a seizure warrant.
 5              Another solution was to ask the company to
 6     consensually take down the information even if it
 7     did not violate their terms of service.  So those
 8     were the two hypothetical solutions that I
 9     remember.
10         Q.   BY MR. SAUER:  Right.  That second
11     hypothetical solution about asking them to take it
12     down even if it didn't violate their terms of
13     service, did you pursue that with respect to the
14     Hunter Biden laptop story?
15         A.   No.
16         Q.   Did you contact any social media platforms
17     and say, "Hey, can you take this stuff down because
18     it looks hacked"?
19         A.   No.
20         Q.   When the social media platforms answer,
21     did Facebook and Twitter indicate that they would
22     remove hacked materials under their terms of
23     service when you asked them?
24         A.   From my recollection, I think both of
25     those companies said that they would remove hacked
```

**ELVIS CHAN  11/29/2022**

Page 253

```
 1    materials if they were able to validate that it was
 2    hacked.  I don't remember -- I don't remember the
 3    qualifiers that they used to determine whether they
 4    were hacked materials or not.
 5        Q.    When did they tell you that, roughly?
 6        A.    I can't remember, but it was ahead of the
 7    2020 elections.
 8        Q.    That would have been before that Hunter
 9    Biden laptop story broke?
10        A.    I don't remember.  It would have been --
11    it might have happened in October.  It could have
12    happened before.  I think it may have happened
13    before then, but I can't remember.
14        Q.    They made that representation to you, both
15    Twitter and Facebook, in these FITF Facebook
16    preelection meetings -- sorry.  Let me rephrase
17    that.
18            Did they make that representation to you
19    in the FITF-organized meetings with Facebook and
20    then Twitter?
21        A.    I can't remember the specifics, but
22    generally speaking, the companies provided us with
23    overview of what their terms of service was and how
24    hacked materials could be categorized within these
25    terms of service and then just the types of actions
```

**ELVIS CHAN  11/29/2022**

Page 254

```
 1   that they would potentially take.
 2       Q.    I think you said a minute ago that the
 3   kinds of actions they would potentially take
 4   included taking the materials down?
 5       A.    Yeah, that was -- that was a potential
 6   action.  I think it had to reach a -- you know, it
 7   had -- they had an internal validation process and
 8   it had to clear internal hurdles before they would
 9   take that certain type of content down.  But I
10   can't remember the specifics of what the internal
11   hurdles were.
12       Q.    That information was conveyed to a group
13   of FBI officials that had included you and
14   Ms. Dehmlow as well as Mr. Olson, Mr. Cone,
15   Ms. Chock and Mr. Giannini?
16       A.    Yeah, I don't know if all of these people
17   were present during any of those meetings where
18   they were discussed, but in general, I would say
19   that at least some subset of them would have been
20   present.
21       Q.    Okay.  And then did you guys relay that
22   information to anyone, "Here's what Facebook and
23   Twitter will do if they find and receive hacked
24   materials on their platforms"?
25       A.    So I did not relay it to anyone else,
```

**ELVIS CHAN  11/29/2022**

Page 255

1    outside of my internal discussions with them.  I do

2    not know if they relayed it to anyone else.

3        **Q.   Do you know -- you don't know if it was**

4    **relayed to anyone else by anyone?**

5        A.   I do not.  I am only privy to what I

6    discussed with them.

7        **Q.   Do you remember anything else -- turning**

8    **back to the screen share, and you see**

9    **Mr. Zuckerberg's testimony, he talks about the**

10   **information received "suggested that we be on high**

11   **alert and sensitivity."  Is that a fair**

12   **characterization of the communications from the FBI**

13   **to Facebook that you were involved in?**

14       A.   So I would not have framed it like

15   Mr. Zuckerberg did.  As I mentioned, his language

16   seems stronger than how I would have framed it, or

17   how I believe FBI officials would have framed it.

18           We would have said something to the effect

19   of "We are concerned about potential hack-and-leak

20   operations ahead of the 2020 elections and that one

21   of the methods that we would use is to disseminate

22   the hacked materials on the social media

23   platforms."

24           So I don't know if I -- we would have said

25   that we should view that with suspicion.  Instead

Case 3:22-cv-01213-TAD-KDM   Document 204-1   Filed 03/03/23   Page 256 of 386 PageID #: 10316

**ELVIS CHAN  11/29/2022**

**Page 256**

```
 1   of "foreign manipulation attempt," I would have
 2   said "foreign malign influence."
 3        Q.   Did you, in fact, tell them that if a
 4   trove of document appears, it should be viewed with
 5   suspicion?
 6        A.   No.  That's what I'm saying, is I don't
 7   think we would have said that language.
 8        Q.   Did you tell him that if a trove of
 9   documents appeared, it may be part of a foreign
10   manipulation attempt?
11        A.   I would -- we would not have used that
12   language.  As I said before, what we would have
13   told them and what I recollect saying is that we --
14   that I was concerned about a potential
15   hack-and-leak operation, especially right before
16   the election, and that one of the channels for
17   disseminating that hacked information would be via
18   the social media platforms.
19        Q.   Do you know Timothy Thibault or Thibault,
20   T-h-i-b-a-u-l-t?
21             (Discussion off the record.)
22             THE WITNESS:  I am not familiar with that
23   name.
24        Q.   BY MR. SAUER:  Do you know Brian Auten,
25   A-u-t-e-n?
```

**ELVIS CHAN  11/29/2022**

Page 257

```
 1        A.    Yes.  I believe he was a supervisory
 2   intelligence analyst in the -- in the special
 3   counsel's office.  That's how I know him.
 4        Q.    So he's an FBI official?
 5        A.    Yeah, he is supervisory intelligence
 6   analyst, I believe is his title.
 7        Q.    What's a supervisory intelligence analyst?
 8        A.    A frontline supervisor position for
 9   analysts within the FBI.
10        Q.    Do you know -- how do you know him?
11        A.    I only know him in passing because I
12   have -- I had engaged with the special counsel's
13   office -- specifically Robert Mueller's special
14   counsel's office.  I know there are multiple
15   special counsel's office, but specifically Robert
16   Mueller's.  I believe that he was part of the
17   special counsel's office team.
18        Q.    What was your engagement with Robert
19   Mueller's special counsel's office?
20        A.    So as I previously mentioned, we -- my
21   squad ran one of the investigations associated with
22   the hack of the DNC in 2016.  The special counsel's
23   office consolidated all investigations that had to
24   do with any Russian interference in the 2016
25   elections.  So we, specifically my squad and I, had
```

**ELVIS CHAN  11/29/2022**

Page 258

```
 1   to hand off that portion of the investigation to
 2   the special counsel's office.
 3       Q.   So they took over your investigation of
 4   the DNC hack?
 5       A.   Yes, they took over that portion of the
 6   investigation.
 7       Q.   What other portions were there?
 8       A.   The other portion is the continuing active
 9   investigation against the individuals for our
10   computer intrusions besides the 2016 DNC hack.
11       Q.   So it involves the same malign actors but
12   not the same hacking attempt?
13       A.   Correct, yeah, that is a correct
14   assessment.
15            MR. SAUER:  I am going to email you and
16   your counsel a set of new exhibits.
17            Indraneel, can you tell me when you get
18   these?
19            MR. SUR:  I will.
20            MR. SAUER:  Has that email come yet?
21            MR. SUR:  Still waiting.
22            MR. SAUER:  While you're waiting, I am
23   going to go ahead and share, just to keep things
24   moving, Exhibit 13 with you.
25            (Reporter marked Exhibit No. 13 for
```

**ELVIS CHAN  11/29/2022**

Page 259

```
 1                identification.)
 2      Q.   BY MR. SAUER:  Do you see that now, sir,
 3   Exhibit 13?
 4      A.   Yeah, I see the title is "Audio
 5   Transcription of Recording in re: State of
 6   Missouri, et al., versus Joseph R. Biden, Junior."
 7      Q.   It goes on "File:  FBI on Election-There's
 8   Going to be a Lot of Noise," right?
 9           MR. SUR:  I'm sorry, we still don't have
10   the email.  So is this Exhibit 13?
11           MR. SAUER:  Yeah.  We may have the court
12   reporter make a transcription of his publicly
13   record -- public interviews, the audio of his
14   public interviews.
15      Q.   So Mr. -- Agent Chan, on October 28, 2020,
16   did you give an interview to someone called Tom
17   Field relating to the upcoming election?
18      A.   I believe I did.  I give a lot of
19   interviews, but yeah, I am looking at the
20   transcript of this one.  Tom Field is associated
21   with a media outlet called ISMG.
22      Q.   Interestingly the date of this is October
23   28, 2020, the same date as the tech CEOs
24   congressional testimony we just talked about,
25   right?
```

**ELVIS CHAN  11/29/2022**

Page 260

```
 1        A.   Okay.  Yeah, I didn't remember when the
 2   tech CEOs testified, but you have refreshed my
 3   memory.
 4        Q.   This would be less than a week before the
 5   October 2020 election, right?
 6        A.   Yes.
 7        Q.   And you told him there's going to be a lot
 8   of noise.  Do you know what you were talking about
 9   there?
10        A.   Can you tell me what page you're on?
11        Q.   That title "FBI on Election-There's Going
12   to be a Lot of Noise," did you say that to him?
13        A.   What line is that?  What page?
14        Q.   I am highlighting it.  It is the all caps
15   title on Lines 10 and 11 on Page 1, "FBI on
16   Election-There's Going to be a Lot of Noise."
17        A.   So I don't recall making that title.
18        Q.   Do you remember making that statement,
19   that there's going to be a lot of noise?
20        A.   Is it in the transcript anywhere?
21        Q.   I am just asking do you remember that?
22        A.   I don't remember it.  That's why I'm
23   asking if it is in the transcript anywhere.
24        Q.   Fair enough.  If you don't remember, you
25   don't remember.
```

**ELVIS CHAN  11/29/2022**

Page 261

```
 1        A.    Yeah.

 2        Q.    Go down to Page 9 of the transcript,

 3   there's a paragraph here starting on Line 3 at Page

 4   9 where you say, "So I am going to ask -- I'm

 5   probably going to say the same thing that I said

 6   the last time, but if you see something, say

 7   something; right?  So if you are seeing any types

 8   of cyber attacks against your companies, let your

 9   local FBI office know; right?"

10        A.    Yes, I see that.

11        Q.    Is that -- do you recall saying that to

12   Tom Field?

13        A.    I don't specifically remember, but it

14   appears to be a transcript of an interview I had

15   with him.  That seems like something I would say.

16        Q.    And then you go to say, "If you're seeing

17   something related to the election on your social

18   media platform, all of them have portals where you

19   can report that sort of information," correct?

20        A.    Yes.

21        Q.    So there you are encouraging the listeners

22   of the podcast if they see something inaccurate on

23   their social media platform, to go and report it

24   directly to the social media platform, correct?

25        A.    That is correct.
```

**ELVIS CHAN  11/29/2022**

1    Q.    Then you go on to say, "They are being

2  very aggressive in trying to take down any

3  disinformation or misinformation," right?

4    A.    Yes.

5    Q.    And I take it the context here you're

6  talking about disinformation and misinformation

7  related to the election, right?

8    A.    Yes.

9    Q.    So you're encouraging the listeners of

10  this podcast to report to social media companies

11  any election-related speech that they see that they

12  think is disinformation or misinformation so that

13  the social media platforms can take it down, right?

14    A.    So that the social media platforms can

15  review it and determine if it violates their terms

16  of service.

17    Q.    And it was your view at that time that the

18  social media platforms were being, quote, very

19  aggressive in trying to take down any

20  disinformation or misinformation relating to

21  elections, right?

22    A.    Yes.

23    Q.    And you go on to say "if they see anything

24  on election day or before election day, you can

25  always report it to FBI.gov or justice.gov, and you

**ELVIS CHAN  11/29/2022**

Page 263

1    know, there's a little button you can click to

2    submit a complaint," correct?

3        A.    Yes.

4        Q.    So you're encouraging the listeners to

5    report any disinformation or misinformation to

6    FBI.gov or justice.gov, correct?

7        A.    That is correct.

8        Q.    FBI.gov is the FBI's website, right?

9        A.    Yes.

10       Q.    Justice.gov, is that the Department of

11   Justice's website?

12       A.    That is correct.

13       Q.    Federal Department of Justice, right?

14       A.    Yes, the U.S. Department of Justice.

15       Q.    What happens to disinformation complaints

16   that get submitted to FBI.gov relating to election

17   misinformation or disinformation?

18       A.    I believe that all these tips are reviewed

19   by an intake analyst, either an FBI employee or an

20   FBI contractor.  And then I believe they have

21   certain levels of predication where they would keep

22   sending it higher -- higher up the chain.

23       Q.    What do you mean by certain levels of

24   predication where they would keep sending you

25   higher up the chain?

Case 3:22-cv-01213-TAD-KDM   Document 204-1   Filed 03/03/23   Page 264 of 386 PageID #: 10324

**ELVIS CHAN  11/29/2022**

Page 264

```
 1      A.   So I would say if something is a vague
 2   threat about -- for example, a common type of
 3   threat is "I hate Politician X."  And then someone
 4   sends in a complaint like "I believe this user
 5   wants to kill Politician X," but you know, what
 6   that person said was a vague statement with no
 7   threat in it.
 8           So that is a -- that is like one type of
 9   example.  So in that situation, that type of
10   complaint would be filed away.
11           In another situation, for example, a
12   threat-to-life situation, "I want to kill
13   Politician X, and I know where he lives."
14           So then that would be they would -- the
15   analyst would try to figure out what field office
16   does Politician X reside in and then forward that
17   information to the appropriate field office to
18   conduct an initial assessment.
19           So that would be an example of how we
20   would handle two types of complaints.
21      Q.   Those are complaints about threats.  In
22   this context you're referring to disinformation and
23   misinformation, correct?
24      A.   Yes.
25      Q.   So if somebody reports not a threat to a
```

**ELVIS CHAN  11/29/2022**

1    **public official but a disinformation -- someone**

2    **reports disinformation or misinformation on social**

3    **media to FBI.gov, how would that be processed?**

4         A.    So that would also be reviewed by the

5    analyst, and then it would be the same situation.

6              So if I can give you a hypothetical

7    example, "Political Party A vote on Tuesday.

8    Political party B vote on Wednesday."  So if

9    someone submitted something like that, that would

10   probably be flagged.  Like an analyst would say,

11   "Oh, this is involving the time, place or manner of

12   an actual election.  I need to send this up to

13   someone who is more authoritative that can review

14   this information."

15             So they may actually kick this out to the

16   field office depending on if they can figure out

17   where the account holder is from.

18        **Q.    What if -- okay.  So if that -- sorry, say**

19   **it again.  They send it out to the field office?**

20        A.    In this hypothetical situation, let's say

21   a social media account user somehow identifies

22   themselves as being from the state of Missouri, you

23   know, like it is a handle.  And then they say or

24   they portray themselves as being from St. Louis,

25   Missouri and they say, "If you are affiliated with

**ELVIS CHAN  11/29/2022**

Page 266

```
 1   Party A, you vote on Tuesday.  If you're affiliated
 2   with Party B, you vote on Wednesday."
 3            So that information would be reviewed by
 4   the analyst that does the intake, and that would
 5   likely revolve -- result in a lead being sent to
 6   the St. Louis field office to work with the U.S.
 7   Attorney's Office to see if, you know, they should
 8   serve a subpoena to get the additional information
 9   or if it, you know, if it rises to the level of an
10   election requirement.
11       Q.   Does the FBI also report -- does anyone on
12   that chain in the FBI report it to the social media
13   platform to be assessed under their
14   content-modulation policies?
15       A.   So that would only -- that -- that type of
16   process that I'm aware of only happened during the
17   election command post that I mentioned to you
18   previously.
19       Q.   So if somebody went to FBI.gov and said,
20   "Hey, you know, someone's saying in Missouri
21   Republicans vote on Tuesday, Democrats vote on
22   Wednesday," that would be referred to the Missouri
23   field office for an investigation?
24       A.   Yeah, that would be referred to the St.
25   Louis field office for investigation.  And then
```

**ELVIS CHAN  11/29/2022**

1    like, the investigators in the St. Louis office

2    along with the U.S. Attorney's Office would

3    determine if that is something that should be sent

4    to FBI headquarters.  And then that would be sent

5    to FBI headquarters and there would be an FBI OGC

6    attorney as well as a DOJ public integrity attorney

7    along with, you know, another FBI official.  They

8    would all look at it and say, "Yes, we believe that

9    this should be sent to FBI San Francisco."

10            So by the time it's reached us, there's

11    already been what I will characterize as an FBI

12    headquarter stamp of approval.

13        **Q.   And the FBI San Francisco then would relay**

14    **those to social media platforms as you've discussed**

15    **earlier --**

16        A.   Yes.

17        **Q.   -- in your testimony, correct?**

18        A.   Yes, correct.

19        **Q.   And there the idea is that the social**

20    **media platforms will assess those in connection**

21    **with their terms of service, assess them for**

22    **compliance with their terms of service, correct?**

23        A.   That is correct.

24        **Q.   What if somebody posts something like**

25    **"Voting by mail is unreliable, and your ballot**

**ELVIS CHAN  11/29/2022**

1    **probably won't get there so don't vote that way"?**

2              MR. SUR:  Objection; incomplete

3    hypothetical.

4        **Q.   BY MR. SAUER:  What would happen to a**

5    **report like that to FBI.gov?**

6        A.   So I think that would also be reviewed by

7    the attorneys.  When I mean "the attorneys," I mean

8    specifically the FBI headquarters attorney as well

9    as a DOJ public integrity attorney, and they will

10   determine whether it will get sent to San Francisco

11   or not.

12       **Q.   And would something like that, in your**

13   **experience, get sent to San Francisco?**

14       A.   In my experience, something vague like

15   that would not get sent to San Francisco.

16       **Q.   How about something specific like "Voting**

17   **by mail is rife with fraud and it involves tons of**

18   **people cheating and therefore, it should be**

19   **abolished," how about that?**

20              MR. SUR:  Objection; hypothetical.

21              THE WITNESS:  Honestly, I have never saw

22   that type of complaint being submitted to us

23   through the command post.  As I mentioned to you

24   previously, it was, from my recollection, time,

25   place or manner disinformation or misinformation.

**ELVIS CHAN  11/29/2022**

1      Q.   BY MR. SAUER:  What do you remember
2   specifically about those being referred to you?
3   What kind of things do you remember specifically --
4      A.   The example I gave you where if you are
5   registered with Party A, you vote on Tuesday; if
6   you're registered with Party B, you vote on
7   Wednesday.  So that was a frequent one.
8          Another one was, depending on what state,
9   some states where it has to arrive at the polling
10   location on election day, whereas other states
11   allow it -- the ballot -- the mail-in ballot to be
12   postmarked by election day.  So I remember I would
13   look, and I was like, "Oh, like, huh, I don't
14   understand this one."  And then maybe I would
15   follow up with the field office and they say,
16   "Elvis, in our state it has to arrive at the
17   polling location by a certain date."
18          So that would be the type of different
19   information that we would provide to the social
20   media companies.
21      Q.   And I take it you testified earlier that
22   posting the wrong information about that, the date
23   that your ballot has to arrive, is criminal on --
24   in the government's view; is that right?
25      A.   It is a potential violation of federal

**ELVIS CHAN  11/29/2022**

**Page 270**

 1   election laws.

 2       Q.   **What federal election statute does it**

 3   **violate?**

 4           MR. SUR:  Objection; calls for legal

 5   conclusion.

 6           THE WITNESS:  I am not an attorney, but

 7   you hear me saying the words "time, place or manner

 8   disinformation."  So just based on my law

 9   enforcement training where the attorneys tell me

10   that anything that is related to false information

11   about the time, place or manner of an election or

12   about the voting process, that that is a potential

13   election crime.

14       Q.   **BY MR. SAUER:  You refer to the social**

15   **media platforms being very aggressive in trying to**

16   **take down any disinformation or misinformation.**

17   **What were you talking about?**

18       A.   I was saying in contrast to 2016 when they

19   took no actions.

20       Q.   **What did they do to be very aggressive?**

21       A.   So as I mentioned to you previously, they

22   developed technologies to be able to detect

23   foreign-malign-influence operations, and they also

24   add just their policies to be able to handle

25   foreign-malign-influence operations.

**ELVIS CHAN  11/29/2022**

```
 1              MR. SAUER:  I am going to show you Exhibit
 2    15.  Indraneel, I sent you an email.
 3              MR. SUR:  Okay.  15.
 4              (Reporter marked Exhibit No. 15 for
 5              identification.)
 6       Q.   BY MR. SAUER:  Agent Chan, can you see
 7    this on the screen share?
 8       A.   Yes, the title "Preparing for Retaliatory
 9    Attacks from Russia."
10       Q.   On June 29, 2022?
11       A.   Yes.
12       Q.   Again, this is a court reporter-created
13    transcript of your podcast or interview with Anna
14    Delaney on that date.  Do you see that?
15       A.   Yeah, on June 29th, 2022.
16       Q.   Who is Anna Delaney?
17       A.   She is now the -- now that I am looking at
18    the transcript, she is a reporter with ISMG.
19       Q.   Do you remember giving this interview last
20    June?
21       A.   I believe this was in the context of the
22    RSA conference, but I can't remember specifically.
23              As I mentioned, I did a lot of public
24    speaking, and I get interviewed frequently by media
25    outlets.
```

**ELVIS CHAN  11/29/2022**

Page 272

```
 1        Q.    Going down to Page 8 of this transcript,

 2    starting on Page 7 you see that Ms. Delaney asks

 3    about the midterm elections 2022 and she asked you

 4    what the FBI is doing to prepare, right?   "What's

 5    the FBI doing to prepare," you see that at the

 6    bottom of the page?

 7        A.    Okay.   I see that question.

 8        Q.    And you respond to that, "The good news

 9    is, post 2020, we've never stopped," right?

10        A.    Yes, I said that.

11        Q.    You say that you were -- "As soon as

12    November 3rd happened in 2020, we just pretty much

13    rolled into preparing for 2022," correct?

14        A.    Yes.

15        Q.    And you say -- a little lower down you

16    say, "From FBI San Francisco's standpoint, we are

17    also really engaged with the technology companies

18    out here and represented here at the RSA

19    conference."   There you go.

20        A.    Yeah, so yeah, it was at the RSA

21    conference.

22        Q.    "So making sure that, you know, any

23    vulnerabilities we think advanced persistent

24    threats would be using" and so forth, right?

25        A.    Yes.
```

**ELVIS CHAN  11/29/2022**

1      Q.    I think what you're talking about there is

2  potential hacking attempts and working with the

3  social media companies to defend against hacking

4  attempts; is that right?

5      A.    I wouldn't say because I mention

6  technology companies, against all types of

7  companies, even non-social media companies.

8      Q.    Got you.  You say, "We're also working

9  with the social media companies to make sure that

10  any foreign disinformation that's coming out that,

11  you know, like, if we can identify them, we can

12  share that information with them so they can knock

13  down accounts, knock down disinformation content,"

14  correct?

15      A.    Yes, I said that.

16      Q.    And do you agree with that statement, that

17  you were working with social media companies in the

18  2022 election cycle to make sure that foreign

19  disinformation would be identified and you could

20  share that information with them so they can knock

21  down accounts and knock down disinformation

22  content?

23      A.    Yeah, so looking at that sentence and from

24  my recollection, the FBI part of it is the

25  information sharing portion, and then the social

**ELVIS CHAN  11/29/2022**

Page 274

```
 1   media company portion is to decide if it violates
 2   their terms of service.  And if it does violate
 3   their terms of service, one of the actions they
 4   could take is to knock down accounts or to knock
 5   down content.
 6        Q.   And the purpose of the information sharing
 7   is the get them to assess it; and potentially if it
 8   violates the terms of service, to knock down
 9   content, correct, right?
10             MR. SUR:  Objection; mischaracterizes the
11   document, calls for speculation.
12             THE WITNESS:  Our -- my purpose was to
13   share information with them so that they could
14   protect their platforms as they deemed appropriate.
15   I did highlight two of the actions that they could
16   potentially take, which include knocking down
17   accounts or knocking down misinformation content.
18        Q.   BY MR. SAUER:  And you're aware that they
19   do both of those things in response to your reports
20   of disinformation on their platforms?
21        A.   I am aware of that because of the feedback
22   they have provided me on several occasions.
23        Q.   Do you know Jen Easterly?
24        A.   I do know Jen Easterly.
25        Q.   How do you know Jen Easterly?
```

**ELVIS CHAN  11/29/2022**

Page 275

```
 1      A.   I actually met her at this conference for
 2  the first time.
 3      Q.   Had you been aware of her before that?
 4      A.   I was aware when she was nominated and
 5  confirmed for her role as the director of CISA.
 6      Q.   Were you aware that she's a Star Trek fan?
 7      A.   I am aware that she's a Star Trek fan.
 8      Q.   How do you know that?
 9      A.   From reading news articles about her,
10  specifically at the Black Hat and DEF CON
11  conference which had happened previously.
12      Q.   What is the Black Hat and DEF CON
13  conference?
14      A.   That -- those are two conferences which
15  are back to back in Las Vegas sometime in the
16  summer, and they are -- next to the RSA
17  conference -- the leading cybersecurity conferences
18  in the American industry.
19      Q.   Did you have any -- have you had any
20  communications with Jen Easterly about
21  disinformation on social media?
22      A.   No, I have not had -- the one time I met
23  her in person was at the RSA conference.  And
24  primarily what I recollect us talking about was
25  that I wanted her to have additional CISA
```

**ELVIS CHAN  11/29/2022**

Page 276

1  personnel, specifically to embed with FBI San

2  Francisco cyber task force.

3      **Q.    Did she agree to that?**

4      A.    She said that she would work on it.

5      **Q.    Did it happen?**

6      A.    I was told by the CISA official, the

7  regional CISA officials that I work with that there

8  are funded bullets to hire people, but they are --

9  I believe they are still going through the hiring

10 process.

11     **Q.    Who are the regional CISA officials that**

12 **you work with?**

13     A.    There are two regional CISA officials that

14 I work with.  One individual is based in

15 Sacramento.  His name is Mario Garcia.  And then

16 the second individual is based in the Los Angeles

17 area.  His name is Joseph Oregon.

18     **Q.    How do you -- what do you do to work with**

19 **them?**

20     A.    So primarily when I work with them, it is

21 on cybersecurity matters.  So we coordinate

22 regularly with CISA on any cyber attacks against

23 critical infrastructure companies.

24          For example, a ransomware attack or a data

25 breach against an energy company or -- yeah,

**ELVIS CHAN  11/29/2022**

Page 277

```
 1   specifically an example I can give you is the
 2   ransomware attack against the Colonial Pipeline
 3   Company.
 4       Q.   Do you work with CISA on any
 5   disinformation issues?
 6       A.   I do not work with those two individuals
 7   on disinformation issues.
 8       Q.   Do you work with anyone else at CISA on
 9   any disinformation issues?
10       A.   Only as we have discussed in the CISA-led
11   USG-industry working group meetings.
12       Q.   I am going to open up Exhibit 6 again and
13   share it with you.  These are the amended
14   interrogatory responses.  Can you see them on the
15   screen share now?
16       A.   Which exhibit is that?
17            MR. SUR:  This is 6.  This is on the first
18   page.
19            THE WITNESS:  Okay.
20       Q.   BY MR. SAUER:  I am going to scroll back
21   down to Page 38.
22       A.   Okay.
23       Q.   We talked a bit about this USG-industry
24   meeting that's identified here, correct?
25       A.   You're on the first bullet on that page,
```

**ELVIS CHAN  11/29/2022**

Page 278

```
 1    is that what you're referring to?
 2         Q.   The first bullet on Page 37.
 3         A.   Okay.  "A recurring meeting usually
 4    entitled USG-industry meeting," yes.
 5         Q.   Okay.  We talked about -- I think we
 6    talked about the participants in this meeting in
 7    detail, and the CISA participants you mentioned are
 8    Matt Masterson and Brian Scully?
 9         A.   That's correct.
10         Q.   How about DHS's Office of Intelligence and
11    Analysis, who participated from there?
12         A.   I can't remember.  I believe whoever was
13    the head of that organization -- someone from I&A
14    showed up, but I don't remember the names.
15         Q.   What does I&A do?  What is it?
16         A.   So from my knowledge of I&A, they are the
17    intelligence community agency, or at least one of
18    them, within the Department of Homeland Security.
19    What I -- the products that I have seen from them
20    are all-source products, which means I have seen
21    them take, you know, intelligence reports from
22    different government agencies and provide more
23    strategic overview types of products.  That is what
24    I have personally seen from I&A.
25         Q.   Let's scroll down to this next bullet
```

**ELVIS CHAN  11/29/2022**

Page 279

1  point where it talks about a CISA cybersecurity

2  advisory meeting.  Do you know anything about those

3  meetings between CISA and social media platforms?

4      A.    I have never heard of the CISA

5  cybersecurity advisory committee meetings.  I have

6  never heard of that organization within CISA.

7      Q.    How about "ASD-HKS Tech Policy Paper

8  Series," do you know anything about those meetings?

9      A.    No, I don't even know what the acronym

10  stands for.

11      Q.    How about "DHS/Microsoft Disinformation

12  Follow Up"?

13      A.    I have no idea what that is in reference

14  to.

15      Q.    Let's scroll down to the CISA response.

16  See there's an additional response under the

17  heading here "CISA"; do you see that?

18      A.    Yes.

19      Q.    And that's CISA, C-I-S-A, in all caps?

20      A.    Yes.

21      Q.    It looks like it is identical to the

22  bullet point above that we discussed.

23            There's a reference here in the second

24  bullet point to "A recurring meeting to prepare for

25  and set the agenda for the USG-industry meeting,

**ELVIS CHAN  11/29/2022**

**Page 280**

1  and participants have generally included CISA and

2  Facebook."  Do you see that?

3      A.   I see that.

4      Q.   That is a meeting to prepare for the

5  meeting that we talked about in detail; is that

6  right?

7      A.   I see that.

8      Q.   Were you aware that there were such

9  meetings?

10     A.   I was not aware that there was a separate

11 preparatory meeting between CISA and Facebook ahead

12 of the broader USG-industry meeting.  I was only

13 aware of the USG side, you know, where they would

14 convene us to ask us, specifically the FBI and the

15 other federal components, what agenda topics we

16 wanted to talk about.

17     Q.   So you participated in your own

18 preparatory meeting with CISA that did not involve

19 social media platforms, correct?

20     A.   That is correct.

21     Q.   During the course of those preparatory

22 meetings, CISA would ask the FBI, you, Elvis Chan,

23 what topics it might be useful to discuss at the

24 USG-industry meeting?

25     A.   Yes.  They would ask the FBI, and I was a

**ELVIS CHAN  11/29/2022**

Page 281

```
 1   part of the contingent.

 2        Q.    Who was on that contingent?

 3        A.    It would typically be Laura -- the

 4   individuals that I mentioned from FITF, Laura

 5   Dehmlow, Luke Giannini, Bill Cone, Brady Olson,

 6   Judy Chock.  It would not necessarily be all of

 7   them, but it would be a subset of them or at least

 8   one of them.  Sometimes the FBI would not have any

 9   agenda items for the CISA-hosted meetings.

10        Q.    Anyone else from FBI participate in those

11   meetings?

12        A.    I can't recollect anyone else.

13        Q.    How about who from CISA would participate

14   in those meetings?

15        A.    As I mentioned to you, the two people I

16   remember are Mr. Masterson and Mr. Scully.

17        Q.    The same two who had run the USG-industry

18   meeting, the big meeting, right?

19        A.    They were the two ranking officials that I

20   was aware of from CISA.

21        Q.    Would those preparatory meetings be just

22   Mr. Scully and Mr. Masterson and FBI, or would

23   other agencies be involved with them?

24        A.    From my recollection, the ODNI, I&A, they

25   would be involved in them as well.  So we may have
```

**ELVIS CHAN  11/29/2022**

**Page 282**

```
 1   the preparatory call or we may just have a
 2   coordination email.  I remember both of those
 3   methods happening.
 4       Q.   In either the email or the preparatory
 5   call, did anyone ever discuss raising hack-and-leak
 6   operations or the risk of hack-and-leak operations
 7   in a USG-industry meeting?
 8            MR. SUR:  Objection; falls within the
 9   deliberative process privilege for interagency
10   discussions and recommendations.
11            THE WITNESS:  Yeah, I don't recollect that
12   being a specific topic of discussion.
13            In my recollection, or in my opinion, this
14   would be just a general topic of continued
15   interest.
16       Q.   BY MR. SAUER:  What else was discussed in
17   those preparatory meetings, to your recollection?
18            MR. SUR:  Objection; deliberative process
19   privilege covers interagency advice and
20   recommendations before a decision is made.  So I am
21   going to -- you can respond if you can without
22   describing the specifics of any proposals or
23   recommendations.
24            THE WITNESS:  All I can remember are the
25   actual agenda items.  So as I mentioned to you
```

**ELVIS CHAN  11/29/2022**

Page 283

```
 1    previously, CISA would talk about state, county,
 2    local election processes and infrastructure and
 3    cybersecurity.
 4            ODNI, when they spoke, substantively would
 5    discuss an unclassified description or overview of
 6    potential nation-state threats.
 7            And then the FBI would discuss any
 8    unclassified information or concerns that we had
 9    related to malign-foreign-influence disinformation
10    campaigns.
11    Q.   BY MR. SAUER:  Would that include the kind
12    of strategic and tactical information you testified
13    about earlier?
14    A.   No.  It would be a very condensed or, I'm
15    sorry, more general version of strategic
16    information that we would share with the specific
17    companies, and we would never share tactical
18    information at the CISA-hosted meetings.
19    Q.   That would only be on the kind of one
20    or -- sort of one-on-one meeting, not really
21    one-on-one, but FBI meeting with a specific social
22    media platform, correct?
23    A.   Yes, that is -- that is correct.  And the
24    reason for that is because we would be providing
25    law enforcement sensitive information in some
```

**ELVIS CHAN  11/29/2022**

Page 284

```
 1    instances to the companies.
 2        Q.    Next bullet point refers to a CISA
 3    Cybersecurity Advisory Committee meetings on
 4    certain dates in 2021 and 2022.  Do you know what
 5    those meetings are about?
 6        A.    I do not.
 7        Q.    Below that, "CISA CSAC, protecting
 8    critical infrastructure from misinformation and
 9    disinformation subcommittee meetings"?
10        A.    I have no idea what those are.
11        Q.    How about this next bullet point,
12    "Meetings convened by the Election Infrastructure
13    Subsector Government Coordinating Council
14    (EIS-GCC)," do you know what the EIS-GCC is?
15        A.    I do not know what that organization is.
16        Q.    How about the Election Infrastructure
17    Subsector Government Coordinating Council Joint MDM
18    Working Group?
19        A.    I do not know what that is.
20        Q.    Do you know what the Joint MDM Working
21    Group is?
22        A.    I do not know what that is.
23        Q.    Slipping back, it had to be recurring
24    USG-industry meetings, I can't remember if you said
25    this earlier, these continued throughout 2022,
```

**ELVIS CHAN  11/29/2022**

**Page 285**

1   correct?

2       A.    Yeah, they are continuing.

3       **Q.    And they are planned to continue through**

4   **2024, right?**

5       A.    I don't know that for a fact, but I would

6   assume so.

7       **Q.    And disinformation concerns are discussed**

8   **at these meetings on a regular basis?**

9       A.    I would say from the companies -- so as I

10  mentioned to you previously, the federal agencies

11  discuss the topics that they discuss, and then the

12  social media companies, they -- they provide an

13  overview of the content, which is what I would

14  categorize the disinformation as.

15          For example, CISA would talk about the

16  state election process and different states have

17  different dates for primaries, and, you know, the

18  ODNI would provide threat actor -- nation-state

19  threat actor updates, and then the FBI would

20  provide a broad overview of what we were seeing

21  from, like, Russian and state-sponsored actors.

22      **Q.    And then the social media platforms, would**

23  **they report on what sorts of disinformation they**

24  **were seeing on posts on their platforms?**

25      A.    Yes, that is correct.  And from my

**ELVIS CHAN  11/29/2022**

1   recollection, this primarily came from the three

2   social media companies, Google, Facebook and

3   Twitter.

4       **Q.   So in these USG-industry meetings, Google,**

5   **Facebook and Twitter would report on what sorts of**

6   **election-related disinformation they are seeing on**

7   **their platforms?**

8       A.   I would say they would discuss what broad

9   types of disinformation they received, whether it

10  was election related or not.  And the example I

11  want to flag for you is from my thesis where, for

12  example, you saw like the postings about like Black

13  Lives Matters or about 2nd Amendment rights, they

14  would -- they would highlight the current topics

15  that they saw the Russians were either amplifying

16  information about or sowing disinformation about.

17      **Q.   And would you take anything -- let me ask**

18  **you this:  If they provided that information, would**

19  **there be a back-and-forth with the FBI or another**

20  **federal agency about how that jibes with the**

21  **information the FBI was seeing in its**

22  **investigations?**

23      A.   We would not discuss that during the

24  CISA-hosted USG-industry meetings.

25      **Q.   Would you take what the social media**

**ELVIS CHAN  11/29/2022**

**Page 287**

 1    **platforms had reported, that information, and take**

 2    **further action based on that generally?**

 3        A.    In general -- in general what the social

 4    media companies provided at the CISA-industry USG

 5    working group meetings was just broad, strategic

 6    trends that they were seeing.  So there was no

 7    actionable information from there.

 8            The actionable information shared with the

 9    FBI was one-on-one from the companies with FBI San

10    Francisco either during the FITF meetings or

11    outside of the FITF meetings just during the

12    regular course of work.

13            MR. SAUER:  Why don't we go off the

14    record.

15            THE VIDEOGRAPHER:  Off the record at 5:04

16    p.m.

17            (Whereupon a recess was taken.)

18            THE VIDEOGRAPHER:  We are back on the

19    record at 5:15 p.m.

20            (Reporter marked Exhibit No. 2 for

21            identification.)

22        Q.  **BY MR. SAUER:  Mr. Chan, I am going to**

23    **show you Exhibit 2, which I emailed to your counsel**

24    **earlier today.  This is the read-through version on**

25    **the screen of the LinkedIn emails.**

**ELVIS CHAN  11/29/2022**

Page 288

```
 1           Mr. Chan, have you actually reviewed this
 2    collection of emails?
 3        A.   I have not.
 4        Q.   Okay.  Are you aware that you're on 121
 5    pages of emails with the social media platform
 6    LinkedIn setting up meetings in 2020 and 2022, as
 7    you talked about today?
 8        A.   So I don't know the exact number, but I
 9    believe that sounds about right.
10        Q.   And that would be -- what you did with
11    LinkedIn, you also would have done with about six
12    or seven other social media platforms as well,
13    scheduling monthly -- sorry, quarterly then monthly
14    then weekly meetings that led up to the elections,
15    right?
16        A.   That's correct, they would be similar
17    types of correspondence.
18        Q.   On the first page here you talk about
19    "Increased cadence touch point before election"
20    when you're sending an invite to them.  Why did you
21    increase cadence before the election?
22        A.   This was actually at the company's
23    request.  We said, "Do you think a quarterly
24    cadence is enough or should we go to a more
25    frequent cadence?"  I would say -- I can't remember
```

**ELVIS CHAN  11/29/2022**

```
 1   which companies, but I would characterize most of
 2   the companies as wanting at least a weekly cadence
 3   just to have a touch point on the calendar in case
 4   they or we wanted to talk about something.
 5       Q.   Typically did you actually meet with them
 6   on a weekly basis in the two months or so before
 7   the election?
 8       A.   I think generally we had a meeting, but
 9   like I don't remember, like, the substance.  You
10   know, if during this message thread I may have, you
11   know, put an agenda item or two, then we would have
12   had substance.  But I can't remember just from
13   looking at these emails.  I would have documented
14   any substantive meetings that we had with LinkedIn
15   or any of the other companies.
16       Q.   When you say "documented," did you write
17   up a report of it?
18       A.   Yes.  So the system of record for the FBI
19   is called Sentinel.  It is a file management
20   system, and I would have and I did document every
21   substantive interaction that I had with social
22   media companies, or actually any organization, for
23   that matter.
24       Q.   Would you have written Sentinel reports
25   for all of the FITF social media platform meetings?
```

**ELVIS CHAN  11/29/2022**

```
 1      A.   Based on my recollection, I wrote almost
 2   all of them, but maybe not all of them.  And the
 3   reason I say that is malign foreign influence is
 4   just one of the issues that I have to deal with in
 5   my role.  The majority of my role is dealing with
 6   cyber investigations.  So maybe on a couple of
 7   occasions I may have asked someone else to write
 8   the meeting summary on my behalf.
 9      Q.   But there would be a Sentinel report for
10   every meeting that you had with a social media
11   platform that discussed this information and/or
12   malign foreign influence?
13      A.   Yes.  There would be -- in FBI parlance,
14   they are called electronic communications, ECs.
15      Q.   So ECs exist that record your
16   contemporaneous recollection of all of these
17   meetings we have been talking about?
18      A.   That is correct.
19      Q.   And do those ECs exist with respect to the
20   USG-industry meetings?
21      A.   I would say that I documented all the
22   meetings that I attended at those CISA USG-industry
23   meetings.
24      Q.   So you -- would you have documented what
25   discussions that were related to foreign hacking
```

**ELVIS CHAN  11/29/2022**

**Page 291**

1    attempts?

2        A.    I think in general, my practice for that

3    was I would take the agenda from the email provided

4    by CISA, and then I would cut and paste that or I

5    would just retype that into my meeting summary.

6        **Q.    So your meeting summary would just be the**

7    **agenda that you were given?**

8        A.    Yes.  I would say in the vast majority, if

9    not all, of the communications.  And the reason for

10   that is because they were just very broad overviews

11   or, you know, trends that were being discussed.

12       **Q.    Whereas you'd have more specific detail in**

13   **your ECs with respect to the FITF social media**

14   **platform bilateral sync meetings?**

15       A.    That is correct.  I believe the reason for

16   that is because the companies felt more comfortable

17   or more forthcoming in a bilateral setting as

18   opposed to in a group setting because these

19   companies are all competitors at the end of the

20   day.  That is just my personal opinion.

21       **Q.    On the third page of this document, where**

22   **are those -- by the way, where are those ECs**

23   **stored, or they are all housed by the FBI?**

24       A.    Yeah.  As I mentioned, they are in an

25   application called Sentinel.  They would be

**ELVIS CHAN  11/29/2022**

Page 292

```
 1   stored -- so as I mentioned, Sentinel is a case
 2   file management system.  So they would be
 3   documented to the appropriate case file.
 4       Q.   And then -- and those reports still exist,
 5   correct?
 6       A.   Yes.
 7       Q.   The third page of this document there's a
 8   response to you from someone at LinkedIn whose
 9   identity is redacted, but they are identified as
10   "Director of Threat Prevention LinkedIn Trust &
11   Safety."
12               (Discussion off the record.)
13       Q.   BY MR. SAUER:  Third page of this
14   document, now do you see it on the screen share?
15   You are communicating with --
16       A.   Is it the one -- is it the one dated
17   September 29, 2020, 11:17 a.m.?
18       Q.   Yes.  No, 11:39 a.m., third page of the
19   document.  Just if you look at the -- can you see
20   it on the screen share?  I am highlighting it.
21       A.   Yeah, it looks like the email was sent
22   Tuesday, September 29, 2020, 11:17 a.m.
23       Q.   Yeah, yeah, you're right.  I'm sorry.  I
24   was looking at the top.
25               My only question is:  Is this consistent
```

**ELVIS CHAN  11/29/2022**

**Page 293**

1    with what you testified earlier, that in these

2    bilateral meetings between FITF and the social

3    media platforms, the people that you would be

4    meeting with would be trust and safety and site

5    integrity people, correct?

6        A.    Yes.  Yeah, it would be typically director

7    level and then their direct reports and, you know,

8    people from the organizations.

9        Q.    I am going to jump ahead to this page

10   which is labeled LinkedIn 86.  It is the seventh

11   page of the PDF.  Here in your email you see dated

12   Tuesday, November 17, 2020, which is right after

13   the 2020 election, you tell LinkedIn folks that you

14   want to have a, quote, Post Election Hot Wash.

15   What on earth does that mean, "hot wash"?

16             MR. SUR:  I am sorry to interrupt.  Can I

17   ask for you to repeat what page you are on?  This

18   is a large document.

19             MR. SAUER:  Seventh page of the PDF.

20             MR. SUR:  Seventh page of the PDF.

21             MR. SAUER:  It's got Bates No. 86 at the

22   bottom.

23             MR. SUR:  Okay.  Okay.  Mr. Chan, if you

24   want to read the document.

25             THE WITNESS:  Is this a document dated

**ELVIS CHAN  11/29/2022**

**Page 294**

```
 1   Tuesday, November 17th, 2020, 12:16:09 p.m.?
 2        Q.   BY MR. SAUER:  Yeah.  And you say --
 3        A.   If you could bear with me while I read my
 4   email.
 5        Q.   Sure.
 6        A.   Oh, yeah, so you said the second agenda
 7   item was "Post Election Hot Wash"?
 8        Q.   Yeah.  What does that mean?
 9        A.   So sorry.  That is a law enforcement term.
10   A hot wash -- so after the FBI -- when we conduct a
11   search operation or execute an arrest operation,
12   after we're done with the operation, then we have a
13   meeting as closely thereafter the operation as we
14   can to discuss what we thought went well, what we
15   thought needs improvement, what we think needs to
16   change for next time.
17             So a hot wash is similar to an
18   after-action meeting.
19        Q.   Did you discuss with all the social media
20   platforms what went well, what didn't go well and
21   what we need to do differently next time?
22        A.   Yes.  From my recollection, we had hot
23   wash meetings with all of the social media
24   companies that I previously listed.
25        Q.   And what did -- what did you all think
```

**ELVIS CHAN  11/29/2022**

**Page 295**

 1   **went well and think didn't go well?**

 2       A.   So based on my recollection, this is

 3   specifically during the election command post that

 4   this hot wash occurred.  So after the election

 5   command post.  So my recollection was the hot wash

 6   was specifically about the election command post.

 7           And for that context, what the companies

 8   said worked well was that -- I don't know if I

 9   mentioned this yet, but we used two separate

10   communication channels to communicate with the

11   social media companies at the election command

12   post.  One was called Signal -- I don't know if

13   you're familiar with that communication

14   application.  It's an encrypted chat app.

15           And then the second method is via the

16   Teleporter application, which I referenced before

17   is the FBI's secure file transfer application.

18           So as I mentioned before, the companies

19   liked knowing that they were getting information in

20   realtime from the FBI and that they were getting

21   the same information as all of the other companies

22   on the Signal chat app.  That was one of the things

23   I was highlighting as good.

24           Another thing that was highlighted as good

25   by the companies who received information from us

**ELVIS CHAN  11/29/2022**

Page 296

```
 1   is we would send information about malign foreign
 2   influence to specific companies as we became aware
 3   of it, and then they would review it and determine
 4   if they needed to take action.
 5            So the companies who did receive
 6   one-to-one Teleporter information from us also
 7   liked that.
 8            So those were the two things that I
 9   remember that people liked in general.
10       Q.   What did they not like?
11       A.   So I think that -- so I don't remember the
12   social media companies telling us there wasn't
13   anything that they did not like.  What I do
14   remember was I can't remember who, perhaps it was
15   me, just so you're aware, for the Signal channel,
16   it was one-way communication.  It was the FBI,
17   specifically the FBI San Francisco command post,
18   disseminating information to the companies.
19            If the companies needed to relay
20   information back to the FBI, they would contact the
21   FBI San Francisco election command post either by
22   telephone or by email and request a Teleporter
23   link, and then they would share information back to
24   us in that fashion.
25       Q.   You think that was a cumbersome process?
```

**ELVIS CHAN  11/29/2022**

**Page 297**

1     A.    It was not realtime.  I mean, at the end

2   of the day, I don't remember any specific instance

3   where the delay caused any harm to anything, but I

4   think what my preference would have been was for --

5   if they needed to, to set up direct Signal channels

6   only with the FBI so that they could get realtime

7   information as well.

8         But the social media companies -- or

9   actually all of the companies who were on the

10  receiving end, they -- I was told that they all had

11  an internal discussion and their preference was to

12  only use Signal for FBI broadcasts.

13    **Q.    You mentioned Signal and Teleporter as two**

14  **channels of communication between the FBI and the**

15  **social media companies.  Are there any others?**

16    A.    No.  So, I mean -- let me rephrase that.

17  The only other commun- -- the only other situations

18  where we relayed information to the companies was

19  during those quarterly or monthly or weekly FITF

20  meetings with the social media companies.  So that,

21  I guess, would be a third method of relaying

22  information.

23    **Q.    Is Signal a self-deleting app?  Is it an**

24  **app where your messages disappear after they are**

25  **read?**

**ELVIS CHAN  11/29/2022**

**Page 298**

1      A.   So yes, in general, Signal is a

2  self-deleting app.  But based on guidance from FBI

3  headquarters, we had to turn that functionality off

4  because we needed to save all of that information.

5  So we did.  We took screen shots of all of the

6  information on the Signal channel.  We burned it to

7  DVDs, and then we have saved it as evidence.

8      **Q.   So all the -- all the communications on**

9  **Signal between FBI and social media platforms from**

10  **2022 and 2020 are saved on -- on DVDs or CDs?**

11      A.   No.  Only the information -- only the

12  Signal information from the 2020 FBI San Francisco

13  command post was saved.  And the reason for that

14  was both the social media companies as well as the

15  FBI assessed that there would not require the need

16  for the Signal channel because we did not

17  anticipate a large amount of information being

18  disseminated from the FBI for the 2022 midterm

19  elections.

20      **Q.   Did you not use Signal at all in 2022?**

21      A.   No.  It was primarily through Teleporter.

22      **Q.   You did use Teleporter for the 2022**

23  **elections to report misinformation concerns to**

24  **social media platforms?**

25      A.   That is correct.

**ELVIS CHAN  11/29/2022**

**Page 299**

 1      Q.    And then you used both version -- or both

 2   channels in 2020?

 3      A.    That's correct.

 4      Q.    And the Teleporter communication still

 5   exists as well; is that right?

 6      A.    Yes, they currently exist.

 7      Q.    On this same page you talk about "what we

 8   need to do differently for next time."  What did

 9   you -- what did you all decide you need to do

10   differently next time?

11           MR. SUR:  Objection; calls for

12   speculation.

13           THE WITNESS:  Honestly, I wrote that down,

14   but I don't remember any things that the companies

15   wanted to do differently.

16      Q.    BY MR. SAUER:  I take it one thing you did

17   do differently was you stopped using Signal, right?

18      A.    Well, that was for the 2022 elections only

19   because both the companies and the FBI assessed

20   that there would not be the same volume of

21   information that happened in the 2020 cycle.  I

22   believe that differentiation is, you know, between

23   a general elections versus a midterm election.

24           MR. SAUER:  I am going to jump ahead to

25   the page marked LinkedIn 146.  And Indraneel, it is

**ELVIS CHAN  11/29/2022**

**Page 300**

 1    the tenth page of the PDF.

 2            MR. SUR:  Tenth page of the PDF.

 3        **Q.   BY MR. SAUER:  If you go up there on the**

 4    **ninth page, Agent Chan, you see that Tuesday, July**

 5    **14th, 2020, 11:02 a.m. there's an email from you to**

 6    **the LinkedIn team?**

 7            MR. SUR:  I apologize.  I am not seeing

 8    the date.  Is the date at the bottom of the

 9    previous page?

10            MR. SAUER:  The date's at the bottom of

11    Page 9 if you look at the file share.

12            THE WITNESS:  Did you say July 14, 2020,

13    11:02 a.m.?

14        **Q.   BY MR. SAUER:  I said that.**

15        A.   Okay.

16        **Q.   If you scroll down, you are talking about**

17    **having the next round of FITF bilateral meetings**

18    **with LinkedIn scheduled.  Do you see that?**

19        A.   Correct.

20        **Q.   And then at the bottom you say, "Planning**

21    **for U.S. elections:  FBI posture, your posture, and**

22    **the information sharing" channel and "channels and**

23    **methods," correct?**

24        A.   Yes.

25        **Q.   What did you mean by "FBI posture and your**

**ELVIS CHAN  11/29/2022**

Page 301

1    posture"?

2        A.    The FBI posture was what the FBI San

3    Francisco command post would look like, when it

4    would be active, who it would be staffed by.  And

5    then the FITF personnel would describe what the FBI

6    headquarters command post would look like.  That's

7    what was meant by "FBI posture."

8        **Q.    This is planning --**

9        A.    And then your --

10       **Q.    Go ahead.**

11       A.    And then "Your posture," that's when we

12   asked the companies how they expected to have

13   personnel.

14            Just so you're aware, I think in general,

15   like FBI -- so FBI headquarters, they just ran 24

16   hours a day for their command post, I believe from

17   Friday to Tuesday.  FBI San Francisco ran from, I

18   believe, 8:00 o'clock in the morning to perhaps

19   10:00 o'clock at night every day except the

20   election, when we ran until midnight.

21            So asking about your posture would be

22   asking the companies when they intended to have

23   personnel on what days monitoring their platform

24   for any threats that they saw.

25       **Q.    And what did you say about information**

**ELVIS CHAN  11/29/2022**

**Page 302**

1    sharing channels and methods?

2         A.    So I think that is when we wanted to

3    confirm if Signal and Teleporter would be the

4    accepted communication channels.

5         Q.    **Anything else?**

6         A.    Not that I'm aware of.

7         Q.    **Were the tech companies okay with using**

8    **Signal and Teleporter?**

9         A.    So the tech companies were the ones who

10   suggested Signal as the real -- the, quote/unquote,

11   realtime communication platform.

12        Q.    **And the FBI continued to use Teleporter as**

13   **well?**

14        A.    Yes.  Because that is our secure file

15   transfer system, and I believe that the companies

16   were comfortable using that system.

17        Q.    **Jump ahead to LinkedIn 163.**

18              **(Discussion off the record.)**

19              MR. SUR:  May I ask what the SES heading

20   is?

21              MR. SAUER:  This is the twenty-first page

22   of the PDF.

23        Q.    **Agent Chan, you see there on the file**

24   **share this is an email from you to the LinkedIn**

25   **team dated October 19th, 2020?**

**ELVIS CHAN  11/29/2022**

**Page 303**

```
 1            MR. SUR:  Yes, let's just give him a
 2    moment to see it on the screen.
 3            THE WITNESS:  Yes, I see that email.
 4        Q.   BY MR. SAUER:  In this email you say
 5    "LinkedIn folks," says, "Subject:  Additional
 6    information," correct?
 7        A.   Yes.
 8        Q.   There's a gentleman here who you've copied
 9    from -- right there with the initials AF from the
10    FBI.  Do you see that?
11        A.   Yes, I do.
12        Q.   Who is he?
13        A.   He is a member of the Foreign Influence
14    Task Force, specifically the global unit.
15        Q.   What does "CID" stand for next to his
16    name?
17        A.   Criminal Investigative Division.  That's a
18    headquarters component.
19        Q.   You refer to someone by a nickname here
20    and in the body of the email.  Is that the same
21    individual with the initials AF?
22        A.   That is correct.
23        Q.   You say, "LinkedIn folks, please see
24    additional information from FITF-Global Unit.  I
25    have cc'd" that guy "in case you have any
```

**ELVIS CHAN  11/29/2022**

Page 304

```
 1    questions.  Thanks."
 2            Do you have any idea what the initial
 3    information was you are sending here?
 4        A.   I have -- I have no idea.  I can't
 5    remember.  I sent so much -- you know, it happens
 6    so regularly, I couldn't even speculate.
 7        Q.   It says -- it looks like you cut and
 8    pasted some texts saying, "Named U.S. political
 9    party:  Republicans.  Named U.S. presidential
10    candidate:  Biden.  The U.S. President:  Trump."
11    Do you have any idea what that's referring to?
12        A.   I don't.  I can provide you with my
13    speculation.
14        Q.   Go ahead.
15        A.   I believe that link -- I believe that we
16    may not have named with specificity the U.S.
17    political party, the U.S. presidential candidate or
18    the U.S. president, and that LinkedIn may have
19    asked for clarifying information.
20        Q.   About what, clarifying --
21        A.   About the information that was shared.
22        Q.   Here there's a reference here to
23    "Information Sharing 5," right?
24        A.   Yes.
25        Q.   What's that mean?
```

**ELVIS CHAN  11/29/2022**

**Page 305**

```
 1       A.   So to me that would mean I had probably

 2   shared -- I don't know this for a fact, but from my

 3   own speculation, I would believe that at some point

 4   in October I shared five separate documents with --

 5   at least five separate documents with LinkedIn, and

 6   that one of the documents was named "Information

 7   Sharing 5," and that within that document we have

 8   information about a U.S. political party, a U.S.

 9   presidential candidate and a U.S. president.

10       Q.   What kind of information about the U.S.

11   political party, presidential candidate, president

12   would you have shared with LinkedIn?

13       A.   I have -- I have no idea.  I can't

14   recollect, unfortunately, without looking at the

15   actual document.

16       Q.   Would it be disinformation related?

17       A.   My guess would be it would be

18   disinformation related.  And because it's coming

19   from the global unit, it would be disinformation

20   information not related to Russia or China.

21   Because global unit handles Iran and other

22   countries.

23       Q.   This would be a potentially

24   malign-foreign-influence-type activity from

25   countries other than Russia or China?
```

**ELVIS CHAN  11/29/2022**

```
 1      A.   Without seeing the actual document or
 2   remembering at this time, that would be my best
 3   assessment.
 4      Q.   Let me jump ahead to a page marked
 5   LinkedIn 168.  This is the twenty-sixth page of the
 6   PDF.  Are you with me?
 7           MR. SUR:  Yes.  Mr. Chan needs a moment to
 8   review the document.
 9           THE WITNESS:  Is this a document sent on
10   11/19/2020 9:07:16 a.m.?
11      Q.   BY MR. SAUER:  Correct.  In this email you
12   say, "LinkedIn folks, heads up I'll be sending you
13   a Teleporter link with new indicators, which are
14   not election related."  Do you know what that
15   means?
16      A.   I can't remember, but I would surmise that
17   it meant it was not related to the election that
18   just occurred earlier in the month.
19      Q.   And then indicators I think you testified
20   earlier refers to URLs or specific accounts or
21   things of that nature, right?
22      A.   Yes.  It would be different indicia of
23   that nature.
24      Q.   So do you flag disinformation/
25   misinformation from malign foreign actors to social
```

**ELVIS CHAN  11/29/2022**

 1    media platforms that doesn't relate to elections?

 2        A.   I don't know why I -- I can't remember why

 3    I flagged that as not being election related.   I

 4    think the only -- I don't recall exactly, but I

 5    would surmise that I would have flagged it as

 6    election -- like, if it was election related, I

 7    believe that all of the companies, including

 8    LinkedIn, would have acted on it quickly.

 9            You know, everyone was very tired from

10    working very long hours and very long shifts during

11    the election command posts.

12            So that would be the only reason -- or

13    that would be a reason why I believe I would have

14    flagged it as not election related so that they

15    wouldn't have to, you know -- like, if they were

16    taking the day off or taking time off because it

17    was near Thanksgiving time frame.

18        Q.   What -- what malign-foreign-influence

19    activities do you flag for social media companies

20    that aren't related to elections?  What sort of

21    content do you flag?

22        A.   So in general, it would be -- in general,

23    it would be from our cyber investigations, or from

24    state-sponsored actors that were -- that we would

25    not believe were associated with hack-and-dump

**ELVIS CHAN  11/29/2022**

**Page 308**

```
 1    campaigns.  That would be one type of nonelection
 2    related.
 3         Q.   Are there others?
 4         A.   Off the top of my head, that's the one
 5    that's sticking out to me.  That would be a likely
 6    type of information.  It would be related to a
 7    cyber investigation that was not necessarily
 8    related to any disinformation, specifically any
 9    malign foreign influence.
10              MR. SAUER:  I don't have any further
11    questions.
12              (Discussion off the record.)
13              EXAMINATION BY MR. SUR
14         Q.   Mr. Chan, you testified earlier today
15    about the 2020 Hunter Biden laptop story in the
16    questioning with Mr. Sauer.  Do you remember the
17    question that came from a Facebook analyst at one
18    of the meetings in 2020?
19         A.   Yes.
20         Q.   Okay.  And what was that question, to your
21    recollection?
22         A.   To my recollection, the question was,
23    "What can you share about the Hunter Biden case?"
24         Q.   And at that meeting you were there with
25    other FBI officials; is that right?
```

**ELVIS CHAN  11/29/2022**

Page 309

```
 1        A.   Yes, with Foreign Influence Task Force

 2   officials.

 3        Q.   Okay.  And who were they again?

 4        A.   I specifically remember Laura Dehmlow was

 5   present because she was the official who said that

 6   the FBI had no comment.

 7        Q.   Okay.  Did she --

 8             (Discussion off the record.)

 9        Q.   BY MR. SUR:  So picking up there, did

10   Ms. Dehmlow say anything else?

11        A.   Not in response to the Hunter Biden

12   question.

13             MR. SUR:  That's all I have.

14             MR. SAUER:  Nothing further.

15             (Discussion off the record.)

16             THE VIDEOGRAPHER:  Okay.  This concludes

17   today's deposition of Elvis Chan.  We are off the

18   record at 5:47 p.m.

19                  (Whereupon the proceedings were

20                  concluded at 5:47 p.m.)

21                        ---o0o---

22

23

24

25
```

**ELVIS CHAN  11/29/2022**

```
 1                DEPOSITION OFFICER'S CERTIFICATE
 2     STATE OF CALIFORNIA     )

 3                             ) ss.

 4     COUNTY OF SAN FRANCISCO)

 5

 6           I, Balinda Dunlap, hereby certify:

 7           I am a duly qualified Certified Shorthand

 8     Reporter in the State of California, holder of

 9     Certificate Number CSR 10710 issued by the Certified Court

10     Reporters' Board of California and which is in full

11     force and effect.  (Fed. R. Civ. P. 28(a)(1)).

12           I am authorized to administer oaths or

13     affirmations pursuant to California Code of Civil

14     Procedure, Section 2093(b) and prior to being examined,

15     the witness was first duly sworn by me.  (Fed. R. Civ.

16     P. 28(a)(a)).

17           I am not a relative or employee or attorney or

18     counsel of any of the parties, nor am I a relative or

19     employee of such attorney or counsel, nor am I

20     financially interested in this action.  (Fed. R. Civ. P.

21     28).

22           I am the deposition officer that

23     stenographically recorded the testimony in the foregoing

24     deposition and the foregoing transcript is a true record

25                             / / /
```

**ELVIS CHAN  11/29/2022**

**Page 311**

```
 1    of the testimony given by the witness.  (Fed. R. Civ. P.

 2    30(f)(1)).

 3            Before completion of the deposition, review of

 4    the transcript [  ] was [  ] was not requested.  If

 5    requested, any changes made by the deponent (and

 6    provided to the reporter) during the period allowed, are

 7    appended hereto.  (Fed. R. Civ. P. 30(e)).

 8

 9    Dated:

10

11                          _____

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**ELVIS CHAN  11/29/2022**

**Page 312**

```
 1                           LEXITAS LEGAL

 2    December 5, 2022

 3    DEPARTMENT OF JUSTICE
      1100 L Street Northwest
 4    Washington, D.C.  29530
      INDRANEEL SUR, ESQ.
 5
      IN RE: STATE OF MISSOURI, et al. v. JOSEPH R.
 6          BIDEN, JUNIOR, et al.

 7    Dear Mr. Sur,

 8    Please find enclosed your copies of the deposition of
      ELVIS CHAN taken on November 29, 2022 in the
 9    above-referenced case. Also enclosed is the original

10    signature page and errata sheets.

11

12    Please have the witness read your copy of the

13    transcript, indicate any changes and/or corrections

14    desired on the errata sheets, and sign the signature

15    page before a notary public.

16

17    Please return the errata sheets and notarized

18    signature page within 30 days to our office at 711 N

19    11th Street, St. Louis, MO 63101 for filing.

20

21    Sincerely,

22

23

24    LEXITAS LEGAL

25
```

**ELVIS CHAN  11/29/2022**

**Page 313**

```
 1                        ERRATA SHEET
      Witness Name: ELVIS CHAN
 2    Case Name: STATE OF MISSOURI, et al. v. JOSEPH R.
                 BIDEN, JUNIOR, et al.
 3    Date Taken: NOVEMBER 29, 2022

 4

 5    Page #_____   Line #_____

 6    Should read: _____

 7    Reason for change: _____

 8

 9    Page #_____   Line #_____

10    Should read: _____

11    Reason for change: _____

12

13    Page #_____   Line #_____

14    Should read: _____

15    Reason for change: _____

16

17    Page #_____   Line #_____

18    Should read: _____

19    Reason for change: _____

20

21    Page #_____   Line #_____

22    Should read: _____

23    Reason for change: _____

24

25    Witness Signature: _____
```

**ELVIS CHAN  11/29/2022**

**Page 314**

```
 1   STATE OF _____)

 2   COUNTY OF _____)

 3

 4   I, ELVIS CHAN, do hereby certify:

 5         That I have read the foregoing deposition;

 6         That I have made such changes in form

 7   and/or substance to the within deposition as might

 8   be necessary to render the same true and correct;

 9         That having made such changes thereon, I

10   hereby subscribe my name to the deposition.

11         I declare under penalty of perjury that the

12   foregoing is true and correct.

13         Executed this _____ day of _____,

14   20___, at _____.

15

16

17

18                             _____

19                             ELVIS CHAN

20

21                             _____

22                             NOTARY PUBLIC

23   My Commission Expires:

24   135954

25
```

ELVIS CHAN  11/29/2022

**A**

A-l-i-a 49:5
A-n-t 210:7
A-u-t-e-n 256:25
A-y-l-e-a 49:6
a.m 6:5,12
  22:13,16
  77:10,13
  96:13,16
  106:8,11
  167:25
  197:17
  292:17,18
  292:22
  300:5,13
  306:10
Aaron 46:1
abbreviate
  24:17 25:1
abbrevia...
  143:5
ability
  16:24
  115:2
  206:11
able 14:1
  20:3 31:11
  32:23
  73:11
  86:10,18
  102:24
  112:2
  114:4,18
  120:21
  133:16
  136:23
  146:24
  160:5
  162:25
  176:8
  235:21
  244:22
  253:1
  270:22,24
abolished
  268:19
above-re...

312:9
abstract
  28:14 29:1
abundance
  174:11
accepted
  302:4
accepting
  168:19
access
  136:22
  174:16
accessed
  14:18
accident...
  113:15
  138:11
  139:13
accord
  188:19
  189:8,12
account
  29:11
  32:10,11
  35:19,23
  36:16
  68:22,23
  69:4 76:5
  76:16,17
  76:19
  83:10,11
  89:2,5
  90:11
  100:16
  112:17,18
  112:19
  113:24
  114:20
  115:3,6,20
  116:18
  117:10
  125:20
  128:23
  130:17
  131:4
  133:21
  139:13
  165:19,21
  244:3

265:17,21
accounts
  14:13 15:3
  15:16 30:5
  30:5 31:24
  32:13,24
  33:5,10,15
  34:2,17,24
  35:3,12
  37:21 38:1
  38:5 60:4
  62:4 65:14
  68:21 70:5
  70:10,17
  71:16,25
  74:1,11
  78:3 86:22
  92:20,24
  93:7,8
  95:2 96:6
  96:7,25
  98:17
  99:14,19
  99:21
  100:2,6,8
  100:13
  103:17
  111:3,5,6
  112:12,16
  113:25
  114:2,6,10
  114:14,23
  115:12
  131:8
  132:13,18
  133:25
  134:2,7
  138:18
  143:15,20
  144:1,23
  146:16,24
  147:5,7,12
  147:19
  148:9,19
  149:10,23
  150:7,18
  158:16,21
  159:23
  162:24

163:1
  165:17
  199:3
  232:3
  235:23
  236:22
  273:13,21
  274:4,17
  306:20
accurately
  224:1
achieve
  126:19
achieving
  78:16
  142:20
acknowle...
  38:14
acquire
  111:19
acquired
  73:9
acronym
  279:9
act 16:22
  111:23,24
  121:23
  143:11
acted 108:13
  149:6
  150:17
  165:25
  307:8
action 68:8
  102:19
  147:4
  160:18
  167:12
  205:1
  242:4
  254:6
  287:2
  296:4
  310:20
actionable
  88:21,25
  287:7,8
actions 12:6
  12:10

34:10
  37:18
  102:25
  104:4,17
  129:2,14
  129:16
  133:11
  136:14
  143:12,19
  166:20
  232:19
  249:8,9,17
  249:25
  250:21,23
  251:15
  253:25
  254:3
  270:19
  274:3,15
activate
  168:8
active 71:3
  108:5
  120:23
  125:20
  126:3
  127:11
  147:17
  186:2
  195:20,22
  196:1,4,8
  196:13
  203:17
  215:10
  258:8
  301:4
actively
  204:19
activities
  12:3 13:1
  13:5,6
  14:8 46:22
  54:17
  55:16
  66:24
  69:14,25
  90:1 92:2
  93:7,8,19
  94:1,25

ELVIS CHAN  11/29/2022

| | | | |
|---|---|---|---|
| 95:9 126:2 | 80:14 | 130:12 | 310:13 |
| 138:6,8 | 81:14,21 | 136:15 | **Africa** 31:9 |
| 156:25 | 82:3,4,19 | **ads** 78:1,12 | 31:20 |
| 240:7 | 83:9,12,15 | 78:25 79:2 | **after-ac...** |
| 307:19 | 83:16,25 | 80:15 | 294:18 |
| **activity** | 114:24 | 93:11,12 | **AFTERNOON** |
| 13:7,8 | 115:13 | 93:14 | 141:2 |
| 87:14 | **add** 12:17 | **advance** | **age** 84:23 |
| 90:13 95:7 | 118:21 | 120:10,12 | **agencies** |
| 95:8,14,14 | 239:13 | **advanced** | 17:16 18:1 |
| 126:24 | 270:24 | 272:23 | 18:7,11 |
| 136:17,20 | **added** 42:10 | **advantage** | 24:8 57:7 |
| 137:12 | 42:12 | 227:23 | 57:11 |
| 138:19 | **addition** | **advertise** | 152:20 |
| 160:19 | 10:5 21:16 | 72:24 | 170:9 |
| 167:16 | 131:5 | **advertis...** | 211:12 |
| 305:24 | 184:24 | 77:18 | 218:25 |
| **actor** 113:2 | **additional** | 78:11 | 221:5,8,23 |
| 285:18,19 | 103:11 | 83:14 | 278:22 |
| **actors** 14:5 | 163:19 | **advertising** | 281:23 |
| 32:14 | 164:23 | 93:16 | 285:10 |
| 33:16 | 266:8 | **advice** 30:12 | **agency** 16:23 |
| 39:10,13 | 275:25 | 30:18 | 18:17 31:7 |
| 42:16 51:1 | 279:16 | 282:19 | 31:19 60:2 |
| 53:25 60:3 | 303:5,24 | **advise** | 61:12 |
| 138:5 | **address** 62:4 | 206:10 | 69:17 73:4 |
| 154:5 | 100:9 | **advised** | 75:9,25 |
| 187:4 | 129:3 | 163:21 | 76:3 78:21 |
| 190:5 | 133:6 | **advising** | 100:7,10 |
| 219:2,8,24 | 134:20 | 50:19 | 111:14,14 |
| 226:8,10 | 186:5,15 | **advisories** | 138:4,25 |
| 227:18 | 211:4 | 244:14,16 | 141:18 |
| 258:11 | 248:25 | 244:17,21 | 143:3 |
| 285:21 | 249:4 | 244:24 | 154:6 |
| 306:25 | **addresses** | 245:3,6 | 157:1 |
| 307:24 | 30:5 31:23 | **advisory** | 221:13,15 |
| **actual** 9:24 | 51:4 99:21 | 245:9 | 221:17 |
| 59:13 74:5 | 168:11 | 279:2,5 | 233:9 |
| 111:5 | 199:4 | 284:3 | 278:17 |
| 151:4 | **addressing** | **AF** 303:9,21 | 286:20 |
| 156:21 | 82:7 92:1 | **Affairs** | **Agency's** |
| 168:5 | 250:13 | 140:5 | 126:15 |
| 220:7 | **adjudicated** | **affidavit** | **Agency-a...** |
| 265:12 | 196:10 | 222:23 | 143:16 |
| 282:25 | **adjusted** | 224:21 | **agenda** 27:18 |
| 305:15 | 205:6 | **affiliated** | 27:25 |
| 306:1 | **administer** | 265:25 | 110:3 |
| **ad** 44:20 | 310:12 | 266:1 | 188:1 |
| 68:15,23 | **adopted** | **affirmat...** | 190:20 |
| | | | 213:14 |
| | | | 279:25 |
| | | | 280:15 |
| | | | 281:9 |
| | | | 282:25 |
| | | | 289:11 |
| | | | 291:3,7 |
| | | | 294:6 |
| | | | **agent** 8:11 |
| | | | 23:20 |
| | | | 51:14 |
| | | | 52:10 53:8 |
| | | | 53:11 |
| | | | 54:12 59:2 |
| | | | 77:14 |
| | | | 79:20 |
| | | | 96:17 |
| | | | 107:21 |
| | | | 141:6 |
| | | | 148:7 |
| | | | 259:15 |
| | | | 271:6 |
| | | | 300:4 |
| | | | 302:23 |
| | | | **agents** 105:5 |
| | | | 105:8,14 |
| | | | 106:24 |
| | | | 107:6,15 |
| | | | 107:20 |
| | | | 108:16,21 |
| | | | 110:1 |
| | | | 176:22 |
| | | | 177:8 |
| | | | **aggressive** |
| | | | 76:13 |
| | | | 117:9 |
| | | | 130:11 |
| | | | 242:4 |
| | | | 262:2,19 |
| | | | 270:15,20 |
| | | | **aggressi...** |
| | | | 116:18 |
| | | | **ago** 11:18 |
| | | | 15:20 71:4 |
| | | | 71:14 |
| | | | 95:11 |
| | | | 96:18 |
| | | | 131:22 |
| | | | 194:10 |

**ELVIS CHAN  11/29/2022**

| | | | | |
|---|---|---|---|---|
| 217:19 | 246:14 | **allow**159:15 | 61:6,16 | 213:15 |
| 239:1 | 253:6 | 269:11 | 64:17 | 257:9 |
| 254:2 | 255:20 | **allowed** | 85:21 95:3 | **analyze** |
| **agree** 33:22 | 258:23 | 81:15 | 142:2,7 | 198:14 |
| 68:13 | 280:11 | 112:7 | 143:25 | **and/"or** |
| 77:22,24 | 293:9 | 126:19 | 145:9,16 | 244:7 |
| 82:14 | 299:24 | 311:6 | 145:20,20 | **and/or** |
| 127:17,22 | 301:10 | **allows** | **amount**15:12 | 290:11 |
| 159:8,14 | 302:17 | 111:25 | 73:2 | 312:13 |
| 179:2,3,21 | 304:14 | **alongside** | 110:21 | 314:7 |
| 179:24 | 306:4 | 159:16 | 150:13 | **Angela**46:17 |
| 180:2 | **al**1:6,10 | **AMANDA**2:12 | 298:17 | 124:18,19 |
| 219:22 | 259:6 | **amanda.k...** | **amplific...** | 124:20 |
| 225:17 | 312:5,6 | 2:14 | 76:6 158:5 | **Angeles** |
| 273:16 | 313:2,2 | **ambiguous** | **amplific...** | 276:16 |
| 276:3 | **alert**165:9 | 146:9,20 | 87:8 | **Anna** 271:13 |
| **agreeing** | 165:12 | 154:1 | **amplified** | 271:16 |
| 35:5 | 243:18 | 156:19 | 60:5 86:22 | **announced** |
| **ahead**12:4 | 245:19 | 159:24 | 87:4 | 132:12 |
| 20:1 22:20 | 247:5 | 166:1 | **amplify** | 149:10 |
| 26:21 27:8 | 255:11 | 168:23 | 60:22 | 161:1 |
| 28:14 31:1 | **alerted** | **amended**4:17 | 70:19 | **announcing** |
| 31:2 37:1 | 243:8 | 169:16 | 71:16,19 | 7:19 150:6 |
| 38:8 40:8 | 244:5,10 | 277:13 | 72:12 | **annual**120:8 |
| 40:9,11,13 | **alerts** | **Amendment** | 73:12,13 | 122:23 |
| 51:7 52:16 | 243:16 | 76:14,18 | 73:25 74:8 | **answer** 9:9 |
| 54:21 | 245:17 | 83:16 | 74:15 | 12:1 15:6 |
| 58:23 | 246:7,9 | 122:7,10 | 76:15 | 21:21 |
| 78:24 83:5 | 247:5,11 | 139:5,12 | 158:11 | 34:21 92:4 |
| 84:7 128:6 | **Alex** 54:4 | 163:22 | **amplifying** | 97:12 |
| 132:21 | 57:20,24 | **America** | 286:15 | 104:8 |
| 135:2 | 58:5 | 85:17 | **analysis** | 111:9 |
| 144:19 | **algorithm** | **American** | 4:12 14:24 | 121:15,18 |
| 147:8 | 88:12,24 | 14:7 61:13 | 15:1 24:12 | 122:13 |
| 150:21,25 | 90:12 | 67:9 70:11 | 170:23 | 164:9 |
| 157:6 | **algorithms** | 70:23 | 278:11 | 174:2,4 |
| 158:23 | 88:4,5,17 | 74:19 76:4 | **analyst** | 187:16 |
| 161:14,14 | 89:9,11,15 | 76:13 85:9 | 214:4,18 | 188:24 |
| 161:18,25 | 90:4 | 85:14 86:8 | 216:14 | 189:2,12 |
| 167:4 | 129:25 | 86:16 | 233:23 | 190:22 |
| 176:5 | 136:16 | 163:3 | 257:2,6,7 | 193:20,22 |
| 192:5 | **aligned** | 231:15 | 263:19 | 194:23,24 |
| 203:20,23 | 86:23 | 235:5 | 264:15 | 195:12 |
| 203:25 | **all-source** | 275:18 | 265:5,10 | 199:24 |
| 208:23 | 278:20 | **American-** | 266:4 | 200:19 |
| 220:15 | **allegedly** | 143:6 | 308:17 | 202:2,19 |
| 229:1 | 230:1 | 145:24 | **analysts** | 202:22 |
| 242:7 | **ALLIANCE** | **Americans** | 44:19,22 | 233:18 |
| 245:13 | 2:15,16 | | 139:6 | 243:6 |

**ELVIS CHAN  11/29/2022**

252:20
answers
  250:22
anticipate
  41:8,15
  61:15
  298:17
anticipated
  174:24
  212:8
Antonaros
  210:3
anybody
  175:15
  191:16,16
  209:6
anymore
  76:20
  124:24
anyway 23:14
  23:19
AOL 235:22
AOR 25:1
apart 98:20
apologize
  300:7
app 12:23
  295:14,22
  297:23,24
  298:2
appeal
  149:19
appear
  149:19
  247:12,20
appeared 6:8
  37:13
  67:17
  128:22
  130:15
  133:15
  151:2
  243:19
  247:6
  248:6
  249:7,14
  256:9
appears
  170:16

256:4
  261:14
appended
  311:7
Apple 42:6,8
  234:6
applicable
  232:14
application
  99:2
  138:11
  195:5,7
  291:25
  295:14,16
  295:17
applicat...
  138:7
applies
  94:19
apply 99:21
  108:15
  122:3,8
  185:19
  250:19
appreciate
  102:23
approach
  23:9
  127:24
approaching
  77:3
appropriate
  32:20
  34:10,11
  35:10  51:2
  98:11
  180:5
  226:24
  234:10
  264:17
  274:14
  292:3
approval
  62:22
  82:13
  160:5
  267:12
approve
  133:10

approxim...
  16:12
April 159:12
  161:1
area 24:25
  276:17
arrest
  294:11
arrested
  196:11
arrive 269:9
  269:16,23
arrived
  242:10,21
art 30:3
article
  56:25
  131:19,20
  153:2
  214:9
  230:12,14
articles
  142:2,3,7
  142:10
  144:1
  229:23
  230:4,8,22
  230:23,25
  232:2,14
  232:16
  275:9
arts 10:17
as-needed
  44:21
ASAC 107:7
ascertain
  88:16
ASD-HKS
  279:7
asked 27:11
  89:21
  149:1
  174:22
  213:15
  214:5,23
  215:20
  216:4,14
  233:23
  247:25

248:19,21
  249:3
  250:11
  252:23
  272:3
  290:7
  301:12
  304:19
asking 9:7,9
  9:16 89:14
  89:23
  119:2
  164:6
  171:2
  179:12
  189:17
  248:3,5
  250:14
  252:11
  260:21,23
  301:21,22
asks 272:2
assert
  122:12
  194:11
assess 33:21
  34:16 63:5
  100:6,8
  267:20,21
  274:7
assessed
  168:5
  266:13
  298:15
  299:19
assesses
  217:9
assessing
  73:3
assessment
  35:5 70:15
  70:25  71:1
  73:21
  133:1
  145:22
  147:21
  194:8
  203:18
  229:9

231:14
  242:6
  249:22
  258:14
  264:18
  306:3
assessments
  157:4
assistant
  8:11 184:5
  184:12,21
  185:6
  234:23
associated
  135:18
  193:10,15
  195:25
  222:25
  223:9,14
  223:17
  237:10
  239:11
  257:21
  259:20
  307:25
assume
  150:12
  243:17
  245:18
  246:2,8
  285:6
assumes
  43:19
  74:22
  76:22 82:1
  144:4
  175:2
assumption
  149:8
  150:4
  156:5
  166:16
Atlantic
  162:2
attached
  32:18
  36:23
attack
  276:24

ELVIS CHAN  11/29/2022

277:2
**attacks**
223:2, 3, 9
223:15
225:4
261:8
271:9
276:22
**attempt**
243:21
247:8
256:1, 10
258:12
**attempted**
59:12
**attempting**
64:1
**attempts**
43:18
50:20
174:15
273:2, 4
291:1
**attend** 20:3
20:5  24:18
24:21
46:15
109:19, 20
109:22
110:5, 6, 13
110:19
125:10
239:16, 17
239:20
**attended**
20:8
109:14, 16
109:17
123:18
153:4
156:6
178:17
180:20, 23
181:14, 20
182:15, 22
182:24, 25
183:2
290:22
**attendee**

109:24
171:24
186:2
**attendees**
25:16
**attending**
23:24
125:13
152:23
**attends**
24:13, 14
44:10
**attention**
29:1  77:16
128:20
141:7
217:21
**attorney** 2:4
7:3  22:22
46:14  47:7
47:12
124:3
237:14, 15
237:25
267:6, 6
268:8, 9
270:6
310:17, 19
**Attorney's**
6:19  266:7
267:2
**attorney...**
164:1
187:10
188:9, 25
201:25
202:3, 18
**attorneys**
6:24  23:5
43:12
123:10
135:18
151:16, 18
164:24
268:7, 7
270:9
**attributed**
113:1
**audience**

137:23
140:7
**audiences**
140:2
**audio** 4:23
5:6  126:6
259:4, 13
**August** 155:4
192:15
**Auten** 256:24
**authentic**
132:18
138:18
146:8
**author** 11:15
**authorit...**
265:13
**authorities**
111:16, 17
111:22, 22
**authority**
49:10, 16
215:12
**authorized**
310:12
**available**
24:19
138:16
148:18
**avoids**
121:16
**aware** 18:6
18:15
56:15  57:3
57:6, 8, 10
58:3, 4, 7, 9
58:16, 19
58:22
107:14
108:20, 21
108:24
113:13
125:4
126:1, 3
148:8
161:12
192:3, 6, 22
208:22, 24
212:23

213:4
218:14, 19
220:23
222:17
223:19
224:15
230:8, 9, 16
230:16
232:19, 25
233:2, 8, 10
233:13, 19
233:25
236:22
246:4, 21
246:23
247:2
251:6
266:16
274:18, 21
275:3, 4, 6
275:7
280:8, 10
280:13
281:20
288:4
296:2, 15
301:14
302:6
**awareness**
16:5
172:14
**Aylea** 49:4
_____
            **B**
**B** 157:11
265:8
266:2
269:6
**bachelor**
10:14
**back** 22:15
28:12
38:15  41:2
42:19, 22
50:3  52:11
67:1  71:13
77:12
95:11
96:15, 17

102:19, 24
103:15
104:21
105:12
106:10
112:12
115:4
129:12
141:4, 7
164:14
180:13, 15
198:23
234:17
255:8
275:15, 15
277:20
284:23
287:18
296:20, 23
**back-and...**
286:19
**background**
10:12
**bad** 97:25
100:2, 2
101:24
**Baker** 239:14
239:17
240:3
**Baldwin** 49:4
**Balinda** 1:24
6:6, 21
310:6
**ballot** 19:11
166:15
267:25
269:11, 11
269:23
**ballots**
156:23
164:18
**ballpark**
148:20
**base** 31:8
114:24
**based** 14:22
21:24
63:25  80:7
80:22

```
95:18                Baton 3:5           139:1,3           255:17            216:5,11
103:1,12             bear 294:3          140:6             257:1,6,16        227:11,25
114:18               Bears 4:11          142:16,17         259:18            228:7,17
134:15                11:3               143:21            263:18,20         228:22
135:4                began 54:24         151:21,23         264:4             229:4,10
136:21               beginning           155:25,25         267:8             229:17
137:19                51:18              162:13,25         271:21            230:1,16
140:12                125:23             165:1             276:9             232:7,24
145:6                 155:20             167:24            278:12            233:5,24
151:4                 190:8              171:17            288:9             234:2
167:10               begins 37:8         173:17            291:15            243:25
168:2                 144:21             174:21            299:22            252:14
170:15                170:2              175:23            301:16,18         253:9
194:7                behalf 7:2,6        182:1             302:15            259:6
195:1,17              290:8              184:4             304:15,15         304:10
200:18               behavior            186:8,20          305:3             308:15,23
203:16                86:23              192:13            307:7,13          309:11
230:24                93:13              199:9             307:25            312:6
270:8                beings 45:14        203:19,22        believed           313:2
276:14,16             72:1 85:16         203:24            15:11            Biden's
287:2                 87:22              204:8,18          143:2             212:24
290:1                 89:25              204:21            203:18            230:9,17
295:2                 90:25              205:9,15         believes          big 20:6
298:2                belief 134:9        205:15,22         35:2             213:21,21
basically             204:2              206:2,23        belong             281:18
17:23 78:2            218:23             207:6             236:22           bilateral
78:13                believe             208:21          belonged           39:5 183:2
82:14                 15:20 19:4         211:7             230:1            185:21
158:11                19:24,25           212:15,18       Berger 3:9         189:24
219:23                20:3 25:11         213:25            3:11 7:19        291:14,17
250:4                 27:2 31:18         214:8,15          7:21,21         293:2
basis 23:6            36:21 37:6         214:22            20:24 21:6       300:17
42:5,5                39:14              215:9             21:22           Bill 281:5
44:20,21              42:13              217:16            22:19,25        bit 39:17
97:11                 45:25              219:17            23:2             70:8 77:4
100:1                 47:15,25           221:18          Berkeley           145:7
117:15                48:1 58:13         222:1,18          58:11            197:1
160:11                62:23 74:5         224:8,11        best 13:9          231:5
173:18,21             78:20 90:6         224:13,22         115:2            277:23
173:21                95:23              226:10            306:2           black 67:3
198:5                 109:17             227:22          better 83:4        69:10
208:7,10              116:1,4            228:25            133:20           80:13,16
208:13                117:7             229:3,6,6         134:4            275:10,12
220:14                122:4              231:21          Biden 1:9          286:12
229:18                124:12             240:6             6:15 213:6      blending
239:4                 125:9              244:12            213:8,9,17       146:6
285:8                 133:18             248:10,19         214:6,24        blocked
289:6                 134:6              248:21            215:12,22        232:12
Bates 293:21          138:1              249:24            215:25          249:6
```

ELVIS CHAN  11/29/2022

blocking
  232:1
blog 130:23
BlueJeans
  20:11
Board 310:10
body 303:20
bombing
  143:13
boosted
  13:24
boots 136:5
border 81:15
Borders
  81:14
bot 72:19,21
  76:2,5,14
  76:16
botnet 72:25
  73:1,11
  93:11
bots 63:19
  71:15,24
  72:10,17
  72:17
  73:23 74:3
  74:4,8,10
  74:13,24
  75:1,1
  85:14 87:5
  87:8
  158:10
bottom 28:22
  28:24
  83:19
  84:20
  114:21
  132:14
  150:23
  170:1
  272:6
  293:22
  300:8,10
  300:20
bought 73:6
bounded
  194:4
Box 2:22
Brady 181:21

182:23
183:4
281:5
branch 7:9
  7:17 8:12
  45:5
  121:13
brands 116:5
breach 235:5
  276:25
break 22:6
  77:4 87:24
  180:5
  225:8
  234:10
breaking
  77:2 96:10
breaks 86:8
Brian 25:12
  25:15,19
  26:11,14
  152:7
  256:24
  278:8
brief 226:16
  226:20
briefed
  190:3
briefing
  48:18
  190:10
briefings
  16:5,7,9
  16:14
  38:25
  108:25
  209:2
  226:9,15
  226:22
bring 39:8
  39:11
  206:6
broad 99:23
  285:20
  286:8
  287:5
  291:10
broadcasts
  297:12

broader
  200:25
  280:12
broadly
  59:25
  90:22
  112:2
  135:22
  202:6
  231:15
  235:17
broke 95:22
  141:24
  155:5
  213:21
  214:1,16
  253:9
broken 233:6
broker 58:2
brought
  116:24
  214:15
Building 2:4
bullet 170:2
  277:25
  278:2,25
  279:22,24
  284:2,11
bullets
  276:8
bunch 247:19
Bureau 8:13
burned 298:6
Burns 2:21
  2:23 7:5
button 263:1
buy 78:12
─────────
        C
C 2:1 3:1
C-h-a-n 8:9
C-h-o-c-k
  183:15
C-I-S-A
  279:19
C-o 183:15
C-o-h-e-n
  182:4
C-o-n-e

182:5
cadence 40:1
  40:2,25
  42:20 44:9
  170:8
  171:13
  181:2
  182:15
  219:14
  220:6
  288:19,21
  288:24,25
  289:2
calculation
  85:24
calendar
  289:3
California
  6:1,5,8,19
  58:6,11
  141:1
  310:2,8,10
  310:13
call 27:12
  53:20,21
  97:24
  155:21
  168:6
  282:1,5
called 8:2
  16:2 18:24
  24:12 33:5
  47:24
  53:19,20
  56:13
  62:24
  72:21 99:2
  143:5
  241:24
  259:16,21
  289:19
  290:14
  291:25
  295:12
calling
  128:2
calls 26:6,8
  34:6,20
  35:7 36:8

41:13 48:6
49:14,25
52:3,4,5
53:16
57:21 61:8
63:22
67:14 68:4
68:16,25
70:13 71:8
72:14
73:18
74:21
76:21
78:18
81:25
90:19
104:14
114:15
115:14
117:12
135:10
136:25
138:21
139:17
150:10
153:20
160:21
174:2
188:7
213:1
215:17
224:3
228:19
231:7,18
236:6
237:16,17
237:18
240:9
245:24
246:10
251:23
270:4
274:11
299:11
campaign
13:11
37:13
81:23
84:12,22

ELVIS CHAN  11/29/2022

| | | | | |
|---|---|---|---|---|
| 126:16 | 9:23 115:2 | cautioned | 23:19,20 | 311:5 |
| campaigns | carefully | 248:23 | 51:14 59:2 | 312:13 |
| 4:13 29:10 | 9:8 | caveat 148:4 | 77:14 83:5 | 314:6,9 |
| 30:14,23 | Carnegie | cc'd 197:22 | 84:23 | changing |
| 35:18 36:1 | 142:5 | CDs 298:10 | 96:17 | 130:5 |
| 36:5,11,13 | carry 160:9 | center | 106:12 | 132:2 |
| 39:15 | case 1:8 | 134:11,14 | 141:6 | channel |
| 59:19,24 | 21:11,15 | 134:25 | 180:16 | 98:23 |
| 63:16 70:2 | 30:19 | 137:6 | 197:8 | 296:15 |
| 79:22 | 112:4 | 159:1,1,14 | 259:15 | 298:6,16 |
| 155:2 | 122:7 | 161:4,13 | 271:6 | 300:22 |
| 159:2 | 141:12 | Center' | 280:22 | channels |
| 161:17,24 | 174:12 | 161:3 | 287:22 | 256:16 |
| 162:4 | 191:21 | CEO 242:14 | 288:1 | 295:10 |
| 185:24 | 193:24 | CEOs 4:21 | 293:23 | 297:5,14 |
| 201:17 | 194:16 | 116:21 | 300:4 | 299:2 |
| 223:1,10 | 195:17 | 128:2 | 302:23 | 300:22 |
| 223:15,17 | 196:9,21 | 241:21,24 | 306:7 | 302:1,4 |
| 223:21 | 205:16 | 259:23 | 308:14 | characte... |
| 224:17 | 239:23,24 | 260:2 | 309:17 | 68:20 |
| 283:10 | 289:3 | certain 33:4 | 312:8 | 84:24 |
| 308:1 | 292:1,3 | 73:1,2 | 313:1 | 255:12 |
| Canadian | 303:25 | 90:5 130:6 | 314:4,19 | characte... |
| 93:12 | 308:23 | 131:8 | Chan's 23:16 | 11:22 |
| candidate | 312:9 | 132:3 | chance 10:8 | 15:10 |
| 304:10,17 | 313:2 | 166:18 | change 87:19 | 30:18 34:7 |
| 305:9,11 | cases 120:19 | 190:4,5 | 91:25 | 62:7 65:3 |
| candidates | 166:4,6,23 | 213:24 | 115:19 | 81:12 |
| 16:10,13 | 166:25 | 254:9 | 134:20 | 83:23 |
| 173:10 | 167:1 | 263:21,23 | 294:16 | 89:19 |
| capability | 195:5 | 269:17 | 313:7,11 | 126:22 |
| 209:3 | cast 156:23 | 284:4 | 313:15,19 | 146:10 |
| 236:14 | categories | Certificate | 313:23 | 151:6 |
| capable | 86:9 95:13 | 310:1,9 | changed 78:9 | 167:6 |
| 39:15 | categorize | Certified | 87:16 | 267:11 |
| 190:6 | 285:14 | 6:6 310:7 | 125:19 | 289:1 |
| 226:11,17 | categorized | 310:9 | 206:7,9,10 | characte... |
| capacity | 253:24 | certify | changes | 226:6 |
| 23:16 | category | 310:6 | 118:18 | charge 8:12 |
| 54:12 | 93:18 | 314:4 | 128:23 | 43:23 |
| 55:21 | caucus 19:6 | chain 263:22 | 129:1,3,6 | charges |
| 148:7 | 19:9 | 263:25 | 129:18,24 | 196:3 |
| 234:25 | caucuses | 266:12 | 129:24,24 | chat 295:14 |
| Capps 2:7 | 19:8 | Chan 1:17 | 130:4,16 | 295:22 |
| 7:4 | cause 126:6 | 4:4,14,16 | 130:19,21 | cheating |
| caps 260:14 | 252:4 | 4:16,24 | 130:21,24 | 268:18 |
| 279:19 | caused 297:3 | 5:7,9 6:14 | 132:25 | check 232:23 |
| care 74:14 | caution | 7:21 8:1,9 | 133:6,10 | checked |
| careful 9:18 | 174:12 | | 133:11 | 142:18 |

ELVIS CHAN  11/29/2022

chemical
 10:15
chemistry
 10:15
Chen 48:13
chief 48:1
 54:8 109:7
 109:13
 152:3
 175:18,21
 184:6,10
 184:12,21
 185:4,7
 200:8,23
 201:18
chiefs 184:5
 184:7,8
 185:2,8
China 94:13
 94:23
 109:13
 155:3
 305:20,25
Chinese 95:7
Chock 181:22
 183:14
 254:15
 281:6
choice 34:25
chosen
 168:10
Chris 47:23
 48:12
Christopher
 246:3
Chun 47:12
CHUZI 2:12
CID 303:15
circling
 96:17
Circuit
 194:3
circumst...
 23:8
CISA 16:22
 18:16,23
 24:9 25:8
 26:8,23
 27:14 28:1

152:4,8
154:12,15
155:21
156:20
171:21,25
172:9,13
177:14
178:2
186:5
204:7
211:6,17
213:10
218:22
219:8
220:3
221:18
244:14
275:5,25
276:6,7,11
276:13,22
277:4,8
278:7
279:1,3,4
279:6,15
279:17,19
280:1,11
280:18,22
281:13,20
283:1
284:2,7
285:15
290:22
291:4
CISA's
 170:22
CISA-fac...
 170:19
CISA-held
 189:22
CISA-hosted
 155:15,18
 156:3
 180:24
 187:22,24
 188:13
 189:6
 192:1
 209:17
 218:11,17

281:9
283:18
286:24
CISA-ind...
 287:4
CISA-led
 156:10
 277:10
CISA-org...
 170:12
 181:8,13
 191:11
 218:7
 228:5
Cisco 20:11
citation
 85:5
cite 64:14
 85:25 87:2
 131:19
 142:3
 147:22
 161:5
cited 80:11
 86:25
 95:15
 112:10
 147:23
 195:18
 241:3,7
cites 127:25
citing 85:5
 145:1
 159:18
 162:1
citizen
 76:13
citizen's
 76:4
citizens
 14:7 70:23
 74:19
 78:22
 143:6
 145:24
City 2:5
Civ 310:11
 310:15,20
 311:1,7

civil 2:15
 2:16 7:9
 7:16 9:1
 310:13
clarific...
 9:13
clarify
 33:12
 79:15
 84:15
 129:13
 130:6
 169:18
 194:25
clarifying
 304:19,20
classifi...
 21:1
 160:12
classified
 20:25
 120:21
 236:8
clear 10:1
 23:14 39:4
 179:4
 254:8
clearances
 160:10
 161:9
clearly
 21:19
 28:15
Clemson 87:2
clerk's
 50:15
clerks 50:19
click 14:13
 263:1
clicked
 14:18
clicking
 66:9
client's
 202:24
clients
 179:11,25
Clinton 67:3
 69:10

close 40:3,6
 194:6
closely
 294:13
closer 41:7
 41:9 90:13
 160:2
cloud 42:12
co-optees
 146:3,11
Code 310:13
Cohen 182:4
Coie 197:20
colleagues
 7:4,18
 38:14,22
 57:16,19
collect
 74:12
collection
 288:2
collective
 196:17
colloqui...
 47:22
Colonial
 277:2
combat 4:13
 126:4
 159:17
combatting
 159:20
Combined
 4:17
come 23:12
 75:18
 92:22
 109:9
 118:24
 121:7
 123:15
 137:8
 165:3
 215:22
 216:6
 258:20
comes 18:23
 30:22
comfortable

**ELVIS CHAN  11/29/2022**

| | | | | |
|---|---|---|---|---|
| 73:10 | 71:5 86:6 | 292:15 | 225:11 | 121:4,5 |
| 291:16 | 157:22 | communic... | 231:11,24 | 126:1,18 |
| 302:16 | **comments** | 98:22 | 278:17 | 127:6,20 |
| **coming** 58:4 | 68:12,19 | 99:25 | **community's** | 132:24 |
| 119:18 | 68:24 69:4 | 100:15 | 231:1,6 | 133:5,16 |
| 173:20 | 69:8 | 108:1 | **companies** | 135:11 |
| 190:20 | 117:20 | 160:14 | 4:12 11:5 | 136:11 |
| 273:10 | 118:16 | 179:3 | 12:6 14:23 | 137:3,4 |
| 305:18 | 123:1 | 206:25 | 16:18 | 138:7,17 |
| **command** | **commission** | 295:10,13 | 17:20 | 139:21 |
| 162:13,21 | 159:13 | 296:16 | 18:19,25 | 140:1,9 |
| 164:25 | 160:2 | 297:14 | 20:10,13 | 143:2,8,11 |
| 165:5 | 314:23 | 299:4 | 20:15,20 | 144:10 |
| 167:15,18 | **committee** | 302:4,11 | 20:22 | 146:23 |
| 167:20,24 | 13:10,12 | communic... | 23:24 | 147:3 |
| 168:5,8,10 | 79:24 | 97:23 | 24:24 25:2 | 151:3 |
| 168:15 | 112:22 | 101:23 | 29:9,20 | 152:23 |
| 266:17 | 116:12,13 | 104:24 | 31:11 | 153:1,3,5 |
| 268:23 | 116:16,23 | 107:16,22 | 32:17,19 | 154:3,10 |
| 295:3,5,6 | 123:11,12 | 121:14,23 | 34:8,24 | 155:6,13 |
| 295:11 | 127:13 | 163:20 | 35:17,23 | 155:17 |
| 296:17,21 | 217:17 | 189:11 | 36:24,25 | 156:13 |
| 298:13 | 279:5 | 199:12,18 | 37:20 | 159:16 |
| 301:3,6,16 | 284:3 | 202:4 | 38:25 39:3 | 160:7 |
| 307:11 | **committees** | 203:9 | 39:6,19,20 | 163:17 |
| **commander** | 16:6 | 204:14 | 41:6,17 | 165:12 |
| 162:22 | 116:10 | 219:7 | 42:3,4 | 166:4 |
| 165:4 | 117:21 | 232:25 | 43:6 50:24 | 168:19,20 |
| **commencing** | 119:8 | 233:2,25 | 51:3 61:24 | 168:22 |
| 6:4 | 173:9 | 238:3,5,9 | 77:18 78:8 | 169:1 |
| **comment** | **common** 9:5 | 238:11,18 | 80:1 87:21 | 172:24 |
| 117:17 | 58:1 | 255:12 | 89:21 90:3 | 173:3 |
| 191:3 | 124:20 | 275:20 | 92:6 98:25 | 174:12,15 |
| 213:19 | 264:2 | 290:14 | 100:20,23 | 174:18 |
| 214:5 | **commun-** | 291:9 | 102:4,8,15 | 175:11 |
| 215:4,5,7 | 297:17 | 298:8 | 102:17 | 176:11 |
| 215:13 | **communicate** | **communities** | 103:10 | 177:25 |
| 216:15 | 106:14,22 | 70:19,20 | 105:2,7 | 183:3 |
| 224:12 | 108:22 | 79:6 | 106:3 | 190:18,21 |
| 233:24 | 207:5 | **community** | 108:7 | 191:20 |
| 309:6 | 238:15 | 90:23 92:7 | 110:23 | 192:3,10 |
| **commentary** | 295:10 | 92:9 | 112:8 | 204:19 |
| 63:12 65:7 | communic... | 129:19,21 | 113:11 | 205:5,6 |
| 86:6 | 219:1 | 129:22 | 116:22 | 208:21 |
| 157:24 | 238:22,25 | 205:7 | 117:22 | 209:12 |
| **commented** | communic... | 222:25 | 118:5,7,10 | 210:21,21 |
| 68:10 | 105:23 | 223:8,13 | 118:25 | 210:24 |
| 161:15 | 119:9 | 223:23 | 120:1,3,11 | 211:1,7 |
| **commenting** | 158:16 | 224:15,23 | 120:17,18 | 216:4,10 |

ELVIS CHAN  11/29/2022

| | | | | |
|---|---|---|---|---|
| 227:16 | 238:11,12 | 152:18 | 222:3,3,11 | **concrete** |
| 243:9 | 238:13,14 | 218:13 | 225:20 | 251:2 |
| 244:5 | 243:17 | 280:15 | 246:18 | **condensed** |
| 248:15,17 | 245:18 | **compound** | **concerned** | 283:14 |
| 249:24 | 246:8 | 11:25 | 52:19 | **conditio...** |
| 252:25 | 248:13 | 14:20 | 53:24 | 203:1 |
| 253:22 | 252:5 | 27:19 | 138:10 | **conduct** |
| 261:8 | 274:1 | 64:20 | 155:1 | 155:1 |
| 262:10 | 276:25 | 65:11  71:8 | 187:2 | 190:11 |
| 269:20 | 277:3 | 72:14 | 195:15 | 226:8 |
| 272:17 | **company's** | 75:23  76:8 | 207:7 | 264:18 |
| 273:3,6,7 | 217:10 | 90:20  92:3 | 209:21 | 294:10 |
| 273:7,9,17 | 288:22 | 92:5  95:5 | 222:15 | **conducted** |
| 276:23 | **company-...** | 98:4 | 224:24 | 59:24 |
| 283:17 | 102:7 | 112:20 | 235:13,20 | **conducting** |
| 284:1 | **compare** | **comprised** | 249:22 | 30:15 |
| 285:9,12 | 65:17 | 78:22 | 255:19 | 190:6 |
| 286:2 | **compared** | 110:11 | 256:14 | 209:3 |
| 287:4,9 | 133:22 | **computer** | **concerns** | 226:11,17 |
| 289:1,2,15 | **compelled** | 59:9  71:15 | 105:23 | **Cone** 181:22 |
| 289:22 | 116:20,21 | 72:2,6 | 139:8,10 | 182:5,23 |
| 291:16,19 | **competing** | 136:16 | 168:22 | 183:12 |
| 294:24 | 174:8 | 137:11 | 205:22 | 186:14,15 |
| 295:7,11 | **competitors** | 138:15 | 206:15 | 207:22 |
| 295:18,21 | 291:19 | 139:14 | 221:24 | 254:14 |
| 295:25 | **complaint** | 173:8 | 226:4,20 | 281:5 |
| 296:2,5,12 | 263:2 | 258:10 | 235:13,15 | **confer** |
| 296:18,19 | 264:4,10 | **CON** 275:10 | 244:15 | 194:22 |
| 297:8,9,15 | 268:22 | 275:12 | 283:8 | **conference** |
| 297:18,20 | **complaints** | **concede** | 285:7 | 236:13 |
| 298:14 | 263:15 | 94:19 | 298:23 | 271:22 |
| 299:14,19 | 264:20,21 | **concern** | **concluded** | 272:19,21 |
| 301:12,22 | **compleme...** | 138:14,15 | 31:25  35:3 | 275:1,11 |
| 302:7,9,15 | 143:7 | 139:12,19 | 96:7 122:6 | 275:13,17 |
| 307:7,19 | **complete** | 190:15,18 | 166:9 | 275:23 |
| **companies'** | 198:24 | 190:25 | 234:8 | **conferences** |
| 61:24 | **completed** | 195:11 | 309:20 | 275:14,17 |
| **company** | 213:15 | 205:2,18 | **concludes** | **confidence** |
| 12:24 15:5 | **completely** | 205:21,24 | 309:16 | 32:22 |
| 27:4 42:13 | 151:24 | 207:18,25 | **conclus** | 112:23 |
| 45:21 | **completion** | 208:5,15 | 240:19 | 113:1,3 |
| 46:18 | 311:3 | 209:16 | **conclusion** | **confident** |
| 102:16 | **compliance** | 211:8 | 33:22 | 114:12 |
| 114:22 | 267:22 | 212:13,14 | 139:17 | 216:5,9 |
| 160:9 | **comply** 103:3 | 212:16 | 240:22 | **confirm** |
| 190:24 | **component** | 219:19 | 270:5 | 214:19 |
| 205:11 | 24:11 | 220:21 | **conclusi...** | 302:3 |
| 209:14 | 303:18 | 221:1,10 | 240:20 | **confirmed** |
| 213:11 | **components** | 221:16,19 | 241:2 | 215:9,11 |

ELVIS CHAN  11/29/2022

| | | | | |
|---|---|---|---|---|
| 275:5 | 80:23 97:9 | 71:17,19 | 200:20 | 270:18 |
| **conflicting** | 99:9 | 74:6,7,9 | 202:20 | **contribu...** |
| 20:2 | **considered** | 74:15,17 | 214:10 | 132:9 |
| **Congress** | 19:5 | 74:17,23 | 215:15 | **control** |
| 116:1,8 | **consistent** | 74:24 75:2 | **contest** 78:5 | 32:25 33:2 |
| 117:1,8 | 79:20 | 75:7,8,11 | **context** 29:2 | 71:16 |
| 118:19 | 127:24 | 75:13,13 | 44:5 69:18 | 73:11 |
| 128:3 | 131:21 | 76:1 77:19 | 69:20,22 | **controlled** |
| 131:14,25 | 219:6 | 79:4 80:1 | 85:19 | 14:4 34:23 |
| 132:9 | 292:25 | 80:6 85:23 | 93:10 | 65:13 72:2 |
| 133:5 | **consolid...** | 86:17,23 | 105:24 | 77:20 |
| 241:25 | 257:23 | 89:10 90:5 | 162:8,11 | 100:7 |
| **congress...** | **constraints** | 90:5,9,10 | 164:24 | **convene** |
| 13:11 | 194:5 | 90:17 91:2 | 172:8 | 280:14 |
| 118:14 | **construc...** | 91:8,19 | 178:11 | **convened** |
| 119:22,24 | 132:25 | 95:3,16 | 189:21,24 | 284:12 |
| 120:9 | 133:9,15 | 105:9,16 | 190:1,2,17 | **convenes** |
| 122:23 | 133:18,20 | 126:25 | 190:24 | 26:18 |
| 123:4 | **construed** | 130:1 | 199:1 | **conversa...** |
| 124:5 | 217:11 | 132:3 | 201:16 | 52:24 53:6 |
| 125:17,24 | **consult** | 138:8 | 202:2,4 | 70:23 |
| 125:25 | 200:15 | 144:2 | 206:6 | 89:13 |
| 127:13,25 | **consulted** | 145:4 | 218:10,17 | 95:19 |
| 131:13 | 200:10,12 | 146:7,8 | 236:18 | 123:3 |
| 259:24 | 235:12 | 153:24 | 240:4 | 201:7,9,12 |
| **connect** | **contact** | 156:12 | 244:13,13 | 201:15 |
| 125:21 | 27:11,13 | 157:19,21 | 262:5 | 233:13 |
| **connected** | 53:22 | 158:6,12 | 264:22 | **convey** |
| 53:10 | 252:16 | 165:21,25 | 271:21 | 161:10 |
| 113:25 | 296:20 | 203:8,9 | 295:7 | 220:17 |
| **Connecting** | **contacts** | 205:2 | **contexts** | 221:9 |
| 125:15 | 45:22 46:4 | 206:11 | 44:8,24 | **conveyed** |
| **connection** | **contain** | 217:9,14 | **contingent** | 79:25 |
| 10:24 | 99:12 | 227:17 | 281:1,2 | 143:14 |
| 13:22 | **containing** | 233:4 | **continue** | 222:15 |
| 25:22 | 229:24 | 241:6 | 7:13 39:23 | 254:12 |
| 26:11 53:7 | **contains** | 254:9 | 84:3 | **conveying** |
| 53:8 82:25 | 99:8,10 | 273:13,22 | 122:12 | 221:13,16 |
| 191:13 | **contempo...** | 274:5,9,17 | 285:3 | **convince** |
| 226:22 | 290:16 | 285:13 | **continued** | 144:23 |
| 230:10 | **content** | 307:21 | 282:14 | **coordinate** |
| 267:20 | 43:24 | **content-...** | 284:25 | 276:21 |
| **connects** | 49:23,24 | 95:13 | 302:12 | **coordinated** |
| 136:13 | 60:6,10,16 | 129:7 | **continuing** | 39:1 92:23 |
| **consensu...** | 60:19,22 | 130:11 | 258:8 | 93:4,13 |
| 252:6 | 61:7 63:21 | 153:17 | 285:2 | 95:14 |
| **conserva...** | 64:16 65:9 | 266:14 | **contractor** | 168:4 |
| 149:20 | 67:8 70:12 | **contents** | 263:20 | **Coordina...** |
| **consider** | 70:18 | 193:22 | **contrast** | 284:13,17 |

**ELVIS CHAN  11/29/2022**

| | | | | |
|---|---|---|---|---|
| coordina... | 85:20 87:6 | 158:22 | 288:16 | 258:2 |
| 187:21 | 87:15,18 | 159:18 | 290:18 | Counselor |
| 190:19 | 89:12 | 161:19 | 291:15 | 234:8 |
| 282:2 | 90:15 | 165:8 | 292:5 | counsels |
| copied | 95:21,22 | 170:19 | 293:5 | 46:15 |
| 197:19 | 95:23 | 171:11,23 | 298:25 | 47:16 |
| 303:8 | 98:17,24 | 177:14,15 | 299:3 | counter |
| copies 312:8 | 101:9 | 177:20 | 300:19,23 | 36:10 |
| copy 11:8,12 | 103:19 | 180:22 | 303:6,22 | 133:16 |
| 60:14 | 104:1 | 181:4,17 | 306:11 | 158:25 |
| 312:12 | 106:15,16 | 183:5 | 314:8,12 | countering |
| copying | 107:8,12 | 184:9 | corrections | 134:17 |
| 198:3 | 108:10,18 | 185:2,3 | 312:13 | 159:2 |
| correct | 109:4 | 198:16 | correspo... | counteri... |
| 11:16,19 | 113:4,4,6 | 204:4,5,7 | 4:15 5:8 | 234:24 |
| 11:20 | 113:16 | 204:11 | 288:17 | 235:13 |
| 12:17 17:9 | 114:11 | 214:7 | Coughlin | 238:1 |
| 17:24 | 115:8 | 216:15,16 | 194:2 | counterm... |
| 26:12 28:8 | 117:2 | 216:16 | Council | 17:7 |
| 29:7,12,13 | 119:16 | 217:7 | 162:2 | counterm... |
| 32:3 33:1 | 120:12 | 221:21,22 | 284:13,17 | 11:6 12:9 |
| 33:6,7,23 | 121:9 | 225:22 | counsel | 15:20,22 |
| 33:24 34:4 | 123:16 | 226:22 | 21:20 22:5 | 15:25 |
| 34:18 | 127:2,16 | 229:20 | 22:17 | 64:12 |
| 35:13,14 | 128:25 | 230:5,6 | 43:13,14 | counterpart |
| 36:2,3 | 129:9 | 232:17 | 45:13 77:1 | 45:24 |
| 37:15,16 | 130:2,9,18 | 240:1,17 | 94:16 | counterp... |
| 37:22,23 | 133:7,8,12 | 241:8,25 | 123:11,11 | 140:4 |
| 38:2,6,7 | 133:22 | 242:1,14 | 169:18 | counties |
| 39:21,22 | 134:3 | 243:12 | 180:4 | 50:13 |
| 40:9 41:4 | 136:17,24 | 244:1,8,9 | 187:18 | countries |
| 46:6 49:12 | 141:13 | 248:7 | 194:22 | 94:5,10,12 |
| 51:23 | 142:3,9,12 | 249:7 | 196:23 | 305:22,25 |
| 52:12 | 142:22 | 258:13,13 | 197:6 | country |
| 56:10 59:7 | 144:11,15 | 261:19,24 | 208:20 | 163:5 |
| 59:11,16 | 144:18,25 | 261:25 | 216:19 | county 6:7 |
| 59:21 | 145:12,25 | 263:2,6,7 | 237:15 | 16:24 |
| 63:10,13 | 146:15 | 263:12 | 239:15 | 50:14,14 |
| 64:13 65:2 | 147:15 | 264:23 | 241:11 | 50:19 |
| 66:1,25 | 148:1,10 | 267:17,18 | 258:16 | 283:1 |
| 69:15,18 | 148:15,16 | 267:22,23 | 287:23 | 310:4 |
| 70:7,20 | 149:3,12 | 272:13 | 310:18,19 | 314:2 |
| 71:18 72:8 | 149:17 | 273:14 | counsel's | county- |
| 72:13 | 150:20 | 274:9 | 65:23 87:1 | 172:15 |
| 75:16 80:9 | 151:12 | 277:24 | 241:18 | couple 41:11 |
| 80:14 | 155:9,10 | 278:9 | 257:3,12 | 78:24 84:7 |
| 81:10,19 | 156:4,8 | 280:19,20 | 257:14,15 | 132:22 |
| 81:24 | 157:24 | 283:22,23 | 257:17,19 | 217:19 |
| 84:13 | 158:14,18 | 285:1,25 | 257:22 | 290:6 |

ELVIS CHAN  11/29/2022

course 13:14
49:23
174:18
188:3
236:1,4,5
280:21
287:12
court 1:1
2:4 6:16
9:20 10:8
259:11
271:12
310:9
courtesy
58:2
Cove 3:10
coverage
229:22
covered 70:6
188:8,23
covers
282:19
covertly
77:17
cream 182:7
create 60:25
created
13:21 60:3
141:17
143:24
creating
70:10
credentials
235:6
crime 270:13
criminal 9:2
9:3 111:17
163:13,15
163:22
195:23
196:4
269:23
303:17
critical
276:23
284:8
cross-ve...
22:1
Crossfire

237:4,11
239:12
CRR 1:24
CSAC 284:7
CSR 1:24
310:9
culture
236:14
cumbersome
296:25
current
55:21 60:6
60:17
229:1
235:18,23
238:12
286:14
currently
41:20
109:7
238:10
299:6
cut 291:4
304:7
cyber 8:12
39:11,12
45:5,5
105:5,17
198:11,13
199:1
201:19
202:7
206:25
207:13
245:12
261:8
276:2,22
290:6
307:23
308:7
cybersec...
16:4,14,22
17:2 18:16
30:3 43:10
50:16
55:10
72:20
93:10
172:14

199:1
207:11
211:18,20
211:22
238:12,20
275:17
276:21
279:1,5
283:3
284:3
Cyberspace
159:6
cycle 26:19
39:20,24
41:7 42:18
54:14,22
64:22
87:13
101:17
109:11
134:1,2
141:16
143:23
147:18
148:12,14
148:15
162:5
172:20
176:9
202:13
226:21
241:6
273:18
299:21
cycles 64:25
78:13
87:17

D

D 2:6
D.C 2:11,17
8:21 109:3
183:25
312:4
damage
236:20
238:4
damaged
116:5

dark 72:25
73:7
data 14:25
48:25 59:9
114:19
235:5
276:24
date 6:10
166:14
259:22,23
269:17,22
271:14
300:8,8
313:3
date's
300:10
dated 4:14
4:16,22,24
5:7,9
11:18
241:20
244:2
292:16
293:11,25
302:25
311:9
dates 156:22
284:4
285:17
day 6:4
45:17
165:4
167:25
168:15
217:20
230:15
262:24,24
269:10,12
291:20
297:2
301:16,19
307:16
314:13
day-to-day
24:23
days 182:21
243:11
244:7
245:2

301:23
312:18
daytime
162:22
DCCC 13:11
16:7
173:15
193:11
deal 290:4
dealing
251:1
290:5
deals 79:21
Dear 312:7
December
312:2
Decency
121:23
decide 274:1
299:9
decided
240:15
decision
233:4
282:20
decision...
49:17
decision...
90:8
decisions
153:17
declaration
4:20 217:1
217:15,22
228:2,9
declare
314:11
declassi...
112:6
160:4
declined
215:6
declining
89:15
189:2
deem 32:19
34:9,11
35:10
deemed 34:17

ELVIS CHAN  11/29/2022

98:11
190:6
274:14
DEF 275:10
275:12
defend 83:17
212:5
273:3
DEFENDANT
2:9
defendants
1:11  7:10
7:17
defendants'
4:17
169:16
defending
11:24 23:1
43:17
define 158:3
158:8
definitely
152:6
210:4
220:14
definition
61:24
degree 10:14
10:25
87:17
Dehmlow
109:5,21
175:18,21
176:16,21
178:13
180:21
181:14
184:16,25
185:3,10
186:18
207:22
213:18
214:18
215:3
216:15
221:24
251:14
254:14
281:5

309:4,10
Delaney
271:14,16
272:2
delay 297:3
delegation
123:8
deleted
232:16
delibera...
187:9
delibera...
121:17
188:7
delibera...
27:20
121:12,25
122:2,14
187:10
188:8,25
251:24
282:9,18
Delynn
197:25
Democratic
13:10,11
Democrats
266:21
department
2:10  3:4
7:8,15
24:11
134:15
136:4
138:24
139:14,20
139:22
140:4
163:21
217:7,24
263:10,13
263:14
278:18
312:3
Departme...
140:8
depending
71:21
190:2

265:16
269:8
depends
165:20
deploy 74:8
deployed
139:2
deponent
311:5
deposition
1:17  6:13
6:18  8:23
8:25  9:1
22:24 23:2
122:5
142:21
155:20
180:1
227:4
309:17
310:1,22
310:24
311:3
312:8
314:5,7,10
depositions
9:2,3
depress 79:5
deputy 200:8
200:23
201:18
234:23
describe
10:11 13:1
15:21
59:22
69:21,25
146:1
195:5
248:10
301:5
described
50:8 133:9
142:20
164:5
224:19
230:25
232:9
249:10

describes
247:4
describing
224:1
282:22
description
4:10  5:4
13:4
136:22
170:10
283:5
designed
63:17 79:5
145:19
149:19
desired
312:14
detail 86:11
278:7
280:5
291:12
detailed
128:22
130:16
details 88:5
88:6,9
111:10
166:21
232:5,19
detect 89:9
114:5
129:25
133:16
136:2,16
136:19,24
137:12
270:22
detected
87:8
162:24
detecting
92:19
detection
31:12 88:3
204:22
determine
14:2 33:15
163:1
217:10

236:21
253:3
262:15
267:3
268:10
296:3
determined
142:5
144:22
230:21
develop
88:12
developed
92:9
270:22
development
133:24
develops
72:21
device 19:11
19:12
devices
72:22
Devilotski
44:15
DHS 24:13
151:11
152:4
170:1
186:1
218:15
DHS's 170:23
278:10
DHS/Micr...
279:11
different
19:4,10
23:9 34:14
37:21,25
38:4 48:17
48:18 62:1
75:12 78:7
86:4 88:2
89:21
97:20
98:10
99:15,16
105:5,17
112:22

**ELVIS CHAN  11/29/2022**

| | | | | |
|---|---|---|---|---|
| 135:23,25 | direction | disclosure | discussed | 193:21 |
| 137:7 | 207:9,10 | 195:3 | 15:25 | 200:2 |
| 139:23 | directly | discord | 54:17 59:4 | 203:15 |
| 164:19,19 | 49:19 | 61:12 | 70:20 | 206:21 |
| 169:4 | 106:19 | 141:20 | 92:11 93:3 | 229:10 |
| 177:12 | 107:9 | discourse | 118:22,23 | 249:20 |
| 200:4 | 158:17 | 34:3 | 119:1,14 | 250:10 |
| 223:12 | 261:24 | discover | 119:16,18 | 251:19 |
| 251:6 | director | 31:12 | 135:22 | discussion |
| 269:18 | 24:13 | 32:23 | 152:14 | 7:11,22 |
| 278:22 | 46:24 | 146:24 | 153:24,25 | 21:12 |
| 285:16,17 | 48:12 | discovered | 154:8,10 | 82:23 83:2 |
| 306:22 | 124:2 | 27:10 31:8 | 154:15 | 105:11 |
| differen... | 152:8 | 199:10 | 156:9,21 | 121:1 |
| 299:22 | 234:24 | discredited | 160:10 | 128:14 |
| differently | 246:3 | 142:17 | 172:3,6,13 | 129:10,20 |
| 228:14 | 275:5 | discuss | 177:23 | 130:25 |
| 294:21 | 292:10 | 13:19 | 178:3,5 | 131:2 |
| 299:8,10 | 293:6 | 15:22 | 180:20 | 150:22 |
| 299:15,17 | director... | 90:16 | 181:15 | 184:19 |
| difficult | 44:18 | 91:23 | 182:10,17 | 187:24 |
| 9:20 | 123:10 | 92:18 | 188:2,13 | 256:21 |
| difficulty | DiResta | 121:19 | 202:7 | 282:12 |
| 82:24 | 51:21,24 | 135:19 | 206:23 | 292:12 |
| 141:9 | 51:25 | 141:11 | 207:18 | 297:11 |
| digital | 53:12 85:6 | 151:7 | 209:16 | 302:18 |
| 84:23 | 85:11 | 152:15 | 212:4,19 | 308:12 |
| direct 14:3 | disagree | 154:11,12 | 216:11 | 309:8,15 |
| 14:25 21:6 | 68:14 | 179:10,25 | 225:6,24 | discussions |
| 21:7 28:25 | disappear | 185:10 | 228:22 | 55:5,14 |
| 77:15 | 81:24 | 187:5,13 | 229:19 | 58:10 91:3 |
| 128:17 | 297:24 | 189:18 | 239:5,9 | 117:23 |
| 141:7 | disappears | 191:24 | 246:13 | 124:17 |
| 144:2 | 82:3,4,20 | 203:6,10 | 247:11 | 180:16 |
| 181:9 | 83:10 | 206:3 | 254:18 | 187:17,18 |
| 217:21 | disapproval | 208:16,17 | 255:6 | 187:20 |
| 227:7 | 62:22 | 209:6,15 | 267:14 | 188:3,12 |
| 246:3 | disclose | 210:13,16 | 277:10 | 226:3 |
| 293:7 | 21:7 | 211:14,18 | 279:22 | 233:9,10 |
| 297:5 | 200:20 | 226:7 | 282:16 | 247:15 |
| directed | 202:20 | 229:11 | 285:7 | 251:25 |
| 14:14 | disclosed | 240:2 | 290:11 | 252:2 |
| 15:11 52:6 | 20:20 | 251:15 | 291:11 | 255:1 |
| 52:8 | 21:10,14 | 280:23 | discusses | 282:10 |
| directing | 21:23,25 | 282:5 | 29:21 | 290:25 |
| 128:20 | disclosing | 283:5,7 | discussing | disinfor... |
| 143:17 | 97:13 | 285:11,11 | 91:15,20 | 11:4 45:3 |
| 146:17,18 | 111:10 | 286:8,23 | 154:3 | 45:9 46:13 |
| 158:19 | 121:16 | 294:14,19 | 191:12 | 46:21 |

ELVIS CHAN  11/29/2022

47:20
48:23 52:7
52:25 53:2
55:8 60:5
60:8 79:21
94:6
105:20
106:15,23
107:17
108:23
141:20
153:25
154:4,8,9
154:18,20
154:22
156:9,12
156:15
159:2,17
159:20
161:17,17
161:23,24
162:4,17
163:2,5
167:17
168:17
201:17
262:3,6,12
262:20
263:5,15
263:17
264:22
265:1,2
268:25
270:8,16
273:10,13
273:19,21
274:20
275:21
277:5,7,9
279:11
283:9
284:9
285:7,14
285:23
286:6,9,16
305:16,18
305:19
308:8
disinfor...

306:24
disliked
66:16,18
disliking
62:15
64:18 65:6
67:19,23
disseminate
225:19
255:21
dissemin...
127:1
223:3,11
225:5
298:18
dissemin...
256:17
296:18
distribu...
232:6
District 1:1
1:2 6:15
6:16,19
diverse
158:6
division 1:3
6:17 7:9
7:16 8:13
8:15 171:7
200:9
207:1,12
207:13
234:24
238:1
303:17
divisive
61:16
63:20
72:11
73:24 74:6
74:7
divulging
174:5
DNC 16:7
172:25
173:16
178:11
193:1,11
193:16

194:21
195:22,25
196:5
198:8,15
198:19
199:17
257:22
258:4,10
docket
194:16
document
11:7 28:20
59:20
103:20
104:21
196:18
216:24
218:10
242:8
256:4
274:11
289:20
291:21
292:7,14
292:19
293:18,24
293:25
305:7,15
306:1,8,9
documented
289:13,16
290:21,24
292:3
documents
194:8,14
243:19
247:6,12
247:20
256:9
305:4,5,6
doing 35:23
36:16 51:1
70:1 115:3
119:2,5,7
120:17
157:1
172:9
244:11
272:4,5

DOJ 163:12
164:5,24
171:6
197:23
200:8,23
267:6
268:9
DOJ's 201:19
domain 30:6
51:4
domestic
111:14
138:4
161:17,24
162:4
Dorsey
116:25
131:24
doubt 228:11
download
99:11
dozen 16:12
62:8
110:18
dozens
101:19
drafted
145:4
drive 77:19
78:1,22
229:25
driving
78:16
208:15
Dublin 45:25
due 20:2
150:8,13
205:9
duly 310:7
310:15
dump 172:8
dumping
13:13
Dunlap 1:24
6:6,21
310:6
duped 142:7
DVDs 298:7
298:10

E

E 2:1,1 3:1
3:1
E-l-v-i-s
8:9
earlier
11:17
31:15 47:7
59:2 68:22
80:22 84:8
86:4 89:18
89:23
96:21
99:17
112:10
115:5
122:20
128:1
136:14
142:21
156:4
171:22
173:25
180:17
214:11
230:5
243:8
267:15
269:21
283:13
284:25
287:24
293:1
306:18,20
308:14
early 89:19
237:8
earth 191:16
293:15
easier 51:16
Easterly
274:23,24
274:25
275:20
ECs 290:14
290:15,19
291:13,22
educational
10:11

| | | | | |
|---|---|---|---|---|
| **effect** 158:9 | **election** | 219:4,11 | 260:11,16 | 199:4 |
| 158:15 | 4:13 13:14 | 219:15 | **elections** | 290:14 |
| 173:13 | 16:11,24 | 220:1,7,19 | 11:4 12:5 | **elements** |
| 187:4 | 19:9 26:19 | 221:11 | 18:18 20:1 | 126:20 |
| 190:9 | 39:16,20 | 222:1,6 | 26:21 27:9 | 159:16 |
| 215:5 | 39:24 40:6 | 226:21 | 31:6 37:14 | **Elvis** 1:17 |
| 255:18 | 40:19,22 | 240:8,15 | 37:15 | 4:4,14,16 |
| 310:11 | 41:1,3,7,9 | 240:25 | 38:16,21 | 4:16,24 |
| **effective** | 42:18 | 241:6,25 | 40:3,7,8,9 | 5:7,9 6:14 |
| 64:5 88:17 | 54:14,22 | 243:11 | 40:11,13 | 7:21 8:1,9 |
| 88:21 92:1 | 56:14,16 | 244:8,19 | 40:15 | 20:24 62:3 |
| **effectively** | 56:20 57:2 | 245:2 | 41:24 | 113:11 |
| 29:9 35:17 | 57:9,14 | 251:16 | 45:18 | 114:4 |
| 36:1,5,13 | 64:22,25 | 256:16 | 46:16 50:6 | 269:16 |
| **effects** | 78:4,13 | 259:17 | 55:4,20 | 280:22 |
| 157:15,18 | 87:13,17 | 260:5 | 85:19 | 309:17 |
| 158:1,4 | 109:11 | 261:17 | 131:16 | 312:8 |
| **effort** 10:7 | 141:16 | 262:7,24 | 135:3 | 313:1 |
| 86:21 | 143:23 | 262:24 | 151:1 | 314:4,19 |
| 198:17 | 147:18 | 263:16 | 152:21 | **email** 4:15 |
| **efforts** 4:12 | 148:12 | 265:12 | 155:2 | 4:15 5:8,8 |
| 64:4,4 | 151:10 | 266:10,17 | 161:19,25 | 27:12 30:5 |
| 172:14,15 | 152:16 | 269:10,12 | 162:18 | 89:4 98:25 |
| **eight** 101:22 | 154:16,17 | 270:1,2,11 | 167:23 | 99:4,4,7 |
| 219:16 | 156:21 | 270:13 | 192:5 | 99:10,21 |
| 220:6 | 162:5,12 | 273:18 | 200:14 | 196:25 |
| 234:11 | 162:14,14 | 283:2 | 201:11,18 | 197:3,7,18 |
| **EIS-GCC** | 163:2 | 284:12,16 | 203:21 | 197:22 |
| 284:14,14 | 164:21,25 | 285:16 | 204:1 | 198:4 |
| **either** 25:17 | 167:18,20 | 286:10 | 205:14 | 199:3 |
| 26:5 44:17 | 167:22,25 | 288:19,21 | 208:24 | 200:7 |
| 53:25 60:4 | 168:15 | 289:7 | 220:15 | 241:10 |
| 60:19 | 170:22 | 293:13,14 | 229:2 | 242:20 |
| 78:15 98:7 | 171:18,19 | 294:7 | 244:15 | 258:15,20 |
| 103:10 | 172:1,16 | 295:3,4,6 | 245:14 | 259:10 |
| 118:24 | 172:20 | 295:11 | 246:15 | 271:2 |
| 119:6 | 173:9 | 296:21 | 253:7 | 282:2,4 |
| 120:24 | 192:11,14 | 299:23 | 255:20 | 291:3 |
| 136:19 | 192:21 | 301:20 | 257:25 | 292:21 |
| 180:23 | 199:21 | 306:14,17 | 262:21 | 293:11 |
| 191:21 | 200:2 | 307:3,6,6 | 272:3 | 294:4 |
| 194:5 | 201:8,23 | 307:11,14 | 288:14 | 296:22 |
| 239:9 | 202:12,15 | **election...** | 298:19,23 | 300:5 |
| 250:15 | 203:12,24 | 167:17 | 299:18,23 | 302:24 |
| 263:19 | 205:13 | 168:11 | 300:21 | 303:3,4,20 |
| 282:4 | 208:19 | 262:11 | 307:1,20 | 306:11 |
| 286:15 | 212:10 | 286:6 | **electronic** | **emailed** |
| 287:10 | 217:20 | **Election...** | 19:11 | 169:22 |
| 296:21 | 218:1 | 259:7 | 30:10 | 216:19 |

ELVIS CHAN  11/29/2022

| | | | | |
|---|---|---|---|---|
| 287:23 | encrypted | 107:16 | entire | estimation |
| emails 46:2 | 295:14 | 116:18 | 165:19 | 134:5 |
| 187:21 | ended 232:1 | 133:21 | 222:4 | 136:18 |
| 194:14 | endorse | 144:23 | entitled | 139:1,2 |
| 196:20 | 139:25 | engaged 52:3 | 22:4 170:4 | 228:21 |
| 197:11,19 | endorsed | 52:23 | 170:7,14 | et 1:6,9 |
| 229:24 | 139:24 | 135:3 | 278:4 | 259:6 |
| 287:25 | Endowment | 146:17 | environment | 312:5,6 |
| 288:2,5 | 142:5 | 150:25 | 61:13 | 313:2,2 |
| 289:13 | energy | 151:3,5,7 | envisioned | European... |
| embassies | 276:25 | 257:12 | 159:14 | 143:6 |
| 136:5,6 | enforcement | 272:17 | 160:2 | 145:24 |
| 139:6,7 | 20:19 | engagement | equal 110:24 | Europeans |
| embed 276:1 | 21:17,18 | 15:3,8,15 | equip 35:4 | 145:21 |
| emceeing | 23:15 | 18:7 61:19 | equipped | evaluate |
| 25:18 | 49:20 | 61:22,25 | 133:20 | 33:21 |
| 26:15 | 94:17 | 62:2,5,7,9 | equivalent | event 149:22 |
| Emily 44:15 | 97:11 | 62:13,16 | 63:1 | 194:19 |
| employee | 111:8,14 | 63:9,15 | errata | events |
| 74:6 | 137:21 | 64:24 65:4 | 312:10,14 | 125:21 |
| 151:24 | 138:4 | 65:5,8 | 312:17 | 229:1 |
| 233:19,20 | 174:2,5 | 71:3,6 | 313:1 | eventually |
| 263:19 | 188:10 | 78:16,22 | erroneous | 41:10 |
| 310:17,19 | 189:1 | 80:22 | 164:17 | 127:5 |
| employees | 193:20,25 | 81:10 | especially | evidence |
| 44:23 | 194:11 | 83:22 | 10:6 | 14:16 |
| 70:17 | 195:1,6,11 | 84:10 85:2 | 192:21 | 43:20 |
| 71:14 | 195:14 | 85:22 86:5 | 256:15 | 74:22 |
| 75:10 | 199:23 | 134:11,14 | ESQ 2:6,6,7 | 76:22 82:1 |
| 77:17 | 200:18 | 134:25 | 2:12,12,18 | 144:5 |
| 106:2 | 201:25 | 137:6 | 2:23 3:6 | 298:7 |
| 108:25 | 202:17 | 142:20 | 3:11 312:4 | evolved |
| 118:13 | 215:18 | 237:8 | essentially | 143:23 |
| 136:5 | 218:25 | 257:18 | 63:3 64:11 | exact 150:14 |
| 140:3 | 221:4,8,15 | engagements | 104:24 | 182:18 |
| 151:23 | 270:9 | 64:6 67:13 | 146:7 | 214:22 |
| 160:9 | 283:25 | engaging | 173:4 | 247:14 |
| 177:1 | 294:9 | 30:22 | 176:1,2 | 288:8 |
| 209:11 | enforcing | 126:24 | 232:1 | exactly |
| 233:11 | 43:23 | engineering | establish | 88:10 |
| 235:18,18 | 49:11 | 10:15 | 158:25 | 134:12 |
| enclosed | 90:25 91:1 | enhance | established | 141:14 |
| 312:8,9 | 153:16,17 | 77:19 | 134:14 | 171:16 |
| encompass | engage 61:7 | ensure 127:7 | establis... | 173:2 |
| 12:15 | 61:17 | 127:21 | 161:2 | 209:19 |
| encouraging | 63:20 | 152:20 | estimate | 222:13 |
| 261:21 | 70:11 | entail 60:9 | 100:18,19 | 232:9 |
| 262:9 | 72:12 | entails | 100:21,22 | 237:7 |
| 263:4 | 94:25 | 111:18 | 113:20,22 | 239:1 |

ELVIS CHAN  11/29/2022

248:13
307:4
EXAMINATION
  4:1 8:6
  308:13
examine
  127:6,20
examined 8:4
  12:3,5,8
  310:14
example 10:1
  13:9 19:6
  31:3,18
  60:12
  65:13 67:6
  67:10 68:1
  80:5,13
  82:21 83:8
  88:11 89:1
  93:11
  100:18
  112:10,10
  113:24
  264:2,9,11
  264:19
  265:7
  269:4
  276:24
  277:1
  285:15
  286:10,12
examples
  64:14 89:7
  227:19
exception
  25:3
exceptional
  23:8
exchanged
  46:1
exchanges
  96:3
exclusively
  100:9
Excuse
  184:14
execute
  252:4
  294:11

executed
  251:13
  314:13
executive
  111:24
  121:13,13
executives
  131:14
exercising
  118:15
exert 132:24
exhibit 11:8
  11:10 28:9
  141:7
  169:4,9,11
  169:14,19
  169:21
  196:14,17
  196:18
  197:8
  216:18,18
  216:22
  234:9
  241:10,12
  241:14,15
  258:24,25
  259:3,10
  271:1,4
  277:12,16
  287:20,23
exhibits 4:8
  5:1 258:16
exist 290:15
  290:19
  292:4
  299:6
existing
  60:6,22
  71:17,19
  75:11,13
  195:19
  196:1
exists 299:5
expanded
  155:7
expect 23:9
  172:18
expectation
  221:9

226:6
expectat...
  36:24
  225:23
expected
  163:18
  201:22
  219:1
  220:17,21
  222:25
  223:9,14
  224:9,23
  226:24
  227:2,4
  301:12
Expedited
  4:18
experience
  74:13
  79:20 95:6
  95:17,18
  113:4,5
  114:19
  125:6,25
  131:23
  134:22,24
  151:4
  168:2
  203:16
  268:13,14
experienced
  118:14
Expires
  314:23
explain
  88:23
  99:25
explanation
  100:1
explored
  122:8
expose 37:20
  37:25 38:4
express
  62:21
  207:24
  221:1
expressed
  212:15

expressing
  82:11,13
extends
  121:12
extent 18:20
  50:24
  56:22
  199:24
  232:8
  236:19
  238:4
  249:5
extract
  86:18
  199:2

        F
F-a-r-e-e-d
  58:14
F-a-r-i-d
  58:14
F.2d 194:3
face 67:4
  69:10
Facebook
  12:8,18,19
  17:23
  23:25
  41:25 44:3
  44:12,23
  45:2,11
  49:9 54:9
  54:10,20
  55:6 60:14
  60:15,25
  62:18 63:2
  66:4 74:2
  76:4 80:15
  80:18
  81:24 85:9
  85:21
  86:16
  91:11
  102:12
  110:23
  112:19
  118:11,12
  118:12
  119:10

123:20,22
  123:25
  124:1,4
  125:18,18
  128:11,21
  130:15
  131:12
  134:8
  147:10,13
  147:17,24
  148:20
  151:10
  152:17
  210:22
  211:3
  213:14,15
  214:4,17
  216:2,14
  233:22
  234:1
  241:5
  242:14
  246:14,18
  246:22
  248:18
  252:21
  253:15,15
  253:19
  254:22
  255:13
  280:2,11
  286:2,5
  308:17
faced 131:12
facilitator
  24:10
  26:21,22
fact 11:8
  15:2 35:15
  145:23
  148:11
  151:4
  164:11
  195:9
  203:3
  208:8
  217:17
  226:2
  232:5

| | | | | |
|---|---|---|---|---|
| 237:24 | 70:4,10 | 57:16,20 | 183:2 | 257:4,9 |
| 241:23 | 71:25 72:5 | 58:1,21 | 185:12 | 259:7 |
| 247:23 | 73:25 | 79:20 97:7 | 186:10 | 260:11,15 |
| 256:3 | 74:11 95:2 | 98:12 99:2 | 187:1,20 | 261:9 |
| 285:5 | 144:1 | 99:11 | 187:24 | 263:19,20 |
| 305:2 | 251:7,9 | 105:22 | 189:17 | 266:11,12 |
| **factor** 132:9 | **fall** 41:11 | 106:21 | 190:5 | 267:4,5,5 |
| **factors** | **falls** 282:8 | 108:21,24 | 192:3,9 | 267:7,9,11 |
| 88:13 | **false** 163:23 | 109:22 | 197:25 | 267:13 |
| 157:14 | 270:10 | 110:6,6,25 | 198:11 | 268:8 |
| **facts** 43:19 | **familiar** | 111:13 | 200:3,6,24 | 272:4,5,16 |
| 74:22 | 18:8 56:11 | 119:23 | 201:5 | 273:24 |
| 76:22 82:1 | 67:21 | 120:2 | 206:21 | 276:1 |
| 144:4 | 111:16 | 131:6 | 207:1,6 | 280:14,22 |
| 175:2 | 112:22 | 138:13 | 208:19,22 | 280:25 |
| **fair** 30:15 | 169:23 | 139:9 | 209:11 | 281:8,10 |
| 33:10 | 210:6,8 | 142:23 | 211:13 | 281:22 |
| 41:12 | 216:21 | 143:1 | 212:23 | 283:7,21 |
| 49:21 | 232:5 | 144:8 | 213:16,19 | 285:19 |
| 52:11 | 236:9 | 146:12 | 214:5,23 | 286:19,21 |
| 62:13,14 | 256:22 | 147:24 | 215:5,6,11 | 287:9,9 |
| 62:16 63:3 | 295:13 | 148:6,7,9 | 215:14 | 289:18 |
| 64:7,19 | **fan** 275:6,7 | 148:23 | 217:25 | 290:13 |
| 66:5,9,16 | **far** 171:18 | 149:24 | 218:16 | 291:23 |
| 68:15 | 174:1 | 150:9 | 221:9,14 | 294:10 |
| 73:15 74:2 | **Farid** 58:11 | 151:11,15 | 221:16,19 | 295:20 |
| 75:15 | **farms** 31:13 | 151:20 | 224:14 | 296:16,17 |
| 85:23 | 31:19 | 154:4,11 | 227:6,21 | 296:20,21 |
| 101:3,4 | **fashion** | 156:24 | 231:17,21 | 297:6,12 |
| 102:13 | 296:24 | 159:11 | 232:23 | 297:14 |
| 104:8 | **fast** 10:6 | 162:12,16 | 233:1,11 | 298:2,9,12 |
| 114:10 | **FBI** 8:15,16 | 162:20 | 233:18,20 | 298:15,18 |
| 115:6 | 16:1 17:19 | 165:2,3,5 | 233:24 | 299:19 |
| 132:4 | 17:22 | 168:9,13 | 234:1 | 300:21,25 |
| 150:2 | 24:15,18 | 168:16,21 | 236:14 | 301:2,2,5 |
| 191:7 | 24:22,22 | 169:1 | 237:14 | 301:7,15 |
| 197:21 | 25:4 29:19 | 172:9,10 | 238:8 | 301:15,17 |
| 220:1 | 30:21 | 172:23,24 | 243:8,16 | 302:12 |
| 227:2 | 31:24 32:4 | 175:15 | 244:5,10 | 303:10 |
| 249:1,2 | 32:13,16 | 176:22 | 244:11,14 | 308:25 |
| 255:11 | 34:8,12,17 | 177:8,9,18 | 245:8,12 | 309:6 |
| 260:24 | 35:2,22 | 178:7,10 | 245:16,23 | **FBI's** 24:16 |
| **fairly** | 36:22 | 178:12,17 | 246:22 | 34:1,15 |
| 142:20 | 39:14 | 179:7,14 | 250:1,3,11 | 100:1 |
| **fake** 13:20 | 50:12 | 180:18 | 250:23 | 164:25 |
| 13:23 14:4 | 52:10 53:8 | 181:4,5,9 | 251:6,20 | 170:24 |
| 14:13,19 | 53:10 | 181:13 | 251:20,25 | 263:8 |
| 15:4,15,17 | 54:12 | 182:8,13 | 254:13 | 295:17 |
| 32:23 60:3 | 57:12,13 | 182:15 | 255:12,17 | **FBI-led** |

ELVIS CHAN  11/29/2022

177:24
FBI.gov
  262:25
  263:6,8,16
  265:3
  266:19
  268:5
featured
  161:18,25
Fed 310:11
  310:15,20
  311:1,7
federal 7:9
  7:16  8:13
  16:25
  17:16  18:1
  18:6,11
  57:7,10
  80:9
  111:15
  152:18,19
  216:6
  218:25
  220:16
  221:4,8,15
  221:23
  233:3,9,17
  263:13
  269:25
  270:2
  280:15
  285:10
  286:20
feedback
  7:12
  113:14
  274:21
feeds 84:4
feel 73:9
  226:25
feels 210:8
  227:1
felt 116:5
  118:2
  120:7
  122:22
  291:16
fend 50:19
field 16:8

24:22  39:8
39:11  53:9
53:11  58:2
98:11
104:22
105:1
107:5,13
107:18
108:16,20
110:11,12
110:14
162:16
163:8,9,10
163:17
164:20
168:13,13
177:9,10
181:4
201:1
259:17,20
261:12
264:15,17
265:16,19
266:6,23
266:25
269:15
Fifth 194:3
Fighting
  4:11  11:3
figure 66:22
  79:1,1,9
  80:6,13,15
  81:13
  90:17
  149:13
  235:22
  264:15
  265:16
file 30:6,10
  30:10  99:1
  259:7
  289:19
  292:2,3
  295:17
  300:11
  302:14,23
filed 6:15
  194:16,18
  196:21

264:10
files 21:18
  99:11,12
  193:22
  194:1
filing
  312:19
financial
  115:12
financially
  310:20
find 60:16
  72:11
  73:23  74:6
  86:10
  103:12
  108:12
  113:25
  138:3
  199:7
  204:23
  254:23
  312:8
finding
  214:11
finds 29:4
  72:22
fine 23:11
  95:25
fine-tune
  103:21
finished
  194:13
FIRM 2:21
first 4:15
  4:18  5:8
  8:25  9:1,7
  11:15  13:7
  19:17
  29:20
  39:18
  53:20  70:3
  120:4
  122:6,10
  128:15
  132:15
  136:12
  139:4,11
  148:4

163:22
181:12
183:17
184:4
194:12
195:19
197:7
209:24
210:4
219:22
230:8
231:22
275:2
277:17,25
278:2
288:18
310:15
first-order
  157:18
  158:1,3,8
  158:15
FITF 24:17
  36:9  44:6
  109:3,6,8
  109:16
  151:22,24
  162:8
  177:24
  181:3
  182:13
  183:24
  184:23,25
  185:1,2,21
  187:5,17
  189:25
  190:17,19
  190:24
  204:9
  207:17,18
  213:11
  216:13
  223:19
  253:15
  281:4
  287:10,11
  289:25
  291:13
  293:2
  297:19

300:17
301:5
FITF's 36:4
  36:10
FITF-Global
  303:24
FITF-org...
  181:9
  253:19
five 97:18
  98:21
  100:23
  101:8
  123:14
  148:12,13
  175:6
  305:4,5
fizzled 64:7
flag 22:25
  90:4
  113:18
  136:20
  146:16
  164:22
  286:11
  306:24
  307:19,21
flagged 90:7
  90:12
  100:20
  101:16
  114:10
  144:9
  146:12
  147:24
  148:9
  163:16
  166:9,23
  190:18
  191:3
  211:7
  222:2
  228:25
  229:4,7
  265:10
  307:3,5,14
flagging
  101:3,24
  159:22

**ELVIS CHAN  11/29/2022**

| | | | | |
|---|---|---|---|---|
| **floating** | 152:25 | 247:8 | 197:24 | 224:12 |
| 69:8 82:6 | 159:5 | 250:16 | 199:6 | 255:14,16 |
| 82:6 | **footnoted** | 256:1,2,9 | 264:16 | 255:17 |
| **focal** 159:1 | 65:22 | 273:10,18 | **found** 62:4 | **Framework** |
| **focus** 13:16 | **footnotes** | 290:3,12 | 85:12,14 | 126:20 |
| 17:19 29:3 | 129:5 | 290:25 | 89:22 | **framing** |
| 34:23 | **force** 24:16 | 296:1 | 147:3 | 247:14 |
| 59:14 | 38:23 39:7 | 303:13 | 214:13 | **Francisco** |
| 94:12 | 110:8 | 306:25 | 229:25 | 6:7,20 |
| 104:16,19 | 127:5 | 308:9 | **foundation** | 8:12,15,18 |
| 161:16,23 | 170:24 | 309:1 | 18:3,14 | 24:18 |
| **focused** 16:3 | 184:22 | **foreign-...** | 24:2 30:16 | 105:1 |
| 134:17 | 207:2 | 143:15 | 30:24 | 106:18 |
| 138:5 | 250:16 | **foreign-...** | 32:15 | 107:3,5,13 |
| 154:3,4 | 276:2 | 138:25 | 33:11 34:5 | 107:18 |
| 185:25 | 303:14 | **foreign-...** | 34:19 35:6 | 108:20 |
| 211:22 | 309:1 | 36:11 | 36:7,19 | 119:23 |
| 238:11 | 310:11 | **foreign-...** | 42:7 | 128:4 |
| **focuses** | **forced** | 133:17 | 114:16 | 135:4 |
| 17:21 | 127:19 | 270:23,25 | 117:11 | 165:2,4,5 |
| 59:20 | **foregoing** | **foreign-...** | 133:13 | 168:9,16 |
| **Focusing** | 310:23,24 | 98:16 | 138:20 | 168:21 |
| 105:20 | 314:5,12 | 99:13 | 153:21 | 177:2,9 |
| **folks** 293:13 | **foreign** | **foreign-...** | 155:7 | 181:5 |
| 303:5,23 | 24:16 | 113:1 | 171:15 | 198:12 |
| 306:12 | 38:23 39:6 | **foreign-...** | 172:21 | 201:5 |
| **follow** 103:7 | 39:9 46:13 | 42:16 51:1 | 212:25 | 267:9,13 |
| 104:3 | 47:19 | **foreigners** | 213:23 | 268:10,13 |
| 163:18 | 48:23 | 145:16 | 233:7 | 268:15 |
| 165:16 | 110:7 | **foreshad...** | **four** 97:4 | 276:2 |
| 269:15 | 111:23 | 71:14 | 101:13 | 287:10 |
| 279:12 | 129:3 | **forgot** 171:6 | 107:20 | 296:17,21 |
| **follow-up** | 131:4 | **form** 61:21 | 147:22 | 298:12 |
| 17:4 | 133:7 | 63:8 160:6 | 148:8,14 | 301:3,17 |
| 250:18 | 134:17,20 | 314:6 | 150:6 | 310:4 |
| **followers** | 134:22 | **formation** | 173:24 | **Francisco's** |
| 74:8,11,12 | 136:2,17 | 16:22 | 184:5 | 25:4 50:13 |
| 74:14 | 138:5 | **former** | 207:20 | 58:1 |
| **following** | 140:5 | 235:23 | 210:24 | 162:12,20 |
| 38:11 | 161:2,3 | **forms** 63:14 | **frame** 19:21 | 169:1 |
| 51:10 | 163:3 | 65:4 | 60:18 | 272:16 |
| 108:12 | 170:24 | **forth** 134:8 | 89:20 | **frankly** |
| 181:21 | 184:21 | 156:2 | 120:6 | 94:23 |
| 242:9 | 187:3 | 272:24 | 130:12 | **fraud** 268:17 |
| **follows** 8:5 | 207:1 | **forthcoming** | 192:15 | **free** 126:19 |
| **footnote** | 219:9,24 | 192:23 | 205:23 | 126:23 |
| 77:23 | 225:4 | 291:17 | 237:4,9 | **freelance** |
| 80:11 | 242:4 | **forward** | 307:17 | 142:1,6 |
| 127:10,25 | 243:21 | 28:21 41:7 | **framed** | 145:8 |

ELVIS CHAN  11/29/2022

| | | | | |
|---|---|---|---|---|
| **freely** | 287:2 | 283:15 | 232:4 | 71:12 |
| 120:22 | 308:10 | 287:3,3 | 239:22,23 | 72:10 |
| 127:1 | 309:14 | 291:2 | 295:19,20 | 73:23  76:7 |
| **frequency** | **fusion** 159:1 | 296:9 | **Ghana** 31:14 | 76:19  80:3 |
| 18:8 | **future** 127:8 | 298:1 | **Giannini** | 83:5  87:2 |
| **frequent** | 127:21 | 299:23 | 181:22,24 | 96:11 |
| 166:21 | 195:7,7 | 301:14 | 183:16 | 106:5 |
| 269:7 | ———————— | 307:22,22 | 184:20 | 127:3 |
| 288:25 | **G** | **General's** | 185:1,6 | 130:14 |
| **frequently** | **G-i-a-n-...** | 2:4  7:3 | 207:23 | 131:11,25 |
| 50:12 | 182:2 | **generali...** | 254:15 | 140:10 |
| 57:18 | **Garcia** | 111:10 | 281:5 | 142:4 |
| 95:15 | 276:15 | **generality** | **give** 21:24 | 152:22 |
| 101:12 | **gather** 70:11 | 121:16 | 34:16 | 155:4 |
| 109:16 | 111:25 | **generally** | 60:11 | 159:12 |
| 110:16 | 112:3 | 11:21  13:8 | 65:12 | 167:4 |
| 178:4 | **gearing** | 15:21  18:6 | 96:21  97:7 | 169:20 |
| 210:25 | 171:25 | 19:2  55:9 | 108:3 | 176:5 |
| 244:12 | **GEC** 134:16 | 56:15 | 179:2,20 | 180:8 |
| 271:24 | **GEC's** 138:15 | 69:21 | 179:24 | 234:13 |
| **Friday** | **general** 15:6 | 87:11 | 180:2 | 244:3 |
| 162:14 | 15:18 | 94:22 | 241:10 | 258:23 |
| 167:22 | 30:20 | 97:15 | 259:16,18 | 261:2,16 |
| 301:17 | 56:20 | 121:22 | 265:6 | 261:23 |
| **front** 28:10 | 61:11  65:8 | 170:8 | 277:1 | 262:1,23 |
| 51:15 | 72:17  90:3 | 190:19 | 303:1 | 272:19 |
| 81:15 | 95:12 | 232:4,5 | **given** 8:23 | 287:13 |
| 116:23 | 97:17 | 235:15 | 9:3  53:22 | 288:24 |
| 117:1 | 100:4 | 253:22 | 150:2 | 294:20 |
| 128:2 | 102:3 | 280:1 | 202:1 | 295:1 |
| 131:25 | 121:20 | 287:2 | 243:16 | 300:3 |
| **frontline** | 140:6 | 289:8 | 245:17 | 301:10 |
| 257:8 | 157:4 | **generate** | 246:7 | 304:14 |
| **full** 100:17 | 187:19 | 60:8,19 | 291:7 | **goal** 36:4,10 |
| 101:2 | 188:12 | 75:1 | 311:1 | 61:4,14 |
| 135:8 | 192:20 | **generated** | **giving** 35:1 | **goals** 86:24 |
| 183:22 | 195:13,16 | 60:4  70:17 | 53:25 | **goes** 32:9 |
| 310:10 | 201:3 | 72:17  73:6 | 271:19 | 220:25 |
| **function** | 202:8 | 73:10 | **Glen** 3:10,10 | 222:23 |
| 43:10 | 204:18 | 74:19,24 | **global** | 225:23 |
| 62:21 | 207:6 | 75:9,24 | 134:11,14 | 229:21 |
| **function...** | 212:13 | **generating** | 134:25 | 231:25 |
| 298:3 | 217:11 | 95:2,2 | 137:6 | 259:7 |
| **functions** | 237:15 | **gentleman** | 303:14 | **going** 21:20 |
| 202:1 | 238:20 | 303:8 | 305:19,21 | 28:14  37:1 |
| **funded** 276:8 | 239:15 | **getting** 64:5 | **go** 9:5  15:4 | 37:3  38:8 |
| **further** 68:8 | 248:12,14 | 113:13 | 22:8,19 | 38:11  41:2 |
| 199:12 | 254:18 | 190:3 | 28:21  31:1 | 41:6  51:7 |
| 250:23 | 282:14 | 197:1 | 31:2  52:16 | 51:12  67:1 |

ELVIS CHAN  11/29/2022

| | | | | |
|---|---|---|---|---|
| 84:3 94:18 | 41:25 | 284:13,17 | 291:18 | 243:10 |
| 97:10 | 46:19,20 | **governme...** | **groups** 209:2 | 257:22 |
| 120:10 | 47:4 49:9 | 12:9 37:9 | **GS-10** 110:1 | 258:4,10 |
| 121:11,24 | 118:11,12 | 37:12 | **GS-14** 106:13 | **hack-and...** |
| 126:2,5 | 118:13 | 269:24 | 151:17 | 13:8 16:3 |
| 140:7 | 119:11 | **governments** | 177:1 | 39:15 59:5 |
| 157:6 | 123:20,22 | 219:9 | **GS-14-level** | 172:3,9,19 |
| 169:3 | 125:5,11 | **grade** 109:25 | 106:2 | 173:1,6,12 |
| 178:24 | 131:13 | 177:1 | **GS-14s** | 173:15 |
| 180:2 | 152:24 | **graduate** | 107:10 | 174:25 |
| 188:23 | 210:23 | 10:18 | 108:16 | 175:1,11 |
| 189:15 | 286:2,4 | **graduated** | 109:25 | 175:16,19 |
| 190:10 | **Google/Y...** | 10:13,16 | **GS-15** 109:24 | 176:11 |
| 193:19,24 | 110:23 | **grand** 147:12 | 152:2 | 177:22 |
| 194:19 | **government** | **grants** 16:25 | **guess** 29:2 | 178:3,20 |
| 196:12 | 4:12 11:5 | 16:25 | 50:7 | 187:3 |
| 200:17 | 15:20,22 | 172:14 | 171:21 | 189:5 |
| 201:3 | 15:24 17:7 | **graphic** 67:2 | 297:21 | 208:10 |
| 202:16 | 21:10,14 | **Graphika** | 305:17 | 210:17 |
| 203:8 | 22:2 23:16 | 14:24 | **guessing** | 211:15 |
| 216:17 | 23:18 24:7 | 144:21 | 9:14 | 307:25 |
| 217:21 | 29:9,18,25 | 145:2,6 | **guidance** | **hack-and...** |
| 225:8 | 35:17,21 | **Great** 242:23 | 50:17 | 178:6 |
| 235:16 | 37:19 | **ground** 9:6 | 298:2 | **hack-and...** |
| 241:9 | 61:11 80:9 | 136:6 | **Gurzhiy** 6:22 | 172:4,19 |
| 242:7 | 111:15 | **grounds** | **guy** 303:25 | 180:19 |
| 248:2 | 121:14 | 121:25 | **guys** 23:3 | 181:6,15 |
| 258:15,23 | 122:4 | 122:14 | 94:20 | 182:9,16 |
| 259:8 | 150:25 | 163:25 | 113:14 | 185:11 |
| 260:7,11 | 151:2 | 188:24 | 254:21 | 186:6,16 |
| 260:16,19 | 152:18,19 | 193:20 | | 187:2 |
| 261:4,5 | 155:6 | 199:23 | ——————— | 188:5 |
| 271:1 | 156:17 | 201:24 | **H** | 189:19 |
| 272:1 | 158:24 | 202:17 | **H-a-n-i** | 190:7,12 |
| 276:9 | 159:15 | **group** 18:24 | 58:13 | 191:1,13 |
| 277:12,20 | 161:9 | 19:13 | **hack** 13:10 | 191:17,24 |
| 282:21 | 170:9,21 | 23:22 26:9 | 172:8 | 192:4,6,8 |
| 287:22 | 176:7 | 27:15 | 178:11 | 192:11,18 |
| 293:9 | 191:20,23 | 44:12 | 193:10,16 | 192:20,23 |
| 299:24 | 191:23 | 45:16 | 195:25 | 193:1 |
| **good** 6:9 | 211:9,12 | 46:24 | 196:5,7,9 | 194:21 |
| 48:8 77:7 | 216:7 | 47:21 | 198:8,19 | 199:20 |
| 211:19 | 218:12 | 48:12 | 199:17 | 200:16 |
| 272:8 | 222:4 | 155:15 | 206:12 | 201:22 |
| 295:23,24 | 233:4,17 | 190:11 | 225:10,13 | 202:15 |
| **Google** 12:7 | 235:17,18 | 254:12 | 225:18 | 203:11,20 |
| 12:11,14 | 235:19,23 | 277:11 | 235:1,2,3 | 203:23,25 |
| 17:23 | 236:23 | 284:18,21 | 235:4 | 204:16,20 |
| 23:25 | 278:22 | 287:5 | 239:9,18 | 205:3,16 |
| | | | 240:5 | |

**ELVIS CHAN  11/29/2022**

| | | | | |
|---|---|---|---|---|
| 205:20 | 208:12 | 268:4 | 186:12 | 23:15 |
| 206:22,24 | **hacking** | 276:5 | 217:4 | 152:17 |
| 207:8 | 13:12 | **happened** | 278:13 | 162:13 |
| 208:1,6,18 | 43:17 | 18:1 19:25 | 308:4 | **help** 27:15 |
| 208:23,24 | 50:20 | 97:3 101:8 | **head-shakes** | 88:24 |
| 209:4,21 | 55:13,13 | 117:3,3,4 | 9:24 | **helpful** 22:6 |
| 211:5,10 | 212:5 | 117:5 | **heading** | 31:5 |
| 211:15 | 223:1,3,15 | 173:22,24 | 279:17 | **helps** 103:21 |
| 212:9 | 225:4 | 174:9 | 302:19 | **herder** 72:21 |
| 219:1,10 | 230:24 | 194:10 | **headquarter** | **hereto** 311:7 |
| 219:20,25 | 238:19 | 229:14 | 267:12 | **Hey** 62:3 |
| 220:18,22 | 240:2 | 248:21 | **headquar...** | 103:15 |
| 220:24 | 250:12 | 253:11,12 | 24:25 25:3 | 104:4 |
| 221:10 | 258:12 | 253:12 | 25:5,6 | 131:7 |
| 222:16,18 | 273:2,3 | 266:16 | 169:1 | 214:19 |
| 225:24 | 290:25 | 272:12 | **headquar...** | 227:17 |
| 226:4,8,18 | **hacks** 59:13 | 275:11 | 8:20 38:15 | 247:17 |
| 227:10,10 | 223:20 | 299:21 | 57:17,20 | 252:17 |
| 228:7,17 | 224:9,11 | **happening** | 58:21 | 266:20 |
| 228:24 | 224:15 | 171:17 | 98:12 | **high** 2:5 |
| 229:17 | 238:21 | 229:1 | 162:17 | 32:22 |
| 239:6 | **half** 19:18 | 282:3 | 164:25 | 59:22 64:5 |
| 244:6,18 | 19:20 | **happens** | 168:14 | 64:10,10 |
| 245:1,9 | 28:22 | 76:25 82:3 | 198:23 | 66:3 80:21 |
| 246:19 | 225:1 | 82:12,17 | 267:4,5 | 80:24 |
| 247:18 | **Hammell** | 83:8,11,25 | 268:8 | 83:22,23 |
| 248:24 | 197:25 | 84:5 87:7 | 298:3 | 84:9 |
| 251:16,21 | **hand** 258:1 | 97:17 | 301:6,15 | 110:18 |
| 255:19 | **handle** 248:3 | 98:18 | 303:18 | 112:25 |
| 256:15 | 248:6,16 | 103:17,19 | **heads** 10:3 | 113:3 |
| 282:5,6 | 264:20 | 263:15 | 306:12 | 160:11 |
| **hacked** 176:7 | 265:23 | 304:5 | **heads-up** | 243:18 |
| 198:15 | 270:24 | **happy** 169:4 | 99:4 108:3 | 245:19 |
| 204:23 | **handles** | **hard** 229:25 | **hear** 23:11 | 247:5 |
| 205:8,25 | 305:21 | **harder** 78:12 | 24:17 83:3 | 255:10 |
| 211:21 | **handling** | **harm** 297:3 | 95:24,25 | **high-level** |
| 215:16 | 248:12 | **Harold** 47:12 | 128:7,18 | 30:12,20 |
| 225:14 | **Hang** 169:10 | **hash** 30:6,9 | 169:5 | 62:9,13 |
| 248:1,6 | **Hany** 58:11 | 30:10 | 270:7 | **higher** 15:14 |
| 249:13,23 | **happen** 19:3 | **Hat** 275:10 | **heard** 120:3 | 71:6 90:8 |
| 250:25 | 42:19 78:7 | 275:12 | 207:2,3 | 110:24 |
| 251:11 | 97:7,16 | **hate** 264:3 | 279:4,6 | 128:20 |
| 252:18,22 | 101:11 | **head** 45:17 | **hearing** | 134:4 |
| 252:25 | 127:7,21 | 47:21 | 82:25 | 146:1 |
| 253:2,4,24 | 160:14 | 48:24 | 95:25 | 160:11 |
| 254:23 | 171:12,14 | 53:23 54:2 | 141:9 | 263:22,22 |
| 255:22 | 173:22 | 109:5,7,15 | **hearings** | 263:25 |
| 256:17 | 192:18 | 110:15 | 125:24,25 | **highest-...** |
| **hackers** 59:8 | 225:11 | 166:11 | **held** 6:18 | 109:22 |

ELVIS CHAN  11/29/2022

| | | | | |
|---|---|---|---|---|
| highlight | host 24:9 | Hunter | idea 66:17 | illegal |
| 19:3,8,9 | hosted 39:4 | 212:14 | 77:25 | 93:14 |
| 240:17 | 151:10 | 213:6,8,9 | 148:20 | illustra... |
| 242:15 | 218:12 | 213:17 | 215:20 | 31:4 |
| 274:15 | 246:14,17 | 214:6,24 | 250:3 | image 80:19 |
| 286:14 | 246:24 | 215:12,22 | 267:19 | images 75:3 |
| highlighted | hosting 26:7 | 215:25 | 279:13 | impact |
| 37:10 | hot 164:14 | 216:5,11 | 284:10 | 240:12,20 |
| 51:22 | 293:14,15 | 227:11,25 | 304:2,4,11 | 240:21 |
| 55:24 | 294:7,10 | 228:7,17 | 305:13 | impacted |
| 75:12 | 294:17,22 | 228:22 | identical | 120:25 |
| 161:20 | 295:4,5 | 229:4,10 | 279:21 | impactful |
| 295:24 | hot-button | 229:17 | identifi... | 201:4 |
| highligh... | 60:17,24 | 230:1,9,16 | 11:11 | impede 36:5 |
| 29:2 | 227:23 | 230:17 | 169:12 | impeded |
| 141:24 | 229:13 | 232:7,24 | 196:15 | 29:10 |
| 260:14 | hour 6:4 | 233:5,24 | 216:23 | 35:18 |
| 292:20 | 77:3 110:4 | 234:2 | 241:13 | impeding |
| 295:23 | 234:11 | 243:25 | 259:1 | 36:1,13 |
| highly 64:5 | hours 301:16 | 252:14 | 271:5 | impending |
| Hillary 67:3 | 307:10 | 253:8 | 287:21 | 192:24 |
| 69:9 | house 44:14 | 308:15,23 | identified | impetus |
| hire 141:25 | 79:24 | 309:11 | 78:25 | 205:15 |
| 276:8 | 116:11,15 | Huntley | 81:22 | implicate |
| hired 143:24 | 117:24 | 46:25 47:2 | 100:14 | 199:25 |
| 145:8 | housed | 47:3 125:9 | 113:15 | implicates |
| hiring 276:9 | 161:13 | hurdles | 143:15,19 | 27:20 |
| history | 291:23 | 254:8,11 | 273:19 | 111:7 |
| 235:5 | Howard 77:24 | Hurricane | 277:24 | important |
| hit 64:8 | HPSCI 80:11 | 237:4,11 | 292:9 | 37:18 |
| hoc 44:20 | 116:2,9,9 | 239:12 | identifies | improve 17:1 |
| HOFT 2:20 | 116:11 | hypothet... | 32:13 | improvement |
| hold 7:13 | 118:8 | 76:9,21 | 76:15 96:5 | 294:15 |
| holder | 119:6,8,17 | 250:7 | 99:13 | in-person |
| 265:17 | 127:10,12 | 252:8,11 | 265:21 | 20:7 236:7 |
| 310:8 | huh 269:13 | 265:6,20 | identify | inaccurate |
| homeland | huh-uhs 9:25 | 268:3,20 | 98:15,15 | 261:22 |
| 10:17 | human 45:14 | hypothet... | 158:16 | inapplic... |
| 24:11 | 71:25 72:6 | 250:2 | 273:11 | 21:19 |
| 217:25 | 74:5 85:16 | 251:2 | identifying | inauthentic |
| 278:18 | 87:22 | | 96:25 | 34:2,18,22 |
| honest 69:5 | 89:24,25 | ___I___ | identities | 90:13 |
| honestly | 90:10,25 | I&A 24:12,13 | 86:22 | 92:24 |
| 149:21 | 91:8,14,19 | 278:13,15 | 178:25 | 93:21,22 |
| 240:11 | hundreds | 278:16,24 | 179:6 | 93:23 95:2 |
| 268:21 | 64:16 | 281:24 | identity | 95:14 |
| 299:13 | 93:12 | i.e 71:15 | 292:9 | 111:5 |
| hopefully | 101:5,7,18 | ice 182:7 | IIFA/FAR... | 112:16 |
| 126:6 | 112:12 | iCloud 42:17 | 251:8 | 126:25 |

**ELVIS CHAN  11/29/2022**

| | | | | |
|---|---|---|---|---|
| 129:25 | 145:4 | 84:25 | 207:19,20 | **influence** |
| 136:17 | 152:24 | 118:1 | 210:20,25 | 4:13 13:16 |
| 137:12 | 156:11 | 122:22 | 211:24 | 13:19 |
| 138:18 | 170:22 | **indicates** | 212:2,4 | 24:16 |
| 146:7 | 254:4,13 | 66:2 80:17 | 222:25 | 29:10 |
| 157:19,21 | 280:1 | 85:7 243:3 | 223:9,14 | 30:22 |
| 158:21 | **includes** | **indicating** | 223:16,19 | 35:18 36:1 |
| 159:22 | 18:24 | 87:3 | 258:9 | 36:5,13 |
| 160:19 | 49:23 | **indicators** | 277:6 | 37:13 |
| **incentive** | 50:13 96:5 | 30:2,4 | 281:4 | 38:23 39:6 |
| 115:12 | 96:24 | 42:14 | **Indraneel** | 39:10 |
| **incident** | 109:2 | 50:21 51:3 | 2:12 7:7 | 46:13 |
| 101:16 | 142:6 | 99:15,17 | 7:14 37:3 | 47:19 |
| 216:12 | 157:22 | 99:17,22 | 38:10 51:9 | 48:23 59:3 |
| **include** | 204:6,9 | 99:24 | 58:25 | 59:18,23 |
| 12:19,21 | **including** | 100:3,14 | 84:18 | 63:15 |
| 12:22 14:7 | 61:6 133:4 | 100:19 | 242:8 | 70:22 |
| 30:4 36:12 | 134:22 | 101:2,16 | 258:17 | 110:7 |
| 36:16 | 142:1 | 101:24 | 271:2 | 126:16 |
| 47:12 | 145:9 | 199:2,3 | 299:25 | 129:3 |
| 57:12 | 188:10 | 306:13,19 | 312:4 | 131:4 |
| 71:22 | 195:7 | **indicia** | **indranee...** | 133:7 |
| 79:23 | 223:4 | 199:4,7 | 2:13 | 134:20,23 |
| 118:10 | 225:5,15 | 306:22 | **induced** | 136:3 |
| 123:9 | 307:7 | **indicted** | 145:10 | 157:16 |
| 130:20 | **incomplete** | 196:2,11 | **industry** | 158:2 |
| 135:25 | 268:2 | **individual** | 18:24 | 161:2,4 |
| 140:3 | **incorrect** | 84:4 | 19:13 26:9 | 170:24 |
| 146:23 | 17:11 | 200:20 | 27:8,15 | 184:22 |
| 155:3,7 | **increase** | 204:10 | 30:4 72:20 | 207:2 |
| 156:22 | 40:3 | 209:24 | 155:15,20 | 242:5 |
| 157:18 | 288:21 | 211:19 | 156:3,10 | 250:16 |
| 159:21 | **Increased** | 216:3 | 170:10 | 256:2 |
| 164:16 | 288:19 | 276:14,16 | 172:18 | 290:3,12 |
| 165:17 | **increases** | 303:21 | 217:25 | 296:2 |
| 175:18 | 115:13 | **individuals** | 220:11 | 303:13 |
| 181:5 | **independ...** | 25:9 26:4 | 228:5 | 308:9 |
| 184:24 | 205:22 | 47:9 | 231:16 | 309:1 |
| 212:20 | **INDEX** 4:1,8 | 106:20 | 275:18 | **influencing** |
| 226:13 | 5:1 | 135:14,15 | **industry...** | 34:3 |
| 227:16 | **indicate** | 135:17,20 | 155:21 | **inform** 49:17 |
| 231:17 | 15:1,14 | 146:11 | **infects** | 99:1 |
| 244:17 | 117:24 | 152:5 | 72:23 | 250:22 |
| 249:9 | 204:14 | 153:10 | **infer** 118:17 | **informal** |
| 274:16 | 215:6 | 183:2 | 132:1 | 160:11 |
| 283:11 | 252:21 | 185:7 | **inferred** | **information** |
| **included** | 312:13 | 195:25 | 119:13 | 13:13 |
| 24:20 | **indicated** | 196:8,10 | **inflamma...** | 16:17,19 |
| 119:21 | 79:19 | 207:14,17 | 60:25 | 16:19,23 |

ELVIS CHAN  11/29/2022

| | | | | |
|---|---|---|---|---|
| 17:7,14,15 | 111:1,19 | 261:19 | 264:18 | 43:9,16 |
| 17:18,22 | 112:7,23 | 264:17 | 304:2 | 44:11 |
| 17:25 18:9 | 112:25 | 265:14 | **initials** | 45:12,15 |
| 18:9,17,21 | 113:12 | 266:3,8 | 303:9,21 | 45:17 46:8 |
| 18:22 19:1 | 114:5 | 269:19,22 | **initiative** | 47:18 |
| 21:2,4,11 | 136:4,6,8 | 270:10 | 16:1,2,4 | 48:15 |
| 21:13 22:2 | 136:10 | 273:12,20 | 172:12 | 56:14,17 |
| 27:11,13 | 138:2,12 | 273:25 | **initiatives** | 56:21 57:2 |
| 29:11,14 | 143:2,12 | 274:6,13 | 135:23,25 | 57:9,14 |
| 29:16,18 | 148:17,23 | 283:8,12 | **inroads** | 97:25 |
| 29:20,21 | 149:6,24 | 283:16,18 | 31:20 | 153:12 |
| 29:24,25 | 150:13,18 | 283:25 | **insofar** | 164:24 |
| 30:1,12,18 | 154:7 | 286:16,18 | 97:12 | 217:5,8 |
| 30:20 | 158:25 | 286:21 | 187:16 | 230:21 |
| 31:10,16 | 160:3,6 | 287:1,7,8 | 200:19 | 232:12 |
| 31:21 32:1 | 161:11 | 290:11 | 202:19 | 267:6 |
| 32:3,6,10 | 162:15,23 | 295:19,21 | **Instagram** | 268:9 |
| 32:17 33:3 | 163:10,13 | 295:25 | 12:20 | 293:5 |
| 33:9,13,20 | 163:15,19 | 296:1,6,18 | 62:18 | **integrit...** |
| 34:1,8 | 163:23 | 296:20,23 | 85:10 | 46:23 |
| 35:2,9,19 | 164:17,22 | 297:7,18 | 91:18 | 48:22 |
| 35:22 | 166:19 | 297:22 | 147:13 | **intellig...** |
| 36:17,23 | 167:1 | 298:4,6,11 | **instance** | 24:12,14 |
| 37:19,24 | 168:4,12 | 298:12,17 | 113:9 | 74:4 79:25 |
| 39:1 42:14 | 168:18 | 299:21 | 297:2 | 111:23 |
| 48:1 50:8 | 171:1 | 300:22 | **instances** | 112:1,3,21 |
| 50:15,23 | 173:24 | 301:25 | 97:5 | 116:12,14 |
| 50:25 | 174:3 | 303:6,24 | 147:23 | 116:16 |
| 53:23 80:7 | 179:21,23 | 304:3,19 | 148:8,12 | 119:9 |
| 80:10 | 180:1 | 304:21,23 | 148:13,14 | 170:23 |
| 88:14,22 | 195:18 | 305:6,8,10 | 167:11 | 222:24 |
| 88:25 | 198:4 | 305:20 | 242:3 | 223:8,13 |
| 89:16 96:3 | 202:24 | 308:6 | 284:1 | 223:23 |
| 96:5,19,21 | 203:4 | **informed** | **instruct** | 224:14,19 |
| 96:24 97:6 | 211:10 | 163:12 | 21:21 | 224:23 |
| 97:8 98:7 | 213:16 | **infrastr...** | 121:18 | 225:10 |
| 98:10,16 | 214:23 | 17:1 18:17 | 188:24 | 235:7,21 |
| 99:8,12 | 221:14 | 42:13 | **instructing** | 245:12 |
| 100:12,22 | 225:19 | 154:17 | 189:12 | 257:2,5,7 |
| 102:7,23 | 230:22 | 211:22 | 202:25 | 278:10,17 |
| 102:25 | 231:1,5,11 | 276:23 | **instruction** | 278:21 |
| 103:1,7,12 | 231:15,24 | 283:2 | 202:25 | **intend** 23:7 |
| 103:16,21 | 232:8 | 284:8,12 | 203:5 | **intended** |
| 104:20,23 | 248:11,12 | 284:16 | **instruct...** | 119:11 |
| 105:4,7,9 | 251:4 | **ingratiate** | 23:5 | 141:19 |
| 105:15 | 252:6 | 70:18 | **intake** | 152:20 |
| 106:2 | 254:12,22 | **initial** | 263:19 | 301:22 |
| 108:4,6,9 | 255:10 | 125:23 | 266:4 | **intense** |
| 108:13 | 256:17 | 231:1,6 | **integrity** | 127:4,18 |

ELVIS CHAN  11/29/2022

| | | | | |
|---|---|---|---|---|
| intensive | 206:23 | interview | 199:6,12 | investig... |
| 78:10 | 249:17 | 4:24 5:7 | 199:13,16 | 214:22 |
| intent 160:1 | Internet | 259:16 | 199:19,25 | investig... |
| interact | 13:14 31:7 | 261:14 | 200:21 | 44:19 |
| 27:3 44:23 | 31:19 52:1 | 271:13,19 | 202:21 | 48:17 |
| 61:6 95:3 | 53:5,23 | interviewed | 213:17 | 267:1 |
| 134:25 | 54:3 55:21 | 271:24 | 214:6,14 | invite 24:10 |
| interacted | 56:12 60:1 | interviews | 214:24 | 108:25 |
| 27:6 54:11 | 61:12 | 259:13,14 | 233:24 | 140:2 |
| interacting | 69:16 73:4 | 259:19 | 235:2,8,11 | 288:20 |
| 64:17 | 74:5 75:9 | introduce | 235:11,14 | involve |
| 157:19,21 | 75:25 76:3 | 6:25 | 236:1,18 | 50:18 71:3 |
| interaction | 78:21 | intrusion | 236:20 | 187:17 |
| 45:2 | 100:7,10 | 236:20 | 237:5,6,11 | 227:11 |
| 289:21 | 126:15 | intrusions | 237:22 | 228:7,17 |
| interact... | 141:17 | 173:8 | 239:8,10 | 229:17 |
| 135:9 | 143:3,16 | 174:8,16 | 239:12,25 | 247:1 |
| 235:25 | 154:6 | 258:10 | 258:1,3,6 | 280:18 |
| 236:24 | 157:1 | Invaders | 258:9 | involved |
| interagency | interpret | 81:15 | 266:23,25 | 26:14 |
| 159:1 | 81:7 92:23 | investigate | 308:7 | 27:22 |
| 282:9,19 | 228:13,15 | 198:21 | investig... | 41:17 |
| interest | interpre... | investig... | 39:9,12,13 | 49:20 |
| 282:15 | 66:11 | 199:8 | 45:6 97:20 | 54:15,18 |
| interested | 122:25 | investig... | 98:10,12 | 56:22 57:1 |
| 236:19 | 218:9 | 11:23 | 105:17,18 | 57:8,13 |
| 310:20 | interpreted | 12:15 | 108:5 | 79:11 |
| interesting | 118:16 | 39:14 | 111:20 | 89:25 |
| 72:18 | 123:3 | 215:11 | 120:22 | 90:25 |
| 136:13 | 165:20 | investig... | 174:7 | 94:10 |
| Interest... | interpre... | 8:13 31:7 | 190:4 | 105:23 |
| 259:22 | 118:22 | 97:13 | 193:15 | 108:11 |
| interfer... | interrog... | 111:11 | 195:8 | 123:4 |
| 34:12 | 4:19 21:11 | 142:23 | 196:8 | 124:4,10 |
| 200:13 | 21:23 | 174:6 | 198:8,19 | 124:12,15 |
| 257:24 | 169:17 | 192:25 | 200:24 | 142:23 |
| intermin... | interrog... | 193:6,10 | 201:20 | 154:5 |
| 146:6 | 21:15 | 193:13,18 | 202:8 | 192:25 |
| internal | 169:25 | 193:22 | 203:17 | 193:4,6 |
| 187:8,17 | 170:16 | 194:2,6,9 | 207:9 | 196:9 |
| 187:20,23 | 179:8 | 194:15,21 | 257:21,23 | 198:6,14 |
| 188:7,12 | 277:14 | 195:10,20 | 286:22 | 198:14 |
| 214:14 | interrupt | 195:22,23 | 290:6 | 199:13,18 |
| 251:24 | 9:19 52:17 | 195:24 | 307:23 | 208:12 |
| 252:1 | 106:4 | 196:1,4,7 | investig... | 237:4 |
| 254:7,8,10 | 242:20 | 196:13 | 21:18 | 245:5 |
| 255:1 | 293:16 | 197:5 | 193:25 | 255:13 |
| 297:11 | intervening | 198:22,24 | 194:1 | 281:23,25 |
| internally | 26:24 | 198:25 | 303:17 | involvement |

**ELVIS CHAN  11/29/2022**

27:16,18
57:4 162:3
193:8
194:15
197:4
**involves**
231:21
258:11
268:17
**involving**
70:23
90:12
181:2
218:15
265:11
**Iowa** 19:6,9
**IP** 30:4
31:23 51:4
62:3 99:21
100:9
199:3
**iPad** 28:19
38:11
51:10
197:8
241:18
**IRA** 65:13
69:16,22
70:1,17
71:14
72:11
74:18,20
77:17
84:10 85:1
85:8
126:19
141:25
144:22
**IRA's** 69:14
84:12,21
**IRA-asso...**
132:13,17
**IRA-cont...**
87:5
158:16
**IRA-gene...**
72:10
**IRA-orig...**
85:23

**Iran** 94:13
94:23
155:3
305:21
**Iranian** 95:7
251:7,9
**Iranians**
175:12
**Ireland**
45:25
69:19
**ISMG** 259:21
271:18
**issue** 23:3
23:12
60:24
102:12,12
178:19
211:4
227:23
229:13
245:9
**issued** 310:9
**issues** 12:16
18:1 60:17
70:6 164:3
205:10
240:2
277:5,7,9
290:4
**item** 289:11
294:7
**items** 27:25
188:1
281:9
282:25

_____
                J
**J-a-n** 209:25
**Jack** 116:25
131:24
**Jan** 209:25
210:5
**Jefferson**
2:5
**Jen** 274:23
274:24,25
275:20
**Jenin** 2:18

7:5
**jeninyou...**
2:19
**jibes** 286:20
**Jim** 2:20
239:14
**job** 48:2
74:15
168:21
**John** 2:6,23
7:2,5
76:12,18
**john.sau...**
2:8
**john@bur...**
2:24
**joined** 7:4
**joint** 35:25
284:17,20
**Joseph** 1:9
6:15 259:6
276:17
312:5
313:2
**journalists**
142:1,6
145:8
**judge** 21:8
122:5,11
**judgment**
90:18
**judicial**
196:12
**Judy** 181:22
183:14
281:6
**July** 19:21
300:4,12
**jump** 37:1
38:8 51:7
58:23
128:6
150:21
157:6
161:14,14
169:24
242:7
293:9
299:24

302:17
306:4
**jumping** 84:7
132:21
147:8
158:23
169:21
**June** 5:7
19:21
271:10,15
271:20
**Junior** 1:9
259:6
312:6
313:2
**jurisdic...**
164:19
**Justice** 2:10
3:4 7:9,16
163:21
263:13,14
312:3
**Justice's**
263:11
**justice.gov**
262:25
263:6,10

_____
                K
**Kartapolov**
126:20
**Kate** 55:24
56:2 58:20
**Kay** 135:7
**keep** 110:3
203:1
242:4
258:23
263:21,24
**keeps** 202:25
**Kelly** 44:15
**Ken** 2:7 7:4
**key** 240:16
**kick** 265:15
**Kieft** 47:23
48:12
**kill** 264:5
264:12
**kind** 9:5

11:21 15:2
15:15 17:5
18:21 20:7
26:14
27:17 30:8
30:12 32:5
32:12 37:7
43:17
44:11,20
59:3,10
61:6 62:16
62:21,21
63:17,19
64:7 65:3
65:8 67:2
67:3,8
68:15 69:8
71:3,24
89:9 97:6
102:18
104:25
105:8
112:16
114:13
116:16,24
117:8
118:19
122:21
130:10
136:12,22
138:15
141:19,20
146:6,13
149:1
159:8
167:15
227:17
269:3
283:11,19
305:10
**kinds** 12:16
30:14,14
43:1 59:3
64:6 86:5
94:5
105:23
107:22
132:3
254:3

56:21
251:20
**knock** 136:19
273:12,13
273:20,21
274:4,4,8
**knocking**
274:16,17
**know** 7:20
11:22
12:15
13:23
14:15
17:15  18:5
18:11,20
19:19  20:6
20:18,20
21:24
23:12,13
23:14
24:13
25:19,21
25:23,23
25:25  27:1
27:18
30:13
40:25
41:22
43:23
49:16  52:2
53:19  54:5
54:7,8
55:15,19
56:2,3,16
56:17,23
57:13,16
57:23
58:20  62:3
62:8,15,24
63:2,18,25
63:25
64:18  65:4
65:17,21
66:7,14,21
67:18,25
68:6,18
69:2,7,8
69:11  71:6
72:25  73:1

73:5  76:10
76:11,23
76:24,24
80:2  81:5
82:2,4,9
82:12,17
82:19  83:7
83:9,10,11
83:12,12
83:13,25
84:5  85:2
86:3,7
87:7  88:15
88:16,23
90:18,24
91:7,14,23
92:8  95:1
96:5  97:4
97:14,18
98:5,18
104:11,16
104:17
109:19
112:17,24
114:2,13
115:10,11
115:17
116:18,20
123:17
124:15
126:8,23
128:1
132:19
136:5,9
137:2,5,12
139:5
141:8
145:12,15
146:6
148:3
149:22
150:9,14
150:15
152:1
160:4
161:3,7
164:21
165:23,23
178:9,22

178:23
181:19
182:22
184:3,4
185:14
188:17
198:3
202:23
203:3,10
204:20
206:7,8
213:2
214:1,3,9
214:18
215:14
217:2
218:5
223:24
224:5,7
229:8
231:4,9,10
231:12,14
231:16,20
232:22
233:12,12
234:19,22
234:23
236:19,20
237:6,10
237:16,24
238:2,15
239:11
240:11
241:1
242:9
244:20,24
245:22
246:1,8,12
247:16
249:5,8,11
249:12,16
249:17
251:12
254:6,16
255:2,3,3
255:24
256:19,24
257:3,10
257:10,11

257:14
260:8
261:9
263:1
264:5,13
265:23
266:7,9,20
267:7
272:22
273:11
274:23,24
274:25
275:8
278:21
279:2,8,9
280:13
284:4,14
284:15,19
284:20,22
285:5,17
288:8
289:10,11
291:11
293:7
295:8,12
299:22
304:5
305:2
306:14
307:2,9,15
**knowing**
132:16
295:19
**knowledge**
56:19,22
57:15,24
106:21
117:5
118:9
143:11
203:17
208:11
214:14
215:19,24
221:12
232:10
233:16,19
237:12
278:16

**known** 13:8
24:1  47:22
57:5  72:24
214:2
**Krebs** 152:9
152:10,12
154:13

_____

L

**L** 2:11  312:3
**L-u-c-a-s**
183:23
**L-u-k-e**
183:21
**labeled**
241:15
293:10
**lacks** 18:3
18:13
30:16,24
32:15
33:11  34:5
34:19  35:6
36:7,19
114:16
117:11
133:13
138:20
153:21
171:15
172:21
212:25
213:23
233:7
**language**
102:22
227:5
255:15
256:7,12
**lapses** 194:5
**laptop**
212:24
214:10,25
215:15
230:9,17
232:7
233:5
234:2
252:14

ELVIS CHAN  11/29/2022

253:9
308:15
**large** 101:1
101:4
114:23
133:10
134:6
293:18
298:17
**larger**
110:22
**largest**
235:5
**Las** 275:15
**Lastly**
144:21
**late** 237:8
**Laura** 109:5
109:21
184:25
281:3,4
309:4
**law** 2:21
20:19
21:17,18
23:15
94:17
97:11
111:7,13
137:20
138:4
174:2,5
188:10
189:1
193:19,24
193:25
194:11
195:1,5,11
195:14,17
199:23
200:18
201:24
202:17
215:18
218:25
221:4,8,15
270:8
283:25
294:9

**lawmakers**
127:4,19
**Lawrence**
3:11  7:21
**laws** 164:21
270:1
**lead** 111:13
114:9
207:10
266:5
**lead-up**
201:7,10
**leader** 26:18
**leading**
26:15
243:11
244:7
245:2
275:17
**leak** 195:22
243:10
**leaking**
13:13
**learned**
227:8
228:3,5,16
229:15,22
232:9
**learning**
206:18
**leave** 54:20
115:12
**led** 124:12
132:1
207:9
288:14
**Lee** 194:3
**left** 26:23
54:14,18
54:23,25
55:1,6
81:14
**left-lea...**
141:21
**left-wing**
79:4
**legal** 6:22
6:23  139:4
139:17

163:18
198:9
199:5
208:20
249:19
250:5
270:4
312:1,24
**legislation**
119:1,4,6
119:12
120:12
121:8,10
121:22
134:13
**let's** 10:5
28:12
41:21,22
44:7  67:1
150:21
244:3
265:20
278:25
279:15
303:1
**letting**
126:25
224:6
**level** 15:15
59:22  66:3
71:6  80:21
81:9  83:22
84:9  85:2
85:22
86:11  90:8
109:19,23
121:15
138:9
150:15
160:11
179:5,17
266:9
293:7
**levels** 64:5
64:10  65:4
65:7,9
112:23
179:15
263:21,23

**Lexitas** 6:23
312:1,24
**LIBERTIES**
2:15,16
**life** 9:20
**liked** 66:15
66:18
80:18
81:19
295:19
296:7,9
**likes** 74:20
81:23  82:3
82:6,18
84:1,6
**liking** 62:15
63:1  64:18
65:6  67:19
67:23
71:22
73:14,16
86:5
157:22
**limited**
50:24
160:4
**limiting**
195:3
**line** 86:21
114:21
260:13
261:3
313:5,9,13
313:17,21
**line-level**
123:13
**lines** 69:25
243:7
260:15
**link** 14:14
99:5,10
236:9,12
296:23
304:15
306:13
**LinkedIn**
42:1  155:8
287:25
288:6,11

289:14
292:8,10
293:10,13
299:25
300:6,18
302:17,24
303:5,23
304:18
305:5,12
306:5,12
307:8
**links** 107:23
232:13
**Lisa** 237:13
237:14
**list** 42:11
97:7  100:8
102:15
158:6,7
**listed** 11:14
24:5  25:2
294:24
**listen** 9:8
**listeners**
261:21
262:9
263:4
**listening**
53:3
**lists** 111:2
**little** 28:13
34:13  37:2
51:15  77:4
263:1
272:15
**lives** 264:13
286:13
**local** 16:24
164:20
261:9
283:2
**local-level**
172:15
**located**
57:25
105:2
107:2,4
**location**
269:10,17

**ELVIS CHAN  11/29/2022**

| | | | | |
|---|---|---|---|---|
| logged | 279:21 | mail 164:13 | 45:3,9 | 268:25 |
| 104:22 | 292:21 | 164:16 | 46:21 | 270:7,11 |
| logistics | 304:7 | 166:15 | 54:16 | Mario 276:15 |
| 156:21 | Los 276:16 | 267:25 | 55:16 | Mark 116:24 |
| long 8:14 | lot 17:3 | 268:17 | 79:22 | 131:24 |
| 40:16,16 | 20:13 | mail-in | 81:23  92:2 | 242:13 |
| 110:2 | 52:24 | 164:18 | 94:1 | 243:3 |
| 236:4 | 118:2,15 | 269:11 | 105:21 | marked 11:8 |
| 307:10,10 | 122:24 | main 51:8 | 134:7 | 11:10 |
| longer 45:20 | 148:8 | maintained | 136:20 | 169:11 |
| 46:17 | 169:6 | 70:4 | 147:19 | 196:14 |
| 124:23,23 | 259:8,18 | maintaining | 168:18 | 216:22 |
| 168:1 | 260:7,12 | 24:23 | 240:7,23 | 241:12 |
| look 14:13 | 260:16,19 | majority | 283:9 | 258:25 |
| 60:12  79:9 | 271:23 | 16:10  45:1 | 307:18 | 271:4 |
| 83:15 | lots 74:7 | 168:25 | malign-f... | 287:20 |
| 90:13 | Louis 2:22 | 290:5 | 305:24 | 299:25 |
| 138:7,8 | 265:24 | 291:8 | malign-i... | 306:4 |
| 148:3 | 266:6,25 | making | 12:3  13:1 | masquera... |
| 149:13 | 267:1 | 114:13 | 13:5  70:1 | 67:8 |
| 159:5 | 312:19 | 138:16 | 105:18 | master 10:17 |
| 169:23 | Louisiana | 260:17,18 | 155:1 | Masterson |
| 242:12,16 | 1:2  3:3,4 | 272:22 | 185:24 | 25:12,14 |
| 242:17 | 3:5  6:16 | malicious | malware | 25:15,24 |
| 267:8 | love 148:24 | 72:22,23 | 72:24 | 26:12,19 |
| 269:13 | low 15:7 | malign 13:15 | managed | 26:23  28:2 |
| 292:19 | 81:9 | 13:18 | 198:18 | 152:6,10 |
| 300:11 | 142:20 | 36:10  39:9 | management | 152:12 |
| 301:3,6 | 168:3 | 46:12 | 289:19 | 154:13 |
| looked 17:12 | low-level | 47:19 | 292:2 | 212:3,20 |
| looking | 62:5,6 | 48:23  65:9 | manageme... | 221:20,25 |
| 60:18 | lower 55:23 | 90:13  94:6 | 46:8 | 278:8 |
| 80:12 | 197:19 | 99:13 | manager | 281:16,22 |
| 90:11 | 272:15 | 129:3 | 45:19 | material |
| 162:3 | Lucas 183:22 | 131:4 | 48:13  49:3 | 223:2,10 |
| 179:5 | Luke 181:22 | 133:7 | manager- | 225:3 |
| 197:3 | 183:18,19 | 134:20,22 | 44:17 | 230:25 |
| 204:19 | 183:20,23 | 136:2 | mandated | 249:6 |
| 259:19 | 184:5,20 | 138:5 | 168:14 | materials |
| 271:17 | 281:5 | 161:2,4 | manipula... | 204:23 |
| 273:23 | | 241:5 | 243:21 | 205:9 |
| 289:13 | ———————— | 242:4 | 247:8 | 206:1 |
| 292:24 | **M** | 256:2 | 256:1,10 | 225:14 |
| 305:14 | M 4:14 | 258:11 | manner | 229:25 |
| looks 72:5 | MA 10:22 | 290:3,12 | 162:18 | 248:1,6 |
| 81:18  90:5 | Maffei 47:13 | 296:1 | 163:2,6,24 | 249:13,23 |
| 99:5 | MAGA 149:15 | 306:25 | 164:12 | 250:5,13 |
| 149:14 | magnitude | 308:9 | 168:17 | 250:25 |
| 252:18 | 84:11,21 | malign-f... | 265:11 | 251:11,17 |
| | MAHON 3:9 | | | |

ELVIS CHAN  11/29/2022

251:22
252:22
253:1,4,24
254:4,24
255:22
**math** 110:15
110:17
**Matt** 25:12
25:14
26:12
152:6
278:8
**matter** 6:14
7:10
163:14
224:14
241:19
289:23
**matters**
80:14
202:9
238:12
276:21
286:13
**Matthew**
25:15
**MDM** 284:17
284:20
**mean** 12:18
13:2 23:14
29:14 30:1
30:2 39:12
39:13 43:7
43:7 52:9
52:16 55:2
60:1,1,16
61:19,21
61:25
67:19,22
67:22,23
68:7,8
74:23 75:8
75:24 76:1
81:5 92:23
93:5 119:5
166:12
168:11
175:6
191:15,19

193:3
250:2,15
263:23
268:7,7
293:15
294:8
297:1,16
300:25
304:25
305:1
**meaning** 9:14
176:21
244:13
**means** 33:14
68:7 72:1
73:13 81:3
92:24
219:9
278:20
306:15
**meant** 29:16
75:4 224:6
224:6
246:13
301:7
306:17
**measure**
16:16,20
157:15
**measures**
16:15
127:11
128:12
**mechanics**
83:13
**media** 4:12
11:5 12:4
12:6 13:20
13:24 14:2
14:3,22
15:3,5,16
17:16,20
18:18,25
23:20 24:2
29:9,19
30:5,13,22
31:11,24
32:4,11,12
32:17,18

33:5 35:17
35:23
36:17
37:20
39:19,20
41:6,17
42:3,8
43:2 49:8
50:23
59:18,23
60:4,7
61:1,6,20
63:15
64:12 69:6
69:14 70:5
71:15,16
71:21,24
72:9,10
75:14
77:18 80:1
80:3,8
82:7 84:12
84:22
85:15,16
87:5,13
94:6 95:20
96:4,20,25
97:8 99:14
99:18
100:20
101:21
105:10,24
106:14,22
107:17,24
108:22
110:20
111:2,3
112:8
113:10
114:22
116:17
117:16
118:3,5,7
119:10,15
120:1,3,11
121:4
122:16,17
122:18
123:17

127:5,5,19
127:19
131:23
133:5,15
135:11,21
135:24
136:3,15
137:4,13
137:24
138:17
140:1,8
143:8,10
143:13
144:9,22
145:10
146:13,16
146:19
147:2,23
147:25
151:3
153:10,16
154:3,10
155:8
156:11,13
159:16
160:7,8,18
161:10
162:23
163:16
165:6,10
165:12
166:3
168:19,20
168:22,25
172:24
173:3,19
176:10
177:18,25
180:18
181:3,10
182:10,13
183:3
187:6
189:20,25
190:15,21
190:24
191:19
192:2,9
204:3,10

204:13
205:2,5,6
209:5,11
209:13
210:12,15
210:21
213:4,11
214:13
215:23
216:1,7,10
218:16
222:11
223:4
225:5,14
225:21
227:15
229:22
230:12,13
234:4
241:6
248:14,17
249:13
250:6,12
252:16,20
255:22
256:18
259:21
261:18,23
261:24
262:10,13
262:14,18
265:3,21
266:12
267:14,20
269:20
270:15
271:24
273:3,7,9
273:17
274:1
275:21
279:3
280:19
283:22
285:12,22
286:2,25
287:4
288:5,12
289:22,25

ELVIS CHAN  11/29/2022

| | | | | |
|---|---|---|---|---|
| 290:10 | 155:16,21 | 44:10 | 177:18,21 | 222:12,24 |
| 291:13 | 156:3 | 46:12 50:8 | 177:24 | 223:22 |
| 293:3 | 170:4,5,7 | 54:15 78:8 | 178:2,16 | 224:2 |
| 294:19,23 | 170:8,12 | 89:17,20 | 178:18 | 225:3,7,21 |
| 295:11 | 170:14,20 | 89:23 91:4 | 179:8 | 227:9 |
| 296:12 | 174:21 | 92:12,14 | 180:18,24 | 228:3,4,5 |
| 297:8,15 | 176:23 | 92:17 | 180:25 | 228:6 |
| 297:20 | 185:17 | 95:19 | 181:2,7,8 | 229:5,7,10 |
| 298:9,14 | 188:2,13 | 97:22 98:8 | 181:9,12 | 229:16,19 |
| 298:24 | 211:8 | 98:21 | 181:13,20 | 236:7 |
| 307:1,19 | 213:13 | 104:6 | 181:21 | 239:14,16 |
| **meet** 42:3 | 216:3,10 | 105:25 | 182:9,13 | 239:17,20 |
| 43:6,9,12 | 216:14 | 109:1,10 | 182:13,16 | 243:16 |
| 44:3,14 | 218:11,12 | 109:14,17 | 182:22 | 245:17 |
| 45:8,11,13 | 219:16 | 109:20 | 183:3 | 246:7,9,13 |
| 45:16 | 227:25 | 110:2 | 184:23 | 246:14,16 |
| 46:20 47:5 | 233:23 | 118:1 | 185:12,16 | 246:18,22 |
| 47:11,17 | 277:24 | 119:19,21 | 185:18,20 | 247:4 |
| 48:16,21 | 278:3,4,6 | 119:21 | 185:22 | 253:16,19 |
| 49:1 57:17 | 279:2,24 | 120:5 | 186:1,4,5 | 254:17 |
| 57:20 | 279:25 | 121:5,6 | 186:22 | 277:11 |
| 101:22 | 280:4,5,11 | 122:22,23 | 187:20,22 | 279:3,5,8 |
| 119:24 | 280:12,18 | 123:5,15 | 187:25 | 280:9,22 |
| 120:10,16 | 280:24 | 123:18,23 | 188:16,18 | 281:9,11 |
| 121:3 | 281:18,18 | 124:5,11 | 189:7,22 | 281:14,21 |
| 135:11,14 | 282:7 | 124:13,16 | 189:25 | 282:17 |
| 135:17 | 283:20,21 | 125:14,16 | 190:8,17 | 283:18 |
| 289:5 | 289:8 | 127:14 | 190:20,25 | 284:3,5,9 |
| **meeting** 20:7 | 290:8,10 | 128:3 | 191:11,14 | 284:12,24 |
| 24:10 | 291:5,6 | 135:20 | 191:18 | 285:8 |
| 25:18 | 293:4 | 150:22 | 192:2 | 286:4,24 |
| 26:18 | 294:13,18 | 155:12,15 | 204:4,7,10 | 287:5,10 |
| 40:11,13 | 308:24 | 155:18,23 | 209:17 | 287:11 |
| 40:14,21 | **meetings** | 155:23 | 210:13,18 | 288:6,14 |
| 40:24,25 | 20:4,14,16 | 156:6,10 | 211:6,9,13 | 289:14,25 |
| 43:1 58:3 | 22:3 23:22 | 156:10,18 | 211:14 | 290:17,20 |
| 58:5,17,19 | 23:25 24:8 | 157:3 | 212:3,16 | 290:22,23 |
| 98:14,19 | 24:9,21 | 162:9 | 213:7,10 | 291:14 |
| 103:6 | 25:9 26:2 | 170:17 | 213:12 | 293:2 |
| 104:3 | 26:6,7,9 | 171:10,12 | 216:1,6 | 294:23 |
| 151:11,13 | 26:15 27:8 | 171:14,21 | 217:24 | 297:20 |
| 151:14,15 | 27:15,17 | 171:25 | 218:5,7,8 | 300:17 |
| 151:17 | 27:23,25 | 172:2,4,7 | 218:15,18 | 308:18 |
| 152:11,14 | 28:3 38:24 | 172:17 | 218:19,21 | **member** |
| 152:15,17 | 39:2,3,5,5 | 174:19,20 | 218:25 | 303:13 |
| 152:23 | 39:18,23 | 174:22,24 | 219:8,12 | **members** 43:2 |
| 153:4,11 | 40:17 41:2 | 176:23 | 219:24 | 133:4 |
| 153:25 | 41:6,18 | 177:7,10 | 220:4,9,13 | 250:15 |
| 154:12 | 42:19 44:6 | 177:12,13 | 220:17 | **memory** 171:5 |

ELVIS CHAN  11/29/2022

| | | | | |
|---|---|---|---|---|
| 244:22 | 250:17 | Meta-ass... | 168:3 | 262:20 |
| 260:3 | 252:2 | 12:19 | Mike 44:15 | 263:5,17 |
| **mention** | 255:15 | **Meta-owned** | 44:15 | 264:23 |
| 171:6 | 257:20 | 12:24 | 47:12 | 265:2 |
| 192:13 | 266:17 | **method** 88:3 | **million** | 268:25 |
| 215:25 | 268:23 | 225:18 | 62:10 66:4 | 270:16 |
| 273:5 | 270:21 | 295:15 | 66:23 | 274:17 |
| **mentioned** | 271:23 | 297:21 | 86:14 | 284:8 |
| 16:21 | 278:7 | **methods** | 235:6 | 298:23 |
| 18:25 | 281:4,15 | 19:10 | **millions** | 306:25 |
| 29:17 | 282:25 | 31:12 | 64:17 | **mission** |
| 31:15 39:6 | 285:10 | 129:15 | **mind** 23:3 | 134:19 |
| 43:8 54:19 | 291:24 | 156:22 | 229:9 | **Missouri** 1:6 |
| 71:21 80:2 | 292:1 | 204:22 | 251:3 | 2:4,5,22 |
| 89:24,25 | 295:9,18 | 255:21 | **minimize** | 6:14 7:3,4 |
| 91:17,22 | 297:13 | 282:3 | 211:20 | 259:6 |
| 93:6,18 | **mentioning** | 300:23 | **Ministry** | 265:22,25 |
| 94:22 | 175:22 | 302:1 | 140:4 | 266:20,22 |
| 99:22 | 189:5 | **Michael** | **minority** | 312:5 |
| 101:21 | 219:19 | 197:20 | 79:6 | 313:2 |
| 102:4,9 | **mere** 195:9 | **Microsoft** | **Minus** 8:20 | **misstates** |
| 107:20 | **message** 76:7 | 23:25 25:3 | **minute** 15:19 | 79:13 |
| 116:8,22 | 76:14,19 | 25:5 27:2 | 71:4,14 | 170:25 |
| 118:10 | 112:11 | 27:10 | 95:11 | 176:13 |
| 129:17 | 289:10 | 152:24 | 254:2 | **mistakes** |
| 134:13 | **messages** | 209:13,15 | **minutes** | 114:13 |
| 135:16 | 61:15 66:5 | 209:24 | 234:11 | **mixed** 64:3 |
| 145:14 | 72:11 | 210:23 | **mis-** 142:15 | **MO** 312:19 |
| 153:1 | 73:24 74:9 | 234:6 | **mischara...** | **moderate** |
| 156:20 | 75:22 | 236:9 | 36:20 | 87:22 |
| 162:21 | 158:19 | **middle** 243:2 | 49:13 98:3 | **moderator** |
| 175:19,23 | 297:24 | **midnight** | 102:1 | 90:9,10 |
| 177:8 | **met** 26:3,3 | 162:15 | 104:15 | **moderators** |
| 178:10 | 26:11 | 167:23 | 132:5 | 91:9,19 |
| 186:20 | 41:25 42:6 | 301:20 | 137:1 | **modified** |
| 190:4 | 45:18 47:7 | **midterm** 20:1 | 138:21 | 206:8 |
| 192:16,17 | 47:21 58:7 | 26:21 27:9 | 139:16 | **modify** 92:6 |
| 192:19 | 58:21 64:3 | 40:11,13 | 159:25 | **modulation** |
| 199:2 | 118:25 | 40:15 | 162:7 | 43:24 |
| 207:20,21 | 119:25,25 | 45:18 55:3 | 208:2 | 49:24 |
| 209:1,10 | 123:20 | 55:20 | 274:10 | 153:24 |
| 209:11 | 125:17 | 131:15 | **mischara...** | 217:14 |
| 212:1 | 135:13 | 167:23 | 36:22 | **modulators** |
| 217:3,3 | 144:24 | 272:3 | **misconduct** | 90:17 |
| 219:17,19 | 275:1,22 | 298:18 | 122:4 | 165:25 |
| 221:18 | **Meta** 12:7,18 | 299:23 | **misidentify** | **moment** 96:18 |
| 230:17 | 12:23 | **midterms** | 138:18 | 131:22 |
| 233:10,14 | 20:23 | 55:1,2 | **misinfor...** | 303:2 |
| 243:7 | 242:14 | 149:14 | 262:3,6,12 | 306:7 |

ELVIS CHAN  11/29/2022

| | | | | |
|---|---|---|---|---|
| Monday 168:6 | Mueller | 210:9 | 52:4,5,18 | never 56:6,9 |
| money 73:2 | 86:25 | 256:23 | 52:20 | 88:6 91:15 |
| monitoring | Mueller's | 276:15,17 | 68:19 97:1 | 92:5 206:5 |
| 301:23 | 65:24 | 303:16 | 98:23 | 215:20,21 |
| Monroe 1:3 | 257:13,16 | 313:1,2 | 107:25 | 218:11 |
| 6:16 | 257:19 | 314:10 | 111:4 | 228:22 |
| month 40:18 | multiple | named 47:23 | 121:1 | 241:1 |
| 97:18 | 23:4,4 | 49:3 304:8 | 135:19 | 249:21 |
| 98:22 | 61:20 93:7 | 304:9,16 | 163:13,15 | 268:21 |
| 100:24 | 93:8 117:4 | 305:6 | 163:19 | 272:9 |
| 101:9,14 | 131:25 | names 21:24 | 306:21,23 | 279:4,6 |
| 148:12,13 | 149:5 | 28:4 30:6 | Naval 4:11 | 283:17 |
| 148:14 | 163:7 | 44:21 | 10:16,18 | new 2:15,16 |
| 236:3 | 170:13 | 48:11,19 | near 77:2 | 3:10 27:11 |
| 306:18 | 177:8 | 51:5 123:7 | 307:17 | 27:13 |
| monthly | 188:23 | 151:19 | nears 40:6 | 45:22 |
| 19:22 20:2 | 200:24 | 182:18 | necessarily | 155:4 |
| 40:5,10,24 | 204:3 | 183:4 | 114:7 | 156:1 |
| 41:10 | 230:13 | 278:14 | 148:5 | 214:9 |
| 42:21 44:9 | 235:25 | nation | 159:11 | 216:17 |
| 50:16 | 240:14 | 154:25 | 281:6 | 229:23 |
| 89:17 | 257:14 | 190:5 | 308:7 | 230:11,22 |
| 104:3 | | 202:9 | necessary | 232:3,14 |
| 170:8 | N | 209:2 | 314:8 | 232:16 |
| 171:13 | N 2:1 3:1 | 226:8,10 | need 89:2 | 241:9 |
| 177:16,17 | 312:18 | 227:18 | 108:3 | 243:25 |
| 181:2 | N-A-E-B-C | nation-s... | 112:4 | 258:16 |
| 182:14 | 144:14 | 283:6 | 122:7 | 306:13 |
| 288:13,13 | NAEBC 143:5 | 285:18 | 179:22 | Newell 200:7 |
| 297:19 | 143:18 | nation-s... | 180:1 | 200:15,23 |
| months 19:19 | 144:14,21 | 157:5 | 238:2 | 201:7,10 |
| 40:18 | 144:24 | national | 249:18,18 | 201:12,16 |
| 207:16 | 145:3,17 | 13:10 | 265:12 | 201:18,21 |
| 236:5 | 145:19,23 | 24:14 | 294:21 | 202:1 |
| 239:1 | 146:13,19 | 111:21,25 | 298:15 | Newland |
| 289:6 | name 6:21,22 | 112:5 | 299:8,9 | 45:19 46:5 |
| morning 6:9 | 7:7,14 8:7 | 158:25 | needed 168:4 | news 13:20 |
| 229:24 | 8:9 45:25 | 171:6 | 168:7 | 13:23 14:4 |
| 301:18 | 48:24 | 200:9 | 296:4,19 | 14:19 15:4 |
| motivated | 58:14 | 201:19 | 297:5 | 15:17 |
| 117:9 | 62:25 | 202:7 | 298:4 | 56:24 60:3 |
| move 41:10 | 135:6,8 | national... | needs 294:15 | 60:17 |
| 169:3 | 179:14,18 | 16:6 173:8 | 294:15 | 131:19 |
| 199:5 | 179:19 | nationality | 306:7 | 143:7 |
| moved 19:22 | 181:23 | 145:13 | neither | 213:4,21 |
| 20:1 40:9 | 182:3 | nationwide | 124:24 | 214:1,13 |
| 200:3 | 183:17,22 | 168:11 | network 59:9 | 214:16 |
| moving 95:10 | 209:25 | natural 77:2 | networks | 215:1 |
| 258:24 | 210:1,5,5 | nature 27:16 | 51:6 | 230:7 |

ELVIS CHAN  11/29/2022

| | | | | |
|---|---|---|---|---|
| 251:7,10 | November | object 97:10 | 112:20 | 238:23 |
| 272:8 | 1:16 6:1,4 | 121:11 | 114:15 | 240:9 |
| 275:9 | 6:11 141:1 | 193:19 | 115:14 | 245:24 |
| Newsroom | 220:15 | 199:22 | 117:11 | 246:10 |
| 143:5 | 272:12 | 202:16 | 121:25 | 251:23 |
| 145:23 | 293:12 | objecting | 132:5 | 268:2,20 |
| Nextdoor | 294:1 | 23:5 | 133:13 | 270:4 |
| 12:21,22 | 312:8 | objection | 136:25 | 274:10 |
| nickname | 313:3 | 11:25 14:9 | 137:25 | 282:8,18 |
| 303:19 | NSD 200:23 | 14:20 18:3 | 138:20 | 299:11 |
| Nigeria | number 4:10 | 18:13 | 139:16 | objections |
| 31:14 | 5:4 16:1 | 22:18,19 | 142:25 | 4:18 22:23 |
| night 162:14 | 66:3,10 | 26:16 27:5 | 144:4 | 169:16 |
| 301:19 | 85:8 89:2 | 27:19 | 146:9,20 | Observatory |
| ninth 300:4 | 100:21 | 30:16,24 | 150:10 | 52:1 53:5 |
| nodding 10:2 | 101:1,16 | 32:15 | 153:20 | 53:24 54:3 |
| noise 259:8 | 113:20 | 33:11 34:5 | 154:1 | 55:22 |
| 260:8,12 | 114:23 | 34:19 35:6 | 156:19 | 56:12 |
| 260:16,19 | 131:8 | 36:7,19 | 159:24 | observe |
| nominated | 132:11 | 41:13,19 | 160:21 | 125:16 |
| 275:4 | 134:4 | 43:4,19 | 162:6 | observed |
| non-FBI | 150:14 | 44:25 48:6 | 163:25 | 32:20 |
| 151:22 | 167:9,10 | 49:13,25 | 164:7 | 39:15 70:1 |
| non-social | 184:15,24 | 50:10 | 166:1 | obtained |
| 273:7 | 184:25 | 56:18 | 168:23 | 80:8 220:5 |
| nonelection | 288:8 | 57:21 61:8 | 170:25 | 223:2,11 |
| 308:1 | 310:9 | 63:4,22 | 171:15 | 225:3 |
| nonsense | numbers | 64:20 | 172:21 | 230:23 |
| 75:3 | 65:14,16 | 65:11 | 174:1 | obviously |
| noon 140:15 | 65:20 89:3 | 67:14 68:4 | 175:2 | 63:8 86:4 |
| normal 19:5 | 110:24,25 | 68:16,25 | 176:13 | 114:18 |
| 19:7 | 150:2 | 69:23 | 187:8,15 | 179:11 |
| north 3:5 | numeral | 70:13 71:8 | 188:6,22 | 197:1 |
| 110:16 | 28:15,16 | 72:14 | 189:9 | occasion |
| Northern | | 73:18 | 193:2 | 132:23 |
| 6:19 | ——— O ——— | 74:21 | 195:1 | 175:13,24 |
| Northwest | o'clock | 75:23 76:8 | 199:22 | occasion... |
| 2:11,17 | 301:18,19 | 76:21 | 200:18 | 25:1 |
| 312:3 | O-l-s-o-n | 78:18 | 201:24 | occasions |
| notarized | 183:9 | 79:13 | 204:17 | 27:7 102:6 |
| 312:17 | o0o--- 1:4 | 81:25 | 208:2 | 125:9 |
| notary | 1:15,18 | 90:20 92:3 | 210:14 | 131:15 |
| 312:15 | 2:2 3:2 | 92:16 94:8 | 212:25 | 149:5 |
| 314:22 | 4:2,9 5:2 | 94:16 95:5 | 213:23 | 150:17 |
| noted 11:17 | 6:2 140:17 | 98:3 102:1 | 215:17 | 180:22 |
| noticed | 141:3 | 102:21 | 224:3 | 204:3 |
| 144:7 | 309:21 | 103:4 | 228:19 | 240:14 |
| notifying | oath 179:1 | 104:14 | 231:7,18 | 274:22 |
| 131:5 | oaths 310:12 | 111:7 | 233:7 | 290:7 |

ELVIS CHAN  11/29/2022

occupation
 8:10
occur 19:16
 39:25
 89:13,16
 97:22
 120:5
 167:17
 199:20
 201:7,13
 205:12
 219:2
 220:18
 221:11
 226:21
occurred
 19:18
 122:5
 166:22
 167:21
 171:14
 206:14
 208:8
 214:8
 219:13
 220:14
 235:1
 236:24
 246:25
 250:8,9
 295:4
 306:18
occurrence
 120:8
occurring
 89:19
 223:7
 243:24
October 4:22
 4:24 5:9
 40:24 41:1
 192:15,18
 197:17
 213:21
 219:4
 220:10,15
 220:19
 221:2,3
 229:14,22

 230:15
 241:20,21
 244:1
 253:11
 259:15,22
 260:5
 302:25
 305:4
ODNI 24:14
 151:11
 154:21,23
 157:2
 161:1,13
 217:24
 218:15
 222:2
 223:24
 281:24
 283:4
 285:18
offering
 136:22
office 2:4
 6:19 7:3
 16:8 24:13
 45:25 58:2
 104:22
 106:18
 107:5,14
 107:18
 108:20
 110:11
 164:21
 168:13,14
 170:23
 177:2,9
 201:1
 235:2
 237:15
 257:3,13
 257:14,15
 257:17,19
 257:23
 258:2
 261:9
 264:15,17
 265:16,19
 266:6,7,23
 266:25

 267:1,2
 269:15
 278:10
 312:18
officer 48:2
 54:9 105:1
 310:22
OFFICER'S
 310:1
officers
 235:7,21
offices
 24:22 31:9
 39:8,11
 50:15
 98:11
 110:13,14
 162:16
 163:8,9,10
 163:17
 177:10
 181:5
official
 46:16
 109:22
 179:7
 197:23
 222:2,6
 246:4
 257:4
 265:1
 267:7
 276:6
 309:5
officials
 16:25
 25:11
 44:17,18
 46:8 47:10
 47:11 49:7
 54:10 80:9
 105:22
 106:13,21
 108:22,24
 125:3,13
 154:17
 172:16
 173:9
 175:18

 179:14
 181:14
 182:8,15
 197:25
 200:10
 216:7
 220:16
 221:23
 224:19
 227:6,21
 235:19,24
 236:23
 254:13
 255:17
 276:7,11
 276:13
 281:19
 308:25
 309:2
OGC 267:5
oh 10:21
 33:18
 40:16,21
 52:21 62:8
 69:3 75:11
 80:25 81:3
 97:21
 119:20
 129:13
 152:8
 155:14
 161:22
 177:15
 184:4
 265:11
 269:13
 294:6
okay 6:9
 7:12,13,19
 11:14,17
 12:2,25
 17:3 20:17
 21:9,9
 22:10,11
 23:19
 25:22 28:9
 28:12,16
 30:11,19
 31:15

 33:18 37:6
 38:19
 39:17
 40:21 42:2
 46:19
 48:20 52:8
 52:21,21
 54:2 55:5
 56:7,16
 59:22
 60:11,20
 60:23
 62:12
 65:19
 67:22
 69:16 70:3
 73:5,22
 75:11
 77:25 78:6
 79:3 83:5
 83:6 86:12
 87:24
 93:17
 95:25 96:2
 97:19,21
 99:7
 102:18
 104:11
 108:19
 109:2
 114:8
 115:25
 116:7
 121:6,21
 124:25
 126:12
 128:6,9
 129:11
 131:11
 139:10
 143:22
 144:13
 149:4
 152:14,22
 155:18
 156:6
 157:13
 159:8
 176:16

| | | | | |
|---|---|---|---|---|
| 177:5,11 | 287:9 | 199:20 | 190:7,12 | 282:13 |
| 177:15 | one-to-one | 200:16 | 191:13,17 | 291:20 |
| 178:1,7 | 296:6 | 201:23 | 191:25 | **opposed** |
| 179:10 | **one-way** | 202:15 | 192:4,6,8 | 112:17 |
| 180:4,6,9 | 296:16 | 203:11 | 192:21,23 | 165:18 |
| 181:12 | **ones** 20:17 | 205:3,17 | 203:20,23 | 176:15 |
| 182:12 | 113:18 | 205:20 | 203:25 | 291:18 |
| 183:7 | 153:6 | 206:22 | 204:16,20 | **oral** 9:24 |
| 184:2,18 | 246:23 | 208:1,6,11 | 206:12,24 | **order** 7:20 |
| 185:5 | 302:9 | 208:18 | 207:8 | 17:11 48:3 |
| 189:15 | **ongoing** | 209:22 | 208:23,25 | 111:24 |
| 191:22 | 194:1 | 219:25 | 209:4 | 169:21 |
| 197:12 | **online** 13:6 | 227:10 | 210:17,17 | 180:3 |
| 202:22 | 52:18 54:1 | 228:7,17 | 211:5,11 | 197:2 |
| 209:5 | 59:18,23 | 229:17 | 211:16 | 199:5 |
| 220:9,25 | 61:13 | 239:7 | 212:5,9 | **ordering** |
| 232:11 | 70:19,22 | 243:10 | 219:10,21 | 122:5 |
| 234:12 | 77:18,19 | 244:18 | 220:18,22 | **orders** |
| 243:14 | 83:13 | 245:1,10 | 220:24 | 111:19 |
| 244:3 | 93:15 | 246:19 | 221:10 | **ordinary** |
| 249:3 | **open** 99:8 | 247:18 | 222:16,18 | 61:5 144:2 |
| 254:21 | 140:6 | 248:24 | 225:24 | **Oregon** |
| 260:1 | 277:12 | 251:16,21 | 226:4,9,12 | 276:17 |
| 265:18 | **opened** | 256:15 | 226:18 | **organic** |
| 271:3 | 166:14 | 294:11,11 | 228:24 | 70:18 75:7 |
| 272:7 | **operate** | 294:12,13 | 240:24 | 75:8,13 |
| 277:19,22 | 12:11 42:8 | **operations** | 244:6 | 77:19 |
| 278:3,5 | 89:11 | 16:3 37:21 | 255:20 | 158:6 |
| 288:4 | **operated** | 37:25 38:5 | 270:23,25 | 250:18 |
| 293:23,23 | 15:16 | 45:10 59:4 | 282:6,6 | **organiza...** |
| 300:15 | 31:25 | 59:5 94:6 | **operations'** | 144:9 |
| 302:7 | 32:14 | 105:21 | 219:2 | 176:7 |
| 308:20 | 33:16 76:2 | 133:17 | **opinion** | 211:19 |
| 309:3,7,16 | **operates** | 157:16 | 63:24 | 278:13 |
| **Olson** 181:22 | 88:24 | 158:2,25 | 114:18,25 | 279:6 |
| 183:4,8 | **operating** | 161:18,24 | 115:24 | 284:15 |
| 186:14,15 | 168:1 | 172:3,4,10 | 116:6 | 289:22 |
| 207:22 | **operation** | 173:12 | 117:14,16 | **organiza...** |
| 254:14 | 172:19,19 | 174:25 | 118:20 | 223:21 |
| 281:5 | 173:1,6,15 | 175:1,12 | 119:3 | 224:16 |
| **once** 117:3,6 | 173:19 | 175:16,20 | 120:2 | 293:8 |
| 173:22 | 176:11 | 177:23 | 121:7 | **organiza...** |
| 175:9 | 180:19 | 178:3,6,20 | 128:5 | 134:18 |
| 233:5 | 186:16 | 181:6,15 | 131:20 | **organized** |
| 236:2 | 188:5 | 182:9,17 | 132:7,8 | 171:21,25 |
| **once-a-m...** | 191:1 | 185:11 | 139:9 | 177:14 |
| 237:18 | 192:11,18 | 186:7 | 152:16 | 178:2 |
| **one-on-one** | 193:1 | 187:3 | 160:24 | 186:5 |
| 283:20,21 | 194:21 | 189:6,19 | 249:15 | 204:7,9 |

ELVIS CHAN  11/29/2022

| | | | | |
|---|---|---|---|---|
| 218:22 | 235:10,11 | 126:10,14 | 313:5,9,13 | 51:17 |
| 219:8 | 251:12 | 128:6,9,9 | 313:17,21 | 74:10 |
| **origin** | **overseas** | 128:21 | **pages** 4:14 | 81:22 92:4 |
| 163:19 | 139:2,6,7 | 130:14 | 4:16,19,20 | 113:23 |
| **original** | **oversee** | 132:10,10 | 4:22,24 | 116:2 |
| 312:9 | 198:10 | 132:15,22 | 5:7,9 38:8 | 147:16 |
| **originally** | **overview** | 141:10,11 | 70:5,10,17 | 157:11 |
| 134:17 | 154:24 | 144:20 | 78:24 84:7 | 166:20 |
| **originated** | 156:14 | 146:1 | 132:22 | 179:18,18 |
| 74:18 | 200:24 | 147:8,9 | 144:19 | 243:21 |
| 144:17 | 253:23 | 149:9,13 | 147:13 | 247:8 |
| **Otto** 48:24 | 278:23 | 150:5,21 | 288:5 | 256:9 |
| **ought** 169:23 | 283:5 | 150:23 | **paint** 69:10 | 257:16 |
| **outcome** | 285:13,20 | 152:22 | **painted** 67:3 | 273:24 |
| 240:8 | **overviews** | 157:7,7 | **paper** 19:11 | 281:1 |
| **outlet** 142:8 | 156:25 | 158:23 | 279:7 | **participant** |
| 230:13 | 157:3 | 161:14 | **paragraph** | 186:3 |
| 259:21 | 291:10 | 169:24 | 28:23,24 | **particip...** |
| **outlets** | | 170:1 | 37:8 51:18 | 24:6 |
| 213:4 | **P** | 197:13,14 | 51:19 | 170:21 |
| 230:13 | **P** 2:1,1 3:1 | 227:8 | 59:17 | 171:6,8 |
| 271:25 | 3:1 310:11 | 237:13,14 | 69:24 | 172:18 |
| **outside** | 310:16,20 | 237:21 | 84:20 | 178:25 |
| 94:13 | 311:1,7 | 238:6 | 126:12 | 185:20 |
| 105:24 | **p.m** 141:5 | 239:6 | 128:16 | 220:11 |
| 107:13 | 167:25 | 242:8,12 | 132:15 | 278:6,7 |
| 108:19 | 180:11,14 | 242:25 | 134:10 | 280:1 |
| 137:2 | 234:15,18 | 243:1,2 | 217:22,23 | **participate** |
| 155:14 | 287:16,19 | 260:10,13 | 218:2,3,4 | 19:14 |
| 191:22,23 | 294:1 | 260:15 | 218:6,20 | 20:13,15 |
| 200:5 | 309:18,20 | 261:2,3 | 218:24 | 25:9 27:24 |
| 201:16 | **P.O** 2:22 | 272:1,2,6 | 229:21 | 46:12 |
| 208:19 | **page** 4:4,10 | 277:18,21 | 230:3,20 | 281:10,13 |
| 211:13 | 5:4 11:15 | 277:25 | 231:23 | **particip...** |
| 216:11 | 28:14 37:22 | 278:2 | 232:11,20 | 19:15 |
| 240:4 | 37:4 38:9 | 288:18 | 261:3 | 20:22 22:3 |
| 255:1 | 38:11 51:8 | 291:21 | **paragraphs** | 28:6 38:24 |
| 287:11 | 51:13,13 | 292:7,13 | 126:13 | 137:15 |
| **overall** | 51:21 | 292:18 | 170:6 | 171:9 |
| 152:15 | 55:23 | 293:9,11 | **parameters** | 278:11 |
| **overcome** | 58:24,25 | 293:17,19 | 88:11 | 280:17 |
| 195:11 | 65:12,15 | 293:20 | **paranoid** | **particip...** |
| **overincl...** | 67:1 69:12 | 299:7,25 | 48:3,5 | 28:3 |
| 138:17 | 69:13 76:4 | 300:1,2,4 | **Paranoids** | **particip...** |
| 139:15 | 77:15 | 300:9,11 | 47:22,24 | 23:21 |
| **oversaw** | 78:24 84:8 | 302:21 | **parlance** | **particular** |
| 198:6,11 | 84:16,17 | 306:4,5 | 290:13 | 24:20 25:8 |
| 198:17 | 86:12,13 | 312:10,15 | **part** 33:19 | 91:2 97:13 |
| 201:19 | 126:8,9,10 | 312:18 | 34:14 | 97:15 |

ELVIS CHAN  11/29/2022

111:11
122:11
174:6
193:21
199:25
202:20
204:2
214:25
225:20
particul...
121:17
particul...
194:7
parties 6:25
14:23
310:18
partnered
56:20
Partnership
56:14,17
57:2,9,14
parts 115:22
126:13
225:9
party 216:9
265:7,8
266:1,2
269:5,6
304:9,17
305:8,11
pass 104:25
119:12
pass-thr...
105:4
passed 41:3
162:20
passing
257:11
paste 291:4
pasted 304:8
Patricia 5:9
197:25
PATRIOT
111:24
pdf 37:4
38:12
51:13 59:1
84:18
126:11

128:10
141:11
147:9
157:8
197:12
242:9
243:1
293:11,19
293:20
300:1,2
302:22
306:6
PeaceData
141:12,14
141:25
142:8,24
143:4,17
144:10
145:7
146:18
peers 217:25
penalty
314:11
pending
195:20
196:4,6
220:24
222:17
people 14:16
14:17 43:1
43:6,11
44:14
45:12 48:8
49:10
54:19 61:5
63:18,20
66:8 68:1
68:10,12
72:17 78:2
78:10
80:17 81:2
81:18
83:20
85:16 87:4
97:25
105:3
106:17
109:2,19
109:20

110:5,9,19
111:6
122:16
123:22
138:11
146:2,17
146:18
153:12,15
161:9
168:6
181:21
182:11
183:24
186:12
200:5
207:4,6,11
207:24
219:23
223:8
254:16
268:18
276:8
281:15
293:3,5,8
296:9
people's
28:4 60:15
84:4
percent 85:9
85:9,10,13
85:20
167:5,7
241:4
percentage
15:13
113:21
period 40:17
100:10,11
219:3,10
219:25
311:6
periodic
42:5
135:10
perjury
314:11
Perkins
197:20
Permanent

79:24
116:12,15
perpetrate
219:10
persistent
272:23
person 26:4
26:5 43:8
43:10
184:15,24
184:25
203:14
264:6
275:23
person's
183:17
personal
23:16
95:17,18
114:17
115:24
116:6
117:13
118:20
128:5
132:7,8
139:9
148:5
159:4,10
229:25
235:22
249:15
291:20
personally
18:23
19:14 22:3
25:20 52:2
52:9 56:3
79:11
81:11
119:14
148:2
151:6
278:24
personnel
50:16
119:23
122:19
140:8

200:3
276:1
301:5,13
301:23
perspective
34:15
200:25
201:1
Peter 234:19
235:9
pharmacy
93:12
Phoenix 7:8
phone 52:3,4
52:5 53:15
97:24
107:24
135:10
236:6
Pichai
116:25
pick 97:24
138:11
picking
309:9
picture 67:2
69:9 72:5
piece 136:12
Pierson
222:7,9,10
pilot 136:2
Pinterest
155:8
156:2
Pipeline
277:2
place 112:6
127:6,20
148:4
161:8
162:18
163:2,6,23
168:17
237:7
243:6
265:11
268:25
270:7,11
places 28:20

ELVIS CHAN  11/29/2022

**Plaintiff**
1:7  2:3,15
2:20  3:3,8
8:2
**plaintiffs**
7:6
**Plaintiffs'**
4:18
**plan** 120:16
251:2
**planned**
285:3
**planning**
300:20
301:8
**platform**
23:21  48:4
61:20
71:22  82:7
85:15  89:1
89:5  93:15
110:20
114:25
117:17
122:19
189:25
210:12
232:2
234:4
238:21
261:18,23
261:24
266:13
283:22
288:5
289:25
290:11
291:14
301:23
302:11
**platforms**
12:4  13:20
13:24  14:2
14:3  17:17
30:13  32:4
32:12,19
34:9  35:10
35:12
36:18,25

42:8  43:2
43:3,17,25
49:8,12,21
49:24  50:9
55:12,15
60:7  62:18
64:12  70:5
75:15  80:3
80:8  83:14
85:17
87:13,23
91:6,8
94:7  95:20
96:4,20
97:8
101:21
105:10,24
106:14,22
107:17,25
108:23
111:2
116:17
118:4
119:10,16
120:25
122:16,17
123:18
126:2
127:1,7
131:23
132:25
133:6,18
135:21,24
136:3,15
137:13,24
143:17
146:13,19
147:14,25
153:11
154:9
156:11,16
160:19,20
162:23
165:6,10
173:19
177:18
180:18
181:3,10
182:10,14

187:7
189:20
190:15
204:3,11
204:13,24
209:6
210:16
215:23
216:1,7
218:16
222:11
223:4
225:5,14
225:21
232:7
242:5
249:13
250:6,12
252:16,20
254:24
255:23
256:18
262:13,14
262:18
267:14,20
270:15
274:14,20
279:3
280:19
285:22,24
286:7
287:1
288:12
293:3
294:20
298:9,24
307:1
**play** 157:15
**pleading**
122:9
**please** 6:24
7:13  8:7
9:13  20:21
31:5  41:23
181:25
303:23
312:8,12
312:17
**plural** 221:5

**podcast**
261:22
262:10
271:13
**point** 22:7
22:22
33:19  77:2
120:25
159:2
161:13
165:9
170:2
183:1
186:21
248:22
279:1,22
279:24
284:2,11
288:19
289:3
305:3
**points** 86:13
147:16
**poles** 166:14
**policies**
43:25
78:10
95:13
118:18
129:7
130:7,11
165:17
217:11
232:17
248:11,15
250:13
266:14
270:24
**policy** 129:2
129:18,23
130:4,21
133:11
135:13,15
135:20
166:13
279:7
**political**
16:6  34:3
68:15  70:6

78:11
80:15
132:8
173:9
176:7
223:1,10
223:14,17
223:20
224:16,16
265:7,8
304:8,17
305:8,11
**Politician**
264:3,5,13
264:16
**politicians**
132:23
133:4
**polling**
269:9,17
**pop** 42:16
**popping** 51:5
**portals**
261:18
**portion**
258:1,5,8
273:25
274:1
**portions**
258:7
**portray**
265:24
**posed** 242:13
**posing**
141:25
**position**
194:10
195:2
257:8
**positive**
133:24
**possession**
212:24
**possibility**
175:19
185:10
192:14
199:14,19
207:25

ELVIS CHAN  11/29/2022

```
208:18                132:4              187:2              practices           305:9,11
243:10                142:10             189:5              125:19              presiden...
244:6                 145:5              190:11             pre-marked          16:10,12
245:1                 146:2              192:7              169:22              173:10
possible              158:13             200:2,13           196:17             219:3,11
57:19                 205:2              200:16             precise             220:1
131:11                213:5              203:19,22          150:2               240:8,24
208:17                217:9              203:24             177:7               304:9,17
221:3                 229:23             206:24             predication         305:9,11
245:13                241:15             207:7              263:21,24           pressure
246:25                Postgrad...        208:5              preelection         116:1,8,16
247:2                 4:11 10:16         209:21             253:16              117:8
possibly              10:19              211:10             preface             118:2,15
152:10                posting           219:20              190:9              118:19
post 60:25            145:16             220:22             preference          122:24
61:15,21              163:1              222:16             297:4,11            123:2
62:16                 166:13             223:16             prelimin...         127:4,18
143:25                205:25             224:10,25          230:21              131:24
144:24                269:22             226:7              preliminary         132:9,24
145:9,10              postings          229:1               241:19             242:3
162:13,21             60:14,15           238:20             Prelimin...         pressured
163:23                87:4               240:18             4:19                133:5
164:25                143:13             250:23             preparation         presumably
165:5                 286:12             254:5              27:24               68:13
167:15,21             postmarked        255:19              preparatory         presume
167:24                164:18             256:14             26:6,8              226:13
168:6,8,10            269:12             269:25             280:11,18           pretending
168:15                posts 72:13        270:12             280:21              92:25
205:8                 76:13              273:2              281:21              93:23
214:9                 130:23             283:6              282:1,4,17          pretty 98:9
227:18                165:7,18          potentia...         prepare             272:12
229:23                165:24             177:22             27:15               prevent
230:12,22             166:5,8           potentially         117:25             132:3
232:14                167:18             34:16  54:1         137:11             172:9
244:1                 267:24             90:12              272:4,5             prevented
266:17                285:24             157:23             279:24              232:14
268:23                307:11             176:15,19          280:4              Prevention
272:9                 posture            190:6              preparing           292:10
293:14                300:21,21          209:3              27:17,22            previous
294:7                 300:25             226:11             245:5               48:1  75:6
295:3,5,6             301:1,2,7          240:21,23          271:8               300:9
295:12                301:11,21          248:1,6            272:13              previously
296:17,21             potential          250:24             present 6:24        11:7  12:7
298:13                121:8              252:3              254:17,20           29:17
301:3,6,16            122:6              254:1,3            309:5               102:9
Post's 232:3          172:25             274:7,16           presenta...         177:8
posted 67:9           173:11             305:23             137:16              190:5
68:23                 175:11            practice            president           210:22
75:17                 178:5              291:2              304:10,18           217:4
```

ELVIS CHAN  11/29/2022

219:17
232:15
257:20
266:18
268:24
270:21
275:11
283:1
285:10
294:24
**primaries**
19:2
156:22
285:17
**primarily**
26:5,20,20
29:10 51:4
55:13
134:17
135:13
138:25
156:21
275:24
276:20
286:1
298:21
**primary** 19:7
26:22
74:14 93:1
105:3
208:14
210:20
**principal**
46:4
**principally**
14:8 94:4
**prior** 125:24
133:23
202:12,15
310:14
**privacy**
205:10
**private** 7:6
16:17 18:7
20:10
105:6
155:5
170:9
179:2,3

231:24
238:10
243:16
245:17
246:6,9,12
246:15,17
246:21
247:4
**privilege**
21:17,18
23:15
27:20
94:17,19
97:11
111:8
121:12
122:1,3,8
122:11,14
164:1
174:5
187:10,11
188:8,9,25
189:1,1
193:20,25
194:2,4,11
195:1,6,11
199:23
200:18
201:25
202:1,17
215:18
251:24
282:9,19
**privileged**
174:2
**privileges**
187:11
188:9,23
202:18
**privy** 238:2
255:5
**pro-Second**
76:14,18
83:16
**probable**
68:20
252:4
**probably**
64:25

124:13
163:9
242:17
261:5
265:10
268:1
305:1
**probed** 88:5
88:8
**problem**
22:24 83:1
**problematic**
105:9,16
150:18
165:7
**problems**
126:6
**Procedure**
310:14
**proceed** 23:6
23:10
**proceedings**
309:19
**process**
22:22
27:20
112:6
121:12,25
122:2,14
160:5,5
163:18
187:10
188:8,25
196:12
199:5
250:5
251:24
254:7
266:16
270:12
276:10
282:9,18
285:16
296:25
**processed**
265:3
**processes**
29:22
283:2

**product**
112:24
164:3
236:10
**products**
12:19
139:24,25
278:19,20
278:23
**professi...**
54:11
135:1
**Professor**
55:24
58:11
77:24
**program** 72:7
139:14
**programs** 7:9
7:16 71:15
72:3
136:16
137:11,24
138:16
139:21
**prohibit**
205:25
**prominent**
120:23
**prominently**
161:18,25
**promoted**
109:12,15
**propaganda**
134:18
**proposals**
282:22
**prospect**
185:10
186:6
187:13
189:19
191:12,24
203:11
206:21
210:16
211:5,15
239:6
**protect**

32:19 34:9
35:9,11
36:25
38:16,21
48:3 50:5
87:22
274:14
**protected**
16:2,4
20:25
195:18
**protecting**
55:12,15
284:7
**protection**
211:23
**protections**
139:5
**protective**
172:12
180:3
**provide**
16:24
27:25 31:3
33:3,8
89:15 96:4
100:1,4,8
108:25
111:1
115:23
131:7
137:6
140:5
156:14
157:2,4
164:23
167:2
173:18
179:17
190:10
209:1
214:23
227:19
269:19
278:22
285:12,18
285:20
304:12
**provided**

ELVIS CHAN  11/29/2022

16:5,8,9
16:13,14
27:13
32:21
38:25
45:24
50:14
65:21
113:10
132:23
139:14,25
146:22
148:23
149:7
150:14
154:24
156:24
162:16
226:9,16
227:4
253:22
274:22
286:18
287:4
291:3
311:6
provides
34:8
providing
32:5 53:25
89:3,4
103:15
113:8
131:3
139:21,22
203:1
283:24
provisions
93:18
public 117:8
128:23
130:17,23
131:7
140:6
161:4
164:24
195:2,4
243:9,15
244:5,11

244:16,17
244:21,24
245:5,9,16
245:23
246:2
259:13,14
265:1
267:6
268:9
271:23
312:15
314:22
publicizing
59:10
publicly
147:23
148:17
194:16,18
196:21
214:2
259:12
publicly...
94:24 97:5
published
213:5
pull 33:9
126:5
197:7
206:11
pulled 83:25
purchase
78:1,11
93:15
purchased
77:17
purpose
33:25
34:15 35:1
35:4,8
78:15,20
274:6,12
pursuant
310:13
pursue 250:3
251:7
252:13
pursuing
250:24
push 60:25

73:24
74:20
75:21
93:11,14
put 35:20
116:17
122:23
204:23
216:20
242:3
244:14
289:11
putting
164:7

Q
qualified
310:7
qualifiers
253:3
quarter
131:9
quarterly
19:18,25
39:25
40:10 41:3
41:5 42:5
42:20 44:9
89:17,20
98:8,14,19
98:21
103:6
104:3,6
105:25
109:1,14
177:7,17
181:1
182:14
239:4
288:13,23
297:19
question 9:8
9:9,12,15
27:21
34:14
79:16
88:18,19
90:22 92:5
94:19,20

96:9 98:6
104:8
105:13,20
115:22
122:12,13
138:24
150:8
175:5
189:3,13
190:23
193:21
194:12,19
194:23,24
195:4,10
195:13
199:15
202:11
203:5
214:22
242:13,15
242:18
250:18
272:7
292:25
308:17,20
308:22
309:12
question's
34:13
questioning
308:16
questions
9:7 17:5
21:21
141:8
304:1
308:11
quicker
160:18
quickly
160:14
161:11
307:8
quite 46:3
64:25
240:11
quote 79:12
85:8
105:16

122:3
194:1,4
221:2
245:1
262:18
293:14
quote/quote
15:7
quote/un...
302:10

R
R 1:9 2:1
3:1 6:15
259:6
310:11,15
310:20
311:1,7
312:15
313:2
raise 23:12
23:13
139:11
178:19
187:13
188:4
189:18
190:15,25
221:24
raised 178:7
178:8,15
181:7
186:21
187:6
188:16,17
188:21
205:19,21
206:15
246:19
raising
191:17
205:24
282:5
ran 193:15
235:10
257:21
301:15,17
301:20
random 75:3

ELVIS CHAN 11/29/2022

99:24
101:15
**ranging**
109:25
**ranking**
281:19
**ransomware**
276:24
277:2
**rarely**
135:14
**rate** 167:6,7
167:9,12
**reach** 233:16
254:6
**reached**
65:14 66:3
66:4,10,24
85:8,21
86:16
232:22
241:5
267:10
**reaching**
59:9 86:7
233:20
**reaction**
68:7 87:12
**reactions**
67:17,19
231:2,6
**read** 38:4,20
50:4 51:16
56:24 66:9
77:17 81:5
81:6 86:21
105:12
127:18
128:15
145:20
193:24
228:23
229:8
230:14
231:22
232:20
240:19
244:22
293:24

294:3
297:25
312:12
313:6,10
313:14,18
313:22
314:5
**read-thr...**
287:24
**reading**
61:21 65:5
66:8 68:2
71:4 86:5
157:22
231:22
243:13
275:9
**real** 61:5
63:19
70:23
71:25 72:5
74:12 78:2
78:16
85:15,16
86:22 87:3
111:6,6
112:18
113:15
114:14
139:12
144:23
145:5
157:18
158:17
302:10
**realize**
21:10,13
**really** 66:2
100:21
115:6
154:4
195:15
272:17
283:20
**realm** 45:3
**realtime**
160:3
295:20
297:1,6

302:11
**reason** 24:21
88:19 99:3
103:20
113:23
120:1
122:4
131:12
133:14
138:3
148:16
168:24
203:13
205:9
207:14
209:12
210:11
220:23
223:18
224:13
228:11
251:5
283:24
290:3
291:9,15
298:13
307:12,13
313:7,11
313:15,19
313:23
**reasonable**
194:6
**reasons**
106:6
191:3
208:14
**recall** 20:17
20:18
23:20
191:11
205:13
206:20
209:19
211:2
212:11,17
213:18
215:2,25
221:13
222:13

225:6
229:18
238:25
244:11
248:5
251:14,19
260:17
261:11
307:4
**receive**
102:5
166:3
197:7
247:25
254:23
296:5
**received**
103:8
117:20
163:4,7
255:10
286:9
295:25
**receiving**
297:10
**recess** 22:14
77:11
96:14
106:9
140:15
180:12
234:16
287:17
**recharac...**
176:14
**recipient**
200:8
**recipients**
98:25
**recognize**
196:22
**recollect**
28:4 42:23
42:24
44:21
48:19
53:15
85:18
91:15,20

101:6
120:7
123:1
124:9
125:12
175:13
178:9,21
182:19
185:13
186:17,19
189:4,14
189:21,23
191:2,8,21
199:9
201:14
203:13,14
205:11
244:20,23
248:20
249:20
256:13
275:24
281:12
282:11
305:14
**recollec...**
56:5
101:13
144:12
146:21,22
153:9
154:2,15
154:24
157:2
164:15
166:2
167:8,21
170:15
172:22
175:17
176:18
181:19
186:25
197:4
200:22
205:4
208:4
209:7,8
210:19,24

**ELVIS CHAN  11/29/2022**

| | | | | |
|---|---|---|---|---|
| 211:17 | 105:11 | 199:14 | **referenced** | 206:11 |
| 212:21 | 106:6,7,10 | 205:20 | 295:16 | **refresh** |
| 213:9,13 | 128:14 | **recurring** | **referencing** | 197:3 |
| 219:6 | 129:10,20 | 170:4,7 | 127:10,12 | 244:22 |
| 223:12 | 130:25 | 278:3 | **referrals** | **refreshed** |
| 224:7 | 131:2 | 279:24 | 168:20 | 260:2 |
| 226:23 | 132:6 | 284:23 | **referred** | **refused** |
| 227:14,15 | 137:1 | **redacted** | 12:25 | 216:15 |
| 252:24 | 138:22 | 292:9 | 15:19 59:5 | **regarding** |
| 268:24 | 139:17 | **Reddit** 24:3 | 75:6 84:8 | 148:6 |
| 273:24 | 140:11,13 | 41:25 | 86:12 | 218:1 |
| 281:24 | 141:5 | 48:20,21 | 94:24 | 233:20 |
| 282:13,17 | 159:25 | 48:25 49:1 | 108:17 | **regardless** |
| 286:1 | 162:7 | 49:9 91:18 | 123:18 | 179:15,17 |
| 290:1,16 | 164:8 | 155:8 | 179:8 | **regional** |
| 294:22 | 175:3 | 156:2 | 207:12 | 135:3 |
| 295:2,5 | 176:13 | **redirect** | 210:22 | 276:7,11 |
| 308:21,22 | 179:1,13 | 146:25 | 213:6,9 | 276:13 |
| **recommen...** | 179:18,19 | **Redmond** 25:6 | 214:10,11 | **registered** |
| 158:24 | 179:22,23 | **reduce** 232:6 | 230:5 | 269:5,6 |
| 159:4,14 | 180:8,10 | **refer** 32:11 | 233:23 | **registrar** |
| 160:15 | 180:13,15 | 38:14 | 266:22,24 | 50:14 |
| **recommen...** | 180:16 | 51:21 | 269:2 | **registrars** |
| 91:25 | 184:19 | 59:12,18 | **referring** | 50:19 |
| 157:11 | 189:16 | 86:20 97:4 | 38:22 | **regular** 24:6 |
| 159:6 | 193:24 | 99:18 | 63:16 | 25:16 |
| 282:10,20 | 195:4 | 126:15 | 130:3 | 63:18 |
| 282:23 | 234:13,14 | 173:14 | 155:24 | 213:14 |
| **recommended** | 234:17 | 183:23 | 168:22 | 217:24 |
| 159:9 | 256:21 | 214:25 | 170:17 | 218:5 |
| **recommen...** | 259:13 | 223:24 | 202:3 | 236:2 |
| 161:8 | 287:14,15 | 241:23 | 218:6,20 | 238:11 |
| **reconvene** | 287:19 | 242:2 | 227:13 | 285:8 |
| 179:25 | 289:18 | 270:14 | 228:18 | 287:12 |
| **record** 6:10 | 290:15 | 303:19 | 231:4 | **regularly** |
| 7:11,22 | 292:12 | **reference** | 245:22 | 24:17 |
| 8:8 9:20 | 302:18 | 12:14,18 | 246:9 | 41:24 |
| 20:21 | 308:12 | 13:17 | 264:22 | 46:14 |
| 21:12 22:9 | 309:8,15 | 38:13 | 278:1 | 47:11 |
| 22:12,13 | 309:18 | 55:24 56:8 | 304:11 | 57:17 |
| 22:16 77:9 | 310:24 | 59:8 | **refers** 38:3 | 92:22 |
| 77:10,12 | **record's** | 126:23 | 129:5,14 | 101:22 |
| 79:14 | 10:1 | 129:2 | 156:1 | 122:19 |
| 82:23 83:2 | **recorded** | 150:6 | 158:10 | 174:18 |
| 84:15 | 310:23 | 156:2 | 221:4 | 185:15,16 |
| 96:11,12 | **Recording** | 230:4 | 284:2 | 201:2,15 |
| 96:15 98:4 | 4:23 5:6 | 231:13 | 306:20 | 206:25 |
| 102:2 | 259:5 | 279:13,23 | **reflect** | 208:22 |
| 104:15 | **recurrence** | 304:22 | 117:18 | 211:7 |

**ELVIS CHAN  11/29/2022**

212:2
226:7
227:16
276:22
304:6
**rein** 126:19
126:24
**reiterate**
99:23
188:11
**reiterating**
189:4
**relate** 18:2
46:12
102:11
121:22
149:14
238:18
307:1
**related** 4:19
39:9 42:15
45:4 52:6
60:21
92:19
164:13
234:1,25
261:17
262:7
270:10
283:9
286:10
290:25
305:16,18
305:20
306:14,17
307:3,6,14
307:20
308:2,6,8
**relates** 45:8
47:19
48:22
**relating**
52:11
194:14,15
233:5
244:25
259:17
262:20
263:16

**relation...**
24:24
**relative**
310:17,18
**relay** 104:21
105:6,8
108:4
162:22
164:11
165:6
166:5
225:12,13
254:21,25
267:13
296:19
**relayed**
163:10
165:24
172:11
204:2
220:10
221:20
225:16,20
255:2,4
297:18
**relaying**
167:16
168:17
223:8
297:21
**ReleaseT...**
149:15,18
**relevance**
194:5
**relevant**
103:8
105:1
126:19
138:13
152:18
159:15
242:19
**relied** 14:24
**reluctant**
104:12
**relying**
164:20
**remain** 69:8
173:11

**remedy**
249:19
**remember**
20:12
23:24 24:4
24:6 25:12
28:1,7
54:21 55:1
62:25
88:10 93:2
112:12
113:9
123:7
149:21
151:16,22
152:6,7,8
152:13
153:7
154:19
155:14,16
155:22
163:8,9
164:17
166:4,11
166:17,17
166:18,20
166:22
171:4,7,16
171:18
172:12,23
175:21
181:20
182:11,21
182:24,25
183:1,11
186:8
192:1,4
200:1
201:9
205:4,5,15
206:17,18
207:13
209:25
210:1,4,10
212:2
214:4,21
219:18,18
220:12
221:16

222:20
223:7
225:16
227:5,13
227:24
229:9
230:11,14
245:3
247:14,16
247:18,22
247:23
248:13,14
250:10
252:9
253:2,2,6
253:10,13
253:21
254:10
255:7
260:1,18
260:21,22
260:24,25
261:13
269:1,3,12
271:19,22
278:12,14
281:16
282:2,24
284:24
288:25
289:9,12
296:9,11
296:14,14
297:2
299:14
304:5
306:16
307:2
308:16
309:4
**REMEMBERED**
6:3
**remembering**
306:2
**Remote** 2:6,7
2:18,23
3:6,11 6:1
141:1
**remotely** 6:5

6:8
**remove** 95:15
250:24
252:22,25
**removed**
149:24
159:23
**removing**
147:18
154:8,22
**render** 314:8
**Renée** 51:25
53:12 85:5
85:11
**renew** 200:17
**rent** 72:17
72:19,25
**rented** 73:7
**repeat** 96:9
194:19
199:15
293:17
**repeatedly**
174:23
175:4,6
**rephrase**
27:21
105:19
166:25
253:16
297:16
**report** 14:22
65:23,25
80:11
86:19 87:1
87:1
102:18
103:14
106:17,19
107:6,8,9
127:11
131:7
145:2,6
159:19
161:5
162:2
168:7
261:19,23
262:10,25

| | | | | |
|---|---|---|---|---|
| 263:5 | 274:19 | **requested** | 204:15 | 168:16 |
| 266:11,12 | 278:21 | 105:12 | 205:1 | 190:19 |
| 268:5 | 289:24 | 116:21 | 252:13 | 198:7,18 |
| 285:23 | 292:4 | 311:4,5 | 290:19 | **restate** |
| 286:5 | 293:7 | **requesting** | 291:13 | 167:20 |
| 289:17 | **repost** 74:1 | 22:22 | **respective** | **restrict** |
| 290:9 | 76:3 | **require** | 49:11 | 143:12 |
| 298:23 | 158:12 | 298:15 | 156:15 | **result** 35:25 |
| **reported** | **reposted** | **requirement** | 163:17 | 142:14 |
| 54:19 | 66:20 | 266:10 | **respecti...** | 148:22 |
| 167:11 | **reposting** | **requires** | 29:12 | 149:24 |
| 287:1 | 63:8,11 | 90:8 | 35:21 | 160:17 |
| **reporter** | 64:19 65:6 | **research** | **respond** 9:23 | 166:19 |
| 1:24 6:7 | 65:7 67:24 | 15:14 31:7 | 104:9 | 203:5 |
| 9:21 10:8 | 71:5,23 | 31:19 56:8 | 138:24 | 266:5 |
| 11:10 | 73:14,16 | 56:21 60:2 | 204:14 | **resulted** |
| 105:12 | 76:6 86:6 | 61:12 | 215:3 | 67:13 |
| 169:11 | 86:6 | 69:17 73:4 | 272:8 | 118:18 |
| 196:14 | 157:23,23 | 74:6 75:9 | 282:21 | **results** |
| 216:22 | **represent** | 75:25 76:3 | **responding** | 137:9,10 |
| 241:12 | 7:1,21 | 78:21 79:7 | 9:15 | 148:21 |
| 258:25 | 22:23 | 79:10,18 | 158:20 | 206:12 |
| 259:12 | 23:17 | 79:18,19 | **response** | **Retaliatory** |
| 271:4,18 | **represen...** | 79:23 | 37:9,13 | 271:8 |
| 287:20 | 253:14,18 | 84:25 85:5 | 90:21 | **retired** 47:8 |
| 310:8 | **represen...** | 85:7 100:7 | 103:9 | **return** |
| 311:6 | 24:15 27:4 | 100:10 | 167:2 | 312:17 |
| **reporter's** | 135:3 | 126:15 | 170:16 | **returning** |
| 6:21 | 198:9 | 141:17 | 179:8 | 191:10,10 |
| **reporter...** | **represen...** | 143:3,16 | 202:24 | **retweet** 74:1 |
| 271:12 | 95:20 | 154:6 | 203:4 | 76:20,25 |
| **Reporters'** | 110:12,13 | 157:1 | 274:19 | 158:12 |
| 310:10 | 118:3 | **researcher** | 279:15,16 | **retweeting** |
| **reporting** | 211:1,4 | 51:25 | 292:8 | 76:18 |
| 79:23 | **represented** | 58:10 | 309:11 | **retweets** |
| 134:16 | 24:8 | **researchers** | **responses** | 76:16 |
| **reports** 15:9 | 272:18 | 57:17 58:6 | 4:18 9:24 | **retype** 291:5 |
| 104:5 | **represen...** | 58:16 | 21:15 | **Reuters** |
| 114:9 | 7:10,17 | 140:3,9 | 166:3 | 141:24 |
| 127:25 | 148:3,4 | **researching** | 169:17,25 | **reveal** |
| 131:3 | **Republicans** | 11:24 | 203:2 | 117:22 |
| 147:23 | 266:21 | 169:7 | 277:14 | **revealing** |
| 163:4 | 304:9 | **reside** | **responsi...** | 155:5 |
| 164:13 | **reputable** | 264:16 | 24:25 | **revelation** |
| 165:3 | 85:25 | **Resilience** | 153:16 | 142:14 |
| 167:16 | **request** | 170:22 | 217:14 | **revenues** |
| 241:8 | 103:3 | **respect** 44:2 | **responsible** | 115:13 |
| 264:25 | 288:23 | 91:2 | 24:23 | **review** 70:11 |
| 265:2 | 296:22 | 194:12 | 43:16 | 134:16 |

ELVIS CHAN  11/29/2022

| | | | | |
|---|---|---|---|---|
| 262:15 | 73:17 | 148:9 | 274:9 | **rolling** |
| 265:13 | 74:12,20 | 149:2,7,11 | 280:6 | 198:5 |
| 296:3 | 75:5,7,22 | 149:16,20 | 281:18 | **Roman** 28:15 |
| 306:8 | 77:20,22 | 150:19 | 285:4 | 28:16 37:2 |
| 311:3 | 78:3,17 | 151:1,11 | 288:9,15 | **room** 152:19 |
| **reviewed** | 79:6,12 | 152:24 | 292:23 | **rotate** |
| 79:7,11 | 80:13,18 | 157:12,16 | 293:12 | 207:15,15 |
| 165:1 | 80:19,22 | 157:19 | 299:5,17 | **rotating** |
| 263:18 | 82:5,14,15 | 158:2,7,13 | 303:9 | 44:20 |
| 265:4 | 83:16 | 158:17,21 | 304:23 | **Roth** 4:20 |
| 266:3 | 84:10,23 | 159:3,9,17 | 306:21 | 45:19 46:5 |
| 268:6 | 85:10,17 | 159:23 | 308:25 | 124:17 |
| 288:1 | 86:1,17,20 | 160:3,15 | **right-wing** | 217:1,2 |
| **reviewing** | 86:24 87:5 | 162:10 | 144:16 | 222:23 |
| 91:1 | 87:14 94:1 | 163:6,23 | **rights** | 224:1,6,20 |
| 112:24 | 95:16 96:8 | 165:7,11 | 286:13 | 227:1 |
| **revolve** | 96:22 97:1 | 166:14 | **rises** 266:9 | 228:2 |
| 266:5 | 98:7,23 | 168:12 | **risk** 180:19 | 229:4 |
| **Rich** 5:9 | 99:9,14,19 | 169:19 | 181:6 | 230:20 |
| 197:25 | 103:25 | 172:1 | 186:6,16 | 233:1,14 |
| **Richard** 47:8 | 104:5,7 | 177:13,19 | 187:5 | **Roth's** |
| 125:7,8 | 107:11 | 178:13 | 188:5 | 223:13 |
| **rife** 268:17 | 109:6 | 179:12 | 192:10,17 | 225:17 |
| **right** 17:8 | 114:8 | 180:21 | 192:20 | 233:8 |
| 17:23 21:6 | 115:21 | 181:3,10 | 211:14,20 | **Rouge** 3:5 |
| 23:14 | 122:17,24 | 181:16 | 212:8 | **roughly** |
| 26:15 29:6 | 123:23 | 183:12,14 | 282:6 | 39:25 |
| 33:20 35:1 | 124:11 | 183:16 | **RMR** 1:24 | 253:5 |
| 35:16,19 | 126:21 | 188:16 | **RNC** 16:7 | **round** 300:17 |
| 35:25 36:4 | 127:1,8,15 | 196:25 | **Robert** 65:24 | **RPR** 1:24 |
| 36:6 38:1 | 128:4,13 | 214:12 | 257:13,15 | **RSA** 271:22 |
| 38:3 40:14 | 128:17,24 | 217:19,19 | 257:18 | 272:18,20 |
| 40:22 | 129:7,15 | 227:11 | **robust** 37:14 | 275:16,23 |
| 43:18,25 | 130:1,8,12 | 228:8,9 | 130:10 | **RSCC** 16:7 |
| 49:24 59:6 | 130:17,22 | 232:11 | 132:2 | **ruled** 122:11 |
| 59:10,15 | 131:18 | 236:25 | **Roderick** | **rules** 9:6 |
| 59:20 61:7 | 132:12,25 | 240:16 | 46:1 | **rumors** 227:9 |
| 61:17,22 | 141:12,21 | 242:5 | **role** 43:8 | 228:6,16 |
| 62:9,10 | 142:2,4,8 | 252:10 | 72:21 | 229:16 |
| 63:9,12,21 | 142:11,15 | 256:15 | 135:1 | **run** 19:7 |
| 64:4,11 | 142:21,22 | 259:8,25 | 154:16 | 281:17 |
| 65:1,15 | 144:3,14 | 260:5 | 193:12 | **running** |
| 66:20 67:9 | 144:14 | 261:7,9 | 217:12,18 | 98:11 |
| 68:2,10 | 145:11,17 | 262:3,7,13 | 275:5 | **Ruslan** 6:22 |
| 69:14,17 | 145:20,21 | 262:21 | 290:5,5 | **Russia** 38:3 |
| 69:19 70:6 | 145:24 | 263:8,13 | **roles** 43:7 | 94:3,13 |
| 70:12,24 | 146:8,14 | 269:24 | 200:4 | 95:1 155:3 |
| 71:2,7,17 | 147:10,14 | 272:4,9,24 | **rolled** | 186:13 |
| 71:25 72:7 | 147:20,25 | 273:4 | 272:13 | 226:13,17 |

**ELVIS CHAN  11/29/2022**

271:9
305:20,25
**Russia's**
37:20,25
38:4,5
157:15
158:2
**Russian** 4:13
11:3  12:3
12:9,25
13:4,15,18
14:4,13,18
31:13,18
32:14,22
32:23
33:16  34:2
34:23  36:1
36:5  37:13
52:7,24
53:2,24
55:7  59:3
60:2  61:11
65:8  66:4
73:23
76:14,16
78:22
87:14  89:3
92:20  94:1
95:9
126:25
127:11
142:15
146:7
152:3
158:10
161:16,23
172:18
173:5
175:16
176:6
177:22
178:5,20
180:19
181:15
182:9,16
184:8
185:11
186:6,16
188:5

189:19
191:1,13
191:17,24
198:11,13
200:13,16
201:16,22
202:8,14
203:11,25
204:16
207:25
208:12,18
209:21
211:15
212:9
221:10
235:7,21
239:6
240:6,23
241:5
257:24
285:21
**Russian-bot**
158:5
**Russian-...**
146:24
**Russian-...**
174:25
**Russian-...**
35:3
**Russian-...**
64:15  67:8
80:6  89:9
96:8
112:17
141:15
142:15
146:14
**Russian-...**
144:11
**Russians**
13:21,25
15:16  29:5
29:23
30:14,21
31:25
59:24
63:19  64:1
64:1  73:24
74:18

143:24
144:17
145:20
175:12
190:12
227:18,22
236:21
286:15
**Ryan** 44:15

_____

**S**
**S** 2:1  3:1
**s-e-n** 183:10
**S-h-e-r-...**
124:21
**S-t-r-z-o-k**
234:20
**S-u-r** 7:8,15
**Sacramento**
276:15
**safety** 43:3
43:9,14,15
44:4,11,13
46:4,9,23
47:18
48:22
55:10,11
55:12
135:17
152:20
153:12
217:6,12
292:11
293:4
**safety/site**
45:12,15
48:15
**sales** 114:24
**Salgado** 47:8
125:7,8
**Sam** 135:6
137:5
138:1
**Samaradun**
135:7
**San** 6:7,20
8:12,14,18
24:18  25:4
50:12,12

58:1  105:1
106:18
107:2,5,13
107:17
108:19
119:23
128:3
135:4
162:12,20
165:2,3,5
168:9,16
168:21
169:1
177:2,9
181:5
198:12
201:5
267:9,13
268:10,13
268:15
272:16
276:1
287:9
296:17,21
298:12
301:2,17
310:4
**Sauer** 2:6
4:5  7:2,2
8:6  11:14
12:1  14:10
15:1  18:5
18:20  21:9
21:13  22:1
22:8,11,17
22:21
23:11
26:17
27:14,21
28:18
30:19  31:1
32:25
33:18
34:13,21
35:11
36:12  37:1
37:6  38:10
41:16,21
43:15,22

45:7  48:10
49:19  50:3
50:18  51:9
51:12
56:23
57:23
58:25
61:14  63:7
64:2,23
65:19
67:18  68:9
68:21  69:3
70:3,16
71:12
72:18
73:22
74:25  76:2
76:10,23
77:6,14
78:23
79:17  82:5
82:17,25
83:3,5,15
84:17,20
90:24  92:8
93:4  94:10
94:18
95:10
96:11,17
97:14  98:5
102:10
103:2,14
104:19
105:19
106:12
112:9
113:3
115:4,18
117:15
121:21
122:2,15
128:17
129:12,23
131:5
132:10
133:19
137:10
138:14
139:10,18

140:10
141:6
143:10
144:8
146:12
147:2
150:15
153:23
154:7
157:6
160:13,25
162:10
164:2,4,9
166:8
169:3,13
169:20
171:2,20
173:2
174:14
175:8
176:16
178:24
179:6,12
179:20
180:6,8,15
184:23
187:12,23
188:14
189:2,10
189:15
193:5,23
195:12,21
196:16,25
197:10,14
200:5
201:6
202:11,22
204:25
208:7
210:15
213:2
214:3
215:19
216:17,24
224:18
229:3
231:10,25
233:14
234:12,19

239:2
240:13
241:9,14
242:7,12
242:23
243:1
246:6,17
252:10
256:24
258:15,20
258:22
259:2,11
268:4
269:1
270:14
271:1,6
274:18
277:20
282:16
283:11
287:13,22
292:13
293:19,21
294:2
299:16,24
300:3,10
300:14
302:21
303:4
306:11
308:10,16
309:14
save 298:4
saved 298:7
298:10,13
saves 89:5
saw 50:25
157:1
174:12
268:21
286:12,15
301:24
saying 10:9
73:10
82:14,16
91:5
106:13
131:7
133:3

166:18
190:22
195:21,24
196:3,6
211:25
213:18
220:5
227:25
244:18
247:16,18
247:22
256:6,13
261:11
266:20
270:7,18
304:8
says 38:20
70:16
80:20
83:17,19
84:11
127:10
170:21
171:3,4,13
217:1,6,8
217:23
225:2
227:8
228:2,16
229:15
230:20
232:12
243:7
244:10,25
245:15
303:5
304:7
Scandina...
210:9,11
schedule
20:2
scheduled
300:18
scheduling
288:13
School 4:11
10:16,19
science
10:14

sciences
48:25
Scott 2:6
7:5
screen 28:10
28:19
51:14
197:10,15
216:20
241:16
242:21
255:8
271:7
277:15
287:25
292:14,20
298:5
303:2
screening
42:17
scroll 28:14
129:12
277:20
278:25
279:15
300:16
scrutiny
117:8
131:13
Scully 25:13
25:16,19
26:12,14
26:22  28:2
152:7,10
152:13
154:13
212:3,21
221:21,25
278:8
281:16,22
Sean 200:7
200:15,23
201:7
search
111:18
251:8
294:11
season 13:15
16:11

second 13:18
16:16  17:6
29:24
51:18
52:22
71:13
86:21
93:18
107:14
128:16
169:10
182:3
194:13,14
225:1
241:10
252:10
276:16
279:23
294:6
295:15
second-h...
109:23
seconds
242:22
section 37:7
109:7
121:23
175:18,21
184:6,10
184:12,21
185:1,4,6
245:12
310:14
sector 16:17
18:7 20:10
155:6
231:24
238:10
sector-e...
105:6
secure 99:1
295:17
302:14
secured
81:14
236:12
securely
99:11
securing

ELVIS CHAN  11/29/2022

| | | | | |
|---|---|---|---|---|
| 154:16 | 126:14 | 292:14,19 | **sending** | 271:2 |
| **security** | 127:9 | 293:11 | 232:16 | 292:21 |
| 10:17 | 128:9 | 300:4,18 | 263:22,24 | 304:5 |
| 16:23 | 132:14 | 302:23 | 288:20 | 306:9 |
| 18:17 | 136:2 | 303:2,3,10 | 304:3 | **sentence** |
| 24:12 | 137:18 | 303:23 | 306:12 | 29:1,4 |
| 43:10,13 | 146:3,4 | **seeing** 53:4 | **sends** 264:4 | 35:16 |
| 45:13 | 150:23 | 156:15 | **senior** 16:14 | 37:17 75:7 |
| 46:15 | 152:25 | 201:4 | 45:19 | 75:12 |
| 47:16 48:2 | 165:10,13 | 261:7,16 | 46:16,24 | 77:16 |
| 50:15 54:9 | 169:14 | 285:20,24 | 47:7,10,15 | 84:12 |
| 111:14,21 | 170:1,3,10 | 286:6,21 | 48:13 49:3 | 100:5 |
| 111:25 | 174:8 | 287:6 | 123:11 | 128:15 |
| 112:5 | 196:18 | 300:7 | 125:3,13 | 129:12 |
| 138:4 | 197:8,10 | 306:1 | 131:14 | 141:23 |
| 151:11 | 197:15,17 | **seen** 20:11 | 175:17 | 144:20 |
| 152:16 | 198:1,2,15 | 173:8 | 200:10 | 151:9 |
| 160:9 | 207:2 | 174:11,15 | 222:1,6 | 160:25 |
| 161:9 | 216:24 | 207:8 | 237:25 | 170:3 |
| 170:22 | 217:22 | 278:19,20 | 246:4 | 219:22 |
| 171:7 | 218:1,4 | 278:24 | **senior-** 46:7 | 221:5 |
| 200:9 | 219:4 | **seizure** | **senior-l...** | 224:20 |
| 201:19 | 221:5 | 249:19 | 25:10,11 | 225:1 |
| 202:7 | 223:5 | 250:4,24 | 44:16 | 227:7,8 |
| 217:25 | 225:25 | 251:7,9,13 | 123:6,9 | 245:15 |
| 218:1 | 227:11 | 252:4 | **sense** 220:13 | 273:23 |
| 231:1,6,11 | 228:10 | **Select** 79:24 | **sensitive** | **sentiment** |
| 231:15,24 | 230:1 | 116:12,13 | 20:19 21:4 | 209:20 |
| 278:18 | 231:2 | 116:15 | 21:17 | 222:14,19 |
| **see** 28:15,17 | 241:14,17 | **selector** | 283:25 | **Sentinel** |
| 28:18,20 | 241:17,19 | 100:16 | **sensitivity** | 289:19,24 |
| 28:22,23 | 241:22 | **selectors** | 243:19 | 290:9 |
| 28:24 29:3 | 242:24 | 30:2,4 | 245:20 | 291:25 |
| 35:20 37:3 | 243:2,5,22 | 32:22 33:5 | 247:6 | 292:1 |
| 37:4,10 | 243:23 | 113:8,10 | 255:11 | **separate** |
| 38:17 51:5 | 245:20,21 | 199:10 | **sent** 27:12 | 97:23 |
| 51:14,17 | 247:9,25 | **self-del...** | 90:9 | 121:5 |
| 51:20,22 | 252:3 | 297:23 | 112:11 | 131:15 |
| 55:23,25 | 255:8 | 298:2 | 127:13 | 280:10 |
| 65:13,15 | 259:2,4 | **Senate** 4:21 | 161:12 | 295:9 |
| 67:4 69:7 | 261:6,10 | 116:13 | 165:2 | 305:4,5 |
| 77:23 | 261:22 | 117:24 | 196:24 | **separately** |
| 78:24 79:2 | 262:11,23 | 241:21 | 197:11 | 135:12 |
| 81:1,2,16 | 266:7 | **send** 27:11 | 198:23 | **separatist** |
| 83:19 | 271:6,14 | 98:25 99:3 | 232:15 | 69:19 |
| 84:18 85:4 | 272:2,5,7 | 101:20 | 266:5 | **September** |
| 86:25 | 277:14 | 107:23 | 267:3,4,9 | 4:14,16 |
| 114:18 | 279:16,17 | 265:12,19 | 268:10,13 | 10:20 |
| 126:7,9,12 | 280:2,3,7 | 296:1 | 268:15 | 11:19 |

ELVIS CHAN  11/29/2022

| | | | | |
|---|---|---|---|---|
| 151:10 | **session** 77:3 | 106:2 | 36:23 | 100:5 |
| 155:12 | 141:2 | 108:6,8 | **sharing** | 219:16 |
| 292:17,22 | 234:11 | 112:7,25 | 16:17 17:7 | **shortened** |
| **series** | **sessions** | 113:24 | 17:15,15 | 29:22 |
| 128:11 | 96:19 | 120:19 | 17:18,22 | **shorthand** |
| 279:8 | **set** 4:18 | 131:20 | 17:25 18:9 | 6:6 88:3 |
| **seriously** | 27:17 31:8 | 136:4,9 | 18:10,18 | 310:7 |
| 114:20 | 31:9,13 | 137:9 | 18:21 | **shortly** |
| 115:1 | 109:17 | 138:2 | 29:11,14 | 172:20 |
| **serve** 199:5 | 181:12 | 152:19 | 29:16 32:4 | 192:11,14 |
| 266:8 | 182:8,12 | 197:11,16 | 32:10 | 219:3,11 |
| **server** | 182:18 | 213:16 | 33:20 34:1 | 219:13,25 |
| 195:22 | 258:16 | 216:20 | 35:19,22 | 220:18 |
| 198:15,21 | 279:25 | 241:16 | 36:17 | 221:11 |
| 198:23,24 | 297:5 | 255:8 | 37:19,24 | 241:25 |
| 199:8,17 | **sets** 150:6 | 258:23 | 39:1 50:8 | 244:19 |
| **servers** | 177:12,21 | 271:7 | 88:20 | **shortt@a...** |
| 13:12 | 181:7 | 273:12,20 | 96:19 97:6 | 3:7 |
| **service** | 204:4 | 274:13 | 100:12 | **shots** 298:5 |
| 43:24 | **setting** | 277:13,15 | 103:22 | **show** 139:23 |
| 49:11,20 | 120:21 | 283:16,17 | 128:22 | 216:17 |
| 90:23 91:1 | 288:6 | 292:14,20 | 130:16 | 241:9 |
| 91:22,24 | 291:17,18 | 296:23 | 136:10 | 244:21 |
| 92:1,6,9 | **seven** 24:5 | 300:11 | 160:3 | 271:1 |
| 92:19 93:9 | 50:9 | 302:24 | 171:5 | 287:23 |
| 93:19 | 101:22 | 308:23 | 198:4 | **showed** 27:7 |
| 129:8,19 | 288:12 | **shared** 16:18 | 232:13,15 | 278:14 |
| 130:5,22 | **seventh** | 19:1 29:24 | 273:25 | **showing** 11:7 |
| 132:2 | 293:10,19 | 31:10 | 274:6 | 169:9,13 |
| 138:5 | 293:20 | 42:15 | 300:22 | 196:16 |
| 153:18 | **shake** 182:6 | 50:23 62:3 | 302:1 | **shows** 66:22 |
| 165:13 | **shaking** 10:2 | 78:9 88:7 | 304:23 | **shut** 37:21 |
| 166:7,10 | **Shane** 46:24 | 100:22 | 305:7 | 37:25 38:5 |
| 205:7,25 | 47:3 125:9 | 103:7,13 | **sheer** 84:11 | 76:5,17 |
| 206:4,6,8 | **share** 28:19 | 130:19,20 | 84:21 | 87:8 |
| 206:19 | 30:18 | 143:1 | **SHEET** 313:1 | **side** 23:21 |
| 235:7 | 33:13 35:8 | 156:13 | **sheets** | 24:7 25:8 |
| 248:3,25 | 50:21,22 | 160:6 | 312:10,14 | 34:1 44:13 |
| 249:4,25 | 50:24 51:2 | 166:19 | 312:17 | 46:14,24 |
| 250:19 | 51:14 | 167:1 | **Shelby** 222:7 | 47:12,18 |
| 252:7,13 | 88:13,25 | 208:5 | **Sherrer** | 48:15,22 |
| 252:23 | 89:22 | 209:20 | 46:17 | 87:25 |
| 253:23,25 | 92:21 95:8 | 222:19 | 124:18,19 | 110:6,6,20 |
| 262:16 | 98:7,10 | 232:2 | 124:20 | 111:21 |
| 267:21,22 | 99:24 | 287:8 | **shift** 162:22 | 112:5 |
| 274:2,3,8 | 102:8,15 | 304:21 | **shifted** 29:5 | 120:24 |
| **SES** 109:23 | 102:16,24 | **shares** 29:19 | **shifts** 144:7 | 124:3 |
| 179:5 | 103:11 | 32:16 | 307:10 | 153:16 |
| 302:19 | 104:10 | | **short** 3:6 | 161:10,10 |

ELVIS CHAN  11/29/2022

| | | | | |
|---|---|---|---|---|
| 172:10 | 48:21 | **Slipping** | 94:6 95:20 | 162:23 |
| 191:20 | 97:24 | 284:23 | 96:4,20,25 | 163:16 |
| 224:12 | 142:2,15 | **slotting** | 97:8 99:14 | 165:6,10 |
| 280:13 | 144:10,11 | 54:1 | 99:18 | 165:12 |
| **Siegel** 124:2 | 144:14,16 | **slowly** 10:7 | 100:20 | 166:3 |
| **sign** 81:15 | 144:21,24 | **smaller** | 101:21 | 168:19,20 |
| 312:14 | 145:4,5,7 | 51:16 | 105:10,24 | 168:22,25 |
| **Signal** | 145:9,11 | **Smith** 76:12 | 106:14,22 | 172:24 |
| 295:12,22 | 145:17,19 | **Smith's** | 107:16,24 | 173:3,18 |
| 296:15 | 146:2,13 | 76:18 | 108:22 | 176:10 |
| 297:5,12 | 153:12 | **social** 4:12 | 110:20 | 177:18,25 |
| 297:13,23 | 217:4,8 | 11:5 12:4 | 111:2,3 | 180:18 |
| 298:1,6,9 | 230:21 | 12:6 13:20 | 112:8 | 181:3,10 |
| 298:12,16 | 232:12 | 13:24 14:2 | 113:10 | 182:10,13 |
| 298:20 | 293:4 | 14:3,22 | 114:22 | 183:3 |
| 299:17 | **sites** 13:23 | 15:3,5,15 | 116:17 | 187:6 |
| 302:3,8,10 | 14:4,19 | 17:16,20 | 117:16 | 189:20,25 |
| **signature** | 15:4 77:20 | 18:18,25 | 118:3,5,7 | 190:15,21 |
| 312:10,14 | 78:2 | 23:20 29:9 | 119:10,15 | 190:24 |
| 312:18 | 142:19 | 29:19 30:5 | 119:25 | 191:19 |
| 313:25 | 143:9,13 | 30:13,22 | 120:3,11 | 192:2,9 |
| **significant** | 146:18 | 31:11,23 | 121:4 | 204:3,10 |
| 85:8 | 251:7 | 32:4,11,12 | 122:16,17 | 204:13 |
| 132:11 | **situation** | 32:17,18 | 122:18 | 205:2,5,6 |
| **similar** 63:6 | 143:22 | 33:5 35:17 | 123:17 | 209:5,11 |
| 93:7 94:25 | 146:5 | 35:23 | 127:5,19 | 209:13 |
| 101:15 | 248:4,16 | 36:17 | 131:23 | 210:12,15 |
| 110:21 | 250:19,20 | 37:20 | 133:5,15 | 210:20 |
| 174:8 | 251:6 | 39:19,19 | 135:11,21 | 213:11 |
| 205:22 | 264:9,11 | 41:6,17 | 135:24 | 215:23 |
| 212:14 | 264:12 | 42:3,8 | 136:3,15 | 216:1,7,10 |
| 222:14 | 265:5,20 | 43:2 49:8 | 137:3,12 | 218:16 |
| 288:16 | **situations** | 50:23 | 137:24 | 222:11 |
| 294:17 | 64:15 | 59:18,23 | 138:16 | 223:4 |
| **similari...** | 212:17 | 60:3,6 | 140:1,8 | 225:5,14 |
| 95:8 | 297:17 | 61:1,5,20 | 143:8,10 | 225:21 |
| **Sincerely** | **six** 100:24 | 63:15 | 143:12 | 227:15 |
| 312:21 | 108:16 | 64:12 69:6 | 144:9,22 | 234:4 |
| **single** 98:18 | 194:10 | 69:14 70:5 | 145:10 | 241:6 |
| 112:15 | 219:14,15 | 71:15,16 | 146:13,16 | 248:14,17 |
| **sir** 8:10 | 220:6 | 71:21,24 | 146:19 | 249:12 |
| 61:23 | 236:5 | 72:9,10 | 147:2,24 | 250:6,12 |
| 189:3 | 288:11 | 75:14 | 151:3 | 252:16,20 |
| 259:2 | **size** 73:1 | 77:18 80:1 | 153:10,15 | 255:22 |
| **site** 43:9,16 | **skills** | 80:3,8 | 154:3,10 | 256:18 |
| 44:11 | 208:12 | 82:7 84:12 | 156:11,13 | 261:17,23 |
| 45:17 46:8 | **skip** 78:23 | 84:21 | 159:16 | 261:24 |
| 46:23 | **Skype** 236:8 | 85:15,16 | 160:7,8,18 | 262:10,13 |
| 47:18 | **slash** 81:2 | 87:5,13 | 161:10 | 262:14,18 |

ELVIS CHAN  11/29/2022

| | | | | |
|---|---|---|---|---|
| 265:2,21 | someone's | 283:20 | 168:21 | 110:23 |
| 266:12 | 266:20 | 307:20 | 257:2,12 | 116:2 |
| 267:14,19 | soon 272:11 | sorts 59:23 | 257:13,15 | 124:10 |
| 269:19 | sorry 6:11 | 94:25 | 257:17,19 | 129:18 |
| 270:14 | 30:8 31:2 | 109:20 | 257:22 | 139:4,11 |
| 273:3,9,17 | 40:12 | 121:13 | 258:2 | 151:16 |
| 273:25 | 48:10 | 136:23 | specific | 153:7 |
| 275:21 | 52:16 55:3 | 139:8 | 14:15 | 154:5 |
| 279:3 | 82:24 | 140:2 | 31:22,22 | 162:17 |
| 280:19 | 95:24 | 285:23 | 32:5 60:12 | 164:16 |
| 283:21 | 104:10 | 286:5 | 90:4 96:6 | 168:8 |
| 285:12,22 | 106:4 | sound 210:8 | 96:7,25 | 173:14 |
| 286:2,25 | 107:1 | sounded | 97:7 99:18 | 174:11 |
| 287:3 | 110:22 | 210:11 | 100:19 | 178:10 |
| 288:5,12 | 116:11 | sounds 114:8 | 123:2 | 186:19 |
| 289:21,25 | 120:14 | 136:13,21 | 154:25 | 188:14 |
| 290:10 | 123:7 | 212:12 | 173:23 | 201:15 |
| 291:13 | 148:13,22 | 231:23 | 190:3 | 202:12 |
| 293:2 | 161:22 | 288:9 | 192:10,19 | 205:19 |
| 294:19,23 | 177:6 | source 33:4 | 199:10 | 207:21 |
| 295:11 | 179:16 | 75:18 | 203:14 | 212:7,11 |
| 296:12 | 180:7 | 85:25 | 212:17 | 220:12 |
| 297:8,15 | 183:15 | 145:14 | 222:20 | 227:25 |
| 297:20 | 196:23 | 146:14 | 226:10 | 228:22 |
| 298:9,14 | 207:20 | 163:14 | 232:19 | 231:12 |
| 298:24 | 218:4 | sourcing | 245:3 | 245:11 |
| 306:25 | 253:16 | 230:25 | 248:13 | 249:3 |
| 307:19 | 259:9 | sow 61:12 | 268:16 | 257:13,15 |
| software | 265:18 | 141:19 | 282:12 | 257:25 |
| 72:22,23 | 283:15 | sowing | 283:16,21 | 261:13 |
| 136:1 | 288:13 | 286:16 | 291:12 | 268:8 |
| Solarium | 292:23 | spam 90:5 | 296:2 | 269:2,3 |
| 159:7 | 293:16 | 99:5,6 | 297:2 | 271:22 |
| sole 11:15 | 294:9 | spanning | 306:20 | 275:10 |
| solely 189:8 | sort 15:21 | 237:1 | specific... | 276:1 |
| 189:11 | 22:7 30:20 | speak 120:22 | 12:4,7 | 277:1 |
| solution | 44:9 67:11 | speaking | 13:5 17:21 | 280:14 |
| 250:7 | 67:12 | 59:25 | 18:16 | 295:3,6 |
| 252:5,11 | 72:12 | 69:21 | 25:12 | 296:17 |
| solutions | 85:13 | 94:22 | 29:19 30:1 | 303:14 |
| 252:3,8 | 105:9,15 | 186:2 | 31:14,19 | 308:8 |
| somebody | 121:10 | 235:16,17 | 32:9 35:22 | 309:4 |
| 7:13 | 138:10 | 243:4 | 38:23 | specificity |
| 112:18 | 149:18 | 253:22 | 42:14 44:5 | 164:6 |
| 264:25 | 159:21 | 271:24 | 45:5 62:19 | 304:16 |
| 266:19 | 166:8 | speaks | 80:10 | specifics |
| 267:24 | 187:9 | 110:11 | 85:14 91:7 | 114:6 |
| somebody's | 248:16 | special 8:11 | 91:11 | 166:17 |
| 139:12 | 261:19 | 65:22 87:1 | 105:15,16 | 172:13 |

ELVIS CHAN  11/29/2022

| | | | | |
|---|---|---|---|---|
| 195:14 | **spell** 58:12 | 301:4 | 52:1 53:23 | **state-sp...** |
| 235:16 | 124:19 | **staffer** | 54:2 55:21 | 14:5 33:16 |
| 251:12 | 181:25 | 123:9 | 56:11 | 34:23 |
| 253:21 | 210:2 | **staffers** | 57:25,25 | 39:10,13 |
| 254:10 | **spelling** | 117:20,24 | **Star** 275:6,7 | 52:20 60:2 |
| 282:22 | 124:20 | 118:8,15 | **Starbird** | 95:7,8,9 |
| **speculate** | **spellings** | 118:24 | 55:24 56:2 | 187:4 |
| 115:17 | 183:11 | 119:9,22 | 58:20 | 285:21 |
| 304:6 | **spent** 169:6 | 119:24 | **start** 41:21 | 307:24 |
| **speculating** | **spoke** 210:20 | 120:9 | 41:22 44:7 | **stated** |
| 115:10 | 210:24 | 121:2,3,4 | 197:14 | 128:11 |
| **speculation** | 211:1 | 121:7 | **started** 23:5 | 191:4 |
| 34:6,20 | 212:2 | 122:23 | 171:17 | **statement** |
| 35:7 36:8 | 236:17 | 123:4,6,13 | 177:12 | 127:17,22 |
| 41:14 48:7 | 283:4 | 123:15,19 | **starters** | 225:17 |
| 49:14 50:1 | **spreadsheet** | 124:5 | 123:25 | 245:21 |
| 57:22 61:9 | 100:17 | 125:17 | **starting** | 260:18 |
| 63:23 | 101:2 | 127:13 | 116:15 | 264:6 |
| 67:15 68:5 | 112:11 | **stage** 122:10 | 170:3 | 273:16 |
| 68:17 69:1 | **squad** 105:6 | **Stamos** 54:4 | 261:3 | **statements** |
| 70:14 71:9 | 106:1 | 54:5 55:6 | 272:2 | 122:21 |
| 72:15 | 107:20,21 | 57:20,25 | **state** 1:6 | **states** 1:1 |
| 73:19 | 193:9,13 | 58:5,8 | 3:3 6:8,14 | 7:15 19:7 |
| 74:22 | 193:14,17 | **stamp** 267:12 | 7:3 8:7 | 19:10 34:4 |
| 76:22 | 194:20 | **stance** | 16:24 19:2 | 84:22 |
| 78:19 82:1 | 198:7,10 | 159:10,11 | 134:15 | 141:21 |
| 104:15 | 198:11,13 | **stand** 121:24 | 136:4 | 154:25 |
| 114:16 | 198:18,20 | 168:14 | 138:24 | 162:19 |
| 115:15 | 198:20 | 303:15 | 139:14,20 | 170:6 |
| 117:12 | 235:10 | **standard** | 139:22 | 194:1,17 |
| 137:1 | 251:13 | 19:5 98:9 | 140:3,7 | 196:21 |
| 138:21 | 257:21,25 | **standards** | 156:22 | 240:16 |
| 150:11 | **squads** 105:5 | 90:16,23 | 190:5 | 241:20 |
| 153:21 | 106:25 | 92:7,10 | 202:9 | 269:9,10 |
| 160:22 | 107:2 | 129:19,22 | 209:2 | 285:16 |
| 213:1 | 108:5,16 | 205:7 | 219:2,8,24 | **statistic** |
| 215:17 | **ss** 310:3 | **standing** | 226:8,10 | 148:25 |
| 224:4 | **SSCI** 116:2,9 | 22:18 | 227:18 | **statistics** |
| 228:20 | 116:9,13 | 143:3 | 259:5 | 241:3 |
| 231:8,19 | 118:8 | **standpoint** | 265:22 | **status** 214:5 |
| 240:10 | 119:6,8,17 | 15:6 | 269:8,16 | 239:22 |
| 245:25 | **St** 2:22 | 137:21 | 283:1 | **statute** |
| 246:11 | 265:24 | 174:10 | 285:16 | 270:2 |
| 274:11 | 266:6,24 | 211:18,21 | 310:2,8 | **stay** 69:4 |
| 299:12 | 267:1 | 272:16 | 312:5 | 82:6 83:9 |
| 304:13 | 312:19 | **stands** | 313:2 | 249:23 |
| 305:3 | **staff** 16:14 | 145:23 | 314:1 | **stealing** |
| **speech** | 141:25 | 279:10 | **state-** | 59:9 |
| 262:11 | **staffed** | **Stanford** | 172:15 | **steer** 70:19 |

ELVIS CHAN  11/29/2022

stenogra...
310:23
step 68:9
steps 50:6
73:14
204:15
232:6
Steven 124:2
Stevrud
210:9
Stewart
135:6,7
136:21
137:5
138:2
sticking
77:14
308:5
stolen 235:6
stood 167:24
216:2
stopped
89:23
272:9
299:17
stored
291:23
292:1
stories
215:1
243:25
story 141:24
155:5
156:1
213:21
214:1,16
214:19
232:7,24
233:5,6
234:2
252:14
253:9
308:15
strategic
29:21
30:12
31:10,16
31:17
50:25

86:23
108:8
156:14,24
278:23
283:12,15
287:5
strategi...
16:18
108:6
Street 2:5
2:11,17
3:5,10
312:3,19
strings
32:18
36:23
strive 127:7
127:21
strong 227:5
stronger
255:16
strongly
224:8
Strzok
234:19
235:9,12
237:19,21
238:3
239:5,14
239:18
studies
10:17
study 87:3
stuff 73:16
75:13,17
75:19
131:6
147:24
159:21
252:17
style 205:20
subcommi...
284:9
subject
180:3
187:9
215:1
223:1,15
303:5

subjects
149:15
submit 263:2
submitted
263:16
265:9
268:22
subpoena
266:8
subpoenas
111:18
subscribe
314:10
Subsection
69:13
Subsector
284:13,17
subsequent
199:11,11
199:16
subset 66:7
149:4
150:1,13
254:19
281:7
substance
289:9,12
314:7
substantive
129:2,14
129:16,24
133:11
136:14
157:3
289:14,21
substant...
283:4
success 64:3
64:11
144:25
167:5,7,9
167:12
successful
223:20
224:15
225:10,13
suddenly
247:20
suggest

188:4,15
188:20
189:18
190:1,14
190:23
202:13
234:9
245:8
suggested
191:7
206:4,5
243:18
245:19
247:5
255:10
302:10
suggesting
106:5
241:4
suggestion
34:11
Suite 2:17
3:10
summarize
31:17
summarized
144:6
summary 37:7
100:5
147:10
290:8
291:5,6
summer
275:16
Sundar
116:25
super 31:5
Superior 2:4
supervisor
193:9,14
257:8
supervisors
106:1
107:9,10
107:19
supervis...
106:24
107:2
supervisory

257:1,5,7
supporting
154:17
suppose
60:24
68:21
74:16
76:12
supposed
143:7
suppress
233:4
Sur 2:12  4:6
7:7,8,14
7:15  11:25
14:9,20
18:3,13
22:5,10,25
23:1,7,17
26:16  27:5
27:19
28:16
30:16,24
32:15
33:11  34:5
34:19  35:6
36:7,19
37:5  41:13
41:19  43:4
43:19
44:25  48:6
49:13,25
50:10
51:11
56:18
57:21  61:8
63:4,22
64:20
65:11
67:14  68:4
68:16,25
69:23
70:13  71:8
72:14
73:18
74:21
75:23  76:8
76:21  77:1
77:8  78:18

ELVIS CHAN  11/29/2022

79:13
81:25
82:24 83:4
83:6 84:15
84:19
90:20 92:3
92:16 94:8
94:16 95:5
97:10 98:3
102:1,21
103:4
104:14
106:4
111:7
112:20
114:15
115:14
117:11
121:11,24
122:9
132:5
133:13
136:25
137:25
138:20
139:16
142:25
144:4
146:9,20
150:10
153:20
154:1
156:19
159:24
160:21
162:6
163:25
164:3,7
166:1
168:23
169:10,18
170:25
171:15
172:21
174:1
175:2
176:13
178:24
179:4,10

179:16
180:4,7,9
187:8,15
188:6,22
189:9
193:2,19
194:25
196:23
197:6,12
199:22
200:17
201:24
202:16
204:17
208:2
210:14
212:25
213:23
215:17
224:3
228:19
231:7,18
233:7
234:8
238:23
240:9
242:10,20
242:25
245:24
246:10
251:23
258:19,21
259:9
268:2,20
270:4
271:3
274:10
277:17
282:8,18
293:16,20
293:23
299:11
300:2,7
302:19
303:1
306:7
308:13
309:9,13
312:4,7

sure 9:15
14:11,12
28:20
47:14,25
58:15 73:5
73:8 88:20
112:15
151:25
152:12
169:4
182:1
218:9
272:22
273:9,18
294:5
surface
138:9
surmise
306:16
307:5
Suruchi
48:13
Surveill...
111:23
suspending
232:3
suspicion
243:20
247:7,13
247:21
255:25
256:5
Sussmann
194:17
196:22
197:20
198:3,9
swing 240:16
switch
219:14
sworn 8:3
228:2,8
310:15
sync 291:14
synopsis
12:2
system
289:18,20
292:2

302:15,16
systems
59:13

_____
       T
_____
T-h-i-b-...
256:20
table 65:15
86:13
147:9
tactical
16:19
29:25 30:1
31:16,21
32:1 42:14
96:4,21,24
97:8 98:15
99:8,12
108:9,12
111:1
283:12,17
tactical...
32:5
tactics 29:5
29:22
143:23
TAD-KDM 1:9
take 10:8
14:6 21:8
30:11
32:24 33:9
33:13,19
33:22
34:10,16
34:24 35:4
35:12
43:23 61:4
61:19
63:14 64:2
64:23 66:7
67:6 70:9
71:2 72:9
73:13,22
74:10 77:4
79:3 87:16
90:13
93:25
98:13
102:19,25

103:23
104:2,4,7
112:6
113:19,25
114:19,22
115:1,9,19
137:15
142:13
143:12,19
150:8
160:13
163:4
166:12
171:9
219:9
220:9
223:24
227:22
228:3
242:3
249:9,13
249:18,18
250:1,4,4
250:14,21
250:22
251:3,9,11
251:17
252:6,11
252:17
254:1,3,9
262:2,5,13
262:19
269:21
270:16
274:4,16
278:21
286:17,25
287:1
291:3
296:4
299:16
takedown
76:17
118:18
126:24
132:13
takedowns
29:11
32:10,11

35:19,24
36:17
68:22
114:9,20
115:3,6,20
116:19
117:10
125:20
128:24
130:17
131:4
132:12
133:21
147:10
148:21,22
149:10
150:7
**taken** 12:6
16:15,16
22:14
33:17 34:2
37:18
64:12
68:23,24
69:10 76:5
77:11
81:21 90:6
96:14
103:16
104:18
106:9
114:2
127:6,20
130:7
131:6
133:12,25
134:2,7
136:15
139:13
140:16
142:13,16
147:4,6,13
160:18
165:11,14
166:5,24
167:3,10
167:13
180:12
234:16

249:6
251:15
287:17
312:8
313:3
**talk** 10:7
23:3 37:7
50:4 53:12
64:9,17
69:13 75:3
79:4,10
87:11
107:24
118:24
122:16,17
122:18
124:1,6
132:11,22
134:11
149:9
150:24
154:18,21
159:13
175:15
182:12
191:16
231:25
237:20
239:2
240:13,14
280:16
283:1
285:15
288:18
289:4
299:7
**talked** 49:7
54:16 56:4
56:6,9
57:1 65:5
68:22 71:4
84:9 86:4
89:17
95:12
97:23
105:25
107:11
123:21
127:14

131:22
144:13
155:19
170:13,18
236:16
247:17
259:24
277:23
278:5,6
280:5
288:7
**talkers** 10:6
**talking** 13:6
38:19
39:21
44:10 70:9
94:3 95:10
95:11
107:15
112:13
133:4
154:19
159:21
177:11,13
194:9
197:9
218:22
228:4
231:14,23
246:5
260:8
262:6
270:17
273:1
275:24
290:17
300:16
**talks** 231:5
255:9
279:1
**targeted**
14:8
173:15
201:17
**targeting**
80:16
84:22
**task** 24:16
38:23 39:7

110:8
170:24
184:22
207:2
250:16
276:2
303:14
309:1
**team** 43:11
44:4 48:3
85:6,11
145:2
170:23
217:8
230:21
232:12
257:17
300:6
302:25
**teaming**
56:13
**teams** 43:3
43:16
153:13
**tech** 4:21
27:4 128:2
241:20,24
259:23
260:2
279:7
302:7,9
**technical**
106:6
**technically**
209:13
**techniques**
112:3
195:6,14
**technolo...**
87:25
**technolo...**
270:22
**technology**
87:21 90:4
136:19
204:21
272:17
273:6
**technolo...**

129:15
**telephone**
89:2,3
296:22
**Teleporter**
99:3,4,7
99:10,25
101:23
107:23
108:4
112:11
295:16
296:6,22
297:13
298:21,22
299:4
302:3,8,12
306:13
**tell** 8:3
15:8 20:21
48:10 88:1
88:2 89:8
89:10 90:1
90:1,3
97:25
103:24
104:12
113:17,23
114:1,3,4
114:7
120:9,11
120:16
151:19
161:20
172:6,17
192:9
201:21
204:25
236:21
245:11
253:5
256:3,8
258:17
260:10
270:9
293:13
**telling**
296:12
**ten** 110:8,16

ELVIS CHAN  11/29/2022

| | | | | |
|---|---|---|---|---|
| 113:25 | 134:18 | **thereof** 6:5 | 256:19,19 | 69:3  71:13 |
| 163:9 | **testified** | **thereon** | **thing** 30:8 | 74:3  75:5 |
| **tend** 207:15 | 8:5  59:2 | 314:9 | 52:22  61:1 | 82:5  84:3 |
| **tens** 101:19 | 96:20 | **thesis** 4:11 | 67:11,12 | 84:7  87:11 |
| **tenth** 300:1 | 131:14 | 10:24  11:2 | 176:2 | 89:24 |
| 300:2 | 156:4 | 11:9,13,22 | 261:5 | 91:18 |
| **term** 30:3 | 164:2 | 12:2  13:3 | 295:24 | 98:21  99:6 |
| 131:1 | 180:17 | 13:17,19 | 299:16 | 99:17 |
| 294:9 | 260:2 | 14:1,16,21 | **things** 9:25 | 101:21 |
| **terms** 18:18 | 269:21 | 14:21 | 23:12 | 106:12 |
| 43:24 | 283:12 | 15:23,25 | 43:18  45:4 | 115:4,23 |
| 49:11,20 | 293:1 | 16:21 | 48:18 | 118:21 |
| 70:1  90:23 | 306:19 | 17:12,19 | 50:11 | 122:20 |
| 91:1,22,24 | 308:14 | 17:21 | 61:20  62:1 | 123:9 |
| 91:25  92:6 | **testify** | 28:10  29:4 | 71:20,22 | 129:5 |
| 92:9,19,22 | 116:22 | 32:9  36:14 | 73:14  97:1 | 133:19,24 |
| 93:9,19 | 117:1 | 37:7  50:4 | 99:14 | 137:20 |
| 112:23 | 128:2 | 51:7  53:7 | 104:12 | 138:13 |
| 121:20 | 131:25 | 56:8  58:23 | 108:2 | 139:20,21 |
| 129:7,18 | 241:24 | 59:4,14,19 | 111:3 | 139:24 |
| 130:5,21 | **testifying** | 63:16  64:2 | 114:24 | 147:16 |
| 132:2 | 23:23 | 64:9  69:12 | 115:19 | 148:11 |
| 153:17 | 169:7 | 77:15 | 125:16 | 152:16 |
| 165:13 | **testimony** | 78:25 | 130:6,6 | 155:19 |
| 166:7,10 | 4:21  36:20 | 79:19 | 201:3 | 156:7 |
| 195:13,16 | 49:14 | 84:16  86:1 | 210:13 | 165:20 |
| 205:7,25 | 83:24 | 87:11  94:4 | 230:24 | 171:21 |
| 206:3,6,7 | 208:3 | 94:24  97:4 | 258:23 | 172:10 |
| 206:19 | 230:7 | 126:5 | 269:3 | 176:18 |
| 248:3,25 | 241:21 | 128:7 | 274:19 | 177:11 |
| 249:4,25 | 243:15,24 | 132:21 | 295:22 | 180:23 |
| 250:19 | 245:16,23 | 134:10 | 296:8 | 183:22 |
| 252:7,12 | 246:2,5 | 141:7,10 | 299:14 | 186:21 |
| 252:22 | 255:9 | 144:7,20 | 306:21 | 189:15 |
| 253:23,25 | 259:24 | 147:8,16 | **think** 10:5 | 195:9 |
| 262:15 | 267:17 | 147:22 | 11:18 | 209:19 |
| 267:21,22 | 310:23 | 148:2,6,18 | 12:25  13:9 | 214:11 |
| 274:2,3,8 | 311:1 | 150:22 | 16:11,21 | 221:21 |
| **terms-of...** | **text** 51:8 | 151:8 | 17:6  19:17 | 224:18 |
| 93:2 | **texts** 304:8 | 157:7 | 19:19  22:6 | 225:11 |
| 130:24 | **Thank** 22:21 | 161:16,23 | 24:5  31:23 | 227:17 |
| 167:13 | 77:8  114:4 | 169:6 | 32:8  50:9 | 228:18 |
| 248:15 | **thanks** | 240:13,19 | 51:12 | 229:8,15 |
| **territory** | 103:15 | 240:22 | 54:23,25 | 234:11 |
| 25:4  50:13 | 243:6 | 241:23 | 54:25 | 240:14 |
| 58:1,4,18 | 304:1 | 286:11 | 56:24  59:5 | 241:3 |
| 164:22 | **Thanksgi...** | **they'd** 49:19 | 59:17  64:9 | 242:2,18 |
| 169:2 | 307:17 | 236:11 | 64:14,16 | 247:23,24 |
| **terrorist** | **themes** 70:19 | **Thibault** | 65:21,21 | 249:16 |

**ELVIS CHAN  11/29/2022**

| | | | | |
|---|---|---|---|---|
| 251:1 | 85:1 | 8:19 19:21 | 275:2,22 | 32:21 |
| 252:24 | **thousands** | 24:2,4 | 294:16,21 | 45:20 |
| 253:12 | 64:16 | 26:24 28:5 | 299:8,10 | 87:20,20 |
| 254:2,6 | 93:12 | 42:24 | 306:2 | 92:6 |
| 256:7 | 101:5,6 | 46:16 | 307:16,17 | 118:13 |
| 262:12 | **thread** | 48:19 | **timeline** | 123:19 |
| 268:6 | 289:10 | 53:14 54:8 | 32:8 | 132:19 |
| 272:23 | **threat** 264:2 | 60:18 77:7 | **times** 97:18 | 135:12 |
| 273:1 | 264:3,7,25 | 89:20 | 98:22 | 147:3 |
| 278:5 | 285:18,19 | 100:10,11 | 100:24 | 149:2,5 |
| 288:23 | 292:10 | 102:14 | 101:9,14 | 150:16 |
| 289:8 | **threat-t...** | 114:7 | 102:16 | 164:4 |
| 291:2 | 264:12 | 120:6 | 117:4 | 173:4 |
| 294:15,25 | **threats** 52:6 | 125:12 | 131:25 | 176:10 |
| 295:1 | 52:8,10,13 | 130:12 | 155:5 | 215:21 |
| 296:11,25 | 52:14,15 | 162:18 | 156:1 | 216:12 |
| 297:4 | 52:18 54:1 | 163:2,6,23 | 167:10 | 222:24 |
| 301:14 | 157:5 | 166:13 | 170:13 | 225:2 |
| 302:2 | 202:10 | 168:17 | 175:6,7,14 | 227:1 |
| 306:19 | 243:8 | 169:6 | **Timothy** | 256:13 |
| 307:4 | 244:4 | 173:10 | 256:19 | 260:7 |
| **thinking** | 264:21 | 187:12 | **tip** 143:8 | 276:6 |
| 91:7,11 | 272:24 | 190:16 | **tips** 263:18 | 297:10 |
| 100:2 | 283:6 | 191:9,12 | **tired** 307:9 | **Tom** 259:16 |
| 119:2,5,7 | 301:24 | 192:15 | **title** 8:11 | 259:20 |
| 173:19 | **three** 8:20 | 194:5,7 | 11:2 | 261:12 |
| **third** 3:5 | 12:6 15:24 | 205:23 | 111:17,22 | **tons** 268:17 |
| 14:23 | 17:19 | 206:14,16 | 257:6 | **tools** 29:21 |
| 16:20,20 | 18:25 | 213:3 | 259:4 | 34:16 |
| 77:17 | 19:19 20:3 | 215:8,10 | 260:11,15 | 136:23 |
| 141:24 | 40:18 | 215:14 | 260:17 | 139:2 |
| 158:15 | 69:25 | 217:15 | 271:8 | **top** 51:21 |
| 291:21 | 110:8,10 | 222:6 | **titles** 184:3 | 126:14 |
| 292:7,13 | 110:12,22 | 223:21 | **today** 7:18 | 128:21 |
| 292:18 | 118:9,25 | 228:25,25 | 9:8 10:7 | 157:10,14 |
| 297:21 | 120:17,18 | 230:8 | 23:18 | 166:11 |
| **third-party** | 123:14,17 | 231:22 | 28:21 | 197:14 |
| 15:9 | 131:15 | 235:4 | 145:15 | 292:24 |
| **thoroughly** | 154:25 | 237:3,9,21 | 159:22 | 308:4 |
| 117:25 | 185:1 | 238:24 | 169:8 | **topic** 11:23 |
| **thought** 81:3 | 207:19 | 239:15 | 170:18 | 164:14 |
| 196:2 | 210:21 | 244:23 | 232:21 | 233:1,11 |
| 210:11 | 239:21,22 | 245:4 | 287:24 | 233:21 |
| 229:13 | 240:16 | 261:6 | 288:7 | 282:12,14 |
| 294:14,15 | 286:1 | 262:17 | 308:14 | **topics** 49:2 |
| **thoughts** | **ties** 71:13 | 265:11 | **today's** 6:10 | 149:14 |
| 53:4 | 115:4 | 267:10 | 309:17 | 280:15,23 |
| 145:11 | **tight** 110:3 | 268:24 | **Todd** 2:6 7:5 | 285:11 |
| **thousand** | **time** 6:11 | 270:7,11 | **told** 15:7 | 286:14 |

ELVIS CHAN  11/29/2022

| | | | | |
|---|---|---|---|---|
| Torrey 44:16 | 31:18 | 157:15 | 91:13 | 43:5 46:1 |
| total 107:15 | 92:20 | 198:14 | 102:12 | 47:9,10 |
| 123:15 | Trolls 4:11 | 262:2,19 | 110:24 | 53:15 59:3 |
| 147:12 | 11:3 | 270:15 | 112:19 | 85:10 89:6 |
| touch 288:19 | trove 243:19 | Tuesday 1:16 | 118:11,13 | 91:8,10 |
| 289:3 | 247:6,12 | 6:3 162:15 | 119:10 | 92:22 93:1 |
| touch-sc... | 248:1 | 167:22 | 123:20,22 | 94:12 |
| 19:12 | 256:4,8 | 168:6 | 124:14,15 | 95:12 |
| TPPs 29:22 | true 91:6 | 265:7 | 124:24 | 99:20,22 |
| TRACY 3:6 | 226:2 | 266:1,21 | 125:2,18 | 100:5 |
| traffic | 310:24 | 269:5 | 125:19 | 102:16 |
| 77:20 78:1 | 314:8,12 | 292:22 | 128:22 | 106:13,24 |
| training | Trump 304:10 | 293:12 | 130:15 | 107:1,19 |
| 16:5 17:2 | trust 43:3,9 | 294:1 | 131:12 | 108:15,16 |
| 139:4 | 43:13,15 | 300:4 | 132:12,19 | 110:9,11 |
| 270:9 | 44:3,11,13 | 301:17 | 134:1,8 | 110:13 |
| transcript | 45:12,15 | turn 28:12 | 149:9 | 111:15 |
| 4:2 | 46:4,9 | 298:3 | 150:6 | 115:22 |
| 241:21 | 47:18 | turning 50:3 | 152:24 | 123:12 |
| 259:20 | 48:14 | 69:12 | 210:23 | 125:3,13 |
| 260:20,23 | 55:10,11 | 144:19 | 211:3 | 125:15,21 |
| 261:2,14 | 55:12 | 255:7 | 217:5,9,14 | 126:13 |
| 271:13,18 | 135:17 | turnout 79:6 | 218:15 | 137:17,19 |
| 272:1 | 153:12 | turnover | 219:23 | 143:3 |
| 310:24 | 217:6,12 | 124:25 | 220:10 | 144:19 |
| 311:4 | 292:10 | turns 250:14 | 223:4,11 | 146:22 |
| 312:13 | 293:4 | tweet 63:3 | 225:6,15 | 149:10 |
| transcri... | truth 8:3,4 | tweets 76:4 | 227:16 | 151:16 |
| 4:23 5:6 | 8:4 | 149:11,23 | 228:1,23 | 177:11 |
| 259:5,12 | try 60:16,19 | 232:15,16 | 229:11 | 184:15,25 |
| transfer | 61:16 94:5 | 232:17 | 232:1,3,6 | 204:4 |
| 99:2 | 103:7 | twenty-f... | 232:12,13 | 208:14 |
| 295:17 | 104:6 | 302:21 | 232:22 | 225:9 |
| 302:15 | 119:11 | twenty-s... | 233:3,15 | 239:1 |
| transparent | 136:16 | 306:5 | 233:16,19 | 243:24 |
| 245:13 | 146:25 | twice 26:4 | 248:18 | 249:9 |
| Trek 275:6,7 | 155:1 | 42:6 | 252:21 | 252:8 |
| trenches | 199:2 | Twilio | 253:15,20 | 264:20 |
| 38:15,20 | 245:13 | 238:14,16 | 254:23 | 274:15 |
| 50:5,7 | 264:15 | 238:21 | 286:3,5 | 275:14 |
| 79:12 | trying 31:8 | Twitter 12:8 | Twitter's | 276:13 |
| trend 149:19 | 31:20 | 17:23 24:1 | 150:16 | 277:6 |
| trends 287:6 | 51:11 61:5 | 41:25 45:7 | 232:17 | 281:15,17 |
| 291:11 | 63:17,20 | 45:8,15,22 | two 13:4 | 281:19 |
| triage | 70:10,22 | 46:4,11 | 16:12 | 289:6,11 |
| 198:22,25 | 74:12 | 49:9 62:20 | 20:11 | 295:9 |
| 199:1 | 78:11 95:3 | 66:22,23 | 22:24 | 296:8 |
| tried 204:22 | 126:4 | 69:9 76:19 | 25:11,16 | 297:13 |
| troll 31:13 | 151:22 | 85:10 | 27:7 29:17 | Tyler 48:24 |

**ELVIS CHAN  11/29/2022**

| | | | | |
|---|---|---|---|---|
| **type** 13:7,15 | 100:11 | 267:2 | 226:17 | **update** |
| 13:18 18:9 | 102:22 | 300:21 | 237:23,24 | 239:22,23 |
| 19:1,7 | **typically** | 304:8,9,10 | **understands** | 239:24 |
| 29:20,24 | 20:9 24:15 | 304:16,17 | 30:21 | **updated** |
| 31:10 | 25:10 43:5 | 304:18 | **Understood** | 205:6,24 |
| 50:22 | 43:8,13 | 305:8,8,9 | 111:12 | 206:18 |
| 88:21 | 44:14,18 | 305:10 | 148:19 | **updates** |
| 100:11 | 62:7 74:13 | **U.S.-person** | **unfortun...** | 50:16 |
| 136:6,8,10 | 93:15 98:7 | 113:12 | 148:24 | 205:12 |
| 136:18 | 98:24 | **uh-huh** 10:2 | 161:6 | 206:19 |
| 138:2 | 100:4,13 | 89:8 | 206:17 | 285:19 |
| 139:3 | 103:2 | 103:23 | 240:18 | **updating** |
| 156:14 | 110:2,4,9 | 119:4 | 242:11 | 206:3 |
| 163:10,13 | 110:19 | 131:17 | 305:14 | **uploaded** |
| 230:24 | 119:24 | 135:7 | **unique** 19:4 | 85:1 |
| 254:9 | 123:8 | **uh-huhs** 9:25 | 66:13 | 204:24 |
| 264:2,8,9 | 124:1 | **ultimately** | **unit** 109:12 | **URL** 97:15 |
| 266:15 | 135:16 | 33:21 | 109:13 | **URLs** 96:7,25 |
| 268:22 | 140:4 | **unauthor...** | 152:3,3 | 98:1,16 |
| 269:18 | 281:3 | 174:16 | 182:24 | 99:13,18 |
| 308:1,6 | 289:5 | **unclassi...** | 184:5,7,8 | 100:13 |
| **types** 13:4 | 293:6 | 108:6 | 185:7 | 111:3 |
| 29:18 43:6 | | 154:24 | 186:13 | 146:23 |
| 43:7 62:2 | **U** | 156:25 | 303:14,24 | 306:20 |
| 65:16 | **U.S** 4:12,13 | 283:5,8 | 305:19,21 | **use** 20:10 |
| 99:15,16 | 6:15,18 | **unclear** 9:20 | **United** 1:1 | 31:11 |
| 99:22 | 11:5 12:9 | **underlying** | 7:15 34:4 | 61:24 69:5 |
| 111:15 | 15:20,21 | 69:9 | 84:22 | 73:12 |
| 112:3 | 15:24 17:6 | **understand** | 141:21 | 88:12,13 |
| 117:19,23 | 24:7 29:8 | 9:12 23:1 | 194:16 | 89:8 90:17 |
| 117:25 | 29:18,25 | 195:2 | 196:21 | 91:8,14,18 |
| 120:22 | 35:16,21 | 250:20 | **units** 110:10 | 102:23 |
| 125:14 | 37:9,12,18 | 269:14 | **University** | 112:2 |
| 136:1 | 112:21 | **understa...** | 10:13 | 136:18,23 |
| 137:7 | 127:4,18 | 21:1,3 | 56:12 | 137:4,24 |
| 185:23 | 138:11 | 36:10 | 58:10 87:3 | 148:18 |
| 199:4 | 150:24 | 43:21 44:1 | **unpack** 17:5 | 204:21,22 |
| 204:21 | 155:2,6 | 46:10 | 39:17 | 204:22 |
| 226:11 | 158:24 | 49:15,22 | **unparall...** | 235:20 |
| 238:2,3 | 159:6,15 | 50:2 61:10 | 84:23 | 236:15 |
| 250:21 | 211:9 | 61:18 | **unprotected** | 255:21 |
| 253:25 | 218:12 | 71:11 | 72:22 | 297:12 |
| 261:7 | 222:4 | 78:14 80:5 | **unreliable** | 298:20,22 |
| 264:20 | 224:14 | 80:7 98:6 | 267:25 | 302:12 |
| 273:6 | 235:17,18 | 134:15 | **unwitting** | **useful** 89:4 |
| 278:23 | 235:23 | 137:14 | 142:1 | 89:6 |
| 286:9 | 236:22 | 145:3 | 146:2,11 | 137:20,22 |
| 288:17 | 263:14 | 153:22 | **upcoming** | 137:23 |
| **typical** | 266:6 | 164:10 | 259:17 | 138:3,13 |

ELVIS CHAN  11/29/2022

280:23
**user** 70:4
  73:25
  82:22  83:8
  86:22
  92:25
  93:23  96:6
  98:16
  114:14
  264:4
  265:21
**user's**
  139:12
**user-gen...**
  146:8
**users** 14:15
  60:6  63:19
  65:14  66:3
  66:4,10,23
  67:13  74:7
  75:18
  78:17  85:9
  85:15  86:8
  86:16
  93:13  96:6
  113:15
  114:23
  143:17
  144:2,23
  145:5,10
  145:13
  146:25
  157:19
  158:12,17
  158:20,20
  232:13,15
  241:5
**users'** 74:9
  235:6
**USG** 186:1
  228:4
  280:13
  287:4
**USG-indu...**
  170:4,7,14
  172:2
  177:13
  178:1,16
  179:7

180:24
181:8,13
185:20
186:5
189:6,22
191:11
192:2
204:6
209:17
210:13,18
211:6,13
213:10
218:7,11
218:18,21
219:7
220:3
277:11,23
278:4
279:25
280:12,24
281:17
282:7
284:24
286:4,24
290:20,22
**usually**
  25:17,18
  75:2  104:3
  110:10
  113:4
  170:4,7,14
  278:3

———————
**V**
———————
**v** 28:14,15
  28:16
  312:5
  313:2
**Vacher** 44:15
**vague** 14:9
  18:4,13
  26:16  27:5
  27:19
  41:19  43:4
  43:19
  44:25
  49:25
  50:10
  56:18  61:8

63:4  67:14
69:23
70:13
73:18
74:21
75:23
78:18
79:13  92:3
92:16  94:8
95:5  102:2
102:21
103:4
104:14
137:25
142:25
146:9,20
154:1
156:19
159:24
162:6
166:1
168:23
175:2
193:2
199:22
203:1
204:17
210:14
238:23
264:1,6
268:14
**validate**
  33:14
  253:1
**validating**
  248:11
**validation**
  78:10
  254:7
**values** 30:7
  30:9,10
**varies**
  100:16
**various** 49:8
  49:21  65:4
  86:8  96:20
  144:22
  162:19
  165:6

249:12
**vast** 16:10
  291:8
**Vegas** 275:15
**vendors**
  136:1
  137:3,8,8
  137:11
  139:23
**venue** 139:22
**veracity**
  228:12
**verbatim**
  58:13
**verify** 111:4
  232:23
**Verizon** 24:2
  155:8
**version**
  283:15
  287:24
  299:1
**versus** 6:15
  196:21
  259:6
  299:23
**victim**
  205:10
**video** 236:14
**video-re...**
  6:13
**videocon...**
  20:8
  236:15
**videocon...**
  236:11
**videogra...**
  6:9,23
  7:12  22:12
  22:15  77:9
  77:12
  96:12,15
  106:5,7,10
  140:13
  141:4
  180:10,13
  234:14,17
  287:15,18
  309:16

**videos** 85:1
  85:3
**VIDEOTAPED**
  1:17
**view** 48:5
  115:19
  117:9,18
  243:20
  247:7
  255:25
  262:17
  269:24
**viewed** 81:6
  247:13,21
  256:4
**viewers** 14:3
  14:6,12
  15:3,11,13
  70:11
**viewing** 62:1
  68:3,7
  71:7
  137:19
**views** 62:8
  62:10,12
  66:11,13
  74:19
  80:23
  148:5,5
**vigilant**
  173:11
  207:5
**violate** 93:9
  93:20
  130:7
  166:6,9
  249:25
  252:7,12
  270:3
  274:2
**violated**
  165:13
**violates**
  217:10
  262:15
  274:1,8
**violating**
  232:17
**violation**

**ELVIS CHAN  11/29/2022**

| | | | | |
|---|---|---|---|---|
| 167:14 | 23:3,4 | 74:20 | 228:23 | 266:2,22 |
| 269:25 | 26:3 28:19 | 114:22 | 248:2 | 269:7 |
| **violations** | 52:14 | 264:5 | 251:3 | **week** 40:11 |
| 93:2 122:7 | 53:13 | **warn** 174:23 | 268:1 | 40:14,19 |
| 122:10 | 58:23 | **warned** | 291:22 | 40:22,25 |
| **virtually** | 61:12 | 172:23,24 | **Wayne** 182:23 | 260:4 |
| 87:12 | 68:14 | 174:12 | **we'll** 21:7 | **weekly** 40:6 |
| **visited** | 73:24 | 175:10 | 60:23 | 40:12,17 |
| 117:21 | 75:21 | **warrant** 23:8 | 195:13 | 40:21 |
| 118:6,8 | 77:15 | 249:19 | 242:21 | 41:10 |
| **visits** | 88:15,16 | 250:4,24 | **we're** 10:9 | 42:21 44:9 |
| 118:14 | 88:16 | 251:8,9,13 | 37:5 39:21 | 89:16 |
| **voice** 236:13 | 97:14 99:5 | 252:4 | 94:16 | 177:17 |
| **voices** 16:2 | 120:12 | **warrants** | 103:22 | 181:2 |
| 16:4 | 128:6 | 111:18 | 106:7 | 182:15 |
| 172:12 | 140:10 | **wash** 293:14 | 120:10 | 218:24 |
| **volume** 168:3 | 141:6 | 293:15 | 159:21 | 219:12,14 |
| 299:20 | 169:24 | 294:7,10 | 273:8 | 219:16 |
| **vote** 265:7,8 | 179:6,23 | 294:17,23 | 294:12 | 220:5,14 |
| 266:1,2,21 | 194:24 | 295:4,5 | **we've** 97:22 | 228:4 |
| 266:21 | 202:22,23 | **Washington** | 103:16 | 288:14 |
| 268:1 | 203:3,10 | 2:11,17 | 272:9 | 289:2,6 |
| 269:5,6 | 227:7 | 8:21 10:14 | **web** 72:25 | 297:19 |
| **voter** 79:5 | 234:12 | 16:8 25:7 | 73:7 | **weeks** 217:19 |
| **voters** 80:16 | 239:13 | 56:13 | **Webex** 20:11 | 219:15,16 |
| 141:21 | 242:16 | 109:3 | **webinars** | 220:6 |
| 149:20 | 249:11,12 | 183:25 | 137:7,18 | 243:11,24 |
| **votes** 240:16 | 264:12 | 312:4 | 137:20 | 244:7 |
| **voting** 59:13 | 286:11 | **wasn't** 74:18 | **website** | 245:2 |
| 163:6,24 | 293:14,24 | 140:1 | 14:14 30:6 | **went** 27:10 |
| 164:12,13 | **wanted** 72:11 | 145:13 | 141:12,15 | 137:17 |
| 164:16 | 93:14 | 197:1 | 141:17 | 243:14 |
| 267:25 | 96:18 | 296:12 | 142:11,13 | 266:19 |
| 268:16 | 99:23 | **way** 24:22 | 143:18,18 | 294:14,20 |
| 270:12 | 120:2 | 35:11 | 143:24,25 | 295:1 |
| **vs** 1:8 | 129:13 | 57:14 | 144:3 | **West** 2:5 |
| **vulnerab...** | 152:17 | 62:22 | 229:24 | **western** 1:2 |
| 272:23 | 206:7,8 | 78:15 | 263:8,11 | 6:16 31:9 |
| | 240:17 | 82:10,13 | **websites** | 31:20 |
| **W** | 249:5,8,16 | 85:21 | 13:21 | **WhatsApp** |
| **wait** 28:23 | 249:17 | 86:17 95:1 | 15:17 | 12:20 |
| **waiting** | 275:25 | 111:19 | 31:23 78:3 | **Wikimedia** |
| 258:21,22 | 280:16 | 131:22 | 143:4,7 | 24:2 42:7 |
| **waived** 164:4 | 289:4 | 132:16 | 146:23 | 155:7 |
| **waiver** | 299:15 | 133:3 | 147:1 | 156:1 |
| 194:17 | 302:2 | 193:6 | 251:10 | **William** |
| **want** 17:4 | **wanting** | 213:7 | **Wednesday** | 181:22 |
| 18:7 19:21 | 289:2 | 214:12 | 168:7 | 182:3,23 |
| 20:10,20 | **wants** 22:25 | 224:19 | 265:8 | 183:12 |

**ELVIS CHAN  11/29/2022**

89:22
179:20
**withdraw**
22:19
94:18,20
**withholding**
202:23
203:4
**witness** 8:2
11:12
14:21
18:15  21:3
21:21  27:6
28:17
30:17,25
32:16
33:12  34:7
35:8  36:9
36:21
41:15,20
43:5,21
45:1  48:8
49:15  50:2
50:11
56:19
61:10  63:5
63:24
64:21
65:12
67:16  68:6
68:18  69:2
69:24
70:15
71:10
72:16
73:20
74:23
75:24
78:20
79:15  82:2
83:7  90:21
92:4,17
94:9  95:6
102:3,22
103:5
104:16
105:13
111:9,12
112:21

114:17
115:16
117:13
121:19
122:13
128:15
129:11,21
131:1,3
132:7
133:14
137:2
138:1,23
140:12
143:1
144:6
146:10,21
150:12
153:22
154:2
156:20
160:1,23
162:8
166:2
168:24
171:16
172:22
174:7
175:4
176:14
184:20
187:19
188:11,24
189:14
193:3
195:17
200:1,22
202:2,6
204:18
208:4
213:24
224:5
228:21
231:9,20
233:8
238:24
240:11
246:1,12
252:1
256:22

268:21
270:6
274:12
277:19
282:11,24
293:25
299:13
300:12
303:3
306:9
310:15
311:1
312:12
313:1,25
**witnessed**
18:23
**word** 123:2
220:20,21
226:5,24
**worded** 224:8
224:10
**words** 14:17
33:25
74:16
85:15
111:2
133:2
137:23
217:13
270:7
**work** 25:21
25:22,24
25:25  26:1
26:8  27:14
48:9  53:8
53:10
83:14
159:16
164:3
182:23
223:19
238:16
266:6
276:4,7,12
276:14,18
276:20
277:4,6,8
287:12
**worked** 8:14

8:16  38:16
38:21  50:5
217:17
234:25
235:8
295:8
**working**
18:24
19:13
23:22  26:9
27:15  57:8
120:20
139:8
155:6
238:7
273:2,8,17
277:11
284:18,20
287:5
307:10
**works** 24:22
27:1,2
238:10
**world** 136:7
**wouldn't**
72:16
115:16
220:20
250:6
273:5
307:15
**Wray** 246:3
**write** 142:2
143:25
289:16
290:7
**writing** 53:7
142:7
148:2
**written**
145:4
289:24
**wrong** 166:13
166:14
269:22
**wrote** 70:21
77:21
84:14
127:9,22

145:1
162:1
227:3
232:18
290:1
299:13

_____
      **X**
_____
**X** 67:3
227:20
264:3,5,13
264:16
**xvii** 37:2
**xxii** 38:9

_____
      **Y**
_____
**Y** 227:20
**Yahoo** 24:1
41:25
47:17,19
48:15  49:9
91:18
153:7
235:1,3,4
235:6,19
235:20,22
235:22
236:18
237:22
239:9,18
239:24
240:4
**yeah** 17:13
17:25
20:24  22:8
22:21
23:13
25:15,15
28:24
30:11  36:9
36:21  37:5
40:23,23
44:8,13
45:1  47:3
51:17  53:1
53:15
54:13  55:3
55:13
59:11,16

ELVIS CHAN  11/29/2022

| | | | | |
|---|---|---|---|---|
| 62:14,14 | 219:12 | 45:19 46:5 | 11:10 | **12:27** 140:14 |
| 62:20,23 | 223:25 | 124:17 | 28:10 | **121** 4:16 |
| 63:7,24 | 224:5,22 | 217:1,2 | 86:13 | 288:4 |
| 66:10,13 | 225:8 | 229:3 | 141:8 | **1225** 2:17 |
| 66:17 | 226:23 | 233:1 | 260:15 | **12333** 111:25 |
| 67:10,25 | 228:21 | **York** 3:10 | **1,233** 150:7 | **126** 66:4 |
| 68:6,18 | 232:8,8 | 155:5 | **1.4** 66:23 | 86:13 |
| 70:15 | 236:17 | 156:1 | **1:20** 141:5 | **13** 4:23 |
| 73:20 74:7 | 237:1 | 214:9 | **10** 4:16 | 258:24,25 |
| 75:1,8,20 | 241:7 | 229:23 | 217:22,23 | 259:3,10 |
| 76:24 77:6 | 243:13 | 230:12,22 | 218:3,4,20 | **134,943** |
| 77:21,22 | 244:10 | 232:3,14 | 260:15 | 81:18 |
| 79:9 80:10 | 249:8 | 243:25 | **10:00** 167:25 | **135954** |
| 80:15 81:6 | 250:9 | **Younes** 2:18 | 301:19 | 314:24 |
| 82:2 83:4 | 252:1 | 7:6 | **10:45** 77:10 | **14** 229:22 |
| 83:18 84:5 | 254:5,16 | **YouTube** | **10:58** 77:12 | 300:12 |
| 84:13,14 | 257:5 | 12:12,15 | **100** 167:5 | **146** 299:25 |
| 84:17,19 | 258:13 | 12:16 85:1 | 175:6 | **149** 4:14 |
| 86:15,18 | 259:4,11 | 91:12 | **100,000** | **14th** 213:21 |
| 93:22 | 259:19 | 112:19 | 62:12 87:3 | 230:15 |
| 94:21 | 260:1 | 119:11 | **104** 161:15 | 300:5 |
| 96:24 97:3 | 261:1 | 125:18,19 | **10710** 1:24 | **15** 5:6 271:2 |
| 97:14 | 266:24 | 134:8 | 310:9 | 271:3,4 |
| 99:15,20 | 271:15 | 248:18 | **11** 4:11 | **16** 50:13 |
| 110:17 | 272:20,20 | **YouTube/...** | 218:2,24 | **163** 302:17 |
| 117:15 | 273:23 | 211:3 | 260:15 | **168** 306:5 |
| 118:5 | 276:25 | | **11/19/2020** | **169** 4:17 |
| 126:9,22 | 282:11 | **Z** | 306:10 | **17** 8:16 51:8 |
| 127:9 | 285:2 | **Z** 227:20 | **11:02** 300:5 | 232:11 |
| 129:17 | 291:24 | **zero** 133:25 | 300:13 | 293:12 |
| 132:8,14 | 292:21,23 | 134:5 | **11:17** 292:17 | **17th** 294:1 |
| 133:1,2 | 292:23 | **Zoom** 1:17 | 292:22 | **18** 111:17 |
| 134:4,21 | 293:6 | 6:1,5 20:6 | **11:22** 96:12 | 207:15 |
| 135:2,8,8 | 294:2,6,8 | 20:9 141:1 | **11:27** 96:16 | **185** 127:25 |
| 139:18 | **year** 10:20 | **Zuckerberg** | **11:39** 292:18 | **1885** 3:5 |
| 144:6 | 11:18 | 116:25 | **11:40** 106:8 | **19** 37:4 85:9 |
| 151:21 | 17:12 | 131:24 | **11:43** 106:11 | **19125** 2:22 |
| 152:2,25 | 19:17,18 | 242:13 | **1100** 2:11 | **196** 5:8 |
| 158:8 | 19:20 20:4 | 243:3,14 | 312:3 | **1991** 194:4 |
| 160:1 | 42:6 47:7 | 244:4,25 | **1152** 194:3 | **19th** 2:17 |
| 169:20 | 109:18 | 245:15 | **11542** 3:10 | 302:25 |
| 170:6 | 236:25 | 255:15 | **1159** 194:3 | |
| 184:9 | **years** 8:17 | **Zuckerbe...** | **118** 157:7 | **2** |
| 188:11 | 8:20 41:11 | 255:9 | **11th** 312:19 | **2** 4:15 |
| 194:25 | 171:13 | | **12** 163:10 | 287:20,23 |
| 200:1 | 173:24 | **0** | 229:21 | **2:11** 180:10 |
| 214:13,15 | 194:10 | | 230:3 | **2:34** 180:14 |
| 214:21 | **Yep** 37:5 | **1** | **12:16:09** | **2:34:35** |
| 218:2 | **Yoel** 4:20 | **1** 4:11 11:8 | 294:1 | 243:5 |

ELVIS CHAN  11/29/2022

**20** 142:6
314:14
**20-** 214:3
**20036** 2:17
**2011** 8:22
**2014** 8:22
**2015** 237:1,8
**2016** 5:9
13:12,14
29:5 37:15
39:16
64:10,21
65:1,9
66:4,24
78:4 84:10
85:19
87:13
115:5
125:22,23
126:16,20
133:12,22
133:25
134:1
147:20
173:14
174:9
176:8
178:11
190:13
193:1,16
195:22
196:1,5,7
196:9
198:8
199:11,16
205:20
206:16
208:9,11
235:1
236:25
237:2,8
238:6
240:8,24
244:13
257:22,24
258:10
270:18
**2016-style**
172:25

205:16
**2017** 89:20
120:5,8
125:23
**2018** 16:23
37:15
42:18 55:2
55:3,20
64:24
65:10 78:7
87:16
115:19
120:6
132:12
133:25
134:2
148:12
149:14
168:2
217:23
**2019** 53:13
53:17
120:6
149:9
151:10
155:13
**202** 2:13,18
**2020** 4:13,16
4:24 11:4
12:5 16:11
19:17
23:23
26:19 29:6
31:6 37:14
38:16,21
39:20 40:8
41:20,22
41:23,24
46:16 50:5
54:14,22
54:24,24
54:25
64:25
65:17 78:7
87:17
100:22
101:9
109:11
112:12

115:20
120:6
135:2
141:16
143:23
147:10,18
148:14
150:25
152:21
155:2,4
161:19,25
162:4,12
167:19,21
168:1
171:18,19
172:1,20
176:9
179:9
180:17
182:10
189:20
192:5,12
199:14,20
200:2,14
201:8,10
201:17,23
202:12,15
203:12,20
204:4
205:13,14
206:16,20
208:16,19
208:23
212:9,23
213:22
214:4
215:23
216:8
219:3,7,11
220:1,7
221:11
225:25
226:3,21
229:22
230:15
241:20,25
244:1,19
245:14
246:15

251:16
253:7
255:20
259:15,23
260:5
272:9,12
288:6
292:17,22
293:12,13
294:1
298:10,12
299:2,21
300:5,12
302:25
308:15,18
**2021** 4:14
10:20
11:19
159:12
161:1
284:4
**2022** 1:16
5:7 6:1,4
6:11 19:23
19:24
23:23
26:21 27:9
39:24 40:9
42:3
100:18
101:11,17
141:1
148:15
167:18
203:23
271:10,15
272:3,13
273:18
284:4,25
288:6
298:10,18
298:20,22
299:18
312:2,8
313:3
**2024** 41:7,11
204:1
285:4
**2093** (b)

310:14
**216** 4:20
**221** 2:5
**223** 80:23
81:1,6,7
**223,799**
80:17,25
**225** 3:6
**23** 5:8
196:14,18
**230** 121:23
**24** 38:11
301:15
**241** 4:21
**249** 3:10
**25** 58:24
**258** 4:23
**2703** (d)
111:18
**271** 5:6
**28** 4:22,24
6:11
241:20,21
244:1
259:15,23
310:21
**28(a)(1))**
310:11
**28(a)(a))**
310:16
**287** 4:15
**29** 1:16 5:7
5:9 6:1
67:2 141:1
271:10
292:17,22
312:8
313:3
**29530** 2:11
312:4
**29th** 6:3,11
271:15
**2nd** 83:17
286:13

_____
3
_____
**3** 4:24 5:7
79:1,9
80:6,13,15

ELVIS CHAN  11/29/2022

| | | |
|---|---|---|
| 261:3 | **5:15** 287:19 | 216:18,22 |
| **3,613** 132:13 | **5:47** 309:18 | 272:1 |
| 134:1 | 309:20 | **8:00** 167:24 |
| **3:22-cv-...** | **50** 111:22 | 301:18 |
| 1:9 | 167:7 | **8:32** 197:17 |
| **3:43** 234:14 | **500** 235:5 | **825** 147:12 |
| **3:57** 234:18 | **516** 3:11 | 148:19 |
| **30** 69:13 | **532-5748** | **85** 141:11 |
| 77:15 | 2:13 | **86** 293:10,21 |
| 312:18 | **56** 242:8,13 | |
| **30(e))** 311:7 | 243:1 | **9** |
| **30(f)(1))** | **573** 2:7 | **9** 4:21 |
| 311:2 | **58** 84:17 | 241:12,15 |
| **308** 4:6 | **59** 85:9,13 | 261:2,4 |
| **314** 2:23 | 85:20 | 300:11 |
| **32** 78:24 | 241:4 | **9:07** 6:5,12 |
| **326-6705** 3:6 | | **9:07:16** |
| **329-5040** | **6** | 306:10 |
| 2:23 | **6** 4:17 | **9:27** 22:13 |
| **34** 84:16 | 169:11,19 | **9:37** 22:16 |
| **35** 65:12,15 | 169:21 | **91** 4:22 |
| 86:13 | 277:12,17 | **918-6902** |
| **37** 169:24 | **61** 141:10 | 2:18 |
| 278:2 | **63** 144:20 | **929,000** |
| **38** 277:21 | **63101** 312:19 | 149:11,23 |
| **3rd** 272:12 | **63119** 2:22 | **94** 147:9 |
| | **65101** 2:5 | 157:7 |
| **4** | **66** 126:11 | **946** 194:3 |
| **4** 4:20  5:9 | **671-2688** | **95** 4:19 |
| 79:1  81:13 | 3:11 | **96,678** 83:20 |
| **41** 51:13,13 | | **99** 81:2,6 |
| **42** 126:9,10 | **7** | 158:23 |
| **422** 149:10 | **7** 81:4  272:2 | |
| 149:23 | **70** 3:10 | |
| **450** 2:17 | 128:9 | |
| **46** 128:6,9 | 147:8 | |
| **47** 132:10 | 251:9 | |
| **49** 58:25 | **70802** 3:5 | |
| 132:22 | **711** 312:18 | |
| **4th** 151:10 | **751-8870** 2:7 | |
| 155:12 | **76** 68:9 | |
| 197:17 | 150:21 | |
| | **763** 67:17 | |
| **5** | 68:1 | |
| **5** 147:9 | **78,000** | |
| 304:23 | 240:15 | |
| 305:7 | | |
| 312:2 | **8** | |
| **5:04** 287:15 | **8** 4:5,20 | |

**LEXITAS LEGAL**
**www.lexitaslegal.com**        **Phone: 1.800.280.3376**        **Fax: 314.644.1334**

**CAROL CRAWFORD  11/15/2022**

**Page 1**

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF LOUISIANA
 2                      MONROE DIVISION

 3   STATE OF MISSOURI ex
     rel. ERIC S. SCHMITT,
 4   Attorney General,
     et al.,
 5                           No. 3:22-cv-01213-TAD-KDM
         Plaintiffs,
 6
     vs.
 7
     JOSEPH R. BIDEN, JR.,
 8   in his official capacity

 9   as President of the United

10   States, et al.,

11       Defendants.

12

13      THE VIDEOTAPED DEPOSITION OF CAROL CRAWFORD

14                 November 15, 2022

15                9:24 a.m. to 5:33 p.m.

16
                 Office of General Counsel
17      Centers for Disease Control and Prevention
                  1600 Clifton Road NE
18                 Atlanta, Georgia

19
     Reporter:
20        Maureen S. Kreimer, CCR-B-1379, CRR

21

22

23

24

25
```

**CAROL CRAWFORD  11/15/2022**

**Page 2**

```
 1                    INDEX TO EXAMINATIONS
 2   Examination                                      PAGE
 3   CAROL CRAWFORD
 4   Cross-Examination by Mr. Vecchione                  9
 5               DESCRIPTION OF EXHIBITS
     Plaintiffs'
 6     EXHIBIT              DESCRIPTION             PAGE
 7   Exhibit 1    Deposition Notice for Carol         21
                  Crawford
 8
     Exhibit 2    Emails ending 2/7/20 Subject FB     22
 9                Coordination
                  MOLA_DEFSPROD_00004442-4445
10
     Exhibit 3    Emails ending 3/5/20 Facebook's     33
11                COVID-19 Response Efforts
                  MOLA_DEFSPROD_0004060-4061
12
     Exhibit 4    Emails ending 3/31/20 CDC brief on  38
13                ways to reach high-risk and
                  frequent travelers
14                MOLA_DEFSPROD_00003872 and
                  MOLA_DEFSPROD00015014-15017
15
     Exhibit 5    Emails ending 3/30/20 CDC brief on  43
16                ways to reach high-risk and
                  frequent travelers
17                MOLA_DEFSPROD_00015018--19
     Exhibit 6    Emails ending 1/26/21 CrowdTangle   49
18                COVID-19 reports for WHO
                  MOLA_DEFSPRDO_00002595-96
19   Exhibit 7    Emails ending 5/26/21 CrowdTangle   60
20                COVID-19 reports
21                MOLA_DEFSPROD_00002591-94
22   Exhibit 8    Emails ending 3/31/21 re: This      67
23                week's meeting
24                MOLA-DEFSPROD-00003031-33
25   (CONTINUED NEXT PAGE)
```

**CAROL CRAWFORD  11/15/2022**

**Page 3**

```
 1    Exhibit 9    Emails ending 5/6/21 Misinfo on two      85
                   issues MOLA_DEFSPROD_00002686-2688
 2
      Exhibit 10    emails ending 5/10/21 CV19 misinfo      91
 3                 reporting channel
                   MOLA_DEFSPROD002684-2685
 4
      Exhibit 11    Emails ending 5/20/21 Agenda item      102
 5                 for CDC call this week
                   MOLA-DEFSPROD_00002659-2660
 6
      Exhibit 12    Lancet April 2021 article.  Bell's     112
 7                 palsy and SARS-CoV-2 vaccines
      Exhibit 13    Lancet September 2021 article          112
 8                 Bell's palsy and SARS-CoV-2
                   vaccines - an unfolding story
 9    Exhibit 14    Document titled Infection fatality     113
                   rate of COVID-19 in
10                 community-dwelling populations with
                   emphasis on the elderly:  An
11                 overview
      Exhibit 15    Emails ending 6/2/21 RE It was this    118
12                 list sorry!
                   MOLA-DEFSPROD_00002538-2541
13    Exhibit 16    Emails ending 6/3/21 RE It was this    126
                   list, sorry!
14                 MOLA-DEFSPROD_00002532-33
      Exhibit 17    Emails 7/26/21 FB Misinformation       138
15                 Claims_Help Debunking
                   MOLA_DEFSPROD_00002478
16    Exhibit 18    Emails ending 7/20/21 CrowdTangle      141

17                 COVID-19 reports

18                 MOLA-DEFSPROD_00002487-2489

19    Exhibit 19    emails ending 8/18/21 CrowdTangle      145

20                 COVID-19 reports

21                 MOLA-DEFSPROD-00002438-440

22    Exhibit 20    Emails ending 8/19/21 VAERS talking    150

23                 points 8.15_AH_PM_CLEAN COPY.docx

24                 MOLA-DEFSPROD_00002434-435

25    (CONTINUED NEXT PAGE)
```

**CAROL CRAWFORD  11/15/2022**

Page 4

```
 1    Exhibit 21    9/1/21 Email BOLO: CDC lab alert &    152
                    misinformation
 2                  MOLA-DEFSPROD_00002249
      Exhibit 22    Emails ending 11/2/21 New Claims &    155
 3                  Policy updates following EAU
                    authorization for 5-11 year olds
 4                  MOLA-DEFSPROD_000011778-779

 5    Exhibit 23    Emails ending 11/8/21 New Claims &    163
                    Policy updates following EAU
 6                  authorization for 5-11 year olds
                    MOLA_DEFSPROD_00001774-775
 7    Exhibit 24    Bloomberg article Frequent Boosters   164
                    Spur Warning on Immune Response
 8
      Exhibit 26    Emails ending 2/3/22 Vaccine          166
 9                  Misinformation Questions for CDC
                    MOLA_DEFSPROD_00001683-1686
10
      Exhibit 27    Emails ending 2/4/22 Have 5 minutes   171
11                  to chat?  MOLA_DEFSPROD_00001677
      Exhibit 28    Emails ending 3/23/21 COVID misinfo   173
12                  project MOLA_DEFSPROD_00003130-31

13    Exhibit 29    Emails ending 4/5/21 Followup on      179
                    mis-info conversation
14                  MOLA_DEFSPROD_00003024-25

15    Exhibit 30    Emails ending 4/12/21 Followup on     187
                    mis-info conversation
16                  MOLA_DEFSPROD_00002936

17    Exhibit 31    Emails ending 12/21/21 Omicron page   188
                    MOLA_DEFSPROD_00001719-21
18    Exhibit 32    Emails ending 4/9/21 Request for      196
                    problem accounts
19                  MOLA_DEFSPROD_00002971
20    Exhibit 33    Emails ending 4/14/21 Request for     200
21                  problem accounts
22                  MOLA_DEFSPROD_00002807
23
24    (CONTINUED NEXT PAGE)
25
```

**CAROL CRAWFORD  11/15/2022**

**Page 5**

```
 1    Exhibit 34    Emails ending 6/30/21 COVID        205
                    Misinformation
 2                  MOLA_DEFSPROD_00002496-500
      Exhibit 35    9/3/21 Email BOLO:  CDC lab alert &  219
 3                  misinformation
                    MOLA-DEFSPROD_00002200
 4    Exhibit 36    Emails ending 4/15/21 Call or VC -   221
                    Facebook weekly sync with CDC
 5                  MOLA_DEFSPROD_00002806
      Exhibit 37    Emails ending 4/29/21 CDC Guides     226
 6                  and this week's meeting
                    MOLA_DEFSPROD_00002694-95
 7    Exhibit 38    Emails ending 4/30/21 WY issue       237
                    MOLA_DEFSPROD_00002690-91
 8
      Exhibit 39    Emails ending 5/6/21 Join with New   239
 9                  Info E call or VC
                    MOLA_DEFSPROD_00002689
10
      Exhibit 40    5/10/21 Email COVID BOLO meetings    241
11                  on misinformation
                    MOLA_DEFSPROD_00002683-2682
12
      Exhibit 41    Emails ending 6/10/21 CDC COVID_19   247
13                  BOLO Meeting
                    MOLA_DEFSPROD_00002521-22
14
      Exhibit 42    Emails ending 10/28/21 Booster       249
15                  Shots MOLA_DEFSPROD_00001827-29
      Exhibit 43    6/29/22 email Claims review          254
16                  MOLA_DEFSPROD_00001556

17    Exhibit 44    Emails ending 3/10/21 Themes that    257

18                  have been removed for misinform

19                  MOLA_DEFSPROD_00003159-161

20

21    (REPORTER'S NOTE:  Original Plaintiffs' Exhibits 1

22    through 24 and 26 through 44 have been attached to

23    the original deposition transcript.)

24

25
```

**CAROL CRAWFORD  11/15/2022**

Page 6

```
 1    APPEARANCES OF COUNSEL:
      On behalf of the Plaintiff State of Missouri:
 2        D. JOHN SAUER, ESQ.
          Missouri Attorney General's Office
 3        Supreme Court Building
          221 W. High Street
 4        P.O. Box 899
          Jefferson City, Missouri 65101
 5        John.sauer@ago.mo.gov
          (877) 696-6775
 6    On behalf of the Plaintiffs Dr. Jayanta Bhattacharya,
      Dr. Martin Kulldorff, Dr. Aaron Kheriaty, and Jill
 7    Hines:

 8        JOHN J. VECCHIONE, ESQ.

 9        New Civil Liberties Alliance

10        1225 19th Street N.W.

11        Suite 450

12        Washington, DC  20036

13        John.vecchione@ncla.legal

14        (202) 869-5210

15    On behalf of Centers for Disease Control and

16    Prevention:

17        JAMES GILLIGAN, ESQ.

18        KYLA SNOW, ESQ.

19        U.S. Department of Justice

20        1100 L Street N.W.

21        Washington, DC 29530

22        202-353-3098

23        James.gilligan@usdoj.gov

24        Kyla.snow@usdoj.gov

25    (Continued next page)
```

**CAROL CRAWFORD  11/15/2022**

```
 1    On behalf of U.S. Department of Health & Human
      Services:
 2         ANANT KUMAR, ESQ.
           U.S. Department of Health & Human Services
 3         200 Independence Avenue S.W.
           Washington, DC 20201
 4         Anant.kumar@hhs.gov

 5    Also Present:
               Kenya S. Ford, Esq.
 6             Sudevi N. Ghosh, Esq.
               Centers for Disease Control & Prevention
 7
               Melissa Thombley, Esq (via Zoom)
 8             U.S. Department of Health and Human

 9             Services

10

11             Joseph Foster, Esq.  (via Zoom)

12             Centers for Disease Control & Prevention

13

14    Legal videographer:  Jason Silling, Lexitas Legal

15

16                       - - -

17

18

19     (Pursuant to Article 10(B) of the Rules and

20    Regulations of the Georgia Board of Court Reporting,

21    disclosure was presented to all counsel present at

22    the proceeding and a written copy is attached

23    hereto.)

24

25
```

**CAROL CRAWFORD  11/15/2022**

```
 1              THE VIDEOGRAPHER: We are on the record.
 2    Today's date is November 15, 2022.  The time is
 3    9:24.  This is the video-recorded deposition of
 4    Carol Crawford in the matter of the State of
 5    Missouri versus Joseph R. Biden in the U.S. District
 6    Court for the Western District of Louisiana.
 7              This deposition is being held at the CDC.
 8    The reporter's name is Maureen Kreimer.  My name is
 9    Jason Silling.  I am the legal videographer.  We are
10    with Lexitas Legal.  Would the attorneys present
11    please introduce themselves and the parties they
12    represent.
13              MR. VECCHIONE:  I am John Vecchione.  I
14    represent the individual plaintiffs Jay
15    Bhattacharya, Aaron Kheriaty, and Jill Hines and
16    Martin Kulldorff.
17              MS. SNOW:  My name is Kyla Snow.  I'm with
18    the Department of Justice representing the
19    defendants in this case.  And defendants reserve
20    their right to review, read, review and sign the
21    transcript.
22              MR. GILLIGAN:  James Gilligan, also with
23    the Department of Justice representing the
24    defendants.
25              MR. KUMAR:  Anant Kumar with the Office of
```

**CAROL CRAWFORD  11/15/2022**

Page 9

```
 1   General Counsel in HHS, and I also represent the
 2   defendant.  I represent the HHS defendants.
 3               THE VIDEOGRAPHER:  Would the court
 4   reporter please swear in the witness.
 5                      CAROL CRAWFORD,
 6   having been first duly sworn, was examined and
 7   testified as follows:
 8               REPORTER:  You can begin, Counsel.
 9               THE VIDEOGRAPHER:  You may proceed.
10                      EXAMINATION
11   BY MR. VECCHIONE:
12       Q.  Good morning, Ms. Crawford.  Have you ever
13   been deposed before?
14       A.  No, I have not.
15       Q.  All right.  So I'm going to lay out some
16   ground rules.  We have to -- the court reporter and
17   everything else can only pick up verbal cues.  In
18   normal conversation, we nod our heads like you're
19   doing now and all that, but for the record we have
20   to say things out loud.  And that also, to keep a
21   clear record, we have to try not to talk over each
22   other.  And that's really something the lawyers, we
23   say to the lawyers, because they're the ones who
24   interrupt, not the witness.  But keep that in mind.
25               If you don't -- I will be asking
```

**CAROL CRAWFORD  11/15/2022**

Page 10

```
 1    questions.  If you don't understand the question,
 2    you can ask me to rephrase, or say you don't
 3    understand.  Don't answer a question that you think
 4    you don't understand.  If during the course of this,
 5    your counsel -- which of you is defending this one?
 6    You're going to defend it?
 7            MS. SNOW:  Yes.
 8    BY MR. VECCHIOINE:
 9        Q.  So your counsel will make objections.
10    Wait for the objections to fade, and then answer the
11    question unless I rephrase or something like that,
12    unless she instructs you not to answer.
13            Let's see.  So do you agree with all that?
14    Do you understand the process?
15        A.  I understand.  Could you speak up a
16    little, though?  It's hard for me to hear you.
17        Q.  I can.  You know what, I didn't turn on
18    this.  I was dealing with the other mic that I have
19    on my tie.
20        A.  Thank you.
21        Q.  But in any event, so.
22            All right.  Are you taking any
23    medications, or do you have any condition that would
24    impact your ability to testify truthfully today?
25        A.  No.
```

**CAROL CRAWFORD  11/15/2022**

Page 11

```
 1          Q.  All right.  For the record please state
 2  your name.
 3          A.  Carol Young Crawford.
 4          Q.  And what's your current employment?
 5          A.  I work for the CDC.
 6          Q.  What's your title?
 7          A.  I am the division director for the
 8  division of Digital Media within the CDC Office of
 9  the Associate Director for Communication, which we
10  call OADC.
11          Q.  Give me the term again.  Office of?
12          A.  The Associate Director for Communication.
13          Q.  And what are your duties in that role?
14          A.  Our division provides leadership for CDC's
15  web presence.  We provide leadership for CDC's
16  social media presence.  We have -- we lead the
17  development operations of CDC's 800-number, which is
18  our Contact Center.  We also provide graphics and
19  visual design services for the Agency.
20          Q.  And what do you do?
21          A.  I'm the director of that work.  I
22  determine strategy, objectives, oversee work.
23          Q.  Do you have any -- well, why don't we
24  start.  Go back a little bit.
25              Could you briefly outline your education
```

**CAROL CRAWFORD  11/15/2022**

Page 12

```
 1    and employment history up until now?
 2         A.   Yes.  I started work at CDC when I was 18.
 3    So I have been here 34 years.  I went to school -- I
 4    have a bachelor's in business and a master's in
 5    public administration, and I have been working at
 6    CDC within digital communications, web, social
 7    media, for really as long as those things existed at
 8    CDC.
 9         Q.   And where are your degrees from?
10         A.   University of -- the University of Georgia
11    for the master's, Georgia State for the bachelor.
12         Q.   Okay.  So have you always been at CDC here
13    in Atlanta?
14         A.   Yes.
15         Q.   Did you have any back- -- do you have any
16    background in medicine, sciences, or epidemiology?
17         A.   No.
18         Q.   And is there anything else about the role
19    of the division of Public Affairs' place within CDC
20    that you haven't told me?  Is there anything --
21         A.   Can you repeat?
22         Q.   Yeah.  You have told me a little bit about
23    what the division of Public Affairs does, I believe,
24    or was that only what OADC does?
25         A.   I was referring to the division of Digital
```

**CAROL CRAWFORD  11/15/2022**

Page 13

```
 1   Media.
 2         Q.  Okay.
 3         A.  Which was created in April of 2022.  Or
 4   maybe March 2022.  Sorry.
 5         Q.  On or about, as we say.
 6         A.  Yes.
 7         Q.  Now -- well, let's go back to that, the
 8   division.  The division of Public Affairs, you're
 9   within that at the CDC?
10         A.  There is no division of Public Affairs in
11   OADC any longer.
12         Q.  What happened there?
13         A.  The reorganization of OADC occurred in
14   March or April of 2022, and there's -- that division
15   does not exist anymore.
16         Q.  Prior to this changeover what did that
17   division do?
18         A.  The division had three branches.  The
19   division -- I mean, the branch of Digital Media,
20   where I was, the branch for News Media, and a branch
21   for Employee Communications.
22         Q.  And then what did the reorganization do
23   with each of those three?  Where did they go?
24         A.  The -- well, Digital Media became the
25   division of Digital Media, and parts from other
```

**CAROL CRAWFORD 11/15/2022**

Page 14

```
 1   divisions came to join the work that we were already
 2   doing such as the Contact Center, and the Graphics,
 3   and that was new to my organization.  The News Media
 4   group is now a branch in the division of News Media,
 5   I believe.  I'm sorry.
 6        Q.   That's your understanding?
 7        A.   Yes.  And then they have a Broadcast group
 8   with them.  And the Employee Communication group is
 9   now an office in the OD of the OADC.  That was the
10   other component of the Public Affairs group that you
11   asked about.
12        Q.   Okay.  So the Digital Media branch now --
13   so I understand.  I'm not sure I got all that.  Who
14   did that before?  Was that only in the Digital Media
15   section of the three you've told me, or was there
16   overlap?
17        A.   Well, there is no Digital Media branch
18   now.
19        Q.   Okay.
20        A.   There is now a division of Digital Media.
21        Q.   Okay.
22        A.   You may have to reask the second part of
23   your question.
24        Q.   Okay.  Now it's the division of Digital
25   Media.  Who had that -- what was the name of the
```

**CAROL CRAWFORD  11/15/2022**

1    organization that had that role before April of

2    March of 2022?

3         A.   I was the branch chief of the Digital

4    Media Branch within the Division of Public Affairs,

5    and most of the roles that our division currently

6    performs, web and social media, were in that branch.

7         Q.   Thank you.  Did anyone else have overlap

8    before?

9         A.   No.

10         Q.   All right.  So what is the current duty of

11    the Division of Digital Media?

12         A.   The current?

13         Q.   Duties?

14         A.   Of the division of Digital Media?  We

15    provide leadership for CDC's website.  We provide

16    leadership for CDC's social media efforts.  We

17    provide graphic support for the entire agency, and

18    we manage the 800-number, the Contact Center.

19         Q.   Okay.  And what's -- what is leadership;

20    when you use that word, what do you mean?

21         A.   We, for web, for example, we convene a web

22    council with people across CDC to manage the

23    governance of the website.  We manage the web

24    content management system.  We draft policies and

25    guidelines around it.

**CAROL CRAWFORD  11/15/2022**

```
 1        Q.  In your current role since April or March
 2   of 2022 --
 3        A.  Mm-hmm (affirmative).
 4        Q.  --  have you had any contact with major
 5   technology companies such as Twitter, Facebook,
 6   LinkedIn, Microsoft or Google?
 7        A.  Yes.
 8        Q.  In your previous role before the
 9   reorganization, did you have such contacts?
10        A.  Yes.
11        Q.  Generally what type of contacts are those
12   when you started them?
13        A.  We started regular contact with the groups
14   at the beginning of the COVID outbreak to exchange
15   information about COVID, and most of the contact
16   since then has been around COVID or other
17   high-priority things, but mostly COVID.
18        Q.  Okay.  Let's get some timeline down.  Is
19   the beginning of COVID, would you think, February or
20   March of 2019?
21        A.  2020.
22        Q.  2020.  Excuse me.
23        A.  Yes.
24        Q.  Okay.  For our purposes.  All right.
25        A.  Mm-hmm (affirmative).
```

**CAROL CRAWFORD  11/15/2022**

1          Q.  So before that, social media had been

2     around for a while, I mean, but did -- you didn't

3     have contact with them before COVID?

4          A.  I had periodic occasional contact with the

5     platforms, depending on maybe they would reach out

6     to CDC for something, or we would be trying to reach

7     out to them for assistance with something.  I didn't

8     have regular meetings.  They were -- they were very

9     occasional.

10         Q.  All right.  COVID hits, let's say, early

11    spring of 2020.

12         A.  Mm-hmm (affirmative).

13         Q.  How did you instigate contact with these

14    systems?  Generally, I'm speaking.  I know there may

15    be some differences, but generally how did you

16    initially instigate contacts with them?

17         A.  I don't recall who initiated contact.

18         Q.  Does that mean you don't know who within

19    CDC, or does that mean you don't know if they called

20    you?

21         A.  I don't recall if they called us first, or

22    we called them first.  It could have differed also

23    depending on the platform.

24         Q.  From media company to media company?

25         A.  There was a lot going on at that time, so.

**CAROL CRAWFORD  11/15/2022**

Page 18

```
 1        Q.  Do you have a present recollection of when
 2   you first spoke to any media platform about COVID,
 3   or email, when I say -- had communications with?
 4        A.  I believe, my recollection is, is that we
 5   started talking to some of them in February and
 6   March of 2020.
 7        Q.  And what was the nature of the
 8   discussions?
 9        A.  My memory of our first interactions were
10   around getting out CDC-credible information.  For
11   instance, I know Facebook was looking at making it
12   easier to find COVID information from the CDC and
13   WHO on a platform, and they wanted to use our public
14   domain content and they were similar in
15   conversations with platforms.
16        Q.  Got it.  And did you take the initiative
17   in these meetings, or did someone direct you to go
18   do these meetings, or contacts?
19        A.  I would say I took initiative on the
20   meetings.  But there were a lot of people asking
21   staff, or other staff, are we -- were we in contact
22   with the groups, and do we have any arrangements.
23        Q.  In your current role who do you report to?
24        A.  In my current role I report to the
25   director of OADC, which is Kevin Griffis.
```

**CAROL CRAWFORD  11/15/2022**

1      Q.   And who did you report to prior to the

2    reorganization?   That a good word.

3      A.   Yes.

4      Q.   Can I call it a "reorg"?

5      A.   Yes, you can.

6      Q.   Prior to the reoorg, who did you report

7    to?

8      A.   I reported to the division director for

9    the division of Public Affairs, who was Michelle

10   Bonds.

11     Q.   All right.  So during the beginning of the

12   pandemic your direct report would be Michelle Barnes

13   [sic]?

14     A.   I was her direct report.

15     Q.   Yes, that's what I meant.

16     A.   Yes.

17     Q.   You would directly report to her?

18     A.   Mm-hmm (affirmative).

19     Q.   All right.  So do you recall her talking

20   to you about what to do with the social media

21   companies early on?

22     A.   I don't believe we discussed it.

23     Q.   And why don't you believe that?

24     A.   It was an extremely busy time, and it was

25   within the scope of work I would normally handle.

**CAROL CRAWFORD  11/15/2022**

```
 1          Q.   All right.  Let's look at the early spring
 2   of 2020.  What were the types of contacts you had
 3   with the social media companies?  And I'm going to
 4   go through some, and you tell me if you had them.
 5               Electronic email, or other communications
 6   that are electronic?
 7          A.   Yes.
 8          Q.   Telephonic?
 9          A.   Yes.
10          Q.   And in person?
11          A.   No.
12          Q.   Okay.  Who did -- if they're telephonic,
13   who were you speaking to?  I have a hard time
14   getting any of these people on the phone.  How did
15   you get -- who did you telephonically speak to at
16   any of these social media companies?
17          A.   I had points of contact at several of
18   them, and we would have meetings when we needed to
19   talk.  So we arranged calls.
20          Q.   Do you recall any particular points of
21   contact?
22          A.   Yes.
23          Q.   Who are they?
24          A.   At Facebook my primary point of contact
25   was Payton Iheme.  I-H-E-M-E.  At Google my two
```

### CAROL CRAWFORD  11/15/2022

Page 21

```
 1   points of contact were Jan Antonaros, and -- forgive
 2   me.  I'm blanking on this.
 3        Q.  We'll be looking at emails.  If you see
 4   the name, will you --
 5        A.  Yes, mm-hmm.
 6        Q.  Who else?
 7        A.  A contact we had at Twitter was Todd
 8   O'Brien [sic], though I spoke to him very rarely.
 9   We had other contacts at Twitter, but I don't know
10   their names too.  I don't recall the names of other
11   platforms.  I didn't talk to them as regularly.
12             (Plaintiffs' Exhibit 1 marked.)
13   BY MR. VECCHIONE:
14        Q.  Okay.  Can you take a look at Exhibit 1.
15   If counsel would hand it to her, please.
16             And have you seen this document before?
17        A.  Yes, I think I did.
18        Q.  So this is the Notice of Video Deposition
19   to be here today; right?
20        A.  Yes.
21        Q.  You're here pursuant to this notice?
22        A.  Yes.
23        Q.  All right.  And I'll just make one
24   correction.  We're not at Building 21.  We're in
25   Building 19?
```

**CAROL CRAWFORD  11/15/2022**

Page 22

```
 1        A.   That's correct.
 2        Q.   All right.   Thank you.   You can put that
 3   aside.
 4             MR. VECCHIONE:   I'm going to hand to
 5   counsel a packet of Exhibit 2, if I might.   And if
 6   you could give -- and if you could give the witness
 7   an original, and there are two for your purposes.
 8             (Plaintiffs' Exhibit 2 marked.)
 9   BY MR. VECCHIONE:
10        Q.   I'll give you a moment to read through it.
11   Do you recognize this?
12        A.   Yes.
13        Q.   All right.   What is it?
14        A.   An email chain with Facebook around COVID.
15        Q.   Yeah.   Early February 2020?
16        A.   Yes.
17        Q.   Let's get -- just so we can get onto the
18   same page, the way this email chain works is the
19   oldest part is in the back; right?   And then it
20   reads up.
21        A.   Yes.
22        Q.   And let's go to the back.   In the first
23   part of the chain, as far as I can see, it says from
24   Carol Y. Crawford?
25        A.   Yes.
```

**CAROL CRAWFORD  11/15/2022**

**Page 23**

1          Q.  All right.  And there is a -- there is an

2     email there.  Well, could you read that for me, your

3     email?

4          A.  "Payton, just looping you in on

5     something."

6          Q.  Oh.  No, no, no.  I mean, I want to get

7     the email down.  I think it's C -- because of

8     your -- I think it's ███@CDC.gov?

9          A.  Mm-hmm (affirmative).

10         Q.  Am I correct about that?

11         A.  That's mine, yes.

12         Q.  Okay.  And is that the only email,

13    government email, you used over this whole period,

14    or is there a different one?

15         A.  There is a -- it's the same email box, but

16    there is also ██████@CDC.gov.  It's like an alias

17    for ███@CDC.gov.  It's the same box.

18         Q.  They all go to the same place?

19         A.  Yes.

20         Q.  It's just how the computer reads it, or?

21         A.  It's just an easier email address for

22    someone to give people --

23         Q.  Quicker to write?

24         A.  -- than ███.

25         Q.  Do you have any other government --

**CAROL CRAWFORD  11/15/2022**

```
 1        A.  No.

 2        Q.  And how about have you contacted any of

 3   the social media companies with a personal email?

 4        A.  Never.

 5        Q.  Okay.  So and then this is -- I believe

 6   this is a fellow we identified earlier; right?

 7   Who's Payton Iheme?

 8        A.  Yes.

 9        Q.  And if I see █████████@fb.com, that's your

10   understanding that's Payton Iheme --

11        A.  Yes.

12        Q.  -- that's his email?  And then it says cc

13   ████████████, and then there is an ███████ Facebook [sic]

14   ███@CDC.gov".  Who is that?

15        A.  Jay Dempsey worked -- works now and within

16   my branch as the social media lead, and he reported

17   to me.

18        Q.  Okay.  And his ███████ has nothing to do with

19   Facebook as in Payton's email; right --

20        A.  No.

21        Q.  -- it's just a coincidence?

22        A.  It's his user ID, yes.

23        Q.  All right.  Thank you.  And what was his

24   role?

25        A.  He was the social media lead within my
```

**CAROL CRAWFORD  11/15/2022**

Page 25

```
 1   branch.
 2        Q.  Okay.  And what do you state here in this
 3   email to Payton?
 4        A.  (As read) Just looping you in on something
 5   Jay and I had awareness of.  Are you in the loop
 6   with this.
 7        Q.  All right.  And what is this?  What have
 8   you attached here?
 9        A.  I don't remember this part of the chain at
10   all, but it appears to be a note from Facebook to
11   someone at the State Department outlining some
12   Facebook work on COVID.
13        Q.  And let's get some terms down here.  The
14   reason you believe that, is that just from your
15   memory, or is that because it's Shelley Thakral --
16   it's from them to a person in the State Department?
17        A.  I don't know any of the names on the
18   email.
19        Q.  Okay.
20        A.  I read this.  This is the first thing I
21   read when you handed --
22        Q.  Yeah.
23        A.  -- me the document.
24        Q.  Got it.
25        A.  I started at the back.
```

**CAROL CRAWFORD  11/15/2022**

Page 26

```
 1          Q.  So I'm just trying to be clear.  You don't
 2    have a present recollection of what this is --
 3          A.  No.
 4          Q.  -- what you just told me you got because
 5    that's what it says; right?
 6          A.  No.  I don't remember that part of the
 7    chain, no.  No.
 8          Q.  And were you asking Mr. Iheme whether he
 9    knew about this, or was he responsible for it?
10    Which what does it mean "in the loop about it"?
11          A.  As a note, Payton is female.
12          Q.  Okay.
13          A.  I mean, I'm reading what I wrote:  Just
14    looping you on something Jay and I had awareness on.
15    Are you in the loop with this?
16              That's all I know.  It's what I typed.
17          Q.  You don't have any other understanding
18    than that?
19          A.  No.
20          Q.  All right.  Let's move to the next part of
21    the chain.
22              (REPORTER'S NOTE:  Mr. Sauer enters
23          deposition.)
24    BY MR. VECCHIONE:
25          Q.  I see it's from Payton, from Ms. Iheme, to
```

**CAROL CRAWFORD  11/15/2022**

**Page 27**

```
 1   you and cc'ing Dempsey; right?
 2        A.  Yes.
 3        Q.  And he's responding to your request about
 4   the loop.  What does he say there?
 5        A.  At 3:35 for Payton is what you're asking
 6   me?
 7        Q.  Yes, I am.  Thank you.
 8        A.  Okay.  (As read) Let me know if you're --
 9   you would like to speak to our teams working on
10   these items.
11           Do you want me to read the whole email?
12        Q.  Yes, please.
13        A.  Okay.  (As read)  Our teams at Facebook
14   have been working to identify how we can support
15   efforts to provide users with accurate and timely
16   information about coronavirus.  We would like to get
17   CDC's feedback on a few key initiatives that we are
18   considering launching in the coming days, weeks.  I
19   have outlined the specifics below, and would greatly
20   appreciate your thoughts on the tactics and proposed
21   design/content.  We would be happy to jump on a
22   quick call today or tomorrow if that would be easier
23   as well."
24        Q.  All right.  That's great.  That's -- okay.
25   And then he has a bunch of proposals, like three
```

**CAROL CRAWFORD  11/15/2022**

Page 28

```
 1   proposals; correct?
 2        A.  Yes.
 3        Q.  All right.  And you respond to him the
 4   next day?
 5        A.  Yes.
 6        Q.  All right.  And you say "sorry for the
 7   delay."
 8            Were you in the habit of responding to him
 9   faster than less than 24 hours on these matters at
10   that point in time?
11        A.  Payton is female.
12        Q.  Yeah, I heard.  Thank you.
13        A.  It's okay.
14        Q.  You know what Payton I'm thinking of?
15        A.  No.
16        Q.  The football player.
17        A.  Oh, sorry.
18            I don't know.  At this time I believe we
19   were working a lot of hours, and a few hours seemed
20   like a long time.  I don't think I -- I don't think
21   Payton and I had known each other via email very
22   long at this point, so I can't speculate on how
23   quick I normally email her.
24        Q.  Okay.  And you say in here in item one:
25   As well, if can rotate messages, there might be
```

**CAROL CRAWFORD  11/15/2022**

Page 29

```
 1    times we might want to address widespread myths like
 2    mask use or new issues.
 3            At this time what was the myth of mask
 4    use?
 5        A.   My general memory of mask use was that
 6    there was confusion about whether people should wear
 7    masks or not.
 8        Q.   And what was CDC's view at that time?
 9        A.   I really can't speak to our
10    recommendations.  I probably don't have the specific
11    recall of the timelines.
12        Q.   Okay.  And then your next sentence:  "This
13    could and should replace flu shot messaging."
14            And was that messaging that the platforms
15    were already doing about flu prior to COVID?
16        A.   This was one of the occasional
17    interactions that I recall having with Facebook.
18    They had -- I believe -- I believe they approached
19    CDC about flu messaging that prior flu season, and
20    we had had a few phone calls with them and our flu
21    division.  And my recollection is that we provided
22    them with some public domain content for them to
23    highlight.
24        Q.   Okay.  And then the next one is you're
25    still trying to get this phone call together.  And
```

**CAROL CRAWFORD 11/15/2022**

Page 30

1   eventually you get a phone call together; right?

2       A.  It looks like it from this chain, yes.

3       Q.  Okay.  Can you tell us who was on that

4   call besides Payton and you?

5       A.  I don't recall the specific calls from

6   that time period.

7       Q.  Okay.  And do you know what was said on

8   the call at all, what you discussed?

9       A.  On that specific call, I do not.

10      Q.  Do you have any notes, calendars, or other

11  records what was said on the call?

12      A.  I don't believe -- I mean, the calendar

13  appointment's probably in my Outlook.  I don't

14  recall us taking notes, much notes, from any of the

15  meetings.  Occasional followup items.  But I don't

16  know if we took any for this.  If we did, it would

17  have been in my email, or my record, the electronic

18  records.

19          MR. VECCHIONE:  All right.  Mr. Sauer has

20  joined us.  Can we take a five-minute break while I

21  put things in order?  And I will give you the next

22  exhibit.

23          MS. SNOW:  Okay.

24          THE VIDEOGRAPHER:  We are off record at

25  9:57.

**CAROL CRAWFORD  11/15/2022**

```
 1                    (Recess 9:57 a.m.  - 10:09 a.m.)

 2                    THE VIDEOGRAPHER:  We are back on the

 3     record at 10:09.

 4                    MS. SNOW:  If I could just --

 5                    MR. VECCHIONE:  Go ahead.

 6                    MS. SNOW:  Defendants just wanted to note

 7     that at the request of plaintiffs' counsel we've

 8     forwarded a Zoom link with a call-in number for

 9     counsel, for plaintiffs' counsel, who could not be

10     here at the deposition to listen in.  And with the

11     agreement of the parties, the Zoom link will not be

12     shared with others beyond the three plaintiffs'

13     counsel who are listening in and the Zoom, the

14     deposition will not be recorded using the phone, the

15     call-in number.

16                    MR. VECCHIONE:  Remotely by them.  Just by

17     him.  (Indicating videographer.)

18                    MS. SNOW:  Yes, yes.  Exactly, yes.  Thank

19     you.  And then we also just wanted to -- the witness

20     wanted to clarify a point during the last round of

21     questioning.

22     BY MR. VECCHIONE:

23          Q.  Go right ahead.

24          A.  In reviewing this email, it refreshed my

25     memory about roles.
```

**CAROL CRAWFORD  11/15/2022**

Page 32

```
 1        Q.  Are you looking at Exhibit 3 or 2, for my
 2   purposes?
 3        A.  2.
 4        Q.  Thank you.
 5        A.  I recalled that during the time of these
 6   emails, I was actually serving as the acting
 7   director for the division of Public Affairs.  I
 8   served in that role for, I think, five or six
 9   months.
10        Q.  Was that an add-on to your other duties,
11   or instead of, or like was it -- how did that come
12   about?
13        A.  Michelle Bonds had gone on a detail
14   somewhere else.  I don't recall where.  Sorry.  But
15   I was still really -- especially when COVID hit, I
16   really started also focusing on digital in-depth.
17   So that's why I was still involved.  I mean, digital
18   was still part of the division of Public Affairs, so
19   it was still part of my portfolio, but I had the
20   expertise on it, so.
21        Q.  All right.  Thank you for that.  And
22   during the day if there is any -- you have further
23   recollection as further documents get put in front
24   of you, feel free to interrupt me and tell me that.
25        A.  Okay.
```

**CAROL CRAWFORD  11/15/2022**

Page 33

```
 1            MR. VECCHIONE:  Does the witness have
 2   Exhibit 3 in front of her?
 3            MS. SNOW:  There you go.
 4            (Plaintiffs' Exhibit 3 marked.)
 5            MR. VECCHIONE:  This is a short one.  Take
 6   a second to take a look at it.
 7   BY MR. VECCHIONE:
 8        Q.  Do you recognize this document?
 9        A.  No.
10        Q.  Can you tell me what the subject line is
11   of the first email on the chain?
12        A.  Facebook COVID-19 Response Efforts.
13        Q.  All right.  And it's from Ms. Iheme that
14   we've spoken about before to you; correct?
15        A.  Yes.
16        Q.  And it says:  "Apologies for the late
17   note," she says to you.  I want to ensure you -- "I
18   want to ensure you are aware that Mark just shared
19   our ongoing work to support government."
20            Who's Mark?
21        A.  I don't know for sure, but I'm assuming
22   this was Mark Zuckerberg.
23        Q.  And she says to you:  "Our goal is to help
24   organizations to get their safety message out to the
25   public, remove misinformation, and support overall
```

**CAROL CRAWFORD  11/15/2022**

1  community efforts in areas where we can be of help;"

2  right?

3      A.  Yes.

4      Q.  Now, the next thing I see is above that it

5  says on "March 5, 2020, at 8:55 a.m. Crawford, Carol

6  Y...wrote," is that an email, is that a reply email

7  from you to her?

8      A.  Yes.

9      Q.  You say there:  "We want to do a very

10 controlled Q&A and would like to know our best

11 options."

12          What are you referring to there, what's

13 going on?

14      A.  I believe this is in reference to a

15 Facebook Live event that we were trying to plan, and

16 it was going to be -- we expected it to be pretty

17 big, and we were asking for help in setting it up in

18 the best practices.

19      Q.  Was that from a technological standpoint,

20 like, how it was going to work, or did you need

21 their input on information?

22      A.  My memory is that it was mostly about how

23 it would work.  We had not done many big Facebook

24 Lives before then, and we were worried about having,

25 like, thousands of Q&A that we couldn't possibly

**CAROL CRAWFORD  11/15/2022**

Page 35

```
 1   answer.
 2        Q.  All right.  And the next thing you say
 3   there is:  "Our lead POC" -- is that point of
 4   contact, when I see POC?
 5        A.  Yes.
 6        Q.  Is Kat Turner at ███ -- I'll say ███?
 7        A.  █.
 8        Q.  █@CDC.gov.  So who is that?
 9        A.  Kat was a social media coordinator in one
10   of our centers that was willing to help manage this
11   effort.
12        Q.  In the original email from Payton Iheme
13   what was your understanding of why she was sending
14   you this information?
15        A.  I don't recall the specific email, or --
16   there looks like there is a link -- or what it said,
17   or what it was about.  But they would often forward
18   posts from their corporations for awareness for us.
19   So I assume that was probably what this was about.
20        Q.  Okay.  And then your final email on the
21   chain you send your -- that's your phone number at
22   work, I take it?
23        A.  It's actually my personal cell that I use
24   as a what CDC calls "bring your own device."
25        Q.  Got it.
```

**CAROL CRAWFORD  11/15/2022**

Page 36

```
 1        A.  Yes, but it was the cell phone.
 2        Q.  It's your cell number you use?
 3        A.  Yes.
 4        Q.  Did you message through that cell to any
 5   of the social media companies?
 6        A.  The only time I recall using my cell phone
 7   to message anyone was like we're late for the
 8   meeting, or the contact number didn't work or
 9   something like that.  We didn't have any kind of
10   conversations on texting.
11        Q.  Do you recall whether you spoke to Payton
12   Iheme at this time?
13        A.  No.
14        Q.  Now, this is -- from my understanding is
15   this call that you're referring at the top, your
16   last part, is that to arrange the Facebook meeting,
17   or is that the Facebook meeting, the Q&A?
18           MS. SNOW:  Objection.  Vague.
19   BY MR. VECCHIONE:
20        Q.  Okay.  So let me tell you -- the reason
21   it's vague is because I don't understand something.
22           Here's what I'm trying to understand from
23   information.  Originally Ms. Iheme writes to you
24   about this information.  And then you say you want a
25   controlled Q&A; right?  On Facebook.  And then
```

CAROL CRAWFORD  11/15/2022

 1    somehow you're going to -- you're going to arrange
 2    that with them and Kat Turner.
 3            And then you say I'll -- here's my number,
 4    and Kat knows it, I have an appointment.
 5            Did you have a conversation is what I'm
 6    getting about besides the Facebook Q&A?
 7        A.  I don't know.  But we talked pretty
 8    regularly around this time, so I imagine we probably
 9    did talk.  But I don't know that for sure.
10        Q.  All right.  What was your understanding of
11    Ms. Iheme's statement that the -- Facebook was going
12    to help organizations remove misinformation?
13        A.  I don't recall a recollection of
14    discussing misinformation with Payton around this
15    time, so I can't speculate.
16        Q.  You don't have a present recollection of
17    what that meant?
18        A.  No.
19        Q.  All right.  And once again for this call
20    that you had, and maybe Kat Turner was on it, maybe
21    she wasn't, do you have any record of that call, or
22    what might have been said?
23        A.  It doesn't look like this had an
24    appointment associated with it, so I don't think
25    there's an appointment, and I don't know -- I don't

## CAROL CRAWFORD  11/15/2022

Page 38

```
 1    remember the call, so I don't recall if there were
 2    notes.  But I know in general very little notes were
 3    kept.
 4         Q.  Now, you said you don't recall many
 5    conversations about removing misinformation at that
 6    time.  When do you recall such conversations?
 7         A.  I remember it becoming occasionally
 8    discussed in the fall of 2020 perhaps.
 9         Q.  Okay.  And what do you recall being
10    discussed at that time?
11         A.  I can recall us generally saying things to
12    the effect of -- I don't remember any specifics, but
13    misinformation is really growing, or, you know, what
14    do you think we could be doing to address it?  That
15    kind of conversation.
16         Q.  All right.
17         A.  Very general.
18             (Plaintiffs' Exhibit 4 marked.)
19    BY MR. VECCHIONE:
20         Q.  Fair enough.  Let's move on to Exhibit 4.
21         A.  Okay.
22         Q.  All right.  And I'll give you a moment to
23    take a look at that.
24             All right.  Have you had a chance to
25    review?
```

**CAROL CRAWFORD  11/15/2022**

Page 39

```
 1        A.  Yes.

 2        Q.  Do you recall this email?

 3        A.  No.

 4        Q.  All right.  Well, let's talk about it and

 5   who these people are because I think we have some

 6   new folks.

 7             So what's the subject line of the first,

 8   the email there at the top?

 9        A.  CDC brief on ways to reach high-risk and

10   frequent travelers.

11        Q.  All right.  And what is the CDC brief?

12   What does that refer to?

13        A.  I don't -- I don't recall what the brief

14   was.

15        Q.  Okay.  But as -- my question is a little

16   broader than that.  We're lawyers.

17        A.  Mm-hmm (affirmative).

18        Q.  We write briefs all the time; right?  They

19   are actually physical pieces of a paper that we put

20   forth our arguments for.  Sometimes people use that

21   term as bullet points, or sometimes their positions,

22   even just orally stated.

23             What I'm trying to get at is what does

24   "brief" mean in this context?

25        A.  To me, a brief probably was a one- or
```

**CAROL CRAWFORD  11/15/2022**

**Page 40**

1  two-page summary of something that we, or they, were

2  trying to do.

3       Q.  **Now, this email exchange I think occurred**

4  **sometime at the end of March 31st; is that correct?**

5       A.  Yes.

6       Q.  **All right.  And it was between you and**

7  **Kevin Hatcher, and his email is** ▮▮▮▮▮▮**@fb.com?**

8       A.  That's what the email says.

9       Q.  **All right.  Who is Kevin Hatcher?**

10      A.  Oh.  That says -- I don't have a clear

11  recollection.  There was a lot going on during this

12  time beyond any of this work.  But I think that

13  Kevin Hatcher might have been some type of

14  instructional designer with Facebook that I --

15  looking at the units and the Unit 1 and Unit 2,

16  there was an effort to put together like learning

17  modules that communities could use.  I think that

18  that might have been what this was about, and that

19  that was Kevin's role.

20      Q.  **All right.**

21      A.  I cannot be sure, though.

22      Q.  **All right.  But from your understanding of**

23  **what this says --**

24      A.  Mm-hmm (affirmative).

25      Q.  **-- and how it worked, that is your best**

**CAROL CRAWFORD  11/15/2022**

1    understanding right now; whether it's right or wrong

2    that's what you understand?

3         A.  Yes, I remember that activity, and this

4    seems to match that activity.

5         Q.  All right.  Then at the top you say:

6    "Kevin, I realized others made comments on the pdfs

7    after I sent you the previous one.  So, this

8    answered your Q."

9              Is that question?

10        A.  Yes.

11        Q.  -- "on breathing.  I hate to ask but can

12   your team check the other comments here?  I

13   apologize."

14             What are the other comments?

15        A.  I don't know what the other comments were.

16   But it appears to me that we sent to a group of

17   people the drafts, and CDC folks commented and I

18   forwarded it back.

19        Q.  All right.

20        A.  But I don't remember the comments.

21        Q.  All right.  Can you go to the end page of

22   this document?

23        A.  Mm-hmm (affirmative).

24        Q.  It says:  "Recommend breaking this

25   sentence up as it's linking stress to severe illness

**CAROL CRAWFORD  11/15/2022**

Page 42

```
 1   in a way I we don't.  If ARTF doesn't suggest an

 2   edit, we can."

 3            Do you know who ARTF is?

 4       A.  I don't.  But I believe it's probably a

 5   CDC task force.  TF would be task force.  I don't

 6   know what AR is.

 7       Q.  Got it.  Do you know what Mr. Hatcher was

 8   referring to where it says:  "Emergency warning

 9   signs include difficulty breathing"?  Do you know

10   what that was referring to?

11       A.  I only know what I'm reading here.

12       Q.  Right.

13       A.  The unit that he was developing must have

14   had this wording, and he was asking for

15   clarification on what the wording should be.

16       Q.  All right.  And do you have an

17   understanding, or do you know, why Mr. Hatcher was

18   asking whether Facebook should add extreme before

19   emergency warning signs?

20       A.  I have no recollection of it.

21       Q.  Okay.  Do you know why Mr. Hatcher asked

22   whether he should replace:  Older people are at high

23   risk from severe illness from COVID to people over

24   65?  Do you know if there was any messaging from CDC

25   at that time?
```

**CAROL CRAWFORD  11/15/2022**

Page 43

```
 1          A.  I do not know.
 2          Q.  All right.  Do you know now sitting here
 3   whether there is any preference by digital media at
 4   CDC's digital output right now, for either of those
 5   terms?
 6          A.  I do not know because our office does not
 7   write the content.
 8          Q.  Okay.  You can put that aside.
 9          A.  Okay.
10              (Plaintiffs' Exhibit 5 marked.)
11   BY MR. VECCHIONE:
12          Q.  Take a minute, take a look at that.
13          A.  Okay.
14          Q.  You've got it?
15          A.  Mm-hmm (affirmative).
16          Q.  So I think we don't have any new players;
17   right?  These are all the same people we talked
18   about before, you and Ms. Iheme and Mr. Hatcher.
19              Can you tell me what the subject of this
20   email string was?
21          A.  CDC brief on ways to reach high-risk and
22   frequent travelers.
23          Q.  Okay.  And I think this is March 30th?
24          A.  2020, yes.
25          Q.  And so I guess it's before the one I
```

**CAROL CRAWFORD  11/15/2022**

1    showed you that was March 31st, Exhibit 4?

2        A.  I don't have that exhibit, but I assume

3    that's correct.

4        Q.  Okay.  We can compare it.

5            Can you go to the very beginning of the

6    string on this?

7        A.  Mm-hmm (affirmative).

8        Q.  There is a blacked out "from," and then it

9    says:  "When:  3:30-4:30, Subject:  CDC brief on

10   ways to reach high-risk and frequent travelers."

11           Do you see that?

12       A.  Yes.

13       Q.  What is that?

14       A.  It looks like an appointment for a phone

15   call.

16       Q.  Okay.

17       A.  But I'm not -- it's not fully there.

18       Q.  Yeah.  Would Facebook be sending that to

19   you, or is that just at the bottom of his email?  Do

20   you have any understanding of how it works?

21       A.  They have a different email system than we

22   have, but it looks similar to someone forwarding on

23   an appointment and using the chain as an email,

24   though I don't know that for sure.

25       Q.  Got it.  And this starts at a March 27th

**CAROL CRAWFORD  11/15/2022**

Page 45

```
 1    email from him to him -- or from her to herself and
 2    you; correct?
 3         A.  Yes.
 4         Q.  And then there is a Margaret E. Silver.
 5    Who is that?
 6         A.  She was with our Travelers Health group.
 7    I believe that's where she was.
 8         Q.  And what was the Travelers Health group?
 9         A.  We have a unit at CDC that focuses on
10    traveler's health.  There is a website on traveler's
11    health.
12         Q.  And who's Caroline Seman?
13         A.  I believe she was also with Travelers
14    Health.
15         Q.  All right.  And then I see Dempsey.  Is
16    that the same Dempsey we saw before?
17         A.  Yes, yes.
18         Q.  Does that -- and then ▮?
19         A.  That's still Jay Dempsey.
20         Q.  Still Dempsey, it's just split; right?
21         A.  Mm-hmm (affirmative).
22         Q.  So Ms. Iheme says to you:  "Hi, Carol and
23    team.  As relayed on the call, we're happy to target
24    additional populations such as youth as the content
25    becomes available.  Just let us know.  For the first
```

**CAROL CRAWFORD  11/15/2022**

Page 46

```
 1    wave, we'd like to move forward with launching this
 2    next week," I think it's "ideally April 3rd to the
 3    groups for which you already produced content (older
 4    adults, HIV plus, asthma and pregnant women)."
 5              Do you know whether that's for travelers,
 6    or just general populations?
 7        A.  That was for general populations.
 8        Q.  All right.  And how do you know that?
 9        A.  I have some recollection of this project.
10        Q.  Okay.
11        A.  It was like units of information on COVID
12    that Facebook communities could attach to their
13    groups.  And I'm not 100 percent sure about this,
14    but I think we asked about travel, and then they
15    mentioned the idea of this project and said if you
16    have content for -- that would help other groups, we
17    could do similar things.
18        Q.  Okay.  And then he then asks how you want
19    this to read on the Facebook's sites, whether
20    sourced from CDC, or authored by CDC?
21        A.  Yes, I see that.
22        Q.  Do you know what the answer was to that?
23        A.  I don't recall which one we picked, but
24    I'm pretty sure it was one of the sources.
25        Q.  Okay.  Let's go up to the next, the March
```

**CAROL CRAWFORD  11/15/2022**

```
 1   27th, 3:01 p.m.
 2          A.  Okay.
 3          Q.  There is some more people here, I just
 4   want to -- I don't know that we've seen.  Well, we
 5   have seen her.  Okay.  Never mind.  You described
 6   it.
 7               And then at the very top, March 30, he
 8   says they are going to have their content
 9   strategists make the changes you'd agreed to that
10   day.
11          A.  That's what I'm reading as well.
12          Q.  Okay.  Now, why was the CDC editing this
13   content?
14               MS. SNOW:  Objection.  Mischaracterizes
15   testimony and the document.
16   BY MR. VECCHIONE:
17          Q.  Okay.  You can answer.
18          A.  I don't have the attachments or the
19   documents, so I don't know what we were editing or
20   not editing.  But we had content on the website, but
21   the format of the units was slightly different.  So
22   we had to take the content from our website and have
23   it fit in the units.
24          Q.  Okay.
25          A.  And they requested CDC's review of that.
```

**CAROL CRAWFORD  11/15/2022**

Page 48

1      Q.  All right.  Do you know why in the part

2   where he says:  "If we don't launch next week we'll

3   be pulled onto other COVID-19 projects, hence the

4   urgency," do you know why he's asking you about when

5   they should launch?

6      A.  I don't think he was asking me about when

7   we should launch.  I think he's letting us know if

8   we don't launch they may not get to it.

9      Q.  All right.  And do you know if those, if

10   he's referring to other COVID projects he has with

11   CDC, or just generally?

12      A.  I don't know for sure.

13      Q.  You can put that aside.

14      A.  Okay.

15      Q.  Just one more question about that.  Is he

16   creating a Facebook page for CDC, or just for

17   Facebook, do you know?

18      A.  My recollection of what this project was,

19   it was like units that would exist in Facebook that

20   like if you're in a group on travel that the group

21   administrator could provide a link to these units if

22   people wanted additional COVID information.  They

23   are not up any longer and my memory is vague on

24   them.

25          MR. VECCHIONE:  Got it.  Thank you.

**CAROL CRAWFORD  11/15/2022**

```
 1                  (Plaintiffs' Exhibit 6 marked.)

 2    BY MR. VECCHIONE:

 3         Q.  Take a moment to look at this.  This is

 4    Exhibit 6.  The mark may look like a 4, but I assure

 5    you it's Exhibit 6.

 6              All right.  Do you recognize this

 7    document?

 8         A.  No.

 9         Q.  But do you know what it is?

10         A.  Yes.

11         Q.  What is it?

12         A.  It's a discussion about access to or for

13    Facebook giving us CrowdTangle COVID reports.

14         Q.  All right.  And let's talk about this a

15    little bit.  We're more forward in time; right?

16    This is sometime in January 2021?

17         A.  Correct.

18         Q.  And I think both dates say January 26,

19    2021.  Would you agree with me there?

20         A.  Yes.  Well no, the first one is

21    January 25th.

22         Q.  All right.  See, that's why we have

23    witnesses.

24              All right.  The first thing is what's

25    CrowdTangle?
```

**CAROL CRAWFORD  11/15/2022**

Page 50

```
 1          A.   I have not used CrowdTangle personally,
 2    but I've seen it demonstrated.  But it is to my --
 3    my description of it is it's a social media
 4    listening tool for Meta properties.
 5          Q.   What are Meta properties?
 6          A.   Like Instagram and Facebook.
 7          Q.   Okay.  So by Meta properties you mean
 8    properties of the company Meta, not on some other
 9    level of?
10          A.   No.
11          Q.   Okay.
12          A.   Their platforms.
13          Q.   Got it.  Thank you.
14               Let's look at that January 25th email,
15    because I think we have some new people here.
16               There is Payton Iheme, and you.  It's from
17    her to you.  And you cc Lauren Balog Wright at
18    Facebook.  Do you know who that is?
19          A.   I think that Lauren, just from reading
20    this, she was the person that was the CrowdTangle
21    expert and was going to provide the reports.
22          Q.   Okay.  And Priya Gangolly?
23          A.   Priya Gangolly I interpreted to be like an
24    assistant to Payton.
25          Q.   And Kelly Perron?
```

**CAROL CRAWFORD  11/15/2022**

Page 51

1        A.   And from this email I believe Kelly was

2   also going to provide the CrowdTangle reports.

3        **Q.   And it says:   Subject CrowdTangle COVID-19**

4   **reports for WHO.**

5             **Not to channel Abbott and Costello, but**

6   **who is that?**

7        A.   World Health Organization.

8        **Q.   And why were they asking you about**

9   **information to WHO?**

10        A.   Well, I do have -- after reading this I do

11   recall the conversation a bit.   But what they are

12   saying in this email is we provide this report to

13   WHO, and we can provide it to you as well.

14        **Q.   Okay.   What do you remember of the**

15   **conversation?**

16        A.   Just that they -- I believe they mentioned

17   on a call that they could possibly do this, and this

18   is a followup email.   And they shared the reports

19   and occasionally they would ask me on the call if

20   these reports were helpful.

21        **Q.   And let's see what he says here, what she**

22   **says here.   "Hi, Carol, I am following up on our**

23   **conversation several weeks ago about providing more**

24   **detailed reporting from our CrowdTangle team.   I**

25   **wanted to share our first CrowdTangle COVID content**

**CAROL CRAWFORD  11/15/2022**

Page 52

1    report with you courtesy of Lauren and Kelly on this

2    cc.  They are providing these to WHO, thought it

3    helpful for CDC's teams as well."  And then she says

4    what the time period of it is, and that these are

5    going to be biweekly.

6              What kind of information was in the

7    CrowdTangle?  What did it provide you?

8         A.  Well, I don't have a clear recollection of

9    the reports because I sent the reports to other

10   teams.  But typically social media listening reports

11   show themes and -- of discussion on social media

12   channels.

13        Q.  Okay.  And so if you look down further

14   I'll just ask you again some words that I think I

15   know what they mean, but we might as well put on the

16   record.

17             (As read) Lauren, can you -- can do that

18   "distro."

19             That's distribution?

20        A.  Yes.

21        Q.  And "the full report is attached but some

22   highlights the CrowdTangle team would like to call

23   to your attention are:  Top engaged COVID and

24   vaccine-related content overall across Pages and

25   Groups."  And it says "largely a mix of educational

**CAROL CRAWFORD  11/15/2022**

Page 53

```
 1    posts, reports of successful vaccinations," and it
 2    goes on.  And then "news/commentary on COVID and
 3    vaccination rollout."
 4            So does this -- is this like an algorithm
 5    that shows you where -- what people are talking
 6    about?
 7       A.  I wouldn't characterize it as an
 8    algorithm.  But it's a search of content on social
 9    media, and a summary of the higher volume
10    conversations.  It's helpful for communicators to
11    know what is being discussed because it helps
12    improve our communication materials.
13       Q.  All right.  And then he says:  "However,
14    posts falling into the following themes, all of
15    which have potential risks, also garnered high
16    engagement."  And then he has reports of healthcare
17    workers refusing the vaccine; right?
18       A.  Yes.
19       Q.  And he says there was an article in Forbes
20    about it?
21       A.  Yes.
22       Q.  Posts about alleged vaccine-related
23    deaths?
24       A.  Yes, I see that, too.
25       Q.  And:  "News and reports of severe vaccine
```

**CAROL CRAWFORD  11/15/2022**

Page 54

```
 1    side effects included both first- and secondhand

 2    reports in Groups, with users sharing photos and

 3    video."

 4            Do you see that?

 5        A.  Yes.

 6        Q.  Why are these of concern to the CDC, if at

 7    all?

 8            MS. SNOW:  Objection.  Mischaracterizes

 9    testimony, and the document.

10    BY MR. VECCHIONE:

11        Q.  You can answer.

12        A.  Well, this doesn't say that they were a

13    concern to CDC.  They are providing a report of the

14    most talked about topics on social media during this

15    time period.  But in general, as I mentioned before,

16    it does help for people to -- for communicators to

17    know what conversations occurs on social media

18    because it helps us identify gaps in knowledge, or

19    confusion, or things that we're not communicating

20    effectively that we need to adjust.

21        Q.  All right.  Again, pardon me -- but

22    secondhand reports and groups, groups are like the

23    travelers information groups; if I'm on Facebook I

24    can belong to various groups, and I get information

25    on that feed?
```

**CAROL CRAWFORD  11/15/2022**

Page 55

```
 1       A.  Can you clarify what you're referring to
 2  with groups?
 3       Q.  He says number 3 -- number -- well, in 1,
 4  2 and 3 he uses the words "groups."  In 1 he says:
 5  Worker-centric groups, groups especially
 6  anti-vaccination groups.  And then in 3 he has
 7  secondhand reports in groups.  So I'm just asking
 8  for the record --
 9       A.  Yeah.
10       Q.  -- that if I am on Facebook I can belong
11  to various groups and get information that that
12  group gets?
13       A.  I cannot -- I can't say for sure that this
14  report was about the Facebook groups, but it seems
15  likely that that's what that is reference to and you
16  are describing them correctly.
17       Q.  Thank you.  And then he tells -- you tell
18  in the next -- in January 26th you write to
19  Ms. Iheme and you say -- you say:  "It looks
20  wonderful and much appreciated," and then send, send
21  them to you.  It says:  "One group we'll be adding
22  is the Census group who hopefully will soon start
23  their project."
24           "Also, the wide group of those looking at
25  misinfo will want this."
```

**CAROL CRAWFORD  11/15/2022**

Page 56

```
 1              First, what's the Census group within CDC?
 2    Or is that not within CDC?  What is that, Census
 3    group?
 4         A.  This is the Census Bureau.
 5         Q.  Okay.  And they would be on this CDC list?
 6         A.  It appears I was suggesting that, yes.
 7         Q.  Okay.  And then who's the wide group of
 8    those looking at -- well, first let's go back.
 9    Misinfo is misinformation?
10         A.  Yes.
11         Q.  Who's the wide group of those looking at
12    misinformation?
13         A.  I don't know specifically what I was
14    referring to there.
15         Q.  Do you know generally?
16         A.  I suspect that it was probably people
17    working on communication materials or developing
18    reports about gaps and areas of confusion.
19         Q.  Okay.  Do you have notes or other records
20    of the phone call he refers -- she refers to:  "I'm
21    following up on our conversation several weeks ago"?
22         A.  I doubt I have notes.
23         Q.  Okay.
24         A.  If I did, they would have been electronic.
25         Q.  Do you know who took part in the
```

**CAROL CRAWFORD  11/15/2022**

Page 57

```
 1   conversation?
 2        A.  I don't know.  But typically I was on the
 3   call, sometimes Jay was as well, Jay Dempsey.  But I
 4   don't recall the specific meeting.
 5        Q.  Did you instruct Ms. Iheme or anyone else
 6   at Facebook to do anything with the biweekly reports
 7   other than send them to you?
 8             MS. SNOW:  Objection.  Mischaracterizes
 9   testimony.
10   BY MR. VECCHIONE:
11        Q.  You did ask Ms. Iheme to send you the
12   biweekly reports, didn't you?
13        A.  She offered to send me the biweekly
14   reports, and I agreed that would be good.
15        Q.  Did you instruct her to do anything else
16   regarding the biweekly reports?
17        A.  Not that I recall.
18        Q.  Do you know who decided the reports would
19   be developed biweekly?
20        A.  I don't recall.  But this email seems to
21   suggest that they were already doing biweekly ones.
22        Q.  For the -- for your purposes, what was the
23   purpose of the reports, receiving them?
24        A.  They would help us understand what was
25   being discussed on social media about COVID, which
```

**CAROL CRAWFORD  11/15/2022**

**Page 58**

1  helps us look for gaps in information, confusion

2  about facts, things that we might need to adjust our

3  communication materials for.

4      **Q.  Had you prior to this email discussed with**

5  **Ms. Iheme such items as reports of healthcare**

6  **workers refusing the vaccine, posts about alleged**

7  **vaccine-related deaths, and news and reports of**

8  **severe vaccine side effects?  Did you ever report to**

9  **her that those would be of interest to the CDC?**

10      A.  I don't recall reporting or discussing

11  these with them specifically.  I do recall generally

12  discussing misinformation with Facebook around this

13  time and --

14      **Q.  And those could have been included within**

15  **that discussion?**

16      A.  Possibly.

17      **Q.  Why did you add Census to the distribution**

18  **of this?**

19      A.  They were going to start working with the

20  CDC regarding misinformation.

21      **Q.  So what did -- what did the wide group of**

22  **those looking at misinformation do with the reports?**

23      A.  I don't know what they did with the

24  reports.  However, I do know two things that were

25  likely done with the reports.  We had -- we have

**CAROL CRAWFORD  11/15/2022**

1  part of our Joint Information Center in the

2  Emergency Response a research team that compiles all

3  the themes of discussion on news and social media.

4  And I know that they received these reports, and

5  they use a lot of sources to develop a summary for

6  the response for all the reasons I just described

7  about why this is helpful.

8          I believe at this time it was also part of

9  a publicly-available vaccine confidence report that

10  also looked across themes, what was being discussed,

11  and where areas of confusion were so that they could

12  update vaccine communication and other issues.

13  Those are posted on CDC's website.

14      **Q.  Did you do anything with the reports**

15  **besides forward them on to Census and to this wide**

16  **group?**

17      A.  Anything with the CrowdTangle reports, I

18  didn't personally do anything else with the

19  CrowdTangle reports.

20      **Q.  Do you know if anyone else did anything**

21  **besides what you've described with the CrowdTangle**

22  **reports?**

23      A.  I would assume that it was used by people

24  to look in background of conversations similar to

25  what I have described.

**CAROL CRAWFORD  11/15/2022**

Page 60

```
 1           MR. VECCHIONE:  All right.  You can put
 2    that aside.
 3           (Plaintiffs' Exhibit 7 marked.)
 4    BY MR. VECCHIONE:
 5       Q.  All right.  So what is the subject line of
 6    this email chain?
 7       A.  "Crowd Tangle COVID-19 Reports."
 8       Q.  All right.  Let's take a look at the
 9    February 21, 2021, 8:39.  Who is this from and who's
10    the recipient?
11       A.  Kelly Perron at Facebook, and I'm the
12    recipient.
13       Q.  All right.  And we've discussed her
14    before.  She was going to be one of the contacts
15    with CrowdTangle; right?
16       A.  Yes.
17       Q.  And what is the summary that Perron
18    reports?
19       A.  She attached the report, which is not
20    here, but and then summarized the high points.
21       Q.  Okay.  And why is she reporting this to
22    you?  Is this part of the biweekly report that you
23    agreed to earlier?
24       A.  Yes.
25       Q.  And this would be a summary of a report
```

**CAROL CRAWFORD  11/15/2022**

1    that's probably attached, but it's not here?

2        A.  Correct.

3        Q.  All right.  And what did you do with this

4    information?

5        A.  We created a mail group, and this was

6    forwarded on by -- I either forwarded it, or over

7    time I had an assistant that started forwarding

8    them.

9        Q.  All right.  So the same groups within the

10   CDC and the Census we talked about before?

11       A.  At some point I recall adding Census to

12   the distro.  I am sure by May or March there were

13   several time periods they were probably included.

14   The distribution list likely changed a bit because

15   people deployed into the response and out of the

16   response, but, yes.

17       Q.  Okay.  Can you take a look at the emails

18   dated Tuesday, February 16 and 17th, 2021 at

19   9:00 p.m.?

20       A.  Yes.

21       Q.  So who is that from, and who is that to?

22       A.  That's Kelly Perron at Facebook to me.

23       Q.  And what is she summarizing here?  What is

24   the summary that she reports?

25       A.  It's the -- it looks like the next

**CAROL CRAWFORD  11/15/2022**

Page 62

```
 1   biweekly report.  And it looks attached, but it's
 2   not in the exhibit.  And she summarized it in the
 3   body of the email.
 4        Q.  All right.  And she's highlighted, some
 5   things are highlighted, right, in dark black?
 6        A.  Some things are bolded.
 7        Q.  Bolded.  That's right.  Reports of deaths
 8   post-vaccination?
 9        A.  Yes, that's in bold.
10        Q.  Double masking?
11        A.  Yes, that's bold.
12        Q.  And personal reports of vaccination?
13        A.  Yes, that's bold.
14        Q.  Why did she report this to you, those
15   highlights?
16        A.  There again, they are using CrowdTangle to
17   do a summary of the themes that are being discussed
18   on Facebook and Instagram channels, and this is a
19   summary of that.
20        Q.  Okay.  And what did you do with this
21   information?
22        A.  As mentioned, we had a distribution list
23   that this was forwarded to.
24        Q.  You just sent it on?
25        A.  Mm-hmm (affirmative).
```

**CAROL CRAWFORD  11/15/2022**

1      Q.  Can you look at the email dated Monday

2  March 1st?  And who is this to?

3      A.  Kelly at Facebook to me.

4      Q.  All right.  And she added someone.  She

5  says she added Chelsey Lepage at Facebook.  Who is

6  that?

7      A.  I think that she may have been --

8      Q.  I'm cheating a little.  I went above what

9  I told you to look at.

10      A.  Yes.  I'm sorry.  I see that now.  But I

11  believe Chelsey was another assistant to Payton, I

12  think.

13      Q.  Okay.  And then on the one I did direct

14  your attention to, March 1st at 5:47, again she says

15  Hi -- Kelly Perron says:  Hi, Carol.  And she

16  attached the latest CrowdTangle insights report for

17  February 10th to 24, and she says it's attached.

18      A.  Mm-hmm.

19      Q.  And then she does a summary.  And there

20  again there are certain points she's bolded:

21  COVID-19 and mental health, vaccine refusal, testing

22  positive post-vaccination.

23          Do you know whether those were bolded

24  because those were of particular concern to the CDC?

25      A.  No.  That's the format of all the reports.

**CAROL CRAWFORD  11/15/2022**

1       Q.  Okay.  So bolding them was -- your

2   testimony is bolding them is not because they were

3   of particular interest to the CDC, that's just how

4   she did it?

5       A.  I really couldn't say what her thinking

6   was when she bolded them.

7       Q.  Okay.  When you received it did you have

8   any understanding about the bolded portions?

9       A.  No.

10       Q.  Were the bolded portions things that you

11   had particularly spoken with Facebook before in your

12   telephone conversations?

13       A.  I don't believe so.

14       Q.  All right.

15       A.  Well, can I clarify that a little bit?

16       Q.  Yes, please.

17       A.  I'm sure -- I don't remember discussing

18   these in terms of the CrowdTangle report or the

19   things in bold.  I am sure that general discussions

20   that there was a lot of information on vaccines,

21   which is one of the bolded words, for example.  I am

22   sure that did occur.

23       Q.  Thank you.  On March 15 Kelly sends you at

24   6:19 p.m.

25       A.  Yes.

**CAROL CRAWFORD  11/15/2022**

Page 65

1        Q.  Sort of goes over, she keeps Chelsey

2   Lepage in there, and then she -- this time she

3   summarizes slightly different items:

4   Post-vaccination guidelines and protocols, vaccine

5   ingredients and vaccine side effects.

6        A.  I see that.

7        Q.  And your testimony is the same as to why

8   they are bolded as before, as far as you know?

9        A.  Correct.

10       Q.  And you did the same thing with them as

11  you did before that you've testified?

12       A.  I believe so, yes.

13       Q.  Let's see.  And then at the bottom of that

14  March 15, she says:  This week we also are including

15  a one off content insights report we did looking at

16  Spanish language content relative to the U.S. we

17  thought might be interesting for you.

18           She asks you not to share it externally.

19           Do you recall any other times you got

20  Spanish language-specific material?

21       A.  No.  But I didn't recall this time either

22  until I read it.

23       Q.  Okay.  And then I'll just -- to finish up,

24  March -- May 25th.  Now, there doesn't seem to be

25  something for April.  Do you know why there would be

**CAROL CRAWFORD  11/15/2022**

Page 66

```
 1   a break in the two-week reporting?

 2        A.  No.  I don't recall unless she just sent

 3   it separate from the chain.

 4        Q.  And then here she's bolded vaccination in

 5   children, healthcare workers and masks and

 6   vaccination; right?

 7        A.  I see that, too.

 8        Q.  And do you recall whether you spoke to her

 9   about those things, or that was just her choice to

10   highlight those?

11        A.  We did not discuss with them the issues we

12   wanted in the CrowdTangle report.

13        Q.  All right.  And then you say "thanks" in

14   response to this on 5:26.  But we've got a new

15   person here.  Tyler Woods.  Who is that?

16        A.  I think, but I'm not positive, that he

17   took over the reports later, so perhaps he was

18   starting to come in on their team.

19        Q.  Okay.  We've been going about an hour.  I

20   always give the witness a chance to break if she

21   wants.

22        A.  I'm okay.

23        Q.  Okay.

24        A.  Thank you for checking.

25             MR. GILLIGAN:  Can I ask one question,
```

**CAROL CRAWFORD  11/15/2022**

Page 67

```
 1    John?
 2              MR. VECCHIONE:  Yeah.
 3              MR. GILLIGAN:  What is the number of your
 4    last exhibit?
 5              MR. VECCHIONE:  42.
 6              MR. GILLIGAN:  Thank you.
 7              And I actually -- that was -- I do have
 8    one that's unmarked that I may use.
 9              MR. GILLIGAN:  Okay.  Just to add a little
10    suspense.  Thank you.
11              MR. VECCHIONE:  Mm-hmm (affirmative).
12              (Plaintiffs' Exhibit 8 marked.)
13    BY MR. VECCHIONE:
14        Q.  All right.  Do you recognize Exhibit 8?
15        A.  I haven't finished reading it.
16        Q.  Okay.  Go ahead.
17        A.  Sorry.  Okay.  Sorry.
18        Q.  It's all right.
19        A.  Can you repeat the question?
20        Q.  Can you identify this document?
21        A.  I recognize the first page chain of
22    emails, but not the previous chain.
23        Q.  So you don't -- tell me where -- the first
24    page at the back?
25        A.  Oh, I'm sorry.  No, the first page of the
```

**CAROL CRAWFORD  11/15/2022**

Page 68

```
 1   packet.
 2           Q.  Got it.
 3           A.  I remembered this email more -- I don't
 4   have a recollection of this previous back and forth.
 5           Q.  Got it.  Well, what's the subject line?
 6           A.  "This week's meeting."
 7           Q.  Okay.  And by this time were you meeting
 8   with them every week?
 9           A.  We were -- we were meeting weekly during
10   parts, so I imagine we were.
11           Q.  All right.  And can you read the email
12   from Ms. Iheme to you about the meeting on
13   March 30th, 2021, 2:42 p.m.?
14           A.  Yes.  "Hi, Carol, hope all is well as it
15   can be.  At least spring is making an appearance.  I
16   wanted to surface any misinfo questions your team
17   may have for the team that I had briefing last time.
18   They are available to attend again, but also want to
19   make sure that we are answering any of your team's
20   questions."
21           Q.  All right.  What's the briefing she refers
22   to?
23           A.  I don't recall the briefing specifically,
24   but I do recall her bringing in people from their
25   Trust and Safety or Misinformation teams -- I'm not
```

**CAROL CRAWFORD  11/15/2022**

1   sure what they called the team -- to talk to us

2   about misinformation at some weekly meetings.  I

3   think that's probably what this is in reference to.

4       **Q.  Why is she offering to surface misinfo**

5   **questions and to answer your team's questions?**

6       A.  Because I think -- I can't say for sure

7   what she was thinking.

8       **Q.  What's your understanding?**

9       A.  But I think it was because we -- we had

10  asked questions about what they were seeing in terms

11  of misinformation and inquired about any activities

12  they were undertaking.  And I believe this was an

13  offer to sort of get back to us on any of those

14  questions.

15      **Q.  All right.  That you had?**

16      A.  Yes.

17      **Q.  Given her.  Thank you.**

18      A.  Yes.

19      **Q.  Let's clean up the record a little.  That**

20  **you had -- the questions that you had proposed to**

21  **her?**

22      A.  I think it was questions asked within the

23  meeting, but.

24      **Q.  Got it.**

25      A.  I'm not 100 percent sure because I don't

**CAROL CRAWFORD  11/15/2022**

Page 70

```
 1   know the timing of that meeting, but I believe
 2   that's what this is in reference to.
 3        Q.  And can you read your response at
 4   3:08 p.m.?
 5        A.  "Hope all is well, too.  I plan to join
 6   and listen to the 3:30 meeting, FYI.  I added this
 7   part in yellow to our chain on turn.io so you
 8   probably missed it.  Did you have thoughts on how we
 9   can regularly meet with Census?  I will also check
10   back with others to see if they have other Qs that
11   went unanswered and get back to you."
12            Do you want me to keep reading?
13        Q.  No, you can stop.
14        A.  Okay.
15        Q.  But what is "turn.io"?
16        A.  This was another project that we were
17   working on with WhatsApp.
18        Q.  And what was that project?
19        A.  I believe this was using WhatsApp to -- so
20   people could use it, they could look up ZIP codes to
21   find vaccines.
22        Q.  Okay.
23        A.  And maybe, I'm speculating, there was also
24   a Spanish offering for vaccine information on
25   WhatsApp.  It was one of those.
```

**CAROL CRAWFORD  11/15/2022**

Page 71

1      Q.  Got it.  Why is Census involved in your
2  coordination with Facebook at this time?
3      A.  We had entered an IAA with Census to help
4  advise on misinformation.
5      Q.  And an IAA is?
6      A.  Interagency agreement.
7      Q.  All right.  Did the CDC ever use any
8  software programs developed by Census that enabled
9  the CDC to track the viewpoints of U.S. citizens?
10      A.  No.
11      Q.  Did the CDC ever gain access to or in any
12  way receive information about the viewpoint of U.S.
13  citizens on COVID masking or vaccination from
14  Census?
15      A.  We likely did because they provided
16  reports on misinformation that they were seeing to
17  us.
18      Q.  Did the CDC ever share data on the
19  viewpoints of U.S. citizens with the Census?
20      A.  I don't recall if we did.
21      Q.  You did share the CrowdTangle with them?
22      A.  Yes.  Can you reask the question?
23      Q.  I will.  Did the CDC ever share the data
24  on the viewpoint of -- the viewpoints of U.S.
25  citizens that CDC was seeing with the Census?

**CAROL CRAWFORD  11/15/2022**

1        A.  You refer to it as data.  I don't recall

2    sharing data.  I do recall sharing social media

3    listening reports such as this, or the publicly

4    available vaccine confidence reports that talk about

5    what people are talking about, and probably the

6    JIC's research, you know.  They had a standing

7    summary of what was being discussed.  I suspect I

8    shared that, too, with Census.

9        **Q.  The JIC?  What kind of research, the?**

10       A.  I mentioned the JIC research team that

11   looked at what the conversations were on news,

12   social media and did summaries of that for everyone

13   in the response.

14       **Q.  All right.  And did information come back**

15   **from the Census to CDC about what they were finding?**

16       A.  My recollection is that the Census did

17   provide us with the key themes they were seeing

18   around misinformation during the times that they

19   were looking at it.

20       **Q.  Who was at the meeting that Ms. Iheme**

21   **references and that you refer to in the next email?**

22       A.  The next email, which email?

23       **Q.  So above it.  It says -- oh, hang on.**

24   **I'll tell you in a second.**

25            "Yes, I did see and will know in a few

**CAROL CRAWFORD  11/15/2022**

Page 73

```
 1   hours."
 2          Hang on for a second.
 3          So I took it to mean that this March 30th,
 4   3:16 email that she says:  "Hi, Carol, Yes, I did
 5   see and will know in a few hours, I'm told if we
 6   plan to present for Census Thursday or if it needs
 7   more work."
 8          And then you say that "I didn't ask Census
 9   if they had questions."
10          Do you know if there was a meeting with
11   Census on or about that time?
12       A.  I don't --
13       Q.  Okay.
14       A.  -- remember enough detail to answer the
15   question.  Sorry.
16       Q.  So in this March 30th, 2021 at 7:38.
17       A.  Yes.
18       Q.  There you say:  "I didn't ask Census if
19   they had questions, but I know they were hoping to
20   go over the deck they had."
21          And is that the one you sent them or
22   Facebook sent them, or did they create that
23   themselves?
24       A.  I don't know for sure.  I'm interpreting
25   from this email that the Census created it, but I do
```

**CAROL CRAWFORD  11/15/2022**

Page 74

```
 1    not know.
 2         Q.   All right.  "And discuss how to engage on
 3    a more regular basis."
 4              Do you know if they ever decided to engage
 5    on a more regular basis?
 6         A.   With -- about their activity, or about
 7    CDC?
 8         Q.   Yeah, with Facebook.
 9         A.   I don't know what Census did directly with
10    Facebook.
11         Q.   And then I'll ask you to take a look at
12    the 3:16 again.  She says:  It would be great to
13    have questions that may not have been answered from
14    your team on misinformation.  She says "misinfo",
15    but I'm using the full word.
16              And is she looking -- is it your
17    understanding she's looking for those answers from
18    Census that you didn't have, CDC?
19         A.   Let me reread this chain.
20         Q.   Go ahead.
21         A.   Sorry.  Can you repeat the question?
22         Q.   I will withdraw the question for a moment.
23         A.   Okay.
24         Q.   Just take a look at March 30th, 7:46 as
25    well.  She writes to you, Carol:  "Hi, Carol.  Yes,
```

**CAROL CRAWFORD  11/15/2022**

**Page 75**

1  **I think it's good to have questions from Census to**
2  **make sure we have the right person.  I can ask Liz**
3  **to join again so she can be asked questions/provide**
4  **more information about influencers and I have noted**
5  **your question about removals and will tee that up as**
6  **well."**
7              **What was your question about removals?**
8       A.  I -- reading in this email?
9       **Q.  Yeah.**
10      A.  I'm saying -- the email before this I'm
11  saying the team is still interested in more info
12  about how you analyze the data on removals.  And my
13  general recollection where this question came from
14  was that we -- the -- that I think there was
15  wondering if they delete the info will we know those
16  myths or information so we could update
17  communication activity.  So if they were deleting
18  content would we know what the themes were.
19      **Q.  And did you ask them to remove any**
20  **content?**
21      A.  No.  This was -- this was when -- this was
22  a meeting where we were just asking what -- how that
23  worked and would there be data, would we be able to
24  see in CrowdTangle or other reports like what kind
25  of themes were removed so we would still have the

**CAROL CRAWFORD  11/15/2022**

Page 76

```
 1   full picture of areas of confusion.

 2         Q.  All right.  And if you look at your March

 3   31st, 2:07 p.m., and you say what "Census mentioned

 4   they'd like to discuss."  "It looks like the post

 5   from last week's deck about infertility and side

 6   effects have all been removed.  Were those

 7   re-evaluated by the moderation team or taken down

 8   for another reason?"

 9             What are you saying there?

10         A.  It looks to me like I cut and pasted this

11   from something that Census had said, and I don't

12   have good recollection of what this was on

13   March 31st.

14         Q.  Then you've also cut and pasted:  "One of

15   the main themes we're seeing and from the

16   CrowdTangle report is local news coverage of deaths

17   after receiving the vaccine.  What's the approach

18   for adding labels to those stories?"

19             Why would you or Census want them to add

20   labels to those stories?

21             MS. SNOW:  Objection.  Calls for

22   speculation and mischaracterizes the testimony -- or

23   the document.

24   BY MR. VECCHIONE:

25         Q.  You can answer.
```

**CAROL CRAWFORD  11/15/2022**

Page 77

1        A.   I don't think we were asking them to add

2   labels, from what I'm reading here.  We were asking

3   them what their approach for labels were.

4        **Q.   Then they have asked:  "Can we add the**

5   **Census team to CrowdTangle?"**

6             **Hadn't it already been added to**

7   **CrowdTangle by this time?  Haven't we established**

8   **that?**

9        A.   There were two different offerings for

10   CrowdTangle.  They had allowed us to directly log

11   into CrowdTangle and run our own reports or

12   searches.  I believe that started back in, you know,

13   March or April 2020.  Then they sent the reports.

14   So this appears to be to log in to CrowdTangle.

15        **Q.   Then what did you mean by your team is**

16   **going to consider how you might want to engage with**

17   **CDC Census team routinely and get back to us?**

18        A.   I don't know specifically this day this

19   email what I meant.  But I do know that we generally

20   discussed, you know, how we should talk about

21   misinformation because they had already been working

22   with Census, on their own Census misinformation, and

23   I wanted to know what was best for them for engaging

24   on any topics that we might want to discuss.

25        **Q.   All right.  Do you know what Facebook was**

**CAROL CRAWFORD  11/15/2022**

Page 78

```
 1   told previously about engaging with CDC and Census

 2   on this?

 3           MS. SNOW:  Objection.  Vague, calls for

 4   speculation.

 5   BY MR. VECCHIONE:

 6       Q.  You can answer.

 7       A.  Can you rephrase the question?

 8       Q.  Yeah.  They were already engaging, it

 9   seems to me, with CDC and Census at this time.  Do

10   you know if there was anything additional from what

11   we've discussed about such engagement that's causing

12   them to ask this question?

13       A.  Causing them to ask what question?

14       Q.  About closer engagement with the Census,

15   and you asking to have -- "can we add the Census

16   team to CrowdTangle?"  Do you know what --

17           MS. SNOW:  Objection.  Mischaracterizes

18   the document.

19   BY MR. VECCHIONE:

20       Q.  It's okay.  You can answer if you

21   understand.  I'm trying to understand.  It seems

22   that Facebook has been talking to CDC and Census

23   throughout for a while now.  And yet here is a

24   request that they want a different CrowdTangle, as

25   you've explained.
```

**CAROL CRAWFORD  11/15/2022**

```
1              MS. SNOW:  Objection.  It assumes facts
2    not in evidence.
3    BY MR. VECCHIONE:
4         Q.  You can still answer.  I'm trying to
5    understand what is happening in this series of
6    emails, since they have already been sending you the
7    CrowdTangle information.  You've explained that
8    there was a different CrowdTangle information that
9    Census might want; right?  That is --
10        A.  I think it was the log-in to the
11   CrowdTangle.
12        Q.  Okay.  Well, I'll give you an example.  So
13   Ms. Iheme asks:  Yes, I think it's good -- this is
14   at 7:46 on March 30th, said:  "I think good to have
15   question from Census so we make sure we have the
16   right person."
17             So my question is, is that the right
18   person to answer those questions to the Census from
19   Facebook?  What's your understanding?
20        A.  I don't know this chain of emails
21   specifically, but I believe it was likely in
22   reference to just me mentioning to Payton that we
23   were partnering with the Census to learn more.  We
24   had been discussing things, and we were going to
25   have some collective questions that we would like to
```

**CAROL CRAWFORD  11/15/2022**

```
 1   discuss at a future meeting.
 2        Q.  Okay.  What's the amplification side at
 3   March 30th at 7:38?  You are going to ask Liz about
 4   what is being done on the amplification side.  What
 5   does that mean?
 6        A.  I don't know why I was asking that.
 7        Q.  And why did you want to get a better
 8   understanding of how Facebook was working with
 9   influencers?
10        A.  I don't remember the meeting before that,
11   so I'm not sure what that is in reference to.
12        Q.  And it says the team's interested in more
13   info on how you analyze the data on removals.
14            Why are you asking about how Facebook
15   operates on removals?
16            MS. SNOW:  Objection.  Asked and answered.
17        A.  I did answer it previously.
18   BY MR. VECCHIONE:
19        Q.  I don't believe I have directed you to
20   that exact portion of this, and I would ask the
21   witness to answer unless she's being instructed not
22   to.
23            MS. SNOW:  No, you may answer.
24        A.  Okay.  What I think this was about was I
25   believe the teams that were looking at, like, our
```

**CAROL CRAWFORD  11/15/2022**

Page 81

```
 1   research reports, or our vaccine confidence report

 2   were wondering if the data was removed if it would

 3   show up in the report, so would they be missing gaps

 4   or information because the posts were removed.

 5   That's what I believe that this question is about.

 6   BY MR. VECCHIONE:

 7        Q.  All right.  CDC wasn't concerned that they

 8   weren't removing materials fast enough?

 9        A.  That's not what I believe was being

10   discussed here.  This was about the data that we

11   could get so we had a full picture on confusion so

12   that we could adjust communication materials, or

13   ways that we were communicating.  That's what I

14   believe that that's in reference to.

15            And you know what, I have a clarification.

16        Q.  Go right ahead.

17        A.  You asked me what the amplification

18   side --

19        Q.  Yes.

20        A.  -- and the influencers.  Now that I'm

21   remembering this, I think that it it was likely

22   about how to promote how to get a vaccine, or where

23   to get a vaccine and I think that was all part of

24   that conversation.

25        Q.  All right.  Let's go to the March 31st,
```

**CAROL CRAWFORD  11/15/2022**

Page 82

```
 1    2021 at 2:07, the one you've told me you've cut and
 2    pasted from Census, at least those bullet points.
 3         A.   You mean March 31st?
 4         Q.   March 31st at 2:07.
 5         A.   Yes.
 6         Q.   It says:  "Were those reevaluated by the
 7    moderation team or taken down for another reason?"
 8              Do you know if that refers to a moderation
 9    team at CDC or Facebook?
10         A.   It must have been Facebook because we
11    don't have a moderation team at CDC.
12              I'd also like to clarify that I think I
13    probably cut and pasted it.  I don't know for sure
14    that I did.
15         Q.   That's fine.  Got it.  I follow you.
16              Why do you -- do you know why you wanted
17    to know what the approach for adding labels to the
18    stories about deaths after receiving the vaccine
19    was?
20              MS. SNOW:  Objection.  Asked and answered.
21         A.   I don't remember this specific set of
22    conversation, or why we were asking about that any
23    longer.
24    BY MR. VECCHIONE:
25         Q.   Okay.  Do you know -- so you're discussing
```

CAROL CRAWFORD  11/15/2022

Page 83

1   talking to Census at some point.  Do you know

2   whether that conversation ever happened, a

3   conversation with -- regarding this string of emails

4   with Census, CDC and at Facebook?

5        A.   I don't know that we were discussing the

6   string of emails, but there were meetings where

7   Census, myself and Facebook were on calls.

8        Q.   Okay.  And do you recall what you

9   discussed?

10       A.   My memory is we had general conversations

11  about what were opportunities to address

12  misinformation.  And things like in this chain I

13  believe were probably discussed, but I don't have

14  specific memory of it.

15       Q.   Do you know who your contact was at

16  Census, like who was the main person at Census on

17  this aspect of the CrowdTangle and dealing with

18  Facebook?

19       A.   There were a couple of people from Census

20  that we were talking with.  I only remember two of

21  the names.  One was Christopher Lewitzke, who I

22  believe was a contractor for them.  And then Jen

23  Shopkorn, I think I'm saying it correctly.  I

24  believe she was their director for digital.

25       Q.   Thank you.

**CAROL CRAWFORD  11/15/2022**

Page 84

```
 1        A.  But there were a couple of others that
 2    typically participated.
 3        Q.  And then March 31st at 2:18 Ms.  Iheme
 4    writes you:  "Hi, Carol we are working on a proposal
 5    how set up sharing partnership on the misinformation
 6    items, what would it look like, so we can discuss
 7    Thursday.  Lots of team members out the last two
 8    weeks due to all the holidays, but that is the plan
 9    so we can discuss on the Thursday call."
10            Do you know whether that meeting, the
11    Thursday meeting, to set up sharing partnerships on
12    misinformation occurred?
13        A.  I don't remember if this specific meeting
14    occurred.
15        Q.  Would you have a calendar that would tell
16    you?
17        A.  Yes.
18            MR. VECCHIONE:  I would ask counsel to
19    produce that calendar of the date of that meeting.
20            MR. GILLIGAN:  We'll take your request
21    under advisement.
22            MR. VECCHIONE:  Thank you.
23    BY MR. VECCHIONE:
24        Q.  And once again would you have notes or
25    recordings of that conversation?
```

**CAROL CRAWFORD  11/15/2022**

Page 85

```
 1          A.  We never recorded the calls.  If I had --
 2    I didn't take many notes, but if there was anything
 3    it would be in Word or email.
 4               MR. VECCHIONE:  You can put 8 aside,
 5    Exhibit 8 aside.
 6               (Plaintiffs' Exhibit 9 marked.)
 7    BY MR. VECCHIONE:
 8          Q.  In this, if you'll just an initial look at
 9    it you can tell me.  I just ask you to -- I'd like
10    you to identify it and tell me the date of the
11    email.
12          A.  The subject is Misinfo on two issues.  And
13    the date of the email is May 6, 2021.
14          Q.  All right.  You can continue to read it.
15          A.  Read the email?
16          Q.  Yeah.
17          A.  "Payton, Genelle" --
18          Q.  No, no.  I mean, to yourself.
19          A.  Oh.
20          Q.  Just scan through it.
21          A.  Sorry.  Thank you.
22          Q.  I want you to be a little familiar with
23    it.
24               MR. GILLIGAN:  Good clarification.
25          A.  Okay.
```

**CAROL CRAWFORD  11/15/2022**

```
 1   BY MR. VECCHIONE:
 2       Q.  All right.  So can you tell us why you
 3   were flagging misinformation about the vaccines for
 4   Facebook?
 5           MS. SNOW:  Objection.  Mischaracterizes
 6   the document.
 7   BY MR. VECCHIONE:
 8       Q.  Well, let's take a look at it for a
 9   moment.  It's from you; right?
10       A.  Yes.
11       Q.  And then it's to Ms. Iheme under a new
12   name Gennelle Adrien.  Do you know her and what her
13   role was?
14       A.  I think she was one of Payton's
15   assistants.
16       Q.  All right.  And then you're cc'ing Sam
17   Huxley at ████@Reingold.com.  Do you know who that
18   is?
19       A.  Yeah, now that I see the name.  Sam was a
20   contractor for Census that was often on our phone
21   calls with Christopher and Jen.
22       Q.  And that's Christopher Lewitzke; right?
23       A.  Yes.
24       Q.  And then Jennifer Shopkorn, I apologize if
25   you told me who that was, but who was that?
```

**CAROL CRAWFORD  11/15/2022**

1      A.  She's with Census, and I believe she's the

2  director for their digital team.

3      **Q.  And Lynn Sokler?**

4      A.  Lynn Sokler is a counterpart of mine in

5  OADC who was working on this partnership with Census

6  along with myself.

7      **Q.  All right.  And then it says:**

8  **"Payton/Genelle.  As mentioned, here are two issues**

9  **we are seeing a great deal of misinfo on that we**

10 **wanted to flag for you all -- vaccine shedding and**

11 **microchips"; right?  You wrote that?**

12     A.  Yes.

13     **Q.  Can you tell us why you were flagging**

14 **misinformation about the vaccines for Facebook?**

15     A.  Because we had had conversations with

16 Facebook about ways that we could address

17 misinformation, and my recollection is that one

18 suggestion that was -- that came up in that

19 conversation was to let them know if we were seeing

20 major themes that CDC had scientific information on,

21 or had web content that would address.

22          I believe that is why I was sending these,

23 because these were two large areas of

24 misinformation.

25     **Q.  What did you mean by the term "flag" or**

**CAROL CRAWFORD  11/15/2022**

Page 88

```
 1   flagging?

 2         A.   Pointing out.

 3         Q.   What was the expectation of what Facebook

 4   would do when something was flagged?

 5         A.   I don't recall having a specific

 6   recollection of what I thought that they would do.

 7         I do know that the platforms have a

 8   variety of ways to address misinformation.  They

 9   might tag it as something that people should look

10   more into.  I think that they have the -- I think,

11   but I do not know, that they have the ability to

12   control how often some of these things show up in

13   peoples' feeds.  And I do know that removing them is

14   an option that they could consider.

15         So I didn't know exactly what they might

16   do with it, but I felt like it was worth pointing

17   out what we knew, that we had seen these myths and

18   that we were going to have information up soon.

19         Q.   All right.  And what was the consequence

20   to Facebook if they didn't do anything with your

21   flagging of these items?

22         A.   Nothing.

23         Q.   All right.  What were you hoping to

24   accomplish by flagging these items for Facebook?

25         A.   I mean, our goal always is to be sure that
```

**CAROL CRAWFORD  11/15/2022**

Page 89

```
1   people have credible health information so that they
2   can make the correct health decisions for
3   themselves.  There were a lot of things circulating
4   that were not accurate information about COVID.  And
5   so we were trying to point out and make the credible
6   information more available to users.
7        Q.  How did you decide on these particular
8   posts?
9        A.  I don't remember specifically this
10  conversation, or what made us decide.  But I do know
11  generally that these were two very high-volume
12  misconceptions online at the time about vaccines.
13       Q.  All right.  Do you recall whether you had
14  any criteria in determining which posts to flag?
15       A.  I don't recall that we had any criteria on
16  what we pointed out to Facebook other than it had to
17  be something that was in CDC's lane that we had
18  information for, you know, to offer about it, and
19  something that had been -- you know, was high
20  volume, that was worth pointing out to this entity.
21       Q.  Did you or anyone at CDC have concerns
22  about the government working with Facebook and
23  telling them what should be flagged or not?
24            MS. SNOW:  Objection.  Mischaracterizes
25  testimony, calls for speculation.
```

**CAROL CRAWFORD  11/15/2022**

**Page 90**

```
 1   BY MR. VECCHIONE:
 2        Q.   You can answer.
 3        A.   Can you rephrase the question again, or
 4   say it again?
 5        Q.   Yeah.  Did you or anyone at CDC have any
 6   concerns about CDC or the government flagging
 7   materials for Facebook when you knew they took some
 8   things down?
 9        A.   I can't speculate what others at CDC might
10   have thought about it.  Personally, because I didn't
11   believe we were asking them to remove content
12   specifically, I did think getting credible
13   information out was important.
14        Q.   Where did this information about
15   microchips and the shedding, what kind of
16   information did the Census team have on those posts
17   at that time?
18        A.   My recollection is that we were pointing
19   out to Facebook that there were these themes going
20   around pretty heavily, and these probably came from
21   the social listening tools, you know, that can
22   consolidate examples.  And we provided some examples
23   of what we meant.
24        Q.   Okay.  You can put that aside.
25        A.   Thank you.
```

**CAROL CRAWFORD  11/15/2022**

Page 91

```
 1              (Plaintiffs' Exhibit 10 marked.)

 2   BY MR. VECCHIONE:

 3       Q.  And, again, I'll give you a chance to read

 4   it, but if you could just identify the document and

 5   the subject line?

 6              MR. GILLIGAN:  The document being

 7   Exhibit 10?

 8              MR. VECCHIONE:  Exhibit 10.

 9       A.  It says:  Subject CV19 misinfo reporting

10   channel.  May 10, 2021.

11   BY MR. VECCHIONE:

12       Q.  All right.  What is -- I presume CV19 is

13   COVID-19?

14       A.  Yes.

15       Q.  "Misinfo" is misinformation?

16       A.  Yes.

17       Q.  All right.  What is the COVID-19

18   misinformation channel?

19       A.  Well, I don't think I -- just rereading

20   this email, I don't think I understood this at

21   first, what she was referring to.  I think I thought

22   that this was CrowdTangle, just by reading the

23   chain, but I now know what it was was Facebook

24   apparently has a portal or reporting channel where

25   you can report misinformation or threats or things
```

**CAROL CRAWFORD  11/15/2022**

Page 92

1  from a specific log-in that I believe they only

2  provide to like federal agencies.

3      Q.  All right.  And who used it at the CDC?

4      A.  To my recollection, the only person that

5  ever logged in at CDC was Brook Aspinall.

6      Q.  Who was that?

7      A.  She was part of our social media team.

8      Q.  For what?

9      A.  For COVID.

10     Q.  For what did she log on?

11     A.  Oh.  Why did she log on?

12     Q.  Yeah.

13     A.  My memory is that we log on one time to

14  see what it was -- what the system was and

15  understand what we could do in it.  And she logged

16  on one time, and I think reported two or three -- I

17  don't remember what they were -- two or three posts

18  or threats or one or the other.

19     Q.  All right.  Would you have a record of

20  what she put on there?

21     A.  I believe so.  But I only really remember

22  this from pulling documents at some point related to

23  this litigation earlier in the process.  I recall

24  there was an email that listed it, but I don't

25  remember what they said.  But I believe that there

**CAROL CRAWFORD  11/15/2022**

Page 93

1    is a record of it because I recall seeing it during

2    that process.

3         Q.  All right.

4              MR. VECCHIONE:  I would request that as

5    well, Counsel.  But I'll put it in writing.

6    BY MR. VECCHIONE:

7         Q.  Well, I'll just ask this question.  I

8    usually ask this question earlier, but I might as

9    well.  In preparation for your deposition today, did

10   you review any documents?

11        A.  No.  Well, we -- the only one I reviewed

12   happened to be one of the ones you had during our

13   practice.

14        Q.  Good.  All right.  That's fine.  Do you

15   know which one it was?

16             MS. SNOW:  Objection.

17        A.  Oh, sorry.

18             MS. SNOW:  To the extent this calls for --

19             MR. GILLIGAN:  Does call for.

20             MS. SNOW:  The question calls for

21   information that's covered by the attorney-client

22   privilege.  So I direct the witness not to answer.

23             MR. VECCHIONE:  No, it doesn't.  What

24   she's reviewed I'm allowed to know.  That's --

25             MR. GILLIGAN:  Not if it didn't refresh

**CAROL CRAWFORD  11/15/2022**

```
 1   her recollection.

 2           MS. SNOW:  Yeah.

 3           MR. VECCHIONE:  Doesn't matter.  She

 4   reviewed it.  I'm allowed to know it.

 5           MR. GILLIGAN:  No, you're not.

 6           MS. SNOW:  Not if it did not refresh her

 7   recollection about the facts.

 8           MR. VECCHIONE:  She's been shown the

 9   document today.  I'm allowed to know which one she

10   reviewed if she's been shown it today.

11           MS. SNOW:  You're asking about documents

12   that --

13           MR. VECCHIONE:  That she saw today.

14           MS. SNOW:  -- she reviewed in

15   preparation --

16           MR. VECCHIONE:  Yeah.

17           MS. SNOW:  -- for the deposition?

18           MR. VECCHIONE:  Yes.

19           MS. SNOW:  Yes, that is covered by

20   attorney-client.

21           MR. VECCHIONE:  She said she's been shown

22   it today.  There is no attorney-client privilege for

23   that.

24           MR. GILLIGAN:  I don't know that -- I

25   don't know that she said that she was shown it
```

**CAROL CRAWFORD  11/15/2022**

1   today.

2   BY MR. VECCHIONE:

3        Q.  **I'll ask.  Were you shown it today?**

4        A.  One of them, yes.

5            MR. GILLIGAN:  It's still --

6            MR. VECCHIONE:  It's an improper

7   objection, but it's not that important, so I'm going

8   to let it go for now.

9            MR. GILLIGAN:  All right.  Well, if you

10  care to raise the issue again later, we'll be happy

11  to discuss it later.

12  BY MR. VECCHIONE:

13       Q.  **All right.  So who's responsible for**

14  **creating this channel, this COVID-19 channel?**

15       A.  Well, I have a small recollection of this

16  channel, and I never looked at it myself to my

17  memory.  But it's, to my understanding, you log onto

18  Facebook as an administrator, and it's something

19  that they make available to you as a federal agency.

20       Q.  **Okay.  So Facebook made it?**

21       A.  Yeah.  It's like a place you can go and

22  report something.  I -- "channel" does feel like an

23  odd description of it to me.

24       Q.  **Okay.  How do you know that it was made**

25  **available to, like, law enforcement?  Do you know**

**CAROL CRAWFORD  11/15/2022**

Page 96

```
 1    that from this document, or do you know that from
 2    your own memory?
 3            MS. SNOW:  Objection.  Facts not in
 4    evidence.
 5            MR. VECCHIONE:  She testified to it a
 6    minute ago.
 7            MS. SNOW:  Okay.  Sorry.  My apologies.  I
 8    missed that.  Sorry.
 9    BY MR. VECCHIONE:
10        Q.  So how do you know that?  Like, why is
11    that your understanding?
12        A.  I guess I can't say I know that.  I have a
13    vague recollection of it being described to me as
14    something that other, like, official groups could
15    use to report, that it wasn't something that was
16    generally available.  But I might be wrong.
17        Q.  Okay.
18        A.  I don't know for sure.
19        Q.  That's fine.  Now, at the end of this
20    email there is a list of other email lists; right?
21    She says:  Thank you, Genelle.  And then she lists
22    some government people and some Census people and
23    CDC people and Reingold again.
24        A.  I see it.
25        Q.  So those -- and she asks you to confirm if
```

**CAROL CRAWFORD  11/15/2022**

Page 97

```
 1     the below emails are correct for onboarding to the
 2     reporting channel; right?
 3          A.  Yes.
 4          Q.  All right.  Are any of those people the
 5     Ms. Aspinall I think you told me before?
 6          A.  Those emails are so difficult, I don't
 7     know.  Perhaps it's ███ or ███ or ███, but I don't
 8     know peoples' user IDs, so I can't answer.
 9               I would also like to clarify that when I
10     was reviewing this based on this chain, I thought
11     this was about CrowdTangle access.
12          Q.  Okay.  At that time?
13          A.  At this -- yes, so.
14          Q.  You don't believe that now, but that's
15     what you thought when you received it?
16          A.  Yes.  I can see in this chain that that's
17     what I thought was happening with this.
18          Q.  All right.  Do you know how this list of
19     employees, whether you recognize them or not, do you
20     know how the people for access were selected,
21     like --
22               (REPORTER'S NOTE:  Loud audio noise heard
23               over loud speakers in room.)
24               (Comments off the record.)
25               MR. VECCHIONE:  Let's go off record.
```

**CAROL CRAWFORD  11/15/2022**

Page 98

```
1              THE VIDEOGRAPHER:  Off record at 11:51.
2              (Comments off the record.)
3              THE VIDEOGRAPHER:  Back on record at
4     11:53.
5     BY MR. VECCHIONE:
6         Q.  All right.  So the question is, the
7     question on the floor, before we were so rudely
8     interrupted, was how was this list of employees or
9     contractors selected?
10        A.  I don't know.  Maybe from a meeting
11    invite.  Maybe people that were on a meeting, but I
12    don't know.
13        Q.  Do you know whether there was any training
14    involved in using this COVID-19 misinformation
15    channel?
16        A.  I don't remember any training.  The email
17    looks like perhaps there was.
18        Q.  Do you know whether CDC employees or
19    contractors asked to flag or report certain kinds of
20    information to Facebook?
21        A.  Yes.  On occasion there were people saying
22    "we saw this."  Usually they were around threats
23    that they wanted us to report, which you can do as
24    an administrator for Facebook now.
25              In terms of this, I only remember the one
```

**CAROL CRAWFORD  11/15/2022**

1    occasion that I mentioned a minute ago.

2         **Q.  Was Facebook asked to flag certain types**

3    **of material to report to CDC or to Census?**

4              MS. SNOW:  Objection.  Vague.

5    BY MR. VECCHIONE:

6         **Q.  I mean, I have asked whether or not CDC**

7    **asked to flag things to Facebook, and you've**

8    **answered that question.  Did Facebook ask CDC to**

9    **flag things to them?**

10        A.  Well, the way I have been using "flag" in

11   these emails is to point out.

12        **Q.  Right.**

13        A.  I don't recall asking them to point

14   anything out to us, but I can maybe recall us saying

15   something are you seeing this too, are y'all

16   considering this too?

17        **Q.  Do you know whether or not we have any**

18   **documents that were given to CDC staff or**

19   **contractors regarding the training on this COVID-19**

20   **channel?**

21        A.  I don't recall.

22        **Q.  Okay.  Did the meeting -- I think it was**

23   **from May 18th.  Let me look at the document for a**

24   **second.**

25              Okay.  You had a meeting that she -- that

**CAROL CRAWFORD  11/15/2022**

Page 100

```
 1   Genelle Adrienne refers to on May 7, 2021, 11:27
 2   a.m.  "Hi, Carol following up from our meeting
 3   yesterday it looks like Monday May 17th at 12 will
 4   work for onboarding meeting."
 5            Do you know whether that onboarding
 6   meeting ever occurred for this channel?
 7       A.  I don't have any recollection of the
 8   onboarding meeting.
 9       Q.  And once again would you have a calendar
10   mark for that onboarding meeting, if it occurred?
11       A.  If I was invited I would.
12            MR. VECCHIONE:  And once again, I'll put
13   that in a letter to you, Counsel.
14            MS. SNOW:  We'll note that document
15   discovery has closed, but we'll take it under
16   advisement.
17            MR. VECCHIONE:  I got you.
18   BY MR. VECCHIONE:
19       Q.  And you can put Exhibit 10 aside.
20            Oh, you know, might need it for this, but
21   I don't know if you do.
22            The Reingold contractors.  Why did CDC
23   need contractors?  What were they doing?  Did they
24   have concern -- let me withdraw the question.
25            Why did CDC have the contractors, the
```

**CAROL CRAWFORD  11/15/2022**

1    Reingold contractors, involved in this?

2            MS. SNOW:  Objection.  Mischaracterizes

3    testimony.

4    BY MR. VECCHIONE:

5        Q.  Was it Census?

6            MS. SNOW:  Objection.  Vague.

7    BY MR. VECCHIONE:

8        Q.  Why were the Reingold contractors involved

9    in all this?

10       A.  They were contractors working with Census.

11       Q.  Okay.  Did you know why they were

12   contractors and not Census directly?

13       A.  No.

14       Q.  Do you know if their duties involve

15   content moderation?

16       A.  I don't.

17       Q.  Do you know whether their duties involve

18   flagging or reporting on certain kinds of opinions

19   expressed by U.S. citizens?

20           MS. SNOW:  Objection.  Vague, calls for

21   speculation.

22   BY MR. VECCHIONE:

23       Q.  You can answer.

24       A.  I really don't know.  I wouldn't know what

25   they had them do.

**CAROL CRAWFORD  11/15/2022**

```
 1            MR. VECCHIONE:  All right.  That's it for
 2   10.  I could go on to 11, and or we could break here
 3   and fix the sound.  You go -- you could have lunch.
 4   Decide what the witness --
 5            MR. GILLIGAN:  It's up to the witness to
 6   break.
 7            THE WITNESS:  Let's break.  Let's break.
 8            MR. VECCHIONE:  There you go.
 9            THE VIDEOGRAPHER:  Off record at 11:59.
10            (Lunch recess 11:59 a.m. - 12:51 p.m.)
11            THE VIDEOGRAPHER:  Back on record at
12   12:51.
13            MS. SNOW:  And, defense counsel, just like
14   to note that we've reestablished the Zoom connection
15   and shared a call-in phone number again, which is
16   being forwarded to plaintiffs' counsel pursuant to
17   the previous agreement that it not be shared, the
18   Zoom link not be shared beyond plaintiffs' counsel
19   or the Zoom, or the call recorded using the Zoom
20   call-in number.
21            MR. VECCHIONE:  That's fine.
22            (Plaintiffs' Exhibit 11 marked.)
23   BY MR. VECCHIONE:
24        Q.  All right.  Ms. Crawford, I have handed
25   you -- once again can you identify Exhibit 11 and
```

**CAROL CRAWFORD  11/15/2022**

Page 103

1    then tell me what the subject matter of the -- what

2    the subject line is, and then you can continue to

3    read it.

4         A.  Agenda item for CDC call this week.

5    May 20th, '21.

6         Okay.

7         Q.  Can you tell me who Liz Lagone is?

8         A.  My understanding is that Liz is on their

9    Trust and Safety team, or the Misinformation team,

10   which I don't know what the official name of it is.

11        Q.  Meaning Facebook's?

12        A.  Yes, Facebook's.  Sorry.

13        Q.  And in these emails Ms. Lagone identified

14   the, quote, "Content Policies" of Facebook as

15   guiding which posts get removed; right?

16        A.  It says "we may reduce, remove or inform."

17        Q.  And I think she describes these policies

18   as evolving?

19        A.  Yes, I see that.

20        Q.  Okay.  Did you or anyone at the CDC

21   participate in the crafting of the content policy of

22   Facebook?

23        A.  No.

24        Q.  Did you or anyone at CDC contribute to the

25   terms of service or community standards of Facebook?

**CAROL CRAWFORD  11/15/2022**

```
 1        A.   No.
 2        Q.   Any other policy at Facebook that they
 3   contributed to?
 4        A.   No.
 5        Q.   Did you do so at any other social media
 6   company?
 7        A.   No.
 8        Q.   Did you or anyone at CDC ever give input
 9   on what such a policy should look like?
10        A.   No.
11        Q.   Did you, or --
12        A.   I should clarify.
13        Q.   Go ahead.
14        A.   I'm speaking from my -- no one in my group
15   or my office.  I can't imagine anyone else did.
16        Q.   To your knowledge?
17        A.   Yes, yes.
18        Q.   You're only testifying to your knowledge.
19   I understand that.
20        A.   Yes.
21        Q.   Thank you.
22             Did you or anyone at the CDC either advise
23   or help Facebook on how to enforce or apply their
24   policies to any particular social media post?
25        A.   Not that I recall.
```

**CAROL CRAWFORD  11/15/2022**

```
 1        Q.   Same question for other social media.  Did
 2   you ever -- did you or anyone at CDC help any other
 3   social media company on how they should apply their
 4   policies to -- toward a particular post?
 5        A.   No.  We didn't -- I have never seen their
 6   policies.
 7        Q.   Did you or anyone at CDC ever discuss with
 8   Ms. Lagone any manner relating to any enforcement of
 9   the policies that she's discussing here?
10             MS. SNOW:  Objection.  Vague.
11   BY MR. VECCHIONE:
12        Q.   Well, she's discussing these policies
13   here.  Did you ever discuss with her their
14   development and enforcement?
15        A.   No.  We did not discuss the development of
16   their policies, or the enforcement of their
17   policies.  What we did provide was scientific
18   information that I did assume that they might use to
19   do those things.
20        Q.   Okay.  I'd like you to take a look at one
21   of -- she -- Payton Iheme lays out a number of items
22   that I think she says at May 19th, 4:19:  To help
23   with scoping on your end for Thursday, here's some
24   of the COVID content items that Liz will be flagging
25   for you the CDC team.
```

**CAROL CRAWFORD  11/15/2022**

Page 106

1          And here she seems to be flagging items

2    for you at CDC.  And then she goes through them.

3    And what did you do when they flagged some of these

4    to you?  What -- why was she flagging those to you,

5    and then what did you do in response?

6          MS. SNOW:  Objection.  Compound.

7    BY MR. VECCHIONE:

8          Q.  You can answer.

9          A.  So why were they flagging this to us?

10   First part.  They were wanting our feedback on

11   whether these things were true or false statements

12   that they were seeing.  Did the CDC have science

13   around this, did we have content on our website.

14          Can you refresh me on the second part of

15   the question?

16          Q.  And what did you do in response to the

17   flagging?

18          A.  Typically what we would do is try to

19   let -- if we knew, if we had something or we had

20   science on these items, we would point to it or

21   provide them an answer.  If we didn't, we wouldn't

22   provide it.

23          My recollection, this might have been one

24   of the first times they asked in this type of

25   format.  And I think we talked about that on the

**CAROL CRAWFORD  11/15/2022**

Page 107

1   call, like, who knew -- some of these people, I

2   thought, could help answer whether -- what we had on

3   these topics.

4        Q.  All right.  And you had -- and let's,

5   since you just pointed out, we'll just say --

6        A.  Mm-hmm (affirmative).

7        Q.  -- your response was:  Thanks for the

8   additional info.  And then you say you're going to

9   have these folks joining.

10           And you've got the Census team members

11   joining this.  Cynthia Jorgensen, director of Comms

12   for NCIRD.  What's that?

13       A.  National Center for Immunization and

14   Respiratory Diseases at CDC.

15       Q.  "And our joint information center

16   co-lead."  So is she that as well?  She's the joint

17   information center co-lead, or is that a different

18   person?

19       A.  She was serving both roles.  She -- we

20   deployed to the response, and she was -- at this

21   point in time was deployed as the co-lead for the

22   joint information center, but her regular job is the

23   ADCS.  So she had a lot of knowledge regarding this

24   topic.

25       Q.  And then you've got Rosie

**CAROL CRAWFORD  11/15/2022**

Page 108

```
1     Bretthauer-Mueller and Demi Haynes.  And they are
2     co-leads for consumer vaccine content development.
3              Is that content development on your
4     website at CDC?
5         A.  Yes.
6         Q.  Okay.  And they say:  "I'm not going to
7     have SME join."
8              Is that subject matter experts?
9         A.  Yes.
10        Q.  What are those?
11        A.  That would have been like an actual
12    scientist that studied these issues, or knew what
13    the science was on it.  When I -- I believe when I
14    scanned this I thought we probably had readily
15    answered -- we probably had a lot of this already
16    addressed on the website, and the content folks
17    would be able to point that out.  We didn't have to
18    have the expert on the call.
19        Q.  I have -- if you look at 11.
20        A.  Mm-hmm (affirmative).
21        Q.  "Is the claim 'COVID-19 manmade' false,
22    unproven, unsupported by evidence, or true?"
23              Do you know whether or not CDC ever
24    responded to that inquiry?
25        A.  I don't know for sure, but I doubt we
```

**CAROL CRAWFORD  11/15/2022**

```
 1    would have.
 2           Q.   And why do you think that?
 3           A.   I don't recall us having any information
 4    on this posted on our website.  I know it came up a
 5    lot, but I don't remember us having it like an FAQ
 6    on it.
 7           Q.   All right.
 8           A.   But I'm not an expert on all the content
 9    we had on the web.  I don't develop the content.
10           Q.   I understand.
11           A.   Okay.
12           Q.   I'm just -- I appreciate the information
13    and why you thought it.
14                I have a -- so this -- Census is now in.
15    Is this after the IAA you mentioned to me yesterday?
16    Earlier today.  It's not yesterday yet.  Before
17    lunch?
18           A.   Yes.
19           Q.   Okay.  So what is the -- what's your
20    understanding of what an interagency memo is, or an
21    interagency agreement is?
22           A.   I'm definitely not an expert on IAAs.  But
23    it's an agreement between two agencies to conduct
24    some kind of work between them.  Sometimes you're
25    given fundings to do it.  Usually you are.  I
```

**CAROL CRAWFORD  11/15/2022**

1   don't -- I wasn't -- I didn't create the IAA, so I

2   don't have a lot of details on what was in it.

3           **Q.  Have you seen it?**

4           A.  I do believe I saw it.

5           **Q.  Is it related just to COVID, or is it**

6   **broader than that?**

7               MS. SNOW:  Objection.  Assumes facts not

8   in evidence.

9   BY MR. VECCHIONE:

10          **Q.  Okay.  Is it related to COVID?**

11          A.  I cannot say for sure what was stated in

12  the IAA, but we were only engaging on COVID

13  misinformation.  But we were learning about how they

14  operated a general misinformation team along the way

15  to --

16          **Q.  How Census did?**

17          A.  How Census did it, yes.

18          **Q.  And did you -- was part of the IAA --**

19  **well, I'll ask it in two parts first.  Was part**

20  **of -- was the purpose of the IAA so that CDC could**

21  **learn what they did and perhaps replicate it?**

22          A.  Was that the purpose of the IAA?  No, I

23  wouldn't say it.  I think that we were learning from

24  it to determine if we needed to do it.  I really

25  don't recall the wording in the IAA.

**CAROL CRAWFORD  11/15/2022**

```
 1        Q.  Okay.  What was your understanding of what
 2   the AII was about?
 3        A.  To let us partner with the Census to learn
 4   how they handled misinformation and help us with the
 5   COVID misinformation.  We were shorthanded.  They
 6   seemed to have more knowledge than we did.
 7        Q.  All right.  And do you know if the IAA is
 8   still in place?
 9        A.  Well, we haven't been working with Census
10   in quite some time.  I don't know the actual date on
11   the end of the IAA, though.
12        Q.  All right.  If you look at item eight of
13   the items flagged:  "COVID-19 vaccine cause bell's
14   palsy."  Do you see that?
15        A.  Yes.
16        Q.  Do you know whether you gave any input on
17   that question?
18        A.  I don't recall.
19        Q.  And how about item number nine:  "COVID-19
20   has 99.96% survival rate"?
21        A.  I don't remember what we said about that
22   one.
23        Q.  All right.
24        MR. VECCHIONE:  I will hand over these all
25   at once because I'm going to ask the same question
```

**CAROL CRAWFORD  11/15/2022**

Page 112

```
 1    about them.
 2              MR. GILLIGAN:  31?
 3              MR. VECCHIONE:  12.  No, no, no, 12
 4    through 14, how about that?
 5              (Plaintiffs' Exhibit 12 and Exhibit 13
 6              marked.)
 7    BY MR. VECCHIONE:
 8         Q.  And you don't have to read through these.
 9    You can just look at them all at once.  I'll let
10    counsel look at them for a second, and then I'll ask
11    the question.
12              Now, I'll just represent to you what these
13    are, unless you can tell me you've seen them before.
14         A.  I haven't seen them before.
15         Q.  All right.  So Exhibit 12 is a scientific
16    paper on the relationship between Bell's palsy and
17    SARS CoV-2, as is 13.
18              Do you know whether or not in relationship
19    to Exhibit 11 and Bell's palsy, that whether or not
20    any of these scientific articles or others on Bell's
21    palsy were flagged by CDC to Facebook?
22              MS. SNOW:  Objection.  Calls for
23    speculation.  Lack of foundation.
24    BY MR. VECCHIONE:
25         Q.  You can answer, if you know.
```

**CAROL CRAWFORD  11/15/2022**

Page 113

```
 1        A.  I wouldn't know.  I mean, I didn't flag
 2   them.
 3             (Plaintiffs' Exhibit 14 marked.)
 4   BY MR. VECCHIONE:
 5        Q.  Okay.  And then on 14, Plaintiffs'
 6   Exhibit 14, have you seen this before?
 7        A.  No.
 8        Q.  And this is another scientific paper on
 9   the percentage survival rate of COVID patients.
10             Do you know whether this was flagged by
11   CDC to Facebook or other social media?
12        A.  We didn't flag this, or specific things.
13   We provided CDC content.
14        Q.  All right.  And that means things that
15   either CDC had on its website, or it knew
16   internally?
17        A.  I think primarily it was things that were
18   on CDC's site, but I can't say that for sure.  I did
19   not, not -- none of the communicators answered the
20   questions directly.
21        Q.  Okay.
22        A.  Unless we had it on our website.
23        Q.  So what you do is would you refer them to
24   subject matter experts?
25        A.  Those questions would -- if they were on
```

**CAROL CRAWFORD  11/15/2022**

1    an email, they would go, you know, we would -- I

2    didn't.

3         **Q.  Right.**

4         A.  People in the response would ask the SMEs

5    about them.  That's my understanding of what

6    happened when they were circulated.

7         **Q.  So I'm trying to get the trail of how they**

8    **get -- how Facebook or the other social media get**

9    **information.  You're the contact point oftentimes.**

10   **They send you things like this?**

11        A.  Mm-hmm (affirmative).

12        **Q.  Then somebody -- and we've already**

13   **determined, you're not -- you don't do science,**

14   **you're a communicator, right?  And a tech person?**

15   **So where do you send this material to get those**

16   **answers if it's not on the website?  Because you've**

17   **told me if it's on the website we just send it over**

18   **to them.**

19        A.  I didn't even always check to see if it

20   was on the website myself or in my office.  I would

21   let the communicator that was assigned to whatever

22   the area was.  For instance, Rosie on the Exhibit 11

23   was working with this area, and she would have the

24   contacts with the experts.

25        **Q.  Okay.**

**CAROL CRAWFORD  11/15/2022**

```
 1        A.  I don't know what they -- how they got the
 2   answers back in every instance.
 3        Q.  Because you weren't always the person to
 4   send the answer back?
 5        A.  I sent the answers back, but I didn't
 6   collect them.  Usually they required multiple
 7   experts.
 8        Q.  Okay.  All right.  And in Exhibit 11
 9   again -- you can put 12 to 14 aside.  Do you know if
10   Cynthia Jorgensen and Rosie Bretthauer-Mueller and
11   Demi Haynes joined the meeting, as indicated?
12             MS. SNOW:  Objection.  Vague.
13             MR. VECCHIONE:  They're the people she's
14   going to bring in for the meeting.
15        A.  I think they probably did.  I don't know
16   if all three of them did.
17   BY MR. VECCHIONE:
18        Q.  And what is -- do you know what the role
19   is of a co-lead for consumer vaccine content
20   development is?
21        A.  She would help write all the materials on
22   vaccines that were on the website, or in a fact
23   sheet.
24        Q.  And do you recall this meeting taking
25   place?
```

**CAROL CRAWFORD  11/15/2022**

Page 116

1       A.   I don't recall the specific meeting.  I do

2   recall meetings such as -- like this.  I mean, maybe

3   it's this one I have in my mind.  I don't know for

4   sure.

5       **Q.   Well, if it's -- what was discussed at the**

6   **meeting, to the best of your recollection?**

7       A.   Sometimes in these meetings they would ask

8   do we know if this is true or false, which is what

9   they were doing.  And then if we knew, the

10  communicators knew the answer, we would provide it.

11  If not, I would say, we would say, I'll have to get

12  back to you later, we'll talk to our SMEs.

13          And then that's why I was referring to not

14  going to have an SME going, but we can go back to

15  the group after the meeting if needed was the gist.

16      **Q.   Do you have notes or other records of what**

17  **was said on the call?**

18      A.   I didn't take notes.  I don't believe

19  notes were taken.

20      **Q.   But once again, on a calendar you might**

21  **have that calendared?**

22      A.   I would have -- the appointment would be

23  there, but it wouldn't necessarily say if Cynthia

24  joined or not.  She would have been invited.

25      **Q.   All right.  And we discussed earlier today**

**CAROL CRAWFORD  11/15/2022**

Page 117

```
 1    your conversations with at least Facebook, but some
 2    social media on misinformation.  And you said it was
 3    on -- I think you said it was on a general level,
 4    you couldn't remember anything specific.
 5              After looking at these documents, has
 6    anything changed in your response?  Do you remember
 7    any specific misinformation you discussed with the
 8    social media organizations around here, around 2021?
 9        A.  I mean, I remember seeing this list before
10    now that you've showed it, but I don't remember what
11    we sent back, or what we said on the phone
12    specifically about each of these items.
13        Q.  And did you -- did CDC -- when I say "you"
14    here I mean you or anyone you know at CDC.
15        A.  Mm-hmm (affirmative).
16        Q.  Ever monitor whether Facebook or other
17    social media company took down material that you
18    have indicated was false?
19        A.  I do think that Census was at least
20    periodically checking on things that they had
21    flagged, or they had seen come up.
22        Q.  Okay.  Thank you.  And why do you believe
23    that?
24        A.  Because I have vague recollections of them
25    mentioning it or asking it in the meetings, and I
```

**CAROL CRAWFORD  11/15/2022**

Page 118

```
 1   believe that was in one of these exhibits.
 2        Q.  Got it.  That you reviewed during this
 3   deposition, or before?
 4        A.  In this one.
 5        Q.  Okay.  You can put Exhibit 11 aside.
 6        A.  Okay.
 7            (Plaintiffs' Exhibit 15 marked.)
 8   BY MR. VECCHIONE:
 9        Q.  And let's go to Exhibit 15.
10            MR. GILLIGAN:  Just a moment, Counsel,
11   before you ask your next question.
12            (REPORTER'S NOTE:  Mr. Gilligan conferring
13       with witness.)
14            MR. VECCHIONE:  The witness has conferred
15   with counsel.
16   BY MR. VECCHIONE:
17        Q.  And, again, I'd just ask you to identify
18   it by the subject of the re:  line and the date, and
19   then continue reviewing it.
20            MR. GILLIGAN:  Referring to Exhibit 15?
21   BY MR. VECCHIONE:
22        Q.  Referring to Exhibit 15.
23        A.  "It was this list, sorry.  Agenda item for
24   CDC call this week."  It was June 2nd, 2021.
25        Q.  Now, please take a look.
```

**CAROL CRAWFORD  11/15/2022**

Page 119

```
 1        A.   Okay.
 2        Q.   All right.  Now, I think the end of this
 3   email is pretty much the same as the one that was
 4   Exhibit 14; right?
 5        A.   It is.
 6        Q.   So let's just start with the email that's
 7   from Liz Lagone to you on May 24 at 1:57 p.m., and
 8   she ccs Carrie Adams at Facebook, it looks like,
 9   from the email.  Who's Carrie Adams?
10        A.   She was part of Liz -- of Payton's team,
11   now Carrie is my main point of contact at Facebook,
12   Payton has since left.
13        Q.   And can you tell me -- so she says on this
14   email:  "Thanks so much again for you and team's
15   help in debunking a few COVID-19 and vaccine
16   misinformation claims for us.  As a followup to our
17   meeting, please see the list of claims below with
18   notes from our conversation last Thursday morning."
19             So if this is Monday May 24th, is it fair
20   to say that the meeting was Thursday May 20th, if
21   that's the Thursday of the previous week?
22        A.   It appears that way to me too.
23        Q.   Okay.  So do you recall who met at that
24   meeting, and where it was?
25        A.   Well, as we were discussing on the other
```

**CAROL CRAWFORD  11/15/2022**

Page 120

```
 1    exhibit, it was a phone conference, and I think that
 2    Cynthia and Rosie and Demi may have attended.  I
 3    can't say for sure all three of them attended, but I
 4    know that they were at least two of them were
 5    probably on the line.
 6         Q.  All right.  And she's listed a number of
 7    those items that we saw before that they had
 8    questions about.  And the first one that she lists,
 9    although it's not in the same order, she sent it to
10    you earlier; right?
11         A.  It does appear in a different order, yes.
12         Q.  But, she says:  "Is the claim, quote,
13    'COVID-19 is manmade' false, unproven, unsupported
14    by evidence or true?"  And the answer's:
15    Inclusive [sic] -- inconclusive; right?
16              And then she also goes on to say:  It's
17    probably from animals jumping to humans.
18              And my question here is she says:  The CDC
19    director in her testimony yesterday said being
20    manmade was technically possible because we did not
21    know the origin still.
22              And was that the CDC dir- --  I think I
23    saw Walensky in this email beforehand.  Is that your
24    understanding of who that is?
25         A.  In May that would be Walensky.
```

**CAROL CRAWFORD  11/15/2022**

Page 121

```
 1          Q.   Okay.  Now, why is Liz Lagone sending this
 2     email to you about -- why is she sending this email
 3     to you to confirm the conclusions below about the
 4     COVID vaccine?
 5               MS. SNOW:  Objection.  Calls for
 6     speculation.
 7     BY MR. VECCHIONE:
 8          Q.   You can answer.
 9          A.   I don't know why Liz specifically sent it
10     for sure.  But I -- because I just mentioned -- when
11     we were talking about the other exhibit -- that we
12     were communicators and not experts, there were
13     probably -- I'm sure we were saying we're pretty
14     sure this is correct.  We might have to go back and
15     check on stuff.  And I think she was trying to give
16     us something to go and follow up.
17               And I can see I said let's -- I'd like to
18     note that we have no scientific experts on the call
19     so these are our thoughts, but we'll definitely
20     check on this on our end.
21          Q.   Okay.  So you didn't -- but you didn't
22     respond that she had misheard anything on the
23     conversation; right?  You just said you needed to
24     check with scientists; right?
25          A.   Correct.  That's what I said in the email.
```

**CAROL CRAWFORD  11/15/2022**

Page 122

1      Q.  Okay.  And then I will just to -- later on
2  the COVID-19 vaccine causes various things, these
3  things had been proposed:  Alzheimer's, Prion's,
4  cytokine storm.  And you respond inconclusive.  We
5  don't know right now; right?  You just didn't have
6  anything at hand?
7      A.  That appears to be what we said on the
8  call, and that Liz, in theory, wrote down what we
9  said correctly.
10      Q.  Right.
11      A.  That's not clear from this chain.
12      Q.  And then --
13      A.  But how I'm interpreting it.
14      Q.  And then once again the survival rate,
15  they say it's inconclusive but it's a hard number to
16  prove, and -- correct, that's what she says?
17      A.  "Not able to debunk now, inconclusive.
18  Scientists would be hesitant to attach a correct
19  number to the survival rates," so.
20      Q.  Okay.  Yes.  And then it says "Note, this
21  claim is tied to the VAERS issue."
22          What's VAERS?
23      A.  VAERS is a Vaccine Adverse Events
24  Reporting system.
25      Q.  And is it your understanding that doctors

**CAROL CRAWFORD  11/15/2022**

Page 123

```
 1    around the country report adverse events for
 2    patients as a matter of course?
 3              MS. SNOW:  Objection.  Calls for
 4    speculation.
 5         A.  I'm not an expert on the system.
 6    BY MR. VECCHIONE:
 7         Q.  But the system, who puts the information
 8    there, do you know?
 9         A.  I actually believe anyone is able to
10    report an adverse event.  It doesn't have to only be
11    physicians.  It can be any of us that wanted to.
12         Q.  Okay.
13         A.  I believe.
14         Q.  Right.  And so it could be someone who
15    doesn't know whether it's connected to the vaccine,
16    or someone else?
17         A.  I think any kind of -- any kind of thing
18    can be reported.
19         Q.  Okay.  In this email do you know who the
20    science experts, the subject matter experts you
21    mention in your email, do you know who they were, or
22    who you checked with?
23         A.  No.  Because people deployed in and out of
24    the response, and I was not usually the person
25    asking the SMEs directly.  It was the communicators
```

**CAROL CRAWFORD  11/15/2022**

Page 124

```
 1   assigned to the topic group such as Rosie who was
 2   the communicator for vaccines.  She was talking to
 3   the SMEs.
 4        Q.  All right.  And then would she talk --
 5   could she talk directly to Facebook or the other
 6   social media after that?
 7        A.  Almost always she'd send back to me, and I
 8   would consolidate responses and send them back.
 9   Sometimes if I was out, Rosie would respond directly
10   with a copy to me or something.  I don't know that
11   that happened ever, but it might have.
12        Q.  All right.  Now, on May 24 at 1:57 she
13   does thank you for your and your team's help in
14   debunking a few COVID-19 and vaccine misinformation
15   claims; correct?
16        A.  Where do you see the thank you?
17        Q.  On May 24th, 2021 at 1:57.  The Bates
18   stamp at the bottom ends in 539.
19        A.  Sorry.  I'm on the wrong --
20        Q.  Yeah.
21        A.  Yeah, she does say that.  But then I note
22   that we haven't had scientific experts review this
23   yet right after she sent that to clarify.
24        Q.  All right.  But you were going to check
25   with them so that it could be debunked; correct?
```

**CAROL CRAWFORD  11/15/2022**

Page 125

```
1         A.   Correct.  If it was supposed to be
2    debunked.
3         Q.   If it --
4         A.   Yes.
5         Q.   Yes, if it was.  I thought -- I'm not
6    seeing it now.  One second.
7              Ah, here it is on the very first page of
8    Exhibit 15.  Liz Lagone refers to a Sam.  "Also I
9    meant to ask in my email earlier but I recall it was
10   either you or Sam mentioning that you could share a
11   transcript."  Who's Sam?
12        A.   I assume that was Sam with the Census
13   team.
14        Q.   Got it.  And have we talked about him
15   before?  Is he --
16        A.   We mentioned that he was one of the Census
17   folks.  I didn't remember his name until the
18   exhibits, but yes.
19        Q.   And do you know if the transcript of
20   Dr. Walensky was just her testimony to Congress, or
21   something else?
22        A.   In re-reading this, my recollection is is
23   that they asked about this, and several of us said I
24   think we heard her address this in the press event,
25   or maybe it was the testimony.  I'm not sure.  I
```

**CAROL CRAWFORD  11/15/2022**

Page 126

```
 1    guess it was the testimony because I was looking for

 2    the transcript, and we mentioned it.  And we were

 3    looking for it because that was the only thing that

 4    we knew of that might exist to help them with their

 5    question.

 6            MR. VECCHIONE:  All right.  You can put

 7    that aside.

 8            (Plaintiffs' Exhibit 16 marked.)

 9    BY MR. VECCHIONE:

10        Q.  And once again if you could just tell me

11    the subject line and the date, and then --

12            MS. SNOW:  And this is Exhibit 16?

13    BY MR. VECCHIONE:

14        Q.  Exhibit 16.

15        A.  "It was this list, sorry.  Agenda item for

16    the CDC call this week."  June 3rd.

17        Q.  Okay.  Now, let's go to the back again.

18    And Liz Lagone writes to you on June 1st, 2021,

19    8:49 p.m.:  "Hi, Carol, I hope you're well and had a

20    restful long weekend.  I want to follow up on my

21    below email and see if you needed any further

22    information or context about COVID-19 vaccine claims

23    below.  We'd love CDC's help in debunking."

24            And the next one from June 2nd, 2021 at

25    6:58, that's from you; right?
```

**CAROL CRAWFORD  11/15/2022**

Page 127

```
 1          A.   Yes.
 2          Q.   And that's to Liz Lagone; right?
 3          A.   Yes.
 4          Q.   And what -- could you read what you say to
 5     her?
 6          A.   "Notes below on some.  I hope this helps.
 7     I will let you know when we have cleared points."
 8          Q.   And then stop there.
 9          A.   Okay.
10          Q.   Then "COVID-19 vaccines causing
11     magnetism."  And, surprisingly, "debunked."
12               Then you'll say "will have cleared TP
13     soon."  What's TP?
14          A.   Talking point.
15          Q.   How does a talking point get cleared?
16     Well, I'll withdraw that.  What is a talking point?
17          A.   Usually it's a bullet or a paragraph on
18     whatever the subject is that one could refer to.
19          Q.   And how does it get cleared?  What's the
20     process?
21          A.   I mean, I'm not sure why I was looking for
22     TP instead of web content.  I don't know if that was
23     just a mistype or not, but -- or maybe -- maybe it
24     was going to be a talking point.  But usually any
25     content that's going outside of the agency goes
```

**CAROL CRAWFORD  11/15/2022**

Page 128

```
 1   through a very specific clearance process.  There
 2   was a clearance process for COVID.  I wasn't -- I
 3   rarely cleared things myself, but there -- many
 4   people have to sign off on content before it leaves
 5   the Agency.
 6        Q.  Got it.  And I'll just notice -- I'll just
 7   point out that the bottom about the COVID-19
 8   vaccines causing erectile dysfunction, again, you
 9   say "will have a cleared TP soon"; right?
10        A.  Yeah.  I believe thinking more about why I
11   said TP, we often provide media with talking points
12   when they ask questions.  And that was -- we were
13   also looking at things that we were providing to
14   media in addition to web content because that was
15   similar, there were similar questions coming.  So
16   perhaps that's why this says TP instead of web
17   content.
18        Q.  All right.
19        A.  I can't say for 100 percent sure, but I
20   think that might be likely.
21        Q.  And you use web content in other -- in
22   other of these points.  So my question there is with
23   respect to items 3, 4 and 6, which, I think if you
24   look at it, that's what they are.
25        A.  Mm-hmm (affirmative).
```

**CAROL CRAWFORD  11/15/2022**

**Page 129**

```
 1        Q.   What does it mean that, quote, "web
 2   content to debunk is in clearance"?
 3        A.   Well, I think what we were referring to is
 4   posting a more specific kind of FAQ or myth.  We had
 5   a myths page where we would more directly address
 6   the myth.  You know, sometimes answers to things
 7   were buried in guidance or scientific papers, and we
 8   were trying to make it easier for people to
 9   understand the myths.  So I think this is in
10   reference to adding a myth or an FAQ to the site.
11        Q.   All right.  And then you said -- well, my
12   next question:  So what does CDC do to debunk the
13   claims that -- I'll make it more specific here.
14   What did CDC do to debunk each of these claims?
15   What process does it go through to debunk them?
16        A.   I can't -- I can't answer what the --
17   because that's a scientific process that I'm not
18   part of.
19        Q.   Okay.  So they give these questions to
20   you, and you send it out to a scientist or a subject
21   matter expert, let's call them.
22        A.   Mm-hmm (affirmative).
23        Q.   I take it -- I take it from the responses
24   there is a number of different CDC answers.  One is
25   inconclusive.  You say that a number of times.  They
```

**CAROL CRAWFORD  11/15/2022**

 1    didn't have the information at that time, is that

 2    fair?

 3         A.   That's my assumption of what was meant by

 4    that.

 5         Q.   Okay.  And sometimes they'd say

 6    inconclusive, but give here's what we know now?

 7         A.   Mm-hmm (affirmative).

 8         Q.   And then in other times it's just

 9    debunked.

10              What did you get from the subject matter

11    experts when they send that back?  Did they just

12    send back "debunked," or do they have some reference

13    or explanatory note?

14         A.   On -- I think it varied.  For this one I'm

15    not sure.  I don't remember if I saw all the

16    explanations, or if they were discussed in meetings

17    with the experts.  I've seen some that seemed to

18    have a little more description when I have asked it,

19    but -- or well, maybe when I was asking the SME they

20    might have given me, but I was really the one

21    discussing it directly with the SME.

22         Q.   Now you've also described already some

23    things they'd already done and put on your website?

24         A.   Yes.

25         Q.   All right.  So do you know if CDC

**CAROL CRAWFORD  11/15/2022**

Page 131

1    conducted any experiment or processes to debunk any

2    of these items?

3        A.  I wouldn't know.

4        Q.  Do you know whether they did surveys of

5    the medical literature of the vaccines?

6            MS. SNOW:  Objection.  Vague.

7    BY MR. VECCHIONE:

8        Q.  In order to debunk claims do you know

9    whether they checked medical literature, or what

10   they reviewed?

11       A.  I wasn't part of the scientific process,

12   so I wouldn't even want to speculate.

13       Q.  So I think if you look at Exhibit 15.

14       A.  Yes.

15       Q.  Do you have it?  If you go to the

16   second-to-last page it's where they start.  And

17   Payton Iheme sends you this list of a number of

18   claims.  And the date of that is May 19th; right?

19       A.  Yes.

20       Q.  And then if you look at 16 by June 3rd at

21   2021, 2:57 you write about the last ones that you

22   hadn't told her about:  "Yes, they are debunked and

23   we will also have content on it soon"; correct?

24       A.  I see that, yes.

25       Q.  All right.  So that is about two weeks'

**CAROL CRAWFORD  11/15/2022**

Page 132

```
 1    time to debunk these claims that?

 2         A.  That seems like the dates, yes.

 3         Q.  So given that short time frame, would you

 4    agree with me that CDC didn't do any experiment to

 5    debunk these proposals?

 6              MS. SNOW:  Objection.  Mischaracterizes

 7    the documents and the testimony.

 8         A.  I feel like it took us two weeks to

 9    respond back to Facebook.  I don't think it was fair

10    to characterize it as the time it took CDC to

11    potentially collect science on this.

12    BY MR. VECCHIONE:

13         Q.  Thank you.  Do you know who -- when you

14    give your initial proposals to Facebook, when --

15    like the discussions we saw earlier where you said

16    those were our discussions but we have to check with

17    the subject matter experts, who in that

18    conversation, when you're meeting with them, who

19    makes those proposals?  Is that you, or is that one

20    of the co-chairs we mentioned?

21              MS. SNOW:  Objection.  Vague.

22         A.  What do you mean by proposals?

23    BY MR. VECCHIONE:

24         Q.  Well, they put together these matters to

25    be debunked; right?  And we saw -- and you can put
```

**CAROL CRAWFORD  11/15/2022**

**Page 133**

```
 1    15 next to 16.  And if you look at 15, as we
 2    discussed earlier, Liz Lagone sends you:  This is
 3    the conversation we had.  It's kind of --
 4              MR. GILLIGAN:  Which page?
 5              MR. VECCHIONE:  Page -- on page 15 [sic],
 6    second page.
 7              MR. GILLIGAN:  Thank you.
 8              MR. VECCHIONE:  Exhibit 15.
 9    BY MR. VECCHIONE:
10        Q.  So she says, and we've discussed this
11    before:  "Please confirm the conclusions I have
12    noted below based on our discussion."
13              So you had a discussion and she got these
14    impressions.  But who gave her these impressions?
15    In other words, who was the person in the room who
16    could say, nah, I don't think that's right, but
17    we'll get back to you with the subject matter
18    expert?
19        A.  I don't remember this call specifically in
20    any kind of detail, but I do believe it was one of
21    the first times they had sent us a list, and I think
22    that Cynthia and Rosie or Demi, who had a lot more
23    knowledge of the content, piped in mostly on what
24    they thought was available.
25        Q.  Okay.
```

**CAROL CRAWFORD  11/15/2022**

Page 134

```
1          A.  But I believe we characterized it during
2     the call that we would need the expert, and I
3     followed up that way at the end.
4          Q.  In the subsequent emails?
5          A.  Yes.
6          Q.  And then -- so then finally there is at
7     the end:  "Yes, these are debunked" --
8          A.  Mm-hmm (affirmative).
9          Q.  -- and you'll "have content on it soon."
10         And that content, is that talking points,
11    or is that web content when you use that term?
12         A.  When I use what term?
13         Q.  Content.
14         A.  Web content, it could have been a FAQ on
15    the web, it could have been a myth, it could have
16    been a fact sheet on the web.  Anything on the
17    web --
18         Q.  All right.
19         A.  -- that was for consumers.
20         Q.  But you considered that debunked by the
21    CDC by June 3rd, 2021?
22         MS. SNOW:  Objection.  Vague.
23    BY MR. VECCHIONE:
24         Q.  Well, she says:  "Yes, they are debunked
25    and we will also have content on it soon" in
```

**CAROL CRAWFORD  11/15/2022**

Page 135

1    **Plaintiffs' Exhibit 16, June 3rd, 2021.**

2         A.  We reported to Facebook that they were

3    debunked at this time.

4              MR. VECCHIONE:  Thank you.  Exhibit 17.

5    You know what, take this one, too, because it will

6    be real quick, I hope.

7    BY MR. VECCHIONE:

8         **Q.  So I'll -- one more question on 16.  On**

9    **that June 3rd date where you said these are**

10   **debunked, who makes the final calls that they are**

11   **debunked before you send it Facebook?**

12        A.  The communicators or the SME that I'm

13   working with would decide if it was okay to send it

14   back to Facebook.  The communicator would get that

15   from the SME that they were working with.

16             For instance, my team posts the web, but I

17   don't know how every piece is exactly cleared, but

18   yet when they send it to us to post it there were

19   trusted people that send it to me, and we assume

20   that it's cleared and we post it.

21             It's very similar.  Rosie was also in

22   charge of clearing other things, and so she would

23   assure to me that she had discussed it with the SMEs

24   of authority.

25        **Q.  Okay.  And do you know of any, the names**

**CAROL CRAWFORD  11/15/2022**

Page 136

```
 1    of any of these SMEs?

 2         A.  No, not off the top of my head.  I mean,

 3    people were in and out of the response, and I don't

 4    recall.

 5         Q.  All right.  I'll ask you to take a look at

 6    Plaintiffs' Exhibit 16 again.

 7         A.  Okay.

 8         Q.  Can you read item seven, and the answer on

 9    -- it's Bates stamped 533.  It's on the second page.

10         A.  Of which exhibit?

11         Q.  Exhibit 16.

12         A.  Of 533.

13         Q.  The bottom at the number is called a Bates

14    stamp.

15         A.  Oh, sorry.

16         Q.  That page, if you go up -- yeah, not

17    everybody knows that and I have to say that --

18              MR. GILLIGAN:  Nobody actually uses a

19    Bates stamp any more either.

20              MR. VECCHIONE:  What do they do?

21              MR. GILLIGAN:  They're all electronically

22    applied.

23              MR. VECCHIONE:  I gotcha.  I remember.

24    BY MR. VECCHIONE:

25         Q.  In any event, could you read item 7 from
```

**CAROL CRAWFORD  11/15/2022**

Page 137

1     the email that you sent?

2          A.   "People who are receiving COVID-19

3     vaccines are subject to medical experiments."

4          Q.   And then the answer at 7(a)?

5          A.   "Debunked.  CDC notes this likely stems

6     from the vaccines only having EUA now and equating

7     lack of full authorization as being involuntary part

8     of a medical experiment."

9          Q.   And WhatsApp EUA?

10         A.   Emergency use authorization.

11         Q.   All right.  And that's when the FTC -- FDA

12    has given an emergency use authorization for certain

13    medicines?

14         A.   This is not my area of expertise, but yes,

15    I believe that's --

16         Q.   That's your understanding?

17         A.   Yes.

18         Q.   So were you aware at this time that

19    vaccine mandates had been employed by governments,

20    employers and colleges as a condition of maintaining

21    employment or enrollment?

22              MS. SNOW:  Objection.  Assumes facts not

23    in evidence.

24    BY MR. VECCHIONE:

25         Q.   Have you ever heard of such a thing?

**CAROL CRAWFORD 11/15/2022**

Page 138

```
 1          A.  Yes.  I don't know --
 2          Q.  Does getting a vaccine as a requirement of
 3     maintaining employment or enrollment affect
 4     voluntariness?
 5               MS. SNOW:  Objection.  Calls for
 6     speculation, assumes facts not in evidence,
 7     argumentative.
 8          A.  This is really not my area of expertise of
 9     any account.  I don't have anything really to
10     provide on that.
11     BY MR. VECCHIONE:
12          Q.  Did you instruct Facebook to do anything
13     with debunked claims?
14          A.  No.
15          Q.  Did you have an understanding of what they
16     were going to do with any claims that the CDC said
17     were debunked?
18          A.  I knew that they had options, but I think
19     we also discussed on a previous exhibit, which is to
20     inform people, to maybe reduce it in the algorithm,
21     or to remove it.  I -- they probably had other
22     options, but I knew of at least those.
23               (Plaintiffs' Exhibit 17 presented.)
24          Q.  Thank you.  Exhibit 17.  And, again, just
25     tell me the subject line and the date.
```

**CAROL CRAWFORD  11/15/2022**

Page 139

```
 1        A.  "FB misinformation claims help debunking,"
 2   misspelled.  The date is 7/26/2021.
 3        Q.  So on July 26, 2021 it's Liz Langone to
 4   you again; right?
 5        A.  Yes.
 6        Q.  And she says:  "Our Misinformation Policy
 7   Team," meaning Facebook's do you believe?
 8        A.  Yes.
 9        Q.  "Has identified some claims that we were
10   hoping your team could help us understand if they
11   are false and can lead to harm"; right?
12        A.  Yes.
13        Q.  And she has spike proteins in COVID-19
14   vaccines, Guillain-Barre syndrome -- which I will
15   use GBS from now on as well -- is possible side
16   effect, and heart inflammation as a possible side
17   effect of all COVID-19 vaccines.
18            Those were the questions that she sent
19   you; right?
20        A.  Yes.
21        Q.  Do you know why she's asking you, or do
22   you have an understanding?  I'll withdraw it.
23            Do you have an understanding of why she's
24   asking you at CDC whether the claims are true or
25   false?
```

**CAROL CRAWFORD  11/15/2022**

Page 140

```
 1        A.  Because CDC would have credible health
 2   information about the claims or scientific
 3   information that would benefit their policy making
 4   is the way I understood it.
 5        Q.  Okay.  And she then asks you she was
 6   "wondering if your team was aware of any global
 7   source of truth/database for vaccine adverse effects
 8   including possibly vaccine-related deaths."
 9            Do you see that?
10        A.  Yes.
11        Q.  Did there ever come a time when WHO or
12   some foreign medical health agency differed with the
13   CDC on any of these vaccine topics that you recall?
14        A.  That's not my area of expertise, and I
15   don't recall any specifics.
16        Q.  Do you know whether on these three
17   requests that you did another response on debunking,
18   inconclusive, or not known like you did in the
19   previous one, exhibits we looked at?
20        A.  I don't remember what I specifically
21   answered with this.
22        Q.  Okay.
23        A.  I know generally what I -- how I handled
24   them, but not what I did with this.
25        Q.  Okay.  And generally how you handled them
```

**CAROL CRAWFORD  11/15/2022**

Page 141

1    we've already discussed?

2        A.  Yes.

3        Q.  And you have nothing different to add on

4    this particular request?

5        A.  No.

6            (Plaintiffs' Exhibit 18 presented.)

7        Q.  Okay.  You can go to Exhibit 18.  And once

8    again could you please give me the subject line and

9    the date of Exhibit 18?

10       A.  Yes.  CrowdTangle COVID-19 reports.

11   7/20/21.

12       Q.  Okay.  And please take a look at it.

13       A.  I've scanned this one.

14       Q.  Who's -- at the top, at the very end, I

15   guess I should say the end, the very top?

16       A.  Mm-hmm (affirmative).

17       Q.  It's Carol Crawford to Tyler Woods.  Who

18   is that?

19       A.  Tyler Woods was a name on another exhibit.

20   I mentioned at that time I'm pretty sure that Tyler

21   Woods took over the reporting from Kelly Perron, and

22   that appears to be the case here.  There is a

23   transfer on the first page saying -- from Kelly

24   saying Tyler is going to be sending the reports in

25   the future.

## CAROL CRAWFORD  11/15/2022

```
 1          Q.   Okay.  And once again these are the
 2   CrowdTangle reports that I think we discussed at one
 3   point you were receiving biweekly?
 4          A.   Yes.
 5          Q.   And were you doing anything different with
 6   this information at this time than you've described
 7   to me earlier?
 8          A.   Not that I recall.
 9          Q.   Okay.  And at this time, June 9th, 2021,
10   are they reporting this to you for the same reasons
11   as you've described previously when we first
12   mentioned CrowdTangle?
13          A.   That's my recollection of it.
14          Q.   On the very last page, which is the
15   beginning of it, June 8th, 2021, 8:13 p.m.,
16   "vaccination lawsuits" --
17          A.   I see it.
18          Q.   -- highlighted.  Do you know what they are
19   referring to there?
20          A.   Sounds like the lawsuits around the
21   mandates that you mentioned previously.
22          Q.   Okay.  Like the OSHA mandate or CMS
23   mandates?
24          MS. SNOW:  Objection.  Assumes facts not
25   in evidence.  Calls for speculation.
```

**CAROL CRAWFORD  11/15/2022**

Page 143

```
 1        A.  I really am speculating.

 2   BY MR. VECCHIONE:

 3        Q.  You're not sure?

 4        A.  I don't know.  This is not really an area

 5   of my expertise.  This is simply a report of

 6   conversations that are occurring on social media.

 7        Q.  All right.  When you received it, did you

 8   have an understanding of what the vaccine lawsuits

 9   they were referring to were?

10        A.  I had a recollection of that from watching

11   the news in my personal life.

12        Q.  Okay.  On that same page "Deciding to Get

13   Vaccinated" she's highlighted.

14            Why does the CDC need to be updated on the

15   statements of public physicians?

16            MS. SNOW:  Objection.  Mischaracterizes

17   testimony and the document.

18   BY MR. VECCHIONE:

19        Q.  Why were you updated on those statements?

20        A.  Again, these are reports that characterize

21   the overall conversation of social media.  They are

22   not -- I don't believe these were picked out

23   specifically for CDC.  I think these are a report of

24   the trends of conversation on social media.

25        Q.  And I'd like you to turn to the next page
```

**CAROL CRAWFORD  11/15/2022**

Page 144

```
 1    where Tyler Woods takes over and he sends a June
 2    22nd, 4:43 p.m. summary to you.
 3        A.  Okay.
 4        Q.  At the end of it it says:  "Let us know if
 5    you have any questions or specific keywords/topics
 6    you'd like us to explore in the next report.  As
 7    always, please do not share."
 8            Did there come a time that you shared
 9    keywords or topics with Facebook that you wanted
10    them to check in?
11        A.  I don't recall doing it.
12        Q.  All right.  Turn to the first page of
13    Exhibit 18.  Once again, this is Tyler Woods to you?
14        A.  Yes.  Sorry.
15        Q.  Thank you.  The very, very mistake on my
16    instructions at the beginning.  You're to be
17    commended, because it usually happens a lot more
18    until now.
19            So the last, the last item that's
20    highlighted:  Door-to-door vaccines.  Do you know
21    whether he's referring to any public statements made
22    on this topic by any plaintiff in this case,
23    including Governor Mike Parson?
24        A.  I wouldn't know.
25            MR. VECCHIONE:  You can put that aside.
```

**CAROL CRAWFORD  11/15/2022**

Page 145

```
 1              (Plaintiffs' Exhibit 19 marked.)
 2    BY MR. VECCHIONE:
 3         Q.  And once again please identify it to me by
 4    subject matter and date of Exhibit 19, and then
 5    please read it to yourself.
 6         A.  CrowdTangle COVID-19 reports, 8/18/21.  I
 7    didn't hear your last part of to yourself, what.
 8         Q.  Just read it to yourself.  In other words,
 9    you get to review the document but you don't have to
10    read it out loud?
11         A.  I'm sorry about that.  Okay.
12         Q.  I'm not caught up to you.
13              Okay.  So as we've discussed, this, once
14    again, is one of the CrowdTangle reports but that
15    Tyler Woods is now sending; correct?
16         A.  Yes.
17         Q.  Let's go back to the August 3rd exchange
18    on this.  So on August 3rd Tyler Woods writes to you
19    at 6:16 p.m.?
20         A.  Yes.
21         Q.  And once again the purpose of this you've
22    already testified to; it hasn't changed, why you're
23    getting these?
24         A.  Correct.
25         Q.  All right.  So did the CDC at this time
```

**CAROL CRAWFORD  11/15/2022**

Page 146

1    have proof that, quote, "the recent uptick in
2    hospitalizations and deaths is being driven by
3    unvaccinated individuals"?
4         A.  I'm not an expert in that area and I
5    wouldn't be able to answer that question.
6         Q.  All right.  Do you know whether subsequent
7    evidence the CDC had supported that view?
8         A.  I'm not an expert in this area, and I
9    don't feel comfortable.  I don't know.
10        Q.  The email exchange that Tyler would send
11   you on July 20th, 2021, the Bates stamp number at
12   the bottom is 2440 of this document.
13        A.  I see it.
14        Q.  You there?  So, once again, when he sends
15   you material from CrowdTangle concerning allowing
16   people to return to religious services, that's
17   because it's appearing on CrowdTangle and not
18   because you asked for it?
19        A.  Correct.
20        Q.  And let's go to the first page here, but
21   I'll ask you to take a look at the August 17th
22   exchange.  Once again, Tyler Woods sending you the
23   CrowdTangle reports?
24        A.  Yes.
25        Q.  Now, by August 17th, 2021 are you still

**CAROL CRAWFORD  11/15/2022**

Page 147

```
 1    using CrowdTangle for the same purposes you

 2    discussed earlier?

 3         A.  Yes.  But this isn't about us using

 4    CrowdTangle.  This is about them sending us

 5    CrowdTangle reports.

 6         Q.  Okay.

 7         A.  But either way it's all the same purpose.

 8    I just wanted to clarify that.

 9         Q.  Okay.  Because by now you may be using

10    CrowdTangle in a different way.  You might be

11    getting the summaries and going in directly?

12         A.  Well, we had access to go in directly to

13    CrowdTangle and run in reports I think from early

14    2020.

15         Q.  Okay.

16         A.  And I mentioned that our research team, I

17    think, searched in it and looked in it to create

18    their reports, and I believe other teams did too.  I

19    did not personally.  These are reports that were

20    sent to us.  So that's different than the way you

21    stated it.

22         Q.  I see.

23         A.  I did not use these reports in any

24    different way than I have been saying in previous.

25         Q.  But just to clarify.
```

**CAROL CRAWFORD  11/15/2022**

Page 148

```
 1          A.   Yes.

 2          Q.   So these are reports from Facebook to you?

 3          A.   Yes.

 4          Q.   As we've discussed?

 5          A.   Yes.

 6          Q.   I might ask you if something's changed,

 7     but you've already testified to that.  But within

 8     CDC you had access to CrowdTangle, and created your

 9     own reports?

10          A.   That we could -- I don't know that we

11     created reports.  I know that we did searches in

12     CrowdTangle, the same way we do searches in other

13     social media and listening tools that we have to

14     create, to understand what's being discussed in the

15     environment, to update our communication material,

16     as I was explaining this morning.

17          Q.   Okay.  So on this particular one that

18     we're discussing, once again Facebook has sent you

19     their CrowdTangle summary.  And I-- the COVID 19

20     mandates at the bottom there that's highlighted.  It

21     says:  "On the other hand, many conservative

22     politicians are calling for an end to government

23     mandated restrictions and vaccinations."

24               And my question is do you know whether or

25     not there was any CrowdTangle information about
```

CAROL CRAWFORD  11/15/2022

```
 1   either Attorney General Schmitt or Attorney General
 2   Landry in these CrowdTangle briefings?
 3        A.  I'm not -- I wouldn't even say I flipped
 4   open this -- every report.  I don't know.  I
 5   couldn't remember any of the details.
 6            They did often put pictures of the posts,
 7   of a post as examples.
 8        Q.  Oh, okay.
 9        A.  But I don't know.
10        Q.  That they're finding?  Sort of like that
11   that attachment we saw earlier where they were
12   asking you about the wording?  Like, in other words,
13   it wouldn't look like this.  It would be some
14   something they had taken off Facebook?
15        A.  Yeah.  But that was -- those samples I
16   feel like you're referencing are different.  This
17   would just be like they are saying a lot of people
18   are talking about COVID-19 mandates; they might put
19   a few example posts someone put in the slide deck to
20   show what they were talking about.
21        Q.  Got it.  Thank you.
22            MR. VECCHIONE:  Exhibit 20.
23            THE WITNESS:  After Exhibit 20, could we
24   take a short break?
25            MR. VECCHIONE:  Let's take one now.
```

**CAROL CRAWFORD  11/15/2022**

Page 150

```
 1              THE WITNESS:  Could we take one now?
 2              THE VIDEOGRAPHER:  Off record at 2:06.
 3              (Recess 2:06 p.m. - 2:19 p.m.)
 4              THE VIDEOGRAPHER:  We are back on the
 5    record at 2:19.
 6              (Plaintiffs' Exhibit 20 marked.)
 7    BY MR. VECCHIONE:
 8         Q.  Okay.  Ms. Crawford, have you had a chance
 9    to look at Plaintiffs' Exhibit 20?
10         A.  I did.
11         Q.  All right.  And could you tell me the
12    subject line and who's it from, who's it to and what
13    the date is?
14         A.  Yes.  The subject is VAERS policy
15    consultation on 8/19, 2021.  The first email is from
16    me to Carrie Adams at Facebook.
17         Q.  All right.  What's your understanding of
18    why the CDC was asking to meet with the VAERS
19    experts for consultation about misinformation?
20         A.  I don't recall a lot of the details, but
21    VAERS, the topic of VAERS was an area that was
22    widely discussed on social media, and there was a
23    lot of areas of confusion about what VAERS data was.
24    There was myths about VAERS data, and there was
25    misinformation about VAERS data.  So it was always
```

**CAROL CRAWFORD  11/15/2022**

Page 151

```
 1   one of the things that rose to the top in terms of
 2   volume of discussion of people were very confused
 3   about VAERS.
 4        Q.  And do you know whether this meeting ever
 5   took place?
 6        A.  I don't remember if the one we were
 7   discussing at this time took place and the Singapore
 8   team attended for sure.  But we did have a session
 9   with the VAERS experts with Facebook.
10        Q.  Okay.
11        A.  Probably as a result of this, I feel like
12   it might have dragged out a little bit after this
13   for a few weeks.
14        Q.  And do you know what was discussed at that
15   meeting?  First, did you attend it?
16        A.  I did attend it.
17        Q.  And do you recall what was discussed at
18   that meeting?
19        A.  We had one of the experts for VAERS,
20   and -- maybe it was two experts for VAERS and a
21   couple of their communication experts on the line
22   with Facebook's team.  I believe it was like their
23   misinformation and policy type team like that Liz
24   was part of, but I don't know who -- I don't
25   remember specifically who was on there.  And we
```

**CAROL CRAWFORD  11/15/2022**

Page 152

```
 1   offered the SME just to answer their questions about
 2   what VAERS was and what it wasn't.
 3           And my recollection is they asked a lot of
 4   questions like, you know, what does -- what does --
 5   who can report something on VAERS and things like
 6   that during the session.
 7       Q.  Okay.  Do you know who the subject matter
 8   experts on VAERS were at CDC?
 9       A.  Goodness.  I'm just totally blanking on
10   their names.  I'm sorry.
11       Q.  If you recall during the course of this
12   deposition, please let me know.
13       A.  Okay.
14           MR. VECCHIONE:  We can move on to the next
15   document.
16           (Plaintiffs' Exhibit 21 marked.)
17       A.  Thank you.
18   BY MR. VECCHIONE:
19       Q.  And once again if you could just read the
20   subject line, and then who -- what the date was and
21   then read it to yourself.
22           MS. SNOW:  Is this for Exhibit 21?
23           MR. VECCHIONE:  21.
24       A.  Subject BOLO, CDC lab alert and
25   misinformation.  September 1st.  It's from me to
```

**CAROL CRAWFORD  11/15/2022**

Page 153

```
 1   Carrie Adams at Facebook.

 2           I have read it.

 3   BY MR. VECCHIONE:

 4       Q.  Okay.  So do you recall this email?

 5       A.  I do now that I'm seeing it, yes.

 6       Q.  What are you telling Adams in this email?

 7       A.  I can't see the attachment.  But there was

 8   a misinterpretation of a lab alert that we issued,

 9   and so I think we put together a deck -- a power

10   point or a two-page just saying what the facts were

11   about this lab alert.

12       Q.  Okay.  What is a lab alert?

13       A.  I don't know if this was a HAN alert or if

14   was some other kind of alert they sent straight to

15   laboratory.  So I don't remember the details.

16       Q.  What is a HAN alert?

17       A.  A health advisory alert.  We send it --

18   no, Network.  Health Advisory Network alert.  Sorry.

19       Q.  And you have:  "Carrie - BOLO."

20           What's BOLO?

21       A.  Be on the lookout.

22       Q.  Why were you concerned about this?

23       A.  Similar to all the other BOLOs, we still

24   thought it was good to point out if we had facts

25   around something that was widely circulating as a
```

**CAROL CRAWFORD  11/15/2022**

1  cause of misinformation to the platforms to assist

2  them in whatever they were going to do with their

3  policy or not do.  And this was one that was kind of

4  growing, and we had a lot of facts about it, and the

5  team was concerned about this, this

6  misunderstanding.

7       **Q.  Do you recall whether Facebook did**

8  **anything upon receiving this information from you?**

9       A.  I don't recall.

10      **Q.  How did you know that it was a small but**

11  **growing area of misinformation?**

12      A.  I vaguely recall that we ran some

13  Meltwater reports, and that people -- that

14  conversation regarding this topic -- Meltwater is

15  sort of like CrowdTangle but for all the

16  platforms -- and that the conversation around this

17  was growing.

18      **Q.  Got it.  Now, tell me about Meltwater.**

19  **Does it aggregate all the platforms and you search**

20  **across them?**

21      A.  Yes.  And social media listening tools are

22  used by every social media team, I believe.  I mean,

23  it's widely common practice, and, yes, it will

24  search.  The CrowdTangle can see more on the Meta

25  properties.  So it's nicer if you're just looking at

**CAROL CRAWFORD  11/15/2022**

Page 155

1    Meta properties.  Meltwater gives you social media

2    at large.  The Meta platforms, to clarify.

3        **Q.  Do you know what the nature of the**

4    **misinterpretation was?  I know we don't have the**

5    **attachment, but do you know?**

6        A.  I don't recall any longer.

7            (Plaintiffs' Exhibit 22 marked.)

8    BY MR. VECCHIONE:

9        **Q.  Go to Exhibit 22.  So what -- before we**

10   **look at that exhibit --**

11       A.  Mm-hmm (affirmative).

12       **Q.  -- when you said "be on the lookout," what**

13   **did you expect them to do once they were on the**

14   **lookout for Facebook?**

15       A.  The same thing I have been describing.  I

16   knew that they had various options.  They could have

17   just used it to inform people.  They could have

18   considered it in their algorithm, I believe.  I did

19   understand that potentially removing posts was

20   something that they might do.

21       **Q.  So if you could, just please identify**

22   **Exhibit 22 to me the same way by its re: line --**

23       A.  Okay.

24       **Q.  -- and its date and then read it to**

25   **yourself.**

**CAROL CRAWFORD  11/15/2022**

Page 156

```
 1        A.  November 2nd, 2021.  Subject New Claims
 2   and Policy Updates Following EUA Authorization for 5
 3   to 11-year-olds.
 4           It's from me to a group, but I think
 5   primarily it was to Facebook.  Also -- never mind.
 6   I thought I missed part of the subject.  Sorry.
 7   Okay.
 8        Q.  All right.  So this is the first one
 9   that -- she actually signs off with Meta this time;
10   right?  So I guess whatever he did took place --
11        A.  I see that.
12        Q.  -- changed over by then.
13           All right.  The -- can you read the first
14   two paragraphs she writes to you on November 2nd,
15   1:22 p.m. into the record?
16        A.  Yes.  "Kristen, thanks so much for
17   confirming the ability for the claims in question
18   last week having the risk of causing vaccine
19   refusals.  And thank you all so much for your input
20   over the last week on our many questions about
21   vaccine misinformation relative to the EUA."
22        Q.  And second paragraph?
23        A.  (As read)  I wanted to share that as a
24   result of our work together, when the FDA give
25   emergency use authorization to the Pfizer vaccine
```

**CAROL CRAWFORD  11/15/2022**

Page 157

1  for children last week, we immediately updated our

2  policies globally to remove false claims about the

3  COVID-19 vaccine for children, e.g., the COVID

4  vaccine is not safe for kids, we also launched a new

5  feature on Instagram where accounts that repeatedly

6  post content that violates our polices on COVID-19

7  or vaccine misinformation may now lose the ability

8  to be tagged or mentioned or may see pop-ups asking

9  if they'd like to delete certain posts that violate

10  our policies.

11      **Q.  And then she goes on to say:  Now we've**

12  **identified new claims; right?  And then she lists**

13  **them?**

14      A.  Yes.

15      **Q.  And she asks you could you tell her**

16  **whether the claim is false, and if believed this**

17  **claim could contribute to vaccine refusals; right?**

18      A.  Yes.

19      **Q.  All right.  And this is similar to the**

20  **other lists she had sent you earlier that we looked**

21  **at to be debunked or not?**

22      A.  This is similar.  This time, though,

23  they -- I think -- I don't know if this is the first

24  time, but this added the whole "could this

25  contribute to vaccine refusals" element that I don't

**CAROL CRAWFORD  11/15/2022**

Page 158

```
1    think we had on the last one.
2         Q.   Okay.   What was your understanding of why
3    she was reporting to you Meta's policies on
4    childhood vaccines?
5              MS. SNOW:   Objection.   Mischaracterizes
6    the document.
7    BY MR. VECCHIONE:
8         Q.   You can answer.
9         A.   Would you reask the question?
10        Q.   Yeah.   What was your understanding of why
11   she was telling you what Meta's policy was on
12   pediatric vaccines?
13        A.   Well, I don't know what -- why she was
14   doing it specifically because I can't speculate on
15   that, but I received it as a thank you for assisting
16   with the claims or the facts about this that we
17   could provide.
18        Q.   And then why did you think she was asking
19   you to tell her which claims were true and which
20   were false on that further list?
21             MS. SNOW:   Objection.
22        A.   Sorry?
23             MS. SNOW:   Mischaracterizes the document.
24   BY MR. VECCHIONE:
25        Q.   Okay.   You can answer.
```

**CAROL CRAWFORD  11/15/2022**

1      A.  Ask the question again.

2      **Q.  Yeah.  What was your understanding of what**

3  **Langone was asking -- why she was asking you to tell**

4  **her which of these claims were true and which were**

5  **false, and, as you said, which would lead to vaccine**

6  **hesitancy?**

7      A.  It was still my interpretation that she

8  was asking to inform their policies.  They were

9  looking for CDC, who would have the scientific

10  facts, to provide them with scientific facts.

11      **Q.  And didn't this email give you a pretty**

12  **good idea that when CDC said something was false**

13  **that Meta was going to take it down?**

14          MS. SNOW:  Objection.  Calls for

15  speculation.

16  BY MR. VECCHIONE:

17      **Q.  You can answer.**

18      A.  I did not have a recollection of this

19  email, and -- when I think about the work we did,

20  but it definitely says here that they updated the

21  policy globally to remove additional false claims.

22      **Q.  All right.  Upon getting your information;**

23  **correct?**

24      A.  It doesn't say upon getting our

25  information.  It just says that when the FDA gave

**CAROL CRAWFORD  11/15/2022**

Page 160

```
 1   the emergency use authorization we immediately
 2   updated our policies.  It doesn't say upon getting
 3   our information.
 4        Q.  She goes on to say:  I wanted to share
 5   that as a result of our work together; right?
 6        A.  Yes.  But I assume this was -- I mean, I
 7   don't -- I'm reading it now.  I don't have memory of
 8   this email.  I'm interpreting it more of like the
 9   ongoing work for us to provide the facts to them.
10   It could have been something specific, but I don't
11   remember something specific regarding the -- this.
12        Q.  Do you know whether -- and then you say --
13   hang on.  I'll get back to it.
14           You then respond to her on 11/2.  I think
15   it's 2:54:26.  It's down to the second.  "Got it,
16   Liz.  I'm going to work on this one with some other
17   vaccine staff and take this one off of Kristen."
18           So who are the other vaccine staff?
19        A.  Kristen Nordlund is a press officer for
20   the National Center -- or at the time was a press
21   officer for the National Center for Immunization,
22   Respiratory Diseases where the vaccine work was, and
23   she was very involved in the COVID response.
24           And I don't see it in this chain, and I
25   cannot be sure, but what I think happened was that
```

**CAROL CRAWFORD  11/15/2022**

```
 1    Kristen helped on some questions regarding this in a
 2    previous set of emails or maybe a conversation.
 3         Q.  All right.  And then you say: "I hope we
 4    can do it by Monday."
 5              So it's going to take a little less than a
 6    week.  But you're going to hope to get back to her
 7    by then.  This is a Tuesday.
 8         A.  Yes.  I see that, yes.
 9         Q.  But then you say: "Thank you so much for
10    the feedback on what you've been able to do.  This
11    is very good to know."  Right?
12         A.  I do say that, yes.
13         Q.  So you're approving of her taking down the
14    COVID vaccine is not safe for kids off the Meta
15    platforms; right?
16              MS. SNOW:  Objection.  Mischaracterizes
17    document and testimony.
18    BY MR. VECCHIONE:
19         Q.  You can answer.
20         A.  I did not mean it generally.  I never felt
21    that my role, or CDC's role, was to determine what
22    to do with the scientific information that we
23    provided.  But I'm happy that providing the
24    scientific information led to less spread of
25    misinformation.  In this email I think what's what I
```

**CAROL CRAWFORD  11/15/2022**

Page 162

```
 1   was reflecting.
 2        Q.  So you were pleased that people who
 3   believed that the COVID vaccine was not safe for
 4   kids were taken off the platforms of Meta?
 5            MS. SNOW:  Objection.  Mischaracterizes
 6   testimony.
 7        A.  I don't think that's what she's saying in
 8   here.
 9   BY MR. VECCHIONE:
10        Q.  (As read)  We immediately updated our
11   policies globally to remove additional false claims
12   about COVID vaccine for children, e.g. the COVID
13   vaccine is not safe for kids.
14            That doesn't tell you that she's removing
15   those people from the platform?
16            MS. SNOW:  Objection.  Mischaracterizes
17   document.
18        A.  No.
19   BY MR. VECCHIONE:
20        Q.  What is she doing then?
21        A.  I understand that she's removing claims
22   that have -- that are not scientifically accurate.
23        Q.  Okay.  Well, let me put it another way.
24   People who post that statement will have that
25   statement removed from Meta; correct?
```

**CAROL CRAWFORD  11/15/2022**

Page 163

```
 1              MS. SNOW:  Objection.  It calls for

 2    speculation, mischaracterizes the document.

 3    BY MR. VECCHIONE:

 4        Q.  That was your understanding of this email;

 5    right?

 6        A.  I think we'd have to just look at what's

 7    written here.

 8        Q.  And it is in English; right?

 9              MS. SNOW:  Objection.

10              MR. GILLIGAN:  Argumentative.

11        A.  I don't think you're characterizing it

12    correctly.  Sorry.

13              (Plaintiffs' Exhibit 23 marked.)

14    BY MR. VECCHIONE:

15        Q.  Move on to Exhibit 23.  And once again I'd

16    like you to just read the subject line and the date,

17    and then read the rest to yourself.

18        A.  New claims and policy updates following

19    EAU authorization for 5 to 11-year olds.

20              This is on November 8th, 2021 from me to

21    Liz and some others at CDC.

22              Okay.

23        Q.  All right.  So once again in Exhibit 23

24    she's asking you a number of questions, particularly

25    number one was COVID-19 vaccines weaken the immune
```

**CAROL CRAWFORD  11/15/2022**

Page 164

```
 1    system.  And then the same question she's asked
 2    before:  "Is this false?  Could this lead to vaccine
 3    refusals?"  Right?
 4        A.  Yes.
 5        Q.  And you've -- and you've responded,
 6    "false"; right?  "COVID vaccination will help people
 7    from getting COVID-19.  Adults and children may have
 8    some side effects from vaccine which is normal signs
 9    that their body is building protection.  These side
10    effects may affect their ability to do daily
11    activities but they should go away in a few days.
12    Some people have no side effects, and allergic
13    reactions are rare.  Learn how mRNA vaccines work."
14    Right?  That's your response to her?
15        A.  That I received from the content teams,
16    yes.
17            (Plaintiffs' Exhibit 24 marked.)
18    BY MR. VECCHIONE:
19        Q.  Okay.  I'm going to give you Exhibit 24.
20    I'll just represent to you this is a report about
21    European's Medicines Agency.
22            Do you know whether or not CDC looked to
23    other worldwide agencies' view of the vaccines in
24    order to inform Facebook on what was true and false?
25        A.  That's completely out of my expertise or
```

**CAROL CRAWFORD  11/15/2022**

Page 165

```
 1    knowledge.

 2         Q.   Have you seen this document before?

 3         A.   No.

 4         Q.   And you don't know whether it was used to

 5    formulate any response you gave to Ms. Lagone?

 6         A.   No.

 7              MS. SNOW:  Objection.  Asked and answered.

 8    BY MR. VECCHIONE:

 9         Q.   That's fine.  You said no.

10         A.   (Nods head.)

11         Q.   And then let's look at -- I think I tossed

12    my document aside.  Yeah.

13              I'll direct you to item number six that

14    you responded to Lagone about breast milk from

15    vaccinated parents, harmful to babies and children.

16              MR. GILLIGAN:  What document you referring

17    to again, John?

18              MR. VECCHIONE:  It's number 23.  It's

19    number six of the Lagone proposals.

20              MR. GILLIGAN:  Thank you.

21              MR. VECCHIONE:  You know what, I'm going

22    to let that -- we're going to move on.

23              MR. GILLIGAN:  Okay.  No objection.

24    BY MR. VECCHIONE:

25         Q.   All right.  We're going to Exhibit 26.
```

**CAROL CRAWFORD  11/15/2022**

```
 1    We're going to skip Exhibit 25.

 2              (Plaintiffs' Exhibit 26 marked.)

 3    BY MR. VECCHIONE:

 4        Q.  And once again I ask you to tell me what

 5    the subject line is, and the date, and then read it

 6    to yourself of Exhibit 26.

 7        A.  Vaccine misinformation questions for CDC.

 8    February 3rd, 2022.

 9              I have read it.  I didn't read all the

10    questions.

11        Q.  I got.  I'll direct you too.  So this is a

12    long email, so let's go by it in pieces.

13        A.  Mm-hmm (affirmative).

14        Q.  If you see Liz Lagone writes to you on

15    February 3rd, 2022 4:36; right?

16        A.  Yes.

17        Q.  The very front page.  She says:  Hi,

18    Carol.  And could you please read her paragraph

19    there?

20        A.  (As read) I hope your team are well and

21    staying healthy.  Thank you so much for the

22    information you provided on claims we asked about

23    last month.  Since we last spoke, I wanted to share

24    updates we made as a result of our work together.  I

25    also wanted to ask for your assessment of a few
```

CAROL CRAWFORD  11/15/2022

Page 167

1    things, including three additional claims we've
2    become aware of from our regular monitoring; how FDA
3    EUA authorization for children under five might
4    impact our policies; and three, CDC's insights
5    regarding deaths from vaccines.  As always, please
6    do let me know if it's easier to set up a time to
7    talk.  Otherwise could we get input before
8    February 9.
9         **Q.  Okay.  Time to talk through any of these**
10   **live; right?**
11        A.  Excuse me?
12        **Q.  I think you just --**
13        A.  Oh, did I miss a sentence?
14        **Q.  I think you just skipped.**
15        A.  Sorry.  "Set up a time to talk through any
16   of these live."  I apologize.
17        **Q.  So what was your understanding of what she**
18   **meant by as a result of our work together?**
19        A.  I believe the result of the work together
20   is us providing the scientific information for the
21   questions that they were asking us periodically like
22   these in this email.
23        **Q.  All right.  And if you'd look -- I'd ask**
24   **you to go to the back of the document, the very**
25   **back.  And the first at three, she says:  "COVID-19**

**CAROL CRAWFORD  11/15/2022**

```
 1    vaccines have caused thousands/millions of deaths."

 2              And she says:  (As read) Under our current

 3    policy, we remove posts that claim that COVID-19

 4    vaccines kill people or lead to death.  We removed

 5    these posts on the grounds that the claim is false

 6    and that it's harmful because people believe it, it

 7    might make them less likely to get vaccinated;

 8    right?

 9         A.  Yes.

10         Q.  And then she notes that:  In fact,

11    vaccines -- some people might have an adverse

12    reaction that leads to death; right?

13              MS. SNOW:  Objection.  Mischaracterizes

14    the document.

15         A.  I also can't --

16    BY MR. VECCHIONE:

17         Q.  Okay.

18         A.  I'm not a scientist.

19         Q.  I understand that.  But she's telling you

20    her understanding.  Putting millions and thousands

21    of deaths aside, we have this -- she's bringing to

22    you a problem now.

23         A.  Okay.  If you'd -- I lost where you're

24    reading from.

25         Q.  Okay.  So on the last page she says:  We
```

**CAROL CRAWFORD  11/15/2022**

1  understand that in general COVID-19 vaccines do not

2  cause death.  However, we are aware that some deaths

3  have been linked to COVID-19 vaccination such as

4  detailed in this correspondence in The Lancet...

5  reporting death rates from TTS following AstraZeneca

6  vaccination in a number of countries.

7          And then she's saying we're going to

8  reconsider our policies, and she's asking you for

9  your advice; correct?

10      A.  She's asking us for scientific

11  information.

12      Q.  I'll ask you to go to the second page of

13  this document, which is Bates stamped 1684 at the

14  bottom.  And in the middle of the page under number

15  2 of the Claims about COVID vaccines for children

16  under five years of age.

17          And she says:  We understand the FDA is

18  considering giving emergency use authorization for

19  COVID-19 vaccine for children under five in coming

20  weeks.  We are considering how our existing policy

21  on COVID-19 vaccines (see below) should apply to

22  claims about children 6 months to 4 years once the

23  vaccine is approved for use.  Can you please assess

24  for each claim whether it is false for children in

25  this age range and if believed, likely to contribute

**CAROL CRAWFORD  11/15/2022**

1    to vaccine hesitancy or refusal?

2            And then:  Please let us know if it's

3    easiest to set up a time to meet and discuss each

4    one.

5            And then she tells you what their policies

6    are; correct?

7        A.  No.  I don't -- I haven't interpreted any

8    of this as being the policies.  These are the

9    claims.

10       Q.  Okay.

11       A.  These are the things or -- they're saying

12   are these true or false or unknown.

13       Q.  Well, at the first one we read, though,

14   they -- she did tell you under our current policy,

15   remove posts that claim COVID-19 vaccines kill

16   people or lead to death; right?

17       A.  But the policy is not the same as the

18   claims.  The claims are the -- what she's asking us

19   about, which is I know that they're using our

20   scientific information to determine their policy,

21   but they're asking us about the science.

22       Q.  Okay.  And your response was:  "PS - the

23   update is very helpful.  Thank you for including

24   that."  Right?

25       A.  Yes.

## CAROL CRAWFORD  11/15/2022

Page 171

```
 1        Q.  But and in this you don't respond on
 2   whether anything's debunked or not?
 3        A.  Yes.  I don't remember if we did or not.
 4        Q.  And what did you find helpful about this?
 5        A.  I think what I think is helpful for us is
 6   to have her ask us specifically what she needs input
 7   on.  So it's been helpful when she started just
 8   sending us the things she's wanting us to do.
 9            I also think it is helpful to know that
10   they're actually using the responses that we have in
11   some form or fashion because it takes time to put
12   them together.
13        Q.  Thank you.  You can put that aside.
14        A.  Okay.
15            (Plaintiffs' Exhibit 27 marked.)
16   BY MR. VECCHIONE:
17        Q.  And just again tell me the subject matter,
18   the date, and then read it to yourself.
19        A.  Okay.
20            MS. SNOW:  What exhibit is it?
21            MR. VECCHIONE:  Exhibit 27.
22        A.  Have five minutes to chat.  E: Vaccine
23   Misinformation questions for CDC February 4th, 2022.
24            Okay.
25            (Reporter clarifying exhibit number.)
```

**CAROL CRAWFORD  11/15/2022**

Page 172

```
 1   BY MR. VECCHIONE:
 2        Q.  All right.  And I think this is the same,
 3   at least part of the email is the same, as the last
 4   one we looked at; right?
 5        A.  I agree.
 6        Q.  But there is a different chain on top of
 7   hers saying she -- the part where she says she hopes
 8   you and your team are well and staying healthy.
 9        A.  Can I see 26?
10        Q.  When you say on February 3rd at 5:21:
11   I'll talk to the vaccine program and see what I can
12   do -- or what we can do.  Excuse me.  You say:  I
13   will talk to the vaccine program and see what we can
14   do; right?
15        A.  Yes.
16        Q.  Is that to have a meeting on these
17   questions that she'd presented?
18        A.  Well, I mean, I guess it could have been a
19   meeting, but I was -- I was meeting -- I'll see if
20   they could -- it was a lot of claims she gave in
21   this email.
22        Q.  Right.
23        A.  And I was thinking I don't know that we're
24   going to be able to address all of these.  So I
25   think I was thinking I would talk to them and see if
```

**CAROL CRAWFORD  11/15/2022**

Page 173

```
 1    would even be willing to look at this many of them
 2    because she's asking for input on them within a
 3    couple of days.
 4          Q.  And it would be difficult to give input on
 5    all those questions that quickly?
 6          A.  I thought so.
 7          Q.  And do you know if this phone call
 8    occurred that you say at the very top of it in
 9    Exhibit 27?
10          A.  I don't know for sure.  I think that she
11    called, and I just said, look, I don't think that
12    we're going to be able to -- I was going out of
13    town.  I do remember that much.  I think I -- I
14    think she may have called, or I had emailed her
15    separately when we didn't catch up, and said I don't
16    think we're going to have it this quickly, it
17    probably will be when I return.
18              MR. VECCHIONE:  Aren't you glad you came?
19              MR. KUMAR:  Make myself useful, yeah.
20              (Plaintiffs' Exhibit 28 marked.)
21    BY MR. VECCHIONE:
22          Q.  And once again I'd ask you to read, for
23    Exhibit 28 read the subject line and the date and
24    read it to yourself.
25          A.  Okay.  COVID Misinfo Project.  3/23/2021.
```

**CAROL CRAWFORD  11/15/2022**

Page 174

```
 1          Okay.
 2     Q.   Okay.  We have a new cast of characters.
 3  I'd like you to take a look at the bottom here, the
 4  March 18, 2021 portion of the email chain.
 5     A.   Yes.
 6     Q.   And that's from you to Stanley Onyimba at
 7  a Google -- it's ███  ███████@google.com and Jan
 8  Antonaros at -- ███████@google.com.
 9          Do you recognize those names?
10     A.   Yes.  And Stanley was the name I couldn't
11  remember when you asked me who my POCs were at
12  Google.
13     Q.   Okay.  Stanley.
14          So you wrote to them on March 18 -- well,
15  read that out loud to me what you wrote to them:
16  "Stanley/Jan"?
17     A.   (As read)  As I believe we discussed
18  previously, CDC is now working with Census to
19  leverage some of their infrastructure to help
20  identify and address COVID vaccine misinfo.  As I
21  understand it from the Census team, when they were
22  doing this for the Census project last year, they
23  met regularly with a Google/YouTube Trust team.  Is
24  it possible for us to start regular meetings on this
25  topic or maybe use our existing time?  Let us know
```

**CAROL CRAWFORD  11/15/2022**

Page 175

1   if you want to discuss in more depth.

2       **Q.  All right.  So what did you mean by CDC is**

3   **now working with Census to leverage some of their**

4   **infrastructure to help identify and address COVID**

5   **vaccine misinfo?**

6       A.  That was the work of the IAA with Census

7   to help consult and work with us on the COVID

8   misinformation information.  I just -- put COVID

9   information one time.  That's what I'm referring to

10  here.  This is more specific.  This is when I refer

11  to infrastructure, I was referring to the fact that

12  Christopher ran those reports and looked for

13  misinformation on these areas for us.

14      **Q.  All right.  And you refer to the Census**

15  **project last year in which they met -- meet**

16  **regularly with Google YouTube Trust team.**

17          **Was that a different project?**

18      A.  That was their -- I believe this was the

19  2020 Census.

20      **Q.  And that's what you think you're referring**

21  **to there?**

22      A.  Yes.

23      **Q.  Do you know whether or not the Census**

24  **engaged in content moderation with Google?**

25      A.  I don't know.

**CAROL CRAWFORD  11/15/2022**

```
 1              MS. SNOW:  Objection.  Vague.
 2    BY MR. VECCHIONE:
 3         Q.  So and here I am not using censorship --
 4    anyways, still drawing objections.
 5              All right.  Let's take a look at
 6    March 23rd, 2021.  Jan Antonaros to you, and cc's
 7    Stanley Onyimba.  Can you read that response out
 8    loud?
 9         A.  Yes.  But before I do, I want to go back
10    to the clarification that she objected.  When you
11    asked me did Census do content moderation, I assumed
12    you meant for the Census project, and I answered for
13    that.
14         Q.  Okay.  How about for --
15         A.  I wondered if there was more vagueness
16    to --
17         Q.  And how about for the COVID-19 vaccine
18    project?
19         A.  Not to my knowledge either.
20         Q.  Okay.
21         A.  But I thought you were referring to their
22    project.
23         Q.  All right.  So please read Mr. Antonaros'
24    response to you.
25         A.  Hey, Carol -- or "Hi, Carol, Thank you for
```

**CAROL CRAWFORD  11/15/2022**

Page 177

1    your patience as we identified the right colleagues

2    from Google to pull into this effort.  Would it be

3    possible to schedule a call for later this week to

4    learn more about how the CDC and Census envision

5    working together on this important topic."

6         Q.  **What was your understanding of what**

7    **Antonaros meant by the right colleague from Google**

8    **to pull into this effort?**

9         A.  I believe she was going to ask people on

10   their trust team, or whatever their name for their,

11   that kind of team is.

12        Q.  **Okay.  Did you -- do you know now or did**

13   **you know then who these people were and what their**

14   **titles were, or are?**

15        A.  No.  I mean, I might have known then.

16   They may have participated in the meeting.

17        Q.  **But you can't remember now?**

18        A.  But I don't know their names now.

19        Q.  **And what's your response to him?**

20        A.  "Sounds good to check in first -- would

21   Friday around 3:30 work?"

22        Q.  **All right.  And do you know whether or not**

23   **you had that call with him?**

24        A.  I don't remember.

25        Q.  **All right.  So you don't recall who was on**

**CAROL CRAWFORD  11/15/2022**

Page 178

1    the call besides you, if it took place?

2              MS. SNOW:  Objection.  Mischaracterizes

3    testimony.

4         A.  I --

5              MS. SNOW:  Sorry.

6              (Inaudible crosstalk.)

7              MR. VECCHIONE:  I'll rephrase.

8    BY MR. VECCHIONE:

9         Q.  You don't recall whether the call happened

10   and who was on it?

11        A.  Correct.

12        Q.  All right.  And do you know whether you'd

13   have a calendar with that call on it, by any chance?

14        A.  If we had a call, we typically had a

15   calendar appointment.

16        Q.  Okay.  All right.  And what was -- you say

17   "sounds good to check in first."

18              What did you want to check in with him

19   for?  What were you -- what did you want to talk

20   about first?

21        A.  I mean, I'm doing this from reading the

22   email.  I think she's saying let's check in before

23   our regular meeting.

24        Q.  Okay.

25        A.  I think that's what -- I mean, that's how

**CAROL CRAWFORD  11/15/2022**

Page 179

```
 1    I interpreted the "check in first."
 2         Q.  And by this time were you already having
 3    regular meetings with Google like we've seen with
 4    Facebook?
 5         A.  Yeah.  This was in 2021.  So we had been
 6    meeting pretty regularly with Google by this time.
 7              MR. VECCHIONE:  Okay.  You can put that
 8    aside.
 9              (Plaintiffs' Exhibit 29 marked.)
10    BY MR. VECCHIONE:
11         Q.  Let's try Exhibit 29.  Same thing, read me
12    the subject line, the date, and then take a look at
13    it.
14         A.  Okay.  Okay.  Subject line's:  Followup on
15    misinformation, or misinfo conversation.  It's
16    4/5/2021.
17              THE WITNESS:  Can I see this?
18              MS. SNOW:  Yes.
19         A.  Okay.
20    BY MR. VECCHIONE:
21         Q.  All right.  So can you go to the very end,
22    I guess, the very last page, read what you said on
23    March 29 at 9:52.
24         A.  "Are you all open to using our regular 4pm
25    meetings to go over things with Census, or what is
```

**CAROL CRAWFORD  11/15/2022**

Page 180

1  preferred?  I wasn't clear how interested you all

2  were on this effort or who the players are on your

3  end."

4      **Q.  So what were the regular 4:00 p.m.**

5  **meetings you refer to?**

6      A.  I think -- because I still have a

7  4:00 p.m. meeting every other Monday with Google.  I

8  think that these were the same every-other-week

9  check-in meetings.  Sometimes we wouldn't have them.

10  Sometimes we would have them and discuss things.

11      **Q.  Did you have similar regular meetings with**

12  **the other platforms we've been discussing, Face- --**

13  **Meta and Twitter?**

14      A.  We -- you asked some of this earlier.

15      **Q.  I did.**

16      A.  The same answer.  So we had regular

17  meetings with Google, and we had regular meetings

18  with Meta.  Most -- you know, the frequency changed.

19  So, you know, I don't meet as often.  I mean, Google

20  we meet every other week.  Right now with Meta it's

21  more ad hoc.

22      **Q.  Okay.**

23      A.  We had had a regular meeting with

24  Pinterest for a short period of time, and we had my

25  memory was just more ad hoc meetings on occasion

**CAROL CRAWFORD  11/15/2022**

```
 1   with Twitter.
 2          Q.  So on the regular meetings with either
 3   Google or Facebook?
 4          A.  Mm-hmm (affirmative).
 5          Q.  Well, let me ask the question this way.
 6   From the CDC end, were the same people usually
 7   attending those meetings with each social media?
 8          A.  It could vary.  I mean, I was always -- I
 9   mean, with Google, it was typically me and Fred
10   Smith, who's our technical lead, because often the
11   Google questions would be more about technical
12   implementations that we might have to work on.  We
13   were usually always on it.  Sometimes I would --
14   depending on the subject, I would bring in other
15   people.
16          With Meta, I was pretty much always on
17   there.  Jay typically listened in.  And then I would
18   bring people in depending on the subject.
19          Q.  All right.  And what were the -- were the
20   topics typically misinformation, or technical
21   subjects?
22          A.  They -- by and large, they were mostly
23   about things other than misinformation; though
24   misinformation was discussed in the meetings.  But
25   they were originated about getting our credible
```

**CAROL CRAWFORD  11/15/2022**

Page 182

```
 1    information out to our audiences and some of the

 2    examples I gave this morning.

 3         Q.  Okay.  And what did you mean by with we're

 4    going to check with -- "to go over things with

 5    Census, or what is preferred"?  What does that mean?

 6         A.  I don't -- I don't have direct memory of

 7    it.  I'm only assuming that -- what I recall doing

 8    is asking through this chain is like is it okay if

 9    we bring Census in?  Do you like -- what format is

10    best to talk about misinformation?

11         Maybe we didn't resolve it on this call

12    from the previous exhibit.  I can't say for sure

13    what I meant by it.

14         Q.  Okay.  And then could you read Onyimba's

15    response to you on that, following that on

16    March 29th?

17         A.  (As read)  We would like to follow up on

18    our discussion with your colleague, Cynthia, on

19    vaccine information a few months ago.  Specifically,

20    we plan to share a new list of common vaccine

21    misinformation claims and would love it if Cynthia

22    or other vaccine experts can join.  We can also save

23    a few minutes for me, you and Jan to discuss

24    potential next steps regarding Census, but will not

25    need the broader team for that discussion.
```

**CAROL CRAWFORD  11/15/2022**

Page 183

1       Q.   So who's Cynthia?

2       A.   Cynthia Jorgensen, which was on a previous

3  exhibit.  She was the -- I mean, at the time of the

4  other exhibits, she was the co-lead and the

5  associate director for communication.  I don't know

6  what role she was -- she was definitely the ACS

7  during this.  I don't know if he was in their JIC

8  during this period of time.

9       Q.   Do you know what vaccine information she

10  provided to Google?

11      A.   I don't recall specifically.  But they --

12  so they were trying to be sure that they had the

13  right information when someone Googled something.

14  When you Google COVID, for instance, there are these

15  little tabs that come up.  They'll say, like,

16  symptoms, treatment, vaccines.  And that content,

17  some of the things came from the CDC website.  So

18  from time to time they wanted to update information

19  like that, and would ask us to have an expert on

20  that could talk about it.

21      Q.   Got it.

22      A.   I don't remember this question, but I'm

23  sure that's what it's in reference to.

24      Q.   All right.  Do you know what Google did

25  with the list of common vaccine misinformation

**CAROL CRAWFORD  11/15/2022**

Page 184

```
 1    claims?
 2         A.   I don't remember the list of claims, or
 3    what the format was or what they asked us about it.
 4    Maybe if you have future exhibits I'll remember, but
 5    I don't recall from this.
 6         Q.   All right.  And then he says and -- "can
 7    save a few minutes for you, me and Jan to discuss
 8    potential next steps regarding the Census but will
 9    not need the broader team for the discussion."
10         Is that your understanding that it's a
11    discussion about Census, or with Census, like are
12    they there?
13         A.   I don't know for sure what this was in
14    reference to.  But it -- I think that it is in
15    reference to discussing how to engage on an ongoing
16    basis about misinformation and the Census suggestion
17    that we have regular meetings with them just on that
18    topic.
19         Q.   I got it.  And you respond that you're
20    going to get those subject matter experts on the
21    next call?
22         A.   Yes.
23         Q.   I think I might as well add, and Census
24    won't be there, but you'll discuss how to engage
25    with them.  Is that the meaning of that, that they
```

**CAROL CRAWFORD  11/15/2022**

Page 185

```
 1    are not going to be at the next meeting but we'll
 2    talk about them?
 3         A.  That's my assumption.
 4         Q.  Okay.
 5         A.  I don't know if it's because they weren't
 6    available, or if there was some reason we didn't
 7    invite them.
 8         Q.  Do you recall what your discussion with
 9    Census was about Google at that time?
10         A.  I don't recall, but I still believe this
11    is just about how to engage more regularly about
12    misinformation, or whatever -- whatever Census had
13    done with Google and YouTube, should we have a
14    similar structure with CDC.  I believe that is what
15    is not resolved in these chains.
16         Q.  All right.  And then Mr. Onyimba asked you
17    another question on Friday April 2nd, 2021.
18         A.  Mm-hmm (affirmative).
19         Q.  He says:  "Thanks again for your time this
20    week.  Attached are some of the claims we discussed
21    for your reference," and they are not attached so we
22    can't see those.  But it says:  "On a separate but
23    related note would you happen to know if the CDC has
24    statistics on hospitalization or death for people in
25    the 40-49 age category who do not have underlying
```

**CAROL CRAWFORD  11/15/2022**

Page 186

```
 1    health conditions or co-morbidities?"

 2            You see that?

 3        A.  Yes.

 4        Q.  Do you know why he was asking you that?

 5        A.  No, I don't know why he was asking me

 6    that.

 7        Q.  And you responded on April 5th that you

 8    couldn't respond over the weekend, but then you -- I

 9    think you sent him this chart?

10        A.  Yes.

11        Q.  What is that chart?

12        A.  I thought that this chart would answer his

13    question.  It's the -- it was from the CDC's data

14    tracker.  It's a chart on hospitalizations.

15        Q.  But it's a chart of people with asthma;

16    right?

17        A.  That's -- the link worked -- you could --

18    that's a drop-down where you can pick anything you

19    want I think I'd screenshot so he'd know what was

20    going to be on the link.

21        Q.  So you could pick without asthma if you

22    wanted?

23        A.  Yeah.  I think I just was showing him what

24    it was.

25        Q.  Okay.
```

**CAROL CRAWFORD  11/15/2022**

Page 187

```
 1        A.  But the link was more interactive.
 2        Q.  Okay.  And so if he went there, if you go
 3   to this website, theoretically he can take out
 4   asthma and put in whatever age range he wants?
 5        A.  Mm-hmm (affirmative).  And you could pick
 6   a different major category or an age.
 7             MR. VECCHIONE:  Thank you.  Put that
 8   aside.
 9             (Plaintiffs' Exhibit 30 marked.)
10   BY MR. VECCHIONE:
11        Q.  Plaintiffs' Exhibit 30.  Again, could you
12   just tell us the subject matter and the date and
13   then read it to yourself.
14        A.  Subject:  Follow up on mis-info
15   conversation.  4/12/21.  4 -- yeah, 2021.  Sorry.
16        Okay.
17        Q.  So would you agree with me that this is
18   also, if you look at Plaintiffs' Exhibit 29, that
19   bottom link you had sent is the same link, and then
20   there is just a new chain on the top of this?
21        A.  Yes.
22        Q.  And then you ask him:  "Can you give me an
23   idea what topics we'll be covering?  But yes, I'll
24   ask them to attend."
25             I guess we ought to read.  Could you
```

**CAROL CRAWFORD  11/15/2022**

Page 188

1    please read to me what question he asked you?

2        A.   "For tomorrow's call would it be possible

3    to include Cynthia or other COVID-19 treatment SMEs

4    to follow up on some additional questions?"

5        Q.   And then you say:  "Can you give me an

6    idea of what topics we'll be covering?  But, yes,

7    I'll ask them to attend"?

8        A.   Yes.

9        Q.   Was this a BOLO meeting or a regular

10   meeting?  Like, was this for something that had just

11   occurred that you wanted to alert them to, or was

12   this a regular meeting?

13       A.   I don't believe this was a BOLO meeting

14   because I don't think we had started BOLO meetings

15   in April.  I think we started those in May.  I don't

16   know for sure, but I don't feel like that's what

17   this was.

18           I -- without that attachment, I don't

19   remember what it was, but it wasn't uncommon for

20   them to have just general questions about things and

21   ask us to bring people to a meeting to help go over

22   it.  Maybe they were trying to display something in

23   the search or whatever.  I just -- I don't remember

24   this context.

25           (Plaintiffs' Exhibit 31 marked.)

**CAROL CRAWFORD  11/15/2022**

**Page 189**

```
 1    BY MR. VECCHIONE:
 2         Q.  All right.  Go to Exhibit 31.
 3         A.  Thank you.
 4         Q.  Once again for Exhibit 31 could you tell
 5    me the date and the subject matter line, and then
 6    read it to yourself.
 7         A.  Subject:  Omicron page.  Sent December 21,
 8    2021.
 9              Okay.
10         Q.  All right.  We can go to the back again,
11    the last page.  And you have an email exchange you
12    sent on December 21, 2021 at 10:38?
13         A.  Yes.
14         Q.  Who did you send it to?
15         A.  That's -- I -- probably to Jan and
16    Stanley.
17         Q.  Okay.  And why are you sending information
18    about Omicron-specific pages to them?
19         A.  Very similar to how I described how we've
20    been working with them.  This was a really big thing
21    at the time, and they are trying to also be sure
22    that people can find things in the search results,
23    and they were -- they were highlighting CDC content
24    and what they -- I call it the knowledge panel,
25    those little tabs on Google.
```

**CAROL CRAWFORD  11/15/2022**

1            So, if something big like this was

2    happening I would let them know if we had new key

3    pages that they were likely getting a high number of

4    searches on.  And I'm pretty sure everyone was

5    searching for Omicron around December of 2021.  So

6    that is why I sent it to them so they would have

7    awareness of this brand new piece of content, and

8    because I was seeing this -- I know.  I have a

9    point.

10           **Q.   Right.**

11           A.   This is a screenshot of what I call the

12    knowledge panel with the tabs, and it wasn't coming

13    up with the newer piece of content.  So I wanted to

14    alert them to it.

15           **Q.   Okay.  So what you've cut and pasted I**

16    **think in there, says, like, coronavirus virus**

17    **disease, and then there is overview statistic**

18    **symptoms?**

19           A.   Yes.

20           **Q.   And then below it has the information on**

21    **variants.**

22           A.   Mm-hmm (affirmative).

23           **Q.   All right.  So let me understand this,**

24    **because I'm not quite sure I'm getting it.**

25                You say: "I see our main Variant page."

**CAROL CRAWFORD  11/15/2022**

Page 191

```
1      That means CDC's variant page; right?
2           A.  Yes.
3           Q.  "Is coming up at the top of the
4      Omicron/variant panel."
5                What -- was that Google search?
6           A.  Yes.
7           Q.  Or what are you referring to then?
8           A.  So this -- when you search Google, you
9      would get -- this is a screenshot --
10          Q.  Got it.
11          A.  -- of the Google results.
12          Q.  Okay.
13          A.  This is not our site.  This is their site.
14     They have these little things that say overview
15     symptom -- I mean, statistic symptoms.  Some of
16     these were populated by CDC's content.  There was
17     one here that's cut off that said variants.
18          Q.  Got it.
19          A.  That was going to just the general
20     variants page.  But I know people were looking --
21     because we'd saw all the search terms, they were
22     looking for Omicron specifically, and I wanted to
23     make them aware that they may want to swap the links
24     out.
25          Q.  Okay.  And so you said:  "So I want to be
```

**CAROL CRAWFORD  11/15/2022**

Page 192

```
 1    sure you were aware that this Omicron specific page
 2    is maturing and I expect further updates."
 3              What does that mean, the Omicron-specific
 4    page is maturing?  The one at CDC?
 5         A.  Yes.  This was our page, like -- you know,
 6    this is pretty early in the Omicron, I believe, I
 7    don't have the timetable in it, but -- so we're
 8    always updating our web pages as situations changes.
 9    So I don't think this -- at the time I sent it I had
10    just tons of concrete information, but it -- we were
11    going to add to it, and I thought it was a better
12    place to send people that were searching for
13    Omicron.
14         Q.  And what did you want them to do with it?
15         A.  Well, they have always been clear that the
16    search results are not something that they mess
17    with, but this part, the knowledge panel, is
18    something that they manually assembled and worked
19    with us on.  So I thought they might want to switch
20    this.  (Indicating.)
21         Q.  Got it.  And then he responds -- at least
22    it looks like Jan Antonaros responds to you; right?
23         A.  Jan does, yes.
24         Q.  "Thanks for heads up.  Our health team,
25    including our Chief Health Officer, is tracking U.S.
```

**CAROL CRAWFORD  11/15/2022**

Page 193

```
 1    federal announcements today closely.  Stanley and I
 2    will take this back to our team."
 3              Do you know who the chief health officer
 4    was?
 5         A.  I think -- I think it may be Karen
 6    DeSalvo.
 7         Q.  Okay.
 8         A.  But on their end.  That's their chief
 9    health officer.  I think that's her title.
10         Q.  And when he says tracking U.S. federal
11    announcements today closely, does he mean on Google?
12    What does he mean by that, in your understanding?
13              MS. SNOW:  Objection.  Calls for
14    speculation.
15    BY MR. VECCHIONE:
16         Q.  What did you understand that term?
17         A.  I don't remember.  I'm guessing there was
18    some announcements then, but I don't recall.
19         Q.  Had Google been instructed by the CDC to
20    update following the CDC guidance?
21         A.  To update what?
22         Q.  To update their search engine, or for
23    their panels to follow the CDC guidance?
24              MS. SNOW:  Objection.  Compound.
25    BY MR. VECCHIONE:
```

**CAROL CRAWFORD  11/15/2022**

Page 194

```
 1          Q.  You could answer if you understand.

 2          A.  We did not instruct Google to update their

 3     search engines, or their panels.  But I did suggest

 4     that -- and he said about CDC guidance.  This was --

 5     this wasn't about -- this was a consumer page about

 6     what people would need to know about Omicron.  I --

 7     it was more of just correcting what I thought was a

 8     better link in the panels that we had provided input

 9     on before.

10          Google is already -- has always made it

11     clear that the search engine is sacred.  There is

12     nothing we can say to have them fix their search

13     engine, or change their search engine to something

14     else.

15          Q.  All right.  But how about the panel

16     itself?  What -- I guess what I'm trying to

17     understand is what -- you send them this panel --

18     because apparently it's going to the wrong place on

19     the CDC -- if you put in certain search terms, it's

20     going to the wrong place on the CDC website?

21          A.  So I think what's hard to understand about

22     this is this is not a typical way that Google

23     presents things.  You will have to ask Google how

24     they considered when they added it.  But my

25     perception is that because of the substantial demand
```

**CAROL CRAWFORD  11/15/2022**

Page 195

```
 1    of searches for COVID, they added this that I call a
 2    knowledge panel.  I think they may have another word
 3    for it.  So that there is this layer before the
 4    search results come up, and it looks like this
 5    screenshot.
 6        Q.  What you're pointing --
 7        A.  But normally when you search, you don't
 8    get that on other topics.  I think they do have it
 9    for a few other topics, but I rarely run into it
10    when I do searches.
11        Q.  Okay.  And then on December 21st I think
12    Stanley Onyimba writes to you?
13        A.  Yes.
14        Q.  And he again said he explains how it's
15    working and what they are going to do; right?
16        A.  Yes.
17        Q.  And then he says again: "As Jan mentioned,
18    we are tracking announcements closely and will
19    continue to update our products to reflect the
20    latest guidance."
21            What did you understand that to mean?
22        A.  I think he is saying -- I -- gosh, I don't
23    remember what was happening the week of December 21.
24    There seems to be a reference to announcements that
25    I just, at this moment I'm not sure.  So I think I'm
```

**CAROL CRAWFORD  11/15/2022**

Page 196

```
1    missing some context to what he's saying.
2         Q.  And at the top?
3         A.  Mm-hmm (affirmative).
4         Q.  Then you say:  "Glad you all are
5    tracking."  You sign off.
6         A.  That would mean I'm glad you're watching
7    what's happening, but I don't -- unfortunately, I
8    can't remember what was happening that week that
9    they're referencing.  But when they say reflect the
10   latest guidance, what I believe he's referring to is
11   what I said before is that we helped populate some
12   of these tabs.
13        Q.  You can put that aside.
14        A.  Okay.
15            (Plaintiffs' Exhibit 32 marked.)
16   BY MR. VECCHIONE:
17        Q.  Exhibit 32.  And once again I'll ask you
18   for Exhibit 32 to read the subject line and the
19   date, and then read it to yourself.
20        A.  Subject:  Request for problem accounts.
21   Sent April 9, 2021.
22            Okay.
23        Q.  All right.  This is from you to Todd
24   O'Boyle at the top.  And then it's from Todd O'Boyle
25   to you at the bottom, right, on April 8th, 2021?
```

**CAROL CRAWFORD  11/15/2022**

```
 1        A.  Yes.

 2        Q.  Can you read what he writes to you, and

 3   then your response?

 4        A.  "Hi, Carol, I'm looking forward to setting

 5   up regular chats; my team has asked for examples of

 6   problematic content so we can examine trends.  All

 7   examples of misinformation are helpful, but in

 8   particular, if you have examples of fraud such as

 9   fraudulent COVID cures, fraudulent vaccine cards,

10   et cetera, that will be very helpful."

11        And I said:  "Yes, we will get back to you

12   early this week."

13        Q.  "Thanks for checking in"; right?

14        So did you -- had you talked to Todd

15   O'Boyle before this exchange?

16        A.  I don't recall.  But I think this is

17   around the time that Census was helping us, and I

18   believe I asked Todd, similar to I asked the other

19   ones, like:  Is there a good way that we should

20   start engaging on misinformation?  And this is

21   probably a followup to either that email or phone

22   call.

23        Q.  And so first, who's Todd O'Boyle?  And he

24   says at Twitter.com, so I assume he's at Twitter?

25        A.  Yes, Todd's at Twitter.  And I know he was
```

**CAROL CRAWFORD  11/15/2022**

Page 198

```
 1    a point of contact that I received for the topic of
 2    misinformation.  I don't know what his title was
 3    specifically.
 4         Q.  Okay.  Have you ever met him in person?
 5         A.  No.  And as a clarification, I think I
 6    called him Todd O'Brien when you asked me earlier
 7    who the POCs were.  Until I see this, I didn't
 8    remember his name correctly.
 9         Q.  So O'Boyle, different, yes.
10         A.  Yes.
11         Q.  That's fine.  At this time did you set up
12    regular meetings with Twitter?
13         A.  My memory is is that we never got regular
14    meetings with Twitter set up.  I mean, around this
15    time.  I know they participated in the BOLO
16    meetings, but I don't recall any kind of regular
17    schedule with them.  I don't remember many occasions
18    we actually got on a phone call and discussed
19    anything during COVID.  There was a couple, but not
20    many.
21         Q.  How many BOLO meetings did you have with
22    the social media companies from the beginning of
23    COVID to, say, now?
24         A.  I think that we only had two.  And then I
25    think that I sent one time a -- in lieu of a meeting
```

**CAROL CRAWFORD  11/15/2022**

Page 199

1    a PowerPoint.  And I didn't recall it but we sent

2    another PowerPoint regarding that lab issue that was

3    in a previous exhibit.

4         **Q.  Do you know who directed Mr. O'Boyle to**

5    **send misinformation on Twitter to you?**

6              MS. SNOW:  Objection.  Mischaracterizes

7    testimony.

8         A.  Say again.

9    BY MR. VECCHIONE:

10        **Q.  Excuse me.  Do you know who directed him**

11   **to ask you for examples of misinformation?**

12        A.  No.

13        **Q.  And do you know whether you sent him any?**

14        A.  No.

15        **Q.  Okay.**

16        A.  Could --

17        **Q.  Yeah, go ahead.**

18        A.  Can I get you to clarify?  What do you

19   mean by directed him to?

20        **Q.  I just wanted to -- I'll put it this way.**

21   **Todd O'Boyle was your point of contact with Twitter?**

22        A.  Yes.

23        **Q.  Was -- did you know of anyone over him**

24   **telling him to do things?**

25        A.  That's how I interpreted it.  No.

**CAROL CRAWFORD  11/15/2022**

Page 200

1          Q.  He says that examples of misinformation
2    are helpful, particularly fraud.  Do you know what
3    he was doing that it would be helpful to him to get
4    this information?
5          A.  I don't remember the exact context of this
6    email, but I believe, as I mentioned before, this
7    was probably part of me saying how could we work
8    together on misinformation.
9              And it sounds like he's kind of wondering
10   what we're seeing that we want to bring up, and he's
11   asking for some examples.  This is how I'm reading
12   it now.  And it sounds familiar based on what we,
13   you know, my memory of this time.
14              MR. VECCHIONE:  You can put that aside.
15              (Plaintiffs' Exhibit 33 marked.)
16   BY MR. VECCHIONE:
17          Q.  Exhibit 33.  And once again please read
18   the subject matter and the date, and then read it to
19   yourself for Exhibit 33.
20          A.  Twitter CDC examples.  4-13-21 xlsx is the
21   extension.  4/14/2021.
22          Q.  Can you read his request to you, and then
23   your response?
24          A.  This is the same email from before.  "I'm
25   looking forward to setting up regular chats.  My

**CAROL CRAWFORD  11/15/2022**

1  team has asked for examples of problematic content

2  so we can examine trends.  All examples of

3  misinformation are helpful, but in particular, if

4  you have examples of fraud such as fraudulent COVID

5  cures, fraudulent vaccine cards, et cetera, that

6  would be very helpful."

7      **Q.  And then this time you respond, though?**

8      A.  Yes.  I didn't recall if we sent them, but

9  we did.

10      **Q.  And what do you say?**

11      A.  "The Census team put together this

12  spreadsheet with four examples.  Is this what you

13  had in mind?"

14      **Q.  And then you have examples:  Vaccines**

15  **aren't FDA approved.  Fraudulent cures.  VAERS data**

16  **taken out of context and infertility; right?**

17      A.  Yes.

18      **Q.  What did you mean by the subject word --**

19  **what was your understanding of the subject "request**

20  **for problem accounts"?**

21      A.  I don't know --

22      **Q.  Okay.**

23      A.  -- why the subject read that.  But what he

24  asked for in the email is for examples of

25  misinformation.

**CAROL CRAWFORD  11/15/2022**

Page 202

```
 1        Q.   Okay.  And when you met with him, did you

 2   have a spreadsheet like this?

 3        A.   I don't -- we, we sent him a spreadsheet.

 4   I don't remember meeting with Todd --

 5        Q.   Okay.

 6        A.   -- besides the BOLO meetings.  We might

 7   have, but I don't recall.

 8        Q.   And if -- and if you look at this email --

 9        A.   Mm-hmm (affirmative).

10        Q.   -- it has attachments?

11        A.   Yes.

12        Q.   And it's Twitter CDC examples.  So you've

13   attached the spreadsheet to this?

14        A.   Right.

15        Q.   Okay.

16        A.   I thought you were asking about when we

17   met with him --

18        Q.   No --

19        A.   -- did we have spreadsheets.

20        Q.   -- that's -- I was asking that.

21        A.   Okay.

22        Q.   Do you know who in the Census put this

23   spreadsheet together?

24        A.   I don't know for sure, but likely it was

25   Christopher.
```

**CAROL CRAWFORD  11/15/2022**

Page 203

```
 1          Q.  Christopher, remind me.
 2          A.  Lewitzke.
 3          Q.  Lewitzke, yes.  I got it.
 4          A.  Something close to that name.
 5          Q.  We discussed him earlier.  He appears on
 6     those emails?
 7          A.  Yes.
 8          Q.  Not a new guy?
 9          A.  No.  I feel like we're saying his name
10     wrong, though.
11          Q.  I think that's correct.  Lewitzke.
12              (Comment off the record.)
13     BY MR. VECCHIONE:
14          Q.  Do you know whether that Census team had
15     any medical professionals on it?
16          A.  No.
17          Q.  And what was the definition of fraudulent
18     cures?
19          A.  I don't remember what that was.
20          Q.  And what is the category:  Vaccines aren't
21     FDA approved?  Is that a claim, or is that a
22     statement about vaccines that you're making?  What
23     is that?
24          A.  I'm interpreting this whole list as things
25     that they saw that were being stated as
```

**CAROL CRAWFORD  11/15/2022**

Page 204

1   misinformation, that there were claims that vaccines

2   aren't FDA approved.

3        **Q.  All right.  And as far as VAERS data taken**

4   **out of context, is your understanding that that's**

5   **the same problem we discussed earlier with VAERS**

6   **reports?**

7        A.  Yes.

8        **Q.  All right.  It's not something different?**

9        A.  Yes.

10       **Q.  Let me rephrase.  No, it's not something**

11  **different?**

12       A.  I believe this VAERS data taken out of

13  context is the same kind of thing we were discussing

14  earlier.

15       **Q.  Thank you.  And what do you believe**

16  **"infertility" is?**

17       A.  I'm assuming this was people claiming that

18  getting the vaccines led to infertility.

19       **Q.  Okay.  And why did you give this chart and**

20  **this information to Mr. O'Boyle?**

21       A.  He asked for examples.  And I believe he

22  was asking for these examples in this email because

23  he was wondering what we would -- what would come up

24  in BOLO meetings, or what we would be discussing.  I

25  think he wanted some sense of what we would be

**CAROL CRAWFORD  11/15/2022**

Page 205

```
 1   bringing to point out.  That's my memory of it.
 2        Q.  You can put that aside.
 3             MS. SNOW:  Can we take like a five-minute
 4   break?
 5             MR. VECCHIONE:  Sure, sure.  We have --
 6   we're -- I was cooking with gas, though, so, you
 7   know --
 8             (Comments off the record.)
 9             THE VIDEOGRAPHER:  Off the record at 3:37.
10             (Recess 3:37 p.m. - 3:51 p.m.)
11             THE VIDEOGRAPHER:  Back on record at 3:51.
12   BY MR. VECCHIONE:
13        Q.  And I will again direct the witness to
14   read the subject line and the date, and then read
15   this one.  And this one is a little more hefty.  You
16   may want to take a look through it.
17             MS. SNOW:  What exhibit?
18             MR. VECCHIONE:  Exhibit 34.
19             (Plaintiffs' Exhibit 34 marked.)
20        A.  Subject line is COVID Misinformation.
21   Sent 6/30/2021.
22             MS. SNOW:  Mine is stapled out of order, I
23   just realized.  I want to make sure, it might just
24   be mine, if you want to clarify.
25             MR. VECCHIONE:  Let's do the Bates stamps.
```

**CAROL CRAWFORD  11/15/2022**

Page 206

```
 1   The bottom right I have it ends 496, 497, 498, 499

 2   and 500.

 3           MS. SNOW:  I think I have all those.  They

 4   are just out of order.  I just want to make sure no

 5   one else's was.

 6           MR. VECCHIONE:  No, I appreciate that.

 7           MS. SNOW:  Yeah.

 8           MR. GILLIGAN:  Is Carol's right?

 9           MS. SNOW:  Yeah.

10       A.  Mine was correct.

11   BY MR. VECCHIONE:

12       Q.  Tell me when you're ready.

13       A.  I'm ready.

14       Q.  All right.  Can you identify Exhibit 34

15   for me?

16       A.  The subject line is COVID misinformation.

17   6/30/2021.

18       Q.  Do you recognize this document?

19       A.  This, yes, feels familiar to me.

20       Q.  And what is it?

21       A.  It's a discussion about accessing

22   Twitter's partner support portal where you can flag

23   information to be reviewed by Twitter.

24       Q.  Let's take a look.  As usual, these chains

25   start at the back.
```

**CAROL CRAWFORD  11/15/2022**

Page 207

```
 1          A.  Mm-hmm (affirmative).
 2          Q.  I think the first one in this chain is
 3    May 10, 2021 at 1:50 p.m. and is that from you to
 4    Todd O'Boyle?
 5          A.  Yes.
 6          Q.  And I think that we've seen this list of
 7    items before to other -- to other social media
 8    outlets about --
 9          A.  Yes.
10          Q.  And it's concerned -- it's mainly
11    concerned about shedding?
12          A.  And microchips.
13          Q.  And microchips.  And you attach sort of a
14    chart.  Could you tell us what that chart is?
15          A.  Just a table of example posts regarding
16    this, those two issues, vaccine shedding and
17    microchips.  It's not really a chart.  It's just
18    formatted in a table.
19          Q.  Okay.  Could you read what you say to him
20    right above the table?
21          A.  (As read)  We wanted to point out two
22    issues that we are seeing a great deal of misinfo
23    about, vaccine shedding and microchips.  These
24    are -- the below are just some example posts.  We do
25    plan to post something shortly to address vaccine
```

**CAROL CRAWFORD  11/15/2022**

Page 208

```
 1   shedding, and I can send that link too.  Our Census
 2   team copied here has much more info on it if needed.
 3        Q.  Okay.  And so you have copied the Census
 4   team that we've discussed earlier.
 5        A.  Yes.
 6        Q.  And then you say -- could you read what
 7   you say next?
 8        A.  (As read) We're -- also we're standing up
 9   a BOLO COVID misinformation meeting and inviting all
10   tech platforms.  We are shooting for 12 p.m. on
11   Friday for our first meeting.  I'll include you on
12   the invite but if you'd like to propose an alternate
13   approach or would like me to include others, just
14   let me know.
15        Q.  All right.  Tell us.  We discussed a
16   little bit the BOLO meetings that you had with the
17   tech companies.  And this BOLO COVID meeting, is
18   this the first one?  Where does it stand amongst
19   those you've discussed?
20        A.  I -- without having the date --
21        Q.  Right.
22        A.  -- in front of me, I think this is in
23   reference to the very first meeting.
24        Q.  Okay.  And BOLO, we said, is be on the
25   lookout.  And this was -- you were sending this to
```

**CAROL CRAWFORD  11/15/2022**

Page 209

1    Mr. O'Boyle so that he would be on the lookout for

2    these things appearing on Twitter?

3        A.  Yes.

4        Q.  Did you have a prior conversation with him

5    about this before you sent it, do you know?

6        A.  I don't think I had a prior conversation

7    about vaccine shedding and microchips, and these are

8    examples of that.  I mean, we saw on the other one

9    we had sort of general conversations about how we

10   could -- how we should have meetings or not have

11   meetings.  And I probably asked about the BOLO, like

12   is the BOLO format, since it was used previously, a

13   good format.

14       Q.  Okay.  And what is that format?  So it's

15   just -- we've seen the previous one, you said to him

16   I'll include you on the invite, but if you'd like to

17   propose an alternative approach, or would like me to

18   include others, just let me know.

19          Did you have some view of whether Twitter

20   wanted to meet alone, or separately?  Is that what

21   that means?

22       A.  No.  But I had a view that I couldn't tell

23   if the platforms wanted to do the BOLO meetings the

24   way Census had done them for their own work, so I

25   was checking.

**CAROL CRAWFORD  11/15/2022**

Page 210

```
 1          Q.  Had you been at any -- invited to any of
 2    the Census BOLOs?
 3          A.  No.  I don't think they were doing BOLOs
 4    by the time that we were meeting.
 5          Q.  So they had done that for the Census?
 6          A.  That's my understanding.
 7          Q.  And it had been in relation to the 2020
 8    Census?
 9          A.  That's my understanding.
10          Q.  All right.  Did you talk to anyone at
11    Census about how they ran BOLO meetings?
12          A.  Yes.
13          Q.  Okay.  In order to create your own?
14          A.  Yes.
15          Q.  And what did they tell you?
16          A.  Well, they explained how they did it.  In
17    fact, they drafted the slide deck.  We talked about
18    this earlier.  They drafted it and showed me how
19    they thought that we should do it, and that it was
20    just we would give examples, we would give the
21    science, and then they --  people could follow up
22    separately.  I mean, I believe we changed some of
23    the format of the PowerPoint, what we did for CDC of
24    course, but they -- you know, they kind of told us
25    how they had done it in the past.
```

**CAROL CRAWFORD  11/15/2022**

Page 211

1        Q.   Okay.  Let's go to his response to you.

2             He says to you -- and here we see

3    Mr. Lewitzke's name spelled correctly; right?

4        A.   Yes.

5        Q.   Okay.  So Todd O'Boyle writes to you on

6    May 10, 2021 on Exhibit 34.  "Hi, Carol.  Thanks for

7    sharing this."

8             And you took that to mean your chart,

9    right, or table, you called it?

10       A.   Yes.

11       Q.   "Agree these are important trends to note.

12   A quick scan shows that at least some of these have

13   been previously reviewed and actioned.  I will now

14   ask the team to review the others."

15            What did you take that to mean?

16       A.   I don't know how Todd meant it

17   specifically, but I interpreted it as Twitter made

18   decisions about the areas of misinformation based on

19   whatever policy they had.

20       Q.   And he says:  "Carol, remind me:  Did you

21   have a chance to enroll in our partner support

22   portal?  In the future that's the best way to get a

23   spreadsheet like this reviewed."

24            So you mentioned that Partner Support

25   Portal.  What is that?

CAROL CRAWFORD  11/15/2022

1       A.   My understanding of it, and I don't

2   believe I ever successfully got into it, but it's

3   similar to what I described for Meta.  It's an

4   offering where you log in and you can report

5   misinformation or threats or problematic posted

6   content in this portal, and it puts it in a system

7   for review.

8       Q.   **Did you know what happened at Twitter to**

9   **reports that were deemed actionable?**

10      A.   I assume similar to Meta that they

11  probably had multiple options.  I am sure some were

12  removed.  I am sure some may have had -- were

13  flagged.  I see flags all the time on the Twitter

14  posts.  I am sure some were just maybe -- I don't

15  know what they do, but maybe they weren't

16  distributed as much on peoples' feeds.

17      Q.   **Where do you see Twitter?  Do you have a**

18  **Twitter?**

19      A.   Yeah.  I mean, my responsibility is social

20  media for CDC, so I do look at Twitter, and we have

21  Twitter accounts at CDC.

22      Q.   **And CDC -- well, I'll just go back for one**

23  **second.  You -- prior -- on May 10 you were**

24  **discussing a Friday meeting that you'd invited**

25  **Mr. O'Boyle to.  And do you know whether that**

**CAROL CRAWFORD  11/15/2022**

Page 213

1   meeting occurred?

2       A.  I mean, I think we set up the first BOLO

3   meeting in May.  And this was May 10th, and the

4   Friday was there so I suspect it did occur.

5       Q.  Okay.  And you said you didn't use the

6   portal.  Did anyone else at CDC use the portal?

7       A.  No, I don't -- I don't recall anyone else

8   trying to get access besides myself.

9       Q.  Had you talked to him about the partner

10  support portal beforehand, before this email chain?

11      A.  I don't remember.  I'm inferring from this

12  chain that perhaps not.

13      Q.  All right.  Had you talked to Census about

14  the portal?

15      A.  I don't recall if we discussed the Twitter

16  portal per se.  But I did know from discussions with

17  them that one technique I think that they used was

18  using portals to -- for their work to report

19  information.  I don't remember if we discussed

20  Twitter or not.

21      Q.  Okay.

22      A.  Or if it was all about Meta.

23      Q.  But it was your understanding that Census

24  did use such devices when offered?

25      A.  That, or they told me it was an option for

**CAROL CRAWFORD  11/15/2022**

Page 214

1    us.  I'm worried I'm mischaracterizing their work

2    with very little actual memory on it.

3         **Q.  Okay.  And you respond to him:  "Todd, I**

4    **don't think we have info on how to enroll, but we'd**

5    **be happy to get on it if you'd send some info";**

6    **right?**

7         A.  Yes.

8         **Q.  And he responds that -- on May 10th at**

9    **8:51, he says he's happy to enroll you, and it**

10   **allows you a special, expedited reporting flow in**

11   **the Twitter Help Center.  That's the purpose of it.**

12        A.  Yes, I see that.

13        **Q.  What's the Twitter Help Center?**

14        A.  The portal is part of their help center

15   somehow.  I mean, I'm not an expert, but I -- it's

16   seeming -- I think the screenshot might even show

17   how it's part of it.

18             No, it doesn't.  But I believe it's like a

19   link on the help center page.

20        **Q.  And he says it worked very well with**

21   **Census colleagues last year; right?**

22        A.  Well, there we go.

23        **Q.  Yeah.**

24        A.  That's why he came up with that.

25        **Q.  Okay.  And did you give him a Twitter**

**CAROL CRAWFORD  11/15/2022**

Page 215

```
 1   account to enroll?
 2        A.  I asked him -- I can see that I asked him
 3   does it have to be our official CDC account, or is
 4   it supposed to be personal.  And I gave him my
 5   personal one.
 6        Q.  Okay.  And what was your problem with
 7   using -- did you have a technical problem with using
 8   it?  What happened?
 9        A.  It was not a priority for me, for one.  I
10   wasn't thinking that we would probably want to use
11   this portal on a regular basis.  I thought that let
12   me just myself, instead of asking my staff to get
13   involved, I want to see what the portal is myself
14   because I wasn't able to look at the Meta portal
15   myself because you had to be administrator.
16           So I wanted to look at it and see what it
17   it looked like, but I -- it wasn't a priority.  So
18   every now and then I would try to get on it, and I
19   don't remember ever solving the problem.  All I know
20   is I think when I clicked it nothing happened, or I
21   didn't get drop-downs.  That's -- and I felt like
22   maybe I wasn't in the right place.
23        Q.  Okay.
24        A.  But I am --
25        Q.  Okay.
```

**CAROL CRAWFORD  11/15/2022**

Page 216

 1      A.  -- unclear of what exactly was wrong.

 2  Sorry.

 3      Q.  I got it.  But here's -- so then I see

 4  **May 24th, 2021, 2:28 email from Christopher Lewitzke**

 5  **that I think Todd forwards it to you.  Is that how**

 6  **that works?  How does that page -- could you tell me**

 7  **what's happening on this page?**

 8      A.  The way the reply works from the email

 9  it's unclear if I was copied or not, so I can't say.

10  But I definitely was copied on Todd's response to

11  Christopher.  I'm not sure if Christopher copied me

12  on his email to Todd, which is what I think you're

13  asking me.

14      Q.  Okay.  But on **May 24th at least it looks**

15  **like Lewitzke sent a note to Todd?**

16      A.  Mm-hmm (affirmative).  And then 30 minutes

17  later Todd hit reply with everyone on it.

18      Q.  Okay.  And Carol says **I had -- (as read)**

19  **Carol and I had a sidebar, and I requested her**

20  **account be enrolled.  Your email reminds me that the**

21  **process should have been completed by now.  I'll**

22  **check with the team to make sure it's properly**

23  **enrolled.**

24          And that's your recollection that's how it

25  occurred?

## CAROL CRAWFORD  11/15/2022

Page 217

1      A.   That's my recollection.  I don't recall
2  the sidebar, but I do know that I wanted it to be
3  CDC people in these portals versus Census.  I felt
4  like that was more appropriate.
5      **Q.   And remind me, who's Christopher Lewitzke?**
6      A.   He's a -- he's a Census contractor.
7      **Q.   Okay.  With this Reingold outfit we talked**
8  **about?**
9      A.   Mm-hmm.
10     **Q.   He says:  We want to have at least some**
11 **CDC accounts whitelisted.  What does whitelisted**
12 **mean?**
13     A.   Let me read this.  I'm not sure.
14     **Q.   You've never heard that term before?**
15     A.   I have heard of whitelisted.  I don't
16 understand it in this context.
17     **Q.   What was your understanding of whitelisted**
18 **meaning?**
19     A.   Like my under -- my general understanding
20 of whitelisting is you can have kind of a list of
21 things that maybe -- of servers that are allowed or
22 not allowed is an example of a list of whitelist.
23     **Q.   Okay.  And then do you know which Census**
24 **accounts had access to this portal?**
25     A.   My memory was that none.  And I think this

**CAROL CRAWFORD  11/15/2022**

Page 218

```
1   email supports my memory, and that Todd responding
2   that I'm going to be the account that's enrolled.
3       Q.  Oh.
4       A.  For CDC.
5       Q.  For CDC.
6       A.  For CDC at least.
7       Q.  But do you know which Census accounts?
8       A.  Oh, no.
9       Q.  Okay.
10      A.  I wouldn't have any knowledge of what they
11  did.
12      Q.  Okay.  And then let's read up to May 27th,
13  2021, 2:30.  And you say haven't seen anything come
14  through.  And then Todd says:  You should now be
15  up -- should be fully -- and period.  You should be
16  fully period, he says.
17          Then he says:  "When you visit the Twitter
18  help center logged in with your account you should
19  see additional reporting options."
20          Do you know what he meant by that?
21      A.  Yes.  This portal, like I think when
22  anyone goes to the health center -- help center, I
23  think there is, like, you can flag threats and
24  things, I believe.  I think he was saying I would
25  have had something more.  But I never could locate
```

**CAROL CRAWFORD  11/15/2022**

```
 1   that.
 2           Q.   Okay.  And you tell him:  "Hi, Todd.  I
 3   have been trying to enter info but I realize I have
 4   been unclear on where to enter them.  I went to
 5   /forms and there is a drop down on things to submit,
 6   but none of them seem relevant to misinformation.
 7   Am I in the right place?"
 8             So is that the problem you had?
 9           A.   I -- based on this email I think it was
10   one of the problems.  I don't -- I think at the
11   beginning I didn't get the links, I couldn't find it
12   on the help center.  There's probably additional
13   chains, I suspect, regarding this.
14           Q.   Okay.  But you don't recall what they
15   were?
16           A.   No.
17             MR. VECCHIONE:  All right.  Put that
18   aside.
19             (Plaintiffs' Exhibit 35 marked.)
20   BY MR. VECCHIONE:
21           Q.   35.  And once again for Exhibit 35 tell me
22   what the subject line is and what's the date at the
23   top.
24           A.   The subject line:  BOLO CDC lab alert
25   misinformation.  Sent September 2nd, 2021.
```

**CAROL CRAWFORD  11/15/2022**

**Page 220**

1      Q.   And I think we've seen this alert before

2   for another social media recipient, am I correct

3   about that?

4      A.   You're correct.

5      Q.   All right.  Is this anything different

6   than when you testified last time about this BOLO?

7      A.   The only difference is this email is going

8   to Twitter.

9      Q.   Okay.  And what was your intent in telling

10   Twitter through O'Boyle to be on the lookout for

11   misinformation about PCR testing?

12      A.   I mean, I, again, I think CDC's role is to

13   provide the facts around issues.  We saw this

14   confusion about this alert brewing and more posts

15   were going up with confusion, and we thought it

16   would be a good idea to provide the platforms with

17   the facts before it became something bigger.

18      Q.   And what did you believe he'd do with the

19   information?

20      A.   I believed that they would consider it in

21   their -- I knew their policy teams or their trust

22   teams or misinfo teams, whatever they -- whatever

23   they called their teams, would evaluate it.

24      Q.   And perhaps remove it?

25      A.   I knew that removal was one of the options

**CAROL CRAWFORD  11/15/2022**

Page 221

```
 1    that they had, yes.
 2              MR. VECCHIONE:  You can put that aside.
 3              (Plaintiffs' Exhibit 36 marked.)
 4    BY MR. VECCHIONE:
 5         Q.  Exhibit 36.  And once again, if you could,
 6    for Exhibit 36 tell me the date and the subject
 7    line, and then read it to yourself.
 8         A.  Subject:  Call or VC-Facebook weekly sync
 9    with CDC (CDC to invite other agencies as needed.)
10    And this was sent on April 15, 2021.
11         Q.  And then please read it to yourself.
12         A.  Okay.
13         Q.  All right.  Do you know who created the
14    meeting agenda there?
15         A.  I think Payton probably inserted these
16    agenda items because it was her appointment.
17         Q.  And what was on that agenda?
18         A.  New attendees intro, CDC needs/questions,
19    FB product updates/feedback requests. (COVID-HUB).
20    And then COVID-19 projects, and several are listed
21    CMU/FB data survey.  Update -- data survey update.
22    Excuse me.  Misinfo collab status.  Others.
23         Q.  Let's go through this.  What's COVID-HUB?
24         A.  I believe the COVID-HUB is what they
25    called when I mentioned you're on Facebook and you
```

**CAROL CRAWFORD  11/15/2022**

Page 222

1  could search for COVID, they actually provided

2  in-app content on COVID that they pulled from WHO,

3  CDC and other sources and I believe they call that

4  internally the COVID-HUB.

5      **Q.  All right.  And I think we have some new**

6  **names here in the middle.  Let's see if we see most**

7  **of them.  Kang-Xing Jin.  Do you know who that was?**

8      A.  Looks like a Facebook employee, but I

9  don't recall.

10      **Q.  And I think we've discussed Raena Saddler,**

11  **but I've forgotten.  Do you recall?**

12      A.  I mean, she's with Facebook, or he is with

13  Facebook, but I don't know who they are.

14      **Q.  All right.  And then she cc'd a number of**

15  **people.  Do you recognize any of those names besides**

16  **Liz Lagone?**

17      A.  Yes, Airton, the first name.

18      **Q.  Yeah.**

19      A.  He was definitely with Facebook, and he

20  seemed to be an expert on like Facebook ads how to

21  run Facebook ads.

22          Julia Eisman is someone we talked to

23  regularly.  I think she's in, like, their public

24  relations type office.  She occasionally would be on

25  the calls with Payton.  Kate Thornton, I don't

**CAROL CRAWFORD  11/15/2022**

**Page 223**

1    recall.  Carrie Adams, I mentioned is the new point

2    of contact I have now.  And Ursula Phoenix Weir was

3    -- is someone at CDC.  I assume that for this

4    meeting she was probably deployed in a -- something

5    that was related to what I thought was going to be

6    discussed here.

7         **Q.  And what was her title?**

8         A.  Ursula's?

9         **Q.  Yeah.**

10        A.  I'm not sure.  When people deploy into

11   something -- Ursula probably had several roles

12   during COVID, as many of us did.  I just don't -- I

13   can't tell why I invited her to this meeting from

14   looking at this.

15        **Q.  Where was she normally?**

16        A.  I believe -- I believe.  I believe she's

17   in the National Center for Birth Defects.

18        **Q.  Now, the subject says "Call or VC," I**

19   **assume that's voice chat?**

20        A.  Yes.

21        **Q.  "Facebook weekly sync."  That's**

22   **synchronization with CDC?**

23        A.  That's how I interpret sync, yes.

24        **Q.  CDC to invite other agendas as -- agencies**

25   **as-needed.  Okay.**

**CAROL CRAWFORD  11/15/2022**

Page 224

 1            **What did you understand CDC needs**

 2     **questions to be about in this agenda?**

 3            A.   I think that that was often just listed.

 4     I mean, it would just be if we had a question that

 5     we needed, we wanted to ask Facebook about, or if we

 6     had something that we -- was upcoming that we wanted

 7     their assistance with or something.  I know, like,

 8     for instance, Airton's on this because sometimes

 9     we'd have technical questions about how to run an ad

10     or the live chat, that kind of -- that we talked

11     about earlier, how to make it work.

12            Q.   **All right.  And then the COVID-19**

13     **projects, she seems to have split them up.  Were**

14     **they split up this way within CDC or within**

15     **Facebook, to your knowledge?**

16            A.   No.  I think it's just a list of things

17     that were just put together in one area.  But I

18     don't recall.

19            Q.   **What's your understanding of CMU/FB?**

20            A.   I think this was -- oh, gosh.  I think

21     this was about some surveying that Facebook was

22     doing regarding COVID maybe, and they wanted to just

23     let us know they were doing it.  But I'm very fuzzy

24     on that, on the details of it.

25            Q.   **All right.  And is data and survey**

**CAROL CRAWFORD  11/15/2022**

Page 225

```
 1   separate?
 2        A.  I think that's all one update.  CMU at
 3   slash FB data survey update.  That's how I believe
 4   this to be.
 5        Q.  All right.  And misinformation.  "Misinfo"
 6   is misinformation?
 7        A.  "Collab status" is one thing.
 8        Q.  Oh, that's one thing?
 9        A.  Yeah.
10        Q.  Okay.  And "collab" is collaboration?
11        A.  Yes.
12        Q.  And then others, I take it, is everything
13   else?
14        A.  Yes.
15        Q.  So when this meeting took place do you
16   know if there is any notes or recordings of it?
17        A.  We didn't record them.  I don't -- like
18   I've been saying, I rarely took notes.  If something
19   was jotted down, it would have been in an email or a
20   Word doc.
21        Q.  Do you recall if all these agenda items
22   were discussed on this call?
23        A.  No.
24        Q.  What do you remember about that meeting?
25        A.  I don't remember the specific meeting at
```

**CAROL CRAWFORD  11/15/2022**

```
 1   all.
 2            MR. VECCHIONE:  Okay.  You can put that
 3   aside.
 4            (Plaintiffs' Exhibit 37 marked.)
 5   BY MR. VECCHIONE:
 6       Q.  37.  And once again for Plaintiffs'
 7   Exhibit 37 please read the date and the subject line
 8   of, and then read it to yourself, please.
 9       A.  Subject line:  CDC "guides," in quotes,
10   and this week's meeting.  And that was sent on
11   4/29/2021.
12            Okay.
13       Q.  All right.  And can you identify what this
14   is?
15       A.  This is an email chain about -- that's
16   called "CDC 'Guides' and this week's meeting."
17       Q.  Okay.  And at this time -- I think we've
18   talked about biweekly meetings.  At this time could
19   you have been having weekly meetings with Facebook?
20       A.  We might have.  There definitely were
21   times that we were talking weekly.
22       Q.  All right.  Let's do it -- let's go to the
23   back, the last page.
24            She writes to you:  "Hi, Carol, we want to
25   flag a couple of items for you this week," right?
```

**CAROL CRAWFORD  11/15/2022**

Page 227

```
 1    And she says:  "Instagram Guides Promotion
 2    Opportunity.  Our Instagram team is looking to run
 3    promotion to amplify vaccine-related Instagram
 4    Guides.  We saw that CDC has a great one on its
 5    feed."  And then she provides a link; is that right?
 6    Am I correct?  Did I read that correctly?
 7         A.  Yes.
 8         Q.  What is an Instagram Guides?  I --
 9         A.  I honestly don't remember.  I noticed I
10    added our social lead to pipe in more of the guides.
11    I think it might have been like a reel, like the
12    little video snippets you can see on Instagram.  But
13    I honestly cannot remember what they were at the
14    time.
15         Q.  Okay.
16         A.  I don't know that Instagram guides still
17    exist.
18         Q.  Let's talk about it just for a moment,
19    though, because we talked about various types of
20    social media.  Instagram is usually like a photo and
21    then some words under it?
22         A.  That is one type of Instagram post, and
23    then there is more like a video version of it.
24         Q.  Okay.  And how long -- does the video run
25    a long time like YouTube, or is it short?
```

## CAROL CRAWFORD  11/15/2022

```
 1        A.  No, it's short.

 2        Q.  And then she says:  "The team is planning

 3   to launch an in-feed promotion of the Guides on

 4   Monday."

 5             What's an in-feed promotion?

 6        A.  If I'm not sure what they meant by in-feed

 7   promotion.  But what I'm -- as reading this at this

 8   moment, I believe they were -- it would, you know,

 9   it would get highlighted more often in a user's

10   feed.  They would -- the content would be promoted

11   more to the users in their scrolling.

12        Q.  Okay.  And then it says that this launch

13   in-feed promotion would run for three weeks, and the

14   anticipated reach is 60 to 80 percent of the people

15   in the U.S. on Instagram.

16             So that's 60 to 80 percent of the people

17   that -- the United States people on that platform,

18   is that your understanding?

19        A.  Yes.

20        Q.  And then she says:  (As read)  "We wanted

21   to know if the Guide above is up-to-date, or if

22   you'd be willing to update it (if needed) and if it

23   is something" you can include in the -- "we can

24   include in the promotion.  Happy to discuss further

25   if this is something you may be interested in, or if
```

**CAROL CRAWFORD  11/15/2022**

Page 229

```
 1    you have any questions."

 2              Did I read that correctly?

 3         A.  Yes.

 4         Q.  Who decides whether the guide is up to

 5    date or not?

 6         A.  That would be us because it's our post.

 7         Q.  Okay.

 8         A.  Like if the guide is like a story -- I

 9    called it a reel earlier, but a story is better for

10    Instagram.  It's something that CDC has posted, so

11    it's our content to update.

12         Q.  Got it.

13         A.  And I'll add, to clarify, I can see on the

14    url it says "/CDC gov."  So it's definitely

15    something we have posted, and if I'm incorrect about

16    the format of it I still can tell it's something

17    we've posted.

18         Q.  Okay.  Then also "FYI", which I think is

19    for your information, "we are hoping for an update

20    on our COVID-19 misinfo reporting, but that is not

21    ready for this week."

22              What did you -- did I read that correctly?

23         A.  You read it correctly.

24         Q.  And what did you take that to mean?

25         A.  I am not sure, but I'm -- it might have
```

**CAROL CRAWFORD  11/15/2022**

Page 230

```
 1   been about those CrowdTangle reports and sending
 2   them to us.
 3        Q.  Can you read your response at 2:32 on the
 4   same day, the 28th?
 5        A.  Read the whole response?
 6        Q.  Yeah.
 7        A.  Okay.  (As read) plus Jay to weigh in on
 8   that guide.  I think he'll have the latest info.  I
 9   think it would be great to get that kind of
10   promotion on it.  Thanks for offering.  I still hope
11   to get you some health equity info, but agree we can
12   pull that meeting down tomorrow.  Are you being
13   asked by the White House to do anything on
14   vaccine.gov or vaccinefinder?  If so, can you share
15   any plans in a nutshell via email?
16        Q.  All right.  So, first, what's health
17   equity info?
18        A.  I can't recall the context of why we were
19   discussing it, or what prompted me to write that.
20   But CDC had posted, I believe around this time,
21   information on health equity.  I'm thinking that we
22   either -- they wanted it, or we wanted to mention it
23   to them, but I don't recall which.
24        Q.  And you asked about the White House.  You
25   asked her whether the White House is asking her to
```

**CAROL CRAWFORD  11/15/2022**

Page 231

```
 1   do anything on vaccine.gov or vaccinefinder.  What's

 2   "vaccinefinder"?

 3        A.  Vaccines.gov originally was called

 4   vaccinefinder.gov.  But we renamed it vaccine.gov or

 5   vaccines.gov when the vac- -- COVID vaccines came

 6   out.  But a lot of us still think of it as the

 7   "vaccinefinder site" because when you go to that

 8   site, in effect, the main thing it does is you can

 9   put in your ZIP code and find out where COVID

10   vaccines are offered.  So it helps you find the

11   vaccine.

12        Q.  Why did you suspect the White House was

13   asking her or Facebook to do something about that

14   site?

15        MS. SNOW:  Objection, calls for

16   speculation.

17   BY MR. VECCHIONE:

18        Q.  And you wrote down:  "Are you being asked

19   by the White House?"  You asked her that.  Why did

20   you do that?

21        A.  I --

22        MR. GILLIGAN:  You asked her why she

23   suspected something.

24   BY MR. VECCHIONE:

25        Q.  Why did you -- why did you ask whether the
```

**CAROL CRAWFORD  11/15/2022**

Page 232

```
 1    White House had asked her to do anything?

 2         A.  I don't remember specifically.  But it was

 3    not uncommon because there was multiple major

 4    agencies such as the White House working on things.

 5    And so Payton had meetings with lots of federal

 6    agencies, and we were -- the vaccine.gov site was

 7    something CDC, HHS and the White House were

 8    collaboratively working on.

 9            So it might have been me just trying to

10    understand if we were about to promote vaccines.gov

11    on -- maybe it was in the guides; maybe I was just

12    trying to see if she knew something related to what

13    we were doing.  We did overlap from time to time and

14    ask Payton similar things.

15         Q.  So you knew that Facebook could also have

16    been being contacted by other agencies besides CDC?

17         A.  Yes.  They -- she -- I'm fairly confident

18    that she was speaking to several federal agencies

19    during the COVID response.

20         Q.  Including HHS?

21         A.  I believe so, yes.

22         Q.  And including the White House?

23         A.  I think.  I believe so, yes.  I don't -- I

24    didn't ask her her meeting schedule, but she often

25    would be up to date.
```

**CAROL CRAWFORD  11/15/2022**

Page 233

1     Q.  Did she ever mention to you who her

2   contact was at the White House?

3     A.  No.

4     Q.  Do you know that of your own knowledge

5   from some other source?

6     A.  No.

7     Q.  Were you ever on a call with any of the

8   agencies in the White House?

9     A.  Yes.  Sometimes what I remember was that

10  when vaccines.gov was coming out, that was involving

11  multiple agencies including people at the White

12  House and the U.S. Design System team and HHS and

13  CDC, and I do believe there might have been some

14  joint calls to discuss some of the promotion of

15  vaccine.gov.

16     Q.  All right.  And U.S. Design are the people

17  who design the websites for the government?

18     A.  Yes.  I think in my mind when I say White

19  House, they are the people in the White House that

20  I'm talking about because that's my counterparts in

21  the White House are digital people.  I should have

22  clarified.  I should have clarified that earlier.

23     Q.  All right.  And do you know of anyone, any

24  names?

25     A.  There was several of them that were

**CAROL CRAWFORD  11/15/2022**

Page 234

1   involved with vaccines.gov.

2          Q.  Okay.  Do you recall any names?

3          A.  I really don't.

4          Q.  All right.  Did anyone from the White

5   House, any office in the White House, direct you to

6   engage with social media companies independent of

7   your supervisor at the CDC?

8          A.  No.

9          Q.  All right.  Let's take a look at the next

10  one.  Payton to you on April 29 at 6:23.  Can you

11  read her response to you?

12         A.  (As read)  Thank you, Carol.  Regarding

13  vaccines.gov -- or vaccine.gov -- we haven't had any

14  specific requests from the White House on this.

15  We've been working at the state level on our vaccine

16  finders tools and promotions.  I also want to

17  followup on our COVID-19 misinfo reporting.  Our

18  team is looking to schedule a training with CDC and

19  Census colleagues who will be reporting content

20  through the tool.  It will cover Community

21  Standards, COVID-19 misinformation and harm policies

22  and a walkthrough of the reporting tool.

23         Q.  Let's stop there.

24         A.  Okay.

25         Q.  Did that training occur with CDC?

**CAROL CRAWFORD  11/15/2022**

**Page 235**

1          A.  To my recollection, that training never

2     occurred.  But I might not have been a part of it,

3     and that's why I don't recall it.

4          Q.  **Do you recall whether or not Census was**

5     **involved in such a training?**

6          A.  No, because I'm not sure that we had the

7     training, so I don't know who would have attended

8     it.

9          Q.  **Okay.  And then could you continue reading**

10    **where you have the asterisks?**

11         A.  "Could you share back some times that may

12    work to schedule?  We'll probably need 1.5 hours to

13    cover.  If needed, we can break the training up if a

14    longer block is hard to schedule."

15         Q.  **All right.  And then you'll respond that**

16    **you'll check with Census; right?**

17         A.  Yes.

18         Q.  **But do you know whether or not you checked**

19    **with Census?**

20         A.  No.

21         Q.  **Do you recall anything more than what**

22    **you've told me about this training?**

23         A.  I recall that when this -- well, can I ask

24    my -- can I ask counsel a question first?

25              MR. GILLIGAN:  Yes, you may.

**CAROL CRAWFORD  11/15/2022**

Page 236

```
 1                (Witness conferring with counsel.)
 2                MR. VECCHIONE:  Let the record reflect
 3      that the witness has consulted with counsel.
 4      BY MR. VECCHIONE:
 5           Q.  Can you answer my question?
 6           A.  Oh.  Yes.  When we went through discovery,
 7      I was pulling documents for discovery, and I was
 8      asked if we had used the portal by I believe the CDC
 9      lawyer that I have been working with, and I could
10      not recall.
11                So I went through a lot of emails at that
12      time, and I concluded that my memory was correct
13      that we really did not use the portal more than the
14      one time that I mentioned earlier, and that's why I
15      don't believe the training occurred.  I don't have
16      any memory of going through the training, or setting
17      up the training.  But it's pos- -- I mean, I have a
18      lot of emails, but that was what I thought after I
19      did discovery.
20      BY MR. VECCHIONE:
21           Q.  Right.  And that's what you think now
22      sitting here?
23           A.  Yes.
24           Q.  All right.  Thank you.  You can put that
25      aside.
```

**CAROL CRAWFORD  11/15/2022**

**Page 237**

```
 1        A.   Okay.
 2             (Plaintiffs' Exhibit 38 marked.)
 3    BY MR. VECCHIONE:
 4        Q.   And, again, for Exhibit 38 just tell me
 5    the date and the subject line, and then read it to
 6    yourself.
 7        A.   I'm sorry.  The subject, Wyoming issue.
 8    April 30th, 2021.  Okay.
 9        Q.   So let's start from the back again.
10             On April 23rd you write to Payton Iheme
11    again.  Can you write what you say to her?
12        A.   (As read)  The Wyoming Department of
13    Health mentioned to one of our groups that the
14    algorithms that Facebook and other social media are
15    apparently using to screen out postings by sources
16    of vaccine misinformation are also apparently
17    screening out valid public health messaging,
18    including Wyoming Health communications.  They were
19    looking for advice about how to work with social
20    media networks to ensure that verifiable information
21    sources are not blocked.  Do you have someone that
22    she could talk to -- sorry.  Do you have someone
23    that could perhaps talk to the state about this?
24        Q.   And then before you get a response you say
25    on top:  "Anything you all can do to help on this?"
```

**CAROL CRAWFORD  11/15/2022**

```
 1    I guess -- you say that five days later, is that why
 2    you sent it again?
 3         A.  They hadn't responded.
 4         Q.  Okay.  Who decided what a verifiable
 5    information source was at this time?
 6         A.  I don't know.
 7         Q.  Now, on April 28th at 6:37 you get an
 8    email back from Adrien Genelle, I think or Genelle
 9    Adrien.  Excuse me.
10         A.  Yes.
11         Q.  And she says that her colleague can solve
12    this problem?
13         MS. SNOW:  Objection, mischaracterizes
14    document.
15    BY MR. VECCHIONE:
16         Q.  Did she direct you to another person to
17    take care of the problem?
18         A.  She looped in another colleague to provide
19    additional guidance, or to connect directly with the
20    state health department that asked.
21         Q.  Okay.  And then you say, you tell her that
22    you don't have an email chain to loop anyone in
23    because it was received via meeting.  Do you know
24    what meeting it was received in?
25         A.  Yes.  Well, no, I don't know exactly which
```

**CAROL CRAWFORD  11/15/2022**

**Page 239**

```
 1   meeting it was in, but it was just relayed to me
 2   during one of the COVID internal meetings that, hey,
 3   we got a call from Wyoming, do we know anyone to
 4   connect them with.
 5        Q.  And you connected to Holly Scheer?  Is
 6   that what you're doing there?
 7        A.  Yes.
 8        Q.  And do you know anything more about Eva
 9   Guidarini than what she states here about her?  Did
10   you ever deal with her?
11        A.  No.
12            MR. VECCHIONE:  You can put that aside.
13            Exhibit 39.  I believe they are all
14   one-pagers, and they are all stapled together, so
15   give me one moment.
16            (Plaintiffs' Exhibit 39 marked.)
17   BY MR. VECCHIONE:
18        Q.  Once again, could you just read the -- 39,
19   could you read the subject line and the date?
20        A.  Join with new info E:  Call or VC-Facebook
21   weekly sync with CDC (CDC to invite other agencies
22   as needed).  May 6, 2021.
23        Q.  Okay.  Tell me when you're ready.
24        A.  Oh, I'm ready.  I'm sorry.
25        Q.  And I think we've seen this meeting
```

**CAROL CRAWFORD  11/15/2022**

1  before, but I just want to make sure it's not a

2  separate one.  Was -- this was just with Facebook;

3  right?

4       A.  This was.

5       Q.  Okay.  And the -- and we've already

6  discussed the items that were -- that were on the

7  agenda; right?

8       A.  We did.  But I'm just now noticing that

9  the items in the agenda might be a cut-and-paste

10  from the same thing and maybe weren't updated

11  regularly.

12       Q.  I see.  That's my question.  All right.

13  So do you have any memory of this particular

14  meeting?

15       A.  I don't.

16       Q.  And you don't recall what was said one way

17  or another?

18       A.  Don't recall, excuse me?

19       Q.  Okay.

20       A.  I didn't catch -- I'm sorry.  I didn't

21  catch what you asked me.

22       Q.  Oh, oh.  Do you recall anything that was

23  said at that meeting?

24       A.  On May 6?  No.

25       Q.  And do you know if the format was in Zoom,

**CAROL CRAWFORD  11/15/2022**

Page 241

1  or what the format, or Microsoft Teams, or in
2  person, or?
3      A.  It was always on either teams or they had
4  BlueJeans that we used occasionally.
5      Q.  Okay.  What's BlueJeans?
6      A.  It's something like a Teams or a Zoom.
7      Q.  Okay.  And, once again, do you know if
8  there is any notes or record kept of the meeting?
9      A.  I did not take any notes at the meeting
10  that I recall.  I mean, same answer I have been
11  giving.  If there were any, it was minor and they
12  would have been in Word or email.
13      Q.  Okay.
14          MR. VECCHIONE:  40.
15          MR. GILLIGAN:  I remember when everybody
16  just used Skype when it was simpler times.
17          (Plaintiffs' Exhibit 40 marked.)
18  BY MR. VECCHIONE:
19      Q.  Exhibit 40.  Once again the date and the
20  subject line, and then read it to yourself.
21      A.  Subject line:  COVID BOLO meetings on
22  misinformation, sent on May 10, 2021.
23          Okay.
24      Q.  All right.  Let's go back to the back page
25  of this that's Bates number 682.

**CAROL CRAWFORD  11/15/2022**

```
 1          A.  Okay.

 2          Q.  Now, this is -- I think we've said this

 3     date.  It's May 10th of 2021?

 4          A.  Yes.

 5          Q.  And you send to Facebook the COVID BOLO

 6     misinformation meeting request; right?

 7          A.  Yes.

 8          Q.  And could you please read that for me?

 9          A.  (As read)  We would like to establish

10     COVID BOLO meetings on misinformation and invite all

11     platforms to join the meetings.  We are aiming for

12     the first one on Friday at noon.  I know you were

13     considering a possible process on your end, but we

14     wanted to start here just as an interim first step.

15     Are there direct POCs on your end I should include

16     on the invite?  I'm happy to chat if better, thanks.

17          Q.  All right.  Now, so this is the first BOLO

18     meeting.  Does that comport with your recollection?

19          A.  This is a note that I'm about to send an

20     appointment for the first BOLO meeting and asking

21     them who to include.

22          Q.  All right.  And we've already said POCs --

23          A.  Yes.

24          Q.  -- are the point of contacts; right?

25          A.  Mm-hmm (affirmative).
```

**CAROL CRAWFORD  11/15/2022**

**Page 243**

1    Q.  And you said:  "I know you are considering
2  possible process on your end."
3        What did you mean by that?
4    A.  As I mentioned, that I was engaging with
5  the platform saying what format would be best for us
6  to talk about this.  And I think there were
7  references in the exhibit a couple of times where
8  they said they were thinking internally about what
9  would be best.  So I think I was just referencing
10  that I knew that they were considering it as well.
11    Q.  Do you know what the topics -- did you
12  know what the topics for the BOLO were when you sent
13  this out?
14    A.  I don't know if I did or not.
15    Q.  All right.  Let's go to the next page back
16  where we have -- I believe this is from Jan
17  Antonaros to you, but he includes your email to him;
18  right?
19    A.  This -- the bottom part --
20    Q.  Mm-hmm (affirmative).
21    A.  -- is where I sent a similar note to
22  Google, which is Jan.
23    Q.  Okay.
24    A.  And I was telling her that we would like
25  to invite the digital platforms to attend the BOLO.

**CAROL CRAWFORD  11/15/2022**

**Page 244**

1    I think it was me sending the appointment or a

2    heads-up that it was coming.  I can't -- it looks

3    like maybe I -- this is an actual appointment.

4         Q.  Okay.

5         A.  But I tried to send each of them a

6    personal note that we were doing it.

7         Q.  And in this one you actually spelled out

8    be on the lookout; right?

9         A.  I did.

10        Q.  And was that because you hadn't discussed

11   it with them before, or did you have some concern

12   they wouldn't know what it was?

13        A.  I don't know why I didn't do it that time.

14        Q.  All right.  And there is Kevin Kane here

15   with the email address ███████@Google.com.  Who is

16   that?

17        A.  I don't remember Kevin, but this indicates

18   that he was from YouTube.

19        Q.  Okay.  And do you recall having

20   discussions with YouTube?

21        A.  YouTube would occasionally -- people from

22   YouTube would occasionally be on our regular

23   meetings, depending on what we talked about.  And

24   because YouTube has the most content, like, hosting,

25   they -- they were at the -- they were a part of the

**CAROL CRAWFORD  11/15/2022**

**Page 245**

1    BOLO meetings, I believe, that Kevin attended

2    probably, or someone from YouTube did.

3        **Q.  And you responded:  "Great.  I was going**

4    **to ask about Kevin."**

5        A.  Yeah.  Maybe I remembered who Kevin was at

6    the time.

7        **Q.  Okay.  And then finally the front page.**

8        A.  That's a repeat of -- oh, no, that's not.

9    I apologize.  I'm looking at the wrong one.

10       **Q.  And here you're sending this to the Google**

11   **folks?**

12       A.  Yes.

13       **Q.  Why don't you read it for the record?**

14       A.  "We would like to establish COVID BOLO

15   meetings on misinformation and invite all platforms

16   to join the meetings.  We were aiming for the first

17   one on Friday at noon.  We heard through the

18   grapevine that Kevin Cain at YouTube would want to

19   join.  Are there other POCs on your end I should

20   include on the invite?"

21       **Q.  All right.  You said YouTube.  Who's**

22   **YouTube related to, is it Google or Facebook?**

23       A.  YouTube is a Google property.

24       **Q.  Okay.**

25       A.  Or platform.

**CAROL CRAWFORD  11/15/2022**

1          Q.   And is it your recollection that you did

2     have a meeting on Friday?

3          A.   I think we did, but I don't have the exact

4     date.  But I believe we had -- that's when we had

5     the first BOLO meeting.

6          Q.   All right.  And do you have any list of

7     who actually showed up and was an attendee?

8          A.   No.

9          Q.   All right.  And, once again, it would be

10    on your calendar as far as if it happened?

11         A.   Now, to clarify I don't remember keeping a

12    list of who attended.  Maybe Census might have

13    because this is something they were arranging.  But

14    I don't recall it being sent to me.  It could have

15    been, but I don't believe so.

16         Q.   So they were helping you arrange this

17    because they'd done it before, this particular

18    meeting?

19         A.   Yes.  I mean, I mentioned that they

20    drafted the slides.

21         Q.   Right.

22         A.   And, you know, Chris participated in the

23    meeting.

24         Q.   Okay.  Chris.  Remind me his last name?

25         A.   Lewinsky, Lewitzke.

**CAROL CRAWFORD  11/15/2022**

 1        Q.  Lewitzke.  I'm glad he's not here because

 2   we've done terrible things to his name, and I

 3   apologize for that.  My name is Vecchione.  I have

 4   no excuses for this.

 5             All right.  I think you can put that

 6   aside.

 7             (Plaintiffs' Exhibit 41 marked.)

 8   BY MR. VECCHIONE:

 9        Q.  Let's go to Exhibit 41.  And once again

10   please tell me the headline, subject line, and the

11   date, and then read it to yourself.

12        A.  Subject, CDC COVID-19 BOLO meeting.

13   6/10/2021.

14        Q.  Okay.  So let's go back -- well, the first

15   item on here, it says "On Wednesday June 9, 2021 at

16   4:23 PM Crawford, Carol wrote."

17             Can you read that to -- into the record?

18        A.  Yes.

19             "We would like to invite digital platforms

20   to attend our third short 'Be On The Lookout'

21   meeting on COVID.  Let us know if you have questions

22   and feel free to forward this message to anyone in

23   your organization that should attend."

24        Q.  And did you send these out separately to

25   all the -- withdrawn.

**CAROL CRAWFORD  11/15/2022**

Page 248

1              You sent this particular one to Todd

2    O'Boyle at Twitter; right?

3         A.   The formatting of the email is odd.  But I

4    don't believe I did that.  I believe I had one

5    appointment and I blind copied everyone, so the

6    emails -- I think that's just because he replied, it

7    looks like it's just him.

8         Q.   Okay.  But you think when you sent these

9    out you sent them out to all the social media places

10   at once?

11        A.   I do.  And I think when we were looking at

12   the other exhibit I wondered the same thing, but I

13   think that was the situation.

14        Q.   All right.  That explains it for me.

15             And did you -- do you know if this meeting

16   in June, I think it would be, ever took place?

17        A.   I don't believe it did.  And this is a

18   morning question.  I'm starting to think maybe

19   Juneteenth was a new holiday we weren't expecting

20   that conflicted with the third BOLO meeting and

21   maybe that is why we didn't end up having it and we

22   sent the materials out via email.

23        Q.   All right.  And who tasked you with

24   sending out the BOLO messages?  Why were you doing

25   it?

**CAROL CRAWFORD  11/15/2022**

Page 249

```
1        A.  Because I was the main person that was the
2   CDC point of contact to talk to Facebook, Twitter
3   and the platforms since our job was to lead digital
4   media.
5            MR. VECCHIONE:  Okay.  You can put that
6   aside.
7            (Plaintiffs' Exhibit 42 marked.)
8   BY MR. VECCHIONE:
9        Q.  Exhibit 42.
10           MR. VECCHIONE:  And I feel that someone
11  has added 43 in here, so I do apologize.  That's a
12  late addition.
13           MR. GILLIGAN:  I thought it was Carnac
14  time.
15           MR. VECCHIONE:  No.
16  BY MR. VECCHIONE:
17       Q.  So, once again, please just name the date
18  and the subject matter, and then take a look at it.
19       A.  Yeah.  Subject:  Booster shots, regarding
20  booster shots.  It was sent on 10/28/2021.
21           Okay.
22       Q.  All right.  Do you recognize this
23  document?
24       A.  Not specifically.
25       Q.  Can you describe what it is?
```

**CAROL CRAWFORD  11/15/2022**

Page 250

```
 1        A.   It's a conversation about some booster
 2   guidance updates that are occurring and some
 3   requests from Google to review some of the changes
 4   that they were considering on the search result
 5   pages.
 6        Q.   All right.  And the date is -- I think it
 7   starts, if you look at the last page, on
 8   September 30th, 2021.
 9        A.   Yes.
10        Q.   And that's from Stanley Onyimba to Fred
11   Smith.
12             Who is Fred Smith?  He's new.
13        A.   He's a direct -- he reports to me.  He was
14   the technical person I mentioned who usually
15   attended the Google meetings with me.  I was out of
16   town this date, so I wasn't on the email.
17        Q.   All right.  And he -- well, I think he
18   sends you the email?
19        A.   Yeah.
20        Q.   Just you're cc'd?
21        A.   Maybe.  I don't believe I was in town,
22   though --
23        Q.   Okay.
24        A.   -- when this was occurring.  I don't see
25   myself cc'd on Stanley's email to Fred.
```

**CAROL CRAWFORD  11/15/2022**

1          Q.  All right.  Why is -- do you have any

2     knowledge why is Stanley Onyimba sending this to

3     Fred?  What is the purpose of this?

4              MS. SNOW:  Objection.  Calls for

5     speculation.

6          A.  Are you going to re-ask the question?

7     BY MR. VECCHIONE:

8          Q.  No.

9          A.  I mean --

10         Q.  What's your understanding of why he's

11    sending this --

12         A.  Yes.

13         Q.  -- to CDC?

14         A.  Well, I don't -- because the screenshots

15    are not available that are attached or put in here,

16    I can't directly explain this, but sometimes on

17    those Google panels that I mentioned they would

18    highlight specific things like, they would -- they

19    would, you know, before the search results came up,

20    they would highlight a link.  And I think that they

21    were considering -- considering taking some words

22    that they saw on vaccines.gov and add it to that

23    panel, and they wanted to be sure it was right and

24    they were asking us.

25         Q.  All right.  And then Fred responds that it

**CAROL CRAWFORD  11/15/2022**

Page 252

```
 1   looks okay to him, but he's not the -- he's not an
 2   expert on this?
 3         A.  Correct.
 4         Q.  All right.  And so -- and then Mr. Smith
 5   writes -- now, after that -- after that, you know, I
 6   don't know, I'm going to go check with some people,
 7   Mr. Smith writes back:  "Hi, Stanley, I heard back
 8   from some folks.  No heartburn over the messages
 9   proposed.  Cheers, Fred."
10             Do you see that?
11         A.  Yes.
12         Q.  Did I read that correctly?
13         A.  Yes.
14         Q.  Do you know who "some folks" are?  Who did
15   he check with?
16         A.  I don't know who he checked with.
17         Q.  Okay.  And then the next -- I'm having a
18   hard time -- I can read the message.  Do you know
19   when that was sent, the next message up?
20         A.  The one from Jan and Megan?
21         Q.  Yeah.
22         A.  It looks like October 28, 2021.
23         Q.  So you go all the way up to the next -- on
24   page 1, and then you read down?
25         A.  That's what it appears, mm-hmm.
```

**CAROL CRAWFORD  11/15/2022**

Page 253

1        Q.  All right.  Why don't you take -- so can

2    you -- you came back, apparently, and emailed

3    Antonio [sic] -- Jan and Stanley and the folks at

4    Google on October 28th at 5:11; right?

5        A.  Yes.

6        Q.  Okay.  And you said:  "This looks good,

7    thanks for checking," in the middle there?

8        A.  Mm-hmm (affirmative).

9        Q.  The next part?

10        A.  (As read)  Yes.  We can discuss the

11    pediatric vaccines early next week but let me give

12    you some general info:  ACIP is likely to vote on

13    this on November 2nd.  CDC is likely to start

14    posting final information on November 3rd...if that

15    helps to know.  There will be many updates so the

16    changes might span over a few days.  We are also

17    looking ahead and misinformation and hope to have a

18    BOLO type meeting later that week with the platforms

19    that are interested.

20        Q.  And who's ACIP?

21        A.  The Advisory Council for Immunization

22    Practices, I believe, I think that's right.

23        Q.  And do you know whether you had a BOLO

24    meeting for this?

25        A.  I don't -- I don't believe that we ever

**CAROL CRAWFORD  11/15/2022**

Page 254

```
 1    had one.
 2          Q.   So the email states that --
 3               You can put that aside.
 4               (Plaintiffs' Exhibit 43 marked.)
 5    BY MR. VECCHIONE:
 6          Q.   Let's go to -- yeah, let's go to the last,
 7    43.
 8               Once again for Exhibit 43 please state the
 9    subject matter line, and then the -- and who it --
10    what the date of it is?
11          A.   Subject:  Claims review.  6/29/2022.
12               I have read it.
13          Q.   Okay.  So can you read the -- well, who is
14    Rachel Gruner?
15          A.   She is my new point of contact at Google.
16    She replaced Jan Antonaros.
17          Q.   And who's Lindsay Steele?
18          A.   Lindsay Steele replaced Stanley.
19          Q.   Onyimba?
20          A.   "O".
21          Q.   Okay.  And they're both -- their emails
22    are here in the to line; right?
23          A.   Yes.
24          Q.   All right.  And if you could read the
25    after Hi, Carol, Hi, Fred from Rachel, what does she
```

**CAROL CRAWFORD  11/15/2022**

1    say here?

2         A.   "The YouTube policy team is requesting

3    evidence-based input on the claims below.  In the

4    past, the CDC has reviewed COVID information claims

5    and commented true or false plus any additional

6    context needed."

7         Q.   And then what are the claims?

8         A.   (As read)  Claim:  High dosage of

9    progesterone is a safe method of reversing chemical

10   abortion, in parentheses, mifepristone and

11   misoprostol.

12             Sorry.

13             (As read)  Claim:  High doses of

14   progesterone is an effective method of reversing

15   chemical abortion, in parentheses, mifepristone and

16   misoprostol.

17        Q.   All right.

18        A.   "Please let me know if you have questions

19   or concerns."

20        Q.   And then what -- how do you respond?

21        A.   "I'll check on this, but I think I'll

22   probably end up needing to refer you to another

23   agency.  I'll get back to you."

24        Q.   So this -- this -- is it your

25   understanding this didn't have anything to do with

**CAROL CRAWFORD  11/15/2022**

Page 256

```
 1    COVID-19 or vaccines?

 2        A.   It definitely didn't have anything to do

 3    with COVID-19 or vaccines.

 4        Q.   Do you know why it was sent to you?

 5        A.   Well, as COVID's -- our focus is not

 6    solely on COVID.  We're focusing on other topics.  I

 7    think Rachel thought that we might be able to help

 8    with this topic as well.

 9        Q.   Okay.  Do you know who you sent it, what

10    agency you sent it to, if any?

11        A.   I -- I didn't know.  I called one of our

12    centers and asked if this was something that CDC

13    dealt with.  I didn't think that we did, and they

14    confirmed that we do not.  And I don't think they

15    had a suggestion on where to refer this to, but I

16    can't recall for sure.

17             MR. VECCHIONE:  All right.  I would like

18    to take a brief break and have the court reporter

19    put my last exhibit together and give you copies

20    and then --

21             MR. GILLIGAN:  There is a 44, too?

22             MR. VECCHIONE:  -- confer, confer with

23    counsel, and I think we'll be finishing up.

24             (Comments off the record.)

25             THE VIDEOGRAPHER:  Off the record at 5:07.
```

**CAROL CRAWFORD  11/15/2022**

**Page 257**

```
 1              (Recess 5:07 p.m. - 5:19 p.m.)

 2              THE VIDEOGRAPHER:  Back on the record at

 3     5:19.

 4              (Plaintiffs' Exhibit 44 marked.)

 5     BY MR. VECCHIONE:

 6        Q.  All right.  Ms. Crawford, this is going to

 7     be Exhibit 44.  And it will have -- once again, read

 8     the subject line and then tell me what the date was.

 9        A.  Subject:  "Themes that have been removed

10     from misinform."  I am sure that was typo.

11     3/10/2021.

12              Okay.

13        Q.  All right.  Let's go to the back end of

14     the exhibit.  And the first email chain is from

15     March 10th, 2021 from you to Payton Iheme; is that

16     correct?

17        A.  Yes.

18        Q.  And it says:  "Themes that have been

19     removed for misinfo."  And I think we've established

20     that's misinformation; correct?

21        A.  Yes.

22        Q.  And you say to her:  "We mentioned this on

23     a call last week and you said you'd be sending

24     something as other had asked -- is that available

25     yet by chance?"
```

**CAROL CRAWFORD  11/15/2022**

Page 258

```
 1              What were you telling her?  What did you

 2   mean?

 3        A.   This is what I was referencing on a

 4   previous exhibit that one of our teams that was

 5   doing those vaccine confidence reports and those

 6   research reports, they were wondering if we -- if

 7   they had info on the -- on the types of posts that

 8   were removed and the themes because they were

 9   worried that we could only see the live posts and so

10   we wouldn't know if there was also confusion about

11   other areas that had been removed.

12        Q.   And she --

13        A.   I feel pretty confident that that is what

14   this is about.

15        Q.   And she responds to you.  "Are you looking

16   for types of COVID-19 misinfo we remove"; right?

17        A.   Yes.

18        Q.   "I think it may be worth a separate

19   meeting to have some of our leads discuss the

20   approach/what they are seeing and doing.  Would that

21   work?"  That's what you said?

22        A.   Yes.

23        Q.   And what are her leads; what was your

24   understanding?

25        A.   Just like I would bring people that were
```

**CAROL CRAWFORD  11/15/2022**

Page 259

```
 1    in charge of different areas, sometimes she would
 2    bring people that had more expertise.  Payton and I
 3    did not know everything in our respective
 4    organizations, so I assume it was a lead for
 5    something, someone in this area.
 6            Q.  All right.  And then you respond to her on
 7    March 10th at 9:24; correct?
 8            A.  Yes.
 9            Q.  "Yes."  And you say "you mentioned
10    that" -- is that White House?
11            A.  Yes.
12            Q.  "And HHS"?
13            A.  Yes.
14            Q.  "Had asked so you'd get it to us"; right?
15            A.  Yes.
16            Q.  "I think it is wanted as part of
17    analysis -- so are you thinking there is no
18    report/file to send?"
19                Is that your question to her?
20            A.  Yes.
21            Q.  All right.  And what you say there is when
22    White House and HHS ask Facebook for this
23    information, they assumed that Facebook would
24    provide it to them; correct?
25                    MS. SNOW:  Objection.  Calls for
```

**CAROL CRAWFORD  11/15/2022**

**Page 260**

1   speculation.

2   BY MR. VECCHIONE:

3       **Q.  You can answer.**

4       A.  Well, I think it was poorly worded by

5   myself and kind of typo maybe.  But what this was

6   was I recall we asked on the meeting if they had

7   this data, like, because we wanted it.  And I think

8   she said, Oh, we did something like this for the

9   White House or HHS.

10          This is my memory of it.

11      **Q.  Okay.  This is one of your weekly**

12  **meetings, or a BOLO?**

13      A.  I think it was at a weekly meeting.

14      **Q.  All right.  And then the next thing she**

15  **says back to you is:  (As read)  It wasn't a report,**

16  **but rather a discussion.  We were setting up a**

17  **meeting with White House and HHS to discuss more**

18  **likely later this week or early next week.  Perhaps**

19  **the CDC rep could participate or HHS share out?**

20          **Is that what she says?**

21      A.  Yes.

22      **Q.  What does HHS share out mean?  That they'd**

23  **give it to you?**

24      A.  Yes.  Oh.

25          MS. SNOW:  You're good.  You're good.

**CAROL CRAWFORD  11/15/2022**

Page 261

1    BY MR. VECCHIONE:

2         **Q.  So let's clean up the record a little.**

3    **What is an HHS share out?  Does that mean they give**

4    **you whatever they are provided?**

5         A.  Yes.

6         **Q.  All right.  So it was your understanding**

7    **that Facebook was having the same kind of meetings**

8    **you were having with them with White House and HHS?**

9         A.  I don't know that in relation to this

10    email.  I was assuming that.  But I do think that

11    they did have meetings with the agencies.

12         **Q.  And could you read what you respond to her**

13    **on May 10th at 9:30 a.m.?**

14         A.  "Oh, I assumed it was a report.  Who at

15    HHS is in the meeting?"

16         **Q.  And what did she respond to you at 9:32?**

17         A.  (As read)  Josh Peck would be the HHS rep

18    once a meeting is confirmed based on that I see him

19    at a previous discussions or meetings with the White

20    House.

21         **Q.  Do you know who he is?**

22         A.  Yes.

23         **Q.  Who is he?**

24         A.  I don't know his specific title, but he, I

25    believe, during this time was running the HHS COVID

**CAROL CRAWFORD  11/15/2022**

Page 262

```
 1    communication marketing campaign.
 2         Q.  All right.  And did you interface with him
 3    in any of your work?
 4         A.  Yes.
 5         Q.  Would he be at these, any of your weekly
 6    meetings?
 7         A.  No.
 8         Q.  All right.  Would he be at your BOLO
 9    meeting?
10         A.  No.
11         Q.  All right.  Next at 9:36 she adds
12    something.  What does she say?
13         A.  (As read)  And of course we are using
14    CrowdTangle as well to visualize the current trends
15    as well.  Lauren has been working on that and can
16    give a refresher if needed.  I know she has been
17    sending reports as well.
18         Q.  And who's Lauren?
19         A.  Lauren is the one who's been -- sent those
20    biweekly CrowdTangle reports during this time frame.
21         Q.  Okay.  And then you respond to her at
22    9:43:56 seconds.  What do you say?
23         A.  (As read)  They want to see what you guys
24    proactively have removed that might not be in those
25    reports.  My guess is a short meeting with Lis
```

**CAROL CRAWFORD  11/15/2022**

Page 263

```
 1   Wilhelm on the vaccine confidence team is what is
 2   needed if Facebook is willing to do it.  Doesn't
 3   seem to me like that would be -- like it should be
 4   part of the White House HHS meeting.
 5        Q.  Who's Lis Wilhelm?
 6        A.  She is the group that was creating those
 7   vaccine confidence reports that was wondering if
 8   they had all the data reflected in them, and what
 9   the people were worried about, or confused about.
10   And she was thinking that if the data -- if we knew
11   the kinds of things that were removed, it might give
12   a fuller picture for those reports.
13        Q.  Okay.  And then you discuss a time for
14   another meeting, and I think it ends at -- this
15   chain ends at 3:10, 9:54 a.m.:  Let's plan on next
16   Thursday then.
17            Do you know whether you ever had that
18   meeting?
19        A.  I think we did.
20        Q.  And do you know what was discussed there?
21        A.  I think that the vaccine confidence team
22   came, and I don't -- and we discussed what they
23   might have that would give them that fuller picture.
24        Q.  You can put that aside.  I have got a few
25   followup questions.
```

**CAROL CRAWFORD  11/15/2022**

Page 264

```
 1         A.  Okay.
 2         Q.  At any of your -- in flagging any material
 3   for any of the social media issues, themes, facts,
 4   whatever you flag, can you say whether or not you
 5   flagged any information from the Great Barrington
 6   Declaration?
 7         A.  I don't know what that is.
 8         Q.  Okay.  How about Jay Bhattacharya?
 9   Anything from him?
10         A.  I don't know who that is.
11         Q.  Marty Kulldorff.  Anything from him?
12         A.  I don't know who that is.
13         Q.  Aaron Kheriaty.  Anything from him?
14         A.  I don't know who that is.
15         Q.  Jim Hoft, or Gateway Pundit?
16         A.  I don't know who that is.
17         Q.  All right.  And Jill Hines?
18         A.  I don't know who she is.
19         Q.  All right.  And I think I have asked you
20   before, but bear with me.  Have you flagged anything
21   from Governor Michael Parson?
22         A.  I -- well, I may or may not have known the
23   name of the governor.  But I don't recall any
24   specific who posted anything we flagged.  That might
25   be a better way to answer these questions.
```

**CAROL CRAWFORD  11/15/2022**

Page 265

```
 1          Q.  Okay.  And that's --
 2          A.  I don't remember anybody associated with
 3     the example posts that we sent.
 4          Q.  Okay.  And that would include -- I'm doing
 5     this for the record, you understand.  I understand
 6     your answer.
 7          A.  Yes.
 8          Q.  That would include Eric Schmitt, Jeff
 9     Landry and John Bel Edwards?
10          A.  Yes.
11          Q.  Thank you.  And now, finally, on the BOLO
12     meetings, who ran the BOLO meetings?
13          A.  I ran the BOLO meetings.
14          Q.  In what manner?  How did you do it?
15          A.  I opened up the meeting, introduced
16     myself, gave context for why we were doing the BOLO
17     meeting in brief.  And then I believe that
18     Christopher went through the slide decks, and I
19     occasionally piped in on them.
20          Q.  Lewitzke?
21          A.  Yes.
22          Q.  And so he -- these slide decks, would they
23     be like the table you showed me or that we looked at
24     with examples of the shedding and the microchips in
25     the bloodstream?
```

**CAROL CRAWFORD  11/15/2022**

```
 1        A.   They were similar to the table, but they
 2   were more like this is a theme, and then there'd be
 3   maybe a little info about what the theme was and
 4   then maybe a couple of example posts.  And then
 5   there would be a slide maybe with CDC links or
 6   information related to that theme.
 7        Q.   All right.
 8        A.   So it was more than just a table.  It had
 9   more context to it.
10        Q.   How long did the meetings go?
11        A.   They were short.  I mean, maybe they were
12   20 minutes.
13        Q.   And what did you and Mr. -- well, first,
14   what did you hope to accomplish by those meetings?
15        A.   The same thing that I've been referencing.
16   I mean, our goal is to be sure that credible
17   information about COVID was out there.  A lot of
18   people seek information on platforms.  We thought
19   that by giving the platform scientific information
20   it might help in our goals to being sure that
21   credible information could be found.
22        Q.   And uncredible information would not be
23   found; correct?
24             MS. SNOW:  Objection, mischaracterizes
25   testimony.
```

**CAROL CRAWFORD  11/15/2022**

Page 267

```
 1   BY MR. VECCHIONE:
 2        Q.   You can answer.
 3        A.   I did want the credible information to be
 4   found in advance of the uncredible information.
 5        Q.   You at least wanted upgraded over --
 6        A.   Yes.
 7        Q.   -- uncredible information?
 8        A.   Yes.
 9        Q.   Do you recall anything anyone at any of
10   the social media platforms asked at any of these
11   BOLO meetings?
12        A.   They weren't able to ask questions during
13   the BOLO meetings.
14        Q.   Why was that?  Tell me how it ran.
15        A.   I think we talked about that this morning.
16   They are muted because the thought was they're
17   competitors, and they could ask questions
18   individually later.
19        Q.   Got it.  One second.
20             (Mr. Vecchione conferring with Mr. Sauer.)
21   BY MR. VECCHIONE:
22        Q.   Did they ask any questions individually
23   later that you recall?
24        A.   No, I don't think that they did.
25             MR. VECCHIONE:  All right.  I have no
```

**CAROL CRAWFORD  11/15/2022**

Page 268

```
 1    further questions at this time.

 2              MS. SNOW:  Okay.  Nothing further.  No

 3    questions for defense.

 4              MR. VECCHIONE:  And you already said

 5    you'll read, right, at the beginning?

 6              MS. SNOW:  I said that at the beginning,

 7    so I didn't want to forget at the end.

 8              MR. VECCHIONE:  All right.

 9              THE VIDEOGRAPHER:  Okay.  I've got to ask

10    on the record, what about video copies for

11    everybody?  Anybody?

12              MR. SAUER:  We want video as soon as it's

13    available.

14              THE VIDEOGRAPHER:  So you want synced,

15    non-synced?

16              MR. SAUER:  I think synced syncs the video

17    to the transcript?

18              THE VIDEOGRAPHER:  Yes, I believe so.

19              MR. VECCHIONE:  And we -- I think what

20    we've been doing, we're going to do is give the

21    originals to her to put the record together, the

22    transcript together, the original exhibits.

23              MR. GILLIGAN:  The original exhibits, yes.

24              MR. SAUER:  So there should be -- that

25    stack of exhibits should go to the court reporter in
```

**CAROL CRAWFORD  11/15/2022**

Page 269

```
1   front of the witness.

2           THE VIDEOGRAPHER:  Do you want a copy also

3   for your group?

4           MR. SAUER:  No, just one.  We're both

5   plaintiffs.

6           MR. VECCHIONE:  And there is no Exhibit.

7   25 that's the one we skipped.  So don't be thinking

8   it's lost.

9           MS. SNOW:  But, yeah, we would like a copy

10  of the video as well.

11          THE VIDEOGRAPHER:  Okay.  A synced copy?

12          MS. SNOW:  Yes.

13          THE VIDEOGRAPHER:  So how about you, sir?

14          MR. GILLIGAN:  She's with us.

15          THE VIDEOGRAPHER:  So just one for each.

16          MS. SNOW:  Yeah.

17          THE VIDEOGRAPHER:  Got you.  Thank you.

18  And we are off the record at 5:33.

19          (Concluded at 5:33 p.m.)

20          (Signature reserved.)

21

22

23

24

25
```

**CAROL CRAWFORD  11/15/2022**

**Page 270**

```
 1                    C E R T I F I C A T E

 2    STATE OF GEORGIA:

 3    DEKALB COUNTY:

 4              I, Maureen S. Kreimer, a Certified Court

 5    Reporter for the State of Georgia, before whom the

 6    foregoing deposition was taken, do hereby certify:

 7              That CAROL CRAWFORD, the witness whose

 8    deposition is hereinbefore set forth in pages 1 to 269,

 9    was duly sworn by me and that such deposition is a true

10    record of the testimony given by the witness.

11              I further certify that I am not related to

12    any of the parties to this action by blood or marriage,

13    and that I am in no way interested in the outcome of this

14    matter.

15              IN WITNESS HEREOF, I have hereunto set my

16    hand this 18th day of November, 2022.

17

18

19

20

21    _____

22    MAUREEN S. KREIMER, CCR-B-1379

23    Notary Public in and for the

24    State of Georgia.  My Commission

25    Expires August 14, 2024.
```

**CAROL CRAWFORD  11/15/2022**

**Page 271**

```
 1                          LEXITAS LEGAL

 2

 3    November 17, 2022

 4
      KYLA SNOW, ESQ.
 5    U.S. Department of Justice
      1100 L Street N.W.
 6    Washington, DC 29530

 7    IN RE: STATE OF MISSOURI ex rel. ERIC S. SCHMITT,
              Attorney General, et al. v. JOSEPH R.
 8            BIDEN, JR., in his official capacity as
              President of the United States, et al.
 9
      Dear Ms. Snow:
10
      Please find enclosed your copies of the deposition of
11    CAROL CRAWFORD taken on November 15, 2022 in the
      above-referenced case. Also enclosed is the original
12    signature page and errata sheets.

13    Please have the witness read your copy of the
      transcript, indicate any changes and/or corrections
14    desired on the errata sheets, and sign the signature
      page before a notary public.
15
16    Please return the errata sheets and notarized

17    signature page within 30 days to our office at 711 N

18    11th Street, St. Louis, MO 63101 for filing.

19
20    Sincerely,

21

22

23    Lexitas Legal

24
25    Enclosures
```

**CAROL CRAWFORD  11/15/2022**

**Page 272**

```
 1                      ERRATA SHEET
      Witness Name: CAROL CRAWFORD
 2    Case Name: STATE OF MISSOURI ex rel. ERIC S. SCHMITT,
                 Attorney General, et al. v. JOSEPH R.
 3               BIDEN, JR., in his official capacity as
                 President of the United States, et al.
 4    Date Taken: NOVEMBER 15, 2022

 5    Page #_____   Line #_____

 6    Should read: _____

 7    Reason for change: _____

 8

 9    Page #_____   Line #_____

10    Should read: _____

11    Reason for change: _____

12

13    Page #_____   Line #_____

14    Should read: _____

15    Reason for change: _____

16

17    Page #_____   Line #_____

18    Should read: _____

19    Reason for change: _____

20

21    Page #_____   Line #_____

22    Should read: _____

23    Reason for change: _____

24

25    Witness Signature: _____
```

**CAROL CRAWFORD  11/15/2022**

**Page 273**

```
 1   STATE OF _____)

 2

 3   COUNTY OF _____)

 4

 5   I, CAROL CRAWFORD, do hereby certify:

 6         That I have read the foregoing deposition;

 7         That I have made such changes in form

 8   and/or substance to the within deposition as might

 9   be necessary to render the same true and correct;

10         That having made such changes thereon, I

11   hereby subscribe my name to the deposition.

12         I declare under penalty of perjury that the

13   foregoing is true and correct.

14         Executed this _____ day of _____,

15   20___, at _____.

16

17

18

19                          _____

20                          CAROL CRAWFORD

21

22                          _____

23                          NOTARY PUBLIC

24   My Commission Expires:

25
```

**CAROL CRAWFORD  11/15/2022**

| A | | | | |
|---|---|---|---|---|

**A**

**a.m** 1:15
31:1,1
34:5  100:2
102:10
261:13
263:15
**Aaron** 6:6
8:15
264:13
**Abbott** 51:5
**ability**
10:24
88:11
156:17
157:7
164:10
**able** 75:23
108:17
122:17
123:9
146:5
161:10
172:24
173:12
215:14
256:7
267:12
**abortion**
255:10,15
**above-re...**
271:11
**access** 49:12
71:11
97:11,20
147:12
148:8
213:8
217:24
**accessing**
206:21
**accomplish**
88:24
266:14
**account**
138:9
215:1,3
216:20
218:2,18

**accounts**
4:18,21
157:5
196:20
201:20
212:21
217:11,24
218:7
**accurate**
27:15  89:4
162:22
**ACIP** 253:12
253:20
**ACS** 183:6
**acting** 32:6
**action**
270:12
**actionable**
212:9
**actioned**
211:13
**activities**
69:11
164:11
**activity**
41:3,4
74:6  75:17
**actual**
108:11
111:10
214:2
244:3
**ad** 180:21,25
224:9
**Adams** 119:8
119:9
150:16
153:1,6
223:1
**ADCS** 107:23
**add** 42:18
58:17  67:9
76:19  77:1
77:4  78:15
141:3
184:23
192:11
229:13
251:22

**add-on** 32:10
**added** 63:4,5
70:6  77:6
157:24
194:24
195:1
227:10
249:11
**adding** 55:21
61:11
76:18
82:17
129:10
**addition**
128:14
249:12
**additional**
45:24
48:22
78:10
107:8
159:21
162:11
167:1
188:4
218:19
219:12
238:19
255:5
**address**
23:21  29:1
38:14
83:11
87:16,21
88:8
125:24
129:5
172:24
174:20
175:4
207:25
244:15
**addressed**
108:16
**adds** 262:11
**adjust** 54:20
58:2  81:12
**administ...**
12:5

**administ...**
48:21
95:18
98:24
215:15
**Adrien** 86:12
238:8,9
**Adrienne**
100:1
**ads** 222:20
222:21
**adults** 46:4
164:7
**advance**
267:4
**adverse**
122:23
123:1,10
140:7
168:11
**advice** 169:9
237:19
**advise** 71:4
104:22
**advisement**
84:21
100:16
**advisory**
153:17,18
253:21
**Affairs**
12:23  13:8
13:10
14:10  15:4
19:9  32:7
32:18
**Affairs'**
12:19
**affect** 138:3
164:10
**affirmative**
16:3,25
17:12
19:18  23:9
39:17
40:24
41:23
43:15  44:7
45:21

62:25
67:11
107:6
108:20
114:11
117:15
128:25
129:22
130:7
134:8
141:16
155:11
166:13
181:4
185:18
187:5
190:22
196:3
202:9
207:1
216:16
242:25
243:20
253:8
**age** 169:16
169:25
185:25
187:4,6
**agencies**
92:2
109:23
221:9
223:24
232:4,6,16
232:18
233:8,11
239:21
261:11
**agencies'**
164:23
**agency** 11:19
15:17
95:19
127:25
128:5
140:12
164:21
255:23
256:10

**CAROL CRAWFORD  11/15/2022**

agenda 3:4
103:4
118:23
126:15
221:14,16
221:17
224:2
225:21
240:7,9
agendas
223:24
aggregate
154:19
ago 51:23
56:21 96:6
99:1
182:19
agree 10:13
49:19
132:4
172:5
187:17
211:11
230:11
agreed 47:9
57:14
60:23
agreement
31:11 71:6
102:17
109:21,23
Ah 125:7
ahead 31:5
31:23
67:16
74:20
81:16
104:13
199:17
253:17
AII 111:2
aiming
242:11
245:16
Airton
222:17
Airton's
224:8
al 1:4,10

271:7,8
272:2,3
alert 4:1
5:2 152:24
153:8,11
153:12,13
153:14,16
153:17,18
188:11
190:14
219:24
220:1,14
algorithm
53:4,8
138:20
155:18
algorithms
237:14
alias 23:16
alleged
53:22 58:6
allergic
164:12
Alliance 6:9
allowed
77:10
93:24 94:4
94:9
217:21,22
allowing
146:15
allows
214:10
alternate
208:12
alternative
209:17
Alzheimer's
122:3
amplific...
80:2,4
81:17
amplify
227:3
analysis
259:17
analyze
75:12
80:13

Anant 7:2
8:25
Anant.ku...
7:4
and/or
271:13
273:8
animals
120:17
announce...
193:1,11
193:18
195:18,24
answer 10:3
10:10,12
35:1 46:22
47:17
54:11 69:5
73:14
76:25 78:6
78:20 79:4
79:18
80:17,21
80:23 90:2
93:22 97:8
101:23
106:8,21
107:2
112:25
115:4
116:10
121:8
129:16
136:8
137:4
146:5
152:1
158:8,25
159:17
161:19
180:16
186:12
194:1
236:5
241:10
260:3
264:25
265:6
267:2

answer's
120:14
answered
41:8 74:13
80:16
82:20 99:8
108:15
113:19
140:21
165:7
176:12
answering
68:19
answers
74:17
114:16
115:2,5
129:6,24
anti-vac...
55:6
anticipated
228:14
Antonaros
21:1 174:8
176:6
177:7
192:22
243:17
254:16
Antonaros'
176:23
Antonio
253:3
anybody
265:2
268:11
anymore
13:15
anything's
171:2
anyways
176:4
apologies
33:16 96:7
apologize
41:13
86:24
167:16
245:9

247:3
249:11
apparently
91:24
194:18
237:15,16
253:2
appear
120:11
appearance
68:15
APPEARANCES
6:1
appearing
146:17
209:2
appears
25:10
41:16 56:6
77:14
119:22
122:7
141:22
203:5
252:25
applied
136:22
apply 104:23
105:3
169:21
appointment
37:4,24,25
44:14,23
116:22
178:15
221:16
242:20
244:1,3
248:5
appointm...
30:13
appreciate
27:20
109:12
206:6
appreciated
55:20
approach
76:17 77:3

**CAROL CRAWFORD  11/15/2022**

82:17
208:13
209:17
approach...
  258:20
approached
  29:18
appropriate
  217:4
approved
  169:23
  201:15
  203:21
  204:2
approving
  161:13
April 3:6
  13:3,14
  15:1 16:1
  46:2 65:25
  77:13
  185:17
  186:7
  188:15
  196:21,25
  221:10
  234:10
  237:8,10
  238:7
AR 42:6
area 114:22
  114:23
  137:14
  138:8
  140:14
  143:4
  146:4,8
  150:21
  154:11
  224:17
  259:5
areas 34:1
  56:18
  59:11 76:1
  87:23
  150:23
  175:13
  211:18
  258:11

259:1
argument...
  138:7
  163:10
arguments
  39:20
arrange
  36:16 37:1
  246:16
arranged
  20:19
arrangem...
  18:22
arranging
  246:13
ARTF 42:1,3
article 3:6
  3:7 4:7
  7:19 53:19
articles
  112:20
as-needed
  223:25
aside 22:3
  43:8 48:13
  60:2 85:4
  85:5 90:24
  100:19
  115:9
  118:5
  126:7
  144:25
  165:12
  168:21
  171:13
  179:8
  187:8
  196:13
  200:14
  205:2
  219:18
  221:2
  226:3
  236:25
  239:12
  247:6
  249:6
  254:3
  263:24

asked 14:11
  42:21
  46:14
  69:10,22
  75:3 77:4
  80:16
  81:17
  82:20
  98:19 99:2
  99:6,7
  106:24
  125:23
  130:18
  146:18
  152:3
  164:1
  165:7
  166:22
  174:11
  176:11
  180:14
  184:3
  185:16
  188:1
  197:5,18
  197:18
  198:6
  201:1,24
  204:21
  209:11
  215:2,2
  230:13,24
  230:25
  231:18,19
  231:22
  232:1
  236:8
  238:20
  240:21
  256:12
  257:24
  259:14
  260:6
  264:19
  267:10
asking 9:25
  18:20 26:8
  27:5 34:17
  42:14,18

48:4,6
  51:8 55:7
  75:22 77:1
  77:2 78:15
  80:6,14
  82:22
  90:11
  94:11
  99:13
  117:25
  123:25
  130:19
  139:21,24
  149:12
  150:18
  157:8
  158:18
  159:3,3,8
  163:24
  167:21
  169:8,10
  170:18,21
  173:2
  182:8
  186:4,5
  200:11
  202:16,20
  204:22
  215:12
  216:13
  230:25
  231:13
  242:20
  251:24
asks 46:18
  65:18
  79:13
  96:25
  140:5
  157:15
aspect 83:17
Aspinall
  92:5 97:5
assembled
  192:18
assess
  169:23
assessment
  166:25

assigned
  114:21
  124:1
assist 154:1
assistance
  17:7 224:7
assistant
  50:24 61:7
  63:11
assistants
  86:15
assisting
  158:15
associate
  11:9,12
  183:5
associated
  37:24
  265:2
assume 35:19
  44:2 59:23
  105:18
  125:12
  135:19
  160:6
  197:24
  212:10
  223:3,19
  259:4
assumed
  176:11
  259:23
  261:14
assumes 79:1
  110:7
  137:22
  138:6
  142:24
assuming
  33:21
  182:7
  204:17
  261:10
assumption
  130:3
  185:3
assure 49:4
  135:23
asterisks

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| 235:10 | 63:14 | 192:1 | 237:9 | 12:23 14:5 |
| **asthma** 46:4 | **Attorney** 1:4 | **awareness** | 238:8 | 18:4 19:22 |
| 186:15,21 | 6:2 149:1 | 25:5 26:14 | 241:24,24 | 19:23 24:5 |
| 187:4 | 149:1 | 35:18 | 243:15 | 25:14 |
| **AstraZeneca** | 271:7 | 190:7 | 247:14 | 28:18 |
| 169:5 | 272:2 | | 252:7,7 | 29:18,18 |
| **Atlanta** 1:18 | **attorney...** | **B** | 253:2 | 30:12 |
| 12:13 | 93:21 | **babies** | 255:23 | 34:14 42:4 |
| **attach** 46:12 | 94:20,22 | 165:15 | 257:2,13 | 45:7,13 |
| 122:18 | **attorneys** | **bachelor** | 260:15 | 51:1,16 |
| 207:13 | 8:10 | 12:11 | **back-** 12:15 | 59:8 63:11 |
| **attached** | **audiences** | **bachelor's** | **background** | 64:13 |
| 5:22 7:22 | 182:1 | 12:4 | 12:16 | 65:12 |
| 25:8 52:21 | **audio** 97:22 | **back** 11:24 | 59:24 | 69:12 70:1 |
| 60:19 61:1 | **August** | 13:7 22:19 | **Balog** 50:17 | 70:19 |
| 62:1 63:16 | 145:17,18 | 22:22 | **Barnes** 19:12 | 77:12 |
| 63:17 | 146:21,25 | 25:25 31:2 | **Barrington** | 79:21 |
| 185:20,21 | 270:25 | 41:18 56:8 | 264:5 | 80:19,25 |
| 202:13 | **authored** | 67:24 68:4 | **based** 97:10 | 81:5,9,14 |
| 251:15 | 46:20 | 69:13 | 133:12 | 83:13,22 |
| **attachment** | **authority** | 70:10,11 | 200:12 | 83:24 87:1 |
| 149:11 | 135:24 | 72:14 | 211:18 | 87:22 |
| 153:7 | **authoriz...** | 77:12,17 | 219:9 | 90:11 92:1 |
| 155:5 | 4:3,6 | 98:3 | 261:18 | 92:21,25 |
| 188:18 | 137:7,10 | 102:11 | **basis** 74:3,5 | 97:14 |
| **attachments** | 137:12 | 115:2,4,5 | 184:16 | 108:13 |
| 47:18 | 156:2,25 | 116:12,14 | 215:11 | 110:4 |
| 202:10 | 160:1 | 117:11 | **Bates** 124:17 | 116:18 |
| **attend** 68:18 | 163:19 | 121:14 | 136:9,13 | 117:22 |
| 151:15,16 | 167:3 | 124:7,8 | 136:19 | 118:1 |
| 187:24 | 169:18 | 126:17 | 146:11 | 123:9,13 |
| 188:7 | **available** | 130:11,12 | 169:13 | 128:10 |
| 243:25 | 45:25 | 132:9 | 205:25 | 133:20 |
| 247:20,23 | 68:18 72:4 | 133:17 | 241:25 | 134:1 |
| **attended** | 89:6 95:19 | 135:14 | **bear** 264:20 | 137:15 |
| 120:2,3 | 95:25 | 145:17 | **becoming** | 139:7 |
| 151:8 | 96:16 | 150:4 | 38:7 | 143:22 |
| 235:7 | 133:24 | 160:13 | **beginning** | 147:18 |
| 245:1 | 185:6 | 161:6 | 16:14,19 | 151:22 |
| 246:12 | 251:15 | 167:24,25 | 19:11 44:5 | 154:22 |
| 250:15 | 257:24 | 176:9 | 142:15 | 155:18 |
| **attendee** | 268:13 | 189:10 | 144:16 | 167:19 |
| 246:7 | **Avenue** 7:3 | 193:2 | 198:22 | 168:6 |
| **attendees** | **aware** 33:18 | 197:11 | 219:11 | 174:17 |
| 221:18 | 137:18 | 205:11 | 268:5,6 | 175:18 |
| **attending** | 140:6 | 206:25 | **behalf** 6:1,6 | 177:9 |
| 181:7 | 167:2 | 212:22 | 6:15 7:1 | 185:10,14 |
| **attention** | 169:2 | 226:23 | **Bel** 265:9 | 188:13 |
| 52:23 | 191:23 | 235:11 | **believe** | 192:6 |

**CAROL CRAWFORD  11/15/2022**

196:10
197:18
200:6
204:12,15
204:21
210:22
212:2
214:18
218:24
220:18
221:24
222:3
223:16,16
223:16
225:3
228:8
230:20
232:21,23
233:13
236:8,15
239:13
243:16
245:1
246:4,15
248:4,4,17
250:21
253:22,25
261:25
265:17
268:18
**believed**
157:16
162:3
169:25
220:20
**bell's** 3:6,8
111:13
112:16,19
112:20
**belong** 54:24
55:10
**benefit**
140:3
**best** 34:10
34:18
40:25
77:23
116:6
182:10

211:22
243:5,9
**better** 80:7
192:11
194:8
229:9
242:16
264:25
**beyond** 31:12
40:12
102:18
**Bhattach...**
6:6  8:15
264:8
**Biden** 1:7
8:5 271:8
272:3
**big** 34:17,23
189:20
190:1
**bigger**
220:17
**Birth** 223:17
**bit** 11:24
12:22
49:15
51:11
61:14
64:15
151:12
208:16
**biweekly**
52:5  57:6
57:12,13
57:16,19
57:21
60:22 62:1
142:3
226:18
262:20
**black** 62:5
**blacked** 44:8
**blanking**
21:2 152:9
**blind** 248:5
**block** 235:14
**blocked**
237:21
**blood** 270:12

**bloodstream**
265:25
**Bloomberg**
4:7
**BlueJeans**
241:4,5
**Board** 7:20
**body** 62:3
164:9
**bold** 62:9,11
62:13
64:19
**bolded** 62:6
62:7 63:20
63:23 64:6
64:8,10,21
65:8 66:4
**bolding** 64:1
64:2
**BOLO** 4:1  5:2
5:10,13
152:24
153:19,20
188:9,13
188:14
198:15,21
202:6
204:24
208:9,16
208:17,24
209:11,12
209:23
210:11
213:2
219:24
220:6
241:21
242:5,10
242:17,20
245:1,14
246:5
247:12
248:20,24
253:18,23
260:12
262:8
265:11,12
265:13,16

267:11,13
**BOLOs** 153:23
210:2,3
**Bonds** 19:10
32:13
**booster** 5:14
249:19,20
250:1
**Boosters** 4:7
**bottom** 44:19
65:13
124:18
128:7
136:13
146:12
148:20
169:14
174:3
187:19
196:25
206:1
243:19
**box** 6:4
23:15,17
**branch** 13:19
13:20,20
14:4,12,17
15:3,4,6
24:16 25:1
**branches**
13:18
**brand** 190:7
**break** 30:20
66:1,20
102:2,6,7
102:7
149:24
205:4
235:13
256:18
**breaking**
41:24
**breast**
165:14
**breathing**
41:11 42:9
**Bretthau...**
108:1
115:10

**brewing**
220:14
**brief** 2:12
2:15 39:9
39:11,13
39:24,25
43:21 44:9
256:18
265:17
**briefing**
68:17,21
68:23
**briefings**
149:2
**briefly**
11:25
**briefs** 39:18
**bring** 35:24
115:14
181:14,18
182:9
188:21
200:10
258:25
259:2
**bringing**
68:24
168:21
205:1
**Broadcast**
14:7
**broader**
39:16
110:6
182:25
184:9
**Brook** 92:5
**building** 6:3
21:24,25
164:9
**bullet** 39:21
82:2
127:17
**bunch** 27:25
**Bureau** 56:4
**buried** 129:7
**business**
12:4
**busy** 19:24

CAROL CRAWFORD  11/15/2022

| C | | | | |
|---|---|---|---|---|
| **C** 23:7 270:1 | 190:11 | 233:14 | 141:22 | 42:24 |
| 270:1 | 195:1 | 251:4 | 144:22 | 43:21 44:9 |
| **Cain** 245:18 | 197:22 | 259:25 | 271:11 | 45:9 46:20 |
| **calendar** | 198:18 | **campaign** | 272:2 | 46:20 |
| 30:12 | 221:8 | 262:1 | **cast** 174:2 | 47:12 |
| 84:15,19 | 222:3 | **capacity** 1:8 | **catch** 173:15 | 48:11,16 |
| 100:9 | 223:18 | 271:8 | 240:20,21 | 54:6,13 |
| 116:20 | 225:22 | 272:3 | **category** | 56:1,2,5 |
| 178:13,15 | 233:7 | **cards** 197:9 | 185:25 | 58:9,20 |
| 246:10 | 239:3,20 | 201:5 | 187:6 | 61:10 |
| **calendared** | 257:23 | **care** 95:10 | 203:20 | 63:24 64:3 |
| 116:21 | **call-in** 31:8 | 238:17 | **caught** | 71:7,9,11 |
| **calendars** | 31:15 | **Carnac** | 145:12 | 71:18,23 |
| 30:10 | 102:15,20 | 249:13 | **cause** 111:13 | 71:25 |
| **call** 3:5 5:4 | **called** 17:19 | **Carol** 1:13 | 154:1 | 72:15 74:7 |
| 5:9 11:10 | 17:21,22 | 2:3,7 8:4 | 169:2 | 74:18 |
| 19:4 27:22 | 69:1 | 9:5 11:3 | **caused** 168:1 | 77:17 78:1 |
| 29:25 30:1 | 136:13 | 22:24 34:5 | **causes** 122:2 | 78:9,22 |
| 30:4,8,9 | 173:11,14 | 45:22 | **causing** | 81:7 82:9 |
| 30:11 | 198:6 | 51:22 | 78:11,13 | 82:11 83:4 |
| 36:15 | 211:9 | 63:15 | 127:10 | 87:20 |
| 37:19,21 | 220:23 | 68:14 73:4 | 128:8 | 89:21 90:5 |
| 38:1 44:15 | 221:25 | 74:25,25 | 156:18 | 90:6,9 |
| 45:23 | 226:16 | 84:4 100:2 | **cc** 24:12 | 92:3,5 |
| 51:17,19 | 229:9 | 126:19 | 50:17 52:2 | 96:23 |
| 52:22 | 231:3 | 141:17 | **cc'd** 222:14 | 98:18 99:3 |
| 56:20 57:3 | 256:11 | 166:18 | 250:20,25 | 99:6,8,18 |
| 84:9 93:19 | **calling** | 176:25,25 | **cc'ing** 27:1 | 100:22,25 |
| 102:19 | 148:22 | 197:4 | 86:16 | 103:4,20 |
| 103:4 | **calls** 20:19 | 211:6,20 | **cc's** 176:6 | 103:24 |
| 107:1 | 29:20 30:5 | 216:18,19 | **CCR-B-1379** | 104:8,22 |
| 108:18 | 35:24 | 226:24 | 1:20 | 105:2,7,25 |
| 116:17 | 76:21 78:3 | 234:12 | 270:22 | 106:2,12 |
| 118:24 | 83:7 85:1 | 247:16 | **ccrawfor...** | 107:14 |
| 121:18 | 86:21 | 254:25 | 23:16 | 108:4,23 |
| 122:8 | 89:25 | 270:7 | **ccs** 119:8 | 110:20 |
| 126:16 | 93:18,20 | 271:11 | **CDC** 2:12,15 | 112:21 |
| 129:21 | 101:20 | 272:1 | 3:5 4:1,9 | 113:11,13 |
| 133:19 | 112:22 | 273:5,20 | 5:2,4,5,12 | 113:15 |
| 134:2 | 121:5 | **Carol's** | 8:7 11:5,8 | 117:13,14 |
| 173:7 | 123:3 | 206:8 | 12:2,6,8 | 118:24 |
| 177:3,23 | 135:10 | **Caroline** | 12:12,19 | 120:18,22 |
| 178:1,9,13 | 138:5 | 45:12 | 13:9 15:22 | 126:16 |
| 178:14 | 142:25 | **Carrie** 119:8 | 17:6,19 | 129:12,14 |
| 182:11 | 159:14 | 119:9,11 | 18:12 | 129:24 |
| 184:21 | 163:1 | 150:16 | 29:19 | 130:25 |
| 188:2 | 193:13 | 153:1,19 | 35:24 39:9 | 132:4,10 |
| 189:24 | 222:25 | 223:1 | 39:11 | 134:21 |
| | 231:15 | **case** 8:19 | 41:17 42:5 | 137:5 |

**CAROL CRAWFORD  11/15/2022**

```
138:16          236:8           79:23 82:2      214:11,13       257:14
139:24          239:21,21       83:1,4,7        214:14,19       263:15
140:1,13        247:12          83:16,16        218:18,22       chains
143:14,23       249:2           83:19           218:22          185:15
145:25          251:13          86:20 87:1      219:12          206:24
146:7           253:13          87:5 90:16      223:17          219:13
148:8           255:4           96:22 99:3      centers 1:17    chance 38:24
150:18          256:12          101:5,10        6:15 7:6        66:20 91:3
152:8,24        260:19          101:12          7:12 35:10      150:8
159:9,12        266:5           107:10          256:12          178:13
163:21          CDC's 11:14     109:14          certain         211:21
164:22          11:15,17        110:16,17       63:20           257:25
166:7           15:15,16        111:3,9         98:19 99:2      change
171:23          27:17 29:8      117:19          101:18          194:13
174:18          43:4 47:25      125:12,16       137:12          272:7,11
175:2           52:3 59:13      174:18,21       157:9           272:15,19
177:4           89:17           174:22          194:19          272:23
181:6           113:18          175:3,6,14      Certified       changed
183:17          126:23          175:19,23       270:4           61:14
185:14,23       161:21          176:11,12       certify         117:6
189:23          167:4           177:4           270:6,11        145:22
192:4           186:13          179:25          273:5           148:6
193:19,20       191:1,16        182:5,9,24      cetera          156:12
193:23          220:12          184:8,11        197:10          180:18
194:4,19        CDC-cred...      184:11,16       201:5           210:22
194:20          18:10           184:23          chain 22:14     changeover
200:20          cell 35:23      185:9,12        22:18,23        13:16
202:12          36:1,2,4,6      197:17          25:9 26:7       changes 47:9
210:23          censorship      201:11          26:21 30:2      192:8
212:20,21       176:3           202:22          33:11           250:3
212:22          Census 55:22    203:14          35:21           253:16
213:6           56:1,2,4        208:1,3         44:23 60:6      271:13
215:3           58:17           209:24          66:3 67:21      273:7,10
217:3,11        59:15           210:2,5,8       67:22 70:7      channel 3:3
218:4,5,6       61:10,11        210:11          74:19           51:5 91:10
219:24          70:9 71:1       213:13,23       79:20           91:18,24
221:9,9,18      71:3,8,14       214:21          83:12           95:14,14
222:3           71:19,25        217:3,6,23      91:23           95:16,22
223:3,22        72:8,15,16      218:7           97:10,16        97:2 98:15
223:24          73:6,8,11       234:19          122:11          99:20
224:1,14        73:18,25        235:4,16        160:24          100:6
226:9,16        74:9,18         235:19          172:6           channels
227:4           75:1 76:3       246:12          174:4           52:12
229:10,14       76:11,19        center 11:18    182:8           62:18
230:20          77:5,17,22      14:2 15:18      187:20          characte...
232:7,16        77:22 78:1      59:1            207:2           53:7
233:13          78:9,14,15      107:13,15       213:10,12       132:10
234:7,18        78:22 79:9      107:17,22       226:15          143:20
234:25          79:15,18        160:20,21       238:22          characte...
```

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| 134:1 | 66:24 | ▮▮▮ @CDC... | 198:5 | 221:21 |
| characte... | 117:20 | 23:8,17 | clarified | 224:19 |
| 163:11 | 197:13 | claim 108:21 | 233:22,22 | co-chairs |
| characters | 209:25 | 120:12 | clarify | 132:20 |
| 174:2 | 253:7 | 122:21 | 31:20 55:1 | co-lead |
| charge | Cheers 252:9 | 157:16,17 | 64:15 | 107:16,17 |
| 135:22 | Chelsey 63:5 | 168:3,5 | 82:12 97:9 | 107:21 |
| 259:1 | 63:11 65:1 | 169:24 | 104:12 | 115:19 |
| chart 186:9 | chemical | 170:15 | 124:23 | 183:4 |
| 186:11,12 | 255:9,15 | 203:21 | 147:8,25 | co-leads |
| 186:14,15 | chief 15:3 | 255:8,13 | 155:2 | 108:2 |
| 204:19 | 192:25 | claiming | 199:18 | co-morbi... |
| 207:14,14 | 193:3,8 | 204:17 | 205:24 | 186:1 |
| 207:17 | childhood | claims 4:2,5 | 229:13 | code 231:9 |
| 211:8 | 158:4 | 5:15 | 246:11 | codes 70:20 |
| chat 4:11 | children | 119:16,17 | clarifying | coincidence |
| 171:22 | 66:5 157:1 | 124:15 | 171:25 | 24:21 |
| 223:19 | 157:3 | 126:22 | clean 69:19 | collab |
| 224:10 | 162:12 | 129:13,14 | 261:2 | 221:22 |
| 242:16 | 164:7 | 131:8,18 | clear 9:21 | 225:7,10 |
| chats 197:5 | 165:15 | 132:1 | 26:1 40:10 | collabor... |
| 200:25 | 167:3 | 138:13,16 | 52:8 | 225:10 |
| cheating | 169:15,19 | 139:1,9,24 | 122:11 | collabor... |
| 63:8 | 169:22,24 | 140:2 | 180:1 | 232:8 |
| check 41:12 | choice 66:9 | 156:1,17 | 192:15 | colleague |
| 70:9 | Chris 246:22 | 157:2,12 | 194:11 | 177:7 |
| 114:19 | 246:24 | 158:16,19 | clearance | 182:18 |
| 121:15,20 | Christopher | 159:4,21 | 128:1,2 | 238:11,18 |
| 121:24 | 83:21 | 162:11,21 | 129:2 | colleagues |
| 124:24 | 86:21,22 | 163:18 | cleared | 177:1 |
| 132:16 | 175:12 | 166:22 | 127:7,12 | 214:21 |
| 144:10 | 202:25 | 167:1 | 127:15,19 | 234:19 |
| 177:20 | 203:1 | 169:15,22 | 128:3,9 | collect |
| 178:17,18 | 216:4,11 | 170:9,18 | 135:17,20 | 115:6 |
| 178:22 | 216:11 | 170:18 | clearing | 132:11 |
| 179:1 | 217:5 | 172:20 | 135:22 | collective |
| 182:4 | 265:18 | 182:21 | clicked | 79:25 |
| 216:22 | circulated | 184:1,2 | 215:20 | colleges |
| 235:16 | 114:6 | 185:20 | Clifton 1:17 | 137:20 |
| 252:6,15 | circulating | 204:1 | close 203:4 | come 32:11 |
| 255:21 | 89:3 | 254:11 | closed | 66:18 |
| check-in | 153:25 | 255:3,4,7 | 100:15 | 72:14 |
| 180:9 | citizens | Claims_Help | closely | 117:21 |
| checked | 71:9,13,19 | 3:15 | 193:1,11 | 140:11 |
| 123:22 | 71:25 | clarific... | 195:18 | 144:8 |
| 131:9 | 101:19 | 42:15 | closer 78:14 | 183:15 |
| 235:18 | City 6:4 | 81:15 | CMS 142:22 | 195:4 |
| 252:16 | Civil 6:9 | 85:24 | CMU 225:2 | 204:23 |
| checking | ▮▮▮ 23:24 | 176:10 | CMU/FB | 218:13 |

CAROL CRAWFORD  11/15/2022

| | | | | |
|---|---|---|---|---|
| 146:9 | 124:2 | concern 54:6 | confirm | 243:1,10 |
| coming 27:18 | 135:14 | 54:13 | 96:25 | 250:4 |
| 128:15 | communic... | 63:24 | 121:3 | 251:21,21 |
| 169:19 | 53:10 | 100:24 | 133:11 | consolidate |
| 190:12 | 54:16 | 244:11 | confirmed | 90:22 |
| 191:3 | 113:19 | concerned | 256:14 | 124:8 |
| 233:10 | 116:10 | 81:7 | 261:18 | consult |
| 244:2 | 121:12 | 153:22 | confirming | 175:7 |
| commended | 123:25 | 154:5 | 156:17 | consulta... |
| 144:17 | 135:12 | 207:10,11 | conflicted | 150:15,19 |
| Comment | communities | concerning | 248:20 | consulted |
| 203:12 | 40:17 | 146:15 | confused | 236:3 |
| commented | 46:12 | concerns | 151:2 | consumer |
| 41:17 | community | 89:21 90:6 | 263:9 | 108:2 |
| 255:5 | 34:1 | 255:19 | confusion | 115:19 |
| comments | 103:25 | concluded | 29:6 54:19 | 194:5 |
| 41:6,12,14 | 234:20 | 236:12 | 56:18 58:1 | consumers |
| 41:15,20 | communit... | 269:19 | 59:11 76:1 | 134:19 |
| 97:24 98:2 | 3:10 | conclusions | 81:11 | contact |
| 205:8 | companies | 121:3 | 150:23 | 11:18 14:2 |
| 256:24 | 16:5 19:21 | 133:11 | 220:14,15 | 15:18 16:4 |
| Commission | 20:3,16 | concrete | 258:10 | 16:13,15 |
| 270:24 | 24:3 36:5 | 192:10 | Congress | 17:3,4,13 |
| 273:24 | 198:22 | condition | 125:20 | 17:17 |
| common | 208:17 | 10:23 | connect | 18:21 |
| 154:23 | 234:6 | 137:20 | 238:19 | 20:17,21 |
| 182:20 | company | conditions | 239:4 | 20:24 21:1 |
| 183:25 | 17:24,24 | 186:1 | connected | 21:7 35:4 |
| Comms 107:11 | 50:8 104:6 | conduct | 123:15 | 36:8 83:15 |
| communic... | 105:3 | 109:23 | 239:5 | 114:9 |
| 54:19 | 117:17 | conducted | connection | 119:11 |
| 81:13 | compare 44:4 | 131:1 | 102:14 | 198:1 |
| communic... | competitors | confer | consequence | 199:21 |
| 11:9,12 | 267:17 | 256:22,22 | 88:19 | 223:2 |
| 14:8 53:12 | compiles | conference | conserva... | 233:2 |
| 56:17 58:3 | 59:2 | 120:1 | 148:21 | 249:2 |
| 59:12 | completed | conferred | consider | 254:15 |
| 75:17 | 216:21 | 118:14 | 77:16 | contacted |
| 81:12 | completely | conferring | 88:14 | 24:2 |
| 148:15 | 164:25 | 118:12 | 220:20 | 232:16 |
| 151:21 | component | 236:1 | considered | contacts |
| 183:5 | 14:10 | 267:20 | 134:20 | 16:9,11 |
| 262:1 | comport | confidence | 155:18 | 17:16 |
| communic... | 242:18 | 59:9 72:4 | 194:24 | 18:18 20:2 |
| 12:6 13:21 | Compound | 81:1 258:5 | considering | 21:9 60:14 |
| 18:3 20:5 | 106:6 | 263:1,7,21 | 27:18 | 114:24 |
| 237:18 | 193:24 | confident | 99:16 | 242:24 |
| communic... | computer | 232:17 | 169:18,20 | content |
| 114:14,21 | 23:20 | 258:13 | 242:13 | 15:24 |

**CAROL CRAWFORD  11/15/2022**

18:14
29:22 43:7
45:24 46:3
46:16 47:8
47:13,20
47:22
51:25
52:24 53:8
65:15,16
75:18,20
87:21
90:11
101:15
103:14,21
105:24
106:13
108:2,3,16
109:8,9
113:13
115:19
127:22,25
128:4,14
128:17,21
129:2
131:23
133:23
134:9,10
134:11,13
134:14,25
157:6
164:15
175:24
176:11
183:16
189:23
190:7,13
191:16
197:6
201:1
212:6
222:2
228:10
229:11
234:19
244:24
**context**
39:24
126:22
188:24

196:1
200:5
201:16
204:4,13
217:16
230:18
255:6
265:16
266:9
**continue**
85:14
103:2
118:19
195:19
235:9
**Continued**
2:25 3:25
4:24 6:25
**contractor**
83:22
86:20
217:6
**contractors**
98:9,19
99:19
100:22,23
100:25
101:1,8,10
101:12
**contribute**
103:24
157:17,25
169:25
**contributed**
104:3
**control** 1:17
6:15 7:6
7:12 88:12
**controlled**
34:10
36:25
**convene**
15:21
**conversa...**
4:13,15
9:18 37:5
38:15
51:11,15
51:23

56:21 57:1
81:24
82:22 83:2
83:3 84:25
87:19
89:10
119:18
121:23
132:18
133:3
143:21,24
154:14,16
161:2
179:15
187:15
209:4,6
250:1
**conversa...**
18:15
36:10 38:5
38:6 53:10
54:17
59:24
64:12
72:11
83:10
87:15
117:1
143:6
209:9
**cooking**
205:6
**coordina...**
2:9 71:2
**coordinator**
35:9
**copied** 208:2
208:3
216:9,10
216:11
248:5
**copies**
256:19
268:10
271:10
**copy** 7:22
124:10
269:2,9,11
271:13

**COPY.docx**
3:23
**coronavirus**
27:16
190:16
**corporat...**
35:18
**correct** 22:1
23:10 28:1
33:14 40:4
44:3 45:2
49:17 61:2
65:9 89:2
97:1
121:14,25
122:16,18
124:15,25
125:1
131:23
145:15,24
146:19
159:23
162:25
169:9
170:6
178:11
203:11
206:10
220:2,4
227:6
236:12
252:3
257:16,20
259:7,24
266:23
273:9,13
**correcting**
194:7
**correction**
21:24
**corrections**
271:13
**correctly**
55:16
83:23
122:9
163:12
198:8
211:3

227:6
229:2,22
229:23
252:12
**correspo...**
169:4
**Costello**
51:5
**council**
15:22
253:21
**counsel** 1:16
6:1 7:21
9:1,8 10:5
10:9 21:15
22:5 31:7
31:9,9,13
84:18 93:5
100:13
102:13,16
102:18
112:10
118:10,15
235:24
236:1,3
256:23
**counterpart**
87:4
**counterp...**
233:20
**countries**
169:6
**country**
123:1
**COUNTY** 270:3
273:3
**couple** 83:19
84:1
151:21
173:3
198:19
226:25
243:7
266:4
**course** 10:4
123:2
152:11
210:24
262:13

**CAROL CRAWFORD  11/15/2022**

**court** 1:1
  6:3  7:20
  8:6  9:3,16
  256:18
  268:25
  270:4
**courtesy**
  52:1
**CoV-2** 112:17
**cover** 234:20
  235:13
**coverage**
  76:16
**covered**
  93:21
  94:19
**covering**
  187:23
  188:6
**COVID** 4:11
  5:1,10
  16:14,15
  16:16,17
  16:19  17:3
  17:10  18:2
  18:12
  22:14
  25:12
  29:15
  32:15
  42:23
  46:11
  48:10,22
  49:13
  51:25
  52:23  53:2
  57:25
  71:13  89:4
  92:9
  105:24
  110:5,10
  110:12
  111:5
  113:9
  121:4
  128:2
  148:19
  157:3
  160:23

161:14
162:3,12
162:12
164:6
169:15
173:25
174:20
175:4,7,8
183:14
195:1
197:9
198:19,23
201:4
205:20
206:16
208:9,17
222:1,2
223:12
224:22
231:5,9
232:19
239:2
241:21
242:5,10
245:14
247:21
255:4
256:6
261:25
266:17
**COVID's**
  256:5
**COVID-19**
  2:11,18,20
  3:9,17,20
  33:12  48:3
  51:3  60:7
  63:21
  91:13,17
  95:14
  98:14
  99:19
  108:21
  111:13,19
  119:15
  120:13
  122:2
  124:14
  126:22

127:10
128:7
137:2
139:13,17
141:10
145:6
149:18
157:3,6
163:25
164:7
167:25
168:3
169:1,3,19
169:21
170:15
176:17
188:3
221:20
224:12
229:20
234:17,21
247:12
256:1,3
258:16
**COVID-HUB**
  221:19,23
  221:24
  222:4
**COVID_19**
  5:12
**crafting**
  103:21
**Crawford**
  1:13  2:3,7
  8:4  9:5,12
  11:3  22:24
  34:5
  102:24
  141:17
  150:8
  247:16
  257:6
  270:7
  271:11
  272:1
  273:5,20
**create** 73:22
  110:1
  147:17

148:14
210:13
**created** 13:3
  61:5  73:25
  148:8,11
  221:13
**creating**
  48:16
  95:14
  263:6
**credible**
  89:1,5
  90:12
  140:1
  181:25
  266:16,21
  267:3
**criteria**
  89:14,15
**Cross-Ex...**
  2:4
**crosstalk**
  178:6
**Crowd** 60:7
**CrowdTangle**
  2:17,19
  3:16,19
  49:13,25
  50:1,20
  51:2,3,24
  51:25  52:7
  52:22
  59:17,19
  59:21
  60:15
  62:16
  63:16
  64:18
  66:12
  71:21
  75:24
  76:16  77:5
  77:7,10,11
  77:14
  78:16,24
  79:7,8,11
  83:17
  91:22
  97:11

141:10
142:2,12
145:6,14
146:15,17
146:23
147:1,4,5
147:10,13
148:8,12
148:19,25
149:2
154:15,24
230:1
262:14,20
**CRR** 1:20
**cues** 9:17
**cures** 197:9
  201:5,15
  203:18
**current** 11:4
  15:10,12
  16:1  18:23
  18:24
  168:2
  170:14
  262:14
**currently**
  15:5
**cut** 76:10,14
  82:1,13
  190:15
  191:17
**cut-and-...**
  240:9
**CV19** 3:2
  91:9,12
**Cynthia**
  107:11
  115:10
  116:23
  120:2
  133:22
  182:18,21
  183:1,2
  188:3
**cytokine**
  122:4

**D**

**D** 6:2

**CAROL CRAWFORD  11/15/2022**

daily 164:10
dark 62:5
data 71:18
  71:23  72:1
  72:2  75:12
  75:23
  80:13  81:2
  81:10
  150:23,24
  150:25
  186:13
  201:15
  204:3,12
  221:21,21
  224:25
  225:3
  260:7
  263:8,10
date 8:2
  84:19
  85:10,13
  111:10
  118:18
  126:11
  131:18
  135:9
  138:25
  139:2
  141:9
  145:4
  150:13
  152:20
  155:24
  163:16
  166:5
  171:18
  173:23
  179:12
  187:12
  189:5
  196:19
  200:18
  205:14
  208:20
  219:22
  221:6
  226:7
  229:5
  232:25

237:5
239:19
241:19
242:3
246:4
247:11
249:17
250:6,16
254:10
257:8
272:4
dated 61:18
  63:1
dates 49:18
  132:2
day 28:4
  32:22
  47:10
  77:18
  230:4
  270:16
  273:14
days 27:18
  164:11
  173:3
  238:1
  253:16
  271:17
DC 6:12,21
  7:3  271:6
deal 87:9
  207:22
  239:10
dealing
  10:18
  83:17
dealt 256:13
Dear 271:9
death 168:4
  168:12
  169:2,5
  170:16
  185:24
deaths 53:23
  58:7  62:7
  76:16
  82:18
  140:8
  146:2

167:5
168:1,21
169:2
debunk
  122:8
  129:2,12
  129:14,15
  131:1,8
  132:1,5
debunked
  124:25
  125:2
  127:11
  130:9,12
  131:22
  132:25
  134:7,20
  134:24
  135:3,10
  135:11
  137:5
  138:13,17
  157:21
  171:2
debunking
  3:15
  119:15
  124:14
  126:23
  139:1
  140:17
December
  189:7,12
  190:5
  195:11,23
decide 89:7
  89:10
  102:4
  135:13
decided
  57:18  74:4
  238:4
decides
  229:4
Deciding
  143:12
decisions
  89:2
  211:18

deck 73:20
  76:5
  149:19
  153:9
  210:17
decks 265:18
  265:22
Declaration
  264:6
declare
  273:12
deemed 212:9
Defects
  223:17
defend 10:6
defendant
  9:2
defendants
  1:11  8:19
  8:19,24
  9:2  31:6
defending
  10:5
defense
  102:13
  268:3
definitely
  109:22
  121:19
  159:20
  183:6
  216:10
  222:19
  226:20
  229:14
  256:2
definition
  203:17
degrees 12:9
DEKALB 270:3
delay 28:7
delete 75:15
  157:9
deleting
  75:17
demand
  194:25
Demi 108:1
  115:11

120:2
133:22
demonstr...
  50:2
Dempsey
  24:15  27:1
  45:15,16
  45:19,20
  57:3
department
  6:19  7:1,2
  7:8  8:18
  8:23  25:11
  25:16
  237:12
  238:20
  271:5
depending
  17:5,23
  181:14,18
  244:23
deploy
  223:10
deployed
  61:15
  107:20,21
  123:23
  223:4
deposed 9:13
deposition
  1:13  2:7
  5:23  8:3,7
  21:18
  26:23
  31:10,14
  93:9  94:17
  118:3
  152:12
  270:6,8,9
  271:10
  273:6,8,11
depth 175:1
DeSalvo
  193:6
describe
  249:25
described
  47:5  59:6
  59:21,25

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| 96:13 | 42:13 | 15:11,14 | 100:15 | 203:5 |
| 130:22 | 56:17 | 32:16,17 | 236:6,7,19 | 204:5 |
| 142:6,11 | **development** | 43:3,4 | **discuss** | 208:4,15 |
| 189:19 | 11:17 | 83:24 87:2 | 66:11 74:2 | 208:19 |
| 212:3 | 105:14,15 | 233:21 | 76:4 77:24 | 213:15,19 |
| **describes** | 108:2,3 | 243:25 | 80:1 84:6 | 222:10 |
| 103:17 | 115:20 | 247:19 | 84:9 95:11 | 223:6 |
| **describing** | **device** 35:24 | 249:3 | 105:7,13 | 225:22 |
| 55:16 | **devices** | **dir-** 120:22 | 105:15 | 240:6 |
| 155:15 | 213:24 | **direct** 18:17 | 170:3 | 244:10 |
| **description** | **differed** | 19:12,14 | 175:1 | 263:20,22 |
| 2:5,6 50:3 | 17:22 | 63:13 | 180:10 | **discussing** |
| 95:23 | 140:12 | 93:22 | 182:23 | 37:14 |
| 130:18 | **difference** | 165:13 | 184:7,24 | 58:10,12 |
| **design** 11:19 | 220:7 | 166:11 | 228:24 | 64:17 |
| 233:12,16 | **differences** | 182:6 | 233:14 | 79:24 |
| 233:17 | 17:15 | 205:13 | 253:10 | 82:25 83:5 |
| **design/c...** | **different** | 234:5 | 258:19 | 105:9,12 |
| 27:21 | 23:14 | 238:16 | 260:17 | 119:25 |
| **designer** | 44:21 | 242:15 | 263:13 | 130:21 |
| 40:14 | 47:21 65:3 | 250:13 | **discussed** | 148:18 |
| **desired** | 77:9 78:24 | **directed** | 19:22 30:8 | 151:7 |
| 271:14 | 79:8 | 80:19 | 38:8,10 | 180:12 |
| **detail** 32:13 | 107:17 | 199:4,10 | 53:11 | 184:15 |
| 73:14 | 120:11 | 199:19 | 57:25 58:4 | 204:13,24 |
| 133:20 | 129:24 | **directly** | 59:10 | 212:24 |
| **detailed** | 141:3 | 19:17 74:9 | 60:13 | 230:19 |
| 51:24 | 142:5 | 77:10 | 62:17 72:7 | **discussion** |
| 169:4 | 147:10,20 | 101:12 | 77:20 | 49:12 |
| **details** | 147:24 | 113:20 | 78:11 | 52:11 |
| 110:2 | 149:16 | 123:25 | 81:10 83:9 | 58:15 59:3 |
| 149:5 | 172:6 | 124:5,9 | 83:13 | 133:12,13 |
| 150:20 | 175:17 | 129:5 | 116:5,25 | 151:2 |
| 153:15 | 187:6 | 130:21 | 117:7 | 182:18,25 |
| 224:24 | 198:9 | 147:11,12 | 130:16 | 184:9,11 |
| **determine** | 204:8,11 | 238:19 | 133:2,10 | 185:8 |
| 11:22 | 220:5 | 251:16 | 135:23 | 206:21 |
| 110:24 | 259:1 | **director** | 138:19 | 260:16 |
| 161:21 | **difficult** | 11:7,9,12 | 141:1 | **discussions** |
| 170:20 | 97:6 173:4 | 11:21 | 142:2 | 18:8 64:19 |
| **determined** | **difficulty** | 18:25 19:8 | 145:13 | 132:15,16 |
| 114:13 | 42:9 | 32:7 83:24 | 147:2 | 213:16 |
| **determining** | **digital** 11:8 | 87:2 | 148:4,14 | 244:20 |
| 89:14 | 12:6,25 | 107:11 | 150:22 | 261:19 |
| **develop** 59:5 | 13:19,24 | 120:19 | 151:14,17 | **disease** 1:17 |
| 109:9 | 13:25 | 183:5 | 174:17 | 6:15 7:6 |
| **developed** | 14:12,14 | **disclosure** | 181:24 | 7:12 |
| 57:19 71:8 | 14:17,20 | 7:21 | 185:20 | 190:17 |
| **developing** | 14:24 15:3 | **discovery** | 198:18 | **Diseases** |

**CAROL CRAWFORD  11/15/2022**

107:14
160:22
display
188:22
distributed
212:16
distribu...
52:19
58:17
61:14
62:22
District 1:1
1:1 8:5,6
distro 52:18
61:12
division 1:2
11:7,8,14
12:19,23
12:25 13:8
13:8,10,14
13:17,18
13:19,25
14:4,20,24
15:4,5,11
15:14 19:8
19:9 29:21
32:7,18
divisions
14:1
doc 225:20
doctors
122:25
document 3:9
21:16
25:23 33:8
41:22
47:15 49:7
54:9 67:20
76:23
78:18 86:6
91:4,6
94:9 96:1
99:23
100:14
143:17
145:9
146:12
152:15
158:6,23

161:17
162:17
163:2
165:2,12
165:16
167:24
168:14
169:13
206:18
238:14
249:23
documents
32:23
47:19
92:22
93:10
94:11
99:18
117:5
132:7
236:7
doing 9:19
14:2 29:15
38:14
57:21
100:23
116:9
142:5
144:11
158:14
162:20
174:22
178:21
182:7
200:3
210:3
224:22,23
232:13
239:6
244:6
248:24
258:5,20
265:4,16
268:20
domain 18:14
29:22
Door-to-...
144:20
dosage 255:8

doses 255:13
Double 62:10
doubt 56:22
108:25
Dr 6:6,6,6
125:20
draft 15:24
drafted
210:17,18
246:20
drafts 41:17
dragged
151:12
drawing
176:4
driven 146:2
drop 219:5
drop-down
186:18
drop-downs
215:21
due 84:8
duly 9:6
270:9
duties 11:13
15:13
32:10
101:14,17
duty 15:10
dysfunction
128:8

_____
E
_____

E 5:9 45:4
171:22
239:20
270:1,1
e.g 157:3
162:12
earlier 24:6
60:23
92:23 93:8
109:16
116:25
120:10
125:9
132:15
133:2
142:7

147:2
149:11
157:20
180:14
198:6
203:5
204:5,14
208:4
210:18
224:11
229:9
233:22
236:14
early 17:10
19:21 20:1
22:15
147:13
192:6
197:12
253:11
260:18
easier 18:12
23:21
27:22
129:8
167:6
easiest
170:3
EAU 4:3,5
163:19
edit 42:2
editing
47:12,19
47:20
education
11:25
educational
52:25
Edwards
265:9
effect 38:12
139:16,17
231:8
effective
255:14
effectively
54:20
effects 54:1
58:8 65:5

76:6 140:7
164:8,10
164:12
effort 35:11
40:16
177:2,8
180:2
efforts 2:11
15:16
27:15
33:12 34:1
eight 111:12
Eisman
222:22
either 43:4
61:6 65:21
104:22
113:15
125:10
136:19
147:7
149:1
176:19
181:2
197:21
230:22
241:3
elderly 3:10
electronic
20:5,6
30:17
56:24
electron...
136:21
element
157:25
else's 206:5
email 4:1
5:2,10,15
18:3 20:5
22:14,18
23:2,3,7
23:12,13
23:15,21
24:3,12,19
25:3,18
27:11
28:21,23
30:17

CAROL CRAWFORD  11/15/2022

33:11 34:6
34:6 35:12
35:15,20
39:2,8
40:3,7,8
43:20
44:19,21
44:23 45:1
50:14 51:1
51:12,18
57:20 58:4
60:6 62:3
63:1 68:3
68:11
72:21,22
72:22 73:4
73:25 75:8
75:10
77:19 85:3
85:11,13
85:15
91:20
92:24
96:20,20
98:16
114:1
119:3,6,9
119:14
120:23
121:2,2,25
123:19,21
125:9
126:21
137:1
146:10
150:15
153:4,6
159:11,19
160:8
161:25
163:4
166:12
167:22
172:3,21
174:4
178:22
189:11
197:21
200:6,24

201:24
202:8
204:22
213:10
216:4,8,12
216:20
218:1
219:9
220:7
225:19
226:15
230:15
238:8,22
241:12
243:17
244:15
248:3,22
250:16,18
250:25
254:2
257:14
261:10
emailed
173:14
253:2
emails 2:8
2:10,12,15
2:17,19,22
3:1,2,4,11
3:13,14,16
3:19,22
4:2,5,8,10
4:11,13,15
4:17,18,20
5:1,4,5,7
5:8,12,14
5:17 21:3
32:6 61:17
67:22 79:6
79:20 83:3
83:6 97:1
97:6 99:11
103:13
134:4
161:2
203:6
236:11,18
248:6
254:21

emergency
42:8,19
59:2
137:10,12
156:25
160:1
169:18
emphasis
3:10
employed
137:19
employee
13:21 14:8
222:8
employees
97:19 98:8
98:18
employers
137:20
employment
11:4 12:1
137:21
138:3
enabled 71:8
enclosed
271:10,11
Enclosures
271:25
ends 124:18
206:1
263:14,15
enforce
104:23
enforcement
95:25
105:8,14
105:16
engage 74:2
74:4 77:16
184:15,24
185:11
234:6
engaged
52:23
175:24
engagement
53:16
78:11,14
engaging

77:23 78:1
78:8
110:12
197:20
243:4
engine
193:22
194:11,13
194:13
engines
194:3
English
163:8
enroll
211:21
214:4,9
215:1
enrolled
216:20,23
218:2
enrollment
137:21
138:3
ensure 33:17
33:18
237:20
enter 219:3
219:4
entered 71:3
enters 26:22
entire 15:17
entity 89:20
environment
148:15
envision
177:4
epidemio...
12:16
equating
137:6
equity
230:11,17
230:21
erectile
128:8
Eric 1:3
265:8
271:7
272:2

errata
271:12,14
271:16
272:1
especially
32:15 55:5
Esq 6:2,8,17
6:18 7:2,5
7:6,7,11
271:4
establish
242:9
245:14
established
77:7
257:19
et 1:4,10
197:10
201:5
271:7,8
272:2,3
EUA 137:6,9
156:2,21
167:3
European's
164:21
Eva 239:8
evaluate
220:23
event 10:21
34:15
123:10
125:24
136:25
events
122:23
123:1
eventually
30:1
every-ot...
180:8
everybody
136:17
241:15
268:11
evidence
79:2 96:4
108:22
110:8

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| 120:14 | 204:21,22 | 100:19 | 199:3 | **experiment** |
| 137:23 | 209:8 | 102:22,25 | 200:15,17 | 131:1 |
| 138:6 | 210:20 | 112:5,5,15 | 200:19 | 132:4 |
| 142:25 | 265:24 | 112:19 | 205:17,18 | 137:8 |
| 146:7 | **exchange** | 113:3,6 | 205:19 | **experiments** |
| **evidence...** | 16:14 40:3 | 114:22 | 206:14 | 137:3 |
| 255:3 | 145:17 | 115:8 | 211:6 | **expert** 50:21 |
| **evolving** | 146:10,22 | 118:5,7,9 | 219:19,21 | 108:18 |
| 103:18 | 189:11 | 118:20,22 | 221:3,5,6 | 109:8,22 |
| **ex** 1:3 271:7 | 197:15 | 119:4 | 226:4,7 | 123:5 |
| 272:2 | **excuse** 16:22 | 120:1 | 237:2,4 | 129:21 |
| **exact** 80:20 | 167:11 | 121:11 | 239:13,16 | 133:18 |
| 200:5 | 172:12 | 125:8 | 241:17,19 | 134:2 |
| 246:3 | 199:10 | 126:8,12 | 243:7 | 146:4,8 |
| **exactly** | 221:22 | 126:14 | 247:7,9 | 183:19 |
| 31:18 | 238:9 | 131:13 | 248:12 | 214:15 |
| 88:15 | 240:18 | 133:8 | 249:7,9 | 222:20 |
| 135:17 | **excuses** | 135:1,4 | 254:4,8 | 252:2 |
| 216:1 | 247:4 | 136:6,10 | 256:19 | **expertise** |
| 238:25 | **Executed** | 136:11 | 257:4,7,14 | 32:20 |
| **Examination** | 273:14 | 138:19,23 | 258:4 | 137:14 |
| 2:2 9:10 | **exhibit** 2:6 | 138:24 | 269:6 | 138:8 |
| **EXAMINAT...** | 2:7,8,10 | 141:6,7,9 | **exhibits** 2:5 | 140:14 |
| 2:1 | 2:12,15,17 | 141:19 | 5:21 118:1 | 143:5 |
| **examine** | 2:19,22 | 144:13 | 125:18 | 164:25 |
| 197:6 | 3:1,2,4,6 | 145:1,4 | 140:19 | 259:2 |
| 201:2 | 3:7,9,11 | 149:22,23 | 183:4 | **experts** |
| **examined** 9:6 | 3:13,14,16 | 150:6,9 | 184:4 | 108:8 |
| **example** | 3:19,22 | 152:16,22 | 268:22,23 | 113:24 |
| 15:21 | 4:1,2,5,7 | 155:7,9,10 | 268:25 | 114:24 |
| 64:21 | 4:8,10,11 | 155:22 | **exist** 13:15 | 115:7 |
| 79:12 | 4:13,15,17 | 163:13,15 | 48:19 | 121:12,18 |
| 149:19 | 4:18,20 | 163:23 | 126:4 | 123:20,20 |
| 207:15,24 | 5:1,2,4,5 | 164:17,19 | 227:17 | 124:22 |
| 217:22 | 5:7,8,10 | 165:25 | **existed** 12:7 | 130:11,17 |
| 265:3 | 5:12,14,15 | 166:1,2,6 | **existing** | 132:17 |
| 266:4 | 5:17 21:12 | 171:15,20 | 169:20 | 150:19 |
| **examples** | 21:14 22:5 | 171:21,25 | 174:25 | 151:9,19 |
| 90:22,22 | 22:8 30:22 | 173:9,20 | **expect** | 151:20,21 |
| 149:7 | 32:1 33:2 | 173:23 | 155:13 | 152:8 |
| 182:2 | 33:4 38:18 | 179:9,11 | 192:2 | 182:22 |
| 197:5,7,8 | 38:20 | 182:12 | **expectation** | 184:20 |
| 199:11 | 43:10 44:1 | 183:3 | 88:3 | **Expires** |
| 200:1,11 | 44:2 49:1 | 187:9,11 | **expected** | 270:25 |
| 200:20 | 49:4,5 | 187:18 | 34:16 | 273:24 |
| 201:1,2,4 | 60:3 62:2 | 188:25 | **expecting** | **explain** |
| 201:12,14 | 67:4,12,14 | 189:2,4 | 248:19 | 251:16 |
| 201:24 | 85:5,6 | 196:15,17 | **expedited** | **explained** |
| 202:12 | 91:1,7,8 | 196:18 | 214:10 | 78:25 79:7 |

**CAROL CRAWFORD  11/15/2022**

210:16
**explaining**
148:16
**explains**
195:14
248:14
**explanat...**
130:16
**explanatory**
130:13
**explore**
144:6
**expressed**
101:19
**extension**
200:21
**extent** 93:18
**externally**
65:18
**extreme**
42:18
**extremely**
19:24

---

**F**
**F** 270:1
**Face-** 180:12
**Facebook** 5:4
16:5 18:11
20:24
22:14
24:13,19
25:10,12
27:13
29:17
33:12
34:15,23
36:16,17
36:25 37:6
37:11
40:14
42:18
44:18
46:12
48:16,17
48:19
49:13 50:6
50:18
54:23

55:10,14
57:6 58:12
60:11
61:22
62:18 63:3
63:5 64:11
71:2 73:22
74:8,10
77:25
78:22
79:19 80:8
80:14 82:9
82:10 83:4
83:7,18
86:4 87:14
87:16 88:3
88:20,24
89:16,22
90:7,19
91:23
95:18,20
98:20,24
99:2,7,8
103:14,22
103:25
104:2,23
112:21
113:11
114:8
117:1,16
119:8,11
124:5
132:9,14
135:2,11
135:14
138:12
144:9
148:2,18
149:14
150:16
151:9
153:1
154:7
155:14
156:5
164:24
179:4
181:3
221:25

222:8,12
222:13,19
222:20,21
223:21
224:5,15
224:21
226:19
231:13
232:15
237:14
240:2
242:5
245:22
249:2
259:22,23
261:7
263:2
**Facebook's**
2:10 46:19
103:11,12
139:7
151:22
**fact** 115:22
134:16
168:10
175:11
210:17
**facts** 58:2
79:1 94:7
96:3 110:7
137:22
138:6
142:24
153:10,24
154:4
158:16
159:10,10
160:9
220:13,17
264:3
**fade** 10:10
**fair** 38:20
119:19
130:2
132:9
**fairly**
232:17
**fall** 38:8
**falling**

53:14
**false** 106:11
108:21
116:8
117:18
120:13
139:11,25
157:2,16
158:20
159:5,12
159:21
162:11
164:2,6,24
168:5
169:24
170:12
255:5
**familiar**
85:22
200:12
206:19
**FAQ** 109:5
129:4,10
134:14
**far** 22:23
65:8 204:3
246:10
**fashion**
171:11
**fast** 81:8
**faster** 28:9
**fatality** 3:9
**FB** 2:8 3:14
139:1
221:19
225:3
**FDA** 137:11
156:24
159:25
167:2
169:17
201:15
203:21
204:2
**feature**
157:5
**February**
16:19 18:5
22:15 60:9

61:18
63:17
166:8,15
167:8
171:23
172:10
**federal** 92:2
95:19
193:1,10
232:5,18
**feed** 54:25
227:5
228:10
**feedback**
27:17
106:10
161:10
**feeds** 88:13
212:16
**feel** 32:24
95:22
132:8
146:9
149:16
151:11
188:16
203:9
247:22
249:10
258:13
**feels** 206:19
**fellow** 24:6
**felt** 88:16
161:20
215:21
217:3
**female** 26:11
28:11
**filing**
271:18
**final** 35:20
135:10
253:14
**finally**
134:6
245:7
265:11
**find** 18:12
70:21

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| 171:4 | 178:17,20 | **flagging** | 182:15 | **forward** |
| 189:22 | 179:1 | 86:3 87:13 | 193:20 | 35:17 46:1 |
| 219:11 | 197:23 | 88:1,21,24 | **follows** 9:7 | 49:15 |
| 231:9,10 | 207:2 | 90:6 | **followup** | 59:15 |
| 271:10 | 208:11,18 | 101:18 | 4:13,15 | 197:4 |
| **finders** | 208:23 | 105:24 | 30:15 | 200:25 |
| 234:16 | 213:2 | 106:1,4,9 | 51:18 | 247:22 |
| **finding** | 222:17 | 106:17 | 119:16 | **forwarded** |
| 72:15 | 230:16 | 264:2 | 179:14 | 31:8 41:18 |
| 149:10 | 235:24 | **flags** 212:13 | 197:21 | 61:6,6 |
| **fine** 82:15 | 242:12,14 | **flipped** | 234:17 | 62:23 |
| 93:14 | 242:17,20 | 149:3 | 263:25 | 102:16 |
| 96:19 | 245:16 | **floor** 98:7 | **football** | **forwarding** |
| 102:21 | 246:5 | **flow** 214:10 | 28:16 | 44:22 61:7 |
| 165:9 | 247:14 | **flu** 29:13,15 | **Forbes** 53:19 | **forwards** |
| 198:11 | 257:14 | 29:19,19 | **force** 42:5,5 | 216:5 |
| **finish** 65:23 | 266:13 | 29:20 | **Ford** 7:5 | **Foster** 7:11 |
| **finished** | **first-** 54:1 | **focus** 256:5 | **foregoing** | **found** 266:21 |
| 67:15 | **fit** 47:23 | **focuses** 45:9 | 270:6 | 266:23 |
| **finishing** | **five** 32:8 | **focusing** | 273:6,13 | 267:4 |
| 256:11 | 167:3 | 32:16 | **foreign** | **foundation** |
| **first** 9:6 | 169:16,19 | 256:6 | 140:12 | 112:23 |
| 17:21,22 | 171:22 | **folks** 39:6 | **forget** 268:7 | **four** 201:12 |
| 18:2,9 | 238:1 | 41:17 | **forgive** 21:1 | **frame** 132:3 |
| 22:22 | **five-minute** | 107:9 | **forgotten** | 262:20 |
| 25:20 | 30:20 | 108:16 | 222:11 | **fraud** 197:8 |
| 33:11 39:7 | 205:3 | 125:17 | **form** 171:11 | 200:2 |
| 45:25 | **fix** 102:3 | 245:11 | 273:7 | 201:4 |
| 49:20,24 | 194:12 | 252:8,14 | **format** 47:21 | **fraudulent** |
| 51:25 56:1 | **flag** 87:10 | 253:3 | 63:25 | 197:9,9 |
| 56:8 67:21 | 87:25 | **follow** 82:15 | 106:25 | 201:4,5,15 |
| 67:23,25 | 89:14 | 121:16 | 182:9 | 203:17 |
| 91:21 | 98:19 99:2 | 126:20 | 184:3 | **Fred** 181:9 |
| 106:10,24 | 99:7,9,10 | 182:17 | 209:12,13 | 250:10,12 |
| 110:19 | 113:1,12 | 187:14 | 209:14 | 250:25 |
| 120:8 | 206:22 | 188:4 | 210:23 | 251:3,25 |
| 125:7 | 218:23 | 193:23 | 229:16 | 252:9 |
| 133:21 | 226:25 | 210:21 | 240:25 | 254:25 |
| 141:23 | 264:4 | **followed** | 241:1 | **free** 32:24 |
| 142:11 | **flagged** 88:4 | 134:3 | 243:5 | 247:22 |
| 144:12 | 89:23 | **following** | **formatted** | **frequency** |
| 146:20 | 106:3 | 4:3,5 | 207:18 | 180:18 |
| 150:15 | 111:13 | 51:22 | **formatting** | **frequent** |
| 151:15 | 112:21 | 53:14 | 248:3 | 2:13,16 |
| 156:8,13 | 113:10 | 56:21 | **forms** 219:5 | 4:7 39:10 |
| 157:23 | 117:21 | 100:2 | **formulate** | 43:22 |
| 167:25 | 212:13 | 156:2 | 165:5 | 44:10 |
| 170:13 | 264:5,20 | 163:18 | **forth** 39:20 | **Friday** |
| 177:20 | 264:24 | 169:5 | 68:4 270:8 | 177:21 |

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| 185:17 | 53:15 | **getting** | 121:15 | 46:25 56:8 |
| 208:11 | **gas** 205:6 | 18:10 | 129:19 | 67:16 |
| 212:24 | **Gateway** | 20:14 37:6 | 130:6 | 73:20 |
| 213:4 | 264:15 | 90:12 | 132:14 | 74:20 |
| 242:12 | **GBS** 139:15 | 138:2 | 141:8 | 81:16,25 |
| 245:17 | **Genelle** | 145:23 | 156:24 | 95:8,21 |
| 246:2 | 85:17 | 147:11 | 159:11 | 97:25 |
| **front** 32:23 | 96:21 | 159:22,24 | 164:19 | 102:2,3,8 |
| 33:2 | 100:1 | 160:2 | 173:4 | 104:13 |
| 166:17 | 238:8,8 | 164:7 | 187:22 | 114:1 |
| 208:22 | **general** 1:4 | 181:25 | 188:5 | 116:14 |
| 245:7 | 1:16 9:1 | 190:3,24 | 204:19 | 118:9 |
| 269:1 | 29:5 38:2 | 204:18 | 210:20,20 | 121:14,16 |
| **FTC** 137:11 | 38:17 46:6 | **Ghosh** 7:6 | 214:25 | 126:17 |
| **full** 52:21 | 46:7 54:15 | **Gilligan** | 239:15 | 129:15 |
| 74:15 76:1 | 64:19 | 6:17 8:22 | 253:11 | 131:15 |
| 81:11 | 75:13 | 8:22 66:25 | 256:19 | 136:16 |
| 137:7 | 83:10 | 67:3,6,9 | 260:23 | 141:7 |
| **fuller** | 110:14 | 84:20 | 261:3 | 145:17 |
| 263:12,23 | 117:3 | 85:24 91:6 | 262:16 | 146:20 |
| **fully** 44:17 | 149:1,1 | 93:19,25 | 263:11,23 | 147:12 |
| 218:15,16 | 169:1 | 94:5,24 | 268:20 | 155:9 |
| **fundings** | 188:20 | 95:5,9 | **given** 69:17 | 164:11 |
| 109:25 | 191:19 | 102:5 | 99:18 | 166:12 |
| **further** | 209:9 | 112:2 | 109:25 | 167:24 |
| 32:22,23 | 217:19 | 118:10,12 | 130:20 | 169:12 |
| 52:13 | 253:12 | 118:20 | 132:3 | 176:9 |
| 126:21 | 271:7 | 133:4,7 | 137:12 | 179:21,25 |
| 158:20 | 272:2 | 136:18,21 | 270:10 | 182:4 |
| 192:2 | **General's** | 163:10 | **gives** 155:1 | 187:2 |
| 228:24 | 6:2 | 165:16,20 | **giving** 49:13 | 188:21 |
| 268:1,2 | **generally** | 165:23 | 169:18 | 189:2,10 |
| 270:11 | 16:11 | 206:8 | 241:11 | 199:17 |
| **future** 80:1 | 17:14,15 | 231:22 | 266:19 | 211:1 |
| 141:25 | 38:11 | 235:25 | **glad** 173:18 | 212:22 |
| 184:4 | 48:11 | 241:15 | 196:4,6 | 214:22 |
| 211:22 | 56:15 | 249:13 | 247:1 | 221:23 |
| **fuzzy** 224:23 | 58:11 | 256:21 | **global** 140:6 | 226:22 |
| **FYI** 70:6 | 77:19 | 268:23 | **globally** | 231:7 |
| 229:18 | 89:11 | 269:14 | 157:2 | 241:24 |
| | 96:16 | **gist** 116:15 | 159:21 | 243:15 |
| **G** | 140:23,25 | **give** 11:11 | 162:11 | 247:9,14 |
| **gain** 71:11 | 161:20 | 22:6,6,10 | **go** 11:24 | 252:6,23 |
| **Gangolly** | **Gennelle** | 23:22 | 13:7,23 | 254:6,6 |
| 50:22,23 | 86:12 | 30:21 | 18:17 20:4 | 257:13 |
| **gaps** 54:18 | **Georgia** 1:18 | 38:22 | 22:22 | 266:10 |
| 56:18 58:1 | 7:20 12:10 | 66:20 | 23:18 31:5 | 268:25 |
| 81:3 | 12:11 | 79:12 91:3 | 31:23 33:3 | **goal** 33:23 |
| **garnered** | 270:2,5,24 | 104:8 | 41:21 44:5 | 88:25 |

**CAROL CRAWFORD  11/15/2022**

```
266:16           185:1            194:22,23        grounds          guidance
goals 266:20     186:20           243:22           168:5            129:7
goes 53:2        191:19           245:10,22        group 14:4,7     193:20,23
 65:1 106:2      192:11           245:23            14:8,10         194:4
 120:16          194:18,20        250:3,15          41:16 45:6      195:20
 127:25          195:15           251:17            45:8 48:20      196:10
 157:11          218:2            253:4             48:20           238:19
 160:4           220:7,15         254:15            55:12,21        250:2
 218:22          223:5           Google/Y...        55:22,24       Guidarini
going 9:15       236:16           174:23            56:1,3,7        239:9
 10:6 17:25      245:3           Googled            56:11          guide 228:21
 20:3 22:4       251:6            183:13            58:21           229:4,8
 34:13,16        252:6           gosh 195:22        59:16 61:5      230:8
 34:20 37:1      257:6            224:20            104:14         guidelines
 37:1,11         268:20          gotcha             116:15          15:25 65:4
 40:11 47:8     good 9:12         136:23            124:1          guides 5:5
 50:21 51:2      19:2 57:14      gov 229:14         156:4           226:9
 52:5 58:19      75:1 76:12      governance         263:6          227:1,4,8
 60:14           79:13,14         15:23             269:3           227:10,16
 66:19           85:24           government        groups 16:13     228:3
 77:16           93:14            23:13,25          18:22 46:3     232:11
 79:24 80:3      153:24           33:19             46:13,16       Guides'
 88:18           159:12           89:22 90:6        52:25 54:2      226:16
 90:19 95:7      161:11           96:22             54:22,22       guiding
 107:8           177:20           148:22            54:23,24        103:15
 108:6           178:17           233:17            55:2,4,5,5     Guillain...
 111:25          197:19          governments        55:6,7,11      139:14
 115:14          209:13           137:19            55:14 61:9     guy 203:8
 116:14,14       220:16          governor           96:14          guys 262:23
 124:24          253:6            144:23            237:13
 127:24,25       260:25,25       264:21,23         growing         ────────────
 138:16         Goodness         grapevine          38:13              H
 141:24          152:9            245:18            154:4,11       habit 28:8
 147:11         Google 16:6      graphic            154:17        HAN 153:13
 154:2           20:25            15:17            Gruner           153:16
 159:13          174:7,12        graphics           254:14        hand 21:15
 160:16          175:16,24        11:18 14:2       guess 43:25      22:4
 161:5,6         177:2,7         great 27:24        96:12           111:24
 164:19          179:3,6          74:12 87:9        126:1          122:6
 165:21,22       180:7,17         207:22            141:15         148:21
 165:25          180:19           227:4            156:10         270:16
 166:1           181:3,9,11       230:9            172:18         handed 25:21
 169:7           183:10,14        245:3            179:22          102:24
 172:24          183:24           264:5            187:25         handle 19:25
 173:12,12       185:9,13        greatly           194:16        handled
 173:16          189:25           27:19            238:1           111:4
 177:9           191:5,8,11      Griffis           262:25          140:23,25
 182:4           193:11,19        18:25           guessing        hang 72:23
 184:20          194:2,10        ground 9:16       193:17          73:2
                                                                   160:13
```

**CAROL CRAWFORD  11/15/2022**

happen
 185:23
happened
 13:12  83:2
 93:12
 114:6
 124:11
 160:25
 178:9
 212:8
 215:8,20
 246:10
happening
 79:5  97:17
 190:2
 195:23
 196:7,8
 216:7
happens
 144:17
happy 27:21
 45:23
 95:10
 161:23
 214:5,9
 228:24
 242:16
hard 10:16
 20:13
 122:15
 194:21
 235:14
 252:18
harm 139:11
 234:21
harmful
 165:15
 168:6
Hatcher 40:7
 40:9,13
 42:7,17,21
 43:18
hate 41:11
Haynes 108:1
 115:11
he'll 230:8
head 136:2
 165:10
headline

247:10
heads 9:18
 192:24
heads-up
 244:2
health 7:1,2
 7:8  45:6,8
 45:10,11
 45:14  51:7
 63:21  89:1
 89:2  140:1
 140:12
 153:17,18
 186:1
 192:24,25
 193:3,9
 218:22
 230:11,16
 230:21
 237:13,17
 237:18
 238:20
healthcare
 53:16  58:5
 66:5
healthy
 166:21
 172:8
hear 10:16
 145:7
heard 28:12
 97:22
 125:24
 137:25
 217:14,15
 245:17
 252:7
heart 139:16
heartburn
 252:8
heavily
 90:20
hefty 205:15
held 8:7
help 33:23
 34:1,17
 35:10
 37:12
 46:16

54:16
57:24  71:3
104:23
105:2,22
107:2
111:4
115:21
119:15
124:13
126:4,23
139:1,10
164:6
174:19
175:4,7
188:21
214:11,13
214:14,19
218:18,22
219:12
237:25
256:7
266:20
helped 161:1
 196:11
helpful
 51:20  52:3
 53:10  59:7
 170:23
 171:4,5,7
 171:9
 197:7,10
 200:2,3
 201:3,6
helping
 197:17
 246:16
helps 53:11
 54:18  58:1
 127:6
 231:10
 253:15
hereinbe...
 270:8
HEREOF
 270:15
hereto 7:23
hereunto
 270:15
hesitancy

159:6
170:1
hesitant
 122:18
hey 176:25
 239:2
HHS 9:1,2
 232:7,20
 233:12
 259:12,22
 260:9,17
 260:19,22
 261:3,8,15
 261:17,25
 263:4
Hi 45:22
 51:22
 63:15,15
 68:14  73:4
 74:25  84:4
 100:2
 126:19
 166:17
 176:25
 197:4
 211:6
 219:2
 226:24
 252:7
 254:25,25
high 6:3
 42:22
 53:15
 60:20
 89:19
 190:3
 255:8,13
high-pri...
 16:17
high-risk
 2:13,16
 39:9  43:21
 44:10
high-volume
 89:11
higher 53:9
highlight
 29:23
 66:10

251:18,20
highlighted
 62:4,5
 142:18
 143:13
 144:20
 148:20
 228:9
highligh...
 189:23
highlights
 52:22
 62:15
Hines 6:7
 8:15
 264:17
history 12:1
hit 32:15
 216:17
hits 17:10
HIV 46:4
hoc 180:21
 180:25
Hoft 264:15
holiday
 248:19
holidays
 84:8
Holly 239:5
honestly
 227:9,13
hope 68:14
 70:5
 126:19
 127:6
 135:6
 161:3,6
 166:20
 230:10
 253:17
 266:14
hopefully
 55:22
hopes 172:7
hoping 73:19
 88:23
 139:10
 229:19
hospital...

**CAROL CRAWFORD  11/15/2022**

185:24
hospital...
 146:2
 186:14
hosting
 244:24
hour 66:19
hours 28:9
 28:19,19
 73:1,5
 235:12
House 230:13
 230:24,25
 231:12,19
 232:1,4,7
 232:22
 233:2,8,12
 233:19,19
 233:21
 234:5,5,14
 259:10,22
 260:9,17
 261:8,20
 263:4
Human 7:1,2
 7:8
humans
 120:17
Huxley 86:17
 ▮▮▮▮ @R...
 86:17

     I
I-- 148:19
I-H-E-M-E
 20:25
IAA 71:3,5
 109:15
 110:1,12
 110:18,20
 110:22,25
 111:7,11
 175:6
IAAs 109:22
ID 24:22
idea 46:15
 159:12
 187:23
 188:6

220:16
ideally 46:2
identified
 24:6
 103:13
 139:9
 157:12
 177:1
identify
 27:14
 54:18
 67:20
 85:10  91:4
 102:25
 118:17
 145:3
 155:21
 174:20
 175:4
 206:14
 226:13
IDs 97:13
IFB 24:18
Iheme 20:25
 24:7,10
 26:8,25
 33:13
 35:12
 36:12,23
 43:18
 45:22
 50:16
 55:19  57:5
 57:11  58:5
 68:12
 72:20
 79:13  84:3
 86:11
 105:21
 131:17
 237:10
 257:15
Iheme's
 37:11
illness
 41:25
 42:23
imagine 37:8
 68:10

104:15
immediately
 157:1
 160:1
 162:10
immune 4:7
 163:25
Immuniza...
 107:13
 160:21
 253:21
impact 10:24
 167:4
implemen...
 181:12
important
 90:13  95:7
 177:5
 211:11
impressions
 133:14,14
improper
 95:6
improve
 53:12
in-app 222:2
in-depth
 32:16
in-feed
 228:3,5,6
 228:13
Inaudible
 178:6
include 42:9
 188:3
 208:11,13
 209:16,18
 228:23,24
 242:15,21
 245:20
 265:4,8
included
 54:1  58:14
 61:13
includes
 243:17
including
 65:14
 140:8

144:23
 167:1
 170:23
 192:25
 232:20,22
 233:11
 237:18
Inclusive
 120:15
inconclu...
 120:15
 122:4,15
 122:17
 129:25
 130:6
 140:18
incorrect
 229:15
Independ...
 7:3
independent
 234:6
INDEX 2:1
indicate
 271:13
indicated
 115:11
 117:18
indicates
 244:17
Indicating
 31:17
 192:20
individual
 8:14
individu...
 267:18,22
individuals
 146:3
Infection
 3:9
inferring
 213:11
infertility
 76:5
 201:16
 204:16,18
inflamma...
 139:16

influencers
 75:4 80:9
 81:20
info 5:9
 75:11,15
 80:13
 107:8
 208:2
 214:4,5
 219:3
 230:8,11
 230:17
 239:20
 253:12
 258:7
 266:3
inform
 103:16
 138:20
 155:17
 159:8
 164:24
information
 16:15
 18:10,12
 27:16
 34:21
 35:14
 36:23,24
 46:11
 48:22 51:9
 52:6 54:23
 54:24
 55:11 58:1
 59:1 61:4
 62:21
 64:20
 70:24
 71:12
 72:14 75:4
 75:16 79:7
 79:8 81:4
 87:20
 88:18 89:1
 89:4,6,18
 90:13,14
 90:16
 93:21
 98:20

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| 107:15,17 | **initially** | **instructed** | 73:24 | 199:2 |
| 107:22 | 17:16 | 80:21 | 122:13 | 237:7 |
| 109:3,12 | **initiated** | 193:19 | 160:8 | **issued** 153:8 |
| 114:9 | 17:17 | **instruct...** | 203:24 | **issues** 3:1 |
| 123:7 | **initiative** | 40:14 | **interrupt** | 29:2 59:12 |
| 126:22 | 18:16,19 | **instruct...** | 9:24 32:24 | 66:11 |
| 130:1 | **initiatives** | 144:16 | **interrupted** | 85:12 87:8 |
| 140:2,3 | 27:17 | **instructs** | 98:8 | 108:12 |
| 142:6 | **input** 34:21 | 10:12 | **intro** 221:18 | 207:16,22 |
| 148:25 | 104:8 | **intent** 220:9 | **introduce** | 220:13 |
| 154:8 | 111:16 | **interact...** | 8:11 | 264:3 |
| 159:22,25 | 156:19 | 18:9 29:17 | **introduced** | **item** 3:4 |
| 160:3 | 167:7 | **interactive** | 265:15 | 28:24 |
| 161:22,24 | 171:6 | 187:1 | **invite** 98:11 | 103:4 |
| 166:22 | 173:2,4 | **interagency** | 185:7 | 111:12,19 |
| 167:20 | 194:8 | 71:6 | 208:12 | 118:23 |
| 169:11 | 255:3 | 109:20,21 | 209:16 | 126:15 |
| 170:20 | **inquired** | **interest** | 221:9 | 136:8,25 |
| 175:8,9 | 69:11 | 58:9 64:3 | 223:24 | 144:19 |
| 182:1,19 | **inquiry** | **interested** | 239:21 | 165:13 |
| 183:9,13 | 108:24 | 75:11 | 242:10,16 | 247:15 |
| 183:18 | **inserted** | 80:12 | 243:25 | **items** 27:10 |
| 189:17 | 221:15 | 180:1 | 245:15,20 | 30:15 58:5 |
| 190:20 | **insights** | 228:25 | 247:19 | 65:3 84:6 |
| 192:10 | 63:16 | 253:19 | **invited** | 88:21,24 |
| 200:4 | 65:15 | 270:13 | 100:11 | 105:21,24 |
| 204:20 | 167:4 | **interesting** | 116:24 | 106:1,20 |
| 206:23 | **Instagram** | 65:17 | 210:1 | 111:13 |
| 213:19 | 50:6 62:18 | **interface** | 212:24 | 117:12 |
| 220:19 | 157:5 | 262:2 | 223:13 | 120:7 |
| 229:19 | 227:1,2,3 | **interim** | **inviting** | 128:23 |
| 230:21 | 227:8,12 | 242:14 | 208:9 | 131:2 |
| 237:20 | 227:16,20 | **internal** | **involuntary** | 207:7 |
| 238:5 | 227:22 | 239:2 | 137:7 | 221:16 |
| 253:14 | 228:15 | **internally** | **involve** | 225:21 |
| 255:4 | 229:10 | 113:16 | 101:14,17 | 226:25 |
| 259:23 | **instance** | 222:4 | **involved** | 240:6,9 |
| 264:5 | 18:11 | 243:8 | 32:17 71:1 | |
| 266:6,17 | 114:22 | **interpret** | 98:14 | ——————— |
| 266:18,19 | 115:2 | 223:23 | 101:1,8 | **J** |
| 266:21,22 | 135:16 | **interpre...** | 160:23 | ——————— |
| 267:3,4,7 | 183:14 | 159:7 | 215:13 | **J** 6:8 |
| **infrastr...** | 224:8 | **interpreted** | 234:1 | **James** 6:17 |
| 174:19 | **instigate** | 50:23 | 235:5 | 8:22 |
| 175:4,11 | 17:13,16 | 170:7 | **involving** | **James.gi...** |
| **ingredients** | **instruct** | 179:1 | 233:10 | 6:23 |
| 65:5 | 57:5,15 | 199:25 | **issue** 5:7 | **Jan** 21:1 |
| **initial** 85:8 | 138:12 | 211:17 | 95:10 | 174:7 |
| 132:14 | 194:2 | **interpre...** | 122:21 | 176:6 |
| | | | | 182:23 |
| | | | | 184:7 |

**CAROL CRAWFORD  11/15/2022**

189:15
192:22,23
195:17
243:16,22
252:20
253:3
254:16
███████ ...
174:8
**January**
49:16,18
49:21
50:14
55:18
**Jason** 7:14
8:9
**Jay** 8:14
24:15  25:5
26:14
45:19  57:3
57:3
181:17
230:7
264:8
**Jayanta** 6:6
**Jeff** 265:8
**Jefferson**
6:4
**Jen** 83:22
86:21
**Jennifer**
86:24
███ 45:18
███
24:13
**JIC** 72:9,10
183:7
**JIC's** 72:6
**Jill** 6:6
8:15
264:17
**Jim** 264:15
**Jin** 222:7
**job** 107:22
249:3
**John** 6:2,8
8:13  67:1
165:17
265:9

**John.sau...**
6:5
**John.vec...**
6:13
**join** 5:8
14:1  70:5
75:3  108:7
182:22
239:20
242:11
245:16,19
**joined** 30:20
115:11
116:24
**joining**
107:9,11
**joint** 59:1
107:15,16
107:22
233:14
**Jorgensen**
107:11
115:10
183:2
**Joseph** 1:7
7:11  8:5
271:7
272:2
**Josh** 261:17
**jotted**
225:19
**JR** 1:7  271:8
272:3
**Julia** 222:22
**July** 139:3
146:11
**jump** 27:21
**jumping**
120:17
**June** 118:24
126:16,18
126:24
131:20
134:21
135:1,9
142:9,15
144:1
247:15
248:16

**Juneteenth**
264:13
**Justice** 6:19
8:18,23
271:5

——————
**K**
███ @...
244:15
**Kane** 244:14
**Kang-Xing**
222:7
**Karen** 193:5
**Kat** 35:6,9
37:2,4,20
**Kate** 222:25
**keep** 9:20,24
70:12
**keeping**
246:11
**keeps** 65:1
**Kelly** 50:25
51:1  52:1
60:11
61:22  63:3
63:15
64:23
141:21,23
**Kenya** 7:5
**kept** 38:3
241:8
**Kevin** 18:25
40:7,9,13
41:6
244:14,17
245:1,4,5
245:18
**Kevin's**
40:19
**key** 27:17
72:17
190:2
**keywords**
144:9
**keywords...**
144:5
**khatcher...**
40:7
**Kheriaty** 6:6

8:15
264:13
**kids** 157:4
161:14
162:4,13
**kill** 168:4
170:15
**kind** 36:9
38:15  52:6
72:9  75:24
90:15
109:24
123:17,17
129:4
133:3,20
153:14
154:3
177:11
198:16
200:9
204:13
210:24
217:20
224:10
230:9
260:5
261:7
**kinds** 98:19
101:18
263:11
**knew** 26:9
88:17  90:7
106:19
107:1
108:12
113:15
116:9,10
126:4
138:18,22
155:16
220:21,25
232:12,15
243:10
263:10
**know** 10:17
17:14,18
17:19
18:11  21:9
25:17

26:16  27:8
28:14,18
30:7,16
33:21
34:10  37:7
37:9,25
38:2,13
41:15  42:3
42:6,7,9
42:11,17
42:21,24
43:1,2,6
44:24
45:25  46:5
46:8,22
47:4,19
48:1,4,7,9
48:12,17
49:9  50:18
52:15
53:11
54:17
56:13,15
56:25  57:2
57:18
58:23,24
59:4,20
63:23  65:8
65:25  70:1
72:6,25
73:5,10,19
73:24  74:1
74:4,9
75:15,18
77:12,18
77:19,20
77:23,25
78:10,16
79:20  80:6
81:15  82:8
82:13,16
82:17,25
83:1,5,15
84:10
86:12,17
87:19  88:7
88:11,13
88:15
89:10,18

**CAROL CRAWFORD　11/15/2022**

| | | | | |
|---|---|---|---|---|
| 89:19 | 144:4,20 | 208:14 | 111:6 | 153:15 |
| 90:21 | 144:24 | 209:5,18 | 133:23 | **lack** 112:23 |
| 91:23 | 146:6,9 | 210:24 | 165:1 | 137:7 |
| 93:15,24 | 148:10,11 | 211:16 | 176:19 | **Lagone** 103:7 |
| 94:4,9,24 | 148:24 | 212:8,15 | 189:24 | 103:13 |
| 94:25 | 149:4,9 | 212:25 | 190:12 | 105:8 |
| 95:24,25 | 151:4,14 | 213:16 | 192:17 | 119:7 |
| 96:1,10,12 | 151:24 | 215:19 | 195:2 | 121:1 |
| 96:18　97:7 | 152:4,7,12 | 217:2,23 | 218:10 | 125:8 |
| 97:8,18,20 | 153:13 | 218:7,20 | 224:15 | 126:18 |
| 98:10,12 | 154:10 | 221:13 | 233:4 | 127:2 |
| 98:13,18 | 155:3,4,5 | 222:7,13 | 251:2 | 133:2 |
| 99:17 | 157:23 | 224:7,23 | **known** 28:21 | 165:5,14 |
| 100:5,20 | 158:13 | 225:16 | 140:18 | 165:19 |
| 100:21 | 160:12 | 227:16 | 177:15 | 166:14 |
| 101:11,14 | 161:11 | 228:8,21 | 264:22 | 222:16 |
| 101:17,24 | 164:22 | 233:4,23 | **knows** 37:4 | **Lancet** 3:6,7 |
| 101:24 | 165:4,21 | 235:7,18 | 136:17 | 169:4 |
| 103:10 | 167:6 | 238:6,23 | **Kreimer** 1:20 | **Landry** 149:2 |
| 108:23,25 | 170:2,19 | 238:25 | 8:8　270:4 | 265:9 |
| 109:4 | 171:9 | 239:3,8 | 270:22 | **lane** 89:17 |
| 111:7,10 | 172:23 | 240:25 | **Kristen** | **Langone** |
| 111:16 | 173:7,10 | 241:7 | 156:16 | 139:3 |
| 112:18,25 | 174:25 | 242:12 | 160:17,19 | 159:3 |
| 113:1,10 | 175:23,25 | 243:1,11 | 161:1 | **language** |
| 114:1 | 177:12,13 | 243:12,14 | **Kulldorff** | 65:16 |
| 115:1,9,15 | 177:18,22 | 244:12,13 | 6:6　8:16 | **language...** |
| 115:18 | 178:12 | 246:22 | 264:11 | 65:20 |
| 116:3,8 | 180:18,19 | 247:21 | **Kumar** 7:2 | **large** 87:23 |
| 117:14 | 183:5,7,9 | 248:15 | 8:25,25 | 155:2 |
| 120:4,21 | 183:24 | 251:19 | 173:19 | 181:22 |
| 121:9 | 184:13 | 252:5,6,14 | **Kyla** 6:18 | **largely** |
| 122:5 | 185:5,23 | 252:16,18 | 8:17　271:4 | 52:25 |
| 123:8,15 | 186:4,5,19 | 253:15,23 | **Kyla.sno...** | **late** 33:16 |
| 123:19,21 | 188:16 | 255:18 | 6:24 | 36:7 |
| 124:10 | 190:2,8 | 256:4,9,11 | ▇ 97:7 | 249:12 |
| 125:19 | 191:20 | 258:10 | | **latest** 63:16 |
| 127:7,22 | 192:5 | 259:3 | **L** | 195:20 |
| 129:6 | 193:3 | 261:9,21 | **L** 6:20　271:5 | 196:10 |
| 130:6,25 | 194:6 | 261:24 | **lab** 4:1　5:2 | 230:8 |
| 131:3,4,8 | 197:25 | 262:16 | 152:24 | **launch** 48:2 |
| 132:13 | 198:2,15 | 263:17,20 | 153:8,11 | 48:5,7,8 |
| 135:5,17 | 199:4,10 | 264:7,10 | 153:12 | 228:3,12 |
| 135:25 | 199:13,23 | 264:12,14 | 199:2 | **launched** |
| 138:1 | 200:2,13 | 264:16,18 | 219:24 | 157:4 |
| 139:21 | 201:21 | **knowledge** | **labels** 76:18 | **launching** |
| 140:16,23 | 202:22,24 | 54:18 | 76:20　77:2 | 27:18　46:1 |
| 142:18 | 203:14 | 104:16,18 | 77:3　82:17 | **Lauren** 50:17 |
| 143:4 | 205:7 | 107:23 | **laboratory** | 50:19　52:1 |

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| 52:17 | **let's** 10:13 | **letting** 48:7 | 206:16 | 183:25 |
| 262:15,18 | 13:7 16:18 | **level** 50:9 | 219:22,24 | 184:2 |
| 262:19 | 17:10 20:1 | 117:3 | 221:7 | 203:24 |
| **law** 95:25 | 22:17,22 | 234:15 | 226:7,9 | 207:6 |
| **lawsuits** | 25:13 | **leverage** | 237:5 | 217:20,22 |
| 142:16,20 | 26:20 | 174:19 | 239:19 | 224:16 |
| 143:8 | 38:20 39:4 | 175:3 | 241:20,21 | 246:6,12 |
| **lawyer** 236:9 | 46:25 | **Lewinsky** | 247:10 | **listed** 92:24 |
| **lawyers** 9:22 | 49:14 | 246:25 | 254:9,22 | 120:6 |
| 9:23 39:16 | 50:14 | **Lewitzke** | 257:8 | 221:20 |
| **lay** 9:15 | 51:21 56:8 | 83:21 | 272:5,9,13 | 224:3 |
| **layer** 195:3 | 60:8 65:13 | 86:22 | 272:17,21 | **listen** 31:10 |
| **lays** 105:21 | 69:19 | 203:2,3,11 | **line's** | 70:6 |
| **lead** 11:16 | 81:25 86:8 | 216:4,15 | 179:14 | **listened** |
| 24:16,25 | 97:25 | 217:5 | **link** 31:8,11 | 181:17 |
| 35:3 | 102:7,7 | 246:25 | 35:16 | **listening** |
| 139:11 | 107:4 | 247:1 | 48:21 | 31:13 50:4 |
| 159:5 | 118:9 | 265:20 | 102:18 | 52:10 72:3 |
| 164:2 | 119:6 | **Lewitzke's** | 186:17,20 | 90:21 |
| 168:4 | 121:17 | 211:3 | 187:1,19 | 148:13 |
| 170:16 | 126:17 | **Lexitas** 7:14 | 187:19 | 154:21 |
| 181:10 | 129:21 | 8:10 271:1 | 194:8 | **lists** 96:20 |
| 227:10 | 145:17 | 271:23 | 208:1 | 96:21 |
| 249:3 | 146:20 | **Liberties** | 214:19 | 120:8 |
| 259:4 | 149:25 | 6:9 | 227:5 | 157:12,20 |
| **leadership** | 165:11 | **lieu** 198:25 | 251:20 | **literature** |
| 11:14,15 | 166:12 | **life** 143:11 | **linked** 169:3 | 131:5,9 |
| 15:15,16 | 176:5 | **Lindsay** | **LinkedIn** | **litigation** |
| 15:19 | 178:22 | 254:17,18 | 16:6 | 92:23 |
| **leads** 168:12 | 179:11 | **line** 33:10 | **linking** | **little** 10:16 |
| 258:19,23 | 205:25 | 39:7 60:5 | 41:25 | 11:24 |
| **learn** 79:23 | 206:24 | 68:5 91:5 | **links** 191:23 | 12:22 38:2 |
| 110:21 | 211:1 | 103:2 | 219:11 | 39:15 |
| 111:3 | 218:12 | 118:18 | 266:5 | 49:15 63:8 |
| 164:13 | 221:23 | 120:5 | **Lis** 262:25 | 64:15 67:9 |
| 177:4 | 222:6 | 126:11 | 263:5 | 69:19 |
| **learning** | 226:22,22 | 138:25 | **list** 3:12,13 | 85:22 |
| 40:16 | 227:18 | 141:8 | 56:5 61:14 | 130:18 |
| 110:13,23 | 234:9,23 | 150:12 | 62:22 | 151:12 |
| **leaves** 128:4 | 237:9 | 151:21 | 96:20 | 161:5 |
| **led** 161:24 | 241:24 | 152:20 | 97:18 98:8 | 183:15 |
| 204:18 | 243:15 | 155:22 | 117:9 | 189:25 |
| **left** 119:12 | 247:9,14 | 163:16 | 118:23 | 191:14 |
| **legal** 7:14 | 254:6,6 | 166:5 | 119:17 | 205:15 |
| 7:14 8:9 | 257:13 | 173:23 | 126:15 | 208:16 |
| 8:10 271:1 | 261:2 | 179:12 | 131:17 | 214:2 |
| 271:23 | 263:15 | 189:5 | 133:21 | 227:12 |
| **Lepage** 63:5 | **letter** | 196:18 | 158:20 | 261:2 |
| 65:2 | 100:13 | 205:14,20 | 182:20 | 266:3 |

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| **live** 34:15 | 38:23 | 172:4 | 192:22 | 182:21 |
| 167:10,16 | 43:12 49:3 | 175:12 | 195:4 | **lunch** 102:3 |
| 224:10 | 49:4 50:14 | 215:17 | 216:14 | 102:10 |
| 258:9 | 52:13 58:1 | 265:23 | 222:8 | 109:17 |
| **Lives** 34:24 | 59:24 60:8 | **looking** | 244:2 | **Lynn** 87:3,4 |
| **Liz** 75:2 | 61:17 63:1 | 18:11 21:3 | 248:7 | |
| 80:3 103:7 | 63:9 70:20 | 32:1 40:15 | 252:1,22 | **M** |
| 103:8 | 74:11,24 | 55:24 56:8 | 253:6 | **magnetism** |
| 105:24 | 76:2 84:6 | 56:11 | **loop** 25:5 | 127:11 |
| 119:7,10 | 85:8 86:8 | 58:22 | 26:10,15 | **mail** 61:5 |
| 121:1,9 | 88:9 99:23 | 65:15 | 27:4 | **main** 76:15 |
| 122:8 | 104:9 | 72:19 | 238:22 | 83:16 |
| 125:8 | 105:20 | 74:16,17 | **looped** | 119:11 |
| 126:18 | 108:19 | 80:25 | 238:18 | 190:25 |
| 127:2 | 111:12 | 117:5 | **looping** 23:4 | 231:8 |
| 133:2 | 112:9,10 | 126:1,3 | 25:4 26:14 | 249:1 |
| 139:3 | 118:25 | 127:21 | **lose** 157:7 | **maintaining** |
| 151:23 | 128:24 | 128:13 | **lost** 168:23 | 137:20 |
| 160:16 | 131:13,20 | 154:25 | 269:8 | 138:3 |
| 163:21 | 133:1 | 159:9 | **lot** 17:25 | **major** 16:4 |
| 166:14 | 136:5 | 191:20,22 | 18:20 | 87:20 |
| 222:16 | 141:12 | 197:4 | 28:19 | 187:6 |
| **local** 76:16 | 146:21 | 200:25 | 40:11 59:5 | 232:3 |
| **locate** | 149:13 | 223:14 | 64:20 89:3 | **making** 18:11 |
| 218:25 | 150:9 | 227:2 | 107:23 | 68:15 |
| **log** 77:10,14 | 155:10 | 234:18 | 108:15 | 140:3 |
| 92:10,11 | 163:6 | 237:19 | 109:5 | 203:22 |
| 92:13 | 165:11 | 245:9 | 110:2 | **manage** 15:18 |
| 95:17 | 167:23 | 248:11 | 133:22 | 15:22,23 |
| 212:4 | 173:1,11 | 253:17 | 144:17 | 35:10 |
| **log-in** 79:10 | 174:3 | 258:15 | 149:17 | **management** |
| 92:1 | 176:5 | **lookout** | 150:20,23 | 15:24 |
| **logged** 92:5 | 179:12 | 153:21 | 152:3 | **mandate** |
| 92:15 | 187:18 | 155:12,14 | 154:4 | 142:22 |
| 218:18 | 202:8 | 208:25 | 172:20 | **mandated** |
| **long** 12:7 | 205:16 | 209:1 | 231:6 | 148:23 |
| 28:20,22 | 206:24 | 220:10 | 236:11,18 | **mandates** |
| 126:20 | 212:20 | 244:8 | 266:17 | 137:19 |
| 166:12 | 215:14,16 | **Lookout'** | **lots** 84:7 | 142:21,23 |
| 227:24,25 | 234:9 | 247:20 | 232:5 | 148:20 |
| 266:10 | 249:18 | **looks** 30:2 | **loud** 9:20 | 149:18 |
| **longer** 13:11 | 250:7 | 35:16 | 97:22,23 | **manmade** |
| 48:23 | **looked** 59:10 | 44:14,22 | 145:10 | 120:20 |
| 82:23 | 72:11 | 55:19 | 174:15 | **manmade'** |
| 155:6 | 95:16 | 61:25 62:1 | 176:8 | 108:21 |
| 235:14 | 140:19 | 76:4,10 | **Louis** 271:18 | 120:13 |
| **look** 20:1 | 147:17 | 98:17 | **Louisiana** | **manner** 105:8 |
| 21:14 33:6 | 157:20 | 100:3 | 1:1 8:6 | 265:14 |
| 37:23 | 164:22 | 119:8 | **love** 126:23 | **manually** |

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| 192:18 | 166:2 | 248:22 | 161:20 | 125:9 |
| **March** 13:4 | 171:15 | **matter** 8:4 | 172:18 | 130:3 |
| 13:14 15:2 | 173:20 | 94:3 103:1 | 175:2 | 167:18 |
| 16:1,20 | 179:9 | 108:8 | 177:15 | 176:12 |
| 18:6 34:5 | 187:9 | 113:24 | 178:21,25 | 177:7 |
| 40:4 43:23 | 188:25 | 123:2,20 | 180:19 | 182:13 |
| 44:1,25 | 196:15 | 129:21 | 181:8,9 | 211:16 |
| 46:25 47:7 | 200:15 | 130:10 | 182:3,5 | 218:20 |
| 61:12 63:2 | 205:19 | 132:17 | 183:3 | 228:6 |
| 63:14 | 219:19 | 133:17 | 191:15 | **media** 11:8 |
| 64:23 | 221:3 | 145:4 | 192:3 | 11:16 12:7 |
| 65:14,24 | 226:4 | 152:7 | 193:11,12 | 13:1,19,20 |
| 68:13 73:3 | 237:2 | 171:17 | 195:21 | 13:24,25 |
| 73:16 | 239:16 | 184:20 | 196:6 | 14:3,4,12 |
| 74:24 76:2 | 241:17 | 187:12 | 198:14 | 14:14,17 |
| 76:13 | 247:7 | 189:5 | 199:19 | 14:20,25 |
| 77:13 | 249:7 | 200:18 | 201:18 | 15:4,6,11 |
| 79:14 80:3 | 254:4 | 249:18 | 209:8 | 15:14,16 |
| 81:25 82:3 | 257:4 | 254:9 | 210:22 | 17:1,24,24 |
| 82:4 84:3 | **marketing** | 270:14 | 211:8,15 | 18:2 19:20 |
| 174:4,14 | 262:1 | **matters** 28:9 | 212:19 | 20:3,16 |
| 176:6 | **marriage** | 132:24 | 213:2 | 24:3,16,25 |
| 179:23 | 270:12 | **maturing** | 214:15 | 35:9 36:5 |
| 182:16 | **Martin** 6:6 | 192:2,4 | 217:12 | 43:3 50:3 |
| 257:15 | 8:16 | **Maureen** 1:20 | 220:12 | 52:10,11 |
| 259:7 | **Marty** 264:11 | 8:8 270:4 | 222:12 | 53:9 54:14 |
| **Margaret** | **mask** 29:2,3 | 270:22 | 224:4 | 54:17 |
| 45:4 | 29:5 | **mean** 13:19 | 229:24 | 57:25 59:3 |
| **mark** 33:18 | **masking** | 15:20 17:2 | 236:17 | 72:2,12 |
| 33:20,22 | 62:10 | 17:18,19 | 241:10 | 92:7 104:5 |
| 49:4 | 71:13 | 23:6 26:10 | 243:3 | 104:24 |
| 100:10 | **masks** 29:7 | 26:13 | 246:19 | 105:1,3 |
| **marked** 21:12 | 66:5 | 30:12 | 251:9 | 113:11 |
| 22:8 33:4 | **master's** | 32:17 | 258:2 | 114:8 |
| 38:18 | 12:4,11 | 39:24 50:7 | 260:22 | 117:2,8,17 |
| 43:10 49:1 | **match** 41:4 | 52:15 73:3 | 261:3 | 124:6 |
| 60:3 67:12 | **material** | 77:15 80:5 | 266:11,16 | 128:11,14 |
| 85:6 91:1 | 65:20 99:3 | 82:3 85:18 | **meaning** | 143:6,21 |
| 102:22 | 114:15 | 87:25 | 103:11 | 143:24 |
| 112:6 | 117:17 | 88:25 99:6 | 139:7 | 148:13 |
| 113:3 | 146:15 | 113:1 | 184:25 | 150:22 |
| 118:7 | 148:15 | 116:2 | 217:18 | 154:21,22 |
| 126:8 | 264:2 | 117:9,14 | **means** 113:14 | 155:1 |
| 145:1 | **materials** | 127:21 | 191:1 | 181:7 |
| 150:6 | 53:12 | 129:1 | 209:21 | 198:22 |
| 152:16 | 56:17 58:3 | 132:22 | **meant** 19:15 | 207:7 |
| 155:7 | 81:8,12 | 136:2 | 37:17 | 212:20 |
| 163:13 | 90:7 | 154:22 | 77:19 | 220:2 |
| 164:17 | 115:21 | 160:6 | 90:23 | 227:20 |

**CAROL CRAWFORD  11/15/2022**

234:6
237:14,20
248:9
249:4
264:3
267:10
**medical**
131:5,9
137:3,8
140:12
203:15
**medications**
10:23
**medicine**
12:16
**medicines**
137:13
164:21
**meet** 70:9
150:18
170:3
175:15
180:19,20
209:20
**meeting** 2:23
5:6,13
36:8,16,17
57:4  68:6
68:7,9,12
69:23  70:1
70:6  72:20
73:10
75:22  80:1
80:10
84:10,11
84:13,19
98:10,11
99:22,25
100:2,4,6
100:8,10
115:11,14
115:24
116:1,6,15
119:17,20
119:24
132:18
151:4,15
151:18
172:16,19

172:19
177:16
178:23
179:6
180:7,23
185:1
188:9,10
188:12,13
188:21
198:25
202:4
208:9,11
208:17,23
210:4
212:24
213:1,3
221:14
223:4,13
225:15,24
225:25
226:10,16
230:12
232:24
238:23,24
239:1,25
240:14,23
241:8,9
242:6,18
242:20
246:2,5,18
246:23
247:12,21
248:15,20
253:18,24
258:19
260:6,13
260:17
261:15,18
262:9,25
263:4,14
263:18
265:15,17
**meetings**
5:10  17:8
18:17,18
18:20
20:18
30:15  69:2
83:6  116:2

116:7
117:25
130:16
174:24
179:3,25
180:5,9,11
180:17,17
180:25
181:2,7,24
184:17
188:14
198:12,14
198:16,21
202:6
204:24
208:16
209:10,11
209:23
210:11
226:18,19
232:5
239:2
241:21
242:10,11
244:23
245:1,15
245:16
250:15
260:12
261:7,11
261:19
262:6
265:12,12
265:13
266:10,14
267:11,13
**Megan** 252:20
**Melissa** 7:7
**Meltwater**
154:13,14
154:18
155:1
**members** 84:7
107:10
**memo** 109:20
**memory** 18:9
25:15  29:5
31:25
34:22

48:23
83:10,14
92:13
95:17  96:2
160:7
180:25
182:6
198:13
200:13
205:1
214:2
217:25
218:1
236:12,16
240:13
260:10
**mental** 63:21
**mention**
123:21
230:22
233:1
**mentioned**
46:15
51:16
54:15
62:22
72:10  76:3
87:8  99:1
109:15
121:10
125:16
126:2
132:20
141:20
142:12,21
147:16
157:8
195:17
200:6
211:24
221:25
223:1
236:14
237:13
243:4
246:19
250:14
251:17
257:22

259:9
**mentioning**
79:22
117:25
125:10
**mess** 192:16
**message**
33:24  36:4
36:7
247:22
252:18,19
**messages**
28:25
248:24
252:8
**messaging**
29:13,14
29:19
42:24
237:17
**met** 119:23
174:23
175:15
198:4
202:1,17
**Meta** 50:4,5
50:7,8
154:24
155:1,2
156:9
159:13
161:14
162:4,25
180:13,18
180:20
181:16
212:3,10
213:22
215:14
**Meta's** 158:3
158:11
**method** 255:9
255:14
**mic** 10:18
**Michael**
264:21
**Michelle**
19:9,12
32:13

## CAROL CRAWFORD  11/15/2022

| | | | | |
|---|---|---|---|---|
| microchips | 161:16 | 74:14 | 241:22 | 166:13 |
| 87:11 | 162:5,16 | 77:21,22 | 242:6,10 | 181:4 |
| 90:15 | 163:2 | 83:12 84:5 | 245:15 | 185:18 |
| 207:12,13 | 168:13 | 84:12 86:3 | 253:17 | 187:5 |
| 207:17,23 | 178:2 | 87:14,17 | 257:20 | 190:22 |
| 209:7 | 199:6 | 87:24 88:8 | misinter... | 196:3 |
| 265:24 | 238:13 | 91:15,18 | 153:8 | 202:9 |
| Microsoft | 266:24 | 91:25 | 155:4 | 207:1 |
| 16:6 241:1 | mischara... | 98:14 | misoprostol | 216:16 |
| middle | 214:1 | 103:9 | 255:11,16 | 217:9 |
| 169:14 | misconce... | 110:13,14 | missed 70:8 | 242:25 |
| 222:6 | 89:12 | 111:4,5 | 96:8 156:6 | 243:20 |
| 253:7 | misheard | 117:2,7 | missing 81:3 | 252:25 |
| mifepris... | 121:22 | 119:16 | 196:1 | 253:8 |
| 255:10,15 | misinfo 3:1 | 124:14 | Missouri 1:3 | MO 271:18 |
| Mike 144:23 | 3:2 4:11 | 139:1,6 | 6:1,2,4 | moderation |
| milk 165:14 | 55:25 56:9 | 150:19,25 | 8:5 271:7 | 76:7 82:7 |
| millions | 68:16 69:4 | 151:23 | 272:2 | 82:8,11 |
| 168:20 | 74:14 | 152:25 | misspelled | 101:15 |
| mind 9:24 | 85:12 87:9 | 154:1,11 | 139:2 | 175:24 |
| 47:5 116:3 | 91:9,15 | 156:21 | mistake | 176:11 |
| 156:5 | 173:25 | 157:7 | 144:15 | modules |
| 201:13 | 174:20 | 161:25 | mistype | 40:17 |
| 233:18 | 175:5 | 166:7 | 127:23 | MOLA-DEF... |
| mine 23:11 | 179:15 | 171:23 | misunder... | 3:21 |
| 87:4 | 207:22 | 175:8,13 | 154:6 | MOLA-DEF... |
| 205:22,24 | 220:22 | 179:15 | mix 52:25 | 2:24 |
| 206:10 | 221:22 | 181:20,23 | mm-hmm 16:3 | MOLA-DEF... |
| minor 241:11 | 225:5 | 181:24 | 16:25 | 4:4 |
| minute 43:12 | 229:20 | 182:10,21 | 17:12 | MOLA-DEF... |
| 96:6 99:1 | 234:17 | 183:25 | 19:18 21:5 | 5:3 |
| minutes 4:10 | 257:19 | 184:16 | 23:9 39:17 | MOLA-DEF... |
| 171:22 | 258:16 | 185:12 | 40:24 | 4:2 |
| 182:23 | misinform | 197:7,20 | 41:23 | MOLA-DEF... |
| 184:7 | 5:18 | 198:2 | 43:15 44:7 | 3:24 |
| 216:16 | 257:10 | 199:5,11 | 45:21 | MOLA-DEF... |
| 266:12 | misinfor... | 200:1,8 | 62:25 | 3:18 |
| mis-info | 3:14 4:1,9 | 201:3,25 | 63:18 | MOLA-DEF... |
| 4:13,15 | 5:1,3,11 | 204:1 | 67:11 | 3:14 |
| 187:14 | 33:25 | 205:20 | 107:6 | MOLA-DEF... |
| mischara... | 37:12,14 | 206:16 | 108:20 | 3:12 |
| 47:14 54:8 | 38:5,13 | 208:9 | 114:11 | MOLA-DEF... |
| 57:8 76:22 | 56:9,12 | 211:18 | 117:15 | 3:5 |
| 78:17 86:5 | 58:12,20 | 212:5 | 128:25 | MOLA_DEF... |
| 89:24 | 58:22 | 219:6,25 | 129:22 | 2:18 |
| 101:2 | 68:25 69:2 | 220:11 | 130:7 | MOLA_DEF... |
| 132:6 | 69:11 71:4 | 225:5,6 | 134:8 | 5:16 |
| 143:16 | 71:16 | 234:21 | 141:16 | MOLA_DEF... |
| 158:5,23 | 72:18 | 237:16 | 155:11 | 4:11 |

| | | | | |
|---|---|---|---|---|
| MOLA_DEF... 4:9 | 2:14 | 88:17 | **necessary** 273:9 | 39:6 43:16 50:15 |
| MOLA_DEF... 4:17 | MOLA_DEF... 3:3 | 129:5,9 150:24 | **need** 34:20 54:20 58:2 | 66:14 86:11 |
| MOLA_DEF... 4:6 | **moment** 22:10 38:22 49:3 | **N** | 100:20,23 | 156:1 157:4,12 |
| MOLA_DEF... 5:15 | 74:22 86:9 118:10 | **N** 7:6 271:17 **N.W** 6:10,20 | 134:2 143:14 | 163:18 174:2 |
| MOLA_DEF... 3:15 | 195:25 227:18 | 271:5 **nah** 133:16 | 182:25 184:9 | 182:20 187:20 |
| MOLA_DEF... 5:2 | 228:8 239:15 | **name** 8:8,8 8:17 11:2 | 194:6 235:12 | 190:2,7 203:8 |
| MOLA_DEF... 5:13 | **Monday** 63:1 100:3 | 14:25 21:4 86:12,19 | **needed** 20:18 110:24 | 221:18 222:5 |
| MOLA_DEF... 2:21 | 119:19 161:4 | 103:10 125:17 | 116:15 121:23 | 223:1 239:20 |
| MOLA_DEF... 5:11 | 180:7 228:4 | 141:19 174:10 | 126:21 208:2 | 248:19 250:12 |
| MOLA_DEF... 3:1 | **monitor** 117:16 | 177:10 198:8 | 221:9 224:5 | 254:15 **newer** 190:13 |
| MOLA_DEF... 5:9 | **monitoring** 167:2 | 203:4,9 211:3 | 228:22 235:13 | **news** 13:20 14:3,4 |
| MOLA_DEF... 5:7 | **MONROE** 1:2 **month** 166:23 | 222:17 246:24 | 239:22 255:6 | 53:25 58:7 59:3 72:11 |
| MOLA_DEF... 5:6 | **months** 32:9 169:22 | 247:2,3 249:17 | 262:16 263:2 | 76:16 143:11 |
| MOLA_DEF... 5:5 | 182:19 **morning** 9:12 | 264:23 272:1,2 | **needing** 255:22 | **news/com...** 53:2 |
| MOLA_DEF... 4:22 | 119:18 148:16 | 273:11 **names** 21:10 | **needs** 73:6 171:6 | **nicer** 154:25 **nine** 111:19 |
| MOLA_DEF... 4:16 | 182:2 248:18 | 21:10 25:17 | 224:1 **needs/qu...** | **nod** 9:18 **Nods** 165:10 |
| MOLA_DEF... 4:19 | 267:15 **move** 26:20 | 83:21 135:25 | 221:18 **Network** | **noise** 97:22 **non-synced** |
| MOLA_DEF... 4:14 | 38:20 46:1 152:14 | 152:10 174:9 | 153:18,18 **networks** | 268:15 **noon** 242:12 |
| MOLA_DEF... 4:12 | 163:15 165:22 | 177:18 222:6,15 | 237:20 **never** 24:4 | 245:17 **Nordlund** |
| MOLA_DEF... 5:19 | **mRNA** 164:13 **multiple** | 233:24 234:2 | 47:5 85:1 95:16 | 160:19 **normal** 9:18 |
| MOLA_DEF... 2:14 | 115:6 212:11 | **National** 107:13 | 105:5 156:5 | 164:8 **normally** |
| MOLA_DEF... 2:9 | 232:3 233:11 | 160:20,21 223:17 | 161:20 198:13 | 19:25 28:23 |
| MOLA_DEF... 2:17 | **muted** 267:16 **myth** 29:3 | **nature** 18:7 155:3 | 217:14 218:25 | 195:7 223:15 |
| MOLA_DEF... 2:11 | 129:4,6,10 134:15 | **NCIRD** 107:12 **NE** 1:17 | 235:1 **new** 4:2,5 | **notarized** 271:16 |
| MOLA_DEF... | **myths** 29:1 75:16 | **necessarily** 116:23 | 5:8 6:9 14:3 29:2 | **notary** |

**CAROL CRAWFORD  11/15/2022**

270:23
271:14
273:23
**note** 5:21
25:10
26:11,22
31:6 33:17
97:22
100:14
102:14
118:12
121:18
122:20
124:21
130:13
185:23
211:11
216:15
242:19
243:21
244:6
**noted** 75:4
133:12
**notes** 30:10
30:14,14
38:2,2
56:19,22
84:24 85:2
116:16,18
116:19
119:18
127:6
137:5
168:10
225:16,18
241:8,9
**notice** 2:7
21:18,21
128:6
**noticed**
227:9
**noticing**
240:8
**November**
1:14 8:2
156:1,14
163:20
253:13,14
270:16

271:3,11
272:4
**number** 31:8
31:15
35:21 36:2
36:8 37:3
55:3,3
67:3
102:15,20
105:21
111:19
120:6
122:15,19
129:24,25
131:17
136:13
146:11
163:24,25
165:13,18
165:19
169:6,14
171:25
190:3
222:14
241:25
**nutshell**
230:15
■ 97:7

───── **O** ─────
**O** 254:20
**O'Boyle**
196:24,24
197:15,23
198:9
199:4,21
204:20
207:4
209:1
211:5
212:25
220:10
248:2
**O'Brien** 21:8
198:6
**OADC** 11:10
12:24
13:11,13
14:9 18:25

87:5
**objected**
176:10
**objection**
36:18
47:14 54:8
57:8 76:21
78:3,17
79:1 80:16
82:20 86:5
89:24
93:16 95:7
96:3 99:4
101:2,6,20
105:10
106:6
110:7
112:22
115:12
121:5
123:3
131:6
132:6,21
134:22
137:22
138:5
142:24
143:16
158:5,21
159:14
161:16
162:5,16
163:1,9
165:7,23
168:13
176:1
178:2
193:13,24
199:6
231:15
238:13
251:4
259:25
266:24
**objections**
10:9,10
176:4
**objectives**
11:22

**occasion**
98:21 99:1
180:25
**occasional**
17:4,9
29:16
30:15
**occasion...**
38:7 51:19
222:24
241:4
244:21,22
265:19
**occasions**
198:17
**occur** 64:22
213:4
234:25
**occurred**
13:13 40:3
84:12,14
100:6,10
173:8
188:11
213:1
216:25
235:2
236:15
**occurring**
143:6
250:2,24
**occurs** 54:17
**October**
252:22
253:4
**OD** 14:9
**odd** 95:23
248:3
**offer** 69:13
89:18
**offered**
57:13
152:1
213:24
231:10
**offering**
69:4 70:24
212:4
230:10

**offerings**
77:9
**office** 1:16
6:2 8:25
11:8,11
14:9 43:6
104:15
114:20
222:24
234:5
271:17
**officer**
160:19,21
192:25
193:3,9
**official** 1:8
96:14
103:10
215:3
271:8
272:3
**oftentimes**
114:9
**oh** 23:6
28:17
40:10
67:25
72:23
85:19
92:11
93:17
100:20
136:15
149:8
167:13
218:3,8
224:20
225:8
236:6
239:24
240:22,22
245:8
260:8,24
261:14
**okay** 12:12
13:2 14:12
14:19,21
14:24
15:19

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| 20:12 | 101:11 | 171:24 | 235:9 | 100:9,12 |
| 21:14 | 103:6,20 | 173:25 | 237:1,8 | 102:25 |
| 23:12  24:5 | 105:20 | 174:1,2,13 | 238:4,21 | 111:25 |
| 24:18  25:2 | 108:6 | 176:14,20 | 239:23 | 112:9 |
| 25:19 | 109:11,19 | 177:12 | 240:5,19 | 116:20 |
| 26:12  27:8 | 110:10 | 178:16,24 | 241:5,7,13 | 122:14 |
| 27:13,24 | 111:1 | 179:7,14 | 241:23 | 126:10 |
| 28:13,24 | 113:5,21 | 179:14,19 | 242:1 | 141:7 |
| 29:12,24 | 114:25 | 180:22 | 243:23 | 142:1 |
| 30:3,7,23 | 115:8 | 182:3,8,14 | 244:4,19 | 144:13 |
| 32:25 | 117:22 | 185:4 | 245:7,24 | 145:3,13 |
| 35:20 | 118:5,6 | 186:25 | 246:24 | 145:21 |
| 36:20  38:9 | 119:1,23 | 187:2,16 | 247:14 | 146:14,22 |
| 38:21 | 121:1,21 | 189:9,17 | 248:8 | 148:18 |
| 39:15 | 122:1,20 | 190:15 | 249:5,21 | 152:19 |
| 42:21  43:8 | 123:12,19 | 191:12,25 | 250:23 | 155:13 |
| 43:9,13,23 | 126:17 | 193:7 | 252:1,17 | 163:15,23 |
| 44:4,16 | 127:9 | 195:11 | 253:6 | 166:4 |
| 46:10,18 | 129:19 | 196:14,22 | 254:13,21 | 169:22 |
| 46:25  47:2 | 130:5 | 198:4 | 256:9 | 173:22 |
| 47:5,12,17 | 133:25 | 199:15 | 257:12 | 189:4 |
| 47:24 | 135:13,25 | 201:22 | 260:11 | 196:17 |
| 48:14  50:7 | 136:7 | 202:1,5,15 | 262:21 | 200:17 |
| 50:11,22 | 140:5,22 | 202:21 | 263:13 | 219:21 |
| 51:14 | 140:25 | 204:19 | 264:1,8 | 221:5 |
| 52:13  56:5 | 141:7,12 | 207:19 | 265:1,4 | 226:6 |
| 56:7,19,23 | 142:1,9,22 | 208:3,24 | 268:2,9 | 239:18 |
| 60:21 | 143:12 | 209:14 | 269:11 | 241:7,19 |
| 61:17 | 144:3 | 210:13 | **older** 42:22 | 246:9 |
| 62:20 | 145:11,13 | 211:1,5 | 46:3 | 247:9 |
| 63:13  64:1 | 147:6,9,15 | 213:5,21 | **oldest** 22:19 | 248:10 |
| 64:7  65:23 | 148:17 | 214:3,25 | **olds** 4:3,6 | 249:17 |
| 66:19,22 | 149:8 | 215:6,23 | 163:19 | 254:8 |
| 66:23  67:9 | 150:8 | 215:25 | **Omicron** 4:17 | 257:7 |
| 67:16,17 | 151:10 | 216:14,18 | 189:7 | 261:18 |
| 68:7  70:14 | 152:7,13 | 217:7,23 | 190:5 | **one-** 39:25 |
| 70:22 | 153:4,12 | 218:9,12 | 191:22 | **one-pagers** |
| 73:13 | 155:23 | 219:2,14 | 192:1,6,13 | 239:14 |
| 74:23 | 156:7 | 220:9 | 194:6 | **ones** 9:23 |
| 78:20 | 158:2,25 | 221:12 | **Omicron-...** | 57:21 |
| 79:12  80:2 | 162:23 | 223:25 | 189:18 | 93:12 |
| 80:24 | 163:22 | 225:10 | 192:3 | 131:21 |
| 82:25  83:8 | 164:19 | 226:2,12 | **Omicron/...** | 197:19 |
| 85:25 | 165:23 | 226:17 | 191:4 | **ongoing** |
| 90:24 | 167:9 | 227:15,24 | **onboarding** | 33:19 |
| 95:20,24 | 168:17,23 | 228:12 | 97:1  100:4 | 160:9 |
| 96:7,17 | 168:25 | 229:7,18 | 100:5,8,10 | 184:15 |
| 97:12 | 170:10,22 | 230:7 | **once** 37:19 | **online** 89:12 |
| 99:22,25 | 171:14,19 | 234:2,24 | 84:24 | **Onyimba** |

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| 174:6 | 117:8 | **P** | 192:1, 4, 5 | 255:10, 15 |
| 176:7 | 259:4 | **p.m** 1:15 | 194:5 | **parents** |
| 185:16 | **origin** | 47:1  61:19 | 214:19 | 165:15 |
| 195:12 | 120:21 | 64:24 | 216:6, 7 | **Parson** |
| 250:10 | **original** | 68:13  70:4 | 226:23 | 144:23 |
| 251:2 | 5:21, 23 | 76:3 | 241:24 | 264:21 |
| 254:19 | 22:7  35:12 | 102:10 | 243:15 | **part** 14:22 |
| **Onyimba's** | 268:22, 23 | 119:7 | 245:7 | 22:19, 23 |
| 182:14 | 271:11 | 126:19 | 250:7 | 25:9  26:6 |
| **open** 149:4 | **originally** | 142:15 | 252:24 | 26:20 |
| 179:24 | 36:23 | 144:2 | 271:12, 14 | 32:18, 19 |
| **opened** | 231:3 | 145:19 | 271:17 | 36:16  48:1 |
| 265:15 | **originals** | 150:3, 3 | 272:5, 9, 13 | 56:25  59:1 |
| **operated** | 268:21 | 156:15 | 272:17, 21 | 59:8  60:22 |
| 110:14 | **originated** | 180:4, 7 | **pages** 52:24 | 70:7  81:23 |
| **operates** | 181:25 | 205:10, 10 | 189:18 | 92:7 |
| 80:15 | **OSHA** 142:22 | 207:3 | 190:3 | 106:10, 14 |
| **operations** | **ought** 187:25 | 208:10 | 192:8 | 110:18, 19 |
| 11:17 | **outbreak** | 257:1, 1 | 250:5 | 119:10 |
| **opinions** | 16:14 | 269:19 | 270:8 | 129:18 |
| 101:18 | **outcome** | **P.O** 6:4 | **palsy** 3:7, 8 | 131:11 |
| **opportun...** | 270:13 | **packet** 22:5 | 111:14 | 137:7 |
| 83:11 | **outfit** 217:7 | 68:1 | 112:16, 19 | 145:7 |
| **Opportunity** | **outlets** | **page** 2:2, 6 | 112:21 | 151:24 |
| 227:2 | 207:8 | 2:25  3:25 | **pandemic** | 156:6 |
| **option** 88:14 | **outline** | 4:17, 24 | 19:12 | 172:3, 7 |
| 213:25 | 11:25 | 6:25  22:18 | **panel** 189:24 | 192:17 |
| **options** | **outlined** | 41:21 | 190:12 | 200:7 |
| 34:11 | 27:19 | 48:16 | 191:4 | 214:14, 17 |
| 138:18, 22 | **outlining** | 67:21, 24 | 192:17 | 235:2 |
| 155:16 | 25:11 | 67:25 | 194:15, 17 | 243:19 |
| 212:11 | **Outlook** | 125:7 | 195:2 | 244:25 |
| 218:19 | 30:13 | 129:5 | 251:23 | 253:9 |
| 220:25 | **output** 43:4 | 131:16 | **panels** | 259:16 |
| **orally** 39:22 | **outside** | 133:4, 5, 5 | 193:23 | 263:4 |
| **order** 30:21 | 127:25 | 133:6 | 194:3, 8 | **participate** |
| 120:9, 11 | **overall** | 136:9, 16 | 251:17 | 103:21 |
| 131:8 | 33:25 | 141:23 | **paper** 39:19 | 260:19 |
| 164:24 | 52:24 | 142:14 | 112:16 | **particip...** |
| 205:22 | 143:21 | 143:12, 25 | 113:8 | 84:2 |
| 206:4 | **overlap** | 144:12 | **papers** 129:7 | 177:16 |
| 210:13 | 14:16  15:7 | 146:20 | **paragraph** | 198:15 |
| **organiza...** | 232:13 | 166:17 | 127:17 | 246:22 |
| 14:3  15:1 | **oversee** | 168:25 | 156:22 | **particular** |
| 51:7 | 11:22 | 169:12, 14 | 166:18 | 20:20 |
| 247:23 | **overview** | 179:22 | **paragraphs** | 63:24  64:3 |
| **organiza...** | 3:11 | 189:7, 11 | 156:14 | 89:7 |
| 33:24 | 190:17 | 190:25 | **pardon** 54:21 | 104:24 |
| 37:12 | 191:14 | 191:1, 20 | **parentheses** | 105:4 |

**CAROL CRAWFORD  11/15/2022**

141:4
148:17
197:8
201:3
240:13
246:17
248:1
particul...
  64:11
  163:24
  200:2
parties 8:11
  31:11
  270:12
partner
  111:3
  206:22
  211:21,24
  213:9
partnering
  79:23
partnership
  84:5 87:5
partners...
  84:11
parts 13:25
  68:10
  110:19
pasted 76:10
  76:14 82:2
  82:13
  190:15
patience
  177:1
patients
  113:9
  123:2
Payton 20:25
  23:4 24:7
  24:10 25:3
  26:11,25
  27:5 28:11
  28:14,21
  30:4 35:12
  36:11
  37:14
  50:16,24
  63:11
  79:22

85:17
105:21
119:12
131:17
221:15
222:25
232:5,14
234:10
237:10
257:15
259:2
Payton's
  24:19
  86:14
  119:10
Payton/G...
  87:8
  ▮▮▮▮▮@f...
  24:9
PCR 220:11
pdfs 41:6
Peck 261:17
pediatric
  158:12
  253:11
penalty
  273:12
people 15:22
  18:20
  20:14
  23:22 29:6
  39:5,20
  41:17
  42:22,23
  43:17 47:3
  48:22
  50:15 53:5
  54:16
  56:16
  59:23
  61:15
  68:24
  70:20 72:5
  83:19 88:9
  89:1 96:22
  96:22,23
  97:4,20
  98:11,21
  107:1

114:4
115:13
123:23
128:4
129:8
135:19
136:3
137:2
138:20
146:16
149:17
151:2
154:13
155:17
162:2,15
162:24
164:6,12
168:4,6,11
170:16
177:9,13
181:6,15
181:18
185:24
186:15
188:21
189:22
191:20
192:12
194:6
204:17
210:21
217:3
222:15
223:10
228:14,16
228:17
233:11,16
233:19,21
244:21
252:6
258:25
259:2
263:9
266:18
peoples'
  88:13 97:8
  212:16
percent
  46:13

69:25
128:19
228:14,16
percentage
  113:9
perception
  194:25
performs
  15:6
period 23:13
  30:6 52:4
  54:15
  180:24
  183:8
  218:15,16
periodic
  17:4
periodic...
  117:20
  167:21
periods
  61:13
perjury
  273:12
Perron 50:25
  60:11,17
  61:22
  63:15
  141:21
person 20:10
  25:16
  50:20
  66:15 75:2
  79:16,18
  83:16 92:4
  107:18
  114:14
  115:3
  123:24
  133:15
  198:4
  238:16
  241:2
  249:1
  250:14
personal
  24:3 35:23
  62:12
  143:11

215:4,5
244:6
personally
  50:1 59:18
  90:10
  147:19
Pfizer
  156:25
Phoenix
  223:2
phone 20:14
  29:20,25
  30:1 31:14
  35:21 36:1
  36:6 44:14
  56:20
  86:20
  102:15
  117:11
  120:1
  173:7
  197:21
  198:18
photo 227:20
photos 54:2
physical
  39:19
physicians
  123:11
  143:15
pick 9:17
  186:18,21
  187:5
picked 46:23
  143:22
picture 76:1
  81:11
  263:12,23
pictures
  149:6
piece 135:17
  190:7,13
pieces 39:19
  166:12
Pinterest
  180:24
pipe 227:10
piped 133:23
  265:19

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| place 12:19 | 187:18 | 247:19 | point 20:24 | 105:17 |
| 23:18 | 188:25 | 249:3 | 28:10,22 | 157:2,10 |
| 95:21 | 196:15 | 253:18 | 31:20 35:3 | 158:3 |
| 111:8 | 200:15 | 266:18 | 61:11 83:1 | 159:8 |
| 115:25 | 205:19 | 267:10 | 89:5 92:22 | 160:2 |
| 151:5,7 | 219:19 | player 28:16 | 99:11,13 | 162:11 |
| 156:10 | 221:3 | players | 106:20 | 167:4 |
| 178:1 | 226:4,6 | 43:16 | 107:21 | 169:8 |
| 192:12 | 237:2 | 180:2 | 108:17 | 170:5,8 |
| 194:18,20 | 239:16 | please 8:11 | 114:9 | 234:21 |
| 215:22 | 241:17 | 9:4 11:1 | 119:11 | policy 4:3,5 |
| 219:7 | 247:7 | 21:15 | 127:14,15 | 103:21 |
| 225:15 | 249:7 | 27:12 | 127:16,24 | 104:2,9 |
| 248:16 | 254:4 | 64:16 | 128:7 | 139:6 |
| places 248:9 | 257:4 | 118:25 | 142:3 | 140:3 |
| plaintiff | plan 34:15 | 119:17 | 153:10,24 | 150:14 |
| 6:1 144:22 | 70:5 73:6 | 133:11 | 190:9 | 151:23 |
| plaintiffs | 84:8 | 141:8,12 | 198:1 | 154:3 |
| 1:5 6:6 | 182:20 | 144:7 | 199:21 | 156:2 |
| 8:14 269:5 | 207:25 | 145:3,5 | 205:1 | 158:11 |
| plaintiffs' | 263:15 | 152:12 | 207:21 | 159:21 |
| 2:5 5:21 | planning | 155:21 | 223:1 | 163:18 |
| 21:12 22:8 | 228:2 | 166:18 | 242:24 | 168:3 |
| 31:7,9,12 | plans 230:15 | 167:5 | 249:2 | 169:20 |
| 33:4 38:18 | platform | 169:23 | 254:15 | 170:14,17 |
| 43:10 49:1 | 17:23 18:2 | 170:2 | pointed | 170:20 |
| 60:3 67:12 | 18:13 | 176:23 | 89:16 | 211:19 |
| 85:6 91:1 | 162:15 | 188:1 | 107:5 | 220:21 |
| 102:16,18 | 228:17 | 200:17 | pointing | 255:2 |
| 102:22 | 243:5 | 221:11 | 88:2,16 | politicians |
| 112:5 | 245:25 | 226:7,8 | 89:20 | 148:22 |
| 113:3,5 | 266:19 | 242:8 | 90:18 | poorly 260:4 |
| 118:7 | platforms | 247:10 | 195:6 | pop-ups |
| 126:8 | 17:5 18:15 | 249:17 | points 3:23 | 157:8 |
| 135:1 | 21:11 | 254:8 | 20:17,20 | populate |
| 136:6 | 29:14 | 255:18 | 21:1 39:21 | 196:11 |
| 138:23 | 50:12 88:7 | 271:10,13 | 60:20 | populated |
| 141:6 | 154:1,16 | 271:16 | 63:20 82:2 | 191:16 |
| 145:1 | 154:19 | pleased | 127:7 | populations |
| 150:6,9 | 155:2 | 162:2 | 128:11,22 | 3:10 45:24 |
| 152:16 | 161:15 | plus 46:4 | 134:10 | 46:6,7 |
| 155:7 | 162:4 | 230:7 | polices | portal 91:24 |
| 163:13 | 180:12 | 255:5 | 157:6 | 206:22 |
| 164:17 | 208:10 | PM 247:16 | policies | 211:22,25 |
| 166:2 | 209:23 | POC 35:3,4 | 15:24 | 212:6 |
| 171:15 | 220:16 | POCs 174:11 | 103:14,17 | 213:6,6,10 |
| 173:20 | 242:11 | 198:7 | 104:24 | 213:14,16 |
| 179:9 | 243:25 | 242:15,22 | 105:4,6,9 | 214:14 |
| 187:9,11 | 245:15 | 245:19 | 105:12,16 | 215:11,13 |

CAROL CRAWFORD  11/15/2022

| | | | | |
|---|---|---|---|---|
| 215:14 | 229:10,15 | 182:5 | 182:12 | 138:21 |
| 217:24 | 229:17 | **pregnant** | 183:2 | 151:11 |
| 218:21 | 230:20 | 46:4 | 199:3 | 173:17 |
| 236:8,13 | 264:24 | **preparation** | 209:15 | 189:15 |
| **portals** | **posting** | 93:9 94:15 | 258:4 | 197:21 |
| 213:18 | 129:4 | **presence** | 261:19 | 200:7 |
| 217:3 | 253:14 | 11:15,16 | **previously** | 209:11 |
| **portfolio** | **postings** | **present** 7:5 | 78:1 80:17 | 212:11 |
| 32:19 | 237:15 | 7:21 8:10 | 142:11,21 | 215:10 |
| **portion** | **posts** 35:18 | 18:1 26:2 | 174:18 | 219:12 |
| 80:20 | 53:1,14,22 | 37:16 73:6 | 209:12 | 221:15 |
| 174:4 | 58:6 81:4 | **presented** | 211:13 | 223:4,11 |
| **portions** | 89:8,14 | 7:21 | **primarily** | 235:12 |
| 64:8,10 | 90:16 | 138:23 | 113:17 | 245:2 |
| **pos-** 236:17 | 92:17 | 141:6 | 156:5 | 255:22 |
| **positions** | 103:15 | 172:17 | **primary** | **problem** 4:18 |
| 39:21 | 135:16 | **presents** | 20:24 | 4:21 |
| **positive** | 149:6,19 | 194:23 | **Prion's** | 168:22 |
| 63:22 | 155:19 | **President** | 122:3 | 196:20 |
| 66:16 | 157:9 | 1:9 271:8 | **prior** 13:16 | 201:20 |
| **possible** | 168:3,5 | 272:3 | 19:1,6 | 204:5 |
| 120:20 | 170:15 | **press** 125:24 | 29:15,19 | 215:6,7,19 |
| 139:15,16 | 207:15,24 | 160:19,20 | 58:4 209:4 | 219:8 |
| 174:24 | 212:14 | **presume** | 209:6 | 238:12,17 |
| 177:3 | 220:14 | 91:12 | 212:23 | **problematic** |
| 188:2 | 258:7,9 | **pretty** 34:16 | **priority** | 197:6 |
| 242:13 | 265:3 | 37:7 46:24 | 215:9,17 | 201:1 |
| 243:2 | 266:4 | 90:20 | **privilege** | 212:5 |
| **possibly** | **potential** | 119:3 | 93:22 | **problems** |
| 34:25 | 53:15 | 121:13 | 94:22 | 219:10 |
| 51:17 | 182:24 | 141:20 | **Priya** 50:22 | **proceed** 9:9 |
| 58:16 | 184:8 | 159:11 | 50:23 | **proceeding** |
| 140:8 | **potentially** | 179:6 | **proactively** | 7:22 |
| **post** 76:4 | 132:11 | 181:16 | 262:24 | **process** |
| 104:24 | 155:19 | 190:4 | **probably** | 10:14 |
| 105:4 | **power** 153:9 | 192:6 | 29:10 | 92:23 93:2 |
| 135:18,20 | **PowerPoint** | 258:13 | 30:13 | 127:20 |
| 149:7 | 199:1,2 | **Prevention** | 35:19 37:8 | 128:1,2 |
| 157:6 | 210:23 | 1:17 6:16 | 39:25 42:4 | 129:15,17 |
| 162:24 | **practice** | 7:6,12 | 56:16 61:1 | 131:11 |
| 207:25 | 93:13 | **previous** | 61:13 69:3 | 216:21 |
| 227:22 | 154:23 | 16:8 41:7 | 70:8 72:5 | 242:13 |
| 229:6 | **practices** | 67:22 68:4 | 82:13 | 243:2 |
| **post-vac...** | 34:18 | 102:17 | 83:13 | **processes** |
| 62:8 63:22 | 253:22 | 119:21 | 90:20 | 131:1 |
| 65:4 | **preference** | 138:19 | 108:14,15 | **produce** |
| **posted** 59:13 | 43:3 | 140:19 | 115:15 | 84:19 |
| 109:4 | **preferred** | 147:24 | 120:5,17 | **produced** |
| 212:5 | 180:1 | 161:2 | 121:13 | 46:3 |

**CAROL CRAWFORD  11/15/2022**

product
 221:19
products
 195:19
professi...
 203:15
progeste...
 255:9,14
program
 172:11,13
programs
 71:8
project 4:12
 46:9,15
 48:18
 55:23
 70:16,18
 173:25
 174:22
 175:15,17
 176:12,18
 176:22
projects
 48:3,10
 221:20
 224:13
promote
 81:22
 232:10
promoted
 228:10
promotion
 227:1,3
 228:3,5,7
 228:13,24
 230:10
 233:14
promotions
 234:16
prompted
 230:19
proof 146:1
properly
 216:22
properties
 50:4,5,7,8
 154:25
 155:1
property

245:23
proposal
 84:4
proposals
 27:25 28:1
 132:5,14
 132:19,22
 165:19
propose
 208:12
 209:17
proposed
 27:20
 69:20
 122:3
 252:9
protection
 164:9
proteins
 139:13
protocols
 65:4
prove 122:16
provide
 11:15,18
 15:15,15
 15:17
 27:15
 48:21
 50:21 51:2
 51:12,13
 52:7 72:17
 92:2
 105:17
 106:21,22
 116:10
 128:11
 138:10
 158:17
 159:10
 160:9
 220:13,16
 238:18
 259:24
provided
 29:21
 71:15
 90:22
 113:13

161:23
 166:22
 183:10
 194:8
 222:1
 261:4
provides
 11:14
 227:5
providing
 51:23 52:2
 54:13
 128:13
 161:23
 167:20
PS 170:22
public 12:5
 12:19,23
 13:8,10
 14:10 15:4
 18:13 19:9
 29:22 32:7
 32:18
 33:25
 143:15
 144:21
 222:23
 237:17
 270:23
 271:14
 273:23
publicly
 72:3
publicly...
 59:9
pull 177:2,8
 230:12
pulled 48:3
 222:2
pulling
 92:22
 236:7
Pundit
 264:15
purpose
 57:23
 110:20,22
 145:21
 147:7

214:11
 251:3
purposes
 16:24 22:7
 32:2 57:22
 147:1
pursuant
 7:19 21:21
 102:16
put 22:2
 30:21
 32:23
 39:19
 40:16 43:8
 48:13
 52:15 60:1
 85:4 90:24
 92:20 93:5
 100:12,19
 115:9
 118:5
 126:6
 130:23
 132:24,25
 144:25
 149:6,18
 149:19
 153:9
 162:23
 171:11,13
 175:8
 179:7
 187:4,7
 194:19
 196:13
 199:20
 200:14
 201:11
 202:22
 205:2
 219:17
 221:2
 224:17
 226:2
 231:9
 236:24
 239:12
 247:5
 249:5

251:15
 254:3
 256:19
 263:24
 268:21
puts 123:7
 212:6
Putting
 168:20

_____
Q
_____
Q&A 34:10,25
 36:17,25
 37:6
Qs 70:10
question
 10:1,3,11
 14:23
 39:15 41:9
 48:15
 66:25
 67:19
 71:22
 73:15
 74:21,22
 75:5,7,13
 78:7,12,13
 79:15,17
 81:5 90:3
 93:7,8,20
 98:6,7
 99:8
 100:24
 105:1
 106:15
 111:17,25
 112:11
 118:11
 120:18
 126:5
 128:22
 129:12
 135:8
 146:5
 148:24
 156:17
 158:9
 159:1
 164:1

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| 181:5 | question... | re-reading | 200:22 | 160:7 |
| 183:22 | 75:3 | 125:22 | 201:23 | 168:24 |
| 185:17 | quick 27:22 | reach 2:13 | 205:14,14 | 178:21 |
| 186:13 | 28:23 | 2:16 17:5 | 207:19,21 | 200:11 |
| 188:1 | 135:6 | 17:6 39:9 | 208:6,8 | 228:7 |
| 224:4 | 211:12 | 43:21 | 216:18 | 235:9 |
| 235:24 | Quicker | 44:10 | 217:13 | reads 22:20 |
| 236:5 | 23:23 | 228:14 | 218:12 | 23:20 |
| 240:12 | quickly | reaction | 221:7,11 | ready 206:12 |
| 248:18 | 173:5,16 | 168:12 | 226:7,8 | 206:13 |
| 251:6 | quite 111:10 | reactions | 227:6 | 229:21 |
| 259:19 | 190:24 | 164:13 | 228:20 | 239:23,24 |
| questioning | quote 103:14 | read 8:20 | 229:2,22 | real 135:6 |
| 31:21 | 120:12 | 22:10 23:2 | 229:23 | realize |
| questions | 129:1 | 25:4,20,21 | 230:3,5,7 | 219:3 |
| 4:9 10:1 | 146:1 | 27:8,11,13 | 234:11,12 | realized |
| 68:16,20 | quotes 226:9 | 46:19 | 237:5,12 | 41:6 |
| 69:5,5,10 | ――――――― | 52:17 | 239:18,19 | 205:23 |
| 69:14,20 | **R** | 65:22 | 241:20 | really 9:22 |
| 69:22 73:9 | R 1:7 8:5 | 68:11 70:3 | 242:8,9 | 12:7 29:9 |
| 73:19 | 270:1 | 85:14,15 | 245:13 | 32:15,16 |
| 74:13 75:1 | 271:7 | 91:3 103:3 | 247:11,17 | 38:13 64:5 |
| 79:18,25 | 272:2 | 112:8 | 252:12,18 | 92:21 |
| 113:20,25 | Rachel | 127:4 | 252:24 | 101:24 |
| 120:8 | 254:14,25 | 136:8,25 | 253:10 | 110:24 |
| 128:12,15 | 256:7 | 145:5,8,10 | 254:12,13 | 130:20 |
| 129:19 | Raena 222:10 | 152:19,21 | 254:24 | 138:8,9 |
| 139:18 | raise 95:10 | 153:2 | 255:8,13 | 143:1,4 |
| 144:5 | ran 154:12 | 155:24 | 257:7 | 189:20 |
| 152:1,4 | 175:12 | 156:13,23 | 260:15 | 207:17 |
| 156:20 | 210:11 | 162:10 | 261:12,17 | 234:3 |
| 161:1 | 265:12,13 | 163:16,17 | 262:13,23 | 236:13 |
| 163:24 | 267:14 | 166:5,9,9 | 268:5 | reask 14:22 |
| 166:7,10 | range 169:25 | 166:18,20 | 271:13 | 71:22 |
| 167:21 | 187:4 | 168:2 | 272:6,10 | 158:9 |
| 171:23 | rare 164:13 | 170:13 | 272:14,18 | reason 25:14 |
| 172:17 | rarely 21:8 | 171:18 | 272:22 | 36:20 76:8 |
| 173:5 | 128:3 | 173:22,23 | 273:6 | 82:7 185:6 |
| 181:11 | 195:9 | 173:24 | readily | 272:7,11 |
| 188:4,20 | 225:18 | 174:15,17 | 108:14 | 272:15,19 |
| 224:2,9 | rate 3:9 | 176:7,23 | reading | 272:23 |
| 229:1 | 111:20 | 179:11,22 | 26:13 | reasons 59:6 |
| 247:21 | 113:9 | 182:14,17 | 42:11 | 142:10 |
| 255:18 | 122:14 | 187:13,25 | 47:11 | recall 17:17 |
| 263:25 | rates 122:19 | 188:1 | 50:19 | 17:21 |
| 264:25 | 169:5 | 189:6 | 51:10 | 19:19 |
| 267:12,17 | re-ask 251:6 | 196:18,19 | 67:15 | 20:20 |
| 267:22 | re-evalu... | 197:2 | 70:12 75:8 | 21:10 |
| 268:1,3 | 76:7 | 200:17,18 | 77:2 91:22 | 29:11,17 |

CAROL CRAWFORD  11/15/2022

| | | | | |
|---|---|---|---|---|
| 30:5,14 | 198:16 | **recipient** | **record** 8:1 | 127:18 |
| 32:14 | 199:1 | 60:10,12 | 9:19,21 | 175:10,14 |
| 35:15 36:6 | 201:8 | 220:2 | 11:1 30:17 | 180:5 |
| 36:11 | 202:7 | **recognize** | 30:24 31:3 | 255:22 |
| 37:13 38:1 | 213:7,15 | 22:11 33:8 | 37:21 | 256:15 |
| 38:4,6,9 | 217:1 | 49:6 67:14 | 52:16 55:8 | **reference** |
| 38:11 39:2 | 219:14 | 67:21 | 69:19 | 34:14 |
| 39:13 | 222:9,11 | 97:19 | 92:19 93:1 | 55:15 69:3 |
| 46:23 | 223:1 | 174:9 | 97:24,25 | 70:2 79:22 |
| 51:11 57:4 | 224:18 | 206:18 | 98:1,2,3 | 80:11 |
| 57:17,20 | 225:21 | 222:15 | 102:9,11 | 81:14 |
| 58:10,11 | 230:18,23 | 249:22 | 150:2,5 | 129:10 |
| 61:11 | 234:2 | **recollec...** | 156:15 | 130:12 |
| 65:19,21 | 235:3,4,21 | 18:1,4 | 203:12 | 183:23 |
| 66:2,8 | 235:23 | 26:2 29:21 | 205:8,9,11 | 184:14,15 |
| 68:23,24 | 236:10 | 32:3 | 225:17 | 185:21 |
| 71:20 72:1 | 240:16,18 | 37:13,16 | 236:2 | 195:24 |
| 72:2 83:8 | 240:22 | 40:11 | 241:8 | 208:23 |
| 88:5 89:13 | 241:10 | 42:20 46:9 | 245:13 | **references** |
| 89:15 | 244:19 | 48:18 52:8 | 247:17 | 72:21 |
| 92:23 93:1 | 246:14 | 68:4 72:16 | 256:24,25 | 243:7 |
| 99:13,14 | 256:16 | 75:13 | 257:2 | **referencing** |
| 99:21 | 260:6 | 76:12 | 261:2 | 149:16 |
| 104:25 | 264:23 | 87:17 88:6 | 265:5 | 196:9 |
| 109:3 | 267:9,23 | 90:18 92:4 | 268:10,21 | 243:9 |
| 110:25 | **recalled** | 94:1,7 | 269:18 | 258:3 |
| 111:18 | 32:5 | 95:15 | 270:10 | 266:15 |
| 115:24 | **receive** | 96:13 | **recorded** | **referring** |
| 116:1,2 | 71:12 | 100:7 | 31:14 85:1 | 12:25 |
| 119:23 | **received** | 106:23 | 102:19 | 34:12 |
| 125:9 | 59:4 64:7 | 116:6 | **recordings** | 36:15 42:8 |
| 136:4 | 97:15 | 125:22 | 84:25 | 42:10 |
| 140:13,15 | 143:7 | 142:13 | 225:16 | 48:10 55:1 |
| 142:8 | 158:15 | 143:10 | **records** | 56:14 |
| 144:11 | 164:15 | 152:3 | 30:11,18 | 91:21 |
| 150:20 | 198:1 | 159:18 | 56:19 | 116:13 |
| 151:17 | 238:23,24 | 216:24 | 116:16 | 118:20,22 |
| 152:11 | **receiving** | 217:1 | **reduce** | 129:3 |
| 153:4 | 57:23 | 235:1 | 103:16 | 142:19 |
| 154:7,9,12 | 76:17 | 242:18 | 138:20 | 143:9 |
| 155:6 | 82:18 | 246:1 | **reel** 227:11 | 144:21 |
| 177:25 | 137:2 | **recollec...** | 229:9 | 165:16 |
| 178:9 | 142:3 | 117:24 | **reestabl...** | 175:9,11 |
| 182:7 | 154:8 | **Recommend** | 102:14 | 175:20 |
| 183:11 | **recess** 31:1 | 41:24 | **reevaluated** | 176:21 |
| 184:5 | 102:10 | **recommen...** | 82:6 | 191:7 |
| 185:8,10 | 150:3 | 29:10 | **refer** 39:12 | 196:10 |
| 193:18 | 205:10 | **reconsider** | 72:1,21 | **refers** 56:20 |
| 197:16 | 257:1 | 169:8 | 113:23 | 56:20 |

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| 68:21 82:8 | 174:24 | 222:24 | 196:8 | 162:25 |
| 100:1 | 178:23 | **relation...** | 198:8,17 | 168:4 |
| 125:8 | 179:3,24 | 112:16,18 | 200:5 | 212:12 |
| **reflect** | 180:4,11 | **relative** | 202:4 | 257:9,19 |
| 195:19 | 180:16,17 | 65:16 | 203:19 | 258:8,11 |
| 196:9 | 180:23 | 156:21 | 213:11,19 | 262:24 |
| 236:2 | 181:2 | **relayed** | 215:19 | 263:11 |
| **reflected** | 184:17 | 45:23 | 225:24,25 | **removing** |
| 263:8 | 188:9,12 | 239:1 | 227:9,13 | 38:5 81:8 |
| **reflecting** | 197:5 | **relevant** | 232:2 | 88:13 |
| 162:1 | 198:12,13 | 219:6 | 233:9 | 155:19 |
| **refresh** | 198:16 | **religious** | 241:15 | 162:14,21 |
| 93:25 94:6 | 200:25 | 146:16 | 244:17 | **renamed** |
| 106:14 | 215:11 | **remember** | 246:11 | 231:4 |
| **refreshed** | 244:22 | 25:9 26:6 | 265:2 | **render** 273:9 |
| 31:24 | **regularly** | 38:1,7,12 | **remembered** | **reoorg** 19:6 |
| **refresher** | 21:11 37:8 | 41:3,20 | 68:3 245:5 | **reorg** 19:4 |
| 262:16 | 70:9 | 51:14 | **remembering** | **reorgani...** |
| **refusal** | 174:23 | 64:17 | 81:21 | 13:13,22 |
| 63:21 | 175:16 | 73:14 | **remind** 203:1 | 16:9 19:2 |
| 170:1 | 179:6 | 80:10 | 211:20 | **rep** 260:19 |
| **refusals** | 185:11 | 82:21 | 217:5 | 261:17 |
| 156:19 | 222:23 | 83:20 | 246:24 | **repeat** 12:21 |
| 157:17,25 | 240:11 | 84:13 89:9 | **reminds** | 67:19 |
| 164:3 | **Regulations** | 92:17,21 | 216:20 | 74:21 |
| **refusing** | 7:20 | 92:25 | **Remotely** | 245:8 |
| 53:17 58:6 | **Reingold** | 98:16,25 | 31:16 | **repeatedly** |
| **regarding** | 96:23 | 109:5 | **removal** | 157:5 |
| 57:16 | 100:22 | 111:21 | 220:25 | **rephrase** |
| 58:20 83:3 | 101:1,8 | 117:4,6,9 | **removals** | 10:2,11 |
| 99:19 | 217:7 | 117:10 | 75:5,7,12 | 78:7 90:3 |
| 107:23 | **rel** 1:3 | 125:17 | 80:13,15 | 178:7 |
| 154:14 | 271:7 | 130:15 | **remove** 33:25 | 204:10 |
| 160:11 | 272:2 | 133:19 | 37:12 | **replace** |
| 161:1 | **related** | 136:23 | 75:19 | 29:13 |
| 167:5 | 92:22 | 140:20 | 90:11 | 42:22 |
| 182:24 | 110:5,10 | 149:5 | 103:16 | **replaced** |
| 184:8 | 185:23 | 151:6,25 | 138:21 | 254:16,18 |
| 199:2 | 223:5 | 153:15 | 157:2 | **replicate** |
| 207:15 | 232:12 | 160:11 | 159:21 | 110:21 |
| 219:13 | 245:22 | 171:3 | 162:11 | **replied** |
| 224:22 | 266:6 | 173:13 | 168:3 | 248:6 |
| 234:12 | 270:11 | 174:11 | 170:15 | **reply** 34:6 |
| 249:19 | **relating** | 177:17,24 | 220:24 | 216:8,17 |
| **regular** | 105:8 | 183:22 | 258:16 | **report** 18:23 |
| 16:13 17:8 | **relation** | 184:2,4 | **removed** 5:18 | 18:24 19:1 |
| 74:3,5 | 210:7 | 188:19,23 | 75:25 76:6 | 19:6,12,14 |
| 107:22 | 261:9 | 193:17 | 81:2,4 | 19:17 |
| 167:2 | **relations** | 195:23 | 103:15 | 51:12 52:1 |

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| 52:21 | 60:21 66:1 | 175:12 | **reserved** | 66:14 70:3 |
| 54:13 | 91:9,24 | 204:6 | 269:20 | 72:13 |
| 55:14 58:8 | 97:2 | 212:9 | **resolve** | 106:5,16 |
| 59:9 60:19 | 101:18 | 230:1 | 182:11 | 107:7,20 |
| 60:22,25 | 122:24 | 250:13 | **resolved** | 114:4 |
| 62:1,14 | 141:21 | 258:5,6 | 185:15 | 117:6 |
| 63:16 | 142:10 | 262:17,20 | **respect** | 123:24 |
| 64:18 | 158:3 | 262:25 | 128:23 | 136:3 |
| 65:15 | 169:5 | 263:7,12 | **respective** | 140:17 |
| 66:12 | 214:10 | **represent** | 259:3 | 160:23 |
| 76:16 81:1 | 218:19 | 8:12,14 | **Respiratory** | 164:14 |
| 81:3 91:25 | 229:20 | 9:1,2 | 107:14 | 165:5 |
| 95:22 | 234:17,19 | 112:12 | 160:22 | 170:22 |
| 96:15 | 234:22 | 164:20 | **respond** 28:3 | 176:7,24 |
| 98:19,23 | **reports** 2:18 | **represen...** | 121:22 | 177:19 |
| 99:3 123:1 | 2:20 3:17 | 8:18,23 | 122:4 | 182:15 |
| 123:10 | 3:20 49:13 | **request** 4:18 | 124:9 | 197:3 |
| 143:5,23 | 50:21 51:2 | 4:20 27:3 | 132:9 | 200:23 |
| 144:6 | 51:4,18,20 | 31:7 78:24 | 160:14 | 211:1 |
| 149:4 | 52:9,9,10 | 84:20 93:4 | 171:1 | 216:10 |
| 152:5 | 53:1,16,25 | 141:4 | 184:19 | 230:3,5 |
| 164:20 | 54:2,22 | 196:20 | 186:8 | 232:19 |
| 212:4 | 55:7 56:18 | 200:22 | 201:7 | 234:11 |
| 213:18 | 57:6,12,14 | 201:19 | 214:3 | 237:24 |
| 260:15 | 57:16,18 | 242:6 | 235:15 | **responses** |
| 261:14 | 57:23 58:5 | **requested** | 255:20 | 124:8 |
| **report/file** | 58:7,22,24 | 47:25 | 259:6 | 129:23 |
| 259:18 | 58:25 59:4 | 216:19 | 261:12,16 | 171:10 |
| **reported** | 59:14,17 | **requesting** | 262:21 | **responsi...** |
| 19:8 24:16 | 59:19,22 | 255:2 | **responded** | 212:19 |
| 92:16 | 60:7,18 | **requests** | 108:24 | **responsible** |
| 123:18 | 61:24 62:7 | 140:17 | 164:5 | 26:9 95:13 |
| 135:2 | 62:12 | 221:19 | 165:14 | **rest** 163:17 |
| **reporter** | 63:25 | 234:14 | 186:7 | **restful** |
| 1:19 9:4,8 | 66:17 | 250:3 | 238:3 | 126:20 |
| 9:16 | 71:16 72:3 | **required** | 245:3 | **restrict...** |
| 171:25 | 72:4 75:24 | 115:6 | **responding** | 148:23 |
| 256:18 | 77:11,13 | **requirement** | 27:3 28:8 | **result** |
| 268:25 | 81:1 | 138:2 | 218:1 | 151:11 |
| 270:5 | 141:10,24 | **reread** 74:19 | **responds** | 156:24 |
| **reporter's** | 142:2 | **rereading** | 192:21,22 | 160:5 |
| 5:21 8:8 | 143:20 | 91:19 | 214:8 | 166:24 |
| 26:22 | 145:6,14 | **research** | 251:25 | 167:18,19 |
| 97:22 | 146:23 | 59:2 72:6 | 258:15 | 250:4 |
| 118:12 | 147:5,13 | 72:9,10 | **response** | **results** |
| **reporting** | 147:18,19 | 81:1 | 2:11 4:7 | 189:22 |
| 3:3 7:20 | 147:23 | 147:16 | 33:12 59:2 | 191:11 |
| 51:24 | 148:2,9,11 | 258:6 | 59:6 61:15 | 192:16 |
| 58:10 | 154:13 | **reserve** 8:19 | 61:16 | 195:4 |

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| 251:19 | 35:2 36:25 | 111:23 | 175:2,14 | 243:15,18 |
| **return** | 37:10,19 | 112:15 | 176:5,23 | 244:8,14 |
| 146:16 | 38:16,22 | 113:14 | 177:1,7,22 | 245:21 |
| 173:17 | 38:24 39:4 | 114:3,14 | 177:25 | 246:6,9,21 |
| 271:16 | 39:11,18 | 115:8 | 178:12,16 | 247:5 |
| **reversing** | 40:6,9,20 | 116:25 | 179:21 | 248:2,14 |
| 255:9,14 | 40:22 41:1 | 119:2,4 | 180:20 | 248:23 |
| **review** 5:15 | 41:1,5,19 | 120:6,10 | 181:19 | 249:22 |
| 8:20,20 | 41:21 | 120:15 | 183:13,24 | 250:6,17 |
| 38:25 | 42:12,16 | 121:23,24 | 184:6 | 251:1,23 |
| 47:25 | 43:2,4,17 | 122:5,5,10 | 185:16 | 251:25 |
| 93:10 | 45:15,20 | 123:14 | 186:16 | 252:4 |
| 124:22 | 46:8 48:1 | 124:4,12 | 189:2,10 | 253:1,4,22 |
| 145:9 | 48:9 49:6 | 124:23,24 | 190:10,23 | 254:22,24 |
| 211:14 | 49:14,15 | 126:6,25 | 191:1 | 255:17 |
| 212:7 | 49:22,24 | 127:2 | 192:22 | 256:17 |
| 250:3 | 53:13,17 | 128:9,18 | 194:15 | 257:6,13 |
| 254:11 | 54:21 60:1 | 129:11 | 195:15 | 258:16 |
| **reviewed** | 60:5,8,13 | 130:25 | 196:23,25 | 259:6,14 |
| 93:11,24 | 60:15 61:3 | 131:18,25 | 197:13 | 259:21 |
| 94:4,10,14 | 61:9 62:4 | 132:25 | 201:16 | 260:14 |
| 118:2 | 62:5,7 | 133:16 | 202:14 | 261:6 |
| 131:10 | 63:4 64:14 | 134:18 | 204:3,8 | 262:2,8,11 |
| 206:23 | 66:6,13 | 136:5 | 206:1,8,14 | 264:17,19 |
| 211:13,23 | 67:14,18 | 137:11 | 207:20 | 266:7 |
| 255:4 | 68:11,21 | 139:4,11 | 208:15,21 | 267:25 |
| **reviewing** | 69:15 71:7 | 139:19 | 210:10 | 268:5,8 |
| 31:24 | 72:14 74:2 | 143:7 | 211:3,9 | **risk** 42:23 |
| 97:10 | 75:2 76:2 | 144:12 | 213:13 | 156:18 |
| 118:19 | 77:25 79:9 | 145:25 | 214:6,21 | **risks** 53:15 |
| **right** 8:20 | 79:16,17 | 146:6 | 215:22 | **Road** 1:17 |
| 9:15 10:22 | 81:7,16,25 | 150:11,17 | 219:7,17 | **role** 11:13 |
| 11:1 15:10 | 85:14 86:2 | 156:8,10 | 220:5 | 12:18 15:1 |
| 16:24 | 86:9,16,22 | 156:13 | 221:13 | 16:1,8 |
| 17:10 | 87:7,11 | 157:12,17 | 222:5,14 | 18:23,24 |
| 19:11,19 | 88:19,23 | 157:19 | 224:12,25 | 24:24 32:8 |
| 20:1 21:19 | 89:13 | 159:22 | 225:5 | 40:19 |
| 21:23 22:2 | 91:12,17 | 160:5 | 226:13,22 | 86:13 |
| 22:13,19 | 92:3,19 | 161:3,11 | 226:25 | 115:18 |
| 23:1 24:6 | 93:3,14 | 161:15 | 227:5 | 161:21,21 |
| 24:19,23 | 95:9,13 | 163:5,8,23 | 230:16 | 183:6 |
| 25:7 26:5 | 96:20 97:2 | 164:3,6,14 | 233:16,23 | 220:12 |
| 26:20 27:1 | 97:4,18 | 165:25 | 234:4,9 | **roles** 15:5 |
| 27:24 28:3 | 98:6 99:12 | 166:15 | 235:15,16 | 31:25 |
| 28:6 30:1 | 102:1,24 | 167:10,23 | 236:21,24 | 107:19 |
| 30:19 | 103:15 | 168:8,12 | 240:3,7,12 | 223:11 |
| 31:23 | 107:4 | 170:16,24 | 241:24 | **rollout** 53:3 |
| 32:21 | 109:7 | 172:2,4,14 | 242:6,17 | **room** 97:23 |
| 33:13 34:2 | 111:7,12 | 172:22 | 242:22,24 | 133:15 |

CAROL CRAWFORD  11/15/2022

rose 151:1
Rosie 107:25
 114:22
 115:10
 120:2
 124:1,9
 133:22
 135:21
rotate 28:25
round 31:20
routinely
 77:17
rudely 98:7
rules 7:19
 9:16
run 77:11
 147:13
 195:9
 222:21
 224:9
 227:2,24
 228:13
running
 261:25

        S
S 1:3,20  7:5
 270:4,22
 271:7
 272:2
s-- 174:7
S.W 7:3
sacred
 194:11
Saddler
 222:10
safe 157:4
 161:14
 162:3,13
 255:9
safety 33:24
 68:25
 103:9
Sam 86:16,19
 125:8,10
 125:11,12
samples
 149:15
SARS 112:17

SARS-CoV-2
 3:7,8
Sauer 6:2
 26:22
 30:19
 267:20
 268:12,16
 268:24
 269:4
save 182:22
 184:7
saw 45:16
 94:13
 98:22
 110:4
 120:7,23
 130:15
 132:15,25
 149:11
 191:21
 203:25
 209:8
 220:13
 227:4
 251:22
saying 38:11
 51:12
 75:10,11
 76:9 83:23
 98:21
 99:14
 121:13
 141:23,24
 147:24
 149:17
 153:10
 162:7
 169:7
 170:11
 172:7
 178:22
 195:22
 196:1
 200:7
 203:9
 218:24
 225:18
 243:5
says 22:23

24:12 26:5
 33:16,17
 33:23 34:5
 40:8,10,23
 41:24 42:8
 44:9 45:22
 47:8 48:2
 51:3,21,22
 52:3,25
 53:13,19
 55:3,4,21
 63:5,14,15
 63:17
 65:14
 72:23 73:4
 74:12,14
 80:12 82:6
 87:7 91:9
 96:21
 103:16
 105:22
 119:13
 120:12,18
 122:16,20
 128:16
 133:10
 134:24
 139:6
 144:4
 148:21
 159:20,25
 166:17
 167:25
 168:2,25
 169:17
 172:7
 184:6
 185:19,22
 190:16
 193:10
 195:17
 197:24
 200:1
 211:2,20
 214:9,20
 216:18
 217:10
 218:14,16
 218:17

223:18
 227:1
 228:2,12
 228:20
 229:14
 238:11
 247:15
 257:18
 260:15,20
scan 85:20
 211:12
scanned
 108:14
 141:13
schedule
 177:3
 198:17
 232:24
 234:18
 235:12,14
Scheer 239:5
Schmitt 1:3
 149:1
 265:8
 271:7
 272:2
school 12:3
science
 106:12,20
 108:13
 114:13
 123:20
 132:11
 170:21
 210:21
sciences
 12:16
scientific
 87:20
 105:17
 112:15,20
 113:8
 121:18
 124:22
 129:7,17
 131:11
 140:2
 159:9,10
 161:22,24

167:20
 169:10
 170:20
 266:19
scientif...
 162:22
scientist
 108:12
 129:20
 168:18
scientists
 121:24
 122:18
scope 19:25
scoping
 105:23
screen
 237:15
screening
 237:17
screenshot
 186:19
 190:11
 191:9
 195:5
 214:16
screenshots
 251:14
scrolling
 228:11
se 213:16
search 53:8
 154:19,24
 188:23
 189:22
 191:5,8,21
 192:16
 193:22
 194:3,11
 194:12,13
 194:19
 195:4,7
 222:1
 250:4
 251:19
searched
 147:17
searches
 77:12

148:11,12
190:4
195:1,10
**searching**
190:5
192:12
**season** 29:19
**second** 14:22
33:6  72:24
73:2  99:24
106:14
112:10
125:6
133:6
136:9
156:22
160:15
169:12
212:23
267:19
**second-t...**
131:16
**secondhand**
54:1,22
55:7
**seconds**
262:22
**section**
14:15
**see** 10:13
21:3  22:23
24:9  26:25
34:4  35:4
44:11
45:15
46:21
49:22
51:21
53:24  54:4
63:10  65:6
65:13  66:7
70:10
72:25  73:5
75:24
86:19
92:14
96:24
97:16
103:19

111:14
114:19
119:17
121:17
124:16
126:21
131:24
140:9
142:17
146:13
147:22
153:7
154:24
156:11
157:8
160:24
161:8
166:14
169:21
172:9,11
172:13,19
172:25
179:17
185:22
186:2
190:25
198:7
211:2
212:13,17
214:12
215:2,13
215:16
216:3
218:19
222:6,6
227:12
229:13
232:12
240:12
250:24
252:10
258:9
261:18
262:23
**seeing** 69:10
71:16,25
72:17
76:15  87:9
87:19  93:1

99:15
106:12
117:9
125:6
153:5
190:8
200:10
207:22
258:20
**seek** 266:18
**seen** 21:16
47:4,5
50:2  88:17
105:5
110:3
112:13,14
113:6
117:21
130:17
165:2
179:3
207:6
209:15
218:13
220:1
239:25
**selected**
97:20  98:9
**Seman** 45:12
**send** 35:21
55:20,20
57:7,11,13
114:10,15
114:17
115:4
124:7,8
129:20
130:11,12
135:11,13
135:18,19
146:10
153:17
189:14
192:12
194:17
199:5
208:1
214:5
242:5,19

244:5
247:24
259:18
**sending**
35:13
44:18  79:6
87:22
121:1,2
141:24
145:15
146:22
147:4
171:8
189:17
208:25
230:1
244:1
245:10
248:24
251:2,11
257:23
262:17
**sends** 64:23
131:17
133:2
144:1
146:14
250:18
**sense** 204:25
**sent** 41:7,16
52:9  62:24
66:2  73:21
73:22
77:13
115:5
117:11
120:9
121:9
124:23
133:21
137:1
139:18
147:20
148:18
153:14
157:20
186:9
187:19
189:7,12

190:6
192:9
196:21
198:25
199:1,13
201:8
202:3
205:21
209:5
216:15
219:25
221:10
226:10
238:2
241:22
243:12,21
246:14
248:1,8,9
248:22
249:20
252:19
256:4,9,10
262:19
265:3
**sentence**
29:12
41:25
167:13
**separate**
66:3
185:22
225:1
240:2
258:18
**separately**
173:15
209:20
210:22
247:24
**September**
3:7  152:25
219:25
250:8
**series** 79:5
**served** 32:8
**servers**
217:21
**service**
103:25

| | | | | |
|---|---|---|---|---|
| services 7:1 | 84:5,11 | 265:23 | 189:19 | SMEs 114:4 |
| 7:2,9 | 211:7 | showing | 197:18 | 116:12 |
| 11:19 | she'd 124:7 | 186:23 | 212:3,10 | 123:25 |
| 146:16 | 172:17 | shown 94:8 | 232:14 | 124:3 |
| serving 32:6 | shedding | 94:10,21 | 243:21 | 135:23 |
| 107:19 | 87:10 | 94:25 95:3 | 266:1 | 136:1 |
| session | 90:15 | shows 53:5 | simpler | 188:3 |
| 151:8 | 207:11,16 | 211:12 | 241:16 | Smith 181:10 |
| 152:6 | 207:23 | sic 19:13 | simply 143:5 | 250:11,12 |
| set 82:21 | 208:1 | 21:8 24:13 | Sincerely | 252:4,7 |
| 84:5,11 | 209:7 | 120:15 | 271:20 | snippets |
| 161:2 | 265:24 | 133:5 | Singapore | 227:12 |
| 167:6,15 | sheet 115:23 | 253:3 | 151:7 | Snow 6:18 |
| 170:3 | 134:16 | side 54:1 | sir 269:13 | 8:17,17 |
| 198:11,14 | 272:1 | 58:8 65:5 | site 113:18 | 10:7 30:23 |
| 213:2 | sheets | 76:5 80:2 | 129:10 | 31:4,6,18 |
| 270:8,15 | 271:12,14 | 80:4 81:18 | 191:13,13 | 33:3 36:18 |
| setting | 271:16 | 139:15,16 | 231:7,8,14 | 47:14 54:8 |
| 34:17 | Shelley | 164:8,9,12 | 232:6 | 57:8 76:21 |
| 197:4 | 25:15 | sidebar | sites 46:19 | 78:3,17 |
| 200:25 | shooting | 216:19 | sitting 43:2 | 79:1 80:16 |
| 236:16 | 208:10 | 217:2 | 236:22 | 80:23 |
| 260:16 | Shopkorn | sign 8:20 | situation | 82:20 86:5 |
| seven 136:8 | 83:23 | 128:4 | 248:13 | 89:24 |
| severe 41:25 | 86:24 | 196:5 | situations | 93:16,18 |
| 42:23 | short 33:5 | 271:14 | 192:8 | 93:20 94:2 |
| 53:25 58:8 | 132:3 | signature | six 32:8 | 94:6,11,14 |
| share 51:25 | 149:24 | 269:20 | 165:13,19 | 94:17,19 |
| 65:18 | 180:24 | 271:12,14 | skip 166:1 | 96:3,7 |
| 71:18,21 | 227:25 | 271:17 | skipped | 99:4 |
| 71:23 | 228:1 | 272:25 | 167:14 | 100:14 |
| 125:10 | 247:20 | signs 42:9 | 269:7 | 101:2,6,20 |
| 144:7 | 262:25 | 42:19 | Skype 241:16 | 102:13 |
| 156:23 | 266:11 | 156:9 | slash 225:3 | 105:10 |
| 160:4 | shorthanded | 164:8 | slide 149:19 | 106:6 |
| 166:23 | 111:5 | Silling 7:14 | 210:17 | 110:7 |
| 182:20 | shortly | 8:9 | 265:18,22 | 112:22 |
| 230:14 | 207:25 | Silver 45:4 | 266:5 | 115:12 |
| 235:11 | shot 29:13 | similar | slides | 121:5 |
| 260:19,22 | shots 5:15 | 18:14 | 246:20 | 123:3 |
| 261:3 | 249:19,20 | 44:22 | slightly | 126:12 |
| shared 31:12 | show 52:11 | 46:17 | 47:21 65:3 | 131:6 |
| 33:18 | 81:3 88:12 | 59:24 | small 95:15 | 132:6,21 |
| 51:18 72:8 | 149:20 | 128:15,15 | 154:10 | 134:22 |
| 102:15,17 | 214:16 | 135:21 | SME 108:7 | 137:22 |
| 102:18 | showed 44:1 | 153:23 | 116:14 | 138:5 |
| 144:8 | 117:10 | 157:19,22 | 130:19,21 | 142:24 |
| sharing 54:2 | 210:18 | 180:11 | 135:12,15 | 143:16 |
| 72:2,2 | 246:7 | 185:14 | 152:1 | 152:22 |

**CAROL CRAWFORD  11/15/2022**

158:5,21
158:23
159:14
161:16
162:5,16
163:1,9
165:7
168:13
171:20
176:1
178:2,5
179:18
193:13,24
199:6
205:3,17
205:22
206:3,7,9
231:15
238:13
251:4
259:25
260:25
266:24
268:2,6
269:9,12
269:16
271:4,9
**social** 11:16
12:6 15:6
15:16 17:1
19:20 20:3
20:16 24:3
24:16,25
35:9 36:5
50:3 52:10
52:11 53:8
54:14,17
57:25 59:3
72:2,12
90:21 92:7
104:5,24
105:1,3
113:11
114:8
117:2,8,17
124:6
143:6,21
143:24
148:13

150:22
154:21,22
155:1
181:7
198:22
207:7
212:19
220:2
227:10,20
234:6
237:14,19
248:9
264:3
267:10
**software**
71:8
**Sokler** 87:3
87:4
**solely** 256:6
**solve** 238:11
**solving**
215:19
**somebody**
114:12
**something's**
148:6
▮▮▮▮ ...
174:7
**soon** 55:22
88:18
127:13
128:9
131:23
134:9,25
268:12
**sorry** 3:12
3:13 13:4
14:5 28:6
28:17
32:14
63:10
67:17,17
67:25
73:15
74:21
85:21
93:17 96:7
96:8
103:12

118:23
124:19
126:15
136:15
144:14
145:11
152:10
153:18
156:6
158:22
163:12
167:15
178:5
187:15
216:2
237:7,22
239:24
240:20
255:12
**sort** 65:1
69:13
149:10
154:15
207:13
209:9
**sound** 102:3
142:20
177:20
178:17
200:9,12
**source** 140:7
233:5
238:5
**sourced**
46:20
**sources**
46:24 59:5
222:3
237:15,21
**span** 253:16
**Spanish**
65:16,20
70:24
**speak** 10:15
20:15 27:9
29:9
**speakers**
97:23

**speaking**
17:14
20:13
104:14
232:18
**special**
214:10
**specific**
29:10 30:5
30:9 35:15
57:4 82:21
83:14
84:13 88:5
92:1
113:12
116:1
117:4,7
128:1
129:4,13
144:5
160:10,11
175:10
192:1
225:25
234:14
251:18
261:24
264:24
**specific...**
56:13
58:11
68:23
77:18
79:21 89:9
90:12
117:12
121:9
133:19
140:20
143:23
151:25
158:14
171:6
182:19
183:11
191:22
198:3
211:17
232:2

249:24
**specifics**
27:19
38:12
140:15
**speculate**
28:22
37:15 90:9
131:12
158:14
**speculating**
70:23
143:1
**speculation**
76:22 78:4
89:25
101:21
112:23
121:6
123:4
138:6
142:25
159:15
163:2
193:14
231:16
251:5
260:1
**spelled**
211:3
244:7
**spike** 139:13
**split** 45:20
224:13,14
**spoke** 18:2
21:8 36:11
66:8
166:23
**spoken** 33:14
64:11
**spread**
161:24
**spreadsheet**
201:12
202:2,3,13
202:23
211:23
**spreadsh...**
202:19

CAROL CRAWFORD  11/15/2022

| | | | | |
|---|---|---|---|---|
| spring 17:11 | 131:16 | 272:3 | 68:5 85:12 | submit 219:5 |
| 20:1 68:15 | 174:24 | statistic | 91:5,9 | subscribe |
| Spur 4:7 | 197:20 | 190:17 | 103:1,2 | 273:11 |
| St 271:18 | 206:25 | 191:15 | 108:8 | subsequent |
| stack 268:25 | 237:9 | statistics | 113:24 | 134:4 |
| staff 18:21 | 242:14 | 185:24 | 118:18 | 146:6 |
| 18:21 | 253:13 | status | 123:20 | substance |
| 99:18 | started 12:2 | 221:22 | 126:11 | 273:8 |
| 160:17,18 | 16:12,13 | 225:7 | 127:18 | substantial |
| 215:12 | 18:5 25:25 | staying | 129:20 | 194:25 |
| stamp 124:18 | 32:16 61:7 | 166:21 | 130:10 | successful |
| 136:14,19 | 77:12 | 172:8 | 132:17 | 53:1 |
| 146:11 | 171:7 | Steele | 133:17 | successf... |
| stamped | 188:14,15 | 254:17,18 | 137:3 | 212:2 |
| 136:9 | starting | stems 137:5 | 138:25 | Sudevi 7:6 |
| 169:13 | 66:18 | step 242:14 | 141:8 | suggest 42:1 |
| stamps | 248:18 | steps 182:24 | 145:4 | 57:21 |
| 205:25 | starts 44:25 | 184:8 | 150:12,14 | 194:3 |
| stand 208:18 | 250:7 | stop 70:13 | 152:7,20 | suggesting |
| standards | state 1:3 | 127:8 | 152:24 | 56:6 |
| 103:25 | 6:1 8:4 | 234:23 | 156:1,6 | suggestion |
| 234:21 | 11:1 12:11 | stories | 163:16 | 87:18 |
| standing | 25:2,11,16 | 76:18,20 | 166:5 | 184:16 |
| 72:6 208:8 | 234:15 | 82:18 | 171:17 | 256:15 |
| standpoint | 237:23 | storm 122:4 | 173:23 | Suite 6:11 |
| 34:19 | 238:20 | story 3:8 | 179:12,14 | summaries |
| Stanley | 254:8 | 229:8,9 | 181:14,18 | 72:12 |
| 174:6,10 | 270:2,5,24 | straight | 184:20 | 147:11 |
| 174:13 | 271:7 | 153:14 | 187:12,14 | summarized |
| 176:7 | 272:2 | strategists | 189:5,7 | 60:20 62:2 |
| 189:16 | 273:1 | 47:9 | 196:18,20 | summarizes |
| 193:1 | stated 39:22 | strategy | 200:18 | 65:3 |
| 195:12 | 110:11 | 11:22 | 201:18,19 | summarizing |
| 250:10 | 147:21 | Street 6:3 | 201:23 | 61:23 |
| 251:2 | 203:25 | 6:10,20 | 205:14,20 | summary 40:1 |
| 252:7 | statement | 271:5,18 | 206:16 | 53:9 59:5 |
| 253:3 | 37:11 | stress 41:25 | 219:22,24 | 60:17,25 |
| 254:18 | 162:24,25 | string 43:20 | 221:6,8 | 61:24 |
| Stanley's | 203:22 | 44:6 83:3 | 223:18 | 62:17,19 |
| 250:25 | statements | 83:6 | 226:7,9 | 63:19 72:7 |
| Stanley/Jan | 106:11 | structure | 237:5,7 | 144:2 |
| 174:16 | 143:15,19 | 185:14 | 239:19 | 148:19 |
| stapled | 144:21 | studied | 241:20,21 | supervisor |
| 205:22 | states 1:1 | 108:12 | 247:10,12 | 234:7 |
| 239:14 | 1:10 | stuff 121:15 | 249:18,19 | support |
| start 11:24 | 228:17 | subject 2:8 | 254:9,11 | 15:17 |
| 55:22 | 239:9 | 33:10 39:7 | 257:8,9 | 27:14 |
| 58:19 | 254:2 | 43:19 44:9 | subjects | 33:19,25 |
| 119:6 | 271:8 | 51:3 60:5 | 181:21 | 206:22 |

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| 211:21,24 | 190:4,24 | 270:9 | 38:23 | **talk** 9:21 |
| 213:10 | 192:1 | **symptom** | 43:12,12 | 20:19 |
| **supported** | 195:25 | 191:15 | 47:22 49:3 | 21:11 37:9 |
| 146:7 | 202:24 | **symptoms** | 60:8 61:17 | 39:4 49:14 |
| **supports** | 205:5,5,23 | 183:16 | 74:11,24 | 69:1 72:4 |
| 218:1 | 206:4 | 190:18 | 84:20 85:2 | 77:20 |
| **supposed** | 212:11,12 | 191:15 | 86:8 | 116:12 |
| 125:1 | 212:14 | **sync** 5:4 | 100:15 | 124:4,5 |
| 215:4 | 216:11,22 | 221:8 | 105:20 | 167:7,9,15 |
| **Supreme** 6:3 | 217:13 | 223:21,23 | 116:18 | 172:11,13 |
| **sure** 14:13 | 223:10 | 239:21 | 118:25 | 172:25 |
| 33:21 37:9 | 228:6 | **synced** | 129:23,23 | 178:19 |
| 40:21 | 229:25 | 268:14,16 | 135:5 | 182:10 |
| 44:24 | 235:6 | 269:11 | 136:5 | 183:20 |
| 46:13,24 | 240:1 | **synchron...** | 141:12 | 185:2 |
| 48:12 | 251:23 | 223:22 | 146:21 | 210:10 |
| 55:13 | 256:16 | **syncs** 268:16 | 149:24,25 | 227:18 |
| 61:12 | 257:10 | **syndrome** | 150:1 | 237:22,23 |
| 64:17,19 | 266:16,20 | 139:14 | 159:13 | 243:6 |
| 64:22 | **surface** | **system** 15:24 | 160:17 | 249:2 |
| 68:19 69:1 | 68:16 69:4 | 44:21 | 161:5 | **talked** 37:7 |
| 69:6,25 | **surprisi...** | 92:14 | 174:3 | 43:17 |
| 73:24 75:2 | 127:11 | 122:24 | 176:5 | 54:14 |
| 79:15 | **survey** | 123:5,7 | 179:12 | 61:10 |
| 80:11 | 221:21,21 | 164:1 | 187:3 | 106:25 |
| 82:13 | 224:25 | 212:6 | 193:2 | 125:14 |
| 88:25 | 225:3 | 233:12 | 205:3,16 | 197:14 |
| 96:18 | **surveying** | **systems** | 206:24 | 210:17 |
| 108:25 | 224:21 | 17:14 | 211:15 | 213:9,13 |
| 110:11 | **surveys** | | 225:12 | 217:7 |
| 113:18 | 131:4 | ————— | 229:24 | 222:22 |
| 116:4 | **survival** | **T** | 234:9 | 224:10 |
| 120:3 | 111:20 | **T** 270:1,1 | 238:17 | 226:18 |
| 121:10,13 | 113:9 | **table** 207:15 | 241:9 | 227:19 |
| 121:14 | 122:14,19 | 207:18,20 | 249:18 | 244:23 |
| 125:25 | **suspect** | 211:9 | 253:1 | 267:15 |
| 127:21 | 56:16 72:7 | 265:23 | 256:18 | **talking** 3:22 |
| 128:19 | 213:4 | 266:1,8 | **taken** 76:7 | 18:5 19:19 |
| 130:15 | 219:13 | **tabs** 183:15 | 82:7 | 53:5 72:5 |
| 141:20 | 231:12 | 189:25 | 116:19 | 78:22 83:1 |
| 143:3 | **suspected** | 190:12 | 149:14 | 83:20 |
| 151:8 | 231:23 | 196:12 | 162:4 | 121:11 |
| 160:25 | **suspense** | **tactics** | 201:16 | 124:2 |
| 173:10 | 67:10 | 27:20 | 204:3,12 | 127:14,15 |
| 182:12 | **swap** 191:23 | **tag** 88:9 | 270:6 | 127:16,24 |
| 183:12,23 | **swear** 9:4 | **tagged** 157:8 | 271:11 | 128:11 |
| 184:13 | **switch** | **take** 18:16 | 272:4 | 134:10 |
| 188:16 | 192:19 | 21:14 | **takes** 144:1 | 149:18,20 |
| 189:21 | **sworn** 9:6 | 30:20 33:5 | 171:11 | 226:21 |
| | | 33:6 35:22 | | |

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| 233:20 | 228:2 | 67:23 | 39:21 | 25:15 |
| **Tangle** 60:7 | 233:12 | 72:24 | 87:25 | **thank** 10:20 |
| **target** 45:23 | 234:18 | 84:15 85:9 | 134:11,12 | 15:7 22:2 |
| **task** 42:5,5 | 255:2 | 85:10 86:2 | 193:16 | 24:23 27:7 |
| **tasked** | 263:1,21 | 87:13 | 217:14 | 28:12 |
| 248:23 | **team's** 68:19 | 103:1,7 | **terms** 25:13 | 31:18 32:4 |
| **team** 41:12 | 69:5 80:12 | 112:13 | 43:5 64:18 | 32:21 |
| 45:23 | 119:14 | 119:13 | 69:10 | 48:25 |
| 51:24 | 124:13 | 126:10 | 98:25 | 50:13 |
| 52:22 59:2 | **teams** 27:9 | 138:25 | 103:25 | 55:17 |
| 66:18 | 27:13 52:3 | 150:11 | 151:1 | 64:23 |
| 68:16,17 | 52:10 | 154:18 | 191:21 | 66:24 67:6 |
| 69:1 72:10 | 68:25 | 157:15 | 194:19 | 67:10 |
| 74:14 | 80:25 | 158:19 | **terrible** | 69:17 |
| 75:11 76:7 | 147:18 | 159:3 | 247:2 | 83:25 |
| 77:5,15,17 | 164:15 | 162:14 | **testified** | 84:22 |
| 78:16 82:7 | 220:21,22 | 166:4 | 9:7 65:11 | 85:21 |
| 82:9,11 | 220:22,23 | 170:14 | 96:5 | 90:25 |
| 84:7 87:2 | 241:1,3,6 | 171:17 | 145:22 | 96:21 |
| 90:16 92:7 | 258:4 | 187:12 | 148:7 | 104:21 |
| 103:9,9 | **tech** 114:14 | 189:4 | 220:6 | 117:22 |
| 105:25 | 208:10,17 | 206:12 | **testify** | 124:13,16 |
| 107:10 | **technical** | 207:14 | 10:24 | 132:13 |
| 110:14 | 181:10,11 | 208:15 | **testifying** | 133:7 |
| 119:10 | 181:20 | 209:22 | 104:18 | 135:4 |
| 125:13 | 215:7 | 210:15 | **testimony** | 138:24 |
| 135:16 | 224:9 | 216:6 | 47:15 54:9 | 144:15 |
| 139:7,10 | 250:14 | 219:2,21 | 57:9 64:2 | 149:21 |
| 140:6 | **technically** | 221:6 | 65:7 76:22 | 152:17 |
| 147:16 | 120:20 | 223:13 | 89:25 | 156:19 |
| 151:8,22 | **technique** | 229:16 | 101:3 | 158:15 |
| 151:23 | 213:17 | 237:4 | 120:19 | 161:9 |
| 154:5,22 | **technolo...** | 238:21 | 125:20,25 | 165:20 |
| 166:20 | 34:19 | 239:23 | 126:1 | 166:21 |
| 172:8 | **technology** | 247:10 | 132:7 | 170:23 |
| 174:21,23 | 16:5 | 257:8 | 143:17 | 171:13 |
| 175:16 | **tee** 75:5 | 267:14 | 161:17 | 176:25 |
| 177:10,11 | **telephone** | **telling** | 162:6 | 187:7 |
| 182:25 | 64:12 | 89:23 | 178:3 | 189:3 |
| 184:9 | **telephonic** | 153:6 | 199:7 | 204:15 |
| 192:24 | 20:8,12 | 158:11 | 266:25 | 234:12 |
| 193:2 | **telephon...** | 168:19 | 270:10 | 236:24 |
| 197:5 | 20:15 | 199:24 | **testing** | 265:11 |
| 201:1,11 | **tell** 20:4 | 220:9 | 63:21 | 269:17 |
| 203:14 | 30:3 32:24 | 243:24 | 220:11 | **thanks** 66:13 |
| 208:2,4 | 33:10 | 258:1 | **texting** | 107:7 |
| 211:14 | 36:20 | **tells** 55:17 | 36:10 | 119:14 |
| 216:22 | 43:19 | 170:5 | **TF** 42:5 | 156:16 |
| 227:2 | 55:17 | **term** 11:11 | **Thakral** | 185:19 |

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| 192:24 | 12:7 16:17 | **think** 10:3 | 133:16,21 | 218:21,23 |
| 197:13 | 30:21 | 16:19 | 138:18 | 218:24 |
| 211:6 | 38:11 | 21:17 23:7 | 142:2 | 219:9,10 |
| 230:10 | 46:17 | 23:8 28:20 | 143:23 | 220:1,12 |
| 242:16 | 54:19 58:2 | 28:20 32:8 | 147:13,17 | 221:15 |
| 253:7 | 58:24 62:5 | 37:24 | 153:9 | 222:5,10 |
| **theme** 266:2 | 62:6 64:10 | 38:14 39:5 | 156:4 | 222:23 |
| 266:3,6 | 64:19 66:9 | 40:3,12,17 | 157:23 | 224:3,16 |
| **themes** 5:17 | 79:24 | 43:16,23 | 158:1,18 | 224:20,20 |
| 52:11 | 83:12 | 46:2,14 | 159:19 | 225:2 |
| 53:14 59:3 | 88:12 89:3 | 48:6,7 | 160:14,25 | 226:17 |
| 59:10 | 90:8 91:25 | 49:18 | 161:25 | 227:11 |
| 62:17 | 99:7,9 | 50:15,19 | 162:7 | 229:18 |
| 72:17 | 105:19 | 52:14 63:7 | 163:6,11 | 230:8,9 |
| 75:18,25 | 106:11 | 63:12 | 165:11 | 231:6 |
| 76:15 | 113:12,14 | 66:16 69:3 | 167:12,14 | 232:23 |
| 87:20 | 113:17 | 69:6,9,22 | 171:5,5,9 | 233:18 |
| 90:19 | 114:10 | 75:1,14 | 172:2,25 | 236:21 |
| 257:9,18 | 117:20 | 77:1 79:10 | 173:10,11 | 238:8 |
| 258:8 | 122:2,3 | 79:13,14 | 173:13,14 | 239:25 |
| 264:3 | 128:3,13 | 80:24 | 173:16 | 242:2 |
| **theoreti...** | 129:6 | 81:21,23 | 175:20 | 243:6,9 |
| 187:3 | 130:23 | 82:12 | 178:22,25 | 244:1 |
| **theory** 122:8 | 135:22 | 83:23 | 180:6,8 | 246:3 |
| **thereon** | 151:1 | 86:14 | 184:14,23 | 247:5 |
| 273:10 | 152:5 | 88:10,10 | 186:9,19 | 248:6,8,11 |
| **they'd** 76:4 | 167:1 | 90:12 | 186:23 | 248:13,16 |
| 130:5,23 | 170:11 | 91:19,20 | 188:14,15 | 248:18 |
| 157:9 | 171:8 | 91:21 | 190:16 | 250:6,17 |
| 246:17 | 179:25 | 92:16 97:5 | 192:9 | 251:20 |
| 260:22 | 180:10 | 99:22 | 193:5,5,9 | 253:22 |
| **thing** 25:20 | 181:23 | 103:17 | 194:21 | 255:21 |
| 34:4 35:2 | 182:4 | 105:22 | 195:2,8,11 | 256:7,13 |
| 49:24 | 183:17 | 106:25 | 195:22,25 | 256:14,23 |
| 65:10 | 188:20 | 109:2 | 197:16 | 257:19 |
| 123:17 | 189:22 | 110:23 | 198:5,24 | 258:18 |
| 126:3 | 191:14 | 113:17 | 198:25 | 259:16 |
| 137:25 | 194:23 | 115:15 | 203:11 | 260:4,7,13 |
| 155:15 | 199:24 | 117:3,19 | 204:25 | 261:10 |
| 179:11 | 203:24 | 119:2 | 206:3 | 263:14,19 |
| 189:20 | 209:2 | 120:1,22 | 207:2,6 | 263:21 |
| 204:13 | 217:21 | 121:15 | 208:22 | 264:19 |
| 225:7,8 | 218:24 | 123:17 | 209:6 | 267:15,24 |
| 231:8 | 219:5 | 125:24 | 210:3 | 268:16,19 |
| 240:10 | 224:16 | 128:20,23 | 213:2,17 | **thinking** |
| 248:12 | 232:4,14 | 129:3,9 | 214:4,16 | 28:14 64:5 |
| 260:14 | 247:2 | 130:14 | 215:20 | 69:7 |
| 266:15 | 251:18 | 131:13 | 216:5,12 | 128:10 |
| **things** 9:20 | 263:11 | 132:9 | 217:25 | 172:23,25 |

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| 215:10 | 92:18 | 97:12 | 268:1 | 216:15,17 |
| 230:21 | 98:22 | 107:21 | **timeline** | 218:1,14 |
| 243:8 | 212:5 | 111:10 | 16:18 | 219:2 |
| 259:17 | 218:23 | 130:1 | **timelines** | 248:1 |
| 263:10 | **three** 13:18 | 132:1,3,10 | 29:11 | **Todd's** |
| 269:7 | 13:23 | 135:3 | **timely** 27:15 | 197:25 |
| **third** 247:20 | 14:15 | 137:18 | **times** 29:1 | 216:10 |
| 248:20 | 27:25 | 140:11 | 65:19 | **told** 12:20 |
| **Thombley** 7:7 | 31:12 | 141:20 | 72:18 | 12:22 |
| **Thornton** | 92:16,17 | 142:6,9 | 106:24 | 14:15 26:4 |
| 222:25 | 115:16 | 144:8 | 129:25 | 63:9 73:5 |
| **thought** 52:2 | 120:3 | 145:25 | 130:8 | 78:1 82:1 |
| 65:17 88:6 | 140:16 | 151:7 | 133:21 | 86:25 97:5 |
| 90:10 | 167:1,4,25 | 156:9 | 226:21 | 114:17 |
| 91:21 | 228:13 | 157:22,24 | 235:11 | 131:22 |
| 97:10,15 | **Thursday** | 160:20 | 241:16 | 210:24 |
| 97:17 | 73:6 84:7 | 167:6,9,15 | 243:7 | 213:25 |
| 107:2 | 84:9,11 | 170:3 | **timetable** | 235:22 |
| 108:14 | 105:23 | 171:11 | 192:7 | **tomorrow** |
| 109:13 | 119:18,20 | 174:25 | **timing** 70:1 | 27:22 |
| 125:5 | 119:21 | 175:9 | **title** 11:6 | 230:12 |
| 133:24 | 263:16 | 179:2,6 | 193:9 | **tomorrow's** |
| 153:24 | **tie** 10:19 | 180:24 | 198:2 | 188:2 |
| 156:6 | **tied** 122:21 | 183:3,8,18 | 223:7 | **tons** 192:10 |
| 173:6 | **time** 8:2 | 183:18 | 261:24 | **tool** 50:4 |
| 176:21 | 17:25 | 185:9,19 | **titled** 3:9 | 234:20,22 |
| 186:12 | 19:24 | 189:21 | **titles** | **tools** 90:21 |
| 192:11,19 | 20:13 | 192:9 | 177:14 | 148:13 |
| 194:7 | 28:10,18 | 197:17 | **today** 10:24 | 154:21 |
| 202:16 | 28:20 29:3 | 198:11,15 | 21:19 | 234:16 |
| 210:19 | 29:8 30:6 | 198:25 | 27:22 93:9 | **top** 36:15 |
| 215:11 | 32:5 36:6 | 200:13 | 94:9,10,13 | 39:8 41:5 |
| 220:15 | 36:12 37:8 | 201:7 | 94:22 95:1 | 47:7 52:23 |
| 223:5 | 37:15 38:6 | 210:4 | 95:3 | 136:2 |
| 236:18 | 38:10 | 212:13 | 109:16 | 141:14,15 |
| 249:13 | 39:18 | 220:6 | 116:25 | 151:1 |
| 256:7 | 40:12 | 226:17,18 | 193:1,11 | 172:6 |
| 266:18 | 42:25 | 227:14,25 | **Today's** 8:2 | 173:8 |
| 267:16 | 49:15 52:4 | 230:20 | **Todd** 21:7 | 187:20 |
| **thoughts** | 54:15 | 232:13,13 | 196:23,24 | 191:3 |
| 27:20 70:8 | 58:13 59:8 | 236:12,14 | 197:14,18 | 196:2,24 |
| 121:19 | 61:7,13 | 238:5 | 197:23 | 219:23 |
| **thousands** | 65:2,21 | 244:13 | 198:6 | 237:25 |
| 34:25 | 68:7,17 | 245:6 | 199:21 | **topic** 107:24 |
| 168:20 | 71:2 73:11 | 249:14 | 202:4 | 124:1 |
| **thousand...** | 77:7 78:9 | 252:18 | 207:4 | 144:22 |
| 168:1 | 89:12 | 261:25 | 211:5,16 | 150:21 |
| **threats** | 90:17 | 262:20 | 214:3 | 154:14 |
| 91:25 | 92:13,16 | 263:13 | 216:5,12 | 174:25 |

CAROL CRAWFORD  11/15/2022

| | | | | |
|---|---|---|---|---|
| 177:5 | 141:23 | 215:18 | 249:2 | 84:2 |
| 184:18 | travel 46:14 | trying 17:6 | Twitter's | 106:18 |
| 198:1 | 48:20 | 26:1 29:25 | 206:22 | 178:14 |
| 256:8 | traveler's | 34:15 | Twitter.com | 181:9,17 |
| topics 54:14 | 45:10,10 | 36:22 | 197:24 | 181:20 |
| 77:24 | travelers | 39:23 40:2 | two 3:1 | typo 257:10 |
| 107:3 | 2:13,16 | 78:21 79:4 | 20:25 22:7 | 260:5 |
| 140:13 | 39:10 | 89:5 114:7 | 58:24 77:9 | |
| 144:9 | 43:22 | 121:15 | 83:20 84:7 | U |
| 181:20 | 44:10 45:6 | 129:8 | 85:12 87:8 | U.S 6:19 7:1 |
| 187:23 | 45:8,13 | 183:12 | 87:23 | 7:2,8 8:5 |
| 188:6 | 46:5 54:23 | 188:22 | 89:11 | 65:16 71:9 |
| 195:8,9 | treatment | 189:21 | 92:16,17 | 71:12,19 |
| 243:11,12 | 183:16 | 194:16 | 109:23 | 71:24 |
| 256:6 | 188:3 | 213:8 | 110:19 | 101:19 |
| tossed | trends | 219:3 | 120:4 | 192:25 |
| 165:11 | 143:24 | 232:9,12 | 131:25 | 193:10 |
| totally | 197:6 | TTS 169:5 | 132:8 | 228:15 |
| 152:9 | 201:2 | Tuesday | 151:20 | 233:12,16 |
| town 173:13 | 211:11 | 61:18 | 156:14 | 271:5 |
| 250:16,21 | 262:14 | 161:7 | 198:24 | unanswered |
| TP 127:12,13 | tried 244:5 | turn 10:17 | 207:16,21 | 70:11 |
| 127:22 | true 106:11 | 143:25 | two-page | unclear |
| 128:9,11 | 108:22 | 144:12 | 40:1 | 216:1,9 |
| 128:16 | 116:8 | turn.io 70:7 | 153:10 | 219:4 |
| track 71:9 | 120:14 | 70:15 | two-week | uncommon |
| tracker | 139:24 | Turner 35:6 | 66:1 | 188:19 |
| 186:14 | 158:19 | 37:2,20 | Tyler 66:15 | 232:3 |
| tracking | 159:4 | Twitter 16:5 | 141:17,19 | uncredible |
| 192:25 | 164:24 | 21:7,9 | 141:20,24 | 266:22 |
| 193:10 | 170:12 | 180:13 | 144:1,13 | 267:4,7 |
| 195:18 | 255:5 | 181:1 | 145:15,18 | underlying |
| 196:5 | 270:9 | 197:24,25 | 146:10,22 | 185:25 |
| trail 114:7 | 273:9,13 | 198:12,14 | type 16:11 | understand |
| training | trust 68:25 | 199:5,21 | 40:13 | 10:1,3,4 |
| 98:13,16 | 103:9 | 200:20 | 106:24 | 10:14,15 |
| 99:19 | 174:23 | 202:12 | 151:23 | 14:13 |
| 234:18,25 | 175:16 | 206:23 | 222:24 | 36:21,22 |
| 235:1,5,7 | 177:10 | 209:2,19 | 227:22 | 41:2 57:24 |
| 235:13,22 | 220:21 | 211:17 | 253:18 | 78:21,21 |
| 236:15,16 | trusted | 212:8,13 | typed 26:16 | 79:5 92:15 |
| 236:17 | 135:19 | 212:17,18 | types 20:2 | 104:19 |
| transcript | truth/da... | 212:20,21 | 99:2 | 109:10 |
| 5:23 8:21 | 140:7 | 213:15,20 | 227:19 | 129:9 |
| 125:11,19 | truthfully | 214:11,13 | 258:7,16 | 139:10 |
| 126:2 | 10:24 | 214:25 | typical | 148:14 |
| 268:17,22 | try 9:21 | 218:17 | 194:22 | 155:19 |
| 271:13 | 106:18 | 220:8,10 | typically | 162:21 |
| transfer | 179:11 | 248:2 | 52:10 57:2 | 168:19 |

CAROL CRAWFORD  11/15/2022

169:1,17
174:21
190:23
193:16
194:1,17
194:21
195:21
217:16
224:1
232:10
265:5,5
understa...
  14:6 24:10
  26:17
  35:13
  36:14
  37:10
  40:22 41:1
  42:17
  44:20 64:8
  69:8 74:17
  79:19 80:8
  95:17
  96:11
  103:8
  109:20
  111:1
  114:5
  120:24
  122:25
  137:16
  138:15
  139:22,23
  143:8
  150:17
  158:2,10
  159:2
  163:4
  167:17
  168:20
  177:6
  184:10
  193:12
  201:19
  204:4
  210:6,9
  212:1
  213:23
  217:17,19

224:19
228:18
251:10
255:25
258:24
261:6
understood
  91:20
  140:4
undertaking
  69:12
unfolding
  3:8
unfortun...
  196:7
unit 40:15
  40:15
  42:13 45:9
United 1:1,9
  228:17
  271:8
  272:3
units 40:15
  46:11
  47:21,23
  48:19,21
University
  12:10,10
unknown
  170:12
unmarked
  67:8
unproven
  108:22
  120:13
unsupported
  108:22
  120:13
unvaccin...
  146:3
up-to-date
  228:21
upcoming
  224:6
update 59:12
  75:16
  148:15
  170:23
  183:18

193:20,21
193:22
194:2
195:19
221:21,21
225:2,3
228:22
229:11,19
updated
  143:14,19
  157:1
  159:20
  160:2
  162:10
  240:10
updates 4:3
  4:5 156:2
  163:18
  166:24
  192:2
  250:2
  253:15
updates/...
  221:19
updating
  192:8
upgraded
  267:5
uptick 146:1
urgency 48:4
url 229:14
Ursula 223:2
  223:11
Ursula's
  223:8
use 15:20
  18:13 29:2
  29:4,5
  35:23 36:2
  39:20
  40:17 59:5
  67:8 70:20
  71:7 96:15
  105:18
  128:21
  134:11,12
  137:10,12
  139:15
  147:23

156:25
160:1
169:18,23
174:25
213:5,6,24
215:10
236:13
useful
  173:19
user 24:22
  97:8
user's 228:9
users 27:15
  54:2 89:6
  228:11
uses 55:4
  136:18
usual 206:24
usually 93:8
  98:22
  109:25
  115:6
  123:24
  127:17,24
  144:17
  181:6,13
  227:20
  250:14
_____
        V
_____
v 271:7
  272:2
vac- 231:5
vaccinated
  143:13
  165:15
  168:7
vaccination
  53:3 62:12
  66:4,6
  71:13
  142:16
  164:6
  169:3,6
vaccinat...
  53:1
  148:23
vaccine 4:8
  53:17,25

58:6,8
59:9,12
63:21 65:4
65:5 70:24
72:4 76:17
81:1,22,23
82:18
87:10
108:2
111:13
115:19
119:15
121:4
122:2,23
123:15
124:14
126:22
137:19
138:2
140:7,13
143:8
156:18,21
156:25
157:3,4,7
157:17,25
159:5
160:17,18
160:22
161:14
162:3,12
162:13
164:2,8
166:7
169:19,23
170:1
171:22
172:11,13
174:20
175:5
176:17
182:19,20
182:22
183:9,25
197:9
201:5
207:16,23
207:25
209:7
231:11

**CAROL CRAWFORD  11/15/2022**

234:15
237:16
258:5
263:1,7,21
vaccine-...
  52:24
  53:22  58:7
  140:8
  227:3
vaccine.gov
  230:14
  231:1,4
  232:6
  233:15
  234:13
vaccinef...
  230:14
  231:1,2,7
vaccinef...
  231:4
vaccines 3:7
  3:8  64:20
  70:21  86:3
  87:14
  89:12
  115:22
  124:2
  127:10
  128:8
  131:5
  137:3,6
  139:14,17
  144:20
  158:4,12
  163:25
  164:13,23
  167:5
  168:1,4,11
  169:1,15
  169:21
  170:15
  183:16
  201:14
  203:20,22
  204:1,18
  231:5,10
  253:11
  256:1,3
vaccines...

231:3,5
232:10
233:10
234:1,13
251:22
VAERS 3:22
  122:21,22
  122:23
  150:14,18
  150:21,21
  150:23,24
  150:25
  151:3,9,19
  151:20
  152:2,5,8
  201:15
  204:3,5,12
vague 36:18
  36:21
  48:23  78:3
  96:13  99:4
  101:6,20
  105:10
  115:12
  117:24
  131:6
  132:21
  134:22
  176:1
vaguely
  154:12
vagueness
  176:15
valid 237:17
variant
  190:25
  191:1
variants
  190:21
  191:17,20
varied
  130:14
variety 88:8
various
  54:24
  55:11
  122:2
  155:16
  227:19

vary 181:8
VC 5:4,9
  223:18
VC-Facebook
  221:8
  239:20
VECCHIOINE
  10:8
Vecchione
  2:4  6:8
  8:13,13
  9:11  21:13
  22:4,9
  26:24
  30:19  31:5
  31:16,22
  33:1,5,7
  36:19
  38:19
  43:11
  47:16
  48:25  49:2
  54:10
  57:10  60:1
  60:4  67:2
  67:5,11,13
  76:24  78:5
  78:19  79:3
  80:18  81:6
  82:24
  84:18,22
  84:23  85:4
  85:7  86:1
  86:7  90:1
  91:2,8,11
  93:4,6,23
  94:3,8,13
  94:16,18
  94:21  95:2
  95:6,12
  96:5,9
  97:25  98:5
  99:5
  100:12,17
  100:18
  101:4,7,22
  102:1,8,21
  102:23
  105:11

106:7
110:9
111:24
112:3,7,24
113:4
115:13,17
118:8,14
118:16,21
121:7
123:6
126:6,9,13
131:7
132:12,23
133:5,8,9
134:23
135:4,7
136:20,23
136:24
137:24
138:11
143:2,18
144:25
145:2
149:22,25
150:7
152:14,18
152:23
153:3
155:8
158:7,24
159:16
161:18
162:9,19
163:3,14
164:18
165:8,18
165:21,24
166:3
168:16
171:16,21
172:1
173:18,21
176:2
178:7,8
179:7,10
179:20
187:7,10
189:1
193:15,25

196:16
199:9
200:14,16
203:13
205:5,12
205:18,25
206:6,11
219:17,20
221:2,4
226:2,5
231:17,24
236:2,4,20
237:3
238:15
239:12,17
241:14,18
247:3,8
249:5,8,10
249:15,16
251:7
254:5
256:17,22
257:5
260:2
261:1
267:1,20
267:21,25
268:4,8,19
269:6
verbal 9:17
verifiable
  237:20
  238:4
version
  227:23
versus 8:5
  217:3
video 21:18
  54:3
  227:12,23
  227:24
  268:10,12
  268:16
  269:10
video-re...
  8:3
videogra...
  7:14  8:1,9
  9:3,9

CAROL CRAWFORD  11/15/2022

| | | | | |
|---|---|---|---|---|
| 30:24 31:2 | **want** 23:6 | 160:4 | **way** 22:18 | 76:15 |
| 31:17 98:1 | 27:11 29:1 | 166:23,25 | 42:1 71:12 | 121:13 |
| 98:3 102:9 | 33:17,18 | 183:18 | 99:10 | 148:18 |
| 102:11 | 34:9 36:24 | 186:22 | 110:14 | 165:22,25 |
| 150:2,4 | 46:18 47:4 | 188:11 | 119:22 | 166:1 |
| 205:9,11 | 55:25 | 190:13 | 134:3 | 169:7 |
| 256:25 | 68:18 | 191:22 | 140:4 | 172:23 |
| 257:2 | 70:12 | 199:20 | 147:7,10 | 173:12,16 |
| 268:9,14 | 76:19 | 204:25 | 147:20,24 | 182:3 |
| 268:18 | 77:16,24 | 207:21 | 148:12 | 192:7 |
| 269:2,11 | 78:24 79:9 | 209:20,23 | 155:22 | 200:10 |
| 269:13,15 | 80:7 85:22 | 215:16 | 162:23 | 203:9 |
| 269:17 | 126:20 | 217:2 | 181:5 | 205:6 |
| **VIDEOTAPED** | 131:12 | 224:5,6,22 | 194:22 | 208:8,8 |
| 1:13 | 175:1 | 228:20 | 197:19 | 256:6 |
| **view** 29:8 | 176:9 | 230:22,22 | 199:20 | 268:20 |
| 146:7 | 178:18,19 | 242:14 | 209:24 | 269:4 |
| 164:23 | 186:19 | 251:23 | 211:22 | **we've** 31:7 |
| 209:19,22 | 191:23,25 | 259:16 | 216:8 | 33:14 47:4 |
| **viewpoint** | 192:14,19 | 260:7 | 224:14 | 60:13 |
| 71:12,24 | 200:10 | 267:5 | 240:16 | 66:14,19 |
| **viewpoints** | 205:16,23 | **wanting** | 252:23 | 78:11 |
| 71:9,19,24 | 205:24 | 106:10 | 264:25 | 102:14 |
| **violate** | 206:4 | 171:8 | 270:13 | 114:12 |
| 157:9 | 215:10,13 | **wants** 66:21 | **ways** 2:13,16 | 133:10 |
| **violates** | 217:10 | 187:4 | 39:9 43:21 | 141:1 |
| 157:6 | 226:24 | **warning** 4:7 | 44:10 | 145:13 |
| **virus** 190:16 | 234:16 | 42:8,19 | 81:13 | 148:4 |
| **visit** 218:17 | 240:1 | **Washington** | 87:16 88:8 | 157:11 |
| **visual** 11:19 | 245:18 | 6:12,21 | **we'll** 21:3 | 167:1 |
| **visualize** | 262:23 | 7:3 271:6 | 48:2 55:21 | 179:3 |
| 262:14 | 267:3 | **wasn't** 37:21 | 84:20 | 180:12 |
| **voice** 223:19 | 268:7,12 | 81:7 96:15 | 95:10 | 189:19 |
| **volume** 53:9 | 268:14 | 110:1 | 100:14,15 | 207:6 |
| 89:20 | 269:2 | 128:2 | 107:5 | 208:4 |
| 151:2 | **wanted** 18:13 | 131:11 | 116:12 | 209:15 |
| **voluntar...** | 31:6,19,20 | 152:2 | 121:19 | 220:1 |
| 138:4 | 48:22 | 180:1 | 133:17 | 222:10 |
| **vote** 253:12 | 51:25 | 188:19 | 185:1 | 226:17 |
| **vs** 1:6 | 66:12 | 190:12 | 187:23 | 229:17 |
| | 68:16 | 194:5 | 188:6 | 234:15 |
| ——————— | 77:23 | 215:10,14 | 235:12 | 239:25 |
| **W** | 82:16 | 215:17,22 | 256:23 | 240:5 |
| **W** 6:3 | 87:10 | 250:16 | **we're** 21:24 | 242:2,22 |
| **Wait** 10:10 | 98:23 | 260:15 | 21:24 36:7 | 247:2 |
| **Walensky** | 123:11 | **watching** | 39:16 | 257:19 |
| 120:23,25 | 144:9 | 143:10 | 45:23 | 268:20 |
| 125:20 | 147:8 | 196:6 | 49:15 | **weaken** |
| **walkthrough** | 156:23 | **wave** 46:1 | 54:19 | 163:25 |
| 234:22 | | | | |

**CAROL CRAWFORD  11/15/2022**

**wear** 29:6
**web** 11:15
  12:6 15:6
  15:21,21
  15:23
  87:21
  109:9
  127:22
  128:14,16
  128:21
  129:1
  134:11,14
  134:15,16
  134:17
  135:16
  192:8
**website**
  15:15,23
  45:10
  47:20,22
  59:13
  106:13
  108:4,16
  109:4
  113:15,22
  114:16,17
  114:20
  115:22
  130:23
  183:17
  187:3
  194:20
**websites**
  233:17
**Wednesday**
  247:15
**week** 3:5
  46:2 48:2
  65:14 68:8
  103:4
  118:24
  119:21
  126:16
  156:18,20
  157:1
  161:6
  177:3
  180:20
  185:20

  195:23
  196:8
  197:12
  226:25
  229:21
  253:11,18
  257:23
  260:18,18
**week's** 2:23
  5:6 68:6
  76:5
  226:10,16
**weekend**
  126:20
  186:8
**weekly** 5:4
  68:9 69:2
  221:8
  223:21
  226:19,21
  239:21
  260:11,13
  262:5
**weeks** 27:18
  51:23
  56:21 84:8
  132:8
  151:13
  169:20
  228:13
**weeks'**
  131:25
**weigh** 230:7
**Weir** 223:2
**went** 12:3
  63:8 70:11
  187:2
  219:4
  236:6,11
  265:18
**weren't** 81:8
  115:3
  185:5
  212:15
  240:10
  248:19
  267:12
**Western** 1:1
  8:6

**WhatsApp**
  70:17,19
  70:25
  137:9
**White** 230:13
  230:24,25
  231:12,19
  232:1,4,7
  232:22
  233:2,8,11
  233:18,19
  233:21
  234:4,5,14
  259:10,22
  260:9,17
  261:8,19
  263:4
**whitelist**
  217:22
**whitelisted**
  217:11,11
  217:15,17
**whitelis...**
  217:20
**wide** 55:24
  56:7,11
  58:21
  59:15
**widely**
  150:22
  153:25
  154:23
**widespread**
  29:1
**Wilhelm**
  263:1,5
**willing**
  35:10
  173:1
  228:22
  263:2
**withdraw**
  74:22
  100:24
  127:16
  139:22
**withdrawn**
  247:25
**witness** 9:4

  9:24 22:6
  31:19 33:1
  66:20
  80:21
  93:22
  102:4,5,7
  118:13,14
  149:23
  150:1
  179:17
  205:13
  236:1,3
  269:1
  270:7,10
  270:15
  271:13
  272:1,25
**witnesses**
  49:23
**women** 46:4
**wondered**
  176:15
  248:12
**wonderful**
  55:20
**wondering**
  75:15 81:2
  140:6
  200:9
  204:23
  258:6
  263:7
**Woods** 66:15
  141:17,19
  141:21
  144:1,13
  145:15,18
  146:22
**word** 15:20
  19:2 74:15
  85:3 195:2
  201:18
  225:20
  241:12
**worded** 260:4
**wording**
  42:14,15
  110:25
  149:12

**words** 52:14
  55:4 64:21
  133:15
  145:8
  149:12
  227:21
  251:21
**work** 11:5,21
  11:22 12:2
  14:1 19:25
  25:12
  33:19
  34:20,23
  35:22 36:8
  40:12 73:7
  100:4
  109:24
  156:24
  159:19
  160:5,9,16
  160:22
  164:13
  166:24
  167:18,19
  175:6,7
  177:21
  181:12
  200:7
  209:24
  213:18
  214:1
  224:11
  235:12
  237:19
  258:21
  262:3
**worked** 24:15
  40:25
  75:23
  186:17
  192:18
  214:20
**Worker-c...**
  55:5
**workers**
  53:17 58:6
  66:5
**working** 12:5
  27:9,14

28:19
56:17
58:19
70:17
77:21  80:8
84:4  87:5
89:22
101:10
111:9
114:23
135:13,15
174:18
175:3
177:5
189:20
195:15
232:4,8
234:15
236:9
262:15
**works** 22:18
24:15
44:20
216:6,8
**World** 51:7
**worldwide**
164:23
**worried**
34:24
214:1
258:9
263:9
**worth** 88:16
89:20
258:18
**wouldn't**
53:7
101:24
106:21
110:23
113:1
116:23
131:3,12
144:24
146:5
149:3,13
180:9
218:10
244:12

258:10
**Wright** 50:17
**write** 23:23
39:18  43:7
55:18
115:21
131:21
230:19
237:10,11
**writes** 36:23
74:25  84:4
126:18
145:18
156:14
166:14
195:12
197:2
211:5
226:24
252:5,7
**writing** 93:5
**written** 7:22
163:7
**wrong** 41:1
96:16
124:19
194:18,20
203:10
216:1
245:9
**wrote** 26:13
34:6  87:11
122:8
174:14,15
231:18
247:16
**WY** 5:7
**Wyoming**
237:7,12
237:18
239:3

_____

**X**

**xlsx** 200:20

_____

**Y**

**Y** 22:24  34:6
**y'all** 99:15
**yeah** 12:22

22:15
25:22
28:12
44:18  55:9
67:2  74:8
75:9  78:8
85:16
86:19  90:5
92:12  94:2
94:16
95:21
124:20,21
128:10
136:16
149:15
158:10
159:2
165:12
173:19
179:5
186:23
187:15
199:17
206:7,9
212:19
214:23
222:18
223:9
225:9
230:6
245:5
249:19
250:19
252:21
254:6
269:9,16
**year** 4:3,6
174:22
175:15
214:21
**years** 12:3
169:16,22
**yellow** 70:7
**yesterday**
100:3
109:15,16
**Young** 11:3
**youth** 45:24

**YouTube**
175:16
185:13
227:25
244:18,20
244:21,22
244:24
245:2,18
245:21,22
245:23
255:2
■■■ 97:7

_____

**Z**

■■■■ 35:6
**ZIP** 70:20
231:9
**Zoom** 7:7,11
31:8,11,13
102:14,18
102:19,19
240:25
241:6
**Zuckerberg**
33:22

_____

■ 35:7
■@CDC.gov
35:8

_____

**1**

**1** 2:7  5:21
21:12,14
40:15  55:3
55:4
252:24
270:8
**1.5** 235:12
**1/26/21** 2:17
**1:22** 156:15
**1:50** 207:3
**1:57** 119:7
124:12,17
**10** 3:2  91:1
91:7,8,10
100:19
102:2
207:3

211:6
212:23
241:22
**10(B)** 7:19
**10/28/2021**
249:20
**10/28/21**
5:14
**10:09** 31:1,3
**10:38** 189:12
**100** 46:13
69:25
128:19
**102** 3:4
**10th** 63:17
213:3
214:8
242:3
257:15
259:7
261:13
**11** 3:4  102:2
102:22,25
108:19
112:19
114:22
115:8
118:5
**11-year**
163:19
**11-year-...**
156:3
**11/2** 160:14
**11/2/21** 4:2
**11/8/21** 4:5
**11:27** 100:1
**11:51** 98:1
**11:53** 98:4
**11:59** 102:9
102:10
**1100** 6:20
271:5
**112** 3:6,7
**113** 3:9
**118** 3:11
**11th** 271:18
**12** 3:6  100:3
112:3,3,5
112:15

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| 115:9 | 271:3 | 150:6,9 | 207:3 | 237:10 |
| 208:10 | **171** 4:10 | 266:12 | 211:6 | **24** 4:7 5:22 |
| **12/21/21** | **173** 4:11 | 273:15 | 216:4 | 28:9 63:17 |
| 4:17 | **179** 4:13 | **200** 4:20 7:3 | 218:13 | 119:7 |
| **12:51** 102:10 | **17th** 61:18 | **2003** 6:12 | 219:25 | 124:12 |
| 102:12 | 100:3 | **2019** 16:20 | 221:10 | 164:17,19 |
| **1225** 6:10 | 146:21,25 | **202** 6:14 | 237:8 | **241** 5:10 |
| **126** 3:13 | **18** 3:16 12:2 | **202-353-...** | 239:22 | **2440** 146:12 |
| **13** 3:7 112:5 | 141:6,7,9 | 6:22 | 241:22 | **247** 5:12 |
| 112:17 | 144:13 | **2020** 16:21 | 242:3 | **249** 5:14 |
| **138** 3:14 | 174:4,14 | 16:22 | 247:15 | **24th** 119:19 |
| **14** 3:9 112:4 | **187** 4:15 | 17:11 18:6 | 250:8 | 124:17 |
| 113:3,5,6 | **188** 4:17 | 20:2 22:15 | 252:22 | 216:4,14 |
| 115:9 | **18th** 99:23 | 34:5 38:8 | 257:15 | **25** 166:1 |
| 119:4 | 270:16 | 43:24 | **2022** 1:14 | 269:7 |
| 270:25 | **19** 3:19 | 77:13 | 8:2 13:3,4 | **254** 5:15 |
| **141** 3:16 | 21:25 | 147:14 | 13:14 15:2 | **257** 5:17 |
| **145** 3:19 | 145:1,4 | 175:19 | 16:2 166:8 | **25th** 49:21 |
| **151** 1:14 3:11 | 148:19 | 210:7 | 166:15 | 50:14 |
| 8:2 64:23 | **196** 4:18 | **20201** 7:3 | 171:23 | 65:24 |
| 65:14 | **19th** 6:10 | **2021** 3:6,7 | 270:16 | **26** 4:8 5:22 |
| 118:7,9,20 | 105:22 | 49:16,19 | 271:3,11 | 49:18 |
| 118:22 | 131:18 | 60:9 61:18 | 272:4 | 139:3 |
| 125:8 | **1st** 63:2,14 | 68:13 | **2024** 270:25 | 165:25 |
| 131:13 | 126:18 | 73:16 82:1 | **205** 5:1 | 166:2,6 |
| 133:1,1,5 | 152:25 | 85:13 | **20th** 103:5 | 172:9 |
| 133:8 | | 91:10 | 119:20 | **269** 270:8 |
| 221:10 | **2** | 100:1 | 146:11 | **26th** 55:18 |
| 271:11 | **2** 2:8 22:5,8 | 117:8 | **21** 2:7 4:1 | **27** 4:10 |
| 272:4 | 32:1,3 | 118:24 | 21:24 60:9 | 171:15,21 |
| **150** 3:22 | 40:15 55:4 | 124:17 | 103:5 | 173:9 |
| **152** 4:1 | 169:15 | 126:18,24 | 152:16,22 | **27th** 44:25 |
| **155** 4:2 | **2/3/22** 4:8 | 131:21 | 152:23 | 47:1 |
| **16** 3:13 | **2/4/22** 4:10 | 134:21 | 189:7,12 | 218:12 |
| 61:18 | **2/7/20** 2:8 | 135:1 | 195:23 | **28** 4:11 |
| 126:8,12 | **2:06** 150:2,3 | 139:3 | **219** 5:2 | 173:20,23 |
| 126:14 | **2:07** 76:3 | 142:9,15 | **21st** 195:11 | 252:22 |
| 131:20 | 82:1,4 | 146:11,25 | **22** 2:8 4:2 | **28th** 230:4 |
| 133:1 | **2:18** 84:3 | 150:15 | 155:7,9,22 | 238:7 |
| 135:1,8 | **2:19** 150:3,5 | 156:1 | **221** 5:4 6:3 | 253:4 |
| 136:6,11 | **2:28** 216:4 | 163:20 | **226** 5:5 | **29** 4:13 |
| **1600** 1:17 | **2:30** 218:13 | 174:4 | **22nd** 144:2 | 179:9,11 |
| **163** 4:5 | **2:32** 230:3 | 176:6 | **23** 4:5 | 179:23 |
| **164** 4:7 | **2:42** 68:13 | 179:5 | 163:13,15 | 187:18 |
| **166** 4:8 | **2:54:26** | 185:17 | 163:23 | 234:10 |
| **1684** 169:13 | 160:15 | 187:15 | 165:18 | **2953** 0 6:21 |
| **173** 4:14 | **2:57** 131:21 | 189:8,12 | **237** 5:7 | 271:6 |
| 135:4 | **20** 3:22 | 190:5 | **239** 5:8 | **29th** 182:16 |
| 138:23,24 | 149:22,23 | 196:21,25 | **23rd** 176:6 | **2nd** 118:24 |

**CAROL CRAWFORD 11/15/2022**

126:24
156:1,14
185:17
219:25
253:13

**3**
**3** 2:10 32:1
  33:2,4
  55:3,4,6
  128:23
**3/10/2021**
  257:11
**3/10/21** 5:17
**3/23/2021**
  173:25
**3/23/21** 4:11
**3/30/20** 2:15
**3/31/20** 2:12
**3/31/21** 2:22
**3/5/20** 2:10
**3:01** 47:1
**3:08** 70:4
**3:10** 263:15
**3:16** 73:4
  74:12
**3:22-cv-...**
  1:5
**3:30** 70:6
  177:21
**3:30-4:30**
  44:9
**3:35** 27:5
**3:37** 205:9
  205:10
**3:51** 205:10
  205:11
**30** 4:15 47:7
  187:9,11
  216:16
  271:17
**30th** 43:23
  68:13 73:3
  73:16
  74:24
  79:14 80:3
  237:8
  250:8
**31** 4:17

112:2
188:25
189:2,4
**31st** 40:4
  44:1 76:3
  76:13
  81:25 82:3
  82:4 84:3
**32** 4:18
  196:15,17
  196:18
**33** 2:10 4:20
  200:15,17
  200:19
**34** 5:1 12:3
  205:18,19
  206:14
  211:6
**35** 5:2
  219:19,21
  219:21
**36** 5:4 221:3
  221:5,6
**37** 5:5 226:4
  226:6,7
**38** 2:12 5:7
  237:2,4
**39** 5:8
  239:13,16
  239:18
**3rd** 46:2
  126:16
  131:20
  134:21
  135:1,9
  145:17,18
  166:8,15
  172:10
  253:14

**4**
**4** 2:12 38:18
  38:20 44:1
  49:4
  128:23
  169:22
  187:15
**4-13-21**
  200:20

**4/12/21** 4:15
  187:15
**4/14/2021**
  200:21
**4/14/21** 4:20
**4/15/21** 5:4
**4/29/2021**
  226:11
**4/29/21** 5:5
**4/30/21** 5:7
**4/5/2021**
  179:16
**4/5/21** 4:13
**4/9/21** 4:18
**4:00** 180:4,7
**4:19** 105:22
**4:23** 247:16
**4:36** 166:15
**4:43** 144:2
**40** 5:10
  241:14,17
  241:19
**40-49** 185:25
**41** 5:12
  247:7,9
**42** 5:14 67:5
  249:7,9
**43** 2:15 5:15
  249:11
  254:4,7,8
**44** 5:17,22
  256:21
  257:4,7
**45** 6:11
**49** 2:17
**496** 206:1
**497** 206:1
**498** 206:1
**499** 206:1
**4pm** 179:24
**4th** 171:23

**5**
**5** 2:15 4:10
  34:5 43:10
  156:2
  163:19
**5-11** 4:3,6
**5/10/21** 3:2

5:10
**5/20/21** 3:4
**5/26/21** 2:19
**5/6/21** 3:1
  5:8
**5:07** 256:25
  257:1
**5:11** 253:4
**5:19** 257:1,3
**5:21** 172:10
**5:26** 66:14
**5:33** 1:15
  269:18,19
**5:47** 63:14
**@CDC.gov**
  24:14
**500** 206:2
**533** 136:9,12
**539** 124:18
**5th** 186:7

**6**
**6** 2:17 49:1
  49:4,5
  85:13
  128:23
  169:22
  239:22
  240:24
**6/10/2021**
  247:13
**6/10/21** 5:12
**6/2/21** 3:11
**6/29/2022**
  254:11
**6/29/22** 5:15
**6/3/21** 3:13
**6/30/2021**
  205:21
  206:17
**6/30/21** 5:1
**6:16** 145:19
**6:19** 64:24
**6:23** 234:10
**6:37** 238:7
**6:58** 126:25
**60** 2:19
  228:14,16
**63101** 271:18

65 42:24
**65101** 6:4
**67** 2:22
**682** 241:25
**696-6775** 6:5

**7**
**7** 2:19 60:3
  100:1
  136:25
**7(a)** 137:4
**7/20/21** 3:16
  141:11
**7/26/2021**
  139:2
**7/26/21** 3:14
**7:38** 73:16
  80:3
**7:46** 74:24
  79:14
**711** 271:17

**8**
**8** 2:22 67:12
  67:14 85:4
  85:5
**8.15_AH_...**
  3:23
**8/18/21** 3:19
  145:6
**8/19** 150:15
**8/19/21** 3:22
**8:13** 142:15
**8:39** 60:9
**8:49** 126:19
**8:51** 214:9
**8:55** 34:5
**80** 228:14,16
**800-number**
  11:17
  15:18
**85** 3:1
**869-5210**
  6:14
**877** 6:5
**899** 6:4
**8th** 142:15
  163:20
  196:25

**CAROL CRAWFORD  11/15/2022**

| 9 |
|---|
| **9** 2:4  3:1 |
| 85:6  167:8 |
| 196:21 |
| 247:15 |
| **9/1/21** 4:1 |
| **9/3/21** 5:2 |
| **9:00** 61:19 |
| **9:24** 1:15 |
| 8:3  259:7 |
| **9:30** 261:13 |
| **9:32** 261:16 |
| **9:36** 262:11 |
| **9:43:56** |
| 262:22 |
| **9:52** 179:23 |
| **9:54** 263:15 |
| **9:57** 30:25 |
| 31:1 |
| **91** 3:2 |
| **99.96** 111:20 |
| **9th** 142:9 |

**DR. ANTHONY FAUCI  11/23/2022**

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE WESTERN DISTRICT OF LOUISIANA

 3                      MONROE DIVISION

 4    - - - - - - - - - - - - - - - X

 5    THE STATE OF MISSOURI, et al., :

 6    Plaintiffs,                     :

 7    V.                              : Case No. 3:22-cv-01213-TAD-KDM

 8    JOSEPH R. BIDEN, JR., et al.,   :

 9    Defendants.                     :

10    - - - - - - - - - - - - - - - X

11                         Bethesda, Maryland

12                         Wednesday, November 23, 2022

13         Videotaped Deposition of DR. ANTHONY FAUCI, a

14    Defendant herein, called for examination by counsel

15    for Plaintiffs in the above-entitled matter, pursuant

16    to notice, the witness being duly sworn by Stephanie

17    Barnes, a Notary Public in and for the State of

18    Maryland, taken at the offices of National Institutes

19    of Health, 31 Center Drive, Building 31, Bethesda,

20    Maryland, at 8:08 a.m., Wednesday, November 23, 2022,

21    and the proceedings being taken down by Stenotype by

22    Stephanie Barnes, and transcribed under her

23    direction.

24

25
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 2

```
 1    APPEARANCES:

 2

 3        On behalf of the Plaintiff the State of

 4    Missouri:

 5              D. JOHN SAUER, ESQ.

 6              ERIC S. SCHMITT, ESQ.

 7              JUSTIN D. SMITH, ESQ.

 8              Missouri Attorney General's Office

 9              221 West High Street

10              Jefferson City, Missouri  65101

11              (573) 751-8870

12              John.Sauer@ago.mo.gov

13

14        On behalf of the Plaintiff the State of

15    Louisiana:

16              JEFFREY M. LANDRY, ESQ.

17              TRACY SHORT, ESQ.

18              WILBUR STILES, ESQ.

19              Louisiana Department of Justice

20              1885 North 3rd Street

21              Baton Rouge, Louisiana  70804

22              (225) 326-6766

23

24        On behalf of the Plaintiffs Dr. Jayanta

25    Bhattacharya, Dr. Martin Kulldorff, Dr. Aaron
```

**DR. ANTHONY FAUCI  11/23/2022**

**Page 3**

```
 1    Kheriaty, and Jill Hines:
 2              JENIN YOUNES, ESQ.
 3              JOHN J. VECCHIONE, ESQ.
 4              New Civil Liberties Alliance
 5              1225 19th Street, Northwest
 6              Suite 450
 7              Washington, D.C.  20036
 8              (202) 918-6905
 9              Jenin.younes@ncla.legal
10              John.vecchione@ncla.legal
11
12         On behalf of the Plaintiff:
13              JONATHAN C. BURNS, ESQ.
14              Burns Law Firm
15              Post Office Box 191250
16              St. Louis, Missouri  63119
17              (314) 329-5040
18              John@Burns-law-firm.com
19
20         On behalf of the Defendant the Department of
21    Justice:
22              ADAM KIRSCHNER, ESQ.
23              JOSH GARDNER, ESQ.
24              KYLA SNOW, ESQ.
25              INDRANEEL SUR, ESQ.
```

**DR. ANTHONY FAUCI  11/23/2022**

```
 1              U.S. Department of Justice

 2              1100 L Street, Northwest

 3              Washington, D.C.  20530

 4              (202) 598-3846

 5              Adam.kirschner@usdoj.gov

 6

 7         On behalf of the Defendant the Department of

 8     Health and Human Services:

 9              ANANT KUMAR, ESQ.

10              Department of Health and Human Services

11              26 Federal Plaza

12              Room 3908

13              New York, New York  10278

14              (212) 264-6373

15              Anant.kumar@hhs.gov

16         On behalf of the Defendant the National

17     Institute of Health:

18              CHRISTOPHER HAMMOND, ESQ.

19              Office of the General Counsel

20              Public Health Division

21              NIH Branch

22              31 Center Drive

23              Building 31

24              Bethesda, Maryland  20892

25              Christopher.hammond2@nih.gov
```

**DR. ANTHONY FAUCI  11/23/2022**

**Page 5**

```
 1        ALSO PRESENT:

 2              CORY DENNIS, Press Secretary

 3              JILL HINES, Plaintiff

 4              JAMES HOFT, Plaintiff

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**DR. ANTHONY FAUCI  11/23/2022**

```
1                     C O N T E N T S

2    WITNESS                    EXAMINATION BY COUNSEL

3    DR. ANTHONY FAUCI                  FOR PLAINTIFFS

4        BY MR. SAUER                            10

5

6                     E X H I B I T S

7    FAUCI EXHIBIT NO.                          PAGE

8    Exhibit No. 1 - December 30, 2011 Article      12

9    Exhibit No. 2 - EcoHealth Alliance            17

10                  Project Details

11   Exhibit No. 3 - Gain of Function Research     25

12   Exhibit No. 4 - Nature Medicine Article       31

13   Exhibit No. 5 - E-mails                       37

14   Exhibit No. 6 - E-mails                       43

15   Exhibit No. 7 - E-mails                       83

16   Exhibit No. 8 - E-mails                       96

17   Exhibit No. 9 - E-mails                      111

18   Exhibit No. 10 - References                  114

19   Exhibit No. 11 - E-mails                     119

20   Exhibit No. 12 - E-mails                     122

21   Exhibit No. 13 - E-mails                     130

22   Exhibit No. 14 - E-mails                     138

23   Exhibit No. 15 - E-mails                     141

24   Exhibit No. 16 - Podcast Transcript          142

25   Exhibit No. 17 - Calendar Printout           148
```

**DR. ANTHONY FAUCI  11/23/2022**

```
 1    Exhibit No. 18 - Quote                              152
 2    Exhibit No. 19 - Wayback Machine Article            158
 3    Exhibit No. 20 - NIH Record Article                 163
 4    Exhibit No. 21 - E-mails                            167
 5    Exhibit No. 22 - E-mails                            170
 6    Exhibit No. 23 - CONFIDENTIAL E-mails               172
 7    Exhibit No. 24 - Nature Medicine Article            178
 8    Exhibit No. 25 - NIH Blog                           182
 9    Exhibit No. 26 - ABC News Article                   185
10    Exhibit No. 27 - E-mails                            187
11    Exhibit No. 28 - White House Archives               196
12    Exhibit No. 29 - E-mails                            201
13    Exhibit No. 30 - E-mails                            203
14    Exhibit No. 31 - The Hill Article                   209
15    Exhibit No. 32 - Meta Printout                      210
16    Exhibit No. 33 - UnHerd Article                     212
17    Exhibit No. 34 - Politico Article                   213
18    Exhibit No. 35 - The Lancelet Article               221
19    Exhibit No. 36 - Good Morning America Article       226
20    Exhibit No. 37 - Breitbart Article                  228
21    Exhibit No. 38 - Breitbart Article                  232
22    Exhibit No. 39 - The Washington Standard Article    242
23    Exhibit No. 40 - Global HCQ/QC Studies              245
24    Exhibit No. 41 - Great Barrington Declaration       249
25    Exhibit No. 42 - E-mails                            253
```

DR. ANTHONY FAUCI  11/23/2022

Page 8

1   Exhibit No. 43 - E-mails                          263

2   Exhibit No. 44 - E-mails                          266

3   Exhibit No. 45 - Washington Post Article          270

4   Exhibit No. 46 - E-mails                          275

5   Exhibit No. 47 - CNBC Article                     277

6   Exhibit No. 48 - Spiked Article                   280

7   Exhibit No. 49 - YouTube Printout                 283

8   Exhibit No. 50 - Google Printout                  284

9   Exhibit No. 51 - Meta Printout                    286

10  Exhibit No. 52 - E-mails                          294

11  Exhibit No. 53 - CONFIDENTIAL E-mails             298

12  Exhibit No. 54 - CONFIDENTIAL E-mails             304

13  Exhibit No. 55 - CONFIDENTIAL E-mails             307

14  Exhibit No. 56 - CONFIDENTIAL E-mails             323

15  Exhibit No. 57 - CONFIDENTIAL E-mails             327

16  Exhibit No. 58 - CONFIDENTIAL E-mails             330

17  Exhibit No. 59 - Substack Article                 334

18  Exhibit No. 60 - The Hill Article                 340

19  Exhibit No. 61 - New York Times Article           343

20  Exhibit No. 62 - Substack Article                 346

21  Exhibit No. 63 - E-mails                          352

22  * Exhibits attached to transcript.

23

24

25

**DR. ANTHONY FAUCI  11/23/2022**

**Page 9**

```
 1              P R O C E E D I N G S
 2              THE VIDEOGRAPHER:  We are now on the
 3   record.  Today is November 23rd, 2022, and the time
 4   on the video screen is 8:08 a.m. Eastern Standard
 5   Time.  This is the video recorded deposition
 6   of Dr. Anthony Fauci taken in the matter of the State
 7   of Missouri, et al, v. Joseph R. Biden, Jr., et al,
 8   Case Number 3:22-CV-01213.
 9              This is pending before the United States
10   District Court for the Western District of Louisiana
11   Monroe Division.  This deposition is being conducted
12   at the NIAID at 31 Center Drive in Bethesda,
13   Maryland.  The reporter today is Stephanie Barnes,
14   and my name is Daniel Holmstock.  I am the legal
15   videographer.
16              Counsel, would you please introduce
17   yourselves and state whom you represent.
18              MR. SAUER:  John Sauer of the Missouri
19   Attorney General's Office on behalf of all the
20   plaintiffs.
21              MR. KIRSCHNER:  Adam Kirschner from the
22   U.S. Department of Justice on behalf of all the
23   defendants.
24              THE VIDEOGRAPHER:  Will the court reporter
25   please administer the oath.
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 10

```
 1   Whereupon,
 2                    DR. ANTHONY FAUCI,
 3   was called as a witness by counsel for Plaintiffs,
 4   and having been duly sworn by the Notary Public, was
 5   examined and testified as follows:
 6          EXAMINATION BY COUNSEL FOR PLAINTIFFS
 7   BY MR. SAUER:
 8      Q.    Good morning.  Can you please state your
 9   name for the record?
10      A.    My name is Anthony S. Fauci.
11      Q.    And, Dr. Fauci, what's your current
12   position?
13      A.    I'm the director of the National Institute
14   of Allergy and Infectious Diseases at the National
15   Institutes of Health and the Chief Medical Advisor to
16   President Biden.
17      Q.    When did you become the Chief Medical
18   Advisor to the President?
19      A.    Very shortly after his inauguration.  He
20   asked me to be the advisor between the election and
21   the inauguration, and I officially became his advisor
22   following his inauguration.
23      Q.    And then how long have you been the
24   director of NIAID, if I can call it that?
25      A.    I've been the director of NIAID for 38
```

```
 1    years a couple of weeks ago.
 2         Q.     Congratulations.
 3                Have you ever given a deposition before?
 4         A.     I have.
 5         Q.     How many times?
 6         A.     Once.
 7         Q.     How long ago was that?
 8         A.     You know, I don't know exactly the time,
 9    but it was probably anywhere between 15 and 20-plus
10    years ago.
11         Q.     Can I go over some ground rules with you?
12         A.     Sure.
13         Q.     First of all, when I ask a question, can
14    you and I be careful not to interrupt each other when
15    we're talking for the clarity of the record?
16         A.     Certainly.
17         Q.     And if I ask a question, if you don't
18    understand the question, could you ask me to clarify
19    to make sure you're answering the question that I'm
20    asking as opposed to some other question you think I
21    might be asking?  Can you do that today?
22         A.     Certainly.
23         Q.     Can you give verbal answers, like you're
24    doing now, instead of merely nodding or saying
25    "uh-huh," "huh-uh," can you say "yes" or "no" as the
```

DR. ANTHONY FAUCI  11/23/2022

Page 12

```
 1   questions go forward?

 2       A.    Yes.

 3       Q.    And maybe both of us can make an effort to

 4   speak slowly.  You're probably going to be better at

 5   that than I will, but to make an effort to speak

 6   slowly so that everything's getting transcribed.

 7             Is that okay?

 8       A.    I will certainly do that.

 9       Q.    I'd like to start off by handing you a

10   document that I've asked the court reporter to mark

11   as Exhibit 1, and I just want to take -- can you take

12   a glance at this and see if you recognize it?

13             (FAUCI Exhibit No. 1 was marked for

14   identification.)

15             MR. KIRSCHNER:  Counsel, this is a

16   standing objection for all of the documents you show.

17   I would ask that you preference your questions, to

18   the extent Dr. Fauci recognizes it, outside of the

19   capacity of preparation for the deposition, otherwise

20   I would object on work product grounds, but if you're

21   asking if you recognize a document outside of

22   anything that was shown in the context of deposition

23   preparation, I will not prevent him from answering.

24             MR. SAUER:  You raise a good point.

25   BY MR. SAUER:
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 13

```
 1        Q.    Dr. Fauci, did you review any documents in
 2   preparation for your deposition today?
 3        A.    We did a couple of documents -- a few
 4   documents, yeah.
 5        Q.    What documents were those?
 6              MR. KIRSCHNER:  I object on work product
 7   grounds, and I instruct the witness not to answer.
 8   BY MR. SAUER:
 9        Q.    Can you look at the document in front of
10   you, Exhibit 1?
11        A.    Yeah.  So let me take a -- be careful I
12   read it, recognize it.
13        Q.    Well, let me ask you this:  In 2011, did
14   you coauthor an op-ed with Francis Collins in the
15   Washington Post called "A Flu Virus Risk Worth
16   Taking"?
17        A.    Well, I have it in front of me here, and
18   it has my name on it.  So, yes, it looks like I
19   did coauthor an editorial in the Washington Post on
20   December 30th of 2011.
21        Q.    Do you remember doing it or do you only
22   remember because you see it in front of you?
23        A.    No.  I vaguely remember.  This was 11
24   years ago.  I've written 1300 articles over my last
25   several years.
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 14

```
 1        Q.    You look at the final paragraph on the
 2   first page in the first -- or sort of the first
 3   sentence of the final paragraph of the first page,
 4   your op-ed states:  "Given these uncertainties,
 5   important information and insights can come from
 6   generating a potentially dangerous virus in the
 7   laboratory."  Do you remember writing that?
 8             MR. KIRSCHNER:  Counsel, I would ask for
 9   Dr. Fauci to have an opportunity to familiarize
10   himself with the document --
11             THE WITNESS:  Yeah.
12             MR. KIRSCHNER:  -- prior to answering
13   questions about it.
14             THE WITNESS:  Yeah.  Let me just read it
15   and see.
16   BY MR. SAUER:
17        Q.    Let me ask you a question unrelated to
18   that document just in general.  Do you believe as you
19   sit here today that important information, insights,
20   can come from generating a potentially dangerous
21   virus in a laboratory?
22        A.    Well, yeah, if you take it into the
23   correct context because when you say "Generating a
24   potentially dangerous virus in the laboratory," that
25   is usually in the context of, for example, taking
```

**DR. ANTHONY FAUCI  11/23/2022**

```
 1   this H5N1 and studying it in different ways that
 2   could potentially make it more dangerous but only
 3   under very strict conditions laid out for the
 4   guardrails of conducting experiments that could
 5   potentially create such a dangerous virus.  And if
 6   you look at the context of this particular paper, the
 7   point that Dr. Collins, Dr. Nabel and I were making
 8   that there is a risk as we were talking about with
 9   pandemic influenza to understand as best as possible.
10   And, in fact, if you go to the next paragraph, we say
11   "Understanding the biology of virus transmission has
12   implications for outbreak prediction, prevention and
13   treatment."
14            And the point we were making in this
15   article is that there is a risk benefit to research
16   like this, and the point we were making it says "A
17   risk worth taking if the benefit is the protection of
18   the American and global public."
19        Q.    You refer to conditions under which such
20   research should be done --
21        A.    Right.
22        Q.    -- when you're generating potentially
23   dangerous viruses.
24        A.    Right.
25        Q.    First of all, is that kind of
```

**DR. ANTHONY FAUCI  11/23/2022**

 1  **research generally referred to as gain-of-function**

 2  **research?**

 3      A.    Gain of function is a very potentially

 4  misleading terminology, and that was one of the

 5  reasons why several years ago outside groups, not the

 6  NIH, made the determination that they would much more

 7  strictly define the guardrails of experiments that

 8  would require additional oversight and did away with

 9  the terminology "gain of function" because it can

10  often be very confusing and misleading.

11      **Q.    When was that terminology "gain of**

12  **function" done away with?**

13      A.    At the time, I believe -- and I'm not a

14  hundred percent sure -- but there was a period of

15  time between, I think, 2011 and 2014 or '12 and '14,

16  I'm not sure, when there was a pause that was put on

17  research that was related to the manipulation of the

18  influenza virus in order to get more concrete and

19  more definitive guidelines about what the guardrails

20  of this research should be.

21      **Q.    Do those guardrails include things like**

22  **the level of biosafety -- biosafety level at which**

23  **such research should be done?**

24      A.    That, I believe, was part of it.  I'm not

25  sure if it was explicitly said, but it certainly

**DR. ANTHONY FAUCI  11/23/2022**

1    could be.  There were two elements to it.  There was

2    the pause, which any research that could potentially

3    have any collaterally dangerous aspects to it were

4    put on pause, and then a number of organizations

5    outside of the NIH, including the Office of Science

6    and Technology Policy, OSTP, the academies of

7    science, engineering and medicine, and a number of

8    working groups on the outside developed more clarity

9    to the kinds of oversight that would be needed.  That

10   is referred to as P3CO or pandemic potential

11   pathogens care and oversight, and the --

12        Q.    Is that some type -- go ahead.

13        A.    And the reason for that was the lack of

14   clarity in the terminology "gain of function," which

15   is often confusing.  So it was felt by these outside

16   groups to be very clear on the kinds of experiments

17   that needed additional oversight.

18        Q.    Could I give you a second document, which

19   I guess will be Exhibit 2?

20              (FAUCI Exhibit No. 2 was marked for

21   identification.)

22              MR. KIRSCHNER:  Just letting Dr. Fauci

23   know that the court reporter will provide him the

24   document that he's to look at.  This -- these

25   are copies for counsel.

**DR. ANTHONY FAUCI  11/23/2022**

```
 1              Do you want to mark this one also?  Thank
 2    you.
 3    BY MR. SAUER:
 4         Q.    This Exhibit 2 is a document printed off
 5    of the NIH website called "Understanding the Risk of
 6    Bat Coronavirus Emergence."  Are you familiar with
 7    the project that's referred to in this document
 8    titled "Understanding the Risk of Bat Coronavirus
 9    Emergence"?
10         A.    I'm vaguely familiar with the fact that
11    EcoHealth Alliance has been doing research on trying
12    to understand the bat coronavirus emergence.
13         Q.    And was this project initiated in 2014 on
14    your understanding?
15         A.    I do not know.  That is not something that
16    I would have followed very carefully.
17         Q.    Would you have approved this in your
18    capacity as head of NIAID?
19         A.    I do --
20              MR. KIRSCHNER:  Objection.  Assuming
21    evidence not in the record.
22    BY MR. SAUER:
23         Q.    You may answer.
24         A.    I do not individually approve grants.
25    They go through multiple levels of peer review, so I
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 19

```
 1   would not have, by standard way things work, have
 2   seen this, read it, or individually approved it.
 3           That's not the way things work in the
 4   Institute.
 5       Q.   Do you have any recollection of this at
 6   the time?
 7       A.   I have no recollection -- I have no
 8   recollection of the initiation of this grant.
 9       Q.   If you flip to the second page, under
10   "Details," it mentions EcoHealth Alliance.  You
11   referred to that a second ago, as the recipient of
12   the project.
13       A.   Right.
14       Q.   Is that right?
15       A.   Right.
16       Q.   And that's your understanding, they did
17   receive funding under this project; is that right?
18           MR. KIRSCHNER:  Objection.  Assuming
19   evidence not in the record.
20   MR. SAUER:
21       Q.   You may answer.
22       A.   I'm sorry.  Would you repeat the question.
23   I'm not understanding what the question is.
24       Q.   Is it your understanding that EcoHealth
25   Alliance received funding from NIAID under this
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 20

```
 1   project?
 2       A.   Well, looking at this, I can't make that
 3   connection.  I do know, with all of the activity
 4   that's been going on with EcoHealth Alliance and the
 5   NIAID funding, that indeed, NIAID has funded
 6   EcoHealth Alliance.  I don't know if I can
 7   specifically link it to this particular grant because
 8   this is the first time that I have seen this piece of
 9   paper.
10       Q.   Got you.  Above that, it lists a man
11   called Peter Daszak.  How do you say his name, if you
12   know?
13       A.   I'm not sure.  I think it's Daszak.  I
14   think so.
15       Q.   Do you know Mr. Daszak?
16       A.   I have met him once or twice.  I would not
17   exactly characterize him as an acquaintance.
18       Q.   In what connection have you met -- sorry,
19   go ahead.
20           MR. KIRSCHNER:  Can you please let the
21   witness answer the questions.
22   MR. SAUER:
23       Q.   Go ahead.
24       A.   So what's the question again.
25       Q.   In what connection have you met him?
```

**DR. ANTHONY FAUCI  11/23/2022**

```
 1       A.    You know, I don't even remember meeting
 2   him, but I do know that someone showed me a picture
 3   at a meeting where somebody said, here, take a
 4   picture with him.  And so I clearly must have met him
 5   because there's a photograph, I believe, of he and I.
 6            But that is not unusual, when you go to a
 7   scientific meeting, you run into hundreds of people.
 8   And I believe that this Dr. Daszak is one of the
 9   people that I almost -- well, I did run into him
10   because I believe I've seen a photograph of he and I
11   together at a meeting.
12            But he's not somebody that I would have
13   had a major amount -- I think someone in one of the
14   thousands of e-mails of mine that have been foyered,
15   someone showed me, I think, or pointed out, that
16   there was an e-mail from Peter Daszak to me.
17            And I don't remember the content, but I
18   think it was some casual type of response to
19   something, but it's not someone that I deal with on a
20   regular basis.  That is rather clear.
21       Q.    On that the same page, below Daszak and
22   EcoHealth Alliance, there's a reference to NIAID
23   funding this grant from 1st June of 2014 to 31st May
24   2019.
25            Do you see that?
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 22

 1      A.    It says "Budget Start, 1st of June.

 2    Budget End."  Is that what you're talking about?

 3          Q.    **Yeah.  Over there on the right.**

 4      A.    Yeah.

 5          Q.    **Did you later become aware that not -- at**

 6    **any time, that NIAID was funding this project?**

 7              MR. KIRSCHNER:  Objection.  Vague.

 8    Assuming evidence not in the record.

 9              THE WITNESS:  So I'm sorry.  What is the

10    question?

11    MR. SAUER:

12          Q.    **Did you, at any time later, become aware**

13    **that NIAID was funding this project understanding the**

14    **risk of bat Coronavirus emergence?**

15      A.    I became aware of this after all of the

16    attention was put on it, following the early part of

17    January, February, mid-March of 2020, but I certainly

18    was not aware -- well, I wouldn't say certainly

19    because who knows what came across my desk.

20    Thousands of pieces of paper come across my desk.

21              But I do not recall at all being aware of

22    the existence of this grant at the time that it was

23    initially funded of the dates shown on page 2.

24          Q.    **If you go to the first page, in the**

25    **abstract text, see that big paragraph that covers**

**DR. ANTHONY FAUCI  11/23/2022**

Page 23

1   most of the first page?

2        A.      Yeah.

3        Q.      **Very bottom, last couple sentences.  Do**

4   **you see where it begins number 3, and it says, "Test**

5   **predictions of COV interspecies transmission"?**

6        A.      Hold on.  What line up from the bottom are

7   you talking about?

8        Q.      **Fourth line up from the bottom.**

9        A.      Fourth line up from the bottom.  "Test

10  predictions" --

11       Q.      **"Test predictions of CoV" --**

12       A.      "Test predictions of -- predictive models

13  of post strains will be tested experimentally using

14  reverse genetics" -- yeah.

15       Q.      **What does reverse genetics refer to in**

16  **that line?  Do you know?**

17              MR. KIRSCHNER:  Objection.

18              THE WITNESS:  I'm not really quite sure

19  what they're referring to.  Reverse genetics can mean

20  many things.  Manipulation of a virus, recombination,

21  things like that.  I'm not exactly sure what they

22  were referring to here.

23  MR. SAUER:

24       Q.      **Can it refer to what we were talking about**

25  **a minute ago that you talked about in your**

**DR. ANTHONY FAUCI  11/23/2022**

Page 24

```
 1    2011 op-ed about generating a more dangerous virus in

 2    a laboratory.

 3            Can reverse genetics refer to that?

 4            MR. KIRSCHNER:  Objection.  Calls for

 5    speculation.

 6            THE WITNESS:  Yeah.  You know, reverse

 7    genetics is a very, very broad term that could have

 8    multiple applications.  The influenza virus vaccine

 9    that I hope you were vaccinated with this year was

10    likely produced by reverse genetics.

11            So reverse genetics is a very broad

12    categorization.

13    MR. SAUER:

14        Q.   Can it refer to genetic manipulation of a

15    virus in a way that renders it either more

16    transmissible or more virulent?

17            MR. KIRSCHNER:  Objection.  Calls for

18    speculation.

19    MR. SAUER:

20        Q.   Can it refer to that, on your

21    understanding?

22        A.   Like I said, reverse genetics is a very

23    broad terminology, and it mean manipulation of a

24    virus.  We do that when we create an attenuated

25    influenza virus, and I believe it can be done also to
```

**DR. ANTHONY FAUCI  11/23/2022**

**Page 25**

```
 1   amplify the function of the virus.
 2        Q.    I'm going to hand you a document that
 3   we've marked Exhibit 3.
 4             (FAUCI Exhibit No. 3 was marked for
 5   identification.)
 6   MR. SAUER:
 7        Q.    Do you recognize this document?
 8             MR. KIRSCHNER:  Objection.  To the extent
 9   the question is asking for what Dr. Fauci was shown
10   during preparation, I would instruct the witness not
11   to answer on work product grounds.  It's a standing
12   objection for all documents.  Not saying whether we
13   did or did not show him such documents, but to the
14   extent you're asking if he recognizes this document
15   outside of the preparation, you can ask.
16             THE WITNESS:  I don't recognize it as a
17   document that I've seen before, but I'm put before
18   me, I would say, tens of thousands of documents in my
19   capacity.  I am aware of the concept of the
20   gain-of-function pause involving influenza, MERS and
21   SARS viruses.
22   MR. SAUER:
23        Q.    Let me ask you this:  Can you flip to the
24   second page of the document?  At the top, it says:
25   "U.S. government gain-of-function deliberative
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 26

```
 1  process and research funding pause."
 2           You referred earlier in your testimony, I
 3  believe, to a period starting in 2014 where there was
 4  a pause on gain-of-function research.
 5           Do you recall that?
 6           MR. KIRSCHNER:  Objection.
 7  Mischaracterizes testimony.
 8  MR. SAUER:
 9      Q.   Do you recall?
10      A.   I'm sorry.  I'm getting confused on your
11  questions.
12      Q.   Well, let me ask you.
13           MR. KIRSCHNER:  I would ask counsel to
14  allow Dr. Fauci to familiarize himself with the
15  document prior to asking more questions.
16           THE WITNESS:  So if the footnote says 1, I
17  have to find out what 1 is referring to.  So if you
18  just give me a second.
19  MR. SAUER:
20      Q.   If you see there, it's the bottom line of
21  the second paragraph.
22      A.   Okay.
23           THE COURT REPORTER:  And if I could just
24  ask counsel to slow down a little bit, please.
25           THE WITNESS:  Okay.  What's the question?
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 27

```
 1   BY MR. SAUER:
 2        Q.      The question is:  Are you familiar with
 3   the U.S. Government policy adopted in 2014 pausing
 4   gain-of-function research on certain viruses?
 5        A.      Yes, I am familiar with it.
 6        Q.      And was there an exception in that policy?
 7                Yes or no?
 8        A.      To my -- to my -- it says right here an
 9   exception; so obviously there was.
10        Q.      Were you aware of that exception at the
11   time --
12        A.      Because --
13        Q.      -- it was adopted?
14        A.      Either at the time it was adopted or
15   sometime thereafter.  And to my recollection and,
16   again, this was 2014; so we're talking eight years
17   ago, but my recollection is that the pause was for
18   all research such as this until a new U.S. Government
19   research policy could be developed.
20        Q.      And was there an exception to that pause
21   that's set forth in the footnote on your
22   understanding?
23        A.      Yeah.  The deliberations at the time based
24   on the need to continue certain critical research
25   that an exception clause was put in saying that under
```

**DR. ANTHONY FAUCI  11/23/2022**

```
 1    special circumstances -- and I'll read it so that you

 2    get an understanding -- an exception from the pause

 3    may be obtained if the head of a U.S. Government

 4    funding agency determines that the research is

 5    urgently needed to protect the public health or

 6    national security.

 7            So at the time that the pause on all of

 8    this research was implemented, it was felt strongly

 9    by just about everybody in the research community and

10    the public health community that if you paused

11    everything, there might be a situation where you

12    would want to do an experiment that would be urgently

13    necessary to protect the public health and national

14    security and, therefore, that would allow an

15    exception to be considered.

16        Q.    Did you ever invoke that exception when --

17    or you're the head of a U.S. Government funding

18    agency --

19        A.    Yeah.

20        Q.    -- aren't you?

21        A.    Yeah.

22        Q.    Did you ever invoke that exception during

23    the years the pause was in place?

24        A.    As I recall, exceptions were given to a

25    couple of experiments.  To my recollection, that does
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 29

```
 1   not usually rise up to the office of the director but
 2   is handled at the level of staff and deputy.  So I
 3   don't recall.  It is possible, though I doubt it, but
 4   it is possible that a piece of paper that was an
 5   ultimate signoff on an exception came to my desk, but
 6   I doubt it because I do not recall specifically ever
 7   being someone that put a piece of paper in front of
 8   me and said "we're going to have an exception.  Would
 9   you sign off on it?"  So it is likely, though, again,
10   I'm not certain.  It was eight years ago.  It was
11   likely that it was done at the staff level or at the
12   level of my deputy or someone like that.
13        Q.    It -- is it your understanding that anyone
14   at NIAID authorized any research under this pause
15   during the years that the gain -- the -- the
16   moratorium was in effect?
17        A.    Again --
18              MR. KIRSCHNER:  Objection.  Calls for
19   speculation.
20   BY MR. SAUER:
21        Q.    If you know?
22        A.    My memory is vague about this because it
23   was eight years ago, but I understand in subsequent
24   discussions that there may have been a couple of
25   exceptions to that in the context of research that
```

**DR. ANTHONY FAUCI  11/23/2022**

1  was considered necessary for the protection of the

2  public health or national security.

3       **Q.    Did any of those projects relate to**

4  **research on viruses conducted by EcoHealth Alliance?**

5            MR. KIRSCHNER:  Objection.  Assumes

6  evidence not in the record.

7            THE WITNESS:  Yeah.  I'm not certain.  I

8  don't -- I don't really recall.  I know -- I believe

9  that after the fact, I was brought -- it was brought

10  to my attention that there were exceptions.  I am not

11  quite sure what the exceptions were for, but there

12  were a couple of exceptions.

13  BY MR. SAUER:

14       **Q.    Who in your agency would have authorized**

15  **those, if not you?**

16       A.    Well, it could have been any of a number

17  of people.  It could have been people at the program

18  level.  It could have been my deputy.  It could have

19  been program managers and division directors.

20       **Q.    Who's your deputy?**

21       A.    Dr. Hugh Auchincloss.

22       **Q.    How do you say his last name, Auchincloss?**

23       A.    Auchincloss, A-U-C-H-I-N-C-L-O-S-S.

24       **Q.    What's his title?**

25       A.    Principal deputy director.

**DR. ANTHONY FAUCI  11/23/2022**

```
 1          Q.    I'm giving you a document we've marked as
 2     Exhibit 4.
 3               (FAUCI Exhibit No. 4 was marked for
 4     identification.)
 5     BY MR. SAUER:
 6          Q.    And do you see this Nature Medicine
 7     article entitled "A SARS-like cluster of circulating
 8     bat coronaviruses shows potential for human
 9     emergence"?
10          A.    Yes.
11          Q.    Were you familiar with this -- this
12     article when it was published in 2015?
13          A.    I was not familiar with it when it was
14     published in 2015.
15          Q.    When did you first become aware of it?
16          A.    I believe -- again, I read a lot of
17     articles -- I believe it was brought to my attention
18     in the context of questions that were raised by
19     members of Congress about experiments that were
20     funded by the NIAID.
21          Q.    So would that have been in and around 2021
22     time frame, do you know, when you first became aware
23     of it?
24          A.    It certainly was after the beginning of
25     the COVID-19 outbreak.
```

**DR. ANTHONY FAUCI  11/23/2022**

**Page 32**

1      Q.     How long after the beginning would you
2   estimate?
3      A.     I don't recall.
4      Q.     **Would it have been right at the beginning**
5   **of the outbreak or months into it or years into it?**
6      A.     You know, years is where we are right now.
7   So it wouldn't have been years.  So it likely would
8   have been several months, though I'm not a hundred
9   percent certain.
10      Q.     **And so who are the last two authors listed**
11   **on the top there?**
12      A.     Well, one is Ralph Baric, who I believe is
13   a scientist at North Carolina, who is a long-term
14   grantee of NIAID.
15      Q.     **Do you know Ralph Baric?**
16      A.     Not really.  I know who he is.  I doubt if
17   I've ever met him.  I may have met him at one of the
18   meetings where there are thousands of scientists
19   saying hi to each other, but I know who he is.  He is
20   a scientist at University of North Carolina.
21      Q.     **And he's funded by NIAID?**
22      A.     He is.
23      Q.     **But you don't remember ever meeting him in**
24   **person?**
25      A.     Again, I don't recall.  I could have met

**DR. ANTHONY FAUCI  11/23/2022**

**Page 33**

1  him.  Again, I run into several thousands of

2  scientists that we refer to, but I don't recall

3  certainly having a relationship with him.

4     **Q.    How about the person that's listed**

5  **immediately before him listed here as Zhengli Shi?**

6            **Do you know who that is?**

7     A.    I believe, if I'm correct, that this is a

8  scientist who is at the Wuhan Institute of Virology,

9  I believe.  I'm not a hundred percent certain.  I get

10  sometimes confused with Asian names, but I believe

11  this is the person who is a scientist at the Wuhan

12  Institute.

13     **Q.    And are you aware generally that there's**

14  **someone called Shi Zhengli who's described in the**

15  **media as the bat woman who does research on bat**

16  **coronaviruses at the Wuhan lab --**

17     A.    Yeah, is that her?  I don't know if that's

18  the same person.  Like I said, when you're dealing

19  with Asian names, sometimes the first name is last

20  and the last name is first.  So I -- I -- I believe

21  this is the person from Wuhan.

22     **Q.    Have you ever met that person before?**

23     A.    To my knowledge, I haven't.  I don't --

24  I'm fairly certain I have not.  I could possibly,

25  again, have run into her at one of the many

**DR. ANTHONY FAUCI  11/23/2022**

Page 34

1  scientific meetings that occur, but I don't

2  specifically recall ever personally running into her.

3      **Q.    Can I direct your attention to the**

4  **beginning of the pandemic or at least the beginning**

5  **of the outbreak?  Do you remember when you first**

6  **became aware that there was an outbreak of a new**

7  **coronavirus in China?**

8      A.    It was either December 31st or the first

9  couple of days of the new year of 2020.  So it was

10  either December the 31st of 19 -- 2019 or the first

11  couple of days of 2020.

12      **Q.    Do you recall at some point somebody,**

13  **anybody, raising concerns to you in January of 2020**

14  **at the beginning of the outbreak or near**

15  **the beginning of the outbreak that the virus might**

16  **have been genetically engineered or originated in a**

17  **laboratory?**

18      A.    There was a phone call in late January of

19  2020, I believe, from Jeremy Farrar.  There was one

20  other person on the phone.  I believe it was

21  Christian Anderson, who piped me in on a three-way

22  call, saying that they looked at the virus and there

23  was some concern about the molecular configuration or

24  makeup of the virus that made them think there was a

25  possibility that there could have been a manipulation

**DR. ANTHONY FAUCI  11/23/2022**

Page 35

1   of the virus.

2         Q.     Before that, had anyone raised a concern

3   like that to you?

4         A.     To my recollection, no.

5         Q.     How about Robert Redfield?  Who's he?

6         A.     Robert Redfield at the time was the

7   director of the Centers for Disease Control and

8   Prevention.

9         Q.     Did he call you in mid January 2020 and

10  raise that kind of concern about whether or not the

11  virus originated from nature or in a laboratory?

12        A.     To my recollection, no.  I know that Bob

13  today talks about that.  I don't recall back in

14  January of 2020 whether Bob was involved or not in

15  any discussion about the manipulation of the virus.

16        Q.     Are you aware if there -- if there's any

17  relationship between Peter Daszak and Shi Zhengli,

18  the two coauthors of that study I showed you in

19  Exhibit 4?  Do they work together or what's your

20  understanding of that?

21               MR. KIRSCHNER:  Objection.  Calls for

22  speculation.  Vague.  Ambiguous.

23               THE WITNESS:  Can you repeat the question?

24  BY MR. SAUER:

25        Q.     Are you -- do you know whether there's a

**DR. ANTHONY FAUCI  11/23/2022**

**Page 36**

1   working relationship between Shi Zhengli and

2   Peter Daszak?

3        A.    Well, I do know now.  I didn't know it at

4   the time, but I do know now that EcoHealth has a

5   subaward from their original grant that goes to

6   Shi Zhengli at the Wuhan Institute of Virology.

7        Q.    So they work together on research that's

8   funded directly by NIAID --

9        A.    The -- yeah, the funding goes to EcoHealth

10  which awards a subaward.  To my knowledge and

11  recollection, it is a five-year grant of somewhere

12  between 500,000 and $600,000.  I believe it averages

13  about 120 to $130,000 a year for a five-year period.

14       Q.    Do you know whether Peter Daszak has

15  access to, for example, the genomes of viruses that

16  Shi Zhengli has generated at the Wuhan Institute of

17  Virology?

18            MR. KIRSCHNER:  Objection.

19  Mischaracterizes the evidence.

20            MR. SAUER:  I'm just asking him if he

21  knows.

22  MR. SAUER:

23       Q.    Do you know?  I'm just asking if you know.

24       A.    Again, repeat the question.  I want to

25  make sure I give you an accurate answer.

**DR. ANTHONY FAUCI  11/23/2022**

Page 37

```
 1        Q.     Do you know whether Peter Daszak had
 2   access, or is in possession of data generated by Shi
 3   Zhengli pursuant to their research together,
 4   including the genomes of Coronaviruses?
 5        A.     I don't know absolutely for sure, but I
 6   would imagine that if Peter Daszak is collaborating
 7   scientifically with Shi Zhengli, that it is likely,
 8   given the norms of scientific collaboration, that he
 9   would have access to data if they were indeed
10   collaborating, which it looks like, from what I have
11   learned subsequently, that they are collaborators,
12   since he has a subaward to the Wuhan Institute that I
13   believe goes to Dr. Shi.
14        Q.     Would it be ordinary practice for someone
15   in his position to have access to her data when he's
16   funding her, essentially through subawards?
17        A.     That would be not be unusual and probably
18   likely.
19        Q.     Can I give you Exhibit 5?  We're
20   premarking them.
21               (FAUCI Exhibit No. 5 was marked for
22   identification.)
23   MR. SAUER:
24        Q.     If you look at the top there, there's
25   someone sending an e-mail to you and Jen Routh called
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 38

```
1    Greg Folkers.  Who's Greg Folkers?
2         A.    Greg Folkers is a member of my inner
3    office.  He's my immediate chief of staff in my
4    office group.
5         Q.    And then who's Jennifer Routh?
6         A.    She's a member of our communications
7    staff.
8         Q.    And then directly below her, who's
9    Courtney Billet?
10        A.    She is the director of the Office of
11   Communication, Legislative Affairs, and Government
12   Outreach.
13        Q.    And if you look at all these people on the
14   CC line, are they all within your kind of -- I think
15   you described it as your inner office?
16        A.    Yes.  They are in the immediate office of
17   the director.
18        Q.    And it looks like the attachment was
19   indicated with talking points for NIAID director,
20   Dr. Fauci?
21        A.    Right.
22        Q.    Would that be a common thing for your
23   chief of staff to do, to prepare talking points for
24   when you're going to a press appearance or something
25   like that?
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 39

```
 1        A.    That would be a not unusual thing if I was
 2   going to whatever, a meeting or a congressional
 3   briefing or what-have-you, and a subject was brought
 4   up that I was not particularly familiar with, that my
 5   staff would put together talking points to at least
 6   update or inform me about what the meeting was about
 7   and things that I should know about it.
 8        Q.    If you look in the body of the e-mail,
 9   that kind of second paragraph that begins:  "Also,
10   hyphen, hyphen, hyphen."
11             Do you see that?
12        A.    Wait a second.  Where are we now?
13        Q.    Well, kind of very close to the top,
14   second kind of text cluster that begins, "Also, when
15   talking about CoV, not necessarily in this venue..."
16   Do you see that?
17        A.    No, I'm really sorry.  As a placeholder,
18   looks good, that's the first paragraph.  "Also,"
19   okay, we're talking -- I got it.
20        Q.    And Greg -- Mr. Folkers says to you, "We
21   have on our team," and then in parentheses, Vincent
22   and folks we fund, Peter Daszak, Ralph Baric, Ian
23   Lipkin, et cetera, "probably the world's experts
24   on nonhuman coronaviruses."
25             Do you see that?
```

```
 1       A.    Yes.

 2       Q.    Do know what he means when he said that

 3   those people are on your team?  Does he mean that you

 4   fund them?

 5       A.    I think he means -- I'm speculating -- I

 6   don't recall this e-mail of January 27th, 2020.  But

 7   my speculation is that what Mr. Folkers was referring

 8   to were people that were in our group or that we know

 9   and are colleagues of ours because -- I mean, Peter

10   Daszak, we've already mentioned, is a grantee.  Ralph

11   Baric is a grantee.  Ian Lipkin is a scientist at the

12   Columbia School of Public Health.

13           I believe Vincent, though I don't know,

14   could possibly be Vincent Munster, who is a scientist

15   who's employed by NIAID, and I believe that's what

16   Mr. Folkers was referring to when he was saying --

17   when talking about COVID, these are people who are

18   well versed in that area.

19       Q.    Who's -- do you know Ian Lipkin?

20       A.    I do.

21       Q.    Is he a grantee of --

22       A.    I believe he is.  I mean, he is a

23   well-established scientist in New York City at the

24   Columbia School -- I believe it's the Mailman School

25   of Public Health.
```

**DR. ANTHONY FAUCI  11/23/2022**

1      Q.    Two paragraphs down, it says, "NIAID has

2  funded Peter's group," referring to Mr. Daszak, "for

3  coronavirus in China for the past five years through

4  understanding the risk of bat coronavirus emergence";

5  correct?  And then the grant number.

6      A.    Yes, I see that.

7      Q.    And that, I take it, would be the grant

8  that we referred to earlier in Exhibit 2, with the

9  same title, "Understanding the risk of bat

10 coronavirus emergence"?

11          MR. SAUER:  Objection.  Calls for

12 speculation.

13          THE WITNESS:  I'm looking at

14 Exhibit Number 2 and the title is, "Understanding the

15 risk of bat coronavirus emergence," and that is the

16 quote that is here, and the grant number is 1R01 --

17 BY MR. SAUER:

18     Q.    Let me ask you this -- I don't need to the

19 hear the grant number?  Can I just ask you --

20     A.    Well, I'm trying to make sure that I'm

21 referring -- to give you a correct answer -- which is

22 the question you asked me:  Is this referring to

23 this?  And it looks like the grant numbers match and

24 the titles match, so my answer to your question is

25 yes -- they're referring to.

**DR. ANTHONY FAUCI  11/23/2022**

Page 42

```
 1              MR. KIRSCHNER:  Counsel, I just would ask
 2    to let the witness fully respond before cutting him
 3    off.
 4    BY MR. SAUER:
 5         Q.   Do you recall that grant being placed on
 6    your radar screen on January 27th of 2020?
 7         A.   Based on this e-mail, it looks like
 8    Mr. Folkers has at least mentioned it, but I wouldn't
 9    characterize that as being, quote, put on my radar
10    screen to the point of garnering my precise attention
11    to it.
12              Let me finish reading the e-mail.  It
13    says, "That's now been renewed with a specific focus
14    to identify cohorts of people exposed to bats in
15    China and work out if they're getting sick from
16    COVID.  Erik Stemmy is the program officer and the
17    collaborators include the Wuhan Institute and Ralph.
18    The results of the work."
19              Yeah, I mean, I think this was likely the
20    situation where, when the idea of an outbreak in
21    China was brought up, or the coronavirus, that my
22    staff thought it would be important for me to
23    understand just the kind of things we were doing.
24    And I think the important sentence in here, which is
25    relevant, is that the grant wanted to
```

**DR. ANTHONY FAUCI  11/23/2022**

```
 1   identify cohorts of people exposed to bats in China,
 2   and the reason for that is wanting to see if there
 3   was the possibility of spillover from bat viruses to
 4   humans that might or might not be related to
 5   SARS-CoV-2.  I believe that was the intent of this
 6   briefing talking points, if I'm not mistaken.
 7        Q.    You're being given an exhibit that's
 8   labeled Exhibit 6.
 9             (FAUCI Exhibit No. 6 was marked for
10   identification.)
11             MR. KIRSCHNER:  Counsel, I would ask that
12   Dr. Fauci be given the opportunity to familiarize
13   himself with this document prior to being asked
14   questions related to it.
15             THE WITNESS:  Okay.  February 1st.
16   BY MR. SAUER:
17        Q.    I think you testified earlier that you
18   recalled the first time the concern about the origin
19   of the virus being posted on your radar screen was
20   from a call from Christian Anderson and Jeremy
21   Farrar; is that right?
22        A.    Yeah.  I believe that my recollection from
23   a few years ago, that that's the first I became aware
24   of this concept of the possibility of there being a
25   manipulation of the virus.
```

**DR. ANTHONY FAUCI  11/23/2022**

 1        Q.    Do you remember what was said in that

 2    call?

 3        A.    To my recollection, on that call, Jeremy

 4    and Christian said they had looked at -- or at least

 5    Christian did, possibly Jeremy -- and maybe one other

 6    scientist -- and said that it is possible that there

 7    may have been a manipulation because it was an

 8    unusual virus.  And on that call, I and others said,

 9    "Well, that being the case, we should bring together

10    a group of highly qualified international

11    evolutionary virologists to discuss the issue, and to

12    see what the way forward would be to try to clarify

13    that."

14            And that was the phone call that we

15    arranged, I believe for the following day, on

16    February 1st, if I'm not mistaken.  I think those are

17    the dates.  I'm fairly sure, but --

18        Q.    You say I and others on the call suggested

19    arranging a group of scientists to discuss this.  Who

20    are the others?

21        A.    Again, I believe -- I'm fairly certain,

22    although I'm not 100 percent -- that was a few years

23    ago -- that Jeremy Farrar was one and Christian

24    Anderson was another.  Eddie Holmes could possibly

25    have been in on that.  I know he got involved in this

**DR. ANTHONY FAUCI  11/23/2022**

**Page 45**

1   later on.

2       **Q.     Who's Eddie Holmes?**

3       A.     Eddie Holmes is a very

4   well-recognized evolutionary virologist who works in

5   Australia.

6       **Q.     Does he receive funding from your agency?**

7       A.     I don't know.  I'm not certain whether he

8   does or not.

9       **Q.     Do you know Eddie Holmes?**

10      A.     I don't know him personally, but I know of

11  him.  He's a very highly -- what's the right word for

12  it?  Highly respected evolutionary virologist.

13      **Q.     Do you know Christian Anderson?**

14      A.     I know Christian.  Not well.  I've spoken

15  to him a few times.  I believe the first time -- and

16  again, when you say "Do you know," remember, we all

17  go to international meetings where there are

18  hundreds, if not thousands, of people that you

19  interact with over the years.

20          To my recollection, I've heard of

21  Christian Anderson for a while.  Christian is a

22  internationally renowned scientist.  I believe maybe

23  the first time that I've actually spoken to Christian

24  was on that phone call, but it is possible that

25  without recalling, I ran into him and spoke to him on

**DR. ANTHONY FAUCI  11/23/2022**

1    other occasions.

2         **Q.    Do you know why he brought that concern to**

3    **you in particular?**

4              MR. KIRSCHNER:  Objection.  Calls for

5    speculation.

6              THE WITNESS:  I would imagine since I am,

7    with all due modesty, recognized as one of the top

8    infectious disease people in the country and the

9    director of the major research institution for

10   infectious diseases in the world that Christian and

11   Jeremy I know -- I've known Jeremy for a long time --

12   that they thought it would be a good idea to give me

13   a call since I'm looked upon, rightly or not, as the

14   top government infectious diseases person, and they

15   felt, I believe -- you'll have to ask them -- but I

16   felt they believed, since I'm generally considered

17   the top government infectious disease person, that it

18   would be appropriate to let me know at the same time

19   as we brought in -- I don't have the list in front of

20   me of the scientists we brought together on the phone

21   call the following day, which was a Saturday -- let

22   me finish because I think it's important -- because

23   the people we brought in, we tried to get a large

24   international group of people together so we could

25   have well representation.  As to my recollection,

**DR. ANTHONY FAUCI  11/23/2022**

Page 47

1    there were people like Sir Patrick Vallance, who was

2    the chief scientist in England on the phone, among

3    other people.

4    BY MR. SAUER:

5         **Q.    Could I pause for a second?**

6         A.    Sure.

7         **Q.    This is a deposition.  I'm going to ask**

8    **you questions, and I'm going to ask you to listen to**

9    **the question --**

10        A.    Right.

11        **Q.    -- and answer the question that I'm**

12   **asking --**

13        A.    Okay.

14        **Q.    -- and not go off on, like, a tangent.**

15        A.    Fine.

16        **Q.    Can you agree to do that, please?**

17        A.    I would be happy to do that.

18            MR. KIRSCHNER:  And, counsel, I would also

19   ask you to let the witness provide proper context

20   where he feels is necessary in response to your

21   questions.

22            MR. SAUER:  Yeah.

23   BY MR. SAUER:

24        **Q.    Let me direct your attention to the first**

25   **page of Exhibit 6 in front of you.  At the bottom of**

**DR. ANTHONY FAUCI  11/23/2022**

Page 48

```
 1    that page, you see it indicates that on Friday,
 2    January 31st, 2020, at 18:47, you wrote an e-mail to
 3    Jeremy and Christian saying "this came out today.
 4    You may have seen it.  If not, it is of interest to
 5    the current discussion"; correct?
 6              MR. KIRSCHNER:  Objection, Your Honor --
 7    not Your Honor.
 8              THE WITNESS:  Well, you're very honorable
 9    but go ahead.
10              MR. KIRSCHNER:  I just would like the
11    witness to have an opportunity to familiarize himself
12    with the document.
13              MR. SAUER:  I'm just directing his
14    attention to that spot on the page.
15    BY MR. SAUER:
16         Q.    Do you see the spot I referred to?
17              MR. KIRSCHNER:  Well, I would like to make
18    sure that the witness is familiar with the
19    document --
20    BY MR. SAUER:
21         Q.    Right here.
22              MR. KIRSCHNER:  -- prior to answering
23    questions about the document.
24    BY MR. SAUER:
25         Q.    So I just asked if you see that spot on
```

DR. ANTHONY FAUCI  11/23/2022

```
 1    the page?
 2         A.    Where it says "this just came out today"?
 3         Q.    Yeah.
 4         A.    Yes.
 5         Q.    And is that a reference to the article by
 6    Jon Cohen in Science Magazine?
 7         A.    You know, I don't recall.
 8         Q.    You don't recall sending that message?
 9         A.    No, no.  I --
10               MR. KIRSCHNER:  Object --
11               THE WITNESS:  No, no.  Let me finish.
12               MR. KIRSCHNER:  Go ahead.
13               THE WITNESS:  You're asking me a question.
14    When you say "this just came out today," and on the
15    next page of Exhibit 6, there's an article by
16    Jon Cohen on mining coronavirus genomes for clues in
17    the outbreak, since they are juxtaposed together, I
18    imagine that that's what I sent, but I don't recall
19    specifically that article.
20    BY MR. SAUER:
21         Q.    Do you know -- do you know why you would
22    have said that article is of interest to the current
23    discussion?
24               MR. KIRSCHNER:  Objection.  Assuming
25    evidence not in the record.  Mischaracterizes the
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 50

```
 1   testimony.
 2            THE WITNESS:  Looking at the title of the
 3   article, which is "Mining Genomes for Clues in the
 4   Outbreak," you know, I'm not sure exactly why I would
 5   have sent it.  Imagine is that if they're referring
 6   to the genomic makeup of the virus and we were
 7   talking about the genomic makeup of SARS-CoV-2 that
 8   raised some suspicion on the part of Christian and
 9   Jeremy, that's an article in science by Jon Cohen
10   that talks about genomes of virus would be, as it
11   said, might be of interest to the current discussion.
12   I imagine that's what I was referring to.
13   BY MR. SAUER:
14       Q.    If you look -- staying on Page 1, if you
15   look immediately above your e-mail, do you see the
16   kind of response e-mail from Dr. Anderson?
17       A.    Let me read it.
18            Yeah.
19       Q.    Okay.  And you see in the second paragraph
20   that e-mail --
21       A.    Yeah.
22       Q.    -- where he mentions I should mention that
23   after discussions earlier today, says Dr. Anderson,
24   Eddie, Bob, Mike and myself all find the genome
25   inconsistent with expectations from evolutionary
```

**DR. ANTHONY FAUCI  11/23/2022**

```
 1    theory?

 2        A.    Right.

 3        Q.    Do you know who Eddie is?

 4        A.    Eddie Holmes probably.

 5        Q.    Do you know who Bob is?

 6        A.    Could be Bob Garry.  I'm not sure.

 7        Q.    And do you know Mike is?

 8        A.    I don't, but it could be Mike Laribee.

 9    I'm not sure.

10        Q.    Okay.  And then immediately above that

11    at -- Dr. Anderson said, "the unusual features of the

12    virus make up a really small part of the genome so

13    one has to look really closely at all of the

14    sequences to see that some of the features

15    potentially look engineered --

16        A.    Right.

17        Q.    -- correct?

18        A.    Yes.

19        Q.    Does that -- is that the sort of concern

20    that he had raised in the call you had earlier that

21    day on Friday, January 31st?

22        A.    The answer is, yes, he was referring to

23    some unusual features, but if I might just take an

24    extra five seconds, it says the unusual features of

25    the virus make up a really small part of the genome
```

**DR. ANTHONY FAUCI  11/23/2022**

**Page 52**

1    and one has to look really closely, and that was the

2    tone of the discussion.

3           And just quickly referring to the last

4    sentence in the second paragraph when he was talking

5    about inconsistent with expectations from

6    evolutionary theory, the next sentence says, "but we

7    have to look at this much more closely and there are

8    still further analyses to be done, so those opinions

9    could still change."

10       **Q.    Did you think this was an alarming concern**

11   **that he was raising?**

12       A.    I think it was an interesting and

13   important concern, and that was the reason why we all

14   agreed it would be a very good idea to get a larger

15   group of qualified evolutionary virologists to look

16   closely, more than just a quick look, but a look over

17   a period of a couple of days at the virus to see if,

18   in fact, this concern and suspicion was justified or

19   there could be another explanation for it.

20       **Q.    Can you stay in that same document,**

21   **Exhibit 6, and flip ahead to the eighth page of the**

22   **document that's got a Bates Number 2432 at the**

23   **bottom?**

24           MR. KIRSCHNER:  Counsel, I, again, ask you

25   to allow Dr. Fauci sufficient time to -- actually,

**DR. ANTHONY FAUCI  11/23/2022**

Page 53

```
 1   counsel, this seems to be several documents together.
 2   I'm a little confused what's going on with -- with --
 3   with this exhibit.
 4   BY MR. SAUER:
 5       Q.    Can you turn to the eighth page of the
 6   exhibit, please?
 7            MR. KIRSCHNER:  Well, I would like for
 8   Dr. Fauci to have an opportunity to familiarize
 9   himself with this exhibit prior to answering
10   questions.
11            MR. SAUER:  I just want him to look at the
12   eighth page.
13   BY MR. SAUER:
14       Q.    Do you see the eighth page?
15       A.    Is that 2421?
16       Q.    2432.
17       A.    Oh, excuse me, 2432.  I'm sorry.  This --
18   the numbers are kind of -- oh, it's going the
19   opposite direction.  Sorry.  The -- I got 2430 and
20   then it's followed by 2431, and then it's 2421.
21            MR. KIRSCHNER:  I have the same.
22            THE WITNESS:  I'm sorry.  I'm confused.
23   BY MR. SAUER:
24       Q.    Can you go to -- starting at the first
25   page, count eight pages.  One, two, three, four,
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 54

```
 1   five, six, seven, look at the eighth page.
 2               MR. KIRSCHNER:  Well, counsel, this seems
 3   to be out of order with the Bates stamping, and so I
 4   would object to this as being misleading.  2432 is
 5   inserted in this document between 2402 and 2426.
 6               MR. SAUER:  Off the record, please.  Can
 7   we go off the record?
 8               THE VIDEOGRAPHER:  Time is 9:04 a.m., and
 9   we are going off the record.
10               (Discussion off the record.)
11               (Recess.)
12               THE VIDEOGRAPHER:  The time is 9:05 a.m.,
13   and we're back on the record.
14   BY MR. SAUER:
15       Q.    Dr. Fauci, do you see the eighth page of
16   this document?
17       A.    Yeah.  If it's the one that says, "Hugh,
18   it's essential that we speak," yeah.
19       Q.    Correct, yeah.  And at the top of this
20   page, you sent this e-mail to Hugh Auchincloss?
21       A.    Correct.
22       Q.    Is that how you say his name?
23       A.    That's correct.
24       Q.    You sent this e-mail to Hugh Auchincloss,
25   your principal deputy --
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 55

```
 1        A.    Yes.
 2        Q.    Did you send it at 12:29 a.m. on Saturday,
 3   February 1st?
 4        A.    Yes.
 5        Q.    In the "To" e-mail, there's a cc there
 6   that's redacted out.  Do you know who you CC'd on
 7   this e-mail?
 8        A.    No.  I don't recall.
 9        Q.    Would you have CC'd one of your personal
10   e-mail addresses on this?
11        A.    No, I very rarely do that.
12        Q.    Have you ever done that?  Have you
13   ever CC'd your personal e-mail on a
14   work-related matter?
15        A.    You know, I don't recall.  I doubt that.
16   I doubt that.
17        Q.    Do you see there's an attachment listed on
18   this e-mail?  Attachments?  Do you see where it says,
19   Shi, et al., Nature Medicine --
20        A.    Yeah.
21        Q.    -- SARS Gain of Function?
22        A.    Right.
23        Q.    Do you know what that attachment was?
24   It's not included on the e-mail.
25        A.    You know, it says, "SARS Baric, Shi, et
```

**DR. ANTHONY FAUCI  11/23/2022**

**Page 56**

 1  al., Nature Medicine."  It could possibly have

 2  been -- it could possibly -- again, I don't know for

 3  sure, but it's certainly consistent with it being

 4  Exhibit No. 4.

 5       **Q.    And that is the 2015 article?**

 6       A.    Right.

 7       **Q.    Coauthored?**

 8       A.    Right.

 9       **Q.    In part by Ralph Baric and Shi Zhengli**

10  **that we talked about earlier?**

11       A.    Right.

12       **Q.    Do you recall attaching that particular**

13  **exhibit to this e-mail to Hugh?**

14       A.    I can't say that I recall that particular,

15  but it is certainly consistent with that because the

16  attachment title is Baric, Shi, Nature Medicine.

17            So it certainly is consistent with, and

18  maybe likely that that's what I was referring to.

19  All those things look consistent.

20       **Q.    In other words, that Exhibit 4 is a Nature**

21  **Medicine article; correct?**

22       A.    Exhibit 4 is a Nature Medicine article.

23       **Q.    And two of the coauthors are Baric and Shi**

24  **that we talked about earlier?**

25       A.    Correct.  Yes.

**DR. ANTHONY FAUCI  11/23/2022**

Page 57

1      Q.      And then did you describe it as a SARS
2   gain-of-function article?
3           MR. KIRSCHNER:  Objection.
4   Mischaracterizes the evidence.
5   BY MR. SAUER:
6      Q.      Did you describe it as that?
7      A.      It looks like it was described as that.
8      Q.      Do you know if you were the one who wrote
9   that title describing that article?
10     A.      I don't recall.  I'm not sure exactly why
11  those words got in there.  It was maybe something
12  that was mentioned by Baric.  I don't really recall.
13  That was some time ago.
14     Q.      Do you think that that article, it refers
15  to the gain of function or do you not recall?
16     A.      I don't recall.
17     Q.      Do you know why you attached that article
18  to this e-mail to Hugh, your principal deputy?
19     A.      I don't recall, but I believe -- and
20  again, I would say I don't precisely recall, but
21  there was some recollection or someone told you that,
22  you know, we do fund research in China,
23  particularly surveillance research -- I think you
24  referred to it when you gave me one of the exhibits
25  about the surveillance of what might be out in the

**DR. ANTHONY FAUCI  11/23/2022**

Page 58

```
 1   community among bats.  And at my recollection, I
 2   brought to Hugh's attention, saying, "We have to
 3   speak in the morning, because I want to find out what
 4   the scope of what it is that we are funding so I'll
 5   know what we're talking about."
 6            And that's what I was referring to when I
 7   said you will have tasks today to give me some
 8   information because this was the first that I had
 9   heard about specifics of what EcoHealth and what
10   other people were doing, and I wanted my staff to say
11   get me up to date.  So that's what I meant by you
12   have work to do.
13       Q.    And you said that it was essential that we
14   speak this morning, this a.m.; correct?
15       A.    Right.
16       Q.    And so you wanted him -- and you said keep
17   your cell phone on; correct?
18       A.    Right.  Yeah.  And the reason is that I
19   know that we were going to have a phone call with the
20   larger group of evolutionary virologists, and this is
21   the first that I had heard of what we may or may not
22   be funding through EcoHealth and others, and I wanted
23   to get a better scope of just what the terrain of
24   what we were doing in collaboration with different
25   scientists, and that's why I asked him that question.
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 59

1        Q.      Did you call Hugh's cell phone that day?

2        A.      I don't recall if I did.

3        Q.      Do you remember talking to him at all that

4    day?

5        A.      I might have, but I don't recall.

6        Q.      Later in the e-mail, you say, "Read this

7    paper, as well as the e-mail that I will forward to

8    you now."

9        A.      Right.

10       Q.      What are the tasks that must be done

11   today?

12       A.      I wanted to be briefed on the scope of

13   what our collaborations were and the kind of work

14   that we were funding in China.  I wanted to know what

15   the nature of that work was.

16       Q.      Were you concerned at that time that the

17   work that you had funded in China might have led to

18   the creation of the coronavirus?

19       A.      I wasn't concerned that it might have, but

20   I didn't like the fact that I was completely in the

21   dark about the totality of the work that were

22   being done, and I was going into a phone call with a

23   larger group of established scientists and I wanted

24   to have at my fingertips just what we were and were

25   not doing.

DR. ANTHONY FAUCI  11/23/2022

Page 60

```
 1        Q.    In the call earlier that evening, had
 2   Christian Anderson or Jeremy Farrar raised this 2015
 3   Nature Medicine paper in any way?
 4        A.    I don't recall.
 5        Q.    How did you think of it?  How did this --
 6   why were you, at midnight, a little after midnight,
 7   thinking of this particular 2015 article?
 8        A.    I don't recall.
 9        Q.    Do you remember how this article kind of
10   got on your radar screen at all?
11        A.    I don't recall.
12        Q.    And I think I showed you earlier, the
13   e-mail, I think is Exhibit 5, where it refers to the
14   grant pursuant to that coronavirus from about three
15   days earlier?  Do you remember that?
16        A.    I'm sorry.  You're going pretty quickly --
17        Q.    Sorry.
18              THE COURT REPORTER:  Also, Counsel, I need
19   you to slow down.
20   BY MR. SAUER:
21        Q.    Let's move on actually.  Your testimony is
22   you do not remember how you became aware at this time
23   of the Shi, Baric Nature Medicine paper; correct?
24        A.    Say that again?  At this time, I'm sorry,
25   I'm not getting your question clearly.
```

Case 3:22-cv-01213-TAD-KDM   Document 206-1   Filed 03/04/23   Page 61 of 446 PageID #: 11476

**DR. ANTHONY FAUCI  11/23/2022**

```
1          Q.    Do you recall how you became aware of this

2    attachment that you've called Baric, Shi, et al.,

3    Nature Medicine SARS gain-of-function?

4          A.    I don't recall -- I mean, I became aware

5    of it, but right now, I really don't recall what

6    specific day I became aware of it.

7          Q.    In your e-mail, you tell Hugh, "Read this

8    paper as well as the paper I will forward to you

9    later on."

10              Can you turn to the next page?

11         A.    Yeah.

12         Q.    And here it's an e-mail just a couple

13    minutes later -- it's literally the same minute that

14    you sent to Hugh at 12:29 a.m. on Saturday, February

15    1st, 2020; correct?

16         A.    Right.

17         Q.    And here you're forwarding him that same

18    Jon Cohen article that you had sent to Christian

19    Anderson and Farrar?

20         A.    Did I send it to Christian and Farrar?

21    Yeah.

22         Q.    Remember sending it to him and saying to

23    him:  This is of interest in the current discussion?

24    This same Jon Cohen e-mail or article?

25         A.    I'm sorry.  I'm getting confused with your
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 62

```
 1   question.  So what is the question?
 2        Q.    Well, let me ask you this:  Looking at
 3   this second e-mail to Hugh Auchincloss?
 4        A.    Right.
 5        Q.    Why did you forward him this
 6   particular article?
 7             MR. KIRSCHNER:  Objection.  Calls for
 8   speculation.
 9             THE WITNESS:  Yeah, I actually don't
10   recall why I forwarded it to him.
11   BY MR. SAUER:
12        Q.    Did you -- you forwarded him two articles,
13   right?  The Baric, Shi Nature Medicine article at
14   12:29 a.m., and then the Jon Cohen Science article as
15   well?
16        A.    Yeah.
17        Q.    Do you know why you did that?
18        A.    I don't recall why I did that.  I think I
19   wanted him to be aware because the question that I
20   was really getting at with him is that I want to find
21   out what the scope of what we were doing in China
22   because they obviously called me up and said they had
23   a concern about a virus.  I wanted to make sure I
24   knew everything that we were doing there.
25        Q.    Do you remember --
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 63

```
 1      A.     That was the purpose of my e-mail.
 2      Q.     Do you remember talking to him about that?
 3             MR. KIRSCHNER:  Objection.  Asked and
 4      answered.
 5      BY MR. SAUER:
 6      Q.     If you know?
 7             Do you remember talking to Hugh about that
 8      concern?
 9      A.     I don't remember, but I think somewhere it
10      says -- I think I said I was going to call you
11      somewhere.  I'm not -- I don't recall speaking to
12      him.  I -- I recognize the e-mails because, as I said
13      and I'll repeat, I was going to be on a phone call
14      with a large group of people who are very versed in
15      the field, and I didn't want to go into the phone
16      call not knowing the scope of what our relationship
17      was regarding funding of grants in China.  I was not
18      familiar with these grants.
19      Q.     Did you ever raise those grants in China
20      in the phone call you had later that day with all the
21      scientists?
22      A.     I don't believe I did.  I might have, but
23      I don't believe I did.  The discussion -- I was
24      relatively silent in the discussion with the group of
25      about a dozen people.  They were all evolutionary
```

**DR. ANTHONY FAUCI  11/23/2022**

```
 1   virologists, and the nature of the discussion was

 2   back and forth about the likelihood or not of there

 3   being a manipulation.

 4              No, I don't recall bringing this up.  In

 5   fact, what I did have -- heard in statements from

 6   people who were on the call that I was, you know,

 7   quite open and let people talk and decide what they

 8   wanted to do, but that's not my field, evolutionary

 9   virology.

10        Q.    Do you remember saying anything at all on

11   that call?

12        A.    I may have said a few things, but I was

13   relatively silent on that call.

14        Q.    Do you know what they were?

15        A.    What "what" were?

16        Q.    The things that you may have said.

17        A.    No, I don't recall, but I certainly was

18   not one of the people actively engaged in the

19   discussion.  I was relatively quiet because I wanted

20   to hear what they had to say.

21        Q.    Can you flip ahead in that document to --

22   five more pages from that ninth page that we were

23   on -- or six more pages from that ninth page that we

24   were on.  There's a document that's Bates Number

25   2421.
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 65

```
 1        A.    2421?

 2        Q.    Yeah.  It's an e-mail from you to --

 3        A.    Yes, got it.

 4        Q.    -- Lawrence Tabak.  Do you have that?

 5        A.    Yes.

 6        Q.    Who -- who -- who's Lawrence Tabak or

 7   Tabak?

 8        A.    Lawrence Tabak is the -- at the time was

 9   the deputy director of the National Institutes of

10   Health.  He is currently the acting director of

11   the National Institutes of Health.

12        Q.    Do you see -- did you forward him the same

13   article at 1:13 in the morning?

14              MR. KIRSCHNER:  Objection.

15   Mischaracterizes the time.

16   BY MR. SAUER:

17        Q.    Or was that done at a different time?

18              MR. KIRSCHNER:  Just for the clarity of

19   the record, counsel, it says 13:19.

20   BY MR. SAUER:

21        Q.    Sorry.  At 1:19 in the morning?

22              MR. KIRSCHNER:  In the morning or

23   afternoon?

24   BY MR. SAUER:

25        Q.    Was it in the morning or the afternoon?
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 66

```
 1    Do you remember?
 2        A.    Thirteen is, I believe, the afternoon.
 3        Q.    Let me ask you this:  Later that day,
 4    then --
 5        A.    Yeah.
 6        Q.    -- on Friday, February 1st, did you
 7    forward Lawrence Tabak the same --
 8        A.    Yeah.
 9        Q.    -- Nature Medicine article that you sent
10    to Hugh?
11        A.    Yeah.
12        Q.    Why?
13        A.    I don't recall why, but likely I wanted to
14    make sure everyone was aware of what the discussions
15    were.  Francis Collins, the director at the time of
16    the NIH, was on that phone call in the morning of
17    February 1st.
18        Q.    But that phone call happened in the
19    morning to your recollection?
20        A.    I believe it was in the morning.
21        Q.    Are you sure it wasn't at 2:00 p.m.?
22        A.    I don't recall.
23        Q.    If your official calendar reflects a call
24    with Jeremy Farrar at 2:00 p.m. that day, that
25    Saturday, would you dispute that?
```

1      A.     You know, I don't recall when it was.  If

2   my calendar says it was at 2:00 p.m., then likely it

3   was at 2:00 p.m.  I don't recall.

4      **Q.     Was Mr. Tabak on that call?**

5      A.     I don't believe so.  I know that

6   Francis Collins was.  I don't believe that Larry was,

7   but he could have been.

8      **Q.     Were you sending it to him so that he**

9   **could give it to Francis Collins?**

10     A.     I don't recall.  That is a possibility

11   that I would have done that.

12     **Q.     Had you discussed with Francis Collins**

13   **that day this concern about -- concern -- had you**

14   **discussed with Francis Collins that day the**

15   **possibility that NIAID had funded research in China?**

16     A.     I don't believe so.  I -- I mean, that we

17   funded research in China?  Well, everybody knows we

18   fund research in China.

19     **Q.     More specifically, had you discussed with**

20   **Francis Collins that day an issue that you may**

21   **have -- that NIAID may have funded**

22   **coronavirus-related research in China?**

23     A.     You know, I'm not sure exactly the point

24   you're making.

25     **Q.     I'm just asking if you discussed that**

**DR. ANTHONY FAUCI  11/23/2022**

Page 68

```
 1    issue with Francis Collins?
 2         A.    I don't recall --
 3         Q.    Okay.
 4         A.    -- to be honest with you.
 5         Q.    That's all I'm -- can you turn to the next
 6    page?  Do you see this e-mail exchange between you
 7    and Hugh Auchincloss?
 8         A.    Yeah.
 9         Q.    Okay.  What's the time of this e-mail?
10    17:51, is that 5:51 in the afternoon where you
11    sent --
12         A.    Yeah.
13         Q.    And then you respond in the e-mail that he
14    sent you at 11:47 a.m. that morning; is that correct?
15              MR. KIRSCHNER:  Counsel, I would ask if
16    you'd give Dr. Fauci a moment to familiarize himself
17    with this document prior to asking questions.
18              THE WITNESS:  Okay.  The paper you sent me
19    says the experiments were provided --
20              ^ (Witness reading to himself.)
21              THE WITNESS:  I'm not sure what that means
22    since --
23              (Witness reading to himself.)
24              THE REPORTER:  And, Dr. Fauci, I need you
25    to speak up.
```

**DR. ANTHONY FAUCI  11/23/2022**

```
 1              THE WITNESS:  Okay.  I'm reading from an
 2   e-mail from Hugh Auchincloss to me at 11:47 a.m. on
 3   February 1st, 2020.  And --
 4   BY MR. SAUER:
 5        Q.    I'm not asking you to read the e-mail.
 6   I'm just asking you to --
 7        A.    Okay.  But she asked me to.
 8        Q.    I'm asking you to identify what time that
 9   e-mail from Hugh was sent to you.
10              MR. KIRSCHNER:  And, Counsel, I'm asking
11   you to give the witness an opportunity to familiarize
12   himself with this document.
13              THE WITNESS:  And what's what I was
14   reading when you're telling me to read it out loud.
15   So let's get together here.
16              THE REPORTER:  And if you read on the
17   record, I need you to speak up so that I can get it
18   on the record --
19              THE WITNESS:  Okay.  I'll keep my mouth
20   shut and read it silently so it's not on the record.
21              Okay.  What's the question, sir?
22   BY MR. SAUER:
23        Q.    Hugh e-mailed you saying, "The paper you
24   sent me says the experience would perform before the
25   gain-of-function pause that have since been reviewed
```

**DR. ANTHONY FAUCI  11/23/2022**

**Page 70**

1   and approved by the NIH."

2           Do you know what he was referring to when

3   he said that?

4       A.   I don't know exactly, but I'm assuming and

5   I think correctly, apropos of what I've been telling

6   you for the last several minutes, is that I wanted to

7   get a feel of the scope of what we were doing, and I

8   had mentioned to Hugh, I'm sure, "Hugh, I want to

9   know everything that's going on because I want to

10  make sure that I understand all of what our

11  involvement is in funding research in China."

12          And Hugh's response was he looked at it

13  and he said everything's been reviewed and approved

14  by NIH, and Emily, who is Emily Erbelding, is the

15  director of the Division of Microbiology and

16  Infectious Diseases, and she would have been the one

17  who was closest to the ground in understanding what

18  we were doing in funding China.

19          And it says, "Emily is sure that no

20  coronavirus work had gone through the P3 framework,

21  which means it did not rise to the level of concern

22  to get the extra approval of P3CO.  She will try to

23  determine if we have any distant ties to this

24  work and above -- all of these sentences and

25  statements are compatible with what I mentioned to

**DR. ANTHONY FAUCI  11/23/2022**

```
 1   you a couple of times now is that this being the
 2   first time I had heard of this, I wanted to be
 3   briefed as to the extent of our involvement
 4   with funding in China.
 5        Q.    Did you raise a specific concern with Hugh
 6   about the possibility that the 2015 research paper
 7   had been inconsistent with the gain-of-function
 8   moratorium that was in place -- put in place in 2014?
 9             MR. KIRSCHNER:  Objection.  Vague.
10   Ambiguous.
11             THE WITNESS:  Again, I'm sorry.  Did --
12   did I --
13   BY MR. SAUER:
14        Q.    Did you raise a specific concern with Hugh
15   that the research reflected in the Baric, Shi Nature
16   Medicine paper may have been inconsistent with the
17   pause on --
18        A.    Right.
19        Q.    -- gain-of-function funding research?
20        A.    That is possible.  As I've said, again,
21   very consistent with what I've been saying, I wanted
22   to make sure I had a good feel for the scope of what
23   we were doing regarding research that we fund in
24   China.  Since that was not something that was on my
25   radar screen, and I will say so that you understand,
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 72

1  this is a $120,000 a year grant in a $6.3 billion

2  portfolio.  So --

3      Q.    Above that on the e-mail you respond to

4  Hugh, "Okay, stay tuned."  Do you see that?

5      A.    Yes.

6      Q.    Stay tuned.  Did you have any follow-up

7  communications with him about this?

8      A.    I don't recall.

9      Q.    Do you remember talking to Emily Erbelding

10  about it at all?

11      A.    I don't recall.  I don't -- I might have.

12  I don't -- I believe certainly that Hugh did.  He

13  said he did on the e-mail.  He said, Emily is sure

14  that no coronavirus work has gone through the P3

15  framework.  Whether I specifically spoke to Emily, I

16  don't recall but Hugh certainly did.

17      Q.    And Emily works for NIAID?

18      A.    Emily is the director of the Division of

19  Microbiology and Infectious Diseases at NIAID.

20      Q.    Can you turn the page one page in this

21  document?

22      A.    Yeah.

23      Q.    Do you see in the bottom part of this

24  page, there's an e-mail from Jeremy Farrar dated

25  February 1st, 2020, at 1524?

**DR. ANTHONY FAUCI  11/23/2022**

```
 1        A.    Yeah.

 2              MR. KIRSCHNER:  Again, Counsel, I would

 3     ask you to give Dr. Fauci an opportunity to

 4     familiarize himself with this document.

 5     MR. SAUER:

 6        Q.    You see immediately below that --

 7        A.    Yes.

 8        Q.    -- where he says, "1st February, 2nd Feb

 9     for Eddie"?

10              Is Eddie Eddie Holmes?

11        A.    I believe it is.  He is in Australia.

12        Q.    So he would be a different date than

13     everyone else?

14        A.    Right.

15        Q.    And then he says, "Information and

16     discussion is shared in total confidence and not to

17     be shared until agreement on next steps."

18              Do you see that?

19        A.    I do.

20        Q.    Do you remember any discussions with

21     Jeremy Farrar about this call being kept in total

22     confidence?

23        A.    I don't recall a discussion about

24     confidentiality or not, but I would imagine that

25     Jeremy -- and again, this is speculation -- I would
```

**DR. ANTHONY FAUCI  11/23/2022**

```
 1   imagine that Jeremy wanted to make sure, when you
 2   have something that obviously has a degree of
 3   sensitivity to it, that he didn't want people just
 4   blathering about it without proper discussion first,
 5   and I think that's what he meant, but that's
 6   speculation on my part.
 7        Q.    Do you remember Jeremy saying anything
 8   about that, keeping it in confidence at any time?
 9        A.    I don't recall, but it is certainly
10   possible that he said that.  It's understandable that
11   he would say that.
12        Q.    Did you ever say anything about keeping in
13   confidence to your recollection?
14        A.    I may have.  I don't recall.
15             THE COURT REPORTER:  And Counsel, I would
16   remind you to slow down, please.
17   BY MR. SAUER:
18        Q.    Can you just turn one page further?  Do
19   you see there, the last text on that page, he's got a
20   list of participants on a call?
21        A.    Yes.  I see that.
22        Q.    Do you know how these participants were
23   selected?
24        A.    It was predominantly -- to my
25   recollection, it was predominantly Christian and
```

**DR. ANTHONY FAUCI  11/23/2022**

1    Jeremy who made the selection of these people.

2         **Q.    Do you have any role in picking who would**

3    **participate in the call?**

4         A.    I don't believe I did.  I felt that

5    Francis Collins should be on the call since he's the

6    director of NIH.

7         **Q.    And did you loop him in later?**

8         A.    I believe I did.  I believe I sent him an

9    e-mail or somehow connected him with the pending

10   phone call.

11        **Q.    Who's Patrick Vallance at the bottom of**

12   **the list or valence?**

13        A.    Patrick Vallance is Sir Patrick Vallance,

14   who is the chief scientific -- or medical -- I

15   believe it's either one or the other -- I believe

16   it's the chief scientific officer who reports to the

17   prime minister of the United Kingdom.

18        **Q.    Is there anyone on this list who's**

19   **affiliated with government as opposed to being an**

20   **independent researcher?**

21        A.    You know, I don't know because many

22   scientists internationally have an affiliation with a

23   government.  But looking at these names, I don't see

24   anybody there on this list that is known to me to be

25   affiliated with any government.

DR. ANTHONY FAUCI  11/23/2022

Page 76

```
 1          Q.      What is Jeremy Farrar's role?
 2          A.      Jeremy, at the time -- and I believe he
 3    still is -- is the director or CEO or head -- I'm not
 4    sure what the title is -- but he is the chief person
 5    at the Wellcome Trust in the United Kingdom.
 6          Q.      Does the Wellcome Trust award grants for
 7    funding scientific research?
 8          A.      Yes, they do.
 9          Q.      About how much do they award per year, do
10    you know?
11          A.      I do not know.
12          Q.      Is it a significant amount?
13          A.      I guess so.  I don't know for sure.  I
14    would imagine it is -- it's a predominant
15    organization in the UK.
16               MR. KIRSCHNER:  Counsel, we've been going
17    for close to an hour and a half.  How much longer on
18    this line of questioning?
19               MR. SAUER:  Well, why don't we finish this
20    document.  Are you okay?
21               MR. KIRSCHNER:  Well, do you know how much
22    longer with this document?
23               MR. SAUER:  Not long.
24               MR. KIRSCHNER:  Okay.
25    BY MR. SAUER:
```

DR. ANTHONY FAUCI  11/23/2022

Page 77

```
 1        Q.    You testified earlier that on this call --
 2   I take it that this call actually occurred, didn't
 3   it?
 4        A.    The call on Saturday -- I believe it was
 5   February 1st -- did occur.
 6        Q.    And you testified earlier there was
 7   scientific back and forth --
 8        A.    Right.
 9        Q.    -- among some of the participants?
10        A.    Right.
11        Q.    And they were discussing and debating, you
12   know, whether the virus had originated from a
13   laboratory as opposed to in nature; correct?  Do you
14   remember anything that anybody said on the call?
15        A.    No.  The only thing I do remember is that
16   there was what appeared to me to be good faith
17   discussion back and forth between people who knew
18   each other, people who had interacted with each
19   other, so they had mutual respect for each other's
20   opinion.
21             I got that impression in listening and I
22   was in a total listening mode because, as I
23   mentioned, these were evolutionary virologists who
24   were talking about the specifics of what detail made
25   them suspicious that it could have been a
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 78

```
 1   manipulation and the other side would counter and
 2   show that this is compatible with a natural evolution
 3   and they were going back and forth.  The tenure of it
 4   ended that we need more time and I believe that in
 5   one of the e-mails that you asked me about a little
 6   bit ago that they said we need some time to more
 7   carefully look at this to see if we can come to a
 8   sound conclusion based on further examination of the
 9   sequences.
10        Q.    Was there concern expressed in the call
11   that people might, you know, express in the media or
12   social media conspiracy theories or anything like
13   that?
14             MR. KIRSCHNER:  Objection.  Vague.
15   Ambiguous.
16   BY MR. SAUER:
17        Q.    If you recall?
18        A.    You know, I don't -- I don't recall
19   whether that was discussed.  I believe there was some
20   concern after that.  Just the mention of something
21   being manipulated could create a lot of buzz-buzz and
22   discussion, but I don't really recall anything
23   specifically that was said during the call about
24   this.
25        Q.    Do you remember any discussion of people
```

**DR. ANTHONY FAUCI  11/23/2022**

```
 1   having concerns that expressions on social media that
 2   the virus was originated in a lab might discredit
 3   scientific funding projects?
 4       A.    I don't recall anything from that phone
 5   call that said that.
 6       Q.    How about in this -- in this time period.
 7   Is that something you ever discussed with Jeremy
 8   Farrar?
 9            MR. KIRSCHNER:  Objection.  Vague.
10   Ambiguous.
11            THE WITNESS:  I'm not sure if I discussed
12   it with Jeremy Farrar.  I have a vague recollection
13   that there was concern about -- I don't think it had
14   anything to do with social media, but it was a
15   concern of diverting attention from the real task of
16   pursuing what needs to be pursued with this outbreak,
17   for the better good of the public health, a
18   distraction of some sort.
19   BY MR. SAUER:
20       Q.    So are -- specifically, would the theory
21   that the virus escaped from a lab might be a
22   distraction from the response to the virus's spread?
23       A.    No.  I think the general feeling among the
24   participants on the call is that they wanted to get
25   down to the truth and not wild speculation about
```

DR. ANTHONY FAUCI  11/23/2022

Page 80

1  things.  They are scientists, highly regarded

2  qualified evolutionary virologists, and they make as

3  their mantra always sticking with evidence and

4  sticking with data, and I believe there's always a

5  concern that when you throw speculations in that are

6  not based on data and evidence, that that's a

7  diversion from more proper things that should be

8  done.

9          I don't think there was any other concern

10  than sticking with the truth and sticking with data,

11  and part of the data would be to carefully look at

12  the virus in a careful measured way and to determine

13  whether or not the initial concern about the

14  molecular makeup upon further examination either

15  validated that concern or made it clear that that

16  concern was somewhat unwarranted, if not completely

17  unwarranted.  That was the nature of the discussion.

18      **Q.    Was the consensus on the call, I think you**

19  **said earlier, that they needed more time**

20  **to investigate this possibility?**

21      A.    Right.

22      **Q.    And was the plan at the end of the call to**

23  **take more time to investigate that possibility?**

24      A.    The plan was to go and spend more time

25  carefully looking at it.  That was the -- the sort of

**DR. ANTHONY FAUCI  11/23/2022**

```
 1   end conclusion that let's take a closer look at this,
 2   and on taking a closer look, perhaps we can, you
 3   know, come to a more evidence-and-fact-based
 4   conclusion.
 5        Q.     Did they -- did they, in fact, do that?
 6   Did they take more time and come to an
 7   evidence-and-fact-based conclusion to your knowledge?
 8        A.     Oh, I believe that a few of -- Christian
 9   and a few of the others carefully got together and
10   looked at it and examined the pros and the cons and
11   the ups and downs, and came to the conclusion that
12   their initial concern about the molecular basis of
13   the concern was unwarranted and that what they saw
14   was quite compatible and, in fact, suggestive of a
15   natural evolution.
16        Q.     Did you have any further involvement after
17   the -- in this after the phone call?  Like, were you
18   talking -- did you talk to people on this call later
19   or were you included in e-mails about it after that?
20        A.     Well, after that, I believe, at some time
21   later, a group of them -- I don't remember all of
22   them, but Christian was certainly one of them -- put
23   out a preprint, I believe, with that statement that
24   was subsequently followed by a manuscript in which
25   they laid out the molecular basis of why they felt
```

Case 3:22-cv-01213-TAD-KDM    Document 206-1    Filed 03/04/23    Page 82 of 446 PageID #: 11497

**DR. ANTHONY FAUCI  11/23/2022**

Page 82

```
 1   this was more likely to be compatible with a natural
 2   evolution.
 3       Q.    During that time period, did you have any
 4   other involvement in this issue?  Did you have any
 5   other communications related to it with any of these
 6   people?
 7           MR. KIRSCHNER:  Objection.  Vague.
 8   Ambiguous.
 9           THE WITNESS:  When you say "involvement,"
10   could you be more specific?
11   BY MR. SAUER:
12       Q.    Well, did you have any -- let me ask you
13   this:  Did you have any communications after the
14   Saturday, February 1st, phone call that you just
15   described, from that time period until a preprint was
16   published of their study, did you have any other
17   discussions or communications with any of the people
18   on the call about this issue of the virus?
19       A.    You know, I had not recalled that until, I
20   believe, in questions that were asked in letters that
21   came in from Congress and others that they may
22   have -- and I believe they did -- send
23   Francis Collins and I a preprint of the article that
24   came to the conclusion that the molecular
25   configuration of the virus was clearly compatible
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 83

```
 1    with a natural occurrence.
 2         Q.    Do you recall any communications with
 3    Jeremy Farrar after that phone call?
 4         A.    You know, I don't.  It is certainly
 5    possible, but I don't specifically remember any
 6    communications with Jeremy about that.  But, you
 7    know, Jeremy and I know each other reasonably well.
 8    I would not be surprised if we did, but I don't
 9    specifically recall a communication related to the
10    subject at question.
11              MR. SAUER:  That's my last question on
12    this exhibit.  Do you want to take a pause now?
13              MR. KIRSCHNER:  Yeah.  If -- if -- it's
14    9:37, if that works for Dr. Fauci?
15              THE WITNESS:  Yeah, a short -- short
16    break.  I'm good.
17              THE VIDEOGRAPHER:  The time is 9:38 a.m.,
18    and we're going off the record.
19              (Recess.)
20              THE VIDEOGRAPHER:  The time is 9:50 a.m.,
21    and we're back on the record.
22    BY MR. SAUER:
23         Q.    Dr. Fauci, you're being handed
24    Exhibit 7 --
25              (FAUCI Exhibit No. 7 was marked for
```

**DR. ANTHONY FAUCI  11/23/2022**

 1    identification.)

 2    BY MR. SAUER:

 3        Q.    -- which is a collection of e-mails that

 4    were produced pursuant to FOIA.  On the front page

 5    here just at the very top, there's an e-mail from you

 6    to Jeremy and Christian Anderson; correct?

 7        A.    Correct.

 8        Q.    And it says, "Jeremy, Collins," and

 9    there's a huge redaction of everything you said.

10    "Best regards, Tony."  Do you see that?

11        A.    I do.

12        Q.    Do you have any recollection of what

13    you're talking about in this e-mail?

14        A.    No, I don't.  I don't recall.

15        Q.    Okay.  Flip ahead four page -- to the

16    fourth page.  There's an e-mail from Jeremy Farrar to

17    you on January 30th saying, "Tony, perfect timing.

18    Thank you.  Great to catch up"; correct?

19        A.    Yeah, the January 30th at 7:13 a.m.?

20        Q.    Right.

21        A.    Yeah.  "Tony, perfect timing.  Thank you.

22    Great to catch up."

23        Q.    And you responded, "Thanks, Jeremy.  Great

24    chatting with you and Patrick.  Will stay in close

25    touch" --

DR. ANTHONY FAUCI  11/23/2022

Page 85

```
 1        A.     Right.

 2        Q.     -- correct?

 3        A.     Correct.

 4        Q.     Do you recall -- and I guess this would be

 5   two days before that Saturday conference call we

 6   talked about?

 7        A.     Yeah.

 8        Q.     Did you have a phone call with

 9   Patrick Vallance and a Jeremy Farrar on -- on that

10   day?

11        A.     Well, I don't recall it, but it says here

12   in an e-mail from me to Jeremy on January 30th,

13   "Great chatting with you and Patrick."  So I assume I

14   did, but I don't recall that -- that --

15        Q.     Do you know why you said, "We'll stay in

16   close touch"?

17        A.     No, I don't recall.

18        Q.     Do you remember what you-all -- you,

19   Jeremy, and Patrick may have said to each other on

20   that phone call?

21        A.     No, I really don't recall that.  I mean,

22   obviously it happened because I -- I refer to it in

23   the e-mail, but I don't recall that, no.

24        Q.     Can you -- can you flip ahead?  So we're

25   going to go one, two, three, four, five, six, seven,
```

DR. ANTHONY FAUCI  11/23/2022

```
 1   eight, nine more pages to a page that has an e-mail
 2   from Jeremy to you on February 1st saying "could you
 3   join" at the top?
 4        A.    Yes.
 5        Q.    Correct?
 6        A.    I see that.
 7        Q.    And is this Jeremy inviting you to the
 8   conference call that would happen later that day?
 9              MR. KIRSCHNER:  Objection.  Speculative.
10   BY MR. SAUER:
11        Q.    If you recall?
12        A.    Yeah.  It looks that way.  I mean, I know
13   we had a conference call on February the 1st, and
14   Jeremy in this e-mail is saying "can you join," and
15   the names on the list are the names that were on the
16   call.  So I would imagine it's quite reasonable to
17   assume that this is the invitation to join the call.
18        Q.    Lower -- yeah.  Lower down in Jeremy's
19   e-mail close to -- close to the bottom, about four
20   lines up from the bottom, he says, "My preference is
21   to keep this a really tight group."
22              Do you see that?
23        A.    Yes.
24        Q.    Do you know why that was his preference?
25              MR. KIRSCHNER:  Objection.  Speculative.
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 87

```
 1                  THE WITNESS:  You know, I don't really
 2     know why.  I think -- I mean, I -- I could speculate
 3     as to why that -- when you have too large a group --
 4     BY MR. SAUER:
 5          Q.    To be clear, I'm not asking you to
 6     speculate.  I'm just asking if you know.  For
 7     example, did he tell you why he wanted it to be a
 8     really tight group --
 9          A.    No, he didn't tell me why, but I can -- I
10     can gather why if you're not interested in hearing
11     it --
12          Q.    What do you gather?  What do you gather?
13                  THE REPORTER:  And please slow down, you
14     guys.
15                  THE WITNESS:  Okay.  I'll slow down.  I
16     said --
17     BY MR. SAUER:
18          Q.    What do you gather?
19          A.    My knowledge of meetings of this sort is
20     that when you want to get something done and you have
21     a task to do, that if you have a really large group
22     of people -- like, I've been on conference calls
23     where there's 50 people on the call and nothing gets
24     done -- I believe, and I think it's a reasonable
25     assumption, that if you want to have a working group
```

DR. ANTHONY FAUCI  11/23/2022

```
 1   to have a serious discussion, you don't want to have
 2   a hundred people on the call.  You want to make it --
 3   and I think that's -- I think that's what Jeremy was
 4   referring to was he said, "I want to make it a tight
 5   group."
 6        Q.    And then four lines lower he says,
 7   "obviously" -- "obviously ask everyone to treat in
 8   total confidence"; correct?
 9        A.    Yes.
10        Q.    Do you know why it was obvious that it
11   should be treated in total confidence?
12             MR. KIRSCHNER:  Objection.  Asked and
13   answered.  Also speculative.
14   BY MR. SAUER:
15        Q.    If you know.  Why is that obvious?
16        A.    Well, my speculation is that what
17   Jeremy meant is that when you're dealing with
18   something in which there is a suspicion of something
19   that would have great consequences but there's no
20   real evidence that it is, that you want to make sure
21   that you don't all of a sudden have a lot of people
22   talking about something based on no evidence.
23             So I think that's what he meant is until
24   we can get together and seriously discuss it, let's
25   not just make it widely disseminated.
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 89

```
 1          Q.     So he didn't like --
 2          A.     I believe that's what he said, but I -- I
 3     don't know.
 4          Q.     Do you know if he wanted Dr. Anderson to
 5     not share his concerns about the origins of the virus
 6     potentially being from a lab with anyone else?
 7                 MR. KIRSCHNER:  Objection.  Speculative.
 8     Vague.
 9                 THE WITNESS:  No.  I believe based on what
10     the purpose of the call was to rather than be at the
11     level of speculation about something that may or may
12     not have been engineered, that we first get a group
13     of highly qualified international evolutionary
14     virologists to discuss it first before people on the
15     outside who have no knowledge of evolutionary
16     virology start wildly speculating about things.
17     BY MR. SAUER:
18          Q.     Can you flip ahead a few pages so the page
19     you're on -- we're going to go ahead -- one, two,
20     three, four, five and then the sixth page, an e-mail
21     from you -- from Jeremy Farrar to you and Francis
22     Collins.
23                 Do you see that?
24          A.     Are you on the page, the top line says,
25     "From Jeremy Farrar, sent Saturday, 1st of February
```

**DR. ANTHONY FAUCI  11/23/2022**

```
 1   at 13:27"?

 2             MR. KIRSCHNER:  I apologize.  I'm not on

 3   the right page then.

 4             THE WITNESS:  You got it.

 5             MR. KIRSCHNER:  Yep.

 6   BY MR. SAUER:

 7       Q.    Farrar has responded "Excellent" to an

 8   e-mail from you where you said "Jeremy, Francis will

 9   be on the call.  He is trying to phone you."

10             MR. KIRSCHNER:  Counsel, I think we're on

11   two different pages.  Dr. Fauci referred to a page

12   with a sub line re:  Conference details.  And you're

13   referring --

14   BY MR. SAUER:

15       Q.    Can you turn more pages?

16       A.    Two more forward?  Two more forward?

17       Q.    Yeah.

18       A.    Teleconference, re teleconference.

19       Q.    Yeah.  And Jeremy responded "Excellent" to

20   your e-mail saying, "Francis, Jeremy will be on the

21   call.  He is trying to phone you"?

22       A.    Right.

23       Q.    Correct?

24       A.    Correct.

25       Q.    Do you recall discussing -- talking to
```

**DR. ANTHONY FAUCI  11/23/2022**

1    **Francis Collins about getting involved in the**

2    **conference call?**

3         A.    I don't specifically recall, but

4    certainly, it was my intention of making sure that

5    the director of the NIH was on the call.  And given

6    what I said in the e-mail at 15:48 to Jeremy, I said,

7    "Francis will be on the call.  He's trying to call --

8    he's trying to phone you."

9              I mean, obviously that is totally

10   consistent with my having spoken to Francis and

11   saying, "Francis, you should be on a call.  Why don't

12   you check with Jeremy to get some feel about what the

13   call is going to be about."

14        **Q.    Do you know if they talked to each other?**

15        A.    I don't know for sure whether they did.

16        **Q.    Can you start with that page you're on and**

17   **flip ahead a few pages?  So one, two, three, four,**

18   **five, six, seven, eight, nine.  And then you're on**

19   **the tenth page?**

20        A.    And what's the top line?

21        **Q.    At the top, it should say From Dr. Fauci,**

22   **Anthony, sent Saturday, February 1, 2020, at 20:30?**

23        A.    Yeah.  And the subject is teleconference.

24        **Q.    Okay?**

25        A.    All right.

DR. ANTHONY FAUCI  11/23/2022

Page 92

1           Q.    And immediately below your e-mail saying,
2    "Yes," there's an e-mail from Jeremy Farrar sent to
3    you, Francis Collins, Patrick Vallance, and Mike
4    Ferguson; correct?
5           A.    Yes.
6           Q.    Who's Mike Ferguson?
7           A.    You know, I should know.  I don't know.
8    I've heard that name before, but I don't know who he
9    is.  He was one of the -- I believe he was one of the
10   people on the call.  Name is familiar, but, you know,
11   I probably should know who he is, but I don't.
12          Q.    Okay.  So Jeremy e-mailed to that smaller
13   group of people, "Can I suggest we shut down the call
14   and then redial just for five to ten minutes";
15   correct?
16          A.    Yes.
17          Q.    And you responded "yes"; correct?
18          A.    Yeah.
19          Q.    Did that happen -- did Jeremy shut down
20   the call?
21          A.    You know, I don't recall.
22          Q.    Do you know why Jeremy was wanting to have
23   the call paused for a minute and floated it only to
24   a small group of participants in the call?
25                MR. KIRSCHNER:  Objection.  Speculative.

**DR. ANTHONY FAUCI  11/23/2022**

Page 93

```
 1                THE WITNESS:  No, I -- I don't remember --
 2    I don't remember shutting down a call, actually.
 3    BY MR. SAUER:
 4        Q.    Do you remember Jeremy talking to you and
 5    Dr. Collins during the course of the call?
 6        A.    No, I can't recall that.
 7        Q.    Can you flip ahead one, two, three, four,
 8    five pages?
 9        A.    The top is Jeremy Farrar, 2020, 19:09?
10        Q.    Yes.  And you see it's the same list of
11    participants, Francis Collins, you, and Patrick
12    Vallance and Mike Ferguson; correct?
13                MR. KIRSCHNER:  I apologize.  I'm lost
14    myself on this.  What's the top e-mail?
15                THE WITNESS:  The top e-mail is Jeremy
16    Farrar, Saturday, 1st of February, 2020, 19:09.
17    BY MR. SAUER:
18        Q.    I'm not on that one.  Mine is 2013.  Can
19    you turn two more pages?
20        A.    Two more forward?
21        Q.    Yeah.
22                MR. KIRSCHNER:  I'd just ask counsel to
23    identify the time when the --
24                THE WITNESS:  Okay.  The one that says
25    Jeremy Farrar, teleconference 2013; right?
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 94

```
 1   BY MR. SAUER:
 2        Q.    Do you remember if Francis Collins
 3   responded to that e-mail about shutting down the
 4   conference call?
 5        A.    No.  I do not recall.  I just don't recall
 6   anything about shutting down a conference call.
 7        Q.    Okay.  Can you turn three more pages to an
 8   e-mail at 22-06-26?
 9        A.    Yeah.
10        Q.    And this is an e-mail chain between you,
11   Jeremy, and Francis Collins; correct?
12        A.    Yes.
13        Q.    Counsel, I would please ask if you can let
14   Dr. Fauci familiarize himself with the document as
15   you're asking questions?
16             MR. SAUER:  If he knows, he can answer the
17   questions.  If he wants to familiarize, he can ask
18   for it.
19   BY MR. SAUER:
20        Q.    If you go down halfway through the page,
21   there's an e-mail from Francis Collins to you and
22   Jeremy; correct?
23        A.    Let me look at it.
24        Q.    Labeled at 2050?
25        A.    Right.  Yes, I see that.
```

**DR. ANTHONY FAUCI  11/23/2022**

1      Q.    It says, "Hi, Jeremy.  I can make myself

2    available at any time, 24/7, for the call with

3    Tedros"; correct?

4      A.    Correct.

5      Q.    Do you know who Tedros is?

6      A.    Tedros is the director general of the

7    World Health Organization.

8      Q.    So there was a plan to have a call with

9    the director general of the World Health Organization

10    at this time?

11      A.    Correct.

12      Q.    Do you remember that plan?

13      A.    What I do recall from the discussion on

14    the call was that we needed to notify various

15    relevant people as to the fact that this was being

16    looked into.  One of the obvious relevant people

17    would be the director of the World Health

18    Organization.

19      Q.    Do you specifically remember a plan

20    between you, Francis, and Jeremy to contact

21    Dr. Tedros?

22            MR. KIRSCHNER:  Objection.

23    Mischaracterizes evidence and speculative.

24            THE WITNESS:  I know that there was a

25    discussion about contacting Tedros.  That

**DR. ANTHONY FAUCI  11/23/2022**

**Page 96**

```
1   responsibility was not put on me.  I believe it was
2   predominantly -- I'm not 100 percent certain, but I
3   think with some degree -- I wouldn't say certainty,
4   but I tend to believe it was Jeremy's responsibility
5   to be the one to contact and reach out to Tedros and
6   explain to him what these deliberations were.
7   BY MR. SAUER:
8       Q.    I'm going to give you a another document
9   marked Exhibit 8.
10           (FAUCI Exhibit No. 8 was marked for
11  identification.)
12           MR. KIRSCHNER:  Counsel, do you have
13  copies for us?
14  BY MR. SAUER:
15      Q.    Do you recall communicating -- before you
16  look at the document, do you recall having any
17  communication with Dr. Tedros about the concerns that
18  were raised in --
19      A.    No.  I don't recall having any
20  communications directly, or even indirectly, with
21  Tedros.
22      Q.    Did you have any input on, you know,
23  having the World Health Organization get involved in
24  this issue of any kind?
25      A.    I don't specifically recall.  But one of
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 97

1  the theme and the spirit of the discussion on the

2  phone call on February 9th, either before or after or

3  during the phone call, was that it would be important

4  to alert, or let in at least to the discussions,

5  important individuals, including the director general

6  of WHO.

7       **Q.    Can you look at this Exhibit 8 that's in**

8  **front of you, and with this one, can we start at the**

9  **back starting at the last page can you turn one page**

10 **forward to the second-to-last page?**

11          MR. KIRSCHNER:  Again, as I've objected

12 beforehand, I would please let the witness have an

13 opportunity to familiarize himself with this document

14 prior to asking questions.

15          THE WITNESS:  So I'm looking at something

16 that says "von an" -- this is, I guess, a German "to"

17 and "from."

18 BY MR. SAUER:

19      **Q.    I think so.  Are you on the second-to-last**

20 **page of the document?**

21      A.    I think so.  The one that has "von,"

22 Jeremy Farrar.  And "an," Fauci, Vallance, CC:

23 Dorsten, Coopman --

24      **Q.    Those are the participants in the call**

25 **there in the cc line.**

**DR. ANTHONY FAUCI  11/23/2022**

```
 1        A.      Right.

 2        Q.      Down there, second-to-last paragraph,

 3   there's a one-sentence paragraph there that begins

 4   there in Jeremy Farrar's e-mail, "I do know there are

 5   papers being prepared."

 6                Do you see that?

 7        A.      "I know there are papers being prepared.

 8   There will be media interest and there already is

 9   chat on Twitter and WeChat."

10        Q.      And Twitter and WeChat are social media

11   platforms; correct?

12        A.      Yes, I guess so.  I don't know about

13   WeChat, but I know what Twitter is.  I don't know.

14        Q.      You don't know what WeChat is?

15        A.      I don't do social media so I'm not

16   familiar with them.

17        Q.      Is that a Chinese-based social media

18   platform?

19        A.      I don't know.

20        Q.      Okay.  Do you remember Jeremy raising

21   concerns about the chat on Twitter and WeChat or

22   other social media platforms about the virus's

23   origins?

24        A.      No.  I'm not -- this is not ringing a bell

25   with me.
```

**DR. ANTHONY FAUCI  11/23/2022**

1      Q.     Well, let me ask you this:  Did you ever

2  have concerns about what people might be saying on

3  social media about the virus's origin?

4           MR. KIRSCHNER:  Objection.  Ambiguous.

5           THE WITNESS:  You know, I'm so dissociated

6  from social media.  I don't have a Twitter account.

7  I don't do Facebook.  I don't do any of that, so I'm

8  not familiar with that.  I've never gotten involved

9  in any of that.

10  BY MR. SAUER:

11      Q.     Do you know anyone who works for a social

12  media platform?

13      A.     Do I know somebody who works for a social

14  media platform.

15      Q.     Or at this time?

16      A.     Well, I've had communications with

17  Mark Zuckerberg in the past who was -- I've done, I

18  believe, three outward FaceTime discussions

19  encouraging people to get vaccinated.

20      Q.     Do you know anyone else who works for a

21  social media platform other than Mark Zuckerberg?

22      A.     When you say do I know somebody who works?

23      Q.     Like, do you have acquaintances, people

24  that you know, who work at social media platforms?

25      A.     Well, a person who used to work as a

**DR. ANTHONY FAUCI  11/23/2022**

1    software engineer for Twitter was my daughter.

2         Q.    Oh, your daughter worked for Twitter?

3         A.    She used to, yes.

4         Q.    Did you ever -- when she was working at

5    Twitter, did you ever discuss with her the content of

6    stuff posted on social media platforms?

7         A.    No.

8         Q.    Did you ever discuss with her the origins

9    of the virus or concerns about the origins of the

10   virus?

11        A.    No, she has no interest in that.

12        Q.    Was she -- what was her role in Twitter?

13        A.    I believe she was a software engineer.

14        Q.    Does she still work at Twitter?

15        A.    No.

16        Q.    When did she stop?

17        A.    Over a year ago.

18        Q.    Do you know anyone else who works at a

19   social media platform --

20        A.    No.

21        Q.    -- other than Mark Zuckerberg and your

22   daughter?

23              THE REPORTER:  Please slow down.

24              THE WITNESS:  Do I know anyone else who

25   works at a social media platform?  To my knowledge,

**DR. ANTHONY FAUCI  11/23/2022**

Page 101

```
 1   no, I think -- I mean, I have done a number of
 2   podcasts and interviews on Instagram, but I don't
 3   think those people work for a social media platform.
 4           I mean, I've done Instagrams with
 5   Steph Curry -- Steph Curry.  I don't think he works
 6   for a media.  He's a basketball player.  But he uses
 7   his -- his Instagram account to get me to talk with
 8   him about encouraging people to get vaccinated.
 9      Q.   Can you go back to that exhibit in front
10   of you, Exhibit 8?  We're on the second-to-last page.
11   Can you flip forward two pages, and on the top there,
12   there's another e-mail from Jeremy Farrar beginning
13   "My view is completely neutral on this."
14           Do you see that?
15           MR. KIRSCHNER:  Dr. Fauci, I think it's
16   the page before.
17           THE WITNESS:  This one?
18           MR. KIRSCHNER:  No, I think you jumped too
19   much.
20           THE WITNESS:  I jumped too much?
21           MR. KIRSCHNER:  No, it's this page, I
22   think.  Oh, nope.  I was wrong.  Sorry.
23           THE WITNESS:  I'm sorry.  Just hold on for
24   a second.  "My view is completely" -- yeah, I got it.
25   I'm on the right page.
```

DR. ANTHONY FAUCI  11/23/2022

Page 102

```
 1   BY MR. SAUER:
 2       Q.    And that next line below that, do you see
 3   where Jeremy says, "I do know these questions are
 4   being asked by politicians citing ^ starting the
 5   scientific literature and certainly on social and
 6   mainstream media."
 7             Do you see that?
 8       A.    Yeah.  (Reading to himself.)
 9       Q.    Do you see that?
10       A.    Let me finish reading it.  One second.
11             But who's the e-mail to?  I'm sorry.  Is
12   this --
13       Q.    I'm just curious if you remember
14   Jeremy raising concerns about expressions on social
15   media about the origins of the virus in this time
16   frame?
17       A.    I don't -- I don't recall anything about
18   social media.  I think Jeremy -- and I believe he
19   says it really very well here -- that what he was
20   afraid of that people would be speculating and
21   blaming people, blaming the Chinese, and -- and that
22   only will increase tensions and reduce cooperation
23   which is necessary to really continue to pursue what
24   actually happened in order to prepare for and prevent
25   similar things from happening in the future.
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 103

```
 1              And I think if you look at the e-mail, he
 2    says, "A respected body convening a group now to
 3    consider the evolutionary origins with an open mind,
 4    neutral, and in a transparent way could prevent wild
 5    claims being made."  I think it was Jeremy trying to
 6    be the honest broker and saying let's do this
 7    properly.
 8         Q.    And he's prepare -- he was concerned about
 9    wild claims being made on traditional and social
10    media.  Is that how you read it?
11         A.    Well, I guess so.  I mean, I -- let me see
12    if he says "social media" here.  Like I said, I'm
13    kind of dissociated from social media.  I don't -- I
14    don't even know how to access a tweet.
15         Q.    Were you ever concerned about what people
16    would be saying on social media about the origins of
17    the virus?
18         A.    I'm concerned about, you know, there being
19    misinformation or disinformation that would
20    interfere with our trying to save the lives of people
21    throughout the world, which happens when people
22    spread false claims.
23         Q.    Including about the origins of the virus
24    specifically?
25         A.    I mean, I think that there's a lot of
```

DR. ANTHONY FAUCI  11/23/2022

```
 1   discussions about the origins of the virus, and we've
 2   got to keep an open mind about that.
 3       Q.    You mention that you're concerned about
 4   misinformation and disinformation about the virus
 5   spreading?
 6       A.    No, I didn't say that.
 7       Q.    Okay.
 8       A.    That's not what I said.
 9       Q.    What'd you say?
10       A.    I said misinformation and disinformation,
11   and misinformation can be that Bill Gates and I put a
12   chip in the vaccine which prevents people from
13   getting vaccinated and perhaps leads to their losing
14   their lives.  That's what I get concerned about as a
15   physician and a scientist, that misinformation and/or
16   disinformation can lead to loss of life, and I'm a
17   physician and that troubles me.
18       Q.    And it troubles you that those kinds of
19   claims are being made on social media in particular?
20       A.    I didn't mention social media.
21       Q.    Does it?
22       A.    I mean, that's part of the way information
23   is disseminated.
24       Q.    Can you take the page that's in front of
25   you, and we're going to turn forward five more pages.
```

DR. ANTHONY FAUCI  11/23/2022

Page 105

```
 1    So we're really on the second page of the document

 2    now.

 3         A.    Second page.  Okay.  Moving forward.

 4         Q.    On the middle of that page, do you see an

 5    e-mail from you on Sunday, 2nd February 2020, at

 6    15:30?

 7         A.    "Jeremy, sorry I took so long."  Is that

 8    it?

 9         Q.    That's the one, yeah.

10               You say here in that second sentence --

11         A.    Right.

12         Q.    -- "Like all of us, I do not know how this

13    evolved"?

14         A.    Right.

15         Q.    Do you see that?

16         A.    Where I say, "And so many people and the

17    threat of further distortions on social media," yeah.

18         Q.    Yeah.  Were you concerned about the

19    further distortions on social media --

20         A.    Well --

21         Q.    -- the day after the conference call?

22         A.    I guess I was.  I said it here in the

23    e-mail that I was concerned about the further

24    distortions.

25         Q.    What -- what distortions on social media
```

DR. ANTHONY FAUCI  11/23/2022

Page 106

```
 1   were you concerned about?  Was that the people
 2   expressing --
 3        A.    Wild -- wild speculations and accusations,
 4   you know, blaming the Chinese and talking about their
 5   deliberately or accidentally -- which certainly is a
 6   possibility.  There was no evidence of that at the
 7   time, and that's what I was concerned about.  And I
 8   think we were all concerned about that because if you
 9   put this e-mail juxtaposed against the statement of
10   Jeremy about wanting to have a situation where we get
11   down to the truth and people in good faith trying to
12   figure out what was going on, certainly there are
13   distortions on social media.  Social media says I put
14   a chip into the vaccine so that I can monitor people.
15   That's a distortion.
16        Q.    In that same -- in that same e-mail, if
17   you look down there, you go on to say -- immediately
18   after the reference to further distortions on social
19   media, and you say, "It's essential that we move
20   quickly."
21             Do you see that?
22        A.    Right.
23        Q.    And then "Hopefully we can get the WHO to
24   convene"; correct?
25        A.    Right.
```

DR. ANTHONY FAUCI  11/23/2022

Page 107

1        Q.     Do you know what you were talking about
2    there?  What were you --
3        A.     I'm talking about getting down to the
4    facts because when the facts come out, that counters
5    distortions wherever that distortion is, speaking
6    here or on social media or in any way, and what I was
7    referring to is that we've got to get WHO to convene
8    an unbiased body of people to try and thoroughly
9    examine the information so we can get to the truth,
10   and when you get to the truth quickly -- and I said,
11   "It is essential that we move quickly."
12       Q.     Did that happen --
13       A.     And when the truth comes quickly, then you
14   can avert and avoid distortions when you don't have
15   the information out.
16       Q.     Did that happen?  Was there actually a
17   group convened by the WHO?
18       A.     You know, I'm not sure where that went
19   quite frankly.
20       Q.     Did you have any further involvement in
21   that suggestion?
22       A.     I think we all felt we should get the WHO
23   involved since that's the natural organization when
24   you have something that has international
25   implications.

**DR. ANTHONY FAUCI  11/23/2022**

1          Q.     If you look in the e-mail above Jeremy's
2     response to you and Francis Collins, it says, "Tedros
3     and Bernard have apparently gone into conclave."
4               Who is Tedros?
5          A.     Tedros is the director general of the WHO.
6          Q.     And who is Bernard?
7          A.     I don't know his last name.  I do know,
8     but I keep forgetting.  Bernard, it's a German last
9     name.  Bernard is one of the high ranking officials
10    at WHO, I believe, if it's the same Bernard that I'm
11    thinking of.  There is a Bernard, and I'm
12    embarrassed that I forgot his last name, but if this
13    is the Bernard who I think it is, it is a close
14    senior associate of Tedros.
15         Q.     What does it mean when they say they have
16    gone into conclave?  Does that mean they are
17    unavailable?
18              MR. KIRSCHNER:  Objection.  Calls for
19    speculative -- speculation.
20              THE WITNESS:  Yeah.  I have no idea where
21    they'd go.^   I -- I would never use a terminology
22    "I'm going into conclave."  I wouldn't know what that
23    means.
24    BY MR. SAUER:
25         Q.     He goes -- Jeremy goes on to say, "They

DR. ANTHONY FAUCI  11/23/2022

```
 1   need to decide today, in my view."
 2           Do you know what he's -- what he -- what
 3   are they supposed to decide that day?
 4       A.    I do not know what they were supposed to
 5   decide.
 6       Q.    Can you -- and then he goes on to say, "If
 7   they do prevaricate, I would appreciate a call with
 8   you later tonight or tomorrow to think how we might
 9   take forward"; correct?
10       A.    Boy, Jeremy must have been having a bad
11   day.  He's using words like conclave and prevaricate.
12   I don't even know what he's talking about.
13       Q.    Well, let me ask you this:  Was there a
14   discussion of having a follow-up call with you and
15   Jeremy and Francis Collins about what steps you would
16   take if the WHO didn't convene a group to study the
17   virus's origins?
18           MR. KIRSCHNER:  Objection.
19   Mischaracterizes the evidence.  Assumes evidence not
20   in the record.
21   BY MR. SAUER:
22       Q.    Was there any follow-up call between you,
23   Jeremy Farrar, and Francis Collins?
24       A.    I don't think so.  I know that my feeling
25   at the time was that Jeremy was going to take the
```

**DR. ANTHONY FAUCI  11/23/2022**

```
 1   bull and run with it regarding getting the
 2   WHO involved.  And my involvement or input into the
 3   WHO I think diminished if not stopped at that time.
 4          So I really would doubt that there was any
 5   further communication between me and the WHO about
 6   this.  This was fundamentally Jeremy's lane, if you
 7   want to call it that.
 8   BY MR. SAUER:
 9      Q.    Can you turn to the first page of this
10   document?  Another e-mail from Jeremy.  This one
11   copies you, Dr. Tedros, Francis Collins, and Bernard
12   Shortlander?
13      A.    That's him.  Shortlander.  We got it.
14      Q.    Down in -- you see a list of bullet points
15   in this e-mail from Jeremy?
16      A.    Yes.
17      Q.    Are -- okay.  And about halfway down,
18   there's a bullet point that says, "Gathering interest
19   evidence in the science literature and in mainstream
20   and social media to questions of the origins of the
21   virus."
22          Do you see that?
23      A.    Yes.
24      Q.    Are you aware of Jeremy discussing with
25   the WHO the concern that there be social media
```

DR. ANTHONY FAUCI  11/23/2022

```
 1    discussion of the origins of the virus?
 2        A.    I have no recollection or information
 3    about Jeremy's discussions with the WHO involving
 4    anything including social media.  And I see this here
 5    in an e-mail, but I -- I really have no additional
 6    further information about Jeremy's gathering interest
 7    evidence in the science literature regarding the
 8    origin, no.
 9        Q.    You're being handed another document
10    marked Exhibit 9.
11             (FAUCI Exhibit No. 9 was marked for
12    identification.)
13    BY MR. SAUER:
14        Q.    Do you see the second page of this
15    document?
16        A.    Yes.
17        Q.    You've got an e-mail there at the top to
18    Francis Collins and Jeremy Farrar where you say,
19    "Agree.  Very thoughtful summary and analysis.  We
20    really need to get WHO moving on getting the
21    convening started."  Correct?
22        A.    Right.
23        Q.    Why did you say that to Jeremy and Francis
24    Collins?
25             MR. KIRSCHNER:  Objection.  Again, I would
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 112

```
 1   ask that Dr. Fauci have an opportunity to familiarize
 2   himself with this document.
 3           THE WITNESS:  Well, I'm looking at this
 4   e-mail and it says, "Agree, very thoughtful summary
 5   and analysis."  And I don't recall what that summary
 6   and analysis was.  I get hundreds, if not thousands,
 7   of documents thrown in front of me.  I don't recall.
 8   So I said, "I agree, very thoughtful summary and
 9   analysis."  But I don't recall today what that
10   summary and analysis was.
11   BY MR. SAUER:
12       Q.   Can you look at the page before the first
13   page of the document?
14       A.   Yes.
15       Q.   Here's an e-mail from Eddie Holmes to
16   Jeremy Farrar; correct?
17       A.   Right.
18       Q.   "And here's our summary so far.  It will
19   be edited further."  Correct?
20       A.   Correct.
21       Q.   Was this a summary of the paper they were
22   drafting as a result of the conference call?
23           MR. KIRSCHNER:  Objection.  Calls for
24   speculation.
25   BY MR. SAUER:
```

DR. ANTHONY FAUCI  11/23/2022

Page 113

1      Q.    If you know?

2      A.    I do not know what the summary was for,

3   whether it was a summary of the discussion at the

4   meeting, or whether it was the summary of what the

5   deliberations were following the meeting.  I really

6   don't know.

7      Q.    He goes on to say in the next line, "It's

8   fundamental science and completely neutral as

9   written"; correct?

10     A.    That's what he says.

11     Q.    And then he says, "Did not mention other

12  anomalies as this will make us look like loons."

13         Do you see that?

14     A.    Yeah.

15     Q.    Do you know what he's referring to?

16         MR. KIRSCHNER:  Objection.  Calls for

17  speculation.

18  BY MR. SAUER:

19     Q.    Do you know?

20     A.    I do not know what he is referring to.

21     Q.    Were anomalies in the virus discussed on

22  that call that you participated in on February 1st?

23     A.    You know, I'm not really sure what you

24  mean by the word "anomalies."  It could mean a number

25  of things.  Unusual observations about the virus.

**DR. ANTHONY FAUCI  11/23/2022**

1    I'm not really sure.  I really don't understand very

2    well what Eddie was referring to when he wrote this

3    e-mail to Jeremy, so --

4        **Q.    Were you e-mailed drafts of a paper that**

5    **Eddie prepared as a result of that meeting?**

6        A.    I was -- Francis and I got -- I believe --

7    I'm trying to recall accurately, but it's -- I think

8    this is the case.  I'm not 100 percent sure -- that

9    we were given copies of a draft of a manuscript at

10   some point that was very fundamentally evolutionary

11   virology, which is not my lane.

12          So I remember getting a paper looking at

13   it.  I don't believe I had any substantive comments

14   on it, just by reading it.  Because that's not my

15   lane, evolutionary virology.

16       **Q.    Can you look at this next document which**

17   **we've marked Exhibit 10?**

18          **(FAUCI Exhibit No. 10 was marked for**

19   **identification.)**

20          MR. KIRSCHNER:  I wanted to make a

21   standing objection that these documents that are

22   being marked as exhibits are merging a lot of

23   documents together and we have -- I object to the

24   extent that this is mischaracterizing the record by

25   putting documents together that may or may not be

**DR. ANTHONY FAUCI  11/23/2022**

Page 115

```
1    together, and I just want to say there's been several
2    exhibits along these lines, including Exhibit 10.
3    BY MR. SAUER:
4         Q.    Can you look at the second page of Exhibit
5    10, Dr. Fauci?
6         A.    Yeah.
7         Q.    And this is an e-mail chain on Tuesday,
8    February 4th, between you, Francis Collins, and
9    Jeremy Farrar; correct?
10        A.    Yes.
11        Q.    At the bottom of the e-mail of this page,
12   the e-mail from you says, "Question mark, question
13   mark, serial passage in ACE2 transgenic mice."
14             Do you see that?
15             MR. KIRSCHNER:  Again, I ask that you give
16   Dr. Fauci an opportunity to familiarize himself with
17   this document.
18             THE WITNESS:  Well, I'm not sure --
19   there's so many different things going on here, I'm
20   not sure what anybody is referring to here.
21   BY MR. SAUER:
22        Q.    Do you know what you're referring to?  Do
23   you remember referring to serial passage in ACE2
24   transgenic mice in connection with that call?
25        A.    No.
```

DR. ANTHONY FAUCI  11/23/2022

```
 1          Q.    Do you know what that phrase means?

 2          A.    Serial passage means you sequentially

 3   passage a virus in mice; right?

 4          Q.    In other words, is that another way of

 5   having the virus gain function?

 6          A.    It's possible.  You could decrease

 7   function, you could gain function.  You could do any

 8   of a number of things.  And I don't recall or

 9   remember why or even to what I was even referring

10   when I said, "Question mark, question mark, serial

11   passage in ACE2 transgenic mice."

12               I don't recall that at all.

13          Q.    Jeremy responded, "Exactly" and then

14   further up, Francis Collins says, "Surely that

15   wouldn't be done in a BSL-2 lab," question mark.

16               Do you see that?

17          A.    Right.

18          Q.    Do you know why Francis Collins raised

19   that issue?

20               MR. KIRSCHNER:  Objection.  Calls for

21   speculation.

22               THE WITNESS:  I don't know why he did it

23   because I don't know the context in which he's

24   talking.  I would imagine if Francis is saying if

25   you're going to do in vivo studies with a virus that
```

**DR. ANTHONY FAUCI  11/23/2022**

```
 1   might have some danger to it, that you would want to

 2   do it in a higher level of containment, but I

 3   don't -- I have to say I don't know what they're

 4   talking about on these e-mails, and it doesn't ring a

 5   bell with me at all.

 6   BY MR. SAUER:

 7        Q.    Do you know whether that the -- whether

 8   the research that was done by Peter Daszak and Shi

 9   Zhengli in the Wuhan Institute of Virology was done

10   at a BSL-2 safety level?

11        A.    When you're dealing with pseudo viruses

12   and in vitro things, it is generally done in a BSL-2.

13        Q.    So is serial passage in ACE2 transgenic

14   mice generally done at BSL-2?

15        A.    Well, it depends.  Each different country,

16   I believe, has their own level of restrictions about

17   where -- at what level of restriction a particular

18   experiment is done, in general.

19             And again, I'm hesitant to go there

20   because that's not my area of expertise.  But in

21   general, when you're dealing with the situation where

22   you need to take extra precautions in an in vivo

23   experiment, that you would do it in a BSL-3.  But

24   again, having said that, I am not sure of what the

25   connection between these different e-mails are
```

DR. ANTHONY FAUCI  11/23/2022

```
 1    referring to.
 2         Q.    Above that, it says, "Wild West" and
 3    that's from the e-mail from Jeremy in response to
 4    Francis; correct?
 5         A.    Right.
 6         Q.    Did Jeremy have an understanding that --
 7    to do the kind of research being referred to --
 8         A.    Right.
 9         Q.    -- at BSL-2 --
10         A.    Right.  Yeah.
11         Q.    -- safety conditions would be the Wild
12    West?
13              MR. KIRSCHNER:  Objection.  Calls for
14    speculation.
15              THE WITNESS:  I actually don't know what
16    Jeremy is referring to when he says, "Wild West."
17    BY MR. SAUER:
18         Q.    Did you have concerns about
19    performing gain-of-function research on viruses in
20    BSL-2 conditions?
21              MR. KIRSCHNER:  Objection.  Ambiguous.
22              THE WITNESS:  No.  You're using the term
23    gain-of-function which as I mentioned earlier in the
24    discussion has such a broad range of interpretation
25    that you would have to specifically tell me what
```

**DR. ANTHONY FAUCI  11/23/2022**

```
 1   experiment you're referring to.

 2   BY MR. SAUER:

 3       Q.    How about the experiment set forth in,

 4   I think it was Exhibit 2, the 2015 Shi and Baric

 5   paper, would those experiments be the sort to --

 6   would be --

 7       A.    Yeah.

 8       Q.    -- appropriate to perform at BSL-2

 9   functions -- sorry -- BSL-2 conditions?

10       A.    I have not familiarized myself with that

11   paper.  I don't know if I ever even read it

12   carefully.  It would take me probably an hour to read

13   through the paper to make a determination of what

14   particular level of function -- not function, level

15   of restriction it would be.

16             So I don't think I could answer that

17   question right now.

18       Q.    I'm handing you an Exhibit 11.  Do you see

19   that?

20       A.    I don't have anything in front of me yet.

21             MR. KIRSCHNER:  Counsel, could I have a

22   copy?

23             MR. SAUER:  Yeah.

24             (Dr. Fauci Exhibit No. 11 was marked for

25   identification.)
```

DR. ANTHONY FAUCI  11/23/2022

```
 1   BY MR. SAUER:
 2       Q.    Can you turn to the second page of this
 3   document?  And is this an e-mail on February 7th of
 4   2020 from Jeremy to you and Francis Collins with the
 5   subject line "revised draft"?
 6       A.    Yeah.
 7       Q.    And it says, "Attachment:  Summary, Feb 7
 8   PDF"; right?
 9       A.    Right.
10       Q.    Is this -- did Jeremy send you a draft
11   of -- a paper that Eddie Holmes was working on that
12   arose from the February 1st conference call?
13       A.    You know, I don't recall.  I believe --
14   and, again, this is vague -- that a draft of a
15   summary of something was sent to me.  My recollection
16   is I really didn't have any meaningful comments on it
17   because it is, again, if I -- if it is a draft of
18   what it might have been, it would be involved in a
19   lot of complicated evolutionary virology that is not
20   my lane.
21       Q.    Turn to the next page, the actual
22   attachment.  Do you see where it says "overview" at
23   the very top?
24       A.    Yes.
25             MR. KIRSCHNER:  Counsel, you say this is
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 121

```
 1    the actual attachment.  I wanted to point out that is
 2    your characterization of it.  There's nothing
 3    indicating that it is necessarily the --
 4            MR. SAUER:  This is produced by NIH in
 5    response to FOIA requests --
 6            MR. KIRSCHNER:  I -- I understand, but --
 7    but there's -- I'm not saying -- I'm just saying for
 8    the record, it's not clear.
 9    BY MR. SAUER:
10        Q.    Under overview, do you see the third
11    sentence that's bolded beginning "Analysis of the
12    virus"?
13        A.    Yes.
14        Q.    That bolded sentence says, "Analysis of
15    the virus genome sequences clearly demonstrates that
16    the virus is not a laboratory construct or
17    experimentally manipulated virus"; correct?
18        A.    Correct.
19        Q.    Was that a conclusion that you and
20    Jeremy and Francis Collins discussed in this time
21    frame?
22        A.    As I mentioned before, I don't find -- I
23    am not qualified since I am not an evolutionary
24    virologist to make any kind of definitive
25    determination about whether a genome could or could
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 122

```
 1   not be a laboratory construct or experimentally

 2   manipulative.

 3            I have relied, as anyone would, with

 4   highly qualified, respected evolutionary virologists

 5   to come to that conclusion or not.

 6       Q.    Were you involved in the response to the

 7   various FOIA requests for your e-mails from NIAID and

 8   NIH?

 9       A.    I'm -- I don't understand what you mean

10   was I involved in them.  I don't -- a FOIA request

11   does not come to me, and I look through my e-mails

12   and give the e-mails that they ask for.  We have a

13   system at the NIH where FOIA requests come in and a

14   different component of the institutes tap into the

15   e-mails and provide the e-mails that are requested.

16   I don't decide which e-mails go and don't go.

17       Q.    Do you approve redactions to them?

18       A.    I never redact -- I don't redact things.

19       Q.    So you don't have any involvement in

20   deciding what gets redacted and what doesn't?

21       A.    I have no involvement in what gets

22   redacted.  It gets redacted at multiple levels beyond

23   my -- beyond me.

24       Q.    I'm handing you Exhibit 12.

25            (FAUCI Exhibit No. 12 was marked for
```

**DR. ANTHONY FAUCI  11/23/2022**

```
 1    identification.)
 2    BY MR. SAUER:
 3        Q.    If you look at the first page of this
 4    document?
 5        A.    Yes.
 6        Q.    And that's an e-mail, again, chain on
 7    February 4th between Jeremy Farrar, you, and
 8    Francis Collins; right?
 9        A.    Yes, I see that.
10        Q.    And the attachment is called
11    "Summary.DOCX"; right?
12        A.    Right.
13        Q.    And he says, "Please treat in confidence.
14    A very rough first draft from Eddie and team.  They
15    will send on an edited, cleaner version later today";
16    correct?
17        A.    Correct.
18        Q.    So you testified earlier that the
19    consensus of the call on September 1st was that they
20    needed to take more time to consider the arguments
21    back and forth; correct?
22        A.    It wasn't September.
23        Q.    I'm sorry.  January.
24        A.    Yes.
25        Q.    Okay.  And then by February 4th, the
```

DR. ANTHONY FAUCI  11/23/2022

Page 124

```
 1    following Tuesday after that Saturday call, you had
 2    received a rough first draft of a -- a paper to be
 3    published as a result -- or to be authored --
 4         A.    Right.
 5         Q.    -- as a result of that; correct?
 6         A.    It says, "Please treat confidence.  A very
 7    rough draft."  So it looks like they did send it to
 8    me.  Right.
 9         Q.    And do you remember getting that draft?
10         A.    I don't recall specifically getting it,
11    but as I mentioned, if I did, I wouldn't have much
12    input into it since it's a draft, I'm sure, that
13    involves very complicated evolutionary virology of
14    which I'm not an expert.
15         Q.    And in the -- Jeremy had forwarded to you
16    lower down on that page the same e-mail we looked at
17    a moment ago where Eddie Holmes says, "Did not
18    mention other anomalies as this will make us look
19    like the^ "?
20         A.    Right.
21         Q.    Do you recall reviewing this draft?
22         A.    I might have looked at it, but I certainly
23    didn't make any meaningful comments since this is
24    outside of my lane of expertise.
25         Q.    If you can turn to the next page -- or
```

**DR. ANTHONY FAUCI  11/23/2022**

```
 1    actually stay on that page for a minute.
 2            Jeremy says, "Pushing WHO again today"
 3    there in the top -- near the top of the page.
 4            Do you see where that is?
 5    A.    I'm sorry.  Top of the first page?
 6    Q.    Yeah.
 7    A.    And what are you referring to?
 8    Q.    Second paragraph of Jeremy's e-mail at the
 9    top of the page to you and Francis Collins.  It says,
10    "Pushing WHO again today"; correct?
11    A.    Yes.
12    Q.    Were you involved in any communications
13    with the WHO at that time to try to get them to act
14    on this project?
15            MR. KIRSCHNER:  Objection.  Asked and
16    answered.
17            THE WITNESS:  To my recollection, I didn't
18    have direct involvement with the WHO, not to my
19    recollection.
20    BY MR. SAUER:
21    Q.    Next page, second page of this document is
22    another e-mail from you we've seen before, right,
23    where you say we really need to get --
24    A.    Right.
25    Q.    -- WHO moving?
```

**DR. ANTHONY FAUCI  11/23/2022**

```
 1      A.     Right.

 2      Q.     Does this jog your memory at all?  Do you

 3   remember being involved in trying to get the WHO to

 4   act?

 5      A.     The context of this exchange and the theme

 6   of the discussion, although I, myself, did not

 7   directly get involved in interactions with WHO on

 8   this, was that we all felt that given the convening

 9   power and the status of WHO, that we wanted to get

10   them involved because we wanted to make sure that

11   this was an open and transparent discussion that

12   involved international global health authority.

13          So it is perfectly consistent and

14   compatible that I would say we really need to get WHO

15   moving on getting the convening involved because we

16   wanted an open convening so that evidence and data

17   could be openly discussed.  That was the theme of

18   everything that was going on at the time.

19      Q.     Can you turn ahead to the second-to-last

20   page of this document?

21      A.     Yes.

22      Q.     And this is an e-mail on Tuesday,

23   February 4th, from Jeremy to you and Francis Collins

24   with an attachment called "Summary.PDF"; right?

25      A.     Correct.
```

DR. ANTHONY FAUCI  11/23/2022

Page 127

1       Q.    And this says -- it just says "tidied up";
2    correct?
3       A.    Yes.
4       Q.    Did he send you a second draft that same
5    day the 4th that was, quote, tidied up?
6       A.    I don't recall.
7       Q.    You don't know if he sent you a second
8    draft?  Does this e-mail jog your recollection?
9       A.    The e-mail does very little to jog my
10   recollection.  Again, I had very little input or even
11   interpretation of the -- the -- the information
12   because it was in an area that is not my area of
13   expertise.  I don't know what he means by tidied up.
14   Usually --
15      Q.    Can you turn to the next -- I'm not asking
16   you about that.  Can you turn to the next page --
17            MR. KIRSCHNER:  Counsel, please don't
18   interrupt -- please don't interrupt the witness.
19   Just he's --
20   BY MR. SAUER:
21      Q.    I'm going to ask you to listen to
22   questions that I'm asking --
23      A.    I'm listening.
24      Q.    -- and answer the question that I'm asking
25   without going on long tangents.  Can you do that,

**DR. ANTHONY FAUCI  11/23/2022**

Page 128

```
 1   please?

 2           MR. KIRSCHNER:  I --

 3           THE WITNESS:  I'd be happy to.  I don't

 4   think I'm going on long tangents, but I'm trying to

 5   put things --

 6   BY MR. SAUER:

 7       Q.    Well, can you turn --

 8       A.    -- into appropriate context.

 9       Q.    Can you turn to the next page of the

10   document?

11       A.    Yes.

12       Q.    This is the last page.  This is a

13   February 5th e-mail from Jeremy to you and Francis;

14   correct?

15       A.    It says, "Tony and Francis, the revised

16   draft from Eddie copied here."

17       Q.    And so he sent you a third draft on

18   February 5th?

19       A.    Right.

20       Q.    Two drafts on the 4th and a third draft on

21   the 5th; correct?

22       A.    I'm not keeping up with the different

23   ones.  So I can't say "correct" because you're going

24   really fast.

25       Q.    And you recall from the prior exhibit that
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 129

```
1    there was another draft that was sent to you on
2    February 7th; correct?
3         A.    It appears that there were a couple of
4    drafts that were sent back and forth.
5         Q.    And those were -- when you say "a couple,"
6    it's about four so far; correct?
7         A.    I can't say.  At least a couple.  I don't
8    know exactly how many.
9         Q.    Were you aware during the same time frame
10   that Peter Daszak was organizing a statement for
11   The Lancet --
12              MR. KIRSCHNER:  Objection.
13   BY MR. SAUER:
14        Q.    -- about the origins of the virus?
15              MR. KIRSCHNER:  Objection.  Speculative,
16   also vague.
17              THE WITNESS:  I don't recall.
18   BY MR. SAUER:
19        Q.    Are you aware that a -- a letter was
20   published in The Lancet in February of 2020 organized
21   by Peter Daszak?
22        A.    You know, I really don't recall this.
23   Again, getting to my statement about context, you're
24   talking about a period of time when thousands of
25   things come across my desk.  So I don't -- I don't
```

**DR. ANTHONY FAUCI  11/23/2022**

```
 1   recall anything specific about something that
 2   Peter Daszak may or may not have written for Lancet.
 3            If I saw it, perhaps, not guaranteed, it
 4   might jog my memory, but I don't recall that right
 5   now.
 6        Q.    I'm handing you Exhibit 13.
 7             (FAUCI Exhibit No. 13 was marked for
 8   identification.)
 9            MR. KIRSCHNER:  May I ask the witness if
10   he needs a break or if he's okay.
11            THE WITNESS:  I'm okay.
12   BY MR. SAUER:
13        Q.    Can you turn to the third page of this
14   document?
15        A.    Third page.
16        Q.    And the top half of this page there's a
17   e-mail from Jeremy to -- that begins "Francis and
18   Tony"; correct?  Do you see that e-mail?
19        A.    I'm reading it.  Yeah.
20        Q.    In that third bullet point in his e-mail,
21   his e-mail is talking about contact with WHO again;
22   correct?
23        A.    Correct.
24        Q.    There's been a number of e-mails.  We
25   talked about that already; correct?
```

DR. ANTHONY FAUCI  11/23/2022

```
 1        A.    Yeah.

 2        Q.    Third bullet point in his e-mail, he says,

 3   "We can have a call this week with the core group of

 4   that to frame the work of the group including if you

 5   could join."

 6        A.    Right.

 7        Q.    And I take it he's inviting you and

 8   Francis Collins to join a call to discuss framing the

 9   work of the WHO convened group?

10        A.    Right.

11        Q.    Is that right?

12        A.    Right.

13        Q.    Did you have that call?

14        A.    I don't recall.  Like I said before, this

15   was mostly a Jeremy-led thing, and I don't recall

16   having a call with WHO.  It's possible that we did,

17   but I don't recall.

18        Q.    Two bullet points down, it says, "With

19   names to be put forward into the group from us,

20   and pressure on this group from your and our teams

21   next week."  Correct?

22        A.    That's what it says.

23        Q.    First half of that line, it talks about,

24   "Names put forward into the group from us."  Did you

25   put forward names for this group for the WHO, or do
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 132

 1    **you recall doing that?**

 2         A.    I think, if you go back -- and when you

 3    say "recall," I recall because the first page of the

 4    cluster of e-mails that you just sent me is an e-mail

 5    from Jeremy to me and Francis saying, "Thank you.

 6    Pardis is great, respected by everyone."

 7              He's referring to Pardis Sabeti.  And as

 8    the e-mail jogs my memory, I believe I made the

 9    suggestion that if you want to have another expert on

10    coronavirus evolution for the working group that

11    I assume is the group in the second bullet of the

12    e-mail from Jeremy to Francis and I, where it says,

13    "They have asked for names to sit on that group.

14    Please do send any names," and I believe that in

15    response -- not I believe.

16              It looks clearly obvious that in response

17    to that e-mail request from Jeremy, I said, "I left

18    out an important name for the group, Pardis Sabeti at

19    the Broad Institute of MIT and Harvard."

20              And Jeremy writes back, "Thank you.

21    Pardis is great.  Respected by everyone."

22         **Q.    And you had provided -- top half of the**

23    **second page of the document, you had provided the**

24    **list to Jeremy --**

25         A.    Right.

DR. ANTHONY FAUCI  11/23/2022

Page 133

1      Q.      -- of people to include in the WHO's work?

2      A.      Correct.

3      Q.      How did you come up with these names?  Did

4   you talk to anyone before proposing them to Jeremy?

5      A.      I don't believe I did.  I just -- I may

6   have.  I just -- I don't recall.  It's likely because

7   these are people, some of whom I know well and I

8   probably asked around my institute for other people

9   who are fluent in molecular virology.

10     Q.      How about Joseph DeRisi, third name on the

11   list, at the Chan Zuckerberg Biohub.  What's the Chan

12   Zuckerberg Biohub?

13     A.      I haven't referred it as Biohub, but the

14   Chan Zuckerberg has supported research institutions

15   at the University of California at San Francisco.

16   That might be what he's referring to, because --

17     Q.      This is he -- this is you; right?  This is

18   your e-mail?

19     A.      Yeah.  But again -- these are names that

20   were given, I believed, even though the e-mail is

21   from me to Jeremy, several of these names, I almost

22   certainly got by asking members of my institute, such

23   as people in the division of microbiology and

24   infectious diseases for some names of people who

25   might actually be able to be contributory to the

**DR. ANTHONY FAUCI  11/23/2022**

Page 134

```
 1   working group.

 2            Let me give you some examples so you can

 3   be clarified.  Harold Varmus I know very well.

 4   Former Nobel Prize winner and former director of the

 5   NIH.

 6       Q.    I'm really not asking you to go through

 7   the whole list.  I just want to focus on --

 8       A.    Well, I want to put it into a context.

 9       Q.    I'm going to ask you to listen to the

10   question that I'm asking and answer that question.

11            This is an extremely long answer that is

12   absolutely nonresponsive.  I just asked you about

13   Joseph DeRisi.  Did you originate that name?

14            MR. KIRSCHNER:  I will say before

15   Dr. Fauci responds, if he has to provide proper

16   context, he provides proper context.  You can ask

17   your question, and then Dr. Fauci will provide his

18   response.

19            THE WITNESS:  Yeah, it's very important to

20   me to provide the context because there are certain

21   names on this list that I don't even recognize.

22   BY MR. SAUER:

23       Q.    How about Joseph DeRisi?

24       A.    I don't recognize that name.  It was

25   almost certainly given to me by someone in my
```

DR. ANTHONY FAUCI  11/23/2022

Page 135

```
 1   institute.  And the reason --
 2        Q.     How about the name -- the name below?
 3        A.     I'm sorry.  I got to finish.
 4        Q.     Go ahead.
 5        A.     This is context, sir.
 6               I don't recognize Joseph DeRisi.  I may
 7   have heard of him.  I know Harold Varmus well.  I
 8   know Dan Gannon well.  I don't know Eugene Koonin
 9   well.
10               So the point that I'm putting into context
11   is that it is highly likely that these names were
12   given to me in part by others.
13               So you're asking about Joseph DeRisi, and
14   Joseph DeRisi's name does not ring a bell.
15        Q.     How about Pardis Sabeti on the page
16   before?
17        A.     Pardis Sabeti does.  She's a well-known
18   virologist.
19        Q.     Did you talk to her before you sent her
20   e-mail to Jeremy for inclusion in the WHO group?
21        A.     Unlikely that I pulled Pardis.  I likely
22   just know her well enough that I would have put her
23   name in.  But perhaps I did call her.  But unlikely
24   that I did.  She's such a well-known figure in
25   molecular virology that it is not unusual for me to
```

**DR. ANTHONY FAUCI  11/23/2022**

```
 1    say, "Of course include Pardis Sabeti."
 2         Q.    How about Don Gannon?
 3         A.    Don Gannon is well-known person.
 4         Q.    Did you talk to him before you put his
 5    name on this list to Jeremy?
 6         A.    I don't believe I did.  I don't believe I
 7    spoke to anyone on this list.  I just pulled the
 8    names out.  Some of which I knew, like Varmus and
 9    Nabel, and some of which were very likely given to me
10    by my staff.
11         Q.    Turn back to the third page of the
12    document, Jeremy's e-mail to you and Francis.  In the
13    third bullet point we talked about earlier, it talks
14    about having a call to, quote, frame the work of the
15    group.
16              Do you know what he was referring to when
17    he was asking you -- or he wanted to frame the work
18    of the group?
19         A.    I can't say exactly that I know what he
20    means by frame the work of the group, but in
21    experience in dealing with a number of working
22    groups, when you frame the work of the group, you
23    usually start off by saying, "What is the theme and
24    what is the question we're asking?  Let's frame the
25    discussion.  What's the issue at hand?"
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 137

```
 1          Q.     Do you recall any discussions about
 2    wanting to the frame the work of the WHO group?
 3          A.     I don't recall anything about framing it,
 4    but --
 5          Q.     Two bullet points lower down, you see
 6    there's a bullet point about the WHO, Jeremy says
 7    he -- refers to pressure on this group from your and
 8    our teams next week.
 9                 Do you know what pressure he's referring
10    to?
11          A.     I don't.
12                 MR. KIRSCHNER:  Objection.
13    Mischaracterizes the record.
14                 THE WITNESS:  I don't know what Jeremy is
15    referring to when he says pressure on this group.
16    BY MR. SAUER:
17          Q.     Do you recall any discussion of having
18    anybody pressure the WHO in its work related to this
19    origins of the virus investigation?
20          A.     I don't have any inkling at all of
21    pressuring them.  The one thing that's clear from the
22    e-mails and my recollection is that everyone wanted
23    the WHO to get involved because of their convening
24    power and their credibility.  We all wanted to make
25    this an open discussion, and the WHO was the most
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 138

```
 1   appropriate forum for an open discussion.

 2            So I don't think a belief had anything to

 3   do with pressuring the WHO to do anything, merely to

 4   get them to meet.

 5            You're sniffling.  You sure you don't have

 6   a cold.

 7       Q.    Exhibit 14?

 8            (FAUCI Exhibit No. 14 was marked for

 9   identification.)

10            MR. KIRSCHNER:  Counsel, can I have

11   copies?

12   BY MR. SAUER:

13       Q.    Can you -- during this same time frame

14   we've been talking about, was there also a discussion

15   of having the WHO sponsor a trip to China to

16   investigate the virus?

17            MR. KIRSCHNER:  Objection.  Calls for

18   speculation.

19            THE WITNESS:  You know, I don't recall.

20   You're asking, Mr. Sauer, about during this

21   discussion, was there discussion about WHO going to

22   China.

23            Well, I know now, memory-wise,

24   that WHO did send a group to China.

25   BY MR. SAUER:
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 139

```
 1        Q.      Did that group include Cliff Lane of your
 2   staff?
 3        A.      Let me answer the question.  The question:
 4   Did I know about it then?  And I'm saying right now,
 5   I don't recall, at this particular time, whether they
 6   were talking about a group going to China.
 7            I do know that they wanted to put together
 8   a WHO group and they may have and they likely did ask
 9   HHS, who asked NIH, who would be a good person to go
10   to China to see -- you know, to get some information
11   about what exactly evolved in China.
12        Q.      Did you make a recommendation about who
13   would be a good person to go to China around February
14   2020?
15        A.      I believe I recommended Dr. Clifford Lane.
16   I recommended or it was obvious because he's a very
17   well-known, competent person.  So it is highly likely
18   that I recommended him.  Though I don't specifically
19   remember, it would be very compatible with the
20   process that I would recommend him.
21        Q.      Do you remember why you were sent an
22   e-mail that says, "WHO advance team on way to China,
23   Tedros tweet"?
24        A.      No idea.
25        Q.      You believe you may have recommended Cliff
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 140

```
 1    Lane for that -- for that trip, but you don't know
 2    for sure?
 3         A.   It's highly likely I would recommend him
 4    if anyone asked me who would go on an international
 5    trip.  Dr. Lane has extensive experience in dealing
 6    at the international level with a number of
 7    countries, including the work he did in Africa with
 8    Ebola and in Southeast Asia.  So he's a very
 9    experienced person at the international level.
10              It's entirely likely, if not very likely,
11    that I would have recommended him.
12         Q.   Did he actually attend that trip?
13         A.   Yes, he did.
14         Q.   During February of 2020 in the kind of
15    month we've been talking about, did you make any
16    public statements about the origins of the virus?
17         A.   That's a very broad question.  I don't
18    recall if I did.
19         Q.   Okay.  Well, did you have any -- did you
20    have any contact with Peter Daszak or conversations
21    with him about the origins of the virus?
22         A.   I don't recall.  I may have, but I don't
23    recall.
24         Q.   You testified earlier that you don't
25    really know Peter Daszak; is that right?
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 141

```
 1        A.     I don't know him very well at all.
 2        Q.     Have you ever done a joint podcast with
 3   him?
 4        A.     You know, that was brought -- it was
 5   interesting.  I think someone recently -- I don't
 6   know when whether it was our discussion or not.  I
 7   don't remember -- brought up that I did do some sort
 8   of an interview with him, but if it had not been
 9   brought to my attention, I would not have remembered
10   it.  I've done several hundred podcasts, maybe --
11   several hundred podcasts.
12             (FAUCI Exhibit No. 15 was marked for
13   identification.)
14   BY MR. SAUER:
15        Q.     I'm handing you Exhibit 15.
16             Does this document jog your memory of
17   doing a podcast with Newt Gingrich and Peter Daszak
18   on February 9th, 2020?
19        A.     Well, there's an advertisement that said
20   that I'm Newt Gingrich's guest.  If you had not put
21   this in front of me, I likely would not have
22   remembered it.  Like I said, I've done at least
23   several hundred podcasts over the last couple of
24   years.
25        Q.     Do you remember this one in particular now
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 142

```
 1    that you see this?  Do you remember doing this
 2    podcast?
 3         A.    I don't -- I don't remember it
 4    specifically, but since the e-mail indicates that the
 5    podcast occurred, I don't even say I vaguely remember
 6    that podcast.  Like I said, I've done many podcasts.
 7         Q.    At the top you say, "Definitely for the
 8    director's page."  What are you referring to?  What's
 9    the director's page?
10         A.    Whenever we do a media thing or a podcast
11    or a paper that comes out that the people who are
12    interested in the goings on of the National Institute
13    of Allergy and Infectious Diseases, we sometimes put
14    it on the director's page, which is the link when you
15    go to NIH.gov and then NIAID.gov, you get the
16    director's page, and on that are various links for
17    people to access things that we may have done.
18         Q.    I'm handing you a document that's marked
19    Exhibit 16.
20              (FAUCI Exhibit No. 16 was marked for
21    identification.)
22    BY MR. SAUER:
23         Q.    And this is an informal transcription of
24    some of your remarks in that podcast.
25              Do you see at the top there it says --
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 143

```
 1    there's a timestamp, 18:48, Newt.  Do you see that?
 2        A.    Yes.
 3        Q.    And it quotes Newt Gingrich as saying, "I
 4    don't know if you had access to enough information
 5    from the Chinese, but as you know, there is sort of
 6    an urban legend that there is a biological warfare
 7    center in Wuhan and that the coronavirus escaped from
 8    that.  Do you have any sense where it probably came
 9    from"; correct?
10            MR. KIRSCHNER:  Objection.  Lack of
11    foundation.
12    BY MR. SAUER:
13        Q.    Is that what it says?
14        A.    You just read it correctly, yes.
15        Q.    And then the transcript reports you as
16    responding at 19:06:  "Well, I think ultimately we
17    know that these things come from an animal reservoir.
18    I heard these conspiracy theories and like all
19    conspiracy theories, Newt, they're just conspiracy
20    theories."
21            Do you see that?
22        A.    Yes, I do.
23        Q.    Do you recall making that comment on
24    Newt Gingrich's podcast?
25            MR. KIRSCHNER:  Objection.  Lack of
```

DR. ANTHONY FAUCI  11/23/2022

1    foundation.

2            THE WITNESS:  I don't recall making it,

3    but if this is a correct transcript, then it's clear

4    that I made that statement, but I don't recall making

5    that statement.

6    BY MR. SAUER:

7        Q.    Do you recall thinking on February 9th,

8    2020, that it was, quote -- or that we know these

9    things come from an animal reservoir?

10       A.    The background of saying that we know

11   things come from an animal reservoir because the

12   history of the evolution of new microbes from an

13   animal reservoir to a human is very clear.  I could

14   give you a number of examples, but one in particular

15   to save time is that SARS-CoV-1, very similar

16   circumstances to SARS-CoV-2, was for a while not

17   knowing what it evolved, but it became clear that it

18   went from a bat to a civet cat to a human.  So very,

19   very similar --

20       Q.    Can I direct your attention to another ^

21   page, if I may?

22       A.    Yeah.

23       Q.    At 34:30 Newt says -- you see halfway

24   down, second bullet point?

25            MR. KIRSCHNER:  Counsel, I would ask for

**DR. ANTHONY FAUCI  11/23/2022**

Page 145

```
 1   you not to interrupt the witness.

 2           MR. SAUER:  He was giving a completely

 3   nonresponsive answer.  I'm just asking --

 4           THE WITNESS:  No, actually I was -- I was

 5   responding to the issue of what you mean by coming

 6   from an animal reservoir, and what I was saying is

 7   that my statement that things -- and I'll quote the

 8   exact words -- "these things come from an animal

 9   reservoir," and the context of that is, is ample

10   historical experience that these things

11   overwhelmingly come from an animal reservoir.  I was

12   putting it into context.

13   BY MR. SAUER:

14       Q.   Thank you for that.

15           Can I direct your attention now to the

16   second bullet point beginning 34:30?

17           Do you see that?

18       A.   Yes.  Yeah.

19       Q.   Where Newt says, the coronavirus probably

20   came from one of the flea markets, although there was

21   a secondary rumor that there is a biological weapons

22   laboratory in Wuhan --

23           THE REPORTER:  I'm sorry, Counsel.  Can

24   you slow down?

25   BY MR. SAUER:
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 146

```
 1        Q.     There is a secondary rumor that there is a

 2   biological weapons laboratory in Wuhan and it may

 3   have come from there.  Is it your sense that it's

 4   almost certain that it came from an animal to human

 5   transition -- transmission.  Do you see that?

 6        A.    I do.

 7        Q.     And then the transcript quotes Daszak

 8   saying, "All the evidence says that is what

 9   happened"; is that right?

10             MR. KIRSCHNER:  Objection.  Lack of

11   foundation.  Speculative.

12             THE WITNESS:  That's what it says.  It

13   says, Daszak, quote, "All the evidence say that is

14   what happened."

15   BY MR. SAUER:

16        Q.    Do you recall Daszak saying that?

17             MR. KIRSCHNER:  Again, objection.  Lack of

18   foundation.

19             THE WITNESS:  I don't recall hardly

20   anything about this interview since, as I mentioned,

21   I give hundreds of podcasts.  So I cannot say that I

22   recall Daszak making that statement, though, if this

23   transcript is correct, it appears that he has made

24   the statement.

25   BY MR. SAUER:
```

**DR. ANTHONY FAUCI  11/23/2022**

1        Q.    Does this jog your recollection of having

2    any communications with Daszak about the origins of

3    the virus in February of 2020?

4              Do you remember any such communication?

5        A.    I told you before that I did not remember

6    any direct conversations with him about the origin,

7    and I said I very well might have had conversations,

8    but I don't specifically remember conversations.  If

9    you are implying, understandably, that being on a

10   podcast with Dr. Daszak in which the origins were

11   discussed, if that constitutes a discussion with him

12   about it, I guess I had a discussion, but at the time

13   you asked the question, I did not recall having a

14   discussion with him about the origins.

15       Q.    How about Dr. Ralph Baric?  We talked

16   about him earlier.  Did you say you knew him or not?

17       A.    I know of him.  I wouldn't say I know him.

18   I'm not sure.  I may have met him at a meeting or

19   not.  I certainly know who he is.  He's a

20   well-established scientist.  I cannot say for certain

21   if I've ever met him.

22       Q.    Okay.  Did you ever -- so you don't recall

23   ever having a one-on-one meeting with him of any

24   kind?

25       A.    I don't recall.  It's possible.  I have

**DR. ANTHONY FAUCI  11/23/2022**

```
 1   meetings with hundreds, if not thousands, of

 2   scientists over the years that I've been at this

 3   position.

 4        Q.    I'm handing you Exhibit 17.

 5             MR. KIRSCHNER:  Counsel, I would like to

 6   take a break soon.  Are we kind of finishing up a

 7   line of questioning or --

 8             MR. SAUER:  Yeah, we can do that after the

 9   exhibit, if that's what you want.

10             MR. KIRSCHNER:  Okay.  Can I have the

11   exhibit myself?

12             (FAUCI Exhibit No. 17 was marked for

13   identification.)

14             THE WITNESS:  So is this 17?

15             MR. SAUER:  Yeah.

16             THE WITNESS:  Thank you.

17   BY MR. SAUER:

18        Q.    Do you see this exhibit is a page from

19   your official Outlook calendar dated February 11th,

20   2020?

21        A.    Right.

22        Q.    And then if you look at 2:30 p.m. in the

23   afternoon that day, there's a meeting marked that

24   says, "Hold meeting with Dr. Ralph Baric."

25             Do you see that?
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 149

```
 1        A.    I do.
 2        Q.    And indicated on it is that the invitation
 3   came from Emily -- sorry -- Emily Erbelding; correct?
 4        A.    Correct.
 5        Q.    Was that -- did that meeting occur?  Did
 6   you and Emily have a meeting with Dr. Ralph Baric on
 7   February 11th, 2020?
 8             MR. KIRSCHNER:  Objection.  Speculative.
 9             THE WITNESS:  You know, I don't recall the
10   meeting, but it's on my calendar.  And as I mentioned
11   a moment ago, I might have had a meeting with him.  I
12   don't recall.
13             Getting into context, it says 7A-18, which
14   is our conference room.  If one goes back and looks,
15   I have literally hundreds of meetings in 7A-18 with
16   scientists who we fund, who we don't fund, who come
17   in and visit the NIH.
18   BY MR. SAUER:
19        Q.    What did you discuss in this meeting, if
20   you remember?
21        A.    I don't recall the discussion that we had
22   at 2:30 on February the 11th, 2020.  I just don't
23   recall it.
24             MR. SAUER:  We can take a break there, if
25   you want?
```

**DR. ANTHONY FAUCI  11/23/2022**

```
 1                THE WITNESS:  Sure.

 2                THE VIDEOGRAPHER:  Okay.  Stand by.  The

 3    time is 11:09 a.m., and we're going off the record.

 4                (Recess.)

 5                THE VIDEOGRAPHER:  The time is 11:21 a.m.,

 6    and we're back on the record.

 7    BY MR. SAUER:

 8        Q.    Dr. Fauci, I want to circle back to

 9    something you said a little while ago before I

10    forget.  You said that misinformation and

11    disinformation can lead to loss of life; correct?

12        A.    Right.

13        Q.    And I think that was in the context of

14    talking about the misinformation and disinformation

15    on social media, among other things; is that correct?

16        A.    However it's disseminated, it can lead to

17    loss of life.

18        Q.    Is it your view that misinformation and

19    disinformation on social media can lead to loss of

20    life?

21                THE WITNESS:  What's the matter?

22                THE COURT REPORTER:  Nothing.

23                THE WITNESS:  You're shaking your head.

24                THE COURT REPORTER:  I need counsel to

25    slow down.
```

DR. ANTHONY FAUCI  11/23/2022

```
 1   BY MR. SAUER:

 2       Q.    Is it your view that misinformation and

 3   disinformation on social media can lead to loss of

 4   life?

 5       A.    I think in any situation where egregious

 6   misinformation such as some of the ones I referred to

 7   before, such as information that would discourage

 8   people from getting vaccinated, that in my mind,

 9   would be a way that life that could otherwise have

10   been saved would be lost, if people were persuaded

11   not to pursue a life-saving intervention.

12       Q.    Do you think that there should be steps

13   taken to curb the spread of misinformation and

14   disinformation?

15       A.    You know, that's not my area.  I'm very

16   well aware of the concept of freedom of speech.  The

17   area of the curtailment of that is something that is

18   not in my area of the expertise.  Those are legal and

19   other things.  And I really don't have any opinion on

20   that.

21       Q.    Have you ever contacted a social media

22   company and asked them to remove misinformation from

23   one of their platforms?

24       A.    No, I have not.

25       Q.    Is that something you ever discussed with
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 152

```
 1    Mark Zuckerberg?
 2         A.    To my knowledge, we have not -- my
 3    discussions with Mark Zuckerberg were very clearly
 4    directed at getting me on some Facebook podcast to
 5    encourage people to get vaccinated.  That was the
 6    extent of our conversations.
 7         Q.    Has anyone on your staff, you know, at
 8    NIAID, ever reached out to a social media platform to
 9    ask them to take content down or to block content in
10    any way?
11              MR. KIRSCHNER:  Objection.  Speculative.
12              THE WITNESS:  To my knowledge, no.  But
13    again, I don't know everything that goes on, but
14    certainly nothing that I was made aware of that they
15    were doing.
16    BY MR. SAUER:
17         Q.    Let me give you Exhibit 18.
18              (FAUCI Exhibit No. 18 was marked for
19    identification.)
20    BY MR. SAUER:
21         Q.    Do you see this short e-mail from Ian
22    Lipkin dated February 11th, 2020?
23              MR. KIRSCHNER:  Objection.  Lack of
24    foundation.
25              THE WITNESS:  To whom was the e-mail
```

DR. ANTHONY FAUCI  11/23/2022

Page 153

```
 1   written to?
 2   BY MR. SAUER:
 3       Q.     Do you know if you were copied on this
 4   e-mail?
 5       A.     Well, let me read it first, and then I'll
 6   see.
 7              Is this an e-mail from Ian to me?
 8       Q.     That's my question.  Do you know if this
 9   is an e-mail from Ian to you?
10       A.     You know, I can't say for sure.  I mean,
11   again, just in the spirit of the context that I've
12   been trying to establish here, I average a couple of
13   thousand e-mails a day.  So this could have been --
14       Q.     Do you have any recollection of this one?
15       A.     I don't have a recollection of it.  It's
16   entirely possible that Ian wrote this to me.  Ian
17   communicates with me -- I wouldn't say a lot, but
18   enough to recognize an e-mail when -- and I will send
19   it, I'll read it, but I don't recognize this
20   particular e-mail.
21       Q.     Can I direct your attention to the last
22   sentence where Ian says, "Given the scale of the bat
23   CO research pursued there -- that is to say at the
24   institute in Wuhan -- and the site of the emergence
25   of the first human cases, we have a nightmare of
```

DR. ANTHONY FAUCI  11/23/2022

Page 154

```
 1   circumstantial evidence to assess."
 2              Do you see that?
 3      A.    I do.
 4      Q.    Do you know what he is talking about?
 5              MR. KIRSCHNER:  Objection.  Speculative.
 6   BY MR. SAUER:
 7      Q.    If you know.
 8      A.    I am not certain of what he's referring
 9   to.  I could surmise what he is referring to is
10   that -- and I think it has to do with circumstantial
11   evidence, is that whenever you have a situation when
12   research is being done and you might have an
13   outbreak, then there will be always people who
14   immediately jump on and say, "Well, this could have
15   had to do with the research."
16      Q.    Did you think it was a nightmare of
17   circumstantial evidence, these factors he's referring
18   to, given that there's a lot of bat coronavirus
19   research pursued at the Institute in Wuhan, and that
20   the first human cases emerged in Wuhan, you view that
21   as a nightmare of circumstantial evidence?
22              MR. KIRSCHNER:  Objection.  Vague.
23   Ambiguous.  Compound.
24              THE WITNESS:  I don't -- at least that's
25   not my style to think in terms of circumstantial
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 155

```
1    evidence.  I think anyone who is involved in the
2    field knows that when there's an outbreak, there's
3    always a concern of how did it happen?  What
4    happened?
5              And when you have an element that there is
6    a research institution involved, there is always
7    speculation that it has something to do with research
8    institution.  I mean, we have been in situations
9    where people questioned what's going on up in
10   Frederick, Maryland, even though there's nothing
11   going on in Frederick, Maryland, to my knowledge,
12   that is of any concern that people always refer to as
13   "Oh, there's that kind of research going on."
14   BY MR. SAUER:
15       Q.    Would it be a nightmare if it turned out
16   that, in fact, that the virus had escaped --
17   accidentally escaped from a lab in Wuhan?
18       A.    You know, again, you're use the word
19   "nightmare," you know, kind of a -- a sort of a vague
20   thing that means different things to different
21   people.
22       Q.    How would you describe it?
23       A.    I mean if -- and I have to emphasize "if,"
24   and I believe the evidence weighs much more toward a
25   natural occurrence, even though you always keep an
```

DR. ANTHONY FAUCI  11/23/2022

1   open mind as to what the origin and etiology is,

2   certainly if that happened, then the purpose of

3   knowing that is try and make sure, looking forward,

4   that those things don't happen again.  The purpose of

5   trying to determine the origin of an outbreak is to

6   see what you can do, looking forward, to prevent it

7   from happening again and it goes both ways.  If it's

8   a factual occurrence, then you want to make sure that

9   you get good animal human surveillance.

10       **Q.   How about it was not a natural occurrence**

11   **on the hypothetical, and it, in fact, escaped from**

12   **the lab and in fact that the research that had**

13   **created the virus was partly funded by NIAID, would**

14   **that be a nightmare scenario?  Can you pick a word**

15   **that would describe the scenario to your knowledge?**

16       A.   Well, I'm going to go to context because

17   you're asking a question that I think needs to be

18   explained.  If you look at the molecular makeup of

19   SARS-CoV-2 and you look at the viruses that were

20   studied under the auspices and funding of the

21   subaward to the Wuhan Institute, those bat viruses

22   evaluated by anyone with even a reasonable

23   acquaintance with evolutionary virology would tell

24   you that given those viruses that they worked on,

25   reported on, and published on was so far removed from

**DR. ANTHONY FAUCI  11/23/2022**

Page 157

1    SARS-CoV-2, that it would be molecularly impossible,

2    even if people tried to manipulate them to become

3    SARS-CoV-2 they wouldn't become SARS-CoV-2.

4              So the idea of conflating research that's

5    funded by NIH to look at in a surveillance way the

6    bat viruses that were circulating in that area, you

7    can talk to any unbiased molecular virologist and you

8    can say that the evolutionary difference between

9    those viruses and SARS-CoV-2 would make it

10   essentially impossible to have this turn into this.

11             And what happens, is when you talked about

12   laboratory leaks and the things you're referring to

13   here, people inappropriately conflate that with

14   research funded by the NIH.  And it's apples and

15   oranges.

16             Could something have, quote, leaked out of

17   a Chinese lab?  I have always kept an open mind that

18   that is possible.  Could it have happened by the

19   experiments that were done and reported that were

20   funded by the NIH?  Getting back to what I said a

21   moment ago, molecularly, that could not have

22   happened.

23     Q.    **What about experiments that were done but**

24   **weren't reported.  For example, are you aware that a**

25   **whole large number of genomic sequences were pulled**

**DR. ANTHONY FAUCI  11/23/2022**

Page 158

```
 1    down in September of 2019 from the Wuhan Institute of

 2    Virology's website?  Are you aware of that?  It's a

 3    yes or no question.

 4              MR. KIRSCHNER:  Objection.  Lack of

 5    foundation.

 6              THE WITNESS:  Tell me what you're

 7    referring to.

 8    BY MR. SAUER:

 9        Q.    Well, are you aware that genomic sequences

10    of viruses were removed from publicly available

11    databases in September of 2019 at the Wuhan Institute

12    of Virology?

13        A.    I am aware of that context.  Those

14    sequences were also, even though they were removed

15    from a bank that has nothing do with my institute,

16    those sequences were published in the literature.

17              So it isn't as if they were unknown.

18        Q.    Let me ask you this.  Actually, let me

19    give you another exhibit.

20              (FAUCI Exhibit No. 19 was marked for

21    identification.)

22    BY MR. SAUER:

23        Q.    I'm handing you Exhibit 20.

24              MR. KIRSCHNER:  Twenty or 19?

25              MR. SAUER:  You're right.  It's 19.
```

DR. ANTHONY FAUCI  11/23/2022

Page 159

```
 1   BY MR. SAUER:

 2       Q.    Do you recognize this as the preprint

 3   version of the proximal origin of SARS-CoV-2 dated

 4   February 17th of 2020?

 5       A.    Yeah, this looks like the preprint that

 6   antedated the full papers that were published in the

 7   peer-reviewed literature.  This is a preprint.

 8       Q.    Did you review the preprint when it came

 9   out?  Did anyone send it to you?  Do you know?

10            MR. KIRSCHNER:  Objection.  Asked and

11   answered.

12   BY MR. SAUER:

13       Q.    Do you know?

14       A.    Again, I -- a lot of things get sent to

15   me.  I -- it likely is that they probably sent a copy

16   of this to Dr. Collins and I, though I don't

17   specifically recall it.

18       Q.    Do you know if you reviewed it when the

19   preprint came out?

20            MR. KIRSCHNER:  Objection.  Asked and

21   answered.

22            THE WITNESS:  It -- it depends.  I think I

23   answered that question before, did I not?

24   BY MR. SAUER:

25       Q.    I'm just asking you again.  I don't
```

### DR. ANTHONY FAUCI  11/23/2022

1    remember what you said.

2        A.    Well, let me try and remember and make

3    sure that it's both true and consistent, that it is

4    likely that this was sent to me.  When you say review

5    a paper, review means different things to different

6    people.

7            Did I look through it?  Yes.  Did

8    I fully understand the molecular virology of it?

9    Unlikely, because I'm not an evolutionary virologist.

10   Did I make any substantive comments on it?  Unlikely,

11   because that would not be my position since I'm not

12   an evolutionary virologist.

13       Q.    Now, you have been copied on four drafts

14   of this paper prior to this on February 4th, 5th, and

15   7th; correct?

16       A.    Correct.

17       Q.    Those drafts were sent to you by

18   Jeremy Farrar as written up by Eddie Holmes?  Do you

19   recall that?

20       A.    I'm not sure it was written up by

21   Eddie Holmes, but it was sent from me, I believe.

22   You showed me an -- you showed me a lot of e-mails

23   and papers before.  I don't have an exact

24   recollection of the name of the person who sent it

25   versus the one who was referred to, but the names of

**DR. ANTHONY FAUCI  11/23/2022**

Page 161

```
 1    Eddie Holmes and Jeremy Farrar are certainly
 2    associated with the paper.
 3         Q.    And, in fact, if you look at the author
 4    line, there's five authors associated with it;
 5    correct?
 6         A.    Yes.
 7         Q.    And all of those people are on that
 8    February 1st call at 2:00 p.m. organized by
 9    Jeremy Farrar; correct?
10         A.    I believe so.  I -- yeah, I believe so,
11    but I'm not a hundred percent sure.  Was he and
12    Lipkin on the call?  He might have been.  I know that
13    the others very likely were on the call.
14         Q.    Is that Ian Lipkin who one week -- or six
15    days earlier had sent an e-mail saying that we have a
16    nightmare of circumstantial evidence to address?
17              MR. KIRSCHNER:  Objection.  Lack of
18    foundation.
19    BY MR. SAUER:
20         Q.    Is that the same human?
21         A.    Well, Ian Lipkin is Ian Lipkin.  There
22    aren't a lot of Ian Lipkins that I know.
23         Q.    Can you turn to the second page of the
24    document?  Second paragraph, last sentence, it says,
25    "Importantly, this analysis provides evidence that
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 162

```
 1    SARS-CoV-2 is not a laboratory ^ construct nor a
 2    purposely manipulated virus"; correct?
 3        A.    Correct.
 4        Q.    Did you have any discussions with any of
 5    these authors about that conclusion?
 6              MR. KIRSCHNER:  Objection.  Asked and
 7    answered.
 8              THE WITNESS:  I don't recall whether I had
 9    a discussion with the authors about that last
10    statement.  When I looked at the paper for things
11    that you understand are clear sentences like that and
12    not necessarily things like Figure 1, which go into
13    the mutations and contact residues, et cetera.  So I
14    am certain that having looked at it, I was aware of
15    what their conclusion was.  I don't recall discussing
16    specifically that conclusion with them.
17    BY MR. SAUER:
18        Q.    How about with Francis Collins?  Did you
19    discuss it with him?
20        A.    It's possible.  I mean, Francis and I know
21    each other very well.  He's the director of NIH.  I
22    would not be surprised if I had in the discussion a
23    mention of and perhaps discussion of the conclusion
24    of that paper.
25        Q.    How about with Jeremy Farrar?  Did you
```

**DR. ANTHONY FAUCI  11/23/2022**

```
 1   have any discussions with him about the conclusion?
 2        A.    I don't recall.  I would not be surprised
 3   if I did, but I don't specifically recall.  It would
 4   be much more likely that I had a conversation of that
 5   type with Dr. Collins, possibly with Dr. Farrar, but
 6   I don't know for sure.
 7        Q.    I'm handing you Exhibit 20.
 8              (FAUCI Exhibit No. 20 was marked for
 9   identification.)
10   BY MR. SAUER:
11        Q.    Do you see this article from the NIH
12   record entitled "NIAID's Lane Discusses WHO COVID-19
13   Mission to China"?
14        A.    And what's the question, sir?  I'm sorry.
15        Q.    I'm just saying do you see this?
16        A.    Yes, I do see it.
17        Q.    Okay.  And then if you look at the first
18   paragraph, it's talking about Dr. Cliff Lane, which
19   is the patient in that WHO mission we talked about
20   earlier; correct?
21        A.    Correct.
22        Q.    Could you turn to the fifth page of the
23   document, bottom paragraph?  There's a quote from
24   Mr. Lane.  Do you see that?
25              MR. KIRSCHNER:  Objection.  I would ask
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 164

1    that Dr. Fauci have an -- an opportunity to

2    familiarize himself with this document.

3              MR. SAUER:  I'm just asking if he sees

4    that -- that quote on the bottom of Page 5.

5              THE WITNESS:  Is it the last paragraph?

6    BY MR. SAUER:

7         Q.    Yeah, beginning "The Chinese were

8    managing"?

9         A.    Yes.

10        Q.    And Mr. Lane, after returning from the

11   trip, said the Chinese were managing this in a very

12   structured, organized way; correct?

13             MR. KIRSCHNER:  Objection.  Lack of

14   foundation.

15   BY MR. SAUER:

16        Q.    Is that what it says?

17        A.    That's what the sentence says on this

18   report on Page 5.  That's what the NIH record --

19   report says, yes.

20        Q.    And the quote goes on to quote Mr. Lane as

21   saying, "When we got there, the outbreak was already

22   coming under control in China.  The measures they put

23   in place appear to be working.  I think that they

24   felt there were lessons learned they wanted to share

25   with the rest of the world"; correct?

DR. ANTHONY FAUCI  11/23/2022

Page 165

```
 1        A.    Correct.
 2        Q.    Did you discuss Mr. Lane's experience on
 3   the trip with him when he got back from the WHO trip?
 4        A.    The answer is I did, and it relates really
 5   a lot to what -- the sentence -- what he said.
 6   Dr. Lane was very impressed about how from a clinical
 7   public health standpoint, the Chinese were handling
 8   the isolation, the contact tracing, the building of
 9   facilities to take care of people, and that's what I
10   believed he meant when he said were managing this in
11   a very structured, organized way.
12        Q.    And he goes on in that last sentence on
13   that page to say, "From what I saw in China, we may
14   have to go to as extreme a degree of social
15   distancing to help bring our outbreak under control";
16   correct?
17        A.    Correct.
18        Q.    So he drew the conclusion that there might
19   have to be extreme, in his word, measures to mandate
20   social distancing to bring the outbreak under
21   control; correct?
22        A.    That's what this is implying, yes.
23        Q.    Did he discuss that with you when he came
24   back from the trip?
25        A.    He might have.  I don't recall the exact
```

## DR. ANTHONY FAUCI  11/23/2022

```
 1   sentence, but he did discuss with me that the Chinese
 2   had a very organized way of trying to contain the
 3   spread in Wuhan and elsewhere.  He didn't get
 4   a chance to go to Wuhan, but he was in Beijing, and I
 5   believe other cities -- at least Beijing -- and he
 6   mentioned that they had a very organized,
 7   well-regimented way of handling the outbreak.
 8        Q.    And so he had a kind of positive reaction
 9   to that.  There might be lessons to be learned for
10   the United States in its response to the outbreak;
11   correct?
12             MR. KIRSCHNER:  Objection.  Vague.
13   Ambiguous.
14   BY MR. SAUER:
15        Q.    Correct?
16        A.    I believe Dr. Lane came to the conclusion
17   that when you have a widespread respiratory disease
18   that a very common and effective way to curtail the
19   rapid spread of the disease is by implementing social
20   distancing measures.
21        Q.    Did you agree with that conclusion when
22   you discussed it with him when he came back?
23        A.    I wasn't there and I didn't see it, but
24   Dr. Lane is a very astute clinician, and I have every
25   reason to believe that his evaluation of the
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 167

```
 1    situation was accurate and correct.
 2         Q.    Do you know if he communicated with
 3    Chinese officials when he was on that trip?
 4         A.    I don't know for sure whether
 5    he communicated with Chinese officials on the trip.
 6         Q.    So you -- would you know the identities of
 7    any Chinese officials he may have communicated with?
 8              MR. KIRSCHNER:  Objection.  Speculative.
 9              THE WITNESS:  I don't recall discussions
10    about -- he may have.  Again, this was a few years
11    ago.  He may have had discussions with them.  I -- I
12    don't know if he did or not.
13    BY MR. SAUER:
14         Q.    I'm going to give you another exhibit, 21.
15              (FAUCI Exhibit No. 21 was marked for
16    identification.)
17    BY MR. SAUER:
18         Q.    Just real briefly, you see this is an
19    e-mail from Cliff Lane dated 22nd February 2020;
20    correct?
21         A.    Correct.
22         Q.    And in the first line of the e-mail he
23    said, "China has demonstrated this infection can be
24    controlled, albeit at great cost"; correct?
25         A.    Right.
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 168

```
 1          Q.     In your discussions with him, did he
 2    discuss controlling the infection at great cost?
 3          A.     Again, I don't recall the precise nature
 4    of the conversation that I had with Dr. Lane, but I
 5    believe what he was referring to is that you have
 6    to -- that you can control it, and by great cost, I
 7    believe he was referring to extreme methods.
 8                 And the Chinese, indeed, went to extreme
 9    methods to do that.
10          Q.     And those extreme methods include very
11    aggressive lockdowns, for example --
12          A.     Yeah, but the lockdowns were the types of
13    lockdowns that were really quite extreme.  They would
14    essentially lock people in their homes, which was
15    extreme to do that.
16          Q.     Did you come to believe that extreme
17    measures would be required to control the spread of
18    the virus?
19                 MR. KIRSCHNER:  Objection.  Vague.
20    Ambiguous.
21                 THE WITNESS:  When you're talking about
22    the virus here in the United States?
23    BY MR. SAUER:
24          Q.     Correct.
25          A.     It was my opinion that social distancing
```

**DR. ANTHONY FAUCI  11/23/2022**

```
 1    would be very important when you have a respiratory

 2    virus that is spreading widely through a community

 3    causing an extraordinary amount of suffering and

 4    death.  Getting to context, I refer specifically that

 5    early on in the epidemic when New York got hit very

 6    badly, there were freezer and cooler trucks that were

 7    loaded with dead bodies from the hospital.  That is

 8    an unprecedented extreme issue that we all felt

 9    strongly, those of us involved in the discussions and

10    the public health recommendations, that social

11    distancing was imperative so that our hospitals would

12    not be overrun, and that we would be in a situation

13    where we would have to almost triage the decision of

14    who would live and who would die.

15              When you get to that extreme, social

16    distancing, even by somewhat difficult means, is

17    warranted to save lives.

18         Q.   Did you think that social distancing --

19    I'm talking about this time frame of around February

20    of 2020 -- did you think that social distancing would

21    have to include only high-risk individuals or would

22    it apply to society as a whole?

23              MR. KIRSCHNER:  Objection.  Vague.

24              THE WITNESS:  When you're -- when you're

25    dealing with a respiratory illness that has the
```

**DR. ANTHONY FAUCI  11/23/2022**

```
1    potential to kill a lot of people -- we've lost over

2    one million people in this country -- in order to

3    have an effective interruption, which would almost

4    certainly be on a temporary basis, but to interrupt

5    this enormous explosion of infections that we were

6    seeing, you would have to involve essentially the

7    entire community.

8    BY MR. SAUER:

9        Q.    Let me hand you Exhibit 22.

10            (FAUCI Exhibit No. 22 was marked for

11    identification.)

12    BY MR. SAUER:

13        Q.    And this is an e-mail chain involving you,

14    Christian Anderson, Jeremy Farrar, and Francis

15    Collins; right?

16        A.    Yeah.

17        Q.    And then it also includes the other

18    authors of that "Proximal Origins of COVID-19" paper

19    that we looked at earlier in the preprint version?

20        A.    Yeah.

21        Q.    If you look at that, just a little way

22    down the March 6th, 2020 4:23 p.m. e-mail from

23    Anderson.  Do you see that?

24        A.    Right.

25        Q.    He says, "Dear Jeremy, Tony and Francis,
```

DR. ANTHONY FAUCI  11/23/2022

```
 1    Thank you again for your advice and leadership as
 2    we've been working through the SARS-CoV-2 origin
 3    paper; correct?
 4        A.    Correct.
 5        Q.    And Jeremy is Jeremy Farrar; correct?
 6        A.    Correct.
 7        Q.    Tony is you?
 8        A.    Yeah.
 9        Q.    And Francis is Francis Collins, right?
10        A.    Correct.
11        Q.    And what advice and leadership did you
12    provide, if any, on the preparation of that paper?
13        A.    Very little.
14        Q.    So you don't know what he's talking about
15    when he says thank you?
16        A.    No.  I think that Jeremy is being
17    courteous, as he is wont to be.  I mean "advice"
18    could be -- and "leadership" could be we really got
19    to get information out.  Thank you for the effort
20    you've put into it.  Advice and leadership, to my
21    recollection, had very little to do with substantive
22    input into the paper.
23        Q.    And that second --
24        A.    And we did not have substantive input into
25    the paper.
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 172

```
 1         Q.    And below that, it says, "Please let me
 2    know if you have any comments, suggestions or
 3    questions about the paper or the press release";
 4    correct?
 5         A.    Correct.
 6         Q.    So he invited you to have comments on the
 7    paper because we're still waiting for proofs?
 8         A.    Right.
 9         Q.    So there was still time to make changes to
10    it; correct?
11         A.    Yeah.  And there were no -- to my
12    recollection, any substantive input into the paper.
13         Q.    Do you recall making comments on it at any
14    time --
15              MR. KIRSCHNER:  Objection.  Asked and
16    answered.
17    BY MR. SAUER:
18         Q.    Do you?
19         A.    I don't recall making any substantive
20    comments on the paper.  I may have made a comment
21    that "nice job," which is very courteous, but doesn't
22    mean that I had a substantive input into the paper.
23    I did not.
24              (FAUCI Exhibit No. 23 was marked for
25    identification.)
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 173

```
 1   BY MR. SAUER:
 2        Q.    Exhibit 23.  The first stage -- page of
 3   this document is an e-mail from you to
 4   Mark Zuckerberg; correct?
 5        A.    Yeah.  The reason I'm smiling, you're
 6   jumping around here, but that's okay.  We're good.
 7   Fake left.  All right.  Let's go.
 8        Q.    Is an e-mail to you from Mark Zuckerberg;
 9   correct?
10        A.    Correct.
11        Q.    The top one is dated February 27, 2020.
12        A.    Right.
13        Q.    And he writes to you, "Tony, I was glad to
14   hear your statement about the COVID-19 vaccine," and
15   so forth.
16        A.    Right.
17        Q.    Were you already on a first-name basis
18   with Mark Zuckerberg on February 27?
19        A.    You know, a lot of people call me Tony who
20   have never even met me before.
21        Q.    Had you met him before this e-mail was
22   sent?
23        A.    I don't recall what the first time I met
24   Mark Zuckerberg.  I actually don't think -- maybe
25   not.  Again, context, I meet thousands of people.
```

DR. ANTHONY FAUCI 11/23/2022

Page 174

1    I'm not sure I've ever met him in person.  I've been

2    on Zooms and Facebook things with him, but it could

3    not be at all unusual -- it happens every day -- that

4    people who have never met me refer to me as Tony.

5    I'm a rather informal person.

6         Q.    Do you have relationships with researchers

7    at the Chan Zuckerberg Institute?

8         A.    If the Chan Zuckerberg Institute that

9    you're referring to is the San Francisco General

10   Hospital.

11        Q.    The one you described earlier.

12        A.    Yeah because remember -- yeah, that's the

13   thing, Mr. Sauer.  I'm not really clear on -- I'm not

14   really quite sure what Bio Club is.  I do know that

15   Chan Zuckerberg supports the San Francisco General

16   Hospital.  And I know Chan Zuckerberg in the context

17   of the University of California, San Francisco

18   General Hospital.

19        Q.    And do you have relationships with

20   researchers at that hospital?

21             MR. KIRSCHNER:  Objection.  Vague and

22   ambiguous.

23   BY MR. SAUER:

24        Q.    If I could finish the question.

25        A.    Again, I'm not sure what you mean by

DR. ANTHONY FAUCI  11/23/2022

Page 175

1    relationship.  I know, to varying degrees of

2    familiarity ranging from knowing who they are to

3    being able to recognize them at a meeting and say

4    hello, to knowing them over the years in our

5    interactions in the medical and scientific community,

6    but the answer to your question is:  I can't pull out

7    people.  I mean, I know researchers who are at the

8    San Francisco General Hospital, for sure.  I've

9    dealt -- our institute deals with them regularly.

10        Q.    Do you remember the first time you met

11   Mark Zuckerberg?

12        A.    I don't remember specifically, but I

13   believe it was on a Zoom call.  I don't believe I've

14   ever physically -- I may have.  Could be.  I don't

15   know for sure, but I don't think I've physically

16   interacted with him.  I believe I have seen him on

17   multiple times that we've interacted on Facebook

18   Zoom-type podcasts.

19        Q.    Did any of those Zooms predate the

20   outbreak of COVID-19?

21        A.    I don't think so.  I mean, I don't -- I've

22   heard of Mark Zuckerberg -- obviously, he's a famous

23   person, but I don't recall -- again, I could have run

24   into him prior to the outbreak, but I don't

25   specifically recall running into Mark Zuckerberg

**DR. ANTHONY FAUCI  11/23/2022**

```
 1   before.  It's possible.
 2        Q.    Can you turn to the third page of this
 3   document?  There's another e-mail from
 4   Mark Zuckerberg dated March 15th of 2020.
 5             Do you see that?
 6             MR. KIRSCHNER:  The page before.
 7             THE WITNESS:  The one in the middle of the
 8   page?
 9             MR. KIRSCHNER:  No, I think it's --
10   BY MR. SAUER:
11        Q.    Third page of the document?
12        A.    Third page of the document, yes.
13             MR. KIRSCHNER:  Again, I would ask for
14   Dr. Fauci to have an opportunity to familiarize
15   himself with this e-mail prior to asking any
16   questions.
17   BY MR. SAUER:
18        Q.    I just want to ask a quick question about
19   the paragraph that begins, "I'm also doing a series
20   of live-streamed Q and As."
21             Do you see that?
22        A.    Yeah.  I see it.  Just let me read it.
23   Yeah.
24        Q.    Did you, in fact, do a live stream Q and
25   A with Mark Zuckerberg as he invited you to do in
```

**DR. ANTHONY FAUCI  11/23/2022**

```
 1    this one -- in this paragraph?
 2         A.    I believe I did.  I did a three -- I think
 3    three is correct.  Three live stream Facebook-type Q
 4    and As where he would ask me important questions --
 5    you know, why is it important to be careful with, you
 6    know, public health measures.  Tell us the truth.
 7    Now, what is the virus?  What do you mean?  How does
 8    it spread?  Things like that.
 9         Q.    Next paragraph down, "Finally, we have
10    allocated technical resources and millions of dollars
11    of free ad credits for the U.S. Government to use for
12    PSAs to get its message out over the platform"?
13         A.    That's what he says, right.
14         Q.    And the platform refers to Facebook, I
15    guess?
16         A.    I guess so.
17         Q.    Did you accept that offer that Facebook
18    would donate millions of dollars of free ad credit?
19         A.    No, I don't have the authority to accept
20    outside money like that.  It would have to go through
21    a different channel.  And I don't believe -- though
22    I'm not 100 percent certain -- I don't believe that
23    there was any money that was given from the
24    Zuckerberg to the United States government to do
25    PSAs.  It's possible, but it certainly didn't happen
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 178

```
1   to my knowledge.  I don't recall money being given

2   for PSAs.  I recall the offer to help get information

3   out, but I don't recall -- again, could have

4   happened, possible.  But I don't recall.

5        Q.    Exhibit 24 --

6             MR. KIRSCHNER:  Counsel, before we go to

7   Exhibit 24, I've noticed on this exhibit it looks

8   like a phone number that I want to make sure is

9   redacted before it becomes a public record.  It looks

10  like a personal cell phone for Mark Zuckerberg.

11            MR. SAUER:  This is a document as we

12  received it from the government.

13            MR. KIRSCHNER:  And it's marked

14  confidential.

15            MR. SAUER:  We have no objection to that.

16  BY MR. SAUER:

17       Q.    And Exhibit 24?

18            (FAUCI Exhibit No. 24 was marked for

19  identification.)

20  BY MR. SAUER:

21       Q.    Is this the actual published version of

22  the "Proximal Origin of SARS-CoV-2"?

23       A.    I don't have anything in front of me.

24       Q.    Oh, sorry.  Is this the published version

25  of the "Proximal Origin of SARS-CoV-2" that was
```

DR. ANTHONY FAUCI  11/23/2022

1    **published online on March 17th of 2020.**

2            MR. KIRSCHNER:  Objection.

3    Mischaracterizes the evidence.  Just to make the

4    record clear, you're saying March 17th.

5            MR. SAUER:  If you look at the last page

6    in the far right column, at the very top, it says,

7    "Published online 17 March, 2020."  Do you see that?

8            MR. KIRSCHNER:  Okay.  I see that.  Thank

9    you.

10           THE WITNESS:  This appears to be the

11   Nature Medicine -- it says Nature Medicine, Volume

12   27, April 2020, on the bottom of the paper so I would

13   imagine this is the original, published,

14   peer-reviewed article that appeared in Nature

15   Medicine.

16   BY MR. SAUER:

17       Q.    **So this is the published version of the**

18   **one that Dr. Anderson had sent you the preprint**

19   **version of a few days earlier; correct?**

20       A.    Well, I can't say exactly that it is.  I

21   do know that it would be standard to have a preprint

22   usually in Med Archive.  And it had the same title,

23   the "Proximate Origin of SARS-CoV-2," and the authors

24   appear to be the same, so I would make a reasonable

25   assumption that Exhibit 24 is the peer-reviewed

DR. ANTHONY FAUCI  11/23/2022

Page 180

```
 1   version of the preprint that you showed me before.
 2        Q.    And the first page, second paragraph?
 3        A.    Yes.
 4        Q.    Last sentence.  "Our analyses clearly show
 5   that SARS-CoV-2 is not a laboratory construct or a
 6   purposely manipulated virus;" correct?
 7        A.    That's what it says.
 8        Q.    Did you have any input in formulating that
 9   conclusion between the time you got the preprint
10   version from Dr. Anderson on March 8 and then the
11   publication online on March 17?
12        A.    Mm-hmm.^  this is a conclusion of the
13   authors.  I'm not really sure of what you're saying
14   did I have any input.  I don't recall conversation
15   that we had -- and as I mentioned before, my input
16   into the formulation of this was minimal, if at all.
17   I remember reading through it.
18             And I'm not quite sure what you mean that
19   I have substantial input into the conclusion.  That
20   conclusion was based on the analysis by the authors
21   of this paper.
22        Q.    Did you have any communications at all
23   about that -- about -- any communications at all
24   about that conclusion in that time frame from
25   March 8th to March 17th?
```

## DR. ANTHONY FAUCI  11/23/2022

Page 181

```
 1       A.     Conversations with whom?
 2       Q.     With anybody.
 3       A.     You know, I don't recall specific
 4  conversations, but we read the preprint and,
 5  therefore, we knew what the conclusion was, and I'm
 6  sure that that conclusion was discussed.  So I would
 7  not be surprised at all following the initial
 8  preprint that I discussed the conclusion of these
 9  authors that this is not a laboratory construct or a
10  purposely manipulated virus.
11            I wouldn't be surprised if I did discuss
12  this with people since it already was out in public
13  knowledge in the preprint.  So the question, did I
14  discuss this between the preprint and now?  I would
15  not be surprised if I did.
16       Q.     Do you know anyone you discussed it with?
17  Do you remember?
18       A.     I can't specifically remember anyone I
19  discussed it with, but, as I said, given the fact
20  that it was out in the preprint literature, it is
21  likely, and I'm not surprised if I did, discuss it.
22  It was being discussed widely.
23       Q.     I'm handing you Exhibit 26.
24            MR. KIRSCHNER:  I think we're on 25.
25            MR. SAUER:  Oh, sorry.  That was it.
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 182

```
 1   Twenty-five.

 2            (FAUCI Exhibit No. 25 was marked for

 3   identification.)

 4   BY MR. SAUER:

 5        Q.    Is this a copy of a blog that

 6   Francis Collins, the NIH director, published on

 7   March 26th, 2020?

 8            MR. KIRSCHNER:  Objection.  Speculative.

 9   BY MR. SAUER:

10        Q.    Is that what appears to be on the cover?

11        A.    The cover states it was a NIH director's

12   blog posted on March 26th, 2020, by Dr. Francis

13   Collins.  So I have no reason to believe that that's

14   not what actually occurred.  That this blog was put

15   up on his director's page.

16        Q.    Can you look at the second page of the

17   document, the beginning of the blog?

18        A.    Yes.

19        Q.    You see where Director Collins says, "Some

20   folks are even making outrageous claims that the new

21   coronavirus causing the pandemic was engineered in a

22   lab"?

23        A.    I'm sorry.  Where -- we are -- where are

24   we?

25        Q.    Second page.
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 183

```
 1        A.    This here?
 2        Q.    First full paragraph.
 3              MR. KIRSCHNER:  Again, I would ask for
 4    Dr. Fauci to have an opportunity to familiarize
 5    himself with this document.
 6              THE WITNESS:  Yeah.  Let me read that
 7    paragraph, please.
 8              Yes.  I've read the paragraph.  What's the
 9    question?
10    BY MR. SAUER:
11        Q.    You see where it says, "Some folks are
12    even making outrageous claims that the new
13    coronavirus causing the pandemic was engineered in a
14    lab"?
15        A.    Yes, I see that.
16        Q.    And he goes on to say, "A new study
17    debunks such claims by providing scientific evidence
18    that this novel coronavirus arose naturally";
19    correct?
20        A.    Correct.
21        Q.    In the immediate following paragraph,
22    he describes that as reassuring findings and refers
23    to the Nature Medicine article we just looked at;
24    right?
25        A.    Correct.
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 184

```
 1          Q.     Were you aware that Francis Collins was

 2     publishing a blog addressing the Nature Medicine

 3     article "Proximal Origins of COVID-19"?

 4               MR. KIRSCHNER:  Objection.  Lack of

 5     foundation.

 6     BY MR. SAUER:

 7          Q.     Were you aware?

 8          A.     Was I aware that he was preparing it?  I

 9     don't think so.  I might have been, but I doubt it.

10     Someone likely would have brought this to my

11     attention.  I don't recall reading this.  I don't

12     read every NIH director's blog.  It is conceivable,

13     maybe likely, that I did read it, but I was not -- to

14     my knowledge -- maybe he mentioned something to me

15     that I forgot that he was going to write a blog, but

16     it doesn't ring a bell in my mind that he was

17     planning to write a blog.  But, you know, Francis

18     writes a lot.  I wouldn't be surprised if he

19     mentioned he was going to do a blog, but this does

20     not ring a bell.  It's clear that he did it and if he

21     did it, I likely saw it.

22          Q.     You don't recall discussing it with him

23     beforehand in any way before he published it?

24          A.     You know, again, I might have discussed it

25     with him, but I don't recall specifically discussing
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 185

1    it with him.

2          Q.    I'm handing you Exhibit 26.  Was there --

3    were you aware of media coverage of the article when

4    it came out?

5              MR. KIRSCHNER:  Can you please wait until

6    Dr. Fauci has the exhibit in front of him?  Also I

7    only have one person -- okay.  What exhibit number is

8    this?

9              MR. SAUER:  Twenty-six.

10             MR. KIRSCHNER:  I apologize, Mr. Sauer,

11    but can you -- once Dr. Fauci has the exhibit, can

12    you restate the question?

13             THE WITNESS:  So this is -- I have two

14    things here.

15             MR. KIRSCHNER:  Oh, I have one copy.

16             THE WITNESS:  So this is --

17             (FAUCI Exhibit No. 26 was marked for

18    identification.)

19    BY MR. SAUER:

20          Q.    Do you see this ABC News article

21    designated at the top of the page entitled "Sorry,

22    conspiracy theorists.  Study concludes COVID-19 is

23    not a laboratory construct."

24              Do you see that?

25          A.    I see it, yes.

DR. ANTHONY FAUCI  11/23/2022

Page 186

```
 1        Q.    And then it -- it's dated March 27th,
 2   2020, the day after the NIH director's blog that we
 3   just looked at; correct?
 4        A.    Correct.
 5        Q.    Did you communicate with the media about
 6   the Nature Medicine article when it came out at all?
 7        A.    You know, I don't recall communicating
 8   with the media about that.  I might have, but I don't
 9   specifically recall communicating with the media
10   about it.
11        Q.    Do you know if Dr. Collins communicated
12   with the media about it?
13        A.    I don't know if he did.
14        Q.    Do you know if anyone in the NIAID staff,
15   the staff that you oversee, communicated with the
16   media about it?
17        A.    I don't recall if they did or did not.
18   They might have, but I don't recall.
19        Q.    Did Dr. Collins ever contact you about the
20   Nature Medicine article after this -- his March 26th
21   blog?
22             MR. KIRSCHNER:  Objection.  Vague.
23   Ambiguous.  Lack of foundation.
24             THE WITNESS:  You're asking if he
25   contacted me about the Nature Medicine article.  I
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 187

```
 1   don't remember a specific contact, but since it's a
 2   published article, I wouldn't be surprised if somehow
 3   or other Dr. Collins commented to me about it or I
 4   commented to him about it.  But I don't specifically
 5   recall any significant discussion.  Again, we might
 6   have.  That would not be surprising to me.
 7   BY MR. SAUER:
 8        Q.    I'm handing -- we're handing you
 9   Exhibit 26.
10             (FAUCI Exhibit No. 27 was marked for
11   identification.)
12             THE WITNESS:  I have Exhibit 26.  You're
13   talking about 27.
14   BY MR. SAUER:
15        Q.    Sorry.  Twenty-seven.  You're right.
16        A.    Francis Collins to me, CC.
17        Q.    Do you recognize this e-mail?
18             MR. KIRSCHNER:  Objection --
19             THE WITNESS:  I have to read it.
20             MR. KIRSCHNER:  -- I would ask for
21   Dr. Fauci to have an opportunity --
22             THE WITNESS:  I have to read it.
23             MR. KIRSCHNER:  -- to familiarize himself
24   with the document.
25             THE WITNESS:  Yes, I've read it.
```

**DR. ANTHONY FAUCI  11/23/2022**

```
 1    BY MR. SAUER:
 2         Q.    Do you recall getting this e-mail from
 3    Dr. Collins on April 14th, 2020 at 5:02 p.m.?
 4         A.    Again, I'm very sorry, but you're talking
 5    about e-mails several years ago.  I don't recall
 6    specifically this e-mail.  You're putting an e-mail
 7    in front of me that's from Francis to me, and I'm
 8    reading what it says.  I don't recall seeing this,
 9    but I know that Francis clearly was concerned that
10    there'd be misinformation out and he wanted -- and
11    that's why he asked:  "Any more we can do as the
12    national academy to weigh in?"
13         Q.    In particular in the first paragraph there
14    he says to you, "Wondering if there is something NIH
15    can do to help us put down this very destructive
16    conspiracy with what seems to be growing momentum";
17    correct?
18         A.    Right.
19         Q.    Have you ever described the lab leak
20    theory of the origins of COVID as a very destructive
21    conspiracy to you?
22         A.    Specifically, to me -- I mean, it's here
23    in this e-mail, but I just think that my little bit
24    of a hyperbole on his part about, you know, using
25    words like destructive conspiracy, I think Francis
```

**DR. ANTHONY FAUCI  11/23/2022**

```
 1   felt -- and you'll have to ask Francis about that --
 2   but I believe he felt that the data -- and you go to
 3   the third paragraph in that e-mail -- he said, "I
 4   hoped that the Nature Medicine article on the genomic
 5   sequence would settle this."
 6            So what I believe Francis was saying that
 7   the scientific data strongly point to a natural
 8   occurrence, and there's a lot of, you know,
 9   discussion by some that this is clearly a deliberate
10   development of a virus that could harm people, and
11   Francis in the e-mail appears to be disturbed saying,
12   the scientific data shown in Nature Medicine we hoped
13   would settle this, and that's why he's concerned.
14            The words that he used, I don't recall him
15   using those words in public -- in person to person to
16   me, but he clearly used those words in this e-mail.
17       Q.    You said a few things there.  To
18   understand what Dr. Collins meant when he sent this
19   e-mail and the various other e-mails, you said you
20   really have to ask Dr. Collins about that?
21       A.    Yeah.
22       Q.    Is that fair to say?
23            MR. KIRSCHNER:  Objection.
24   Mischaracterizes the evidence and also --
25            THE WITNESS:  No, I mean, you're asking me
```

```
1   about something he said, and I think the natural
2   thing is why don't you ask the guy who said it?
3   BY MR. SAUER:
4       Q.    Fair enough.  And then if you look there
5   to the link, he's got a link there to a Bret Baier
6   report that's entitled "Sources increasingly
7   confident coronavirus outbreak started in a
8   Wuhan lab"; correct?
9       A.    I'm sorry.  What -- is this the --
10      Q.    First page?
11      A.    I can't read it.
12      Q.    Yeah, directly.
13      A.    I can't see Bret Baier.  I can't read the
14  rest of it.
15      Q.    Well, let me ask you this:  Dr. Collins,
16  at the end of it says, "Anything more we can do?  Ask
17  the National Academy to weigh in?"  Correct?
18      A.    Right.
19      Q.    So he's asking you if there is anything
20  more that you and he and Cliff Lane and the others
21  copied can do to try to put this destructive
22  conspiracy, in his words, to rest; correct?
23      A.    I think if you look at -- I mean, I'm not
24  sure exactly.  I don't recall this e-mail, so I'm not
25  sure what he was implying.  But reading it now, I
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 191

```
 1   concentrate on the next-to-last paragraph, what he
 2   said.
 3            "I had hoped the Nature Medicine article
 4   on the genomic sequence would settle this, but it
 5   probably didn't get much visibility."  And it is
 6   conceivable that what he is saying is that this is a
 7   scientific, peer-reviewed article.  It's not
 8   surmising.  It's not extrapolation.  It's just a
 9   peer-reviewed scientific article that he feels didn't
10   get a proper amount of visibility.
11            And in the next sentence, he says, "How
12   can we get it to get more visibility?  Perhaps ask
13   the National Academy to weigh in and review the
14   evidence to give the evidence more visibility.  I
15   think this is typical Francis, who's is a very solid
16   scientist, wanting to stick with the scientific data
17   as opposed to discussions of hypotheses with no
18   basis.
19       Q.    Did you take any steps to increase the
20   visibility of the article after this?
21       A.    Not to my knowledge.  I don't think so.  I
22   was busy with a lot of other things.
23       Q.    I'm sure you were very busy.  Did you
24   respond to the e-mail?
25       A.    I don't recall if I did.  You're probably
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 192

```
 1    going to show me an e-mail where I did.
 2          Q.    Can you look at the next page?
 3          A.    Yeah.
 4          Q.    Next day, April 17, 2022, you respond to
 5    that e-mail, saying, quote, "I would not do anything
 6    about this right now.  It is a shiny object that will
 7    go away."  ^  correct?
 8          A.    Right.
 9          Q.    What did you mean when you said, "I would
10    not" -- "I would not do anything about this right
11    now."  Were you saying you don't want to take any
12    steps to increase the visibility of --
13          A.    Right.  No.  I think we should let the
14    Nature Medicine article speak for itself is what I
15    meant.
16          Q.    And you said it is a shiny object --
17          A.    Right.
18          Q.    -- that will go away in time?
19          A.    Right.
20          Q.    What did you mean by that?
21          A.    By shiny object I mean something that
22    people tend to really get excited about.  It's very
23    exciting to say, "Well, this thing was manufactured
24    by the Chinese and they threw it out into the world."
25    That's a shiny object.
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 193

```
 1            If you say that, it gets discussed all

 2   over the world.  That's a shiny object.  And I was

 3   referring to the fact that I stick, as a scientist,

 4   with the science.  And invariably, the science

 5   prevails.

 6            So what I was referring to is that I don't

 7   think you should do anything about it right now.  Let

 8   the Nature Medicine and the data essentially prevail.

 9            And this issue of -- with no proof at all,

10   people stating this is likely manufactured by the

11   Chinese and released, that's what I meant by a shiny

12   object, it's something with no evidence but a lot of

13   pizzazz to it if you say it.  And that's what I was

14   referring to.

15       Q.   Tying back to your earlier comment, do you

16   think that that theory was a form of misinformation

17   or disinformation that could lead to loss of life?

18            MR. KIRSCHNER:  Objection.  Vague.

19   Ambiguous.

20            THE WITNESS:  No.  I'm not sure.

21   BY MR. SAUER:

22       Q.   Well, Dr. Collins described it as a very

23   destructive conspiracy.

24       A.   Correct.

25       Q.   And I take it that's the destructive
```

DR. ANTHONY FAUCI  11/23/2022

Page 194

1    conspiracy theory that the virus originated from a

2    lab?

3         A.    Right, right.

4         Q.    Did you view that theory as a form of

5    misinformation or disinformation that could lead to

6    the loss of life?

7         A.    It could be misinformation.  Remember,

8    misinformation are things that are untrue, not

9    necessarily deliberately, you know, propagated as

10   untrue, whereas disinformation is when you know it's

11   wrong and you still spread it.

12            So this very well might be, at least at

13   the time there was no indication that this was

14   correct information.  So let me categorize it that

15   way.

16            So for someone -- or anyone -- to be going

17   around spreading that this clearly is something that

18   was made by the Chinese and released in society and

19   killed a lot people, that would be misinformation

20   because there's no evidence that that's the case.

21            And the second part of your question was

22   that could lead to a number of other things.  When

23   you pursue misinformation and disinformation, often

24   you take away from the effort of pursuing something

25   that is in the line of correct information.

DR. ANTHONY FAUCI  11/23/2022

1      Q.    Did you take any further steps after that
2   e-mail to increase the visibility or the public
3   awareness of the Nature Medicine article?
4            MR. KIRSCHNER:  Objection.  Asked and
5   answered.
6            THE WITNESS:  Again, I'm not really sure
7   what you mean.  When the paper came out, it was a
8   peer-reviewed scientific analysis that came to a
9   conclusion that we've already discussed.
10           Did I discuss this with people since this
11   was a topic of considerable concern, likely I did.
12   If you're asking did I do anything to promote the
13   dissemination of that, I don't think I went out of my
14   way, as I mentioned and you agreed, I'm a really busy
15   person.  I have a lot of other things to do.  I don't
16   think I made this something that was a high level of
17   priority for me.
18   BY MR. SAUER:
19      Q.    You don't think you made -- let me ask you
20   this:  You knew what Nature Medicine article he was
21   talking about, right?
22      A.    Yeah.
23      Q.    And in particular, this is the article
24   that has Christian Anderson as a corresponding
25   author?

**DR. ANTHONY FAUCI  11/23/2022**

1       A.      Right.

2       Q.      **Correct?**

3       A.      Correct.

4       Q.      **This is the article where he, you know,**

5    **you had been sent at least four drafts of it, based**

6    **on the e-mails we saw previously; correct?**

7       A.      That's the same one of which I had very

8    little input into, yeah.

9       Q.      **And this is the article that Christian**

10   **Anderson had sent you a preprint and had said thank**

11   **you for your advice and leadership about the article;**

12   **correct?**

13          MR. KIRSCHNER:  Objection.

14   Mischaracterizes the evidence.

15   BY MR. SAUER:

16      Q.      **Correct?**

17      A.      It's the article that we discussed before.

18      Q.      **Proximal Origins of COVID-19?**

19      A.      Yes.

20      Q.      **Exhibit 28.**

21          **(FAUCI Exhibit No. 28 was marked for**

22   **identification.)**

23   BY MR. SAUER:

24      Q.      **And this is a excerpt from the transcript**

25   **of the Coronavirus Task Force press briefing in the**

**DR. ANTHONY FAUCI  11/23/2022**

```
 1    White House dated April 17th, 2020; correct?
 2               MR. KIRSCHNER:  Objection.
 3               THE WITNESS:  That's what it says on the
 4    top of the piece of paper of Exhibit 28, it says
 5    "Remarks by President Trump, Vice President Pence,
 6    and members of the Coronavirus Task Force."
 7    BY MR. SAUER:
 8        Q.    At that time, you were a member of the
 9    Coronavirus Task Force; correct?
10        A.    That is correct.
11        Q.    And you participated in this briefing with
12    the president and the vice president; correct?
13               MR. KIRSCHNER:  Objection.  I would ask
14    Dr. Fauci have an opportunity to familiarize himself
15    with this document.
16               THE WITNESS:  I'm looking at the document
17    now.  And as I scan, I see on page 44 of 48, that it
18    says Dr. Fauci, and it says something that it looks
19    like I said at the press -- this looks like a
20    transcript, which it looks like it is, then clearly I
21    participated in that because my name is here.
22    BY MR. SAUER:
23        Q.    And if you look little bit above that on
24    that second page, there's a question from a member of
25    the media saying, "Mr. President, I wanted to ask
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 198

```
 1    Dr. Fauci, could you address the suggestions or
 2    concerns that the virus was somehow manmade, possibly
 3    came out of a laboratory in China?"  Correct?
 4         A.    That's what it says.
 5         Q.    And the president says to you, "Want to
 6    go?"  Correct?
 7         A.    That's what the president said.
 8         Q.    And then the reporter repeated, addressing
 9    you.  "You studied this virus.  What are the
10    prospects of that?"  Right?
11         A.    That's what the question said.
12         Q.    And your response to that was, "There was
13    a study recently that we can make available to you
14    where a group of highly qualified evolutionary
15    virologists looked at the sequences there and the
16    sequences in bats as they evolved.  And the mutations
17    that it took to get to the point where it is now is
18    totally consistent with a jump of a species from an
19    animal to a human"; correct?
20         A.    That's what it says.
21         Q.    Do you remember saying that?
22         A.    I don't recall.  I was at -- as you
23    probably know, multiple, multiple White House press
24    conferences.  I have no reason to doubt that the
25    transcript is not accurate, and it looks like that's
```

DR. ANTHONY FAUCI  11/23/2022

Page 199

```
 1   what I said.  So I would imagine I said it.
 2        Q.    And this is April 17, which is the same
 3   day that you had e-mailed Dr. Collins this last
 4   exhibit saying this theory is a shiny toy that will
 5   go away in time.  Correct?
 6        A.    Shiny object.
 7        Q.    Sorry.  Shiny object that will go away in
 8   time.
 9             MR. KIRSCHNER:  Objection.  Lack of
10   foundation.
11             THE WITNESS:  You know, I would have to go
12   back and look where -- you're asking me if it was the
13   same date.  And I have to look here.  The date on
14   Exhibit 27 is 17th of April.  And this is the date of
15   the press conference, yes.  So it's the same date.
16   Yeah.
17   BY MR. SAUER:
18        Q.    And I've watched the video of this
19   particular comment?
20        A.    Yeah.
21        Q.    And I noted in watching the video that,
22   when you said that sentence about totally consistent,
23   you pause and use that phrase, "totally consistent"
24   with emphasis.
25        A.    Right.
```

**DR. ANTHONY FAUCI  11/23/2022**

1      Q.    Do you remember doing that?

2      A.    I don't remember doing that.  Like I said,

3  it's one of many, many, many press conferences.  So I

4  don't remember a pause of a statement I made in one

5  of dozens and dozens and dozens of press conferences.

6      Q.    And you have given many, to be sure.  But

7  do you remember saying the mutations that it took to

8  get to the point where it is now -- pause for

9  emphasis -- is totally consistent with a jump from

10  species, from animal to human.  You don't remember

11  that?

12          MR. KIRSCHNER:  Objection.  Lack of

13  foundation.

14          THE WITNESS:  I don't remember pauses in

15  the hundreds of conferences that I've been at.

16  BY MR. SAUER:

17      Q.    You went on to say, "So the paper will be

18  available.  I don't have the authors right now, but

19  we can make that available to you"; correct?

20      A.    Right.

21      Q.    This is the same paper that, on the same

22  day, you had been e-mailing with Dr. Collins about in

23  the previous exhibit; correct?

24      A.    I'm a little bit confused with your

25  question.  I'm not sure what you mean.  Is the

**DR. ANTHONY FAUCI  11/23/2022**

Page 201

```
 1   paper --

 2        Q.     What paper are you referring to here in

 3   your comments from the White House podium at the task

 4   force briefing on April 17th?  Do you know?

 5        A.     I don't know.  I assume it was the Nature

 6   Medicine paper.  I don't know.  I think it was.

 7        Q.     Did you make the paper available to any

 8   reporters after this press conference?

 9        A.     Not to my knowledge.

10               MR. KIRSCHNER:  Mr. Sauer, how long do you

11   want to go before lunch?

12               MR. SAUER:  Why don't we do one more

13   exhibit.

14               THE WITNESS:  Okay.

15   BY MR. SAUER:

16        Q.     Exhibit 29.

17               (FAUCI Exhibit No. 29 was marked for

18   identification.)

19   BY MR. SAUER:

20        Q.     If you'll look at the bottom of this page,

21   did you receive an e-mail on April 19th, 2020, from a

22   reporter at the Washington -- at The Times asking:

23   "Dr. Fauci on Friday said he would share a scientific

24   paper with the press on the origin of the

25   coronavirus.  Can you please help me get a copy of
```

**DR. ANTHONY FAUCI  11/23/2022**

1    that paper?"  Do you recall that?

2         A.    This is Bill -- Bill Gertz's e-mail to

3    Katie.  I don't recall it, but I'm looking up ahead

4    and I -- this is -- I guess this is Katie Miller, if

5    I'm not mistaken, who is the vice president's press

6    person.  I think that's probably who it was.  It

7    doesn't say who it's to or from, and then up above I

8    sent a link.  So that -- that may be the papers we're

9    talking about.

10        Q.    Did you send the link to Bill in there in

11   the first line of the e-mail, directly to Bill?

12        A.    Yeah.  He asked for the scientific paper

13   in the press briefing that you asked for.  That may

14   have been the press person that asked the question,

15   and it looks like Katie Miller, who is the press

16   person for the Vice President Pence,

17   probably contacted me.  I don't see a connecting

18   e-mail here, but she probably contacted me and said,

19   would you send the links to the paper to Bill Gertz,

20   and it looks like I did.  It says here, "Bill, here

21   are the links to the scientific papers and a

22   commentary about the papers."

23             So there are two aspects here.  There is

24   the original paper that came online that I believe

25   was not yet out or maybe just did come out and a

DR. ANTHONY FAUCI  11/23/2022

Page 203

```
 1   commentary on it in the journal Cell, yes.
 2        Q.    And the first paper is, in fact, the
 3   proximal origin of SARS-CoV-2 --
 4        A.    Right.
 5        Q.    -- the Nature Medicine paper that we've
 6   talked about?
 7        A.    It looks -- yes, it says here Nature
 8   Medicine April 2020.  That is the paper that is the
 9   peer-reviewed version of the original preprint that
10   came out earlier.
11        Q.    And then the other two citations are both
12   authored by Eddie Holmes who was --
13        A.    Right.
14        Q.    -- involved in drafting that paper;
15   correct?
16        A.    Right.
17              MR. SAUER:  Let's take a break there.
18              THE VIDEOGRAPHER:  The time is 12:27 p.m.,
19   and we're going off the record.
20              (Recess.)
21              THE VIDEOGRAPHER:  The time is 1:19 p.m.,
22   and we're back on the record.
23   BY MR. SAUER:
24        Q.    Dr. Fauci, I'm handing you Exhibit 30.
25              (FAUCI Exhibit No. 30 was marked for
```

DR. ANTHONY FAUCI  11/23/2022

Page 204

```
 1    identification.)

 2    BY MR. SAUER:

 3         Q.    You see this is an e-mail at the top from

 4    you to Peter Daszak dated at -- dated April 19th,

 5    2020?

 6         A.    Yes.

 7         Q.    And you're responding to an e-mail from

 8    him the day before, April 18th, 2020; correct?

 9         A.    Correct.

10         Q.    And his e-mail was the day after that

11    coronavirus task force press conference that we

12    looked at, the previous exhibit; correct?

13         A.    Right.

14         Q.    And he said, "Tony, CC'ing David so that

15    you might pass this on to Tony once he has a spare

16    sec"; correct?

17         A.    Correct.

18         Q.    Is David a reference to David Morens?

19         A.    That's true, yes.

20         Q.    Who is David Morens?

21         A.    David Morens is a person who works at

22    NIAID, is a scientist, been with us for a very long

23    time.

24         Q.    Does he know Peter Daszak?

25         A.    I believe he does.
```

DR. ANTHONY FAUCI  11/23/2022

Page 205

```
 1        Q.    Do you know Peter Daszak?

 2        A.    You know --

 3              MR. KIRSCHNER:  Objection.  Asked and

 4    answered.

 5              THE WITNESS:  Yeah.  To the extent that

 6    I've answered that multiple times, I'm acquainted in

 7    the sense of I have seen him once or twice.  I don't

 8    have a friendship or a relationship, if you want to

 9    call it that, with him.  I'm just aware of him, and

10    I've seen him a couple of times.  I think I did a

11    podcast once where he was another member of the

12    podcast group.

13    BY MR. SAUER:

14        Q.    These other people he copies, Erik Stemmy,

15    Emily Erbelding, and Aleksei Chmura, are they all

16    people that work on your staff at NIAID?

17        A.    Erik Stemmy does for sure.  Emily does for

18    sure.  I believe Aleksei Chmura does also, but I'm

19    not 100 percent sure.  I believe that person does.

20    I've seen his name circulated around in -- in

21    correspondence in our institute, but for sure

22    Erik Stemmy and Emily Erbelding work at NIAID.

23        Q.    Do you know how he got all your e-mail

24    addresses?

25              MR. KIRSCHNER:  Objection.  Calls for
```

DR. ANTHONY FAUCI  11/23/2022

Page 206

```
 1    speculation.
 2    BY MR. SAUER:
 3        Q.    For example, do you know how he got your
 4    e-mail address?
 5        A.    How Peter Daszak got my e-mail address?
 6        Q.    Yeah.
 7        A.    It's pretty easy to get an e-mail address.
 8    You just go on to the global NIH and you can get it.
 9        Q.    That's publicly available, your e-mail
10    address?
11        A.    Oh, totally.
12        Q.    Even though it's redacted under B6 in this
13    document?
14            MR. KIRSCHNER:  Objection.  Argumentative.
15    BY MR. SAUER:
16        Q.    You may answer.
17        A.    I don't know what you're talking about.
18    You don't redact a website.  If you go on to the NIH
19    global, you can find my e-mail address.
20        Q.    You responded to this the day after you
21    received it saying, "Many thanks for your kind note";
22    correct?
23        A.    Right.  That's a very typical response of
24    mine.  I can show you 45,000 e-mails that say thank
25    you for your kind note.
```

DR. ANTHONY FAUCI  11/23/2022

Page 207

1          Q.     You say you get about 2,000 e-mails a day?

2          A.     I get -- yeah, some days -- some days a

3    thousand, two thousand, some days several hundred.

4          Q.     Do you respond to all of them like that?

5          A.     No, no.  The -- the ones that are

6    irrelevant and -- what's the right word for them --

7    the ones that I don't really need to see.

8          Q.     That's how you respond to them?

9          A.     I don't respond -- no, to this?  No.  I

10   don't respond to every one of my e-mails.  I get a

11   lot of e-mails from a number of different sources

12   that are completely distracting and irrelevant to me,

13   but when an e-mail comes through, we got -- people

14   think I should see from a legitimate scientist,

15   they let it through and then I see it.

16         Q.     And that Peter Daszak is a legitimate

17   scientist in that category.  Fair to say?

18                MR. KIRSCHNER:  Objection.  Vague.

19                THE WITNESS:  Peter Daszak is a -- is a

20   grantee of NIAID.  So it would be perfectly

21   appropriate to let an e-mail from a grantee of NIAID

22   through to me.

23   BY MR. SAUER:

24         Q.     Are you aware that -- generally, that

25   after your comments at the White House April 17th,

DR. ANTHONY FAUCI  11/23/2022

Page 208

```
 1    coronavirus task force briefing speech about the lab
 2    leak hypothesis was censored on social media?
 3              Are you aware of that?
 4              MR. KIRSCHNER:  Objection.  Lack of
 5    foundation.  Vague.
 6              MR. SAUER:  I've asked him if he's aware
 7    of it.
 8    BY MR. SAUER:
 9         Q.   Are you aware of it?
10         A.   I'm not aware of suppression of speech on
11    social media to my knowledge.  If -- if it was
12    brought to my attention, it went (unreportable
13    sound.)  I -- I don't recall being aware of
14    suppression of anything.
15         Q.   Were you -- were you aware that Twitter,
16    for example, removed content that suggested the virus
17    may have escaped from a lab?
18              MR. KIRSCHNER:  Objection.  Lack of
19    foundation.
20    BY MR. SAUER:
21         Q.   If you know?
22         A.   You know, I don't know for sure.  I can
23    say I am not aware of it.  It may be someone somehow
24    sent me one of the thousands of e-mails and said,
25    "Hey, this is happening," but I was not aware to the
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 209

1  point of noting it in my memory that Twitter or any

2  other social media was suppressing anything.

3      **Q.    Exhibit 31.**

4          **(FAUCI Exhibit No. 31 was marked for**

5  **identification.)**

6  BY MR. SAUER:

7      **Q.    Here's a report in The Hill, if you see**

8  **that at the top, headline is Twitter suspends**

9  **accounts of Chinese virologist who**

10  **claimed coronavirus was made in the lab; correct?**

11      A.    That's what it says.

12      **Q.    Does this incident ring a bell?  Were you**

13  **aware of an incident like this which --**

14          THE REPORTER:  Counsel, please slow down.

15  BY MR. SAUER:

16      **Q.    Were you aware of a -- Twitter suspending**

17  **the account of a Chinese virologist --**

18      A.    Yeah.

19      **Q.    -- who claimed it was removed from a lab?**

20      A.    You know, Mr. Sauer, I might have -- been

21  brought to my attention then.  I don't recall this.

22  If you show me this now and ask me the question:  Do

23  you recall this?  I'd have to say I don't recall.

24          Is it possible that back then somebody

25  said, "Hey, you know, Twitter suspended a Chinese

DR. ANTHONY FAUCI  11/23/2022

Page 210

```
 1    virologist's account," and I would have went, ah,
 2    okay, and move on to the other things I do in life.
 3             This is not something that would be
 4    catching my attention because, you know, the social
 5    media and Twitter, I told you, I don't have a Twitter
 6    account.  I don't tweet.  I don't do Facebook.  I
 7    don't do anything.  So social media stuff, I don't
 8    really pay that much attention to.
 9        Q.    Exhibit 33?
10             MR. KIRSCHNER:  Thirty-two.
11             MR. SAUER:  Thirty-two.
12             (FAUCI Exhibit No. 32 was marked for
13    identification.)
14    BY MR. SAUER:
15        Q.    Is this a document from Meta entitled,
16    "Update on our work to keep people informed and limit
17    misinformation about COVID-19"?
18             MR. KIRSCHNER:  Objection.  Lack of
19    foundation.  Speculative.
20    BY MR. SAUER:
21        Q.    Is that what it says on the front of it?
22        A.    The title say "Meta," and it says, "Update
23    on our work to keep people informed and limit
24    misinformation about COVID-19."
25        Q.    Third page of this document, can you turn
```

DR. ANTHONY FAUCI  11/23/2022

Page 211

```
 1    to that?
 2         A.    Page 3.  Okay.  All right.
 3         Q.    It says at the top, the very first line,
 4    mostly across, "We are expanding the list of
 5    false claims we will remove to include additional
 6    debunked claims"?
 7         A.    I'm sorry.  What -- where is it?
 8         Q.    Top page.
 9         A.    "We are expanding," the middle of the
10    sentence.  Okay.  I got it.
11         Q.    "We will remove to include
12    additional debunked claims about the coronavirus and
13    vaccine"; correct?
14              MR. KIRSCHNER:  I object.  I'd like to
15    have Dr. Fauci to have a moment to familiarize
16    himself with this document.
17              THE WITNESS:  So I'm not -- is this --
18    what is Meta?  That is a ^  Facebook.
19    BY MR. SAUER:
20         Q.    Let me cut past all that.  If you look at
21    the top of page 3, there's a reference to removing
22    debunked claims in that first bullet point that
23    COVID-19 is manmade or manufactured.  Generally, were
24    you aware that Meta, which controlled Facebook and
25    Instagram, changed its policy alleging that it would
```

**DR. ANTHONY FAUCI  11/23/2022**

```
 1   remove its content alleging that COVID-19 is
 2   manufactured or manmade?
 3        A.    I don't recall being aware of this --
 4   some -- again, when you say were you aware, you're
 5   talking a couple of years ago.  Could someone have
 6   passed me in the hall and said, "By the way, were you
 7   aware that Meta did this?"  Would have been one of
 8   10,000 things that that was said to me that day.  I
 9   don't recall being aware of anything that Meta did.
10   In fact, I didn't even know what the Meta was.
11        Q.    You've heard of Facebook; right?
12        A.    If I -- yeah, I understand now.  Somebody
13   told me that they are part of Facebook or own
14   Facebook or something like that.
15        Q.    Exhibit 33.
16             (FAUCI Exhibit No. 33 was marked for
17   identification.)
18   BY MR. SAUER:
19        Q.    Very briefly -- oh, sorry.
20             Very briefly, this article is headlined
21   "Facebook Censors Award-Winning Journalist for
22   Criticizing the WHO."  Is that correct?
23        A.    That's what this title of Exhibit 33 says.
24        Q.    And the article referred to a man named
25   Ian Birrel, B-i-r-r-e-l.  Have you ever heard of him?
```

**DR. ANTHONY FAUCI  11/23/2022**

**Page 213**

```
 1        A.    I don't recall of ever hearing of Ian
 2   Birrel.  Maybe back then somebody said something
 3   about him.  But right now, I wouldn't know.  It says
 4   here a multiaward-winning investigative reporter.
 5   But if it hadn't said that, I wouldn't know who Ian
 6   Birrel is.
 7        Q.    Did you ever have any communications with
 8   anybody removing speech about the lab leak theory of
 9   the origins of the COVID from social media platforms?
10        A.    I don't recall ever having any
11   conversation.  But again, no, I would say it would be
12   unlike me because I don't get involved in that sort
13   of stuff.  Like I said, my association with social
14   media is almost zero.  I don't have an account.  I
15   don't tweet.  I don't pay attention to social media.
16   I wouldn't know how to access a tweet if you paid me.
17        Q.    Exhibit 34.
18            (FAUCI Exhibit No. 34 was marked for
19   identification.)
20   BY MR. SAUER:
21        Q.    During 2020, was there a controversy about
22   the effectiveness of hydroxychloroquine in treatment
23   of COVID-19?
24            MR. KIRSCHNER:  Objection.  Vague.
25   Ambiguous.
```

DR. ANTHONY FAUCI  11/23/2022

Page 214

 1            THE WITNESS:  There were claims that

 2   hydroxychloroquine was effective against coronavirus.

 3   BY MR. SAUER:

 4        Q.    And did you disagree with those claims?

 5        A.    I did.

 6        Q.    What was your basis for disagreeing with

 7   those claims?

 8        A.    Lack of any evidence whatsoever that

 9   hydroxychloroquine was effective against coronavirus,

10   followed by clinical studies that showed that, in

11   fact, was not effective against hydroxychloroquine ^

12   and statements by clinical trials guideline groups

13   stating explicitly that there's no evidence

14   whatsoever that hydroxychloroquine works against

15   coronavirus.

16        Q.    Did you -- you're referring to the studies

17   and so forth.  Did you collect those studies yourself

18   and review them or did someone collect them for you?

19            MR. KIRSCHNER:  Objection.  Assumes

20   evidence not in the record.

21            THE WITNESS:  What studies are you

22   referring to?

23            MR. SAUER:  Well, I think you referred to

24   studies.

25            THE WITNESS:  Well, there were claims

DR. ANTHONY FAUCI 11/23/2022

1    based on anecdotal data.  And if you look at the

2    record, it was clear that when people made definitive

3    claims about efficacy based on anecdotal data that's

4    not scientific, that does not indicate that a drug is

5    effective.

6            Subsequently, papers were published

7    showing a lack of effect of hydroxychloroquine.

8    BY MR. SAUER:

9        Q.    And my question is:  Did you do all this

10   research yourself where you are getting all the

11   studies --

12       A.    No.

13       Q.    -- or did someone else do the research for

14   you?

15       A.    I don't do research myself on the efficacy

16   of drugs.  The research is performed by researchers

17   who publish their data in peer-reviewed journals, and

18   that's how you get information that's applicable to

19   the real world.

20       Q.    Did you have discussions with others in

21   NIAID about the efficacy of hydroxychloroquine?

22       A.    The subject of the hydroxychloroquine and

23   the claims based on no data that hydroxychloroquine

24   was effective against coronavirus was a topic of

25   discussions on and off, both in NIAID and in the

DR. ANTHONY FAUCI  11/23/2022

Page 216

```
 1   scientific community in general.
 2        Q.     Who did you discuss it with at NIAID, to
 3   your recollection?
 4        A.     I'm sure I discussed it with a number of
 5   people.  Probably Dr. Cliff Lane, who was the
 6   clinical director of my institute.  It's likely that
 7   I discussed the efficacy of hydroxychloroquine with
 8   him.
 9        Q.     Anyone else within NIAID?
10        A.     I'm -- I would imagine there were other
11   people.  I don't specifically recall.  But given the
12   fact that Cliff Lane is one of the top infectious
13   disease clinicians in the country and happens to be
14   my clinical director and the director of my division
15   of clinical research, it is highly likely that I had
16   that discussion with him.
17        Q.     How about outside of NIAID?  Anyone else
18   within government that you discussed its efficacy
19   with?
20        A.     I can't say for sure.  As I mentioned, it
21   was a topic of considerable discussion.  So I would
22   not be surprised if somehow you pulled out a piece of
23   paper where I spoke to someone about it.  It was a
24   very important subject because hydroxychloroquine can
25   have some deleterious effects in people, and it was
```

**DR. ANTHONY FAUCI  11/23/2022**

1    concern within the established medical community that

2    based on claims based on no data, anecdotal data at

3    best that hydroxychloroquine works, that people would

4    be taking it, in which it does not help, but

5    possibly harms them.

6         **Q.    Is that one of the pieces of**

7    **misinformation or disinformation that may cause loss**

8    **of lives that you referred to earlier, in your view?**

9         A.    The claim, based on no data, juxtaposed on

10   clear-cut clinical data showing that

11   hydroxychloroquine does not work.  If one propagates

12   this concept that hydroxychloroquine is highly

13   effective and people take it based on that

14   information, which is incorrect, yes, that would be

15   misinformation or even disinformation that could lead

16   people to take a drug that would not help them, that

17   could possibly hurt them.

18        **Q.    Did you make a series of public statements**

19   **about the efficacy of hydroxychloroquine in the**

20   **summer of 2020?**

21        A.    I don't know when I made it, whether it

22   was the spring or the summer, but I definitely made

23   public statements.  I recall, when people asked at a

24   White House press conference whether

25   hydroxychloroquine worked, and I said those data are

**DR. ANTHONY FAUCI  11/23/2022**

Page 218

```
 1   anecdotal, and there's not definitive proof that it
 2   works.  So I have made public statements in places
 3   like a White House press conference.
 4        Q.    Just looking at the exhibit in front of
 5   you.  This is a Politico article entitled, "Fauci:
 6   Hydroxychloroquine not effective against
 7   coronavirus."  Correct?
 8        A.    That's what the title says, yes.
 9        Q.    And then the second page of it gives a
10   date of May 22nd, 2020.  Correct?
11        A.    Correct.
12        Q.    And in the second paragraph there, it
13   quotes you as saying, "The scientific data is really
14   quite evident now about lack of efficacy;" correct?
15        A.    Correct.
16        Q.    And the next page, when you said that,
17   you're referring to the hydroxychloroquine; correct?
18        A.    I guess so.  I guess if the topic of
19   discussion was hydroxychloroquine, it isn't
20   explicitly stated hydroxychloroquine, but in the
21   antecedent paragraph, the author, Zachary Brennan,
22   is referring to hydroxychloroquine.  So I would
23   imagine that I was also referring to
24   hydroxychloroquine.
25        Q.    And the next page, third page, it says,
```

DR. ANTHONY FAUCI  11/23/2022

Page 219

```
 1    "Fauci's comments come days after the Lancet
 2    published" --
 3              (Discussion off the record.)
 4              THE VIDEOGRAPHER:  The time is 1:37 p.m.
 5              (Recess taken.)
 6              THE VIDEOGRAPHER:  The time is 1:38 p.m.
 7    and we're back on the record.
 8    BY MR. SAUER:
 9         Q.    Turning your attention to the third page
10    there, it says, "Fauci's comments come days after you
11    The Lancet published a 96,000-patient observational
12    study that concluded that hydroxychloroquine has no
13    effect on COVID-19 and may have even caused some
14    harm"; correct?
15         A.    That's what it says, yes.
16         Q.    It says that -- was that, in fact, the
17    basis of your statement that the scientific data is
18    really now quite evident about lack of efficacy?
19         A.    That could be.  Again, you're going back a
20    couple of years.  It is quite consistent with that.
21    I can't say definitively that that was the specific
22    study that I was referring to.  There was information
23    coming from a number of studies, some of which were
24    negative studies that showed that it did not work.
25    And others were positive studies to show that it did
```

**DR. ANTHONY FAUCI  11/23/2022**

**Page 220**

```
 1    not work.
 2              So this could have been the study that I
 3    was referring to.  I'm not 100 percent certain.
 4         Q.    In the time frame, was there discussion
 5    of -- was there a situation with the FDA first in
 6    March of 2020 issuing an EUA as to
 7    hydroxychloroquine?  Did that occur, do you recall?
 8         A.    I don't recall exactly when, but I -- and
 9    again, you're going back and they may have -- I think
10    they did, but I'm not 100 percent sure, that they did
11    issue an EUA for the emergency use of
12    hydroxychloroquine, but I believe that that EUA was
13    subsequently pulled back.
14         Q.    Would that have been in June of 2020?
15         A.    Could possibly have been.  I don't recall
16    exactly.
17         Q.    Were you consulted in that process by the
18    FDA?  Did you have any input on the decision by the
19    FDA to revoke the EUA?
20         A.    I don't recall.  It is possible that I was
21    but I don't recall.
22         Q.    Do you have any recollection of why the
23    EUA was revoked?
24         A.    I don't have any recollection now of why
25    it was revoked then, but I would imagine, as the data
```

DR. ANTHONY FAUCI  11/23/2022

Page 221

```
 1   accumulated, that clinical trials showed a lack of

 2   efficacy.

 3          The criteria for an emergency use

 4   authorization that a drug that has not been proven to

 5   be effective, that the potential benefit of the drug

 6   might outweigh the risk.

 7          If data comes in to show that there's no

 8   benefit for the drug, then that would be a basis for

 9   pulling back on the EUA.

10      Q.     Next 35.

11             (FAUCI Exhibit No. 35 was marked for

12   identification.)

13   BY MR. SAUER:

14      Q.     Is this The Lancet study that was referred

15   to in the Politico article that we just discussed, to

16   your knowledge?

17             MR. KIRSCHNER:  Objection.  Lack of

18   foundation.

19   BY MR. SAUER:

20      Q.     If you know?

21      A.     I don't know if it's the same article, to

22   be honest with you.

23      Q.     If you look on the front page of this

24   exhibit on the right?

25      A.     Yeah.
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 222

```
 1          Q.    Do you see where it says at the top -- the
 2    very top, "Published online May 22nd, 2020"?
 3          A.    Okay.
 4          Q.    The word "May" is under the D and
 5    retracted.^   Do you see that?
 6          A.    Yeah.
 7          Q.    And that's five days before that Politico
 8    article dated May 27th?
 9          A.    Right.
10          Q.    And the Politico article referred to a
11    study in The Lancet that surveyed 96,000 patients;
12    correct?
13          A.    That's what the Politico article says.
14          Q.    And if you look at the third paragraph
15    here in the summary, the very beginning of it, it
16    says, "Findings:  96,032 --
17          A.    Yeah.
18          Q.    -- patients --
19          A.    Right.
20          Q.    -- are discussed"?
21                Then this study was later retracted;
22    correct?
23          A.    Well, it says "retracted" across the
24    front.  I don't recall it being retracted, but if it
25    says "retracted" --
```

Case 3:22-cv-01213-TAD-KDM   Document 206-1   Filed 03/04/23   Page 223 of 446 PageID #: 11638

**DR. ANTHONY FAUCI  11/23/2022**

```
 1          Q.     Were you aware that it was retracted at
 2    the time?  Do you have any recollection of that?
 3              MR. KIRSCHNER:  Objection.  Lack of
 4    foundation.
 5    BY MR. SAUER:
 6          Q.     If you know?
 7          A.     I don't recall it being retracted.  I
 8    might have at the time heard that it was retracted,
 9    but it wasn't the only paper that was on
10    hydroxychloroquine.
11    BY MR. SAUER:
12          Q.     Did you -- was your opinion based
13    on other papers as well?
14          A.     My -- I mean, I'm thinking back, then,
15    my -- my opinion of the effect of hydroxychloroquine
16    was based on accumulating data from a number of
17    studies.  I don't recall specifically what those
18    studies are now.
19          Q.     Some of -- obviously not every doctor
20    agreed with your views on hydroxychloroquine;
21    correct?
22              MR. KIRSCHNER:  Objection.  Argumentative.
23              THE WITNESS:  Not every doctor agreed.  I
24    don't think every doctor in the world agrees on
25    everything, but I'm sure there was some doctors who
```

DR. ANTHONY FAUCI  11/23/2022

Page 224

1  disagreed with it despite the fact that the evidence
2  was ample, accumulating, and continued to accumulate
3  that hydroxychloroquine was not effective.
4  BY MR. SAUER:
5      Q.   **Were you aware that there were doctors who**
6  **continued to prescribe it for their patients with**
7  **COVID?**
8      A.   I heard that doctors were continuing to
9  prescribe it.
10     Q.   **If a doctor makes that clinical judgment**
11 **with respect to their patient, are you qualified to**
12 **second guess that clinical judgment?**
13          MR. KIRSCHNER:  Objection.  Argumentative.
14          THE WITNESS:  I don't -- I don't know what
15 you're talking about.  Am I qualified to -- what do
16 you mean by qualified to question?
17 BY MR. SAUER:
18     Q.   **Well, do you have qualifications --**
19     A.   There's no -- you mean, like, a written
20 statement that says you are qualified to -- I'm not
21 sure what you mean am I qualified to.
22     Q.   **What is your qualification to second guess**
23 **a decision that's made between a doctor and their**
24 **individual patient about the prescription of**
25 **hydroxychloroquine for -- to treat COVID?**

**DR. ANTHONY FAUCI  11/23/2022**

```
 1        A.    Well, I mean, you're using the word
 2   "second guess."  If a physician is prescribing a
 3   medication that has no benefit and can clearly cause
 4   harm, that would make me pause as to whether or not
 5   that was an appropriate thing.  When you say "second
 6   guess," I'm wondering what you mean.  Second guess,
 7   go out and demonstrate in front of his or her office?
 8   No, that's not it, but I can certainly have an
 9   opinion that if a physician prescribes a medication
10   with no proven efficacy and clearcut potential
11   toxicity, then I would be concerned about that
12   because as a physician, I never want to see a patient
13   harmed by an intervention that has no benefit to
14   begin with.
15        Q.    Were you aware -- or do you recall that in
16   July of 2020, a couple of months after the -- your
17   statement that -- from Politico that we talked about,
18   there were a group of doctors who had a -- posted a
19   video in front of the Supreme Court touting the --
20   what they perceived as the benefits of
21   hydroxychloroquine?
22             MR. KIRSCHNER:  Objection.  Lack of
23   foundation.
24             THE WITNESS:  I don't recall.  I do
25   vaguely recall a group of doctors -- I forgot who
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 226

```
1    they called themselves -- got up and were talking
2    about a bunch of things regarding COVID.  I don't
3    precisely recall what they were saying.
4    BY MR. SAUER:
5        Q.    You don't remember --
6        A.    I think at the time I knew what they were
7    saying, but quite frankly, I've forgotten what they
8    were saying.
9        Q.    Exhibit 36.
10             (FAUCI Exhibit No. 36 was marked for
11   identification.)
12   BY MR. SAUER:
13       Q.    Do you recall appearing on Good Morning
14   America around July 27th or 28th of 2020?
15       A.    No.  I don't recall.  Do you know how many
16   times I've appeared on television?
17       Q.    I'm just asking if you remember this
18   particular one, sir.
19       A.    Yeah, I don't recall.
20       Q.    Can you turn to the fourth page -- or
21   fifth page of this document?
22             MR. KIRSCHNER:  What -- what -- the top of
23   the page, Mr. Sauer?
24             MR. SAUER:  There's white space and
25   then it says, "Responding to questions about an
```

DR. ANTHONY FAUCI  11/23/2022

Page 227

```
 1   antimalarial drug."
 2           MR. KIRSCHNER:  I would ask for Dr. Fauci
 3   to have the time to familiarize himself with this
 4   document.
 5           THE WITNESS:  Yes.  What about it?
 6   BY MR. SAUER:
 7       Q.    And -- sorry.  That -- that quote on
 8   Page 5, you said on Good Morning America, "The
 9   overwhelming prevailing clinical trials that have
10   looked at the efficacy of hydroxychloroquine have
11   indicated that it is not effective in coronavirus
12   disease"; correct?
13       A.    Right.  Correct.
14       Q.    And do you recall those comments being
15   made in response to a video of doctors -- they called
16   themselves America's Frontline Doctors --
17       A.    Right.
18       Q.    -- appearing on the -- I think the steps
19   of the Supreme Court --
20       A.    Right.
21       Q.    -- and touting the perceived benefits of
22   that drug?
23       A.    Right.
24       Q.    Do you remember that?
25       A.    Let's make sure we get the connections
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 228

```
 1   right.  I do recall a group of doctors that were in
 2   front of the Supreme Court.  I guess there were six
 3   or seven of them.  One, I believe, was an
 4   African-American woman, female physician, if I'm not
 5   mistaken.  Could be.  I think that -- I think that's
 6   the group that we were referring to who were in front
 7   of the Supreme Court making a bit of statements.  I
 8   don't precisely recall what they were talking about,
 9   but I know that in general the people who were
10   watching that were concerned about the -- the truth
11   of what they were saying.  They were making -- I
12   don't recall specifically what they were saying, but
13   there was some concern about the accuracy of what
14   they were saying.
15        Q.    Exhibit 37.
16              (FAUCI Exhibit No. 37 was marked for
17   identification.)
18              MR. KIRSCHNER:  Mr. Sauer, I have one
19   version of this.  Do you have two versions of that?
20              THE WITNESS:  I have one.
21              MR. KIRSCHNER:  That's fine.  What number
22   are we on?
23   BY MR. SAUER:
24        Q.    This is a -- is this a Bret Baier article
25   with the headline "Fauci uncensored:
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 229

```
 1    Hydroxychloroquine video.  A bunch of people spouting
 2    something that isn't true"
 3         A.    That's what it says.
 4         Q.    And the next -- if you look at the second
 5    page, just look at the first paragraph of this --
 6    this report.  It quotes you appearing on MSNBC's
 7    Andrea Mitchell Reports saying that a video
 8    re-tweeted by President Trump that featured doctors
 9    at a press conference touting hydroxychloroquine as a
10    coronavirus treatment was, quote, "people spouting
11    something that isn't true"; correct?
12         A.    That's what it says here.
13         Q.    Do you recall saying that?
14              MR. KIRSCHNER:  Objection.  Lack of
15    foundation.
16              THE WITNESS:  You know, I certainly may
17    have said that.  Yes, I think the general impression
18    that if one looked at the video, some -- I recall --
19    I don't know exactly, but it was pretty clear among
20    physicians and those involved that what was being
21    said on the steps in many respects didn't make much
22    medical sense.
23    BY MR. SAUER:
24         Q.    In your review, what was being said was
25    that misinformation or disinformation that could lead
```

**DR. ANTHONY FAUCI  11/23/2022**

**Page 230**

1    to loss of lives?

2        A.    Well, it's possible.  I don't recall

3    exactly.  If you want to play the tape for me and we

4    could go over it, and I could then properly answer

5    your question.  I just know that there was a lot of

6    negative response on the overwhelming representation

7    of the medical community that was said on that press

8    conference on the steps, I believe, of the

9    Supreme Court.  It was really quite unorthodox.

10        Q.    I'm sorry.  I didn't really follow what

11    you just said.  You said there was an

12    overwhelming medical response --

13        A.    In general, if you were to take a poll of

14    physicians in established medical centers throughout

15    the country and have them look at the tape of what

16    was being said at that time, I believe -- it's not

17    been proven, but I believe you would find that the

18    overwhelming majority would find that what was said

19    there really didn't make much medical sense.

20        Q.    Did you take such a poll at the time?

21        A.    I did not, but I know my community and

22    everyone who has ever looked at that just raised

23    their eyebrows and said what the heck are they

24    talking about?

25        Q.    You say you know your community.  Who in

**DR. ANTHONY FAUCI  11/23/2022**

Page 231

```
 1   your community did you discuss the efficacy of
 2   hydroxychloroquine with?
 3        A.   We discussed the efficacy of
 4   hydroxychloroquine with a number of people in the
 5   community.
 6        Q.   Can you name one?
 7        A.   Yeah, I can name a whole group.
 8        Q.   Please do.
 9        A.   We -- we have clinical trials -- I want to
10   get the correct name of it.  It's the NIH Treatment
11   Guidelines Panel.  The Treatment Guidelines Panel is
12   made up of, oh, I would say a total,
13   mostly physicians and health care providers, of about
14   40-plus individuals who are representative of the
15   infectious diseases community throughout the country.
16           Most of them are the chiefs of infectious
17   diseases throughout the medical centers in the
18   country.  Harvard, Cornell, San Francisco.  These are
19   the real leaders in infectious diseases in the
20   country.  They came to a determination based on an
21   examination of all the literature that
22   hydroxychloroquine had no evidence at all of
23   efficacy.
24        Q.   When was that determination made?
25        A.   I don't know the exact date, but it is a
```

**DR. ANTHONY FAUCI  11/23/2022**

**Page 232**

1    group that can easily be asked about when that

2    occurred and you could find out on the record, but it

3    was very, very clear that that was the case that they

4    felt that way.

5              They kept an open mind, but they looked at

6    the literature and said that they really felt that

7    there was no evidence at all that

8    hydroxychloroquine -- and it isn't an individual

9    person.  It's a treatment guidelines panels that

10   represents the leadership of infectious diseases in

11   the entire country.

12        Q.    I'm going to give you Exhibit 38.

13              (FAUCI Exhibit No. 38 was marked for

14   identification.)

15   BY MR. SAUER:

16        Q.    Do you see this Breitbart report that

17   says Facebook/Google/YouTube/Twitter censor viral

18   video of doctors, Capitol Hill Coronavirus press

19   conference?

20        A.    Yes.  I see that, another Breitbart

21   statement.

22        Q.    And then can you turn to the third page

23   of -- actually can you see what the date of this

24   report is?

25        A.    The date.  Let me see.

DR. ANTHONY FAUCI  11/23/2022

Page 233

```
 1          Q.     Actually, if you turn to the third page
 2   there at the top, is the date, July 27, 2020.
 3          A.     Correct.
 4          Q.     So this is within a day of the comments --
 5   your comments to Good Morning America and Andrea
 6   Mitchell that we just talked about.   Correct?
 7              MR. KIRSCHNER:  Objection, lack of
 8   foundation.
 9   BY MR. SAUER:
10          Q.     Is that correct?
11          A.     I'm getting confused about dates here.   So
12   let's go back, and what's the date of the Andrea
13   Mitchell thing?
14          Q.     If you look at the last two exhibits,
15   July 28th was your comment on Good Morning America.
16   Or the 27th.
17          A.     On Tuesday, well the news article here, it
18   says:  Updated July 28th.   So I assume that the
19   statement was either July 28th or it was reported on
20   July 28th and the statement was July 27th.   I can't
21   tell from this exhibit.
22          Q.     So it would be within a day of this
23   article we're looking at now, that's page 127;
24   correct?
25          A.     Correct.
```

DR. ANTHONY FAUCI  11/23/2022

Page 234

```
 1        Q.    Okay.  So staying on the third page, the
 2   report says Facebook entered a ^ video posted by
 3   Breitbart News earlier today, which was the
 4   top-performing Facebook post in the world Monday
 5   afternoon of a press conference in DC held by the
 6   group, America's Frontline Doctors.  You see that?
 7        A.    I see that, yes.
 8        Q.    And that group and press conference has
 9   been saying that -- that group and press conference
10   that you were disagreeing with in your two prior
11   statements; correct?
12             MR. KIRSCHNER:  Objection.  Lack of
13   foundation.  Speculative.
14   BY MR. SAUER:
15        Q.    Your two prior statements to Andrea
16   Mitchell and to Good Morning America; correct?
17             MR. KIRSCHNER:  Again, objection.  Lack of
18   foundation.  Speculative.
19             THE WITNESS:  It is likely it was that.  I
20   can't say absolutely for sure, but if you were
21   talking about the press conference by a group of
22   doctors on the steps of wherever, the Capitol or the
23   Supreme Court, and I was referring to that, it is
24   likely that's what I was referring to but I can't say
25   for sure.  I don't have a precise recollection of
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 235

```
 1   that.
 2   BY MR. SAUER:
 3        Q.    Looking down on this page, do you see
 4   under that big paragraph, there's a smaller paragraph
 5   that says, "The video accumulated over 17 million
 6   views during the eight hours it was hosted on
 7   Facebook."
 8        A.    Correct.
 9        Q.    Does the widespread dissemination of this
10   video touting the benefits of hydroxychloroquine,
11   would that trouble you as a doctor who was concerned
12   about --
13             MR. KIRSCHNER:  Objection.
14   BY MR. SAUER:
15        Q.    -- misinformation and disinformation being
16   disseminated?
17             MR. KIRSCHNER:  Objection.  Lack of
18   foundation.
19             THE WITNESS:  You know, I don't really pay
20   much attention to the quantity.  Like I said, for
21   maybe now the ninth or tenth time, I don't get
22   involved in social media stuff.  I don't follow -- I
23   wouldn't even know how to access how many views
24   something has, so --
25   BY MR. SAUER:
```

Case 3:22-cv-01213-TAD-KDM   Document 206-1   Filed 03/04/23   Page 236 of 446 PageID #: 11651

**DR. ANTHONY FAUCI  11/23/2022**

1      **Q.    If you were aware that a video did have 17**
2  **million views, would that you bother you as a doctor**
3  **who is concerned about the dissemination of**
4  **misinformation and disinformation about COVID**
5  **treatments?**
6            MR. KIRSCHNER:  Objection.
7            THE WITNESS:  I don't know what 17 million
8  views means.  What's the denominator?  Is 17 million
9  a large amount?  Is it a small amount?  I don't go on
10  social media, so I don't know what 17 million views
11  means.
12  BY MR. SAUER:
13      **Q.    So that doesn't bother you or you have no**
14  **opinion one way or the other on that question; fair**
15  **to say?**
16      A.    Well, I don't know how to quantitate the
17  number of views with whatever it is, the point you're
18  trying to make.
19      **Q.    But those 17 million people watching that**
20  **video, were those doctors standing on the steps of**
21  **the Supreme Court and touted the benefits of**
22  **hydroxychloroquine, would that bother you?**
23      A.    It would likely bother me if a very large
24  number of people were given information that was
25  not only based on no data, but in which data actually

**DR. ANTHONY FAUCI  11/23/2022**

Page 237

```
 1    showed that those statements were untrue.

 2              As a physician who takes care of patients

 3    and cares about the health of patients, I think that

 4    information that spreads falseness not based on data,

 5    as physician would be troublesome to me.  What does

 6    troublesome mean?  Would I do anything about it?  Not

 7    necessarily at all.  But it's just I don't like false

 8    information that hurts patients.

 9         Q.   Could you turn two pages forward in that

10    document, please?

11              MR. KIRSCHNER:  When you say two pages

12    forward, you mean page 5 of 19?

13              MR. SAUER:  Correct.

14              THE WITNESS:  Okay.  What do you want me

15    to look at?

16    BY MR. SAUER:

17         Q.   Fourth paragraph down, there's a quote on

18    the Facebook copy, stating, "We removed the video for

19    sharing false information about curious and treatment

20    for treatment of COVID-19?"

21         A.   That's what it says.

22              MR. SAUER:  Objection.  Lack of

23    foundation.

24    BY MR. SAUER:

25         Q.   Are you aware of anyone communicating with
```

Case 3:22-cv-01213-TAD-KDM   Document 206-1   Filed 03/04/23   Page 238 of 446 PageID #: 11653

DR. ANTHONY FAUCI  11/23/2022

Page 238

```
 1    Facebook about that decision to remove the video?
 2        A.   I don't recall anybody communicating with
 3    them about that.  Could have been, but I don't recall
 4    anybody -- I don't recall anybody communicating with
 5    the social media people.
 6        Q.   Do you recall anyone at NIAID
 7    communicating with social media people?
 8        A.   To my recollection, I don't recall.  But I
 9    don't know everything that everybody does.  But I
10    don't recall anybody communicating with social media.
11        Q.   Were you aware of anyone associated with
12    the federal government communicating with Facebook
13    about that decision?
14        A.   I don't recall anyone in the federal
15    government that I know.  They might have.  Possible.
16    But I don't recall specifically anyone in the federal
17    government communicating with them.
18             Like I said, I don't pay attention to
19    those types of things.  I have a really important day
20    job that I work at, so --
21        Q.   How about any other topics, setting aside
22    this America's Frontline Doctors, are you aware of
23    anyone the U.S. Government communicating with social
24    media platforms about what can and can't be posted on
25    their platform?
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 239

```
 1      A.    You know, I have to say I don't recall any
 2  of that.  I mean, it could be that back then someone
 3  did and brought it to my attention, but I don't
 4  recall any federal official or anybody communicating
 5  directly with social media.  That doesn't ring a bell
 6  for me now.  That doesn't mean it hasn't happened.
 7  It just doesn't ring a bell to me right now.
 8      Q.    Can you turn one page forward in this
 9  exhibit, in that first full paragraph that goes all
10  the way across the page.  "Facebook's decision to
11  censor the Livestream was quickly followed by
12  YouTube, the Google-owned video sharing platform"?
13      A.    Yes, I knew of that.
14      Q.    Or at the time, were you aware of Google
15  or YouTube pulling down this video about
16  hydroxychloroquine?
17           MR. KIRSCHNER:  Objection.  Asked and
18  answered.
19  BY MR. SAUER:
20      Q.    Were you aware?
21      A.    Well, as I've said multiple times, I don't
22  pay attention to what social media organizations like
23  Google and YouTube and Twitter, and all that, what
24  they do because I'm not involved in that.
25           So was I aware -- could someone have
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 240

```
1   cursorily mentioned to me that they did?  Possibly.
2   And it probably went over my head, because that's not
3   something that I pay attention to.
4        Q.    Next paragraph down, following Facebook
5   and YouTube's removal of the video, Twitter follows
6   suit, removing Breitbart News's Periscope Livestream
7   of the press conference; correct?
8        A.    Where is that?  What paragraph?  I'm
9   sorry.
10       Q.    Immediately below, there's a two line?
11       A.    Yeah, I'm on the wrong page.
12             MR. KIRSCHNER:  Dr. Fauci is on page 7 of
13   16.  Turn back another page.
14             THE WITNESS:  Okay.  And what's the
15   paragraph, Mr. Sauer, you're talking about?
16             Yes, Twitter followed suit, removing
17   Breitbart's Periscope, whatever that is.  Jack
18   Dorsey's platform also -- yeah.
19   BY MR. SAUER:
20       Q.    Same question.  Were you aware at the time
21   that Twitter followed suit with Facebook and YouTube
22   and pulled this video down?
23             MR. KIRSCHNER:  Objection.  Lack of
24   foundation.
25   BY MR. SAUER:
```

DR. ANTHONY FAUCI  11/23/2022

Page 241

```
 1          Q.    Were you aware?
 2          A.    I was not aware, to my knowledge, and when
 3    you say aware, it's possible that somebody walking in
 4    the hall said, "Hey, did you hear this happened?"
 5    Very likely, I would have paid no attention.  Because
 6    like I said, I do not get involved in any way with
 7    social media.  I don't have an account, I don't
 8    tweet, I don't Facebook, and I don't pay attention to
 9    that.
10          So you keep asking questions about am
11    I aware of what's going on with people putting things
12    down, I don't pay attention to what gets put up and
13    put down on social media.
14          Q.    Are you generally aware of the terms of
15    service about content moderation on the social media
16    platform?  Do you know anything about them?
17          A.    Terms of service?
18          Q.    Their policies with respect to what people
19    can and can post to social media.  Do you have any
20    knowledge of what those policies say?
21          A.    I'm not even knowing what you're talking
22    about.  The answer would be, like I said -- I'll
23    repeat it again.  I don't pay attention to social
24    media issues.  That's something I don't do.  I don't
25    follow it.  I don't have an account.  I don't follow
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 242

```
1    it.  I don't even know what the condition is.

2         Q.     Never once?

3         A.     Well, I can't say never ever.  I'm sure

4    when you're in a place where there's thousands of

5    people, and you get thousands of e-mails, somebody

6    somewhere is going to say something and I'm going to

7    say, "Oh, good."

8              So if you're going to show me one time

9    where someone mentions, good.  Show me.

10        Q.     Exhibit 39.

11             (FAUCI Exhibit No. 39 was marked for

12   identification.)

13   BY MR. SAUER:

14        Q.     This is a report from the Washington

15   Standard entitled "America's Frontline Doctors

16   website shut down."  Do you see that?

17        A.     Yeah.

18        Q.     And right there in the front page it

19   indicates that this is dated August 1st, 2020?

20        A.     Right.

21        Q.     So this is just a couple of days after the

22   report about their video being pulled off Twitter,

23   Facebook and YouTube; correct?

24             MR. KIRSCHNER:  Objection.  Lack of

25   foundation.
```

**DR. ANTHONY FAUCI  11/23/2022**

```
 1              THE WITNESS:  I'm sorry.  I'm getting
 2   confused here.  So it says the Washington Standard
 3   America's Frontline Doctors website shuts down on the
 4   first page.  Now, what's the next issue you're
 5   pointing out to me?
 6   BY MR. SAUER:
 7       Q.    Is the date of it August 1st, 2020?
 8       A.    Yes, it is.
 9       Q.    Were you aware of their website being
10   taken down by their web hosting provider?
11              MR. KIRSCHNER:  Objection.  Lack of
12   foundation.
13              THE WITNESS:  I don't recall that.  I
14   might have been aware.  Someone may have pointed it
15   out to me, but that's not something, as I say, that
16   would normally attract my attention or my interest.
17   I could have been aware, but, again, I concentrate on
18   other things besides this.
19   BY MR. SAUER:
20       Q.    Do you still -- you testified about your
21   views about the efficacy of hydroxychloroquine.  Is
22   that still your view today that there's still no
23   evidence of its efficacy?
24       A.    Correct.
25       Q.    Are you aware of any metaanalyses of the
```

**DR. ANTHONY FAUCI  11/23/2022**

1    studies that have been done on a global scale of the

2    efficacy of hydroxychloroquine?

3        A.    I'm not specifically aware of that, but

4    there really are some real ^ failings of

5    metaanalyses, and when you get statisticians to look

6    at them, they often debunk some of those

7    metaanalyses.

8        Q.    Do you recall saying in connection with

9    the discussion of hydroxychloroquine that a

10    randomized double blind placebo based study is the

11    gold standard?

12        A.    That is the gold standard for everything.

13    It isn't always needed, but for the most part, it's

14    the gold standard.

15        Q.    Do you remember criticizing publicly a --

16    a study done by -- a sort of real-time study done by

17    practitioners of the Henry Ford Medical Center who

18    has about a thousand participants that found an

19    observational benefit to hydroxychloroquine?

20            MR. KIRSCHNER:  Objection.  Lack of

21    foundation.

22    BY MR. SAUER:

23        Q.    Do you remember that?

24        A.    I don't recall.  It's possible.  I see a

25    lot of studies, hundreds and hundreds of studies

**DR. ANTHONY FAUCI  11/23/2022**

1    that come across my desk.  Some that are put there,

2    some that I find myself.  So I can't say for sure

3    what my opinion or comment was on any given study.

4         Q.    Exhibit 40.

5              (FAUCI Exhibit No. 40 was marked for

6    identification.)

7    BY MR. SAUER:

8         Q.    Is this the first page of a meta-analysis

9    of the studies addressing the efficacy of

10   hydroxychloroquine?  Is that what it appears to be?

11        A.    This is confusing.  Global HCQ/CQ studies.

12   Let me read this paragraph first.

13             I'm not sure what the summary is saying.

14   Negative evaluations typically ignore treatment

15   delay.  Some in vitro evidence suggests that

16   therapeutical level could not be reached, however,

17   that was incorrect.

18        Q.    Let's just focus on that first sentence

19   for a minute, would you, where it says, 449 HCQ

20   COVID-19 studies; correct?

21        A.    Right.

22        Q.    HCQ is a common -- a Shortlander for

23   hydroxychloroquine; correct?

24        A.    Right.

25        Q.    And it indicates there's -- 351 of these

**DR. ANTHONY FAUCI  11/23/2022**

Page 246

```
 1    449 studies are peer reviewed; correct?
 2            MR. KIRSCHNER:  Objection.  Lack of
 3    foundation.
 4    BY MR. SAUER:
 5        Q.    Is that what it says?
 6        A.    351 peer reviewed, 371 comparing treatment
 7    and control groups.  Late treatment in high dosages
 8    may be harmful while early treatment consistently
 9    shows positive results.
10        Q.    Just focusing on that comparing treatment
11    and control groups, is that a description of a
12    placebo based double blind study?
13        A.    Well, it's not --
14            MR. KIRSCHNER:  Objection --
15    BY MR. SAUER:
16        Q.    To your understanding?
17        A.    To my --
18            MR. KIRSCHNER:  Objection.  Speculative.
19            THE WITNESS:  I'm not sure what they're
20    referring to.  There's a difference between a
21    treatment and a control group versus a randomized
22    placebo control group.  Lack of randomization very
23    infrequently leads to confusing, if not inaccurate,
24    results.  It depends on what the control group was.
25    If it was a historical control, you want to make sure
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 247

```
 1   that there were no confounding variables in the
 2   control group that could have skewed the data, and
 3   that's the reason why I said if you look at the
 4   preponderance of evaluation of these studies by
 5   groups such as the NIH clinical trials guideline
 6   group, they come to the conclusion that the studies
 7   that claim efficacy are statistically not valid
 8   studies.
 9   BY MR. SAUER:
10        Q.    Would that apply to all 371 studies here
11   that are reported to --
12        A.    If --
13        Q.    If I may finish my question, please?
14        A.    Oh.  Please, go ahead.
15        Q.    371 comparing treatment and control groups
16   that indicates that early treatment, that is,
17   receiving hydroxychloroquine early within the course
18   of infection with the virus, consistently shows
19   positive results?
20        A.    Yeah.  That's what this says.  I would
21   have go to back, take a look at the study, and
22   consult with our statisticians, who I believe were
23   the ones that looked at the study and allowed
24   the treatment guidelines panel, which, as I said, is
25   comprised of anywhere from 30 to 40 of the top
```

DR. ANTHONY FAUCI  11/23/2022

Page 248

```
 1    infectious disease physicians in the country, have
 2    still come to the conclusion that there's no evidence
 3    that hydroxychloroquine works and that, in fact, it
 4    can harm.
 5         Q.    But that --
 6         A.    So you can show me this study, and I don't
 7    see the study.  It would probably take, when you talk
 8    about meta-analysis, a long period of time to look at
 9    each thing.  What are they referring to as a control
10    group?  Is it randomized or is it not randomized?
11    All of those factors play a major role in the
12    validity or not of a study.
13         Q.    Are you familiar with the Great Barrington
14    Declaration?
15         A.    Yes, I am.
16         Q.    What is the Great Barrington Declaration?
17         A.    It's a declaration signed by a number of
18    people who proposed letting the virus circulate in
19    the community with the statement that you can protect
20    vulnerable people and if you let the virus circulate
21    freely, that you would get what's called herd
22    immunity, and then ultimately the virus would
23    essentially go to such a low level because of herd
24    immunity.
25         Q.    And if you look at Exhibit 40 in front of
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 249

```
 1   you, is that a copy of the Great Barrington

 2   Declaration?

 3              MR. KIRSCHNER:  I think -- is this

 4   Exhibit 41 or 40?

 5              MR. SAUER:  Forty-one, I apologize.

 6              (FAUCI Exhibit No. 41 was marked for

 7   identification.)

 8   BY MR. SAUER:

 9       Q.    Looking at Exhibit 41 in front of you, is

10   that a copy of the Great Barrington Declaration?

11       A.    Well, it says on the front page Great

12   Barrington Declaration.  I'm not sure if it is.  I

13   have no reason to believe it isn't.

14       Q.    Did you ever review the Great Barrington

15   Declaration?

16       A.    I have read it some time ago.

17       Q.    Flipping ahead to the third page where it

18   says the Great Barrington Declaration at the top,

19   does that look like the Great Barrington Declaration?

20              MR. KIRSCHNER:  Objection.  Lack of

21   foundation.

22              THE WITNESS:  What page are we on?  Three

23   of 13?

24   BY MR. SAUER:

25       Q.    Correct.
```

**DR. ANTHONY FAUCI  11/23/2022**

**Page 250**

```
 1        A.     It says the Great Barrington Declaration.
 2        Q.     And is this familiar to you?  You said
 3   you've read it before?
 4        A.     I read it some time ago when it first came
 5   out.
 6        Q.     At the end of the first paragraph there it
 7   just talks about recommending an approach called
 8   focus protection; correct?
 9        A.     Right.
10        Q.     And is that what you described earlier
11   as --
12        A.     Right.
13        Q.     -- by circulating among certain
14   populations --
15        A.     Right.
16        Q.     -- while trying to provide targeted
17   protection for more vulnerable population?
18        A.     I believe that's what they're referring
19   to.
20        Q.     You -- this was published on October 4th,
21   2020; correct?
22               MR. KIRSCHNER:  Objection.  Lack of
23   foundation.
24               THE WITNESS:  I don't know when it
25   was published, to be honest with you.
```

DR. ANTHONY FAUCI  11/23/2022

Page 251

```
 1   BY MR. SAUER:
 2        Q.    Well, flip ahead to Page 5 of 13 at the
 3   very top.
 4        A.    It says on October 4th, the declaration
 5   was authored and signed.
 6        Q.    Okay.  So that's when at least it purports
 7   to have been executed?
 8        A.    Right.
 9        Q.    Were you -- when did you become aware of
10   it after it was published?
11        A.    I don't recall.
12        Q.    Would it have been soon after that to your
13   knowledge?
14        A.    Possibly.  I don't recall.
15        Q.    Do you know these three scientists who are
16   listed as the leaders of it -- or the authors of it,
17   Dr. Martin Kulldorff, Dr. Sunetra Gupta, and
18   Dr. Jay Bhattacharya?
19             MR. KIRSCHNER:  Objection.  Vague.
20   BY MR. SAUER:
21        Q.    Do you know them?
22        A.    I don't know them.  I know their names now
23   because it's been kicked around a fair amount over
24   the last -- period of time.  I don't -- I don't know
25   them.
```

DR. ANTHONY FAUCI  11/23/2022

Page 252

```
 1          Q.    You did -- and you didn't -- were you
 2   familiar with them or their reputations at the time
 3   that this was published?
 4          A.    I don't know them so I'm not familiar with
 5   them.
 6          Q.    Okay.  Flipping ahead to Page 8 of 13.
 7   There's a list -- in the list of joiners there,
 8   second from the bottom, it lists Dr. Michael Levitt
 9   at Stanford?
10          A.    Yes.
11          Q.    And he was a Nobel Prize winner?
12          A.    Correct.
13          Q.    Do you know him?
14          A.    I don't know him.  I've heard of him.  I
15   don't know him.
16          Q.    You said earlier, I think, that you don't
17   recall how you first became aware of the Great
18   Barrington Declaration?
19          A.    I can't say the moment I became aware of
20   it.  I don't recall.  I became aware of it.  I don't
21   know precisely when I became aware of it.
22          Q.    Do you remember the context in which you
23   became aware of it?  Was it raised to you by a
24   colleague or surfing the internet or something like
25   that?
```

**DR. ANTHONY FAUCI  11/23/2022**

**Page 253**

```
 1        A.    I don't recall how that -- how that

 2   occurred.

 3              MR. KIRSCHNER:  I would like to,

 4   Mr. Sauer, take a break in the next five minutes.  Do

 5   you want to take a break now or do you want to take a

 6   break after the next exhibit.

 7              MR. SAUER:  Let's do it now.

 8              THE VIDEOGRAPHER:  Okay.  Time is 2:17

 9   p.m. and we're going off the record.

10              (Recess taken.)

11              THE VIDEOGRAPHER:  The time is 2:28 p.m.

12   and we're back on the record.

13   BY MR. SAUER:

14        Q.    Exhibit 42.

15              (FAUCI Exhibit No. 42 was marked for

16   identification.)

17   BY MR. SAUER:

18        Q.    Dr. Fauci, do you recognize this e-mail

19   dated October 8th, 2020, at 2:31 p.m.?

20              MR. KIRSCHNER:  Objection.  Lack of

21   foundation.

22              THE WITNESS:  I don't recognize it like I

23   remember it, but it's sitting right in front of me

24   and it's an e-mail from Francis Collins to myself and

25   Cliff Lane, with a copy to Larry Tabak.  So I'll read
```

**DR. ANTHONY FAUCI  11/23/2022**

**Page 254**

```
 1    it and see what it says.  Yes, I've read it.
 2    BY MR. SAUER:
 3         Q.    Do you remember getting this e-mail?
 4         A.    Yeah.  Vaguely, yeah.
 5         Q.    Dr. Collins sent it to you on October 4th,
 6    four days after the Great Barrington Declaration was
 7    offered; correct?
 8              MR. KIRSCHNER:  Objection.  It says
 9    October 8th on it.
10    BY MR. SAUER:
11         Q.    Sorry.  He sent it to you on October 8,
12    after the Great Barrington Declaration was offered on
13    October 4th.  Correct?
14         A.    Correct.
15         Q.    And he sent it to you and Cliff Lane;
16    correct?
17         A.    Correct.
18         Q.    And he says, "Hi, Tony and Cliff.  See
19    https://urldefense.com/v3/__https://gbdeclaration.org__;!!
20    NtP9J7iH11vXGg!OfjQ3HS19TPlz9Q_r-u4RtZWR1naETdrZpFm3si2l2_
21    NbcloUbvSz3asoQn-l8Dm2C-z5uDtNV26mSJ8uMD5iM6vYqN78_3ajww$ "; correct?
22         A.    Correct.
23         Q.    And is that a reference to the Great
24    Barrington Declaration?
25         A.    I believe so.  I believe so.  I would
```

DR. ANTHONY FAUCI  11/23/2022

Page 255

1    imagine.  It's a link and it says gbdeclaration, so I

2    would imagine.

3        Q.    Did you read the Great Barrington

4    Declaration for the first time when you got this

5    e-mail?  Or do you not know?

6        A.    I don't recall.

7        Q.    Did you click on that link when you got

8    the e-mail?

9        A.    I don't recall.

10       Q.    He goes on to say, "This proposal from the

11   three fringe epidemiologists who met with the

12   Secretary"; right?

13             Were you aware of those three authors of

14   the Great Barrington Declaration meeting with the

15   Secretary?

16       A.    I don't recall.  This may have been my

17   first awareness of it, or I could have been

18   peripherally aware of it at the time.  I can't say

19   for sure.

20       Q.    So you don't know -- when he refers to

21   the three fringe epidemiologists, is he referring to

22   a prior conversation or communication where you

23   discussed them with him, if you know?

24             MR. KIRSCHNER:  Objection, speculative.

25             THE WITNESS:  I don't know.

**DR. ANTHONY FAUCI  11/23/2022**

Page 256

```
 1   BY MR. SAUER:
 2        Q.    You don't remember?
 3        A.    No.
 4        Q.    Do you recall Dr. Bhattacharya, Gupta and
 5   Dr. Kulldorff meeting with Secretary Azar?
 6        A.    You know, I don't.  I think after the
 7   fact, I would have known because Francis said they
 8   did.  It is very likely, although I'm not 100 percent
 9   sure that the meeting of the epidemiologists, authors
10   of the declaration with the Secretary, this was very
11   likely the first time it was brought to my attention,
12   although I can't say for sure.  I would imagine --
13   again, getting back to context, this is not something
14   that I would have been paying a lot of attention to.
15   I was knee deep in trying to do things like develop a
16   vaccine that wound up saving the lives of millions of
17   people.  That's what I was doing at the time.
18             So an e-mail like this may not have
19   necessarily risen to the top of my awareness and
20   interest.
21        Q.    So he goes on to say, "You believe that
22   this didn't catch your interest at the time that you
23   received it"?
24             MR. KIRSCHNER:  Objection.
25   Mischaracterizes his testimony.
```

**DR. ANTHONY FAUCI  11/23/2022**

```
 1              THE WITNESS:  I don't know if it did or
 2    not.  I wouldn't imagine that I would be
 3    overwhelmingly interested.  I may have responded.
 4    I'm sure you're going to pull out my e-mail and show
 5    my response.  But I don't recall -- this is an e-mail
 6    from Francis just bringing it to my attention.  I
 7    don't recall what, if any, was my response to this.
 8         Q.    It seems to be getting a lot of attention
 9    and even a cosignature from a Nobel Prize winner,
10    Mike Levitt at Stanford.
11         A.    Right.
12         Q.    And that was the person we referred to a
13    minute ago.
14         A.    Yes.
15         Q.    Then Dr. Collins goes on to say, "There
16    needs to be a quick and devastating published
17    takedown of his premises."
18              Do you know what he's referring to when he
19    talks about a quick and devastating takedown?
20              MR. KIRSCHNER:  Objection.  Speculative.
21    BY MR. SAUER:
22         Q.    If you know.
23         A.    I do not know what he was referring to.  I
24    would imagine I was thinking that someone would take
25    the counterargument of what the premise was, and I
```

### DR. ANTHONY FAUCI  11/23/2022

Page 258

```
 1   believe, you know, knowing now what's in the
 2   declaration, the premise that you could actually
 3   selectively target susceptible people and protect
 4   them and yet let the virus spread through society
 5   without doing considerable damage.
 6              I would imagine that that is the premise
 7   that Dr. Collins felt was an invalid assumption.
 8        Q.    And did you discuss this with him at the
 9   time?  Did you talk to him about getting a quick and
10   devastating published takedown of the Great
11   Barrington Declaration?
12        A.    I don't recall.  You know, quick and
13   devastating takedown, that doesn't sound like some
14   terminologies that I would use.  So I don't believe I
15   had a conversation about that specific.
16        Q.    And so you don't know specifically what he
17   meant?
18        A.    I don't know specifically what he meant.
19   But knowing Francis, he is a scholar.  He's likely
20   talking about writing a scholarly article to contest
21   some of the premises.  That's what I would imagine
22   Francis is referring to.  That would be his style.
23              That if someone writes an article that he
24   disagrees with, that he would write a counterargument
25   to challenge the premises.  Again, I don't know for
```

DR. ANTHONY FAUCI  11/23/2022

Page 259

1   sure, but knowing Francis, I believe that's what he

2   means, to provide a counterargument.

3        Q.    Do you know for sure, then, what he meant

4   or we would ask him if -- if you know?

5             MR. KIRSCHNER:  Objection.  Speculative.

6             THE WITNESS:  Again, I'm not sure --

7   again, I'm not 100 percent sure.  You can never be

8   sure what's in someone's mind, but knowing Francis,

9   he is a scholar, a fair person.  Highly respected in

10  the community.  When he talks about premises, just

11  the way he would with a scientific article with

12  scientific data, if he had an issue with it, he would

13  write a scholarly article to try and challenge it.

14            And I believe that's what he's referring

15  to.

16  BY MR. SAUER:

17       Q.    Okay.  He goes on in the e-mail to say, "I

18  don't see anything like that online yet.  Is it

19  underway?"  Do you see that?

20       A.    I see that.

21       Q.    Why would he think that you and Cliff Lane

22  would know whether or not there was a swift and

23  devastating takedown of this declaration underway?

24            MR. KIRSCHNER:  Objection.  Speculative.

25            THE WITNESS:  Certainly speculative.  I

**DR. ANTHONY FAUCI  11/23/2022**

```
 1   don't know what he meant.  I just think he was

 2   speaking bluntly.  I don't think he was specifically

 3   pointing to us to have known if there was something

 4   online.  He scours the online better than we do.

 5   He's got an entire staff that does that.

 6            So I think it was a just a casual comment,

 7   "Hey, you guys.  Did you see anything online yet?"

 8   BY MR. SAUER:

 9      Q.     And he says not "Is there something up

10   there?"  He says, "Is it underway?"

11            Did he have any reason to think that you

12   guys might be working on --

13      A.     Absolutely not.

14      Q.     Let me finish the question -- of some kind

15   of refutation of the Great Barrington Declaration?

16      A.     No.  This is not something I would

17   be involved in.  As I told you, I have a very

18   important day job that is running a $6.4 billion

19   institute.  I would not be involved in examining this

20   and doing something that would, quote, counter it.

21      Q.     Do you know why he copied Cliff Lane on

22   this e-mail with you?

23            MR. KIRSCHNER:  Objection.  Speculative.

24            THE WITNESS:  I don't know why he copied

25   Cliff.  But as I mentioned, Cliff is the clinical
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 261

```
1   director of the Institute, the deputy director for

2   clinical research, and a highly -- what's the right

3   word -- respected clinical scientist in the

4   institute.

5            So it would not be unusual for Francis to

6   send me an e-mail and have Cliff Lane, as my deputy

7   director for clinical research, be copied.

8            That would not be surprising.

9   BY MR. SAUER:

10       Q.   Is Cliff Lane the same one who went on the

11   WHO-sponsored trip to China in February of 2020 that

12   we talked about this morning?

13           MR. KIRSCHNER:  Objection.  Asked and

14   answered.

15   BY MR. SAUER:

16       Q.   Is he the same guy?

17       A.   Cliff Lane is the same person, and the

18   same motivation that led to his going to China was

19   probably the same motivation that Francis copied him

20   in the e-mail, that he's highly respected and well

21   thought of and a very knowledgeable physician

22   scientist.

23       Q.   When he came back from China, he was the

24   one who had reported about China -- I think he called

25   them extreme lockdown measures being effective in
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 262

```
 1    controlling the spread of the virus.  Do you recall
 2    that?
 3              MR. KIRSCHNER:  Objection.  Asked and
 4    answered.
 5              THE WITNESS:  I answered that question,
 6    but he was the one that said social distancing that
 7    they have done was, in fact, effective.  He believes
 8    in curtailing the spread of the virus.
 9    BY MR. SAUER:
10        Q.    Do you recall any discussions between you,
11    Francis Collin, and Cliff Lane in that time frame
12    of him returning from the WHO-sponsored trip to China
13    that related to the efficacy of extreme lockdown
14    measures or extreme social distancing measures?
15        A.    We're going back to the same question.  I
16    think I answered that.  I think --
17        Q.    I'm just asking if you had any discussions
18    on that topic that I just described, you, Cliff Lane,
19    and Francis Collins back when Cliff Lane returned
20    from the trip to China?
21        A.    Did we have any discussions about the
22    efficacy of -- of severe social distancing on
23    shutting down to spread a virus?
24        Q.    Correct.
25        A.    It's entirely possible that we had that
```

## DR. ANTHONY FAUCI  11/23/2022

1    conversation.  I don't specifically recall that

2    conversation, but it would not be unusual.  Cliff

3    went to China, and we wanted to find out what was

4    going on there to see if there could be any lessons

5    learned from what they were doing compared to what

6    we're doing.

7        Q.    Exhibit 43.

8             (FAUCI Exhibit No. 43 was marked for

9    identification.)

10   BY MR. SAUER:

11       Q.    Do you recognize this e-mail exchange also

12   dated October 8th, 2020?

13       A.    You know, you say do I recognize it.

14       Q.    Do you remember it?

15       A.    I don't remember it, but now that you've

16   put it in front of me, it's got my name on it next to

17   "from" and Francis next to "to."  So I get back to my

18   statement before.  I receive literally thousands of

19   e-mails, many of which get screened.  So I generally

20   wind up seeing only a few hundred.

21            I don't remember this one specifically,

22   but clearly it was sent by me to Francis.

23       Q.    And to the same list of recipients on his

24   e-mail to you that was in the previous exhibit;

25   correct?

**DR. ANTHONY FAUCI  11/23/2022**

```
 1        A.      Right.
 2        Q.      And you said to him, "Francis, I'm pasting
 3   in below a piece from The Wire ^  that debunks this
 4   theory"; correct?
 5        A.      That's what it says.
 6        Q.      If you look at the top, your -- the
 7   subject line is the Great Barrington Declaration;
 8   correct?
 9        A.      Correct.
10        Q.      And Francis responds to you "Excellent";
11   correct?
12        A.      That's what it says.
13        Q.      You've pasted in here an article from
14   Wired magazine by Matt Reynolds; right?
15        A.      Yes.
16        Q.      How did you find that?
17        A.      I don't recall.
18        Q.      Did someone find it for you or did you
19   Google it yourself?
20        A.      I don't recall.
21        Q.      Do you know this author Matt Reynolds?
22        A.      Doesn't ring a bell.  I may have run into
23   him or interacted with him in the past, but doesn't
24   come out -- jump out of the page at me.
25        Q.      Did you have any communications with
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 265

1    Mr. Reynolds before he published this article?

2        A.    I don't recall.

3        Q.    Do you know of anyone at NIAID

4    communicating with him before publishing this

5    article?

6        A.    I don't recall.

7        Q.    Do you know Gregg Gonsalves?

8        A.    I do.

9        Q.    Who is he?

10       A.    Gregg Gonsalves is the person on the

11   faculty of the Yale School of Public Health, I

12   believe, certainly Yale University of New Haven, who

13   formerly was a member of the AIDS activist group

14   ACT UP, and then a member of the therapy group, TAG,

15   treatment action group, of ACT UP.

16       Q.    How long have you known him?

17       A.    I've known Gregg since the first decade of

18   HIV.  So I would imagine that would likely be

19   sometime in late 1980s, early 1990.

20       Q.    Is he a friend of yours?

21       A.    Well, it depends on what you mean by a

22   friend.  He's someone I know.  He's an associate.  I

23   think he's a solid person.  He cares deeply about

24   public health.

25              Yeah, I -- again, it depends on definition

**DR. ANTHONY FAUCI  11/23/2022**

Page 266

```
 1   of friend or not.  He's somebody that's more than
 2   just hello.  I mean, I've -- I've interacted with him
 3   a fair amount.
 4        Q.    Exhibit 44.
 5              (FAUCI Exhibit No. 44 was marked for
 6   identification.)
 7   BY MR. SAUER:
 8        Q.    Another e-mail chain between you,
 9   Francis Collins, and Cliff Lane regarding the Great
10   Barrington Declaration; correct?
11              MR. KIRSCHNER:  Objection.  Lack of
12   foundation.
13              THE WITNESS:  This is an e-mail from me to
14   Francis in which I forwarded to him a commentary or a
15   Twitter, I guess, a commentary by Gregg Gonsalves
16   concerning the idea of herd immunity and focused
17   protection.
18   BY MR. SAUER:
19        Q.    And you said above -- sending that, you
20   said, "another refutation of the herd immunity
21   approach"; right?
22        A.    Correct.
23        Q.    And this is also addressing essentially
24   the approach -- the herd immunity approach, are you
25   there referring to the approach espoused by the
```

**DR. ANTHONY FAUCI  11/23/2022**

**Page 267**

```
 1    authors of the Great Barrington Declaration?

 2         A.    Could be.  I would imagine it was, but,

 3    you know, since herd immunity was a significant

 4    component of the declaration, I don't see specific

 5    reference to the declaration here, but it is

 6    compatible with this being -- referring to the

 7    declaration, though I -- I don't see any specific

 8    indication of it.

 9         Q.    Can you turn to the second page of this

10    document?  In the Gonsalves article, the second

11    paragraph begins "However, after some

12    acknowledgment."  Do you see that?

13         A.    Yes.

14         Q.    And if you go about five lines down,

15    there's a sentence beginning "Fast forward to this

16    week."  Do you see that?

17         A.    Yes.

18         Q.    It says, "Fast forward to this week where

19    one of the Harvard professors in question,

20    Martin Kulldorff, along with Dr. Jay Bhattacharya

21    from Stanford University and Sunetra Gupta from the

22    University of Oxford were in DC meeting with

23    Scott Atlas ^ and Health and Human Services as

24    secretary Alex Azar ^ ?

25         A.    Yes.
```

DR. ANTHONY FAUCI  11/23/2022

Page 268

1        Q.    And then it goes on to say they were

2   promoting their new focus protection strategy;

3   correct?

4        A.    That's what it says.

5        Q.    And focus protection is a phrase used in

6   the Great Barrington Declaration; correct?

7        A.    That's correct.

8        Q.    Did you have any communications with

9   Gregg Gonsalves before he wrote this piece?

10       A.    I don't recall.  I might have.  I don't

11  recall specifically having any communications with

12  Gregg before he wrote this.  I might have, but I

13  don't know.  It doesn't come out at me as something I

14  remember having a communication with him.

15       Q.    Do you -- do you remember consulting --

16  him consulting with you or anyone at NIAID staff in

17  any way about his piece on this?

18       A.    You know, I don't recall.  It's possible,

19  but I don't recall.

20       Q.    Do you know what Francis Collins was going

21  to do with this information?  You're sending him

22  these articles refuting the Great Barrington

23  Declaration.  What was his plan to do with them?

24            MR. KIRSCHNER:  Objection.  Speculation.

25            THE WITNESS:  I don't know what his

**DR. ANTHONY FAUCI  11/23/2022**

Page 269

```
 1   plan -- I think he was getting back to a prior e-mail
 2   that you showed me.  He was wondering what the
 3   community in general's response was to the Great
 4   Barrington Declaration, and I believe, if I can
 5   recall from a few moments -- minutes ago when he was
 6   talking -- is anybody else refuting this premise?
 7   That's one of the things he asked in an e-mail he
 8   sent to me.
 9              So I would imagine -- I'm trying to piece
10   it together -- that the things that I forwarded to
11   Francis were in response to his question "Is anybody
12   else refuting this premise?"  And this looks like a
13   refutation that I forwarded to him on October 8th and
14   then on that same day what Gregg Gonsalves tweeted.
15   BY MR. SAUER:
16        Q.    Do you know if Francis Collins has any
17   contacts or acquaintances that work for social media
18   companies?
19              MR. KIRSCHNER:  Objection.  Calls for
20   speculation.
21              THE WITNESS:  I don't know of
22   Francis Collins's connection to any -- I don't know
23   of it.  I mean, whether he does or not, I don't -- I
24   don't -- I have no knowledge of that.
25   BY MR. SAUER:
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 270

```
 1        Q.    Does he have social media accounts?

 2        A.    His office does.  I think he tweets.  I

 3   have heard he tweets.  Since I don't have a Twitter

 4   account, I don't see tweets.

 5        Q.    Exhibit 45.

 6              MR. KIRSCHNER:  Yes.

 7              (FAUCI Exhibit No. 45 was marked for

 8   identification.)

 9   BY MR. SAUER:

10        Q.    Before we -- before we get to this

11   exhibit, has Dr. Collins ever discussed with you the

12   content of matters posted on social media that you

13   recall?

14        A.    I'm sorry.  What's the question again?

15        Q.    Has Dr. Collins ever discussed with you

16   the content of speech posted on social media?

17              MR. KIRSCHNER:  Objection.  Ambiguous.

18              THE WITNESS:  You know, I'm -- I'm not

19   sure.

20   BY MR. SAUER:

21        Q.    Has he ever discussed with you any

22   communications that he or his staff has had with

23   social media companies?

24        A.    Not specifically that I can recall.  He

25   may have but, again, it's not something that rings a
```

```
 1   bell with me that I would remember.
 2        Q.    Can you look briefly at the exhibit in
 3   front of you, Exhibit 45?
 4        A.    Right.
 5        Q.    This is a Washington Post article dated
 6   October 14th, 2020?
 7        A.    Right.
 8        Q.    And the headline is "Proposal to hasten
 9   herd immunity to the coronavirus grabs White House
10   attention but appalls the top scientists"; correct?
11        A.    Correct.
12        Q.    If you go to the fourth paragraph on the
13   first page, Dr. Collins quoted in this article --
14             MR. KIRSCHNER:  Again, I would ask for
15   Dr. Fauci to have an opportunity to familiarize
16   himself with this document.
17             THE WITNESS:  Just give me a sec.
18   BY MR. SAUER:
19        Q.    Do you see that -- the fourth paragraph on
20   the first page, where it says that, "A senior
21   administration official told reporters in a
22   background briefing called Monday that the proposed
23   strategy, which has been denounced by other
24   infectious disease experts and called, quote, fringe,
25   and, quote, dangerous by NIH director Francis
```

Case 3:22-cv-01213-TAD-KDM   Document 206-1   Filed 03/04/23   Page 272 of 446 PageID #: 11687

**DR. ANTHONY FAUCI  11/23/2022**

```
 1   Collins."

 2           Do you see that?

 3      A.    Yes.

 4      Q.    Did you consult with Dr. Collins before he

 5   told the Washington Post that this was a fringe and

 6   dangerous idea?

 7      A.    Yes.

 8           MR. KIRSCHNER:  Objection.  Lack of

 9   foundation.

10           THE WITNESS:  Yeah.  I'm not sure of the

11   connections because it's saying here, "which has been

12   denounced by other infectious disease experts and

13   called fringe and dangerous," whether Francis spoke

14   to Joel directly and said it was fringe and dangerous

15   or whether Joel was reporting on statements that

16   Francis Collins made not directly to him, but he may

17   have heard of statements that Francis made.

18   BY MR. SAUER:

19      Q.    Why don't we flip ahead to page 4 of this

20   document -- 4 of 6 in the bottom left corner?  You --

21      A.    Four of 5.

22      Q.    Page 4 of 5?

23      A.    Got it.

24      Q.    You see that third full paragraph?

25   There's a quotation from Dr. Collins that says, "What
```

**DR. ANTHONY FAUCI  11/23/2022**

```
 1    I'm worried about with this is it's being presented
 2    as a major alternative view that's held by large
 3    numbers of experts in the scientific community."
 4            That is not true, correct?
 5            MR. KIRSCHNER:  Objection.  Lack of
 6    foundation.
 7            THE WITNESS:  That's what this says.
 8    BY MR. SAUER:
 9        Q.    And he goes on to say in the next
10    paragraph, "This is a fringe component of
11    epidemiology.  This is not mainstream science.  It's
12    dangerous."  Correct?
13            MR. KIRSCHNER:  Objection.  Lack of
14    foundation.
15            THE WITNESS:  Well, I'm reading the quote
16    from Dr. Collins.
17    BY MR. SAUER:
18        Q.    Did he consult with you before he gave
19    that quote or made those statements to the Washington
20    Post?
21            MR. KIRSCHNER:  Objection.  Lack of
22    foundation.
23            THE WITNESS:  I can't say for sure whether
24    he consulted with me or spoke to me about it.  It was
25    clear how Dr. Collins felt about the premise of the
```

Case 3:22-cv-01213-TAD-KDM   Document 206-1   Filed 03/04/23   Page 274 of 446 PageID #: 11689

**DR. ANTHONY FAUCI  11/23/2022**

```
 1   declaration.  He felt that it was, in fact, an
 2   ill-founded premise, and that it would be dangerous
 3   because it would lead to the unnecessary infection,
 4   sickness, hospitalization, and death of larger
 5   numbers of people if you pulled back and let the
 6   virus freely circulate, even if you tried to protect
 7   targeted populations.
 8   BY MR. SAUER:
 9        Q.    Did he think it would be dangerous if
10   those communications were conducted on social media
11   platforms?
12             MR. KIRSCHNER:  Objection, speculative.
13   BY MR. SAUER:
14        Q.    To your knowledge?
15        A.    To my knowledge, I don't see a connection
16   here with what he's saying and things being spread on
17   social media, but perhaps, since a lot of things get
18   spread on social media, I'm sure that -- I'm not
19   sure, but that could have been something that he was
20   concerned about.
21        Q.    Did you ever discuss that with him, his
22   concerns about it circulating on social media?
23             MR. KIRSCHNER:  Objection.  Asked and
24   answered.
25             THE WITNESS:  You know, we've been down
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 275

```
 1    that question before.  And I said, "I'm not certain
 2    at all."
 3              I've had discussions with Dr. Collins a
 4    few years ago about these issues and I don't know if
 5    we discussed the implications of social media on it.
 6    BY MR. SAUER:
 7        Q.    Did you become aware -- did he -- did he
 8    let's do the next exhibit, 46?
 9              (FAUCI Exhibit No. 46 was marked for
10    identification.)
11    BY MR. SAUER:
12        Q.    On October 13th at 3:36 p.m., did
13    Dr. Collins send you and some others a link to the
14    Washington Post article that we just looked at?
15        A.    The link on the bottom, is that the same
16    article?  I don't know if it is.  Let me see if the
17    link is the same.  "COVID herd immunity 2020," yeah,
18    it looks like it's the link to the article that we
19    were referring to.
20        Q.    So this is on October 13th, which would be
21    the day after -- or no -- strike that.  So he e-mails
22    you and others and says, "My quotes in the article
23    are accurate but will not be appreciated in the White
24    House"; correct?
25        A.    It says here, "My quotes are accurate, but
```

**DR. ANTHONY FAUCI  11/23/2022**

```
 1   will not be appreciated in the White House."
 2        Q.    Did he discuss with you whether the White
 3   House would approve the quotes he made about
 4   the Great Barrington Declaration?
 5        A.    I don't recall him discussing whether they
 6   would be appreciated or not, but he clearly states in
 7   the e-mail to me -- is it to me?  Yes, to me and
 8   others -- that his quotes are accurate.  Namely, that
 9   he rejects the premise of herd immunity, but that
10   will not be appreciated in the White House.
11        Q.    And you responded, "They are too busy with
12   other things to worry about this"?
13        A.    Right.
14        Q.    What you said was entirely correct?
15        A.    Right.
16        Q.    So was it your view at the time that the
17   Great Barrington Declaration was a fringe and
18   dangerous idea?
19        A.    I'm not sure I would have categorized it
20   like that.  I would say that the premise, I believe,
21   is invalid.  And the invalid premise of
22   essentially letting the virus freely circulate under
23   the assumption which has already been proven to
24   be incorrect with the one million deaths that we've
25   had in the country, that the premise of allowing the
```

**DR. ANTHONY FAUCI  11/23/2022**

```
 1   virus to freely circulate is a premise that is
 2   invalid because it is not possible to
 3   selectively protect all the vulnerable people.
 4       Q.    Do you think --
 5       A.    So I agree that the premise of the Great
 6   Barrington Declaration is ill-founded and incorrect
 7   and I'm joined by the overwhelming majority of
 8   physicians, public health officials, and
 9   epidemiologists.
10       Q.    Do you think it's nonsense?
11       A.    You know, you're putting words.  It could
12   be nonsense.  In fact, I believe that you're going to
13   show me an e-mail shortly in which I call it
14   nonsense, you know.
15       Q.    Why don't we go with that?
16       A.    Okay.
17       Q.    Exhibit 47.
18       A.    All right.  Thank you.
19            (FAUCI Exhibit No. 47 was marked for
20   identification.)
21   BY MR. SAUER:
22       Q.    Is this a -- can you look at that?
23       A.    I see it.
24       Q.    Can you see this is an NBC News article
25   dated October 15, 2020.
```

DR. ANTHONY FAUCI  11/23/2022

Page 278

```
 1        A.      Correct.

 2        Q.      And the headline says, "Dr. Fauci says

 3   letting the coronavirus spread to achieve herd

 4   immunity is, quote, nonsense, and quote, dangerous."

 5            Correct?

 6        A.      That is correct.

 7        Q.      Turn to the third page of the document in

 8   the first full paragraph.

 9        A.      Right.

10        Q.      You describe the view of letting everybody

11   get infected and then we'll have herd immunity.  And

12   you say, "Quite frankly, that is nonsense and anybody

13   who knows anything about epidemiology will tell you

14   that that is nonsense and very dangerous."  Correct?

15        A.      That is correct.

16        Q.      Were those the statements that you made at

17   the time?

18        A.      That's the quote there.  I have no reason

19   to believe that it's a misquote.

20        Q.      Do you still believe that?

21        A.      Do I believe that the Barrington

22   Declaration premise of letting the virus rip

23   through society and infect people, leading to their

24   illness, hospitalization, and death is nonsense and

25   dangerous?  I still do.
```

DR. ANTHONY FAUCI  11/23/2022

Page 279

```
 1          Q.     Are you an epidemiologist?
 2          A.     I'm an infectious disease person with some
 3     pretty good experience in epidemiology.
 4          Q.     Is Dr. Bhattacharya an epidemiologist?
 5          A.     I don't know.  I guess you'll have to look
 6     up his credentials.  I don't know precisely his
 7     credentials.
 8          Q.     How about Dr. Kulldorff?
 9          A.     Again, I'm not familiar offhand with their
10     qualifications.
11          Q.     So your statement was made within two days
12     of Dr. Collins' statement?
13          A.     Right.
14          Q.     With the Washington Post; correct?
15          A.     Right.
16          Q.     Did you coordinate with making those
17     statements, discussing with each other that you were
18     going to make these statements criticizing the Great
19     Barrington Declaration, other than the e-mails you've
20     already seen?
21          A.     I don't believe so, but I don't -- no, I'm
22     not -- that's not our style to be coordinating
23     things.  I don't know -- it's possible we discussed
24     it, depending on what your coordination is.
25          Q.     In this same time frame, did you become
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 280

```
 1   aware that the Great Barrington Declaration was being
 2   censored in social media?
 3              I'm not aware of anything being censored.
 4   Like I said multiple times -- and I'll repeat it
 5   again -- I don't follow what goes on on social media,
 6   censoring or otherwise.  That's not something that I
 7   pay attention to.
 8              (FAUCI Exhibit No. 48 was marked for
 9   identification.)
10   BY MR. SAUER:
11      Q.   Would you look at exhibit 48.  And is this
12   an article from the website Spiked entitled, "Why has
13   Google censored the Great Barrington Declaration?"
14              MR. KIRSCHNER:  Objection.  Lack of
15   foundation.
16              THE WITNESS:  The first page says:  Why
17   has Google censored the Great Barrington Declaration?
18   BY MR. SAUER:
19      Q.   Without going into details of the article,
20   were you aware that there were reports that Google
21   had deboosted the Great Barrington Declaration in the
22   search results.  So if you search for it on Google,
23   the declaration itself would be buried in the results
24   and you would only get articles that were critical of
25   it, like for example, the Washington Post article
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 281

```
 1   that quoted Francis Collins and the NBC?
 2           MR. KIRSCHNER:  Objection.  Lack of
 3   foundation and compound.  Many compounds.
 4   BY MR. SAUER:
 5       Q.    Did you know about that?
 6       A.    Could you repeat ^  the specific question.
 7   Did I know about what?
 8       Q.    Did you know about the fact that the Great
 9   Barrington Declaration had been deboosted in people's
10   search results in the same time frame?
11           MR. KIRSCHNER:  Objection.  Lack of
12   foundation.
13   BY MR. SAUER:
14       Q.    Did you know?
15       A.    I believe not.  It is possible that
16   someone walking by the hall mentioned that to me.
17   But as I mentioned to you, I don't pay much attention
18   to what goes on in social media, and I certainly
19   would not have had this plop up on my radar screen so
20   I would say, "I can't say 100 percent," but it is
21   highly unlikely that I am aware -- was aware of, or
22   if I was, I paid any attention to this thing of
23   Google censoring the Great Barrington.
24           I don't pay attention to that whole
25   culture of social media censoring or not censoring.
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 282

```
 1    I've said that maybe 50 times today.  That's not what

 2    I do.

 3         Q.    Let me ask you a new question then.

 4         A.    Sure.

 5         Q.    Are you familiar with the social media

 6    platform Reddit?

 7         A.    Reddit?

 8         Q.    R-e-d-d-i-t?

 9         A.    I'm heard the that term, but --

10         Q.    Are you aware that Reddit also censored

11    the Great Barrington Declaration, along with Google?

12              MR. KIRSCHNER:  Objection.  Lack of

13    foundation.

14    BY MR. SAUER:

15         Q.    If you know.

16         A.    Again, I'm not even sure what Reddit is,

17    and so I don't think I could be aware of its

18    censoring.  If I did -- was aware at one time, I

19    certainly didn't register it as something that I

20    would want to remember.

21         Q.    Have you ever heard of YouTube?

22         A.    Have I ever heard of YouTube?  Yes, I

23    have.  There you go.  I've heard of one thing, yeah.

24         Q.    Were you aware that YouTube actually

25    amended its terms of service in October of 2020 to
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 283

```
 1    clarify that it would remove content related to the

 2    Great Barrington Declaration?

 3            MR. KIRSCHNER:  Objection.  Lack of

 4    foundation.

 5    BY MR. SAUER:

 6        Q.    Do you know?

 7        A.    I don't know for sure whether someone

 8    pointed that out to me, but, again, with the

 9    repetitive theme that I keep saying if I was aware of

10    it, I would not have paid much attention to it.

11        Q.    Exhibit 49.

12            (FAUCI Exhibit No. 49 was marked for

13    identification.)

14    BY MR. SAUER:

15        Q.    This is a copy of YouTube's online site

16    admissions relations ^  policy.  Have you ever seen

17    it before?

18        A.    Not to my recollection, no.

19        Q.    And on the second page, there's a kind of

20    rolling chronology.  Do you see on the second page in

21    the far left it indicates 2020 in the middle?

22        A.    Yeah.

23        Q.    And then there's various links.  So if you

24    go on to the third page, there's one from October

25    of 2020 called fighting misinformation?
```

DR. ANTHONY FAUCI  11/23/2022

Page 284

```
 1        A.     Yeah.
 2        Q.     And that indicates in kind of one sentence
 3   that they have updated their COVID-19 medical
 4   misinformation policy in October of 2020; correct?
 5        A.     Correct.  It looks that way.
 6        Q.     Exhibit 50.
 7               (Dr. Fauci Exhibit No. 50 was marked for
 8   identification.)
 9               THE WITNESS:  I'm sorry.  What -- what was
10   the question?  I didn't see any question.
11   BY MR. SAUER:
12        Q.     Oh, I was -- now I was going to give you
13   what you get when you click on that.  That's
14   Exhibit 50.
15        A.     Okay.
16        Q.     Did I slide over an extra copy to you?
17   Oh, no.  Here it is.  Sorry.
18               I take it you've never seen this sort of
19   document before either, Exhibit 50, the sort of
20   detailed version of the COVID-19 medical
21   misinformation policy that you're privy ^  to?
22        A.     No.  I don't recall ever seeing this
23   before.
24        Q.     Can you go to Page 4 of 5, the fourth
25   bullet point from the bottom on the list of items
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 285

```
 1    that YouTube does not allow on its platform, quote,

 2    "Claims that achieving herd immunity through natural

 3    infection is safer than vaccinating the population."

 4          Do you see that?

 5    A.    I see it, yes.

 6    Q.    Is that a claim that paraphrases the

 7    recommendations in the Great Barrington Declaration?

 8          MR. KIRSCHNER:  Objection.  Speculative.

 9          THE WITNESS:  You know, I'm not sure.  I

10    know that the Great Barrington Declaration promotes

11    the concept of herd immunity through natural

12    infection.  I am not certain -- I don't recall if

13    they specifically mention that it's safer than

14    vaccinating the population.  It might.

15    BY MR. SAUER:

16    Q.    Did you have any knowledge of any update

17    to YouTube's terms of service in October of 2020 to

18    add that as a disfavored claim?

19          MR. KIRSCHNER:  Objection.  Asked and

20    answered.

21    BY MR. SAUER:

22    Q.    Did you?  Yes or no?

23    A.    Not to my knowledge.  It doesn't ring a

24    bell.

25    Q.    Do you know of anyone who communicated to
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 286

```
1    YouTube about that topic?
2         A.    Not to my knowledge.
3         Q.    Exhibit 51.
4               (FAUCI Exhibit No. 51 was marked for
5    identification.)
6    BY MR. SAUER:
7         Q.    This is Meta's online misinformation
8    policy, and I think we talked about earlier how Meta
9    is the company that --
10        A.    Now I know what Meta is.  We can proceed.
11        Q.    It's Facebook and Instagram.
12        A.    Yes.  Okay.
13        Q.    And the CEO of Meta is someone you're on a
14   first-name basis with, a man called Mark Zuckerberg;
15   is that correct?
16              MR. KIRSCHNER:  Objection.
17   Mischaracterizes the evidence.
18              THE WITNESS:  Yeah, right.  I'm on a
19   first-name basis with a lot of people.
20   BY MR. SAUER:
21        Q.    Apparently.  Did you do some PSAs with
22   Mark Zuckerberg back in March of 2015?
23        A.    I don't know --
24        Q.    I'm sorry.  March of 2020?
25        A.    I'm not sure of the date, but I did some
```

DR. ANTHONY FAUCI  11/23/2022

Page 287

```
 1   Facebook PSAs encouraging people to get vaccinated
 2   and answering questions about the virus.
 3       Q.    And in your interrogatory responses, you
 4   identify 13 communications with Mark Zuckerberg
 5   consisting of both e-mails and phone calls.
 6             Do you recall that?
 7       A.    Interrogatories, when you and I were
 8   talking -- what is he talking about?
 9             MR. KIRSCHNER:  Well, Dr. Fauci, I would
10   ask not to talk about -- about our communications.
11             THE WITNESS:  Yeah.  I'm not sure what you
12   mean by "interrogatory."  What is that?
13   BY MR. SAUER:
14       Q.    Did you prepare information in response to
15   written discovery requests in this case identifying
16   13 communications with Mark Zuckerberg during 2020?
17             MR. KIRSCHNER:  Mr. Sauer, if you have a
18   document to show Dr. Fauci, I would ask that you
19   show --
20             THE WITNESS:  Yeah, I'm not sure what
21   you're talking about.  Interrogatory about -- show
22   me something, and I'll tell you.
23   BY MR. SAUER:
24       Q.    Do you dispute that you had 13
25   conversations -- or communications with
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 288

```
 1   Mark Zuckerberg in 2020?

 2        A.    I don't know how many I had.  I do know

 3   some time ago that of the many, many, many thousands

 4   of e-mails of mine that were FOIA'd, that someone

 5   mentioned that there were e-mails between Mark and I.

 6   And I don't know how many there were so I can't

 7   answer the question completely accurately.

 8        Q.    Let me ask you this.  Can you turn to

 9   Page 4 of 12?

10        A.    And remind me what's this -- this is the

11   misinformation policy document of --

12        Q.    Meta.

13        A.    Meta, okay.

14        Q.    Page 4 of 12 under Roman II, harmful

15   health misinformation, there's a bullet in bold

16   saying "Misinformation about vaccines"; correct?

17        A.    Right.

18        Q.    And it says, "We remove misinformation

19   primarily about vaccines when public health

20   authorities conclude that the information is

21   false and likely to directly contribute to imminent

22   vaccine refusals"; correct?

23        A.    Correct.

24        Q.    Are you one of the public health

25   authorities whose conclusions Meta relies on when
```

DR. ANTHONY FAUCI  11/23/2022

Page 289

1    they're deciding to remove information?

2              MR. KIRSCHNER:  Objection.  Speculative.

3              THE WITNESS:  I have no idea who the

4    public health authority is.

5    BY MR. SAUER:

6         Q.    **Did you ever have a conversation with**

7    **Mark Zuckerberg where he told you that you're a**

8    **respected public health authority?**

9         A.    Did I ever have a conversation with Mark

10   saying that I was a respected public health

11   authority?

12        Q.    **Or something like that.**

13        A.    My conversations with Mark are documented

14   on the PSAs that we have.  I'm not sure whether he

15   said now I'm going to introduce the public health

16   authority.  I'm not sure about that.

17        Q.    **How about in the phone calls you had with**

18   **him?**

19        A.    The phone calls, I believe, were related

20   to saying, you know, look forward to being on the PSA

21   with you.  You got any questions about the technical

22   aspects of it or stuff like that.  I don't think

23   there was anything more substantiative than that on

24   the e-mails.

25        Q.    **Did anyone ever say to you that you're a**

**DR. ANTHONY FAUCI  11/23/2022**

Page 290

```
 1    public health authority that platforms like Meta and

 2    Facebook and so forth would rely on in --

 3         A.    Not to my knowledge.

 4         Q.    If I may finish -- may rely on in

 5    modulating content on their platform?

 6         A.    No, no.  To my knowledge, I've never had

 7    anyone mention me and my authority or my reputation

 8    that has anything to do with influencing social media

 9    platforms.

10         Q.    After the Great Barrington Declaration was

11    published, did you ever communicate with anyone at

12    Stanford about it?

13         A.    I don't recall.  It's possible.  Like I

14    say, I made thousands of phone calls and thousands of

15    e-mails.  I may have, but I doubt it.

16         Q.    Well, more generally, do you recall

17    communicating with anyone outside of the government

18    and aside from the reporters that quoted you about

19    the Great Barrington Declaration and its approach?

20         A.    Outside of government, I don't know.

21    That's possible, but I don't recall.

22         Q.    How about do you know a man named Dr. Phil

23    Pizzo or Pizzo?  P-I-Z-Z-O --

24         A.    I do.  I do.

25         Q.    Who is he?
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 291

```
 1          A.    Phil Pizzo is a pediatric infectious
 2   disease expert who used to be at the NIH who then
 3   went on to become the dean at the School of Medicine
 4   at Stanford who now, I believe, is either dean
 5   emeritus or professor emeritus at Stanford.
 6          Q.    And did you know him from his time at the
 7   NIH?
 8          A.    I did.
 9          Q.    So you've known him for decades, then?
10          A.    Yes.
11          Q.    Did you ever contact him to discuss the
12   Great Barrington Declaration?
13          A.    I don't recall.  That's possible.
14          Q.    Is it possible you had a conversation with
15   him about Dr. Jay Bhattacharya also at Stanford?
16          A.    I don't recall.
17          Q.    How about Lloyd Minor?  Who's that?
18   Someone named Dr. Lloyd Minor?
19          A.    I've heard the name.  I -- it doesn't ring
20   a bell of any connection.
21          Q.    How about Mark Tessier-Lavigne?  Do you
22   know him?
23          A.    Mark is the current president of Stanford.
24          Q.    Did you ever have a conversation with him?
25                MR. KIRSCHNER:  Objection.  Vague.
```

**DR. ANTHONY FAUCI 11/23/2022**

Page 292

```
 1                    THE WITNESS:  Yeah.  I don't know what you
 2     mean by a conversation with him.  He used to be at
 3     the Rockefeller Institution.  I had conversations --
 4     scientific conversations with him, and I met him at
 5     meetings.
 6                    So I'm not sure what you mean.  Yeah, I've
 7     had conversations with Mark, but I don't recall the
 8     content of the conversation.
 9     BY MR. SAUER:
10         Q.    Have you ever discussed the Great
11     Barrington Declaration with him?  Or --
12         A.    Not my knowledge.
13         Q.    How about the focused protection or herd
14     immunity approaches?
15         A.    I don't recall.  These are possible.  It's
16     not ringing a bell when you're asking that question.
17         Q.    How about any of the following names:
18     Harry Greenberg?  Do you know him?
19         A.    Harry Greenberg is the scientist who used
20     to be at the NIH and is still now at Stanford.
21         Q.    Did you ever talk to him about focused
22     protection or herd immunity?
23         A.    I doubt it.  I can't say 100 percent, but
24     I doubt it.  I don't recall discussing this issue
25     with these people, but it's possible it came up in a
```

DR. ANTHONY FAUCI  11/23/2022

Page 293

 1    discussion about something else, but I don't recall.
 2        Q.    How about Jack Rowe, R-o-w-e?  Do you know
 3    him?
 4        A.    I know Jack.  I don't know him well.  He
 5    used to be the CEO of a medical center maybe in
 6    New York.  I'm not sure.
 7        Q.    Do you know a scientist with the last name
 8    of Ioannides, I-o-a-n-n-i-d-e-s?
 9        A.    I've heard of him.  I don't know him.
10    I've heard the name Ioannides, but I don't know him.
11        Q.    Are you are familiar with a serial
12    prevalence study of people in Santa Clara County from
13    March of 2020?  It was done by him and some others.
14            MR. KIRSCHNER:  Objection.  Vague.
15            THE WITNESS:  No.  It doesn't ring a bell.
16    BY MR. SAUER:
17        Q.    So you don't remember there being a study
18    of the people in Santa Clara County early in the
19    pandemic to assess how widespread the virus already
20    was at that time?
21        A.    Again, I get hundreds and hundreds of
22    studies that come across my desk.  It is possible
23    that someone brought such a study to my attention,
24    but I don't specifically recall it.
25        Q.    Exhibit 52.

**DR. ANTHONY FAUCI  11/23/2022**

Page 294

```
 1                  MR. KIRSCHNER:  What time are we at?
 2                  THE VIDEOGRAPHER:  5:41.
 3                  MR. KIRSCHNER:  What exhibit number is
 4      this?
 5                  MR. SAUER:  52.
 6                  (FAUCI Exhibit No. 52 was marked for
 7      identification.)
 8      BY MR. SAUER:
 9          Q.    Is this an e-mail from Greg Folkers to you
10      dated November 2nd, 2020?
11          A.    Me to Greg, November the 2nd.  Greg to me,
12      November the 1st.
13          Q.    Gotcha.  So on November 1st, he sent you
14      a list of articles and highlighted the three he found
15      most useful?
16          A.    Right.
17                  MR. KIRSCHNER:  Is there a question,
18      Counsel?
19      BY MR. SAUER:
20          Q.    Is that what he did in this e-mail?
21          A.    It appears in this e-mail that he has sent
22      me, it looks like blanks maybe or at least titles of
23      articles -- let me read them -- see what connection
24      there is to the article.
25                  (Reading.) "Herd Immunity, the false
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 295

```
 1    premise of the herd immunity."

 2              Yeah, there's a bunch of articles to --

 3    from different scientific and lay press.

 4        Q.    And these are all articles that are

 5    critical of the herd immunity approach of the Great

 6    Barrington Declaration; correct?

 7        A.    Right.

 8        Q.    Do you know why Greg sent you these?

 9        A.    I don't recall.  Greg would probably send

10    me something that I've asked for.  So somehow, back

11    then, a couple of years ago, I asked for articles

12    concerning herd immunity and I believe he sent them.

13        Q.    Did you forward these on to Francis

14    Collins?

15              Sorry.  Were you still talking?

16        A.    Yeah.  I mean, I don't know.  This would

17    be something Greg would do if I asked him to get some

18    articles for me.  And looks like -- I likely -- and I

19    don't see the e-mail requesting them.  I either

20    e-mailed him or called him up, or walked in his

21    office and said, "Get some articles on the issue of

22    herd immunity."  Yes, so --

23        Q.    Did you ever communicate with the authors

24    of any of these articles about this topic?

25        A.    I don't recall.  I'm looking at the people
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 296

```
1    here and I don't recognize the names, except for John

2    Barry and Gregg Gonsalves and ^^  Michelle -- some

3    people I know and I -- some people I've never heard

4    of.  I don't recall if I communicated with any of

5    them about these articles.

6         Q.    Which one do you know?  Do you know John

7    Barry?

8         A.    I know John Barry.

9         Q.    And who else do you know?

10        A.    All right.  Let's go through the list.

11   John Barry.

12             I've been interviewed by Apoorva

13   Mandavilli and Sheryl Stolberg, two reporters for the

14   New York Times.

15             I've met Mark Lipschitz.  I don't know him

16   well.  I know Gregg Gonsalves, Carlos del Rio, and

17   Rochelle Walensky well.

18        Q.    Did you communicate with any of those

19   people about the Great Barrington Declaration in any

20   connection?

21        A.    I don't recall.  I mean --

22        Q.    Did you ever take any steps to ensure

23   there would be an online criticism of the Great

24   Barrington Declaration in any --

25             MR. KIRSCHNER:  Objection.  Asked and
```

**DR. ANTHONY FAUCI  11/23/2022**

**Page 297**

1    answered.

2              THE WITNESS:  I don't ever recall -- I

3    don't recall ever taking any steps to do anything

4    online or influence online criticism of them.  I just

5    knew how I felt personally about the Great Barrington

6    Declaration and we already discussed that.  I felt

7    that it was and is misguided and could lead to the

8    unnecessary infection, hospitalization, and death of

9    individuals if you follow the premise of the Great

10   Barrington Declaration.

11   BY MR. SAUER:

12       Q.    **Did you share that view with the people in**

13   **the media other than the ones we talked about?**

14       A.    I don't recall necessarily what I said to

15   people in the media, but my opinion of the nature of

16   the premise of the Great Barrington Declaration, I

17   believe, is reasonably well known and shared by a

18   very large number of scientists throughout the

19   country, as actually stated in some of these

20   articles.

21       Q.    **Are there large numbers of scientists who**

22   **disagree with your view, who signed the Great**

23   **Barrington Declaration?**

24              MR. KIRSCHNER:  Objection.  Vague.

25              THE WITNESS:  I haven't quantitated the

**DR. ANTHONY FAUCI  11/23/2022**

Page 298

```
1    number of people.  I haven't done a

2    quantitative study on the number of people who agree

3    with it.  But I can tell you that I interact with a

4    lot of scientists in the country.  And

5    overwhelmingly, they disagree with it.

6    BY MR. SAUER:

7         Q.    Does that include the 15,000 who signed

8    it?

9              MR. KIRSCHNER:  Objection.  Argumentative.

10             THE WITNESS:  Yes.

11   BY MR. SAUER:

12        Q.    It does or does not?

13        A.    I haven't even looked at the names of the

14   15,000 who signed it.  A lot of people sign petitions

15   and are not fully aware of what the implications of

16   those petitions are.

17        Q.    Exhibit 53.

18             (FAUCI Exhibit No. 53 was marked for

19   identification.)

20   BY MR. SAUER:

21        Q.    Can you turn to the second page of this

22   e-mail chain on the bottom half?  Do you see there's

23   an e-mail from someone at Twitter to a Carol Crawford

24   dated March 14th of 2020?

25        A.    Right.
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 299

```
 1                  MR. KIRSCHNER:  I would ask for Dr. Fauci
 2      to be able to familiarize himself with this document.
 3                  THE WITNESS:  I'm all confused.  I don't
 4      recognize anything on this piece of paper.
 5      BY MR. SAUER:
 6          Q.    Could you just point to the part where I'm
 7      pointing to where there's an e-mail from someone at
 8      Twitter to a ^^  Carol Cross?
 9          A.    Right.
10          Q.    And this other client is @anthonyfauci_
11      account.  Correct?
12          A.    Right.  Yes.
13          Q.    And the Twitter person says, "Hi CDC team.
14      A few folks have flagged this account to me wondering
15      if it's real or not.  Is it a legitimate account?"
16                Do you see that?
17          A.    Yes.
18          Q.    And there's a reference to an Anthony
19      Fauci Twitter account; correct?
20          A.    Right.
21          Q.    And then if you go up above, you see Carol
22      Crawford on March 14th, the response I'm adding
23      someone at NIH and someone at HHS to verify that.
24          A.    Right.
25          Q.    And then if you go further up on the page,
```

**DR. ANTHONY FAUCI  11/23/2022**

**Page 300**

1    the NIH person, Scott Prince.  Do you know him?

2         A.    No.  I mean, it says here, "Deputy

3    director for public information."  You know, I have

4    about six thousand employees work for me.  I don't

5    recognize this name.

6         Q.    But he works in NIH?

7         A.    Yeah.

8         Q.    Is that fair to say?

9         A.    Yeah.  He probably works in Building

10   1 which is the NIH director's office.  Not my -- it

11   doesn't say NIAID, which means he doesn't work for

12   me.

13        Q.    And he e-mailed Twitter back, and said,

14   "Fake/Imposter handle," and then in all caps,

15   "Please remove, exclamation point, exclamation point,

16   exclamation point."  Correct?

17        A.    That's what it says right here.

18        Q.    Were you aware that staff at the NIH were

19   communicating with Twitter about removing accounts

20   from Twitter because they were impersonating you?

21        A.    I don't -- I kind of vaguely recall that

22   there was a fake account of people using my name

23   under false pretenses.  I'm not 100 percent sure what

24   they did about it.  I'm sure that when they found out

25   that it was a false account, that they would want it

**DR. ANTHONY FAUCI  11/23/2022**

Page 301

```
 1   to be removed.  I didn't say remove it.  I believe I

 2   have a communication staff that I'm sure, if they

 3   found out it was a false and misleading account, that

 4   they would want it to be removed.

 5       Q.    And would your communication staff contact

 6   the social media platforms to have that false and

 7   misleading content removed?

 8             MR. KIRSCHNER:  Objection.  Speculative.

 9             THE WITNESS:  I don't know how they would

10   do it.  Again, I said I don't pay attention to things

11   related to social media accounts.

12   BY MR. SAUER:

13       Q.    Who's in your communication staff?

14       A.    A lot of people.

15       Q.    Can you name -- who's the leader of it?

16       A.    Courtney Billet.

17       Q.    Okay.  Did you ever tell Courtney Billet

18   to communicate with a social media platform about

19   taking down an imposter account or fake account?

20             MR. KIRSCHNER:  Objection.  Asked and

21   answered.

22             THE WITNESS:  I don't recall doing it, but

23   I assume, when Courtney found out that it was an

24   imposter handle, that she would have asked to take it

25   down herself, possibly without even telling me except
```

DR. ANTHONY FAUCI  11/23/2022

Page 302

```
 1   to say, "There's an imposter account on you.  We'll
 2   take care of it."  Something like that.
 3   BY MR. SAUER:
 4       Q.    Do you remember her having that
 5   conversation with you?
 6       A.    I don't specifically remember it, but I
 7   vaguely remember somebody mentioning something about
 8   an imposter account.  I didn't even know what
 9   an imposter account was.  And I likely would have
10   said, "Well, how can they do that?"
11           And I found out that people do
12   imposter accounts, so I don't get involved in
13   searching for them or doing anything about them.  We
14   have an entire communication staff that worries about
15   that.
16       Q.    To be clear, your entire communication
17   staff worries about things like false and misleading
18   accounts like this on social media?
19           MR. KIRSCHNER:  Objection.
20   Mischaracterizes the evidence -- or the testimony.
21           THE WITNESS:  My staff worries about me,
22   not other people's accounts and what's spread on
23   other people's -- they don't worry about -- they work
24   for me.  They don't scour the social media looking
25   for things that may or may not be true.
```

**DR. ANTHONY FAUCI  11/23/2022**

**Page 303**

```
 1   BY MR. SAUER:

 2        Q.    Do they scour social media looking for

 3   imposter accounts or ^ accounts --

 4        A.    I don't think they spend time looking for

 5   them, but when someone like Lauren Duvall says, "Hey,

 6   we have an Anthony -- @Anthony Fauci," and brings it

 7   to the attention of the NIH, then they would

 8   obviously be concerned about an imposter account.

 9        Q.    Turn to the first page.  The HHS official

10   says, "Thanks, Lauren.  Is there anything else you

11   can do to block other variations of his name from

12   impersonations so we don't have this occur again";

13   correct?

14             MR. KIRSCHNER:  Objection.  Speculative.

15             THE WITNESS:  It says, "Thanks, Lauren."

16   They're trying to make sure that other people don't

17   impersonate me.

18   BY MR. SAUER:

19        Q.    Correct.

20        A.    I think impersonating me is a bad thing,

21   isn't it?  I think so.

22        Q.    Perhaps.  If you go further up on

23   March 14th, it says -- the Twitter official responds,

24   "Will freeze this at -- @ handle and some other

25   variations so no one can talk on that"; correct?
```

DR. ANTHONY FAUCI  11/23/2022

Page 304

```
 1        A.     That's what it says.
 2        Q.     So they would freeze a number of different
 3   account handles to make sure that no one uses them to
 4   impersonate you?
 5        A.     I don't know what this -- I don't know
 6   what this statement means.  I don't -- I know it says
 7   will freeze the @ handle and some other variations of
 8   the @ handle.  I don't know what they're referring
 9   to.
10        Q.     Let's do another exhibit.
11        A.     I think what they're trying to say
12   possibly is that someone is impersonating me and
13   that's a bad thing, and they're trying to stop it.
14        Q.     Correct.  Specifically they're trying to
15   stop it by removing accounts from the social media
16   platform Twitter; correct?
17             MR. KIRSCHNER:  Objection.  Speculative.
18             THE WITNESS:  I'm not sure where you're
19   going with this, but I believe if someone is saying
20   they're Fauci and they're not, that that would
21   be disturbing to my communication staff.
22   BY MR. SAUER:
23        Q.     Exhibit 54.
24             (FAUCI Exhibit No. 54 was marked for
25   identification.)
```

DR. ANTHONY FAUCI  11/23/2022

Page 305

```
 1    BY MR. SAUER:
 2         Q.    Can you look at the third page of this
 3    e-mail chain?  At the very bottom there's an e-mail
 4    from someone called Nicole Burkholtz or Burkes.
 5              Do you see that?
 6         A.    Nicole Berkowitz, yes.
 7         Q.    Do you know who she is?
 8         A.    I don't recognize the name.
 9         Q.    And if you look at this e-mail, if you
10    look up at the top of this e-mail, it looks like she
11    sent an e-mail to the NIH.gov list?
12         A.    It looks that way, yes.
13         Q.    Do you know what that list is?
14              MR. KIRSCHNER:  Objection.  Spec- --
15    BY MR. SAUER:
16         Q.    F --
17              MR. KIRSCHNER:  Sorry.
18    BY MR. SAUER:
19         Q.    FCN@list.NIH.gov?
20         A.    No, I don't know what that is.  I mean, it
21    says "NIH.gov" so it has something to do with the
22    NIH, but I don't really know what FCN@list is.
23         Q.    Third paragraph down in her e-mail there
24    she says, "Reason for the request, I have come across
25    a very misleading YouTube video titled "How to Kill
```

DR. ANTHONY FAUCI  11/23/2022

Page 306

```
 1    Coronavirus" that because of the unfortunate
 2    placement of the ad banner and the algorithm which
 3    chose my ad makes it look like this is a CDC video on
 4    COVID-19"; correct?
 5              MR. KIRSCHNER:  Objection.  Lack of
 6    foundation, and I would ask for Dr. Fauci to have an
 7    opportunity to familiarize himself with this
 8    document.
 9              THE WITNESS:  Yeah.  Let me read it.  Hold
10    on.
11    BY MR. SAUER:
12        Q.    Do you see that reference?
13        A.    I don't know what this is.  This looks
14    like a CDC thing.  Let me read it carefully so that I
15    can answer your question.
16              Okay.  So what's the question?  I'm sorry.
17        Q.    Were you aware of someone -- or do you see
18    where she refer -- describes the content of the video
19    she's looked at as incredibly dangerous information?
20        A.    Yeah, and I want to make sure I'm not
21    confused.  So she is an NIH -- who is she?
22        Q.    I think if you look at the next page,
23    she's identified as a communications lead for the
24    EPA.  Do you see that?
25        A.    Where's that next page?
```

DR. ANTHONY FAUCI  11/23/2022

Page 307

```
 1        Q.     The very next page.   The one we're looking
 2   at.
 3        A.     This one?  EPA.gov.
 4        Q.     Yeah.
 5        A.     Environmental Protection Agency; right?
 6        Q.     Let me ask you this:  Did you have any
 7   knowledge of someone from the EPA consulting with an
 8   NIH list to try and find a contact at social media to
 9   have dangerous information taken out?
10        A.     I don't have any recollection of any of
11   this.
12        Q.     Let's move on to another exhibit.
13        A.     I don't even know what you're talking
14   about.
15               (FAUCI Exhibit No. 55 was marked for
16   identification.)
17   BY MR. SAUER:
18        Q.     Here's an e-mail chain from April of 2020.
19   Can you turn to the second-to-last page where there's
20   an e-mail from someone called Judith Lavelle of NIAID
21   sent to Facebook?
22        A.     Yeah.
23        Q.     And here -- do you know who Judith Lavelle
24   is?
25        A.     She -- it says NIAID, NIH.  So I'm the
```

```
 1   director of NIAID.  So she obviously works in my

 2   multi-thousand-person institute.  So maybe I've run

 3   into her, and I don't know exactly what she does.

 4        Q.    And the next page it indicates she's a

 5   technical writer editor in her signature block.

 6              Do you see that?

 7        A.    Right.  And she's located at Fishers Lane,

 8   which is not the building that you and I are now

 9   sitting in.  So it is unlikely I would have run into

10   her.

11        Q.    She's copied on this e-mail someone called

12   Jennifer Routh at the last CRC.^  Do you see that?

13        A.    Yes.

14        Q.    Who is Jennifer Routh?

15        A.    Jennifer Routh is a member of my

16   communications staff.

17        Q.    Is Judith Lavelle a member of your

18   communications staff?

19        A.    Let me look.  It says Judith Lavelle,

20   technical writer editor.  So that would probably put

21   her in the communications staff.

22        Q.    Okay.  So she is on the communications

23   team?

24              MR. KIRSCHNER:  Objection.

25              THE WITNESS:  Well, that's what technical
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 309

```
 1   writers generally fall under, the broad group of

 2   communications all under Courtney Billet.

 3   BY MR. SAUER:

 4        Q.    And she's e-mailed Facebook and said, "We

 5   wanted to flag a few more fake Dr. Fauci accounts on

 6   Facebook and Instagram for you." Do you see that?

 7        A.    Yes.

 8        Q.    And she says she's also reported them from

 9   at NIAID and her personal Facebook account; correct?

10        A.    Correct.

11        Q.    And there's a list of about eight accounts

12   there in this e-mail?

13        A.    Correct.

14        Q.    And then if you flip to the next page,

15   there's another one called Dr. Fauci the hero where

16   she says, "I think this one may be fine as a fan page

17   but just as a reminder that it could have been more

18   clear"; correct?

19        A.    That's what it says.

20        Q.    So really you -- were you aware that, in

21   fact, your communications staff was flagging many

22   fake accounts from Facebook to have them removed?

23        A.    I was not aware that they were flagging

24   many accounts, but from looking at this, they are

25   trying to get rid of fake accounts because fake
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 310

```
 1   accounts are bad things, I believe.
 2       Q.    "They" are -- "they" are your
 3   communications staff, right, when you say "they are
 4   working to remove fake accounts"?
 5            MR. KIRSCHNER:  Objection.
 6   Mischaracterizes testimony.
 7            THE WITNESS:  Yeah.  I'm not sure what
 8   you're saying or what you're getting at, but I'm
 9   reading here that there are people that are using my
10   name falsely and creating fake accounts which people
11   in the communications staff saying that this is
12   troubling because they're doing things like selling
13   masks and doing things like that.
14            So I think that that would be kind of
15   appropriate for my communications staff to be
16   concerned when people are falsely impersonating me.
17   BY MR. SAUER:
18       Q.    Are some of them parody accounts?
19            MR. KIRSCHNER:  Objection.  Speculative.
20            THE WITNESS:  Who?
21   BY MR. SAUER:
22       Q.    Parody.
23            If I may finish the question?
24            Are some of them parody accounts?
25            MR. KIRSCHNER:  Objection.  Speculative.
```

DR. ANTHONY FAUCI  11/23/2022

Page 311

```
 1                    THE WITNESS:  What is a parody account?
 2    BY MR. SAUER:
 3         Q.    Someone pretending to be you in a way
 4    that's ironic or making a point.
 5                    MR. KIRSCHNER:  Again, objection.
 6    Speculative.
 7                    THE WITNESS:  I don't know what these are.
 8    I just got a bunch of links to them.  I'm not sure
 9    what they are.
10    BY MR. SAUER:
11         Q.    And there's one more.  She sent a second
12    e-mail flagging one more -- apologies for one more in
13    the middle of that page.  Do you see that?
14         A.    Apologies for one more, right.
15         Q.    And then the -- directly above that, the
16    Facebook person responds, "Hi, all, flagged this for
17    the fake accounts team and they have confirmed that
18    all but two accounts were removed for the
19    impersonation of Dr. Fauci"; correct?
20         A.    Right.  Right.  Impersonation are bad
21    things.
22         Q.    And bad things should be removed from
23    social media on your --
24         A.    No.  I mean, I think when someone says
25    they're me and they're not me, I think someone should
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 312

```
 1   take a close look at that.
 2        Q.     Should someone take a close look at other
 3   false statements on social media?
 4        A.     That's not my lane.  I don't -- I never
 5   get involved in that, nor do I concentrate on that,
 6   so I don't have an opinion on that.  Like I've told
 7   you maybe now, I can repeat it for the hundredth
 8   time, I really don't get involved in social media
 9   issues.
10        Q.     Do people on your communication staff get
11   involved in social media issues regarding false
12   information or misinformation?
13        A.     Not to my knowledge.
14        Q.     If I may finish my question.
15               Other than impersonation accounts?
16               MR. KIRSCHNER:  Objection.  Speculative.
17               THE WITNESS:  To my knowledge, they don't
18   get involved in trying to influence social media in
19   any way.  But when someone impersonates me, I think
20   it's totally appropriate for them to be concerned
21   about that.
22               MR. KIRSCHNER:  And after this, can we
23   take a break?
24               MR. SAUER:  Why don't we do that now?
25               THE VIDEOGRAPHER:  The time is 3:39 p.m.
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 313

```
 1    and we are going off the record.

 2              (Recess.)

 3              THE VIDEOGRAPHER:  The time is 3:55 p.m.

 4    and we're back on the record.

 5    BY MR. SAUER:

 6         Q.    Dr. Fauci, do you know Sylvia Burwell?

 7         A.    I do.

 8         Q.    Who's that?

 9         A.    Sylvia Burwell is the former Secretary of

10    the Department of Health and Human Services and the

11    current president of American University.

12         Q.    Did she e-mail you in February of 2020

13    asking whether she should wear a mask if she was

14    traveling in an airport in the early stages of the

15    pandemic?

16              MR. KIRSCHNER:  Objection.  Speculative.

17              THE WITNESS:  Sylvia has, over the past

18    couple of years, asked me advice about personal

19    safety during the COVID-19 pandemic.

20    BY MR. SAUER:

21         Q.    And in particular, in February of 2020,

22    did she e-mail you and say, "I am traveling to --

23    redacted -- folks are suggesting I take a mask

24    through the airport.  Is this something I should do?"

25              MR. KIRSCHNER:  Objection.  Lack of
```

**DR. ANTHONY FAUCI  11/23/2022**

```
 1    foundation.
 2              THE WITNESS:  You know, I don't recall
 3    specifically that.  I -- I do know that Sylvia has
 4    called me over the last couple of years asking me
 5    questions about health.  I don't specifically recall
 6    that.
 7    BY MR. SAUER:
 8         Q.    Do you recall writing this in response:
 9    "Masks are really for infected people to prevent them
10    from spreading infection to people who are not
11    infected, rather than protecting uninfected people
12    from acquiring infection.  The typical mask you buy
13    in the drugstore is not really effective in keeping
14    out virus, which is small enough to pass through
15    material.  It might, however, provide some slight
16    benefit in keep out gross droplets if someone coughs
17    or sneezes on you.  I do not recommend that you wear
18    a mask, particularly since you're going to a low risk
19    location."
20              Do you recall writing that?
21              MR. KIRSCHNER:  Objection.  Lack of
22    foundation.
23              THE WITNESS:  I vaguely recall talking to
24    her about certain safety issues regarding masks.
25    BY MR. SAUER:
```

**DR. ANTHONY FAUCI  11/23/2022**

**Page 315**

```
 1        Q.    Do you specifically recall recommending

 2   that she not wear a mask as she's traveling --

 3        A.    If that's an accurate -- I mean, you're

 4   asking if I recall?

 5        Q.    Yeah.

 6        A.    I don't recall.  I mean, these things --

 7   thousands of things happen.  If you show me an e-mail

 8   that has my name and the proper identification and I

 9   said that, I would not argue with you.  It would not

10   be out of the question that at that time in the

11   outbreak, I would have said that.

12        Q.    In fact, you made several statements that

13   are similar to that at that time frame; fair to say?

14        A.    Yeah.

15        Q.    Saying that masks are not effective --

16        A.    Yeah.

17        Q.    -- in keeping out the virus, and I don't

18   recommend you wear masks, in February of 2020?

19        A.    Yeah, in the very early months prior to

20   our understanding of the virus and its modality of

21   transmission, I, the surgeon general, and the CDC

22   were not recommending masks for people for three

23   reasons.  I'd be happy to tell you those three

24   reasons.

25        Q.    Please do.
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 316

```
 1        A.    The three reasons are as follows:  There
 2   was this understanding and discussion that the best
 3   masks that we used in hospitals were in short supply,
 4   and if people did a run on masks and bought them all,
 5   that masks would not be available for the people in
 6   the medical community who needed them; point number
 7   one.
 8              Point number two, there was no evidence at
 9   the time or any studies that showed outside of the
10   medical environment, i.e., in a hospital or in an
11   ICU, that masks actually worked in protecting
12   transmission or acquisition.  At the time, there were
13   no studies.  And thirdly, we were not aware at the
14   time that 50 to 60 percent of the transmission occur
15   from someone who is without symptoms, either someone
16   who never will develop symptoms or someone who is in
17   the presymptomatic stage.
18              So based on those three considerations,
19   both myself, the surgeon general, and the CDC were
20   saying you really don't need to wear masks.  Then
21   things changed.  Three things changed:  A, it was
22   clear that there was not a shortage, and that if
23   people wore masks, they would not be taking masks
24   away from the medical community.  Two, it became
25   clear that there was an asymptomatic spread of --
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 317

1  of -- of virus where people walking around not

2  knowing they're infected were spreading virus.  And

3  then three, it became clear -- let me see.  It was

4  three?  There was asymptomatic spread -- oh.

5  Evidence began accumulating that masks actually

6  work in preventing acquisition and transmission.

7          So the three reasons that I might have

8  said and did say -- if that is correct -- that you

9  don't need to wear a mask now, particularly in a low

10  risk situation, the basis for those statements

11  dramatically changed over a period of time, which

12  then made me be a very vocal proponent of wearing

13  masks.

14      Q.    And you became a vocal proponent as soon

15  as April 3rd of 2020 -- correct -- when you joined a

16  universal recommendation --

17      A.    Right.

18      Q.    -- a recommendation for universal masking;

19  correct?

20      A.    I'm not sure of the dates, why --

21      Q.    How many studies were done between

22  February of 2020, when you e-mailed Ms. Burwell and

23  told her that "the typical mask you buy in the

24  drugstore is not really effective in keeping out

25  virus, which is small enough to pass through the

DR. ANTHONY FAUCI  11/23/2022

Page 318

```
 1    material," between when you said that and April 3rd
 2    of 2020, what studies were done of the efficacy of
 3    masks --
 4         A.    Yeah.
 5         Q.    -- in preventing the spread of -- of
 6    COVID-19?
 7              MR. KIRSCHNER:  Objection.  Speculative.
 8              THE WITNESS:  I could find those and --
 9    and get them for you, but I don't have them in my
10    fingertips right now.
11    BY MR. SAUER:
12         Q.    Who'd you consult with about the efficacy
13    of masks during that time period?  Who'd you talk to
14    in the government about it?
15         A.    I don't recall who I spoke to.
16         Q.    Did your opinion on masking change based
17    on new information and new scientific evidence that
18    came forward?
19         A.    I believe it did, yes.
20         Q.    Was there disputes about the efficacy of
21    masking at that time?
22              MR. KIRSCHNER:  Objection.  Vague.
23    BY MR. SAUER:
24         Q.    For example, on March 31st, 2020, where
25    you forwarded a -- a study showing that masking is
```

DR. ANTHONY FAUCI  11/23/2022

Page 319

```
1    ineffective; a review of masking on March 31st, 2020
2    that said there was no evidence that masks works --
3    that masks worked?
4              MR. KIRSCHNER:  Objection.  Lack of
5    foundation.
6              THE WITNESS:  Yeah, I don't recall that,
7    so I'm not able to answer that accurately, I believe.
8    BY MR. SAUER:
9        Q.    Is it important for that kind of
10   development of your view that you had access to both
11   sides of that debate?
12             MR. KIRSCHNER:  Objection.  Lack of
13   foundation.  Vague.
14             THE WITNESS:  You always have access to
15   both sides of the debate.
16   BY MR. SAUER:
17       Q.    Do you?  In science, do you always have
18   access to both sides of the debate?
19       A.    Most of time.
20       Q.    Is that important for people --
21       A.    Yeah.
22       Q.    --  to have access to both sides of the
23   debate?
24       A.    Yeah, and then you make a decision based
25   on your judgment based on the preponderance of the
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 320

```
 1    correct data.
 2         Q.     Right.  And so you would look at the
 3    studies --
 4         A.     Yeah.
 5         Q.     -- that come one way --
 6         A.     Yeah.
 7         Q.     -- or the opinions --
 8         A.     Sure.
 9         Q.     -- one way and look at the studies that go
10    the other way?  Is that --
11         A.     Yeah, but often there are studies that
12    when you subject them to proper physical statistical
13    analysis, that the conclusions don't hold up; that
14    happens often.  So you've got to be careful when
15    you're looking at one study versus another that it
16    goes through the proper statistical analysis and
17    there's proper design.
18         Q.     Part of the reason that you recommended
19    against masking in February was to avoid too many
20    people going out and buying masks to ensure that they
21    were available for --
22         A.     That was one of the reasons, yes.
23         Q.     -- to be available for healthcare
24    providers; correct?
25         A.     That was one of the reasons is that we
```

DR. ANTHONY FAUCI  11/23/2022

Page 321

```
 1   were told multiple times at the coronavirus task
 2   force meeting, that there was a shortage of masks,
 3   and that if, in fact, there was a run on the purchase
 4   of masks, that that could potentially lead to a
 5   shortage for the healthcare providers that really
 6   needed them.
 7       Q.    So the recommendation you gave as to masks
 8   was motivated in part by not wanting people to go out
 9   and -- and buy a bunch of masks, so that the people
10   who really needed them wouldn't have them?
11       A.    That was one of the considerations that
12   was discussed at the coronavirus task force, that
13   there was a shortage of masks, which led to a lot of
14   activities of trying to increase the supply of masks,
15   either by importing them because many of the masks
16   were made outside of the United States, increasing
17   production of masks, or using alternative masks, such
18   as cloth masks.  So the -- the discussion, the
19   dialogue -- the discussion at the time was that there
20   is a shortage of masks.  We were trying desperately
21   to get masks as well other personal protective
22   equipment into the country, and there was a concern
23   that there was a shortage of them.  That was one of
24   the considerations which went into a lack of
25   promoting, go out and buy masks and wear masks.
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 322

1      Q.    Were there placebo-based, randomized,
2  double-blind studies of the efficacy of masking that
3  were done between February and April of 2020?
4      A.    I don't recall.  I'd have to go back and
5  take a close look at the literature.  I don't recall.
6      Q.    Have you seen any studies that contradict
7  the efficacy of masking?
8      A.    There were some studies early on -- I
9  don't know the dates of them -- that made the
10  statement that masks were not effective.  When those
11  studies were subject to statistical scrutinization,
12  they were felt to be not definitive.
13          Subsequent to that time, there have been
14  studies to indicate that in situations where mask
15  wearing was compared to not mask wearing, that masks
16  clearly have an effect.
17      Q.    In a situation like this, a debate about
18  the efficacy of mask wearing, is it important for
19  people to have access to both sides of the debate but
20  to propose -- to expose the different viewpoints
21  reflected in the debate?
22          MR. KIRSCHNER:  Objection.  Argumentative.
23  BY MR. SAUER:
24      Q.    Is it important?
25      A.    Is it important for people?  I think it's

DR. ANTHONY FAUCI  11/23/2022

Page 323

1    important for people to have all of the information

2    that's available.

3        Q.    And so they can assess what's good

4    information and what's bad information?

5        A.    Yeah.  Well, you know, it depends.  If

6    information is clearly inadequate and statistically

7    not sound, there can be a danger in people who don't

8    have the ability or the experience of being able to

9    understand that it's a flawed study, that that's when

10   the literature is self-correcting.  Science is

11   self-correcting.

12          So if you have something that makes a

13   certain statement based on data that isn't

14   statistically significant, that often there are

15   studies that come out and examine that and do

16   proper statistical analysis to try and get the real

17   truth of what the data are showing.

18          MR. SAUER:  Can you give the witness

19   Exhibit 56?

20          (FAUCI Exhibit No. 56 was marked for

21   identification.)

22   BY MR. SAUER:

23       Q.    It's right there.  We marked it before the

24   break.

25          Here's an e-mail chain from October

DR. ANTHONY FAUCI  11/23/2022

Page 324

1    of 2020.  Do you see that at the top?

2         A.    October 30th, 2020, from Jen Routh?

3         Q.    Yeah, and she's on your communications

4    team; is that right?

5         A.    Correct.

6         Q.    And she's e-mailing with people -- some

7    people from -- with Google.com e-mail addresses in

8    the "to" line?

9         A.    Yeah.  There's Google, yeah.

10        Q.    And then she's copying Courtney Billet,

11   who is the head of your communications team; correct?

12        A.    Correct.

13        Q.    And the second page of this e-mail, can

14   you turn to that?  There's an e-mail from -- that --

15   this chain begins with an e-mail from a Sandra Sitar

16   from NIAID; correct?

17        A.    Right.

18        Q.    Do you know who she is?

19        A.    It says director of communications,

20   clinical trials program, VRC.  I don't recognize the

21   name, but the signature block indicates she is part

22   of the vaccine research center at NIAID.

23        Q.    And she's e-mailing Jen -- Jennifer Routh

24   saying, "As I mentioned, Jan and the Google team are

25   hoping to connect on vaccine communications,

**DR. ANTHONY FAUCI  11/23/2022**

Page 325

```
 1    specifically misinformation."
 2            Do you see that?  It's the second full
 3    paragraph on this page.
 4            MR. KIRSCHNER:  Objection.  Lack of
 5    foundation.  Mischaracterizes the evidence.
 6    BY MR. SAUER:
 7        Q.   Do you see where Sandra writes that Jen
 8    and the Google team are hoping to connect on vaccine
 9    communications, specifically misinformation?
10        A.   I'm reading it, yeah.
11        Q.   Did your communications team communicate
12    with the Google, YouTube team about vaccine
13    misinformation?
14            MR. KIRSCHNER:  Objection.  Speculative.
15            THE WITNESS:  Not to my knowledge.  I
16    don't -- I don't know if they did.  I have no
17    knowledge that they did.
18    BY MR. SAUER:
19        Q.   Page before this, go to the first page;
20    e-mailing from the Google person, says, "Hi, Sandra
21    and Jen, thank you so much for reaching out.  It
22    would be great to find a time early next week for a
23    quick call on vaccine communications."
24            Do you know if your team had that call in
25    October 30th of 2020 or thereabouts with Google about
```

DR. ANTHONY FAUCI  11/23/2022

Page 326

```
 1   vaccine communications?
 2           MR. KIRSCHNER:  Objection.  Speculative.
 3   BY MR. SAUER:
 4       Q.    Do you know?
 5       A.    Not to my knowledge.
 6       Q.    Did you --
 7       A.    I don't recall that, no.
 8       Q.    Did you authorize them to talk to Google
 9   about vaccine communications including
10   misinformation -- or, actually, specifically
11   misinformation?
12       A.    That would be unlikely that I would
13   authorize or not authorize someone to do that, again.
14       Q.    You don't believe you authorized your
15   communication team to communicate with Google about
16   vaccine misinformation?
17       A.    When you say "authorize," I'm -- it
18   doesn't work -- it doesn't work that way in the
19   institute.  The communication team would -- if they
20   were going to do it, they would do it.
21       Q.    Okay.  So they would just do this on their
22   own to the extent they did it?
23       A.    Yeah.  I don't think that they would need
24   my permission to communicate with people.  That's --
25   that's their job.
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 327

```
 1        Q.    And then Jan -- sorry -- Jen Routh then
 2   looped in Courtney Billet, who's the head of your
 3   communications team; correct?  At the very top of the
 4   e-mail?
 5            MR. KIRSCHNER:  Objection.  Speculative.
 6   BY MR. SAUER:
 7        Q.    Where it says, "Hi, Jen, I'm adding
 8   Courtney Billet, Director of the Office of
 9   Communications and Government Relations at NIAID" --
10        A.    Right.
11        Q.    -- "to talk about vaccine communications."
12   She's -- Courtney Billet is the director of your
13   whole communications team; right?
14        A.    Right.  Yes, she is.
15        Q.    And you never discussed with her having
16   communications with Google about vaccine
17   misinformation?
18            MR. KIRSCHNER:  Objection.  Asked and
19   answered.
20            THE WITNESS:  I don't recall having
21   specific conversations with Courtney about
22   communicating with Google.
23   BY MR. SAUER:
24        Q.    Exhibit 57.
25            (FAUCI Exhibit No. 57 was marked for
```

DR. ANTHONY FAUCI  11/23/2022

Page 328

```
 1    identification.)

 2              (Discussion off the record.)

 3    BY MR. SAUER:

 4        Q.    Just briefly, if you look at the second

 5    page of this exhibit, do you see an e-mail from

 6    someone called Clarke Humphrey?

 7        A.    Clarke Humphrey, July 2021.  Okay.

 8        Q.    The second page -- do you know who

 9    Clarke Humphrey is?

10        A.    She -- Clarke, I believe, is one of the

11    communications people at the White House.

12        Q.    And she e-mailed to -- at Facebook in July

13    of 2021 saying, "Hi there, any way we can get

14    this pulled down?  It is not actually one of ours,"

15    with a link to an Instagram account called

16    Anthony Fauci official; correct?

17        A.    It says, "Subject:  Deactivating the fake

18    Fauci IG," which I would imagine is Instagram.  I

19    don't know if that's what that is.

20        Q.    Were you aware that the White House was

21    communicating with Facebook to have accounts with

22    your name taken down?

23        A.    The only thing I remember is someone

24    mentioning that there's fake stuff impersonating me

25    going on.  I don't specifically recall who
```

**DR. ANTHONY FAUCI  11/23/2022**

1   specifically was asked to address that problem of

2   people impersonating me, but I know that there was

3   some talk.  Someone mentioned to me in my group that

4   there's an impersonation of you going on out there.

5            I don't recall anything specific except

6   that they're obviously trying to do something about

7   it.

8        Q.    And, in fact, they succeeded, it looks

9   like, where Carrie Adams says, "This account has been

10  removed.  Thank you for flagging," in the second

11  e-mail on the first page.  Do you see that?

12       A.    "This account has been removed.  Thank you

13  for flagging."  So they removed a spurious, fake

14  account, which I think was a good thing --

15       Q.    At the request of the --

16       A.    -- because those accounts are bad.

17       Q.    At the request of the White House?

18            MR. KIRSCHNER:  Objection.  Speculative.

19  BY MR. SAUER:

20       Q.    Or Clarke Humphrey, the digital director

21  for the White House?

22            Is that your understanding of that e-mail?

23            MR. KIRSCHNER:  Objection.  Speculative.

24            THE WITNESS:  I wasn't even know you were

25  asking me questions.  Clarke Humphrey is at the White

**DR. ANTHONY FAUCI  11/23/2022**

Page 330

```
1    House, and there was communication that there was a
2    fake, impersonating Fauci Instagram that was
3    deactivated.
4    BY MR. SAUER:
5         Q.    Can you look at Exhibit 58?
6               (FAUCI Exhibit No. 58 was marked for
7    identification.)
8               THE WITNESS:  Okay.
9    BY MR. SAUER:
10        Q.    Here is an e-mail chain between people at
11   Google and people at the CDC that include
12   Carol Crawford; correct?
13        A.    Hold on.  Carol Crawford of the CDC;
14   right?  So I'm -- there's a bunch of e-mails here.
15   So what -- what do you want -- you want me to read
16   this and then you'll ask your question or --
17        Q.    No.  I just want to ask you on the first
18   page, do you see there's an e-mail from
19   Catherine Jamal of the CDC; right?
20        A.    Right.
21        Q.    And she's sending it to two people at
22   Facebook and copying Carol Crawford; correct?
23        A.    Copy Carol Crawford, yes.
24        Q.    And it says -- the subject is:
25   Ivermectin questions for the CDC; correct?
```

**DR. ANTHONY FAUCI  11/23/2022**

**Page 331**

```
 1        A.    Correct.
 2        Q.    And in that e-mail, this -- Ms. Jamal
 3   notifies -- or gives Facebook the CDC's position on
 4   three claims:  The claim that ivermectin --
 5   ivermectin is effective in treating COVID with the
 6   answer that that is not accurate; correct?  That's
 7   the first item.
 8        A.    That's Item Number 1.  That's what it
 9   says:  Ivermectin is effective in treating COVID.
10   And, I believe -- is this what the CDC said, "Answer
11   is not accurate"?  I would imagine that that's what
12   they typed in.
13        Q.    Yeah, and if you look at each of those --
14        A.    Yeah.
15        Q.    -- what they're citing for their claim
16   that ivermectin -- the claim about ivermectin's
17   effectiveness is not accurate --
18        A.    Right.
19        Q.    -- is they link to something from the NIH;
20   correct?
21             MR. KIRSCHNER:  Objection.  Speculative.
22             THE WITNESS:  I see a guideline that says:
23   Practice guideline, COVID-19 guideline, treatment
24   management.
25   BY MR. SAUER:
```

DR. ANTHONY FAUCI  11/23/2022

Page 332

```
 1        Q.    And do you see something before that or
 2   nearly before that where it says:   Ivermectin
 3   COVID-19 treatment guidelines, and then in
 4   parentheses NIH.gov?
 5        A.    Yeah.
 6        Q.    Were you aware that the CDC citing NIH
 7   provided information to debunk claims about efficacy
 8   of ivermectin to Facebook?
 9             MR. KIRSCHNER:   Objection.   Lack of
10   foundation.
11   BY MR. SAUER:
12        Q.    Were you aware?
13        A.    I was -- I was not aware of this, but this
14   is not surprising.   Just a second somebody is -- just
15   let me --
16             I was not aware, but it's not surprising
17   that organizations, including the CDC, would use the
18   treatment guidelines of the NIH, which is, as I
19   mentioned before in a prior question you asked me,
20   it's a group of, you know, up to 40 people who are
21   infectious disease experts from throughout the
22   country, usually the chiefs of infectious diseases at
23   various medical centers throughout the country.   So
24   it's not at all surprising that when people want to
25   find out what the latest documented information and
```

DR. ANTHONY FAUCI  11/23/2022

**Page 333**

1    clinical opinions among the top infectious disease

2    people, that they would refer to or access the

3    treatment guidelines.

4        **Q.    Would it be surprising if the social media**

5    **platforms also relied on the public statements of**

6    **someone like yourself on matters of health policy for**

7    **their own decisions?**

8            MR. KIRSCHNER:  Objection.  Speculative.

9    BY MR. SAUER:

10       **Q.    You just said it would not be surprising**

11   **if they relied on the published NIH guidelines --**

12       A.    Right.

13       **Q.    -- to debunk --**

14       A.    Right.

15       **Q.    -- ivermectin claims.  Would it be**

16   **surprising if they relied on public statements by**

17   **Dr. Fauci about the efficacy of --**

18       A.    I don't think that --

19       **Q.    -- ivermectin?**

20       A.    I don't think that would have as much

21   weight as the measured, scholarly analysis of

22   hundreds of articles that the treatment guideline

23   panel -- so the weight of the opinion of 30 to 40

24   infectious diseases experts would likely carry

25   considerably more weight than the statement by an

DR. ANTHONY FAUCI  11/23/2022

Page 334

```
 1    individual physician or scientist.
 2         Q.    Multiple times today you've characterized
 3    your opinions as reflecting and reporting on the
 4    consensus of that 40 scholars --
 5         A.    Right.
 6         Q.    -- and if you make a public statement, is
 7    it surprising if social media platforms take your
 8    public statement and view it as reflecting knowledge
 9    of that kind of consensus of government experts or
10    public health authorities?
11              MR. KIRSCHNER:  Objection.  Speculative.
12    Compound.
13              THE WITNESS:  Yeah, I'm not -- it's a
14    convoluted question.  I'm not sure really what the
15    point you're making.
16    BY MR. SAUER:
17         Q.    Exhibit 59.
18         A.    Yeah.
19         Q.    Have ever heard of -- sorry.
20              (FAUCI Exhibit No. 59 was marked for
21    identification.)
22    BY MR. SAUER:
23         Q.    Have you ever heard of Alex Berenson?
24         A.    I've heard of him.  I'm not sure -- I'm
25    trying to remember what context, but now you've put
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 335

```
 1   this in front of me, and it -- it's the person who
 2   says that the White House demanded Twitter ban -- ban
 3   me months before the company did so.  I had never
 4   heard of who Alex Berenson was before this, but -- I
 5   mean, not before this but I had heard that there was
 6   an issue that he was complaining that he was being
 7   banned.  I don't even know who -- who he is.
 8        Q.   What -- what issue did you hear about?
 9        A.   I think he was complaining that he was
10   being muzzled or something.  I -- something like
11   that.  Again, I don't pay attention to these social
12   media things of people getting banned or impeded or
13   what have you.  That's not an interest of mine.
14        Q.   Can you look at the second paragraph of
15   this document, Exhibit 59?
16        A.   Yes.
17        Q.   See how it says -- you know, in this
18   subset post by Alex Berenson, he says, "In a White
19   House meeting in April 2021, four months
20   before Twitter suspended my account, the company
21   faced one really tough question about why Alex
22   Berenson hadn't been kicked off the platform."
23             Do you recall -- you were the White House
24   chief medical advisor in April of 2021; correct?
25        A.   Yes.
```

DR. ANTHONY FAUCI  11/23/2022

Page 336

```
 1        Q.    Do you recall any communications or
 2   discussion of Alex Berenson, as a vaccine critic,
 3   being on Twitter, or being booted off Twitter?
 4        A.    I don't recall that, no.
 5        Q.    Do you remember -- were you aware of any
 6   meeting between -- do you know who Andy Slavitt is or
 7   Slavitt?
 8        A.    Andy Slavitt for a relatively small period
 9   of time was a part of the coronavirus team.  He was
10   at the White House a fair amount, and then he left,
11   and I forgot where he went, but he was with the group
12   at the White House for a few months.
13        Q.    How about Rob Flaherty?  Do you know who
14   that is?
15        A.    No.  I know Andy Slavitt.  I don't know
16   Rob Flaherty.
17        Q.    Do you know who the digital director is at
18   the White House, coronavirus response team?
19        A.    Digital?  I thought that was Clarke, or
20   maybe Clarke reports to the director.
21        Q.    Let me ask you this:  Were you aware of a
22   meeting between Andy Slavitt, Rob Flaherty, and
23   people at Twitter in April of 2021 to discuss vaccine
24   misinformation?
25              MR. KIRSCHNER:  Objection.  Lack of
```

**DR. ANTHONY FAUCI  11/23/2022**

**Page 337**

```
 1    foundation.
 2    BY MR. SAUER:
 3         Q.    Were you aware of it?
 4         A.    I don't recall.  I mean, you're bringing
 5    it up.  It doesn't ring a bell that I was aware of
 6    it.
 7         Q.    Can you turn to the third page of this
 8    document?  At the very bottom, in the Twitter
 9    employee Slack message thread, it says:  Andy
10    Slavitt -- it says, "They really wanted to know about
11    Alex Berenson"; the very bottom post.  Do you see
12    that?
13         A.    Yes.
14         Q.    And then it says, "Andy Slavitt suggested
15    they had seen data viz that had showed he was the
16    epicenter of the disinfo that radiated outwards to
17    the persuadable public."
18              Do you see that?
19         A.    Yeah.
20         Q.    Were you aware of any discussions of
21    someone on Twitter who was, you know, an epicenter of
22    disinformation radiating outward to the
23    persuadable public about vaccines?
24              MR. KIRSCHNER:  Objection.  Lack of
25    foundation.
```

DR. ANTHONY FAUCI  11/23/2022

Page 338

```
 1                THE WITNESS:  You know, you're asking me
 2    if I was aware of -- I mean, there was always talk
 3    about misinformation and disinformation.  I'm not
 4    aware of any connection, to my memory.  Maybe someone
 5    casually mentioned it of -- you know, I don't even
 6    know the connection, whether An -- Berenson was --
 7    no.  I mean, this does -- this does not ring a bell
 8    to me, to be honest with you.
 9    BY MR. SAUER:
10         Q.    Well, do you remember any discussions more
11    generally of misinformation and disinformation on
12    social media leading to vaccine hesitancy?
13         A.    You know, there's a lot of different
14    discussions about misinformation.  You're making a
15    connection between misinformation and something about
16    social media.  It's all blob about misinformation.
17         Q.    Well, let's take the whole blob.  What
18    sort of discussions were there about misinformation?
19    You say there's discussions about --
20         A.    Well, I'll give you an example.
21         Q.    Yeah, that'd be great.
22         A.    The misinformation that Bill Gates and I
23    put a chip in the vaccine to monitor people, and,
24    therefore, people should not get vaccinated.  I think
25    that falls under the category of disinformation.
```

DR. ANTHONY FAUCI  11/23/2022

Page 339

```
 1          Q.     Or misinformation if people honestly --
 2          A.     No, this is dis --
 3          Q.     Okay.
 4          A.     Because I didn't put a chip, so this dis.
 5          Q.     I think they're both false -- right -- mis
 6    and dis are both incorrect --
 7          A.     Yeah, yeah --
 8          Q.     -- under your definition.
 9          A.     Yeah, but --
10          Q.     You testified to earlier --
11          A.     Yeah, right, but the disinformation --
12                 MR. KIRSCHNER:  Please let the witness
13    finish.
14                 THE WITNESS:  Yeah, but the disinformation
15    is when you deliberately get -- propagate information
16    that you know to be true.^   there's no evidence
17    because it isn't true that I put a chip in the
18    vaccine.  So I think that qualifies as
19    disinformation.
20    BY MR. SAUER:
21          Q.     Were there discussions of that with your
22    colleagues at the White House about that particular
23    issue of trying to stop the spread of that kind of
24    disinformation?
25          A.     No, no, I -- you know, you just said
```

**DR. ANTHONY FAUCI  11/23/2022**

```
 1   something important.  I never engaged in any
 2   discussion about stopping the spread.  It just was
 3   been disconcerted that there's so much disinformation
 4   going on out there.  I don't recall, to my knowledge,
 5   that I got involved in any discussions about stopping
 6   or blocking things.
 7        Q.    So your testimony is that you were never
 8   involved in any discussions about stopping the spread
 9   of disinformation --
10        A.    Not -- no.
11        Q.    If I may finish the question.  So your
12   recollection is that you have never been involved in
13   any discussions about stopping the spread of
14   disinformation, whether on social media or elsewhere?
15        A.    I don't recall.  Someone may have
16   mentioned that we should be stopping misinformation,
17   but I don't recall specifically that I was involved
18   in interfering with the dissemination, not to my
19   recollection.  Like I said, someone may have made a
20   mention of that, but I didn't put it squarely on my
21   radar screen.
22             (FAUCI Exhibit No. 60 was marked for
23   identification.)
24   BY MR. SAUER:
25        Q.    If you'd look at Exhibit 60, is this a
```

DR. ANTHONY FAUCI  11/23/2022

Page 341

1    report from The Hill dated July 11th of 2021?

2        A.    Yes.

3        Q.    And if you turn to -- it reports on some

4    of your public comments on a Sunday talk show --

5    correct -- I think on CNN State of the Union?

6            MR. KIRSCHNER:  I would ask for the

7    witness to be able to familiarize himself.

8            THE WITNESS:  I have to -- I have to read

9    this before I make any comments, so I'm going to read

10   the whole thing.

11   BY MR. SAUER:

12       Q.    You'll see there at the top of the second

13   page of the document --

14       A.    Yes.

15       Q.    Where it says, "Fauci was responding to a

16   clip of conservative author Alex Berenson, who spoke

17   at CPAC on Saturday"; correct?

18       A.    Correct.

19       Q.    Does that jog your memory as to who

20   Alex Berenson is?

21       A.    It does jog my memory to who he is because

22   at that time, they were talking about this CPAC where

23   people were cheering on not taking a lifesaving

24   intervention.  And it says in this Exhibit 60, Fauci

25   was responding to a clip of conservative author

**DR. ANTHONY FAUCI  11/23/2022**

**Page 342**

1    Alex Berenson who spoke at CPAC.

2              So it looks like on the show, the Sunday

3    show, that they showed me a clip of this person who I

4    very likely had not heard of before saying that,

5    quote -- they quote Berenson, "The government was

6    hoping that they could sort of sucker 90 percent of

7    the population into getting vaccinated, and it isn't

8    happening," he added, to applause.

9         **Q.    And then you made a response to that on**

10   **CNN State of the Union where you described it as**

11   **horrifying; correct?**

12        A.    Yeah.

13        **Q.    It quotes you as saying, "It's**

14   **horrifying."  Is that what you said?**

15        A.    Well, this is the quote that they're

16   saying here.  I don't recall saying it's horrifying,

17   but I have no reason to believe that CNN would

18   misquote me.

19        **Q.    And they went on to -- or The Hill -- it**

20   **goes on to say in the next paragraph that "Fauci said**

21   **it was almost frightening for people to say they**

22   **don't want health officials to save their lives";**

23   **right?**

24        A.    That's what it says that I said.  I have

25   no reason to believe that's not what I said.

**DR. ANTHONY FAUCI  11/23/2022**

1        **Q.    Were there any discussions before you made**

2   **these comments on CNN State of the Union on -- in**

3   **July of 2021, were there any -- did you have any**

4   **discussions with anyone in the government about**

5   **making statements to criticize Alex Berenson in any**

6   **way?**

7        A.    I don't recall.  Again, the context of

8   this "almost frightening for people to say," if one

9   looks at the data comparing the hospitalizations and

10  deaths of vaccinated people and unvaccinated people,

11  it is overwhelmingly weighted towards unvaccinated

12  people.  So someone cheering to the statement that

13  you shouldn't be vaccinating people, I think is

14  really very much contrary to the principles of good

15  public health.

16       **Q.    Before you made those comments, do you**

17  **recall discussing Alex Berenson with anyone in the**

18  **government?**

19       A.    I don't recall that.  It is possible, but,

20  again, Alex Berenson rings the bell here when you

21  show me this clip.  But, again, I -- I don't recall

22  any necessary discussions with him.  They may have

23  occurred, but I don't recall.

24       **Q.    Exhibit 61.  Five days -- oh, sorry.**

25            **(FAUCI Exhibit No. 61 was marked for**

**DR. ANTHONY FAUCI  11/23/2022**

```
 1    identification.)

 2    BY MR. SAUER:

 3        Q.    You see this is a New York Times report

 4    dated five days later on July 16th of 2021?

 5        A.    I don't see the date.  Yeah, July 16th,

 6    2021.

 7              MR. KIRSCHNER:  Just to clarify the

 8    record, it also says it was updated July 19th, 2021.

 9              THE WITNESS:  Right.

10    BY MR. SAUER:

11        Q.    And the first line says, "President Biden

12    unleashed his growing frustration with Social Media

13    on Friday saying that platforms like Facebook were

14    killing people by allowing disinformation about the

15    coronavirus vaccine to spread online"; correct?

16        A.    That's what the first sentence says.

17        Q.    Do you recall the president saying that,

18    that social media companies are, quote, "killing

19    people"?

20        A.    I don't recall him saying that, but this

21    is reported by the New York Times saying that that's

22    what he said.  So I have no reason to believe that he

23    did not say that, but I don't specifically recall him

24    saying that specific comment.  I may -- I may have

25    been aware of it when he said it, but I don't recall
```

DR. ANTHONY FAUCI  11/23/2022

Page 345

```
 1   now that he said it except when you put this
 2   statement in front of me.
 3       Q.    Do you recall any discussions with anyone
 4   in the government of how disinformation or
 5   misinformation on social media platforms are killing
 6   people?
 7       A.    Well, it is very clear that, as I've said
 8   multiple times before, that misinformation and
 9   disinformation, particularly that encourages people
10   to avoid lifesaving interventions, can certainly
11   result in the unnecessary death of people whose lives
12   would have been saved.  So when misinformation and
13   disinformation leads people to avoid a lifesaving
14   intervention, that is equivalent to contributing to
15   the death of that person.
16       Q.    My question was:  Do you recall discussing
17   that with anyone in the government in this time
18   frame?
19            MR. KIRSCHNER:  Objection.  Lack of
20   foundation.  Vague.
21            THE WITNESS:  You know, when you say
22   "anyone in the government," I have often said that
23   misinformation and disinformation is the enemy of
24   public health.  Could I have said it to someone in
25   the government?  It is certainly possible that I did
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 346

```
 1   because I do feel strongly that misinformation and
 2   disinformation, when it leads to people avoiding
 3   lifesaving interventions, can be deadly.
 4   BY MR. SAUER:
 5        Q.    Misinformation and disinformation are the
 6   enemy of public health you said just now?
 7        A.    Yeah.
 8        Q.    Is that true when they are propagated on
 9   social media platforms, on your view?  Yes or no?
10        A.    If social media is propagating
11   disinformation that leads to the death of people by
12   encouraging them to avoid lifesaving interventions, I
13   believe that's contrary to public health.
14        Q.    Can you look at Exhibit 62?
15             (FAUCI Exhibit No. 62 was marked for
16   identification.)
17             MR. KIRSCHNER:  Can I get a copy, Counsel?
18   There's -- I don't know what this is.
19             MR. SAUER:  Oh.
20   BY MR. SAUER:
21        Q.    Do you know who Scott Gottlieb is?
22        A.    I do.
23        Q.    Do you know him personally?
24        A.    Well, I've met him.  I -- I don't socially
25   interact with him.  I know him because for a time he
```

DR. ANTHONY FAUCI  11/23/2022

Page 347

```
 1   was the commissioner of the FDA, and currently he is

 2   frequently on CBS Sunday Morning shows commenting on

 3   COVID-19 and other health matters.

 4        Q.   In 2021, did you have any communications

 5   with him about vaccines or misinformation?

 6             MR. KIRSCHNER:  Objection.  Compound.

 7   BY MR. SAUER:

 8        Q.   Do you recall communicating with him in

 9   any way in the summer of 2021?

10        A.   You know, I may have, but I don't recall.

11   I communicate with hundreds, if not many more people.

12   So I don't recall specifically.  But if you showed me

13   a document of some sort that showed I communicated

14   with him, I would not be surprised.

15        Q.   Why don't you look at the Exhibit 62 on

16   the first page in the middle of that page?  Do you

17   see there's a -- you see this is another subset post

18   by Alex Berenson talking about how he was banned from

19   Twitter, generally?

20        A.   I'm sorry.  What paragraph are you

21   referring to?

22        Q.   I'll tell you, will you look at that --

23   that kind of e-mail that's pasted in the middle

24   of the page --

25        A.   Pasted in the middle -- oh, the pasted
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 348

```
 1   e-mail.
 2        Q.     The one that shows --
 3        A.     Scott Gottlieb to someone that has been
 4   redacted.
 5        Q.     Someone at Twitter?
 6        A.     Yeah.
 7        Q.     And he's forwarded a posting by
 8   Alex Berenson that's critical of you; right?  "Quite
 9   frankly," said Alex Berenson, "the arrogance of
10   Anthony Fauci and what it means for the rest of us";
11   correct?
12        A.     So Berenson said the arrogance of
13   Anthony Fauci and what it means for the rest of us?
14        Q.     And then Gottlieb forwarded that to
15   someone at Twitter; correct?
16             MR. KIRSCHNER:  Objection.  Lack of
17   foundation.
18             THE WITNESS:  Yeah.  So I want to make
19   sure I understand what you're saying.  So this is
20   a -- this is a tweet from Berenson calling me
21   arrogant, and then it's Scott forwarding the tweet to
22   Twitter saying this is what is promoted on Twitter
23   and this is why Tony needs a security detail?
24   BY MR. SAUER:
25        Q.     Correct, yeah.  Tony is a reference to
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 349

```
 1   you, I presume?
 2        A.    There's a lot of Tonys around, but I guess
 3   he's talking about me.
 4        Q.    I mean, that's the one that's referred in
 5   the e-mail.
 6        A.    Right.
 7        Q.    Did you ever have a discussion with
 8   Scott Gottlieb about needing a security detail
 9   because of the things that people posted about you on
10   the Internet?
11        A.    I don't recall having that discussion with
12   him, but it is possible in a discussion I had with
13   him that -- it's no secret that I have a security
14   detail.  My life has been threatened multiple times.
15   So I might have discussed that I need a security
16   detail with him, but I -- that doesn't ring a bell as
17   something -- unless there was a reason for me to -- I
18   don't usually talk to people about my security
19   detail.
20        Q.    He refers to you as "Tony" in this
21   e-mail --
22        A.    Everybody refers to me as Tony.  We
23   said -- we got that established before.
24        Q.    Is there somebody at Twitter who was on a
25   first-name basis with you?  I would refer to you as
```

```
 1   Dr. Fauci --
 2        A.    Yeah.
 3        Q.    -- if I was sending it to someone who
 4   didn't know you.  Is there someone who works for
 5   Twitter who -- who you're on a first-name basis with?
 6        A.    Scott -- Scott refers to me as Tony, but I
 7   don't see anybody on Twitter referring to me as Tony.
 8        Q.    He's referring you to some unidentified
 9   person --
10        A.    But he's using his own --
11        Q.    If I may finish the question?
12        A.    Yeah, yeah.  Sure.  Sorry.
13        Q.    He's referring to you as Tony to some
14   unidentified person at Twitter?
15        A.    Right.
16        Q.    Are you on a first-name basis with anyone
17   who works at Twitter?  Yes or no?
18        A.    Am I on a first-name basis of anyone who
19   works at Twitter?
20        Q.    Correct.  That's my question.
21        A.    Well, right now, no, but when my daughter
22   worked at Twitter, I was on a first-name basis with
23   her.
24        Q.    Did she work at Twitter in August 24th
25   of 2021?
```

DR. ANTHONY FAUCI  11/23/2022

Page 351

```
 1        A.    I don't recall.  She may have already left
 2   then.
 3        Q.    Did anyone else -- have you ever been on a
 4   first-name basis with anyone else who worked at
 5   Twitter?
 6        A.    Not that I know of.  Not that I know of.
 7   I mean, I'm trying to think of people that I know at
 8   Twitter, and the only person that I've really known
 9   that works at Twitter, I believe, is my daughter.
10        Q.    Did you have any communications with -- at
11   this time, Scott Gottlieb was on the board of Pfizer;
12   is that right?
13        A.    He might -- I know he's on -- I believe --
14   I believe he's on the board of Pfizer.  I don't know
15   if he was on the board of Pfizer at this time.
16        Q.    Did you have any communications with him
17   in connection with the development of the vaccines
18   that you talked about earlier?
19        A.    You know, I don't know.  I mean, we talk
20   about the development of vaccines all the time.
21   Vaccines was a big subject of discussion from the
22   time we began developing the vaccines; right?  In a
23   few weeks into January we began developing the
24   vaccine.  So we spoke about vaccine development a
25   lot.  Did -- would I have mentioned vaccine
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 352

1    development to Scott?  I don't see any reason why I

2    would not, but I don't specifically recall discussing

3    vaccine development with Scott.

4         **Q.    How about discussing any speech on the**

5    **internet that would lead to vaccine hesitancy?  Did**

6    **you discuss that with him?**

7              MR. KIRSCHNER:  Objection.  Vague.

8              THE WITNESS:  You know, again, I don't --

9    I don't recall specific conversations with Scott

10   about hardly anything.

11   BY MR. SAUER:

12        **Q.    How about Alex Berenson?  Did you ever**

13   **discuss Alex Berenson with Scott Gottlieb?**

14        A.    You know, again, you had mentioned before,

15   I -- Alex Berenson doesn't ring a bell.  It's

16   possible associated with some of the things you

17   showed me before, but I don't recall discussing

18   Alex Berenson with Scott Gottlieb.

19        **Q.    Exhibit 63.**

20             **(FAUCI Exhibit No. 63 was marked for**

21   **identification.)**

22   BY MR. SAUER:

23        **Q.    Who is Ezekiel J. Emmanuel?**

24        A.    Ezekiel J, better known as Zeke Emmanuel,

25   is a vice provost at the University of Pennsylvania

**DR. ANTHONY FAUCI  11/23/2022**

Page 353

```
 1   and was at a time and might still be the director of
 2   the division or program of medical ethics.
 3        Q.    At the university?  At that university?
 4        A.    At the University of Pennsylvania.
 5        Q.    In this e-mail chain, he says to you on
 6   the second to last page, "I'm a bit perplexed by your
 7   seeming strong endorsement of remdesivir.  Was it
 8   just a bit forced?  My reading of the data were weak
 9   and in normal times for normal disease.  It is not
10   enough to approve and very likely to really impact
11   COVID-19 disease pattern regardless of supply
12   issues."
13             Do you see that?
14        A.    Yeah.
15        Q.    And what were you talking -- what was he
16   talking about there?
17             MR. KIRSCHNER:  Objection.  Again, I ask
18   for Dr. Fauci to have an opportunity to familiarize
19   himself with this document.
20             THE WITNESS:  So there was a clinical
21   trial that showed a modest effect but nonetheless a
22   clear but modest effect of remdesivir, which is an
23   antiviral drug used for the treatment of COVID-19.
24   And when the announcement came out of the clinical
25   trial, I believe, I said this is a good thing that we
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 354

```
 1    have a drug when we had no other drugs.  This is well
 2    before Paxlovid, so we had no good drugs for COVID.
 3    And when the study came out, I was pleased that we
 4    had a drug that at least had a modest effect.  Zeke,
 5    who is a good person, said my reading of the data
 6    were weak and normal times for normal disease, not
 7    enough to approve, yada, ya, and I write back, and
 8    say, "Zeke, I did not strongly endorse it."  I
 9    specifically said that it was not a knockout drug but
10    was only a baby step in the development -- in the
11    direction of developing more and better drugs.  I
12    said it was important because it proved in a
13    well-powered -- which it was -- "randomized" -- which
14    it was -- "placebo-controlled trial that one can
15    suppress the virus enough to see a clinical effect as
16    modest as that effect was."  I do not think --
17    BY MR. SAUER:
18        Q.    If I may right there.
19        A.    -- that I forced anything.
20        Q.    Dr. Fauci, thank you.
21              Why don't we go off the record now?
22              MR. KIRSCHNER:  Okay.
23              THE VIDEOGRAPHER:  Time is 4:46 p.m. and
24    we're going off the record.
25              (Recess.)
```

**DR. ANTHONY FAUCI  11/23/2022**

```
 1                THE VIDEOGRAPHER:  The time is 4:55 p.m.

 2   and we're back on the record.

 3   BY MR. SAUER:

 4       Q.    Dr. Fauci, we've discussed a lot of

 5   opinions today about COVID and treatments for COVID

 6   and related things.  For example, we talked about

 7   hydroxychloroquine; we talked about masks for a while

 8   and whether they're effective; we talked about the

 9   origins of COVID, whether it came out of a lab; we

10   talked about vaccines and the efficacy of vaccines;

11   we talked about herd immunity.  And you've made some

12   pretty strong statements in media about a lot of

13   these issues -- is that fair to say -- using strong

14   language to disagree with opinions that you disagree

15   with?

16                MR. KIRSCHNER:  Objection.  Vague.

17                THE WITNESS:  No, I'm not sure what you

18   mean by strong language.  Most of the time it was

19   measured language.  I think you pointed out at one

20   point when I was talking about the premise of herd

21   immunity that I believe I said that it was nonsense

22   which is -- if you want to call that strong language.

23   I believe it resulted in the deaths of -- unnecessary

24   deaths of individuals.

25   BY MR. SAUER:
```

**DR. ANTHONY FAUCI  11/23/2022**

**Page 356**

1         Q.    And people have disagreed with you in

2    strong language as well.  For example, Alex Berenson

3    saying -- calling the arrogance of Dr. Fauci --

4         A.    Right.

5         Q.    -- and so forth.

6               Do you think people should be able to post

7    their opinions on social media, for example, about

8    the efficacy of hydroxychloroquine, even if you

9    disagree with them?

10              MR. KIRSCHNER:  Objection.  Compound.

11              THE WITNESS:  You know, I'm not an expert

12   on what should or should not be on social media.  I

13   ^ audio cuts out here believe that people certainly

14   can express their opinions.  I'm not an expert.  I've

15   said that multiple times during the deposition.  I'm

16   not a social media person.

17   BY MR. SAUER:

18        Q.    Do you have an opinion about whether

19   people should be allowed to post on social media

20   opinions that you think, for example, are dangerous

21   and might lead to loss of life?  What's your view on

22   that?

23        A.    You know, again, you say allowed, I don't

24   know what the legal or other First Amendment issues

25   are associated with that.  That's not my lane or my

**DR. ANTHONY FAUCI  11/23/2022**

Page 357

```
 1   area of expertise.  As a physician and a scientist

 2   and a public health person, I'm very sensitive to the

 3   fact that disinformation, including some of the

 4   disinformation that we discussed that, for example,

 5   has people avoid lifesaving interventions, is

 6   dangerous to health.

 7            How you -- how you counter that I think is

 8   open to question.  My way of countering false

 9   information, and I've been on the record multiple

10   times as saying that, is that my approach is to try

11   to ^  and flood the system with the correct

12   information as opposed to interfering with other

13   people's ability to say what they want to say.  And

14   I've said, I think, if you, in your investigations

15   and your discovery, you looked into how many times

16   I've often said the best way to counter

17   misinformation and disinformation is to flood the

18   system with correct information.

19        Q.    Do you think social media platforms have a

20   responsibility to take down dangerous misinformation

21   that gets posted on their platforms?

22        A.    You know, I'm not an expert in the legal

23   and other aspects of that to make an informed

24   comment.  I would leave that to experts.  I told you

25   I'm not someone fluent in the ins and outs of what
```

DR. ANTHONY FAUCI  11/23/2022

Page 358

```
 1   could or should be on social media, so I don't really
 2   have any comment on that, because that's not an area
 3   that I've seriously thought about and analyzed about
 4   the pros and cons of that.
 5        Q.    Do you think that allowing both sides to
 6   openly debate their positions on hotly contested
 7   issues, like the efficacy of hydroxychloroquine or
 8   where the COVID-19 virus came from, do you think it's
 9   important to allow both sides to freely debate those
10   issues?
11             MR. KIRSCHNER:  Objection.  Argumentative.
12             THE WITNESS:  You know, when you say
13   allowed to debate, I think honest debate is
14   important, but when it goes beyond debate and leads
15   people who are unwitting about these things to do
16   things that are clearly detrimental to their life and
17   their safety, I find that disturbing.  How you
18   mitigate against that, I would leave to other people.
19   That's not in my lane.
20        Q.    Have you taken steps to mitigate against
21   it in the last two and a half years?
22        A.    As I said, the theme that I've gone by is
23   the best way to counter misinformation and
24   disinformation is to flood the system with correct
25   information.  That's the reason why I very often am
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 359

```
 1   involved with the media with writing, with
 2   interviewing, with podcasts to get people to get
 3   vaccinated.  The most recent of which was yesterday,
 4   I believe, when I was -- or the day before -- when I
 5   made my final press conference at the White House and
 6   my message was:  Please go out for your own safety,
 7   the safety of your community and your family, to go
 8   out and get the updated booster.
 9            That's how I counter misinformation and
10   disinformation.
11            THE VIDEOGRAPHER:  That is it.  That's the
12   seven hours.
13            MR. KIRSCHNER:  Very well.  Two things:
14   One, first, we have no questions for the witness, and
15   second of all, we want to reserve the right to read
16   and sign.
17            THE VIDEOGRAPHER:  Okay.  If there's no
18   further statements for record, we'll be going off.
19   The time is 5:01 p.m. on November 23rd, 2022.  We are
20   going off the record completing today's video
21   recorded session.
22            (Whereupon, at 5:01 p.m., the taking of
23   the deposition ceased.)
24
25
```

**DR. ANTHONY FAUCI  11/23/2022**

**Page 360**

```
 1                  CERTIFICATE OF REPORTER
 2   UNITED STATES OF AMERICA ) ss.:
 3   STATE OF MARYLAND        )
 4                I, STEPHANIE BARNES, the officer
 5   before whom the foregoing deposition was taken, do
 6   hereby certify that the witness whose testimony
 7   appears in the foregoing deposition was duly sworn by
 8   me; that the testimony of said witness was taken by
 9   me to the best of my ability and thereafter reduced
10   to typewriting under my direction; that I am neither
11   counsel for, related to, nor employed by any of the
12   parties for the action in which this deposition was
13   taken, and further that I am not a relative or
14   employee of any attorney or counsel employed by the
15   parties thereto, nor financially or otherwise
16   interested in the outcome of the action.
17
18
19
20                        Notary public in and for
21                          the State of Maryland
22             My commission expires: 10/3/2025
23
24
25
```

**DR. ANTHONY FAUCI  11/23/2022**

**Page 361**

```
 1                          LEXITAS LEGAL

 2

 3    November 28, 2022

 4

      ADAM KIRSCHNER, ESQ.
 5    U.S. Department of Justice
      1100 L Street, Northwest
 6    Washington, D.C.  20530

 7    IN RE: THE STATE OF MISSOURI, et al. v. JOSEPH R.
             BIDEN, JR., et al.
 8
      Dear Mr. Kirschner:
 9
      Please find enclosed your copies of the deposition of
10    DR. ANTHONY FAUCI taken on November 23, 2022 in the
      above-referenced case. Also enclosed is the original
11    signature page and errata sheets.

12    Please have the witness read your copy of the
      transcript, indicate any changes and/or corrections
13    desired on the errata sheets, and sign the signature

14    page before a notary public.

15

16    Please return the errata sheets and notarized

17    signature page within 30 days to our office at 711 N

18    11th Street, St. Louis, MO 63101 for filing.

19

20    Sincerely,

21

22

23    Lexitas Legal

24

25    Enclosures
```

**DR. ANTHONY FAUCI  11/23/2022**

**Page 362**

```
1                          ERRATA SHEET
       Witness Name: DR. ANTHONY FAUCI
2      Case Name: THE STATE OF MISSOURI, et al. v. JOSEPH R.
                  BIDEN, JR., et al.
3      Date Taken: NOVEMBER 23, 2022

4

5      Page #_____   Line #_____

6      Should read: _____

7      Reason for change: _____

8

9      Page #_____   Line #_____

10     Should read: _____

11     Reason for change: _____

12

13     Page #_____   Line #_____

14     Should read: _____

15     Reason for change: _____

16

17     Page #_____   Line #_____

18     Should read: _____

19     Reason for change: _____

20

21     Page #_____   Line #_____

22     Should read: _____

23     Reason for change: _____

24

25     Witness Signature: _____
```

**DR. ANTHONY FAUCI  11/23/2022**

Page 363

```
 1   STATE OF _____)

 2

 3   COUNTY OF _____)

 4

 5   I, DR. ANTHONY FAUCI, do hereby certify:

 6          That I have read the foregoing deposition;

 7          That I have made such changes in form

 8   and/or substance to the within deposition as might

 9   be necessary to render the same true and correct;

10          That having made such changes thereon, I

11   hereby subscribe my name to the deposition.

12          I declare under penalty of perjury that the

13   foregoing is true and correct.

14          Executed this _____ day of _____,

15   20___, at _____.

16

17

18

19                         _____

20                         DR. ANTHONY FAUCI

21

22                         _____

23                         NOTARY PUBLIC

24   My Commission Expires:

25
```

DR. ANTHONY FAUCI  11/23/2022

| A | | | | |
|---|---|---|---|---|
| A-U-C-H-... 30:23 | 143:4 213:16 235:23 319:10,14 319:18,22 322:19 333:2 | accumulate 224:2 | act 125:13 126:4 265:14,15 | 266:23 |
| a.m 1:20 9:4 54:8,12 55:2 58:14 61:14 62:14 68:14 69:2 83:17,20 84:19 150:3,5 | accident... 106:5 155:17 | accumulated 221:1 235:5 | acting 65:10 action 265:15 360:12,16 | administer 9:25 administ... 271:21 admissions 283:16 adopted 27:3 27:13,14 advance 139:22 advertis... 141:19 advice 171:1 171:11,17 171:20 196:11 313:18 advisor 10:15,18 10:20,21 335:24 Affairs 38:11 affiliated 75:19,25 affiliation 75:22 afraid 102:20 Africa 140:7 African-... 228:4 afternoon 65:23,25 66:2 68:10 148:23 234:5 agency 28:4 28:18 30:14 45:6 307:5 aggressive 168:11 ago 11:1,7 11:10 13:24 16:5 19:11 23:25 |
| Aaron 2:25 ABC 7:9 185:20 | account 99:6 101:7 209:17 210:1,6 213:14 241:7,25 270:4 299:11,14 299:15,19 300:22,25 301:3,19 301:19 302:1,8,9 303:8 304:3 309:9 311:1 328:15 329:9,12 329:14 335:20 | accumula... 223:16 224:2 317:5 | actively 64:18 | |
| ability 323:8 357:13 360:9 | | accuracy 228:13 | activist 265:13 | |
| able 133:25 175:3 299:2 319:7 323:8 341:7 356:6 | | accurate 36:25 167:1 198:25 275:23,25 276:8 315:3 331:6,11 331:17 | activities 321:14 | |
| | | | activity 20:3 | |
| above-en... 1:15 | | accurately 114:7 288:7 319:7 | actual 120:21 121:1 178:21 | |
| above-re... 361:10 | | accusations 106:3 | ad 177:11,18 306:2,3 | |
| absolutely 37:5 134:12 234:20 260:13 | accounts 209:9 270:1 300:19 301:11 302:12,18 302:22 303:3,3 304:15 309:5,11 309:22,24 309:25 310:1,4,10 310:18,24 311:17,18 312:15 328:21 329:16 | ACE2 115:13 115:23 116:11 117:13 | Adam 3:22 9:21 361:4 | |
| abstract 22:25 | | achieve 278:3 | Adam.kir... 4:5 | |
| academies 17:6 | | achieving 285:2 | Adams 329:9 add 285:18 | |
| academy 188:12 190:17 191:13 | | acknowle... 267:12 | added 342:8 adding 299:22 327:7 | |
| accept 177:17,19 | | acquaint... 20:17 156:23 | additional 16:8 17:17 111:5 211:5,12 | |
| access 36:15 37:2,9,15 103:14 142:17 | | acquaint... 99:23 269:17 | address 161:16 198:1 206:4,5,7 206:10,19 329:1 | |
| | | acquainted 205:6 | addresses 55:10 205:24 324:7 | |
| | | acquiring 314:12 | | |
| | | acquisition 316:12 317:6 | addressing 184:2 198:8 245:9 | |

```
27:17                252:6            52:25            76:12            Andy 336:6,8
29:10,23             272:19           285:1            169:3            336:15,22
43:23                AIDS 265:13      358:9            191:10           337:9,14
44:23                airport          allowed          236:9,9          anecdotal
57:13 78:6           313:14,24        247:23           251:23           215:1,3
100:17               al 1:5,8 9:7     356:19,23        266:3            217:2
124:17               9:7 55:19        358:13           336:10           218:1
149:11               56:1 61:2        allowing         ample 145:9      animal
150:9                361:7,7          276:25           224:2            143:17
157:21               362:2,2          344:14           amplify 25:1     144:9,11
167:11               alarming         358:5            analyses         144:13
188:5                52:10            alternative      52:8 180:4       145:6,8,11
212:5                albeit           273:2            analysis         146:4
249:16               167:24           321:17           111:19           156:9
250:4                Aleksei          ambiguous        112:5,6,9        198:19
257:13               205:15,18        35:22            112:10           200:10
269:5                alert 97:4       71:10            121:11,14        announce...
275:4                Alex 267:24      78:15            161:25           353:24
288:3                334:23           79:10 82:8       180:20           anomalies
295:11               335:4,18         99:4             195:8            113:12,21
agree 47:16          335:21           118:21           320:13,16        113:24
111:19               336:2            154:23           323:16           124:18
112:4,8              337:11           166:13           333:21           answer 13:7
166:21               341:16,20        168:20           analyzed         18:23
277:5                342:1            174:22           358:3            19:21
298:2                343:5,17         186:23           ANANT 4:9        20:21
agreed 52:14         343:20           193:19           Anant.ku...      25:11
195:14               347:18           213:25           4:15             36:25
223:20,23            348:8,9          270:17           and/or           41:21,24
agreement            352:12,13        amended          104:15           47:11
73:17                352:15,18        282:25           361:12           51:22
agrees               356:2            Amendment        363:8            94:16
223:24               algorithm        356:24           Anderson         119:16
ah 210:1             306:2            America 7:19     34:21            127:24
ahead 17:12          alleging         226:14           43:20            134:10,11
20:19,23             211:25           227:8            44:24            139:3
48:9 49:12           212:1            233:5,15         45:13,21         145:3
52:21                Allergy          234:16           50:16,23         165:4
64:21                10:14            360:2            51:11 60:2       175:6
84:15                142:13           America's        61:19 84:6       206:16
85:24                Alliance 3:4     227:16           89:4             230:4
89:18,19             6:9 18:11        234:6            170:14,23        241:22
91:17 93:7           19:10,25         238:22           179:18          288:7
126:19               20:4,6           242:15           180:10           306:15
135:4                21:22 30:4       243:3            195:24           319:7
202:3                allocated        American         196:10           331:6,10
247:14               177:10          15:18            Andrea 229:7     answered
249:17               allow 26:14     313:11           233:5,12         63:4 88:13
251:2                28:14            amount 21:13     234:15           125:16
```

DR. ANTHONY FAUCI  11/23/2022

| | | | | |
|---|---|---|---|---|
| 159:11,21 | 181:2 | applicable | 307:18 | 31:12 49:5 |
| 159:23 | 213:8 | 215:18 | 317:15 | 49:15,19 |
| 162:7 | 238:2,4,4 | applicat... | 318:1 | 49:22 50:3 |
| 172:16 | 238:10 | 24:8 | 322:3 | 50:9 56:5 |
| 195:5 | 239:4 | apply 169:22 | 335:19,24 | 56:21,22 |
| 205:4,6 | 269:6,11 | 247:10 | 336:23 | 57:2,9,14 |
| 239:18 | 278:12 | appreciate | apropos 70:5 | 57:17 60:7 |
| 261:14 | 350:7 | 109:7 | Archive | 60:9 61:18 |
| 262:4,5,16 | apologies | appreciated | 179:22 | 61:24 62:6 |
| 274:24 | 311:12,14 | 275:23 | Archives | 62:13,14 |
| 285:20 | apologize | 276:1,6,10 | 7:11 | 65:13 66:9 |
| 297:1 | 90:2 93:13 | approach | area 40:18 | 82:23 |
| 301:21 | 185:10 | 250:7 | 117:20 | 163:11 |
| 327:19 | 249:5 | 266:21,24 | 127:12,12 | 179:14 |
| answering | Apoorva | 266:24,25 | 151:15,17 | 183:23 |
| 11:19 | 296:12 | 290:19 | 151:18 | 184:3 |
| 12:23 | appalls | 295:5 | 157:6 | 185:3,20 |
| 14:12 | 271:10 | 357:10 | 357:1 | 186:6,20 |
| 48:22 53:9 | apparently | approaches | 358:2 | 186:25 |
| 287:2 | 108:3 | 292:14 | argue 315:9 | 187:2 |
| answers | 286:21 | appropriate | Argument... | 189:4 |
| 11:23 | appear | 46:18 | 206:14 | 191:3,7,9 |
| antecedent | 164:23 | 119:8 | 223:22 | 191:20 |
| 218:21 | 179:24 | 128:8 | 224:13 | 192:14 |
| antedated | appearance | 138:1 | 298:9 | 195:3,20 |
| 159:6 | 38:24 | 207:21 | 322:22 | 195:23 |
| Anthony 1:13 | APPEARANCES | 225:5 | 358:11 | 196:4,9,11 |
| 6:3 9:6 | 2:1 | 310:15 | arguments | 196:17 |
| 10:2,10 | appeared | 312:20 | 123:20 | 212:20,24 |
| 91:22 | 77:16 | approval | arose 120:12 | 218:5 |
| 299:18 | 179:14 | 70:22 | 183:18 | 221:15,21 |
| 303:6,6 | 226:16 | approve | arranged | 222:8,10 |
| 328:16 | appearing | 18:24 | 44:15 | 222:13 |
| 348:10,13 | 226:13 | 122:17 | arranging | 228:24 |
| 361:10 | 227:18 | 276:3 | 44:19 | 233:17,23 |
| 362:1 | 229:6 | 353:10 | arrogance | 258:20,23 |
| 363:5,20 | appears | 354:7 | 348:9,12 | 259:11,13 |
| anthonyf... | 129:3 | approved | 356:3 | 264:13 |
| 299:10 | 146:23 | 18:17 19:2 | arrogant | 265:1,5 |
| antimala... | 179:10 | 70:1,13 | 348:21 | 267:10 |
| 227:1 | 182:10 | April 179:12 | article 6:8 | 271:5,13 |
| antiviral | 189:11 | 188:3 | 6:12 7:2,3 | 275:14,16 |
| 353:23 | 245:10 | 192:4 | 7:7,9,14 | 275:18,22 |
| anybody | 294:21 | 197:1 | 7:16,17,18 | 277:24 |
| 34:13 | 360:7 | 199:2,14 | 7:19,20,21 | 280:12,19 |
| 75:24 | applause | 201:4,21 | 7:22 8:3,5 | 280:25 |
| 77:14 | 342:8 | 203:8 | 8:6,17,18 | 294:24 |
| 115:20 | apples | 204:4,8 | 8:19,20 | articles |
| 137:18 | 157:14 | 207:25 | 15:15 31:7 | 13:24 |

DR. ANTHONY FAUCI  11/23/2022

| | | | | |
|---|---|---|---|---|
| 31:17 | 274:23 | 329:25 | 55:17,23 | 9:19 |
| 62:12 | 285:19 | 338:1 | 56:16 61:2 | 360:14 |
| 268:22 | 295:10,11 | **aspects** 17:3 | 120:7,22 | **attract** |
| 280:24 | 295:17 | 202:23 | 121:1 | 243:16 |
| 294:14,23 | 296:25 | 289:22 | 123:10 | **Auchincloss** |
| 295:2,4,11 | 301:20,24 | 357:23 | 126:24 | 30:21,22 |
| 295:18,21 | 313:18 | **assess** 154:1 | **Attachments** | 30:23 |
| 295:24 | 327:18 | 293:19 | 55:18 | 54:20,24 |
| 296:5 | 329:1 | 323:3 | **attend** | 62:3 68:7 |
| 297:20 | 332:19 | **associate** | 140:12 | 69:2 |
| 333:22 | **asking** 11:20 | 108:14 | **attention** | **audio** 356:13 |
| **Asia** 140:8 | 11:21 | 265:22 | 22:16 | **August** |
| **Asian** 33:10 | 12:21 25:9 | **associated** | 30:10 | 242:19 |
| 33:19 | 25:14 | 161:2,4 | 31:17 34:3 | 243:7 |
| **aside** 238:21 | 26:15 | 238:11 | 42:10 | 350:24 |
| 290:18 | 36:20,23 | 352:16 | 47:24 | **auspices** |
| **asked** 10:20 | 47:12 | 356:25 | 48:14 58:2 | 156:20 |
| 12:10 | 49:13 | **association** | 79:15 | **Australia** |
| 41:22 | 67:25 | 213:13 | 141:9 | 45:5 73:11 |
| 43:13 | 68:17 69:5 | **assume** 85:13 | 144:20 | **author** 161:3 |
| 48:25 | 69:6,8,10 | 86:17 | 145:15 | 195:25 |
| 58:25 63:3 | 87:5,6 | 132:11 | 153:21 | 218:21 |
| 69:7 78:5 | 94:15 | 201:5 | 184:11 | 264:21 |
| 82:20 | 97:14 | 233:18 | 208:12 | 341:16,25 |
| 88:12 | 127:15,22 | 301:23 | 209:21 | **authored** |
| 102:4 | 127:24 | **Assumes** 30:5 | 210:4,8 | 124:3 |
| 125:15 | 133:22 | 109:19 | 213:15 | 203:12 |
| 132:13 | 134:6,10 | 214:19 | 219:9 | 251:5 |
| 133:8 | 135:13 | **assuming** | 235:20 | **authorities** |
| 134:12 | 136:17,24 | 18:20 | 238:18 | 288:20,25 |
| 139:9 | 138:20 | 19:18 22:8 | 239:3,22 | 334:10 |
| 140:4 | 145:3 | 49:24 70:4 | 240:3 | **authority** |
| 147:13 | 156:17 | **assumption** | 241:5,8,12 | 126:12 |
| 151:22 | 159:25 | 87:25 | 241:23 | 177:19 |
| 159:10,20 | 164:3 | 179:25 | 243:16 | 289:4,8,11 |
| 162:6 | 176:15 | 258:7 | 256:11,14 | 289:16 |
| 172:15 | 186:24 | 276:23 | 257:6,8 | 290:1,7 |
| 188:11 | 189:25 | **astute** | 271:10 | **authoriz...** |
| 195:4 | 190:19 | 166:24 | 280:7 | 221:4 |
| 202:12,13 | 195:12 | **asymptom...** | 281:17,22 | **authorize** |
| 202:14 | 199:12 | 316:25 | 281:24 | 326:8,13 |
| 205:3 | 201:22 | 317:4 | 283:10 | 326:13,17 |
| 208:6 | 226:17 | **Atlas** 267:23 | 293:23 | **authorized** |
| 217:23 | 241:10 | **attached** | 301:10 | 29:14 |
| 232:1 | 262:17 | 8:22 57:17 | 303:7 | 30:14 |
| 239:17 | 292:16 | **attaching** | 335:11 | 326:14 |
| 261:13 | 313:13 | 56:12 | **attenuated** | **authors** |
| 262:3 | 314:4 | **attachment** | 24:24 | 32:10 |
| 269:7 | 315:4 | 38:18 | **attorney** 2:8 | 161:4 |

**DR. ANTHONY FAUCI  11/23/2022**

| | | | | |
|---|---|---|---|---|
| 162:5, 9 | 66:14 | 316:13 | 256:13 | 360:4 |
| 170:18 | 110:24 | 328:20 | 261:23 | **Barrington** |
| 179:23 | 129:9, 19 | 332:6, 12 | 262:15, 19 | 7:24 |
| 180:13, 20 | 151:16 | 332:13, 16 | 263:17 | 248:13, 16 |
| 181:9 | 152:14 | 336:5, 21 | 269:1 | 249:1, 10 |
| 200:18 | 157:24 | 337:3, 5, 20 | 274:5 | 249:12, 14 |
| 251:16 | 158:2, 9, 13 | 338:2, 4 | 286:22 | 249:18, 19 |
| 255:13 | 162:14 | 344:25 | 295:10 | 250:1 |
| 256:9 | 184:1, 7, 8 | **awareness** | 300:13 | 252:18 |
| 267:1 | 185:3 | 195:3 | 313:4 | 254:6, 12 |
| 295:23 | 205:9 | 255:17 | 322:4 | 254:24 |
| **available** | 207:24 | 256:19 | 354:7 | 255:3, 14 |
| 95:2 | 208:3, 6, 9 | **Azar** 256:5 | 355:2 | 258:11 |
| 158:10 | 208:10, 13 | 267:24 | **background** | 260:15 |
| 198:13 | 208:15, 23 | _____ | 144:10 | 264:7 |
| 200:18, 19 | 208:25 | **B** | 271:22 | 266:10 |
| 201:7 | 209:13, 16 | **B** 6:6 | **bad** 109:10 | 267:1 |
| 206:9 | 211:24 | **B-i-r-r-e-l** | 303:20 | 268:6, 22 |
| 316:5 | 212:3, 4, 7 | 212:25 | 304:13 | 269:4 |
| 320:21, 23 | 212:9 | **B6** 206:12 | 310:1 | 276:4, 17 |
| 323:2 | 223:1 | **baby** 354:10 | 311:20, 22 | 277:6 |
| **average** | 224:5 | **back** 35:13 | 323:4 | 278:21 |
| 153:12 | 225:15 | 54:13 64:2 | 329:16 | 279:19 |
| **averages** | 236:1 | 77:7, 17 | **badly** 169:6 | 280:1, 13 |
| 36:12 | 237:25 | 78:3 83:21 | **Baier** 190:5 | 280:17, 21 |
| **avert** 107:14 | 238:11, 22 | 97:9 101:9 | 190:13 | 281:9, 23 |
| **avoid** 107:14 | 239:14, 20 | 123:21 | 228:24 | 282:11 |
| 320:19 | 239:25 | 129:4 | **ban** 335:2, 2 | 283:2 |
| 345:10, 13 | 240:20 | 132:2, 20 | **bank** 158:15 | 285:7, 10 |
| 346:12 | 241:1, 2, 3 | 136:11 | **banned** 335:7 | 290:10, 19 |
| 357:5 | 241:11, 14 | 149:14 | 335:12 | 291:12 |
| **avoiding** | 243:9, 14 | 150:6, 8 | 347:18 | 292:11 |
| 346:2 | 243:17, 25 | 157:20 | **banner** 306:2 | 295:6 |
| **award** 76:6, 9 | 244:3 | 165:3, 24 | **Baric** 32:12 | 296:19, 24 |
| **Award-Wi...** | 251:9 | 166:22 | 32:15 | 297:5, 10 |
| 212:21 | 252:17, 19 | 193:15 | 39:22 | 297:16, 23 |
| **awards** 36:10 | 252:20, 21 | 199:12 | 40:11 | **Barry** 296:2 |
| **aware** 22:5 | 252:23 | 203:22 | 55:25 56:9 | 296:7, 8, 11 |
| 22:12, 15 | 255:13, 18 | 209:24 | 56:16, 23 | **based** 27:23 |
| 22:18, 21 | 275:7 | 213:2 | 57:12 | 42:7 78:8 |
| 25:19 | 280:1, 3, 20 | 219:7, 19 | 60:23 61:2 | 80:6 88:22 |
| 27:10 | 281:21, 21 | 220:9, 13 | 62:13 | 89:9 |
| 31:15, 22 | 282:10, 17 | 221:9 | 71:15 | 180:20 |
| 33:13 34:6 | 282:18, 24 | 223:14 | 119:4 | 196:5 |
| 35:16 | 283:9 | 233:12 | 147:15 | 215:1, 3, 23 |
| 43:23 | 298:15 | 239:2 | 148:24 | 217:2, 2, 9 |
| 60:22 61:1 | 300:18 | 240:13 | 149:6 | 217:13 |
| 61:4, 6 | 306:17 | 247:21 | **Barnes** 1:17 | 223:12, 16 |
| 62:19 | 309:20, 23 | 253:12 | 1:22 9:13 | 231:20 |

| | | | | |
|---|---|---|---|---|
| 236:25 | 145:16 | 82:20,22 | 281:15 | 244:19 |
| 237:4 | 164:7 | 87:24 89:2 | 289:19 | 314:16 |
| 244:10 | 182:17 | 89:9 92:9 | 291:4 | **benefits** |
| 246:12 | 222:15 | 96:1,4 | 295:12 | 225:20 |
| 316:18 | 267:15 | 99:18 | 297:17 | 227:21 |
| 318:16 | **begins** 23:4 | 100:13 | 301:1 | 235:10 |
| 319:24,25 | 39:9,14 | 102:18 | 304:19 | 236:21 |
| 323:13 | 98:3 | 108:10 | 310:1 | **Berenson** |
| **basis** 21:20 | 130:17 | 114:6,13 | 318:19 | 334:23 |
| 81:12,25 | 176:19 | 117:16 | 319:7 | 335:4,18 |
| 170:4 | 267:11 | 120:13 | 326:14 | 335:22 |
| 173:17 | 324:15 | 132:8,14 | 328:10 | 336:2 |
| 191:18 | **behalf** 2:3 | 132:15 | 331:10 | 337:11 |
| 214:6 | 2:14,24 | 133:5 | 342:17,25 | 338:6 |
| 219:17 | 3:12,20 | 136:6,6 | 344:22 | 341:16,20 |
| 221:8 | 4:7,16 | 139:15,25 | 346:13 | 342:1,5 |
| 286:14,19 | 9:19,22 | 155:24 | 351:9,13 | 343:5,17 |
| 317:10 | **Beijing** | 160:21 | 351:14 | 343:20 |
| 349:25 | 166:4,5 | 161:10,10 | 353:25 | 347:18 |
| 350:5,16 | **belief** 138:2 | 166:5,16 | 355:21,23 | 348:8,9,12 |
| 350:18,22 | **believe** | 166:25 | 356:13 | 348:20 |
| 351:4 | 14:18 | 168:5,7,16 | 359:4 | 352:12,13 |
| **basketball** | 16:13,24 | 175:13,13 | **believed** | 352:15,18 |
| 101:6 | 21:5,8,10 | 175:16 | 46:16 | 356:2 |
| **bat** 18:6,8 | 24:25 26:3 | 177:2,21 | 133:20 | **Berkowitz** |
| 18:12 | 30:8 31:16 | 177:22 | 165:10 | 305:6 |
| 22:14 31:8 | 31:17 | 182:13 | **believes** | **Bernard** |
| 33:15,15 | 32:12 33:7 | 189:2,6 | 262:7 | 108:3,6,8 |
| 41:4,9,15 | 33:9,10,20 | 202:24 | **bell** 98:24 | 108:9,10 |
| 43:3 | 34:19,20 | 204:25 | 117:5 | 108:11,13 |
| 144:18 | 36:12 | 205:18,19 | 135:14 | 110:11 |
| 153:22 | 37:13 | 220:12 | 184:16,20 | **best** 15:9 |
| 154:18 | 40:13,15 | 228:3 | 209:12 | 84:10 |
| 156:21 | 40:22,24 | 230:8,16 | 239:5,7 | 217:3 |
| 157:6 | 43:5,22 | 230:17 | 264:22 | 316:2 |
| **Bates** 52:22 | 44:15,21 | 247:22 | 271:1 | 357:16 |
| 54:3 64:24 | 45:15,22 | 249:13 | 285:24 | 358:23 |
| **Baton** 2:21 | 46:15 | 250:18 | 291:20 | 360:9 |
| **bats** 42:14 | 57:19 | 254:25,25 | 292:16 | **Bethesda** |
| 43:1 58:1 | 63:22,23 | 256:21 | 293:15 | 1:11,19 |
| 198:16 | 66:2,20 | 258:1,14 | 337:5 | 4:24 9:12 |
| **began** 317:5 | 67:5,6,16 | 259:1,14 | 338:7 | **better** 12:4 |
| 351:22,23 | 72:12 | 265:12 | 343:20 | 58:23 |
| **beginning** | 73:11 75:4 | 269:4 | 349:16 | 79:17 |
| 31:24 32:1 | 75:8,8,15 | 276:20 | 352:15 | 260:4 |
| 32:4 34:4 | 75:15 76:2 | 277:12 | **benefit** | 352:24 |
| 34:4,14,15 | 77:4 78:4 | 278:19,20 | 15:15,17 | 354:11 |
| 101:12 | 78:19 80:4 | 278:21 | 221:5,8 | **beyond** |
| 121:11 | 81:8,20,23 | 279:21 | 225:3,13 | 122:22,23 |

DR. ANTHONY FAUCI  11/23/2022

| | | | | |
|---|---|---|---|---|
| 358:14 | 353:6,8 | 52:23 | 271:22 | 132:11 |
| **Bhattach...** | **blaming** | 72:23 | **briefly** | 136:13 |
| 2:25 | 102:21,21 | 75:11 | 167:18 | 137:5,6 |
| 251:18 | 106:4 | 86:19,20 | 212:19,20 | 144:24 |
| 256:4 | **blanks** | 115:11 | 271:2 | 145:16 |
| 267:20 | 294:22 | 163:23 | 328:4 | 211:22 |
| 279:4 | **blathering** | 164:4 | **bring** 44:9 | 284:25 |
| 291:15 | 74:4 | 179:12 | 165:15,20 | 288:15 |
| **Biden** 1:8 | **blind** 244:10 | 201:20 | **bringing** | **bunch** 226:2 |
| 9:7 10:16 | 246:12 | 252:8 | 64:4 257:6 | 229:1 |
| 344:11 | **blob** 338:16 | 272:20 | 337:4 | 295:2 |
| 361:7 | 338:17 | 275:15 | **brings** 303:6 | 311:8 |
| 362:2 | **block** 152:9 | 284:25 | **broad** 24:7 | 321:9 |
| **big** 22:25 | 303:11 | 298:22 | 24:11,23 | 330:14 |
| 235:4 | 308:5 | 305:3 | 118:24 | **buried** |
| 351:21 | 324:21 | 337:8,11 | 132:19 | 280:23 |
| **Bill** 104:11 | **blocking** | **bought** 316:4 | 140:17 | **Burkes** 305:4 |
| 202:2,2,10 | 340:6 | **Box** 3:15 | 309:1 | **Burkholtz** |
| 202:11,19 | **blog** 7:8 | **Boy** 109:10 | **broker** 103:6 | 305:4 |
| 202:20 | 182:5,12 | **Branch** 4:21 | **brought** 30:9 | **Burns** 3:13 |
| 338:22 | 182:14,17 | **break** 83:16 | 30:9 31:17 | 3:14 |
| **Billet** 38:9 | 184:2,12 | 130:10 | 39:3 42:21 | **Burwell** |
| 301:16,17 | 184:15,17 | 148:6 | 46:2,19,20 | 313:6,9 |
| 309:2 | 184:19 | 149:24 | 46:23 58:2 | 317:22 |
| 324:10 | 186:2,21 | 203:17 | 141:4,7,9 | **busy** 191:22 |
| 327:2,8,12 | **bluntly** | 253:4,5,6 | 184:10 | 191:23 |
| **billion** 72:1 | 260:2 | 312:23 | 208:12 | 195:14 |
| 260:18 | **board** 351:11 | 323:24 | 209:21 | 276:11 |
| **Bio** 174:14 | 351:14,15 | **Breitbart** | 239:3 | **buy** 314:12 |
| **Biohub** | **Bob** 35:12,14 | 7:20,21 | 256:11 | 317:23 |
| 133:11,12 | 50:24 51:5 | 232:16,20 | 293:23 | 321:9,25 |
| 133:13 | 51:6 | 234:3 | **BSL-2** 116:15 | **buying** |
| **biological** | **bodies** 169:7 | 240:6 | 117:10,12 | 320:20 |
| 143:6 | **body** 39:8 | **Breitbart's** | 117:14 | **buzz-buzz** |
| 145:21 | 103:2 | 240:17 | 118:9,20 | 78:21 |
| 146:2 | 107:8 | **Brennan** | 119:8,9 | ─────── |
| **biology** | **bold** 288:15 | 218:21 | **BSL-3** 117:23 | **C** |
| 15:11 | **bolded** | **Bret** 190:5 | **Budget** 22:1 | **C** 3:13 6:1 |
| **biosafety** | 121:11,14 | 190:13 | 22:2 | 9:1 |
| 16:22,22 | **booster** | 228:24 | **building** | **calendar** |
| **Birrel** | 359:8 | **briefed** | 1:19 4:23 | 6:25 66:23 |
| 212:25 | **booted** 336:3 | 59:12 71:3 | 165:8 | 67:2 |
| 213:2,6 | **bother** 236:2 | **briefing** | 300:9 | 148:19 |
| **bit** 26:24 | 236:13,22 | 39:3 43:6 | 308:8 | 149:10 |
| 78:6 | 236:23 | 196:25 | **bull** 110:1 | **California** |
| 188:23 | **bottom** 23:3 | 197:11 | **bullet** | 133:15 |
| 197:23 | 23:6,8,9 | 201:4 | 110:14,18 | 174:17 |
| 200:24 | 26:20 | 202:13 | 130:20 | **call** 10:24 |
| 228:7 | 47:25 | 208:1 | 131:2,18 | 34:18,22 |

DR. ANTHONY FAUCI  11/23/2022

| | | | | |
|---|---|---|---|---|
| 35:9 43:20 | 131:3,8,13 | 118:13 | 361:10 | 332:6,17 |
| 44:2,3,8 | 131:16 | 138:17 | 362:2 | **CDC's** 331:3 |
| 44:14,18 | 135:23 | 205:25 | **cases** 153:25 | **ceased** |
| 45:24 | 136:14 | 269:19 | 154:20 | 359:23 |
| 46:13,21 | 161:8,12 | 287:5 | **casual** 21:18 | **cell** 58:17 |
| 51:20 | 161:13 | 289:17,19 | 260:6 | 59:1 |
| 58:19 59:1 | 173:19 | 290:14 | **casually** | 178:10 |
| 59:22 60:1 | 175:13 | **capacity** | 338:5 | 203:1 |
| 63:10,13 | 205:9 | 12:19 | **cat** 144:18 | **censor** |
| 63:16,20 | 277:13 | 18:18 | **catch** 84:18 | 232:17 |
| 64:6,11,13 | 325:23,24 | 25:19 | 84:22 | 239:11 |
| 66:16,18 | 355:22 | **Capitol** | 256:22 | **censored** |
| 66:23 67:4 | **called** 1:14 | 232:18 | **catching** | 208:2 |
| 73:21 | 10:3 13:15 | 234:22 | 210:4 | 280:2,3,13 |
| 74:20 75:3 | 18:5 20:11 | **caps** 300:14 | **categori...** | 280:17 |
| 75:5,10 | 33:14 | **care** 17:11 | 24:12 | 282:10 |
| 77:1,2,4 | 37:25 61:2 | 165:9 | **categorize** | **censoring** |
| 77:14 | 62:22 | 231:13 | 194:14 | 280:6 |
| 78:10,23 | 123:10 | 237:2 | **categorized** | 281:23,25 |
| 79:5,24 | 126:24 | 302:2 | 276:19 | 281:25 |
| 80:18,22 | 226:1 | **careful** | **category** | 282:18 |
| 81:17,18 | 227:15 | 11:14 | 207:17 | **Censors** |
| 82:14,18 | 248:21 | 13:11 | 338:25 | 212:21 |
| 83:3 85:5 | 250:7 | 80:12 | **Catherine** | **center** 1:19 |
| 85:8,20 | 261:24 | 177:5 | 330:19 | 4:22 9:12 |
| 86:8,13,16 | 271:22,24 | 320:14 | **cause** 217:7 | 143:7 |
| 86:17 | 272:13 | **carefully** | 225:3 | 244:17 |
| 87:23 88:2 | 283:25 | 18:16 78:7 | **caused** | 293:5 |
| 89:10 90:9 | 286:14 | 80:11,25 | 219:13 | 324:22 |
| 90:21 91:2 | 295:20 | 81:9 | **causing** | **centers** 35:7 |
| 91:5,7,7 | 305:4 | 119:12 | 169:3 | 230:14 |
| 91:11,13 | 307:20 | 306:14 | 182:21 | 231:17 |
| 92:10,13 | 308:11 | **cares** 237:3 | 183:13 | 332:23 |
| 92:20,23 | 309:15 | 265:23 | **CBS** 347:2 | **CEO** 76:3 |
| 92:24 93:2 | 314:4 | **Carlos** | **cc** 38:14 | 286:13 |
| 93:5 94:4 | 328:6,15 | 296:16 | 55:5 97:22 | 293:5 |
| 94:6 95:2 | **calling** | **Carol** 298:23 | 97:25 | **certain** 27:4 |
| 95:8,14 | 348:20 | 299:8,21 | 187:16 | 27:24 |
| 97:2,3,24 | 356:3 | 330:12,13 | **CC'd** 55:6,9 | 29:10 30:7 |
| 105:21 | **calls** 24:4 | 330:22,23 | 55:13 | 32:9 33:9 |
| 109:7,14 | 24:17 | **Carolina** | **CC'ing** | 33:24 |
| 109:22 | 29:18 | 32:13,20 | 204:14 | 44:21 45:7 |
| 110:7 | 35:21 | **Carrie** 329:9 | **CDC** 299:13 | 96:2 |
| 112:22 | 41:11 46:4 | **carry** 333:24 | 306:3,14 | 134:20 |
| 113:22 | 62:7 87:22 | **case** 1:7 9:8 | 315:21 | 146:4 |
| 115:24 | 108:18 | 44:9 114:8 | 316:19 | 147:20 |
| 120:12 | 112:23 | 194:20 | 330:11,13 | 154:8 |
| 123:19 | 113:16 | 232:3 | 330:19,25 | 162:14 |
| 124:1 | 116:20 | 287:15 | 331:10 | 177:22 |

DR. ANTHONY FAUCI  11/23/2022

220:3
250:13
275:1
285:12
314:24
323:13
certainly
11:16,22
12:8 16:25
22:17,18
31:24 33:3
56:3,15,17
64:17
72:12,16
74:9 81:22
83:4 91:4
102:5
106:5,12
124:22
133:22
134:25
147:19
152:14
156:2
161:1
170:4
177:25
225:8
229:16
259:25
265:12
281:18
282:19
345:10,25
356:13
certainty
96:3
CERTIFICATE
360:1
certify
360:6
363:5
cetera 39:23
162:13
chain 94:10
115:7
123:6
170:13
266:8

298:22
305:3
307:18
323:25
324:15
330:10
353:5
challenge
258:25
259:13
Chan 133:11
133:11,14
174:7,8,15
174:16
chance 166:4
change 52:9
318:16
362:7,11
362:15,19
362:23
changed
211:25
316:21,21
317:11
changes
172:9
361:12
363:7,10
channel
177:21
characte...
121:2
characte...
20:17 42:9
characte...
334:2
chat 98:9,21
chatting
84:24
85:13
check 91:12
cheering
341:23
343:12
chief 10:15
10:17 38:3
38:23 47:2
75:14,16
76:4

335:24
chiefs
231:16
332:22
China 34:7
41:3 42:15
42:21 43:1
57:22
59:14,17
62:21
63:17,19
67:15,17
67:18,22
70:11,18
71:4,24
138:15,22
138:24
139:6,10
139:11,13
139:22
163:13
164:22
165:13
167:23
198:3
261:11,18
261:23,24
262:12,20
263:3
Chinese
102:21
106:4
143:5
157:17
164:7,11
165:7
166:1
167:3,5,7
168:8
192:24
193:11
194:18
209:9,17
209:25
Chinese-...
98:17
chip 104:12
106:14
338:23

339:4,17
Chmura
205:15,18
chose 306:3
Christian
34:21
43:20 44:4
44:5,23
45:13,14
45:21,21
45:23
46:10 48:3
50:8 60:2
61:18,20
74:25 81:8
81:22 84:6
170:14
195:24
196:9
CHRISTOPHER
4:18
Christop...
4:25
chronology
283:20
circle 150:8
circulate
248:18,20
274:6
276:22
277:1
circulated
205:20
circulating
31:7 157:6
250:13
274:22
circumst...
28:1
144:16
circumst...
154:1,10
154:17,21
154:25
161:16
citations
203:11
cities 166:5
citing 102:4

331:15
332:6
City 2:10
40:23
civet 144:18
Civil 3:4
claim 217:9
247:7
285:6,18
331:4,15
331:16
claimed
209:10,19
claims 103:5
103:9,22
104:19
182:20
183:12,17
211:5,6,12
211:22
214:1,4,7
214:25
215:3,23
217:2
285:2
331:4
332:7
333:15
Clara 293:12
293:18
clarified
134:3
clarify
11:18
44:12
283:1
344:7
clarity
11:15 17:8
17:14
65:18
Clarke 328:6
328:7,9,10
329:20,25
336:19,20
clause 27:25
cleaner
123:15
clear 17:16

| | | | | |
|---|---|---|---|---|
| 21:20 | 190:20 | 51:13 52:1 | collection | 269:16 |
| 80:15 87:5 | 216:5,12 | 52:7,16 | 84:3 | 270:11,15 |
| 121:8 | 253:25 | closer 81:1 | Collin | 271:13 |
| 137:21 | 254:15,18 | 81:2 | 262:11 | 272:1,4,16 |
| 144:3,13 | 259:21 | closest | Collins | 272:25 |
| 144:17 | 260:21,25 | 70:17 | 13:14 15:7 | 273:16,25 |
| 162:11 | 260:25 | cloth 321:18 | 66:15 67:6 | 275:3,13 |
| 174:13 | 261:6,10 | Club 174:14 | 67:9,12,14 | 281:1 |
| 179:4 | 261:17 | clues 49:16 | 67:20 68:1 | 295:14 |
| 184:20 | 262:11,18 | 50:3 | 75:5 82:23 | Collins' |
| 215:2 | 262:19 | cluster 31:7 | 84:8 89:22 | 279:12 |
| 229:19 | 263:2 | 39:14 | 91:1 92:3 | Collins's |
| 232:3 | 266:9 | 132:4 | 93:5,11 | 269:22 |
| 273:25 | Clifford | CNBC 8:5 | 94:2,11,21 | Columbia |
| 302:16 | 139:15 | CNN 341:5 | 108:2 | 40:12,24 |
| 309:18 | clinical | 342:10,17 | 109:15,23 | column 179:6 |
| 316:22,25 | 165:6 | 343:2 | 110:11 | come 14:5,20 |
| 317:3 | 214:10,12 | coauthor | 111:18,24 | 22:20 78:7 |
| 345:7 | 216:6,14 | 13:14,19 | 115:8 | 81:3,6 |
| 353:22 | 216:15 | Coauthored | 116:14,18 | 107:4 |
| clear-cut | 217:10 | 56:7 | 120:4 | 122:5,11 |
| 217:10 | 221:1 | coauthors | 121:20 | 122:13 |
| clearcut | 224:10,12 | 35:18 | 123:8 | 129:25 |
| 225:10 | 227:9 | 56:23 | 125:9 | 133:3 |
| clearly 21:4 | 231:9 | Cohen 49:6 | 126:23 | 143:17 |
| 60:25 | 247:5 | 49:16 50:9 | 131:8 | 144:9,11 |
| 82:25 | 260:25 | 61:18,24 | 159:16 | 145:8,11 |
| 121:15 | 261:2,3,7 | 62:14 | 162:18 | 146:3 |
| 132:16 | 324:20 | cohorts | 163:5 | 149:16 |
| 152:3 | 333:1 | 42:14 43:1 | 170:15 | 168:16 |
| 180:4 | 353:20,24 | cold 138:6 | 171:9 | 202:25 |
| 188:9 | 354:15 | collabor... | 182:6,13 | 219:1,10 |
| 189:9,16 | clinician | 37:6,10 | 182:19 | 245:1 |
| 194:17 | 166:24 | collabor... | 184:1 | 247:6 |
| 197:20 | clinicians | 37:8 58:24 | 186:11,19 | 248:2 |
| 225:3 | 216:13 | collabor... | 187:3,16 | 264:24 |
| 263:22 | clip 341:16 | 59:13 | 188:3 | 268:13 |
| 276:6 | 341:25 | collabor... | 189:18,20 | 293:22 |
| 322:16 | 342:3 | 37:11 | 190:15 | 305:24 |
| 323:6 | 343:21 | 42:17 | 193:22 | 320:5 |
| 358:16 | close 39:13 | collater... | 199:3 | 323:15 |
| click 255:7 | 76:17 | 17:3 | 200:22 | comes 107:13 |
| 284:13 | 84:24 | colleague | 253:24 | 142:11 |
| client | 85:16 | 252:24 | 254:5 | 207:13 |
| 299:10 | 86:19,19 | colleagues | 257:15 | 221:7 |
| Cliff 139:1 | 108:13 | 40:9 | 258:7 | coming 145:5 |
| 139:25 | 312:1,2 | 339:22 | 262:19 | 164:22 |
| 163:18 | 322:5 | collect | 266:9 | 219:23 |
| 167:19 | closely | 214:17,18 | 268:20 | comment |

DR. ANTHONY FAUCI  11/23/2022

| | | | | |
|---|---|---|---|---|
| 143:23 | communic... | 287:4,10 | 343:9 | 151:16 |
| 172:20 | 167:2,5,7 | 287:16,25 | **compatible** | 217:12 |
| 193:15 | 186:11,15 | 306:23 | 70:25 78:2 | 285:11 |
| 199:19 | 285:25 | 308:16,18 | 81:14 82:1 | **concern** |
| 233:15 | 296:4 | 308:21,22 | 82:25 | 34:23 35:2 |
| 245:3 | 347:13 | 309:2,21 | 126:14 | 35:10 |
| 260:6 | **communic...** | 310:3,11 | 139:19 | 43:18 46:2 |
| 344:24 | 153:17 | 310:15 | 267:6 | 51:19 |
| 357:24 | **communic...** | 324:3,11 | **competent** | 52:10,13 |
| 358:2 | 96:15 | 324:19,25 | 139:17 | 52:18 |
| **commentary** | 186:7,9 | 325:9,11 | **complaining** | 62:23 63:8 |
| 202:22 | 237:25 | 325:23 | 335:6,9 | 67:13,13 |
| 203:1 | 238:2,4,7 | 326:1,9 | **completely** | 70:21 71:5 |
| 266:14,15 | 238:10,12 | 327:3,9,11 | 59:20 | 71:14 |
| **commented** | 238:17,23 | 327:13,16 | 80:16 | 78:10,20 |
| 187:3,4 | 239:4 | 328:11 | 101:13,24 | 79:13,15 |
| **commenting** | 265:4 | 336:1 | 113:8 | 80:5,9,13 |
| 347:2 | 290:17 | 347:4 | 145:2 | 80:15,16 |
| **comments** | 300:19 | 351:10,16 | 207:12 | 81:12,13 |
| 114:13 | 327:22 | **community** | 288:7 | 110:25 |
| 120:16 | 328:21 | 28:9,10 | **completing** | 155:3,12 |
| 124:23 | 347:8 | 58:1 169:2 | 359:20 | 195:11 |
| 160:10 | **communic...** | 170:7 | **complicated** | 217:1 |
| 172:2,6,13 | 38:11 83:9 | 175:5 | 120:19 | 228:13 |
| 172:20 | 96:17 | 216:1 | 124:13 | 321:22 |
| 201:3 | 110:5 | 217:1 | **component** | **concerned** |
| 207:25 | 147:4 | 230:7,21 | 122:14 | 59:16,19 |
| 219:1,10 | 255:22 | 230:25 | 267:4 | 103:8,15 |
| 227:14 | 268:14 | 231:1,5,15 | 273:10 | 103:18 |
| 233:4,5 | 301:2,5,13 | 248:19 | **compound** | 104:3,14 |
| 341:4,9 | 302:14,16 | 259:10 | 154:23 | 105:18,23 |
| 343:2,16 | 304:21 | 269:3 | 281:3 | 106:1,7,8 |
| **commission** | 312:10 | 273:3 | 334:12 | 188:9 |
| 360:22 | 326:15,19 | 316:6,24 | 347:6 | 189:13 |
| 363:24 | 330:1 | 359:7 | 356:10 | 225:11 |
| **commissi...** | **communic...** | **companies** | **compounds** | 228:10 |
| 347:1 | 38:6 72:7 | 269:18 | 281:3 | 235:11 |
| **common** 38:22 | 82:5,13,17 | 270:23 | **comprised** | 236:3 |
| 166:18 | 83:2,6 | 344:18 | 247:25 | 274:20 |
| 245:22 | 96:20 | **company** | **conceivable** | 303:8 |
| **communicate** | 99:16 | 151:22 | 184:12 | 310:16 |
| 186:5 | 125:12 | 286:9 | 191:6 | 312:20 |
| 290:11 | 147:2 | 335:3,20 | **concentrate** | **concerning** |
| 295:23 | 180:22,23 | **compared** | 191:1 | 266:16 |
| 296:18 | 213:7 | 263:5 | 243:17 | 295:12 |
| 301:18 | 264:25 | 322:15 | 312:5 | **concerns** |
| 325:11 | 268:8,11 | **comparing** | **concept** | 34:13 79:1 |
| 326:15,24 | 270:22 | 246:6,10 | 25:19 | 89:5 96:17 |
| 347:11 | 274:10 | 247:15 | 43:24 | 98:21 99:2 |

**DR. ANTHONY FAUCI  11/23/2022**

| | | | | |
|---|---|---|---|---|
| 102:14 | 85:5 86:8 | 247:1 | 123:19 | construct |
| 118:18 | 86:13 | confused | 334:4,9 | 121:16 |
| 198:2 | 87:22 | 26:10 | conseque... | 122:1 |
| 274:22 | 90:12 91:2 | 33:10 53:2 | 88:19 | 162:1 |
| conclave | 94:4,6 | 53:22 | conserva... | 180:5 |
| 108:3,16 | 105:21 | 61:25 | 341:16,25 | 181:9 |
| 108:22 | 112:22 | 200:24 | consider | 185:23 |
| 109:11 | 120:12 | 233:11 | 103:3 | consult |
| conclude | 149:14 | 243:2 | 123:20 | 247:22 |
| 288:20 | 199:15 | 299:3 | consider... | 272:4 |
| concluded | 201:8 | 306:21 | 195:11 | 273:18 |
| 219:12 | 204:11 | confusing | 216:21 | 318:12 |
| concludes | 217:24 | 16:10 | 258:5 | consulted |
| 185:22 | 218:3 | 17:15 | consider... | 220:17 |
| conclusion | 229:9 | 245:11 | 333:25 | 273:24 |
| 78:8 81:1 | 230:8 | 246:23 | consider... | consulting |
| 81:4,7,11 | 232:19 | Congratu... | 316:18 | 268:15,16 |
| 82:24 | 234:5,8,9 | 11:2 | 321:11,24 | 307:7 |
| 121:19 | 234:21 | Congress | considered | contact |
| 122:5 | 240:7 | 31:19 | 28:15 30:1 | 95:20 96:5 |
| 162:5,15 | 359:5 | 82:21 | 46:16 | 130:21 |
| 162:16,23 | conferences | congress... | consistent | 140:20 |
| 163:1 | 198:24 | 39:2 | 56:3,15,17 | 162:13 |
| 165:18 | 200:3,5,15 | connect | 56:19 | 165:8 |
| 166:16,21 | confidence | 324:25 | 71:21 | 186:19 |
| 180:9,12 | 73:16,22 | 325:8 | 91:10 | 187:1 |
| 180:19,20 | 74:8,13 | connected | 126:13 | 291:11 |
| 180:24 | 88:8,11 | 75:9 | 160:3 | 301:5 |
| 181:5,6,8 | 123:13 | connecting | 198:18 | 307:8 |
| 195:9 | 124:6 | 202:17 | 199:22,23 | contacted |
| 247:6 | confident | connection | 200:9 | 151:21 |
| 248:2 | 190:7 | 20:3,18,25 | 219:20 | 186:25 |
| conclusions | confiden... | 115:24 | consiste... | 202:17,18 |
| 288:25 | 7:6 8:11 | 117:25 | 246:8 | contacting |
| 320:13 | 8:12,13,14 | 244:8 | 247:18 | 95:25 |
| concrete | 8:15,16 | 269:22 | consisting | contacts |
| 16:18 | 178:14 | 274:15 | 287:5 | 269:17 |
| condition | confiden... | 291:20 | conspiracy | contain |
| 242:1 | 73:24 | 294:23 | 78:12 | 166:2 |
| conditions | configur... | 296:20 | 143:18,19 | containment |
| 15:3,19 | 34:23 | 338:4,6,15 | 143:19 | 117:2 |
| 118:11,20 | 82:25 | 351:17 | 185:22 | content |
| 119:9 | confirmed | connections | 188:16,21 | 21:17 |
| conducted | 311:17 | 227:25 | 188:25 | 100:5 |
| 9:11 30:4 | conflate | 272:11 | 190:22 | 152:9,9 |
| 274:10 | 157:13 | cons 81:10 | 193:23 | 208:16 |
| conducting | conflating | 358:4 | 194:1 | 212:1 |
| 15:4 | 157:4 | consensus | constitutes | 241:15 |
| conference | confounding | 80:18 | 147:11 | 270:12,16 |

DR. ANTHONY FAUCI  11/23/2022

| | | | | |
|---|---|---|---|---|
| 283:1 | contribu... | 152:6 | 324:10 | correct |
| 290:5 | 345:14 | 330:22 | core 131:3 | 14:23 33:7 |
| 292:8 | contribu... | 287:25 | Cornell | 41:5,21 |
| 301:7 | 133:25 | 289:13 | 231:18 | 48:5 51:17 |
| 306:18 | control 35:7 | 292:3,4,7 | corner | 54:19,21 |
| contest | 164:22 | 327:21 | 272:20 | 54:23 |
| 258:20 | 165:15,21 | 352:9 | coronavirus | 56:21,25 |
| contested | 168:6,17 | convoluted | 18:6,8,12 | 58:14,17 |
| 358:6 | 246:7,11 | 334:14 | 22:14 34:7 | 60:23 |
| context | 246:21,22 | cooler 169:6 | 41:3,4,10 | 61:15 |
| 12:22 | 246:24,25 | cooperation | 41:15 | 68:14 |
| 14:23,25 | 247:2,15 | 102:22 | 42:21 | 77:13 84:6 |
| 15:6 29:25 | 248:9 | Coopman | 49:16 | 84:7,18 |
| 31:18 | controlled | 97:23 | 59:18 | 85:2,3 |
| 47:19 | 167:24 | coordinate | 60:14 | 86:5 88:8 |
| 116:23 | 211:24 | 279:16 | 70:20 | 90:23,24 |
| 126:5 | controlling | coordina... | 72:14 | 92:4,15,17 |
| 128:8 | 168:2 | 279:22 | 132:10 | 93:12 |
| 129:23 | 262:1 | coordina... | 143:7 | 94:11,22 |
| 134:8,16 | controversy | 279:24 | 145:19 | 95:3,4,11 |
| 134:16,20 | 213:21 | copied | 154:18 | 98:11 |
| 135:5,10 | convene | 128:16 | 182:21 | 106:24 |
| 145:9,12 | 106:24 | 153:3 | 183:13,18 | 109:9 |
| 149:13 | 107:7 | 160:13 | 190:7 | 111:21 |
| 150:13 | 109:16 | 190:21 | 196:25 | 112:16,19 |
| 153:11 | convened | 260:21,24 | 197:6,9 | 112:20 |
| 156:16 | 107:17 | 261:7,19 | 201:25 | 113:9 |
| 158:13 | 131:9 | 308:11 | 204:11 | 115:9 |
| 169:4 | convening | copies 17:25 | 208:1 | 118:4 |
| 173:25 | 103:2 | 96:13 | 209:10 | 121:17,18 |
| 174:16 | 111:21 | 110:11 | 211:12 | 123:16,17 |
| 252:22 | 126:8,15 | 114:9 | 214:2,9,15 | 123:21 |
| 256:13 | 126:16 | 138:11 | 215:24 | 124:5 |
| 334:25 | 137:23 | 205:14 | 218:7 | 125:10 |
| 343:7 | conversa... | 361:9 | 227:11 | 126:25 |
| continue | 163:4 | copy 119:22 | 229:10 | 127:2 |
| 27:24 | 168:4 | 159:15 | 232:18 | 128:14,21 |
| 102:23 | 180:14 | 182:5 | 271:9 | 128:23 |
| continued | 213:11 | 185:15 | 278:3 | 129:2,6 |
| 224:2,6 | 255:22 | 201:25 | 306:1 | 130:18,22 |
| continuing | 258:15 | 237:18 | 321:1,12 | 130:23,25 |
| 224:8 | 263:1,2 | 249:1,10 | 336:9,18 | 131:21 |
| contradict | 289:6,9 | 253:25 | 344:15 | 133:2 |
| 322:6 | 291:14,24 | 283:15 | coronavi... | 143:9 |
| contrary | 292:2,8 | 284:16 | 67:22 | 144:3 |
| 343:14 | 302:5 | 330:23 | coronavi... | 146:23 |
| 346:13 | conversa... | 346:17 | 31:8 33:16 | 149:3,4 |
| contribute | 140:20 | 361:12 | 37:4 39:24 | 150:11,15 |
| 288:21 | 147:6,7,8 | copying | | 160:15,16 |

DR. ANTHONY FAUCI  11/23/2022

| | | | | |
|---|---|---|---|---|
| 161:5,9 | 233:3,6,10 | 327:3 | 94:13 | 13:3 23:3 |
| 162:2,3 | 233:24,25 | 328:16 | 96:12 | 28:25 |
| 163:20,21 | 234:11,16 | 330:12,22 | 119:21 | 29:24 |
| 164:12,25 | 235:8 | 330:25 | 120:25 | 30:12 34:9 |
| 165:1,16 | 237:13 | 331:1,6,20 | 127:17 | 34:11 |
| 165:17,21 | 240:7 | 335:24 | 138:10 | 52:17 |
| 166:11,15 | 242:23 | 341:5,17 | 144:25 | 61:12 71:1 |
| 167:1,20 | 243:24 | 341:18 | 145:23 | 129:3,5,7 |
| 167:21,24 | 245:20,23 | 342:11 | 148:5 | 141:23 |
| 168:24 | 246:1 | 344:15 | 150:24 | 153:12 |
| 171:3,4,5 | 249:25 | 348:11,15 | 178:6 | 205:10 |
| 171:6,10 | 250:8,21 | 348:25 | 209:14 | 212:5 |
| 172:4,5,10 | 252:12 | 350:20 | 294:18 | 219:20 |
| 173:4,9,10 | 254:7,13 | 357:11,18 | 346:17 | 225:16 |
| 177:3 | 254:14,16 | 358:24 | 360:11,14 | 242:21 |
| 179:19 | 254:17,21 | 363:9,13 | **count** 53:25 | 295:11 |
| 180:6 | 254:22 | **corrections** | **counter** 78:1 | 313:18 |
| 183:19,20 | 262:24 | 361:12 | 260:20 | 314:4 |
| 183:25 | 263:25 | **correctly** | 357:7,16 | **course** 93:5 |
| 186:3,4 | 264:4,8,9 | 70:5 | 358:23 | 136:1 |
| 188:17 | 264:11 | 143:14 | 359:9 | 247:17 |
| 190:8,17 | 266:10,22 | **correspo...** | **countera...** | **court** 1:1 |
| 190:22 | 268:3,6,7 | 205:21 | 257:25 | 9:10,24 |
| 192:7 | 271:10,11 | **correspo...** | 258:24 | 12:10 |
| 193:24 | 273:4,12 | 195:24 | 259:2 | 17:23 |
| 194:14,25 | 275:24 | **CORY** 5:2 | **countering** | 26:23 |
| 196:2,3,6 | 276:14 | **cosignature** | 357:8 | 60:18 |
| 196:12,16 | 278:1,5,6 | 257:9 | **counters** | 74:15 |
| 197:1,9,10 | 278:14,15 | **cost** 167:24 | 107:4 | 150:22,24 |
| 197:12 | 279:14 | 168:2,6 | **countries** | 225:19 |
| 198:3,6,19 | 284:4,5 | **coughs** | 140:7 | 227:19 |
| 199:5 | 286:15 | 314:16 | **country** 46:8 | 228:2,7 |
| 200:19,23 | 288:16,22 | **counsel** 1:14 | 117:15 | 230:9 |
| 203:15 | 288:23 | 4:19 6:2 | 170:2 | 234:23 |
| 204:8,9,12 | 295:6 | 9:16 10:3 | 216:13 | 236:21 |
| 204:16,17 | 299:11,19 | 10:6 12:15 | 230:15 | **courteous** |
| 206:22 | 300:16 | 14:8 17:25 | 231:15,18 | 171:17 |
| 209:10 | 303:13,19 | 26:13,24 | 231:20 | 172:21 |
| 211:13 | 303:25 | 42:1 43:11 | 232:11 | **Courtney** |
| 212:22 | 304:14,16 | 47:18 | 248:1 | 38:9 |
| 218:7,10 | 306:4 | 52:24 53:1 | 276:25 | 301:16,17 |
| 218:11,14 | 309:9,10 | 54:2 60:18 | 297:19 | 301:23 |
| 218:15,17 | 309:13,18 | 65:19 | 298:4 | 309:2 |
| 219:14 | 311:19 | 68:15 | 321:22 | 324:10 |
| 222:12,22 | 317:8,15 | 69:10 73:2 | 332:22,23 | 327:2,8,12 |
| 223:21 | 317:19 | 74:15 | **County** | 327:21 |
| 227:12,13 | 320:1,24 | 76:16 | 293:12,18 | **CoV** 23:5,11 |
| 229:11 | 324:5,11 | 90:10 | 363:3 | 39:15 |
| 231:10 | 324:12,16 | 93:22 | **couple** 11:1 | **cover** 182:10 |

DR. ANTHONY FAUCI  11/23/2022

| | | | | |
|---|---|---|---|---|
| 182:11 | create 15:5 | 65:10 | 40:10 41:2 | 243:7 |
| **coverage** | 24:24 | 347:1 | 117:8 | 286:25 |
| 185:3 | 78:21 | **Curry** 101:5 | 129:10,21 | 344:5 |
| **covers** 22:25 | **created** | 101:5 | 130:2 | 362:3 |
| **COVID** 40:17 | 156:13 | **cursorily** | 140:20,25 | **dated** 72:24 |
| 42:16 | **creating** | 240:1 | 141:17 | 148:19 |
| 188:20 | 310:10 | **curtail** | 146:7,13 | 152:22 |
| 213:9 | **creation** | 166:18 | 146:16,22 | 159:3 |
| 224:7,25 | 59:18 | **curtailing** | 147:2,10 | 167:19 |
| 226:2 | **credentials** | 262:8 | 204:4,24 | 173:11 |
| 236:4 | 279:6,7 | **curtailment** | 205:1 | 176:4 |
| 275:17 | **credibility** | 151:17 | 206:5 | 186:1 |
| 331:5,9 | 137:24 | **cut** 211:20 | 207:16,19 | 197:1 |
| 354:2 | **credit** | **cuts** 356:13 | **data** 37:2,9 | 204:4,4 |
| 355:5,5,9 | 177:18 | **cutting** 42:2 | 37:15 80:4 | 222:8 |
| **COVID-19** | **credits** | ——————— | 80:6,10,11 | 242:19 |
| 31:25 | 177:11 | **D** | 126:16 | 253:19 |
| 163:12 | **criteria** | **D** 2:5,7 9:1 | 189:2,7,12 | 263:12 |
| 170:18 | 221:3 | 222:4 | 191:16 | 271:5 |
| 173:14 | **critic** 336:2 | **D.C** 3:7 4:3 | 193:8 | 277:25 |
| 175:20 | **critical** | 361:6 | 215:1,3,17 | 294:10 |
| 184:3 | 27:24 | **damage** 258:5 | 215:23 | 298:24 |
| 185:22 | 280:24 | **Dan** 135:8 | 217:2,2,9 | 341:1 |
| 196:18 | 295:5 | **danger** 117:1 | 217:10,25 | 344:4 |
| 210:17,24 | 348:8 | 323:7 | 218:13 | **dates** 22:23 |
| 211:23 | **criticism** | **dangerous** | 219:17 | 44:17 |
| 212:1 | 296:23 | 14:6,20,24 | 220:25 | 233:11 |
| 213:23 | 297:4 | 15:2,5,23 | 221:7 | 317:20 |
| 219:13 | **criticize** | 17:3 24:1 | 223:16 | 322:9 |
| 237:20 | 343:5 | 271:25 | 236:25,25 | **daughter** |
| 245:20 | **criticizing** | 272:6,13 | 237:4 | 100:1,2,22 |
| 284:3,20 | 212:22 | 272:14 | 247:2 | 350:21 |
| 306:4 | 244:15 | 273:12 | 259:12 | 351:9 |
| 313:19 | 279:18 | 274:2,9 | 320:1 | **David** 204:14 |
| 318:6 | **Cross** 299:8 | 276:18 | 323:13,17 | 204:18,18 |
| 331:23 | **culture** | 278:4,14 | 337:15 | 204:20,21 |
| 332:3 | 281:25 | 278:25 | 343:9 | **day** 44:15 |
| 347:3 | **curb** 151:13 | 306:19 | 353:8 | 46:21 |
| 353:11,23 | **curious** | 307:9 | 354:5 | 51:21 59:1 |
| 358:8 | 102:13 | 356:20 | **databases** | 59:4 61:6 |
| **CPAC** 341:17 | 237:19 | 357:6,20 | 158:11 | 63:20 66:3 |
| 341:22 | **current** | **Daniel** 9:14 | **date** 58:11 | 66:24 |
| 342:1 | 10:11 48:5 | **dark** 59:21 | 73:12 | 67:13,14 |
| **Crawford** | 49:22 | **Daszak** 20:11 | 199:13,13 | 67:20 |
| 298:23 | 50:11 | 20:13,15 | 199:14,15 | 85:10 86:8 |
| 299:22 | 61:23 | 21:8,16,21 | 218:10 | 105:21 |
| 330:12,13 | 291:23 | 35:17 36:2 | 231:25 | 109:3,11 |
| 330:22,23 | 313:11 | 36:14 37:1 | 232:23,25 | 127:5 |
| **CRC** 308:12 | **currently** | 37:6 39:22 | 233:2,12 | 148:23 |

DR. ANTHONY FAUCI  11/23/2022

153:13
174:3
186:2
192:4
199:3
200:22
204:8, 10
206:20
207:1
212:8
233:4, 22
238:19
260:18
269:14
275:21
359:4
363:14
days 34:9, 11
52:17
60:15  85:5
161:15
179:19
207:2, 2, 3
219:1, 10
222:7
242:21
254:6
279:11
343:24
344:4
361:17
DC 234:5
267:22
deactivated
330:3
Deactiva...
328:17
dead 169:7
deadly 346:3
deal 21:19
dealing
33:18
88:17
117:11, 21
136:21
140:5
169:25
deals 175:9
dealt 175:9

dean 291:3, 4
Dear 170:25
361:8
death 169:4
274:4
278:24
297:8
345:11, 15
346:11
deaths
276:24
343:10
355:23, 24
debate
319:11, 15
319:18, 23
322:17, 19
322:21
358:6, 9, 13
358:13, 14
debating
77:11
deboosted
280:21
281:9
debunk 244:6
332:7
333:13
debunked
211:6, 12
211:22
debunks
183:17
264:3
decade
265:17
decades
291:9
December 6:8
13:20  34:8
34:10
decide 64:7
109:1, 3, 5
122:16
deciding
122:20
289:1
decision
169:13

220:18
224:23
238:1, 13
239:10
319:24
decisions
333:7
declaration
7:24
248:14, 16
248:17
249:2, 10
249:12, 15
249:18, 19
250:1
251:4
252:18
254:6, 12
254:24
255:4, 14
256:10
258:2, 11
259:23
260:15
264:7
266:10
267:1, 4, 5
267:7
268:6, 23
269:4
274:1
276:4, 17
277:6
278:22
279:19
280:1, 13
280:17, 21
280:23
281:9
282:11
283:2
285:7, 10
290:10, 19
291:12
292:11
295:6
296:19, 24
297:6, 10
297:16, 23

declare
363:12
decrease
116:6
deep 256:15
deeply
265:23
Defendant
1:14  3:20
4:7, 16
defendants
1:9  9:23
define 16:7
definitely
142:7
217:22
definition
265:25
339:8
definitive
16:19
121:24
215:2
218:1
322:12
definiti...
219:21
degree 74:2
96:3
165:14
degrees
175:1
del 296:16
delay 245:15
deleterious
216:25
deliberate
189:9
delibera...
106:5
194:9
339:15
delibera...
27:23  96:6
113:5
delibera...
25:25
demanded
335:2

demonstrate
225:7
demonstr...
167:23
demonstr...
121:15
DENNIS 5:2
denominator
236:8
denounced
271:23
272:12
Department
2:19  3:20
4:1, 7, 10
9:22
313:10
361:5
depending
279:24
depends
117:15
159:22
246:24
265:21, 25
323:5
deposition
1:13  9:5
9:11  11:3
12:19, 22
13:2  47:7
356:15
359:23
360:5, 7, 12
361:9
363:6, 8, 11
deputy 29:2
29:12
30:18, 20
30:25
54:25
57:18  65:9
261:1, 6
300:2
DeRisi
133:10
134:13, 23
135:6, 13
DeRisi's

DR. ANTHONY FAUCI  11/23/2022

| | | | | |
|---|---|---|---|---|
| 135:14 | **details** 6:10 | 122:14 | 66:15 | **discovery** |
| **describe** | 19:10 | 128:22 | 70:15 | 287:15 |
| 57:1,6 | 90:12 | 155:20,20 | 72:18  75:6 | 357:15 |
| 155:22 | 280:19 | 160:5,5 | 76:3  91:5 | **discredit** |
| 156:15 | **determin...** | 177:21 | 95:6,9,17 | 79:2 |
| 278:10 | 16:6 | 207:11 | 97:5 108:5 | **discuss** |
| **described** | 119:13 | 295:3 | 134:4 | 44:11,19 |
| 33:14 | 121:25 | 304:2 | 162:21 | 88:24 |
| 38:15  57:7 | 231:20,24 | 322:20 | 182:6,19 | 89:14 |
| 82:15 | **determine** | 338:13 | 216:6,14 | 100:5,8 |
| 174:11 | 70:23 | **difficult** | 216:14 | 131:8 |
| 188:19 | 80:12 | 169:16 | 261:1,1,7 | 149:19 |
| 193:22 | 156:5 | **digital** | 271:25 | 162:19 |
| 250:10 | **determines** | 329:20 | 300:3 | 165:2,23 |
| 262:18 | 28:4 | 336:17,19 | 308:1 | 166:1 |
| 342:10 | **detrimental** | **diminished** | 324:19 | 168:2 |
| **describes** | 358:16 | 110:3 | 327:8,12 | 181:11,14 |
| 183:22 | **devastating** | **direct** 34:3 | 329:20 | 181:21 |
| 306:18 | 257:16,19 | 47:24 | 336:17,20 | 195:10 |
| **describing** | 258:10,13 | 125:18 | 353:1 | 216:2 |
| 57:9 | 259:23 | 144:20 | **director's** | 231:1 |
| **description** | **develop** | 145:15 | 142:8,9,14 | 258:8 |
| 246:11 | 256:15 | 147:6 | 142:16 | 274:21 |
| **design** | 316:16 | 153:21 | 182:11,15 | 276:2 |
| 320:17 | **developed** | **directed** | 184:12 | 291:11 |
| **designated** | 17:8 27:19 | 152:4 | 186:2 | 336:23 |
| 185:21 | **developing** | **directing** | 300:10 | 352:6,13 |
| **desired** | 351:22,23 | 48:13 | **directors** | **discussed** |
| 361:13 | 354:11 | **direction** | 30:19 | 67:12,14 |
| **desk** 22:19 | **development** | 1:23 53:19 | **dis** 339:2,4 | 67:19,25 |
| 22:20 29:5 | 189:10 | 354:11 | 339:6 | 78:19 79:7 |
| 129:25 | 319:10 | 360:10 | **disagree** | 79:11 |
| 245:1 | 351:17,20 | **directly** | 214:4 | 113:21 |
| 293:22 | 351:24 | 36:8 38:8 | 297:22 | 121:20 |
| **desperately** | 352:1,3 | 96:20 | 298:5 | 126:17 |
| 321:20 | 354:10 | 126:7 | 355:14,14 | 147:11 |
| **despite** | **dialogue** | 190:12 | 356:9 | 151:25 |
| 224:1 | 321:19 | 202:11 | **disagreed** | 166:22 |
| **destructive** | **die** 169:14 | 239:5 | 224:1 | 181:6,8,16 |
| 188:15,20 | **difference** | 272:14,16 | 356:1 | 181:19,22 |
| 188:25 | 157:8 | 288:21 | **disagreeing** | 184:24 |
| 190:21 | 246:20 | 311:15 | 214:6 | 193:1 |
| 193:23,25 | **different** | **director** | 234:10 | 195:9 |
| **detail** 77:24 | 15:1 58:24 | 10:13,24 | **disagrees** | 196:17 |
| 348:23 | 65:17 | 10:25 29:1 | 258:24 | 216:4,7,18 |
| 349:8,14 | 73:12 | 30:25 35:7 | **disconce...** | 221:15 |
| 349:16,19 | 90:11 | 38:10,17 | 340:3 | 222:20 |
| **detailed** | 115:19 | 38:19 46:9 | **discourage** | 231:3 |
| 284:20 | 117:15,25 | 65:9,10 | 151:7 | 255:23 |

270:21
275:5
279:23
292:10
297:6
321:12
327:15
349:15
355:4
357:4
**Discusses**
163:12
**discussing**
77:11
90:25
110:24
162:15
184:22,25
276:5
279:17
292:24
343:17
345:16
352:2,4,17
**discussion**
35:15 48:5
49:23
50:11 52:2
54:10
61:23
63:23,24
64:1,19
73:16,23
74:4 77:17
78:22,25
80:17 88:1
95:13,25
97:1
109:14
111:1
113:3
118:24
126:6,11
136:25
137:17,25
138:1,14
138:21,21
141:6
147:11,12

147:14
149:21
162:9,22
162:23
187:5
189:9
216:16,21
218:19
219:3
220:4
244:9
293:1
316:2
321:18,19
328:2
336:2
340:2
349:7,11
349:12
351:21
**discussions**
29:24
50:23
66:14
73:20
82:17 97:4
99:18
104:1
111:3
137:1
152:3
162:4
163:1
167:9,11
168:1
169:9
191:17
215:20,25
262:10,17
262:21
275:3
337:20
338:10,14
338:18,19
339:21
340:5,8,13
343:1,4,22
345:3
**disease** 35:7

46:8,17
166:17,19
216:13
227:12
248:1
271:24
272:12
279:2
291:2
332:21
333:1
353:9,11
354:6
**diseases**
10:14
46:10,14
70:16
72:19
133:24
142:13
231:15,17
231:19
232:10
332:22
333:24
**disfavored**
285:18
**disinfo**
337:16
**disinfor...**
103:19
104:4,10
104:16
150:11,14
150:19
151:3,14
193:17
194:5,10
194:23
217:7,15
229:25
235:15
236:4
337:22
338:3,11
338:25
339:11,14
339:19,24
340:3,9,14

344:14
345:4,9,13
345:23
346:2,5,11
357:3,4,17
358:24
359:10
**dispute**
66:25
287:24
**disputes**
318:20
**dissemin...**
88:25
104:23
150:16
235:16
**dissemin...**
195:13
235:9
236:3
340:18
**dissociated**
99:5
103:13
**distancing**
165:15,20
166:20
168:25
169:11,16
169:18,20
262:6,14
262:22
**distant**
70:23
**distortion**
106:15
107:5
**distortions**
105:17,19
105:24,25
106:13,18
107:5,14
**distracting**
207:12
**distraction**
79:18,22
**District** 1:1
1:2 9:10

9:10
**disturbed**
189:11
**disturbing**
304:21
358:17
**diversion**
80:7
**diverting**
79:15
**division** 1:3
4:20 9:11
30:19
70:15
72:18
133:23
216:14
353:2
**doctor**
223:19,23
223:24
224:10,23
235:11
236:2
**doctors**
223:25
224:5,8
225:18,25
227:15,16
228:1
229:8
232:18
234:6,22
236:20
238:22
242:15
243:3
**document**
12:10,21
13:9 14:10
14:18
17:18,24
18:4,7
25:2,7,14
25:17,24
26:15 31:1
43:13
48:12,19
48:23

DR. ANTHONY FAUCI  11/23/2022

| | | | | |
|---|---|---|---|---|
| 52:20,22 | 288:11 | 97:23 | 119:24 | 275:3,13 |
| 54:5,16 | 299:2 | **dosages** | 134:15,17 | 278:2 |
| 64:21,24 | 306:8 | 246:7 | 139:15 | 279:4,8,12 |
| 68:17 | 335:15 | **double** | 140:5 | 284:7 |
| 69:12 | 337:8 | 244:10 | 147:10,15 | 287:9,18 |
| 72:21 73:4 | 341:13 | 246:12 | 148:24 | 290:22 |
| 76:20,22 | 347:13 | **double-b...** | 149:6 | 291:15,18 |
| 94:14 96:8 | 353:19 | 322:2 | 150:8 | 299:1 |
| 96:16 | **documented** | **doubt** 29:3,6 | 159:16 | 306:6 |
| 97:13,20 | 289:13 | 32:16 | 163:5,5,18 | 309:5,15 |
| 105:1 | 332:25 | 55:15,16 | 164:1 | 311:19 |
| 110:10 | **documents** | 110:4 | 165:6 | 313:6 |
| 111:9,15 | 12:16 13:1 | 184:9 | 166:16,24 | 333:17 |
| 112:2,13 | 13:3,4,5 | 198:24 | 168:4 | 350:1 |
| 114:16 | 25:12,13 | 290:15 | 176:14 | 353:18 |
| 115:17 | 25:18 53:1 | 292:23,24 | 179:18 | 354:20 |
| 120:3 | 112:7 | **downs** 81:11 | 180:10 | 355:4 |
| 123:4 | 114:21,23 | **dozen** 63:25 | 182:12 | 356:3 |
| 125:21 | 114:25 | **dozens** 200:5 | 183:4 | 361:10 |
| 126:20 | **doing** 11:24 | 200:5,5 | 185:6,11 | 362:1 |
| 128:10 | 13:21 | **Dr** 1:13 2:24 | 186:11,19 | 363:5,20 |
| 130:14 | 18:11 | 2:25,25 | 187:3,21 | **draft** 114:9 |
| 132:23 | 42:23 | 6:3 9:6 | 188:3 | 120:5,10 |
| 136:12 | 58:10,24 | 10:2,11 | 189:18,20 | 120:14,17 |
| 141:16 | 59:25 | 12:18 13:1 | 190:15 | 123:14 |
| 142:18 | 62:21,24 | 14:9 15:7 | 193:22 | 124:2,7,9 |
| 161:24 | 70:7,18 | 15:7 17:22 | 197:14,18 | 124:12,21 |
| 163:23 | 71:23 | 21:8 25:9 | 198:1 | 127:4,8 |
| 164:2 | 132:1 | 26:14 | 199:3 | 128:16,17 |
| 173:3 | 141:17 | 30:21 | 200:22 | 128:20 |
| 176:3,11 | 142:1 | 37:13 | 201:23 | 129:1 |
| 176:12 | 152:15 | 38:20 | 203:24 | **drafting** |
| 178:11 | 176:19 | 43:12 | 211:15 | 112:22 |
| 182:17 | 200:1,2 | 50:16,23 | 216:5 | 203:14 |
| 183:5 | 256:17 | 51:11 | 227:2 | **drafts** 114:4 |
| 187:24 | 258:5 | 52:25 53:8 | 240:12 | 128:20 |
| 197:15,16 | 260:20 | 54:15 | 251:17,17 | 129:4 |
| 206:13 | 263:5,6 | 68:16,24 | 251:18 | 160:13,17 |
| 210:15,25 | 301:22 | 73:3 83:14 | 252:8 | 196:5 |
| 211:16 | 302:13 | 83:23 89:4 | 253:18 | **dramatic...** |
| 226:21 | 310:12,13 | 90:11 | 254:5 | 317:11 |
| 227:4 | **dollars** | 91:21 93:5 | 256:4,5 | **drew** 165:18 |
| 237:10 | 177:10,18 | 94:14 | 257:15 | **Drive** 1:19 |
| 267:10 | **Don** 136:2,3 | 95:21 | 258:7 | 4:22 9:12 |
| 271:16 | **donate** | 96:17 | 267:20 | **droplets** |
| 272:20 | 177:18 | 101:15 | 270:11,15 | 314:16 |
| 278:7 | **Dorsey's** | 110:11 | 271:13,15 | **drug** 215:4 |
| 284:19 | 240:18 | 112:1 | 272:4,25 | 217:16 |
| 287:18 | **Dorsten** | 115:5,16 | 273:16,25 | 221:4,5,8 |

**DR. ANTHONY FAUCI  11/23/2022**

| | | | | |
|---|---|---|---|---|
| 227:1,22 | 106:9,16 | 206:9,19 | 317:22 | 77:1,6 |
| 353:23 | 108:1 | 207:13,21 | 328:12 | 80:19 |
| 354:1,4,9 | 110:10,15 | 253:18,24 | **e-mailing** | 118:23 |
| **drugs** 215:16 | 111:5,17 | 254:3 | 200:22 | 123:18 |
| 354:1,2,11 | 112:4,15 | 255:5,8 | 324:6,23 | 136:13 |
| **drugstore** | 114:3 | 256:18 | 325:20 | 140:24 |
| 314:13 | 115:7,11 | 257:4,5 | **e-mails** 6:13 | 147:16 |
| 317:24 | 115:12 | 259:17 | 6:14,15,16 | 161:15 |
| **due** 46:7 | 118:3 | 260:22 | 6:17,19,20 | 163:20 |
| **duly** 1:16 | 120:3 | 261:6,20 | 6:21,22,23 | 170:19 |
| 10:4 360:7 | 123:6 | 263:11,24 | 7:4,5,6,10 | 174:11 |
| **Duvall** 303:5 | 124:16 | 266:8,13 | 7:12,13,25 | 179:19 |
| | 125:8,22 | 269:1,7 | 8:1,2,4,10 | 193:15 |
| **E** | 126:22 | 276:7 | 8:11,12,13 | 203:10 |
| **E** 6:1,6 9:1 | 127:8,9 | 277:13 | 8:14,15,16 | 217:8 |
| 9:1 | 128:13 | 294:9,20 | 8:21 21:14 | 234:3 |
| **e-mail** 21:16 | 130:17,18 | 294:21 | 63:12 78:5 | 250:10 |
| 37:25 39:8 | 130:20,21 | 295:19 | 81:19 84:3 | 252:16 |
| 40:6 42:7 | 131:2 | 298:22,23 | 117:4,25 | 286:8 |
| 42:12 48:2 | 132:4,8,12 | 299:7 | 122:7,11 | 339:10 |
| 50:15,16 | 132:17 | 305:3,3,9 | 122:12,15 | 351:18 |
| 50:20 | 133:18,20 | 305:10,11 | 122:15,16 | **early** 22:16 |
| 54:20,24 | 135:20 | 305:23 | 130:24 | 169:5 |
| 55:5,7,10 | 136:12 | 307:18,20 | 132:4 | 246:8 |
| 55:13,18 | 139:22 | 308:11 | 137:22 | 247:16,17 |
| 55:24 | 142:4 | 309:12 | 153:13 | 265:19 |
| 56:13 | 152:21,25 | 311:12 | 160:22 | 293:18 |
| 57:18 59:6 | 153:4,7,9 | 313:12,22 | 188:5 | 313:14 |
| 59:7 60:13 | 153:18,20 | 315:7 | 189:19 | 315:19 |
| 61:7,12,24 | 161:15 | 323:25 | 196:6 | 322:8 |
| 62:3 63:1 | 167:19,22 | 324:7,13 | 206:24 | 325:22 |
| 65:2 68:6 | 170:13,22 | 324:14,15 | 207:1,10 | **easily** 232:1 |
| 68:9,13 | 173:3,8,21 | 327:4 | 207:11 | **Eastern** 9:4 |
| 69:2,5,9 | 176:3,15 | 328:5 | 208:24 | **easy** 206:7 |
| 72:3,13,24 | 187:17 | 329:11,22 | 242:5 | **Ebola** 140:8 |
| 75:9 84:5 | 188:2,6,6 | 330:10,18 | 263:19 | **EcoHealth** |
| 84:13,16 | 188:23 | 331:2 | 275:21 | 6:9 18:11 |
| 85:12,23 | 189:3,11 | 347:23 | 279:19 | 19:10,24 |
| 86:1,14,19 | 189:16,19 | 348:1 | 287:5 | 20:4,6 |
| 89:20 90:8 | 190:24 | 349:5,21 | 288:4,5 | 21:22 30:4 |
| 90:20 91:6 | 191:24 | 353:5 | 289:24 | 36:4,9 |
| 92:1,2 | 192:1,5 | **e-mailed** | 290:15 | 58:9,22 |
| 93:14,15 | 195:2 | 69:23 | 330:14 | **Eddie** 44:24 |
| 94:3,8,10 | 201:21 | 92:12 | **earlier** 26:2 | 45:2,3,9 |
| 94:21 98:4 | 202:2,11 | 114:4 | 41:8 43:17 | 50:24 51:3 |
| 101:12 | 202:18 | 199:3 | 50:23 | 51:4 73:9 |
| 102:11 | 204:3,7,10 | 295:20 | 51:20 | 73:10,10 |
| 103:1 | 205:23 | 300:13 | 56:10,24 | 112:15 |
| 105:5,23 | 206:4,5,7 | 309:4 | 60:1,12,15 | 114:2,5 |

DR. ANTHONY FAUCI 11/23/2022

| | | | | |
|---|---|---|---|---|
| 120:11 | 217:19 | 155:5 | 101:8 | environment |
| 123:14 | 218:14 | elements | 287:1 | 316:10 |
| 124:17 | 219:18 | 17:1 | 346:12 | Environm... |
| 128:16 | 221:2 | embarrassed | ended 78:4 | 307:5 |
| 160:18,21 | 225:10 | 108:12 | endorse | EPA 306:24 |
| 161:1 | 227:10 | emerged | 354:8 | 307:7 |
| 203:12 | 231:1,3,23 | 154:20 | endorsement | EPA.gov |
| edited | 243:21,23 | emergence | 353:7 | 307:3 |
| 112:19 | 244:2 | 18:6,9,12 | enemy 345:23 | epicenter |
| 123:15 | 245:9 | 22:14 31:9 | 346:6 | 337:16,21 |
| editor 308:5 | 247:7 | 41:4,10,15 | engaged | epidemic |
| 308:20 | 262:13,22 | 153:24 | 64:18 | 169:5 |
| editorial | 318:2,12 | emergency | 340:1 | epidemio... |
| 13:19 | 318:20 | 220:11 | engineer | 279:1,4 |
| effect 29:16 | 322:2,7,18 | 221:3 | 100:1,13 | epidemio... |
| 215:7 | 332:7 | emeritus | engineered | 255:11,21 |
| 219:13 | 333:17 | 291:5,5 | 34:16 | 256:9 |
| 223:15 | 355:10 | Emily 70:14 | 51:15 | 277:9 |
| 322:16 | 356:8 | 70:14,19 | 89:12 | epidemio... |
| 353:21,22 | 358:7 | 72:9,13,15 | 182:21 | 273:11 |
| 354:4,15 | effort 12:3 | 72:17,18 | 183:13 | 278:13 |
| 354:16 | 12:5 | 149:3,3,6 | engineering | 279:3 |
| effective | 171:19 | 205:15,17 | 17:7 | equipment |
| 166:18 | 194:24 | 205:22 | England 47:2 | 321:22 |
| 170:3 | egregious | Emmanuel | enormous | equivalent |
| 214:2,9,11 | 151:5 | 352:23,24 | 170:5 | 345:14 |
| 215:5,24 | eight 27:16 | emphasis | ensure | Erbelding |
| 217:13 | 29:10,23 | 199:24 | 296:22 | 70:14 72:9 |
| 218:6 | 53:25 86:1 | 200:9 | 320:20 | 149:3 |
| 221:5 | 91:18 | emphasize | entered | 205:15,22 |
| 224:3 | 235:6 | 155:23 | 234:2 | ERIC 2:6 |
| 227:11 | 309:11 | employed | entire 170:7 | Erik 42:16 |
| 261:25 | eighth 52:21 | 40:15 | 232:11 | 205:14,17 |
| 262:7 | 53:5,12,14 | 360:11,14 | 260:5 | 205:22 |
| 314:13 | 54:1,15 | employee | 302:14,16 | errata |
| 315:15 | either 24:15 | 337:9 | entirely | 361:11,13 |
| 317:24 | 27:14 34:8 | 360:14 | 140:10 | 361:16 |
| 322:10 | 34:10 | employees | 153:16 | 362:1 |
| 331:5,9 | 75:15 | 300:4 | 262:25 | escaped |
| 355:8 | 80:14 97:2 | enclosed | 276:14 | 79:21 |
| effectiv... | 233:19 | 361:9,10 | entitled | 143:7 |
| 213:22 | 284:19 | Enclosures | 31:7 | 155:16,17 |
| 331:17 | 291:4 | 361:25 | 163:12 | 156:11 |
| effects | 295:19 | encourage | 185:21 | 208:17 |
| 216:25 | 316:15 | 152:5 | 190:6 | espoused |
| efficacy | 321:15 | encourages | 210:15 | 266:25 |
| 215:3,15 | election | 345:9 | 218:5 | ESQ 2:5,6,7 |
| 215:21 | 10:20 | encouraging | 242:15 | 2:16,17,18 |
| 216:7,18 | element | 99:19 | 280:12 | 3:2,3,13 |

DR. ANTHONY FAUCI  11/23/2022

| | | | | |
|---|---|---|---|---|
| 3:22,23,24 | everybody | 81:3,7 | 229:19 | 263:11 |
| 3:25 4:9 | 28:9 67:17 | evident | 230:3 | excited |
| 4:18 361:4 | 238:9 | 218:14 | 308:3 | 192:22 |
| essential | 278:10 | 219:18 | examination | exciting |
| 54:18 | 349:22 | evolution | 1:14 6:2 | 192:23 |
| 58:13 | everythi... | 78:2 81:15 | 10:6 78:8 | exclamation |
| 106:19 | 12:6 70:13 | 82:2 | 80:14 | 300:15,15 |
| 107:11 | evidence | 132:10 | 231:21 | 300:16 |
| essentially | 18:21 | 144:12 | examine | excuse 53:17 |
| 37:16 | 19:19 22:8 | evolutio... | 107:9 | executed |
| 157:10 | 30:6 36:19 | 44:11 45:4 | 323:15 | 251:7 |
| 168:14 | 49:25 57:4 | 45:12 | examined | 363:14 |
| 170:6 | 80:3,6 | 50:25 52:6 | 10:5 81:10 | exhibit 6:7 |
| 193:8 | 88:20,22 | 52:15 | examining | 6:8,9,11 |
| 248:23 | 95:23 | 58:20 | 260:19 | 6:12,13,14 |
| 266:23 | 106:6 | 63:25 64:8 | example | 6:15,16,17 |
| 276:22 | 109:19,19 | 77:23 80:2 | 14:25 | 6:18,19,20 |
| establish | 110:19 | 89:13,15 | 36:15 87:7 | 6:21,22,23 |
| 153:12 | 111:7 | 103:3 | 157:24 | 6:24,25 |
| established | 126:16 | 114:10,15 | 168:11 | 7:1,2,3,4 |
| 59:23 | 146:8,13 | 120:19 | 206:3 | 7:5,6,7,8 |
| 217:1 | 154:1,11 | 121:23 | 208:16 | 7:9,10,11 |
| 230:14 | 154:17,21 | 122:4 | 280:25 | 7:12,13,14 |
| 349:23 | 155:1,24 | 124:13 | 318:24 | 7:15,16,17 |
| estimate | 161:16,25 | 156:23 | 338:20 | 7:18,19,20 |
| 32:2 | 179:3 | 157:8 | 355:6 | 7:21,22,23 |
| et 1:5,8 9:7 | 183:17 | 160:9,12 | 356:2,7,20 | 7:24,25 |
| 9:7 39:23 | 189:24 | 198:14 | 357:4 | 8:1,2,3,4 |
| 55:19,25 | 191:14,14 | evolved | examples | 8:5,6,7,8 |
| 61:2 | 193:12 | 105:13 | 134:2 | 8:9,10,11 |
| 162:13 | 194:20 | 139:11 | 144:14 | 8:12,13,14 |
| 361:7,7 | 196:14 | 144:17 | Excellent | 8:15,16,17 |
| 362:2,2 | 214:8,13 | 198:16 | 90:7,19 | 8:18,19,20 |
| ethics 353:2 | 214:20 | exact 145:8 | 264:10 | 8:21 12:11 |
| etiology | 224:1 | 160:23 | exception | 12:13 |
| 156:1 | 231:22 | 165:25 | 27:6,9,10 | 13:10 |
| EUA 220:6,11 | 232:7 | 231:25 | 27:20,25 | 17:19,20 |
| 220:12,19 | 243:23 | exactly 11:8 | 28:2,15,16 | 18:4 25:3 |
| 220:23 | 245:15 | 20:17 | 28:22 29:5 | 25:4 31:2 |
| 221:9 | 248:2 | 23:21 50:4 | 29:8 | 31:3 35:19 |
| Eugene 135:8 | 286:17 | 57:10 | exceptions | 37:19,21 |
| evaluated | 302:20 | 67:23 70:4 | 28:24 | 41:8,14 |
| 156:22 | 316:8 | 116:13 | 29:25 | 43:7,8,9 |
| evaluation | 317:5 | 129:8 | 30:10,11 | 47:25 |
| 166:25 | 318:17 | 136:19 | 30:12 | 49:15 |
| 247:4 | 319:2 | 139:11 | excerpt | 52:21 53:3 |
| evaluations | 325:5 | 179:20 | 196:24 | 53:6,9 |
| 245:14 | 339:16 | 190:24 | exchange | 56:4,13,20 |
| evening 60:1 | evidence... | 220:8,16 | 68:6 126:5 | 56:22 |

DR. ANTHONY FAUCI  11/23/2022

| | | | | |
|---|---|---|---|---|
| 60:13 | 221:11,24 | 211:4,9 | 357:24 | 168:13,15 |
| 83:12,24 | 226:9,10 | **expectat...** | **expires** | 168:16 |
| 83:25  96:9 | 228:15,16 | 50:25  52:5 | 360:22 | 169:8,15 |
| 96:10  97:7 | 232:12,13 | **experience** | 363:24 | 261:25 |
| 101:9,10 | 233:21 | 69:24 | **explain** 96:6 | 262:13,14 |
| 111:10,11 | 239:9 | 136:21 | **explained** | **extremely** |
| 114:17,18 | 242:10,11 | 140:5 | 156:18 | 134:11 |
| 115:2,4 | 245:4,5 | 145:10 | **explanation** | **eyebrows** |
| 119:4,18 | 248:25 | 165:2 | 52:19 | 230:23 |
| 119:24 | 249:4,6,9 | 279:3 | **explicitly** | **Ezekiel** |
| 122:24,25 | 253:6,14 | 323:8 | 16:25 | 352:23,24 |
| 128:25 | 253:15 | **experienced** | 214:13 | |
| 130:6,7 | 263:7,8,24 | 140:9 | 218:20 | **F** |
| 138:7,8 | 266:4,5 | **experiment** | **explosion** | **F** 305:16 |
| 141:12,15 | 270:5,7,11 | 28:12 | 170:5 | **Facebook** |
| 142:19,20 | 271:2,3 | 117:18,23 | **expose** | 99:7  152:4 |
| 148:4,9,11 | 275:8,9 | 119:1,3 | 322:20 | 174:2 |
| 148:12,18 | 277:17,19 | **experime...** | **exposed** | 175:17 |
| 152:17,18 | 280:8,11 | 23:13 | 42:14  43:1 | 177:14,17 |
| 158:19,20 | 283:11,12 | 121:17 | **express** | 210:6 |
| 158:23 | 284:6,7,14 | 122:1 | 78:11 | 211:18,24 |
| 163:7,8 | 284:19 | **experiments** | 356:14 | 212:11,13 |
| 167:14,15 | 286:3,4 | 15:4  16:7 | **expressed** | 212:14,21 |
| 170:9,10 | 293:25 | 17:16 | 78:10 | 234:2,4 |
| 172:24 | 294:3,6 | 28:25 | **expressing** | 235:7 |
| 173:2 | 298:17,18 | 31:19 | 106:2 | 237:18 |
| 178:5,7,7 | 304:10,23 | 68:19 | **expressions** | 238:1,12 |
| 178:17,18 | 304:24 | 119:5 | 79:1 | 240:4,21 |
| 179:25 | 307:12,15 | 157:19,23 | 102:14 | 241:8 |
| 181:23 | 323:19,20 | **expert** | **extensive** | 242:23 |
| 182:2 | 327:24,25 | 124:14 | 140:5 | 286:11 |
| 185:2,6,7 | 328:5 | 132:9 | **extent** 12:18 | 287:1 |
| 185:11,17 | 330:5,6 | 291:2 | 25:8,14 | 290:2 |
| 187:9,10 | 334:17,20 | 356:11,14 | 71:3 | 307:21 |
| 187:12 | 335:15 | 357:22 | 114:24 | 309:4,6,9 |
| 196:20,21 | 340:22,25 | **expertise** | 152:6 | 309:22 |
| 197:4 | 341:24 | 117:20 | 205:5 | 311:16 |
| 199:4,14 | 343:24,25 | 124:24 | 326:22 | 328:12,21 |
| 200:23 | 346:14,15 | 127:13 | **extra** 51:24 | 330:22 |
| 201:13,16 | 347:15 | 151:18 | 70:22 | 331:3 |
| 201:17 | 352:19,20 | 357:1 | 117:22 | 332:8 |
| 203:24,25 | **exhibits** | **experts** | 284:16 | 344:13 |
| 204:12 | 8:22  57:24 | 39:23 | **extraord...** | **Facebook's** |
| 209:3,4 | 114:22 | 271:24 | 169:3 | 239:10 |
| 210:9,12 | 115:2 | 272:12 | **extrapol...** | **Facebook...** |
| 212:15,16 | 233:14 | 273:3 | 191:8 | 177:3 |
| 212:23 | **existence** | 332:21 | **extreme** | **Facebook...** |
| 213:17,18 | 22:22 | 333:24 | 165:14,19 | 232:17 |
| 218:4 | **expanding** | 334:9 | 168:7,8,10 | **faced** 335:21 |

DR. ANTHONY FAUCI  11/23/2022

| | | | | |
|---|---|---|---|---|
| **FaceTime** | 259:9 | 252:2,4 | 90:7 92:2 | 138:8 |
| 99:18 | 266:3 | 279:9 | 93:9,16,25 | 141:12 |
| **facilities** | 300:8 | 282:5 | 97:22 | 142:20 |
| 165:9 | 315:13 | 293:11 | 101:12 | 148:12 |
| **fact** 15:10 | 336:10 | **familiarity** | 109:23 | 150:8 |
| 18:10 30:9 | 355:13 | 175:2 | 111:18 | 152:18 |
| 52:18 | **fairly** 33:24 | **familiarize** | 112:16 | 158:20 |
| 59:20 64:5 | 44:17,21 | 14:9 26:14 | 115:9 | 163:8 |
| 81:5,14 | **faith** 77:16 | 43:12 | 123:7 | 164:1 |
| 95:15 | 106:11 | 48:11 53:8 | 160:18 | 167:15 |
| 155:16 | **fake** 173:7 | 68:16 | 161:1,9 | 170:10 |
| 156:11,12 | 300:22 | 69:11 73:4 | 162:25 | 172:24 |
| 161:3 | 301:19 | 94:14,17 | 163:5 | 176:14 |
| 176:24 | 309:5,22 | 97:13 | 170:14 | 178:18 |
| 181:19 | 309:25,25 | 112:1 | 171:5 | 182:2 |
| 193:3 | 310:4,10 | 115:16 | **Farrar's** | 183:4 |
| 203:2 | 311:17 | 164:2 | 76:1 98:4 | 185:6,11 |
| 212:10 | 328:17,24 | 176:14 | **fast** 128:24 | 185:17 |
| 214:11 | 329:13 | 183:4 | 267:15,18 | 187:10,21 |
| 216:12 | 330:2 | 187:23 | **Fauci** 1:13 | 196:21 |
| 219:16 | **Fake/Imp...** | 197:14 | 6:3,7 9:6 | 197:14,18 |
| 224:1 | 300:14 | 211:15 | 10:2,10,11 | 198:1 |
| 248:3 | **fall** 309:1 | 227:3 | 12:13,18 | 201:17,23 |
| 256:7 | **falls** 338:25 | 271:15 | 13:1 14:9 | 203:24,25 |
| 262:7 | **false** 103:22 | 299:2 | 17:20,22 | 209:4 |
| 274:1 | 211:5 | 306:7 | 25:4,9 | 210:12 |
| 277:12 | 237:7,19 | 341:7 | 26:14 31:3 | 211:15 |
| 281:8 | 288:21 | 353:18 | 37:21 | 212:16 |
| 309:21 | 294:25 | **familiar...** | 38:20 43:9 | 213:18 |
| 315:12 | 300:23,25 | 119:10 | 43:12 | 218:5 |
| 321:3 | 301:3,6 | **family** 359:7 | 52:25 53:8 | 221:11 |
| 329:8 | 302:17 | **famous** | 54:15 | 226:10 |
| 357:3 | 312:3,11 | 175:22 | 68:16,24 | 227:2 |
| **factors** | 339:5 | **fan** 309:16 | 73:3 83:14 | 228:16,25 |
| 154:17 | 357:8 | **far** 112:18 | 83:23,25 | 232:13 |
| 248:11 | **falsely** | 129:6 | 90:11 | 240:12 |
| **facts** 107:4 | 310:10,16 | 156:25 | 91:21 | 242:11 |
| 107:4 | **falseness** | 179:6 | 94:14 | 245:5 |
| **factual** | 237:4 | 283:21 | 96:10 | 249:6 |
| 156:8 | **familiar** | **Farrar** 34:19 | 97:22 | 253:15,18 |
| **faculty** | 18:6,10 | 43:21 | 101:15 | 263:8 |
| 265:11 | 27:2,5 | 44:23 60:2 | 111:11 | 266:5 |
| **failings** | 31:11,13 | 61:19,20 | 112:1 | 270:7 |
| 244:4 | 39:4 48:18 | 66:24 | 114:18 | 271:15 |
| **fair** 189:22 | 63:18 | 72:24 | 115:5,16 | 275:9 |
| 190:4 | 92:10 | 73:21 79:8 | 119:24 | 277:19 |
| 207:17 | 98:16 99:8 | 79:12 83:3 | 122:25 | 278:2 |
| 236:14 | 248:13 | 84:16 85:9 | 130:7 | 280:8 |
| 251:23 | 250:2 | 89:21,25 | 134:15,17 | 283:12 |

| | | | | |
|---|---|---|---|---|
| 284:7 | 120:7 | **feeling** | 245:2 | 74:4 89:12 |
| 286:4 | **February** | 79:23 | 263:3 | 89:14 |
| 287:9,18 | 22:17 | 109:24 | 264:16,18 | 110:9 |
| 294:6 | 43:15 | **feels** 47:20 | 307:8 | 112:12 |
| 298:18 | 44:16 55:3 | 191:9 | 318:8 | 123:3,14 |
| 299:1,19 | 61:14 66:6 | **felt** 17:15 | 325:22 | 124:2 |
| 303:6 | 66:17 69:3 | 28:8 46:15 | 332:25 | 125:5 |
| 304:20,24 | 72:25 73:8 | 46:16 75:4 | 358:17 | 131:23 |
| 306:6 | 77:5 82:14 | 81:25 | 361:9 | 132:3 |
| 307:15 | 86:2,13 | 107:22 | **findings** | 153:5,25 |
| 309:5,15 | 89:25 | 126:8 | 183:22 | 154:20 |
| 311:19 | 91:22 | 164:24 | 222:16 | 163:17 |
| 313:6 | 93:16 97:2 | 169:8 | **fine** 47:15 | 167:22 |
| 323:20 | 105:5 | 189:1,2 | 228:21 | 173:2,23 |
| 327:25 | 113:22 | 232:4,6 | 309:16 | 175:10 |
| 328:16,18 | 115:8 | 258:7 | **fingertips** | 180:2 |
| 330:2,6 | 120:3,12 | 273:25 | 59:24 | 183:2 |
| 333:17 | 123:7,25 | 274:1 | 318:10 | 188:13 |
| 334:20 | 126:23 | 297:5,6 | **finish** 42:12 | 190:10 |
| 340:22 | 128:13,18 | 322:12 | 46:22 | 202:11 |
| 341:15,24 | 129:2,20 | **female** 228:4 | 49:11 | 203:2 |
| 342:20 | 139:13 | **Ferguson** | 76:19 | 211:3,22 |
| 343:25 | 140:14 | 92:4,6 | 102:10 | 220:5 |
| 346:15 | 141:18 | 93:12 | 135:3 | 229:5 |
| 348:10,13 | 144:7 | **field** 63:15 | 174:24 | 239:9 |
| 350:1 | 147:3 | 64:8 155:2 | 247:13 | 243:4 |
| 352:20 | 148:19 | **fifth** 163:22 | 260:14 | 245:8,12 |
| 353:18 | 149:7,22 | 226:21 | 290:4 | 245:18 |
| 354:20 | 152:22 | **fighting** | 310:23 | 250:4,6 |
| 355:4 | 159:4 | 283:25 | 312:14 | 252:17 |
| 356:3 | 160:14 | **figure** | 339:13 | 255:4,17 |
| 361:10 | 161:8 | 106:12 | 340:11 | 256:11 |
| 362:1 | 167:19 | 135:24 | 350:11 | 265:17 |
| 363:5,20 | 169:19 | 162:12 | **finishing** | 271:13,20 |
| **Fauci's** | 173:11,18 | **filing** | 148:6 | 278:8 |
| 219:1,10 | 261:11 | 361:18 | **Firm** 3:14 | 280:16 |
| **FCN@list** | 313:12,21 | **final** 14:1,3 | **first** 11:13 | 303:9 |
| 305:22 | 315:18 | 359:5 | 14:2,2,2,3 | 325:19 |
| **FCN@list...** | 317:22 | **Finally** | 15:25 20:8 | 329:11 |
| 305:19 | 320:19 | 177:9 | 22:24 23:1 | 330:17 |
| **FDA** 220:5,18 | 322:3 | **financially** | 31:15,22 | 331:7 |
| 220:19 | **federal** 4:11 | 360:15 | 33:19,20 | 344:11,16 |
| 347:1 | 238:12,14 | **find** 26:17 | 34:5,8,10 | 347:16 |
| **featured** | 238:16 | 50:24 58:3 | 39:18 | 356:24 |
| 229:8 | 239:4 | 62:20 | 43:18,23 | 359:14 |
| **features** | **feel** 70:7 | 121:22 | 45:15,23 | **first-name** |
| 51:11,14 | 71:22 | 206:19 | 47:24 | 173:17 |
| 51:23,24 | 91:12 | 230:17,18 | 53:24 58:8 | 286:14,19 |
| **Feb** 73:8 | 346:1 | 232:2 | 58:21 71:2 | 349:25 |

DR. ANTHONY FAUCI  11/23/2022

| | | | | |
|---|---|---|---|---|
| 350:5,16 | floated | following | 180:8 | 301:3,23 |
| 350:18,22 | 92:23 | 10:22 | formulation | 302:11 |
| 351:4 | flood 357:11 | 22:16 | 180:16 | foundation |
| Fishers | 357:17 | 44:15 | forth 27:21 | 143:11 |
| 308:7 | 358:24 | 46:21 | 64:2  77:7 | 144:1 |
| five 41:3 | Flu 13:15 | 113:5 | 77:17  78:3 | 146:11,18 |
| 51:24  54:1 | fluent 133:9 | 124:1 | 119:3 | 152:24 |
| 64:22 | 357:25 | 181:7 | 123:21 | 158:5 |
| 85:25 | focus 42:13 | 183:21 | 129:4 | 161:18 |
| 89:20 | 134:7 | 240:4 | 173:15 | 164:14 |
| 91:18 | 245:18 | 292:17 | 214:17 | 184:5 |
| 92:14  93:8 | 250:8 | follows 10:5 | 290:2 | 186:23 |
| 104:25 | 268:2,5 | 240:5 | 356:5 | 199:10 |
| 161:4 | focused | 316:1 | Forty-one | 200:13 |
| 222:7 | 266:16 | footnote | 249:5 | 208:5,19 |
| 253:4 | 292:13,21 | 26:16 | forum 138:1 | 210:19 |
| 267:14 | focusing | 27:21 | forward 12:1 | 221:18 |
| 343:24 | 246:10 | force 196:25 | 44:12  59:7 | 223:4 |
| 344:4 | FOIA 84:4 | 197:6,9 | 61:8  62:5 | 225:23 |
| five-year | 121:5 | 201:4 | 65:12  66:7 | 229:15 |
| 36:11,13 | 122:7,10 | 204:11 | 90:16,16 | 233:8 |
| flag 309:5 | 122:13 | 208:1 | 93:20 | 234:13,18 |
| flagged | FOIA'd 288:4 | 321:2,12 | 97:10 | 235:18 |
| 299:14 | Folkers 38:1 | forced 353:8 | 101:11 | 237:23 |
| 311:16 | 38:1,2 | 354:19 | 104:25 | 240:24 |
| flagging | 39:20  40:7 | Ford 244:17 | 105:3 | 242:25 |
| 309:21,23 | 40:16  42:8 | foregoing | 109:9 | 243:12 |
| 311:12 | 294:9 | 360:5,7 | 131:19,24 | 244:21 |
| 329:10,13 | folks 39:22 | 363:6,13 | 131:25 | 246:3 |
| Flaherty | 182:20 | forget | 156:3,6 | 249:21 |
| 336:13,16 | 183:11 | 150:10 | 237:9,12 | 250:23 |
| 336:22 | 299:14 | forgetting | 239:8 | 253:21 |
| flawed 323:9 | 313:23 | 108:8 | 267:15,18 | 266:12 |
| flea 145:20 | follow | forgot | 289:20 | 272:9 |
| flip 19:9 | 230:10 | 108:12 | 295:13 | 273:6,14 |
| 25:23 | 235:22 | 184:15 | 318:18 | 273:22 |
| 52:21 | 241:25,25 | 225:25 | forwarded | 280:15 |
| 64:21 | 280:5 | 336:11 | 62:10,12 | 281:3,12 |
| 84:15 | 297:9 | forgotten | 124:15 | 282:13 |
| 85:24 | follow-up | 226:7 | 266:14 | 283:4 |
| 89:18 | 72:6 | form 193:16 | 269:10,13 | 306:6 |
| 91:17  93:7 | 109:14,22 | 194:4 | 318:25 | 314:1,22 |
| 101:11 | followed | 363:7 | 348:7,14 | 319:5,13 |
| 251:2 | 18:16 | former 134:4 | forwarding | 325:5 |
| 272:19 | 53:20 | 134:4 | 61:17 | 332:10 |
| 309:14 | 81:24 | 313:9 | 348:21 | 337:1,25 |
| Flipping | 214:10 | formerly | found 244:18 | 345:20 |
| 249:17 | 239:11 | 265:13 | 294:14 | 348:17 |
| 252:6 | 240:16,21 | formulating | 300:24 | four 53:25 |

**DR. ANTHONY FAUCI  11/23/2022**

| | | | | |
|---|---|---|---|---|
| 84:15 | 89:21  90:8 | 272:17 | 272:14 | 17:14  25:1 |
| 85:25 | 90:20  91:1 | 281:1 | 273:10 | 55:21 |
| 86:19  88:6 | 91:7,10,11 | 295:13 | 276:17 | 57:15 |
| 89:20 | 92:3  93:11 | **Francisco** | **front** 13:9 | 116:5,7,7 |
| 91:17  93:7 | 94:2,11,21 | 133:15 | 13:17,22 | 119:14,14 |
| 129:6 | 95:20 | 174:9,15 | 29:7  46:19 | **functions** |
| 160:13 | 108:2 | 174:17 | 47:25  84:4 | 119:9 |
| 196:5 | 109:15,23 | 175:8 | 97:8 101:9 | **fund** 39:22 |
| 254:6 | 110:11 | 231:18 | 104:24 | 40:4  57:22 |
| 272:21 | 111:18,23 | **frankly** | 112:7 | 67:18 |
| 335:19 | 114:6 | 107:19 | 119:20 | 71:23 |
| **fourth** 23:8 | 115:8 | 226:7 | 141:21 | 149:16,16 |
| 23:9  84:16 | 116:14,18 | 278:12 | 178:23 | **fundamental** |
| 226:20 | 116:24 | 348:9 | 185:6 | 113:8 |
| 237:17 | 118:4 | **Frederick** | 188:7 | **fundamen...** |
| 271:12,19 | 120:4 | 155:10,11 | 210:21 | 110:6 |
| 284:24 | 121:20 | **free** 177:11 | 218:4 | 114:10 |
| **foyered** | 123:8 | 177:18 | 221:23 | **funded** 20:5 |
| 21:14 | 125:9 | **freedom** | 222:24 | 22:23 |
| **frame** 31:22 | 126:23 | 151:16 | 225:7,19 | 31:20 |
| 102:16 | 128:13,15 | **freely** | 228:2,6 | 32:21  36:8 |
| 121:21 | 130:17 | 248:21 | 242:18 | 41:2  59:17 |
| 129:9 | 131:8 | 274:6 | 248:25 | 67:15,17 |
| 131:4 | 132:5,12 | 276:22 | 249:9,11 | 67:21 |
| 136:14,17 | 136:12 | 277:1 | 253:23 | 156:13 |
| 136:20,22 | 162:18,20 | 358:9 | 263:16 | 157:5,14 |
| 136:24 | 170:14,25 | **freeze** | 271:3 | 157:20 |
| 137:2 | 171:9,9 | 303:24 | 335:1 | **funding** |
| 138:13 | 182:6,12 | 304:2,7 | 345:2 | 19:17,25 |
| 169:19 | 184:1,17 | **freezer** | **Frontline** | 20:5  21:23 |
| 180:24 | 187:16 | 169:6 | 227:16 | 22:6,13 |
| 220:4 | 188:7,9,25 | **frequently** | 234:6 | 26:1  28:4 |
| 262:11 | 189:1,6,11 | 347:2 | 238:22 | 28:17  36:9 |
| 279:25 | 191:15 | **Friday** 48:1 | 242:15 | 37:16  45:6 |
| 281:10 | 253:24 | 51:21  66:6 | 243:3 | 58:4,22 |
| 315:13 | 256:7 | 201:23 | **frustration** | 59:14 |
| 345:18 | 257:6 | 344:13 | 344:12 | 63:17 |
| **framework** | 258:19,22 | **friend** | **full** 159:6 | 70:11,18 |
| 70:20 | 259:1,8 | 265:20,22 | 183:2 | 71:4,19 |
| 72:15 | 261:5,19 | 266:1 | 239:9 | 76:7  79:3 |
| **framing** | 262:11,19 | **friendship** | 272:24 | 156:20 |
| 131:8 | 263:17,22 | 205:8 | 278:8 | **further** 52:8 |
| 137:3 | 264:2,10 | **frightening** | 325:2 | 74:18  78:8 |
| **Francis** | 266:9,14 | 342:21 | **fully** 42:2 | 80:14 |
| 13:14 | 268:20 | 343:8 | 160:8 | 81:16 |
| 66:15  67:6 | 269:11,16 | **fringe** | 298:15 | 105:17,19 |
| 67:9,12,14 | 269:22 | 255:11,21 | **function** | 105:23 |
| 67:20  68:1 | 271:25 | 271:24 | 6:11  16:3 | 106:18 |
| 75:5  82:23 | 272:13,16 | 272:5,13 | 16:9,12 | 107:20 |

DR. ANTHONY FAUCI  11/23/2022

| | | | | |
|---|---|---|---|---|
| 110:5 | 117:18,21 | 157:25 | 36:25 | 126:12 |
| 111:6 | 174:9,15 | 158:9 | 37:19 | 206:8,19 |
| 112:19 | 174:18 | 189:4 | 41:21 | 244:1 |
| 116:14 | 175:8 | 191:4 | 46:12 58:7 | 245:11 |
| 195:1 | 216:1 | **German** 97:16 | 67:9 68:16 | **go** 11:11 |
| 299:25 | 228:9 | 108:8 | 69:11 73:3 | 12:1 15:10 |
| 303:22 | 229:17 | **Gertz** 202:19 | 96:8 | 17:12 |
| 359:18 | 230:13 | **Gertz's** | 115:15 | 18:25 |
| 360:13 | 315:21 | 202:2 | 122:12 | 20:19,23 |
| **future** | 316:19 | **getting** 12:6 | 134:2 | 21:6 22:24 |
| 102:25 | **general's** | 26:10 | 144:14 | 45:17 |
| | 9:19 269:3 | 42:15 | 146:21 | 47:14 48:9 |
| **G** | **General's** | 60:25 | 152:17 | 49:12 |
| **G** 9:1 | 2:8 | 61:25 | 158:19 | 53:24 54:7 |
| **gain** 6:11 | **generally** | 62:20 91:1 | 167:14 | 63:15 |
| 16:3,9,11 | 16:1 33:13 | 104:13 | 191:14 | 80:24 |
| 17:14 | 46:16 | 107:3 | 232:12 | 85:25 |
| 29:15 | 117:12,14 | 110:1 | 271:17 | 89:19 |
| 55:21 | 207:24 | 111:20 | 284:12 | 94:20 |
| 57:15 | 211:23 | 114:12 | 323:18 | 101:9 |
| 116:5,7 | 241:14 | 124:9,10 | 338:20 | 106:17 |
| **gain-of-...** | 263:19 | 126:15 | **given** 11:3 | 108:21 |
| 16:1 25:20 | 290:16 | 129:23 | 14:4 28:24 | 117:19 |
| 25:25 26:4 | 309:1 | 149:13 | 37:8 43:7 | 122:16,16 |
| 27:4 57:2 | 338:11 | 151:8 | 43:12 91:5 | 132:2 |
| 61:3 69:25 | 347:19 | 152:4 | 114:9 | 134:6 |
| 71:7,19 | **generated** | 157:20 | 126:8 | 135:4 |
| 118:19,23 | 36:16 37:2 | 169:4 | 133:20 | 139:9,13 |
| **Gannon** 135:8 | **generating** | 188:2 | 134:25 | 140:4 |
| 136:2,3 | 14:6,20,23 | 215:10 | 135:12 | 142:15 |
| **GARDNER** 3:23 | 15:22 24:1 | 233:11 | 136:9 | 156:16 |
| **garnering** | **genetic** | 243:1 | 153:22 | 162:12 |
| 42:10 | 24:14 | 254:3 | 154:18 | 165:14 |
| **Garry** 51:6 | **genetically** | 256:13 | 156:24 | 166:4 |
| **Gates** 104:11 | 34:16 | 257:8 | 177:23 | 173:7 |
| 338:22 | **genetics** | 258:9 | 178:1 | 177:20 |
| **gather** 87:10 | 23:14,15 | 269:1 | 181:19 | 178:6 |
| 87:12,12 | 23:19 24:3 | 310:8 | 200:6 | 189:2 |
| 87:18 | 24:7,10,11 | 335:12 | 216:11 | 192:7,18 |
| **gathering** | 24:22 | 342:7 | 236:24 | 198:6 |
| 110:18 | **genome** 50:24 | **Gingrich** | 245:3 | 199:5,7,11 |
| 111:6 | 51:12,25 | 141:17 | **gives** 218:9 | 201:11 |
| **gbdeclar...** | 121:15,25 | 143:3 | 331:3 | 206:8,18 |
| 255:1 | **genomes** | **Gingrich's** | **giving** 31:1 | 225:7 |
| **general** 4:19 | 36:15 37:4 | 141:20 | 145:2 | 230:4 |
| 14:18 | 49:16 50:3 | 143:24 | **glad** 173:13 | 233:12 |
| 79:23 95:6 | 50:10 | **give** 11:23 | **glance** 12:12 | 236:9 |
| 95:9 97:5 | **genomic** 50:6 | 17:18 | **global** 7:23 | 247:14,21 |
| 108:5 | 50:7 | 26:18 | 15:18 | 248:23 |

DR. ANTHONY FAUCI  11/23/2022

| | | | | |
|---|---|---|---|---|
| 267:14 | 78:3 83:18 | 341:9 | 327:16,22 | 207:20,21 |
| 271:12 | 85:25 | 354:24 | 330:11 | **grants** 18:24 |
| 277:15 | 89:19 | 359:18,20 | **Google-o...** | 63:17,18 |
| 282:23 | 91:13 96:8 | **goings** | 239:12 | 63:19 76:6 |
| 283:24 | 104:25 | 142:12 | **Google.com** | **great** 7:24 |
| 284:24 | 106:12 | **gold** 244:11 | 324:7 | 84:18,22 |
| 296:10 | 108:22 | 244:12,14 | **Gotcha** | 84:23 |
| 299:21,25 | 109:25 | **Gonsalves** | 294:13 | 85:13 |
| 303:22 | 115:19 | 265:7,10 | **gotten** 99:8 | 88:19 |
| 320:9 | 116:25 | 266:15 | **Gottlieb** | 132:6,21 |
| 321:8,25 | 126:18 | 267:10 | 346:21 | 167:24 |
| 322:4 | 127:21,25 | 268:9 | 348:3,14 | 168:2,6 |
| 325:19 | 128:4,23 | 269:14 | 349:8 | 248:13,16 |
| 354:21 | 134:9 | 296:2,16 | 351:11 | 249:1,10 |
| 359:6,7 | 138:21 | **good** 7:19 | 352:13,18 | 249:11,14 |
| **goes** 36:5,9 | 139:6 | 10:8 12:24 | **government** | 249:18,19 |
| 37:13 | 150:3 | 39:18 | 25:25 27:3 | 250:1 |
| 108:25,25 | 155:9,11 | 46:12 | 27:18 28:3 | 252:17 |
| 109:6 | 155:13 | 52:14 | 28:17 | 254:6,12 |
| 113:7 | 156:16 | 71:22 | 38:11 | 254:23 |
| 149:14 | 167:14 | 77:16 | 46:14,17 | 255:3,14 |
| 152:13 | 184:15,19 | 79:17 | 75:19,23 | 258:10 |
| 156:7 | 192:1 | 83:16 | 75:25 | 260:15 |
| 164:20 | 194:16 | 106:11 | 177:11,24 | 264:7 |
| 165:12 | 203:19 | 139:9,13 | 178:12 | 266:9 |
| 183:16 | 219:19 | 156:9 | 216:18 | 267:1 |
| 239:9 | 220:9 | 173:6 | 238:12,15 | 268:6,22 |
| 255:10 | 232:12 | 226:13 | 238:17,23 | 269:3 |
| 256:21 | 241:11 | 227:8 | 290:17,20 | 276:4,17 |
| 257:15 | 242:6,6,8 | 233:5,15 | 318:14 | 277:5 |
| 259:17 | 253:9 | 234:16 | 327:9 | 279:18 |
| 268:1 | 257:4 | 242:7,9 | 334:9 | 280:1,13 |
| 273:9 | 261:18 | 279:3 | 342:5 | 280:17,21 |
| 280:5 | 262:15 | 323:3 | 343:4,18 | 281:8,23 |
| 281:18 | 263:4 | 329:14 | 345:4,17 | 282:11 |
| 320:16 | 268:20 | 343:14 | 345:22,25 | 283:2 |
| 342:20 | 277:12 | 353:25 | **grabs** 271:9 | 285:7,10 |
| 358:14 | 279:18 | 354:2,5 | **grant** 19:8 | 290:10,19 |
| **going** 12:4 | 280:19 | **Google** 8:8 | 20:7 21:23 | 291:12 |
| 20:4 25:2 | 284:12 | 239:14,23 | 22:22 36:5 | 292:10 |
| 29:8 38:24 | 289:15 | 264:19 | 36:11 41:5 | 295:5 |
| 39:2 47:7 | 304:19 | 280:13,17 | 41:7,16,19 | 296:19,23 |
| 47:8 53:2 | 313:1 | 280:20,22 | 41:23 42:5 | 297:5,9,16 |
| 53:18 54:9 | 314:18 | 281:23 | 42:25 | 297:22 |
| 58:19 | 320:20 | 282:11 | 60:14 72:1 | 325:22 |
| 59:22 | 326:20 | 324:9,24 | **grantee** | 338:21 |
| 60:16 | 328:25 | 325:8,12 | 32:14 | **Greenberg** |
| 63:10,13 | 329:4 | 325:20,25 | 40:10,11 | 292:18,19 |
| 70:9 76:16 | 340:4 | 326:8,15 | 40:21 | **Greg** 38:1,1 |

38:2 39:20
294:9,11
294:11
295:8,9,17
Gregg 265:7
265:10,17
266:15
268:9,12
269:14
296:2,16
gross 314:16
ground 11:11
70:17
grounds
12:20 13:7
25:11
group 38:4
40:8 41:2
44:10,19
46:24
52:15
58:20
59:23
63:14,24
81:21
86:21 87:3
87:8,21,25
88:5 89:12
92:13,24
103:2
107:17
109:16
131:3,4,9
131:19,20
131:24,25
132:10,11
132:13,18
134:1
135:20
136:15,18
136:20,22
137:2,7,15
138:24
139:1,6,8
198:14
205:12
225:18,25
228:1,6
231:7

232:1
234:6,8,9
234:21
246:21,22
246:24
247:2,6
248:10
265:13,14
265:15
309:1
329:3
332:20
336:11
groups 16:5
17:8,16
136:22
214:12
246:7,11
247:5,15
growing
188:16
344:12
guaranteed
130:3
guardrails
15:4 16:7
16:19,21
guess 17:19
76:13 85:4
97:16
98:12
103:11
105:22
147:12
177:15,16
202:4
218:18,18
224:12,22
225:2,6,6
228:2
266:15
279:5
349:2
guest 141:20
guideline
214:12
247:5
331:22,23
331:23

333:22
guidelines
16:19
231:11,11
232:9
247:24
332:3,18
333:3,11
Gupta 251:17
256:4
267:21
guy 190:2
261:16
guys 87:14
260:7,12

─────────
H

H 6:6
H5N1 15:1
half 76:17
130:16
131:23
132:22
298:22
358:21
halfway
94:20
110:17
144:23
hall 212:6
241:4
281:16
HAMMOND 4:18
hand 25:2
136:25
170:9
handed 83:23
111:9
handing 12:9
119:18
122:24
130:6
141:15
142:18
148:4
158:23
163:7
181:23
185:2

187:8,8
203:24
handle
300:14
301:24
303:24
304:7,8
handled 29:2
handles
304:3
handling
165:7
166:7
happen 86:8
92:19
107:12,16
155:3
156:4
177:25
315:7
happened
66:18
85:22
102:24
146:9,14
155:4
156:2
157:18,22
178:4
239:6
241:4
happening
102:25
156:7
208:25
342:8
happens
103:21
157:11
174:3
216:13
320:14
happy 47:17
128:3
315:23
harm 189:10
219:14
225:4
248:4

harmed
225:13
harmful
246:8
288:14
harms 217:5
Harold 134:3
135:7
Harry 292:18
292:19
Harvard
132:19
231:18
267:19
hasten 271:8
Haven 265:12
HCQ 245:19
245:22
HCQ/CQ
245:11
HCQ/QC 7:23
head 18:18
28:3,17
76:3
150:23
240:2
324:11
327:2
headline
209:8
228:25
271:8
278:2
headlined
212:20
health 1:19
4:8,10,17
4:20 10:15
28:5,10,13
30:2 40:12
40:25
65:10,11
79:17 95:7
95:9,17
96:23
126:12
165:7
169:10
177:6

| | | | |
|---|---|---|---|
| 231:13 | **hearing** | 327:7 | 243:10 |
| 237:3 | 87:10 | 328:13 | **hotly** 358:6 |
| 265:11,24 | 213:1 | **high** 2:9 | **hour** 76:17 |
| 267:23 | **heck** 230:23 | 108:9 | 119:12 |
| 277:8 | **held** 234:5 | 195:16 | **hours** 235:6 |
| 288:15,19 | 273:2 | 246:7 | 359:12 |
| 288:24 | **hello** 175:4 | **high-risk** | **House** 7:11 |
| 289:4,8,10 | 266:2 | 169:21 | 197:1 |
| 289:15 | **help** 165:15 | **higher** 117:2 | 198:23 |
| 290:1 | 178:2 | **highlighted** | 201:3 |
| 313:10 | 188:15 | 294:14 | 207:25 |
| 314:5 | 201:25 | **highly** 44:10 | 217:24 |
| 333:6 | 217:4,16 | 45:11,12 | 218:3 |
| 334:10 | **Henry** 244:17 | 80:1 89:13 | 271:9 |
| 342:22 | **herd** 248:21 | 122:4 | 275:24 |
| 343:15 | 248:23 | 135:11 | 276:1,3,10 |
| 345:24 | 266:16,20 | 139:17 | 328:11,20 |
| 346:6,13 | 266:24 | 140:3 | 329:17,21 |
| 347:3 | 267:3 | 198:14 | 330:1 |
| 357:2,6 | 271:9 | 216:15 | 335:2,19 |
| **healthcare** | 275:17 | 217:12 | 335:23 |
| 320:23 | 276:9 | 259:9 | 336:10,12 |
| 321:5 | 278:3,11 | 261:2,20 | 336:18 |
| **hear** 41:19 | 285:2,11 | 281:21 | 339:22 |
| 64:20 | 292:13,22 | **Hill** 7:14 | 359:5 |
| 173:14 | 294:25 | 8:18 209:7 | **https://**... |
| 241:4 | 295:1,5,12 | 232:18 | 254:19 |
| 335:8 | 295:22 | 341:1 | **https://**... |
| **heard** 45:20 | 355:11,20 | 342:19 | 254:19 |
| 58:9,21 | **hero** 309:15 | **Hines** 3:1 | **huge** 84:9 |
| 64:5 71:2 | **hesitancy** | 5:3 | **Hugh** 30:21 |
| 92:8 135:7 | 338:12 | **historical** | 54:17,20 |
| 143:18 | 352:5 | 145:10 | 54:24 |
| 175:22 | **hesitant** | 246:25 | 56:13 |
| 212:11,25 | 117:19 | **history** | 57:18 61:7 |
| 223:8 | **Hey** 208:25 | 144:12 | 61:14 62:3 |
| 224:8 | 209:25 | **hit** 169:5 | 63:7 66:10 |
| 252:14 | 241:4 | **HIV** 265:18 | 68:7 69:2 |
| 270:3 | 260:7 | **HOFT** 5:4 | 69:9,23 |
| 272:17 | 303:5 | **hold** 23:6 | 70:8,8 |
| 282:9,21 | **HHS** 139:9 | 101:23 | 71:5,14 |
| 282:22,23 | 299:23 | 148:24 | 72:4,12,16 |
| 291:19 | 303:9 | 306:9 | **Hugh's** 58:2 |
| 293:9,10 | **hi** 32:19 | 320:13 | 59:1 70:12 |
| 296:3 | 95:1 | 330:13 | **huh-uh** 11:25 |
| 334:19,23 | 254:18 | **Holmes** 44:24 | **human** 4:8,10 |
| 334:24 | 299:13 | 45:2,3,9 | 31:8 |
| 335:4,5 | 311:16 | 51:4 73:10 | 144:13,18 |
| 342:4 | 325:20 | 112:15 | 146:4 |
| | **hearing** | 120:11 | |
| | 87:10 | 124:17 | |
| | | 160:18,21 | |
| | | 161:1 | |
| | | 203:12 | |
| | | **Holmstock** | |
| | | 9:14 | |
| | | **homes** 168:14 | |
| | | **honest** 68:4 | |
| | | 103:6 | |
| | | 221:22 | |
| | | 250:25 | |
| | | 338:8 | |
| | | 358:13 | |
| | | **honestly** | |
| | | 339:1 | |
| | | **Honor** 48:6,7 | |
| | | **honorable** | |
| | | 48:8 | |
| | | **hope** 24:9 | |
| | | **hoped** 189:4 | |
| | | 189:12 | |
| | | 191:3 | |
| | | **Hopefully** | |
| | | 106:23 | |
| | | **hoping** | |
| | | 324:25 | |
| | | 325:8 | |
| | | 342:6 | |
| | | **horrifying** | |
| | | 342:11,14 | |
| | | 342:16 | |
| | | **hospital** | |
| | | 169:7 | |
| | | 174:10,16 | |
| | | 174:18,20 | |
| | | 175:8 | |
| | | 316:10 | |
| | | **hospital**... | |
| | | 274:4 | |
| | | 278:24 | |
| | | 297:8 | |
| | | **hospital**... | |
| | | 343:9 | |
| | | **hospitals** | |
| | | 169:11 | |
| | | 316:3 | |
| | | **hosted** 235:6 | |
| | | **hosting** | |

**DR. ANTHONY FAUCI  11/23/2022**

| | | | | |
|---|---|---|---|---|
| 153:25 | 220:7,12 | 139:24 | 275:10 | 218:23 |
| 154:20 | 223:10,15 | 157:4 | 277:20 | 220:25 |
| 156:9 | 223:20 | 266:16 | 280:9 | 255:1,2 |
| 161:20 | 224:3,25 | 272:6 | 283:13 | 256:12 |
| 198:19 | 225:21 | 276:18 | 284:8 | 257:2,24 |
| 200:10 | 227:10 | 289:3 | 286:5 | 258:6,21 |
| 267:23 | 229:1,9 | **identifi...** | 294:7 | 265:18 |
| 313:10 | 231:2,4,22 | 12:14 | 298:19 | 267:2 |
| **humans** 43:4 | 232:8 | 17:21 25:5 | 304:25 | 269:9 |
| **Humphrey** | 235:10 | 31:4 37:22 | 307:16 | 328:18 |
| 328:6,7,9 | 236:22 | 43:10 84:1 | 315:8 | 331:11 |
| 329:20,25 | 239:16 | 96:11 | 323:21 | **immediate** |
| **hundred** | 243:21 | 111:12 | 328:1 | 38:3,16 |
| 16:14 32:8 | 244:2,9,19 | 114:19 | 330:7 | 183:21 |
| 33:9 88:2 | 245:10,23 | 119:25 | 334:21 | **immediately** |
| 141:10,11 | 247:17 | 123:1 | 340:23 | 33:5 50:15 |
| 141:23 | 248:3 | 130:8 | 344:1 | 51:10 73:6 |
| 161:11 | 355:7 | 138:9 | 346:16 | 92:1 |
| 207:3 | 356:8 | 141:13 | 352:21 | 106:17 |
| 263:20 | 358:7 | 142:21 | **identified** | 154:14 |
| **hundreds** | **hyperbole** | 148:13 | 306:23 | 240:10 |
| 21:7 45:18 | 188:24 | 152:19 | **identify** | **imminent** |
| 112:6 | **hyphen** 39:10 | 158:21 | 42:14 43:1 | 288:21 |
| 146:21 | 39:10,10 | 163:9 | 69:8 93:23 | **immunity** |
| 148:1 | **hypotheses** | 167:16 | 287:4 | 248:22,24 |
| 149:15 | 191:17 | 170:11 | **identifying** | 266:16,20 |
| 200:15 | **hypothesis** | 172:25 | 287:15 | 266:24 |
| 244:25,25 | 208:2 | 178:19 | **identities** | 267:3 |
| 293:21,21 | **hypothet...** | 182:3 | 167:6 | 271:9 |
| 333:22 | 156:11 | 185:18 | **IG** 328:18 | 275:17 |
| 347:11 | _____ | 187:11 | **ignore** | 276:9 |
| **hundredth** | **I** | 196:22 | 245:14 | 278:4,11 |
| 312:7 | **I-o-a-n-...** | 201:18 | **II** 288:14 | 285:2,11 |
| **hurt** 217:17 | 293:8 | 204:1 | **ill-founded** | 292:14,22 |
| **hurts** 237:8 | **i.e** 316:10 | 209:5 | 274:2 | 294:25 |
| **hydroxyc...** | **Ian** 39:22 | 210:13 | 277:6 | 295:1,5,12 |
| 213:22 | 40:11,19 | 212:17 | **illness** | 295:22 |
| 214:2,9,11 | 152:21 | 213:19 | 169:25 | 355:11,21 |
| 214:14 | 153:7,9,16 | 221:12 | 278:24 | **impact** |
| 215:7,21 | 153:16,22 | 226:11 | **imagine** 37:6 | 353:10 |
| 215:22,23 | 161:14,21 | 228:17 | 46:6 49:18 | **impeded** |
| 216:7,24 | 161:21,22 | 232:14 | 50:5,12 | 335:12 |
| 217:3,11 | 212:25 | 242:12 | 73:24 74:1 | **imperative** |
| 217:12,19 | 213:1,5 | 245:6 | 76:14 | 169:11 |
| 217:25 | **ICU** 316:11 | 249:7 | 86:16 | **impersonate** |
| 218:6,17 | **idea** 42:20 | 253:16 | 116:24 | 303:17 |
| 218:19,20 | 46:12 | 263:9 | 179:13 | 304:4 |
| 218:22,24 | 52:14 | 266:6 | 199:1 | **imperson...** |
| 219:12 | 108:20 | 270:8 | 216:10 | 312:19 |

DR. ANTHONY FAUCI  11/23/2022

| | | | | |
|---|---|---|---|---|
| imperson... | importing | 326:9 | 267:8 | 272:12 |
| 300:20 | 321:15 | 332:17 | indirectly | 279:2 |
| 303:20 | impossible | 357:3 | 96:20 | 291:1 |
| 304:12 | 157:1,10 | inclusion | individual | 332:21,22 |
| 310:16 | imposter | 135:20 | 224:24 | 333:1,24 |
| 328:24 | 301:19,24 | inconsis... | 232:8 | influence |
| 329:2 | 302:1,8,9 | 50:25 52:5 | 334:1 | 297:4 |
| 330:2 | 302:12 | 71:7,16 | individu... | 312:18 |
| imperson... | 303:3,8 | incorrect | 18:24 19:2 | influencing |
| 311:19,20 | impressed | 217:14 | individuals | 290:8 |
| 312:15 | 165:6 | 245:17 | 97:5 | influenza |
| 329:4 | impression | 276:24 | 169:21 | 15:9 16:18 |
| imperson... | 77:21 | 277:6 | 231:14 | 24:8,25 |
| 303:12 | 229:17 | 339:6 | 297:9 | 25:20 |
| implemented | inaccurate | increase | 355:24 | inform 39:6 |
| 28:8 | 246:23 | 102:22 | INDRANEEL | informal |
| implemen... | inadequate | 191:19 | 3:25 | 142:23 |
| 166:19 | 323:6 | 192:12 | ineffective | 174:5 |
| implicat... | inapprop... | 195:2 | 319:1 | information |
| 15:12 | 157:13 | 321:14 | infect | 14:5,19 |
| 107:25 | inaugura... | increasing | 278:23 | 58:8 73:15 |
| 275:5 | 10:19,21 | 321:16 | infected | 104:22 |
| 298:15 | 10:22 | increasi... | 278:11 | 107:9,15 |
| implying | incident | 190:6 | 314:9,11 | 111:2,6 |
| 147:9 | 209:12,13 | incredibly | 317:2 | 127:11 |
| 165:22 | include | 306:19 | infection | 139:10 |
| 190:25 | 16:21 | independent | 167:23 | 143:4 |
| important | 42:17 | 75:20 | 168:2 | 151:7 |
| 14:5,19 | 133:1 | indicate | 247:18 | 171:19 |
| 42:22,24 | 136:1 | 215:4 | 274:3 | 178:2 |
| 46:22 | 139:1 | 322:14 | 285:3,12 | 194:14,25 |
| 52:13 97:3 | 168:10 | 361:12 | 297:8 | 215:18 |
| 97:5 | 169:21 | indicated | 314:10,12 | 217:14 |
| 132:18 | 211:5,11 | 38:19 | infections | 219:22 |
| 134:19 | 298:7 | 149:2 | 170:5 | 236:24 |
| 169:1 | 330:11 | 227:11 | infectious | 237:4,8,19 |
| 177:4,5 | included | indicates | 10:14 46:8 | 268:21 |
| 216:24 | 55:24 | 48:1 142:4 | 46:10,14 | 287:14 |
| 238:19 | 81:19 | 242:19 | 46:17 | 288:20 |
| 260:18 | includes | 245:25 | 70:16 | 289:1 |
| 319:9,20 | 170:17 | 247:16 | 72:19 | 300:3 |
| 322:18,24 | including | 283:21 | 133:24 | 306:19 |
| 322:25 | 17:5 37:4 | 284:2 | 142:13 | 307:9 |
| 323:1 | 97:5 | 308:4 | 216:12 | 312:12 |
| 340:1 | 103:23 | 324:21 | 231:15,16 | 318:17 |
| 354:12 | 111:4 | indicating | 231:19 | 323:1,4,4 |
| 358:9,14 | 115:2 | 121:3 | 232:10 | 323:6 |
| Importantly | 131:4 | indication | 248:1 | 332:7,25 |
| 161:25 | 140:7 | 194:13 | 271:24 | 339:15 |

DR. ANTHONY FAUCI  11/23/2022

| | | | | |
|---|---|---|---|---|
| 357:9,12 | 33:12 36:6 | interest | 145:1 | 86:7 131:7 |
| 357:18 | 36:16 | 48:4 49:22 | 170:4 | invoke 28:16 |
| 358:25 | 37:12 | 50:11 | interrup... | 28:22 |
| informed | 42:17 | 61:23 98:8 | 170:3 | involve |
| 210:16,23 | 117:9 | 100:11 | interspe... | 170:6 |
| 357:23 | 132:19 | 110:18 | 23:5 | involved |
| infreque... | 133:8,22 | 111:6 | interven... | 35:14 |
| 246:23 | 135:1 | 243:16 | 151:11 | 44:25 91:1 |
| initial | 142:12 | 256:20,22 | 225:13 | 96:23 99:8 |
| 80:13 | 153:24 | 335:13 | 341:24 | 107:23 |
| 81:12 | 154:19 | interested | 345:14 | 110:2 |
| 181:7 | 156:21 | 87:10 | interven... | 120:18 |
| initially | 158:1,11 | 142:12 | 345:10 | 122:6,10 |
| 22:23 | 158:15 | 257:3 | 346:3,12 | 125:12 |
| initiated | 174:7,8 | 360:16 | 357:5 | 126:3,7,10 |
| 18:13 | 175:9 | interesting | interview | 126:12,15 |
| initiation | 205:21 | 52:12 | 141:8 | 137:23 |
| 19:8 | 216:6 | 141:5 | 146:20 | 155:1,6 |
| inkling | 260:19 | interfere | interviewed | 169:9 |
| 137:20 | 261:1,4 | 103:20 | 296:12 | 203:14 |
| inner 38:2 | 308:2 | interfering | intervie... | 213:12 |
| 38:15 | 326:19 | 340:18 | 359:2 | 229:20 |
| input 96:22 | institutes | 357:12 | interviews | 235:22 |
| 110:2 | 1:18 10:15 | internat... | 101:2 | 239:24 |
| 124:12 | 65:9,11 | 44:10 | introduce | 241:6 |
| 127:10 | 122:14 | 45:17 | 9:16 | 260:17,19 |
| 171:22,24 | institution | 46:24 | 289:15 | 302:12 |
| 172:12,22 | 46:9 155:6 | 89:13 | invalid | 312:5,8,11 |
| 180:8,14 | 155:8 | 107:24 | 258:7 | 312:18 |
| 180:15,19 | 292:3 | 126:12 | 276:21,21 | 340:5,8,12 |
| 196:8 | institut... | 140:4,6,9 | 277:2 | 340:17 |
| 220:18 | 133:14 | internat... | invariably | 359:1 |
| ins 357:25 | instruct | 45:22 | 193:4 | involvement |
| inserted | 13:7 25:10 | 75:22 | investigate | 70:11 71:3 |
| 54:5 | intent 43:5 | internet | 80:20,23 | 81:16 82:4 |
| insights | intention | 252:24 | 138:16 | 82:9 |
| 14:5,19 | 91:4 | 349:10 | investig... | 107:20 |
| Instagram | interact | 352:5 | 137:19 | 110:2 |
| 101:2,7 | 45:19 | interpre... | investig... | 122:19,21 |
| 211:25 | 298:3 | 118:24 | 357:14 | 125:18 |
| 286:11 | 346:25 | 127:11 | investig... | involves |
| 309:6 | interacted | Interrog... | 213:4 | 124:13 |
| 328:15,18 | 77:18 | 287:7 | invitation | involving |
| 330:2 | 175:16,17 | interrog... | 86:17 | 25:20 |
| Instagrams | 264:23 | 287:3,12 | 149:2 | 111:3 |
| 101:4 | 266:2 | 287:21 | invited | 170:13 |
| institute | interact... | interrupt | 172:6 | Ioannides |
| 4:17 10:13 | 126:7 | 11:14 | 176:25 | 293:8,10 |
| 19:4 33:8 | 175:5 | 127:18,18 | inviting | ironic 311:4 |

DR. ANTHONY FAUCI  11/23/2022

**irrelevant**
207:6,12
**isolation**
165:8
**issue** 44:11
67:20 68:1
82:4,18
96:24
116:19
136:25
145:5
169:8
193:9
220:11
243:4
259:12
292:24
295:21
335:6,8
339:23
**issues**
241:24
275:4
312:9,11
314:24
353:12
355:13
356:24
358:7,10
**issuing**
220:6
**item** 331:7,8
**items** 284:25
**ivermectin**
330:25
331:4,5,9
331:16
332:2,8
333:15,19
**ivermect...**
331:16

_____
**J**
**J** 3:3 352:23
352:24
**Jack** 240:17
293:2,4
**Jamal** 330:19
331:2

**JAMES** 5:4
**Jan** 324:24
327:1
**January**
22:17
34:13,18
35:9,14
40:6 42:6
48:2 51:21
84:17,19
85:12
123:23
351:23
**Jay** 251:18
267:20
291:15
**Jayanta** 2:24
**Jefferson**
2:10
**JEFFREY** 2:16
**Jen** 37:25
324:2,23
325:7,21
327:1,7
**JENIN** 3:2
**Jenin.yo...**
3:9
**Jennifer**
38:5
308:12,14
308:15
324:23
**Jeremy** 34:19
43:20 44:3
44:5,23
46:11,11
48:3 50:9
60:2 66:24
72:24
73:21,25
74:1,7
75:1 76:1
76:2 79:7
79:12 83:3
83:6,7
84:6,8,16
84:23 85:9
85:12,19
86:2,7,14

88:3,17
89:21,25
90:8,19,20
91:6,12
92:2,12,19
92:22 93:4
93:9,15,25
94:11,22
95:1,20
97:22 98:4
98:20
101:12
102:3,14
102:18
103:5
105:7
106:10
108:25
109:10,15
109:23,25
110:10,15
110:24
111:18,23
112:16
114:3
115:9
116:13
118:3,6,16
120:4,10
121:20
123:7
124:15
125:2
126:23
128:13
130:17
132:5,12
132:17,20
132:24
133:4,21
135:20
136:5
137:6,14
160:18
161:1,9
162:25
170:14,25
171:5,5,16
**Jeremy's**

86:18 96:4
108:1
110:6
111:3,6
125:8
136:12
**Jeremy-led**
131:15
**Jill** 3:1 5:3
**job** 172:21
238:20
260:18
326:25
**Joel** 272:14
272:15
**jog** 126:2
127:8,9
130:4
141:16
147:1
341:19,21
**jogs** 132:8
**John** 2:5 3:3
9:18 296:1
296:6,8,11
**John.Sau...**
2:12
**John.vec...**
3:10
**John@Bur...**
3:18
**join** 86:3,14
86:17
131:5,8
**joined** 277:7
317:15
**joiners**
252:7
**joint** 141:2
**Jon** 49:6,16
50:9 61:18
61:24
62:14
**JONATHAN**
3:13
**Joseph** 1:8
9:7 133:10
134:13,23
135:6,13

135:14
361:7
362:2
**JOSH** 3:23
**journal**
203:1
**Journalist**
212:21
**journals**
215:17
**Jr** 1:8 9:7
361:7
362:2
**judgment**
224:10,12
319:25
**Judith**
307:20,23
308:17,19
**July** 225:16
226:14
233:2,15
233:18,19
233:20,20
328:7,12
341:1
343:3
344:4,5,8
**jump** 154:14
198:18
200:9
264:24
**jumped**
101:18,20
**jumping**
173:6
**June** 21:23
22:1
220:14
**Justice** 2:19
3:21 4:1
9:22 361:5
**justified**
52:18
**JUSTIN** 2:7
**juxtaposed**
49:17
106:9
217:9

DR. ANTHONY FAUCI  11/23/2022

| K | | | | |
|---|---|---|---|---|
| **Katie** 202:3 | 166:8 | 88:12 89:7 | 178:6,13 | 251:19 |
| 202:4,15 | 206:21,25 | 90:2,5,10 | 179:2,8 | 253:3,20 |
| **keep** 58:16 | 260:14 | 92:25 | 181:24 | 254:8 |
| 69:19 | 283:19 | 93:13,22 | 182:8 | 255:24 |
| 86:21 | 284:2 | 95:22 | 183:3 | 256:24 |
| 104:2 | 300:21 | 96:12 | 184:4 | 257:20 |
| 108:8 | 310:14 | 97:11 99:4 | 185:5,10 | 259:5,24 |
| 155:25 | 319:9 | 101:15,18 | 185:15 | 260:23 |
| 210:16,23 | 334:9 | 101:21 | 186:22 | 261:13 |
| 241:10 | 339:23 | 108:18 | 187:18,20 | 262:3 |
| 283:9 | 347:23 | 109:18 | 187:23 | 266:11 |
| 314:16 | **kinds** 17:9 | 111:25 | 189:23 | 268:24 |
| **keeping** 74:8 | 17:16 | 112:23 | 193:18 | 269:19 |
| 74:12 | 104:18 | 113:16 | 195:4 | 270:6,17 |
| 128:22 | **Kingdom** | 114:20 | 196:13 | 271:14 |
| 314:13 | 75:17 76:5 | 115:15 | 197:2,13 | 272:8 |
| 315:17 | **Kirschner** | 116:20 | 199:9 | 273:5,13 |
| 317:24 | 3:22 9:21 | 118:13,21 | 200:12 | 273:21 |
| **kept** 73:21 | 9:21 12:15 | 119:21 | 201:10 | 274:12,23 |
| 157:17 | 13:6 14:8 | 120:25 | 205:3,25 | 280:14 |
| 232:5 | 14:12 | 121:6 | 206:14 | 281:2,11 |
| **Kheriaty** 3:1 | 17:22 | 125:15 | 207:18 | 282:12 |
| **kicked** | 18:20 | 127:17 | 208:4,18 | 283:3 |
| 251:23 | 19:18 | 128:2 | 210:10,18 | 285:8,19 |
| 335:22 | 20:20 22:7 | 129:12,15 | 211:14 | 286:16 |
| **kill** 170:1 | 23:17 24:4 | 130:9 | 213:24 | 287:9,17 |
| 305:25 | 24:17 25:8 | 134:14 | 214:19 | 289:2 |
| **killed** | 26:6,13 | 137:12 | 221:17 | 291:25 |
| 194:19 | 29:18 30:5 | 138:10,17 | 223:3,22 | 293:14 |
| **killing** | 35:21 | 143:10,25 | 224:13 | 294:1,3,17 |
| 344:14,18 | 36:18 42:1 | 144:25 | 225:22 | 296:25 |
| 345:5 | 43:11 46:4 | 146:10,17 | 226:22 | 297:24 |
| **kind** 15:25 | 47:18 48:6 | 148:5,10 | 227:2 | 298:9 |
| 35:10 | 48:10,17 | 149:8 | 228:18,21 | 299:1 |
| 38:14 39:9 | 48:22 | 152:11,23 | 229:14 | 301:8,20 |
| 39:13,14 | 49:10,12 | 154:5,22 | 233:7 | 302:19 |
| 42:23 | 49:24 | 158:4,24 | 234:12,17 | 303:14 |
| 50:16 | 52:24 53:7 | 159:10,20 | 235:13,17 | 304:17 |
| 53:18 | 53:21 54:2 | 161:17 | 236:6 | 305:14,17 |
| 59:13 60:9 | 57:3 62:7 | 162:6 | 237:11 | 306:5 |
| 96:24 | 63:3 65:14 | 163:25 | 239:17 | 308:24 |
| 103:13 | 65:18,22 | 164:13 | 240:12,23 | 310:5,19 |
| 118:7 | 68:15 | 166:12 | 242:24 | 310:25 |
| 121:24 | 69:10 71:9 | 167:8 | 243:11 | 311:5 |
| 140:14 | 73:2 76:16 | 168:19 | 244:20 | 312:16,22 |
| 147:24 | 76:21,24 | 169:23 | 246:2,14 | 313:16,25 |
| 148:6 | 78:14 79:9 | 172:15 | 246:18 | 314:21 |
| 155:13,19 | 82:7 83:13 | 174:21 | 249:3,20 | 318:7,22 |
| | 86:9,25 | 176:6,9,13 | 250:22 | 319:4,12 |

**DR. ANTHONY FAUCI  11/23/2022**

| | | | | |
|---|---|---|---|---|
| 322:22 | 35:12,25 | 100:18,24 | 172:2 | 252:21 |
| 325:4,14 | 36:3,3,4 | 102:3 | 173:19 | 255:5,20 |
| 326:2 | 36:14,23 | 103:14,18 | 174:14,16 | 255:23,25 |
| 327:5,18 | 36:23 37:1 | 105:12 | 175:1,7,15 | 256:6 |
| 329:18,23 | 37:5 39:7 | 106:4 | 177:5,6 | 257:1,18 |
| 331:21 | 40:2,8,13 | 107:1,18 | 179:21 | 257:22,23 |
| 332:9 | 40:19 | 108:7,7,22 | 181:3,16 | 258:1,12 |
| 333:8 | 44:25 45:7 | 109:2,4,12 | 184:17,24 | 258:16,18 |
| 334:11 | 45:9,10,10 | 109:24 | 186:7,11 | 258:25 |
| 336:25 | 45:13,14 | 113:1,2,6 | 186:13,14 | 259:3,4,22 |
| 337:24 | 45:16 46:2 | 113:15,19 | 188:9,24 | 260:1,21 |
| 339:12 | 46:11,18 | 113:20,23 | 189:8 | 260:24 |
| 341:6 | 49:7,21,21 | 115:22 | 194:9,10 | 263:13 |
| 344:7 | 50:4 51:3 | 116:1,18 | 196:4 | 264:21 |
| 345:19 | 51:5,7 | 116:22,23 | 198:23 | 265:3,7,22 |
| 346:17 | 55:6,15,23 | 117:3,7 | 199:11 | 267:3 |
| 347:6 | 55:25 56:2 | 118:15 | 201:4,5,6 | 268:13,18 |
| 348:16 | 57:8,17,22 | 119:11 | 204:24 | 268:20,25 |
| 352:7 | 58:5,19 | 120:13 | 205:1,2,23 | 269:16,21 |
| 353:17 | 59:14 | 127:7,13 | 206:3,17 | 269:22 |
| 354:22 | 62:17 63:6 | 129:8,22 | 208:21,22 | 270:18 |
| 355:16 | 64:6,14 | 133:7 | 208:22 | 274:25 |
| 356:10 | 67:1,5,23 | 134:3 | 209:20,25 | 275:4,16 |
| 358:11 | 70:2,4,9 | 135:7,8,8 | 210:4 | 277:11,14 |
| 359:13 | 74:22 | 135:22 | 212:10 | 279:5,6,23 |
| 361:4,8 | 75:21,21 | 136:16,19 | 213:3,5,16 | 281:5,7,8 |
| **knee** 256:15 | 76:10,11 | 137:9,14 | 217:21 | 281:14 |
| **knew** 62:24 | 76:13,21 | 138:19,23 | 221:20,21 | 282:15 |
| 77:17 | 77:12 | 139:4,7,10 | 223:6 | 283:6,7 |
| 136:8 | 78:11,18 | 140:1,25 | 224:14 | 285:9,10 |
| 147:16 | 81:3 82:19 | 141:1,4,6 | 226:15 | 285:25 |
| 181:5 | 83:4,7,7 | 143:4,5,17 | 228:9 | 286:10,23 |
| 195:20 | 85:15 | 144:8,10 | 229:16,19 | 288:2,2,6 |
| 226:6 | 86:12,24 | 147:17,17 | 230:5,21 | 289:20 |
| 239:13 | 87:1,2,6 | 147:19 | 230:25 | 290:20,22 |
| 297:5 | 88:10,15 | 149:9 | 231:25 | 291:6,22 |
| **knockout** | 89:3,4 | 151:15 | 235:19,23 | 292:1,18 |
| 354:9 | 91:14,15 | 152:7,13 | 236:7,10 | 293:2,4,4 |
| **know** 11:8,8 | 92:7,7,7,8 | 153:3,8,10 | 236:16 | 293:7,9,10 |
| 17:23 | 92:10,11 | 154:4,7 | 238:9,15 | 295:8,16 |
| 18:15 20:3 | 92:21,22 | 155:18,19 | 239:1 | 296:3,6,6 |
| 20:6,12,15 | 95:5,24 | 159:9,13 | 241:16 | 296:8,9,15 |
| 21:1,2 | 96:22 98:4 | 159:18 | 242:1 | 296:16 |
| 23:16 24:6 | 98:7,12,13 | 161:12,22 | 250:24 | 300:1,3 |
| 29:21 30:8 | 98:13,14 | 162:20 | 251:15,21 | 301:9 |
| 31:22 32:6 | 98:19 99:5 | 163:6 | 251:22,22 | 302:8 |
| 32:15,16 | 99:11,13 | 167:2,4,6 | 251:24 | 304:5,5,6 |
| 32:19 33:6 | 99:20,22 | 167:12 | 252:4,13 | 304:8 |
| 33:17 | 99:24 | 171:14 | 252:14,15 | 305:7,13 |

| | | | | |
|---|---|---|---|---|
| 305:20,22 | 89:15 | 279:8 | 200:12 | 219:1,11 |
| 306:13 | 100:25 | **KUMAR** 4:9 | 208:4,18 | 221:14 |
| 307:13,23 | 152:2,12 | **KYLA** 3:24 | 210:18 | 222:11 |
| 308:3 | 155:11 | | 214:8 | **LANDRY** 2:16 |
| 311:7 | 156:15 | **L** | 215:7 | **lane** 110:6 |
| 313:6 | 178:1 | **L** 4:2 361:5 | 218:14 | 114:11,15 |
| 314:2,3 | 181:13 | **lab** 33:16 | 219:18 | 120:20 |
| 322:9 | 184:14 | 79:2,21 | 221:1,17 | 124:24 |
| 323:5 | 191:21 | 89:6 | 223:3 | 139:1,15 |
| 324:18 | 201:9 | 116:15 | 225:22 | 140:1,5 |
| 325:16,24 | 208:11 | 155:17 | 229:14 | 163:12,18 |
| 326:4 | 221:16 | 156:12 | 233:7 | 163:24 |
| 328:8,19 | 241:2,20 | 157:17 | 234:12,17 | 164:10,20 |
| 329:2,24 | 251:13 | 182:22 | 235:17 | 165:6 |
| 332:20 | 269:24 | 183:14 | 237:22 | 166:16,24 |
| 335:7,17 | 274:14,15 | 188:19 | 240:23 | 167:19 |
| 336:6,13 | 285:16,23 | 190:8 | 242:24 | 168:4 |
| 336:15,15 | 286:2 | 194:2 | 243:11 | 190:20 |
| 336:17 | 290:3,6 | 208:1,17 | 244:20 | 216:5,12 |
| 337:10,21 | 292:12 | 209:10,19 | 246:2,22 | 253:25 |
| 338:1,5,6 | 307:7 | 213:8 | 249:20 | 254:15 |
| 338:13 | 312:13,17 | 355:9 | 250:22 | 259:21 |
| 339:16,25 | 325:15,17 | **labeled** 43:8 | 253:20 | 260:21 |
| 345:21 | 326:5 | 94:24 | 266:11 | 261:6,10 |
| 346:18,21 | 334:8 | **laboratory** | 272:8 | 261:17 |
| 346:23,25 | 340:4 | 14:7,21,24 | 273:5,13 | 262:11,18 |
| 347:10 | **knowledg...** | 24:2 34:17 | 273:21 | 262:19 |
| 350:4 | 261:21 | 35:11 | 280:14 | 266:9 |
| 351:6,6,7 | **known** 46:11 | 77:13 | 281:2,11 | 308:7 |
| 351:13,14 | 75:24 | 121:16 | 282:12 | 312:4 |
| 351:19,19 | 256:7 | 122:1 | 283:3 | 356:25 |
| 352:8,14 | 260:3 | 145:22 | 306:5 | 358:19 |
| 356:11,23 | 265:16,17 | 146:2 | 313:25 | **Lane's** 165:2 |
| 356:24 | 291:9 | 157:12 | 314:21 | **language** |
| 357:22 | 297:17 | 162:1 | 319:4,12 | 355:14,18 |
| 358:12 | 351:8 | 180:5 | 321:24 | 355:19,22 |
| **knowing** | 352:24 | 181:9 | 325:4 | 356:2 |
| 63:16 | **knows** 22:19 | 185:23 | 332:9 | **large** 46:23 |
| 144:17 | 36:21 | 198:3 | 336:25 | 63:14 87:3 |
| 156:3 | 67:17 | **lack** 17:13 | 337:24 | 87:21 |
| 175:2,4 | 94:16 | 143:10,25 | 345:19 | 157:25 |
| 241:21 | 155:2 | 146:10,17 | 348:16 | 236:9,23 |
| 258:1,19 | 278:13 | 152:23 | **laid** 15:3 | 273:2 |
| 259:1,8 | **Koonin** 135:8 | 158:4 | 81:25 | 297:18,21 |
| 317:2 | **Kulldorff** | 161:17 | **Lancelet** | **larger** 52:14 |
| **knowledge** | 2:25 | 164:13 | 7:18 | 58:20 |
| 33:23 | 251:17 | 184:4 | **Lancet** | 59:23 |
| 36:10 81:7 | 256:5 | 186:23 | 129:11,20 | 274:4 |
| 87:19 | 267:20 | 199:9 | 130:2 | **Laribee** 51:8 |

DR. ANTHONY FAUCI  11/23/2022

Larry 67:6
253:25
late 34:18
246:7
265:19
latest
332:25
Lauren 303:5
303:10,15
Lavelle
307:20,23
308:17,19
Law 3:14
Lawrence
65:4,6,8
66:7
lay 295:3
lead 104:16
150:11,16
150:19
151:3
193:17
194:5,22
217:15
229:25
274:3
297:7
306:23
321:4
352:5
356:21
leader
301:15
leaders
231:19
251:16
leadership
171:1,11
171:18,20
196:11
232:10
leading
278:23
338:12
leads 104:13
246:23
345:13
346:2,11
358:14

leak 188:19
208:2
213:8
leaked
157:16
leaks 157:12
learned
37:11
164:24
166:9
263:5
leave 357:24
358:18
led 59:17
261:18
321:13
left 132:17
173:7
272:20
283:21
336:10
351:1
legal 9:14
151:18
356:24
357:22
361:1,23
legend 143:6
Legislative
38:11
legitimate
207:14,16
299:15
lessons
164:24
166:9
263:4
let's 60:21
69:15 81:1
88:24
103:6
136:24
173:7
203:17
227:25
233:12
245:18
253:7
275:8

296:10
304:10
307:12
338:17
letter
129:19
letters
82:20
letting
17:22
248:18
276:22
278:3,10
278:22
level 16:22
16:22 29:2
29:11,12
30:18
70:21
89:11
117:2,10
117:16,17
119:14,14
140:6,9
195:16
245:16
248:23
levels 18:25
122:22
Levitt 252:8
257:10
Lexitas
361:1,23
Liberties
3:4
life 104:16
150:11,17
150:20
151:4,9
193:17
194:6
210:2
349:14
356:21
358:16
life-saving
151:11
lifesaving
341:23

345:10,13
346:3,12
357:5
likelihood
64:2
limit 210:16
210:23
line 23:6,8
23:9,16
26:20
38:14
76:18
89:24
90:12
91:20
97:25
102:2
113:7
120:5
131:23
148:7
161:4
167:22
194:25
202:11
211:3
240:10
264:7
324:8
344:11
362:5,9,13
362:17,21
lines 86:20
88:6 115:2
267:14
link 20:7
142:14
190:5,5
202:8,10
255:1,7
275:13,15
275:17,18
328:15
331:19
links 142:16
202:19,21
283:23
311:8
Lipkin 39:23

40:11,19
152:22
161:12,14
161:21,21
Lipkins
161:22
Lipschitz
296:15
list 46:19
74:20
75:12,18
75:24
86:15
93:10
110:14
132:24
133:11
134:7,21
136:5,7
211:4
252:7,7
263:23
284:25
294:14
296:10
305:11,13
307:8
309:11
listed 32:10
33:4,5
55:17
251:16
listen 47:8
127:21
134:9
listening
77:21,22
127:23
lists 20:10
252:8
literally
61:13
149:15
263:18
literature
102:5
110:19
111:7
158:16

DR. ANTHONY FAUCI  11/23/2022

| | | | | |
|---|---|---|---|---|
| 159:7 | 46:11 | 197:23 | 232:5 | 329:8 |
| 181:20 | 76:23 | 199:12,13 | 247:23 | 342:2 |
| 231:21 | 105:7 | 201:20 | 275:14 | 343:9 |
| 232:6 | 127:25 | 211:20 | 298:13 | **loons** 113:12 |
| 322:5 | 128:4 | 215:1 | 306:19 | **loop** 75:7 |
| 323:10 | 134:11 | 221:23 | 357:15 | **looped** 327:2 |
| **little** 26:24 | 201:10 | 222:14 | **looking** 20:2 | **losing** |
| 53:2 60:6 | 204:22 | 229:4,5 | 41:13 50:2 | 104:13 |
| 78:5 127:9 | 248:8 | 230:15 | 62:2 75:23 | **loss** 104:16 |
| 127:10 | 265:16 | 233:14 | 80:25 | 150:11,17 |
| 150:9 | **long-term** | 237:15 | 97:15 | 150:19 |
| 170:21 | 32:13 | 244:5 | 112:3 | 151:3 |
| 171:13,21 | **longer** 76:17 | 247:3,21 | 114:12 | 193:17 |
| 188:23 | 76:22 | 248:8,25 | 156:3,6 | 194:6 |
| 196:8 | **look** 13:9 | 249:19 | 197:16 | 217:7 |
| 197:23 | 14:1 15:6 | 264:6 | 202:3 | 230:1 |
| 200:24 | 17:24 | 271:2 | 218:4 | 356:21 |
| **live** 169:14 | 37:24 | 277:22 | 233:23 | **lost** 93:13 |
| 176:24 | 38:13 39:8 | 279:5 | 235:3 | 151:10 |
| 177:3 | 50:14,15 | 280:11 | 249:9 | 170:1 |
| **live-str...** | 51:13,15 | 289:20 | 295:25 | **lot** 31:16 |
| 176:20 | 52:1,7,15 | 305:2,9,10 | 302:24 | 78:21 |
| **lives** 103:20 | 52:16,16 | 306:3,22 | 303:2,4 | 88:21 |
| 104:14 | 53:11 54:1 | 308:19 | 307:1 | 103:25 |
| 169:17 | 56:19 78:7 | 312:1,2 | 309:24 | 114:22 |
| 217:8 | 80:11 81:1 | 320:2,9 | 320:15 | 120:19 |
| 230:1 | 81:2 94:23 | 322:5 | **looks** 13:18 | 153:17 |
| 256:16 | 96:16 97:7 | 328:4 | 37:10 | 154:18 |
| 342:22 | 103:1 | 330:5 | 38:18 | 159:14 |
| 345:11 | 106:17 | 331:13 | 39:18 | 160:22 |
| **Livestream** | 108:1 | 335:14 | 41:23 42:7 | 161:22 |
| 239:11 | 112:12 | 340:25 | 57:7 86:12 | 165:5 |
| 240:6 | 113:12 | 346:14 | 124:7 | 170:1 |
| **Lloyd** 291:17 | 114:16 | 347:15,22 | 132:16 | 173:19 |
| 291:18 | 115:4 | **looked** 34:22 | 149:14 | 184:18 |
| **loaded** 169:7 | 122:11 | 44:4 46:13 | 159:5 | 189:8 |
| **located** | 123:3 | 70:12 | 178:7,9 | 191:22 |
| 308:7 | 124:18 | 81:10 | 197:18,19 | 193:12 |
| **location** | 148:22 | 95:16 | 197:20 | 194:19 |
| 314:19 | 156:18,19 | 124:16,22 | 198:25 | 195:15 |
| **lock** 168:14 | 157:5 | 162:10,14 | 202:15,20 | 207:11 |
| **lockdown** | 160:7 | 170:19 | 203:7 | 230:5 |
| 261:25 | 161:3 | 183:23 | 269:12 | 244:25 |
| 262:13 | 163:17 | 186:3 | 275:18 | 256:14 |
| **lockdowns** | 170:21 | 198:15 | 284:5 | 257:8 |
| 168:11,12 | 179:5 | 204:12 | 294:22 | 274:17 |
| 168:13 | 182:16 | 227:10 | 295:18 | 286:19 |
| **long** 10:23 | 190:4,23 | 229:18 | 305:10,12 | 298:4,14 |
| 11:7 32:1 | 192:2 | 230:22 | 306:13 | 301:14 |

321:13
338:13
349:2
351:25
355:4,12
**loud** 69:14
**Louis** 3:16
361:18
**Louisiana**
1:2 2:15
2:19,21
9:10
**low** 248:23
314:18
317:9
**lower** 86:18
86:18 88:6
124:16
137:5
**lunch** 201:11

**M**
**M** 2:16
**Machine** 7:2
**magazine**
49:6
264:14
**Mailman**
40:24
**mainstream**
102:6
110:19
273:11
**major** 21:13
46:9
248:11
273:2
**majority**
230:18
277:7
**makeup** 34:24
50:6,7
80:14
156:18
**making** 15:7
15:14,16
67:24 91:4
143:23
144:2,4

146:22
172:13,19
182:20
183:12
228:7,11
279:16
311:4
334:15
338:14
343:5
**man** 20:10
212:24
286:14
290:22
**management**
331:24
**managers**
30:19
**managing**
164:8,11
165:10
**mandate**
165:19
**Mandavilli**
296:13
**manipulate**
157:2
**manipulated**
78:21
121:17
162:2
180:6
181:10
**manipula...**
16:17
23:20
24:14,23
34:25
35:15
43:25 44:7
64:3 78:1
**manipula...**
122:2
**manmade**
198:2
211:23
212:2
**mantra** 80:3
**manufact...**

192:23
193:10
211:23
212:2
**manuscript**
81:24
114:9
**March** 170:22
176:4
179:1,4,7
180:10,11
180:25,25
182:7,12
186:1,20
220:6
286:22,24
293:13
298:24
299:22
303:23
318:24
319:1
**mark** 12:10
18:1 99:17
99:21
100:21
115:12,13
116:10,10
116:15
152:1,3
173:4,8,18
173:24
175:11,22
175:25
176:4,25
178:10
286:14,22
287:4,16
288:1,5
289:7,9,13
291:21,23
292:7
296:15
**marked** 12:13
17:20 25:3
25:4 31:1
31:3 37:21
43:9 83:25
96:9,10

111:10,11
114:17,18
114:22
119:24
122:25
130:7
138:8
141:12
142:18,20
148:12,23
152:18
158:20
163:8
167:15
170:10
172:24
178:13,18
182:2
185:17
187:10
196:21
201:17
203:25
209:4
210:12
212:16
213:18
221:11
226:10
228:16
232:13
242:11
245:5
249:6
253:15
263:8
266:5
270:7
275:9
277:19
280:8
283:12
284:7
286:4
294:6
298:18
304:24
307:15
323:20,23

327:25
330:6
334:20
340:22
343:25
346:15
352:20
**markets**
145:20
**Martin** 2:25
251:17
267:20
**Maryland**
1:11,18,20
4:24 9:13
155:10,11
360:3,21
**mask** 313:13
313:23
314:12,18
315:2
317:9,23
322:14,15
322:18
**masking**
317:18
318:16,21
318:25
319:1
320:19
322:2,7
**masks** 310:13
314:9,24
315:15,18
315:22
316:3,4,5
316:11,20
316:23,23
317:5,13
318:3,13
319:2,3
320:20
321:2,4,7
321:9,13
321:14,15
321:17,17
321:18,20
321:21,25
321:25

322:10,15
355:7
**match** 41:23
41:24
**material**
314:15
318:1
**Matt** 264:14
264:21
**matter** 1:15
9:6 55:14
150:21
**matters**
270:12
333:6
347:3
**mean** 23:19
24:23 40:3
40:9,22
42:19 61:4
67:16
85:21
86:12 87:2
91:9 101:1
101:4
103:11,25
104:22
108:15,16
113:24,24
122:9
145:5
153:10
155:8,23
162:20
171:17
172:22
174:25
175:7,21
177:7
180:18
188:22
189:25
190:23
192:9,20
192:21
195:7
200:25
223:14
224:16,19

224:21
225:1,6
237:6,12
239:2,6
265:21
266:2
269:23
287:12
292:2,6
295:16
296:21
300:2
305:20
311:24
315:3,6
335:5
337:4
338:2,7
349:4
351:7,19
355:18
**meaningful**
120:16
124:23
**means** 40:2,5
68:21
70:21
108:23
116:1,2
127:13
136:20
155:20
160:5
169:16
236:8,11
259:2
300:11
304:6
348:10,13
**meant** 58:11
74:5 88:17
88:23
165:10
189:18
192:15
193:11
258:17,18
259:3
260:1

**measured**
80:12
333:21
355:19
**measures**
164:22
165:19
166:20
168:17
177:6
261:25
262:14,14
**Med** 179:22
**media** 33:15
78:11,12
79:1,14
98:8,10,15
98:17,22
99:3,6,12
99:14,21
99:24
100:6,19
100:25
101:3,6
102:6,15
102:18
103:10,12
103:13,16
104:19,20
105:17,19
105:25
106:13,13
106:19
107:6
110:20,25
111:4
142:10
150:15,19
151:3,21
152:8
185:3
186:5,8,9
186:12,16
197:25
208:2,11
209:2
210:5,7
213:9,14
213:15

235:22
236:10
238:5,7,10
238:24
239:5,22
241:7,13
241:15,19
241:24
269:17
270:1,12
270:16,23
274:10,17
274:18,22
275:5
280:2,5
281:18,25
282:5
290:8
297:13,15
301:6,11
301:18
302:18,24
303:2
304:15
307:8
311:23
312:3,8,11
312:18
333:4
334:7
335:12
338:12,16
340:14
344:12,18
345:5
346:9,10
355:12
356:7,12
356:16,19
357:19
358:1
359:1
**medical**
10:15,17
75:14
175:5
217:1
229:22
230:7,12

230:14,19
231:17
244:17
284:3,20
293:5
316:6,10
316:24
332:23
335:24
353:2
**medication**
225:3,9
**medicine**
6:12  7:7
17:7 31:6
55:19 56:1
56:16,21
56:22 60:3
60:23 61:3
62:13 66:9
71:16
179:11,11
179:15
183:23
184:2
186:6,20
186:25
189:4,12
191:3
192:14
193:8
195:3,20
201:6
203:5,8
291:3
**meet** 138:4
173:25
**meeting** 21:1
21:3,7,11
32:23 39:2
39:6 113:4
113:5
114:5
147:18,23
148:23,24
149:5,6,10
149:11,19
175:3
255:14

**DR. ANTHONY FAUCI  11/23/2022**

256:5,9
267:22
321:2
335:19
336:6,22
**meetings**
32:18  34:1
45:17
87:19
148:1
149:15
292:5
**member** 38:2
38:6  197:8
197:24
205:11
265:13,14
308:15,17
**members**
31:19
133:22
197:6
**memory** 29:22
126:2
130:4
132:8
141:16
209:1
338:4
341:19,21
**memory-wise**
138:23
**mention**
50:22
78:20
104:3,20
113:11
124:18
162:23
285:13
290:7
340:20
**mentioned**
40:10  42:8
57:12  70:8
70:25
77:23
118:23
121:22

124:11
146:20
149:10
166:6
180:15
184:14,19
195:14
216:20
240:1
260:25
281:16,17
288:5
324:24
329:3
332:19
338:5
340:16
351:25
352:14
**mentioning**
302:7
328:24
**mentions**
19:10
50:22
242:9
**merely** 11:24
138:3
**merging**
114:22
**MERS** 25:20
**message** 49:8
177:12
337:9
359:6
**met** 20:16,18
20:25  21:4
32:17,17
32:25
33:22
147:18,21
173:20,21
173:23
174:1,4
175:10
255:11
292:4
296:15
346:24

**Meta** 7:15
8:9  210:15
210:22
211:18,24
212:7,9,10
286:8,10
286:13
288:12,13
288:25
290:1
**Meta's** 286:7
**meta-ana...**
245:8
248:8
**metaanal...**
243:25
244:5,7
**methods**
168:7,9,10
**mice** 115:13
115:24
116:3,11
117:14
**Michael**
252:8
**Michelle**
296:2
**microbes**
144:12
**microbio...**
70:15
72:19
133:23
**mid** 35:9
**mid-March**
22:17
**middle** 105:4
176:7
211:9
283:21
311:13
347:16,23
347:25
**midnight**
60:6,6
**Mike** 50:24
51:7,8
92:3,6
93:12

257:10
**Miller** 202:4
202:15
**million**
170:2
235:5
236:2,7,8
236:10,19
276:24
**millions**
177:10,18
256:16
**mind** 103:3
104:2
151:8
156:1
157:17
184:16
232:5
259:8
**mine** 21:14
93:18
206:24
288:4
335:13
**minimal**
180:16
**mining** 49:16
50:3
**minister**
75:17
**Minor** 291:17
291:18
**minute** 23:25
61:13
92:23
125:1
245:19
257:13
**minutes**
61:13  70:6
92:14
253:4
269:5
**mis** 339:5
**Mischara...**
26:7  36:19
49:25  57:4
65:15

95:23
109:19
137:13
179:3
189:24
196:14
256:25
286:17
302:20
310:6
325:5
**mischara...**
114:24
**misguided**
297:7
**misinfor...**
103:19
104:4,10
104:11,15
150:10,14
150:18
151:2,6,13
151:22
188:10
193:16
194:5,7,8
194:19,23
210:17,24
217:7,15
229:25
235:15
236:4
283:25
284:4,21
286:7
288:11,15
288:16,18
312:12
325:1,9,13
326:10,11
326:16
327:17
336:24
338:3,11
338:14,15
338:16,18
338:22
339:1
340:16

DR. ANTHONY FAUCI  11/23/2022

| | | | | |
|---|---|---|---|---|
| 345:5,8,12 | molecular | 66:16,19 | mutual 77:19 | 131:25 |
| 345:23 | 34:23 | 66:20 | muzzled | 132:13,14 |
| 346:1,5 | 80:14 | 68:14 | 335:10 | 133:3,19 |
| 347:5 | 81:12,25 | 226:13 | ——————— | 133:21,24 |
| 357:17,20 | 82:24 | 227:8 | **N** | 134:21 |
| 358:23 | 133:9 | 233:5,15 | N 6:1,1  9:1 | 135:11 |
| 359:9 | 135:25 | 234:16 | 361:17 | 136:8 |
| misleading | 156:18 | 261:12 | Nabel 15:7 | 160:25 |
| 16:4,10 | 157:7 | 347:2 | 136:9 | 251:22 |
| 54:4  301:3 | 160:8 | motivated | name 9:14 | 292:17 |
| 301:7 | molecularly | 321:8 | 10:9,10 | 296:1 |
| 302:17 | 157:1,21 | motivation | 13:18 | 298:13 |
| 305:25 | moment 68:16 | 261:18,19 | 20:11 | national |
| misquote | 124:17 | mouth 69:19 | 30:22 | 1:18  4:16 |
| 278:19 | 149:11 | move 60:21 | 33:19,20 | 10:13,14 |
| 342:18 | 157:21 | 106:19 | 54:22  92:8 | 28:6,13 |
| mission | 211:15 | 107:11 | 92:10 | 30:2  65:9 |
| 163:13,19 | 252:19 | 210:2 | 108:7,9,12 | 65:11 |
| Missouri 1:5 | moments | 307:12 | 132:18 | 142:12 |
| 2:4,8,10 | 269:5 | moving 105:3 | 133:10 | 188:12 |
| 3:16  9:7 | momentum | 111:20 | 134:13,24 | 190:17 |
| 9:18  361:7 | 188:16 | 125:25 | 135:2,2,14 | 191:13 |
| 362:2 | Monday 234:4 | 126:15 | 135:23 | natural 78:2 |
| mistaken | 271:22 | MSNBC's | 136:5 | 81:15  82:1 |
| 43:6  44:16 | money 177:20 | 229:6 | 160:24 | 83:1 |
| 202:5 | 177:23 | multi-th... | 197:21 | 107:23 |
| 228:5 | 178:1 | 308:2 | 205:20 | 155:25 |
| MIT 132:19 | monitor | multiawa... | 231:6,7,10 | 156:10 |
| Mitchell | 106:14 | 213:4 | 263:16 | 189:7 |
| 229:7 | 338:23 | multiple | 291:19 | 190:1 |
| 233:6,13 | Monroe 1:3 | 18:25  24:8 | 293:7,10 | 285:2,11 |
| 234:16 | 9:11 | 122:22 | 300:5,22 | naturally |
| mitigate | month 140:15 | 175:17 | 301:15 | 183:18 |
| 358:18,20 | months 32:5 | 198:23,23 | 303:11 | nature 6:12 |
| Mm-hmm | 32:8 | 205:6 | 305:8 | 7:7  31:6 |
| 180:12 | 225:16 | 239:21 | 310:10 | 35:11 |
| MO 361:18 | 315:19 | 280:4 | 315:8 | 55:19  56:1 |
| modality | 335:3,19 | 321:1 | 324:21 | 56:16,20 |
| 315:20 | 336:12 | 334:2 | 328:22 | 56:22 |
| mode 77:22 | moratorium | 345:8 | 362:1,2 | 59:15  60:3 |
| models 23:12 | 29:16  71:8 | 349:14 | 363:11 | 60:23  61:3 |
| moderation | Morens | 356:15 | named 212:24 | 62:13  64:1 |
| 241:15 | 204:18,20 | 357:9 | 290:22 | 66:9  71:15 |
| modest | 204:21 | Munster | 291:18 | 77:13 |
| 353:21,22 | morning 7:19 | 40:14 | names 33:10 | 80:17 |
| 354:4,16 | 10:8  58:3 | mutations | 33:19 | 168:3 |
| modesty 46:7 | 58:14 | 162:13 | 75:23 | 179:11,11 |
| modulating | 65:13,21 | 198:16 | 86:15,15 | 179:14 |
| 290:5 | 65:22,25 | 200:7 | 131:19,24 | 183:23 |

DR. ANTHONY FAUCI  11/23/2022

| | | | | |
|---|---|---|---|---|
| 184:2 | 17:17 28:5 | 268:2 | 324:16,22 | 333:11 |
| 186:6,20 | 80:19 | 282:3 | 327:9 | **NIH.gov** |
| 186:25 | 95:14 | 293:6 | **NIAID's** | 142:15 |
| 189:4,12 | 123:20 | 296:14 | 163:12 | 305:11,21 |
| 191:3 | 244:13 | 318:17,17 | **NIAID.gov** | 332:4 |
| 192:14 | 316:6 | 344:3,21 | 142:15 | **nine** 86:1 |
| 193:8 | 321:6,10 | **news** 7:9 | **nice** 172:21 | 91:18 |
| 195:3,20 | **needing** | 185:20 | **Nicole** 305:4 | **ninth** 64:22 |
| 201:5 | 349:8 | 233:17 | 305:6 | 64:23 |
| 203:5,7 | **needs** 79:16 | 234:3 | **nightmare** | 235:21 |
| 297:15 | 130:10 | 277:24 | 153:25 | **Nobel** 134:4 |
| **NBC** 277:24 | 156:17 | **News's** 240:6 | 154:16,21 | 252:11 |
| 281:1 | 257:16 | **Newt** 141:17 | 155:15,19 | 257:9 |
| **NbcloUbv...** | 348:23 | 141:20 | 156:14 | **nodding** |
| 254:21 | **negative** | 143:1,3,19 | 161:16 | 11:24 |
| **near** 34:14 | 219:24 | 143:24 | **NIH** 4:21 7:3 | **nonhuman** |
| 125:3 | 230:6 | 144:23 | 7:8 16:6 | 39:24 |
| **nearly** 332:2 | 245:14 | 145:19 | 17:5 18:5 | **nonrespo...** |
| **necessarily** | **neither** | **next-to-...** | 66:16 70:1 | 134:12 |
| 39:15 | 360:10 | 191:1 | 70:14 75:6 | 145:3 |
| 121:3 | **neutral** | **NIAID** 9:12 | 91:5 121:4 | **nonsense** |
| 162:12 | 101:13 | 10:24,25 | 122:8,13 | 277:10,12 |
| 194:9 | 103:4 | 18:18 | 134:5 | 277:14 |
| 237:7 | 113:8 | 19:25 20:5 | 139:9 | 278:4,12 |
| 256:19 | **never** 99:8 | 20:5 21:22 | 149:17 | 278:14,24 |
| 297:14 | 108:21 | 22:6,13 | 157:5,14 | 355:21 |
| **necessary** | 122:18 | 29:14 | 157:20 | **nope** 101:22 |
| 28:13 30:1 | 173:20 | 31:20 | 162:21 | **normal** 353:9 |
| 47:20 | 174:4 | 32:14,21 | 163:11 | 353:9 |
| 102:23 | 225:12 | 36:8 38:19 | 164:18 | 354:6,6 |
| 343:22 | 242:2,3 | 40:15 41:1 | 182:6,11 | **normally** |
| 363:9 | 259:7 | 67:15,21 | 184:12 | 243:16 |
| **need** 27:24 | 284:18 | 72:17,19 | 186:2 | **norms** 37:8 |
| 41:18 | 290:6 | 122:7 | 188:14 | **North** 2:20 |
| 60:18 | 296:3 | 152:8 | 206:8,18 | 32:13,20 |
| 68:24 | 312:4 | 156:13 | 231:10 | **Northwest** |
| 69:17 78:4 | 316:16 | 186:14 | 247:5 | 3:5 4:2 |
| 78:6 109:1 | 327:15 | 204:22 | 271:25 | 361:5 |
| 111:20 | 335:3 | 205:16,22 | 291:2,7 | **notarized** |
| 117:22 | 340:1,7,12 | 207:20,21 | 292:20 | 361:16 |
| 125:23 | **new** 3:4 4:13 | 215:21,25 | 299:23 | **notary** 1:17 |
| 126:14 | 4:13 8:19 | 216:2,9,17 | 300:1,6,10 | 10:4 |
| 150:24 | 27:18 34:6 | 238:6 | 300:18 | 360:20 |
| 207:7 | 34:9 40:23 | 265:3 | 303:7 | 361:14 |
| 316:20 | 144:12 | 268:16 | 305:22 | 363:23 |
| 317:9 | 169:5 | 300:11 | 306:21 | **note** 206:21 |
| 326:23 | 182:20 | 307:20,25 | 307:8,25 | 206:25 |
| 349:15 | 183:12,16 | 308:1 | 331:19 | **noted** 199:21 |
| **needed** 17:9 | 265:12 | 309:9 | 332:6,18 | **notice** 1:16 |

DR. ANTHONY FAUCI  11/23/2022

| | | | | |
|---|---|---|---|---|
| noticed | numbers | 125:15 | 236:6 | 310:25 |
| 178:7 | 41:23 | 129:12,15 | 237:22 | 311:5 |
| notifies | 53:18 | 137:12 | 239:17 | 312:16 |
| 331:3 | 273:3 | 138:17 | 240:23 | 313:16,25 |
| notify 95:14 | 274:5 | 143:10,25 | 242:24 | 314:21 |
| noting 209:1 | 297:21 | 146:10,17 | 243:11 | 318:7,22 |
| novel 183:18 | | 149:8 | 244:20 | 319:4,12 |
| November | ——————— | 152:11,23 | 246:2,14 | 322:22 |
| 1:12,20 | **O** | 154:5,22 | 246:18 | 325:4,14 |
| 9:3 294:10 | O 6:1 9:1 | 158:4 | 249:20 | 326:2 |
| 294:11,12 | oath 9:25 | 159:10,20 | 250:22 | 327:5,18 |
| 294:13 | object 12:20 | 161:17 | 251:19 | 329:18,23 |
| 359:19 | 13:6 49:10 | 162:6 | 253:20 | 331:21 |
| 361:3,10 | 54:4 | 163:25 | 254:8 | 332:9 |
| 362:3 | 114:23 | 164:13 | 255:24 | 333:8 |
| NtP9J7iH... | 192:6,16 | 166:12 | 256:24 | 334:11 |
| 254:20 | 192:21,25 | 167:8 | 257:20 | 336:25 |
| number 9:8 | 193:2,12 | 168:19 | 259:5,24 | 337:24 |
| 17:4,7 | 199:6,7 | 169:23 | 260:23 | 345:19 |
| 23:4 30:16 | 211:14 | 172:15 | 261:13 | 347:6 |
| 41:5,14,16 | objected | 174:21 | 262:3 | 348:16 |
| 41:19 | 97:11 | 178:15 | 266:11 | 352:7 |
| 52:22 | objection | 179:2 | 268:24 | 353:17 |
| 64:24 | 12:16 | 182:8 | 269:19 | 355:16 |
| 101:1 | 18:20 | 184:4 | 270:17 | 356:10 |
| 113:24 | 19:18 22:7 | 186:22 | 272:8 | 358:11 |
| 116:8 | 23:17 24:4 | 187:18 | 273:5,13 | observat... |
| 130:24 | 24:17 25:8 | 189:23 | 273:21 | 219:11 |
| 136:21 | 25:12 26:6 | 193:18 | 274:12,23 | 244:19 |
| 140:6 | 29:18 30:5 | 195:4 | 280:14 | observat... |
| 144:14 | 35:21 | 196:13 | 281:2,11 | 113:25 |
| 157:25 | 36:18 | 197:2,13 | 282:12 | obtained |
| 178:8 | 41:11 46:4 | 199:9 | 283:3 | 28:3 |
| 185:7 | 48:6 49:24 | 200:12 | 285:8,19 | obvious |
| 194:22 | 57:3 62:7 | 205:3,25 | 286:16 | 88:10,15 |
| 207:11 | 63:3 65:14 | 206:14 | 289:2 | 95:16 |
| 216:4 | 71:9 78:14 | 207:18 | 291:25 | 132:16 |
| 219:23 | 79:9 82:7 | 208:4,18 | 293:14 | 139:16 |
| 223:16 | 86:9,25 | 210:18 | 296:25 | obviously |
| 228:21 | 88:12 89:7 | 213:24 | 297:24 | 27:9 62:22 |
| 231:4 | 92:25 | 214:19 | 298:9 | 74:2 85:22 |
| 236:17,24 | 95:22 99:4 | 221:17 | 301:8,20 | 88:7,7 |
| 248:17 | 108:18 | 223:3,22 | 302:19 | 91:9 |
| 294:3 | 109:18 | 224:13 | 303:14 | 175:22 |
| 297:18 | 111:25 | 225:22 | 304:17 | 223:19 |
| 298:1,2 | 112:23 | 229:14 | 305:14 | 303:8 |
| 304:2 | 113:16 | 233:7 | 306:5 | 308:1 |
| 316:6,8 | 114:21 | 234:12,17 | 308:24 | 329:6 |
| 331:8 | 116:20 | 235:13,17 | 310:5,19 | occasions |
| | 118:13,21 | | | |

DR. ANTHONY FAUCI  11/23/2022

| | | | | |
|---|---|---|---|---|
| 46:1 | 295:21 | 69:21 72:4 | 205:7,11 | 333:23 |
| occur 34:1 | 300:10 | 76:20,24 | 242:2 | 356:18 |
| 77:5 149:5 | 327:8 | 84:15 | one-on-one | opinions |
| 220:7 | 361:17 | 87:15 | 147:23 | 52:8 320:7 |
| 303:12 | officer | 91:24 | one-sent... | 333:1 |
| 316:14 | 42:16 | 92:12 | 98:3 | 334:3 |
| occurred | 75:16 | 93:24 94:7 | ones 128:23 | 355:5,14 |
| 77:2 142:5 | 360:4 | 98:20 | 151:6 | 356:7,14 |
| 182:14 | offices 1:18 | 104:7 | 207:5,7 | 356:20 |
| 232:2 | official | 105:3 | 247:23 | opportunity |
| 253:2 | 66:23 | 110:17 | 297:13 | 14:9 43:12 |
| 343:23 | 148:19 | 123:25 | online 179:1 | 48:11 53:8 |
| occurrence | 239:4 | 130:10,11 | 179:7 | 69:11 73:3 |
| 83:1 | 271:21 | 140:19 | 180:11 | 97:13 |
| 155:25 | 303:9,23 | 147:22 | 202:24 | 112:1 |
| 156:8,10 | 328:16 | 148:10 | 222:2 | 115:16 |
| 189:8 | officially | 150:2 | 259:18 | 164:1 |
| October | 10:21 | 163:17 | 260:4,4,7 | 176:14 |
| 250:20 | officials | 173:6 | 283:15 | 183:4 |
| 251:4 | 108:9 | 179:8 | 286:7 | 187:21 |
| 253:19 | 167:3,5,7 | 185:7 | 296:23 | 197:14 |
| 254:5,9,11 | 277:8 | 201:14 | 297:4,4 | 271:15 |
| 254:13 | 342:22 | 210:2 | 344:15 | 306:7 |
| 263:12 | oh 53:17,18 | 211:2,10 | op-ed 13:14 | 353:18 |
| 269:13 | 81:8 100:2 | 222:3 | 14:4 24:1 | opposed |
| 271:6 | 101:22 | 234:1 | open 64:7 | 11:20 |
| 275:12,20 | 155:13 | 237:14 | 103:3 | 75:19 |
| 277:25 | 178:24 | 240:14 | 104:2 | 77:13 |
| 282:25 | 181:25 | 251:6 | 126:11,16 | 191:17 |
| 283:24 | 185:15 | 252:6 | 137:25 | 357:12 |
| 284:4 | 206:11 | 253:8 | 138:1 | opposite |
| 285:17 | 212:19 | 259:17 | 156:1 | 53:19 |
| 323:25 | 231:12 | 277:16 | 157:17 | oranges |
| 324:2 | 242:7 | 284:15 | 232:5 | 157:15 |
| 325:25 | 247:14 | 286:12 | 357:8 | order 16:18 |
| offer 177:17 | 284:12,17 | 288:13 | openly | 54:3 |
| 178:2 | 317:4 | 301:17 | 126:17 | 102:24 |
| offered | 343:24 | 306:16 | 358:6 | 170:2 |
| 254:7,12 | 346:19 | 308:22 | opinion | ordinary |
| offhand | 347:25 | 326:21 | 77:20 | 37:14 |
| 279:9 | okay 12:7 | 328:7 | 151:19 | organiza... |
| office 2:8 | 26:22,25 | 330:8 | 168:25 | 76:15 95:7 |
| 3:15 4:19 | 39:19 | 339:3 | 223:12,15 | 95:9,18 |
| 9:19 17:5 | 43:15 | 354:22 | 225:9 | 96:23 |
| 29:1 38:3 | 47:13 | 359:17 | 236:14 | 107:23 |
| 38:4,10,15 | 50:19 | once 11:6 | 245:3 | organiza... |
| 38:16 | 51:10 68:3 | 20:16 | 297:15 | 17:4 |
| 225:7 | 68:9,18 | 185:11 | 312:6 | 239:22 |
| 270:2 | 69:1,7,19 | 204:15 | 318:16 | 332:17 |

DR. ANTHONY FAUCI  11/23/2022

| | | | | |
|---|---|---|---|---|
| organized | 196:18 | 337:16 | 70:22 | 142:16 |
| 129:20 | 213:9 | outweigh | page 6:7 | 144:21 |
| 161:8 | 355:9 | 221:6 | 14:2,3 | 148:18 |
| 164:12 | OSTP 17:6 | overrun | 19:9 21:21 | 161:23 |
| 165:11 | other's | 169:12 | 22:23,24 | 163:22 |
| 166:2,6 | 77:19 | oversee | 23:1 25:24 | 164:4,18 |
| organizing | outbreak | 186:15 | 47:25 48:1 | 165:13 |
| 129:10 | 15:12 | oversight | 48:14 49:1 | 173:2 |
| origin 43:18 | 31:25 32:5 | 16:8 17:9 | 49:15 | 176:2,6,8 |
| 99:3 111:8 | 34:5,6,14 | 17:11,17 | 50:14 | 176:11,12 |
| 147:6 | 34:15 | overview | 52:21 53:5 | 179:5 |
| 156:1,5 | 42:20 | 120:22 | 53:12,14 | 180:2 |
| 159:3 | 49:17 50:4 | 121:10 | 53:25 54:1 | 182:15,16 |
| 171:2 | 79:16 | overwhel... | 54:15,20 | 182:25 |
| 178:22,25 | 154:13 | 227:9 | 61:10 | 185:21 |
| 179:23 | 155:2 | 230:6,12 | 64:22,23 | 190:10 |
| 201:24 | 156:5 | 230:18 | 68:6 72:20 | 192:2 |
| 203:3 | 164:21 | 277:7 | 72:20,24 | 197:17,24 |
| original | 165:15,20 | overwhel... | 74:18,19 | 201:20 |
| 36:5 | 166:7,10 | 145:11 | 84:4,15,16 | 210:25 |
| 179:13 | 175:20,24 | 257:3 | 86:1 89:18 | 211:2,8,21 |
| 202:24 | 190:7 | 298:5 | 89:20,24 | 218:9,16 |
| 203:9 | 315:11 | 343:11 | 90:3,11 | 218:25,25 |
| 361:10 | outcome | Oxford | 91:16,19 | 219:9 |
| originate | 360:16 | 267:22 | 94:20 97:9 | 221:23 |
| 134:13 | Outlook | | 97:9,10,20 | 226:20,21 |
| originated | 148:19 | P | 101:10,16 | 226:23 |
| 34:16 | outrageous | P 9:1 | 101:21,25 | 227:8 |
| 35:11 | 182:20 | P-I-Z-Z-O | 104:24 | 229:5 |
| 77:12 79:2 | 183:12 | 290:23 | 105:1,3,4 | 232:22 |
| 194:1 | Outreach | p.m 66:21,24 | 110:9 | 233:1,23 |
| origins 89:5 | 38:12 | 67:2,3 | 111:14 | 234:1 |
| 98:23 | outs 357:25 | 148:22 | 112:12,13 | 235:3 |
| 100:8,9 | outside | 161:8 | 115:4,11 | 237:12 |
| 102:15 | 12:18,21 | 170:22 | 120:2,21 | 239:8,10 |
| 103:3,16 | 16:5 17:5 | 188:3 | 123:3 | 240:11,12 |
| 103:23 | 17:8,15 | 203:18,21 | 124:16,25 | 240:13 |
| 104:1 | 25:15 | 219:4,6 | 125:1,3,5 | 242:18 |
| 109:17 | 89:15 | 253:9,11 | 125:9,21 | 243:4 |
| 110:20 | 124:24 | 253:19 | 125:21 | 245:8 |
| 111:1 | 177:20 | 275:12 | 126:20 | 249:11,17 |
| 129:14 | 216:17 | 312:25 | 127:16 | 249:22 |
| 137:19 | 290:17,20 | 313:3 | 128:9,12 | 251:2 |
| 140:16,21 | 316:9 | 354:23 | 130:13,15 | 252:6 |
| 147:2,10 | 321:16 | 355:1 | 130:16 | 264:24 |
| 147:14 | outward | 359:19,22 | 132:3,23 | 267:9 |
| 170:18 | 99:18 | P3 70:20 | 135:15 | 271:13,20 |
| 184:3 | 337:22 | 72:14 | 136:11 | 272:19,22 |
| 188:20 | outwards | P3CO 17:10 | 142:8,9,14 | 278:7 |

280:16
283:19,20
283:24
284:24
288:9,14
298:21
299:25
303:9
305:2
306:22,25
307:1,19
308:4
309:14,16
311:13
324:13
325:3,19
325:19
328:5,8
329:11
330:18
337:7
341:13
347:16,16
347:24
353:6
361:11,14
361:17
362:5,9,13
362:17,21
**pages** 53:25
64:22,23
86:1 89:18
90:11,15
91:17 93:8
93:19 94:7
101:11
104:25
237:9,11
**paid** 213:16
241:5
281:22
283:10
**pandemic**
15:9 17:10
34:4
182:21
183:13
293:19
313:15,19

**panel** 231:11
231:11
247:24
333:23
**panels** 232:9
**paper** 15:6
20:9 22:20
29:4,7
59:7 60:3
60:23 61:8
61:8 68:18
69:23 71:6
71:16
112:21
114:4,12
119:5,11
119:13
120:11
124:2
142:11
160:5,14
161:2
162:10,24
170:18
171:3,12
171:22,25
172:3,7,12
172:20,22
179:12
180:21
195:7
197:4
200:17,21
201:1,2,6
201:7,24
202:1,12
202:19,24
203:2,5,8
203:14
216:23
223:9
299:4
**papers** 98:5
98:7 159:6
160:23
202:8,21
202:22
215:6
223:13

**paragraph**
14:1,3
15:10
22:25
26:21 39:9
39:18
50:19 52:4
98:2,3
125:8
161:24
163:18,23
164:5
176:19
177:1,9
180:2
183:2,7,8
183:21
188:13
189:3
191:1
218:12,21
222:14
229:5
235:4,4
237:17
239:9
240:4,8,15
245:12
250:6
267:11
271:12,19
272:24
273:10
278:8
305:23
325:3
335:14
342:20
347:20
**paragraphs**
41:1
**paraphrases**
285:6
**Pardis** 132:6
132:7,18
132:21
135:15,17
135:21
136:1

**parentheses**
39:21
332:4
**parody**
310:18,22
310:24
311:1
**part** 16:24
22:16 50:8
51:12,25
56:9 72:23
74:6 80:11
104:22
135:12
188:24
194:21
212:13
244:13
299:6
320:18
321:8
324:21
336:9
**particip...**
74:20,22
77:9 79:24
92:24
93:11
97:24
244:18
**participate**
75:3
**particip...**
113:22
197:11,21
**particular**
15:6 20:7
46:3 56:12
56:14 60:7
62:6
104:19
117:17
119:14
139:5
141:25
144:14
153:20
188:13
195:23

199:19
226:18
313:21
339:22
**particul...**
39:4 57:23
314:18
317:9
345:9
**parties**
360:12,15
**partly**
156:13
**pass** 204:15
314:14
317:25
**passage**
115:13,23
116:2,3,11
117:13
**passed** 212:6
**pasted**
264:13
347:23,25
347:25
**pasting**
264:2
**pathogens**
17:11
**patient**
163:19
224:11,24
225:12
**patients**
222:11,18
224:6
237:2,3,8
**Patrick** 47:1
75:11,13
75:13
84:24 85:9
85:13,19
92:3 93:11
**pattern**
353:11
**pause** 16:16
17:2,4
25:20 26:1
26:4 27:17

DR. ANTHONY FAUCI  11/23/2022

| | | | | |
|---|---|---|---|---|
| 27:20 28:2 | 352:25 | 174:4 | 319:20 | 256:8 |
| 28:7,23 | 353:4 | 175:7 | 320:20 | 259:7 |
| 29:14 47:5 | people 21:7 | 181:12 | 321:8,9 | 281:20 |
| 69:25 | 21:9 30:17 | 189:10 | 322:19,25 | 292:23 |
| 71:17 | 30:17 | 192:22 | 323:1,7 | 300:23 |
| 83:12 | 38:13 40:3 | 193:10 | 324:6,7 | 316:14 |
| 199:23 | 40:8,17 | 194:19 | 326:24 | 342:6 |
| 200:4,8 | 42:14 43:1 | 195:10 | 328:11 | **perfect** |
| 225:4 | 45:18 46:8 | 205:14,16 | 329:2 | 84:17,21 |
| **paused** 28:10 | 46:23,24 | 207:13 | 330:10,11 | **perfectly** |
| 92:23 | 47:1,3 | 210:16,23 | 330:21 | 126:13 |
| **pauses** | 58:10 | 215:2 | 332:20,24 | 207:20 |
| 200:14 | 63:14,25 | 216:5,11 | 333:2 | **perform** |
| **pausing** 27:3 | 64:6,7,18 | 216:25 | 335:12 | 69:24 |
| **Paxlovid** | 74:3 75:1 | 217:3,13 | 336:23 | 119:8 |
| 354:2 | 77:17,18 | 217:16,23 | 338:23,24 | **performed** |
| **pay** 210:8 | 78:11,25 | 228:9 | 339:1 | 215:16 |
| 213:15 | 81:18 82:6 | 229:1,10 | 341:23 | **performing** |
| 235:19 | 82:17 | 231:4 | 342:21 | 118:19 |
| 238:18 | 87:22,23 | 236:19,24 | 343:8,10 | **period** 16:14 |
| 239:22 | 88:2,21 | 238:5,7 | 343:10,12 | 26:3 36:13 |
| 240:3 | 89:14 | 241:11,18 | 343:13 | 52:17 79:6 |
| 241:8,12 | 92:10,13 | 242:5 | 344:14,19 | 82:3,15 |
| 241:23 | 95:15,16 | 248:18,20 | 345:6,9,11 | 129:24 |
| 280:7 | 99:2,19,23 | 256:17 | 345:13 | 248:8 |
| 281:17,24 | 101:3,8 | 258:3 | 346:2,11 | 251:24 |
| 301:10 | 102:20,21 | 274:5 | 347:11 | 317:11 |
| 335:11 | 103:15,20 | 277:3 | 349:9,18 | 318:13 |
| **paying** | 103:21 | 278:23 | 351:7 | 336:8 |
| 256:14 | 104:12 | 286:19 | 356:1,6,13 | **peripher...** |
| **PDF** 120:8 | 105:16 | 287:1 | 356:19 | 255:18 |
| **pediatric** | 106:1,11 | 292:25 | 357:5 | **Periscope** |
| 291:1 | 106:14 | 293:12,18 | 358:15,18 | 240:6,17 |
| **peer** 18:25 | 107:8 | 295:25 | 359:2 | **perjury** |
| 246:1,6 | 133:1,7,8 | 296:3,3,19 | **people's** | 363:12 |
| **peer-rev...** | 133:23,24 | 297:12,15 | 281:9 | **permission** |
| 159:7 | 142:11,17 | 298:1,2,14 | 302:22,23 | 326:24 |
| 179:14,25 | 151:8,10 | 300:22 | 357:13 | **perplexed** |
| 191:7,9 | 152:5 | 301:14 | **perceived** | 353:6 |
| 195:8 | 154:13 | 302:11 | 225:20 | **person** 32:24 |
| 203:9 | 155:9,12 | 303:16 | 227:21 | 33:4,11,18 |
| 215:17 | 155:21 | 310:9,10 | **percent** | 33:21,22 |
| **penalty** | 157:2,13 | 310:16 | 16:14 32:9 | 34:20 |
| 363:12 | 160:6 | 312:10 | 33:9 44:22 | 46:14,17 |
| **Pence** 197:5 | 161:7 | 314:9,10 | 96:2 114:8 | 76:4 99:25 |
| 202:16 | 165:9 | 314:11 | 161:11 | 136:3 |
| **pending** 9:9 | 168:14 | 315:22 | 177:22 | 139:9,13 |
| 75:9 | 170:1,2 | 316:4,5,23 | 205:19 | 139:17 |
| **Pennsylv...** | 173:19,25 | 317:1 | 220:3,10 | 140:9 |

DR. ANTHONY FAUCI  11/23/2022

160:24
174:1,5
175:23
185:7
189:15,15
195:15
202:6,14
202:16
204:21
205:19
232:9
257:12
259:9
261:17
265:10,23
279:2
299:13
300:1
311:16
325:20
335:1
342:3
345:15
350:9,14
351:8
354:5
356:16
357:2
**personal**
55:9,13
178:10
309:9
313:18
321:21
**personally**
34:2 45:10
297:5
346:23
**persuadable**
337:17,23
**persuaded**
151:10
**Peter** 20:11
21:16
35:17 36:2
36:14 37:1
37:6 39:22
40:9 117:8
129:10,21

130:2
140:20,25
141:17
204:4,24
205:1
206:5
207:16,19
**Peter's** 41:2
**petitions**
298:14,16
**Pfizer**
351:11,14
351:15
**Phil** 290:22
291:1
**phone** 34:18
34:20
44:14
45:24
46:20 47:2
58:17,19
59:1,22
63:13,15
63:20
66:16,18
75:10 79:4
81:17
82:14 83:3
85:8,20
90:9,21
91:8 97:2
97:3 178:8
178:10
287:5
289:17,19
290:14
**photograph**
21:5,10
**phrase** 116:1
199:23
268:5
**physical**
320:12
**physically**
175:14,15
**physician**
104:15,17
225:2,9,12
228:4

237:2,5
261:21
334:1
357:1
**physicians**
229:20
230:14
231:13
248:1
277:8
**pick** 156:14
**picking** 75:2
**picture** 21:2
21:4
**piece** 20:8
29:4,7
197:4
216:22
264:3
268:9,17
269:9
299:4
**pieces** 22:20
217:6
**piped** 34:21
**pizzazz**
193:13
**Pizzo** 290:23
290:23
291:1
**place** 28:23
71:8,8
164:23
242:4
**placebo**
244:10
246:12,22
**placebo-...**
322:1
**placebo-...**
354:14
**placed** 42:5
**placeholder**
39:17
**placement**
306:2
**places** 218:2
**Plaintiff**
2:3,14

3:12 5:3,4
**plaintiffs**
1:6,15
2:24 6:3
9:20 10:3
10:6
**plan** 80:22
80:24 95:8
95:12,19
268:23
269:1
**planning**
184:17
**platform**
98:18
99:12,14
99:21
100:19,25
101:3
152:8
177:12,14
238:25
239:12
240:18
241:16
282:6
285:1
290:5
301:18
304:16
335:22
**platforms**
98:11,22
99:24
100:6
151:23
213:9
238:24
274:11
290:1,9
301:6
333:5
334:7
344:13
345:5
346:9
357:19,21
**play** 230:3
248:11

**player** 101:6
**Plaza** 4:11
**please** 9:16
9:25 10:8
20:20
26:24
47:16 53:6
54:6 74:16
87:13
94:13
97:12
100:23
123:13
124:6
127:17,18
128:1
132:14
172:1
183:7
185:5
201:25
209:14
231:8
237:10
247:13,14
300:15
315:25
339:12
359:6
361:9,12
361:16
**pleased**
354:3
**plop** 281:19
**podcast** 6:24
141:2,17
142:2,5,6
142:10,24
143:24
147:10
152:4
205:11,12
**podcasts**
101:2
141:10,11
141:23
142:6
146:21
175:18

DR. ANTHONY FAUCI  11/23/2022

| | | | | |
|---|---|---|---|---|
| 359:2 | 27:3,6,19 | 15:9 29:3 | 234:4 | 226:3 |
| podium 201:3 | 211:25 | 29:4 44:6 | 241:19 | 228:8 |
| point 12:24 | 283:16 | 45:24 | 271:5 | 252:21 |
| 15:7,14,16 | 284:4,21 | 71:20 | 272:5 | 279:6 |
| 34:12 | 286:8 | 74:10 83:5 | 273:20 | predate |
| 42:10 | 288:11 | 116:6 | 275:14 | 175:19 |
| 67:23 | 333:6 | 131:16 | 279:14 | prediction |
| 110:18 | politicians | 147:25 | 280:25 | 15:12 |
| 114:10 | 102:4 | 153:16 | 335:18 | predictions |
| 121:1 | Politico | 157:18 | 337:11 | 23:5,10,11 |
| 130:20 | 7:17 218:5 | 162:20 | 347:17 | 23:12 |
| 131:2 | 221:15 | 176:1 | 356:6,19 | predictive |
| 135:10 | 222:7,10 | 177:25 | posted 43:19 | 23:12 |
| 136:13 | 222:13 | 178:4 | 100:6 | predominant |
| 137:6 | 225:17 | 209:24 | 182:12 | 76:14 |
| 144:24 | poll 230:13 | 220:20 | 225:18 | predomin... |
| 145:16 | 230:20 | 230:2 | 234:2 | 74:24,25 |
| 189:7 | population | 238:15 | 238:24 | 96:2 |
| 198:17 | 250:17 | 241:3 | 270:12,16 | preference |
| 200:8 | 285:3,14 | 244:24 | 349:9 | 12:17 |
| 209:1 | 342:7 | 262:25 | 357:21 | 86:20,24 |
| 211:22 | populations | 268:18 | posting | premarking |
| 236:17 | 250:14 | 277:2 | 348:7 | 37:20 |
| 284:25 | 274:7 | 279:23 | potential | premise |
| 299:6 | portfolio | 281:15 | 17:10 31:8 | 257:25 |
| 300:15,15 | 72:2 | 290:13,21 | 170:1 | 258:2,6 |
| 300:16 | position | 291:13,14 | 221:5 | 269:6,12 |
| 311:4 | 10:12 | 292:15,25 | 225:10 | 273:25 |
| 316:6,8 | 37:15 | 293:22 | potentially | 274:2 |
| 334:15 | 148:3 | 343:19 | 14:6,20,24 | 276:9,20 |
| 355:20 | 160:11 | 345:25 | 15:2,5,22 | 276:21,25 |
| pointed | 331:3 | 349:12 | 16:3 17:2 | 277:1,5 |
| 21:15 | positions | 352:16 | 51:15 89:6 | 278:22 |
| 243:14 | 358:6 | possibly | 321:4 | 295:1 |
| 283:8 | positive | 33:24 | power 126:9 | 297:9,16 |
| 355:19 | 166:8 | 40:14 44:5 | 137:24 | 355:20 |
| pointing | 219:25 | 44:24 56:1 | practice | premises |
| 243:5 | 246:9 | 56:2 163:5 | 37:14 | 257:17 |
| 260:3 | 247:19 | 198:2 | 331:23 | 258:21,25 |
| 299:7 | possession | 217:5,17 | practiti... | 259:10 |
| points 38:19 | 37:2 | 220:15 | 244:17 | preparation |
| 38:23 39:5 | possibility | 240:1 | precautions | 12:19,23 |
| 43:6 | 34:25 43:3 | 251:14 | 117:22 | 13:2 25:10 |
| 110:14 | 43:24 | 301:25 | precise | 25:15 |
| 131:18 | 67:10,15 | 304:12 | 42:10 | 171:12 |
| 137:5 | 71:6 80:20 | post 3:15 | 168:3 | prepare |
| policies | 80:23 | 8:3 13:15 | 234:25 | 38:23 |
| 241:18,20 | 106:6 | 13:19 | precisely | 102:24 |
| policy 17:6 | possible | 23:13 | 57:20 | 103:8 |

DR. ANTHONY FAUCI  11/23/2022

| | | | | |
|---|---|---|---|---|
| 287:14 | 198:23 | 102:24 | **Prize** 134:4 | 353:2 |
| **prepared** | 199:15 | 103:4 | 252:11 | **project** 6:10 |
| 98:5,7 | 200:3,5 | 156:6 | 257:9 | 18:7,13 |
| 114:5 | 201:8,24 | 314:9 | **probably** | 19:12,17 |
| **preparing** | 202:5,13 | **preventing** | 11:9 12:4 | 20:1 22:6 |
| 184:8 | 202:14,15 | 317:6 | 37:17 | 22:13 |
| **preponde...** | 204:11 | 318:5 | 39:23 51:4 | 125:14 |
| 247:4 | 217:24 | **prevention** | 92:11 | **projects** |
| 319:25 | 218:3 | 15:12 35:8 | 119:12 | 30:3 79:3 |
| **preprint** | 229:9 | **prevents** | 133:8 | **promote** |
| 81:23 | 230:7 | 104:12 | 143:8 | 195:12 |
| 82:15,23 | 232:18 | **previous** | 145:19 | **promoted** |
| 159:2,5,7 | 234:5,8,9 | 200:23 | 159:15 | 348:22 |
| 159:8,19 | 234:21 | 204:12 | 191:5,25 | **promotes** |
| 170:19 | 240:7 | 263:24 | 198:23 | 285:11 |
| 179:18,21 | 295:3 | **previously** | 202:6,17 | **promoting** |
| 180:1,9 | 359:5 | 196:6 | 202:18 | 268:2 |
| 181:4,8,13 | **pressure** | **primarily** | 216:5 | 321:25 |
| 181:14,20 | 131:20 | 288:19 | 240:2 | **proof** 193:9 |
| 196:10 | 137:7,9,15 | **prime** 75:17 | 248:7 | 218:1 |
| 203:9 | 137:18 | **Prince** 300:1 | 261:19 | **proofs** 172:7 |
| **prescribe** | **pressuring** | **principal** | 295:9 | **propagate** |
| 224:6,9 | 137:21 | 30:25 | 300:9 | 339:15 |
| **prescribes** | 138:3 | 54:25 | 308:20 | **propagated** |
| 225:9 | **presume** | 57:18 | **problem** | 194:9 |
| **prescribing** | 349:1 | **principles** | 329:1 | 346:8 |
| 225:2 | **presympt...** | 343:14 | **proceed** | **propagates** |
| **prescrip...** | 316:17 | **printed** 18:4 | 286:10 | 217:11 |
| 224:24 | **pretending** | **Printout** | **proceedings** | **propagating** |
| **PRESENT** 5:1 | 311:3 | 6:25 7:15 | 1:21 | 346:10 |
| **presented** | **pretenses** | 8:7,8,9 | **process** 26:1 | **proper** 47:19 |
| 273:1 | 300:23 | **prior** 14:12 | 139:20 | 74:4 80:7 |
| **president** | **pretty** 60:16 | 26:15 | 220:17 | 134:15,16 |
| 10:16,18 | 206:7 | 43:13 | **produced** | 191:10 |
| 197:5,5,12 | 229:19 | 48:22 53:9 | 24:10 84:4 | 315:8 |
| 197:12,25 | 279:3 | 68:17 | 121:4 | 320:12,16 |
| 198:5,7 | 355:12 | 97:14 | **product** | 320:17 |
| 202:16 | **prevail** | 128:25 | 12:20 13:6 | 323:16 |
| 229:8 | 193:8 | 160:14 | 25:11 | **properly** |
| 291:23 | **prevailing** | 175:24 | **production** | 103:7 |
| 313:11 | 227:9 | 176:15 | 321:17 | 230:4 |
| 344:11,17 | **prevails** | 234:10,15 | **professor** | **proponent** |
| **president's** | 193:5 | 255:22 | 291:5 | 317:12,14 |
| 202:5 | **prevalence** | 269:1 | **professors** | **proposal** |
| **press** 5:2 | 293:12 | 315:19 | 267:19 | 255:10 |
| 38:24 | **prevaricate** | 332:19 | **program** | 271:8 |
| 172:3 | 109:7,11 | **priority** | 30:17,19 | **propose** |
| 196:25 | **prevent** | 195:17 | 42:16 | 322:20 |
| 197:19 | 12:23 | **privy** 284:21 | 324:20 | **proposed** |

```
248:18            231:13            289:15            265:4             96:1
271:22            320:24            290:1             pull 175:6        104:11
proposing         321:5             300:3             257:4             106:9,13
  133:4           provides          333:5,16          pulled            128:5
pros 81:10        134:16            334:6,8,10        135:21            131:19,24
  358:4           161:25            337:17,23         136:7             131:25
prospects         providing         341:4             157:25            134:8
  198:10          183:17            343:15            216:22            135:22
protect 28:5      provost           345:24            220:13            136:4
  28:13           352:25            346:6,13          240:22            139:7
  248:19          proximal          357:2             242:22            141:20
  258:3           159:3             360:20            274:5             142:13
  274:6           170:18            361:14            328:14            164:22
  277:3           178:22,25         363:23            pulling           171:20
protecting        184:3             publication       221:9             182:14
  314:11          196:18            180:11            239:15            188:15
  316:11          203:3             publicly          purchase          190:21
protection        Proximate         158:10            321:3             241:12,13
  15:17  30:1     179:23            206:9             purports          245:1
  250:8,17        PSA 289:20        244:15            251:6             263:16
  266:17          PSAs 177:12       publish           purpose 63:1      308:20
  268:2,5         177:25            215:17            89:10             334:25
  292:13,22       178:2             published         156:2,4           338:23
  307:5           286:21            31:12,14          purposely         339:4,17
protective        287:1             82:16             162:2             340:20
  321:21          289:14            124:3             180:6             345:1
proved            pseudo            129:20            181:10            putting
  354:12          117:11            156:25            pursuant          114:25
proven 221:4      public 1:17       158:16            1:15  37:3        135:10
  225:10          4:20  10:4        159:6             60:14  84:4       145:12
  230:17          15:18  28:5       178:21,24         pursue            188:6
  276:23          28:10,13          179:1,7,13        102:23            241:11
provide           30:2  40:12       179:17            151:11            277:11
  17:23           40:25             182:6             194:23           _____
  47:19           79:17             184:23            pursued                 Q
  122:15          140:16            187:2             79:16             qualific...
  134:15,17       165:7             215:6             153:23            224:22
  134:20          169:10            219:2,11          154:19            qualific...
  171:12          177:6             222:2             pursuing          224:18
  250:16          178:9             250:20,25         79:16             279:10
  259:2           181:12            251:10            194:24            qualified
  314:15          189:15            252:3             Pushing           44:10
provided          195:2             257:16            125:2,10          52:15  80:2
  68:19           217:18,23         258:10            put 16:16         89:13
  132:22,23       218:2             265:1             17:4  22:16       121:23
  332:7           265:11,24         290:11            25:17             122:4
provider          277:8             333:11            27:25  29:7       198:14
  243:10          288:19,24         publishing        39:5  42:9        224:11,15
providers         289:4,8,10        184:2             71:8  81:22       224:16,20
```

| | | | | |
|---|---|---|---|---|
| qualifies | 183:9 | 43:14  47:8 | 272:25 | radiated |
| 339:18 | 185:12 | 47:21 | quote 7:1 | 337:16 |
| quantitate | 194:21 | 48:23 | 41:16  42:9 | radiating |
| 236:16 | 197:24 | 53:10 | 127:5 | 337:22 |
| quantitated | 198:11 | 68:17 | 136:14 | raise 12:24 |
| 297:25 | 200:25 | 82:20 | 144:8 | 35:10 |
| quantita... | 202:14 | 94:15,17 | 145:7 | 63:19  71:5 |
| 298:2 | 209:22 | 97:14 | 146:13 | 71:14 |
| quantity | 215:9 | 102:3 | 157:16 | raised 31:18 |
| 235:20 | 224:16 | 110:20 | 163:23 | 35:2  50:8 |
| question | 230:5 | 127:22 | 164:4,20 | 51:20  60:2 |
| 11:13,17 | 236:14 | 172:3 | 164:20 | 96:18 |
| 11:18,19 | 240:20 | 176:16 | 192:5 | 116:18 |
| 11:20 | 247:13 | 177:4 | 227:7 | 230:22 |
| 14:17 | 260:14 | 226:25 | 229:10 | 252:23 |
| 19:22,23 | 262:5,15 | 241:10 | 237:17 | raising |
| 20:24 | 267:19 | 287:2 | 260:20 | 34:13 |
| 22:10  25:9 | 269:11 | 289:21 | 271:24,25 | 52:11 |
| 26:25  27:2 | 270:14 | 314:5 | 273:15,19 | 98:20 |
| 35:23 | 275:1 | 329:25 | 278:4,4,18 | 102:14 |
| 36:24 | 281:6 | 330:25 | 285:1 | Ralph 32:12 |
| 41:22,24 | 282:3 | 359:14 | 342:5,5,15 | 32:15 |
| 47:9,11 | 284:10,10 | quick 52:16 | 344:18 | 39:22 |
| 49:13 | 288:7 | 176:18 | quoted | 40:10 |
| 58:25 | 292:16 | 257:16,19 | 271:13 | 42:17  56:9 |
| 60:25  62:1 | 294:17 | 258:9,12 | 281:1 | 147:15 |
| 62:1,19 | 306:15,16 | 325:23 | 290:18 | 148:24 |
| 69:21 | 310:23 | quickly 52:3 | quotes 143:3 | 149:6 |
| 83:10,11 | 312:14 | 60:16 | 146:7 | ran 45:25 |
| 115:12,12 | 315:10 | 106:20 | 218:13 | randomiz... |
| 116:10,10 | 330:16 | 107:10,11 | 229:6 | 246:22 |
| 116:15 | 332:19 | 107:13 | 275:22,25 | randomized |
| 119:17 | 334:14 | 239:11 | 276:3,8 | 244:10 |
| 127:24 | 335:21 | quiet 64:19 | 342:13 | 246:21 |
| 134:10,10 | 340:11 | quite 23:18 | | 248:10,10 |
| 134:17 | 345:16 | 30:11  64:7 | _____ | 322:1 |
| 136:24 | 350:11,20 | 81:14 | **R** | 354:13 |
| 139:3,3 | 357:8 | 86:16 | R 1:8  9:1,7 | range 118:24 |
| 140:17 | questioned | 107:19 | 361:7 | ranging |
| 147:13 | 155:9 | 168:13 | 362:2 | 175:2 |
| 153:8 | questioning | 174:14 | R-e-d-d-i-t | ranking |
| 156:17 | 76:18 | 180:18 | 282:8 | 108:9 |
| 158:3 | 148:7 | 218:14 | R-o-w-e | rapid 166:19 |
| 159:23 | questions | 219:18,20 | 293:2 | rarely 55:11 |
| 163:14 | 12:1,17 | 226:7 | radar 42:6,9 | re-tweeted |
| 174:24 | 14:13 | 230:9 | 43:19 | 229:8 |
| 175:6 | 20:21 | 278:12 | 60:10 | reach 96:5 |
| 176:18 | 26:11,15 | 348:8 | 71:25 | reached |
| 181:13 | 31:18 | quotation | 281:19 | 152:8 |
| | | | 340:21 | |

DR. ANTHONY FAUCI  11/23/2022

| | | | | |
|---|---|---|---|---|
| 245:16 | 190:25 | 195:6,14 | 87:24 | 92:21 93:6 |
| **reaching** | 273:15 | 207:7 | 156:22 | 94:5,5 |
| 325:21 | 294:25 | 210:8 | 179:24 | 95:13 |
| **reaction** | 310:9 | 218:13 | **reasonably** | 96:15,16 |
| 166:8 | 325:10 | 219:18 | 83:7 | 96:19,25 |
| **read** 13:12 | 353:8 | 230:9,10 | 297:17 | 102:17 |
| 14:14 19:2 | 354:5 | 230:19 | **reasons** 16:5 | 112:5,7,9 |
| 28:1 31:16 | **real** 79:15 | 232:6 | 315:23,24 | 114:7 |
| 50:17 59:6 | 88:20 | 235:19 | 316:1 | 116:8,12 |
| 61:7 69:5 | 167:18 | 238:19 | 317:7 | 120:13 |
| 69:14,16 | 215:19 | 244:4 | 320:22,25 | 124:10,21 |
| 69:20 | 231:19 | 305:22 | **reassuring** | 127:6 |
| 103:10 | 244:4 | 309:20 | 183:22 | 128:25 |
| 119:11,12 | 299:15 | 312:8 | **recall** 22:21 | 129:17,22 |
| 143:14 | 323:16 | 314:9,13 | 26:5,9 | 130:1,4 |
| 153:5,19 | **real-time** | 316:20 | 28:24 29:3 | 131:14,15 |
| 176:22 | 244:16 | 317:24 | 29:6 30:8 | 131:17 |
| 181:4 | **really** 23:18 | 321:5,10 | 32:3,25 | 132:1,3,3 |
| 183:6,8 | 30:8 32:16 | 334:14 | 33:2 34:2 | 133:6 |
| 184:12,13 | 39:17 | 335:21 | 34:12 | 137:1,3,17 |
| 187:19,22 | 51:12,13 | 337:10 | 35:13 40:6 | 138:19 |
| 187:25 | 51:25 52:1 | 343:14 | 42:5 49:7 | 139:5 |
| 190:11,13 | 57:12 61:5 | 351:8 | 49:8,18 | 140:18,22 |
| 245:12 | 62:20 | 353:10 | 55:8,15 | 140:23 |
| 249:16 | 78:22 | 358:1 | 56:12,14 | 143:23 |
| 250:3,4 | 85:21 | **reason** 17:13 | 57:10,12 | 144:2,4,7 |
| 253:25 | 86:21 87:1 | 43:2 52:13 | 57:15,16 | 146:16,19 |
| 254:1 | 87:8,21 | 58:18 | 57:19,20 | 146:22 |
| 255:3 | 102:19,23 | 135:1 | 59:2,5 | 147:13,22 |
| 294:23 | 105:1 | 166:25 | 60:4,8,11 | 147:25 |
| 306:9,14 | 110:4 | 173:5 | 61:1,4,5 | 149:9,12 |
| 330:15 | 111:5,20 | 182:13 | 62:10,18 | 149:21,23 |
| 341:8,9 | 113:5,23 | 198:24 | 63:11 64:4 | 159:17 |
| 359:15 | 114:1,1 | 247:3 | 64:17 | 160:19 |
| 361:12 | 120:16 | 249:13 | 66:13,22 | 162:8,15 |
| 362:6,10 | 125:23 | 260:11 | 67:1,3,10 | 163:2,3 |
| 362:14,18 | 126:14 | 278:18 | 68:2 72:8 | 165:25 |
| 362:22 | 128:24 | 305:24 | 72:11,16 | 167:9 |
| 363:6 | 129:22 | 320:18 | 73:23 74:9 | 168:3 |
| **reading** | 134:6 | 342:17,25 | 74:14 | 172:13,19 |
| 42:12 | 140:25 | 344:22 | 78:17,18 | 173:23 |
| 68:20,23 | 151:19 | 349:17 | 78:22 79:4 | 175:23,25 |
| 69:1,14 | 165:4 | 352:1 | 83:2,9 | 178:1,2,3 |
| 102:8,10 | 168:13 | 358:25 | 84:14 85:4 | 178:4 |
| 114:14 | 171:18 | 362:7,11 | 85:11,14 | 180:14 |
| 130:19 | 174:13,14 | 362:15,19 | 85:17,21 | 181:3 |
| 180:17 | 180:13 | 362:23 | 85:23 | 184:11,22 |
| 184:11 | 189:20 | **reasonable** | 86:11 | 184:25 |
| 188:8 | 192:22 | 86:16 | 90:25 91:3 | 186:7,9,17 |

**DR. ANTHONY FAUCI  11/23/2022**

| | | | | |
|---|---|---|---|---|
| 186:18 | 284:22 | 263:18 | 36:11 | **record** 7:3 |
| 187:5 | 285:12 | **received** | 43:22  44:3 | 9:3  10:9 |
| 188:2,5,8 | 287:6 | 19:25 | 45:20 | 11:15 |
| 189:14 | 290:13,16 | 124:2 | 46:25 | 18:21 |
| 190:24 | 290:21 | 178:12 | 57:21  58:1 | 19:19  22:8 |
| 191:25 | 291:13,16 | 206:21 | 66:19 | 30:6  49:25 |
| 198:22 | 292:7,15 | 256:23 | 74:13,25 | 54:6,7,9 |
| 202:1,3 | 292:24 | **receiving** | 79:12 | 54:10,13 |
| 208:13 | 293:1,24 | 247:17 | 84:12 | 65:19 |
| 209:21,23 | 295:9,25 | **Recess** 54:11 | 111:2 | 69:17,18 |
| 209:23 | 296:4,21 | 83:19 | 120:15 | 69:20 |
| 212:3,9 | 297:2,3,14 | 150:4 | 125:17,19 | 83:18,21 |
| 213:1,10 | 300:21 | 203:20 | 127:8,10 | 109:20 |
| 216:11 | 301:22 | 219:5 | 137:22 | 114:24 |
| 217:23 | 314:2,5,8 | 253:10 | 147:1 | 121:8 |
| 220:7,8,15 | 314:20,23 | 313:2 | 153:14,15 | 137:13 |
| 220:20,21 | 315:1,4,6 | 354:25 | 160:24 | 150:3,6 |
| 222:24 | 318:15 | **recipient** | 171:21 | 163:12 |
| 223:7,17 | 319:6 | 19:11 | 172:12 | 164:18 |
| 225:15,24 | 322:4,5 | **recipients** | 216:3 | 178:9 |
| 225:25 | 326:7 | 263:23 | 220:22,24 | 179:4 |
| 226:3,13 | 327:20 | **recognize** | 223:2 | 203:19,22 |
| 226:15,19 | 328:25 | 12:12,21 | 234:25 | 214:20 |
| 227:14 | 329:5 | 13:12  25:7 | 238:8 | 215:2 |
| 228:1,8,12 | 335:23 | 25:16 | 283:18 | 219:3,7 |
| 229:13,18 | 336:1,4 | 63:12 | 307:10 | 232:2 |
| 230:2 | 337:4 | 134:21,24 | 340:12,19 | 253:9,12 |
| 238:2,3,4 | 340:4,15 | 135:6 | **recombin...** | 313:1,4 |
| 238:6,8,10 | 340:17 | 153:18,19 | 23:20 | 328:2 |
| 238:14,16 | 342:16 | 159:2 | **recommend** | 344:8 |
| 239:1,4 | 343:7,17 | 175:3 | 139:20 | 354:21,24 |
| 243:13 | 343:19,21 | 187:17 | 140:3 | 355:2 |
| 244:8,24 | 343:23 | 253:18,22 | 314:17 | 357:9 |
| 251:11,14 | 344:17,20 | 263:11,13 | 315:18 | 359:18,20 |
| 252:17,20 | 344:23,25 | 296:1 | **recommen...** | **recorded** 9:5 |
| 253:1 | 345:3,16 | 299:4 | 139:12 | 359:21 |
| 255:6,9,16 | 347:8,10 | 300:5 | 317:16,18 | **redact** |
| 256:4 | 347:12 | 305:8 | 321:7 | 122:18,18 |
| 257:5,7 | 349:11 | 324:20 | **recommen...** | 206:18 |
| 258:12 | 351:1 | **recognized** | 169:10 | **redacted** |
| 262:1,10 | 352:2,9,17 | 46:7 | 285:7 | 55:6 |
| 263:1 | **recalled** | **recognizes** | **recommended** | 122:20,22 |
| 264:17,20 | 43:18 | 12:18 | 139:15,16 | 122:22 |
| 265:2,6 | 82:19 | 25:14 | 139:18,25 | 178:9 |
| 268:10,11 | **recalling** | **recollec...** | 140:11 | 206:12 |
| 268:18,19 | 45:25 | 19:5,7,8 | 320:18 | 313:23 |
| 269:5 | **receive** | 27:15,17 | **recommen...** | 348:4 |
| 270:13,24 | 19:17  45:6 | 28:25  35:4 | 250:7 | **redaction** |
| 276:5 | 201:21 | 35:12 | 315:1,22 | 84:9 |

**DR. ANTHONY FAUCI  11/23/2022**

**redactions**
122:17
**Reddit** 282:6
282:7,10
282:16
**Redfield**
35:5,6
**redial** 92:14
**reduce**
102:22
**reduced**
360:9
**refer** 15:19
23:15,24
24:3,14,20
33:2 85:22
155:12
169:4
174:4
306:18
333:2
349:25
**reference**
21:22 49:5
106:18
204:18
211:21
254:23
267:5
299:18
306:12
348:25
**References**
6:18
**referred**
16:1 17:10
18:7 19:11
26:2 41:8
48:16
57:24
90:11
118:7
133:13
151:6
160:25
212:24
214:23
217:8
221:14

222:10
257:12
349:4
**referring**
23:19,22
26:17 40:7
40:16 41:2
41:21,22
41:25 50:5
50:12
51:22 52:3
56:18 58:6
70:2 88:4
90:13
107:7
113:15,20
114:2
115:20,22
115:23
116:9
118:1,16
119:1
125:7
132:7
133:16
136:16
137:9,15
142:8
154:8,9,17
157:12
158:7
168:5,7
174:9
193:3,6,14
201:2
214:16,22
218:17,22
218:23
219:22
220:3
228:6
234:23,24
246:20
248:9
250:18
255:21
257:18,23
258:22
259:14

266:25
267:6
275:19
304:8
347:21
350:7,8,13
**refers** 57:14
60:13
137:7
177:14
183:22
255:20
349:20,22
350:6
**reflected**
71:15
322:21
**reflecting**
334:3,8
**reflects**
66:23
**refusals**
288:22
**refutation**
260:15
266:20
269:13
**refuting**
268:22
269:6,12
**regarded**
80:1
**regarding**
63:17
71:23
110:1
111:7
226:2
266:9
312:11
314:24
**regardless**
353:11
**regards**
84:10
**register**
282:19
**regular**
21:20

**regularly**
175:9
**rejects**
276:9
**relate** 30:3
**related**
16:17 43:4
43:14 82:5
83:9
137:18
262:13
283:1
289:19
301:11
355:6
360:11
**relates**
165:4
**relations**
283:16
327:9
**relation...**
33:3 35:17
36:1 63:16
175:1
205:8
**relation...**
174:6,19
**relative**
360:13
**relatively**
63:24
64:13,19
336:8
**release**
172:3
**released**
193:11
194:18
**relevant**
42:25
95:15,16
**relied** 122:3
333:5,11
333:16
**relies**
288:25
**rely** 290:2,4
**remarks**

142:24
197:5
**remdesivir**
353:7,22
**remember**
13:21,22
13:23 14:7
21:1,17
32:23 34:5
44:1 45:16
59:3 60:9
60:15,22
61:22
62:25 63:2
63:7,9
64:10 66:1
72:9 73:20
74:7 77:14
77:15
78:25
81:21 83:5
85:18 93:1
93:2,4
94:2 95:12
95:19
98:20
102:13
114:12
115:23
116:9
124:9
126:3
139:19,21
141:7,25
142:1,3,5
147:4,5,8
149:20
160:1,2
174:12
175:10,12
180:17
181:17,18
187:1
194:7
198:21
200:1,2,4
200:7,10
200:14
226:5,17

## DR. ANTHONY FAUCI  11/23/2022

| | | | | |
|---|---|---|---|---|
| 227:24 | 213:8 | 74:15 | 122:7,13 | 144:9,11 |
| 244:15,23 | 240:6,16 | 87:13 | 287:15 | 144:13 |
| 252:22 | 300:19 | 100:23 | **require** 16:8 | 145:6,9,11 |
| 253:23 | 304:15 | 145:23 | **required** | **residues** |
| 254:3 | **render** 363:9 | 150:22,24 | 168:17 | 162:13 |
| 256:2 | **renders** | 198:8 | **research** | **resources** |
| 263:14,15 | 24:15 | 201:22 | 6:11  15:15 | 177:10 |
| 263:21 | **renewed** | 209:14 | 15:20  16:1 | **respect** |
| 268:14,15 | 42:13 | 213:4 | 16:2,17,20 | 77:19 |
| 271:1 | **renowned** | 360:1 | 16:23  17:2 | 224:11 |
| 282:20 | 45:22 | **reporters** | 18:11  26:1 | 241:18 |
| 293:17 | **repeat** 19:22 | 201:8 | 26:4  27:4 | **respected** |
| 302:4,6,7 | 35:23 | 271:21 | 27:18,19 | 45:12 |
| 328:23 | 36:24 | 290:18 | 27:24  28:4 | 103:2 |
| 334:25 | 63:13 | 296:13 | 28:8,9 | 122:4 |
| 336:5 | 241:23 | **reporting** | 29:14,25 | 132:6,21 |
| 338:10 | 280:4 | 272:15 | 30:4  33:15 | 259:9 |
| **remembered** | 281:6 | 334:3 | 36:7  37:3 | 261:3,20 |
| 141:9,22 | 312:7 | **reports** | 46:9  57:22 | 289:8,10 |
| **remind** 74:16 | **repeated** | 75:16 | 57:23 | **respects** |
| 288:10 | 198:8 | 143:15 | 67:15,17 | 229:21 |
| **reminder** | **repetitive** | 229:7 | 67:18,22 | **respiratory** |
| 309:17 | 283:9 | 280:20 | 70:11  71:6 | 166:17 |
| **removal** | **report** | 336:20 | 71:15,19 | 169:1,25 |
| 240:5 | 164:18,19 | 341:3 | 71:23  76:7 | **respond** 42:2 |
| **remove** | 190:6 | **represent** | 117:8 | 68:13  72:3 |
| 151:22 | 209:7 | 9:17 | 118:7,19 | 191:24 |
| 211:5,11 | 229:6 | **represen...** | 133:14 | 192:4 |
| 212:1 | 232:16,24 | 46:25 | 153:23 | 207:4,8,9 |
| 238:1 | 234:2 | 230:6 | 154:12,15 | 207:10 |
| 283:1 | 242:14,22 | **represen...** | 154:19 | **responded** |
| 288:18 | 341:1 | 231:14 | 155:6,7,13 | 84:23  90:7 |
| 289:1 | 344:3 | **represents** | 156:12 | 90:19 |
| 300:15 | **reported** | 232:10 | 157:4,14 | 92:17  94:3 |
| 301:1 | 156:25 | **reputation** | 215:10,13 | 116:13 |
| 310:4 | 157:19,24 | 290:7 | 215:15,16 | 206:20 |
| **removed** | 233:19 | **reputations** | 216:15 | 257:3 |
| 156:25 | 247:11 | 252:2 | 261:2,7 | 276:11 |
| 158:10,14 | 261:24 | **request** | 324:22 | **responding** |
| 208:16 | 309:8 | 122:10 | **researcher** | 143:16 |
| 209:19 | 344:21 | 132:17 | 75:20 | 145:5 |
| 237:18 | **reporter** | 305:24 | **researchers** | 204:7 |
| 301:1,4,7 | 9:13,24 | 329:15,17 | 174:6,20 | 226:25 |
| 309:22 | 12:10 | **requested** | 175:7 | 341:15,25 |
| 311:18,22 | 17:23 | 122:15 | 215:16 | **responds** |
| 329:10,12 | 26:23 | **requesting** | **reserve** | 134:15 |
| 329:13 | 60:18 | 295:19 | 359:15 | 264:10 |
| **removing** | 68:24 | **requests** | **reservoir** | 303:23 |
| 211:21 | 69:16 | 121:5 | 143:17 | 311:16 |

DR. ANTHONY FAUCI  11/23/2022

| | | | | |
|---|---|---|---|---|
| **response** | 247:19 | 19:13,14 | 150:12 | 271:4,7 |
| 21:18 | 280:22,23 | 19:15,17 | 158:25 | 276:13,15 |
| 47:20 | 281:10 | 22:3 27:8 | 167:25 | 277:18 |
| 50:16 | **retracted** | 32:4,6 | 170:15,24 | 278:9 |
| 70:12 | 222:5,21 | 38:21 | 171:9 | 279:13,15 |
| 79:22 | 222:23,24 | 43:21 | 172:8 | 286:18 |
| 108:2 | 222:25 | 45:11 | 173:7,12 | 288:17 |
| 118:3 | 223:1,7,8 | 47:10 | 173:16 | 294:16 |
| 121:5 | **return** | 48:21 51:2 | 177:13 | 295:7 |
| 122:6 | 361:16 | 51:16 | 179:6 | 296:10 |
| 132:15,16 | **returned** | 55:22 56:6 | 183:24 | 298:25 |
| 134:18 | 262:19 | 56:8,11 | 187:15 | 299:9,12 |
| 166:10 | **returning** | 58:15,18 | 188:18 | 299:20,24 |
| 198:12 | 164:10 | 59:9 61:5 | 190:18 | 300:17 |
| 206:23 | 262:12 | 61:16 62:4 | 192:6,8,10 | 307:5 |
| 227:15 | **reverse** | 62:13 | 192:13,17 | 308:7 |
| 230:6,12 | 23:14,15 | 71:18 | 192:19 | 310:3 |
| 257:5,7 | 23:19 24:3 | 73:14 77:8 | 193:7 | 311:14,20 |
| 269:3,11 | 24:6,10,11 | 77:10 | 194:3,3 | 311:20 |
| 287:14 | 24:22 | 80:21 | 195:21 | 317:17 |
| 299:22 | **review** 13:1 | 84:20 85:1 | 196:1 | 318:10 |
| 314:8 | 18:25 | 90:3,22 | 198:10 | 320:2 |
| 336:18 | 159:8 | 91:25 | 199:25 | 323:23 |
| 342:9 | 160:4,5 | 93:25 | 200:18,20 | 324:4,17 |
| **responses** | 191:13 | 94:25 98:1 | 203:4,13 | 327:10,13 |
| 287:3 | 214:18 | 101:25 | 203:16 | 327:14 |
| **responsi...** | 229:24 | 105:11,14 | 204:13 | 330:14,19 |
| 96:1,4 | 249:14 | 106:22,25 | 206:23 | 330:20 |
| 357:20 | 319:1 | 111:22 | 207:6 | 331:18 |
| **rest** 164:25 | **reviewed** | 112:17 | 211:2 | 333:12,14 |
| 190:14,22 | 69:25 | 116:3,17 | 212:11 | 334:5 |
| 348:10,13 | 70:13 | 118:5,8,10 | 213:3 | 339:5,11 |
| **restate** | 159:18 | 119:17 | 221:24 | 342:23 |
| 185:12 | 246:1,6 | 120:8,9 | 222:9,19 | 344:9 |
| **restriction** | **reviewing** | 123:8,11 | 227:13,17 | 348:8 |
| 117:17 | 124:21 | 123:12 | 227:20,23 | 349:6 |
| 119:15 | **revised** | 124:4,8,20 | 228:1 | 350:15,21 |
| **restrict...** | 120:5 | 125:22,24 | 239:7 | 351:12,22 |
| 117:16 | 128:15 | 126:1,24 | 242:18,20 | 354:18 |
| **result** | **revoke** | 128:19 | 245:21,24 | 356:4 |
| 112:22 | 220:19 | 130:4 | 250:9,12 | 359:15 |
| 114:5 | **revoked** | 131:6,10 | 250:15 | **rightly** |
| 124:3,5 | 220:23,25 | 131:11,12 | 251:8 | 46:13 |
| 345:11 | Reynolds | 132:25 | 253:23 | **ring** 117:4 |
| **resulted** | 264:14,21 | 133:17 | 255:12 | 135:14 |
| 355:23 | 265:1 | 139:4 | 257:11 | 184:16,20 |
| **results** | **rid** 309:25 | 140:25 | 261:2 | 209:12 |
| 42:18 | **right** 15:21 | 146:9 | 264:1,14 | 239:5,7 |
| 246:9,24 | 15:24 | 148:21 | 266:21 | 264:22 |

DR. ANTHONY FAUCI  11/23/2022

285:23
291:19
293:15
337:5
338:7
349:16
352:15
**ringing**
98:24
292:16
**rings** 270:25
343:20
**Rio** 296:16
**rip** 278:22
**rise** 29:1
70:21
**risen** 256:19
**risk** 13:15
15:8,15,17
18:5,8
22:14 41:4
41:9,15
221:6
314:18
317:10
**Rob** 336:13
336:16,22
**Robert** 35:5
35:6
**Rochelle**
296:17
**Rockefeller**
292:3
**role** 75:2
76:1
100:12
248:11
**rolling**
283:20
**Roman** 288:14
**room** 4:12
149:14
**Rouge** 2:21
**rough** 123:14
124:2,7
**Routh** 37:25
38:5
308:12,14
308:15

324:2,23
327:1
**Rowe** 293:2
**rules** 11:11
**rumor** 145:21
146:1
**run** 21:7,9
33:1,25
110:1
175:23
264:22
308:2,9
316:4
321:3
**running** 34:2
175:25
260:18

——————
**S**
**S** 2:6 6:1,6
9:1 10:10
**Sabeti** 132:7
132:18
135:15,17
136:1
**safer** 285:3
285:13
**safety**
117:10
118:11
313:19
314:24
358:17
359:6,7
**San** 133:15
174:9,15
174:17
175:8
231:18
**Sandra**
324:15
325:7,20
**Santa** 293:12
293:18
**SARS** 25:21
55:21,25
57:1 61:3
**SARS-CoV-1**
144:15

**SARS-CoV-2**
43:5 50:7
144:16
156:19
157:1,3,3
157:9
159:3
162:1
171:2
178:22,25
179:23
180:5
203:3
**SARS-like**
31:7
**Saturday**
46:21 55:2
61:14
66:25 77:4
82:14 85:5
89:25
91:22
93:16
124:1
341:17
**Sauer** 2:5
6:4 9:18
9:18 10:7
12:24,25
13:8 14:16
18:3,22
19:20
20:22
22:11
23:23
24:13,19
25:6,22
26:8,19
27:1 29:20
30:13 31:5
35:24
36:20,22
37:23
41:11,17
42:4 43:16
47:4,22,23
48:13,15
48:20,24
49:20

50:13 53:4
53:11,13
53:23 54:6
54:14 57:5
60:20
62:11 63:5
65:16,20
65:24 69:4
69:22
71:13 73:5
74:17
76:19,23
76:25
78:16
79:19
82:11
83:11,22
84:2 86:10
87:4,17
88:14
89:17 90:6
90:14 93:3
93:17 94:1
94:16,19
96:7,14
97:18
99:10
102:1
108:24
109:21
110:8
111:13
112:11,25
113:18
115:3,21
117:6
118:17
119:2,23
120:1
121:4,9
123:2
125:20
127:20
128:6
129:13,18
130:12
134:22
137:16
138:12,20

138:25
141:14
142:22
143:12
144:6
145:2,13
145:25
146:15,25
148:8,15
148:17
149:18,24
150:7
151:1
152:16,20
153:2
154:6
155:14
158:8,22
158:25
159:1,12
159:24
161:19
162:17
163:10
164:3,6,15
166:14
167:13,17
168:23
170:8,12
172:17
173:1
174:13,23
176:10,17
178:11,15
178:16,20
179:5,16
181:25
182:4,9
183:10
184:6
185:9,10
185:19
187:7,14
188:1
190:3
193:21
195:18
196:15,23
197:7,22

**DR. ANTHONY FAUCI  11/23/2022**

| | | | | |
|---|---|---|---|---|
| 199:17 | 254:2,10 | 319:8,16 | 71:21  74:7 | 342:16,16 |
| 200:16 | 256:1 | 322:23 | 84:17  86:2 | 344:13,17 |
| 201:10,12 | 257:21 | 323:18,22 | 86:14 | 344:20,21 |
| 201:15,19 | 259:16 | 325:6,18 | 90:20 | 344:24 |
| 203:17,23 | 260:8 | 326:3 | 91:11  92:1 | 348:19,22 |
| 204:2 | 261:9,15 | 327:6,23 | 99:2 103:6 | 356:3 |
| 205:13 | 262:9 | 328:3 | 103:16 | 357:10 |
| 206:2,15 | 263:10 | 329:19 | 116:24 | **says** 15:16 |
| 207:23 | 266:7,18 | 330:4,9 | 121:7,7 | 22:1 23:4 |
| 208:6,8,20 | 269:15,25 | 331:25 | 132:5 | 25:24 |
| 209:6,15 | 270:9,20 | 332:11 | 136:23 | 26:16 27:8 |
| 209:20 | 271:18 | 333:9 | 139:4 | 39:20 41:1 |
| 210:11,14 | 272:18 | 334:16,22 | 143:3 | 42:13 49:2 |
| 210:20 | 273:8,17 | 337:2 | 144:10 | 50:23 |
| 211:19 | 274:8,13 | 338:9 | 145:6 | 51:24 52:6 |
| 212:18 | 275:6,11 | 339:20 | 146:8,16 | 54:17 |
| 213:20 | 277:21 | 340:24 | 161:15 | 55:18,25 |
| 214:3,23 | 280:10,18 | 341:11 | 163:15 | 63:10 |
| 215:8 | 281:4,13 | 344:2,10 | 164:21 | 65:19 67:2 |
| 219:8 | 282:14 | 346:4,19 | 179:4 | 68:19 |
| 221:13,19 | 283:5,14 | 346:20 | 180:13 | 69:24 |
| 223:5,11 | 284:11 | 347:7 | 189:6,11 | 70:19 73:8 |
| 224:4,17 | 285:15,21 | 348:24 | 191:6 | 73:15 84:8 |
| 226:4,12 | 286:6,20 | 352:11,22 | 192:5,11 | 85:11 |
| 226:23,24 | 287:13,17 | 354:17 | 197:25 | 86:20 88:6 |
| 227:6 | 287:23 | 355:3,25 | 198:21 | 89:24 |
| 228:18,23 | 289:5 | 356:17 | 199:4 | 93:24 95:1 |
| 229:23 | 292:9 | **save** 103:20 | 200:7 | 97:16 |
| 232:15 | 293:16 | 144:15 | 206:21 | 102:3,19 |
| 233:9 | 294:5,8,19 | 169:17 | 218:13 | 103:2,12 |
| 234:14 | 297:11 | 342:22 | 226:3,7,8 | 106:13 |
| 235:2,14 | 298:6,11 | **saved** 151:10 | 228:11,12 | 108:2 |
| 235:25 | 298:20 | 345:12 | 228:14 | 110:18 |
| 236:12 | 299:5 | **saving** | 229:7,13 | 112:4 |
| 237:13,16 | 301:12 | 256:16 | 234:9 | 113:10,11 |
| 237:22,24 | 302:3 | **saw** 81:13 | 244:8 | 115:12 |
| 239:19 | 303:1,18 | 130:3 | 245:13 | 116:14 |
| 240:15,19 | 304:22 | 165:13 | 272:11 | 118:2,16 |
| 240:25 | 305:1,15 | 184:21 | 274:16 | 120:7,22 |
| 242:13 | 305:18 | 196:6 | 283:9 | 121:14 |
| 243:6,19 | 306:11 | **saying** 11:24 | 288:16 | 123:13 |
| 244:22 | 307:17 | 25:12 | 289:10,20 | 124:6,17 |
| 245:7 | 309:3 | 27:25 | 304:19 | 125:2,9 |
| 246:4,15 | 310:17,21 | 32:19 | 310:8,11 | 127:1,1 |
| 247:9 | 311:2,10 | 34:22 | 315:15 | 128:15 |
| 249:5,8,24 | 312:24 | 40:16 48:3 | 316:20 | 131:2,18 |
| 251:1,20 | 313:5,20 | 58:2 61:22 | 324:24 | 131:22 |
| 253:4,7,13 | 314:7,25 | 64:10 | 328:13 | 132:12 |
| 253:17 | 318:11,23 | 69:23 | 342:4,13 | 137:6,15 |

DR. ANTHONY FAUCI 11/23/2022

| | | | | |
|---|---|---|---|---|
| 139:22 | 245:19 | scan 197:17 | scientif... | 303:2 |
| 142:25 | 246:5 | scenario | 37:7 | scours 260:4 |
| 143:13 | 247:20 | 156:14,15 | scientist | screen 9:4 |
| 144:23 | 249:11,18 | SCHMITT 2:6 | 32:13,20 | 42:6,10 |
| 145:19 | 250:1 | scholar | 33:8,11 | 43:19 |
| 146:8,12 | 251:4 | 258:19 | 40:11,14 | 60:10 |
| 146:13 | 254:1,8,18 | 259:9 | 40:23 44:6 | 71:25 |
| 148:24 | 255:1 | scholarly | 45:22 47:2 | 281:19 |
| 149:13 | 260:9,10 | 258:20 | 104:15 | 340:21 |
| 153:22 | 264:5,12 | 259:13 | 147:20 | screened |
| 161:24 | 267:18 | 333:21 | 191:16 | 263:19 |
| 164:16,17 | 268:4 | scholars | 193:3 | scrutini... |
| 164:19 | 271:20 | 334:4 | 204:22 | 322:11 |
| 170:25 | 272:25 | School 40:12 | 207:14,17 | search |
| 171:15 | 273:7 | 40:24,24 | 261:3,22 | 280:22,22 |
| 172:1 | 275:22,25 | 265:11 | 292:19 | 281:10 |
| 177:13 | 278:2,2 | 291:3 | 293:7 | searching |
| 179:6,11 | 280:16 | science 17:5 | 334:1 | 302:13 |
| 180:7 | 288:18 | 17:7 49:6 | 357:1 | sec 204:16 |
| 182:19 | 299:13 | 50:9 62:14 | scientists | 271:17 |
| 183:11 | 300:2,17 | 110:19 | 32:18 33:2 | second 17:18 |
| 188:8,14 | 303:5,10 | 111:7 | 44:19 | 19:9,11 |
| 190:16 | 303:15,23 | 113:8 | 46:20 | 25:24 |
| 191:11 | 304:1,6 | 193:4,4 | 58:25 | 26:18,21 |
| 197:3,4,18 | 305:21,24 | 273:11 | 59:23 | 39:9,12,14 |
| 197:18 | 307:25 | 319:17 | 63:21 | 47:5 50:19 |
| 198:4,5,20 | 308:19 | 323:10 | 75:22 80:1 | 52:4 62:3 |
| 202:20 | 309:8,16 | scientific | 148:2 | 101:24 |
| 203:7 | 309:19 | 21:7 34:1 | 149:16 | 102:10 |
| 209:11 | 311:24 | 37:8 75:14 | 251:15 | 105:1,3,10 |
| 210:21,22 | 324:19 | 75:16 76:7 | 271:10 | 111:14 |
| 211:3 | 325:20 | 77:7 79:3 | 297:18,21 | 115:4 |
| 212:23 | 327:7 | 102:5 | 298:4 | 120:2 |
| 213:3 | 328:17 | 175:5 | scope 58:4 | 125:8,21 |
| 218:8,25 | 329:9 | 183:17 | 58:23 | 127:4,7 |
| 219:10,15 | 330:24 | 189:7,12 | 59:12 | 132:11,23 |
| 219:16 | 331:9,22 | 191:7,9,16 | 62:21 | 144:24 |
| 222:1,13 | 332:2 | 195:8 | 63:16 70:7 | 145:16 |
| 222:16,23 | 335:2,17 | 201:23 | 71:22 | 161:23,24 |
| 222:25 | 335:18 | 202:12,21 | Scott 267:23 | 171:23 |
| 224:20 | 337:9,10 | 215:4 | 300:1 | 180:2 |
| 226:25 | 337:14 | 216:1 | 346:21 | 182:16,25 |
| 229:3,12 | 341:15,24 | 218:13 | 348:3,21 | 194:21 |
| 232:17 | 342:24 | 219:17 | 349:8 | 197:24 |
| 233:18 | 344:8,11 | 259:11,12 | 350:6,6 | 218:9,12 |
| 234:2 | 344:16 | 273:3 | 351:11 | 224:12,22 |
| 235:5 | 353:5 | 292:4 | 352:1,3,9 | 225:2,5,6 |
| 237:21 | scale 153:22 | 295:3 | 352:13,18 | 229:4 |
| 243:2 | 244:1 | 318:17 | scour 302:24 | 252:8 |

**DR. ANTHONY FAUCI  11/23/2022**

| | | | | |
|---|---|---|---|---|
| 267:9,10 | 51:14 | 176:22 | 324:1 | 124:7 |
| 283:19,20 | 52:17 | 179:7,8 | 325:2,7 | 127:4 |
| 298:21 | 53:14 | 182:19 | 328:5 | 132:14 |
| 311:11 | 54:15 | 183:11,15 | 329:11 | 138:24 |
| 324:13 | 55:17,18 | 185:20,24 | 330:18 | 153:18 |
| 325:2 | 65:12 68:6 | 185:25 | 331:22 | 159:9 |
| 328:4,8 | 72:4,23 | 190:13 | 332:1 | 202:10,19 |
| 329:10 | 73:6,18 | 197:17 | 335:17 | 261:6 |
| 332:14 | 74:19,21 | 202:17 | 337:11,18 | 275:13 |
| 335:14 | 75:23 78:7 | 204:3 | 341:12 | 295:9 |
| 341:12 | 84:10 86:6 | 207:7,14 | 344:3,5 | **sending** |
| 353:6 | 86:22 | 207:15 | 347:17,17 | 37:25 49:8 |
| 359:15 | 89:23 | 209:7 | 350:7 | 61:22 67:8 |
| **second-t...** | 93:10 | 222:1,5 | 352:1 | 266:19 |
| 97:10,19 | 94:25 98:6 | 225:12 | 353:13 | 268:21 |
| 98:2 | 101:14 | 232:16,20 | 354:15 | 330:21 |
| 101:10 | 102:2,7,9 | 232:23,25 | **seeing** 170:6 | 350:3 |
| 126:19 | 103:11 | 234:6,7 | 188:8 | **senior** |
| 307:19 | 105:4,15 | 235:3 | 263:20 | 108:14 |
| **secondary** | 106:21 | 242:16 | 284:22 | 271:20 |
| 145:21 | 110:14,22 | 244:24 | **seen** 19:2 | **sense** 143:8 |
| 146:1 | 111:4,14 | 248:7 | 20:8 21:10 | 146:3 |
| **seconds** | 113:13 | 254:1,18 | 25:17 48:4 | 205:7 |
| 51:24 | 115:14 | 259:18,19 | 125:22 | 229:22 |
| **secret** | 116:16 | 259:20 | 175:16 | 230:19 |
| 349:13 | 119:18 | 260:7 | 205:7,10 | **sensitive** |
| **secretary** | 120:22 | 263:4 | 205:20 | 357:2 |
| 5:2 255:12 | 121:10 | 267:4,7,12 | 279:20 | **sensitivity** |
| 255:15 | 123:9 | 267:16 | 283:16 | 74:3 |
| 256:5,10 | 125:4 | 270:4 | 284:18 | **sent** 49:18 |
| 267:24 | 130:18 | 271:19 | 322:6 | 50:5 54:20 |
| 313:9 | 137:5 | 272:2,24 | 337:15 | 54:24 |
| **security** | 139:10 | 274:15 | **sees** 164:3 | 61:14,18 |
| 28:6,14 | 142:1,25 | 275:16 | **selected** | 66:9 68:11 |
| 30:2 | 143:1,21 | 277:23,24 | 74:23 | 68:14,18 |
| 348:23 | 144:23 | 283:20 | **selection** | 69:9,24 |
| 349:8,13 | 145:17 | 284:10 | 75:1 | 75:8 89:25 |
| 349:15,18 | 146:5 | 285:4,5 | **selectively** | 91:22 92:2 |
| **see** 12:12 | 148:18,25 | 294:23 | 258:3 | 120:15 |
| 13:22 | 152:21 | 295:19 | 277:3 | 127:7 |
| 14:15 | 153:6 | 298:22 | **self-cor...** | 128:17 |
| 21:25 | 154:2 | 299:16,21 | 323:10,11 | 129:1,4 |
| 22:25 23:4 | 156:6 | 305:5 | **selling** | 132:4 |
| 26:20 31:6 | 163:11,15 | 306:12,17 | 310:12 | 135:19 |
| 39:11,16 | 163:16,24 | 306:24 | **send** 55:2 | 139:21 |
| 39:25 41:6 | 166:23 | 308:6,12 | 61:20 | 159:14,15 |
| 43:2 44:12 | 167:18 | 309:6 | 82:22 | 160:4,17 |
| 48:1,16,25 | 170:23 | 311:13 | 120:10 | 160:21,24 |
| 50:15,19 | 176:5,21 | 317:3 | 123:15 | 161:15 |

DR. ANTHONY FAUCI  11/23/2022

| | | | |
|---|---|---|---|
| 173:22 | sequenti... | 239:12 | 319:15,18 |
| 179:18 | 116:2 | SHEET 362:1 | 319:22 |
| 189:18 | serial | 287:21 | 322:19 |
| 196:5,10 | 115:13,23 | sheets | 358:5,9 |
| 202:8 | 116:2,10 | 361:11,13 | sign 29:9 |
| 208:24 | 117:13 | 361:16 | 298:14 |
| 254:5,11 | 293:11 | Sheryl | 359:16 |
| 254:15 | series | 296:13 | 361:13 |
| 263:22 | 176:19 | Shi 33:5,14 | signature |
| 269:8 | 217:18 | 35:17 36:1 | 308:5 |
| 294:13,21 | serious 88:1 | 36:6,16 | 324:21 |
| 295:8,12 | seriously | 37:2,7,13 | 361:11,13 |
| 305:11 | 88:24 | 55:19,25 | 361:17 |
| 307:21 | 358:3 | 56:9,16,23 | 362:25 |
| 311:11 | service | 60:23 61:2 | signed |
| sentence | 241:15,17 | 62:13 | 248:17 |
| 14:3 42:24 | 282:25 | 71:15 | 251:5 |
| 52:4,6 | 285:17 | 117:8 | 297:22 |
| 105:10 | Services 4:8 | 119:4 | 298:7,14 |
| 121:11,14 | 4:10 | shiny 192:6 | significant |
| 153:22 | 267:23 | 192:16,21 | 76:12 |
| 161:24 | 313:10 | 192:25 | 187:5 |
| 164:17 | session | 193:2,11 | 267:3 |
| 165:5,12 | 359:21 | 199:4,6,7 | 323:14 |
| 166:1 | set 27:21 | short 2:17 | signoff 29:5 |
| 180:4 | 119:3 | 83:15,15 | silent 63:24 |
| 191:11 | setting | 152:21 | 64:13 |
| 199:22 | 238:21 | 316:3 | silently |
| 211:10 | settle 189:5 | shortage | 69:20 |
| 245:18 | 189:13 | 316:22 | similar |
| 267:15 | 191:4 | 321:2,5,13 | 102:25 |
| 284:2 | seven 54:1 | 321:20,23 | 144:15,19 |
| 344:16 | 85:25 | Shortlander | 315:13 |
| sentences | 91:18 | 110:12,13 | Sincerely |
| 23:3 70:24 | 228:3 | 245:22 | 361:20 |
| 162:11 | 359:12 | shortly | sir 47:1 |
| September | severe | 10:19 | 69:21 |
| 123:19,22 | 262:22 | 277:13 | 75:13 |
| 158:1,11 | shaking | show 12:16 | 135:5 |
| sequence | 150:23 | 25:13 78:2 | 163:14 |
| 189:5 | share 89:5 | 180:4 | 226:18 |
| 191:4 | 164:24 | 192:1 | sit 14:19 |
| sequences | 201:23 | 206:24 | 132:13 |
| 51:14 78:9 | 297:12 | 209:22 | Sitar 324:15 |
| 121:15 | shared 73:16 | 219:25 | site 153:24 |
| 157:25 | 73:17 | 221:7 | 283:15 |
| 158:9,14 | 297:17 | 242:8,9 | sitting |
| 158:16 | sharing | 248:6 | 253:23 |
| 198:15,16 | 237:19 | 257:4 | 308:9 |
| | | 277:13 | |
| | | 287:18,19 | |
| | | 315:7 | |
| | | 341:4 | |
| | | 342:2,3 | |
| | | 343:21 | |
| | | showed 21:2 | |
| | | 21:15 | |
| | | 35:18 | |
| | | 60:12 | |
| | | 160:22,22 | |
| | | 180:1 | |
| | | 214:10 | |
| | | 219:24 | |
| | | 221:1 | |
| | | 237:1 | |
| | | 269:2 | |
| | | 316:9 | |
| | | 337:15 | |
| | | 342:3 | |
| | | 347:12,13 | |
| | | 352:17 | |
| | | 353:21 | |
| | | showing | |
| | | 215:7 | |
| | | 217:10 | |
| | | 318:25 | |
| | | 323:17 | |
| | | shown 12:22 | |
| | | 22:23 25:9 | |
| | | 189:12 | |
| | | shows 31:8 | |
| | | 246:9 | |
| | | 247:18 | |
| | | 347:2 | |
| | | 348:2 | |
| | | shut 69:20 | |
| | | 92:13,19 | |
| | | 242:16 | |
| | | shuts 243:3 | |
| | | shutting | |
| | | 93:2 94:3 | |
| | | 94:6 | |
| | | 262:23 | |
| | | sick 42:15 | |
| | | sickness | |
| | | 274:4 | |
| | | side 78:1 | |
| | | sides 319:11 | |

DR. ANTHONY FAUCI  11/23/2022

| | | | | |
|---|---|---|---|---|
| situation | smaller | 238:23 | somebody | 199:7 |
| 28:11 | 92:12 | 239:5,22 | 21:3,12 | 211:7 |
| 42:20 | 235:4 | 241:7,13 | 34:12 | 212:19 |
| 106:10 | smiling | 241:15,19 | 99:13,22 | 227:7 |
| 117:21 | 173:5 | 241:23 | 209:24 | 230:10 |
| 151:5 | SMITH 2:7 | 262:6,14 | 212:12 | 240:9 |
| 154:11 | sneezes | 262:22 | 213:2 | 243:1 |
| 167:1 | 314:17 | 269:17 | 241:3 | 254:11 |
| 169:12 | sniffling | 270:1,12 | 242:5 | 270:14 |
| 220:5 | 138:5 | 270:16,23 | 266:1 | 284:9,17 |
| 317:10 | SNOW 3:24 | 274:10,17 | 302:7 | 286:24 |
| 322:17 | social 78:12 | 274:18,22 | 332:14 | 295:15 |
| situations | 79:1,14 | 275:5 | 349:24 | 305:17 |
| 155:8 | 98:10,15 | 280:2,5 | someone's | 306:16 |
| 322:14 | 98:17,22 | 281:18,25 | 259:8 | 327:1 |
| six 54:1 | 99:3,6,11 | 282:5 | somewhat | 334:19 |
| 64:23 | 99:13,21 | 290:8 | 80:16 | 343:24 |
| 85:25 | 99:24 | 301:6,11 | 169:16 | 347:20 |
| 91:18 | 100:6,19 | 301:18 | soon 148:6 | 350:12 |
| 161:14 | 100:25 | 302:18,24 | 251:12 | sort 14:2 |
| 228:2 | 101:3 | 303:2 | 317:14 | 51:19 |
| 300:4 | 102:5,14 | 304:15 | sorry 19:22 | 79:18 |
| sixth 89:20 | 102:18 | 307:8 | 20:18  22:9 | 80:25 |
| skewed 247:2 | 103:9,12 | 311:23 | 26:10 | 87:19 |
| Slack 337:9 | 103:13,16 | 312:3,8,11 | 39:17 | 119:5 |
| Slavitt | 104:19,20 | 312:18 | 53:17,19 | 141:7 |
| 336:6,7,8 | 105:17,19 | 333:4 | 53:22 | 143:5 |
| 336:15,22 | 105:25 | 334:7 | 60:16,17 | 155:19 |
| 337:10,14 | 106:13,13 | 335:11 | 60:24 | 213:12 |
| slide 284:16 | 106:18 | 338:12,16 | 61:25 | 244:16 |
| slight | 107:6 | 340:14 | 65:21 | 284:18,19 |
| 314:15 | 110:20,25 | 344:12,18 | 71:11 | 338:18 |
| slow 26:24 | 111:4 | 345:5 | 101:22,23 | 342:6 |
| 60:19 | 150:15,19 | 346:9,10 | 102:11 | 347:13 |
| 74:16 | 151:3,21 | 356:7,12 | 105:7 | sound 78:8 |
| 87:13,15 | 152:8 | 356:16,19 | 119:9 | 208:13 |
| 100:23 | 165:14,20 | 357:19 | 123:23 | 258:13 |
| 145:24 | 166:19 | 358:1 | 125:5 | 323:7 |
| 150:25 | 168:25 | socially | 135:3 | sources |
| 209:14 | 169:10,15 | 346:24 | 145:23 | 190:6 |
| slowly 12:4 | 169:18,20 | society | 149:3 | 207:11 |
| 12:6 | 208:2,11 | 169:22 | 163:14 | Southeast |
| small 51:12 | 209:2 | 194:18 | 178:24 | 140:8 |
| 51:25 | 210:4,7 | 258:4 | 181:25 | space 226:24 |
| 92:24 | 213:9,13 | 278:23 | 182:23 | spare 204:15 |
| 236:9 | 213:15 | software | 185:21 | speak 12:4,5 |
| 314:14 | 235:22 | 100:1,13 | 187:15 | 54:18  58:3 |
| 317:25 | 236:10 | solid 191:15 | 188:4 | 58:14 |
| 336:8 | 238:5,7,10 | 265:23 | 190:9 | 68:25 |

DR. ANTHONY FAUCI  11/23/2022

| | | | | |
|---|---|---|---|---|
| 69:17 | 186:9 | 138:18 | 213:8 | 104:5 |
| 192:14 | 187:4 | 155:7 | 270:16 | 169:2 |
| **speaking** | 188:6,22 | 206:1 | 352:4 | 194:17 |
| 63:11 | 216:11 | 268:24 | **spend** 80:24 | 314:10 |
| 107:5 | 223:17 | 269:20 | 303:4 | 317:2 |
| 260:2 | 228:12 | **speculat...** | **Spiked** 8:6 | **spreads** |
| **Spec-** 305:14 | 238:16 | 80:5 106:3 | 280:12 | 237:4 |
| **special** 28:1 | 244:3 | **speculative** | **spillover** | **spring** |
| **species** | 258:16,18 | 86:9,25 | 43:3 | 217:22 |
| 198:18 | 260:2 | 88:13 89:7 | **spirit** 97:1 | **spurious** |
| 200:10 | 263:1,21 | 92:25 | 153:11 | 329:13 |
| **specific** | 268:11 | 95:23 | **spoke** 45:25 | **squarely** |
| 42:13 61:6 | 270:24 | 108:19 | 72:15 | 340:20 |
| 71:5,14 | 285:13 | 129:15 | 136:7 | **ss** 360:2 |
| 82:10 | 293:24 | 146:11 | 216:23 | **St** 3:16 |
| 130:1 | 302:6 | 149:8 | 272:13 | 361:18 |
| 181:3 | 304:14 | 152:11 | 273:24 | **staff** 29:2 |
| 187:1 | 314:3,5 | 154:5 | 318:15 | 29:11 38:3 |
| 219:21 | 315:1 | 167:8 | 341:16 | 38:7,23 |
| 258:15 | 325:1,9 | 182:8 | 342:1 | 39:5 42:22 |
| 267:4,7 | 326:10 | 210:19 | 351:24 | 58:10 |
| 281:6 | 328:25 | 234:13,18 | **spoken** 45:14 | 136:10 |
| 327:21 | 329:1 | 246:18 | 45:23 | 139:2 |
| 329:5 | 340:17 | 255:24 | 91:10 | 152:7 |
| 344:24 | 344:23 | 257:20 | **sponsor** | 186:14,15 |
| 352:9 | 347:12 | 259:5,24 | 138:15 | 205:16 |
| **specific...** | 352:2 | 259:25 | **spot** 48:14 | 260:5 |
| 20:7 29:6 | 354:9 | 260:23 | 48:16,25 | 268:16 |
| 34:2 49:19 | **specifics** | 274:12 | **spouting** | 270:22 |
| 67:19 | 58:9 77:24 | 285:8 | 229:1,10 | 300:18 |
| 72:15 | **speculate** | 289:2 | **spread** 79:22 | 301:2,5,13 |
| 78:23 | 87:2,6 | 301:8 | 103:22 | 302:14,17 |
| 79:20 83:5 | **speculating** | 303:14 | 151:13 | 302:21 |
| 83:9 91:3 | 40:5 89:16 | 304:17 | 166:3,19 | 304:21 |
| 95:19 | 102:20 | 310:19,25 | 168:17 | 308:16,18 |
| 96:25 | **speculation** | 311:6 | 177:8 | 308:21 |
| 103:24 | 24:5,18 | 312:16 | 194:11 | 309:21 |
| 118:25 | 29:19 | 313:16 | 258:4 | 310:3,11 |
| 124:10 | 35:22 40:7 | 318:7 | 262:1,8,23 | 310:15 |
| 139:18 | 41:12 46:5 | 325:14 | 274:16,18 | 312:10 |
| 142:4 | 62:8 73:25 | 326:2 | 278:3 | **stage** 173:2 |
| 147:8 | 74:6 79:25 | 327:5 | 302:22 | 316:17 |
| 159:17 | 88:16 | 329:18,23 | 316:25 | **stages** |
| 162:16 | 89:11 | 331:21 | 317:4 | 313:14 |
| 163:3 | 108:19 | 333:8 | 318:5 | **stamping** |
| 169:4 | 112:24 | 334:11 | 339:23 | 54:3 |
| 175:12,25 | 113:17 | **speech** | 340:2,8,13 | **Stand** 150:2 |
| 181:18 | 116:21 | 151:16 | 344:15 | **standard** |
| 184:25 | 118:14 | 208:1,10 | **spreading** | 7:22 9:4 |

DR. ANTHONY FAUCI  11/23/2022

| | | | | |
|---|---|---|---|---|
| 19:1 | 145:7 | **stating** | 193:3 | 214:10,16 |
| 179:21 | 146:22,24 | 193:10 | **sticking** | 214:17,21 |
| 242:15 | 162:10 | 214:13 | 80:3,4,10 | 214:24 |
| 243:2 | 173:14 | 237:18 | 80:10 | 215:11 |
| 244:11,12 | 200:4 | **statistical** | **STILES** 2:18 | 219:23,24 |
| 244:14 | 219:17 | 320:12,16 | **Stolberg** | 219:25 |
| **standing** | 224:20 | 322:11 | 296:13 | 223:17,18 |
| 12:16 | 225:17 | 323:16 | **stop** 100:16 | 244:1,25 |
| 25:11 | 232:21 | **statisti...** | 304:13,15 | 244:25 |
| 114:21 | 233:19,20 | 247:7 | 339:23 | 245:9,11 |
| 236:20 | 248:19 | 323:6,14 | **stopped** | 245:20 |
| **standpoint** | 263:18 | **statisti...** | 110:3 | 246:1 |
| 165:7 | 279:11,12 | 244:5 | **stopping** | 247:4,6,8 |
| **Stanford** | 304:6 | 247:22 | 340:2,5,8 | 247:10 |
| 252:9 | 322:10 | **status** 126:9 | 340:13,16 | 293:22 |
| 257:10 | 323:13 | **stay** 52:20 | **strains** | 316:9,13 |
| 267:21 | 333:25 | 72:4,6 | 23:13 | 317:21 |
| 290:12 | 334:6,8 | 84:24 | **strategy** | 318:2 |
| 291:4,5,15 | 343:12 | 85:15 | 268:2 | 320:3,9,11 |
| 291:23 | 345:2 | 125:1 | 271:23 | 322:2,6,8 |
| 292:20 | **statements** | **staying** | **stream** | 322:11,14 |
| **start** 12:9 | 64:5 70:25 | 50:14 | 176:24 | 323:15 |
| 22:1 89:16 | 140:16 | 234:1 | 177:3 | **study** 35:18 |
| 91:16 97:8 | 214:12 | **Stemmy** 42:16 | **Street** 2:9 | 82:16 |
| 136:23 | 217:18,23 | 205:14,17 | 2:20 3:5 | 109:16 |
| **started** | 218:2 | 205:22 | 4:2 361:5 | 183:16 |
| 111:21 | 228:7 | **Stenotype** | 361:18 | 185:22 |
| 190:7 | 234:11,15 | 1:21 | **strict** 15:3 | 198:13 |
| **starting** | 237:1 | **step** 354:10 | **strictly** | 219:12,22 |
| 26:3 53:24 | 272:15,17 | **Steph** 101:5 | 16:7 | 220:2 |
| 97:9 102:4 | 273:19 | 101:5 | **strike** | 221:14 |
| **state** 1:5,17 | 278:16 | **Stephanie** | 275:21 | 222:11,21 |
| 2:3,14 9:6 | 279:17,18 | 1:16,22 | **strong** 353:7 | 244:10,16 |
| 9:17 10:8 | 312:3 | 9:13 360:4 | 355:12,13 | 244:16 |
| 341:5 | 315:12 | **steps** 73:17 | 355:18,22 | 245:3 |
| 342:10 | 317:10 | 109:15 | 356:2 | 246:12 |
| 343:2 | 333:5,16 | 151:12 | **strongly** | 247:21,23 |
| 360:3,21 | 343:5 | 191:19 | 28:8 169:9 | 248:6,7,12 |
| 361:7 | 355:12 | 192:12 | 189:7 | 293:12,17 |
| 362:2 | 359:18 | 195:1 | 346:1 | 293:23 |
| 363:1 | **states** 1:1 | 227:18 | 354:8 | 298:2 |
| **stated** | 9:9 14:4 | 229:21 | **structured** | 318:25 |
| 218:20 | 166:10 | 230:8 | 164:12 | 320:15 |
| 297:19 | 168:22 | 234:22 | 165:11 | 323:9 |
| **statement** | 177:24 | 236:20 | **studied** | 354:3 |
| 81:23 | 182:11 | 296:22 | 156:20 | **studying** |
| 106:9 | 276:6 | 297:3 | 198:9 | 15:1 |
| 129:10,23 | 321:16 | 358:20 | **studies** 7:23 | **stuff** 100:6 |
| 144:4,5 | 360:2 | **stick** 191:16 | 116:25 | 210:7 |

**DR. ANTHONY FAUCI  11/23/2022**

| | | | | |
|---|---|---|---|---|
| 213:13 | 160:10 | **Sunday** 105:5 | 72:13  74:1 | 259:1,3,6 |
| 235:22 | 171:21,24 | 341:4 | 76:4,13 | 259:7,8 |
| 289:22 | 172:12,19 | 342:2 | 79:11 | 270:19 |
| 328:24 | 172:22 | 347:2 | 88:20  91:4 | 272:10 |
| **style** 154:25 | **succeeded** | **Sunetra** | 91:15 | 273:23 |
| 258:22 | 329:8 | 251:17 | 107:18 | 274:18,19 |
| 279:22 | **sucker** 342:6 | 267:21 | 113:23 | 276:19 |
| **sub** 90:12 | **sudden** 88:21 | **supply** 316:3 | 114:1,8 | 282:4,16 |
| **subaward** | **suffering** | 321:14 | 115:18,20 | 283:7 |
| 36:5,10 | 169:3 | 353:11 | 117:24 | 285:9 |
| 37:12 | **sufficient** | **supported** | 124:12 | 286:25 |
| 156:21 | 52:25 | 133:14 | 126:10 | 287:11,20 |
| **subawards** | **suggest** | **supports** | 138:5 | 289:14,16 |
| 37:16 | 92:13 | 174:15 | 140:2 | 292:6 |
| **subject** 39:3 | **suggested** | **supposed** | 147:18 | 293:6 |
| 83:10 | 44:18 | 109:3,4 | 150:1 | 300:23,24 |
| 91:23 | 208:16 | **suppress** | 153:10 | 301:2 |
| 120:5 | 337:14 | 354:15 | 156:3,8 | 303:16 |
| 215:22 | **suggesting** | **suppressing** | 160:3,20 | 304:3,18 |
| 216:24 | 313:23 | 209:2 | 161:11 | 306:20 |
| 264:7 | **suggestion** | **suppression** | 163:6 | 310:7 |
| 320:12 | 107:21 | 208:10,14 | 167:4 | 311:8 |
| 322:11 | 132:9 | **Supreme** | 174:1,14 | 317:20 |
| 328:17 | **suggestions** | 225:19 | 174:25 | 320:8 |
| 330:24 | 172:2 | 227:19 | 175:8,15 | 334:14,24 |
| 351:21 | 198:1 | 228:2,7 | 178:8 | 348:19 |
| **subscribe** | **suggestive** | 230:9 | 180:13,18 | 350:12 |
| 363:11 | 81:14 | 234:23 | 181:6 | 355:17 |
| **subsequent** | **suggests** | 236:21 | 190:24,25 | **Surely** |
| 29:23 | 245:15 | **SUR** 3:25 | 191:23 | 116:14 |
| 322:13 | **suit** 240:6 | **sure** 11:12 | 193:20 | **surfing** |
| **subseque...** | 240:16,21 | 11:19 | 195:6 | 252:24 |
| 37:11 | **Suite** 3:6 | 16:14,16 | 200:6,25 | **surgeon** |
| 81:24 | **summary** | 16:25 | 205:17,18 | 315:21 |
| 215:6 | 111:19 | 20:13 | 205:19,21 | 316:19 |
| 220:13 | 112:4,5,8 | 23:18,21 | 208:22 | **surmise** |
| **subset** | 112:10,18 | 30:11 | 216:4,20 | 154:9 |
| 335:18 | 112:21 | 36:25  37:5 | 220:10 | **surmising** |
| 347:17 | 113:2,3,4 | 41:20 | 223:25 | 191:8 |
| **Substack** | 120:7,15 | 44:17  47:6 | 224:21 | **surprised** |
| 8:17,20 | 222:15 | 48:18  50:4 | 227:25 | 83:8 |
| **substance** | 245:13 | 51:6,9 | 234:20,25 | 162:22 |
| 363:8 | **Summary....** | 56:3  57:10 | 242:3 | 163:2 |
| **substantial** | 123:11 | 62:23 | 245:2,13 | 181:7,11 |
| 180:19 | **Summary.PDF** | 66:14,21 | 246:19,25 | 181:15,21 |
| **substant...** | 126:24 | 67:23 | 249:12 | 184:18 |
| 289:23 | **summer** | 68:21  70:8 | 255:19 | 187:2 |
| **substantive** | 217:20,22 | 70:10,19 | 256:9,12 | 216:22 |
| 114:13 | 347:9 | 71:22 | 257:4 | 347:14 |

---

**DR. ANTHONY FAUCI  11/23/2022**

surprising
 187:6
 261:8
 332:14,16
 332:24
 333:4,10
 333:16
 334:7
surveill...
 57:23,25
 156:9
 157:5
surveyed
 222:11
susceptible
 258:3
suspended
 209:25
 335:20
suspending
 209:16
suspends
 209:8
suspicion
 50:8 52:18
 88:18
suspicious
 77:25
swift 259:22
sworn 1:16
 10:4 360:7
Sylvia 313:6
 313:9,17
 314:3
symptoms
 316:15,16
system
 122:13
 357:11,18
 358:24

_____

        T

T 6:1,1,6
Tabak 65:4,6
 65:7,8
 66:7 67:4
 253:25
TAG 265:14
take 12:11

12:11
13:11
14:22 21:3
41:7 51:23
77:2 80:23
81:1,6
83:12
104:24
109:9,16
109:25
117:22
119:12
123:20
131:7
148:6
149:24
152:9
165:9
191:19
192:11
193:25
194:24
195:1
203:17
217:13,16
230:13,20
247:21
248:7
253:4,5,5
257:24
284:18
296:22
301:24
302:2
312:1,2,23
313:23
322:5
334:7
338:17
357:20
takedown
 257:17,19
 258:10,13
 259:23
taken 1:18
 1:21 9:6
 151:13
 219:5
 243:10

253:10
307:9
328:22
358:20
360:5,8,13
361:10
362:3
takes 237:2
talk 64:7
 81:18
 101:7
 133:4
 135:19
 136:4
 157:7
 248:7
 258:9
 287:10
 292:21
 303:25
 318:13
 326:8
 327:11
 329:3
 338:2
 341:4
 349:18
 351:19
talked 23:25
 56:10,24
 85:6 91:14
 130:25
 136:13
 147:15
 157:11
 163:19
 203:6
 225:17
 233:6
 261:12
 286:8
 297:13
 351:18
 355:6,7,8
 355:10,11
talking
 11:15 15:8
 22:2 23:7
 23:24

27:16
38:19,23
39:5,15,19
40:17 43:6
50:7 52:4
58:5 59:3
63:2,7
72:9 77:24
81:18
84:13
88:22
90:25 93:4
106:4
107:1,3
109:12
116:24
117:4
129:24
130:21
138:14
139:6
140:15
150:14
154:4
163:18
168:21
169:19
171:14
187:13
188:4
195:21
202:9
206:17
212:5
224:15
226:1
228:8
230:24
234:21
240:15
241:21
258:20
269:6
287:8,8,21
295:15
307:13
314:23
341:22
347:18

349:3
353:15,16
355:20
talks 35:13
 50:10
 131:23
 136:13
 250:7
 257:19
 259:10
tangent
 47:14
tangents
 127:25
 128:4
tap 122:14
tape 230:3
 230:15
target 258:3
targeted
 250:16
 274:7
task 79:15
 87:21
 196:25
 197:6,9
 201:3
 204:11
 208:1
 321:1,12
tasks 58:7
 59:10
team 39:21
 40:3
 123:14
 139:22
 299:13
 308:23
 311:17
 324:4,11
 324:24
 325:8,11
 325:12,24
 326:15,19
 327:3,13
 336:9,18
teams 131:20
 137:8
technical

DR. ANTHONY FAUCI  11/23/2022

| | | | | |
|---|---|---|---|---|
| 177:10 | 282:9 | 329:10,12 | 248:9 | 241:11 |
| 289:21 | terminol... | 354:20 | 281:22 | 243:18 |
| 308:5,20 | 258:14 | **thanks** 84:23 | 282:23 | 256:15 |
| 308:25 | **terminology** | 206:21 | 303:20 | 269:7,10 |
| **Technology** | 16:4,9,11 | 303:10,15 | 304:13 | 274:16,17 |
| 17:6 | 17:14 | **that'd** | 306:14 | 276:12 |
| **Tedros** 95:3 | 24:23 | 338:21 | 328:23 | 279:23 |
| 95:5,6,21 | 108:21 | **theme** 97:1 | 329:14 | 301:10 |
| 95:25  96:5 | **terms** 154:25 | 126:5,17 | 341:10 | 302:17,25 |
| 96:17,21 | 241:14,17 | 136:23 | 353:25 | 310:1,12 |
| 108:2,4,5 | 282:25 | 283:9 | **things** 16:21 | 310:13 |
| 108:14 | 285:17 | 358:22 | 19:1,3 | 311:21,22 |
| 110:11 | **terrain** | **theories** | 23:20,21 | 315:6,7 |
| 139:23 | 58:23 | 78:12 | 39:7  42:23 | 316:21,21 |
| teleconf... | **Tessier-...** | 143:18,19 | 56:19 | 335:12 |
| 90:18,18 | 291:21 | 143:20 | 64:12,16 | 340:6 |
| 91:23 | **Test** 23:4,9 | **theorists** | 80:1,7 | 349:9 |
| 93:25 | 23:11,12 | 185:22 | 89:16 | 352:16 |
| **television** | **tested** 23:13 | **theory** 51:1 | 102:25 | 355:6 |
| 226:16 | **testified** | 52:6  79:20 | 113:25 | 358:15,16 |
| **tell** 61:7 | 10:5  43:17 | 188:20 | 115:19 | 359:13 |
| 87:7,9 | 77:1,6 | 193:16 | 116:8 | **think** 11:20 |
| 118:25 | 123:18 | 194:1,4 | 117:12 | 16:15 |
| 156:23 | 140:24 | 199:4 | 122:18 | 20:13,14 |
| 158:6 | 243:20 | 213:8 | 128:5 | 21:13,15 |
| 177:6 | 339:10 | 264:4 | 129:25 | 21:18 |
| 233:21 | **testimony** | **therapeu...** | 142:17 | 34:24 |
| 278:13 | 26:2,7 | 245:16 | 143:17 | 38:14  40:5 |
| 287:22 | 50:1  60:21 | **therapy** | 144:9,11 | 42:19,24 |
| 298:3 | 256:25 | 265:14 | 145:7,8,10 | 43:17 |
| 301:17 | 302:20 | **thereabouts** | 150:15 | 44:16 |
| 315:23 | 310:6 | 325:25 | 151:19 | 46:22 |
| 347:22 | 340:7 | **thereon** | 155:20 | 52:10,12 |
| **telling** | 360:6,8 | 363:10 | 156:4 | 57:14,23 |
| 69:14  70:5 | **text** 22:25 | **thereto** | 157:12 | 60:5,12,13 |
| 301:25 | 39:14 | 360:15 | 159:14 | 62:18  63:9 |
| **temporary** | 74:19 | **they'd** | 160:5 | 63:10  70:5 |
| 170:4 | **thank** 18:1 | 108:21 | 162:10,12 | 74:5  79:13 |
| **ten** 92:14 | 84:18,21 | **thing** 38:22 | 174:2 | 79:23  80:9 |
| **tend** 96:4 | 132:5,20 | 39:1  77:15 | 177:8 | 80:18  87:2 |
| 192:22 | 145:14 | 131:15 | 185:14 | 87:24  88:3 |
| **tens** 25:18 | 148:16 | 137:21 | 189:17 | 88:3,23 |
| **tensions** | 171:1,15 | 142:10 | 191:22 | 90:10  96:3 |
| 102:22 | 171:19 | 155:20 | 194:8,22 | 97:19,21 |
| **tenth** 91:19 | 179:8 | 174:13 | 195:15 | 101:1,3,5 |
| 235:21 | 196:10 | 190:2 | 210:2 | 101:15,18 |
| **tenure** 78:3 | 206:24 | 192:23 | 212:8 | 101:22 |
| **term** 24:7 | 277:18 | 225:5 | 226:2 | 102:18 |
| 118:22 | 325:21 | 233:13 | 238:19 | 103:1,5,25 |

**DR. ANTHONY FAUCI  11/23/2022**

| | | | | |
|---|---|---|---|---|
| 107:22 | 259:21 | 136:11,13 | 208:24 | 52:25 54:8 |
| 108:13 | 260:1,2,6 | 176:2,11 | 242:4,5 | 54:12 |
| 109:8,24 | 260:11 | 176:12 | 263:18 | 57:13 |
| 110:3 | 261:24 | 189:3 | 288:3 | 59:16 |
| 114:7 | 262:16,16 | 210:25 | 290:14,14 | 60:22,24 |
| 119:4,16 | 265:23 | 218:25 | 315:7 | 65:8,15,17 |
| 128:4 | 269:1 | 219:9 | **thread** 337:9 | 66:15 68:9 |
| 132:2 | 270:2 | 222:14 | **threat** | 69:8 71:2 |
| 138:2 | 274:9 | 232:22 | 105:17 | 74:8 76:2 |
| 141:5 | 277:4,10 | 233:1 | **threatened** | 78:4,6 |
| 143:16 | 282:17 | 234:1 | 349:14 | 79:6 80:19 |
| 150:13 | 286:8 | 249:17 | **three** 53:25 | 80:23,24 |
| 151:5,12 | 289:22 | 272:24 | 60:14 | 81:6,20 |
| 154:10,16 | 303:4,20 | 278:7 | 85:25 | 82:3,15 |
| 154:25 | 303:21 | 283:24 | 89:20 | 83:17,20 |
| 155:1 | 304:11 | 305:2,23 | 91:17 93:7 | 93:23 95:2 |
| 156:17 | 306:22 | 337:7 | 94:7 99:18 | 95:10 |
| 159:22 | 309:16 | **thirdly** | 177:2,3,3 | 99:15 |
| 164:23 | 310:14 | 316:13 | 249:22 | 102:15 |
| 169:18,20 | 311:24,25 | **Thirteen** | 251:15 | 106:7 |
| 171:16 | 312:19 | 66:2 | 255:11,13 | 109:25 |
| 173:24 | 322:25 | **Thirty-two** | 255:21 | 110:3 |
| 175:15,21 | 326:23 | 210:10,11 | 294:14 | 121:20 |
| 176:9 | 329:14 | **thoroughly** | 315:22,23 | 123:20 |
| 177:2 | 333:18,20 | 107:8 | 316:1,18 | 125:13 |
| 181:24 | 335:9 | **thought** | 316:21 | 126:18 |
| 184:9 | 338:24 | 42:22 | 317:3,4,7 | 129:9,24 |
| 188:23,25 | 339:5,18 | 46:12 | 331:4 | 138:13 |
| 190:1,23 | 341:5 | 261:21 | **three-way** | 139:5 |
| 191:15,21 | 343:13 | 336:19 | 34:21 | 144:15 |
| 192:13 | 351:7 | 358:3 | **threw** 192:24 | 147:12 |
| 193:7,16 | 354:16 | **thoughtful** | **throw** 80:5 | 150:3,5 |
| 195:13,16 | 355:19 | 111:19 | **thrown** 112:7 | 169:19 |
| 195:19 | 356:6,20 | 112:4,8 | **tidied** 127:1 | 172:9,14 |
| 201:6 | 357:7,14 | **thousand** | 127:5,13 | 173:23 |
| 202:6 | 357:19 | 153:13 | **ties** 70:23 | 175:10 |
| 205:10 | 358:5,8,13 | 207:3,3 | **tight** 86:21 | 180:9,24 |
| 207:14 | **thinking** | 244:18 | 87:8 88:4 | 192:18 |
| 214:23 | 60:7 | 300:4 | **time** 9:3,5 | 194:13 |
| 220:9 | 108:11 | **thousands** | 11:8 16:13 | 197:8 |
| 223:24 | 144:7 | 21:14 | 16:15 19:6 | 199:5,8 |
| 226:6 | 223:14 | 22:20 | 20:8 22:6 | 203:18,21 |
| 227:18 | 257:24 | 25:18 | 22:12,22 | 204:23 |
| 228:5,5 | **third** 121:10 | 32:18 33:1 | 27:11,14 | 219:4,6 |
| 229:17 | 128:17,20 | 45:18 | 27:23 28:7 | 220:4 |
| 237:3 | 130:13,15 | 112:6 | 31:22 35:6 | 223:2,8 |
| 249:3 | 130:20 | 129:24 | 36:4 43:18 | 226:6 |
| 252:16 | 131:2 | 148:1 | 45:15,23 | 227:3 |
| 256:6 | 133:10 | 173:25 | 46:11,18 | 230:16,20 |

235:21
239:14
240:20
242:8
248:8
249:16
250:4
251:24
252:2
253:8,11
255:4,18
256:11,17
256:22
258:9
262:11
276:16
278:17
279:25
281:10
282:18
288:3
291:6
293:20
294:1
303:4
312:8,25
313:3
315:10,13
316:9,12
316:14
317:11
318:13,21
319:19
321:19
322:13
325:22
336:9
341:22
345:17
346:25
351:11,15
351:20,22
353:1
354:23
355:1,18
359:19
**times** 8:19
  11:5  45:15
  71:1

175:17
201:22
205:6,10
226:16
239:21
280:4
282:1
296:14
321:1
334:2
344:3,21
345:8
349:14
353:9
354:6
356:15
357:10,15
**timestamp**
143:1
**timing** 84:17
  84:21
**title** 30:24
  41:9,14
  50:2  56:16
  57:9  76:4
  179:22
  210:22
  212:23
  218:8
**titled** 18:8
  305:25
**titles** 41:24
  294:22
**today** 9:3,13
  11:21  13:2
  14:19
  35:13  48:3
  49:2,14
  50:23  58:7
  59:11
  109:1
  112:9
  123:15
  125:2,10
  234:3
  243:22
  282:1
  334:2
  355:5

**today's**
  359:20
**told** 57:21
  147:5
  210:5
  212:13
  260:17
  271:21
  272:5
  289:7
  312:6
  317:23
  321:1
  357:24
**tomorrow**
  109:8
**tone** 52:2
**tonight**
  109:8
**Tony** 84:10
  84:17,21
  128:15
  130:18
  170:25
  171:7
  173:13,19
  174:4
  204:14,15
  254:18
  348:23,25
  349:20,22
  350:6,7,13
**Tonys** 349:2
**top** 25:24
  32:11
  37:24
  39:13  46:7
  46:14,17
  54:19  84:5
  86:3  89:24
  91:20,21
  93:9,14,15
  101:11
  111:17
  120:23
  125:3,3,5
  125:9
  130:16
  132:22

142:7,25
173:11
179:6
185:21
197:4
204:3
209:8
211:3,8,21
216:12
222:1,2
226:22
233:2
247:25
249:18
251:3
256:19
264:6
271:10
305:10
324:1
327:3
333:1
341:12
**top-perf...**
  234:4
**topic** 195:11
  215:24
  216:21
  218:18
  262:18
  286:1
  295:24
**topics**
  238:21
**total** 73:16
  73:21
  77:22  88:8
  88:11
  231:12
**totality**
  59:21
**totally** 91:9
  198:18
  199:22,23
  200:9
  206:11
  312:20
**touch** 84:25
  85:16

**tough** 335:21
**touted**
  236:21
**touting**
  225:19
  227:21
  229:9
  235:10
**toxicity**
  225:11
**toy** 199:4
**tracing**
  165:8
**TRACY** 2:17
**traditional**
  103:9
**transcribed**
  1:22  12:6
**transcript**
  6:24  8:22
  143:15
  144:3
  146:7,23
  196:24
  197:20
  198:25
  361:12
**transcri...**
  142:23
**transgenic**
  115:13,24
  116:11
  117:13
**transition**
  146:5
**transmis...**
  24:16
**transmis...**
  15:11  23:5
  146:5
  315:21
  316:12,14
  317:6
**transparent**
  103:4
  126:11
**traveling**
  313:14,22
  315:2

DR. ANTHONY FAUCI  11/23/2022

| | | | | |
|---|---|---|---|---|
| treat 88:7 | 262:12,20 | 153:12 | 240:13 | 298:23 |
| 123:13 | trouble | 156:5 | 267:9 | 299:8,13 |
| 124:6 | 235:11 | 166:2 | 278:7 | 299:19 |
| 224:25 | troubles | 236:18 | 288:8 | 300:13,19 |
| treated | 104:17,18 | 250:16 | 298:21 | 300:20 |
| 88:11 | troublesome | 256:15 | 303:9 | 303:23 |
| treating | 237:5,6 | 269:9 | 307:19 | 304:16 |
| 331:5,9 | troubling | 303:16 | 324:14 | 335:2,20 |
| treatment | 310:12 | 304:11,13 | 337:7 | 336:3,3,23 |
| 15:13 | trucks 169:6 | 304:14 | 341:3 | 337:8,21 |
| 213:22 | true 160:3 | 309:25 | turned | 347:19 |
| 229:10 | 204:19 | 312:18 | 155:15 | 348:5,15 |
| 231:10,11 | 229:2,11 | 321:14,20 | Turning | 348:22,22 |
| 232:9 | 273:4 | 329:6 | 219:9 | 349:24 |
| 237:19,20 | 302:25 | 334:25 | tweet 103:14 | 350:5,7,14 |
| 245:14 | 339:16,17 | 339:23 | 139:23 | 350:17,19 |
| 246:6,7,8 | 346:8 | 351:7 | 210:6 | 350:22,24 |
| 246:10,21 | 363:9,13 | Tuesday | 213:15,16 | 350:8,8,9 |
| 247:15,16 | Trump 197:5 | 115:7 | 241:8 | two 17:1 |
| 247:24 | 229:8 | 124:1 | 348:20,21 | 32:10 |
| 265:15 | Trust 76:5,6 | 126:22 | tweeted | 35:18  41:1 |
| 331:23 | truth 79:25 | 233:17 | 269:14 | 53:25 |
| 332:3,18 | 80:10 | tuned 72:4,6 | tweets 270:2 | 56:23 |
| 333:3,22 | 106:11 | turn 53:5 | 270:3,4 | 62:12  85:5 |
| 353:23 | 107:9,10 | 61:10  68:5 | Twenty | 85:25 |
| treatments | 107:13 | 72:20 | 158:24 | 89:19 |
| 236:5 | 177:6 | 74:18 | Twenty-five | 90:11,16 |
| 355:5 | 228:10 | 90:15 | 182:1 | 90:16 |
| triage | 323:17 | 93:19  94:7 | Twenty-s... | 91:17  93:7 |
| 169:13 | try 44:12 | 97:9 | 187:15 | 93:19,20 |
| trial 353:21 | 70:22 | 104:25 | Twenty-six | 101:11 |
| 353:25 | 107:8 | 110:9 | 185:9 | 128:20 |
| 354:14 | 125:13 | 120:2,21 | twice 20:16 | 131:18 |
| trials | 156:3 | 124:25 | 205:7 | 137:5 |
| 214:12 | 160:2 | 126:19 | Twitter 98:9 | 185:13 |
| 221:1 | 190:21 | 127:15,16 | 98:10,13 | 202:23 |
| 227:9 | 259:13 | 128:7,9 | 98:21  99:6 | 203:11 |
| 231:9 | 307:8 | 130:13 | 100:1,2,5 | 207:3 |
| 247:5 | 323:16 | 136:11 | 100:12,14 | 228:19 |
| 324:20 | 357:10 | 157:10 | 208:15 | 233:14 |
| tried 46:23 | trying 18:11 | 161:23 | 209:1,8,16 | 234:10,15 |
| 157:2 | 41:20  90:9 | 163:22 | 209:25 | 237:9,11 |
| 274:6 | 90:21  91:7 | 176:2 | 210:5,5 | 240:10 |
| trip 138:15 | 91:8  103:5 | 210:25 | 239:23 | 279:11 |
| 140:1,5,12 | 103:20 | 226:20 | 240:5,16 | 296:13 |
| 164:11 | 106:11 | 232:22 | 240:21 | 311:18 |
| 165:3,3,24 | 114:7 | 233:1 | 242:22 | 316:8,24 |
| 167:3,5 | 126:3 | 237:9 | 266:15 | 330:21 |
| 261:11 | 128:4 | 239:8 | 270:3 | 358:21 |

DR. ANTHONY FAUCI  11/23/2022

| | | | | |
|---|---|---|---|---|
| 359:13 | 114:1 | 321:16 | **update** 39:6 | 343:13 |
| **Tying** 193:15 | 121:6 | 360:2 | 210:16,22 | **vaccine** 24:8 |
| **type** 17:12 | 122:9 | **universal** | 285:16 | 104:12 |
| 21:18 | 160:8 | 317:16,18 | **updated** | 106:14 |
| 163:5 | 162:11 | **university** | 233:18 | 173:14 |
| **typed** 331:12 | 189:18 | 32:20 | 284:3 | 211:13 |
| **types** 168:12 | 212:12 | 133:15 | 344:8 | 256:16 |
| 238:19 | 323:9 | 174:17 | 359:8 | 288:22 |
| **typewriting** | 348:19 | 265:12 | **ups** 81:11 | 324:22,25 |
| 360:10 | **understa...** | 267:21,22 | **urban** 143:6 | 325:8,12 |
| **typical** | 74:10 | 313:11 | **urgently** | 325:23 |
| 191:15 | **understa...** | 352:25 | 28:5,12 | 326:1,9,16 |
| 206:23 | 147:9 | 353:3,3,4 | **use** 108:21 | 327:11,16 |
| 314:12 | **understa...** | **unknown** | 155:18 | 336:2,23 |
| 317:23 | 15:11 18:5 | 158:17 | 177:11 | 338:12,23 |
| **typically** | 18:8,14 | **unleashed** | 199:23 | 339:18 |
| 245:14 | 19:16,23 | 344:12 | 220:11 | 344:15 |
| | 19:24 | **unnecessary** | 221:3 | 351:24,24 |
| ——————— | 22:13 | 274:3 | 258:14 | 351:25 |
| **U** | 24:21 | 297:8 | 332:17 | 352:3,5 |
| **U.S** 4:1  9:22 | 27:22 28:2 | 345:11 | **useful** | **vaccines** |
| 25:25 27:3 | 29:13 | 355:23 | 294:15 | 288:16,19 |
| 27:18 28:3 | 35:20 41:4 | **unorthodox** | **uses** 101:6 | 337:23 |
| 28:17 | 41:9,14 | 230:9 | 304:3 | 347:5 |
| 177:11 | 70:17 | **unpreced...** | **usually** | 351:17,20 |
| 238:23 | 118:6 | 169:8 | 14:25 29:1 | 351:21,22 |
| 361:5 | 246:16 | **unrelated** | 127:14 | 355:10,10 |
| **uh-huh** 11:25 | 315:20 | 14:17 | 136:23 | **vague** 22:7 |
| **UK** 76:15 | 316:2 | **unreport...** | 179:22 | 29:22 |
| **ultimate** | 329:22 | 208:12 | 332:22 | 35:22 71:9 |
| 29:5 | **underway** | **untrue** 194:8 | 349:18 | 78:14 79:9 |
| **ultimately** | 259:19,23 | 194:10 | | 79:12 82:7 |
| 143:16 | 260:10 | 237:1 | ——————— | 89:8 |
| 248:22 | **unfortunate** | **unusual** 21:6 | **V** | 120:14 |
| **unavailable** | 306:1 | 37:17 39:1 | **v** 1:7  9:7 | 129:16 |
| 108:17 | **UnHerd** 7:16 | 44:8 51:11 | 361:7 | 154:22 |
| **unbiased** | **unidenti...** | 51:23,24 | 362:2 | 155:19 |
| 107:8 | 350:8,14 | 113:25 | **vaccinated** | 166:12 |
| 157:7 | **uninfected** | 135:25 | 24:9 99:19 | 168:19 |
| **uncensored** | 314:11 | 174:3 | 101:8 | 169:23 |
| 228:25 | **Union** 341:5 | 261:5 | 104:13 | 174:21 |
| **uncertai...** | 342:10 | 263:2 | 151:8 | 186:22 |
| 14:4 | 343:2 | **unvaccin...** | 152:5 | 193:18 |
| **understand** | **United** 1:1 | 343:10,11 | 287:1 | 207:18 |
| 11:18 15:9 | 9:9 75:17 | **unwarranted** | 338:24 | 208:5 |
| 18:12 | 76:5 | 80:16,17 | 342:7 | 213:24 |
| 29:23 | 166:10 | 81:13 | 343:10 | 251:19 |
| 42:23 | 168:22 | **unwitting** | 359:3 | 291:25 |
| 70:10 | 177:24 | 358:15 | **vaccinating** | 293:14 |
| 71:25 | | | 285:3,14 | |

DR. ANTHONY FAUCI  11/23/2022

| | | | | |
|---|---|---|---|---|
| 297:24 | verify | 294:2 | 77:23 80:2 | 116:3,5,25 |
| 318:22 | 299:23 | 312:25 | 89:14 | 121:12,15 |
| 319:13 | versed 40:18 | 313:3 | 122:4 | 121:16,17 |
| 345:20 | 63:14 | 354:23 | 198:15 | 129:14 |
| 352:7 | version | 355:1 | virology | 137:19 |
| 355:16 | 123:15 | 359:11,17 | 33:8 36:6 | 138:16 |
| vaguely | 159:3 | Videotaped | 36:17 64:9 | 140:16,21 |
| 13:23 | 170:19 | 1:13 | 89:16 | 147:3 |
| 18:10 | 178:21,24 | view 101:13 | 114:11,15 | 155:16 |
| 142:5 | 179:17,19 | 101:24 | 117:9 | 156:13 |
| 225:25 | 180:1,10 | 109:1 | 120:19 | 162:2 |
| 254:4 | 203:9 | 150:18 | 124:13 | 168:18,22 |
| 300:21 | 228:19 | 151:2 | 133:9 | 169:2 |
| 302:7 | 284:20 | 154:20 | 135:25 | 177:7 |
| 314:23 | versions | 194:4 | 156:23 | 180:6 |
| valence | 228:19 | 217:8 | 158:12 | 181:10 |
| 75:12 | versus | 243:22 | 160:8 | 189:10 |
| valid 247:7 | 160:25 | 273:2 | Virology's | 194:1 |
| validated | 246:21 | 276:16 | 158:2 | 198:2,9 |
| 80:15 | 320:15 | 278:10 | virulent | 208:16 |
| validity | vice 197:5 | 297:12,22 | 24:16 | 247:18 |
| 248:12 | 197:12 | 319:10 | virus 13:15 | 248:18,20 |
| Vallance | 202:5,16 | 334:8 | 14:6,21,24 | 248:22 |
| 47:1 75:11 | 352:25 | 346:9 | 15:5,11 | 258:4 |
| 75:13,13 | video 9:4,5 | 356:21 | 16:18 | 262:1,8,23 |
| 85:9 92:3 | 199:18,21 | viewpoints | 23:20 24:1 | 274:6 |
| 93:12 | 225:19 | 322:20 | 24:8,15,24 | 276:22 |
| 97:22 | 227:15 | views 223:20 | 24:25 25:1 | 277:1 |
| variables | 229:1,7,18 | 235:6,23 | 34:15,22 | 278:22 |
| 247:1 | 232:18 | 236:2,8,10 | 34:24 35:1 | 287:2 |
| variations | 234:2 | 236:17 | 35:11,15 | 293:19 |
| 303:11,25 | 235:5,10 | 243:21 | 43:19,25 | 314:14 |
| 304:7 | 236:1,20 | Vincent | 44:8 50:6 | 315:17,20 |
| various | 237:18 | 39:21 | 50:10 | 317:1,2,25 |
| 95:14 | 238:1 | 40:13,14 | 51:12,25 | 354:15 |
| 122:7 | 239:12,15 | viral 232:17 | 52:17 | 358:8 |
| 142:16 | 240:5,22 | virologist | 62:23 | virus's |
| 189:19 | 242:22 | 45:4,12 | 77:12 79:2 | 79:22 |
| 283:23 | 305:25 | 121:24 | 79:21 | 98:22 99:3 |
| 332:23 | 306:3,18 | 135:18 | 80:12 | 109:17 |
| Varmus 134:3 | 359:20 | 157:7 | 82:18,25 | viruses |
| 135:7 | videogra... | 160:9,12 | 89:5 100:9 | 15:23 |
| 136:8 | 9:2,15,24 | 209:9,17 | 100:10 | 25:21 27:4 |
| varying | 54:8,12 | virologi... | 102:15 | 30:4 36:15 |
| 175:1 | 83:17,20 | 210:1 | 103:17,23 | 43:3 |
| VECCHIONE | 150:2,5 | virologists | 104:1,4 | 117:11 |
| 3:3 | 203:18,21 | 44:11 | 110:21 | 118:19 |
| venue 39:15 | 219:4,6 | 52:15 | 111:1 | 156:19,21 |
| verbal 11:23 | 253:8,11 | 58:20 64:1 | 113:21,25 | 156:24 |

**DR. ANTHONY FAUCI  11/23/2022**

| | | | | |
|---|---|---|---|---|
| 157:6, 9 | 110:7 | 137:22, 24 | 86:12 | 90:10 |
| 158:10 | 115:1 | 139:7 | 103:4 | 101:10 |
| **visibility** | 117:1 | 164:24 | 104:22 | 104:25 |
| 191:5, 10 | 132:9 | 188:10 | 107:6 | 105:1 |
| 191:12, 14 | 134:7, 8 | 197:25 | 116:4 | 136:24 |
| 191:20 | 148:9 | 263:3 | 139:22 | 150:3, 6 |
| 192:12 | 149:25 | 309:5 | 151:9 | 172:7 |
| 195:2 | 150:8 | 337:10 | 152:10 | 173:6 |
| **visit** 149:17 | 156:8 | **wanting** 43:2 | 157:5 | 181:24 |
| **vitro** 117:12 | 176:18 | 92:22 | 164:12 | 187:8 |
| 245:15 | 178:8 | 106:10 | 165:11 | 202:8 |
| **vivo** 116:25 | 192:11 | 137:2 | 166:2, 7, 18 | 203:19, 22 |
| 117:22 | 198:5 | 191:16 | 170:21 | 219:7 |
| **viz** 337:15 | 201:11 | 321:8 | 184:23 | 233:23 |
| **vocal** 317:12 | 205:8 | **wants** 94:17 | 194:15 | 253:9, 12 |
| 317:14 | 225:12 | **warfare** | 195:14 | 262:15 |
| **Volume** | 230:3 | 143:6 | 212:6 | 263:6 |
| 179:11 | 231:9 | **warranted** | 232:4 | 307:1 |
| **von** 97:16, 21 | 237:14 | 169:17 | 236:14 | 313:4 |
| **VRC** 324:20 | 246:25 | **Washington** | 239:10 | 354:24 |
| **vulnerable** | 253:5, 5 | 3:7  4:3 | 241:6 | 355:2 |
| 248:20 | 282:20 | 7:22  8:3 | 259:11 | **we've** 25:3 |
| 250:17 | 300:25 | 13:15, 19 | 268:17 | 31:1  40:10 |
| 277:3 | 301:4 | 201:22 | 284:5 | 76:16 |
| | 306:20 | 242:14 | 305:12 | 104:1 |
| ————— | 330:15, 15 | 243:2 | 311:3 | 107:7 |
| **W** | 330:17 | 271:5 | 312:19 | 114:21 |
| **wait** 39:12 | 332:24 | 272:5 | 320:5, 9, 10 | 125:22 |
| 185:5 | 342:22 | 273:19 | 326:18 | 138:14 |
| **waiting** | 348:18 | 275:14 | 328:13 | 140:15 |
| 172:7 | 355:22 | 279:14 | 343:6 | 170:1 |
| **Walensky** | 357:13 | 280:25 | 347:9 | 171:2 |
| 296:17 | 359:15 | 361:6 | 357:8, 16 | 175:17 |
| **walked** | **wanted** 42:25 | **wasn't** 59:19 | 358:23 | 195:9 |
| 295:20 | 58:10, 16 | 66:21 | **Wayback** 7:2 | 203:5 |
| **walking** | 58:22 | 123:22 | **ways** 15:1 | 274:25 |
| 241:3 | 59:12, 14 | 166:23 | 156:7 | 276:24 |
| 281:16 | 59:23 | 223:9 | **we'll** 85:15 | 355:4 |
| 317:1 | 62:19, 23 | 329:24 | 278:11 | **weak** 353:8 |
| **want** 12:11 | 64:8, 19 | **watched** | 302:1 | 354:6 |
| 18:1  28:12 | 66:13  70:6 | 199:18 | 359:18 | **weapons** |
| 36:24 | 71:2, 21 | **watching** | **we're** 11:15 | 145:21 |
| 53:11  58:3 | 74:1  79:24 | 199:21 | 27:16  29:8 | 146:2 |
| 62:20 | 87:7  89:4 | 228:10 | 37:19 | **wear** 313:13 |
| 63:15  70:8 | 114:20 | 236:19 | 39:19 | 314:17 |
| 70:9  74:3 | 121:1 | **way** 19:1, 3 | 54:13  58:5 | 315:2, 18 |
| 83:12 | 126:9, 10 | 24:15 | 83:18, 21 | 316:20 |
| 87:20, 25 | 126:16 | 44:12  60:3 | 85:24 | 317:9 |
| 88:1, 2, 4 | 136:17 | 80:12 | 89:19 | 321:25 |
| 88:20 | | | | |

DR. ANTHONY FAUCI  11/23/2022

| | | | | |
|---|---|---|---|---|
| wearing | went 107:18 | widely 88:25 | 100:24 | 214:1,21 |
| 317:12 | 144:18 | 169:2 | 101:17,20 | 214:25 |
| 322:15,15 | 168:8 | 181:22 | 101:23 | 223:23 |
| 322:18 | 195:13 | widespread | 108:20 | 224:14 |
| web 243:10 | 200:17 | 166:17 | 112:3 | 225:24 |
| website 18:5 | 208:12 | 235:9 | 115:18 | 227:5 |
| 158:2 | 210:1 | 293:19 | 116:22 | 228:20 |
| 206:18 | 240:2 | WILBUR 2:18 | 118:15,22 | 229:16 |
| 242:16 | 261:10 | wild 79:25 | 125:17 | 234:19 |
| 243:3,9 | 263:3 | 103:4,9 | 127:18 | 235:19 |
| 280:12 | 291:3 | 106:3,3 | 128:3 | 236:7 |
| WeChat 98:9 | 321:24 | 118:2,11 | 129:17 | 237:14 |
| 98:10,13 | 336:11 | 118:16 | 130:9,11 | 240:14 |
| 98:14,21 | 342:19 | wildly 89:16 | 134:19 | 243:1,13 |
| Wednesday | weren't | wind 263:20 | 137:14 | 246:19 |
| 1:12,20 | 157:24 | winner 134:4 | 138:19 | 249:22 |
| week 131:3 | West 2:9 | 252:11 | 144:2 | 250:24 |
| 131:21 | 118:2,12 | 257:9 | 145:1,4 | 253:22 |
| 137:8 | 118:16 | Wire 264:3 | 146:12,19 | 255:25 |
| 161:14 | Western 1:2 | Wired 264:14 | 148:14,16 | 257:1 |
| 267:16,18 | 9:10 | witness 1:16 | 149:9 | 259:6,25 |
| 325:22 | What'd 104:9 | 6:2 10:3 | 150:1,21 | 260:24 |
| weeks 11:1 | what-hav... | 13:7 14:11 | 150:23 | 262:5 |
| 351:23 | 39:3 | 14:14 | 152:12,25 | 266:13 |
| weigh 188:12 | whatsoever | 20:21 22:9 | 154:24 | 268:25 |
| 190:17 | 214:8,14 | 23:18 24:6 | 158:6 | 269:21 |
| 191:13 | white 7:11 | 25:10,16 | 159:22 | 270:18 |
| weighs | 197:1 | 26:16,25 | 162:8 | 271:17 |
| 155:24 | 198:23 | 30:7 35:23 | 164:5 | 272:10 |
| weight | 201:3 | 41:13 42:2 | 167:9 | 273:7,15 |
| 333:21,23 | 207:25 | 43:15 46:6 | 168:21 | 273:23 |
| 333:25 | 217:24 | 47:19 48:8 | 169:24 | 274:25 |
| weighted | 218:3 | 48:11,18 | 176:7 | 280:16 |
| 343:11 | 226:24 | 49:11,13 | 179:10 | 284:9 |
| well-est... | 271:9 | 50:2 53:22 | 183:6 | 285:9 |
| 40:23 | 275:23 | 62:9 68:18 | 185:13,16 | 286:18 |
| 147:20 | 276:1,2,10 | 68:20,21 | 186:24 | 287:11,20 |
| well-known | 328:11,20 | 68:23 69:1 | 187:12,19 | 289:3 |
| 135:17,24 | 329:17,21 | 69:11,13 | 187:22,25 | 292:1 |
| 136:3 | 329:25 | 69:19 | 189:25 | 293:15 |
| 139:17 | 335:2,18 | 71:11 | 193:20 | 297:2,25 |
| well-pow... | 335:23 | 79:11 82:9 | 195:6 | 298:10 |
| 354:13 | 336:10,12 | 83:15 87:1 | 197:3,16 | 299:3 |
| well-rec... | 336:18 | 87:15 89:9 | 199:11 | 301:9,22 |
| 45:4 | 339:22 | 90:4 93:1 | 200:14 | 302:21 |
| well-reg... | 359:5 | 93:15,24 | 201:14 | 303:15 |
| 166:7 | WHO-spon... | 95:24 | 205:5 | 304:18 |
| Wellcome | 261:11 | 97:12,15 | 207:19 | 306:9 |
| 76:5,6 | 262:12 | 99:5 | 211:17 | 308:25 |

310:7,20
311:1,7
312:17
313:17
314:2,23
318:8
319:6,14
323:18
325:15
327:20
329:24
330:8
331:22
334:13
338:1
339:12,14
341:7,8
344:9
345:21
348:18
352:8
353:20
355:17
356:11
358:12
359:14
360:6,8
361:12
362:1,25
woman 33:15
228:4
wondering
188:14
225:6
269:2
299:14
wont 171:17
word 45:11
113:24
155:18
156:14
165:19
207:6
222:4
225:1
261:3
words 56:20
57:11
109:11

116:4
145:8
188:25
189:14,15
189:16
190:22
277:11
wore 316:23
work 12:20
13:6 19:1
19:3 25:11
35:19 36:7
42:15,18
58:12
59:13,15
59:17,21
70:20,24
72:14
99:24,25
100:14
101:3
131:4,9
133:1
136:14,17
136:20,22
137:2,18
140:7
205:16,22
210:16,23
217:11
219:24
220:1
238:20
269:17
300:4,11
302:23
317:6
326:18,18
350:24
work-rel...
55:14
worked 100:2
156:24
217:25
316:11
319:3
350:22
351:4
working 17:8

36:1 87:25
100:4
120:11
132:10
134:1
136:21
164:23
171:2
260:12
310:4
works 45:4
72:17
83:14
99:11,13
99:20,22
100:18,25
101:5
204:21
214:14
217:3
218:2
248:3
300:6,9
308:1
319:2
350:4,17
350:19
351:9
world 46:10
95:7,9,17
96:23
103:21
164:25
192:24
193:2
215:19
223:24
234:4
world's
39:23
worried
273:1
worries
302:14,17
302:21
worry 276:12
302:23
worth 13:15
15:17

wouldn't
22:18 32:7
42:8 96:3
108:22
116:15
124:11
147:17
153:17
157:3
181:11
184:18
187:2
213:3,5,16
235:23
257:2
321:10
wound 256:16
write 184:15
184:17
258:24
259:13
354:7
writer 308:5
308:20
writers
309:1
writes
132:20
173:13
184:18
258:23
325:7
writing 14:7
258:20
314:8,20
359:1
written
13:24
113:9
130:2
153:1
160:18,20
224:19
287:15
wrong 101:22
194:11
240:11
wrote 48:2
57:8 114:2

153:16
268:9,12
Wuhan 33:8
33:11,16
33:21 36:6
36:16
37:12
42:17
117:9
143:7
145:22
146:2
153:24
154:19,20
155:17
156:21
158:1,11
166:3,4
190:8

_____
       X
_____
X 1:4,10 6:6
_____
       Y
_____
ya 354:7
yada 354:7
Yale 265:11
265:12
yeah 13:4,11
14:11,14
14:22 22:3
22:4 23:2
23:14 24:6
27:23
28:19,21
30:7 33:17
36:9 42:19
43:22
47:22 49:3
50:18,21
54:17,18
54:19
55:20
58:18
61:11,21
62:9,16
65:2 66:5
66:8,11
68:8,12

DR. ANTHONY FAUCI  11/23/2022

| | | | | |
|---|---|---|---|---|
| 72:22 73:1 | 212:12 | 34:9 36:13 | **YouTube's** | 50:14 |
| 83:13,15 | 221:25 | 72:1 76:9 | 240:5 | 91:22 |
| 84:19,21 | 222:6,17 | 100:17 | 283:15 | 162:12 |
| 85:7 86:12 | 226:19 | **years** 11:1 | 285:17 | 300:10 |
| 86:18 | 231:7 | 11:10 | ⎯⎯⎯⎯⎯ | 331:8 |
| 90:17,19 | 240:11,18 | 13:24,25 | **Z** | **1:13** 65:13 |
| 91:23 | 242:17 | 16:5 27:16 | **Zachary** | **1:19** 65:21 |
| 92:18 | 247:20 | 28:23 | 218:21 | 203:21 |
| 93:21 94:9 | 254:4,4 | 29:10,15 | **Zeke** 352:24 | **1:37** 219:4 |
| 101:24 | 265:25 | 29:23 32:5 | 354:4,8 | **1:38** 219:6 |
| 102:8 | 272:10 | 32:6,7 | **zero** 213:14 | **10** 6:4,18 |
| 105:9,17 | 275:17 | 41:3 43:23 | **Zhengli** 33:5 | 114:17,18 |
| 105:18 | 282:23 | 44:22 | 33:14 | 115:2,5 |
| 108:20 | 283:22 | 45:19 | 35:17 36:1 | **10,000** 212:8 |
| 113:14 | 284:1 | 141:24 | 36:6,16 | **10/3/2025** |
| 115:6 | 286:18 | 148:2 | 37:3,7 | 360:22 |
| 118:10 | 287:11,20 | 167:10 | 56:9 117:9 | **100** 44:22 |
| 119:7,23 | 292:1,6 | 175:4 | **Zoom** 175:13 | 96:2 114:8 |
| 120:6 | 295:2,16 | 188:5 | **Zoom-type** | 177:22 |
| 125:6 | 300:7,9 | 212:5 | 175:18 | 205:19 |
| 130:19 | 306:9,20 | 219:20 | **Zooms** 174:2 | 220:3,10 |
| 131:1 | 307:4,22 | 275:4 | 175:19 | 256:8 |
| 133:19 | 310:7 | 295:11 | **Zuckerberg** | 259:7 |
| 134:19 | 315:5,14 | 313:18 | 99:17,21 | 281:20 |
| 144:22 | 315:16,19 | 314:4 | 100:21 | 292:23 |
| 145:18 | 318:4 | 358:21 | 133:11,12 | 300:23 |
| 148:8,15 | 319:6,21 | **Yep** 90:5 | 133:14 | **102** 78:4:13 |
| 159:5 | 319:24 | **yesterday** | 152:1,3 | **11** 6:19 |
| 161:10 | 320:4,6,11 | 359:3 | 173:4,8,18 | 13:23 |
| 164:7 | 323:5 | **York** 4:13,13 | 173:24 | 119:18,24 |
| 168:12 | 324:3,9,9 | 8:19 40:23 | 174:7,8,15 | **11:09** 150:3 |
| 170:16,20 | 325:10 | 169:5 | 174:16 | **11:21** 150:5 |
| 171:8 | 326:23 | 293:6 | 175:11,22 | **11:47** 68:14 |
| 172:11 | 331:13,14 | 296:14 | 175:25 | 69:2 |
| 173:5 | 332:5 | 344:3,21 | 176:4,25 | **1100** 4:2 |
| 174:12,12 | 334:13,18 | **you-all** | 177:24 | 361:5 |
| 176:22,23 | 337:19 | 85:18 | 178:10 | **111** 6:17 |
| 183:6 | 338:21 | **YOUNES** 3:2 | 286:14,22 | **114** 6:18 |
| 189:21 | 339:7,7,9 | **YouTube** 8:7 | 287:4,16 | **119** 6:19 |
| 190:12 | 339:11,14 | 239:12,15 | 288:1 | **11th** 148:19 |
| 192:3 | 342:12 | 239:23 | 289:7 | 149:7,22 |
| 195:22 | 344:5 | 240:21 | ⎯⎯⎯⎯⎯ | 152:22 |
| 196:8 | 346:7 | 242:23 | **0** | 341:1 |
| 199:16,20 | 348:6,18 | 282:21,22 | ⎯⎯⎯⎯⎯ | 361:18 |
| 202:12 | 348:25 | 282:24 | **1** | **12** 6:8,20 |
| 205:5 | 350:2,12 | 285:1 | **1** 6:8 12:11 | 16:15 |
| 206:6 | 350:12 | 286:1 | 12:13 | 122:24,25 |
| 207:2 | 353:14 | 305:25 | 13:10 | 288:9,14 |
| 209:18 | **year** 24:9 | 325:12 | 26:16,17 | **12:27** 203:18 |

DR. ANTHONY FAUCI  11/23/2022

**12:29** 55:2
61:14
62:14
**120** 36:13
**120,000** 72:1
**122** 6:20
**1225** 3:5
**127** 233:23
**13** 6:21
130:6,7
249:23
251:2
252:6
287:4,16
287:24
**13:19** 65:19
**13:27** 90:1
**130** 6:21
**130,000**
36:13
**1300** 13:24
**138** 6:22
**13th** 275:12
275:20
**14** 6:22
16:15
138:7,8
**141** 6:23
**142** 6:24
**148** 6:25
**14th** 188:3
271:6
298:24
299:22
303:23
**15** 6:23  11:9
141:12,15
277:25
**15,000** 298:7
298:14
**15:30** 105:6
**15:48** 91:6
**152** 7:1
**1524** 72:25
**158** 7:2
**15th** 176:4
**16** 6:24
142:19,20
240:13

**163** 7:3
**167** 7:4
**16th** 344:4,5
**17** 6:9,25
148:4,12
148:14
179:7
180:11
192:4
199:2
235:5
236:1,7,8
236:10,19
**17:51** 68:10
**170** 7:5
**172** 7:6
**178** 7:7
**17th** 159:4
179:1,4
180:25
197:1
199:14
201:4
207:25
**18** 7:1
152:17,18
**18:47** 48:2
**18:48** 143:1
**182** 7:8
**185** 7:9
**187** 7:10
**1885** 2:20
**18th** 204:8
**19** 7:2  34:10
158:20,24
158:25
237:12
**19:06** 143:16
**19:09** 93:9
93:16
**191250** 3:15
**196** 7:11
**1980s** 265:19
**1990** 265:19
**19th** 3:5
201:21
204:4
344:8
**1R01** 41:16

**1st** 21:23
22:1  43:15
44:16  55:3
61:15  66:6
66:17  69:3
72:25  73:8
77:5  82:14
86:2,13
89:25
93:16
113:22
120:12
123:19
161:8
242:19
243:7
294:12,13

_____
**2**
_____
**2** 6:9  17:19
17:20  18:4
22:23  41:8
41:14
119:4
**2,000** 207:1
**2:00** 66:21
66:24  67:2
67:3  161:8
**2:17** 253:8
**2:28** 253:11
**2:30** 148:22
149:22
**2:31** 253:19
**20** 7:3
158:23
163:7,8
363:15
**20-plus** 11:9
**20:30** 91:22
**2003** 6:3:7
**201** 7:12
**2011** 6:8
13:13,20
16:15  24:1
**2013** 93:18
93:25
**2014** 16:15
18:13
21:23  26:3

27:3,16
71:8
**2015** 31:12
31:14  56:5
60:2,7
71:6  119:4
286:22
**2019** 21:24
34:10
158:1,11
**202** 3:8  4:4
**2020** 22:17
34:9,11,13
34:19  35:9
35:14  40:6
42:6  48:2
61:15  69:3
72:25
91:22  93:9
93:16
105:5
120:4
129:20
139:14
140:14
141:18
144:8
147:3
148:20
149:7,22
152:22
159:4
167:19
169:20
170:22
173:11
176:4
179:1,7,12
182:7,12
186:2
188:3
197:1
201:21
203:8
204:5,8
213:21
217:20
218:10
220:6,14

222:2
225:16
226:14
233:2
242:19
243:7
250:21
253:19
261:11
263:12
271:6
275:17
277:25
282:25
283:21,25
284:4
285:17
286:24
287:16
288:1
293:13
294:10
298:24
307:18
313:12,21
315:18
317:15,22
318:2,24
319:1
322:3
324:1,2
325:25
**2021** 31:21
328:7,13
335:19,24
336:23
341:1
343:3
344:4,6,8
347:4,9
350:25
**2022** 1:12,20
9:3  192:4
359:19
361:3,10
362:3
**203** 7:13
**2050** 94:24
**20530** 4:3

**DR. ANTHONY FAUCI  11/23/2022**

| | | | | |
|---|---|---|---|---|
| 361:6 | 182:2 | 211:2,21 | 340 8:18 | 43 6:14  8:1 |
| 2089 2 4:24 | 253 7:25 | 3:22-CV-... | 343 8:19 | 263:7,8 |
| 209 7:14 | 26 4:11  7:9 | 9:8 | 346 8:20 | 44 8:2 |
| 21 7:4 | 181:23 | 3:22-cv-... | 35 7:18 | 197:17 |
| 167:14,15 | 185:2,17 | 1:7 | 221:10,11 | 266:4,5 |
| 210 7:15 | 187:9,12 | 3:36 275:12 | 351 245:25 | 449 245:19 |
| 212 4:14 | 263 8:1 | 3:39 312:25 | 246:6 | 246:1 |
| 7:16 | 264-6373 | 3:55 313:3 | 352 8:21 | 45 8:3  270:5 |
| 213 7:17 | 4:14 | 30 6:8  7:13 | 36 7:19 | 270:7 |
| 22 7:5  170:9 | 266 8:2 | 203:24,25 | 226:9,10 | 271:3 |
| 170:10 | 26th 182:7 | 247:25 | 37 6:13  7:20 | 45,000 |
| 22-06-26 | 182:12 | 333:23 | 228:15,16 | 206:24 |
| 94:8 | 186:20 | 361:17 | 371 246:6 | 450 3:6 |
| 221 2:9  7:18 | 27 7:10 | 304 8:12 | 247:10,15 | 46 8:4  275:8 |
| 225 2:22 | 173:11,18 | 307 8:13 | 38 7:21 | 275:9 |
| 226 7:19 | 179:12 | 30th 13:20 | 10:25 | 47 8:5 |
| 228 7:20 | 187:10,13 | 84:17,19 | 232:12,13 | 277:17,19 |
| 22nd 167:19 | 199:14 | 85:12 | 39 7:22 | 48 8:6 |
| 218:10 | 233:2 | 324:2 | 242:10,11 | 197:17 |
| 222:2 | 270 8:3 | 325:25 | 390 8 4:12 | 280:8,11 |
| 23 1:12,20 | 275 8:4 | 31 1:19,19 | 3rd 2:20 | 49 8:7 |
| 7:6  172:24 | 277 8:5 | 4:22,23 | 317:15 | 283:11,12 |
| 173:2 | 27th 40:6 | 6:12  7:14 | 318:1 | 4th 115:8 |
| 361:10 | 42:6  186:1 | 9:12  209:3 | | 123:7,25 |
| 362:3 | 222:8 | 209:4 | **4** | 126:23 |
| 232 7:21 | 226:14 | 314 3:17 | 4 6:12  31:2 | 127:5 |
| 23rd 9:3 | 233:16,20 | 31st 21:23 | 31:3  35:19 | 128:20 |
| 359:19 | 28 7:11 | 34:8,10 | 56:4,20,22 | 160:14 |
| 24 7:7  178:5 | 196:20,21 | 48:2  51:21 | 272:19,20 | 250:20 |
| 178:7,17 | 197:4 | 318:24 | 272:22 | 251:4 |
| 178:18 | 361:3 | 319:1 | 284:24 | 254:5,13 |
| 179:25 | 280 8:6 | 32 7:15 | 288:9,14 | |
| 24/7 95:2 | 283 8:7 | 210:12 | 4:23 170:22 | **5** |
| 2402 54:5 | 284 8:8 | 323 8:14 | 4:46 354:23 | 5 6:13  37:19 |
| 242 7:22 | 286 8:9 | 326-6766 | 4:55 355:1 | 37:21 |
| 2421 53:15 | 28th 226:14 | 2:22 | 40 7:23 | 60:13 |
| 53:20 | 233:15,18 | 327 8:15 | 245:4,5 | 164:4,18 |
| 64:25  65:1 | 233:19,20 | 329-5040 | 247:25 | 227:8 |
| 2426 54:5 | 29 7:12 | 3:17 | 248:25 | 237:12 |
| 2430 53:19 | 201:16,17 | 33 7:16 | 249:4 | 251:2 |
| 2431 53:20 | 294 8:10 | 210:9 | 332:20 | 272:21,22 |
| 2432 52:22 | 298 8:11 | 212:15,16 | 333:23 | 284:24 |
| 53:16,17 | 2nd 73:8 | 212:23 | 334:4 | 5:01 359:19 |
| 54:4 | 105:5 | 330 8:16 | 40-plus | 359:22 |
| 245 7:23 | 294:10,11 | 334 8:17 | 231:14 | 5:02 188:3 |
| 249 7:24 | | 34 7:17 | 41 7:24 | 5:41 294:2 |
| 24th 350:24 | **3** | 213:17,18 | 249:4,6,9 | 5:51 68:10 |
| 25 6:11  7:8 | 3 6:11  23:4 | 34:30 144:23 | 42 7:25 | 50 8:8  87:23 |
| 181:24 | 25:3,4 | 145:16 | 253:14,15 | 282:1 |

DR. ANTHONY FAUCI  11/23/2022

| | | |
|---|---|---|
| 284:6,7,14 | 347:15 | **918-6905** 3:8 |
| 284:19 | **63** 8:21 | **96** 6:16 |
| 316:14 | 352:19,20 | **96,000** |
| **500,000** | **63101** 361:18 | 222:11 |
| 36:12 | **63119** 3:16 | **96,000-p...** |
| **51** 8:9  286:3 | **65101** 2:10 | 219:11 |
| 286:4 | **6th** 170:22 | **96,032** |
| **52** 8:10 | | 222:16 |
| 293:25 | **7** | **9th** 97:2 |
| 294:5,6 | **7** 6:15  83:24 | 141:18 |
| **53** 8:11 | 83:25 | 144:7 |
| 298:17,18 | 120:7 | |
| **54** 8:12 | 240:12 | |
| 304:23,24 | **7:13** 84:19 | |
| **55** 8:13 | **70804** 2:21 | |
| 307:15 | **711** 361:17 | |
| **56** 8:14 | **751-8870** | |
| 323:19,20 | 2:11 | |
| **57** 8:15 | **7A-18** 149:13 | |
| 327:24,25 | 149:15 | |
| **573** 2:11 | **7th** 120:3 | |
| **58** 8:16 | 129:2 | |
| 330:5,6 | 160:15 | |
| **59** 8:17 | | |
| 334:17,20 | **8** | |
| 335:15 | **8** 6:16  96:9 | |
| **598-3846** 4:4 | 96:10  97:7 | |
| **5th** 128:13 | 101:10 | |
| 128:18,21 | 180:10 | |
| 160:14 | 252:6 | |
| | 254:11 | |
| **6** | **8:08** 1:20 | |
| **6** 6:14  43:8 | 9:4 | |
| 43:9  47:25 | **83** 6:15 | |
| 49:15 | **8th** 180:25 | |
| 52:21 | 253:19 | |
| 272:20 | 254:9 | |
| **6.3** 72:1 | 263:12 | |
| **6.4** 260:18 | 269:13 | |
| **60** 8:18 | | |
| 316:14 | **9** | |
| 340:22,25 | **9** 6:17 | |
| 341:24 | 111:10,11 | |
| **600,000** | **9:04** 54:8 | |
| 36:12 | **9:05** 54:12 | |
| **61** 8:19 | **9:37** 83:14 | |
| 343:24,25 | **9:38** 83:17 | |
| **62** 8:20 | **9:50** 83:20 | |
| 346:14,15 | **90** 342:6 | |

**DANIEL KIMMAGE  11/10/2022**

**Page 1**

```
 1           IN THE UNITED STATES DISTRICT COURT

 2         FOR THE WESTERN DISTRICT OF LOUISIANA

 3                  MONROE DIVISION

 4    - - - - - - - - - - - - - x

 5    STATE OF MISSOURI ex rel.,:

 6    ERIC S. SCHMITT, Attorney :

 7    General, STATE OF          :

 8    LOUISIANA ex rel. JEFFREY :

 9    M. LANDRY, Attorney        :

10    General, DR. JAYANTA       :

11    BHATTACHARYA, JILL HINES, :

12    JIM HOFT, DR. AARON        :

13    KHERIATY, and DR. MARTIN   :

14    KULLDORFF,                 :

15             Plaintiffs,       :  No.

16    v.                         :  3:22-cv-01213-TAD-KDM

17    JOSEPH R. BIDEN, JR., in   :

18    his official capacity as   :

19    President of the United    :

20    States;                    :

21    KARINE JEAN-PIERRE in her :

22    Official capacity as White:

23    House Press Secretary;     :

24    VIVEK H. MURTHY, in his    :

25    Official capacity of       :
```

**DANIEL KIMMAGE  11/10/2022**

Page 2

```
 1    Surgeon General of the      :
 2    United States;              :
 3    XAVIER BECERRA, in his      :
 4    Official capacity as        :
 5    Secretary of the            :
 6    Department of Health and    :
 7    Human Services;             :
 8    DEPARTMENT OF HEALTH AND    :
 9    HUMAN SERVICES;             :
10    DR. ANTHONY FAUCI, in his   :
11    Official capacity as        :
12    Director of the National    :
13    Institute of Allergy and    :
14    Infectious Diseases and as  :
15    Chief Medical Advisor to    :
16    the President;              :
17    NATIONAL INSTITUTE OF       :
18    ALLERGY AND INFECTIOUS      :
19    DISEASES;                   :
20    CENTERS FOR DISEASE         :  No.
21    CONTROL AND PREVENTION;     :  3:22-cv-01213-TAD-KDM
22    CAROL Y. CRAWFORD, in her   :
23    Official capacity as Chief  :
24    of the Digital Media        :
25    Branch of the Division of   :
```

**DANIEL KIMMAGE  11/10/2022**

```
 1    Public Affairs within the :

 2    Centers for Disease        :

 3    Control and Prevention;    :

 4    UNITED STATES CENSUS       :

 5    BUREAU, a.k.a. BUREAU OF   :

 6    THE CENSUS;                :

 7    JENNIFER SHOPKORN, in her :

 8    Official capacity as       :

 9    Senior Advisor for         :

10    Communications with the    :

11    U.S. Census Bureau;        :

12    DEPARTMENT OF COMMERCE;    :

13    ALEJANDRO MAYORKAS, in his:

14    Official capacity as       :

15    Secretary of the           :

16    Department of Homeland     :

17    Security;                  :

18    ROBERT SILVERS, in his     :

19    Official capacity as Under:

20    Secretary of the Office of:

21    Strategy, Policy, and      :

22    Plans, within DHS;         :

23    SAMANTHA VINOGRAD, in her :

24    Official capacity as       :

25    Senior Counselor for       :
```

**DANIEL KIMMAGE  11/10/2022**

```
 1    National Security in the    :
 2    Office of the Secretary     :
 3    For DHS;                     :
 4    DEPARTMENT OF HOMELAND       :
 5    SECURITY;                    :
 6    JEN EASTERLY, in her         :
 7    Official capacity as         :
 8    Director of the             :
 9    Cybersecurity and            :
10    Infrastructure Security      :
11    Agency;                      :
12    CYBERSECURITY AND            :
13    INFRASTRUCTURE SECURITY      :
14    AGENCY;                      :
15    GINA McCARTHY, in her        :
16    Official capacity as White:
17    House National Climate       :
18    Advisor, and                 :
19    NINA JANKOWICZ, in her       :
20    Official capacity as         :
21    Director of the so-called :
22    "Disinformation Governance:
23    Board" within the           :
24    Department of Homeland       :
25    Security,                    :
```

**DANIEL KIMMAGE   11/10/2022**

```
 1    ANDREW SLAVITT, in his      :
 2    Official capacity as White :
 3    House Senior COVID-10       :
 4    Advisor,                    :
 5    ROB FLAHERTY, in his        :
 6    Official capacity as        :
 7    Deputy Assistant to the     :
 8    President and Director of   :
 9    Digital Strategy at the     :
10    White House,                :
11    COURTNEY ROWE, in her       :
12    Official capacity as White :
13    House Covid-19 Director of :
14    Strategic Communications    :
15    And Engagement,             :
16    CLARKE HUMPHREY, in her     :
17    Official capacity as White :
18    House Digital Director for :
19    the Covid-19 Response       :
20    Team,                       :
21    BENJAMIN WAKANA, in his     :
22    Official capacity as the    :
23    Deputy Director of          :
24    Strategic Communications    :
25    And Engagement at the       :
```

**DANIEL KIMMAGE  11/10/2022**

Page 6

```
 1    White House COVID-19      :
 2    Response Team,            :
 3    SUBHAN CHEEMA, in his     :
 4    Official capacity as      :
 5    Deputy Director for       :
 6    Strategic Communications  :
 7    and External Engagement   :
 8    For the White House       :
 9    Covid-19 Response Team,   :
10    DORI SALCIDO, in her      :
11    Official capacity as White:
12    House Covid-19 Director of:
13    Strategic Communications  :
14    and Engagement,           :
15    TIMOTHY W. MANNING, in his:
16    Official capacity as White:
17    House Covid-19 Supply     :
18    Coordinator,              :
19    DANA REMUS, in her        :
20    Official capacity as      :
21    Counsel to the President, :
22    AISHA SHAH, in her        :
23    Official capacity as White:
24    House Partnerships        :
25    Manager,                  :
```

**DANIEL KIMMAGE  11/10/2022**

```
 1   LAURA ROSENBERGER, in her :

 2   Official capacity as      :

 3   Special Assistant to the  :

 4   President,                :

 5   MINA HSIANG, in her       :

 6   Official capacity as      :

 7   Administrator of the U.S. :

 8   Digital Service within the:

 9   Office of Management and  :

10   Budget in the Executive   :

11   Office of the President,  :

12   U.S. DEPARTMENT OF        :

13   JUSTICE, FEDERAL BUREAU OF:

14   INVESTIGATION,            :

15   LAURA DEHMLOW, in her     :

16   Official capacity as      :

17   Section Chief for the     :

18   FBI's Foreign Influence   :

19   Task Force,               :

20   ELVIS M. CHAN, in his     :

21   Official capacity as      :

22   Supervisory Special Agent :

23   of Squad CY1 in the San   :

24   Francisco Division of the :

25   Federal Bureau of         :
```

**DANIEL KIMMAGE  11/10/2022**

```
 1   Investigation,               :

 2   JAY DEMPSEY, in his          :

 3   Official capacity as         :

 4   Social Media Team Lead,      :

 5   Digital Media Branch,        :

 6   Division of Public Affairs:

 7   at the CDC,                  :

 8   KATE GALATAS, in her         :

 9   Official capacity as         :

10   Deputy Communications        :

11   Director at the CDC,         :

12   ERIC WALDO, in his           :

13   Official capacity as         :

14   Chief Engagement Officer     :

15   For the Surgeon General,     :

16   YOLANDA BYRD, in her         :

17   Official capacity as a       :

18   Member of the Digital        :

19   Engagement Team at HHS,      :

20   CHRISTY CHOI, in her         :

21   Official capacity as         :

22   Deputy Director, Office of:

23   Communications, HRSA         :

24   within HHS,                  :

25   TERICKA LAMBERT, in her      :
```

DANIEL KIMMAGE  11/10/2022

```
 1    Official capacity as      :

 2    Director of Digital       :

 3    Engagement at HHS and     :

 4    Deputy Director of the    :

 5    Office of Digital Strategy:

 6    at the White House,       :

 7    JOSHUA PECK, in his       :

 8    Official capacity as      :

 9    Deputy Assistant Secretary:

10    for Public Engagement at  :

11    HHS,                      :

12    JANELL MUHAMMED, in her   :

13    Official capacity as      :

14    Deputy Digital Director at:

15    HHS,                      :

16    MATTHEW MASTERSON, in his :

17    Official capacity as      :

18    Senior Cybersecurity      :

19    Advisory within CISA in   :

20    the Department of         :

21    Homeland Security,        :

22    LAUREN PROTENTIS, in her  :

23    Official capacity as an   :

24    official of CISA,         :

25    GEOFFREY HALE, in his     :
```

**DANIEL KIMMAGE  11/10/2022**

```
 1   Official capacity as an    :
 2   Official of CISA,          :
 3   ALLISON SNELL, in her      :
 4   Official capacity as an    :
 5   Official of CISA,          :
 6   KIM WYMAN, in her official :
 7   Capacity as CISA's Senior  :
 8   Election Security Lead,    :
 9   BRIAN SCULLY, in his       :
10   Official capacity as an    :
11   Official of DHS and CISA,  :
12   ZACHARY HENRY SCHWARTZ, in :
13   his official capacity as   :
14   Division Chief for the     :
15   Communications Directorate :
16   at the U.S. Census Bureau, :
17   LORENA MOLINA-IRIZARRY, in :
18   her official capacity as   :
19   an official of the Census  :
20   Bureau,                    :
21   KRISTIN GALEMORE, in her   :
22   Official capacity as       :
23   Deputy Director of the     :
24   Office of Faith Based and  :
25   Neighborhood Partnerships  :
```

**DANIEL KIMMAGE  11/10/2022**

```
 1    at the Census Bureau,      :

 2    U.S. FOOD AND DRUG         :

 3    ADMINISTRATION,            :

 4    ERICA JEFFERSON, in her    :

 5    Official capacity as       :

 6    Associate Commissioner for:

 7    External Affairs within    :

 8    the Office of the          :

 9    Commissioner at the U.S.   :

10    Food and Drug              :

11    Administration,            :

12    MICHAEL MURRAY, in his     :

13    Official capacity as       :

14    Acquisition Strategy       :

15    Program Manager for the    :

16    Office of Health           :

17    Communications and         :

18    Education at the FDA,      :

19    BRAD KIMBERLY, in his      :

20    Official capacity as       :

21    Director of Social Media   :

22    at the FDA,                :

23    U.S. DEPARTMENT OF STATE, :

24    LEAH BRAY, in her official:

25    capacity as Acting         :
```

**DANIEL KIMMAGE  11/10/2022**

Page 12

```
 1    Coordinator of the State    :

 2    Department's Global          :

 3    Engagement Center,           :

 4    SAMARUDDIN K. STEWART, in    :

 5    His official capacity as     :

 6    Senior Technical Advisor     :

 7    and/or Senior Advisor for    :

 8    the Global Engagement        :

 9    Center of the State          :

10    Department,                  :

11    DANIEL KIMMAGE, in his       :

12    official capacity as         :

13    Acting Coordinator for the:

14    Global Engagement Center     :

15    at the State Department,     :

16    ALEXIS FRISBIE, in her       :

17    official capacity as a       :

18    member of the Technology     :

19    Engagement Team at the       :

20    Global Engagement Center     :

21    at the State Department,     :

22    U.S. DEPARTMENT OF           :

23    TREASURY,                    :

24    WALLY ADEYEMO, in his        :

25    Official capacity as         :
```

**DANIEL KIMMAGE  11/10/2022**

Page 13

```
 1   Deputy Secretary of the    :

 2   Treasury,                   :

 3   U.S. ELECTION ASSISTANCE    :

 4   COMMISSION,                 :

 5   MARK A. ROBBINS, in his     :

 6   Official capacity as        :

 7   Interim Executive Director:

 8   of the EAC, and             :

 9   KRISTEN MUTHIG, in her      :

10   Official capacity as        :

11   Director of Communications:

12   for the EAC,                :

13           Defendants.         :

14   - - - - - - - - - - - - - - x

15

16        Videotaped Deposition of DANIEL KIMMAGE

17             Thursday, November 10, 2022

18                  10:04 a.m.

19

20

21   Job No.:  135884

22   Pages 1 through 304

23   Reported by:  Cassandra E. Ellis, RPR

24

25
```

**DANIEL KIMMAGE  11/10/2022**

**Page 14**

```
 1              Deposition of DANIEL KIMMAGE, held

 2    pursuant to agreement, before Cassandra E. Ellis,

 3    Certified Shorthand Reporter -- Hawaii #475,

 4    Certified Court Reporter - Washington #3484,

 5    Certified Shorthand Reporter - California -

 6    #14448, Registered Professional Reporter #823848,

 7    Certified Realtime Reporter, Realtime Systems

 8    Administrator, and Notary Public of The District

 9    of Columbia.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

DANIEL KIMMAGE  11/10/2022

```
 1                    A P P E A R A N C E S
 2        ON BEHALF OF PLAINTIFF:
 3             D. JOHN SAUER, ESQUIRE
 4             MISSOURI ATTORNEY GENERAL'S OFFICE
 5             Supreme Court Building
 6             P.O. Box 899
 7             Jefferson City, Missouri  65102
 8             (573) 751-8870
 9             John.sauer@ago.mo.gov
10             Todd.scott@ago.mo.gov
11
12        ON BEHALF OF DEFENDANT:
13             ADAM KIRSCHNER, ESQUIRE
14             KYLA SNOW, ESQUIRE
15             AMANDA CHUZI, ESQUIRE
16             INDRANEEL SUR, ESQUIRE
17             DEPARTMENT OF JUSTICE
18             1100 L Street, Northwest
19             Washington, D.C.  20530
20             (202) 514-3259
21             Adam.kirschner@usdoj.gov
22             Kyla.snow@usdoj.gov
23             Amanda.k.chuzi@usdoj.gov
24             Indraneel.sur@usdoj.gov
25
```

**DANIEL KIMMAGE  11/10/2022**

**Page 16**

```
 1      A P P E A R A N C E S     C O N T I N U E D

 2       ON BEHALF OF NEW CIVIL LIBERTIES ALLIANCE:

 3            JOHN J. VECCHIONE, ESQUIRE

 4            JENIN YOUNES, ESQUIRE

 5            NEW CIVIL LIBERTIES ALLIANCE

 6            1225 19th Street, Northwest, Suite 450

 7            Washington, D.C.  20036

 8            (202) 918-6902

 9            John.vecchione@ncla.legal

10            Jeninyounes@ncla.legal

11

12

13       ON BEHALF OF U.S. DEPARTMENT OF STATE:

14            MEHA A. SHAH, ESQUIRE

15            PUBLIC DIPLOMACY AND PUBLIC AFFAIRS

16            SA-5, Suite 5H03

17            2200 C Street, Northwest

18            Washington, D.C.  20520

19            (202) 632-9254

20            Shahma@state.gov

21

22

23   ALSO PRESENT:

24   Joseph E. Ellis, Certified Legal Video Specialist

25
```

**DANIEL KIMMAGE  11/10/2022**

```
 1                C O N T E N T S
 2   EXAMINATION OF DANIEL KIMMAGE            PAGE
 3        By Mr. Sauer                        21
 4        By Mr. Kimmage                      151
 5        By Mr. Sauer                        152
 6
 7                 E X H I B I T S
 8           (Attached to the Transcript)
 9   DANIEL KIMMAGE   Deposition Exhibit      PAGE
10   Exhibit 1   01/08/2016 The White House,  42
11        Statement by NSC Spokesperson Ned Price
12        On Updates to U.S. Government Efforts
13        To Counter Violent Extremism
14   Exhibit 2   02/09/2018 Nation Now, State  47
15        Department's answer to Russian
16        Meddling is about to be funded
17   Exhibit 3   02/13/2018 Nation Now,       56
18        Information warriors: Here's how the
19        U.S. is combating 'fake news' from
20        Russia
21   Exhibit 4   09/04/2020 AFCEA, Russia     93
22        Weaponizes Increasingly Sophisticated
23        Disinformation
24
25
```

**DANIEL KIMMAGE  11/10/2022**

Page 18

```
 1        E X H I B I T S    C O N T I N U E D

 2              (Attached to the Transcript)

 3   DANIEL KIMMAGE   Deposition Exhibit          PAGE

 4   Exhibit 5   08/2020 U.S. Department of State  106

 5        GEC Special Report: Pillars of Russia's

 6   Disinformation and Propaganda Ecosystem

 7   Exhibit 6   Excerpt from Youtube video,       113

 8        Disinformed democracy: The past,

 9        Present, and future of information

10        Warfare Part 4, Brookings Institution,

11        October 2, 2020*

12   Exhibit 7   Second Amended Complaint          127

13   Exhibit 8   United States Department of State 153

14        Programs - Technology Engagement Team -

15        What are our Programs?

16   Exhibit 9   Meeting request and Various       159

17        E-mail(s) Bates Stamped Linkedin0000236,

18        Linkedin0000342-353, Linkedin0000406

19   Exhibit 10  05/03/2O21 Confidential E-mail    177

20        Bates Stamped MOLA_DEFSPROD_00011860-861,

21        05/10/2O21 Confidential E-mail Bates

22        Stamped MOLA_DEFSPROD_000112196-215

23   Exhibit 11  03/25/2O20 Confidential E-mail    188

24        Bates Stamped MOLA_DEFSPROD_0007669-676

25
```

**DANIEL KIMMAGE  11/10/2022**

```
 1        E X H I B I T S    C O N T I N U E D
 2            (Attached to the Transcript)
 3  DANIEL KIMMAGE   Deposition Exhibit         PAGE
 4  Exhibit 12  The Long Fuse: Misinformation    206
 5       And the 2020 Election, 2021 The
 6       Election Integrity Partnership
 7  Exhibit 13  11/08/2022 Facebook Content      253
 8       Requests
 9  Exhibit 14  02/17/2021 Transcript,           260
10       Countering and Exposing Terrorist
11       Propaganda and Disinformation
12  Exhibit 15  05/17/2022 Functional Bureau     276
13       Strategy, Global Engagement Center
14  Exhibit 16  10/17/2022 Remarks to the Press, 288
15       Anthony J. Blinken, Secretary of State
16
17
18
19
20
21
22
23
24
25
```

Case 3:22-cv-01213-TAD-KDM  Document 208-1  Filed 03/04/23  Page 20 of 363 PageID #:
12299

**DANIEL KIMMAGE  11/10/2022**

```
 1                P R O C E E D I N G S

 2                THE VIDEOGRAPHER:  Good morning.

 3     This is the beginning of the media in the

 4     deposition of Daniel Kimmage taken in the matter

 5     of the State of Missouri, et al., plaintiffs

 6     versus Joseph R. Biden, Junior, et al.,

 7     defendants, with a Case Number

 8     3:22-CV-01213-TAD-KDM, held in the United States

 9     District Court for the Western District of

10     Louisiana, Monroe division.

11                Today's date is November 10th,

12     2022, and the time on the monitor is

13     approximately 10:04 a.m.

14                My name is Joseph Ellis.  I'm the

15     certified legal videographer.  The court

16     reporter is Cassandra Ellis.  And we are here

17     representing Lexitas Deposition Services.

18                Counsel appearances will be noted

19     on the stenographic record, only.

20                Will the court reporter please

21     swear in the witness, then you may proceed.

22     ///

23     ///

24     ///

25     ///
```

**DANIEL KIMMAGE  11/10/2022**

**Page 21**

```
 1                  DANIEL KIMMAGE
 2      having been duly sworn, testified as follows:
 3                    EXAMINATION
 4   BY MR. SAUER:
 5           Q.   Could you please state your name,
 6      for the record?
 7           A.   Daniel Kimmage.
 8           Q.   And Mr. Kimmage, what's your
 9      current title?
10           MR. KIRSCHNER:  Mr. Sauer, I just
11      wanted to put something on the record before we
12      got started, just before you start going into
13      the -- to the basics.
14           I just wanted to put on the record
15      that yesterday, November 9th, 2022, the
16      defendants moved for a protective order
17      concerning this deposition, and other
18      depositions, to protect the -- related to the
19      dissemination of the video of the deposition,
20      and also related to certain personal information
21      that may be discussed at the deposition.
22           Yesterday -- today, in docket entry
23      111, the Court temporarily granted that motion
24      to allow for the briefing of this issue, and we
25      ask that plaintiffs abide by that order.
```

**DANIEL KIMMAGE  11/10/2022**

Page 22

```
 1                  MR. SAUER:  Plaintiffs will abide
 2     by that order, and will respond to the motion in
 3     due course on the Court's briefing schedule.
 4   BY MR. SAUER:
 5          Q.   Mr. Kimmage, what's your current
 6     title?
 7          A.   My title is principal deputy
 8     coordinator of the Global Engagement Center.
 9          Q.   And at various times you've been
10     acting coordinator as well as principal deputy
11     coordinator of that; is that right?
12          A.   Yes.
13          Q.   How long have you been at the
14     Global Engagement Center for the State
15     Department?
16          A.   Since January, I think January
17     21st, 2017.
18          Q.   Let me ask you this:  Have you ever
19     been deposed before?
20          A.   No.
21          Q.   So can I just go through some
22     ground rule type questions?
23          A.   Sure.
24          Q.   One thing is when I ask a question
25     could you wait until I finish the question
```

**DANIEL KIMMAGE  11/10/2022**

Page 23

```
 1      before you respond?

 2              A.    Mm-hmm.   Yes.

 3              Q.    Next thing is, could you give an

 4      oral response to all my questions, because the

 5      court reporter is transcribing, so a nod doesn't

 6      come across, necessarily, in the transcripts,

 7      can you give an oral response to all my

 8      questions?

 9              A.    Yes.

10              Q.    And I'm a bad offender at this, but

11      can you and I be careful not to interrupt each

12      other?

13              A.    Yes.

14              Q.    And if at any time, I would like

15      you to listen carefully to the question that I'm

16      asking and answer the question that I'm asking,

17      as we go forward, are you willing to do that?

18              A.    Yes.

19              Q.    And if at any time you don't

20      understand the question, could you ask me for

21      clarification rather than answer a question that

22      you're not sure that I asked?

23              A.    Yes.

24              Q.    Okay.   So you've been at the Global

25      Engagement Center for about five years; is that
```

**DANIEL KIMMAGE  11/10/2022**

```
 1    fair to say, beginning of 2017?
 2            A.   Since January 21st, 2017, with --
 3    with breaks.
 4            Q.   And prior to that, and breaks
 5    include a stint at the National Defense
 6    University, that was fairly recent; is that
 7    right?
 8            A.   Yes.
 9            Q.   How -- how recently did you come
10    back to the Global Engagement Center from the
11    National Defense University?
12            A.   In July 2022, July of this year.
13            Q.   And that was a 10-month stint, you
14    were away for 10 months at that university?
15            A.   Yes.
16            Q.   And you've been back for about four
17    months, since then?
18            A.   Yes.
19            Q.   I may ask you other things today,
20    about stuff that may have happened while you
21    were gone, in which case I'm just asking you to
22    respond to the best of your knowledge; is that
23    fair to say?
24            A.   Yeah.
25            Q.   Okay.  Other than that 10-month
```

DANIEL KIMMAGE  11/10/2022

Page 25

```
 1      period, were there other periods where you were
 2      not at the Global Engagement Center?
 3              A.    Before January 21st, 2017, I was in
 4      the Office of Policy Planning.
 5              Q.    But between January 1st, 2017 and
 6      now, other than the 10-month interruption at the
 7      NDU, you've been continuously at the Global
 8      Engagement Center?
 9              A.    Yes.
10              Q.    And during that time period, you've
11      been in a senior role, either as acting
12      coordinator or a principal deputy coordinator;
13      fair to say?
14              A.    Correct.
15              Q.    And I take it the difference
16      between those two, executive coordinator -- is
17      the coordinator a senate-confirmed position?
18              A.    It is not.
19              Q.    Well, let me ask this:  Can you
20      describe, generally, what the Global Engagement
21      Center does?
22              A.    The Global Engagement Center has a
23      congressional mandate, it comes from the 2017
24      National Defense Authorization Act to direct and
25      lead the US government's efforts to counter
```

**DANIEL KIMMAGE  11/10/2022**

```
 1    foreign propaganda and disinformation.
 2            Q.   Is the word disinformation in that
 3    statute?
 4            A.   It is.
 5            Q.   Okay.  So there's a congressional
 6    mandate that counter foreign propaganda and
 7    disinformation?
 8            A.   Yes.
 9            Q.   Is that -- and does the Global
10    Engagement Center carry on activities to
11    implement that mission?
12            A.   Yes.
13            MR. KIRSCHNER:  Objection, vague.
14    BY MR. SAUER:
15            Q.   Can you describe the nature of
16    those activities?
17            MR. KIRSCHNER:  Objection, calls
18    for a narrative.
19    BY MR. SAUER:
20            Q.   You may answer if you understand
21    the question.
22            A.   Could you clarify what you mean by
23    that?
24            Q.   What does the Global Engagement
25    Center do to carry out its statutory mission,
```

**DANIEL KIMMAGE  11/10/2022**

1    **can you give a summary of that?**

2              A.   Yeah.  It analyzes the activities

3    of adversarial state and non-state actors, so

4    countries like Russia and China, that use

5    propaganda and disinformation to harm the

6    national security of the United States, or

7    terrorist organizations like Al-Queda and Isis.

8              So the Global Engagement Center

9    looks analytically at what those malign actors

10   are doing, how they're using propaganda and

11   disinformation.

12             It also has partnerships, it -- it

13   supports organizations that can more actively

14   counter the propaganda and disinformation of

15   these foreign actors.

16             And it also coordinates and

17   communicates internally within the US government

18   with other offices at the State Department and

19   with interagency partners.

20             **Q.   Are there internal divisions or**

21   **teams within the Global Engagement Center?**

22             A.   Yes.

23             **Q.   And from now on can I just refer to**

24   **it as the GEC?**

25             A.   Yes.

DANIEL KIMMAGE  11/10/2022

Page 28

```
1              Q.   And you'll understand that we're
2         talking about the Global Engagement Center;
3         correct?
4              A.   Yes.
5              Q.   What are the internal divisions or
6         teams within it?
7              A.   So there is -- there are teams that
8         focus on the major threat actors.  There is a
9         China team, a Russia team, an Iran team, and a
10        counterterrorism team.
11             And then there are some sort of
12        structural support -- there's a resources team,
13        there's a front office, there's a -- I'm not
14        sure what the current name is, but there's an
15        interagency coordination team.
16             Q.   Is that the -- is that the I2C2?
17             A.   The I2C2, there's an interagency
18        coordination team, and there's a Technology
19        Engagement Team.
20             Q.   And that's sometimes referred to as
21        the TET?
22             (Reporter clarification)
23             MR. SAUER:  I think she was talking
24        to me.
25             MR. KIRSCHNER:  I was also going to
```

DANIEL KIMMAGE  11/10/2022

```
 1   ask:  Can you let him finish his response
 2   before -- before following up.
 3   BY MR. SAUER:
 4           Q.    And is the Technology Engagement
 5   Team called the TET?
 6           A.    Sometimes, yes.
 7           Q.    And do any of those divisions,
 8   teams, or components interface directly with
 9   social media companies?
10           A.    The Technology Engagement Team does
11   engage with social media companies.  The front
12   office and senior leadership engage with social
13   media companies, yes.
14           Q.    So what does the TET do to engage
15   with social media companies?
16               MR. KIRSCHNER:  Objection, vague.
17   BY MR. SAUER:
18           Q.    Can you summarize that for us?
19               MR. KIRSCHNER:  Objection, calling
20   for a narrative.
21   BY MR. SAUER:
22           Q.    If you understand the question you
23   may answer.
24           A.    They hold meetings.
25           Q.    What do they discuss in the
```

**DANIEL KIMMAGE  11/10/2022**

1    meetings?

2         A.    I'm not in the meetings that the

3    Technology Engagement Team holds with the social

4    media companies.

5         **Q.    Do you have any understanding of**

6    **what they discuss in the meetings?**

7         A.    Yeah, the -- the -- the general

8    thrust would be information exchange.

9         **Q.    And what -- what kind of**

10   **information is exchanged?**

11        A.    Primarily, the tools and techniques

12   that are adversaries.  So malign actors like the

13   ones I listed, like Russia and China, how are

14   they using propaganda and disinformation.

15        **Q.    Is there discussion of technologies**

16   **that can be used to combat disinformation in**

17   **those meetings?**

18        A.    There certainly could be, tools,

19   for example.

20        **Q.    And is there a discussion of, you**

21   **know, content posted on social media that might**

22   **be of concern to the GEC, that's discussed with**

23   **social media companies in those meetings?**

24        A.    I think that would be rare.  The

25   focus of the discussion would be at a higher

**DANIEL KIMMAGE  11/10/2022**

Page 31

```
 1    conceptual level.  It would be:  How are these
 2    actors doing what they do, not so much specific
 3    pieces of content.
 4          Q.    But do you think there may be rare
 5    conversations where specific pieces of content
 6    are discussed, of concern?
 7          A.    Yes, I -- I couldn't rule it out.
 8          Q.    Okay.  And do you know of any
 9    specific instance where that was done in these
10    TET meetings with social media companies?
11          A.    No.
12          Q.    How about the front office
13    engagement with social media companies that you
14    referred to, what's the nature of that?
15          A.    It's primarily relationship
16    building.  So at the more senior level the
17    engagements that I would hold, the meetings I
18    would hold, it would be really relationship
19    building to facilitate better communication at
20    the working level.
21          Q.    So who would be present at a
22    meeting like that, on your side?
23          A.    On our side, it would be the acting
24    coordinator or the coordinator if -- or the
25    appointed coordinator, probably one or two of
```

**DANIEL KIMMAGE  11/10/2022**

Page 32

```
 1   the deputies, because there are deputy
 2   coordinators, maybe a team chief, and then,
 3   potentially, a member of a team with relevant
 4   substantive expertise.
 5        Q.   How frequently do those kinds of
 6   meetings occur where someone at the coordinator
 7   level and others are meeting directly with the
 8   social media platforms?
 9        A.   Every few months, can b e
10   quarterly, but sometimes less than quarterly.
11        Q.   What kind of topics are discussed
12   at those meetings?
13        A.   The tools and techniques of our
14   adversaries would probably be the number one
15   topic.  So what are the campaigns we see,
16   foreign propaganda actors, like Russia, China,
17   Iran or terrorist organizations, what campaigns
18   are they conducting, what tools are they using,
19   potentially which narratives they're promoting.
20             And we would be in listening mode
21   for anything the companies wanted to share.
22        Q.   And you say what the companies
23   wanted to share, what sort of information might
24   that be?
25        A.   My recollection is that it was
```

## DANIEL KIMMAGE  11/10/2022

```
 1    fairly minimal.
 2              Q.   Can you think of an instance where
 3    that happened, you referred to it just now?
 4              A.   They would also be looking for
 5    Chinese disinformation campaigns, fairly general
 6    information along those lines.
 7              Q.   And so they might flag for you, the
 8    GEC representatives, content that they see on
 9    their platforms that their concerns may be
10    originating from malign state actors?
11              MR. KIRSCHNER:  Objection, assumes
12    evidence not in record.
13    BY MR. SAUER:
14              Q.   You may answer if you understand
15    the question.
16              A.   I don't recall discussions of
17    specific content.  These would be higher-level
18    discussions along the lines of a campaign with a
19    narrative, but not specific content that would
20    be a part of the campaign.
21              Q.   So they would not be flagging
22    specific posts, for example, but they might be
23    saying, hey, there's a narrative about, you
24    know, at a high-level description that's --
25    that's trending on their platform, something
```

Case 3:22-cv-01213-TAD-KDM   Document 208-1   Filed 03/04/23   Page 34 of 363 PageID #:
12313

**DANIEL KIMMAGE  11/10/2022**

```
 1      like that?
 2              A.   Yes.
 3              Q.   Do you remember specific instances
 4      where that kind of conversation occurred?
 5              A.   No.
 6              Q.   But you have the understanding that
 7      that sort of thing would happen?
 8              A.   Yes, general discussions of
 9      campaigns.
10              Q.   And then on your side would you
11      also be discussing such campaigns?
12              A.   Yes.
13              Q.   And flagging them for them; is that
14      fair to say?
15              A.   Yes.  But I wouldn't use the word
16      flagging.  Flagging is generally associated with
17      specific content, that was generally not the
18      focus of our discussions, certainly not the ones
19      that I conducted.
20              Q.   So what discussions -- let me take
21      a concrete example, for example, that's in some
22      of the GECs online materials.
23                   I take it there was a campaign back
24      in the 1980s, from Russia and malign actors, to
25      try and accuse the United States of
```

DANIEL KIMMAGE  11/10/2022

1    manufacturing the AIDS virus in a laboratory in

2    the 1970s when, in fact, there's demonstrable

3    scientific evidence that it emerged in the

4    1950s, so this is kind of a Russian lie.

5              Is that at the sort of level of

6    specificity that you might be raising these

7    kinds of issues in these meetings with social

8    media platforms?

9              MR. KIRSCHNER:  Objection, vague,

10   ambiguous.

11   BY MR. SAUER:

12        Q.   If you understand, you may answer.

13        A.   Yes, that is the -- the -- the

14   level of detail.

15        Q.   Yeah, and I'm not asking -- I'm not

16   asking for a, hey, anything current.

17        A.   Mm-hmm.

18        Q.   But that would be the nature of

19   information, you might sit down with them and

20   say, hey, look, here's a malign foreign actor,

21   Russia, they are pushing this narrative out on

22   social media platforms using bots or whatever,

23   and, you know, here's the nature of the

24   narrative, and this is something to be on the

25   lookout for; is that a fair characterization of

**DANIEL KIMMAGE  11/10/2022**

**Page 36**

1    how those discussions go?

2          A.   Yes, with the caveat that we might

3    not say:  Be on the lookout, it might be just

4    what we're seeing.  Our interactions were not

5    directive with social media companies.

6          **Q.   What's the purpose of advising them**

7    **of those narratives of concern, from your side?**

8          A.   The purpose is to deepen their

9    understanding of the actions of malign actors

10   seeking to harm the national security in the

11   United States, in line with the GEC's

12   congressional mandate.

13         **Q.   Is there a concern or is there an**

14   **indention that for particularly malign**

15   **narratives, that once they're advised of them**

16   **they might be equipped to enforce their content**

17   **standards against users or bots who post those**

18   **narratives?**

19         A.   Could you clarify the question?

20         **Q.   Is part of the purpose of raising**

21   **these narratives to inform the social media**

22   **companies on how they might apply their content**

23   **modulation policies against that kind of**

24   **content?**

25                MR. KIRSCHNER:  Objection,

**DANIEL KIMMAGE  11/10/2022**

**Page 37**

```
 1    ambiguous.
 2    BY MR. SAUER:
 3           Q.    You may answer, if you understand.
 4           A.    No.  Our purpose was not to effect
 5    internal decisions at the social media
 6    companies.  Our purpose was to deepen their
 7    understanding of the actions of malign actors.
 8           Q.    And this -- these meetings occur
 9    every few months; is that fair to say?
10           A.    At the senior level, every few
11    months.
12           Q.    How often do they occur with the
13    TET level?
14           A.    More frequently, but I don't know
15    the exact frequency.
16           Q.    Does the GEC engage in any
17    activities where the intention is to influence
18    or -- or at least propose to social media
19    companies that certain content might not be
20    posted on their platforms?
21                 MR. KIRSCHNER:  Objection,
22    compound.
23    BY MR. SAUER:
24           Q.    You may respond, if you answer --
25           A.    No.
```

**DANIEL KIMMAGE  11/10/2022**

Page 38

```
 1              Q.    -- if you understand?
 2              A.    The GEC does not seek to influence
 3      the decisions of the social media companies.
 4              Q.    Does a CE -- GEC seek to provide
 5      information that might inform those decisions?
 6              A.    No.  The GEC is not looking to
 7      inform specific decisions.  These are general
 8      conversations about what we are seeing in the
 9      environment.  They're not geared toward
10      decisions that the social media companies may or
11      may not make.
12              Q.    And are you aware of any instances,
13      whether in the context of these meetings or any
14      other context, where the GEC has been involved
15      in, you know, raising concerns to social media
16      companies, whether directly or indirectly, about
17      content posted on their platforms?
18              MR. KIRSCHNER:  Objection,
19      compound.
20              A.    Yes, I can recall one specific
21      instance --
22              Q.    Can you tell me about that?
23              A.    -- that -- with myself.
24              Q.    Sorry, I didn't mean to interrupt.
25                    Can you tell me about that?
```

**DANIEL KIMMAGE  11/10/2022**

```
 1              A.   Yes.   I believe this was in 2018,
 2     but I don't have the records in front of me.   I
 3     was informed by a colleague that there was a
 4     security situation in a middle eastern country
 5     where demonstrators or protesters were using a
 6     social media platform to communicate, and the
 7     Department was concerned for the safety of its
 8     personnel.
 9              And this was a concern that was
10     being tracked in realtime, at the highest levels
11     of the State Department.  And that was the one
12     time that I recall that I did communicate
13     directly to a social media platform or
14     representative that this was an ongoing concern.
15     I was very specific in my interactions, simply
16     saying that this is a realtime situation where
17     we believe that the safety of our personnel is
18     at stake, and I would simply ask that you review
19     the activity on these accounts to make a
20     determination in line with your own terms of
21     service.
22              I did not ask for anything to be
23     removed, but I did have a direct interaction
24     about specific content motivated by security
25     concerns about the safety of our people.
```

**DANIEL KIMMAGE  11/10/2022**

Page 40

```
 1              Q.    Were those posts foreign or
 2      domestic?
 3              A.    All foreign.
 4              Q.    And what action was taken, to your
 5      knowledge, by the social media platforms?
 6              A.    I don't know what specific action.
 7      They did not report back to me.
 8              Q.    You mentioned that you, personally,
 9      engaged in that interaction.  Are you aware of
10      others in the GEC having any interactions of
11      that nature, where there's a discussion with
12      social media platforms about specific content of
13      concern?
14              A.    No, I'm not.
15              Q.    You're not aware of any other
16      personnel within your -- the GEC doing that on
17      any other occasion?
18              A.    There were other personnel involved
19      in this interaction, but not beyond this
20      interaction.
21              Q.    How many personnel are at the GEC?
22              A.    I -- I believe it's between one and
23      two hundred now.
24              Q.    Okay.  And do they all ultimately
25      report to you, in your role as principal deputy
```

**DANIEL KIMMAGE  11/10/2022**

Page 41

1    coordinator?

2            A.    No.  I'm -- I'm currently serving

3    as a senior advisor, so I'm not in a -- in a

4    direct management role.

5                When I was the acting coordinator,

6    they would have -- I would have been responsible

7    for the entire office.  They would not have

8    reported directly to me.  There's a chain of

9    command

10               And, you know, when I was the

11   principal deputy some would report to me, but

12   ultimately it would be the appointed coordinator

13   who was the head of the office.

14           Q.    Are -- how much knowledge do you

15   have of the office's activities in your role of

16   senior advisor?  Do you have a good overview of

17   everything the office is doing or do you only

18   really oversee or, you know, get involved in

19   smaller portions of it?

20           A.    Currently, only in small portions.

21   I don't have an oversight role.

22           Q.    What are the -- what are those

23   smaller portions that you're involved in?

24           A.    Strategic issues of interest to the

25   acting coordinator.

**DANIEL KIMMAGE  11/10/2022**

**Page 42**

```
 1            Q.   Can you, without getting into too
 2     much detail, can you tell us whether any of
 3     those issues involved interaction with social
 4     media platforms?
 5            A.   No, they do not.
 6            Q.   Your answer is:  No, they do not?
 7            A.   No.
 8            Q.   But are you still participating in
 9     these, you know, few monthly meetings with the
10     social media platforms?
11            A.   No.
12            Q.   That was something you did when you
13     were acting coordinator and deputy acting
14     coordinator?
15            A.   Yes, only in my capacity as acting
16     coordinator or principal deputy coordinator.
17            Q.   And that was a role that you held
18     from the beginning of 2017 until -- until about
19     a year ago or about 14 months ago?
20            A.   Until June 2021.
21            MR. SAUER:  Let me give you a
22     document.  Let's call this Exhibit 1.
23            (Exhibit No. 1 was marked for
24     identification.)
25            MR. KIRSCHNER:  Mr. Sauer, do you
```

**DANIEL KIMMAGE  11/10/2022**

```
 1    only have one extra copy for us?
 2                MR. SAUER:  No, we've got two extra
 3    copies.
 4                MR. KIRSCHNER:  Do you mind?
 5                MR. SAUER:  Yeah, that's fine.
 6    That's fine.
 7   BY MR. SAUER:
 8          Q.    Do you recognize this document?
 9          A.    Can you clarify what that means?
10          Q.    Have you ever seen it before?
11          A.    No.
12          Q.    So if you see at the top, it's a --
13    appears to be a White House press release from
14    January 28, 2016; right?
15          A.    Mm-hmm.
16          Q.    Is that right?
17          A.    Yes.
18          Q.    And it describes, I believe, the
19    creation by executive order of the Global
20    Engagement Center in the beginning of 2016;
21    right?
22                MR. KIRSCHNER:  Objection, assuming
23    facts not in evidence.  Can the witness have an
24    opportunity to look at the document?
25                MR. SAUER:  Sure.
```

**DANIEL KIMMAGE  11/10/2022**

```
 1   BY MR. SAUER:
 2              Q.    And if it helps, if I can direct
 3        your attention to the second sentence of the
 4        second paragraph?
 5              A.    Mm-hmm.
 6              Q.    Talks about how the Department of
 7        Homeland Security and the Department of Justice
 8        will announce the establishment of a countering
 9        violent extremism task force; correct?
10              A.    Yes.
11              Q.    And then it goes on to say:  The
12        State Department will establish the Global
13        Engagement Center; is that fair to say?
14              A.    Yes.
15              Q.    So is this, to your understanding,
16        the beginning of how the GEC got going, created
17        by executive order in 2016?
18              MR. KIRSCHNER:  Objection,
19        speculative.
20   BY MR. SAUER:
21              Q.    If you know?
22              A.    There was an executive order in
23        2016 that established the Global Engagement
24        Center.  Subsequently, there was a provision in
25        the national defense authorization act that
```

**DANIEL KIMMAGE  11/10/2022**

Page 45

```
 1    created the Global Engagement Center in its
 2    current iteration.
 3            Q.   So in other words, there was a
 4    precursor that was created by executive order,
 5    and then the 2017 NDAA gave it specific
 6    statutory authorization?
 7            A.   Yes.  They're separate -- separate
 8    documents.
 9            Q.   This press release goes on to
10    say -- do you see the sentence in that paragraph
11    beginning:  Additionally?
12            A.   Yes.
13            Q.   Today, some of the most senior
14    officials from the White House and across the
15    President's national security team are meeting
16    in Silicon Valley with representatives from a
17    number of leading technology companies?
18            A.   Yes.
19            Q.   Do you have any understanding of
20    what the nature of those meetings was?
21            A.   No.
22            Q.   Were you involved in the GEC in
23    this iteration prior to 2017?
24            A.   No.  I was on detail in the Office
25    of Policy Planning at this time.
```

Case 3:22-cv-01213-TAD-KDM   Document 208-1   Filed 03/04/23   Page 46 of 363 PageID #: 12325

**DANIEL KIMMAGE  11/10/2022**

```
 1              Q.   But from the beginning, at least,
 2       it appears there was some aspect of the GEC's
 3       mission that involved interacting with social
 4       media platforms?
 5                   MR. KIRSCHNER:  Objection, assuming
 6       evidence.  That's not in the record.
 7       BY MR. SAUER:
 8              Q.   Fair to say?
 9              A.   I don't see a connection between
10       the meeting in Silicon Valley, here, and the
11       establishment of the Global Engagement Center.
12       I -- could you explain what the connection is?
13              Q.   Do you -- are you aware of any
14       connection --
15              A.   I'm not.
16              Q.   -- between the GEC and interactions
17       with social media platforms?
18              A.   I'm not aware of any connection
19       between the establishment of the Global
20       Engagement Center through the executive order or
21       the Global Engagement Center in its iteration
22       then, and then in the senior officials from the
23       White House meeting in Silicon Valley the Global
24       Engagement Center is not a part of the White
25       House.
```

**DANIEL KIMMAGE  11/10/2022**

Page 47

```
 1                This sentence talks about, you

 2    know, White House national security team, I

 3    don't know whether the Global Engagement Center

 4    was involved in that.

 5          Q.   Let me ask you this:  How -- how --

 6    how -- you've been there since the beginning of

 7    2017, during all that time have there been

 8    interactions with social media companies to

 9    discuss narratives and things like that?

10          A.   I -- I don't believe it was across

11    the entire time.  The initial period was really

12    focused on setting up the office.  So there

13    weren't -- there weren't a lot of outside

14    meetings.  I don't recall when, exactly, they

15    began.

16          Q.   Did you ever have a conversation

17    with social media companies where you encouraged

18    them to speed up the removal of posts that they

19    posted online?

20          A.   No.

21                MR. SAUER:  Let's do B.

22                Let me give you another document.

23    This will be, I think, labeled Exhibit 2.

24                (Exhibit No. 2 was marked for

25    identification.)
```

**DANIEL KIMMAGE  11/10/2022**

Page 48

```
 1   BY MR. SAUER:
 2            Q.    And is this a report from USA Today
 3       dated February 9th, 2018, discussing the Global
 4       Engagement Center?
 5            A.    Yes.
 6            Q.    And you're quoted in this article,
 7       aren't you, in there, in the second paragraph?
 8                 MR. KIRSCHNER:  Objection.  I would
 9       like to have an opportunity to read this
10       article, as well, before -- before going forward
11       on this.
12                 MR. SAUER:  If you're going to read
13       the entirety of every document we're going to be
14       here a long time.
15                 MR. KIRSCHNER:  Just to be able to
16       put eyes on the document, just --
17                 MR. SAUER:  I tell you what, when I
18       get to a question that is of concern, and we
19       need some time, let me know.  But --
20                 MR. KIRSCHNER:  You just give at
21       least the witness a little bit of time to
22       familiarize himself with the document?
23   BY MR. SAUER:
24            Q.    Well, let me ask this:  Do you
25       recall giving an interview to the USA Today in
```

**DANIEL KIMMAGE  11/10/2022**

Page 49

```
 1      around February of 2018 or giving comments to
 2      them?
 3            A.   I -- I -- I don't recall it
 4      specifically, but I gave -- I did a fair amount
 5      of media engagement, so I -- I see the
 6      interview, yes.
 7            Q.   And do you see there, on the second
 8      paragraph of this, where it talks about how
 9      there's an agreement to transfer 40 million
10      dollars from the Defense Department to more
11      fully fund the GEC?
12            A.   Mm-hmm.
13            Q.   You remember that incident, I'm
14      sure.
15            A.   Yes.
16            Q.   And do you remember talking to the
17      media about that?
18            A.   I don't recall speaking to the
19      media specifically about the funding transfer.
20            Q.   Two paragraphs down from that,
21      there's a reference to Stephen Goldstein, the
22      State Department Undersecretary for Public
23      Diplomacy, describing the Center's job; is that
24      fair to say?
25            A.   Yes.
```

**DANIEL KIMMAGE  11/10/2022**

```
 1            Q.   Do you remember getting involved in

 2      a conversation with reporters with

 3      Mr. Goldstein?

 4            A.   I don't recall whether

 5      Undersecretary Goldstein and I did a joint or

 6      separate engagement with USA Today for this

 7      interview.

 8            Q.   Okay.  Can you turn to the next

 9      page of this article.

10            A.   Mm-hmm.

11            Q.   Actually, turn in two pages, to the

12      third page of the document.

13            A.   Okay.

14            Q.   There is a freestanding paragraph

15      that begins:  Some of that work has already

16      begun, Kimmage and Goldstein said; do you see

17      where it says that?

18            A.   Yes.

19            Q.   And then immediately below that,

20      there's a quote from Goldstein, that said:  Top

21      managers have been working with other government

22      agency, the White House, and technology

23      companies, quote, encouraging them to help us in

24      this fight; correct?

25            A.   That is Undersecretary Goldstein's
```

DANIEL KIMMAGE  11/10/2022

Page 51

```
 1    quote, correct.
 2             Q.    And do you remember him saying
 3    that?
 4             A.    I -- I -- I don't.  I don't know
 5    whether I was there when he said that.
 6             Q.    Okay.  And then it goes on to say
 7    he, which I take it refers to Goldstein, met
 8    with executives in Google, in January, and
 9    Twitter in February, and plans to meet with
10    Facebook; correct?
11             A.    Yes.
12             Q.    And were you present at those
13    meetings?
14             A.    I don't recall being present at
15    those meetings.
16             Q.    Okay.  And it goes on to say:  They
17    discussed shutting down bots, thousands of
18    automated accounts that spew misleading
19    information; correct?
20             A.    Yes.
21             Q.    So that --
22             A.    Correct.
23             Q.    -- would be a discussion of taking
24    content down from a social media platform;
25    correct?
```

A. Can I clarify? This is Undersecretary Goldstein's engagement. I wasn't present there. I can't speak to the content of his engagement.

**Q. You don't remember whether or not you were present for those meetings?**

A. I don't.

**Q. You don't recall?**

**Do you recall having any specific recollection of what's discussed here?**

A. No.

**Q. Okay. And then he goes on to say that he discussed with Google, Twitter, and plans to discuss with Facebook to speed up the removal of posts and videos that target US audiences; correct?**

MR. KIRSCHNER: Objection, assumes evidence not in the record. These are not quotes. These are paraphrases.

BY MR. SAUER:

**Q. That's what the article reports him as saying; correct?**

A. That's what the article reports him as saying, correct.

**Q. Not with quotes around it, but as a**

**DANIEL KIMMAGE  11/10/2022**

```
 1    summary; correct?

 2              A.    Correct, as a summary.

 3              Q.    Do you remember any conversations

 4    from that timeframe where there was a discussion

 5    of speeding up the removal of posts between

 6    anyone associated with the State Department and

 7    any social media platform?

 8              A.    I don't recall any conversations

 9    between myself, at the GEC, and social media

10    companies about speeding up the removal of

11    posts.

12              Q.    Do you recall anyone from the State

13    Department telling you that they had a

14    conversation with a social media platform about

15    speeding up the removal of posts?

16              A.    No.  I recall Undersecretary

17    Goldstein engaging with the companies, and I

18    don't remember all of the details.  I -- I -- I

19    don't remember what he said he discussed with

20    them.

21              Q.    Okay.  And you -- you don't recall

22    whether you were personally present when those

23    meetings occurred?

24              A.    I don't believe I was, but I

25    don't -- I don't -- I don't recall being
```

**DANIEL KIMMAGE  11/10/2022**

Page 54

```
 1    present, no.
 2              Q.   How about anyone else, other than
 3    Secretary Goldstein, Undersecretary Goldstein,
 4    have you ever had a discussion with anyone else
 5    at the State Department that discussed, for
 6    example, talking to social media platforms about
 7    speeding up the removal of posts?
 8              A.   I don't recall any conversation
 9    with others at the State Department about
10    specifically speeding up the removal of posts.
11              Q.   How about any kind of removal of
12    posts, any discussion, other than the incident
13    you described earlier, obviously, in 2018?
14              A.   Outside of the very specific
15    context of this is what I would describe as an
16    exceptional case involving a threat, I don't
17    recall specific discussions of meetings with
18    social media companies about speeding up the
19    removal of posts.
20              Q.   How about making sure -- or how
21    about taking steps to stop bots from -- from
22    spreading disinformation?
23              A.   I don't recall conversations about
24    taking steps.  We would talk about foreign
25    actors use of things like bots, but not to
```

**DANIEL KIMMAGE  11/10/2022**

Page 55

```
 1    encourage some type of action, it would be
 2    really for a -- to inform.  So I don't recall
 3    conversations about taking steps.
 4         Q.    Would you -- do you recall
 5    conversations about informing social media
 6    companies that bots are spreading a certain kind
 7    of disinformation or narrative?
 8         A.    I do recall conversations about
 9    Chinese use of bots to spread propaganda
10    narratives.
11         Q.    Do you know whether the use of bots
12    would violate the social media platforms content
13    violations policies?
14         A.    I don't know, no.
15         Q.    Are you aware of anyone at the
16    State Department, including the GEC, going
17    through intermediaries to indirectly flag or
18    raise content concerns with social media
19    platforms?
20         A.    Could -- could you clarify?
21         Q.    Well, are you aware of any instance
22    where someone at a social media platform -- or
23    sorry -- someone at the GEC may have gone to
24    some third party on the understanding that that
25    third party might convey a concern about content
```

**DANIEL KIMMAGE  11/10/2022**

Page 56

```
 1      on the social media platform to the social media
 2      platform?
 3             A.   I -- no, I can't speak to every
 4      engagement that someone at the State Department
 5      might have had.
 6             Q.   Are you aware of any engagements of
 7      that nature that I described?
 8             A.   No, not that I can think of.
 9                  MR. SAUER:  Can you get C?
10                  Let's call this Exhibit 3.
11                  (Exhibit No. 3 was marked for
12      identification.)
13                  MR. KIRSCHNER:  Mr. Sauer, so to
14      clarify the record, now -- never mind.  I see
15      you're -- are you identifying this as USA Today,
16      as the -- the URL is not USA Today, so both for
17      Exhibit 2 and assume you'll also mention for
18      Exhibit 3, is it because there's a USA Today in
19      parenthetical next to the author?  I just want
20      to make sure I understand.
21                  MR. SAUER:  Yeah, that's all I'm
22      referring to.
23                  MR. KIRSCHNER:  Okay.
24      BY MR. SAUER:
25             Q.   Then can you take a quick look at
```

**DANIEL KIMMAGE  11/10/2022**

Page 57

```
1      this article by Oren Dorell, who is indicated in

2      parentheses as from USA Today?

3              A.    Mm-hmm.

4              Q.    And is this one dated September --

5      sorry -- February 13th, 2018, so just a few days

6      after Exhibit 2?

7              A.    Yes.

8              Q.    Does this article, if you turn to

9      page 2, also refer to you and quote you?

10             A.    Yes, I see my name.

11             Q.    Yeah, and in the middle of the

12     second page, you see where you're quoted as

13     saying:  We're now a coordinating body and

14     incubator of ideas; right?

15             A.    Yes.

16             Q.    Okay.  And then below that it says:

17     How does the Center do that?  And then it says:

18     The Center's 66 employees coordinate with US

19     agencies, such as the FBI and the Department of

20     Homeland Security, to target the American

21     audience; correct?

22             A.    Yes, that's what this says.

23             Q.    Is that a fair description of -- of

24     what you told them at the time, do you think?

25             A.    No, it's not.
```

**DANIEL KIMMAGE 11/10/2022**

Page 58

```
 1              Q.   Why -- what's unfair about that?
 2              A.   The Global Engagement Center does
 3    not target American audiences.
 4              Q.   Okay.  How does it coordinate with
 5    US agencies at FBI and the Department of
 6    Homeland Security?
 7              A.   It meets with them periodically.
 8              Q.   How often do those meetings occur?
 9              A.   At the senior level, every few
10    months, I would say.
11              Q.   And then at what other levels?
12              A.   At the working level, you would
13    have regular engagement through the National
14    Security Council on a much more frequent basis,
15    because you would have officials from all
16    agencies there.  But maybe every few weeks at
17    the working level.
18              Q.   So every few weeks, under the aegis
19    of the National Security Agency, there would be
20    coordination between the GEC, the FBI, and
21    the -- and the DHS; correct?
22              A.   No.
23              MR. KIRSCHNER:  Objection.  I was
24    going to say, mischaracterizes the evidence.
25              A.   No.  You said National Security
```

**DANIEL KIMMAGE  11/10/2022**

Page 59

```
 1     Agency, that's a component of the intelligence
 2     community.
 3               The meetings I would refer to would
 4     be through the National Security Council.
 5          Q.    I got you.
 6          A.    Which periodically convene all the
 7     agencies within the National Security Complex.
 8          Q.    Are there any other forms of direct
 9     coordination between the FBI and DHS and GEC?
10          A.    Yes.  There are periodic meetings
11     and there are interagency forums where
12     representatives of those agencies would be
13     present.
14          Q.    How often do those occur?
15          A.    Every few weeks or months.
16          Q.    And who -- who -- not -- I don't
17     want their names, but what sort of personnel
18     from the GEC are participating in these
19     meetings?
20          A.    Clarification, could you clarify,
21     at the senior level or the working level?
22          Q.    Well, why don't we start with the
23     senior level.  Who at the senior level, you
24     know, by title, would be participating in those
25     kinds of meetings with the FBI and DHS, outside
```

**DANIEL KIMMAGE  11/10/2022**

Page 60

```
 1        the aegis of the NEC and meetings you referred
 2        to earlier.
 3              A.   At the senior level it would be the
 4        coordinator, either acting or appointed, and
 5        potentially the principal deputy coordinator.
 6        Those would be the senior-level meetings.  And
 7        at the working level, probably a team director
 8        from the Global Engagement Center.
 9              Q.   Which team would typically do that?
10        Would that be the TET or the I2C2 or who would
11        be doing that?
12              A.   It would be entirely dependent on
13        the focus of the meting.  If a meeting is
14        focused on Russia, it would be the Russia team.
15        Generally, it would be threat-actor focused.
16              Q.   Threat-actor focused?
17              A.   Threat-actor focused, so Russia,
18        China, counterterrorism.
19              Q.   If you turn back to that article --
20        let me ask this:  Those meetings you described,
21        are they on an as-needed basis or is there a
22        kind of standing or recurring meeting between
23        GEC and FBI and DHS?
24                   MR. KIRSCHNER:  Objection, vague.
25              A.   I -- I don't recall any standing
```

**DANIEL KIMMAGE  11/10/2022**

1    meeting with FBI.  There were standing internal

2    forums, where both GEC and potentially FBI or

3    DHS would be there, but it wasn't a specific

4    meting for the GEC and that agency to

5    coordinate.  They would be there as part of a

6    larger group.

7          Q.    Okay.  What -- what sorts of

8    discussions would they have at a meeting like

9    that?  You know, can you characterize the sorts

10   of discussions that would occur in those kinds

11   of meetings?

12         A.    I would describe them as

13   threat-actor focused.  So it would be the

14   actions of a specific foreign threat actor and

15   then the coordination of what the interagency

16   would do in response.

17         Q.    And would -- would content on

18   social media platforms be discussed at those

19   meetings as part of a threat-actor focus?

20         A.    Generally, the focus would be on

21   the threat actor, potentially with mention of

22   social media.  Outside of a specific threat you

23   would generally not focus on content, specific

24   pieces of content, with the exception of, for

25   example in counterterrorism, something that

**DANIEL KIMMAGE  11/10/2022**

Page 62

```
 1    would be threat related.
 2            Q.   How about these narratives, for
 3    example, you said there might be a Russia
 4    meeting where that involves the GEC and the FBI
 5    and DHS, or a China-focused meeting, suppose
 6    Russia and malign actors are pushing narratives
 7    on social media, would that be discussed at
 8    these meetings?
 9            MR. KIRSCHNER:  Objection,
10    speculative, and calling for a hypothetical.
11 BY MR. SAUER:
12            Q.   If you know?
13            A.   Are you asking about a specific
14    meeting?
15            Q.   Well, more generally, is that
16    something that has come up from time to time, to
17    your knowledge?
18            A.   Russian narratives would come up in
19    the context of a meeting.
20            Q.   And would those be -- are there
21    scenarios where GEC actors are briefing the FBI
22    and DHS on Russian narratives?
23            A.   I don't know that the GEC would be
24    the lead briefer.  It would really depend on the
25    meeting and the context.  You might have the
```

**DANIEL KIMMAGE  11/10/2022**

Page 63

```
 1    intelligence community, for example, lead with a
 2    briefing.
 3               There are subject matter experts at
 4    the GEC who can speak to that.  I can't say who
 5    briefed what at a -- at a specific meeting.
 6          Q.   But you -- you're aware, at least,
 7    that narratives from threat actors on social
 8    media have been discussed at those meetings?
 9               MR. KIRSCHNER:  Objection, assuming
10    evidence not in the record.
11          A.   Yes, it's part of the GEC's
12    congressional mandate to identify the propaganda
13    and disinformation of malign foreign actors and
14    a significant amount of that is structured
15    around narratives, yes.
16          Q.   Okay.  So -- so it would be -- it
17    would be, I take it, sort of routine practice
18    for GEC staff to brief the FBI about a malign
19    foreign narrative or brief DHS about a malign
20    foreign narrative that they've identified?
21               MR. KIRSCHNER:  Objection, assumes
22    evidence not in the record.
23    BY MR. SAUER:
24          Q.   Go ahead.
25          A.   No, I don't recall it being routine
```

**DANIEL KIMMAGE  11/10/2022**

```
 1    practice.  The GEC met infrequently with the
 2    FBI.  I don't recall any specific meetings with
 3    the FBI.  They would be present at interagency
 4    forums, but there were no specific meetings I
 5    can recall where the GEC would meet with the FBI
 6    to brief them on narratives.
 7              Q.   How about DHS, did the GEC meet
 8    with DHS to -- and at least as part of that
 9    meeting inform them about malign foreign
10    narratives?
11              A.   So there were meetings with DHS at
12    the senior level.  I don't recall whether
13    narratives were discussed.  I don't believe that
14    narratives would have been a focus for the
15    meetings with DHS.
16              Q.   Who is at these meetings at the
17    senior level, on your side?
18              A.   I recall meetings with DHS with the
19    appointed coordinator, where I was present in my
20    role as the principal deputy.
21              Q.   Who else on the GEC side?
22              A.   On the GEC side, you would have one
23    or potentially two of the other deputies, the
24    team chiefs, and then maybe some individuals
25    from the -- what we call the threat team, so the
```

**DANIEL KIMMAGE  11/10/2022**

Page 65

```
 1    China or the Russia team, with relevant subject
 2    matter expertise.
 3            Q.    And who would participate on the
 4    DHS side?
 5            A.    On the DHS side, it would be the --
 6    the principal, and then -- I don't recall the
 7    people on the DHS side.  I believe -- yeah --
 8            Q.    What does that mean, the principal?
 9            A.    The principal is the highest level
10    official involved in the meeting.
11            Q.    So who would -- what would the
12    title of that person be at these meetings?
13            A.    I -- I believe it would -- I'm -- I
14    don't recall whether we had a meeting with the
15    undersecretary for CISA, the -- the center
16    for -- the Cyber and Infrastructure Security
17    Agency, or whether it was the official below
18    that.
19                  There's also a team at DHS that
20    deals with disinformation.  So I don't -- it
21    would have been either the undersecretary or
22    someone more junior --
23            Q.    Okay.
24            A.    -- who was a principal for DHS.
25            Q.    I'm sorry, finish.
```

**DANIEL KIMMAGE  11/10/2022**

**Page 66**

```
 1              A.   So it would be either the
 2    undersecretary or the people below that.  I -- I
 3    believe there was at least one meeting involving
 4    the GEC coordinator and the DHS undersecretary.
 5              Q.   And when you said undersecretary,
 6    and you referred to CISA?
 7              A.   Right.
 8              Q.   So for clarity of the record, CISA
 9    is the Cyber Security and Infrastructure
10    Security Agency within DHS; correct?
11              A.   Yes.  Yes.
12              Q.   And the person you described as the
13    undersecretary, is that the director of CISA?
14              A.   Yes.
15              Q.   Okay.  And who was that person who
16    was at the meetings, was that Director Krebs or
17    Director Easterly?
18              A.   It would have been Director Krebs
19    in the period, that I recall.
20              Q.   Okay.  Do you know how many
21    meetings there were at the
22    director-to-coordinator level with CISA?
23              A.   I believe there was at least one.
24              Q.   Do you know if there were more than
25    one?
```

**DANIEL KIMMAGE  11/10/2022**

**Page 67**

```
 1              A.   I -- I -- I don't recall.  There
 2      may have been.  I don't recall.
 3              Q.   What would the timeframe of these
 4      meetings have been?
 5              A.   It would have been between 2019 and
 6      2021.
 7              Q.   So at some point you had one or
 8      more meetings in a three-year period?
 9              A.   I -- I -- I --
10              Q.   You had at least one, but maybe
11      more meetings with the CISA director sometime in
12      2019, 2020 or 2021?
13              A.   Yeah, there were one or more
14      meetings during the two-year period when the GEC
15      had an appointed coordinator.
16              Q.   When was that?
17              A.   That would have been between
18      February 2019 and February 2021, so that
19      two-year period.
20              Q.   Okay.  Do you remember anywhere
21      within that two-year range when that meeting
22      occurred?
23              A.   I believe it was 2020, but I'm --
24      I -- I -- I don't remember.
25              Q.   Do you recall what, generally, was
```

**DANIEL KIMMAGE  11/10/2022**

Page 68

```
 1      discussed at that meeting?
 2              A.   I don't recall the full agenda.
 3              The primary purpose was information
 4      sharing and update on the GEC, what is the GEC
 5      focused on, what is it doing, what are its major
 6      activities.
 7              And then I don't recall what the --
 8      the CISA part of the agenda was, but the -- I
 9      would describe the primary focus as information
10      sharing.
11         Q.   When you say information sharing,
12      were you trying to set up or establish a
13      coordination or communicating relationship
14      between the two agencies, GEC and CISA?
15              A.   Could you clarify what you mean by
16      coordinating or communicating relationship?
17         Q.   Well, let me rephrase that
18      question.
19              In that meeting, did you propose
20      ongoing communication or coordination between
21      GEC and CISA?
22              MR. KIRSCHNER:  Objection to the
23      extent that this calls for privilege
24      information, that's deliberative, I would
25      instruct the witness not to answer.  To the
```

**DANIEL KIMMAGE  11/10/2022**

Page 69

```
 1    extent you can answer the question without

 2    revealing privileged information, you can go for

 3    it.

 4         A.   The GEC's congressional mandate

 5    strongly encourages ongoing communication with

 6    all of the agencies that are engaged on

 7    propaganda and disinformation by foreign actors.

 8         Q.   Is there -- is there ongoing

 9    communication between the GEC and CISA?

10         A.   I don't know, now.  There were

11    periodic meetings, they were not very frequent.

12    But how would you define ongoing?

13         Q.   Well, you used the word, how would

14    you define it?  You referred to on -- you said

15    your statutory mandate requires ongoing

16    communication, and I asked whether there is

17    ongoing communication with CISA.

18              Can you describe what kind of

19    communication with CISA occurred during the

20    period of your knowledge, that five-year period

21    when you were acting coordinator?

22         A.   So I was acting coordinator for two

23    years, and then I was the principal deputy for

24    two.  And there were -- there was at least one

25    senior-level and potentially more senior-level
```

DANIEL KIMMAGE  11/10/2022

Page 70

```
 1    engagements every few months, I would say.
 2            Q.    When you say more senior-level
 3    engagements every few months, who would have
 4    participated in those?
 5            A.    The senior-level engagements, as I
 6    said, would involve the coordinator, the acting
 7    coordinator, the appointed coordinator, and the
 8    principal deputy, those are the senior-level
 9    engagements.
10            Q.    Okay.  So senior-level engagements
11    would include you --
12            A.    Yes.
13            Q.    -- and then the CISA director;
14    correct?
15            A.    Yes.
16            Q.    And you said those engagements
17    would occur every few months?
18            MR. KIRSCHNER:  Objection, assuming
19    evidence not in the record, and
20    mischaracterizing his testimony?
21    BY MR. SAUER:
22            Q.    Is that correct, those would occur
23    every few months?
24            A.    Every few months, I know we had at
25    least one meeting, and there were at -- there
```

DANIEL KIMMAGE  11/10/2022

Page 71

```
 1    may have been two, so every few months, yeah.
 2             Q.    One meeting or two over a four-year
 3    period or every few months, those seem different
 4    to me, can you clarify?
 5             A.    Sure.  I think the aim was to meet
 6    every few months.  I don't know that we achieved
 7    that.
 8             Q.    How about at the staff level,
 9    below, you're -- I think we've been talking
10    about the principal level --
11             A.    Yeah.
12             Q.    -- in these interactions between
13    GEC and CISA, how about at the staff level?
14             A.    At the staff level, outside of the
15    NSC process, I -- I don't recall how frequently
16    GEC representatives met with the -- the
17    disinformation office within CISA.
18             Q.    When you say the disinformation
19    office within CISA, is that the team that's been
20    described as the mis-dis- and mal information
21    team?
22             A.    I believe that's the current name
23    for it, yes.
24             Q.    And did it previously have a name
25    that was something like the countering -- in any
```

**DANIEL KIMMAGE  11/10/2022**

Page 72

```
 1    event, so when you're talking --
 2            A.    Right.
 3            Q.    -- about this -- earlier, when you
 4    referred to how there was a meeting with either
 5    the director or the director of the
 6    misinformation group --
 7            A.    Mm-hmm.
 8            Q.    -- that's a reference to what
 9    became -- came to be known and still is known as
10    the mis-dis- and mal information team; correct?
11            A.    Yes.  Yes.
12            Q.    Who was the director or who was the
13    head of that group?
14            A.    I don't recall.
15            Q.    Were there ongoing interactions
16    between GEC staff and -- in that mis-dis- and
17    mal information team?
18            MR. KIRSCHNER:  Objection,
19    speculative.
20            A.    I believe there were interactions.
21    I don't recall how frequent they were or how
22    ongoing.
23            Q.    Do you know what was discussed in
24    those interactions, generally?
25            A.    Specifically, no, generally,
```

**DANIEL KIMMAGE  11/10/2022**

Page 73

```
 1    information sharing.
 2            Q.    Okay.  What kind of information was
 3    shared?
 4            A.    The actions of the major malign
 5    foreign propaganda and disinformation actors
 6    as -- as -- as part of the GEC's mandate.
 7            Q.    So it would be discussions of
 8    the -- you know, sorts of narratives that are
 9    being pushed by malign foreign actors?
10            MR. KIRSCHNER:  Objection, assumes
11    evidence not in the record.
12    BY MR. SAUER:
13            Q.    Is that fair to say?
14            A.    It could be anything from the plans
15    of those actors to the activities.  I can't
16    speak to the nature of the discussions.  I
17    wasn't part of them.
18            Q.    Okay.  Do you know who participated
19    in those on the GEC side?
20            A.    No, I don't.  I don't.
21            Q.    Can you stick with Exhibit 3,
22    there, right in that same middle of the second
23    page, we talked about how the center's 66
24    employees coordinate with US agencies, such as
25    the FBI and the Department of Homeland Security;
```

**DANIEL KIMMAGE  11/10/2022**

**Page 74**

```
 1    correct?

 2            A.   Yes, that's what the paragraph

 3    says.

 4            Q.   And then the -- the news article

 5    goes on to say:  To target the American

 6    audience; correct?

 7            A.   Yes, that's what the news article

 8    says.

 9            Q.   And you -- you don't think that's a

10    fair characterization of what you would have

11    said to them at the time?

12            A.   No.  That's an inaccurate

13    characterization of the GEC's mission and focus.

14            Q.   Does the GEC's mission and focus

15    include concern about foreign narratives that

16    are pushed on social media that get replicated

17    by domestic speakers?

18                 So suppose, for example, Russia is

19    pushing the narrative that the US government

20    invented the AIDS virus in a lab in 1970, and

21    they pushed that out through media or social

22    media, and it gets re-tweeted by, you know,

23    domestic actors, is that a point of concern for

24    the GEC?

25                 MR. KIRSCHNER:  Objection, calls
```

**DANIEL KIMMAGE  11/10/2022**

```
 1    for a hypothetical.
 2   BY MR. SAUER:
 3        Q.    If you know.
 4        A.    The GEC's concern is with the
 5   actions of foreign propaganda actors.  The GEC's
 6   concern stops there.  It doesn't extend to the
 7   speech of Americans.
 8        Q.    Okay.  So if American -- like,
 9   Americans pick up, for example, a malign foreign
10   narrative, is that something that you would --
11   the GEC would track?
12             MR. KIRSCHNER:  Objection.
13   BY MR. SAUER:
14        Q.    That, oh, this is getting traction
15   in the -- you know, in the American social media
16   sphere?
17             MR. KIRSCHNER:  Objection,
18   speculative, hypothetical.
19        A.    No.  The GEC does not track the
20   American social media sphere.
21        Q.    Okay.  So you don't pay attention
22   to what's being said on Facebook and Twitter and
23   whether or not they are -- whether or not these
24   malign foreign narratives are kind of spilling
25   over into what Americans are saying on Facebook
```

**DANIEL KIMMAGE  11/10/2022**

Page 76

```
 1     and Twitter and YouTube and so forth?
 2                 MR. KIRSCHNER:  Objection,
 3     ambiguous.
 4  BY MR. SAUER:
 5          Q.    If you -- is that correct?
 6          A.    No.  The GEC's focus is on foreign
 7     propaganda and disinformation.
 8          Q.    Would the GEC ever discuss with
 9     social media platforms in these various
10     interactions issues about whether or not malign
11     foreign narratives have been replicated in
12     domestic speech?
13          A.    No.  That would not be the GEC's
14     focus.  I can't speak to what the social media
15     companies may raise or how they raise it, but
16     that would not be the GEC's focus.
17          Q.    How about CISA, is that something
18     that CISA might focus on, to your knowledge?
19          A.    I can't speculate about CISA's
20     focus.
21          Q.    CISA is C-I-S-A; correct?
22                Do you know what CISA's mission is?
23          A.    It's -- I assume it's listed on
24     their website.  I'm not going to try to
25     reproduce it.
```

**DANIEL KIMMAGE  11/10/2022**

Page 77

```
 1              Q.   I'm just asking if you know.  Do
 2      you have a general understanding of what they're
 3      concerned with?
 4              A.   It's primarily cyber security
 5      focused.
 6              Q.   And how about the mis-dis- and mal
 7      information team, do you know what their focus
 8      is?
 9                   MR. KIRSCHNER:  Objection,
10      speculative.
11   BY MR. SAUER:
12              Q.   If you know.
13              A.   I don't recall their precise
14      mission within -- within CISA.  It was a small
15      team.
16              Q.   How about more generally, do you
17      have a general understanding of what that team
18      focuses on?
19                   MR. KIRSCHNER:  Objection,
20      speculative.
21   BY MR. SAUER:
22              Q.   If you know.
23              A.   Disinformation and misinformation
24      as it pertains to cyber and infrastructure
25      security.
```

DANIEL KIMMAGE  11/10/2022

Page 78

```
 1              Q.    And does that include
 2      misinformation and disinformation that come from
 3      domestic actors?
 4                    MR. KIRSCHNER:  Objection,
 5      speculative.
 6              A.    I don't know.
 7              Q.    So you don't know whether the
 8      mis-dis- and mal information team focuses
 9      exclusively on foreign disinformation or whether
10      its concern with disinformation extends to sort
11      of disinformation propagated by domestic
12      speakers?
13              A.    I'm not going to speculate about
14      the focus of a team at another agency.
15              Q.    I'm not asking you to speculate.
16      I'm just asking you to answer if you know.  What
17      do you know?
18              A.    I don't recall what their specific
19      focus was within the CISA mandate.
20              Q.    Same paragraph there in paragraph
21      three, under:  How does the center do that.
22              A.    Mm-hmm.
23              Q.    The next sentence goes on to say
24      that it, meaning the GEC, works with social
25      media companies that have been used to spread
```

**DANIEL KIMMAGE  11/10/2022**

```
 1     foreign propaganda; correct?
 2            A.    Correct, that's what the sentence
 3     says.
 4            Q.    And is that -- I take it they're
 5     attributing that sentence to you in this
 6     article; correct?
 7                  MR. KIRSCHNER:  Objection, assumes
 8     evidence not in the record.
 9   BY MR. SAUER:
10            Q.    Is that your understanding?
11            A.    I don't see that here.
12            Q.    Okay.  Well, let me ask you this:
13     Did you tell a reporter that the GEC works with
14     social media companies that have been used to
15     spread foreign propaganda?
16            A.    I wouldn't characterize it as works
17     with, I would characterize it as meets with,
18     periodically, social media companies, that, you
19     know, have been used to spread foreign
20     propaganda.
21            Q.    Okay.  And does the GEC still do
22     that to this day?
23            A.    I believe that the -- the meetings
24     continue, yes.
25            Q.    Do you know who -- who is attending
```

**DANIEL KIMMAGE  11/10/2022**

```
 1      those meetings nowadays?

 2              A.    No.

 3              Q.    Do you know who attended meetings

 4      like that during 2021, meetings between social

 5      media platforms and GEC personnel?

 6              A.    So the senior-level meetings would

 7      have involved me and one or more of the deputy

 8      coordinators, the chiefs of the relevant teams,

 9      and then working-level people with relevant

10      subject matter expertise.

11              Q.    And I think you may have talked

12      about this earlier, but how often would those

13      meetings occur in 2021, specifically?

14              A.    I believe with the aim was for

15      quarterly meetings.  I don't know that they

16      always happened on a quarterly basis.

17              Q.    And what social media platforms

18      were met with?

19              A.    I believe we had meetings with

20      Twitter and maybe Facebook or Google.

21              Q.    How about YouTube.  Google is -- I

22      think owns YouTube.  Was that a YouTube-related

23      meeting?

24              A.    I don't -- I don't recall.

25              Q.    How about Parler?
```

**DANIEL KIMMAGE  11/10/2022**

Page 81

```
 1                 A.   I don't recall meeting with Parler.
 2         I don't believe we met with them.
 3                 Q.   How about LinkedIn?
 4                 A.   I don't recall a meeting with
 5         LinkedIn.
 6                 Q.   How are these meetings done, is it
 7         all on a big Zoom call, or do you guys fly to
 8         San Francisco or do you meet with their -- you
 9         know, their -- their D.C. people, like, who --
10         who -- where do they occur?
11                 A.   Sure.  Before COVID the meetings
12         would be generally at the GEC offices in
13         Washington, D.C.; in 2021, it would have been
14         over Zoom or a virtual platform.
15                 Q.   Okay.  And would there be, for
16         example, would there be, you know, on people's
17         calendars electronic invites to those Zoom
18         meetings?
19                 A.   I believe so, yes.
20                 Q.   Would that include your calendar?
21                 A.   Yes.
22                 Q.   Okay.  So if you were to look at
23         your calendar for 2021, you could probably
24         figure out which social media platforms you met
25         with and how often; fair to say?
```

**DANIEL KIMMAGE  11/10/2022**

Page 82

```
 1                    MR. KIRSCHNER:  Objection,
 2      mischaracterizes evidence, assumes evidence not
 3      in the record.
 4           A.   Yes.
 5           Q.   Okay.  So you said, like, for
 6      example, in the 2021 timeframe the goal was to
 7      meet with them quarterly, and you can't remember
 8      whether or not you met that goal; correct?
 9           A.   Yeah, yeah, I don't -- I don't
10      remember whether we ever had a recurring
11      quarterly meeting on the calendar.
12           Q.   And that you believe you met with
13      Twitter and Facebook; correct?
14           A.   Yes.
15           Q.   Possibly met with YouTube and,
16      slash, Google?
17           A.   Possibly.
18           Q.   Do you remember any other social
19      media platforms that you've ever met with?
20           A.   In 2021?
21           Q.   Well, we'll start with 2021, yeah.
22           A.   No, I -- I -- I recall meeting with
23      Twitter.
24           Q.   Mm-hmm.
25           A.   And possibly with the other
```

**DANIEL KIMMAGE  11/10/2022**

Page 83

```
 1   companies you mentioned.  I do not recall any

 2   other meetings with -- with big social media

 3   companies.

 4          Q.   How about little social media

 5   companies?

 6          A.   With social media companies.

 7          Q.   How about others at -- at -- others

 8   at the GEC, are you aware of them meeting with

 9   social media companies?

10          A.   No.  It wouldn't -- normally they

11   wouldn't share every single meeting with me.

12          Q.   Okay.  Are you generally aware that

13   such meetings occurred, that you were not

14   participating in, during the 2021 timeframe?

15          A.   Yes.

16          Q.   Okay.  Who would have participated

17   in meeting with social media companies then?

18          A.   Representatives of the Technology

19   Engagement Team, and then relevant members of

20   what we call the threat team, so the Russia

21   China, Iran, or counterterrorism teams.

22          Q.   Do you know what social media

23   companies were met with?

24          A.   No.

25          Q.   And do you know what kind of
```

**DANIEL KIMMAGE  11/10/2022**

Page 84

```
 1        threats were discussed?

 2              A.    The -- I -- I don't know the

 3        specific threats that were discussed, no.

 4              Q.    Starting with focusing on your

 5        meetings --

 6              A.    Mm-hmm.

 7              Q.    -- at any of your meetings, where

 8        it was foreign generated election-related

 9        disinformation discussed with social media

10        platforms?

11              A.    I don't recall any discussion of

12        election-related threats in my 2021 meetings.

13              Q.    How about in earlier meetings, how

14        about in 2019, 2020, at any time did you have a

15        meeting with the social media platform where

16        election-related disinformation was discussed?

17              A.    I don't recall a meeting focused on

18        election-related disinformation or propaganda.

19        The companies may have briefed on some of the

20        steps they were taking.  They spoke about this

21        publicly, as well.  But I don't recall the GEC

22        introducing anything election-related.

23              Q.    What do the companies say about

24        election-related disinformation?

25              A.    I don't recall the specifics, just
```

Case 3:22-cv-01213-TAD-KDM   Document 208-1   Filed 03/04/23   Page 85 of 363 PageID #: 12364

**DANIEL KIMMAGE  11/10/2022**

```
 1    that they were focused on it and taking steps.
 2              Q.    Did they tell what steps they were
 3    taking?
 4              A.    I don't recall the specifics.
 5              Q.    Did those steps that they were
 6    taking include steps relating to content
 7    modulation?
 8              A.    Not that I recall.  I believe it
 9    would have been more along the lines of -- I
10    believe there was media coverage of, like, a war
11    room or -- or things like that.
12              MR. KIRSCHNER:  Mr. Sauer, just in
13    terms of timing, what do you think?  We've been
14    going for about an hour.
15              MR. SAUER:  I'm fine with a short
16    break now.  Let's keep it real short.  Are you
17    guys okay with that?
18              MR. KIRSCHNER:  Yeah.
19              MR. SAUER:  Let's go off the
20    record.
21              MR. KIRSCHNER:  Do a five-minute
22    break.
23              THE WITNESS:  Okay.
24              THE VIDEOGRAPHER:  Just one second.
25              MR. KIRSCHNER:  Then we'll go for
```

**DANIEL KIMMAGE  11/10/2022**

Page 86

```
 1     another 45 minutes or an hour.
 2               MR. SAUER:  Let's hold it for five
 3     minutes.
 4               MR. KIRSCHNER:  Yeah, okay.
 5               MR. SAUER:  Are we off the record?
 6               THE VIDEOGRAPHER:  The time is
 7     11:10 a.m.  We're off the record.
 8               (Recess.)
 9               THE VIDEOGRAPHER:  The time is
10     11:21 a.m.  We are back on the record.  Please
11     proceed.
12     BY MR. SAUER:
13          Q.   Mr. Kimmage, who is Alexis Frisbee?
14          A.   Alexis Frisbee is a member of the
15     Technology Engagement Team the Global Engagement
16     Center.
17          Q.   That's the TET, as we've called it?
18          A.   Yes.
19          Q.   At what -- what's her -- what's her
20     title within that team?
21          A.   I don't recall her title.
22          Q.   Is she the head of the team or is
23     she a member of the team?
24          A.   No.  She's not the head of the
25     team.  She's a member of the team.
```

Case 3:22-cv-01213-TAD-KDM  Document 208-1  Filed 03/04/23  Page 87 of 363 PageID #: 12366

DANIEL KIMMAGE  11/10/2022

```
 1            Q.   Are you aware of her communicating
 2      with social media platforms?
 3            A.   I believe she helped to set up
 4      meetings, yes.
 5            Q.   Okay.  And did she have
 6      communications with them or did she just set up
 7      the meetings?
 8            A.   The communication I'm aware of
 9      would be in the context of setting up a meeting.
10            Q.   So you're aware that she set up a
11      meeting with what social media platform?
12            A.   I don't recall.
13            Q.   Was it more than one?
14            A.   I -- I don't recall.
15            Q.   What was the timeframe of that,
16      setting up that meeting?
17            A.   I believe it would have been 2021.
18            Q.   Do you know whether she
19      participated in the meetings that she set up?
20            A.   I -- I don't recall.
21            Q.   Who -- who would have participated
22      in the meetings that she set up or who did
23      participate in the meeting or meetings that she
24      set up?
25            A.   Sure.  In the -- we've already been
```

**DANIEL KIMMAGE  11/10/2022**

```
 1      through this, I believe, the acting coordinator,

 2      one or more of the deputies, the team chiefs

 3      from some of the threat teams, and then some

 4      working-level staff with relevant subject matter

 5      expertise.

 6             Q.    So did she set up all of the

 7      meetings that you described as aspire to be

 8      quarterly in 2021 or did she set up one

 9      particular one?

10             A.    I -- I -- I don't know.  The -- the

11      coordinator doesn't normally know who sets up

12      the meetings.

13             Q.    How do you know she set up that one

14      or more?

15             MR. KIRSCHNER:  Objection, assuming

16      evidence not in record.

17   BY MR. SAUER:

18             Q.    If you know?

19             A.    I believe she -- she -- she helped

20      to set up at least one meeting.

21             Q.    What makes you think that?  What do

22      you remember about that?

23             A.    She was on the Technology

24      Engagement Team.

25             Q.    Do you remember any specific issue
```

**DANIEL KIMMAGE  11/10/2022**

1    that -- that was discussed in the meeting she

2    set up?

3           A.   The -- the agenda, you know, we --

4    we went over would have been an update on what

5    the Global Engagement Center is seeing in the

6    environment, some of the potentially relevant

7    analysis that the Global Engagement Center would

8    be engaged in, and then information sharing with

9    whatever the social media company wanted to

10   share.

11          Q.   Do you know if this was a

12   Russia-specific meeting or a China-specific

13   meeting or an Isis-specific meeting?

14          A.   I don't recall the 2021 meetings as

15   being focused on a specific threat actor.

16          Q.   What were they more focused on?

17          A.   I believe it would have been across

18   the board, so here's what China is potentially

19   up to, here's what Russian propaganda

20   disinformation is, I don't recall the specific

21   agenda, but I don't believe it was limited to a

22   single threat actor.

23          Q.   Okay.  Were there other threat

24   actors that were discussed in those 2021

25   meetings, besides, I think you mentioned, Russia

**DANIEL KIMMAGE  11/10/2022**

Page 90

```
 1     and China?
 2            A.    Potentially, I just don't recall
 3     the specific agenda.
 4            Q.    Do you recall election-related
 5     issues being discussed in any of those meetings?
 6            A.    Could you --
 7            MR. KIRSCHNER:  Objection.  I'm
 8     sorry, I was going to say, objection, vague.
 9            A.    Could you clarify what you mean be
10     election-related.
11            Q.    Well, do you remember the word
12     election coming up?  And by election I mean an
13     American election.
14            A.    Right.
15            Q.    So I'm not asking about
16     disinformation that relates to an election
17     conducted in what passes for elections in some
18     of these threat actor states, but was there any
19     discussion that related to an American election
20     or elections?
21            A.    I don't recall any discussions in
22     American elections in my 2021 meetings with
23     social media companies.
24            Q.    How about discussion of mis- or
25     disinformation that relates to American
```

**DANIEL KIMMAGE  11/10/2022**

Page 91

```
1      electoral processes or American elections?

2            A.   I don't recall any discussion

3      related to American elections in my 2021

4      meetings.

5            Q.   Who is Samaruddin K. Stewart, also

6      known as Sam Stewart?

7            A.   Sam Stewart was also a member of

8      the Technology Engagement Team.

9            Q.   What was his role on that team?

10           A.   His role was to facilitate

11     engagement with social media companies.

12           Q.   When was he -- when did he work for

13     the GEC?

14           A.   I don't recall the specific dates

15     of his employment.

16           Q.   Is he still there?

17           A.   No, I don't believe so.

18           Q.   Do you know when he left?

19           A.   No.

20           Q.   Do you know what timeframe he

21     worked, would it have been back in the 2017/2018

22     timeframe, 2019/2020?

23           A.   I believe it was later, sort of

24     2019 to 2021.

25           Q.   Okay.  And do you know what,
```

**DANIEL KIMMAGE  11/10/2022**

```
 1      exactly, he did for the TET?
 2              A.   He helped to set up meetings and
 3      establish contact with social media companies
 4      and technology companies.
 5              Q.   How did he do that?
 6              MR. KIRSCHNER:  Objection,
 7      speculative.
 8              A.   E-mails, meetings, phone calls.
 9              Q.   Okay.  Where was he based?
10              A.   I believe he was based in
11      Washington, D.C., and -- and potentially
12      elsewhere.  I don't recall exactly where he was
13      based.  This overlaps with the COVID period, and
14      I don't -- I don't recall.
15              Q.   Do you -- were you included in any
16      of the e-mails, meetings, and phone calls he had
17      with social media platforms?
18              MR. KIRSCHNER:  Objection,
19      speculative.
20              A.   I don't recall any specific
21      e-mails.  I may have been included on the
22      scheduling e-mail, but I don't recall any
23      specific e-mails.
24              MR. SAUER:  Okay.  Can I have G as
25      in goat.
```

**DANIEL KIMMAGE  11/10/2022**

```
 1                    And we're going to hand you a
 2      document that's going to be labeled Exhibit 4.
 3                    (Exhibit No. 4 was marked for
 4      identification.)
 5                    THE WITNESS:  Okay.
 6      BY MR. SAUER:
 7           Q.    And is this a media report by
 8      Robert K. Ackerman, dated September 4th, 2020?
 9                    MR. KIRSCHNER:  Objection, assumes
10      evidence not in the record, speculative.
11           A.    Yes.
12           Q.    And if you look in the second page
13      there, there's a reference to Lea Gabrielle; do
14      you see that?
15                    MR. KIRSCHNER:  I would just ask, I
16      don't want to stay here for an hour reading
17      documents, but can we give the witness a couple
18      minutes to familiarize himself with the document
19      before proceeding with questions?
20                    MR. SAUER:  Sure.  If he needs time
21      he can ask for it.
22      BY MR. SAUER:
23           Q.    Do you see a reference to Lea
24      Gabrielle?
25                    MR. KIRSCHNER:  Well, he -- he
```

**DANIEL KIMMAGE 11/10/2022**

Page 94

```
1     hasn't looked up.  He's still looking at the
2     documented.  Can you ask the witness if he's
3     ready to answer questions about the document
4     when he has an opportunity to look at it first?
5   BY MR. SAUER:
6           Q.    Do you know who Lea Gabrielle is?
7           A.    Yes.
8           Q.    And who is she?
9           A.    She was the appointed coordinator
10    of the Global Engagement Center from February
11    2019 to February 2021.
12          Q.    So is she a -- I take it you
13    reported directly to her; right?
14          A.    Yes.
15          Q.    And you were the principal deputy
16    coordinator?
17          A.    Yes.
18          Q.    So you worked closely with her
19    during that time period?
20          A.    Yes.
21          Q.    If you flip to the second page, can
22    you go down to the -- it's basically the third
23    full paragraph from the bottom, there's a
24    paragraph that begins with:  These three
25    adversaries?
```

**DANIEL KIMMAGE  11/10/2022**

```
 1                    MR. KIRSCHNER:  Objection.  The
 2      witness still hasn't identified whether he's
 3      ready to proceed with the questions.  I would
 4      please ask counsel to give an opportunity for
 5      the witness to be able to familiarize himself
 6      with the document before proceeding with
 7      questions.
 8                    MR. SAUER:  He hasn't asked me for
 9      more time.
10      BY MR. SAUER:
11           Q.    But do you see the paragraph I'm
12      referring to?  That's my only question.
13           A.    Yes.
14           Q.    Okay.  And do you see in the second
15      sentence of that paragraph, in the first
16      sentence it refers to Gabrielle's nightmare
17      scenario is propaganda that can lead to, among
18      other things, public health problems; right?
19           A.    Yes.
20           Q.    And then, in the third sentence, it
21      says:  The GEC is countering disinformation on
22      the spread of COVID-19; correct?
23           A.    Yes.
24           Q.    What steps did the GEC take to
25      counter the spread of disinformation on the
```

**DANIEL KIMMAGE  11/10/2022**

Page 96

```
 1    spread of COVID-19 --

 2              MR. KIRSCHNER:  Objection, assumes

 3    evidence not in the record.

 4  BY MR. SAUER:

 5         Q.    -- if any.

 6         A.    So the GEC tracked propaganda and

 7    disinformation by foreign actors, such as Russia

 8    and China, that was related to the pandemic.

 9    And the GEC worked with partners to counter the

10    effects of that abroad, outside the United

11    States.

12         Q.   Okay.  What were -- what were

13    the -- what was the nature of COVID-related

14    disinformation that originated from, like,

15    Russia and China?

16         A.    The nature of it would have been

17    false narratives about the origins of the

18    pandemic, for example, blaming the United States

19    or implicating the US government.

20              Some of it would have been related

21    to the efficacy of, for example, vaccines that

22    the Russian government was developing.

23              And the modes of dissemination

24    would have been various.  They could involve

25    bots, they could involve official media.  There
```

**DANIEL KIMMAGE  11/10/2022**

Page 97

```
1    was a whole ecosystem of, for example, Russia
2    propaganda, Russian propaganda actors.
3            Q.    Tell me about that ecosystem of
4    Russia.  You mentioned China and Russia, so
5    let's start with Russia.  You said Russia had
6    misinformation or disinformation about the
7    efficacy of vaccines.  What was the nature of
8    that disinformation?
9            A.    The nature of the disinformation
10   would have been to denigrate the effectiveness
11   of western-developed vaccines and to promote the
12   effectiveness of Russian-developed vaccines.
13           Q.    Okay.  And how is that propa- --
14   those kinds of narratives promulgated?
15           A.    The --
16           MR. KIRSCHNER:  I was going to say,
17   objection, mischaracterizes evidence, and also
18   assumes evidence not in the record.
19           A.    They would utilize the standard
20   toolbox of Russian propaganda and disinformation
21   efforts.  So everything from official statements
22   by senior Russian officials to Russian
23   state-funded or controlled media outlets,
24   proxies, online tools, like bots.  It would be a
25   whole suite of tools that researchers have
```

**DANIEL KIMMAGE  11/10/2022**

1    documented as -- as being part of this Russian

2    propaganda and disinformation toolbox.

3            Q.    **And what steps did the GEC take to**

4    **combat those tools?**

5            MR. KIRSCHNER:  Objection, assumes

6    evidence not in the record.

7            A.    The primary step, the primary

8    focus, was to expose this effort through things

9    like a public report that the Global Engagement

10   Center released on the pillars of Russian

11   disinformation and the ecosystem that Russia

12   used to promote it.

13           Q.    **Were there any -- you say that was**

14   **the primary focus, was there other aspects of**

15   **that attempt to counter this Russian**

16   **disinformation?**

17           A.    Yes.  The GEC would act along the

18   major lines of effort that I've described.  So

19   it would conduct analysis along the lines of

20   that report, it would coordinate within the US

21   government, and it would work with partners to

22   counter the propaganda and disinformation

23   abroad.

24           Q.    **What kind of partners?**

25           A.    Nongovernmental organizations,

**DANIEL KIMMAGE  11/10/2022**

1    foreign governments, research organizations.

2         Q.    And what kind of work would be done

3    with those partners or was done?

4         A.    Research on Russian propaganda

5    narratives, research on the resonance, the

6    substance, interactions with foreign governments

7    on what they're tracking, for example.

8         Q.    Were there any interaction with

9    social media companies about these kinds of

10   Russian disinformation related to COVID-19

11   vaccines?

12        A.    I believe that -- that it would

13   have come up in some of the meetings that I

14   described with the social media companies, yes.

15        Q.    So you believe that in those

16   meetings with social media companies, that you

17   described as occurring in 2021, there was

18   discussion of Russian disinformation campaigns

19   related to COVID-19?

20        A.    I don't recall in 2021.  I believe

21   it was more of a pressing topic a little

22   earlier, when the pandemic was at its height.

23        Q.    So that would have been in 2020,

24   most likely?

25        A.    2020, for example.

**DANIEL KIMMAGE  11/10/2022**

```
 1            Q.    How about other -- were there other
 2     Russia-originated COVID disinformation
 3     campaigns, other than the efficacy of -- the
 4     relative efficacy of Russian and American
 5     vaccines?
 6            A.    Yes.  I believe there were Russian
 7     narratives about the origins of the virus.
 8     There were false allegations about US government
 9     research facilities.  The -- the -- there would
10     be a wide array of propaganda narratives.
11            Q.    What -- what would be the -- what
12     was the nature of the origins of the virus
13     disinformation from Russia?
14            A.    I -- I don't recall the specific
15     narratives.  I believe there were some that --
16     that alleged a US government role.
17            Q.    What sort of role?
18            A.    US government funded research or --
19     or -- or some US government role along the lines
20     of the campaign in the 1980s that you
21     referenced.
22            Q.    So there was a Russian
23     disinformation campaign that suggested that the
24     US government had some role in creating the
25     COVID-19 virus?
```

**DANIEL KIMMAGE  11/10/2022**

```
 1          A.    There were multiple Russian
 2   disinformation campaigns, involving a large
 3   number of narratives, and that would have been
 4   one of the narratives.
 5          Q.    Was that another narrative that was
 6   discussed in those 2020 timeframe meetings with
 7   social media platforms?
 8               MR. KIRSCHNER:  Objection,
 9   mischaracterizes testimony, assumes evidence not
10   in the record.
11          A.    I don't recall.
12          Q.    Now, you do remember that the
13   Russian disinformation about vaccine efficacy
14   was discussed in those meetings; fair to say?
15          A.    I don't recall any specific
16   discussions.  I -- it's entirely within the
17   realm of possibility, discussed Russian
18   narratives.  I don't recall the specific
19   narratives.
20          Q.    Okay.  So you believe that you may
21   well have discussed Russian narratives in those
22   2020 meetings with the social media platforms as
23   it pertains to COVID?
24          A.    Yes, it's possible.
25          Q.    And you don't remember which
```

**DANIEL KIMMAGE  11/10/2022**

Page 102

```
 1      specific Russian narratives were discussed?

 2           A.   No, I don't.

 3           Q.   How about Chinese narratives that

 4      relate to COVID.  You referred to those earlier.

 5      What are those?

 6           A.   So those would be also focused on

 7      the origins of the virus, also touting China's

 8      effective response to the -- to the pandemic,

 9      and contrasting that favorably to other

10      countries, including the United States on --

11      those would be two Chinese narratives related to

12      the pandemic.

13           Q.   What did the Chinese disinformation

14      say about the origins of the virus?

15           A.   I don't recall, specifically.  I

16      believe that it was also insinuating, in some

17      cases, a non-Chinese origin of the virus, much

18      along the lines -- along the lines of what

19      Russian propaganda insinuated.

20           Q.   Did it insinuate a US government

21      role or an American role of the origins of the

22      virus?

23           A.   I don't recall the specific

24      narratives, no.

25           Q.   Do you know whether those Chinese
```

DANIEL KIMMAGE  11/10/2022

1    narratives were discussed in relation to the

2    social media companies?

3         A.   I don't recall the narratives.  I

4    believe we were focused on some of the

5    techniques that China was using, a little bit

6    more than the content of the narratives, so

7    botnets, for example.

8         Q.   So did you, for example, tell them

9    that the Chinese were using bots to spread

10   narratives?

11        A.   I don't know whether we told them.

12   I know that we discussed Chinese use of bots.

13        Q.   Okay.  What did you say about the

14   Chinese use of bots?

15        A.   That they were using them.

16        Q.   Okay.  And how about Russia, what

17   was discussed about Russian disinformation, to

18   your recollection?

19        A.   I believe it would have been the

20   narratives, and that it would -- that I already

21   mentioned.

22        Q.   So with respect to Russia,

23   narratives were discussed, whereas, with respect

24   to China, to your recollection, techniques were

25   discussed, like using bots as opposed to

**DANIEL KIMMAGE  11/10/2022**

 1    **narratives?**

 2            A.   Yes, because one of the notable

 3    features of the pandemic was that China began to

 4    adopt techniques that we had previously really

 5    only seen Russia use.  So, for example, Russia

 6    has been documented in many reports as using

 7    aggressive online tactics, proxies, bots,

 8    trolls.  China had not been as active in that

 9    way.

10            And so during the pandemic we began

11    to see both the convergence of narratives

12    between China and Russia and a convergence of

13    techniques.

14            So those were things that -- that

15    we and other researchers were seeing during the

16    pandemic.

17        Q.   **See, when you say a convergence,**

18    **you mean a convergence between what Russia and**

19    **China are both doing?**

20            A.   Yes, a convergence both of

21    narratives and the techniques for disseminating

22    those narratives.

23        Q.   **And maybe this piggybacks on -- if**

24    **you can look back at that document, the very**

25    **next sentence or the next part of that sentence,**

**DANIEL KIMMAGE  11/10/2022**

1       it says:  The GEC is countering disinformation

2       on the spread of COVID-19 and China already has

3       tried to discredit US vaccine efforts; do you

4       see that?

5              A.   Yes.

6              Q.   Do you recall narratives from China

7       that were trying to discredit US vaccine

8       efforts?

9              A.   I don't recall specific narratives,

10      but I do recall that China was disseminating

11      narratives that tried to discredit US vaccine

12      efforts.

13             Q.   Do you know if those were similar

14      to the Russian narratives that you described a

15      moment ago?

16             A.   I believe that they -- they were,

17      they may have differed in some specifics, but

18      yes.

19             Q.   And were those narratives about

20      vaccine efficacy discussed in the meetings with

21      social media platforms during, as you said, the

22      height of the pandemic?

23             A.   I -- I don't recall the specific

24      discussions.

25             Q.   So you don't know for sure, is that

**DANIEL KIMMAGE  11/10/2022**

```
 1      something that could well have been raised in

 2      those meetings?

 3              MR. KIRSCHNER:  Objection,

 4      speculative.

 5           A.   Yes, it is.

 6              MR. SAUER:  Can you get H?

 7              Let's hand you a document that

 8      we're going to label Exhibit 5.

 9              (Exhibit No. 5 was marked for

10      identification.)

11  BY MR. SAUER:

12           Q.   Do you recognize Exhibit 5?

13           A.   I do.

14           Q.   And is this a GEC special report

15      called:  Pillars of Russia's Disinformation and

16      Propaganda Ecosystem?

17           A.   Yes.

18           Q.   And this report, I think, was

19      singled out for particular praise in your recent

20      OIG report; is that fair to say?

21           A.   I believe so.

22           Q.   Can you turn to page 8.  You see

23      how I'm kind of turning it sideways, and there's

24      five graphics.

25                  On the far right graphic, under
```

**DANIEL KIMMAGE  11/10/2022**

1    Cyber Enabled Disinformation, what is cyber

2    enabled disinformation?

3        A.   It's using cyber tools to

4    disseminate disinformation.

5        Q.   And what -- what are some examples

6    of cyber enabled disinformation by foreign

7    actors?

8        A.   So these would be listed beneath

9    it, for example, hacking into a system, taking

10   data out of that system and releasing it into an

11   online environment, that would be an example of

12   cyber enabled disinformation.

13       Q.   Okay.  And so could you give

14   example of when that's ever happened, without

15   straying into any sensitive areas?

16       A.   I believe an example would be

17   the -- I believe this is documented in either

18   the senate intelligence committee report or

19   another congressional report would be the

20   Russian hacking of the DNC e-mails, and then the

21   subsequent release, that would be an example of

22   a hack and release operation.

23       Q.   Okay.  So -- and that's -- that's

24   what happened in 2016, I believe?

25       A.   I believe so.

**DANIEL KIMMAGE  11/10/2022**

1          Q.   That's a situation where Russian

2     foreign actors just hacked into the DNC's

3     e-mails and then publicly released them on

4     Wikileaks or something like that; right?

5          A.   Yes.

6          Q.   Or they publicly released them in

7     some form, it's fair to say?

8          A.   Publicly released them in some

9     form.

10         Q.   Is that a disinformation campaign?

11    How is that a form of disinformation?

12         A.   It can be if the information is

13    altered, it can be if the context is

14    misrepresented, it -- it -- it depends very much

15    on the context.

16         Q.   Can you -- are there other examples

17    of hack and release operations that the GEC has

18    tracked?

19              MR. KIRSCHNER:  Objection,

20    mischaracterizes evidence, assumes evidence not

21    in the record.

22         A.   The GEC did not track any of the

23    2016, it hadn't been established with the

24    mandate to do so.

25         Q.   Are there examples of hack and

**DANIEL KIMMAGE  11/10/2022**

```
 1    release operations since then, that the GEC has
 2    focused on?
 3              A.   Not that I recall right now.  You
 4    know, this -- this is focused on the techniques,
 5    not specific operations.
 6              Q.   And without identifying any
 7    specific operations, from your five-year period
 8    at GEC, do you recall any hack and release
 9    operations, other than the 2016 hack by Russians
10    of the DNC's e-mails?
11              A.   Without getting into specifics, I
12    do recall internal discussions about Russian
13    hacking, yes.
14              Q.   Okay.  It was -- were the
15    discussions of Russian hacking that relate to
16    incidents other than the 2016 hacking incident
17    that you described?
18              A.   Yes.
19              Q.   Okay.  I don't want to get into
20    specifics, but what -- in what timeframe were
21    you focused, if you can say, what timeframe was
22    there other concerns about specific issues of
23    potential Russian hacking?
24              A.   Concern over Russian hacking would
25    have been ongoing throughout the period of the
```

**DANIEL KIMMAGE  11/10/2022**

```
 1     GEC's mandate.

 2             Q.    How about, is there any -- other

 3     than a general concern for it arising from

 4     obviously a very high profile hack that you

 5     referred to, was there concern that other

 6     incidents of hacking and releasing may have

 7     occurred?

 8             A.    Yes, there was concern.

 9             Q.    Okay.   And were there actual hack

10     and release operations that succeeded?

11     Presumably it's released, it's probably now a

12     matter of public record if they did succeed.

13             MR. KIRSCHNER:   Objection, to the

14     extent that this is calling for classified

15     information, defer to the witness on this, but

16     I -- I do want to make sure that we -- or law

17     enforcement information, I want to make sure we

18     stay clear of that.

19             So I will instruct the witness not

20     to answer to the extent that this calls for

21     classified or law enforcement material.

22             A.    The GEC, itself, doesn't have the

23     tools to track things like hacking operations.

24     We would have followed reporting from those

25     who -- who did have those tools and those
```

**DANIEL KIMMAGE  11/10/2022**

```
 1    priorities.
 2              Q.    Okay.  And you say is that public
 3    reporting or would that be internal government
 4    reporting?
 5              A.    Potentially both.
 6              Q.    What public reporting would you
 7    have followed?
 8              A.    Media reports.
 9              Q.    Do you remember media reports
10    relating to Russian hacking that addressed any
11    incident other than the 2016 DNC Russian hack?
12              A.    I don't recall anything specific,
13    no.
14              Q.    You mentioned hack and release
15    incidents in your report as a technique used by
16    the Russians.  Did you have a basis for
17    identifying that as a technique that they used,
18    other than the 2016 DNC hack?
19              MR. KIRSCHNER:  Objection,
20    mischaracterizing the evidence, the testimony.
21              A.    I -- I don't recall.  I didn't do
22    the base -- basic research for this report.  I
23    don't recall.
24              Q.    Do you know -- do you know what the
25    basis was for identifying them in this report?
```

DANIEL KIMMAGE  11/10/2022

Page 112

```
 1        By them, I mean hack and release techniques.
 2               A.   I believe it's footnote 16, here.
 3        So we could look in the report.
 4               Q.   Yeah, can you flip to the next page
 5        where footnote 16 occurs?
 6               A.   Mm-hmm.
 7               Q.   It's page 9.
 8                    I think there's two things cited
 9        there, one is a US Department of Justice report
10        on the investigation into Russian interference
11        in the 2016 presidential election; do you see
12        that?
13               A.   Yes.  Yes.
14               Q.   And does that refer to that 2016
15        hack, high profile hack?
16               A.   Yes.
17               Q.   And then, underneath it, there's a
18        government of the Netherlands, Netherlands
19        defense intelligence and security service
20        disrupts Russian cyber operation targeting OPCW.
21                    Do you know what OPCW is?
22               A.   It's the organization for the --
23        it's about chemical weapons.  It's a chemical
24        weapons focused.
25               Q.   Okay.
```

**DANIEL KIMMAGE  11/10/2022**

```
 1              A.   I don't recall the exact acronym.
 2              Q.   Gotcha.  Other than those two
 3      incidents cited in the footnote, can you recall
 4      any other incidents that would have supported
 5      the report's conclusion that hack and release is
 6      a disinformation technique used by Russia?
 7              A.   No.
 8              Q.   Do you remember any conversation
 9      you had with that technique of hack and release
10      with any social media platform?
11              A.   No.
12              Q.   Do you recall that being discussed
13      by any -- that technique, hack and release,
14      being used by or being discussed by anyone else
15      at the GEC in any social media platform?
16              A.   No.
17              MR. SAUER:  Let's do I.
18              And this is going to be labeled --
19      I think we're on Exhibit 6.
20              (Exhibit No. 6 was marked for
21      identification.)
22      BY MR. SAUER:
23              Q.   Do you recall participating in an
24      interview or panel discussion at the Brookings
25      Institution on October 2nd, 2020?
```

**DANIEL KIMMAGE  11/10/2022**

```
 1              A.   Yes.

 2              Q.   Okay.  And rather than play the

 3    entire video, we got a little excerpt here of

 4    comments you made about minute 29.

 5              A.   Mm-hmm.

 6              Q.   Can you look at that?  There's a

 7    question from Fiona Hill and then answered by

 8    you; correct?

 9              A.   Yes.

10              MR. KIRSCHNER:  Objection, assuming

11    evidence not in the record or lack of

12    foundation.

13    BY MR. SAUER:

14              Q.   This document --

15              MR. KIRSCHNER:  Let me just make

16    the record clear.  Lack of foundation.

17    BY MR. SAUER:

18              Q.   This document kind of reports you

19    saying, in this online video on YouTube,

20    basically discussing government coordination;

21    fair to say?

22              A.   Yes.

23              Q.   And you say it doesn't have an

24    exciting visible component; correct?

25              A.   Yes.
```

**DANIEL KIMMAGE  11/10/2022**

```
 1              Q.    And it consists of e-mails and
 2      phone calls and meetings; right?
 3              A.    Yes.
 4              Q.    And you say:  We are in close
 5      communication with our colleagues at DHS; right?
 6              MR. KIRSCHNER:  Objection, lack of
 7      foundation.  We don't have the full context.
 8      Just objection to this entire line of
 9      questioning on this exhibit as lacking
10      foundation.
11      BY MR. SAUER:
12              Q.    And you go on to say:  We're in
13      close communication with our colleagues at DHS;
14      correct?
15              A.    Yes.
16              Q.    What was the nature of the
17      communication that you're referring to there
18      when you made this statement?
19              A.    E-mails.
20              MR. KIRSCHNER:  Objection, assuming
21      evidence that's not in the record.
22              A.    E-mails, phone calls and meetings.
23              Q.    Okay.  What kind of coordination,
24      back in that late 2020 timeframe, what kind of
25      close communication was going on with colleagues
```

**DANIEL KIMMAGE  11/10/2022**

```
 1    at DHS?
 2           A.    Communication related to the GEC's
 3    mandate to counter foreign propaganda
 4    misinformation.
 5           Q.    Who at DHS was GEC communicating
 6    with?
 7                 MR. KIRSCHNER:  Objection, asked
 8    and answered.
 9           A.    It would have been primarily the
10    office, either -- I don't recall what it was
11    called, at the time, but the task force or
12    what's I believe now known as the
13    misinformation, disinformation and
14    mal-information office.
15           Q.    So that's the mis-dis- and mal
16    information team we talked about earlier?
17           A.    Right.
18           Q.    And this October 2nd, 2020 is about
19    a month before the 2020 election?
20           A.    Right.
21           Q.    Who was communicating between GEC
22    and DHS in that timeframe?
23                 MR. KIRSCHNER:  Objection, assuming
24    evidence not in the record.
25           A.    I don't recall the specific staff
```

**DANIEL KIMMAGE  11/10/2022**

```
 1    members who would have done that.

 2              Q.    Would you have been involved in

 3    those communications?

 4              A.    Generally not, not the direct

 5    communications, no.

 6              Q.    Do you remember what your basis was

 7    for saying that we're in close communication

 8    with our colleagues at DHS?

 9              MR. KIRSCHNER:  Objection, assuming

10    evidence not in the record, lack of foundation.

11              A.    It would have been meetings with

12    the head of the relevant interagency team at the

13    GEC or meetings where the person from that team

14    would report on other agencies that they were in

15    communication with, so they would list that

16    we're in communication with DHS, for example.

17              Q.    Okay.  And do you -- I'm sorry, you

18    may have answered this -- who at GEC is involved

19    in these meetings?

20              MR. KIRSCHNER:  Objection, assuming

21    evidence not in the record, mischaracterizes

22    testimony, vague.

23              A.    It would be the staff from the I2C2

24    or potentially someone with relevant subject

25    matter expertise from one of the threat teams at
```

DANIEL KIMMAGE  11/10/2022

 1    GEC.

 2        Q.   And do you know what was discussed

 3    in those meetings of close communication with

 4    DHS in the October 2020 timeframe?

 5             MR. KIRSCHNER:  Objection,

 6    mischaracterizes his testimony, assumes evidence

 7    not in the record, lack of foundation.

 8        A.   No, not specifically.

 9        Q.   You just don't remember what was

10    discussed in those meetings?

11             MR. KIRSCHNER:  Objection,

12    mischaracterizes testimony, assumes evidence not

13    in the record.

14        A.   It wouldn't be -- there wouldn't be

15    any reason to report the content of a specific

16    communication to the principal deputy

17    coordinator.

18        Q.   Who would we have to ask to know

19    what was said in those meetings?

20             MR. KIRSCHNER:  Objection,

21    speculative.

22        A.   The staffers involved.

23        Q.   And you think those staffers would

24    have been people in the TET or the I2C2 -- sorry

25    -- I2C2?

**DANIEL KIMMAGE  11/10/2022**

```
 1                 MR. KIRSCHNER:  Objection,
 2      speculative.
 3             A.   It could be the I2C2 team, but it
 4      could be anyone with relevant subject matter
 5      expertise at the GEC.
 6             Q.   Who was in charge of the I2C2 team
 7      at this time?
 8             A.   I believe it was Stevie Hamilton,
 9      but it may have been somebody else.  I don't
10      remember the exact dates of all of the heads of
11      all the teams.
12             Q.   Is that a matter of public record
13      who's in charge of the I2 -- I2C2 team?
14             A.   I don't believe so.  I don't think
15      that the GEC provides information below the
16      level of coordinator on who's in charge of which
17      team.
18             Q.   Who has been in charge of the I2C2
19      team during your tenure there?
20             A.   I believe it was Stevie Hamilton.
21             Q.   The whole time?
22             A.   I believe so.  There may have
23      been -- there was a lot -- a lot of staff
24      movement.  I believe it was Stevie Hamilton.
25             Q.   Do you remember anyone else being
```

**DANIEL KIMMAGE  11/10/2022**

1    in charge of that team?

2           A.    I don't recall.

3           **Q.    The next sentence in this Exhibit 6**

4    **says:  With our colleagues at FBI, the Global**

5    **Engagement Center has set up an interagency**

6    **coordination cell; do you see that?**

7           A.    Yes.

8           **Q.    Is that a true statement?**

9           A.    I believe that we set up an

10   interagency coordination cell that was in

11   contact with the FBI.  So I would -- I would --

12   I would clarify it that way.

13          **Q.    What is an interagency coordination**

14   **cell?  I mean, what does that mean?**

15          A.    So an interagency coordination cell

16   is a team with, say, a number of members, and

17   each one will be responsible for contact with

18   one or more agencies in the interagency.

19                So you have an individual whose job

20   it is to stay in contact with components in the

21   intelligence community or the Department of

22   Defense or DHS.  That's what an interagency

23   coordination cell would be.

24          **Q.    So someone whose who's tasked with**

25   **remaining in fairly close contact with another**

**DANIEL KIMMAGE  11/10/2022**

Page 121

```
 1    close counterpart at another agency?

 2           A.    Yes, with the clarification that it

 3    may be sporadic, it may be close, it could

 4    depend on events, it could depend on what's

 5    happening.  It can be difficult to predict how

 6    close it is.

 7           The primary engagements for the

 8    Global Engagement Center were really with the

 9    Department of Defense and the intelligence

10    community.

11           Q.    Without mentioning their names or

12    by title, do you know who at the -- or role --

13    do you know who at the GEC was involved in this

14    interagency coordinating cell with -- with the

15    FBI?

16           A.    No, I don't recall.

17           Q.    Do you know what team they would

18    have been on?

19           A.    I believe it would have been the

20    I2C2 team.

21           Q.    So you believe someone -- this

22    interagency coordinating cell means someone at

23    IC -- I2C2 is designated to be in -- in close

24    contact with someone in the FBI?

25           A.    Yes, there would be someone with a
```

**DANIEL KIMMAGE  11/10/2022**

```
 1     portfolio that includes FBI for coordination.
 2            Q.    And then who on the FBI side would
 3     they have -- did they coordinate with, to your
 4     knowledge?
 5            MR. KIRSCHNER:  Objection,
 6     speculative.
 7  BY MR. SAUER:
 8            Q.    And again, not names, I just want
 9     to know their title and role.
10            A.    I don't know their title.
11            Q.    Okay.  Do you know what their role
12     would have been or what office or section they
13     would have been involved in?
14            MR. KIRSCHNER:  Objection,
15     speculative.
16            A.    I believe it would be the foreign
17     influence task force at the FBI.
18            Q.    So you believe -- does that -- is
19     that ongoing to this day, is there still an
20     interagency coordinating cell between GEC and --
21     can I call it the FITF?
22            A.    Sure.
23            Q.    The FBI?  Is that ongoing to this
24     day?
25            A.    I believe there is an interagency
```

DANIEL KIMMAGE  11/10/2022

Page 123

```
 1    cell at the GEC.  I don't know which other
 2    agencies it's in contact with now or the
 3    frequency of those contacts.
 4         Q.    There is an interagency cell at the
 5    GEC, but you don't know whether or not that
 6    interagency cell is in contact with the FBI now?
 7         A.    Yes, that's correct.
 8         Q.    But I take it, they were in contact
 9    with the FBI during October of 2020, when you
10    gave the talk at the Brookings Institute?
11              MR. KIRSCHNER:  Objection, assumes
12    evidence not in the record, mischaracterizes
13    testimony.
14         A.    I don't know whether they were in
15    contact in October 2020.  But when I was giving
16    these remarks the I2C2 would have had someone
17    with FBI in their profile.  And if the
18    circumstances required they would be in touch
19    with a counterpart at the FBI.
20         Q.    Do you know whether there were any
21    such communications during that timeframe?
22         A.    I don't.
23         Q.    And you go on to say:  So we are in
24    constant communication, in the next sentence of
25    Exhibit 6; do you see that?
```

**DANIEL KIMMAGE  11/10/2022**

```
 1          A.   Yes.
 2               MR. KIRSCHNER:  Objection.
 3   BY MR. SAUER:
 4          Q.   What's that a reference to, the
 5     constant communication?
 6               MR. KIRSCHNER:  Objection, lack of
 7     foundation, assumes evidence not in the record.
 8   BY MR. SAUER:
 9          Q.   On your understanding?
10          A.   It's a reference to the GEC's
11     exercise of it's interagency coordination
12     mandate, which requires communications with the
13     relevant agencies.
14          Q.   And that's done through the I2C2's
15     coordination cell to communicate with the FBI?
16          A.   Yes.  The I2C2 is specifically
17     focused on interagency communication, but it
18     could involve anyone with relevant subject
19     matter expertise.
20          Q.   Do you know anyone -- let me ask
21     you this:  Do you recall any issues that the GEC
22     raised with the FBI's FITF at any time, without
23     saying what the issues are, do you know whether
24     there were issues that the GEC raised with the
25     FITF?
```

**DANIEL KIMMAGE  11/10/2022**

```
 1              A.   I don't recall any specific issues,
 2      no.
 3              Q.   Is it possible that they did and
 4      you just don't remember or do you believe that
 5      they never did raise an issue with the FITF?
 6              MR. KIRSCHNER:  Objection,
 7      speculative.
 8              A.   It's possible that they raised an
 9      issue with the FBI, yes.
10              Q.   And they being someone within the
11      I2C2?
12              A.   Yes.
13              Q.   Okay.  But you just don't know what
14      sort of communication?
15              A.   No, I don't.
16              MR. KIRSCHNER:  Objection,
17      mischaracterizes testimony.
18      BY MR. SAUER:
19              Q.   More generally -- sorry, you can
20      answer that question.
21              A.   I -- I don't recall.
22              Q.   Okay.  Do you recall any
23      interaction, any substantive interaction,
24      between FITF and the GEC?
25              A.   I don't recall any substantive
```

**DANIEL KIMMAGE  11/10/2022**

1    interaction.  There were just a lot of different

2    meanings.  I don't recall anything specific and

3    substantive.

4         **Q.   Did you ever interact with FITF?**

5         A.   I believe I may have been in the

6    context of an interagency meeting with -- with

7    representatives of I think they call it FITF or

8    FITF, but I don't recall any specific meetings.

9         **Q.   Was that a -- when you say an**

10   **interagency meeting, was there a -- an**

11   **essentially GEC/FITF meeting?**

12        A.   I don't recall a GEC/FITF meeting.

13   I mean a broader interagency meeting, where one

14   of the representatives would have been FBI, for

15   example.

16        **Q.   Do you know who's in charge of**

17   **FITF?**

18        A.   I don't know who's in charge of

19   FITF, no.

20        **Q.   Other than what we've just now**

21   **talked about, are you aware of any interactions**

22   **between GEC and FITF?**

23        A.   I'm not aware of any specific

24   interactions.  As I said, in the interagency,

25   it's entirely possible that we would have been

DANIEL KIMMAGE  11/10/2022

Page 127

```
 1    in meetings together, yes.
 2            Q.    Do you remember anything about
 3    those meetings?
 4            MR. KIRSCHNER:  Objection,
 5    mischaracterizes testimony and assumes evidence
 6    not in the record.
 7            A.    I don't recall any specific items
 8    involving FITF, no.
 9            MR. SAUER:  Let me give you another
10    exhibit.  I've got this one.  I think this is
11    going to be 7, right?
12            (Exhibit No. 7 was marked for
13    identification.)
14            MR. KIRSCHNER:  Counsel, do you
15    know how long you're going to spend on this
16    exhibit?  I'm just trying to think in terms of a
17    possible lunch break.
18            MR. SAUER:  Oh, well, if we go for
19    about five minutes?
20            MR. KIRSCHNER:  Okay.
21            MR. SAUER:  We can revisit it.  I'm
22    not sure, but once we're done with this exhibit
23    why don't we raise that?
24            MR. KIRSCHNER:  Okay.  I just
25    didn't know if you were going to spend an hour
```

**DANIEL KIMMAGE  11/10/2022**

Page 128

```
1     on one exhibit.  I just --
2                 MR. SAUER:  My exhibits are like my
3     children.  I love them all equally.
4     BY MR. SAUER:
5           Q.   Mr. Kimmage, I've handed -- you've
6     been handed Exhibit 7, which is excerpts from
7     the second amended complaint in this case.
8                 Have you ever reviewed the second
9     amended complaint?
10          A.   Yes, I have looked at this.
11          Q.   So you've seen this before, this
12    document before, or you've seen the big
13    document, this is obviously only 14 pages of the
14    162 page?
15          A.   Yes.
16          Q.   Fair to say you've seen it before?
17          A.   Yes.
18          Q.   Can you flip to page 117?
19          A.   Mm-hmm.
20          Q.   And look at paragraph 396.
21          A.   Mm-hmm.
22          Q.   And there's a -- there's an
23    allegation in paragraph 396 that says:  Pursuant
24    to third-party subpoena, Twitter has identified
25    personnel associated with the State Department's
```

**DANIEL KIMMAGE  11/10/2022**

1       Global Engagement Center, including Alexis

2       Frisbee and Daniel Kimmage, as likely involved

3       in communications with Twitter about censorship

4       and/or content modulation on issues such as

5       election integrity, vaccines/COVID

6       misinformation, and related subjects; do you see

7       that?

8               A.   I see that.

9               Q.   Do you know what -- if -- to the

10      extent Twitter said that about you, do you know

11      what they were referring to?  Do you remember

12      any meetings with Twitter?

13              MR. KIRSCHNER:  Objection, lack of

14      foundation.

15   BY MR. SAUER:

16              Q.   Let's start with the first

17      question.

18              Do you remember meetings with

19      Twitter?

20              A.   I recall at least one meeting with

21      Twitter.

22              Q.   Do you remember any other meetings

23      besides the one?

24              A.   Yes, I recall at least two meetings

25      with Twitter.

**DANIEL KIMMAGE  11/10/2022**

```
 1              Q.   Okay.  Do you recall any besides
 2      those two?
 3              A.   No, I do not.
 4              Q.   When did those meetings occur?
 5              A.   One was in 2021, and one would have
 6      been before the pandemic.
 7              Q.   Would that have been in 2019 or
 8      late 2020?
 9              A.   Potentially 2019 or even 2018.  I
10      don't recall the date.
11              Q.   Okay.  The 2021 meeting, let's
12      start with that, what -- what -- do you know
13      what time of year that happened?
14              A.   It would have been in the spring, I
15      believe.
16              Q.   Do you remember more specifically
17      what date it was?
18              A.   No, I don't.
19              Q.   Would that be reflected on your
20      official calendar?
21              A.   I believe it would be, yes.
22              Q.   Do you know who attended that
23      meeting?
24              A.   It would be the acting coordinator,
25      me, in that capacity, then one or more of the
```

**DANIEL KIMMAGE  11/10/2022**

1    deputy coordinators, team chiefs from the Global

2    Engagement Center, and working-level staff with

3    relevant subject matter expertise.

4         **Q.   So a significant number of**

5    **individuals on the GEC side were at that**

6    **meeting?**

7              MR. KIRSCHNER:  Objection,

8    mischaracterizes testimony, assumes evidence not

9    in the record.

10        A.   How would you define significant?

11        **Q.   Well, how many people on the GEC**

12   **side would you estimate?**

13        A.   Between five and ten.

14        **Q.   Okay.  And that included you and**

15   **you were then acting coordinator?**

16        A.   Yes, in 2021, from February to

17   June, yes.

18        **Q.   And then the deputy coordinator was**

19   **there, too?**

20        A.   I believe so.

21        **Q.   Who was that?**

22        A.   At the time, it would have been

23   Leah Bray.

24        **Q.   And then the team chief, who's**

25   **that?**

**DANIEL KIMMAGE  11/10/2022**

Page 132

```
 1              A.    Patricia Watts, the Technology
 2     Engagement Team.
 3              Q.    So that was a TET team?
 4              A.    The TET, right.
 5              Q.    And was there anyone else from the
 6     TET there?
 7              A.    I believe Alexis Frisbee.
 8              Q.    Okay.  How about -- you mentioned
 9     subject matter experts?
10              A.    Right.
11              Q.    Who -- do you remember -- I don't
12     necessarily want their -- well, let me ask this:
13     What unit did they come from?
14              A.    I don't recall for the 2021
15     meeting.
16              Q.    Do you know was Russia maybe?
17              A.    I simply don't remember who all the
18     GEC personnel were.
19              Q.    Okay.  And then who was present at
20     that meeting on the Twitter side?
21              A.    I -- I don't remember the
22     individual.
23              Q.    There's only one person?
24              A.    No, there were others, but I don't
25     remember their names.
```

**DANIEL KIMMAGE  11/10/2022**

```
 1              Q.   Okay.  Do you remember what their
 2      roles were within Twitter?
 3              A.   I believe it was the -- the sort of
 4      assurance or compliance.  I don't recall the
 5      exact name of the component within Twitter.
 6              Q.   When you say assurance or
 7      compliance, what is that, a member of the trust
 8      and safety team?
 9              A.   It may have been, yes.
10              Q.   Does that sound right to you, at
11      least?
12              MR. KIRSCHNER:  Objection,
13      speculative.
14              A.   Yes.
15              Q.   If you know?  Is that a yes?
16              A.   Yes.
17              Q.   To the best of your recollection,
18      someone from the trust and safety team was
19      there?
20              A.   Yes.
21              Q.   Do you know if it was a man or a
22      woman?
23              A.   No.
24              Q.   And you -- you -- do you believe
25      there were other members of Twitter there or
```

**DANIEL KIMMAGE  11/10/2022**

```
 1      Twitter officials?

 2              A.    Yes.

 3              Q.    How many, would you say?

 4              A.    Fewer than on our side.

 5              Q.    Were they -- so maybe less than

 6      five?

 7              A.    Yes.

 8              Q.    And there would be a -- on your

 9      official calendar, if there were an -- there's

10      an invite for this meeting; correct?

11              A.    Yes.

12              Q.    And that would reflect all the

13      participants; fair to say?

14                    MR. KIRSCHNER:  Objection,

15      speculative.

16              A.    I -- I --

17                    MR. KIRSCHNER:  Lack of foundation.

18              A.    I don't know how the invite is

19      structured --

20              Q.    Okay.

21              A.    -- and what it reflects.

22              Q.    Let me ask you this:  Were there

23      other individuals from Twitter, there?  Do you

24      remember any of their names?

25              A.    No.
```

**DANIEL KIMMAGE  11/10/2022**

Page 135

```
1            Q.    Do you remember any of their roles
2       within Twitter?
3            A.    I believe their roles were in
4       the -- the trust and safety area.
5            Q.    So there would be multiple Twitter
6       officials from the trust and safety group there?
7            A.    Yes, I believe so.
8            Q.    How about any other area of
9       Twitter, you know, did anyone else attend that
10      wasn't a trust and safety person?
11           A.    Not that I recall.
12           Q.    Who asked for this meeting, was
13      it -- did GEC ask for it or did Twitter ask for
14      it?
15           A.    I -- I don't recall where the exact
16      impetus came from, which side initiated, which
17      side asked for the meeting.
18           Q.    Okay.  Was this a recurring meeting
19      or was it kind of a standalone meeting that had
20      been set up to address a specific topic?
21           A.    As I said, we had -- we hoped to
22      set up recurring quarterly meetings.  I don't
23      recall whether this one was -- was a
24      continuation, as in whether the same people were
25      there from our side.  I was only recently in the
```

**DANIEL KIMMAGE  11/10/2022**

```
 1    role of acting coordinator, because before that
 2    there was an appointed coordinator.
 3            Q.    Who was that?
 4            A.    That was Lea Gabrielle, the
 5    appointed coordinator before the --
 6            Q.    Okay.  So what was discussed in
 7    this meeting?
 8            A.    So as I said, in this meeting the
 9    GEC would provide an overview of what it was
10    seeing in terms of foreign propaganda and
11    disinformation.  And Twitter would, to the
12    extent that they felt comfortable sharing
13    information, would discuss similar topics.
14            Q.    And you said would?
15            A.    Right.
16            Q.    Did you -- you said you would
17    provide it, and they would share, in fact,
18    did -- did you guys do that?
19            A.    I recall that we gave an overview.
20    I don't recall the specifics of what Twitter
21    presented.
22            Q.    What did -- what did you get an
23    overview of?
24            MR. KIRSCHNER:  Objection, calls
25    for a narrative response.
```

**DANIEL KIMMAGE  11/10/2022**

Page 137

```
1              A.   I believe it was an overview of the
2    major actions by malign foreign actors, like
3    Russia, China, and terrorist organizations.
4              Q.   Do you remember what was discussed
5    about that?
6              A.   I -- I -- I don't.
7              Q.   Who was the principal speaker in
8    this meeting, on your side, or was there?
9              A.   The -- the GEC side had multiple
10   speakers.  I believe I kicked things off with
11   sort of very general remarks, and then there
12   were -- there were other -- other speakers at
13   the GEC.
14             Q.   Did Alexis Frisbee talk?
15             A.   I don't -- I don't recall whether
16   she had a speaking role.
17             Q.   Who -- who else talked, to your
18   recollection?
19             A.   I -- I don't recall the specifics
20   of the meeting.
21             Q.   Okay.  You don't remember how many
22   people talked?
23             A.   No, I don't.
24             Q.   Do you remember any content about
25   the conversation?
```

**DANIEL KIMMAGE  11/10/2022**

1              A.    No, I don't remember the specifics.

2              Q.    I think if you look back to

3     paragraph 396, there's a specific reference to

4     certain topics.

5              A.    Mm-hmm.

6              Q.    Election integrity, is that

7     something that was discussed at this meeting?

8                    MR. KIRSCHNER:   Objection, vague.

9     BY MR. SAUER:

10             Q.    If you remember.

11             A.    I don't -- I don't recall.

12             Q.    Do you remember anything said at

13    the meeting that would have related to elections

14    in any way?

15             A.    I don't recall.

16             Q.    How about vaccine/COVID

17    misinformation, do you remember anything that

18    would have related to that in a spring 2021

19    meeting with Twitter?

20             A.    I -- I -- I just don't recall the

21    specifics of the meeting.

22             Q.    How about your own statements of

23    the meeting, do you remember anything that you

24    said at this meeting?  I know you said earlier

25    you kicked things off, it sounds like you

**DANIEL KIMMAGE  11/10/2022**

```
 1      introduced some speakers; did you say anything
 2      else at the meeting?
 3           A.   I don't recall the specifics.  I
 4      would have introduced our team, and talked a bit
 5      about sort of general trends and propaganda and
 6      disinformation, but I don't -- I simply don't
 7      recall the specifics.
 8           Q.   So you don't remember anything
 9      specific about what you personally said in that
10      2021 meeting?
11           A.   No, I don't.  I would have been
12      doing multiple meetings every day.  I just don't
13      recall the specifics.
14           Q.   And you say multiple meetings every
15      day, is that with social media platforms in this
16      timeframe?
17           A.   No, no, it would have just been
18      multiple meetings in my capacity as the acting
19      coordinator.
20           Q.   Did you have a similar meeting to
21      this one, with Facebook or YouTube or any
22      others?
23           A.   I believe we had meetings with
24      either Facebook or Google or both.  I don't
25      remember the specifics, but there were -- I
```

**DANIEL KIMMAGE  11/10/2022**

Page 140

```
 1      believe there were meetings with Facebook and

 2      Google.

 3              Q.    Would they be in that same

 4      timeframe?

 5              A.    They would be in the same period

 6      when I was the acting coordinator, yes.

 7              Q.    So in the spring 2021 timeframe?

 8              A.    Yes.

 9              Q.    And I think you testified earlier

10      that you were acting coordinator from February

11      to --

12              A.    June.

13              Q.    -- June?  Okay.

14              And you believe you had at least

15      one meeting with Facebook and Google that was

16      similar to this meeting with Twitter that we

17      have been talking about?

18              MR. KIRSCHNER:  Objection,

19      mischaracterizes testimony.

20              A.    I believe we -- we -- we met with

21      them, yes.

22              MR. SAUER:  Apparently I didn't

23      mischaracterize it.

24              MR. KIRSCHNER:  Those were

25      different statements.  He said something
```

**DANIEL KIMMAGE  11/10/2022**

```
 1    different than what you said.

 2   BY MR. SAUER:

 3         Q.   Did you have a similar meeting with

 4    Facebook and Google, during this timeframe, that

 5    was similar to the meeting you had with Twitter?

 6         A.   I believe so, I don't recall the

 7    specifics of which -- which company we met with.

 8         Q.   So you're not sure whether you met

 9    with Facebook?

10         A.   I believe we did.  I don't -- I

11    don't recall, exactly.  I believe we met with

12    Facebook.

13         Q.   Do you remember who at Facebook you

14    met with or what their roles were?

15         A.   I don't remember the individual.  I

16    believe it was a similar area.  I don't remember

17    what it was called at Facebook.  But it was a

18    similar -- similar to the component at Twitter,

19    the assurance or safety part of Facebook.

20         Q.   Right.  So at Twitter we described

21    it as the trust and safety team --

22         A.   Right.

23         Q.   -- correct?

24         A.   Yes.

25         Q.   And then at Facebook you believe
```

**DANIEL KIMMAGE  11/10/2022**

```
 1    you met with the analogous component of Facebook
 2    in your meeting in 2021; fair to say?
 3            A.   Yes, I believe it was the analogous
 4    component.
 5            Q.   But you don't remember exactly how
 6    they described it, but it had similar
 7    responsibility to the Twitter trust and safety
 8    team; correct?
 9            A.   I don't recall how they described
10    it, and I don't know what its internal
11    responsibilities are at Facebook.
12            Q.   Okay.  Okay.  But you believe it
13    was the similar or analogous component to the
14    Twitter trust and safety team; fair to say?
15            A.   I believe so, it may have been
16    public policy, that was another component.
17            Q.   How about Payton Iheme, is that a
18    name you recognize from Facebook?
19            A.   No.
20            Q.   And then you also had -- believe
21    you had a meeting with Google or, slash, YouTube
22    in that same timeframe?
23            A.   I believe so, yes.
24            Q.   And would that have been with the
25    same components, the kind of trust and safety
```

**DANIEL KIMMAGE  11/10/2022**

1    type component at YouTube/Google?

2         A.    I believe it would have been

3    analogous component, yes.

4         Q.    Okay.  Do you know how many

5    representatives came from Facebook to your

6    meeting?

7              MR. KIRSCHNER:  Objection, assumes

8    evidence not in the record.

9         A.    No.  A handful.

10        Q.    Okay.  And then on the GEC side,

11   did you have a -- a series of -- or sorry -- did

12   you bring similar people on the GEC side to that

13   Facebook meeting?

14             MR. KIRSCHNER:  Again, objection,

15   assumes evidence not in the record.

16        A.    Yes, I believe the lineup would

17   have been similar.

18        Q.    Have you taken any steps, since you

19   read this document for the first time, to

20   refresh your recollection about these meetings?

21        A.    No.

22        Q.    Have you reviewed any documents in

23   preparation for your deposition.

24        A.    No.

25        Q.    So you read this, but you didn't go

**DANIEL KIMMAGE  11/10/2022**

```
 1      check and see, oh, did I have a meeting with

 2      Twitter?  You didn't take any steps to refresh

 3      your recollection to try and see what was

 4      discussed at that meeting?

 5              A.   No, I did not.

 6              Q.   And you haven't reviewed a single

 7      document in preparation for your testimony

 8      today?

 9              A.   No.  I looked at this when it came

10      out.

11              Q.   How about vaccine COVID

12      misinformation, we talked about that statement

13      in paragraph 396, about election integrity, how

14      about vaccine COVID misinformation, is that

15      something that may have come up in those

16      meetings -- that meeting with Twitter, to start

17      with?

18              A.   Yes.  It's -- it's possible, I -- I

19      don't recall the specifics.

20              Q.   And what kind of vaccine/COVID

21      misinformation might have come up?

22              A.   The Global Engagement Center would

23      be looking at disinformation narratives or

24      campaigns by foreign actors, like Russia, China,

25      on -- on -- on COVID.
```

**DANIEL KIMMAGE  11/10/2022**

1          Q.    And do you remember that coming up

2    in these meetings?

3          A.    I don't recall whether it

4    specifically came up at this meeting.  I simply

5    don't recall.

6          Q.    Do you recall whether there were

7    any e-mails that relate to these meetings,

8    setting them up or having a follow-up or

9    anything like that?

10          MR. KIRSCHNER:  Objection,

11    speculative.

12          A.    I recall a scheduling invite,

13    that's what I recall.

14          Q.    For all three of them?

15          MR. KIRSCHNER:  Objection, assumes

16    evidence not in the record.

17          A.    I -- I recall scheduling, I believe

18    the Twitter and maybe the Facebook meeting,

19    because I had to click on a link for the Zoom

20    part of the meeting.

21          Q.    Oh, right.  But as far as

22    Google/YouTube you're not sure if you had a

23    calendar invite?

24          A.    I -- I -- I just don't recall

25    everything on the calendar.

**DANIEL KIMMAGE  11/10/2022**

```
 1              Q.   You inferred, also, to a meeting

 2    with Twitter in 2019.  Can you tell me about

 3    that meeting?

 4              A.   I believe it was in an initial

 5    meeting, after they had set up, like, a policy

 6    office in -- in -- in D.C., and I don't remember

 7    the individual's name, but it was sort of a -- a

 8    meet and greet meeting.

 9              Q.   Okay.  You personally attended

10    that?

11              A.   Yes.

12              Q.   Were you then acting coordinator or

13    principal deputy coordinator?

14              A.   I don't recall whether I was the

15    acting coordinator or the principal deputy.  I

16    would have been one of those two positions,

17    depending on the date.

18              Q.   Do you know who attended that

19    meeting, other than you?

20              A.   No, I don't.

21              Q.   Do you know who attended that

22    meeting for Twitter?

23              A.   I -- I don't recall the person's

24    name.

25              Q.   Did you have similar meetings in
```

**DANIEL KIMMAGE  11/10/2022**

```
1       that timeframe with any other social media
2       platforms?
3              A.   I don't recall specific meetings.
4       I recall the meeting with -- with Twitter, but I
5       don't -- I don't recall other specific meetings.
6              Q.   Why does that one stand out in your
7       mind?
8              A.   I just remember that Twitter had a
9       new person in Washington, and they were, I
10      think, sort of making the rounds and introducing
11      themselves.
12             Q.   Okay.  Turning back to the 2021
13      meeting, I think I asked you earlier if you knew
14      whether the GEC had initiated that or whether
15      Twitter had initiated that, I mean, I've asked
16      you a bunch of questions about that, does that
17      jog your recollection at all?
18             A.   I -- I don't know who specifically
19      initiated the -- the request for a meeting.
20             Q.   Do you know whether there was a
21      specific threat that led to the meeting, that
22      one side or the other wanted to raise a specific
23      issue, and that's what led to the meeting?
24             A.   No, I don't -- I don't believe it
25      was -- was based on a specific threat.
```

**DANIEL KIMMAGE  11/10/2022**

```
 1              Q.   And -- and you believe there were
 2      multiple speakers on the GEC side discussing
 3      different kinds of threats?
 4                   MR. KIRSCHNER:  Objection, assumes
 5      evidence not in the record, mischaracterizes
 6      testimony.
 7              A.   There were multiple speakers not
 8      necessarily addressing threats.  These meetings
 9      were not threat-focused, they were more general
10      than that.
11              Q.   What were they focused on?
12              A.   Propaganda narratives disseminated
13      by foreign actors, like Russia and China.
14              Q.   Okay.  And do you remember what
15      narratives were discussed?
16                   MR. KIRSCHNER:  Objection, assumes
17      evidence not in the record, mischaracterizes
18      testimony.
19              A.   I -- I don't recall the specific
20      Russian or Chinese campaigns we would have been
21      discussing in the spring of 2021.
22              Q.   Do you believe you were discussing
23      Russian and Chinese disinformation campaigns at
24      that meeting in 2021 with Twitter?
25                   MR. KIRSCHNER:  Objection,
```

**DANIEL KIMMAGE  11/10/2022**

```
 1    speculative.
 2           A.   Yes, I -- I believe we would have,
 3    we would have discussed those, yes.
 4           Q.   Would you also have discussed
 5    techniques, like, for example, the techniques
 6    that are discussed in the report that we showed
 7    you earlier on Russian disinformation
 8    techniques?
 9           A.   Yes.
10           Q.   How many -- you said there would be
11    multiple speakers, so to speak, from GEC at the
12    Twitter meeting, how many were there on the GEC
13    side?
14           MR. KIRSCHNER:  Objection,
15    speculative.
16           A.   I believe I answered this, between
17    five and ten.
18           Q.   Oh, yes, I think you did.  You said
19    there were five attendees?
20           A.   On the GEC side.
21           Q.   Right.  Right.  Did everybody talk?
22    Like, did everybody give a little presentation?
23    Was there three of them?  That's my question.
24           A.   I don't know whether everybody
25    talked.  I know that two or three definitely
```

**DANIEL KIMMAGE  11/10/2022**

```
 1    would have talked.

 2                 MR. KIRSCHNER:  Counsel, we've been

 3    going for about fifteen minutes when you said

 4    five minutes.  So I do want to wrap up this

 5    of questioning and then take a break, but I --

 6    how much longer do you have?

 7                 MR. SAUER:  Why don't we take a

 8    break now, and then we can decide over lunch

 9    whether we've wrapped up the line of

10    questioning.

11                 For the record, I did not say five

12    minutes.  I said I didn't know how long it would

13    go.

14                 So I'm fine taking a break.  We're

15    at a lunch time.

16                 MR. KIRSCHNER:  Just let's call it

17    1:30 to get actually started.

18                 MR. SAUER:  I would rather start at

19    1:15.  I don't want to -- I do want to

20    accommodate the --

21                 THE VIDEOGRAPHER:  Want to go off

22    the record?

23                 MR. SAUER:  Go ahead.  Are we off

24    the record?

25                 THE VIDEOGRAPHER:  The time is
```

DANIEL KIMMAGE  11/10/2022

```
 1     12:23 p.m.  We're off the record.

 2                     (Recess.)

 3                     THE VIDEOGRAPHER:  The time is 1:33

 4     p.m.  We're back on the record.  Please proceed.

 5                     MR. KIRSCHNER:  I'd like to just

 6     ask a couple quick clarifying questions for

 7     Mr. Kimmage.

 8                     MR. SAUER:  Okay.

 9                     EXAMINATION

10     BY MR. KIRSCHNER:

11          Q.   So Mr. Kimmage, do you remember

12     when counsel asked you if you looked at any

13     documents to refresh your recollection in

14     preparation for this deposition?

15          A.   Yes.

16          Q.   I just wanted to ask:  Do you, upon

17     further memory, remember looking at any

18     documents in preparation of this deposition?

19          A.   Yes.

20          Q.   And do you know -- do you remember

21     what those documents were?

22          A.   I believe they were court

23     documents.

24                     MR. KIRSCHNER:  Okay.

25     ///
```

**DANIEL KIMMAGE  11/10/2022**

Page 152

```
 1                      EXAMINATION
 2    BY MR. SAUER:
 3            Q.   What documents did you review?
 4            A.   The amended complaint, I believe.
 5            Q.   Anything else?
 6            A.   Court -- some other court document,
 7    I don't remember precisely which.
 8            Q.   What did you read in them?
 9            A.   Versions of the same charges that
10    are here.
11                 MR. SAUER:  Can we have K?
12    BY MR. SAUER:
13            Q.   Did you read a motion for a
14    preliminary injunction?
15            A.   I don't recall, exactly.
16            Q.   Did you read a joint statement on
17    depositions?
18            A.   I don't recall.
19            Q.   Did you read anything other than
20    court documents that are publicly filed in
21    preparation for your testimony today?
22            A.   No, I didn't read anything else in
23    preparation for the testimony.
24                 MR. SAUER:  I think you're being
25    handed what's going to be marked Exhibit 8.
```

**DANIEL KIMMAGE  11/10/2022**

Page 153

```
 1                    (Exhibit No. 8 was marked for

 2      identification.)

 3                    MR. KIRSCHNER:  Oh, I have it.

 4      BY MR. SAUER:

 5             Q.    Do you recognize this document?

 6             A.    Yes.

 7             Q.    So is this from the website of the

 8      Technology Engagement Team within GEC?

 9             A.    It -- it -- yes, it looks like it.

10             Q.    Or it's a description of the

11      Technology Engagement Team online?

12             A.    Mm-hmm.

13             Q.    Here on the third page there is a

14      paragraph there on Silicon Valley engagement;

15      correct?

16             A.    Mm-hmm.  Yes.

17             Q.    And it states that in December 2019

18      GEC/TET established a Silicon Valley location;

19      correct?

20             A.    Yes.

21             Q.    Are you familiar with that

22      location?

23             A.    Yes, I believe it was an

24      individual.

25             Q.    Is that a location related to just
```

**DANIEL KIMMAGE  11/10/2022**

1     one person?

2          A.   Yes.

3          Q.   Who's that person?

4          A.   I believe it was Sam, I can't

5     remember the last name.

6          Q.   Stewart?

7          A.   Stewart, yes.

8          Q.   So earlier when you testified that

9     you thought he worked in D.C. is it possible

10    that that was incorrect?

11         A.   He did work in D.C., and then for

12    some portion of that he was also in California,

13    I believe.

14         Q.   How long was there a Silicon Valley

15    location?

16         A.   I don't -- I don't recall how long

17    he was actually physically located in Silicon

18    Valley.

19         Q.   Is it -- is someone still there

20    today?

21         A.   I don't believe so, no.

22         Q.   And this is on your website now;

23    fair to say?

24         A.   I haven't reviewed it.  I'm not

25    aware.

**DANIEL KIMMAGE  11/10/2022**

Page 155

```
1                  Q.    Do you know how long that Silicon
2        Valley location, consisting of one person, was
3        in operation?
4                  A.    No, I don't recall.
5                  Q.    And the purpose of the Silicon
6        Valley location, according to your website, is
7        to facilitate public/private coordination and
8        broker constructive engagements between the US
9        government and the tech sector, as well as
10       academia and research; correct?
11                 A.    Yes, that's correct.
12                 Q.    And the tech sector there, is that
13       a reference, in whole or in part, to social
14       media platforms?
15                 MR. KIRSCHNER:  Objection,
16       speculative.
17    BY MR. SAUER:
18                 Q.    If you know.
19                 A.    It would include potentially social
20       media companies, among other -- other -- other
21       tech-related things out there.
22                 Q.    Does your Silicon Valley engagement
23       person talk to social media platforms?
24                 MR. KIRSCHNER:  Objection,
25       speculative, assumes evidence not in the record.
```

DANIEL KIMMAGE  11/10/2022

```
 1    BY MR. SAUER:
 2              Q.    If you know.
 3              A.    Yes.
 4              Q.    What -- what -- what kinds of
 5    conversations did they have or what kind of
 6    engagement did they conduct?
 7              A.    Primarily information sharing.
 8              Q.    What kind of information?
 9              A.    Information sharing related to the
10    Global Engagement Center's mission to counter
11    foreign propaganda and disinformation.
12              Q.    And that next sentence there says:
13    The goal is to increase collaboration that
14    results in identifying, exposing, and defending
15    against foreign adversarial propaganda and
16    disinformation; correct?
17              A.    Yes, that's what it says.
18              Q.    What's involved in defending a --
19    collaborating with social media platforms to
20    defend against disinformation?
21              A.    Primarily exchanging information to
22    deepen their understanding of the actions of
23    foreign propaganda and disinformation actors.
24              Q.    I'm sorry, say that again.  I
25    apologize.
```

**DANIEL KIMMAGE  11/10/2022**

Page 157

```
 1              A.    Sure.  Primarily deepening their

 2       understanding of the actions, the tools,

 3       techniques of foreign propaganda and

 4       disinformation actors.

 5              Q.    So mostly it's GEC educating the

 6       tech companies on those tools and methods?

 7              A.    Not necessarily, I can't

 8       characterize what the balance is --

 9              Q.    Okay.

10              A.    -- in the engagements.

11              Q.    But the purpose, from your

12       perspective, is to educate them on tools and

13       methods of dissemination of foreign propaganda

14       and disinformation?

15                    MR. KIRSCHNER:  Objection,

16       mischaracterizes testimony.

17       BY MR. SAUER:

18              Q.    Is that fair to say?

19              A.    Not necessarily.  That would be the

20       primary focus, from the GEC side, but they may

21       also educate us based on what they are seeing.

22       It's -- I can't characterize the exact breakdown

23       of the information sharing.

24              Q.    It's a two-way street, then?

25              A.    Potentially, yes.
```

**DANIEL KIMMAGE  11/10/2022**

1          **Q.    Why do you want them educated, them**
2     **being social media platforms?  Why do you want**
3     **them to be educated on tools and methods for the**
4     **propagation of foreign disinformation?**
5          A.   We want them to understand how
6     foreign propaganda and disinformation actors are
7     trying to exploit the platforms to disseminate
8     propaganda and disinformation.
9          **Q.   Why do you want them to understand**
10    **that?**
11         A.   We want them to understand it
12    because they are the ones who are the owners of
13    the platforms.
14         **Q.    Okay.  So why do you want the**
15    **owners of the platforms to understand that?**
16         A.   Because it's part of the Global
17    Engagement Center's mission to increase overall
18    awareness of propaganda and disinformation by
19    malign actors.
20         **Q.    If they are aware of those foreign**
21    **malign tools and methods, are they more likely,**
22    **on your view, to take their own defensive**
23    **actions against them?**
24              MR. KIRSCHNER:  Objection,
25    speculative.

**DANIEL KIMMAGE  11/10/2022**

 1          A.   I -- I can't speculate about the
 2     actions that the social media companies may or
 3     may not take.  We would not ask them to do
 4     anything.  Our -- the extent of our engagement
 5     would be to share insights, but not to ask them
 6     to do something.
 7          **Q.   Has the GEC ever asked a social**
 8     **media platform to do something with respect to**
 9     **content, other than the 2018 threat you**
10     **described this morning?**
11               MR. KIRSCHNER:  Objection,
12     hypothetical, hypothetical, assumes facts not in
13     evidence.
14          A.   Not that I'm aware of.
15               MR. SAUER:  Can I have L?
16               You're going to be handed a
17     document we're -- I think we're going to call
18     Exhibit 9.
19               (Exhibit No. 9 was marked for
20     identification.)
21     BY MR. SAUER:
22          **Q.   Do you see this document?**
23          A.   I do.
24          **Q.   And this is a collection of e-mails**
25     **we received from the government -- I'm sorry --**

**DANIEL KIMMAGE  11/10/2022**

1    we received from the social media platform

2    LinkedIn, that include Samaruddin K. Stewart; do

3    you see that?

4         A.   I do.

5         Q.   Okay.  Do you know -- do you know

6    whether Mr. Stewart was reaching out to social

7    media platforms to schedule meetings?

8         A.   I believe he was.

9         Q.   And was he scheduling meetings with

10   just LinkedIn or other meetings?  I mean, sorry,

11   other social media platforms?

12        A.   I believe it would be others, as

13   well.

14        Q.   Do you know which others he did

15   this with?

16        A.   No, I don't recall the -- the list.

17        Q.   Do you know if he met with Twitter?

18        A.   I -- I don't know, no.

19        Q.   Do you know if he met with

20   Facebook?

21        A.   I don't know his meeting schedule,

22   no.

23        Q.   Okay.  You don't know, same

24   question as to other social media platforms,

25   your answer is you don't know any of them?

**DANIEL KIMMAGE  11/10/2022**

Page 161

```
 1                A.    Not that I don't know them.  I
 2      simply I don't know what his meeting schedule
 3      was, I wouldn't have kept track of his schedule.
 4                Q.    Were you generally aware that he
 5      was setting up meetings with multiple social
 6      media platforms?
 7                A.    Yes.
 8                Q.    Did he do that at your direction?
 9                A.    He did that as part of his job to
10      facilitate engagement.
11                Q.    And was he on the TET?
12                A.    I believe so, yes.
13                Q.    And I believe -- turn back that
14      last exhibit -- was he basically the Silicon
15      Valley location that was talked about on your
16      website?
17                A.    Yes, I believe so.
18                Q.    On the second page of this
19      document, the one bearing Bates page 10342 --
20      high level, did you participate in any of the
21      meetings that Mr. Stewart set up with social
22      media platforms?
23                A.    I believe, yeah, I participated in
24      meetings.  I don't know if he was the one who
25      set them up.  I don't know the full, like, all
```

**DANIEL KIMMAGE  11/10/2022**

```
 1    the mechanics.
 2             Q.   Okay.  Do you know who participated
 3    in his meetings, other than himself?
 4             A.   No.
 5             Q.   Okay.  Looking at this, this second
 6    page, the one at the top, February 5th, 2020, he
 7    initially reached out to Paul Rockwell at
 8    LinkedIn; correct?  Do you see that in the
 9    middle of the page?
10             A.   Yes, I see that.
11             Q.   Do you know who Paul Rockwell is?
12             A.   No.
13             Q.   Would it surprise you if he's the
14    vice president and head of trust and safety for
15    LinkedIn?
16             A.   No.  I don't know his position.
17             Q.   Okay.  Was -- I know you testified
18    earlier that your Twitter meeting in 2021 dealt
19    with their trust and safety team; correct?
20             A.   Right.
21             Q.   And then your analogous meetings
22    you had with Facebook and possibly Google, in
23    the same timeframe, were also are the trust and
24    safety teams or their equivalents at those other
25    entities; correct?
```

**DANIEL KIMMAGE  11/10/2022**

Page 163

```
 1              A.   Yes.
 2              Q.   Was Mr. Stewart told to reach out
 3     to the trust and safety team at LinkedIn?
 4              A.   I don't believe we instructed him
 5     or I didn't instruct him on which individuals or
 6     teams to contact.
 7              Q.   Okay.  And he, in this e-mail in
 8     February of 2020, reaches out to Paul Rockwell
 9     and says he's a senior advisor for the GEC
10     working out of Silicon Valley; correct?
11              A.   Yes, I see that.
12              Q.   So that corroborates your
13     understanding that he's in the Silicon Valley
14     location, so to speak; correct?
15              A.   Yes.
16              Q.   And he says that he's in -- his
17     agency's got interest in countering
18     disinformation in foreign state and non-state
19     propaganda; right?
20              A.   That's what the e-mail says.
21              Q.   Yeah, what's non-state propaganda?
22              A.   That would be a terrorist
23     organization, for example.
24              Q.   Got you.  Okay.
25                   And he links in the GEC's website;
```

DANIEL KIMMAGE  11/10/2022

```
 1     correct?

 2            A.   Yes.

 3            Q.   He talks about, let's explore

 4     shared interest and alignment of mutual goals

 5     regarding the challenge; do you know what he's

 6     talking about there?

 7                 MR. KIRSCHNER:   I apologize, where

 8     are you reading from?

 9                 MR. SAUER:   Next paragraph down in

10     his e-mail, so it's the very last paragraph on

11     this page.

12     BY MR. SAUER:

13            Q.   Your time permitting, I'd like to

14     schedule a meeting to discuss -- or a phone call

15     to discuss, to explore shared interests and

16     alignment of mutual goals regarding the

17     challenge; right?

18            A.   Mm-hmm.

19            Q.   What's he -- what are these shared

20     interests and alignment of mutual goals?

21                 MR. KIRSCHNER:   Objection,

22     speculative.

23     BY MR. SAUER:

24            Q.   If you know.

25            A.   Shared interests regarding
```

**DANIEL KIMMAGE  11/10/2022**

```
 1    countering disinformation in foreign state and
 2    non-state propaganda.
 3         Q.   And what are your mutual goals with
 4    the social media companies on that front?
 5              MR. KIRSCHNER:  Again, objection,
 6    speculative.
 7         A.   As I stated, sharing our
 8    understanding of the tools, techniques, and
 9    campaigns of these foreign propaganda and
10    disinformation actors.
11         Q.   Is it a goal of the GEC that those
12    foreign disinformation not spread in the United
13    States on social media; is that a goal of the
14    GEC?
15         A.   The GEC's goals are not related to
16    this space within the United States.  The GEC is
17    looking at foreign propaganda and
18    disinformation.
19         Q.   The GEC is not interested in the
20    propagation of disinformation in the United
21    States; correct?
22         A.   The GEC is focused on the
23    campaigns, the actions, the tools and techniques
24    of foreign propaganda and disinformation actors,
25    like Russia and China.
```

DANIEL KIMMAGE  11/10/2022

1        Q.    If you go to the top of this page,
2    there's some other LinkedIn people on this
3    e-mail, Patrick Corrigan; do you see that?
4        A.    Yes.
5        Q.    Do you know who he is?
6        A.    No.
7        Q.    Would it surprise you if he's the
8    vice president for legal and digital safety?
9        A.    Okay.
10       Q.    Yeah, and then Nicole Isaac, is she
11   a trust strategist at LinkedIn?
12       A.    I don't know her -- her job title.
13       Q.    But it seems like the people at
14   LinkedIn are all members of the trust and safety
15   team, would that be consistent with -- if I may
16   finish the question -- would that be consistent
17   with other meetings that you talked about, where
18   you were meeting with people on their trust and
19   safety teams from these entities?
20            MR. KIRSCHNER:  Objection,
21   speculative, and then compound.
22       A.    Yes.
23       Q.    If you flip to the next page, page
24   343, there's a reference to him setting up a
25   face-to-face meeting in February or March?

**DANIEL KIMMAGE  11/10/2022**

```
 1            A.    Okay.
 2            Q.    Do you know if that meeting
 3     occurred?
 4            A.    I don't.
 5            Q.    Was it -- was it his common
 6     practice to have oral face-to-face meetings
 7     instead of, you know, kind of written exchanges
 8     with -- with the social media platforms?
 9                  MR. KIRSCHNER:  Objection, calls
10     for speculation.
11     BY MR. SAUER:
12            Q.    If you know.
13            A.    I don't know how, exactly, he
14     conducted his engagement.
15            Q.    Turning a couple pages back to page
16     345, Bates page 345, a woman called Diana Patel
17     agrees to the meeting with him on the LinkedIn
18     side; right?
19                  MR. KIRSCHNER:  Objection, lack of
20     foundation.
21     BY MR. SAUER:
22            Q.    If you look there at the top level
23     e-mail on the chain, the top of the page:  Hi
24     Sam --
25            A.    Okay.
```

**DANIEL KIMMAGE  11/10/2022**

1          Q.    -- thanks for reaching out; do you

2     see that?

3          A.    Yes, I do.

4          Q.    And he was responded to by Diana

5     Patel; correct?

6          A.    Yes.

7          Q.    What her title, according to the

8     e-mail?

9          A.    Head of threat prevention.

10         Q.    And under that?

11         A.    Trust and safety.

12         Q.    So she was the head of threat

13    prevention for the trust and safety team at

14    LinkedIn?

15              MR. KIRSCHNER:  Objection,

16    speculative.

17         A.    Yes, according to the e-mail.

18         Q.    Okay.  Can you flip ahead to the

19    page marked 351?

20         A.    Mm-hmm.

21         Q.    And this is a follow-up e-mail in

22    March that Mr. Stewart sent to the LinkedIn

23    trust and safety team after he had the oral

24    meeting; correct?

25              He says:  Hello, Diana, it was nice

**DANIEL KIMMAGE  11/10/2022**

1    meeting you and your colleagues recently, at the

2    beginning of the e-mail; correct?

3              MR. KIRSCHNER:  Objection,

4    speculative, lack of foundation.

5         A.   Yes.

6         Q.   And he discussed about being happy

7    to continue the engagement with them; is that

8    right?

9              MR. KIRSCHNER:  Again, objection,

10   speculative, lack of foundation.

11        A.   Where does it say that?

12        Q.   Second sentence of the second

13   paragraph, as mentioned, the GEC has begun

14   sharing information, when appropriate, with

15   companies in the technology industry, and I

16   would be happy to continue the engagement with

17   you; correct?

18        A.   Yes.

19        Q.   Lower down he gives some links and

20   he links to something called the disinfo-cloud.

21   What's the disinfo-cloud?

22        A.   It was an information sharing

23   platform for -- on tools to counter propaganda

24   and disinformation.

25        Q.   What sort of tools were discussed

**DANIEL KIMMAGE  11/10/2022**

 1     on that, are these computer programs or, you

 2     know, what kind of tools are we talking about,

 3     hammers and chisels?

 4             A.   No, I believe they were sort of

 5     computer analytic tools.

 6             Q.   What kind of tools?

 7             A.   I -- I wasn't an active user of the

 8     platform, but as I understand it, they were sort

 9     of analytical tools.

10             Q.   Just help me, as someone who's not

11     super tech savvy, what is an analytical tool?

12             A.   Sure.

13             Q.   I just don't understand what it

14     means.

15             A.   An analytical tool would help -- a

16     tool that could identify coordinated inauthentic

17     activity on a social media platform by a foreign

18     disinformation actor.

19             Q.   So did you say it could coordinate

20     inauthentic activity?

21             A.   No.  No.

22             Q.   Okay.

23             A.   I said:  A tool that could identify

24     coordinated inauthentic activity by a foreign

25     propaganda and disinformation actor, like China

**DANIEL KIMMAGE  11/10/2022**

```
 1    or Russia.
 2              Q.   Yeah, what's coordinated
 3    inauthentic activity, is that, like, bots?
 4              A.   Yeah, it's -- it's -- it's -- it's
 5    fake activity that is being coordinated for a
 6    purpose.
 7              Q.   And I think some of your materials
 8    talk about how you -- they would create fake
 9    accounts of people who don't exist and give
10    them, you know, real looking pictures; is that
11    another example of coordinated fake activity?
12              A.   It could be, you'd need to look at
13    the specifics more.
14              Q.   Okay.  What -- what do the tools do
15    to -- to identify coordinated specific activity?
16              A.   I'm not a software expert.  I don't
17    know how they work internally.
18              Q.   Who was posting on that website or
19    is it a website or what is it, exactly?
20              A.   It's a website.  It's a -- it's a
21    platform that, as I understand, you can log into
22    and see examples of tools.
23              Q.   Okay.  And who -- who can log into
24    it, is it open to the public or is it only for
25    social media platforms or how does it work?
```

**DANIEL KIMMAGE  11/10/2022**

Page 172

```
 1              A.   I believe it was for US government
 2    tool developers and I believe some researchers,
 3    and it would be not anyone, but you would have
 4    to, I think, send in a request and then be
 5    approved for -- for -- for access.
 6              Q.   It was -- was it a -- a GEC
 7    initiative?
 8              A.   I believe so, yes.  Yes.
 9              Q.   And was it funded by GEC?
10              A.   I believe so, yes.
11              Q.   Do you know who participated in it,
12    who had access to the platform?
13              A.   I don't have the full list of all
14    the participants.
15              Q.   What kinds of participants?  I
16    think you mentioned earlier there would be tech
17    platforms could do that?
18              MR. KIRSCHNER:  Objection,
19    mischaracterizing testimony.
20              A.   It was, I believe, tool developers,
21    government agencies, and I believe researchers.
22    I don't have the full -- full list.
23              Q.   And it got discontinued; correct or
24    is it still up and running?
25              A.   I -- I don't recall.  I believe it
```

**DANIEL KIMMAGE  11/10/2022**

Page 173

```
1    was up and running when I left for -- for
2    training.
3              Q.    Left for?
4              A.    For training in National Defense
5    University.
6              Q.    Okay.  So you were being trained at
7    National Defense?  I thought you were teaching,
8    but you were --
9              A.    No, no, no, I was in a master's
10   program there.
11             Q.    Oh, congratulations.
12                   Okay.  Whose team ran the
13   disinfo-cloud or runs it, I guess, if we don't
14   know if it's still up and running.
15             A.    The Technology Engagement Team.
16             Q.    That's the TET?
17             A.    Yes.
18             Q.    Can you flip ahead to the last page
19   of the document, 406?
20             A.    Mm-hmm.
21             Q.    And there is a calendar invite here
22   between Mr. Stewart and a series of recipients
23   on the LinkedIn side; do you see that?
24             A.    Yes.
25             Q.    And the subject of the meeting is:
```

**DANIEL KIMMAGE  11/10/2022**

```
 1      LinkedIn and GEC countering disinformation and
 2      propaganda; correct?
 3              A.   Yes.
 4              Q.   And it looks like the participants
 5      in the LinkedIn side are Patrick Corrigan;
 6      correct?
 7              A.   Yes.
 8              Q.   And is he the VP of legal and
 9      digital strategy for LinkedIn?
10              MR. KIRSCHNER:  Objection, lack of
11      foundation, speculative.
12   BY MR. SAUER:
13              Q.   If you know.
14              A.   I don't know his position.
15              Q.   And then Paul Rockwell, the vice
16      president of trust and safety, is on there?
17              MR. KIRSCHNER:  Objection, same,
18      speculative, lack of foundation.
19   BY MR. SAUER:
20              Q.   On the line below, if you know?
21              A.   Yes, I see the name.
22              Q.   Ousman Jobe; do you know who that
23      is?
24              A.   No, I do not.
25              Q.   Nicole Tarasoff, directly below?
```

**DANIEL KIMMAGE  11/10/2022**

Page 175

```
 1                  A.    What's the question?

 2                  Q.    Oh, do you see her name there?

 3                  A.    Yes.

 4                  Q.    Do you know if she's the director

 5        of content policy at LinkedIn?

 6                  A.    I don't know her position.

 7                  Q.    And then there's a bunch of people

 8        with state e-mails on this; do you see them

 9        there?

10                  A.    Yes.

11                  Q.    Without reading their names into

12        the record, do you know who they are?

13                  A.    I recognize one, two, three of the

14        names.

15                  Q.    What are their roles in -- in --

16        within state or within GEC?

17                  A.    As of the date of this e-mail, I

18        was already in National Defense University, so I

19        don't know exactly what their roles were at that

20        time.

21                  Q.    What are -- what roles did you

22        understand them to have at some time?

23                  A.    I believe one was on the China

24        team.

25                  Q.    Which one is that, in terms of
```

**DANIEL KIMMAGE  11/10/2022**

```
 1     order?  I see one --
 2             A.    I believe it's the first name.
 3             Q.    Okay.  I got you.
 4             A.    And one, I believe, was on the
 5     Russia team.
 6             Q.    Uh-h8h, and which one is that in
 7     the order?
 8             A.    It is the penultimate name.
 9             Q.    Okay.  And do you recognize the
10     other ones?
11             A.    I recognize the second name.
12             Q.    What's the role of that person?
13             A.    I don't recall the precise role.
14             Q.    Okay.  Do you know what this
15     meeting is about on July 29th, 2021?
16             A.    No.
17             Q.    Do you have any -- any reason to
18     think there would be a counter -- countering
19     disinformation meeting on July 29th of 2021?
20                   MR. KIRSCHNER:  Objection.
21     BY MR. SAUER:
22             Q.    And any specific topic that might
23     have come up in that timeframe, anything like
24     that?
25                   MR. KIRSCHNER:  Objection,
```

**DANIEL KIMMAGE  11/10/2022**

1    speculative.

2              A.    I was no longer involved in the

3    day-to-day operations of the Global Engagement

4    Center in -- on July 29th, 2021.

5                   MR. SAUER:  Can I have M?

6                   And so we're handing you what's

7    been marked as Exhibit 10.

8                   (Exhibit No. 10 was marked for

9    identification.)

10   BY MR. SAUER:

11              **Q.   Do you recognize these e-mails, at**

12   **all, e-mails between people at the State**

13   **Department and CISA regarding a program for**

14   **African CSIRTs?**

15              A.   And what do you mean by recognize?

16              **Q.   Well, have you seen them before?**

17              A.   I don't -- I don't believe so.  I

18   don't think I was on these e-mails.

19              **Q.   What's a CSIRT?**

20              A.   I -- a CSIRT?

21              **Q.   Do you know what that stands for?**

22              **If you look at the very first page,**

23   **in the very first paragraph:  We're looking**

24   **forward to having you speak at the workshop on**

25   **disinformation and misinformation --**

**DANIEL KIMMAGE  11/10/2022**

```
 1              A.   I'm --
 2              Q.   -- for African CSIRTs next Tuesday.
 3              A.   No.  There are a lot of acronyms in
 4       government.  I don't actually recognize this one
 5       off the top of my head.
 6              Q.   Computer security incident response
 7       team, is that a -- is that what it stands for,
 8       do you think?
 9                   MR. KIRSCHNER:  Objection,
10       speculative.
11    BY MR. SAUER:
12              Q.   If you know.
13              A.   It sounds plausible.
14              Q.   And then the other people, on the
15       state side, participating here, are they members
16       of the GEC, do you know?  If you look at that
17       name at the very top, who's sending this e-mail,
18       kind of organizing the conference, is that a GEC
19       person?
20                   MR. KIRSCHNER:  Objection, assuming
21       evidence not in the record.
22              A.   I -- I don't recognize the person
23       who it's from.
24              Q.   How about down there in the -- down
25       there in the cc line, second line, far right, I
```

**DANIEL KIMMAGE  11/10/2022**

Page 179

```
 1      see Samaruddin K. Stewart?

 2              A.   Yes.

 3              Q.   Yeah, at that time he was still a

 4      GEC person; fair to say?

 5              A.   Yes.  Yes.

 6              Q.   Is he gone now?

 7              A.   I believe so, yes.

 8              Q.   Okay.  And then directly below him,

 9      there's another state person; is that a person

10      associated with GEC?

11              A.   I -- I don't know.

12              Q.   Were you familiar with this or do

13      you recall this particular program?

14              A.   I -- I don't recall this particular

15      program.

16              Q.   And I guess that we've been talking

17      about in May of 2021, were you at GEC then or

18      were you at National Defense University?

19              A.   I was still at GEC in May.

20              Q.   Okay.  Third page of this --

21              A.   Mm-hmm.

22              Q.   -- if you go to the bottom of the

23      page, it's the one marked 12/1/96; do you see

24      that?

25              A.   Yes.
```

**DANIEL KIMMAGE  11/10/2022**

```
 1              Q.    There's a personnel state there who
 2       I think was the original sender on the first
 3       page; is that a name -- I take it that's a name
 4       you do not recognize?
 5              A.    No, I don't.
 6              Q.    So you do not know if she's
 7       associated with GEC?
 8              MR. KIRSCHNER:  Objection, asked
 9       and answered.
10              A.    No.
11              Q.    And --
12              MR. KIRSCHNER:  Clarify the record,
13       he's saying -- just -- because he said no on
14       that question is he does not know, not that
15       the -- the person is not -- I just thought for
16       all our purposes it was a little bit of --
17    BY MR. SAUER:
18              Q.    Do you know whether that person is
19       associated with the GEC?
20              A.    I do not know whether that person
21       is associated with the GEC.
22              Q.    Just looking at what she wrote
23       here, on May 10th:  Hello all, one more set of
24       answers from participants, these in response to
25       the question:  What topics do you hope the
```

## DANIEL KIMMAGE  11/10/2022

```
 1    workshop will cover; correct?
 2            A.    Okay.
 3            Q.    And if you go down to the bottom
 4    bullet point on this page, if you go to the top
 5    one it's about how to combat mis- and
 6    disinformation; correct?
 7            A.    Yes, that's WHAT it says.
 8            Q.    And how to mitigate it once viral;
 9    correct?
10            A.    Yes.
11            Q.    Bottom -- bottom bullet point,
12    there, says:  Slow response to incidences
13    escalated to service providers; right?
14            A.    That's what it says.
15            Q.    So that's an expression of concern
16    that the service providers aren't responding
17    when people are raising concerns about content
18    on their platforms?
19                  MR. KIRSCHNER:  Objection,
20    speculative.
21    BY MR. SAUER:
22            Q.    Is that what it seems to say?
23            A.    I don't see a reference to content.
24            Q.    So what incidences might be
25    escalated to service providers that don't relate
```

**DANIEL KIMMAGE  11/10/2022**

```
 1      to content on their platforms?

 2                    MR. KIRSCHNER:  Objection,

 3      hypothetical and speculative.

 4  BY MR. SAUER:

 5              Q.    You may answer.

 6              A.    Slow connectivity, malfunctions on

 7      the platform, any number of things.  I don't see

 8      any reference to specify what type of incidents,

 9      here.

10              Q.    Okay.  Can you turn to the next

11      page?

12                    There's a reference there at the

13      top bullet point to fact checking techniques and

14      how to identify disinformation and

15      misinformation; correct?

16              A.    Yes.

17              Q.    Does GEC work with any

18      fact-checking organizations?

19              A.    Yes, I believe it does.

20              Q.    What -- what does it do?  What sort

21      of work does it do with fact-checking

22      organizations?

23              A.    I believe the GEC has supported

24      fact-checking organizations outside of the

25      United States.
```

**DANIEL KIMMAGE  11/10/2022**

Page 183

1          Q.    Has the GEC ever supported

2     fact-checking organizations inside the United

3     States?

4          A.    I don't believe so.

5          Q.    Has the GEC ever worked with

6     fact-checking organizations that are used as

7     fact-checkers by social media platforms, like

8     Twitter, Facebook, Google and so forth?

9               MR. KIRSCHNER:  Objection, vague.

10          A.    What do you mean by used by?

11          Q.    Well, do the social media platforms

12     consult with the fact checkers on their own?

13               MR. KIRSCHNER:  Objection,

14     speculative.

15          A.    I don't know what the social media

16     companies do with fact-checkers.

17          Q.    What fact-checkers do you work

18     with?

19          A.    I believe the Pointer Institute is

20     the only one I recall.  I don't recall the --

21     the specific organizations.

22          Q.    Where is that?  Where is that

23     located?

24          A.    I don't recall.

25          Q.    Is that a foreign or domestic

**DANIEL KIMMAGE  11/10/2022**

```
 1     fact-checking organization?
 2             A.   I don't -- I don't recall.  I don't
 3     recall anything beyond the name.
 4             Q.   Okay.  How do you remember that?
 5     In what connection do you remember that name?
 6             A.   I remember it coming up in either a
 7     meeting or a document.  I don't remember the
 8     specific context.
 9             Q.   Do you remember how GEC works with
10     them?
11             A.   No, I don't remember the specifics.
12             Q.   Do you have any understanding of
13     how GEC works with fact-checking organizations,
14     in general?
15             A.   I believe it would be identifying
16     an organization that works in a location where a
17     foreign propaganda disinformation actor, like
18     Russia or China, would be active and supporting
19     them in some fashion.
20             Q.   What kind of fashion?
21             A.   Support could range from a grant or
22     a financial support to information sharing or
23     training in tools and techniques.
24             Q.   Okay.  So information sharing,
25     would that be identifying narratives and things
```

**DANIEL KIMMAGE  11/10/2022**

1    like that, that they should be aware of?

2          A.   I -- I don't know what the

3    specific, you know, information sharing would

4    be.

5          Q.   So you don't know what kind of

6    information would be shared between GEC and

7    international fact-checking organizations or any

8    fact-checking organization; fair to say?

9          A.   No.  I wasn't involved in the

10   direct back and forth, so I can't speak to

11   the -- to the specifics.

12         Q.   Who was involved on GEC's side, by

13   title?

14         A.   I don't know.

15         Q.   Do you know what team would have

16   engaged -- engages with fact-checking

17   organizations?

18         A.   It would have been one of the three

19   nation-state focus teams, so probably the

20   Russian, China, or Iran team.

21         Q.   Next bullet point down, second one

22   on the page:  Proven techniques to take down

23   these articles.  Does that, in the effectiveness

24   of fake news checkers, right, so the topics

25   being raised by this State Department person for

**DANIEL KIMMAGE  11/10/2022**

Page 186

```
 1      discussion from, I take it, the CSIRT

 2      participants about how to take down these

 3      articles relating to misinformation and

 4      disinformation; correct?

 5              MR. KIRSCHNER:  Objection,

 6      mischaracterizes.  Well, lack of foundation and

 7      assumes evidence not in the record and

 8      mischaracterizes document.

 9  BY MR. SAUER:

10          Q.   Is that what it says?

11          A.   Yes, that's what it says.

12          Q.   Okay.  And does GEC -- you talk a

13      lot about tools and techniques, does GEC have

14      information about how to take down -- techniques

15      to take down these articles?

16          A.   No, not generally, the GEC doesn't

17      flag and take things down.

18          Q.   Do you know what this state

19      official is referring to when she talks about

20      proven techniques to take down these articles?

21          A.   No.

22              MR. KIRSCHNER:  Objection,

23      speculative.

24          A.   No, I don't -- I don't see the

25      context.
```

**DANIEL KIMMAGE  11/10/2022**

1          Q.    Okay.  Lower on down there,

2    international takedown requests, three bullet

3    points down; correct?

4          A.    Yes, I see that.

5          Q.    Do you know what that refers to?

6          A.    I don't see the additional -- any

7    additional context here.

8          Q.    So you don't know what -- are

9    you -- are you aware of there being

10    international -- international takedown requests

11    presented to social media platforms?

12          A.    I'm aware that international

13    governments would sometimes reach out with

14    requests.  I know that it's an issue.  It's not

15    one that generally involve the GEC.

16          Q.    What are -- what are international

17    governments?

18          A.    Government of any other country.

19          Q.    Okay.  So a government of a foreign

20    country?

21          A.    A foreign government might reach

22    out to a social media company.

23          Q.    And ask them to take something

24    down?

25          A.    Yes.

**DANIEL KIMMAGE  11/10/2022**

```
 1              Q.    But you're saying GEC doesn't do
 2      that?
 3              A.    No.  No.  That's what I believe
 4      this refers to, international takedown requests.
 5      So a request from a foreign government to a
 6      social media company to -- to remove something.
 7                    MR. SAUER:  Can you give me N?
 8                    I think this is going to be Exhibit
 9      11 that you're being handed.
10                    (Exhibit No. 11 was marked for
11      identification.)
12      BY MR. SAUER:
13              Q.    Do you have Exhibit 11 in front of
14      you?
15              A.    I do.
16              Q.    And this is an e-mail chain or
17      actually it's against multiple e-mail chains,
18      involving CISA and the GEC, from 2020; correct?
19              A.    Yes.
20              Q.    Okay.  The bottom of the first
21      page, you see there's an e-mail from a state
22      official called Alex Dempsey; do you see that?
23              A.    I do.
24              Q.    Who's Alex Dempsey?
25              A.    I believe he's on the I2C2 team, so
```

**DANIEL KIMMAGE  11/10/2022**

```
 1      the interagency coordination cell.
 2              Q.    So he's a GEC official?  Sorry --
 3              A.    Yes, yes, I believe he's a member
 4      of the GEC.
 5              Q.    And if you flip to the second page,
 6      it looks like he has flagged a, quote, disinfo
 7      campaign on YouTube targeting a DS officer;
 8      what's a DS officer, do you know?
 9              A.    I believe it would be diplomatic
10      security.
11              Q.    What's a diplomatic security
12      officer?
13              A.    A member of the Diplomatic Security
14      Office of the State Department.
15              Q.    So would that be somebody working
16      in an embassy abroad or here in Washington,
17      D.C.?
18              A.    It could be either.
19              Q.    But it's a state employee of some
20      kind?
21              A.    Yes.
22              Q.    And is involved -- says:  Claiming
23      she brought COVID-19 to something in an athletic
24      competition; right?
25              A.    Right.
```

**DANIEL KIMMAGE  11/10/2022**

Page 190

```
 1              Q.   Yeah, and without mentioning this
 2     person's name, he identifies, who, what, when,
 3     where, and why; right?
 4                   MR. KIRSCHNER:  Objection, vague,
 5     assuming evidence not in the record.
 6     BY MR. SAUER:
 7              Q.   Well, I'm just reading, who, what,
 8     when, where and why, from Mr. Dempsey's e-mail;
 9     do you see that?
10              A.   Yes, I do.
11                   MR. KIRSCHNER:  I don't see the
12     why.
13              A.   I see, who, what, when, where and
14     why, yes.
15              Q.   Okay.  And then the where is
16     online, and he links a YouTube video?
17              A.   Yes.
18              Q.   And what is a targeted
19     disinformation campaign against a state
20     official; correct?
21              A.   Yes.
22              Q.   And then, down there in the why, it
23     talks about there's a false narrative being
24     pushed online about this person, and there's a
25     YouTube channel run by Americans falsely
```

**DANIEL KIMMAGE  11/10/2022**

```
 1        claiming that she is, quote, patient zero, and
 2        that as a US army reservist she brought COVID-19
 3        to Wuhan during an athletic competition;
 4        correct?
 5             A.    Yes.
 6             Q.    Is there a theory out there that
 7        COVID-19 originated or spread at an
 8        international athletic competition in Wuhan
 9        during the fall of 2019?
10             A.    Apparently, according to the -- to
11        the -- to the information here.
12             Q.    Okay.  And so Mr. Dempsey, of the
13        GEC, forwarded this to CISA; right?  Do you know
14        who Robert Schaul is?
15             A.    No.
16             Q.    He's called Rob.
17             A.    No.
18             Q.    Do you know who Brian Scully is?
19             A.    I believe Brian Scully was either
20        at or was the head of the disinformation office
21        at CISA.
22             Q.    That's what we've described earlier
23        as the mis-dis- and mal information team?
24             A.    Right.  The -- it was initially, I
25        think, a task force, and it was subsequently
```

**DANIEL KIMMAGE  11/10/2022**

```
 1    renamed as the mis-dis- and mal information
 2    team.
 3              Q.   And Brian Scully here, about a
 4    third of the way down the first page, has a
 5    CISA.DHS.gov e-mail address; correct?
 6              A.   Yes, correct.
 7              Q.   So Alex Dempsey's e-mail is taken
 8    by Brian Scully, at CISA, and forwarded to two
 9    Facebook officials; correct?
10              A.   Yes.
11              Q.   They have FB.com e-mails there?
12              A.   Yes.
13              Q.   And Scully says to these two
14    officials:  Please see the below reporting from
15    our State Department GEC colleagues, Global
16    Engagement Center colleagues, that's your unit;
17    right?
18              A.   Yes, that's the Global Engagement
19    Center.
20              Q.   Okay.  About a disinformation on
21    YouTube targeting a diplomatic security officer;
22    correct?
23              A.   Yes.
24              Q.   And then one of the Facebook
25    officials responds, and says:  Thank you so much
```

**DANIEL KIMMAGE  11/10/2022**

```
 1     for this.  Have flagged for our internal teams;
 2     correct?
 3          A.   Yes.
 4          Q.   And so this was a -- a report from
 5     the GEC to CISA about a disinformation campaign
 6     run by Americans; correct?
 7               MR. KIRSCHNER:  Objection, lack of
 8     foundation, speculative.
 9  BY MR. SAUER:
10          Q.   According to the -- according to
11     the bold paragraph Y on the second page?
12               MR. KIRSCHNER:  Again, objection,
13     lack of foundation.
14          A.   It says here that the channel is
15     run by Americans.  I don't know about the
16     campaign.
17          Q.   So it's the content that he's
18     complaining about is on a channel, a YouTube
19     channel, run by Americans; correct?
20          A.   That's what the e-mail says, yes.
21          Q.   And this gets sent to CISA, who
22     forwards it onto Facebook, who says:  We have
23     flagged this for our internal teams; correct?
24               MR. KIRSCHNER:  Objection,
25     speculative, lack of foundation.
```

**DANIEL KIMMAGE  11/10/2022**

1    BY MR. SAUER:

2              **Q.    Is that what the e-mail says?**

3              A.    The e-mail went from the Global

4    Engagement Center to CISA to Facebook.

5              **Q.    Okay.  And CISA described itself on**

6    **its website as, quote, routing disinformation**

7    **concerns to social media platforms?**

8              MR. KIRSCHNER:  Objection,

9    speculative.

10             A.   I don't know how they describe

11   themselves on their website.

12             **Q.    Were you aware of this incident**

13   **when it happened?**

14             A.   I don't -- I believe I was aware of

15   the YouTube video.  I don't know that I was

16   aware or on the e-mails here.  I -- I do recall

17   the disinformation involving a diplomatic

18   security officer.  I do recall that.

19             **Q.    And this incident in 2020 is**

20   **different than the 2018 incident you described**

21   **this morning, where you discussed there was a**

22   **threat to the life of someone abroad; right?**

23             A.   They are separate incidents.

24             **Q.    Yeah, this is two years later, it's**

25   **a completely different incident.**

**DANIEL KIMMAGE  11/10/2022**

```
 1              A.    Completely different.
 2              Q.    Were you aware -- what was your
 3      knowledge of this incident when it happened?
 4      Did they ask you for authority to flag this for
 5      CISA or did you hear about it afterwards?  What
 6      was your knowledge at the time?
 7              A.    I believe I was aware that there
 8      was a disinformation campaign involving a
 9      diplomatic security officer.  I don't see myself
10      on these e-mails, and I don't recall whether I
11      was in the internal discussion that led to this
12      chain.
13              Q.    Did you authorize anyone to raise
14      this with CISA so that they could flag it for a
15      social media platforms?
16              A.    I don't -- I don't recall that.
17              Q.    Do you know one way or the other
18      whether you did that?
19              A.    I -- I -- I don't recall.
20              Q.    If you flip ahead through this
21      e-mail chain --
22              A.    Mm-hmm.
23              Q.    -- see the next page, 7671.
24              A.    Okay.  Mm-hmm.
25              Q.    Scully, at CISA, takes the same
```

**DANIEL KIMMAGE  11/10/2022**

1     e-mail chain and forwards it onto Twitter, as

2     well; correct?

3              MR. KIRSCHNER:  Objection, lack of

4     foundation.

5          A.   I -- I see that here.

6          Q.   Yeah, and -- and Twitter just

7     responds:  Thank you, Brian; correct?

8          A.   Yes.

9          Q.   Then flip ahead to page 7675.

10         A.   Okay.

11         Q.   This is the Alex Dempsey e-mail

12    raising this, who what.  When, where, and why,

13    is forwarded by Scully onto Google, as well;

14    right?

15              MR. KIRSCHNER:  Again, objection,

16    lack of foundation.

17    BY MR. SAUER:

18         Q.   The top of the page, without

19    mentioning the name, it's Brian Scully is

20    forwarding this Alex Dempsey e-mail to a third

21    social media platform, someone with a Google.com

22    e-mail address; correct?

23         A.   Yes.

24         Q.   And that cover page, it says:

25    Please see below, reporting from colleagues at

**DANIEL KIMMAGE  11/10/2022**

```
 1      the State Department, Global Engagement Center,

 2      about disinformation on YouTube regarding a

 3      diplomatic security officer; correct?

 4            A.   Yes.

 5            Q.   And then it goes on to say:   It

 6      does appear the FBI has been notified --

 7      notified, so you may also have heard from them;

 8      correct?

 9            A.   Yes.

10            Q.   Was this incident -- did the GEC

11      notify the FBI of this incident?

12                 MR. KIRSCHNER:  Object.  Go on.

13            A.   I don't know.

14            Q.   Do you remember that, at all?

15            A.   I -- I don't recall.

16            Q.   You don't remember any discussions

17      with the FBI?  I know you say you remember this

18      incident, at some level.  Do you remember any

19      interaction with the FBI relating to it?

20            A.   I remember the incident.  I don't

21      recall which interagency entities were

22      contacted.

23            Q.   Okay.  Some were, though, obviously

24      CISA?

25                 MR. KIRSCHNER:  Objection,
```

**DANIEL KIMMAGE  11/10/2022**

Page 198

```
 1    mischaracterizing testimony.
 2   BY MR. SAUER:
 3           Q.    Yes or no?
 4           A.    I'm seeing these e-mails, but I
 5    wasn't on these e-mails.
 6           Q.    And you don't remember them?
 7           A.    I wasn't on these e-mails.
 8           Q.    Do you -- did you authorize the
 9    sending of e-mails like this, with respect to
10    this incident?
11           A.    I don't --
12                MR. KIRSCHNER:  Object.  I was
13    going to say, objection, asked and answered.
14   BY MR. SAUER:
15           Q.    If you know.
16           A.    I don't recall.
17           Q.    Looking down here at the bottom of
18    this page, it's another copy of the same Alex
19    Dempsey e-mail to Rob Schaul.  I can't remember
20    if you said, do you know who Rob Schaul is?
21           A.    No, I do not.
22           Q.    And he says:  Rob, our leadership
23    has asked that we share the below information
24    with our IA counterparts; right?
25           A.    Yes.
```

DANIEL KIMMAGE  11/10/2022

```
 1            Q.    What's -- who's our leadership, do
 2      you know?
 3            A.    Under the why, I see listed:
 4      Special envoy, Lea Gabrielle, who would have
 5      been the highest ranking official in the office
 6      at that time.  So if she authorized it my
 7      authorization wouldn't be necessary.
 8            Q.    Okay.  Do you know if Lea
 9      Gabrielle -- I think you testified about her
10      earlier -- you would have been reporting
11      directly to her, at this time; right?
12            A.    Yes.
13            Q.    So we're talking about March 25th,
14      2020, she was the acting coordinator?
15            A.    She was the appointed coordinator.
16      She was not acting, she was the coordinator.
17            Q.    And you were principal deputy
18      coordinator at the time?
19            A.    Yes.
20            Q.    And as you say, it looks like Lea
21      Gabrielle -- in other words, you interpreted --
22      let me ask you this, and I don't know what you
23      interpret -- what do you remember?  Do you
24      remember Lea Gabrielle authorizing people to
25      flag this for CISA and the FBI?
```

DANIEL KIMMAGE  11/10/2022

```
1              A.   I do not know.
2              Q.   And you don't know who,
3    specifically, our leadership is, do you?
4              A.   I don't know what "our leadership"
5    refers to here.  Down under the why it refers to
6    special envoy, Lea Gabrielle.
7              Q.   Here in the first sentence, could
8    that be you or you don't remember?
9              A.   It could be, it doesn't specify
10   what "our leadership" means.
11             Q.   And you don't remember whether you
12   made any authorization about this?
13             A.   I don't.
14             Q.   And that later made sense, it talks
15   about share them with our IA counterparts; do
16   you know what IA stands for?
17             A.   Interagency.
18             Q.   Okay.  Are you aware of any other
19   situations where anyone at the GEC flagged
20   content on a YouTube channel run by Americans to
21   CISA or a social media platform or the FBI as a
22   disinformation campaign to be combatted?
23             A.   No, I'm not.
24             Q.   This is the only incident that you
25   can recall at this time?
```

**DANIEL KIMMAGE  11/10/2022**

```
 1                 MR. KIRSCHNER:  Objection,
 2      mischaracterizing testimony.
 3             A.   I'm seeing this in these e-mails,
 4      but I wasn't on these e-mails.  I recall the --
 5      the video and the campaign.  I don't recall
 6      the -- the interagency communications here.
 7             Q.   That whole campaign about the virus
 8      being spread at an international athletic
 9      competition in Wuhan, was that one of the
10      China-related false narratives you talked about
11      earlier?
12             A.   I believe it was a minor, like, a
13      sub-narrative, because it involved, like, an
14      athletic competition.  But it wasn't one of the
15      major narratives.
16             Q.   How about as -- was it a Russian
17      narrative?
18             A.   I don't recall it as a Russian
19      narrative.
20             Q.   You don't recall it as a major
21      Chinese narrative or a Russian narrative?
22                 MR. KIRSCHNER:  Objection,
23      mischaracterizes testimony.
24             A.   I don't recall it as this.  I
25      recall it as a minor narrative.
```

**DANIEL KIMMAGE  11/10/2022**

1          Q.    Have you ever heard of the Election
2     Integrity Partnership?
3          A.    Yes.
4          Q.    What is that?
5          A.    I -- I don't recall the exact
6     specifics of -- of what it was.
7          Q.    What have you heard about it?
8          A.    I read the section in the
9     complaint.
10          Q.    Independent of the complaint, do
11     you have any knowledge of the Election Integrity
12     Partnership?
13          A.    Independent of the complaint, I
14     recall that it was an entity that someone at the
15     GEC was in contact with, that's -- that's --
16     that's the extent.
17          Q.    Who was -- who at the GEC was in
18     contact with it?
19          A.    I believe -- I believe it was -- I
20     believe it was a member of the Russia team.
21     I -- I think it may have been George Beebe on
22     the Russia -- George Beebe on the Russia team.
23          Q.    How do you spell Beebe?
24          A.    B-e-e-b-e.
25          Q.    B-e-e-b-e, first name George?

**DANIEL KIMMAGE  11/10/2022**

```
 1            A.   George.

 2            Q.   G-e-o-r-g-e?

 3            A.   Right.

 4            Q.   What makes you think it was him?

 5            A.   I seem to remember he was the

 6    individual who -- who -- who was engaged with

 7    the -- what did you call it, the Election

 8    Integrity Partnership, right?

 9            Q.   Yes.

10            A.   Okay.

11            Q.   I'll call it the EIP from now on.

12            A.   Okay.

13            Q.   You remember that he was engaged in

14    that, how did you know that?  How did you know

15    he was engaged in that?

16            A.   I think it was sort of reported at

17    a meeting.  I don't recall the exact context.

18            Q.   Do you know who authorized him to

19    be involved in it?

20            A.   No, I don't know who -- who -- who

21    authorized it.

22            Q.   Do you know what the nature of his

23    involvement was, like, what did he do with

24    respect to the EIP?

25            A.   No.  I know he had some
```

**DANIEL KIMMAGE  11/10/2022**

Page 204

```
 1    communication with him.  I don't know the
 2    specifics of his involvement.
 3          Q.   Okay.  Do you know what the EIP
 4    was?
 5          A.   Only broadly, that it was a
 6    partnership to counter, I think, our -- our --
 7    our involvement would have been foreign
 8    propaganda and disinformation focused on the
 9    election or elections.  I don't recall.
10          Q.   Do you know what Mr. Beebe or
11    whoever it was -- I take it you think it was
12    Mr. Beebe, but you're not sure?
13          A.   I think it was him, but I'm not
14    sure.
15          Q.   Okay.  Whoever it was involved,
16    your understanding is they would be involved in
17    flagging foreign disinformation relating to the
18    election?
19          MR. KIRSCHNER:  Objection, assuming
20    evidence not in the record, mischaracterizes
21    testimony.
22          A.   I -- I -- I don't recall the exact
23    nature of their involvement.
24          Q.   Okay.  So you -- earlier, when you
25    said:  Our involvement would have been --
```

**DANIEL KIMMAGE  11/10/2022**

```
 1              A.   Right.

 2              Q.   -- flagging foreign disinformation

 3    or raising foreign disinformation concerns,

 4    what's your basis for that?

 5              A.   I said:  Our involvement would have

 6    been related to foreign propaganda.

 7              Q.   Okay.

 8              A.   And the basis for that is the GEC's

 9    mandate.

10              Q.   In other words, that's what the GEC

11    does, generally, but you don't have any specific

12    knowledge with respect to what Mr. Beebe did?

13              A.   No, I don't recall anything

14    specific about what he did.

15              Q.   Do you know who authorized the GEC

16    to be involved in the EIP, at all?

17              MR. KIRSCHNER:  Objection, assumes

18    evidence not in the record.

19              A.   I don't.

20              Q.   Did someone authorize it or did

21    Mr. Beebe just kind of do it on his own?

22              A.   I don't recall who -- who

23    authorized it.

24              Q.   Yeah, okay.

25              MR. SAUER:  Can I have P?
```

**DANIEL KIMMAGE  11/10/2022**

```
 1                    This is going to be, I think,
 2     Exhibit 12.  Is that right, 12?
 3                    (Exhibit 12 was marked for
 4     identification.)
 5                    MR. KIRSCHNER:  Mr. Sauer, just --
 6     the water's now starting to drip towards the
 7     table.  Do you want to take a two-minute break
 8     to wipe off the --
 9                    MR. SAUER:  That didn't work very
10     well.
11                    MR. KIRSCHNER:  We can get a
12     napkin.  I won't put this one in my manilla
13     folder.
14                    MR. SAUER:  You should have rubber
15     bands.
16                    MR. KIRSCHNER:  We're going to ask
17     the witness to read the entire document, and
18     that will be the seven hours.
19                    I'm joking, but I do want to allow
20     the witness, when you have something -- when you
21     have something that you're asking, specifically,
22     to have -- allow the witness to have sufficient
23     time to understand the context.
24                    MR. SAUER:  That's okay, only a few
25     pages that are --
```

**DANIEL KIMMAGE  11/10/2022**

```
 1                    MR. KIRSCHNER:  Okay.
 2    BY MR. SAUER:
 3          Q.    Have you seen this report before?
 4          A.    I believe I've seen the cover of
 5    it.
 6          Q.    Okay.  In what connection did you
 7    see the cover of it?
 8          A.    It may have been a news thing.  I
 9    don't recall the exact context.
10          Q.    Was it in context of a GEC meeting
11    or was it just, you know, seeing it somewhere
12    else?
13          A.    It could have been both.
14          Q.    Okay.  You just don't remember?
15          A.    I don't.  I think I did see media
16    coverage, and it may also have come up at a GEC
17    meeting.
18          Q.    And is this the report that the EIP
19    did about its activities in 2020, with respect
20    to disinformation on social media?
21          A.    Yes, that's what it appears to be.
22          Q.    It's quite a lengthy report, about
23    292 pages; fair to say?
24          A.    Yes.
25          Q.    Before today, have you read any of
```

**DANIEL KIMMAGE  11/10/2022**

Page 208

```
 1      this?

 2              A.    I had glanced at the -- I think the

 3      executive summary.

 4              Q.    When did you do that?

 5              A.    I don't recall.  I think it may

 6      have been when it came out, but I don't recall

 7      exactly.

 8              Q.    And when it came out, I think, is

 9      that identified on the second page or this only

10      says 2021, third page, I think it says it came

11      out in June 15th, 2021?

12              A.    June 15th, 2021.

13              Q.    Do you think you looked at it at

14      that time?

15              A.    Or maybe after that, that was

16      almost exactly when I was leaving the Global

17      Engagement Center.

18              Q.    Did you look at it more recently,

19      like, for example, before your testimony today?

20              A.    I think I looked at the -- the --

21      the -- like the front, the cover.

22              Q.    The cover?

23              A.    Yeah.

24              Q.    You may have --

25              A.    I did not read the whole report.  I
```

DANIEL KIMMAGE  11/10/2022

```
 1    did not read the whole report.
 2              Q.   Well, let me -- let me kind of walk
 3    you through some questions, and obviously if you
 4    haven't read it before, you know, if you don't
 5    know the answer, if you don't know, let me know.
 6              But just -- can you go to page V,
 7    the first page of the executive summary, little
 8    Roman five.
 9              A.   Okay.
10              Q.   There's a -- in the bottom
11    paragraph there, there's a statement that the
12    EIP -- this is the EIP talking about its own
13    activities, quote, bridge the gap between
14    government and civil society, end quote, help to
15    strengthen platform standards for combatting an
16    election-related misinformation.
17              Do you know -- do you have any
18    knowledge of helping strengthen platform
19    standards for combatting disinformation?
20              MR. KIRSCHNER:  Objection, vague.
21    BY MR. SAUER:
22              Q.   Do you know what they're talking
23    about there?
24              A.   No.  I'm not going to -- I -- I --
25    I can't interpret beyond the words here.  I
```

**DANIEL KIMMAGE  11/10/2022**

```
 1    don't know.

 2            Q.   Okay.  Higher up in the page, it

 3    says:  Dozens of federal agencies support this

 4    effort, including CISA.  Do you know if CISA's

 5    involved in the EIP?

 6                 MR. KIRSCHNER:  Objection,

 7    speculative.

 8  BY MR. SAUER:

 9            Q.   If you know.

10            A.   I don't know any of the specifics

11    of CISA's involvement with the EIP.

12            Q.   Next page, page little Roman six,

13    at the very top, it talks about how the EIP was

14    formed to enable realtime information exchange

15    between election officials, government agencies,

16    and others, including social media platforms;

17    correct?

18            A.   That's what it says, yes.

19            Q.   Do you know of any other

20    arrangements for realtime information exchange

21    between government agencies and social media

22    platforms?

23            A.   What -- what -- could you -- could

24    you be more specific?

25            Q.   Well, can you think of anything
```

**DANIEL KIMMAGE  11/10/2022**

```
 1      that you would describe as a realtime
 2      information exchange between government
 3      officials and social media platforms, any
 4      arrangement?
 5             A.   Well, what do you mean by realtime?
 6             Q.   Well, stuff that's -- anything that
 7      raises concerns as they're occurring on social
 8      media?
 9             A.   I'm not aware of any standing
10      arrangement like that at the GEC.  I can't speak
11      to other parts of government.
12             Q.   At the bottom of this page, there's
13      bullet points, you see there's four bullet
14      points there, and the last one is:
15      Delegitimization of election results; do you see
16      that?
17             A.   Yes.
18             Q.   It talks about content aiming to
19      delegitimize election results on the basis of
20      false or misleading claims; right?
21             A.   Yes.
22             Q.   Are you aware of Mr. Beebe raising
23      concerns about delegitimization of election
24      results?
25             A.   No, I don't -- no, I'm not aware.
```

**DANIEL KIMMAGE  11/10/2022**

```
 1            Q.    Or anyone else at GEC raising those
 2     kinds of concerns to the EIP?
 3            MR. KIRSCHNER:  Objection, lack of
 4     foundation.
 5            A.    No, I'm not aware of any of the
 6     specifics of interactions between GEC members
 7     and the EIP.
 8            Q.    Next paragraph down, last line of
 9     the page, it says:  Of the tickets we, the EIP,
10     processed 72 percent were related to
11     delegitimization of the election; correct?
12            A.    That's what it says.
13            Q.    So it sounds like it was processing
14     complaints that had to do with attacking the
15     legitimacy of the 2020 election?
16            MR. KIRSCHNER:  Objection, lack of
17     foundation.
18            A.    That's what it says here, yes.
19            MR. KIRSCHNER:  John, we've been --
20     Mr. Sauer, we've been going over an hour, so we
21     should take a break sometime soon.
22            MR. SAUER:  That's fine with me.
23            THE WITNESS:  Yeah, let's take a --
24            MR. SAUER:  That's fine.  If the
25     witness wants a break, we can do it.
```

**DANIEL KIMMAGE  11/10/2022**

Page 213

```
 1                    Can we keep it at five minutes or
 2     so?
 3                    MR. KIRSCHNER:  Yeah.
 4                    MR. SAUER:  Let's keep moving
 5     forward.
 6                    THE VIDEOGRAPHER:  The time is 2:31
 7     p.m.  We are off the record.
 8                    (Recess.)
 9                    THE VIDEOGRAPHER:  The time is 2:40
10     p.m.  We're back on the record.  Please proceed.
11     BY MR. SAUER:
12            Q.    Still in Exhibit 12, can you flip
13     ahead to page XI little Roman 11.
14            A.    Okay.
15            Q.    Do you see there's a note there
16     that lists about 15 social media platforms?
17            A.    Yes.
18            Q.    Eyeballing that list, are you aware
19     of anyone from the GEC interacting with anyone
20     from any of those social media platforms in
21     connection with the EIP?
22                    MR. KIRSCHNER:  Objection, lack of
23     foundation, speculative.
24            A.    I'm not aware of any specific GEC
25     interactions related both to the EIP and the
```

**DANIEL KIMMAGE  11/10/2022**

```
 1    platforms listed here.
 2              Q.    Okay.  So you anticipate my next
 3    question is:  You don't know of anyone at GEC
 4    reaching out to EIP in connection with any of
 5    these platforms; fair to say?
 6              A.    I -- I don't have any information
 7    about anyone at the GEC reaching out to these
 8    platforms in connection with the EIP.
 9              Q.    Do you have any specific
10    information about GEC's involvement in the EIP?
11              A.    Not that I recall.  I recall a
12    general engagement with the EIP.  I don't recall
13    the specifics of it.
14              Q.    Do you recall anything other than
15    the fact that there was a general engagement
16    with the EIP?
17              A.    No.  I recall the GEC was engaging
18    with the partnership, but I don't -- I don't
19    recall any specifics.
20              Q.    And do you know -- I know you
21    mentioned Mr. Beebe?
22              A.    Right.
23              Q.    Do you know if there was more than
24    one person or whether it was just one person?
25              A.    I remember his name in connection
```

**DANIEL KIMMAGE  11/10/2022**

```
 1    with it, and we also had an individual who --
 2    who liaised on election-related issues, but I
 3    don't recall whether she engaged with the EIP.
 4         Q.    Who -- what was her name?
 5         A.    Her name was Adele Ruppe.
 6         Q.    And is she still there at the GEC?
 7         A.    No.
 8         Q.    Why did she -- why did she engage
 9    on election issues?  You said she engaged on
10    election issues, tell us what that involves?
11         A.    She would attend interagency
12    meetings on safeguarding the security of the
13    elections.
14         Q.    Okay.  And what agencies did she
15    meet with?
16         A.    I -- I don't recall, it would be
17    probably the full range of national security
18    agencies.
19         Q.    And you say she attended
20    interagency meetings on safeguarding the
21    security of elections.  Were those American
22    elections, specifically?
23         A.    Yes, I believe so.
24         Q.    So we're not talking about
25    elections in foreign countries.  She was on
```

**DANIEL KIMMAGE  11/10/2022**

```
 1      meetings that discussed safeguarding the

 2      security of American elections; is that right?

 3           A.   Yes, I believe so.

 4           Q.   And -- and you think she may have

 5      had some connection or involvement with the EIP?

 6                MR. KIRSCHNER:  Objection,

 7      mischaracterizes testimony.

 8           A.   I -- I simply don't know.

 9           Q.   You don't know?  How did -- and

10      maybe I'm just forgetting.  How did -- why did

11      you bring up her name just now, because you

12      thought she might have had that interaction?

13           A.   Because she was the other -- she

14      was the GEC person who held the portfolio on

15      election security-related issues.

16           Q.   Okay.  What else was involved in

17      that portfolio, the election security portfolio

18      for GEC, other than going to interagency

19      meetings with other federal agencies?

20           A.   I believe it was almost entirely

21      focused on interagency meetings.

22           Q.   Do you know if she raised concerns

23      about election security in those meetings or did

24      she merely listen?

25                MR. KIRSCHNER:  Objection,
```

**DANIEL KIMMAGE  11/10/2022**

Page 217

```
 1    speculative.
 2    BY MR. SAUER:
 3            Q.    If you know.
 4            A.    I don't know the exact nature of
 5    her interactions in those meetings.
 6            Q.    What other activities, if any, does
 7    the GEC conduct with respect to election
 8    security?
 9            MR. KIRSCHNER:  Objection, vague,
10    ambiguous.
11            A.    The GEC, as I recall, was primarily
12    in listening mode, on occasion it might discuss,
13    you know, general Russian or Chinese or other,
14    you know, foreign disinformation actors.  And as
15    I've noted, the narratives are the tools and
16    techniques that they use.
17            Q.    And would those be narratives,
18    tools and techniques that relate to kind of
19    destabilizing or disrupting American domestic
20    elections?
21            MR. KIRSCHNER:  Objection.
22    BY MR. SAUER:
23            Q.    If you know.
24            A.    I don't recall any specific
25    narratives.
```

**DANIEL KIMMAGE  11/10/2022**

```
 1              Q.    Okay.  And you don't know whether
 2    that individual with the election security
 3    portfolio for GEC had any direct involvement
 4    with the EIP?
 5              A.    I don't, no.
 6              Q.    But you think that she may have
 7    because of the nature -- just because of the
 8    nature of her portfolio, this was
 9    election-related, she was the election person,
10    therefore, she may have been involved in this?
11              A.    Yes, that's possible.
12              Q.    Next page, XII little Roman 12.
13              A.    Mm-hmm.
14              Q.    List of contributors at the very
15    bottom, it says that the EIP would like to thank
16    Matthew Masterson; do you know who he is?
17              A.    No, I don't.
18              Q.    Have you ever heard that name
19    before, to your recollection?
20              A.    I don't know.  Is he listed in the
21    complaint?  I don't -- I don't -- I don't really
22    know.
23              Q.    Okay.  I was just curious if you
24    know.
25              A.    No.  No idea.
```

**DANIEL KIMMAGE  11/10/2022**

```
 1              Q.    Okay.  Next page, XIII, little
 2      Roman 13.  There's acknowledgments which are
 3      basically thanking the people who funded the
 4      EIP.
 5              A.    Mm-hmm.
 6              Q.    Do you know who funded the EIP?
 7              A.    No, I don't.
 8              Q.    Okay.  And there's four -- four
 9      entities involved in it; were you aware of that,
10      that are listed here?
11              MR. KIRSCHNER:  Can you point us to
12      where you're referring to?
13  BY MR. SAUER:
14              Q.    Digital Research Forensic Lab of
15      the Atlantic Council, in bold, Graphika, in
16      bold, Stanford Internet Observatory, in bold,
17      and university of Washington Center For an
18      Informed Public, in bold; do you see those four
19      entities?
20              MR. KIRSCHNER:  All right.
21              A.    Yes.
22              Q.    Were you aware that they were
23      involved in the EIP?
24              A.    I'm only seeing this here, I
25      don't -- I don't recall who was involved in the
```

**DANIEL KIMMAGE  11/10/2022**

```
 1    EIP.
 2            Q.    Okay.  Well, then, down at the
 3    bottom of the page, last sentence, third line
 4    from the bottom, researchers who contributed to
 5    the EIP also received partial support from the
 6    US National Science Foundation; correct?
 7            A.    I -- I see that in here.
 8            Q.    So that's government funding, at
 9    least in part, for the EIP; correct?
10            MR. KIRSCHNER:  Objection, lack of
11    foundation.
12  BY MR. SAUER:
13            Q.    Is that what it says?
14            MR. KIRSCHNER:  Speculation.
15            A.    I see what it -- that's what it
16    says here, yes.
17            Q.    Were you aware of -- are you aware
18    of government funding for the EIP from any other
19    source?
20            A.    No.
21            Q.    Are you aware of government funding
22    for the EIP from any State Department source?
23            A.    No.
24            Q.    Are you aware of government funding
25    or support for the EIP from anyone at CISA?
```

**DANIEL KIMMAGE  11/10/2022**

Page 221

```
 1              A.    No.
 2              Q.    Generally speaking, you -- you
 3     don't know who funded it, essentially; is that
 4     fair to say?
 5              A.    Yes, I don't know.
 6              Q.    Were there ever any discussions at
 7     State about funding it or supporting it, that
 8     you recall?
 9              A.    I don't recall any discussions
10     about funding or supporting it.
11              Q.    If you flip ahead a few pages, to
12     Arabic page 2, do you see at the beginning of
13     the second full paragraph, where it says:  The
14     initial idea?
15              A.    Mm-hmm.
16              Q.    The initial idea for the
17     partnership, that's the EIP, came from four
18     students that the Stanford Internet Observatory
19     funded to complete volunteer internships at CISA
20     at the Department of Homeland Security; correct?
21              MR. KIRSCHNER:  Objection, lack of
22     foundation.
23     BY MR. SAUER:
24              Q.    Is that what it says?
25              A.    I see that, yes, that's what it
```

**DANIEL KIMMAGE  11/10/2022**

```
 1    says.
 2            Q.    Okay.  And then, were you aware of
 3    CISA interns originating the idea for this EIP?
 4            A.    No, I was not.
 5            Q.    Were you -- did anyone at the State
 6    Department contribute to the origination of --
 7    of EIP?
 8                  MR. KIRSCHNER:  Objection, lack of
 9    foundation.
10            A.    I'm not aware of any State
11    Department involvement.
12            Q.    So it appears that it was partly
13    funded by the government, and that it was -- the
14    idea was originated by government workers at the
15    time; correct?
16                  MR. KIRSCHNER:  Objection, lack of
17    foundation.
18    BY MR. SAUER:
19            Q.    Is that what it says?
20            A.    I --
21                  MR. KIRSCHNER:  Objection,
22    mischaracterizing testimony.
23            A.    I -- I see what it says here.
24            Q.    Yeah.  Go down further in that
25    paragraph, and specifically that's what it says;
```

**DANIEL KIMMAGE  11/10/2022**

Page 223

```
 1      right?  It says that it was originated by people

 2      who were working for CISA at the time; correct?

 3              MR. KIRSCHNER:  Objection, asked

 4      and answered, mischaracterizing the evidence.

 5   BY MR. SAUER:

 6              Q.   Is that what it says?

 7              A.   It says that:  Stanford funded the

 8      students to complete internships, not that CISA

 9      funded them.  It says the Stanford Internet

10      Observatory funded to complete.

11              Q.   Right, the internships were funded.

12              A.   By Stanford.

13              Q.   Right.  And they were volunteer

14      internships at CISA.  So CISA interns who were

15      funded by Stanford --

16              A.   Right.

17              Q.   -- originated the idea for the EIP?

18      I'm just asking if that's what it says.

19              A.   Yes, that is what it says here,

20      yes.

21              Q.   Okay.  Lower down on in the same

22      paragraph:  This is especially true; do you see

23      that sentence?  Actually, immediately before

24      that, it says:  No government agency in the

25      United States has the explicit mandate to
```

**DANIEL KIMMAGE  11/10/2022**

```
 1     monitor and correct mis and disinformation;
 2     correct?
 3          A.   Yes.
 4          Q.   And it goes on to say:  This is
 5     especially true for election disinformation that
 6     originates from within the United States, which
 7     would likely be excluded from law enforcement
 8     action under the First Amendment and not
 9     appropriate for study by intelligence agencies
10     restricted from operating inside the United
11     States; correct?
12          A.   That's what it says, yes.
13          Q.   Okay.  And are you aware of any
14     discussions at GEC of, you know, setting up a
15     collaboration with nongovernmental third parties
16     to engage in activities that the GEC would be
17     prohibited from engaging in under the First
18     Amendment?
19               MR. KIRSCHNER:  Objection, to the
20     extent this is asking for attorney-client
21     information, I would instruct the witness not to
22     answer, to the extent you can answer without --
23     BY MR. SAUER:
24          Q.   Yeah, I'm not asking for anything
25     the lawyers told you in the context of
```

**DANIEL KIMMAGE  11/10/2022**

Page 225

1    representing you.  I'm just asking for

2    conversations within the GEC about working with

3    outside third parties to conduct activities that

4    the GEC could not do because of First Amendment

5    restrictions.

6                MR. KIRSCHNER:  Again, objection,

7    I'm instructing the witness not to answer to

8    include any attorney-client communication within

9    the Department of State about what can and

10   cannot be done.

11               MR. SAUER:  I'm not asking for

12   that.

13               Go ahead.

14               MR. KIRSCHNER:  Well, no, I'm

15   instructing him not to answer about -- about

16   attorney-client communication, to the extent he

17   can answer that is outside of any legal

18   advice --

19               THE WITNESS:  Right.

20               MR. KIRSCHNER:  -- received in the

21   context of this question, he can answer.

22        A.   Outside of legal advice, I'm not

23   aware of any conversations at the GEC that would

24   involve any infringement on First Amendment

25   rights.

**DANIEL KIMMAGE  11/10/2022**

Page 226

```
 1              Q.    Flip ahead to page 6, Arabic 6.
 2              Do you see there's a kind of list
 3    of the goals of the Election Integrity
 4    Partnership?
 5              A.    Yes.
 6              Q.    Are you aware of the GEC having any
 7    input in the formulation of their goals?
 8              MR. KIRSCHNER:  Objection,
 9    speculative, asked and answered.
10    BY MR. SAUER:
11              Q.    Are you aware?
12              A.    No, I'm not aware of any GEC input
13    into these goals.
14              Q.    Bottom left corner of this page, of
15    this diagram, you see it says:  Flag policy
16    violations for platforms; correct?
17              A.    Yes.
18              Q.    Okay.  Are you aware of anyone at
19    the GEC working with EIP to flag policy
20    violations for platforms?
21              MR. KIRSCHNER:  Objection,
22    speculative, asked and answered.
23              A.    No, I'm not aware.
24              Q.    Flip ahead to page 8, it talks
25    about how the EIP tracked its analysis topics
```

**DANIEL KIMMAGE  11/10/2022**

Page 227

```
 1      and engaged it with outside stakeholder
 2      organizations using an internal ticketed work
 3      flow management system; correct?
 4           A.   Where is this?
 5           Q.   I'm sorry, very bottom, full
 6      paragraph?
 7           A.   Okay.
 8           Q.   Second sentence -- or sorry --
 9      first sentence there.
10           A.   Okay.
11           Q.   Third sentence, there, goes on to
12      say:  Tickets were submitted by trusted external
13      stakeholders, as detailed in section 1 -- sorry,
14      1.4 and internal EIP analyst; do you see that?
15           A.   I do see that.
16           Q.   Do you know who the trusted
17      external stakeholders were who were submitting
18      tickets to the EIP?
19               MR. KIRSCHNER:  Objection,
20      speculative, asked and answered.
21   BY MR. SAUER:
22           Q.   Do you know?
23           A.   No, I do not.
24           Q.   Now, there's a reference there to
25      section 1.4 on page 11, right?  There it
```

**DANIEL KIMMAGE  11/10/2022**

Page 228

```
 1      identifies external stakeholders; correct?

 2              A.    Yes.

 3              Q.    And there it starts saying:  The

 4      EIP served as a connector for many stakeholders

 5      and so forth; right?

 6              A.    Mm-hmm.

 7              Q.    The next sentence, which is on page

 8      12, first full sentence on page 12, said:

 9      External stakeholders included government, civil

10      society, social media companies and news media

11      companies; correct?

12              A.    Yes.

13              Q.    Okay.  And so the external

14      stakeholders include some governmental entities

15      correct?

16              A.    Yes.

17              Q.    According to the report?

18                    Is the GEC one of them?

19                    MR. KIRSCHNER:  Objection, lack of

20      foundation, speculative.

21              A.    I -- I see the GEC listed here,

22      yes.

23              Q.    Down there under four, you're

24      getting ahead of me, down there under four,

25      major stakeholder groups; right?
```

**DANIEL KIMMAGE  11/10/2022**

Page 229

```
 1                  A.    Yes.
 2                  Q.    And those external stakeholders are
 3         the ones listed in the reports as government
 4         partners, quote, could create tickets or send
 5         notes to EIP analysts, and they used these
 6         procedures to flag incidents or emerging
 7         narrative to be assessed for EIP analysis?
 8                  MR. KIRSCHNER:  Objection,
 9         mischaracterizes evidence, lack of foundation.
10     BY MR. SAUER:
11                  Q.    Do you see where it says that in
12         the first sentence, in the first full paragraph
13         of this page, exactly as I read it?
14                  A.    I do see that.
15                  Q.    Was the GEC one of those government
16         partners who could create tickets or send notes
17         to EIP analysts and use those procedures to flag
18         incidents or emerging narratives?
19                  MR. KIRSCHNER:  Objection,
20         speculative.
21     BY MR. SAUER:
22                  Q.    Do you know?
23                  A.    I don't know, beyond what's written
24         here.
25                  Q.    Okay.  And down there in the middle
```

**DANIEL KIMMAGE  11/10/2022**

```
 1        of the diagram, in the middle, where it
 2        identifies four major stakeholder groups, the
 3        first one is government; right?
 4              A.    Yes.
 5              Q.    And there's three partners listed,
 6        the elections infrastructure, ISAC; do you know
 7        what that is?
 8              A.    No, I don't.
 9              Q.    And CISA; correct?
10              A.    Yes.
11              Q.    And then GEC; correct?
12              A.    Yes.
13              Q.    So GEC is at least identified in
14        this report as a major stakeholder group;
15        correct?
16              A.    It's listed as a member of a major
17        stakeholder group, yes.
18              Q.    Right, right, right, it's one of
19        three members of a major stakeholder group.  And
20        the report says that external stakeholders,
21        trusted stakeholders, include government;
22        correct, up there at the top?
23              A.    Yes.
24              Q.    And that those stakeholders,
25        including government partners, could submit
```

**DANIEL KIMMAGE  11/10/2022**

Page 231

```
 1     tickets to the EIC; right?
 2          A.   Yes.
 3               MR. KIRSCHNER:  Objection, lack of
 4     foundation.
 5   BY MR. SAUER:
 6          Q.   Did anyone authorize -- do you
 7     remember anyone authorizing anyone at GEC to
 8     submit tickets to the EIP?
 9               MR. KIRSCHNER:  Objection, lack of
10     foundation, mischaracterizes evidence.
11          A.   No, I don't recall that.
12          Q.   Did you authorize that?
13          A.   I don't recall authorizing it.
14          Q.   Who was that?  Who was in charge
15     of -- like, who was in charge of GEC during the
16     period from, you know, the three months prior to
17     the 2020 election?
18          A.   It would have been coordinator Lea
19     Gabrielle.
20          Q.   Okay.  Do you know if she ever
21     issued any orders about the GEC of any kind.
22          A.   If she issued any orders about the
23     GEC of any kind?
24          Q.   Yeah, do you know if she did?  Do
25     you know if she gave any directive to anyone --
```

**DANIEL KIMMAGE  11/10/2022**

```
 1      sorry -- do you know if she gave any directive

 2   to anyone at GEC about EIP of any kind?

 3           A.   No, I don't.

 4           Q.   Can you turn to the next page.

 5                Do you see how there's a section

 6   there called EI-ISAC?

 7           A.   Yes.

 8           Q.   Do you know what EI-ISAC is?

 9           A.   No.

10           Q.   There, it says:  The election

11   infrastructure information sharing and analysis

12   center -- analysis center, which is run by The

13   Center For Internet Security; do you know what

14   that is?

15           A.   No, I do not.

16           Q.   Are you aware of any relationship

17   between The Center For Internet Security and

18   CISA?

19           A.   No.

20           Q.   Can you turn to page 17, talks

21   about using platforms, in the middle of the

22   page, under there it says:  The EIP established

23   relationships with social media platforms to

24   facilitate flagging of incidents for evaluation

25   when content or behavior appeared to violate
```

**DANIEL KIMMAGE  11/10/2022**

Page 233

1     platform policies; correct?

2          A.    Yes.

3          Q.    So the EIP wanted to facilitate

4     flagging of incidents for evaluation when there

5     appeared to be a content modulation policy; is

6     that what it's saying?

7               MR. KIRSCHNER:  Objection, lack of

8     foundation.

9          A.    No.  It's saying flagging of

10    incidents for evaluation when content or

11    behavior appeared to violate platform policies;

12    it doesn't say anything about modulation.

13         Q.    Okay.  Are you aware of anyone at

14    the GEC flagging incidents for evaluation of any

15    kind for -- for social media platforms?

16              MR. KIRSCHNER:  Objection to form.

17   BY MR. SAUER:

18         Q.    Let me rephrase that.

19              Are you aware of anyone at the GEC,

20    quote, flagging of incidents for evaluation for

21    social media platforms in any way?

22         A.    Not that I recall.

23         Q.    Can you flip ahead to page 27?

24         A.    Mm-hmm.

25         Q.    If you see under key findings, it

**DANIEL KIMMAGE  11/10/2022**

Page 234

```
 1    says:  We processed 639 in-scope tickets?
 2          A.    Yes.
 3          Q.    And then it says, 72 percent of
 4    these tickets were related to delegitimizing the
 5    election results; correct?
 6          A.    Yes.
 7          Q.    Then down at the bottom, it says:
 8    35 percent of the URLs we shared with Facebook,
 9    Instagram, Twitter, TikTok and YouTube were
10    either labeled removed or soft blocked; correct?
11          A.    I see that, yes.
12          Q.    So their data indicates that they
13    processed hundreds of tickets, 72 percent of
14    them related to delegitimizing of election
15    results; correct?
16          A.    Yes.
17          Q.    And then some sort of action was
18    taken by the social media platforms, either
19    labeling, removing, or soft blocking 35 percent
20    of them?
21                MR. KIRSCHNER:  Objection, lack of
22    foundation, speculative.
23          A.    Yes, I see that sentence.
24          Q.    Did GEC have any involvement in
25    seeking the soft blocking, removal or -- or --
```

**DANIEL KIMMAGE  11/10/2022**

```
 1    or other action against any content on the
 2    internet?
 3              MR. KIRSCHNER:  Objection,
 4    speculative, asked and answered.
 5         A.   I'm not -- I don't know of any GEC
 6    actions of that type.
 7         Q.   Can you go to page 30?  And I've
 8    got a kind of internal communication, electronic
 9    communication chain here, between the government
10    partner, a platform partner, and EIP member; do
11    you see that?
12         A.   I do.
13         Q.   And the government -- the platform
14    partner and government partner are redacted over
15    the person who was actually participating in the
16    conversation; do you know who those were?
17              MR. KIRSCHNER:  Objection,
18    speculative.
19         A.   No, I don't.
20         Q.   Could you go to page 33?  Do you
21    see in the second paragraph there, at the
22    bottom, there's a reference to the
23    gatewaypundit.com?
24         A.   Where is this?
25         Q.   Second paragraph, last sentence.
```

**DANIEL KIMMAGE  11/10/2022**

```
 1              A.   Yes, I see that.
 2              Q.   And it says:  The top
 3    misinformation-spreading websites were the far
 4    right forum theDonald.win, blah, blah, blah,
 5    blah, blah, and the gatewaypundit.com, a far
 6    right news website?
 7              A.   I see that.
 8              Q.   Have you ever heard of the
 9    gatewaypundit.com?
10              A.   I may have.  I don't -- I don't
11    recall any details.
12              Q.   Have you ever heard it discussed in
13    any meetings with any government officials?
14              A.   No, I don't recall.
15              Q.   And would it surprise you to learn
16    that it's cited 49 times in this report?
17              MR. KIRSCHNER:  Objection, lack of
18    foundation, speculative.
19              A.   I -- I have no -- it doesn't
20    surprise me or not surprise me.
21              Q.   Do you know -- do you remember any
22    discussion of any kind relating to the
23    gatewaypundit and social media content relating
24    to the elections?
25              A.   No, I don't.
```

**DANIEL KIMMAGE  11/10/2022**

```
 1              Q.   You don't?
 2              Could you go to page 35.  Do you
 3    see there, right above the bold heading, tickets
 4    by fact-checking URLs, there's a paragraph?
 5              A.   Yes.
 6              Q.   And the report states that last, we
 7    coded tickets based on whether they additionally
 8    related to COVID-19 narratives, or had an
 9    element of foreign interference; correct?
10              A.   Yes.
11              Q.   And it says -- remember, there were
12    639 tickets referred to earlier; do you recall
13    that?
14              A.   Yes.
15              Q.   And it says:  Interestingly, just
16    one percent of the tickets related to COVID-19,
17    and less than one percent related to foreign
18    interference; correct?
19              A.   Yes.
20              Q.   So if less than one percent related
21    to foreign interference, it seems that over 99
22    percent of what the EIP was doing with its
23    tickets related to stuff that's kind of outside
24    what you've described as the mission of GEC; is
25    that fair to say?
```

**DANIEL KIMMAGE  11/10/2022**

Page 238

```
 1                    MR. KIRSCHNER:  Objection, lack of
 2      foundation, speculative, asked and answered.
 3   BY MR. SAUER:
 4           Q.    Is that -- is that fair to say?
 5           A.    No, because a foreign-originated
 6      narrative can relate to anything.  This is just
 7      talking about the narratives are related to
 8      foreign interference.  A COVID-related narrative
 9      could originate with a foreign malign influence
10      factor.  This doesn't tell you anything about
11      that, so no, I would -- I would disagree.
12           Q.    So you think that GEC could flag
13      things for the EIP that wouldn't be related to a
14      foreign interference?
15                    MR. KIRSCHNER:  Objection,
16      mischaracterizes testimony.
17           A.    No.  What I said is that a foreign
18      disinformation narrative does not necessarily
19      have to be related to foreign interference.  The
20      Russian propaganda and disinformation is not
21      about Russian interference.  It could be about
22      COVID, it can be about anything.
23                    The foreign actor behind it, and
24      the subject of foreign interference, those two
25      things are not equivalent.
```

**DANIEL KIMMAGE  11/10/2022**

```
 1                You cannot conclude that 99 percent
 2     of the narratives had no relation to a foreign
 3     actor just because they weren't related to
 4     foreign interference.  They could be about
 5     anything and still originate with the foreign
 6     actor.
 7                Q.   I got you.  So -- so that's a
 8     distinction between the originator of the
 9     narrative and the content of the narrative, fair
10     to say, that you're drawing?
11                A.   Yes.
12                Q.   Okay.  So foreign interference
13     tickets would relate to foreign -- I take it
14     foreign interference in elections or -- go
15     ahead.
16                A.   The subject of the narrative in the
17     foreign or non-foreign origination, the nexus to
18     a foreign actor, are not necessarily related.
19                You can't draw a conclusion about a
20     nexus to a foreign actor and, therefore, the GEC
21     mandate, based on the focus of the narrative.
22                Q.   So, in other words, you could have
23     a COVID narrative that's false, has nothing to
24     do with foreign interference, but it might be of
25     concern to the GEC because it originated with
```

**DANIEL KIMMAGE  11/10/2022**

Page 240

```
 1      China or Russia, for example?

 2              A.   Correct.

 3              Q.   And there could be other

 4      narratives, as well.

 5                   Why don't you flip ahead to --

 6      let's flip ahead to page 38.

 7              A.   Okay.

 8              Q.   Do you see the graph there at the

 9      top of the part of the page, a bar graph?

10              A.   Yes.

11              Q.   And it says:  Percent of tickets by

12      organization flagged; right?

13              A.   Yes.

14              Q.   And GEC's kind of there in the

15      middle, right, indicating that something between

16      zero and ten percent of tickets were flagged by

17      the GEC?

18              A.   Well, it's in the middle of the

19      graph, but it seems to be quite far down, if you

20      add up the percentages.

21              Q.   Right.  What's below Facebook and

22      Twitter, for example, and well below the EE at

23      ISAC; correct?

24              A.   Yes.

25              Q.   But it looks like that bar is
```

**DANIEL KIMMAGE  11/10/2022**

```
 1     somewhere between zero and ten; right?
 2          A.   It looks like it's between zero and
 3     five.
 4          Q.   Yeah, I agree with that, too.
 5               Do you have any idea what was being
 6     flagged by GEC for the EIP?
 7          A.   No, I don't.
 8          Q.   Okay.  Turn to the next page, just
 9     a number there, do you see in the -- towards the
10     bottom of the page, in the second to last
11     paragraph, there's reference to a web scraping
12     tool and how they ran it on all 4,832 URLs in
13     the tickets; right?
14          A.   Yes, I see that.
15          Q.   So the 639 tickets involved a lot
16     more than 639 URLs; correct?
17               MR. KIRSCHNER:  Objection,
18     speculative.
19          A.   The relationship between the
20     tickets and URLs is not clear to me here.
21          Q.   Page 42, can you turn ahead to
22     that, bottom of the page, concerns by reporting
23     collaborators, correct, very last sentence?
24     Other groups that it reported tickets include
25     the State Department's Global Engagement Center;
```

**DANIEL KIMMAGE  11/10/2022**

```
 1    correct?
 2            A.    Yes, I see that.
 3            Q.    And again, you have no idea what
 4    those were; is that fair to say?
 5            A.    I don't know what they were.
 6            Q.    Do you know how this reporting was
 7    done, do you know if there was, like, an online
 8    kind of platform to do it, that you logged into
 9    or --
10            A.    I -- I don't know anything about
11    the -- the mechanics.
12            Q.    Okay.  Later, in page 51, you need
13    to read it, there's a reference to general
14    concerns relating to mail-in ballots, it says:
15    That constituted the most prominent type of
16    misinformation assessed in the months leading up
17    to election day.
18                  Have you ever heard discussions of
19    that in the GEC in any connection?
20            A.    No.
21            Q.    So you -- you -- you're not aware
22    of any discussions or conversations within the
23    GEC about, you know, disinformation relating to
24    the security of voting by mail?
25            A.    No, I'm not.
```

**DANIEL KIMMAGE  11/10/2022**

Page 243

1            Q.    Including such disinformation that
2      might have originated as a foreign narrative or
3      anything like that?
4            A.    No, I'm not aware of any
5      discussions within the GEC about disinformation
6      narratives related to mail-in ballots.
7            Q.    Are you aware of any narratives
8      relating to mail-in ballots that are
9      disinformation?
10                 MR. KIRSCHNER:  Objection, vague.
11     BY MR. SAUER:
12            Q.    You can answer.
13            A.    I believe there were Russian
14     narratives on the overall integrity of the
15     elections.  I don't recall all the specifics.
16            Q.    Do you know what the -- generally,
17     what those narratives said?
18            A.    I -- I don't recall the specifics.
19            Q.    Were those narratives discussed
20     within the Russia team that you mentioned
21     Mr. Beebe is a member of?
22            A.    I -- I don't know what the internal
23     discussions of the Russia team were.
24            Q.    Do you remember anything about what
25     they said about those narratives?

**DANIEL KIMMAGE  11/10/2022**

```
 1                     MR. KIRSCHNER:  Objection, asked
 2     and answered.
 3          A.    No, I do not.
 4          Q.    If you flip way ahead, to page 183,
 5     the very middle paragraph of that page, it
 6     discusses there incident-related tweet data;
 7     correct?
 8                     MR. KIRSCHNER:  Objection.
 9          A.    Which paragraph is this?
10          Q.    Are you on page 183?
11          A.    Yes.
12          Q.    It's the last paragraph before the
13     heading:  Facebook and Instagram data
14     collection?
15          A.    Yes, I see that.
16          Q.    And there it talks about -- earlier
17     I talked about how there were, you know,
18     thousands of URLs, talks about number of tweets
19     affected, that last number is 21,897,364 tweets;
20     correct?
21          A.    Yes, I see the number.
22          Q.    And is that the -- is that a scope
23     of how many tweets were affected by the -- or
24     considered by the EIP's tickets?
25                     MR. KIRSCHNER:  Objection, lack of
```

**DANIEL KIMMAGE  11/10/2022**

Page 245

```
 1    foundation, speculative.
 2            A.    It says that their incident-related
 3    tweet data included -- the relationships are not
 4    entirely clear to me -- included 5,888,771
 5    tweets and retweets from ticket status -- from
 6    ticket status IDs directly, 1,094,115 tweets and
 7    retweets, collected first from ticket URLs, and
 8    14,914,478 from key word searches, for a total
 9    of 21,897,364 tweets.  It's not entirely clear
10    to me what that means.
11            Q.    Can you flip ahead to page 211.
12    There's a chapter six called policy.
13            A.    Mm-hmm.
14            Q.    And there in the first paragraph,
15    in the third line, it says:  During the 2020
16    election all the major platforms made
17    significant changes to election integrity
18    policies; correct?
19            A.    Yes, I see the sentence.
20            Q.    And without, you know, going to all
21    the tabs, also in the report they talk about how
22    the EIP actually kind of pushed for those
23    changes; is that right?
24            MR. KIRSCHNER:  Objection, lack of
25    foundation.
```

**DANIEL KIMMAGE  11/10/2022**

Page 246

```
 1                A.    I haven't read the full report.
 2                Q.    Are you aware of public statements
 3       to that effect, that the EIP advocated for more
 4       restrictive election-integrity policies at the
 5       major social media platforms?
 6                A.    No, I didn't track the EIP's public
 7       statements.
 8                Q.    Do you have any knowledge of the
 9       GEC being involved in advocating for more
10       restrictive content modulation policies with
11       respect to elections at social media platforms?
12                A.    No.
13                Q.    Do you have any knowledge of anyone
14       at the GEC being involved in any kind of, you
15       know, advocacy or argument relating to content
16       modulation policies of any kind?
17                      MR. KIRSCHNER:  Objection, vague,
18       ambiguous.
19                A.    Do you mean advocating to change
20       their policies?
21                Q.    Correct.
22                A.    No.
23                Q.    How about any discussion of content
24       modulation policies at the GEC in any
25       connection?
```

**DANIEL KIMMAGE  11/10/2022**

```
 1                    MR. KIRSCHNER:  Objection, vague,
 2      ambiguous.
 3            A.   Can I ask you to clarify?  I
 4      haven't heard the term:  Content modulation,
 5      before.  I've heard content moderation.
 6            Q.   Why don't we use content
 7      moderation, then.
 8            A.   Okay.
 9            Q.   You understand -- to you, what does
10      content moderation policy mean?
11            A.   I'm not going to define -- I don't
12      know how the social media companies define that,
13      specifically.
14            Q.   How do you understand it as a -- go
15      ahead.
16            A.   Their terms of service.
17            Q.   And are they, in particular, their
18      terms of service as it permits them to either
19      de-emphasize, block, remove, or de-platform
20      content that they deem to be inappropriate, is
21      that content moderation?
22            A.   I -- I -- I don't know the
23      specifics for each company, but it's, I believe,
24      how they -- how they determine what is
25      appropriate and inappropriate content on their
```

**DANIEL KIMMAGE  11/10/2022**

Page 248

```
 1   platform.
 2              Q.    And then -- and then take action
 3   against inappropriate content; correct?
 4              A.    Potentially.
 5              Q.    Okay.  And can I, for the purpose
 6   of my next line of questions with you, can we
 7   use it that way, as referring to the policies of
 8   the social media platforms by which they
 9   determine what's appropriate and inappropriate
10   content, and potentially take some kind of
11   action against inappropriate content?
12              A.    With the caveat that I don't know
13   specifically how the companies, themselves,
14   define it.
15              Q.    Sure.  And my only question is:
16   Are you aware of that general issue, which we
17   were calling content moderation policies, being
18   discussed at the GEC in any connection?
19              A.    No.  The GEC didn't engage on the
20   specifics of their content moderation policies.
21              Q.    Were there ever any discussions
22   within the GEC about content moderation policies
23   and how they might apply to, say, Russian, you
24   know, originated narratives?
25                    MR. KIRSCHNER:  Objection.  To the
```

**DANIEL KIMMAGE  11/10/2022**

```
 1    extent this is asking for deliberative

 2    information within the GEC, I instruct the

 3    witness not to answer on privileged grounds.  To

 4    the extent you can answer without getting into

 5    internal deliberations, you may answer.

 6  BY MR. SAUER:

 7         Q.   For starters, can you identify

 8    whether you're aware of any such conversations

 9    without identifying the content of such

10    conversations.

11         A.   I'm not aware of conversations

12    specifically focused on content moderation

13    policies at specific social media companies.

14         Q.   Other than specifically focused,

15    are you aware of conversations or discussions

16    that address that issue in any way?

17         A.   I think the only context would be

18    the platforms periodically released public

19    statements on campaigns they identified and

20    things that they took down.  And we looked at

21    those public statements like -- like -- like

22    everybody else.

23              But that wasn't focussed on the

24    moderation policies.  It was focused on how they

25    were looking at foreign propaganda and
```

**DANIEL KIMMAGE  11/10/2022**

Page 250

```
 1    disinformation actors.
 2              Q.   Do you remember a specific public
 3    statement of that kind, like, did Facebook ever
 4    say, hey, we've decided to take down, you know,
 5    allegations that the US government manufactured
 6    AIDS in a lab in the 1970s?
 7              A.   No, because each platform releases
 8    them regularly.  I don't remember a specific
 9    one, no.
10              Q.   So it happens frequently?
11              A.   (Nodding.)
12              Q.   And that's something -- sorry, it
13    happens frequently?
14              A.   Yes, it -- I don't remember the
15    frequency at each social media company, but
16    they -- they release them periodically.
17              Q.   Why do you track that information?
18              MR. KIRSCHNER:  Objection,
19    assuming -- mischaracterizing testimony and
20    vague.  You said:  "That information."
21    BY MR. SAUER:
22              Q.   Why do you track the information
23    that is released by the social media companies?
24              A.   It's publicly-released information
25    that's also covered in the media, and we look at
```

**DANIEL KIMMAGE  11/10/2022**

Page 251

```
 1    it to stay informed about the tools, techniques,
 2    and campaigns of foreign propaganda and
 3    disinformation actors.
 4          Q.   Do you know whether the EIP is
 5    still functioning?
 6          A.   I don't.
 7          Q.   Do you know if they had activities
 8    that relate to the 2022 election that just
 9    finished on Tuesday?
10          A.   I don't.
11          Q.   And do you know whether they plan
12    to have, you know, activity with respect to
13    future elections, like 2024?
14          A.   No.
15          Q.   Do you know if GEC is still
16    involved in the EIP in any capacity?
17          MR. KIRSCHNER:  Objection, assumes
18    evidence not on record, lack of foundation,
19    vague.
20    BY MR. SAUER:
21          Q.   Do you know?
22          A.   No.
23          Q.   You do not know?
24          A.   I do not.
25          Q.   For example, Mr. Beebe, is he still
```

**DANIEL KIMMAGE  11/10/2022**

```
 1    at GEC?

 2            A.    I believe he is.

 3            Q.    And then the other lady you

 4    mentioned, I can't remember her name.

 5            A.    Adele Ruppe is no longer at the

 6    GEC.

 7            Q.    She's no longer at the GEC?  And

 8    you don't know if either they or anyone else is

 9    still interacting with EIP in any way?

10            A.    I don't, no.

11            MR. KIRSCHNER:  If you're done with

12    that exhibit, then can we take a five-minute

13    break?

14            MR. SAUER:  Yeah, sure.  Yeah.

15    Yeah.  I'll go through the remaining exhibits

16    during the break and see what we can do to move

17    forward.

18            MR. KIRSCHNER:  All right.  Do you

19    have a sense -- sorry, let's go off the record

20    first.

21            THE VIDEOGRAPHER:  All right.  The

22    time is 3:21 p.m.  We are off the record.

23            (Recess.)

24            THE VIDEOGRAPHER:  The time is 3:31

25    p.m.  We're back on the record.  Please proceed.
```

**DANIEL KIMMAGE  11/10/2022**

Page 253

1              MR. SAUER:  You're being handed

2      Exhibit 13, it's just a one-pager.

3              (Exhibit No. 13 was marked for

4      identification.)

5   BY MR. SAUER:

6          **Q.    And this is a website called**

7   **Facebook Content Requests, that says that this**

8   **portal is for on-boarded partner requests**

9   **pertaining to content issues at Facebook and**

10  **Instagram; have you ever seen a website like**

11  **this?**

12         A.    I don't believe so.

13         **Q.    Are you familiar with anyone at GEC**

14  **having authority to use a website that provides**

15  **a kind of privileged or sort of line of**

16  **communication with social media platform?**

17             MR. KIRSCHNER:  Objection, lack of

18      foundation, speculative.

19   BY MR. SAUER:

20         **Q.    Are you aware of any?**

21         A.    I -- I'm not aware of any specific

22      individual at GEC, no.

23         **Q.    Have you ever heard of the phrase:**

24  **Partner support portal?**

25         A.    No, not before you just used it.

**DANIEL KIMMAGE  11/10/2022**

```
 1            Q.   Okay.  Are you aware of certain
 2   social media platforms having lines of
 3   electronic communication or websites that their
 4   partners can log into to report issues relating
 5   to content on their platforms?
 6            A.   Yes, I'm aware that there are
 7   portals where users can -- or anyone can report
 8   issues, I believe.
 9            Q.   Are you aware of anyone at the GEC
10   using any such portal?
11            A.   I'm not aware of any -- I'm not
12   aware of any specific instance of someone using
13   a portal like that.
14            Q.   Are you aware of any discussions
15   with the FBI about a Russian hack and leak
16   operation that was anticipated to occur in late
17   2020?
18            MR. KIRSCHNER:  Objection.  To the
19   extent this is calling for law enforcement
20   activity, and Mr. Kimmage is aware of any such
21   law enforcement activity, I would instruct the
22   witness not to answer.
23                 To the extent you can answer
24   without engaging in discussion of law
25   enforcement or other deliberative information,
```

**DANIEL KIMMAGE  11/10/2022**

```
 1    you may answer.

 2            A.    I'm not aware of any specific

 3    discussion.  Could you be more specific?

 4            Q.    Sure.  Did you hear, at any time,

 5    that the FBI had raised any kind of concerns

 6    relating to a Russian hack and leak operation or

 7    hack and release operation is, I think, how you

 8    described it earlier, in 2020?

 9                 MR. KIRSCHNER:  Again, same

10    objection.  To the extent this is calling for

11    internal deliberations or a law enforcement

12    information that is privileged, I instruct the

13    witness not to answer.  To the extent that you

14    can answer without revealing potential

15    privileged information, you may proceed.

16            A.    I don't recall, and I can't speak

17    for FBI's concerns and activities in the period.

18            Q.    Do you recall -- do you recall

19    there being any concern, in any quarter, about a

20    hack and release operation that the Russians

21    might employ in the 2020 election cycle?

22                 MR. KIRSCHNER:  Again, I instruct

23    the witness -- object.  I instruct the witness,

24    to the extent that this is calling for law

25    enforcement information or even classified
```

**DANIEL KIMMAGE  11/10/2022**

```
 1    information, I instruct the witness not to

 2    answer.

 3              To the extent the witness can

 4    answer without divulging such information, the

 5    witness may proceed.

 6         A.   Given that reporting would have

 7    potentially occurred through classified

 8    channels, I don't feel that I can answer that

 9    in -- in open discussion.

10         Q.   Let me -- let me tease that out a

11    little bit.

12              So are you withholding any

13    information, in response to my question, because

14    of the instruction -- the conditional

15    instruction you received from your counsel.

16         A.   No.  I'm not aware of any specific,

17    but because communication on topics like this

18    would have occurred generally through classified

19    channels I don't feel that I can answer that

20    here.

21         Q.   So your answer to my question is,

22    no, you're not withholding any information on

23    the grounds of privilege in responding to my

24    question?

25         A.   No.
```

**DANIEL KIMMAGE  11/10/2022**

Page 257

```
 1              Q.    That is not your answer?  Sorry,
 2      let's --
 3              A.    Could you clarify that?
 4              Q.    I just want to know, we've had -- I
 5      asked you a question.
 6              A.    Right.
 7              Q.    And your lawyer said:  To the
 8      extent that your answer raises classified
 9      information or law enforcement information I
10      instruct you not to answer.
11                    And you said -- I'm not clear
12      whether you know of something that relates to a
13      hack and leak operation, but you're not going to
14      tell me because you received a privilege
15      instruction?
16              A.    Right.
17              Q.    Or you don't know anything.
18                    Those are two totally different
19      answers?
20              A.    Right.
21              Q.    And I'm not asking for the content
22      of any such communication.
23              A.    Right.
24              Q.    Right?  Because we get to that in a
25      minute.  I just want to know if there is such
```

**DANIEL KIMMAGE  11/10/2022**

```
 1    communication.
 2            A.   I'm not aware of anything specific.
 3            Q.   Okay.  So you're not withholding
 4    any information from me on grounds of privilege
 5    in response to that question?
 6            A.   I'm not withholding anything
 7    specific.
 8            Q.   So you're not aware of any concern
 9    raised in any quarter about a Russian hack and
10    release operation with respect to the 2020
11    election?
12            A.   Could you be more specific?  Is
13    there a specific operation?
14            Q.   Well, if you've read our complaint
15    you may know there's allegations relating -- or
16    read some of our pleadings, at least -- you may
17    know there's allegations that there were
18    communications to certain social media platforms
19    from the federal government that said:  We
20    anticipate a Russian hack and release operation
21    in October of 2020.
22                So remember, there was the 2016
23    hack and release operation, we talked about
24    before; right?
25            A.   Right.
```

Case 3:22-cv-01213-TAD-KDM   Document 208-1   Filed 03/04/23   Page 259 of 363 PageID #: 12538

**DANIEL KIMMAGE  11/10/2022**

```
 1              Q.   And are you aware of any -- let me
 2      put it this way:  Are you aware of any
 3      communication between any federal official, in
 4      any social media platform, that related to any
 5      concern about a Russian hack and release
 6      operation that might or might be planned for the
 7      2020 election cycle?
 8              A.   Are you asking about GEC?
 9              Q.   No.  I'm asking about any federal
10      official, when I said any federal official.
11              A.   I can't speak for any federal
12      official.
13              Q.   I'm asking you:  Do you know of
14      any, are you aware?
15              A.   I'm note aware of any.
16              Q.   How about GEC, are you aware of any
17      GEC communication with any social media platform
18      about any concern or anticipated Russian hack
19      and release operation with respect to the 2020
20      election?
21              A.   I don't recall any GEC
22      communications about Russian hack and release
23      operations.
24              Q.   How about State Department, any
25      communication from State Department?
```

**DANIEL KIMMAGE  11/10/2022**

```
 1              A.   I can't speak for the entire
 2      department.
 3              Q.   Okay.
 4              A.   I'm not aware.
 5              Q.   Are you aware?
 6              A.   Nom I'm not aware.
 7              Q.   Are you aware -- how about CISA or
 8      DHS, are you aware of any communication or
 9      anything like that from that quarter?
10              A.   I can't speak to their
11      communications.
12              Q.   Are you aware?
13              A.   I'm not aware of any.
14              Q.   And how about the FBI, are you
15      aware of any communications from FBI or FTIF to
16      any social media platform that relates to that?
17              A.   I'm not aware, no.
18                   MR. SAUER:  Can you give me S?
19                   You're being handed Exhibit 14.
20                   (Exhibit No. 14 was marked for
21      identification.)
22      BY MR. SAUER:
23              Q.   Do you recognize this document?
24              A.   Yes.
25              Q.   And what is it?
```

**DANIEL KIMMAGE  11/10/2022**

```
 1              A.   It's a transcript of a talk I gave
 2       in 2021.
 3              Q.   And was this at the Washington
 4       Institute For Near East Policy?
 5              A.   Yes.
 6              Q.   The bottom of the first page, you
 7       talk about:  Technology is woven into virtually
 8       aspects of this problem and you're trying to --
 9       trying to stay ahead of the curve; right?
10              A.   Yes.
11              Q.   And spilling onto the next page,
12       you talk about counter-disinformation
13       technologies and their implementation?
14              A.   Yes.
15              Q.   At what -- what are those?  What
16       are the counter-disinformation technologies that
17       you're talking about there and their
18       implementation?
19              A.   So as I detailed earlier, they
20       could be software that would help to identify
21       coordinated inauthentic activity by a foreign
22       propaganda and disinformation.
23              Q.   Any -- anything else, other than
24       tracking propaganda and disinformation?
25              A.   There's a wide array of
```

**DANIEL KIMMAGE  11/10/2022**

Page 262

```
 1    technologies.  I -- I can't list them all.  I
 2    can -- there -- there are many different
 3    technologies that can be applied to the problem.
 4            Q.    Can you give me a better picture of
 5    what they're like?  I know we had some type of
 6    discussion of this earlier, and I didn't come
 7    away with any --
 8            A.    Sure.
 9            Q.    -- real grasp of what these
10    technologies are?
11            A.    Right.
12            Q.    And I'm not a techie person.
13            A.    Sure.
14            Q.    But can you clarify that, at all?
15            A.    So with the caveat that I'm also
16    not a technology expert, it would be, you know,
17    a tool that could analyze data to cast light on
18    how Russia or China is trying to manipulate
19    online discourse, it could be a tool that raises
20    awareness, for example, a game that people play,
21    to understand how disinformation is introduced
22    by a foreign actor, something that raises their
23    awareness, it could be a tool like that, for
24    example.
25                  It could be an interactive website
```

**DANIEL KIMMAGE  11/10/2022**

Page 263

```
 1    that shows Chinese investments in the tech

 2    sector, for example, to show how Chinese

 3    influence is expanding in the tech sector.  And

 4    that is a -- computed as a technology-driven

 5    tool that helps to counter propaganda and

 6    disinformation, because, of course, China's

 7    propaganda is that they're not doing this, in

 8    fact, they are doing this.

 9              And when you're casting light on it

10    with, for example, a data rich website that

11    would show that, you're countering their

12    propaganda.

13         Q.   Lower down on that page, second

14    paragraph from the bottom --

15         A.   Mm-hmm.

16         Q.   -- you talk -- you talk about their

17    work, your work in the context of the COVID

18    crisis; correct?

19         A.   Yes.

20         Q.   And you -- you talk about how they

21    would -- COVID involved a new wave of propaganda

22    and disinformation; right?

23         A.   Where does it say that?

24         Q.   I'm paraphrasing, it rapidly became

25    clear that this would be an issue of global
```

**DANIEL KIMMAGE  11/10/2022**

1    consequence, not simply in the scope of the

2    crisis but also in our area of propaganda and

3    disinformation; correct?

4          A.   Yes.

5          Q.   Okay.  And you talked about Russia

6    pushing conspiracy theories.  Do you know what

7    those were?  What were you talking about there?

8          A.   Yeah, as I detailed earlier, they

9    were propaganda narratives and disinformation

10   narratives about the origins of the virus, about

11   the efficacy of US and Western-developed

12   vaccines, about the efficacy of Russian

13   vaccines.  These were propaganda narratives that

14   Russia sought to use in the context of the

15   pandemic.

16         Q.   And you go on to say:  We saw the

17   Peoples Republic of China suggesting various

18   false and nefarious narratives about the origin

19   of the virus.  Do you remember what -- is that

20   right?

21         A.   Yes.

22         Q.   Do you remember what those

23   narratives were or are?

24         A.   Some of them alleged a US role.  I

25   don't recall the specifics, but along the lines

**DANIEL KIMMAGE  11/10/2022**

```
 1    of the notorious KGB operation alleging a US
 2    government role in the creation of the AIDS
 3    virus, there were Chinese propaganda narratives
 4    that suggested some sort of US role, and there
 5    were Russian narratives that suggested the same
 6    things.
 7            Q.    What was that -- what role did
 8    China say or --
 9            A.    Right.
10            Q.    -- Chinese actors say that the US
11    had in the origin of the virus?
12                 MR. KIRSCHNER:  Objection, calls
13    for a narrative response.
14            A.    With the caveat that I don't recall
15    all the specifics, it would be that US medical
16    research led to the creation of a virus.
17                 There are many different
18    narratives, it would be alleging some nefarious
19    US government role.
20            Q.    That the government -- so you said
21    US medical research funded by the government, is
22    that a narrative that the Chinese propagated?
23                 MR. KIRSCHNER:  Objection,
24    mischaracterizes testimony.
25            A.    It -- it's a narrative that I know
```

**DANIEL KIMMAGE  11/10/2022**

Page 266

```
1    Russian propagandists have used.  I don't recall
2    whether Chinese propagandists used that specific
3    narrative discussion.  I know Russian
4    propagandists did.
5           Q.   What Chinese-specific narratives do
6    you remember about the origins of the virus?
7    You've got a robust reference to them here, and
8    I just wonder if I can get my head around what
9    you're talking about.
10          A.   The primary Chinese narratives, as
11   I recall, were really about how well China
12   responded to the pandemic compared to Western
13   countries.  But I also recall that they disputed
14   and suggested alternative theories for the
15   emergence of the virus.  And some of them
16   alleged a nefarious US government role.
17          Q.   Do you remember what that role was
18   that they alleged?
19          A.   No, I don't remember the specifics.
20          Q.   What did they say about -- what did
21   these narratives say about the first thing you
22   said, which had to do with how the Chinese
23   response was more successful?
24          A.   It would be touting how well -- how
25   quickly China responded, how effectively they
```

**DANIEL KIMMAGE  11/10/2022**

Page 267

```
 1    responded, and contrasting that with, for
 2    example, Western countries, like Italy, that
 3    struggled, initially, in dealing with the virus.
 4         Q.   Was that -- was that disinformation
 5    is, in fact, false that China did a better job
 6    of responding to the virus?
 7         A.   This would be more propaganda,
 8    where they are selectively highlighting things
 9    that are not necessarily false, but in the
10    context or misleading.  So this is the
11    distinction between propaganda and
12    disinformation.
13         Q.   Can you flip to the next page.
14         A.   Mm-hmm.
15         Q.   At the top there, very top of the
16    page, at the bottom of that first paragraph, you
17    say:  Finally, we provided rapid response grants
18    to local organizations on the front lines,
19    fighting the adversarial narratives of the COVID
20    info-demic, as some have called it.
21              What's -- what's involved there?
22         A.   I believe we had a program with
23    several embassies abroad, where we provided
24    rapid response grants to foreign organizations
25    fighting, generally, Russian and propaganda --
```

**DANIEL KIMMAGE  11/10/2022**

Page 268

```
 1      Chinese propaganda and disinformation in their

 2      local environments.

 3              Q.    So those grants went to foreign --

 4      foreign entities abroad?

 5              A.    Yes.

 6              Q.    And what -- what sorts of entities

 7      would get them, would they be, like, local news

 8      stations or who was fighting the COVID

 9      info-demic abroad?

10              A.    Generally, they would be civil

11      society organizations or potentially research

12      organizations.

13              Q.    What's a civil society

14      organization?

15              A.    A non-governmental organization

16      that is focused on a particular issue.

17              Q.    Halfway down this page, at the

18      bottom and that middle paragraph, you say:  I

19      would note in the counterterrorism context an

20      increasing focus on racially and ethnically

21      motivated violent extremism REMVE, what are you

22      talking about there, what are you referring to?

23              A.    I'm referring to extremist

24      organizations that are promoting white supremacy

25      or similar racial and racially and ethnically
```

**DANIEL KIMMAGE  11/10/2022**

```
 1    motivated narratives to justify violent

 2    extremism.

 3          Q.   And are those -- is that something

 4    that the GEC kind of tracks or monitors or pays

 5    attention to?

 6               MR. KIRCHNER:  Objection,

 7    mischaracterizes the testimony.

 8  BY MR. SAUER:

 9          Q.   That's a question, is it

10    something --

11          A.   The counterterrorism team at the

12    Global Engagement Center looks at violent

13    extremist organizations abroad and how they seek

14    to recruit people.

15               And as there has been an upswing in

16    the activity of groups focused on racially and

17    ethnically motivated violent extremism the

18    Global Engagement Center's counterterrorism team

19    has begun to look at those groups.

20          Q.   Are you saying those -- those --

21    are those strictly groups abroad or does that

22    include domestic violent extremist groups?

23          A.   Those are groups abroad.

24          Q.   Okay.  Do you -- does Global

25    Engagement Center have any role with respect to
```

**DANIEL KIMMAGE  11/10/2022**

```
 1       tracking or paying attention to domestic

 2       racially or ethnically motivated violent

 3       extremist groups?

 4            A.   No, it does not.

 5            Q.   What agency does that?

 6                 MR. KIRSCHNER:  Objection.

 7  BY MR. SAUER:

 8            Q.   If you know.

 9                 MR. KIRSCHNER:  Lack of foundation,

10       speculative.

11            A.   The -- the federal law enforcement

12       and federal and local law enforcement agencies.

13            Q.   Turning to the next page, in that

14       second to last paragraph in the second line,

15       there's another reference to the -- the

16       disinfo-cloud, and you describe it as sharing

17       findings and information on disinformation

18       related challenges; correct?

19            A.   Yes.

20            Q.   And it describes a platform, and I

21       guess you're saying this in early 2021; right?

22            A.   Mm-hmm.

23            Q.   It describes a platform as having

24       1200 members, and has assessed 70 tools; right?

25                 Do you know who those members were?
```

**DANIEL KIMMAGE  11/10/2022**

```
 1     It's a lot of members, is this just anyone who
 2     wants to access that web page, who seeks and
 3     receives authority to do so?
 4          A.   So as I explained earlier, the
 5     members of the disinfo-cloud would include some
 6     representatives of government agencies, some
 7     developers in the tech sector, and I believe
 8     some researchers, as well.
 9          Q.   And you go on, later in that
10     paragraph, to say:  We have established a
11     liaison in Silicon Valley with the purpose of
12     sharing lessons learned and developing two-way
13     communications about foreign disinformation and
14     propaganda with our partners in the technology
15     industry; correct?
16          A.   Yes.
17          Q.   Is that a reference to the -- the
18     Silicon Valley location we talked about earlier?
19          A.   Yes, it is.
20          Q.   So that's a reference, essentially,
21     to Mr. Stewart --
22          A.   Yes, it is.
23          Q.   -- right?
24               Is there anything else that falls
25     in that bucket of a two-way liaison with Silicon
```

**DANIEL KIMMAGE  11/10/2022**

Page 272

```
 1      Valley?
 2               A.    Could you clarify?
 3               Q.    Well, your -- your statement there,
 4      about -- about establishing a liaison in Silicon
 5      Valley and developing two-way communications
 6      with technology companies, is that referring to
 7      anything other than Mr. Stewart being located
 8      out there, as we talked about earlier?
 9               A.    The two-way communications would
10      involve more than just Mr. Stewart, but the
11      liaison position was, of course, developed for
12      that purpose.
13               Q.    And that -- so that liaison you're
14      referring to is, in fact, Mr. Stewart and these
15      remarks?
16               A.    Yes.
17               Q.    And I can't remember, I think you
18      said he's gone now, he's not at GEC anymore or
19      do you not remember?
20               A.    Yes, I believe he's left the GEC.
21               Q.    Did someone replaced him out in
22      Silicon Valley, is someone liaising there now?
23               A.    There -- I don't think -- there is
24      no one from the GEC who is based in Silicon
25      Valley now.
```

**DANIEL KIMMAGE  11/10/2022**

Page 273

1          Q.    Was Mr. Stewart the last one or did

2     someone else -- did anyone else ever hold that

3     role of the Silicon Valley liaison based out in

4     California?

5          A.    I don't think anyone held the role

6     based in California.

7          Q.    Other than Mr. Stewart, you mean?

8                Mr. Stewart was based in

9     California, wasn't he?  He said that in e-mails.

10         A.    Yes.  I believe he was the only GEC

11     employee to be based in California.

12         Q.    When you're talking about these

13     liaison with tech companies, is part of the

14     purpose there to, you know, partner with tech

15     companies to stop the spread of disinformation

16     online?

17               MR. KIRSCHNER:  Objection.

18         A.    No.  No.  The purpose is, as stated

19     here, to share lessons and develop two-way

20     communications.  The actions that they take are

21     for the tech companies.  The GEC is sharing

22     lessons learned, information about the

23     techniques, the campaigns, the narrative of

24     foreign propaganda and disinformation actors.

25         Q.    Is it a purpose of GEC, more

**DANIEL KIMMAGE  11/10/2022**

Page 274

1      generally, to, you know, partner with private

2      tech firms to stop the spread of disinformation

3      on social media?

4              A.    It's the purpose of the GEC to

5      engage with the tech industry and other partners

6      to counter propaganda and disinformation.  It's

7      not dictating a specific action that they would

8      take.

9              Q.    But is it a purpose that you said

10     to counter?

11             A.    Yes.

12             Q.    Yet earlier described counter can

13     involve a number of things, one thing, counter

14     can be a reputation, for example; right?

15             A.    Yes.

16             Q.    And your disinformation bulletins

17     refer to difficulties and talk about Lithuania

18     and so forth.

19                   Another way of countering

20     disinformation might be, as you say, in some of

21     those bulletins, to attack credibility of the

22     person spreading it, right, that would another

23     way to counter?

24                   And the third way to counter would

25     be to stop it from spreading in the first place,

**DANIEL KIMMAGE  11/10/2022**

```
 1      right?  Those are three different things?
 2              A.   That's correct.  Those are three
 3      different things.  You can also raise awareness.
 4      You can conduct what's called an inoculation
 5      campaign by making people aware of the types of
 6      campaigns.  The -- these are all tools in the
 7      toolbox.
 8              Q.   Okay.  And as one of those tools
 9      that could be in the toolbox to stop the spread?
10                   MR. KIRSCHNER:  Objection, vague.
11                   MR. SAUER:  Just asking.
12                   MR. KIRSCHNER:  Well, I don't know
13      what you're asking.
14                   MR. SAUER:  Okay.
15              A.   Can you clarify what you mean by
16      stop the spread?
17              Q.   What does that mean to you, to stop
18      the spread of disinformation on social media?
19              A.   It could cover a huge range of
20      things.  It could -- if there's an effective
21      refutation out there, that people read and find
22      compelling, they may stop sharing the propaganda
23      and disinformation that could stop the spread.
24      I -- could you clarify what you mean by it?
25                   MR. SAUER:  Why don't you give me
```

**DANIEL KIMMAGE  11/10/2022**

Page 276

```
 1    T?
 2                    Why don't we look at Exhibit 15.
 3                    (Exhibit No. 15 was marked for
 4      identification.)
 5    BY MR. SAUER:
 6            Q.    Have you seen this document before?
 7            A.    Yes, I believe so.
 8            Q.    Were you involved in drafting it?
 9            A.    I was not involved in drafting it.
10            Q.    Did you have any input into its
11      formulation?
12            A.    I believe I reviewed it, but I
13      didn't -- I didn't draft it or formulate it.
14            Q.    When you reviewed it, did you
15      provide any input or edits or suggestions?
16            A.    I don't recall whether I provided
17      input or suggestions.
18            Q.    And this is titled:  Functional
19      Bureau Strategy for the Global Engagement
20      Center; right?
21            A.    Yes.
22            Q.    And it's dated May 17 of 2022, this
23      year?
24            A.    Yes.
25            Q.    Who did draft this?
```

**DANIEL KIMMAGE  11/10/2022**

```
 1              A.   I don't know.
 2              Q.   Is it a -- and it's on the GEC's
 3    website; right?
 4              A.   Actually, let correct what I just
 5    said.  If this was released in May 17, 2022, I
 6    may not actually have reviewed this version.
 7    This is a document that I believe is
 8    periodically updated.  And just because I was
 9    not at the Global Engagement Center in -- in
10    2022 I don't think that I would have reviewed
11    this.  I would have reviewed a previous version,
12    so I didn't notice the date until just now.
13              Q.   So this date would have been when
14    you were at the National Defense University?
15              A.   Yes.  Yes.
16              Q.   Okay.  Well, can you turn to -- how
17    about to the -- it's labeled page 2 of 17, it's
18    really the fourth page of the document.
19              A.   Okay.
20              Q.   And then there's a paragraph two
21    there that starts in the middle of the page,
22    called:  Counter-disinformation technology?
23              A.   Yes.
24              Q.   And it talks about how technology
25    plays an important role in the problems and
```

**DANIEL KIMMAGE  11/10/2022**

Page 278

```
1         solutions of propaganda and disinformation.
2                   And the GEC works with government
3         and private sector stakeholders to identify the
4         needs and available tools to counter foreign
5         propaganda and disinformation; correct?
6              A.    Yes, that's what it says.
7              Q.    Is that all a fair and accurate
8         description of GEC's mission or goals?
9              A.    Yes, I believe so.
10             Q.    And the next sentence says:
11        Wherever possible, the GEC promotes integration
12        of appropriate technology or technologies to
13        support the mission; do you know what that's
14        talking about?
15             A.    With the caveat that I was not --
16        with the caveat that I don't believe I was
17        involved in the drafting or approval of this
18        document, I -- I believe it's a reference to
19        using technology to carry out the GEC's mission
20        of countering propaganda and disinformation by
21        foreign state and non-state actors.
22             Q.    And the next sentence says:  The
23        GEC also partners with private technology
24        companies to stop the spread of disinformation
25        on social media; correct?
```

### DANIEL KIMMAGE  11/10/2022

```
 1          A.    That's what it says, yes.
 2          Q.    What's it referring to?
 3                MR. KIRSCHNER:  Objection,
 4     speculative.
 5   BY MR. SAUER:
 6          Q.    How does the GEC partner with
 7     social media companies or private technology
 8     companies to stop the spread of disinformation
 9     on social media?
10          A.    I believe that would be through
11     meetings to discuss -- to share information
12     about the tools and techniques and campaigns and
13     narratives of foreign propaganda and
14     disinformation actors, to deepen the
15     understanding of those campaigns and actors for
16     the technology companies.
17          Q.    How does deepening their
18     understanding help stop the spread of
19     disinformation?
20          A.    It can help them to identify, for
21     example, coordinated inauthentic activity or to
22     understand what these actors are trying to
23     achieve, to understand the types of narratives
24     they are promoting, to understand the -- the --
25     the actors, the proxies, the tools, for example,
```

**DANIEL KIMMAGE  11/10/2022**

```
 1    as listed in the Pillars of Disinformation
 2    report, the elements in the Russian propaganda
 3    ecosystem.  All of those things are important
 4    elements of understanding the problem.
 5         Q.   And so it promotes -- it's -- I
 6    think you said it helps them identify certain
 7    aspects of the problem and understand aspects of
 8    the problem.
 9              How, if the search or the
10    technology companies identify and understand
11    those aspects of the problem, does that stop the
12    spread of anything?
13              MR. KIRSCHNER:  Objection,
14    speculative.
15         A.   Solving a problem has to start with
16    understanding the problem, the elements of the
17    problem.  The Global Engagement Center has an
18    important function, it's laid out in its
19    congressional legislation to identify and -- and
20    track what foreign propaganda and disinformation
21    actors are doing, and releasing, for example, a
22    public report on what Russian propaganda is
23    promoting that doesn't, in and of itself, stop
24    it, but it equips people, it equips, you know,
25    potentially technology companies to better
```

**DANIEL KIMMAGE  11/10/2022**

```
1    understand it so that they can take whatever
2    actions they would take to -- to -- to stop the
3    spread.
4          Q.   What actions could technology
5    companies possibly take to stop the spread once
6    they've been educated with this understanding
7    you described?
8               MR. KIRSCHNER:  Objection,
9    speculative.
10         A.   I -- I can't speculate about all
11   the things a technology company can do.
12         Q.   Well, what do you -- your document
13   or GEC's document says:  We partner with them to
14   stop the spread.  You've recounted, in detail,
15   how you educate them and advance their
16   understanding and identification.  I don't get
17   the next step, how does it stop the spread?
18              MR. KIRSCHNER:  Objection, asked
19   and answered.
20         A.   You know, with the caveat that I
21   don't believe I was involved in drafting --
22         Q.   Sure.
23         A.   -- this document, including the
24   specific wording of stop the spread, but, for
25   example, you can label state-owned media as
```

**DANIEL KIMMAGE  11/10/2022**

Page 282

```
 1    being state-owned media.  I know that some
 2    social media companies have labeled Russia today
 3    as this is a Russian state-owned entity.
 4              And by labeling it, and, for
 5    example, this is something that's listed in the
 6    Pillars of Disinformation report that the GEC
 7    released, you can then label that, and as people
 8    see that, hopefully they'll be less likely to
 9    forward it or share it, and that will help to
10    stop the spread.
11         Q.   So applying labels, the -- in other
12    words, GEC doesn't apply labels to anything on
13    social media; correct?
14         A.   No.
15         Q.   But it gives information to the
16    tech companies, and then they apply labels to
17    things or they can, if they want to, apply
18    labels to things to help stop the spread; is
19    that a fair characterization?
20         A.   In the case that I mentioned, the
21    GEC is not giving the information specifically
22    to tech companies.  The Pillars of
23    Disinformation report was a public report that
24    anyone can access, anyone all over the world,
25    including a tech company, can access.
```

**DANIEL KIMMAGE  11/10/2022**

Page 283

```
 1              Q.   Yeah, but that's your example.   I'm
 2     really talking about what they're saying here in
 3     the document, where it talks about partnering
 4     with private technology companies, that Russian
 5     disinformation report, that was made available
 6     to the whole world.   That's not a specific
 7     partnership with a private technology company;
 8     correct?
 9                  I'm wondering how partnering a
10     private technology companies, and having these
11     meetings, like you're meeting with Twitter in
12     2021, and the other meetings that Mr. Stewart
13     set up and so forth, how do those -- and you
14     described that those meetings are involved in a
15     kind of information sharing and educational
16     function, how do they stop the spread?
17              A.   Just to repeat, they help to deepen
18     the understanding so that a technology company,
19     just like a user, can take action.   And they
20     take whatever action they deem is necessary.
21     The Global Engagement Center does not tee up
22     actions for social media companies to take.
23              Q.   Did Mr. Dempsey ever tee up an
24     action for a social media company to take?
25              A.   I -- I -- I don't know about
```

**DANIEL KIMMAGE  11/10/2022**

```
 1     Mr. Dempsey.

 2            Q.    Alex Dempsey?

 3            A.    Alex Dempsey.

 4            Q.    Do you remember him from the 2020

 5     e-mail chain we talked about earlier?

 6            A.    I -- I don't believe that chain

 7     teed up an action.  I don't believe it

 8     recommended an action.

 9            Q.    So you don't view that Alex Dempsey

10     chain as teeing up an action; is that fair to

11     say?

12            MR. KIRSCHNER:  Objection,

13     mischaracterizing the evidence.

14            MR. SAUER:  I'm asking what he --

15     how he views the evidence.

16     BY MR. SAUER:

17            Q.    You do not view that Alex Dempsey

18     is teeing up an action for social media

19     companies?

20            MR. KIRSCHNER:  Objection, lack of

21     foundation, mischaracterizing the evidence.

22            MR. SAUER:  I'm asking how he views

23     the evidence.

24            A.    Well, did it request a specific

25     action?
```

**DANIEL KIMMAGE  11/10/2022**

Page 285

```
 1              Q.    I'm asking you whether you viewed
 2       it as teeing up an action.
 3              A.    I don't recall that it requested a
 4       specific action.
 5              Q.    So do you view it as not teeing up
 6       something for -- for a specific action?
 7                    MR. KIRSCHNER:  Objection, asked
 8       and answered.  That's just --
 9              A.    I don't recall it requesting a
10       specific action.
11              Q.    Is it your view that if there's a
12       meeting between the GEC and social media
13       platforms, where no specific action is
14       requested, then you haven't teed up anything for
15       action?
16              A.    Yes.  I don't -- I don't believe
17       that the GEC requested specific actions of
18       social media companies.
19              Q.    Could the GEC give social media
20       companies, for example, a briefing about how
21       content on their platforms is, you know,
22       violative of their platform policies, without
23       requesting removal?
24                    MR. KIRSCHNER:  Objection, vague.
25              A.    The GEC would not brief a social
```

**DANIEL KIMMAGE  11/10/2022**

```
 1    media company on their policies.
 2            Q.    Would it brief them on information
 3    that -- that would relate to violations of their
 4    policies?
 5            A.    Could you be -- could you clarify
 6    that.
 7            Q.    Let me ask the question
 8    differently.
 9                  Did anyone associated with the GEC
10    ever flag information -- or I'm sorry -- flag
11    content on a social media platform with the
12    intent of alerting them to information that
13    violates their policies?
14                  MR. KIRSCHNER:  Objection,
15    speculative and vague, ambiguous.
16            A.    The only specific example that I
17    recall is the one that I gave you earlier, about
18    a threat to US personnel at a facility abroad.
19            Q.    That's the 2018 example you talked
20    about?
21            A.    Yeah, I believe it occurred in
22    2018.
23            Q.    Do any of the -- there was a
24    reference in your previous statements to the 70
25    tools on the disinfo-cloud.  Did any of those
```

**DANIEL KIMMAGE  11/10/2022**

Page 287

```
 1     tools relate to -- to content modulation in any
 2     way or, I'm sorry, content moderation?
 3          A.   Right.
 4          Q.   Using the definition that you and I
 5     agreed to a little while ago, do any of those
 6     tools have any relationship with content
 7     moderation?
 8          A.   I'm not familiar with the specifics
 9     of all the tools.
10          Q.   You don't know what -- are you
11     aware of any tools that do relate to content
12     moderation?
13          A.   None that I can recall.
14          Q.   Are you aware of any tools that
15     would, if used by a social media platform, make
16     it easier for them to identify content to
17     moderate?
18               MR. KIRSCHNER:  Objection, vague,
19     ambiguous, speculative.
20          A.   I don't know enough about the
21     specifics of how they conduct content moderation
22     to say what tools would or would not be useful.
23          Q.   Some of the tools, at least, are
24     designed to assess content that's out there on
25     social media and try to identify foreign malign
```

**DANIEL KIMMAGE  11/10/2022**

```
 1      narratives within it; right?

 2              MR. KIRSCHNER:  Objection, lack of

 3      foundation.

 4   BY MR. SAUER:

 5          Q.   I thought that's what you said

 6      earlier, can you tell me?

 7          A.   I don't recall.  I was giving an

 8      example of what might be a tool.  I don't recall

 9      the specific tools on the platform.

10          Q.   So you don't recall the specifics

11      of any tool on that platform; is that right?

12          A.   No.  I was not an active user of

13      the platform, no.

14              MR. SAUER:  Can I have W?

15              I think it's going to be Exhibit 16

16      or 17?  16.

17              (Exhibit No. 16 was marked for

18      identification.)

19              MR. KIRSCHNER:  Sorry, you said?

20              MR. SAUER:  Yeah, is this -- I

21      think we're on 16.

22              MR. KIRSCHNER:  Yeah, 16.

23   BY MR. SAUER:

24          Q.   Do you see this exhibit?

25          A.   I do.
```

**DANIEL KIMMAGE  11/10/2022**

```
 1                Q.    It's October 17, 2022 remarks to
 2       the press by Secretary Blinken, the Secretary of
 3       State?
 4                A.    Yes.
 5                Q.    Were you aware that he made these
 6       comments or is this --
 7                A.    Not these specific comments, no.
 8                Q.    Can you turn to the second page?
 9                A.    Okay.
10                Q.    Second full paragraph, after a
11       paragraph discussing collaborations with
12       Stanford, and partnerships with Silicon Valley
13       and so forth, the Secretary says:  We also have
14       to be the ones who are at the table who are
15       helping to shape the rules, the norms, and the
16       standards by which technology is used.
17                      Do you know what the Secretary's
18       referring to there?
19                      MR. KIRSCHNER:  Objection,
20       speculative.
21       BY MR. SAUER:
22                Q.    Do you know?
23                A.    I -- I don't know specifically.  I
24       believe he's referring to international
25       organizations.
```

**DANIEL KIMMAGE  11/10/2022**

```
 1           Q.   Okay.  So why don't you -- what do
 2    international organizations do to help shape the
 3    rules, the norms, and standards by which
 4    technology is used?
 5           A.   I'm not specifically familiar with,
 6    the GEC was not a policy and is not a policy
 7    shop.  So I'm not specifically familiar with the
 8    international organizations that shape the rules
 9    and norms.
10           Q.   Are you aware of any efforts by the
11    GEC to help shape the rules, the norms, and
12    standards by which technology is used?
13           A.   As I said, the GEC is not a -- a
14    policy shop.  I don't -- it does not have the
15    lead on -- on policy issues like this.
16           Q.   Are you aware of any role of the
17    GEC, at all, on that?
18           A.   To the extent that the GEC has a
19    role, I think it would be informing the
20    discussion through insight into the actions of
21    malign propaganda and disinformation actors.
22    It's not a policy office.
23           Q.   How about elsewhere in the State
24    Department, what -- what -- what State
25    Department office would be involved in helping
```

**DANIEL KIMMAGE  11/10/2022**

 1     to shape the rules, the norms, and the standards

 2     by which technology is used?

 3               MR. KIRSCHNER:  Objection,

 4     speculative.

 5          A.   I -- I believe there's a new

 6     office, I don't recall the name.  There's a

 7     change in this area.  I -- I -- you would have

 8     to ask my colleagues at the department, but I

 9     believe there is a new office for --

10     specifically for technology policy.

11          Q.   Was there a predecessor to that

12     office that you're familiar with?

13          A.   I believe that previously there

14     were two offices, and I don't -- I don't -- I

15     don't recall the specifics.  We were not a

16     policy shop or a direct participant in policy

17     debates.

18          Q.   That technology policy office, is

19     it involved in interfacing with social media

20     platforms?

21               MR. KIRSCHNER:  Objection,

22     speculative.

23          A.   I -- I -- I don't know what their

24     interactions are.

25          Q.   Can you flip ahead three more

**DANIEL KIMMAGE  11/10/2022**

```
 1     pages?

 2                   Sorry.

 3                   On the fifth page of the document,

 4     do you see there, there's a question from

 5     someone called Janelle, where she asks:

 6     Stanford is one of the leading institutions to

 7     combat misinformation research and pointing out

 8     propaganda narratives and how they spread.

 9                   Are you familiar with Stanford

10     having that role?

11                   MR. KIRSCHNER:  Objection,

12     speculative.

13           A.   I'm familiar with the Stanford -- I

14     think it's called the Stanford Internet

15     Observatory.

16           Q.   Is that the SIO?

17           A.   Yes.

18           Q.   What do you know about them?  How

19     are you familiar with them?

20           A.   I'm familiar with them as a -- a

21     well-known research organization, like the -- I

22     think there's the Oxford Internet Institute.

23     There are a number of these research entities.

24           Q.   Does GEC work with the SIO or the

25     Stanford Internet Observatory in any way?
```

**DANIEL KIMMAGE  11/10/2022**

Page 293

```
 1              A.   I don't recall whether we have a
 2    specific interaction with -- specific
 3    partnership with the Stanford Internet
 4    Observatory.
 5              Q.   So you don't know if there's
 6    anything -- in what connection are you familiar
 7    with them?
 8              A.   My general familiarity with the
 9    researchers and research in the field.
10              Q.   How do you get familiar with the
11    researchers in the field?  Do you read the
12    reports or do people in GEC talk about stuff
13    that they're saying?  Does GEC rely on their
14    reports in the research that it does or explain
15    that?
16              MR. KIRSCHNER:  Objection,
17    ambiguous, vague.
18              MR. SAUER:  And compound.
19              MR. KIRSCHNER:  And compound.
20    Thank you.
21              THE WITNESS:  I -- I --
22    BY MR. SAUER:
23              Q.   Go ahead.
24              A.   I follow the news on -- and
25    research on issues related to the GEC's mandate.
```

**DANIEL KIMMAGE  11/10/2022**

```
 1    And I note some of the research institutes that

 2    are -- that are -- that are producing it.

 3           Q.   But do you know of any direct

 4    involvement between any GEC people and the

 5    Stanford Internet Observatory?

 6           A.   I don't recall whether there was a

 7    direct partnership.  I simply don't recall.

 8           Q.   How about the Atlantic Research

 9    Council, have you ever heard of them?

10           A.   The Atlantic Council.

11           Q.   Yeah, Atlantic Council?

12           A.   All right.

13           Q.   Who are they, exactly?

14           A.   It's a Washington, D.C.-based think

15    tank.

16           Q.   Is it government funded or

17    privately funded or do you know?

18           A.   It's a mix, I believe.

19           Q.   Okay.  And do you have any -- does

20    GEC have relationship with them?

21           A.   So I'm recused from -- starting in,

22    I think, early 2019 my wife is an employee at

23    the Atlantic Council, so I recused myself from

24    any Atlantic Council-related discussions in

25    2019.  She's at the Eurasia Center at the
```

**DANIEL KIMMAGE  11/10/2022**

Page 295

```
 1    Atlantic Council.
 2              Q.    Okay.  How about Graphika, with a
 3    K, are you familiar with that?
 4              A.    Yes, I am familiar with that.
 5              Q.    What are they, exactly?
 6              A.    I believe that they're a private
 7    sector entity that does research in this area.
 8              Q.    Are they based in D.C., or where
 9    are they based?
10              A.    I don't recall where they're based.
11              Q.    Does it -- are you aware of GEC
12    having a relationship with Graphika?
13              A.    I don't recall whether GEC has a
14    direct relationship with Graphika.
15              Q.    Okay.  How are you familiar with
16    them?
17              A.    I'm familiar with their general
18    research.  I believe they released public
19    reports and I would see those the way I would
20    see reports that the Stanford Internet
21    Observatory would release.
22              Q.    Any other -- any other direct
23    relationship between GEC and -- and them?
24              A.    Not that I recall.
25              Q.    Turning back to the document here
```

**DANIEL KIMMAGE  11/10/2022**

```
 1    on the fifth page, the reporter asked the
 2    Secretary:  How do you envision the cooperation
 3    between the State Department and institutions
 4    like Stanford, and combatting the spread of
 5    propaganda, and how does this fit within the
 6    recently released national security strategy;
 7    correct?
 8          A.   Yes.
 9          Q.   And the Secretary talks about
10    Stanford doing remarkable work on that, and we
11    want to be sure we're benefitting it, because
12    it's a day-to-day battle of combatting
13    misinformation and disinformation; right?
14          A.   Right.
15          Q.   And then he refers specifically to
16    your unit; right?  He says:  We have something
17    called the Global Engagement Center that's
18    working on this every single day; correct?
19          A.   Yes.
20          Q.   And that work is inspired by work
21    that's being done in academia, academia,
22    including here at Stanford, as well as, where
23    appropriate, collaborations; right?
24          A.   Yes.
25          Q.   So is he talking about your work,
```

**DANIEL KIMMAGE  11/10/2022**

1    the GEC's work, being inspired by work being

2    done at Stanford?

3              MR. KIRSCHNER:  Objection,

4    speculative.

5         A.    I -- I believe he's talking about

6    academic research that helps to inform the work

7    of the Global Engagement Center.

8         Q.    And are there collab- -- when he

9    talks about appropriate collaborations, are you

10   aware of any collaborations between the GEC and

11   academia?

12             MR. KIRSCHNER:  Objection,

13   speculative.

14   BY MR. SAUER:

15        Q.    Including, but not limited to,

16   Stanford?

17        A.    The GEC engages regularly with

18   researchers on foreign propaganda and

19   disinformation, some of whom are in academic

20   institutions.

21        Q.    Including the SIO, Stanford

22   Internet Observatory?

23        A.    I believe so, I'm not aware of the

24   specifics of the interactions with all the

25   institutions, but yes, like the SIO.

**DANIEL KIMMAGE  11/10/2022**

```
 1            Q.   But you believe there are --
 2     Mr. Kimmage, you don't know specifically whether
 3     there's direct interaction with the SIO, but
 4     generally it's overdue for the GEC to have
 5     direction interactions with research
 6     institutions like the SIO?
 7                 MR. KIRSCHNER:  Objection, vague,
 8     assumes evidence not in record.
 9   BY MR. SAUER:
10            Q.   Correct?
11            A.   The GEC stays abreast of current
12     research in -- in the field, and meets
13     periodically with the researchers, yes.
14            Q.   Okay.  And then the Secretary goes
15     on to say:  One of the things we have to do is
16     to make sure that we're using technology,
17     itself, to deal with some of the downsides of
18     technology when it's misused, including when it
19     comes to misinformation and disinformation?
20            A.   Mm-hmm.
21            Q.   Do you know what he's talking
22     about, how is the State Department using -- or
23     the GEC, which he's referred to two sentences
24     earlier -- using technology, itself, to deal
25     with the downsides of technology when it comes
```

**DANIEL KIMMAGE  11/10/2022**

```
 1      to misinformation and disinformation?

 2              MR. KIRSCHNER:  Objection,

 3      speculative.

 4          A.   So I don't know, specifically, what

 5      the Secretary is referring to, here, but the

 6      Technology Engagement Team at the Global

 7      Engagement Center engages with people who are

 8      developing tools that would help to identify and

 9      counter propaganda disinformation.  I believe

10      those are the types of engagements that he's

11      referring to.

12              MR. KIRSCHNER:  Counsel, do you

13      know how much longer?

14              MR. SAUER:  Why don't we take a

15      five-minute break.

16              MR. KIRSCHNER:  Okay.

17              MR. SAUER:  And I will use that

18      time to see whether and to what extent I have

19      more to go over.

20              THE VIDEOGRAPHER:  The time is 4:19

21      p.m.  We're off the record.

22              (Recess.)

23              THE VIDEOGRAPHER:  The time is 4:32

24      p.m.  We're back on the record.  Please proceed.

25              MR. SAUER:  We have -- plaintiffs
```

**DANIEL KIMMAGE  11/10/2022**

Page 300

```
 1    have no further questions for this witness at

 2    the time.

 3             MR. KIRSCHNER:  The defendants have

 4    no questions, either.  And we believe that this

 5    is closed.  And this is Mr. Kimmage's --

 6    completion of Mr. Kimmage's deposition for this

 7    case.

 8             MR. SAUER:  His first deposition

 9    for this case.

10             MR. KIRSCHNER:  No, this is the

11    close of his deposition, and that we would

12    object to any other further reopening of his

13    deposition.

14             MR. SAUER:  If that issue ever

15    comes up, I'm sure we'll take it up at that

16    time.  So is that the end?

17             THE VIDEOGRAPHER:  With that --

18             MR. KIRSCHNER:  Before -- before

19    the close of it, we would like to read and

20    review the transcript for him to -- and sign

21    before --

22             MR. SAUER:  Sure.  And we're going

23    to be asking for expedited, if that's available.

24    I know I'd asked for Monday, I don't know if

25    that's feasible.
```

**DANIEL KIMMAGE  11/10/2022**

**Page 301**

```
 1                    THE REPORTER:  It's fine.

 2                    MR. SAUER:  Thanks.

 3                    THE VIDEOGRAPHER:  Okay.  And with

 4     that, that concludes the deposition of Daniel

 5     Kimmage.  The time is 4:33 p.m.  We're off the

 6     record.

 7                    (Signature having not been waived,

 8     the deposition of DANIEL KIMMAGE was concluded

 9     at 4:33 p.m.)

10                    ACKNOWLEDGMENT OF DEPONENT

11            I, DANIEL KIMMAGE, do hereby acknowledge

12     that I have read and examined the foregoing

13     testimony, and the same is a true, correct and

14     complete transcription of the testimony given by

15     me and any corrections appear on the attached

16     Errata sheet signed by me.

17

18     _____    _____

19         (DATE)                   (SIGNATURE)

20

21

22

23

24

25
```

**DANIEL KIMMAGE  11/10/2022**

**Page 302**

```
 1              CERTIFICATE OF SHORTHAND REPORTER

 2              I, Cassandra E. Ellis, Registered

 3    Professional Reporter, the officer before whom the

 4    foregoing proceedings were taken, do hereby

 5    certify that the foregoing transcript is a true

 6    and correct record of the proceedings; that said

 7    proceedings were taken by me stenographically and

 8    thereafter reduced to typewriting under my

 9    supervision; and that I am neither counsel for,

10    related to, nor employed by any of the parties to

11    this case and have no interest, financial or

12    otherwise, in its outcome.

13              IN WITNESS WHEREOF, I have hereunto set

14    my hand this 14th day of November 2022.

15

16

17    _____

18    CASSANDRA E. ELLIS, CSR-HI, CSR-VA, CCR-WA, RPR,

19    CRR

20    REALTIME SYSTEMS ADMINISTRATOR

21    NOTARY PUBLIC

22

23

24

25
```

**DANIEL KIMMAGE  11/10/2022**

Page 303

```
 1                          LEXITAS LEGAL

 2

 3    November 14, 2022

 4

 5    ADAM KIRSCHNER, ESQUIRE
      DEPARTMENT OF JUSTICE
 6    1100 L STREET, NORTHWEST
      WASHINGTON, D.C.  20530

 7

 8    IN RE: STATE OF MISSOURI, et al. v. JOSEPH R.
             BIDEN, JR. , et al.

 9

10    Dear ADAM KIRSCHNER:

11    Please find enclosed your copies of the deposition of

12    DANIEL KIMMAGE taken on November 10, 2022 in the

13    above-referenced case. Also enclosed is the original

14    signature page and errata sheets.

15    Please have the witness read your copy of the

16    transcript, indicate any changes and/or corrections

17    desired on the errata sheets, and sign the signature

18    page before a notary public.

19    Please return the errata sheets and notarized

20    signature page within 30 days to our office at 1608

21    Locust Street, Kansas City, MO 64108 for filing.

22    Sincerely,

23

24    Lexitas Legal

25    Enclosures
```

**DANIEL KIMMAGE  11/10/2022**

**Page 304**

```
 1                        ERRATA SHEET

 2    Witness Name: DANIEL KIMMAGE

 3    Case Name: STATE OF MISSOURI, et al. v. JOSEPH R.
                 BIDEN, JR. , et al.
 4    Date Taken: NOVEMBER 10, 2022

 5    Page #_____   Line #_____

 6    Should read: _____

 7    Reason for change: _____

 8

 9    Page #_____   Line #_____

10    Should read: _____

11    Reason for change: _____

12

13    Page #_____   Line #_____

14    Should read: _____

15    Reason for change: _____

16

17    Page #_____   Line #_____

18    Should read: _____

19    Reason for change: _____

20

21    Page #_____   Line #_____

22    Should read: _____

23    Reason for change: _____

24

25    Witness Signature: _____
```

**DANIEL KIMMAGE  11/10/2022**

Page 305

```
 1   STATE OF _____)

 2

 3   COUNTY OF _____)

 4

 5   I, DANIEL KIMMAGE, do hereby certify:

 6          That I have read the foregoing deposition;

 7          That I have made such changes in form

 8   and/or substance to the within deposition as might

 9   be necessary to render the same true and correct;

10          That having made such changes thereon, I

11   hereby subscribe my name to the deposition.

12          I declare under penalty of perjury that the

13   foregoing is true and correct.

14          Executed this _____ day of _____,

15   20___, at _____.

16

17

18

19                            _____

20                            DANIEL KIMMAGE

21

22                            _____

23                            NOTARY PUBLIC

24   My Commission Expires:

25
```

DANIEL KIMMAGE  11/10/2022

**A**

a.k.a 3:5
a.m 13:18
  20:13 86:7
  86:10
AARON 1:12
abide 21:25
  22:1
able 48:15
  95:5
above-re...
  303:13
abreast
  298:11
abroad 96:10
  98:23
  189:16
  194:22
  267:23
  268:4,9
  269:13,21
  269:23
  286:18
academia
  155:10
  296:21,21
  297:11
academic
  297:6,19
access 172:5
  172:12
  271:2
  282:24,25
accommodate
  150:20
accounts
  39:19
  51:18
  171:9
accurate
  278:7
accuse 34:25
achieve
  279:23
achieved
  71:6
Ackerman
  93:8
acknowledge

301:11
ACKNOWLE...
  301:10
acknowle...
  219:2
Acquisition
  11:14
acronym
  113:1
acronyms
  178:3
act 25:24
  44:25
  98:17
acting 11:25
  12:13
  22:10
  25:11
  31:23 41:5
  41:25
  42:13,13
  42:15 60:4
  69:21,22
  70:6 88:1
  130:24
  131:15
  136:1
  139:18
  140:6,10
  146:12,15
  199:14,16
action 40:4
  40:6 55:1
  224:8
  234:17
  235:1
  248:2,11
  274:7
  283:19,20
  283:24
  284:7,8,10
  284:18,25
  285:2,4,6
  285:10,13
  285:15
actions 36:9
  37:7 61:14
  73:4 75:5
  137:2

156:22
157:2
158:23
159:2
165:23
235:6
273:20
281:2,4
283:22
285:17
290:20
active 104:8
  170:7
  184:18
  288:12
actively
  27:13
activities
  26:10,16
  27:2 37:17
  41:15 68:6
  73:15
  207:19
  209:13
  217:6
  224:16
  225:3
  251:7
  255:17
activity
  39:19
  170:17,20
  170:24
  171:3,5,11
  171:15
  251:12
  254:20,21
  261:21
  269:16
  279:21
actor 35:20
  61:14,21
  89:15,22
  90:18
  170:18,25
  184:17
  238:23
  239:3,6,18
  239:20

262:22
actors 27:3
  27:9,15
  28:8 30:12
  31:2 32:16
  33:10
  34:24 36:9
  37:7 54:25
  62:6,21
  63:7,13
  69:7 73:5
  73:9,15
  74:23 75:5
  78:3 89:24
  96:7 97:2
  107:7
  108:2
  137:2
  144:24
  148:13
  156:23
  157:4
  158:6,19
  165:10,24
  217:14
  250:1
  251:3
  265:10
  273:24
  278:21
  279:14,15
  279:22,25
  280:21
  290:21
actual 110:9
ADAM 15:13
  303:5,10
Adam.kir...
  15:21
add 240:20
additional
  187:6,7
addition...
  45:11
  237:7
address
  135:20
  192:5
  196:22

249:16
addressed
  111:10
addressing
  148:8
Adele 215:5
  252:5
ADEYEMO
  12:24
Administ...
  11:3,11
Administ...
  7:7 14:8
  302:20
adopt 104:4
advance
  281:15
adversarial
  27:3
  156:15
  267:19
adversaries
  30:12
  32:14
  94:25
advice
  225:18,22
advised
  36:15
advising
  36:6
advisor 2:15
  3:9 4:18
  5:4 12:6,7
  41:3,16
  163:9
Advisory
  9:19
advocacy
  246:15
advocated
  246:3
advocating
  246:9,19
aegis 58:18
  60:1
AFCEA 17:21
Affairs 3:1
  8:6 11:7

**DANIEL KIMMAGE  11/10/2022**

16:15
African
 177:14
 178:2
agencies
 57:19 58:5
 58:16 59:7
 59:12
 68:14 69:6
 73:24
 117:14
 120:18
 123:2
 124:13
 172:21
 210:3,15
 210:21
 215:14,18
 216:19
 224:9
 270:12
 271:6
agency 4:11
 4:14 50:22
 58:19 59:1
 61:4 65:17
 66:10
 78:14
 121:1
 223:24
 270:5
agency's
 163:17
agenda 68:2
 68:8 89:3
 89:21 90:3
Agent 7:22
aggressive
 104:7
ago 42:19,19
 105:15
 287:5
agree 241:4
agreed 287:5
agreement
 14:2 49:9
agrees
 167:17
ahead 63:24

150:23
168:18
173:18
195:20
196:9
213:13
221:11
225:13
226:1,24
228:24
233:23
239:15
240:5,6
241:21
244:4
245:14
247:15
261:9
291:25
293:23
AIDS 35:1
 74:20
 250:6
 265:2
aim 71:5
 80:14
aiming
 211:18
AISHA 6:22
al 20:5,6
 303:8,8
 304:3,3
Al-Queda
 27:7
ALEJANDRO
 3:13
alerting
 286:12
Alex 188:22
 188:24
 192:7
 196:11,20
 198:18
 284:2,3,9
 284:17
Alexis 12:16
 86:13,14
 129:1
 132:7

137:14
alignment
 164:4,16
 164:20
allegation
 128:23
allegations
 100:8
 250:5
 258:15,17
alleged
 100:16
 264:24
 266:16,18
alleging
 265:1,18
Allergy 2:13
 2:18
ALLIANCE
 16:2,5
ALLISON 10:3
allow 21:24
 206:19,22
altered
 108:13
alternative
 266:14
AMANDA 15:15
Amanda.k...
 15:23
ambiguous
 35:10 37:1
 76:3
 217:10
 246:18
 247:2
 286:15
 287:19
 293:17
amended
 18:12
 128:7,9
 152:4
Amendment
 224:8,18
 225:4,24
American
 57:20 58:3
 74:5 75:8

75:15,20
90:13,19
90:22,25
91:1,3
100:4
102:21
215:21
216:2
217:19
Americans
 75:7,9,25
 190:25
 193:6,15
 193:19
 200:20
amount 49:4
 63:14
analogous
 142:1,3,13
 143:3
 162:21
analysis
 89:7 98:19
 226:25
 229:7
 232:11,12
analyst
 227:14
analysts
 229:5,17
analytic
 170:5
analytical
 170:9,11
 170:15
analytic...
 27:9
analyze
 262:17
analyzes
 27:2
and/or 12:7
 129:4
 303:16
 305:8
ANDREW 5:1
announce
 44:8
answer 17:15

23:16,21
26:20
29:23
33:14
35:12 37:3
37:24 42:6
68:25 69:1
78:16 94:3
110:20
125:20
160:25
182:5
209:5
224:22,22
225:7,15
225:17,21
243:12
249:3,4,5
254:22,23
255:1,13
255:14
256:2,4,8
256:19,21
257:1,8,10
answered
 114:7
 116:8
 117:18
 149:16
 180:9
 198:13
 223:4
 226:9,22
 227:20
 235:4
 238:2
 244:2
 281:19
 285:8
answers
 180:24
 257:19
Anthony 2:10
 19:15
anticipate
 214:2
 258:20
anticipated
 254:16

**DANIEL KIMMAGE  11/10/2022**

| | | | | |
|---|---|---|---|---|
| 259:18 | 20:13 | 281:18 | assume 56:17 | 295:1 |
| anymore | Arabic | 285:7 | 76:23 | attached |
| 272:18 | 221:12 | 296:1 | assumes | 17:8 18:2 |
| apologize | 226:1 | 300:24 | 33:11 | 19:2 |
| 156:25 | area 135:4,8 | asking 23:16 | 52:17 | 301:15 |
| 164:7 | 141:16 | 23:16 | 63:21 | attack |
| Apparently | 264:2 | 24:21 | 73:10 79:7 | 274:21 |
| 140:22 | 291:7 | 35:15,16 | 82:2 93:9 | attacking |
| 191:10 | 295:7 | 62:13 77:1 | 96:2 97:18 | 212:14 |
| appear 197:6 | areas 107:15 | 78:15,16 | 98:5 101:9 | attempt |
| 301:15 | argument | 90:15 | 108:20 | 98:15 |
| appearances | 246:15 | 206:21 | 118:6,12 | attend 135:9 |
| 20:18 | arising | 223:18 | 123:11 | 215:11 |
| appeared | 110:3 | 224:20,24 | 124:7 | attended |
| 232:25 | army 191:2 | 225:1,11 | 127:5 | 80:3 |
| 233:5,11 | arrangement | 249:1 | 131:8 | 130:22 |
| appears | 211:4,10 | 257:21 | 143:7,15 | 146:9,18 |
| 43:13 46:2 | arrangem... | 259:8,9,13 | 145:15 | 146:21 |
| 207:21 | 210:20 | 275:11,13 | 148:4,16 | 215:19 |
| 222:12 | array 100:10 | 284:14,22 | 155:25 | attendees |
| applied | 261:25 | 285:1 | 159:12 | 149:19 |
| 262:3 | article 48:6 | 300:23 | 186:7 | attending |
| apply 36:22 | 48:10 50:9 | asks 292:5 | 205:17 | 79:25 |
| 248:23 | 52:21,23 | aspect 46:2 | 251:17 | attention |
| 282:12,16 | 57:1,8 | aspects | 298:8 | 44:3 75:21 |
| 282:17 | 60:19 74:4 | 98:14 | assuming | 269:5 |
| applying | 74:7 79:6 | 261:8 | 43:22 46:5 | 270:1 |
| 282:11 | articles | 280:7,7,11 | 63:9 70:18 | Attorney 1:6 |
| appointed | 185:23 | aspire 88:7 | 88:15 | 1:9 15:4 |
| 31:25 | 186:3,15 | assess | 114:10 | attorney... |
| 41:12 60:4 | 186:20 | 287:24 | 115:20 | 224:20 |
| 64:19 | as-needed | assessed | 116:23 | 225:8,16 |
| 67:15 70:7 | 60:21 | 229:7 | 117:9,20 | attributing |
| 94:9 136:2 | asked 23:22 | 242:16 | 178:20 | 79:5 |
| 136:5 | 69:16 95:8 | 270:24 | 190:5 | audience |
| 199:15 | 116:7 | ASSISTANCE | 204:19 | 57:21 74:6 |
| appropriate | 135:12,17 | 13:3 | 250:19 | audiences |
| 169:14 | 147:13,15 | Assistant | assurance | 52:16 58:3 |
| 224:9 | 151:12 | 5:7 7:3 | 133:4,6 | author 56:19 |
| 247:25 | 159:7 | 9:9 | 141:19 | authority |
| 248:9 | 180:8 | Associate | athletic | 195:4 |
| 278:12 | 198:13,23 | 11:6 | 189:23 | 253:14 |
| 296:23 | 223:3 | associated | 191:3,8 | 271:3 |
| 297:9 | 226:9,22 | 34:16 53:6 | 201:8,14 | authoriz... |
| approval | 227:20 | 128:25 | Atlantic | 25:24 |
| 278:17 | 235:4 | 179:10 | 219:15 | 44:25 45:6 |
| approved | 238:2 | 180:7,19 | 294:8,10 | 199:7 |
| 172:5 | 244:1 | 180:21 | 294:11,23 | 200:12 |
| approxim... | 257:5 | 286:9 | 294:24 | authorize |

**DANIEL KIMMAGE  11/10/2022**

195:13
198:8
205:20
231:6,12
**authorized**
199:6
203:18,21
205:15,23
**authorizing**
199:24
231:7,13
**automated**
51:18
**available**
278:4
283:5
300:23
**aware** 38:12
40:9,15
46:13,18
55:15,21
56:6 63:6
83:8,12
87:1,8,10
126:21,23
154:25
158:20
159:14
161:4
185:1
187:9,12
194:12,14
194:16
195:2,7
200:18
211:9,22
211:25
212:5
213:18,24
219:9,22
220:17,17
220:21,24
222:2,10
224:13
225:23
226:6,11
226:12,18
226:23
232:16

233:13,19
242:21
243:4,7
246:2
248:16
249:8,11
249:15
253:20,21
254:1,6,9
254:11,12
254:14,20
255:2
256:16
258:2,8
259:1,2,14
259:15,16
260:4,5,6
260:7,8,12
260:13,15
260:17
275:5
287:11,14
289:5
290:10,16
295:11
297:10,23
**awareness**
158:18
262:20,23
275:3

———————
**B**
**b** 17:7 18:1
19:1 32:9
47:21
**B-e-e-b-e**
202:24,25
**back** 24:10
24:16
34:23 40:7
60:19
86:10
91:21
104:24
115:24
138:2
147:12
151:4
161:13

167:15
185:10
213:10
252:25
295:25
299:24
**bad** 23:10
**balance**
157:8
**ballots**
242:14
243:6,8
**bands** 206:15
**bar** 240:9,25
**base** 111:22
**based** 10:24
92:9,10,13
147:25
157:21
237:7
239:21
272:24
273:3,6,8
273:11
295:8,9,10
**basic** 111:22
**basically**
94:22
114:20
161:14
219:3
**basics** 21:13
**basis** 58:14
60:21
80:16
111:16,25
117:6
205:4,8
211:19
**Bates** 18:17
18:20,21
18:24
161:19
167:16
**battle**
296:12
**bearing**
161:19
**BECERRA** 2:3

**Beebe** 202:21
202:22,23
204:10,11
205:12,21
211:22
214:21
243:21
251:25
**began** 47:15
104:3,10
**beginning**
20:3 24:1
42:18
43:20
44:16
45:11 46:1
47:6 169:2
221:12
**begins** 50:15
94:24
**begun** 50:16
169:13
269:19
**BEHALF** 15:2
15:12 16:2
16:13
**behavior**
232:25
233:11
**believe** 39:1
39:17
40:22
43:18
47:10
53:24
64:13 65:7
65:13 66:3
66:23
67:23
71:22
72:20
79:23
80:14,19
81:2,19
82:12 85:8
85:10 87:3
87:17 88:1
88:19
89:17,21

91:17,23
92:10
99:12,15
99:20
100:6,15
101:20
102:16
103:4,19
105:16
106:21
107:16,17
107:24,25
112:2
116:12
119:8,14
119:20,22
119:24
120:9
121:19,21
122:16,18
122:25
125:4
126:5
130:15,21
131:20
132:7
133:3,24
135:3,7
137:1,10
139:23
140:1,14
140:20
141:6,10
141:11,16
141:25
142:3,12
142:15,20
142:23
143:2,16
145:17
146:4
147:24
148:1,22
149:2,16
151:22
152:4
153:23
154:4,13
154:21

**DANIEL KIMMAGE  11/10/2022**

161:12,13
161:17,23
163:4
170:4
172:1,2,8
172:10,20
172:21,25
175:23
176:2,4
177:17
179:7
182:19,23
183:4,19
184:15
188:3,25
189:3,9
191:19
194:14
195:7
201:12
202:19,19
202:20
207:4
215:23
216:3,20
243:13
247:23
252:2
253:12
254:8
267:22
271:7
272:20
273:10
276:7,12
277:7
278:9,16
278:18
279:10
281:21
284:6,7
285:16
286:21
289:24
291:5,9,13
294:18
295:6,18
297:5,23
298:1

299:9
300:4
**beneath**
107:8
**benefitting**
296:11
**BENJAMIN**
5:21
**best** 24:22
133:17
**better** 31:19
262:4
267:5
280:25
**beyond** 40:19
184:3
209:25
229:23
**BHATTACH...**
1:11
**Biden** 1:17
20:6 303:8
304:3
**big** 81:7
83:2
128:12
**bit** 48:21
103:5
139:4
180:16
256:11
**blah** 236:4,4
236:4,5,5
**blaming**
96:18
**Blinken**
19:15
289:2
**block** 247:19
**blocked**
234:10
**blocking**
234:19,25
**board** 4:23
89:18
**body** 57:13
**bold** 193:11
219:15,16
219:16,18

237:3
**botnets**
103:7
**bots** 35:22
36:17
51:17
54:21,25
55:6,9,11
96:25
97:24
103:9,12
103:14,25
104:7
171:3
**bottom** 94:23
179:22
181:3,11
181:11
188:20
198:17
209:10
211:12
218:15
220:3,4
226:14
227:5
234:7
235:22
241:10,22
261:6
263:14
267:16
268:18
**Box** 15:6
**BRAD** 11:19
**Branch** 2:25
8:5
**Bray** 11:24
131:23
**break** 85:16
85:22
127:17
150:5,8,14
206:7
212:21,25
252:13,16
299:15
**breakdown**
157:22

**breaks** 24:3
24:4
**Brian** 10:9
191:18,19
192:3,8
196:7,19
**bridge**
209:13
**brief** 63:18
63:19 64:6
285:25
286:2
**briefed** 63:5
84:19
**briefer**
62:24
**briefing**
21:24 22:3
62:21 63:2
285:20
**bring** 143:12
216:11
**broader**
126:13
**broadly**
204:5
**broker** 155:8
**Brookings**
18:10
113:24
123:10
**brought**
189:23
191:2
**bucket**
271:25
**Budget** 7:10
**building**
15:5 31:16
31:19
**bullet** 181:4
181:11
182:13
185:21
187:2
211:13,13
**bulletins**
274:16,21
**bunch** 147:16

175:7
**Bureau** 3:5,5
3:11 7:13
7:25 10:16
10:20 11:1
19:12
276:19
**BYRD** 8:16

─────────
C
─────────
**C** 15:1 16:1
16:1,17
17:1 18:1
19:1 20:1
56:9
**C-I-S-A**
76:21
**calendar**
81:20,23
82:11
130:20
134:9
145:23,25
173:21
**calendars**
81:17
**California**
14:5
154:12
273:4,6,9
273:11
**call** 42:22
56:10
64:25 81:7
83:20
122:21
126:7
150:16
159:17
164:14
203:7,11
**called** 29:5
86:17
106:15
116:11
141:17
167:16
169:20
188:22

**DANIEL KIMMAGE  11/10/2022**

191:16
232:6
245:12
253:6
267:20
275:4
277:22
292:5,14
296:17
calling
29:19
62:10
110:14
248:17
254:19
255:10,24
calls 26:17
68:23
74:25  92:8
92:16
110:20
115:2,22
136:24
167:9
265:12
campaign
33:18,20
34:23
100:20,23
108:10
189:7
190:19
193:5,16
195:8
200:22
201:5,7
275:5
campaigns
32:15,17
33:5  34:9
34:11
99:18
100:3
101:2
144:24
148:20,23
165:9,23
249:19
251:2

273:23
275:6
279:12,15
capacity
1:18,22,25
2:4,11,23
3:8,14,19
3:24  4:7
4:16,20
5:2,6,12
5:17,22
6:4,11,16
6:20,23
7:2,6,16
7:21  8:3,9
8:13,17,21
9:1,8,13
9:17,23
10:1,4,7
10:10,13
10:18,22
11:5,13,20
11:25  12:5
12:12,17
12:25  13:6
13:10
42:15
130:25
139:18
251:16
careful
23:11
carefully
23:15
CAROL 2:22
carry 26:10
26:25
278:19
case 20:7
24:21
54:16
128:7
282:20
300:7,9
302:11
303:13
304:3
cases 102:17
Cassandra

13:23  14:2
20:16
302:2,18
cast 262:17
casting
263:9
caveat 36:2
248:12
262:15
265:14
278:15,16
281:20
cc 178:25
CCR-WA
302:18
CDC 8:7,11
CE 38:4
cell 120:6
120:10,14
120:15,23
121:14,22
122:20
123:1,4,6
124:15
189:1
censorship
129:3
Census 3:4,6
3:11  10:16
10:19  11:1
center 12:3
12:9,14,20
19:13  22:8
22:14
23:25
24:10  25:2
25:8,21,22
26:10,25
27:8,21
28:2  43:20
44:13,24
45:1  46:11
46:20,21
46:24  47:3
48:4  57:17
58:2  60:8
65:15
78:21
86:16  89:5

89:7  94:10
98:10
120:5
121:8
129:1
131:2
144:22
177:4
192:16,19
194:4
197:1
208:17
219:17
232:12,12
232:13,17
241:25
269:12,25
276:20
277:9
280:17
283:21
294:25
296:17
297:7
299:7
center's
49:23
57:18
73:23
156:10
158:17
269:18
Centers 2:20
3:2
certain
21:20
37:19  55:6
138:4
254:1
258:18
280:6
certainly
30:18
34:18
CERTIFICATE
302:1
certified
14:3,4,5,7
16:24

20:15
certify
302:5
305:5
chain 41:8
167:23
188:16
195:12,21
196:1
235:9
284:5,6,10
chains
188:17
challenge
164:5,17
challenges
270:18
CHAN 7:20
change
246:19
291:7
304:7,11
304:15,19
304:23
changes
245:17,23
303:16
305:7,10
channel
190:25
193:14,18
193:19
200:20
channels
256:8,19
chapter
245:12
characte...
35:25
74:10,13
282:19
characte...
61:9  79:16
79:17
157:8,22
charge 119:6
119:13,16
119:18
120:1

DANIEL KIMMAGE  11/10/2022

126:16,18
231:14,15
charges
  152:9
check 144:1
checkers
  183:12
  185:24
checking
  182:13
CHEEMA 6:3
chemical
  112:23,23
chief 2:15
  2:23 7:17
  8:14 10:14
  32:2
  131:24
chiefs 64:24
  80:8 88:2
  131:1
children
  128:3
China 27:4
  28:9 30:13
  32:16
  60:18 65:1
  83:21
  89:18 90:1
  96:8,15
  97:4 103:5
  103:24
  104:3,8,12
  104:19
  105:2,6,10
  137:3
  144:24
  148:13
  165:25
  170:25
  175:23
  184:18
  185:20
  240:1
  262:18
  264:17
  265:8
  266:11,25
  267:5

China's
  102:7
  263:6
China-fo...
  62:5
China-re...
  201:10
China-sp...
  89:12
Chinese 33:5
  55:9 102:3
  102:11,13
  102:25
  103:9,12
  103:14
  148:20,23
  201:21
  217:13
  263:1,2
  265:3,10
  265:22
  266:2,10
  266:22
  268:1
Chinese-...
  266:5
chisels
  170:3
CHOI 8:20
CHRISTY 8:20
CHUZI 15:15
circumst...
  123:18
CISA 9:19,24
  10:2,5,11
  65:15 66:6
  66:8,13,22
  67:11 68:8
  68:14,21
  69:9,17,19
  70:13
  71:13,17
  71:19
  76:17,18
  76:21
  77:14
  78:19
  177:13
  188:18

191:13,21
192:8
193:5,21
194:4,5
195:5,14
195:25
197:24
199:25
200:21
210:4
220:25
221:19
222:3
223:2,8,14
223:14
230:9
232:18
260:7
CISA's 76:19
  76:22
  210:4,11
CISA.DHS...
  192:5
CISA's 10:7
cited 112:8
  113:3
  236:16
City 15:7
  303:21
civil 16:2,5
  209:14
  228:9
  268:10,13
claiming
  189:22
  191:1
claims
  211:20
clarific...
  23:21
  28:22
  59:20
  121:2
clarify
  26:22
  36:19 43:9
  52:1 55:20
  56:14
  59:20

68:15 71:4
90:9
120:12
180:12
247:3
257:3
262:14
272:2
275:15,24
286:5
clarifying
  151:6
clarity 66:8
CLARKE 5:16
classified
  110:14,21
  255:25
  256:7,18
  257:8
clear 110:18
  114:16
  241:20
  245:4,9
  257:11
  263:25
click 145:19
Climate 4:17
close 115:4
  115:13,25
  117:7
  118:3
  120:25
  121:1,3,6
  121:23
  300:11,19
closed 300:5
closely
  94:18
coded 237:7
collab-
  297:8
collabor...
  156:19
collabor...
  156:13
  224:15
collabor...
  289:11
  296:23

297:9,10
collabor...
  241:23
colleague
  39:3
colleagues
  115:5,13
  115:25
  117:8
  120:4
  169:1
  192:15,16
  196:25
  291:8
collected
  245:7
collection
  159:24
  244:14
Columbia
  14:9
combat 30:16
  98:4 181:5
  292:7
combating
  17:19
combatted
  200:22
combatting
  209:15,19
  296:4,12
come 23:6
  24:9 62:16
  62:18 78:2
  99:13
  132:13
  144:15,21
  176:23
  207:16
  262:6
comes 25:23
  298:19,25
  300:15
comfortable
  136:12
coming 90:12
  145:1
  184:6
command 41:9

DANIEL KIMMAGE  11/10/2022

| | | | | |
|---|---|---|---|---|
| comments | 5:24 6:6 | 169:15 | complaints | 110:3,5,8 |
| 49:1 114:4 | 6:13 8:10 | 183:16 | 212:14 | 181:15 |
| 289:6,7 | 8:23 10:15 | 228:10,11 | complete | 239:25 |
| COMMERCE | 11:17 | 247:12 | 221:19 | 255:19 |
| 3:12 | 13:11 87:6 | 248:13 | 223:8,10 | 258:8 |
| Commission | 117:3,5 | 249:13 | 301:14 | 259:5,18 |
| 13:4 | 123:21 | 250:23 | completely | concerned |
| 305:24 | 124:12 | 272:6 | 194:25 | 39:7 77:3 |
| Commissi... | 129:3 | 273:13,15 | 195:1 | concerning |
| 11:6,9 | 201:6 | 273:21 | completion | 21:17 |
| committee | 258:18 | 278:24 | 300:6 | concerns |
| 107:18 | 259:22 | 279:7,8,16 | Complex 59:7 | 33:9 38:15 |
| common 167:5 | 260:11,15 | 280:10,25 | compliance | 39:25 |
| communicate | 271:13 | 281:5 | 133:4,7 | 55:18 |
| 39:6,12 | 272:5,9 | 282:2,16 | component | 109:22 |
| 124:15 | 273:20 | 282:22 | 59:1 | 181:17 |
| communic... | community | 283:4,10 | 114:24 | 194:7 |
| 27:17 | 59:2 63:1 | 283:22 | 133:5 | 205:3 |
| communic... | 120:21 | 284:19 | 141:18 | 211:7,23 |
| 68:13,16 | 121:10 | 285:18,20 | 142:1,4,13 | 212:2 |
| 87:1 116:5 | companies | company 89:9 | 142:16 | 216:22 |
| 116:21 | 29:9,11,13 | 141:7 | 143:1,3 | 241:22 |
| communic... | 29:15 30:4 | 187:22 | components | 242:14 |
| 31:19 | 30:23 | 188:6 | 29:8 | 255:5,17 |
| 68:20 69:5 | 31:10,13 | 247:23 | 120:20 | conclude |
| 69:9,16,17 | 32:21,22 | 250:15 | 142:25 | 239:1 |
| 69:19 87:8 | 36:5,22 | 281:11 | compound | concluded |
| 115:5,13 | 37:6,19 | 282:25 | 37:22 | 301:8 |
| 115:17,25 | 38:3,10,16 | 283:7,18 | 38:19 | concludes |
| 116:2 | 45:17 47:8 | 283:24 | 166:21 | 301:4 |
| 117:7,15 | 47:17 | 286:1 | 293:18,19 | conclusion |
| 117:16 | 50:23 | compared | computed | 113:5 |
| 118:3,16 | 53:10,17 | 266:12 | 263:4 | 239:19 |
| 123:24 | 54:18 55:6 | compelling | computer | concrete |
| 124:5,17 | 76:15 | 275:22 | 170:1,5 | 34:21 |
| 125:14 | 78:25 | competition | 178:6 | conditional |
| 204:1 | 79:14,18 | 189:24 | conceptual | 256:14 |
| 225:8,16 | 83:1,3,5,6 | 191:3,8 | 31:1 | conduct |
| 235:8,9 | 83:9,17,23 | 201:9,14 | concern | 98:19 |
| 253:16 | 84:19,23 | complaining | 30:22 31:6 | 156:6 |
| 254:3 | 90:23 | 193:18 | 36:7,13 | 217:7 |
| 256:17 | 91:11 92:3 | complaint | 39:9,14 | 225:3 |
| 257:22 | 92:4 99:9 | 18:12 | 40:13 | 275:4 |
| 258:1 | 99:14,16 | 128:7,9 | 48:18 | 287:21 |
| 259:3,17 | 103:2 | 152:4 | 55:25 | conducted |
| 259:25 | 155:20 | 202:9,10 | 74:15,23 | 34:19 |
| 260:8 | 157:6 | 202:13 | 75:4,6 | 90:17 |
| communic... | 159:2 | 218:21 | 78:10 | 167:14 |
| 3:10 5:14 | 165:4 | 258:14 | 109:24 | conducting |

DANIEL KIMMAGE  11/10/2022

| | | | | |
|---|---|---|---|---|
| 32:18 | consult | 247:10,20 | contribu... | coordina... |
| conference | 183:12 | 247:21,25 | 218:14 | 25:15,18 |
| 178:18 | contact 92:3 | 248:3,10 | Control 2:21 | 58:20 59:9 |
| Confiden... | 120:11,17 | 248:11,17 | 3:3 | 61:15 |
| 18:19,21 | 120:20,25 | 248:20,22 | controlled | 68:13,20 |
| 18:23 | 121:24 | 249:9,12 | 97:23 | 114:20 |
| congratu... | 123:2,6,8 | 253:7,9 | convene 59:6 | 115:23 |
| 173:11 | 123:15 | 254:5 | convergence | 120:6,10 |
| congress... | 163:6 | 257:21 | 104:11,12 | 120:13,15 |
| 25:23 26:5 | 202:15,18 | 285:21 | 104:17,18 | 120:23 |
| 36:12 | contacted | 286:11 | 104:20 | 122:1 |
| 63:12 69:4 | 197:22 | 287:1,2,6 | conversa... | 124:11,15 |
| 107:19 | contacts | 287:11,16 | 34:4 47:16 | 155:7 |
| 280:19 | 123:3 | 287:21,24 | 50:2 53:14 | 189:1 |
| connection | content 19:7 | context | 54:8 113:8 | coordinator |
| 46:9,12,14 | 30:21 31:3 | 38:13,14 | 137:25 | 6:18 12:1 |
| 46:18 | 31:5 33:8 | 54:15 | 235:16 | 12:13 22:8 |
| 184:5 | 33:17,19 | 62:19,25 | conversa... | 22:10,11 |
| 207:6 | 34:17 | 87:9 | 31:5 38:8 | 25:12,12 |
| 213:21 | 36:16,22 | 108:13,15 | 53:3,8 | 25:16,17 |
| 214:4,8,25 | 36:24 | 115:7 | 54:23 55:3 | 31:24,24 |
| 216:5 | 37:19 | 126:6 | 55:5,8 | 31:25 32:6 |
| 242:19 | 38:17 | 184:8 | 156:5 | 41:1,5,12 |
| 246:25 | 39:24 | 186:25 | 225:2,23 | 41:25 |
| 248:18 | 40:12 | 187:7 | 242:22 | 42:13,14 |
| 293:6 | 51:24 52:3 | 203:17 | 249:8,10 | 42:16,16 |
| connecti... | 55:12,18 | 206:23 | 249:11,15 | 60:4,5 |
| 182:6 | 55:25 | 207:9,10 | convey 55:25 | 64:19 66:4 |
| connector | 61:17,23 | 224:25 | cooperation | 67:15 |
| 228:4 | 61:24 85:6 | 225:21 | 296:2 | 69:21,22 |
| consequence | 103:6 | 249:17 | coordinate | 70:6,7,7 |
| 264:1 | 118:15 | 263:17 | 57:18 58:4 | 88:1,11 |
| considered | 129:4 | 264:14 | 61:5 73:24 | 94:9,16 |
| 244:24 | 137:24 | 267:10 | 98:20 | 118:17 |
| consistent | 159:9 | 268:19 | 122:3 | 119:16 |
| 166:15,16 | 175:5 | continua... | 170:19 | 130:24 |
| consisting | 181:17,23 | 135:24 | coordinated | 131:15,18 |
| 155:2 | 182:1 | continue | 170:16,24 | 136:1,2,5 |
| consists | 193:17 | 79:24 | 171:2,5,11 | 139:19 |
| 115:1 | 200:20 | 169:7,16 | 171:15 | 140:6,10 |
| conspiracy | 211:18 | continuo... | 261:21 | 146:12,13 |
| 264:6 | 232:25 | 25:7 | 279:21 | 146:15 |
| constant | 233:5,10 | contrasting | coordinates | 199:14,15 |
| 123:24 | 235:1 | 102:9 | 27:16 | 199:16,18 |
| 124:5 | 236:23 | 267:1 | coordina... | 231:18 |
| constituted | 239:9 | contribute | 57:13 | coordina... |
| 242:15 | 246:10,15 | 222:6 | 68:16 | 32:2 80:8 |
| construc... | 246:23 | contributed | 121:14,22 | 131:1 |
| 155:8 | 247:4,5,6 | 220:4 | 122:20 | copies 43:3 |

**DANIEL KIMMAGE  11/10/2022**

| | | | | |
|---|---|---|---|---|
| **copy** 43:1 | 193:2,6,19 | 163:12 | 274:19 | **COVID** 81:11 |
| 198:18 | 193:23 | **Council** | 278:20 | 92:13 |
| 303:15 | 196:2,7,22 | 58:14 59:4 | **counterpart** | 100:2 |
| **corner** | 197:3,8 | 219:15 | 121:1 | 101:23 |
| 226:14 | 210:17 | 294:9,10 | 123:19 | 102:4 |
| **correct** | 212:11 | 294:11,23 | **counterp...** | 144:11,14 |
| 25:14 28:3 | 220:6,9 | 295:1 | 198:24 | 144:25 |
| 44:9 50:24 | 221:20 | **Council-...** | 200:15 | 238:22 |
| 51:1,10,19 | 222:15 | 294:24 | **countert...** | 239:23 |
| 51:22,25 | 223:2 | **counsel** 6:21 | 28:10 | 263:17,21 |
| 52:16,22 | 224:1,2,11 | 20:18 95:4 | 60:18 | 267:19 |
| 52:24 53:1 | 226:16 | 127:14 | 61:25 | 268:8 |
| 53:2 57:21 | 227:3 | 150:2 | 83:21 | **COVID-10** 5:3 |
| 58:21 | 228:1,11 | 151:12 | 268:19 | **Covid-19** |
| 66:10 | 228:15 | 256:15 | 269:11,18 | 5:13,19 |
| 70:14,22 | 230:9,11 | 299:12 | **countries** | 6:1,9,12 |
| 72:10 74:1 | 230:15,22 | 302:9 | 27:4 | 6:17 95:22 |
| 74:6 76:5 | 233:1 | **Counselor** | 102:10 | 96:1 99:10 |
| 76:21 79:1 | 234:5,10 | 3:25 | 215:25 | 99:19 |
| 79:2,6 | 234:15 | **counter** | 266:13 | 100:25 |
| 82:8,13 | 237:9,18 | 17:13 | 267:2 | 105:2 |
| 95:22 | 240:2,23 | 25:25 26:6 | **country** 39:4 | 189:23 |
| 114:8,24 | 241:16,23 | 27:14 | 187:18,20 | 191:2,7 |
| 115:14 | 242:1 | 95:25 96:9 | **COUNTY** 305:3 | 237:8,16 |
| 123:7 | 244:7,20 | 98:15,22 | **couple** 93:17 | **COVID-re...** |
| 134:10 | 245:18 | 116:3 | 151:6 | 96:13 |
| 141:23 | 246:21 | 156:10 | 167:15 | 238:8 |
| 142:8 | 248:3 | 169:23 | **course** 22:3 | **CRAWFORD** |
| 153:15,19 | 263:18 | 176:18 | 263:6 | 2:22 |
| 155:10,11 | 264:3 | 204:6 | 272:11 | **create** 171:8 |
| 156:10 | 270:18 | 263:5 | **court** 1:1 | 229:4,16 |
| 162:8,19 | 271:15 | 274:6,10 | 14:4 15:5 | **created** |
| 162:25 | 275:2 | 274:12,13 | 20:9,15,20 | 44:16 45:1 |
| 163:10,14 | 277:4 | 274:23,24 | 21:23 23:5 | 45:4 |
| 164:1 | 278:5,25 | 278:4 | 151:22 | **creating** |
| 165:21 | 282:13 | 299:9 | 152:6,6,20 | 100:24 |
| 168:5,24 | 283:8 | **counter-...** | **Court's** 22:3 | **creation** |
| 169:2,17 | 296:7,18 | 261:12,16 | **COURTNEY** | 43:19 |
| 172:23 | 298:10 | 277:22 | 5:11 | 265:2,16 |
| 174:2,6 | 301:13 | **countering** | **cover** 181:1 | **credibility** |
| 181:1,6,9 | 302:6 | 19:10 44:8 | 196:24 | 274:21 |
| 182:15 | 305:9,13 | 71:25 | 207:4,7 | **crisis** |
| 186:4 | **corrections** | 95:21 | 208:21,22 | 263:18 |
| 187:3 | 301:15 | 105:1 | 275:19 | 264:2 |
| 188:18 | 303:16 | 163:17 | **coverage** | **CRR** 302:19 |
| 190:20 | **Corrigan** | 165:1 | 85:10 | **CSIRT** 177:19 |
| 191:4 | 166:3 | 174:1 | 207:16 | 177:20 |
| 192:5,6,9 | 174:5 | 176:18 | **covered** | 186:1 |
| 192:22 | **corrobor...** | 263:11 | 250:25 | **CSIRTs** |

177:14
178:2
CSR-HI
  302:18
CSR-VA
  302:18
curious
  218:23
current 21:9
  22:5 28:14
  35:16 45:2
  71:22
  298:11
currently
  41:2,20
curve 261:9
CY1 7:23
cyber 65:16
  66:9 77:4
  77:24
  107:1,1,3
  107:6,12
  112:20
Cybersec...
  4:9,12
  9:18
cycle 255:21
  259:7

_____
|        D        |

D 15:3 16:1
  18:1 19:1
  20:1
D.C 15:19
  16:7,18
  81:9,13
  92:11
  146:6
  154:9,11
  189:17
  295:8
  303:6
D.C.-based
  294:14
DANA 6:19
Daniel 12:11
  13:16 14:1
  17:2,9
  18:3 19:3

20:4 21:1
21:7 129:2
301:4,8,11
303:12
304:2
305:5,20
data 107:10
  234:12
  244:6,13
  245:3
  262:17
  263:10
date 20:11
  130:10,17
  146:17
  175:17
  277:12,13
  301:19
  304:4
dated 48:3
  57:4 93:8
  276:22
dates 91:14
  119:10
day 79:22
  122:19,24
  139:12,15
  242:17
  296:18
  302:14
  305:14
day-to-day
  177:3
  296:12
days 57:5
  303:20
de-empha...
  247:19
de-platform
  247:19
deal 298:17
  298:24
dealing
  267:3
deals 65:20
dealt 162:18
Dear 303:10
debates
  291:17

December
  153:17
decide 150:8
decided
  250:4
decisions
  37:5 38:3
  38:5,7,10
declare
  305:12
deem 247:20
  283:20
deepen 36:8
  37:6
  156:22
  279:14
  283:17
deepening
  157:1
  279:17
defend
  156:20
DEFENDANT
  15:12
defendants
  13:13 20:7
  21:16
  300:3
defending
  156:14,18
defense 24:5
  24:11
  25:24
  44:25
  49:10
  112:19
  120:22
  121:9
  173:4,7
  175:18
  179:18
  277:14
defensive
  158:22
defer 110:15
define 69:12
  69:14
  131:10
  247:11,12

248:14
definitely
  149:25
definition
  287:4
DEHMLOW 7:15
delegiti...
  211:15,23
  212:11
delegiti...
  211:19
delegiti...
  234:4,14
delibera...
  249:5
  255:11
delibera...
  68:24
  249:1
  254:25
democracy
  18:8
demonstr...
  35:2
demonstr...
  39:5
Dempsey 8:2
  188:22,24
  191:12
  196:11,20
  198:19
  283:23
  284:1,2,3
  284:9,17
Dempsey's
  190:8
  192:7
denigrate
  97:10
department
  2:6,8 3:12
  3:16 4:4
  4:24 7:12
  9:20 11:23
  12:10,15
  12:21,22
  15:17
  16:13 18:4
  18:13

22:15
27:18 39:7
39:11 44:6
44:7,12
49:10,22
53:6,13
54:5,9
55:16 56:4
57:19 58:5
73:25
112:9
120:21
121:9
177:13
185:25
189:14
192:15
197:1
220:22
221:20
222:6,11
225:9
259:24,25
260:2
290:24,25
291:8
296:3
298:22
303:5
Departme...
  17:15
  128:25
  241:25
Departme...
  12:2
depend 62:24
  121:4,4
dependent
  60:12
depending
  146:17
depends
  108:14
DEPONENT
  301:10
deposed
  22:19
deposition
  13:16 14:1

DANIEL KIMMAGE  11/10/2022

| | | | | |
|---|---|---|---|---|
| 19:3 20:4 | 99:14,17 | 272:11 | differently | director |
| 20:17 | 105:14 | developers | 286:8 | 2:12 4:8 |
| 21:17,19 | 109:17 | 172:2,20 | difficult | 4:21 5:8 |
| 21:21 | 141:20 | 271:7 | 121:5 | 5:13,18,23 |
| 143:23 | 142:6,9 | developing | difficul... | 6:5,12 |
| 151:14,18 | 159:10 | 96:22 | 274:17 | 8:11,22 |
| 300:6,8,11 | 191:22 | 271:12 | digital 2:24 | 9:2,4,14 |
| 300:13 | 194:5,20 | 272:5 | 5:9,18 7:8 | 10:23 |
| 301:4,8 | 237:24 | 299:8 | 8:5,18 9:2 | 11:21 13:7 |
| 303:11 | 255:8 | DHS 3:22 4:3 | 9:5,14 | 13:11 60:7 |
| 305:6,8,11 | 274:12 | 10:11 | 166:8 | 66:13,16 |
| depositions | 281:7 | 58:21 59:9 | 174:9 | 66:17,18 |
| 21:18 | 283:14 | 59:25 | 219:14 | 67:11 |
| 152:17 | describes | 60:23 61:3 | Diplomacy | 70:13 72:5 |
| deputies | 43:18 | 62:5,22 | 16:15 | 72:5,12 |
| 32:1 64:23 | 270:20,23 | 63:19 64:7 | 49:23 | 175:4 |
| 88:2 | describing | 64:8,11,15 | diplomatic | director... |
| deputy 5:7 | 49:23 | 64:18 65:4 | 189:9,11 | 66:22 |
| 5:23 6:5 | description | 65:5,7,19 | 189:13 | Directorate |
| 8:10,22 | 33:24 | 65:24 66:4 | 192:21 | 10:15 |
| 9:4,9,14 | 57:23 | 66:10 | 194:17 | disagree |
| 10:23 13:1 | 153:10 | 115:5,13 | 195:9 | 238:11 |
| 22:7,10 | 278:8 | 116:1,5,22 | 197:3 | disconti... |
| 25:12 32:1 | designated | 117:8,16 | direct 25:24 | 172:23 |
| 40:25 | 121:23 | 118:4 | 39:23 41:4 | discourse |
| 41:11 | designed | 120:22 | 44:2 59:8 | 262:19 |
| 42:13,16 | 287:24 | 260:8 | 117:4 | discredit |
| 60:5 64:20 | desired | diagram | 185:10 | 105:3,7,11 |
| 69:23 70:8 | 303:17 | 226:15 | 218:3 | discuss |
| 80:7 94:15 | destabil... | 230:1 | 291:16 | 29:25 30:6 |
| 118:16 | 217:19 | Diana 167:16 | 294:3,7 | 47:9 52:14 |
| 131:1,18 | detail 35:14 | 168:4,25 | 295:14,22 | 76:8 |
| 146:13,15 | 42:2 45:24 | dictating | 298:3 | 136:13 |
| 199:17 | 281:14 | 274:7 | direction | 164:14,15 |
| describe | detailed | differed | 161:8 | 217:12 |
| 25:20 | 227:13 | 105:17 | 298:5 | 279:11 |
| 26:15 | 261:19 | difference | directive | discussed |
| 54:15 | 264:8 | 25:15 | 36:5 | 21:21 |
| 61:12 68:9 | details | different | 231:25 | 30:22 31:6 |
| 69:18 | 53:18 | 71:3 126:1 | 232:1 | 32:11 |
| 194:10 | 236:11 | 140:25 | directly | 51:17 |
| 211:1 | determin... | 141:1 | 29:8 32:7 | 52:10,13 |
| 270:16 | 39:20 | 148:3 | 38:16 | 53:19 54:5 |
| described | determine | 194:20,25 | 39:13 41:8 | 61:18 62:7 |
| 54:13 56:7 | 247:24 | 195:1 | 94:13 | 63:8 64:13 |
| 60:20 | 248:9 | 257:18 | 174:25 | 68:1 72:23 |
| 66:12 | develop | 262:2 | 179:8 | 84:1,3,9 |
| 71:20 88:7 | 273:19 | 265:17 | 199:11 | 84:16 89:1 |
| 98:18 | developed | 275:1,3 | 245:6 | 89:24 90:5 |

DANIEL KIMMAGE  11/10/2022

101:6,14
101:17,21
102:1
103:1,12
103:17,23
103:25
105:20
113:12,14
118:2,10
136:6
137:4
138:7
144:4
148:15
149:3,4,6
169:6,25
194:21
216:1
236:12
243:19
248:18
**discusses**
244:6
**discussing**
34:11 48:3
114:20
148:2,21
148:22
289:11
**discussion**
30:15,20
30:25
40:11
51:23 53:4
54:4,12
84:11
90:19,24
91:2 99:18
113:24
186:1
195:11
236:22
246:23
254:24
255:3
256:9
262:6
266:3
290:20

**discussions**
33:16,18
34:8,18,20
36:1 54:17
61:8,10
73:7,16
90:21
101:16
105:24
109:12,15
197:16
221:6,9
224:14
242:18,22
243:5,23
248:21
249:15
254:14
294:24
**Disease** 2:20
3:2
**Diseases**
2:14,19
**disinfo**
189:6
**disinfo-...**
169:20,21
173:13
270:16
271:5
286:25
**disinfor...**
4:22 17:23
18:6 19:11
26:1,2,7
27:5,11,14
30:14,16
33:5 54:22
55:7 63:13
65:20 69:7
71:17,18
73:5 76:7
77:23 78:2
78:9,10,11
84:9,16,18
84:24
89:20
90:16,25
95:21,25

96:7,14
97:6,8,9
97:20 98:2
98:11,16
98:22
99:10,18
100:2,13
100:23
101:2,13
102:13
103:17
105:1
106:15
107:1,2,4
107:6,12
108:10,11
113:6
116:13
136:11
139:6
144:23
148:23
149:7
156:11,16
156:20,23
157:4,14
158:4,6,8
158:18
163:18
165:1,10
165:12,18
165:20,24
169:24
170:18,25
174:1
176:19
177:25
181:6
182:14
184:17
186:4
190:19
191:20
192:20
193:5
194:6,17
195:8
197:2
200:22

204:8,17
205:2,3
207:20
209:19
217:14
224:1,5
238:18,20
242:23
243:1,5,9
250:1
251:3
261:22,24
262:21
263:6,22
264:3,9
267:4,12
268:1
270:17
271:13
273:15,24
274:2,6,16
274:20
275:18,23
278:1,5,20
278:24
279:8,14
279:19
280:1,20
282:6,23
283:5
290:21
296:13
297:19
298:19
299:1,9
**Disinformed**
18:8
**disputed**
266:13
**disrupting**
217:19
**disrupts**
112:20
**disseminate**
107:4
158:7
**dissemin...**
148:12
**dissemin...**

104:21
105:10
**dissemin...**
21:19
96:23
157:13
**distinction**
239:8
267:11
**District** 1:1
1:2 14:8
20:9,9
**division** 1:3
2:25 7:24
8:6 10:14
20:10
**divisions**
27:20 28:5
29:7
**divulging**
256:4
**DNC** 107:20
111:11,18
**DNC's** 108:2
109:10
**docket** 21:22
**document**
42:22 43:8
43:24
47:22
48:13,16
48:22
50:12 93:2
93:18 94:3
95:6
104:24
106:7
114:14,18
128:12,13
143:19
144:7
152:6
153:5
159:17,22
161:19
173:19
184:7
186:8
206:17

DANIEL KIMMAGE  11/10/2022

| | | | | |
|---|---|---|---|---|
| 260:23 | **drafting** | 92:16,21 | 288:6 | 210:4 |
| 276:6 | 276:8,9 | 92:23 | 298:24 | **efforts** |
| 277:7,18 | 278:17 | **early** 270:21 | **early** 270:21 | 17:12 |
| 278:18 | 281:21 | 107:20 | 294:22 | 25:25 |
| 281:12,13 | **draw** 239:19 | 108:3 | **easier** | 97:21 |
| 281:23 | **drawing** | 109:10 | 287:16 | 105:3,8,12 |
| 283:3 | 239:10 | 115:1,19 | **East** 261:4 | 290:10 |
| 292:3 | **drip** 206:6 | 115:22 | **Easterly** 4:6 | **EI-ISAC** |
| 295:25 | **Drug** 11:2,10 | 145:7 | 66:17 | 232:6,8 |
| **documented** | **DS** 189:7,8 | 159:24 | **eastern** 39:4 | **EIC** 231:1 |
| 94:2 98:1 | **due** 22:3 | 175:8 | **ecosystem** | **EIP** 203:11 |
| 104:6 | **duly** 21:2 | 177:11,12 | 18:6 97:1 | 203:24 |
| 107:17 | | 177:18 | 97:3 98:11 | 204:3 |
| **documents** | **E** | 192:11 | 106:16 | 205:16 |
| 45:8 93:17 | **e** 13:23 14:2 | 194:16 | 280:3 | 207:18 |
| 143:22 | 15:1,1 | 195:10 | **edits** 276:15 | 209:12,12 |
| 151:13,18 | 16:1,1,1 | 198:4,5,7 | **educate** | 210:5,11 |
| 151:21,23 | 16:24 17:1 | 198:9 | 157:12,21 | 210:13 |
| 152:3,20 | 17:7 18:1 | 201:3,4 | 281:15 | 212:2,7,9 |
| **doing** 27:10 | 18:1 19:1 | 273:9 | **educated** | 213:21,25 |
| 31:2 40:16 | 19:1 20:1 | **EAC** 13:8,12 | 158:1,3 | 214:4,8,10 |
| 41:17 | 20:1 32:9 | **earlier** | 281:6 | 214:12,16 |
| 60:11 68:5 | 302:2,18 | 54:13 60:2 | **educating** | 215:3 |
| 104:19 | **e-mail** 18:19 | 72:3 80:12 | 157:5 | 216:5 |
| 139:12 | 18:21,23 | 84:13 | **Education** | 218:4,15 |
| 237:22 | 92:22 | 99:22 | 11:18 | 219:4,6,23 |
| 263:7,8 | 163:7,20 | 102:4 | **educational** | 220:1,5,9 |
| 280:21 | 164:10 | 116:16 | 283:15 | 220:18,22 |
| 296:10 | 166:3 | 138:24 | **EE** 240:22 | 220:25 |
| **dollars** | 167:23 | 140:9 | **effect** 37:4 | 221:17 |
| 49:10 | 168:8,17 | 147:13 | 246:3 | 222:3,7 |
| **domestic** | 168:21 | 149:7 | **effective** | 223:17 |
| 40:2 74:17 | 169:2 | 154:8 | 102:8 | 226:19,25 |
| 74:23 | 175:17 | 162:18 | 275:20 | 227:14,18 |
| 76:12 78:3 | 178:17 | 172:16 | **effectively** | 228:4 |
| 78:11 | 188:16,17 | 191:22 | 266:25 | 229:5,7,17 |
| 183:25 | 188:21 | 199:10 | **effectiv...** | 231:8 |
| 217:19 | 190:8 | 201:11 | 97:10,12 | 232:2,22 |
| 269:22 | 192:5,7 | 204:24 | 185:23 | 233:3 |
| 270:1 | 193:20 | 237:12 | **effects** | 235:10 |
| **Dorell** 57:1 | 194:2,3 | 244:16 | 96:10 | 237:22 |
| **DORI** 6:10 | 195:21 | 255:8 | **efficacy** | 238:13 |
| **downsides** | 196:1,11 | 261:19 | 96:21 97:7 | 241:6 |
| 298:17,25 | 196:20,22 | 262:6 | 100:3,4 | 245:22 |
| **Dozens** 210:3 | 198:19 | 264:8 | 101:13 | 246:3 |
| **DR** 1:10,12 | 284:5 | 271:4,18 | 105:20 | 251:4,16 |
| 1:13 2:10 | **E-mail(s)** | 272:8 | 264:11,12 | 252:9 |
| **draft** 276:13 | 18:17 | 274:12 | **effort** 98:8 | **EIP's** 244:24 |
| 276:25 | **e-mails** 92:8 | 284:5 | 98:18 | 246:6 |
| | | 286:17 | | |

**DANIEL KIMMAGE  11/10/2022**

| | | | | |
|---|---|---|---|---|
| **either** 25:11 | **election...** | 255:21 | 203:6,13 | 161:10 |
| 60:4 65:21 | 84:8,12,16 | **employed** | 203:15 | 167:14 |
| 66:1 72:4 | 84:18,22 | 302:10 | 215:3,9 | 169:7,16 |
| 107:17 | 84:24 90:4 | **employee** | 227:1 | 173:15 |
| 116:10 | 90:10 | 189:19 | **engagement** | 177:3 |
| 139:24 | 209:16 | 273:11 | 5:15,25 | 192:16,18 |
| 184:6 | 215:2 | 294:22 | 6:7,14 | 194:4 |
| 189:18 | 218:9 | **employees** | 8:14,19 | 197:1 |
| 191:19 | **elections** | 57:18 | 9:3,10 | 208:17 |
| 234:10,18 | 90:17,20 | 73:24 | 12:3,8,14 | 214:12,15 |
| 247:18 | 90:22 91:1 | **employment** | 12:19,20 | 241:25 |
| 252:8 | 91:3 | 91:15 | 18:14 | 269:12,18 |
| 300:4 | 138:13 | **enable** | 19:13 22:8 | 269:25 |
| **election** | 204:9 | 210:14 | 22:14 | 276:19 |
| 10:8 13:3 | 215:13,21 | **enabled** | 23:25 | 277:9 |
| 19:5,6 | 215:22,25 | 107:1,2,6 | 24:10 25:2 | 280:17 |
| 90:12,12 | 216:2 | 107:12 | 25:8,20,22 | 283:21 |
| 90:13,16 | 217:20 | **enclosed** | 26:10,24 | 296:17 |
| 90:19 | 230:6 | 303:11,13 | 27:8,21 | 297:7 |
| 112:11 | 236:24 | **Enclosures** | 28:2,19 | 299:6,7 |
| 116:19 | 239:14 | 303:25 | 29:4,10 | **engagements** |
| 129:5 | 243:15 | **encourage** | 30:3 31:13 | 31:17 56:6 |
| 138:6 | 246:11 | 55:1 | 43:20 | 70:1,3,5,9 |
| 144:13 | 251:13 | **encouraged** | 44:13,23 | 70:10,16 |
| 202:1,11 | **electoral** | 47:17 | 45:1 46:11 | 121:7 |
| 203:7 | 91:1 | **encourages** | 46:20,21 | 155:8 |
| 204:9,18 | **electronic** | 69:5 | 46:24 47:3 | 157:10 |
| 210:15 | 81:17 | **encouraging** | 48:4 49:5 | 299:10 |
| 211:15,19 | 235:8 | 50:23 | 50:6 52:2 | **engages** |
| 211:23 | 254:3 | **enforce** | 52:4 56:4 | 185:16 |
| 212:11,15 | **element** | 36:16 | 58:2,13 | 297:17 |
| 215:9,10 | 237:9 | **enforcement** | 60:8 83:19 | 299:7 |
| 216:15,17 | **elements** | 110:17,21 | 86:15,15 | **engaging** |
| 216:23 | 280:2,4,16 | 224:7 | 88:24 89:5 | 53:17 |
| 217:7 | **Ellis** 13:23 | 254:19,21 | 89:7 91:8 | 214:17 |
| 218:2,9 | 14:2 16:24 | 254:25 | 91:11 | 224:17 |
| 224:5 | 20:14,16 | 255:11,25 | 94:10 98:9 | 254:24 |
| 226:3 | 302:2,18 | 257:9 | 120:5 | **entire** 41:7 |
| 231:17 | **ELVIS** 7:20 | 270:11,12 | 121:8 | 47:11 |
| 232:10 | **embassies** | **engage** 29:11 | 129:1 | 114:3 |
| 234:5,14 | 267:23 | 29:12,14 | 131:2 | 115:8 |
| 242:17 | **embassy** | 37:16 | 132:2 | 206:17 |
| 245:16,17 | 189:16 | 215:8 | 144:22 | 260:1 |
| 251:8 | **emerged** 35:3 | 224:16 | 153:8,11 | **entirely** |
| 255:21 | **emergence** | 248:19 | 153:14 | 60:12 |
| 258:11 | 266:15 | 274:5 | 155:22 | 101:16 |
| 259:7,20 | **emerging** | **engaged** 40:9 | 156:6,10 | 126:25 |
| **election...** | 229:6,18 | 69:6 89:8 | 158:17 | 216:20 |
| 246:4 | **employ** | 185:16 | 159:4 | 245:4,9 |

**DANIEL KIMMAGE  11/10/2022**

| | | | | |
|---|---|---|---|---|
| entirety | 15:15,16 | 73:11  79:8 | 141:11 | 285:20 |
| 48:13 | 16:3,4,14 | 82:2,2 | 142:5 | 286:16,19 |
| entities | 303:5 | 88:16 | 152:15 | 288:8 |
| 162:25 | essentially | 93:10  96:3 | 167:13 | examples |
| 166:19 | 126:11 | 97:17,18 | 171:19 | 107:5 |
| 197:21 | 221:3 | 98:6  101:9 | 175:19 | 108:16,25 |
| 219:9,19 | 271:20 | 108:20,20 | 208:7,16 | 171:22 |
| 228:14 | establish | 111:20 | 229:13 | exception |
| 268:4,6 | 44:12 | 114:11 | 294:13 | 61:24 |
| 292:23 | 68:12  92:3 | 115:21 | 295:5 | exceptional |
| entity | established | 116:24 | EXAMINATION | 54:16 |
| 202:14 | 44:23 | 117:10,21 | 17:2  21:3 | excerpt 18:7 |
| 282:3 | 108:23 | 118:6,12 | 151:9 | 114:3 |
| 295:7 | 153:18 | 123:12 | 152:1 | excerpts |
| entry 21:22 | 232:22 | 124:7 | examined | 128:6 |
| environment | 271:10 | 127:5 | 301:12 | exchange |
| 38:9  89:6 | establis... | 131:8 | example | 30:8 |
| 107:11 | 272:4 | 143:8,15 | 30:19 | 210:14,20 |
| environm... | establis... | 145:16 | 33:22 | 211:2 |
| 268:2 | 44:8  46:11 | 148:5,17 | 34:21,21 | exchanged |
| envision | 46:19 | 155:25 | 54:6  61:25 | 30:10 |
| 296:2 | estimate | 159:13 | 62:3  63:1 | exchanges |
| envoy 199:4 | 131:12 | 178:21 | 74:18  75:9 | 167:7 |
| 200:6 | et 20:5,6 | 186:7 | 81:16  82:6 | exchanging |
| equally | 303:8,8 | 190:5 | 96:18,21 | 156:21 |
| 128:3 | 304:3,3 | 204:20 | 97:1  99:7 | exciting |
| equipped | ethnically | 205:18 | 99:25 | 114:24 |
| 36:16 | 268:20,25 | 223:4 | 103:7,8 | excluded |
| equips | 269:17 | 229:9 | 104:5 | 224:7 |
| 280:24,24 | 270:2 | 231:10 | 107:9,11 | exclusively |
| equivalent | Eurasia | 251:18 | 107:14,16 | 78:9 |
| 238:25 | 294:25 | 284:13,15 | 107:21 | Executed |
| equivalents | evaluation | 284:21,23 | 117:16 | 305:14 |
| 162:24 | 232:24 | 298:8 | 126:15 | executive |
| ERIC 1:6 | 233:4,10 | ex 1:5,8 | 149:5 | 7:10  13:7 |
| 8:12 | 233:14,20 | exact 37:15 | 163:23 | 25:16 |
| ERICA 11:4 | event 72:1 | 113:1 | 171:11 | 43:19 |
| errata | events 121:4 | 119:10 | 208:19 | 44:17,22 |
| 301:16 | everybody | 133:5 | 240:1,22 | 45:4  46:20 |
| 303:14,17 | 149:21,22 | 135:15 | 251:25 | 208:3 |
| 303:19 | 149:24 | 157:22 | 262:20,24 | 209:7 |
| 304:1 | 249:22 | 202:5 | 263:2,10 | executives |
| escalated | evidence | 203:17 | 267:2 | 51:8 |
| 181:13,25 | 33:12  35:3 | 204:22 | 274:14 | exercise |
| especially | 43:23  46:6 | 207:9 | 279:21,25 | 124:11 |
| 223:22 | 52:18 | 217:4 | 280:21 | exhibit 17:9 |
| 224:5 | 58:24 | exactly | 281:25 | 17:10,14 |
| ESQUIRE 15:3 | 63:10,22 | 47:14  92:1 | 282:5 | 17:17,21 |
| 15:13,14 | 70:19 | 92:12 | 283:1 | 18:3,4,7 |

**DANIEL KIMMAGE  11/10/2022**

18:12,13
18:16,19
18:23 19:3
19:4,7,9
19:12,14
42:22,23
47:23,24
56:10,11
56:17,18
57:6 73:21
93:2,3
106:8,9,12
113:19,20
115:9
120:3
123:25
127:10,12
127:16,22
128:1,6
152:25
153:1
159:18,19
161:14
177:7,8
188:8,10
188:13
206:2,3
213:12
252:12
253:2,3
260:19,20
276:2,3
288:15,17
288:24
**exhibits**
128:2
252:15
**exist** 171:9
**expanding**
263:3
**expedited**
300:23
**expert**
171:16
262:16
**expertise**
32:4 65:2
80:10 88:5
117:25

119:5
124:19
131:3
**experts** 63:3
132:9
**Expires**
305:24
**explain**
46:12
293:14
**explained**
271:4
**explicit**
223:25
**exploit**
158:7
**explore**
164:3,15
167:16
**expose** 98:8
**exposing**
19:10
156:14
**expression**
181:15
**extend** 75:6
**extends**
78:10
**extent** 68:23
69:1
110:14,20
129:10
136:12
159:4
202:16
224:20,22
225:16
249:1,4
254:19,23
255:10,13
255:24
256:3
257:8
290:18
299:18
**external** 6:7
11:7
227:12,17
228:1,9,13
229:2

230:20
**extra** 43:1,2
**extremism**
17:13 44:9
268:21
269:2,17
**extremist**
268:23
269:13,22
270:3
**Eyeballing**
213:18
**eyes** 48:16

———————
**F**
**face-to-...**
166:25
167:6
**Facebook**
19:7 51:10
52:14
75:22,25
80:20
82:13
139:21,24
140:1,15
141:4,9,12
141:13,17
141:19,25
142:1,11
142:18
143:5,13
145:18
160:20
162:22
183:8
192:9,24
193:22
194:4
234:8
240:21
244:13
250:3
253:7,9
**facilitate**
31:19
91:10
155:7
161:10

232:24
233:3
**facilities**
100:9
**facility**
286:18
**fact** 35:2
136:17
182:13
183:12
214:15
263:8
267:5
272:14
**fact-che...**
183:7,16
183:17
**fact-che...**
182:18,21
182:24
183:2,6
184:1,13
185:7,8,16
237:4
**factor**
238:10
**facts** 43:23
159:12
**fair** 24:1,23
25:13
34:14
35:25 37:9
44:13 46:8
49:4,24
57:23
73:13
74:10
81:25
101:14
106:20
108:7
114:21
128:16
134:13
142:2,14
154:23
157:18
179:4
185:8

207:23
214:5
221:4
237:25
238:4
239:9
242:4
278:7
282:19
284:10
**fairly** 24:6
33:1,5
120:25
**Faith** 10:24
**fake** 17:19
171:5,8,11
185:24
**fall** 191:9
**falls** 271:24
**false** 96:17
100:8
190:23
201:10
211:20
239:23
264:18
267:5,9
**falsely**
190:25
**familiar**
153:21
179:12
253:13
287:8
290:5,7
291:12
292:9,13
292:19,20
293:6,10
295:3,4,15
295:17
**familiarity**
293:8
**familiarize**
48:22
93:18 95:5
**far** 106:25
145:21
178:25

**DANIEL KIMMAGE  11/10/2022**

236:3,5
240:19
fashion
184:19,20
FAUCI 2:10
favorably
102:9
FB.com
192:11
FBI 57:19
58:5,20
59:9,25
60:23 61:1
61:2 62:4
62:21
63:18 64:2
64:3,5
73:25
120:4,11
121:15,24
122:1,2,17
122:23
123:6,9,17
123:19
124:15
125:9
126:14
197:6,11
197:17,19
199:25
200:21
254:15
255:5
260:14,15
FBI's 124:22
255:17
FBI's 7:18
FDA 11:18,22
feasible
300:25
features
104:3
February
48:3 49:1
51:9 57:5
67:18,18
94:10,11
131:16
140:10

162:6
163:8
166:25
federal 7:13
7:25 210:3
216:19
258:19
259:3,9,10
259:11
270:11,12
feel 256:8
256:19
felt 136:12
Fewer 134:4
field 293:9
293:11
298:12
fifteen
150:3
fifth 292:3
296:1
fight 50:24
fighting
267:19,25
268:8
figure 81:24
filed 152:20
filing
303:21
Finally
267:17
financial
184:22
302:11
find 275:21
303:11
findings
233:25
270:17
fine 43:5,6
85:15
150:14
212:22,24
301:1
finish 22:25
29:1 65:25
166:16
finished
251:9

Fiona 114:7
firms 274:2
first 94:4
95:15
129:16
143:19
176:2
177:22,23
180:2
188:20
192:4
200:7
202:25
209:7
224:8,17
225:4,24
227:9
228:8
229:12,12
230:3
245:7,14
252:20
261:6
266:21
267:16
274:25
300:8
fit 296:5
FITF 122:21
124:22,25
125:5,24
126:4,7,8
126:17,19
126:22
127:8
five 23:25
86:2
106:24
127:19
131:13
134:6
149:17,19
150:4,11
209:8
213:1
241:3
five-minute
85:21
252:12

299:15
five-year
69:20
109:7
flag 33:7
55:17
186:17
195:4,14
199:25
226:15,19
229:6,17
238:12
286:10,10
flagged
189:6
193:1,23
200:19
240:12,16
241:6
flagging
33:21
34:13,16
34:16
204:17
205:2
232:24
233:4,9,14
233:20
FLAHERTY 5:5
flip 94:21
112:4
128:18
166:23
168:18
173:18
189:5
195:20
196:9
213:12
221:11
226:1,24
233:23
240:5,6
244:4
245:11
267:13
291:25
flow 227:3
fly 81:7

focus 28:8
30:25
34:18
60:13
61:19,20
61:23
64:14 68:9
74:13,14
76:6,14,16
76:18,20
77:7 78:14
78:19 98:8
98:14
157:20
185:19
239:21
268:20
focused
47:12
60:14,15
60:16,17
61:13 68:5
77:5 84:17
85:1 89:15
89:16
102:6
103:4
109:2,4,21
112:24
124:17
148:11
165:22
204:8
216:21
249:12,14
249:24
268:16
269:16
focuses
77:18 78:8
focusing
84:4
focussed
249:23
folder
206:13
follow
293:24
follow-up

**DANIEL KIMMAGE  11/10/2022**

| | | | | |
|---|---|---|---|---|
| 145:8 | 158:4,6,20 | **forms** 59:8 | 220:6,11 | **front** 28:13 |
| 168:21 | 163:18 | **formulate** | 221:22 | 29:11 |
| **followed** | 165:1,9,12 | 276:13 | 222:9,17 | 31:12  39:2 |
| 110:24 | 165:17,24 | **formulation** | 228:20 | 165:4 |
| 111:7 | 170:17,24 | 226:7 | 229:9 | 188:13 |
| **following** | 183:25 | 276:11 | 231:4,10 | 208:21 |
| 29:2 | 184:17 | **forth** 76:1 | 233:8 | 267:18 |
| **follows** 21:2 | 187:19,21 | 183:8 | 234:22 | **FTIF** 260:15 |
| **Food** 11:2,10 | 188:5 | 185:10 | 236:18 | **full** 68:2 |
| **footnote** | 204:7,17 | 228:5 | 238:2 | 94:23 |
| 112:2,5 | 205:2,3,6 | 274:18 | 245:1,25 | 115:7 |
| 113:3 | 215:25 | 283:13 | 251:18 | 161:25 |
| **force** 7:19 | 217:14 | 289:13 | 253:18 | 172:13,22 |
| 44:9 | 237:9,17 | **forum** 236:4 | 270:9 | 172:22 |
| 116:11 | 237:21 | **forums** 59:11 | 284:21 | 215:17 |
| 122:17 | 238:8,9,14 | 61:2  64:4 | 288:3 | 221:13 |
| 191:25 | 238:17,19 | **forward** | **four** 24:16 | 227:5 |
| **foregoing** | 238:23,24 | 23:17 | 211:13 | 228:8 |
| 301:12 | 239:2,4,5 | 48:10 | 219:8,8,18 | 229:12 |
| 302:4,5 | 239:12,13 | 177:24 | 221:17 | 246:1 |
| 305:6,13 | 239:14,17 | 213:5 | 228:23,24 | 289:10 |
| **foreign** 7:18 | 239:18,20 | 252:17 | 230:2 | **fully** 49:11 |
| 26:1,6 | 239:24 | 282:9 | **four-year** | **function** |
| 27:15 | 243:2 | **forwarded** | 71:2 | 280:18 |
| 32:16 | 249:25 | 191:13 | **fourth** | 283:16 |
| 35:20  40:1 | 251:2 | 192:8 | 277:18 | **Functional** |
| 40:3 54:24 | 261:21 | 196:13 | **Francisco** | 19:12 |
| 61:14 | 262:22 | **forwarding** | 7:24  81:8 | 276:18 |
| 63:13,19 | 267:24 | 196:20 | **freestan...** | **functioning** |
| 63:20 64:9 | 268:3,4 | **forwards** | 50:14 | 251:5 |
| 69:7 73:5 | 271:13 | 193:22 | **frequency** | **fund** 49:11 |
| 73:9 74:15 | 273:24 | 196:1 | 37:15 | **funded** 17:16 |
| 75:5,9,24 | 278:4,21 | **foundation** | 123:3 | 100:18 |
| 76:6,11 | 279:13 | 114:12,16 | 250:15 | 172:9 |
| 78:9 79:1 | 280:20 | 115:7,10 | **frequent** | 219:3,6 |
| 79:15,19 | 287:25 | 117:10 | 58:14 | 221:3,19 |
| 84:8 96:7 | 297:18 | 118:7 | 69:11 | 222:13 |
| 99:1,6 | **foreign-...** | 124:7 | 72:21 | 223:7,9,10 |
| 107:6 | 238:5 | 129:14 | **frequently** | 223:11,15 |
| 108:2 | **Forensic** | 134:17 | 32:5 37:14 | 265:21 |
| 116:3 | 219:14 | 167:20 | 71:15 | 294:16,17 |
| 122:16 | **forgetting** | 169:4,10 | 250:10,13 | **funding** |
| 136:10 | 216:10 | 174:11,18 | **Frisbee** | 49:19 |
| 137:2 | **form** 108:7,9 | 186:6 | 86:13,14 | 220:8,18 |
| 144:24 | 108:11 | 193:8,13 | 129:2 | 220:21,24 |
| 148:13 | 233:16 | 193:25 | 132:7 | 221:7,10 |
| 156:11,15 | 305:7 | 196:4,16 | 137:14 | **further** |
| 156:23 | **formed** | 212:4,17 | **FRISBIE** | 151:17 |
| 157:3,13 | 210:14 | 213:23 | 12:16 | 222:24 |

DANIEL KIMMAGE  11/10/2022

| | | | | |
|---|---|---|---|---|
| **Fuse** 19:4 | 68:4,4,14 | 172:6,9 | 240:17 | 163:25 |
| **future** 18:9 | 68:21 69:9 | 174:1 | 241:6 | 165:15 |
| 251:13 | 71:13,16 | 175:14 | 242:19,23 | 185:12 |
| | 72:16 | 178:16,18 | 243:5 | 205:8 |
| **G** | 73:19 | 179:4,10 | 246:9,14 | 214:10 |
| **G** 20:1 92:24 | 74:24 | 179:17,19 | 246:24 | 240:14 |
| **G-e-o-r-g-e** | 75:11,19 | 180:7,19 | 248:18,19 | 277:2 |
| 203:2 | 76:8 78:24 | 180:21 | 248:22 | 278:8,19 |
| **Gabrielle** | 79:13,21 | 182:17,23 | 249:2 | 281:13 |
| 93:13,24 | 80:5 81:12 | 183:1,5 | 251:15 | 293:25 |
| 94:6 136:4 | 83:8 84:21 | 184:9,13 | 252:1,6,7 | 297:1 |
| 199:4,9,21 | 91:13 | 185:6 | 253:13,22 | **GEC/FITF** |
| 199:24 | 95:21,24 | 186:12,13 | 254:9 | 126:11,12 |
| 200:6 | 96:6,9 | 186:16 | 259:8,16 | **GEC/TET** |
| 231:19 | 98:3,17 | 187:15 | 259:17,21 | 153:18 |
| **Gabrielle's** | 105:1 | 188:1,18 | 269:4 | **GECs** 34:22 |
| 95:16 | 106:14 | 189:2,4 | 272:18,20 | **general** 1:7 |
| **GALATAS** 8:8 | 108:17,22 | 191:13 | 272:24 | 1:10 2:1 |
| **GALEMORE** | 109:1,8 | 192:15 | 273:10,21 | 8:15 30:7 |
| 10:21 | 110:22 | 193:5 | 273:25 | 33:5 34:8 |
| **game** 262:20 | 113:15 | 197:10 | 274:4 | 38:7 77:2 |
| **gap** 209:13 | 116:5,21 | 200:19 | 278:2,11 | 77:17 |
| **gatewayp...** | 117:13,18 | 202:15,17 | 278:23 | 110:3 |
| 236:23 | 118:1 | 205:10,15 | 279:6 | 137:11 |
| **gatewayp...** | 119:5,15 | 207:10,16 | 282:6,12 | 139:5 |
| 235:23 | 121:13 | 211:10 | 282:21 | 148:9 |
| 236:5,9 | 122:20 | 212:1,6 | 285:12,17 | 184:14 |
| **geared** 38:9 | 123:1,5 | 213:19,24 | 285:19,25 | 214:12,15 |
| **GEC** 18:5 | 124:21,24 | 214:3,7,17 | 286:9 | 217:13 |
| 27:24 | 125:24 | 215:6 | 290:6,11 | 242:13 |
| 30:22 33:8 | 126:22 | 216:14,18 | 290:13,17 | 248:16 |
| 37:16 38:2 | 131:5,11 | 217:7,11 | 290:18 | 293:8 |
| 38:4,6,14 | 132:18 | 218:3 | 292:24 | 295:17 |
| 40:10,16 | 135:13 | 224:14,16 | 293:12,13 | **GENERAL'S** |
| 40:21 | 136:9 | 225:2,4,23 | 294:4,20 | 15:4 |
| 44:16 | 137:9,13 | 226:6,12 | 295:11,13 | **generally** |
| 45:22 | 143:10,12 | 226:19 | 295:23 | 25:20 |
| 46:16 | 147:14 | 228:18,21 | 297:10,17 | 34:16,17 |
| 49:11 53:9 | 148:2 | 229:15 | 298:4,11 | 60:15 |
| 55:16,23 | 149:11,12 | 230:11,13 | 298:23 | 61:20,23 |
| 58:20 59:9 | 149:20 | 231:7,15 | **GEC's** 36:11 | 62:15 |
| 59:18 | 153:8 | 231:21,23 | 46:2 63:11 | 67:25 |
| 60:23 61:2 | 157:5,20 | 232:2 | 69:4 73:6 | 72:24,25 |
| 61:4 62:4 | 159:7 | 233:14,19 | 74:13,14 | 77:16 |
| 62:21,23 | 163:9 | 234:24 | 75:4,5 | 81:12 |
| 63:4,18 | 165:11,14 | 235:5 | 76:6,13,16 | 83:12 |
| 64:1,5,7 | 165:16,19 | 237:24 | 110:1 | 117:4 |
| 64:21,22 | 165:22 | 238:12 | 116:2 | 125:19 |
| 66:4 67:14 | 169:13 | 239:20,25 | 124:10 | 161:4 |

DANIEL KIMMAGE  11/10/2022

186:16
187:15
205:11
221:2
243:16
256:18
267:25
268:10
274:1
298:4
**generated**
84:8
**GEOFFREY**
9:25
**George**
202:21,22
202:25
203:1
**getting** 42:1
50:1 75:14
109:11
228:24
249:4
**GINA** 4:15
**give** 23:3,7
27:1 42:21
47:22
48:20
93:17 95:4
107:13
127:9
149:22
171:9
188:7
260:18
262:4
275:25
285:19
**given** 256:6
301:14
**gives** 169:19
282:15
**giving** 48:25
49:1
123:15
282:21
288:7
**glanced**
208:2

**global** 12:2
12:8,14,20
19:13 22:8
22:14
23:24
24:10 25:2
25:7,20,22
26:9,24
27:8,21
28:2 43:19
44:12,23
45:1 46:11
46:19,21
46:23 47:3
48:3 58:2
60:8 86:15
89:5,7
94:10 98:9
120:4
121:8
129:1
131:1
144:22
156:10
158:16
177:3
192:15,18
194:3
197:1
208:16
241:25
263:25
269:12,18
269:24
276:19
277:9
280:17
283:21
296:17
297:7
299:6
**go** 22:21
23:17 36:1
63:24 69:2
85:19,25
94:22
115:12
123:23
127:18

143:25
150:13,21
150:23
166:1
179:22
181:3,4
197:12
209:6
222:24
225:13
235:7,20
237:2
239:14
247:14
252:15,19
264:16
271:9
293:23
299:19
**goal** 82:6,8
156:13
165:11,13
**goals** 164:4
164:16,20
165:3,15
226:3,7,13
278:8
**goat** 92:25
**goes** 44:11
45:9 51:6
51:16
52:12 74:5
78:23
197:5
224:4
227:11
298:14
**going** 21:12
28:25
44:16
48:10,12
48:13
55:16
58:24
76:24
78:13
85:14 90:8
93:1,2
97:16

106:8
113:18
115:25
127:11,15
127:25
150:3
152:25
159:16,17
188:8
198:13
206:1,16
209:24
212:20
216:18
245:20
247:11
257:13
288:15
300:22
**Goldstein**
49:21 50:3
50:5,16,20
51:7 53:17
54:3,3
**Goldstein's**
50:25 52:2
**good** 20:2
41:16
**Google** 51:8
52:13
80:20,21
82:16
139:24
140:2,15
141:4
142:21
162:22
183:8
196:13
**Google.com**
196:21
**Google/Y...**
145:22
**Gotcha** 113:2
**Governance**
4:22
**government**
17:12
27:17

50:21
74:19
96:19,22
98:21
100:8,16
100:18,19
100:24
102:20
111:3
112:18
114:20
155:9
159:25
172:1,21
178:4
187:18,19
187:21
188:5
209:14
210:15,21
211:2,11
220:8,18
220:21,24
222:13,14
223:24
228:9
229:3,15
230:3,21
230:25
235:9,13
235:14
236:13
250:5
258:19
265:2,19
265:20,21
266:16
271:6
278:2
294:16
**governme...**
25:25
**governme...**
228:14
**governments**
99:1,6
187:13,17
**grant** 184:21
**granted**

**DANIEL KIMMAGE  11/10/2022**

21:23
grants
 267:17,24
 268:3
graph 240:8
 240:9,19
graphic
 106:25
graphics
 106:24
Graphika
 219:15
 295:2,12
 295:14
grasp 262:9
greet 146:8
ground 22:22
grounds
 249:3
 256:23
 258:4
group 61:6
 72:6,13
 135:6
 230:14,17
 230:19
groups
 228:25
 230:2
 241:24
 269:16,19
 269:21,22
 269:23
 270:3
guess 173:13
 179:16
 270:21
guys 81:7
 85:17
 136:18

H
H 1:24 17:7
 18:1 19:1
 106:6
hack 107:22
 108:17,25
 109:8,9
 110:4,9

111:11,14
111:18
112:1,15
112:15
113:5,9,13
254:15
255:6,7,20
257:13
258:9,20
258:23
259:5,18
259:22
hacked 108:2
hacking
 107:9,20
 109:13,15
 109:16,23
 109:24
 110:6,23
 111:10
HALE 9:25
Halfway
 268:17
Hamilton
 119:8,20
 119:24
hammers
 170:3
hand 93:1
 106:7
 302:14
handed 128:5
 128:6
 152:25
 159:16
 188:9
 253:1
 260:19
handful
 143:9
handing
 177:6
happen 34:7
happened
 24:20 33:3
 80:16
 107:14,24
 130:13
 194:13

195:3
happening
 121:5
happens
 250:10,13
happy 169:6
 169:16
harm 27:5
 36:10
Hawaii 14:3
head 41:13
 72:13
 86:22,24
 117:12
 162:14
 168:9,12
 178:5
 191:20
 266:8
heading
 237:3
 244:13
heads 119:10
health 2:6,8
 11:16
 95:18
hear 195:5
 255:4
heard 197:7
 202:1,7
 218:18
 236:8,12
 242:18
 247:4,5
 253:23
 294:9
height 99:22
 105:22
held 14:1
 20:8 42:17
 216:14
 273:5
Hello 168:25
 180:23
help 50:23
 170:10,15
 209:14
 261:20
 279:18,20

282:9,18
283:17
290:2,11
299:8
helped 87:3
 88:19 92:2
helping
 209:18
 289:15
 290:25
helps 44:2
 263:5
 280:6
 297:6
HENRY 10:12
hereunto
 302:13
hey 33:23
 35:16,20
 250:4
HHS 8:19,24
 9:3,11,15
Hi 167:23
high 110:4
 112:15
 161:20
high-level
 33:24
higher 30:25
 210:2
higher-l...
 33:17
highest
 39:10 65:9
 199:5
highligh...
 267:8
Hill 114:7
HINES 1:11
HOFT 1:12
hold 29:24
 31:17,18
 86:2 273:2
holds 30:3
Homeland
 3:16 4:4
 4:24 9:21
 44:7 57:20
 58:6 73:25

221:20
hope 180:25
hoped 135:21
hopefully
 282:8
hour 85:14
 86:1 93:16
 127:25
 212:20
hours 206:18
House 1:23
 4:17 5:3
 5:10,13,18
 6:1,8,12
 6:17,24
 9:6 17:10
 43:13
 45:14
 46:23,25
 47:2 50:22
HRSA 8:23
HSIANG 7:5
huge 275:19
Human 2:7,9
HUMPHREY
 5:16
hundred
 40:23
hundreds
 234:13
hypothet...
 62:10 75:1
 75:18
 159:12,12
 182:3

I
I2 119:13
I2C2 28:16
 28:17
 60:10
 117:23
 118:24,25
 119:3,6,13
 119:18
 121:20,23
 123:16
 124:16
 125:11

DANIEL KIMMAGE  11/10/2022

| | | | | |
|---|---|---|---|---|
| I2C2's | 280:19 | 195:3 | 298:18 | 271:15 |
| 124:14 | 287:16,25 | 197:10,11 | incorrect | 274:5 |
| IA 198:24 | 299:8 | 197:18,20 | 154:10 | Infectious |
| 200:15,16 | identifying | 198:10 | increase | 2:14,18 |
| IC 121:23 | 56:15 | 200:24 | 156:13 | inferred |
| idea 218:25 | 109:6 | incident... | 158:17 | 146:1 |
| 221:14,16 | 111:17,25 | 244:6 | increasing | influence |
| 222:3,14 | 156:14 | 245:2 | 268:20 | 7:18 37:17 |
| 223:17 | 184:15,25 | incidents | Increasi... | 38:2 |
| 241:5 | 249:9 | 109:16 | 17:22 | 122:17 |
| 242:3 | IDs 245:6 | 110:6 | incubator | 238:9 |
| ideas 57:14 | Iheme 142:17 | 111:15 | 57:14 | 263:3 |
| identifi... | immediately | 113:3,4 | indention | info-demic |
| 42:24 | 50:19 | 182:8 | 36:14 | 267:20 |
| 47:25 | 223:23 | 194:23 | Independent | 268:9 |
| 56:12 93:4 | impetus | 229:6,18 | 202:10,13 | inform 36:21 |
| 106:10 | 135:16 | 232:24 | indicate | 38:5,7 |
| 113:21 | implement | 233:4,10 | 303:16 | 55:2 64:9 |
| 127:13 | 26:11 | 233:14,20 | indicated | 297:6 |
| 153:2 | implemen... | include 24:5 | 57:1 | information |
| 159:20 | 261:13,18 | 70:11 | indicates | 17:18 18:9 |
| 177:9 | implicating | 74:15 78:1 | 234:12 | 21:20 30:8 |
| 188:11 | 96:19 | 81:20 85:6 | indicating | 30:10 |
| 206:4 | important | 155:19 | 240:15 | 32:23 33:6 |
| 253:4 | 277:25 | 160:2 | indirectly | 35:19 38:5 |
| 260:21 | 280:3,18 | 225:8 | 38:16 | 51:19 68:3 |
| 276:4 | in-scope | 228:14 | 55:17 | 68:9,11,24 |
| 281:16 | 234:1 | 230:21 | individual | 69:2 71:20 |
| 288:18 | inaccurate | 241:24 | 120:19 | 72:10,17 |
| identified | 74:12 | 269:22 | 132:22 | 73:1,2 |
| 63:20 95:2 | inapprop... | 271:5 | 141:15 | 77:7 78:8 |
| 128:24 | 247:20,25 | included | 153:24 | 89:8 |
| 208:9 | 248:3,9,11 | 92:15,21 | 203:6 | 108:12 |
| 230:13 | inauthentic | 131:14 | 215:1 | 110:15,17 |
| 249:19 | 170:16,20 | 228:9 | 218:2 | 116:16 |
| identifies | 170:24 | 245:3,4 | 253:22 | 119:15 |
| 190:2 | 171:3 | includes | individu... | 136:13 |
| 228:1 | 261:21 | 122:1 | 146:7 | 156:7,8,9 |
| 230:2 | 279:21 | including | individuals | 156:21 |
| identify | incidences | 55:16 | 64:24 | 157:23 |
| 63:12 | 181:12,24 | 102:10 | 131:5 | 169:14,22 |
| 170:16,23 | incident | 129:1 | 134:23 | 184:22,24 |
| 171:15 | 49:13 | 210:4,16 | 163:5 | 185:3,6 |
| 182:14 | 54:12 | 230:25 | INDRANEEL | 186:14 |
| 249:7 | 109:16 | 243:1 | 15:16 | 191:11,23 |
| 261:20 | 111:11 | 281:23 | Indranee... | 192:1 |
| 278:3 | 178:6 | 282:25 | 15:24 | 198:23 |
| 279:20 | 194:12,19 | 296:22 | industry | 210:14,20 |
| 280:6,10 | 194:20,25 | 297:15,21 | 169:15 | 211:2 |

DANIEL KIMMAGE  11/10/2022

214:6,10
224:21
232:11
249:2
250:17,20
250:22,24
254:25
255:12,15
255:25
256:1,4,13
256:22
257:9,9
258:4
270:17
273:22
279:11
282:15,21
283:15
286:2,10
286:12
informed
39:3
219:18
251:1
informing
55:5
290:19
infrastr...
4:10,13
65:16 66:9
77:24
230:6
232:11
infreque...
64:1
infringe...
225:24
initial
47:11
146:4
221:14,16
initially
162:7
191:24
267:3
initiated
135:16
147:14,15
147:19

initiative
172:7
injunction
152:14
inoculation
275:4
input 226:7
226:12
276:10,15
276:17
inside 183:2
224:10
insight
290:20
insights
159:5
insinuate
102:20
insinuated
102:19
insinuating
102:16
inspired
296:20
297:1
Instagram
234:9
244:13
253:10
instance
31:9 33:2
38:21
55:21
254:12
instances
34:3 38:12
Institute
2:13,17
123:10
183:19
261:4
292:22
institutes
294:1
Institution
18:10
113:25
institut...
292:6

296:3
297:20,25
298:6
instruct
68:25
110:19
163:5
224:21
249:2
254:21
255:12,22
255:23
256:1
257:10
instructed
163:4
instructing
225:7,15
instruction
256:14,15
257:15
integration
278:11
integrity
19:6 129:5
138:6
144:13
202:2,11
203:8
226:3
243:14
245:17
intellig...
59:1 63:1
107:18
112:19
120:21
121:9
224:9
intent
286:12
intention
37:17
interact
126:4
interacting
46:3
213:19
252:9

interaction
39:23 40:9
40:19,20
42:3 99:8
125:23,23
126:1
197:19
216:12
293:2
298:3
interact...
36:4 39:15
40:10
46:16 47:8
71:12
72:15,20
72:24
76:10 99:6
126:21,24
212:6
213:25
217:5
291:24
297:24
298:5
interactive
262:25
interagency
27:19
28:15,17
59:11
61:15 64:3
117:12
120:5,10
120:13,15
120:18,22
121:14,22
122:20,25
123:4,6
124:11,17
126:6,10
126:13,24
189:1
197:21
200:17
201:6
215:11,20
216:18,21
interest

41:24
163:17
164:4
302:11
interested
165:19
Interest...
237:15
interests
164:15,20
164:25
interface
29:8
interfacing
291:19
interfer...
112:10
237:9,18
237:21
238:8,14
238:19,21
238:24
239:4,12
239:14,24
Interim 13:7
intermed...
55:17
internal
27:20 28:5
37:5 61:1
109:12
111:3
142:10
193:1,23
195:11
227:2,14
235:8
243:22
249:5
255:11
internally
27:17
171:17
internat...
185:7
187:2,10
187:10,12
187:16
188:4

**DANIEL KIMMAGE  11/10/2022**

191:8
201:8
289:24
290:2,8
**internet**
219:16
221:18
223:9
232:13,17
235:2
292:14,22
292:25
293:3
294:5
295:20
297:22
**interns**
222:3
223:14
**internships**
221:19
223:8,11
223:14
**interpret**
199:23
209:25
**interpreted**
199:21
**interrupt**
23:11
38:24
**interrup...**
25:6
**interview**
48:25 49:6
50:7
113:24
**introduced**
139:1,4
262:21
**introducing**
84:22
147:10
**invented**
74:20
**investig...**
7:14 8:1
112:10
**investments**

263:1
**invite**
134:10,18
145:12,23
173:21
**invites**
81:17
**involve** 70:6
96:24,25
124:18
187:15
225:24
272:10
274:13
**involved**
38:14
40:18
41:18,23
42:3 45:22
46:3 47:4
50:1 65:10
80:7 117:2
117:18
118:22
121:13
122:13
129:2
156:18
177:2
185:9,12
189:22
201:13
203:19
204:15,16
205:16
210:5
216:16
218:10
219:9,23
219:25
241:15
246:9,14
251:16
263:21
267:21
276:8,9
278:17
281:21
283:14

290:25
291:19
**involvement**
203:23
204:2,7,23
204:25
205:5
210:11
214:10
216:5
218:3
222:11
234:24
294:4
**involves**
62:4
215:10
**involving**
54:16 66:3
101:2
127:8
188:18
194:17
195:8
**Iran** 28:9
32:17
83:21
185:20
**Isaac** 166:10
**ISAC** 130:6
240:23
**Isis** 27:7
**Isis-spe...**
89:13
**issue** 21:24
88:25
125:5,9
147:23
187:14
248:16
249:16
263:25
268:16
300:14
**issued**
231:21,22
**issues** 35:7
41:24 42:3
76:10 90:5

109:22
124:21,23
124:24
125:1
129:4
215:2,9,10
216:15
253:9
254:4,8
290:15
293:25
**Italy** 267:2
**items** 127:7
**iteration**
45:2,23
46:21

_____

**J**

**J** 16:3 19:15
**JANELL** 9:12
**Janelle**
292:5
**JANKOWICZ**
4:19
**January**
22:16,16
24:2 25:3
25:5 43:14
51:8
**JAY** 8:2
**JAYANTA** 1:10
**JEAN-PIERRE**
1:21
**Jefferson**
11:4 15:7
**JEFFREY** 1:8
**JEN** 4:6
**JENIN** 16:4
**Jeninyou...**
16:10
**JENNIFER** 3:7
**JILL** 1:11
**JIM** 1:12
**job** 13:21
49:23
120:19
161:9
166:12
267:5

**Jobe** 174:22
**jog** 147:17
**John** 15:3
16:3
212:19
**John.sau...**
15:9
**John.vec...**
16:9
**joint** 50:5
152:16
**joking**
206:19
**Joseph** 1:17
16:24 20:6
20:14
303:8
304:3
**JOSHUA** 9:7
**JR** 1:17
303:8
304:3
**July** 24:12
24:12
176:15,19
177:4
**June** 42:20
131:17
140:12,13
208:11,12
**junior** 20:6
65:22
**Justice** 7:13
15:17 44:7
112:9
303:5
**justify**
269:1

_____

**K**

**K** 12:4 91:5
93:8
152:11
160:2
179:1
295:3
**Kansas**
303:21
**KARINE** 1:21

**DANIEL KIMMAGE  11/10/2022**

| | | | | |
|---|---|---|---|---|
| **KATE** 8:8 | 144:20 | 42:25  43:4 | 138:8 | 217:9,21 |
| **keep** 85:16 | 156:5,8 | 43:22 | 140:18,24 | 219:11,20 |
| 213:1,4 | 167:7 | 44:18  46:5 | 143:7,14 | 220:10,14 |
| **kept** 161:3 | 170:2,6 | 48:8,15,20 | 145:10,15 | 221:21 |
| **key** 233:25 | 178:18 | 52:17 | 148:4,16 | 222:8,16 |
| 245:8 | 184:20 | 56:13,23 | 148:25 | 222:21 |
| **KGB** 265:1 | 185:5 | 58:23 | 149:14 | 223:3 |
| **KHERIATY** | 189:20 | 60:24  62:9 | 150:2,16 | 224:19 |
| 1:13 | 205:21 | 63:9,21 | 151:5,10 | 225:6,14 |
| **kicked** | 209:2 | 68:22 | 151:24 | 225:20 |
| 137:10 | 217:18 | 70:18 | 153:3 | 226:8,21 |
| 138:25 | 226:2 | 72:18 | 155:15,24 | 227:19 |
| **KIM** 10:6 | 231:21,23 | 73:10 | 157:15 | 228:19 |
| **KIMBERLY** | 232:2 | 74:25 | 158:24 | 229:8,19 |
| 11:19 | 233:15 | 75:12,17 | 159:11 | 231:3,9 |
| **Kimmage** | 235:8 | 76:2  77:9 | 164:7,21 | 233:7,16 |
| 12:11 | 236:22 | 77:19  78:4 | 165:5 | 234:21 |
| 13:16  14:1 | 237:23 | 79:7  82:1 | 166:20 | 235:3,17 |
| 17:2,4,9 | 240:14 | 85:12,18 | 167:9,19 | 236:17 |
| 18:3  19:3 | 242:8 | 85:21,25 | 168:15 | 238:1,15 |
| 20:4  21:1 | 245:22 | 86:4  88:15 | 169:3,9 | 241:17 |
| 21:7,8 | 246:14,16 | 90:7  92:6 | 172:18 | 243:10 |
| 22:5  50:16 | 248:10 | 92:18  93:9 | 174:10,17 | 244:1,25 |
| 86:13 | 250:3 | 93:15,25 | 176:20,25 | 245:24 |
| 128:5 | 253:15 | 95:1  96:2 | 178:9,20 | 246:17 |
| 129:2 | 255:5 | 97:16  98:5 | 180:8,12 | 247:1 |
| 151:7,11 | 269:4 | 101:8 | 181:19 | 248:25 |
| 254:20 | 283:15 | 106:3 | 182:2 | 250:18 |
| 298:2 | **kinds** 32:5 | 108:19 | 183:9,13 | 251:17 |
| 301:5,8,11 | 35:7  59:25 | 110:13 | 186:5,22 | 252:11,18 |
| 303:12 | 61:10 | 111:19 | 190:4,11 | 253:17 |
| 304:2 | 97:14  99:9 | 114:10,15 | 193:7,12 | 254:18 |
| 305:5,20 | 148:3 | 115:6,20 | 193:24 | 255:9,22 |
| **Kimmage's** | 156:4 | 116:7,23 | 194:8 | 265:12,23 |
| 300:5,6 | 172:15 | 117:9,20 | 196:3,15 | 270:6,9 |
| **kind** 30:9 | 212:2 | 118:5,11 | 197:12,25 | 273:17 |
| 32:11  34:4 | **KIRCHNER** | 118:20 | 198:12 | 275:10,12 |
| 35:4  36:23 | 244:8 | 119:1 | 201:1,22 | 279:3 |
| 54:11  55:6 | 269:6 | 122:5,14 | 204:19 | 280:13 |
| 60:22 | **KIRSCHNER** | 123:11 | 205:17 | 281:8,18 |
| 69:18  73:2 | 15:13 | 124:2,6 | 206:5,11 | 284:12,20 |
| 75:24 | 21:10 | 125:6,16 | 206:16 | 285:7,24 |
| 83:25 | 26:13,17 | 127:4,14 | 207:1 | 286:14 |
| 98:24  99:2 | 28:25 | 127:20,24 | 209:20 | 287:18 |
| 106:23 | 29:16,19 | 129:13 | 210:6 | 288:2,19 |
| 114:18 | 33:11  35:9 | 131:7 | 212:3,16 | 288:22 |
| 115:23,24 | 36:25 | 133:12 | 212:19 | 289:19 |
| 135:19 | 37:21 | 134:14,17 | 213:3,22 | 291:3,21 |
| 142:25 | 38:18 | 136:24 | 216:6,25 | 292:11 |

**DANIEL KIMMAGE  11/10/2022**

293:16,19
297:3,12
298:7
299:2,12
299:16
300:3,10
300:18
303:5,10
**knew** 147:13
**know** 30:21
31:8 33:24
35:23
37:14
38:15 40:6
41:10,18
42:9 44:21
47:2,3
48:19 51:4
55:11,14
59:24 61:9
62:12,23
66:20,24
69:10
70:24 71:6
72:23 73:8
73:18
74:22 75:3
75:15
76:22 77:1
77:7,12,22
78:6,7,16
78:17
79:19,25
80:3,15
81:9,16
83:22,25
84:2 87:18
88:10,11
88:13,18
89:3,11
91:18,20
91:25 94:6
102:25
103:11,12
105:13,25
109:4
111:24,24
112:21
118:2,18

121:12,13
121:17
122:9,10
122:11
123:1,5,14
123:20
124:20,23
125:13
126:16,18
127:15,25
129:9,10
130:12,22
132:16
133:15,21
134:18
135:9
138:24
142:10
143:4
146:18,21
147:18,20
149:24,25
150:12
151:20
155:1,18
156:2
160:5,5,14
160:17,18
160:19,21
160:23,25
161:1,2,24
161:25
162:2,11
162:16,17
164:5,24
166:5,12
167:2,7,12
167:13
170:2
171:10,17
172:11
173:14
174:13,14
174:20,22
175:4,6,12
175:19
176:14
177:21
178:12,16

179:11
180:6,14
180:18,20
183:15
185:2,3,5
185:14,15
186:18
187:5,8,14
189:8
191:13,18
193:15
194:10,15
195:17
197:13,17
198:15,20
199:2,8,22
200:1,2,4
200:16
203:14,14
203:18,20
203:22,25
204:1,3,10
205:15
207:11
209:4,5,5
209:5,17
209:22
210:1,4,9
210:10,19
214:3,20
214:20,23
216:8,9,22
217:3,4,13
217:14,23
218:1,16
218:20,22
218:24
219:6
221:3,5
224:14
227:16,22
229:22,23
230:6
231:16,20
231:24,25
232:1,8,13
235:5,16
236:21
242:5,6,7

242:10,23
243:16,22
244:17
245:20
246:15
247:12,22
248:12,24
250:4
251:4,7,11
251:12,15
251:21,23
252:8
257:4,12
257:17,25
258:15,17
259:13
262:5,16
264:6
265:25
266:3
270:8,25
273:14
274:1
275:12
277:1
278:13
280:24
281:20
282:1
283:25
285:21
287:10,20
289:17,22
289:23
291:23
292:18
293:5
294:3,17
298:2,21
299:4,13
300:24,24
**knowledge**
24:22 40:5
41:14
62:17
69:20
76:18
122:4
195:3,6

202:11
205:12
209:18
246:8,13
**known** 72:9,9
91:6
116:12
**Krebs** 66:16
66:18
**KRISTEN** 13:9
**KRISTIN**
10:21
**KULLDORFF**
1:14
**KYLA** 15:14
**Kyla.sno...**
15:22

———————
L
**L** 15:18
159:15
303:6
**lab** 74:20
219:14
250:6
**label** 106:8
281:25
282:7
**labeled**
47:23 93:2
113:18
234:10
277:17
282:2
**labeling**
234:19
282:4
**labels**
282:11,12
282:16,18
**laboratory**
35:1
**lack** 114:11
114:16
115:6
117:10
118:7
124:6
129:13

DANIEL KIMMAGE  11/10/2022

| | | | | |
|---|---|---|---|---|
| 134:17 | lawyers | legitimacy | liaison | 174:1,5,9 |
| 167:19 | 224:25 | 212:15 | 271:11,25 | 175:5 |
| 169:4,10 | Lea 93:13,23 | lengthy | 272:4,11 | Linkedin... |
| 174:10,18 | 94:6 136:4 | 207:22 | 272:13 | 18:17 |
| 186:6 | 199:4,8,20 | lessons | 273:3,13 | Linkedin... |
| 193:7,13 | 199:24 | 271:12 | LIBERTIES | 18:18 |
| 193:25 | 200:6 | 273:19,22 | 16:2,5 | Linkedin... |
| 196:3,16 | 231:18 | let's 42:22 | lie 35:4 | 18:18 |
| 212:3,16 | lead 8:4 | 47:21 | life 194:12 | links 163:25 |
| 213:22 | 10:8 25:25 | 56:10 | light 262:17 | 169:19,20 |
| 220:10 | 62:24 63:1 | 85:16,19 | 263:9 | 190:16 |
| 221:21 | 95:17 | 86:2 97:5 | limited | list 117:15 |
| 222:8,16 | 290:15 | 106:7 | 89:21 | 160:16 |
| 228:19 | leadership | 113:17 | 297:15 | 172:13,22 |
| 229:9 | 29:12 | 129:16 | line 36:11 | 213:18 |
| 231:3,9 | 198:22 | 130:11 | 39:20 | 218:14 |
| 233:7 | 199:1 | 150:16 | 115:8 | 226:2 |
| 234:21 | 200:3,4,10 | 164:3 | 150:4,9 | 262:1 |
| 236:17 | leading | 212:23 | 174:20 | listed 30:13 |
| 238:1 | 45:17 | 213:4 | 178:25,25 | 76:23 |
| 244:25 | 242:16 | 240:6 | 212:8 | 107:8 |
| 245:24 | 292:6 | 252:19 | 220:3 | 199:3 |
| 251:18 | Leah 11:24 | 257:2 | 245:15 | 214:1 |
| 253:17 | 131:23 | level 31:1 | 248:6 | 218:20 |
| 270:9 | leak 254:15 | 31:16,20 | 253:15 | 219:10 |
| 284:20 | 255:6 | 32:7 35:5 | 270:14 | 228:21 |
| 288:2 | 257:13 | 35:14 | 304:5,9,13 | 229:3 |
| lacking | learn 236:15 | 37:10,13 | 304:17,21 | 230:5,16 |
| 115:9 | learned | 58:9,12,17 | lines 33:6 | 280:1 |
| lady 252:3 | 271:12 | 59:21,21 | 33:18 85:9 | 282:5 |
| laid 280:18 | 273:22 | 59:23,23 | 98:18,19 | listen 23:15 |
| LAMBERT 8:25 | leaving | 60:3,7 | 100:19 | 216:24 |
| LANDRY 1:9 | 208:16 | 64:12,17 | 102:18,18 | listening |
| large 101:2 | led 147:21 | 65:9 66:22 | 254:2 | 32:20 |
| larger 61:6 | 147:23 | 71:8,10,13 | 264:25 | 217:12 |
| late 115:24 | 195:11 | 71:14 | 267:18 | lists 213:16 |
| 130:8 | 265:16 | 119:16 | lineup | Lithuania |
| 254:16 | left 91:18 | 161:20 | 143:16 | 274:17 |
| LAURA 7:1,15 | 173:1,3 | 167:22 | link 145:19 | little 48:21 |
| LAUREN 9:22 | 226:14 | 197:18 | LinkedIn | 83:4 99:21 |
| law 110:16 | 272:20 | levels 39:10 | 81:3,5 | 103:5 |
| 110:21 | legal 16:24 | 58:11 | 160:2,10 | 114:3 |
| 224:7 | 20:15 | Lexitas | 162:8,15 | 149:22 |
| 254:19,21 | 166:8 | 20:17 | 163:3 | 180:16 |
| 254:24 | 174:8 | 303:1,24 | 166:2,11 | 209:7 |
| 255:11,24 | 225:17,22 | liaised | 166:14 | 210:12 |
| 257:9 | 303:1,24 | 215:2 | 167:17 | 213:13 |
| 270:11,12 | legislation | liaising | 168:14,22 | 218:12 |
| lawyer 257:7 | 280:19 | 272:22 | 173:23 | 219:1 |

**DANIEL KIMMAGE  11/10/2022**

256:11
287:5
**local** 267:18
268:2,7
270:12
**located**
154:17
183:23
272:7
**location**
153:18,22
153:25
154:15
155:2,6
161:15
163:14
184:16
271:18
**Locust**
303:21
**log** 171:21
171:23
254:4
**logged** 242:8
**long** 19:4
22:13
48:14
127:15
150:12
154:14,16
155:1
**longer** 150:6
177:2
252:5,7
299:13
**look** 35:20
43:24
56:25
81:22
93:11,12  94:4
104:24
112:3
114:6
128:20
138:2
167:22
171:12
177:22
178:16

208:18
250:25
269:19
276:2
**looked** 94:1
128:10
144:9
151:12
208:13,20
249:20
**looking** 33:4
38:6  94:1
144:23
151:17
162:5
165:17
171:10
177:23
180:22
198:17
249:25
**lookout**
35:25  36:3
**looks** 27:9
153:9
174:4
189:6
199:20
240:25
241:2
269:12
**LORENA** 10:17
**lot** 47:13
119:23,23
126:1
178:3
186:13
241:15
271:1
**Louisiana**
1:2,8
20:10
**love** 128:3
**Lower** 169:19
187:1
223:21
263:13
**lunch** 127:17
150:8,15

**M**

**M** 1:9  7:20
177:5
**mail** 242:24
**mail-in**
242:14
243:6,8
**major** 28:8
68:5  73:4
98:18
137:2
201:15,20
228:25
230:2,14
230:16,19
245:16
246:5
**making** 54:20
147:10
275:5
**mal** 71:20
72:10,17
77:6  78:8
116:15
191:23
192:1
**mal-info...**
116:14
**malfunct...**
182:6
**malign** 27:9
30:12
33:10
34:24
35:20  36:9
36:14  37:7
62:6  63:13
63:18,19
64:9  73:4
73:9  75:9
75:24
76:10
137:2
158:19,21
238:9
287:25
290:21
**man** 133:21
**management**

7:9  41:4
227:3
**Manager** 6:25
11:15
**managers**
50:21
**mandate**
25:23  26:6
36:12
63:12  69:4
69:15  73:6
78:19
108:24
110:1
116:3
124:12
205:9
223:25
239:21
293:25
**manilla**
206:12
**manipulate**
262:18
**MANNING** 6:15
**manufact...**
250:5
**manufact...**
35:1
**March** 166:25
168:22
199:13
**MARK** 13:5
**marked** 42:23
47:24
56:11  93:3
106:9
113:20
127:12
152:25
153:1
159:19
168:19
177:7,8
179:23
188:10
206:3
253:3
260:20

276:3
288:17
**MARTIN** 1:13
**master's**
173:9
**Masterson**
9:16
218:16
**material**
110:21
**materials**
34:22
171:7
**matter** 20:4
63:3  65:2
80:10  88:4
110:12
117:25
119:4,12
124:19
131:3
132:9
**Matthew** 9:16
218:16
**MAYORKAS**
3:13
**McCARTHY**
4:15
**mean** 26:22
38:24  65:8
68:15  90:9
90:12
104:18
112:1
120:14,14
126:13
147:15
160:10
177:15
183:10
211:5
246:19
247:10
273:7
275:15,17
275:24
**meaning**
78:24
**meanings**

DANIEL KIMMAGE  11/10/2022

| | | | | |
|---|---|---|---|---|
| 126:2 | 87:11 89:9 | 253:16 | 126:6,10 | 30:2,6,17 |
| **means** 43:9 | 90:23 | 254:2 | 126:11,12 | 30:23 |
| 121:22 | 91:11 92:3 | 258:18 | 126:13 | 31:10,17 |
| 170:14 | 92:17 93:7 | 259:4,17 | 129:20 | 32:6,12 |
| 200:10 | 96:25 | 260:16 | 130:11,23 | 35:7 37:8 |
| 245:10 | 97:23 99:9 | 274:3 | 131:6 | 38:13 42:9 |
| **mechanics** | 99:14,16 | 275:18 | 132:15,20 | 45:20 |
| 162:1 | 101:7,22 | 278:25 | 134:10 | 47:14 |
| 242:11 | 103:2 | 279:7,9 | 135:12,17 | 51:13,15 |
| **Meddling** | 105:21 | 281:25 | 135:18,19 | 52:6 53:23 |
| 17:16 | 111:8,9 | 282:1,2,13 | 136:7,8 | 54:17 58:8 |
| **media** 2:24 | 113:10,15 | 283:22,24 | 137:8,20 | 59:3,10,19 |
| 8:4,5 | 139:15 | 284:18 | 138:7,13 | 59:25 60:1 |
| 11:21 20:3 | 147:1 | 285:12,18 | 138:19,21 | 60:6,20 |
| 29:9,11,13 | 155:14,20 | 285:19 | 138:23,24 | 61:11,19 |
| 29:15 30:4 | 155:23 | 286:1,11 | 139:2,10 | 62:8 63:8 |
| 30:21,23 | 156:19 | 287:15,25 | 139:20 | 64:2,4,11 |
| 31:10,13 | 158:2 | 291:19 | 140:15,16 | 64:15,16 |
| 32:8 35:8 | 159:2,8 | **medical** 2:15 | 141:3,5 | 64:18 |
| 35:22 36:5 | 160:1,7,11 | 265:15,21 | 142:2,21 | 65:12 |
| 36:21 37:5 | 160:24 | **meet** 51:9 | 143:6,13 | 66:16,21 |
| 37:18 38:3 | 161:6,22 | 64:5,7 | 144:1,4,16 | 67:4,8,11 |
| 38:10,15 | 165:4,13 | 71:5 81:8 | 145:4,18 | 67:14 |
| 39:6,13 | 167:8 | 82:7 146:8 | 145:20 | 69:11 |
| 40:5,12 | 170:17 | 215:15 | 146:1,3,5 | 79:23 80:1 |
| 42:4,10 | 171:25 | **meeting** | 146:8,19 | 80:3,4,6 |
| 46:4,17 | 183:7,11 | 18:16 | 146:22 | 80:13,15 |
| 47:8,17 | 183:15 | 31:22 32:7 | 147:4,13 | 80:19 81:6 |
| 49:5,17,19 | 187:11,22 | 45:15 | 147:19,21 | 81:11,18 |
| 51:24 53:7 | 188:6 | 46:10,23 | 147:23 | 83:2,13 |
| 53:9,14 | 194:7 | 60:13,22 | 148:24 | 84:5,7,12 |
| 54:6,18 | 195:15 | 61:1,8 | 149:12 | 84:13 87:4 |
| 55:5,12,18 | 196:21 | 62:4,5,14 | 160:21 | 87:7,19,22 |
| 55:22 56:1 | 200:21 | 62:19,25 | 161:2 | 87:23 88:7 |
| 56:1 61:18 | 207:15,20 | 63:5 64:9 | 162:18 | 88:12 |
| 61:22 62:7 | 210:16,21 | 65:10,14 | 164:14 | 89:14,25 |
| 63:8 74:16 | 211:3,8 | 66:3 67:21 | 166:18,25 | 90:5,22 |
| 74:21,22 | 213:16,20 | 68:1,19 | 167:2,17 | 91:4 92:2 |
| 75:15,20 | 228:10,10 | 70:25 71:2 | 168:24 | 92:8,16 |
| 76:9,14 | 232:23 | 72:4 80:23 | 169:1 | 99:13,16 |
| 78:25 | 233:15,21 | 81:1,4 | 173:25 | 101:6,14 |
| 79:14,18 | 234:18 | 82:11,22 | 176:15,19 | 101:22 |
| 80:5,17 | 236:23 | 83:8,11,17 | 184:7 | 105:20 |
| 81:24 | 246:5,11 | 84:15,17 | 203:17 | 106:2 |
| 82:19 83:2 | 247:12 | 87:9,11,16 | 207:10,17 | 115:2,22 |
| 83:4,6,9 | 248:8 | 87:23 | 283:11 | 117:11,13 |
| 83:17,22 | 249:13 | 88:20 89:1 | 285:12 | 117:19 |
| 84:9,15 | 250:15,23 | 89:12,13 | **meetings** | 118:3,10 |
| 85:10 87:2 | 250:25 | 89:13 | 29:24 30:1 | 118:19 |

**DANIEL KIMMAGE 11/10/2022**

126:8
127:1,3
129:12,18
129:22,24
130:4
135:22
139:12,14
139:18,23
140:1
143:20
144:16
145:2,7
146:25
147:3,5
148:8
160:7,9,10
161:5,21
161:24
162:3,21
166:17
167:6
215:12,20
216:1,19
216:21,23
217:5
236:13
279:11
283:11,12
283:14
**meets** 58:7
79:17
298:12
**MEHA** 16:14
**member** 8:18
12:18 32:3
86:14,23
86:25 91:7
133:7
189:3,13
202:20
230:16
235:10
243:21
**members**
83:19
117:1
120:16
133:25
166:14

178:15
212:6
230:19
270:24,25
271:1,5
**memory**
151:17
**mention**
56:17
61:21
**mentioned**
40:8 83:1
89:25 97:4
103:21
111:14
132:8
169:13
172:16
214:21
243:20
252:4
282:20
**mentioning**
121:11
190:1
196:19
**merely**
216:24
**met** 51:7
64:1 71:16
80:18 81:2
81:24 82:8
82:12,15
82:19
83:23
140:20
141:7,8,11
141:14
142:1
160:17,19
**methods**
157:6,13
158:3,21
**meting** 60:13
61:4
**MICHAEL**
11:12
**middle** 39:4
57:11

73:22
162:9
229:25
230:1
232:21
240:15,18
244:5
268:18
277:21
**million** 49:9
**MINA** 7:5
**mind** 43:4
56:14
147:7
**minimal** 33:1
**minor** 201:12
201:25
**minute** 114:4
257:25
**minutes** 86:1
86:3 93:18
127:19
150:3,4,12
213:1
**mis** 224:1
**mis-** 90:24
181:5
**mis-dis-**
71:20
72:10,16
77:6 78:8
116:15
191:23
192:1
**mischara...**
140:23
**mischara...**
58:24 82:2
97:17
101:9
108:20
117:21
118:6,12
123:12
125:17
127:5
131:8
140:19
148:5,17

157:16
186:6,8
201:23
204:20
216:7
229:9
231:10
238:16
265:24
269:7
**mischara...**
70:20
111:20
172:19
198:1
201:2
222:22
223:4
250:19
284:13,21
**misinfor...**
19:4 72:6
77:23 78:2
97:6 116:4
116:13
129:6
138:17
144:12,14
144:21
177:25
182:15
186:3
209:16
242:16
292:7
296:13
298:19
299:1
**misinfor...**
236:3
**misleading**
51:18
211:20
267:10
**misrepre...**
108:14
**mission**
26:11,25
46:3 74:13

74:14
76:22
77:14
156:10
158:17
237:24
278:8,13
278:19
**Missouri** 1:5
15:4,7
20:5 303:8
304:3
**misused**
298:18
**mitigate**
181:8
**mix** 294:18
**Mm-hmm** 23:2
35:17
43:15 44:5
49:12
50:10 57:3
72:7 78:22
82:24 84:6
112:6
114:5
128:19,21
138:5
153:12,16
164:18
168:20
173:20
179:21
195:22,24
218:13
219:5
221:15
228:6
233:24
245:13
263:15
267:14
270:22
298:20
**MO** 303:21
**mode** 32:20
217:12
**moderate**
287:17

DANIEL KIMMAGE  11/10/2022

moderation
  247:5,7,10
  247:21
  248:17,20
  248:22
  249:12,24
  287:2,7,12
  287:21
modes 96:23
modulation
  36:23 85:7
  129:4
  233:5,12
  246:10,16
  246:24
  247:4
  287:1
MOLA_DEF...
  18:22
MOLA_DEF...
  18:20
MOLA_DEF...
  18:24
MOLINA-I...
  10:17
moment
  105:15
Monday
  300:24
monitor
  20:12
  224:1
monitors
  269:4
Monroe 1:3
  20:10
month 116:19
monthly 42:9
months 24:14
  24:17 32:9
  37:9,11
  42:19
  58:10
  59:15 70:1
  70:3,17,23
  70:24 71:1
  71:3,6
  231:16
  242:16

morning 20:2
  159:10
  194:21
motion 21:23
  22:2
  152:13
motivated
  39:24
  268:21
  269:1,17
  270:2
move 252:16
moved 21:16
movement
  119:24
moving 213:4
MUHAMMED
  9:12
multiple
  101:1
  135:5
  137:9
  139:12,14
  139:18
  148:2,7
  149:11
  161:5
  188:17
MURRAY 11:12
MURTHY 1:24
MUTHIG 13:9
mutual 164:4
  164:16,20
  165:3
  —————
        N
  —————
N 15:1 16:1
  16:1,1
  17:1,1
  18:1,1
  19:1,1
  20:1 188:7
name 20:14
  21:5 28:14
  57:10
  71:22,24
  133:5
  142:18
  146:7,24

154:5
174:21
175:2
176:2,8,11
178:17
180:3,3
184:3,5
190:2
196:19
202:25
214:25
215:4,5
216:11
218:18
252:4
291:6
304:2,3
305:11
names 59:17
121:11
122:8
132:25
134:24
175:11,14
napkin
206:12
narrative
26:18
29:20
33:19,23
35:21,24
55:7 63:19
63:20
74:19
75:10
101:5
136:25
190:23
201:17,19
201:21,21
201:25
229:7
238:6,8,18
239:9,9,16
239:21,23
243:2
265:13,22
265:25
266:3

273:23
narratives
32:19 36:7
36:15,18
36:21 47:9
55:10 62:2
62:6,18,22
63:7,15
64:6,10,13
64:14 73:8
74:15
75:24
76:11
96:17
97:14 99:5
100:7,10
100:15
101:3,4,18
101:19,21
102:1,3,11
102:24
103:1,3,6
103:10,20
103:23
104:1,11
104:21,22
105:6,9,11
105:14,19
144:23
148:12,15
184:25
201:10,15
217:15,17
217:25
229:18
237:8
238:7
239:2
240:4
243:6,7,14
243:17,19
243:25
248:24
264:9,10
264:13,18
264:23
265:3,5,18
266:5,10
266:21

267:19
269:1
279:13,23
288:1
292:8
Nation 17:14
17:17
nation-s...
185:19
national
2:12,17
4:1,17
24:5,11
25:24 27:6
36:10
44:25
45:15 47:2
58:13,19
58:25 59:4
59:7 173:4
173:7
175:18
179:18
215:17
220:6
277:14
296:6
nature 26:15
31:14
35:18,23
40:11
45:20 56:7
73:16
96:13,16
97:7,9
100:12
115:16
203:22
204:23
217:4
218:7,8
NDAA 45:5
NDU 25:7
Near 261:4
NEC 60:1
necessarily
23:6
132:12
148:8

**DANIEL KIMMAGE  11/10/2022**

157:7,19
238:18
239:18
267:9
**necessary**
199:7
283:20
305:9
**Ned** 17:11
**need** 48:19
171:12
242:12
**needs** 93:20
278:4
**nefarious**
264:18
265:18
266:16
**Neighbor...**
10:25
**neither**
302:9
**Netherlands**
112:18,18
**never** 56:14
125:5
**new** 16:2,5
147:9
263:21
291:5,9
**news** 74:4,7
185:24
207:8
228:10
236:6
268:7
293:24
**news'** 17:19
**nexus** 239:17
239:20
**nice** 168:25
**Nicole**
166:10
174:25
**nightmare**
95:16
**NINA** 4:19
**nod** 23:5
**Nodding**

250:11
**Nom** 260:6
**non-Chinese**
102:17
**non-foreign**
239:17
**non-gove...**
268:15
**non-state**
27:3
163:18,21
165:2
278:21
**nongover...**
98:25
224:15
**normally**
83:10
88:11
**norms** 289:15
290:3,9,11
291:1
**Northwest**
15:18  16:6
16:17
303:6
**notable**
104:2
**notarized**
303:19
**notary** 14:8
302:21
303:18
305:23
**note** 213:15
259:15
268:19
294:1
**noted** 20:18
217:15
**notes** 229:5
229:16
**notice**
277:12
**notified**
197:6,7
**notify**
197:11
**notorious**

265:1
**November**
13:17
20:11
21:15
302:14
303:3,12
304:4
**nowadays**
80:1
**NSC** 17:11
71:15
**number** 20:7
32:14
45:17
101:3
120:16
131:4
182:7
241:9
244:18,19
244:21
274:13
292:23

―――――――――
**O**
―――――――――

**O** 16:1  17:1
18:1  19:1
20:1
**object**
197:12
198:12
255:23
300:12
**objection**
26:13,17
29:16,19
33:11  35:9
36:25
37:21
38:18
43:22
44:18  46:5
48:8  52:17
58:23
60:24  62:9
63:9,21
68:22
70:18

72:18
73:10
74:25
75:12,17
76:2  77:9
77:19  78:4
79:7  82:1
88:15  90:7
90:8  92:6
92:18  93:9
95:1  96:2
97:17  98:5
101:8
106:3
108:19
110:13
111:19
114:10
115:6,8,20
116:7,23
117:9,20
118:5,11
118:20
119:1
122:5,14
123:11
124:2,6
125:6,16
127:4
129:13
131:7
133:12
134:14
136:24
138:8
140:18
143:7,14
145:10,15
148:4,16
148:25
149:14
155:15,24
157:15
158:24
159:11
164:21
165:5
166:20
167:9,19

168:15
169:3,9
172:18
174:10,17
176:20,25
178:9,20
180:8
181:19
182:2
183:9,13
186:5,22
190:4
193:7,12
193:24
194:8
196:3,15
197:25
198:13
201:1,22
204:19
205:17
209:20
210:6
212:3,16
213:22
216:6,25
217:9,21
220:10
221:21
222:8,16
222:21
223:3
224:19
225:6
226:8,21
227:19
228:19
229:8,19
231:3,9
233:7,16
234:21
235:3,17
236:17
238:1,15
241:17
243:10
244:1,8,25
245:24
246:17

DANIEL KIMMAGE  11/10/2022

| | | | | |
|---|---|---|---|---|
| 247:1 | 70:17,22 | 303:20 | 259:10,12 | 97:13 |
| 248:25 | 80:13 | **office's** | **officials** | 101:20 |
| 250:18 | 81:10 | 41:15 | 45:14 | 103:13,16 |
| 251:17 | 130:4 | **officer** 8:14 | 46:22 | 107:13,23 |
| 253:17 | 254:16 | 189:7,8,12 | 58:15 | 109:14,19 |
| 254:18 | **occurred** | 192:21 | 97:22 | 110:9 |
| 255:10 | 34:4 53:23 | 194:18 | 134:1 | 111:2 |
| 265:12,23 | 67:22 | 195:9 | 135:6 | 112:25 |
| 269:6 | 69:19 | 197:3 | 192:9,14 | 114:2 |
| 270:6 | 83:13 | 302:3 | 192:25 | 115:23 |
| 273:17 | 110:7 | **offices** | 210:15 | 117:17 |
| 275:10 | 167:3 | 27:18 | 211:3 | 122:11 |
| 279:3 | 256:7,18 | 81:12 | 236:13 | 125:13,22 |
| 280:13 | 286:21 | 291:14 | **oh** 75:14 | 127:20,24 |
| 281:8,18 | **occurring** | **official** | 127:18 | 130:1,11 |
| 284:12,20 | 99:17 | 1:18,22,25 | 144:1 | 131:14 |
| 285:7,24 | 211:7 | 2:4,11,23 | 145:21 | 132:8,19 |
| 286:14 | **occurs** 112:5 | 3:8,14,19 | 149:18 | 133:1 |
| 287:18 | **October** | 3:24 4:7 | 153:3 | 134:20 |
| 288:2 | 18:11 | 4:16,20 | 173:11 | 135:18 |
| 289:19 | 113:25 | 5:2,6,12 | 175:2 | 136:6 |
| 291:3,21 | 116:18 | 5:17,22 | **OIG** 106:20 | 137:21 |
| 292:11 | 118:4 | 6:4,11,16 | **okay** 23:24 | 140:13 |
| 293:16 | 123:9,15 | 6:20,23 | 24:25 26:5 | 142:12,12 |
| 297:3,12 | 258:21 | 7:2,6,16 | 31:8 40:24 | 143:4,10 |
| 298:7 | 289:1 | 7:21 8:3,9 | 50:8,13 | 146:9 |
| 299:2 | **offender** | 8:13,17,21 | 51:6,16 | 147:12 |
| **Observatory** | 23:10 | 9:1,8,13 | 52:12 | 148:14 |
| 219:16 | **office** 3:20 | 9:17,23,24 | 53:21 | 151:8,24 |
| 221:18 | 4:2 7:9,11 | 10:1,2,4,5 | 56:23 | 157:9 |
| 223:10 | 8:22 9:5 | 10:6,10,11 | 57:16 58:4 | 158:14 |
| 292:15,25 | 10:24 11:8 | 10:13,18 | 61:7 63:16 | 160:5,23 |
| 293:4 | 11:16 15:4 | 10:19,22 | 65:23 | 162:2,5,17 |
| 294:5 | 25:4 28:13 | 11:5,13,20 | 66:15,20 | 163:7,24 |
| 295:21 | 29:12 | 11:24 12:5 | 67:20 | 166:9 |
| 297:22 | 31:12 41:7 | 12:12,17 | 70:10 73:2 | 167:1,25 |
| **obviously** | 41:13,17 | 12:25 13:6 | 73:18 75:8 | 168:18 |
| 54:13 | 45:24 | 13:10 | 75:21 | 170:22 |
| 110:4 | 47:12 | 65:10,17 | 79:12,21 | 171:14,23 |
| 128:13 | 71:17,19 | 96:25 | 81:15,22 | 173:6,12 |
| 197:23 | 116:10,14 | 97:21 | 82:5 83:12 | 176:3,9,14 |
| 209:3 | 122:12 | 130:20 | 83:16 | 179:8,20 |
| **occasion** | 146:6 | 134:9 | 85:17,23 | 181:2 |
| 40:17 | 189:14 | 186:19 | 86:4 87:5 | 182:10 |
| 217:12 | 191:20 | 188:22 | 89:23 | 184:4,24 |
| **occur** 32:6 | 199:5 | 189:2 | 91:25 92:9 | 186:12 |
| 37:8,12 | 290:22,25 | 190:20 | 92:24 93:5 | 187:1,19 |
| 58:8 59:14 | 291:6,9,12 | 199:5 | 95:14 | 188:20 |
| 61:10 | 291:18 | 259:3,10 | 96:12 | 190:15 |

**DANIEL KIMMAGE  11/10/2022**

| | | | |
|---|---|---|---|
| 191:12 | 298:14 | 258:10,13 | 268:24 | 54:14 |
| 192:20 | 299:16 | 258:20,23 | 269:13 | 59:25 |
| 194:5 | 301:3 | 259:6,19 | 289:25 | 61:22 |
| 195:24 | **on-boarded** | 265:1 | 290:2,8 | 71:14 |
| 196:10 | 253:8 | **operations** | **organizing** | 96:10 |
| 197:23 | **once** 36:15 | 108:17 | 178:18 | 182:24 |
| 199:8 | 127:22 | 109:1,5,7 | **origin** | 225:3,17 |
| 200:18 | 181:8 | 109:9 | 102:17 | 225:22 |
| 203:10,12 | 281:5 | 110:10,23 | 264:18 | 227:1 |
| 204:3,15 | **one-pager** | 177:3 | 265:11 | 237:23 |
| 204:24 | 253:2 | 259:23 | **original** | **overall** |
| 205:7,24 | **ones** 30:13 | **opportunity** | 180:2 | 158:17 |
| 206:24 | 34:18 | 43:24 48:9 | 303:13 | 243:14 |
| 207:1,6,14 | 158:12 | 94:4 95:4 | **originate** | **overdue** |
| 209:9 | 176:10 | **opposed** | 238:9 | 298:4 |
| 210:2 | 229:3 | 103:25 | 239:5 | **overlaps** |
| 213:14 | 289:14 | **oral** 23:4,7 | **originated** | 92:13 |
| 214:2 | **ongoing** | 167:6 | 96:14 | **oversee** |
| 215:14 | 39:14 | 168:23 | 191:7 | 41:18 |
| 216:16 | 68:20 69:5 | **order** 21:16 | 222:14 | **oversight** |
| 218:1,23 | 69:8,12,15 | 21:25 22:2 | 223:1,17 | 41:21 |
| 219:1,8 | 69:17 | 43:19 | 239:25 | **overview** |
| 220:2 | 72:15,22 | 44:17,22 | 243:2 | 41:16 |
| 222:2 | 109:25 | 45:4 46:20 | 248:24 | 136:9,19 |
| 223:21 | 122:19,23 | 176:1,7 | **originates** | 136:23 |
| 224:13 | **online** 34:22 | **orders** | 224:6 | 137:1 |
| 226:18 | 47:19 | 231:21,22 | **originating** | **owners** |
| 227:7,10 | 97:24 | **Oren** 57:1 | 33:10 | 158:12,15 |
| 228:13 | 104:7 | **organiza...** | 222:3 | **owns** 80:22 |
| 229:25 | 107:11 | 112:22 | **origination** | **Oxford** |
| 231:20 | 114:19 | 163:23 | 222:6 | 292:22 |
| 233:13 | 153:11 | 184:1,16 | 239:17 | |
| 239:12 | 190:16,24 | 185:8 | **originator** | **P** |
| 240:7 | 242:7 | 240:12 | 239:8 | **P** 15:1,1 |
| 241:8 | 262:19 | 268:14,15 | **origins** | 16:1,1 |
| 242:12 | 273:16 | 292:21 | 96:17 | 20:1 |
| 247:8 | **OPCW** 112:20 | **organiza...** | 100:7,12 | 205:25 |
| 248:5 | 112:21 | 27:7,13 | 102:7,14 | **p.m** 151:1,4 |
| 254:1 | **open** 171:24 | 32:17 | 102:21 | 213:7,10 |
| 258:3 | 256:9 | 98:25 99:1 | 264:10 | 252:22,25 |
| 260:3 | **operating** | 137:3 | 266:6 | 299:21,24 |
| 264:5 | 224:10 | 182:18,22 | **Ousman** | 301:5,9 |
| 269:24 | **operation** | 182:24 | 174:22 | **P.O** 15:6 |
| 275:8,14 | 107:22 | 183:2,6,21 | **outcome** | **page** 17:2,9 |
| 277:16,19 | 112:20 | 184:13 | 302:12 | 18:3 19:3 |
| 289:9 | 155:3 | 185:7,17 | **outlets** | 50:9,12 |
| 290:1 | 254:16 | 227:2 | 97:23 | 57:9,12 |
| 294:19 | 255:6,7,20 | 267:18,24 | **outside** | 73:23 |
| 295:2,15 | 257:13 | 268:11,12 | 47:13 | 93:12 |

**DANIEL KIMMAGE  11/10/2022**

| | | | | |
|---|---|---|---|---|
| 94:21 | 240:6,9 | 144:13 | 158:16 | 253:8,24 |
| 106:22 | 241:8,10 | 153:14 | 161:9 | 273:14 |
| 112:4,7 | 241:21,22 | 164:9,10 | 220:9 | 274:1 |
| 128:14,18 | 242:12 | 169:13 | 240:9 | 279:6 |
| 153:13 | 244:4,5,10 | 177:23 | 273:13 | 281:13 |
| 161:18,19 | 245:11 | 193:11 | **partial** | **partnering** |
| 162:6,9 | 261:6,11 | 209:11 | 220:5 | 283:3,9 |
| 164:11 | 263:13 | 212:8 | **participant** | **partners** |
| 166:1,23 | 267:13,16 | 221:13 | 291:16 | 27:19 96:9 |
| 166:23 | 268:17 | 222:25 | **particip...** | 98:21,24 |
| 167:15,16 | 270:13 | 223:22 | 134:13 | 99:3 229:4 |
| 167:23 | 271:2 | 227:6 | 172:14,15 | 229:16 |
| 168:19 | 277:17,18 | 229:12 | 174:4 | 230:5,25 |
| 173:18 | 277:21 | 235:21,25 | 180:24 | 254:4 |
| 177:22 | 289:8 | 237:4 | 186:2 | 271:14 |
| 179:20,23 | 292:3 | 241:11 | **participate** | 274:5 |
| 180:3 | 296:1 | 244:5,9,12 | 65:3 87:23 | 278:23 |
| 181:4 | 303:14,18 | 245:14 | 161:20 | **partnership** |
| 182:11 | 303:20 | 263:14 | **particip...** | 19:6 202:2 |
| 185:22 | 304:5,9,13 | 267:16 | 70:4 73:18 | 202:12 |
| 188:21 | 304:17,21 | 268:18 | 83:16 | 203:8 |
| 189:5 | **pages** 13:22 | 270:14 | 87:19,21 | 204:6 |
| 192:4 | 50:11 | 271:10 | 161:23 | 214:18 |
| 193:11 | 128:13 | 277:20 | 162:2 | 221:17 |
| 195:23 | 167:15 | 289:10,11 | 172:11 | 226:4 |
| 196:9,18 | 206:25 | **paragraphs** | **particip...** | 283:7 |
| 196:24 | 207:23 | 49:20 | 42:8 59:18 | 293:3 |
| 198:18 | 221:11 | **paraphrases** | 59:24 | 294:7 |
| 208:9,10 | 292:1 | 52:19 | 83:14 | **partners...** |
| 209:6,7 | **pandemic** | **paraphra...** | 113:23 | 6:24 10:25 |
| 210:2,12 | 96:8,18 | 263:24 | 178:15 | 27:12 |
| 210:12 | 99:22 | **parentheses** | 235:15 | 289:12 |
| 211:12 | 102:8,12 | 57:2 | **particular** | **parts** 211:11 |
| 212:9 | 104:3,10 | **parenthe...** | 88:9 | **party** 55:24 |
| 213:13 | 104:16 | 56:19 | 106:19 | 55:25 |
| 218:12 | 105:22 | **Parler** 80:25 | 179:13,14 | **passes** 90:17 |
| 219:1 | 130:6 | 81:1 | 247:17 | **Patel** 167:16 |
| 220:3 | 264:15 | **part** 18:10 | 268:16 | 168:5 |
| 221:12 | 266:12 | 33:20 | **particul...** | **patient** |
| 226:1,14 | **panel** 113:24 | 36:20 | 36:14 | 191:1 |
| 226:24 | **paragraph** | 46:24 61:5 | **parties** | **Patricia** |
| 227:25 | 44:4 45:10 | 61:19 | 224:15 | 132:1 |
| 228:7,8 | 48:7 49:8 | 63:11 64:8 | 225:3 | **Patrick** |
| 229:13 | 50:14 74:2 | 68:8 73:6 | 302:10 | 166:3 |
| 232:4,20 | 78:20,20 | 73:17 98:1 | **partly** | 174:5 |
| 232:22 | 94:23,24 | 104:25 | 222:12 | **Paul** 162:7 |
| 233:23 | 95:11,15 | 141:19 | **partner** | 162:11 |
| 235:7,20 | 128:20,23 | 145:20 | 235:10,10 | 163:8 |
| 237:2 | 138:3 | 155:13 | 235:14,14 | 174:15 |

**DANIEL KIMMAGE  11/10/2022**

pay 75:21
paying 270:1
pays 269:4
Payton
 142:17
PECK 9:7
penalty
 305:12
penultimate
 176:8
people 39:25
 65:7 66:2
 80:9 81:9
 118:24
 131:11
 135:24
 137:22
 143:12
 166:2,13
 166:18
 171:9
 175:7
 177:12
 178:14
 181:17
 199:24
 219:3
 223:1
 262:20
 269:14
 275:5,21
 280:24
 282:7
 293:12
 294:4
 299:7
people's
 81:16
Peoples
 264:17
percent
 212:10
 234:3,8,13
 234:19
 237:16,17
 237:20,22
 239:1
 240:11,16
percentages

240:20
period 25:1
 25:10
 47:11
 66:19 67:8
 67:14,19
 69:20,20
 71:3 92:13
 94:19
 109:7,25
 140:5
 231:16
 255:17
periodic
 59:10
 69:11
periodic...
 58:7 59:6
 79:18
 249:18
 250:16
 277:8
 298:13
periods 25:1
perjury
 305:12
permits
 247:18
permitting
 164:13
person 65:12
 66:12,15
 117:13
 132:23
 135:10
 147:9
 154:1,3
 155:2,23
 176:12
 178:19,22
 179:4,9,9
 180:15,18
 180:20
 185:25
 190:24
 214:24,24
 216:14
 218:9
 235:15

262:12
 274:22
person's
 146:23
 190:2
personal
 21:20
personally
 40:8 53:22
 139:9
 146:9
personnel
 39:8,17
 40:16,18
 40:21
 59:17 80:5
 128:25
 132:18
 180:1
 286:18
perspective
 157:12
pertaining
 253:9
pertains
 77:24
 101:23
phone 92:8
 92:16
 115:2,22
 164:14
phrase
 253:23
physically
 154:17
pick 75:9
picture
 262:4
pictures
 171:10
pieces 31:3
 31:5 61:24
piggybacks
 104:23
pillars 18:5
 98:10
 106:15
 280:1
 282:6,22

place 274:25
PLAINTIFF
 15:2
plaintiffs
 1:15 20:5
 21:25 22:1
 299:25
plan 251:11
planned
 259:6
Planning
 25:4 45:25
plans 3:22
 51:9 52:14
 73:14
platform
 33:25 39:6
 39:13
 51:24 53:7
 53:14
 55:22 56:1
 56:2 81:14
 84:15
 87:11
 113:10,15
 159:8
 160:1
 169:23
 170:8,17
 171:21
 172:12
 182:7
 196:21
 200:21
 209:15,18
 233:1,11
 235:10,13
 242:8
 248:1
 250:7
 253:16
 259:4,17
 260:16
 270:20,23
 285:22
 286:11
 287:15
 288:9,11
 288:13

platforms
 32:8 33:9
 35:8,22
 37:20
 38:17 40:5
 40:12 42:4
 42:10 46:4
 46:17 54:6
 55:12,19
 61:18 76:9
 80:5,17
 81:24
 82:19
 84:10 87:2
 92:17
 101:7,22
 105:21
 139:15
 147:2
 155:14,23
 156:19
 158:2,7,13
 158:15
 160:7,11
 160:24
 161:6,22
 167:8
 171:25
 172:17
 181:18
 182:1
 183:7,11
 187:11
 194:7
 195:15
 210:16,22
 211:3
 213:16,20
 214:1,5,8
 226:16,20
 232:21,23
 233:15,21
 234:18
 245:16
 246:5,11
 248:8
 249:18
 254:2,5
 258:18

**DANIEL KIMMAGE  11/10/2022**

| | | | | |
|---|---|---|---|---|
| 285:13,21 | 226:15,19 | **posted** 30:21 | 152:14 | **Price** 17:11 |
| 291:20 | 233:5 | 37:20 | **preparation** | **primarily** |
| **plausible** | 245:12 | 38:17 | 143:23 | 30:11 |
| 178:13 | 247:10 | 47:19 | 144:7 | 31:15 77:4 |
| **play** 114:2 | 261:4 | **posting** | 151:14,18 | 116:9 |
| 262:20 | 290:6,6,14 | 171:18 | 152:21,23 | 156:7,21 |
| **plays** 277:25 | 290:15,22 | **posts** 33:22 | **present** | 157:1 |
| **pleadings** | 291:10,16 | 40:1 47:18 | 16:23 18:9 | 217:11 |
| 258:16 | 291:16,18 | 52:15 53:5 | 31:21 | **primary** 68:3 |
| **please** 20:20 | **portal** 253:8 | 53:11,15 | 51:12,14 | 68:9 98:7 |
| 21:5 86:10 | 253:24 | 54:7,10,12 | 52:3,6 | 98:7,14 |
| 95:4 151:4 | 254:10,13 | 54:19 | 53:22 54:1 | 121:7 |
| 192:14 | **portals** | **potential** | 59:13 64:3 | 157:20 |
| 196:25 | 254:7 | 109:23 | 64:19 | 266:10 |
| 213:10 | **portfolio** | 255:14 | 132:19 | **principal** |
| 252:25 | 122:1 | **potentially** | **presenta...** | 22:7,10 |
| 299:24 | 216:14,17 | 32:3,19 | 149:22 | 25:12 |
| 303:11,15 | 216:17 | 60:5 61:2 | **presented** | 40:25 |
| 303:19 | 218:3,8 | 61:21 | 136:21 | 41:11 |
| **point** 67:7 | **portion** | 64:23 | 187:11 | 42:16 60:5 |
| 74:23 | 154:12 | 69:25 89:6 | **president** | 64:20 65:6 |
| 181:4,11 | **portions** | 89:18 90:2 | 1:19 2:16 | 65:8,9,24 |
| 182:13 | 41:19,20 | 92:11 | 5:8 6:21 | 69:23 70:8 |
| 185:21 | 41:23 | 111:5 | 7:4,11 | 71:10 |
| 219:11 | **position** | 117:24 | 162:14 | 94:15 |
| **Pointer** | 25:17 | 130:9 | 166:8 | 118:16 |
| 183:19 | 162:16 | 155:19 | 174:16 | 137:7 |
| **pointing** | 174:14 | 157:25 | **President's** | 146:13,15 |
| 292:7 | 175:6 | 248:4,10 | 45:15 | 199:17 |
| **points** 187:3 | 272:11 | 256:7 | **presiden...** | **prior** 24:4 |
| 211:13,14 | **positions** | 268:11 | 112:11 | 45:23 |
| **policies** | 146:16 | 280:25 | **press** 1:23 | 231:16 |
| 36:23 | **possibility** | **practice** | 19:14 | **priorities** |
| 55:13 | 101:17 | 63:17 64:1 | 43:13 45:9 | 111:1 |
| 233:1,11 | **possible** | 167:6 | 289:2 | **private** |
| 245:18 | 101:24 | **praise** | **pressing** | 274:1 |
| 246:4,10 | 125:3,8 | 106:19 | 99:21 | 278:3,23 |
| 246:16,20 | 126:25 | **precise** | **Presumably** | 279:7 |
| 246:24 | 127:17 | 77:13 | 110:11 | 283:4,7,10 |
| 248:7,17 | 144:18 | 176:13 | **prevention** | 295:6 |
| 248:20,22 | 154:9 | **precisely** | 2:21 3:3 | **privately** |
| 249:13,24 | 218:11 | 152:7 | 168:9,13 | 294:17 |
| 285:22 | 278:11 | **precursor** | **previous** | **privilege** |
| 286:1,4,13 | **possibly** | 45:4 | 277:11 | 68:23 |
| **policy** 3:21 | 82:15,17 | **predecessor** | 286:24 | 256:23 |
| 25:4 45:25 | 82:25 | 291:11 | **previously** | 257:14 |
| 142:16 | 162:22 | **predict** | 71:24 | 258:4 |
| 146:5 | 281:5 | 121:5 | 104:4 | **privileged** |
| 175:5 | **post** 36:17 | **preliminary** | 291:13 | 69:2 249:3 |

**DANIEL KIMMAGE  11/10/2022**

| | | | | |
|---|---|---|---|---|
| 253:15 | 123:17 | 139:5 | 68:19 | 303:18 |
| 255:12,15 | **program** | 148:12 | **protect** | 305:23 |
| **probably** | 11:15 | 156:11,15 | 21:18 | **public/p...** |
| 31:25 | 173:10 | 156:23 | **protective** | 155:7 |
| 32:14 60:7 | 177:13 | 157:3,13 | 21:16 | **publicly** |
| 81:23 | 179:13,15 | 158:6,8,18 | **PROTENTIS** | 84:21 |
| 110:11 | 267:22 | 163:19,21 | 9:22 | 108:3,6,8 |
| 185:19 | **programs** | 165:2,9,17 | **protesters** | 152:20 |
| 215:17 | 18:14,15 | 165:24 | 39:5 | **publicly...** |
| **problem** | 170:1 | 169:23 | **proven** | 250:24 |
| 261:8 | **prohibited** | 170:25 | 185:22 | **purpose** 36:6 |
| 262:3 | 224:17 | 174:2 | 186:20 | 36:8,20 |
| 280:4,7,8 | **prominent** | 184:17 | **provide** 38:4 | 37:4,6 |
| 280:11,15 | 242:15 | 204:8 | 136:9,17 | 68:3 155:5 |
| 280:16,17 | **promote** | 205:6 | 276:15 | 157:11 |
| **problems** | 97:11 | 238:20 | **provided** | 171:6 |
| 95:18 | 98:12 | 249:25 | 267:17,23 | 248:5 |
| 277:25 | **promotes** | 251:2 | 276:16 | 271:11 |
| **procedures** | 278:11 | 261:22,24 | **providers** | 272:12 |
| 229:6,17 | 280:5 | 263:5,7,12 | 181:13,16 | 273:14,18 |
| **proceed** | **promoting** | 263:21 | 181:25 | 273:25 |
| 20:21 | 32:19 | 264:2,9,13 | **provides** | 274:4,9 |
| 86:11 95:3 | 268:24 | 265:3 | 119:15 | **purposes** |
| 151:4 | 279:24 | 267:7,11 | 253:14 | 180:16 |
| 213:10 | 280:23 | 267:25 | **provision** | **pursuant** |
| 252:25 | **promulgated** | 268:1 | 44:24 | 14:2 |
| 255:15 | 97:14 | 271:14 | **proxies** | 128:23 |
| 256:5 | **propa-** 97:13 | 273:24 | 97:24 | **pushed** 73:9 |
| 299:24 | **propaganda** | 274:6 | 104:7 | 74:16,21 |
| **proceeding** | 18:6 19:11 | 275:22 | 279:25 | 190:24 |
| 93:19 95:6 | 26:1,6 | 278:1,5,20 | **public** 3:1 | 245:22 |
| **proceedings** | 27:5,10,14 | 279:13 | 8:6 9:10 | **pushing** |
| 302:4,6,7 | 30:14 | 280:2,20 | 14:8 16:15 | 35:21 62:6 |
| **process** | 32:16 55:9 | 280:22 | 16:15 | 74:19 |
| 71:15 | 63:12 69:7 | 290:21 | 49:22 | 264:6 |
| **processed** | 73:5 75:5 | 292:8 | 95:18 98:9 | **put** 21:11,14 |
| 212:10 | 76:7 79:1 | 296:5 | 110:12 | 48:16 |
| 234:1,13 | 79:15,20 | 297:18 | 111:2,6 | 206:12 |
| **processes** | 84:18 | 299:9 | 119:12 | 259:2 |
| 91:1 | 89:19 | **propagan...** | 142:16 | |
| **processing** | 95:17 96:6 | 266:1,2,4 | 171:24 | **Q** |
| 212:13 | 97:2,2,20 | **propagated** | 219:18 | **quarter** |
| **producing** | 98:2,22 | 78:11 | 246:2,6 | 255:19 |
| 294:2 | 99:4 | 265:22 | 249:18,21 | 258:9 |
| **Professi...** | 100:10 | **propagation** | 250:2 | 260:9 |
| 14:6 302:3 | 102:19 | 158:4 | 280:22 | **quarterly** |
| **profile** | 106:16 | 165:20 | 282:23 | 32:10,10 |
| 110:4 | 116:3 | **propose** | 295:18 | 80:15,16 |
| 112:15 | 136:10 | 37:18 | 302:21 | 82:7,11 |

**DANIEL KIMMAGE  11/10/2022**

88:8
135:22
**question**
22:24,25
23:15,16
23:20,21
26:21
29:22
33:15
36:19
48:18
68:18  69:1
95:12
114:7
125:20
129:17
149:23
160:24
166:16
175:1
180:14,25
214:3
225:21
248:15
256:13,21
256:24
257:5
258:5
269:9
286:7
292:4
**questioning**
115:9
150:5,10
**questions**
22:22 23:4
23:8 93:19
94:3 95:3
95:7
147:16
151:6
209:3
248:6
300:1,4
**quick** 56:25
151:6
**quickly**
266:25
**quite** 207:22

240:19
**quote** 50:20
50:23 51:1
57:9 189:6
191:1
194:6
209:13,14
229:4
233:20
**quoted** 48:6
57:12
**quotes** 52:19
52:25

_____

**R**
**R** 1:17 15:1
16:1 20:1
20:6 303:8
304:3
**racial**
268:25
**racially**
268:20,25
269:16
270:2
**raise** 55:18
76:15,15
125:5
127:23
147:22
195:13
275:3
**raised** 106:1
124:22,24
125:8
185:25
216:22
255:5
258:9
**raises** 211:7
257:8
262:19,22
**raising** 35:6
36:20
38:15
181:17
196:12
205:3
211:22

212:1
**ran** 173:12
241:12
**range** 67:21
184:21
215:17
275:19
**ranking**
199:5
**rapid** 267:17
267:24
**rapidly**
263:24
**rare** 30:24
31:4
**re-tweeted**
74:22
**reach** 163:2
187:13,21
**reached**
162:7
**reaches**
163:8
**reaching**
160:6
168:1
214:4,7
**read** 48:9,12
143:19,25
152:8,13
152:16,19
152:22
202:8
206:17
207:25
208:25
209:1,4
229:13
242:13
246:1
258:14,16
275:21
293:11
300:19
301:12
303:15
304:6,10
304:14,18
304:22

305:6
**reading**
93:16
164:8
175:11
190:7
**ready** 94:3
95:3
**real** 85:16
171:10
262:9
**really** 31:18
41:18
47:11  55:2
62:24
104:4
121:8
218:21
266:11
277:18
283:2
**realm** 101:17
**realtime**
14:7,7
39:10,16
210:14,20
211:1,5
302:20
**reason**
118:15
176:17
304:7,11
304:15,19
304:23
**recall** 33:16
38:20
39:12
47:14
48:25  49:3
49:18  50:4
51:14  52:8
52:9  53:8
53:12,16
53:21,25
54:8,17,23
55:2,4,8
60:25
63:25  64:2
64:5,12,18

65:6,14
66:19 67:1
67:2,25
68:2,7
71:15
72:14,21
77:13
78:18
80:24  81:1
81:4  82:22
83:1  84:11
84:17,21
84:25  85:4
85:8  86:21
87:12,14
87:20
89:14,20
90:2,4,21
91:2,14
92:12,14
92:20,22
99:20
100:14
101:11,15
101:18
102:15,23
103:3
105:6,9,10
105:23
109:3,8,12
111:12,21
111:23
113:1,3,12
113:23
116:10,25
120:2
121:16
124:21
125:1,21
125:22,25
126:2,8,12
127:7
129:20,24
130:1,10
132:14
133:4
135:11,15
135:23
136:19,20

**DANIEL KIMMAGE  11/10/2022**

| | | | | |
|---|---|---|---|---|
| 137:15,19 | 243:15,18 | 133:17 | 213:7,10 | 31:14 33:3 |
| 138:11,15 | 255:16,18 | 137:18 | 251:18 | 60:1 66:6 |
| 138:20 | 255:18 | 143:20 | 252:19,22 | 69:14 72:4 |
| 139:3,7,13 | 259:21 | 144:3 | 252:25 | 102:4 |
| 141:6,11 | 264:25 | 147:17 | 298:8 | 110:5 |
| 142:9 | 265:14 | 151:13 | 299:21,24 | 237:12 |
| 144:19 | 266:1,11 | 218:19 | 301:6 | 298:23 |
| 145:3,5,6 | 266:13 | **recommended** | 302:6 | **referring** |
| 145:12,13 | 276:16 | 284:8 | **records** 39:2 | 56:22 |
| 145:17,24 | 285:3,9 | **record** 20:19 | **recounted** | 95:12 |
| 146:14,23 | 286:17 | 21:6,11,14 | 281:14 | 115:17 |
| 147:3,4,5 | 287:13 | 33:12 46:6 | **recruit** | 129:11 |
| 148:19 | 288:7,8,10 | 52:18 | 269:14 | 186:19 |
| 152:15,18 | 291:6,15 | 56:14 | **recurring** | 219:12 |
| 154:16 | 293:1 | 63:10,22 | 60:22 | 248:7 |
| 155:4 | 294:6,7 | 66:8 70:19 | 82:10 | 268:22,23 |
| 160:16 | 295:10,13 | 73:11 79:8 | 135:18,22 | 272:6,14 |
| 172:25 | 295:24 | 82:3 85:20 | **recused** | 279:2 |
| 176:13 | **received** | 86:5,7,10 | 294:21,23 | 289:18,24 |
| 179:13,14 | 159:25 | 88:16 | **redacted** | 299:5,11 |
| 183:20,20 | 160:1 | 93:10 96:3 | 235:14 | **refers** 51:7 |
| 183:24 | 220:5 | 97:18 98:6 | **reduced** | 95:16 |
| 184:2,3 | 225:20 | 101:10 | 302:8 | 187:5 |
| 194:16,18 | 256:15 | 108:21 | **refer** 27:23 | 188:4 |
| 195:10,16 | 257:14 | 110:12 | 57:9 59:3 | 200:5,5 |
| 195:19 | **receives** | 114:11,16 | 112:14 | 296:15 |
| 197:15,21 | 271:3 | 115:21 | 274:17 | **reflect** |
| 198:16 | **Recess** 86:8 | 116:24 | **reference** | 134:12 |
| 200:25 | 151:2 | 117:10,21 | 49:21 72:8 | **reflected** |
| 201:4,5,18 | 213:8 | 118:7,13 | 93:13,23 | 130:19 |
| 201:20,24 | 252:23 | 119:12 | 124:4,10 | **reflects** |
| 201:25 | 299:22 | 123:12 | 138:3 | 134:21 |
| 202:5,14 | **recipients** | 124:7 | 155:13 | **refresh** |
| 203:17 | 173:22 | 127:6 | 166:24 | 143:20 |
| 204:9,22 | **recognize** | 131:9 | 181:23 | 144:2 |
| 205:13,22 | 43:8 | 143:8,15 | 182:8,12 | 151:13 |
| 207:9 | 106:12 | 145:16 | 227:24 | **refutation** |
| 208:5,6 | 142:18 | 148:5,17 | 235:22 | 275:21 |
| 214:11,11 | 153:5 | 150:11,22 | 241:11 | **regarding** |
| 214:12,14 | 175:13 | 150:24 | 242:13 | 164:5,16 |
| 214:17,19 | 176:9,11 | 151:1,4 | 266:7 | 164:25 |
| 215:3,16 | 177:11,15 | 155:25 | 270:15 | 177:13 |
| 217:11,24 | 178:4,22 | 175:12 | 271:17,20 | 197:2 |
| 219:25 | 180:4 | 178:21 | 278:18 | **Registered** |
| 221:8,9 | 260:23 | 180:12 | 286:24 | 14:6 302:2 |
| 231:11,13 | **recollec...** | 186:7 | **referenced** | **regular** |
| 233:22 | 32:25 | 190:5 | 100:21 | 58:13 |
| 236:11,14 | 52:10 | 204:20 | **referred** | **regularly** |
| 237:12 | 103:18,24 | 205:18 | 28:20 | 250:8 |

**DANIEL KIMMAGE  11/10/2022**

| | | | | |
|---|---|---|---|---|
| 297:17 | 204:17 | 295:18 | 132:11,17 | 54:7,10,11 |
| **rel** 1:5,8 | 236:22,23 | 296:6 | 132:21,25 | 54:19 |
| **relate** 102:4 | 242:14,23 | **releases** | 133:1 | 234:25 |
| 109:15 | 243:8 | 250:7 | 134:24 | 285:23 |
| 145:7 | 246:15 | **releasing** | 135:1 | **remove** 188:6 |
| 181:25 | 254:4 | 107:10 | 137:4,21 | 247:19 |
| 217:18 | 255:6 | 110:6 | 137:24 | **removed** |
| 238:6 | 258:15 | 280:21 | 138:1,10 | 39:23 |
| 239:13 | **relation** | **relevant** | 138:12,17 | 234:10 |
| 251:8 | 103:1 | 32:3 65:1 | 138:23 | **removing** |
| 286:3 | 239:2 | 80:8,9 | 139:8,25 | 234:19 |
| 287:1,11 | **relation...** | 83:19 88:4 | 141:13,15 | **REMUS** 6:19 |
| **related** | 31:15,18 | 89:6 | 141:16 | **REMVE** 268:21 |
| 21:18,20 | 68:13,16 | 117:12,24 | 142:5 | **renamed** |
| 62:1 90:19 | 232:16 | 119:4 | 145:1 | 192:1 |
| 91:3 96:8 | 241:19 | 124:13,18 | 146:6 | **render** 305:9 |
| 96:20 | 287:6 | 131:3 | 147:8 | **reopening** |
| 99:10,19 | 294:20 | **rely** 293:13 | 148:14 | 300:12 |
| 102:11 | 295:12,14 | **remaining** | 151:11,17 | **repeat** |
| 116:2 | 295:23 | 120:25 | 151:20 | 283:17 |
| 129:6 | **relation...** | 252:15 | 152:7 | **rephrase** |
| 138:13,18 | 232:23 | **remarkable** | 154:5 | 68:17 |
| 153:25 | 245:3 | 296:10 | 184:4,5,6 | 233:18 |
| 156:9 | **relative** | **remarks** | 184:7,9,11 | **replaced** |
| 165:15 | 100:4 | 19:14 | 197:14,16 | 272:21 |
| 205:6 | **release** | 123:16 | 197:17,18 | **replicated** |
| 212:10 | 43:13 45:9 | 137:11 | 197:20 | 74:16 |
| 213:25 | 107:21,22 | 272:15 | 198:6,19 | 76:11 |
| 234:4,14 | 108:17 | 289:1 | 199:23,24 | **report** 18:5 |
| 237:8,16 | 109:1,8 | **remember** | 200:8,11 | 40:7,25 |
| 237:17,20 | 110:10 | 34:3 49:13 | 203:5,13 | 41:11 48:2 |
| 237:23 | 111:14 | 49:16 50:1 | 207:14 | 93:7 98:9 |
| 238:7,13 | 112:1 | 51:2 52:5 | 214:25 | 98:20 |
| 238:19 | 113:5,9,13 | 53:3,18,19 | 231:7 | 106:14,18 |
| 239:3,18 | 250:16 | 67:20,24 | 236:21 | 106:20 |
| 243:6 | 255:7,20 | 82:7,10,18 | 237:11 | 107:18,19 |
| 259:4 | 258:10,20 | 88:22,25 | 243:24 | 111:15,22 |
| 270:18 | 258:23 | 90:11 | 250:2,8,14 | 111:25 |
| 293:25 | 259:5,19 | 101:12,25 | 252:4 | 112:3,9 |
| 302:10 | 259:22 | 111:9 | 258:22 | 117:14 |
| **relates** | 295:21 | 113:8 | 264:19,22 | 118:15 |
| 90:16,25 | **released** | 117:6 | 266:6,17 | 149:6 |
| 257:12 | 98:10 | 118:9 | 266:19 | 193:4 |
| 260:16 | 108:3,6,8 | 119:10,25 | 272:17,19 | 207:3,18 |
| **relating** | 110:11 | 125:4 | 284:4 | 207:22 |
| 85:6 | 249:18 | 127:2 | **removal** | 208:25 |
| 111:10 | 250:23 | 129:11,18 | 47:18 | 209:1 |
| 186:3 | 277:5 | 129:22 | 52:15 53:5 | 228:17 |
| 197:19 | 282:7 | 130:16 | 53:10,15 | 230:14,20 |

**DANIEL KIMMAGE  11/10/2022**

236:16
237:6
245:21
246:1
254:4,7
280:2,22
282:6,23
282:23
283:5
report's
113:5
reported
13:23 41:8
94:13
203:16
241:24
reporter
14:3,4,5,6
14:7 20:16
20:20 23:5
28:22
79:13
296:1
301:1
302:1,3
reporters
50:2
reporting
110:24
111:3,4,6
192:14
196:25
199:10
241:22
242:6
256:6
reports
52:21,23
104:6
111:8,9
114:18
229:3
293:12,14
295:19,20
represen...
39:14
represen...
33:8 45:16
59:12

71:16
83:18
126:7,14
143:5
271:6
represen...
20:17
225:1
reproduce
76:25
Republic
264:17
reputation
274:14
request
18:16
147:19
172:4
188:5
284:24
requested
285:3,14
285:17
requesting
285:9,23
requests
19:8 187:2
187:10,14
188:4
253:7,8
required
123:18
requires
69:15
124:12
research
99:1,4,5
100:9,18
111:22
155:10
219:14
265:16,21
268:11
292:7,21
292:23
293:9,14
293:25
294:1,8
295:7,18

297:6
298:5,12
researchers
97:25
104:15
172:2,21
220:4
271:8
293:9,11
297:18
298:13
reservist
191:2
resonance
99:5
resources
28:12
respect
103:22,23
159:8
198:9
203:24
205:12
207:19
217:7
246:11
251:12
258:10
259:19
269:25
respond 22:2
23:1 24:22
37:24
responded
168:4
266:12,25
267:1
responding
181:16
256:23
267:6
responds
192:25
196:7
response
5:19 6:2,9
23:4,7
29:1 61:16
102:8

136:25
178:6
180:24
181:12
256:13
258:5
265:13
266:23
267:17,24
responsi...
142:11
responsi...
142:7
responsible
41:6
120:17
restricted
224:10
restrict...
225:5
restrictive
246:4,10
results
156:14
211:15,19
211:24
234:5,15
return
303:19
retweets
245:5,7
revealing
69:2
255:14
review 39:18
152:3
300:20
reviewed
128:8
143:22
144:6
154:24
276:12,14
277:6,10
277:11
revisit
127:21
rich 263:10
right 22:11

24:7 43:14
43:16,21
57:14 66:7
72:2 73:22
90:14
94:13
95:18
106:25
108:4
109:3
115:2,5
116:17,20
127:11
132:4,10
133:10
136:15
141:20,22
145:21
149:21,21
162:20
163:19
164:17
167:18
169:8
178:25
181:13
185:24
189:24,25
190:3
191:13,24
192:17
194:22
196:14
198:24
199:11
203:3,8
205:1
206:2
211:20
214:22
216:2
219:20
223:1,11
223:13,16
225:19
227:25
228:5,25
230:3,18
230:18,18

DANIEL KIMMAGE  11/10/2022

231:1
236:4,6
237:3
240:12,15
240:21
241:1,13
245:23
252:18,21
257:6,16
257:20,23
257:24
258:24,25
261:9
262:11
263:22
264:20
265:9
270:21,24
271:23
274:14,22
275:1
276:20
277:3
287:3
288:1,11
294:12
296:13,14
296:16,23
**rights**
225:25
**Rob** 5:5
191:16
198:19,20
198:22
**ROBBINS** 13:5
**Robert** 3:18
93:8
191:14
**robust** 266:7
**Rockwell**
162:7,11
163:8
174:15
**role** 25:11
40:25 41:4
41:15,21
42:17
64:20 91:9
91:10

100:16,17
100:19,24
102:21,21
121:12
122:9,11
136:1
137:16
176:12,13
264:24
265:2,4,7
265:19
266:16,17
269:25
273:3,5
277:25
290:16,19
292:10
**roles** 133:2
135:1,3
141:14
175:15,19
175:21
**Roman** 209:8
210:12
213:13
218:12
219:2
**room** 85:11
**ROSENBERGER**
7:1
**rounds**
147:10
**routine**
63:17,25
**routing**
194:6
**ROWE** 5:11
**RPR** 13:23
302:18
**rubber**
206:14
**rule** 22:22
31:7
**rules** 289:15
290:3,8,11
291:1
**run** 190:25
193:6,15
193:19

200:20
232:12
**running**
172:24
173:1,14
**runs** 173:13
**Ruppe** 215:5
252:5
**Russia** 17:20
17:21 27:4
28:9 30:13
32:16
34:24
35:21
60:14,14
60:17 62:3
62:6 65:1
74:18
83:20
89:25 96:7
96:15 97:1
97:4,4,5,5
98:11
100:13
103:16,22
104:5,5,12
104:18
113:6
132:16
137:3
144:24
148:13
165:25
171:1
176:5
184:18
202:20,22
202:22
240:1
243:20,23
262:18
264:5,14
282:2
**Russia's**
18:5
106:15
**Russia-o...**
100:2
**Russia-s...**

89:12
**Russian**
17:15 35:4
62:18,22
89:19
96:22 97:2
97:20,22
97:22 98:1
98:10,15
99:4,10,18
100:4,6,22
101:1,13
101:17,21
102:1,19
103:17
105:14
107:20
108:1
109:12,15
109:23,24
111:10,11
112:10,20
148:20,23
149:7
185:20
201:16,18
201:21
217:13
238:20,21
243:13
248:23
254:15
255:6
258:9,20
259:5,18
259:22
264:12
265:5
266:1,3
267:25
280:2,22
282:3
283:4
**Russian-...**
97:12
**Russians**
109:9
111:16
255:20

**S**

**S** 1:6 15:1
16:1 17:1
17:7 18:1
19:1 20:1
260:18
**SA-5** 16:16
**safeguar...**
215:12,20
216:1
**safety** 39:7
39:17,25
133:8,18
135:4,6,10
141:19,21
142:7,14
142:25
162:14,19
162:24
163:3
166:8,14
166:19
168:11,13
168:23
174:16
**SALCIDO** 6:10
**Sam** 91:6,7
154:4
167:24
**SAMANTHA**
3:23
**Samaruddin**
12:4 91:5
160:2
179:1
**San** 7:23
81:8
**Sauer** 15:3
17:3,5
21:4,10
22:1,4
26:14,19
28:23 29:3
29:17,21
33:13
35:11 37:2
37:23
42:21,25
43:2,5,7

**DANIEL KIMMAGE  11/10/2022**

| | | | | |
|---|---|---|---|---|
| 43:25  44:1 | 174:12,19 | 279:5 | 193:14,20 | 145:12,17 |
| 44:20  46:7 | 176:21 | 284:14,16 | 193:22 | 160:9 |
| 47:21  48:1 | 177:5,10 | 284:22 | 194:2 | **SCHMITT** 1:6 |
| 48:12,17 | 178:11 | 288:4,14 | 196:24 | **SCHWARTZ** |
| 48:23 | 180:17 | 288:20,23 | 198:22 | 10:12 |
| 52:20  56:9 | 181:21 | 289:21 | 208:10,10 | **Science** |
| 56:13,21 | 182:4 | 293:18,22 | 210:3,18 | 220:6 |
| 56:24 | 186:9 | 297:14 | 212:9,12 | **scientific** |
| 62:11 | 188:7,12 | 298:9 | 212:18 | 35:3 |
| 63:23 | 190:6 | 299:14,17 | 218:15 | **scope** 244:22 |
| 70:21 | 193:9 | 299:25 | 220:13,16 | 264:1 |
| 73:12  75:2 | 194:1 | 300:8,14 | 221:13,24 | **scraping** |
| 75:13  76:4 | 196:17 | 300:22 | 222:1,19 | 241:11 |
| 77:11,21 | 198:2,14 | 301:2 | 222:23,25 | **Scully** 10:9 |
| 79:9  85:12 | 205:25 | **savvy** 170:11 | 223:1,6,7 | 191:18,19 |
| 85:15,19 | 206:5,9,14 | **saw** 264:16 | 223:9,18 | 192:3,8,13 |
| 86:2,5,12 | 206:24 | **saying** 33:23 | 223:19,24 | 195:25 |
| 88:17 | 207:2 | 39:16  51:2 | 224:12 | 196:13,19 |
| 92:24  93:6 | 209:21 | 52:22,24 | 226:15 | **search** 280:9 |
| 93:20,22 | 210:8 | 57:13 | 229:11 | **searches** |
| 94:5  95:8 | 212:20,22 | 75:25 | 230:20 | 245:8 |
| 95:10  96:4 | 212:24 | 114:19 | 232:10,22 | **second** 18:12 |
| 106:6,11 | 213:4,11 | 117:7 | 234:1,3,7 | 44:3,4 |
| 113:17,22 | 217:2,22 | 124:23 | 236:2 | 48:7  49:7 |
| 114:13,17 | 219:13 | 180:13 | 237:11,15 | 57:12 |
| 115:11 | 220:12 | 188:1 | 240:11 | 73:22 |
| 122:7 | 221:23 | 228:3 | 242:14 | 85:24 |
| 124:3,8 | 222:18 | 233:6,9 | 245:2,15 | 93:12 |
| 125:18 | 223:5 | 269:20 | 253:7 | 94:21 |
| 127:9,18 | 224:23 | 270:21 | 278:6,10 | 95:14 |
| 127:21 | 225:11 | 283:2 | 278:22 | 128:7,8 |
| 128:2,4 | 226:10 | 293:13 | 279:1 | 161:18 |
| 129:15 | 227:21 | **says** 50:17 | 281:13 | 162:5 |
| 138:9 | 229:10,21 | 57:16,17 | 289:13 | 169:12,12 |
| 140:22 | 231:5 | 57:22  74:3 | 296:16 | 176:11 |
| 141:2 | 233:17 | 74:8  79:3 | **scenario** | 178:25 |
| 150:7,18 | 238:3 | 95:21 | 95:17 | 185:21 |
| 150:23 | 243:11 | 105:1 | **scenarios** | 189:5 |
| 151:8 | 249:6 | 120:4 | 62:21 | 193:11 |
| 152:2,11 | 250:21 | 128:23 | **Schaul** | 208:9 |
| 152:12,24 | 251:20 | 156:12,17 | 191:14 | 221:13 |
| 153:4 | 252:14 | 163:9,16 | 198:19,20 | 227:8 |
| 155:17 | 253:1,5,19 | 163:20 | **schedule** | 235:21,25 |
| 156:1 | 260:18,22 | 168:25 | 22:3  160:7 | 241:10 |
| 157:17 | 269:8 | 181:7,12 | 160:21 | 263:13 |
| 159:15,21 | 270:7 | 181:14 | 161:2,3 | 270:14,14 |
| 164:9,12 | 275:11,14 | 186:10,11 | 164:14 | 289:8,10 |
| 164:23 | 275:25 | 189:22 | **scheduling** | **Secretary** |
| 167:11,21 | 276:5 | 192:13,25 | 92:22 | 1:23  2:5 |

**DANIEL KIMMAGE  11/10/2022**

| | | | | |
|---|---|---|---|---|
| 3:15,20 | 221:20 | 213:15 | 276:6 | 156:12 |
| 4:2 9:9 | 232:13,17 | 219:18 | **selectively** | 169:12 |
| 13:1 19:15 | 242:24 | 220:7,15 | 267:8 | 200:7 |
| 54:3 289:2 | 296:6 | 221:12,25 | **senate** | 220:3 |
| 289:2,13 | **security...** | 222:23 | 107:18 | 223:23 |
| 296:2,9 | 216:15 | 223:22 | **senate-c...** | 227:8,9,11 |
| 298:14 | **see** 32:15 | 226:2,15 | 25:17 | 228:7,8 |
| 299:5 | 33:8 43:12 | 227:14,15 | **send** 172:4 | 229:12 |
| **Secretary's** | 45:10 46:9 | 228:21 | 229:4,16 | 234:23 |
| 289:17 | 49:5,7 | 229:11,14 | **sender** 180:2 | 235:25 |
| **section** 7:17 | 50:16 | 232:5 | **sending** | 241:23 |
| 122:12 | 56:14 | 233:25 | 178:17 | 245:19 |
| 202:8 | 57:10,12 | 234:11,23 | 198:9 | 278:10,22 |
| 227:13,25 | 79:11 | 235:11,21 | **senior** 3:9 | **sentences** |
| 232:5 | 93:14,23 | 236:1,7 | 3:25 5:3 | 298:23 |
| **sector** 155:9 | 95:11,14 | 237:3 | 9:18 10:7 | **separate** |
| 155:12 | 104:11,17 | 240:8 | 12:6,7 | 45:7,7 |
| 263:2,3 | 105:4 | 241:9,14 | 25:11 | 50:6 |
| 271:7 | 106:22 | 242:2 | 29:12 | 194:23 |
| 278:3 | 112:11 | 244:15,21 | 31:16 | **September** |
| 295:7 | 120:6 | 245:19 | 37:10 41:3 | 57:4 93:8 |
| **security** | 123:25 | 252:16 | 41:16 | **series** |
| 3:17 4:1,5 | 129:6,8 | 282:8 | 45:13 | 143:11 |
| 4:10,13,25 | 144:1,3 | 288:24 | 46:22 58:9 | 173:22 |
| 9:21 10:8 | 159:22 | 292:4 | 59:21,23 | **served** 228:4 |
| 27:6 36:10 | 160:3 | 295:19,20 | 59:23 60:3 | **service** 7:8 |
| 39:4,24 | 162:8,10 | 299:18 | 64:12,17 | 39:21 |
| 44:7 45:15 | 163:11 | **seeing** 36:4 | 97:22 | 112:19 |
| 47:2 57:20 | 166:3 | 38:8 89:5 | 163:9 | 181:13,16 |
| 58:6,14,19 | 168:2 | 104:15 | **senior-l...** | 181:25 |
| 58:25 59:4 | 171:22 | 136:10 | 60:6 69:25 | 247:16,18 |
| 59:7 65:16 | 173:23 | 157:21 | 69:25 70:2 | **Services** 2:7 |
| 66:9,10 | 174:21 | 198:4 | 70:5,8,10 | 2:9 20:17 |
| 73:25 77:4 | 175:2,8 | 201:3 | 80:6 | **serving** 41:2 |
| 77:25 | 176:1 | 207:11 | **sense** 200:14 | **set** 68:12 |
| 112:19 | 179:1,23 | 219:24 | 252:19 | 87:3,6,10 |
| 178:6 | 181:23 | **seek** 38:2,4 | **sensitive** | 87:19,22 |
| 189:10,11 | 182:7 | 269:13 | 107:15 | 87:24 88:6 |
| 189:13 | 186:24 | **seeking** | **sent** 168:22 | 88:8,13,20 |
| 192:21 | 187:4,6 | 36:10 | 193:21 | 89:2 92:2 |
| 194:18 | 188:21,22 | 234:25 | **sentence** | 120:5,9 |
| 195:9 | 190:9,11 | **seeks** 271:2 | 44:3 45:10 | 135:20,22 |
| 197:3 | 190:13 | **seen** 43:10 | 47:1 78:23 | 146:5 |
| 215:12,17 | 192:14 | 104:5 | 79:2,5 | 161:21,25 |
| 215:21 | 195:9,23 | 128:11,12 | 95:15,16 | 180:23 |
| 216:2,17 | 196:5,25 | 128:16 | 95:20 | 283:13 |
| 216:23 | 199:3 | 177:16 | 104:25,25 | 302:13 |
| 217:8 | 207:7,15 | 207:3,4 | 120:3 | **sets** 88:11 |
| 218:2 | 211:13,15 | 253:10 | 123:24 | **setting** |

**DANIEL KIMMAGE  11/10/2022**

| | | | | |
|---|---|---|---|---|
| 47:12  87:9 | 303:14,17 | 304:25 | 106:19 | 63:7  74:16 |
| 87:16 | 303:19 | **signed** | **SIO** 292:16 | 74:21 |
| 145:8 | **shop** 290:7 | 301:16 | 292:24 | 75:15,20 |
| 161:5 | 290:14 | **significant** | 297:21,25 | 76:9,14 |
| 166:24 | 291:16 | 63:14 | 298:3,6 | 78:24 |
| 224:14 | **SHOPKORN** 3:7 | 131:4,10 | **sit** 35:19 | 79:14,18 |
| **seven** 206:18 | **short** 85:15 | 245:17 | **situation** | 80:4,17 |
| **SHAH** 6:22 | 85:16 | **Silicon** | 39:4,16 | 81:24 |
| 16:14 | **Shorthand** | 45:16 | 108:1 | 82:18  83:2 |
| **Shahma@s...** | 14:3,5 | 46:10,23 | **situations** | 83:4,6,9 |
| 16:20 | 302:1 | 153:14,18 | 200:19 | 83:17,22 |
| **shape** 289:15 | **show** 263:2 | 154:14,17 | **six** 210:12 | 84:9,15 |
| 290:2,8,11 | 263:11 | 155:1,5,22 | 245:12 | 87:2,11 |
| 291:1 | **showed** 149:6 | 161:14 | **slash** 82:16 | 89:9  90:23 |
| **share** 32:21 | **shows** 263:1 | 163:10,13 | 142:21 | 91:11  92:3 |
| 32:23 | **shutting** | 271:11,18 | **SLAVITT** 5:1 | 92:17  99:9 |
| 83:11 | 51:17 | 271:25 | **Slow** 181:12 | 99:14,16 |
| 89:10 | **side** 31:22 | 272:4,22 | 182:6 | 101:7,22 |
| 136:17 | 31:23 | 272:24 | **small** 41:20 | 103:2 |
| 159:5 | 34:10  36:7 | 273:3 | 77:14 | 105:21 |
| 198:23 | 64:17,21 | 289:12 | **smaller** | 113:10,15 |
| 200:15 | 64:22  65:4 | **SILVERS** 3:18 | 41:19,23 | 139:15 |
| 273:19 | 65:5,7 | **similar** | **SNELL** 10:3 | 147:1 |
| 279:11 | 73:19 | 105:13 | **SNOW** 15:14 | 155:13,19 |
| 282:9 | 122:2 | 136:13 | **so-called** | 155:23 |
| **shared** 73:3 | 131:5,12 | 139:20 | 4:21 | 156:19 |
| 164:4,15 | 132:20 | 140:16 | **social** 8:4 | 158:2 |
| 164:19,25 | 134:4 | 141:3,5,16 | 11:21  29:9 | 159:2,7 |
| 185:6 | 135:16,17 | 141:18,18 | 29:11,12 | 160:1,6,11 |
| 234:8 | 135:25 | 142:6,13 | 29:15  30:3 | 160:24 |
| **sharing** 68:4 | 137:8,9 | 143:12,17 | 30:21,23 | 161:5,21 |
| 68:10,11 | 143:10,12 | 146:25 | 31:10,13 | 165:4,13 |
| 73:1  89:8 | 147:22 | 268:25 | 32:8  35:7 | 167:8 |
| 136:12 | 148:2 | **simply** 39:15 | 35:22  36:5 | 170:17 |
| 156:7,9 | 149:13,20 | 39:18 | 36:21  37:5 | 171:25 |
| 157:23 | 157:20 | 132:17 | 37:18  38:3 | 183:7,11 |
| 165:7 | 167:18 | 139:6 | 38:10,15 | 183:15 |
| 169:14,22 | 173:23 | 145:4 | 39:6,13 | 187:11,22 |
| 184:22,24 | 174:5 | 161:2 | 40:5,12 | 188:6 |
| 185:3 | 178:15 | 216:8 | 42:3,10 | 194:7 |
| 232:11 | 185:12 | 264:1 | 46:3,17 | 195:15 |
| 270:16 | **sideways** | 294:7 | 47:8,17 | 196:21 |
| 271:12 | 106:23 | **Sincerely** | 51:24  53:7 | 200:21 |
| 273:21 | **sign** 300:20 | 303:22 | 53:9,14 | 207:20 |
| 275:22 | 303:17 | **single** 83:11 | 54:6,18 | 210:16,21 |
| 283:15 | **signature** | 89:22 | 55:5,12,18 | 211:3,7 |
| **sheet** 301:16 | 301:7,19 | 144:6 | 55:22  56:1 | 213:16,20 |
| 304:1 | 303:14,17 | 296:18 | 56:1  61:18 | 228:10 |
| **sheets** | 303:20 | **singled** | 61:22  62:7 | 232:23 |

**DANIEL KIMMAGE  11/10/2022**

233:15,21
234:18
236:23
246:5,11
247:12
248:8
249:13
250:15,23
253:16
254:2
258:18
259:4,17
260:16
274:3
275:18
278:25
279:7,9
282:2,13
283:22,24
284:18
285:12,18
285:19,25
286:11
287:15,25
291:19
society
209:14
228:10
268:11,13
soft 234:10
234:19,25
software
171:16
261:20
solutions
278:1
Solving
280:15
somebody
119:9
189:15
soon 212:21
Sophisti...
17:22
sorry 38:24
55:23 57:5
65:25 90:8
117:17
118:24

125:19
143:11
156:24
159:25
160:10
189:2
227:5,8,13
232:1
250:12
252:19
257:1
286:10
287:2
288:19
292:2
sort 28:11
32:23 34:7
35:5 59:17
63:17
78:10
91:23
100:17
125:14
133:3
137:11
139:5
146:7
147:10
169:25
170:4,8
182:20
203:16
234:17
253:15
265:4
sorts 61:7,9
73:8 268:6
sought
264:14
sound 133:10
138:25
sounds
138:25
178:13
212:13
source
220:19,22
space 165:16
speak 52:3
56:3 63:4

73:16
76:14
149:11
163:14
177:24
185:10
211:10
255:16
259:11
260:1,10
speaker
137:7
speakers
74:17
78:12
137:10,12
139:1
148:2,7
149:11
speaking
49:18
137:16
221:2
special 7:3
7:22 18:5
106:14
199:4
200:6
Specialist
16:24
specific
31:2,5,9
33:17,19
33:22 34:3
34:17 38:7
38:20
39:15,24
40:6,12
45:5 52:9
54:14,17
61:3,14,22
61:23
62:13 63:5
64:2,4
78:18 84:3
88:25
89:15,20
90:3 91:14
92:20,23

100:14
101:15,18
102:1,23
105:9,23
109:5,7,22
111:12
116:25
118:15
125:1
126:2,8,23
127:7
135:20
138:3
139:9
147:3,5,21
147:22,25
148:19
171:15
176:22
183:21
184:8
185:3
205:11,14
210:24
213:24
214:9
217:24
249:13
250:2,8
253:21
254:12
255:2,3
256:16
258:2,7,12
258:13
266:2
274:7
281:24
283:6
284:24
285:4,6,10
285:13,17
286:16
288:9
289:7
293:2,2
specific...
49:4,19
54:10

72:25
80:13
102:15
118:8
124:16
130:16
145:4
147:18
200:3
206:21
215:22
222:25
247:13
248:13
249:12,14
282:21
289:23
290:5,7
291:10
296:15
298:2
299:4
specificity
35:6
specifics
84:25 85:4
105:17
109:11,20
136:20
137:19
138:1,21
139:3,7,13
139:25
141:7
144:19
171:13
184:11
185:11
202:6
204:2
210:10
212:6
214:13,19
243:15,18
247:23
248:20
264:25
265:15
266:19

**DANIEL KIMMAGE  11/10/2022**

287:8,21
288:10
291:15
297:24
**specify**
182:8
200:9
**speculate**
76:19
78:13,15
159:1
281:10
**speculation**
167:10
220:14
**speculative**
44:19
62:10
72:19
75:18
77:10,20
78:5 92:7
92:19
93:10
106:4
118:21
119:2
122:6,15
125:7
133:13
134:15
145:11
149:1,15
155:16,25
158:25
164:22
165:6
166:21
168:16
169:4,10
174:11,18
177:1
178:10
181:20
182:3
183:14
186:23
193:8,25
194:9

210:7
213:23
217:1
226:9,22
227:20
228:20
229:20
234:22
235:4,18
236:18
238:2
241:18
245:1
253:18
270:10
279:4
280:14
281:9
286:15
287:19
289:20
291:4,22
292:12
297:4,13
299:3
**speech** 75:7
76:12
**speed** 47:18
52:14
**speeding**
53:5,10,15
54:7,10,18
**spell** 202:23
**spend** 127:15
127:25
**spew** 51:18
**sphere** 75:16
75:20
**spilling**
75:24
261:11
**spoke** 84:20
**Spokespe...**
17:11
**sporadic**
121:3
**spread** 55:9
78:25
79:15,19

95:22,25
96:1 103:9
105:2
165:12
191:7
201:8
273:15
274:2
275:9,16
275:18,23
278:24
279:8,18
280:12
281:3,5,14
281:17,24
282:10,18
283:16
292:8
296:4
**spreading**
54:22 55:6
274:22,25
**spring**
130:14
138:18
140:7
148:21
**Squad** 7:23
**staff** 63:18
71:8,13,14
72:16 88:4
116:25
117:23
119:23
131:2
**staffers**
118:22,23
**stake** 39:18
**stakeholder**
227:1
228:25
230:2,14
230:17,19
**stakehol...**
227:13,17
228:1,4,9
228:14
229:2
230:20,21

230:24
278:3
**Stamped**
18:17,20
18:22,24
**stand** 147:6
**standalone**
135:19
**standard**
97:19
**standards**
36:17
209:15,19
289:16
290:3,12
291:1
**standing**
60:22,25
61:1 211:9
**stands**
177:21
178:7
200:16
**Stanford**
219:16
221:18
223:7,9,12
223:15
289:12
292:6,9,13
292:14,25
293:3
294:5
295:20
296:4,10
296:22
297:2,16
297:21
**start** 21:12
59:22
82:21 97:5
129:16
130:12
144:16
150:18
280:15
**started**
21:12
150:17

**starters**
249:7
**starting**
84:4 206:6
294:21
**starts** 228:3
277:21
**state** 1:5,7
11:23 12:1
12:9,15,21
16:13
17:14 18:4
18:13
19:15 20:5
21:5 22:14
27:3,18
33:10
39:11
44:12
49:22 53:6
53:12 54:5
54:9 55:16
56:4
128:25
163:18
165:1
175:8,16
177:12
178:15
179:9
180:1
185:25
186:18
188:21
189:14,19
190:19
192:15
197:1
220:22
221:7
222:5,10
225:9
241:25
259:24,25
278:21
289:3
290:23,24
296:3
298:22

DANIEL KIMMAGE  11/10/2022

303:8
304:3
305:1
state-fu...
97:23
state-owned
281:25
282:1,3
stated 165:7
273:18
statement
17:11
115:18
120:8
144:12
152:16
209:11
250:3
272:3
statements
97:21
138:22
140:25
246:2,7
249:19,21
286:24
states 1:1
1:20  2:2
3:4  18:13
20:8  27:6
34:25
36:11
90:18
96:11,18
102:10
153:17
165:13,16
165:21
182:25
183:3
223:25
224:6,11
237:6
stations
268:8
status 245:5
245:6
statute 26:3
statutory

26:25  45:6
69:15
stay 93:16
110:18
120:20
251:1
261:9
stays 298:11
stenogra...
20:19
stenogra...
302:7
step 98:7
281:17
Stephen
49:21
steps 54:21
54:24  55:3
84:20  85:1
85:2,5,6
95:24  98:3
143:18
144:2
Stevie 119:8
119:20,24
Stewart 12:4
91:5,6,7
154:6,7
160:2,6
161:21
163:2
168:22
173:22
179:1
271:21
272:7,10
272:14
273:1,7,8
283:12
stick 73:21
stint 24:5
24:13
stop 54:21
273:15
274:2,25
275:9,16
275:17,22
275:23
278:24

279:8,18
280:11,23
281:2,5,14
281:17,24
282:10,18
283:16
stops 75:6
Strategic
5:14,24
6:6,13
41:24
strategist
166:11
strategy
3:21  5:9
9:5  11:14
19:13
174:9
276:19
296:6
straying
107:15
street 15:18
16:6,17
157:24
303:6,21
strengthen
209:15,18
strictly
269:21
strongly
69:5
structural
28:12
structured
63:14
134:19
struggled
267:3
students
221:18
223:8
study 224:9
stuff 24:20
211:6
237:23
293:12
sub-narr...
201:13

SUBHAN 6:3
subject 63:3
65:1  80:10
88:4
117:24
119:4
124:18
131:3
132:9
173:25
238:24
239:16
subjects
129:6
submit
230:25
231:8
submitted
227:12
submitting
227:17
subpoena
128:24
subscribe
305:11
subsequent
107:21
subseque...
44:24
191:25
substance
99:6  305:8
substantive
32:4
125:23,25
126:3
succeed
110:12
succeeded
110:10
successful
266:23
sufficient
206:22
suggested
100:23
265:4,5
266:14
suggesting

264:17
suggestions
276:15,17
suite 16:6
16:16
97:25
summarize
29:18
summary 27:1
53:1,2
208:3
209:7
super 170:11
supervision
302:9
Supervisory
7:22
Supply 6:17
support
28:12
184:21,22
210:3
220:5,25
253:24
278:13
supported
113:4
182:23
183:1
supporting
184:18
221:7,10
supports
27:13
suppose 62:5
74:18
supremacy
268:24
Supreme 15:5
SUR 15:16
sure 22:23
23:22
28:14
43:25
49:14
54:20
56:20  71:5
81:11
87:25

**DANIEL KIMMAGE  11/10/2022**

93:20
105:25
110:16,17
122:22
127:22
141:8
145:22
157:1
170:12
204:12,14
248:15
252:14
255:4
262:8,13
281:22
296:11
298:16
300:15,22
**Surgeon** 2:1
8:15
**surprise**
162:13
166:7
236:15,20
236:20
**swear** 20:21
**sworn** 21:2
**system** 107:9
107:10
227:3
**Systems** 14:7
302:20

**T**
**T** 16:1 17:1
17:1,7
18:1,1
19:1,1
276:1
**table** 206:7
289:14
**tabs** 245:21
**tactics**
104:7
**take** 25:15
34:20,23
51:7 56:25
63:17 79:4
94:12

95:24 98:3
123:8
144:2
150:5,7
158:22
159:3
180:3
185:22
186:1,2,14
186:15,17
186:20
187:23
204:11
206:7
212:21,23
239:13
248:2,10
250:4
252:12
273:20
274:8
281:1,2,5
283:19,20
283:22,24
299:14
300:15
**takedown**
187:2,10
188:4
**taken** 20:4
40:4
143:18
192:7
234:18
302:4,7
303:12
304:4
**takes** 195:25
**talk** 54:24
123:10
137:14
149:21
155:23
171:8
186:12
245:21
261:1,7,12
263:16,16
263:20

274:17
293:12
**talked** 73:23
80:11
116:16
126:21
137:17,22
139:4
144:12
149:25
150:1
161:15
166:17
201:10
244:17
258:23
264:5
271:18
272:8
284:5
286:19
**talking** 28:2
28:23
49:16 54:6
71:9 72:1
140:17
164:6
170:2
179:16
199:13
209:12,22
215:24
238:7
261:17
264:7
266:9
268:22
273:12
278:14
283:2
296:25
297:5
298:21
**talks** 44:6
47:1 49:8
164:3
186:19
190:23
200:14

210:13
211:18
226:24
232:20
244:16,18
277:24
283:3
296:9
297:9
**tank** 294:15
**Tarasoff**
174:25
**target** 52:15
57:20 58:3
74:5
**targeted**
190:18
**targeting**
112:20
189:7
192:21
**task** 7:19
44:9
116:11
122:17
191:25
**tasked**
120:24
**teaching**
173:7
**team** 5:20
6:2,9 8:4
8:19 12:19
18:14 28:9
28:9,9,10
28:12,15
28:18,19
29:5,10
30:3 32:2
32:3 45:15
47:2 60:7
60:9,14
64:24,25
65:1,19
71:19,21
72:10,17
77:7,15,17
78:8,14
83:19,20

86:15,20
86:22,23
86:25,25
88:2,24
91:8,9
116:16
117:12,13
119:3,6,13
119:17,19
120:1,16
121:17,20
131:1,24
132:2,3
133:8,18
139:4
141:21
142:8,14
153:8,11
162:19
163:3
166:15
168:13,23
173:12,15
175:24
176:5
178:7
185:15,20
188:25
191:23
192:2
202:20,22
243:20,23
269:11,18
299:6
**teams** 27:21
28:6,7
29:8 80:8
83:21 88:3
117:25
119:11
162:24
163:6
166:19
185:19
193:1,23
**tease** 256:10
**tech** 155:9
155:12
157:6

**DANIEL KIMMAGE  11/10/2022**

| | | | | |
|---|---|---|---|---|
| 170:11 | 50:22 | 21:23 | 265:24 | 265:6 |
| 172:16 | 83:18 | **ten** 131:13 | 269:7 | 267:8 |
| 263:1,3 | 86:15 | 149:17 | 301:13,14 | 274:13 |
| 271:7 | 88:23 91:8 | 240:16 | **TET** 28:21 | 275:1,3,20 |
| 273:13,14 | 92:4 132:1 | 241:1 | 29:5,14 | 280:3 |
| 273:21 | 153:8,11 | **tenure** | 31:10 | 281:11 |
| 274:2,5 | 169:15 | 119:19 | 37:13 | 282:17,18 |
| 282:16,22 | 173:15 | **TERICKA** 8:25 | 60:10 | 298:15 |
| 282:25 | 261:7 | **term** 247:4 | 86:17 92:1 | **think** 22:16 |
| **tech-rel...** | 262:16 | **terms** 39:20 | 118:24 | 28:23 |
| 155:21 | 271:14 | 85:13 | 132:3,4,6 | 30:24 31:4 |
| **techie** | 272:6 | 127:16 | 161:11 | 33:2 47:23 |
| 262:12 | 277:22,24 | 136:10 | 173:16 | 56:8 57:24 |
| **Technical** | 278:12,19 | 175:25 | **thank** 192:25 | 71:5,9 |
| 12:6 | 278:23 | 247:16,18 | 196:7 | 74:9 80:11 |
| **technique** | 279:7,16 | **terrorist** | 218:15 | 80:22 |
| 111:15,17 | 280:10,25 | 19:10 27:7 | 293:20 | 85:13 |
| 113:6,9,13 | 281:4,11 | 32:17 | **thanking** | 88:21 |
| **techniques** | 283:4,7,10 | 137:3 | 219:3 | 89:25 |
| 30:11 | 283:18 | 163:22 | **thanks** 168:1 | 106:18 |
| 32:13 | 289:16 | **testified** | 301:2 | 112:8 |
| 103:5,24 | 290:4,12 | 21:2 140:9 | **theDonal...** | 113:19 |
| 104:4,13 | 291:2,10 | 154:8 | 236:4 | 118:23 |
| 104:21 | 291:18 | 162:17 | **theories** | 119:14 |
| 109:4 | 298:16,18 | 199:9 | 264:6 | 126:7 |
| 112:1 | 298:24,25 | **testimony** | 266:14 | 127:10,16 |
| 149:5,5,8 | 299:6 | 70:20 | **theory** 191:6 | 138:2 |
| 157:3 | **technolo...** | 101:9 | **thereon** | 140:9 |
| 165:8,23 | 263:4 | 111:20 | 305:10 | 147:10,13 |
| 182:13 | **tee** 283:21 | 117:22 | **thing** 22:24 | 149:18 |
| 184:23 | 283:23 | 118:6,12 | 23:3 34:7 | 152:24 |
| 185:22 | **teed** 284:7 | 123:13 | 207:8 | 159:17 |
| 186:13,14 | 285:14 | 125:17 | 266:21 | 171:7 |
| 186:20 | **teeing** | 127:5 | 274:13 | 172:4,16 |
| 217:16,18 | 284:10,18 | 131:8 | **things** 24:19 | 176:18 |
| 251:1 | 285:2,5 | 140:19 | 47:9 54:25 | 177:18 |
| 273:23 | **tell** 38:22 | 144:7 | 85:11 | 178:8 |
| 279:12 | 38:25 42:2 | 148:6,18 | 95:18 98:8 | 180:2 |
| **technolo...** | 48:17 | 152:21,23 | 104:14 | 188:8 |
| 30:15 | 79:13 85:2 | 157:16 | 110:23 | 191:25 |
| 261:13,16 | 97:3 103:8 | 172:19 | 112:8 | 199:9 |
| 262:1,3,10 | 146:2 | 198:1 | 137:10 | 202:21 |
| 278:12 | 215:10 | 201:2,23 | 138:25 | 203:4,16 |
| **technology** | 238:10 | 204:21 | 155:21 | 204:6,11 |
| 12:18 | 257:14 | 208:19 | 182:7 | 204:13 |
| 18:14 | 288:6 | 216:7 | 184:25 | 206:1 |
| 28:18 29:4 | **telling** | 222:22 | 186:17 | 207:15 |
| 29:10 30:3 | 53:13 | 238:16 | 238:13,25 | 208:2,5,8 |
| 45:17 | **temporarily** | 250:19 | 249:20 | 208:10,13 |

**DANIEL KIMMAGE  11/10/2022**

| | | | | |
|---|---|---|---|---|
| 208:20 | 90:18 | **TikTok** 234:9 | 116:22 | 172:2,20 |
| 210:25 | 117:25 | **time** 20:12 | 118:4 | 241:12 |
| 216:4 | 147:21,25 | 23:14,19 | 123:21 | 262:17,19 |
| 218:6 | 159:9 | 25:10 | 139:16 | 262:23 |
| 238:12 | 168:9,12 | 39:12 | 140:4,7 | 263:5 |
| 249:17 | 194:22 | 45:25 47:7 | 141:4 | 288:8,11 |
| 255:7 | 286:18 | 47:11 | 142:22 | **toolbox** |
| 272:17,23 | **threat-a...** | 48:14,19 | 147:1 | 97:20 98:2 |
| 273:5 | 60:15,16 | 48:21 | 162:23 | 275:7,9 |
| 277:10 | 60:17 | 57:24 | 176:23 | **tools** 30:11 |
| 280:6 | 61:13,19 | 62:16,16 | **times** 22:9 | 30:18 |
| 288:15,21 | **threat-f...** | 74:11 | 236:16 | 32:13,18 |
| 290:19 | 148:9 | 84:14 86:6 | **timing** 85:13 | 97:24,25 |
| 292:14,22 | **threats** 84:1 | 86:9 93:20 | **TIMOTHY** 6:15 | 98:4 107:3 |
| 294:14,22 | 84:3,12 | 94:19 95:9 | **title** 21:9 | 110:23,25 |
| **third** 50:12 | 148:3,8 | 116:11 | 22:6,7 | 157:2,6,12 |
| 55:24,25 | **three** 78:21 | 119:7,21 | 59:24 | 158:3,21 |
| 94:22 | 94:24 | 124:22 | 65:12 | 165:8,23 |
| 95:20 | 145:14 | 130:13 | 86:20,21 | 169:23,25 |
| 153:13 | 149:23,25 | 131:22 | 121:12 | 170:2,5,6 |
| 179:20 | 175:13 | 143:19 | 122:9,10 | 170:9 |
| 192:4 | 185:18 | 150:15,25 | 166:12 | 171:14,22 |
| 196:20 | 187:2 | 151:3 | 168:7 | 184:23 |
| 208:10 | 230:5,19 | 164:13 | 185:13 | 186:13 |
| 220:3 | 231:16 | 175:20,22 | **titled** | 217:15,18 |
| 224:15 | 275:1,2 | 179:3 | 276:18 | 251:1 |
| 225:3 | 291:25 | 195:6 | **today** 21:22 | 270:24 |
| 227:11 | **three-year** | 199:6,11 | 24:19 | 275:6,8 |
| 245:15 | 67:8 | 199:18 | 45:13 48:2 | 278:4 |
| 274:24 | **thrust** 30:8 | 200:25 | 48:25 50:6 | 279:12,25 |
| **third-party** | **Thursday** | 206:23 | 56:15,16 | 286:25 |
| 128:24 | 13:17 | 208:14 | 56:18 57:2 | 287:1,6,9 |
| **thought** | **ticket** 245:5 | 213:6,9 | 144:8 | 287:11,14 |
| 154:9 | 245:6,7 | 222:15 | 152:21 | 287:22,23 |
| 173:7 | **ticketed** | 223:2 | 154:20 | 288:9 |
| 180:15 | 227:2 | 252:22,24 | 207:25 | 299:8 |
| 216:12 | **tickets** | 255:4 | 208:19 | **top** 43:12 |
| 288:5 | 212:9 | 299:18,20 | 282:2 | 50:20 |
| **thousands** | 227:12,18 | 299:23 | **Today's** | 162:6 |
| 51:17 | 229:4,16 | 300:2,16 | 20:11 | 166:1 |
| 244:18 | 231:1,8 | 301:5 | **Todd.sco...** | 167:22,23 |
| **threat** 28:8 | 234:1,4,13 | **timeframe** | 15:10 | 178:5,17 |
| 54:16 | 237:3,7,12 | 53:4 67:3 | **told** 57:24 | 181:4 |
| 61:14,21 | 237:16,23 | 82:6 83:14 | 103:11 | 182:13 |
| 61:22 62:1 | 239:13 | 87:15 | 163:2 | 196:18 |
| 63:7 64:25 | 240:11,16 | 91:20,22 | 224:25 | 210:13 |
| 83:20 88:3 | 241:13,15 | 101:6 | **tool** 170:11 | 230:22 |
| 89:15,22 | 241:20,24 | 109:20,21 | 170:15,16 | 236:2 |
| 89:23 | 244:24 | 115:24 | 170:23 | 240:9 |

**DANIEL KIMMAGE  11/10/2022**

267:15,15
topic 32:15
99:21
135:20
176:22
topics 32:11
136:13
138:4
180:25
185:24
226:25
256:17
total 245:8
totally
257:18
touch 123:18
touting
102:7
266:24
track 75:11
75:19
108:22
110:23
161:3
246:6
250:17,22
280:20
tracked
39:10  96:6
108:18
226:25
tracking
99:7
261:24
270:1
tracks 269:4
traction
75:14
trained
173:6
training
173:2,4
184:23
transcri...
23:5
transcript
17:8  18:2
19:2,9
261:1

300:20
302:5
303:16
transcri...
301:14
transcripts
23:6
transfer
49:9,19
Treasury
12:23  13:2
trending
33:25
trends 139:5
tried 105:3
105:11
trolls 104:8
true 120:8
223:22
224:5
301:13
302:5
305:9,13
trust 133:7
133:18
135:4,6,10
141:21
142:7,14
142:25
162:14,19
162:23
163:3
166:11,14
166:18
168:11,13
168:23
174:16
trusted
227:12,16
230:21
try 34:25
76:24
144:3
287:25
trying 68:12
105:7
127:16
158:7
261:8,9

262:18
279:22
Tuesday
178:2
251:9
turn 50:8,11
57:8  60:19
106:22
161:13
182:10
232:4,20
241:8,21
277:16
289:8
turning
106:23
147:12
167:15
270:13
295:25
tweet 244:6
245:3
tweets
244:18,19
244:23
245:5,6,9
Twitter 51:9
52:13
75:22  76:1
80:20
82:13,23
128:24
129:3,10
129:12,19
129:21,25
132:20
133:2,5,25
134:1,23
135:2,5,9
135:13
136:11,20
138:19
140:16
141:5,18
141:20
142:7,14
144:2,16
145:18
146:2,22

147:4,8,15
148:24
149:12
160:17
162:18
183:8
196:1,6
234:9
240:22
283:11
two 25:16
31:25
40:23  43:2
49:20
50:11
64:23
68:14
69:22,24
71:1,2
102:11
112:8
113:2
129:24
130:2
146:16
149:25
175:13
192:8,13
194:24
238:24
257:18
277:20
291:14
298:23
two-minute
206:7
two-way
157:24
271:12,25
272:5,9
273:19
two-year
67:14,19
67:21
type 22:22
55:1 143:1
182:8
235:6
242:15

262:5
types 275:5
279:23
299:10
typewriting
302:8
typically
60:9

_____
U
_____
U 16:1  18:1
19:1
U.S 3:11  7:7
7:12 10:16
11:2,9,23
12:22 13:3
16:13
17:12,19
18:4
Uh-h8h 176:6
ultimately
40:24
41:12
underneath
112:17
undersec...
49:22 50:5
50:25 52:2
53:16 54:3
65:15,21
66:2,4,5
66:13
understand
23:20
26:20 28:1
29:22
33:14
35:12 37:3
38:1 56:20
158:5,9,11
158:15
170:8,13
171:21
175:22
206:23
247:9,14
262:21
279:22,23
279:24

**DANIEL KIMMAGE  11/10/2022**

280:7,10
281:1
understa...
30:5 34:6
36:9 37:7
44:15
45:19
55:24 77:2
77:17
79:10
124:9
156:22
157:2
163:13
165:8
184:12
204:16
279:15,18
280:4,16
281:6,16
283:18
unfair 58:1
unit 132:13
192:16
296:16
United 1:1
1:19 2:2
3:4 18:13
20:8 27:6
34:25
36:11
96:10,18
102:10
165:12,16
165:20
182:25
183:2
223:25
224:6,10
university
24:6,11,14
173:5
175:18
179:18
219:17
277:14
update 68:4
89:4
updated

277:8
Updates
17:12
upswing
269:15
URL 56:16
URLs 234:8
237:4
241:12,16
241:20
244:18
245:7
USA 48:2,25
50:6 56:15
56:16,18
57:2
use 27:4
34:15
54:25 55:9
55:11
103:12,14
104:5
217:16
229:17
247:6
248:7
253:14
264:14
299:17
useful
287:22
user 170:7
283:19
288:12
users 36:17
254:7
utilize
97:19
_____
V
v 1:16 209:6
303:8
304:3
vaccine
101:13
105:3,7,11
105:20
144:11,14
vaccine/...

138:16
144:20
vaccines
96:21 97:7
97:11,12
99:11
100:5
264:12,13
vaccines...
129:5
vague 26:13
29:16 35:9
60:24 90:8
117:22
138:8
183:9
190:4
209:20
217:9
243:10
246:17
247:1
250:20
251:19
275:10
285:24
286:15
287:18
293:17
298:7
Valley 45:16
46:10,23
153:14,18
154:14,18
155:2,6,22
161:15
163:10,13
271:11,18
272:1,5,22
272:25
273:3
289:12
various
18:16 22:9
76:9 96:24
264:17
VECCHIONE
16:3
version

277:6,11
Versions
152:9
versus 20:6
vice 162:14
166:8
174:15
video 16:24
18:7 21:19
114:3,19
190:16
194:15
201:5
videogra...
20:2,15
85:24 86:6
86:9
150:21,25
151:3
213:6,9
252:21,24
299:20,23
300:17
301:3
videos 52:15
Videotaped
13:16
view 158:22
284:9,17
285:5,11
viewed 285:1
views 284:15
284:22
VINOGRAD
3:23
violate
55:12
232:25
233:11
violates
286:13
violations
55:13
226:16,20
286:3
violative
285:22
violent
17:13 44:9

268:21
269:1,12
269:17,22
270:2
viral 181:8
virtual
81:14
virtually
261:7
virus 35:1
74:20
100:7,12
100:25
102:7,14
102:17,22
201:7
264:10,19
265:3,11
265:16
266:6,15
267:3,6
visible
114:24
VIVEK 1:24
volunteer
221:19
223:13
voting
242:24
VP 174:8
_____
W
W 6:15
288:14
wait 22:25
waived 301:7
WAKANA 5:21
WALDO 8:12
walk 209:2
WALLY 12:24
want 56:19
59:17
93:16
109:19
110:16,17
122:8
132:12
150:4,19
150:19,21

**DANIEL KIMMAGE  11/10/2022**

| | | | | |
|---|---|---|---|---|
| 158:1,2,5 | 195:17 | **Weaponizes** | 6:16,23 | 69:13 |
| 158:9,11 | 233:21 | 17:22 | 9:6 17:10 | 90:11 |
| 158:14 | 244:4 | **weapons** | 43:13 | 245:8 |
| 206:7,19 | 248:7 | 112:23,24 | 45:14 | **wording** |
| 257:4,25 | 249:16 | **web** 241:11 | 46:23,24 | 281:24 |
| 282:17 | 252:9 | 271:2 | 47:2 50:22 | **words** 45:3 |
| 296:11 | 259:2 | **website** | 268:24 | 199:21 |
| **wanted** 21:11 | 274:19,23 | 76:24 | **wide** 100:10 | 205:10 |
| 21:14 | 274:24 | 153:7 | 261:25 | 209:25 |
| 32:21,23 | 287:2 | 154:22 | **wife** 294:22 | 239:22 |
| 89:9 | 292:25 | 155:6 | **Wikileaks** | 282:12 |
| 147:22 | 295:19 | 161:16 | 108:4 | **work** 50:15 |
| 151:16 | **we'll** 82:21 | 163:25 | **willing** | 91:12 |
| 233:3 | 85:25 | 171:18,19 | 23:17 | 98:21 99:2 |
| **wants** 212:25 | 300:15 | 171:20 | **wipe** 206:8 | 154:11 |
| 271:2 | **we're** 28:1 | 194:6,11 | **withholding** | 171:17,25 |
| **war** 85:10 | 36:4 48:13 | 236:6 | 256:12,22 | 182:17,21 |
| **Warfare** | 57:13 86:7 | 253:6,10 | 258:3,6 | 183:17 |
| 18:10 | 93:1 106:8 | 253:14 | **witness** | 206:9 |
| **warriors** | 113:19 | 262:25 | 20:21 | 227:2 |
| 17:18 | 115:12 | 263:10 | 43:23 | 263:17,17 |
| **Washington** | 117:7,16 | 277:3 | 48:21 | 292:24 |
| 14:4 15:19 | 127:22 | **websites** | 68:25 | 296:10,20 |
| 16:7,18 | 150:14 | 236:3 | 85:23 93:5 | 296:20,25 |
| 81:13 | 151:1,4 | 254:3 | 93:17 94:2 | 297:1,1,6 |
| 92:11 | 159:17,17 | **weeks** 58:16 | 95:2,5 | **worked** 91:21 |
| 147:9 | 177:6,23 | 58:18 | 110:15,19 | 94:18 96:9 |
| 189:16 | 199:13 | 59:15 | 206:17,20 | 154:9 |
| 219:17 | 206:16 | **well-known** | 206:22 | 183:5 |
| 261:3 | 213:10 | 292:21 | 212:23,25 | **workers** |
| 294:14 | 215:24 | **went** 89:4 | 224:21 | 222:14 |
| 303:6 | 252:25 | 194:3 | 225:7,19 | **working** |
| **wasn't** 52:2 | 288:21 | 268:3 | 249:3 | 31:20 |
| 61:3 73:17 | 296:11 | **weren't** | 254:22 | 50:21 |
| 135:10 | 298:16 | 47:13,13 | 255:13,23 | 58:12,17 |
| 170:7 | 299:21,24 | 239:3 | 255:23 | 59:21 60:7 |
| 185:9 | 300:22 | **Western** 1:2 | 256:1,3,5 | 163:10 |
| 198:5,7 | 301:5 | 20:9 | 293:21 | 189:15 |
| 201:4,14 | **we've** 43:2 | 266:12 | 300:1 | 223:2 |
| 249:23 | 71:9 85:13 | 267:2 | 302:13 | 225:2 |
| 273:9 | 86:17 | **western-...** | 303:15 | 226:19 |
| **water's** | 87:25 | 97:11 | 304:2,25 | 296:18 |
| 206:6 | 126:20 | 264:11 | **woman** 133:22 | **working-...** |
| **Watts** 132:1 | 150:2,9 | **WHEREOF** | 167:16 | 80:9 88:4 |
| **wave** 263:21 | 179:16 | 302:13 | **wonder** 266:8 | 131:2 |
| **way** 104:9 | 191:22 | **white** 1:22 | **wondering** | **works** 78:24 |
| 120:12 | 212:19,20 | 4:16 5:2 | 283:9 | 79:13,16 |
| 138:14 | 250:4 | 5:10,12,17 | **word** 26:2 | 184:9,13 |
| 192:4 | 257:4 | 6:1,8,11 | 34:15 | 184:16 |

**DANIEL KIMMAGE  11/10/2022**

278:2
**workshop**
177:24
181:1
**world** 282:24
283:6
**wouldn't**
34:15
79:16
83:10,11
118:14,14
161:3
199:7
238:13
**woven** 261:7
**wrap** 150:4
**wrapped**
150:9
**written**
167:7
229:23
**wrote** 180:22
**Wuhan** 191:3
191:8
201:9
**WYMAN** 10:6

**X**
**x** 1:4  13:14
17:7  18:1
19:1
**XAVIER** 2:3
**XI** 213:13
**XII** 218:12
**XIII** 219:1

**Y**
**Y** 2:22
193:11
**yeah** 24:24
27:2  30:7
35:15  43:5
56:21
57:11  65:7
67:13  71:1
71:11  82:9
82:9,21
85:18  86:4
112:4

161:23
163:21
166:10
171:2,4
179:3
190:1
194:24
196:6
205:24
208:23
212:23
213:3
222:24
224:24
231:24
241:4
252:14,14
252:15
264:8
283:1
286:21
288:20,22
294:11
**year** 24:12
42:19
130:13
276:23
**years** 23:25
69:23
194:24
**yesterday**
21:15,22
**YOLANDA** 8:16
**YOUNES** 16:4
**Youtube** 18:7
76:1  80:21
80:22
82:15
114:19
139:21
142:21
189:7
190:16,25
192:21
193:18
194:15
197:2
200:20
234:9

**YouTube-...**
80:22
**YouTube/...**
143:1

**Z**
**ZACHARY**
10:12
**zero** 191:1
240:16
241:1,2
**Zoom** 81:7,14
81:17
145:19

**0**
**01/08/2016**
17:10
**02/09/2018**
17:14
**02/13/2018**
17:17
**02/17/2021**
19:9
**03/25/2O20**
18:23
**05/03/2021**
18:19
**05/10/2O21**
18:21
**05/17/2022**
19:12
**08/2020** 18:4
**09/04/2020**
17:21

**1**
**1** 13:22
17:10
42:22,23
227:13
**1,094,115**
245:6
**1.4** 227:14
227:25
**1:15** 150:19
**1:30** 150:17
**1:33** 151:3
**10** 13:17

18:19
24:14
177:7,8
303:12
304:4
**10-month**
24:13,25
25:6
**10/17/2022**
19:14
**10:04** 13:18
20:13
**10342** 161:19
**106** 18:4
**10th** 20:11
180:23
**11** 18:23
188:9,10
188:13
213:13
227:25
**11/08/2022**
19:7
**11:10** 86:7
**11:21** 86:10
**1100** 15:18
303:6
**111** 21:23
**113** 18:7
**117** 128:18
**12** 19:4
206:2,2,3
213:12
218:12
228:8,8
**12/1/96**
179:23
**12:23** 151:1
**1200** 270:24
**1225** 16:6
**127** 18:12
**13** 19:7
219:2
253:2,3
**13588** 4 13:21
**13th** 57:5
**14** 19:9
42:19
128:13

260:19,20
303:3
**14,914,478**
245:8
**14448** 14:6
**14th** 302:14
**15** 19:12
213:16
276:2,3
**151** 17:4
**152** 17:5
**153** 18:13
**159** 18:16
**15th** 208:11
208:12
**16** 19:14
112:2,5
288:15,16
288:17,21
288:22
**1608** 303:20
**162** 128:14
**17** 232:20
276:22
277:5,17
288:16
289:1
**177** 18:19
**183** 244:4,10
**188** 18:23
**1950s** 35:4
**1970** 74:20
**1970s** 35:2
250:6
**1980s** 34:24
100:20
**19th** 16:6
**1st** 25:5

**2**
**2** 17:14
18:11
47:23,24
56:17  57:6
57:9
221:12
277:17
**2:31** 213:6
**2:40** 213:9

DANIEL KIMMAGE  11/10/2022

| | | | | |
|---|---|---|---|---|
| **20** 305:15 | 123:9,15 | 20:12 | 303:20 | **6** 18:7 |
| **2003** 6 16:7 | 130:8 | 21:15 | **304** 13:22 | 113:19,20 |
| **2016** 43:14 | 162:6 | 24:12 | **33** 235:20 | 120:3 |
| 43:20 | 163:8 | 251:8 | **343** 166:24 | 123:25 |
| 44:17,23 | 188:18 | 276:22 | **345** 167:16 | 226:1,1 |
| 107:24 | 194:19 | 277:5,10 | 167:16 | **632-9254** |
| 108:23 | 199:14 | 289:1 | **3484** 14:4 | 16:19 |
| 109:9,16 | 207:19 | 302:14 | **35** 234:8,19 | **639** 234:1 |
| 111:11,18 | 212:15 | 303:3,12 | 237:2 | 237:12 |
| 112:11,14 | 231:17 | 304:4 | **351** 168:19 | 241:15,16 |
| 258:22 | 245:15 | **2024** 251:13 | **38** 240:6 | **64108** 303:21 |
| **2017** 22:17 | 254:17 | **20520** 16:18 | **396** 128:20 | **65102** 15:7 |
| 24:1,2 | 255:8,21 | **20530** 15:19 | 128:23 | **66** 57:18 |
| 25:3,5,23 | 258:10,21 | 303:6 | 138:3 | 73:23 |
| 42:18 45:5 | 259:7,19 | **206** 19:4 | 144:13 | |
| 45:23 47:7 | 284:4 | **21** 17:3 | ———— | **7** |
| **2017/2018** | **2021** 19:5 | **21,897,364** | **4** | **7** 18:12 |
| 91:21 | 42:20 67:6 | 244:19 | **4** 17:21 | 127:11,12 |
| **2018** 39:1 | 67:12,18 | 245:9 | 18:10 93:2 | 128:6 |
| 48:3 49:1 | 80:4,13 | **211** 245:11 | 93:3 | **70** 270:24 |
| 54:13 57:5 | 81:13,23 | **21st** 22:17 | **4,832** 241:12 | 286:24 |
| 130:9 | 82:6,20,21 | 24:2 25:3 | **4:19** 299:20 | **72** 212:10 |
| 159:9 | 83:14 | **2200** 16:17 | **4:32** 299:23 | 234:3,13 |
| 194:20 | 84:12 | **253** 19:7 | **4:33** 301:5,9 | **751-8870** |
| 286:19,22 | 87:17 88:8 | **25th** 199:13 | **40** 49:9 | 15:8 |
| **2019** 67:5,12 | 89:14,24 | **260** 19:9 | **406** 173:19 | **7671** 195:23 |
| 67:18 | 90:22 91:3 | **27** 233:23 | **42** 17:10 | **7675** 196:9 |
| 84:14 | 91:24 | **276** 19:12 | 241:21 | |
| 91:24 | 94:11 | **28** 43:14 | **45** 86:1 | **8** |
| 94:11 | 99:17,20 | **288** 19:14 | **450** 16:6 | **8** 18:13 |
| 130:7,9 | 130:5,11 | **29** 114:4 | **47** 17:14 | 106:22 |
| 146:2 | 131:16 | **292** 207:23 | **475** 14:3 | 152:25 |
| 153:17 | 132:14 | **29th** 176:15 | **49** 236:16 | 153:1 |
| 191:9 | 138:18 | 176:19 | **4th** 93:8 | 226:24 |
| 294:22,25 | 139:10 | 177:4 | | **823848** 14:6 |
| **2019/2020** | 140:7 | **2nd** 113:25 | **5** | **899** 15:6 |
| 91:22 | 142:2 | 116:18 | **5** 18:4 106:8 | |
| **202** 15:20 | 147:12 | ———— | 106:9,12 | **9** |
| 16:8,19 | 148:21,24 | **3** | **5,888,771** | **9** 18:16 |
| **2020** 18:11 | 162:18 | **3** 17:17 | 245:4 | 112:7 |
| 19:5 67:12 | 176:15,19 | 56:10,11 | **51** 242:12 | 159:18,19 |
| 67:23 | 177:4 | 56:18 | **514-3259** | **918-6902** |
| 84:14 93:8 | 179:17 | 73:21 | 15:20 | 16:8 |
| 99:23,25 | 208:10,11 | **3:21** 252:22 | **56** 17:17 | **93** 17:21 |
| 101:6,22 | 208:12 | **3:22-cv-...** | **573** 15:8 | 237:21 |
| 113:25 | 261:2 | 1:16 2:21 | **5H03** 16:16 | 239:1 |
| 115:24 | 270:21 | 20:8 | **5th** 162:6 | **9th** 21:15 |
| 116:18,19 | 283:12 | **3:31** 252:24 | ———— | 48:3 |
| 118:4 | **2022** 13:17 | **30** 235:7 | **6** | |

**RIAN . SC LL  1/12/2023**

```
 1              IN THE UNITED STATES DISTRICT COURT

 2          FOR THE WESTERN DISTRICT OF LOUISIANA

 3                    MONROE DIVISION

 4     - - - - - - - - - - - - - - x

 5     THE STATE OF MISSOURI      :

 6     et al.,                    :

 7              Plaintiffs,       :   No.

 8     v.                         :   3:22-cv-01213-TAD-KDM

 9     JOSEPH R. BIDEN, JR.,      :

10     et al.,                    :

11              Defendants.       :

12     - - - - - - - - - - - - - x

13

14        Videotaped Deposition of BRIAN J. SCULLY

15              Thursday, January 12, 2023

16                    9:06 a.m.

17

18

19

20

21     Job No.: 138046

22     Pages 1 through 376

23     Reported by:  Cassandra E. Ellis, RPR

24

25
```

**RIAN  . SC  LL   1/12/2023**

**Page 2**

```
 1              Deposition of BRIAN J. SCULLY, held

 2    pursuant to agreement, before Cassandra E. Ellis,

 3    Certified Shorthand Reporter -- Hawaii #475,

 4    Certified Court Reporter - Washington #3484,

 5    Certified Shorthand Reporter - California -

 6    #14448, Registered Professional Reporter #823848,

 7    Certified Realtime Reporter, Realtime Systems

 8    Administrator, and Notary Public of the District

 9    of Columbia.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

RIAN . SC LL   1/12/2023

**Page 3**

```
 1                A P P E A R A N C E S
 2       ON BEHALF OF PLAINTIFF:
 3            D. JOHN SAUER, ESQUIRE
 4            TODD SCOTT, ESQUIRE
 5            KENT CAPPS, ESQUIRE
 6            JOSH DIVINE, ESQUIRE
 7            MISSOURI ATTORNEY GENERAL'S OFFICE
 8            Supreme Court Building
 9            221 W. High Street
10            P.O. Box 899
11            Jefferson City, Missouri  65101
12            (573) 751-8870
13            John.sauer@ago.mo.gov
14            Todd.scott@ago.mo.gov
15
16       ON BEHALF OF DEFENDANT:
17            JOSHUA E. GARDNER, ESQUIRE
18            INDRANEEL SUR, ESQUIRE
19            DEPARTMENT OF JUSTICE
20            1100 L Street, Northwest
21            Washington, D.C.  20530
22            (202) 514-3259
23            Joshua.e.gardner@usdoj.gov
24            Indraneel.sur@usdoj.gov
25
```

RIAN . SC LL  1/12/2023

Page 4

```
 1      A P P E A R A N C E S   C O N T I N U E D

 2       ON BEHALF OF DEFENDANTS:

 3              JESSICA SCHAU NELSON, ESQUIRE

 4              Senior Counsel, Special

 5              Litigation and Matters

 6              Cybersecurity and Infrastructure

 7              Security Agency

 8              (202) 870-3578

 9              Jessica.SchauNelson@cisa.dhs.gov

10

11              MATTHEW FLEISCHMAN, ESQUIRE

12              OFFICE OF THE GENERAL COUNSEL

13              U.S. DEPARTMENT OF HOMELAND SECURITY

14              (202) 746-8414

15              matthew.fleischman@hq.dhs.gov

16

17

18

19   ALSO PRESENT:

20   Joseph E. Ellis, Certified Legal Video Specialist

21

22

23

24

25
```

RIAN . SC LL  1/12/2023

```
 1                  C O N T E N T S
 2   EXAMINATION OF BRIAN J. SCULLY            PAGE
 3       By Mr. Sauer                          11
 4
 5
 6                  E X H I B I T S
 7             (Attached to the Transcript)
 8   BRIAN J. SCULLY   Deposition Exhibit      PAGE
 9   Exhibit 1   EIP The Long Fuse:            69
10        Misinformation and the 2020 Election
11   Exhibit 2   The Virality Project Memes    138
12        Magnets and Microchips Narrative
13        Dynamics around COVID-19 VACCINES
14   Exhibit 6   Audio Transcription Event:    368
15        Atlantic council: Lightning talk:
16        Election Integrity Partnership
17        JUNE 24, 2021
18   Exhibit 7   Audio Transcription Event: CISA  369
19        Cyber Security Summit 2021: Responding
20        to Mis, Dis, and mal-information
21        OCTOBER 27, 2021
22
23
24
25
```

RIAN  . SC  LL   1/12/2023

```
 1        E X H I B I T S    C O N T I N U E D

 2            (Attached to the Transcript)

 3   BRIAN J. SCULLY   Deposition Exhibit        PAGE

 4   Exhibit 9   Assortment of Documents Bates    156

 5        Stamped MOLA_DEFSPROD_00008353-355,

 6        9676-680,8356-358, 10679-682,

 7        10603-605, 13661-663,13511-517,

 8        7633-634, 8349-352, 13729-734,

 9        9603-605, 7583-587, 7574-576,

10        10538-541, 7564-566, 8768-769,

11        10512-516, 10523-526, 8496-498,

12        8756-758, 8778-780, 10492-494

13   Exhibit 10  Assortment of Documents         212

14        Bates Stamped MOLA_DEFSPROD_00008722-725,

15        10449-453, 13603-609, 8739-741, 8696-700,

16        10420-422, 8521-522, 8693-694, 8710-711,

17        8695, 8663-667, 8660-662, 8689, 8679,

18        8668-669, 8649-650, 8634, 8636-639,

19        8631-632, 8628-630, 8640-643

20   Exhibit 11  12/01/2020 E-mail(s) Bates      227

21        Stamped MOLA_DEFSPROD_00008600-604

22   Exhibit 12  Defendants' Amended Combined    190

23        Objections and Responses to Plaintiffs'

24        First Set of Expedited Preliminary-

25        Injunction Related Interrogatories
```

**RIAN  . SC  LL   1/12/2023**

**Page 7**

```
 1        E X H I B I T S    C O N T I N U E D

 2              (Attached to the Transcript)

 3   BRIAN J. SCULLY   Deposition Exhibit          PAGE

 4   Exhibit 13  Declaration of Yoel Roth dated    243

 5        12/17/2020

 6   Exhibit 14  Excerpts of 11/29/2022 Elvis      249

 7        Chan Deposition

 8   Exhibit 15  04/14/2022 E-mail string Bates    252

 9        Stamped MOLA_DEFSPROD_00014552-553

10   Exhibit 16  09/16/2020 E-mail Bates Stamped   252

11        MOLA_DEFSPROD_00013671

12   Exhibit 17  Assortment of Documents Bates     252

13        Stamped MOLA_DEFSPROD_00014551, 14545,

14        14552-553, 15741-743, 14526-529,

15        14545-547, 7598-600, 7654-659, 12076-079,

16        13599, 13696-701

17   Exhibit 18  Assortment of Documents Bates     277

18        Stamped MOLA_DEFSPROD_00007669-670,

19        10298-300, 8188-189, 10718, 9703,

20        7484-487, 7552-554, 10564-565, 8519,

21        10392-394, 10389-391, 8625-627,

22        8623-627, 10410-412, 8595, 8586-587,

23        8554-557, 12223-224,12053-059

24

25
```

**RIAN  . SC  LL   1/12/2023**

Page 8

```
 1        E X H I B I T S    C O N T I N U E D

 2             (Attached to the Transcript)

 3   BRIAN J. SCULLY   Deposition Exhibit          PAGE

 4   Exhibit 19  Elections Misinformation        363

 5       Reporting Portal Bates Stamped

 6       MOLA_DEFSPROD_00012672

 7   Exhibit 21  CNN Politics Web Article CNN     364

 8       Exclusive DHS rejects plan to protect

 9       Election officials from harassment as

10       Midterms loom

11   Exhibit 23  The Hill Web article Cyber       335

12       Agency beefing up disinformation,

13       Misinformation team

14   Exhibit 24  10/18/2022 CISA Mis, Dis,        365

15       Mal-information Team Announcement

16   Exhibit 27  Cyberscoop Article CISA          301

17       Expands efforts to fight election

18       Disinformation ahead of  challenging'

19       2024 vote, dated 08/12/2022

20   Exhibit 28  01/28/2022 E-mail Bates          306

21       Stamped MOLA_DEFSPROD_00011450-451

22   Exhibit 29  Text Messages Bates Stamped      309

23       MOLA_DEFSPROD_00015749-751

24

25
```

**RIAN . SC LL  1/12/2023**

```
 1        E X H I B I T S    C O N T I N U E D

 2             (Attached to the Transcript)

 3   BRIAN J. SCULLY   Deposition Exhibit          PAGE

 4   Exhibit 30  The Intercept_ Truth Cops         319

 5        Article Leaked Documents Outline

 6        DHS's Plan to Police Disinformation,

 7        Dated 10/31/2022

 8   Exhibit 31  OIG Report DHS Needs a            328

 9        Unified Strategy to Counter

10        Disinformation Campaigns, dated

11        08/10/2022

12   Exhibit 46  CISA Draft Report to the CISA     352

13        Director, dated 06/22/2022 Bates

14        Stamped MOLA_DEFSPROD_00015459-463

15   Exhibit 49  The Breakdown Article Brian       345

16        Scully on government response to

17        Disinformation, dated 06/18/2020

18   Exhibit 52  02/17/2022 E-mail string Bates    349

19        Stamped MOLA_DEFSPROD_00015736-737

20   Exhibit 59  02/11/2022 E-mail Bates Stamped   359

21        MOLA_DEFSPROD_00011414-415

22   Exhibit 61  NRMC Election Security Initiative 13

23        Organizational Chart - August 2022

24   Exhibit 62  LinkedIn Profile of Jack Cable    194

25        Public Interest Technologist
```

RIAN . SC LL   1/12/2023

```
 1              P R O C E E D I N G S
 2              THE VIDEOGRAPHER:  We are on the
 3    record.  Today's date is January 12th, 2023, and
 4    the time is now 9:06 a.m.  This is the video
 5    recorded deposition of Brian Scully in the
 6    matter of the State of Missouri, et al.,
 7    plaintiff, versus Joseph R. Biden, Junior, et
 8    al., defendants, Case Number
 9    3:22-CV-01213-TAD-KDM in the United States
10    District Court for the Western District of
11    Louisiana, Monroe Division.
12              This deposition is being held via
13    Zoom.
14              The reporter's name is Cassandra
15    Ellis.  My name is Robyn Ellis.  I'm the legal
16    videographer.  We are with Lexitas Legal.
17              Would the attorneys present please
18    introduce themselves and parties they represent.
19              MR. SAUER:  John Sauer, from the
20    Missouri Attorney General's Office, on behalf of
21    the plaintiffs.  And I'm joined by my colleague,
22    Todd Scott, who's in the room with the witness,
23    also of the Missouri Attorney General's Office.
24              MR. GARDNER:  And this is Josh
25    Gardner, with the United States Department of
```

RIAN . SC  LL   1/12/2023

```
 1      Justice, on behalf of the defendants, and
 2      witness does reserve the right to read and sign.
 3                  With me today is Jessica Nelson,
 4      with CISA.  Matt Fleischman, with the Department
 5      of Homeland Security and Indraneel Sur, with my
 6      office, the Department of Justice.  We all
 7      represent the defendants.
 8                  THE VIDEOGRAPHER:  Would the court
 9      reporter please swear in the witness.
10                  (Witness sworn)
11                  THE VIDEOGRAPHER:  You may proceed.
12                  BRIAN J. SCULLY
13       having been duly sworn, testified as follows:
14                      EXAMINATION
15    BY MR. SAUER:
16          Q.   Mr. Scully, could you please state
17      your full name for the record?
18          A.    Sure.  Brian Joseph Scully.
19          Q.   How long -- or what is your current
20      job title?
21          A.    Brand P for the MDM branch, at the
22      National Risk Management Center, which is part
23      of the Department of Homeland Security.
24          Q.   How long have you had that
25      particular job?
```

RIAN . SC  LL   1/12/2023

Page 12

```
 1              A.   Almost -- almost four years, I
 2      started in January 2019.
 3              Q.   What did you do before that?
 4              A.   I was a deputy for the countering
 5      and foreign influence task force, starting in
 6      April-ish, April/May 2018.
 7              Q.   And what was your -- what was your
 8      job before that one?
 9              A.   I was a director for policy and
10      strategy in the Office of Infrastructure
11      Protection.
12              Q.   Have you ever given a deposition
13      before?
14              A.   I have not.
15              Q.   So this is your first one?
16              A.   This is my first deposition.
17              Q.   Can I just go over some common
18      ground rules with you?
19                   First of all, obviously what you
20      and I say is being transcribed by the court
21      reporter, so can we make an effort not to talk
22      too fast?
23              A.   Yep.
24              Q.   And could you give -- I saw you nod
25      your head there, and then you said yes.  Could
```

RIAN . SC LL   1/12/2023

```
 1     you try and give a verbal answer to my

 2     questions, you know, don't rely on uh-huh or

 3     uhn-uhn or head shaking as we go forward today.

 4            A.   Yes, I can do that.

 5            Q.   Can we make an effort not to

 6     interrupt each other, because that results in a

 7     kind of confused transcript.

 8            A.   Of course.

 9            Q.   Okay.  And then can you make an

10     effort to listen carefully to the question that

11     I'm asking you, and respond to the question that

12     I ask, instead of discussing some other

13     tangential topic as the day goes forward?

14            A.   Of course.

15            Q.   And you understand --

16            A.   Yes.

17            Q.   You understand that at the end of

18     the day, if your attorney wants to ask you some

19     follow-up questions he may have the opportunity

20     to do that.

21                 But when -- as I ask questions, I

22     would ask you to focus on the questions I'm

23     asking you, and respond to those; is that fair?

24            A.   That's fair.

25                 (Exhibit No. 61 was marked for
```

Case 3:22-cv-01213-TAD-KDM  Document 209-1  Filed 03/04/23  Page 14 of 456 PageID #:
13127

RIAN . SC LL  1/12/2023

```
 1    identification.)

 2   BY MR. SAUER:

 3         Q.   Let me start by showing you an

 4   exhibit, and I apologize, this exhibit is out of

 5   numerical order already, so I'm e-mailing it to

 6   your counsel right now.  It's pre-marked Exhibit

 7   61, but it will be the first exhibit we look at

 8   today.

 9              And I'm going to pull it up on the

10   screen share.  Can you see that screen share?

11   I'm going to zoom in a little bit.

12              MR. GARDNER:  Hey, John, it hasn't

13   come through yet, the e-mail, so it's just --

14   unfortunately, that's kind of far away, it's a

15   little challenging to see, but as soon as we get

16   your e-mail we'll pull it up.

17              MR. SAUER:  You said you can't see

18   what's on the screen share if I zoom in?

19              MR. GARDNER:  As you make it larger

20   it's easier, but I don't want to speak for what

21   the witness can and can't see.

22              THE WITNESS:  Yeah, I can see it.

23   BY MR. SAUER:

24         Q.   Okay.  I'm happy to wait until it

25   arrives on the e-mail.  I just want to make
```

RIAN  . SC  LL   1/12/2023

```
 1    sure, because I think the day's going to go more
 2    smoothly, if I can direct your attention to
 3    stuff on the screen share.
 4              So you can see the screen share,
 5    sir?
 6         A.   Yes, I can.
 7         Q.   Okay.  Just looking at the top of
 8    this document, do you recognize it as an org
 9    chart for August 2022, of a subdivision of CISA?
10         A.   Yes.
11         Q.   And what -- what -- are you
12    familiar with this org chart?
13         A.   Somewhat familiar with it, yes.
14         Q.   I just want to direct your
15    attention over here on the right side of the
16    page, you see here where it lists you as the
17    chief of the mis, dis and mal-information team?
18         A.   Okay.
19         Q.   Is that your job title?
20         A.   Yes.
21         Q.   Yeah, what, exactly -- generally
22    speaking, what do you do as the chief of the
23    mis, dis and mal-information team for CISA, the
24    Cyber Security and Infrastructure Security
25    Agency?
```

RIAN . SC LL  1/12/2023

```
 1            A.   So I -- obviously I manage the
 2     team, as a team lead.  So I manage the staff,
 3     set priority, things like that.
 4            The purpose of the team is to build
 5     national resilience to MDM, targeting critical
 6     infrastructure.
 7        Q.   Generally speaking, what kind of
 8     activities are involved in building resilience
 9     to critical infrastructure -- or sorry --
10            A.   We felt -- sure.
11            So principally what we do is
12     develop products for public awareness and
13     education or products for key stakeholders to
14     help them understand how MDM works and steps
15     they can take to mitigate the risks.
16        Q.   Do you do anything else, besides
17     developing products?
18            A.   We engage with different
19     stakeholders, civil society groups, obviously
20     other federal partners, private sector
21     organizations, and then we -- we do some
22     analysis of open source reporting, and we do --
23     obviously, you know, in 2020 we did some
24     switchboard work on behalf of election
25     officials.
```

RIAN  . SC  LL   1/12/2023

```
 1              Q.    Switchboard work, what does that

 2    mean?

 3              A.    It was essentially an audit

 4    official to identify something on social media

 5    they deemed to be disinformation aimed at their

 6    jurisdiction.  They could forward that to CISA

 7    and CISA would share that with the appropriate

 8    social media companies.

 9              Q.    And what was the purpose of sharing

10    it with social media companies?

11              A.    Mostly for informational awareness

12    purposes, just to make sure that the social

13    media companies were aware of potential

14    disinformation.

15              Q.    Was there an understanding that if

16    the social media platforms were aware of

17    disinformation that they might apply their

18    content moderation policies to it?

19              A.    Yes.  So the idea was that they

20    would make decision on the content that was

21    forwarded to them based on their policies.

22              Q.    Whereas, if it hadn't been brought

23    to their attention then they obviously wouldn't

24    have moderated it as content; correct?

25              A.    Yeah, I suppose that's true, as far
```

RIAN . SC LL   1/12/2023

```
 1   as I'm aware of it.
 2           Q.    Directing your attention to the org
 3   chart again, can you -- I would sort of walk
 4   through the people here on your team and ask
 5   you, kind of who they are and what they do, so
 6   starting on the right column, I see Lauren
 7   Protentis on as the engagements lead; who is she
 8   and what does she do for your team?
 9           A.    So she was -- she's a -- she's the
10   engagements lead.  So her job was engaging with
11   key stakeholders, interagency partners, private
12   sector partners, essentially a majority of
13   our outreach and engagement efforts, she managed
14   those.
15           Q.    Outreach and engagement to key
16   stakeholders, does that include social media
17   platforms?
18           A.    It did, yeah.
19           Q.    When you say:  "It did," does she
20   still do this or does she no longer communicate
21   with social media platforms?
22           A.    Well, she's on the -- she's been on
23   maternity leave since September, so she's --
24   she's not currently doing it, when she returns
25   to CISA that would be her role.
```

RIAN . SC LL   1/12/2023

```
 1              Q.   Who's doing it while she's gone?
 2              A.   And she -- I'm sorry, could you
 3       repeat that?
 4              Q.   Who's -- who's playing that role in
 5       her absence?
 6              A.   I am.
 7              Q.   Okay.  And so for the past, I
 8       guess, three or four months you've served as
 9       essentially the active engagements lead for the
10       MDM team?
11              A.   Correct.
12              Q.   And that goes back, I think you
13       said, to September of 2022; is that right?
14              A.   Correct.
15              Q.   When do you expect Ms. Protentis to
16       return?
17              A.   Her maternity leave ends in a
18       couple of weeks, I believe the 23rd, potentially
19       being gone on a detail assignment, so probably
20       January 2024.
21              Q.   Oh, so you don't expect her back
22       for another year, because of the detail?
23              A.   Correct.
24              Q.   Is the detail in -- relate to
25       anything having to do with mis, dis or
```

RIAN . SC LL   1/12/2023

 1    mal-information?

 2          A.    I believe that will be part of her

 3    portfolio on the detail, yeah.

 4          Q.    **Where is she going, if I may ask?**

 5          A.    The National Security Council.

 6          Q.    **And in her absence, you're serving**

 7    **as the kind of person who directly communicates**

 8    **with social media platforms, among other**

 9    **stakeholders?**

10          A.    Correct.

11          Q.    **I should mention, you used the**

12    **shorthand earlier, MDM, and I assume it will**

13    **come up again today.  When you use that, you're**

14    **referring to mis, dis and mal-information;**

15    **right?**

16          A.    Correct.

17          Q.    **I think sometimes CISA refers to MD**

18    **to refer to mis and disinformation; is that**

19    **right?**

20          A.    I'm not sure I've ever seen us use

21    MD, but that would be proactive in the context,

22    yeah.

23          Q.    **Turning your attention back to the**

24    **period from September of 2022 to the present,**

25    **what sorts of communications have you had with**

RIAN . SC LL   1/12/2023

1       social media platforms in Ms. Protentis's stead?

2           A.   Two -- I would say two general

3       types of communications, one, we did regular

4       sync meetings between government and industry,

5       so federal partners and different social media

6       platforms.  So it's just a coordinated meeting.

7               Facebook was the industry lead, so

8       I would have coordination calls with them prior

9       to the meetings, just to set the agenda for the

10      meetings, so that was one.

11              And then two, if a platform was

12      putting out a public statement -- or not public

13      statement -- public report on policies or

14      activities, we would often get a briefing on

15      that or at least get an awareness that it was

16      going out.

17              Those are the two main types of

18      communications.

19          Q.   Did you -- were you involved in the

20      last -- in the period since September 2022, and

21      have you been involved in flagging any

22      misinformation or disinformation issues for

23      social media platforms?

24          A.   No, not that we recall.  We didn't

25      do switchboarding in 2022.

RIAN . SC LL   1/12/2023

Page 22

```
 1              Q.   So when was that decision made not
 2    to do switchboarding in 2022?
 3              A.   I believe it was back in April that
 4    that decision was made?
 5              Q.   Who made that decision?
 6              A.   April 2022.
 7              Q.   Was that early or late April, do
 8    you know?
 9              A.   I don't.  I don't recall.
10              Q.   Who made that decision?
11              A.   I -- I heard about it through Geoff
12    Hale, who is -- is a senior org chart would be
13    my supervisor.  I believe he received that
14    guidance from the director, Director Easterly.
15              Q.   So in -- some time around -- was
16    this late April?
17              A.   Honestly, I don't recall.  It's
18    even possible it was in May by the time -- my
19    memory's a little foggy on it -- but the
20    earliest it was is probably mid April.
21              Q.   Do you know --
22              A.   And it could have gone any time
23    into early May.
24              Q.   So the earliest would have been
25    late April, but possibly early May is when that
```

RIAN  . SC  LL   1/12/2023

```
 1     decision was made; correct?
 2               MR. GARDNER:  Objection.
 3     BY MR. SAUER:
 4          Q.    Correct?
 5               MR. GARDNER:  Sorry.  Objection,
 6     mischaracterizes the witness's previous
 7     testimony.
 8          A.   Yeah, the earliest would have been
 9     mid April --
10          Q.    The earliest would have been mid
11     April?
12          A.   -- probably.
13          Q.    Okay.  And then possibly beginning
14     of May?
15          A.   Yeah.
16          Q.    And you said -- you called this
17     switchboarding.
18          A.   Mm-hmm.
19          Q.    Switchboarding refers to routing
20     particular disinformation concerns to social
21     media platforms so they can evaluate them under
22     the content modulation -- modulation policies;
23     correct?
24          A.   So switchboarding is CISA's role in
25     forwarding reporting received from election
```

RIAN . SC  LL   1/12/2023

```
 1    officials, state/local election officials, to
 2    social media platforms.
 3          Q.   CISA forwarded disinformation
 4    concerns from many other sources, besides state
 5    and local election officials, to social media
 6    platforms?
 7          A.   I don't believe so, not that I
 8    recall.
 9          Q.   Turning back to the two kinds of
10    interactions you had with social media
11    platforms, the last months since September of
12    2022, the first one you mentioned was, I
13    believe, a sync meeting between social media
14    platforms and the US government; correct?
15          A.   Correct.
16          Q.   How often did those occur?
17          A.   They started as monthly, until, I
18    think, October.  And then we did a couple of
19    biweekly, I believe two biweekly meetings --
20          Q.   What was the purpose of the --
21          A.   -- prior to the election.
22          Q.   What was the purpose of these
23    meetings?
24          A.   Generally speaking, from a CISA
25    perspective, we would -- we would provide kind
```

RIAN . SC LL   1/12/2023

1    of -- we would try to educate the platforms on

2    how elections actually function, how they're

3    administered, potential threats to the election

4    administration, things like that.

5              So CISA's -- you know, has some

6    expertise in the election security space.  So

7    our role in the meetings was generally to

8    provide kind of expertise on how elections

9    actually work to the platforms.

10        **Q.    And you said that was your role.**

11             **Were there other federal agencies**

12    **involved in these meetings?**

13        A.    There were, and -- and that role

14    was generally Geoff Hale.  My role in the

15    meetings was generally to just oversee them,

16    facilitate the meetings.

17             Other agencies would provide

18    high-level reviews or strategic intelligence

19    briefs, if they had any -- anything to share

20    that was unclassified.

21        **Q.    What sorts of -- first of all, what**

22    **agencies participated?**

23        A.    DOJ, FBI, ODNI, and then DHS.

24        **Q.    When you say DHS, was that just**

25    **CISA, you and Geoff Hale, or were there other**

RIAN . SC LL  1/12/2023

```
 1    components of DHS involved?

 2            A.   The Office of Intelligence and

 3    Analysis of DHS also participated.

 4            Q.   And that's called IA; is that

 5    correct?

 6            A.   Correct.

 7            Q.   And what was -- what did they say

 8    at these meetings, I A?

 9            A.   If they put out unclassified

10    reporting, under their normal mandate, they

11    would just talk about the reporting that they --

12    that they published, that was related to

13    election security.

14            Q.   What kind of reporting did they do,

15    is it about foreign influence or is it about

16    domestic threats, what kind of reporting do they

17    do?

18            A.   I'm not a hundred percent certain

19    of their -- their mission of authority.  I

20    believe and recall what they talked about, they

21    certainly talked about foreign threats.  I'm not

22    sure -- they may have also talked a little bit

23    about domestic terrorism threats, but I think

24    that -- but I'm not 100 percent certain.

25            Q.   Like what sorts of things are they
```

RIAN . SC LL  1/12/2023

1    **saying to social media platforms, are they**

2    **saying, hey, you're going to see this kind of**

3    **content popping up on Facebook and Twitter and**

4    **so forth, and, you know, therefore, we want you**

5    **to be alert to it, what kind of -- what's the**

6    **purpose of giving them these briefings?**

7            A.   So generally speaking, it's hard

8    for me to speak directly to the I A reporting

9    because, you know, I don't recall all the

10   details of it, but generally speaking, it was

11   more strategic-level.  So high-level things that

12   they might be seeing, actors that might be

13   interested in undermining confidence in the

14   elections.

15           If they were seeing potential

16   domestic terrorism type threats, those sorts of

17   things, generally speaking, at least as long as

18   I recall, there was never any discussion of

19   specific content.

20           **Q.   Did they identify specific domestic**

21   **actors who they believed might try to undermine**

22   **confidence in election outcomes through social**

23   **media?**

24           A.   Not that I recall.

25           **Q.   Let me ask this:  Who, on the**

RIAN . SC LL   1/12/2023

1    **government side of these meetings, who**

2    **participates on behalf of -- who participated on**

3    **behalf of CISA?**

4         A.   Geoff Hale and myself were the

5    primaries, and then you might have others who

6    were in listen-only mode.  So Kim Wyman, for

7    example, would sometimes be in listen-only mode.

8    Allison Snell would sometimes be essentially the

9    deputy or, slash, chief of staff of the --

10   underneath Geoff, she would sometimes be in

11   listen-only mode.  And then obviously when

12   Lauren was pre-maternity leave she would also be

13   on.

14        **Q.   And then for I A, who was on these**

15   **meetings?**

16        A.   In 2022, I believe Luke Beckman was

17   the lead.  And then they would, depending on,

18   you know, what product they were briefing, they

19   would bring an analyst on, so those would

20   change.

21        **Q.   Do you remember any other human**

22   **beings, besides Luke Beckman, from I A, who**

23   **participated in these meetings in the period of**

24   **time we're talking about, from September 2022 to**

25   **the present?**

RIAN . SC LL   1/12/2023

```
 1              A.   I don't know.  Like I -- Luke was

 2       the kind of principal lead, and who I coordinate

 3       with, I don't recall the analysts' names that

 4       they might have on there now.

 5              Q.   What's his title?

 6              A.   Honestly, I don't know.  I believe

 7       he's in the cyber mission center, but they are

 8       odd up there, so I'm not entirely sure what his

 9       title was, sorry.

10              Q.   You mentioned FBI had

11       representatives at these meetings; is that

12       right?

13              A.   Correct.

14              Q.   Who from FBI participated in these

15       meetings?

16              A.   I recall Laura Dehmlow, at least

17       one, and I forget who -- who the other folks

18       were.

19              Q.   How many FBI people?

20              A.   Generally, there would be one,

21       maybe two.

22              Q.   How about Elvis Chan, was he on

23       these meetings?

24              A.   Oh, good reminder.  Thank you.

25                   Yes, he would be on some of them,
```

RIAN . SC LL  1/12/2023

```
1    as well.  I forgot about Elvis.
2              Q.   Do you remember anyone else,
3    besides him?
4              A.   There would be, again, periodically
5    other people would be on from different parts of
6    FBI, but again, Laura was usually who we
7    coordinated through, and I don't really
8    remember -- I don't really remember the other
9    names, sorry.
10             Q.   When you say Laura, that's Laura
11   Dehmlow is who you coordinated through?
12             A.   Correct.
13             Q.   When you say:  You coordinated
14   through them, what kind of coordination did CISA
15   do with FBI as it pertained to these meetings?
16             A.   Yeah, so basically coordinating
17   time and the logistics of the meeting, and then
18   two, if they had any particular agenda items
19   they wanted to raise, you know, when we were
20   putting together the agenda, I would just check
21   with them to see if they had any -- any
22   particular agenda items they wanted to raise.
23             Q.   What sort of agenda items did they
24   raise?
25             A.   I don't believe in the time I was
```

1    working, you know, in the timeframe we're

2    talking about, I don't believe that they raised

3    any.

4              Q.   Do you have -- how about before

5    that, when Ms. Protentis was still handling the

6    meetings?

7              A.   Not -- not that I recall.  Yeah, I

8    don't -- I don't -- I don't recall, in

9    particular, yeah, sorry.

10             Q.   And I take it these meetings, we've

11   been talking about them in the period from last

12   September until now, but they're actually going

13   on intermittently, at least, for years; right?

14             A.   Yeah, so the first meeting we had

15   with -- between federal and -- and industry was

16   in 2018.

17             Q.   Yeah, we're talking -- we're now

18   kind of four years in, and then in terms of

19   their frequency I take it they -- they --

20   they're less frequent when you're further away

21   from election, and they become monthly as the

22   election gets closer, and then they become

23   weekly or biweekly, you know, within the last

24   month or so before an election; is that right?

25             A.   I would say 2018, 2019 they were

RIAN . SC LL   1/12/2023

**Page 32**

```
 1    very infrequent, so we maybe did them quarterly

 2    or less.  And then sometime in 2020 we started

 3    monthly.  And then, like you said, as we got

 4    closer to the election they would pick up.  And

 5    then after the election they would -- we would

 6    spread them back out again.

 7                  But 2018 and 2019 was different

 8    than 2020 and beyond.

 9          Q.    And is there a plan to have these

10    meetings continue in 2023?

11          A.    Not currently.

12          Q.    So you don't know -- you don't know

13    whether there's going to be quarterly meetings

14    or anything like that in 2023?

15          A.    Correct.

16          Q.    Who from DOJ was at these meetings?

17          A.    Rodney Patton -- Patton.

18          Q.    Anyone else?

19          A.    No, not that I recall.

20          Q.    How do you spell his last name?

21          A.    I believe it's P-a-t-t-o-n.

22          Q.    Like the general?

23          A.    Yes.

24          Q.    What -- what is his title at DOJ?

25          A.    I don't know what his title is, but
```

RIAN . SC LL  1/12/2023

**Page 33**

```
 1      I believe he's in the national security
 2      division.
 3              Q.    Was national security division of
 4      DOJ participating in these meetings leading up
 5      to the 2020 election?
 6              A.    Yes.
 7              Q.    Who from NSD participated in those
 8      meetings?
 9              A.    I believe it was Rodney, back then,
10      as well.
11              Q.    Do you remember anyone else?
12              A.    Adam Hickey may have jumped on a
13      couple.
14              Q.    Is he also from the national
15      security division of DOJ?
16              A.    I believe so, yeah.
17              Q.    Is that H-i-c-k-e-y?
18              A.    Yes.
19              Q.    What, if anything, did DOJ say in
20      these meetings?
21              A.    Generally speaking, they didn't say
22      anything.  Yeah, I don't recall in 2022 or even
23      back in 2020 that they were -- were particularly
24      active in the meetings.
25              Q.    Do you remember anyone from DOJ
```

RIAN .SC LL  1/12/2023

```
 1    saying anything at any point?
 2           A.   I mean, I'm -- I'm sure they did,
 3    but I don't recall.
 4           Q.   Do you remember anyone from DOJ
 5    ever, you know, putting an agenda items on the
 6    calendar for these meetings?
 7           A.   I don't, no.
 8           Q.   How about ODNI, the Office of the
 9    Director of National Intelligence, what human
10    being from there participated in these meetings
11    in 2022?
12           A.   Is it okay if I ask my attorneys a
13    quick question?
14           Q.   The question --
15                MR. GARDNER:  Is it about a
16    privilege?
17                THE WITNESS:  Yeah.
18                MR. GARDNER:  Yeah, John, if you
19    want him to answer that question we'll need to
20    recess quickly so he can consult with counsel
21    about these issues of privilege.
22                MR. SAUER:  Let's go off the
23    record.
24                THE VIDEOGRAPHER:  The time is now
25    9:32.  We're off the record.
```

RIAN . SC LL   1/12/2023

```
 1                    (Recess.)
 2                    THE VIDEOGRAPHER:  The time is now
 3      9:34.  We're back on the record.
 4                    MR. GARDNER:  And counsel, I will
 5      instruct the witness not to answer that question
 6      on the basis of the National Security Act, that
 7      information is extraordinarily protected.
 8                    MR. SAUER:  Before we proceed, I --
 9      I'm announcing, for the record, that Mr. Kent
10      Capps, from the Missouri Attorney General's
11      Office joined the call on behalf of plaintiffs
12      in the last break.
13   BY MR. SAUER:
14           Q.   Was there anyone -- how many
15      individuals from ODNI participated in these
16      meetings in 2022?
17           A.   I believe there were two to three.
18           Q.   Without telling me who they are, do
19      you remember who they are?
20           A.   I remember one's name and one's
21      position, the second one's position.
22           Q.   How about 2020, how many --
23           A.   Again, it was -- it was three or
24      four.
25           Q.   Do you remember who they were?
```

RIAN . SC LL   1/12/2023

```
 1              A.    I remember the lead person's name.
 2              Q.    Did people from ODNI speak in these
 3      meetings during 2022?
 4              A.    Yes.
 5              Q.    What did they say?
 6              A.    Again, generally speaking, if they
 7      had some strategic intelligence, unclassified,
 8      strategic intelligence reporting, they might
 9      share a quick summary of that.  It was fairly
10      limited in the timeframe from September
11      through -- through the election, though.
12              Q.    Were you in the meetings prior to
13      September of 2022, when Ms. Protentis was still
14      at your team?
15              A.    I joined several of them over the
16      summer, a couple -- couple of them over the
17      summer, prior to her departure.  And that was
18      just the meetings, themselves, not necessarily
19      the coordination meetings prior to the actual
20      sync meetings.
21              Q.    So the coordination meeting, is
22      that a bilateral meeting that happens between
23      CISA and Facebook?
24              A.    Yes, CISA and Facebook, and then we
25      would do CISA with the interagency.  We would
```

RIAN . SC LL   1/12/2023

```
 1    do -- federal interagency partners would do a
 2    coordination meeting.
 3              Q.    That would be separate from the
 4    meeting with Facebook?
 5              A.    Correct.
 6              Q.    Would there be two preparatory
 7    meetings, one between CISA --
 8              A.    Generally, yes.
 9              Q.    One between --
10              A.    Sorry.
11              Q.    -- CISA and Facebook, and one
12    between CISA and other federal agencies?
13              A.    Yes, that is correct.
14              Q.    Turning back to what ODNI said at
15    these meetings in 2022, what do you remember,
16    more specifically, that they said?  Did they
17    ever raise a specific threat advisory?
18              A.    Not that I recall.  I -- again,
19    generally speaking, it was -- it was -- I don't
20    recall specifics, so I'll just say that upfront.
21              And generally speaking, it was --
22    it was higher level, kind of strategic of what a
23    threat actor may be considering or thinking
24    about.
25              Q.    And do they identify specific
```

RIAN . SC LL   1/12/2023

Page 38

```
 1    threat actors?

 2            A.    Potential state actors, yeah, so

 3    other countries.

 4            Q.    How about domestic actors?

 5            A.    No, not that I recall.

 6            Q.    Did anyone on the US government

 7    side, in these meetings, identify domestic

 8    actors in the lead-up to the 2022 election?

 9            A.    They -- they may identify domestic

10    actors, generally, but not -- to my

11    recollection, there's no mention of specific

12    actors, individuals, or groups that I recall.

13            Q.    What social media platforms

14    participated in these meetings?

15            A.    So obviously Facebook, Twitter,

16    Microsoft, Google, Reddit generally

17    participated, I believe sometimes LinkedIn would

18    join.  They're a subsidiary of Microsoft, so

19    generally we worked through Microsoft.  Those

20    are the ones that I recall.

21                  I believe there are others, as

22    well, at different times, that maybe

23    participated in a meeting or two.

24                  But from September 2022 to the

25    election, I think it was principally the five I
```

RIAN . SC LL  1/12/2023

1    mentioned.

2          Q.    How about Wiki Media Foundation?

3          A.    I know they participated in some, I

4    don't know how frequently, and if it -- I don't

5    recall them participating from September on, but

6    it's possible.

7          Q.    Were concerns about misinformation

8    and disinformation on social media platforms

9    discussed in these meetings in the 2022

10   timeframe?

11         A.    Yes.

12         Q.    What -- what was -- what was said

13   about those concerns and by whom?

14         A.    Again, it was a more general

15   approach.  So from a CISA MDM team perspective,

16   if we were developing any products we would

17   discuss those.  We didn't -- we released, I

18   believe, two sets of products in that timeframe.

19               And in others, if there was the

20   intelligence community, if they're reporting

21   included foreign actors who were potentially

22   going to use information operations, they might

23   mention that in their briefings.  But I don't

24   remember specific, you know, what the specifics

25   of every kind of mention were.

RIAN . SC LL   1/12/2023

```
 1              Q.    But you --
 2              A.    And then the platforms -- sorry, to
 3     give you both sides, that was just the
 4     government side -- the platforms, they might
 5     share some high-level trend information from
 6     public reporting that they put out.  So a lot of
 7     the platforms do their own regular reports on
 8     what they're seeing on their platforms and what
 9     they're -- what actions they're taking.  And so
10     the platforms, themselves, would share that type
11     of information.
12              Q.    So they would report to the
13     government on what sorts of mis and
14     disinformation they were seeing on their
15     platforms and what content moderation actions
16     they were taking with respect to it?
17              A.    So they would share essentially
18     what they were getting ready to make public or
19     what they had already made public.  So they
20     would share kind of what they're seeing in their
21     public reports, and then potentially provide
22     some additional context around that.
23                    So as I mentioned, most of the
24     platforms would put out regular public reporting
25     on what they were doing and what actions they
```

RIAN  . SC  LL   1/12/2023

```
 1    were taking.  And so they would share that, and

 2    if the government had questions or was looking

 3    for additional context they would often talk

 4    about that, they would generally talk about any

 5    new tactics that they were seeing.

 6                Most of what they -- my

 7    recollections for the time period we're talking

 8    about here, from September 2022 to the election

 9    in 2022, I recall most of it was foreign based.

10                But, you know, when we -- often

11    what you see overseas essentially makes its way

12    to the United States.  So they would share kind

13    of trends and tactics that they were seeing, but

14    again, it was all based on public reporting that

15    they put out.

16         Q.  And you say that this -- all these

17    things that they're doing all relate to

18    misinformation and disinformation on the

19    platforms; correct?

20         A.  They don't call it misinformation

21    or disinformation, generally, on the platforms.

22    They generally define it as coordinated

23    inauthentic behavior.

24                So they -- so -- so that's how they

25    would describe it.  They wouldn't normally kind
```

RIAN  . SC  LL   1/12/2023

Page 42

```
 1    of say misinformation or disinformation.  And
 2    they would each kind of define coordinated and
 3    inauthentic behavior differently.
 4              I don't -- so I don't know that
 5    they would agree.  I don't want to speak for the
 6    platforms, obviously.  I don't know if they
 7    would agree that they were framing it as
 8    misinformation or disinformation.
 9         Q.   From the CISA MDM teams
10    perspective, is coordinated inauthentic behavior
11    typically a kind of mis and disinformation?
12         A.   It could lead to mis or
13    disinformation, for sure, yeah.  But it's not
14    always mis or disinformation.
15         Q.   So the coordinated and inauthentic
16    behavior may be a source of mis or
17    disinformation of particular concern?
18         A.   It could be, yeah.  It could be an
19    indicator.
20         Q.   Let me ask this:  Turning back to
21    the org chart, that should be on the screen,
22    below Ms. Protentis, is Chad Josiah, who's
23    described as the resilience lead.  What is his
24    role on your team?
25         A.   So he manages the production of our
```

RIAN . SC LL   1/12/2023

1    products.  So, you know, for putting out a fact

2    sheet or, for example, we have several graphic

3    novels that we've developed, he would work and

4    manage that process to get the products out, so

5    the review process, the drafting process, things

6    like that.

7           Q.   These products you're referring to,

8    I take it those are written, publicly available

9    bulletins or other written work products

10   discussing disinformation and misinformation; is

11   that right?

12          A.   Correct.  All of our product are

13   available on our website.

14          Q.   Below him is Alex Zaheer, analyst;

15   what does he do?

16          A.   He's a more junior analyst.  He

17   supports essentially across our three lines of

18   work.  So he helps Chad on some, he helps Warren

19   on some of the engagement work, and then he

20   supports Rob Schaul, who leads our analysis work

21   in doing analysis activities, but he kind of

22   cuts across all three.

23          Q.   And Rob Schaul is listed over there

24   on the left side as analysis and response lead;

25   correct?

RIAN . SC LL   1/12/2023

```
 1              A.   Yes.

 2              Q.   What does he do?

 3              A.   So he does a couple things, so one,

 4    he leads our engagement with international

 5    partners; two, he builds relationships with the

 6    research community, both in academia, across the

 7    federal government, as well as in the private

 8    sector; and then, three, he pulls that together

 9    to identify new reporting or research about MDM

10    that might be of interest to the team; and then

11    the fourth bucket of it is he helps develop kind

12    of analytic type products.

13              So right now, for example, we're

14    working on a risk framework to help our

15    stakeholders understand how to determine if an

16    MDM campaign is a risk to them or not.

17              So he would help kind of on that

18    side of things.

19              Q.   Okay.  There was -- so he talks to

20    international partners; who are they?

21              A.   It varies.  Generally, all of our

22    engagements with international partners come

23    through the State Department or the CISA

24    international office.

25              We have engaged with NATO, G7 at
```

RIAN . SC LL   1/12/2023

1    the kind of multilateral level, with the CFI,

2    counter foreign interference forum, that

3    includes several countries.  And then we have

4    different bilateral engagements.  A lot of

5    countries want to come and talk to us, and so

6    we'll do basically MDM 101 for different

7    countries at their request.

8         **Q.   So this is both -- these are both**

9    **foreign governments and foreign nongovernmental**

10   **organizations?**

11        A.   Yeah.  I suppose if you consider

12   the multilateral organizations, like NATO and G7

13   as nongovernmental, but essentially we're only

14   talking to government -- foreign government

15   officials.

16        **Q.   So the purpose of those discussions**

17   **is to, what, track misinformation that is**

18   **circulating in foreign countries that might come**

19   **to the United States?**

20        A.   No, that's not the purpose of the

21   meetings.

22        **Q.   Then what's the purpose?**

23        A.   The purpose of the meetings is to

24   share information about -- from a CISA

25   perspective, share information about resilience

RIAN . SC LL   1/12/2023

```
 1    building.  So there's some countries that are
 2    much more mature and have been doing it for a
 3    long time.  So we try to learn from them kind of
 4    what they're doing, what works, what doesn't
 5    work.
 6              So that's, again, from a CISA
 7    perspective, that's primarily our engagement
 8    with these groups.
 9         Q.   And then you mentioned that
10    Mr. Schaul coordinates with academic and
11    research partners; is that correct?
12         A.   He doesn't coordinate, he builds
13    relationships with, so that we can -- you know,
14    if you have questions about reporting they put
15    out or public reports that they have, public
16    research, things like that, then we can have
17    conversations with them about that research.
18         Q.   Who -- who -- who -- who do you
19    have relationships like that with?
20         A.   We have relationships with a range
21    of different entities.  So from an academic
22    standpoint, we've talked to folks at Harvard, at
23    Clemson, University of Washington, Stanford, I
24    believe we talked to people at Georgetown and
25    American University, Michigan University,
```

RIAN  . SC  LL   1/12/2023

1    University of Michigan.

2              Essentially, if there's an academic

3    research that puts out a report that we think is

4    of interest, and kind of reflects our work, we

5    try to have conversations with them to try to

6    understand what their research findings are, and

7    in a non-profit stage, you know, the Alliance

8    For Securing Democracy, the Digital Frameworks

9    Research Lab -- sorry, for the court reporter, I

10   know I'm talking quickly.  So, you know, groups

11   like that.

12             And then from a private sector

13   perspective we talk to groups like Graphika,

14   Alethia Group (phonetic), and organizations like

15   those, who, again, kind of do that sort of work,

16   mandates, you know, different organizations.

17             So again, the idea is to have a

18   relationship with them so if they put out some

19   reporting or some research publicly, that we can

20   set up a meeting and kind of learn more about

21   what they're seeing and what they're doing.

22        **Q.   And has that kind of coordination**

23   **gone on not from the last year but before the**

24   **2020 election cycle?**

25        A.   Yeah.

RIAN . SC  LL   1/12/2023

```
 1            Q.   And I think you mentioned a few
 2      entities there that includes Stanford and the
 3      University of Washington, Graphika; correct?
 4            A.   Correct.
 5            Q.   And all those organizations were --
 6      were involved in something called Election
 7      Integrity Partnership; right?
 8            A.   Yep.
 9            Q.   Yeah, what is the Election
10      Integrity Partnership?
11            A.   I mean, it's a collaboration
12      amongst -- I believe in 2020 it's amongst those
13      four -- amongst four organizations, to -- to
14      better understand what was going on in the
15      information environment around elections.
16            Q.   And you say were those four -- you
17      say those four organizations, I think I
18      mentioned three, Stanford, University of
19      Washington and Graphika, and was the Atlanta
20      Council involved in that?
21            A.   Yeah, I believe the Digital
22      Forensic Research Lab was involved.
23            Q.   And then were there other
24      collaborators, besides those four, on the
25      Election Integrity Partnership?
```

RIAN . SC LL   1/12/2023

Page 49

```
 1              A.   I think those were the official
 2    members of the partnership.  I -- I don't know
 3    if you mean something different about
 4    collaborators.
 5              Q.   Well, let me ask this:  Was CISA --
 6    did CISA have any involvement in the Election
 7    Integrity Partnership?
 8              A.   Involvement in the sense that a
 9    couple of our interns came up with the idea and
10    that we had some communications with them, yes.
11              Q.   What kinds of communications did
12    you have with them?
13              A.   So we received some briefings on
14    the work that they were doing.  And then, like I
15    said, we had some interns that ended up working
16    on it.  Those are principally -- principally the
17    communications.
18              We had some communications early on
19    in the process, when they were making decisions,
20    when Stanford was trying to figure out what the
21    gap was.
22              So yeah, so it was just general,
23    like you would have with any other research
24    organization.
25              Q.   So it was no different than the
```

RIAN . SC LL   1/12/2023

```
 1     communications you had with other research
 2     organizations?
 3            A.   I think the one difference, I would
 4     say, is that we -- we probably connected them
 5     with other -- so we connected them with the
 6     Center For Internet Security, and we connected
 7     them with some of the election official groups,
 8     so the National Association of Secretaries of
 9     State and the National Association of State
10     Election Directors, and then we facilitated some
11     meetings between those three.
12            Q.   Let me ask you this:  You said you
13     had -- I take it you said some CISA interns came
14     up with the idea; is that right?
15            A.   Correct.
16            Q.   And who are those interns?
17            A.   I'm not going to give their names.
18            Q.   Who were those interns?
19            A.   Yeah, I'm not going to give those
20     names.
21            Q.   Who were -- you have no --
22            A.   The Stanford students -- Stanford
23     students have seen substantial amount of
24     harassment from public reporting.  I'm not going
25     to include my interns in that.
```

RIAN . SC LL   1/12/2023

1          Q.   Are you -- you're declining to

2     answer the question without an instruction?

3          A.   Correct.

4          Q.   And you said those interns were

5     also involved in the Election Integrity

6     Partnership; correct?

7          A.   I believe they worked for the

8     Stanford Internet Observatory, as well, so yes.

9          Q.   And they were working for CISA and

10    Stanford Internet Observatory on the project?

11         A.   When they came up with the idea,

12    they -- obviously they were just interns.  After

13    their internships a couple of interns remained

14    as interns.  Several others went back to

15    Stanford, as students, and did not remain as

16    interns.  Two of the interns ended up working on

17    both in the fall; correct.

18         Q.   You said two of the interns who

19    were CISA interns, in the fall of 2020, worked

20    on the Election Integrity Partnership; is that

21    right?

22         A.   They worked at the Stanford

23    Internet Observatory, which was part of the

24    Partnership.

25         Q.   Were there any other interactions

RIAN . SC LL   1/12/2023

```
 1     between CISA and the Election Integrity

 2     Partnership, that you're aware of?

 3          A.   So just to say so we had some

 4     initial conversation with the interns.  We had a

 5     conversation with the Stanford Internet

 6     Observatory folks about the gap.

 7               I believe we received a briefing

 8     from them, or two, on kind of what they were

 9     putting together.

10               We facilitated some meetings

11     between Stanford folks, the Center For Internet

12     Security, and election officials, where they had

13     discussions about how they would work together.

14               And then I -- I'm sure we had some

15     conversations, kind of throughout, when they

16     were -- particularly when they were putting out

17     public reporting about what they were seeing.

18               I wouldn't be surprised if there

19     were some other kind of brief conversations in

20     there, but I'm not recalling.

21               But those are generally the

22     categories of the conversations we had.

23          Q.   Did the Election Integrity

24     Partnership, or a similar collaboration of any

25     kind, operate during the 2022 election cycle?
```

RIAN .SC LL  1/12/2023

```
 1                    MR. GARDNER:  Objection, vague.
 2     BY MR. SAUER:
 3               Q.   You may answer.
 4               A.   So I believe the EIP did operate,
 5     but I'm not -- I'm not certain what they did.
 6               Q.   How do you know they operated in
 7     2022?
 8               A.   I believe they put out a public --
 9     some public reporting.
10               Q.   Did you have --
11               A.   But I --
12               Q.   Go ahead.
13               A.   We did not have communications with
14     them.  They gave us a briefing, early on, about
15     what they were thinking about, and that was the
16     extent of our communications with them on that
17     stuff.
18               Q.   When did that briefing occur?
19               A.   I believe it was May/June of 2022.
20               Q.   Who was at that briefing on your
21     end, CISA?
22               A.   On my end, it was me, I believe
23     Geoff Hale.  Who else was in that?  I think one
24     of our -- I think that may have been it, but
25     there might have been one other staff person
```

Case 3:22-cv-01213-TAD-KDM  Document 209-1  Filed 03/04/23  Page 54 of 456 PageID #:
13167

RIAN . SC LL  1/12/2023

```
 1    there, as well.  But it was primarily Geoff Hale
 2    and myself, that I recall.
 3           Q.   Who was in the briefing on the EIP
 4    side?
 5           A.   Ren e DiResta was the lead, and
 6    then one of their staff, I believe his name was
 7    John, but honestly I forget what his name is.
 8           Q.   So just two people?
 9           A.   That I recall, yeah.
10           Q.   What did they say in the briefing?
11           A.   Essentially, they just walked
12    through what their plans were for 2022, some of
13    the lessons learned from 2020, that was
14    essentially the gist of the conversation.
15           Q.   What were their plans for 2022?
16           A.   It sounded like they were going to
17    do something similar to what they did in 2020 in
18    terms of trying to support election officials.
19           Q.   Did they indicate that they were
20    coordinating with state and local election
21    officials?
22           A.   I think that was their goal with
23    the -- with the work with state and local
24    election officials.  I'm not sure how they would
25    describe it.
```

RIAN . SC LL   1/12/2023

Page 55

```
 1            Q.    Sorry, I think you said this
 2      earlier, and I can't remember.
 3                  When did this briefing occur, would
 4      you say it was in May or June of 2022?
 5            A.    I believe it was around that
 6      timeframe.  My timeline recollections are awful,
 7      so I apologize for that, but I think it was
 8      around that timeline.
 9            Q.    Did you --
10            A.    Things all blur together.
11            Q.    Did they -- in fact, let me ask
12      you:  Did they invite CISA to participate again?
13            A.    No.  CISA didn't -- I mean, I
14      wouldn't say CISA participated in 2020, so it
15      wouldn't have been again, so it would have been
16      participate for -- kind of for the first time.
17            Q.    Did they invite CISA to have any
18      role, at all, in what they were doing?
19            A.    Not that I recall.
20            Q.    Why were they giving you a
21      briefing, then?
22            A.    I think they should know our role
23      in the federal government for election security.
24      And we have, you know, an established
25      relationship with them.  So I think they were
```

RIAN . SC LL   1/12/2023

 1    just going around and making sure -- again, I

 2    don't -- I don't want to speak for them, but my

 3    sense was that they were just kind of briefing

 4    people who -- who were involved in election

 5    security at the federal level.

 6              Q.   Do you -- do you know -- do you

 7    have any knowledge of what they actually did,

 8    after that briefing, during the 2022 election

 9    cycle?

10              A.   No.  I know -- like I said, the

11    reason I -- I think they were operating was

12    there was a couple of public reports, one -- at

13    least one public report, that I recall, that I

14    thought was pretty good, but was it about

15    specific disinformation, it was basically how to

16    think about whether or not a narrative poses

17    risks.

18              As I mentioned earlier, we were

19    particularly interested in understanding how to

20    determine if MDM creates risk.  And we thought

21    their products was pretty good on that.

22              Q.   You used a phrase earlier, that I

23    did -- I passed over, and I didn't understand, a

24    specific gap that we were talking about putting

25    together the I P in the first place.  What's the

RIAN . SC LL  1/12/2023

Page 57

```
 1     gap that you're referring to?
 2           A.   Sure.  So we had a conversation
 3     with the interns, and they were asking questions
 4     about kind of needs that the election officials
 5     have, generally.
 6                One of the gaps that we identified
 7     from 2018 is, as you know, most election
 8     officials their offices are fairly low staff,
 9     low resourced, and so there was no -- they
10     didn't have capabilities to try to identify
11     disinformation targeting their jurisdictions,
12     and so was essentially the gap is that most
13     election offices throughout the country just
14     didn't have that capacity or capability to be
15     monitoring so that they could identify anything
16     that would be potentially target their
17     jurisdictions, so that was the gap.
18           Q.   So the gap is that state and local
19     election officials don't -- just don't have the
20     bandwidth or capacity to monitor mis and
21     disinformation on social media that may affect
22     their jurisdictions; right?
23           A.   Correct.
24           Q.   And then I take it was it the
25     interns' idea that the Election Integrity
```

RIAN . SC LL  1/12/2023

Page 58

1      Partnership could be set up to kind of fill in
2      that gap, was that the idea?
3             A.   Again, I don't want to speak for
4      the interns.  But at that point I don't think
5      they were necessarily thinking about more of a
6      partnership.
7             I think the conversation was more
8      along the lines of this may be something that
9      the Stanford Internet Observatory could look
10     into, and then I think they went back and talked
11     to their folks at the Stanford Internet
12     Observatory and the idea was formed from there.
13            So I don't think that was the
14     interns' initial thought was to have the EIP.
15         Q.   Was there discussions of having
16     CISA fill that gap, for example, by doing
17     routing disinformation concerns to social media
18     platforms?
19            A.   With the -- there's no conversation
20     with the interns about CISA filling the gap, no.
21         Q.   How about internally to CISA, did
22     CISA view itself as kind of helping fill that
23     gap by, you know, helping state and local
24     election officials addressing this mis and
25     disinformation concern?

RIAN . SC LL   1/12/2023

```
 1              A.   Our focus generally was not to play

 2      that role, no.  We -- we weren't looking to

 3      identify -- monitor social media to share with

 4      platforms.

 5              Q.   You mentioned that you -- I think

 6      you mentioned you put EIP in touch with CIS, the

 7      Center For Internet Security; is that right?

 8              A.   Correct.

 9              Q.   What is the Center For Internet

10      Security.

11              A.   I don't -- I don't know how to

12      describe them.  They're essentially, as I

13      understand it, they're non-profit that oversees

14      the multi-state ISAC and the election

15      infrastructure subsector information sharing and

16      analysis center, that's what ISAC stands for, so

17      that's my understanding of what they do.  I

18      don't know what else they do.  I know them in

19      those two contexts.

20              Q.   And those two contexts are

21      overseeing an ISAC, I-S-A-C, that involves

22      multiple states; is that right?

23              A.   Correct.

24              Q.   Now, and that's a -- basically a

25      sharing collaborative that they facilitate
```

RIAN . SC LL   1/12/2023

```
 1      amongst state and local election officials; is
 2      that right?
 3              A.   Yeah, it's a general woven artifact
 4      is information sharing with the sector.  So each
 5      sector -- not each -- most sectors have their
 6      own information sharing and analysis center.
 7      They're independently stood up to serve those
 8      sectors.
 9              And so CIS was the one who was
10      responsible for kind of running the two that I
11      mentioned.
12              Q.   I'm sorry, what were those two, can
13      you identify them again?
14              A.   Sure.  The multistate ISAC and the
15      election infrastructure subsector ISAC.  And
16      just as a reminder of what ISAC is Information
17      Sharing and Analysis Center.
18              Q.   And those are, I think, referred to
19      as the EI-ISAC and the MS-ISAC; is that right?
20              A.   That's correct.
21              Q.   And both of those, I take it,
22      involve basically information sharing amongst
23      state and local election officials; is that
24      right?
25              A.   I believe only the election
```

RIAN . SC LL  1/12/2023

```
 1    infrastructure one is focussed on -- on election

 2    officials.  I believe the multistate one is

 3    broader across state and local government, but

 4    includes a broader set.  I'm not sure if

 5    election officials are involved in the

 6    multistate.

 7            Q.   Is the Center For Internet Security

 8    funded, in part, by CISA?

 9            A.   To the best of my knowledge, CISA

10    provides funding for the EI-ISAC.

11            Q.   Okay.  And do you know how -- how

12    is that funding provided, is it grants or how is

13    it provided?

14            A.   I don't believe it's a grant, but

15    I'm not 100 percent certain what the -- what the

16    actual mechanism is, vehicle for the money to go

17    there.

18            Q.   But they're --

19            A.   My understanding is that it's

20    statutory, as well, but I could be wrong, also,

21    so I don't want to speak too much.

22            Q.   But you're aware that CISA does

23    provide funding for CIS to operate the EI-ISAC;

24    is that right?

25            A.   My understanding is that they
```

RIAN . SC LL   1/12/2023

```
 1    provide funding to the EI-ISAC.  I don't know if
 2    the goes -- if the EI-ISAC is an organization,
 3    and the money goes to them or if the money goes
 4    to CIS, and then they filter it down to the
 5    EI-ISAC.  I'm not sure how it works, in
 6    practice.
 7            Q.    Does CIS operate the EI-ISAC, I
 8    mean, does it kind of run it?
 9            A.    Yeah, that's essentially how I see
10    it, yeah.
11            Q.    And then you say you put them in
12    touch, or CISA put the EIP in touch with CIS in
13    2020, do you remember that?
14            A.    Yes.
15            Q.    How did that happen?
16            A.    So CISA's general position on -- on
17    the switchboarding role was that it wasn't a
18    role we necessarily wanted to play, because it's
19    very resource intensive.  And so we had been
20    working with election officials to try to find
21    an alternate way for them to have that role,
22    somebody play that role.
23                  They seemed to settle on the Center
24    For Internet Security.  And so since the EIP was
25    working on the same mission, we wanted to make
```

RIAN . SC LL   1/12/2023

```
 1    sure that they were all connected.
 2              Q.   And so the same mission, I take it,
 3    is the switchboarding role that you've talked
 4    about before?
 5              A.   Correct.
 6              Q.   Yeah, so I take it CISA was playing
 7    a switchboarding role in 2020, but you mentioned
 8    that that's resource intensive and it wasn't
 9    something that you guys wanted to be principally
10    responsible for; right?
11              A.   Something we didn't want to be
12    responsible for, at all.  But election officials
13    asked if we could continue serving in that role
14    until they kind of got something else set up.
15              Q.   And you did do that, right, in 2020
16    you mentioned earlier that CISA performed a
17    switchboarding function; right?
18              A.   Correct, in 2020.
19              Q.   And then Center For Internet
20    Security performs a switchboarding function,
21    too; is that right?
22              A.   Yeah.  So yes, yes and no.  So yes
23    in the sense they were receiving reporting
24    directly from election officials.  In the early
25    part of 2020, they would forward what they were
```

1    receiving election officials to us at CISA, and
2    then we would push that to the social media
3    platform; as 2021 moved along, CIS more
4    frequently provided that directly to the
5    platforms, themselves.
6            And so I would say early on in the
7    process, the switchboarding generally came
8    through CISA.  Later on in the process, it was
9    more of a mixed bag of how the switchboarding
10   worked.
11       **Q.   And then did EIP play a**
12   **switchboarding role, too?**
13       A.   I believe EIP did report stuff to
14   the platforms, themselves, yes.
15       **Q.   And was there coordination between**
16   **the switchboarders, so to speak, CISA and EIP**
17   **and CIS?**
18       A.   Most of the coordination was
19   between CISA and the Centers For Internet
20   Security.
21            There was a point where one of the
22   platforms was concerned about too much kind of
23   duplicate reporting coming in, and so we did
24   have some conversations with EIP and CIS on how
25   to kind of better manage that activity to make

RIAN . SC LL  1/12/2023

1    sure we weren't overwhelming the platforms.
2            **Q.    In other words, like Twitter or**
3    **Facebook would be hearing from CIS and CISA and**
4    **EIP about a disinformation concern; correct?**
5            A.    Yeah.  Generally speaking, yes,
6    I'll just leave it there, yes, that's correct.
7            **Q.    And then --**
8            A.    Twitter, in particular, reached out
9    to us and had some concerns about that.
10           **Q.    And I take you talked to EIP and**
11   **talked to CIS about creating a more streamlined**
12   **process through the platforms?**
13           A.    I don't think it was necessarily a
14   streamlined process.  We just wanted to make
15   sure that there was -- that there was awareness
16   for the platform.
17                So I think, to be honest with you,
18   I don't recall how we ended up following this,
19   in practice.  But I think it was just we would
20   let everybody know when we were setting
21   something up through CIS.  We would let CIS
22   know, and I think CIS, through that
23   relationship, would like EIP know.
24                But I don't recall, specifically,
25   how we ended up kind of solving that problem.

RIAN . SC LL  1/12/2023

1          Q.   But at least there was, I guess,

2     kind of communication among CISA, the EIP, and

3     CIS about who was reporting various concerns in

4     an attempt to kind of de-duplicate what's being

5     sent to the social media platforms?

6          A.   Yeah, I don't recall being directly

7     from CISA to EIP.  Like I said, I think we

8     mostly worked it through CIS.

9          Q.   Was there -- for example, was there

10    direct e-mail communication between EIP and

11    CISA?

12         A.   I'm sure there was.

13         Q.   I mean, was it your practice to

14    copy the CISA's -- or sorry -- the EIP's tips,

15    e-mail address when you were -- you or CIS was

16    reporting a disinformation concern to a social

17    media platform?

18         A.   No, that was not standard practice.

19         Q.   Did CIS do that?

20         A.   I don't know.  That's a good

21    question.  I don't know.

22         Q.   Why don't we --

23         A.   Just to be clear, you're -- sorry,

24    just to be clear, you were asking if they were

25    sending EIP when they sent e-mail to social

RIAN . SC LL   1/12/2023

1    media platforms; correct.

2         Q.    Yeah.

3         A.    Yeah, I'm not sure.  Sorry.

4         Q.    When -- when was EIP copied by CIS

5    or you on disinformation e-mails, if ever?

6         A.    I don't believe we ever -- CISA

7    ever copied EIS on e-mails we sent to platforms.

8    I don't -- but where we were forwarding -- if we

9    were forwarding something we received from an

10   election official to the platform, I don't

11   believe CISA ever copied EIP, certainly not to

12   my recollection.  It wasn't kind of our process.

13              I can't speak for the Center For

14   Internet Security.  I don't -- I don't recall

15   who they were including on theirs.

16        Q.    Did you notify EIP if you were

17   flagging a disinformation concern for a social

18   media platform in any way?

19        A.    Not that I -- not directly, that I

20   recall.  We would -- we would generally copy the

21   Center For Internet Security.

22        Q.    Was it your understanding that they

23   were communicating with EIP?

24        A.    CIS?  Yeah, that was essentially

25   the -- their relationship was between those two,

RIAN . SC LL   1/12/2023

```
 1    yeah.
 2           Q.   So in other words, you had the
 3    understanding that CIS had a relationship of
 4    communication and coordination with the Election
 5    Integrity Partnership; right?
 6           A.   Yes.  Correct.
 7           Q.   And then you would notify CIS if
 8    you were reporting something to a social media
 9    platform on the understanding that they were
10    coordinating with EIP on what was being
11    reported; correct?
12           A.   No.  The reason we -- we would
13    coordinate with CIS was generally most of the
14    reporting we received from an election official
15    came through CIS.  And so we just wanted to let
16    them know that we were -- we had set it up so
17    that they had awareness of kind of where the
18    report had gone.  And so that was the rationale
19    for us coordinating with CIS.
20           Q.   And did you have the understanding
21    that CIS was coordinating with EIP on what was
22    being reported?
23           A.   I -- that would be speculating on
24    exactly what they were doing there.  I'm not
25    sure.
```

RIAN . SC LL  1/12/2023

Page 69

```
 1              Q.    You didn't know what they were
 2      doing?
 3              A.    I mean, I know they coordinated on
 4      things.  I don't know the full nature of what
 5      they were coordinating on, I don't want to put
 6      words in their mouth.
 7                    (Exhibit No. 1 was marked for
 8      identification.)
 9                    MR. SAUER:  Let's look at Exhibit
10      1.  I've sent that to your counsel.
11                    MR. GARDNER:  Yeah, we've got it up
12      here.
13      BY MR. SAUER:
14              Q.    Can you also see it on the screen
15      share?
16              A.    Yes.
17              Q.    Are you familiar with this
18      document?
19              A.    Yes.
20              Q.    In other words, is this the report
21      that the Election Integrity Partnership did in
22      2021, about its activities in the 2020 election?
23              A.    Correct.
24              Q.    Had you read it before or how did
25      it get on your attention?
```

RIAN . SC LL  1/12/2023

```
 1              A.   Yeah, I've read portions of it

 2     before, and some of the folks briefed us on it.

 3              Q.   Who are the folks that briefed you

 4     on it?

 5              A.   Alex Stamos and Ren e DiResta.

 6              Q.   When did that briefing occur?

 7              A.   I'm sorry, when or where?

 8              Q.   When did that briefing occur?

 9              A.   It was late spring, early summer

10     2021.

11              Q.   This would have been around the

12     time that the report was released?

13              A.   Yeah, sometime after that.

14              Q.   And Alex Stamos is at Stanford

15     Internet Observatory; right?

16              A.   Yes.

17              Q.   Does he also serve on some CISA

18     committees or subcommittees?

19              A.   I don't know.

20              Q.   Ren e DiResta, is she also at

21     Stanford -- Stanford Internet Observatory; is

22     that right?

23              A.   Yes.  Yes, last I checked.

24              Q.   Do you remember what they said in

25     the briefing?
```

RIAN . SC LL   1/12/2023

Page 71

```
 1              A.   I think they just walked through
 2    kind of what they did and how they did it,
 3    explained what they kind of learned, how they
 4    viewed some of the issues, things like that.
 5              Q.   Who participated in the briefing,
 6    other than you, for CISA?
 7              A.   So I received a briefing when I was
 8    at the National Security Council.  So it was a
 9    National Security Council colleague of mine,
10    Marybeth Foley (phonetic).
11              Q.   Did CISA receive a briefing?
12              A.   I don't know for certain.
13              Q.   Did you do -- I can't remember if
14    you said this -- did you do a detail on the
15    National Security Council in that timeframe?
16              A.   From January 2021 to March 2022 I
17    was on detail to the National Security Council.
18              Q.   Why did they report to the National
19    Security Council?
20              MR. GARDNER:  Objection, calls for
21    speculation.
22    BY MR. SAUER:
23              Q.   You may answer.
24              A.   Yeah, I don't know why.
25              Q.   I mean, were they reporting back to
```

RIAN . SC LL    1/12/2023

```
 1      you because you had communicated with them back

 2      in 2020 or was it a report to your agency?

 3              MR. GARDNER:  Objection, compound,

 4      calls for speculation.

 5          A.   Yeah, again, I don't -- I don't

 6      know why they -- why they wanted to brief us.

 7          Q.   Can you see the document on the

 8      screen share?

 9          A.   Yep.

10          Q.   Scrolling down here on the third

11      page of the document, they list the participants

12      here.  Are these the same participants that you

13      talked about earlier?

14          A.   Yeah.

15          Q.   Yeah?  And I think you mentioned

16      Stanford Internet Observatory includes Alex

17      Stamos and Ren e DiResta; correct?

18          A.   Yes.

19          Q.   And then the University of

20      Washington, Center For an Informed Public, is

21      that where Dr. Kate Starbird works?

22          A.   I believe so, yes.

23          Q.   And is she also on a CISA

24      subcommittee?  Actually, isn't she on the MDM

25      subcommittee for the CSAC?
```

RIAN . SC LL   1/12/2023

```
 1            A.   I believe that's correct, yeah.
 2            Q.   And is she also involved in the
 3       Election Integrity Partnership?
 4            A.   Yeah, that's my understanding.
 5            Q.   Jumping ahead just a tiny bit, past
 6       the table of contents, here in the executive
 7       summary, on page six, little Roman six, you see
 8       here it says:  Election Integrity Partnership
 9       was formed to enable realtime information
10       exchange between election officials, government
11       agencies, civil society organizations, social
12       media platforms, the media, and the research
13       community; correct?
14            A.   Yeah, I see that sentence.
15            Q.   There's a reference to both
16       election officials and government agencies
17       engaging in realtime information exchange with
18       social media platforms; correct?
19            A.   Yes.
20            Q.   What -- do you know what government
21       agencies engaged in realtime information
22       exchange under the aegis of the EIP?
23            A.   I don't know who they're referring
24       to.
25            Q.   Did CISA do that, at all?  Did CISA
```

RIAN . SC LL  1/12/2023

```
 1    share information with EIP?

 2            A.   Generally speaking, no.

 3            Q.   How about more specifically, did

 4    anyone at CISA share information with the EIP?

 5            A.   I mean, that's very broad.  Did we

 6    share information?  Can you be more specific

 7    about what type of information you're asking

 8    that we shared?  We had conversations with them,

 9    so in that sense we shared information.  Is

10    there something in particular that you're asking

11    about?

12            Q.   Sure.  What conversations did you

13    have with them?  I know you summarized them

14    earlier, can you be more specific?

15            A.   Yeah, I mean, I think that summary

16    actually is -- is probably as specific as I can

17    get.  Like I said, we -- we had conversations

18    with Stanford about the gap.  They gave us some

19    briefings on what they were doing, how they were

20    doing it.

21            Prior to the election, we had some

22    conversations with them to facilitate and

23    coordinate meetings, as I mentioned.  And then

24    when they put public reporting out, if we had

25    questions about it, we would probably have
```

RIAN . SC LL  1/12/2023

Page 75

```
 1    conversations with them around that, as well.
 2              Q.   Was there any communication from
 3    government officials to EIP about specific
 4    disinformation concerns?
 5              A.   Not that I'm aware of, no.
 6              Q.   Who at CISA was involved in any
 7    interactions with the Election Integrity
 8    Partnership?
 9              A.   In addition to the two interns, the
10    primary interaction was myself and Matt
11    Masterson.
12              Q.   Are you aware of anyone else at
13    CISA communicating with them?
14              A.   It's possible, but I don't recall,
15    and it certainty wouldn't have been -- you know,
16    they would have just been part of a meeting with
17    either Matt or myself.
18              Q.   How about Lauren Protentis, did she
19    communicate?
20              A.   She wasn't part of the MDM team in
21    2020.
22              Q.   How about --
23              A.   So she would not have been
24    communicating them.
25              Q.   How about Geoff Hale?
```

```
 1              A.   I -- I wouldn't be surprised if
 2      Geoff was on some of the conversations, but I
 3      don't recall -- I don't recall him
 4      participating.
 5              Q.   How about Director Easterly?  I
 6      guess she wasn't director back then.  How about
 7      Director Krebs?
 8              A.   I believe Director Krebs had a
 9      relationship with Alex Stamos.  So he may have
10      had conversations in that context.  I don't -- I
11      don't believe he had -- necessarily had
12      conversations in relation to EIP.
13              Q.   And then, in fact, when he left
14      CISA he joined Alex Stamos at the Stanford
15      Internet Observatory or he joined Alex Stamos in
16      some capacity, didn't he?
17              A.   I believe they started a business
18      together, yes.
19              Q.   Do you know what that business was?
20              A.   I'm sorry?
21              Q.   Do you know what that business was?
22              A.   I believe the name of it is
23      Krebs -- Krebs/Stamos Group.
24              Q.   Do you know what it does?
25              A.   I believe cyber security theft.
```

RIAN . SC  LL   1/12/2023

 1    I'm not entirely sure.
 2              **Q.    Does it do anything related to**
 3    **misinformation and disinformation?**
 4              A.   I don't know, if they do it hasn't
 5    been something they've been promoting, that I'm
 6    aware of.
 7              **Q.    Are you aware of any communications**
 8    **between Director Krebs -- Krebs and Alex Stamos**
 9    **while he -- while Krebs was still director?**
10              MR. GARDNER:  Objection, vague.
11              A.   Yeah, it's really vague.
12    Again what --
13              **Q.    Any communications is broad and not**
14    **vague.**
15              **I want to know if you have any**
16    **communications of any kind between Director**
17    **Krebs and Alex Stamos when Krebs was still**
18    **director of CISA?**
19              MR. GARDNER:  Same objection.
20              A.   I believe they -- Director Krebs
21    may have participated in a couple of meetings
22    that I'm aware of, that Stamos was also in, but
23    beyond that I'm -- I'm not familiar with --
24    obviously not going to be familiar with Krebs's
25    direct communications with Stamos.

RIAN  . SC  LL  1/12/2023

```
 1          Q.   What meetings were they both
 2     involved in, if you recall?
 3          A.   So I can recall an event that
 4     occurred out in Stanford, that Krebs spoke at
 5     for the Stanford Internet Observatory, for
 6     example.  I believe the first government
 7     industry sync Stamos was the Facebook lead, at
 8     the time.  This was before he went to Stanford
 9     Internet Observatory, and Director Krebs
10     participated in that meeting, so meetings like
11     that.
12               Beyond that, I don't have a real
13     understanding of how they communicated with each
14     other.
15          Q.   Was there any discussion of the
16     Election Integrity Partnership at the meetings
17     you're aware of?
18          A.   Not that I'm aware of, no.
19          Q.   Turning back to the screen share,
20     it talks about election officials, engaging in
21     realtime information sharing with social media
22     platforms, among others; do you see that?
23          A.   Yeah, as part of that same
24     sentence, right; is that what you're referring
25     to?
```

RIAN . SC LL   1/12/2023

```
 1              Q.    Yeah.
 2              A.    Yeah.
 3              Q.    Are you aware of state and local
 4       election officials engaging in realtime
 5       information sharing with the election
 6       integrity -- you know, with social media
 7       platforms through the Election Integrity
 8       Partnership?
 9              A.    I -- I don't know the relationship
10       between EIP and election officials.  I'm not
11       sure if they're referring to direct reporting to
12       them from election officials or if they're
13       referring to reporting through the Center for
14       Internet Security, I'm just not sure what
15       they're referring to there.
16              Q.    How about through the Center For
17       Internet Security, was there election reporting
18       through them?
19              A.    Yeah, so generally speaking, the
20       reporting that CISA received came through the
21       Center For Internet Security.
22              Q.    Gotcha.
23                    And how about -- did -- did --
24       as -- to the extent you understand, did EIP
25       receive reporting through the Center of Internet
```

RIAN . SC LL   1/12/2023

```
 1      Security, you know, kind of from election

 2      officials through the internet security to the

 3      Election Integrity Partnership?

 4                  MR. GARDNER:  Objection, lack of

 5      foundation.

 6   BY MR. SAUER:

 7           Q.    You may answer.  Do you know if --

 8           A.    Yeah, I -- I'm not -- I'm not sure

 9      what their full relationship was and how they

10      were sharing, what the specifics were.  It

11      wouldn't surprise me if CIS had shared some with

12      EIP, but I just don't know.

13           Q.    You mentioned Matt Masterson, and I

14      think you said that he was involved in briefing

15      with the EIP; is that correct?

16           A.    No.  He was involved -- involved

17      in -- in conversations with Stanford Internet

18      Observatory.  He probably -- generally, all of

19      our -- so just to take a step back, generally

20      our communications, when VIPs stood up, were

21      still at the Stanford Internet Observatory.

22                  So the conversations I'm aware of

23      with Masterson were generally at the Stanford

24      Internet Observatory.  He was also briefed -- I

25      seem to recall he was probably in some of the
```

RIAN . SC LL  1/12/2023

```
 1    briefings I was in or conversations when we had
 2    questions about reporting that they did, public
 3    reporting.
 4              So I don't know how to kind of
 5    thread the needle between, you know, when they
 6    were just conversations with Stanford Internet
 7    Observatory and when they would be considered
 8    conversations with the EIP.
 9         Q.   And that, I take it, you said
10    thread the needle, I take it that's kind of a
11    fuzzy distinction, because the EIP is a
12    collaboration that involves the Stanford
13    Internet Observatory; correct?
14         A.   Right.
15         Q.   Do you know -- do you know -- let
16    me ask you this:  What discussions do you know
17    of between Matt Masterson and Stanford Internet
18    Observatory that related in any way to the EIP?
19         A.   I think it would have just been if
20    we had questions about public reporting.
21         Q.   What is --
22         A.   Kind of once they were up and
23    running.
24              So he was involved in some of the
25    conversations before, you know, the first couple
```

RIAN  . SC  LL  1/12/2023

 1    that I talked to about, kind of in our

 2    engagement with Stanford Internet Observatory,

 3    he was involved, I know, in at least one of the

 4    conversations about that.

 5              And then, after that, I don't think

 6    he was particularly involved, but he may have

 7    been involved, and we had some briefings for --

 8    or not briefings, I don't think is the right

 9    word, where we had conversations with them about

10    public reporting we put out.

11         Q.   When you say public reporting, what

12    do you mean?

13         A.   So the EIP put out regular kind of

14    blog posts, excuse me, regular blog posts on

15    what they were seeing, so -- so it was publicly

16    available information.

17         Q.   And -- and did you -- did they

18    discuss, you know, those blog posts with Matt

19    Masterson or you before they were posted?

20         A.   Not that I recall.

21         Q.   And what discussions did you have

22    with the public reporting?

23              MR. SCOTT:  John, just one second,

24    it looks like the video is frozen on our end.

25    Does it appear frozen on your end, as well.

RIAN . SC LL  1/12/2023

```
 1                    MR. SAUER:  I see a little
 2     interference.  Shall we go off the record?
 3                    THE WITNESS:  There's interference
 4     with the top and the bottom.  I'm not seeing
 5     that.  Still, we can go off -- we can go off the
 6     record and try to fix that.
 7                    MR. SAUER:  Let's go off the
 8     record.
 9                    THE VIDEOGRAPHER:  The time is now
10     10:27.  We are off the record.
11                    (Recess.)
12                    THE VIDEOGRAPHER:  The time is now
13     10:40.  We are back on the record.
14     BY MR. SAUER:
15          Q.   Mr. Scully, I think we were talking
16     about Matt Masterson before we had the
17     technical -- technical difficulty.
18                    Generally speaking, do you know
19     what role he had, if any, in originating the
20     concept for the Election Integrity Partnership?
21          A.   So his primary role was the same as
22     mine, in terms of just clarifying the gap that
23     election officials faced for the folks at the
24     Stanford Internet Observatory early on in the
25     process.
```

**RIAN . SC LL   1/12/2023**

```
 1          Q.   And is that something that you
 2     discussed with the interns when they came up
 3     with the idea?  Did the interns come to you or
 4     Mr. Masterson and talk about the gap?
 5          A.   I'm sorry, so are you referring
 6     specifically to the gap?
 7          Q.   Yeah.
 8          A.   Yeah, so the gap came from our --
 9     the gap came from myself.
10          Q.   That was your idea, that there is a
11     gap, and you shared that with the interns?
12          A.   I'm not sure I would say that was
13     my idea.  That was -- that was just kind of from
14     lessons learned from 2018, I think across the
15     election community.
16               I don't know that I would say that
17     that was -- that was something that we came up
18     with on our own.
19          Q.   Is that something you shared with
20     the interns?
21          A.   It is something I shared with the
22     interns, correct.
23          Q.   And then the interns came up with
24     the idea of putting together the Election
25     Integrity Partnership as a way of assisting
```

RIAN  .SC  LL   1/12/2023

Page 85

```
 1      state and local election authorities of filling
 2      that gap; right?
 3              A.   I don't -- I don't know what the
 4      exact process was, essentially they identified
 5      the gap.  They went back and talked to the folks
 6      at the Stanford Internet Observatory.  And
 7      somewhere in that sausage making process, along
 8      the way, they decided that this partnership
 9      would be the best approach to take.
10              Q.   In that timeframe, did they also
11      have discussions with you about putting together
12      something like this?
13              A.   I'm sure they mentioned it to us
14      somewhere along the line, that this was
15      something they were thinking about, but I
16      don't -- I don't know that it went beyond that.
17              Q.   How about Mr. Masterson, did they
18      discuss it with him?
19              A.   Again, I'm not familiar with all of
20      Matt's communications with these folks, but he
21      was in the meeting where we talked about the gap
22      with Stamos, in particular.  And I believe
23      Stamos mentioned that as an option during that
24      call.  I don't know if he had any other
25      conversations with them.  I don't know about
```

RIAN . SC  LL   1/12/2023

```
 1    that.
 2          Q.    When did that meeting with Alex
 3    Stamos occur?
 4          A.    Sometime in the summer of 2020, it
 5    would have -- yeah, I don't know.  The exact
 6    date would be hard for me to figure out, sorry.
 7    Yeah, the interns -- sorry -- the interns
 8    probably arrived in the May timeframe, so we
 9    probably would have had had that conversation --
10    the initial conversation sometime in June.  And
11    then probably Stamos, you know, a week or two
12    after that, so probably June/July, I would say.
13          Q.    Was Mr. Masterson in the meeting
14    where you discussed the gap with the interns?
15          A.    Not that I recall, no.
16          Q.    What did Mr. Stamos say in this
17    meeting you recall from the June to July
18    timeframe of 2020?
19          A.    Essentially, he just wanted to
20    confirm that we agreed with the interns that
21    this was a gap.
22          Q.    What -- what was said about the gap
23    in that meeting, that you remember?
24          A.    Yeah, it was basically along the
25    lines he just said, hey, the interns told me
```

```
 1   that there's a gap for election officials where
 2   most of them don't have the resources to do --
 3   to identify disinformation that may be targeting
 4   their jurisdictions, is that -- did the interns
 5   give me that information correctly.  He was
 6   thinking about potentially doing something, and
 7   he obviously didn't want to spend time and
 8   resources doing something if there wasn't, in
 9   fact, a gap.
10        Q.    How long did this meeting occur or
11   last, do you think?
12        A.    That's all of maybe 10 or 15
13   minutes.
14        Q.    Was there any other communications
15   with Mr. Stamos during this timeframe?
16             MR. GARDNER:  Objection, vague,
17   also calls for speculation.
18   BY MR. SAUER:
19        Q.    Do you remember any?
20        A.    So I don't recall any conversations
21   I had with him in that timeframe.  I obviously
22   can't speak for Masterson.
23        Q.    Okay.  Scroll ahead to page XII.
24   There's a thank you there for contributors, and
25   you see Kate Starbird is on that list; do you
```

RIAN .SC LL   1/12/2023

```
 1      see that?  You can look at the screen share.
 2              A.   Yes.
 3              Q.   You're there?  Yeah, do you know --
 4              A.   Yeah, I got it.
 5              Q.   Do you know how she contributed to
 6      the Election Integrity Partnership?
 7              A.   I don't.
 8              Q.   And I see Alex Stamos up here,
 9      obviously kind of set the thing off; right?  Do
10      you know how else he was involved?
11              A.   I don't.
12              Q.   Okay.  Down here it says the
13      Election Integrity Partnership would like to
14      thank Matt Masterson for additional feedback; do
15      you see that?
16              A.   I do.
17              Q.   Do you know what feedback
18      Mr. Masterson provided to the Election Integrity
19      Partnership?
20              A.   I don't.
21              Q.   When did Mr. Masterson leave CISA
22      and go to Microsoft?
23              A.   So Matt left CISA, I believe, in
24      January 2021.  I don't think he started at
25      Microsoft until early 2022.
```

RIAN . SC LL   1/12/2023

```
 1              Q.   Oh, do you know what he did in the
 2     intervening year?
 3              A.   I believe he -- he worked -- he was
 4     a fellow at the Stanford Internet Observatory.
 5              Q.   Oh, so he went from CISA to work
 6     with Alex Stamos's group at the Stanford
 7     Internet Observatory?
 8              A.   That's my understanding, yes.
 9              Q.   And Mr. Masterson is thanked here,
10     in this spring of 2021, I take it he was at the
11     Stanford Internet Observatory by then?
12              A.   I don't know when he officially
13     started.
14              Q.   I'm going to jump ahead to page 2
15     of the executive summary.  So if you're
16     following on the PDF it would be the 20th page
17     of the PDF.
18                   There's a discussion here where it
19     says:  The initial idea for the partnership came
20     from four students that the Stanford Internet
21     Observatory funded to complete volunteer
22     internships at CISA; right?
23              A.   Correct.
24              Q.   Okay.  You've declined to identify
25     them, early in your testimony.  Do you know who
```

RIAN . SC LL    1/12/2023

```
 1      they are?  Who are those four students?  Do you
 2      know who they are?
 3              A.   I know for certain who two are, I
 4      believe I know who the third is, I'm unsure who
 5      the fourth is.
 6              Q.   What -- what were they doing in
 7      their internships for CISA at the time they
 8      originated this idea?
 9              A.   They had different activities, so
10      they supported across the election security
11      initiative, broadly.  So tying to think if I can
12      recall specific tasks that they had.
13              Q.   And then, if you look to the next
14      two sentences, it talks about responsibilities
15      for election information security is divided
16      across government offices, and it goes on to say
17      that, yet, no government agency in the United
18      States has the explicit mandate to monitor and
19      correct election mis and disinformation;
20      correct?
21              A.   I'm sorry, is that the next page?
22              Q.   If you look at the screen share,
23      can you read that?  I can zoom in, if that
24      helps.
25                      MR. GARDNER:  A few sentences below
```

RIAN . SC LL  1/12/2023

```
1    where he was reading.

2              THE WITNESS:  Okay.  Got you.

3    BY MR. SAUER:

4         Q.   So it says:  Yet, no government

5    agency in the United States has the explicit

6    mandate to monitor and correct misinformation

7    and disinformation; correct?

8         A.   Sorry, I'm just trying to read and

9    catch up.

10        Q.   I'm just asking if you see where it

11   says that.

12        A.   Yeah, I see where it says that.

13        Q.   And it seems to me that they're

14   talking about a slightly different gap than the

15   one you talked about earlier; right?  They're

16   saying there's a gap in federal government

17   authority to monitor and correct election mis

18   and disinformation, right, as opposed to a gap

19   among the capacity for state and local election

20   authorities to do it; right?

21        A.   To be honest, I don't know what

22   they're referencing, so I don't -- I don't want

23   to speculate on what they're trying to say

24   there.

25        Q.   Let me ask you this:  Do you think
```

RIAN . SC LL   1/12/2023

```
 1      there's a gap in the authority of federal

 2      government agencies to monitor and correct

 3      election mis and disinformation?

 4              MR. GARDNER:  Objection to the

 5      extent it calls for a legal conclusion.

 6  BY MR. SAUER:

 7          Q.   Do you think that?

 8          A.   Yeah, I'm not a -- I'm not a

 9      lawyer, I don't want to comment on the legal

10      authorities of the departmental agencies.

11          Q.   I'm just asking whether you

12      think --  I'm not asking for your legal

13      conclusion, I'm asking whether you think there's

14      a gap in the authority of federal agencies that

15      makes them unable to monitor and correct mis and

16      disinformation?

17              MR. GARDNER:  Same objection, calls

18      for a legal conclusion.

19          A.   Yeah, by definition, an authority

20      is a legal determination I'm not comfortable

21      making.

22          Q.   Let me ask you this:  As a

23      practical matter, do you believe there's a gap

24      in the ability, as opposed to the authority, the

25      ability of federal government agencies to
```

RIAN . SC LL   1/12/2023

```
 1      monitor and correct mis and disinformation?
 2              MR. GARDNER:  Objection, vague.
 3   BY MR. SAUER:
 4          Q.   You may answer.
 5          A.   Yeah, can you clarify exactly what
 6   you're asking?  I just want to make sure I
 7   understand what you're trying to get at.
 8          Q.   I'm using your word, a gap; right?
 9          A.   Yes.
10          Q.   You just called it a gap, earlier,
11   and that's a practical word, it's not a legal
12   conclusion?
13          A.   Correct.
14          Q.   So I'm asking you, you talked about
15   a gap with respect to the capacities of state
16   and local election authorities; correct?
17          A.   That's correct, yeah.
18          Q.   Do you think there's a similar gap
19   with respect to the ability of federal
20   government agencies to respond to mis and
21   disinformation on social media?
22              MR. GARDNER:  Same objection,
23   vague.
24          A.   I -- I think the federal government
25   certainly would have the capability, if it chose
```

RIAN . SC LL  1/12/2023

1    to use it, and had the authority to do it.

2         Q.   Do you think it hasn't chosen to

3    use that capability?

4         A.   So generally speaking, I'm trying

5    to understand your question.  So is there a gap

6    in the federal government's ability to, what, to

7    provide information on social media about what's

8    online on their platforms, is that what you're

9    asking?

10        Q.   I'm asking if there was a gap in

11   the federal government's ability to, you know,

12   take any kind of action to correct mis and

13   disinformation on social media?

14             MR. GARDNER:  Same objection, to

15   the extent it calls for a legal conclusion.

16        A.   Yeah, I don't know that there's a

17   gap in the federal government's ability to do

18   it.

19        Q.   Well, let me ask this:  It goes on

20   to say -- let me ask you this:  This notion that

21   the report says that no government agency in the

22   United States has the explicit mandate to

23   monitor and correct election mis and

24   disinformation, is that something that was

25   discussed with the CISA interns who originated

RIAN  . SC  LL   1/12/2023

```
 1      the EIP?

 2              A.   Not that I recall, no.

 3              Q.   Do you remember any discussions of

 4      that with anyone else, suggesting that, you

 5      know, there's no government agency in United

 6      States with an explicit mandate to monitor and

 7      correct election mis and disinformation?

 8              A.   No, not that I -- not that I

 9      recall.  It's possible, though.

10              Q.   It goes on to say:  This is

11      especially true for election disinformation that

12      originates from within the United States, which

13      would likely be excluded from law enforcement

14      action under the first amendment, is not

15      appropriate for study by intelligence agencies

16      restricted from operating in the United States;

17      connect?

18              A.   That's what the sentence says, yes.

19              Q.   Do you agree with that sentence?

20              MR. GARDNER:  Objection, calls for

21      a legal conclusion.

22      BY MR. SAUER:

23              Q.   Do you?

24              MR. GARDNER:  Same objection.

25              A.   I'm sorry, I'm reading the
```

RIAN . SC LL   1/12/2023

 1  sentence.

 2          Yeah, this definitely gets into

 3  legal authority stuff that I would not want to

 4  comment on.

 5          Q.   And the next sentence says:  As a

 6  result, during the 2020 election local and state

 7  election officials, who had a strong partner on

 8  election system and overall cyber security

 9  efforts in CISA, were without a clearinghouse

10  for assessing mis and disinformation targeting

11  their voting operations; correct?

12          A.   Yeah, that's what this sentence

13  says.

14          Q.   That, to me, sounds like it's

15  talking about the same gap you talked about

16  earlier, and that's state and local election

17  officials were without a clearinghouse for

18  assessing mis and disinformation targeting their

19  voting operations; right?

20          A.   That's how I read that sentence,

21  yeah.

22          Q.   Yeah, and I take it that this

23  report links that gap to gaps that they perceive

24  in federal authority; right?

25               MR. GARDNER:  Objection, calls for

RIAN . SC LL   1/12/2023

```
 1   speculation.
 2          A.   Yeah, I don't want to speculate on
 3   what they're trying to do there.
 4          Q.   Okay.  Next sentence says:
 5   Students approach SIO leadership in the early
 6   summer, and in consultation with CISA and other
 7   stakeholders a coalition was assembled with
 8   like-minded partner institutions; do you see
 9   that?
10          A.   I do.
11          Q.   What -- let me ask you this:  It
12   says, in consultation with CISA, what
13   consultation with CISA do you recall relating to
14   the assembling of this coalition?
15          A.   I don't recall any consultation
16   with relation to the assembly of the coalition.
17          Q.   Well, you don't recall anyone
18   consulting with CISA about putting together the
19   Election Integrity Partnership?
20              MR. GARDNER:  Objection,
21   mischaracterizes the witness's previous
22   testimony.
23          A.   Yeah, so I don't recall any
24   consultation with us about who would be involved
25   in the -- in the EIP, who their members would be
```

RIAN . SC LL    1/12/2023

```
 1    or anything like that.

 2            Q.    Do you remember any consultation of

 3    any kind about starting up the EIP in any

 4    connection?

 5            A.    Just what I referred to earlier,

 6    the conversations with the interns and the

 7    conversation with Stamos about verifying the gap

 8    existed.

 9            Q.    How about Mr. Masterson, is it

10    possible they consulted with him?

11            MR. GARDNER:  Objection, calls for

12    speculation.

13            A.    Yeah, I don't know what

14    conversations Matt had with them.

15            Q.    Do you know whether he had any

16    conversations with them relating to the

17    commencement of the EIP?

18            A.    I don't.

19            Q.    And the next page of the document,

20    they provide an operational timeline; do you see

21    that?

22            A.    I do.

23            Q.    And here, the second entry in their

24    operational timeline, is -- I'm having trouble

25    highlighting -- it says:  July 9th of 2020,
```

RIAN . SC LL   1/12/2023

```
 1      meeting with CISA to present EIP concept; do you

 2      see that?

 3              A.   Yep, I see that.

 4              Q.   Do you know what meeting that is

 5      referring to?

 6              A.   I don't know specifically what

 7      meeting that's referring to, no.

 8              Q.   Would that -- to your mind, would

 9      that describe the 10 to 15 minute phone call you

10      had with Alex Stamos about the gap that you

11      talked about earlier?  Would you have described

12      that phone call as a meeting with the EIP for

13      EIP to present -- for -- to present the EIP

14      concept to CISA?

15              A.   That 10 to 15 minute phone call

16      only included Stamos, that I recall.  So I don't

17      know that I would frame it as a meeting to

18      present the EIP concept.

19                   As I mentioned earlier, he did kind

20      of raise the possibility of setting up some sort

21      of a partnership, during that call, so that

22      could be what his -- what his thinking was, but

23      I don't know what he's referring to there.

24              Q.   What kind of a partnership did he

25      talk about in that call?
```

RIAN . SC LL   1/12/2023

1              A.   He just said he thought he -- he

2    was thinking about potentially just getting

3    other -- other similar institutions involved.

4              I don't recall it -- I don't even

5    recall if he mentioned any names or not.  I

6    think it was more of a generic, where he didn't

7    think Stanford could necessarily do it on its

8    own, and would consider kind of forming some

9    sort of partnership.

10             Q.   Did he talk about forming any kind

11   of partnership with CISA?

12             A.   No.

13             Q.   So he didn't ask CISA to play any

14   role in the concept he was putting together?

15             A.   No.  Again, beyond -- sorry, just

16   to -- beyond what I've talked about earlier, you

17   know, I think he knew he would need us helping

18   him connect with election officials.

19             Q.   So he -- to the extent he -- okay.

20             So he was asking for your help in

21   connecting with election officials in that

22   meeting?

23             A.   I believe that was one of the asks,

24   but I don't -- it could have been then, it could

25   have been at another time, if that happened.

RIAN . SC LL  1/12/2023

```
 1              Q.   Is there a later conversation with
 2    Mr. Stamos?
 3              A.   I don't recall, but that's what I
 4    think there was a fifth call.  But again, I
 5    don't -- you know, this was several years ago,
 6    and my memory's a little foggy on timelines and
 7    everything that happened.
 8              Q.   But to the best of your
 9    recollection, at some point he asked for CISA's
10    assistance in connecting with state and local
11    election officials; right?
12              A.   Yeah.
13              Q.   Is that when you put him in touch
14    with the Center For Internet Security?
15              A.   I think they way initially put him
16    in touch with the National Association, so the
17    two I mentioned earlier, the National
18    Association of Secretary's of State, and the
19    National Association of State Election
20    Directors.  I'm not entirely -- I don't recall
21    when, exactly, Center For Internet Security got
22    involved.
23              Q.   At some point, did you put him --
24    put him in touch with CIS?
25              A.   So we put the Stanford Internet
```

RIAN . SC LL  1/12/2023

 1    Observatory in touch with them.  I forget if it

 2    was Alex, himself, or if it was somebody from

 3    the team there.

 4         Q.   So at some point you put them in

 5    touch with CIS.  And were you involved in

 6    further communications with CIS and anyone at

 7    EIP?

 8         A.   Yeah, so as I mentioned earlier, I

 9    facilitated some meetings between them, involved

10    between them and election officials.

11         Q.   What sort of -- can you unpack that

12    a little bit, you facilitated some meetings

13    between -- was that both EIP and CIS?

14         A.   Right.  So I facilitated meetings,

15    some meetings between EIP and CIS to make sure

16    that they were -- they didn't have relationship

17    before the -- they didn't know each other.

18              So we just facilitated getting them

19    together to talk and figure out how they were

20    going to work together.

21         Q.   Got you.  And who was at those

22    meetings from EIP?

23         A.   I don't recall.

24         Q.   How about CIS, who did you put them

25    in touch with at CIS?

RIAN . SC LL   1/12/2023

```
 1              A.   I only recall the CIS person's
 2    first name was Aaron.  I'm blanking on his last
 3    name, at this point.  I suspect there were other
 4    people from CIS on the call, as well, but he
 5    was -- Aaron was my principal contact at CIS.
 6    And that's Aaron, A-a-r-o-n.
 7              Q.   And I take it the purpose of that
 8    meeting was to set up a direct line of
 9    communication between CIS and EIP?
10              A.   Correct.
11              Q.   And then did you mention that you
12    facilitated other meetings, for example, between
13    EIP and NASED or National Association of
14    Secretaries of State?
15              A.   Yeah, my recollection is that we
16    did facilitate.  We put them in contact.  I
17    don't -- I don't know if we were on the calls or
18    not, I don't recall, but -- but I seem to recall
19    we did put them in contact.
20              Q.   Okay.  And specifically you mean
21    you put EIP --
22              A.   EIP in.
23              Q.   -- in contact with NASED and NASOS;
24    is that what it's called?
25              A.   Just NASS, but yes.
```

RIAN . SC LL   1/12/2023

1          Q.   Okay.  And so, yeah, sorry, for
2      clarity, you put EIP in contact with both NASED
3      and NASS; correct?
4          A.   And just to be clear, we put SIO
5      folks in contact with them.
6          Q.   Okay.
7          A.   But they were part of EIP, so
8      that's kind of the -- I don't know when EIP was
9      stood up in relation to the conversations,
10     because I don't really know when the
11     conversations occurred, either.  So just so
12     you're clear, we worked through the SIO when we
13     made those connections.
14         Q.   Got you.  Do you remember who at
15     the SIO was involved in those connections?
16         A.   I don't.
17         Q.   And again, SIO is short for
18     Stanford Internet Observatory; correct?
19         A.   Correct.
20         Q.   Do you know, what was the timeframe
21     of those, you know, connections that you
22     facilitated with, you know, Stanford Internet
23     Observatory folks and CIS, NASED and NASS?
24         A.   I don't know for certain, but I
25     would guess they were late July or August.

RIAN . SC LL   1/12/2023

```
 1            Q.    So this would have been around the
 2    time that the EIP is kind of ramping up its
 3    activities?
 4            A.    Yeah, I don't -- I mean, I don't
 5    know when they were ramping up their activities,
 6    but I would assume it was around that time.
 7            Q.    Let me scroll down, so you can see
 8    this on the screen share, it's page 8.  Is that
 9    size on the screen share visible to you?
10            A.    Somewhat.
11            Q.    Do you see here on page 8 there's a
12    kind of graphic where the EIP report lists four
13    major stakeholders, government, civil society,
14    platforms and media; right?
15            A.    Yep, I see that.
16            Q.    You got an arrow from government, a
17    black arrow that flows from government to intake
18    queue; correct?
19            A.    Yep.
20            Q.    Do you know what that's referring
21    to, did the government -- do you know what
22    governments as stakeholders submitting
23    information for the intake queue for the EIP?
24            A.    I don't know if, specifically, what
25    that's in reference to, no.  I mean, I would
```

RIAN . SC LL   1/12/2023

```
 1    think it was election officials, but I don't --
 2    I don't know.
 3              Q.    How about CISA, would CISA ever
 4    receive a report from election officials and
 5    pass it along to EIP?
 6              A.    I don't recall us doing that.  It
 7    wasn't part of our process, and -- and we would
 8    just send it to the platforms, ourselves, so I
 9    don't know that we would send it to EIP.
10              Q.    How about CIS, do you know if they
11    did that on behalf of state and local officials?
12              A.    Did CIS forward messages that
13    election officials sent to them to EIP?
14              Q.    Yeah, about disinformation.
15              A.    I would think so, but I don't know
16    for certain.
17              Q.    And you see there's a red arrow
18    down here at the bottom, from tier 3:
19    Mitigation, and then that flows back to
20    government.
21              Were you aware of EIP reporting
22    back to CISA about what happened with
23    disinformation or misinformation reports?
24              A.    I don't recall that there was
25    communication when -- so just let me take a step
```

**RIAN . SC LL   1/12/2023**

1    back.  So you're asking if we were familiar with

2    when EIP would send reports to the platforms,

3    were we aware of that?

4            Q.    Correct.

5            A.    Generally speaking, we were not --

6    as far as I know we were not aware.  I wouldn't

7    say generally.

8                As far as I'm aware, we were not in

9    the loop when they were communicating with

10   platforms.

11           **Q.   And I apologize, I split the screen**

12   **on screen share.  Actually, stay with that**

13   **graphic for a minute.  Up here in the corner, it**

14   **says, tier one:  Detection intake.  On-call data**

15   **gathering, triage, and response; do you see**

16   **that?**

17           A.    I do.

18           **Q.   Do you know how the Election**

19   **Integrity Partnership gathered data about what**

20   **was being said on social media in 2020?**

21           A.    I don't know the specifics of how

22   they did that, no.

23           **Q.   Did you have any understanding at**

24   **all, other than obviously receiving reports from**

25   **CIS, NASED and NASS?**

RIAN . SC  LL   1/12/2023

1            A.    My understanding was that they

2     monitored social media in some way.

3            **Q.    Yeah, do you have any idea how they**

4     **did it?  I mean, there's different ways of doing**

5     **that, do you know how they did it?**

6            A.    I don't know what tools or

7     capabilities they used, no.

8            **Q.    Down here below the graphic, it**

9     **talks about tickets being submitted to the EIP,**

10    **it says tickets were submitted both by trusted**

11    **expert stakeholders detailed in section 1.4 on**

12    **page 11, an internal EIP analysts; correct?**

13           A.    Yes.

14           **Q.    Do you know who the trusted**

15    **external stakeholders were?**

16           A.    I don't.

17           **Q.    Do you know whether CISA, at least**

18    **EIP considered CISA a trusted external**

19    **stakeholder?**

20                 MR. GARDNER:  Objection, calls for

21    separation.

22    BY MR. SAUER:

23           **Q.    Do you know.**

24           A.    I suspect if we scroll down to page

25    11 we'll find out who the stakeholders were.

RIAN . SC LL   1/12/2023

1            Q.    Good idea.  So here at the bottom

2      of page 11, section 1.4, discussing external

3      stakeholders; do you see where we are?

4            A.    Getting there.  And 11, external

5      stakeholders.  Yep.

6            Q.    It says:  The EIP serve as a

7      connector for many stakeholders, who both

8      provided inputs and received outputs; correct?

9            A.    Yep.

10            Q.    Okay.  And then flipping to the

11      next page, 12, first sentence:  External

12      stakeholders include government, civil society,

13      social media companies, and news media entities;

14      correct?

15            A.    Correct.

16            Q.    It says:  Government and civil

17      society partners could create tickets or send

18      notes to EIP analysts; right?

19            A.    That's what it says, yes.

20            Q.    It goes on to say:  They use these

21      procedures to flag incidents to be emerging

22      narratives to be assessed by EIP analysts;

23      correct?

24            A.    That's what it says, correct.

25            Q.    And do you know what government's

RIAN . SC LL  1/12/2023

1    partners were creating tickets to flag incidents

2    or merging narratives to the EIP?

3         A.    I don't.

4         Q.    Immediately below that paragraph,

5    they mention some government officials; right?

6         A.    Yep.

7         Q.    Right there, it says:  Four major

8    stakeholder groups in that graphic in the middle

9    of page 12; right?

10        A.    Yep.

11        Q.    And there's three that are listed

12   there; right?

13        A.    Mm-hmm.

14        Q.    There's Election Infrastructure

15   ISAC; right?

16        A.    Correct.

17        Q.    And that's the EI-ISAC that CISA

18   funds the Center For Internet Security to

19   operate; is that right?

20        A.    Again, I don't know if the money

21   goes directly to the EI-ISAC.  I don't know how

22   the money flows, but EI-ISAC is part of CIS and

23   we do fund the EI-ISAC.

24        Q.    Yeah, and then the next one listed

25   is CISA?

RIAN . SC LL   1/12/2023

```
 1              A.   Mm-mmm.
 2              Q.   And the next one is listed as the
 3    GEC; right?
 4              A.   Correct.
 5              Q.   So do you know why CISA is listed
 6    there, why the EIP listed CISA as a major
 7    stakeholder group in the EIP?
 8              MR. GARDNER:  Objection, calls for
 9    speculation.
10              A.   Yeah, I don't know why.
11              Q.   Down at the bottom, it says:  Four
12    major stakeholder groups that collaborated with
13    the EIP.  Do you believe that CISA collaborated
14    with the EIP?
15              A.   Did we have conversations with
16    representatives of the EIP?  Yes.  If that's
17    considered collaboration then I guess we
18    collaborated with the EIP.
19              Q.   Tell me about those conversations.
20    I know you mentioned a couple of them or a few
21    of them, already.  I take it those included a
22    call with Alex Stamos to talk about the gap;
23    right?
24              A.   Yep.
25              Q.   And it included facilitating
```

RIAN . SC LL   1/12/2023

1    meetings between the EIP and NASED and NASS;

2    correct?

3         A.   Yes.

4         Q.   And it included in some -- I take

5    it, it included in some connection putting EIP

6    in touch with Center For Internet Security;

7    correct?

8         A.   That's correct.

9         Q.   And I take it were you kind of

10   putting them in touch with the EI-ISAC people

11   for the Centers For Internet Security?

12        A.   I don't recall that we put them in

13   touch with the EI-ISAC people.  We put them in

14   contact with CIS-specific people.

15        Q.   And, in particular, I think you

16   mentioned someone called Aaron; is that right?

17        A.   Yes, Aaron, Aaron, as far as I'm

18   aware, did not work for the EI-ISAC.  He worked

19   just for CIS.

20        Q.   What other conversations with

21   representatives of EIP do you recall, other than

22   those four we just listed?

23        A.   As I mentioned earlier, I believe

24   we had some conversations when they put out

25   public reports.  If we had any questions about

RIAN . SC LL   1/12/2023

1   those public reports I believe we have had a

2   couple conversations about that.

3         Q.    Sorry, go ahead and finish.

4         A.    No, I think that's -- I think

5   that's it, that I recall.

6         Q.    Who was involved in those

7   conversations about the public reports?

8         A.    Again, it would likely be

9   Masterson, and then there probably would have

10  been some staff.  So I don't know specifically,

11  but there would have been other election

12  security staff, and probably other MDM-specific

13  team staff.  But I don't recall who,

14  specifically, it would have been.  It could have

15  shifted, you know, based on who was available,

16  and things like that, so -- so I don't recall.

17        Q.    About how many conversations of

18  that nature, relating to public reports, do you

19  recall?

20        A.    To be honest, I don't recall any,

21  specifically.  I just know that we had a few.

22  And so I -- I don't want to make up a number for

23  you, but it was -- it was probably somewhere

24  between two and four.

25        Q.    And were you on the two and four

RIAN . SC LL  1/12/2023

1    conversations or did other people have them?

2          A.   I mean, those are the ones that I

3    recall, so those are the ones I would have been

4    on, I don't know if there are others that other

5    people from CISA would have been on, that I was

6    not.

7          Q.   Okay.  What was discussed in the --

8    about their public reporting in the

9    conversations you were involved in?

10         A.   We would just ask questions about

11    tactics and things like that, what they were

12    seeing.

13         Q.   What kind of contacts would they

14    have?

15         A.   They were just fairly brief

16    conversations -- sorry -- they were just fairly

17    brief conversations, based on blog posts.  So if

18    we had a question about jurisdiction being

19    targeted or a new tactic or things like that, we

20    would just ask them kind of questions about that

21    sort of thing.

22         Q.   And what -- when you said tactics,

23    those are kind of online tactics for spreading

24    social media misinformation and disinformation?

25         A.   Correct.  Like we were talking

RIAN . SC LL   1/12/2023

```
 1    about earlier, the coordinated inauthentic
 2    behavior.  So were they using things like bots
 3    or stuff like that, kind of what was their --
 4    the technique that they were using to
 5    distribute.
 6         Q.    Were people at CISA following their
 7    blog posts to sort of, you know, get information
 8    from them?
 9              MR. GARDNER:  Objection, calls for
10    speculation.
11         A.    Yeah, can you specify what you mean
12    by people?
13         Q.    Was anyone at CISA following the
14    EIP's public reports?
15              MR. GARDNER:  Same objection.
16         A.    I can only speak for myself.  I was
17    following the public reports.
18         Q.    Okay.  How about anyone -- how
19    about anyone on your team?
20              MR. GARDNER:  Same objection.
21         A.    Yeah, I mean, I -- they likely
22    were, but, you know, I couldn't say for certain.
23         Q.    And so --
24         A.    The only job requirement -- there's
25    nobody responsible on my team, as part of their
```

RIAN . SC  LL   1/12/2023

1    job, to regularly file to the EIP reporting.

2         **Q.   I take it you did it, and saw some**

3    **stuff you thought was interesting; is that**

4    **right?**

5         A.   Yeah.

6         **Q.   And then are you the one who**

7    **decided to reach out to them and ask questions**

8    **about follow-up questions about stuff that they**

9    **posted?**

10        A.   Yeah.

11        **Q.   And then do you remember anything**

12   **specific about the tactics they flagged in their**

13   **blog posts?**

14        A.   I don't.

15        **Q.   Who did you talk to at the EIP when**

16   **you reached out?**

17             MR. GARDNER:  Objection to the form

18   of the question.

19        A.   I don't recall.

20        **Q.   Was it Mr. Stamos?**

21        A.   It could have been Alex, it could

22   have been Ren e.  I forget, kind of, how they --

23   I forget how we connected with them.

24        **Q.   Did you already know Alex Stamos**

25   **and Ren e DiResta when these conversations**

RIAN . SC LL   1/12/2023

1    started happening in the summer of '20?

2         A.   I knew Alex Stamos from previous --

3    from when he was at Facebook.  And then, as I

4    mentioned, Masterson and I went out to an event

5    that Stamos hosted when he got to the Stanford

6    Internet Observatory.  So I knew him.  Ren e, I

7    think I may have had a conversation or two with,

8    prior, but I didn't know her as well as Alex.

9         Q.   You say you knew him when he was at

10   Facebook.  What was your interactions with him

11   then?

12        A.   He headed the team at Facebook that

13   we did the coordination for some of the initial

14   government industry meetings.  So if you recall

15   back then, essentially the first meeting was

16   back in 2018, Alex was the Facebook lead for

17   that meeting.

18        Q.   So he was the contact person at

19   Facebook that would be in those meetings that

20   involved CISA and ODNI and DOJ and the FBI?

21        A.   Correct.

22        Q.   I just want to flip one page in the

23   report.  Up here on the screen share, do you see

24   up here they have a comment that says:

25   Additionally, the Countering Foreign Influence

RIAN . SC LL   1/12/2023

Page 118

```
 1        Task Force, a subcomponent of CISA, aided in the
 2        reporting process and in implementing resilience
 3        efforts to counter misinformation; do you see
 4        that sentence?
 5               A.   I do.
 6               Q.   I take it the counter -- countering
 7        and foreign influence task force is now called
 8        the MDM team that you lead; right?
 9               A.   Yeah, that's correct.
10               Q.   Were you the leader of that team
11        then called the CFITF in 2020?
12               A.   I was.
13               Q.   Do you know what the report means
14        when at it says that the CFITF, which was your
15        team, aided in the reporting process?
16               MR. GARDNER:  Objection, calls for
17        speculation.
18               A.   Yeah, I -- I don't know,
19        specifically, what they're referencing.  My
20        assumption would be they're referencing a
21        switchboarding we discussed earlier.
22               Q.   Tell me about that switchboarding.
23        I take it your testimony earlier was that you --
24        you were switchboarding or routing
25        disinformation concerns to social media
```

RIAN . SC  LL   1/12/2023

```
 1      platforms and that there was coordination with
 2      CIS and EIP on how they should be reported;
 3      correct?
 4              A.    No, that's not correct.
 5              Q.    Okay.
 6              A.    So I believe what my testimony said
 7      earlier is that you would receive -- generally
 8      receive reporting through one of three ways, one
 9      of those was through the Center For Internet
10      Security, two-fifths of that we would then
11      forwarded to the platforms.
12                    I don't recall any reporting
13      directly coming from EIP.  So generally
14      speaking, that's, you know, adding EIP into your
15      question I think is incorrect.
16              Q.    What were the other two ways, you
17      said there were three ways, one is you get
18      them --
19              A.    Yep.
20              Q.    -- through Center for Internet
21      Security, what are the other two?
22              A.    So the other two ways, sometimes
23      election officials would send them in to CISA
24      central, which is CISA's kind of ops center
25      block room type setup.  And then the third way
```

RIAN . SC LL   1/12/2023

```
 1    was they would just send direct to a CISA
 2    employee, often -- often Matt Masterson, who had
 3    relationships with many of the election
 4    officials.  So those were the principal ways we
 5    received reporting from election officials.
 6              Q.   So through the CIS, kind of
 7    directly to -- was there a kind of e-mail
 8    address for reporting misinformation that CISA
 9    maintained?
10              A.   Not specific to misinformation.  It
11    was -- CISA central had their own e-mail
12    address, and obviously Matt had his.  We had an
13    internal CFITF e-mail address, but I don't
14    believe we -- we put that out for election
15    officials to send messages to, I don't recall us
16    doing that.
17              Q.   And then sometimes they would go to
18    straight to Mr. Masterson?
19              A.   Right.
20              Q.   And then I take it you -- did you
21    coordinate with CIS on what you were reporting
22    to social media platforms?
23              A.   Only in the sense that we would let
24    them know when we reported something to a
25    platform, again, to avoid duplication or, you
```

RIAN . SC LL  1/12/2023

```
 1    know, most of the reporting that I recall in
 2    2020 came through CIS.  And so we just wanted to
 3    let them know that we were acting on what they
 4    sent us.
 5              For reporting that didn't come
 6    through CIS, we would often let them know after
 7    we had shared it with the platforms that we had
 8    shared something with the platforms for their
 9    arrangement.
10         Q.   And then I take it you said
11    earlier, your understanding is that CIS was
12    coordinating with EIP?
13         A.   Again, they had a relationship.  I
14    don't know how I would characterize what they
15    were -- what they were doing with the EIP.
16         Q.   Do you know what interactions they
17    had, at all, other than the ones we talked about
18    between CIS and EIP?
19         A.   I mean, I can't specifically say
20    what they were doing.  They had a relationship.
21    They shared information.  I don't know kind of
22    the extent of that or kind of what their
23    policies and procedures were for what they were
24    doing.  So I know they were sharing stuff.  I
25    don't know what, how or when, towards the
```

RIAN . SC LL   1/12/2023

 1    questions.

 2              Q.    I'm going to jump ahead to page 35

 3    of this report.

 4              A.    35?  All right.

 5              Q.    That's going to be on page 53 of

 6    the PDF?

 7              A.    Almost there, sorry.  All right.

 8    I'm on 35.

 9              Q.    If you look here on the last

10    sentence before that heading on the page, it

11    says, according to the EIP, interestingly, just

12    one percent of tickets related to COVID-19, and

13    less than one percent related to foreign

14    interference; do you see that?

15              A.    I do.

16              Q.    Is that consistent with your

17    understanding of the reports that you were

18    making to social media platforms in that

19    timeframe that only a small minority related to

20    before and afters?

21              MR. GARDNER:  Objection, lack of

22    foundation, calls for speculation.

23    BY MR. SAUER:

24              Q.    If you know.

25              A.    So CISA does not do attribution.

**RIAN . SC LL   1/12/2023**

```
 1    We didn't do analysis of what we received from
 2    election officials.  So we would not know what
 3    percentage were foreign derived.
 4           Q.   So you would receive reports and
 5    you would forward them onto social media
 6    platforms, you know, for consideration under
 7    their content moderation policies, without
 8    assessing whether they were originated from
 9    foreign or domestics sources?
10           A.   That's correct.
11           Q.   In other words, a report would come
12    in, and you, like, didn't take steps to see
13    whether this came from a foreign or domestic
14    source?
15           A.   Correct.
16           Q.   You would just pass it along to the
17    social media platforms?
18           A.   Right.
19           Q.   Are you familiar with the gateway
20    pundit?
21           A.   Am I familiar with it?  Yeah.
22           Q.   How do you know about it, what is
23    the gateway pundit, on your understanding?
24           A.   It's some sort of a website.
25           Q.   How do you know about it?
```

RIAN . SC LL   1/12/2023

 1            A.    I believe they've written some
 2    articles about CISA.
 3            **Q.    How did that get on your radar**
 4    **screen?**
 5            A.    Articles probably in our clips.
 6            **Q.    Do you remember hearing --**
 7            A.    I don't -- I don't --
 8            **Q.    Go ahead.**
 9            A.    I don't recall specifically how
10    they got on my radar.
11            **Q.    Do you remember hearing of them in**
12    **any other connection, other than writing**
13    **articles about CISA?**
14            A.    I do think of the general kind of
15    recall.  Yeah, I think probably just as a
16    general fact that it had news on it I think is
17    probably the extent of what I know.
18                I'm sure I've just seen them, you
19    know, in reading other stories and things like
20    that, I don't -- I don't -- honestly, I don't
21    know how I came to know them.
22            **Q.    Are you aware of anyone at CISA**
23    **raising concerns that the gateway pundit might**
24    **be spreading misinformation or disinformation?**
25            A.    No.

RIAN . SC LL   1/12/2023

```
 1              Q.   I'm going to jump far down in this
 2      document to page 196.
 3              A.   Let me see if there's a quick way
 4      for me to get down there.
 5              Q.   Yeah, it's page 213 of the PDF.
 6              MR. GARDNER:  I think you can go
 7      here.  That's a lot.
 8              THE WITNESS:  Sorry.
 9              MR. GARDNER:  Yeah, you have to
10      scroll.  All right, John, we're getting there.
11              THE WITNESS:  It's two what in the
12      PDF?  I'm sorry.
13   BY MR. SAUER:
14              Q.   It's page 214 of the PDF.
15              A.   Okay.  196.  Almost there.  Sorry.
16              Okay.  Yep.
17              Q.   Okay.  Do you see here, there's a
18      whole section that begins:  The gateway pundit
19      interval?
20              A.   I see that.
21              Q.   In the first sentence of that says:
22      The gateway pundit was among the most active
23      spreaders of election-related misinformation in
24      our analyses; correct?
25              A.   That's what it says.
```

RIAN . SC  LL   1/12/2023

1          Q.   Does that ring a bell, at all?  Do

2     you recall anyone at CISA ever raising the

3     concern that the gateway pundit was a spreader

4     of so-called election-related misinformation?

5               MR. GARDNER:  Objection.  Asked and

6     answered.

7     BY MR. SAUER:

8          Q.   Do you recall that?

9          A.   Yep.  As I said earlier, I don't

10     recall any examples of that, no.

11          Q.   Jump ahead to page 211.  This is

12     page 229 of the PDF.

13          A.   Almost there.  Okay.  211, policy.

14          Q.   Yeah, chapter six.

15          A.   Gotcha.

16          Q.   There at the introduction, at the

17     very beginning, it says:  Platform policies

18     establish the rules of participation in social

19     media communities; correct?

20          A.   Yes.

21          Q.   It says:  Recognizing the

22     heightened rhetoric and the use of mis and

23     disinformation during the 2020 election, all the

24     major platforms made significant changes to

25     election integrity policies, both as the

RIAN . SC LL   1/12/2023

```
 1    campaigns kicked off and through the weeks after

 2    election day; correct?

 3            A.   Yes.

 4            Q.   And let me ask you this:  Are you

 5    aware of social media platforms like Twitter and

 6    Facebook and YouTube and so forth changing their

 7    election integrity policies to limit

 8    election-related misinformation and

 9    disinformation during 2020?

10            A.   I'm aware that they changed

11    policies.  I don't know -- again, I don't know

12    that they needed mis and disinformation as their

13    terminology, so I don't want to go there.  But I

14    do recall that they changed policies in 2020

15    related to election security.

16            Q.   How did you know that, at the time,

17    did they report it to you?

18            A.   They -- they did talk about some of

19    it in our regular sync meetings.  And then I

20    believe there's some media coverage and public

21    statements that they made about their changes.

22            Q.   In the sync meetings, were there

23    any questions on the government side?  Did the

24    government ask:  What are you doing to change

25    your policies?
```

RIAN . SC LL   1/12/2023

1          A.    I don't recall that.  I think,
2     generally speaking, the platforms would just
3     talk, you know, on a regular course of the
4     conversation they would -- that would be one of
5     their briefing points, that they were making
6     significant changes.  But it wasn't an essential
7     part of the conversations, generally speaking.
8          **Q.    Were you aware of anyone in the**
9     **federal government kind of asking or encouraging**
10    **them to change their content moderation policies**
11    **to address election integrity?**
12         A.    Not that I'm aware of, no.
13         **Q.    Do you recall, was it placed on the**
14    **agenda for the sync meetings?**
15         A.    Was what placed on the agenda?
16         **Q.    Changes in content moderation**
17    **policies.**
18         A.    Not that I recall.
19         **Q.    Do you know how it came up in those**
20    **meetings?**
21         A.    Again, I think, you know, part of
22    the meetings were generally different
23    participants providing updates on what they were
24    doing relating to election security.  And my
25    recollection is, is that platforms might raise

RIAN . SC LL   1/12/2023

```
 1    those sorts of things during that portion of the
 2    agenda.
 3           Q.   Did they ever separately e-mail you
 4    to notify you of a content policy update?
 5           A.   Not that I recall, though it's
 6    certainly possible.  You know, I would get press
 7    releases that they would put out sometimes, they
 8    would forward to me.  But I don't recall
 9    specific e-mail on that.
10           Q.   Do you know whether anyone at the
11    Center For Internet Security discussed content
12    policy changes with the social media platforms?
13           A.   I don't.
14           Q.   Do you know whether anybody at CISA
15    did so during the 2020 election cycle?
16           A.   Not that I'm aware of, no.
17           Q.   How about Mr. Masterson?
18           A.   Not that I'm aware of.
19           Q.   What was Mr. Masterson's title or
20    what was his role at CISA during this timeframe
21    in 2020?
22           A.   He was the senior -- I don't know
23    what his exact title was, but he was a senior
24    election security person at CISA.
25           Q.   So did you report to him when you
```

RIAN . SC LL   1/12/2023

```
 1      were the head the countering foreign influence
 2      task force?
 3            A.   No.  Matt was what I call a
 4      political appointee, so for organizational
 5      reasons I reported up to Geoff and Geoff
 6      reported to a normal chain of command.  So there
 7      was something weird about Matt being a political
 8      appointee and where he could sit in the org
 9      chart, so none of us technically reported up to
10      him.
11            Q.   So he was -- but he was -- as a
12      political appointee is higher than you in the
13      org chart?
14            A.   Yeah.
15            Q.   Okay.  And did you coordinate with
16      him on the sort of -- sort of disinformation and
17      misinformation related activities that CISA was
18      engaged in, in 2020?
19                 MR. GARDNER:  Objection, vague.
20            A.   Yeah, could you be a little more
21      clear in what you're asking, please?
22            Q.   Well, did you work with Matt
23      Masterson on election disinformation and
24      misinformation related issues in 2020?
25            A.   Yes.
```

RIAN . SC LL   1/12/2023

```
 1          Q.   Okay.  What sort of work did you do
 2     with him?
 3          A.   Again, a majority of our work, as I
 4     mentioned earlier, was resilience building, so
 5     trying to develop products, public education,
 6     public awareness, product to help election
 7     officials, those sort of things.  And then I
 8     would have discussed with him -- he would have
 9     been familiar with the switchboarding work that
10     we were doing.
11          Q.   Did he participate in the
12     switchboarding work?
13          A.   Not beyond when he would receive
14     e-mails, he forwarded them to us.
15          Q.   Well, he would send them to you to
16     be switchboarded, so to speak?
17          A.   Yeah, I mean, he would send them to
18     me or the team e-mail address.
19          Q.   Oh, and you mentioned earlier that
20     he had close relationships with social media
21     platforms?
22          A.   No, I don't think I ever said that.
23     He had close relationships with election
24     officials.
25          Q.   Oh, okay.  Did you also mention
```

RIAN . SC LL  1/12/2023

1    that he was in -- he had contacts with social

2    media platforms?

3         A.   Again, he would have participated

4    in the sync meetings that I talked about, the

5    government industry syncs.  If we had a briefing

6    or something at other meetings he would likely

7    participate.  Those are the only communications

8    I'm aware of, but he may have had others.  I'm

9    not sure.

10        Q.   Are you aware of anyone at the

11   Election Integrity Partnership communicating

12   with the social media platforms about changing

13   their policies to, you know, kind of restrict

14   election-related misinformation?

15        A.   I am not, no.

16        Q.   Is that something, that idea of

17   advocating to the social media platforms to

18   adopt more restrictive policies on

19   election-related misinformation, is that

20   something that's -- that you recall coming up in

21   any meetings or discussions you had in 2020?

22        A.   So did we ever have -- so one, if

23   you can clarify who the meetings were with, that

24   you're asking about.

25        Q.   I'm asking --

RIAN . SC LL   1/12/2023

Page 133

```
 1              A.   Or the general -- did anyone at
 2    CISA meet to discuss changes in platform policy?
 3    To the best of my recollection, the answer is
 4    no, we never meant to discuss asking the
 5    platforms to make any changes to their policies.
 6              Q.   Do you recall -- I take it that was
 7    a response as to internal meetings, are you
 8    aware of any meetings with anyone external to
 9    CISA to discuss, you know, changes in platform
10    policies?
11              A.   I'm not aware of any external
12    meetings along those lines.
13              Q.   Do you recall any communications of
14    any kind that related to that in 2020?
15              A.   Any communications that related to
16    what?  To -- to platforms changing their
17    policies?  Any communications -- with -- I mean,
18    that's a very broad -- I mean, it's possible
19    that somebody at CISA, along the way, had a
20    conversation about that, but I don't recall any
21    specific conversations where we sat down to talk
22    specifically about that.  I don't -- I don't
23    recall any of that.  It's a very broad answer,
24    so I don't want to say definitively that nobody
25    at CISA ever had any conversations in 2020 about
```

RIAN . SC  LL   1/12/2023

```
 1    policy changes.
 2            Q.    How about you, do you recall
 3    communicating with anyone outside of CISA about
 4    social media platform policy changes in 2020?
 5            A.    I don't.  I don't.
 6            Q.    Have you ever heard of the Virality
 7    Project?
 8            A.    I have.
 9            Q.    What is the Virality Project?
10            A.    My understanding, it was Stanford's
11    attempt to mimic the EIP for COVID.
12            Q.    How do you know about that?
13            A.    Good question.  I believe they sent
14    me some of their public reports.
15            Q.    The Virality Project did?
16            A.    Yes.
17            Q.    Who -- who would have sent those to
18    you?  Was it the same people involved in -- same
19    people involved in the Election Integrity
20    Partnership?
21            A.    I think Alex was involved, and I
22    believe Ren e was involved.  I don't know if the
23    rest were similar or not.  I don't recall who
24    was sending it, the exact individual who was
25    forwarding me their reports.
```

RIAN . SC  LL   1/12/2023

```
 1            Q.    Was that --
 2            A.    And to be honest, I'm not sure if
 3   they sent them directly to me or if they went to
 4   somebody else in government who forwarded it to
 5   me.
 6            Q.    Okay.  Was there -- did you have an
 7   oral conversation with anyone associated with
 8   the Virality Project about what they do?
 9            A.    Not specifically about what they
10   do, but I did have some conversations where they
11   were asking us for -- asking me, not us -- for
12   any connections I had with HHS or CDC.
13            Q.    And did you provide them with
14   connections?
15            A.    I did not.
16            Q.    What did you -- what did you say in
17   that conversation?
18            A.    I don't recall that I had any --
19   any relevant points of contacts to provide them.
20            Q.    Did you have any other
21   conversations with them relating to the Virality
22   Project?
23            A.    Not -- not substantial.  I'm trying
24   to think.  I mean, I -- most of that work took
25   place when I was over at the National Security
```

RIAN . SC LL   1/12/2023

 1   Council, so I had substantially less

 2   communication.

 3              But I believe there were some

 4   informal kind of not work conversations that I

 5   may have had with Alex, in particular, and maybe

 6   Ren e, as well.

 7        **Q.   You believe when you were detailed**

 8   **to the National Security Council you had**

 9   **conversations with Alex Stamos and Ren e DiResta**

10   **about the Virality Project?**

11        A.   Just in the sense that it was

12   something that they were doing, and that was

13   when I think Alex asked if I had any contacts is

14   when I was at the National Security Council.

15        **Q.   Did you and Alex discuss anything**

16   **else about it?  And let me ask you this:  Did he**

17   **give you any kind of overview what they planned**

18   **to do in the Virality Project?**

19        A.   Not beyond that it was similar to

20   what they did with the -- with the EIP, that was

21   the extent.  We didn't get into any details or

22   anything like that.

23        **Q.   And he asked you for contacts at --**

24   **at kind of federal kind of health agencies?**

25        A.   Yeah, that's my recollection of

RIAN . SC LL   1/12/2023

```
 1    what he was asking for.
 2             Q.   And did you have any other
 3    discussions with him that related to Virality
 4    Project?
 5             A.   Not that I recall.  I don't know
 6    that we ever got briefed on their work, so I
 7    don't think there was anything like that.  So I
 8    think to the extent was, you know, that
 9    conversation about that, and then, like I said,
10    I believe I received some of their reports, the
11    public reports.
12             Q.   And you say either they or someone
13    within government forwarded you with their
14    public reports?
15             A.   Right, yeah, I don't recall exactly
16    how I got them.  I think it was from -- from the
17    Virality Project, itself, but I'm not a hundred
18    percent certain of that.
19             Q.   And let me ask you this:  Was CISA
20    active in -- in -- or take any activities to
21    follow or address information -- misinformation
22    relating to COVID-19?
23             A.   I believe we did at least one
24    product for our critical infrastructure
25    stakeholders related to COVID-19.
```

RIAN . SC LL   1/12/2023

```
1              Q.    How about --
2              A.    It should be on our -- sorry.
3                    It should be on our public website.
4              Q.    How about switchboarding, did CISA
5     do any switchboarding related to COVID-19
6     misinformation concerns?
7              A.    No.
8              Q.    And again, the switchboarding
9     that -- when I use that term I'm using your term
10    for kind of routing disinformation concerns and
11    misinformation concerns to the social media
12    platforms; correct?
13             A.    Correct, yeah, as far as I'm aware
14    there was no -- there was none of that occurred
15    related to COVID.
16                   MR. SAUER:  I'm going to pull up
17    Exhibit 2 on the screen share, which has also
18    been e-mailed to you, which is the Virality
19    Project's public reporter.
20                   (Exhibit No. 2 was marked for
21    identification.)
22                   MR. GARDNER:  Hold on one second,
23    John.
24                   MR. SAUER:  Which is the Virality
25    Project's public report, Virality,
```

RIAN . SC LL   1/12/2023

```
 1    V-i-r-a-l-i-t-y.
 2                 MR. GARDNER:  Yeah, hold on, John.
 3    Hold on, John.  Hold on.  Got it.
 4  BY MR. SAUER:
 5            Q.   You mentioned -- before we turn to
 6    the document, you mentioned that you had
 7    conversations with Alex Stamos and Ren e DiResta
 8    about the Virality Project.  What were the
 9    nature of the conversations with Ren e DiResta?
10            A.   They were at the same time as the
11    conversations with Alex.  I believe it was
12    similar content.  And I don't -- it wasn't a
13    lengthy conversation, it was just, hey, we're
14    doing something, I believe.
15            Q.   Mm-hmm.  Did she ask you for any
16    context or anything like that?
17            A.   I'm sorry, could you repeat that?
18            Q.   Did she ask you for any context or
19    anything like that?
20            A.   Not that I recall, but I think she
21    was with Alex when we had that conversation.
22            Q.   So you believe it was the same
23    conversation with Alex and Ren e happened at the
24    same time?
25            A.   Yeah, I believe we were having a
```

 1    meeting, they were briefing us about -- so I

 2    think this was connected to when I got the brief

 3    on the report, the election report, when I was

 4    at the White House.  I think that's when they

 5    mentioned that they were going to potentially do

 6    something similar around COVID, and asked if we

 7    had any contacts.

 8         Q.   And did you -- and I take it you

 9    said earlier you didn't have any contacts;

10    right?

11         A.   Yeah, I didn't have any good

12    contacts at CDC or HHS.

13         Q.   Did you ask anyone else in

14    government if they had contacts that would be

15    useful to them?

16         A.   I don't recall doing that, so I

17    don't think so.

18         Q.   Did you notify people at the White

19    House about, you know, the briefing you got from

20    them or the information you got from them?

21         A.   So I'm sure I talked to my

22    supervisor about the election briefing.  I may

23    have mentioned, although I don't recall if I did

24    or not, that they were going to do something

25    similar for -- for COVID.

RIAN . SC LL   1/12/2023

```
 1              Q.    What did you report back about the

 2       election briefing?  I take it that's the long

 3       fuse report from the Election Integrity Project

 4       right, or partnership; right?

 5              A.    Yeah, just to the extent we -- just

 6       in general, we met with them kind of shared kind

 7       of their lessons learned, kind of what some of

 8       their big takeaways were.  I don't recall what

 9       the specifics were.  It was a brief kind of

10       conversation in passing.

11              Q.    Who was your supervisor at that

12       time?

13              A.    Kaitlin Gegovich (phonetic).

14              Q.    Looking at the Virality Project

15       report, skipping ahead to page 4 of the report?

16              A.    4, 4, or Roman numeral four?

17              Q.    Regular four.

18              A.    Gotcha.

19              Q.    Is there's recommendations --

20              A.    Okay.  Okay.

21              Q.    Is there a recommendation here to

22       implement misinformation and disinformation

23       center of excellence housed within the cyber

24       security infrastructure security agency; do you

25       see that?
```

RIAN . SC LL   1/12/2023

1          A.   I do.

2          Q.   **So Stanford recommends that the**

3    **government create a misinformation and**

4    **disinformation center of excellence housed**

5    **within CISA; correct?**

6               MR. GARDNER:  Objection.  He said

7    it calls for speculation.

8          A.   That's what the sentence says.

9          Q.   **Did they ever discuss --**

10         A.   What they meant by that, I don't

11   know what they meant.

12         Q.   **Did they ever -- did Alex Stamos or**

13   **Ren e DiResta ever discuss that with you, you**

14   **know, having CISA take on a new and more**

15   **formalized roll with respect to misinformation**

16   **and disinformation?**

17         A.   Not that I recall.  I don't think I

18   was ever briefed on this report, so I don't

19   recall having that conversation.

20         Q.   **Do you know of anyone -- they**

21   **talked to anyone else at CISA about that?**

22         A.   I don't know.  I don't know.

23         Q.   **By the time of this report, in**

24   **2021, Matt Masterson was actually working for**

25   **the Stanford Internet Observatory; correct?**

RIAN . SC LL  1/12/2023

```
 1              A.   I believe so, yeah.
 2              Q.   Have you ever read this report
 3      before?
 4              A.   I think I read a little bit of it,
 5      but I don't think I read the whole -- I don't
 6      recall.  I haven't read the whole thing.  I
 7      shouldn't say I don't recall.  I haven't read
 8      the whole thing.
 9              Q.   Do you know when you read it?
10              A.   I don't.
11              Q.   Do you know why you read it?
12              A.   I mean, I would read it, generally
13      speaking, I'm interested in understanding what
14      researchers find related to mis, dis and
15      mal-information.
16              Q.   I'm sorry, relating to what?
17              A.   What researchers find, understand,
18      what they're learning relating to mis, dis and
19      mal-information.
20              Q.   And did you have any takeaways from
21      this report, that informed your work at the MDM
22      team?
23              A.   I don't think there's anything
24      specific that we took from this, from a product
25      standpoint or anything like that.
```

RIAN . SC LL   1/12/2023

1          Q.    Do you know how -- do you know how

2     the Virality Project tracked, you know,

3     misinformation narratives about COVID vaccines

4     on social media?

5          A.    I don't.

6          Q.    I'm going to jump ahead to page 30

7     of the report, very usefully that's also page 30

8     of the PDF.

9          A.    Making things easier.

10         Q.    I think they learned a lesson after

11    the first report.

12         A.    Yeah.

13         Q.    Reference here to your --

14         A.    Okay.  Got you.

15         Q.    There's a reference here to tiered

16    ticket analysis, it says:  Their analysis

17    consisted of lateral -- lateral research that

18    used Crowd Tangle and Google searches to assess

19    the spread of the incident or content and so

20    forth; do you see that?

21         A.    I do.

22         Q.    What Crowd Tangle is?

23         A.    I believe Crowd Tangle was a

24    Facebook-owned social media monitoring service.

25         Q.    And is that something that's

RIAN . SC LL   1/12/2023

 1    available to the public?  Can the public kind of

 2    subscribe to Crowd Tangle?

 3              MR. GARDNER:  Objection.

 4    BY MR. SAUER:

 5         Q.    Or is it kind of a --

 6              MR. GARDNER:  Objection.  Sorry.

 7    Sorry, thought you were done, John, please, are

 8    you done?

 9              MR. SAUER:  Yeah.

10              MR. GARDNER:  Sorry, objection,

11    lack of foundation.

12         A.    So I don't know -- I don't know the

13    nature of Crowd Tangle, if it's publicly

14    available or not.

15         Q.    Have you ever heard of it before?

16         A.    I have.

17         Q.    In what connection have you heard

18    of it?

19         A.    Just talking, you know, in the

20    general, mis, dis, mal-information research

21    community, I know it's a tool that some

22    researchers use.

23         Q.    Okay.  Next page of the report,

24    there's a reference to collecting video --

25    there's a reference to -- it says:  The

RIAN . SC LL   1/12/2023

```
 1      engagement data or video view data for links

 2      associated with each ticket is collected

 3      differently depending on the social media

 4      platform in question, colon; do you see that?

 5              A.   I do.

 6              Q.   It talks about how Facebook and

 7      Instagram, they used Crowd Tangle API; right?

 8              A.   I see that, yeah.

 9              Q.   What is -- do you know what API

10      stands for?

11              A.   I don't.

12              Q.   Okay.  Same question, then, as to

13      Twitter, it says Twitter API, YouTube, API, do

14      you know what API refers to?

15              A.   I --

16              MR. GARDNER:  Objection, asked and

17      answered.

18              A.   Yeah, I don't know, that's a little

19      above my technical knowledge.

20              Q.   Let's jump ahead to page 143.

21              A.   Okay.

22              Q.   Okay.  Here under:  Maintain clear

23      channels of communication across all levels of

24      government; do you see that?

25              A.   I do.
```

RIAN . SC LL   1/12/2023

```
 1            Q.   And then there in this sentence it
 2      says -- or sorry, in this paragraph -- it says:
 3      For example, as voting-related mis and
 4      disinformation arose in the 2020 presidential
 5      election, the Election Infrastructure
 6      Information Sharing and Analysis Center, EI-ISAC
 7      served a critical role in sharing information in
 8      the Election Integrity Partnership in pushing
 9      its rapid response analysis back out to election
10      stakeholders across the states; right?
11            A.   That's what the sentence says,
12      yeah.
13            Q.   And I take it, we asked you this
14      before, but are you aware of the EI-ISAC
15      sharing -- serving a critical role in sharing
16      information with the EIP during 2020?
17            A.   I -- I'm not.  My understanding and
18      recollection it was Center For Internet
19      Security, it's of course possible that the
20      Stanford folks are conflating the EI-ISAC with
21      the Center For Internet Security, kind of we
22      talked about earlier, they're kind of part of
23      the same organization, but I'm not aware of
24      those sorts of direct communications with
25      EI-ISAC.
```

RIAN . SC LL   1/12/2023

Page 148

```
 1              Q.   What is the difference between the
 2     EI-ISAC and the CIS?  My understanding was that
 3     the CIS was a non-profit, and EI-ISAC is kind of
 4     like a program that it runs, that allows for
 5     information sharing among state and local
 6     election officials, is that the distinction of
 7     what's the difference?
 8              MR. GARDNER:  Objection, form.
 9     BY MR. SAUER:
10              Q.   You may answer.
11              A.   What's the difference between what,
12     CIS and EI-ISAC.
13              Q.   Yeah, what's the distinction
14     between them.
15              A.   I mean, I don't -- to be honest, I
16     don't fully know what the distinction is, my
17     understanding is it's roughly, as you kind of
18     stated it, right, is CIS is an umbrella
19     organization that has organizations underneath
20     it.  I don't know what the operating
21     relationship is between the EI-ISAC and CIS.  If
22     it's a direct line, I just don't know how they
23     operate that way.
24              But my understanding is that the
25     CIS has its own staff, and that those staff and
```

RIAN . SC LL   1/12/2023

1    their own funding, and that that staff and

2    funding is what supported the 2020 election

3    switchboarding work.

4         **Q.   So, in other words, you think the**

5    **CIS was -- was switchboarding to EIP during**

6    **2020?**

7         A.   I'm not sure that's what I said.  I

8    mean, the relationship that I understood was

9    between CIS and EIP, what specifically they were

10   doing as part of that relationship I'm not --

11   again, I don't necessarily want to speak to,

12   because I'm not 100 percent sure how it worked.

13        **Q.   Well, is the EI-ISAC kind of a**

14   **vehicle in which CIS receives reports of**

15   **misinformation and disinformation from state and**

16   **local election officials?**

17        MR. GARDNER:  Objection, lack of

18   foundation, calls for speculation.

19        A.   Yeah, I don't know how -- how the

20   EI-ISAC played in this switchboarding role.

21        **Q.   Down here at the bottom of the same**

22   **page there's another reference to the**

23   **recommendations to implement a misinformation**

24   **and disinformation center of excellence housed**

25   **within the federal government; correct?**

RIAN . SC LL   1/12/2023

```
 1              A.   Yeah.
 2              Q.   And that there in that paragraph it
 3      specifically recommends that it be housed within
 4      the federal government at CISA; correct?  See
 5      where I've highlighted?
 6              A.   Yeah, I'm just reading that now.
 7                   Yeah, that's what the sentence
 8      says, yeah.
 9              Q.   Do you have any recollection -- let
10      me ask you this:  I think you testified earlier
11      you don't remember discussing that
12      recommendation with anyone; correct?
13              A.   Correct.
14              Q.   Okay.  How about any discussions of
15      changing or increasing CISA's role in -- in kind
16      of tracking or monitoring online dis and
17      misinformation?
18                   MR. GARDNER:  Objection to the
19      extent that answers calls for the disclosure of
20      information, subject to the local process
21      privilege.  I would instruct the witness not to
22      answer.  To the extent that you can answer that
23      without disclosing information related to the
24      privilege you can do so.
25                   THE WITNESS:  I'm sorry, can you
```

RIAN . SC LL    1/12/2023

```
 1    repeat the question, just to make sure I
 2    understand it.
 3              MR. SAUER:  Let's break it down.
 4    BY MR. SAUER:
 5         Q.    Do you recall any discussions with
 6    anyone outside of CISA about expanding CISA's
 7    role in addressing misinformation and
 8    disinformation concerns on social media?
 9         A.    CISA's role, expanding CISA's role,
10    yeah.  Yes.
11         Q.    Okay.  What conversations do you
12    remember about that?
13         A.    So we were piloting a capability
14    that would allow us to monitor narratives
15    online.
16         Q.    Now, when was this piloted?
17         A.    I believe it was -- we did one
18    short pilot, I believe, in summer 2020, so I
19    believe it was all 2020.
20         Q.    What -- what -- what sort of
21    pilighting -- can you explain what you mean by
22    pilighting -- I'm sorry -- piloting something to
23    track mis and disinformation online?
24         A.    So it wasn't necessarily to track,
25    it was to understand the information
```

RIAN . SC LL   1/12/2023

```
 1    environment, what narratives were -- were kind
 2    of perking up.  The piloting was, as I'm sure
 3    you're aware, there was extensive -- extensive
 4    privacy rules around that sort of work, and so
 5    it was just kind of piloting it to see if it
 6    would work, if it did what we wanted it to do.
 7            In particular, we were trying to
 8    predict the likely impact of narratives on
 9    stakeholders.  And so we weren't sure if the
10    predictive activity that we were doing actually
11    worked, so we wanted to test that, and then we
12    wanted to just get a sense of the privacy and
13    other kind of rules that might be in play and if
14    it's something that we could -- we could do.
15        Q.   What exactly was the pilot?  I
16    mean, what -- what -- did you have a computer
17    program that would, you know, go out and track
18    what people were saying on social media?  What
19    exactly was the pilot?  I don't understand.
20            MR. GARDNER:  I'll object on the
21    grounds that that calls for disclosure of
22    information subject to deliberative process
23    privilege.  I instruct the witness not to
24    answer.
25            MR. SAUER:  Yeah, the deliberative
```

**RIAN . SC  LL   1/12/2023**

```
 1    process privilege only applies when there is no
 2    indication of any government wrongdoing.  Our
 3    court has already found that there's at least a
 4    substantial concern that there were significant
 5    first amendment violations, here, so I ask you
 6    to withdraw the objection.
 7                MR. GARDNER:  I understand your
 8    position and I decline your invitation.
 9 BY MR. SAUER:
10          Q.   Are you declining to answer the
11    question, sir?
12          A.   Yes.
13          Q.   So in that case, can you kind of
14    explain more generally what this pilot project
15    involved in 2020, to track social media on the
16    internet?
17                MR. GARDNER:  To the extent that
18    that calls for the disclosure of information
19    subject to the deliberative process privilege I
20    instruct the witness not to answer.
21                To the extent that you can answer
22    that question at a high level of generality, you
23    may do so.
24          A.   Yeah, so as I mentioned, our
25    mission is to build the variance to MDM
```

RIAN . SC LL   1/12/2023

```
 1    targeting critical infrastructure.
 2              So essentially what we were trying
 3    to understand is if we could predict the likely
 4    impact of MDM narrative in terms of increasing
 5    risks to critical infrastructure by a better
 6    understanding the information environment, so
 7    the pilot was essentially trying to test that
 8    theory out.
 9         Q.   Yeah, kind of, again, at a high
10    level of generality, how do you test that theory
11    out?
12         A.   So the predictive model essentially
13    was to say -- say you had an image, it would
14    pull particular components of an image out and
15    based on -- I don't want to get too -- I don't
16    know that I understand the black box that they
17    used all that well, if I were trying to test it,
18    but there was a methodology that they used to do
19    that, and so we were just trying to see if that
20    methodology, in fact, worked from a
21    disinformation standpoint.
22         Q.   When you say:  They, who's they?
23    Is this people at CISA or is there a contractor
24    that created a product?
25         A.   It was a contractor.
```

RIAN . SC LL  1/12/2023

```
 1           Q.    What contractor?
 2           A.    I believe the company was Limbik.
 3           Q.    Sorry, can you spell that?
 4           A.    L-i-m-b-i-k.
 5                 And then there was a separate
 6      pilot, that's more generically around
 7      situational awareness of potential narratives
 8      online, that didn't feed into the -- into the
 9      predictive modeling.
10           Q.    Was that a Limbik product, too,
11      that second pilot?
12           A.    No, that was a -- that was a
13      different contractor, and I forget who it was.
14           Q.    Did either of these pilots ever get
15      any actual programming, something that you used?
16           A.    No.  The rules we operated the
17      pilot on was that none of it could be used for
18      operational purposes, because there's privacy
19      requirements around that.  And so essentially we
20      were just using it for internal deliberations in
21      terms of if the -- if the tools were helpful or
22      not.
23           Q.    Did you conclude that they were
24      helpful?
25                 MR. GARDNER:  Object on the grounds
```

RIAN  . SC  LL   1/12/2023

1    of deliberative process privilege.  I instruct

2    the witness not to answer.

3              MR. SAUER:  To be clear, I'm asking

4    for the conclusion, not the deliberation.

5  BY MR. SAUER:

6          Q.   **Did you conclude that they would be**

7    **useful?**

8              MR. GARDNER:  Same objections, same

9    instructions.

10             THE WITNESS:  Yeah, I'm not going

11   to answer.

12             MR. SAUER:  I've e-mailed around

13   Exhibit 9.

14             (Exhibit No. 9 was marked for

15   identification.)

16  BY MR. SAUER:

17         Q.   **And if you have a minute to look at**

18   **it, I'm also putting on the screen share, it's a**

19   **collection of e-mails from October of 2020,**

20   **produced by the government, involving CISA.  And**

21   **I think they relate to the switchboarding you**

22   **testified there about earlier.**

23             **Do you see the -- the document?**

24         A.   I do.

25         Q.   **Just look here on the first page,**

RIAN . SC LL   1/12/2023

1     there's an e-mail, if you look here, kind of on

2     Thursday, October 1st, at 4:23 p.m., it shows

3     misinformation reports sending an e-mail to you,

4     to CISA central, which I think you mentioned

5     earlier, to CFITF e-mail address, and -- and

6     misinformation reports; do you see that?

7              A.    I do.

8              Q.    And this is a -- I take it, some

9     report that relates to misinformation in social

10    media from CIS; correct?

11             A.    Let me just scroll to the beginning

12    of the e-mail chain.

13                   Yeah, this is a report I received

14    from CIS.

15             Q.    And when CIS e-mailed you this

16    report, if you look here, towards the top or

17    right in the middle of the first page, CIS --

18    first of all, it's signed by Walter Oberes and

19    Aaron Wilson; correct?

20             A.    Yeah.

21             Q.    And that Aaron, is that the Aaron

22    you talked about earlier, as your CIS contact?

23             A.    It is, correct.

24             Q.    And how about -- who's Walter

25    Oberes?

RIAN . SC LL   1/12/2023

Page 158

```
 1              A.   I don't know.
 2              Q.   Okay.  And he -- they say:
 3     Brian -- referring to you -- we know many are
 4     already aware of this case, but the impact seems
 5     to be escalating.  Our hope is the platforms can
 6     do more to take down the misinformation;
 7     correct?
 8              A.   That's what this says, correct.
 9              Q.   And then it goes on to say:  The
10     EIP has been tracking this spread under ticket
11     EIP-243, and has more examples; correct?
12              A.   Correct.
13              Q.   Did they commonly tell you when the
14     EIP was tracking online misinformation, as well
15     as CIS?
16              A.   I don't think that was common, no.
17              Q.   Okay.  Were you aware, at the time,
18     of what an EIP ticket was?
19              A.   I understood that EIP was using a
20     ticketing system.  That's the extent of it, so
21     that's what I assumed it was.
22              Q.   And how did you know that?
23              A.   That they were using a ticketing
24     system?
25              Q.   Yeah.
```

RIAN . SC LL   1/12/2023

```
 1            A.   So as I mentioned earlier, we did
 2     get some briefs from them when they were setting
 3     things up, to let us know how they would work,
 4     and there was mention of a ticketing system
 5     during that, those conversations.
 6            Q.   When you received this report you
 7     forwarded it onto Facebook, correct, directly
 8     above?
 9            A.   I did.
10            Q.   And you said --
11            A.   Correct.
12            Q.   And you said:  This is not
13     Facebook-related reporting, but thought it would
14     be of interest to your team; right?
15            A.   Right.
16            Q.   Why did you forward it onto
17     Facebook if it appears to relate to tweets or
18     Twitter, as opposed to Facebook?
19            A.   Well, it related to Twitter and I
20     believe YouTube, if I'm reading this correctly.
21            Q.   Yeah, why did you forward it onto
22     Facebook?
23            A.   There's a lot of ways that people
24     generate traffic to YouTube, in particular, but
25     Twitter, as well, is by posting it across
```

RIAN . SC LL   1/12/2023

```
 1    platforms.
 2              So something like this, it would
 3    sometimes share across other platforms that we
 4    thought there might be -- it might be relevant
 5    content showing up on their platforms.
 6         Q.   In other words, if the
 7    disinformation or misinformation might be
 8    spreading to other platforms you would notify
 9    not just the platform reported, but other
10    platforms, as well, so that they could be aware
11    of this content; is that what you did?
12         A.   Yeah.  So if I'm reading this
13    correctly, it sounds like it literally jumped
14    platforms.  So maybe I'm misreading.  And so,
15    yeah, sometimes we would just -- we would share.
16         Q.   When you say:  We would share, you
17    mean you would share it with other platforms
18    than the one that was currently hosting the
19    reported content?
20         A.   Correct.
21         Q.   Okay.  Just scrolling down a few
22    pages, there a page with a Bates number 9676 at
23    the bottom.
24         A.   9676.
25         Q.   It's page 7 of the PDF.
```

RIAN . SC LL   1/12/2023

```
 1              A.   Let me just make sure I got the
 2    right one.  Got it.
 3              Q.   And again, on this one, here's
 4    another e-mail, and you said:  Hi Richard, this
 5    is not Google-specific reporting, but thought it
 6    might be of interest to your team; correct?
 7              A.   Correct.
 8              Q.   And there's this other situation
 9    where a misinformation report had come in that
10    related to a content of other platforms, and you
11    shared it with a different platform; right?
12              A.   This looks like the same example we
13    talked about above.
14              Q.   Oh, yeah, because this is the one
15    being tracked under ticket EIP243?
16              A.   I believe it's the same.  Reading
17    the e-mail it looks the same.
18              Q.   Is this something that was kind of
19    a common practice when you were performing this
20    switchboarding function that you described in
21    2020, that you would report misinformation
22    concerns, not just platform directly affected,
23    but other platforms, as well, to get ahead of
24    it, so to speak?
25                   MR. GARDNER:  Objection, asked and
```

RIAN . SC LL   1/12/2023

```
1    answered.  You can answer.
2            A.   I wouldn't say it was a common
3    practice, but we did do it period -- do it
4    periodically.
5            Q.   Let me jump ahead to Bates number
6    8356.
7            A.   Which PDF page is that?
8            Q.   That looks like it's going to be
9    page 12 of the PDF.
10           A.   Okay.  All right.  Just so you
11   know, for the e-mail, the PDF page numbers are
12   going to be a lot more helpful.
13           Q.   Sure.
14           A.   So 8357, is that what I'm looking
15   at?
16           Q.   56, I think it's the page before.
17           A.   Oh, the one above?  I got you.
18           Q.   So, yeah, and I think this still
19   relates to the same ticket; right?  If you look
20   at the middle of the page, you're still dealing
21   with the same report from CIS that has that same
22   EIP ticket number; correct?
23           A.   Yeah, it appears correct.
24           Q.   And this one you passed this onto
25   Twitter; right?
```

RIAN . SC LL   1/12/2023

```
 1              A.   Mm-hmm.

 2              Q.   And that was the platform that was

 3      directly affected; right?

 4              A.   Correct.

 5              Q.   And then talking to Twitter, at the

 6      very top, there, you said, you know, good

 7      afternoon, suspect you are -- you all are

 8      already aware of these issues, we wanted to pass

 9      along this reporting from Sonoma County,

10      California, to see if there's anything you can

11      share on how you're approaching; right?

12              A.   Mm-hmm.

13              Q.   Is that -- sorry, can you answer it

14      with a yes or no?

15              A.   Oh, I'm sorry.

16                   Yes.

17              Q.   Is that something you did when you

18      were serving the switchboarding function was ask

19      the social media platforms to report back how

20      they had addressed the contents reported?

21              A.   Generally we would do that if the

22      election official asked.

23              Q.   Why did you do that?

24              A.   Well, the -- the election official

25      reported something, they just wanted to know if
```

RIAN . SC  LL   1/12/2023

Page 164

```
 1     a decision was made often, not often, sometimes.
 2               And so if the platform was open to
 3     sharing if they had made a decision or not, we
 4     would just push that back to the election
 5     officials so they were aware --
 6          Q.    So --
 7          A.    -- of where the platform landed.
 8          Q.    So CISA would, if the state or
 9     local official wanted to know, you know, whether
10     the reported misinformation had been actioned in
11     some way, CISA would ask the social media
12     platform to report that back, and then CISA
13     would relay that to the social media -- sorry --
14     to the state or local official; is that right?
15          A.    Yeah, we did that periodically,
16     where we would ask if the decision was made and
17     if we can share back.
18          Q.    Did you do --
19          A.    The platforms got better, along the
20     way, of communicating directly with the election
21     officials, themselves.
22          Q.    Sometimes they would report back
23     directly, later in the process, especially?
24          A.    Yeah, I believe it got better kind
25     of as time went on.
```

RIAN . SC LL   1/12/2023

1          Q.    Did you do anything else with that

2      information, about whether and how the reported

3      misinformation had been actioned by the social

4      media platform?

5          A.    Did we do anything else with it?

6               No.  No.  I mean, if it came to CIS

7      we would push the response from the platform

8      back up to CIS.  If the information we received

9      from the election official came direct to us we

10      would push that back, just back to the election

11      official.

12          Q.    How about anyone else, would anyone

13      else be notified how they acted?

14          A.    I think we may have put a notation

15      in the tracking spreadsheet we kept, if a

16      platform said something returned.  But that was

17      an internal set of documents that would go to --

18      normally our attorneys, the privacy folks, would

19      let you see the tracking list review,

20      periodically.

21          Q.    So there was an internal

22      spreadsheet created by CISA to track these

23      reports?

24          A.    Yes.

25          Q.    And did you enter, you know, all of

RIAN . SC LL   1/12/2023

```
 1      your switchboarding activity reports into that
 2      spreadsheet?
 3            A.    Yeah, we did the best we could to
 4      make sure everything was captured in there.
 5            Q.    Does that spreadsheet still exist?
 6            A.    I believe -- I would assume so.
 7            Q.    Who else -- or who would enter the
 8      information in this spreadsheet?
 9            A.    So the MDM team took shifts, in
10      terms of receiving and doing -- like I said, it
11      was very resource intensive for us, and so other
12      members of the MDM team would have asserted
13      stuff in there, as well, if it was their shifts.
14            Q.    Who would have -- who took shifts,
15      other than you?
16            A.    So back then it would have been
17      myself, Chad, Rob, from that org chart, sorry,
18      Rob Schaul, Chad Josiah, who else was doing it
19      back then, myself, Alex Zaheer, an intern, which
20      I'm not going to name, and I think that was it.
21            Q.    Let me see if I caught all --
22            A.    I think that was it.
23            Q.    Let me see if I caught all those
24      e-mails, Chad Josiah did that?
25            A.    Mm-hmm.
```

RIAN . SC LL   1/12/2023

```
 1              Q.   And then I think you said Rob
 2    Schaul did that, S-c-h-a-u-l; corrects?
 3              A.   Correct, and then Alex Zaheer, who
 4    also should be on the org chart.
 5              Q.   How do you spell letter name?
 6              A.   His name, Alex, A-l-e-x,
 7    Z-a-h-e-e-r.
 8              Q.   Okay.  Anyone else?
 9              A.   There's an intern.
10              Q.   Can you name the intern, please?
11              A.   No, I'm not going to name the
12    intern.
13              Q.   Are you refusing to answer that
14    question without an instruction, again?
15              A.   Yes.
16              Q.   Okay.  Anyone else?
17              A.   I feel like there was, but I'm
18    forgetting names, right now.  But those would
19    have been the principal -- oh, John Stafford,
20    sorry.
21              Q.   What's his role at CISA?
22              A.   He is not at CISA any longer.  He
23    left sometime in 2021.
24              Q.   Okay.  What was his role?
25              A.   He was an analyst by -- like the
```

RIAN . SC LL   1/12/2023

```
 1    others.
 2            Q.   And would all those people be
 3    involved in e-mails like the ones we're looking
 4    at here in October 9 -- sorry -- in Exhibit 9,
 5    where word would come in from, you know, CIS or
 6    somebody like that, they would forward it onto a
 7    social media platform?
 8            A.   Yeah, so they would -- if -- if
 9    they received something, they would play that
10    switchboard role and they would forward it to
11    the platforms.
12            Q.   And then would they, like you,
13    report back sometimes to CIS or whatever
14    reporter on how things had been actioned?
15            A.   I don't recall if they did that or
16    not.  If the -- if the platform sent something
17    back on their own, which sometimes happened, as
18    well, they would report that.  I don't know that
19    they did anything beyond that.
20            Q.   Did any of them communicate with
21    anyone at the Election Integrity Partnership?
22            A.   Well, the intern, I believe, worked
23    both, although, when he was on duty, he was only
24    working for us.  Beyond that, I don't -- I don't
25    know.  I don't know that we would have
```

**RIAN . SC LL   1/12/2023**

 1   conversations, not about the switchboarding, I

 2   wouldn't think.

 3          **Q.   You say the intern worked both, you**

 4   **mean the intern part of the time was working for**

 5   **CISA and part of the time was working for EIP?**

 6          A.   So my understanding -- so the

 7   intern was a Stanford student, so he worked part

 8   time for us.  On election day, when he would

 9   have been on the agenda, he was just working for

10   us.

11          And my understanding is he also did

12   some work for the Stanford Internet Observatory.

13   I don't know what that work entailed, if it was

14   EIP-specific or not.  But yeah, he was -- he did

15   do some stuff with the Stanford Internet

16   Observatory, I'm just not a hundred percent

17   certain of the nature of it.

18          **Q.   Do you know whether he was involved**

19   **in tracking misinformation and disinformation**

20   **for the Stanford Internet Observatory?**

21          A.   I don't know if that intern was

22   responsible for that or doing that work.

23          **Q.   Was that the only intern during**

24   **2020 who was simultaneously working part time**

25   **for CISA, and also working with Stanford**

RIAN . SC LL   1/12/2023

```
 1        Internet Observatory?
 2              A.   No.  There was one other, as I
 3        mentioned earlier, there were two.
 4              Q.   And so, I see, in other words, it
 5        wasn't sequential.  Those two interns, did they
 6        maintain their part-time internship at CISA
 7        through the election -- the end of the election
 8        cycle in 2020?
 9              A.   Correct.  They were summer interns,
10        full-time summer interns, and then they went
11        back, they continued their studies at Stanford
12        and part-time interns of us.
13              Q.   Okay.  So they also, I take it,
14        when they went back to Stanford for the fall
15        semester they also worked for the Stanford
16        Internet Observatory?
17              A.   That's my understanding, correct.
18              Q.   And at least one of those interns
19        was involved in doing these switchboarding
20        e-mails like we're looking at in Exhibit 9;
21        right?
22              A.   Correct.
23              Q.   Okay.  What -- what did the other
24        intern do during this timeframe for CISA?
25              A.   He also did some of the
```

RIAN . SC LL   1/12/2023

```
 1    switchboarding.
 2              Q.    Okay.  So should we add intern
 3    number two is also a -- a person who engages in
 4    switchboarding e-mails?
 5              A.    Correct.
 6              Q.    Are you declining to disclose the
 7    name of intern number two, as well?
 8              A.    Intern number two is on our staff
 9    now.
10              Q.    What's his name?
11              A.    Alex.
12              Q.    Alex what?
13              A.    Zaheer.
14              Q.    So Alex Zaheer was -- was he one of
15    the interns who originated the idea of the EIP?
16              A.    Correct.
17              Q.    What's his role in CISA now?
18              A.    He is an analyst on the MDM team.
19              Q.    What does he do for CISA?
20              A.    He works on the MDM team.  He
21    does -- we talked about him earlier in the org
22    chart discussion.
23              Q.    I'm sorry, I don't remember, what
24    does he do?
25              A.    So he steps across the range of
```

RIAN . SC  LL   1/12/2023

```
 1    work, he does some analysis, he does some

 2    engagement, he does some product development

 3    work.

 4           Q.    What's engagement?  Does he talk to

 5    social media platforms for CISA?

 6           A.    He does not, no.

 7           Q.    Does he still do any work for

 8    Stanford Internet Observatory?

 9           A.    No, not that I'm aware of.

10           Q.    When was he involved in working for

11    Stanford Internet -- Stanford Internet

12    Observatory, to your knowledge?

13           A.    I don't know.  It would have been

14    before he graduated, as far as I'm aware.

15           Q.    I'm asking you again, what's the

16    name of intern number one, the one who was

17    involved in routing disinformation concerns to

18    social media platforms, during the 2020

19    election, whose name you haven't disclosed yet?

20           A.    I'm still not going to disclose his

21    name.

22           MR. SAUER:  Counsel, on the break

23    let's talk about that.

24    BY MR. SAUER:

25           Q.    Moving on a little bit, if I could
```

RIAN . SC LL  1/12/2023

```
 1      direct your attention back to -- or actually,
 2      let's jump ahead in the Exhibit 9.  Actually,
 3      let me -- let's stay on this page.
 4              A.   Which page?
 5              Q.   I think we're on page 11 of the
 6      PDF.
 7              A.   Okay.
 8              Q.   Or actually, I'm sorry, let's jump
 9      ahead to page 10603 Bates, and then that's going
10      to be page 18 of the PDF.
11              A.   All right.  Okay.  I'm on page 18.
12              Q.   Okay.  If you look here, this is a
13      reporting chain of a misinformation concern from
14      you to Twitter, on October 10th; correct?
15              A.   Yes, that's what it appears to be.
16              Q.   And you're making this report at --
17      on the Saturday afternoon; right?  Or is that an
18      early Saturday morning?  It looks like it's a
19      Saturday afternoon, at 12:52 p.m., there at the
20      bottom of the page; do you see that?
21              A.   I do.
22              Q.   So you talked about this being
23      resource intensive.  Were you guys staffing, you
24      know, the misinformation reports and doing the
25      switchboarding on nights and weekends?
```

RIAN . SC LL  1/12/2023

1          A.   So we ramped up as we got closer to

2     the election.  At this stage I think it was

3     primarily me that would receive them over the

4     weekends.  I forget when we started -- when I

5     started handing some of that off to my team to

6     also pick it up over the weekends.

7               But at some point, we did have

8     people on the schedule.  It didn't mean that

9     they were 24/7 waiting for things, they just

10    needed to monitor their phones in case something

11    came in.

12         Q.   How -- so somebody was kind of

13    tasked with -- I think you called them shifts,

14    earlier -- someone was tasked with covering a

15    shift at all times, not at all times, but at

16    times over the weekend?

17         A.   Yeah, particularly as we got closer

18    to the election.  I wouldn't say it was the

19    entire election cycle, it was -- I don't know

20    when it started, but probably sometime in

21    mid-October when -- when we started just shifts

22    so that people could review, before that it was

23    mostly me that would receive them from CIS.

24         Q.   And -- and then how about did you

25    ever have it where you were doing shifts in the

RIAN . SC LL   1/12/2023

1    **meddling of the night.**

2         A.   No.  I mean, technically, you would

3    be on for a day, if you're on your shift.  But

4    there wasn't an expectation, if something came

5    in at 3:00 in the morning, that you were

6    forwarding it on.

7         **Q.   How because between 11:00 and 12:00**

8    **at night?**

9         A.   Yeah, I mean if you were awake at

10   11:00 or 12:00 at night, I think that we would

11   push it on, and then obviously on election --

12   election night we were -- we were up until at

13   least midnight.  So if we received anything we

14   would push it forward.

15             But again, it was more when we got

16   into kind of off hours you just ask people to

17   monitor their phones, if they could, and if

18   something came in just to push it forward.  But

19   the expectation that, as per this e-mail, that

20   they would be responsible for forwarding

21   something.

22        **Q.   Let me ask you this:  If you look**

23   **at this e-mail chain we're looking at, where it**

24   **says you would forward on a concern at 12:52**

25   **p.m., and looks like about 20 minutes later, on**

RIAN . SC LL   1/12/2023

1    a Saturday afternoon, maybe Saturday morning,

2    for them, Twitter responds and says:  Thanks,

3    Brian, we will escalate; do you see that?

4         A.   Yes.

5         Q.   So it looks like the people at

6    Twitter are monitoring their phones to respond

7    promptly to your reports; is that right?

8         A.   I mean, that would -- I don't know

9    what their monitoring behavior was, in this case

10   she certainty responded relatively quickly on a

11   Saturday.

12        Q.   And that's not the only case, it

13   happens again and again and again, where you get

14   almost immediate responses from not just

15   Twitter, but Facebook and others; correct?

16        A.   I mean, don't know.  I'd have to --

17   I'm sure you could show me documents that would

18   who that, but I honestly don't know the

19   timelines of sends and returns.

20        Q.   Well, you remember them pinging you

21   back promptly and being very responsive when you

22   would make reports like this?

23        A.   They were generally responsive in

24   making sure that we knew that they received it,

25   yeah.

RIAN . SC LL   1/12/2023

Page 177

```
 1              Q.   And not just received it, for
 2    example, in this case, not long after that, at
 3    6:30 p.m. the same day, she notifies you:  These
 4    tweets have actioned for violations of our
 5    policies; right?
 6              A.   That's what the e-mail says, yep.
 7              Q.   And was that timeframe typical,
 8    were they turning around, you know, content that
 9    was flagged and taking action on it within hours
10    of your reports?
11              A.   It's hard to say, because they
12    didn't always get back to us if they hadn't
13    taken any action.  So I don't know if I would
14    say that's typical.
15                   You know, sometimes they would let
16    us know, sometimes they wouldn't.  Generally
17    speaking, I think they made their decisions
18    relatively quickly.  So I would assume if they
19    did get back to me it would be relatively
20    quickly.  But I can't speak to their timing or
21    their processes or any of that stuff.  A lot of
22    times they just didn't let us know --
23              Q.   But the more response --
24              A.   -- to be honest, if they received
25    it.
```

RIAN . SC LL   1/12/2023

```
 1              Q.   Sorry to interrupt.
 2              A.   Yeah, I just wanted to say,
 3     normally we would get a note that they received
 4     the messages I forwarded to them.  We often
 5     didn't receive any kind of notification that
 6     they had taken action, no action, or what their
 7     decision was, so it's hard to say kind of what
 8     their typical timeline was for making decisions.
 9              Q.   Let me ask you this:  Were they
10     more responsive to you, as a representative of a
11     federal national security agency, than they were
12     to ordinary people who made such reports, if you
13     know?
14              MR. GARDNER:  Objection.
15     Objection, lack of foundation, calls for
16     speculation.
17              A.   Yeah, I have no clue.  I don't know
18     what the timeline was, generally.
19              Q.   Were there ever discussions between
20     you or anyone at CISA and any one of the
21     platforms about making sure the platforms are
22     monitoring their e-mails for the -- the
23     government's reports of misinformation?
24              A.   No.
25              Q.   How about in the synch meetings
```

RIAN . SC LL   1/12/2023

1    that you talked about, between the USG and the

2    industry, was it ever brought up that, hey, you

3    know, we're going to have people standing by and

4    watching for misinformation reports so we can

5    move quickly on them?

6         A.   Not that I recall.  I believe on

7    election night several of the platforms set up

8    their own operations center.  But I don't know

9    that there's ever a conversation about -- from

10   the government expecting platforms to have any

11   particular timeline.

12        Q.   Again, these sort of e-mail --

13   e-mails that we're looking at here in Exhibit 9,

14   from you to the platform and the platforms

15   responding back about misinformation that you

16   guys have switchboarded to them, I take it

17   there's a set of e-mails like this, for not just

18   you, but also for Chad Josiah, Rob Schaul, Alex

19   Zaheer, John Stafford, and an intern that you

20   haven't named yet; right?

21        MR. GARDNER:  Objection, compound.

22        A.   So if I'm understanding your

23   question, would you find e-mails from those

24   individuals to platforms notifying them or

25   forwarding information from an election

RIAN . SC LL   1/12/2023

```
 1    official, so yes.

 2                Would there likely be -- it's hard

 3    for me to know if -- if they always responded

 4    back, beyond the received, which I think was

 5    pretty standard.

 6                So I would assume that you would

 7    find change with other members of the team,

 8    where they sent something over to a platform and

 9    the platform said received, so yeah, if that's

10    your question.

11         Q.   So in other words, at least those

12    five individuals I just listed were involved,

13    separate from the e-mails that we're looking at

14    that involved you, they were sending their own

15    e-mails, when it was their shift, to social

16    media platforms, flagging disinformation

17    concerns?

18         A.   Yeah, that's correct.  But keep in

19    mind, over the entire course of the election I

20    think we forwarded about 200 e-mails, total.  So

21    I would imagine the vast majority of them are

22    mine, because for a period of time I was the

23    principal one relaying it.

24                But then to answer your question,

25    yes, there's probably other e-mail chains with
```

RIAN . SC LL   1/12/2023

```
 1    those five representatives on it.

 2                MR. GARDNER:  So we've now been

 3    going almost two hours.  I think now would

 4    probably be a good time for a break.

 5                MR. SAUER:  Let me ask one more

 6    question, that's right on this topic, and how

 7    about that or one little set of questions.

 8                MR. GARDNER:  Sure.

 9   BY MR. SAUER:

10        Q.    Did you ever discuss with Alex

11   Zaheer what he did for the Election Integrity

12   Partnership?

13        A.    I'm sure I had conversations with

14   Alex about his work with SIO, which was part of

15   the larger integrity partnership.

16        Q.    What did you discuss with him about

17   his work for SIO?

18        A.    I think he just talked about that

19   he was participating in it, I don't know the

20   specifics of the conversation, but that he was

21   participating in it, and he was one of the

22   people that were working with the ticketing

23   system.

24        Q.    When you say:  Working with the

25   ticketing system, what did he say he was doing
```

RIAN . SC LL   1/12/2023

Page 182

```
 1   with the ticketing system?
 2          A.   I don't recall.  I mean, I was -- I
 3   don't know how the ticketing system works, so I
 4   don't know, kind of, how his role would have
 5   played in there, what it was.
 6          Q.   When you refer to the ticketing
 7   system, is that the system that Stanford had for
 8   receiving reports of disinformation that they
 9   would analyze?
10          A.   Correct.
11          Q.   How about the other intern, the one
12   you haven't named yet, did you ever discuss with
13   that intern the work he did for the Stanford
14   Internet Observatory?
15          A.   I don't -- I don't recall.  I don't
16   think -- certainly not in the level of detail
17   with Alex.  Obviously Alex came to work for us,
18   so I have a little more familiarity with what he
19   did with SIO.  So I don't -- I didn't have a
20   clear understanding of the other intern's role.
21          Q.   What did the other intern go on to
22   do?
23          A.   I don't know.  As far as I know,
24   he's still at Stanford.  But I don't know if he
25   graduated.
```

RIAN . SC LL   1/12/2023

1                   MR. SAUER:  Why don't we take a

2       break there.

3                   MR. GARDNER:  Okay.  I mean, it is

4       now -- oh, let's go off the record.

5                   THE VIDEOGRAPHER:  The time is now

6       12:34.  We're off the record.

7                   (Recess.)

8                   THE VIDEOGRAPHER:  The time is now

9       1:41 p.m.  We are back on the record.

10                  MR. GARDNER:  Thank you.  And as I

11      had mentioned before we got back on the record,

12      the witness wanted to say something before we

13      began.

14                  THE WITNESS:  So the intern that

15      did both SIO and CISA push forwarding was Pierce

16      Lowary.

17   BY MR. SAUER:

18          Q.    And is that L-o-w-a-r-y?

19          A.    I believe so, yeah.

20          Q.    And that intern worked

21      simultaneously with CISA and the EIP?

22          A.    And SIO was a member of the EIP.

23          Q.    Right.  What did he do for SIO

24      while this was going on, do you know?

25          A.    I don't.

RIAN . SC LL  1/12/2023

```
 1              Q.    What did he do for CISA while this
 2      was going on?
 3              A.    Again, he was part-time in the
 4      fall, so he would support the analytic stuff,
 5      and then, as I mentioned, he did some work in
 6      terms of the switchboarding.  I'm not --
 7      obviously not sure the extent of the e-mails or
 8      anything like that, that he would have forwarded
 9      over to the platforms.
10              Q.    Now, Pierce Lowary was involved in
11      forwarding e-mails over to the platforms?
12              A.    Correct.
13              Q.    And that's in addition to Chad
14      Josiah, Rob Schaul, Alex Zaheer, John Stafford,
15      and yourself; correct?
16              A.    Correct.
17              Q.    Anyone else, in 2020, who would
18      engage in those switchboarding e-mails?
19              A.    I believe that was all.
20              Q.    Was Pierce --
21              A.    From my recollection.
22              Q.    Was Pierce Lowary one of the four
23      interns who originated the idea of the EIP?
24              A.    Yes.
25              Q.    Okay.  Who were the other two?
```

RIAN . SC LL   1/12/2023

```
 1              A.   I don't --
 2              Q.   Well, let me -- what about Alex
 3      Zaheer, was he one of the ones?
 4              A.   Alex was one.
 5              Q.   The idea --
 6              A.   It got --
 7              MR. GARDNER:  Hold on, guys, you
 8      keep talking over each other.  So let Mr. Sauer
 9      ask the question and then please answer.
10              John, can you re-ask it?
11      BY MR. SAUER:
12              Q.   Was Alex Zaheer one of the four
13      interns who originated the idea of the EIP?
14              A.   He was.
15              Q.   And he went on, like Mr. Lowary, to
16      simultaneously work for CISA and for Stanford
17      Internet Observatory during the 2020 election
18      cycle?
19              A.   Correct.
20              Q.   Who were the other two interns who
21      originated the idea?
22              A.   The fourth intern I do not know who
23      they're referring to, so I'm not sure who that
24      is.
25              The first intern is Isabella
```

RIAN . SC LL   1/12/2023

```
 1    Camargo, I forget the rest of her last name, I'm
 2    sorry.  I'd have to look.
 3            Q.    Is it Isabella Garcia-Camargo?
 4            A.    Yes.
 5            Q.    Okay.  When did she intern for
 6    CISA?
 7            A.    Over the summer of 2020.
 8            Q.    Did she do that into the fall?
 9            A.    She did not.
10            Q.    Did she go on in the fall to work
11    for Stanford -- Stanford Internet Observatory?
12            A.    Yes.
13            Q.    And did she work for Stanford
14    Internet Observatory during the summer, when she
15    was also working for CISA?
16            A.    Yes.
17            Q.    Who is Ayelet Drazen, D-r-a --
18            A.    Hold on a second, I'm sorry, can
19    you repeat that last question?
20            Q.    Which question, who is Ayelet
21    Drazen?
22            A.    No, the one before.
23            Q.    Did she work for Stanford Internet
24    Observatory during the time she was also working
25    for CISA?
```

RIAN . SC LL   1/12/2023

```
1              A.   I don't believe so, but I'm not
2    sure kind of their arrangement in the SIO front.
3    I think SIO was -- I think SIO may have been --
4    I'm not sure how that worked with SIO when
5    they're interns, but she did not work for us in
6    the fall, when she was working for SIO, that I'm
7    certain of, so I don't know what the
8    relationship was over the summer internship.
9              Q.   What -- what did she do for CISA?
10             A.   Again, like the other analysts,
11   typical intern stuff, supporting product
12   development, helping with, you know, any
13   research projects, standard kind of intern work
14   across the three panels I mentioned before,
15   engagement, product development, and analysis
16   research.
17             Q.   Who is Ayelet Drazen, D-r-a-z-e-n,
18   first name A-y-e-l-e-t?
19             A.   I don't know.
20             Q.   Who is Ashwin Ramaswami?
21             A.   I believe he was one of the
22   election security interns.
23             Q.   During 2020 at CISA?
24             A.   At least the summer of 2020.  I
25   don't -- I don't know, kind of, how long he
```

RIAN . SC LL   1/12/2023

1    stuck around.  I didn't really work with him.

2              Q.    Is he another Stanford intern?

3              A.    Yeah, I believe so.

4              Q.    Did he go on to work for the

5    Stanford Internet Observatory?

6              A.    I don't know.  I don't know.

7              Q.    How about Jack Cable, C-a-b-l-e?

8              A.    He was a Stanford intern.  I

9    don't -- I don't know what he did, after, just

10   for the summer, that I'm aware of, but I'm not

11   entirely sure.  He didn't work on the MDM stuff

12   with me.

13             Q.    What did he do at CISA, do you

14   know?

15             A.    He was more cyber-focused, so I'm

16   not entirely sure, really, what his projects

17   are.

18             Q.    Just a second, I'm e-mailing you

19   two new exhibits.

20                   Let me ask this:  Were you involved

21   in -- Mr. Scully, were you involved in preparing

22   CISA's discovery responses to written discovery

23   in this case?

24             A.    I believe I provided names of the

25   team.  And the IT folks searched my records for

RIAN . SC LL   1/12/2023

```
 1    me.
 2               Q.    You provided names?
 3               A.    Don't ask --
 4               Q.    Names of the team, what does that
 5    mean?
 6               A.    So I believe I provided names of
 7    the people who are part of the MDM team or the
 8    CFITF.
 9               Q.    So you provided names of key
10    custodians, for example, who might have relevant
11    e-mails in their inboxes, stuff like that?
12               A.    Right.
13               Q.    Okay.  Were you involved in
14    drafting interrogatory responses?
15               A.    If I recall correctly, I reviewed
16    some of them.
17               Q.    Did you review the ones that were
18    submitted on behalf of CISA?
19               A.    Yeah, those would have been the
20    only ones I reviewed.
21               Q.    Before the break, you mentioned
22    that there were about 200 e-mails that CISA
23    forwarded to serve this switchboarding function
24    of routing disinformation concerns to the social
25    media platforms in 2020; right?
```

RIAN  . SC  LL    1/12/2023

```
 1              A.   Yeah, give or take a few.  I don't
 2      know the exact number, but it's about 200.
 3              Q.   How do you know how many there
 4      were.
 5              A.   Well, as I mentioned previously, we
 6      kept a tracking spreadsheet.  Everything we sent
 7      over we logged.
 8              Q.   Would you consult that tracking
 9      spreadsheet when you were preparing or working
10      on responding to written discovery in this case?
11              A.   I don't recall that I did, it's
12      possible, but I don't recall doing it.
13                   (Exhibit No. 12 was marked for
14      identification.)
15      BY MR. SAUER:
16              Q.   Let me show you Exhibit 12.
17              A.   Okay.  That's a complaint.
18              Q.   It should be amended interrogatory
19      responses that have also been filed publicly
20      with the Court as document 86-3?
21                   MR. GARDNER:  I'd like to take a
22      look.  Hold on.
23                   THE WITNESS:  I don't know.
24                   MR. GARDNER:  Hold on one sec.
25      Yeah, that's right.  That's right.
```

RIAN . SC LL   1/12/2023

```
 1                    THE WITNESS:  Okay.
 2    BY MR. SAUER:
 3            Q.   Can you go to page 19 of that
 4    document?  I've also got it up on the screen
 5    share.
 6            A.   All right.  Page 19?  Okay.  I'm at
 7    19.
 8            Q.   In here, at the bottom of page 19,
 9    you see where it says:  CISA, colon?
10            A.   Yes.
11            Q.   It's identifying people with
12    relevant communications response to our
13    discovery requests.
14                 CISA has identified the following
15    custodians as having relevant communications as
16    produced in the response to requests two and
17    three; correct?  Do you see that?
18            A.   I do.
19            Q.   CISA custodians listed are Jen
20    Easterly, Christopher Krebs, Matt Masterson,
21    Geoff Hale, Brian Scully, and Lauren Protentis;
22    right?
23            A.   Yep.
24            Q.   So these other people, Chad Josiah,
25    Rob Schaul, Alex Zaheer, John Stafford, Pierce
```

RIAN . SC LL   1/12/2023

1    Lowary, who were involved in forwarding e-mails
2    to social media platforms to flag them, were not
3    disclosed in this part of the interrogatories;
4    correct?
5        A.   I think if you scroll down another
6    paragraph, you would see most of those names.
7        Q.   Yeah, that's extremely interesting,
8    isn't it?  Very next paragraph it says, oh,
9    we've also identified some other people as
10   appearing in the communications you produced,
11   and it lists four of those five people, Chad
12   Josiah, Robert Schaul, Alex Zaheer, John
13   Stafford; right?
14       A.   Yes, that's who is listed there.
15       Q.   It appears --
16       A.   I don't know that that's
17   interesting.
18       Q.   It's interesting that CISA knew
19   about the involvement of these people and
20   relevant communications, but didn't search their
21   inboxes in response to our discovery requests;
22   isn't that what this indicates?
23       A.   I have no idea what this indicates.
24       Q.   Well, let me ask you this:  You
25   testified before the break that those four

RIAN . SC LL   1/12/2023

 1    people there, plus Pierce Lowary, who you just

 2    disclosed, all forwarded disinformation reports

 3    to social media platforms as part of the

 4    switchboarding function; isn't that right?

 5          A.    They were all part of the

 6    switchboarding function.  I don't know who sent

 7    e-mails or how many e-mails or any of that.

 8          Q.    But you testified that they took

 9    shifts and sent e-mails to social media

10    platforms reporting this information; correct?

11          A.    They took shifts, and if they

12    received something they would have sent an

13    e-mail.  But without going through the

14    spreadsheet that I mentioned I wouldn't know if

15    an actual individual was on a shift, sent one,

16    but that would be my expectation that they did.

17          Q.    What was the last --

18          A.    There were generally two people

19    per -- there were generally two people per

20    shift, so it's possible that just one of those

21    two people were sending e-mails.

22          Q.    Pierce Lowary is not identified

23    anywhere in these discovery responses, is he?

24          A.    I mean, he's not identified in

25    these.  This is a small section.  I don't know

RIAN . SC LL   1/12/2023

```
 1     if he is elsewhere.
 2              Q.    Well, you said you reviewed them
 3     when they were being prepared.  Do you remember
 4     seeing his name anywhere -- anywhere in the
 5     government's discovery responses?
 6              A.    I don't recall, but I wouldn't
 7     have -- I don't think I would have reviewed the
 8     entire document, so I don't know.
 9              Q.    Who would have --
10              A.    Obviously, I didn't see the final
11     document.
12              Q.    Who would have reviewed the final
13     document?
14              MR. GARDNER:  Objection, calls for
15     speculation.
16     BY MR. SAUER:
17              Q.    If you know.
18              A.    Yeah, I don't know.
19              MR. SAUER:  Exhibit 62, which I've
20     also e-mailed you.
21              MR. GARDNER:  John, did you say 62?
22              MR. SAUER:  62, should be the most
23     recent one in your inbox.
24                   THE WITNESS:  Okay.  Okay.
25                   (Exhibit No. 62 was marked for
```

RIAN . SC LL   1/12/2023

```
 1      identification.)

 2   BY MR. SAUER:

 3           Q.    Here's Jack --

 4           A.    Is it the -- sorry, go ahead.

 5           Q.    This is Jack Cable's publicly

 6      available online LinkedIn profile; do you see

 7      that?

 8           A.    I do.

 9           Q.    If you scroll down, a fifth page of

10      this document, it looks like he was a research

11      assistant at Stanford Internet Observatory from

12      2019 to 2021; correct?

13           A.    That's what it says, yep.

14           Q.    And that he ended in June of 2021,

15      correct, at SIO?

16           A.    That's what it says, yeah.

17           Q.    And immediately below that, it

18      looks like he was an election security technical

19      advisor at CISA from June 2020 to January 2021;

20      correct?

21           A.    That's what he says.

22           Q.    So he also overlapped, for an

23      entire year, in working simultaneously for CISA

24      and for the SIO; correct?

25                 MR. GARDNER:  Objection, lack of
```

RIAN . SC LL  1/12/2023

```
 1    foundation.

 2   BY MR. SAUER:

 3           Q.    According to his LinkedIn profile?

 4           MR. GARDNER:  Same objection.

 5           A.    LinkedIn profile says he worked at

 6    CISA for eight months.

 7               (Reporter admonition.)

 8           THE WITNESS:  Sorry.

 9           A.    The LinkedIn profile said he worked

10    at CISA for eight months.

11           Q.    Right.  Does the LinkedIn profile

12    also indicate that during those same eight

13    months, from June of 2020 to January of 2021, he

14    also was an intern -- a research assistant at

15    Stanford?

16           A.    It appears that way, yep.

17           Q.    Were you aware that Jack Cable was

18    working for Stanford Internet Observatory while

19    he was also interning for CISA?

20           A.    No.  Jack didn't work for me, so I

21    didn't really pay attention to what he was

22    doing.

23           Q.    He shares this simultaneous

24    employment with SIO and CISA, along with Alex

25    Zaheer and Pierce Lowary; correct?
```

RIAN . SC LL   1/12/2023

```
 1                    MR. GARDNER:  Objection, lack of
 2      foundation.
 3      BY MR. SAUER:
 4           Q.    Correct?
 5           A.    I'm sorry, could you repeat the
 6      question?
 7           Q.    Pierce Lowary and Alex Zaheer also
 8      simultaneously worked for CISA and SIO; correct?
 9           A.    They did.
10           Q.    And then, if you scroll up a little
11      bit, to the page before, it looks like he went
12      on to work for the Krebs-Stamos Group; were you
13      aware of that?
14           A.    No, I don't think so.
15           Q.    And then he went on to work for the
16      senate; correct?  Does that ring a bell?
17           A.    I mean, it's what it says here.
18           Q.    So you didn't know what Jack Cable
19      went on to do after he left CISA?
20           A.    No, I didn't really pay attention
21      to what -- like I said, he didn't work for me,
22      so I didn't really follow him.  In fact, I'm --
23      a couple of my interns I'm not sure what they're
24      doing, either.
25           Q.    Let's go back to Exhibit 9.
```

RIAN . SC LL    1/12/2023

```
 1                    Is it possible that Jack Cable was
 2       another one of the interns who originated the
 3       EIP?  You mentioned there's one, and you're not
 4       sure if it was them?
 5                    MR. GARDNER:  Objection, calls for
 6       speculation.
 7            A.    Yeah, I wouldn't know.  I wouldn't
 8       know.
 9            Q.    Let's go to page 8769 in this
10       document, Exhibit 9.
11            A.    Do you know what the PDF page is,
12       John?
13            Q.    I'm scrolling down to it, so I'll
14       tell you as soon as I know the answer.
15            A.    Okay.
16            Q.    I think it's PDF page 62.
17            A.    All right.
18            Q.    All right.  If you see here, it
19       looks like Alex Zaheer, on October 30th, sends a
20       report about misinformation to CFITF, which is
21       the CISA reporting e-mail address; correct?
22                    MR. GARDNER:  John, I'm sorry, are
23       you going to post this on the -- on the live
24       screen for us?
25                    MR. SAUER:  I'm sorry, I didn't
```

RIAN . SC LL   1/12/2023

1    realize it wasn't up.  Can you see it on the

2    screen share?

3              MR. GARDNER:  Yeah, we got it now.

4    Thank you.

5    BY MR. SAUER:

6              Q.    Alex Zaheer, on October 30th, sends

7    an e-mail to CFITF; correct?

8              A.    Yep.

9              Q.    And he's actually --

10             A.    Yes.

11             Q.    He says:  FYSA, EIP has reported

12    the following to EI-ISAC and Twitter from EIP,

13    and then he reports on an EIP ticket; correct?

14             A.    Correct.

15             Q.    And then this -- you responded to

16    him, Thanks Alex; do you see that on the page

17    before?

18             A.    Yes.

19             Q.    And then you sent an e-mail, it's

20    not clear to whom, saying:  FYI, the EIP,

21    submitted the below to Twitter, no need to

22    respond.  But it looks like you were saying that

23    to Twitter; right?

24             A.    Yeah, there's no header there, so

25    I'm not certain, but that's what it appears.

RIAN . SC LL   1/12/2023

1          Q.   It appears that from your intern,
2     who was simultaneously working for EIP, you
3     received a report of alleged misinformation and
4     submitted it onto Twitter; right?
5          A.   Yeah.
6          Q.   And then -- and that was an
7     EIP-specific report; correct?
8          A.   Yep.
9          Q.   And then Twitter responded and
10     said, thanks Brian, we received that report from
11     the EIP and escalated it; correct?
12          A.   Yes.
13          Q.   And then she goes on to specify to
14     you the action they took against that; correct?
15          A.   Yeah, on a contextual label
16     pursuant to their policy on civic integrity,
17     yeah.
18          Q.   Were there other instances where
19     this occurred, where an EIP report was forwarded
20     to you, and you forwarded it onto -- to a social
21     media platform?
22          A.   As I said earlier, it's possible,
23     but I don't recall.
24          Q.   How about --
25          A.   It was our standard practice.

RIAN . SC LL   1/12/2023

```
 1              Q.    How about the other five people who
 2       were monitoring these misinformation reporting
 3       e-mails, did they ever review that, do you know?
 4              MR. GARDNER:  Objection, calls for
 5       speculation.
 6              A.    Yeah, I don't know.  Again, it
 7       wasn't part of our normal process, so I'm not
 8       sure.
 9              Q.    Would that be reflected in this
10       spreadsheet you referred to multiple times?
11              A.    Yeah, it should be.
12              Q.    So if there was -- if the EIP is
13       referenced or is the originator of the report
14       you would note that in the spreadsheet?
15              A.    I believe so.  I believe we would
16       have the case number.
17              Q.    Can you scroll back up to page 33
18       of the PDF?
19              A.    Yep.
20              Q.    It's Bates 8349.
21              A.    8349, yep.
22              Q.    You see at the top of this page
23       there's a misinformation report from Oregon,
24       that's being sent on by the CIS, Center For
25       Internet Security, reporting e-mail; do you see
```

RIAN . SC LL   1/12/2023

```
 1    that?
 2          A.   Yes.
 3          Q.   And it's sent to you and a couple
 4    other CISA e-mails or -- CISA e-mails, there in
 5    the first line; right?
 6          A.   Yep.
 7          Q.   In the second line it's sent to
 8    tips@2020partnership.atlassian.net; do you see
 9    that?
10          A.   I do.
11          Q.   What is that?
12          A.   I don't know.
13          Q.   Is that the reporting e-mail for
14    tips to the 2020 Election Integrity Partnership?
15               MR. GARDNER:  Objection, calls for
16    speculation, also, asked and answered.
17          A.   Yeah, I don't know what it is.
18          Q.   Is it your testimony that you're
19    not aware whether or not that's the reporting
20    e-mail for the EIP?
21          A.   Yeah, I'm not aware -- the answer
22    is, I'm not aware of what e-mail that is.
23          Q.   Were you aware that -- did you
24    notice that CIS was commonly forwarding these
25    reports to both you and that
```

**RIAN . SC  LL   1/12/2023**

**Page 203**

```
 1      tips@2020partnership e-mail?

 2             A.   I'm not sure that I paid that much

 3      attention to it, no.

 4             Q.   You didn't notice --

 5             A.   Again, yeah, I wasn't -- I guess

 6      that I wasn't aware of what processes they were

 7      following.

 8             Q.   So you didn't know they were

 9      looping in the EIP on their reports; is that

10      what you're saying?

11             A.   I don't recall it, but again, as we

12      discussed earlier, it could have been part of

13      the effort to deconflate for the platforms.

14             Q.   Up here on page 51 of the PDF,

15      scrolling to the bottom of that page down to 52,

16      here's another CIS report.  Once again, it's

17      sent to you at -- to CISA e-mails and

18      tips@2020partnership@atlassian.net; correct?

19             A.   Yeah, I see the e-mail address in

20      there.

21             Q.   And you don't recall that being --

22      you getting copied -- that being copied on

23      e-mails of this nature?

24             A.   I don't.

25             Q.   Really briefly, jumping ahead to
```

RIAN . SC LL   1/12/2023

Page 204

1     page 10539, page 55, once again, CIS is copying

2     you and tips@2020partnership.atlassian.net;

3     correct?

4            A.    That's the e-mail, yes.

5            Q.    Jumping ahead to page 7565, here's

6     a report from the Colorado secretary of state's

7     office.  Do you see, we're on page 59 of the

8     PDF, where they're reporting it to EI-ISAC,

9     CISA, and Stanford Partners; correct?

10           A.    That's what the e-mail says, yep.

11           Q.    It says Stanford is presumably --

12           MR. GARDNER:  Objection, calls for

13    speculation.

14           A.    Yeah, I don't know what they mean

15    by Stanford.

16           Q.    Do you think Stanford might be some

17    other Stanford entity to which state and local

18    election officials are reporting disinformation

19    concerns --

20           MR. GARDNER:  Objection.

21    BY MR. SAUER:

22           Q.    -- during the 2020 cycle?

23           MR. GARDNER:  Objection, calls for

24    speculation, lacks foundation.

25    ///

RIAN . SC LL   1/12/2023

```
 1    BY MR. SAUER:
 2              Q.    Do you know?
 3              A.    I don't know.
 4              Q.    Scrolling above this, again, CIS
 5       forwards this to you and tips22020partnership,
 6       that reporting e-mail or that e-mail address;
 7       correct?
 8              A.    Are you up on -- what page are you
 9       on now?
10              Q.    Page 58 of the PDF, immediately
11       above, shows CIS forwarding that report from
12       Colorado secretary of state's office to both you
13       and tips@2020partnership.atlassian.net?
14              A.    So Colorado sends to CIS, CIS sends
15       to me, CISA, and atlassian.net, okay.
16              Q.    And you forward this onto -- to
17       Twitter; correct, immediately above that?
18              A.    So again, there's no header, but
19       the response is from Twitter, so that's what I
20       assume.
21              Q.    And you -- they say -- you say:
22       Please see below reporting from Colorado.  These
23       do not appear to be connected to the imposter
24       parody accounts previously shared; correct?
25              A.    Correct.
```

RIAN . SC LL   1/12/2023

```
 1              Q.   And Twitter responds within 15
 2    minutes:  We will escalate.  Thank you; correct?
 3              A.   Correct.
 4              Q.   Okay.  And if you scroll down a
 5    couple pages, you see that Colorado secretary of
 6    state's office has flagged some parody or
 7    imposter accounts, including one with 14
 8    followers; correct?
 9              A.   What page are you on?
10              Q.   59 of the PDF.
11              A.   59 of the PDF?  I don't see what
12    you're talking about there.  This is the same
13    e-mail chain we were just talking about.
14              Q.   Maybe look up at the screen share,
15    can you see where secretary of state's office
16    has forwarded a screen shot of a Twitter
17    account, it's got 14 followers?
18              A.   I do.
19              Q.   And secretary of state's office in
20    Colorado says:  These are concerning to us here
21    in Colorado because of their recent FBI/CISA
22    warnings about impersonation accounts; correct?
23              A.   That's what it says, yep.
24              Q.   So they say that we're reporting
25    this because it -- because it's the sort of
```

RIAN . SC LL   1/12/2023

1      things that the FBI and CISA warned us may

2      warrant reporting; right?

3           A.   I mean, I don't want to speak for

4      the secretary of state, but that's kind of how

5      the account sentence reads.

6           Q.   Did you -- in fact, were you

7      involved in warning state and local election

8      officials about impersonation accounts spreading

9      false information about the election?

10          A.   I'm sure I would have reviewed a

11     document that went out along those lines.  I'm

12     not aware of the document, but I'm sure if it

13     went out I would have reviewed it.

14          Q.   Do you remember reviewing it?

15          A.   They put out -- in 2020 we put out

16     a couple of joint FBI and CISA products.  I

17     don't remember specifically which one this is,

18     but it certainly sounds like something we would

19     do.

20          Q.   Okay.  Scrolling down, there's

21     another one they're flagging here, that if you

22     didn't know, it has two followers; correct?

23          A.   So it appears.

24          Q.   And you forwarded that onto

25     Twitter, and Twitter said:  We'll escalate;

RIAN . SC  LL   1/12/2023

1    right?

2         A.    Yes.  They said they will escalate.

3         Q.    Moving onto page 10512, just a few

4    pages down, that's going to be page 63 of the

5    PDF.

6         A.    Okay.

7         Q.    Do you see here in the middle,

8    here, it's an inquiry from Twitter, and she

9    says:  Hey Brian, can we talk about CIS

10   misinformation reporting duplicate reports to

11   EIP, possible to have just you escalate;

12   correct?

13        A.    Yeah, that's what the e-mail says.

14        Q.    What is she talking about, is this

15   the duplicate reporting issue that you talked

16   about earlier, where they were getting reports

17   from you and EIP and CIS?

18        A.    That's what I would imagine it is,

19   yeah.

20        Q.    Okay.  Do you remember anything

21   about this?  We're talking about October 27th,

22   so, you know, maybe a week before the 2020

23   election, do you remember the social media

24   platform is having this concern about duplicate

25   reports from CIS and EIP?

RIAN . SC LL   1/12/2023

```
 1              A.   I remember Twitter, in particular,
 2     having that concern.
 3              Our screen is screwy again.
 4              THE REPORTER:  Can we go off the
 5     record?
 6              MR. SAUER:  Yeah, we can go off the
 7     record.
 8              THE VIDEOGRAPHER:  The time is now
 9     2:11 p.m.  We're off the record.
10              (Recess.)
11              THE VIDEOGRAPHER:  The time is now
12     2:13 p.m.  We are back on the record.
13     BY MR. SAUER:
14              Q.   Okay.  So -- and then, Mr. Scully,
15     you responded to this:  So here's the deal, EIP
16     will only report something to Twitter if they
17     have additional context to provided based on
18     their research; correct?
19              A.   That's what I wrote, yes.
20              Q.   How did you know that was going to
21     be their policy or their practice, did you talk
22     to EIP?
23              A.   I would imagine I did.
24              Q.   Who did you talk to?
25              A.   I don't recall.
```

RIAN . SC LL   1/12/2023

1           Q.    And that he goes on -- or you go on

2     to say, they will not send Twitter reporting

3     unless it has that additional context that would

4     help you make a decision; correct?

5           A.    Yep.

6           Q.    And then it says:  EIP will also

7     let CISA know when they are reporting something

8     to you so I can give you a heads up; correct?

9           A.    Yep.

10          Q.    Is that what happened after this

11    e-mail, did EIP report to you when they were

12    reporting something to the social media

13    platforms?

14          A.    I don't recall that, in practice.

15    Although, obviously, we just went through each

16    one e-mail that did that.  I don't remember it

17    being a common thing but, again, I don't -- I

18    don't know.  It's possible.

19          Q.    Okay.  And then it says:  EIP will

20    continue to use the CIA -- CIS case number to

21    facilitate identifying duplicative reports;

22    correct?

23          A.    Yep.

24          Q.    So EIP was talking to CIS enough to

25    know what CIS's misinformation reporting case

```
1    numbers were; right?
2          A.   I don't know.  I don't know if
3    that's true.
4          Q.   Were you aware that EIP was using
5    CIS's case numbers, because you said it in this
6    e-mail?
7          A.   Yep, I mean, if that's what I
8    wrote, that's probably what they were doing.
9          Q.   Okay.  Do you remember discussing
10   that with CIS or EIP that they were going to,
11   you know, kind of share case numbers?
12         A.   I don't recall any such
13   specificity.  I know we had a conversation.  I
14   recall that we had conversations about how to
15   de-duplicate, make sure we weren't overtaxing
16   Twitter, in particular.
17         Q.   And that de-duplication process
18   involved some kind of coordination between you,
19   EIP and CIS; correct?
20         A.   Again, reading this, it appears we
21   are just making sure we are sending something
22   over and everybody is aware of it.
23         Q.   Right.  So everybody would tell
24   everybody else that they were sending something
25   over, and there was an attempt to avoid sending
```

RIAN . SC LL   1/12/2023

```
 1      duplicative reports to Twitter?
 2                  MR. GARDNER:  Objection, compound.
 3      BY MR. SAUER:
 4            Q.    Correct?
 5            A.    Yeah, can you -- can you break
 6      that -- can you start that over again?
 7            Q.    Was there an agreement for EIP and
 8      CIS and CISA to coordinate and let each other
 9      know what they were reporting to platforms like
10      Twitter?
11            A.    I think that's generally right,
12      yeah.
13                  MR. SAUER:  Let me send you a
14      couple more exhibits, 10 and 11.  I'm going to
15      pull up 10 on the screen share while you're
16      waiting.
17                  MR. GARDNER:  John, do you -- John,
18      did you send them over?
19                  MR. SAUER:  Yeah.  They should be
20      in your inbox.
21                  MR. GARDNER:  Yeah, I'm looking.
22                  MR. SAUER:  They're in my sent box.
23                  MR. GARDNER:  Okay.  I believe you.
24      Hold on.
25                  (Exhibit No. 10 was marked for
```

RIAN . SC LL   1/12/2023

```
 1    identification.)

 2  BY MR. SAUER:

 3          Q.    Let me ask this:  Can you see it on

 4    the screen share?

 5          A.    I can.

 6                MR. GARDNER:  You haven't shared it

 7    yet, John.

 8                THE WITNESS:  Trick question.

 9  BY MR. SAUER:

10          Q.    Now can you see it on the screen

11    share?

12          A.    Yes.

13          Q.    Just looking here at the first

14    page, you know, this exhibit is a collection of

15    your switchboarding e-mails from November of

16    2020, do you see you, are copied here on

17    misinformation report from CIS on November 2nd

18    of 2020?

19          A.    Yes.

20          Q.    Once again, CIS continues to copy

21    tips@2020partnership.atlassian.net; do you see

22    that?

23          A.    I do.

24          Q.    Does that ring a bell for you about

25    what that e-mail is, after we talked about that
```

RIAN . SC LL   1/12/2023

```
 1      last e-mail, where you were arranging to

 2      coordinate with EIP about de-duplicating reports

 3      to social media platforms?

 4           A.   I forget.  I don't recall the

 5      e-mail.  If you tell me that that was the tips

 6      for the 2020 EIP I would believe you.

 7           Q.   Okay.  Let me scroll down a page to

 8      Bates 13603.

 9           A.   What page was that?  I'm sorry.

10           Q.   Bates 13603, 10 of the PDF.

11           A.   Okay.

12           Q.   You see here there's a report from

13      the Iowa secretary of state's office on November

14      2nd, that's sent to CIS; do you see that?

15           A.   Just scrolling through it, sorry.

16      Give me a second.  Yes.

17           Q.   And then it looks like the Iowa

18      secretary of state's office also sent this to

19      three FBI e-mail addresses; right, with the

20      recipients redacted, FBI number two, FBI number

21      three, and FBI number four; correct?

22              MR. GARDNER:  Lack of -- objection,

23      lack of foundation.

24           A.   I don't see the e-mail addresses

25      you're referring to.
```

RIAN . SC LL   1/12/2023

```
1              Q.   Do you see @FBI, if you look on the
2        screen share, @FBI.gov?
3                   MR. GARDNER:  Same objections.
4        BY MR. SAUER:
5              Q.   With the handle omitted, three
6        e-mails?
7              A.   Okay.
8              Q.   Were you aware of the FBI being
9        involved in receiving misinformation reports
10       from state and local elections officials?
11             A.   Generally speaking, we tell
12       election officials to report what they saw to
13       either DHS or the FBI, and it would end up where
14       it needed to be.
15             Q.   So you told them to report it to
16       either DHS or the FBI?
17             A.   Correct.
18             Q.   Who at the FBI was receiving those
19       kinds of reports?
20             A.   I don't know.  I think it --
21             Q.   Go ahead.
22             A.   Generally speaking, the FBI has
23       field offices, and so the idea was if they
24       were -- election officials had established
25       relationships with the FBI field office and the
```

RIAN . SC LL    1/12/2023

```
1    elections coordinator in that office, and that's
2    where they wanted to report it, that they could
3    do so.
4         Q.   So there was -- these FBI officials
5    tended to be FBI field officers -- officers?
6         A.   I don't want to speculate, but --
7    but again, that was, you know, us trying to --
8    to help the election officials, just if they had
9    something they needed to report, if they had as
10   many different options to do that as possible.
11        Q.   Okay.  Do you know what FBI did
12   with its misinformation reports, was it
13   switchboarding them like you guys were doing?
14        A.   I don't know, to be honest.
15        Q.   Is that notion that you could
16   forward things to the FBI, is that something
17   that was discussed in those USG
18   industry-specific meetings you talked about?
19        A.   I -- not that I recall, but it's
20   possible we -- we talked to them about the
21   guidance we gave to election officials, that
22   election officials could it either way, but I
23   don't recall specific conversations along those
24   lines.
25        Q.   Can you scroll down to the page 27
```

RIAN . SC LL   1/12/2023

```
 1     of the PDF.
 2            A.   Let's go.  Okay.
 3            Q.   If you look here, kind of at the
 4     bottom of this text chain, Aaron Wilson, he's
 5     your contact at CIS; right?
 6            A.   Correct.
 7            Q.   And he's forwarding something to --
 8     November 3rd, with a report about alleged
 9     election misinformation; right?
10            A.   Well, poll worker Erie PA says
11     announces on Instagram they will throw away
12     Pro-Trump votes, that's what you're talking
13     about?
14            Q.   Yeah.
15            A.   That's the subject of the e-mail.
16            Q.   He uses the EIP case number for
17     this report; correct?
18            A.   He does.
19            Q.   And he sent it to CISA at the CFITF
20     e-mail; correct?
21            A.   He does, correct.
22            Q.   And the CFITF e-mail forwards it to
23     you, and you forward it to Matt Masterson at
24     Facebook; correct?
25            A.   No, that's not correct.  I -- Matt
```

```
 1    was still at CISA at the time.  I forwarded it
 2    to Saleela Salahuddin at Facebook.
 3            Q.    Copying Matt Masterson?
 4            A.    I'm sorry?
 5            Q.    Copying Matt Masterson?
 6            A.    Yeah, who was at CISA.  You said he
 7    was at Facebook.  I just wanted to make sure
 8    that that was clear that he was still --
 9            Q.    I'm sorry, I meant to say and
10    Facebook, not at Facebook?
11            A.    Gotcha.
12            Q.    And then Facebook came back to you
13    for clarification; right?  Do you recall that?
14            A.    So we -- sorry, go ahead.
15            Q.    Go ahead, what were you going to
16    say?
17            A.    I said, just to be clear, we
18    forwarded the statement from Pennsylvania about
19    that incident to Facebook and Matt Masterson.
20            Q.    And so --
21            A.    That's what is here.
22            Q.    And they -- and it looks like
23    Facebook asked you, could you please confirm
24    that, A, the worker in question who was
25    supposedly destroying Pro-Trump ballots is not a
```

RIAN . SC LL   1/12/2023

```
 1      poll worker, or B, that he did not, in fact,

 2      destroy ballots or at least there's no evidence

 3      he did.

 4              So Facebook asked you, Brian Scully

 5      and Matt Masterson, for that clarification;

 6      right?

 7          A.   They did.

 8          Q.   Yeah, and then you responded:  Not

 9      sure I understand the distinction you're trying

10      to make, but both components of the narrative

11      are false.  The person is not a poll worker and

12      no ballots were destroyed.  I suppose that makes

13      the entire thing a hoax; correct?

14          A.   Yeah, that was my response.

15          Q.   What was your basis for concluding

16      that both components of the narrative were

17      false?

18          A.   I believe the statements from

19      Pennsylvania.  I assume if you have that

20      document we can take a look and confirm.

21          Q.   You read the statement from

22      Pennsylvania and reported its content back to

23      Facebook?

24          A.   Correct.

25          Q.   Okay.  Did you -- did that happen
```

RIAN . SC LL  1/12/2023

```
 1      from time to time, where you wouldn't just

 2      forward the disinformation concern, but then you

 3      would provide, you know, information that would

 4      help debunk it through the social media network?

 5           A.   I think I frame it a little

 6      differently, if social media platforms needed

 7      additional information from an election official

 8      we would try to support that.  There was also

 9      one time when I believe it was Facebook had a

10      question about DHS immigration and customs

11      enforcement having agents going places where we

12      also provided a response back on a specific

13      piece.

14           But generally speaking, we would do

15      what we did here, which is if the -- if the

16      jurisdiction made a public statement or if there

17      was additional information the jurisdiction

18      could provide, and the platforms asked for it,

19      that we would try to facilitate getting the

20      information they asked for.

21           Q.   Did you merely relay that

22      information, the sort of debunking information

23      from the election official, would you sometimes

24      find it on your own and helpfully supply it to

25      the social media platform?
```

1          A.   If it was a public statement, I'm

2    sure we pulled it ourselves.  If there was not a

3    public statement, I would imagine we would go

4    back to the election official.

5          **Q.   But you might --**

6          A.   I don't know --

7          **Q.   Go ahead.**

8          A.   Sorry, I don't want to say that

9    every case was exactly like that, but again, if

10   there was a public statement that was put out by

11   the jurisdiction, we would -- we would defer to

12   that.

13         **Q.   Did you take any steps to find**

14   **out -- for example, suppose there's a public**

15   **statement that disputes what a private citizen**

16   **has said on Facebook or Twitter, would you do**

17   **further research to figure out who was telling**

18   **the truth or would you just relay the official**

19   **government explanation of the incident to the**

20   **social media platforms?**

21         A.   We would relay the -- the official

22   statement from the jurisdiction.

23         **Q.   I take it sometimes you would go**

24   **find that official statement on your own, and**

25   **sometimes you would reach out to the state or**

RIAN . SC LL   1/12/2023

Page 222

     1    **local jurisdiction to see if they issued a**
     2    **statement?**
     3              A.   Yeah, we would find, I think it
     4    implies that we were doing a rigorous search.
     5    Generally, we would be aware if a jurisdiction
     6    put out a statement and we would just pull it
     7    ourselves.
     8              Q.   **Look ahead to --**
     9              A.   And sometimes --
    10              Q.   **Go ahead.**
    11              A.   Sorry.
    12              Sometimes we would reach out to the
    13    jurisdiction and they would just provide the
    14    statements that they had already made public, as
    15    well.
    16              Q.   **Would you relay that to the social**
    17    **media platform?**
    18              A.   Yeah, if they were asking for
    19    additional information we would.
    20              Q.   **Here's another one, page 35 of the**
    21    **PDF, Bates 8663.  Do you see that on the screen**
    22    **share?**
    23              A.   I'm scrolling down to it.  8663?
    24              Q.   **Yeah.**
    25              A.   Yep.

RIAN . SC LL   1/12/2023

```
 1              Q.   And here in this e-mail chain it
 2      looks like it's another situation where Twitter
 3      asked for some clarification, for example, she
 4      says, on November 6th, have Pennsylvania state
 5      officials provided initial information to you on
 6      the authenticity of the video or the
 7      circumstances under -- underpinning it; do you
 8      see that?
 9              A.   I do.
10              Q.   And then you respond, scrolling
11      back up, you say:  There are two reports in the
12      e-mail chain, and you explain what you
13      understand what Pennsylvania is saying about the
14      disputed information; right?
15              A.   Sorry, I'm just scrolling down to
16      make sure I understand the context of the chain.
17              Okay.  Sorry.  Could you repeat the
18      question?
19              Q.   Sure.  My question is:  You
20      provided clarification to the social media
21      platform about what you believe the Pennsylvania
22      reporter meant; correct?
23              A.   I don't believe that is correct.
24              Q.   Well, did you say, for example, on
25      the authenticity Pennsylvania states in the very
```

RIAN . SC LL  1/12/2023

```
 1        first e-mail that they believe the videos are
 2        false and we're reaching out to our partners to
 3        validate; correct?
 4               A.   Correct.
 5               Q.   Okay.  And then, later that day, if
 6        you scroll up, you say:  Hey, to Twitter, just
 7        came across this debunk of the video on Twitter;
 8        correct?
 9               A.   Yes.
10               Q.   And then -- so you are looking
11        around to find information that would debunk it;
12        correct?
13               A.   I don't know if that's correct.
14        It's possible somebody just let us know that
15        there was something there.
16               Q.   And then 17 minutes later Twitter
17        responds, thank you so much, we applied a label
18        to the tweet; correct?
19               A.   Yes, that's what they said back,
20        correct.
21               Q.   Scroll down to page 8669.
22               A.   What page of the PDF?
23               Q.   46.
24               A.   46?
25               Q.   Yes.  And here you've got a
```

```
 1     misinformation report from the secretary of
 2     state of Arizona's office; do you see that?
 3            A.   Yes.
 4            Q.   It says:  This post is on a private
 5     Facebook page, above.  I've included a screen
 6     shot; correct?
 7            A.   That's what the Arizona e-mail
 8     says, yep.
 9            Q.   How did they -- was that unusual
10     for them to report statements on a private
11     Facebook page?
12            A.   I don't -- I don't know.  We didn't
13     do any analysis of that kind.
14            Q.   Okay.  So you don't know whether
15     someone was monitoring how posts appeared on a
16     private Facebook page containing alleged
17     misinformation?
18            A.   I don't know how Arizona secretary
19     of state came across that information, no.
20            Q.   Dropping ahead to page 864, now.
21     Here at 954 --
22            A.   I'm sorry.
23            Q.   Sorry.
24            A.   54?
25            Q.   Oh, sorry, page 54 of the PDF, yes,
```

RIAN . SC LL   1/12/2023

```
 1      sorry.  Actually, no, I'm sorry, that's not the
 2      right page.
 3             A.   Okay.
 4             Q.   No, sorry, page 59 of the PDF?
 5             A.   59?  Okay.
 6             Q.   Here's a chain on Tuesday, November
 7      10th, at 7:23 in the evening, you forwarded a
 8      report of information -- misinformation to
 9      Twitter; correct, at 7:23?
10             A.   Yeah, that's what appears, there's
11      no he header on the e-mail, but considering the
12      responses is from Twitter, I assume that's who I
13      sent it to.
14             Q.   And Twitter responds in two
15      minutes, we will escalate; right?
16             A.   Yep.
17             Q.   And then Twitter responds here a
18      few minutes later, after midnight, at 12:11
19      a.m., hey, we labeled all the tweets except two;
20      right?
21             A.   Yes.
22             Q.   So Twitter was working on this well
23      into the evening, along with -- were you guys
24      doing that well into the evening?
25                  MR. GARDNER:  Objection, compound.
```

RIAN . SC LL   1/12/2023

```
 1   BY MR. SAUER:
 2           Q.    Timeframe?
 3           A.    So was Twitter working on it well
 4   into the evening?  I mean, I guess.  Were we?
 5   Again, if somebody was checking the phone, most
 6   of the post-election stuff would have been me.
 7   We would have done something with it, but it
 8   wasn't a requirement.
 9               (Exhibit No. 11 was marked for
10   identification.)
11   BY MR. SAUER:
12           Q.    And showing you Exhibit 11, which
13   should be in your inbox.
14               MR. GARDNER:  Yeah, I think that's
15   right.
16           A.    Okay.
17           Q.    On the last page of this PDF,
18   there's an e-mail from Aaron Wilson?
19               MR. GARDNER:  I'm sorry, John, do
20   you want to post it on the screen?
21               MR. SAUER:  Oh, thank you.
22               MR. GARDNER:  You don't need to, if
23   you don't want to, I mean, we have the --
24               MR. SAUER:  I got it, I mean, I
25   thought it was up.
```

RIAN . SC LL   1/12/2023

```
 1   BY MR. SAUER:
 2            Q.   Last -- see it, last page of the
 3       PDF, there's a report from CIS.
 4            A.   Yeah.
 5            Q.   Actually, this is, interstingly, a
 6       report from CIS to Gwinnet County; right?  Where
 7       they say:  Hi Kristi, the EI-ISAC and our
 8       partners at the Election Integrity Partnership
 9       are tracking a social media post that's getting
10       traction very quickly; right?
11            A.   Yes, that's what the e-mail reads,
12       yeah.
13            Q.   So this is a situation where the
14       reporting was actually originated by CIS or EIP
15       or actually, according to this e-mail, both of
16       them.  They're the ones who noticed the
17       misinformation, online, first; right?
18                 MR. GARDNER:  Objection to form.
19   BY MR. SAUER:
20            Q.   Correct?
21            A.   That's what -- that's what the
22       e-mail appears to say, yeah.
23            Q.   And they reached out, you know,
24       proactively to Gwinnett County asking them to
25       debunk it; right?
```

RIAN . SC LL   1/12/2023

```
 1              A.   Yeah, they're just trying to get
 2    what was actually going on, yeah.
 3              Q.   Yeah, they say:  We're tracking a
 4    social media post that's gaining traction very
 5    quickly.  It's likely a misunderstanding, but
 6    being portrayed as a nefarious act.  If you can
 7    clarify for us what is being shown, if it even
 8    happened, we can work with the social media
 9    platforms to try to have the post removed as
10    misinformation; correct?
11              A.   Yeah, that's what he wrote.
12              Q.   And then Gwinnett County comes back
13    with a -- a -- an explanation of the post;
14    correct?
15              A.   Yes.
16              Q.   And that's forwarded to Twitter by
17    CIS, along with their explanation; correct?
18              Well, actually, before they report
19    it to Twitter they report it to you; right?
20    Here's there's an e-mail that says --
21              A.   Yeah.
22              Q.   -- Brian and EIP --
23              A.   Yes.
24              Q.   Right?  So Brian --
25              A.   Yep.
```

RIAN . SC LL   1/12/2023

```
1              Q.    And EIP is Election Integrity
2      Partnership; right?
3              A.    Yep.
4              Q.    And that's what CIS says, and they
5      sent this to --
6              A.    Yes.
7              Q.    -- your e-mail, two CISA e-mails,
8      their own e-mail and
9      tips@2020partnership.atlassian.net; right?
10             A.    Yep.
11             Q.    So they sent this e-mail, where
12     they say:  Brian and EIP, to you, two CISA
13     accounts, their own account, and
14     tips@2020partnership.atlassian.net; right?
15             A.    Yep.
16             Q.    So it appears that that
17     tips@2020partnership e-mail is an EIP e-mail;
18     right?
19             MR. GARDNER:  Objection, asked and
20     answered, multiple times.
21  BY MR. SAUER:
22             Q.    Does that refresh your memory?
23             A.    I wouldn't say refreshes my memory,
24     but it's going on CISA or CIS e-mail there, so
25     it's probably a reasonable assumption to make.
```

RIAN . SC LL   1/12/2023

```
 1              Q.    Then you forward this on, having

 2      received the report from CIS; right?

 3              A.    Yep.

 4              Q.    And then @Twitter reports back to

 5      you, and says, they labeled the tweet and are

 6      taking steps to limit trending; right?

 7              A.    Yes.

 8              Q.    What does that mean to take steps

 9      to limit trending; do you know?

10              MR. GARDNER:  Objection, calls for

11      speculation.

12              A.    Yeah, I don't know.  Twitter has a

13      range of tools that they use.  I couldn't

14      possibly speculate on what they were doing here.

15              Q.    Let's put Exhibit 12 back up.

16                    These are the interrogatory

17      responses.

18              MR. GARDNER:  Yeah, hold on one

19      second, John.  You said 12?

20              MR. SAUER:  Yeah.

21              MR. GARDNER:  Hold on one second.

22              MR. SAUER:  Go to page 38.

23              THE WITNESS:  38.

24              MR. SAUER:  Yeah, if you would.

25              THE WITNESS:  Okay.  I'm on page
```

RIAN . SC  LL   1/12/2023

```
 1    38, John.
 2   BY MR. SAUER:
 3           Q.   Oh, sorry, I'm on page 28.  My
 4   mistake.
 5           A.   All right.
 6           Q.   38 asks that here, you see where it
 7   says CISA, and it says:  CISA responds that
 8   meetings taking place with the social media
 9   platforms relating to misinformation include,
10   but are not limited to, and then there's a
11   bullet list; right?
12           A.   I think that is 38, not 28.
13           Q.   Yeah, it should be on page 38?
14           A.   Sorry.  I thought you said 28.  Let
15   me get back down there.
16           Q.   Oh, I meant I was mistaken.
17           A.   Okay.  So there's a table, am I
18   looking below the table or above the table?
19   Below the table?
20           Q.   Yeah.
21           A.   Got you.  Okay.
22           Q.   Okay.
23           A.   I'm sorry, what am I looking for?
24           Q.   Were you involved in identifying
25   meetings between CISA and social media platforms
```

RIAN  . SC  LL   1/12/2023

 1      relating to misinformation in responding to

 2      discovery requests?

 3            A.   Yes, I believe I was.

 4            Q.   What meetings did you identify?

 5            A.   Certainly these, the recurring

 6      meetings listed here, that we talked about, the

 7      preparation meeting we talked about, going

 8      through the list, MDM, joint MDM working group,

 9      I think I missed -- those are the ones I would

10      have identified.

11            Q.   Start with the first one, first

12      bullet point, a recurring meeting usually

13      entitled USG industry meeting, which has

14      generally had a monthly cadence; right?

15            A.   Yep.

16            Q.   And that is the one that you refer

17      to as the sync meeting between industry and

18      social media platforms; correct?  I'm sorry,

19      industry --

20            A.   Right.  Yes, that's correct.

21            Q.   And you list there, I think seven

22      or eight social media platforms, and the

23      response, Google, Facebook, Twitter, Reddit,

24      Microsoft, and then Verizon Media, Pinterest,

25      LinkedIn and Wiki Media Foundation; correct?

**RIAN . SC LL   1/12/2023**

```
 1          A.   Right, that's correct.
 2          Q.   And when you say this generally has
 3     a -- had a monthly cadence, in fact, far away
 4     from elections it was only quarterly, and then
 5     it became monthly close to elections, and became
 6     weekly before the 2020 election; right?
 7          A.   I would say from summer of 2018 to
 8     2020 they were -- to early 2020 they were
 9     quarterly.  Sometime in 2020 they became monthly
10     and then as we got closer to the election in
11     2020 they became weekly.
12          Q.   Why did they become weekly close to
13     the election?
14          A.   They were mostly just touch points
15     in case anything kind of popped up.  Those are
16     much less formal than the monthly ones.  We
17     didn't have an agenda for those, just an
18     opportunity for folks to share, if they had any
19     questions or anything like that.
20          Q.   What sort of stuff did folks share
21     in these weekly touch point meetings?
22          A.   So from a CISA perspective, we
23     generally provide updates on any election
24     security-related issues.  So if -- you know, if
25     there were any administrative kind of problems
```

RIAN . SC LL   1/12/2023

```
1    that say we're having, speaking along those
2    lines, the other federal partners, if they had
3    any, again, kind of strategic, unclassified.
4    Intelligence reporting that they felt was
5    relevant, they might share that.  And then the
6    platforms, I don't know what they were sharing
7    generally.  I don't -- probably just general
8    trends that they might be seeing on the
9    platforms, but I don't recall specifically what
10   they talked about.
11        Q.   And all these things that they
12   share are related to election misinformation and
13   misinformation on social media platforms?
14        A.   No.  It also included cyber
15   security, in fact, I would say most of it -- I
16   wouldn't say most of it -- a lot of it was cyber
17   security.  And then there was a little bit on
18   any physical threats that were occurring.
19        Q.   So that -- that's if someone was
20   actually threatening poll workers, something
21   like that?
22        A.   Correct.
23        Q.   And so in addition to physical
24   threats, there were cyber security and issues
25   related to misinformation and disinformation?
```

RIAN . SC LL    1/12/2023

Page 236

```
 1              A.    Correct.
 2              Q.    Is anything else discussed in these
 3      meetings?
 4              A.    I mean, I think those are the
 5      main -- main topics that I recall.
 6              Q.    Was -- was the risk of hack and
 7      leak operations or hack and dump operations
 8      discussed in these meetings?
 9              A.    I don't -- I don't recall a
10      specific incident of that, but it's definitely
11      possible.  It's a tactic that had been used in
12      the past.
13              Q.    Did you remember you raising
14      concerns about hack and leak operations?
15              A.    Me, personally, I don't recall
16      myself raising that, but it's possible.
17              Q.    How about -- how about Laura
18      Dehmlow, did she ever raise that, discuss hack
19      and leak operations?
20              A.    Again, I don't know.  It was a
21      tactic that had been used globally, previously.
22      So it wouldn't surprise me if there was some
23      discussion of that somewhere in these meetings.
24              Q.    Do you remember anyone on the
25      government side discussing it?
```

RIAN . SC LL   1/12/2023

Page 237

```
 1              A.    Not specifically, no.
 2              Q.    How about on the industry side,
 3    anyone from the social media platforms
 4    discussing hack and leak operations?
 5              A.    Yeah, unfortunately, I just don't
 6    have that kind of recollection of conversations.
 7    So no, I don't specifically remember that.
 8    Again, it's possible, and I wouldn't be
 9    surprised.
10              Q.    How about Elvis Chan, you know who
11    he is; right?
12              A.    I do.
13              Q.    Did he ever -- do you remember him
14    ever talking about hack and leak issues in these
15    meetings in 2020?
16              A.    Again, I don't have any specific
17    recollection of that, but it's always possible,
18    for sure.
19              Q.    How about Matt Masterson?
20              A.    Same answer, you know, it's
21    possible, but I don't recall specific
22    conversations.
23              Q.    Let me e-mail you a couple more
24    exhibits.
25              A.    Sure.
```

RIAN . SC LL   1/12/2023

1           **Q.    Do you know Yoel Roth is?**

2           A.    Yes, I know who Yoel Roth is.

3           **Q.    Do you know him personally?**

4           A.    Only in the fact that I've met him

5    a couple times.  He was at meetings, you know,

6    some of these synch meetings he would be at.

7           **Q.    Were these meetings related to**

8    **misinformation with CISA?**

9           A.    Again, these are regular sync

10   meetings that we talked about, it's also I do

11   recall we had some Twitter-only calls, as well,

12   that he participated in, so again, it's general

13   meetings would be of conversations.

14          **Q.    What was -- what was discussed in**

15   **the Twitter-only meetings?**

16          A.    Similar, basic

17   relationship-building stuff would be some of it,

18   so, you know, just going and making sure we know

19   who's who, and having conversations about, you

20   know, just relationship-building sides.  I also

21   believe we had some briefings from them on some

22   of their public reports, if I recall correctly,

23   so things like that.  There wasn't a ton of

24   them.

25          **Q.    Is this public reporting related to**

RIAN . SC LL  1/12/2023

```
 1    misinformation and disinformation issues?

 2          A.   Yeah, again, I don't know if that's

 3    what they called it, but that was kind of our

 4    interpretation of it.  I think they used

 5    coordinated and in-authenticated or so, but I

 6    don't recall if Twitter -- if Twitter

 7    articulated it.

 8          Q.   You would view those briefings in

 9    those bilateral meetings with Twitter as

10    relating to misinformation and disinformation on

11    social media?

12          A.   Yeah, some of that, and some of it

13    I'm sure kind of talking him through how

14    elections work, because a lot of education they

15    weren't super familiar with the election

16    administration, how they worked, and a different

17    role and responsibility, you know, about

18    elections.  So again, we tried to educate as

19    much as we could.

20          Q.   Were there bilateral meetings with

21    other social media platforms, like this, where

22    misinformation was discussed in any way?

23          A.   Yeah, again, generally, from a

24    relationship-building standpoint, particularly

25    early on in the process, we would meet -- we met
```

**RIAN . SC LL   1/12/2023**

```
 1    with the platforms just to talk about kind of

 2    what our role, what we would do, kind of how the

 3    relationship should act.

 4              So just as an example, we could

 5    relate to the K-theoretical.  You know, in those

 6    meetings we wanted to make sure that the

 7    platforms understood we would never ask them to

 8    undertake any specific actions.  So we would

 9    reiterate that in all of our meetings.  And, you

10    know, that was something we continued throughout

11    the process.

12              We would educate them on -- on

13    elections, as I mentioned.  We would talk to

14    them a little bit about our resilience-building

15    work, as I discussed.  They would just kind

16    of -- again, relationship-building type stuff,

17    very general kind of conversations.

18         Q.   What you describe as the process,

19    is that the process of, you know, referring

20    disinformation concerns to them, that we've been

21    talking about today?

22         A.   We did have conversations, but I

23    think I was referring to the election processes,

24    how the election processes worked.

25         Q.   You said early, when you said early
```

RIAN . SC LL  1/12/2023

1    in the process, you meant early in the election

2    process?

3          A.   Oh, yeah, sorry.

4          Q.   You would have -- you had meetings

5    with -- bilateral meetings with Twitter and

6    Facebook and other social media companies?

7          A.   Right.  So in 2018 we didn't have

8    any relationships with the platforms, at all.

9    So in our initial stages of trying to build

10   those relationships we would go meet with each

11   platform one-on-one, just to make sure we could

12   kind of talk to, understand what their concerns

13   are, and then, you know, basic

14   relationship-building stuff.

15         Q.   Did those bilateral meetings happen

16   in 2020, as well?

17         A.   I would say they probably --

18   probably had bilateral meetings in 2020.  I'm

19   not remembering any specific, off the top of my

20   head, but I believe prior to starting the

21   switchboarding work, in 2020, we had

22   conversations with each platform individually.

23         Q.   Those would be when you talk about

24   what you would be doing in the switchboarding

25   area; right?

RIAN . SC LL    1/12/2023

```
 1              A.   Yeah, kind of what we would be

 2    doing, and again, to reaffirm our position that

 3    we would never ask them to take any specific

 4    actions, that they should make decisions based

 5    on their term of service.

 6              Q.   So you're specifically talking

 7    about the fact that you would be sending them

 8    reports about disinformation during the election

 9    cycle?

10              A.   Yeah, we would be forwarding them

11    reports from different election officials, yeah.

12              Q.   Just putting Exhibit 12 back up,

13    here.

14              Let me show you where in your

15    interrogatory responses you disclosed those

16    bilateral meetings with social media platforms

17    here in --

18              MR. GARDNER:  Hold on.  We're --

19    we're pulling 12 back up, John.  Hold on.

20              MR. SAUER:  Page 38 to 39, it

21    actually goes onto 40.

22              MR. GARDNER:  Yeah, hold on.  Whoa

23    whoa, whoa, whoa, yeah, almost there.  You said

24    38, John?

25              MR. SAUER:  Page 38.
```

```
 1   BY MR. SAUER:
 2             Q.    There's a list of five bullet
 3       points.
 4             A.    Okay.  I'm sorry, what was your
 5       question?
 6             Q.    Can you show me where on this
 7       interrogatory response you disclosed, for
 8       example, bilateral meetings between CISA and
 9       Twitter or CISA and Facebook relating to the
10       misinformation reporting that we've been talking
11       about?
12             A.    So I don't want to speak on behalf
13       of whoever submitted the final product, but my
14       assumption would be that they would be on the
15       preparation meeting.  But I'm not -- I'm not
16       sure how they captured those in here.
17             Q.    Were those the same as preparation
18       meetings for the USG industry meeting?
19             A.    I probably wouldn't consider them
20       to be the same, but there's -- there are similar
21       types of meetings.
22                   (Exhibit No. 13 was marked for
23       identification.)
24   BY MR. SAUER:
25             Q.    Let's get Exhibit 13 back up.
```

RIAN . SC LL   1/12/2023

```
 1              Do you see this as a document filed
 2     before the FEC, entitled:  Declaration of Yoel
 3     Roth?
 4          A.   Okay.
 5          Q.   And scrolling, have you seen this
 6     document before?
 7          A.   I have not.
 8          Q.   Scroll down to paragraph 11.  Start
 9     with paragraph 10.  Mr. Roth says in this
10     declaration, he says, since 2018 I have had
11     regular meetings with the office of the director
12     of National Intelligence, the Department of
13     Homeland Security, the FBI, and industry peers
14     regarding election security; right?
15          A.   Yep.
16          Q.   Was this a description of the --
17     the sync meetings that we talked about today,
18     between US government and social media
19     platforms?
20              MR. GARDNER:  Objection, lack of
21     foundation, calls for speculation.
22     BY MR. SAUER:
23          Q.   Do you see that?
24          A.   Yeah, I don't know what he's
25     talking about, obviously I can't tell for
```

RIAN . SC LL   1/12/2023

```
 1    certain what he's talking about.
 2              Q.    No?  Since 2018 has the Department
 3    of Homeland Security had regular meetings with
 4    social media platforms --
 5              A.    Yep.
 6              Q.    -- ODNI and the FBI?
 7              MR. GARDNER:  Objection, lack of
 8    foundation.
 9              A.    Yes.
10              Q.    Yes, it has, because you've
11    testified about them repeatedly today, so there
12    obviously is a foundation, isn't there?
13              You have been personally involved
14    in multiple meetings, these sync meetings,
15    between USG and industry, and they involve seven
16    or eight social media platforms, ODNI, the
17    Department of Homeland Security, specifically
18    CISA, and the FBI, didn't they?
19              A.    We had regular meetings, as I
20    talked about.  Whether or not that is what Yoel
21    is also talking about, here, I can't say.  But I
22    don't think that's a bad inference to make.
23              Q.    Okay.  Scroll down to paragraph 11:
24    During these weekly meetings the federal law
25    enforcement agencies communicated that they
```

RIAN . SC LL   1/12/2023

Page 246

1    expected hack and leak operations by state

2    actors might occur in the period shortly before

3    the 2020 presidential election, likely in

4    October; do you see that?

5         A.   Yes.

6         Q.   Do you recall that kind of

7    communication occurring in any of these sync

8    meetings that occurred in 2020?

9         A.   Again, I don't specifically recall.

10   But as I said earlier, it's certainly possible,

11   because it was a common tactic.

12        Q.   But you don't remember any federal

13   agencies talking about hack and leak operations

14   in these meetings, but you don't dispute that it

15   could have happened?

16        A.   That's correct, yes.

17        Q.   Okay.  Next sentence, Mr. Roth

18   says:  I was told in these meetings that the

19   intelligence community expected that individuals

20   associated with political campaigns would be

21   subject to hacking attacks, and that the

22   material obtained through those hacking attacks

23   would likely be disseminated over social media

24   platforms, including Twitter; do you see that?

25        A.   I do.

RIAN . SC LL    1/12/2023

1          Q.    Do you recall that being

2     communicated in any of these sync meetings?

3          A.    Again, it's -- I don't remember

4     specifics, but it would not surprise me if this

5     was discussed.

6          Q.    Next sentence, Mr. Roth says:

7     These expectations of hack and leak operations

8     were discussed throughout 2020.

9                Does that ring a bell?  Do you

10    recall this being raised multiple times and

11    repeatedly in these sync meetings?

12         A.    Again, it's the same response.  I

13    don't have specific memories of every item that

14    was requested or very good memory of the

15    conversations, in general.  But I would

16    definitely not be surprised if these were

17    included in those conversations.

18         Q.    Okay.  And then the very next

19    sentence, spilling onto page 3, I also learned

20    in these meetings that there were rumors that a

21    hack and leak operation would involve Hunter

22    Biden; do you see that?

23         A.    I do.

24         Q.    Do you recall any mention of Hunter

25    Biden in any of these meetings with social media

RIAN  . SC  LL   1/12/2023

```
 1    platforms?
 2            A.    I don't.
 3            Q.    So you don't know -- do you -- do
 4    you dispute that Mr. Roth remembers it
 5    correctly?
 6            A.    I mean, I have no basis to dispute
 7    or not dispute.
 8            Q.    Okay.
 9            A.    These aren't topics that CISA would
10    be briefing on, so it's possible another agency
11    did brief on them.
12            Q.    How about the FBI, do you remember
13    the FBI, Laura Dehmlow and Elvis Chan, saying
14    anything about Hunter Biden during these
15    meetings?
16            A.    I don't.
17            Q.    How about ODNI?
18            A.    I don't, no.
19            Q.    How about DOJ, national security
20    division?
21            A.    I don't, no.
22            Q.    This is dated December 17th, 2020,
23    so that would have been within a couple of
24    months of these meetings, a month or two of the
25    last meeting; is that right?
```

**RIAN . SC LL   1/12/2023**

Page 249

```
 1            A.   I'm sorry, what was -- could you
 2     repeat that?  I just want to make sure I
 3     understand what you're asking.
 4            Q.   I was just scrolling down to the
 5     fourth page of the document, where it's dated
 6     December 17th, 2020.
 7            A.   Oh.
 8            Q.   Do you see that?
 9            A.   Yep.
10            Q.   So this declaration would be
11     executed close in time to the meetings that are
12     being discussed; correct?
13            A.   Correct.
14            MR. SAUER:  I'm going to e-mail you
15     Exhibit 14.
16            MR. GARDNER:  John, did you say 14?
17            MR. SAUER:  Exhibit 14, yeah, do
18     you have that?
19            MR. GARDNER:  Yeah, we already have
20     that, the deposition of Elvis Chan.
21            MR. SAUER:  Yeah.  Sorry, guys.
22            (Exhibit No. 14 was marked for
23     identification.)
24     BY MR. SAUER:
25            Q.   This is the third page of this
```

RIAN . SC LL   1/12/2023

```
 1    document.
 2           A.    Okay.
 3           Q.    There's an exchanges here where Mr.
 4    Chan is asked -- he refers to the federal law
 5    enforcement agencies, plura, in that sentence,
 6    do you see that answer, yes; do you see where
 7    that is?
 8           A.    Line four?
 9           Q.    Yeah.
10           A.    Is that what you're referring to?
11                 Yeah, you're referring to the
12    question at line four?
13           Q.    Right.
14           A.    Okay.  Yeah, I see that.
15           Q.    And Mr. Chan was asked the question
16    on line eight, whether other federal law
17    enforcement agencies, other than the FBI, talked
18    about hack and leak operations; do you see that?
19           A.    I do.
20           Q.    And he says he doesn't think of any
21    other federal law enforcement agencies, there at
22    line 15.  The only federal law enforcement
23    agency I remember conveying our concern about
24    hack and leak operations was the FBI; right?
25           A.    That's his response, correct.
```

RIAN . SC LL   1/12/2023

```
 1            Q.    And then he was asked, how about
 2     any other agency, not law enforcement.  And he
 3     answered, as I mentioned, I believe CISA would
 4     have had the same concern as the FBI; right?
 5            A.    That was his response, yep.
 6            Q.    And I asked him:  That was relayed
 7     through Mr. Masterson and Mr. Scully, I think
 8     you said, correct?  And he answered, correct;
 9     right?
10            A.    Okay.  Yep.
11            Q.    Do you remember either you or
12     Mr. Masterson relaying a concern about hack and
13     leak operations in those meetings?
14            A.    I don't.
15            Q.    Next page of the document, page
16     222, fourth page of the PDF, you testify:  I
17     believe that the senior election official from
18     ODNI would also flag -- flag that as a concern;
19     correct?
20            A.    Yes.  That's what he says, yes.
21            Q.    Do you remember anyone from ODNI
22     raising a concern about hack and leak operations
23     in these meetings?
24            A.    Again, as I said in your previous
25     questions, I don't recall specifics, but it
```

**RIAN . SC LL   1/12/2023**

Page 252

```
 1    wouldn't surprise me if -- if they were
 2    mentioned.
 3              MR. SAUER:  I'm sending you Exhibit
 4    15 by e-mail.
 5              (Exhibit No's. 15, 16 and 17 were
 6    marked for identification.)
 7              MR. GARDNER:  John, are you
 8    intending to screen share?
 9              MR. SAUER:  Yeah, I'm doing that
10    right now.
11              MR. GARDNER:  We're still waiting
12    for the exhibit.
13              MR. SAUER:  Sorry.  I think I got
14    my exhibits switched up.  Yeah, here, I'm
15    showing you exhibit -- I think it will be
16    Exhibits 15, 16 and 17.  You know, the one that
17    I thought was 15 is 16, the one that I thought
18    was 16 is 15, so I'm showing you Exhibit 16.
19              MR. GARDNER:  So when we receive
20    your e-mail do you want us to pull up the
21    document marked 16?
22              MR. SAUER:  Yeah, you should have
23    received it already.
24              MR. GARDNER:  Yeah, not yet.
25              MR. SAUER:  There should be an
```

**RIAN . SC LL   1/12/2023**

Page 253

```
 1    e-mail with 15, 16 and 17 all attached.
 2                  MR. GARDNER:  Yeah, not yet.
 3                  MR. SAUER:  Really?  Well --
 4                  MR. GARDNER:  Oh, here we go.
 5                  Do you want us to pull up 16 first?
 6                  MR. SAUER:  Yeah.
 7                  MR. GARDNER:  Okay.  John, I have
 8    15 here, and I got set up -- I see what's
 9    happening.  Hold on.  Yeah, sorry.
10                  MR. SAUER:  It's a one-page e-mail,
11    it should be up.
12                  MR. GARDNER:  Yep.  Yeah.
13  BY MR. SAUER:
14          Q.    Here's a -- Mr. Scully, you see an
15    e-mail here from Facebook to you and
16    Mr. Masterson, as well as Allison Snell and
17    Geoff Hale; correct?
18          A.    I do.
19          Q.    And there it indicates that there
20    it's called today's industry statement; right?
21          A.    Joint industry statement.
22          Q.    Right.  And they say -- and
23    Facebook says to you, I wanted to ensure you had
24    the statement we will look to release following
25    today's meeting; right?
```

RIAN . SC LL   1/12/2023

```
 1              A.   Correct.

 2              Q.   And then, under the joint industry

 3      statement, it talks about how there are these

 4      meetings that have been going on; right?

 5              A.   Yes.

 6              Q.   And then it says -- the majority of

 7      the statement says:  At today's meeting we

 8      specifically discussed three things; right?

 9              A.   Yes.

10              Q.   And the second one of those says:

11      Ways to counter targeted attempts to undermine

12      election conversation before, during, and after

13      the election; right?

14              A.   It does.

15              Q.   And the industry statement goes on

16      to say:  This includes preparing for possible

17      so-called hack and leak operations, attempted to

18      use platforms and traditional media to amplify

19      unauthorized information drops; correct?

20              A.   Correct.

21              Q.   Does that -- and so the industry

22      prepared a public statement saying that hack and

23      leak operations were discussed at one of these

24      meetings; correct?

25              A.   Correct.  Yes.
```

RIAN . SC LL   1/12/2023

```
 1            Q.    Does that refresh your memory, at

 2     all, about hack and leak operations being raised

 3     at these sync meetings in 2020?

 4            A.    Again, I don't have any specific

 5     recollections of the conversations.  But as I

 6     said a few times, now, it doesn't surprise me

 7     that they would discuss the common tactic used

 8     globally.

 9            Q.    Were you aware of any pending

10     investigations, at that time, into possible

11     hack -- actual possible hack and leak

12     operations?

13            A.    No.

14            Q.    I'm showing you what should be

15     Exhibit 15.

16                  MR. GARDNER:  Got it.

17                  THE WITNESS:  Okay.

18     BY MR. SAUER:

19            Q.    And here's an e-mail from Lauren

20     Protentis to people at Facebook and CISA, that

21     refers to the prep USG industry called monthly,

22     in the subject line; correct?

23            A.    Yes, correct.

24            Q.    And I think you testified earlier

25     that Facebook was kind of the point for the
```

RIAN . SC LL   1/12/2023

```
 1      industry.  And so there would be a preparatory

 2      meetings between CISA and Facebook to kind of

 3      set the agenda for the big monthly meeting that

 4      involved all the platforms and at least four

 5      agencies; right?

 6              A.   That's correct, yeah.

 7              Q.   Okay.  Here it says, among other

 8      things, industry prompts, themes, narratives,

 9      approaches you anticipate for races you think

10      will be targeted, right, is number two?

11              A.   Yes.

12              Q.   Okay.  What's that talking about,

13      are they asking that industry to report back on

14      what themes and narratives on social media they

15      anticipate may happen in certain election races?

16              A.   So I'm not -- I'm not sure what,

17      specifically, they were talking about here.

18      It's possible they were trying to understand if

19      they were particularly they were being targeted

20      by foreign actors, but I don't know, that's --

21              Q.   How about themes and narratives?

22              A.   Yeah, I think that would be

23      pretty --

24              Q.   Go ahead.

25              A.   I think that would be the same kind
```

RIAN . SC LL   1/12/2023

```
 1    of idea.  Again, as I mentioned earlier, in a
 2    lot of these calls the intelligence community
 3    would provide kind of high-level assessments of
 4    unclassified reporting that they had done.
 5          Q.    What does industry prompts mean?
 6          A.    Generally speaking, it would be the
 7    questions that industry had for government.
 8          Q.    So industry --
 9          A.    For --
10          Q.    Go ahead.
11          A.    Actually, let me rephrase.  Sorry.
12                I think in this case it's --
13    it's -- I'm not sure, that's how I would have
14    interpreted it, but based on where it is in the
15    agenda I'm not sure that's what Warren meant.
16          Q.    In other words, these questions of
17    government for industry say, hey, social media
18    platforms tell us what themes, narratives,
19    approaches you're anticipating for the upcoming
20    election?
21          A.    No, my -- my interpretation of this
22    is that it's industry questions for government,
23    because the government portion of the agenda.
24    So industry, if possible, would like to hear
25    government's perspective on these questions.
```

RIAN . SC LL   1/12/2023

Page 258

```
 1              Q.   Did government share that with the
 2    social media platforms in these meetings?  Did,
 3    you know, the federal agencies talk about what
 4    themes and narratives and approaches they
 5    anticipated on social media for election races?
 6                   MR. GARDNER:  Objection, compound.
 7                   THE WITNESS:  Yeah, can you just
 8    kind of break that question down for me?
 9    BY MR. SAUER:
10              Q.   In the actual meetings did the
11    federal agencies provide information to the
12    social media platforms about the themes and
13    narratives they anticipated seeing on social
14    media for particular races, election races?
15              A.   I don't think it was ever broken
16    down by particular races.  I think there were --
17    again, there was intelligence.  If there's
18    intelligence that was unclassified they could be
19    shared about, targets and things like that, the
20    intelligence community would share that.
21                   But generally speaking, I don't
22    think that we would necessary get down to the
23    individual race level, but again, I'm not -- I
24    don't have a memory of every specific item that
25    was discussed.
```

**RIAN . SC LL  1/12/2023**

Page 259

1          Q.    How about do you remember themes
2    and narratives being discussed, like, hey, we
3    expect people to be, you know, talking about --
4    expect, you know, social media postings to
5    reflect this theme or that narrative?
6          A.    So I think there are two components
7    to this one.  I believe there are some
8    discussion about would we have seen historically
9    in the past, and may see going forward.  So --
10   so I believe there might have been some
11   discussion around that.
12             And then if -- again, if the intel
13   communities had reporting talked about foreign
14   actor efforts, they would share those.
15             I don't recall, specifically, what
16   was discussed.  So I -- I don't know if -- what
17   level of detail, if any, they got down to in
18   those conversations.
19             And I'm not even -- to be honest,
20   I'm not even sure if I attended this meeting.  I
21   think I either just got back from my detail or
22   it was right before I got back to my detail, so
23   I'm not sure I attended this one.
24         Q.    I'm going to share Exhibit 17.
25         A.    Okay.

RIAN  . SC  LL   1/12/2023

```
 1            Q.   And this is a collection of
 2    e-mails, again.
 3            Here on the first page, in April of
 4    2022, this year, Lauren Protentis is sharing the
 5    agenda for one of these USG sync meetings.  And,
 6    among other things, she says:  One-pager
 7    reminder; do you know what she's talking about?
 8            A.   Yeah, she -- we had asked industry
 9    to provide a one-page summary of their content
10    moderation rules that we could share with
11    election officials.
12            Q.   What's the purpose of that, a
13    one-page summary of their content moderation
14    rules?
15            A.   So we -- we would receive a lot of
16    questions from election officials about how
17    different platforms made decisions about their
18    terms of service.  And we thought this was a way
19    to help the platforms be more transparent with
20    election officials.  So we asked them to just
21    put together kind of a one-page summary.
22            Q.   A one-page summary of basically
23    what their content moderation policies were as
24    applies to election misinformation?
25            A.   Yeah, that we could share with
```

RIAN . SC LL  1/12/2023

1    election officials.

2         Q.   I take it, then, the election

3    officials when they see something on social

4    media that they view as disinformation or

5    misinformation would be educated on whether or

6    not it violates that platform's policy; is that

7    right?

8         A.   I'm not sure that was the full

9    expectation, but I think it was just to try to

10   provide some transparency and some understanding

11   of how the platforms make a decision.

12        Q.   And why is it useful?  I take it

13   this was your idea, CISA's idea, not -- it

14   wasn't something that the election officials

15   have asked for?

16        A.   To be honest, it asks of maybe

17   before I returned, so I'm not entirely certain,

18   but I suspect it was some combination of

19   election officials asking.  We got a lot of

20   questions over the years about that, and us

21   just, you know, raising it with the platforms

22   the way they're trying to help the election

23   officials.

24        Q.   Jumping ahead, 15743, should be on

25   the 7th page of the PDF, there's a discussion in

RIAN . SC  LL   1/12/2023

Page 262

```
 1     the April --
 2                 MR. GARDNER:  Are you at that now?
 3                 THE WITNESS:  Sorry, I just
 4     accidentally got out.  I'm going to the page.  I
 5     think I'm there.
 6   BY MR. SAUER:
 7          Q.   There's a discussion, a bullet
 8     point in the agenda for the August 2020 USG
 9     industry meeting of election-day coordination.
10                 Do you know what -- what that was
11     discussed under that?
12          A.   Yeah, and just to be clear, you
13     know, we just jumped from 2022 back to 2020;
14     right?
15          Q.   Yeah.
16          A.   Okay.  Yeah, so CISA regularly set
17     up an operation center on election day, around
18     the election.  And the platforms and some of the
19     other agencies do the same.  But I think it was
20     just a conversation about how all the different
21     organizations were going to be managing on
22     election day.
23          Q.   What is the nature of a -- what is
24     CISA's election day operation do, does it
25     receive disinformation reports?
```

**RIAN . SC LL   1/12/2023**

```
1            A.   It's more of a -- so just taking a
2    step back, right, essentially what CISA does is
3    it invites key stakeholders to CISA to
4    facilitate information sharing about what's
5    going on within the elections.
6                 Most of it is cyber related, but
7    the NAV and NAFTA that we talked about earlier
8    were there, and so if they heard reporting up
9    through their members, they might mention it.
10                Generally speaking, you might
11   have -- in 2020 it was a little different,
12   because of COVID.  But generally speaking, we
13   would have somebody from our team there who we
14   would have a team kind of working on the chats.
15                And so the switchboard reporting
16   might come in and in 2018, for example, our guy
17   was sitting in the room, in 2020 I think I was
18   the only one in the room, maybe one other from
19   our team.  And then they would -- you know, so
20   that's -- I don't know if that helps clarify.  I
21   think I just talked in mode right there.
22          Q.   When you say in the room, is there,
23   like, a physical location where CISA and NASED
24   and NASS and social media platforms all have
25   people or what room are we talking about?
```

RIAN . SC LL   1/12/2023

```
 1              A.   Yeah, so in 2020, CISA had a room
 2     where we had some of our stakeholders attend in
 3     person.  I don't have a full list of who was
 4     there.  It was obviously not substantial, due to
 5     COVID restrictions.  But we would have federal
 6     partners, and we have NASS and NASED there.
 7              I don't know who else was there,
 8     but I believe there was a couple other, you
 9     know, maybe election security vendors, folks
10     like that, just to facilitate information
11     sharing in case an incident occurred.
12              Q.   Who were the federal partners?
13              A.   I don't -- I don't believe in 2020
14     we had too many in the room, but CISA's watch
15     center operations for CISA central I talked
16     about earlier, they're our liaisons for many of
17     the different agencies, and then we had
18     connectivity with FBI, DOJ, NEI, I A, things
19     like that.  Again, 2020 all you need due to the
20     pandemic.
21              Q.   And part of what happens in this
22     election-day operation is that NASED and NASS
23     may receive misinformation reports from their
24     members and report them up to you guys; right?
25              A.   Generally speaking, it would --
```

RIAN . SC LL   1/12/2023

Page 265

1    they would handle them themselves, with the

2    platforms, but I'm sure there were examples of

3    where they sent it to us.

4           Q.   And then would you guys perform the

5    same misinformation routing function and pass

6    that along to the platforms?

7           A.   Yeah, correct.

8           Q.   Okay.  This happened again in 2022,

9    was there an election-day operation?

10          A.   It was an election operation center

11   in 2022.  We didn't do switchboarding in 2022,

12   as we discussed earlier.

13          Q.   You say you didn't do

14   switchboarding in 2022, did you relay --

15          A.   Correct.

16          Q.   -- misinformation or disinformation

17   concerns to social media platforms at any time

18   during the 2022 election cycle?

19          A.   Not that I recall, no.

20          Q.   How did the state and local

21   election officials relay those concerns to the

22   social media platforms, did they do a --

23          A.   Yeah, my understanding was

24   two-fold, one, I think some of the platforms

25   developed a little more robust infrastructure to

RIAN . SC LL   1/12/2023

1    engage with election officials, themselves.  And

2    then I also believe that CIS was up and running,

3    but I'm not certain what -- kind of how it all

4    worked.

5         **Q.   So you believed that CIS continued**

6    **to receive disinformation/misinformation reports**

7    **from state and local election officials during**

8    **the 2022 election cycle, and relay them directly**

9    **to social media platforms?**

10        A.   Yeah, I'm speculating a bit on

11   that, because I'm not particularly familiar with

12   what they actually did in 2020, but that was the

13   general understanding I had.

14        **Q.   Did they copy you on those reports,**

15   **like they were doing in 2020?**

16        A.   They were not, no.

17        **Q.   Why not?  Did you tell them not to?**

18   **Did you say:  Don't copy us on these or did they**

19   **just stop?**

20        A.   Yeah, we discussed earlier, CISA

21   didn't -- was not doing switchboarding in 2022,

22   so there's no reason for them to copy us.

23        **Q.   And did you tell --**

24        A.   But I --

25        **Q.   Go ahead.**

RIAN . SC LL   1/12/2023

1          A.   So I didn't have a conversation,

2     myself, with CIS about it, so I'm not sure who

3     told them not to do it.

4          Q.   **Turning back to the 2022 election**

5     **day operation, was that another case where CISA,**

6     **NASED, NASS, and other federal agencies all had**

7     **representatives in one room?**

8          A.    I -- I think there was some federal

9     representative there, like I said, most of that

10    would -- would be in the ops center.  There were

11    other nongovernment partners there, like -- like

12    I said, like the -- the vendors, election

13    security, election system vendors and folks like

14    that.

15         Q.   **What -- what's the ops center?**

16         A.   That's essential, that's kind of

17    the 24/7 situational awareness that CISA runs.

18    And my understanding is that it has liaisons

19    from across the federal agencies.

20         Q.   **And were you there at the -- at the**

21    **ops center in 2022 election day?**

22         A.   So the room we would be in would be

23    a separate room.  We wouldn't actually be on the

24    ops center floor.  We called it a situational

25    awareness room.

RIAN . SC  LL   1/12/2023

```
 1              Q.    On election -- were you there?
 2              A.    I was in the situational awareness
 3    room on election day in 2022, yep.
 4              Q.    Any misinformation or
 5    disinformation concerns arise on election day in
 6    2022?
 7              A.    I don't think there was too much.
 8    I'm not recalling specific incidents.  I would
 9    imagine the two were, but I don't think there
10    was very much, if there was.
11              Q.    What happened?
12              A.    I'm sorry, that's not very clear.
13              I just don't recall if there's
14    anything specific.  I have a general sense that
15    there were a couple of items, but I don't think
16    there was very much.
17              Q.    What happened to the ones that did
18    occur or that did arise, did they get routed to
19    different platforms?
20              A.    No, I think it -- no, if any of
21    those were mentioned, I think it was just in
22    general conversation of what might be happening,
23    but we didn't have anything on social media
24    platforms.
25              Q.    Did NASED and NASS route things to
```

RIAN . SC LL   1/12/2023

```
 1      social media platforms?

 2           A.   I don't -- I don't know for

 3      certain.  I would -- I would guess they did.

 4           Q.   Jumping ahead in Exhibit 17, page

 5      14545, it's page 12 of the PDF, and here's an

 6      agenda from one of these sync meetings from July

 7      of 2022; do you see that?

 8           A.   Is it 14545?

 9           Q.   Yeah, page 12 of the PDF.

10           A.   Just making sure.  Sorry, it's

11      weird how it shows the pages here.  Yeah, okay.

12      Yep.

13           Q.   And then Lauren Protentis, here, is

14      circulating an agenda for a sync meeting;

15      correct?

16           A.   This looks like it's for a prep

17      meeting.

18           Q.   Prep meeting?  Okay.

19                And then here in item four, it

20      says:  CISA elections infrastructure risks,

21      Scully; correct?

22           A.   Yep.

23           Q.   So is that referring to the plan

24      that you -- and do you have a briefing on

25      election infrastructure risks at the big sync
```

RIAN . SC LL   1/12/2023

```
 1     meeting?

 2          A.   Yeah, I believe normally Geoff Hale

 3     would do that, I believe this meeting Geoff was

 4     going to be unavailable, so they asked me to

 5     cover the election infrastructure portion of the

 6     agenda.

 7          Q.   Now, what you said about them, what

 8     does that mean, election infrastructure risks,

 9     does that refer to informational infrastructure?

10          A.   No, that's -- again, that's kind of

11     the broader understanding of how elections

12     function, so the systems, physical security,

13     things like that.  It would just be an update on

14     kind of where things stand across kind of the

15     broader election infrastructure community.

16          Q.   Below that, item six, it says:

17     FBI, domestic, adversarial actor update, down

18     below; do you see that?

19          A.   I do.

20          Q.   Do you recall Laura Dehmlow giving

21     a briefing at that meeting you were at about a

22     domestic adversarial actor?

23          A.   I don't, and I -- I -- if I recall

24     correctly, and I don't know if you have the

25     actual agenda for the meeting, I think the --
```

RIAN . SC LL   1/12/2023

1     that changed.
2             Q.   Oh, you don't think she gave
3     that -- that -- that briefing?
4             A.   I don't believe so, no.
5             Q.   What kind of domestic adversarial
6     actors is the FBI's foreign influence task force
7     concerned about?
8             A.   I don't know.
9             Q.   Let's jump ahead to page 7599.
10            MR. GARDNER:  John, before we go
11    on, we've been going about two hours, again.  I
12    think now would probably be a good time for a
13    break.
14            MR. SAUER:  I just got a few more
15    questions about this document.  Can you keep
16    going for a couple more minutes.
17            MR. GARDNER:  Sure, we can do that.
18    BY MR. SAUER:
19            Q.   Let's just -- here, 7599.
20            A.   What page are we on?
21            Q.   That is page 16 of the PDF?
22            A.   Okay.
23            Q.   Do you see here on the bottom half
24    of the page, on July 1st, 2020, Facebook sends
25    e-mail to you and Matt Masterson, Matt and

1    Brian, thank you so much for the outreach on our

2    next sync; right?

3         A.   Yep.

4         Q.   And then she gives a proposed

5    agenda for a meeting that she proposes having on

6    July 15th of 2020; correct?

7         A.   Yes.

8         Q.   And then, in that agenda, there's

9    an item here, under number two, that says:

10   Hack/leak and USG attribution speed/process; do

11   you see that?

12        A.   Yep.

13        Q.   What was that referring to?

14        A.   I -- I don't recall.  You know, I

15   would have to speculate based on what it says

16   here.

17        Q.   So you don't remember hack/leak

18   being put on the agenda for one of these

19   meetings?

20        A.   Again, as I said earlier, I don't

21   remember all the agenda items on the meetings or

22   specific discussion points.  But I'm not

23   surprised that it's on here, no.

24        Q.   Do you know why Facebook would have

25   put that on?

RIAN . SC LL    1/12/2023

```
 1                    MR. GARDNER:  Objection, calls for
 2        speculation.
 3     BY MR. SAUER:
 4            Q.    If you know.
 5            A.    I don't know.
 6            Q.    And then what is --
 7            A.    I mean, again --
 8            Q.    Go ahead.
 9            A.    Sorry, just as I said, you know, a
10        few times, right, it's not surprising, it was a
11        common tactic that was used globally.  But I
12        don't know why they -- if there was a specific
13        reason that they put it on here.
14            Q.    What -- how about that, in the
15        second half of that line, USG attribution
16        speed/process; right?  Do you know what that
17        means?
18            A.    I don't, CISA doesn't do
19        attributions, so I'm not sure what that could be
20        related to.
21            Q.    Attribution, when you say CISA does
22        not do attribution, what does that mean?
23            A.    Well, the way I would look at
24        attribution would be attributing specific actors
25        to something.
```

RIAN  . SC  LL   1/12/2023

```
 1              Q.    That was --
 2              A.    In the MDM context CISA does not do
 3       attribution.
 4              Q.    So attribution is figuring out who
 5       is the actual source of the social media
 6       posting?
 7              A.    I mean, if you're talking about a
 8       social media posting, that would be attribution.
 9       If you're talking about hack and leak, I assume
10       that would be known as the attribution to who
11       the hacker and leaker was.
12              Q.    So this, then, could be a
13       discussion of -- you know -- and by the way,
14       this is listed there under 40 minutes deep dive
15       topics; right?
16              A.    Mm-hmm.
17              Q.    Do you know if you participated in
18       that July 15th, 2020 meeting?
19              A.    I would imagine I did, but I -- you
20       know, I would have to go back and look at my
21       calendar.  I don't know for certain.
22              Q.    You don't know -- sorry.
23                    You don't know about whether there
24       was a deep dive on hack/leak and USG
25       attributions, the process?
```

RIAN . SC LL   1/12/2023

```
 1              A.   I don't know for certain.  I mean,
 2    I would have to go back.  Do you have the actual
 3    agenda that we used for the meeting or just the
 4    proposed one by -- by Facebook?
 5              Q.   No, let me ask you this:  I take it
 6    you -- you interpret, in the context of hack and
 7    leak, USG attribution, USG is United States
 8    government; right?
 9              A.   Yeah, that's what I would assume it
10    is.
11              Q.   Attribution, I take it, is having
12    the USG, the government, figure out who did the
13    hack and the leak; right?  That's what
14    attribution means in this context?
15              A.   Assuming I was connected to hack
16    and leak, I obviously don't know what this is
17    specifically referring to, but if I were reading
18    that bullet point that's how I would read it,
19    that the attribution was USG attributing a hack
20    and leak.
21              Q.   Okay.  And then the question is
22    how -- how fast speed and how USG would go about
23    doing it; right, speed/process?
24              A.   Again, that's what the agenda says.
25    I don't know exactly what that means.
```

RIAN . SC  LL   1/12/2023

```
 1                   MR. SAUER:  Let's take a break
 2      there.
 3                   MR. GARDNER:  10 minutes good?
 4                   MR. SAUER:  Yeah.  How long have we
 5      been on the record.
 6                   THE VIDEOGRAPHER:  The time is now
 7      3:34 p.m.  We are off the record.
 8                   (Recess.)
 9                   THE VIDEOGRAPHER:  The time is now
10      3:50.  We are back on the record.
11                   MR. SAUER:  Before we go back to
12      questioning, I'm formally requesting, on the
13      record, a supplementation of the document
14      production directed to CISA custodians.  If you
15      look at those pages where the key custodians are
16      disclosed, we've had testimony today that that
17      list of custodians at ESI should have been
18      searched, should have included the five names
19      that the witness has testified to today, Chad
20      Josiah, Rob Schaul, Adam Zaheer, John Stafford
21      and Pierce Lowary.
22                   And, in fact, I think it's
23      astonishing that four of those names are
24      specifically identified as copied on e-mails
25      from the key custodians, but whose ESI was not
```

```
 1    searched.

 2              So I request supplementation by

 3    tomorrow, which is the close of fact discovery.

 4    We were entitled to that going back to August.

 5    And this is the first time we've heard about

 6    this, one day before the close of discovery.

 7              So I'm asking for those e-mails

 8    from those custodians, including their

 9    communications with social media platforms, and

10    it now appears there were communications with

11    the EIP, potentially, those be produced by

12    tomorrow.

13              MR. GARDNER:  I understand your

14    request.  We'll take it back.

15              MR. SAUER:  Thanks.

16              (Exhibit No. 18 was marked for

17    identification.)

18    BY MR. SAUER:

19         Q.   Let's go to Exhibit 18, it should

20    be in your e-mail.

21              MR. GARDNER:  Yeah, hold on one

22    second.

23    BY MR. SAUER:

24         Q.   This document is another one of

25    these collective exhibits of a bunch of CISA
```

RIAN . SC LL    1/12/2023

```
 1    e-mails involving you.

 2                If you look at the first page, in

 3    the middle, here, it indicates there's reporting

 4    that you are forwarding from the state

 5    department's global engagement centers about

 6    disinformation on YouTube, and you're forwarding

 7    it onto -- to social media platform; do you see

 8    that?

 9        A.    Yes.

10        Q.    Yeah.  Let me ask this:  What role

11    does the state department's global engagement

12    center have in addressing misinformation and

13    disinformation on social media?

14        A.    I don't know what the specific

15    authorities are.

16        Q.    Do you know what they do,

17    generally?

18        A.    Yeah, but also, just to be clear,

19    that this e-mail is regarding a State Department

20    employee that was targeted overseas, I believe.

21    So I -- to answer your -- to answer your

22    question, I believe they -- they have a mandate

23    to deal with information operations overseas.

24        Q.    Do you interact with them, at all,

25    in your MDM team activities?
```

RIAN . SC LL   1/12/2023

```
 1            A.   Yes.
 2            Q.   How do you interact with them?
 3            A.   In a couple ways.  So one, they do
 4      a lot of reporting on what they're seeing
 5      overseas, particularly as it relates to actions.
 6      So it's a good source of understanding tactics
 7      and things like that, that are occurring
 8      overseas.
 9                 We often see what happens overseas
10      end up showing up domestically.  So it's a good
11      source of information for that.
12                 They also have a tech demo program
13      that they run, where they bring in different
14      tech companies that work in the information
15      operations space.  So we'll go -- we have
16      members of the team that will go and watch some
17      of the demo.
18                 So I think those are the two main
19      ones.  We -- trying to think if there's others.
20            Q.   Do you know George Beebe,
21      B-e-e-b-e?
22            A.   Do I know George?  I'm sorry, could
23      you spell that again?
24            Q.   B-e-e-b-e.
25            A.   The name does not sound familiar.
```

RIAN . SC LL   1/12/2023

1          Q.   Do you know if the GEC was involved

2     in the Election Integrity Partnership in any

3     way?

4          A.   I don't.  I know you showed me a

5     document earlier, that they were listed, but I

6     don't know what they did.

7          Q.   Okay.  Second page, here, where

8     this lists information report, you said -- it

9     indicates, in the last sentence there, the

10    journalist tells me there's a YouTube channel

11    run by Americans falsely claiming that this

12    diplomatic officer is patient zero for COVID-19;

13    correct?

14         A.   I'm sorry, what page are you on?

15         Q.   Second page of the PDF.

16         A.   Okay.  Yes, that's what the e-mail

17    says.

18         Q.   So you said -- well, maybe

19    overseas, it looks like the thing they're

20    challenging is something posted by Americans;

21    correct?

22         A.   I -- I don't know.  I mean, that's

23    just a YouTube channel run by Americans, that's

24    what they say, yeah.

25         Q.   You forward this onto him; right?

RIAN . SC LL   1/12/2023

```
 1              A.   I believe that's true, yes.
 2              Q.   Scrolling down to page 10718 -- by
 3       the way, did you flag these accounts?  If you
 4       look here on the 11th page of the PDF for a
 5       section --
 6              A.   Sorry, page 11 of the PDF?
 7              Q.   Yeah, here there's a screen shot of
 8       unofficialcogov, and the Twitter handle, says:
 9       DM us your weed store location, open
10       parentheses, hoes be mad, but this is a parody
11       account; correct?
12              A.   It appears I forwarded it to
13       Twitter, yes.
14              Q.   Okay.  And then that was the only
15       one, and the next page there's one you forwarded
16       to Twitter that says:  Smoke, weed, erry day, I
17       think they mean every day.  The official
18       (unofficial) Twitter account of the State of
19       Colorado; right?
20              A.   Yeah, it seems to be part of the
21       same e-mail in Colorado.
22              Q.   Those two accounts you forwarded to
23       Twitter, you forward those to Twitter for
24       consideration; correct?
25              A.   Yeah.
```

RIAN . SC LL  1/12/2023

Page 282

```
 1              Q.   And then, sorry, moving back a
 2     little bit of the document, I apologize, on the
 3     9th page there's an e-mail on September 25th of
 4     2020, from you to Twitter, saying, good morning,
 5     do you all have five minutes for a quick call
 6     today.  I'd like to give you a quick update on
 7     our reporting process this year.  Do you know
 8     what that was about?
 9              A.   I don't --
10              Q.   It looks like --
11              A.   -- know specifically what it's
12     about, no.
13              Q.   It looks like the specific subject
14     you mentioned was:  Election disinfo reporting;
15     correct?
16              A.   Let me scroll down.  Do you have
17     the rest of the e-mail chain?  Obviously it
18     appears to be a reply to something.  Am I
19     missing something, here?
20              Q.   Well, this is all we've got.  It
21     says --
22              A.   Oh, there's no -- there's no
23     header, again.
24              Q.   But -- but Twitter's response to
25     you, says:  Re:  Election disinfo reporting?
```

RIAN . SC LL   1/12/2023

1      A.    Yeah.

2          Q.    Okay.  Do you know -- do you

3    remember having a call with them about your

4    process reporting election disinformation on

5    that date?

6          A.    I don't.

7          Q.    Next page, 9703, tenth page of the

8    PDF, there's an e-mail from Twitter to you and

9    Matt Masterson, in September of 2020, where it

10   says:  Hi Matthew and Brian, hope you're doing

11   very well.  We want to give you an update today.

12   We're updating our civic integrity policy.  Our

13   existing policy does such and such, and it says,

14   starting next week we will label or remove false

15   or misleading information intended to undermine

16   public confidence in an election or other civic

17   process; right?

18         A.    Yep.

19         Q.    Do you know why they gave you this

20   report?

21              MR. GARDNER:  Objection, calls for

22   speculation.

23         A.    Yeah, I don't know why they

24   specifically -- it looks like there's ways to

25   public information about it, so as I mentioned

**RIAN . SC LL   1/12/2023**

1    earlier, sometimes they would -- they're putting

2    things out publicly they would just give us a

3    heads up.

4        **Q.   Now, have you ever asked them to**

5    **give you a heads up or Matt Masterson ask them**

6    **to give you a heads up about changes in their**

7    **content moderation policies?**

8        A.    Not that I recall.

9        **Q.   Page 8519, sorry, I'm in the wrong**

10   **spot on the document.**

11           **Let me ask you this:  Do you**

12   **remember sharing a -- with Facebook, a**

13   **disinformation report about CISA and Director**

14   **Krebs, does that ring a bell, where the**

15   **disinformation was disinformation about your own**

16   **agency?**

17       A.    I don't recall that, specifically,

18   no.

19       **Q.   Here it is, 19th page of the PDF.**

20       A.    19?

21       **Q.   Yeah, page 19 of the PDF.**

22       A.    Okay.

23       **Q.   And it says:  Good afternoon -- you**

24   **sent an e-mail on November 5th of 2020 to**

25   **Facebook, saying, good afternoon Facebook,**

RIAN . SC LL   1/12/2023

```
 1       wanted to share this disinfo report about CISA
 2       and Director Krebs; do you know what that was
 3       about?
 4            A.   I don't.
 5            Q.   And your second --
 6            A.   I don't recall.
 7            Q.   The second line says:  IG disinfo
 8       report; do you know what IG means?
 9            A.   It appears, based on the link in
10       the e-mail, that it was referring to Instagram.
11            Q.   By you don't remember -- you don't
12       remember a specific -- anything specific
13       relating to Director Krebs, do you?
14            A.   No, I don't.
15            Q.   Let's scroll ahead a few pages, to
16       10394.
17                 Well, let me ask this:  Do you
18       remember disinformation about Director Krebs
19       circulating in that timeframe, just after the
20       2020 election?
21            A.   I recall that he was named on an
22       Iranian-driven enemies of the people list.
23       Beyond that, I don't -- I don't recall any other
24       specific MDM related to the director, no.
25            Q.   Okay.  Scroll down to the 22nd page
```

RIAN . SC LL   1/12/2023

```
 1    of the PDF.

 2           A.    Okay.  Okay.

 3           Q.    Do you see here, you sent an e-mail

 4    to Facebook on November 10th, 2020, saying:

 5    Good morning, Director Krebs is particularly

 6    concerned about the hammer and scorecard

 7    narrative that is making the rounds; do you see

 8    that?

 9           A.    Yep.

10           Q.    Do you know what that was, the

11    hammer and scorecard narrative?

12           A.    If I remember correctly, it was

13    something about the NSA, and maybe a different

14    federal agency, conspiring to change votes or

15    something along those lines.  Like there's new

16    technology that the NSA developed.  I forget the

17    specifics of the narrative, itself, but it's

18    something along those lines.

19           Q.    So this is a narrative on social

20    media suggesting that the federal government is

21    engaging in intellectual or sort of election

22    interference in some way?

23           A.    I think it could have been social

24    media, it could have been other media.  I'm not

25    sure what I was referring to when I said making
```

RIAN . SC LL   1/12/2023

```
 1    the rounds.  I don't recall.

 2              Q.    Okay.  Well, your next sentence

 3    says:  Wanted to see if you all, meaning

 4    Facebook, have been tracking this narrative and

 5    if there's anything you can share around

 6    amplification; right?

 7              A.    Yep.

 8              Q.    What does amplification mean?

 9              A.    If a particular narrative is being

10    amplified.

11              Q.    So, in other words, you wanted to

12    know -- you're asking Facebook to tell you

13    whether or not that narrative is being amplified

14    on its platform?

15              A.    Correct.  That's how I read that,

16    yeah.

17              Q.    Okay.  And then Facebook responds

18    by saying:  Our teams are actively -- actively

19    monitoring developments on this at this time and

20    to the extent you or USG have information about

21    confirmed misinformation or other information of

22    note, we absolutely welcome that; correct?

23              A.    Yep, that's what they wrote.

24              Q.    And they follow up by saying:

25    Wanted to follow up on the below to say that our
```

RIAN . SC LL  1/12/2023

```
 1      teams have confirmed that we have third-party
 2      fact checker verification that the "hammer and
 3      scorecard" narrative is false; right?
 4              A.   Yes, that's what they say.
 5              Q.   And they go on to report to you:
 6      Our systems are labeling and downranking the
 7      contents as identified; correct?
 8              A.   Yes.
 9              Q.   Is that consistent with other
10      e-mails, where they report back to you on how
11      they've taken action against a content that you
12      have flagged?
13              A.   Yeah, generally consistent, I
14      think.
15              Q.   Let's jump ahead to the 10390, that
16      is going to be page 24 of the PDF, and here at
17      the bottom of the page you sent the very same
18      e-mail to Twitter, as well; right?
19              A.   Yep.
20              Q.   Director Krebs is very concerned
21      about the hammer and scorecard narrative, and
22      I'm wondering if you have been tracking this
23      one, if there's anything you can share in terms
24      of sharing and amplification; correct?
25              A.   Yeah, that's what I wrote.
```

RIAN . SC LL   1/12/2023

 1          Q.    The usual context says:  We have
 2    been tracking this issue.  I will allow Yoel to
 3    follow up with detailed information; right?
 4          A.    Yes.
 5          Q.    And that's Yoel Roth; right?
 6          A.    I believe so, yeah, that's -- let's
 7    see, yep.
 8          Q.    He was then the chief content
 9    modulation officer for Twitter, right, ahead of
10    their trust and safety team?
11          A.    I don't recall what his title was,
12    but he certainly was in charge of some trust and
13    safety, safety stuff.
14          Q.    Trust and safety, that means
15    enforcing content moderation policies; right?
16          A.    I suspect that's one of the
17    responsibilities.
18          Q.    He comes back to you with a kind of
19    detailed report here at the top of the page
20    about what Twitter's been doing on this, he
21    says, we've been tracking the hammer/scorecard
22    issue closely, particularly since Director
23    Krebs's tweet on the subject, which is pretty
24    unambiguous as debunks go; correct?
25          A.    That's what he wrote, yeah.

RIAN . SC LL    1/12/2023

```
 1              Q.   Do you recall Director Krebs
 2      debunking this in a tweet?
 3              A.   I suspect, and I keep on, let me
 4      just add, I don't recall Director Krebs'
 5      specific tweet.  Two, its possible, as part of
 6      our universe reality page, and Director Krebs
 7      would put a new item up on our universe reality
 8      page, he would tweet out the new universe
 9      reality entry, but I'm not aware of the specific
10      tweet, but that would be my guess as to what was
11      going on.
12              Q.   Were you aware that the social
13      media platforms were following the rumor page
14      posted by CISA and using that as a debunking
15      method for content on their platforms?
16              A.   We had a sense they were doing
17      that, yeah.
18              Q.   And that's kind of the point of it,
19      right, the point of the rumor page is to debunk
20      things; right?
21              A.   No.  The point of the page is just
22      to provide accurate information about rumors
23      that we were hearing.
24              Q.   Okay.  You were aware, I think you
25      just said, that the social media platforms, like
```

RIAN . SC LL   1/12/2023

1      Twitter, were following the page and using it to

2      fact check, essentially, things that people were

3      posting on their platforms?

4              A.   Yeah.  So the platforms are looking

5      for a place to get accurate information about

6      different things that they were seeing on their

7      platforms.  And I know some of them used the

8      universe reality page to do that.

9              Q.   And, in fact, this e-mail indicates

10      that they used it to debunk the hammer/scorecard

11      narrative, if the tweet that Director Krebs did

12      refers to the rumor page; correct?

13              A.   I'm sorry, could you repeat the

14      question?

15              Q.   Actually, let's move on to the page

16      8625, it's a couple pages down, on page 27 of

17      the PDF.  Here you're flagging, on Friday,

18      November 13th of 2020, you've been flagging a

19      tweet for Twitter.  And at one point you say, at

20      11:26 p.m. on a Friday night, you e-mail Twitter

21      and say:  Some Friday night fun for the two of

22      us, hope you are well; right?

23              A.   Yeah.

24              Q.   So you were forwarding and routing

25      disinformation concerns to social media

RIAN . SC LL   1/12/2023

```
 1    platforms near midnight on a Friday?
 2           A.   It appears so.
 3           Q.   And they were responding in
 4    realtime, for example, 7 minutes later, at 11:33
 5    p.m., Twitter's responding to you late on a
 6    Friday night; correct?
 7           A.   Yeah.
 8           Q.   And she says, among other things,
 9    we have labeled so many tweets tonight, so I'm
10    afraid that the answer is there isn't any
11    tonight; correct?
12           A.   I'm sorry, what are you asking?
13           Q.   Directly above, she said:  We've
14    labeled so many tweets tonight that it isn't
15    ending tonight; correct?
16           A.   We have labeled so many tweets
17    tonight, so I am afraid that for now the answer
18    is that it isn't ending tonight?
19           Q.   Right.
20           A.   Yes, that's what she wrote.
21           Q.   This is based on an exchange a
22    little lower down, that you flagged something on
23    Dominion machines for her, at 11:20 p.m.  And
24    she responded at 11:21 p.m., within one minute,
25    saying, thanks, Brian, we will escalate;
```

RIAN . SC LL   1/12/2023

```
 1    correct?
 2            A.   Yep, that's what the timestamps
 3    say.
 4            Q.   Were you getting -- you were kind
 5    of reporting misinformation on social media late
 6    at night to social media platforms during this
 7    timeframe?
 8            A.   I accidently closed -- that's page
 9    24?
10            Q.   Yeah.
11            A.   Sorry.  Yeah, as I said, if I were
12    on my phone, and I saw something come in, I
13    would push it along.
14            Q.   Jump ahead to -- and was it common
15    for Twitter or Facebook or other platforms to
16    respond almost immediately, even near midnight
17    on a Friday?
18            A.   I mean, it's hard to say common.  I
19    know it happened.  They were generally pretty
20    responsive.  Common's a pretty loose term so,
21    you know, I don't know how to respond to that.
22            Q.   But you say they were generally
23    responsive, and that includes prompt in their
24    responses to you?
25            A.   Correct.  Right.  So they were
```

RIAN  . SC  LL   1/12/2023

```
 1    prompt in letting me know that they had received
 2    any e-mail that I sent them, that's essentially
 3    what I was talking about.
 4           Q.   Let's go to 8557, it's page 42 of
 5    the PDF.
 6           A.   42?  Okay.
 7           Q.   Here it looks like Facebook is
 8    e-mailing Lauren Protentis and saying that:  I
 9    wanted to share our account security doc that
10    we've been working on, and we're grateful for
11    any feedback; right?
12           A.   Yep.
13           Q.   Do you know what account security
14    document they're talking about, here in April
15    15th of 2022?
16                MR. GARDNER:  Objection, calls for
17    speculation.
18           A.   Yeah, I don't know what specific
19    documents they're talking about.
20           Q.   Is it possible this is the
21    one-pager that we were talking about earlier,
22    does that ring a bell?
23                MR. GARDNER:  Objection, calls --
24    objection, calls for speculation.
25           A.   Yeah, I don't -- I don't -- I don't
```

RIAN . SC LL   1/12/2023

```
 1   know.
 2           Q.    Okay.  Next page, Lauren Protentis,
 3   thanks so much for sending, this looks great.
 4   The only thing I recommend is any steps for
 5   flagging or escalating MDM content, if possible;
 6   right?
 7           A.    Yeah, that's what Lauren said.
 8           Q.    And she said:  I think then that
 9   this -- I think, then, that would make this a
10   comprehensive product on both the critical needs
11   of officials, account security, and MDM
12   concerns; correct?
13           A.    Yeah, that's what she wrote.
14           Q.    She says:  We discussed this a bit
15   in our in-person meting a few weeks ago; right?
16           A.    Yep.
17           Q.    Okay.  Were you aware of Lauren
18   asking for Facebook to produce a document and
19   asking them to include steps for planning or
20   escalating MDM content for officials?
21           A.    I was not aware of this document,
22   no.  I know that the -- I knew those
23   conversations about the one-pagers we discussed
24   earlier, but I'm not -- I'm not entirely sure
25   what this is referring to.
```

RIAN . SC LL   1/12/2023

```
 1            Q.   Well, I think you said earlier the
 2     one-pagers would talk about what their content
 3     moderation policies are?
 4            A.   Right.
 5            Q.   If you look higher, on that same
 6     page, Facebook is replying to Lauren and saying,
 7     would it be -- would it work to just provide my
 8     e-mail when you share out this one-pager; right?
 9     Do you see that?
10            A.   So I'm scrolling up.
11            Q.   When you share out this one-pager;
12     do you see that?
13            A.   Yes.
14            Q.   Okay.  So -- so does it seem that
15     Lauren is talking about the one-pager that all
16     the social media platforms were asked to provide
17     for state and local elections; is that what's
18     going on?
19            A.   Again, I'm not sure.  It could be
20     two different one-pagers that she's talking
21     about, one on account security and one that
22     Lauren was working on, I wouldn't be -- again, I
23     wouldn't be surprised if they were similar, but
24     I -- I can't -- I don't know.
25            Q.   Regardless, for the purpose of this
```

RIAN . SC LL   1/12/2023

1      one-pager, Lauren is specifically asking that

2      they add to it a procedure for state officials

3      to flag and escalate MDM content; correct?

4              A.    It appears she's asking for a

5      process for election officials to report MDM

6      content to Facebook, yeah.

7              Q.    Jump ahead to 12223, here on the --

8      starting at the 48th page of the PDF and

9      spilling to the 49th page, there's another

10     e-mail from Lauren Protentis, this time to

11     people at Microsoft, which is subject is

12     one-pager for election officials; do you see

13     that?

14             A.    Did you say 48?

15             Q.    Yeah, 48, spilling over onto 49,

16     it's -- the header's on 48 and the -- oh, I'm

17     sorry, 43.  Bad eyesight.  Sorry.  It really

18     looks like an 8.

19             A.    That's okay.

20             Q.    Sorry, 43.

21             A.    I understand that.

22                   Okay.  So one-pager for election

23     officials, got the header, okay.

24             Q.    And in this e-mail Lauren says to

25     Microsoft:  META is working with industry

RIAN . SC LL   1/12/2023

```
 1    partners to create one-pagers for election
 2    officials, in the lead-up to the midterms, that
 3    provide steps to create secure accounts --
 4    secure accounts and to report MDM; do you see
 5    that?
 6         A.   I do.
 7         Q.   And she said:  We'll be sharing
 8    these products at our various engagements with
 9    officials, presumably meaning state and local
10    election officials; right?
11              MR. GARDNER:  Objection, calls for
12    speculation.
13         A.   Yeah, I mean, obviously, I don't
14    know what she means by officials, but I think
15    that's a fair assumption.
16         Q.   And that's a one-pager for election
17    officials; correct?
18         A.   Yes.
19         Q.   Skipping ahead to 22053, page 45 of
20    the PDF, going onto 46.
21         A.   Okay.
22         Q.   You see here, on May 11, 2022,
23    Lauren Protentis is writing to Twitter:  Hope
24    this e-mail finds you well, wanted to circle
25    back on this and see if you have any questions.
```

**RIAN . SC LL   1/12/2023**

```
 1      The team has a few upcoming engagements with

 2      elections officials for this one-pager, would be

 3      particularly helpful to share as a leave behind;

 4      correct?

 5           A.    Yes, that's what she's written.

 6           Q.    And Twitter goes back and says:

 7      I'll have a one-pager for you later today, just

 8      getting the final signoff; right?

 9           A.    Correct.

10           Q.    And then, once he sends it to him,

11      scrolling back up, first, she says:  State and

12      local officials in New Hampshire, Illinois, will

13      be the first recipients of this; right?  There

14      at the top of the page.

15                The first line on page 45 of the

16      PDF Lauren says --

17           A.    Yeah, the e-mail chain is a little

18      funky, so I was just trying to read and make

19      sure the e-mails were connected.

20                Okay.  So Twitter provided the

21      one-pager.  Lauren said thanks.  State and local

22      officials in New Hampshire and Illinois will be

23      the first recipients to this?  Okay.  Sorry.

24           Q.    Then she follows up with another

25      e-mail, saying:  Actually, one question, is
```

RIAN . SC LL  1/12/2023

```
 1      there a way to include something about how to

 2      report disinformation; do you see that?

 3           A.   Yep.  Yep.

 4           Q.   And Twitter says:  The best way for

 5      them to do that is to contact gov@twitter.com;

 6      right?

 7           A.   Yep.

 8           Q.   And I can add that to the doc if

 9      that would be helpful; correct?

10           A.   Correct.

11           Q.   And Lauren says:  That would be so

12      helpful if you could add that to the doc.  Thank

13      you; right?

14           A.   Yep.

15           Q.   And Twitter says:  They do; right?

16           A.   Mm-hmm.

17           Q.   So that's the second time she's

18      pushed the social media platform to expand the

19      one-pager to include a reporting process for MDM

20      for the state and local election officials;

21      correct?

22           A.   I'm not sure that's how I would

23      characterize it.  I think she's just trying to

24      make sure that election officials have the

25      information they need if they want to report.
```

RIAN . SC  LL   1/12/2023

**Page 301**

1    I'm not sure it's expanding.  I don't know.

2    You're making it more dramatic than it was, I

3    think.

4         **Q.   Well, suffice to say that she's**

5    **asking Twitter to include information**

6    **specifically about how do you report MDM;**

7    **correct?**

8         A.   About how election officials should

9    support MDM, correct.

10        **Q.   And Twitter had not included that**

11   **in theirs, and she asked them to put it in and**

12   **they did; right?**

13        A.   It appears so, yeah.

14        **Q.   Same thing happened, actually, with**

15   **YouTube in your earlier e-mail, right, they**

16   **hadn't included it in a one-pager, and she asked**

17   **them to put it in; correct?**

18        A.   I don't recall that e-mail.  Which

19   e-mail is that?

20             (Exhibit No. 27 was marked for

21   identification.)

22   BY MR. SAUER:

23        **Q.   Let's move on, actually.**

24             **I'm going to e-mail you some new**

25   **exhibits.**

RIAN . SC LL   1/12/2023

```
 1                    I'm pulling up Exhibit 27, which
 2       should also be popping up in your inbox.
 3       There's a news report entitled:  CISA expands
 4       efforts to fight election disinformation ahead
 5       of challenging 2024 vote; do you see that?
 6                    MR. GARDNER:  Yeah.  I'm sorry,
 7       John, we're still waiting for your -- oh, just
 8       got it.  Hold on.  Hold up.  You said 27?
 9                    MR. SAUER:  Yeah.
10                    MR. GARDNER:  Here you go.
11                    THE WITNESS:  Okay.
12       BY MR. SAUER:
13            Q.   Do you see the headline:  CISA
14       expands efforts to fight election disinformation
15       ahead of challenging 2024 vote; do you see that?
16            A.   I do.
17            Q.   What steps are you aware of CISA
18       taking to expand its efforts to fight election
19       disinformation going into the next election
20       cycle, 2024?
21            A.   At this time, I'm not aware of any.
22            Q.   This is dated August 12th, 2022, if
23       you scroll down.
24            A.   Sure.
25            Q.   Were you aware of any discussions
```

RIAN . SC LL   1/12/2023

1    or efforts -- any efforts at that time?

2         A.   When this was written, in August of

3    2022?  I'm sorry, what time?

4         Q.   Well, I'm just saying, are you

5    aware, around August of 2022, did CISA -- was

6    CISA expanding efforts to fight disinformation?

7         A.   No, no specific efforts, that I'm

8    aware of, I believe there might have been some

9    additional funding requested in the budget, but

10   I'm not sure if that actually went up or not.

11        Q.   What -- what efforts did CISA

12   undertake to fight election disinformation

13   during the 2022 election cycle?

14        A.   We put out a couple of sets of

15   products.

16        Q.   Anything else?

17        A.   Not -- not that I recall.  We

18   honestly we didn't do a ton in 2022.

19        Q.   What were you guys doing, you're

20   the MDM team, what did you do to fight MDM?

21        A.   So again, our -- as I mentioned,

22   our role is to build resilience, so we put out

23   the two sets of products, as I mentioned.

24   Earlier in 2022, we put out additional products.

25   I'm sure we gave some stakeholders to build

**RIAN . SC LL   1/12/2023**

```
 1    relationships.

 2             But generally speaking, we did a

 3    lot of foundational work to better understand

 4    how it functions, those sorts of things, as

 5    opposed to very election-specific activities.

 6             Q.    Here in the article it says:  The

 7    danger -- in the second paragraph -- it says:

 8    The danger of disinformation has become an

 9    incredibly difficult problem, CISA Director Jen

10    Easterly said on Friday; do you see that?

11             A.    I do.

12             Q.    And it goes on in his report:  That

13    Easterly has taken several specific steps to

14    fight the problem, including bringing Kim Wyman,

15    former Secretary of State of Washington into

16    CISA to bolster its election work; correct?

17             A.    That's what the article says, yep.

18             Q.    What has Kim Wyman done to fight

19    election-related disinformation at CISA?

20             MR. GARDNER:  Objection.

21    Objection, lack of foundation, calls for

22    speculation.

23    BY MR. SAUER:

24             Q.    You may answer.

25             A.    Yeah, can you be more specific
```

RIAN . SC LL  1/12/2023

1    about what you're trying to get to?

2            Q.   Well, what does Kim Wyman do at

3    CISA?

4            A.   Kim Wyman is essentially the new

5    Matt Masterson.  So she's a senior advisor to

6    the director on election security.  Most of her

7    work has been engagement with election

8    officials.  I also think she was CISA's

9    representative on the CSAC for MDM.

10           So beyond some public speaking

11   and -- and the CSAC work, I'm not sure what else

12   she would have done, would have been doing on

13   MDM.

14           Q.   Down here at the very last

15   paragraph, second page of the document, sorry,

16   this is hard to highlight, very last paragraph,

17   it says:  While it's not CISA's role to police

18   social media Easterly said her team has

19   discussions with platforms, but they're more to

20   understand large trends, not specific tweets; is

21   that right?

22           A.   That's what the article says, yeah.

23           Q.   Do you have discussions with

24   platforms discussing large trends of online

25   disinformation?

RIAN . SC LL   1/12/2023

```
 1              A.   Yeah, I think that's consistent

 2      with what we talked about from the sync meetings

 3      and the discussions around the public reporting

 4      that the platforms have done.

 5              Q.   Any other time when there would

 6      be -- where there was discussions with platforms

 7      about disinformation trends?

 8              A.   I think it's just the two, the

 9      normal sync meetings we discussed, and then the

10      normal if they were putting up public reporting

11      we might get a briefing on it.  I'm trying to

12      think if we ever received -- yeah, I think those

13      are the big things.  We may have done a briefing

14      where we had a platform maybe talk about -- talk

15      with election officials, but I'm not sure if I'm

16      remembering that correctly, so just those two, I

17      think, would be the main ones.

18              (Exhibit No. 28 was marked for

19      identification.)

20              MR. SAUER:  Exhibit 28.

21              MR. GARDNER:  Should be right

22      there.

23              THE WITNESS:  Okay.

24      BY MR. SAUER:

25              Q.   Should be on the screen share, too.
```

RIAN . SC LL  1/12/2023

```
1              Here's an e-mail chain, starting

2    with Facebook sending an e-mail directly to Jen

3    Easterly, saying she had spoken to Facebook

4    about receiving a briefing from us on 2022

5    election approach; do you see that there, the

6    second page of the document, the beginning of

7    the chain?

8         A.   I do.

9         Q.   Were you aware that Easterly had

10   reached out to Facebook directly and asked for,

11   I guess in January of 2022, a briefing on how

12   Facebook planned to approach the election?

13        A.   I was not.

14        Q.   Facebook says:  We're happy to do

15   this with your team at your convenience, and

16   we'd also love to discuss further how we might

17   help support the JCDC effort; do you see that?

18        A.   I do.

19        Q.   What does JCDC stand for?

20        A.   I was afraid you were going to ask

21   me that.  I don't know exactly what it -- what

22   it stands for, I think it's joint cyber

23   something or another.  Sorry, I -- I forget the

24   exact acronym, too many acronyms.

25        Q.   Is it a committee or a subdivision
```

**RIAN . SC LL   1/12/2023**

```
 1    within CISA or within DHS?
 2          A.   I believe it's a -- it's an effort
 3    by CISA to -- to collaborate with private sector
 4    on cyber defense.
 5          Q.   Okay.  And Director Easterly
 6    responds to Facebook saying:  Looping in Kris
 7    and teammates to please follow up; do you see
 8    that?
 9          A.   I do.
10          Q.   And then Kris Rose; do you know who
11    Kris Rose is?
12          A.   My understanding is counselor for
13    the director, for Director Easterly.
14          Q.   So -- and he says:  Thank you,
15    Director.  Moving you to BCC; does that stand
16    for blind carbon copy?
17          A.   That would be my understanding.
18          Q.   And he says per Geoff, G-e-o-f-f, I
19    presume that's a Geoff Hale; right?
20          A.   Yeah.
21          Q.   Sounds like we may want to discuss
22    three primary topics that include 2022
23    elections; right?
24          A.   Mm-hmm.
25          Q.   Risk management in the face of
```

RIAN . SC LL   1/12/2023

```
 1       influence of operations; do you know what that

 2       means?

 3              A.   I mean, I don't know what context

 4       he was saying it here, but generally speaking,

 5       that's CISA's mission to reduce risks to

 6       critical infrastructure.  So I assume it's risk

 7       management from critical infrastructure to

 8       influence of operations.

 9              Q.   And JCDC, that's the thing you

10       testified before?

11              A.   Yeah.

12              Q.   Do you know -- let me ask you this:

13       Were you included in this meeting between

14       Director Easterly and Facebook?

15              A.   I was not, in fact, I don't know if

16       the meeting actually ever occurred.

17              Q.   Do you know if Geoff Hale

18       participated?

19              A.   I -- I don't.

20              (Exhibit No. 29 was marked for

21       identification.)

22   BY MR. SAUER:

23              Q.   Let's look at Exhibit 29.

24              A.   Okay.

25              Q.   Here's a series of text messages
```

RIAN . SC LL   1/12/2023

```
1    that were produced to us as coming from Director

2    Easterly.

3              So do you see the blue text, that

4    would be Director Easterly, the other side, in

5    the gray, is the interlocutor here on the first

6    page is this gentleman from Facebook; do you see

7    that?

8         A.   Yeah.

9         Q.   This -- he -- he -- he issued a

10   series of texts.  Do you know why he would be

11   texting Director Easterly, does he know her?

12             MR. GARDNER:  Objection, compound.

13   Objection, calls for speculation.

14        A.   Yeah, I -- I don't know is the

15   short answer.  I don't know what their

16   relationship is.

17        Q.   Do you know him, Mr. Gleicher?

18        A.   Yeah, I know Nathaniel Gleicher,

19   yeah.

20        Q.   Does he interact with CISA about

21   misinformation issues on Facebook?

22        A.   He does, he participates in the

23   monthly regular meetings that we talked about.

24        Q.   What else does he do, do you know,

25   for Facebook on --
```

RIAN . SC LL   1/12/2023

```
 1              A.    I'm sorry, what was the last part?
 2              Q.    What else does he do for Facebook
 3       on misinformation?
 4              A.    Again, I think he would articulate
 5       the inoffensive behavior, coordinating
 6       inoffensive behavior.  So I don't know if he
 7       would talk about it in the context of
 8       disinformation.  But my understanding is he
 9       leads the team one of the teams that deals with
10       the coordinated inoffensive behavior.
11              Q.    Let me ask you about Rob Silvers.
12       Do you know who Rob Silvers?
13              A.    Yes.
14              Q.    Who's Rob Silvers?
15              A.    He heads up the DHS office of
16       policy.  I don't know what his back title is,
17       assistant secretary or secretary, something like
18       that.
19              Q.    So he's in the secretary's office?
20              A.    I believe he reports up to the
21       secretary, yeah.
22              Q.    He -- he -- and Mr. Gleicher says
23       to Jen Easterly:  Do you have any context you
24       can share in the role Rob Silvers is playing on
25       disinfo; right?
```

RIAN . SC LL   1/12/2023

1          A.   Yep, that's what the text says.

2          Q.   I understand his team is a task

3    force set up, and it was suggested that his team

4    is handing policy on disinfo while CISA is

5    handling operations; right?

6          A.   Yeah, that's what Nathaniel wrote.

7          Q.   What is -- what was your

8    understanding of Rob Silver being involved in

9    policy on disinformation?

10          A.   So that is the DHS office of

11    policy.  He would be involved in most, I would

12    say, policy activities related to any topic that

13    crossed the department, including

14    disinformation.

15          Q.   And Director Easterly says she's

16    happy to chat with Mr. Gleicher; right?

17          A.   Yep.

18          Q.   You don't know if they actually

19    talked to each other, do you?

20          A.   I don't.

21          Q.   She goes on to say:  Rob is running

22    a governance board to look at potential new

23    areas of confronting MDM; correct?

24          A.   That's what she wrote, yeah.

25          Q.   Then she says:  It doesn't change

RIAN . SC LL   1/12/2023

```
 1    or impact anything, we, meaning CISA, are doing

 2    or have already established; right?

 3         A.   Yes, that's what she wrote.

 4         Q.   What were the potential -- what

 5    potential new areas of confronting MDM were

 6    discussed, do you know?

 7              MR. GARDNER:  Objection, lack of

 8    foundation.

 9         A.   I don't have any clue.

10         Q.   Next page, there's an e-mail from

11    Matt Masterson to the director; right?

12         A.   Yep.

13         Q.   This is a -- Matt Masterson know

14    the director well, I take it he was a political

15    appointee, did you say that?

16         A.   In previous administration --

17    excuse me -- yeah, he was a political appointee.

18    I don't know what his relationship with the

19    director was, so I don't know how well he knew

20    her.

21         Q.   What was the director's role in the

22    previous administration, was she at CISA?

23         A.   No.  Director Easterly was not at

24    CISA, no.

25         Q.   Who was she?
```

RIAN . SC LL   1/12/2023

```
 1            A.    I'm sorry?

 2            Q.    Was she in government?

 3            A.    Prior to the -- in the previous

 4    administration?

 5            Q.    Yeah.

 6            A.    I don't know.  I think her

 7    immediate previous job was in the private

 8    sector, but I don't know how long and if she

 9    spent any time, at all, in the -- in the

10    previous administration in government.

11            Q.    And here, Director Easterly says to

12    Matt Masterson, just trying to get us in a place

13    where FED can work with platforms to better

14    understand the mis, dis trends so relevant

15    agencies can try to prebunk/debunk as useful;

16    correct?

17            A.    That's what she wrote, yeah.

18            Q.    And that discussion of trends is

19    similar to her statement in the media article we

20    just looked at about how CISA is interacting

21    with social media platforms to identify trends;

22    correct?

23            A.    She mentioned trends in both,

24    correct.

25            Q.    And here she -- the reason she
```

RIAN . SC  LL    1/12/2023

```
 1    wants to understand the trends from the

 2    platforms is so that the relevant agencies can

 3    try to prebunk or debunk the mis and

 4    disinformation; correct?

 5            A.    Yeah, I think that's what she's

 6    saying.

 7            Q.    Can you do that at CISA, when you

 8    find out about a trend do you go try to work

 9    with another federal agency to prebunk or debunk

10    it?

11            A.    So again, from a resilience-

12    building perspective, you know, what we try to

13    do is provide accurate information about those

14    issues and topics that are relevant to us.  So

15    from an election perspective we would try to

16    provide appropriate information about elections,

17    so that the universe reality page would be an

18    example of that, it would fall more potentially

19    into the debunking side.

20                 Prebunking is trying to understand

21    ahead of time what could happen so you could

22    fill information gaps.

23                 And so that's generally kind of how

24    resilience works.  So yeah, we would -- we would

25    try to do some of that.
```

```
1                   I don't know -- so we worked a

2        little bit with the FBI, on products or

3        resilience-based products, as I mentioned.  I

4        say that's probably -- we worked, as I mentioned

5        earlier, we worked with the GAC initiative about

6        tactics and such.

7                   So those are the types of things

8        that we would do to, again, help people

9        understand how MDM works and steps they can take

10       to reduce the risks.

11            Q.   Her next text here, Director

12       Easterly's next text says:  Not our mission, but

13       was looking to play a coord role so not every

14       D/A is independently reaching out to platforms

15       which could cause a lot of chaos; right?

16            A.   That's what she wrote, yep.

17            Q.   What does D/A mean, is that

18       department or agency?

19                 MR. GARDNER:  Objection, calls for

20       speculation.

21  BY MR. SAUER:

22            Q.   If you know.

23            A.   That's -- that is one of our common

24       abbreviations for department and agency, but I'm

25       not sure if that's what she's referring to here.
```

RIAN . SC LL   1/12/2023

```
 1           Q.    Do you know -- let me ask this:  Do
 2      you believe that if every federal department and
 3      agency is independently reaching out to the
 4      platforms that could cause chaos?
 5           A.    Yeah, I think chaos might be a
 6      little strong.  But, you know, it does create
 7      challenges and provides the platforms
 8      opportunities to play departments off each
 9      other.
10           Q.    Does -- does CISA try to play a
11      coordinating role in that, in other words,
12      coordinating between the federal agencies and
13      the social media platforms on disinformation and
14      misinformation issues?
15           A.    So we did do that as it relates to
16      the sync meetings we discussed throughout the
17      testimony.  Beyond that, we didn't -- we didn't
18      attempt to play a substantial role in terms of
19      coordinating between.
20           Q.    Let me ask you this:  Matt
21      Masterson responds to this e-mail or this text
22      and says:  We'll get there, and that kind of
23      leadership really helps.  Platforms have got to
24      get more comfortable with government.  It's
25      really interesting how hesitant they remain;
```

```
 1    correct?

 2            A.   That's something I wrote.

 3            Q.   Is that consistent with your

 4    experience that the social media platforms have

 5    to be kind of pushed or encouraged to coordinate

 6    with the government on misinformation issues?

 7            A.   I don't think that's how I would

 8    characterize it.  You know, we operate in a

 9    voluntary kind of manner, so it's voluntary

10    whether -- for CISA, again, for CISA, the MDM

11    team, so it's always up to the platforms what

12    level of engagement they want to have with us.

13            Q.   Do you know whether Masterson and

14    Easterly had any further discussion of these

15    issues?

16            A.   I don't know.

17            Q.   Let me send you a couple more

18    exhibits.  And while they are coming, do you

19    know, were you involved, at all, in the

20    formation --

21            MR. GARDNER:  I'm sorry, John, I'm

22    sorry, the witness just asked me if we can take

23    a break.

24            MR. SAUER:  Oh.

25            THE WITNESS:  Just a few minutes,
```

**RIAN . SC  LL   1/12/2023**

Page 319

```
 1    bathroom break.
 2                 MR. SAUER:  Well, why don't we make
 3    it five, and try to make it the last break of
 4    the day.  How long have we been on the record?
 5                 MR. SCOTT:  We got back on at 3:50,
 6    so it's 4:40, so it's 50 minutes in, we have an
 7    hour and 10 minutes left.
 8                 MR. GARDNER:  He's been reliable.
 9    We need to do this off the record, first of all.
10                 THE VIDEOGRAPHER:  The time is now
11    4:42.  We are off the record.
12                 (Recess.)
13                 THE VIDEOGRAPHER:  The time is
14    4:53.  We are back on the record.
15                 (Exhibit No. 30 was marked for
16    identification.)
17    BY MR. SAUER:
18          Q.   Exhibit 30 should be in your inbox.
19    I'll put it up on the screen share.
20                 Here's an article in The Intercept
21    called Truth Cops, Leaked Documents Outline
22    DHSA's Plans to Police Disinformation; do you
23    see that?
24          A.   Yeah, we don't have it on here, but
25    I saw the headline in your screen share.
```

RIAN . SC LL   1/12/2023

1           Q.    Okay.   Sorry.   But scrolling down,

2    still on the first page, it says:   The

3    Department of Homeland Security is quietly

4    broadening its effort to curb speech it

5    considers dangerous; do you see that?

6           A.    I see that in the article, yep.

7           Q.    Are you aware of DHS broadening its

8    efforts to address disinformation?

9           A.    I am not, no.

10          Q.    Has CISA been expanding its MDM

11   team?

12          A.    As I mentioned earlier, we have

13   not.

14          Q.    Let me ask you this:   Scrolling

15   down here, third page of the document, it says:

16   There is also a formalized process for

17   government officials to directly flag content on

18   Facebook or Instagram and request that it be

19   throttled or suppressed through a special

20   Facebook portal that requires a government or

21   law enforcement e-mail to use; do you see that?

22          A.    Yeah, I see that in the article.

23          Q.    And it actually provides a link for

24   it, Facebook.com/Xtakedowns/login; are you aware

25   of that reporting channel for government

RIAN . SC LL   1/12/2023

```
 1    officials?

 2           A.    I am not, no.

 3           Q.    On the next page, fourth page of

 4    the document, it says:  According to a draft

 5    copy of DHS's quadrennial Homeland Security

 6    review, DHS's capstone report outlining the

 7    department's strategy and priorities in the

 8    coming years, the department plans to target

 9    inaccurate information on a wide range of

10    topics; do you see that?

11           A.    Yeah, I see that in the article.

12           Q.    Are you aware of the document

13    that's a draft of the quadrennial Homeland

14    Security review?

15           A.    I know it says quadrennial Homeland

16    Security review is, I don't know if I've seen

17    the draft of the most recent one.

18           Q.    Have you seen any drafts of the

19    most recent one?

20           A.    Not that I recall.

21           Q.    When does it -- when does it get

22    finalized?

23           A.    I -- I -- I don't know.

24           Q.    It says:  Including the origins of

25    the COVID-19 pandemic and the efforts of the
```

**RIAN . SC LL   1/12/2023**

```
 1      COVID-19 vaccines, racial justice, US withdrawal

 2      from Afghanistan, and the nature of US support

 3      for Ukraine, in quotes; do you see that?

 4           A.   I do.

 5           Q.   Are you aware of discussions

 6      anywhere in DHS about addressing misinformation

 7      about the origins of the COVID-19 pandemic?

 8           A.   I am not.

 9           Q.   So how about the efficacy of

10      COVID-19 vaccines?

11           A.   Yes, I'm aware of some discussions

12      on that.

13           Q.   What discussions are you aware of?

14           A.   So it was a -- as I mentioned

15      earlier, our building critical infrastructure

16      help in public health is one of the sectors of

17      critical infrastructure, so we engage with CDC

18      and HHS to help them.  We've also put out one

19      product, sometime in mid 2020, for

20      infrastructure stakeholders about COVID-related

21      disinformation.

22           Q.   What do you do to assist CDC and

23      HSH?

24           A.   For the most part, not a lot, to be

25      honest.  Like I said, we did the one product
```

RIAN . SC LL   1/12/2023

1    related to them, and we just participate in

2    meetings with them.  From our perspective,

3    again, we're trying to understand trends, how

4    this information is spreading tactics so we can

5    help the public, the public and organizations,

6    critical infrastructure organizations, as well

7    as some others, understand the risks from MDM

8    and how it works and what they can do about it.

9          **Q.    Do you -- do you obtain information**

10   **from CDC and HHS about how COVID vaccine**

11   **misinformation spreads?**

12         A.    I believe that they provided some

13   briefings on that, yeah.

14         **Q.    And do you also provide briefings**

15   **to them or information to them?**

16         A.    We did some work on the kind of

17   bio-lab narratives, so this is essentially

18   foreign governments, whenever anything happens,

19   whether biological and sometimes not, they will

20   point to US biolabs as being the culprit behind

21   it, and so as part of our resilience-building

22   efforts we're trying to understand how foreign

23   actors have used that narrative over time.

24              And so we, starting back in the

25   '80s, probably since back in the '80s, the

RIAN . SC  LL   1/12/2023

1    Russians were using that.  Usually they're

2    saying at Fort Detrick or some other kind of US

3    entity is a biolab, and that's where whatever it

4    starts.

5                We saw this with COVID.  We saw

6    this Monkey Pox.  We saw this around Ukraine.

7    And so, again, just helping people understand

8    that a lot of these disinformation narratives

9    are recycled over time, for different issues, as

10   a way to help build resilience.

11          **Q.   How about racial justice, are you**

12   **doing anything to address misinformation about**

13   **racial justice issue?**

14          A.   CISA has not, to my knowledge, done

15   anything related to racial justice.

16          **Q.   How about other DHS components, do**

17   **they do anything on that?**

18          A.   Not that I'm aware of, but

19   obviously I don't know everything that they do.

20          **Q.   How about US withdrawal from**

21   **Afghanistan, does CISA work on that?**

22          A.   Not that I'm aware of.

23          **Q.   And how about other DHS components?**

24                MR. GARDNER:  Objection, calls for

25   speculation.

RIAN . SC  LL   1/12/2023

```
 1            A.   Yeah, I -- I'm not aware of what
 2    other components are doing.
 3            Q.   And then the nature of US support
 4    to Ukraine?
 5            A.   So there was a department stood
 6    out, what's called the Unified Coordination
 7    Group, when Russia invaded Ukraine, to
 8    coordinate DHS activities related to the crisis.
 9    As a part of that there was an MDM component,
10    and a member of the MDM team was detailed to
11    lead the MDM component of the Russian/Ukraine
12    work.  I believe it lasted about two months.
13            Q.   What did they do?
14            A.   The Unified Coordination Group.
15    Sorry.
16            Q.   What did that group do?
17            A.   So most of it took place while I
18    was out, so I don't have a super clear
19    understanding of everything, but generally
20    speaking, they provided a -- they would monitor
21    open source researching.
22                 So we talk about third-party
23    researchers, we put out reports, and things like
24    that, and they would provide situational
25    awareness, at least from our perspective, CISA
```

RIAN . SC LL   1/12/2023

```
 1    perspective, they would provide situational
 2    awareness up to the MDM Unified Coordination
 3    Group.
 4         Q.   Who at CISA participated in that?
 5         A.   So Rob Schaul from the MDM team was
 6    detailed to the Unified Coordination Group, and
 7    then several members of the team would have been
 8    monitoring open source.
 9              So we have the open source
10    reporting.  These are third-party research
11    reports, things like that, to point to
12    information to just make leadership aware.
13         Q.   Did they -- did that group
14    communicate with social media platforms about
15    disinformation relating to Ukraine?
16         A.   By that group, do you mean Unified
17    Coordination Group?
18         Q.   Correct.
19         A.   I -- I don't know.
20         Q.   Rob Schaul would know that?
21         A.   He led the team, so I suspect he
22    might.
23         Q.   Do you know if that team
24    communicated with social media platforms, at
25    all?
```

**RIAN . SC LL   1/12/2023**

```
 1              A.   I don't know.  There was a call, at
 2     some point, early, between -- between critical
 3     infrastructure and I believe some social media
 4     around that, but I wasn't around for that call
 5     so I don't really know the nature of what was
 6     discussed or anything along those lines.
 7              Q.   There was a call between -- and I'm
 8     sorry, I couldn't hear clearly what you said --
 9     there was a call between social media platforms
10     and -- and who?
11              A.   So I believe the way I understand
12     the call is it facilitated a call with critical
13     infrastructure, the critical infrastructure
14     community, to private sector companies, sector
15     risk management agencies, folks that were
16     involved in critical infrastructure security.  I
17     believe, my understanding is that call did
18     include some social media platforms.
19              Q.   And you -- but you don't know what
20     was said in that call?
21              A.   No, I wasn't -- I wasn't back at
22     CISA yet.
23              Q.   Do you know when the call occurred?
24              A.   It would have been in probably the
25     February -- February time -- timeframe, I would
```

RIAN . SC  LL   1/12/2023

Page 328

```
 1    think.
 2            Q.    February 2022?
 3            A.    Correct.
 4                  (Exhibit No. 31 was marked for
 5    identification.)
 6    BY MR. SAUER:
 7            Q.    I'm putting up Exhibit 31 on the
 8    screen share.  You should have it in front of
 9    you.
10            A.    Okay.  I got it.
11            Q.    Here's a report from the Office of
12    the Inspector General, entitled:  DHS needs a
13    unified strategy to counter disinformation
14    campaigns; do you see that?
15            A.    I do.
16            Q.    Are you familiar with this OIG
17    report?
18            A.    Mostly familiar with it, yeah.
19            Q.    Were you aware that they -- do you
20    know what the day of the report is?
21            A.    Says August 10th, 2022.
22            Q.    And I take it this report is
23    recommending that here to what we have found,
24    DHS needs unified strategy or -- to address
25    disinformation; right?  Right here, it says:
```

```
 1      DHS does not yet have a unified department-wide

 2      strategy to effectively counter disinformation

 3      that originates from both foreign and domestic

 4      sources; correct?

 5              A.   I'm trying to find that.  Okay.

 6              Q.   Yeah.

 7              A.   DHS does not yet have a unified

 8      strategy.  Correct, yeah, that's what's written

 9      there.

10              Q.   Do you share that view, do you

11      think DHS lacks a department-wide strategy?

12              A.   Yes.

13              Q.   Do you think that different

14      components of DHS are engaging in different sort

15      of MDM-related activities without coordinating

16      with each other?

17              A.   Yeah, I think that's a fair

18      assumption.

19              Q.   Were you aware that this

20      recommendation was made for DHS to do internal

21      and external coordination better?

22              A.   Was I aware that this report was

23      stating that DHS needs to do better in internal

24      and external coordination?

25              Q.   Yeah.
```

RIAN . SC  LL   1/12/2023

```
 1              A.   I -- I don't know if that's what it
 2    says, is there a page in here where that
 3    recommendation is or those recommendations?
 4              Q.   Let's go to page 7.
 5              A.   Is this PDF 7 or document page 7?
 6              Q.   Good question.  It's PDF 9,
 7    document --
 8              A.   PDF 9?  Okay.
 9              Q.   It's here underneath the graphic
10    novels images, there's a paragraph that begins:
11    More recently; do you see that?
12              A.   Yep.
13              Q.   It says:  In January 2021 CISA
14    transitioned its countering foreign influence
15    task force to promote more flexibility to focus
16    on general MDM; right?
17              A.   Mm-hmm, that's what it says.
18              Q.   And that CISA's got 15 dedicated
19    part- and full-time staff; is that still true?
20              A.   No.
21              Q.   I'm sorry, the MDM team has 15
22    staff; is that still true?
23              A.   No.
24              Q.   How many does it have?
25              A.   Right now, we have five full-time
```

RIAN . SC  LL   1/12/2023

```
1    staff plus one on maternity leave, so six.  And
2    then we have one, two, two contractor's
3    support -- no, three contractor's supporting us.
4          Q.   Did at some time you have 15 people
5    working on this on the MDM team?
6          A.   I suspect at the height of the team
7    if you add in all the contractors there it
8    probably got close to 15, but I'm not sure of
9    the exact number.
10         Q.   When was the height of the team?
11         A.   Staff plus contractors was
12   probably -- good question.  When was the height
13   of the team?  We didn't have much contract
14   support in 2020, so I would probably say 2021,
15   while I was gone.
16         Q.   It says:  The MDM team focuses on
17   disinformation activities targeting elections
18   and critical infrastructure.  According to a
19   CISA official, the MDM team counters all types
20   of disinformation, to be responsive to current
21   events; is that right?
22         A.   That's what the document says, yep.
23         Q.   Is that true that the MDM team
24   counters all types of disinformation to be
25   responsive to current events?
```

RIAN . SC LL   1/12/2023

```
 1              A.   We, again, try to build resilience
 2      and reduce risks to critical infrastructure.  So
 3      I -- you know, if the event could impact
 4      critical infrastructure, that would be something
 5      we would consider addressing.
 6              Q.   Does critical infrastructure
 7      include cognitive infrastructure?
 8              A.   Not through national policy.
 9              Q.   Okay.  Let me go two pages further,
10      paragraph -- page 9, it says:  For example,
11      according to an ODNI official, prior to the
12      November 2020 elections CISA and I A joined in
13      weekly teleconferences to coordinate
14      intelligence community activities to counter
15      election-related disinformation; correct?
16              A.   That's what the document says, yes.
17              Q.   Were you aware of those calls,
18      that's a coordinating call between CISA, I A and
19      ODNI?
20              A.   No, that was a coordinate -- so
21      yeah, from the call, but the calls were DNI-led
22      coordination calls of the intelligence
23      community.  CISA was there mostly from an
24      observer standpoint, to do as an election
25      security lead.  But it was -- it was an intel
```

RIAN . SC LL   1/12/2023

```
 1    community-focused coordination and conversation.
 2            Q.    Who from CISA participated in those
 3    calls?
 4            A.    I think it was just a random -- a
 5    random mix.  Geoff did not generally participate
 6    in them.  I didn't generally participate in
 7    them, although I think I did maybe once or
 8    twice, normally somebody at the staff level.
 9                  Yeah, we have an intel office in
10    CISA, so I suspect that at least somebody from
11    the intel office was on the calls.  But I think
12    it was just, you know, it was who's available at
13    the staff level would go participate at that
14    time.
15            Q.    Was disinformation, you know, how
16    to combat disinformation on social media, is
17    that discussed in these calls?
18                  MR. GARDNER:  Objection, calls for
19    speculation, lack of foundation.
20            A.    My understanding, my recollection
21    of the calls, at least the couple I was on, it
22    was generally the intel community talking about
23    what products they were developing, what
24    analysis they were doing, things along those
25    lines.
```

RIAN . SC LL   1/12/2023

1          Q.   The next sentence says:  The office

2     of the DNI official stated the teleconferences

3     continue to occur every two weeks after the 2020

4     elections, and were still taking place at the

5     time of this audit in August of 2022; do you see

6     that?

7          A.   I do.

8          Q.   Yeah, what -- are those calls still

9     going on today, every two weeks?

10          A.   I don't know.  That was -- that's

11     a -- THAT they're still continuing to November

12     of 2022 is news to me.  So yeah, I don't -- as

13     far as I know, we weren't participating in them.

14     I wouldn't be surprised if there was some calls

15     going on, but I don't recall.  The intel

16     community doesn't tell community things when I

17     was involved in that.

18          Q.   Why don't I e-mail you another

19     exhibit, 27.

20          MR. GARDNER:  John, if you just

21     spoke, I couldn't hear you, but sound wasn't

22     coming through.

23          MR. SAUER:  I'm sorry.  Yeah,

24     actually, I'm going to skip that one.  I meant

25     Exhibit 23, which I'm now e-mailing you.

**RIAN . SC LL   1/12/2023**

```
 1                    MR. GARDNER:  Not Exhibit 27?
 2                    MR. SAUER:  27 should look familiar
 3       to you.  We talked about it already.
 4                    MR. GARDNER:  Okay.  Just to be
 5       clear, are we talking about 27 now or a
 6       different exhibit?
 7                    MR. SAUER:  23.
 8                    MR. GARDNER:  Okay.  Don't have
 9       that yet, but as soon as we do.
10                    MR. SAUER:  And I'm putting it up
11       on the screen share, too.
12                    (Exhibit No. 23 was marked for
13       identification.)
14     BY MR. SAUER:
15             Q.    Here's a November 2021 report on
16       public comments by Director Easterly and The
17       Hill; do you see that?
18             A.    Yes.
19             Q.    It says:  The title is cyber agency
20       beefing up disinformation misinformation team;
21       correct?
22             A.    Correct.
23             Q.    And in the first paragraph says:
24       CISA is beefing up its disinformation and
25       misinformation team in the wake of a dismissive
```

RIAN . SC LL   1/12/2023

Page 336

```
 1    precedential election that saw a proliferation

 2    of misleading online information; correct?

 3            A.   Yeah, that's what the article says.

 4            Q.   Were you aware of efforts to beef

 5    up the misinformation team in November of '21?

 6            A.   No, not specific efforts.  I was

 7    over at the National Security Council at the

 8    time.

 9            Q.   When did you come back from that

10    detail?

11            A.   The detail officially ended in

12    early March, and I took some leave and started

13    back at CISA in early to mid April.

14            Q.   And the director says in the next

15    paragraph:  I'm actually going to grow and

16    strengthen my misinformation and disinformation

17    team; do you see that?

18            A.   I do.

19            Q.   I know you were on detail then, are

20    you aware of efforts to grow and strengthen the

21    team, for example, by adding new people?

22            A.   Again as I mentioned earlier in my

23    testimony, my understanding is there was some

24    budget increase that was proposed.  I don't -- I

25    don't know if that moved forward or not, from
```

RIAN . SC LL  1/12/2023

```
 1    the department.

 2              Q.   Is the -- do these remarks coincide

 3    with what you said was kind of the high point,

 4    when you had 15 people on the MDM team, was that

 5    around, you know, November 2021?

 6              A.   It's hard to say for sure.  I'm

 7    not -- I'm not sure how they're counting

 8    positions.  So I don't think we ever had 15

 9    federal employees.  So there's, you know, it

10    seems to me like they were probably counting

11    contract support, so -- so it's hard for me to

12    say exactly when that would have been.

13              Q.   You say there was, in this

14    timeframe, some attempt to get budget authority

15    to add people to the MDM team?

16              A.   It was my understanding that there

17    was a request for additional funds made to the

18    budget.  But again, I don't know, the budget

19    process is a little bit of a mystery to me, so

20    I'm not sure what exactly happened along the

21    way, if it ended up in the -- you know, in the

22    budget requests or what.

23              Q.   The next paragraph says that

24    Easterly noted that earlier this week she had a

25    meeting with six of the nation's experts in that
```

**RIAN . SC LL   1/12/2023**

Page 338

1    misinformation and disinformation space; do you

2    see that?

3            A.    I do.

4            Q.    **Do you know who she met with?**

5            A.    I don't.

6            Q.    **Do you know who are six of the**

7    **nation's experts in disinformation and**

8    **misinformation?**

9            A.    I mean, I could come up with a list

10    of experts.  I don't know if that's who she met

11    with.

12            Q.    **She stressed her concerns around**

13    **this being a top threat for CISA; correct?**

14            A.    That's what the article says, yep.

15            Q.    **And it goes on to quote her,**

16    **saying:  One could argue we're in the business**

17    **of critical infrastructure, and the most**

18    **critical infrastructure is our cognitive**

19    **infrastructure; correct?**

20            A.    That's what the quote says, yep.

21            Q.    **Do you -- do you -- do you -- does**

22    **the MDM team view protecting our cognitive**

23    **infrastructure as part of its mission?**

24            A.    No.  We look at the -- again, the

25    international policy there's, like, 16 sectors,

**RIAN . SC LL   1/12/2023**

```
 1    and those are the critical infrastructure

 2    factors we look to protect.  So we wouldn't

 3    include cognitive infrastructure in that list.

 4          Q.   One of them is election

 5    infrastructure; is that right?

 6          A.   Election infrastructure is actually

 7    a subsector of the government's stability

 8    structure.

 9          Q.   So if someone posts information on

10    social media implying that, you know, ballots

11    were being shredded by poll workers, what

12    infrastructure is that a threat to?

13               MR. GARDNER:  Objection, calls for

14    a hypothetical.

15          A.   Yeah, I would rather not answer

16    hypotheticals.

17          Q.   You have no instruction not to

18    answer, please answer the question.

19               MR. GARDNER:  Same objection.

20          A.   Yeah, I'm not answering a

21    hypothetical.

22          Q.   Please answer the questions.  If

23    someone posts on social media --

24          A.   Can you give me an example of the

25    post?
```

RIAN . SC LL   1/12/2023

1           Q.   If you look at all the posts we

2      looked at earlier in your e-mails, where, for

3      example, suppose someone posts the hammer and

4      scorecard conspiracy on social media, and

5      Director Krebs tells you to reach out to social

6      media platforms to see what they're doing about

7      it, how does the posting about the hammer and

8      scorecard narrative on social media threaten

9      critical infrastructure?

10           A.   So it -- so generally speaking,

11     this mis, mal-information threatens critical

12     infrastructure in a number of ways, it could be

13     operational impact, so in the case of the

14     elections, disrupting election operations,

15     things along those lines.  It could be human

16     impact, so again, see election example, there's

17     a lot of threats of violence made against

18     election officials, making it harder to do their

19     jobs.

20              So a multitude of ways that

21     disinformation could impact critical

22     infrastructure, like I said, we -- you know,

23     there's financial, there's reputational, there's

24     just a multitude of ways that this

25     disinformation could affect critical

RIAN . SC LL   1/12/2023

```
 1     infrastructure.
 2              Q.    Does infrastructure have a
 3     reputational interest?
 4              A.    Does infrastructure have a
 5     reputational interest?
 6                    MR. GARDNER:  Objection, vague.
 7                    THE WITNESS:  Yeah, could you be a
 8     little more specific.
 9     BY MR. SAUER:
10              Q.    You just used the word, you said
11     there's financial, there's reputational, what do
12     you mean by that?  What is the reputational
13     threat to critical infrastructure from social
14     media postings?
15              A.    Well, I wouldn't -- I wasn't saying
16     specifically from social media postings.  I was
17     saying from fraud, from mis, dis and
18     mal-information, a reputational risk could come
19     about if the integrity or the public confidence
20     in a particular sector was critical to that
21     sector's functioning.
22                    So I think the financial services
23     would probably be a good example.  So if there's
24     a loss of confidence by the American public in
25     financial services, financial systems of the
```

RIAN . SC LL   1/12/2023

Page 342

```
 1    United States, that could create national
 2    security concerns.
 3           Q.   Explain that to me, how would a
 4    loss of confidence in the financial system
 5    create national security concerns?
 6           A.   Lots of ways, you can have runs on
 7    banks, such as the banking, you could have, you
 8    know, other sorts of issues related to that, so
 9    yeah, so there's -- you know, if there's a loss
10    of confidence, if there's a run on banks and
11    there's a run on the financial systems, those
12    sorts of things can create physical harms,
13    operational harms.
14                So again, if we go back to the list
15    of potential harms, the reputational could lead
16    to operational, right?  So banks could be
17    overwhelmed with people showing up trying to
18    take money out.  They could be overwhelmed with
19    people showing up elsewhere at other facilities
20    and disrupt our operations.  So it's a full
21    range of potential risks.  A lot of these are
22    cascading, and so, yeah.
23           Q.   So is it part of the MDM team's job
24    and CISA's job to counter disinformation that
25    creates reputational risks to, for example, the
```

RIAN . SC LL   1/12/2023

Page 343

```
 1       financial services industry?
 2             A.   So again, our mission is to build
 3       resilience.  And so we would work -- if the
 4       financial services sector wanted us to work with
 5       them, to develop products to help them
 6       understand how mis, dis and mal-information
 7       could impact their -- their sector, we would --
 8       we would work with them on that yes.
 9             Q.   What sorts of mis, dis and
10       mal-information might undermine confidence in
11       the financial services?
12             A.   I don't know.  We haven't -- we
13       haven't dealt with that.  We're not financial
14       services experts, so we generally defer to a
15       department or agency.
16                  So in this case, Treasury, the
17       sector risk management agency responsible for
18       the financial services sector, so our expertise
19       with the MDM team is understanding MDM and
20       potentially to mitigate risks and to build
21       resilience, and so we wouldn't be the experts on
22       the actual financial services MDM.
23             Q.   So everything you just said about
24       the financial services was a lengthy
25       hypothetical?
```

RIAN . SC LL  1/12/2023

```
 1                 A.   Like I said, I don't like getting
 2       into hypotheticals.
 3                 Q.   You did for awhile, there.
 4                      Scrolling down in the same
 5       document, it says -- there's a quote from
 6       Director Easterly, where she says now --
 7                 MR. GARDNER:  Sorry, hold on.
 8                 MR. SAUER:  Can you guys hear me
 9       now?
10                 MR. GARDNER:  Yeah.
11                 MR. SAUER:  Okay.
12       BY MR. SAUER:
13                 Q.   Quote from Director Easterly, we
14       now live in a world where people talk about
15       alternative facts, post truth, which I think is
16       really, really dangerous, if you get to pick
17       your own facts, and it's particularly corrosive
18       when you talk about matters of election
19       security; right?
20                 A.   That's the quote, yeah.
21                 Q.   And is that kind of consistent with
22       what the MDM team does, it tries to prevent a
23       situation where Americans get to pick their own
24       facts?
25                 MR. GARDNER:  Objection, vague.
```

RIAN . SC LL   1/12/2023

```
 1              A.   I -- I -- that's -- no, that's not
 2       consistent with what we do.
 3              Q.   So that's -- that's not a -- you
 4       don't think Director Easterly's description is
 5       very fair?
 6              MR. GARDNER:  Objection,
 7       mischaracterizes the witness's previous
 8       testimony.
 9              A.   Yeah, if I understand your question
10       you said that CISA played a role in alternate
11       facts and post truths and things like that, and
12       CISA does not do that sort of thing.
13              MR. SAUER:  Sending you a few more
14       exhibits by e-mail.  You should be getting two
15       e-mails, the first one with three attachments,
16       and the second one with one.
17              It may take a minute.  It's loading
18       slowly on my end.  Okay.  I'm opening Exhibit
19       49, and I'll put that on the screen share.
20              (Exhibit No. 49 was marked for
21       identification.)
22       BY MR. SAUER:
23              Q.   Did you give an interview to the
24       Berkman Klein Center on June 18th of 2020?
25              A.   I don't recall the specific date,
```

RIAN . SC LL   1/12/2023

1    but I did give them an interview, so that's

2    probably about right.

3         Q.    And this is an interview by The

4    Breakdown.  And do you recall doing this

5    interview?

6         A.    I do.

7         Q.    On the third page of the document,

8    you say:  For us, in particular -- oops, it

9    didn't highlight well -- for us, in particular,

10   you see here, it's the second bullet -- for us,

11   in particular, we're trying to reduce the amount

12   that Americans engage with disinformation;

13   right?

14        A.    Yes.

15        Q.    Is that -- to your mind, is that a

16   good summary of what the MDM team does, it tries

17   to reduce the amount that Americans engage with

18   disinformation?

19        A.    That's the general idea behind

20   resilience-building, yeah.

21        Q.    What is engaging with

22   disinformation?

23        A.    Amplifying it, re-tweeting it,

24   resending it, things like that.

25        Q.    How about liking it on social

RIAN . SC LL   1/12/2023

```
 1    media, is that a form of engagement?

 2           A.    Yep.

 3           Q.    How about just reading it, is that

 4    a form of engagement?

 5           A.    No.

 6           Q.    So if you're reading disinformation

 7    is not engagement with it?

 8           A.    Correct.

 9           Q.    But -- but so engagement is taking

10    some affirmative step further, like you said,

11    amplify, like, repost, that's kind of

12    disinformation, in your view, I'm sorry, that's

13    engagement; correct?

14           A.    Yes.

15           Q.    And it's part of CISA's or the --

16    CISA's job to try to reduce the amount that that

17    happens; right?

18           A.    I wouldn't characterize it that

19    way.  I would say the ultimate goal of building

20    resilience is that people are less likely to

21    amplify mis and disinformation.

22           Q.    And that's what you're trying to do

23    at the MDM team, is reduce the amount that

24    Americans engage with disinformation?

25           A.    Yeah, through public awareness and
```

```
 1    public engagement and things like that, yep.
 2           Q.   The last page of the document, you
 3    say -- here there's a paragraph where you say:
 4    The question is, we have people calling for more
 5    monitoring of speech on platforms.  And then you
 6    go on to say:  We have to built the platforms
 7    that this is a lie and they need to take it down
 8    or we're asking the platforms to do that; right?
 9           A.   Yeah, that's what -- that's what
10    the quote is, yep.
11           Q.   Okay.  Is that, in fact, what the
12    MDM team is doing or I guess it was countering
13    foreign influence task force team was doing in
14    2020 when it was routing disinformation concerns
15    to Facebook, were you telling them to --
16           A.   No.
17           Q.   Go ahead.
18           A.   No.  Essentially what this quote is
19    saying is that in the general conversation about
20    how to address mis and disinformation there are
21    a lot of people saying that we should -- the
22    government should be the ones taking things
23    down, or the government should be asking the
24    platforms to do certain things, and that's not
25    necessarily the right spot for government to be.
```

RIAN . SC LL   1/12/2023

```
 1          Q.   So when you say:  We have to tell
 2    the platforms that this is a lie and they need
 3    to take it down, you're attributing that view to
 4    other people, not yourself?
 5          A.   Yeah, so that's generally what we
 6    hear a lot, you go out and you talk to different
 7    groups about disinformation that's just a common
 8    theme that we would hear from people that we
 9    should be doing.
10          And as I mentioned, the rest of the
11    quote is -- is -- it's just not a question of
12    what we should be doing.  There's lots of issues
13    and things like that there.  So that's what I
14    was trying to get across there.
15          (Exhibit No. 52 was marked for
16    identification.)
17    BY MR. SAUER:
18          Q.   Exhibit 52.
19          A.   52?  I've got it.
20          MR. SAUER:  How long have we been
21    on the record.
22          MR. SCOTT:  So I have an unofficial
23    tally of six hours and 32 minutes.
24          MR. SAUER:  Okay.  Exhibit --
25          MR. GARDNER:  I agree.
```

RIAN . SC LL   1/12/2023

Page 350

```
 1   BY MR. SAUER:
 2            Q.   Exhibit 52, if we go in this
 3   e-mail -- excuse me, there's an e-mail from
 4   Lauren Protentis copying Allison Snell and Geoff
 5   Hale and Rob Schaul to a contact at Google; do
 6   you see that?
 7            A.   Mm-hmm.
 8            Q.   And she says, this is in February
 9   17th of 2022; do you see that?
10            A.   I do.
11            Q.   And she says:  Hi Richard, I hope
12   this e-mail finds you well.  The Department of
13   Treasury has asked our team for an appropriate
14   POCs -- I assume that means points of contact --
15   to discuss social media and influence matters.
16   We would like to make a connection to Google, if
17   you're amenable; do you see that?
18            A.   I do.
19            Q.   What -- do you know why Treasury
20   reached out to CISA to get a contact for -- at
21   social media platforms to discuss social media
22   and influence matters?
23            MR. GARDNER:  Objection, lack of
24   foundation.
25            A.   I -- I don't know why Treasury
```

RIAN . SC LL   1/12/2023

Page 351

```
1     reached out, but CISA obviously, as we discussed
2     earlier, has points of contact in various social
3     media companies.
4          Q.   Does that happen from time to time,
5     that other agencies would reach out to CISA and
6     say:  Can you put us in touch with a social
7     media contact?
8          A.   It's -- it's happened a couple
9     times.  I don't -- I don't -- I don't recall how
10    many, and it's -- it's been awhile, I think,
11    but -- so if that qualifies as time to time.
12         Q.   Do you know what Lauren Protentis
13    meant when she talked about social media
14    influence matters, do you know what that means?
15              MR. GARDNER:  Objection, calls for
16    speculation.
17         A.   Yeah, I don't know what she means.
18         Q.   Were you on detail when this e-mail
19    was sent?
20         A.   I was.
21         Q.   Do you remember any discussions
22    with anyone about the Department of Treasury
23    reaching out to discuss -- I'm sorry -- wanting
24    to be put in place in contact with social media
25    platforms?
```

RIAN . SC LL   1/12/2023

Page 352

```
 1             A.   I don't, no.

 2             Q.   There's a follow up e-mail from

 3    Ms. Protentis, saying:  Apologies for the second

 4    e-mail, this is somewhat time sensitive.  Do you

 5    know why Treasury was raising a time sensitive

 6    concern -- concern?

 7                  MR. GARDNER:  Objection, calls for

 8    speculation.

 9             A.   I don't know.

10             Q.   Do you know if Treasury ever

11    connected with the social media platform?

12             A.   I don't know.

13                  (Exhibit No. 46 was marked for

14    identification.)

15  BY MR. SAUER:

16             Q.   I'm pulling up Exhibit 46.  It

17    should be in the second e-mail I sent you a

18    moment ago.

19             A.   I got it.

20             Q.   Here's a draft report to the CISA

21    director, dated June 22nd, 2022; correct?

22             A.   Yes.

23             Q.   This is from the CISA cyber

24    security advisory committee; correct?

25             A.   It appears so, yep.
```

RIAN . SC LL   1/12/2023

Page 353

```
 1              Q.    I believe you said in your
 2      interrogatory responses that this also has an
 3      MDM subcommittee; is that right?
 4              A.    Yes, that's correct.
 5              Q.    Do you participate in those
 6      committees, either the security advisory
 7      committee or the MDM subcommittee?
 8              A.    I don't.
 9              Q.    Who participates from -- does
10      anyone participate from the MDM team in those --
11      those committees?
12              A.    Not from the MDM team, no.
13              Q.    So no one on the MDM team
14      participates in the committees?
15              A.    No.
16              Q.    Who from CISA participates, do you
17      know?
18              A.    Kim Wyman is, as I mentioned
19      earlier, I think, that was one of her
20      responsibilities, and then Geoff Hale
21      participated.
22              Q.    And then who else, from outside
23      CISA, participates in these meetings?
24                    MR. GARDNER:  Objection, lack of
25      foundation.
```

RIAN . SC LL  1/12/2023

```
 1                A.   I don't know who's -- I don't know
 2      who's in the -- the participant list.  I believe
 3      it's all publicly available online.
 4                Q.   Turning to the second page of this
 5      document.
 6                A.   Okay.  Recommendations?
 7                Q.   Yeah.  First bullet point, do you
 8      see there, it says:  CISA should focus on MD --
 9      I assume that's mis and disinformation?
10                A.   Is that a question?
11                Q.   Yeah.  Is that --
12                MR. GARDNER:  Objection, calls for
13      speculation, lack of foundation.
14  BY MR. SAUER:
15                Q.   Does MD refer to mis and
16      disinformation?
17                A.   In the context, I would say that it
18      does, but I don't -- I don't know what they
19      meant by it.
20                Q.   It says:  CISA should focus on MD
21      that risks undermining critical functions of
22      American society, including sub-bullet one, MD
23      that suppresses election participation or
24      falsely undermines confidence in election
25      procedures and outcomes; correct?
```

RIAN . SC LL   1/12/2023

1          A.    Correct.

2          Q.    **So the advisory committee is**

3    **recommending that CISA focus on election-related**

4    **disinformation; right?**

5              MR. GARDNER:  Objection, lack of

6    foundation.

7          A.    That's how I would read that

8    sentence, correct.

9          Q.    **Okay.  Second bullet point says:**

10   **MD that undermines critical functions carried**

11   **out by other key democratic institutions, such**

12   **as the courts or by other sectors, such as the**

13   **financial system or public health measures;**

14   **right?**

15         A.    That's what it says, yep.

16         Q.    **You talked about the financial**

17   **system, earlier, and interestingly that's raised**

18   **in this recommendation.  Are you aware of CISA**

19   **doing anything to address MD that undermines the**

20   **financial system?**

21         A.    So we've -- as I mentioned earlier,

22   we -- we're working with Treasury to develop a

23   product to help the financial services sector

24   understand MDM risks to the sector.

25         Q.    **What risks have there been to that**

RIAN . SC LL   1/12/2023

```
 1     sector?  And I don't remember any runs on banks,

 2     you know, recently, what risks?

 3          A.   So again, as I mentioned earlier,

 4     we're not the experts in financial services, so

 5     we, you know, depend on the financial services

 6     sector to kind of work us through, help us work

 7     through what those risks are, we're pretty early

 8     in the process, so we're still kind of working

 9     through those sorts of questions.

10          Q.   Do you know what, what was the

11     impetus for doing that product in the first

12     place?  Was someone worried about MDM that would

13     undermine financial services?

14          A.   I -- I don't -- I don't know why

15     Treasury reached out to us and discussed that, I

16     don't recall.

17          Q.   Is that unrelated to the last

18     e-mail we saw, where they wanted to talk to

19     social media platforms about social media and

20     influence matters?

21          MR. GARDNER:  Objection, calls for

22     speculation, lack of foundation.

23          A.   Yeah, I don't know.  I don't know

24     if the two are connected.

25          Q.   Okay.  The bottom of the same page,
```

**RIAN . SC LL   1/12/2023**

```
 1      there's a bullet recommending that CISA should

 2      consider MD across the information ecosystem;

 3      right?

 4           A.    Yep.

 5           Q.    And it goes down in the second

 6      sub-bullet there, it says:  CISA should approach

 7      the MD problems with the entire information

 8      ecosystem in mind, this includes social media

 9      platforms of all sizes, mainstream media, cable

10      news, hyper partisan media, talk radio and other

11      online resources; do you see that?

12           A.    I do.

13           Q.    Has CISA been taking steps to

14      consider or address misinformation in these

15      other venues, besides social media, for example,

16      mainstream media?

17           A.    No.  What I would say is that,

18      generally speaking, we -- we -- I believe it's

19      generally too much of a focus on just the social

20      media platform, and MDM that kind of flows

21      through social media.  When potentially it's MDM

22      that flows through all different sources of

23      media communication.

24                So that's kind of how we think

25      about it, we try not to just focus on MDM, but
```

RIAN . SC LL   1/12/2023

Page 358

```
1    we don't do anything counter to your point.
2    Again, we built resilience helping people
3    understand what's going on and how to mitigate
4    the risks.
5            Q.   Do you try to build resilience to
6    MDM on -- in cable news?
7            A.   I mean, generically speaking, all
8    of our resilience activity would be useful
9    regardless of how -- we try to make it as broad
10   as possible so it's applicable anywhere that
11   somebody may come across MDM.
12           Q.   How about hyper partisan media,
13   what does that mean, do you know?
14           MR. GARDNER:  Objection, calls for
15   speculation.
16           A.   I don't know what it's meant in
17   this context, but again, we try to be general
18   enough in our kind of guidance to help people
19   understand.
20           We're essentially agnostic of where
21   it's coming from, we just want people to be able
22   to understand where -- what it is, how it works,
23   and things they can do to mitigate those risks.
24           Q.   I take it, then, the MDM team would
25   agree with this recommendation that CISA should
```

RIAN . SC LL   1/12/2023

```
 1      approach the MDM problem, you know, with a whole

 2      information universe in mind, including

 3      mainstream media, cable news, hyper partisan

 4      media, talk radio, and other online resources?

 5                  MR. GARDNER:  Objection, form.

 6            A.    What I would say, from a

 7      resilience-building standpoint, we generally

 8      don't -- try not to hone too much on any one

 9      particular medium for communication.  There's

10      obviously tactics that fall across multiple, but

11      we don't generally try to hone in on any one in

12      particular.

13                  (Exhibit No. 59 was marked for

14      identification.)

15   BY MR. SAUER:

16            Q.    I'm pulling up Exhibit 59.

17            A.    Okay.

18            Q.    And then here's a cyber security

19      advisory committee e-mail to a group, I assume

20      it's the committee members; does that look right

21      to you or do you not know?

22                  MR. GARDNER:  Objection, lack of

23      foundation, calls for speculation.

24            A.    Yeah, I don't -- I don't know who

25      all the members are, so it would be hard for me
```

```
 1     to say if that's the case.

 2              Q.    Here's some people that are copied

 3     on this e-mail from the CISA cyber security

 4     advisory committee e-mail, the first one is Kate

 5     Starbird; right?

 6              A.    Yeah.

 7              Q.    Do you know who she is?

 8              A.    She's a professor at the University

 9     of Washington.

10              Q.    She was involved in the Election

11     Integrity Partnership that we talked about

12     earlier; right?

13              A.    I believe so, yeah.

14              Q.    Next one is Vijaya Gadde or Gadde,

15     do you know who she is?

16              A.    I don't know.

17              Q.    Was she a senior official at

18     Twitter, at the time, do you know?

19              MR. GARDNER:  Objection, calls for

20     speculation.

21              A.    I don't know.

22              Q.    I see you've got Kim Wyman and

23     Geoff Hale on this e-mail.  They were the two

24     that you testified earlier are involved in the

25     cyber security advisory committee for CISA;
```

RIAN . SC LL   1/12/2023

```
 1    right?
 2          A.    Yep.
 3          Q.    And then lower down, there's a list
 4    of -- we have identified a list of potential
 5    subject matter experts to potentially brief at
 6    our biweekly meetings, bios attached; do you see
 7    that?
 8          A.    I do.
 9          Q.    So -- and that's a list of, I take
10    it, experts who would provide briefings at the
11    advisory committee's meetings; is that how you
12    read that?
13                MR. GARDNER:  Objection, lack of
14    foundation, calls for speculation.
15          A.    So the paragraph reads:  Identify a
16    list of subject matter experts.  Please be
17    prepared to provide your feedback.  I'm sorry,
18    what was your question again?
19          Q.    Let me just ask:  Is the third
20    expert on the list is Ren e DiResta; right?
21          A.    Yeah.
22          Q.    And she's at Stanford Internet
23    Observatory; right?
24          A.    Correct.
25          Q.    You were involved in conversations
```

RIAN . SC  LL   1/12/2023

```
 1    with her, because she was a part of the Election

 2    Integrity Partnership; right?

 3         A.   We should have Stanford Internet

 4    Observatory, we were certainly involved in

 5    conversations with her, as I talked about

 6    earlier.

 7         Q.   And those conversations were

 8    related to the commencement of the Election

 9    Integrity Partnership; right?

10         A.   I -- I don't know if she was

11    involved in the early conversations, before it

12    stood up.  I know Stamos was there, I don't know

13    if Ren e was there in those early conversations.

14         Q.   Was she in some conversations

15    between -- with you about the EIP?

16         A.   As I mentioned before, she briefed

17    us about the 2022 EIP work.  I don't recall

18    conversations in 2020, but again, it wouldn't

19    surprise me if she was involved in those.

20              MR. SAUER:  Let's go off the

21    record.

22              THE VIDEOGRAPHER:  The time is now

23    5:46 p.m.  We are off the record.

24              (Recess.)

25              THE VIDEOGRAPHER:  The time is now
```

RIAN . SC LL   1/12/2023

```
 1    5:53 p.m.  We're back on the record.
 2              MR. SAUER:  Are we back on the
 3    record?
 4              THE VIDEOGRAPHER:  Yes.
 5              MR. SAUER:  Oh, sorry.
 6              (Exhibit No. 19 was marked for
 7    identification.)
 8  BY MR. SAUER:
 9         Q.   Exhibit 19, I put it on the screen
10    share.
11              Here's a proposal from CIS, Center
12    For Internet Security, to create an election
13    misinformation reporting portal, and it talks
14    about the benefits to election officials being
15    in a single place for reporting mis and
16    disinformation across multiple social media
17    platforms.
18              Do you know if this proposal was
19    ever implemented to create a single election
20    misinformation reporting portal?
21         A.   I -- I don't know.  I'm not
22    entirely sure.  I don't know that I've seen
23    this, I don't know if I've seen this proposal
24    before, so I'm not certain.
25         Q.   So you don't know?
```

RIAN . SC LL   1/12/2023

1          A.    It sounds like what they were

2     trying to do, that we discussed earlier, but I

3     don't know to what extent it was, to your

4     question, to what extent it was stood up or

5     established.

6          **Q.    You don't know to what extent that**

7     **CIS managed to implement this proposal for an**

8     **elections misinformation reporting portal?**

9          A.    Yeah, or if they -- if they did it

10    at all.

11          (Exhibit No. 21 was marked for

12    identification.)

13    BY MR. SAUER:

14          **Q.    Exhibit 21, it's on the screen**

15    **share, this is a CNN political report, September**

16    **of 2022.  If you go to the third -- fourth page**

17    **of the document, in this report it says:  While**

18    **the anti-doxing and foreign influence parts of**

19    **the proposal remain stalled, work on the online,**

20    **quote, portal for election officials to flag**

21    **misinformation to social media platforms**

22    **predated the proposal and continues today,**

23    **according to people familiar with it.**

24          **So are you aware of ongoing work,**

25    **at least as of September of 2022, to set up an**

RIAN . SC LL  1/12/2023

```
 1      online portal for election officials to flag

 2      misinformation to social media platforms.

 3              A.   So I think as I testified to

 4      earlier, my understanding is that CIS did do

 5      something along the lines, I just don't know the

 6      extent of it.

 7              Q.   And you don't know whether or when

 8      it -- it might be completed?

 9              A.   Correct.

10              (Exhibit No. 24 was marked for

11      identification.)

12   BY MR. SAUER:

13              Q.   Exhibit 24, here's a CISA bulletin

14      that's on your website called --

15              A.   Mm-hmm.

16              Q.   -- misinformation, you go to the

17      third page.

18              A.   Correct.

19              Q.   Are you familiar with this

20      bulletin?

21              A.   Actually, I think this may be our

22      website.  I'm not sure if it's a bulletin.

23              Q.   It is on your website.  I don't

24      know if it's a bulletin, either.

25                  Let me ask you this:  Here on the
```

RIAN . SC LL   1/12/2023

Page 366

```
 1      third page, it says:  Bridging election
 2      stakeholders and social media, and under there
 3      it says:  The MDM team serves as a switchboard
 4      for routing disinformation concerns to
 5      appropriate social media platforms and law
 6      enforcement; correct.
 7            A.   It does, yep.
 8            Q.   You guys refer stuff to law
 9      enforcement, too?
10            A.   Yes, if there was -- particularly
11      if there was violence, promoted in whatever was
12      sent to us from an election official.
13            Q.   Anything else involved that would
14      be reported to law enforcement, other than
15      threats of violence?
16            A.   So we would generally share
17      whatever we received from the election officials
18      with the FBI, in case there was an ongoing
19      investigation related to whatever it was that we
20      forwarded to them.
21            Q.   And is this still true, I mean,
22      it's on your website today, is it still true
23      that the MDM team serves as a switchboard for
24      routing disinformation concerns to appropriate
25      social media platforms?
```

RIAN . SC LL   1/12/2023

1          A.    No.   Like I said earlier, we didn't
2    do this in 2022, so we should change that to
3    served.   Thank you for finding that.
4          **Q.    And I take it you -- you testified**
5    **earlier that that decision was made in late**
6    **April or early May of 2022?**
7          A.    That's my recollection.
8          **Q.    Do you know why the decision was**
9    **made?**
10         A.    I don't, but as I also mentioned,
11   it was something that we were comfortable with,
12   from the MDM team perspective, because of heavy
13   burden on our resources.
14         **Q.    You anticipate serving in a**
15   **switchboard in the future or do you not know**
16   **whether you will?**
17         A.    That's not my decision to make,
18   so -- so I don't want to speak on behalf of the
19   director or future directors.
20         **Q.    You don't know what the director's**
21   **plans are for the future when it comes to**
22   **serving as a switchboard for routing**
23   **disinformation concerns?**
24         A.    I don't know what direct --
25   Director Easterly's position is, and obviously I

RIAN . SC LL   1/12/2023

```
 1    wouldn't know any future director's position on
 2    that, either.
 3               (Exhibit No. 6 was marked for
 4    identification.)
 5    BY MR. SAUER:
 6         Q.    Exhibit 6?
 7         A.    Okay.
 8         Q.    Here's a public comments by Ren e
 9    DiResta about -- about the Election Integrity
10    Project.  And let me put it on the screen share.
11               On the third page, call -- which is
12    called page 2 of the transcript, she talks -- or
13    sorry, it's quoting Alex Stamos, saying that the
14    EIP started with our team at Stanford sending a
15    group of interns to work with CISA; right?  Do
16    you see that?
17         A.    Yep.
18         Q.    It talks about the sort of stuff we
19    talked about the gap earlier, about how there's
20    a lack of capability, about disinformation.
21               But Stamos says they lack a funding
22    and legal authorization to do the kinds of work
23    that will be necessary to truly understand how
24    election disinformation was operated; correct?
25         A.    That's what he says, yep.
```

**RIAN . SC LL   1/12/2023**

```
 1          Q.   And he goes on to say:  Our
 2    partners in government, most particularly those
 3    in CISA and DHS, but also state and local
 4    governments whom we worked with; correct?
 5          A.   He says that, yes.
 6          Q.   Were CISA and DHS partners of the
 7    EIP, in your view?
 8          A.   We generally describe any external
 9    organization that we have a relationship as a
10    partner.  So I think that probably, you know --
11    so yeah.
12          Q.   Okay.  So in a sense that you were
13    a partner of the EIP, fair to say?
14          A.   Again, we would say that of any
15    external entity that we have a relationship
16    with.
17               (Exhibit No. 7 was marked for
18    identification.)
19    BY MR. SAUER:
20          Q.   On the screen share I put Exhibit
21    7, which is now public comments from Ren e
22    DiResta from the EIP; do you see it up there?
23          A.   Sorry, you are an on Exhibit 7?
24          Q.   Yeah.
25          A.   Yep.
```

RIAN . SC  LL    1/12/2023

```
 1              Q.   If you go to page 2 of the

 2    transcript, which is page 4 of the PDF, and

 3    it -- it quotes Ren e DiResta, again, talking

 4    about the students from Stanford doing an

 5    internship at CISA and identifying a gap, right,

 6    that was the word we used earlier?

 7              A.   Mm-hmm.

 8              Q.   It talks about how there was no

 9    clear federal lead to coordinate, and it wasn't

10    prepared to identify it; correct?

11              A.   I don't --

12              Q.   It says that gap, the federal

13    government wasn't prepared to identify and

14    analyze election mis and disinfo; correct?

15              A.   Correct.  That's what she says,

16    yep.

17              Q.   And she says there was no clear

18    federal lead to coordinate the work and so

19    forth?

20              A.   Correct.

21              Q.   And she says:  There were unclear

22    legal authorities, including very clear first

23    amendment questions; right?

24              A.   That's what she says.

25              Q.   That's a reference to the federal
```

RIAN . SC LL  1/12/2023

1    government taking the leadership role and
2    analyzing to respond to election mis and
3    disinformation; correct?
4           A.   I'm not seeing that in here, is
5    that a sentence or are you asking me to --
6           Q.   I'm just --
7           A.   -- interpret what Ren e is saying?
8           Q.   Yeah, interpret, is that how you
9    read it?  That's how I read it.
10          MR. GARDNER:  I'm sorry, can you --
11   John, can you re-ask that question?
12   BY MR. SAUER:
13          Q.   Let me ask you this:  Were there
14   any discussions of -- that you're aware of,
15   relating to the EIP, that related to unclear
16   legal authorities, including very real first
17   amendment questions, when it comes to direct
18   involvement of the federal government?
19          A.   I'm not aware, but, in general,
20   conversations about MDM, first amendment comes
21   up.
22          Q.   Did it come up with the CISA
23   interns who originated the idea of the EIP?
24          A.   I don't -- I don't recall that
25   being the nature of the conversation.  I think

**RIAN  . SC  LL   1/12/2023**

```
 1    it was really mostly around gaps for election

 2    officials.  But as you probably picked up, I

 3    don't remember in detail the conversations that

 4    well that long ago.

 5              MR. SAUER:  I think that's all the

 6    questions I have.

 7              MR. GARDNER:  Well, the government

 8    has no questions.  We just, again, we emphasize

 9    that the witness will read and sign.

10              THE VIDEOGRAPHER:  This

11    concludes -- this concludes the deposition of

12    Brian Scully.  The time is now 6:04 p.m.  We are

13    off the record.

14              THE REPORTER:  Mr. Sauer, when do

15    you need the transcript?

16              MR. SAUER:  Could we have it

17    expedited within two days, that's -- Ben, I

18    think our standard request for these is two

19    business days?

20              MR. GARDNER:  Yes.

21              THE REPORTER:  And Mr. Gardner,

22    will you be purchasing a copy.

23              MR. GARDNER:  Yes, ma'am, we'll be

24    purchasing a copy.

25              THE REPORTER:  And you want the
```

**RIAN . SC LL    1/12/2023**

**Page 373**

```
 1    same delivery?

 2                MR. GARDNER:  Yes, ma'am.

 3                THE REPORTER:  Is it okay if I

 4    e-mail you spelling questions on Monday?

 5                MR. GARDNER:  You have until

 6    Tuesday, with the holiday.

 7                (Signature having not been waived,

 8    the deposition of BRIAN SCULLY was concluded at

 9    6:04 p.m.)

10            ACKNOWLEDGMENT OF DEPONENT

11        I, BRIAN SCULLY, do hereby acknowledge

12    that I have read and examined the foregoing

13    testimony, and the same is a true, correct and

14    complete transcription of the testimony given by

15    me and any corrections appear on the attached

16    Errata sheet signed by me.

17

18    _____    _____

19        (DATE)                  (SIGNATURE)

20

21

22

23

24

25
```

RIAN  . SC  LL   1/12/2023

```
 1            CERTIFICATE OF SHORTHAND REPORTER

 2            I, Cassandra E. Ellis, Registered

 3   Professional Reporter, the officer before whom the

 4   foregoing proceedings were taken, do hereby

 5   certify that the foregoing transcript is a true

 6   and correct record of the proceedings; that said

 7   proceedings were taken by me stenographically and

 8   thereafter reduced to typewriting under my

 9   supervision; and that I am neither counsel for,

10   related to, nor employed by any of the parties to

11   this case and have no interest, financial or

12   otherwise, in its outcome.

13            IN WITNESS WHEREOF, I have hereunto set

14   my hand this 17th day of January 2023.

15

16

17   _____

18   CASSANDRA E. ELLIS, CSR-HI, CSR-VA, CCR-WA, RPR,

19   CRR

20   REALTIME SYSTEMS ADMINISTRATOR

21   NOTARY PUBLIC

22

23

24

25
```

**RIAN . SC LL   1/12/2023**

```
 1                              LEXITAS LEGAL

 2

 3     January 17, 2023

 4

 5     JOSHUA E. GARDNER, ESQUIRE
       DEPARTMENT OF JUSTICE
 6     1100 L STREET, NORTHWEST
       WASHINGTON, D.C.  20530

 7

 8     IN RE: THE STATE OF MISSOURI, et al. v. JOSEPH R.
              BIDEN, JR., et al.

 9

10     Dear JOSHUA E. GARDNER:

11     Please find enclosed your copies of the deposition of

12     BRIAN J. SCULLY taken on January 12, 2023 in the

13     above-referenced case. Also enclosed is the original

14     signature page and errata sheets.

15     Please have the witness read your copy of the

16     transcript, indicate any changes and/or corrections

17     desired on the errata sheets, and sign the signature

18     page before a notary public.

19     Please return the errata sheets and notarized

20     signature page within 30 days to our office at 1608

21     Locust Street, Kansas City, MO 64108 for filing.

22     Sincerely,

23

24     Lexitas Legal

25     Enclosures
```

RIAN . SC LL  1/12/2023

Page 376

```
 1                        ERRATA SHEET

 2    Witness Name: BRIAN J. SCULLY

 3    Case Name: THE STATE OF MISSOURI, et al. v. JOSEPH R.
                 BIDEN, JR., et al.
 4    Date Taken: JANUARY 12, 2023

 5    Page #_____   Line #_____

 6    Should read:  _____

 7    Reason for change:  _____

 8

 9    Page #_____   Line #_____

10    Should read:  _____

11    Reason for change:  _____

12

13    Page #_____   Line #_____

14    Should read:  _____

15    Reason for change:  _____

16

17    Page #_____   Line #_____

18    Should read:  _____

19    Reason for change:  _____

20

21    Page #_____   Line #_____

22    Should read:  _____

23    Reason for change:  _____

24

25    Witness Signature:  _____
```

**RIAN . SC LL  1/12/2023**

**Page 377**

```
 1    STATE OF _____)

 2

 3    COUNTY OF _____)

 4

 5    I, BRIAN J. SCULLY, do hereby certify:

 6          That I have read the foregoing deposition;

 7          That I have made such changes in form

 8    and/or substance to the within deposition as might

 9    be necessary to render the same true and correct;

10          That having made such changes thereon, I

11    hereby subscribe my name to the deposition.

12          I declare under penalty of perjury that the

13    foregoing is true and correct.

14          Executed this _____ day of _____,

15    20___, at _____.

16

17

18

19                         _____

20                         BRIAN J. SCULLY

21

22                         _____

23                         NOTARY PUBLIC

24    My Commission Expires:

25
```

RIAN . SC LL   1/12/2023

| **A** | | | |
|---|---|---|---|
| A-a-r-o-n | 205:24 | 105:3,5 | **addition** |
| 103:6 | 206:7,22 | 130:17 | 75:9 |
| A-l-e-x | 207:8 | 137:20 | 184:13 |
| 167:6 | 230:13 | 278:25 | 235:23 |
| A-y-e-l-e-t | 281:3,22 | 304:5 | **additional** |
| 187:18 | 298:3,4 | 312:12 | 40:22 41:3 |
| **a.m** 1:16 | **accurate** | 325:8 | 88:14 |
| 10:4 | 290:22 | 329:15 | 209:17 |
| 226:19 | 291:5 | 331:17 | 210:3 |
| **Aaron** 103:2 | 315:13 | 332:14 | 220:7,17 |
| 103:5,6 | **acknowledge** | **activity** | 222:19 |
| 112:16,17 | 373:11 | 64:25 | 303:9,24 |
| 112:17 | **ACKNOWLE...** | 152:10 | 337:17 |
| 157:19,21 | 373:10 | 166:1 | **Addition...** |
| 157:21 | **acronym** | 358:8 | 117:25 |
| 217:4 | 307:24 | **actor** 37:23 | **address** |
| 227:18 | **acronyms** | 259:14 | 66:15 |
| **abbrevia...** | 307:24 | 270:17,22 | 120:8,12 |
| 316:24 | **act** 35:6 | **actors** 27:12 | 120:13 |
| **ability** | 229:6 | 27:21 38:1 | 128:11 |
| 92:24,25 | 240:3 | 38:2,4,8 | 131:18 |
| 93:19 94:6 | **acted** 165:13 | 38:10,12 | 137:21 |
| 94:11,17 | **acting** 121:3 | 39:21 | 157:5 |
| **able** 358:21 | **action** 94:12 | 246:2 | 198:21 |
| **above-re...** | 95:14 | 256:20 | 203:19 |
| 375:13 | 177:9,13 | 271:6 | 205:6 |
| **absence** 19:5 | 178:6,6 | 273:24 | 320:8 |
| 20:6 | 200:14 | 323:23 | 324:12 |
| **absolutely** | 288:11 | **actual** 36:19 | 328:24 |
| 287:22 | **actioned** | 61:16 | 348:20 |
| **academia** | 164:10 | 155:15 | 355:19 |
| 44:6 | 165:3 | 193:15 | 357:14 |
| **academic** | 168:14 | 255:11 | **addressed** |
| 46:10,21 | 177:4 | 258:10 | 163:20 |
| 47:2 | **actions** 40:9 | 270:25 | **addresses** |
| **accident...** | 40:15,25 | 274:5 | 214:19,24 |
| 262:4 | 240:8 | 275:2 | **addressing** |
| **accidently** | 242:4 | 343:22 | 58:24 |
| 293:8 | 279:5 | **Adam** 33:12 | 151:7 |
| **account** | **active** 19:9 | 276:20 | 278:12 |
| 206:17 | 33:24 | **add** 171:2 | 322:6 |
| 207:5 | 125:22 | 290:4 | 332:5 |
| 230:13 | 137:20 | 297:2 | **administ...** |
| 281:11,18 | **actively** | 300:8,12 | 25:3 |
| 294:9,13 | 287:18,18 | 331:7 | **administ...** |
| 295:11 | **activities** | 337:15 | 25:4 |
| 296:21 | 16:8 21:14 | **adding** | 239:16 |
| **accounts** | 43:21 | 119:14 | 313:16,22 |
| | 69:22 90:9 | 336:21 | 314:4,10 |
| | | | **administ...** |
| | | | 234:25 |
| | | | **Administ...** |
| | | | 2:8 374:20 |
| | | | **admonition** |
| | | | 196:7 |
| | | | **adopt** 132:18 |
| | | | **adversarial** |
| | | | 270:17,22 |
| | | | 271:5 |
| | | | **advisor** |
| | | | 195:19 |
| | | | 305:5 |
| | | | **advisory** |
| | | | 37:17 |
| | | | 352:24 |
| | | | 353:6 |
| | | | 355:2 |
| | | | 359:19 |
| | | | 360:4,25 |
| | | | 361:11 |
| | | | **advocating** |
| | | | 132:17 |
| | | | **aegis** 73:22 |
| | | | **affect** 57:21 |
| | | | 340:25 |
| | | | **affirmative** |
| | | | 347:10 |
| | | | **Afghanistan** |
| | | | 322:2 |
| | | | 324:21 |
| | | | **afraid** |
| | | | 292:10,17 |
| | | | 307:20 |
| | | | **afternoon** |
| | | | 163:7 |
| | | | 173:17,19 |
| | | | 176:1 |
| | | | 284:23,25 |
| | | | **afters** |
| | | | 122:20 |
| | | | **agencies** |
| | | | 25:11,17 |
| | | | 25:22 |
| | | | 37:12 |
| | | | 73:11,16 |
| | | | 73:21 92:2 |
| | | | 92:10,14 |
| | | | 92:25 |

RIAN . SC LL   1/12/2023

| | | | | |
|---|---|---|---|---|
| 93:20 | 272:21 | 293:14 | **alleged** | **analyses** |
| 95:15 | 275:3,24 | 297:7 | 200:3 | 125:24 |
| 136:24 | **agents** | 298:19 | 217:8 | **analysis** |
| 245:25 | 220:11 | 302:4,15 | 225:16 | 16:22 26:3 |
| 246:13 | **agnostic** | 315:21 | **Alliance** | 43:20,21 |
| 250:5,17 | 358:20 | 348:17 | 47:7 | 43:24 |
| 250:21 | **ago** 101:5 | **aided** 118:1 | **Allison** 28:8 | 59:16 60:6 |
| 256:5 | 295:15 | 118:15 | 253:16 | 60:17 |
| 258:3,11 | 352:18 | **aimed** 17:5 | 350:4 | 123:1 |
| 262:19 | 372:4 | **al** 1:6,10 | **allow** 151:14 | 144:16,16 |
| 264:17 | **agree** 42:5,7 | 10:6,8 | 289:2 | 147:6,9 |
| 267:6,19 | 95:19 | 375:8,8 | **allows** 148:4 | 172:1 |
| 314:15 | 349:25 | 376:3,3 | **alternate** | 187:15 |
| 315:2 | 358:25 | **alert** 27:5 | 62:21 | 225:13 |
| 317:12 | **agreed** 86:20 | **Alethia** | 345:10 | 333:24 |
| 327:15 | **agreement** | 47:14 | **alternative** | **analyst** |
| 351:5 | 2:2 212:7 | **Alex** 43:14 | 344:15 | 28:19 |
| **agency** 4:7 | **ahead** 8:18 | 70:5,14 | **amenable** | 43:14,16 |
| 8:12 15:25 | 53:12 73:5 | 72:16 76:9 | 350:17 | 167:25 |
| 72:2 90:17 | 87:23 | 76:14,15 | **amended** 6:22 | 171:18 |
| 91:5 94:21 | 89:14 | 77:8,17 | 190:18 | **analysts** |
| 95:5 | 113:3 | 86:2 88:8 | **amendment** | 108:12 |
| 141:24 | 122:2 | 89:6 99:10 | 95:14 | 109:18,22 |
| 178:11 | 124:8 | 102:2 | 153:5 | 187:10 |
| 248:10 | 126:11 | 111:22 | 370:23 | **analysts'** |
| 250:23 | 141:15 | 116:21,24 | 371:17,20 | 29:3 |
| 251:2 | 144:6 | 117:2,8,16 | **American** | **analytic** |
| 284:16 | 146:20 | 134:21 | 46:25 | 44:12 |
| 286:14 | 161:23 | 136:5,9,13 | 341:24 | 184:4 |
| 315:9 | 162:5 | 136:15 | 354:22 | **analyze** |
| 316:18,24 | 173:2,9 | 139:7,11 | **Americans** | 182:9 |
| 317:3 | 195:4 | 139:21,23 | 280:11,20 | 370:14 |
| 335:19 | 203:25 | 142:12 | 280:23 | **analyzing** |
| 343:15,17 | 204:5 | 166:19 | 344:23 | 371:2 |
| **agenda** 21:9 | 215:21 | 167:3,6 | 346:12,17 | **and/or** |
| 30:18,20 | 218:14,15 | 171:11,12 | 347:24 | 375:16 |
| 30:22,23 | 221:7 | 171:14 | **amount** 50:23 | 377:8 |
| 34:5 | 222:8,10 | 179:18 | 346:11,17 | **Announce...** |
| 128:14,15 | 225:20 | 181:10,14 | 347:16,23 | 8:15 |
| 129:2 | 256:24 | 182:17,17 | **amplific...** | **announces** |
| 169:9 | 257:10 | 184:14 | 287:6,8 | 217:11 |
| 234:17 | 261:24 | 185:2,4,12 | 288:24 | **announcing** |
| 256:3 | 266:25 | 191:25 | **amplified** | 35:9 |
| 257:15,23 | 269:4 | 192:12 | 287:10,13 | **answer** 13:1 |
| 260:5 | 271:9 | 196:24 | **amplify** | 34:19 35:5 |
| 262:8 | 273:8 | 197:7 | 254:18 | 51:2 53:3 |
| 269:6,14 | 285:15 | 198:19 | 347:11,21 | 71:23 80:7 |
| 270:6,25 | 288:15 | 199:6,16 | **Amplifying** | 93:4 133:3 |
| 272:5,8,18 | 289:9 | 368:13 | 346:23 | 133:23 |

RIAN  . SC  LL   1/12/2023

148:10
150:22,22
152:24
153:10,20
153:21
156:2,11
162:1
163:13
167:13
180:24
185:9
198:14
202:21
237:20
250:6
278:21,21
292:10,17
304:24
310:15
339:15,18
339:18,22
answered
126:6
146:17
162:1
202:16
230:20
251:3,8
answering
339:20
answers
150:19
anti-doxing
364:18
anticipate
256:9,15
367:14
anticipated
258:5,13
anticipa...
257:19
anybody
129:14
API 146:7,9
146:13,13
146:14
Apologies
352:3
apologize

14:4 55:7
107:11
282:2
appear 82:25
205:23
373:15
appeared
225:15
appearing
192:10
appears
159:17
162:23
173:15
192:15
196:16
199:25
200:1
207:23
211:20
226:10
228:22
230:16
277:10
281:12
282:18
285:9
292:2
297:4
301:13
352:25
applicable
358:10
applied
224:17
applies
153:1
260:24
apply 17:17
appointee
130:4,8,12
313:15,17
approach
39:15 85:9
97:5 307:5
307:12
357:6
359:1
approaches

256:9
257:19
258:4
approaching
163:11
appropriate
17:7 95:15
315:16
350:13
366:5,24
April 22:3,6
22:7,16,20
22:25 23:9
23:11
260:3
262:1
294:14
336:13
367:6
April-ish
12:6
April/May
12:6
area 241:25
areas 312:23
313:5
argue 338:16
Arizona
225:7,18
Arizona's
225:2
arose 147:4
arrangement
121:9
187:2
arranging
214:1
arrived 86:8
arrives
14:25
arrow 105:16
105:17
106:17
article 8:7
8:11,16
9:5,15
304:6,17
305:22
314:19

319:20
320:6,22
321:11
336:3
338:14
articles
124:2,5,13
articulate
311:4
articulated
239:7
artifact
60:3
Ashwin
187:20
asked 63:13
101:9
126:5
136:13,23
140:6
146:16
147:13
161:25
163:22
202:16
218:23
219:4
220:18,20
223:3
230:19
250:4,15
251:1,6
260:8,20
261:15
270:4
284:4
296:16
301:11,16
307:10
318:22
350:13
asking 13:11
13:23 57:3
66:24 74:7
74:10
91:10
92:11,12
92:13 93:6
93:14 94:9

94:10
100:20
107:1
128:9
130:21
132:24,25
133:4
135:11,11
137:1
156:3
172:15
222:18
228:24
249:3
256:13
261:19
277:7
287:12
292:12
295:18,19
297:1,4
301:5
348:8,23
371:5
asks 100:23
232:6
261:16
assembled
97:7
assembling
97:14
assembly
97:16
asserted
166:12
assess
144:18
assessed
109:22
assessing
96:10,18
123:8
assessments
257:3
assignment
19:19
assist
322:22
assistance

| | | | | |
|---|---|---|---|---|
| 101:10 | atlassia... | 273:22,24 | awake 175:9 | 326:12 |
| assistant | 205:15 | 274:3,4,8 | aware 17:13 | 328:19 |
| 195:11 | attached 5:7 | 274:10 | 17:16 18:1 | 329:19,22 |
| 196:14 | 6:2 7:2 | 275:7,11 | 52:2 61:22 | 332:17 |
| 311:17 | 8:2 9:2 | 275:14,19 | 75:5,12 | 336:4,20 |
| assisting | 253:1 | attribut... | 77:6,7,22 | 355:18 |
| 84:25 | 361:6 | 273:19 | 78:17,18 | 364:24 |
| associated | 373:15 | 274:25 | 79:3 80:22 | 371:14,19 |
| 135:7 | attachments | Audio 5:14 | 106:21 | awareness |
| 146:2 | 345:15 | 5:18 | 107:3,6,8 | 16:12 |
| 246:20 | attacks | audit 17:3 | 112:18 | 17:11 |
| Association | 246:21,22 | 334:5 | 124:22 | 21:15 |
| 50:8,9 | attempt 66:4 | August 9:23 | 127:5,10 | 65:15 |
| 101:16,18 | 134:11 | 15:9 | 128:8,12 | 68:17 |
| 101:19 | 211:25 | 104:25 | 129:16,18 | 131:6 |
| 103:13 | 317:18 | 262:8 | 132:8,10 | 155:7 |
| Assortment | 337:14 | 277:4 | 133:8,11 | 267:17,25 |
| 6:4,13 | attempted | 302:22 | 147:14,23 | 268:2 |
| 7:12,17 | 254:17 | 303:2,5 | 152:3 | 325:25 |
| assume 20:12 | attempts | 328:21 | 158:4,17 | 326:2 |
| 105:6 | 254:11 | 334:5 | 160:10 | 347:25 |
| 166:6 | attend 264:2 | authenti... | 163:8 | awful 55:6 |
| 177:18 | attended | 223:6,25 | 164:5 | awhile 344:3 |
| 180:6 | 259:20,23 | authorities | 172:9,14 | 351:10 |
| 205:20 | attention | 85:1 91:20 | 188:10 | Ayelet |
| 219:19 | 15:2,15 | 92:10 | 196:17 | 186:17,20 |
| 226:12 | 17:23 18:2 | 93:16 | 197:13 | 187:17 |
| 274:9 | 20:23 | 278:15 | 202:19,21 | |
| 275:9 | 69:25 | 370:22 | 202:22,23 | **B** |
| 309:6 | 173:1 | 371:16 | 203:6 | B 5:6 6:1 |
| 350:14 | 196:21 | authority | 207:12 | 7:1 8:1 |
| 354:9 | 197:20 | 26:19 | 211:4,22 | 9:1 219:1 |
| 359:19 | 203:3 | 91:17 92:1 | 215:8 | B-e-e-b-e |
| assumed | attorney 3:7 | 92:14,19 | 222:5 | 279:21,24 |
| 158:21 | 10:20,23 | 92:24 94:1 | 255:9 | back 19:12 |
| Assuming | 13:18 | 96:3,24 | 290:9,12 | 19:21 |
| 275:15 | 35:10 | 337:14 | 290:24 | 20:23 22:3 |
| assumption | attorneys | authoriz... | 295:17,21 | 24:9 32:6 |
| 118:20 | 10:17 | 368:22 | 302:17,21 | 33:9,23 |
| 230:25 | 34:12 | available | 302:25 | 35:3 37:14 |
| 243:14 | 165:18 | 43:8,13 | 303:5,8 | 42:20 |
| 298:15 | attributing | 82:16 | 307:9 | 51:14 |
| 329:18 | 273:24 | 113:15 | 320:7,24 | 58:10 |
| astonishing | 275:19 | 145:1,14 | 321:12 | 71:25 72:1 |
| 276:23 | 349:3 | 195:6 | 322:5,11 | 76:6 78:19 |
| Atlanta | attribution | 333:12 | 322:13 | 80:19 |
| 48:19 | 122:25 | 354:3 | 324:18,22 | 83:13 85:5 |
| Atlantic | 272:10 | avoid 120:25 | 325:1 | 106:19,22 |
| 5:15 | 273:15,21 | 211:25 | | 107:1 |

RIAN . SC LL   1/12/2023

| | | | | |
|---|---|---|---|---|
| 141:1 | 342:14 | 222:21 | 51:7 52:7 | 224:1 |
| 147:9 | 363:1,2 | **bathroom** | 53:4,8,19 | 233:3 |
| 163:19 | **bad** 245:22 | 319:1 | 53:22 54:6 | 238:21 |
| 164:4,12 | 297:17 | **BCC** 308:15 | 55:5 60:25 | 241:20 |
| 164:17,22 | **bag** 64:9 | **Beckman** | 61:2,14 | 251:3,17 |
| 165:8,10 | **ballots** | 28:16,22 | 64:13 67:6 | 259:7,10 |
| 165:10 | 218:25 | **Beebe** 279:20 | 67:11 | 264:8,13 |
| 166:16,19 | 219:2,12 | **beef** 336:4 | 72:22 73:1 | 266:2 |
| 168:13,17 | 339:10 | **beefing** 8:12 | 76:8,11,17 | 270:2,3 |
| 170:11,14 | **bandwidth** | 335:20,24 | 76:22,25 | 271:4 |
| 173:1 | 57:20 | **began** 183:13 | 77:20 78:6 | 278:20,22 |
| 176:21 | **banking** | **beginning** | 85:22 | 281:1 |
| 177:12,19 | 342:7 | 23:13 | 88:23 89:3 | 289:6 |
| 179:15 | **banks** 342:7 | 126:17 | 90:4 92:23 | 303:8 |
| 180:4 | 342:10,16 | 157:11 | 100:23 | 308:2 |
| 183:9,11 | 356:1 | 307:6 | 111:13 | 311:20 |
| 197:25 | **based** 17:21 | **begins** | 112:23 | 317:2 |
| 201:17 | 41:9,14 | 125:18 | 113:1 | 323:12 |
| 209:12 | 113:15 | 330:10 | 119:6 | 325:12 |
| 218:12 | 114:17 | **behalf** 3:2 | 120:14 | 327:3,11 |
| 219:22 | 154:15 | 3:16 4:2 | 124:1 | 327:17 |
| 220:12 | 209:17 | 16:24 28:2 | 127:20 | 353:1 |
| 221:4 | 242:4 | 28:3 35:11 | 134:13,22 | 354:2 |
| 223:11 | 257:14 | 106:11 | 136:3,7 | 357:18 |
| 224:19 | 272:15 | 189:18 | 137:10,23 | 360:13 |
| 229:12 | 285:9 | 243:12 | 139:11,14 | **believed** |
| 231:4,15 | 292:21 | 367:18 | 139:22,25 | 27:21 |
| 232:15 | **basic** 238:16 | **behavior** | 143:1 | 266:5 |
| 242:12,19 | 241:13 | 41:23 42:3 | 144:23 | **bell** 126:1 |
| 243:25 | **basically** | 42:10,16 | 151:17,18 | 197:16 |
| 256:13 | 30:16 45:6 | 115:2 | 151:19 | 213:24 |
| 259:21,22 | 56:15 | 176:9 | 155:2 | 247:9 |
| 262:13 | 59:24 | 311:5,6,10 | 159:20 | 284:14 |
| 263:2 | 60:22 | **beings** 28:22 | 161:16 | 294:22 |
| 267:4 | 86:24 | **believe** | 164:24 | **Ben** 372:17 |
| 274:20 | 260:22 | 19:18 20:2 | 166:6 | **benefits** |
| 275:2 | **basis** 35:6 | 22:3,13 | 168:22 | 363:14 |
| 276:10,11 | 219:15 | 24:7,13,19 | 179:6 | **Berkman** |
| 277:4,14 | 248:6 | 26:20 | 183:19 | 345:24 |
| 282:1 | **Bates** 6:4,14 | 28:16 29:6 | 184:19 | **best** 61:9 |
| 288:10 | 6:20 7:8 | 30:25 31:2 | 187:1,21 | 85:9 101:8 |
| 289:18 | 7:10,12,17 | 32:21 33:1 | 188:3,24 | 133:3 |
| 298:25 | 8:5,20,22 | 33:9,16 | 189:6 | 166:3 |
| 299:6,11 | 9:13,18,20 | 35:17 | 201:15,15 | 300:4 |
| 311:16 | 160:22 | 38:17,21 | 212:23 | **better** 48:14 |
| 319:5,14 | 162:5 | 39:18 | 214:6 | 64:25 |
| 323:24,25 | 173:9 | 46:24 | 219:18 | 154:5 |
| 327:21 | 201:20 | 48:12,21 | 220:9 | 164:19,24 |
| 336:9,13 | 214:8,10 | | 223:21,23 | 304:3 |

RIAN . SC LL  1/12/2023

314:13
329:21,23
**beyond** 32:8
77:23
78:12
85:16
100:15,16
131:13
136:19
168:19,24
180:4
285:23
305:10
317:17
**Biden** 1:9
10:7
247:22,25
248:14
375:8
376:3
**big** 141:8
256:3
269:25
306:13
**bilateral**
36:22 45:4
239:9,20
241:5,15
241:18
242:16
243:8
**bio-lab**
323:17
**biolab** 324:3
**biolabs**
323:20
**biological**
323:19
**bios** 361:6
**bit** 14:11
26:22 73:5
102:12
143:4
172:25
197:11
235:17
240:14
266:10
282:2

295:14
316:2
337:19
**biweekly**
24:19,19
31:23
361:6
**black** 105:17
154:16
**blanking**
103:2
**blind** 308:16
**block** 119:25
**blog** 82:14
82:14,18
114:17
115:7
116:13
**blue** 310:3
**blur** 55:10
**board** 312:22
**bolster**
304:16
**bots** 115:2
**bottom** 83:4
106:18
109:1
111:11
149:21
160:23
173:20
191:8
203:15
217:4
271:23
288:17
356:25
**box** 3:10
154:16
212:22
**branch** 11:21
**Brand** 11:21
**break** 35:12
151:3
172:22
181:4
183:2
189:21
192:25

212:5
258:8
271:13
276:1
318:23
319:1,3
**Breakdown**
9:15 346:4
**Brian** 1:14
2:1 5:2,8
6:3 7:3
8:3 9:3,15
10:5 11:12
11:18
158:3
176:3
191:21
200:10
208:9
219:4
229:22,24
230:12
272:1
283:10
292:25
372:12
373:8,11
375:12
376:2
377:5,20
**Bridging**
366:1
**brief** 52:19
72:6
114:15,17
140:2
141:9
248:11
361:5
**briefed** 70:2
70:3 80:24
137:6
142:18
362:16
**briefing**
21:14
28:18 52:7
53:14,18
53:20 54:3

54:10 55:3
55:21 56:3
56:8 70:6
70:8,25
71:5,7,11
80:14
128:5
132:5
140:1,19
140:22
141:2
248:10
269:24
270:21
271:3
306:11,13
307:4,11
**briefings**
27:6 39:23
49:13
74:19 81:1
82:7,8
238:21
239:8
323:13,14
361:10
**briefly**
203:25
**briefs** 25:19
159:2
**bring** 28:19
279:13
**bringing**
304:14
**broad** 74:5
77:13
133:18,23
358:9
**broadening**
320:4,7
**broader** 61:3
61:4
270:11,15
**broadly**
90:11
**broken**
258:15
**brought**
17:22

179:2
**bucket** 44:11
**budget** 303:9
336:24
337:14,18
337:18,22
**build** 16:4
153:25
241:9
303:22,25
324:10
332:1
343:2,20
358:5
**building** 3:8
16:8 46:1
131:4
315:12
322:15
347:19
**builds** 44:5
46:12
**built** 348:6
358:2
**bullet**
232:11
233:12
243:2
262:7
275:18
346:10
354:7
355:9
357:1
**bulletin**
365:13,20
365:22,24
**bulletins**
43:9
**bunch** 277:25
**burden**
367:13
**business**
76:17,19
76:21
338:16
372:19

_____

C

_____

RIAN . SC LL   1/12/2023

| | | | | |
|---|---|---|---|---|
| **C** 3:1  4:1,1 | 253:20 | 333:3,11 | 342:22 | 67:13,21 |
| 5:1  6:1 | 255:21 | 333:17,18 | **case** 10:8 | 72:20 |
| 7:1  8:1 | 267:24 | 333:21 | 153:13 | 79:13,16 |
| 9:1  10:1 | 319:21 | 334:8,14 | 158:4 | 79:21,25 |
| **C-a-b-l-e** | 325:6 | 339:13 | 174:10 | 101:14,21 |
| 188:7 | 365:14 | 351:15 | 176:9,12 | 110:18 |
| **cable** 9:24 | 368:12 | 352:7 | 177:2 | 112:6 |
| 188:7 | **calling** | 354:12 | 188:23 | 119:9,20 |
| 196:17 | 348:4 | 356:21 | 190:10 | 119:24 |
| 197:18 | **calls** 21:8 | 358:14 | 201:16 | 129:11 |
| 198:1 | 71:20  72:4 | 359:23 | 210:20,25 | 141:23 |
| 357:9 | 87:17  92:5 | 360:19 | 211:5,11 | 142:4 |
| 358:6 | 92:17 | 361:14 | 217:16 | 147:6,18 |
| 359:3 | 94:15 | **Camargo** | 221:9 | 147:21 |
| **Cable's** | 95:20 | 186:1 | 234:15 | 149:24 |
| 195:5 | 96:25 | **campaign** | 257:12 | 179:8 |
| **cadence** | 98:11 | 44:16 | 264:11 | 201:24 |
| 233:14 | 103:17 | **campaigns** | 267:5 | 262:17 |
| 234:3 | 108:20 | 9:10  127:1 | 340:13 | 264:15 |
| **calendar** | 111:8 | 246:20 | 343:16 | 265:10 |
| 34:6 | 115:9 | 328:14 | 360:1 | 267:10,15 |
| 274:21 | 118:16 | **capabili...** | 366:18 | 267:21,24 |
| **California** | 122:22 | 57:10 | 374:11 | 278:12 |
| 2:5  163:10 | 142:7 | 108:7 | 375:13 | 345:24 |
| **call** 35:11 | 149:18 | **capability** | 376:3 | 363:11 |
| 41:20 | 150:19 | 57:14 | **Cassandra** | **centers** |
| 85:24  99:9 | 152:21 | 93:25  94:3 | 1:23  2:2 | 64:19 |
| 99:12,15 | 153:18 | 151:13 | 10:14 | 112:11 |
| 99:21,25 | 178:15 | 368:20 | 374:2,18 | 278:5 |
| 101:4 | 194:14 | **capacities** | **catch** 91:9 | **central** |
| 103:4 | 198:5 | 93:15 | **categories** | 119:24 |
| 111:22 | 201:4 | **capacity** | 52:22 | 120:11 |
| 130:3 | 202:15 | 57:14,20 | **caught** | 157:4 |
| 282:5 | 204:12,23 | 76:16 | 166:21,23 | 264:15 |
| 283:3 | 231:10 | 91:19 | **cause** 316:15 | **certain** |
| 327:1,4,7 | 238:11 | **Capps** 3:5 | 317:4 | 26:18,24 |
| 327:9,12 | 244:21 | 35:10 | **CCR-WA** | 53:5  61:15 |
| 327:12,17 | 257:2 | **capstone** | 374:18 | 71:12  90:3 |
| 327:20,23 | 273:1 | 321:6 | **CDC** 135:12 | 104:24 |
| 332:18,21 | 283:21 | **captured** | 140:12 | 106:16 |
| 368:11 | 294:16,23 | 166:4 | 322:17,22 | 115:22 |
| **called** 23:16 | 294:24 | 243:16 | 323:10 | 137:18 |
| 26:4  48:6 | 298:11 | **carbon** | **center** 11:22 | 169:17 |
| 93:10 | 304:21 | 308:16 | 29:7  50:6 | 187:7 |
| 103:24 | 310:13 | **carefully** | 52:11  59:7 | 199:25 |
| 112:16 | 316:19 | 13:10 | 59:9,16 | 245:1 |
| 118:7,11 | 324:24 | **carried** | 60:6,17 | 256:15 |
| 174:13 | 332:17,21 | 355:10 | 61:7  62:23 | 261:17 |
| 239:3 | 332:22 | **cascading** | 63:19 | 266:3 |

269:3
274:21
275:1
348:24
363:24
certainly
26:21
67:11
93:25
129:6
182:16
207:18
233:5
246:10
289:12
362:4
certainty
75:15
176:10
CERTIFICATE
374:1
Certified
2:3,4,5,7
4:20
certify
374:5
377:5
CFI 45:1
CFITF 118:11
118:14
120:13
157:5
189:8
198:20
199:7
217:19,22
Chad 42:22
43:18
166:17,18
166:24
179:18
184:13
191:24
192:11
276:19
chain 130:6
157:12
173:13
175:23

206:13
217:4
223:1,12
223:16
226:6
282:17
299:17
307:1,7
chains
180:25
challenges
317:7
challenging
14:15
280:20
302:5,15
challeng...
8:18
Chan 7:7
29:22
237:10
248:13
249:20
250:4,15
change 28:20
127:24
128:10
180:7
286:14
312:25
367:2
376:7,11
376:15,19
376:23
changed
127:10,14
271:1
changes
126:24
127:21
128:6,16
129:12
133:2,5,9
134:1,4
284:6
375:16
377:7,10
changing
127:6

132:12
133:16
150:15
channel
280:10,23
320:25
channels
146:23
chaos 316:15
317:4,5
chapter
126:14
characte...
121:14
300:23
318:8
347:18
charge
289:12
chart 9:23
15:9,12
18:3 22:12
42:21
130:9,13
166:17
167:4
171:22
chat 312:16
chats 263:14
check 30:20
291:2
checked
70:23
checker
288:2
checking
227:5
chief 15:17
15:22 28:9
289:8
chose 93:25
chosen 94:2
Christopher
191:20
CIA 210:20
circle
298:24
circulating
45:18

269:14
285:19
circumst...
223:7
CIS 59:6
60:9 61:23
62:4,7,12
64:3,17,24
65:3,11,21
65:21,22
66:3,8,15
66:19 67:4
67:24 68:3
68:7,13,15
68:19,21
80:11
101:24
102:5,6,13
102:15,24
102:25
103:1,4,5
103:9
104:23
106:10,12
107:25
110:22
112:19
119:2
120:6,21
121:2,6,11
121:18
148:2,3,12
148:18,21
148:25
149:5,9,14
157:10,14
157:15,17
157:22
158:15
162:21
165:6,8
168:5,13
174:23
201:24
202:24
203:16
204:1
205:4,11
205:14,14

208:9,17
208:25
210:20,24
211:10,19
212:8
213:17,20
214:14
217:5
228:3,6,14
229:17
230:4,24
231:2
266:2,5
267:2
363:11
364:7
365:4
CIS's 210:25
211:5
CIS-spec...
112:14
CISA 5:18
8:14,16
9:12,12
11:4 15:9
15:23 17:6
17:7 18:25
20:17 24:3
24:24
25:25 28:3
30:14
36:23,24
36:25 37:7
37:11,12
39:15 42:9
44:23
45:24 46:6
49:5,6
50:13 51:9
51:19 52:1
53:21
55:12,13
55:14,17
58:16,20
58:21,22
61:8,9,22
62:12 63:6
63:16 64:1
64:8,16,19

65:3 66:2
66:7,11
67:6,11
70:17 71:6
71:11
72:23
73:25,25
74:4 75:6
75:13
76:14
77:18
79:20
88:21,23
89:5,22
90:7 94:25
96:9 97:6
97:12,13
97:18 99:1
99:14
100:11,13
106:3,3,22
108:17,18
110:17,25
111:5,6,13
114:5
115:6,13
117:20
118:1
119:23
120:1,8,11
122:25
124:2,13
124:22
126:2
129:14,20
129:24
130:17
133:2,9,19
133:25
134:3
137:19
138:4
142:5,14
142:21
150:4
151:6
154:23
156:20
157:4

164:8,11
164:12
165:22
167:21,22
169:5,25
170:6,24
171:17,19
172:5
178:20
183:15,21
184:1
185:16
186:6,15
186:25
187:9,23
188:13
189:18,22
191:9,14
191:19
192:18
195:19,23
196:6,10
196:19,24
197:8,19
198:21
202:4,4
203:17
204:9
205:15
207:1,16
210:7
212:8
217:19
218:1,6
230:7,12
230:24
232:7,7,25
234:22
238:8
243:8,9
245:18
248:9
251:3
255:20
256:2
262:16
263:2,3,23
264:1,15
266:20

267:5,17
269:20
273:18,21
274:2
276:14
277:25
284:13
285:1
290:14
302:3,13
302:17
303:5,6,11
304:9,16
304:19
305:3
308:1,3
310:20
312:4
313:1,22
313:24
314:20
315:7
317:10
318:10,10
320:10
324:14,21
325:25
326:4
327:22
330:13
331:19
332:12,18
332:23
333:2,10
335:24
336:13
338:13
345:10,12
350:20
351:1,5
352:20,23
353:16,23
354:8,20
355:3,18
357:1,6,13
358:25
360:3,25
365:13
368:15

369:3,6
370:5
371:22
CISA's 23:24
25:5 62:16
66:14
101:9
119:24
150:15
151:6,9,9
188:22
261:13
262:24
264:14
305:8,17
309:5
330:18
342:24
347:15,16
citizen
221:15
City 3:11
375:21
civic 200:16
283:12,16
civil 16:19
73:11
105:13
109:12,16
claiming
280:11
clarific...
218:13
219:5
223:3,20
clarify 93:5
132:23
229:7
263:20
clarifying
83:22
clarity
104:2
clear 66:23
66:24
104:4,12
130:21
146:22
156:3

182:20
199:20
218:8,17
262:12
268:12
278:18
325:18
335:5
370:9,17
370:22
clearing...
96:9,17
clearly
327:8
Clemson
46:23
clips 124:5
close 131:20
131:23
234:5,12
249:11
277:3,6
331:8
closed 293:8
closely
289:22
closer 31:22
32:4 174:1
174:17
234:10
clue 178:17
313:9
CNN 8:7,7
364:15
coalition
97:7,14,16
cognitive
332:7
338:18,22
339:3
coincide
337:2
collaborate
308:3
collabor...
111:12,13
111:18
collabor...
48:11

RIAN  . SC  LL   1/12/2023

```
52:24              358:11             210:17             77:25              26:1
81:12              371:22             246:11             80:20              154:14
111:17             comes 229:12       255:7              85:20              219:10,16
collabor...        289:18             273:11             87:14              259:6
59:25              367:21             293:14,18          102:6              324:16,23
collabor...        371:17,20          316:23             132:7              325:2
48:24 49:4         comfortable        349:7              133:13,15          329:14
colleague          92:20              Common's           133:17             compound
10:21 71:9         317:24             293:20             147:24             72:3
collected          367:11             commonly           191:12,15          179:21
146:2              coming 64:23       158:13             192:10,20          212:2
collecting         119:13             202:24             277:9,10           226:25
145:24             132:20             communicate        communities        258:6
collection         310:1              18:20              126:19             310:12
156:19             318:18             75:19              259:13             comprehe...
213:14             321:8              168:20             community          295:10
260:1              334:22             326:14             39:20 44:6         computer
collective         358:21             communic...        73:13              152:16
277:25             command            72:1 78:13         84:15              concept
colon 146:4        130:6              245:25             145:21             83:20 99:1
191:9              commence...        247:2              246:19             99:14,18
Colorado           98:17              326:24             257:2              100:14
204:6              362:8              communic...        258:20             concern
205:12,14          comment 92:9       20:7               270:15             42:17
205:22             96:4               communic...        327:14             58:25 65:4
206:5,20           117:24             67:23              332:14,23          66:16
206:21             comments           75:13,24           333:22             67:17
281:19,21          335:16             107:9              334:16,16          126:3
Columbia 2:9       368:8              132:11             communit...        153:4
column 18:6        369:21             134:3              333:1              173:13
combat             Commission         164:20             companies          175:24
333:16             377:24             communic...        17:8,10,13         208:24
combination        committee          66:2,10            109:13             209:2
261:18             307:25             68:4 75:2          241:6              220:2
Combined           352:24             103:9              279:14             250:23
6:22               353:7              106:25             327:14             251:4,12
come 14:13         355:2              136:2              351:3              251:18,22
20:13              359:19,20          146:23             company            352:6,6
44:22 45:5         360:4,25           246:7              155:2              concerned
45:18 84:3         committee's        357:23             complaint          64:22
121:5              361:11             359:9              190:17             271:7
123:11             committees         communic...        complete           286:6
161:9              70:18              20:25 21:3         89:21              288:20
168:5              353:6,11           21:18              373:14             concerning
263:16             353:14             49:10,11           completed          206:20
293:12             common 12:17       49:17,18           365:8              concerns
336:9              158:16             50:1 53:13         component          23:20 24:4
338:9              161:19             53:16 77:7         325:9,11           39:7,13
341:18             162:2              77:13,16          components          58:17 65:9
```

RIAN  . SC  LL   1/12/2023

| | | | |
|---|---|---|---|
| 66:3 75:4 | confirmed | 81:7 | 140:7,9,12 | contexts |
| 118:25 | 287:21 | 108:18 | 140:14 | 59:19,20 |
| 124:23 | 288:1 | 111:17 | containing | contextual |
| 138:6,10 | conflating | considering | 225:16 | 200:15 |
| 138:11 | 147:20 | 37:23 | content | continue |
| 151:8 | confronting | 226:11 | 17:18,20 | 32:10 |
| 161:22 | 312:23 | considers | 17:24 | 63:13 |
| 172:17 | 313:5 | 320:5 | 23:22 27:3 | 210:20 |
| 180:17 | confused | consisted | 27:19 | 334:3 |
| 189:24 | 13:7 | 144:17 | 40:15 | continued |
| 204:19 | connect | consistent | 123:7 | 170:11 |
| 236:14 | 95:17 | 122:16 | 128:10,16 | 240:10 |
| 240:20 | 100:18 | 288:9,13 | 129:4,11 | 266:5 |
| 241:12 | connected | 306:1 | 139:12 | continues |
| 265:17,21 | 50:4,5,6 | 318:3 | 144:19 | 213:20 |
| 268:5 | 63:1 | 344:21 | 160:5,11 | 364:22 |
| 291:25 | 116:23 | 345:2 | 160:19 | continuing |
| 295:12 | 140:2 | conspiracy | 161:10 | 334:11 |
| 338:12 | 205:23 | 340:4 | 177:8 | contract |
| 342:2,5 | 275:15 | conspiring | 219:22 | 331:13 |
| 348:14 | 299:19 | 286:14 | 260:9,13 | 337:11 |
| 366:4,24 | 352:11 | consult | 260:23 | contractor |
| 367:23 | 356:24 | 34:20 | 284:7 | 154:23,25 |
| conclude | connecting | 190:8 | 288:11 | 155:1,13 |
| 155:23 | 100:21 | consulta... | 289:8,15 | contract... |
| 156:6 | 101:10 | 97:6,12,13 | 290:15 | 331:2,3 |
| concluded | connection | 97:15,24 | 295:5,20 | contractors |
| 373:8 | 98:4 112:5 | 98:2 | 296:2 | 331:7,11 |
| concludes | 124:12 | consulted | 297:3,6 | contributed |
| 372:11,11 | 145:17 | 98:10 | 320:17 | 88:5 |
| concluding | 350:16 | consulting | contents | contribu... |
| 219:15 | connections | 97:18 | 73:6 | 87:24 |
| conclusion | 104:13,15 | contact | 163:20 | convenience |
| 92:5,13,18 | 104:21 | 103:5,16 | 288:7 | 307:15 |
| 93:12 | 135:12,14 | 103:19,23 | context | conversa... |
| 94:15 | connecti... | 104:2,5 | 20:21 | 52:4,5 |
| 95:21 | 264:18 | 112:14 | 40:22 41:3 | 54:14 57:2 |
| 156:4 | connector | 117:18 | 76:10 | 58:7,19 |
| confidence | 109:7 | 157:22 | 139:16,18 | 86:9,10 |
| 27:13,22 | consider | 217:5 | 209:17 | 98:7 101:1 |
| 283:16 | 45:11 | 300:5 | 210:3 | 117:7 |
| 341:19,24 | 100:8 | 350:5,14 | 223:16 | 128:4 |
| 342:4,10 | 243:19 | 350:20 | 274:2 | 133:20 |
| 343:10 | 332:5 | 351:2,7,24 | 275:6,14 | 135:7,17 |
| 354:24 | 357:2,14 | contacts | 289:1 | 137:9 |
| confirm | consider... | 114:13 | 309:3 | 139:13,21 |
| 86:20 | 123:6 | 132:1 | 311:7,23 | 139:23 |
| 218:23 | 281:24 | 135:19 | 354:17 | 141:10 |
| 219:20 | considered | 136:13,23 | 358:17 | 142:19 |

| | | | | |
|---|---|---|---|---|
| 179:9 | 295:23 | 117:13 | 43:12,25 | 157:10,19 |
| 181:20 | 361:25 | 119:1 | 46:11 48:3 | 157:23 |
| 211:13 | 362:5,7,11 | 211:18 | 48:4 50:15 | 158:7,8,11 |
| 254:12 | 362:13,14 | 262:9 | 51:3,6,17 | 158:12 |
| 262:20 | 362:18 | 325:6,14 | 57:23 59:8 | 159:7,11 |
| 267:1 | 371:20 | 326:2,6,17 | 59:23 | 160:20 |
| 268:22 | 372:3 | 329:21,24 | 60:20 63:5 | 161:6,7 |
| 333:1 | **conveying** | 332:22 | 63:18 65:4 | 162:22,23 |
| 348:19 | 250:23 | 333:1 | 65:6 67:1 | 163:4 |
| 371:25 | **coord** 316:13 | **coordinator** | 68:6,11 | 167:3 |
| **conversa...** | **coordinate** | 216:1 | 69:23 | 170:9,17 |
| 46:17 47:5 | 29:2 46:12 | **copied** 67:4 | 72:17 73:1 | 170:22 |
| 52:15,19 | 68:13 | 67:7,11 | 73:13,18 | 171:5,16 |
| 52:22 | 74:23 | 203:22,22 | 80:15 | 173:14 |
| 64:24 74:8 | 120:21 | 213:16 | 81:13 | 176:15 |
| 74:12,17 | 130:15 | 276:24 | 84:22 | 180:18 |
| 74:22 75:1 | 212:8 | 360:2 | 89:23 | 182:10 |
| 76:2,10,12 | 214:2 | **copies** | 90:19,20 | 184:12,15 |
| 80:17,22 | 318:5 | 375:11 | 91:6,7,17 | 184:16 |
| 81:1,6,8 | 325:8 | **Cops** 9:4 | 92:2,15 | 185:19 |
| 81:25 82:4 | 332:13,20 | 319:21 | 93:1,13,16 | 191:17 |
| 82:9 85:25 | 370:9,18 | **copy** 66:14 | 93:17 | 192:4 |
| 87:20 98:6 | **coordinated** | 67:20 | 94:12,23 | 193:10 |
| 98:14,16 | 21:6 30:7 | 213:20 | 95:7 96:11 | 195:12,15 |
| 104:9,11 | 30:11,13 | 266:14,18 | 103:10 | 195:20,24 |
| 111:15,19 | 41:22 42:2 | 266:22 | 104:3,18 | 196:25 |
| 112:20,24 | 42:10,15 | 308:16 | 104:19 | 197:4,8,16 |
| 113:2,7,17 | 69:3 115:1 | 321:5 | 105:18 | 198:21 |
| 114:1,9,16 | 239:5 | 372:22,24 | 107:4 | 199:7,13 |
| 114:17 | 311:10 | 375:15 | 108:12 | 199:14 |
| 116:25 | **coordinates** | **copying** | 109:8,14 | 200:7,11 |
| 128:7 | 46:10 | 204:1 | 109:15,23 | 200:14 |
| 133:21,25 | **coordina...** | 218:3,5 | 109:24 | 203:18 |
| 135:10,21 | 30:16 | 350:4 | 110:16 | 204:3,9 |
| 136:4,9 | 54:20 | **corner** | 111:4 | 205:7,17 |
| 139:7,9,11 | 68:10,19 | 107:13 | 112:2,7,8 | 205:24,25 |
| 151:11 | 68:21 69:5 | **correct** | 114:25 | 206:2,3,8 |
| 159:5 | 121:12 | 17:24 | 117:21 | 206:22 |
| 169:1 | 311:5 | 19:11,14 | 118:9 | 207:22 |
| 181:13 | 317:11,12 | 19:23 | 119:3,4 | 208:12 |
| 211:14 | 317:19 | 20:10,16 | 123:10,15 | 209:18 |
| 216:23 | 329:15 | 23:1,4,23 | 125:24 | 210:4,8,22 |
| 237:6,22 | 332:18 | 24:14,15 | 126:19 | 211:19 |
| 238:13,19 | **coordina...** | 26:5,6 | 127:2 | 212:4 |
| 240:17,22 | 21:8 30:14 | 29:13 | 138:12,13 | 214:21 |
| 241:22 | 36:19,21 | 30:12 | 142:5,25 | 215:17 |
| 247:15,17 | 37:2 47:22 | 32:15 37:5 | 149:25 | 217:6,17 |
| 255:5 | 64:15,18 | 37:13 | 150:4,12 | 217:20,21 |
| 259:18 | 68:4 | 41:19 | 150:13 | 217:24,25 |

RIAN . SC LL    1/12/2023

| | | | | |
|---|---|---|---|---|
| 219:13,24 | 315:4 | 4:12 14:6 | 202:3 | 322:1,7,10 |
| 223:22,23 | 318:1 | 34:20 35:4 | 206:5 | COVID-re... |
| 224:3,4,8 | 326:18 | 69:10 | 207:16 | 322:20 |
| 224:12,13 | 328:3 | 172:22 | 212:14 | create |
| 224:18,20 | 329:4,8 | 374:9 | 237:23 | 109:17 |
| 225:6 | 332:15 | counselor | 238:5 | 142:3 |
| 226:9 | 335:21,22 | 308:12 | 248:23 | 298:1,3 |
| 228:20 | 336:2 | counter 9:9 | 264:8 | 317:6 |
| 229:10,14 | 338:13,19 | 45:2 118:3 | 268:15 | 342:1,5,12 |
| 229:17 | 347:8,13 | 118:6 | 271:16 | 363:12,19 |
| 233:18,20 | 352:21,24 | 254:11 | 279:3 | created |
| 233:25 | 353:4 | 328:13 | 291:16 | 154:24 |
| 234:1 | 354:25 | 329:2 | 303:14 | 165:22 |
| 235:22 | 355:1,8 | 332:14 | 318:17 | creates |
| 236:1 | 361:24 | 342:24 | 333:21 | 56:20 |
| 246:16 | 365:9,18 | 358:1 | 351:8 | 342:25 |
| 249:12,13 | 366:6 | countering | course 13:8 | creating |
| 250:25 | 368:24 | 12:4 | 13:14 | 65:11 |
| 251:8,8,19 | 369:4 | 117:19 | 128:3 | 110:1 |
| 253:17 | 370:10,14 | 118:6 | 147:19 | crisis 325:8 |
| 254:1,19 | 370:15,20 | 130:1 | 180:19 | critical |
| 254:20,24 | 371:3 | 330:14 | court 1:1 | 16:5,9 |
| 254:25 | 373:13 | 348:12 | 2:4 3:8 | 137:24 |
| 255:22,23 | 374:6 | counters | 10:10 11:8 | 147:7,15 |
| 256:6 | 377:9,13 | 331:19,24 | 12:20 47:9 | 154:1,5 |
| 265:7,15 | corrections | counting | 153:3 | 295:10 |
| 269:15,21 | 373:15 | 337:7,10 | 190:20 | 309:6,7 |
| 272:6 | 375:16 | countries | courts | 322:15,17 |
| 280:13,21 | correctly | 38:3 45:3 | 355:12 | 323:6 |
| 281:11,24 | 87:5 | 45:5,7,18 | cover 270:5 | 327:2,12 |
| 282:15 | 159:20 | 46:1 | coverage | 327:13,16 |
| 287:15,22 | 160:13 | country | 127:20 | 331:18 |
| 288:7,24 | 189:15 | 57:13 | covering | 332:2,4,6 |
| 289:24 | 238:22 | County 163:9 | 174:14 | 338:17,18 |
| 291:12 | 248:5 | 228:6,24 | COVID 134:11 | 339:1 |
| 292:6,11 | 270:24 | 229:12 | 138:15 | 340:9,11 |
| 292:15 | 286:12 | 377:3 | 140:6,25 | 340:21,25 |
| 293:1,25 | 306:16 | couple 19:18 | 144:3 | 341:13,20 |
| 295:12 | corrects | 24:18 | 263:12 | 354:21 |
| 297:3 | 167:2 | 33:13 | 264:5 | 355:10 |
| 298:17 | corrosive | 36:16,16 | 323:10 | crossed |
| 299:4,9 | 344:17 | 44:3 49:9 | 324:5 | 312:13 |
| 300:9,10 | council 5:15 | 51:13 | COVID-19 | Crowd 144:18 |
| 300:21 | 20:5 48:20 | 56:12 | 5:13 | 144:22,23 |
| 301:7,9,17 | 71:8,9,15 | 77:21 | 122:12 | 145:2,13 |
| 304:16 | 71:17,19 | 81:25 | 137:22,25 | 146:7 |
| 312:23 | 136:1,8,14 | 111:20 | 138:5 | CRR 374:19 |
| 314:16,22 | 336:7 | 113:2 | 280:12 | CSAC 72:25 |
| 314:24 | counsel 4:4 | 197:23 | 321:25 | 305:9,11 |

| | | | | |
|---|---|---|---|---|
| **CSR-HI** | 204:22 | 277:6 | 367:5,8,17 | 29:16 |
| 374:18 | 242:9 | 281:16,17 | **decisions** | 30:11 |
| **CSR-VA** | 265:18 | 319:4 | 49:19 | 236:18 |
| 374:18 | 266:8 | 328:20 | 177:17 | 248:13 |
| **culprit** | 302:20 | 374:14 | 178:8 | 270:20 |
| 323:20 | 303:13 | 377:14 | 242:4 | **delibera...** |
| **curb** 320:4 | ——————— | **day's** 15:1 | 260:17 | 156:4 |
| **current** | **D** | **days** 372:17 | **declaration** | **delibera...** |
| 11:19 | **D** 3:3  4:1 | 372:19 | 7:4 244:2 | 155:20 |
| 331:20,25 | 6:1  7:1 | 375:20 | 244:10 | **delibera...** |
| **currently** | 8:1  9:1 | **de-dupli...** | 249:10 | 152:22,25 |
| 18:24 | 10:1 | 66:4 | **declare** | 153:19 |
| 32:11 | **D-r-a** 186:17 | 211:15 | 377:12 | 156:1 |
| 160:18 | **D-r-a-z-e-n** | **de-dupli...** | **decline** | **delivery** |
| **custodians** | 187:17 | 214:2 | 153:8 | 373:1 |
| 189:10 | **D.C** 3:21 | **de-dupli...** | **declined** | **demo** 279:12 |
| 191:15,19 | 375:6 | 211:17 | 89:24 | 279:17 |
| 276:14,15 | **D/A** 316:14 | **deal** 209:15 | **declining** | **Democracy** |
| 276:17,25 | 316:17 | 278:23 | 51:1 | 47:8 |
| 277:8 | **danger** 304:7 | **dealing** | 153:10 | **democratic** |
| **customs** | 304:8 | 162:20 | 171:6 | 355:11 |
| 220:10 | **dangerous** | **deals** 311:9 | **deconflate** | **department** |
| **cuts** 43:22 | 320:5 | **dealt** 343:13 | 203:13 | 3:19  4:13 |
| **cyber** 5:19 | 344:16 | **Dear** 375:10 | **dedicated** | 10:25 11:4 |
| 8:11  15:24 | **data** 107:14 | **debunk** 220:4 | 330:18 | 11:6,23 |
| 29:7  76:25 | 107:19 | 224:7,11 | **deemed** 17:5 | 44:23 |
| 96:8 | 146:1,1 | 228:25 | **deep** 274:14 | 244:12 |
| 141:23 | **date** 10:3 | 290:19 | 274:24 | 245:2,17 |
| 235:14,16 | 86:6 283:5 | 291:10 | **DEFENDANT** | 278:19 |
| 235:24 | 345:25 | 315:3,9 | 3:16 | 312:13 |
| 263:6 | 373:19 | **debunking** | **defendants** | 316:18,24 |
| 307:22 | 376:4 | 220:22 | 1:11  4:2 | 317:2 |
| 308:4 | **dated** 7:4 | 290:2,14 | 6:22 10:8 | 320:3 |
| 335:19 | 8:19  9:7 | 315:19 | 11:1,7 | 321:8 |
| 352:23 | 9:10,13,17 | **debunks** | **defense** | 325:5 |
| 359:18 | 248:22 | 289:24 | 308:4 | 337:1 |
| 360:3,25 | 249:5 | **December** | **defer** 221:11 | 343:15 |
| **cyber-fo...** | 302:22 | 248:22 | 343:14 | 350:12 |
| 188:15 | 352:21 | 249:6 | **define** 41:22 | 351:22 |
| **Cyberscoop** | **day** 13:13,18 | **decided** 85:8 | 42:2 | 375:5 |
| 8:16 | 127:2 | 116:7 | **definitely** | **departme...** |
| **Cybersec...** | 169:8 | **decision** | 96:2 | 278:5,11 |
| 4:6 | 175:3 | 17:20 22:1 | 236:10 | 321:7 |
| **cycle** 47:24 | 177:3 | 22:4,5,10 | 247:16 | **departme...** |
| 52:25 56:9 | 224:5 | 23:1 164:1 | **definition** | 329:1,11 |
| 129:15 | 262:17,22 | 164:3,16 | 92:19 | **departme...** |
| 170:8 | 262:24 | 178:7 | **definiti...** | 92:10 |
| 174:19 | 267:5,21 | 210:4 | 133:24 | **departments** |
| 185:18 | 268:3,5 | 261:11 | **Dehmlow** | 317:8 |

RIAN . SC LL    1/12/2023

| | | | | |
|---|---|---|---|---|
| departure | 182:16 | 308:1 | 42:3 146:3 | 77:18,20 |
| 36:17 | 259:17,21 | 311:15 | 220:6 | 78:9 |
| depend 356:5 | 259:22 | 312:10 | difficult | 244:11 |
| depending | 336:10,11 | 320:7 | 304:9 | 284:13 |
| 28:17 | 336:19 | 322:6 | difficulty | 285:2,13 |
| 146:3 | 351:18 | 324:16,23 | 83:17 | 285:18,24 |
| DEPONENT | 372:3 | 325:8 | Digital 47:8 | 286:5 |
| 373:10 | detailed | 328:12,24 | 48:21 | 288:20 |
| deposition | 108:11 | 329:1,7,11 | diplomatic | 289:22 |
| 1:14 2:1 | 136:7 | 329:14,20 | 280:12 | 290:1,4,6 |
| 5:8 6:3 | 289:3,19 | 329:23 | direct 15:2 | 291:11 |
| 7:3,7 8:3 | 325:10 | 369:3,6 | 15:14 | 304:9 |
| 9:3 10:5 | 326:6 | DHS's 9:6 | 66:10 | 305:6 |
| 10:12 | details | 321:5,6 | 77:25 | 308:5,13 |
| 12:12,16 | 27:10 | DHSA's | 79:11 | 308:13,15 |
| 249:20 | 136:21 | 319:22 | 103:8 | 309:14 |
| 372:11 | Detection | difference | 120:1 | 310:1,4,11 |
| 373:8 | 107:14 | 50:3 148:1 | 147:24 | 312:15 |
| 375:11 | determin... | 148:7,11 | 148:22 | 313:11,14 |
| 377:6,8,11 | 92:20 | different | 165:9 | 313:19,23 |
| deputy 12:4 | determine | 16:18 21:5 | 173:1 | 314:11 |
| 28:9 | 44:15 | 30:5 32:7 | 367:24 | 316:11 |
| derived | 56:20 | 38:22 45:4 | 371:17 | 335:16 |
| 123:3 | Detrick | 45:6 46:21 | directed | 336:14 |
| describe | 324:2 | 47:16 49:3 | 276:14 | 340:5 |
| 41:25 | develop | 49:25 90:9 | Directing | 344:6,13 |
| 54:25 | 16:12 | 91:14 | 18:2 | 345:4 |
| 59:12 99:9 | 44:11 | 108:4 | directly | 352:21 |
| 240:18 | 131:5 | 128:22 | 20:7 27:8 | 367:19,25 |
| 369:8 | 343:5 | 155:13 | 63:24 64:4 | director's |
| described | 355:22 | 161:11 | 66:6 67:19 | 313:21 |
| 42:23 | developed | 216:10 | 110:21 | 367:20 |
| 99:11 | 43:3 | 239:16 | 119:13 | 368:1 |
| 161:20 | 265:25 | 242:11 | 120:7 | directors |
| description | 286:16 | 260:17 | 135:3 | 50:10 |
| 244:16 | developing | 262:20 | 159:7 | 101:20 |
| 345:4 | 16:17 | 263:11 | 161:22 | 367:19 |
| desired | 39:16 | 264:17 | 163:3 | DiResta 54:5 |
| 375:17 | 333:23 | 268:19 | 164:20,23 | 70:5,20 |
| destroy | development | 279:13 | 266:8 | 72:17 |
| 219:2 | 172:2 | 286:13 | 292:13 | 116:25 |
| destroyed | 187:12,15 | 291:6 | 307:2,10 | 136:9 |
| 219:12 | developm... | 296:20 | 320:17 | 139:7,9 |
| destroying | 287:19 | 324:9 | director | 142:13 |
| 218:25 | DHS 8:8 9:8 | 329:13,14 | 9:13 12:9 | 361:20 |
| detail 19:19 | 25:23,24 | 335:6 | 22:14,14 | 368:9 |
| 19:22,24 | 26:1,3 | 349:6 | 34:9 76:5 | 369:22 |
| 20:3 71:14 | 215:13,16 | 357:22 | 76:6,7,8 | 370:3 |
| 71:17 | 220:10 | differently | 77:8,9,16 | dis 5:20 |

RIAN  . SC  LL  1/12/2023

| | | | | |
|---|---|---|---|---|
| 8:14 15:17 | 351:23 | 262:7 | 87:3 90:19 | 305:25 |
| 15:23 | **discussed** | 272:22 | 91:7,18 | 306:7 |
| 19:25 | 39:9 84:2 | 274:13 | 92:3,16 | 311:8 |
| 20:14 | 86:14 | 314:18 | 93:1,21 | 312:9,14 |
| 143:14,18 | 94:25 | 318:14 | 94:13,24 | 315:4 |
| 145:20 | 114:7 | **discussions** | 95:7,11 | 317:13 |
| 150:16 | 118:21 | 45:16 | 96:10,18 | 319:22 |
| 314:14 | 129:11 | 52:13 | 106:14,23 | 320:8 |
| 341:17 | 131:8 | 58:15 | 114:24 | 322:21 |
| 343:6,9 | 203:12 | 81:16 | 118:25 | 324:8 |
| **disclose** | 216:17 | 82:21 | 124:24 | 326:15 |
| 171:6 | 236:2,8 | 85:11 95:3 | 126:23 | 328:13,25 |
| 172:20 | 238:14 | 132:21 | 127:9,12 | 329:2 |
| **disclosed** | 239:22 | 137:3 | 130:16,23 | 331:17,20 |
| 172:19 | 240:15 | 150:14 | 138:10 | 331:24 |
| 192:3 | 247:5,8 | 151:5 | 141:22 | 332:15 |
| 193:2 | 249:12 | 178:19 | 142:4,16 | 333:15,16 |
| 242:15 | 254:8,23 | 302:25 | 147:4 | 335:20,24 |
| 243:7 | 258:25 | 305:19,23 | 149:15,24 | 336:16 |
| 276:16 | 259:2,16 | 306:3,6 | 151:8,23 | 338:1,7 |
| **disclosing** | 262:11 | 322:5,11 | 154:21 | 340:21,25 |
| 150:23 | 265:12 | 322:13 | 160:7 | 342:24 |
| **disclosure** | 266:20 | 351:21 | 169:19 | 346:12,18 |
| 150:19 | 295:14,23 | 371:14 | 172:17 | 346:22 |
| 152:21 | 306:9 | **disinfo** | 180:16 | 347:6,12 |
| 153:18 | 313:6 | 282:14,25 | 182:8 | 347:21,24 |
| **discovery** | 317:16 | 285:1,7 | 189:24 | 348:14,20 |
| 188:22,22 | 327:6 | 311:25 | 193:2 | 349:7 |
| 190:10 | 333:17 | 312:4 | 204:18 | 354:9,16 |
| 191:13 | 351:1 | 370:14 | 220:2 | 355:4 |
| 192:21 | 356:15 | **disinfor...** | 235:25 | 363:16 |
| 193:23 | 364:2 | 8:12,18 | 239:1,10 | 366:4,24 |
| 194:5 | **discussing** | 9:6,10,17 | 240:20 | 367:23 |
| 233:2 | 13:12 | 17:5,14,17 | 242:8 | 368:20,24 |
| 277:3,6 | 43:10 | 20:18 | 261:4 | 371:3 |
| **discuss** | 109:2 | 21:22 | 262:25 | **disinfor...** |
| 39:17 | 150:11 | 23:20 24:3 | 265:16 | 266:6 |
| 82:18 | 211:9 | 39:8 40:14 | 268:5 | **dismissive** |
| 85:18 | 236:25 | 41:18,21 | 278:6,13 | 335:25 |
| 133:2,4,9 | 237:4 | 42:1,8,11 | 283:4 | **dispute** |
| 136:15 | 305:24 | 42:13,14 | 284:13,15 | 246:14 |
| 142:9,13 | **discussion** | 42:17 | 284:15 | 248:4,6,7 |
| 181:10,16 | 27:18 | 43:10 | 285:18 | **disputed** |
| 182:12 | 78:15 | 56:15 | 291:25 | 223:14 |
| 236:18 | 89:18 | 57:11,21 | 300:2 | **disputes** |
| 255:7 | 171:22 | 58:17,25 | 302:4,14 | 221:15 |
| 307:16 | 236:23 | 65:4 66:16 | 302:19 | **disrupt** |
| 308:21 | 259:8,11 | 67:5,17 | 303:6,12 | 342:20 |
| 350:15,21 | 261:25 | 75:4 77:3 | 304:8,19 | **disrupting** |

RIAN . SC LL   1/12/2023

340:14
dissemin...
246:23
distinction
81:11
148:6,13
148:16
219:9
distribute
115:5
District 1:1
1:2 2:8
10:10,10
dive 274:14
274:24
divided
90:15
DIVINE 3:6
division 1:3
10:11 33:2
33:3,15
248:20
DM 281:9
DNI 334:2
DNI-led
332:21
doc 294:9
300:8,12
document
15:8 69:18
72:7,11
98:19
125:2
139:6
156:23
190:20
191:4
194:8,11
194:13
195:10
198:10
207:11,12
219:20
244:1,6
249:5
250:1
251:15
252:21
271:15

276:13
277:24
280:5
282:2
284:10
294:14
295:18,21
305:15
307:6
320:15
321:4,12
330:5,7
331:22
332:16
344:5
346:7
348:2
354:5
364:17
documents
6:4,13
7:12,17
9:5 165:17
176:17
294:19
319:21
doing 18:24
19:1 40:25
41:17
43:21 46:2
46:4 47:21
49:14
55:18
58:16
68:24 69:2
74:19,20
87:6,8
90:6 106:6
108:4
120:16
121:15,20
121:24
127:24
128:24
131:10
136:12
139:14
140:16
149:10

152:10
166:10,18
169:22
170:19
173:24
174:25
181:25
190:12
196:22
197:24
211:8
216:13
222:4
226:24
231:14
241:24
242:2
252:9
266:15,21
275:23
283:10
289:20
290:16
303:19
305:12
313:1
324:12
325:2
333:24
340:6
346:4
348:12,13
349:9,12
355:19
356:11
370:4
DOJ 25:23
32:16,24
33:4,15,19
33:25 34:4
117:20
248:19
264:18
domestic
26:16,23
27:16,20
38:4,7,9
123:13
270:17,22

271:5
329:3
domestic...
279:10
domestics
123:9
Dominion
292:23
downranking
288:6
Dr 72:21
draft 9:12
321:4,13
321:17
352:20
drafting
43:5
189:14
drafts
321:18
dramatic
301:2
Drazen
186:17,21
187:17
Dropping
225:20
drops 254:19
due 264:4,19
duly 11:13
dump 236:7
duplicate
64:23
208:10,15
208:24
duplication
120:25
duplicative
210:21
212:1
duty 168:23
Dynamics
5:13

_____E_____
E 1:23 2:2
3:1,1,17
4:1,1,1,20
5:1,6 6:1

6:1 7:1,1
8:1,1 9:1
9:1 10:1,1
374:2,18
375:5,10
e-mail 7:8
7:10 8:20
9:18,20
14:13,16
14:25
66:10,15
66:25
120:7,11
120:13
129:3,9
131:18
157:1,3,5
157:12
161:4,17
162:11
175:19,23
177:6
179:12
180:25
193:13
198:21
199:7,19
201:25
202:13,20
202:22
203:1,19
204:4,10
205:6,6
206:13
208:13
210:11,16
211:6
213:25
214:1,5,19
214:24
217:15,20
217:22
223:1,12
224:1
225:7
226:11
227:18
228:11,15
228:22

230:7,8,11
230:17,17
230:24
237:23
249:14
252:4,20
253:1,10
253:15
255:19
271:25
277:20
278:19
280:16
281:21
282:3,17
283:8
284:24
285:10
286:3
288:18
291:9,20
294:2
296:8
297:10,24
298:24
299:17,25
301:15,18
301:19,24
307:1,2
313:10
317:21
320:21
334:18
345:14
350:3,3,12
351:18
352:2,4,17
356:18
359:19
360:3,4,23
373:4
**E-mail(s)**
6:20
**e-mailed**
138:18
156:12
157:15
194:20
**e-mailing**

14:5
188:18
294:8
334:25
**e-mails** 67:5
67:7
131:14
156:19
166:24
168:3
170:20
171:4
178:22
179:13,17
179:23
180:13,15
180:20
184:7,11
184:18
189:11,22
192:1
193:7,7,9
193:21
201:3
202:4,4
203:17,23
213:15
215:6
230:7
260:2
276:24
277:7
278:1
288:10
299:19
340:2
345:15
**earlier**
20:12  55:2
56:18,22
63:16
72:13
74:14
91:15
93:10
96:16  98:5
99:11,19
100:16
101:17

102:8
112:23
115:1
118:21,23
119:7
121:11
126:9
131:4,19
140:9
147:22
150:10
156:20
157:5,22
159:1
170:3
171:21
174:14
200:22
203:12
208:16
246:10
255:24
257:1
263:7
264:16
265:12
266:20
272:20
280:5
284:1
294:21
295:24
296:1
301:15
303:24
316:5
320:12
322:15
336:22
337:24
340:2
351:2
353:19
355:17,21
356:3
360:12,24
362:6
364:2
365:4

367:1,5
368:19
370:6
**earliest**
22:20,24
23:8,10
**early** 22:7
22:23,25
49:18
53:14
63:24  64:6
70:9  83:24
88:25
89:25  97:5
173:18
234:8
239:25
240:25,25
241:1
327:2
336:12,13
356:7
362:11,13
367:6
**easier** 14:20
144:9
**Easterly**
22:14  76:5
191:20
304:10,13
305:18
307:3,9
308:5,13
309:14
310:2,4,11
311:23
312:15
313:23
314:11
318:14
335:16
337:24
344:6,13
**Easterly's**
316:12
345:4
367:25
**ecosystem**
357:2,8

**educate** 25:1
239:18
240:12
**educated**
261:5
**education**
16:13
131:5
239:14
**effectively**
329:2
**efficacy**
322:9
**effort** 12:21
13:5,10
203:13
307:17
308:2
320:4
**efforts** 8:17
18:13  96:9
118:3
259:14
302:4,14
302:18
303:1,1,6
303:7,11
320:8
321:25
323:22
336:4,6,20
**EI-ISAC**
60:19
61:10,23
62:1,2,5,7
110:17,21
110:22,23
112:10,13
112:18
147:6,14
147:20,25
148:2,3,12
148:21
149:13,20
199:12
204:8
228:7
**eight** 196:6
196:10,12

RIAN . SC LL　1/12/2023

| | | | | |
|---|---|---|---|---|
| 233:22 | 121:18 | **EIP243** | 68:4,14 | 168:21 |
| 245:16 | 122:11 | 161:15 | 69:21,22 | 169:8 |
| 250:16 | 134:11 | **EIS** 67:7 | 73:3,8,10 | 170:7,7 |
| **EIP** 5:9 53:4 | 136:20 | **either** 75:17 | 73:16 | 172:19 |
| 54:3 58:14 | 147:16 | 104:11 | 74:21 75:7 | 174:2,18 |
| 59:6 62:12 | 149:5,9 | 137:12 | 78:16,20 | 174:19 |
| 62:24 | 158:10,14 | 155:14 | 79:4,5,7 | 175:11,12 |
| 64:11,13 | 158:18,19 | 197:24 | 79:10,12 | 179:7,25 |
| 64:16,24 | 162:22 | 215:13,16 | 79:17 80:1 | 180:19 |
| 65:4,10,23 | 169:5 | 216:22 | 80:3 83:20 | 181:11 |
| 66:2,7,10 | 171:15 | 251:11 | 83:23 | 185:17 |
| 66:25 67:4 | 183:21,22 | 259:21 | 84:15,24 | 187:22 |
| 67:11,16 | 184:23 | 353:6 | 85:1 87:1 | 195:18 |
| 67:23 | 185:13 | 365:24 | 88:6,13,18 | 202:14 |
| 68:10,21 | 198:3 | 368:2 | 90:10,15 | 204:18 |
| 73:22 74:1 | 199:11,12 | **election** | 90:19 | 207:7,9 |
| 74:4 75:3 | 199:13,20 | 5:10,16 | 91:17,19 | 208:23 |
| 76:12 | 200:2,11 | 8:9,17 | 92:3 93:16 | 215:12,24 |
| 79:10,24 | 200:19 | 9:22 16:24 | 94:23 95:7 | 216:8,21 |
| 80:12,15 | 201:12 | 23:25 24:1 | 95:11 96:6 | 216:22 |
| 81:8,11,18 | 202:20 | 24:5,21 | 96:7,8,16 | 217:9 |
| 82:13 95:1 | 203:9 | 25:3,6 | 97:19 | 220:7,23 |
| 97:25 98:3 | 208:11,17 | 26:13 | 100:18,21 | 221:4 |
| 98:17 99:1 | 208:25 | 27:22 | 101:11,19 | 228:8 |
| 99:12,13 | 209:15,22 | 31:21,22 | 102:10 | 230:1 |
| 99:13,18 | 210:6,11 | 31:24 32:4 | 106:1,4,13 | 234:6,10 |
| 102:7,13 | 210:19,24 | 32:5 33:5 | 107:18 | 234:13,23 |
| 102:15,22 | 211:4,10 | 36:11 38:8 | 110:14 | 235:12 |
| 103:9,13 | 211:19 | 38:25 41:8 | 113:11 | 239:15 |
| 103:21,22 | 212:7 | 47:24 48:6 | 119:23 | 240:23,24 |
| 104:2,7,8 | 214:2,6 | 48:9,25 | 120:3,5,14 | 241:1 |
| 105:2,12 | 217:16 | 49:6 50:7 | 123:2 | 242:8,11 |
| 105:23 | 228:14 | 50:10 51:5 | 126:23,25 | 244:14 |
| 106:5,9,13 | 229:22 | 51:20 52:1 | 127:2,7,15 | 246:3 |
| 106:21 | 230:1,12 | 52:12,23 | 128:11,24 | 251:17 |
| 107:2 | 230:17 | 52:25 | 129:15,24 | 254:12,13 |
| 108:9,12 | 277:11 | 54:18,20 | 130:23 | 256:15 |
| 108:18 | 362:15,17 | 54:24 | 131:6,23 | 257:20 |
| 109:6,18 | 368:14 | 55:23 56:4 | 132:11 | 258:5,14 |
| 109:22 | 369:7,13 | 56:8 57:4 | 134:19 | 260:11,16 |
| 110:2 | 369:22 | 57:7,13,19 | 140:3,22 | 260:20,24 |
| 111:6,7,13 | 371:15,23 | 57:25 | 141:2,3 | 261:1,2,14 |
| 111:14,16 | **EIP's** 66:14 | 58:24 | 147:5,5,8 | 261:19,22 |
| 111:18 | 115:14 | 59:14 60:1 | 147:9 | 262:17,18 |
| 112:1,5,21 | **EIP-243** | 60:15,23 | 148:6 | 262:22,24 |
| 116:1,15 | 158:11 | 60:25 61:1 | 149:2,16 | 264:9 |
| 119:2,13 | **EIP-spec...** | 61:5 62:20 | 163:22,24 | 265:10,18 |
| 119:14 | 169:14 | 63:12,24 | 164:4,20 | 265:21 |
| 121:12,15 | 200:7 | 64:1 67:10 | 165:9,10 | 266:1,7,8 |

267:4,12
267:13,21
268:1,3,5
269:25
270:5,8,15
280:2
282:14,25
283:4,16
285:20
286:21
297:5,12
297:22
298:1,10
298:16
300:20,24
301:8
302:4,14
302:18,19
303:12,13
304:16
305:6,7
306:15
307:5,12
315:15
332:24
336:1
339:4,6
340:14,16
340:18
344:18
354:23,24
360:10
362:1,8
363:12,14
363:19
364:20
365:1
366:1,12
366:17
368:9,24
370:14
371:2
372:1
election...
262:9
264:22
265:9
election...
125:23

126:4
127:8
132:14,19
304:19
332:15
355:3
election...
304:5
elections
8:4 25:2,8
27:14
48:15
215:10
216:1
234:4,5
239:14,18
240:13
263:5
269:20
270:11
296:17
299:2
308:23
315:16
331:17
332:12
334:4
340:14
364:8
Ellis 1:23
2:2 4:20
10:15,15
374:2,18
Elvis 7:6
29:22 30:1
237:10
248:13
249:20
emerging
109:21
emphasize
372:8
employed
374:10
employee
120:2
278:20
employees
337:9

employment
196:24
enable 73:9
enclosed
375:11,13
Enclosures
375:25
encouraged
318:5
encouraging
128:9
ended 49:15
51:16
65:18,25
195:14
336:11
337:21
ends 19:17
enemies
285:22
enforcement
95:13
220:11
245:25
250:5,17
250:21,22
251:2
320:21
366:6,9,14
enforcing
289:15
engage 16:18
184:18
266:1
322:17
346:12,17
347:24
engaged
44:25
73:21
130:18
engagement
18:13,15
43:19 44:4
46:7 82:2
146:1
172:2,4
187:15
278:5,11

305:7
318:12
347:1,4,7
347:9,13
348:1
engagements
18:7,10
19:9 44:22
45:4 298:8
299:1
engages
171:3
engaging
18:10
73:17
78:20 79:4
286:21
329:14
346:21
ensure
253:23
entailed
169:13
enter 165:25
166:7
entire
174:19
180:19
194:8
195:23
219:13
357:7
entirely
29:8 77:1
101:20
188:11,16
261:17
295:24
363:22
entities
46:21 48:2
109:13
entitled
233:13
244:2
277:4
302:3
328:12
entity

204:17
324:3
369:15
entry 98:23
290:9
environment
48:15
152:1
154:6
Erie 217:10
errata
373:16
375:14,17
375:19
376:1
erry 281:16
escalate
176:3
206:2
207:25
208:2,11
226:15
292:25
297:3
escalated
200:11
escalating
158:5
295:5,20
ESI 276:17
276:25
especially
95:11
164:23
ESQUIRE 3:3
3:4,5,6,17
3:18 4:3
4:11 375:5
essential
128:6
267:16
essentially
17:3 18:12
19:9 28:8
40:17
41:11
43:17
45:13 47:2
54:11,14

57:12
59:12 62:9
67:24 85:4
86:19
117:15
154:2,7,12
155:19
263:2
291:2
294:2
305:4
323:17
348:18
358:20
**establish**
126:18
**established**
55:24
215:24
313:2
364:5
**et** 1:6,10
10:6,7
375:8,8
376:3,3
**evaluate**
23:21
**evening**
226:7,23
226:24
227:4
**event** 5:14
5:18 78:3
117:4
332:3
**events**
331:21,25
**everybody**
65:20
211:22,23
211:24
**evidence**
219:2
**exact** 85:4
86:5
129:23
134:24
190:2
307:24

**331:9**
**exactly**
15:21
68:24 93:5
101:21
137:15
152:15,19
221:9
275:25
307:21
337:12,20
**EXAMINATION**
5:2 11:14
**examined**
373:12
**example** 28:7
43:2 44:13
58:16 66:9
78:6
103:12
147:3
161:12
177:2
189:10
221:14
223:3,24
240:4
243:8
263:16
292:4
315:18
332:10
336:21
339:24
340:3,16
341:23
342:15
357:15
**examples**
126:10
158:11
265:2
**excellence**
141:23
142:4
149:24
**Excerpts** 7:6
**exchange**
73:10,17

73:22
292:21
**exchanges**
250:3
**excluded**
95:13
**Exclusive**
8:8
**excuse** 82:14
313:17
350:3
**executed**
249:11
377:14
**executive**
73:6 89:15
**exhibit** 5:8
5:9,11,14
5:18 6:3,4
6:13,20,22
7:3,4,6,8
7:10,12,17
8:3,4,7,11
8:14,16,20
8:22 9:3,4
9:8,12,15
9:18,20,22
9:24 13:25
14:4,4,6,7
69:7,9
138:17,20
156:13,14
168:4
170:20
173:2
179:13
190:13,16
194:19,25
197:25
198:10
212:25
213:14
227:9,12
231:15
242:12
243:22,25
249:15,17
249:22
252:3,5,12

252:15,18
255:15
259:24
269:4
277:16,19
301:20
302:1
306:18,20
309:20,23
319:15,18
328:4,7
334:19,25
335:1,6,12
345:18,20
349:15,18
349:24
350:2
352:13,16
359:13,16
363:6,9
364:11,14
365:10,13
368:3,6
369:17,20
369:23
**exhibits**
188:19
212:14
237:24
252:14,16
277:25
301:25
318:18
345:14
**exist** 166:5
**existed** 98:8
**existing**
283:13
**expand**
300:18
302:18
**expanding**
151:6,9
301:1
303:6
320:10
**expands** 8:17
302:3,14
**expect** 19:15

19:21
259:3,4
**expectation**
175:4,19
193:16
261:9
**expectat...**
247:7
**expected**
246:1,19
**expecting**
179:10
**expedited**
6:24
372:17
**experience**
318:4
**expert**
108:11
361:20
**expertise**
25:6,8
343:18
**experts**
337:25
338:7,10
343:14,21
356:4
361:5,10
361:16
**Expires**
377:24
**explain**
151:21
153:14
223:12
342:3
**explained**
71:3
**explanation**
221:19
229:13,17
**explicit**
90:18 91:5
94:22 95:6
**extensive**
152:3,3
**extent** 53:16
79:24 92:5

94:15
100:19
121:22
124:17
136:21
137:8
141:5
150:19,22
153:17,21
158:20
184:7
287:20
364:3,4,6
365:6
**external**
108:15,18
109:2,4,11
133:8,11
329:21,24
369:8,15
**extraord...**
35:7
**extremely**
192:7
**eyesight**
297:17

**F**
**face** 308:25
**Facebook**
21:7  27:3
36:23,24
37:4,11
38:15  65:3
78:7  117:3
117:10,12
117:16,19
127:6
146:6
159:7,17
159:18,22
176:15
217:24
218:2,7,10
218:10,12
218:19,23
219:4,23
220:9
221:16

225:5,11
225:16
233:23
241:6
243:9
253:15,23
255:20,25
256:2
271:24
272:24
275:4
284:12,25
284:25
286:4
287:4,12
287:17
293:15
294:7
295:18
296:6
297:6
307:2,3,10
307:12,14
308:6
309:14
310:6,21
310:25
311:2
320:18,20
348:15
**Facebook...**
144:24
**Facebook...**
159:13
**Facebook...**
320:24
**faced** 83:23
**facilitate**
25:16
59:25
74:22
103:16
210:21
220:19
263:4
264:10
**facilitated**
50:10
52:10

102:9,12
102:14,18
103:12
104:22
327:12
**facilita...**
111:25
**facilities**
342:19
**fact** 43:1
55:11
76:13  87:9
124:16
154:20
197:22
207:6
219:1
234:3
235:15
238:4
242:7
276:22
277:3
288:2
291:2,9
309:15
348:11
**factors**
339:2
**facts** 344:15
344:17,24
345:11
**fair** 13:23
13:24
298:15
329:17
345:5
369:13
**fairly** 36:9
57:8
114:15,16
**fall** 51:17
51:19
170:14
184:4
186:8,10
187:6
315:18
359:10

**false** 207:9
219:11,17
224:2
283:14
288:3
**falsely**
280:11
354:24
**familiar**
15:12,13
69:17
77:23,24
85:19
107:1
123:19,21
131:9
239:15
266:11
279:25
328:16,18
335:2
364:23
365:19
**familiarity**
182:18
**far** 14:14
17:25
107:6,8
112:17
125:1
138:13
172:14
182:23
234:3
334:13
**fast** 12:22
275:22
**FBI** 25:23
29:10,14
29:19  30:6
30:15
117:20
207:1,16
214:19,20
214:20,21
215:1,8,13
215:16,18
215:22,25
216:4,5,11

216:16
244:13
245:6,18
248:12,13
250:17,24
251:4
264:18
270:17
316:2
366:18
**FBI's** 271:6
**FBI.gov**
215:2
**FBI/CISA**
206:21
**February**
327:25,25
328:2
350:8
**FEC** 244:2
**FED** 314:13
**federal**
16:20  21:5
25:11
31:15  37:1
37:12  44:7
55:23  56:5
91:16  92:1
92:14,25
93:19,24
94:6,11,17
96:24
128:9
136:24
149:25
150:4
178:11
235:2
245:24
246:12
250:4,16
250:21,22
258:3,11
264:5,12
267:6,8,19
286:14,20
315:9
317:2,12
337:9

370:9,12
370:18,25
371:18
**feed** 155:8
**feedback**
88:14,17
294:11
361:17
**feel** 167:17
**fellow** 89:4
**felt** 16:10
235:4
**field** 215:23
215:25
216:5
**fifth** 101:4
195:9
**fight** 8:17
302:4,14
302:18
303:6,12
303:20
304:14,18
**figure** 49:20
86:6
102:19
221:17
275:12
**figuring**
274:4
**file** 116:1
**filed** 190:19
244:1
**filing**
375:21
**fill** 58:1,16
58:22
315:22
**filling**
58:20 85:1
**filter** 62:4
**final** 194:10
194:12
243:13
299:8
**finalized**
321:22
**financial**
340:23

341:11,22
341:25,25
342:4,11
343:1,4,11
343:13,18
343:22,24
355:13,16
355:20,23
356:4,5,13
374:11
**find** 62:20
108:25
143:14,17
179:23
180:7
220:24
221:13,24
222:3
224:11
315:8
329:5
375:11
**finding**
367:3
**findings**
47:6
**finds** 298:24
350:12
**finish** 113:3
**first** 6:24
12:15,16
12:19 14:7
24:12
25:21
31:14
55:16
56:25 78:6
81:25
95:14
103:2
109:11
117:15
125:21
144:11
153:5
156:25
157:17,18
185:25
187:18

202:5
213:13
224:1
228:17
233:11,11
253:5
260:3
277:5
278:2
299:11,13
299:15,23
310:5
319:9
320:2
335:23
345:15
354:7
356:11
360:4
370:22
371:16,20
**five** 38:25
180:12
181:1
192:11
201:1
243:2
276:18
282:5
319:3
330:25
**fix** 83:6
**flag** 109:21
110:1
192:2
251:18,18
281:3
297:3
320:17
364:20
365:1
**flagged**
116:12
177:9
206:6
288:12
292:22
**flagging**
21:21

67:17
180:16
207:21
291:17,18
295:5
**Fleischman**
4:11 11:4
**flexibility**
330:15
**flip** 117:22
**flipping**
109:10
**floor** 267:24
**flows** 105:17
106:19
110:22
357:20,22
**focus** 13:22
59:1
330:15
354:8,20
355:3
357:19,25
**focuses**
331:16
**focussed**
61:1
**foggy** 22:19
101:6
**Foley** 71:10
**folks** 29:17
46:22 52:6
52:11
58:11 70:2
70:3 83:23
85:5,20
104:5,23
147:20
165:18
188:25
234:18,20
264:9
267:13
327:15
**follow**
137:21
197:22
287:24,25
289:3

308:7
352:2
**follow-up**
13:19
116:8
**followers**
206:8,17
207:22
**following**
65:18
89:16
115:6,13
115:17
191:14
199:12
203:7
253:24
290:13
291:1
**follows**
11:13
299:24
**force** 12:5
118:1,7
130:2
271:6
312:3
330:15
348:13
**foregoing**
373:12
374:4,5
377:6,13
**foreign** 12:5
26:15,21
39:21 41:9
45:2,9,9
45:14,18
117:25
118:7
122:13
123:3,9,13
130:1
256:20
259:13
271:6
323:18,22
329:3
330:14

| | | | | |
|---|---|---|---|---|
| 348:13 | 159:16,21 | **forwards** | 269:19 | 193:4,6 |
| 364:18 | 168:6,10 | 205:5 | 276:23 | 265:5 |
| **Forensic** | 175:14,21 | 217:22 | **fourth** 44:11 | 270:12 |
| 48:22 | 175:24 | **found** 153:3 | 90:5 | **functioning** |
| **forget** 29:17 | 205:16 | 328:23 | 185:22 | 341:21 |
| 54:7 102:1 | 216:16 | **foundation** | 249:5 | **functions** |
| 116:22,23 | 217:23 | 39:2 80:5 | 251:16 | 304:4 |
| 155:13 | 220:2 | 122:22 | 321:3 | 354:21 |
| 174:4 | 231:1 | 145:11 | 364:16 | 355:10 |
| 186:1 | 259:9 | 149:18 | **frame** 99:17 | **fund** 110:23 |
| 214:4 | 280:25 | 178:15 | 220:5 | **funded** 61:8 |
| 286:16 | 281:23 | 196:1 | **framework** | 89:21 |
| 307:23 | 336:25 | 197:2 | 44:14 | **funding** |
| **forgetting** | **forwarded** | 204:24 | **Frameworks** | 61:10,12 |
| 167:18 | 17:21 24:3 | 214:23 | 47:8 | 61:23 62:1 |
| **forgot** 30:1 | 119:11 | 233:25 | **framing** 42:7 | 149:1,2 |
| **form** 116:17 | 131:14 | 244:21 | **fraud** 341:17 | 303:9 |
| 148:8 | 135:4 | 245:8,12 | **frequency** | 368:21 |
| 228:18 | 137:13 | 304:21 | 31:19 | **funds** 110:18 |
| 347:1,4 | 159:7 | 313:8 | **frequent** | 337:17 |
| 359:5 | 178:4 | 333:19 | 31:20 | **funky** 299:18 |
| 377:7 | 180:20 | 350:24 | **frequently** | **further** |
| **formal** | 184:8 | 353:25 | 39:4 64:4 | 31:20 |
| 234:16 | 189:23 | 354:13 | **Friday** | 102:6 |
| **formalized** | 193:2 | 355:6 | 291:17,20 | 221:17 |
| 142:15 | 200:19,20 | 356:22 | 291:21 | 307:16 |
| 320:16 | 206:16 | 359:23 | 292:1,6 | 318:14 |
| **formally** | 207:24 | 361:14 | 293:17 | 332:9 |
| 276:12 | 218:1,18 | **foundati...** | 304:10 | 347:10 |
| **formation** | 226:7 | 304:3 | **front** 187:2 | **fuse** 5:9 |
| 318:20 | 229:16 | **four** 12:1 | 328:8 | 141:3 |
| **formed** 58:12 | 281:12,15 | 19:8 31:18 | **frozen** 82:24 | **future** |
| 73:9 | 281:22 | 35:24 | 82:25 | 367:15,19 |
| **former** | 366:20 | 48:13,13 | **full** 11:17 | 367:21 |
| 304:15 | **forwarding** | 48:16,17 | 69:4 80:9 | 368:1 |
| **forming** | 23:25 67:8 | 48:24 | 261:8 | **fuzzy** 81:11 |
| 100:8,10 | 67:9 | 89:20 90:1 | 264:3 | **FYI** 199:20 |
| **Fort** 324:2 | 134:25 | 105:12 | 342:20 | **FYSA** 199:11 |
| **forth** 27:4 | 175:6,20 | 110:7 | **full-time** | |
| 127:6 | 179:25 | 111:11 | 170:10 | G |
| 144:20 | 183:15 | 112:22 | 330:19,25 | **G** 10:1 |
| 370:19 | 184:11 | 113:24,25 | **fully** 148:16 | **G-e-o-f-f** |
| **forum** 45:2 | 192:1 | 141:16,17 | **fun** 291:21 | 308:18 |
| **forward** 13:3 | 202:24 | 184:22 | **function** | **G7** 44:25 |
| 13:13 17:6 | 205:11 | 185:12 | 25:2 63:17 | 45:12 |
| 63:25 | 217:7 | 192:11,25 | 63:20 | **GAC** 316:5 |
| 106:12 | 242:10 | 214:21 | 161:20 | **Gadde** 360:14 |
| 123:5 | 278:4,6 | 250:8,12 | 163:18 | 360:14 |
| 129:8 | 291:24 | 256:4 | 189:23 | **gaining** |

RIAN . SC LL    1/12/2023

229:4
**gap** 49:21
52:6 56:24
57:1,12,17
57:18 58:2
58:16,20
58:23
74:18
83:22 84:4
84:6,8,9
84:11 85:2
85:5,21
86:14,21
86:22 87:1
87:9 91:14
91:16,18
92:1,14,23
93:8,10,15
93:18 94:5
94:10,17
96:15,23
98:7 99:10
111:22
368:19
370:5,12
**gaps** 57:6
96:23
315:22
372:1
**Garcia-C...**
186:3
**Gardner** 3:17
10:24,25
14:12,19
23:2,5
34:15,18
35:4 53:1
69:11
71:20 72:3
77:10,19
80:4 87:16
90:25 92:4
92:17 93:2
93:22
94:14
95:20,24
96:25
97:20
98:11

108:20
111:8
115:9,15
115:20
116:17
118:16
122:21
125:6,9
126:5
130:19
138:22
139:2
142:6
145:3,6,10
146:16
148:8
149:17
150:18
152:20
153:7,17
155:25
156:8
161:25
178:14
179:21
181:2,8
183:3,10
185:7
190:21,24
194:14,21
195:25
196:4
197:1
198:5,22
199:3
201:4
202:15
204:12,20
204:23
212:2,17
212:21,23
213:6
214:22
215:3
226:25
227:14,19
227:22
228:18
230:19

231:10,18
231:21
242:18,22
244:20
245:7
249:16,19
252:7,11
252:19,24
253:2,4,7
253:12
255:16
258:6
262:2
271:10,17
273:1
276:3
277:13,21
283:21
294:16,23
298:11
302:6,10
304:20
306:21
310:12
313:7
316:19
318:21
319:8
324:24
333:18
334:20
335:1,4,8
339:13,19
341:6
344:7,10
344:25
345:6
349:25
350:23
351:15
352:7
353:24
354:12
355:5
356:21
358:14
359:5,22
360:19
361:13

371:10
372:7,20
372:21,23
373:2,5
375:5,10
**gateway**
123:19,23
124:23
125:18,22
126:3
**gathered**
107:19
**gathering**
107:15
**GEC** 111:3
280:1
**Gegovich**
141:13
**general** 4:12
21:2 32:22
39:14
49:22 60:3
62:16
124:14,16
133:1
141:6
145:20
235:7
238:12
240:17
247:15
266:13
268:14,22
328:12
330:16
346:19
348:19
358:17
371:19
**General's**
3:7 10:20
10:23
35:10
**generality**
153:22
154:10
**generally**
15:21 16:7
24:24 25:7

25:14,15
27:7,10,17
29:20
33:21 36:6
37:8,19,21
38:10,16
38:19 41:4
41:21,22
44:21
52:21 57:5
59:1 64:7
65:5 67:20
68:13 74:2
79:19
80:18,19
80:23
83:18 94:4
107:5,7
119:7,13
128:2,7,22
143:12
153:14
163:21
176:23
177:16
178:18
193:18,19
212:11
215:11,22
220:14
222:5
233:14
234:2,23
235:7
239:23
257:6
258:21
263:10,12
264:25
278:17
288:13
293:19,22
304:2
309:4
315:23
325:19
333:5,6,22
340:10
343:14

| | | | | |
|---|---|---|---|---|
| 349:5 | 13:1 40:3 | 197:25 | 200:13 | 238:18 |
| 357:18,19 | 50:17,19 | 198:9 | 210:1 | 249:14 |
| 359:7,11 | 87:5 | 209:4,6 | 242:21 | 254:4 |
| 366:16 | 136:17 | 210:1 | 254:15 | 259:9,24 |
| 369:8 | 190:1 | 215:21 | 299:6 | 262:4,21 |
| **generate** | 210:8 | 217:2 | 304:12 | 263:5 |
| 159:24 | 214:16 | 218:14,15 | 312:21 | 270:4 |
| **generic** | 282:6 | 221:3,7,23 | 338:15 | 271:11,16 |
| 100:6 | 283:11 | 222:10 | 357:5 | 277:4 |
| **generically** | 284:2,5,6 | 231:22 | 369:1 | 288:16 |
| 155:6 | 339:24 | 241:10 | **going** 14:9 | 290:11 |
| 358:7 | 345:23 | 253:4 | 14:11 15:1 | 296:18 |
| **gentleman** | 346:1 | 256:24 | 20:4 21:16 | 298:20 |
| 310:6 | **given** 12:12 | 257:10 | 27:2 31:12 | 301:24 |
| **Geoff** 22:11 | 373:14 | 266:25 | 32:13 | 302:19 |
| 25:14,25 | **gives** 272:4 | 271:10 | 39:22 | 307:20 |
| 28:4,10 | **giving** 27:6 | 273:8 | 48:14 | 334:9,15 |
| 53:23 54:1 | 55:20 | 274:20 | 50:17,19 | 334:24 |
| 75:25 76:2 | 270:20 | 275:2,22 | 50:24 | 336:15 |
| 130:5,5 | **Gleicher** | 276:11 | 54:16 56:1 | 358:3 |
| 191:21 | 310:17,18 | 277:19 | 77:24 | **good** 29:24 |
| 253:17 | 311:22 | 279:15,16 | 89:14 | 56:14,21 |
| 270:2,3 | 312:16 | 288:5 | 102:20 | 66:20 |
| 308:18,19 | **global** 278:5 | 289:24 | 122:2,5 | 109:1 |
| 309:17 | 278:11 | 294:4 | 125:1 | 134:13 |
| 333:5 | **globally** | 302:10 | 138:16 | 140:11 |
| 350:4 | 236:21 | 315:8 | 140:5,24 | 163:6 |
| 353:20 | 255:8 | 330:4 | 144:6 | 181:4 |
| 360:23 | 273:11 | 332:9 | 156:10 | 247:14 |
| **George** | **go** 12:17 | 333:13 | 162:8,12 | 271:12 |
| 279:20,22 | 13:3 15:1 | 342:14 | 166:20 | 276:3 |
| **Georgetown** | 34:22 | 348:6,17 | 167:11 | 279:6,10 |
| 46:24 | 53:12 | 349:6 | 172:20 | 282:4 |
| **getting** | 61:16 83:2 | 350:2 | 173:9 | 284:23,25 |
| 40:18 | 83:5,5,7 | 362:20 | 179:3 | 286:5 |
| 100:2 | 88:22 | 364:16 | 181:3 | 330:6 |
| 102:18 | 113:3 | 365:16 | 183:24 | 331:12 |
| 109:4 | 120:17 | 370:1 | 184:2 | 341:23 |
| 125:10 | 124:8 | **goal** 54:22 | 193:13 | 346:16 |
| 203:22 | 125:6 | 347:19 | 198:23 | **Google** 38:16 |
| 208:16 | 127:13 | **goes** 13:13 | 208:4 | 144:18 |
| 220:19 | 152:17 | 19:12 62:2 | 209:20 | 233:23 |
| 228:9 | 165:17 | 62:3,3 | 211:10 | 350:5,16 |
| 293:4 | 182:21 | 90:16 | 212:14 | **Google-s...** |
| 299:8 | 183:4 | 94:19 | 218:15 | 161:5 |
| 344:1 | 186:10 | 95:10 | 220:11 | **Gotcha** 79:22 |
| 345:14 | 188:4 | 109:20 | 229:2 | 126:15 |
| **gist** 54:14 | 191:3 | 110:21 | 230:24 | 141:18 |
| **give** 12:24 | 195:4 | 158:9 | 233:7 | 218:11 |

RIAN  . SC  LL   1/12/2023

| | | | | |
|---|---|---|---|---|
| gov@twit... | 318:6 | 325:16 | 9:1 | 312:4 |
| 300:5 | 320:17,20 | 326:3,6,13 | H-i-c-k-e-y | handle 215:5 |
| governance | 320:25 | 326:16,17 | 33:17 | 265:1 |
| 312:22 | 348:22,23 | 359:19 | hack 236:6,7 | 281:8 |
| government | 348:25 | 368:15 | 236:14,18 | handling |
| 9:16 21:4 | 369:2 | groups 16:19 | 237:4,14 | 31:5 312:5 |
| 24:14 28:1 | 370:13 | 38:12 46:8 | 246:1,13 | happen 62:15 |
| 38:6 40:4 | 371:1,18 | 47:10,13 | 247:7,21 | 219:25 |
| 40:13 41:2 | 372:7 | 50:7 110:8 | 250:18,24 | 241:15 |
| 44:7 45:14 | governme... | 111:12 | 251:12,22 | 256:15 |
| 45:14 | 94:6,11,17 | 349:7 | 254:17,22 | 315:21 |
| 55:23 61:3 | 109:25 | grow 336:15 | 255:2,11 | 351:4 |
| 73:10,16 | 178:23 | 336:20 | 255:11 | happened |
| 73:20 75:3 | 194:5 | guess 19:8 | 274:9 | 100:25 |
| 78:6 90:16 | 257:25 | 66:1 76:6 | 275:6,13 | 101:7 |
| 90:17 91:4 | 339:7 | 104:25 | 275:15,19 | 106:22 |
| 91:16 92:2 | governments | 111:17 | hack/leak | 139:23 |
| 92:25 | 45:9 | 203:5 | 272:10,17 | 168:17 |
| 93:20,24 | 105:22 | 227:4 | 274:24 | 210:10 |
| 94:21 95:5 | 323:18 | 269:3 | hacker | 229:8 |
| 105:13,16 | 369:4 | 290:10 | 274:11 | 246:15 |
| 105:17,21 | graduated | 307:11 | hacking | 265:8 |
| 106:20 | 172:14 | 348:12 | 246:21,22 | 268:11,17 |
| 109:12,16 | 182:25 | guidance | Hale 22:12 | 293:19 |
| 110:5 | grant 61:14 | 22:14 | 25:14,25 | 301:14 |
| 117:14 | grants 61:12 | 216:21 | 28:4 53:23 | 337:20 |
| 127:23,24 | graphic 43:2 | 358:18 | 54:1 75:25 | 351:8 |
| 128:9 | 105:12 | guy 263:16 | 191:21 | happening |
| 132:5 | 107:13 | guys 63:9 | 253:17 | 117:1 |
| 135:4 | 108:8 | 173:23 | 270:2 | 253:9 |
| 137:13 | 110:8 | 179:16 | 308:19 | 268:22 |
| 140:14 | 330:9 | 185:7 | 309:17 | happens |
| 142:3 | Graphika | 216:13 | 350:5 | 36:22 |
| 146:24 | 47:13 48:3 | 226:23 | 353:20 | 176:13 |
| 149:25 | 48:19 | 249:21 | 360:23 | 264:21 |
| 150:4 | grateful | 264:24 | half 271:23 | 279:9 |
| 153:2 | 294:10 | 265:4 | 273:15 | 323:18 |
| 156:20 | gray 310:5 | 303:19 | hammer 286:6 | 347:17 |
| 179:10 | great 295:3 | 344:8 | 286:11 | happy 14:24 |
| 221:19 | ground 12:18 | 366:8 | 288:2,21 | 307:14 |
| 236:25 | grounds | Gwinnet | 340:3,7 | 312:16 |
| 244:18 | 152:21 | 228:6 | hammer/s... | harassment |
| 257:7,17 | 155:25 | Gwinnett | 289:21 | 8:9 50:24 |
| 257:22,23 | group 47:14 | 228:24 | 291:10 | hard 27:7 |
| 258:1 | 76:23 89:6 | 229:12 | Hampshire | 86:6 |
| 275:8,12 | 111:7 | | 299:12,22 | 177:11 |
| 286:20 | 197:12 | ——— H ——— | hand 374:14 | 178:7 |
| 314:2,10 | 233:8 | H 5:6  6:1 | handing | 180:2 |
| 317:24 | 325:7,14 | 7:1  8:1 | 174:5 | 293:18 |

305:16
337:6,11
359:25
**harder**
340:18
**harms** 342:12
342:13,15
**Harvard**
46:22
**Hawaii** 2:3
**head** 12:25
13:3 130:1
241:20
**headed**
117:12
**header**
199:24
205:18
226:11
282:23
297:23
**header's**
297:16
**heading**
122:10
**headline**
302:13
319:25
**heads** 210:8
284:3,5,6
311:15
**health**
136:24
322:16
355:13
**hear** 257:24
327:8
334:21
344:8
349:6,8
**heard** 22:11
134:6
145:15,17
263:8
277:5
**hearing** 65:3
124:6,11
290:23
**heavy** 367:12

**height** 331:6
331:10,12
**heightened**
126:22
**held** 2:1
10:12
**help** 16:14
44:14,17
100:20
131:6
210:4
216:8
220:4
260:19
261:22
307:17
316:8
322:16,18
323:5
324:10
343:5
355:23
356:6
358:18
**helpful**
155:21,24
162:12
299:3
300:9,12
**helpfully**
220:24
**helping**
58:22,23
100:17
187:12
324:7
358:2
**helps** 43:18
43:18
44:11
90:24
263:20
317:23
**hereunto**
374:13
**hesitant**
317:25
**hey** 14:12
27:2 86:25

139:13
179:2
208:9
224:6
226:19
257:17
259:2
**HHS** 135:12
140:12
322:18
323:10
**Hi** 161:4
228:7
283:10
350:11
**Hickey** 33:12
**high** 3:9
153:22
154:9
337:3
**high-level**
25:18
27:11 40:5
257:3
**higher** 37:22
130:12
296:5
**highlight**
305:16
346:9
**highlighted**
150:5
**highligh...**
98:25
**Hill** 8:11
335:17
**historic...**
259:8
**hoax** 219:13
**hoes** 281:10
**hold** 138:22
139:2,3,3
185:7
186:18
190:22,24
212:24
231:18,21
242:18,19
242:22

253:9
277:21
302:8,8
344:7
**holiday**
373:6
**Homeland**
4:13  11:5
11:23
244:13
245:3,17
320:3
321:5,13
321:15
**hone** 359:8
359:11
**honest** 65:17
91:21
113:20
135:2
148:15
177:24
216:14
259:19
261:16
322:25
**honestly**
22:17 29:6
54:7
124:20
176:18
303:18
**hope** 158:5
283:10
291:22
298:23
350:11
**hosted** 117:5
**hosting**
160:18
**hour** 319:7
**hours** 175:16
177:9
181:3
271:11
349:23
**House** 140:4
140:19
**housed**

141:23
142:4
149:24
150:3
**HSH** 322:23
**human** 28:21
34:9
340:15
**hundred**
26:18
137:17
169:16
**Hunter**
247:21,24
248:14
**hyper** 357:10
358:12
359:3
**hypothet...**
339:14,21
343:25
**hypothet...**
339:16
344:2

---

**I**

**I-S-A-C**
59:21
**I A** 26:8
27:8 28:14
28:22
264:18
332:12,18
**I P** 56:25
**IA** 26:4
**idea** 17:19
47:17 49:9
50:14
51:11
57:25 58:2
58:12 84:3
84:10,13
84:24
89:19 90:8
108:3
109:1
132:16
171:15
184:23

RIAN . SC LL   1/12/2023

| | | | | |
|---|---|---|---|---|
| 185:5,13 | 59:3 60:13 | 141:22 | 301:5 | 196:12 |
| 185:21 | 87:3 89:24 | 149:23 | 308:22 | 375:16 |
| 192:23 | 233:4 | 364:7 | 327:18 | **indicates** |
| 215:23 | 314:21 | **implemented** | 332:7 | 192:22,23 |
| 257:1 | 361:15 | 363:19 | 339:3 | 253:19 |
| 261:13,13 | 370:10,13 | **implemen...** | **included** | 278:3 |
| 346:19 | **identifying** | 118:2 | 39:21 | 280:9 |
| 371:23 | 191:11 | **implies** | 99:16 | 291:9 |
| **identifi...** | 210:21 | 222:4 | 111:21,25 | **indication** |
| 14:1 69:8 | 232:24 | **implying** | 112:4,5 | 153:2 |
| 138:21 | 370:5 | 339:10 | 225:5 | **indicator** |
| 156:15 | **IG** 285:7,8 | **imposter** | 235:14 | 42:19 |
| 190:14 | **Illinois** | 205:23 | 247:17 | **individual** |
| 195:1 | 299:12,22 | 206:7 | 276:18 | 134:24 |
| 213:1 | **image** 154:13 | **in-authe...** | 301:10,16 | 193:15 |
| 227:10 | 154:14 | 239:5 | 309:13 | 258:23 |
| 243:23 | **images** | **in-person** | **includes** | **individu...** |
| 249:23 | 330:10 | 295:15 | 45:3 48:2 | 241:22 |
| 252:6 | **imagine** | **inaccurate** | 61:4 72:16 | **individuals** |
| 277:17 | 180:21 | 321:9 | 254:16 | 35:15 |
| 301:21 | 208:18 | **inauthentic** | 293:23 | 38:12 |
| 306:19 | 209:23 | 41:23 42:3 | 357:8 | 179:24 |
| 309:21 | 221:3 | 42:10,15 | **including** | 180:12 |
| 319:16 | 268:9 | 115:1 | 67:15 | 246:19 |
| 328:5 | 274:19 | **inbox** 194:23 | 206:7 | **Indraneel** |
| 335:13 | **immediate** | 212:20 | 246:24 | 3:18 11:5 |
| 345:21 | 176:14 | 227:13 | 277:8 | **Indranee...** |
| 349:16 | 314:7 | 302:2 | 304:14 | 3:24 |
| 352:14 | **immediately** | 319:18 | 312:13 | **industry** |
| 359:14 | 110:4 | **inboxes** | 321:24 | 21:4,7 |
| 363:7 | 195:17 | 189:11 | 354:22 | 31:15 78:7 |
| 364:12 | 205:10,17 | 192:21 | 359:2 | 117:14 |
| 365:11 | 293:16 | **incident** | 370:22 | 132:5 |
| 368:4 | **immigration** | 144:19 | 371:16 | 179:2 |
| 369:18 | 220:10 | 218:19 | **incorrect** | 233:13,17 |
| **identified** | **impact** 152:8 | 221:19 | 119:15 | 233:19 |
| 57:6 85:4 | 154:4 | 236:10 | **increase** | 237:2 |
| 191:14 | 158:4 | 264:11 | 336:24 | 243:18 |
| 192:9 | 313:1 | **incidents** | **increasing** | 244:13 |
| 193:22,24 | 332:3 | 109:21 | 150:15 | 245:15 |
| 233:10 | 340:13,16 | 110:1 | 154:4 | 253:20,21 |
| 276:24 | 340:21 | 268:8 | **incredibly** | 254:2,15 |
| 288:7 | 343:7 | **include** | 304:9 | 254:21 |
| 361:4 | **imperson...** | 18:16 | **independ...** | 255:21 |
| **identify** | 206:22 | 50:25 | 60:7 | 256:1,8,13 |
| 17:4 27:20 | 207:8 | 109:12 | 316:14 | 257:5,7,8 |
| 37:25 38:7 | **impetus** | 232:9 | 317:3 | 257:17,22 |
| 38:9 44:9 | 356:11 | 295:19 | **indicate** | 257:24 |
| 57:10,15 | **implement** | 300:1,19 | 54:19 | 260:8 |

262:9
297:25
343:1
industry...
216:18
inference
245:22
influence
12:5 26:15
117:25
118:7
130:1
271:6
309:1,8
330:14
348:13
350:15,22
351:14
356:20
364:18
informal
136:4
information
35:7 39:22
40:5,11
45:24,25
48:15
59:15 60:4
60:6,16,22
73:9,17,21
74:1,4,6,7
74:9 78:21
79:5 82:16
87:5 90:15
94:7
105:23
115:7
121:21
137:21
140:20
147:6,7,16
148:5
150:20,23
151:25
152:22
153:18
154:6
165:2,8
166:8

179:25
193:10
207:9
220:3,7,17
220:20,22
220:22
222:19
223:5,14
224:11
225:19
226:8
254:19
258:11
263:4
264:10
278:23
279:11,14
280:8
283:15,25
287:20,21
289:3
290:22
291:5
300:25
301:5
315:13,16
315:22
321:9
323:4,9,15
326:12
336:2
339:9
357:2,7
359:2
informat...
17:11
270:9
informed
72:20
143:21
infrastr...
4:6 12:10
15:24 16:6
16:9 59:15
60:15 61:1
110:14
137:24
141:24
147:5

154:1,5
265:25
269:20,25
270:5,8,9
270:15
309:6,7
322:15,17
322:20
323:6
327:3,13
327:13,16
331:18
332:2,4,6
332:7
338:17,18
338:19,23
339:1,3,5
339:6,12
340:9,12
340:22
341:1,2,4
341:13
infrequent
32:1
initial 52:4
58:14
86:10
89:19
117:13
223:5
241:9
initially
101:15
initiative
9:22 90:11
316:5
Injunction
6:25
inoffensive
311:5,6,10
inputs 109:8
inquiry
208:8
Inspector
328:12
Instagram
146:7
217:11
285:10

320:18
instances
200:18
institut...
97:8 100:3
355:11
instruct
35:5
150:21
152:23
153:20
156:1
instruction
51:2
167:14
339:17
instruct...
156:9
intake
105:17,23
107:14
integrity
5:16 48:7
48:10,25
49:7 51:5
51:20 52:1
52:23
57:25 68:5
69:21 73:3
73:8 75:7
78:16 79:6
79:7 80:3
83:20
84:25 88:6
88:13,18
97:19
107:19
126:25
127:7
128:11
132:11
134:19
141:3
147:8
168:21
181:11,15
200:16
202:14
228:8

230:1
280:2
283:12
341:19
360:11
362:2,9
368:9
intel 259:12
332:25
333:9,11
333:22
334:15
intellec...
286:21
intellig...
25:18 26:2
34:9 36:7
36:8 39:20
95:15
235:4
244:12
246:19
257:2
258:17,18
258:20
332:14,22
intended
283:15
intending
252:8
intensive
62:19 63:8
166:11
173:23
interact
278:24
279:2
310:20
interacting
314:20
interaction
75:10
interact...
24:10
51:25 75:7
117:10
121:16
interagency
18:11

RIAN  . SC  LL   1/12/2023

| | | | |
|---|---|---|---|
| 36:25 37:1 | 196:14 | 153:16 | 170:6 | 263:3 |
| **Intercept** | 200:1 | 169:12,15 | 187:8 | **involve** |
| 9:4 319:20 | **intern's** | 169:20 | 370:5 | 60:22 |
| **interest** | 182:20 | 170:1,16 | **internships** | 245:15 |
| 9:25 44:10 | **internal** | 172:8,11 | 51:13 | 247:21 |
| 47:4 | 108:12 | 172:11 | 89:22 90:7 | **involved** |
| 159:14 | 120:13 | 182:14 | **interpret** | 16:8 21:19 |
| 161:6 | 133:7 | 185:17 | 275:6 | 21:21 |
| 341:3,5 | 155:20 | 186:11,14 | 371:7,8 | 25:12 26:1 |
| 374:11 | 165:17,21 | 186:23 | **interpre...** | 48:6,20,22 |
| **interested** | 329:20,23 | 188:5 | 239:4 | 51:5 56:4 |
| 27:13 | **internally** | 195:11 | 257:21 | 61:5 73:2 |
| 56:19 | 58:21 | 196:18 | **interpreted** | 75:6 78:2 |
| 143:13 | **internat...** | 201:25 | 257:14 | 80:14,16 |
| **interesting** | 44:4,20,22 | 361:22 | **interrog...** | 80:16 |
| 116:3 | 44:24 | 362:3 | 6:25 192:3 | 81:24 82:3 |
| 192:7,17 | 338:25 | 363:12 | **interrog...** | 82:6,7 |
| 192:18 | **internet** | **interning** | 189:14 | 88:10 |
| 317:25 | 50:6 51:8 | 196:19 | 190:18 | 97:24 |
| **interest...** | 51:10,23 | **interns** 49:9 | 231:16 | 100:3 |
| 122:11 | 52:5,11 | 49:15 | 242:15 | 101:22 |
| 355:17 | 58:9,11 | 50:13,16 | 243:7 | 102:5,9 |
| **interfer...** | 59:7,9 | 50:18,25 | 353:2 | 104:15 |
| 45:2 83:2 | 61:7 62:24 | 51:4,12,13 | **interrupt** | 113:6 |
| 83:3 | 63:19 | 51:14,16 | 13:6 178:1 | 114:9 |
| 122:14 | 64:19 | 51:16,18 | **intersti...** | 117:20 |
| 286:22 | 67:14,21 | 51:19 52:4 | 228:5 | 134:18,19 |
| **interloc...** | 70:15,21 | 57:3 58:4 | **interval** | 134:21,22 |
| 310:5 | 72:16 | 58:20 75:9 | 125:19 | 153:15 |
| **intermit...** | 76:15 78:5 | 84:2,3,11 | **intervening** | 168:3 |
| 31:13 | 78:9 79:14 | 84:20,22 | 89:2 | 169:18 |
| **intern** | 79:17,21 | 84:23 86:7 | **interview** | 170:19 |
| 166:19 | 79:25 80:2 | 86:7,14,20 | 345:23 | 172:10,17 |
| 167:9,10 | 80:17,21 | 86:25 87:4 | 346:1,3,5 | 180:12,14 |
| 167:12 | 80:24 81:6 | 94:25 98:6 | **introduce** | 184:10 |
| 168:22 | 81:13,17 | 170:5,9,10 | 10:18 | 188:20,21 |
| 169:3,4,7 | 82:2 83:24 | 170:12,18 | **introduc...** | 189:13 |
| 169:21,23 | 85:6 89:4 | 171:15 | 126:16 | 192:1 |
| 170:24 | 89:7,11,20 | 184:23 | **invaded** | 207:7 |
| 171:2,7,8 | 101:14,21 | 185:13,20 | 325:7 | 211:18 |
| 172:16 | 101:25 | 187:5,22 | **investig...** | 215:9 |
| 179:19 | 104:18,22 | 197:23 | 366:19 | 232:24 |
| 182:11,13 | 110:18 | 198:2 | **investig...** | 245:13 |
| 182:21 | 112:6,11 | 368:15 | 255:10 | 256:4 |
| 183:14,20 | 117:6 | 371:23 | **invitation** | 280:1 |
| 185:22,25 | 119:9,20 | **interns'** | 153:8 | 312:8,11 |
| 186:5 | 129:11 | 57:25 | **invite** 55:12 | 318:19 |
| 187:11,13 | 142:25 | 58:14 | 55:17 | 327:16 |
| 188:2,8 | 147:18,21 | **internship** | **invites** | 334:17 |

RIAN . SC LL    1/12/2023

360:10,24
361:25
362:4,11
362:19
366:13
**involvement**
49:6,8
192:19
371:18
**involves**
59:21
81:12
**involving**
156:20
278:1
**Iowa** 214:13
214:17
**Iranian-...**
285:22
**Isabella**
185:25
186:3
**ISAC** 59:14
59:16,21
60:14,15
60:16
110:15
**issue** 208:15
289:2,22
324:13
**issued** 222:1
310:9
**issues** 21:22
34:21 71:4
130:24
163:8
234:24
235:24
237:14
239:1
310:21
315:14
317:14
318:6,15
324:9
342:8
349:12
**item** 247:13
258:24

269:19
270:16
272:9
290:7
**items** 30:18
30:22,23
34:5
268:15
272:21

───────
**J**
**J** 1:14 2:1
5:2,8 6:3
7:3 8:3
9:3 11:12
375:12
376:2
377:5,20
**Jack** 9:24
188:7
195:3,5
196:17,20
197:18
198:1
**January** 1:15
10:3 12:2
19:20
71:16
88:24
195:19
196:13
307:11
330:13
374:14
375:3,12
376:4
**JCDC** 307:17
307:19
309:9
**Jefferson**
3:11
**Jen** 191:19
304:9
307:2
311:23
**Jessica** 4:3
11:3
**Jessica....**
4:9

**job** 1:21
11:20,25
12:8 15:19
18:10
115:24
116:1
314:7
342:23,24
347:16
**jobs** 340:19
**John** 3:3
10:19
14:12
34:18 54:7
82:23
125:10
138:23
139:2,3
145:7
167:19
179:19
184:14
185:10
191:25
192:12
194:21
198:12,22
212:17,17
213:7
227:19
231:19
232:1
242:19,24
249:16
252:7
253:7
271:10
276:20
302:7
318:21
334:20
371:11
**John.sau...**
3:13
**join** 38:18
**joined** 10:21
35:11
36:15
76:14,15

332:12
**joint** 207:16
233:8
253:21
254:2
307:22
**Joseph** 1:9
4:20 10:7
11:18
375:8
376:3
**Josh** 3:6
10:24
**JOSHUA** 3:17
375:5,10
**Joshua.e...**
3:23
**Josiah** 42:22
166:18,24
179:18
184:14
191:24
192:12
276:20
**journalist**
280:10
**JR** 1:9 375:8
376:3
**July** 86:17
98:25
104:25
269:6
271:24
272:6
274:18
**jump** 89:14
122:2
125:1
126:11
144:6
146:20
162:5
173:2,8
271:9
288:15
293:14
297:7
**jumped** 33:12
160:13

262:13
**jumping** 73:5
203:25
204:5
261:24
269:4
**June** 5:17
55:4 86:10
86:17
195:14,19
196:13
345:24
352:21
**June/July**
86:12
**junior** 10:7
43:16
**jurisdic...**
17:6
114:18
220:16,17
221:11,22
222:1,5,13
**jurisdic...**
57:11,17
57:22 87:4
**justice** 3:19
11:1,6
322:1
324:11,13
324:15
375:5

───────
**K**
**K-theore...**
240:5
**Kaitlin**
141:13
**Kansas**
375:21
**Kate** 72:21
87:25
360:4
**keep** 180:18
185:8
271:15
290:3
**Kent** 3:5
35:9

RIAN  . SC  LL   1/12/2023

| | | | | |
|---|---|---|---|---|
| **kept** 165:15 | 99:19,24 | 242:1 | 42:6 43:1 | 104:20,21 |
| 190:6 | 100:8,10 | 246:6 | 46:13 47:7 | 104:22,24 |
| **key** 16:13 | 104:8 | 255:25 | 47:10,10 | 105:5,20 |
| 18:11,15 | 105:2,12 | 256:2,25 | 47:16 49:2 | 105:21,24 |
| 189:9 | 112:9 | 257:3 | 53:6 55:22 | 106:2,9,10 |
| 263:3 | 114:13,20 | 258:8 | 55:24 56:6 | 106:15 |
| 276:15,25 | 114:23 | 260:21 | 56:10 57:7 | 107:6,18 |
| 355:11 | 115:3 | 263:14 | 58:23 | 107:21 |
| **kicked** 127:1 | 116:22 | 266:3 | 59:11,18 | 108:5,6,14 |
| **Kim** 28:6 | 119:24 | 267:16 | 59:18 | 108:17,23 |
| 304:14,18 | 120:6,7 | 270:10,14 | 61:11 62:1 | 109:25 |
| 305:2,4 | 121:21,22 | 270:14 | 65:20,22 | 110:20,21 |
| 353:18 | 124:14 | 271:5 | 65:23 | 111:5,10 |
| 360:22 | 128:9 | 289:18 | 66:20,21 | 111:20 |
| **kind** 13:7 | 132:13 | 290:18 | 68:16 69:1 | 113:10,15 |
| 14:14 16:7 | 133:14 | 293:4 | 69:3,4 | 113:21 |
| 18:5 20:7 | 136:4,17 | 315:23 | 70:19 | 114:4 |
| 24:25 25:8 | 136:24,24 | 317:22 | 71:12,24 | 115:7,22 |
| 26:14,16 | 138:10 | 318:5,9 | 72:6 73:20 | 116:24 |
| 27:2,5 | 141:6,6,7 | 323:16 | 73:23 | 117:8 |
| 29:2 30:14 | 141:9 | 324:2 | 74:13 | 118:13,18 |
| 31:18 | 145:1,5 | 337:3 | 75:15 | 119:14 |
| 37:22 | 147:21,22 | 344:21 | 76:19,21 | 120:24 |
| 39:25 | 148:3,17 | 347:11 | 76:24 77:4 | 121:1,3,6 |
| 40:20 | 149:13 | 356:6,8 | 77:15 79:6 | 121:14,16 |
| 41:12,25 | 150:15 | 357:20,24 | 79:9 80:1 | 121:21,24 |
| 42:2,11 | 152:1,5,13 | 358:18 | 80:7,12 | 121:25 |
| 43:21 | 153:13 | **kinds** 24:9 | 81:4,5,15 | 122:24 |
| 44:11,17 | 154:9 | 49:11 | 81:15,16 | 123:2,6,22 |
| 45:1 46:3 | 157:1 | 215:19 | 81:25 82:3 | 123:25 |
| 47:4,15,20 | 161:18 | 368:22 | 82:18 | 124:17,19 |
| 47:22 52:8 | 164:24 | **Klein** 345:24 | 83:18 | 124:21,21 |
| 52:15,19 | 174:12 | **knew** 100:17 | 84:16 85:3 | 127:11,11 |
| 52:25 | 175:16 | 117:2,6,9 | 85:16,24 | 127:16 |
| 55:16 56:3 | 178:5,7 | 176:24 | 85:25 86:5 | 128:3,19 |
| 57:4 58:1 | 182:4 | 192:18 | 86:11 88:3 | 128:21 |
| 58:22 | 187:2,13 | 295:22 | 88:5,10,17 | 129:6,10 |
| 60:10 62:8 | 187:25 | 313:19 | 89:1,12,25 | 129:14,22 |
| 63:14 | 207:4 | **know** 13:2 | 90:2,3,4 | 132:13 |
| 64:22,25 | 211:11,18 | 16:23 22:8 | 91:21 | 133:9 |
| 65:25 66:2 | 217:3 | 22:21 25:5 | 94:11,16 | 134:12,22 |
| 66:4 67:12 | 225:13 | 27:4,9 | 95:5 98:13 | 137:5,8 |
| 68:17 71:2 | 234:15,25 | 28:18 29:1 | 98:15 99:4 | 140:19 |
| 71:3 77:16 | 235:3 | 29:6 30:19 | 99:6,17,23 | 142:11,14 |
| 80:1 81:4 | 237:6 | 31:1,23 | 100:17 | 142:20,22 |
| 81:10,22 | 239:3,13 | 32:12,12 | 101:5 | 142:22 |
| 82:1,13 | 240:1,2,15 | 32:25 34:5 | 102:17 | 143:9,11 |
| 84:13 88:9 | 240:17 | 39:3,4,24 | 103:17 | 144:1,1,2 |
| 94:12 98:3 | 241:12 | 41:10 42:4 | 104:8,10 | 145:12,12 |

RIAN . SC LL   1/12/2023

| | | | | |
|---|---|---|---|---|
| 145:19,21 | 203:8 | 273:12,16 | 327:1,5,19 | 76:23 77:8 |
| 146:9,14 | 204:14 | 274:13,17 | 327:23 | 77:8,9,17 |
| 146:18 | 205:2,3 | 274:20,21 | 328:20 | 77:17,20 |
| 148:16,20 | 207:22 | 274:22,23 | 330:1 | 78:4,9 |
| 148:22 | 208:22 | 275:1,16 | 332:3 | 191:20 |
| 149:19 | 209:20 | 275:25 | 333:12,15 | 284:14 |
| 152:17 | 210:7,18 | 278:14,16 | 334:10,13 | 285:2,13 |
| 154:16 | 210:25 | 279:20,22 | 336:19,25 | 285:18 |
| 158:1,3,22 | 211:2,2,11 | 280:1,4,6 | 337:5,9,18 | 286:5 |
| 159:3 | 211:13 | 280:22 | 337:21 | 288:20 |
| 162:11 | 212:9 | 282:7,11 | 338:4,6,10 | 290:1,6 |
| 163:6,25 | 213:14 | 283:2,19 | 339:10 | 291:11 |
| 164:9,9 | 215:20 | 283:23 | 340:22 | 340:5 |
| 165:25 | 216:7,11 | 285:2,8 | 342:8,9 | **Krebs'** 290:4 |
| 168:5,18 | 216:14 | 286:10 | 343:12 | **Krebs's** |
| 168:25,25 | 220:3 | 287:12 | 350:19,25 | 77:24 |
| 169:13,18 | 221:6 | 291:7 | 351:12,14 | 289:23 |
| 169:21 | 224:13,14 | 293:19,21 | 351:17 | **Krebs-St...** |
| 172:13 | 225:12,14 | 293:21 | 352:5,9,10 | 197:12 |
| 173:24 | 225:18 | 294:1,13 | 352:12 | **Krebs/St...** |
| 174:19 | 228:23 | 294:18 | 353:17 | 76:23 |
| 176:8,16 | 231:9,12 | 295:1,22 | 354:1,1,18 | **Kris** 308:6 |
| 176:18 | 234:24 | 296:24 | 356:2,5,10 | 308:10,11 |
| 177:8,13 | 235:6 | 298:14 | 356:14,23 | **Kristi** 228:7 |
| 177:15,16 | 236:20 | 301:1 | 356:23 | |
| 177:22 | 237:10,20 | 307:21 | 358:13,16 | **L** |
| 178:13,17 | 238:1,2,3 | 308:10 | 359:1,21 | **L** 3:20 375:6 |
| 179:3,8 | 238:5,18 | 309:1,3,12 | 359:24 | **L-i-m-b-i-k** |
| 180:3 | 238:18,20 | 309:15,17 | 360:7,15 | 155:4 |
| 181:19 | 239:2,17 | 310:10,11 | 360:16,18 | **L-o-w-a-r-y** |
| 182:3,4,23 | 240:5,10 | 310:14,15 | 360:21 | 183:18 |
| 182:23,24 | 240:19 | 310:17,18 | 362:10,12 | **Lab** 47:9 |
| 183:24 | 241:13 | 310:24 | 362:12 | 48:22 |
| 185:22 | 244:24 | 311:6,12 | 363:18,21 | **label** 200:15 |
| 187:7,12 | 248:3 | 311:16 | 363:22,23 | 224:17 |
| 187:19,25 | 252:16 | 312:18 | 363:25 | 283:14 |
| 188:6,6,9 | 256:20 | 313:6,13 | 364:3,6 | **labeled** |
| 188:14 | 258:3 | 313:18,19 | 365:5,7,24 | 226:19 |
| 190:2,3,23 | 259:3,4,16 | 314:6,8 | 367:8,15 | 231:5 |
| 192:16 | 260:7 | 315:12 | 367:20,24 | 292:9,14 |
| 193:6,14 | 261:21 | 316:1,22 | 368:1 | 292:16 |
| 193:25 | 262:10,13 | 317:1,6 | 369:10 | **labeling** |
| 194:8,17 | 263:19,20 | 318:8,13 | **knowledge** | 288:6 |
| 194:18 | 264:7,9 | 318:16,19 | 56:7 61:9 | **lack** 80:4 |
| 197:18 | 269:2 | 321:15,16 | 146:19 | 122:21 |
| 198:7,8,11 | 270:24 | 321:23 | 172:12 | 145:11 |
| 198:14 | 271:8 | 324:19 | 324:14 | 149:17 |
| 201:3,6 | 272:14,24 | 326:19,20 | **known** 274:10 | 178:15 |
| 202:12,17 | 273:4,5,9 | 326:23 | **Krebs** 76:7,8 | 195:25 |

RIAN . SC LL   1/12/2023

| | | | | |
|---|---|---|---|---|
| 197:1 | 297:24 | 274:9 | 84:14 | 5:15 |
| 214:22,23 | 298:23 | 275:7,13 | 141:7 | **like-minded** |
| 244:20 | 299:16,21 | 275:16,20 | **let's** 34:22 | 97:8 |
| 245:7 | 300:11 | **Leaked** 9:5 | 69:9 83:7 | **liking** |
| 304:21 | 350:4 | 319:21 | 146:20 | 346:25 |
| 313:7 | 351:12 | **leaker** | 151:3 | **Limbik** 155:2 |
| 333:19 | **law** 95:13 | 274:11 | 172:23 | 155:10 |
| 350:23 | 245:24 | **learn** 46:3 | 173:2,3,8 | **limit** 127:7 |
| 353:24 | 250:4,16 | 47:20 | 183:4 | 231:6,9 |
| 354:13 | 250:21,22 | **learned** | 197:25 | **limited** |
| 355:5 | 251:2 | 54:13 71:3 | 198:9 | 36:10 |
| 356:22 | 320:21 | 84:14 | 217:2 | 232:10 |
| 359:22 | 366:5,8,14 | 141:7 | 231:15 | **line** 85:14 |
| 361:13 | **lawyer** 92:9 | 144:10 | 243:25 | 103:8 |
| 368:20,21 | **lead** 16:2 | 247:19 | 271:9,19 | 148:22 |
| **lacks** 204:24 | 18:7,10 | **learning** | 276:1 | 202:5,7 |
| 329:11 | 19:9 21:7 | 143:18 | 277:19 | 250:8,12 |
| **landed** 164:7 | 28:17 29:2 | **leave** 18:23 | 285:15 | 250:16,22 |
| **large** 305:20 | 36:1 42:12 | 19:17 | 288:15 | 255:22 |
| 305:24 | 42:23 | 28:12 65:6 | 289:6 | 273:15 |
| **larger** 14:19 | 43:24 54:5 | 88:21 | 291:15 | 285:7 |
| 181:15 | 78:7 | 299:3 | 294:4 | 299:15 |
| **lasted** | 117:16 | 331:1 | 301:23 | 376:5,9,13 |
| 325:12 | 118:8 | 336:12 | 309:23 | 376:17,21 |
| **late** 22:7,16 | 325:11 | **led** 326:21 | 330:4 | **lines** 43:17 |
| 22:25 70:9 | 332:25 | **left** 43:24 | 362:20 | 58:8 86:25 |
| 104:25 | 342:15 | 76:13 | **letter** 167:5 | 133:12 |
| 292:5 | 370:9,18 | 88:23 | **letting** | 207:11 |
| 293:5 | **lead-up** 38:8 | 167:23 | 294:1 | 216:24 |
| 367:5 | 298:2 | 197:19 | **level** 37:22 | 235:2 |
| **lateral** | **leader** | 319:7 | 45:1 56:5 | 286:15,18 |
| 144:17,17 | 118:10 | **legal** 4:20 | 153:22 | 327:6 |
| **Laura** 29:16 | **leadership** | 10:15,16 | 154:10 | 333:25 |
| 30:6,10,10 | 97:5 | 92:5,9,12 | 182:16 | 340:15 |
| 236:17 | 317:23 | 92:18,20 | 258:23 | 365:5 |
| 248:13 | 326:12 | 93:11 | 259:17 | **link** 285:9 |
| 270:20 | 371:1 | 94:15 | 318:12 | 320:23 |
| **Lauren** 18:6 | **leading** 33:4 | 95:21 96:3 | 333:8,13 | **LinkedIn** |
| 28:12 | **leads** 43:20 | 368:22 | **levels** | 9:24 38:17 |
| 75:18 | 44:4 311:9 | 370:22 | 146:23 | 195:6 |
| 191:21 | **leak** 236:7 | 371:16 | **Lexitas** | 196:3,5,9 |
| 255:19 | 236:14,19 | 375:1,24 | 10:16 | 196:11 |
| 260:4 | 237:4,14 | **lengthy** | 375:1,24 | 233:25 |
| 269:13 | 246:1,13 | 139:13 | **liaisons** | **links** 96:23 |
| 294:8 | 247:7,21 | 343:24 | 264:16 | 146:1 |
| 295:2,7,17 | 250:18,24 | **lesson** | 267:18 | **list** 72:11 |
| 296:6,15 | 251:13,22 | 144:10 | **lie** 348:7 | 87:25 |
| 296:22 | 254:17,23 | **lessons** | 349:2 | 165:19 |
| 297:1,10 | 255:2,11 | 54:13 | **Lightning** | 232:11 |

RIAN . SC LL   1/12/2023

233:8,21
243:2
264:3
276:17
285:22
338:9
339:3
342:14
354:2
361:3,4,9
361:16,20
**listed** 43:23
110:11,24
111:2,5,6
112:22
180:12
191:19
192:14
233:6
274:14
280:5
**listen** 13:10
**listen-only**
28:6,7,11
**lists** 15:16
105:12
192:11
280:8
**literally**
160:13
**Litigation**
4:5
**little** 14:11
14:15
22:19
26:22 73:7
83:1 101:6
102:12
130:20
143:4
146:18
172:25
181:7
182:18
197:10
220:5
235:17
240:14
263:11

265:25
282:2
292:22
299:17
316:2
317:6
337:19
341:8
**live** 198:23
344:14
**loading**
345:17
**local** 24:5
54:20,23
57:18
58:23 60:1
60:23 61:3
79:3 85:1
91:19
93:16 96:6
96:16
101:10
106:11
148:5
149:16
150:20
164:9,14
204:17
207:7
215:10
222:1
265:20
266:7
296:17
298:9
299:12,21
300:20
369:3
**location**
263:23
281:9
**Locust**
375:21
**logged** 190:7
**logistics**
30:17
**long** 5:9
11:19,24
27:17 46:3

87:10
141:2
177:2
187:25
276:4
314:8
319:4
349:20
372:4
**longer** 18:20
167:22
**look** 14:7
58:9 69:9
88:1 90:13
90:22
122:9
156:17,25
157:1,16
162:19
173:12
175:22
186:2
190:22
206:14
215:1
217:3
219:20
222:8
253:24
273:23
274:20
276:15
278:2
281:4
296:5
309:23
312:22
335:2
338:24
339:2
340:1
359:20
**looked**
314:20
340:2
**looking** 15:7
41:2 59:2
141:14
162:14

168:3
170:20
175:23
179:13
180:13
212:21
213:13
224:10
232:18,23
291:4
316:13
**looks** 82:24
161:12,17
162:8
173:18
175:25
176:5
195:10,18
197:11
198:19
199:22
214:17
218:22
223:2
269:16
280:19
282:10,13
283:24
294:7
295:3
297:18
**loom** 8:10
**loop** 107:9
**looping**
203:9
308:6
**loose** 293:20
**loss** 341:24
342:4,9
**lot** 40:6
45:4 125:7
159:23
162:12
177:21
235:16
239:14
257:2
260:15
261:19

279:4
304:3
316:15
322:24
324:8
340:17
342:21
348:21
349:6
**lots** 342:6
349:12
**Louisiana**
1:2 10:11
**love** 307:16
**low** 57:8,9
**Lowary**
183:16
184:10,22
185:15
192:1
193:1,22
196:25
197:7
276:21
**lower** 292:22
361:3
**Luke** 28:16
28:22 29:1

———— M ————
**ma'am** 372:23
373:2
**machines**
292:23
**mad** 281:10
**Magnets** 5:12
**main** 21:17
236:5,5
279:18
306:17
**mainstream**
357:9,16
359:3
**maintain**
146:22
170:6
**maintained**
120:9
**major** 105:13

RIAN  . SC  LL   1/12/2023

| | | | | |
|---|---|---|---|---|
| 110:7 | 26:10 | 98:9 113:9 | 313:11,13 | 300:19 |
| 111:6,12 | 90:18 91:6 | 117:4 | 314:12 | 301:6,9 |
| 126:24 | 94:22 95:6 | 120:2,18 | 317:20 | 303:20,20 |
| **majority** | 278:22 | 129:17 | **Matt's** 85:20 | 305:9,13 |
| 18:12 | **mandates** | 130:23 | **matter** 10:6 | 312:23 |
| 131:3 | 47:16 | 142:24 | 92:23 | 313:5 |
| 180:21 | **manner** 318:9 | 191:20 | 361:5,16 | 316:9 |
| 254:6 | **March** 71:16 | 217:23 | **matters** 4:5 | 318:10 |
| **making** 49:19 | 336:12 | 218:3,5,19 | 344:18 | 320:10 |
| 56:1 85:7 | **marked** 13:25 | 219:5 | 350:15,22 | 323:7 |
| 92:21 | 69:7 | 237:19 | 351:14 | 325:9,10 |
| 122:18 | 138:20 | 251:7,12 | 356:20 | 325:11 |
| 128:5 | 156:14 | 253:16 | **Matthew** 4:11 | 326:2,5 |
| 144:9 | 190:13 | 271:25 | 283:10 | 330:16,21 |
| 173:16 | 194:25 | 283:9 | **matthew....** | 331:5,16 |
| 176:24 | 212:25 | 284:5 | 4:15 | 331:19,23 |
| 178:8,21 | 227:9 | 305:5 | **mature** 46:2 | 337:4,15 |
| 211:21 | 243:22 | 313:11,13 | **May/June** | 338:22 |
| 238:18 | 249:22 | 314:12 | 53:19 | 342:23 |
| 269:10 | 252:6,21 | 317:21 | **MD** 20:17,21 | 343:19,19 |
| 286:7,25 | 277:16 | 318:13 | 354:8,15 | 343:22 |
| 301:2 | 301:20 | **Masterson's** | 354:20,22 | 344:22 |
| 340:18 | 306:18 | 129:19 | 355:10,19 | 346:16 |
| **mal-info...** | 309:20 | **material** | 357:2,7 | 347:23 |
| 5:20 8:15 | 319:15 | 246:22 | **MDM** 11:21 | 348:12 |
| 15:17,23 | 328:4 | **maternity** | 16:5,14 | 353:3,7,10 |
| 20:1,14 | 335:12 | 18:23 | 19:10 | 353:12,13 |
| 143:15,19 | 345:20 | 19:17 | 20:12 | 355:24 |
| 145:20 | 349:15 | 331:1 | 39:15 42:9 | 356:12 |
| 340:11 | 352:13 | **Matt** 11:4 | 44:9,16 | 357:20,21 |
| 341:18 | 359:13 | 75:10,17 | 45:6 56:20 | 357:25 |
| 343:6,10 | 363:6 | 80:13 | 72:24 | 358:6,11 |
| **manage** 16:1 | 364:11 | 81:17 | 75:20 | 358:24 |
| 16:2 43:4 | 365:10 | 82:18 | 118:8 | 359:1 |
| 64:25 | 368:3 | 83:16 | 143:21 | 366:3,23 |
| **managed** | 369:17 | 88:14,23 | 153:25 | 367:12 |
| 18:13 | **Marybeth** | 98:14 | 154:4 | 371:20 |
| 364:7 | 71:10 | 120:2,12 | 166:9,12 | **MDM-related** |
| **management** | **Masterson** | 130:3,7,22 | 171:18,20 | 329:15 |
| 11:22 | 75:11 | 142:24 | 188:11 | **MDM-spec...** |
| 308:25 | 80:13,23 | 191:20 | 189:7 | 113:12 |
| 309:7 | 81:17 | 217:23,25 | 233:8,8 | **mean** 17:2 |
| 327:15 | 82:19 | 218:3,5,19 | 274:2 | 34:2 48:11 |
| 343:17 | 83:16 84:4 | 219:5 | 278:25 | 49:3 55:13 |
| **manages** | 85:17 | 237:19 | 285:24 | 62:8 66:13 |
| 42:25 | 86:13 | 271:25,25 | 295:5,11 | 69:3 71:25 |
| **managing** | 87:22 | 283:9 | 295:20 | 74:5,15 |
| 262:21 | 88:14,18 | 284:5 | 297:3,5 | 82:12 |
| **mandate** | 88:21 89:9 | 305:5 | 298:4 | 103:20 |

| | | | |
|---|---|---|---|
| 105:4,25 | meaning | 94:13 | 241:6 |
| 108:4 | 287:3 | 105:14 | 242:16 |
| 114:2 | 298:9 | 107:20 | 244:18 |
| 115:11,21 | 313:1 | 108:2 | 245:4,16 |
| 121:19 | means 118:13 | 109:13,13 | 246:23 |
| 131:17 | 273:17 | 114:24 | 247:25 |
| 133:17,18 | 275:14,25 | 118:25 | 254:18 |
| 135:24 | 285:8 | 120:22 | 256:14 |
| 143:12 | 289:14 | 122:18 | 257:17 |
| 148:15 | 298:14 | 123:5,17 | 258:2,5,12 |
| 149:8 | 309:2 | 126:19 | 258:14 |
| 151:21 | 350:14 | 127:5,20 | 259:4 |
| 152:16 | 351:14,17 | 129:12 | 261:4 |
| 160:17 | meant 133:4 | 131:20 | 263:24 |
| 165:6 | 142:10,11 | 132:2,12 | 265:17,22 |
| 169:4 | 218:9 | 132:17 | 266:9 |
| 174:8 | 223:22 | 134:4 | 268:23 |
| 175:2,9 | 232:16 | 138:11 | 269:1 |
| 176:8,16 | 241:1 | 144:4,24 | 274:5,8 |
| 182:2 | 257:15 | 146:3 | 277:9 |
| 183:3 | 334:24 | 151:8 | 278:7,13 |
| 189:5 | 351:13 | 152:18 | 286:20,24 |
| 193:24 | 354:19 | 153:15 | 286:24 |
| 197:17 | 358:16 | 157:10 | 290:13,25 |
| 204:14 | measures | 163:19 | 291:25 |
| 207:3 | 355:13 | 164:11,13 | 293:5,6 |
| 211:7 | mechanism | 165:4 | 296:16 |
| 227:4,23 | 61:16 | 168:7 | 300:18 |
| 227:24 | meddling | 172:5,18 | 305:18 |
| 231:8 | 175:1 | 180:16 | 314:19,21 |
| 236:4 | media 17:4,8 | 189:25 | 317:13 |
| 248:6 | 17:10,13 | 192:2 | 318:4 |
| 257:5 | 17:16 | 193:3,9 | 326:14,24 |
| 270:8 | 18:16,21 | 200:21 | 327:3,9,18 |
| 273:7,22 | 20:8 21:1 | 208:23 | 333:16 |
| 274:7 | 21:5,23 | 210:12 | 339:10,23 |
| 275:1 | 23:21 24:2 | 214:3 | 340:4,6,8 |
| 280:22 | 24:5,10,13 | 220:4,6,25 | 341:14,16 |
| 281:17 | 27:1,23 | 221:20 | 347:1 |
| 287:8 | 38:13 39:2 | 222:17 | 350:15,21 |
| 293:18 | 39:8 57:21 | 223:20 | 350:21 |
| 298:13 | 58:17 59:3 | 228:9 | 351:3,7,13 |
| 309:3 | 64:2 66:5 | 229:4,8 | 351:24 |
| 316:17 | 66:17 67:1 | 232:8,25 | 352:11 |
| 326:16 | 67:18 68:8 | 233:18,22 | 356:19,19 |
| 338:9 | 73:12,12 | 233:24,25 | 357:8,9,10 |
| 341:12 | 73:18 | 235:13 | 357:15,16 |
| 358:7,13 | 78:21 79:6 | 237:3 | 357:20,21 |
| 366:21 | 93:21 94:7 | 239:11,21 | 357:23 |

| | |
|---|---|
| 358:12 | |
| 359:3,4 | |
| 363:16 | |
| 364:21 | |
| 365:2 | |
| 366:2,5,25 | |
| medium 359:9 | |
| meet 133:2 | |
| 239:25 | |
| 241:10 | |
| meeting 21:6 | |
| 24:13 | |
| 30:17 | |
| 31:14 | |
| 36:21,22 | |
| 37:2,4 | |
| 38:23 | |
| 47:20 | |
| 75:16 | |
| 78:10 | |
| 85:21 86:2 | |
| 86:13,17 | |
| 86:23 | |
| 87:10 99:1 | |
| 99:4,7,12 | |
| 99:17 | |
| 100:22 | |
| 103:8 | |
| 117:15,17 | |
| 140:1 | |
| 233:7,12 | |
| 233:13,17 | |
| 243:15,18 | |
| 248:25 | |
| 253:25 | |
| 254:7 | |
| 256:3 | |
| 259:20 | |
| 262:9 | |
| 269:14,17 | |
| 269:18 | |
| 270:1,3,21 | |
| 270:25 | |
| 272:5 | |
| 274:18 | |
| 275:3 | |
| 309:13,16 | |
| 337:25 | |
| meetings | |

RIAN . SC LL    1/12/2023

| | | | |
|---|---|---|---|
| 21:4,9,10 | 241:4,5,15 | **memory's** | 257:1 | 322:19 |
| 24:19,23 | 241:18 | 22:19 | 268:21 | 336:13 |
| 25:7,12,15 | 242:16 | 101:6 | 282:14 | **mid-October** |
| 25:16 26:8 | 243:8,18 | **mention** | 283:25 | 174:21 |
| 28:1,15,23 | 243:21 | 20:11 | 303:21,23 | **middle** 110:8 |
| 29:11,15 | 244:11,17 | 38:11 | 314:23 | 157:17 |
| 29:23 | 245:3,14 | 39:23,25 | 316:3,4 | 162:20 |
| 30:15 31:6 | 245:14,19 | 103:11 | 320:12 | 208:7 |
| 31:10 | 245:24 | 110:5 | 322:14 | 278:3 |
| 32:10,13 | 246:8,14 | 131:25 | 336:22 | **midnight** |
| 32:16 33:4 | 246:18 | 159:4 | 349:10 | 175:13 |
| 33:8,20,24 | 247:2,11 | 247:24 | 353:18 | 226:18 |
| 34:6,10 | 247:20,25 | 263:9 | 355:21 | 292:1 |
| 35:16 36:3 | 248:15,24 | **mentioned** | 356:3 | 293:16 |
| 36:12,18 | 249:11 | 24:12 | 362:16 | **midterms** |
| 36:19,20 | 251:13,23 | 29:10 39:1 | 367:10 | 8:10 298:2 |
| 37:7,15 | 254:4,24 | 40:23 46:9 | **merely** | **mimic** 134:11 |
| 38:7,14 | 255:3 | 48:1,18 | 220:21 | **mind** 99:8 |
| 39:9 45:21 | 256:2 | 56:18 59:5 | **merging** | 180:19 |
| 45:23 | 258:2,10 | 59:6 60:11 | 110:2 | 346:15 |
| 50:11 | 260:5 | 63:7,16 | **messages** | 357:8 |
| 52:10 | 269:6 | 72:15 | 8:22 | 359:2 |
| 74:23 | 272:19,21 | 74:23 | 106:12 | **mine** 71:9 |
| 77:21 78:1 | 306:2,9 | 80:13 | 120:15 | 83:22 |
| 78:10,16 | 310:23 | 85:13,23 | 178:4 | 180:22 |
| 102:9,12 | 317:16 | 99:19 | 309:25 | **minority** |
| 102:14,15 | 323:2 | 100:5 | **met** 141:6 | 122:19 |
| 102:22 | 353:23 | 101:17 | 238:4 | **minute** 99:9 |
| 103:12 | 361:6,11 | 102:8 | 239:25 | 99:15 |
| 112:1 | **member** | 111:20 | 338:4,10 | 107:13 |
| 117:14,19 | 183:22 | 112:16,23 | **META** 297:25 | 156:17 |
| 127:19,22 | 325:10 | 117:4 | **method** | 292:24 |
| 128:14,20 | **members** 49:2 | 131:4,19 | 290:15 | 345:17 |
| 128:22 | 97:25 | 139:5,6 | **methodology** | **minutes** |
| 132:4,6,21 | 166:12 | 140:5,23 | 154:18,20 | 87:13 |
| 132:23 | 180:7 | 153:24 | **meting** | 175:25 |
| 133:7,8,12 | 263:9 | 157:4 | 295:15 | 206:2 |
| 178:25 | 264:24 | 159:1 | **Michigan** | 224:16 |
| 216:18 | 279:16 | 170:3 | 46:25 47:1 | 226:15,18 |
| 232:8,25 | 326:7 | 183:11 | **Microchips** | 271:16 |
| 233:4,6 | 359:20,25 | 184:5 | 5:12 | 274:14 |
| 234:21 | **Memes** 5:11 | 187:14 | **Microsoft** | 276:3 |
| 236:3,8,23 | **memories** | 189:21 | 38:16,18 | 282:5 |
| 237:15 | 247:13 | 190:5 | 38:19 | 292:4 |
| 238:5,6,7 | **memory** | 193:14 | 88:22,25 | 318:25 |
| 238:10,13 | 230:22,23 | 198:3 | 233:24 | 319:6,7 |
| 238:15 | 247:14 | 240:13 | 297:11,25 | 349:23 |
| 239:9,20 | 255:1 | 251:3 | **mid** 22:20 | **mis** 5:20 |
| 240:6,9 | 258:24 | 252:2 | 23:9,10 | 8:14 15:17 |

RIAN . SC LL    1/12/2023

| | | | | |
|---|---|---|---|---|
| 19:25 | 127:8 | 293:5 | **mix** 333:5 | **MOLA_DEF...** |
| 20:14,18 | 130:17,24 | 310:21 | **mixed** 64:9 | 8:6 |
| 40:13 | 132:14,19 | 311:3 | **Mm-hmm** 23:18 | **MOLA_DEF...** |
| 42:11,12 | 137:21 | 317:14 | 110:13 | 7:11 |
| 42:14,16 | 138:6,11 | 318:6 | 139:15 | **MOLA_DEF...** |
| 57:20 | 141:22 | 322:6 | 163:1,12 | 7:13 |
| 58:24 | 142:3,15 | 323:11 | 166:25 | **MOLA_DEF...** |
| 90:19 | 144:3 | 324:12 | 274:16 | 7:9 |
| 91:17 92:3 | 149:15,23 | 335:20,25 | 300:16 | **MOLA_DEF...** |
| 92:15 93:1 | 150:17 | 336:5,16 | 308:24 | 9:14 |
| 93:20 | 151:7 | 338:1,8 | 330:17 | **MOLA_DEF...** |
| 94:12,23 | 157:3,6,9 | 357:14 | 350:7 | 9:19 |
| 95:7 96:10 | 158:6,14 | 363:13,20 | 365:15 | **MOLA_DEF...** |
| 96:18 | 160:7 | 364:8,21 | 370:7 | 8:23 |
| 126:22 | 161:9,21 | 365:2,16 | **Mm-mmm** 111:1 | **moment** |
| 127:12 | 164:10 | **misleading** | **MO** 375:21 | 352:18 |
| 143:14,18 | 165:3 | 283:15 | **mode** 28:6,7 | **Monday** 373:4 |
| 145:20 | 169:19 | 336:2 | 28:11 | **money** 61:16 |
| 147:3 | 173:13,24 | **misreading** | 263:21 | 62:3,3 |
| 151:23 | 178:23 | 160:14 | **model** 154:12 | 110:20,22 |
| 314:14 | 179:4,15 | **missed** 233:9 | **modeling** | 342:18 |
| 315:3 | 198:20 | **missing** | 155:9 | **monitor** |
| 340:11 | 200:3 | 282:19 | **moderated** | 57:20 59:3 |
| 341:17 | 201:2,23 | **mission** | 17:24 | 90:18 91:6 |
| 343:6,9 | 208:10 | 26:19 29:7 | **moderation** | 91:17 92:2 |
| 347:21 | 210:25 | 62:25 63:2 | 17:18 | 92:15 93:1 |
| 348:20 | 213:17 | 153:25 | 40:15 | 94:23 95:6 |
| 354:9,15 | 215:9 | 309:5 | 123:7 | 151:14 |
| 363:15 | 216:12 | 316:12 | 128:10,16 | 174:10 |
| 370:14 | 217:9 | 338:23 | 260:10,13 | 175:17 |
| 371:2 | 225:1,17 | 343:2 | 260:23 | 325:20 |
| **mischara...** | 226:8 | **Missouri** 1:5 | 284:7 | **monitored** |
| 23:6 97:21 | 228:17 | 3:7,11 | 289:15 | 108:2 |
| 345:7 | 229:10 | 10:6,20,23 | 296:3 | **monitoring** |
| **misinfor...** | 232:9 | 35:10 | **modulation** | 57:15 |
| 5:10 8:4 | 233:1 | 375:8 | 23:22,22 | 144:24 |
| 8:13 21:22 | 235:12,13 | 376:3 | 289:9 | 150:16 |
| 39:7 41:18 | 235:25 | **mistake** | **MOLA_DEF...** | 176:6,9 |
| 41:20 42:1 | 238:8 | 232:4 | 7:18 | 178:22 |
| 42:8 43:10 | 239:1,10 | **mistaken** | **MOLA_DEF...** | 201:2 |
| 45:17 77:3 | 239:22 | 232:16 | 6:5 | 225:15 |
| 91:6 | 243:10 | **misunder...** | **MOLA_DEF...** | 287:19 |
| 106:23 | 260:24 | 229:5 | 6:21 | 326:8 |
| 114:24 | 261:5 | **mitigate** | **MOLA_DEF...** | 348:5 |
| 118:3 | 264:23 | 16:15 | 6:14 | **Monkey** 324:6 |
| 120:8,10 | 265:5,16 | 343:20 | **MOLA_DEF...** | **Monroe** 1:3 |
| 124:24 | 268:4 | 358:3,23 | 9:21 | 10:11 |
| 125:23 | 278:12 | **Mitigation** | **MOLA_DEF...** | **month** 31:24 |
| 126:4 | 287:21 | 106:19 | 8:21 | 248:24 |

monthly
  24:17
  31:21 32:3
  233:14
  234:3,5,9
  234:16
  255:21
  256:3
  310:23
months 19:8
  24:11
  196:6,10
  196:13
  248:24
  325:12
morning
  173:18
  175:5
  176:1
  282:4
  286:5
mouth 69:6
move 179:5
  291:15
  301:23
moved 64:3
  336:25
moving
  172:25
  208:3
  282:1
  308:15
MS-ISAC
  60:19
multi-state
  59:14
multilat...
  45:1,12
multiple
  59:22
  201:10
  230:20
  245:14
  247:10
  359:10
  363:16
multistate
  60:14 61:2
  61:6

multitude
  340:20,24
mystery
  337:19

─────────────
        N
─────────────
N 3:1 4:1,1
  4:1 5:1,1
  6:1,1 7:1
  7:1 8:1,1
  9:1,1 10:1
NAFTA 263:7
name 10:14
  10:15
  11:17
  32:20
  35:20 36:1
  54:6,7
  76:22
  103:2,3
  166:20
  167:5,6,10
  167:11
  171:7,10
  172:16,19
  172:21
  186:1
  187:18
  194:4
  279:25
  376:2,3
  377:11
named 179:20
  182:12
  285:21
names 29:3
  30:9 50:17
  50:20
  100:5
  167:18
  188:24
  189:2,4,6
  189:9
  192:6
  276:18,23
narrative
  5:12 56:16
  154:4
  219:10,16

259:5
286:7,11
286:17,19
287:4,9,13
288:3,21
291:11
323:23
340:8
narratives
  109:22
  110:2
  144:3
  151:14
  152:1,8
  155:7
  256:8,14
  256:21
  257:18
  258:4,13
  259:2
  323:17
  324:8
NASED 103:13
  103:23
  104:2,23
  107:25
  112:1
  263:23
  264:6,22
  267:6
  268:25
NASOS 103:23
NASS 103:25
  104:3,23
  107:25
  112:1
  263:24
  264:6,22
  267:6
  268:25
Nathaniel
  310:18
  312:6
nation's
  337:25
  338:7
national
  11:22 16:5
  20:5 33:1

33:3,14
34:9 35:6
50:8,9
71:8,9,15
71:17,18
101:16,17
101:19
103:13
135:25
136:8,14
178:11
244:12
248:19
332:8
336:7
342:1,5
NATO 44:25
  45:12
nature 69:4
  113:18
  139:9
  145:13
  169:17
  203:23
  262:23
  322:2
  325:3
  327:5
  371:25
NAV 263:7
near 292:1
  293:16
necessarily
  36:18 58:5
  62:18
  65:13
  76:11
  100:7
  149:11
  151:24
  348:25
necessary
  258:22
  368:23
  377:9
need 34:19
  100:17
  199:21
  227:22

264:19
300:25
319:9
348:7
349:2
372:15
needed
  127:12
  174:10
  215:14
  216:9
  220:6
needle 81:5
  81:10
needs 9:8
  57:4
  295:10
  328:12,24
  329:23
nefarious
  229:6
NEI 264:18
neither
  374:9
Nelson 4:3
  11:3
network
  220:4
never 27:18
  133:4
  240:7
  242:3
new 41:5
  44:9
  114:19
  142:14
  188:19
  286:15
  290:7,8
  299:12,22
  301:24
  305:4
  312:22
  313:5
  336:21
news 109:13
  124:16
  302:3
  334:12

RIAN . SC LL   1/12/2023

357:10
358:6
359:3
**night** 175:1
175:8,10
175:12
179:7
291:20,21
292:6
293:6
**nights**
173:25
**No's** 252:5
**nod** 12:24
**non-profit**
47:7 59:13
148:3
**nongover...**
267:11
**nongover...**
45:9,13
**normal** 26:10
130:6
201:7
306:9,10
**normally**
41:25
165:18
178:3
270:2
333:8
**Northwest**
3:20 375:6
**notarized**
375:19
**notary** 2:8
374:21
375:18
377:23
**notation**
165:14
**note** 178:3
201:14
287:22
**noted** 337:24
**notes** 109:18
**notice**
202:24
203:4

**noticed**
228:16
**notifica...**
178:5
**notified**
165:13
**notifies**
177:3
**notify** 67:16
68:7 129:4
140:18
160:8
**notifying**
179:24
**notion** 94:20
216:15
**novels** 43:3
330:10
**November**
213:15,17
214:13
217:8
223:4
226:6
284:24
286:4
291:18
332:12
334:11
335:15
336:5
337:5
**NRMC** 9:22
**NSA** 286:13
286:16
**NSD** 33:7
**number** 10:8
113:22
160:22
162:5,22
171:3,7,8
172:16
190:2
201:16
210:20
214:20,20
214:21
217:16
256:10

272:9
331:9
340:12
**numbers**
162:11
211:1,5,11
**numeral**
141:16
**numerical**
14:5

_____
**O**

**O** 4:1 5:1
6:1 7:1
8:1 9:1
10:1
**Oberes**
157:18,25
**object**
152:20
155:25
**objection**
23:2,5
53:1 71:20
72:3 77:10
77:19 80:4
87:16 92:4
92:17 93:2
93:22
94:14
95:20,24
96:25
97:20
98:11
108:20
111:8
115:9,15
115:20
116:17
118:16
122:21
126:5
130:19
142:6
145:3,6,10
146:16
148:8
149:17
150:18

153:6
161:25
178:14,15
179:21
194:14
195:25
196:4
197:1
198:5
201:4
202:15
204:12,20
204:23
212:2
214:22
226:25
228:18
230:19
231:10
244:20
245:7
258:6
273:1
283:21
294:16,23
294:24
298:11
304:20,21
310:12,13
313:7
316:19
324:24
333:18
339:13,19
341:6
344:25
345:6
350:23
351:15
352:7
353:24
354:12
355:5
356:21
358:14
359:5,22
360:19
361:13
**objections**

6:23 156:8
215:3
**Observatory**
51:8,10,23
52:6 58:9
58:12
70:15,21
72:16
76:15 78:5
78:9 80:18
80:21,24
81:7,13,18
82:2 83:24
85:6 89:4
89:7,11,21
102:1
104:18,23
117:6
142:25
169:12,16
169:20
170:1,16
172:8,12
182:14
185:17
186:11,14
186:24
188:5
195:11
196:18
361:23
362:4
**observer**
332:24
**obtain** 323:9
**obtained**
246:22
**obviously**
12:19 16:1
16:19,23
17:23
28:11
38:15 42:6
51:12
77:24 87:7
87:21 88:9
107:24
120:12
175:11

| | | | | |
|---|---|---|---|---|
| 182:17 | 245:6,16 | 332:11 | 261:1,3,14 | 15:18 19:7 |
| 184:7 | 248:17 | 334:2 | 261:19,23 | 23:13 |
| 194:10 | 251:18,21 | 360:17 | 265:21 | 34:12 |
| 210:15 | 332:11,19 | 366:12 | 266:1,7 | 44:19 |
| 244:25 | **office** 3:7 | **officially** | 295:11,20 | 61:11 |
| 245:12 | 4:12 10:20 | 89:12 | 297:2,5,12 | 87:23 |
| 264:4 | 10:23 11:6 | 336:11 | 297:23 | 88:12 |
| 275:16 | 12:10 26:2 | **officials** | 298:2,9,10 | 89:24 91:2 |
| 282:17 | 34:8 35:11 | 8:9 16:25 | 298:14,17 | 97:4 |
| 298:13 | 44:24 | 24:1,1,5 | 299:2,12 | 100:19 |
| 324:19 | 204:7 | 45:15 | 299:22 | 103:20 |
| 351:1 | 205:12 | 52:12 | 300:20,24 | 104:1,6 |
| 359:10 | 206:6,15 | 54:18,21 | 301:8 | 109:10 |
| 367:25 | 206:19 | 54:24 57:4 | 305:8 | 114:7 |
| **occur** 24:16 | 214:13,18 | 57:8,19 | 306:15 | 115:18 |
| 53:18 55:3 | 215:25 | 58:24 60:1 | 320:17 | 119:5 |
| 70:6,8 | 216:1 | 60:23 61:2 | 321:1 | 125:15,16 |
| 86:3 87:10 | 225:2 | 61:5 62:20 | 340:18 | 125:17 |
| 246:2 | 244:11 | 63:12,24 | 363:14 | 126:13 |
| 268:18 | 311:15,19 | 64:1 73:10 | 364:20 | 130:15 |
| 334:3 | 312:10 | 73:16 75:3 | 365:1 | 131:1,25 |
| **occurred** | 328:11 | 78:20 79:4 | 366:17 | 135:6 |
| 78:4 | 333:9,11 | 79:10,12 | 372:2 | 141:20,20 |
| 104:11 | 334:1 | 80:2 83:23 | **oh** 19:21 | 144:14 |
| 138:14 | 375:20 | 87:1 96:7 | 29:24 89:1 | 145:23 |
| 200:19 | **officer** | 96:17 | 89:5 | 146:12,21 |
| 246:8 | 280:12 | 100:18,21 | 131:19,25 | 146:22 |
| 264:11 | 289:9 | 101:11 | 161:14 | 150:14 |
| 309:16 | 374:3 | 102:10 | 162:17 | 151:11 |
| 327:23 | **officers** | 106:1,4,11 | 163:15 | 158:2,17 |
| **occurring** | 216:5,5 | 106:13 | 167:19 | 160:21 |
| 235:18 | **offices** 57:8 | 110:5 | 183:4 | 162:10 |
| 246:7 | 57:13 | 119:23 | 192:8 | 167:8,16 |
| 279:7 | 90:16 | 120:4,5,15 | 225:25 | 167:24 |
| **October** 5:21 | 215:23 | 123:2 | 227:21 | 170:13,23 |
| 24:18 | **official** | 131:7,24 | 232:3,16 | 171:2 |
| 156:19 | 17:4 49:1 | 148:6 | 241:3 | 173:7,11 |
| 157:2 | 50:7 67:10 | 149:16 | 249:7 | 173:12 |
| 168:4 | 68:14 | 164:5,21 | 253:4 | 183:3 |
| 173:14 | 163:22,24 | 204:18 | 271:2 | 184:25 |
| 198:19 | 164:9,14 | 207:8 | 282:22 | 186:5 |
| 199:6 | 165:9,11 | 215:10,12 | 297:16 | 189:13 |
| 208:21 | 180:1 | 215:24 | 302:7 | 190:17 |
| 246:4 | 220:7,23 | 216:4,8,21 | 318:24 | 191:1,6 |
| **odd** 29:8 | 221:4,18 | 216:22 | 363:5 | 194:24,24 |
| **ODNI** 25:23 | 221:21,24 | 223:5 | **OIG** 9:8 | 198:15 |
| 34:8 35:15 | 251:17 | 242:11 | 328:16 | 205:15 |
| 36:2 37:14 | 281:17 | 260:11,16 | **okay** 13:9 | 206:4 |
| 117:20 | 331:19 | 260:20 | 14:24 15:7 | 207:20 |

| | | | | |
|---|---|---|---|---|
| 208:6,20 | 299:20,23 | 300:19 | 148:23 | 159:18 |
| 209:14 | 302:11 | 301:16 | 318:8 | 304:5 |
| 210:19 | 306:23 | **one-pagers** | **operated** | **ops** 119:24 |
| 211:9 | 308:5 | 295:23 | 53:6 | 267:10,15 |
| 212:23 | 309:24 | 296:2,20 | 155:16 | 267:21,24 |
| 214:7,11 | 320:1 | 298:1 | 368:24 | **option** 85:23 |
| 215:7 | 328:10 | **ones** 38:20 | **operating** | **options** |
| 216:11 | 329:5 | 114:2,3 | 56:11 | 216:10 |
| 217:2 | 330:8 | 121:17 | 95:16 | **oral** 135:7 |
| 219:25 | 332:9 | 168:3 | 148:20 | **order** 14:5 |
| 223:17 | 335:4,8 | 185:3 | **operation** | **ordinary** |
| 224:5 | 344:11 | 189:17,20 | 247:21 | 178:12 |
| 225:14 | 345:18 | 228:16 | 262:17,24 | **Oregon** |
| 226:3,5 | 348:11 | 233:9 | 264:22 | 201:23 |
| 227:16 | 349:24 | 234:16 | 265:9,10 | **org** 15:8,12 |
| 231:25 | 354:6 | 268:17 | 267:5 | 18:2 22:12 |
| 232:17,21 | 355:9 | 279:19 | **operational** | 42:21 |
| 232:22 | 356:25 | 306:17 | 98:20,24 | 130:8,13 |
| 243:4 | 359:17 | 348:22 | 155:18 | 166:17 |
| 244:4 | 368:7 | **ongoing** | 340:13 | 167:4 |
| 245:23 | 369:12 | 364:24 | 342:13,16 | 171:21 |
| 246:17 | 373:3 | 366:18 | **operations** | **organiza...** |
| 247:18 | **omitted** | **online** 94:8 | 39:22 | 49:24 62:2 |
| 248:8 | 215:5 | 114:23 | 96:11,19 | 147:23 |
| 250:2,14 | **On-call** | 150:16 | 179:8 | 148:19 |
| 251:10 | 107:14 | 151:15,23 | 236:7,7,14 | 369:9 |
| 253:7 | **once** 81:22 | 155:8 | 236:19 | **organiza...** |
| 255:17 | 203:16 | 158:14 | 237:4 | 9:23 130:4 |
| 256:7,12 | 204:1 | 195:6 | 246:1,13 | **organiza...** |
| 259:25 | 213:20 | 228:17 | 247:7 | 16:21 |
| 262:16 | 299:10 | 305:24 | 250:18,24 | 45:10,12 |
| 265:8 | 333:7 | 336:2 | 251:13,22 | 47:14,16 |
| 269:11,18 | **one's** 35:20 | 354:3 | 254:17,23 | 48:5,13,17 |
| 271:22 | 35:20,21 | 357:11 | 255:2,12 | 50:2 73:11 |
| 275:21 | **one-on-one** | 359:4 | 264:15 | 148:19 |
| 280:7,16 | 241:11 | 364:19 | 278:23 | 262:21 |
| 281:14 | **one-page** | 365:1 | 279:15 | 323:5,6 |
| 283:2 | 253:10 | **oops** 346:8 | 309:1,8 | **original** |
| 284:22 | 260:9,13 | **open** 16:22 | 312:5 | 375:13 |
| 285:25 | 260:21,22 | 164:2 | 340:14 | **originated** |
| 286:2,2 | **one-pager** | 281:9 | 342:20 | 90:8 94:25 |
| 287:2,17 | 260:6 | 325:21 | **opportun...** | 123:8 |
| 290:24 | 294:21 | 326:8,9 | 317:8 | 171:15 |
| 294:6 | 296:8,11 | **opening** | **opportunity** | 184:23 |
| 295:2,17 | 296:15 | 345:18 | 13:19 | 185:13,21 |
| 296:14 | 297:1,12 | **operate** | 234:18 | 198:2 |
| 297:19,22 | 297:22 | 52:25 53:4 | **opposed** | 228:14 |
| 297:23 | 298:16 | 61:23 62:7 | 91:18 | 371:23 |
| 298:21 | 299:2,7,21 | 110:19 | 92:24 | **originates** |

RIAN . SC LL   1/12/2023

| | | | | |
|---|---|---|---|---|
| 95:12 | **P** | 173:3,4,5 | 285:25 | 322:7 |
| 329:3 | **P** 3:1,1 4:1 | 173:9,10 | 288:16,17 | **panels** |
| **originating** | 4:1 10:1 | 173:11,20 | 289:19 | 187:14 |
| 83:19 | 11:21 | 191:3,6,8 | 290:6,8,13 | **paragraph** |
| **originator** | **P-a-t-t-o-n** | 195:9 | 290:19,21 | 110:4 |
| 201:13 | 32:21 | 197:11 | 291:1,8,12 | 147:2 |
| **origins** | **p.m** 157:2 | 198:9,11 | 291:15,16 | 150:2 |
| 321:24 | 173:19 | 198:16 | 293:8 | 192:6,8 |
| 322:7 | 175:25 | 199:16 | 294:4 | 244:8,9 |
| **outcome** | 177:3 | 201:17,22 | 295:2 | 245:23 |
| 374:12 | 183:9 | 203:14,15 | 296:6 | 304:7 |
| **outcomes** | 209:9,12 | 204:1,1,5 | 297:8,9 | 305:15,16 |
| 27:22 | 276:7 | 204:7 | 298:19 | 330:10 |
| 354:25 | 291:20 | 205:8,10 | 299:14,15 | 332:10 |
| **Outline** 9:5 | 292:5,23 | 206:9 | 305:15 | 335:23 |
| 319:21 | 292:24 | 208:3,4 | 307:6 | 336:15 |
| **outlining** | 362:23 | 213:14 | 310:6 | 337:23 |
| 321:6 | 363:1 | 214:7,9 | 313:10 | 348:3 |
| **outputs** | 372:12 | 216:25 | 315:17 | 361:15 |
| 109:8 | 373:9 | 222:20 | 320:2,15 | **parentheses** |
| **outreach** | **P.O** 3:10 | 224:21,22 | 321:3,3 | 281:10 |
| 18:13,15 | **PA** 217:10 | 225:5,11 | 330:2,4,5 | **parody** |
| 272:1 | **page** 5:2,8 | 225:16,20 | 332:10 | 205:24 |
| **outside** | 6:3 7:3 | 225:25 | 346:7 | 206:6 |
| 134:3 | 8:3 9:3 | 226:2,4 | 348:2 | 281:10 |
| 151:6 | 15:16 | 227:17 | 354:4 | **part** 11:22 |
| 353:22 | 72:11 73:7 | 228:2 | 356:25 | 20:2 51:23 |
| **overall** 96:8 | 87:23 | 231:22,25 | 364:16 | 61:8 63:25 |
| **overlapped** | 89:14,16 | 232:3,13 | 365:17 | 75:16,20 |
| 195:22 | 90:21 | 242:20,25 | 366:1 | 78:23 |
| **overseas** | 98:19 | 247:19 | 368:11,12 | 104:7 |
| 41:11 | 105:8,11 | 249:5,25 | 370:1,2 | 106:7 |
| 278:20,23 | 108:12,24 | 251:15,15 | 375:14,18 | 110:22 |
| 279:5,8,9 | 109:2,11 | 251:16 | 375:20 | 115:25 |
| 280:19 | 110:9 | 260:3 | 376:5,9,13 | 128:7,21 |
| **oversee** | 117:22 | 261:25 | 376:17,21 | 147:22 |
| 25:15 | 122:2,5,10 | 262:4 | **pages** 1:22 | 149:10 |
| **overseeing** | 125:2,5,14 | 269:4,5,9 | 160:22 | 169:4,5,7 |
| 59:21 | 126:11,12 | 271:9,20 | 206:5 | 169:24 |
| **oversees** | 141:15 | 271:21,24 | 208:4 | 181:14 |
| 59:13 | 144:6,7 | 278:2 | 269:11 | 189:7 |
| **overtaxing** | 145:23 | 280:7,14 | 276:15 | 192:3 |
| 211:15 | 146:20 | 280:15 | 285:15 | 193:3,5 |
| **overview** | 149:22 | 281:2,4,6 | 291:16 | 201:7 |
| 136:17 | 156:25 | 281:15 | 332:9 | 203:12 |
| **overwhelmed** | 157:17 | 282:3 | **paid** 203:2 | 264:21 |
| 342:17,18 | 160:22,25 | 283:7,7 | **pandemic** | 281:20 |
| **overwhel...** | 162:7,9,11 | 284:9,19 | 264:20 | 290:5 |
| 65:1 | 162:16,20 | 284:21 | 321:25 | 311:1 |

RIAN . SC LL   1/12/2023

| | | | | |
|---|---|---|---|---|
| 322:24 | 181:19,21 | 369:10,13 | 364:18 | 291:17 |
| 323:21 | 334:13 | **partners** | **pass** 106:5 | 294:5 |
| 325:9 | **particip...** | 16:20 | 123:16 | 297:8 |
| 338:23 | 126:18 | 18:11,12 | 163:8 | 298:20 |
| 342:23 | 354:23 | 21:5 37:1 | 265:5 | 299:16 |
| 347:15 | **particular** | 44:5,20,22 | **passed** 56:23 | 330:5,6,8 |
| 362:1 | 11:25 | 46:11 | 162:24 | 370:2 |
| **part-** 330:19 | 23:20 | 109:17 | **passing** | **peers** 244:13 |
| **part-time** | 30:18,22 | 110:1 | 141:10 | **penalty** |
| 170:6,12 | 31:9 42:17 | 204:9 | **patient** | 377:12 |
| 184:3 | 65:8 74:10 | 224:2 | 280:12 | **pending** |
| **participant** | 85:22 | 228:8 | **Patton** 32:17 | 255:9 |
| 354:2 | 112:15 | 235:2 | 32:17 | **Pennsylv...** |
| **particip...** | 136:5 | 264:6,12 | **pay** 196:21 | 218:18 |
| 72:11,12 | 152:7 | 267:11 | 197:20 | 219:19,22 |
| 128:23 | 154:14 | 298:1 | **PDF** 89:16,17 | 223:4,13 |
| **participate** | 159:24 | 369:2,6 | 122:6 | 223:21,25 |
| 55:12,16 | 179:11 | **partnership** | 125:5,12 | **people** 18:4 |
| 131:11 | 209:1 | 5:16 48:7 | 125:14 | 29:19 30:5 |
| 132:7 | 211:16 | 48:10,25 | 126:12 | 36:2 46:24 |
| 323:1 | 258:14,16 | 49:2,7 | 144:8 | 54:8 56:4 |
| 333:5,6,13 | 287:9 | 51:6,20,24 | 160:25 | 103:4 |
| 353:5,10 | 341:20 | 52:2,24 | 162:7,9,11 | 112:10,13 |
| **particip...** | 346:8,9,11 | 58:1,6 | 173:6,10 | 112:14 |
| 25:22 26:3 | 359:9,12 | 68:5 69:21 | 198:11,16 | 114:1,5 |
| 28:2,23 | **particul...** | 73:3,8 | 201:18 | 115:6,12 |
| 29:14 33:7 | 33:23 | 75:8 78:16 | 203:14 | 134:18,19 |
| 34:10 | 52:16 | 79:8 80:3 | 204:8 | 140:18 |
| 35:15 | 56:19 82:6 | 83:20 | 205:10 | 152:18 |
| 38:14,17 | 174:17 | 84:25 85:8 | 206:10,11 | 154:23 |
| 38:23 39:3 | 239:24 | 88:6,13,19 | 208:5 | 159:23 |
| 55:14 71:5 | 256:19 | 89:19 | 214:10 | 168:2 |
| 77:21 | 266:11 | 97:19 | 217:1 | 174:8,22 |
| 78:10 | 279:5 | 99:21,24 | 222:21 | 175:16 |
| 132:3 | 286:5 | 100:9,11 | 224:22 | 176:5 |
| 238:12 | 289:22 | 107:19 | 225:25 | 178:12 |
| 274:17 | 299:3 | 132:11 | 226:4 | 179:3 |
| 309:18 | 344:17 | 134:20 | 227:17 | 181:22 |
| 326:4 | 366:10 | 141:4 | 228:3 | 189:7 |
| 333:2 | 369:2 | 147:8 | 251:16 | 191:11,24 |
| 353:21 | **parties** | 168:21 | 261:25 | 192:9,11 |
| **particip...** | 10:18 | 181:12,15 | 269:5,9 | 192:19 |
| 28:2 | 374:10 | 202:14 | 271:21 | 193:1,18 |
| 310:22 | **partisan** | 228:8 | 280:15 | 193:19,21 |
| 353:9,14 | 357:10 | 230:2 | 281:4,6 | 201:1 |
| 353:16,23 | 358:12 | 280:2 | 283:8 | 255:20 |
| **particip...** | 359:3 | 360:11 | 284:19,21 | 259:3 |
| 33:4 39:5 | **partner** 96:7 | 362:2,9 | 286:1 | 263:25 |
| 76:4 | 97:8 | **parts** 30:5 | 288:16 | 285:22 |

291:2
297:11
316:8
324:7
331:4
336:21
337:4,15
342:17,19
344:14
347:20
348:4,21
349:4,8
358:2,18
358:21
360:2
364:23
perceive
96:23
percent
26:18,24
61:15
122:12,13
137:18
149:12
169:16
percentage
123:3
perform
265:4
performed
63:16
performing
161:19
performs
63:20
period 20:24
21:20
28:23
31:11 41:7
162:3
180:22
246:2
periodic...
30:4 162:4
164:15
165:20
perjury
377:12
perking

152:2
person 20:7
53:25
117:18
129:24
171:3
219:11
264:3
person's
36:1 103:1
personally
236:15
238:3
245:13
perspective
24:25
39:15
42:10
45:25 46:7
47:13
234:22
257:25
315:12,15
323:2
325:25
326:1
367:12
pertained
30:15
phone 99:9
99:12,15
227:5
293:12
phones
174:10
175:17
176:6
phonetic
47:14
71:10
141:13
phrase 56:22
physical
235:18,23
263:23
270:12
342:12
pick 32:4
174:6

344:16,23
picked 372:2
piece 220:13
Pierce
183:15
184:10,20
184:22
191:25
193:1,22
196:25
197:7
276:21
pilighting
151:21,22
pilot 151:18
152:15,19
153:14
154:7
155:6,11
155:17
piloted
151:16
piloting
151:13,22
152:2,5
pilots
155:14
pinging
176:20
Pinterest
233:24
place 56:25
135:25
232:8
291:5
314:12
325:17
334:4
351:24
356:12
363:15
placed
128:13,15
places
220:11
plaintiff
3:2 10:7
plaintiffs
1:7 6:23

10:21
35:11
plan 8:8 9:6
32:9
269:23
planned
136:17
307:12
planning
295:19
plans 54:12
54:15
319:22
321:8
367:21
platform
21:11 64:3
65:16
66:17
67:10,18
68:9
120:25
126:17
133:2,9
134:4
146:4
160:9
161:11,22
163:2
164:2,7,12
165:4,7,16
168:7,16
179:14
180:8,9
200:21
208:24
220:25
222:17
223:21
241:11,22
278:7
287:14
300:18
306:14
352:11
357:20
platform's
261:6
platforms

17:16
18:17,21
20:8 21:1
21:6,23
23:21 24:2
24:6,11,14
25:1,9
27:1 38:13
39:8 40:2
40:4,7,8
40:10,15
40:24
41:19,21
42:6 58:18
59:4 64:5
64:14,22
65:1,12
66:5 67:1
67:7 73:12
73:18
78:22 79:7
94:8
105:14
106:8
107:2,10
119:1,11
120:22
121:7,8
122:18
123:6,17
126:24
127:5
128:2,25
129:12
131:21
132:2,12
132:17
133:5,16
138:12
158:5
160:1,3,5
160:8,10
160:14,17
161:10,23
163:19
164:19
168:11
172:5,18
178:21,21

RIAN . SC LL   1/12/2023

| | | | | |
|---|---|---|---|---|
| 179:7,10 | 315:2 | **plus** 193:1 | 284:7 | 62:16 |
| 179:14,24 | 316:14 | 289:15 | 153:8 |
| 180:16 | 317:4,7,13 | **POCs** 350:14 | 296:3 | 242:2 |
| 184:9,11 | 317:23 | **point** 34:1 | **policy** 12:9 | 367:25 |
| 189:25 | 318:4,11 | 58:4 64:21 | 126:13 | 368:1 |
| 192:2 | 326:14,24 | 101:9,23 | 129:4,12 | **positions** |
| 193:3,10 | 327:9,18 | 102:4 | 133:2 | 337:8 |
| 203:13 | 340:6 | 103:3 | 134:1,4 | **possibility** |
| 210:13 | 348:5,6,8 | 174:7 | 200:16 | 99:20 |
| 212:9 | 348:24 | 233:12 | 209:21 | **possible** |
| 214:3 | 349:2 | 234:21 | 261:6 | 22:18 39:6 |
| 220:6,18 | 350:21 | 255:25 | 283:12,13 | 75:14 95:9 |
| 221:20 | 351:25 | 262:8 | 311:16 | 98:10 |
| 229:9 | 356:19 | 275:18 | 312:4,9,11 | 129:6 |
| 232:9,25 | 357:9 | 290:18,19 | 312:12 | 133:18 |
| 233:18,22 | 363:17 | 290:21 | 332:8 | 147:19 |
| 235:6,9,13 | 364:21 | 291:19 | 338:25 | 190:12 |
| 237:3 | 365:2 | 323:11 | **political** | 193:20 |
| 239:21 | 366:5,25 | 326:11 | 130:4,7,12 | 198:1 |
| 240:1,7 | **play** 59:1 | 327:2 | 246:20 | 200:22 |
| 241:8 | 62:18,22 | 337:3 | 313:14,17 | 208:11 |
| 242:16 | 64:11 | 354:7 | 364:15 | 210:18 |
| 244:19 | 100:13 | 355:9 | **Politics** 8:7 | 216:10,20 |
| 245:4,16 | 152:13 | 358:1 | **poll** 217:10 | 224:14 |
| 246:24 | 168:9 | **points** 128:5 | 219:1,11 | 236:11,16 |
| 248:1 | 316:13 | 135:19 | 235:20 | 237:8,17 |
| 254:18 | 317:8,10 | 234:14 | 339:11 | 237:21 |
| 256:4 | 317:18 | 243:3 | **popped** | 246:10 |
| 257:18 | **played** | 272:22 | 234:15 | 248:10 |
| 258:2,12 | 149:20 | 350:14 | **popping** 27:3 | 254:16 |
| 260:17,19 | 182:5 | 351:2 | 302:2 | 255:10,11 |
| 261:11,21 | 345:10 | **police** 9:6 | **portal** 8:5 | 256:18 |
| 262:18 | **playing** 19:4 | 305:17 | 320:20 | 257:24 |
| 263:24 | 63:6 | 319:22 | 363:13,20 | 290:5 |
| 265:2,6,17 | 311:24 | **policies** | 364:8,20 | 294:20 |
| 265:22,24 | **please** 10:17 | 17:18,21 | 365:1 | 295:5 |
| 266:9 | 11:9,16 | 21:13 | **portfolio** | 358:10 |
| 268:19,24 | 130:21 | 23:22 | 20:3 | **possibly** |
| 269:1 | 145:7 | 121:23 | **portion** | 22:25 |
| 277:9 | 167:10 | 123:7 | 129:1 | 23:13 |
| 290:13,15 | 185:9 | 126:17,25 | 257:23 | 231:14 |
| 290:25 | 205:22 | 127:7,11 | 270:5 | **post** 198:23 |
| 291:3,4,7 | 218:23 | 127:14,25 | **portions** | 225:4 |
| 292:1 | 308:7 | 128:10,17 | 70:1 | 227:20 |
| 293:6,15 | 339:18,22 | 132:13,18 | **portrayed** | 228:9 |
| 296:16 | 361:16 | 133:5,10 | 229:6 | 229:4,9,13 |
| 305:19,24 | 375:11,15 | 133:17 | **poses** 56:16 | 339:25 |
| 306:4,6 | 375:19 | 177:5 | **position** | 344:15 |
| 314:13,21 | **plura** 250:5 | 260:23 | 35:21,21 | 345:11 |

post-ele...
  227:6
posted 82:19
  116:9
  280:20
  290:14
posting
  159:25
  274:6,8
  291:3
  340:7
postings
  259:4
  341:14,16
posts 82:14
  82:14,18
  114:17
  115:7
  116:13
  225:15
  339:9,23
  340:1,3
potential
  17:13  25:3
  27:15  38:2
  155:7
  312:22
  313:4,5
  342:15,21
  361:4
potentially
  19:18
  39:21
  40:21
  57:16  87:6
  100:2
  140:5
  277:11
  315:18
  343:20
  357:21
  361:5
Pox 324:6
practical
  92:23
  93:11
practice
  62:6  65:19
  66:13,18

161:19
162:3
200:25
209:21
210:14
pre-marked
  14:6
pre-mate...
  28:12
prebunk
  315:3,9
prebunk/...
  314:15
Prebunking
  315:20
preceden...
  336:1
predated
  364:22
predict
  152:8
  154:3
predictive
  152:10
  154:12
  155:9
Prelimin...
  6:24
prep 255:21
  269:16,18
preparation
  233:7
  243:15,17
preparatory
  37:6  256:1
prepared
  194:3
  254:22
  361:17
  370:10,13
preparing
  188:21
  190:9
  254:16
present 4:19
  10:17
  20:24
  28:25  99:1
  99:13,13

99:18
presiden...
  147:4
  246:3
press 129:6
presumably
  204:11
  298:9
presume
  308:19
pretty 56:14
  56:21
  180:5
  256:23
  289:23
  293:19,20
  356:7
prevent
  344:22
previous
  23:6  97:21
  117:2
  251:24
  313:16,22
  314:3,7,10
  345:7
previously
  190:5
  205:24
  236:21
primaries
  28:5
primarily
  46:7  54:1
  174:3
primary
  75:10
  83:21
  308:22
principal
  29:2  103:5
  120:4
  167:19
  180:23
principally
  16:11
  38:25
  49:16,16
  63:9

prior 21:8
  24:21
  36:12,17
  36:19
  74:21
  117:8
  241:20
  314:3
  332:11
priorities
  321:7
priority
  16:3
privacy
  152:4,12
  155:18
  165:18
private
  16:20
  18:11  44:7
  47:12
  221:15
  225:4,10
  225:16
  308:3
  314:7
  327:14
privilege
  34:16,21
  150:21,24
  152:23
  153:1,19
  156:1
Pro-Trump
  217:12
  218:25
proactive
  20:21
proactively
  228:24
probably
  19:19
  22:20
  23:12  50:4
  74:16,25
  80:18,25
  86:8,9,11
  86:12
  113:9,12

113:23
  124:5,15
  124:17
  174:20
  180:25
  181:4
  211:8
  230:25
  235:7
  241:17,18
  243:19
  271:12
  316:4
  323:25
  327:24
  331:8,12
  331:14
  337:10
  341:23
  346:2
  369:10
  372:2
problem
  65:25
  304:9,14
  359:1
problems
  234:25
  357:7
procedure
  297:2
procedures
  109:21
  121:23
  354:25
proceed
  11:11  35:8
proceedings
  374:4,6,7
process 43:4
  43:5,5
  49:19  64:7
  64:8  65:12
  65:14
  67:12
  83:25  85:4
  85:7  106:7
  118:2,15
  150:20

RIAN . SC LL    1/12/2023

| | | | | |
|---|---|---|---|---|
| 152:22 | 16:12,13 | 366:11 | 24:25 25:8 | 53:9 56:12 |
| 153:1,19 | 16:17 | **promoting** | 25:17 | 56:13 |
| 156:1 | 39:16,18 | 77:5 | 40:21 | 72:20 |
| 164:23 | 43:1,4,7,9 | **prompt** | 61:23 62:1 | 74:24 81:2 |
| 201:7 | 44:12 | 293:23 | 94:7 98:20 | 81:20 |
| 211:17 | 56:21 | 294:1 | 135:13,19 | 82:10,11 |
| 239:25 | 131:5 | **promptly** | 220:3,18 | 82:22 |
| 240:11,18 | 207:16 | 176:7,21 | 222:13 | 112:25 |
| 240:19 | 298:8 | **prompts** | 234:23 | 113:1,7,18 |
| 241:1,2 | 303:15,23 | 256:8 | 257:3 | 114:8 |
| 274:25 | 303:24 | 257:5 | 258:11 | 115:14,17 |
| 282:7 | 316:2,3 | **proposal** | 260:9 | 127:20 |
| 283:4,17 | 333:23 | 363:11,18 | 261:10 | 131:5,6 |
| 297:5 | 343:5 | 363:23 | 290:22 | 134:14 |
| 300:19 | **Professi...** | 364:7,19 | 296:7,16 | 137:11,14 |
| 320:16 | 2:6 374:3 | 364:22 | 298:3 | 138:3,19 |
| 337:19 | **professor** | **proposed** | 315:13,16 | 138:25 |
| 356:8 | 360:8 | 272:4 | 323:14 | 145:1,1 |
| **processes** | **profile** 9:24 | 275:4 | 325:24 | 220:16 |
| 177:21 | 195:6 | 336:24 | 326:1 | 221:1,3,10 |
| 203:6 | 196:3,5,9 | **proposes** | 361:10,17 | 221:14 |
| 240:23,24 | 196:11 | 272:5 | **provided** | 222:14 |
| **produce** | **program** | **protect** 8:8 | 61:12,13 | 238:22,25 |
| 295:18 | 148:4 | 339:2 | 64:4 88:18 | 254:22 |
| **produced** | 152:17 | **protected** | 109:8 | 283:16,25 |
| 156:20 | 279:12 | 35:7 | 188:24 | 305:10 |
| 191:16 | **programming** | **protecting** | 189:2,6,9 | 306:3,10 |
| 192:10 | 155:15 | 338:22 | 209:17 | 322:16 |
| 277:11 | **project** 5:11 | **Protection** | 220:12 | 323:5,5 |
| 310:1 | 51:10 | 12:11 | 223:5,20 | 335:16 |
| **product** | 134:7,9,15 | **Protentis** | 299:20 | 341:19,24 |
| 28:18 | 135:8,22 | 18:7 19:15 | 323:12 | 347:25 |
| 43:12 | 136:10,18 | 31:5 36:13 | 325:20 | 348:1 |
| 131:6 | 137:4,17 | 42:22 | **provides** | 355:13 |
| 137:24 | 139:8 | 75:18 | 61:10 | 368:8 |
| 143:24 | 141:3,14 | 191:21 | 317:7 | 369:21 |
| 154:24 | 144:2 | 255:20 | 320:23 | 374:21 |
| 155:10 | 153:14 | 260:4 | **providing** | 375:18 |
| 172:2 | 368:10 | 269:13 | 128:23 | 377:23 |
| 187:11,15 | **Project's** | 294:8 | **public** 2:8 | **publicly** |
| 243:13 | 138:19,25 | 295:2 | 9:25 16:12 | 43:8 47:19 |
| 295:10 | **projects** | 297:10 | 21:12,12 | 82:15 |
| 322:19,25 | 187:13 | 298:23 | 21:13 40:6 | 145:13 |
| 355:23 | 188:16 | 350:4 | 40:18,19 | 190:19 |
| 356:11 | **prolifer...** | 351:12 | 40:21,24 | 195:5 |
| **production** | 336:1 | 352:3 | 41:14 | 284:2 |
| 42:25 | **promote** | **Protentis's** | 46:15,15 | 354:3 |
| 276:14 | 330:15 | 21:1 | 50:24 | **published** |
| **products** | **promoted** | **provide** | 52:17 53:8 | 26:12 |

RIAN . SC LL   1/12/2023

| | | | | |
|---|---|---|---|---|
| **pull** 14:9,16 | 46:14 | 156:18 | 339:18 | **quietly** |
| 138:16 | 47:18 53:8 | 242:12 | 345:9 | 320:3 |
| 154:14 | 59:6 62:11 | 284:1 | 348:4 | **quote** 338:15 |
| 212:15 | 62:12 69:5 | 306:10 | 349:11 | 338:20 |
| 222:6 | 74:24 | 328:7 | 354:10 | 344:5,13 |
| 252:20 | 82:10,13 | 335:10 | 361:18 | 344:20 |
| 253:5 | 101:13,15 | | 364:4 | 348:10,18 |
| **pulled** 221:2 | 101:23,24 | **Q** | 371:11 | 349:11 |
| **pulling** | 101:25 | **quadrennial** | **questioning** | 364:20 |
| 242:19 | 102:4,24 | 321:5,13 | 276:12 | **quotes** 322:3 |
| 302:1 | 103:16,19 | 321:15 | **questions** | 370:3 |
| 352:16 | 103:21 | **qualifies** | 13:2,19,21 | **quoting** |
| 359:16 | 104:2,4 | 351:11 | 13:22 41:2 | 368:13 |
| **pulls** 44:8 | 112:12,13 | **quarterly** | 46:14 57:3 | |
| **pundit** | 112:24 | 32:1,13 | 74:25 81:2 | **R** |
| 123:20,23 | 120:14 | 234:4,9 | 81:20 | **R** 1:9 3:1 |
| 124:23 | 129:7 | **question** | 112:25 | 4:1 10:1,7 |
| 125:18,22 | 165:14 | 13:10,11 | 114:10,20 | 375:8 |
| 126:3 | 207:15,15 | 34:13,14 | 116:7,8 | 376:3 |
| **purchasing** | 221:10 | 34:19 35:5 | 122:1 | **race** 258:23 |
| 372:22,24 | 222:6 | 51:2 66:21 | 127:23 | **races** 256:9 |
| **purpose** 16:4 | 231:15 | 94:5 | 181:7 | 256:15 |
| 17:9 24:20 | 260:21 | 114:18 | 234:19 | 258:5,14 |
| 24:22 27:6 | 272:18,25 | 116:18 | 251:25 | 258:14,16 |
| 45:16,20 | 273:13 | 119:15 | 257:7,16 | **racial** 322:1 |
| 45:22,23 | 290:7 | 134:13 | 257:22,25 | 324:11,13 |
| 103:7 | 301:11,17 | 146:4,12 | 260:16 | 324:15 |
| 260:12 | 303:14,22 | 151:1 | 261:20 | **radar** 124:3 |
| 296:25 | 303:24 | 153:11,22 | 271:15 | 124:10 |
| **purposes** | 319:19 | 167:14 | 298:25 | **radio** 357:10 |
| 17:12 | 322:18 | 179:23 | 339:22 | 359:4 |
| 155:18 | 325:23 | 180:10,24 | 356:9 | **raise** 30:19 |
| **pursuant** 2:2 | 345:19 | 181:6 | 370:23 | 30:22,24 |
| 200:16 | 351:6,24 | 185:9 | 371:17 | 37:17 |
| **push** 64:2 | 363:9 | 186:19,20 | 372:6,8 | 99:20 |
| 164:4 | 368:10 | 197:6 | 373:4 | 128:25 |
| 165:7,10 | 369:20 | 213:8 | **queue** 105:18 | 236:18 |
| 175:11,14 | **puts** 47:3 | 218:24 | 105:23 | **raised** 31:2 |
| 175:18 | **putting** | 220:10 | **quick** 34:13 | 247:10 |
| 183:15 | 21:12 | 223:18,19 | 36:9 125:3 | 255:2 |
| 293:13 | 30:20 34:5 | 243:5 | 282:5,6 | 355:17 |
| **pushed** | 43:1 52:9 | 250:12,15 | **quickly** | **raising** |
| 300:18 | 52:16 | 258:8 | 34:20 | 124:23 |
| 318:5 | 56:24 | 275:21 | 47:10 | 126:2 |
| **pushing** | 84:24 | 278:22 | 176:10 | 236:13,16 |
| 147:8 | 85:11 | 291:14 | 177:18,20 | 251:22 |
| **put** 26:9 | 97:18 | 299:25 | 179:5 | 261:21 |
| 40:6,24 | 100:14 | 330:6 | 228:10 | 352:5 |
| 41:15 | 112:5,10 | 331:12 | 229:5 | **Ramaswami** |

| | | | | |
|---|---|---|---|---|
| 187:20 | 371:9,9 | 292:4 | 113:5,13 | 251:25 |
| ramped 174:1 | 372:9 | 374:20 | 113:16,19 | 259:15 |
| ramping | 373:12 | reason 56:11 | 113:20 | 265:19 |
| 105:2,5 | 375:15 | 68:12 | 114:3 | 268:13 |
| random 333:4 | 376:6,10 | 266:22 | 116:19 | 270:20,23 |
| 333:5 | 376:14,18 | 273:13 | 117:14 | 272:14 |
| range 46:20 | 376:22 | 314:25 | 119:12 | 284:8,17 |
| 171:25 | 377:6 | 376:7,11 | 120:15 | 285:6,21 |
| 231:13 | reading 91:1 | 376:15,19 | 121:1 | 285:23 |
| 321:9 | 95:25 | 376:23 | 124:9,15 | 287:1 |
| 342:21 | 124:19 | reasonable | 126:2,8,10 | 289:11 |
| rapid 147:9 | 150:6 | 230:25 | 127:14 | 290:1,4 |
| rationale | 159:20 | reasons | 128:1,13 | 301:18 |
| 68:18 | 160:12 | 130:5 | 128:18 | 303:17 |
| re-ask | 161:16 | recall 21:24 | 129:5,8 | 321:20 |
| 185:10 | 211:20 | 22:9,17 | 132:20 | 334:15 |
| 371:11 | 275:17 | 24:8 26:20 | 133:6,13 | 345:25 |
| re-tweeting | 347:3,6 | 27:9,18,24 | 133:20,23 | 346:4 |
| 346:23 | reads 207:5 | 29:3,16 | 134:2,23 | 351:9 |
| reach 116:7 | 228:11 | 31:7,8 | 135:18 | 356:16 |
| 221:25 | 361:15 | 32:19 | 137:5,15 | 362:17 |
| 222:12 | ready 40:18 | 33:22 34:3 | 139:20 | 371:24 |
| 340:5 | reaffirm | 37:18,20 | 140:16,23 | recalling |
| 351:5 | 242:2 | 38:5,12,20 | 141:8 | 52:20 |
| reached 65:8 | real 78:12 | 39:5 41:9 | 142:17,19 | 268:8 |
| 116:16 | 371:16 | 54:2,9 | 143:6,7 | receive |
| 228:23 | reality | 55:19 | 151:5 | 71:11 |
| 307:10 | 290:6,7,9 | 56:13 | 168:15 | 79:25 |
| 350:20 | 291:8 | 65:18,24 | 179:6 | 106:4 |
| 351:1 | 315:17 | 66:6 67:14 | 182:2,15 | 119:7,8 |
| 356:15 | realize | 67:20 | 189:15 | 123:4 |
| reaching | 199:1 | 75:14 76:3 | 190:11,12 | 131:13 |
| 224:2 | really 30:7 | 76:3 78:2 | 194:6 | 174:3,23 |
| 316:14 | 30:8 77:11 | 78:3 80:25 | 200:23 | 178:5 |
| 317:3 | 104:10 | 82:20 | 203:11,21 | 252:19 |
| 351:23 | 188:1,16 | 86:15,17 | 209:25 | 260:15 |
| read 11:2 | 196:21 | 87:20 | 210:14 | 262:25 |
| 69:24 70:1 | 197:20,22 | 90:12 95:2 | 211:12,14 | 264:23 |
| 90:23 91:8 | 203:25 | 95:9 97:13 | 214:4 | 266:6 |
| 96:20 | 253:3 | 97:15,17 | 216:19,23 | received |
| 143:2,4,5 | 297:17 | 97:23 | 218:13 | 22:13 |
| 143:6,7,9 | 317:23,25 | 99:16 | 235:9 | 23:25 |
| 143:11,12 | 327:5 | 100:4,5 | 236:5,9,15 | 49:13 52:7 |
| 219:21 | 344:16,16 | 101:3,20 | 237:21 | 67:9 68:14 |
| 275:18 | 372:1 | 102:23 | 238:11,22 | 71:7 79:20 |
| 287:15 | realtime 2:7 | 103:1,18 | 239:6 | 109:8 |
| 299:18 | 2:7 73:9 | 103:18 | 246:6,9 | 120:5 |
| 355:7 | 73:17,21 | 106:6,24 | 247:1,10 | 123:1 |
| 361:12 | 78:21 79:4 | 112:12,21 | 247:24 | 137:10 |

RIAN . SC LL  1/12/2023

| | | | | |
|---|---|---|---|---|
| 157:13 | 184:21 | **records** | 214:25 | 262:16 |
| 159:6 | 237:6,17 | 188:25 | 240:19,23 | **reiterate** |
| 165:8 | 333:20 | **recurring** | 250:10,11 | 240:9 |
| 168:9 | 367:7 | 233:5,12 | 269:23 | **rejects** 8:8 |
| 175:13 | **recollec...** | **recycled** | 272:13 | **relate** 19:24 |
| 176:24 | 41:7 55:6 | 324:9 | 275:17 | 41:17 |
| 177:1,24 | 255:5 | **red** 106:17 | 285:10 | 156:21 |
| 178:3 | **recommend** | **redacted** | 286:25 | 159:17 |
| 180:4,9 | 295:4 | 214:20 | 295:25 | 240:5 |
| 193:12 | **recommen...** | **Reddit** 38:16 | 316:25 | **related** 6:25 |
| 200:3,10 | 141:21 | 233:23 | **refers** 20:17 | 26:12 77:2 |
| 231:2 | 150:12 | **reduce** 309:5 | 23:19 | 81:18 |
| 252:23 | 329:20 | 316:10 | 146:14 | 122:12,13 |
| 294:1 | 330:3 | 332:2 | 250:4 | 122:19 |
| 306:12 | 355:18 | 346:11,17 | 255:21 | 127:15 |
| 366:17 | 358:25 | 347:16,23 | 291:12 | 130:17,24 |
| **receives** | **recommen...** | **reduced** | **reflect** | 133:14,15 |
| 149:14 | 141:19 | 374:8 | 259:5 | 137:3,25 |
| **receiving** | 149:23 | **refer** 20:18 | **reflected** | 138:5,15 |
| 63:23 64:1 | 330:3 | 182:6 | 201:9 | 143:14 |
| 107:24 | 354:6 | 233:16 | **reflects** | 150:23 |
| 166:10 | **recommen...** | 270:9 | 47:4 | 159:19 |
| 182:8 | 328:23 | 354:15 | **refresh** | 161:10 |
| 215:9,18 | 355:3 | 366:8 | 230:22 | 235:12,25 |
| 307:4 | 357:1 | **reference** | 255:1 | 238:7,25 |
| **recess** 34:20 | **recommends** | 73:15 | **refreshes** | 263:6 |
| 35:1 83:11 | 142:2 | 105:25 | 230:23 | 273:20 |
| 183:7 | 150:3 | 144:13,15 | **refusing** | 285:24 |
| 209:10 | **record** 10:3 | 145:24,25 | 167:13 | 312:12 |
| 276:8 | 11:17 | 149:22 | **regarding** | 323:1 |
| 319:12 | 34:23,25 | 370:25 | 244:14 | 324:15 |
| 362:24 | 35:3,9 | **referenced** | 278:19 | 325:8 |
| **recipients** | 83:2,6,8 | 201:13 | **regardless** | 342:8 |
| 214:20 | 83:10,13 | **referencing** | 296:25 | 362:8 |
| 299:13,23 | 183:4,6,9 | 91:22 | 358:9 | 366:19 |
| **recognize** | 183:11 | 118:19,20 | **Registered** | 371:15 |
| 15:8 | 209:5,7,9 | **referred** | 2:6 374:2 | 374:10 |
| **Recognizing** | 209:12 | 60:18 98:5 | **regular** 21:3 | **relates** |
| 126:21 | 276:5,7,10 | 201:10 | 40:7,24 | 157:9 |
| **recollec...** | 276:13 | **referring** | 82:13,14 | 162:19 |
| 38:11 | 319:4,9,11 | 20:14 43:7 | 127:19 | 279:5 |
| 67:12 | 319:14 | 57:1 73:23 | 128:3 | 317:15 |
| 101:9 | 349:21 | 78:24 | 141:17 | **relating** |
| 103:15 | 362:21,23 | 79:11,13 | 238:9 | 97:13 |
| 128:25 | 363:1,3 | 79:15 84:5 | 244:11 | 98:16 |
| 133:3 | 372:13 | 99:5,7,23 | 245:3,19 | 113:18 |
| 136:25 | 374:6 | 105:20 | 310:23 | 128:24 |
| 147:18 | **recorded** | 158:3 | **regularly** | 135:21 |
| 150:9 | 10:5 | 185:23 | 116:1 | 137:22 |

RIAN . SC LL    1/12/2023

| | | | | |
|---|---|---|---|---|
| 143:16,18 | 266:8 | 150:11 | 142:13 | 145:23 |
| 232:9 | **relayed** | 151:12 | 361:20 | 157:9,13 |
| 233:1 | 251:6 | 171:23 | 362:13 | 157:16 |
| 239:10 | **relaying** | 176:20 | 368:8 | 159:6 |
| 243:9 | 180:23 | 194:3 | 369:21 | 161:9,21 |
| 285:13 | 251:12 | 207:14,17 | 370:3 | 162:21 |
| 326:15 | **release** | 208:20,23 | 371:7 | 163:19 |
| 371:15 | 253:24 | 209:1 | **repeat** 19:3 | 164:12,22 |
| **relation** | **released** | 210:16 | 139:17 | 168:13,18 |
| 76:12 | 39:17 | 211:9 | 151:1 | 173:16 |
| 97:16 | 70:12 | 236:13,24 | 186:19 | 198:20 |
| 104:9 | **releases** | 237:7,13 | 197:5 | 200:3,7,10 |
| **relation...** | 129:7 | 246:12 | 223:17 | 200:19 |
| 47:18 | **relevant** | 247:3 | 249:2 | 201:13,23 |
| 55:25 | 135:19 | 248:12 | 291:13 | 203:16 |
| 65:23 | 160:4 | 250:23 | **repeatedly** | 204:6 |
| 67:25 68:3 | 189:10 | 251:11,21 | 245:11 | 205:11 |
| 76:9 79:9 | 191:12,15 | 259:1 | 247:11 | 209:16 |
| 80:9 | 192:20 | 272:17,21 | **rephrase** | 210:11 |
| 102:16 | 235:5 | 283:3 | 257:11 | 213:17 |
| 121:13,20 | 314:14 | 284:12 | **reply** 282:18 | 214:12 |
| 148:21 | 315:2,14 | 285:11,12 | **replying** | 215:12,15 |
| 149:8,10 | **reliable** | 285:18 | 296:6 | 216:2,9 |
| 187:8 | 319:8 | 286:12 | **report** 9:8 | 217:8,17 |
| 240:3 | **rely** 13:2 | 351:21 | 9:12 21:13 | 225:1,10 |
| 310:16 | **remain** 51:15 | 356:1 | 40:12 47:3 | 226:8 |
| 313:18 | 317:25 | 372:3 | 56:13 | 228:3,6 |
| 369:9,15 | 364:19 | **remembering** | 64:13 | 229:18,19 |
| **relation...** | **remained** | 241:19 | 68:18 | 231:2 |
| 238:17,20 | 51:13 | 306:16 | 69:20 | 256:13 |
| 239:24 | **remarks** | **remembers** | 70:12 | 264:24 |
| 240:16 | 337:2 | 248:4 | 71:18 72:2 | 280:8 |
| 241:14 | **remember** | **reminder** | 94:21 | 283:20 |
| **relation...** | 28:21 30:2 | 29:24 | 96:23 | 284:13 |
| 44:5 46:13 | 30:8,8 | 60:16 | 105:12 | 285:1,8 |
| 46:19,20 | 33:11,25 | 260:7 | 106:4 | 288:5,10 |
| 120:3 | 34:4 35:19 | **remove** | 117:23 | 289:19 |
| 131:20,23 | 35:20,25 | 283:14 | 118:13 | 297:5 |
| 215:25 | 36:1 37:15 | **removed** | 122:3 | 298:4 |
| 241:8,10 | 39:24 55:2 | 229:9 | 123:11 | 300:2,25 |
| 304:1 | 62:13 | **render** 377:9 | 127:17 | 301:6 |
| **relatively** | 70:24 | **Ren e** 54:5 | 129:25 | 302:3 |
| 176:10 | 71:13 | 70:5,20 | 138:25 | 304:12 |
| 177:18,19 | 86:23 | 72:17 | 140:3,3 | 321:6 |
| **relay** 164:13 | 87:19 95:3 | 116:22,25 | 141:1,3,15 | 328:11,17 |
| 220:21 | 98:2 | 117:6 | 141:15 | 328:20,22 |
| 221:18,21 | 104:14 | 134:22 | 142:18,23 | 329:22 |
| 222:16 | 116:11 | 136:6,9 | 143:2,21 | 335:15 |
| 265:14,21 | 124:6,11 | 139:7,9,23 | 144:7,11 | 352:20 |

RIAN . SC LL    1/12/2023

364:15,17
**reported**
1:23 68:11
68:22
119:2
120:24
130:5,6,9
160:9,19
163:20,25
164:10
165:2
199:11
219:22
366:14
**reporter** 2:3
2:4,5,6,7
11:9 12:21
47:9
138:19
168:14
196:7
209:4
223:22
372:14,21
372:25
373:3
374:1,3
**reporter's**
10:14
**reporting**
8:5 16:22
23:25
26:10,11
26:14,16
27:8 36:8
39:20 40:6
40:24
41:14 44:9
46:14
47:19
50:24
52:17 53:9
63:23
64:23 66:3
66:16 68:8
68:14
71:25
74:24
79:11,13

79:17,20
79:25 81:2
81:3,20
82:10,11
82:22
106:21
114:8
116:1
118:2,15
119:8,12
120:5,8,21
121:1,5
159:13
161:5
163:9
173:13
193:10
198:21
201:2,25
202:13,19
204:8,18
205:6,22
206:24
207:2
208:10,15
210:2,7,12
210:25
212:9
228:14
235:4
238:25
243:10
257:4
259:13
263:8,15
278:3
279:4
282:7,14
282:25
283:4
293:5
300:19
306:3,10
320:25
326:10
363:13,15
363:20
364:8
**reports** 40:7

40:21
46:15
56:12
106:23
107:2,24
112:25
113:1,7,18
115:14,17
122:17
123:4
134:14,25
137:10,11
137:14
149:14
157:3,6
165:23
166:1
173:24
176:7,22
177:10
178:12,23
179:4
182:8
193:2
199:13
202:25
203:9
208:10,16
208:25
210:21
212:1
214:2
215:9,19
216:12
223:11
231:4
238:22
242:8,11
262:25
264:23
266:6,14
311:20
325:23
326:11
**repost**
347:11
**represent**
10:18 11:7
**represen...**

178:10
267:9
305:9
**represen...**
29:11
111:16
112:21
181:1
267:7
**reputati...**
340:23
341:3,5,11
341:12,18
342:15,25
**request** 45:7
277:2,14
320:18
337:17
372:18
**requested**
247:14
303:9
**requesting**
276:12
**requests**
191:13,16
192:21
233:2
337:22
**requirement**
115:24
227:8
**requirem...**
155:19
**requires**
320:20
**research**
44:6,9
46:11,16
46:17 47:3
47:6,9,19
48:22
49:23 50:1
73:12
144:17
145:20
187:13,16
195:10
196:14

209:18
221:17
326:10
**researchers**
143:14,17
145:22
325:23
**researching**
325:21
**resending**
346:24
**reserve** 11:2
**resilience**
16:5,8
42:23
45:25
118:2
131:4
303:22
315:24
324:10
332:1
343:3,21
347:20
358:2,5,8
**resilience-**
315:11
**resilien...**
316:3
**resilien...**
240:14
323:21
346:20
359:7
**resource**
62:19 63:8
166:11
173:23
**resourced**
57:9
**resources**
87:2,8
357:11
359:4
367:13
**respect**
40:16
93:15,19
142:15

RIAN . SC LL  1/12/2023

**respond**
13:11,23
93:20
176:6
199:22
223:10
293:16,21
371:2
**responded**
176:10
180:3
199:15
200:9
209:15
219:8
292:24
**responding**
5:19
179:15
190:10
233:1
292:3,5
**responds**
176:2
206:1
224:17
226:14,17
232:7
287:17
308:6
317:21
**response**
9:16 43:24
107:15
133:7
147:9
165:7
177:23
191:12,16
192:21
205:19
219:14
220:12
233:23
243:7
247:12
250:25
251:5
282:24

**responses**
6:23
176:14
188:22
189:14
190:19
193:23
194:5
226:12
231:17
242:15
293:24
353:2
**responsi...**
90:14
289:17
353:20
**responsi...**
239:17
**responsible**
60:10
63:10,12
115:25
169:22
175:20
343:17
**responsive**
176:21,23
178:10
293:20,23
331:20,25
**rest** 134:23
186:1
282:17
349:10
**restrict**
132:13
**restricted**
95:16
**restrict...**
264:5
**restrictive**
132:18
**result** 96:6
**results** 13:6
**return** 19:16
375:19
**returned**
165:16

261:17
**returns**
18:24
176:19
**review** 43:5
165:19
174:22
189:17
201:3
321:6,14
321:16
**reviewed**
189:15,20
194:2,7,12
207:10,13
**reviewing**
207:14
**reviews**
25:18
**rhetoric**
126:22
**Richard**
161:4
350:11
**right** 11:2
14:6 15:15
18:6 19:13
20:15,19
29:12
31:13,24
43:11
44:13 48:7
50:14
51:21
57:22 59:7
59:22 60:2
60:19,24
61:24
63:10,15
63:17,21
68:5 70:15
70:22
78:24
81:14 82:8
85:2 88:9
89:22
91:15,18
91:20 93:8
96:19,24

101:11
102:14
105:14
109:18
110:5,7,9
110:12,15
110:19
111:3,23
112:16
116:4
118:8
120:19
122:4,7
123:18
125:10
137:15
140:10
141:4,4
146:7
147:10
148:18
157:17
159:14,15
161:2,11
162:10,19
162:25
163:3,11
164:14
167:18
170:21
173:11,17
176:7
177:5
179:20
181:6
183:23
189:12,25
190:25,25
191:6,22
192:13
193:4
196:11
198:17,18
199:23
200:4
202:5
207:2
208:1
211:1,23

212:11
214:19
217:5,9
218:13
219:6
223:14
226:2,15
226:20
227:15
228:6,10
228:17,25
229:19,24
230:2,9,14
230:18
231:2,6
232:5,11
233:14,20
234:1,6
237:11
241:7,25
244:14
248:25
250:13,24
251:4,9
252:10
253:20,22
253:25
254:4,8,13
256:5,10
259:22
261:7
262:14
263:2,21
264:24
272:2
273:10,16
274:15
275:8,13
275:23
280:25
281:19
283:17
287:6
288:3,18
289:3,5,9
289:15
290:19,20
291:22
292:19

| | | | | |
|---|---|---|---|---|
| 293:25 | 327:15 | 100:14 | 23:19 | 167:2 |
| 294:11 | 341:18 | 129:20 | 58:17 | **safety** |
| 295:6,15 | 343:17 | 147:7,15 | 118:24 | 289:10,13 |
| 296:4,8 | **risks** 16:15 | 149:20 | 138:10 | 289:13,14 |
| 298:10 | 56:17 | 150:15 | 172:17 | **Salahuddin** |
| 299:8,13 | 154:5 | 151:7,9,9 | 189:24 | 218:2 |
| 300:6,13 | 269:20,25 | 167:21,24 | 265:5 | **Saleela** |
| 300:15 | 270:8 | 168:10 | 291:24 | 218:2 |
| 301:12,15 | 309:5 | 171:17 | 348:14 | **sat** 133:21 |
| 305:21 | 316:10 | 182:4,20 | 366:4,24 | **Saturday** |
| 306:21 | 323:7 | 239:17 | 367:22 | 173:17,18 |
| 308:19,23 | 332:2 | 240:2 | **RPR** 1:23 | 173:19 |
| 311:25 | 342:21,25 | 278:10 | 374:18 | 176:1,1,11 |
| 312:5,16 | 343:20 | 303:22 | **rules** 12:18 | **Sauer** 3:3 |
| 313:2,11 | 354:21 | 305:17 | 126:18 | 5:3 10:19 |
| 316:15 | 355:24,25 | 311:24 | 152:4,13 | 10:19 |
| 328:25,25 | 356:2,7 | 313:21 | 155:16 | 11:15 14:2 |
| 330:16,25 | 358:4,23 | 316:13 | 260:10,14 | 14:17,23 |
| 331:21 | **Rob** 43:20,23 | 317:11,18 | **rumor** 290:13 | 23:3 34:22 |
| 339:5 | 166:17,18 | 345:10 | 290:19 | 35:8,13 |
| 342:16 | 167:1 | 371:1 | 291:12 | 53:2 69:9 |
| 344:19 | 179:18 | **roll** 142:15 | **rumors** | 69:13 |
| 346:2,13 | 184:14 | **Roman** 73:7 | 247:20 | 71:22 80:6 |
| 347:17 | 191:25 | 141:16 | 290:22 | 83:1,7,14 |
| 348:8,25 | 276:20 | **room** 10:22 | **run** 62:8 | 87:18 91:3 |
| 353:3 | 311:11,12 | 119:25 | 279:13 | 92:6 93:3 |
| 355:4,14 | 311:14,24 | 263:17,18 | 280:11,23 | 95:22 |
| 357:3 | 312:8,21 | 263:22,25 | 342:10,11 | 108:22 |
| 359:20 | 326:5,20 | 264:1,14 | **running** | 122:23 |
| 360:5,12 | 350:5 | 267:7,22 | 60:10 | 125:13 |
| 361:1,20 | **Robert** | 267:23,25 | 81:23 | 126:7 |
| 361:23 | 192:12 | 268:3 | 266:2 | 138:16,24 |
| 362:2,9 | **robust** | **Rose** 308:10 | 312:21 | 139:4 |
| 368:15 | 265:25 | 308:11 | **runs** 148:4 | 145:4,9 |
| 370:5,23 | **Robyn** 10:15 | **Roth** 7:4 | 267:17 | 148:9 |
| **rigorous** | **Rodney** 32:17 | 238:1,2 | 342:6 | 151:3,4 |
| 222:4 | 33:9 | 244:3,9 | 356:1 | 152:25 |
| **ring** 126:1 | **role** 18:25 | 246:17 | **Russia** 325:7 | 153:9 |
| 197:16 | 19:4 23:24 | 247:6 | **Russian/...** | 156:3,5,12 |
| 213:24 | 25:7,10,13 | 248:4 | 325:11 | 156:16 |
| 247:9 | 25:14 | 289:5 | **Russians** | 172:22,24 |
| 284:14 | 42:24 | **roughly** | 324:1 | 181:5,9 |
| 294:22 | 55:18,22 | 148:17 | | 183:1,17 |
| **risk** 11:22 | 59:2 62:17 | **rounds** 286:7 | ——————— | 185:8,11 |
| 44:14,16 | 62:18,21 | 287:1 | **S** | 190:15 |
| 56:20 | 62:22 63:3 | **route** 268:25 | **S** 3:1 4:1 | 191:2 |
| 236:6 | 63:7,13 | **routed** | 5:1,6 6:1 | 194:16,19 |
| 308:25 | 64:12 | 268:18 | 7:1 8:1 | 194:22 |
| 309:6 | 83:19,21 | **routing** | 9:1 10:1 | 195:2 |
| | | | **S-c-h-a-u-l** | |

RIAN . SC LL 1/12/2023

196:2
197:3
198:25
199:5
204:21
205:1
209:6,13
212:3,13
212:19,22
213:2,9
215:4
227:1,11
227:21,24
228:1,19
230:21
231:20,22
231:24
232:2
242:20,25
243:1,24
244:22
249:14,17
249:21,24
252:3,9,13
252:22,25
253:3,6,10
253:13
255:18
258:9
262:6
271:14,18
273:3
276:1,4,11
277:15,18
277:23
301:22
302:9,12
304:23
306:20,24
309:22
316:21
318:24
319:2,17
328:6
334:23
335:2,7,10
335:14
341:9
344:8,11

344:12
345:13,22
349:17,20
349:24
350:1
352:15
354:14
359:15
362:20
363:2,5,8
364:13
365:12
368:5
369:19
371:12
372:5,14
372:16
**sausage** 85:7
**saw** 12:24
116:2
215:12
293:12
319:25
324:5,5,6
336:1
356:18
**saying** 27:1
27:2 34:1
91:16
152:18
199:20,22
203:10
223:13
248:13
254:22
282:4
284:25
286:4
287:18,24
292:25
294:8
296:6
299:25
303:4
307:3
308:6
309:4
315:6
324:2

338:16
341:15,17
348:19,21
352:3
368:13
371:7
**says** 73:8
88:12
89:19 91:4
91:11,12
94:21
95:18 96:5
96:13 97:4
97:12
98:25
107:14
108:10
109:6,16
109:19,24
110:7
111:11
117:24
118:14
122:11
125:21,25
126:17,21
142:8
144:16
145:25
146:13
147:2,2,11
150:8
158:8
175:24
176:2
177:6
191:9
192:8
195:13,16
195:21
196:5
197:17
199:11
204:10,11
206:20,23
208:9,13
210:6,19
217:10
223:4

225:4,8
229:20
230:4
231:5
232:7,7
244:9,10
246:18
247:6
250:20
251:20
253:23
254:6,7,10
256:7
260:6
269:20
270:16
272:9,15
275:24
280:17
281:8,16
282:21,25
283:10,13
284:23
285:7
287:3
289:1,21
292:8
295:14
297:24
299:6,11
299:16
300:4,11
300:15
304:6,7,17
305:17,22
307:14
308:14,18
311:22
312:1,15
312:25
314:11
316:12
317:22
320:2,15
321:4,15
321:24
328:21,25
330:2,13
330:17

331:16,22
332:10,16
334:1
335:19,23
336:3,14
337:23
338:14,20
344:5,6
350:8,11
354:8,20
355:9,15
357:6
364:17
366:1,3
368:21,25
369:5
370:12,15
370:17,21
370:24
**SCHAU** 4:3
**Schaul** 43:20
43:23
46:10
166:18
167:2
179:18
184:14
191:25
192:12
276:20
326:5,20
350:5
**schedule**
174:8
**scorecard**
286:6,11
288:3,21
340:4,8
**Scott** 3:4
10:22
82:23
319:5
349:22
**screen** 14:10
14:10,18
15:3,4
42:21
69:14 72:8
78:19 88:1

| | | | | |
|---|---|---|---|---|
| 90:22 | 72:10 | 155:11 | 327:14,14 | 136:8,14 |
| 105:8,9 | 160:21 | 186:18 | 341:20 | 141:24,24 |
| 107:11,12 | 198:13 | 188:18 | 343:4,7,17 | 147:19,21 |
| 117:23 | 203:15 | 202:7 | 343:18 | 178:11 |
| 124:4 | 205:4 | 214:16 | 355:23,24 | 187:22 |
| 138:17 | 207:20 | 231:19,21 | 356:1,6 | 195:18 |
| 156:18 | 214:15 | 254:10 | **sector's** | 201:25 |
| 191:4 | 222:23 | 273:15 | 341:21 | 235:15,17 |
| 198:24 | 223:10,15 | 277:22 | **sectors** 60:5 | 235:24 |
| 199:2 | 244:5 | 280:7,15 | 60:8 | 244:13,14 |
| 206:14,16 | 249:4 | 285:5,7 | 322:16 | 245:3,17 |
| 209:3 | 281:2 | 300:17 | 338:25 | 248:19 |
| 212:15 | 296:10 | 304:7 | 355:12 | 264:9 |
| 213:4,10 | 299:11 | 305:15 | **secure** 298:3 | 267:13 |
| 215:2 | 320:1,14 | 307:6 | 298:4 | 270:12 |
| 222:21 | 344:4 | 345:16 | **Securing** | 294:9,13 |
| 225:5 | **Scully** 1:14 | 346:10 | 47:8 | 295:11 |
| 227:20 | 2:1 5:2,8 | 352:3,17 | **security** 4:7 | 296:21 |
| 252:8 | 6:3 7:3 | 354:4 | 4:13 5:19 | 305:6 |
| 281:7 | 8:3 9:3,16 | 355:9 | 9:22 11:5 | 320:3 |
| 306:25 | 10:5 11:12 | 357:5 | 11:23 | 321:5,14 |
| 319:19,25 | 11:16,18 | **Secretaries** | 15:24,24 | 321:16 |
| 328:8 | 83:15 | 50:8 | 20:5 25:6 | 327:16 |
| 335:11 | 188:21 | 103:14 | 26:13 33:1 | 332:25 |
| 345:19 | 191:21 | **secretary** | 33:3,15 | 336:7 |
| 363:9 | 209:14 | 204:6 | 35:6 50:6 | 342:2,5 |
| 364:14 | 219:4 | 205:12 | 52:12 | 344:19 |
| 368:10 | 251:7 | 206:5,15 | 55:23 56:5 | 352:24 |
| 369:20 | 253:14 | 206:19 | 59:7,10 | 353:6 |
| **screwy** 209:3 | 269:21 | 207:4 | 61:7 62:24 | 359:18 |
| **scroll** 87:23 | 372:12 | 214:13,18 | 63:20 | 360:3,25 |
| 105:7 | 373:8,11 | 225:1,18 | 64:20 | 363:12 |
| 108:24 | 375:12 | 304:15 | 67:14,21 | **security...** |
| 125:10 | 376:2 | 311:17,17 | 71:8,9,15 | 234:24 |
| 157:11 | 377:5,20 | 311:21 | 71:17,19 | **see** 14:10,15 |
| 192:5 | **search** | **secretary's** | 76:25 | 14:17,21 |
| 195:9 | 192:20 | 101:18 | 79:14,17 | 14:22 15:4 |
| 197:10 | 222:4 | 311:19 | 79:21 80:1 | 15:16 18:6 |
| 201:17 | **searched** | **section** | 80:2 90:10 | 27:2 30:21 |
| 206:4 | 188:25 | 108:11 | 90:15 96:8 | 41:11 62:9 |
| 214:7 | 276:18 | 109:2 | 101:14,21 | 69:14 72:7 |
| 216:25 | 277:1 | 125:18 | 110:18 | 73:7,14 |
| 224:6,21 | **searches** | 193:25 | 112:6,11 | 78:22 83:1 |
| 244:8 | 144:18 | 281:5 | 113:12 | 87:25 88:1 |
| 245:23 | **sec** 190:24 | **sector** 16:20 | 119:10,21 | 88:8,15 |
| 282:16 | **second** 35:21 | 18:12 44:8 | 127:15 | 91:10,12 |
| 285:15,25 | 82:23 | 47:12 60:4 | 128:24 | 97:8 98:20 |
| 302:23 | 98:23 | 60:5 308:3 | 129:11,24 | 99:2,3 |
| **scrolling** | 138:22 | 314:8 | 135:25 | 105:7,11 |

RIAN . SC LL   1/12/2023

| | | | | |
|---|---|---|---|---|
| 105:15 | 246:4,24 | 27:15 40:8 | 199:6 | **sentence** |
| 106:17 | 247:22 | 40:14,20 | 205:14,14 | 73:14 |
| 107:15 | 249:8 | 41:5,13 | 271:24 | 78:24 |
| 109:3 | 250:6,6,14 | 47:21 | 299:10 | 95:18,19 |
| 117:23 | 250:18 | 52:17 | **senior** 4:4 | 96:1,5,12 |
| 118:3 | 253:8,14 | 82:15 83:4 | 22:12 | 96:20 97:4 |
| 122:14 | 259:9 | 114:12 | 129:22,23 | 109:11 |
| 123:12 | 261:3 | 194:4 | 251:17 | 118:4 |
| 125:3,17 | 269:7 | 235:8 | 305:5 | 122:10 |
| 125:20 | 270:18 | 258:13 | 360:17 | 125:21 |
| 141:25 | 271:23 | 279:4 | **sense** 49:8 | 142:8 |
| 144:20 | 272:11 | 291:6 | 56:3 63:23 | 147:1,11 |
| 146:4,8,24 | 278:7 | 371:4 | 74:9 | 150:7 |
| 150:4 | 279:9 | **seen** 20:20 | 120:23 | 207:5 |
| 152:5 | 286:3,7 | 50:23 | 136:11 | 246:17 |
| 154:19 | 287:3 | 124:18 | 152:12 | 247:6,19 |
| 156:23 | 289:7 | 244:5 | 268:14 | 250:5 |
| 157:6 | 296:9,12 | 259:8 | 290:16 | 280:9 |
| 163:10 | 297:12 | 321:16,18 | 369:12 | 287:2 |
| 165:19 | 298:4,22 | 363:22,23 | **sensitive** | 334:1 |
| 166:21,23 | 298:25 | **semester** | 352:4,5 | 355:8 |
| 170:4 | 300:2 | 170:15 | **sent** 66:5,25 | 371:5 |
| 173:20 | 302:5,13 | **senate** | 67:7 69:10 | **sentences** |
| 176:3 | 302:15 | 197:16 | 106:13 | 90:14,25 |
| 191:9,17 | 304:10 | **send** 106:8,9 | 121:4 | **separate** |
| 192:6 | 307:5,17 | 107:2 | 134:13,17 | 37:3 155:5 |
| 194:10 | 308:7 | 109:17 | 135:3 | 180:13 |
| 195:6 | 310:3,6 | 119:23 | 168:16 | 267:23 |
| 198:18 | 319:23 | 120:1,15 | 180:8 | **separately** |
| 199:1,16 | 320:5,6,21 | 131:15,17 | 190:6 | 129:3 |
| 201:22,25 | 320:22 | 210:2 | 193:6,9,12 | **separation** |
| 202:8 | 321:10,11 | 212:13,18 | 193:15 | 108:21 |
| 203:19 | 322:3 | 318:17 | 199:19 | **September** |
| 204:7 | 328:14 | **sending** | 201:24 | 18:23 |
| 205:22 | 330:11 | 66:25 | 202:3,7 | 19:13 |
| 206:5,11 | 334:5 | 134:24 | 203:17 | 20:24 |
| 206:15 | 335:17 | 157:3 | 212:22 | 21:20 |
| 208:7 | 336:17 | 180:14 | 214:14,18 | 24:11 |
| 213:3,10 | 338:2 | 193:21 | 217:19 | 28:24 |
| 213:16,21 | 340:6,16 | 211:21,24 | 226:13 | 31:12 |
| 214:12,14 | 346:10 | 211:25 | 230:5,11 | 36:10,13 |
| 214:24 | 350:6,9,17 | 242:7 | 265:3 | 38:24 39:5 |
| 215:1 | 354:8 | 252:3 | 284:24 | 41:8 282:3 |
| 222:1,21 | 357:11 | 295:3 | 286:3 | 283:9 |
| 223:8 | 360:22 | 307:2 | 288:17 | 364:15,25 |
| 225:2 | 361:6 | 345:13 | 294:2 | **sequential** |
| 228:2 | 368:16 | 368:14 | 351:19 | 170:5 |
| 232:6 | 369:22 | **sends** 176:19 | 352:17 | **series** |
| 244:1,23 | **seeing** 27:12 | 198:19 | 366:12 | 309:25 |

| | | | | |
|---|---|---|---|---|
| 310:10 | **seven** 233:21 | 328:8 | **shifted** | 372:9 |
| **serve** 60:7 | 245:15 | 329:10 | 113:15 | 375:17 |
| 70:17 | **shaking** 13:3 | 335:11 | **shifts** 166:9 | **signature** |
| 109:6 | **share** 14:10 | 345:19 | 166:13,14 | 373:7,19 |
| 189:23 | 14:10,18 | 363:10 | 174:13,21 | 375:14,17 |
| **served** 19:8 | 15:3,4 | 364:15 | 174:25 | 375:20 |
| 147:7 | 17:7 25:19 | 366:16 | 193:9,11 | 376:25 |
| 367:3 | 36:9 40:5 | 368:10 | **short** 104:17 | **signed** |
| **serves** 366:3 | 40:10,17 | 369:20 | 151:18 | 157:18 |
| 366:23 | 40:20 41:1 | **shared** 74:8 | 310:15 | 373:16 |
| **service** | 41:12 | 74:9 80:11 | **shorthand** | **significant** |
| 144:24 | 45:24,25 | 84:11,19 | 2:3,5 | 126:24 |
| 242:5 | 59:3 69:15 | 84:21 | 20:12 | 128:6 |
| 260:18 | 72:8 74:1 | 121:7,8,21 | 374:1 | 153:4 |
| **services** | 74:4,6 | 141:6 | **shortly** | **signoff** |
| 341:22,25 | 78:19 88:1 | 161:11 | 246:2 | 299:8 |
| 343:1,4,11 | 90:22 | 205:24 | **shot** 206:16 | **Silver** 312:8 |
| 343:14,18 | 105:8,9 | 213:6 | 225:6 | **Silvers** |
| 343:22,24 | 107:12 | 258:19 | 281:7 | 311:11,12 |
| 355:23 | 117:23 | **shares** | **show** 176:17 | 311:14,24 |
| 356:4,5,13 | 138:17 | 196:23 | 190:16 | **similar** |
| **serving** 20:6 | 156:18 | **sharing** 17:9 | 242:14 | 52:24 |
| 63:13 | 160:3,15 | 59:15,25 | 243:6 | 54:17 |
| 147:15 | 160:16,17 | 60:4,6,17 | **showed** 280:4 | 93:18 |
| 163:18 | 163:11 | 60:22 | **showing** 14:3 | 100:3 |
| 367:14,22 | 164:17 | 78:21 79:5 | 160:5 | 134:23 |
| **set** 6:24 | 191:5 | 80:10 | 227:12 | 136:19 |
| 16:3 21:9 | 199:2 | 121:24 | 252:15,18 | 139:12 |
| 47:20 58:1 | 206:14 | 147:6,7,15 | 255:14 | 140:6,25 |
| 61:4 63:14 | 211:11 | 147:15 | 279:10 | 238:16 |
| 68:16 88:9 | 212:15 | 148:5 | 342:17,19 | 243:20 |
| 103:8 | 213:4,11 | 164:3 | **shown** 229:7 | 296:23 |
| 165:17 | 215:2 | 235:6 | **shows** 157:2 | 314:19 |
| 179:7,17 | 222:22 | 260:4 | 205:11 | **simultan...** |
| 181:7 | 234:18,20 | 263:4 | 269:11 | 196:23 |
| 253:8 | 235:5,12 | 264:11 | **shredded** | **simultan...** |
| 256:3 | 252:8 | 284:12 | 339:11 | 169:24 |
| 262:16 | 258:1,20 | 288:24 | **side** 15:15 | 183:21 |
| 312:3 | 259:14,24 | 298:7 | 28:1 38:7 | 185:16 |
| 364:25 | 260:10,25 | **sheet** 43:2 | 40:4 43:24 | 195:23 |
| 374:13 | 285:1 | 373:16 | 44:18 54:4 | 197:8 |
| **sets** 39:18 | 287:5 | 376:1 | 127:23 | 200:2 |
| 303:14,23 | 288:23 | **sheets** | 236:25 | **Sincerely** |
| **setting** | 294:9 | 375:14,17 | 237:2 | 375:22 |
| 65:20 | 296:8,11 | 375:19 | 310:4 | **single** |
| 99:20 | 299:3 | **shift** 174:15 | 315:19 | 363:15,19 |
| 159:2 | 306:25 | 175:3 | **sides** 40:3 | **SIO** 97:5 |
| **settle** 62:23 | 311:24 | 180:15 | 238:20 | 104:4,12 |
| **setup** 119:25 | 319:19,25 | 193:15,20 | **sign** 11:2 | 104:15,17 |

| | | | | |
|---|---|---|---|---|
| 181:14,17 | 253:16 | 168:7 | 317:13 | **sorry** 16:9 |
| 182:19 | 350:4 | 172:5,18 | 318:4 | 19:2 23:5 |
| 183:15,22 | **so-called** | 180:15 | 326:14,24 | 29:9 30:9 |
| 183:23 | 126:4 | 189:24 | 327:3,9,18 | 31:9 37:10 |
| 187:2,3,3 | 254:17 | 192:2 | 333:16 | 40:2 47:9 |
| 187:4,6 | **social** 17:4 | 193:3,9 | 339:10,23 | 55:1 60:12 |
| 195:15,24 | 17:8,10,12 | 200:20 | 340:4,5,8 | 66:14,23 |
| 196:24 | 17:16 | 208:23 | 341:13,16 | 67:3 70:7 |
| 197:8 | 18:16,21 | 210:12 | 346:25 | 76:20 84:5 |
| **sir** 15:5 | 20:8 21:1 | 214:3 | 350:15,21 | 86:6,7 |
| 153:11 | 21:5,23 | 220:4,6,25 | 350:21 | 90:21 91:8 |
| **sit** 130:8 | 23:20 24:2 | 221:20 | 351:2,6,13 | 95:25 |
| **sitting** | 24:5,10,13 | 222:16 | 351:24 | 100:15 |
| 263:17 | 27:1,22 | 223:20 | 352:11 | 104:1 |
| **situation** | 38:13 39:8 | 228:9 | 356:19,19 | 113:3 |
| 161:8 | 57:21 | 229:4,8 | 357:8,15 | 114:16 |
| 223:2 | 58:17 59:3 | 232:8,25 | 357:19,21 | 122:7 |
| 228:13 | 64:2 66:5 | 233:18,22 | 363:16 | 125:8,12 |
| 344:23 | 66:16,25 | 235:13 | 364:21 | 125:15 |
| **situational** | 67:17 68:8 | 237:3 | 365:2 | 138:2 |
| 155:7 | 73:11,18 | 239:11,21 | 366:2,5,25 | 139:17 |
| 267:17,24 | 78:21 79:6 | 241:6 | **society** | 143:16 |
| 268:2 | 93:21 94:7 | 242:16 | 16:19 | 145:6,7,10 |
| 325:24 | 94:13 | 244:18 | 73:11 | 147:2 |
| 326:1 | 107:20 | 245:4,16 | 105:13 | 150:25 |
| **six** 73:7,7 | 108:2 | 246:23 | 109:12,17 | 151:22 |
| 126:14 | 109:13 | 247:25 | 354:22 | 155:3 |
| 270:16 | 114:24 | 256:14 | **solving** | 163:13,15 |
| 331:1 | 118:25 | 257:17 | 65:25 | 164:13 |
| 337:25 | 120:22 | 258:2,5,12 | **somebody** | 166:17 |
| 338:6 | 122:18 | 258:13 | 62:22 | 167:20 |
| 349:23 | 123:5,17 | 259:4 | 102:2 | 168:4 |
| **size** 105:9 | 126:18 | 261:3 | 133:19 | 171:23 |
| **sizes** 357:9 | 127:5 | 263:24 | 135:4 | 173:8 |
| **skip** 334:24 | 129:12 | 265:17,22 | 168:6 | 178:1 |
| **skipping** | 131:20 | 266:9 | 174:12 | 186:2,18 |
| 141:15 | 132:1,12 | 268:23 | 224:14 | 195:4 |
| 298:19 | 132:17 | 269:1 | 227:5 | 196:8 |
| **slash** 28:9 | 134:4 | 274:5,8 | 263:13 | 197:5 |
| **slightly** | 138:11 | 277:9 | 333:8,10 | 198:22,25 |
| 91:14 | 144:4,24 | 278:7,13 | 358:11 | 214:9,15 |
| **slowly** | 146:3 | 286:19,23 | **somewhat** | 218:4,9,14 |
| 345:18 | 151:8 | 290:12,25 | 15:13 | 221:8 |
| **small** 122:19 | 152:18 | 291:25 | 105:10 | 222:11 |
| 193:25 | 153:15 | 293:5,6 | 352:4 | 223:15,17 |
| **Smoke** 281:16 | 157:9 | 296:16 | **Sonoma** 163:9 | 225:22,23 |
| **smoothly** | 163:19 | 300:18 | **soon** 14:15 | 225:25 |
| 15:2 | 164:11,13 | 305:18 | 198:14 | 226:1,1,4 |
| **Snell** 28:8 | 165:3 | 314:21 | 335:9 | 227:19 |

RIAN  . SC  LL   1/12/2023

| | | | | |
|---|---|---|---|---|
| 232:3,14 | 100:9 | 279:15 | **specific** | 133:22 |
| 232:23 | 102:11 | 338:1 | 27:19,20 | 135:9 |
| 233:18 | 114:21 | **speak** 14:20 | 37:17,25 | 149:9 |
| 241:3 | 115:7 | 27:8 36:2 | 38:11 | 150:3 |
| 243:4 | 123:24 | 42:5 56:2 | 39:24 | 207:17 |
| 249:1,21 | 130:16,16 | 58:3 61:21 | 56:15,24 | 235:9 |
| 252:13 | 131:1,7 | 64:16 | 74:6,14,16 | 237:1,7 |
| 253:9 | 151:20 | 67:13 | 75:3 90:12 | 242:6 |
| 257:11 | 152:4 | 87:22 | 116:12 | 245:17 |
| 262:3 | 179:12 | 115:16 | 120:10 | 246:9 |
| 268:12 | 206:25 | 131:16 | 129:9 | 254:8 |
| 269:10 | 220:22 | 149:11 | 133:21 | 256:17 |
| 273:9 | 234:20 | 161:24 | 143:24 | 259:15 |
| 274:22 | 286:21 | 177:20 | 216:23 | 275:17 |
| 279:22 | 329:14 | 207:3 | 220:12 | 276:24 |
| 280:14 | 345:12 | 243:12 | 236:10 | 282:11 |
| 281:6 | 368:18 | 367:18 | 237:16,21 | 283:24 |
| 282:1 | **sorts** 20:25 | **speaking** | 240:8 | 284:17 |
| 284:9 | 25:21 | 15:22 16:7 | 241:19 | 297:1 |
| 291:13 | 26:25 | 24:24 27:7 | 242:3 | 301:6 |
| 292:12 | 27:16 | 27:10,17 | 247:13 | 341:16 |
| 293:11 | 40:13 | 33:21 36:6 | 255:4 | **specificity** |
| 297:17,17 | 129:1 | 37:19,21 | 258:24 | 211:13 |
| 297:20 | 147:24 | 65:5 74:2 | 268:8,14 | **specifics** |
| 299:23 | 304:4 | 79:19 | 272:22 | 37:20 |
| 302:6 | 342:8,12 | 83:18 94:4 | 273:12,24 | 39:24 |
| 303:3 | 343:9 | 107:5 | 278:14 | 80:10 |
| 305:15 | 356:9 | 119:14 | 282:13 | 107:21 |
| 307:23 | **sound** 279:25 | 128:2,7 | 285:12,12 | 141:9 |
| 311:1 | 334:21 | 143:13 | 285:24 | 181:20 |
| 314:1 | **sounded** | 177:17 | 290:5,9 | 247:4 |
| 318:21,22 | 54:16 | 215:11,22 | 294:18 | 251:25 |
| 320:1 | **sounds** 96:14 | 220:14 | 303:7 | 286:17 |
| 325:15 | 160:13 | 235:1 | 304:13,25 | **specify** |
| 327:8 | 207:18 | 257:6 | 305:20 | 115:11 |
| 330:21 | 308:21 | 258:21 | 336:6 | 200:13 |
| 334:23 | 364:1 | 263:10,12 | 341:8 | **speculate** |
| 344:7 | **source** 16:22 | 264:25 | 345:25 | 91:23 97:2 |
| 347:12 | 42:16 | 304:2 | **specific...** | 216:6 |
| 351:23 | 123:14 | 305:10 | 37:16 | 231:14 |
| 361:17 | 274:5 | 309:4 | 65:24 74:3 | 272:15 |
| 363:5 | 279:6,11 | 325:20 | 84:6 99:6 | **speculating** |
| 368:13 | 325:21 | 340:10 | 103:20 | 68:23 |
| 369:23 | 326:8,9 | 357:18 | 105:24 | 266:10 |
| 371:10 | **sources** 24:4 | 358:7 | 113:10,14 | **speculation** |
| **sort** 18:3 | 123:9 | **special** 4:4 | 113:21 | 71:21 72:4 |
| 30:23 | 329:4 | 320:19 | 118:19 | 87:17 97:1 |
| 47:15 | 357:22 | **Specialist** | 121:19 | 98:12 |
| 99:20 | **space** 25:6 | 4:20 | 124:9 | 111:9 |

RIAN . SC LL    1/12/2023

115:10
118:17
122:22
142:7
149:18
178:16
194:15
198:6
201:5
202:16
204:13,24
231:11
244:21
273:2
283:22
294:17,24
298:12
304:22
310:13
316:20
324:25
333:19
351:16
352:8
354:13
356:22
358:15
359:23
360:20
361:14
**speech** 320:4
348:5
**speed** 275:22
**speed/pr...**
272:10
273:16
275:23
**spell** 32:20
155:3
167:5
279:23
**spelling**
373:4
**spend** 87:7
**spent** 314:9
**spilling**
247:19
297:9,15
**split** 107:11

**spoke** 78:4
334:21
**spoken** 307:3
**spot** 284:10
348:25
**spread** 32:6
144:19
158:10
**spreader**
126:3
**spreaders**
125:23
**spreading**
114:23
124:24
160:8
207:8
323:4
**spreads**
323:11
**spreadsheet**
165:15,22
166:2,5,8
190:6,9
193:14
201:10,14
**spring** 70:9
89:10
**stability**
339:7
**staff** 16:2
28:9 53:25
54:6 57:8
113:10,12
113:13
148:25,25
149:1
171:8
330:19,22
331:1,11
333:8,13
**staffing**
173:23
**Stafford**
167:19
179:19
184:14
191:25
192:13

276:20
**stage** 47:7
174:2
**stages** 241:9
**stakeholder**
108:19
110:8
111:7,12
**stakehol...**
16:13,19
18:11,16
20:9 44:15
97:7
105:13,22
108:11,15
108:25
109:3,5,7
109:12
137:25
147:10
152:9
263:3
264:2
303:25
322:20
366:2
**stalled**
364:10
**Stamos** 70:5
70:14
72:17 76:9
76:14,15
77:8,17,22
77:25 78:7
85:22,23
86:3,11,16
87:15 88:8
98:7 99:10
99:16
101:2
111:22
116:20,24
117:2,5
136:9
139:7
142:12
362:12
368:13,21
**Stamos's**

89:6
**Stamped** 6:5
6:14,21
7:9,10,13
7:18 8:5
8:21,22
9:14,19,20
**stand** 270:14
307:19
308:15
**standard**
66:18
180:5
187:13
200:25
372:18
**standing**
179:3
**standpoint**
46:22
143:25
154:21
239:24
332:24
359:7
**stands** 59:16
146:10
307:22
**Stanford**
46:23 48:2
48:18
49:20
50:22,22
51:8,10,15
51:22 52:5
52:11 58:9
58:11
70:14,21
70:21
72:16
74:18
76:14 78:4
78:5,8
80:17,21
80:23 81:6
81:12,17
82:2 83:24
85:6 89:4
89:6,11,20

100:7
101:25
104:18,22
117:5
142:2,25
147:20
169:7,12
169:15,20
169:25
170:11,14
170:15
172:8,11
172:11
182:7,13
182:24
185:16
186:11,11
186:13,23
188:2,5,8
195:11
196:15,18
204:9,11
204:15,16
204:17
361:22
362:3
368:14
370:4
**Stanford's**
134:10
**Starbird**
72:21
87:25
360:5
**start** 14:3
212:6
233:11
244:8
**started** 12:2
24:17 32:2
76:17
88:24
89:13
117:1
174:4,5,20
174:21
336:12
368:14
**starting**

RIAN . SC LL    1/12/2023

| | | | | |
|---|---|---|---|---|
| 12:5 18:6 | 377:1 | **stead** 21:1 | 338:12 | **subdivision** |
| 98:3 | **state's** | **stenogra...** | **string** 7:8 | 15:9 |
| 241:20 | 204:6 | 374:7 | 9:18 | 307:25 |
| 283:14 | 205:12 | **step** 80:19 | **strong** 96:7 | **subject** |
| 297:8 | 206:6,15 | 106:25 | 317:6 | 150:20 |
| 307:1 | 206:19 | 263:2 | **structure** | 152:22 |
| 323:24 | 214:13,18 | 347:10 | 339:8 | 153:19 |
| **starts** 324:4 | **state/local** | **steps** 16:14 | **stuck** 188:1 | 217:15 |
| **state** 1:5 | 24:1 | 123:12 | **student** | 246:21 |
| 10:6 11:16 | **stated** | 171:25 | 169:7 | 255:22 |
| 24:4 38:2 | 148:18 | 221:13 | **students** | 282:13 |
| 44:23 50:9 | 334:2 | 231:6,8 | 50:22,23 | 289:23 |
| 50:9 54:20 | **statement** | 295:4,19 | 51:15 | 297:11 |
| 54:23 | 21:12,13 | 298:3 | 89:20 90:1 | 361:5,16 |
| 57:18 | 218:18 | 302:17 | 97:5 370:4 | **submitted** |
| 58:23 60:1 | 219:21 | 304:13 | **studies** | 108:9,10 |
| 60:23 61:3 | 220:16 | 316:9 | 170:11 | 189:18 |
| 79:3 85:1 | 221:1,3,10 | 357:13 | **study** 95:15 | 199:21 |
| 91:19 | 221:15,22 | **stood** 60:7 | **stuff** 15:3 | 200:4 |
| 93:15 96:6 | 221:24 | 80:20 | 53:17 | 243:13 |
| 96:16 | 222:2,6 | 104:9 | 64:13 96:3 | **submitting** |
| 101:10,18 | 253:20,21 | 325:5 | 115:3 | 105:22 |
| 101:19 | 253:24 | 362:12 | 116:3,8 | **subscribe** |
| 103:14 | 254:3,7,15 | 364:4 | 121:24 | 145:2 |
| 106:11 | 254:22 | **stop** 266:19 | 166:13 | 377:11 |
| 148:5 | 314:19 | **store** 281:9 | 169:15 | **subsector** |
| 149:15 | **statements** | **stories** | 177:21 | 59:15 |
| 164:8,14 | 127:25 | 124:19 | 184:4 | 60:15 |
| 204:17 | 219:18 | **straight** | 187:11 | 339:7 |
| 207:4,7 | 222:14 | 120:18 | 188:11 | **subsidiary** |
| 215:10 | 225:10 | **strategic** | 189:11 | 38:18 |
| 221:25 | **states** 1:1 | 25:18 36:7 | 227:6 | **substance** |
| 223:4 | 10:9,25 | 36:8 37:22 | 234:20 | 377:8 |
| 225:2,19 | 41:12 | 235:3 | 238:17 | **substantial** |
| 246:1 | 45:19 | **strategi...** | 240:16 | 50:23 |
| 265:20 | 59:22 | 27:11 | 241:14 | 135:23 |
| 266:7 | 90:18 91:5 | **strategy** 9:9 | 289:13 | 153:4 |
| 278:4,11 | 94:22 95:6 | 12:10 | 366:8 | 264:4 |
| 278:19 | 95:12,16 | 321:7 | 368:18 | 317:18 |
| 281:18 | 147:10 | 328:13,24 | **sub-bullet** | **substant...** |
| 296:17 | 223:25 | 329:2,8,11 | 354:22 | 136:1 |
| 297:2 | 275:7 | **streamlined** | 357:6 | **suffice** |
| 298:9 | 342:1 | 65:11,14 | **subcommi...** | 301:4 |
| 299:11,21 | **stating** | **Street** 3:9 | 72:24,25 | **suggested** |
| 300:20 | 329:23 | 3:20 375:6 | 353:3,7 | 312:3 |
| 304:15 | **statutory** | 375:21 | **subcommi...** | **suggesting** |
| 369:3 | 61:20 | **strengthen** | 70:18 | 95:4 |
| 375:8 | **stay** 107:12 | 336:16,20 | **subcompo...** | 286:20 |
| 376:3 | 173:3 | **stressed** | 118:1 | **summarized** |

RIAN . SC LL   1/12/2023

| | | | |
|---|---|---|---|
| 74:13 | **suppose** | 187:2,4 | 362:19 | 170:19 |
| **summary** 36:9 | 17:25 | 188:11,16 | **surprised** | 171:1,4 |
| 73:7 74:15 | 45:11 | 197:23 | 52:18 76:1 | 173:25 |
| 89:15 | 219:12 | 198:4 | 237:9 | 184:6,18 |
| 260:9,13 | 221:14 | 201:8 | 247:16 | 189:23 |
| 260:21,22 | 340:3 | 203:2 | 272:23 | 193:4,6 |
| 346:16 | **supposedly** | 207:10,12 | 296:23 | 213:15 |
| **summer** 36:16 | 218:25 | 211:15,21 | 334:14 | 216:13 |
| 36:17 70:9 | **suppressed** | 218:7 | **surprising** | 241:21,24 |
| 86:4 97:6 | 320:19 | 219:9 | 273:10 | 265:11,14 |
| 117:1 | **suppresses** | 221:2 | **suspect** | 266:21 |
| 151:18 | 354:23 | 223:16,19 | 103:3 | **switched** |
| 170:9,10 | **Supreme** 3:8 | 237:18,25 | 108:24 | 252:14 |
| 186:7,14 | **Sur** 3:18 | 238:18 | 163:7 | **sworn** 11:10 |
| 187:8,24 | 11:5 | 239:13 | 261:18 | 11:13 |
| 188:10 | **sure** 11:18 | 240:6 | 289:16 | **sync** 21:4 |
| 234:7 | 15:1 16:10 | 241:11 | 290:3 | 24:13 |
| **Summit** 5:19 | 17:12 | 243:16 | 326:21 | 36:20 78:7 |
| **super** 239:15 | 20:20 | 249:2 | 331:6 | 127:19,22 |
| 325:18 | 26:22 29:8 | 256:16 | 333:10 | 128:14 |
| **supervision** | 34:2 42:13 | 257:13,15 | **swear** 11:9 | 132:4 |
| 374:9 | 52:14 | 259:20,23 | **switchboard** | 233:17 |
| **supervisor** | 54:24 56:1 | 261:8 | 16:24 17:1 | 238:9 |
| 22:13 | 57:2 60:14 | 265:2 | 168:10 | 244:17 |
| 140:22 | 61:4 62:5 | 267:2 | 263:15 | 245:14 |
| 141:11 | 63:1 65:1 | 269:10 | 366:3,23 | 246:7 |
| **suppleme...** | 65:15 | 271:17 | 367:15,22 | 247:2,11 |
| 276:13 | 66:12 67:3 | 273:19 | **switchbo...** | 255:3 |
| 277:2 | 68:25 | 286:25 | 131:16 | 260:5 |
| **supply** | 74:12 77:1 | 295:24 | 179:16 | 269:6,14 |
| 220:24 | 79:11,14 | 296:19 | **switchbo...** | 269:25 |
| **support** | 80:8 84:12 | 299:19 | 64:16 | 272:2 |
| 54:18 | 85:13 93:6 | 300:22,24 | **switchbo...** | 306:2,9 |
| 184:4 | 102:15 | 301:1 | 21:25 22:2 | 317:16 |
| 220:8 | 124:18 | 302:24 | 23:17,19 | **synch** 178:25 |
| 301:9 | 132:9 | 303:10,25 | 23:24 | 238:6 |
| 307:17 | 135:2 | 305:11 | 62:17 63:3 | **syncs** 132:5 |
| 322:2 | 140:21 | 306:15 | 63:7,17,20 | **system** 96:8 |
| 325:3 | 149:7,12 | 316:25 | 64:7,9,12 | 158:20,24 |
| 331:3,14 | 151:1 | 331:8 | 118:21,22 | 159:4 |
| 337:11 | 152:2,9 | 337:6,7,20 | 118:24 | 181:23,25 |
| **supported** | 161:1 | 363:22 | 131:9,12 | 182:1,3,7 |
| 90:10 | 162:13 | 365:22 | 138:4,5,8 | 182:7 |
| 149:2 | 166:4 | **surprise** | 149:3,5,20 | 267:13 |
| **supporting** | 176:17,24 | 80:11 | 156:21 | 342:4 |
| 187:11 | 178:21 | 236:22 | 161:20 | 355:13,17 |
| 331:3 | 181:8,13 | 247:4 | 163:18 | 355:20 |
| **supports** | 184:7 | 252:1 | 166:1 | **systems** 2:7 |
| 43:17,20 | 185:23 | 255:6 | 169:1 | 270:12 |

RIAN . SC LL   1/12/2023

| | | | | |
|---|---|---|---|---|
| 288:6 | 137:20 | 116:15 | 245:20 | 370:3 |
| 341:25 | 140:8 | 127:18 | 250:17 | **talks** 44:19 |
| 342:11 | 141:2 | 128:3 | 259:13 | 78:20 |
| 374:20 | 142:14 | 133:21 | 263:7,21 | 90:14 |
| | 147:13 | 172:4,23 | 264:15 | 108:9 |
| **T** | 157:8 | 208:9 | 306:2 | 146:6 |
| **T** 4:1 5:1,1 | 158:6 | 209:21,24 | 310:23 | 254:3 |
| 5:6 6:1,1 | 170:13 | 240:1,13 | 312:19 | 363:13 |
| 7:1,1 8:1 | 179:16 | 241:12,23 | 335:3 | 368:12,18 |
| 8:1 9:1,1 | 183:1 | 258:3 | 351:13 | 370:8 |
| **table** 73:6 | 190:1,21 | 296:2 | 355:16 | **tally** 349:23 |
| 232:17,18 | 219:20 | 306:14,14 | 360:11 | **tangential** |
| 232:18,19 | 221:13,23 | 311:7 | 362:5 | 13:13 |
| **tactic** | 231:8 | 325:22 | 368:19 | **Tangle** |
| 114:19 | 242:3 | 344:14,18 | **talking** | 144:18,22 |
| 236:11,21 | 261:2,12 | 349:6 | 28:24 31:2 | 144:23 |
| 246:11 | 275:5,11 | 356:18 | 31:11,17 | 145:2,13 |
| 255:7 | 276:1 | 357:10 | 41:7 45:14 | 146:7 |
| 273:11 | 277:14 | 359:4 | 47:10 | **target** 57:16 |
| **tactics** 41:5 | 313:14 | **talked** 26:20 | 56:24 | 321:8 |
| 41:13 | 316:9 | 26:21,22 | 83:15 | **targeted** |
| 114:11,22 | 318:22 | 46:22,24 | 91:14 | 114:19 |
| 114:23 | 328:22 | 58:10 63:3 | 96:15 | 254:11 |
| 116:12 | 342:18 | 65:10,11 | 114:25 | 256:10,19 |
| 279:6 | 345:17 | 72:13 82:1 | 145:19 | 278:20 |
| 316:6 | 348:7 | 85:5,21 | 163:5 | **targeting** |
| 323:4 | 349:3 | 91:15 | 185:8 | 16:5 57:11 |
| 359:10 | 358:24 | 93:14 | 206:12,13 | 87:3 96:10 |
| **take** 16:15 | 361:9 | 96:15 | 208:14,21 | 96:18 |
| 31:10,19 | 367:4 | 99:11 | 210:24 | 154:1 |
| 43:8 50:13 | **takeaways** | 100:16 | 217:12 | 331:17 |
| 57:24 | 141:8 | 121:17 | 237:14 | **targets** |
| 60:21 63:2 | 143:20 | 132:4 | 239:13 | 258:19 |
| 63:6 65:10 | **taken** 177:13 | 140:21 | 240:21 | **task** 12:5 |
| 80:19 81:9 | 178:6 | 142:21 | 242:6 | 118:1,7 |
| 81:10 85:9 | 288:11 | 147:22 | 243:10 | 130:2 |
| 89:10 | 304:13 | 157:22 | 244:25 | 271:6 |
| 94:12 | 374:4,7 | 161:13 | 245:1,21 | 312:2 |
| 96:22 | 375:12 | 171:21 | 246:13 | 330:15 |
| 103:7 | 376:4 | 173:22 | 256:12,17 | 348:13 |
| 106:25 | **talk** 5:15 | 179:1 | 259:3 | **tasked** |
| 111:21 | 12:21 | 181:18 | 260:7 | 174:13,14 |
| 112:4,9 | 26:11 41:3 | 208:15 | 263:25 | **tasks** 90:12 |
| 116:2 | 41:4 45:5 | 213:25 | 274:7,9 | **team** 8:13,15 |
| 118:6,23 | 47:13 84:4 | 216:18,20 | 294:3,14 | 15:17,23 |
| 120:20 | 99:25 | 233:6,7 | 294:19,21 | 16:2,2,4 |
| 121:10 | 100:10 | 235:10 | 296:15,20 | 18:4,8 |
| 123:12 | 102:19 | 238:10 | 333:22 | 19:10 |
| 133:6 | 111:22 | 244:17 | 335:5 | 36:14 |

RIAN . SC LL   1/12/2023

39:15
42:24
44:10
75:20
102:3
113:13
115:19,25
117:12
118:8,10
118:15
131:18
143:22
159:14
161:6
166:9,12
171:18,20
174:5
180:7
188:25
189:4,7
263:13,14
263:19
278:25
279:16
289:10
299:1
303:20
305:18
307:15
311:9
312:2,3
318:11
320:11
325:10
326:5,7,21
326:23
330:21
331:5,6,10
331:13,16
331:19,23
335:20,25
336:5,17
336:21
337:4,15
338:22
343:19
344:22
346:16
347:23

348:12,13
350:13
353:10,12
353:13
358:24
366:3,23
367:12
368:14
team's
 342:23
teammates
 308:7
teams 42:9
 287:18
 288:1
 311:9
tech 279:12
 279:14
technical
 83:17,17
 146:19
 195:18
technically
 130:9
 175:2
technique
 115:4
Technolo...
 9:25
technology
 286:16
teleconf...
 332:13
 334:2
tell 111:19
 118:22
 158:13
 198:14
 211:23
 214:5
 215:11
 244:25
 257:18
 266:17,23
 287:12
 334:16
 349:1
telling
 35:18

221:17
348:15
tells 280:10
 340:5
tended 216:5
tenth 283:7
term 138:9,9
 242:5
 293:20
terminology
 127:13
terms 31:18
 54:18
 83:22
 154:4
 155:21
 166:10
 184:6
 260:18
 288:23
 317:18
terrorism
 26:23
 27:16
test 152:11
 154:7,10
 154:17
testified
 11:13
 150:10
 156:22
 192:25
 193:8
 245:11
 255:24
 276:19
 309:10
 360:24
 365:3
 367:4
testify
 251:16
testimony
 23:7 89:25
 97:22
 118:23
 119:6
 202:18
 276:16

317:17
336:23
345:8
373:13,14
text 8:22
 217:4
 309:25
 310:3
 312:1
 316:11,12
 317:21
texting
 310:11
texts 310:10
thank 29:24
 87:24
 88:14
 183:10
 199:4
 206:2
 224:17
 227:21
 272:1
 300:12
 308:14
 367:3
thanked 89:9
thanks 176:2
 199:16
 200:10
 277:15
 292:25
 295:3
 299:21
theft 76:25
theirs 67:15
 301:11
theme 259:5
 349:8
themes 256:8
 256:14,21
 257:18
 258:4,12
 259:1
theory 154:8
 154:10
thereon
 377:10
thing 88:9

114:21
143:6,8
210:17
219:13
280:19
295:4
301:14
309:9
345:12
things 16:3
 25:4 26:25
 27:11,17
 41:17 43:5
 44:3,18
 46:16
 55:10 69:4
 71:4
 113:16
 114:11,19
 115:2
 124:19
 129:1
 131:7
 144:9
 159:3
 168:14
 174:9
 207:1
 216:16
 235:11
 238:23
 254:8
 256:8
 258:19
 260:6
 264:18
 268:25
 270:13,14
 279:7
 284:2
 290:20
 291:2,6
 292:8
 304:4
 306:13
 316:7
 325:23
 326:11
 333:24

RIAN  . SC  LL    1/12/2023

| | | | | |
|---|---|---|---|---|
| 334:16 | 125:6 | 255:24 | 371:25 | **threats** 25:3 |
| 340:15 | 128:1,21 | 256:9,22 | 372:5,18 | 26:16,21 |
| 342:12 | 131:22 | 256:25 | **thinking** | 26:23 |
| 345:11 | 134:21 | 257:12 | 37:23 | 27:16 |
| 346:24 | 135:24 | 258:15,16 | 53:15  58:5 | 235:18,24 |
| 348:1,22 | 136:13 | 258:22 | 85:15  87:6 | 340:17 |
| 348:24 | 137:7,8,16 | 259:6,21 | 99:22 | 366:15 |
| 349:13 | 139:20 | 261:9 | 100:2 | **three** 19:8 |
| 358:23 | 140:2,4,17 | 262:5,19 | **third** 72:10 | 35:17,23 |
| **think** 15:1 | 142:17 | 263:17,21 | 90:4 | 43:17,22 |
| 19:12 | 143:4,5,23 | 265:24 | 119:25 | 44:8  48:18 |
| 20:17 | 144:10 | 267:8 | 249:25 | 50:11 |
| 24:18 | 149:4 | 268:7,9,15 | 320:15 | 110:11 |
| 26:23 | 150:10 | 268:20,21 | 346:7 | 119:8,17 |
| 38:25  47:3 | 156:21 | 270:25 | 361:19 | 187:14 |
| 48:1,17 | 157:4 | 271:2,12 | 364:16 | 191:17 |
| 49:1  50:3 | 158:16 | 276:22 | 365:17 | 214:19,21 |
| 53:23,24 | 162:16,18 | 279:18,19 | 366:1 | 215:5 |
| 54:22  55:1 | 165:14 | 281:17 | 368:11 | 254:8 |
| 55:7,22,25 | 166:20,22 | 286:23 | **third-party** | 308:22 |
| 56:11,16 | 167:1 | 288:14 | 288:1 | 331:3 |
| 58:4,7,10 | 169:2 | 290:24 | 325:22 | 345:15 |
| 58:13  59:5 | 173:5 | 295:8,9 | 326:10 | **throttled** |
| 60:18 | 174:2,13 | 296:1 | **thought** | 320:19 |
| 65:13,17 | 175:10 | 298:14 | 56:14,20 | **throw** 217:11 |
| 65:19,22 | 177:17 | 300:23 | 58:14 | **Thursday** |
| 66:7  71:1 | 180:4,20 | 301:3 | 100:1 | 1:15  157:2 |
| 72:15 | 181:3,18 | 305:8 | 116:3 | **ticket** |
| 74:15 | 182:16 | 306:1,8,12 | 145:7 | 144:16 |
| 80:14 | 187:3,3 | 306:12,17 | 159:13 | 146:2 |
| 81:19  82:5 | 192:5 | 307:22 | 160:4 | 158:10,18 |
| 82:8  83:15 | 194:7 | 311:4 | 161:5 | 161:15 |
| 84:14 | 197:14 | 314:6 | 227:25 | 162:19,22 |
| 87:11 | 198:16 | 315:5 | 232:14 | 199:13 |
| 88:24 | 204:16 | 317:5 | 252:17,17 | **ticketing** |
| 90:11 | 212:11 | 318:7 | 260:18 | 158:20,23 |
| 91:25  92:7 | 215:20 | 328:1 | **thread** 81:5 | 159:4 |
| 92:12,13 | 220:5 | 329:11,13 | 81:10 | 181:22,25 |
| 93:18,24 | 222:3 | 329:17 | **threat** 37:17 | 182:1,3,6 |
| 94:2  100:6 | 227:14 | 333:4,7,11 | 37:23  38:1 | **tickets** |
| 100:7,17 | 232:12 | 337:8 | 338:13 | 108:9,10 |
| 101:4,15 | 233:9,21 | 341:22 | 339:12 | 109:17 |
| 106:1,15 | 236:4 | 344:15 | 341:13 | 110:1 |
| 112:15 | 239:4 | 345:4 | **threaten** | 122:12 |
| 113:4,4 | 240:23 | 351:10 | 340:8 | **tier** 106:18 |
| 117:7 | 245:22 | 353:19 | **threatening** | 107:14 |
| 119:15 | 250:20 | 357:24 | 235:20 | **tiered** |
| 124:14,15 | 251:7 | 365:3,21 | **threatens** | 144:15 |
| 124:16 | 252:13,15 | 369:10 | 340:11 | **time** 10:4 |

RIAN . SC LL  1/12/2023

| | | | | |
|---|---|---|---|---|
| 22:15,18 | 351:4,4,11 | 214:5 | 303:18 | 169:19 |
| 22:22 | 351:11 | tips@202... | tonight | 190:6,8 |
| 28:24 | 352:4,5 | 203:1 | 292:9,11 | 228:9 |
| 30:17,25 | 360:18 | 230:17 | 292:14,15 | 229:3 |
| 34:24 35:2 | 362:22,25 | tips@202... | 292:17,18 | 287:4 |
| 41:7 46:3 | 372:12 | 202:8 | tool 145:21 | 288:22 |
| 55:16 | timeframe | 204:2 | tools 108:6 | 289:2,21 |
| 70:12 78:8 | 31:1 36:10 | 205:13 | 155:21 | traction |
| 83:9,12 | 39:10,18 | 213:21 | 231:13 | 228:10 |
| 87:7 90:7 | 55:6 71:15 | 230:9,14 | top 15:7 | 229:4 |
| 100:25 | 85:10 86:8 | tips@202... | 83:4 | traditional |
| 105:2,6 | 86:18 | 203:18 | 157:16 | 254:18 |
| 127:16 | 87:15,21 | tips2202... | 163:6 | traffic |
| 139:10,24 | 104:20 | 205:5 | 201:22 | 159:24 |
| 141:12 | 122:19 | title 11:20 | 241:19 | transcribed |
| 142:23 | 129:20 | 15:19 29:5 | 289:19 | 12:20 |
| 158:17 | 170:24 | 29:9 32:24 | 299:14 | transcript |
| 164:25 | 177:7 | 32:25 | 338:13 | 5:7 6:2 |
| 169:4,5,8 | 227:2 | 129:19,23 | topic 13:13 | 7:2 8:2 |
| 169:24 | 285:19 | 289:11 | 181:6 | 9:2 13:7 |
| 180:22 | 293:7 | 311:16 | 312:12 | 368:12 |
| 181:4 | 327:25 | 335:19 | topics 236:5 | 370:2 |
| 183:5,8 | 337:14 | today 11:3 | 248:9 | 372:15 |
| 186:24 | timeline | 13:3 14:8 | 274:15 | 374:5 |
| 209:8,11 | 55:6,8 | 20:13 | 308:22 | 375:16 |
| 218:1 | 98:20,24 | 240:21 | 315:14 | transcri... |
| 220:1,1,9 | 178:8,18 | 244:17 | 321:10 | 5:14,18 |
| 249:11 | 179:11 | 245:11 | total 180:20 | 373:14 |
| 255:10 | timelines | 276:16,19 | touch 59:6 | transiti... |
| 265:17 | 101:6 | 282:6 | 62:12,12 | 330:14 |
| 271:12 | 176:19 | 283:11 | 101:13,16 | transpar... |
| 276:6,9 | times 38:22 | 299:7 | 101:24 | 261:10 |
| 277:5 | 174:15,15 | 334:9 | 102:1,5,25 | transparent |
| 287:19 | 174:16 | 364:22 | 112:6,10 | 260:19 |
| 297:10 | 177:22 | 366:22 | 112:13 | Treasury |
| 300:17 | 201:10 | today's 10:3 | 234:14,21 | 343:16 |
| 302:21 | 230:20 | 253:20,25 | 351:6 | 350:13,19 |
| 303:1,3 | 238:5 | 254:7 | track 45:17 | 350:25 |
| 306:5 | 247:10 | Todd 3:4 | 151:23,24 | 351:22 |
| 314:9 | 255:6 | 10:22 | 152:17 | 352:5,10 |
| 315:21 | 273:10 | Todd.sco... | 153:15 | 355:22 |
| 319:10,13 | 351:9 | 3:14 | 165:22 | 356:15 |
| 323:23 | timestamps | told 86:25 | tracked | trend 40:5 |
| 324:9 | 293:2 | 215:15 | 144:2 | 315:8 |
| 327:25 | timing | 246:18 | 161:15 | trending |
| 331:4 | 177:20 | 267:3 | tracking | 231:6,9 |
| 333:14 | tiny 73:5 | tomorrow | 150:16 | trends 41:13 |
| 334:5 | tips 66:14 | 277:3,12 | 158:10,14 | 235:8 |
| 336:8 | 202:14 | ton 238:23 | 165:15,19 | 305:20,24 |

```
306:7                 347:16                290:10                283:8                 223:11
314:14,18             357:25                291:11,19             288:18                226:14,19
314:21,23             358:5,9,17            tweets                289:9                 230:7,12
315:1                 359:8,11              159:17                291:1,19              248:24
323:3                 trying 49:20          177:4                 291:20                256:10
triage                54:18 91:8            226:19                293:15                259:6
107:15                91:23 93:7            292:9,14              298:23                268:9
Trick 213:8           94:4 97:3             292:16                299:6,20              271:11
tried 239:18          131:5                 305:20                300:4,15              272:9
tries 344:22          135:23                twice 333:8           301:5,10              279:18
346:16                152:7                 Twitter 27:3          360:18                281:22
trouble               154:2,7,17            38:15 65:2            Twitter's             290:5
98:24                 154:19                65:8 127:5            282:24                291:21
true 17:25            216:7                 146:13,13             289:20                296:20
95:11                 219:9                 159:18,19             292:5                 303:23
211:3                 229:1                 159:25                Twitter-...           306:8,16
281:1                 241:9                 162:25                238:11,15             325:12
330:19,22             256:18                163:5                 two 21:2,2            331:2,2
331:23                261:22                173:14                21:11,17              332:9
366:21,22             279:19                176:2,6,15            24:9,19               334:3,9
373:13                299:18                199:12,21             29:21                 345:14
374:5                 300:23                199:23                30:18                 356:24
377:9,13              305:1                 200:4,9               35:17 37:6            360:23
truly 368:23          306:11                205:17,19             38:23                 372:17,18
trust 289:10          314:12                206:1,16              39:18 44:5            two-fifths
289:12,14             315:20                207:25,25             51:16,18              119:10
trusted               323:3,22              208:8                 52:8 54:8             two-fold
108:10,14             329:5                 209:1,16              59:19,20              265:24
108:18                342:17                210:2                 60:10,12              tying 90:11
truth 9:4             346:11                211:16                67:25 75:9            type 27:16
221:18                347:22                212:1,10              86:11 90:3            40:10
319:21                349:14                221:16                90:14                 44:12 74:7
344:15                364:2                 223:2                 101:17                119:25
truths                Tuesday               224:6,7,16            113:24,25             240:16
345:11                226:6                 226:9,12              117:7                 types 21:3
try 13:1              373:6                  226:14,17             119:16,21             21:17
25:1 27:21            turn 139:5            226:22                119:22                243:21
46:3 47:5             turning               227:3                 125:11                316:7
47:5 57:10            20:23 24:9            229:16,19             170:3,5               331:19,24
62:20 83:6            37:14                 231:4,12              171:3,7,8             typewriting
220:8,19              42:20                 233:23                181:3                 374:8
229:9                 78:19                 239:6,6,9             184:25                typical
261:9                 177:8                 241:5                 185:20                177:7,14
314:15                267:4                 243:9                 188:19                178:8
315:3,8,12            354:4                 246:24                191:16                187:11
315:15,25             tweet 224:18          281:8,13             193:18,19             typically
317:10                231:5                 281:16,18             193:21                42:11
319:3                 289:23                281:23,23             207:22
332:1                 290:2,5,8            282:4                  214:20                      U
```

RIAN  . SC  LL    1/12/2023

U 4:1  6:1
7:1  8:1
9:1
U.S 4:13
uh-huh 13:2
uhn-uhn 13:3
Ukraine
322:3
324:6
325:4,7
326:15
ultimate
347:19
umbrella
148:18
unable 92:15
unambiguous
289:24
unauthor...
254:19
unavailable
270:4
unclassi...
25:20 26:9
36:7 235:3
257:4
258:18
unclear
370:21
371:15
undermine
27:21
254:11
283:15
343:10
356:13
undermines
354:24
355:10,19
undermining
27:13
354:21
underneath
28:10
148:19
330:9
underpin...
223:7
understand

13:15,17
16:14
44:15 47:6
48:14
56:23
59:13
79:24 93:7
94:5
143:17
151:2,25
152:19
153:7
154:3,16
219:9
223:13,16
241:12
249:3
256:18
277:13
297:21
304:3
305:20
312:2
314:14
315:1,20
316:9
323:3,7,22
324:7
327:11
343:6
345:9
355:24
358:3,19
358:22
368:23
understa...
17:15
56:19
59:17
61:19,25
67:22 68:3
68:9,20
73:4 78:13
89:8
107:23
108:1
121:11
122:17
123:23

134:10
143:13
147:17
148:2,17
148:24
154:6
169:6,11
170:17
179:22
182:20
261:10
265:20
266:13
267:18
270:11
279:6
308:12,17
311:8
312:8
325:19
327:17
333:20
336:23
337:16
343:19
365:4
understood
149:8
158:19
240:7
undertake
240:8
303:12
unfortun...
14:14
237:5
unified 9:9
325:6,14
326:2,6,16
328:13,24
329:1,7
United 1:1
10:9,25
41:12
45:19
90:17 91:5
94:22 95:5
95:12,16
275:7

342:1
universe
290:6,7,8
291:8
315:17
359:2
University
46:23,25
46:25 47:1
48:3,18
72:19
360:8
unofficial
281:18
349:22
unoffici...
281:8
unpack
102:11
unrelated
356:17
unsure 90:4
unusual
225:9
upcoming
257:19
299:1
update 129:4
270:13,17
282:6
283:11
updates
128:23
234:23
updating
283:12
upfront
37:20
use 20:13,20
39:22 94:1
94:3
109:20
126:22
138:9
145:22
210:20
231:13
254:18
320:21

useful
140:15
156:7
261:12
314:15
358:8
usefully
144:7
uses 217:16
USG 179:1
216:17
233:13
243:18
245:15
255:21
260:5
262:8
272:10
273:15
274:24
275:7,7,12
275:19,22
287:20
usual 289:1
usually 30:6
233:12
324:1

                V

v 1:8 375:8
376:3
V-i-r-a-...
139:1
vaccine
323:10
vaccines
5:13 144:3
322:1,10
vague 53:1
77:10,11
77:14
87:16 93:2
93:23
130:19
341:6
344:25
validate
224:3
variance

RIAN . SC LL   1/12/2023

| | | | | |
|---|---|---|---|---|
| 153:25 | 347:12 | **waived** 373:7 | 164:9 | 261:14 |
| **varies** 44:21 | 349:3 | **wake** 335:25 | 178:2 | 327:4, 21 |
| **various** 66:3 | 369:7 | **walk** 18:3 | 183:12 | 327:21 |
| 298:8 | **viewed** 71:4 | **walked** 54:11 | 216:2 | 334:21 |
| 351:2 | Vijaya | 71:1 | 218:7 | 341:15 |
| **vast** 180:21 | 360:14 | Walter | 240:6 | 370:9, 13 |
| **vehicle** | **violates** | 157:18, 24 | 253:23 | **watch** 264:14 |
| 61:16 | 261:6 | **want** 14:20 | 285:1 | 279:16 |
| 149:14 | **violations** | 14:25 | 287:3, 11 | **watching** |
| **vendors** | 153:5 | 15:14  27:4 | 287:25 | 179:4 |
| 264:9 | 177:4 | 34:19  42:5 | 294:9 | **way** 41:11 |
| 267:12, 13 | **violence** | 45:5  56:2 | 298:24 | 62:21 |
| **venues** | 340:17 | 58:3  61:21 | 343:4 | 67:18 |
| 357:15 | 366:11, 15 | 63:11  69:5 | 356:18 | 81:18 |
| **verbal** 13:1 | **VIPs** 80:20 | 77:15  87:7 | **wanting** | 84:25  85:8 |
| **verifica...** | **Virality** | 91:22  92:9 | 351:23 | 101:15 |
| 288:2 | 5:11  134:6 | 93:6  96:3 | **wants** 13:18 | 108:2 |
| **verifying** | 134:9, 15 | 97:2 | 315:1 | 119:25 |
| 98:7 | 135:8, 21 | 113:22 | **warned** 207:1 | 125:3 |
| **Verizon** | 136:10, 18 | 117:22 | **warning** | 133:19 |
| 233:24 | 137:3, 17 | 127:13 | 207:7 | 148:23 |
| **versus** 10:7 | 138:18, 24 | 133:24 | **warnings** | 164:11, 20 |
| **video** 4:20 | 138:25 | 149:11 | 206:22 | 196:16 |
| 10:4  82:24 | 139:8 | 154:15 | **warrant** | 216:22 |
| 145:24 | 141:14 | 207:3 | 207:2 | 239:22 |
| 146:1 | 144:2 | 216:6 | **Warren** 43:18 | 260:18 |
| 223:6 | **visible** | 221:8 | 257:15 | 261:22 |
| 224:7 | 105:9 | 227:20, 23 | **Washington** | 273:23 |
| **videogra...** | **voluntary** | 243:12 | 2:4  3:21 | 274:13 |
| 10:2, 16 | 318:9, 9 | 249:2 | 46:23  48:3 | 280:3 |
| 11:8, 11 | **volunteer** | 252:20 | 48:19 | 281:3 |
| 34:24  35:2 | 89:21 | 253:5 | 72:20 | 286:22 |
| 83:9, 12 | **vote** 8:19 | 283:11 | 304:15 | 300:1, 4 |
| 183:5, 8 | 302:5, 15 | 300:25 | 360:9 | 324:10 |
| 209:8, 11 | **votes** 217:12 | 308:21 | 375:6 | 327:11 |
| 276:6, 9 | 286:14 | 318:12 | **wasn't** 62:17 | 337:21 |
| 319:10, 13 | **voting** 96:11 | 358:21 | 63:8  67:12 | 347:19 |
| 362:22, 25 | 96:19 | 367:18 | 75:20  76:6 | **ways** 108:4 |
| 363:4 | **voting-r...** | 372:25 | 87:8  106:7 | 119:8, 16 |
| 372:10 | 147:3 | **wanted** 30:19 | 128:6 | 119:17, 22 |
| **videos** 224:1 | | 30:22 | 139:12 | 120:4 |
| **Videotaped** | **W** | 62:18, 25 | 151:24 | 159:23 |
| 1:14 | **W** 3:9 | 63:9  65:14 | 170:5 | 254:11 |
| **view** 58:22 | **wait** 14:24 | 68:15  72:6 | 175:4 | 279:3 |
| 146:1 | **waiting** | 86:19 | 199:1 | 283:24 |
| 239:8 | 174:9 | 121:2 | 201:7 | 340:12, 20 |
| 261:4 | 212:16 | 152:6, 11 | 203:5, 6 | 340:24 |
| 329:10 | 252:11 | 152:12 | 227:8 | 342:6 |
| 338:22 | 302:7 | 163:8, 25 | 238:23 | **we'll** 14:16 |

RIAN . SC LL   1/12/2023

| | | | | |
|---|---|---|---|---|
| 34:19 45:6 | 240:20 | 170:10,14 | 213:8 | 135:24 |
| 108:25 | 243:10 | 185:15 | 231:23,25 | 136:4 |
| 207:25 | 271:11 | 197:11,15 | 255:17 | 137:6 |
| 277:14 | 276:16 | 197:19 | 258:7 | 143:21 |
| 279:15 | 277:5 | 207:11,13 | 262:3 | 149:3 |
| 298:7 | 282:20 | 210:15 | 276:19 | 152:4,6 |
| 317:22 | 289:21 | 303:10 | 302:11 | 159:3 |
| 372:23 | 292:13 | **weren't** 59:2 | 306:23 | 169:12,13 |
| **we're** 28:24 | 294:10 | 65:1 152:9 | 318:22,25 | 169:22 |
| 31:1,17,17 | 322:18 | 211:15 | 341:7 | 172:1,3,7 |
| 34:25 35:3 | 355:21 | 239:15 | 372:9 | 181:14,17 |
| 41:7 44:13 | **Web** 8:7,11 | 334:13 | 374:13 | 182:13,17 |
| 45:13 | **website** | **Western** 1:2 | 375:15 | 184:5 |
| 125:10 | 43:13 | 10:10 | 376:2,25 | 185:16 |
| 139:13 | 123:24 | **WHEREOF** | **witness's** | 186:10,13 |
| 168:3 | 138:3 | 374:13 | 23:6 97:21 | 186:23 |
| 170:20 | 365:14,22 | **White** 140:4 | 345:7 | 187:5,13 |
| 173:5 | 365:23 | 140:18 | **wondering** | 188:1,4,11 |
| 175:23 | 366:22 | **whoa** 242:22 | 288:22 | 196:20 |
| 179:3,13 | **weed** 281:9 | 242:23,23 | **word** 82:9 | 197:12,15 |
| 180:13 | 281:16 | 242:23 | 93:8,11 | 197:21 |
| 183:6 | **week** 86:11 | **wide** 321:9 | 168:5 | 229:8 |
| 204:7 | 208:22 | **Wiki** 39:2 | 341:10 | 239:14 |
| 206:24 | 283:14 | 233:25 | 370:6 | 240:15 |
| 208:21 | 337:24 | **Wilson** | **words** 65:2 | 241:21 |
| 209:9 | **weekend** | 157:19 | 68:2 69:6 | 279:14 |
| 224:2 | 174:16 | 217:4 | 69:20 | 296:7 |
| 229:3 | **weekends** | 227:18 | 123:11 | 304:3,16 |
| 235:1 | 173:25 | **withdraw** | 149:4 | 305:7,11 |
| 242:18,19 | 174:4,6 | 153:6 | 160:6 | 314:13 |
| 252:11 | **weekly** 31:23 | **withdrawal** | 170:4 | 315:8 |
| 283:12 | 234:6,11 | 322:1 | 180:11 | 323:16 |
| 294:10 | 234:12,21 | 324:20 | 257:16 | 324:21 |
| 302:7 | 245:24 | **witness** | 287:11 | 325:12 |
| 307:14 | 332:13 | 10:22 11:2 | 317:11 | 343:3,4,8 |
| 323:3,22 | **weeks** 19:18 | 11:9,10 | **work** 16:24 | 356:6,6 |
| 338:16 | 127:1 | 14:21,22 | 17:1 25:9 | 362:17 |
| 343:13 | 295:15 | 34:17 35:5 | 43:3,9,18 | 364:19,24 |
| 346:11 | 334:3,9 | 83:3 91:2 | 43:19,20 | 368:15,22 |
| 348:8 | **weird** 130:7 | 125:8,11 | 46:5 47:4 | 370:18 |
| 355:22 | 269:11 | 150:21,25 | 47:15 | **worked** 38:19 |
| 356:4,7,8 | **welcome** | 152:23 | 49:14 | 51:7,19,22 |
| 358:20 | 287:22 | 153:20 | 52:13 | 64:10 66:8 |
| 363:1 | **went** 51:14 | 156:2,10 | 54:23 89:5 | 89:3 |
| **we've** 31:10 | 58:10 78:8 | 183:12,14 | 102:20 | 104:12 |
| 43:3 46:22 | 85:5,16 | 190:23 | 112:18 | 112:18 |
| 69:11 | 89:5 117:4 | 191:1 | 130:22 | 149:12 |
| 181:2 | 135:3 | 194:24 | 131:1,3,9 | 152:11 |
| 192:9 | 164:25 | 196:8 | 131:12 | 154:20 |

RIAN . SC LL    1/12/2023

168:22
169:3,7
170:15
183:20
187:4
196:5,9
197:8
239:16
240:24
266:4
316:1,4,5
369:4
**worker**
217:10
218:24
219:1,11
**workers**
235:20
339:11
**working** 31:1
44:14
49:15  51:9
51:16
62:20,25
142:24
168:24
169:4,5,9
169:24,25
172:10
181:22,24
186:15,24
187:6
190:9
195:23
196:18
200:2
226:22
227:3
233:8
263:14
294:10
296:22
297:25
331:5
355:22
356:8
**works** 16:14
46:4 62:5
72:21

171:20
182:3
315:24
316:9
323:8
358:22
**world** 344:14
**worried**
356:12
**wouldn't**
17:23
41:25
52:18
55:14,15
75:15  76:1
80:11
107:6
162:2
169:2
174:18
177:16
193:14
194:6
198:7,7
220:1
230:23
235:16
236:22
237:8
243:19
252:1
267:23
296:22,23
334:14
339:2
341:15
343:21
347:18
362:18
368:1
**woven** 60:3
**writing**
124:12
298:23
**written** 43:8
43:9 124:1
188:22
190:10
299:5

303:2
329:8
**wrong** 61:20
284:9
**wrongdoing**
153:2
**wrote** 209:19
211:8
229:11
287:23
288:25
289:25
292:20
295:13
312:6,24
313:3
314:17
316:16
318:2
**Wyman** 28:6
304:14,18
305:2,4
353:18
360:22

——————
**X**
——————
**x** 1:4,12  5:6
6:1  7:1
8:1  9:1
**XII** 87:23

——————
**Y**
——————
**yeah** 14:22
15:21
17:25
18:18  20:3
20:22  23:8
23:15
30:16  31:7
31:9,14,17
33:16,22
34:17,18
38:2  42:13
42:18
45:11
47:25  48:9
48:21
49:22
50:19  54:9

60:3 62:9
62:10 63:6
63:22 65:5
66:6 67:2
67:3,24
68:1 69:11
70:1,13
71:24 72:5
72:14,15
73:1,4,14
74:15
77:11
78:23 79:1
79:2,19
80:8 84:7
84:8 86:5
86:7,24
88:3,4
91:12 92:8
92:19 93:5
93:17
94:16 96:2
96:12,21
96:22 97:2
97:23
98:13
101:12
102:8
103:15
104:1
105:4
106:14
108:3
110:24
111:10
115:11,21
116:5,10
118:9,18
123:21
124:15
125:5,9
126:14
130:14,20
131:17
136:25
137:15
138:13
139:2,25
140:11

141:5
143:1
144:12
145:9
146:8,18
147:12
148:13
149:19
150:1,6,7
150:8
151:10
152:25
153:24
154:9
156:10
157:13,20
158:25
159:21
160:12,15
161:14
162:18,23
164:15,24
166:3
168:8
169:14
174:17
175:9
176:25
178:2,17
180:9,18
183:19
188:3
189:19
190:1,25
192:7
194:18
195:16
198:7
199:3,24
200:5,15
200:17
201:6,11
202:17,21
203:5,19
204:14
208:13,19
209:6
212:5,12
212:19,21

RIAN . SC LL   1/12/2023

| | | | | |
|---|---|---|---|---|
| 217:14 | 287:16 | 351:17 | 244:15 | **Z** |
| 218:6 | 288:13,25 | 354:7,11 | 245:5 | **Z-a-h-e-e-r** |
| 219:8,14 | 289:6,25 | 356:23 | 249:9 | 167:7 |
| 222:3,18 | 290:17 | 359:24 | 251:5,10 | **Zaheer** 43:14 |
| 222:24 | 291:4,23 | 360:6,13 | 253:12 | 166:19 |
| 226:10 | 292:7 | 361:21 | 268:3 | 167:3 |
| 227:14 | 293:10,11 | 364:9 | 269:12,22 | 171:13,14 |
| 228:4,12 | 294:18,25 | 369:11,24 | 272:3,12 | 179:19 |
| 228:22 | 295:7,13 | 371:8 | 283:18 | 181:11 |
| 229:1,2,3 | 297:6,15 | **year** 19:22 | 286:9 | 184:14 |
| 229:11,21 | 298:13 | 47:23 89:2 | 287:7,23 | 185:3,12 |
| 231:12,18 | 299:17 | 195:23 | 288:19 | 191:25 |
| 231:20,24 | 301:13 | 260:4 | 289:7 | 192:12 |
| 232:13,20 | 302:6,9 | 282:7 | 293:2 | 196:25 |
| 237:5 | 304:25 | **years** 12:1 | 294:12 | 197:7 |
| 239:2,12 | 305:22 | 31:13,18 | 295:16 | 198:19 |
| 239:23 | 306:1,12 | 101:5 | 300:3,3,7 | 199:6 |
| 241:3 | 308:20 | 261:20 | 300:14 | 276:20 |
| 242:1,10 | 309:11 | 321:8 | 304:17 | **zero** 280:12 |
| 242:11,22 | 310:8,14 | **yep** 12:23 | 312:1,17 | **zoom** 10:13 |
| 242:23 | 310:18,19 | 48:8 72:9 | 313:12 | 14:11,18 |
| 244:24 | 311:21 | 99:3 | 316:16 | 90:23 |
| 249:17,19 | 312:6,24 | 105:15,19 | 320:6 | |
| 249:21 | 313:17 | 109:5,9 | 330:12 | **0** |
| 250:9,11 | 314:5,17 | 110:6,10 | 331:22 | **01/28/2022** |
| 250:14 | 315:5,24 | 111:24 | 338:14,20 | 8:20 |
| 252:9,14 | 317:5 | 119:19 | 347:2 | **02/11/2022** |
| 252:22,24 | 319:24 | 125:16 | 348:1,10 | 9:20 |
| 253:2,6,9 | 320:22 | 126:9 | 352:25 | **02/17/2022** |
| 253:12 | 321:11 | 177:6 | 355:15 | 9:18 |
| 256:6,22 | 323:13 | 191:23 | 357:4 | **04/14/2022** |
| 258:7 | 325:1 | 195:13 | 361:2 | 7:8 |
| 260:8,25 | 328:18 | 196:16 | 366:7 | **06/18/2020** |
| 262:12,15 | 329:6,8,17 | 199:8 | 368:17,25 | 9:17 |
| 262:16 | 329:25 | 200:8 | 369:25 | **06/22/2022** |
| 264:1 | 332:21 | 201:19,21 | 370:16 | 9:13 |
| 265:7,23 | 333:9 | 202:6 | **Yoel** 7:4 | **08/10/2022** |
| 266:10,20 | 334:8,12 | 204:10 | 238:1,2 | 9:11 |
| 269:9,11 | 334:23 | 206:23 | 244:2 | **08/12/2022** |
| 270:2 | 336:3 | 210:5,9,23 | 245:20 | 8:19 |
| 275:9 | 339:15,20 | 211:7 | 289:2,5 | **09/16/2020** |
| 276:4 | 341:7 | 222:25 | **YouTube** | 7:10 |
| 277:21 | 342:9,22 | 225:8 | 127:6 | |
| 278:10,18 | 344:10,20 | 226:16 | 146:13 | **1** |
| 280:24 | 345:9 | 229:25 | 159:20,24 | **1** 1:22 5:9 |
| 281:7,20 | 346:20 | 230:3,10 | 278:6 | 69:7,10 |
| 281:25 | 347:25 | 230:15 | 280:10,23 | **1.4** 108:11 |
| 283:1,23 | 348:9 | 231:3 | 301:15 | 109:2 |
| 284:21 | 349:5 | 233:15 | | **1:41** 183:9 |

RIAN . SC LL   1/12/2023

| | | | | |
|---|---|---|---|---|
| **10** 6:13 | 6:6 | 7:15 | 7:14 | **200** 180:20 |
| 87:12  99:9 | **10718** 7:19 | **12223** 297:7 | **15743** 261:24 | 189:22 |
| 99:15 | 281:2 | **12223-22...** | **15th** 272:6 | 190:2 |
| 212:14,15 | **10th** 173:14 | 7:23 | 274:18 | **2018** 12:6 |
| 212:25 | 226:7 | **12th** 10:3 | 294:15 | 31:16,25 |
| 214:10 | 286:4 | 302:22 | **16** 7:10 | 32:7  57:7 |
| 244:9 | 328:21 | **13** 7:4  9:22 | 252:5,16 | 84:14 |
| 276:3 | **11** 5:3  6:20 | 243:22,25 | 252:17,18 | 117:16 |
| 319:7 | 108:12,25 | **13599** 7:16 | 252:18,21 | 234:7 |
| **10/18/2022** | 109:2,4 | **13603** 214:8 | 253:1,5 | 241:7 |
| 8:14 | 173:5 | 214:10 | 271:21 | 244:10 |
| **10/31/2022** | 212:14 | **13603-609** | 338:25 | 245:2 |
| 9:7 | 227:9,12 | 6:15 | **1608** 375:20 | 263:16 |
| **10:27** 83:10 | 244:8 | **13661-66...** | **17** 7:12 | **2019** 12:2 |
| **10:40** 83:13 | 245:23 | 6:7 | 224:16 | 31:25  32:7 |
| **100** 26:24 | 281:6 | **13696-701** | 252:5,16 | 195:12 |
| 61:15 | 298:22 | 7:16 | 253:1 | **202** 3:22  4:8 |
| 149:12 | **11/29/2022** | **13729-734** | 259:24 | 4:14 |
| **101** 45:6 | 7:6 | 6:8 | 269:4 | **2020** 5:10 |
| **10298-300** | **11:00** 175:7 | **138** 5:11 | 375:3 | 16:23  32:2 |
| 7:19 | 175:10 | **138046** 1:21 | **17th** 248:22 | 32:8  33:5 |
| **10389-391** | **11:20** 292:23 | **13th** 291:18 | 249:6 | 33:23 |
| 7:21 | **11:21** 292:24 | **14** 7:6  206:7 | 350:9 | 35:22 |
| **10390** 288:15 | **11:26** 291:20 | 206:17 | 374:14 | 47:24 |
| **10392-394** | **11:33** 292:4 | 249:15,16 | **18** 7:17 | 48:12 |
| 7:21 | **1100** 3:20 | 249:17,22 | 173:10,11 | 51:19 |
| **10394** 285:16 | 375:6 | **143** 146:20 | 277:16,19 | 54:13,17 |
| **10410-412** | **11th** 281:4 | **14448** 2:6 | **18th** 345:24 | 55:14 |
| 7:22 | **12** 1:15  6:22 | **14526-529** | **19** 8:4  191:3 | 62:13  63:7 |
| **10420-422** | 109:11 | 7:14 | 191:6,7,8 | 63:15,18 |
| 6:16 | 110:9 | **14545** 7:13 | 284:20,21 | 63:25 |
| **10449-453** | 162:9 | 269:5,8 | 363:6,9 | 69:22  72:2 |
| 6:15 | 190:13,16 | **14545-547** | **190** 6:22 | 75:21  86:4 |
| **10492-494** | 231:15,19 | 7:15 | **194** 9:24 | 86:18  96:6 |
| 6:12 | 242:12,19 | **14552-553** | **196** 125:2,15 | 98:25 |
| **10512** 208:3 | 269:5,9 | 7:14 | **19th** 284:19 | 107:20 |
| **10512-516** | 375:12 | **15** 7:8  87:12 | **1st** 157:2 | 118:11 |
| 6:11 | 376:4 | 99:9,15 | 271:24 | 121:2 |
| **10523-526** | **12/01/2020** | 206:1 | | 126:23 |
| 6:11 | 6:20 | 250:22 | **2** | 127:9,14 |
| **10538-541** | **12/17/2020** | 252:4,5,16 | **2** 5:11  89:14 | 129:15,21 |
| 6:10 | 7:5 | 252:17,18 | 138:17,20 | 130:18,24 |
| **10539** 204:1 | **12:00** 175:7 | 253:1,8 | 368:12 | 132:21 |
| **10564-565** | 175:10 | 255:15 | 370:1 | 133:14,25 |
| 7:20 | **12:11** 226:18 | 330:18,21 | **2:11** 209:9 | 134:4 |
| **10603** 173:9 | **12:34** 183:6 | 331:4,8 | **2:13** 209:12 | 147:4,16 |
| **10603-605** | **12:52** 173:19 | 337:4,8 | **20** 117:1 | 149:2,6 |
| 6:7 | 175:24 | **156** 6:4 | 175:25 | 151:18,19 |
| **10679-682** | **12076-079** | **15741-743** | 377:15 | 153:15 |

RIAN . SC LL   1/12/2023

| | | | | |
|---|---|---|---|---|
| 156:19 | **2021** 5:17,19 | 303:18,24 | **252** 7:8,10 | **35** 122:2,4,8 |
| 161:21 | 5:21 64:3 | 307:4,11 | 7:12 | 222:20 |
| 169:24 | 69:22 | 308:22 | **25th** 282:3 | **352** 9:12 |
| 170:8 | 70:10 | 328:2,21 | **27** 5:21 8:16 | **359** 9:20 |
| 172:18 | 71:16 | 334:5,12 | 216:25 | **363** 8:4 |
| 184:17 | 88:24 | 350:9 | 291:16 | **364** 8:7 |
| 185:17 | 89:10 | 352:21 | 301:20 | **365** 8:14 |
| 186:7 | 142:24 | 362:17 | 302:1,8 | **368** 5:14 |
| 187:23,24 | 167:23 | 364:16,25 | 334:19 | **369** 5:18 |
| 189:25 | 195:12,14 | 367:2,6 | 335:1,2,5 | **376** 1:22 |
| 195:19 | 195:19 | **2023** 1:15 | **277** 7:17 | **38** 231:22,23 |
| 196:13 | 196:13 | 10:3 32:10 | **27th** 208:21 | 232:1,6,12 |
| 202:14 | 330:13 | 32:14 | **28** 8:20 | 232:13 |
| 204:22 | 331:14 | 374:14 | 232:3,12 | 242:20,24 |
| 207:15 | 335:15 | 375:3,12 | 232:14 | 242:25 |
| 208:22 | 337:5 | 376:4 | 306:18,20 | **39** 242:20 |
| 213:16,18 | **2022** 9:23 | **2024** 8:19 | **29** 8:22 | **3rd** 217:8 |
| 214:6 | 15:9 19:13 | 19:20 | 309:20,23 | |
| 234:6,8,8 | 20:24 | 302:5,15 | **2nd** 213:17 | **4** |
| 234:9,11 | 21:20,25 | 302:20 | 214:14 | **4** 141:15,16 |
| 237:15 | 22:2,6 | **2053** 3:21 | | 141:16 |
| 241:16,18 | 24:12 | 375:6 | **3** | 370:2 |
| 241:21 | 28:16,24 | **20th** 89:16 | **3** 106:18 | **4:23** 157:2 |
| 246:3,8 | 33:22 | **21** 8:7 336:5 | 247:19 | **4:40** 319:6 |
| 247:8 | 34:11 | 364:11,14 | **3:00** 175:5 | **4:42** 319:11 |
| 248:22 | 35:16 36:3 | **211** 126:11 | **3:22-cv-...** | **4:53** 319:14 |
| 249:6 | 36:13 | 126:13 | 1:8 10:9 | **40** 242:21 |
| 255:3 | 37:15 38:8 | **212** 6:13 | **3:34** 276:7 | 274:14 |
| 262:8,13 | 38:24 39:9 | **213** 125:5 | **3:50** 276:10 | **42** 294:4,6 |
| 263:11,17 | 41:8,9 | **214** 125:14 | 319:5 | **43** 297:17,20 |
| 264:1,13 | 52:25 53:7 | **2205** 3 298:19 | **30** 9:4 144:6 | **45** 298:19 |
| 264:19 | 53:19 | **221** 3:9 | 144:7 | 299:15 |
| 266:12,15 | 54:12,15 | **222** 251:16 | 319:15,18 | **46** 9:12 |
| 271:24 | 55:4 56:8 | **227** 6:20 | 375:20 | 224:23,24 |
| 272:6 | 71:16 | **229** 126:12 | **301** 8:16 | 298:20 |
| 274:18 | 88:25 | **22nd** 285:25 | **306** 8:20 | 352:13,16 |
| 282:4 | 260:4 | 352:21 | **309** 8:22 | **475** 2:3 |
| 283:9 | 262:13 | **23** 8:11 | **30th** 198:19 | **48** 297:14,15 |
| 284:24 | 265:8,11 | 334:25 | 199:6 | 297:16 |
| 285:20 | 265:11,14 | 335:7,12 | **31** 9:8 328:4 | **48th** 297:8 |
| 286:4 | 265:18 | **23rd** 19:18 | 328:7 | **49** 9:15 |
| 291:18 | 266:8,21 | **24** 5:17 8:14 | **319** 9:4 | 297:15 |
| 322:19 | 267:4,21 | 288:16 | **32** 349:23 | 345:19,20 |
| 331:14 | 268:3,6 | 293:9 | **328** 9:8 | **49th** 297:9 |
| 332:12 | 269:7 | 365:10,13 | **33** 201:17 | |
| 334:3 | 294:15 | **24/7** 174:9 | **335** 8:11 | **5** |
| 345:24 | 298:22 | 267:17 | **345** 9:15 | **5:46** 362:23 |
| 348:14 | 302:22 | **243** 7:4 | **3484** 2:4 | **5:53** 363:1 |
| 362:18 | 303:3,5,13 | **249** 7:6 | **349** 9:18 | **50** 319:6 |

RIAN . SC LL  1/12/2023

| | | | |
|---|---|---|---|
| **51** 203:14 | **7484-487** | **8625-627** | 173:2 |
| **514-3259** | 7:20 | 7:21 | 179:13 |
| 3:22 | **751-8870** | **8628-630** | 197:25 |
| **52** 9:18 | 3:12 | 6:19 | 198:10 |
| 203:15 | **7552-554** | **8631-632** | 330:6,8 |
| 349:15,18 | 7:20 | 6:19 | 332:10 |
| 349:19 | **7564-566** | **8634** 6:18 | **9:06** 61:16 |
| 350:2 | 6:10 | **8636-639** | 10:4 |
| **53** 122:5 | **7565** 204:5 | 6:18 | **9:32** 34:25 |
| **54** 225:24,25 | **7574-576** 6:9 | **864** 225:20 | **9:34** 35:3 |
| **55** 204:1 | **7583-587** 6:9 | **8640-643** | **954** 225:21 |
| **56** 162:16 | **7598-600** | 6:19 | **9603-605** 6:9 |
| **573** 3:12 | 7:15 | **8649-650** | **9676** 160:22 |
| **58** 205:10 | **7599** 271:9 | 6:18 | 160:24 |
| **59** 9:20 | 271:19 | **8660-662** | **9676-680**... |
| 204:7 | **7633-634** 6:8 | 6:17 | 6:6 |
| 206:10,11 | **7654-659** | **8663** 222:21 | **9703** 7:19 |
| 226:4,5 | 7:15 | 222:23 | 283:7 |
| 359:13,16 | **7th** 261:25 | **8663-667** | **9th** 98:25 |
| **5th** 284:24 | ___ | 6:17 | 282:3 |
| ___ | **8** | **8668-669** | |
| **6** | **8** 105:8,11 | 6:18 | |
| **6** 5:14  368:3 | 297:18 | **8669** 224:21 | |
| 368:6 | **80s** 323:25 | **8679** 6:17 | |
| **6:04** 372:12 | 323:25 | **8689** 6:17 | |
| 373:9 | **8188-189** | **8693-694** | |
| **6:30** 177:3 | 7:19 | 6:16 | |
| **61** 9:22 | **823848** 2:6 | **8695** 6:17 | |
| 13:25  14:7 | **8349** 201:20 | **8696-700** | |
| **62** 9:24 | 201:21 | 6:15 | |
| 194:19,21 | **8349-352** 6:8 | **870-3578** 4:8 | |
| 194:22,25 | **8356** 162:6 | **8710-711** | |
| 198:16 | **8357** 162:14 | 6:16 | |
| **63** 208:4 | **8496-498** | **8739-741** | |
| **64108** 375:21 | 6:11 | 6:15 | |
| **65101** 3:11 | **8519** 7:20 | **8756-758** | |
| **69** 5:9 | 284:9 | 6:12 | |
| **6th** 223:4 | **8521-522** | **8768-769** | |
| ___ | 6:16 | 6:10 | |
| **7** | **8554-557** | **8769** 198:9 | |
| **7** 5:18 | 7:23 | **8778-780** | |
| 160:25 | **8557** 294:4 | 6:12 | |
| 292:4 | **8586-587** | **899** 3:10 | |
| 330:4,5,5 | 7:22 | ___ | |
| 369:17,21 | **8595** 7:22 | **9** | |
| 369:23 | **86-3** 190:20 | **9** 6:4  156:13 | |
| **7:23** 226:7,9 | **8623-627** | 156:14 | |
| **746-8414** | 7:22 | 168:4,4 | |
| 4:14 | **8625** 291:16 | 170:20 | |

**ERIC WALDO  12/22/2022**

```
 1            IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF LOUISIANA
 2                   MONROE DIVISION

 3

 4   THE STATE OF MISSOURI, et al.,

 5        Plaintiffs,

 6   vs.                        Case No.
                                3:22-cv-01213-TAD-KDM
 7   JOSEPH R. BIDEN, JR., et al.,

 8        Defendants.

 9

10

11

12

13

14       VIDEORECORDED VIDEOCONFERENCED DEPOSITION
                    OF ERIC WALDO
15               DECEMBER 22, 2022

16

17

18

19

20

21

22

23

24

25
```

**ERIC WALDO  12/22/2022**

Page 2

```
 1                    I N D E X

 2                     WITNESSES

 3    All Witnesses:                         Page

 4    Eric Waldo
       Examination by Mr. Sauer
 5
                      EXHIBITS
 6
      Exhibit 1     Resume                     20
 7
      Exhibit 2     Org Chart                  49
 8
      Exhibit 3     Defendant's Second-Amended
 9                  Combined Objections and
                    Responses to Plaintiffs'
10                  First Set of Expedited
                    Preliminary Injunction-Related
11                  Interrogatories             72

12    Exhibit 4     5/28/21 E-mail            134

13    Exhibit 5     6/12/21 E-mail            139

14    Exhibit 6     E-mail                    144

15    Exhibit 7     Document                  149

16    Exhibit 8     E-mail                    151

17    Exhibit 9     E-mail                    154

18    Exhibit 10    Press Conference Transcript 160

19    Exhibit 11    Health Advisory           196

20    Exhibit 12    Document                  206

21    Exhibit 14    7/16/21 New York Times
                    Article                   214
22
      Exhibit 16    7/21/21 E-mail            225
23
      Exhibit 17    E-mail                    234
24

25
```

**ERIC WALDO  12/22/2022**

**Page 3**

```
 1                    EXHIBITS (continued)
 2
     Exhibit 18      7/18/21 Text Message          238
 3
     Exhibit 19      E-mail Chain                  242
 4
     Exhibit 21      E-mail                        254
 5
     Exhibit 22      E-mail                        260
 6
     Exhibit 24      8/18/21 E-mail                266
 7
     Exhibit 25      E-mail                        269
 8
     Exhibit 27      E-mail                        279
 9
     Exhibit 28      Virality Report               282
10
     Exhibit 30      9/18/21 E-mail                290
11
     Exhibit 31      9/29/21 E-mail                296
12
     Exhibit 32      E-mail                        297
13
     Exhibit 33      Article                       302
14
     Exhibit 35      E-mail                        306
15
     Exhibit 36      E-mail                        309
16
     Exhibit 37      E-mail                        315
17
     Exhibit 38      Document                      319
18
     Exhibit 39      1/3/22 Podcast Document       324
19
     Exhibit 41      2/14/22 Document              330
20
     Exhibit 42      Impact of Health
21                   Misinformation Document       336
22   Exhibit 44      Article                       347
23   Exhibit 45      E-mail                        349
24   Exhibit 46      3/3/22 Letter - Google        349
25
```

**ERIC WALDO  12/22/2022**

**Page 4**

```
 1                    EXHIBITS (continued)

 2
    Exhibit 47      3/3/22 Letter                352
 3
    Exhibit 48      3/3/22 Letter - LinkedIn     352
 4
    Exhibit 49      3/3/22 Letter - Twitter      353
 5
    Exhibit 50      3/3/22 Letter - YouTube      353
 6
    Exhibit 51      3/3/22 Letter - Microsoft    353
 7
    Exhibit 52      CQ Cover                     354
 8
    Exhibit 53      E-mail                       361
 9
    Exhibit 54      E-mail                       367
10

11  (The original exhibits were sent to the reporter
    electronically at the conclusion of the deposition
12  and copies will be provided as requested.)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**ERIC WALDO  12/22/2022**

Page 5

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF LOUISIANA
 2                       MONROE DIVISION

 3

 4    THE STATE OF MISSOURI, et al.,

 5         Plaintiffs,

 6    vs.                        Case No.
                                 3:22-cv-01213-TAD-KDM
 7    JOSEPH R. BIDEN, JR., et al.,

 8         Defendants.

 9

10         VIDEORECORDED VIDEOCONFERENCED DEPOSITION OF

11    ERIC WALDO, produced, sworn, and examined on

12    December 22, 2022, between the hours of eight

13    o'clock in the forenoon and six o'clock in the

14    afternoon of that day, via different remote

15    locations, before Tammie A. Heet, a Registered

16    Professional Reporter, Certified Shorthand Reporter

17    and Notary Public within and for the states of

18    Illinois and Missouri, in a certain cause now

19    pending before the United States District Court for

20    the Western Division of Louisiana, Monroe Division

21    in re:  THE STATE OF MISSOURI, et al., vs. JOSEPH

22    R. BIDEN, JR., et al.; on behalf of the Plaintiffs.

23

24

25
```

**ERIC WALDO  12/22/2022**

```
 1                    REMOTE APPEARANCES

 2

 3    For the Plaintiff State of Missouri:

 4          Mr. D. John Sauer, Esq.
            Mr. Todd Scott, Esq.
 5          Mr. Ken Capps, Esq.
            MISSOURI ATTORNEY GENERAL'S OFFICE
 6          P.O. Box 899
            Jefferson City, Missouri  65102
 7          573/751-8870
            john.sauer@ago.mo.gov

 8

 9    For the Plaintiff State of Louisiana:

10          Mr. Tracy Short, Esq.
            LOUISIANA ATTORNEY GENERAL'S OFFICE
11          1885 North Third Street
            Baton Rouge, Louisiana  70802
12          225/326-6705
            shortt@ag.louisiana.gov

13

14    For the Plaintiffs Dr. Jayanta Bhattacharga,
      Dr. Martin Kulldorff, Dr. Aaron Kheriaty, and Jill
15    Hines:

16          Ms. Jenin Younes, Esq.
            NEW CIVIL LIBERTIES ALLIANCE
17          1225 19th Street, Northwest, Suite 450
            Washington, D.C.  20036
18          202/918-6902
            jeninyounes@ncla.legal

19

20    For the Defendants:

21          Ms. Amanda Chuzi, Esq.
            Mr. Josh Gardner, Esq.
22          U.S. DEPARTMENT OF JUSTICE
            1100 L Street Northwest
23          Washington, D.C.  29530
            202/514-4686
24          amanda.k.chuzi@usdoj.gov
            joshua.e.gardner@usdoj.gov

25
```

**ERIC WALDO  12/22/2022**

**Page 7**

```
 1              REMOTE APPEARANCES (continued)

 2

 3   For the Defendants (continued):

 4        Mr. Anant Kumar, Esq.
          U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES
 5        26 Federal Plaza, Room 19-300
          New York, New York  10278
 6        202/597-1564
          anant.kumar@hhs.gov

 7

 8   Reported/Videorecorded By:

 9        Ms. Tammie A. Heet, RPR, CSR(IL), CCR(MO)
          Mr. David Doell
10        LEXITAS LEGAL
          711 North 11th Street
11        St. Louis, Missouri 63101
          314/644-2191

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**ERIC WALDO  12/22/2022**

```
 1                 IT IS HEREBY STIPULATED AND AGREED by
 2       and between counsel for the Plaintiffs and counsel
 3       for the Defendants that this deposition may be
 4       taken in shorthand by Tammie A. Heet, RPR, CSR, CCR
 5       and notary public, and afterwards transcribed into
 6       printing, and signature by the witness expressly
 7       reserved.
 8                           * * * * *
 9                 THE VIDEOGRAPHER:  We are now on the
10       record.  Today's date is December the 22nd, 2022.
11       The time is approximately 8:08 a.m., Central
12       Standard Time.  This begins the videorecorded
13       deposition of Eric Waldo in the matter of The State
14       of Missouri, et al. versus Joseph R. Biden, Junior,
15       et al., Case Number 3:22-cv-01213 in the United
16       States District Court for the Western District of
17       Louisiana.
18                 This deposition is being held via
19       Zoom video.  The reporter's name is Tammie Heet.
20       My name is David Doell, and I'm the legal
21       videographer.  We are here with Lexitas.
22                 The attorneys attending remotely and
23       in person, please introduce yourselves and the
24       parties you represent.
25                 MR. SAUER:  John Sauer on behalf of
```

**ERIC WALDO  12/22/2022**

Page 9

```
 1   Plaintiff State of Missouri, and I'm joined by my
 2   colleagues Ken Capps and Todd Scott of the Missouri
 3   Attorney General's office.
 4              MS. CHUZI:  Amanda Chuzi for
 5   Defendants, and I'm joined by Josh Gardner of the
 6   Department of Justice and Anant Kumar of the
 7   Department of Health and Senior Services.
 8              And before we begin, I'd like to
 9   reserve the right to read and sign.
10              MR. SHORT:  I'm Tracy Short on behalf
11   of the Office of the Attorney General of the State
12   of Louisiana.
13              MS. YOUNES:  Jenin Younes on behalf
14   of NCLA, the New Civil Liberties Alliance.
15              THE VIDEOGRAPHER:  Court reporter
16   please swear in the witness and we may proceed.
17                   ERIC WALDO,
18   of lawful age, produced, sworn, and examined on
19   behalf of Plaintiffs, deposes and says:
20                   EXAMINATION
21   QUESTIONS BY MR. SAUER:
22        Q.    Mr. Waldo, could you please state
23   your full name for the record?
24        A.    My name is Eric William Waldo.
25        Q.    And have you ever given a deposition
```

**ERIC WALDO  12/22/2022**

```
 1   before?

 2         A.    I have not.

 3         Q.    So this is your very first

 4   deposition?

 5         A.    That is correct.

 6         Q.    Can I just go over a few kind of

 7   ground rules for today that are common in all

 8   depositions.  Will that be okay?

 9         A.    You may.

10         Q.    First of all, could you and I be

11   careful not to interrupt each other because it

12   makes it difficult for the court reporter to take

13   down what we're saying.  So can we try to do our

14   best to sort of wait until the other one finishes

15   talking as we go forward today?

16         A.    That sounds reasonable, yes.

17         Q.    And also, could you make an effort to

18   give a verbal answer to my questions, you know,

19   instead of saying -- shaking our head or nodding or

20   saying "huh-uh," "uh-huh," you know, try and give

21   an affirmative yes or no.  And again, that helps

22   the clarity of the record.

23         A.    I'll do my best, sir.

24         Q.    In addition to that, if at any time

25   you have a difficulty hearing me, because we're on
```

**ERIC WALDO  12/22/2022**

```
 1    a remote link or don't understand the question,

 2    could you please ask for clarification instead of

 3    trying to guess at my meaning and answering a

 4    question that you think I may have asked, but

 5    you're not sure.  Can you do that?

 6            A.    Yes.  Yes, I do can that.

 7            Q.    In addition to that, can you listen

 8    to the questions that I'm asking and answer the

 9    question that I ask instead of addressing some

10    other topic that you may be interested in

11    discussing?

12            A.    I will do my best to answer the

13    questions you ask, sir.

14            Q.    Thank you.  Let's just get started.

15    Can you tell us what your current job title is?

16            A.    Senior advisor to the Surgeon

17    General.

18            Q.    And then how long have you held that

19    title?

20            A.    Since late June.

21            Q.    Is that --

22            A.    Of 2022.

23            Q.    And then prior to that, did you work

24    in the Surgeon General's office?

25            A.    I did.
```

**ERIC WALDO  12/22/2022**

Page 12

```
 1              Q.    What was your title then?
 2              A.    Chief engagement officer.
 3              Q.    And when -- how long were you chief
 4    engagement officer for the Surgeon General' office?
 5              A.    From June 20th or so of 2021 to
 6    around June 20th of 2022, so about one year, sir.
 7              Q.    And then did you hold any titles in
 8    between those two?
 9              A.    No, sir.
10              Q.    What were your job duties when you
11    were chief engagement officer?
12              A.    Primarily working as liaison, helping
13    connect with the public and stakeholder groups
14    about the issues of importance in the Surgeon
15    General's office around public health.
16                    In addition, I was in charge of our
17    youth mental health outreach coordination, but in
18    general, was the person helping connect the public
19    with subject matter experts and our priorities
20    around our issues.
21              Q.    What issues were you particularly
22    involved in?
23              A.    As I mentioned, I was the -- I was
24    sort of in charge of our youth mental health work.
25    That was the -- of our priority issues, that was
```

**ERIC WALDO  12/22/2022**

```
 1   the one that I ran.

 2         Q.    Any other issues that you were

 3   engaged on?

 4         A.    Engaged?  Can you define -- what do

 5   you mean by engaged on, sir?

 6         Q.    Are there any other issues when you

 7   were chief engagement officer that you were

 8   involved in addressing for the -- for the Surgeon

 9   General's office?

10         A.    Yeah, so there were various issues

11   that the office was working on, and I was in some

12   way engaged on -- on most of them.  So that

13   included COVID-19, including our -- our general

14   public engagement around our efforts to educate the

15   public about COVID-19, including our vaccination

16   efforts, our rollout of our COVID-19 misinformation

17   advisory.

18              Then I work on youth mental health,

19   and then our -- our -- in addition, I work on

20   workplace -- sort of -- sorry, health worker,

21   mental health, which we announced later, and then

22   some development work on our work around workplace

23   mental health and social isolation and loneliness.

24         Q.    And so you had some role in the

25   rollout of the misinformation advisory, I believe
```

**ERIC WALDO  12/22/2022**

```
 1   you said; is that right?

 2         A.    That's correct.

 3         Q.    What was your role in that regard?

 4         A.    So I came into the office after the

 5   advisory had already been created.  I started the

 6   week of June 20th of 2021, so the advisory had

 7   already been developed, so I didn't have any part

 8   in the development of it, but I -- I worked with

 9   the team on the rollout.  So how we were going to

10   communicate to the public about this advisory.

11         Q.    Who was involved in developing it, to

12   your knowledge?

13         A.    To my knowledge, that would have been

14   that moment Daniel Tartakovsky in the science and

15   policy team I think was the chief author in terms

16   of, like, the policy development behind the scenes.

17   At that point, he reported to Adam Beckman, who was

18   a senior advisor and I think the acting policy

19   director.  We were sort of lightly staffed at the

20   beginning of the administration.  Certainly,

21   Dr. Murthy would have worked on it, and then there

22   were probably some other staffers in the science

23   and policy team, like Tyiesha Short, perhaps.  But

24   that's not an exhaustive list, but that's off the

25   top of my head, sir.
```

**ERIC WALDO  12/22/2022**

Page 15

```
 1          Q.      What was that -- you mentioned a man
 2   named Daniel as the principal author.  Can you
 3   spell his last name?
 4          A.      I can try, sir.  It's a -- it's a
 5   Russian name, Tartakovsky.
 6          Q.      Yeah.
 7          A.      T-A-R-T-A-K-O-V-S-K-Y.  I may be
 8   incorrect, and I'm sure there are some e-mails in
 9   the record that we can find, if we need to find
10   that, sir.
11          Q.      And you say Dr. Murthy worked
12   directly on directing the health advisory of the
13   misinformation advisory?
14          A.      I don't have direct knowledge of
15   that, but we worked on all our advisories, so I --
16   I have no reason to believe he didn't work on -- on
17   the advisory, wouldn't have had -- had a pen and
18   seen the drafts that Daniel put together and been
19   final signoff.
20          Q.      Okay.  When you say he was involved
21   in all your advisories, what -- what generally is
22   his role?  Does he edit them?  You know, what does
23   he do?
24          A.      So I can only speak to the -- you
25   know, I saw the advisories come out for youth
```

**ERIC WALDO  12/22/2022**

 1    mental health that came out after I started.  I was

 2    deeply involved in that and our workplace advisory.

 3    Each was a little different because our team grew

 4    in size and scope, but Dr. Murthy typically

 5    certainly was helping the team understand that, you

 6    know, the -- was signing off on whether we were

 7    going to issue an advisory or not because that's a

 8    large undertaking for the office, and then in

 9    addition, you know, he was certainly someone who

10    would review drafts and have -- and final signoff.

11         **Q.    And did he also kind of provide the**

12    **big picture of what the advisory would address?  I**

13    **mean, the idea to issue a health advisory on**

14    **misinformation, would that originate from him or is**

15    **that kind of staff decision?**

16         A.    I don't know with respect to health

17    misinformation because that came -- that was before

18    my time in the office, but in general, there -- it

19    could have been -- it could have come in either

20    way.  Sometimes a staff member may have had a

21    suggestion and say I think we ought to do an

22    advisory on this or we ought to do a report on this

23    and might make a recommendation.  Or the Surgeon

24    General could say I know I want to issue more -- in

25    that -- about a specific topic.

**ERIC WALDO  12/22/2022**

```
 1          Q.    And you don't know how this -- I
 2   mean, I take it this health advisory on
 3   misinformation that we're talking about is the one
 4   that was launched on July 15th of 2021, correct?
 5          A.    That's the one I'm referring to, sir,
 6   yes.
 7          Q.    Just for clarity.  And you don't know
 8   whose idea that was originally to do an advisory?
 9          A.    I do not.  As I mentioned, that was
10   -- I didn't join until June of 2021, so whatever
11   the development was, or process, I was not a part
12   of it.
13          Q.    Prior to June 2021, were you in
14   government?  Were you working for HHS or were you
15   somewhere else?
16          A.    I was not in government, sir.
17          Q.    What were you doing before that?
18          A.    I was working at a nonprofit.
19          Q.    At which one?
20          A.    The Common Application.
21          Q.    What -- what is -- what is the nature
22   of that nonprofit?
23          A.    The Common Application is a
24   technology nonprofit that helps students around the
25   country apply to college, so they have about 900
```

**ERIC WALDO  12/22/2022**

```
 1   member colleges, and it's an online application so
 2   that you can apply to multiple colleges at the same
 3   time.
 4        Q.     Did that nonprofit have any
 5   involvement to issues related to COVID-19 and --
 6   and health misinformation?
 7        A.     No, sir, none to my knowledge.
 8        Q.     You mentioned you had a role in
 9   communicating with the public about the
10   misinformation advisory that we're talking about.
11   Can you characterize that?  Describe what did you
12   actually do to -- to -- to kind of communicate
13   about that.
14        A.     So to communicate about the advisory,
15   this was our first advisory so we didn't have a
16   template, but my -- my general experience in
17   government was trying to reach out to stakeholders
18   who might be interested or affected by the advisory
19   to give them a heads-up that the advisory was going
20   to come out.  So setting up some stakeholder calls
21   with relevant parties.
22              And then in partnership with the
23   communications team, the policy team, and others in
24   the office, we had a general rollout, what I would
25   call -- what is called a tick-tock in the parlance
```

**ERIC WALDO  12/22/2022**

```
 1   of DC to say, here, we're communicating on this day
 2   with these parties, these are the stakeholders who
 3   will receive an e-mail, these are who might post a
 4   tweet, these are who -- partners we might do an
 5   event with.  And then we have a press team that
 6   also will do communications and press for an event
 7   and a rollout.
 8          Q.   You mentioned key stakeholders that
 9   you communicated with.  What kinds of stakeholders
10   are we talking about?
11          A.   So you know, the science and policy
12   team who developed this advisory helped put
13   together a list, including some subject matter
14   experts, policy experts, folks affected by this.
15   So -- so, for instance, the technology
16   organizations, government organizations, other
17   membership nonprofits like teacher unions, et
18   cetera.  Just what I would consider a robust group
19   of partners who might be interested in this work or
20   might help share the -- the advisory or be
21   interested in what the advisory has to say.
22          Q.   What -- when you mentioned technology
23   organizations, what does that mean?
24          A.   So given that the advisory called for
25   an all-society approach and mentioned what
```

**ERIC WALDO  12/22/2022**

1   technology and social media companies could do, we

2   reached out to some technology and social media

3   companies.

4        Q.    You -- you mentioned reaching out to

5   social media companies.  Who was that, to your

6   recollection?

7        A.    We definitely did pre-rollout calls

8   with Twitter, Facebook, Google/YouTube.  Sorry --

9   you -- sorry.  Twitter, Facebook, YouTube/Google.

10   Those are the ones I can remember off the top of my

11   head, sir.

12        Q.    And then you mentioned technology

13   companies other than social media companies.  What

14   are those?

15        A.    I don't -- maybe I'm putting more

16   social media companies.  I'm trying to think if

17   there were any other technology organizations we

18   would have reached out to.  I can't recall.

19        Q.    Let me switch gears a little bit.

20   I'm going to e-mail your counsel a few exhibits and

21   share one of them with you on the screen that will

22   be marked Exhibit 1.

23            MR. SAUER:  Okay.  And, Amanda, that

24   e-mail should be popping up in your inbox

25   momentarily.

**ERIC WALDO  12/22/2022**

Page 21

```
 1                  MS. CHUZI:  I don't see it yet, but I
 2    am looking out for it.
 3          Q.    (BY MR. SAUER)  And then, Mr. Waldo,
 4    I have attempted to screen share.  Can you see this
 5    document that's marked Exhibit 1 down here?  That's
 6    just a copy of your online LinkedIn resume.
 7          A.    Yes, sir.  I can see it on the
 8    screen.
 9          Q.    And then if I scroll down here a few
10    pages, the most recent entry you have here is chief
11    engagement officer for the U.S. Surgeon General,
12    correct?
13          A.    That's correct, sir.  That's what it
14    says.
15          Q.    Yeah.  And, in fact, I take it
16    recently, last June, you actually adopted a new
17    title, which is senior advisor to the --
18          A.    That's correct.  I've not updated my
19    LinkedIn.
20          Q.    Sure, yeah.  What's the difference
21    between your duties as senior advisor to the
22    Surgeon General and chief engagement officer?
23          A.    We now have a different chief
24    engagement officer, so I'm no longer managing
25    staff.  I also have some reduced hours because I'm
```

**ERIC WALDO  12/22/2022**

Page 22

```
 1   taking care of some family members, and so I'm

 2   mostly engaged on partnership work with respect to

 3   youth mental health.

 4          Q.    Okay.  Are you involved --

 5          A.    The previous --

 6          Q.    Go ahead.

 7          A.    Pardon me, sir.  Go ahead.

 8          Q.    No, you go ahead and finish what you

 9   said.

10          A.    I'm okay.

11          Q.    Okay.  So you're -- as senior

12   advisor, you do list here general senior advisor to

13   Surgeon General, right?  And I take it that since

14   June of this year, is that your only duty?

15          A.    That's correct.

16          Q.    And you say right now, you deal with

17   the youth mental health issues?

18          A.    That's correct.

19          Q.    Generally speaking, what do you do

20   with respect to those?

21          A.    Working with external organizations

22   to try to, you know, help build campaign interests

23   in addressing the issues of youth mental health.

24   So helping to destigmatize youth mental health and

25   helping raise awareness on youth mental health.
```

**ERIC WALDO  12/22/2022**

Page 23

```
 1            Q.    And did you kind of step away from
 2   more active duties because you had family issues?
 3            A.    That's correct, sir.
 4            Q.    And that started last June, I take
 5   it?
 6            A.    That -- that started June 20th of
 7   2022, sir.
 8            Q.    Okay.  So you were in the chief
 9   engagement officer role for almost exactly a year,
10   correct?
11            A.    That's correct.
12            Q.    And I believe you said you started on
13   June 20th of 2021?
14            A.    Exactly.  It's, like, literally --
15   I'd have to go look.  It's about -- I think it's
16   approximately a year.
17            Q.    And I take it you're -- you said one
18   of the reasons of that is you're taking care of
19   some family members; is that right?
20            A.    That's correct.
21            Q.    Yeah.  And that's, in fact, why we're
22   doing this deposition by Zoom today, correct?  You
23   asked for it to be done by Zoom because you're
24   worried about, you know, having exposure, correct?
25            A.    I asked to be able to be deposed with
```

**ERIC WALDO  12/22/2022**

```
 1   my mask on, that -- because I wanted to reduce
 2   exposure to my family members, that's correct.
 3        Q.    Okay.  Yeah.  And we ended up in a
 4   compromise where we're taking it by Zoom and people
 5   observing are masked, correct?
 6        A.    That's correct.
 7        Q.    So since last June, at least, you've
 8   had to observe restrictions in your personal life
 9   to be careful around people that might expose you
10   to illnesses?
11        A.    That's correct.
12        Q.    Okay.  Looking here, you say senior
13   advisor Surgeon General, and you describe your
14   duties on LinkedIn as, quote, advising and
15   designing constituent and public-facing campaigns
16   around the country and the world around -- and you
17   mention COVID-19 vaccines and health
18   misinformation, correct?
19        A.    That's correct.
20        Q.    Yeah.  What is -- what constituent
21   and public-facing campaigns did you advise and
22   design for that related to health misinformation?
23        A.    I think it was really our rollout and
24   then advising on -- on how we were engaging with
25   the public on health misinformation and how it
```

**ERIC WALDO  12/22/2022**

Page 25

```
 1    should sit as a -- how we wanted to continue to

 2    follow up from our -- our -- our advisory.

 3         Q.    What kind of follow-up to the

 4    advisory were you involved in?

 5         A.    We worked in the office to also do

 6    a -- I guess I'd call it -- it was like a community

 7    toolkit for how folks could have conversations with

 8    others around health misinformation in their

 9    community.

10         Q.    Was there anything else?  Was there

11    any other follow-up related to the health advisory

12    that you recall?

13         A.    Can you be more specific about what

14    type of follow-up?

15         Q.    Well, I thought that was the phrase

16    that you used when I asked you what you meant --

17         A.    I see.

18         Q.    Yeah, yeah.  And I just wanted to

19    know what you meant.

20         A.    With respect to campaigns, that --

21    you know, that was the only sort of, like, product

22    we put out or additional pieces.  Certainly,

23    Dr. Murthy continued from a communications

24    perspective to talk about health misinformation

25    using his bully pulpit.
```

**ERIC WALDO  12/22/2022**

Page 26

```
 1              But that's -- you know, we sort of --
 2    I think our -- our role in the Surgeon General's
 3    office is to elevate issues of public health that
 4    are priorities for the Surgeon General's office,
 5    and we want to make sure the public is aware, and I
 6    think that was done vis-a-vis the advisory.  And so
 7    now, you know, as the advisory calls for an
 8    all-society approach, I think we're also, you know,
 9    continuing to see how folks are doing that.  But
10    that's -- it's sort of deprioritized after our
11    announcement.
12         Q.    Yeah, I think you mentioned Surgeon
13    General Murthy using his bully pulpit to elevate
14    the issue of health misinformation that's addressed
15    in the advisory.  What do you mean by that?
16         A.    So, you know, this is a little bit --
17    the Office of the Surgeon General, as opposed to,
18    let's say, the secretary of HHS, you know, the
19    Office of the Surgeon General doesn't have a --
20    doesn't have a budget in terms of, you know, we
21    don't give out grants, we aren't a regulatory
22    agency in terms of -- you know, I worked at the
23    Department of Education in a previous life, and
24    it's not like we have Title IX authority.
25              We're not showing up to regulate
```

**ERIC WALDO  12/22/2022**

1  people, we're not giving out grants.  So the

2  primary power of the office is, I think, around its

3  reputational authority, its ability to convene

4  people, its ability to help drive attention to an

5  issue.

6              I think most famously is certainly

7  the Surgeon General's report on smoking or the

8  Surgeon General's report on HIV/AIDS.  So being

9  able to make sure the public is aware of issues

10  that are of public interest for the public health.

11       **Q.    And you describe that as the**

12  **principal power of the office is to drive this kind**

13  **of public awareness.  How has that power been used**

14  **by the Surgeon General's office while you've been**

15  **there to address misinformation?**

16       A.    Again, I think primarily by issuing

17  the reports.  So again, I think -- I think it's

18  having the infomateur of the Surgeon General saying

19  this is a big public health issue is -- helps,

20  whether you're a nonprofit, whether you're a doctor

21  in the field, whether you're a constituent or just

22  a citizen of the country, oh, wow, I didn't know

23  this was an issue, I should be aware of it.

24              Again, much like smoking, you may not

25  have been aware that smoking was a hazard to your

**ERIC WALDO  12/22/2022**

```
 1   health before someone said this is hazardous, I
 2   need to be thoughtful about it.  So raising this, I
 3   think, helps the field, you know, say we want to
 4   understand this more, we want to work on it, et
 5   cetera.
 6        Q.   And does the Surgeon General's power
 7   extend to, for example, persuading social media
 8   companies to be more proactive in addressing health
 9   misinformation?
10        A.   I think certainly the Surgeon General
11   has the ability to -- to talk to the relevant
12   stakeholders and say we want you to be aware of
13   this issue and that we think you have a role to
14   play to improve the health outcomes, yes.
15        Q.   And that -- that -- when you say "the
16   relevant stakeholders" there, that includes social
17   media platforms?
18        A.   Yes, we call out social media
19   platforms in the advisory.
20        Q.   Yeah, yeah.  And you say "call out,"
21   you mean you're kind of calling for them to take
22   more substantial or aggressive action to address
23   misinformation on their platforms, correct?
24        A.   I believe the advisory says what
25   social -- it has a section that says what social
```

**ERIC WALDO  12/22/2022**

```
 1   media companies can do with some potential steps or
 2   actions that social media companies could take, and
 3   it's a -- a range of actions.
 4        Q.    Uh-huh.  And then does the Surgeon --
 5   you've mentioned the Surgeon General's bully pulpit
 6   earlier.  What -- what's that exactly?  Is that
 7   visibility to kind of make public speeches and, you
 8   know, put kind of public pressure on an issue?
 9        A.    I think the bully pulpit, the way I
10   mean it, is really the fact that he commands
11   attention, including being able to, as you
12   mentioned, you know, speak with the press, speak
13   with the public, and I think people take him
14   seriously as a -- as, you know, I think we think of
15   the Surgeon General as the nation's doctor.  But
16   when he says something is an issue of public
17   health, we think that people will -- you know, are
18   more likely to listen and hear and hopefully take
19   steps to improve health outcomes.
20        Q.    And you say "take steps to improve,"
21   the idea would be the Surgeon General's use of the
22   power that you described as the bully pulpit would
23   drive change, you know, change that the Surgeon
24   General views as positives when it comes to the
25   dissemination of health misinformation?
```

**ERIC WALDO  12/22/2022**

```
 1        A.    In that respect -- with -- in all --
 2   all the issues that he's raising, we are trying to
 3   improve health outcomes, and, yes, absolutely
 4   including health misinformation.
 5        Q.    And so the goal of the use of that
 6   power is to kind of reduce the dissemination of
 7   health misinformation and promote the dissemination
 8   of kind of accurate health information.   Fair to
 9   say?
10        A.    That sounds fair.  I think in
11   general, the Surgeon General saying health
12   misinformation is an -- is an issue, misinformation
13   is an issue that we need to address, and I think he
14   calls for an all-society approach, including
15   studying it, taking steps to, you know, essentially
16   reduce that harm, which I think there are multiple
17   ways, and you know, again a little bit -- to go
18   back to the smoking analogy, we need to learn what
19   are the steps you can take, you know, is it -- is
20   it stopping smoking, is it -- is it reducing, is
21   it, you know, Nicorette gum?  What are the things
22   you can do?
23             And again, in the advisory, the
24   Surgeon General makes some potential
25   recommendations of what, again, everyone can do
```

**ERIC WALDO  12/22/2022**

**Page 31**

1    across the society, but certainly among the

2    technology/social media companies.

3         Q.    Right.  And particularly, I seem to

4    recall there's recommendations of specific steps

5    the social media platforms are, as you said

6    earlier, called out to take to reduce the spread of

7    misinformation on the platforms.  Fair to say?

8         A.    I think that's fair to say.

9         Q.    Has that been a common theme, not

10   just in this misinformation, but in this Surgeon

11   General's public communications about health

12   misinformation on social media platforms?

13        A.    I would say across, actually,

14   everything the Surgeon General is saying and doing

15   with our advisories, he's -- certainly tries to

16   provide ways that we can improve the public health

17   outcomes.

18              So for youth mental health, we say

19   here's what different organizations, stakeholders

20   can do.  We did that for our health worker

21   advisory, and certainly we did it for the

22   misinformation advisory as well.

23        Q.    And that includes communications that

24   are conducted both publicly, like in public

25   speeches and so forth, and also communications kind

**ERIC WALDO  12/22/2022**

Page 32

1   of conducted in private and kind of direct

2   engagements with social media platforms?

3        A.    Sorry, can you -- can you rephrase

4   the question or repeat the question, sir?

5        Q.    Does that, you know, message of

6   calling out the social media platforms to take

7   steps to reduce the spread of misinformation on

8   their platforms, has the Surgeon General's office

9   conveyed that message in private through private

10  engagement with social media platforms as well as

11  public engagement?

12       A.    Yes, I think that what we're saying

13  publicly, we're also, you know, between the rollout

14  said that privately to them as well.

15       Q.    What -- what kind of private

16  engagement was there in 2021 with respect to social

17  media platforms?

18       A.    So I think I mentioned this before,

19  sir.  We did what I would call, like, a -- rollout

20  calls.  So before the advisory came out, these were

21  calls where I was reaching out to mostly either

22  government relationsy (phonetic), public policy

23  folks to get on the phone to give them a heads-up

24  that the advisory was coming out, that it was still

25  embargoed, to give them a rough sense of what it

**ERIC WALDO  12/22/2022**

Page 33

1  was going to say, and that we would share the

2  advisory with them when it came out.  Those are the

3  original calls that occurred.

4           And then I think because of -- you

5  know, because of, I think, some of the rollout

6  statements that were made, we ended up doing an

7  additional call with Facebook, who I think was

8  upset about how the rollout had gone.

9      **Q.    You -- you -- you recall an**

10 **additional call with Facebook.  Do you remember**

11 **what was discussed in that call?**

12     A.    So again, we had two -- I think a

13 rollout -- there was an original rollout call with

14 Facebook that was at, I think, what I would call a

15 staff level.  We were trying to schedule it before

16 the rollout.  Facebook was unable to schedule it,

17 and it ended up happening, I think, the day of

18 rollout.

19          So on that day, Press Secretary

20 General Jen Psaki had already made remarks

21 specifically about Facebook, and then I believe

22 that's -- either in congruity with the call or

23 sometime either before or after was when President

24 Biden made his remarks that social media and

25 Facebook were killing people.  So that call was

**ERIC WALDO  12/22/2022**

Page 34

```
 1   more originally just a high level, we put this out,
 2   and I connected the Facebook folks with our -- one
 3   of our subject matter experts.  So I think there
 4   was some back-and-forth questions, but it wasn't
 5   really -- not -- I wouldn't call it the most
 6   productive call.
 7              Then later, with our call, we had a
 8   call with Nick Clegg from Facebook, and at his
 9   request, and that was, I think, a call meant to --
10   his intentions were to sort of I think deescalate
11   and just find ways that we could work together,
12   given how Facebook would -- was -- was treated in
13   that rollout day.
14        Q.   Did you find ways to deescalate and
15   work together?
16        A.   I -- I -- I'm not sure in the sense
17   that we didn't really do any much more work
18   together.  We certainly had a call that I think was
19   cordial where Dr. Murthy, I think, acknowledged
20   that it must have been hard for the Facebook team
21   to go through that rollout day, given how they were
22   called out by the -- the President and the Press
23   Secretary, and you know, we had asked questions
24   and -- and brainstormed on ways to work together.
25        Q.   When you say "brainstormed on ways to
```

**ERIC WALDO  12/22/2022**

Page 35

```
 1     work together," were the people from the Surgeon
 2     General's office, you know, communicating with
 3     Facebook about what the Surgeon General would like
 4     to see them to do more or to do better about the
 5     spread of misinformation on their platforms?
 6          A.    The Surgeon General -- on the call
 7     with Nick Clegg, the Surgeon General did, I think,
 8     reiterate the idea that, you know, as we described
 9     in the advisory, that we think there's more that
10     the technology -- that Facebook and other social
11     media companies can do, and I think this -- yeah,
12     that's -- that's what we -- we reiterated that.
13          Q.    Sorry.  And what -- was it specific
14     -- do you remember Dr. Murthy saying, hey, you
15     know, honestly the health advisory has some pretty
16     specific proposals in it?  Did Dr. Murthy say in
17     this call with Nick Clegg that, you know, hey, we'd
18     really like to see you do this specific thing and
19     that specific thing?
20          A.    Not to my recollection.  I think the
21     most specific questions were about understanding
22     the data around the spread of misinformation and
23     how we were measuring that, and whether or not, you
24     know, how -- how we could have external researchers
25     validate the spread of misinformation and -- and
```

**ERIC WALDO  12/22/2022**

Page 36

```
 1   helping us as a field understand the depth of the
 2   problem.
 3        Q.    When you say "external researchers,"
 4   what sort of people would we be talking about?  Are
 5   you talking about people outside of the Surgeon
 6   General's office?
 7        A.    Yeah.  So I think in general --
 8   again, I haven't -- I'd have to go back and look at
 9   the advisory, but I think the notion is how -- I
10   mean, we would want external researchers outside
11   the Surgeon General's office, you know, academics
12   to be able to say -- just like we would with any
13   other public health issue, we think -- you know,
14   here's how we're measuring the harm and the impact,
15   and that it -- I think the conversation was, like,
16   it's currently difficult to do so.
17        Q.    Do you know how many academics who do
18   that kind of research?
19        A.    I do know -- at least we did a
20   rollout event for the -- for the -- for the day of
21   the -- I think the day or the week of the advisory
22   with Renee DiResta from the Stanford Internet
23   Observatory.  That's one person I know externally.
24        Q.    Anyone else?
25        A.    Not off -- I'd have to ask someone
```

**ERIC WALDO  12/22/2022**

Page 37

```
 1    like Daniel from the policy team who would be other
 2    external folks, but my -- my imagination is, again,
 3    sort of, you know, tier one research institutions
 4    and partners who would -- would have researchers
 5    who are certainly interested in this data.
 6           Q.    Do you know if -- you say Daniel with
 7    the Russian last name and the policy team, do you
 8    know if they worked with those kinds of external
 9    researchers when they were developing the health
10    advisory?
11           A.    I don't have any specific knowledge
12    about that, sir.
13           Q.    Do you know if it was -- you
14    mentioned, I think, Renee DiResta.  Do you know if
15    there was any interaction between the Surgeon
16    General's office and Professor DiResta in the
17    leading up to the development of the July 15th
18    misinformation advisory?
19           A.    I'm not familiar.  As I mentioned,
20    the -- the advisories were developed before --
21    before I arrived, so I don't know who -- who was
22    consulted for that.
23           Q.    Do you know, were there
24    communications or coordination with Professor
25    DiResta after the advisory came out?
```

**ERIC WALDO  12/22/2022**

Page 38

1          A.    I know there was coordination with

2     her with respect to the launch of the -- there was

3     a panel, a public sort of virtual town hall that we

4     hosted with -- with the Sanford Internet

5     Observatory that Dr. Murthy spoke at, and that was

6     part of the launch day.  So certainly there would

7     have been coordination with -- with her, with

8     respect to that panel.

9          Q.    **And you -- I think you mentioned that**

10    **launch would have occurred in the day or the week**

11    **of the -- of the advisory in July of 2021?**

12         A.    Yeah, it -- it was either that week

13    or, like, shortly thereafter.  It would have been

14    within the, I would say a week, of the -- of the

15    launch we would have had that event with her.  I

16    don't recall the date off the top of my head.

17         Q.    **Is -- is Professor DiResta affiliated**

18    **with an academic institution or a think tank or**

19    **what?**

20         A.    I believe that -- that was with

21    Stanford, so -- but I don't -- I don't know.

22         Q.    **Are you aware of any other kind of**

23    **communications or coordination with Professor**

24    **DiResta after that launch event?**

25         A.    I think that we had another subject

**ERIC WALDO  12/22/2022**

```
 1   matter expert, Kyla Fullenwider, who was a subject
 2   matter expert and -- and worked on the advisory
 3   with Daniel.  And I believe she maybe did a
 4   follow-up call with Renee after the event.
 5          Q.    Was she -- when you say "subject
 6   matter expert," is she an -- and employee of the
 7   Surgeon General's office?
 8          A.    I believe so.  I think she was
 9   detailed to the office.  I'm not -- I don't
10   precisely know what her employment status was.  I
11   don't know if it was a contractor, I'm not sure if
12   it was an IPA, or -- or if it was a direct hire.
13   But she certainly had a -- some relation -- some
14   more formal relationship with the Surgeon General's
15   office.
16          Q.    Where was she actually employed?
17          A.    I'm not sure, sir.
18          Q.    Okay.  What -- what is her subject
19   matter expertise?
20          A.    What's that?
21          Q.    You mentioned that she's a subject
22   matter expert.  What exactly is she a subject
23   matter expert in?
24          A.    I believe she's a subject matter
25   expert in health mis- and disinformation.
```

**ERIC WALDO  12/22/2022**

Page 40

```
 1          Q.    So she's a health mis- and
 2    disinformation researcher, like Professor DiResta,
 3    to your understanding?
 4          A.    I'm not -- I don't know that -- I'm
 5    not deeply familiar with her bio, but she certainly
 6    was considered a subject matter expert that was
 7    working on this issue.  She may have multiple areas
 8    of expertise.
 9          Q.    You mentioned that there was some
10    kind of communication or later communication
11    between her and Professor DiResta at Stanford.  Do
12    you know what the nature of that communication was?
13          A.    I believe we did a call that was more
14    of a brainstorm around, you know, again, potential
15    other events or, you know, public-facing --
16    public-facing events that we could do to talk about
17    this issue.
18          Q.    And you were on that call along with
19    Ms. Fullenwider and the professor from Stanford?
20          A.    I was, yeah.
21          Q.    What else was discussed in that call?
22          A.    I don't recall, but I just remember
23    -- I do remember that we talked about sort of if
24    there were events that we could do for follow-up.
25    But that's -- that's -- that's the most of my
```

ERIC WALDO  12/22/2022

Page 41

```
 1   recollection.
 2         Q.     Did Ms. Fullenwider and Professor
 3   DiResta discuss misinformation issues in the calls?
 4         A.     I mean, most likely.  It was -- it
 5   was about how we would follow up about
 6   misinformation, so that was broadly the subject.
 7         Q.     And what -- what else was discussed
 8   in that call, to your recollection, if anything?
 9         A.     I don't have any other recollection
10   of that call.
11         Q.     Did you talk in the call?
12         A.     I think I was more listening.  This
13   is some -- mis- and disinformation was not in my
14   area of subject matter expertise coming into this
15   job, and so I was just trying to learn and -- and
16   make sure I was aware of, from a public engagement
17   perspective, how we might think about talking with
18   stakeholders or, you know, just move -- continue --
19   if we wished to moved the ball forward and continue
20   to have public engagement, how we might do so.  So
21   I was more in listening mode.
22         Q.     Gotcha.  But I take it
23   Ms. Fullenwider was acting on behalf of the Surgeon
24   General's office in that call.  She's not an
25   outside researcher that you're connecting with
```

**ERIC WALDO  12/22/2022**

Page 42

```
 1    Professor DiResta, but she's a -- has some, in your
 2    understanding, formal role with the Surgeon
 3    General's office, correct?
 4           A.    That's my understanding, sir.
 5           Q.    Okay.  But you don't know exactly
 6    what it is, whether she's an employee or an outside
 7    contractor or anything like that?
 8           A.    I do not.
 9           Q.    Okay.
10           A.    There are various ways that one can
11    be employed in the Office of the Surgeon General,
12    so I don't know what her employment status -- what
13    formal structure she had in place.
14           Q.    Other than that call, are you aware
15    of any other kind of communications with Professor
16    DiResta or anyone at Stanford relating to mis- and
17    disinformation after the health advisory was rolled
18    out in July of 2021?
19           A.    Not to my recollection.
20           Q.    How about any other outside
21    researchers at any other institution, are you aware
22    of communication and coordination between the
23    attorney -- sorry, the Surgeon General's office
24    and -- and any other outside researchers or
25    research entities?
```

**ERIC WALDO  12/22/2022**

Page 43

```
 1           A.    There was at least one entity that
 2    briefed -- I think it was not just the Surgeon
 3    General's office, it briefed -- I think it was
 4    brought in by someone else at HHS that was an
 5    external group that had research on, like, their --
 6    their views on -- on mis- and disinformation and
 7    the effects of mis- and disinformation so I
 8    definitely sat in on one other briefing.
 9           Q.    Do you know who that was, what group
10    that was?
11           A.    I don't.  It was -- it was an outside
12    group that I think was brought in by someone at
13    HHS, and their -- it was a separate HHS sort of
14    public affairs shop, and they had requested a
15    briefing, so I was looped in, given that we had
16    done the outreach.  So I sort of sat and listened
17    to the -- a briefing on the health and mis- and
18    disinformation from their perspective.
19           Q.    Do you remember who at HHS called for
20    that meeting or called for the briefing?
21           A.    It was the person who invited me, I'm
22    blanking on her name.  She's now left the office,
23    but she worked for Marvin Figueroa was my
24    recollection.
25           Q.    Who's Marvin?
```

**ERIC WALDO  12/22/2022**

Page 44

```
 1          A.    Marvin has some -- a senior public
 2     affairs job.  I don't know what his official title
 3     is.
 4          Q.    What was the nature of the outside
 5     group?  Was it a think tank, was it a set of
 6     academic researchers?
 7          A.    I think it was -- I think it was a
 8     mix of those things, sir.  I don't really recall.
 9     I'm not positive.
10          Q.    Do you know when the meeting
11     happened?
12          A.    It's sometime probably within two
13     weeks, you know, before or after the rollout.  I
14     think probably after, given that I think that's why
15     I got looped in, because we put out the advisory.
16          Q.    Okay.  So probably within a couple
17     weeks of that July 15th health advisory rollout?
18          A.    Yeah.
19          Q.    What was -- what kind of
20     misinformation issues or concerns were addressed in
21     that -- that briefing?
22          A.    I think what I remember the most was
23     this group talking -- talking about the
24     misinformation dozen.
25          Q.    Was this the Center for Countering
```

**ERIC WALDO  12/22/2022**

Page 45

```
 1    Digital Hate, by any chance?
 2           A.    That may be it, sir.  I'm not
 3    positive.  That sounds -- that sounds familiar.
 4           Q.    Yeah, CCDH -- I mean, they're the
 5    ones who identified the Disinformation Dozen.  Does
 6    that ring a bell?
 7           A.    That does.  That sounds familiar.
 8    I'd have to check my e-mails to be -- or calendar
 9    to be certain, but that sounds accurate.
10           Q.    That is -- so you attended a
11    briefing, along with HHS officials, from the Center
12    for Counter -- Countering Digital Hate around
13    second half of July 2021, to the best of your
14    recollection?
15           A.    I would want to check to make sure
16    that's the group, but it was certainly -- if it's
17    not the group, it's certainly those same issues,
18    sir.
19           Q.    And what did they say about the
20    Disinformation Dozen?
21           A.    I mean, I -- I think overall, it was
22    highlighting that they were the -- the main source
23    of health misinformation around COVID-19 and
24    vaccines was my recollection.
25           Q.    What did they -- when you said
```

**ERIC WALDO   12/22/2022**

Page 46

```
 1    "highlighting that they were a main source," that
 2    means highlighting that the so-called
 3    Disinformation Dozen were a main source of online
 4    social media disinformation?
 5          A.    Correct.
 6          Q.    And did they propose any action
 7    items?  Did they want actions to be taken against
 8    the Disinformation Dozen?
 9          A.    I don't recall.
10          Q.    Do you know if that group
11    communicated with anyone else in the federal
12    government about the Disinformation Dozen?
13          A.    I don't -- I'm not sure.
14          Q.    Do you remember anything else that
15    was said in that -- that meeting with HHS
16    officials, Mr. Figueroa's office, yourself, and the
17    CCDH, was anything else discussed?
18          A.    I don't recall.  I think it was
19    mostly a listening session.  We were -- they had a
20    presentation that they were giving, so it was
21    mostly an information in session.
22          Q.    So did they give, like, a PowerPoint
23    or something like that?
24          A.    That's correct.
25          Q.    Do you know what the PowerPoint said?
```

**ERIC WALDO  12/22/2022**

Page 47

```
 1          A.    I think as we discussed, sir, the --
 2    it was a presentation about the Disinformation
 3    Dozen and sort of how they were measuring those --
 4    that those were the folks primarily responsible for
 5    a lot of misinformation online.
 6          Q.    And they're actually external
 7    researchers who are kind of tracking misinformation
 8    online, correct?
 9          A.    I don't have deep expertise about
10    that organization or group, so I'm not sure.
11          Q.    Did you do anything with the
12    information you got in that briefing, like did you
13    relay it back to anyone in the Surgeon General's
14    office?
15          A.    In all likelihood, I probably
16    forwarded the PowerPoint to some members of the
17    policy team, probably Daniel and Kyla would be my
18    guess, but I'd have to go back and check.
19          Q.    And that's the two -- Daniel and Kyla
20    is Daniel with the Russian name and Kyla
21    Fullenwider, correct?
22          A.    That's correct.
23          Q.    And you believe most likely you
24    e-mailed them the -- the -- the PowerPoint from
25    this presentation about the Disinformation Dozen?
```

**ERIC WALDO  12/22/2022**

Page 48

```
 1          A.    That's correct.
 2          Q.    Anyone else -- was anyone else at
 3   that meeting, other than the HHS official,
 4   yourself, and the presenters?
 5          A.    I'm not positive.  I don't recall.
 6   It was probably a big call in terms of I think
 7   there were a lot of folks from that organization,
 8   and then I -- I think I had invited Daniel and Kyla
 9   to the call.  I don't think they made it.  And I
10   would have perhaps also invited Rafael Compos, who
11   was another member of the engagement team.
12                Rafael helped create the event with
13   -- with -- with the Sanford Internet Observatory
14   for the launch, so this was in his sort of
15   portfolio on my team.  So I would have invited
16   Rafael, perhaps.
17          Q.    How do you spell his name?
18          A.    Rafael is just R-A-F-A-E-L, and then
19   Compos is C-O-M-P-O-S.
20          Q.    Was he -- I think you mentioned he
21   was the point person working with Stanford and
22   Professor DiResta and the launch event?
23          A.    So Rafael, yes, that is correct.
24          Q.    Did he have other communications with
25   Stanford or Professor DiResta?
```

**ERIC WALDO  12/22/2022**

```
1              A.    I'm not sure.  I imagine he would
2    have in the run-up to the event.  So Rafael was a
3    member of my team who was helping plan that rollout
4    event, and it was -- prior to my arrival was the
5    main engagement person working on rollout.
6              Q.    How about after the event, did he
7    have communications with them afterwards?
8              A.    I'm not sure.
9              Q.    I'm showing you a document that's
10   previously marked Exhibit 2 that I e-mailed to your
11   lawyer a little while ago as well.  Can you see
12   that?
13             A.    I do.
14             Q.    You see this document called OSG
15   high-level org chart marked Exhibit 2?
16             A.    I see it, sir, yes.
17             Q.    And then down here, you're listed
18   right here as the leader of the engagement team for
19   the Surgeon General's office?
20             A.    That's correct.
21             Q.    And it says that you lead outreach
22   and engagement with key stakeholders and groups,
23   correct?
24             A.    That's correct.
25             Q.    And it talks about how you have
```

**ERIC WALDO  12/22/2022**

Page 50

```
 1    relationship management with nonmedical groups and
 2    key influencers?
 3         A.    That's correct.
 4         Q.    What does that mean "relationship
 5    management with nonmedical groups and key
 6    influencers"?
 7         A.    So I think the notion that we had as
 8    we were continuing to build and design this version
 9    of Surgeon General's team, which is certainly
10    unique is that we would -- the engagement team
11    would be designed a little bit like the White House
12    Office of Public Engagement.
13              So we would think about different
14    constituent groups and how we were reaching out to
15    them.  So whether that's -- so you might think
16    there's civil rights groups, education groups,
17    mayors, governors, sort of a litany of
18    organizations, foundations, philanthropy, et
19    cetera, that there's sort of a list of high-level
20    organizational groups who we might want to reach
21    out to about our issues or might have feedback for
22    us as well.
23              And then our team would be the main
24    liaison.  So we'd be the person helping have a
25    point of contact at the PTA or at the -- at the
```

**ERIC WALDO  12/22/2022**

Page 51

```
 1   NEA, at AFT, and say, great, we have that
 2   relationship, and we may connect them with
 3   different members of our team, but when we're doing
 4   an event on youth mental health, we know, well,
 5   gosh, if we want to talk to parents, you know, the
 6   engagement team has the contact and the Rolodex
 7   with the -- the PTA or with the AFT or with the
 8   teacher union or with a school district.  So we
 9   were sort of -- that was the notion of how we could
10   help the relationship management.
11        Q.    And I take it that that -- those
12   contacts would extend to social media platforms as
13   well, that you as the engagement team leader would
14   be the one in charge of maintaining the contacts
15   and the relationships with representatives of
16   social media platforms?
17        A.    That's correct.
18        Q.    Yeah, and you --
19        A.    I think social media, there's, like,
20   two versions of that where also given that on
21   some -- in other cases, we are working social media
22   on just, you know, the -- the Surgeon General might
23   be having a Twitter town hall that our coms team
24   might take the lead or we might loop in other
25   members of the team as appropriate.  So if it was
```

**ERIC WALDO  12/22/2022**

**Page 52**

1   more of a press event, we may, you know -- there

2   may be some co-ownership.

3       Q.    Gotcha.  Whereas other kind of

4   engagements would fall more under your wheelhouse

5   that wasn't about, you know, rolling something out

6   on Twitter and Facebook, right?

7       A.    I'm sorry, can you repeat that, sir?

8       Q.    Other engagement that wasn't kind of

9   about the Surgeon General's office pushing public

10  communications onto social media platforms, other

11  engagement with social media platforms would fall

12  under your responsibilities?

13      A.    I think so.  Again, trying to -- my

14  view is that our team would be the -- help maintain

15  the relationships, and then connect them with the

16  subject matter experts on the policy team or -- or

17  more -- we're a more, very cross-functional team,

18  but we were the ones who would be sort of the folks

19  helping manage those relationships, know who we

20  needed to reach out to in the constellation and

21  then connect them to the right people to help share

22  the information.

23      Q.    Who did you develop contacts with,

24  social media platforms?  Like how'd you know who to

25  talk to at Facebook or Twitter, you know, when

**ERIC WALDO  12/22/2022**

1    **you -- I think you mentioned earlier you reached**

2    **out to them, you know, to loop them in, that the**

3    **health advisory was coming.  How did you know who**

4    **to talk to there?**

5          A.    During the rollout when I arrived,

6    there had had already been a lot of work done --

7    again, this was our first rollout, and it was

8    really, you know, my first two days I got looped

9    in.  I think Daniel had taken a crack at, again, a

10   rollout tick-tock of here's who we need to reach

11   out to, here's the days we're going to do it.

12              And I think there was a list of --

13   of -- of technology companies and people were

14   dropping in names of, you know, the folks they knew

15   or who we might reach out to.

16              So I think -- I know certainly

17   Dr. Murthy was the one who flagged for me that we

18   should reach out to Nick Clegg, so he had his --

19   his contact information.  For the other

20   organizations, I'm not -- I don't really recall.

21   It probably came from a spreadsheet that Daniel

22   had.

23              I'd worked with Twitter certainly in

24   other jobs, and I knew at least, like, a person or

25   two.  I may have sent a -- you know, I had contact

**ERIC WALDO  12/22/2022**

Page 54

```
 1    at -- at Google from a different -- from a previous
 2    employment and asked, hey, who's the government
 3    affairs person?  So I may have asked that.  I don't
 4    really recall, but it was either crowd-sourced in a
 5    Google -- or in an Excel spreadsheet or previous
 6    spokes- --
 7              So we can see when you're typing, if
 8    someone's typing an e-mail -- an e-mail right now.
 9        Q.    Sorry, yeah.  I'll get rid of that.
10              Let me ask you this:  I think you had
11    mentioned that Daniel had a spreadsheet of
12    contacts.  Do you know where he got those contacts?
13        A.    I do not.
14        Q.    How about do you know if he had
15    communicated with them prior to your starting in
16    June?  On June 20th of 2021, had he been touching
17    base with social media platforms before that?
18        A.    I don't know.  I don't think so.
19    Because when we were talking about the rollout, a
20    very specific decision was made that I would do the
21    outreach to the -- to those organizations, and I
22    took the implication, but I don't really remember
23    that there hadn't been deep contact with them.  I
24    think partly because we didn't think they would be
25    happy about this -- you know, the content of the
```

**ERIC WALDO  12/22/2022**

Page 55

```
 1   advisory.
 2          Q.     Let me ask you this:  What -- do you
 3   know if anyone -- prior to your starting on
 4   June 20th of 2021, do you know if anyone in the
 5   Surgeon General's office had any contact with
 6   social media platforms like Facebook, Twitter
 7   Google/YouTube?
 8          A.     I think there was at least one call
 9   that I'm aware of that the Surgeon General had with
10   Facebook during the transition.
11          Q.     When you say "during the transition,"
12   would that have been prior to the inauguration of
13   the President?
14          A.     That's correct.  During the
15   transition team, sometime between November -- I
16   guess I don't know when the election was --
17   November 8th and -- and January 2020.
18          Q.     Do you know roughly when in that time
19   frame there would have been a call --
20          A.     I don't.
21          Q.     -- between --
22          A.     I do not.
23          Q.     Go ahead.  Were you involved in that
24   call?
25          A.     I was not.
```

**ERIC WALDO  12/22/2022**

Page 56

```
 1              Q.     Okay.  How do you know about it?

 2              A.     When we were setting up our call with

 3    Nick Clegg, I mentioned to folks who had been on

 4    the call with Facebook for that rollout call, and

 5    Dr. Murthy had mentioned that he had been on a call

 6    with that person during the transition.

 7              Q.     What person was that, other than Nick

 8    Clegg?

 9              A.     It was a -- someone -- it was, like,

10    a data person from the Facebook team.

11              Q.     Do you know what was discussed in

12    that call between Surgeon General Murthy and the

13    data person from the Facebook team during the

14    transition?

15              A.     I'm not positive, but I believe it

16    was, again, about that issue of trying to

17    understand the reach of the mis- and disinformation

18    and understanding, you know, how far it was

19    spreading.

20              Q.     Do you know -- do you know anything

21    that was said in that call?

22              A.     I do not.

23                     THE REPORTER:  I'm sorry, what was

24    that?

25              Q.     (BY MR. SAUER)  Do you know anything
```

**ERIC WALDO  12/22/2022**

Page 57

```
 1    that was said in that call?
 2         A.    I do not.
 3         Q.    And are you aware -- or do you know
 4    what the nature of the concern was about the reach
 5    of mis- and disinformation that was raised in that
 6    call?
 7         A.    I'm not sure.
 8         Q.    Do you know if anyone participated in
 9    that call from the Surgeon General's team, so to
10    speak, other than Dr. Murthy?
11         A.    I'm not sure.
12         Q.    How about -- how about any other
13    calls prior to your starting on June 20th of '21,
14    or any other communications, between anyone on the
15    Surgeon General's team and social media platforms?
16         A.    I am not aware of any.
17         Q.    Down here, turning your attention
18    back to Exhibit 2, there's a person listed here:
19    Anne Kim is the head of the design and innovation
20    team.  Do you see that?
21         A.    Yes.
22         Q.    And it says she creates digital
23    platforms.  Do you know what that means?
24         A.    So Anne comes from a design
25    background at a firm called IDO, and so I think she
```

**ERIC WALDO  12/22/2022**

Page 58

```
 1  has members of her team who also, you know, were

 2  doing a website refresh for the Surgeon General's

 3  team.  So I think it's -- some of those online

 4  digital -- digital content.

 5        Q.    That -- so when it says produces

 6  nonwritten content, is that, like, photos and

 7  videos for the Surgeon General?

 8        A.    Yes, correct, yeah.  So, like, and

 9  also I think now the Surgeon General has a -- a

10  podcast as well that I think her team has been key

11  on designing.

12        Q.    Okay.  And at the bottom of the list

13  there, it says that she directs mis- and

14  disinformation engagement.  Do you see that?

15        A.    I do.

16        Q.    And what does that involve?

17        A.    I think -- again, I'm not sure when

18  -- which version of this -- obviously this org

19  chart continued to change over time.  I think it's

20  likely because Kyla Fullenwilder reported up to

21  Anne Kim.  And since Kyla, I think, was our main

22  subject matter expert or continued to do work on

23  mis- and disinformation, maybe that was why that

24  was put under Anne's list of duties.

25        Q.    You don't think that Ms. Kim herself
```

**ERIC WALDO  12/22/2022**

Page 59

```
 1    was directly carrying out the direction of mis- and

 2    disinformation engagement?

 3           A.    Not to my knowledge.

 4           Q.    But you think that Kyla Fullenwilder

 5    was doing that?

 6           A.    Kyla was definitely working on mis-

 7    and disinformation.

 8           Q.    And what was she doing?  When you say

 9    she's working on it, what was she doing?

10           A.    I know Kyla was, again, with Daniel,

11    I think probably working -- well, I wasn't there,

12    but I'm pretty sure she was working with Daniel on

13    the design of the -- of the advisory.  And then I

14    think Kyla was continuing to help us think about

15    were there additional ways we might engage.

16                So I know that Kyla, I think, was the

17    principal designer of options around follow-up with

18    respect to data.  So I think the Surgeon General's

19    office put out an RFI around misinformation data,

20    and I think Kyla worked on that.

21           Q.    And that RFI, is that the one that

22    was launched on March 3rd of 2022?

23           A.    That sounds correct, sir.

24           Q.    Yeah.  And your understanding is Kyla

25    Fullenwilder worked on developing that.  Is that
```

**ERIC WALDO  12/22/2022**

Page 60

```
 1   fair to say?
 2         A.    That's my understanding, sir.
 3         Q.    What was her role in that, to your
 4   knowledge?
 5         A.    I'm not entirely certain, but I think
 6   she was the subject matter expert who was chiefly
 7   creating options for the Surgeon General's -- you
 8   know, to consider how we would continue to, you
 9   know, talk about mis- and disinformation with
10   respect to data.
11         Q.    Do you know who else was involved in
12   developing that RFI?
13         A.    I'm not sure, but I think Max Lesko,
14   the chief of staff, was helping Kyla process-wise
15   for that.
16         Q.    You mentioned Mr. Lesko, he's here on
17   the org chart, and you report directly to him,
18   right, through this current line?
19         A.    That's correct, yep.
20         Q.    What's his role when it comes to --
21   to your knowledge, when it comes to dealing with
22   mis- and disinformation issues?
23         A.    I think Max became a de facto lead as
24   teams -- as teams shifted and helped -- helped
25   follow up on engagement.  You know, I was doing the
```

**ERIC WALDO  12/22/2022**

Page 61

```
 1   rollout, then I went on paternity leave, then Adam
 2   left -- Adam Beckman, and then -- so I think -- I
 3   think Max sort of filled in the gap and was
 4   certainly helping Kyla and helping advise the
 5   Surgeon General on -- on -- on some of the
 6   misinformation issues of if there was any follow-up
 7   we needed to do.
 8        Q.    Was Max Lesko involved in
 9   communicating directly with social media platforms,
10   for example --
11        A.    To my knowledge, Max was the person
12   who sent the RFI to the tech companies while I was
13   out.
14        Q.    And when were you on paternity leave?
15        A.    There were two rounds of paternity
16   leave.
17        Q.    Congratulations.
18        A.    You know, around one month or
19   between -- around September 16th to, like,
20   October 16th or 17th, I'd have to check, and then
21   around January through early March.
22        Q.    Okay.  Did Mr. Lesko have any other
23   communications with social media platforms that
24   you're aware of?
25        A.    Not to my knowledge.
```

**ERIC WALDO  12/22/2022**

Page 62

```
 1              Q.    How about Kyla Fullenwilder --
 2              A.    Actually, sorry -- sir --
 3              Q.    Go ahead.
 4              A.    -- may I -- no, that -- no, I'm
 5      right, sorry, not to my knowledge.
 6              Q.    Okay.  You thought of something there
 7      for a second.  What were you --
 8              A.    I was trying to remember -- I
 9      apologize, sir, I'm interrupting you, making it
10      hard for our court reporter.
11              Q.    Go ahead.
12              A.    Thank you.  I was trying to remember
13      if Max had been on the call with Nick Clegg and he
14      was not is my recollection.
15              Q.    Any other involvement of Mr. Lesko in
16      communications with social media platforms that you
17      can think of?
18              A.    Not to my knowledge, sir.
19              Q.    How about Kyla Fullenwilder?  We
20      talked earlier that she was communicating, I think,
21      with external researchers, for example Professor
22      DiResta.  Was she involved in communicating
23      directly with social media platforms at any stage?
24              A.    So Kyla was someone I invited to
25      those rollout calls as a subject matter exert, and
```

**ERIC WALDO  12/22/2022**

Page 63

```
 1   she joined some of them but not all.  So I recall
 2   that she joined the Twitter call and the Facebook
 3   call, but I'm not sure if she joined any of the
 4   other ones.
 5        Q.    Other than those rollout calls with
 6   you, what -- did she have any other communications
 7   with social media platforms?
 8        A.    I'm not sure, not to my knowledge.  I
 9   guess it's possible in the RFI pieces, but I'm
10   not -- I think Max was the one who communicated, so
11   I don't have knowledge of that.
12        Q.    Okay.  How about other people
13   anywhere on the org chart?  I think obviously, you
14   know, that statement directs mis- and
15   disinformation engagement under Anne Kim's job
16   description seems to suggest that somebody's --
17   engagement usually means some form of
18   communication.
19             Is there anyone else that you're
20   aware of who's communicated with social media
21   platforms about mis- and disinformation?
22        A.    Not to my knowledge.
23        Q.    So the only ones you know of are
24   yourself and Ms. Fullenwider and then Mr. Lesko
25   when it came to announcing the RFI?
```

**ERIC WALDO  12/22/2022**

Page 64

```
 1         A.     Again, Daniel may have -- Daniel
 2   Tartakovsky may have been invited as an optional to
 3   some of those rollout calls with the tech
 4   companies.  I don't recall if he was on.
 5         Q.     How about anyone outside the Surgeon
 6   General's office, are you aware of other federal
 7   officials communicating with social media platforms
 8   about mis- and disinformation?
 9         A.     I believe -- I certainly was on some
10   e-mails and at least one call with -- Rob Flaherty
11   would communicate with Facebook.
12         Q.     Did he communicate -- is that Rob
13   Flaherty from the White House?
14         A.     That's correct, sir.
15         Q.     Yeah.  What's his title and role?
16         A.     I think he -- he is a -- some sort of
17   digital title.  I don't know if it's digital
18   director, head of digital, but he has a role on the
19   digital team at the White House, to the best of my
20   knowledge.
21         Q.     Did you communicate with him or
22   coordinate with him about talking to social media
23   platforms about disinformation and misinformation?
24         A.     I didn't talk to Rob until after we
25   did the rollout, so it wasn't -- it was -- it was
```

**ERIC WALDO  12/22/2022**

```
1    before our call with Nick Clegg, I think I had a

2    call with Rob.

3         Q.    What was the nature of that call?

4         A.    I think it was just giving us a

5    heads-up on his experiences with -- in

6    communicating with -- with -- with Facebook.

7         Q.    So he had been separately

8    communicating with Facebook?

9         A.    I believe so.

10        Q.    And you were coordinating on how to

11   present a united message to them?

12        A.    No.

13        Q.    No?  What -- what was the nature of

14   the -- the -- the discussion in that call with Rob

15   Flaherty?

16             MS. CHUZI:  Objection to the extent

17   that the question is asking for privileged

18   information that's covered by the delivery of

19   process privilege, I will instruct the witness not

20   to answer.

21             THE WITNESS:  On the advice of

22   counsel, I will not answer.

23        Q.    (BY MR. SAUER)  So you're refusing to

24   answer a question about your communications with

25   Rob Flaherty regarding both of your communications
```

**ERIC WALDO  12/22/2022**

Page 66

```
 1    with Facebook?

 2         A.    On the advice of counsel, I will not

 3    answer the question.

 4         Q.    Was there anyone else involved in

 5    that call?  Without disclosing the content of

 6    communications, who else was on that call?

 7         A.    No one else was on the call.

 8         Q.    Did you have any other communications

 9    with Mr. Flaherty, other than that call?

10         A.    There was one other call that Brian

11    Rice from Facebook requested for me and Brian --

12    for me and Rob to attend.  So there was some call,

13    I think around August of 2021, where -- where we --

14    the three of us were on a call together.

15         Q.    What was the nature of that call?

16         A.    Brian had -- Brian Rice from Facebook

17    had requested a call to give us an update on some

18    sort of internal action they were doing.  So I

19    think it was him sharing some sort of -- he called

20    it an operation.  I don't really recall what it was

21    about, but it was something that Facebook had

22    either found something or removed something and was

23    letting us know about it.

24         Q.    Are you aware of any other federal

25    officials communicating with social media platforms
```

**ERIC WALDO  12/22/2022**

Page 67

1    about misinformation and disinformation other than

2    Mr. Flaherty?

3        A.    Other than the folks we've already --

4    other than the people we've already talked about?

5        Q.    Right, yeah, I think I'm talking

6    about now outside the Office of the Surgeon

7    General.

8        A.    Sorry.  Pardon me.  Thank you, sir.

9    Thank you for the clarification.  Not to my

10   knowledge.

11       Q.    How about Andy Slavitt, do you know

12   of any communications with him with social media

13   platforms?

14       A.    I know that Dr. Murthy shared with me

15   that Andy had connect -- Andy had connected

16   Dr. Murthy to Nick Clegg because when Andy was

17   leading the White House, he had been a connection

18   for Nick and someone he talked to, and that he

19   promised Nick -- Andy promised Nick that he could

20   have, you know, a person he could talk to, and then

21   looped -- looped Dr. Murthy and -- and Nick.

22       Q.    So Nick Clegg's contacts in the

23   federal government to talk about misinformation

24   issues prior to that was Andy Slavitt in the White

25   House?

**ERIC WALDO  12/22/2022**

Page 68

```
 1          A.    I don't know that they spoke of
 2   misinformation.  I know that they were -- they were
 3   certainly in contact.
 4          Q.    And then when Andy Slavitt left the
 5   White House, he kind of offered Surgeon General
 6   Murthy as a -- as a direct contact for Nick Clegg?
 7          A.    That's my understanding, sir, yes.
 8          Q.    Are you aware of Andy Slavitt having
 9   any other communications with social media
10   platforms about mis- or disinformation?
11          A.    I am not aware of any communications.
12          Q.    How about anyone else in the White
13   House?  Are you aware of anyone else in the White
14   House being involved in communications or
15   discussions with social media platforms that relate
16   to misinformation or disinformation?
17          A.    I'm not aware of any, sir.
18          Q.    How about anyone else in the
19   Department of Health and Human Services?
20          A.    I'm not aware, sir.
21          Q.    How about anyone else in any other
22   federal agency?
23          A.    I'm not aware.
24          Q.    Have you ever had communications with
25   anyone at CISA, Cybersecurity and Infrastructure
```

**ERIC WALDO  12/22/2022**

**Page 69**

```
 1    Security Agency?
 2           A.    I don't think so.  I don't recall
 3    that.
 4           Q.    How about someone called Brian
 5    Scully, do you know who that is?
 6           A.    I do not -- that does not ring a
 7    bell, sir.
 8           Q.    How about Jen Easterly, does that
 9    name ring a bell?
10           A.    I don't think so, sir.
11           Q.    How about Lauren Protentis?
12           A.    I don't think so, sir.
13           Q.    How about Dr. Fauci, Anthony Fauci,
14    have you had communications or discussions with him
15    of any kind?
16           A.    I have not had any communications
17    with Dr. Fauci, sir.
18           Q.    Do you know if he has had discussions
19    with other people in the Surgeon General's office
20    such as Surgeon General Murthy or others?
21           A.    Dr. Murthy has certainly had
22    conversations with Dr. Fauci.
23           Q.    Do you know what the nature of those
24    conversations were?
25           A.    I do not.
```

**ERIC WALDO  12/22/2022**

```
 1          Q.     Do you know if any of those
 2   conversations related to misinformation or
 3   disinformation?
 4          A.     I do not.
 5          Q.     Do you know of anyone else in the
 6   Office of Surgeon General communicating with
 7   Dr. Fauci?
 8          A.     None to my knowledge.  Adam Beckman
 9   would maybe be someone who might have helped
10   coordinate calls.  He was sort of -- did a lot
11   of -- a lot of things, especially as we were
12   lightly -- more lightly staffed at the beginning of
13   the administration, but I think Dr. Murthy would
14   have directly communicated with Dr. Fauci, to my
15   knowledge.
16          Q.     And you're not aware of anyone else
17   being on those communications other than Dr. Murthy
18   from the OSG side?
19          A.     Yeah, not to any knowledge.
20          Q.     Okay.  How about Dr. Francis Collins,
21   the head of NIH?  Have you ever communicated with
22   him?
23          A.     I have not.
24          Q.     Are you aware of anyone at the Office
25   of Surgeon General communicating with him?
```

**ERIC WALDO  12/22/2022**

```
1            A.    I -- I imagine -- I think -- I'm
2    certain that Dr. Murthy has connected, but I don't
3    know.
4            Q.    You say you're certain that
5    Dr. Murthy has connected --
6            A.    Sorry.
7            Q.    Yeah, go ahead.
8            A.    Sorry.  It would -- I believe
9    Dr. Murthy has connected with Dr. Collins.
10           Q.    Were you involved in those
11   conversations?
12           A.    I was not.
13           Q.    Do you know if they related to
14   misinformation or disinformation?
15           A.    I do not.
16           Q.    Did Dr. Fauci or Dr. Collins have any
17   role in devising either the health advisory from
18   July of 2021 or the RFI from March of 2022 that
19   you've already talked about?
20           A.    I don't know.
21           Q.    And I think you said that
22   Dr. Murthy -- you believe Dr. Murthy has had direct
23   conversations with Dr. Collins.  Do you know who
24   else was involved in those communications, if
25   anyone?
```

**ERIC WALDO  12/22/2022**

Page 72

```
 1          A.     I do not.
 2          Q.     So, to your knowledge, the only
 3   people that you know who would have been involved
 4   would be Dr. Murthy himself and Dr. Collins?
 5          A.     That's correct.
 6          Q.     Same question for Dr. Fauci, the only
 7   ones you know of who were directly involved in
 8   those communications were Dr. Murthy and Dr. Fauci?
 9          A.     That's correct.
10          MS. CHUZI:  Counsel, we've been going
11   for about an hour.  Is there -- are we approaching
12   a good stopping point for a short break?
13          MR. SAUER:  I was going to do one
14   more exhibit.  It's a long exhibit, a longer, so
15   probably be on it for about 15, 20 minutes.  Do you
16   want to keep going, or I'm fine taking a break,
17   too.
18          THE WITNESS:  Let's -- let's finish
19   this exhibit and then we'll take a break.
20          Q.     (BY MR. SAUER)  Okay.  It's Exhibit
21   3, which I previously e-mailed to your counsel.
22   Can you see the document?
23          A.     I have the document in front of me
24   from my counsel, from government counsel.
25          Q.     Hang on a second, I'm not showing --
```

**ERIC WALDO  12/22/2022**

Page 73

```
 1          A.    But I don't see it on the shared
 2    screen.
 3          Q.    Here we go.  How that's?
 4          A.    Yes, sir.
 5          Q.    And this is Defendant's
 6    Second-Amended Combined Objections and Responses to
 7    Plaintiffs' First Set of Expedited Preliminary
 8    Injunction-Related Interrogatories.  That's what
 9    it's titled, correct?
10          A.    That is what it says, sir.
11          Q.    Are you aware that the Office of
12    Surgeon General responded to interrogatories in
13    this case?
14          A.    I know that we had been -- had
15    various legal issues around misinformation and were
16    creating documents for DOJ.  I'm not -- I don't
17    know that I specifically knew about this set of
18    interrogatories.
19          Q.    Were you involved in, you know,
20    collecting information to respond to
21    interrogatories?
22          A.    I believe so.  Again, I was
23    responding to requests around the legal matters
24    with respect to misinformation, so probably.  I
25    don't -- I know there have been multiple lawsuits
```

**ERIC WALDO  12/22/2022**

```
 1   about this, so I'm not sure which one.

 2        Q.    What -- what was -- what was the

 3   nature of -- I don't want to ask anything that your

 4   lawyers told you, but I want to know what is the

 5   nature of your activities of collecting the, you

 6   know, information in response to interrogatories.

 7   Did you, you know, dig up documents, search your

 8   e-mail?  What kind of stuff did you do?

 9        A.    So, for example -- yes, searching

10   e-mails, searching my calendar for meetings with

11   organizations, et cetera.

12        Q.    Anything else?  Did you search

13   personal devices and personal e-mails?

14        A.    I would have looked at all -- all

15   records that were requested from DOJ.  I would have

16   looked at any relevant devices that might have --

17   as part of the request.

18        Q.    Have you ever communicated with the

19   social media platform using a sort of personal

20   e-mail account, personal device, anything like

21   that?

22        A.    No, sir.

23        Q.    And have you ever had work-related

24   communications that related to misinformation or

25   disinformation on a personal account or device?
```

**ERIC WALDO  12/22/2022**

 1          A.     No, sir.

 2          Q.     **Were you aware that we received**

 3   **amended interrogatories on Tuesday of this week**

 4   **that relate to the responses from the Office of**

 5   **Surgeon General?**

 6          A.     I don't think so, but I'm not sure.

 7          Q.     **So are you aware that the responses**

 8   **were provided on September 27th and then amended**

 9   **responses were provided a few days ago.**

10          A.     I'm not aware of the dates of -- or

11   the responses.

12          Q.     **I want to direct your attention to**

13   **page 32 of this document.**

14                 **Is this familiar to you, this OSG**

15   **response where it says:  OSG responds that the**

16   **following meetings took place with social media**

17   **platforms relating to misinformation?**

18          A.     Are you -- is this the whole page?

19   Can you give me a second to read this, sir?

20          Q.     **Sure, yeah.  This response goes on**

21   **for about two full pages.  So if you look at page**

22   **32 and 33 with a little paragraph spilling onto**

23   **page 34.**

24          A.     Okay, sir, I reviewed pages 32 and

25   33.

**ERIC WALDO  12/22/2022**

```
 1          Q.    Gotcha.  And you see there's nine
 2    bullets points there identifying nine meetings
 3    between people from the Office of Surgeon General
 4    and social media platforms relating to
 5    misinformation?
 6          A.    I see this, yes.
 7          Q.    Were you involved in collecting
 8    information to identify these meetings?
 9          A.    I was.
10          Q.    And so you searched your calendar,
11    for example, to find information to identify
12    meetings that you were involved in?
13          A.    That's correct.
14          Q.    Do you know why we received an
15    updated version that added a couple new meetings
16    that hadn't previously been mentioned?  Do you know
17    why that happened a couple days ago?
18          A.    I do not.
19          Q.    Did you find new meetings to disclose
20    to us, you know, recently?
21          A.    I did not.
22          Q.    Okay.  Do you know why these
23    interrogatories were amended to add new information
24    shortly before your deposition?
25          A.    I do not.
```

**ERIC WALDO  12/22/2022**

```
 1          Q.    Let me ask you this:  Did you review
 2   any documents to prepare for your deposition?
 3          A.    I did.
 4          Q.    Yeah, what sort of documents did you
 5   review?
 6                MS. CHUZI:  Objection.  Work product.
 7          Q.    (BY MR. SAUER)  What sort of
 8   documents did you review to -- to prepare for your
 9   deposition?
10                MS. CHUZI:  Same objection.  The
11   question calls for information covered by the work
12   product doctrine, and I will instruct the witness
13   not to answer.
14                THE WITNESS:  On the advice of
15   counsel, I will not answer the question.
16          Q.    (BY MR. SAUER)  Let me turn your
17   attention to -- here on the top of page 32.  Let's
18   just -- I want to walk through these meetings, and
19   just see what you remember about them.
20                So for the first bullet point here
21   identifies a meeting on May 25th, 2021, involving
22   Dr. Murthy and Andy Slavitt meeting remotely with
23   Nick Clegg from Facebook, correct?
24          A.    That is what the document says,
25   correct.
```

**ERIC WALDO  12/22/2022**

1    Q.    And I take it this is before you

2  started at the Office of Surgeon General and you

3  weren't directly involved in this meeting?

4    A.    That's correct.

5    Q.    But I think you testified about this

6  meeting a minute ago from what your understanding

7  of it was.  What do you understand?

8    A.    I'm -- I'm --

9    Q.    Go ahead.

10    A.    Sir, I don't think that's correct.

11  I -- I know that they were connected.  I don't know

12  that this was that meeting or if it was an e-mail

13  or something else.

14    Q.    Oh, interesting.  Okay.  Yeah, sorry,

15  I didn't mean to put words in your mouth.  Looking

16  at this description of the meeting where it talks

17  about how on May 25th there was a remote meeting

18  between Dr. Murthy, Andy Slavitt, and Nick Clegg,

19  what do you know about what happened in that

20  meeting?

21    A.    I don't know anything, sir.

22    Q.    Do you know of any meetings --

23  obviously these meetings are listed in

24  chronological order.  And the first meeting listed

25  between OSG personnel and social media platforms is

**ERIC WALDO  12/22/2022**

1    on May 25th, 2021, correct?

2         A.    That is what is listed, sir, yes.

3         Q.    Are you aware of any meetings that

4    happened before May 25th, 2021, between anyone in

5    the Office of Surgeon General and anyone at a

6    social media platform?

7         A.    I think this is what we talked about

8    before, sir.  I think there may have been a meeting

9    during the transition.  That's only meeting I'm

10   aware of.

11        Q.    And that was that meeting you talked

12   about involving Dr. Murthy and someone on the data

13   side at Facebook?

14        A.    That's correct.

15        Q.    Do you know who that was?  Do you

16   know the name of that Facebook individual in that

17   meeting?

18        A.    I don't recall, sir.

19        Q.    Do you know if anyone else was in

20   that meeting, other than Dr. Murthy and the person

21   from Facebook?

22        A.    I don't recall -- or I actually don't

23   know.

24        Q.    Do you know if any -- well, let me

25   ask you this:  Do you know if the data being

**ERIC WALDO  12/22/2022**

Page 80

```
 1    discussed was data about misinformation on -- on
 2    Facebook?
 3         A.    I believe that was a topic of
 4    conversation.
 5         Q.    Do you know of any other topics of
 6    conversation?
 7         A.    I do not.
 8         Q.    Do you know what was said about the
 9    data of misinformation -- data about misinformation
10    on Facebook?
11         A.    I think the only piece I know from
12    that conversation was, again, Facebook sort of
13    being un- -- you know, not clear, or unable to
14    present the -- the depth or reach of the
15    misinformation, that they didn't have that data.
16         Q.    And so Facebook told Dr. Murthy in
17    the transition, on your understanding, that they
18    didn't really have good data on the depth and reach
19    of misinformation on their platform?
20         A.    I believe so.
21         Q.    And Dr. Murthy, do you know what he
22    said about that?
23         A.    I don't know.
24         Q.    Who was on that call, other than that
25    unidentified Facebook person and Dr. Murthy, to
```

**ERIC WALDO  12/22/2022**

```
 1    your knowledge?

 2         A.    I don't know.

 3         Q.    So you don't know of anyone other

 4    than Dr. Murthy who would be able to identify what

 5    was stated in that call?

 6         A.    I don't know.  It's possible DJ Patil

 7    would have been on that call.  I think he was on

 8    the transition as well, but I'm not positive.

 9         Q.    Who's DJ Patil?

10         A.    DJ was that chief data scientist in

11    the Obama administration, and he was a special

12    government employee at the White House for part of

13    the first year.

14         Q.    What -- what time range -- frame?

15         A.    I think the first six months or so.

16         Q.    So he was a White House official for

17    about six months in some capacity?

18         A.    That's my understanding.

19         Q.    Yeah, do you know exactly what his

20    role was?

21         A.    I do not.

22         Q.    Do you know if he communicated with

23    social media platforms about misinformation?

24         A.    DJ was on the call with Dr. Murthy

25    and myself with Nick Clegg.
```

**ERIC WALDO  12/22/2022**

Page 82

```
 1              Q.      Okay.  And so he was joining that
 2      call in his capacity as a White House official?
 3              A.      That's my understanding.
 4              Q.      Okay.  And then you think he may have
 5      been involved in this call in the transition
 6      involving Dr. Murthy and the data person at
 7      Facebook?
 8              A.      Maybe.  I'm not certain, sir.
 9              Q.      How about any other communications
10      involving DJ Patil and social media platforms, are
11      you aware of any others?
12              A.      There was a follow-up e-mail from
13      Nick after our call, and I connected DJ to another
14      research data person on -- on the -- I think I was
15      doing a matchmaking of DJ and a Facebook data
16      person.  I'm not certain if they ever connected.
17              Q.      Who was that Facebook data person?
18              A.      I don't recall the name, sir.
19              Q.      How did you know who to connect him
20      to?
21              A.      I think either Nick or Brian Rice
22      gave us the person to connect them with.
23              Q.      What was the purpose of connecting DJ
24      Patil, the White House scientist, with the Facebook
25      data person?
```

**ERIC WALDO  12/22/2022**

Page 83

1         A.    I think to better understand the --

2    the nature of the data reach on the misinformation.

3         Q.    **So the idea was -- go ahead, sorry.**

4         A.    I think, again, the problem was we

5    were still in this piece of not understanding the

6    reach and depth of the -- of the -- of the reach of

7    the misinformation on the -- on Facebook.  And I

8    think this person was going to try to explain to DJ

9    the data challenges in doing so.

10        Q.    **So the idea was that DJ, the White**

11   **House scientist, would be able to talk to the data**

12   **person at Facebook so that the White House could**

13   **understand the reach and depth of misinformation on**

14   **Facebook?**

15        A.    I'm not certain, but I think that

16   was -- that was one of the pieces.

17        Q.    **Are you aware of any other pieces?**

18        A.    I am not.

19        Q.    **Do you know if DJ, you know, proposed**

20   **action items to them about sharing data or any**

21   **other action items relating to misinformation?**

22        A.    I'm not aware of any.

23        Q.    **Do you know of any -- anyone else in**

24   **the federal government proposing action items to**

25   **social media platforms about controlling**

**ERIC WALDO  12/22/2022**

Page 84

1    misinformation on their platforms?

2            A.    I think certainly Jen Psaki made

3    statements during the press conference on the

4    release date that could be -- that I think would

5    answer -- would be within what you're describing.

6            Q.    And she was the White House press

7    secretary at the time?

8            A.    That's correct.

9            Q.    Anyone else other than Ms. Psaki?

10           A.    To my knowledge?

11           Q.    I'm sorry, did you say not to your

12    knowledge or?

13           A.    Not to my knowledge, sir, yeah.

14           Q.    Let me direct your attention back to

15    this document.  We talked about this May 25th

16    meeting.  And do you know -- you said this may or

17    may not have been the interaction you testified

18    about earlier where Nick Clegg was connected to

19    Dr. Murthy.  Do you know what was discussed in this

20    call, other than introducing them to each other?

21           A.    I do not.

22           Q.    So it mentions here in the

23    interrogatory response that the purpose of the call

24    was to introduce Dr. Murthy to Mr. Clegg, and it

25    goes on to say:  Misinformation may have been

**ERIC WALDO  12/22/2022**

```
 1    discussed.
 2              Do you know whether misinformation
 3    was discussed in any connection?
 4         A.    I do not.
 5         Q.    Do you know why the interrogatory
 6    responses say that it may have been discussed?
 7         A.    I don't know why, other than the
 8    prima facie because it's possible it could have
 9    happened.
10         Q.    Okay.  On July 12th, the next meeting
11    listed, there's a meeting listed between you and
12    Lauren Culbertson and Todd O'Boyle from Twitter,
13    and it mentions that Kyla Fullenwilder from US
14    Digital Response was invited and may have attended,
15    correct?
16         A.    That's correct.
17         Q.    And this is the same Ms. Fullenwider
18    that you talked about earlier who had a role in --
19    some kind of role on behalf of the Surgeon
20    General's office, right?
21         A.    That's correct.
22         Q.    And it lists her as from US Digital
23    Response.  Do you know what US Digital Response is?
24         A.    I think it's some sort of
25    quasi-governmental organization that helps -- helps
```

Case 3:22-cv-01213-TAD-KDM   Document 210-1   Filed 03/04/23   Page 86 of 464 PageID #: 14648

**ERIC WALDO  12/22/2022**

```
 1   do -- helps government do digital and data better.
 2        Q.     Is it -- is it, like, a private
 3   organization that contracts with the federal
 4   government, or is it a -- you know, is it a federal
 5   government agency?
 6        A.     I'm not positive, sir.  I don't know
 7   the nature of USDR.  I think they have .gov e-mail
 8   addresses is what I do know.
 9        Q.     And it says here that the meeting
10   provided notice of the upcoming OSG advisory.  I
11   take it that's the health misinformation advisory
12   that was launched three days later, correct?
13        A.     Yes, sir.  This refers to the meeting
14   you and I have discussed already about the rollout
15   calls, the prerollout calls, yep.
16        Q.     Okay.  It says:  A high-level view of
17   what issues the OSG would be prioritizing in the
18   advisory.  Did you give them that -- that
19   high-level view?
20        A.     I believe Kyla would have walked them
21   through the high-level view.  So, again, my role as
22   part of the -- for the rollout was to, essentially,
23   reach out to those groups to establish that
24   relationship and then connect them to our subject
25   matter expert to be able to stay at a high level,
```

**ERIC WALDO  12/22/2022**

Page 87

```
 1   this is what's happening.

 2               Again, because it was a rollout, we

 3   couldn't share the document, it was embargoed, but

 4   we could say at a high level, we're going to be

 5   calling for these things, and we encourage you to

 6   take a look when it comes out.

 7        Q.     And did Kyla give that high-level

 8   view?

 9        A.     It says she was invited and may have

10   also attended.  I can't recall.  If she did attend,

11   she would have done so.  Otherwise, I would have

12   provided a very general overview.

13        Q.     Okay.  When you say here that things

14   we're calling for, what sort of things do you tell

15   them in this rollout call?

16        A.     I think it -- sorry, go ahead, sir.

17        Q.     Go ahead.  Describe what was said.

18        A.     It would have been a high-level

19   overview to say next week, you'll hear the Surgeon

20   General talking about health misinformation, this

21   is your first advisory.  We're calling for an

22   all-society approach, and certainly there are

23   things we think that everyone can do to, you know,

24   given that we're in a -- a pandemic, that there's

25   more that everyone can do, and so we're happy to
```

**ERIC WALDO  12/22/2022**

Page 88

```
1    take a look at that, and we'd love your feedback,

2    you know, once you've had a chance to review it,

3    and that we'll share it with you when it comes out.

4         Q.    And did you specifically mention that

5    the Surgeon General would be saying there's more

6    that the social media platforms can do?

7         A.    I don't recall if that was

8    specifically mentioned.  I think we said we're

9    calling for an all-of-society approach and asking

10   everybody to do more.

11        Q.    The next meeting listed here on

12   July 14th from 3:00 to 5:00 p.m., it's a meeting

13   between yourself and Kevin Kane and Jan Antonaros

14   and Ariel Altman from Google/YouTube, correct?

15        A.    That's correct.

16        Q.    And that's the same description as

17   the rollout meeting from July 12th with Twitter,

18   correct?

19        A.    Yeah.  So, again, this is the same --

20   precisely the same type of call.  It's a prerollout

21   call to give a stakeholder a heads-up and give them

22   a high-level overview, recognizing that the -- the

23   advisory's embargoed.  So almost the exact -- the

24   goal was the same for those calls.

25        Q.    And would you have -- I take it
```

**ERIC WALDO  12/22/2022**

Page 89

1  you're the only one on the government side of this

2  meeting, correct?

3      A.     Yeah, if that's what's reported, then

4  neither Daniel nor Kyla were able to join those

5  calls, or that call, sir.

6      Q.     What did you say -- sorry, go ahead.

7  What did you say in that call?

8      A.     I would have said the similar thing

9  to what I said on the previous call, next week or

10  in a few days we're having -- in two days, we're

11  going to announce an advisory, it's embargoed, I

12  can't share the details, but a high level, we're

13  calling to an all-society approach, we're asking

14  everybody to do more, given that we're in a

15  pandemic, and we know this issue is of great

16  importance, and we hope you'll take a look, I'll

17  share this with you and would love -- love to hear

18  from you after it comes out, if you think there's

19  ways we can collaborate.

20      Q.     Okay.  And did you -- did they say

21  anything in response to that, either in the Twitter

22  call or the YouTube/Google call?

23      A.     I think -- again, these were -- they

24  sort of gave the -- what I would call an overall,

25  like we agree -- you know, we agree this is

**ERIC WALDO  12/22/2022**

Page 90

```
 1   important, or we are working on this and we're
 2   excited to take a look at the advisory.
 3        Q.    Okay.  Anything beyond that in either
 4   of these two calls?
 5        A.    Not to my recollection.
 6        Q.    If you go down to the next line on
 7   July 16th, 2021, there's a meeting between you and
 8   Kyla Fullenwilder with Payton Iheme and Justine
 9   Isola from Facebook.  And it mentions that Kate
10   Thornton and Brian Rice from Facebook may also have
11   attended, correct?
12        A.    That is correct.
13        Q.    Yeah.  And it says:  The meeting
14   discussed the newly issued OSG advisory, correct?
15        A.    Correct.  So we are -- tried to
16   schedule this meeting before the release, but
17   Facebook was unable to book it, so it ended up
18   happening after the release.  So this was intended
19   as a prerelease call, just like the others.
20        Q.    Gotcha.  So this was supposed to be a
21   rollout call, but it ended up being scheduled a day
22   after the release?
23        A.    I think it may be the same -- is it
24   the same day?  It was the same day as certainly
25   President Biden's, I think, statement, but yeah, it
```

**ERIC WALDO  12/22/2022**

Page 91

```
 1   was a day or two -- yeah, the next day, I think.
 2          Q.    Gotcha.  And what was the -- I take
 3   it the discussion in this call was different --
 4   it's described differently than the two previous
 5   meetings, correct?
 6          A.    That's correct.
 7          Q.    Yeah, what was said in this call?  It
 8   says:  The meeting discussed the newly issued OSG
 9   advisory.  Can you be more specific and describe
10   what was discussed in this call?
11          A.    Yeah.  So again, the advisory now is
12   out, so we didn't have to be coy about whether the
13   advisory -- what it said or didn't say.  So I was
14   able -- at the call, Kyla was able, at a high
15   level, to walk over the -- the recommendations
16   section for -- for technology companies.
17          Q.    So she -- you basically -- you guys
18   talked first and gave an overview of the health
19   advisory as it related to the recommendations on
20   the social media platforms?
21          A.    I believe so.  I don't recall, but
22   that sounds right.
23          Q.    And you say that was done by Kyla, to
24   your knowledge, not you?
25          A.    Correct.
```

**ERIC WALDO  12/22/2022**

1    Q.    Do you remember -- and I take it her

2    presentation or her discussion focused on the kind

3    of recommendations and the advisory of what social

4    media platforms could do to combat the spread of

5    disinformation and misinformation on their

6    platforms?

7        A.    I believe so.  I don't really recall.

8        Q.    Do you remember anything specific

9    that she said in that -- that presentation?

10       A.    I do not.

11       Q.    Did you talk in the call?

12       A.    I would have helped emcee the call,

13   introduced parties, you know, helped sort of guide

14   and steer the call a little bit, but it would have

15   been turning over the mic to the subject matter

16   expert.

17       Q.    And that subject matter expert was

18   Kyla?

19       A.    Correct.

20       Q.    Then social media platforms say, I

21   take it -- not the social media platforms, the

22   Facebook people, did they say anything on this

23   call?

24       A.    I don't really remember.  It was

25   definitely a slightly awkward call because I think

**ERIC WALDO  12/22/2022**

```
 1   either some -- you know, during the call, I'd have
 2   to look at the time signature, but I think
 3   President Biden made his comment about social media
 4   companies and Facebook killing people, you know,
 5   right before, or even potentially during the call,
 6   but the Facebook team looked a little sad.
 7          Q.    Did they say anything about that
 8   comment in the call?
 9          A.    Not to my recollection.
10          Q.    You said they looked sad.  Was this a
11   Zoom call?
12          A.    It was, sir.
13          Q.    Do you remember them giving any
14   reaction at all to Kyla's presentation about, you
15   know, the proposed action items for social media
16   platforms?
17          A.    I don't recall.
18          Q.    Do you remember who spoke on the
19   Facebook side and during this Zoom call?
20          A.    I know Payton spoke, but I don't
21   recall -- I don't recall who else spoke.
22          Q.    What did Payton say, to your
23   recollection?
24          A.    I don't actually recall.
25          Q.    You know she spoke, but you don't
```

1    remember anything she said?

2         A.    That's correct.

3         Q.    And you remember them looking sad,

4    correct?

5         A.    That was my interpretation of their

6    facial expressions.

7         Q.    Did they say anything that would

8    reinforce their being sad or upset about the recent

9    public statements?

10        A.    They did not.

11        Q.    Let's move down one more bullet point

12   to July 23rd, 2021.  There's a call between

13   Dr. Murthy, yourself, and DJ Patil, correct?

14        A.    That's correct.

15        Q.    And this is a call with Nick Clegg,

16   and it says very likely Brian Rice from Facebook,

17   correct?

18        A.    That's correct.

19        Q.    This would have been about one week

20   after that July 16th rollout call that we just

21   talked about, right?

22        A.    That's correct.

23        Q.    How did this call get set up?

24        A.    Nick e-mailed Dr. Murthy directly.  I

25   think either -- it must have been --- it was after

**ERIC WALDO  12/22/2022**

```
 1    President Biden made his remarks, because he
 2    referenced the remarks, and he wanted to -- he
 3    asked if they could have a call, and I think he
 4    wanted to -- to -- to deescalate.
 5         Q.    And did he use the phrase deescalate
 6    in this call?
 7         A.    I -- I don't recall.  I think
 8    there's -- I think his e-mail maybe said something
 9    about, like, wanted to reset the tone.
10    Something -- it was recognizing the -- the -- the
11    feelings, potentially, that -- that the Facebook
12    team were feeling, and feeling like they were --
13    that they had been uniquely called out.
14         Q.    And so Nick Clegg is -- did -- he's
15    the one who kind of initiated the discussion in
16    this call, kind of the --
17         A.    That's correct.  He e-mailed
18    Dr. Murthy directly and I believe asked for time.
19         Q.    And then in the call, did he express
20    that the Facebook team was upset about Facebook
21    being uniquely called out?
22         A.    I don't remember.  He definitely said
23    something like that in the e-mail, but I don't
24    recall him saying that during the call.
25         Q.    What do you remember him saying in
```

**ERIC WALDO  12/22/2022**

Page 96

```
 1   the call?
 2         A.    I think it was just in general a, you
 3   know, wanting to restart the tone and feeling --
 4   you know, seeing -- I think also feeling that they
 5   actually were doing a lot to address this issue and
 6   sort of a "you don't understand all the good work
 7   we're doing" and that -- sort of, you know, a
 8   little unfair that they had been called out.
 9         Q.    And was the good work they were
10   doing, did that include taking steps to slow or
11   reduce the spread of misinformation on Facebook
12   platforms?
13         A.    I know that -- that Nick did share
14   definitely over e-mail more information about what
15   they were doing to reduce mis- and disinformation,
16   COVID mis- and disinformation on -- on the
17   platform, yes.
18         Q.    How about in the call, did he discuss
19   that on the call?
20         A.    I don't recall.
21         Q.    Did that include new steps that they
22   were taking, you know, since they'd been uniquely
23   called out by the President and -- and at the -- at
24   the July 15th press conference?
25         A.    Not -- I don't recall, sir.
```

**ERIC WALDO  12/22/2022**

```
 1          Q.    Do you know -- in other words, do you
 2   know if Mr. Clegg identified anything new they were
 3   doing that they hadn't already been doing prior to
 4   July 15th or July 16th?
 5          A.    I don't recall that from the call.
 6          Q.    Okay.  How about from the e-mails?
 7          A.    I think there was a follow-up e-mail
 8   sometime the next couple of weeks where -- where
 9   Nick, I believe, or Nick or Brian shared here's --
10   here's additional work we're doing, here's how
11   we're responding to the advisory.
12          Q.    And did that additional work
13   responding to the advisory include taking more
14   proactive steps to remove misinformation from their
15   platforms?
16          A.    I think it was a catalog of -- of --
17   of removal and other steps to -- to tamp down mis-
18   and disinformation on the platform, yes.
19          Q.    So it included both removal of
20   misinformation and other steps to tamp down mis-
21   and disinformation, correct?
22          A.    I believe -- I believe so.
23          Q.    And those were new steps that they
24   had taken in the week or so since the -- the --
25   they felt uniquely called out on July 15th and
```

**ERIC WALDO  12/22/2022**

Page 98

1   16th?

2          A.    I'm not sure.  I believe that's the

3   case.  I think the -- the e-mail was asking, was

4   that -- there was an e-mail thread after the call

5   asking for, can you let us know, like, what you're

6   doing in addition, and so this was responding to

7   that.  So I've have to go look at the e-mail code

8   to be certain.

9          Q.    Gotcha.  Did anyone else talk on this

10  call other than Nick Clegg?

11         A.    Dr. Murthy spoke, I -- I spoke a

12  little bit, I think DJ Patil a little bit as well.

13         Q.    How about Brian Rice or anyone else

14  on the Facebook side?

15         A.    Not to my recollection.

16         Q.    You said Dr. Murthy spoke.  What did

17  he say?

18         A.    I don't recall exhaustively, but

19  again, I think Dr. Murthy raised the issue of

20  wanting to have a better understanding of the reach

21  of the mis- and disinformation on -- on the social

22  media platform.

23         Q.    And what's the purpose of wanting to

24  know more about the reach of mis- and

25  disinformation?

**ERIC WALDO  12/22/2022**

**Page 99**

```
1            A.    I think, again, as a Surgeon General,
2   he's trying to understand not just the harm
3   direction but the harm magnitude, right?  So,
4   again, you might say, all right, two things can be
5   bad for you, eating a cookie or eating, like, a
6   piece of uranium.  One has a different magnitude.
7   Both are bad.  And you'd want to know if one's
8   really, really bad.
9            And so in this case, you know, from a
10  research perspective, if we're identifying mis- and
11  disinformation as a social harm or health harm,
12  you'd want to know not just will it hurt, but how
13  much does it hurt or how prevalent is it?  You
14  know, is it a small tumor that we just need to
15  excise, is it something little, or is it -- is it
16  metastases, is it everywhere?
17       Q.    And your cancer example, I think,
18  prefaces my next question:  I take it the purpose
19  of understanding the reach is to allow the Surgeon
20  General to use his bully pulpit, as you talked
21  about earlier, or you know, persuasive power to
22  push for change, if it's an extensive problem,
23  correct?
24       A.    Possibly.  I guess I would say, in
25  general, the purpose of having that knowledge, and
```

**ERIC WALDO   12/22/2022**

Page 100

1  again, we talked about the research piece as well

2  earlier in the conversation, sir, is so that if we

3  could have a broader understanding of the nature of

4  the harm, there can be a deeper understanding of

5  the different methods to ameliorate that harm.

6          So again, I'm making up a person.  If

7  there's a head of research at NYU who does this,

8  who has access to that data and studies it, they

9  might say, actually, if we just do -- tweak the

10  algorithm like this, we'll reduce harm by X

11  percent, and whatever better health outcomes will

12  occur, or we can do Z.

13          By having more information, we can

14  increase research, which then can help us craft

15  different outcomes.  So again, to continue with our

16  cancer analogy, cancer was a death sentence

17  40 years ago.  Now we might say, you know what, you

18  actually just get a little radiation treatment, you

19  take a pill and it's fine, and you're fine.  And so

20  how -- we need to understand the problem in order

21  to understand how to best create ameliorative

22  policy proposals.

23      Q.    **Gotcha.**

24      A.    And then that could come from within

25  government or outside of government.  I think,

**ERIC WALDO  12/22/2022**

Page 101

```
 1   again, the -- the advisory calls for an

 2   all-of-society approach.

 3          Q.     Okay.  So on your cancer analogy

 4   here, the cancer is disinformation and

 5   misinformation on social media platforms, correct?

 6          A.     That is -- that is -- that is the

 7   potential health harm, yes, that we are trying to

 8   ameliorate.

 9          Q.     And I take it the purpose of getting

10   more data from the social media platforms would be

11   able to allow either government or outside academic

12   researchers to devise solutions that would limit

13   the spread of disinformation and misinformation,

14   correct?

15          A.     Limit the harm or spread.  I mean,

16   again, you might say spread -- you might learn, we

17   don't know, this is why you need research.  We

18   don't know -- you know, maybe actually there isn't

19   as much harm as we think, maybe the spread is

20   actually not the problem.  You'd need to understand

21   it and figure out how you're -- I think,

22   ultimately, you're right, limiting the harm.  I

23   don't know if spread actually is harmful.

24          Q.     But certainly the health advisory

25   seems to think that spread is very harmful?
```

**ERIC WALDO  12/22/2022**

Page 102

```
 1          A.    Sure.  I think, again, absent the --
 2    absent additional data, the sort of -- that is the
 3    view.
 4          Q.    Yeah, and that is the view
 5    specifically of the Surgeon General's office as
 6    expressed in the health advisory, correct?
 7          A.    I think that's a fair reading.
 8          Q.    Yeah.  And I take it the idea of
 9    calling for more data and more transparency from
10    the social media platforms is to allow people
11    outside the social media platforms to devise
12    solutions that would limit that harm, which the
13    Surgeon General believes to be linked to the spread
14    of misinformation and disinformation on social
15    media platforms, right?
16          A.    I think limit the harm.  Also, again,
17    additional solutions, you know, could be also,
18    like, how do we better spread the cure -- you know,
19    the right information, which again could be one of
20    the policy prescriptions, right?  You may discover,
21    actually, what's most important is that here's the
22    information that we're -- the right information,
23    how we spread it more quickly.
24              Again, there could be multiple policy
25    proposals from academia, from nonprofits, from
```

**ERIC WALDO  12/22/2022**

Page 103

```
 1   advocates, but yes, to understand it, you know, we
 2   do think it would be -- seems more beneficial to
 3   have external validation and multiple eyes.
 4        Q.    And you mentioned that someone like
 5   at NYU might be able to devise an algorithm tweak
 6   that might really limit the spread or might, as you
 7   said, promote accurate information as well,
 8   correct?
 9        A.    That's just me making up policy
10   solutions, but yes, that's -- that's a possible
11   outcome of greater access to data and research.
12        Q.    And that would allow the Surgeon
13   General's office in turn to advocate for those
14   kinds of policy changes to be adopted by the social
15   media platforms?
16        A.    I think that would be a reasonable
17   outcome to say we're going to look at
18   evidence-based policy proposals, and if we see ones
19   that make sense, I certainly think the Surgeon
20   General's office would think, hey, this is a smart
21   policy proposal, and it would be within the -- the
22   gamut to recommend it.
23        Q.    Yeah, recommend it, both,
24   publicly through the bully pulpit and privately in,
25   you know, engagement directly with the social media
```

**ERIC WALDO  12/22/2022**

Page 104

```
 1   platforms?

 2          A.    It's possible.   That's certainly

 3   within the -- the realm of possibility.

 4          Q.    And something very like that is

 5   actually what happened in the health advisory,

 6   right?  I mean, there's several -- as I recall,

 7   several recommendations for the social media

 8   platforms, maybe not even quite as specific as your

 9   NYU hypothetical, but several recommendations of

10   here's what, you know, we want you to step up and

11   do more of when it comes to the spread of

12   disinformation, correct?

13          A.    I think the -- the recommendations

14   are examples of what could be -- are examples of

15   what parties could -- could do.  And yes, it

16   provides specific examples to technology companies

17   what they could do more of to reduce the spread of

18   health mis- and disinformation.

19          Q.    And on your analogies, that's -- the

20   spread of health mis- and disinformation is what

21   you analogized to eating uranium and having cancer

22   in your earlier hypotheticals, correct?

23          A.    Well, I said it's -- you don't know

24   if it's eating the cookie that's going to cause the

25   -- I don't remember what my first -- like, you need
```

**ERIC WALDO  12/22/2022**

Page 105

```
 1    more data to understand whether it's just the
 2    cookie that may cause cancer one day with too much
 3    sugar or if it's uranium.  You want to know the
 4    size and the scope of the poison.
 5         Q.    Gotcha.  And poison is not your word,
 6    right?  That's the word that Surgeon General Murthy
 7    has used in describing misinformation and
 8    disinformation on social media platforms, correct?
 9               MS. CHUZI:  Objection.  Assumes facts
10    not in evidence.
11         Q.    (BY MR. SAUER)  To your knowledge?
12         A.    I can't recall if he used the word
13    "poison."  That may have occurred, but I don't
14    recall.
15         Q.    Do you remember it appearing in the
16    health advisory we've been talking about as a verb?
17         A.    It seems possible that that occurred,
18    yeah.
19               (A discussion was held off the
20    record.)
21               THE VIDEOGRAPHER:  The time is
22    9:51 a.m, Central Standard Time.  We are off the
23    record.
24               (A short break was taken.)
25               THE VIDEOGRAPHER:  The time is 10:05
```

**ERIC WALDO  12/22/2022**

```
 1   a.m. Central Standard Time.  We are back on the
 2   record.
 3        Q.    (BY MR. SAUER)  Mr. Waldo, I believe
 4   before the break, we were talking about this
 5   July 23rd meeting between yourself and Dr. Murthy,
 6   DJ Patil, and Nick Clegg of Facebook, correct?
 7        A.    That sounds correct.
 8        Q.    I'm putting that Exhibit 3 back on
 9   the screen share.  Can you see it?
10        A.    I can see it, sir, yes.
11        Q.    Okay.  I think you mentioned that
12   Mr. Clegg is -- described what he had been saying
13   in that call.  Who else talked in that call?
14        A.    I believe I said that Dr. Murthy
15   spoke, Nick spoke, I spoke, and DJ spoke.
16        Q.    Okay.  And I think you said that --
17   something about -- about -- data about the reach of
18   misinformation on the platforms, correct?
19        A.    That's correct.
20        Q.    Yeah.  Did he talk about anything
21   else in that call?
22        A.    I do recall that in general he opened
23   the call sort of saying how hard he knows it must
24   have been and that everyone is working hard and
25   trying to sort of empathize and I think sort of
```

**ERIC WALDO  12/22/2022**

**Page 107**

```
 1   create a -- more of a -- a more cordial atmosphere,

 2   given that people's sort of feelings were hurt.

 3         Q.    Uh-huh.  And people being Facebook's

 4   in particular.  Is that fair to say?

 5         A.    Correct.

 6         Q.    Yeah.  Anything else besides setting

 7   a cordial tone and inquiring about data on the

 8   reach of misinformation?

 9         A.    I don't recall specifically, but I

10   think the notion was that Dr. Murthy would continue

11   to sort of say we're in a -- you know, we're

12   calling on everybody.  This is a unique time in our

13   history.  It's a pandemic.  We're asking everyone

14   to do more.  And so, you know, that was -- that's

15   what the advisory said, so I think -- I believe we

16   emphasized that again.

17         Q.    So in other words, you emphasized the

18   message that they're calling on everyone to do

19   more, and that includes Facebook, right?

20         A.    Yes.

21         Q.    So you all didn't retreat, so to

22   speak, from the message of the advisory, which

23   explicitly calls for social media platforms to do

24   more to control the reach of misinformation on

25   their platforms, correct?
```

**ERIC WALDO  12/22/2022**

Page 108

```
 1          A.    That's correct.
 2          Q.    And, in fact, I think you just said
 3    you just emphasized that message to them, right?
 4          A.    I think we -- we continued to stay --
 5    to -- to -- to discuss that message.
 6          Q.    Yeah.  And let me ask you this.  You
 7    said you spoke on the call.  What did you say?
 8          A.    I don't really remember.  I think I
 9    probably would have just been staying on general
10    talking points of, you know, introducing the call,
11    getting folks together, making sure we were on
12    time, and also thinking about follow-up of how we
13    were going to communicate.
14          Q.    What do you mean by thinking about
15    follow-up?
16          A.    I think just whether or not we were
17    going to have another call, whether or not we
18    wanted to ask, you know -- whether or not we were
19    going to ask Facebook to -- to -- to share more
20    with us, just sort of what -- what would -- the
21    next steps might be.
22          Q.    Were those next steps discussed in
23    the call?
24          A.    I think on the call one of the
25    conversations was to say -- was whether or not
```

**ERIC WALDO  12/22/2022**

```
 1    Facebook would share what they -- again, I think we
 2    already talked about this, sir, but whether or not
 3    they would share what they were doing in response
 4    to the advisory, if they were taking any actions.
 5         Q.    Gotcha.  So that was specifically
 6    asked by people on your side of the call will they
 7    share what they're doing --
 8         A.    I -- I -- I believe so.
 9         Q.    Okay.  Who -- was that you or was
10    that Dr. Murthy?
11         A.    I don't recall.
12         Q.    Okay.  But somebody on the Surgeon
13    General's side made a specific ask for them to
14    share what they would do in response to the
15    advisory; is that correct?
16         A.    I think it's what, if anything, if
17    they -- if they would share, yeah.
18         Q.    Yeah.  And did they indicate they
19    would share?
20         A.    I don't recall.
21         Q.    I think you said DJ Patil talked on
22    the call; is that right?
23         A.    Yeah.  I think DJ, I think, probably
24    was also asking the data impact questions, just
25    with some more specificity given his -- his -- his
```

**ERIC WALDO  12/22/2022**

Page 110

```
 1   subject knowledge.

 2         Q.    He's the subject matter expert on

 3   data relating to social media information?

 4         A.    He's subject matter expert related to

 5   data overall.  He was the chief data scientist in

 6   the Obama administration.

 7         Q.    And then he had some sort of similar

 8   role in the Biden White House at this time?

 9         A.    I don't know what his title was.

10         Q.    Do you know what his duties were for

11   the White House at that time?

12         A.    I do not.

13         Q.    Okay.  But it related to data in some

14   way, him being a data scientist?

15         A.    I actually don't know he was -- that

16   makes the most sense, given that that's his deep

17   area of expertise.  But, yeah, I think he was

18   advising the Office of Science and Technology

19   policy and maybe helping them in the first -- first

20   part of the year.

21         Q.    What did he say about data on

22   Facebook's misinformation in this call?  Do you

23   remember?

24         A.    I don't recall.

25         Q.    You believe he said something more
```

**ERIC WALDO  12/22/2022**

```
 1    specific about the kind of data they want.  Do you
 2    remember what kind of data he was interested in
 3    getting from Facebook?
 4          A.    I think, again, the issue was sort of
 5    a question of Facebook had been sharing I think --
 6    again, I'm sort of paraphrasing, but something
 7    people talk about that Facebook was sharing the
 8    nominator, like, hey, we know this -- this -- this
 9    amount of people are seeing X but not the
10    denominator of -- you know, out of a universe of
11    what.  So I think he was inquiring more about that
12    denominator question.
13          Q.    Okay.  So he was asking, you know --
14    I gotcha.  He was asking for information about what
15    is the total reach of information compared to the
16    reach of disinformation?
17          A.    That's correct.  I -- I think that's
18    correct.  I think that was the nature of the
19    question, which I know -- I think he just
20    understood it in greater specificity than someone
21    like myself or Dr. Murthy.
22          Q.    Did Facebook say anything in response
23    to that?  Did they indicate willingness to share
24    more information?
25          A.    I don't recall.  I think the -- I
```

**ERIC WALDO  12/22/2022**

Page 112

```
 1   think the offer made, which either was on the call
 2   or in the subsequent e-mail, was about connecting
 3   DJ to a data person, which I know we already
 4   discussed.
 5        Q.    Okay.  And that actually happened, I
 6   believe.  I think you said that DJ was connected to
 7   a Facebook data person.
 8        A.    There was definitely a loop made over
 9   e-mail.  I don't know whether or not they
10   connected.
11        Q.    Okay.  How did this call end?  You
12   know, what were the last things that were said in
13   the call?
14        A.    I -- I -- I mean, it was obviously
15   some sort of good-bye salutations of, you know,
16   thank you and let's -- I think -- I do recall that,
17   yeah, I think Nick talked about wanting to -- to
18   get together again, but it was a -- I think it was
19   a cordial ending of the call.
20        Q.    Did he indicate that -- and were
21   people -- did people leave with like proposed
22   action items or, you know, tasks?
23        A.    Not to my recollection.
24        Q.    Was there a follow-up call?  You
25   mentioned Nick wanting to get together again.  Was
```

**ERIC WALDO  12/22/2022**

Page 113

```
 1    there a follow-up call between anyone in the
 2    Surgeon General's office and Mr. Clegg?
 3         A.    Not to my recollection.  I think he
 4    asked for another call, but I don't think that we
 5    ended up doing one.  I think the determination was
 6    made that we didn't think it would be a good use of
 7    Dr. Murthy's time.
 8         Q.    Okay.  Why not?  Did not expect
 9    cooperation from Facebook?
10         A.    No.  I think that we just didn't
11    think that they -- we thought that it was just more
12    of a PR stunt for them to meet with us to sort of
13    keep Dr. Murthy from saying other -- you know, any
14    other things that might be viewed as bad for their
15    business.
16         Q.    Gotcha.  So you didn't think they
17    were doing enough of real changes to address the
18    concerns in the health advisory?
19         A.    No.  I think we just didn't think
20    that it would be a fruitful use of our time.  I
21    think there were two things.  Number one is I think
22    there was the recognition -- I'm trying to slow
23    down for our court reporter.
24               Number one, I think there was a
25    recognition that we didn't think that there was
```

**ERIC WALDO  12/22/2022**

```
 1    much change that they were going to make in
 2    response to the -- the -- the advisory, however
 3    much they were going to do.  And number -- and we
 4    didn't think they were going to be transparent with
 5    us about that.
 6                And then number two is I think we had
 7    done the work that we intended vis-a-vis the
 8    advisory, which is the Surgeon General's role, to
 9    raise up the issue, bring attention to it, and then
10    -- and then we wanted to move on to other
11    priorities and that, you know, our part of the
12    relay race was over.
13                We had -- we had raised up the
14    flagpole that this is an issue of public importance
15    and that hopefully researchers, nonprofits,
16    citizens, whomever, relative stakeholders would
17    take actions.  But we weren't -- we're not a
18    regulatory agency.  We don't have oversight
19    authority, et cetera.
20                So it wasn't our job then to sort of
21    show up with a clipboard, but rather we were trying
22    to encourage the field to move forward and give
23    permission structure where others might recognize
24    that this is important and want to study it more,
25    want to do more work in this area.  But the --
```

**ERIC WALDO  12/22/2022**

**Page 115**

```
1   Dr. Murthy wanted to focus on other core issues,
2   and we made a deliberate decision at -- I believe
3   in August as a senior team that we didn't think
4   that misinformation was going to be one of our
5   priority areas going into the rest of the year.
6           Q.    So you made a powerful statement on
7   misinformation in July, but you decided that the
8   rest of the year you'd focus on other issues?
9           A.    I think we decided that we would
10  still talk about it from a -- from a press or
11  communications perspective, but that from a
12  staffing perspective of where we would be spending,
13  you know, it takes a lot of energy and work to do
14  some of the pieces that we would be working on
15  developing our additional advisories and not -- not
16  doing -- you know, from a budget perspective of
17  time, we didn't want the health misinformation work
18  to take up more than 10 percent of our time.
19          Q.    Gotcha.  Do you -- do you know why
20  there was such a focus on Facebook in this July
21  time frame as opposed to other social media
22  platforms like Twitter and YouTube?
23          A.    I think it was in some ways just
24  random luck or bad luck, depending on your
25  perspective.  I think that because it was raised at
```

**ERIC WALDO  12/22/2022**

Page 116

```
 1    the press conference, it got additional attention.
 2                    And so I think when you add the press
 3    conference remarks plus President Biden's remarks,
 4    it made it seem as though there were -- there was
 5    more attention on Facebook.  But certainly that's
 6    not what the advisory -- the advisory didn't call
 7    out individual organizations.  We certainly hadn't
 8    had a plan beforehand to -- to call out Facebook
 9    specifically.
10            Q.    Was there a sense in the Office of
11    Surgeon General that the problem of misinformation
12    was particularly acute on Facebook as compared to
13    other platforms?
14            A.    I don't think so.  I think there was
15    a view among the subject matter experts that it was
16    a problem across multiple platforms.
17            Q.    So they -- the subject matter experts
18    are people like Kyla and DJ Patil?
19            A.    And Daniel as well.  But I think
20    certainly in my conversations with Kyla, I don't
21    think -- we hadn't done a ranking of who were the
22    worst social media companies in terms of
23    misinformation.  There was a view that all -- you
24    know, different -- different companies, you know,
25    certainly had different strengths and weaknesses.
```

**ERIC WALDO  12/22/2022**

Page 117

1   And all of them had -- you know, had an opportunity

2   to improve how they were handling this issue.  And

3   our job was to raise this as an issue so folks

4   could know about it and hopefully take steps to --

5   to ameliorate the situation.

6       **Q.    Yeah.  And that -- those taking steps**

7   **to ameliorate would include social media platforms,**

8   **correct?**

9       A.    Correct.  But I would again

10  highlight, you know, when you think about our --

11  the advisory but also the work we were doing, the

12  -- the community toolkit, we recognize that we did

13  call for an all-society approach, and we recognize

14  that there are multiple ways to stop or lessen the

15  spread or damage of misinformation, including

16  individuals and others.  You know, it's -- it's not

17  just -- it wasn't just a technology company issue

18  or a social media issue.

19      **Q.    Are you aware who devised that phrase**

20  **all-of-society approach to describe the advisory --**

21  **or the advisory --**

22      A.    I'm not --

23      **Q.    -- recommendations?**

24      A.    I'm not aware.

25      **Q.    Scrolling down in Exhibit 3, the next**

**ERIC WALDO  12/22/2022**

Page 118

```
 1    bullet point talks about meeting on July 30th, 2021
 2    between yourself and representatives of
 3    Google/YouTube, correct?
 4          A.    That is correct.
 5          Q.    And the interrogatory responses
 6    supplied as topics discussed included in
 7    YouTube/Google, following up on the announcement of
 8    the OSG advisory to share and work the work it was
 9    doing around health mis- and disinformation,
10    correct?
11          A.    That's correct.
12          Q.    What do you remember being said about
13    that in this phone call or Zoom call?
14          A.    It was a Zoom call.  I think it was
15    really just the YouTube and Google teams saying,
16    hey, we agree that this is a really important
17    issue, and here's all the things that -- that we
18    are working on about it.  So it was -- it was them
19    informing us of the steps they are currently
20    taking.
21          Q.    And I believe you said part of the
22    follow-up call with Facebook was to ask them to,
23    you know, give a report on any steps they would be
24    taking in response to the health advisory, correct?
25          A.    Correct.
```

**ERIC WALDO  12/22/2022**

```
 1          Q.     And is that what's going on here with
 2    -- with YouTube as well, to ask them, okay, we've
 3    issued a health advisory.  What are you guys doing
 4    about it?
 5          A.     I think they -- they asked for the
 6    call.  So this was a little different.  They asked
 7    for the call on their own to share with us what
 8    they were doing.  I think they -- from a government
 9    affairs perspective, public affairs people were
10    trying to say, hey, look, you know, we agree with
11    you, and we want to let you know all the things
12    we're doing.
13          Q.     Did the report --
14          A.     And, again, I think --
15          Q.     Go ahead.
16          A.     And I would think, right, we had
17    first had that first call to let them know the
18    report was coming out.  The report came out.  They
19    looked at it, and then they said, hey, we've looked
20    at it.  Let us tell you, you know, what we're
21    doing.
22          Q.     And in the first call you had
23    mentioned, I think, that you advised them that
24    there would be some potential recommendations for
25    them, right?
```

**ERIC WALDO  12/22/2022**

Page 120

```
 1         A.    That there were recommendations for
 2  -- I think they -- certainly within the advisory
 3  there are recommendations for what social media
 4  companies can do.
 5         Q.    And then in the follow-up call, they
 6  came back to you and said, okay, we've read the
 7  advisory and here are steps that we are taking or
 8  plan to take in response to the issues raised in
 9  the advisory?
10         A.    I don't recall specifically, but that
11  was -- the general tone was let us tell you what
12  we're doing about this issue.  I didn't -- I didn't
13  get the impression that it was new things.  I got
14  the impression that it was work that they were
15  already doing.
16         Q.    What did they report to you?
17         A.    I don't really remember, but I think
18  it was generally saying, hey, we have a -- you
19  know, we have a team that does -- that works on
20  this issue.  Like we're -- you know, it's important
21  to us.  Like we're thinking about how we're
22  addressing it.
23               Just it was, I think, more of a
24  process call of saying, you know, we want you to
25  know this is on our agenda.
```

**ERIC WALDO  12/22/2022**

Page 121

```
 1            Q.    So did they, for example, report that
 2     they had adopted new policies to address
 3     misinformation on YouTube?
 4            A.    I don't recall.
 5            Q.    Or did they give indication they were
 6     taking more steps to kind of remove more harmful
 7     information on YouTube?
 8            A.    I don't recall if there was a new.  I
 9     recall them telling us what they were currently
10     doing to address that.  So I -- and some of these
11     calls I experienced as them -- you know, they read
12     the advisory and said, yeah, we are doing that.
13     Thanks.  You may not know all the things we're
14     doing, so let us share with you what we're doing.
15            Q.    And you don't -- you don't remember
16     whether they, you know, advised you of kind of new
17     policies, like, hey, you raised an issue for us,
18     and -- and here's are some things we're going to do
19     to respond to it?
20            A.    I don't recall.  I think I would
21     remember because if it was the something new, I
22     feel like we would have shared it or probably done
23     something like put it in a fact sheet to say, look,
24     because of this report, these many new things are
25     happening.
```

**ERIC WALDO  12/22/2022**

Page 122

1          Q.     Did you do that for any of them?  Did
2     you issue any fact sheets saying, you know, here
3     are some positive developments that came out of the
4     health advisory?
5          A.     I don't remember.  I don't think so.
6     The only time that could have happened would have
7     been when we did the -- that -- what I keep calling
8     the community toolkit, but I don't recall -- I do
9     remember Twitter tweeted something in support of
10    Dr. Murthy's advisory.
11              So when we launched on whatever, the
12    15th or 16th, the Twitter policy handle I think
13    either retweeted or quote tweeted and said
14    something like, we agree.  This does call -- we do
15    need an all-society approach, and here's what we're
16    doing.  So that's my one recollection.
17         Q.     And we talked earlier about how there
18    was a particular focus on Facebook on July 15th and
19    16th, and you mentioned that, I think, Jennifer
20    Psaki mentioned Facebook specifically in the press
21    conference and President Biden said "They're
22    killing people," the next day.
23              Do you know why the White House
24    thought a particular focus on Facebook was
25    appropriate?

**ERIC WALDO  12/22/2022**

Page 123

```
 1          A.    I do not.
 2          Q.    Do you know if they thought
 3     misinformation was a bigger problem on Facebook
 4     than on other social media platforms?
 5          A.    I don't know.
 6          Q.    Do you know if they were having
 7     private communications with social media platforms
 8     other than Facebook, raising kind of similarly
 9     sharply phrased concerns?
10          A.    I don't know.
11          Q.    Do you remember anything else that
12     was discussed in this July 30th meeting with
13     YouTube and yourself that was the follow-up meeting
14     for the health advisory?
15          A.    I do not.
16          Q.    Did you say anything in that meeting?
17          A.    I mean, I would have -- you know, it
18     would have been a general, like hello, thank you,
19     you know, greeting and just sort of trying to --
20     probably was just in listening mode, and -- I don't
21     recall specifically.
22          Q.    Do you remember, you know, expressing
23     approval or concern about the action items that
24     they reported they were doing to address
25     misinformation?
```

**ERIC WALDO  12/22/2022**

Page 124

```
 1            A.    I don't recall.
 2            Q.    Scrolling down the bullet point,
 3    there's a reference to an August 10 call between
 4    yourself and Rob Flaherty in the White House and
 5    people from Facebook that discussed, quote, an
 6    operation Facebook uncovered that is related to
 7    vaccine misinformation, correct?
 8            A.    That's correct.
 9            Q.    Do you -- I think I asked you -- I
10    think we talked about this a little bit before.  Do
11    you remember what that was about?
12            A.    I believe we -- we did discuss that
13    already.  I think I mentioned that Brian Rice had
14    requested a call with me and Rob and, during the
15    call, flagged that Facebook had done some sort of
16    -- had done some sort of internal operation where
17    they discovered -- I don't know if it was bots or
18    something.  I actually don't remember.  But that
19    they had done something where they discovered some
20    misinformation pieces happening and had taken some
21    corrective action.
22            Q.    Do you know why -- first of all,
23    who's Brian Rice?
24            A.    Brian Rice is an employee at
25    Facebook.  I don't know his exact title, but he's
```

**ERIC WALDO  12/22/2022**

Page 125

1   something like a government affairs, public policy

2   type person.  He was, I think, the main sort of

3   like staff level liaison.

4        **Q.    So he's -- he's like their government**

5   **affairs person in, you know, Washington, DC?**

6        A.    I don't know what his direct title

7   is, but functionally, he was our contact and

8   operated in a way that I would consider a

9   government affairs person to operate.

10        **Q.    How did you get connected with him**

11   **originally?**

12        A.    I don't recall.  I think he -- he

13   might -- no.  Payton must have looped him in that

14   -- one of those calls, or maybe -- maybe Nick did.

15   Actually, that's not true.

16             Nick -- I think Brian was on the

17   e-mail with Nick, and I think -- so I got the

18   contacts from that contact sheet, but I don't -- I

19   think I may have also worked with Brian before.  I

20   don't really remember.

21        **Q.    Okay.  Did they ask for this call --**

22   **Facebook ask for that August 10th call?**

23        A.    That -- that's correct.

24        **Q.    Do you know why they asked for you**

25   **and Rob Flaherty?**

**ERIC WALDO  12/22/2022**

Page 126

```
1          A.     I do not know.
2          Q.     In other words, have you and Rob
3    Flaherty worked, you know, together on
4    misinformation issues?
5          A.     No.  Not on -- I think I mentioned --
6    we talked about the -- the one call I had with Rob,
7    but Rob and I had not worked on this issue other
8    than that.
9          Q.     So you don't know why Facebook was
10   looping in you and -- and Flaherty on this?
11         A.     I think that they had been e-mailing
12   Rob a list -- like a COVID report list that had,
13   you know, some sort of report from Facebook on a
14   biweekly basis.  I hadn't been a part of that
15   e-mail, and then I was added to it after my calls
16   with Nick and Dr. Murthy.  And so I think Brian was
17   just looping us both, thinking that we were POCs in
18   our respective organizations.
19         Q.     And your organizations would be the
20   White House and the Surgeon General's office?
21         A.     Correct.
22         Q.     And he had the perspective that you
23   were the two POCs to deal with vaccine
24   misinformation for those two agencies?
25                MS. CHUZI:  Objection.  Calls for
```

**ERIC WALDO  12/22/2022**

Page 127

```
 1   speculation.
 2               THE WITNESS:  I think on the -- on
 3   the COVID -- the COVID report was something that
 4   looked like Brian sent to a lot of people, so --
 5   and a lot of people at the White House and
 6   elsewhere.  So I don't know -- I don't know why he
 7   selected Rob and me, but he did select us.
 8         Q.    (BY MR. SAUER)  Why were they sending
 9   -- sorry.  Go ahead.
10         A.    No.  You go ahead, sir.
11         Q.    Why did they -- why -- why was he
12   sending a COVID report to people at the White House
13   and elsewhere?
14         A.    I don't know.
15         Q.    Okay.  You don't know how that got
16   started?
17         A.    That's correct.
18         Q.    What did Facebook -- or what did
19   Brian Rice say -- actually, it says personnel from
20   Facebook.  What did the personnel from Facebook say
21   in this meeting?
22         A.    Again, I think -- I think I've
23   already answered this question, sir, but basically,
24   it was the heads-up that they were going to do an
25   announcement the next day about some -- some sort
```

**ERIC WALDO  12/22/2022**

Page 128

1   of -- something they discovered.  I think it ended

2   up being like a foreign entity was doing work on

3   Facebook, spreading -- I don't know if it -- what

4   type of misinformation, but they were letting us

5   know that they discovered it.

6           Q.    **Do you know why they thought to brief**

7   **you guys on that?**

8           A.    I do not --

9                 MS. CHUZI:  Objection.  Calls for

10   speculation.

11                THE WITNESS:  I don't know why.

12          Q.    **(BY MR. SAUER)  Scrolling down**

13   **another bullet point, there's a reference to a**

14   **September 14th meeting between yourself and Kevin**

15   **Kane and Jan Antonaros at Google/YouTube, correct?**

16          A.    That is what the document says,

17   correct.

18          Q.    **Yeah.  And do you recall that meeting**

19   **or phone call?**

20          A.    Not really.  That's actually a few

21   days before my first child was born, so I don't --

22   I -- I vaguely remember this.

23          Q.    **You had other matters on your mind at**

24   **that time?**

25          A.    I -- I did.

**ERIC WALDO  12/22/2022**

Page 129

```
 1              Q.    It -- it -- it -- it says the purpose
 2    was a brief meeting to discuss a new policy we are
 3    working on as well as provide and update on our
 4    overall efforts to combat harmful COVID-19
 5    misinformation on the platform, right?
 6              A.    That's what it says, yes.
 7              Q.    So this would have been, I take it, a
 8    kind of second update by them to you following the
 9    health advisory of stuff they're doing to combat
10    harmful COVID-19 misinformation through YouTube,
11    correct?
12              A.    That's correct.
13              Q.    So first, they provided that update,
14    I think, on the July 30th meeting that we talked
15    about above, correct?
16              A.    Yes.
17              Q.    And then they --
18              A.    Correct.
19              Q.    Sorry.  And they followed up again on
20    September 14th of another update of, you know, kind
21    of telling the Surgeon General's office what they
22    were doing to fight misinformation?
23              A.    That's correct.
24              Q.    Do you know what it was -- it says
25    they gave some kind of update on overall efforts to
```

**ERIC WALDO  12/22/2022**

Page 130

```
 1    combat harmful COVID-19 misinformation on the
 2    platform.  Do you know what those efforts were?
 3           A.    I don't recall.
 4           Q.    Do you remember anything specific
 5    about what YouTube and Google were doing in this
 6    time frame to kind of remove or -- or reduce the
 7    spread of misinformation?
 8           A.    I don't recall.
 9           Q.    It also says that they were -- the
10    meeting was to discuss a new policy we were working
11    on.  Do you remember that?
12           A.    I do not.
13           Q.    Do you know what new -- was that a
14    new policy that related to misinformation?
15           A.    I'm not sure.
16           Q.    Or a new policy related to something
17    unrelated?
18           A.    I don't recall.
19           Q.    You remember YouTube and Google
20    raising anything that was unrelated to the health
21    advisory about this information and these two
22    calls?
23           A.    I don't recall.
24           Q.    So you don't know whether other
25    topics came up or if they were just focused on
```

**ERIC WALDO  12/22/2022**

Page 131

```
 1    health misinformation following the advisory?
 2            A.    I'm not certain.  I don't recall.
 3            Q.    Do you remember anything specific
 4    that was said in this call on September 14th?
 5            A.    I do not.
 6            Q.    Did you say anything?
 7            A.    I mean, I would have, in general,
 8    been -- tried to greet them, asked them how they
 9    were doing, and certainly asked them, you know, be
10    -- expressed some sort of feeling of, you know,
11    interest in what they wanted to share.
12            Q.    Okay.  But do you remember saying
13    anything in response to what they did share about a
14    new policy and update on overall efforts to combat
15    harmful misinformation?
16            A.    I do not.
17            Q.    Going down a little further, last
18    bullet point here refers to a meeting on
19    November 22nd, 2021.  It mentions that personnel
20    from OSG were involved in this meeting.  Do you
21    remember -- were you involved in this meeting?  Do
22    you know?
23            A.    I don't think so.  I do not believe
24    so.  If I was on it -- if I was in the meeting, I
25    would have identified it.
```

**ERIC WALDO  12/22/2022**

Page 132

```
 1              Q.    Who's Tericka Lambert?
 2              A.    I think Tericka -- she's an HSS
 3      employee.  She is not an OSG employee.  I think she
 4      was the digital person helping maybe Kristina
 5      Schake's team doing some of the COVID-19 vaccine
 6      campaign work.  I know -- what I -- what I know,
 7      for instance, is that she would help us set up --
 8      she would help us set up basically like virtual
 9      town halls for when we were doing -- you know,
10      doing outreach about our -- our vaccine outreach
11      work, especially for like -- we had like a Listserv
12      of coalition of medical organizations and -- and --
13      and doctors who were -- who were helping on -- on
14      -- on vaccine rollout.
15              Q.    What does ASPA stand for, A-S-P-A?
16              A.    What a great question.  I'm not --
17      there's so many acronyms in the federal government,
18      and I try to forget as many of them as possible.
19      I'm not certain, sir.
20              Q.    Is that an HHS component?  Do you --
21              A.    It is.
22              Q.    And it mentions others ASPA
23      personnel.  Do you know who they were?
24              A.    I was not at this meeting, sir, so I
25      do not know.
```

**ERIC WALDO  12/22/2022**

Page 133

1    Q.    How about -- what's the Fors Marsh

2    group, F-O-R-S, space, Marsh?

3    A.    I'm trying to remember.  Maybe I'm --

4    there was -- maybe there was a briefing where they

5    had an external group who I had some contract with

6    them that was doing some sort of external research.

7    I don't -- I honestly don't recall.  I think they

8    -- Fors Marsh.  I don't -- I don't know, sir.  I'm

9    trying to rack my brain here.

10    Q.    Okay.  And you said you weren't in

11    this meeting.  The interrogatory response says that

12    it touched on misinformation.  Do you know how the

13    meeting touched on misinformation?

14    A.    I don't.

15    Q.    Are you aware of any -- we've gone

16    through, I think, nine bullet points here of

17    meetings.  Are you aware of any other meetings

18    between anyone in the Office of Surgeon General and

19    anyone from the social media platform that's not

20    listed here in the interrogatory response?

21    A.    I think the only thing -- I think the

22    only other possible meetings with -- with

23    technology companies would have been about not

24    misinformation per se, but from press team

25    potentially, if Dr. Murthy, for instance, was going

**ERIC WALDO  12/22/2022**

Page 134

```
1    to do a Twitter town hall or, you know, do a

2    conversation with the CEO of SNAP on -- about

3    mental health, like we would have -- our press team

4    would have communicated with a technology company

5    about a potential use of the platform for a press

6    or communication engagement.

7         Q.    Other than those kind of press and

8    communications engagements in the meetings listed

9    here, are you aware of any other contacts between

10   anyone in the Surgeon General's office and social

11   media platforms?

12        A.    I'm not aware.

13        Q.    I'm going to close out of that

14   document, so it should have dropped off the screen.

15   And then I'm going to e-mail your counsel a few

16   more exhibits.

17              MR. SAUER:  Amanda, you should be

18   getting Exhibits 4 through 9 by e-mail momentarily.

19              MS. CHUZI:  I am refreshing my inbox.

20        Q.    (BY MR. SAUER)  And then, Mr. Waldo,

21   I pulled up Exhibit 4 on the screen.  Do you see

22   that?

23        A.    Yes.

24        Q.    Do you see this is an e-mail from

25   Nick Clegg at Facebook to Andy Slavitt and
```

Case 3:22-cv-01213-TAD-KDM   Document 210-1   Filed 03/04/23   Page 135 of 464 PageID #:
14697

**ERIC WALDO  12/22/2022**

Page 135

```
 1    Dr. Murthy, dated May 28, 2021, correct?
 2            A.    That's correct.
 3            Q.    So this would have been, I think,
 4    three days after the May 25th, 2021 phone call that
 5    was the first bullet point in the interrogatories
 6    that we looked at a moment ago in Exhibit 3,
 7    correct?
 8            A.    That's correct.
 9            Q.    And I take it this would have been
10    before you started with the Surgeon General's
11    office, right?
12            A.    That's correct.  I was not at the
13    office at this time.
14            Q.    Okay.  And he has an attachment to
15    this e-mail called 5/28 COVID-19 insights.pdf.
16    Correct?
17            A.    That is what is listed as the
18    attachment, correct.
19            Q.    Is that the COVID report that you
20    were talking about earlier that you -- I think you
21    said Facebook would send to people at the White
22    House and others?
23            A.    I believe so.  I -- that's my -- my
24    best guess, sir.
25            Q.    Okay.  And in the e-mail he says,
```

**ERIC WALDO  12/22/2022**

Page 136

1    thanks for -- again for the time the other day,

2    right?

3         A.    That's what he says, yes.

4         Q.    Yea.  So is that possibly a reference

5    back to the May 25th meeting that's in the

6    interrogatory?

7         A.    That's possible, yes.

8         Q.    Could there have been another meeting

9    between Nick Clegg and Andy Slavitt and Dr. Murthy?

10        A.    It's technically possible, but I find

11   it unlikely.

12        Q.    Okay.  He goes -- he goes on to say:

13   As promised, I'm sending our latest report that

14   includes top line performing posts for the weeks of

15   May 3rd and May 9th.  Do you see that?

16        A.    I do.

17        Q.    Yeah.  He says "as promised."  Do you

18   know if this was something that was promised by

19   Facebook in that May 25th meeting with Andy Slavitt

20   and Dr. Murthy?

21        A.    I don't know since I wasn't there.

22        Q.    Do you know why he's saying "as

23   promised" here?

24        A.    I do not.

25        Q.    Okay.  Who would know that, what was

**ERIC WALDO  12/22/2022**

Page 137

```
 1    promised or may have been promised in the May 25th
 2    meeting?
 3         A.    It seems like if Brian was at the
 4    meeting he would know.  Andy would know.
 5    Dr. Murthy would know.  Potentially, someone like
 6    Max Lesko or Adam Beckman would know, just as
 7    someone whom Dr. Murthy would have debriefed about
 8    any call like this.
 9         Q.    Would he, as a routine matter,
10    debrief Max Lesko about a call like this?
11         A.    I think at that point in the
12    administration, the team was so small that, yes.
13    It would be very unlikely that Max or -- or Adam
14    Beckman wouldn't know about what happened -- they
15    would have asked how the call went, and he would
16    have debriefed with them.  There were -- yes.
17    That's correct.
18         Q.    But to your knowledge, they weren't
19    on the call?
20         A.    I don't know whether or not they were
21    on the call.
22         Q.    Nick Clegg goes on to say:  I also
23    want to highlight a few policy updates we announced
24    yesterday regarding repeat misinformation, correct?
25         A.    That is what the document says,
```

**ERIC WALDO  12/22/2022**

Page 138

```
 1   correct.
 2           Q.    And so that would be, I take it,
 3   policy updates announced on May 27, two days after
 4   the May 25th call with Andy Slavitt and Dr. Murthy,
 5   right?
 6           A.    That is two days after the call,
 7   correct.
 8           Q.    And Nick Clegg reports back to
 9   Dr. Murthy and Andy Slavitt what he called a few
10   key points, right?
11           A.    That's correct.
12           Q.    And these include three things that
13   are adding more context about pages that repeatedly
14   share false claims, right?
15           A.    That is what the document says,
16   correct.
17           Q.    And expanding penalties for
18   individual Facebook accounts that share
19   misinformation, correct?
20           A.    That is what the sentence says,
21   correct.
22           Q.    And redesigning notifications when
23   Facebook accounts share content that a fact checker
24   later rates, right?
25           A.    That is what the sentence says,
```

**ERIC WALDO  12/22/2022**

Page 139

```
 1    correct.
 2           Q.    Do you know why Nick Clegg reported
 3    back to Andy Slavitt and Dr. Murthy about these
 4    three key points about addressing repeat
 5    misinformation on its platform?
 6           A.    I do not.
 7           Q.    Do you know whether that was
 8    something they discussed in the call?
 9           A.    I do not.
10           Q.    Let me put up Exhibit 5.  Can you see
11    that one?
12           A.    Yes, I can.  Thank you.
13           Q.    So here's an e-mail chain back and
14    forth between Nick Clegg to Dr. Murthy with the
15    biweekly COVID content report attached on June 12,
16    correct?
17           A.    That's correct.
18           Q.    He says:  I'm happy to jump on a call
19    at any point, as is my team, to delve into any
20    details further as needed.  Do you know if any such
21    call ever happened?  Did people at OSG ever jump on
22    a call with Facebook to talk about these content
23    reports?
24           A.    Not to my knowledge.
25           Q.    Did you ever read these COVID content
```

**ERIC WALDO  12/22/2022**

Page 140

```
 1   reports?

 2        A.    I would give them that cursory glance

 3   on occasion?

 4        Q.    What do they -- what kind of

 5   information was in them?

 6        A.    I think at the highest level it was

 7   about who were the most -- the most engaged tweets,

 8   the most viewed -- or sorry, not tweets, the most

 9   engaged posts, I think, with respect to both

10   accurate and inaccurate information.

11        Q.    So it was a report that said, here's

12   the post that had the most engagements with respect

13   to, you know, kind of accurate COVID information?

14        A.    I'm not -- I honestly don't remember

15   it was the most -- I think it was the most engaged

16   or the most viewed posts, and so you could see some

17   of them were about -- had positive information.

18   Some had negative.  But I actually didn't spend a

19   lot of time looking at these reports.  I only got

20   added to them late.

21        Q.    Who -- who -- who was reviewing those

22   reports on the federal government side?

23        A.    I'm not -- I don't have an exhaustive

24   list.  I know that Rob received these reports.

25        Q.    Anybody else besides him?
```

**ERIC WALDO  12/22/2022**

Page 141

```
 1          A.    I don't recall off the top of my
 2     head.
 3          Q.    How about Adam Beckman?  You see he's
 4     mentioned up here.  You've mentioned him several
 5     times already.  Was he getting these reports?
 6          A.    I don't -- I'm not sure.  I'm not
 7     sure.  I don't think so.
 8          Q.    What was the point of getting these
 9     reports from Facebook?  What is the point to allow
10     federal officials to track, you know, how much
11     misinformation is being reached or engaged with on
12     Facebook?
13          A.    I'm not sure.
14          Q.    Do you know if the federal officials
15     did -- did anything with these reports?
16          A.    Not to my knowledge.
17          Q.    Okay.  And I take it the report would
18     have the information.  It says:  Here's our top
19     highest engagement Facebook post relating to COVID,
20     and it would describe them so you could assess
21     whether or not they contained misinformation or
22     disinformation?
23          A.    I honestly don't recall.  I think it
24     was a list of the -- again, the highest posts.  So
25     yes.  You could see, yes, that these were -- this
```

**ERIC WALDO  12/22/2022**

Page 142

1   -- that the highest posts was -- was uplaid with

2   misinformation.  You could probably make that --

3   that determination place.

4        **Q.    Are you aware of these reports being**

5   **sent before the May 25th meeting, or did they start**

6   **after that May 25th meeting between Dr. Murthy Nick**

7   **Clegg, and Andy Slavitt?**

8        A.    I don't know based on just a plain

9   reading.  It seemed like it's a biweekly report.

10   It seemed like it had preexisted the -- the -- it

11   predates the meeting.

12        **Q.    Were they sent every two weeks kind**

13   **of from then on?**

14        A.    I don't know.  I didn't start

15   receiving these until after -- after my meeting

16   with -- with Nick and Brian, and then I believe

17   they kept going, and at some point Brian asked

18   whether or not they should stop sending them.  And

19   I think it was right before child -- under 5

20   vaccines was rolled out.  So I think we ended up

21   keeping them, but I don't know that anyone was

22   really looking at them anymore.

23        **Q.    It does say here in Dr. Murthy's**

24   **response, "I'll look forward to reviewing it."  Do**

25   **you know if Dr. Murthy reviewed it?**

**ERIC WALDO  12/22/2022**

Page 143

```
 1           A.     I do not.

 2           Q.     Do you remember him discussing those

 3   COVID content reports from Facebook in any

 4   connection?

 5           A.     I do not.  I'm not sure he ever

 6   received it again after this.

 7           Q.     Do you know why Adam Beckman is on

 8   this e-mail chain?  It looks like he was probably

 9   added as a CC by Dr. Murthy potentially.

10           A.     Well, it looks like the e-mail is

11   from Nick.  So I don't think -- so it wouldn't have

12   been -- oh, sorry.  It's from Dr. Murthy.  Thank

13   you, sir.  From Dr. Murthy, yeah.

14               I think Adam -- in the early days,

15   Adam was sort of our main COVID policy person, and

16   he was the acting policy director, but he was sort

17   of -- in my parlance of Washington, I would call

18   Adam like a functional deputy chief of staff.  He

19   sort of did a little bit of everything.  And so he

20   was certainly someone Dr. Murthy relied on for

21   analysis with respect to COVID and other things.

22   So it was probably making sure Adam was in the

23   know.

24           Q.     Do you know if Adam reviewed these

25   reports?
```

**ERIC WALDO  12/22/2022**

Page 144

```
 1          A.    I do not know if he did.
 2          Q.    Let me share with you Exhibit 6.
 3    Here's an e-mail chain involving you and Lauren
 4    Culbertson of Twitter and Todd O'Boyle of Twitter,
 5    correct?
 6          A.    That's correct.
 7          Q.    And you copied Kyla Fullenwider on
 8    the e-mail?
 9          A.    That's correct.
10          Q.    And she's at US Digital Response.  I
11    think I asked you this earlier.  Do you have an
12    understanding of what US Digital response actually
13    is?
14                THE REPORTER:  What US Digital
15    response what?  I'm sorry.
16          Q.    (BY MR. SAUER)  Actually is.
17          A.    I think you asked me this question
18    before, sir.  I'm not positive, and I think it's a
19    quasi-governmental organization that helps -- that
20    helps federal agencies improve their -- their --
21    their digital data-type work.
22          Q.    Gotcha.  And do you recall what the
23    purpose of this e-mail chain is here on July --
24          A.    Sorry.  Can I -- I now have the
25    document in front of me, sir.  Can you give me a
```

**ERIC WALDO  12/22/2022**

Page 145

```
 1   moment to -- to review, please?
 2          Q.      Please do.
 3          A.      Oh, yeah.  This is just to set up the
 4   -- we -- we -- this is to set up that outreach call
 5   that we talked about previously, sir.  So that
 6   first e-mail comes on the 6th where I'm -- I'm
 7   giving him a heads-up.  So then we're -- this is
 8   just set up the -- that precall to give them the
 9   soft rollout of the advisory.
10          Q.      Gotcha.  And I think that call --
11   that call ended up happening on July 10th or 12th,
12   is that right, to your recollection?
13          A.      That -- that sounds correct, sir,
14   whatever we discussed previously.
15          Q.      And the second page of your initial
16   e-mail to them:  Hi, Lauren and Todd, you introduce
17   yourself, and you say:  As you know, one of the
18   issues Dr. Murthy has been thinking about is how to
19   help stop the spread of health misinformation as we
20   continue to tackle COVID-19 and beyond.  Correct?
21          A.      That is what the document says,
22   correct.
23          Q.      And you wrote that, right, to them,
24   that you wanted to connect with them about how you
25   stop the spread of health misinformation, correct?
```

**ERIC WALDO  12/22/2022**

Page 146

```
 1          A.     That's -- that's correct.
 2          Q.     Yeah.
 3          A.     And I -- I wrote to them saying that
 4   Dr. Murthy has been thinking about how to stop the
 5   spread, yes.
 6          Q.     And that's what you wanted to connect
 7   with them about, correct?
 8          A.     Correct.  This was the rollout call,
 9   so we were giving them a heads-up about the
10   advisory.
11          Q.     Yeah.  It says:  I know you and your
12   teams are working hard and thinking deeply about
13   this issue.  We'd love to chat over Zoom to connect
14   and discuss what's on the horizon for our teams.
15   Correct?
16          A.     That is what I wrote, correct.
17          Q.     Yeah.  And so what's -- what was on
18   the horizon for your team at that time?  Are you
19   referring to the health advisory?
20          A.     Yeah.  So again, this is the -- this
21   is trying to meet with them to give them a heads-up
22   about the advisory.
23          Q.     Was there anything else on the
24   horizon for this general's -- I'm sorry the Surgeon
25   General's team at that time?
```

**ERIC WALDO  12/22/2022**

1          A.    I think we were -- we knew that we

2     were going to eventually tackle issues like youth

3     mental health, you know, health worker mental --

4     mental health, and social isolation and loneliness.

5     So I already had those high level themes that I

6     knew Dr. Murthy wanted to work on.

7               So as a -- sort of first intro to

8     potential partner or impacted partner by our work,

9     I might have given them a general, like, hey, these

10    are some of the other things that we'll likely be

11    tackling as an office in the years to come.

12         Q.    You say:  I know you and your teams

13    -- I guess that's the Twitter teams -- are working

14    hard and thinking -- thinking deeply about this

15    issue -- being how to help stop the spread of

16    health misinformation, correct?

17         A.    That is correct.

18         Q.    Yeah.  And then in this e-mail, you

19    go on to say you want to connect and discuss what's

20    on the horizon for our teams.  So that includes

21    what's on the horizon for the Twitter team,

22    correct?

23         A.    That's correct.

24         Q.    Did you ask them in that first call

25    what was on the horizon for their team when it came

**ERIC WALDO  12/22/2022**

```
 1    to helping stop the spread of health
 2    misinformation?
 3         A.    I think -- again, I think that we've
 4    already discussed that -- what occurred during that
 5    call, but it was the overall giving them a heads-up
 6    about the advisory.  Now with the recollection
 7    here, maybe I gave them a heads-up also about other
 8    things coming from our office for the year.  But
 9    that would have been the nature -- nature of what
10    we discussed.
11         Q.    Was there any inquiry by you about
12    what was on the horizon for their teams, or was it
13    just kind of a one-way communication, here's what
14    OSG plans to do?
15         A.    There may have been some polite
16    rapport.  I don't recall.
17         Q.    Did you ask them anything about
18    whether, you know, taking the steps to help stop
19    the spread of health misinformation was something
20    on their horizon?
21         A.    I don't think so, because, again, the
22    purpose of the call, which I know we've already
23    discussed, was about letting them know this is
24    coming out, letting them know how overall to take a
25    look at it and then, you know, we want them -- we'd
```

**ERIC WALDO  12/22/2022**

Page 149

```
 1   share with them and we could follow up without that
 2   and TBD.
 3              You know, maybe they didn't want to
 4   work on youth mental health.  Maybe they wanted to
 5   work on another issue that we could collaborate
 6   potentially on other things as well.
 7        Q.    I'm going to show you Exhibit 7.  Do
 8   you see this exhibit on the shared screen?
 9        A.    I do.  And I also have it in front of
10   me.
11        Q.    Yeah.  And is this -- briefly, is
12   this the -- I think you mentioned that you wanted
13   to have the introductory call with you and Kyla and
14   Facebook before the rollout, but it happened to be
15   -- end up being scheduled on Friday, the 16th,
16   right?
17        A.    Correct.  That's correct.
18        Q.    And was that -- was that by design?
19   Did you, you know, kind of want the Facebook
20   initial call to occur after the 15th and 16th when
21   the rollout happened, or was that a kind of vagary
22   of scheduling?
23        A.    That was a vagary of scheduling.
24   Have you -- yeah.  Because there was a trip to --
25   to New Mexico where I was staffing Dr. Murthy.  So
```

**ERIC WALDO  12/22/2022**

Page 150

```
1   it limited some of our travel windows, but I tried
2   to schedule all of the calls beforehand.  So I had
3   offered them the Monday slot, hoping that they
4   would take it, but it didn't work out.
5           Q.    Yeah.  Do you know -- so that Monday,
6   I take it, would have been like July 12th, and
7   Friday was the 16th, which ended up being after the
8   rollout, correct?
9           A.    You're accurately describing those
10  dates.
11          Q.    Yeah.  Gotcha.  Did you know at the
12  time that the rollout would involve a kind of
13  unique focus on Facebook?
14          A.    I did not.
15          Q.    So were you surprised, for example,
16  when Jen Psaki made comments that were kind of
17  specifically calling out Facebook at the July 15th
18  press conference?
19          A.    Yes.  I was surprised.
20          Q.    Do you know what her basis for those
21  comments was?
22          A.    I do not.
23          Q.    And obviously, did you know the
24  President was going to tell the media "They're
25  killing people" in response to a question about
```

**ERIC WALDO  12/22/2022**

Page 151

```
 1    Facebook?
 2           A.    I did not know that.
 3           Q.    Let me show you Exhibit 8.  Can you
 4    see that on the screen?
 5           A.    I can.  I also have it in front of
 6    me.
 7           Q.    And, again, is this the kind of
 8    e-mail chain where you and Kyla were connecting
 9    with people at Google, slash, YouTube for this
10    rollout call?
11           A.    Correct.
12           Q.    And I believe this is the one you
13    testified earlier ended up being scheduled on
14    July 14th, right, just the day before the rollout?
15           A.    That's -- that's correct.
16           Q.    Go to the third page of this
17    document.  You send basically the same initial
18    e-mail that you'd sent to Twitter in the prior
19    e-mail I showed you, right?
20           A.    And I also used the same e-mail to
21    Facebook.
22           Q.    Yeah.  Yeah.  You -- and, again, you
23    said that to them -- first of all, you refer to
24    Alexandra and Kevin.  Do you know how -- I take it
25    that's Kevin Kane and Alexandra Veitch.  Is that
```

**ERIC WALDO  12/22/2022**

Page 152

```
 1   right?
 2         A.    That's what the last name appears to
 3   be online, yes.
 4         Q.    Do you know how you got the contact
 5   for those people, how you got their contact
 6   information?
 7         A.    I think you asked me this before,
 8   sir, but that was the -- we had a spreadsheet for
 9   the rollout that was cross-populated.  And so I
10   think I would have gotten it from -- from those
11   folks.  It's also possible -- I did know of former
12   a former -- former colleague of mine worked at
13   Google.  If I didn't have it from the spreadsheet
14   which had suggestion of partners to reach out to, I
15   might have asked someone for the government affairs
16   person at Google and YouTube.
17         Q.    Who prepared that spreadsheet?
18         A.    I think it was a -- it was a cross --
19   it was a shared document.  I think -- I think
20   Daniel might have had the first pen at it since he
21   was originally running the rollout for -- for the
22   advisory.
23         Q.    Do you know if that document still
24   exists in electronic form?
25         A.    I don't.  It -- it's a share point.
```

**ERIC WALDO  12/22/2022**

Page 153

```
 1    I don't have any reason to believe it wouldn't
 2    exist.
 3            Q.    Is that on Google drive or what kind
 4    of share point is used?
 5            A.    It's whatever the government has
 6    approved, but it's a -- it's a SharePoint on --
 7    it's a -- it's a government-approved SharePoint.
 8            Q.    Here, you --
 9            A.    I think it's a Microsoft type
10    document.  I think we used Teams in SharePoint.
11    Certainly not a Google document.
12            Q.    Here, you say again that Dr. Murthy's
13    been thinking about how to help stop the spread of
14    health misinformation, and you'd love to connect
15    and discuss what's on the horizon for our teams.
16                  In the meeting that you had with
17    these Google representatives, did you discuss what
18    was on the horizon for their teams when it comes to
19    this the spread of health misinformation?
20            A.    I don't recall.
21            Q.    So you --
22            A.    I think, again, just -- just -- just
23    like the last one, this was -- we had Kyla on the
24    call and giving them a high-level update that we're
25    going to have this advisory come out and that we
```

**ERIC WALDO  12/22/2022**

Page 154

```
 1    want them to take a look at it.
 2           Q.    Do you remember you, yourself, asking
 3    them for any kind of input on what they might do in
 4    this area?
 5           A.    I don't recall.
 6           Q.    Do you remember them saying anything
 7    about that, whether or not you asked?  Oh, here's
 8    what, you know, you and Google may be doing in the
 9    space of stopping the spread of health
10    misinformation?
11           A.    I don't recall.
12           Q.    Let me show you Exhibit 9.  Here's
13    another e-mail from Nick Clegg to Dr. Murthy and
14    Andy Slavitt, copying Brian Rice, correct?
15           A.    That's correct.
16           Q.    And he's sending another one of these
17    COVID insight reports, correct?
18           A.    That's correct.
19           Q.    He highlights a couple of
20    vaccine-related efforts in that e-mail to them,
21    right?
22           A.    That's correct.
23           Q.    Do you know whether Andy Slavitt or
24    Dr. Murthy asked Facebook to send them information
25    or updates about what kind of information Facebook
```

**ERIC WALDO  12/22/2022**

Page 155

```
 1   was spreading about vaccines in particular?
 2           A.    I don't know.
 3           Q.    And in the e-mail above, another
 4   e-mail from Nick Clegg to Dr. Murthy and Andy
 5   Slavitt, he gives yet another COVID report and he
 6   says that I understand that -- per Brian that my
 7   team is meeting with yours next week to delve
 8   deeper into our COVID misinformation efforts,
 9   correct?
10           A.    That's what the document says,
11   correct.
12           Q.    Do you know what meeting that is
13   between the Facebook and -- and Surgeon General's
14   teams was?
15           A.    Yeah.  I think -- I think he's
16   referring to the meeting on the 16th that we're
17   going to have the rollout meeting that got pushed
18   to the Friday after the rollout.
19           Q.    And so he's sending this e-mail on
20   July 10th?
21           A.    Right.  And the --
22           Q.    Go ahead.
23           A.    And the rollout call with them was on
24   the 16th, I believe.
25           Q.    So you think that -- are you aware of
```

**ERIC WALDO  12/22/2022**

Page 156

```
 1   any other meeting between, you know, Facebook's
 2   team and Dr. Murthy's team in that week?
 3         A.    I'm not familiar with any other
 4   meeting.
 5         Q.    Okay.  And it talks about how
 6   Facebook's understanding of that meeting is that it
 7   was going to delve deeper into our COVID
 8   misinformation efforts, correct?
 9         A.    That is what the document says,
10   correct.
11         Q.    So that was Mr. Clegg's understanding
12   of what was going to happen in this rollout
13   meeting, right?
14         A.    It would appear so.  I don't -- I
15   can't speak to what he understood, but that's what
16   he expresses.
17         Q.    Is that what you -- do you know why
18   he thinks that's what the meeting is going to be
19   about?
20         A.    I think we have the e-mail that you
21   already showed of me inviting Nick and Brian to the
22   meeting, which is the same e-mail I used for all
23   the parties, with the same language, same that
24   we'll discuss health misinformation.
25         Q.    So you think that's his basis for
```

**ERIC WALDO  12/22/2022**

Page 157

1    thinking that you sent that same e-mail that you'd

2    already sent to Twitter and YouTube talking about

3    how, you know, Dr. Murthy wants to help stop the

4    spread of health misinformation and wanted to

5    discuss how -- what's on the horizon for our teams,

6    right?

7         A.    That's correct.

8         Q.    And so Facebook had the understanding

9    at this stage that these meetings would be to,

10   quote, delve deeper into our COVID misinformation

11   efforts, right?

12        A.    That's -- that's your interpretation,

13   and that makes sense based on what he said.

14        Q.    Did you, in that July 16th meeting,

15   delve deeper into Facebook's COVID misinformation

16   efforts?

17        A.    Not to my recollection.  This was

18   again Kyla sort of going a little bit more over the

19   -- as we discussed previously when we talked about

20   this meeting, when you're going over the

21   interrogatories, I think it was Kyla going more

22   over the advisory, to my recollection.  She may

23   have asked additional questions.

24        Q.    Could those additional questions have

25   related to Facebook's efforts to combat health

**ERIC WALDO  12/22/2022**

Page 158

```
 1    misinformation?

 2          A.    Absolutely.

 3          Q.    Did they, to your recollection?

 4          A.    I think she had some questions about,

 5    again, the research side.  I think some questions

 6    came up about CrowdTangle, if I recall correctly,

 7    which was a -- a data port for some -- some ways to

 8    understand the Facebook, again, impact and research

 9    of the misinformation.

10          Q.    So you think she, in that July 16th

11    meeting, asked about CrowdTangle?

12          A.    I think so.  I'm not positive.

13          Q.    What is -- what is CrowdTangle

14    exactly?

15          A.    I'm not exactly positive, sir.  I've

16    never used CrowdTangle, but I believe it's -- it's

17    some sort of data port to help -- help some

18    researchers or help users understand, you know, the

19    reach of some -- some of Facebook's posts and --

20    and -- and interactions.

21          Q.    Is that something that's publicly

22    available, or is it something that Facebook only

23    provides to select individuals?

24          A.    I think it's publicly available, but

25    I really don't know.
```

**ERIC WALDO  12/22/2022**

Page 159

```
 1            Q.    And you don't remember what Kyla was

 2     saying about the use of CrowdTangle in this

 3     meeting?

 4            A.    I do not.

 5            Q.    Was she asking if they could have

 6     access to it or asking how you interpret data from

 7     it, anything like that?

 8            A.    I don't recall.

 9            Q.    Is this information from CrowdTangle

10     different from the information in the COVID

11     insights reports that we've seen, you know, Nick

12     Clegg e-mailing to Dr. Murthy, and you said you got

13     added to later on?  Are those two different things,

14     CrowdTangle and the COVID insight reports from

15     Facebook?

16            A.    I mean, that could be a per se

17     different things, but I don't know if materially

18     the -- the -- the information expressed is

19     different.

20            Q.    Do you know whether it was -- do you

21     know whether Kyla was asking for -- you know, was

22     raising CrowdTangle in connection with asking for

23     more transparency or more access to data about

24     misinformation on Facebook?

25            A.    I'm not -- I don't recall.
```

**ERIC WALDO  12/22/2022**

Page 160

```
 1            Q.    Did your remember anything else --

 2    what did Facebook say about CrowdTangle in that

 3    meeting?

 4            A.    I don't recall what their answer was.

 5            Q.    Do you remember anything else that --

 6    that Kyla said in that meeting?

 7            A.    I do not.

 8            Q.    I'm e-mailing your counsel three more

 9    exhibits, 11 and 12, and I'm going to pull up

10    Exhibit 10 on the screen, but I'll wait until

11    Ms. Chuzi --

12            MS. CHUZI:  Thank you, Counsel.

13    While we're waiting, we've been going for another

14    hour, so what are we thinking about a break?

15            MR. SAUER:  This is a natural

16    breaking point for me if you want a short break now

17    and then go another hour before having a later

18    lunch, that's fine.  I'm also fine going -- either

19    way would be fine with me.  Tammie's opinion is

20    very important here.

21                (A discussion was held off the

22    record.)

23                THE VIDEOGRAPHER:  The time is 11:07

24    a.m.  We are off the record.

25                (A short break was taken.)
```

**ERIC WALDO  12/22/2022**

```
 1                    THE VIDEOGRAPHER:  The time is 11:19
 2      a.m.  We are back on the record.
 3             Q.    (BY MR. SAUER)  Mr. Waldo, in the
 4      next few exhibits, I want to direct your attention
 5      more specifically to that July 15th rollout of the
 6      health advisory we've been talking about.  And I
 7      want to start by sharing Exhibit 10 with you, which
 8      is the transcript of the press conference involving
 9      Jen Psaki and Dr. Murthy where the health advisory
10      was announced.  Do you see that on the screen?
11             A.    I can.  I also have the document in
12      front of me.
13             Q.    Were you at this press conference?
14             A.    I was not.
15             Q.    Okay.  Did you watch it?  Did you see
16      the attorney general speak?
17             A.    I think I had some multiple screens
18      up.  I was probably doing calls or work, but it may
19      have been on in the background.
20             Q.    And would you -- were you part of the
21      team that worked with him to craft the message at
22      this press conference?
23             A.    It would have been the press
24      secretary who would have worked on this.
25             Q.    But not you.  Would you have had
```

**ERIC WALDO  12/22/2022**

Page 162

```
 1    input in his comments on -- on this?
 2         A.   I -- at this juncture, I did not to
 3    my recollection.
 4         Q.   Uh-huh.  Okay.  If you go to the
 5    second page of the document, there's an
 6    announcement today.  I issued a Surgeon General's
 7    advisory on the dangers of health misinformation,
 8    right?
 9         A.   Correct.
10         Q.   Yeah.  And then Dr. Murthy goes on to
11    say:  Surgeon general advisories are reserved for
12    urgent public health threats.  Correct?
13         A.   That is what the document says.
14         Q.   So his message is that health
15    misinformation is an urgent public health threat,
16    correct?
17         A.   That is what he says, correct.
18         Q.   Yeah.  And he -- he describes it as
19    an imminent and insidious threat to our nation's
20    health, correct?
21         A.   Where is that, sir?  Oh, yes.  The
22    next -- I see it.  Thank you.  He -- he says:  And
23    while those threats have often been related to what
24    we eat, drink, and smoke, today we live in a world
25    where misinformation poses an imminent and
```

**ERIC WALDO  12/22/2022**

Page 163

```
 1    insidious threat to our nation's health.
 2           Q.     So he's likening -- kind of like you
 3    did earlier, he's likening health misinformation to
 4    carcinogens in -- in tobacco, for example, with a
 5    reference to smoking, right?
 6           A.     That's the example I used, correct.
 7           Q.     Yeah.  And he references the smoking
 8    himself, too, right?  So that's a similar point,
 9    right?
10           A.     Oh, yes.  He does say -- well, he
11    says that, in previous -- previous advisories have
12    been about threats like smoking, and misinformation
13    is -- is an imminent and insidious threat.
14           Q.     Gotcha.  And he goes on to say that
15    health misinformation is false or misleading
16    information about health according to the best
17    evidence at the time, right?
18           A.     Correct.
19           Q.     And is that definition of health
20    misinformation is something that's used by the
21    Surgeon General's office in -- in this health
22    advisory and elsewhere as well, right?
23           A.     I believe that is the definition that
24    is listed within the advisory, correct.
25           Q.     And were you involved in adopting
```

**ERIC WALDO  12/22/2022**

1    that definition?

2         A.    As we discussed previously, I was not

3    in the office while the advisory was developed or

4    finalized, so I was not part of the creation or did

5    not have input into the definition, therefore.

6         Q.    So do you know who devised that

7    definition or how it was formulated?

8         A.    So I think as we've already

9    discussed, the content of the advisory would have

10   been worked on by people like Daniel Tartakovsky,

11   Kyla Fullenwider, maybe Adam Beckman, you know.

12   Certainly, Dr. Murthy would have had eyes on it.

13   Those are the types of people who would have looked

14   at it.  Probably some other members of the -- of

15   the science and policy team like maybe Tyiesha

16   Short, who was a policy associate.

17        Q.    And does that definition contemplate

18   that what constitutes misinformation might change

19   over time?

20        A.    I think that's a fair reading of --

21   of the -- of the -- of the definition.

22        Q.    So in other words, the best evidence

23   may indicate at one stage that something is

24   misinformation, and later better evidence may come

25   up that makes it turn out to be more reliable.  Is

**ERIC WALDO  12/22/2022**

Page 165

```
 1    that fair to say?
 2          A.    I think that's a fair reading of --
 3    of the definition.
 4          Q.    So something that we now think is
 5    misinformation may later turn out to be accurate
 6    information, right?
 7          A.    And vice versa.
 8          Q.    Yeah.  Right.  Where something you
 9    think was accurate may turn out to be misleading,
10    right?
11          A.    I think -- I think we're -- I think
12    you stated the definition and multiple reasonable
13    interpretations of that definition.
14          Q.    And Surgeon General goes on to say
15    that the truth is that misinformation takes away
16    our freedom to make informed decisions about our
17    health and the health of our loved ones, right?
18          A.    That is what he said in the press
19    conference, correct.
20          Q.    Yeah.  And is that the view of the
21    Surgeon General's office, that health
22    misinformation takes away freedom, specifically the
23    freedom to make informed health decisions?
24          A.    I'm not sure we've made a
25    determination that that's the -- the signed-off
```

**ERIC WALDO  12/22/2022**

Page 166

```
1    view of the entire office, but that's coming out
2    from the Surgeon General, so I think it's fair to
3    ascribe to our office.
4            Q.     In other words, that's Surgeon
5    General Murthy's view.  That's what he said at says
6    that press conference, right?
7            A.     That's what he said at the
8    conference, so I think it's fair to ascribe as his
9    view.
10           Q.     And he immediately goes on to say:
11   During the COVID-19 pandemic, health misinformation
12   has led people to resist wearing masks in high-risk
13   settings, right?
14           A.     That is what the sentence says,
15   correct.
16           Q.     Yeah.  And so I take it his view is
17   that it's health misinformation that masks are
18   ineffective in stopping the spread of the virus in
19   high-risk settings, right?
20           A.     I think that's a fair reading.
21           Q.     So here, I jotted down a sentence
22   about masks here that says:  The typical mask you
23   buy in a drug store is not really effective in
24   keeping out virus, which is small enough to pass
25   through material as a discussion of the
```

**ERIC WALDO  12/22/2022**

1  effectiveness of mask wearing.  Would that sentence

2  be health misinformation on the view of the Surgeon

3  General's office?

4      A.   Well, I guess you're asking me a

5  hypothetical.  There is no -- Surgeon General's

6  office doesn't have like a team that -- that helps

7  determine whether or not something is health

8  misinformation.  But I think it would be under a

9  reasonable person's standard.  You could look at a

10  sentence like that and decide whether or not you

11  thought it was.  I'd want to consult the policy

12  lead or someone to say whether it was or was not.

13  It doesn't sound like misinformation to me, but

14  that's just, you know, I'm -- that's my sort of

15  layperson's view.

16      Q.   Is this the sort of information that

17  could lead people to resist wearing masks in

18  high-risk settings to say --

19          MS. CHUZI:  Objection.  Calls for

20  speculation.

21          MR. SAUER:  Let me finish.

22          THE WITNESS:  I'm not --

23      Q.   (BY MR. SAUER)  Go ahead.

24      A.   Go ahead, sir.  No.  Go ahead, sir.

25      Q.   Go ahead.

**ERIC WALDO  12/22/2022**

Page 168

```
 1         A.    Sorry.  No.  I -- I -- can you repeat
 2    the question?
 3         Q.    Is that the sort of misinformation
 4    that could lead people to resist wearing masks in
 5    high-risk settings, the statement that the typical
 6    mask you buy in a drug store is not really
 7    effective in keeping out virus?
 8         A.    I don't know.
 9         Q.    Does the Surgeon General -- Surgeon
10    General's office has given a lot of -- or made a
11    lot of statements about combating health
12    misinformation.  Does the Surgeon General's office
13    give any guidance about how to determine whether or
14    not something is misinformation?
15         A.    I think the definition is the attempt
16    to recognize the complexity of it.  I also think
17    it's important to recognize that the advisories
18    about mis- and disinformation and that there's a --
19    certainly a spectrum of -- within that.
20              And I think Dr. Murthy explicitly
21    also talks about that oftentimes people are
22    spreading information with good intention that may
23    not be accurate.  And our goal is to spread more
24    accurate information and to create connections and
25    -- and ways for people to connect with folks who
```

**ERIC WALDO  12/22/2022**

Page 169

```
 1   are more likely to share accurate information.
 2          Q.    Does the Surgeon General give advice
 3   on how to determine what's accurate and what's not
 4   accurate?
 5          A.    I don't recall that -- I think there
 6   was the -- that view -- I -- I think within the
 7   documents, certainly within the toolkit he talks
 8   about examples of more trusted sources that he
 9   recommends people reach out to.
10          Q.    He goes on to say:  Modern technology
11   companies have enabled misinformation to poison our
12   information environment with little accountability
13   to their users.  Do you see that?
14          A.    I do see that.
15          Q.    So I think we alluded earlier to the
16   fact that he did use the word "poison" to describe
17   misinformation, right?
18          A.    That's correct.  We did discuss the
19   use of the word "poison."
20          Q.    He talks about another word here that
21   I think the Surgeon General's office uses a lot,
22   which is the word "accountability."  I think that
23   Dr. Murthy and advisory talk about holding the
24   social media platforms accountable for
25   misinformation on their platforms.  Do you know
```

**ERIC WALDO  12/22/2022**

Page 170

```
 1    what's meant by "accountable"?
 2          A.    I don't -- I don't have a definition
 3    of accountable in the -- for the purposes of your
 4    question.
 5          Q.    Do you know what the Surgeon
 6    General's office intends it to mean when it uses
 7    the word accountable and accountability for social
 8    media platforms?
 9          A.    I think there's generally the notion
10    that, you know, they've -- that they have, you
11    know, I would say an obligation to try to make sure
12    that they're not doing harm.  So as opposed to just
13    saying, hey, I built this -- I built this highway
14    and I'm not going to put any speed limits on it or
15    stop signs or warn people that there's a turn
16    ahead, you know.  We want to say are we doing
17    anything to reduce the likelihood of a collision.
18    You want a stop sign, a speed limit, some lines on
19    the road, some -- some -- some -- some traffic
20    cameras, et cetera.
21              So I think the, you know, idea is
22    social media companies have created this platform
23    that is where many, many people receive news that
24    they believe.  How can we in a time of a historic
25    pandemic think about ways to -- to have a
```

**ERIC WALDO  12/22/2022**

Page 171

```
 1    heightened sense of obligation to make sure that
 2    that's not being used in a -- have a corrosive
 3    effect on -- on the health of others.
 4          Q.    Does accountability include accepting
 5    the consequences for when you do something wrong or
 6    -- or inappropriate?
 7          A.    That's a -- that's a fair and modern
 8    use of the word accountable.
 9          Q.    And is that what's included in what's
10    intended or meant when that word is used by the
11    Surgeon General's office with respect to social
12    media platforms, that they should accept
13    consequences --
14          A.    I don't --
15          Q.    -- for when they don't do enough to
16    stop the spread of misinformation that can harm
17    people?
18          A.    I don't know.
19          Q.    But you'd say that would be a fair
20    understanding to a modern user of that word,
21    correct?
22          A.    I think you're providing a reasonable
23    reading of the word accountable in the context of
24    this paragraph.
25          Q.    Were you involved in discussions
```

**ERIC WALDO  12/22/2022**

Page 172

1    about using -- choosing to use the word

2    accountable?  It does pop up a lot in these OSG

3    communications.

4         A.    I think if you asked before whether

5    or not I was -- participated in the creation of

6    these remarks, I did not.  So, therefore, I would

7    not have had any view into whether or not -- and

8    how to choose the word accountable.

9         Q.    Goes on to say that the social media

10   platforms have allowed people who intentionally

11   spread misinformation, what we call disinformation,

12   to have extraordinary reach, correct?

13        A.    That is what the sentence says,

14   correct.

15        Q.    And that's something he's calling on

16   them to stop to prevent the reach of those who

17   spread disinformation.  Is that fair to say?

18        A.    He's call -- again, I think the

19   advisory and all this is -- is providing technology

20   companies and others with the idea of this is an

21   issue.  There -- there's an obligation or -- or --

22   or certainly an imperative to do more.  So reduce

23   -- reduce if not only -- not only stop but reduce

24   or take some sort of mitigating efforts so that the

25   misinformation and disinformation is not leading to

**ERIC WALDO  12/22/2022**

Page 173

```
1    poor health results for people.
2          Q.    Yeah.  In other words, that some
3    steps should be taken by social media platforms to
4    stop the extraordinary reach of disinformation on
5    their platforms, correct?
6          A.    I think it's to stop -- I would view
7    it as stopping the harm, and this goes to our
8    conversation that you and I have had earlier,
9    right?  I think you want to -- I think there's the
10   presumption right now that the reach is leading to
11   harm.  I think that within the context of the
12   advisory, there's a desire to learn and study more,
13   which is also part of the conversations we've
14   already talked about vis-a-vis Facebook around
15   understanding the nature of the reach to understand
16   the depth of harm.  So I think -- I think that's
17   all -- all on the table.
18         Q.    Yeah.  And one of the things that's
19   on the table, I think you testified earlier, is
20   that when the health advisory was issued, the
21   Surgeon General's view was that stopping the spread
22   is one way to stop the harm, correct?
23         A.    I think that's what the document
24   says, so I don't have any reason to believe that's
25   not what -- what -- what -- what -- what the
```

**ERIC WALDO  12/22/2022**

Page 174

```
 1   Surgeon General meant when it was written.
 2          Q.     On the next page, the Surgeon General
 3   goes on to say:  We are saying we expect more from
 4   our technology companies.  Correct?
 5          A.     That's correct.
 6          Q.     And it says:  We're asking them to
 7   operate with greater transparency and
 8   accountability.  Correct?
 9          A.     Correct.
10          Q.     Yeah.  In other words, so this is
11   kind of a call to action to the social media
12   platforms, right?  We're asking them to do things,
13   right?
14          A.     That's correct.
15          Q.     Yeah.  And one of those things is
16   greater transparency.  I assume that's a reference
17   to the kind of data sharing that was raised in
18   these private calls including with Kyla
19   Fullenwider, correct?
20          A.     Yeah.  I think, again, helping people
21   understand what is the nature of the reach and the
22   nature of the impact of -- of this health
23   misinformation, disinformation.
24          Q.     And then accountability, I think you
25   testified earlier, a reasonable understanding of
```

**ERIC WALDO  12/22/2022**

```
 1    that term would be -- include the social media

 2    platforms accepting consequences for negative

 3    behavior that's -- that they're responsible for,

 4    correct?

 5         A.    I read -- I read this sentence -- it

 6    says:  Fourth, we're saying we expect more from our

 7    technology companies.  We're asking them to operate

 8    with greater transparency and accountability.

 9              I read that sentence to mean

10    accountability as accountability to the -- to the

11    public around this public health emergency.

12         Q.    And -- and -- and again, the public,

13    then, would expect them to accept responsibility

14    and consequences if they behaved badly, correct?

15         A.    I mean, in my mind -- again, we're

16    asking them about accountability means, hey, we

17    can't just say it's not.  We have -- it's not our

18    fault.  There's nothing we can do to improve this

19    accountability.  It's like we -- we -- this is

20    happening with our platform.  We have a duty to try

21    to improve the outcomes and help -- help make sure

22    there's fewer bad outcomes when using our platform

23    during a pandemic with historic deaths.

24         Q.    Yeah.  In other words --

25         A.    Historic and preventable deaths.
```

**ERIC WALDO  12/22/2022**

Page 176

```
 1          Q.    Yeah.  In other words, we're asking
 2     them to take more proactive steps to stop the
 3     spread of misinformation?
 4          A.    Yes.  Or to help us -- help the
 5     public or help people understand how to do that.
 6     It could be -- research could help us understand
 7     that if you send a positive message this way, it
 8     can undo the harm of the negative messaging.
 9     There's all sorts of things we could learn that
10     would create the actual tactics as to opposed to
11     the, you know, prescriptive strategies.
12          Q.    Right.  And one tactic is mentioned
13     in the -- later in the paragraph -- or two tactics.
14     One is he says, we're asking him to monitor
15     misinformation more closely, right?  So --
16          A.    That is what the sentence says,
17     correct.
18          Q.    Yeah.  And then Dr. Murthy said,
19     we're asking them to consistently take action
20     against misinformation superspreaders on their
21     platforms, correct?
22          A.    That is what he says, yes.
23          Q.    That's a specific action item that
24     the Surgeon General urged social media platforms to
25     take, which is essentially to remove content spread
```

**ERIC WALDO  12/22/2022**

Page 177

```
 1   by misinformation superspreaders, right?
 2          A.    That's not what the sentence says.
 3   He says:  We're asking them to consistently take
 4   action against.
 5                You are supposing that means remove.
 6   It could just be we're not going to have the
 7   algorithm amplify it or we're not going to allow it
 8   to be retweeted, or we're going to put a corrective
 9   warning label.  There are plenty of the examples
10   that would be -- that could take action that would
11   reduce the harm of the misinformation superspreader
12   and keep it from spreading.
13          Q.    So some of those potential actions
14   that they could take would include assigning
15   warning labels, correct?
16          A.    Correct.
17          Q.    Yeah.  And some might include
18   deamplifying the content from information
19   superspreaders and their algorithms, correct?
20          A.    That's correct.
21          Q.    And another action might be taking
22   down the content.  Bad posts just get taken down
23   altogether.  That would be a potential action to
24   take against superspreaders, right?
25          A.    That is a potential action, yes.
```

**ERIC WALDO  12/22/2022**

Page 178

1          Q.     And another potential action would be

2     to, you know, deplatform that, right?  To cancel

3     their accounts altogether, right?

4          A.     That's a potential action that a --

5     that a social media platform could take.

6          Q.     And Dr. Murthy calls for social media

7     platforms to take action against misinformation

8     superspreaders, right?

9          A.     That is what the sentence says,

10    correct.

11         Q.     I'm going to flip ahead a few pages

12    in this.  It's the page marked 45.5 on the bottom

13    right.

14         A.     I'm sorry.  Could you repeat that.

15    We had to unlock the -- the laptop -- or the iPad.

16    What -- what the page are we on again?

17         Q.     45.5.  It should be the fifth in the

18    exhibit pdf.

19         A.     Fifth page of the pdf?  Okay.  Thank

20    you.

21         Q.     Do you see --

22         A.     Yep.

23         Q.     -- about halfway down --

24         A.     Yep.

25         Q.     -- the page a reporter asks the

**ERIC WALDO  12/22/2022**

Page 179

```
 1      Surgeon General Murthy the question:  Do you
 2      personally believe that public figures and public
 3      companies that are helping spread misinformation
 4      about the vaccine should be held accountable?
 5      Right?
 6             A.    I do see that -- that question, yes.
 7             Q.    Yeah.  And he responds by saying:
 8      How can we be more accountable and responsible for
 9      the information that we share?  Right?
10             A.    Yes.
11             Q.    And he says the bottom line is that
12      all of us have an important role to play, and
13      technology companies have a particularly important
14      role, right?
15             A.    That is what he says, correct.
16             Q.    And he goes on to say:  We're asking
17      them to step up?  Right?
18             A.    Yes.  Can I actually read that whole
19      paragraph, sir?  Give me one second.
20             Q.    Sure.
21             A.    Okay.  Thank you, sir.
22             Q.    Okay.  And he says that -- in that
23      paragraph the speed and scale at spreading this
24      information has been in part enabled by these
25      platforms.  That's social media platforms, correct?
```

**ERIC WALDO  12/22/2022**

Page 180

```
 1          A.     That's correct.

 2          Q.     And that's why he says that's why in

 3  the health advisory today we're asking them to step

 4  up, right?

 5          A.     That's correct.  That's what he says.

 6          Q.     Yeah.  And he says we know they have

 7  taken some steps to address misinformation, but

 8  much, much more has to be done, right?

 9          A.     That is what he says, correct.

10          Q.     He says:  We can't wait longer for

11  them to take aggressive action because it's costing

12  people their lives.  Right?

13          A.     That's correct.

14          Q.     So in other words, he's calling for

15  aggressive action by social media platforms to

16  address misinformation on their platforms, right?

17          A.     Correct.

18          Q.     Yeah.  And he doesn't specify there

19  what the aggressive action should be, but it needs

20  to be much, much more in his view than is already

21  -- is already being done, right?

22          A.     That's correct.

23          Q.     And that's a public message that all

24  the social media platforms are receiving, right?

25          A.     Well, I don't know which ones of them
```

**ERIC WALDO  12/22/2022**

Page 181

```
 1   were watching this press conference or not, but

 2   they presume -- we know we sent them the advisory,

 3   and it's certainly a well-covered event.  So

 4   hopefully, they received that message.

 5        Q.    And, in fact, you had some

 6   introductory calls with at least three of them to

 7   tell them it was coming and encouraging them to

 8   watch, right?

 9        A.    We did not encourage them to watch

10   the press conference.

11        Q.    Okay.  But you encouraged them to pay

12   attention to the advisory, right?

13        A.    We encouraged them to read the

14   advisory we shared with them, yes.

15        Q.    And then you asked them -- each of

16   them as a follow-up what actions they might have

17   taken in response to the advisory, right?

18        A.    I don't think we asked each of them.

19   I think we definitely -- I think Facebook and

20   Twitter, maybe Google, but my guess is that most of

21   them, yeah.

22        Q.    Did you ever communicate with any

23   other social media platforms other than Facebook,

24   Twitter, and Google/YouTube?

25        A.    I guess, again, Facebook also
```

**ERIC WALDO  12/22/2022**

Page 182

```
 1   includes Instagram.  So, you know, I think it's
 2   Facebook, Instagram, Twitter.  I can't -- I don't
 3   think so.  I know there was a discussion about
 4   whether or not we wanted to reach out to, I think,
 5   Pinterest, but we -- I don't believe that we did.
 6            I think Dr. Murthy had shared -- I
 7   think Next Door is another social media site that
 8   maybe actually had like some more favorable
 9   policies that they were -- were their take on this.
10   We talked about potentially highlighting them, but
11   I -- I didn't do any outreach to those groups.
12        Q.    How about LinkedIn or Reddit or
13   Verizon Media, Microsoft?  Any of those?
14        A.    We did not do any outreach to
15   LinkedIn, to my knowledge; not to Microsoft, to my
16   knowledge.  We did a Reddit "Ask Me Anything."  May
17   not have been about misinformation.  It may have
18   been about one of our other health topics.  I
19   remember us doing prep for a Reddit AMA, which
20   stands for "Ask Me Anything."  But I don't believe
21   we reached out to Reddit for misinformation.
22        Q.    The American Medical Association will
23   be pleased to hear that -- that acronym.
24            Let me turn your attention to page 10
25   of this document, 4510.  And this is after
```

**ERIC WALDO  12/22/2022**

Page 183

```
1    Dr. Murthy has already left the press conference.
2    There's follow-up questions to Jen Psaki.  Do you
3    see that?
4         A.   Yes.
5         Q.   Okay.  So there's a question here
6    that refers back, I think, to Dr. Murthy's comment
7    about being more aggressive, where it says -- the
8    reporter says:  Can you talk a little bit more
9    about this request for tech companies to be more
10   aggressive in policing misinformation?  Has the
11   administration been in touch with any of these
12   companies, and are there any actions that the
13   federal government can take to ensure their
14   cooperation, because we've seen from the start
15   there's not a lot of action on some of these
16   platforms?  Correct?
17        A.   That is the question that was asked
18   to Ms. Psaki, correct.
19        Q.   And she responds:  Sure.  Well,
20   first, we are in regular touch with these social
21   media platforms, and those engagements typically
22   happen through members of our senior staff but also
23   members of our COVID-19 team.  Correct?
24        A.   That is what Jen Psaki answers,
25   correct.
```

**ERIC WALDO  12/22/2022**

Page 184

```
1              Q.     Yeah.  Do you know who she's

2    referring to when she talks about being in regular

3    touch with social media platforms and those

4    engagements typically happening through members of

5    our senior staff?

6              A.     I do not.

7              Q.     So you don't know what human being

8    she's talking about who are regularly in touch with

9    social media platforms?

10             A.     I do not.

11             Q.     Is -- is she possibly talking about

12   Dr. Murthy?

13             A.     Is it technically possible?  I

14   suppose.  But I don't -- I don't think so.

15             Q.     And was he in regular touch with

16   social media platforms by July 15th of 2021, to

17   your knowledge?

18             A.     Not to my knowledge.

19             Q.     How about Rob Flaherty?  Do you know,

20   was he in regular touch with social media

21   platforms?

22             A.     I don't know.

23             Q.     She refers to members of our senior

24   staff.  Do you know who that is?

25             A.     I don't know.  I think we discussed
```

**ERIC WALDO  12/22/2022**

Page 185

```
 1    Andy Slavitt already having clearly a connection
 2    with Nick Clegg, so that's a member of the senior
 3    COVID-19 team.
 4         Q.    Do you know of anyone else who she
 5    might be referring to?
 6         A.    I do not.
 7         Q.    How about also members of our
 8    COVID-19 team who would be --
 9         A.    Yeah.  They --
10         Q.    -- in touch with social media
11    platforms?  Go ahead.  Do you know who that is?
12         A.    I -- I -- I do think that that would
13    probably have been Andy Slavitt, is my guess.
14         Q.    Okay.  So he would be both members of
15    our senior staff and members of our COVID-19 team?
16         A.    Correct.  Andy, I believe -- I'm not
17    positive, but his title was something like -- I
18    don't know if he was the -- I guess Jeff Zients is
19    technically the czar, getting back to our Russian
20    references from before.  Jeff Zients ran the
21    COVID-19 team, but Andy was a very important member
22    of that team as well.  Was considered a senior
23    staffer, and so I would assume it's Andy.
24         Q.    How about Jeff Zients?  Do you know
25    if he was talking to social media platforms at all?
```

**ERIC WALDO  12/22/2022**

```
 1            A.    I don't know.
 2            Q.    Anyone else who she might be
 3    referring to, to your knowledge?
 4            A.    I don't know.
 5            Q.    Okay.  She goes on in the next
 6    paragraph to say, in terms of actions, the first
 7    one she lists is an increased disinformation
 8    research and tracking within the Surgeon General's
 9    office.  Do you know what she's referring to?
10            A.    I do not.
11            Q.    So are you aware of any increase in
12    disinformation research and tracking at any phase
13    in the Surgeon General's office?
14            A.    I am not aware.  I think obviously
15    there was a research done by the policy team in the
16    creation of the advisory, so that's certainly the
17    research side of it, but I'm -- I'm not familiar
18    with any of -- any increase in tracking of -- of
19    disinformation.
20            Q.    So you don't know what her basis was
21    for saying there's an increase in disinformation
22    research and tracking?
23            A.    I don't -- my -- again, my only
24    thought, as I've already said, is that given the
25    preparation for the -- for the advisory certainly
```

**ERIC WALDO  12/22/2022**

Page 187

```
 1   was -- we did research.  The team had to have done
 2   -- done research to -- you know, that's our
 3   standard business practice before we issue an
 4   advisory, is to -- to -- to -- to research an
 5   issue.
 6        Q.    Who did that research?  I think you
 7   mentioned the gentleman with a Russian name and
 8   Kyla Fullenwider.  Were they involved in that
 9   research?
10        A.    Yes.  So as I've answered previously,
11   my understanding is Daniel had the -- the first pen
12   or was like the key -- key policy person working on
13   the advisory.  So that's Daniel Tartakovsky.  Kyla,
14   I believe, participated, and probably someone like
15   Tyiesha Short, who worked with Daniel on the policy
16   team were involved.
17              At that time in the office, Adam
18   Beckman managed Daniel.  So it's possible that he
19   had some input.  But I think Daniel was the -- was
20   one of the chief drivers of the drafting process.
21        Q.    And he --
22        A.    I think I already mentioned -- I
23   mentioned -- this is -- again, we discussed this
24   already before, but also Dr. Murthy certainly would
25   have -- and this is based on just our general
```

**ERIC WALDO  12/22/2022**

Page 188

```
1   practice in the office.  He would have seen the

2   drafts and would have signed off on the final

3   draft.

4        Q.    And Jen Psaki goes on to say:  We're

5   flagging problematic posts for Facebook that spread

6   disinformation.

7            Do you know what she's referring to?

8   Who is flagging problematic posts for Facebook?

9        A.    I don't know.

10       Q.    So are you aware of anyone in the

11  Surgeon General's office who's flagging problematic

12  posts for Facebook?

13       A.    I'm not aware of anybody in the

14  Surgeon General's office who was flagging

15  problematic posts for Facebook.

16       Q.    How about Kyla?  Could she have done

17  that by communicating with the outside researchers

18  like Renee DiResta?

19       A.    I -- I'm very doubtful of that.  I

20  don't think Kyla would have represented that this

21  -- that was an ask from the Surgeon General's

22  office because we didn't -- there was no system set

23  up where we were either looking at reviewing or in

24  any way -- there had been no policy decision around

25  that.  So I'd be hard pressed to -- to -- to guess
```

**ERIC WALDO  12/22/2022**

Page 189

```
 1   that, but I don't know.
 2         Q.    Are you aware of any other federal
 3   officials inside or outside the Surgeon General's
 4   office who flagged problematic posts for Facebook?
 5         A.    I don't know.
 6         Q.    You just don't know whether there are
 7   or there aren't?
 8         A.    I know that there aren't -- I don't
 9   know of any of the Surgeon General's office who
10   flagged bad posts to for Facebook, and I -- I know
11   -- I know that I don't have knowledge of anyone
12   who's done it in the Surgeon General's office, and
13   I don't know of anyone else outside within the
14   administration that did it.
15         Q.    You're not aware of anyone in the
16   Surgeon General's office, and you don't know if
17   there's anyone outside?
18         A.    That's correct.
19         Q.    Do you have any reason to believe or
20   suspect that anyone may have done it?
21         A.    I know that Rob Flaherty was in touch
22   with Facebook, and so that would be the only
23   person.  Given his role as digital director, he
24   might have been seeing content.  That would be my
25   only -- my only guess.
```

**ERIC WALDO  12/22/2022**

Page 190

```
 1          Q.     So you think Rob Flaherty may have
 2   been flagging problematic posts for Facebook?
 3          A.     I know that -- I know he was
 4   certainly were very aware of misinformation posts.
 5   So I that's the only other person I know who was
 6   deeply looking at what -- the posts themselves.
 7          Q.     What about the CDC?  Are you aware of
 8   the CDC, Centers for Disease Control, being
 9   involved in flagging problematic posts?
10          A.     I am not aware of that.
11          Q.     Do you know Carol Crawford?
12          A.     Not off the top of my head.
13          Q.     Is the name familiar to you?
14          A.     Very vaguely.
15          Q.     How do you know of her?
16          A.     I -- I don't.  I'm just saying the
17   name sounds vaguely familiar.  I've also been
18   living in DC for 14 years now, so it's possible
19   I've -- names start to all sound alike.
20          Q.     Let me scroll down to the next page.
21   It's still Jen Psaki talking, and she says:  There
22   are also proposed changes that we have made to
23   social media platforms, including Facebook, and
24   those specifically are four key steps.  Do you see
25   that?
```

**ERIC WALDO  12/22/2022**

Page 191

```
 1          A.    I do.
 2          Q.    Were you aware at this time frame of
 3   anyone in the federal government proposing changes
 4   to social media platforms, including Facebook?
 5          A.    I was not.
 6          Q.    So you're not aware of any
 7   communications between anyone in the federal
 8   government prior to the health advisory where these
 9   kinds of recommendations were made to any social
10   media platform?
11          A.    I was not aware, no.
12          Q.    Her first point is one that they
13   measure and publicly share the impact of
14   misinformation on their platform, correct?
15          A.    That is what the document says,
16   correct.
17          Q.    And that kind of echoes what Surgeon
18   General Murthy has said and what -- in the health
19   advisory, and I think you said was discussed in
20   some of the calls, right?
21          A.    That's correct.
22          Q.    But you're not aware of anyone
23   separately proposing those changes to Facebook?
24          A.    I am not.
25          Q.    Second, she goes on to say:  We have
```

**ERIC WALDO  12/22/2022**

Page 192

```
 1    recommended/proposed that they create a robust
 2    enforcement strategy that bridges their properties
 3    and provides transparency about the rules.
 4              Do you know what robust enforcement
 5    strategy was proposed to social media platforms?
 6         A.    I do not.
 7         Q.    Do you know if anyone in the federal
 8    government proposed anything like that to them
 9    prior to this July 15th date?
10         A.    I am not aware of anything.
11         Q.    She goes on to say in reference to
12    this:  There's about 12 people who are producing 65
13    percent of anti-vaccine misinformation on social
14    media platforms.  All of them remain active on
15    Facebook, despite some even being banned on other
16    platforms, including ones that Facebook owns.
17    Correct?
18         A.    That is what the statement says,
19    correct.
20         Q.    And that's reference to the so-called
21    Disinformation Dozen, right?
22         A.    It would appear so, yes.
23         Q.    And I remember you said earlier that
24    you had a briefing from what you think could have
25    been the CCDH, the Center for Countering Digital
```

**ERIC WALDO  12/22/2022**

Page 193

```
 1    Hate, about the Disinformation Dozen, right?
 2           A.    That's correct.
 3           Q.    Were you aware that -- of any federal
 4    officials prior to this July 15th press conference
 5    calling for social media companies to take action
 6    against the Disinformation Dozen?
 7           A.    I was not.
 8           Q.    Are you aware of any proposal for a
 9    robust enforcement strategy that would stop --
10           A.    I'm not --
11           Q.    -- from that --
12           A.    I'm not --
13           Q.    -- disinformation?
14           A.    I'm not aware of that.
15           Q.    Then Jen Psaki goes on to say:
16    Third, it's important to take faster action against
17    harmful posts.  Right?
18           A.    That is what the document says,
19    correct.
20           Q.    She talks about how information
21    travels quickly, and Facebook needs to move more
22    quickly to remove harmful, violative posts.  Posts
23    that will be within their policies for removal
24    often remain up for days.  Right?
25           A.    That is what the document says,
```

**ERIC WALDO  12/22/2022**

Page 194

```
 1   correct.
 2        Q.     So she's calling on Facebook to move
 3   more quickly to remove content, to remove harmful
 4   posts, correct?
 5        A.     I think she's saying to remove those
 6   harmful posts that are already violating the
 7   policy, the harmful, violative posts.
 8        Q.     Right.  She's asking for harmful,
 9   violative posts that violate Facebook's policies to
10   be taken down more quickly, right?
11        A.     That is what she says, correct.
12        Q.     Is that consistent with what the
13   health advisory calls for, for faster action to
14   take down harmful posts?
15        A.     I don't recall that level of
16   specificity within the advisory, but the --
17   certainly the advisory overall has recommendations
18   for technology companies, including -- I think
19   there's more vague language of sort of that that
20   says something to the extent of move faster or --
21   or, you know, more aggressive, but I don't think it
22   -- this level of specificity.  Like too many days
23   is certainly not on there.
24        Q.     Okay.  But there is a call for more
25   aggressive action that could include moving more
```

**ERIC WALDO  12/22/2022**

Page 195

```
 1    quickly to remove harmful violative posts?
 2            A.    I think that's a specific
 3    interpretation.  That's not -- I don't think that's
 4    -- that's not in the document, to my knowledge, but
 5    if you have the document and you can show it to me,
 6    I'm happy to take a look.
 7            Q.    Well, let me ask you this.  Is that
 8    something that ever came up in the follow-up calls
 9    is, hey, you know, can there be faster action to
10    remove, you know, kind of harmful posts that are
11    getting a lot of spread?  Like if a Disinformation
12    Dozen post goes viral, can you guys get it taken
13    down faster?  Were there any conversations like
14    that in your follow-up calls?
15            A.    Not -- not on -- not from our side.
16    I think when we were setting up the meeting with --
17    when the meeting -- because the meeting team with
18    Facebook and Payton occurred after this, I think
19    there's an e-mail from Payton to me saying we're
20    understanding that these are your four asks; is
21    that correct?  And I believe I responded to her and
22    said that's actually not what we were going to talk
23    about.  We were going to talk about the advisory
24    more generally.
25                  So we weren't -- we weren't sort of
```

**ERIC WALDO  12/22/2022**

Page 196

1   continuing on that -- on that.  I think Facebook,

2   at first, was inquiring as to whether or not, you

3   know, that was coming from our office.

4          Q.    I see.  And so did Facebook then

5   report back to you with information about how they

6   had been taking faster action to remove harmful

7   posts?

8          A.    I don't recall.

9          Q.    Did they report back to you about

10  specific actions taken against the Disinformation

11  Dozen?

12         A.    I don't think so, but I don't recall.

13         Q.    Do you have any other knowledge of

14  what might be the possible basis for Ms. Psaki's

15  statements that we've gone over other than what

16  we've already asked you?

17         A.    I don't.

18         Q.    You don't know what her basis was for

19  saying all those things?

20         A.    I do not.

21         Q.    Let's pull up Exhibit 11.  And now

22  this actually is the health advisory we've been

23  talking about, right?

24         A.    Right.  Yes.

25         Q.    Issued on July 15th of 2021?

**ERIC WALDO   12/22/2022**

Page 197

```
 1          A.     Yes.

 2          Q.     We talked about this quite a bit.  So

 3   I want to jump ahead down to page 5 of the

 4   document.  You see how the -- in the text I've

 5   highlighted on shared screen, the health advisory

 6   says:  Product features built into technology

 7   platforms have contributed to the spread of

 8   misinformation.  For example --

 9          A.     Can --

10          Q.     Go ahead.

11          A.     Sir, can -- can you give me a moment

12   to read a little bit more of this page?

13          Q.     Sure.

14          A.     Thank you.  Okay.  Thank you.

15          Q.     So it says:  Product features built

16   into technology platforms have contributed to the

17   spread of misinformation.  Correct?

18          A.     That is what the document says,

19   correct.

20          Q.     And it says that social media

21   platforms incentivize people to share content to

22   get likes, comments, and other positive signals of

23   engagement, correct?

24          A.     That is what the sentence says,

25   correct.
```

**ERIC WALDO  12/22/2022**

1          Q.    And thus, it rewards engagement

2    rather than accuracy, right?

3          A.    That is what the statement -- the

4    sentence says, correct.

5          Q.    So is there a suggestion or proposal

6    from the Surgeon General's office that social media

7    companies ought to change their product features to

8    slow the spread of -- of inaccurate information?

9          A.    I think when you go to the bottom,

10   what it says is, you know, additional research is

11   needed to better understand how people are exposed

12   to and affected by misinformation and how this may

13   vary across subpopulations based on facts such as

14   race, ethnicity, socioeconomic status --

15              (A discussion was held off the

16   record.)

17              THE WITNESS:  Subpopulations based on

18   factors such as race, ethnicity, socioeconomic

19   status, education, age, sexual orientation, gender

20   identity, cultural, and religious practices,

21   hobbies and interests and personal net worths.

22              So I think Dr. Murthy is describing

23   the current product and ultimately saying that we

24   need to understand more about how this is affecting

25   our -- the population, and that would potentially

**ERIC WALDO  12/22/2022**

Page 199

```
 1   lead to different sorts of ameliorative policy

 2   goals for potential product changes.

 3          Q.    (BY MR. SAUER)  So you think -- is he

 4   saying -- he's saying more research is needed.  Is

 5   he also saying there should be product changes?

 6          A.    I don't see that in there, sir.  Can

 7   you point me to it?

 8          Q.    Page 12, what technology platforms

 9   can do, do you see that on the shared screen?

10          A.    Yes.  And I now have it up on my

11   screen as well.

12          Q.    And you see how the first

13   recommendation is assess the benefits and harms of

14   products and platforms and take responsibility for

15   addressing these harms?

16          A.    Yes.  I see that.

17          Q.    And it says:  In particular, it --

18   make meaningful, long-term investments to address

19   misinformation, including product changes, correct?

20          A.    That is correct.

21          Q.    And he recommends redesigning

22   recommendation algorithms to avoid amplifying

23   misinformation, build in friction such as

24   suggestions and warnings to reduce the sharing of

25   misinformation, and make it easier for users to
```

**ERIC WALDO  12/22/2022**

Page 200

1    report misinformation, correct?

2          A.    That's correct.

3          Q.    And so those are all action items

4    above and beyond additional research that would --

5    that would slow the spread of misinformation on the

6    platforms, right?

7          A.    Right.  So now we are in the What

8    Technology Platforms Can Do section.  I think we

9    were still up just in the summary section.  So this

10   is -- you're asking me if that previous section

11   talked about product changes.  It did not.  This

12   section does.

13         Q.    So this section of the health

14   advisory does call for product changes, correct?

15         A.    It -- it -- it -- I -- I guess the

16   term it's using, yeah.  It asks -- it says -- it

17   suggests that these are things that they can do.

18   They could do a product change.  It's a

19   recommendation.

20         Q.    Yeah.  And they recommend redesigning

21   algorithms and building in frictions and actually

22   make it easier for users to report misinformation,

23   right?

24         A.    That is a -- exactly what it says.

25         Q.    And that would be a method for users

**ERIC WALDO  12/22/2022**

Page 201

```
1    to flag problematic posts so that they could be
2    reviewed for content modulation, policy violations,
3    right?
4         A.    Yes.  That's a fair reading of that
5    sentence, I think.
6         Q.    Yeah.  And then lower down on the
7    page, same column talks about how a social media
8    platform should strengthen the monitoring of
9    misinformation, correct?
10         A.    Can you give me a second to read this
11    page, sir?
12         Q.    Yeah.  I -- I don't think you need to
13    read this whole document.  I'm just asking you to
14    look at this one.
15         A.    Oh, yeah.  Yeah.  I know, but I want
16    to understand the context.  Okay.  Sir, I'm ready.
17         Q.    Strengthen the monitoring of
18    misinformation, correct?  That's another
19    recommendation?
20         A.    Yes.
21         Q.    And it says:  Platforms should
22    increase staffing of multilingual content
23    moderation teams.  Correct?
24         A.    That is what the document says.
25         Q.    The idea is putting more resources
```

**ERIC WALDO  12/22/2022**

Page 202

1    into the content modulation teams that detect the

2    misinformation and apply content modulation

3    policies to it, correct?

4          A.    This one right -- when I read that

5    one, it's talking about, again, the content

6    moderation -- I think you said "modulation," sir.

7    So it's -- it's -- it's saying you want more

8    multilingual moderation teams so that if there's --

9    if there's misinformation being spread in one

10   language and one community is -- is being

11   disproportionately harmed, we want to make sure

12   that we're being -- you know, to find the harm in

13   multiple languages.  So this is a common problem

14   that can occur in -- in -- in policy areas where if

15   we don't have something in multiple languages, it

16   might be hard to reach certain communities.

17         Q.    And so the idea is have more staff on

18   the social media platform side to be able to

19   identify misinformation in non-English-speaking

20   communities?

21         A.    Absolutely.

22         Q.    Yeah.  And the idea there would be

23   able to detect it and stop its spread in those

24   communities who may be being, as you said,

25   disproportionately harmed?

**ERIC WALDO  12/22/2022**

Page 203

```
 1          A.    That is a correct.  That is, I think,

 2   what the -- what the paragraph is trying to get at.

 3          Q.    Yeah.  And later in the paragraph, it

 4   says:  Platforms should also address misinformation

 5   live streams which are more difficult to moderate

 6   due to their temporary nature and use of audio and

 7   video.  Right?

 8          A.    That is what the sentence says,

 9   correct.

10          Q.    And moderating misinformation usually

11   involves taking one of those actions that we talked

12   about earlier, like, you know, applying a label to

13   it, removing a post, deamplifying it, so forth,

14   right?

15          A.    Those are examples, yes.

16          Q.    Yeah.  So this -- this advisory is

17   calling for the platforms to do more moderation in

18   a particular area; that is, live stream with video

19   and audio content, correct?

20          A.    It flags that live steams are a place

21   where -- it's recognizing it's difficult to

22   moderate is what I think it says, and it should

23   create -- it should also create a plan to address

24   how to deal with moderation and live streams, yes.

25          Q.    Yeah.  In other words, to increase
```

**ERIC WALDO  12/22/2022**

```
 1    moderation of misinformation that's currently not
 2    detecting because it's, you know, done through
 3    video feeds, right?
 4         A.    Yes.
 5         Q.    And then underneath that, it talks
 6    about prioritize early detection of misinformation
 7    superspreaders and repeat offenders, right?
 8         A.    That's correct.
 9         Q.    So the recommendation is the social
10    media platform should make it a priority to the
11    identify the superspreaders and the repeat
12    offenders, right?
13         A.    Correct.
14         Q.    And not just that.  It's to impose
15    clear consequences for accounts that repeatedly
16    violate platform policies, right?
17         A.    That is what the document says,
18    correct.
19         Q.    And what it says implies not just
20    removing posts, but to impose clear consequences
21    for accounts that --
22         A.    I don't think it --
23         Q.    -- that violate policies, right?
24         A.    I don't think it implies that.  I
25    think it says that explicitly.
```

**ERIC WALDO  12/22/2022**

Page 205

1      Q.     Right.  It explicitly says that there

2    should be consequences for the account, not just

3    the offending post, right?

4      A.     It says impose clear consequences for

5    accounts that repeatedly violate platform policies.

6      Q.     And clear consequences for repeat

7    violator of policies usually includes things like

8    issuing strikes against them, suspensions, you

9    know, and -- and sometimes permanent deplatforming,

10   correct?

11     A.     Those are examples of -- of current

12   policies in place by social media companies,

13   correct.

14     Q.     Skipping ahead to page 16, at the

15   conclusion, there's a reference to institutions

16   recognizing that this issue --

17     A.     Sir, may I have a moment again to

18   read this page?

19     Q.     Sure.  It's the one marked Where We

20   Go From Here.

21     A.     Yeah.  I'm -- I've got it.  Thank you

22   so much.  Okay.  I'm ready, sir.

23     Q.     Here, on page 16, the advisory says:

24   We need institutions to recognize that this issue

25   related to misinformation is their moral and civic

**ERIC WALDO  12/22/2022**

Page 206

```
 1   responsibility and that they are accountable.

 2   Right?

 3        A.    That is what the sentence says,

 4   correct.

 5        Q.    So calling for accountability for

 6   social media platforms is something that's kind of

 7   a word that's repeatedly used both in the advisory

 8   and the Surgeon General's public remarks, right?

 9        A.    The word "accountable" was used in

10   the press conference, and it's definitely used here

11   in the advisory.

12        Q.    Why don't we look at Exhibit 12.

13   Now, the health advisory was actually launched not

14   from the White House press conference but in a --

15   an event at Stanford, right?

16        A.    I don't now recall what the order of

17   operations was, whether the Stanford event happened

18   before the press conference, but it was all part of

19   the launch day, yes.  I think it was -- I would

20   call it a launch day as opposed to -- launch counts

21   as like that morning.  The embargo is done.  We

22   sent it out to reporters.  So it's a multitiered

23   launch.

24        Q.    There's two -- at least two events

25   that day.  There's a White House press conference,
```

**ERIC WALDO  12/22/2022**

**Page 207**

1    and then there's Dr. Murthy giving remarks through

2    the Stanford Internet Observatory, right?

3          A.    That is correct.

4          Q.    Yeah.  And the Stanford Internet

5    Observatory, that's -- is that where Renee DiResta

6    is?

7          A.    I know that Renee DiResta was part of

8    this event.  I'm -- I think that's where she is,

9    but I'm not positive.

10          Q.    And the Stanford Internet Observatory

11    is also something -- part of something called the

12    Virality Project, right?

13          A.    I don't -- I've never heard of that

14    term.

15          Q.    So V-I-R-A-L-I-T-Y, Virality Project,

16    does that ring a bell to you?

17          A.    It does not.

18          Q.    So you're not aware of the Surgeon

19    General's office being directly involved in

20    something called the Virality Project?

21          A.    I am not.

22          Q.    Now this in exhibit, you've got here,

23    includes the kind of cover page of the post on the

24    Stanford Internet Observatory with a YouTube video

25    of Dr. Murthy's public remarks.  And then attached

**ERIC WALDO  12/22/2022**

```
 1    to that is an audio transcription done by a court
 2    reporter of excerpts from those remarks.  Can you
 3    see that if you scroll through?
 4         A.    I -- I can see that, yes.
 5         Q.    I want to skip ahead to page 5.
 6    Dr. Murthy says in this kind of Stanford --
 7               MS. CHUZI:  Counsel -- Counsel, I'm
 8    sorry to interrupt.  The document is not up on the
 9    screen.
10               MR. SAUER:  Oh, I'm sorry.
11         Q.    (BY MR. SAUER)  Can you see it now?
12         A.    Yes.  Thank you.  May I have a moment
13    to read this page, sir?
14         Q.    Sure.  Actually, why don't you read
15    the next page, page 6.
16         A.    Not this page, sir?  Okay.
17         Q.    Yeah.  Do page 6.
18         A.    Okay.
19         Q.    See the sentence I've highlighted on
20    the shared screen where Dr. Murthy says:  We're
21    asking technology companies to operate with greater
22    transparency and accountability so that
23    misinformation doesn't continue to poison our
24    sharing platforms, right?
25         A.    Yes.  I see that.
```

**ERIC WALDO  12/22/2022**

Page 209

1          Q.     So there's two words that repeated

2     here.  One is accountable and the other is poison,

3     right?

4          A.     Those are, yes, words we've discussed

5     before.

6          Q.     Yeah.  And so he's using those words

7     again in his second event announcing this.  And I

8     take it you -- is that correct?

9          A.     Correct.

10          Q.     Yeah.  He goes on to say:  We know

11     the government can play an important role too.

12               Do you know what role of the

13     government he's referring to?

14          A.     He, I think, highlights that bringing

15     stakeholders to together with urgency around a

16     common vision for a healthy information environment

17     as well as supporting community organizations that

18     are trying to get accurate information to the

19     community members.  So I believe that's what he

20     means, that the government can help bring together

21     stakeholders, sort of what I would call the

22     convening power of a bully pulpit.  So you're able

23     to bring parties together.

24          Q.     So and those stakeholders, I assume,

25     would include social media platforms.  Right?

**ERIC WALDO  12/22/2022**

```
 1         A.    I think that's fair to think they're
 2  -- they are stakeholders that you would want to
 3  bring together, yes.
 4         Q.    Yeah.  And you'd want them to share
 5  the urgency to have a common vision for healthy
 6  information environment, right?
 7         A.    You would want all your stakeholders
 8  to have that, yes.
 9         Q.    Let's turn ahead to page 9.  Are you
10  there?
11         A.    I am there, yes.  Can I have a moment
12  to read this page, sir.
13         Q.    Sure.
14         A.    Great.  Go ahead.
15         Q.    In the middle of the page, Dr. Murthy
16  says:  We know technology companies have a really
17  important role.  They must step up and play to slow
18  the spread of misinformation on their sites where
19  that's by either sharing data with people and
20  researchers about what interventions they're making
21  and the impact that that's having, right?
22         A.    That is what the sentence says,
23  correct.
24         Q.    So he -- he provides an explanation
25  to kind of data sharing there.  It's data sharing
```

**ERIC WALDO  12/22/2022**

Page 211

```
 1    that would allow researchers to assess what

 2    information -- what interventions they're making

 3    and the impact that they're having, right?

 4            A.    That is what the sentence says,

 5    correct.

 6            Q.    So the purpose of the data sharing is

 7    so that outside people come in and kind of assess

 8    how well they're doing with their own internal

 9    policies to combat the spread of misinformation,

10    right?

11            A.    That's -- yes.

12            Q.    And he also refers to changing

13    algorithms and making other alterations to identify

14    the misinformation early and slow it spread, right?

15            A.    Correct.  That's what he says.

16            Q.    And he goes on to refer to that as

17    steps that all of us can take, right?

18            A.    That's correct.

19            Q.    By all of us, that includes social

20    media platforms, right?

21            A.    Yeah.  That's in keeping with his

22    all-of-society approach.

23            Q.    Yeah.  Skip ahead two pages to the

24    last page here.  It's called page 11.

25            A.    Great.  Give me one moment, sir.  I'm
```

**ERIC WALDO  12/22/2022**

Page 212

```
 1   ready.
 2         Q.    Okay.  Here, toward the bottom of
 3   page, if you look at ahead of page 10, it's
 4   responding to a question by Renee DiResta, who we
 5   talked about before, right?
 6         A.    Yes.
 7         Q.    Yeah.  And what he says here at the
 8   bottom of page 11 is:  I'm optimistic we can make
 9   progress in this area, and myself, my team, we're
10   committed to working with you, Renee, with others,
11   you know, who we've been, you know, partnered with
12   over the last many months.  Do you see that?
13         A.    I do.
14         Q.    Were you aware that the Surgeon
15   General's office was partnered with Renee DiResta
16   and others over the last many months?
17         A.    I -- I certainly know that Renee
18   DiResta would have been part of the planning
19   process for the launch event.  So that's -- that
20   might be one of the definitions of partnership.
21         Q.    Was she planning the launch event for
22   many months?
23         A.    I don't know.
24         Q.    This was July 15th of 2021.  Surgeon
25   General Murthy had been Surgeon General since
```

**ERIC WALDO  12/22/2022**

Page 213

```
 1    January of 2021, correct?

 2          A.   I don't think so.  I think he was

 3    confirmed in February, but I'm not -- I don't think

 4    he got confirmed in January.  You may be correct.

 5    I -- I don't recall the date of his confirmation.

 6          Q.    But in any event, something like

 7    February to July, what partnership was there

 8    between Renee DiResta and the Stanford Internet

 9    Observatory and the Surgeon General's office for

10    those many months prior to July 15th 2021?

11          A.   I don't know.

12          Q.    So you don't know what he's referring

13    to about how they partnered with them over the last

14    many months?

15          A.   I don't know.  My guess would be that

16    Renee may have been one of the subject matter

17    experts consulted in the creation of the advisory,

18    but that's just an educated guess.

19          Q.    So you don't know for sure whether

20    she had input in the advisory?

21          A.   I do not.

22          MR. SAUER:  That's a breaking point,

23    and I see it's 1:15 there.  Do you want to take a

24    lunch break now?  I get a thumbs up from the

25    witness on that.
```

**ERIC WALDO  12/22/2022**

Page 214

```
 1                    MS. CHUZI:  That sounds great.

 2                    MR. SAUER:  Okay.  Let's do it.

 3                    THE VIDEOGRAPHER:  I'm sorry.  Did

 4      you want to go off now or did you have one more?

 5                    MR. SAUER:  Go off the record,

 6      please.

 7                    THE VIDEOGRAPHER:  Sorry.  The time

 8      is 12:19 p.m.  We are off the record.

 9                    (A lunch break was taken.)

10                    THE VIDEOGRAPHER:  The time is 12:59

11      p.m.  We are back on the record.

12           Q.   (BY MR. SAUER)  Mr. Waldo, I just

13      e-mailed your counsel Exhibits 14, 16, 17, 18, and

14      19.  Those ought to hit the inbox soon.  And I'd

15      like to pull up Exhibit 14 now and ask you to take

16      a look at it.

17                    And you can see on the shared screen,

18      it's a New York Times article on July 16th, 2021

19      reporting on President Biden's comment about --

20      Facebook quote, "They're killing people."

21                    Do you see that in the headline,

22      "They're killing people"?

23           A.   I do.  I -- I see the headline.

24           Q.   The part about this that I want to

25      ask you about is here on the second page, there's
```

**ERIC WALDO  12/22/2022**

Page 215

```
 1    discussions in meetings between administration

 2    officials and -- and -- and social media platforms

 3    here on the second page of this article in the area

 4    I've highlighted.

 5                Do you see that?  It's directly below

 6    the picture of Surgeon General Murthy and Jen

 7    Psaki.  Do you see that highlighted text?

 8         A.   We're still waiting for the document

 9    to come through over e-mail here.  I can see it on

10    the screen, but I'd like an opportunity to review

11    the article.

12         Q.   Do you want to start by looking at

13    this blue text that's highlighted --

14         A.   Would you mind just scrolling up so I

15    can see the top of the article, sir?

16         Q.   Yeah, sure.

17         A.   Thank you very much.  Can you stop

18    there, sir?  Sorry.  Can you scroll back up?  Thank

19    you.  Can you stop there, sir, please?  I'll let

20    you know when you can scroll down.  Sorry.  Now I

21    have a copy of it in front of me, sir, so I'll go

22    ahead and take a look at that.

23         Q.   Okay.  And again, I think that my

24    questions are going to relate to this blue

25    highlighted text here.  I don't think it's
```

**ERIC WALDO  12/22/2022**

Page 216

```
 1   necessary for you to read the entire article.  If

 2   it seems like to you, you need to read the whole

 3   article while I'm asking questions, I'm going to

 4   ask you to let you (sic) know, but I'm going to go

 5   ahead and ask questions.  If you're going to read

 6   the entirety of every single document --

 7         A.    I -- I -- I'm trying to --

 8         Q.    If I may finish.

 9         A.    Sir, I'm just --

10         Q.    If -- if I may finish my comment.  If

11   you're going to read --

12         A.    Sorry, sir.

13         Q.    -- the entirety of every single

14   document I give you, that's going to take a long

15   time and we're going to ask to go extra time.  I'm

16   going to have the videographer start timing the

17   amount of time you spend to review it.  I think

18   this will go quicker if we just look at the area

19   I'm highlighting.  If you think you need more

20   context, let me know when the question comes up.

21   I'm not asking you to read the entirety of every

22   single document that I hand you.  Is that clear?

23         A.    I understand that, sir.  I'm just

24   trying to get a overall sense of the article.  I'm

25   not trying to read the entire thing, sir.
```

**ERIC WALDO  12/22/2022**

Page 217

1          Q.     Okay.

2          A.     I don't think -- I don't think that's

3     unreasonable.

4          Q.     Right here on the second page, in the

5     blue highlighted text, there's a quote from Jen

6     Psaki where she says:  We've raised for them in our

7     direct channels of which every administration has

8     always had with every social media platform.

9                 Do you know what direct channels Jen

10    Psaki's referring to between -- are you aware of

11    direct channels between every administration and

12    every social media platform?

13         A.     I do not know what she's referring

14    to, sir.

15         Q.     Are you aware of direct channels of

16    communications between the Biden administration and

17    soc- -- every social media platform?

18         A.     I'm not familiar with what she's

19    referring to, sir.

20         Q.     In the next paragraph, it says:

21    Since January, Senior White House officials,

22    including the Surgeon General, Dr. Vivek Murthy,

23    have been in talks with the social media company to

24    stop the spread of false stories about vaccination

25    side effects and other harms.  Correct?

**ERIC WALDO  12/22/2022**

Page 218

```
 1          A.      That's what the article says, sir,
 2    yes.
 3          Q.      So the article reports on July 16th
 4    of 2021 that since January of 2021, there have been
 5    Senior White House officials, including the Surgeon
 6    General, that have engaged in talks with social
 7    media -- with -- with the social media company,
 8    here, referring to Facebook, correct?
 9          A.      This is what the New York Times is
10    reporting, sir, yes.
11          Q.      Are you aware of any meetings that
12    occurred between Surgeon General Murthy and
13    Facebook since January of 2021 to July of 2021?
14          A.      Only the ones you and I have already
15    talked about, sir.  So that -- you showed me the --
16    the meeting between Andy Slavitt, Dr. Murthy, and
17    Nick Clegg that -- I recall that was in May.
18    That's the only one I'm familiar with before I
19    arrived.
20          Q.      The only one you're familiar with is
21    that May 25th, 2021 introductory meeting between
22    Nick Clegg, Andy Slavitt, and Dr. Murthy, right?
23          A.      Since January.  We also discussed,
24    sir, the potential transition -- the transition
25    call.  So I don't know when that would have
```

**ERIC WALDO  12/22/2022**

Page 219

```
 1    occurred, but that would have been sometime between

 2    the election day November of 2020 and January 20th

 3    of 2021.

 4         Q.    And would that have been called to

 5    quote, stop the spread of false stories about

 6    vaccination side effects and other harms?

 7         A.    I'm sorry.

 8               Can you repeat the question?

 9         Q.    I'm just reading from how the New

10    York Times reporter describes those talks with

11    social media -- social media company, Facebook, to

12    stop the spread of false stories about vaccination

13    side effects and other harms.  Is --

14         A.    I'm not -- I'm not familiar with

15    those calls before I started.

16         Q.    Gotcha.

17               Does that accurately describe your

18    understanding of that introductory call between

19    Nick Clegg, Andy Slavitt, and Dr. Murthy on May

20    25th of 2021?

21         A.    It does not.

22         Q.    So you think -- if it's -- if this

23    reporting is accurate, it's talking about some

24    other meeting other than the May 25th, 2021

25    meeting, correct?
```

**ERIC WALDO  12/22/2022**

Page 220

```
 1          A.    If the report is accurate, that --
 2    that's a fair guess.
 3          Q.    Yeah.  Next paragraph says:  There's
 4    been repeated requests from the White House, but
 5    Facebook has not shared even basic data on how much
 6    vaccine misinformation exists and if the company's
 7    efforts to stop its spread are working.  Correct?
 8          A.    That is -- you read that correctly.
 9          Q.    Are you aware of efforts or talks
10    involving Surgeon General Murthy prior to July 16th
11    of 2021 to request basic data on how much vaccine
12    misinformation exists and whether Facebook's
13    efforts to stop its spread are working?
14              MS. CHUZI:  Objection.  Compound.
15              THE WITNESS:  Can you clarify the
16    question, sir?
17          Q.    (BY MR. SAUER)  Are you aware of any
18    of these talks that are described here in this
19    paragraph, talks where there were repeated requests
20    from the White House, but Facebook refused to share
21    even basic data on how much vaccine misinformation
22    exists and whether its efforts to stop its spread
23    are working?
24          A.    Again, the only -- the only meeting
25    I'm aware of are the ones you've shown me, the May
```

**ERIC WALDO  12/22/2022**

**Page 221**

```
 1    Nick Clegg and then the one I already described to
 2    you that we previously discussed, that happened
 3    during transition.  And I think we described that
 4    that meeting, during the transition, as covering --
 5    that the reach -- understanding the research and
 6    data side of the reach of health misinformation.
 7          Q.    Okay.  So you're not aware of any
 8    meetings between the beginning of the
 9    administration in January 20th of 2021 and July
10    16th of 2021 that would match the description
11    provided in this New York Times article, right?
12          A.    That's correct.
13          Q.    There's a reference to CrowdTangle.
14    It says:  When administration officials presented
15    data from CrowdTangle, a content-tracking tool
16    owned by Facebook, that showed vaccine
17    misinformation was soaring, Facebook officials
18    dismissed its accuracy, correct?
19          A.    That is what the reporting in the New
20    York Times article says, correct.
21          Q.    Are you aware of any meeting
22    regarding the Surgeon General staff where that was
23    discussed?
24          A.    I am not aware.
25          Q.    And then they go on to say:  In
```

**ERIC WALDO  12/22/2022**

**Page 222**

1    another meeting with Dr. Murthy, officials at

2    Facebook noted that it had tried to get influencers

3    with big audiences to promote vaccination as an

4    apparent push against misinformation.  Correct?

5         A.    That is what the article reports,

6    correct.

7         Q.    Do you know when that meeting

8    occurred with Dr. Murthy, where it --

9         A.    I don't --

10        Q.    -- talked about using influencers to

11   promote vaccination?

12        A.    I don't know if or when that meeting

13   occurred.

14        Q.    And if this reporting is accurate, it

15   doesn't meet the description of any meeting that

16   we've talked about yet today, correct?

17        A.    That's correct.

18        Q.    And in particular, it doesn't meet

19   the description of the only meeting prior to July

20   16th, 2021, that was identified in the

21   interrogatory responses involving Dr. Murthy,

22   correct?

23        A.    Correct.

24        Q.    It goes on to say:  The person

25   familiar with the -- sorry.  It goes on to say:  In

**ERIC WALDO   12/22/2022**

Page 223

```
1    that meeting, Dr. Murthy angrily said that while

2    the company promoted its efforts to encourage

3    vaccination, it did not do enough to defend against

4    bad information.   Correct?

5         A.    That is what the report in the New

6    York Times article says, correct.

7         Q.    And are you aware of any meeting that

8    meets that description prior to --

9         A.    No, I --

10        Q.    -- July 16th of 2021?

11        A.    I am not.

12        Q.    And certainly no such meeting was

13   disclosed in response to our interrogatories,

14   correct?

15        A.    That is correct.

16        Q.    Are you a -- do you recall Dr. Murthy

17   ever talking about getting angry with Facebook in a

18   meeting and angrily telling it that it doesn't do

19   enough to defend against bad information?

20        A.    No, I have no recollection of

21   Dr. Murthy ever describing this.   And frankly, I'm

22   doubtful that -- I don't -- I worked with

23   Dr. Murthy for over a year and a half and I've

24   never seen him get angry or even express anger,

25   frustration in -- in any way that would be
```

**ERIC WALDO  12/22/2022**

Page 224

```
 1   noticeable.  So I'm -- I'm -- I'm -- I'm skeptical
 2   of this reporting.
 3          Q.    Okay.  And then it goes on to say:
 4   In one tense meeting in the late spring, according
 5   to the person familiar with the matter, a Facebook
 6   official responded defensively to Dr. Murthy, "How
 7   do you know if your efforts are working?"  Correct?
 8              MS. CHUZI:  Objection.
 9   Mischaracterizes the evidence.
10          Q.    (BY MR. SAUER)  Is that what that
11   article says?
12          A.    The ar- -- the -- the -- the -- the
13   line that you've read says:  In one tense meeting
14   in the late spring, according to the person
15   familiar with the matter, a Facebook official
16   responded defensively, "How do you know if your
17   efforts are working?"  I don't know to whom they
18   said that.
19          Q.    Well, the immediately preceding
20   sentence refers to one person, Dr. Murthy, right?
21          A.    Another meeting with Dr. Murthy
22   officials, yes, it does.
23          Q.    So are you aware of Dr. Murthy having
24   a tense meeting in late spring with Facebook?
25          A.    I am not.
```

**ERIC WALDO  12/22/2022**

Page 225

```
 1            Q.    And that would be late spring of
 2    2021, correct?
 3            A.    That is correct.
 4            Q.    And the Facebook official became
 5    defensive in that meeting according to the
 6    reporting?
 7            A.    That is what the New York Times
 8    article reports.
 9            Q.    And again, that does not meet the
10    description of the May 25th, 2021 meeting disclosed
11    in the interrogatory responses, correct?
12            A.    It does not.  And also, I -- I -- I
13    just -- I think that in the rollout of the -- of
14    the advisory, I would have been informed about this
15    meeting in preparation to meet with Facebook
16    officials.  So I -- I'm not familiar with it and
17    I'm not sure if it happened.
18            Q.    Okay.  So you don't know whether or
19    not it happened based on this reporting?
20            A.    That's correct.
21            Q.    Let's look at Exhibit 16.  And again,
22    I -- I welcome you to familiarize yourself with it,
23    but I'm not asking you to read the whole thing.
24            A.    Yep.
25            Q.    You see here at the top -- can you
```

**ERIC WALDO  12/22/2022**

Page 226

```
 1    see on the screen share?
 2         A.    I can see on the screen share, yes.
 3    Thank you.
 4         Q.    And here's a July 21st, 2021 e-mail
 5    from Payton Iheme of Facebook to you and Kyla
 6    Fullenwider, right?
 7         A.    That's correct.
 8         Q.    So this would have been five days
 9    after that -- I think you described it as sad-faced
10    July 16th meeting with Facebook that was the
11    rollout meeting.
12              That happened after the rollout,
13    right?
14         A.    I described that as Facebook's -- the
15    Facebook folks who were on the -- with the call had
16    sad faces, correct.
17         Q.    Yeah.  In the first paragraph here,
18    Payton says:  Hi, Eric and Kyla.  Thank you again
19    for reaching out and providing more context to the
20    ongoing discussions around the Surgeon General's
21    recent announcement.  We wanted to follow up with
22    you on a few questions you asked in the meeting
23    focused on CrowdTangle, data on the online
24    interventions, and Facebook's borderline content
25    policies.  Correct?
```

**ERIC WALDO  12/22/2022**

Page 227

```
 1          A.    That is what the e-mail says,
 2     correct.
 3          Q.    Is she referring to the July 16th
 4     meeting in which you provided more context or was
 5     there some other meeting between the 16th and the
 6     21st?
 7          A.    It would have to be the meeting on
 8     the 16th.
 9          Q.    Okay.  And I think you testified
10     earlier that you couldn't remember specifically
11     what was discussed in this meeting.  Does her --
12          A.    I -- I --
13          Q.    Go ahead.
14          A.    I think I mentioned that I think Kyla
15     asked some questions about CrowdTangle.
16          Q.    Yeah.
17                Does this help you remember what kind
18     of questions she asked?  She says -- she -- she:
19     Facebook wants to follow up with you on a few
20     questions you asked focusing on CrowdTangle, data
21     on the online interventions, and Facebook's
22     borderline content policies.
23          A.    I think it's a fair reading of this
24     e-mail that Kyla asked questions about CrowdTangle,
25     those interventions, and their -- their policies.
```

**ERIC WALDO  12/22/2022**

Page 228

```
 1          Q.    So on the CrowdTangle issue, she has

 2    bullet points here that say things like:  Can

 3    confirm no plans to wind down or change the ability

 4    of people that access CrowdTangle.  A few months

 5    ago, the team moved management of CrowdTangle from

 6    the partnerships team.

 7               Does that -- do these bullet points

 8    jog your memory as to what Kyla asked about

 9    CrowdTangle at all?

10          A.    I think -- I'm trying to recall.

11    Kyla may have asked, you know, whether or not there

12    was -- people were being removed or the ability of

13    researchers to use CrowdTangle was being taken

14    away.  So I think -- I think that may have been a

15    question she asked.

16          Q.    Looking up above, the second thing

17    that she's following up with is data on the online

18    interventions.

19               Do you know what the online

20    interventions were that were discussed in the July

21    16th meeting with Facebook?

22          A.    I do not.

23          Q.    Does this ring a bell here where she

24    gives these bullet points where she talks about:

25    Interventions we have put into place during
```

**ERIC WALDO  12/22/2022**

**Page 229**

1   COVID-19, and it says:  Some of which specifically

2   create friction in how people consume information?

3          A.    I am reading these and I see that

4   those are clearly responses to what they're doing

5   to create friction.  So that must have been in

6   response to a question Kyla asked.

7          Q.    So did Ky- -- do you remember Kyla

8   asking her what they were doing to increase

9   friction and how information shared?

10         A.    I don't remember that.  But I think

11  it's a fair reading of the e-mail to say she asked

12  that question.

13         Q.    And their response includes:

14  WhatsApp forward limits.  Cut highly-forwarded

15  messages by 70 percent.  And then:  Facebook

16  warning labels on fact-checked content and things

17  like that.  Right?

18         A.    Yes.  You are reading the example

19  that Payton is providing.

20         Q.    And then the last one is:

21  Informational labels on posts about COVID-19

22  vaccines and friction when someone goes to share

23  these posts on Facebook and Instagram.  Correct?

24         A.    That's correct.  That's what the --

25  Payton's reply says.

**ERIC WALDO  12/22/2022**

Page 230

```
 1            Q.    Do you remember -- do you remember
 2    Kyla asking about that?  I take it these are all
 3    ways to slow the spread of misinformation on
 4    Facebook, friction and --
 5            A.    I think you --
 6            Q.    Yeah, go ahead.
 7            A.    No.  I said I think you just asked
 8    that and it -- this doesn't jog my recollection.
 9    It's clear she asked a question about creating
10    friction and these are the responses that Payton
11    provided.
12            Q.    Gotcha.  And going up here, she --
13    the third area to -- that Payton is addressing is
14    questions about Facebook's borderline content
15    policies.
16                  Did either you or Kyla raise that
17    with them?
18            A.    I don't recall, but I think it's fair
19    to guess that Kyla, who was driving the
20    conversation, likely raised that if they're
21    responding to it.
22            Q.    What are borderline content policies?
23            A.    What a great question.  I'm not sure
24    that I know.
25            Q.    Okay.  But going down here where she
```

**ERIC WALDO  12/22/2022**

**Page 231**

1    has a response, the -- the bottom third of this

2    first page where she has a sort of section

3    dedicated to COVID policies, and she says:  We

4    remove COVID-19 content that contributes to the

5    risk of imminent physical harms, including numerous

6    false claims about the COVID-19 vaccine.  Correct?

7         A.    That is what the -- the -- the e-mail

8    says, correct.

9         Q.    Then she reports:  We permanently ban

10   pages, groups, and accounts that repeatedly break

11   our rules on COVID-19 misinformation.  Correct?

12        A.    That is what the e-mail says,

13   correct.

14        Q.    And then the third thing she reports

15   is that:  We also reduce the reach of posts, pages,

16   groups, and accounts that share other false claims

17   that do not violate our policies but may present

18   misleading or sensationalized information about

19   COVID-19 and vaccines.  Correct?

20        A.    That is -- that is a accurate reading

21   of her e-mail.

22        Q.    So what she understood that she was

23   being asked in the July 16 meeting about borderline

24   content policies was the removal of contents,

25   permanently banning of groups and pages, and the

**ERIC WALDO  12/22/2022**

**Page 232**

```
 1    reducing of the reach of the posts, groups, and
 2    pages that share misleading or sensationalized
 3    content, correct?
 4            A.    That --
 5                  MS. CHUZI:  Objection.  Calls for
 6    speculation.
 7            Q.    (BY MR. SAUER)  Correct?
 8            A.    I'm not -- I don't recall what Kyla
 9    asked.  The response indicates that it's about
10    COVID policies including removal, banning and
11    reducing the reach.
12            Q.    So do you remember Kyla asking any --
13    anything about content policies that would involve
14    removing posts, reducing the reach of potentially
15    harmful posts, and permanently -- or banning pages,
16    groups, and accounts?
17            A.    I do not.
18            Q.    So you -- you -- you -- you -- you
19    don't remember specifically what was discussed
20    about that in the July 16th meeting?
21            A.    I do not.
22            Q.    Do you remember why -- or do you have
23    an understanding why Facebook thought it was
24    important or thought it was worth reporting back to
25    you and Kyla about removing posts, permanently
```

**ERIC WALDO  12/22/2022**

Page 233

```
 1     banning pages, and reducing the -- the -- the reach

 2     of posts, pages, and groups?

 3          A.    There was an e-mail from Payton, I

 4     think to me and Kyla before the meeting, where she

 5     was asking whether or not we wanted them to take

 6     the steps articulated by Jen Psaki in the press

 7     conference.  Obviously, that's one of the things

 8     that Ms. Psaki asked about in terms of the -- the

 9     removal.  So it's -- it's not impossible to assume

10     that she may have included this, not because Kyla

11     asked, but because it was something that had come

12     up in the press conference.

13          Q.    Yes.  Although, in the first -- as we

14     read before, in the first paragraph of this e-mail,

15     she says she's following up with you on a few

16     questions asked in the meeting, not at the press

17     conference; focused on CrowdTangle, and then she

18     talks about CrowdTangle; data on the online

19     interventions, and then she talks about the

20     interventions; and Facebook's borderline content

21     policies, and then she talks about those COVID

22     policies.

23               So she seems to be referring to

24     questions that were raised in the meeting with you

25     and Kyla on July 16th, correct?
```

**ERIC WALDO  12/22/2022**

Page 234

```
 1          A.    That -- that's a fair reading.
 2          Q.    Let's look at Exhibit 17.  I'm going
 3   to screen share.  If you can pull it up on your
 4   iPad.  If you look at this e-mail chain involving
 5   Nick Clegg, and Dr. Murthy, and eventually yourself
 6   there at the top.
 7                Do you remember this e-mail chain?
 8          A.    Yes.
 9          Q.    So if you go down to the second page,
10   there's -- starting on the first page, going to the
11   second page, the first e-mail is from Nick Clegg to
12   Dr. Murthy, copying Brian Rice, right?
13          A.    That's correct.  Brian Rice is copied
14   on this e-mail from Nick Clegg to Dr. Murthy.
15          Q.    And Nick Clegg says:  Dear Vivek,
16   reaching out after what has transpired over the
17   past few days following the publication of the
18   misinformation advisory and culminating today, and
19   the President's remarks about us.
20                This is July 16th, so I take it he's
21   referring to the "they're killing people comment,"
22   correct?
23          A.    I don't know -- that's a fair
24   reading.  I don't know what, in specific, Nick was
25   referring to, but that seems like a fair guess.
```

**ERIC WALDO  12/22/2022**

```
 1          Q.     Yeah.   He goes -- next sentence, he
 2   says:   I know our teams met today.   Right?   And
 3   this is July 16th.
 4          A.     Right.
 5          Q.     Is that a reference to the meeting
 6   between you and Kyla and Payton and the other
 7   Facebook representatives that had been intended to
 8   be the rollout meeting, but was actually the post
 9   announcing meeting, right?
10          A.     Yes, that's correct.
11          Q.     And Nick Clegg -- by the way, what's
12   Nick Clegg's title?   Is he the senior government
13   affairs person at Facebook?
14          A.     I don't actually know Nick's title.
15          Q.     He used to be the Deputy Prime
16   Minister of the United Kingdom, right?
17          A.     I believe that's correct.
18          Q.     So in other words, he was like --
19   that's like being vice president of the United
20   States for Britain, right?
21          A.     You tell me.
22          Q.     I don't know.   He's the senior --
23   former senior government official in United
24   Kingdom, now head of global affairs at Facebook.
25                 Is that the guy we're talking about?
```

**ERIC WALDO  12/22/2022**

Page 236

```
 1        A.     Sorry.

 2               Can you repeat that?  What's the

 3   question?

 4        Q.     Never mind.  Let me -- let me look at

 5   this next sentence in the e-mail.  He says:  I know

 6   our teams met today.

 7               And I take it that's the meeting

 8   between you and --

 9        A.     Can you highlight the -- can you

10   highlight the text while you're doing that, sir?

11   You were doing that so well.  Thank you.  Okay.

12        Q.     Yeah, here.  Here you go.

13        A.     Thank you.

14        Q.     I know your teams met today to better

15   understand the scope of what the White House

16   expects from us on misinformation going forward.

17   Correct?

18        A.     That is what Nick Clegg wrote in the

19   e-mail to Dr. Murthy, yes.

20        Q.     Yeah.

21               Was that his under- -- was that your

22   understanding that the meeting related to what the

23   White House expects from Facebook on misinformation

24   going forward?

25        A.     No.
```

**ERIC WALDO  12/22/2022**

1          Q.      Okay.  You had a different under- --

2     how -- how did he -- do you know how he got that

3     understanding?

4          A.      I do not.

5          Q.      Is it possible that Payton Iheme and

6     the other Facebook participants in the July 16th

7     meeting got that impression when they met with you

8     and Kyla and were asked things about CrowdTangle

9     and borderline content policies and so forth?

10         A.      Is it possible?

11         Q.      Sure.

12         A.      In the sense that anything is

13    possible, yes.

14         Q.      At the conclusion of this e-mail, he

15    says:  I would appreciate the opportunity to speak

16    directly and discuss a path forward with you.

17    Correct?

18         A.      That is correct.  That is what

19    Mr. Clegg wrote to Dr. Murthy.

20         Q.      Did -- did Dr. Murthy respond to this

21    e-mail immediately, do you know?

22         A.      I don't recall.  I can't recall if

23    Dr. Murthy responded or if I ended up responding to

24    set up the meeting.

25         Q.      So that -- that e-mail requesting the

**ERIC WALDO  12/22/2022**

Page 238

```
 1    meeting from Dr. -- from Nick Clegg was dated July
 2    16th, right?
 3         A.    Yes, that's correct.
 4         Q.    And he's asking for another meeting
 5    as well to the one you'd already had that day,
 6    right?
 7         A.    That's correct.
 8         Q.    Yeah.  And I'm putting on the screen
 9    share, Exhibit 18, a text message from Nick Clegg
10    to Dr. Murthy dated July 18th of 2021.
11               Do you see that?
12         A.    I do see that.
13         Q.    So this is two days after the --
14    after that July 16th e-mail, right?
15         A.    That's correct.
16         Q.    And he says:  Hi, Vivek.  You may
17    have seen this post today in which we -- which we
18    issued to provide more context.  We do not plan to
19    issue more public posts, et cetera.  I imagine you
20    and your team are feeling a little aggrieved, as is
21    the Facebook team.  It's not great to be accused of
22    killing people.  Correct?
23         A.    That is -- you are correctly reading
24    the text from Nick, correct.
25         Q.    Were you aware that Nick Clegg
```

**ERIC WALDO  12/22/2022**

Page 239

```
 1    followed up with Dr. Murthy by text message?
 2          A.    Dr. Murthy may have mentioned it.  I
 3    don't recall explicitly.  I do recall discussing
 4    that he had sent him the e-mail asking for time.
 5          Q.    And then, what -- what did -- what
 6    did you guys decide about that?  Or what did you
 7    discuss about the e-mail asking for time?  Did you
 8    decide to meet with him?
 9          A.    You -- I think, sir, we've discussed
10    that meeting already in this deposition.  But, yes,
11    we -- we -- we determined that we would meet with
12    -- with Nick.  That's the deescalation call that I
13    think you and I discussed earlier today.
14          Q.    Yeah.  And fortuitously, the text
15    message goes on to say that, right.  But as I said
16    by e-mail, I'm keen to kind find a way to
17    deescalate and work collaboratively -- work
18    together collaboratively.  Right?
19          A.    That is what Nick wrote to
20    Dr. Murthy.
21          Q.    So after he -- after Facebook felt
22    singled out on the 15th and 16th at the press
23    conference and the "they're killing people"
24    comment, they were saying they were keen to
25    deescalate and work together collaboratively,
```

**ERIC WALDO  12/22/2022**

**Page 240**

 1    right?

 2         A.    Again, that is -- I agree with you

 3    that that is what Nick wrote to Dr. Murthy.

 4         **Q.    And did he say -- eventually a**

 5    **meeting gets set up in response to these requests**

 6    **by Nick Clegg, right?**

 7         A.    Yes.  I think we've -- we've already

 8    talked about the -- the substance of this meeting.

 9         **Q.    In fact, showing you on the screen**

10    **share, Exhibit 17, one we were looking at before.**

11    **On the 16th, Clegg e-mailed Dr. Murthy asking for a**

12    **meeting.  But on the 18th, he texted the Surgeon**

13    **General and reiterated his request for a --**

14              **(A discussion was held off the**

15    **record.)**

16         **Q.    (BY MR. SAUER)  On the 18th, he**

17    **texted to request a meeting to deescalate and work**

18    **collaboratively.  And then it looks like on the**

19    **19th, Dr. Murthy responded to the e-mail and said**

20    **he'd be happy to speak directly about how we move**

21    **forward.  Right?**

22         A.    Yes.  He says:  I'd be happy to speak

23    directly.  Sorry, you scrolled up, so I can't

24    finish that sentence.

25         **Q.    Sorry.**

**ERIC WALDO  12/22/2022**

Page 241

```
1         A.    But yep.  He says:  I'd be happy to
2    speak directly about how we move forward.  Let me
3    know the best way to schedule time later this week
4    and we'll make it happen.
5         Q.    Yeah.  And that -- he looped in you
6    and Adam Beckman on that e-mail, correct?
7         A.    Yes.  Brian Rice, Adam Beckman, and
8    myself are CC'd from -- on that -- on that e-mail.
9         Q.    And so, is this the meeting that got
10   scheduled for the 23rd, I mean, that you talked
11   about earlier?
12        A.    Yes, this is the meeting with -- with
13   Nick, with me, with DJ, and Dr. Murthy that we've
14   already spoken about.
15        Q.    Just refresh my memory because we've
16   talked about a lot of meetings.  Generally
17   speaking, what was discussed at that meeting with
18   -- with Nick Clegg and -- did Brian Rice
19   participate?
20        A.    I don't think Brian did.  I think
21   when we talked about it last time, I don't recall.
22   Brian may have been.  If he was there, he was in a
23   listening mode.  I don't think he would have spoken
24   much.  But Nick, myself, Dr. Murthy, and DJ were
25   there.
```

**ERIC WALDO  12/22/2022**

**Page 242**

```
 1                  So are you asking me the same

 2      question you asked me before --

 3           Q.    Yeah.

 4           A.    -- about this meeting?

 5           Q.    Yeah.  What was talked about in this

 6      meeting?

 7           A.    I think we said that Dr. Murthy --

 8      the last time we asked this question, Dr. Murthy

 9      asked Mr. Clegg about sort of the research

10      questions about understanding the -- the reach of

11      the data in terms the impact of the mis- -- health

12      misinformation.  And as we discussed before, the

13      last time you asked me this question, I think DJ

14      had some questions about also on the data side and

15      Nick offered to connect DJ with a data person from

16      Facebook.  That's what we discussed the last time,

17      I believe, when you asked me this question about

18      what was discussed at this meeting.

19           Q.    Okay.  Let me pull up Exhibit 19.

20                 Do you recall that e-mail chain,

21      starting here on July 23rd, from Nick Clegg to

22      Dr. Murthy that copies you?

23           A.    Yes.

24           Q.    He begins:  Dear Vivek, if I may.

25      Correct?
```

**ERIC WALDO  12/22/2022**

**Page 243**

```
1              A.    Yes.  He says:  Dear Vivek, if I may.
2              Q.    And first thing he says is:  Thanks
3       again for taking the time to meet earlier today.
4       Right?  On the 23rd, right?
5              A.    Yes.  Nick sends the e-mail on
6       Friday, July 23rd and says:  Dear Vivek, if I may,
7       thanks again for taking the time to meet earlier
8       today.
9              Q.    And he talks about it being helpful
10      to take stock and to establish our next steps,
11      right?
12             A.    That is what the e-mail from Nick to
13      Dr. Murthy says, with -- I'm CC'd, so were a few
14      other people from Facebook.
15             Q.    And Dr. -- Nick Clegg goes on to say:
16      We talked about the speed at which we are all
17      having to iterate as the pandemic progresses.
18      Right?
19             A.    Yes, that -- Nick says:  We talked
20      about the speed at which we are all having to
21      iterate as the pandemic progresses.
22             Q.    Did you, in the meeting, talk about
23      the speed with which, you know, sort of problematic
24      posts are -- are -- are addressed or taken down?
25      Was that some of the speed that was talked about in
```

**ERIC WALDO  12/22/2022**

Page 244

1    the meeting?

2        A.    I don't really recall, but I have no

3    reason to think that Nick is lying here.  So

4    presumably, that came up.

5        Q.    And he says:  I wanted to make sure

6    you saw the steps we took just this past week to

7    adjust policies on what we are removing with

8    respect to misinformation.  Right?

9        A.    Yes.  He says:  I want to make sure

10   you saw the steps we took just this past week to

11   adjust policies on what we are removing with

12   respect to misinformation as well as steps taken to

13   further address the Disinfo Dozen.

14       Q.    So just this past week -- we're on

15   July 23rd here -- July 16th was the day of the

16   President's comment, "They're killing people," and

17   July 15th was the health advisory, right?

18       A.    Those -- those dates are correct,

19   yes.

20       Q.    Yeah.  So just this past week are

21   steps Facebook has taken since they were called out

22   in the press conference and in the President's

23   comments to adjust policy.

24            So they've changed their policies,

25   right?

**ERIC WALDO  12/22/2022**

Page 245

```
1            A.    I'm not sure whether they adjusted.
2    They're saying that they took additional steps here
3    is what I read that to say.
4            Q.    Yeah.
5            A.    I guess, yeah.  They say we -- we --
6    we -- yeah, they say:  We adjust policies.  Yeah,
7    that's what they're saying they did.
8            Q.    Yeah.  So they're reporting that
9    they've -- they're taking -- they've changed their
10   policies to remove disinformation and they've taken
11   steps to further address the Disinfo Dozen, right?
12           A.    That they are -- that they are taking
13   -- they removed 17 additional pages, groups, and
14   Instagram accounts tied to the Disinfo Dozen.
15           Q.    So they --
16           A.    Again, those are -- those are Ins- --
17   just to be clear, he's talking about Instagram
18   accounts, which is different than Facebook.  Just
19   for clarity for you and me.
20           Q.    Okay.  But he said they've taken down
21   17 additional pages, groups, and Instagram accounts
22   tied to the Disinfo Dozen.
23                 So a total of 39 profiles, pages,
24   groups, and IG accounts deleted thus far, right?
25           A.    Yeah, that is what the e-mail from
```

**ERIC WALDO  12/22/2022**

Page 246

```
 1    Nick says to Dr. Murthy.
 2          Q.    And these are steps taken in just the
 3    past week, right, the removal of 17 pages, groups,
 4    and Instagram accounts, right?
 5          A.    That is what Nick says to Dr. Murthy,
 6    yes.
 7          Q.    And he also says:  We are also
 8    continuing to make four other pages and profiles
 9    which have not yet met the removal thresholds more
10    difficult to find than our platform.  Correct?
11          A.    Yes, that is what Nick says.
12          Q.    And then he also says:  In the past
13    week, they've expanded the group of false claims
14    that we remove to keep up with recent trends and
15    misinformation that we're seeing.  Right?
16          A.    Yes.
17          Q.    And then immediately after that, he
18    says:  We hear your call for us to do more.  Right?
19          A.    Yes, that what he -- he wrote to
20    Dr. Murthy.
21          Q.    And that's actually a fair
22    description of what the health advisory does, it
23    calls for Facebook and other social media platforms
24    to do more, right?
25          A.    Yes.  It calls up for an all-society
```

**ERIC WALDO  12/22/2022**

**Page 247**

```
 1   approach, for everyone to do more.
 2           Q.     Including social media platforms,
 3   correct?
 4           A.     Absolutely, yes.
 5           Q.     And -- and after the July 23rd
 6   meeting, the call to do more included removing
 7   specific pages and accounts associated with the
 8   Disinfo Dozen, correct?
 9           A.     I don't think that's what the --
10   that's not what Dr. Murthy asked for.  That's what
11   they're saying they did.
12           Q.     And that's what Jen Psaki asked for,
13   in fact, right, in the press conference; fair to
14   say?
15           A.     I'd have to go back and look at
16   precisely what Ms. Psaki said, but she certainly
17   described the -- the pro- -- problematic nature of
18   the Disinformation Dozen.  But I don't -- I don't
19   recall.  You may be correct, but I don't recall
20   whether or not she explicitly called for their
21   removal.
22           Q.     And after the -- the July 23rd
23   meeting, Nick Clegg thought it important enough to
24   raise as to you that they adjusted policies to --
25   to remove disinformation and took specific actions
```

**ERIC WALDO  12/22/2022**

```
 1    against 17 pages, groups, and Instagram accounts

 2    associated with the Disinformation Dozen, correct?

 3              MS. CHUZI:  Objection.  Calls for

 4    speculation.

 5         Q.   (BY MR. SAUER)  That's what he

 6    reported back hours after that meeting, right?

 7         A.   Can you repeat the question, sir?

 8         Q.   Well, it seems to me that hours after

 9    this July 16th meeting, Nick Clegg e-mails you, and

10    Dr. Murthy and others, and reports back a couple

11    things.  First, he reports back that they've

12    changed their policies with respect to what they're

13    removing of disinformation, which includes

14    expanding the group of false claims that we remove

15    to keep up with recent trends of misinformation,

16    correct?

17         A.   No.  In your question, sir, you said

18    that hours after the July 16th meeting --

19         Q.   No, sir.

20         A.   -- Mr. Clegg reported these policy

21    changes.  That's not correct.

22         Q.   I meant hours after the July 23rd

23    meeting.  You're right.

24         A.   Yeah, that -- yes, after -- a week

25    after the issuance of -- more than a week after the
```

**ERIC WALDO  12/22/2022**

Page 249

1  issuance of the advisory and, yes, hours after the

2  meeting, Mr. Clegg reported on what Facebook was

3  doing.

4          **Q.    And what they had done in the week**

5  **between the advisory and July 23rd meeting, right?**

6          A.    I -- that's what he's -- that is how

7  Mr. Clegg is representing that, yes.

8          **Q.    And those steps include "adjusting**

9  **policies and what we're removing with respect to**

10  **misinformation," correct?**

11          A.    That is what Mr. Clegg is -- is -- is

12  reporting, yes.

13          **Q.    Yeah.**

14              **And taking specific actions against**

15  **accounts tied to the Disinformation Dozen, correct?**

16          A.    That -- that is what Mr. Clegg is

17  reporting to Dr. Murthy, yes.

18          **Q.    And then also expanding the group of**

19  **false claims that they remove as misinformation,**

20  **correct?  Down there in the bottom.**

21          A.    Yes, that is what -- yeah, I see it.

22  Thank you, sir.  This is what Mr. Clegg is

23  reporting to Dr. Murthy in that e-mail, correct.

24          **Q.    You remember those kinds of changes,**

25  **adjustments of policies and so forth, being touched**

**ERIC WALDO  12/22/2022**

```
 1    upon in the July 23rd meeting that involved
 2    Dr. Murthy and Nick Clegg?
 3          A.    I do not.
 4          Q.    So you -- you don't know why
 5    Mr. Clegg thought it appropriate to report back
 6    shortly after the meeting with those changes that
 7    they'd made in the last week since the health
 8    advisory came out?
 9          A.    I don't -- it didn't -- my
10    recollection is that was not raised on that call.
11    I think -- my guess, as we've discussed previously,
12    is that them perhaps viewing, much like Payton did
13    in her first e-mail to us after -- before our
14    meeting, viewing Ms. Psaki's remarks as -- as -- as
15    in -- in line with what Dr. Murthy was asking for.
16          Q.    So they viewed Ms. Psaki's remarks at
17    the joint press conference she held with
18    Dr. Murthy, as the spokesperson for the President,
19    as in line with what the Surgeon General of the
20    United States wanted?
21          A.    That's my -- that would be my guess,
22    but that's -- it wasn't because we asked for it and
23    that calls my recollection.
24          Q.    All right.  He goes on to say:  We
25    hear your call to do more -- for us to do more.
```

**ERIC WALDO  12/22/2022**

Page 251

1    Right?

2              And I think we said we said a moment

3    ago, that's a pretty fair description of the health

4    advisory, right, a call for Facebook and others to

5    do more, right?

6         A.    Yes.  I think, as we've established,

7    the advisory and the -- and the remarks, and the

8    event with the Stanford Internet Observatory,

9    Dr. Murthy is calling on -- for an all-society

10   approach, including social media companies to do

11   more to address the problem of health mis- and

12   disinformation during the height of a historic

13   pandemic costing American lives that can be saved.

14        Q.    And in particular, the -- one of the

15   things to do more is, he goes on to say:  We will

16   reach out directly to DJ to schedule a deeper dive

17   on how to best measure COVID-related content.

18   Right?

19        A.    Yes.  And I believe you and I

20   discussed this before that they were going to

21   connect us -- they were going to have us do a

22   connection with DJ and a data person from Facebook

23   to better understand that question.

24        Q.    Was -- was anyone from the Office of

25   Surgeon General involved in that communication

**ERIC WALDO  12/22/2022**

Page 252

```
 1    between DJ and the Facebook communication person?
 2         A.    When you say "communication," do you
 3    mean, like, the actual call or setting up the call?
 4    Or how do you mean, sir?
 5         Q.    Either.
 6               Was there any involvement in the
 7    Office of Surgeon General and further
 8    communications between DJ Patil and Facebook?
 9         A.    I think Brian Rice sent a follow-up
10    e-mail where I looped him with -- I think Facebook
11    reached out to DJ; I don't think they heard from
12    him.  Brain reached out to me and I think I looped
13    him with DJ.  And so, I -- I don't know whether or
14    not that loop got closed.  I don't know whether DJ
15    met with the data person or not, but I know I was
16    -- I did try to help Brian connect with DJ --
17         Q.    Were --
18         A.    -- or make the connection between
19    Facebook and DJ.
20         Q.    Were you involved in any discussions
21    of, you know, the kind of substance of that issue
22    between DJ and anyone at Facebook?
23         A.    I was not.
24         Q.    So you tried to make the connection,
25    but you weren't there when they talked about the
```

**ERIC WALDO  12/22/2022**

**Page 253**

1   merits, if they ever did?

2          A.    Yeah, correct.  I -- I don't know

3   that they did talk.  I did try to help connect

4   them.  But I was not -- if there was a call, I was

5   not there.

6          Q.    On the next page, Nick Clegg goes on

7   to say:  You have identified four specific

8   recommendations for improvement and we want to make

9   sure to keep you informed on our work on each one.

10  Correct?

11         A.    That is what Nick is writing in his

12  e-mail to Dr. Murthy, correct.

13         Q.    You remember a -- a -- a -- a

14  discussion of four specific recommendations for

15  improvement in this call or elsewhere?

16         A.    I do not.

17         Q.    So you don't know what he's referring

18  to when he says to Dr. Murthy that he's identified

19  four specific recommendations for improvement?

20         A.    I'm not certain.  It could be the --

21  the four -- I -- I don't know if there's more than

22  four bullets in the advisory.  Yeah, or it could be

23  -- I'm not sure if it -- if it come from the --

24  Ms. Psaki's comments.  I don't know what the four

25  are.

**ERIC WALDO  12/22/2022**

Page 254

1       Q.    He talks about trying to schedule a

2    regular cadence of meetings with your team so they

3    can update you on their progress on these

4    misinformation issues, correct?

5       A.    Yes.  Mr. Clegg asked for a regular

6    cadence of meetings.

7       Q.    I think you testified earlier that

8    you guys decided not to do that because you didn't

9    think they were making good progress?

10      A.    I believe I testified that I didn't

11   think they would be worth our time given our

12   competing priorities.

13      Q.    Is a holiday in Spain a consummation

14   devoutly to be wished?

15      A.    Are you a Shakespeare fan, sir?

16      Q.    Yes.

17      A.    So -- so you may know Hamlet

18   soliloquy talks about a consummation devoutly to be

19   wished.  So I'm making a pun and a reference about

20   him vacationing in Spain and that it's a

21   consummation devoutly to be wished.

22      Q.    I think Hamlet was talking about

23   death, so...

24      A.    He was, but Spain sounds much better.

25      Q.    I agree.  Let me share Exhibit 21

**ERIC WALDO  12/22/2022**

Page 255

```
 1   with you.  Oh, you know what, I don't think I've

 2   sent this to your lawyer yet because they wouldn't

 3   all fit on one e-mail.

 4             MR. SAUER:  Amanda, I'm sending you

 5   Exhibits 21, 22, 24, 25, and 27 by the next e-mail.

 6   and while that's coming, I'll try and pull it up on

 7   the -- on the shared screen.

 8        Q.    (BY MR. SAUER)  This e-mail chain,

 9   that involves Brian Rice, as well as Payton and

10   Nick Clegg.

11        A.    Yes.

12        Q.    So I think you testified, just a

13   minute ago, that you were involved in trying to

14   loop in DJ Patil to connect with Facebook, right?

15        A.    Yes.

16        Q.    You mentioned you're using his G-mail

17   account.  Do you know why?

18        A.    I just didn't -- I wasn't sure when

19   Mr. Patil's special government employee status was

20   coming to an end, so I wasn't sure whether or not

21   he was -- how regularly he was checking his

22   osdp.gov e-mail.  So if he was missing one, I

23   wanted to just make sure he knew that Brian was

24   trying to get in touch with him.

25        Q.    Here, this is August 6th, right?  So
```

**ERIC WALDO  12/22/2022**

Page 256

 1    this is, you know, a little less than two weeks

 2    after that July 23rd call, right?

 3         A.    Correct.

 4         Q.    Yeah.  And in this, you say:  Also

 5    Brian and Nick.

 6              That's Brian Rice and Nick Clegg,

 7    right?

 8         A.    Yes.

 9         Q.    It says:  I know on the call with

10    Dr. Murthy, he mentioned seeing if you were able to

11    send an update of any new additional steps you are

12    taking with respect to health misinformation in

13    light of the advisory.  Right?

14         A.    Yes.

15         Q.    Do you remember Dr. Murthy as- --

16    asking for that in the July 23rd call?

17         A.    I think I already mentioned this

18    earlier in the discussion of the call, in one of

19    our earlier conversations during the deposition,

20    that we asked for an update.  I didn't recall if I

21    asked for it or Dr. Murthy.  But it appears that

22    based on this recollection, Dr. Murthy perhaps

23    asked for it.

24         Q.    So Dr. Murthy asked Nick Clegg to

25    give an update on any new slash additional steps

**ERIC WALDO  12/22/2022**

Page 257

```
1    they were taking with respect to health

2    misinformation in light of the advisory, correct?

3         A.    Yeah.   That -- I don't recall per se.

4    But if that's what I wrote down, then I have no

5    reason not to believe myself.

6         Q.    And you went on to say:   We are

7    asking all platforms for this type of update.

8    Right?

9         A.    Yes, that's what I wrote there.

10        Q.    Did you, in fact, ask other platforms

11   for that type of update?  Say, hey, you've seen our

12   health advisory, can you tell us what new or

13   additional steps you're taking in light of it, with

14   respect to misinformation?

15        A.    I believe so, but I don't recall per

16   se.

17        Q.    Do you know if you sent a request

18   like that to Twitter?

19        A.    I probably did, if I said I did.   But

20   I don't recall.

21        Q.    And how about YouTube/Google?

22        A.    Same -- same answer.

23        Q.    When you said "all platforms," did

24   you send a request like that to any other

25   platforms?
```

**ERIC WALDO  12/22/2022**

Page 258

```
 1          A.    I think I meant the folks who we had
 2   talked to in the rollout of this report.  So who --
 3   I guess who we were viewing as the -- the most
 4   impacted stakeholders.
 5          Q.    Who was that?  Platforms.
 6          A.    Again, the groups you and I have
 7   already talked about.  So Facebook, Twitter.  So
 8   Facebook, Twitter, Instagram, and YouTube, and
 9   Google.
10          Q.    How about LinkedIn?
11          A.    I think as we discussed previously,
12   we did not reach out to LinkedIn.
13          Q.    Or Reddit?
14          A.    As discussed and answered previously,
15   we did not reach out to Reddit.
16          Q.    Did Facebook provide an update?
17          A.    I think that they did.  I don't
18   recall whether it was Brian who sent it or Nick,
19   but I think Brian sent us something.
20          Q.    And you said:  Would you be able to
21   send something over within two weeks.  Correct?
22          A.    Yes, that's what my e-mail to Brian
23   says -- or to Brian, DJ, Payton, and Nick.
24          Q.    And then I think Brian copied you
25   later, trying to connect to DJ about that data
```

**ERIC WALDO  12/22/2022**

Page 259

```
 1    sharing issue, right?
 2           A.    Yes.  It appears that that e-mail's
 3    from the 17th from Brian reaching out to DJ, and
 4    I'm CC'd, yes.
 5           Q.    But you don't recall being involved
 6    in the follow-up conversations between DJ, or
 7    Brian, or anyone else at Facebook about that,
 8    correct?
 9           A.    That's -- that's correct, as I
10    answered the last time that you asked me this
11    question.  I don't know if that call ever happened.
12    And if it did, I certainly wasn't part of it.
13           Q.    And then in the e-mail in between --
14    I skipped over this -- Brian said:  Our teams have
15    been working on additional steps.  We will have
16    something back to you within two weeks outlining
17    our approach.  Right?
18           A.    That is what that Brian writes to DJ,
19    correct.
20           Q.    Or to Eric.
21                 That's you, right?
22           A.    But I think he's addressing DJ in
23    that sentence.  He says:  DJ, let me know when best
24    would work on your end.  Our teams have been
25    working on additional steps.  We will have
```

**ERIC WALDO  12/22/2022**

**Page 260**

```
1    something to you to within the next two weeks

2    outlining our approach.

3           Q.    Right.

4           A.    I -- I -- I -- I view that as

5    outlining the approach for DJ, but maybe not.

6           Q.    Well, you were the one who just sent

7    an e-mail saying:  Would you be able to send

8    something over in two weeks?  And maybe it's a

9    addressing both of you:  We'll have something back

10   to you in two weeks outlining our approach for

11   additional steps.  Right?

12          A.    Yeah, it's possible.  Yeah.

13          Q.    Okay.  Let's look at Exhibit 22.

14   Should be in your counsel's inbox.  I'll put it on

15   the screen share.  Here on July 21st, so this is

16   about five days after the "they're killing people"

17   comment, there's an e-mail from Rob Flaherty to

18   Dr. Murthy, CC'ing Alexandria Phillips, who I think

19   is Dr. Murthy's communications person, right?

20          A.    Yes, Alexandria Phillips is

21   Dr. Murthy's communications director.

22          Q.    Yeah.  And then he copies a Jiore

23   Craig at gmail.com, right?

24          A.    It's pronounced Jiore.

25          Q.    Jiore?
```

**ERIC WALDO  12/22/2022**

Page 261

```
 1          A.     Yes, like -- like -- rhymes with
 2    Dory.
 3          Q.     Gotcha.  Not Nemo.
 4                 So Jiore Craig and says to
 5    Dr. Murthy:  Wanted to link you with Jiore Craig,
 6    who's been a critical leader on the DNC's misinfo
 7    work for a long time.  Right?
 8          A.     Yes, that's the e-mail that Rob has
 9    written to Dr. Murthy.
10          Q.     And Rob is the digital director in
11    the White House, right?
12          A.     I believe that's his title.
13          Q.     And I think we talked earlier about
14    your communications with him.
15                 And do you know what misinfo work
16    Jiore Craig does for the DNC?
17          A.     I'm not certain.  My guess would be
18    maybe around voter suppression or sort of the
19    disinformation that sometimes is shared with voters
20    to discourage them from voting.
21          Q.     And the DNC's the Democratic National
22    Committee, right?
23          A.     That's what I would assume.
24          Q.     Yeah.  And it says, she's, quote,
25    also been helping us think through mis slash dis on
```

**ERIC WALDO  12/22/2022**

Page 262

```
 1    the COVID side.  Right?
 2            A.    Yes, that's what Rob's e-mail says to
 3    Dr. Murthy.
 4            Q.    Yeah.  So he wanted -- he says:  I
 5    thought it would be great for both of you to
 6    connect as OSG charts out next steps.  Right?
 7            A.    Yes, that's what Rob has written to
 8    Dr. Murthy.
 9            Q.    Yeah.
10                  Do you know why Rob Flaherty thought
11    it would help for the Office of Surgeon General to
12    be talking to Jiore Craig about COVID-19
13    misinformation?
14            A.    It appears, based on his e-mail, that
15    he's indicating that she is a subject matter expert
16    on mis- and disinformation.
17            Q.    What is her subject matter expertise,
18    do you know?
19            A.    I'm not positive, but his indication
20    is that one of those areas is mis- and
21    disinformation.
22            Q.    With respect to COVID in particular?
23            A.    I think it may be multipronged, but I
24    think it includes COVID.
25            Q.    And it says:  She's been helping us
```

**ERIC WALDO  12/22/2022**

Page 263

```
 1    think through mis/dis on the COVID side.
 2                 Are you -- do you know what she was
 3    doing to help Rob Flaherty in the White House think
 4    through mis- and disinformation on the COVID side?
 5         A.    I do not.
 6         Q.    Were there follow-up communications
 7    between the Office of Surgeon General and Jiore
 8    Craig?
 9         A.    Yes.  I set up a call with her.
10         Q.    What was the end -- I think that's in
11    the first page here.  Is this the calendar invite
12    for that call --
13         A.    Yes.
14         Q.    Eric Waldo and Jiore connect?
15         A.    Yes.
16         Q.    You had a call with her on the 22nd
17    of July, the next day?
18         A.    That's what it looks like, yes.
19         Q.    And did -- was Kyla on that call?  It
20    says she's an optional participant, correct?
21         A.    I don't recall whether Kyla joined or
22    not.  She may have.
23         Q.    What about Alexandria Phillips?
24    She's on the invite, too.
25         A.    My very strong guess is Alex did not
```

**ERIC WALDO  12/22/2022**

Page 264

```
1   join because she was pretty understaffed at that

2   moment and was usually in multiple meetings at one

3   time.

4        Q.    What did you guys talk about in this

5   call, you and Jiore?

6        A.    I think it was more of a courtesy,

7   getting-to-know-you call.  So Rob had sent the note

8   to Dr. Murthy.  I was doing the call in lieu of

9   Dr. Murthy, so I was just really trying to meet

10  her, learn what her -- what her views were and if

11  there was anything she thought we should be

12  thinking about.

13       Q.    What did she say you should be

14  thinking about, if anything?

15       A.    I think she was, in some ways, just

16  another person saying I'm glad you guys are working

17  on this.  And, you know, I don't think she thought

18  we were going to get much movement from technology

19  or -- or social media companies, but that we were

20  doing the right thing and asking for it.

21       Q.    Did she say anything other than that

22  on the call?  Do you remember anything specific

23  that she said?

24       A.    Not to my recollection.

25       Q.    Did you ask her anything on the call?
```

**ERIC WALDO  12/22/2022**

Page 265

```
 1    Did you ask her how she could be helpful to the

 2    Surgeon General's office in combating

 3    misinformation?

 4         A.    Not to my recollection.

 5         Q.    Do you remember what you said on the

 6    call?

 7         A.    I think I wanted to learn more about

 8    her career path and what got her into that line of

 9    work and, you know, what she was working on.

10         Q.    Was there an understanding that she

11    might be considered to be a subject matter expert

12    for the Surgeon General's office?

13         A.    Sorry.  How do you mean, sir?

14         Q.    Well, let me ask you this.

15               Did -- did anything come of this

16    call?  Did she go on to have any role in advising

17    the Surgeon General's office on COVID

18    misinformation?

19         A.    She did not.

20         Q.    And why was that, did you not

21    recommend it?  Or, you know, what happened after

22    the call?

23         A.    Well, I think she seemed like a very

24    competent person.  I think the reality was that our

25    office had subject matter expertise already and was
```

**ERIC WALDO  12/22/2022**

Page 266

```
 1   still determining what the course of action would
 2   be for any follow-up we were going to do after the
 3   launch.  So I don't think we had a role or a proper
 4   way to include her other than, you know, just a
 5   person -- a -- a public-facing citizen who clearly
 6   was interested in our work and a courtesy call to
 7   -- for -- to a colleague.
 8        Q.    Did you ask her in the call what she
 9   had done to advise the White House to help them
10   think through COVID misinformation?
11        A.    I did not.
12        Q.    Do you have any understanding of what
13   her role may have been in coordinating with the
14   White House on that issue?
15        A.    I do not.
16        Q.    Exhibit 23.
17              MS. CHUZI:  Counsel, I don't think I
18   have 23.  I have 21, 22 --
19              MR. SAUER:  I'm sorry.  I'm sorry.  I
20   meant -- I meant Exhibit 24.  Here.
21              MS. CHUZI:  Oh.  Got it.
22              MR. SAUER:  I skipped 23.  So here's
23   24.  My bad.
24        Q.    (BY MR. SAUER)  Do you remember Brian
25   Rice sending you this e-mail on August 18th?
```

**ERIC WALDO  12/22/2022**

```
 1            A.    I do not.
 2            Q.    Here, if you look at the -- the --
 3     the e-mail that he sent to you and DJ Patil on
 4     August 18th, he -- he's captioned it Disinfo Dozen
 5     Post, right?
 6            A.    That's correct.
 7            Q.    And it says:  Eric and DJ, flagging
 8     this post for you and for Surgeon General Murthy.
 9     This detail -- details how we are approaching
10     content from the Disinfo Dozen.   Correct?
11            A.    Yes, that's correct.
12            Q.    And then there's a following post
13     that talks about -- I think Facebook disputes --
14     the Disinfo Dozen are actually responsible for as
15     much misinformation spreading as the CCDH thing.
16     Is that correct?
17            A.    Sorry.  Can you repeat that, sir?
18            Q.    Well, let me ask you this.  In the
19     second paragraph of the post, it talks about:  Any
20     amount of COVID-19 misinformation violates our
21     policies is too much by our standards.  And we have
22     removed over three dozen pages, groups, Facebook or
23     Instagram accounts linked to these 12 people.
24     Right?
25            A.    Yes.  The first sentence says that.
```

**ERIC WALDO  12/22/2022**

**Page 268**

1    Said:  Any amount of COVID-19 that violates our

2    policies is too much by our standards.  And we've

3    removed over three dozen pages, groups, and

4    Facebook or Instagram accounts linked to these 12

5    people, including at least one linked to each of

6    the 12 people for violating our policies.  And then

7    it goes on to describe other things.

8         Q.    About imposing penalties on two --

9    nearly two dozen additional pages, groups, or

10   accounts linked to these 12 people, right?

11        A.    Yes.

12        Q.    So this is the kind of second report

13   that Facebook has sent you guys after that July

14   23rd meeting where they're reporting back about

15   actions taken against the Disinfo Dozen, correct?

16        A.    That's correct.

17        Q.    So there was a Nick Clegg e-mail at

18   7:30 p.m. on July 23rd where he reported back the

19   steps they'd taken that included moving against

20   many Disinfo Dozen accounts, correct?

21        A.    That's correct.

22        Q.    And then again, on August 18th,

23   there's a report back with further adverse actions

24   taken to remove content and -- and pages and groups

25   associated with the Disinfo Dozen, correct?

**ERIC WALDO  12/22/2022**

Page 269

```
 1          A.    If you're referring to this e-mail.

 2          Q.    Correct.  Yeah.  Right?

 3          A.    Yes.

 4          Q.    Yeah.  Okay.  And you -- you just

 5    responded:  Thank you, Brian.  Appreciate you

 6    sharing this.  Right?

 7          A.    That is my response to Brian,

 8    correct.

 9          Q.    Does this e-mail jog your memory as

10    to any further discussions with Facebook from the

11    Surgeon General's office about the Disinfo Dozen?

12          A.    There were no further conversations

13    with Facebook regarding the -- the Disinfo Dozen

14    between Facebook and the Surgeon General's office

15    to my recollection.

16          Q.    Yeah.

17                Were -- were the Disinfo Dozen raised

18    at all in the July 23rd call?

19          A.    Not to my memory.

20          Q.    Exhibit 25.

21                Do -- do you see it?

22          A.    I see that you have it up, and now

23    gov- -- government counsel is providing me with it

24    as well.

25          Q.    In the middle of this e-mail, there's
```

**ERIC WALDO  12/22/2022**

Page 270

```
 1    -- or the -- the -- the first e-mail here,

 2    chronologically, about halfway down the first page,

 3    is an e-mail from Nick Clegg to you, Dr. Murthy,

 4    and DJ, and Brian Rice, correct?

 5          A.    Yes.

 6          Q.    And this was sent on August 20th of

 7    2021, correct?

 8          A.    That's correct.

 9          Q.    So this is two weeks exactly after

10    your August 6th e-mail where you -- you asked them

11    for an update within two weeks as the actions they

12    took in light of the health advisory, correct?

13          A.    That's correct.

14          Q.    And, in fact, Nick Clegg says, you

15    know:  Dear Surgeon General, you asked for an

16    update on existing and new steps that Facebook is

17    taking.  Right?

18          A.    Yes, that's what that e-mail says.

19          Q.    So this is, I guess, the report back

20    to your request for a -- a request for report in

21    two weeks related to actions they took in respect

22    to the advisory, right?

23          A.    That's correct.

24          Q.    And one of the things, in the next

25    paragraph, that Nick Clegg talks about is -- he
```

**ERIC WALDO  12/22/2022**

```
 1    talks about several things, but one is further
 2    policy work to enable stronger action against
 3    persistence distributors of vaccine information,
 4    correct?
 5           A.    Sorry.  Can you go a little earlier
 6    in that paragraph just so I understand what he's
 7    referring to?  Those prior -- all right.  (Reading
 8    in sotto voce.)  Okay.
 9           Q.    So he says --
10           A.    Yes, got it.
11           Q.    Yeah.  Further --
12           A.    Yep.
13           Q.    -- policy work to enable stronger
14    action against persistence distributors of vaccine
15    misinformation, right?
16           A.    That's correct.
17           Q.    He talks about boost the access to
18    authorative information and other things as well,
19    right?
20           A.    Sorry, where?  What -- what's -- I --
21    I -- I don't think you're lying to me, I just want
22    to know where -- where you're seeing that.
23           Q.    Let me make it bigger.
24           A.    Yeah, thank you.  That's very
25    helpful.
```

**ERIC WALDO  12/22/2022**

Page 272

1          Q.     Yeah.  Sorry.  Boosting access to

2     authoritative information --

3          A.     Yeah, I see that.  Thank you, sir.

4          Q.     There's two pieces to this report;

5     one is elevating access to better information,

6     right?  That's one thing he talks about with some

7     bullet points, right?

8          A.     Yeah, that's a section that he's

9     lined out in -- in bold.

10          Q.     Yeah.  And then limiting potentially

11     harmful information is the second section in bold

12     on the next page, right?

13          A.     Yes.  And I believe there's a third

14     section as well on increasing transparency.

15          Q.     Yeah.  And I take it, that was a bit

16     of a sticking point in your discussions with them,

17     right, increasing transparency?

18          A.     I think that's -- that's fair.

19          Q.     In other words, the -- the perception

20     of the Surgeon General's office is they weren't

21     really taking meaningful steps to increase

22     transparency, right?

23          A.     I think we -- I don't -- I don't

24     think we -- we few -- we thought that they would

25     make -- make many moves in that direction, correct.

**ERIC WALDO  12/22/2022**

Page 273

```
 1          Q.     Yeah.  And then going back up where

 2     it talks about limiting potentially harmful

 3     information, he says:  We continue to improve and

 4     refine measures that reduce the spread of

 5     potentially harmful content and limit the

 6     distribution of actors who share misleading

 7     information about COVID and the vaccine.  Correct?

 8          A.     Yes, that's what the document says.

 9          Q.     And he's got about nine bullet points

10     on that, right?

11          A.     I think it's five.  One of -- I

12     consider those other sub bullets possibly, or he's

13     just bad at formatting, but I don't know if he

14     thinks that the -- that the -- the -- the -- the --

15     the ones that are not filled in or -- or I think

16     those might be sub bullets.  But yeah, I -- I -- I

17     don't -- not -- not a dispute of -- of -- of merit.

18          Q.     Those are five bullets and the first

19     bullet has four sub bullets, right?

20          A.     Three sub bullets, yes.

21          Q.     I see four.

22          A.     One, two, three -- oh, you're right.

23     Thank you so much.

24          Q.     First one is:  We will shortly be

25     expanding our COVID policies to further reduce the
```

**ERIC WALDO  12/22/2022**

Page 274

```
1    spread of potentially harmful content on our

2    platform and these changes will apply across

3    Facebook and Instagram.  Right?

4         A.    Yes, that's what the e-mail says.

5         Q.    So he's reporting back with new

6    policy changes, in addition to the ones he already

7    reported to you in the e-mail on July 23rd, that

8    will reduce content -- misinformation content about

9    COVID, right?

10        A.    The only thing I'll say to that

11   question is I -- you know, I don't have both of

12   them in front of me to compare and say whether or

13   not there was some overlap.  I don't know if they

14   were -- if some of the things he reported in that

15   first e-mail are also captured here.

16        Q.    Suffice to say --

17        A.    So I'm not sure --

18        Q.    Go ahead.

19        A.    I'm not sure -- I -- I -- I'm not

20   sure how much of this is, like, new and in addition

21   versus, in some ways, a re- -- recapture of what

22   they've shared.

23        Q.    But it's being presented here as new

24   changes, right?  He says:  We continue to improve

25   and refine measures.  Right?
```

**ERIC WALDO  12/22/2022**

**Page 275**

```
 1          A.    Yes.  Yeah.
 2          Q.    And those measures --
 3          A.    I'm just saying I don't know how
 4    accurate that is.
 5          Q.    Right.  Right.  Yeah.
 6                But this is what he's reporting to
 7    you guys, right?
 8          A.    Correct.
 9          Q.    And new measures include increasing
10    the strength of dem- -- demotions for COVID and
11    vaccine-related content that's related partly falls
12    on missing context, right?
13          A.    That's correct.
14          Q.    And he says he's making it easier --
15    they're making it easier to have pages, groups, and
16    accounts demoted for sharing COVID and
17    vaccine-related misinformation and so forth.
18    Right?
19          A.    Yes, that is what he has written in
20    that bullet.
21          Q.    And he talks about making entities
22    linked to other entities that have been removed, as
23    non recommendable.  Right?
24          A.    Sorry, can I -- (reading in sotto
25    voce).  Rendered and is not -- okay.  Yes, I see
```

**ERIC WALDO  12/22/2022**

Page 276

```
 1   that.  Thank you.
 2          Q.    And lastly:  We will also be
 3   strengthening our existing demotion penalties for
 4   websites that are repeatedly fact-checked for COVID
 5   and vaccine misinformation content shared on our
 6   platform.  Right?
 7          A.    Yes.
 8          Q.    Then he's got -- looks like he's got
 9   a report about removing 20 million pieces of
10   content and removing 3,000 accounts, pages, and
11   groups for people who have been violating rules
12   against COVID and vaccine misinformation.
13          A.    Yes.  And I would note that it
14   appears that that bullet is a summation, not a new
15   thing, right.  That's just sort of saying in total,
16   these are all the things we've done.
17          Q.    Yeah.  Going back to the beginning of
18   the pandemic it looks like.
19          A.    Exactly.  Yes, sir.
20          Q.    Yeah.  It says:  We've specifically
21   investigated the people sometimes identified in the
22   media as the Disinfo Dozen.  Right?
23          A.    Yes.
24          Q.    And it talks about applying penalties
25   to some of their website domains as well as -- so
```

**ERIC WALDO  12/22/2022**

```
1    that posts are moved lower in the news feed and so

2    forth.

3         A.    Yes, that's what Nick is describing.

4         Q.    So this is Nick's -- or this is

5    Facebook's third report since July 16th to you guys

6    about adverse actions taken about -- taken against

7    content associated with the Disinfo Dozen, right?

8         A.    I believe so.

9         Q.    Okay.  Let me flip back to the first

10   page of this document.  You respond to Nick right

11   here in this --

12        A.    Yes.

13        Q.    You say:  I hope this finds you well.

14   No Shakespeare quotes in this response,

15   unfortunately.  But you say:  Brian and I are also

16   in touch, but we look forward to continuing to move

17   forward together with urgency and solutions during

18   these extraordinary times.  Right?

19        A.    Yes, that's what I wrote.

20        Q.    What did you mean by "moving forward

21   together with urgency and solutions"?  It's unusual

22   phrasing.

23        A.    I think I was hoping that Facebook

24   would continue to move.  Urgency means, you know,

25   that they would take this seriously, and solutions
```

**ERIC WALDO  12/22/2022**

Page 278

```
 1   means that they would also come with real solutions
 2   to the problems and not just pretend to solve
 3   problems.  So I think that's what I meant.
 4            Q.    Exhibit 27, do you remember getting
 5   this e-mail from Brian Rice on August 23rd?
 6            A.    Can I review this for one second,
 7   sir?
 8            Q.    Yeah.  Sure.
 9            A.    I don't remember it, but now that I
10   see it, it rings a bell.
11            Q.    If you go to the next page, it
12   actually starts with an e-mail from Brian Rice to
13   Rob Flaherty -- or actually from Rob Flaherty to
14   Brian --
15            A.    Oh.
16            Q.    -- Rice.
17                  Does that ring a bell?
18            A.    I'm -- I'm seeing it now.  Sorry.
19   Brian.  Okay, I see the note.
20            Q.    So --
21            A.    Va- -- vaguely familiar, yes.
22            Q.    So Flaherty said to Rice:  Now that
23   the FDA has approved Pfizer -- presuming the Pfizer
24   vaccine --
25            A.    Yes.
```

**ERIC WALDO  12/22/2022**

Page 279

```
 1          Q.      -- I'm making rounds to get a sense
 2     from the various platforms if you guys are planning
 3     to promote it in any way.
 4          A.      Yes, that's correct.
 5          Q.      And he says:  We appreciate a push
 6     here, given the fact that this is an off-cited
 7     blocker for many folks.  Right?
 8          A.      Yes, that's what Brain has written to
 9     -- I'm sorry -- what Rob has written to Brian.
10          Q.      So Rob's asking -- he's asking
11     Facebook and other social media platforms to kind
12     of, you know, promote the fact that the FDA has now
13     approved the Pfizer vaccine, which had been a point
14     of vaccine hesitancy for some people until then,
15     correct?
16          A.      Yes.  That is -- that -- that is --
17     appears to be a correct reading of the e-mail.
18          Q.      And Brian responded to Rob talking
19     about an update about what they're doing about it
20     to -- you know, to update any language as needed,
21     for example, right?
22          A.      Yes.
23          Q.      And that -- that -- he says:  We'll
24     keep you updated on this as it progresses.  Right?
25          A.      Yes, that's what Brian writes to Rob.
```

**ERIC WALDO  12/22/2022**

Page 280

1        Q.    And then Brian, who is the Facebook

2    guy, also states:  We're also updating our

3    misinformation policies to remove the specific

4    claims that there are no FDA-approved vaccines and

5    the Pfizer vaccine is not FDA approved, and we'll

6    continue to look for claims that are no longer

7    accurate, given the approval today.  Correct?

8        A.    That is what Brian has written to

9    Rob, yes.

10        Q.    So his response to Rob includes a

11    report back on additional content that Facebook

12    plans to remove from its platforms if people post

13    it, right?

14        A.    I don't know that he says remove.

15    Oh, you're right.  Yes.  He says:  We're updating

16    our (unintelligible) to remove the specific claims.

17    Yeah, so it looks like they're defining claims that

18    -- that Pfizer's not FDA approved, they're defining

19    that as health misinformation, which according to

20    their policies, they would remove.  It sounds like

21    they're adding that as a definition of

22    misinformation.

23        Q.    And that --

24        A.    I don't know that they're updating

25    the overall policy.  I think they're adding that to

**ERIC WALDO  12/22/2022**

**Page 281**

1   their definition of misinformation.

2        Q.    Right.  So they're update -- they're

3   updating the policy to remove those specific claims

4   if people post them on their platform, right?

5        A.    Yeah, I -- I -- that is what he says,

6   yes.

7        Q.    Yeah.  And he then forwarded that on

8   to you too, right?  He reported to you on those

9   points?

10       A.    Yes.  He says: Eric, making sure to

11  flag for you as well.  Let me know if you have any

12  questions.

13       Q.    Did you have any questions?

14       A.    Not to my recollection.

15       Q.    Do you remember any discussions of

16  removing misinformation related to the FDA approval

17  of the Pfizer vaccine?

18       A.    No.

19       Q.    And this is sent to you three days

20  after that report on August 20th that Nick Clegg

21  sent about expanding or adjusting their policies to

22  remove more misinformation, right?

23       A.    Yes.  The 23rd is three days after

24  the 20th.

25       Q.    This is a breaking point.

**ERIC WALDO  12/22/2022**

**Page 282**

```
 1          A.    Great.
 2          Q.    We can take a quick break.  I'm happy
 3   taking a quick break now or going forward.  Break?
 4          A.    I would say to break in five minutes.
 5   I didn't know how much longer you were going to go.
 6   but, yeah, should we -- do you want to take an
 7   eight-minute break?
 8          Q.    Yeah.
 9          MR. SAUER:  Off the record.
10          THE VIDEOGRAPHER:  The time is 2:14
11   p.m.  We are off the record.
12          (A short break was taken.)
13          THE VIDEOGRAPHER:  The time is
14   2:28 p.m., Central Standard Time.  We are back on
15   record.
16          Q.    (BY MR. SAUER)  Mr. Waldo, I'm
17   showing you Exhibit 28, and this is a lengthy,
18   232-page report that was done by the Virality
19   Project.  I think you testified earlier that you
20   never heard of Virality Project; is that right?
21          A.    That's correct.  I have not heard of
22   them.
23          Q.    Okay.  And so do -- have you ever
24   seen this report before?  It's kind of got a
25   distinctive cover.
```

```
 1            A.    I have not.
 2            Q.    And then were you aware of any
 3      involvement in the Surgeon General's office with
 4      the Virality Project?
 5            A.    I'm not aware of any involvement with
 6      the Surgeon General's office and the Virality
 7      Project.
 8            Q.    Okay.  And then how about with the
 9      entities that make it up, include the Stanford
10      Internet Observatory, which we've already talked
11      about.  Are you -- other than the announcement
12      being hosted at Stanford, are you aware of any
13      collaboration between the Surgeon General's office
14      and the Stanford Internet Observatory?
15            A.    I think I mentioned that we had a
16      call with Renee at some point.  I think after the
17      announcement.  I think that was just, again, a
18      brainstorm about potential follow-up events to do.
19            Q.    How about the University of
20      Washington's Center for Informed Public, does that
21      ring a bell?
22            A.    I'm not familiar with them.
23            Q.    How about Kate Starbird, a professor
24      at the University of Washington?
25            A.    I don't think so, unless she was a
```

**ERIC WALDO  12/22/2022**

Page 284

```
1    panelist on the -- at that Stanford event, but I
2    don't believe so.
3         Q.    How about Graphika, an organization
4    called Graphika with a p-h and a k?
5         A.    I'm not familiar with Graphika, sir.
6         Q.    How about the Atlantic Council?
7         A.    Is that the Atlantic magazine, sir?
8         Q.    No, it's associated with NATO.
9         A.    I'm not familiar with them.
10        Q.    In this report, at one point, it
11   says:  The Office of the Surgeon General
12   incorporated the Virality Project's research and
13   perspectives into its own vaccine misinformation
14   strategy.
15             Would you have any knowledge of the
16   basis for a statement like that?
17        A.    I do not have any knowledge for the
18   basis of that statement.
19        Q.    This report talks about how
20   stakeholders, including government stakeholders,
21   were allowed to submit tips through the Virality
22   Project of online content they thought was harmful
23   misinformation about COVID-19 vaccines.  Are you
24   aware of anyone in the Office of Surgeon General
25   submitting tips to the Virality Project about
```

**ERIC WALDO  12/22/2022**

Page 285

```
 1    content that they wanted to be flagged for removal
 2    from social media platforms?
 3           A.    I'm not familiar.
 4           Q.    Are you aware of any other federal
 5    official participating in -- in that -- that
 6    activity of submitting tips to the Virality Project
 7    about online COVID vaccine misinformation?
 8           A.    I am not familiar with any government
 9    official participating with the Virality Project in
10    any capacity.
11           Q.    Okay.  There's a reference in here to
12    health freedom organizations and content --
13    misinformation content spread by health freedom
14    organizations.  Are you familiar with that concern
15    at all, that health freedom organizations are
16    spreading misinformation?
17           A.    I am not familiar with that.
18           Q.    And I take it -- same question for
19    Virality Project tickets, that there are tickets
20    they used to track online misinformation related to
21    COVID vaccines.  Are you aware of government
22    officials being involved in Virality Project
23    tickets?
24           A.    I'm not familiar with any government
25    officials being involved in Virality Project
```

**ERIC WALDO  12/22/2022**

Page 286

```
 1    tickets.
 2           Q.     There's a reference -- there's about
 3    49 references in this report to someone called Alex
 4    Berenson.  Do you know who that is?
 5           A.     I do not know who Alex Berenson is.
 6           Q.     You've never heard of former New York
 7    Times reporter and well-known vaccine skeptic Alex
 8    Berenson?
 9           A.     I do not know who Alex Berenson is,
10    sir.
11           Q.     So that -- have you ever -- remember
12    any discussions of -- I guess if you don't know who
13    he is, do you remember his name coming up in
14    discussions of misinformation?
15           A.     I do not know who Alex Berenson is,
16    and I do not recall his name coming up in any
17    discussions about health misinformation.
18           Q.     There's a reference in this report to
19    the Gateway Pundit, a website where it's
20    described -- the report describes the Gateway
21    Pundit as a purveyor of health misinformation.
22                  Do you remember any references in any
23    connection to the Gateway Pundit?
24           A.     I do not, sir.
25           Q.     How about someone called Jim Hoft or
```

**ERIC WALDO  12/22/2022**

Page 287

```
 1     Joe Hoft, H-O-F-T?  Has that name ever come up?
 2            A.    Sorry, is that the name of a person
 3     or an organization?
 4            Q.    Person.  H-O-F-T, Jim Hoft and Joe
 5     Hoft, brothers.
 6            A.    I have not heard of Jim or Joe Hoft.
 7            Q.    How about Dr. Jay Bhattacharya, is
 8     that name familiar to you?
 9            A.    I'm not familiar with Dr. Jay
10     Bhattacharya.
11            Q.    How about Martin Kulldorff,
12     K-U-L-L-D-O-R-F-F?
13            A.    I'm not familiar with Martin
14     Kulldorff.
15            Q.    You don't remember those names ever
16     coming up?
17            A.    Ever coming up?  I've never heard
18     that -- that name before, sir.
19            Q.    Okay.  How about Aaron Kheriaty,
20     K-H-E-R-I-A-T-Y.
21            A.    I do not know Mr. Kheriaty.
22            Q.    Have you ever heard his name before?
23            A.    I have not heard his name before this
24     moment.
25            Q.    About America's Frontline Doctors, an
```

**ERIC WALDO  12/22/2022**

Page 288

```
 1    organization.  Do you remember that ever coming up?

 2         A.    I don't have any recollection of

 3    America's Frontline Doctors.

 4         Q.    How about Robert F. Kennedy, Junior?

 5         A.    I have heard of Robert F. Kennedy,

 6    Junior.

 7         Q.    What have you heard about him?

 8         A.    I know that he is a vaccine skeptic.

 9         Q.    What -- what -- has his name ever

10    come up in connection with online misinformation

11    about COVID vaccines?

12         A.    Only in what I've read in my personal

13    capacity.

14         Q.    How about in your official capacity?

15    Is that a name that's ever crossed your desk?

16         A.    No, it is not.

17         Q.    There's multiple references in this

18    report to the involvement of the Surgeon General's

19    office in the Virality Project.  Who would know --

20    and there's five references to Dr. Murthy.  Who in

21    the Surgeon General's office would know whether or

22    to what extent the Surgeon General's office is

23    involved in the Virality Project?

24         A.    So I'm not familiar with the Virality

25    Project, and -- but I think given the -- given the
```

**ERIC WALDO  12/22/2022**

1    area that this is focused on, misinformation, I

2    would assume the only people who could know would

3    be Kyla Fullenwilder, Daniel Tartakovsky, Tyiesha

4    Short, Rafael Compos, Max Lesko, and Dr. Murthy

5    himself.

6           **Q.    I think all those names have come up**

7    **today already except I don't remember you**

8    **mentioning Tyiesha Short.  Who's she?**

9           A.    I think I mentioned Tyiesha in

10   passing.  She reported to Daniel Tartakovsky.

11   She's another policy expert in the policy team, so

12   I'm not precisely sure about Tyiesha's role in the

13   development of the advisory, but she reported to

14   Daniel, and I believe that she was someone who did

15   some research for the -- the report itself.

16          **Q.    So you're -- you're -- the report**

17   **being health advisory?**

18          A.    Yeah, sorry.  The -- the health mis-

19   and disinformation advisory.

20          **Q.    So that's your kind of educated**

21   **speculation as to who would be likely to know would**

22   **be those names?**

23          A.    That's correct, sir.

24          **Q.    Yeah, and I guess that makes sense**

25   **because the report says that the health advisory**

**ERIC WALDO  12/22/2022**

Page 290

```
1    adopted essentially the approach of the Virality
2    Project, so the people most likely to know about
3    the Surgeon General's involvement in the Virality
4    Project would be the people who were involved in
5    drafting the health advisory, right?
6              A.    You're -- what you're describing
7    is --
8              Q.    And so you mentioned the policy team,
9    Dr. Murthy himself, and Max Lesko, right?
10             A.    I mentioned Daniel and Tyiesha from
11   the policy team.  As we described previously on the
12   org chart, Kyla Fullenwilder technically reports to
13   the design team, to Anne Kim, and then Max Lesko
14   and Dr. Murthy.
15             At some point when he was in the
16   office, Adam maybe would have -- Adam Beckman would
17   be someone who may know because during this time,
18   we did not have a policy director and Adam was
19   functionally the policy director, during that, you
20   know, until sometime I think in late August, early
21   September when we got a policy director.  So Adam
22   Beckman is the only other person I didn't mention
23   in our first round of this question.
24             Q.    Okay.  I'm going to put up Exhibit
25   30.  Can you see it on the screen share?
```

**ERIC WALDO  12/22/2022**

Page 291

```
 1          A.    Yes, I can.  And I also have the
 2    document in front of me from government counsel.
 3          Q.    And this is an e-mail chain going to
 4    September 18th from Brian Rice.  I think he's
 5    emailing you and some White House people, right?
 6    Courtney Rowe, is she in the White House?
 7          A.    Yes, Courtney was a member of the
 8    COVID-19 team.
 9          Q.    What was her role exactly?
10          A.    I'm not positive, but I think she was
11    a -- the communications lead.  She -- I knew
12    Courtney previously in the Obama administration as
13    a communications lead, so that's my very -- very
14    educated guess.
15          Q.    Did you interact with her with -- on
16    any misinformation-related issues in -- in the
17    Biden administration?
18          A.    After the report came out, at some
19    point, we did have a call that Courtney was on --
20    between the Office of the Surgeon General and
21    members of the COVID-19 team to discuss
22    misinformation.
23          Q.    Yeah, what kind of misinformation
24    concerns were discussed?
25          A.    It was overall just a call to talk
```

**ERIC WALDO  12/22/2022**

Page 292

```
1    about whether or not we were going to do any

2    other -- of that sort of public-facing events or

3    there was any other sort of press-related things we

4    were going to do to talk about the issue.

5         Q.    And what was the -- did the White

6    House people want you to do more or what was the

7    nature of the discussions?

8              MS. CHUZI:  Objection.  To the extent

9    that the question is asking for privileged

10   information, I would instruct the witness not to

11   answer.

12             THE WITNESS:  On the advice of

13   counsel, I will not answer the question.

14        Q.    (BY MR. SAUER)  Let me ask you about

15   the e-mail on the shared screen.  Where -- do you

16   remember Brian Rice writing to you -- he says Eric

17   and team.  I assume Eric is you, and the team is

18   Courtney Rowe, DJ Patil, and Rob Flaherty; is that

19   fair to guess?

20        A.    Yes.  I think if you look at the

21   chain, it starts -- it starts with just a COVID

22   inside report from the 21st, then another report on

23   the 7th.  So yes, I think it's -- it's fair to

24   assume he's -- he's referring to me and the -- the

25   COVID-19 team.
```

**ERIC WALDO  12/22/2022**

Page 293

```
 1          Q.    And as to those COVID reports,
 2    those -- during all this time frame, Facebook is
 3    sending those to you guys every two weeks,
 4    basically, right?
 5          A.    That sounds correct, sir.  I think
 6    it's been referred to in these documents as
 7    biweekly.  That sounds accurate.
 8          Q.    And that continues, I think, all the
 9    way until the following summer of 2022, right?
10    Because you mentioned earlier that at one point,
11    Facebook kind of said we want to stop it, and the
12    response was no, please keep sending them because
13    we have early childhood vaccine authorization in
14    the summer of 2022, right?
15          A.    Early childhood happened before then,
16    I think.  I don't -- I don't -- I know this because
17    I also have a child -- yeah, and maybe it was,
18    like, late spring, but, yes, they -- they
19    continued -- we continued to receive them on a
20    biweekly basis for a while, but I don't know that
21    anyone was doing anything with them.
22          Q.    Are you still getting them?  I mean,
23    I know you've changed in a different role as senior
24    advisor.  Do you know if they're still here in
25    November of 2022?
```

**ERIC WALDO  12/22/2022**

**Page 294**

```
 1          A.    I don't think I'm getting them

 2   anymore, sir.

 3          Q.    It says Eric and team in this e-mail,

 4   and he talks about:  I'm sure you saw yesterdays's

 5   story in the Wall Street Journal about spread of

 6   COVID mess -- COVID-19 misinformation and comments

 7   on Facebook.  Right?

 8          A.    Yes, that's the -- yeah, I'm sure you

 9   saw yesterday's story in the Wall Street Journal --

10   sorry, WSJ -- about the spread of COVID-19

11   misinformation and comments on Facebook.  The

12   story, largely based on cherry-picked leaked

13   documents, doesn't accurately represent the problem

14   or the solutions we have put in place to make

15   comments on posts about COVID and vaccines safer.

16   Yes.

17          Q.    Yeah.  So in other words, Brian is

18   referring to a recent media article about COVID-19

19   misinformation on Facebook, and he's trying to kind

20   of refute the article to -- to you guys, right?

21          A.    Yes, that is what -- it appears

22   that's what he's trying to do, yes.

23          Q.    And Rob Flaherty is the one who

24   responds to this e-mail, right?

25          A.    Yes, Rob is the one who responds on
```

**ERIC WALDO  12/22/2022**

**Page 295**

1    Saturday, September 18th.

2          Q.      **Which is the same day that Brian sent**

3    **his, right?  It falls on Saturday?**

4          A.      Yes.  And again, sir, just for the

5    benefit of you, to the extent it's relevant, my

6    child was born on September 17th, so I was not

7    checking e-mail.  There was an out-of-office reply

8    for me starting on the 16th.  So I -- while I'm

9    seeing these now, I definitely was not responding

10    to these or looking at them.

11          Q.      **I gotcha.  Well, let me ask you this:**

12    **Rob says:  Happy to talk about it, Brian.  Would be**

13    **interested to see, as we have long asked for, how**

14    **big the problem is, what solutions you're**

15    **implementing, and how effective they have been,**

16    **right?**

17          A.      Yes, that is what Rob writes to

18    Brian.

19          Q.      **Right.  And then Rob says:**

20    **Understood, Rob.  We will circle back over the next**

21    **few days to brief.**

22                  **Right?**

23          A.      That is what, yes, Brian writes to

24    Rob.

25          Q.      **Yeah, and you may not have been that**

**ERIC WALDO  12/22/2022**

Page 296

```
 1    focused, given your personal situation at the time,

 2    but do you know whether there was a briefing on

 3    this?

 4         A.   I do not.

 5         Q.   Do you know whether Facebook talked

 6    to, you know, Courtney, Rob Flaherty, DJ Patil

 7    about this in your absence?

 8         A.   I do not.

 9         Q.   Exhibit 31.  Do you remember this

10    e-mail from the Google/YouTube team in

11    September 29th?

12         A.   So I would have been on paternity

13    leave during this time.

14         Q.   Okay.  And in this e-mail, they

15    report back to you and Nancy S. Negron about --

16         A.   Negron.

17         Q.   Yeah, who's she?

18         A.   Nancy Negron was my deputy director

19    of engagement.

20         Q.   And they report back about having a

21    COVID-19 vaccine misinfo policy that allows them to

22    remove a limited list of verified false claims

23    about COVID vaccines, right?

24         A.   Yes, that's what the e-mail says.

25         Q.   And they also report back to you guys
```

**ERIC WALDO  12/22/2022**

Page 297

```
 1    that they're introducing a new policy that
 2    prohibits content that includes harmful
 3    misinformation about the safety, efficacy, and
 4    ingredients for the vaccines, right?
 5         A.    Yes, that's what the e-mail says.
 6         Q.    Is this an unsolicited e-mail or are
 7    they responding to some kind of communication or
 8    request from you guys, do you know?
 9         A.    I'm not positive, but it would appear
10    to be an unsolicited e-mail.
11         Q.    I know that you had said earlier that
12    you reached out to Facebook, Twitter, and YouTube
13    in the aftermath of the health advisory that --
14    to -- to see what steps they were taking.  Is that
15    response to that request for information?
16         A.    Could be.  I'm not certain, to be
17    honest with you.  But based on both my departure --
18    and I think I had had an out-of-office at this
19    moment, which may have led them to add Nancy.
20    Nancy was also just coming on, and I don't think
21    her HHS e-mail had been set up yet, but I'm not --
22    I'm not positive.
23         Q.    Let's look at Exhibit 32.  Can you
24    see this one on screen share?
25         A.    Yes, I see this note.
```

**ERIC WALDO  12/22/2022**

Page 298

1          Q.    Do you remember, Rob Flaherty copies
2   you on this, the initial e-mail, to Brian Rice of
3   Facebook.  Do you remember being copied on this?  I
4   think you -- I think you may have said you were out
5   for 30 days.  Looks like you're probably just back
6   from paternity leave, your first stint of paternity
7   leave.  Do you remember this?
8          A.    Yeah, I was probably just back.  As
9   I'm looking at it -- hold on.  I do recall that
10  for -- for vaccines for -- for kids, Kristina
11  Schake and others were leading the outreach.
12         Q.    Kristina Schake, is she in the Office
13  of Surgeon General or Office for HHS?
14         A.    No, she was elsewhere in HHS.
15         Q.    Okay.  And Rob here, I think,
16  initiates this and asks for a meeting with
17  Facebook, right?
18         A.    Yes, I think to discuss outreach for
19  kids' vaccines.
20         Q.    Yeah, 5 to 11 vaccine is the
21  authorization for children ages 5 to 11, right?
22         A.    That's correct, and -- vaccines for
23  -- for young people ages 5 to 11.
24         Q.    And he says:  We'd like to talk about
25  what we're seeing as the biggest headwinds we're

**ERIC WALDO  12/22/2022**

Page 299

 1   going to face and discuss what you-all are planning

 2   as we move into the next phase, right?

 3        A.   Yes, that's what Rob has written to

 4   -- to Brian.

 5        Q.   And Rob says:  We remain concerned

 6   about mis- and disinformation on feed and in

 7   groups, and the wide reach of hesitancy inducing

 8   content across your platform, right?

 9        A.   Yes, that's what Rob has written to

10   Brian.

11        Q.   And he says:  With that said, we hope

12   as ever that this will be a productive and

13   forward-looking conversation, right?

14        A.   Correct, that is what Brian has -- or

15   what Rob has written to Brian.

16        Q.   So Rob's asking for a meeting where

17   one of the concerns he wants to talk about is mis-

18   and disinformation on feed and in groups on

19   Facebook's platforms, right?

20        A.   I'm not sure.  He definitely says

21   there that he's concerned about it.  But in

22   general, it seems like the subject is they want to

23   talk about headwinds.  They're concerned about

24   misinformation and they want to have a productive

25   conversation about how to help on -- I think

**ERIC WALDO  12/22/2022**

**Page 300**

1    probably share what the admin's plans are for the 5

2    to 11 rollout.

3         Q.    And their concerns include mis- and

4    disinformation on feed and in groups, correct?

5         A.    That is what Brian has -- says in his

6    e-mail.

7         Q.    Rob, right?  Not Brian?

8         A.    Sorry, sorry.  That's what Rob has

9    written to Brian.

10        Q.    Yeah, and then he's -- another

11   concern is the wide reach of hesitancy-inducing

12   content across your platform, right?

13        A.    Yes.

14        Q.    Do you know, did this meeting

15   occur --

16        A.    I'm not certain.

17        Q.    -- because Rob says -- Thanks, Rob,

18   we welcome the opportunity and adding Felicia on

19   our end to help coordinate, right?

20        A.    Yeah, I'm guessing.

21        Q.    Did this meeting occur?

22        A.    I'm not certain.  Probably.  If they

23   added schedulers, usually those meetings happen.

24        Q.    Were you included in the meeting?  I

25   mean, you're on the list of recipients.  Were you

**ERIC WALDO  12/22/2022**

Page 301

```
 1    included in that meeting, do you recall?
 2         A.    I don't recall.
 3         Q.    How about at -- your colleague at
 4    HHS, Kristina Schake?
 5         A.    Kristina was likely on that call.
 6         Q.    But you don't -- you don't know if
 7    you were.  Was anyone else in the Office of Surgeon
 8    General on that call?
 9         A.    So Kristina Schake ran -- ran the
10    public engagement campaign for vaccines at HHS, so
11    that was -- we sort of took our marching orders on
12    some of those, like, public-facing pieces from
13    Kristina, so she would have led, and then possibly
14    looped in Alex Phillips, our communications
15    director, based on what they wanted us to do to
16    help -- help roll out the -- the vaccine.
17         Q.    Okay.  Do you have any understanding
18    of what was discussed in this meeting?
19         A.    I don't recall.  I don't recall if I
20    was on the -- the call or -- or what would have
21    been discussed.
22         Q.    So you may have been on the call, but
23    you're not sure?
24         A.    It's possible.  I may have been on
25    it.  I -- around this time, we ended up doing, for
```

**ERIC WALDO  12/22/2022**

Page 302

1    the rollout, an event with Dr. Biden, so I remember

2    that was sort of how we were engaging with the

3    White House on the kids' vaccine rollout.

4          Q.    Let's look at Exhibit 33.  Not long

5    after that Wall Street Journal article, there was

6    another Washington Post article criticizing

7    Facebook for misinformation, right?  Do you

8    remember that?

9          A.    I think -- is that the Frances

10   Haugen, the leaker op ed, or no.

11         Q.    I believe it had to do with Frances

12   Haugen.

13         A.    Okay.

14         Q.    Does that ring a bell?

15         A.    Yes.

16         Q.    October 28th of 2021?

17         A.    Yes, I do recall when the article

18   came out about the leaker, yes.

19         Q.    And Dr. Murthy retweeted the article

20   on October 28th saying he was deeply disappointed

21   to read this story, right?

22         A.    Yes, he -- that his -- his tweet

23   says:  I was deeply disappointed to read this.

24         Q.    And he refers back to the -- the

25   advisory on health misinformation and states:  I

**ERIC WALDO  12/22/2022**

Page 303

```
 1    stated clearly that tech platforms have a
 2    responsibility to improve our health information
 3    echo system.
 4            Right?
 5        A.    Yes, that is what Dr. Murthy tweets.
 6        Q.    And then he's got a several-tweet
 7    thread on this, at the bottom, which he says:  We
 8    must demand Facebook and the rest of the social
 9    media ecosystem take responsibility for stopping
10    health misinformation on their platforms.  The time
11    for excuses and half-measures is long past.  We
12    need transparency and accountability now.  The
13    health of our country is at stake.
14            Correct?
15        Q.    That's correct.
16        A.    That's what Dr. Murthy has tweeted.
17        Q.    Were you involved in crafting these
18    tweets for Dr. Murthy?
19        A.    I was involved in reviewing them.  I
20    think there was a deliberation between the
21    communications team and Dr. Murthy about what the
22    content would be of this Twitter thread.
23        Q.    And were you involved in formulating
24    the content?
25        A.    I -- I looked at different drafts and
```

**ERIC WALDO  12/22/2022**

Page 304

```
 1  helped on different drafts, but ultimately, this
 2  was a -- what Dr. Murthy ended up writing --
 3  drafting himself.
 4        Q.    Okay.  So he was the author of the
 5  these, principally?
 6        A.    I think, again, as you know, writing
 7  is a complicated process.  I think there was a
 8  draft from -- a draft from the -- probably -- I
 9  don't recall, but my guess based on how the office
10  tended to work was there would have been a draft
11  from the communications team of a tweet thread,
12  then there was probably a version control where
13  then I maybe made some edits and I had a version,
14  and then Dr. Murthy ultimately came in and -- and
15  -- and made the final and substantial edits to what
16  he wanted there to be from -- from his Twitter
17  account.
18        Q.    Do you have an understanding --
19        A.    I'm sorry.
20        Q.    Go ahead.
21        A.    And I would say, in addition, likely,
22  and I don't recall, someone from the policy team
23  would have reviewed the content to ensure the
24  integrity of our -- you know, of our scientific
25  accuracy.
```

**ERIC WALDO  12/22/2022**

**Page 305**

```
 1          Q.     Do you have an understanding of what
 2    message was being -- was intended to be conveyed by
 3    this tweet thread?
 4          A.     I mean, I think it -- I think the --
 5    the tweet thread speaks for itself to say that
 6    it's clearly Dr. Murthy expressing disappointment,
 7    and then in the thread talking about -- I think
 8    really referencing things that are referenced in
 9    the advisory, doing this vis-a-vis his Twitter
10    thread about how -- why -- why it's important for
11    us to have more transparency and accountability
12    around health misinformation, especially vis-a-vis
13    the social media organizations.
14          Q.     Yeah, and the very last tweet, he
15    sums it up by demanding that Facebook and the other
16    platforms do more, or take responsibility for
17    stopping health misinformation on their platforms,
18    right?
19          A.     Yes.  He writes:  We must demand
20    Facebook and the rest of the social media ecosystem
21    take responsibility for stopping health
22    misinformation on their platforms.
23          Q.     And he goes on to say:  The time for
24    excuses and half-measures is long past.
25                 Right?
```

**ERIC WALDO  12/22/2022**

**Page 306**

```
 1          A.    Yes, that's his next line in his
 2     tweet thread.
 3          Q.    And so that was a carefully crafted
 4     message.  It sounds like there were a lot of people
 5     who thought about exactly what to say in this tweet
 6     thread, including yourself as one of them, right?
 7          A.    Whether it's carefully crafted or
 8     not, it was lots of work went into it.  I don't
 9     know if that means it was careful, but I appreciate
10     what you're trying to say.
11          Q.    Let me pull up Exhibit 35.  That same
12     day, October 28th, that the -- the Surgeon General
13     tweeted that Washington Post article, Rob Flaherty
14     e-mailed Brian Rice a link to the same article with
15     a subject line:  Not even sure what to say at this
16     point.
17                Correct?
18          A.    Yes, that's Rob's e-mail to Brian.
19          Q.    Yeah, so that's all he says in the
20     e-mail, he links the article and says in the
21     subject line:  Not even sure what to say at this
22     point.
23                Right?
24          A.    Yes, that's what his e-mail says in
25     the subject line to -- to Brian.
```

**ERIC WALDO  12/22/2022**

Page 307

1          Q.     What -- let me ask you this:  Was

2    there any coordination between you and your office

3    and Rob Flaherty about you have the tweets and they

4    have the e-mail of Facebook.  Was that -- was that

5    just a coincidence that you both raised in

6    different venues, or was there a kind of

7    coordination there?

8          A.     There was no coordination.

9          Q.     So it's a coincidence that Rob

10   happened to send the same article to Brian Rice

11   that you guys had written the tweet thread for

12   about -- with Dr. Murthy on, right?

13         A.     I think this was one of the most

14   popular articles in all of news that week, so I'm

15   not surprised that people who care a lot about this

16   issue were certainly hitting up Facebook about it.

17         Q.     You say you both hit up Facebook in

18   different ways, right?  You with a tweet thread and

19   Rob with a e-mail?

20         A.     We -- we commented upon it using our

21   public platform to -- to comment upon the substance

22   of the article.  And Rob e-mailed, you know, Brian.

23         Q.     And -- and then Brian sent a kind of

24   response where he tries to justify what their

25   practices are and he disagrees with the analysis in

```
 1    the article, right?
 2           A.    Yes, that's what Brian writes to Rob.
 3           Q.    And then Brian forwards that e-mail
 4    chain to you, right?  And a few days later, saying
 5    we heard from Rob Thursday as well regarding
 6    Thursday's Washington Post story, right?
 7           A.    Yes, Brian forwards me the
 8    interaction between the two of them.
 9           Q.    Yeah, and then he says:  I saw the
10    Surgeon General's reaction on Twitter.
11                 Presumably that's a reference to the
12    Twitter thread we just looked at, right, from
13    October 28th?
14           A.    Yes.
15           Q.    And it says:  We want to make sure
16    you have the context necessary as we feel strongly
17    the claims in the story are not accurate.  Right?
18           A.    Yes, that's what Brian has written to
19    me.
20           Q.    Then he asks you for a meeting,
21    basically, says:  Please let me know if you have
22    time for a longer conversation next week, right?
23           A.    Yes, he requests a meeting by asking
24    me for time.
25           Q.    Did you, in fact, meet with him, do
```

**ERIC WALDO  12/22/2022**

**Page 309**

1    you recall?

2            A.    I don't think I did.

3            Q.    **Did you respond to his request for a**

4    **meeting in any way?**

5            A.    I probably wrote something, but maybe

6    not.  I'm not sure.  I tried to be responsive, but

7    I'm not sure if I wrote back.  If you have that

8    e-mail, I'd be happy to look at it.

9            Q.    **I'm trying to remember myself.**

10           A.    If you can refresh your recollection

11   and mine at the same time, we'll call it a win.

12           Q.    **Let's look at Exhibit 36.  Second**

13   **page of this document, independent of the e-mail**

14   **with Rob Flaherty on the day of the Frances Haugen**

15   **article, October 28th, Nick Clegg e-mailed**

16   **Dr. Murthy directly, right?**

17           A.    Yes, that first e-mail is from Nick

18   to Dr. Murthy on October 28th, yes.

19           Q.    **He talks about the launching of the**

20   **Mediverse and so forth, and at the end, he talks**

21   **about the intense debate that's been prompted by**

22   **the documents that have been disclosed by a former**

23   **employee, right?**

24           A.    That last paragraph, yes.

25           Q.    **Yeah.  That's a reference to the**

**ERIC WALDO  12/22/2022**

```
 1    Washington Post article, presumably, right?
 2         A.    Yes, I -- yes.
 3         Q.    And then you're the one who responds
 4    to this e-mail, scrolling up to the first page, on
 5    the next day, October 29th.  You send an e-mail to
 6    Nick Clegg and Brian Rice.  You're kind of omitting
 7    Dr. Murthy from the e-mail chain, right?
 8         A.    That's correct.
 9         Q.    Yeah.  And you mention that -- you
10    thank him for the note to Dr. Murthy, and you say:
11    I did want to say that we have seen the recent
12    public reports around Facebook and the
13    misinformation, right?
14         A.    Yes.
15         Q.    And you say:  We're certainly
16    concerned about what we are seeing, given our
17    emphasis on health misinformation in our advisory
18    and the ongoing conversation our teams have been
19    having.
20               Right?
21         A.    Correct.
22         Q.    Are there any conversations your
23    teams have been having at this stage that we
24    haven't covered by talking about these e-mails and
25    so forth in your testimony today?
```

**ERIC WALDO  12/22/2022**

**Page 311**

```
 1          A.     No.

 2          Q.     So there's -- go ahead.

 3          A.     Sorry, sir.  Can you repeat your

 4   question?

 5          Q.     Yeah.  Were there any other

 6   conversations in this period from July and October

 7   of 2021 between your teams about misinformation?

 8          A.     Not to my knowledge.

 9          Q.     You go on to say:  As has been the

10   case, you'll continue to see us raising the issue

11   of health misinformation in public and private as a

12   critical public health issue.

13                 Right?

14          A.     Yes, that's what I write.

15          Q.     Yeah.  What -- what are the private

16   conversations where you're going to continue

17   raising the issue of health misinformation?

18          A.     I assume in that -- in the context of

19   that -- of that e-mail, I think I'm trying to say

20   we're going to talk, this is an issue we've raised

21   as a priority, that we -- that's why we issued an

22   advisory, and when people come and talk to us,

23   whether it's at a -- a panel or on Meet the Press,

24   or it's a meeting with a stakeholder that's in

25   private, they'll say what are your issues of
```

**ERIC WALDO  12/22/2022**

Page 312

```
 1   importance?
 2             And you'll see Eric Waldo or
 3   Dr. Murthy or whomever would stand up and say the
 4   issues we're talking about are:  Health
 5   misinformation, youth mental health, workplace
 6   mental health, clinician burnout, et cetera.  So
 7   that's one of the issues that we were going to keep
 8   talking about.
 9        Q.    How about that issue of -- that used
10   the word "private".  What are the private
11   conversations where you raise it?
12        A.    Again, I think as I've just
13   mentioned, sir, as you know, in the government,
14   you're not always just doing a panel that's open
15   press, you're meeting with stakeholders, you know,
16   in closed-door meetings and they ask you what your
17   priority areas are or what areas they might want to
18   partner with you.
19             And so my philosophy as a chief --
20   you know, as a public engagement official is that
21   -- explain to anyone who work -- who's working with
22   us or meeting with us overall what our office is
23   focused on.  And certainly at this time, in
24   nonpublic meetings, I was telling people of any
25   kind, whether it was one at the PTA or someone else
```

**ERIC WALDO  12/22/2022**

Page 313

```
 1   to say when someone says, what is the Surgeon
 2   General interested and what is he working on, I'd
 3   say:  You saw that we issued -- we're working on
 4   COVID-19.  You saw us issue an advisory on health
 5   mis- and disinformation.  You saw, you know, coming
 6   soon, youth mental health, workplace mental health,
 7   clinician burnout, social isolation and loneliness.
 8            So I would say that talking about
 9   health mis- and disinformation was in our talking
10   points of when we talked to stakeholders in public
11   and private.
12        Q.    You say talking points.  I think you
13   referred to them this morning, too.  Did you
14   actually have literal talking points when you would
15   go into these meetings, and specifically the
16   meetings with social media platforms?  Did you talk
17   to them about the meetings --
18        A.    No.
19        Q.    Would you actually have a document
20   that was your talking points?
21        A.    No.
22        Q.    Okay.  So you're referring to them
23   kind of virtually or analogously?
24        A.    Yeah.  I think when you're trying to
25   describe any office you work in or that I've worked
```

```
 1   in, you want to be able to have the elevator pitch

 2   of what you're working on and ways you want to

 3   collaborate and what your priorities are.

 4        Q.    In this e-mail that's on the screen,

 5   Exhibit 36, you know, you said that point about

 6   the -- that we just discussed.  And Brian responds

 7   by asking you for a meeting, and I think you

 8   responded, "Let me get back to you next week once

 9   we're done crashing on our rollout of vaccines

10   5-11."  Right?

11        A.    Yes.

12        Q.    So you kind of put him off.  Did you

13   ever give him that meeting, do you recall?

14        A.    I don't think I did.

15        Q.    Okay.

16        A.    But I'm not sure.  If you can show me

17   that meeting, I'm happy to talk about it, or not

18   remember it, but I -- I don't -- I don't think --

19   I -- I was not -- I was not looking to spend more

20   time with Brian or folks at Facebook.

21        Q.    Was it -- was it a tense relationship

22   by this stage?

23        A.    No.  Actually, I think as we've

24   discussed, you know, I think the Surgeon General's

25   office, I think we felt like we raised the issue,
```

**ERIC WALDO  12/22/2022**

Page 315

```
1    and that as I mentioned before in the conversation,

2    you know, we had other priorities that we needed to

3    move on to, and with a, you know, small but mighty

4    team and limited bandwidth, we had done our part in

5    -- in the relay race of policy work, and we're now

6    trying to continue to move on to other priority

7    areas.

8         Q.    Can you look at Exhibit 37, which is

9    up on the screen?

10        A.    Sure.

11        Q.    Taking this -- scrolling down to the

12   bottom, so we're taking these e-mails in kind of

13   chronological order, there's an e-mail from Brian

14   Rice to Rob Flaherty, you, Courtney Rowe, and Becca

15   Siegel.  Do you see that?

16        A.    I do.

17        Q.    So that's dated October -- Friday,

18   October 29th, right?

19        A.    Yes, yes.  Sorry, I was looking at

20   the e-mail above that.  Yes, the Friday, October

21   29th e-mail, yes.  COVID insights and plan for

22   approval of kids' vaccines, yes.

23        Q.    And then he says:  Thanks again -- in

24   the beginning of this, he says:  Thanks again for

25   taking the time to meet with us on Monday.  Right?
```

**ERIC WALDO  12/22/2022**

Page 316

```
 1          A.     Yes.
 2          Q.     Okay.  Do you remember that meeting?
 3     It sounds like you and Rob Flaherty and Courtney
 4     Rowe and Becca Siegel were involved in that?
 5          A.     So I think that's what you were
 6     asking me before when they -- when Rob asked for
 7     time to talk about the kids' vaccine rollout, and I
 8     said I wasn't sure if I attended.  So it looks like
 9     I probably did, if he's addressed -- or he's just
10     still cc'ing me and thanking Rob and Courtney, or
11     folks who attended the meeting.
12          Q.     So you're still not sure whether
13     you -- I take it this would have been -- if this is
14     the 29th, that meeting would have happened on
15     Monday the 25th, right?
16          A.     That sounds right.
17          Q.     And you don't -- you still -- based
18     on this, you're still not sure whether you're at
19     that meeting, right?
20          A.     I honestly don't recall.
21          Q.     Okay.
22          A.     Again, we had a launch that we were
23     doing with Dr. Biden for kids' vaccine, and that
24     was taking a lot of my time.
25          Q.     In this e-mail, one of the first
```

**ERIC WALDO  12/22/2022**

Page 317

```
 1   things they say is:  As discussed -- so discussed

 2   in the meeting.  As soon as the EUA is issued -- I

 3   take it that's the emergency use authorization --

 4   for vaccines for children 5 to 11, we will also be

 5   able to apply claims for our current misinfo

 6   policies for COVID-19 vaccines to include claims

 7   about child vaccinations, right?

 8        A.    Yes, that's what he's written in this

 9   e-mail.

10        Q.    So do you remember him being -- he

11   says that -- he indicates that was discussed in the

12   meeting on October 25th.  Does that ring a bell?

13        A.    Okay.

14        Q.    Do you remember them discussing that

15   they were going to expand their misinformation

16   policies to include claims about child vaccination?

17        A.    As I mentioned, I'm not sure if I

18   attended this meeting, but I don't recall.

19        Q.    Yeah, so none of this rings a bell

20   about several -- they say several claims that we

21   will be able to remove as soon as the CDC debunks

22   them, such as COVID vaccines giving children Bell's

23   palsy and blood clots and so forth.

24              Does that ring a bell at all?

25        A.    It does not.
```

**ERIC WALDO  12/22/2022**

Page 318

```
 1          Q.     Do you remember the CDC being
 2    mentioned in any conversations with Facebook about
 3    misinformation?
 4          A.     I do not.
 5          Q.     And this e-mail is actually sent to
 6    you guys the day after -- I guess, yeah, the day
 7    after the Frances Haugen article and Surgeon
 8    General Murthy's tweet, right?
 9          A.     That sounds correct.
10          Q.     Yeah, October 28th was the date of
11    those, and October 29th is the date of this e-mail?
12          A.     Okay.
13          Q.     Yeah, so immediately after -- the day
14    after that tweet, Facebook e-mails the group of you
15    and reports back how they're going to apply their
16    current misinfo policies to things about child
17    vaccination, right?
18          A.     That is the day after, correct.
19          Q.     Yeah, and then they follow up again,
20    if you scroll back up, on the next Thursday,
21    November 4th, where Brian Rice says to you he
22    wanted to follow up and share what steps we've
23    taken over the last several days, as the FDA and
24    CDC approvals have now been granted, right?
25          A.     Yes.
```

**ERIC WALDO  12/22/2022**

Page 319

1        Q.    And it says:  Last Friday, we updated

2   our misinformation policies for COVID-19 vaccines

3   to make clear that they apply to claims about

4   children, including Bell's palsy and blood clots

5   and multiple sclerosis, right?

6        A.    Yes, that's what the e-mail says.

7        Q.    So -- and this would be a, I guess,

8   less than a week after the tweets about the Frances

9   Haugen article, correct, where they're giving you a

10  second update about applying their misinformation

11  policies to content about child vaccination, right?

12       A.    That's correct.

13       Q.    Let's briefly look at Exhibit -- just

14  a second.

15              MR. SAUER:  David, what's our

16  on-the-record time?  You're muted.

17              THE VIDEOGRAPHER:  One second,

18  please.  We are at 5:42.

19       Q.    (BY MR. SAUER)  Okay.  Let's look at

20  Exhibit 38.  After that Washington Post article on

21  October 28th, the Surgeon General gave a series of

22  public statements and podcasts where he talked

23  about health -- or speeches where he talked about

24  health information, correct?

25              MS. CHUZI:  Counsel, the exhibit is

**ERIC WALDO  12/22/2022**

**Page 320**

```
1    not on the screen.  I don't know if you intended to

2    pull it up just yet, but it's not on the screen.

3           Q.    (BY MR. SAUER)  Following that

4    October 28th Washington Post article, did the

5    Surgeon General do a series of public statements

6    and podcasts and so forth about health

7    misinformation?

8           A.    I'm not sure.

9           Q.    Okay.  Do you remember a discussion

10   after the October 28th article of having the

11   Surgeon General's office take a more proactive role

12   in using the bully pulpit, so to speak, to

13   emphasize the issue of health misinformation?

14          A.    After the October 28th meeting?

15          Q.    October 28th, Washington Post

16   article.

17          A.    I do not recall that.

18          Q.    Okay.  For example, here's a podcast

19   that the Surgeon General gave on December 21st,

20   2021.  Does that ring a bell?  Did you know he was

21   doing that podcast?

22          A.    The podcast -- podcast was part of

23   the communications team, so Alex Phillips was the

24   one -- this is -- goes within the press team, so my

25   team wasn't responsible for preparation or creation
```

**ERIC WALDO  12/22/2022**

**Page 321**

 1   of the podcast outreach, so I probably knew about

 2   it right before it happened, but I wasn't tracking

 3   it.

 4        Q.    And were you involved in kind of

 5   formulating his remarks for the podcast or anything

 6   like that?

 7        A.    I was not.

 8        Q.    Okay.  Just real briefly, then, if

 9   you scroll down, there's a little bit of it that's

10   transcribed by a court reporter here where he says:

11   I think, number 1, we have to track down where this

12   misinformation is coming from and understand how to

13   hold the platforms accountable, new technology

14   platforms that are driving so much of the

15   misinformation spread.

16             Right?

17        A.    Yes, I -- I can see that.

18        Q.    That's another emphasis on the points

19   that are raised in the health advisory, right,

20   about holding them accountable for the spread of

21   misinformation on their platforms?

22        A.    Yes, this is consistent with his

23   previous statements as well as the content within

24   the advisory itself.

25        Q.    And he says:  They, the platforms,

**ERIC WALDO  12/22/2022**

**Page 322**

```
1    are subjecting people in the United States and

2    around the world to extraordinary harm, and they're

3    doing so with little accountability and very little

4    transparency, right?

5         A.    Yes.  That is what he says on this

6    transcript.

7         Q.    And he says:  That can't be allowed

8    to continue because it's putting everyone's health

9    at risk.

10              Right?

11        A.    Yes, that's what Dr. Murthy says.

12        Q.    And he also says:  I do think that

13   part of what they have to do, the platforms, is

14   take aggressive action against people who are

15   intentionally spreading misinformation.

16              Right?

17        A.    Yes, that's what he says in this

18   podcast.

19        Q.    Okay.  And does that reflect kind of

20   the -- that kind of reflect or re-emphasize the

21   message in the health advisory?

22        A.    I think this is consistent with the

23   messaging we've reviewed all day today of the

24   advisory, the rollout, and public statements, yes.

25        Q.    Were -- in this time frame, now we're
```

**ERIC WALDO  12/22/2022**

Page 323

```
 1    to December of 2021, were there more communications
 2    with the social media platforms directly, in
 3    private, you know, that relate to them taking more
 4    aggressive action against people spreading
 5    misinformation?
 6            A.    In December of 2021?
 7            Q.    Yeah.
 8            A.    Not to my knowledge.
 9            Q.    Do you remember any -- any -- let me
10    ask this:  In the period between October of 2021
11    and December of 2021 or January of 2022, were
12    there -- do you recall any communications with any
13    of those social media platforms?
14            A.    I do not.
15                  And, sir, I think I just want --
16    again, I mentioned at the top, but I'll remind you,
17    since it sounds like we're starting to get into
18    2022, I was on paternity leave sort of January
19    through early March of -- of 2022.
20            Q.    So you -- you may not be aware
21    whether or not people in the Surgeon General's
22    office had communications with social media
23    platforms in that time frame?
24            A.    It's possible that it could have
25    occurred while I was on leave, but I would assume I
```

**ERIC WALDO  12/22/2022**

Page 324

```
1    would have been informed about those meetings when

2    I returned.

3          Q.    Were you informed about any meetings

4    like that?

5          A.    I mean, in general, I was checking in

6    with my team about major issues.  And I think,

7    given the scrutiny that we had seen from this

8    issue, I -- I think the team would have told me if

9    there had been a lot of meetings with Facebook or

10   other social media companies.

11         Q.    Are you aware of any meetings between

12   anyone in the Surgeon General's office and any

13   social media platforms anytime from October of 2021

14   through March of 2022?

15         A.    Not to my knowledge.

16         Q.    And I take it during a lot of that

17   time from January to March, you were out on kind of

18   the second part of your paternity leave, right?

19         A.    That's correct.

20         Q.    Let me call up Exhibit 39 real

21   quickly.  Can you see this Surgeon General Murthy

22   on COVID mental health and Alyssa Milano's podcast

23   Sorry, Not Sorry?

24         A.    I do see that this is a podcast, yes.

25         Q.    And I take it this podcast occurred
```

**ERIC WALDO  12/22/2022**

**Page 325**

```
 1    on January 3rd, 2022.  Does that ring a bell?
 2         A.   So, again, I would have been out on
 3    leave, but I remember that we were trying to
 4    schedule this podcast.
 5         Q.   Okay.  But you --
 6         A.   I think it was -- it was a
 7    rescheduled multiple times.
 8         Q.   Okay.  And why was it rescheduled?
 9         A.   Scheduling.
10         Q.   Those people had conflicts or Surgeon
11    General had conflicts?
12         A.   Correct.
13         Q.   And, again, were you involved in sort
14    of inputting into the kind of message that would be
15    conveyed in this podcast?
16         A.   No, that would have been designed by
17    the communications team.
18         Q.   Who's that, by the way?  Does that
19    include Alexandria Phillips?
20         A.   Yeah, so Alexandria Phillips is the
21    communications director, and was the communications
22    director at the time.
23         Q.   Who else is on that team?
24         A.   The team has grown.  She has a press
25    secretary, a chief of staff, a digital director, a
```

**ERIC WALDO  12/22/2022**

**Page 326**

1    speech writer, a sort of a correspondence

2    story-bank person as well.  Those are some of the

3    staffers that I'm aware of.

4           Q.    Okay.  Let me actually turn to --

5    direct your attention to the transcript of

6    Dr. Murthy's comments here in January of 2022.

7    He's talking to the -- the host of the podcast, and

8    he says, among other things -- sorry, I'm in the

9    wrong spot.  Unless those platforms step up and

10   make their spaces safer and reduce the amount of

11   misinformation on their site, it's going to be

12   pretty tough to get a full handle on the spread of

13   misinformation.

14              Right?

15              MS. CHUZI:  Objection.  I'd like to

16   call attention to the portion of this transcript

17   that says that it is not necessarily an accurate

18   transcription.

19           Q.    (BY MR. SAUER)  Sure.  Do you see

20   there where the transcript reports he said:  Unless

21   those platforms step up and make their spaces safer

22   and reduce the amount of misinformation on their

23   site, it's going to be pretty tough to get a full

24   handle on the spread of misinformation?  Do you see

25   that?

**ERIC WALDO  12/22/2022**

**Page 327**

1      A.    I do see that.

2      Q.    **Yeah, and is that -- do you have any**

3   **reason to doubt that that's what Dr. Murthy said in**

4   **this podcast?**

5      A.    That -- I have not listened to the

6   podcast, I've not read the transcript before this

7   moment, but those talking points or that statement

8   seems aligned with the other -- with the advisory

9   and the other public statements we've seen thus

10  far.

11     Q.    **And -- and so that would be**

12  **consistent with all the messages we've talked about**

13  **today in this deposition from Dr. Murthy and your**

14  **office?**

15     A.    Yes.

16     Q.    **And then the podcast cuts to a -- a**

17  **-- a quote of President Biden, you see that,**

18  **saying:  The unvaccinated are responsible for their**

19  **own choices, but those choices have be shulled**

20  **(sic) by dangerous misinformation on cable TV and**

21  **social media.**

22           **Correct?**

23     A.    Do you think that means shilled?  I

24  don't -- I don't know what shulled means.

25     Q.    **Yeah, let me ask you this:  Do you**

**ERIC WALDO  12/22/2022**

Page 328

```
1   recall any discussion of using this quote from

2   President Biden in the podcast, along with

3   Dr. Murthy's comments?

4        A.    No, I do not.

5        Q.    And President Biden goes on to say:

6   You know these companies and (inaudible) are making

7   money by peddling lies and allowing misinformation

8   that can kill their own customers and their own

9   supporters.  It's wrong.

10             Right?

11             MS. CHUZI:  Objection.

12   Mischaracterization of the record.

13        Q.    (BY MR. SAUER)  Do you see where it

14   says that?

15        A.    I see that that is the -- the quote

16   from President Biden that says:  You know, these

17   companies and blank are making money by -- it says

18   pedally -- lies and allowing misinformation that

19   can kill their own customers and their own

20   supporters. It's wrong.

21        Q.    Do you remember President Biden

22   saying that?

23        A.    Not really.

24        Q.    He goes on to say in the quote:  Not

25   just it's wrong, but it's immoral.  I call on the
```

**ERIC WALDO  12/22/2022**

Page 329

 1    purveyors of these lies and misinformation to stop

 2    it.  Stop it now.

 3             Correct?

 4        A.    That is -- you're -- that is a

 5    correct reading of this transcript.

 6        Q.    Was it -- was it -- do you know if it

 7    was the Surgeon General's office's idea to use that

 8    statement from President Biden in connection with

 9    Surgeon General Murthy's comments calling upon the

10    technology companies to step up and make their

11    spaces safer and reduce the amount of

12    misinformation on their sites?

13        A.    Sir, I know you just repeated the

14    quote, but can you repeat the question?

15        Q.    Was it the Surgeon General's office's

16    idea to use President Biden's strongly worded quote

17    in connection with Dr. Murthy's comments in his

18    podcast?

19        A.    I don't know.  But my strong

20    speculation would be that we did -- the podcasts

21    that we went on were edited and run by whomever to

22    the -- to the desires of those podcast folks.

23        Q.    On the next page, the transcript

24    reports that Dr. Murthy said:  We're also asking

25    them to go after people who are superspreaders of

**ERIC WALDO  12/22/2022**

Page 330

```
 1    misinformation on these sites, that they're causing
 2    harm.
 3              Correct?
 4        A.    That is what the transcript says,
 5    correct.
 6        Q.    And so that's consistent with Surgeon
 7    General Murthy's prior public and private
 8    statements asking the social media companies to
 9    take action against superspreaders of
10    misinformation, right?
11        A.    I consider that consistent, yes.
12        Q.    And in a sense, it kind of reinforces
13    the prior messaging going back to at least
14    July 15th, right?
15        A.    I think it's consistent with -- I
16    think it's entirely consistent and -- with the
17    messages that Dr. Murthy was sharing about health
18    mis- and disinformation.
19        Q.    Let's look at Exhibit 41.
20              MR. SAUER:  Amanda, this should be in
21    the third e-mail I sent you at the beginning of the
22    break.
23        Q.    (BY MR. SAUER)  Here's a
24    February 14th, 2022, panel discussion involving
25    Dr. Murthy.  I take it this would have happened
```

**ERIC WALDO  12/22/2022**

**Page 331**

```
 1    when you were out on paternity leave as well,
 2    correct?
 3        A.    Yes, I was on paternity leave at the
 4    time of this panel.
 5        Q.    Okay.  Did you know that the Surgeon
 6    General was involved in this panel hosted by the
 7    Rockefeller Foundation?
 8        A.    I don't recall.  I don't -- I wasn't
 9    aware of this panel.
10        Q.    Okay.  Let's look at quickly, then --
11    I'm going to flip ahead to page 10 of the
12    transcript.  It talks about the speed scale and
13    sophistication with which misinformation is
14    spreading, right?
15        A.    Yes.
16        Q.    And it talks about how it's been
17    enabled, in fact, by technology platforms, right?
18        A.    Correct.
19        Q.    And again, that's, I take it,
20    consistent with the prior messaging that we
21    discussed today, from --
22        A.    Yes, I think this is -- yes, this
23    looks like a consistent message with what we've
24    seen in previous public statements, interviews, as
25    well as the advisory itself.
```

**ERIC WALDO  12/22/2022**

1    Q.    And is it also true that these kinds

2    of messages were conveyed in private meetings and

3    conversations that we've talked about today?

4    A.    I think -- I don't have any -- any

5    update for what I've described about the private --

6    about the private meetings.  If I didn't recall

7    what had, then I don't recall.  And if I said I

8    recalled something, then that's the description.  I

9    don't have an update for those meetings.

10    Q.    Lower on the page, he says:  We

11    certainly need technology companies to step up and

12    do more to help reduce this spread of

13    misinformation and to be transparent with the

14    public about how much misinformation is being

15    transacted on their sites and so forth.

16          Right?

17    A.    Yes, you've read that accurately.

18    Q.    Yeah.  And that, I take it, is very

19    consistent with the message of the health advisory,

20    right?

21    A.    Yes.  I think the message of -- of

22    asking an all-society approach, including

23    technology companies, to do more at a moment of a

24    pandemic and public health crisis is consistent

25    with Dr. Murthy's messaging.

**ERIC WALDO  12/22/2022**

Page 333

```
1           Q.     On the next page here, page 11 of the
2    transcript, he goes on to say:  And of course,
3    there's a role for government here as well to set
4    safety standards to push for transparency and
5    accountability particularly from platforms.
6                  Right?
7           A.     Yes, that is the -- that is an
8    accurate reading of -- of what the transcript
9    that's being shown on the screen.
10          Q.     What does he mean, to your
11   understanding, about the role of the government in
12   setting safety standards when it comes to
13   misinformation?
14          A.     He says:  And of course, there's a --
15   can I take a look at this for a second?
16          Q.     Sure.
17          A.     I just want to make sure I'm reading
18   it in the right context.
19                 Okay.  I don't know what he means by
20   safety standards, but he, in the next sentence,
21   talks about that -- that his office can call
22   attention to these challenges, which is what my
23   office is doing.  So, again, I think as we've
24   described previously, I think the role of the
25   Surgeon General is to help call attention to issues
```

**ERIC WALDO  12/22/2022**

Page 334

```
 1    of -- of national public health import.
 2         Q.    Of course he says:  And also to call
 3    attention to these challenges.
 4              So calling attention is in addition
 5    to setting safety standards.  Has there been any
 6    discussions in the Surgeon General's office about
 7    the government setting safety standards when it
 8    comes to misinformation issues?
 9         A.    Not -- not to my knowledge.
10         Q.    So do you know what Dr. Murthy's
11    talking about here?
12         A.    I do not.
13         Q.    Two pages later, he says:  I would
14    submit this is what we need the platforms to do is
15    we can't, I think, tolerate an environment anymore
16    where platforms are saying no, we're trying our
17    best, even though it's not good enough.  That's --
18    that's not good enough for society.
19              Correct?
20         A.    That is an accurate reading of that
21    transcript as presented on this screen.
22         Q.    And that's consistent with the
23    messaging of the health advisory and he emphasizes
24    that message, correct?
25         A.    I think -- I think, again, it's
```

**ERIC WALDO  12/22/2022**

Page 335

```
 1   consistent with the theme of we're asking people to
 2   do more at the time of a public health crises where
 3   people are dying every day during a historic
 4   pandemic.
 5        Q.    He goes on to say:  We're seeing the
 6   harms that are being visited upon us in terms of
 7   not just COVID information, and you know, illness
 8   and death, but in a whole range of other
 9   circumstances, other than COVID information.
10             What other circumstances is he
11   talking about, do you know?
12        A.    I don't know.
13             MS. CHUZI:  Counsel, I think we're at
14   the six-hour mark.  I think we've been going for an
15   hour if my -- if my counting is accurate.  I'm
16   wondering if now would be a good time to take a
17   break?
18             MR. SAUER:  Yeah, it sure is, and it
19   will give me a chance to cull through -- we are at
20   breaking point, but give me a chance to
21   whip through the last few exhibits and see what I
22   can pull out and see how quickly we can wrap up.
23             THE VIDEOGRAPHER:  The time is
24   3:29 p.m.  We are off the record.
25             (A short break was taken.)
```

**ERIC WALDO  12/22/2022**

```
 1                    THE VIDEOGRAPHER:  The time is 3:41

 2    p.m. Central Standard Time.  We are back on the

 3    record.

 4            Q.    (BY MR. SAUER)  Mr. Waldo, you're

 5    aware that on March 3rd the Surgeon General's

 6    office issued a Request For Information about

 7    social media misinformation.  You recall that?

 8            A.    Yes.

 9            Q.    Yeah.  And here on the screens share,

10    I'm showing you Exhibit 42 that I previously

11    e-mailed your counsel.  (Technical difficulty) this

12    the RFI --

13            A.    That's correct.

14            Q.    -- on here, right?  Yeah.  Called

15    Impact of Health Misinformation on the Digital

16    Information Environment in the United States

17    Through the COVID-19 Pandemic Request for

18    Information, right?

19            A.    That's correct.

20            Q.    And were you involved in formulating

21    this RFI at all?

22            A.    I was involved in meetings where the

23    -- where there was a discussion about whether or

24    not to do this RFI or for the overall strategy

25    around -- around this data by -- with -- with the
```

**ERIC WALDO  12/22/2022**

Page 337

```
 1   team, yes.
 2          Q.     Overall strategy.  What overall
 3   strategy was there with -- regarding this RFI?
 4          A.     I'm sorry, I didn't say strategy
 5   about this RFI.  Strategy whether or not there was
 6   going to be additional data requests to make and
 7   how to make them.
 8          Q.     Oh.  You mean additional data
 9   requests.  What do you mean by that?
10          A.     I mean -- I shouldn't say additional.
11   I think there was a question of whether or not we
12   were going to -- going to make questions, you know,
13   ask for -- given that the -- given the
14   conversations with Facebook and others, was there
15   something more constructive we could do around
16   helping researchers have a better understanding of
17   what's happening in this community.  And so
18   ultimately, the RFI was -- was determined as the
19   path forward.
20          Q.     Okay.  So were there other paths
21   forward (technical difficulty) Surgeon General's
22   office --
23              (A discussion was held off the
24   record.)
25          Q.     (BY MR. SAUER)  Were there other
```

**ERIC WALDO  12/22/2022**

Page 338

 1    paths forward about COVID-19 misinformation that

 2    the Surgeon General's office did or was this the

 3    only one at this time?

 4            MS. CHUZI:  Objection.  To the extent

 5    that question calls for information covered by the

 6    deliberative process privilege, I will instruct the

 7    witness not to answer.

 8            THE WITNESS:  On the advice of

 9    counsel, I will not answer the question.

10        Q.    (BY MR. SAUER)  I'm not asking about

11    deliberations.  I'm asking if there were actions

12    taken.  Did the Surgeon General's office do

13    anything other than RFI to address issues of COVID

14    misinformation in this time frame?

15        A.    Not to my knowledge.

16        Q.    Scrolling down, were you involved in

17    formulating, you know, kind of what kind of

18    information to ask for here in the RFI?

19        A.    No.

20        Q.    Who was involved in formulating kind

21    of the specific types of information to ask for?

22        A.    I think Kyla was the primary driver

23    on the RFI from a content expert perspective.

24        Q.    That's Kyla Fullenwider?

25        A.    That's correct.

**ERIC WALDO  12/22/2022**

**Page 339**

1          Q.     Do you know if she had input from
2     Renee DiResta or other academics in formulating the
3     RFI?
4          A.     I do not.
5          Q.     Do you know -- do you know who she --
6     who she would have worked with in formulating it?
7          A.     I do not.
8          Q.     Do you know if anyone besides Kyla
9     had any input into what information to ask for?
10         A.     I know that Kyla was running these
11    ideas by Max Lesko from an -- more of a process,
12    getting Dr. Murthy's input perspective.  More or
13    less of a content expertise perspective.  But I
14    think she certainly ran this by Max.
15         Q.     And that was to get Dr. Murthy's
16    approval on the approach taken?
17         A.     I believe so, yes.
18         Q.     Do you know if Dr. Murthy provided
19    input on the content of the RFI, asked for this
20    information, that kind of thing?
21         A.     I'm not certain.
22         Q.     Anyone else you know of besides
23    Dr. Murthy, Max Lesko, and Kyla Fullenwider
24    involved in the formulation of the RFI?
25         A.     Not to my knowledge.

**ERIC WALDO   12/22/2022**

**Page 340**

1      Q.    What is Kyla's role in the Surgeon

2  General's office in this time frame?  I remember

3  she's in US Digital Response.  Is she a -- an

4  employee of the Surgeon General's office by now or

5  what's her formal role?

6      A.    I'm not certain how -- what was the

7  mechanism for how she was employed out of HHS, but

8  I know she was doing work on behalf of the Surgeon

9  General.

10      Q.    The RFI here on the -- I think it's

11  on the second page of the document -- asks for

12  information about technology platforms, correct?

13      A.    What page are you on, sir?

14      Q.    Second page of the document, here

15  down in the bottom right, column number 2,

16  Information about Technology Platforms.

17      A.    Yes.  That's correct.

18      Q.    And it asks number 3:  Information

19  about how widespread COVID-19 misinformation is on

20  individual technology platforms including general

21  search engines, content sharing platforms, social

22  media platforms, e-commerce platforms, crowdsourced

23  platforms, and instant messaging systems, correct?

24      A.    That's correct.

25      Q.    Were there discussions -- general

**ERIC WALDO  12/22/2022**

Page 341

```
 1    search engines, that's like Google, right?
 2           A.    I assume so.
 3           Q.    What's a content sharing platform?
 4    Is that like Reddit?
 5           A.    I'm not certain.  I don't -- I'm not
 6    sure what the technical definition is there, but
 7    it --
 8           Q.    Do you know what kind of platform --
 9           A.    Because that seems -- that seems
10    different than social media.
11           Q.    Yeah, what kind of platforms are they
12    referring to there, do you know?
13           A.    I do not.
14           Q.    It goes on to say social media
15    platforms, then e-commerce platforms.  What are
16    those?
17           A.    I presume places where you -- where
18    e-commerce occurs so...
19           Q.    eBay, Amazon, places like that?
20           A.    I think -- I definitely would think
21    Amazon, yeah.
22           Q.    What -- were there discussions that
23    you're aware of about COVID misinformation being
24    shared on e-commerce platforms?
25           A.    I recall at some point in the rollout
```

**ERIC WALDO  12/22/2022**

```
 1   Kyla sharing with me just from a factual
 2   perspective that on sites like Amazon it was
 3   possible to also spread health mis- and
 4   disinformation based on promotion of, you know,
 5   certain -- I think the algorithm could promote if
 6   you like this, buy this, and maybe promoting
 7   conspiracy theories.
 8        Q.    So conspiracy theories about COVID or
 9   other conspiracy theories?
10        A.    I think it was about COVID but I
11   don't truly recall.
12        Q.    Okay.  What are crowdsourced
13   platforms?
14        A.    I'm not sure what the technical
15   definition is of a crowdsourced platform.
16        Q.    Do you know what platforms are being
17   referred to there in that -- in that phrase?
18        A.    As I said just now, I don't know what
19   crowdsourced platforms means in the context of this
20   document.
21        Q.    So one of the things that's asked for
22   here is aggregate data and analysis on the
23   prevalence of COVID-19 misinformation on individual
24   platforms including exactly how many users saw or
25   may have been exposed to instances of COVID-19
```

**ERIC WALDO  12/22/2022**

**Page 343**

1    misinformation, right?

2         A.    Yes, that's what the RFI says on that

3    paragraph.

4         Q.    Is that the kind of data that you

5    guys have been asking Facebook for in the meetings

6    in 2021 where you talked about data transparency?

7         A.    It appears to be a version of that,

8    yes.

9         Q.    Scrolling down here at number 5, it

10   says information about the sources of COVID-19

11   misinformation.  Do you see that?

12        A.    I do see that.

13        Q.    And it asks for information about the

14   major sources of COVID-19 misinformation associated

15   with exposure, correct?

16        A.    That is what 5 sub bullet A says,

17   correct.

18        Q.    What does "associated with exposure"

19   mean there?

20        A.    It says -- I'm not sure technically.

21   It says information about COVID -- resources about

22   COVID-19 misinformation.  Information about the

23   major sources of COVID-19 misinformation associated

24   with exposure.  I don't -- let's see, does it have

25   the definition in there further down?

**ERIC WALDO  12/22/2022**

**Page 344**

1          Q.    I don't recall.  I guess up here it
2    says --
3          A.    Sorry.  I was trying to look.  Yes.
4          Q.    **Seeing content in news feeds and**
5    **exposure.**
6          A.    Yeah, okay.  So it seems to be saying
7    that information associated with seeing the content
8    in news feeds and search results are
9    algorithmically nominated content.
10         Q.    **It goes on under little I there to**
11   **say:  By source, we mean both specific public**
12   **actors that are providing misinformation as well as**
13   **components of specific platforms that are driving**
14   **exposure to misinformation, correct?**
15         A.    Yes, that's what the document says.
16         Q.    **So the RFI is actually seeking**
17   **information about specific speakers or posters on**
18   **social media platforms that spread misinformation,**
19   **right?**
20         A.    I'm not sure, because earlier, you
21   highlighted that it talks about aggregate data and
22   I'm pretty sure the document also talks about
23   anonymity.
24         Q.    **So you think that specific public**
25   **actors does not refer to specific people who spread**

**ERIC WALDO  12/22/2022**

**Page 345**

1    -- provide misinformation?

2         A.    It may, but I'm pretty sure in this

3    document there's some sort of caveat about having

4    to submit anonymized data.

5         Q.    Okay.  That would be an indicator of

6    people who are reviewing it, right, the people

7    exposed to the misinformation, right?

8         A.    I'm sorry.  Say again, sir.

9         Q.    Doesn't the anonymized data refer to

10   the users who are exposed, not the public actors

11   who are providing this information?

12        A.    I'm not sure.  If you can bring up

13   that portion of the document, I'm happy to take a

14   look.  But I'm pretty sure in general when the

15   federal government does requests for information

16   like this, there are various stipulations that have

17   to be made to -- for -- to ensure that there's

18   anonymized data.

19        Q.    Let me ask you this.  I believe there

20   was a plan expressed by the Surgeon General's

21   office to render any comments received in response

22   of this information public, right, to publicly post

23   them?

24        A.    Are you asking -- can you repeat the

25   question?  It sounded like a statement.

**ERIC WALDO  12/22/2022**

1    Q.    Did the -- did the Surgeon General's

2  office announce that it would publicly post all the

3  comments received in response to this RFI?

4    A.    I don't know.

5    Q.    Was there a -- do you recall a policy

6  of that?

7    A.    I don't know.  In my other life

8  working in government for, like, noticing common

9  rule making, which I'm sure you know from your law

10  school days, there was requirements about public --

11  making public comments, but I'm not sure if that

12  refers to RFIs as well.

13    Q.    Let me ask this.  Do you know whether

14  the comments received in response to this RFI have

15  ever been published?

16    A.    I'm -- I'm not aware of whether they

17  have or not.

18    Q.    And we submitted a FOIA request for

19  them months ago and haven't received any yet.  Are

20  you aware of that?

21    A.    I am not.

22    Q.    So you don't know whether the Surgeon

23  General's office ever made these -- the comments it

24  received public?

25            MS. CHUZI:  Objection.  Asked and

**ERIC WALDO  12/22/2022**

**Page 347**

1   answered.

2          Q.     (BY MR. SAUER)   Fair to say?

3          A.     As previously stated, I do not know.

4          Q.     Let's look at Exhibit 44.

5                 MR. SAUER:   Amanda, I e-mailed these

6    right as the break was ending, and it was a big

7    group of exhibits.

8                 MS. CHUZI:   Yes.

9          Q.     (BY MR. SAUER)   Here's an article

10   from The Hill the same day as the -- the RFI went

11   out entitled Surgeon General Demands Data on

12   COVID-19 Misinformation From Major Tech Firms.   Do

13   you see that?

14         A.     I do.

15         Q.     That -- focusing on that word

16   "demands," I recall that kind of description of

17   this being repeated in other media articles.   Did

18   you view the -- does the Surgeon General's office

19   review the article as demanding information?

20         A.     Not to my knowledge.   It's a -- by

21   definition, an RFI is a voluntary request for

22   information.

23         Q.     Did the Surgeon General's office take

24   any steps to, you know, have the public messaging

25   reflect the description of this RFI as a demand for

**ERIC WALDO  12/22/2022**

```
 1    information?

 2          A.    Not to my knowledge.

 3          Q.    Do you know if the communications

 4    team was involved in talking to the reporters like

 5    this Brad Dress who reported on it?

 6          A.    I don't know.

 7          Q.    Were you involved in any

 8    communications with reporters?

 9          A.    I was not.  Again, I was actually

10    still on paternity leave at this point, sir.

11          Q.    Oh, March 3rd, you weren't back yet?

12          A.    Yeah, so our nanny canceled on us, so

13    I had to be on leave for another week.

14          Q.    Oh.  Okay.  Okay.  Do you -- so do

15    you -- well, let me ask -- let me search another

16    exhibit.

17                Did the Surgeon General's office take

18    any steps to try and encourage social media

19    platforms to -- to respond to the RFI?

20          A.    I believe that the chief of staff,

21    Max Lesko, sent the RFI to contacts at various

22    social media organizations.

23          Q.    And that would include Facebook,

24    right?

25          A.    Correct.
```

**ERIC WALDO  12/22/2022**

Page 349

1          Q.    And here, for example in Exhibit 45,

2     there's an e-mail from Max Lesko to Nick Clegg and

3     Brian Rice and someone else at Facebook with a

4     letter from the U.S. Surgeon General attached,

5     correct?

6          A.    Yes, that's an e-mail from Max Lesko

7     to Nick Clegg, Brian Rice, and Nathaniel Gleicher.

8          Q.    And it indicates that he's attached a

9     letter from Surgeon General Murthy to Mark

10    Zuckerberg, right?

11         A.    That's correct.

12         Q.    And he says -- also says:  Let me

13    know if I can be helpful with respect to the

14    request for information which has been sent to the

15    Federal Register and expect to receive submissions

16    in the coming days.  Correct?

17         A.    Yes, that's what Max has written to

18    -- to those individuals.

19         Q.    And so the Surgeon General's office

20    e-mailed a link to the RFI to Facebook and also

21    attached a letter directly from Surgeon General

22    Murthy to Mark Zuckerberg, right?

23         A.    That is what the e-mail says, yes.

24         Q.    And then Exhibit 46.  And this is --

25    is this actually the letter from Surgeon General

**ERIC WALDO  12/22/2022**

Page 350

```
 1    Murthy to Mark Zuckerberg dated March 3rd, 2022
 2    that Max Lesko e-mailed?
 3         A.    It would appear so.
 4         Q.    Yeah, let me put it on the screen
 5    share.  And the purpose of this letter is to
 6    encourage Facebook to participate in the RFI,
 7    right?
 8         A.    It's -- it says:  I am writing today
 9    to request that your company contribute to the RFI.
10         Q.    So he's encouraging Facebook to
11    contribute to the RFI, right?
12         A.    He's definitely asking him to do so,
13    yes.
14         Q.    And he says:  Given that a large
15    proportion of health misinformation is spread
16    through technology platforms, my Advisory includes
17    a call for technology companies to join this
18    broader effort to create a safer, healthier
19    information environment, right?
20         A.    Yes, that's what -- that's an
21    accurate reading of that portion of the letter.
22         Q.    And he requests responses from
23    companies about the extent and spread of COVID-19
24    misinformation on your platforms, policies to
25    address COVID-19 misinformation, and their
```

**ERIC WALDO   12/22/2022**

Page 351

1   effectiveness, sources of COVID-19 misinformation

2   and so forth, right?

3        A.    That's an accurate reading of that

4   portion of the letter.

5        Q.    Were you involved in drafting the

6   letter?  I think you probably were still on

7   paternity leave at this time, right?

8        A.    Yeah.  As I mentioned, this letter is

9   dated March 3rd and I was still on paternity leave.

10  So I was not involved in the drafting of this

11  letter.

12       Q.    Did Max Lesko send similar letters to

13  other social media platforms?

14       A.    I think so.

15       Q.    Yeah.  I mean, I don't want to put

16  six more exhibits in front of you, but would you

17  agree that he sent a very similar, basically

18  identically phrased letter to Google, LinkedIn,

19  Twitter, YouTube, and Microsoft all on that same

20  day, March 3rd, 2022?

21       A.    I don't know if he did, but if you --

22  I don't have any reason to disbelieve that he did,

23  so.  That, I believe was the plan.

24       Q.    Let's just very briefly, I'm going to

25  e-mail those to your counsel and I'll pull them up

**ERIC WALDO  12/22/2022**

**Page 352**

1    real quick.

2             And you said you're aware that that

3    was the plan, right?

4         A.    I think I became aware after I got

5    back that that happened.  I wasn't part of the

6    planning process.

7         Q.    Here on the screen share, I'm showing

8    you Exhibit 47.  Similar letter to Sundar Pichai of

9    Google from Surgeon General Murthy about the RFI

10   dated March 3rd, correct?

11        A.    Yes, that's the date of the letter.

12             Sir, if you're -- okay.  Sorry.

13        Q.    Exhibit 48, yeah, -- similar

14   letter --

15        A.    Thank you.

16        Q.    -- to the CEO of LinkedIn about the

17   RFI encouraging them to participate, correct?

18        A.    It's a letter asking -- informing

19   them and requesting that they participate in the

20   RFI.

21        Q.    In fact, these letters kind of all

22   have exactly the same text, right?  Is that your

23   understanding?

24        A.    You're moving the letters up and down

25   very quickly but I don't have any reason to believe

**ERIC WALDO  12/22/2022**

Page 353

```
1    they're not virtually the same.
2            Q.    Exhibit 49, similar letter to
3    Twitter, right, and Parag Agrawal, who was then the
4    CEO of Twitter?
5            A.    Yes, it appears to be the same
6    functional letter.  I'm not having much of an
7    opportunity to review it.  But I don't have any
8    reason to believe it's not the same overall text
9    requesting that they participate in the RFI.
10           Q.    Exhibit 50, same letter to Microsoft
11   -- I'm sorry, YouTube, I apologize.  Same letter to
12   YouTube, correct?
13           A.    You're okay.  Yes, sir, I'm only
14   looking at part of the letter that you're sharing
15   and I can't actually review all of it in the way
16   that we're doing it right now.  But it appears to
17   be the same form of a letter asking for a request
18   -- requesting that -- informing them about the RFI
19   and requesting that they participate.
20           Q.    And then finally, Exhibit 51, similar
21   letter to Microsoft, correct?
22           A.    That looks like it's to the Microsoft
23   corporation.  Right now, I'm only being exposed to
24   the first couple of lines.  But it looks -- the
25   first -- overall, it seems to be the same letter
```

**ERIC WALDO  12/22/2022**

Page 354

```
 1    requesting that they participate in the RFI.

 2            Q.    Did all of those companies that got

 3    the letter, did they all participate, do you know?

 4            A.    I don't know.

 5            Q.    Do you know if Facebook submitted

 6    anything?

 7            A.    I think so.  But I'm not positive.

 8            Q.    How about Google?

 9            A.    I don't know.

10            Q.    How about Twitter?

11            A.    I don't know.

12            Q.    How about Microsoft?

13            A.    I don't know.

14            Q.    Shortly after the RFI was issued, the

15    Surgeon General gave an interview to GQ Magazine,

16    right?  Does that ring a bell?

17            A.    It does not.

18            Q.    So you weren't -- let me -- let me

19    show Exhibit 52 on the screen share.  Does this

20    dazzling picture of Surgeon General Murthy jog your

21    memory?

22            A.    It does not.

23            Q.    So you don't recall him giving an

24    interview to GQ Magazine on March 11th of 2022?

25            A.    I do not.
```

**ERIC WALDO  12/22/2022**

Page 355

1          Q.      Well let me just touch briefly on a

2    couple things in the interview and see what you

3    know about them.

4                  On page 6 of the interview, Surgeon

5    General Murthy's asked about Spotify and Joe Rogan.

6    Do you remember a kind of controversy in February

7    of 2022 about whether Spotify should deplatform Joe

8    Rogan for allegedly spreading COVID misinformation

9    in his podcast?

10         A.      I remember that Joe Rogan was having

11   controversial people on his podcast.  That's about

12   the depth of my knowledge.

13         Q.      So you don't remember a specific

14   controversy that related to Joe Rogan and COVID

15   misinformation?

16         A.      I think that he was having guests on

17   who were talking about the COVID misinformation.

18   You asked about deplatforming.  I don't recall

19   that.

20         Q.      And in the interview, Surgeon General

21   Murthy says if you're running a platform whether

22   it's Spotify or another social media platform

23   you've got to think about how do I create a healthy

24   information environment, correct?

25         A.      Can you please highlight the text,

**ERIC WALDO  12/22/2022**

Page 356

```
 1   sir.
 2        Q.    Yeah, I'm having trouble with the
 3   highlighting.
 4        A.    I can see.  Okay.  Everything's
 5   highlighted.  Hold on.  I have it in front of me.
 6   If you give me one moment, I can read that question
 7   and answer in a short trip.
 8        Q.    Here, if -- it starts with --
 9        A.    Starting with the  -- yeah, hold on
10   one second.
11        Q.    There it goes again.
12        A.    Okay.
13        Q.    So he talks about creating if you're
14   a platform, whether it's Spotify or another social
15   media platform, you've got to think about how do I
16   create a healthy information environment here, how
17   do I create rules and a culture that promotes
18   accurate information.  Correct?
19        A.    Yes, that's an accurate reading of
20   the transcript.
21        Q.    And he's saying this eight days after
22   the RFI was issued.  Is he talking about what the
23   RFI is getting at, which is trying to get
24   information about how social media platforms can
25   create rules in a culture to promote accurate
```

**ERIC WALDO  12/22/2022**

```
 1   information, right?

 2        A.    I'm actually not sure, sir, that he

 3   did this interview eight days afterwards.  It was

 4   published eight days afterwards.  I don't know when

 5   this interview was actually recorded.

 6              And typically, for a magazine

 7   article, it's usually done actually a few -- could

 8   have been done weeks earlier.  I don't know.

 9        Q.    So you mentioned you didn't know he

10   was doing this interview, so maybe that answers my

11   question.  But do you know whether the idea was to

12   have this interview come out in connection with the

13   RFI?

14        A.    I don't know but I'm doubtful that

15   that would have been the purpose of a GQ Magazine

16   interview.

17        Q.    Well, it would highlight the

18   information, or highlight the issue of COVID

19   misinformation; that's also what's being sought in

20   the RFI, correct?

21        A.    I don't think I -- again, Alex

22   Phillips would be the one to answer this question

23   as our communications director.  But I don't think

24   GQ is where we were going to try to move the ball

25   on misinformation is my guess.
```

**ERIC WALDO  12/22/2022**

Page 358

```
 1          Q.     On the next page of the GQ interview,
 2    going to page 7 here, you see where my cursor is,
 3    where it says but I do think a platform has the
 4    ability, the opportunity, and the responsibility to
 5    create rules and a culture that supports the
 6    dissemination of accurate information and that
 7    reduces the spread of misinformation, correct?
 8          A.     Yes.
 9          Q.     And again, that's similar to what he
10    said on the previous page about creating rules and
11    a culture for the social media platforms, right?
12          A.     Yes.
13          Q.     And he goes on to say that he
14    believes this is, quote, different from censorship,
15    and he talk about how in America, we believe in
16    free speech.  And he goes on to say right here:
17    But we also live in a society.  That means we need
18    common rules for the common good.  We have speed
19    limits on the road because we know that sometimes
20    if we drive too fast that can have an impact on
21    somebody else's health and well being.  Right?
22          A.     Yes, that's what the -- Dr. Murthy
23    said to the answer to this question.
24          Q.     And that reference to speed limit
25    seems to echo his statement from the February
```

**ERIC WALDO  12/22/2022**

**Page 359**

```
 1    podcast where he talked about the government
 2    creating standards for misinformation on social
 3    media platforms, right?
 4         A.    Sorry.  Ask your question again, sir.
 5         Q.    Well, let me ask you this.  It seems
 6    to me that he's making a similar point here as he
 7    made in the February 14th podcast that we looked at
 8    earlier where he talked about the government having
 9    a role to set standards for COVID -- for
10    misinformation on social media platforms.
11              Here, he's talking about speed limits
12    on the road, which are a standard that the
13    government sets to try and set guardrails around
14    what people do on the roads, right?
15              MS. CHUZI:  Objection.  Calls for
16    speculation.
17         Q.    (BY MR. SAUER)  If you know.
18         A.    I don't know, sir.
19         Q.    Do you know whether his reference to
20    speed limits is intended to, you know, refer to the
21    possibility of, you know, the government setting
22    some guardrails around misinformation?
23              MS. CHUZI:  Same objection.
24              THE WITNESS:  I -- I don't know.  And
25    it just seems like he's trying to use an analogy or
```

**ERIC WALDO  12/22/2022**

Page 360

```
 1   a metaphor to communicate the point that -- and I

 2   read the "we" as him referring to society, and we

 3   need rules for the common good so -- and the way

 4   that the RFI is and the advisory are asking what

 5   folks can do more of, I think it's trying to say

 6   how can we create a better public square.

 7           Q.    (BY MR. SAUER)  In other words, a

 8   better public square is one that has more rules

 9   that prevent the spread of misinformation, right?

10           MS. CHUZI:  Objection.

11   Mischaracterizes the testimony.

12           THE WITNESS:  I think -- I think what

13   he's saying is we need better public health

14   outcomes.  And in this case, we want to make sure

15   that -- that we're not spreading it in a way --

16   spreading health misinformation in a way that's

17   causing outsized harm at the time of a pandemic

18   when people are dying every day and preventable

19   deaths because of misinformation.

20           Q.    (BY MR. SAUER)  Right.  In other

21   words, the rules to stop those preventable deaths

22   due the misinformation include what he calls common

23   rules for the common good, right there where my

24   cursor is?

25           A.    He says that means we need common
```

**ERIC WALDO  12/22/2022**

Page 361

```
 1    rules for the common good, that is what he said,

 2    yes.

 3          Q.    Yeah.  And then he ananolges (sic)

 4    those common rules for the common good to speed

 5    limits on the road because we know that sometimes

 6    if we drive too fast that can have an impact on

 7    someone else's health and well being, right?

 8          A.    Yes.  He uses that analogy.

 9          Q.    And he says if we're going to live

10    together in a society, we've got to take steps and

11    observe certain rules to help protect other people.

12    And that's true here as well, right?

13          A.    Yes.

14          Q.    Exhibit 53 -- actually before we talk

15    about this exhibit, you may have already answered

16    this, but do you know whether any of the social

17    media platforms responded to the RFI?

18          A.    I think you already asked this

19    question, sir, but I said I didn't know who had

20    responded.  You asked each individual organization,

21    and I said I thought Facebook might have responded,

22    and I didn't know about any of the others.

23          Q.    Gotcha.  Have you ever seen any of

24    the responses?

25          A.    Not to my knowledge.
```

**ERIC WALDO  12/22/2022**

Page 362

1        Q.      How about responses from anyone else?

2    Obviously, the RFI was open to the public.  Did

3    anyone else respond?

4        A.      I'm not aware.  I assume there were

5    other responses.

6        Q.      Who in the Surgeon General's office

7    kind of receives those responses and processes

8    them?

9        A.      I think, again, Kyla Fullenwider was

10   the one running point on this.

11       Q.      Would there be anyone else besides

12   her?

13       A.      I think to the extent that Max was

14   helping shepherd the process, he may have been

15   aware or possibly seen it.  But Kyla was the

16   subject matter expert who was guiding this RFI

17   process.

18       Q.      Would she be the only one that

19   reviews the responses?

20       A.      I don't know.

21       Q.      You don't know if she had other team

22   members reviewing responses?

23       A.      That's correct.  I don't know.

24       Q.      Do you know what volume roughly of

25   responses were received?  Sometimes you get, you

**ERIC WALDO  12/22/2022**

Page 363

```
 1    know, a hundred thousand comments; sometimes you

 2    get five.  Do you know roughly what volume was

 3    received?

 4          A.    I don't recall.

 5          Q.    Did you ever know that or did you

 6    just -- you don't remember or?

 7          A.    It's possible someone shared it with

 8    me anecdotally, but I don't recall.

 9          Q.    Looking at Exhibit 53, is that up on

10    the screen share for you?

11                You were copied on an e-mail from

12    Brian Rice at Facebook directing to Rob Flaherty

13    and other White House officials including Tim

14    Manning, Dori Salcido, and Subhan Cheema, correct?

15          A.    Yes, that is correct.

16          Q.    And this is sent on June 22nd of

17    2022?

18          A.    That's correct.

19          Q.    And he also copies Rebecca Siegel of

20    HHS, right?

21          A.    That's correct, Rebecca Siegel from

22    HHS is cc'd.

23          Q.    Yeah.  Who is she again?  She was on

24    the one of the earlier e-mails and I can't remember

25    who you said she is.
```

**ERIC WALDO  12/22/2022**

Page 364

```
 1          A.      Rebecca Siegel was a member of the
 2     public education campaign team; I think working
 3     with the Kristina Schake.
 4          Q.      Okay.  So she is in HHS outside of
 5     the Solicitor (sic) General's office?
 6          A.      Outside the Surgeon General's office
 7     yes, sir.
 8          Q.      Sorry.  Yeah.  And where are she and
 9     Ms. Schake actually located?  Are they in the
10     executive office of the secretary of HHS?
11          A.      Ms. Schake, I think, left the -- left
12     HHS at the end of 2021 is my recollection.  I don't
13     know what their reporting structure was.  I think
14     -- I think Ms. Schake reported to the secretary is
15     my recollection.
16          Q.      Here, in this e-mail, Brian Rice
17     says:  Rob and team, wanted to ensure you were
18     aware of our policy updates following the early
19     childhood vaccine approval.  Correct?
20          A.      Yes, that is an accurate reading of
21     that first sentence.
22          Q.      And I think you testified earlier
23     that you couldn't remember exactly when the early
24     childhood vaccine approvals came out.  Here, does
25     this June 22nd e-mail refresh your recollection?
```

**ERIC WALDO  12/22/2022**

Page 365

```
 1          A.    Yes, it appears that that was -- that
 2    it happened in the summer of 2022.
 3          Q.    Yeah, around sometime in late June of
 4    2022.  Fair to say?
 5          A.    Yeah, I think I was confusing the 5
 6    to 11 versus the -- sort of the infants.
 7          Q.    Yeah.  This is under 5, for children
 8    under 5, right?
 9          A.    Correct.
10          Q.    And Brian e-mails you all and says:
11    As of today, June 22nd, all COVID-19 vaccine
12    related misinformation and harm policies on
13    Facebook and Instagram apply to people six months
14    or older with the exception of the claim that the
15    COVID vaccines have full FDA approval since
16    children have only emergency use authorization.
17    Correct?
18          A.    That's an accurate reading of that
19    sentence.
20          Q.    So he's reporting back to you and the
21    White House, yet, again on how they've updated or
22    changed their policies to remove misinformation
23    from their platforms; is that right?
24          A.    I again read this as him saying now
25    just sort of an update on how -- how this -- how
```

**ERIC WALDO  12/22/2022**

```
 1   they're changing the definition of what's

 2   misinformation.

 3        Q.   So in other words, they're updating

 4   it to include claims about vaccines for children

 5   under 5, right?

 6        A.   Correct.

 7        Q.   So that's a -- kind of an expansion

 8   of the policy against COVID misinformation to

 9   include a category of new claims, correct?

10        A.   I think that's a fair -- that's a

11   fair reading.

12        Q.   And he goes on to say:  We expanded

13   these policies in coordination with the CDC and

14   ensured that we also included false claims that

15   might be connected to children, such as the false

16   claim that COVID vaccines cause MIS-C.  Do you see

17   that?

18        A.   I see that, sir.

19        Q.   And so he reports how there's been an

20   expansion of their policies to address false claims

21   related to childhood vaccines, correct?

22        A.   That's correct.

23        Q.   Was this e-mail prior -- was this

24   e-mail sent to you guys out of the blue?  Was there

25   any prior communication with Facebook about the
```

**ERIC WALDO  12/22/2022**

Page 367

```
 1    under 5 vaccines that you're aware of?

 2          A.    I'm not aware of any communications

 3    with them about under 5.

 4          Q.    So you think he just sent this update

 5    unsolicited, or do you not know?

 6          A.    I don't know.

 7          Q.    So you don't know whether the, like

 8    the White House people on this, Rob Flaherty, Tim

 9    Manning, Dori Salcido, and Subhan Cheema might have

10    asked for what their position was going to be on

11    these?

12          A.    I don't know.

13          Q.    Did anyone from the Surgeon General's

14    office ask for this information to your

15    recollection?

16          A.    Not to my knowledge.

17          Q.    Exhibit 54, do you remember this

18    e-mail chain from July -- June and July of 2022?

19          A.    Looks like the e-mail chain started

20    in February, if you go back to the beginning, if

21    I'm looking at the right exhibit, sir.  It starts

22    as a COVID insights report biweekly in February of

23    2022.

24          Q.    And then March of 2022?

25          A.    And then they reup it for March.
```

**ERIC WALDO  12/22/2022**

**Page 368**

```
 1           Q.     Then April of 2022?

 2           A.     Yeah.

 3           Q.     Then May?

 4           A.     Then May, then June, and that's where

 5    he says:  We'll plan to discontinue.

 6           Q.     Right.

 7           A.     And then Rob says:  Yeah.

 8           Q.     Right.

 9           A.     Sounds like Rob -- Rob -- I think I

10    mentioned I maybe referred to this before, sir,

11    when you were asking when and if we ever stopped

12    getting these.  So there is where Rob said he would

13    be fine discontinuing but he wanted to keep them as

14    we continued to work on under 5.

15           Q.     Gotcha.  Yeah, and I take it that --

16    I do recall you saying that.  And that exchange I

17    think begins on June 13th of 2022, here on the

18    first page, right?

19           A.     That's correct, yes.

20           Q.     And Brian says:  Attaching the recent

21    reports for your review.  We will plan to

22    discontinue these unless we hear from you that this

23    information continues to be valuable.  Is that

24    right?

25           A.     That is what Rob -- that is what
```

**ERIC WALDO  12/22/2022**

Page 369

```
 1   Brian writes to Rob, yes, and others.
 2          Q.    So Facebook is saying to Rob --
 3   others including you, right, because you're copied
 4   on this?
 5          A.    Yes, I'm cc'd on that e-mail.
 6          Q.    Did you -- were you ever asking for
 7   these reports to continue?
 8          A.    I was not.
 9          Q.    How about anyone in the Surgeon
10   General's office or HHS, did they ask for the
11   reports to continue?
12          A.    Nobody to my knowledge.
13          Q.    But Rob Flaherty did, right, on June
14   13th?
15          A.    Yes, as discussed, that they asked if
16   they can discontinue it, and Rob says that he
17   normally would say we are good to go to discontinue
18   but it would be help to continue to get these as we
19   start to ramp up for under 5 vaccines.
20          Q.    And we know from the prior exhibit --
21   this is June 13th.  We know from the prior exhibit
22   that the under 5 vaccines got authorized shortly,
23   right, in later June of 2022?
24          A.    That sounds correct.
25          Q.    And Flaherty says:  Obviously that --
```

**ERIC WALDO  12/22/2022**

**Page 370**

1  meaning under 5 vaccines -- has a potential to be

2  just as charged, right?

3          A.    That is what Rob has written.

4          Q.    So he means that presumably that

5  that's a controversial topic; the vaccination of

6  children under 5 and might result in people posting

7  things on Facebook that Rob views as

8  misinformation, right?

9              MS. CHUZI:  Objection.  Calls for

10  speculation?

11              THE WITNESS:  I'm not sure what Rob

12  means, but what you're saying doesn't sound crazy.

13          Q.    (BY MR. SAUER)  In other words,

14  that's a fair inference from what he's saying,

15  correct?

16          A.    I'm not -- again, I don't know what

17  Rob means, but I think, yes, it seems like a fair

18  reading.

19          Q.    And then as a result of that e-mail,

20  it looks like Brian Rice kept sending the COVID

21  reports, right?  So here --

22          A.    It would appear so.

23          Q.    Here we got an e-mail on July 17th of

24  2022, right?

25          A.    Yes.

**ERIC WALDO  12/22/2022**

Page 371

```
1              Q.     And there were two more COVID insight
2     reports attached to that, right?
3              A.     Yes.  Yes.  Correct.
4              Q.     And you were copied on those as well,
5     right?
6              A.     I'm copied on that, yes.
7              Q.     Were you aware of any other
8     communications between anyone in the federal
9     government and Facebook in this time frame that
10    related to information about under 5 COVID
11    vaccines?
12             A.     I was not familiar with that, sir.
13                    MR. SAUER:  David, how much time have
14    we been on the record?
15                    THE VIDEOGRAPHER:  We are at five
16    forty.
17                    THE WITNESS:  I think six forty.
18                    THE VIDEOGRAPHER:  Six forty.  My
19    apologies.  My apologies.  Six forty.
20                    MR. SAUER:  Why don't we take a
21    five-minute break now and see if we can wrap up.
22                    THE VIDEOGRAPHER:  The time is 4:22
23    p.m.  We are off the record.
24                    (A short break was taken.)
25                    THE VIDEOGRAPHER:  The time is 4:27
```

**ERIC WALDO  12/22/2022**

Page 372

1  p.m. Central Standard Time.  We are back on the

2  record.

3          Q.    (BY MR. SAUER)  Mr. Waldo, on Kyla

4  Fullenwider, whose name has come up multiple times

5  in this deposition, do you know, was she affiliated

6  with the Surgeon General's office all throughout

7  this time period from early 2021 through the RFI in

8  2022?

9          A.    I only came into the office in June

10  of 2021, so I know that she was affiliated with the

11  office from the time I started until I still think

12  currently, today.

13          Q.    And do you know if -- so she's still

14  affiliated with the office today, right?

15          A.    To the best of my knowledge, yes.

16          Q.    Is she a full-time employee or a

17  political appointee, do you know?

18          A.    I think as we've discussed previously

19  as I've answered, I don't know what the nature of

20  her relationship, whether she's a contractor, an

21  IPA, a schedule A, etc.

22          Q.    Do you know if she -- I mean, does

23  she kind of physically work, have her principal

24  place of work in the Surgeon General's office?

25          A.    We're a hybrid office, so everyone

**ERIC WALDO  12/22/2022**

Page 373

```
 1   can work from home and come in person.  So I've
 2   seen Kyla mostly on Zooms, but she has a place in
 3   -- in DC and Virginia so I've also seen her at
 4   inperson meetings.
 5        Q.    So she's got a physical office in the
 6   Surgeon General's office as well as remotely?
 7        A.    I mean we have -- she has space she
 8   can use in the Surgeon General's office.  The
 9   majority of the team does hybrid and works
10   remotely.
11        Q.    Does she still have a US Digital
12   Response e-mail, or does she have a HHS.gov e-mail?
13        A.    I don't know.
14        Q.    Do you know if she's a political
15   appointee?
16        A.    I would be surprised if she's a
17   political appointee.  Most of the -- most of the
18   people in our office are schedule A appointees.
19        Q.    Do you know what her background was,
20   like what her job -- her career was like before she
21   worked for the Surgeon General's office?
22        A.    I think she was at the Kennedy School
23   doing something before she was in the Surgeon
24   General's office and I think she had done work in
25   the Obama administration.  I don't recall for what
```

**ERIC WALDO  12/22/2022**

**Page 374**

```
 1   agency.
 2          Q.    You don't know what the nature of the
 3   work was?
 4          A.    I think it was data-related work.
 5          Q.    Is she a, kind of data expert?
 6          A.    I think that's one of the areas of
 7   her expertise.
 8          Q.    What other areas of expertise does
 9   she have?
10          A.    I'm -- I'm not deeply familiar with
11   her bio.
12                MR. SAUER:  No further questions.
13                MS. CHUZI:  Nothing from the
14   Government.
15                THE VIDEOGRAPHER:  The time is 4:30
16   p.m.  We are off the record.  This concludes our
17   deposition of Eric Waldo.
18
19
20
21
22
23
24
25
```

**ERIC WALDO  12/22/2022**

**Page 375**

```
 1                    NOTARIAL CERTIFICATE

 2

 3        I, Tammie A. Heet, Registered Professional

 4   Reporter, certified Shorthand Reporter for the

 5   State of Illinois, and Certified Court Reporter for

 6   the state of Missouri and a duly commissioned

 7   Notary Public within and for the States of Missouri

 8   and Illinois, do hereby certify that the witness

 9   whose testimony appears in the foregoing deposition

10   was duly sworn by me; that the testimony of said

11   witness was taken by me to the best of my ability

12   and thereafter reduced to printing under my

13   direction; that I am neither counsel for, related

14   to, nor employed by any of the parties to the

15   action in which this deposition was taken, and

16   further that I am not a relative or employee of any

17   attorney or counsel employed by the parties

18   thereto, nor financially or otherwise interested in

19   the outcome of the action.

20

21

22                     _____
                        Tammie A. Heet, RPR, CSR, CCR
23

24

25
```

**ERIC WALDO  12/22/2022**

**Page 376**

```
 1                    Lexitas Legal
                   711 North 11th Street
 2                 St. Louis, Missouri 63101
 3                   Phone 314/644-2191
 4
 5    December 28, 2022
 6
      Ms. Amanda Chuzi, Esq.
 7    U.S. Department of Justice
      1100 L Street Northwest
 8    Washington, D.C.  29530
 9
      RE:   THE STATE OF MISSOURI, et al. v JOSEPH R.
10    BIDEN, JR., et al.
11
      Dear Ms. Chuzi:
12
      Please find enclosed your copies of the deposition
13    of ERIC WALDO taken on DECEMBER 22, 2022 in the
      above-referenced case.  Also enclosed is the
14    original signature page and errata sheets.
15    Please have the witness read a copy of the
      transcript, indicate any changes and/or corrections
16    desired on the errata sheets, and sign the
      signature page before a notary public.
17
      Please return the errata sheets and notarized
18    signature page to Lexitas Legal, ATTN: Production
      Department, 711 N. 11th Street, St. Louis, Missouri
19    63101 within 30 days of receipt of this letter.
20    Sincerely,
21
      Tammie A. Heet, RPR, CSR, CCR
22
      Enclosures
23
      cc:  Mr. Sauer              Mr. Burns
24         Production Department
25
```

**ERIC WALDO  12/22/2022**

**Page 377**

```
 1   STATE OF _____   )
                                 )
 2   CITY OF _____    )

 3

 4        I, ERIC WALDO, do hereby certify:

 5        That I have read the foregoing deposition;

 6        That I have made such changes in form and/or

 7   substance to the within deposition as might be

 8   necessary to render the same true and correct;

 9        That having made such changes thereon, I

10   hereby subscribe my name to the deposition.

11        I declare under penalty of perjury that the

12   foregoing is true and correct.

13

14   Executed this _____ day of _____,

15   20_____, at _____.

16

17

18                     _____
                       ERIC WALDO
19

20   My Commission Expires:   _____

21   Notary Public:       _____

22   Signature Page Sent to:   Ms. Chuzi

23

24

25
```

**ERIC WALDO  12/22/2022**

```
 1                                    ERIC WALDO
                                   NAME OF DEPONENT
 2
                        DEPOSITION CORRECTION SHEET
 3
        In re:THE STATE OF MISSOURI, et al. v JOSEPH R.
 4      BIDEN, JR., et al.

 5      Reported by:  TAH

 6      Upon reading the deposition and before subscribing
        thereto, the deponent indicated the following
 7      changes should be made:

 8      Page    Line    Should Read:
          Reason assigned for change:
 9

10      Page     Line    Should Read:
          Reason assigned for change:
11

12      Page    Line    Should Read:
          Reason assigned for change:
13

14      Page    Line    Should Read:
          Reason assigned for change:
15

16      Page    Line    Should Read:
          Reason assigned for change:
17

18      Page    Line    Should Read:
          Reason assigned for change:
19

20      Page    Line    Should Read:
          Reason assigned for change:
21

22      Page    Line    Should Read:
          Reason assigned for change:
23

24                         _____
                              SIGNATURE OF DEPONENT
25
```

**ERIC WALDO  12/22/2022**

**A**

A-S-P-A
 132:15
a.m 8:11
 105:22
 106:1
 160:24
 161:2
Aaron 6:14
 287:19
ability 27:3
 27:4 28:11
 228:3,12
 358:4
 375:11
able 23:25
 27:9 29:11
 36:12 81:4
 83:11
 86:25 89:4
 91:14,14
 101:11
 103:5
 202:18,23
 209:22
 256:10
 258:20
 260:7
 314:1
 317:5,21
above-re...
 376:13
absence
 296:7
absent 102:1
 102:2
absolutely
 30:3 158:2
 202:21
 247:4
academia
 102:25
academic
 38:18 44:6
 101:11
academics
 36:11,17
 339:2
accept

171:12
 175:13
accepting
 171:4
 175:2
access 100:8
 103:11
 159:6,23
 228:4
 271:17
 272:1,5
account
 74:20,25
 205:2
 255:17
 304:17
accounta...
 169:12,22
 170:7
 171:4
 174:8,24
 175:8,10
 175:10,16
 175:19
 206:5
 208:22
 303:12
 305:11
 322:3
 333:5
accountable
 169:24
 170:1,3,7
 171:8,23
 172:2,8
 179:4,8
 206:1,9
 209:2
 321:13,20
accounts
 138:18,23
 178:3
 204:15,21
 205:5
 231:10,16
 232:16
 245:14,18
 245:21,24
 246:4

247:7
 248:1
 249:15
 267:23
 268:4,10
 268:20
 275:16
 276:10
accuracy
 198:2
 221:18
 304:25
accurate
 30:8 45:9
 103:7
 140:10,13
 165:5,9
 168:23,24
 169:1,3,4
 209:18
 219:23
 220:1
 222:14
 231:20
 275:4
 280:7
 293:7
 308:17
 326:17
 333:8
 334:20
 335:15
 350:21
 351:3
 356:18,19
 356:25
 358:6
 364:20
 365:18
accurately
 150:9
 219:17
 294:13
 332:17
accused
 238:21
acknowle...
 34:19
acronym

182:23
acronyms
 132:17
acting 14:18
 41:23
 143:16
action 28:22
 46:6 66:18
 83:20,21
 83:24
 93:15
 112:22
 123:23
 124:21
 174:11
 176:19,23
 177:4,10
 177:21,23
 177:25
 178:1,4,7
 180:11,15
 180:19
 183:15
 193:5,16
 194:13,25
 195:9
 196:6
 200:3
 266:1
 271:2,14
 322:14
 323:4
 330:9
 375:15,19
actions 29:2
 29:3 46:7
 109:4
 114:17
 177:13
 181:16
 183:12
 186:6
 196:10
 203:11
 247:25
 249:14
 268:15,23
 270:11,21
 277:6

338:11
active 23:2
 192:14
activities
 74:5
activity
 285:6
actors 273:6
 344:12,25
 345:10
actual
 176:10
 252:3
acute 116:12
Adam 14:17
 61:1,2
 70:8 137:6
 137:13
 141:3
 143:7,14
 143:15,18
 143:22,24
 164:11
 187:17
 241:6,7
 290:16,16
 290:18,21
add 76:23
 116:2
 297:19
added 76:15
 126:15
 140:20
 143:9
 159:13
 300:23
adding
 138:13
 280:21,25
 300:18
addition
 10:24 11:7
 12:16
 13:19 16:9
 98:6 274:6
 274:20
 304:21
 334:4
additional

**ERIC WALDO  12/22/2022**

25:22 33:7
33:10
59:15
97:10,12
102:2,17
115:15
116:1
157:23,24
198:10
200:4
245:2,13
245:21
256:11,25
257:13
259:15,25
260:11
268:9
280:11
337:6,8,10
**address**
16:12
27:15
28:22
30:13 96:5
113:17
121:2,10
123:24
180:7,16
199:18
203:4,23
244:13
245:11
251:11
338:13
350:25
366:20
**addressed**
26:14
44:20
243:24
316:9
**addresses**
86:8
**addressing**
11:9 13:8
22:23 28:8
120:22
139:4
199:15

230:13
259:22
260:9
**adjust** 244:7
244:11,23
245:6
**adjusted**
245:1
247:24
**adjusting**
249:8
281:21
**adjustments**
249:25
**admin's**
300:1
**administ...**
14:20
70:13
81:11
110:6
137:12
183:11
189:14
215:1
217:7,11
217:16
221:9,14
291:12,17
373:25
**adopted**
21:16
103:14
121:2
290:1
**adopting**
163:25
**adverse**
268:23
277:6
**advice** 65:21
66:2 77:14
169:2
292:12
338:8
**advise** 24:21
61:4 266:9
**advised**
119:23

121:16
**advising**
24:14,24
110:18
265:16
**advisor**
11:16
14:18
21:17,21
22:12,12
24:13
293:24
**advisories**
15:15,21
15:25
31:15
37:20
115:15
162:11
163:11
168:17
**advisory**
2:19 13:17
13:25 14:5
14:6,10
15:12,13
15:17 16:2
16:7,12,13
16:22 17:2
17:8 18:10
18:14,15
18:18,19
19:12,20
19:21,24
25:2,4,11
26:6,7,15
28:19,24
30:23
31:21,22
32:20,24
33:2 35:9
35:15 36:9
36:21
37:10,18
37:25
38:11 39:2
42:17
44:15,17
53:3 55:1

59:13
71:17
86:10,11
86:18
87:21
89:11 90:2
90:14 91:9
91:11,13
91:19 92:3
97:11,13
101:1,24
102:6
104:5
105:16
107:15,22
109:4,15
113:18
114:2,8
116:6,6
117:11,20
117:21
118:8,24
119:3
120:2,7,9
121:12
122:4,10
123:14
129:9
130:21
131:1
145:9
146:10,19
146:22
148:6
152:22
153:25
157:22
161:6,9
162:7
163:22,24
164:3,9
169:23
172:19
173:12,20
180:3
181:2,12
181:14,17
186:16,25
187:4,13

191:8,19
194:13,16
194:17
195:23
196:22
197:5
200:14
203:16
205:23
206:7,11
206:13
213:17,20
225:14
234:18
244:17
246:22
249:1,5
250:8
251:4,7
253:22
256:13
257:2,12
270:12,22
289:13,17
289:19,25
290:5
297:13
302:25
305:9
310:17
311:22
313:4
321:19,24
322:21,24
327:8
331:25
332:19
334:23
350:16
360:4
**advisory's**
88:23
**advocate**
103:13
**advocates**
103:1
**affairs**
43:14 44:2
54:3 119:9

**ERIC WALDO  12/22/2022**

| | | | | |
|---|---|---|---|---|
| 125:1,5,9 | 346:19 | 320:23 | 172:10 | 267:20 |
| 152:15 | **Agrawal** | 357:21 | 284:21 | 268:1 |
| 235:13,24 | 353:3 | **Alexandra** | 322:7 | 326:10,22 |
| **affiliated** | **agree** 89:25 | 151:24,25 | **allowing** | 329:11 |
| 38:17 | 89:25 | **Alexandria** | 328:7,18 | **amplify** |
| 372:5,10 | 118:16 | 260:18,20 | **allows** | 177:7 |
| 372:14 | 119:10 | 263:23 | 296:21 | **amplifying** |
| **affirmative** | 122:14 | 325:19,20 | **alluded** | 199:22 |
| 10:21 | 240:2 | **algorithm** | 169:15 | **analogies** |
| **AFT** 51:1,7 | 254:25 | 100:10 | **alterations** | 104:19 |
| **aftermath** | 351:17 | 103:5 | 211:13 | **analogized** |
| 297:13 | **AGREED** 8:1 | 177:7 | **Altman** 88:14 | 104:21 |
| **afternoon** | **ahead** 22:6,7 | 342:5 | **altogether** | **analogously** |
| 5:14 | 22:8 55:23 | **algorith...** | 177:23 | 313:23 |
| **age** 9:18 | 62:3,11 | 344:9 | 178:3 | **analogy** |
| 198:19 | 71:7 78:9 | **algorithms** | **Alyssa** | 30:18 |
| **agencies** | 83:3 87:16 | 177:19 | 324:22 | 100:16 |
| 126:24 | 87:17 89:6 | 199:22 | **AMA** 182:19 | 101:3 |
| 144:20 | 119:15 | 200:21 | **Amanda** 6:21 | 359:25 |
| **agency** 26:22 | 127:9,10 | 211:13 | 9:4 20:23 | 361:8 |
| 68:22 69:1 | 155:22 | **aligned** | 134:17 | **analysis** |
| 86:5 | 167:23,24 | 327:8 | 255:4 | 143:21 |
| 114:18 | 167:24,25 | **alike** 190:19 | 330:20 | 307:25 |
| 374:1 | 170:16 | **all-of-s...** | 347:5 | 342:22 |
| **agenda** | 178:11 | 88:9 101:2 | 376:6 | **ananolges** |
| 120:25 | 185:11 | 117:20 | **amanda.k...** | 361:3 |
| **ages** 298:21 | 197:3,10 | 211:22 | 6:24 | **Anant** 7:4 |
| 298:23 | 205:14 | **all-society** | **Amazon** | 9:6 |
| **aggregate** | 208:5 | 19:25 26:8 | 341:19,21 | **anant.ku...** |
| 342:22 | 210:9,14 | 30:14 | 342:2 | 7:6 |
| 344:21 | 211:23 | 87:22 | **ameliorate** | **and/or** |
| **aggressive** | 212:3 | 89:13 | 100:5 | 376:15 |
| 28:22 | 215:22 | 117:13 | 101:8 | 377:6 |
| 180:11,15 | 216:5 | 122:15 | 117:5,7 | **Andy** 67:11 |
| 180:19 | 227:13 | 246:25 | **ameliora...** | 67:15,15 |
| 183:7,10 | 230:6 | 251:9 | 100:21 | 67:16,19 |
| 194:21,25 | 274:18 | 332:22 | 199:1 | 67:24 68:4 |
| 322:14 | 304:20 | **allegedly** | **amended** 75:3 | 68:8 77:22 |
| 323:4 | 311:2 | 355:8 | 75:8 76:23 | 78:18 |
| **aggrieved** | 331:11 | **Alliance** | **America** | 134:25 |
| 238:20 | **al** 1:4,7 5:4 | 6:16 9:14 | 358:15 | 136:9,19 |
| **ago** 49:11 | 5:7,21,22 | **allow** 99:19 | **America's** | 137:4 |
| 75:9 76:17 | 8:14,15 | 101:11 | 287:25 | 138:4,9 |
| 78:6 | 376:9,10 | 102:10 | 288:3 | 139:3 |
| 100:17 | 378:3,4 | 103:12 | **American** | 142:7 |
| 135:6 | **Alex** 263:25 | 141:9 | 182:22 | 154:14,23 |
| 228:5 | 286:3,5,7 | 177:7 | 251:13 | 155:4 |
| 251:3 | 286:9,15 | 211:1 | **amount** 111:9 | 185:1,13 |
| 255:13 | 301:14 | **allowed** | 216:17 | 185:16,21 |

**ERIC WALDO  12/22/2022**

| | | | | |
|---|---|---|---|---|
| 185:23 | 357:22 | 152:2 | 332:22 | 37:21 53:5 |
| 218:16,22 | 358:23 | 256:21 | 339:16 | 218:19 |
| 219:19 | **answered** | 259:2 | **approaching** | **article** 2:21 |
| **anecdotally** | 127:23 | 262:14 | 72:11 | 3:13,22 |
| 363:8 | 187:10 | 276:14 | 267:9 | 214:18 |
| **anger** 223:24 | 258:14 | 279:17 | **appropriate** | 215:3,11 |
| **angrily** | 259:10 | 294:21 | 51:25 | 215:15 |
| 223:1,18 | 347:1 | 343:7 | 122:25 | 216:1,3,24 |
| **angry** 223:17 | 361:15 | 353:5,16 | 250:5 | 218:1,3 |
| 223:24 | 372:19 | 365:1 | **approval** | 221:11,20 |
| **Anne** 57:19 | **answering** | 375:9 | 123:23 | 222:5 |
| 57:24 | 11:3 | **application** | 280:7 | 223:6 |
| 58:21 | **answers** | 17:20,23 | 281:16 | 224:11 |
| 63:15 | 183:24 | 18:1 | 315:22 | 225:8 |
| 290:13 | 357:10 | **apply** 17:25 | 339:16 | 294:18,20 |
| **Anne's** 58:24 | **Anthony** | 18:2 202:2 | 364:19 | 302:5,6,17 |
| **announce** | 69:13 | 274:2 | 365:15 | 302:19 |
| 89:11 | **anti-vac...** | 317:5 | **approvals** | 306:13,14 |
| 346:2 | 192:13 | 318:15 | 318:24 | 306:20 |
| **announced** | **Antonaros** | 319:3 | 364:24 | 307:10,22 |
| 13:21 | 88:13 | 365:13 | **approved** | 308:1 |
| 137:23 | 128:15 | **applying** | 153:6 | 309:15 |
| 138:3 | **anybody** | 203:12 | 278:23 | 310:1 |
| 161:10 | 140:25 | 276:24 | 279:13 | 318:7 |
| **announce...** | 188:13 | 319:10 | 280:5,18 | 319:9,20 |
| 26:11 | **anymore** | **appointee** | **approxim...** | 320:4,10 |
| 118:7 | 142:22 | 372:17 | 8:11 23:16 | 320:16 |
| 127:25 | 294:2 | 373:15,17 | **April** 368:1 | 347:9,19 |
| 162:6 | 334:15 | **appointees** | **ar-** 224:12 | 357:7 |
| 226:21 | **anytime** | 373:18 | **area** 41:14 | **articles** |
| 283:11,17 | 324:13 | **appreciate** | 110:17 | 307:14 |
| **announcing** | **apologies** | 237:15 | 114:25 | 347:17 |
| 63:25 | 371:19,19 | 269:5 | 154:4 | **articulated** |
| 209:7 | **apologize** | 279:5 | 203:18 | 233:6 |
| 235:9 | 62:9 | 306:9 | 212:9 | **as-** 256:15 |
| **anonymity** | 353:11 | **approach** | 215:3 | **ascribe** |
| 344:23 | **apparent** | 19:25 26:8 | 216:18 | 166:3,8 |
| **anonymized** | 222:4 | 30:14 | 230:13 | **asked** 11:4 |
| 345:4,9,18 | **appear** | 87:22 88:9 | 289:1 | 23:23,25 |
| **answer** 10:18 | 156:14 | 89:13 | **areas** 40:7 | 25:16 |
| 11:8,12 | 192:22 | 101:2 | 115:5 | 34:23 54:2 |
| 65:20,22 | 297:9 | 117:13,20 | 202:14 | 54:3 95:3 |
| 65:24 66:3 | 350:3 | 122:15 | 262:20 | 95:18 |
| 77:13,15 | 370:22 | 211:22 | 312:17,17 | 109:6 |
| 84:5 160:4 | **APPEARANCES** | 247:1 | 315:7 | 113:4 |
| 257:22 | 6:1 7:1 | 251:10 | 374:6,8 | 119:5,6 |
| 292:11,13 | **appearing** | 259:17 | **Ariel** 88:14 | 124:9 |
| 338:7,9 | 105:15 | 260:2,5,10 | **arrival** 49:4 | 125:24 |
| 356:7 | **appears** | 290:1 | **arrived** | 131:8,9 |

**ERIC WALDO  12/22/2022**

137:15
142:17
144:11,17
152:7,15
154:7,24
157:23
158:11
172:4
181:15,18
183:17
196:16
226:22
227:15,18
227:20,24
228:8,11
228:15
229:6,11
230:7,9
231:23
232:9
233:8,11
233:16
237:8
242:2,8,9
242:13,17
247:10,12
250:22
254:5
256:20,21
256:23,24
259:10
270:10,15
295:13
316:6
339:19
342:21
346:25
355:5,18
361:18,20
367:10
369:15
**asking** 11:8
65:17 88:9
89:13 98:3
98:5
107:13
109:24
111:13,14
154:2

159:5,6,21
159:22
167:4
174:6,12
175:7,16
176:1,14
176:19
177:3
179:16
180:3
194:8
200:10
201:13
208:21
216:3,21
225:23
229:8
230:2
232:12
233:5
238:4
239:4,7
240:11
242:1
250:15
256:16
257:7
264:20
279:10,10
292:9
299:16
308:23
314:7
316:6
329:24
330:8
332:22
335:1
338:10,11
343:5
345:24
350:12
352:18
353:17
360:4
368:11
369:6
**asks** 178:25
195:20

200:16
298:16
308:20
340:11,18
343:13
**ASPA** 132:15
132:22
**assess**
141:20
199:13
211:1,7
**assigned**
378:8,10
378:12,14
378:16,18
378:20,22
**assigning**
177:14
**associate**
164:16
**associated**
247:7
248:2
268:25
277:7
284:8
343:14,18
343:23
344:7
**Association**
182:22
**assume**
174:16
185:23
209:24
233:9
261:23
289:2
292:17,24
311:18
323:25
341:2
362:4
**Assumes**
105:9
**Atlantic**
284:6,7
**atmosphere**
107:1

**attached**
139:15
207:25
349:4,8,21
371:2
**Attaching**
368:20
**attachment**
135:14,18
**attempt**
168:15
**attempted**
21:4
**attend** 66:12
87:10
**attended**
45:10
85:14
87:10
90:11
316:8,11
317:18
**attending**
8:22
**attention**
27:4 29:11
57:17
75:12
77:17
84:14
114:9
116:1,5
161:4
181:12
182:24
326:5,16
333:22,25
334:3,4
**ATTN** 376:18
**attorney** 6:5
6:10 9:3
9:11 42:23
161:16
375:17
**attorneys**
8:22
**audiences**
222:3
**audio** 203:6

203:19
208:1
**August** 66:13
115:3
124:3
125:22
255:25
266:25
267:4
268:22
270:6,10
278:5
281:20
290:20
**author** 14:15
15:2 304:4
**authorative**
271:18
**authorit...**
272:2
**authority**
26:24 27:3
114:19
**authoriz...**
293:13
298:21
317:3
365:16
**authorized**
369:22
**available**
158:22,24
**avoid** 199:22
**aware** 26:5
27:9,23,25
28:12
38:22
41:16
42:14,21
55:9 57:3
57:16
61:24
63:20 64:6
66:24 68:8
68:11,13
68:17,20
68:23
70:16,24
73:11 75:2

ERIC WALDO  12/22/2022

| | **B** | 34:4 | 351:17 | 39:8,24 |
|---|---|---|---|---|
| 75:7,10 | **back** 30:18 | **background** | **basis** 126:14 | 40:13 |
| 79:3,10 | 36:8  47:13 | 57:25 | 150:20 | 47:23 |
| 82:11 | 47:18 | 161:19 | 156:25 | 56:15 64:9 |
| 83:17,22 | 57:18 | 373:19 | 186:20 | 65:9 71:8 |
| 117:19,24 | 84:14 | **bad** 99:5,7,8 | 196:14,18 | 71:22 |
| 133:15,17 | 106:1,8 | 113:14 | 284:16,18 | 73:22 80:3 |
| 134:9,12 | 120:6 | 115:24 | 293:20 | 80:20 |
| 142:4 | 136:5 | 175:22 | **Baton** 6:11 | 86:20 |
| 155:25 | 138:8 | 177:22 | **Becca** 315:14 | 91:21 92:7 |
| 186:11,14 | 139:3,13 | 189:10 | 316:4 | 95:18 97:9 |
| 188:10,13 | 161:2 | 223:4,19 | **Beckman** | 97:22,22 |
| 189:2,15 | 183:6 | 266:23 | 14:17 61:2 | 98:2 106:3 |
| 190:4,7,10 | 185:19 | 273:13 | 70:8 137:6 | 106:14 |
| 191:2,6,11 | 196:5,9 | **badly** 175:14 | 137:14 | 107:15 |
| 191:22 | 214:11 | **ball** 41:19 | 141:3 | 109:8 |
| 192:10 | 215:18 | 357:24 | 143:7 | 110:25 |
| 193:3,8,14 | 232:24 | **ban** 231:9 | 164:11 | 112:6 |
| 207:18 | 247:15 | **bandwidth** | 187:18 | 115:2 |
| 212:14 | 248:6,10 | 315:4 | 241:6,7 | 118:21 |
| 217:10,15 | 248:11 | **banned** | 290:16,22 | 124:12 |
| 218:11 | 250:5 | 192:15 | **beginning** | 131:23 |
| 220:9,17 | 259:16 | **banning** | 14:20 | 135:23 |
| 220:25 | 260:9 | 231:25 | 70:12 | 142:16 |
| 221:7,21 | 268:14,18 | 232:10,15 | 221:8 | 151:12 |
| 221:24 | 268:23 | 233:1 | 276:17 | 153:1 |
| 223:7 | 270:19 | **base** 54:17 | 315:24 | 155:24 |
| 224:23 | 273:1 | **based** 142:8 | 330:21 | 158:16 |
| 238:25 | 274:5 | 157:13 | 367:20 | 163:23 |
| 283:2,5,12 | 276:17 | 187:25 | **begins** 8:12 | 170:24 |
| 284:24 | 277:9 | 198:13,17 | 242:24 | 173:24 |
| 285:4,21 | 280:11 | 225:19 | 368:17 | 179:2 |
| 323:20 | 282:14 | 256:22 | **behalf** 5:22 | 182:5,20 |
| 324:11 | 295:20 | 262:14 | 8:25 9:10 | 185:16 |
| 326:3 | 296:15,20 | 294:12 | 9:13,19 | 187:14 |
| 331:9 | 296:25 | 297:17 | 41:23 | 189:19 |
| 336:5 | 298:5,8 | 301:15 | 85:19 | 195:21 |
| 341:23 | 302:24 | 304:9 | 340:8 | 209:19 |
| 346:16,20 | 309:7 | 316:17 | **behaved** | 235:17 |
| 352:2,4 | 314:8 | 342:4 | 175:14 | 242:17 |
| 362:4,15 | 318:15,20 | **basic** 220:5 | **behavior** | 251:19 |
| 364:18 | 330:13 | 220:11,21 | 175:3 | 254:10 |
| 367:1,2 | 336:2 | **basically** | **believe** | 257:5,15 |
| 371:7 | 348:11 | 91:17 | 13:25 | 261:12 |
| **awareness** | 352:5 | 127:23 | 15:16 | 272:13 |
| 22:25 | 365:20 | 132:8 | 23:12 | 277:8 |
| 27:13 | 367:20 | 151:17 | 28:24 | 284:2 |
| **awkward** | 372:1 | 293:4 | 33:21 | 289:14 |
| 92:25 | **back-and...** | 308:21 | 38:20 39:3 | 302:11 |

ERIC WALDO  12/22/2022

| | | | | |
|---|---|---|---|---|
| 339:17 | **better** 35:4 | 298:25 | **bottom** 58:12 | 125:16,19 |
| 345:19 | 83:1 86:1 | **bio** 40:5 | 178:12 | 126:16 |
| 348:20 | 98:20 | 374:11 | 179:11 | 127:4,19 |
| 351:23 | 100:11 | **bit** 20:19 | 198:9 | 137:3 |
| 352:25 | 102:18 | 26:16 | 212:2,8 | 142:16,17 |
| 353:8 | 164:24 | 30:17 | 231:1 | 154:14 |
| 358:15 | 198:11 | 50:11 | 249:20 | 155:6 |
| **believes** | 236:14 | 92:14 | 303:7 | 156:21 |
| 102:13 | 251:23 | 98:12,12 | 315:12 | 234:12,13 |
| 358:14 | 254:24 | 124:10 | 340:15 | 241:7,18 |
| **bell** 45:6 | 272:5 | 143:19 | **Box** 6:6 | 241:20,22 |
| 69:7,9 | 337:16 | 157:18 | **Brad** 348:5 | 252:9,16 |
| 207:16 | 360:6,8,13 | 183:8 | **brain** 133:9 | 255:9,23 |
| 228:23 | **beyond** 90:3 | 197:2,12 | 252:12 | 256:5,6 |
| 278:10,17 | 145:20 | 272:15 | 279:8 | 258:18,19 |
| 283:21 | 200:4 | 321:9 | **brainstorm** | 258:22,23 |
| 302:14 | **Bhattach...** | **biweekly** | 40:14 | 258:24 |
| 317:12,19 | 6:14 | 126:14 | 283:18 | 259:3,7,14 |
| 317:24 | **Bhattach...** | 139:15 | **brainsto...** | 259:18 |
| 320:20 | 287:7,10 | 142:9 | 34:24,25 | 266:24 |
| 325:1 | **Biden** 1:7 | 293:7,20 | **break** 72:12 | 269:5,7 |
| 354:16 | 5:7,22 | 367:22 | 72:16,19 | 270:4 |
| **Bell's** | 8:14 33:24 | **blank** 328:17 | 105:24 | 277:15 |
| 317:22 | 93:3 95:1 | **blanking** | 106:4 | 278:5,12 |
| 319:4 | 110:8 | 43:22 | 160:14,16 | 278:14,19 |
| **beneficial** | 122:21 | **blocker** | 160:25 | 279:9,18 |
| 103:2 | 217:16 | 279:7 | 213:24 | 279:25 |
| **benefit** | 291:17 | **blood** 317:23 | 214:9 | 280:1,8 |
| 295:5 | 302:1 | 319:4 | 231:10 | 291:4 |
| **benefits** | 316:23 | **blue** 215:13 | 282:2,3,3 | 292:16 |
| 199:13 | 327:17 | 215:24 | 282:4,7,12 | 294:17 |
| **Berenson** | 328:2,5,16 | 217:5 | 330:22 | 295:2,12 |
| 286:4,5,8 | 328:21 | 366:24 | 335:17,25 | 295:18,23 |
| 286:9,15 | 329:8 | **bold** 272:9 | 347:6 | 298:2 |
| **best** 10:14 | 376:10 | 272:11 | 371:21,24 | 299:4,10 |
| 10:23 | 378:4 | **book** 90:17 | **breaking** | 299:14,15 |
| 11:12 | **Biden's** | **boost** 271:17 | 160:16 | 300:5,7,9 |
| 45:13 | 90:25 | **Boosting** | 213:22 | 306:14,18 |
| 64:19 | 116:3 | 272:1 | 281:25 | 306:25 |
| 100:21 | 214:19 | **borderline** | 335:20 | 307:10,22 |
| 135:24 | 329:16 | 226:24 | **Brian** 66:10 | 307:23 |
| 163:16 | **big** 16:12 | 227:22 | 66:11,16 | 308:2,3,7 |
| 164:22 | 27:19 48:6 | 230:14,22 | 66:16 69:4 | 308:18 |
| 241:3 | 222:3 | 231:23 | 82:21 | 310:6 |
| 251:17 | 295:14 | 233:20 | 90:10 | 314:6,20 |
| 259:23 | 347:6 | 237:9 | 94:16 97:9 | 315:13 |
| 334:17 | **bigger** 123:3 | **born** 128:21 | 98:13 | 318:21 |
| 372:15 | 271:23 | 295:6 | 124:13,23 | 349:3,7 |
| 375:11 | **biggest** | **bots** 124:17 | 124:24 | 363:12 |

**ERIC WALDO  12/22/2022**

| | | | | |
|---|---|---|---|---|
| 364:16 | 200:21 | 76:10 | 95:3,6,16 | 194:24 |
| 365:10 | **built** 170:13 | 263:11 | 95:19,24 | 200:14 |
| 368:20 | 170:13 | **call** 18:25 | 96:1,18,19 | 206:20 |
| 369:1 | 197:6,15 | 25:6 28:18 | 97:5 98:4 | 209:21 |
| 370:20 | **bullet** 77:20 | 28:20 | 98:10 | 218:25 |
| **bridges** | 94:11 | 32:19 33:7 | 106:13,13 | 219:18 |
| 192:2 | 118:1 | 33:10,11 | 106:21,23 | 226:15 |
| **brief** 128:6 | 124:2 | 33:13,14 | 108:7,10 | 239:12 |
| 129:2 | 128:13 | 33:22,25 | 108:17,23 | 246:18 |
| 295:21 | 131:18 | 34:5,6,7,8 | 108:24 | 247:6 |
| **briefed** 43:2 | 133:16 | 34:9,18 | 109:6,22 | 250:10,25 |
| 43:3 | 135:5 | 35:6,17 | 110:22 | 251:4 |
| **briefing** | 228:2,7,24 | 39:4 40:13 | 112:1,11 | 252:3,3 |
| 43:8,15,17 | 272:7 | 40:18,21 | 112:13,19 | 253:4,15 |
| 43:20 | 273:9,19 | 41:8,10,11 | 112:24 | 256:2,9,16 |
| 44:21 | 275:20 | 41:24 | 113:1,4 | 256:18 |
| 45:11 | 276:14 | 42:14 48:6 | 116:6,8 | 259:11 |
| 47:12 | 343:16 | 48:9 55:8 | 117:13 | 263:9,12 |
| 133:4 | **bullets** 76:2 | 55:19,24 | 118:13,13 | 263:16,19 |
| 192:24 | 253:22 | 56:2,4,4,5 | 118:14,22 | 264:5,7,8 |
| 296:2 | 273:12,16 | 56:12,21 | 119:6,7,17 | 264:22,25 |
| **briefly** | 273:18,19 | 57:1,6,9 | 119:22 | 265:6,16 |
| 149:11 | 273:20 | 62:13 63:2 | 120:5,24 | 265:22 |
| 319:13 | **bully** 25:25 | 63:3 64:10 | 122:14 | 266:6,8 |
| 321:8 | 26:13 29:5 | 65:1,2,3 | 124:3,14 | 269:18 |
| 351:24 | 29:9,22 | 65:14 66:5 | 124:15 | 283:16 |
| 355:1 | 99:20 | 66:6,7,9 | 125:21,22 | 291:19,25 |
| **bring** 114:9 | 103:24 | 66:10,12 | 126:6 | 301:5,8,20 |
| 209:20,23 | 209:22 | 66:14,15 | 128:19 | 301:22 |
| 210:3 | 320:12 | 66:17 | 131:4 | 309:11 |
| 345:12 | **burnout** | 80:24 81:5 | 135:4 | 324:20 |
| **bringing** | 312:6 | 81:7,24 | 137:8,10 | 326:16 |
| 209:14 | 313:7 | 82:2,5,13 | 137:15,19 | 328:25 |
| **Britain** | **Burns** 376:23 | 84:20,23 | 137:21 | 333:21,25 |
| 235:20 | **business** | 87:15 | 138:4,6 | 334:2 |
| **broader** | 113:15 | 88:20,21 | 139:8,18 | 350:17 |
| 100:3 | 187:3 | 89:5,7,9 | 139:21,22 | **called** 18:25 |
| 350:18 | **buy** 166:23 | 89:22,22 | 143:17 | 19:24 31:6 |
| **broadly** 41:6 | 168:6 | 89:24 | 145:4,10 | 34:22 |
| **brothers** | 342:6 | 90:19,21 | 145:11 | 43:19,20 |
| 287:5 | | 91:3,7,10 | 146:8 | 49:14 |
| **brought** 43:4 | ——————— | 91:14 | 147:24 | 57:25 |
| 43:12 | **C** | 92:11,12 | 148:5,22 | 66:19 69:4 |
| **budget** 26:20 | **C-O-M-P-O-S** | 92:14,23 | 149:13,20 | 95:13,21 |
| 115:16 | 48:19 | 92:25 93:1 | 151:10 | 96:8,23 |
| **build** 22:22 | **cable** 327:20 | 93:5,8,11 | 153:24 | 97:25 |
| 50:8 | **cadence** | 93:19 | 155:23 | 135:15 |
| 199:23 | 254:2,6 | 94:12,15 | 172:11,18 | 138:9 |
| **building** | **calendar** | 94:20,23 | 174:11 | 207:11,20 |
| | 45:8 74:10 | | | |

| | | | | |
|---|---|---|---|---|
| 211:24 | 194:13 | **carefully** | 45:11 | 116:25 |
| 219:4 | 195:8,14 | 306:3,7 | 192:25 | 120:2 |
| 244:21 | 219:15 | **Carol** 190:11 | 283:20 | 131:9 |
| 247:20 | 232:5 | **carrying** | **Centers** | 143:20 |
| 284:4 | 246:23,25 | 59:1 | 190:8 | 153:11 |
| 286:3,25 | 248:3 | **case** 1:6 5:6 | **Central** 8:11 | 164:12 |
| 336:14 | 250:23 | 8:15 73:13 | 105:22 | 168:19 |
| **calling** | 338:5 | 98:3 99:9 | 106:1 | 169:7 |
| 28:21 32:6 | 359:15 | 311:10 | 282:14 | 172:22 |
| 87:5,14,21 | 360:22 | 360:14 | 336:2 | 181:3 |
| 88:9 89:13 | 370:9 | 376:13 | 372:1 | 186:16,25 |
| 102:9 | **cameras** | **cases** 51:21 | **CEO** 134:2 | 187:24 |
| 107:12,18 | 170:20 | **catalog** | 352:16 | 190:4 |
| 122:7 | **campaign** | 97:16 | 353:4 | 194:17,23 |
| 150:17 | 22:22 | **category** | **certain** 5:18 | 212:17 |
| 172:15 | 132:6 | 366:9 | 45:9 60:5 | 223:12 |
| 180:14 | 301:10 | **cause** 5:18 | 71:2,4 | 247:16 |
| 193:5 | 364:2 | 104:24 | 82:8,16 | 259:12 |
| 194:2 | **campaigns** | 105:2 | 83:15 98:8 | 307:16 |
| 203:17 | 24:15,21 | 366:16 | 131:2 | 310:15 |
| 206:5 | 25:20 | **causing** | 132:19 | 312:23 |
| 251:9 | **cancel** 178:2 | 330:1 | 202:16 | 332:11 |
| 329:9 | **canceled** | 360:17 | 253:20 | 339:14 |
| 334:4 | 348:12 | **caveat** 345:3 | 261:17 | **CERTIFICATE** |
| **calls** 18:20 | **cancer** 99:17 | **cc** 143:9 | 297:16 | 375:1 |
| 20:7 26:7 | 100:16,16 | 376:23 | 300:16,22 | **certified** |
| 30:14 | 101:3,4 | **cc'd** 241:8 | 339:21 | 5:16 375:4 |
| 32:20,21 | 104:21 | 243:13 | 340:6 | 375:5 |
| 33:3 41:3 | 105:2 | 259:4 | 341:5 | **certify** |
| 57:13 | **capacity** | 363:22 | 342:5 | 375:8 |
| 62:25 63:5 | 81:17 82:2 | 369:5 | 361:11 | 377:4 |
| 64:3 70:10 | 285:10 | **cc'ing** | **certainly** | **cetera** 19:18 |
| 77:11 | 288:13,14 | 260:18 | 14:20 16:5 | 28:5 50:19 |
| 86:15,15 | **Capps** 6:5 | 316:10 | 16:9 25:22 | 74:11 |
| 88:24 89:5 | 9:2 | **CCDH** 45:4 | 27:6 28:10 | 114:19 |
| 90:4 101:1 | **captioned** | 46:17 | 31:1,15,21 | 170:20 |
| 107:23 | 267:4 | 192:25 | 34:18 37:5 | 238:19 |
| 121:11 | **captured** | 267:15 | 38:6 39:13 | 312:6 |
| 125:14 | 274:15 | **CCR** 8:4 | 40:5 45:16 | **chain** 3:3 |
| 126:15,25 | **carcinogens** | 375:22 | 45:17 50:9 | 139:13 |
| 128:9 | 163:4 | 376:21 | 53:16,23 | 143:8 |
| 130:22 | **care** 22:1 | **CCR(MO)** 7:9 | 61:4 64:9 | 144:3,23 |
| 150:2 | 23:18 | **CDC** 190:7,8 | 68:3 69:21 | 151:8 |
| 161:18 | 307:15 | 317:21 | 84:2 87:22 | 234:4,7 |
| 167:19 | **career** 265:8 | 318:1,24 | 90:24 | 242:20 |
| 174:18 | 373:20 | 366:13 | 101:24 | 255:8 |
| 178:6 | **careful** | **censorship** | 103:19 | 291:3 |
| 181:6 | 10:11 24:9 | 358:14 | 104:2 | 292:21 |
| 191:20 | 306:9 | **Center** 44:25 | 116:5,7,20 | 308:4 |

**ERIC WALDO  12/22/2022**

| | | | | |
|---|---|---|---|---|
| 310:7 | 18:11 | 319:11 | 360:10 | 230:9 |
| 367:18,19 | charge 12:16 | childhood | 370:9 | 245:17 |
| challenges | 12:24 | 293:13,15 | 374:13 | 319:3 |
| 83:9 | 51:14 | 364:19,24 | 376:6,11 | clearly |
| 333:22 | charged | 366:21 | 377:22 | 185:1 |
| 334:3 | 370:2 | children | circle | 229:4 |
| chance 45:1 | chart 2:7 | 298:21 | 295:20 | 266:5 |
| 88:2 | 49:15 | 317:4,22 | circumst... | 303:1 |
| 335:19,20 | 58:19 | 319:4 | 335:9,10 | 305:6 |
| change 29:23 | 60:17 | 365:7,16 | CISA 68:25 | Clegg 34:8 |
| 29:23 | 63:13 | 366:4,15 | citizen | 35:7,17 |
| 58:19 | 290:12 | 370:6 | 27:22 | 53:18 56:3 |
| 99:22 | charts 262:6 | choices | 266:5 | 56:8 62:13 |
| 114:1 | chat 146:13 | 327:19,19 | citizens | 65:1 67:16 |
| 164:18 | check 45:8 | choose 172:8 | 114:16 | 68:6 77:23 |
| 198:7 | 45:15 | choosing | City 6:6 | 78:18 |
| 200:18 | 47:18 | 172:1 | 377:2 | 81:25 |
| 228:3 | 61:20 | chronolo... | civic 205:25 | 84:18,24 |
| 378:8,10 | checker | 78:24 | civil 6:16 | 94:15 |
| 378:12,14 | 138:23 | 315:13 | 9:14 50:16 | 95:14 97:2 |
| 378:16,18 | checking | chronolo... | claim 365:14 | 98:10 |
| 378:20,22 | 255:21 | 270:2 | 366:16 | 106:6,12 |
| changed | 295:7 | Chuzi 6:21 | claims | 113:2 |
| 244:24 | 324:5 | 9:4,4 21:1 | 138:14 | 134:25 |
| 245:9 | Cheema | 65:16 | 231:6,16 | 136:9 |
| 248:12 | 363:14 | 72:10 77:6 | 246:13 | 137:22 |
| 293:23 | 367:9 | 77:10 | 248:14 | 138:8 |
| 365:22 | cherry-p... | 105:9 | 249:19 | 139:2,14 |
| changes | 294:12 | 126:25 | 280:4,6,16 | 142:7 |
| 103:14 | chief 12:2,3 | 128:9 | 280:17 | 154:13 |
| 113:17 | 12:11 13:7 | 134:19 | 281:3 | 155:4 |
| 190:22 | 14:15 | 160:11,12 | 296:22 | 159:12 |
| 191:3,23 | 21:10,22 | 167:19 | 308:17 | 185:2 |
| 199:2,5,19 | 21:23 23:8 | 208:7 | 317:5,6,16 | 218:17,22 |
| 200:11,14 | 60:14 | 214:1 | 317:20 | 219:19 |
| 248:21 | 81:10 | 220:14 | 319:3 | 221:1 |
| 249:24 | 110:5 | 224:8 | 366:4,9,14 | 234:5,11 |
| 250:6 | 143:18 | 232:5 | 366:20 | 234:14,15 |
| 274:2,6,24 | 187:20 | 248:3 | clarific... | 235:11 |
| 376:15 | 312:19 | 266:17,21 | 11:2 67:9 | 236:18 |
| 377:6,9 | 325:25 | 292:8 | clarify | 237:19 |
| 378:7 | 348:20 | 319:25 | 220:15 | 238:1,9,25 |
| changing | chiefly 60:6 | 326:15 | clarity | 240:6,11 |
| 211:12 | child 128:21 | 328:11 | 10:22 17:7 | 241:18 |
| 366:1 | 142:19 | 335:13 | 245:19 | 242:9,21 |
| channels | 293:17 | 338:4 | clear 80:13 | 243:15 |
| 217:7,9,11 | 295:6 | 346:25 | 204:15,20 | 247:23 |
| 217:15 | 317:7,16 | 347:8 | 205:4,6 | 248:9,20 |
| characte... | 318:16 | 359:15,23 | 216:22 | 249:2,7,11 |

**ERIC WALDO  12/22/2022**

249:16,22
250:2,5
253:6
254:5
255:10
256:6,24
268:17
270:3,14
270:25
281:20
309:15
310:6
349:2,7
**Clegg's**
67:22
156:11
235:12
**clinician**
312:6
313:7
**clipboard**
114:21
**close** 134:13
**closed**
252:14
**closed-door**
312:16
**closely**
176:15
**clots** 317:23
319:4
**co-owner...**
52:2
**coalition**
132:12
**code** 98:7
**coincidence**
307:5,9
**collaborate**
89:19
149:5
314:3
**collabor...**
283:13
**collabor...**
239:17,18
239:25
240:18
**colleague**

152:12
266:7
301:3
**colleagues**
9:2
**collecting**
73:20 74:5
76:7
**college**
17:25
**colleges**
18:1,2
**Collins**
70:20 71:9
71:16,23
72:4
**collision**
170:17
**column** 201:7
340:15
**combat** 92:4
129:4,9
130:1
131:14
157:25
211:9
**combating**
168:11
265:2
**Combined** 2:9
73:6
**come** 15:25
16:19
18:20
100:24
147:11
153:25
164:24
211:7
215:9
233:11
253:23
265:15
278:1
287:1
288:10
289:6
311:22
357:12

372:4
373:1
**comes** 29:24
57:24
60:20,21
87:6 88:3
89:18
104:11
145:6
153:18
216:20
333:12
334:8
**coming** 32:24
41:14 53:3
119:18
148:8,24
166:1
181:7
196:3
255:6,20
286:13,16
287:16,17
288:1
297:20
313:5
321:12
349:16
**commands**
29:10
**comment** 93:3
93:8 183:6
214:19
216:10
234:21
239:24
244:16
260:17
307:21
**commented**
307:20
**comments**
150:16,21
162:1
197:22
244:23
253:24
294:6,11
294:15

326:6
328:3
329:9,17
345:21
346:3,11
346:14,23
363:1
**Commission**
377:20
**commissi...**
375:6
**committed**
212:10
**Committee**
261:22
**common** 10:7
17:20,23
31:9
202:13
209:16
210:5
346:8
358:18,18
360:3,22
360:23,25
361:1,4,4
**communicate**
14:10
18:12,14
64:11,12
64:21
108:13
181:22
360:1
**communic...**
19:9 46:11
54:15
63:10,20
70:14,21
74:18
81:22
134:4
**communic...**
18:9 19:1
35:2 61:9
62:20,22
64:7 65:6
65:8 66:25
70:6,25

188:17
**communic...**
40:10,10
40:12
42:22
63:18
134:6
148:13
251:25
252:1,2
297:7
366:25
**communic...**
18:23 19:6
25:23
31:11,23
31:25
37:24
38:23
42:15
48:24 49:7
52:10
57:14
61:23
62:16 63:6
65:24,25
66:6,8
67:12 68:9
68:11,14
68:24
69:14,16
70:17
71:24 72:8
74:24 82:9
115:11
123:7
134:8
172:3
191:7
217:16
252:8
260:19,21
261:14
263:6
291:11,13
301:14
303:21
304:11
320:23

**ERIC WALDO  12/22/2022**

323:1,12
323:22
325:17,21
325:21
348:3,8
357:23
367:2
371:8
communities
202:16,20
202:24
community
25:6,9
117:12
122:8
202:10
209:17,19
337:17
companies
20:1,3,5
20:13,13
20:16 28:8
29:1,2
31:2 35:11
53:13
61:12 64:4
91:16 93:4
104:16
116:22,24
120:4
133:23
169:11
170:22
172:20
174:4
175:7
179:3,13
183:9,12
193:5
194:18
198:7
205:12
208:21
210:16
251:10
264:19
324:10
328:6,17
329:10

330:8
332:11,23
350:17,23
354:2
company
117:17
134:4
217:23
218:7
219:11
223:2
350:9
company's
220:6
compare
274:12
compared
111:15
116:12
competent
265:24
competing
254:12
complexity
168:16
complicated
304:7
component
132:20
components
344:13
Compos 48:10
48:19
289:4
Compound
220:14
compromise
24:4
coms 51:23
concern 57:4
123:23
285:14
300:11
concerned
299:5,21
299:23
310:16
concerns
44:20

113:18
123:9
291:24
299:17
300:3
concludes
374:16
conclusion
4:11
205:15
237:14
conducted
31:24 32:1
conference
2:18 84:3
96:24
116:1,3
122:21
150:18
161:8,13
161:22
165:19
166:6,8
181:1,10
183:1
193:4
206:10,14
206:18,25
233:7,12
233:17
239:23
244:22
247:13
250:17
confirm
228:3
confirma...
213:5
confirmed
213:3,4
conflicts
325:10,11
confusing
365:5
Congratu...
61:17
congruity
33:22
connect

12:13,18
51:2 52:15
52:21
67:15
82:19,22
86:24
145:24
146:6,13
147:19
153:14
168:25
242:15
251:21
252:16
253:3
255:14
258:25
262:6
263:14
connected
34:2 67:15
71:2,5,9
78:11
82:13,16
84:18
112:6,10
125:10
366:15
connecting
41:25
82:23
112:2
151:8
connection
67:17 85:3
143:4
159:22
185:1
251:22
252:18,24
286:23
288:10
329:8,17
357:12
connections
168:24
conseque...
171:5,13
175:2,14

204:15,20
205:2,4,6
consider
19:18 60:8
125:8
273:12
330:11
considered
40:6
185:22
265:11
consistent
194:12
321:22
322:22
327:12
330:6,11
330:15,16
331:20,23
332:19,24
334:22
335:1
consiste...
176:19
177:3
conspiracy
342:7,8,9
constell...
52:20
constituent
24:15,20
27:21
50:14
constitutes
164:18
construc...
337:15
consult
167:11
consulted
37:22
213:17
consume
229:2
consumma...
254:13,18
254:21
contact
50:25 51:6

**ERIC WALDO  12/22/2022**

| | | | | |
|---|---|---|---|---|
| 53:19,25 | 280:11 | 369:18 | 134:2 | 234:13 |
| 54:23 55:5 | 284:22 | **continued** | 173:8 | 258:24 |
| 68:3,6 | 285:1,12 | 3:1 4:1 | 230:20 | 298:3 |
| 125:7,18 | 285:13 | 7:1,3 | 299:13,25 | 363:11 |
| 152:4,5 | 297:2 | 25:23 | 308:22 | 369:3 |
| **contacts** | 299:8 | 58:19,22 | 310:18 | 371:4,6 |
| 51:12,14 | 300:12 | 108:4 | 315:1 | **copies** 4:12 |
| 52:23 | 303:22,24 | 293:19,19 | **conversa...** | 242:22 |
| 54:12,12 | 304:23 | 368:14 | 25:7 69:22 | 260:22 |
| 67:22 | 319:11 | **continues** | 69:24 70:2 | 298:1 |
| 125:18 | 321:23 | 293:8 | 71:11,23 | 363:19 |
| 134:9 | 338:23 | 368:23 | 108:25 | 376:12 |
| 348:21 | 339:13,19 | **continuing** | 116:20 | **copy** 21:6 |
| **contained** | 340:21 | 26:9 50:8 | 173:13 | 215:21 |
| 141:21 | 341:3 | 59:14 | 195:13 | 376:15 |
| **contemplate** | 344:4,7,9 | 196:1 | 256:19 | **copying** |
| 164:17 | **content-...** | 246:8 | 259:6 | 154:14 |
| **content** | 221:15 | 277:16 | 269:12 | 234:12 |
| 54:25 58:4 | **contents** | **contract** | 310:22 | **cordial** |
| 58:6 66:5 | 231:24 | 133:5 | 311:6,16 | 34:19 |
| 138:23 | **context** | **contractor** | 312:11 | 107:1,7 |
| 139:15,22 | 138:13 | 39:11 42:7 | 318:2 | 112:19 |
| 139:25 | 171:23 | 372:20 | 332:3 | **core** 115:1 |
| 143:3 | 173:11 | **contracts** | 337:14 | **corporation** |
| 164:9 | 201:16 | 86:3 | **conveyed** | 353:23 |
| 176:25 | 216:20 | **contribute** | 32:9 305:2 | **correct** 10:5 |
| 177:18,22 | 226:19 | 350:9,11 | 325:15 | 14:2 17:4 |
| 189:24 | 227:4 | **contributed** | 332:2 | 21:12,13 |
| 194:3 | 238:18 | 197:7,16 | **cookie** 99:5 | 21:18 |
| 197:21 | 275:12 | **contributes** | 104:24 | 22:15,18 |
| 201:2,22 | 308:16 | 231:4 | 105:2 | 23:3,10,11 |
| 202:1,2,5 | 311:18 | **control** | **cooperation** | 23:20,22 |
| 203:19 | 333:18 | 107:24 | 113:9 | 23:24 24:2 |
| 226:24 | 342:19 | 190:8 | 183:14 | 24:5,6,11 |
| 227:22 | **continue** | 304:12 | **coordinate** | 24:18,19 |
| 229:16 | 25:1 41:18 | **controlling** | 64:22 | 28:23 42:3 |
| 230:14,22 | 41:19 60:8 | 83:25 | 70:10 | 46:5,24 |
| 231:4,24 | 100:15 | **controve...** | 300:19 | 47:8,21,22 |
| 232:3,13 | 107:10 | 355:11 | **coordina...** | 48:1,23 |
| 233:20 | 145:20 | 370:5 | 65:10 | 49:20,23 |
| 237:9 | 208:23 | **controversy** | 266:13 | 49:24 50:3 |
| 251:17 | 273:3 | 355:6,14 | **coordina...** | 51:17 |
| 267:10 | 274:24 | **convene** 27:3 | 12:17 | 55:14 58:8 |
| 268:24 | 277:24 | **convening** | 37:24 38:1 | 59:23 |
| 273:5 | 280:6 | 209:22 | 38:7,23 | 60:19 |
| 274:1,8,8 | 311:10,16 | **conversa...** | 42:22 | 64:14 72:5 |
| 275:11 | 315:6 | 36:15 80:4 | 307:2,7,8 | 72:9 73:9 |
| 276:5,10 | 322:8 | 80:6,12 | 366:13 | 76:13 |
| 277:7 | 369:7,11 | 100:2 | **copied** 144:7 | 77:23,25 |

**ERIC WALDO  12/22/2022**

| | | | | |
|---|---|---|---|---|
| 78:4,10 | 144:5,6,9 | 197:17,19 | 244:18 | 334:19,24 |
| 79:1,14 | 145:13,20 | 197:23,25 | 246:10 | 336:13,19 |
| 84:8 85:15 | 145:22,25 | 198:4 | 247:3,8,19 | 338:25 |
| 85:16,21 | 146:1,7,8 | 199:19,20 | 248:2,16 | 340:12,17 |
| 86:12 | 146:15,16 | 200:1,2,14 | 248:21 | 340:23,24 |
| 88:14,15 | 147:16,17 | 201:9,18 | 249:10,15 | 343:15,17 |
| 88:18 89:2 | 147:22,23 | 201:23 | 249:20,23 | 344:14 |
| 90:11,12 | 149:17,17 | 202:3 | 253:2,10 | 348:25 |
| 90:14,15 | 150:8 | 203:1,9,19 | 253:12 | 349:5,11 |
| 91:5,6,25 | 151:11,15 | 204:8,13 | 254:4 | 349:16 |
| 92:19 94:2 | 154:14,15 | 204:18 | 256:3 | 352:10,17 |
| 94:4,13,14 | 154:17,18 | 205:10,13 | 257:2 | 353:12,21 |
| 94:17,18 | 154:22 | 206:4 | 258:21 | 355:24 |
| 94:22 | 155:9,11 | 207:3 | 259:8,9,19 | 356:18 |
| 95:17 | 156:8,10 | 209:8,9 | 263:20 | 357:20 |
| 97:21 | 157:7 | 210:23 | 267:6,10 | 358:7 |
| 99:23 | 162:9,12 | 211:5,15 | 267:11,16 | 362:23 |
| 101:5,14 | 162:16,17 | 211:18 | 268:15,16 | 363:14,15 |
| 102:6 | 162:20 | 213:1,4 | 268:20,21 | 363:18,21 |
| 103:8 | 163:6,18 | 217:25 | 268:25 | 364:19 |
| 104:12,22 | 163:24 | 218:8 | 269:2,8 | 365:9,17 |
| 105:8 | 165:19 | 219:25 | 270:4,7,8 | 366:6,9,21 |
| 106:6,7,18 | 166:15 | 220:7 | 270:12,13 | 366:22 |
| 106:19 | 169:18 | 221:12,18 | 270:23 | 368:19 |
| 107:5,25 | 171:21 | 221:20 | 271:4,16 | 369:24 |
| 108:1 | 172:12,14 | 222:4,6,16 | 272:25 | 370:15 |
| 109:15 | 173:5,22 | 222:17,22 | 273:7 | 371:3 |
| 111:17,18 | 174:4,5,8 | 222:23 | 275:8,13 | 377:8,12 |
| 117:8,9 | 174:9,14 | 223:4,6,14 | 279:4,15 | **CORRECTION** |
| 118:3,4,10 | 174:19 | 223:15 | 279:17 | 378:2 |
| 118:11,24 | 175:4,14 | 224:7 | 280:7 | **corrections** |
| 118:25 | 176:17,21 | 225:2,3,11 | 282:21 | 376:15 |
| 124:7,8 | 177:15,16 | 225:20 | 289:23 | **corrective** |
| 125:23 | 177:19,20 | 226:7,16 | 293:5 | 124:21 |
| 126:21 | 178:10 | 226:25 | 298:22 | 177:8 |
| 127:17 | 179:15,25 | 227:2 | 299:14 | **correctly** |
| 128:15,17 | 180:1,5,9 | 229:23,24 | 300:4 | 158:6 |
| 129:11,12 | 180:13,17 | 231:6,8,11 | 303:14,15 | 220:8 |
| 129:15,18 | 180:22 | 231:13,19 | 306:17 | 238:23 |
| 129:23 | 183:16,18 | 232:3,7 | 310:8,21 | **correspo...** |
| 135:1,2,7 | 183:23,25 | 233:25 | 318:9,18 | 326:1 |
| 135:8,12 | 185:16 | 234:13,22 | 319:9,12 | **corrosive** |
| 135:16,18 | 189:18 | 235:10,17 | 319:24 | 171:2 |
| 137:17,24 | 191:14,16 | 236:17 | 324:19 | **costing** |
| 138:1,7,11 | 191:21 | 237:17,18 | 325:12 | 180:11 |
| 138:16,19 | 192:17,19 | 238:3,7,15 | 327:22 | 251:13 |
| 138:21 | 193:2,19 | 238:22,24 | 329:3,5 | **Council** |
| 139:1,16 | 194:1,4,11 | 241:6 | 330:3,5 | 284:6 |
| 139:17 | 195:21 | 242:25 | 331:2,18 | **counsel** 8:2 |

**ERIC WALDO  12/22/2022**

| | | | | |
|---|---|---|---|---|
| 8:2 20:20 | 10:12 | 274:9 | 294:6,10 | 360:6 |
| 65:22 66:2 | 62:10 | 275:10,16 | 294:18 | created 14:5 |
| 72:10,21 | 113:23 | 276:4,12 | 296:21 | 170:22 |
| 72:24,24 | 208:1 | 285:7,21 | 313:4 | creates |
| 77:15 | 321:10 | 288:11 | 317:6 | 57:22 |
| 134:15 | 375:5 | 292:21 | 319:2 | creating |
| 160:8,12 | courtesy | 293:1 | 336:17 | 60:7 73:16 |
| 208:7,7 | 264:6 | 294:6,15 | 338:1 | 230:9 |
| 214:13 | 266:6 | 296:23 | 340:19 | 356:13 |
| 266:17 | Courtney | 315:21 | 342:23,25 | 358:10 |
| 269:23 | 291:6,7,12 | 317:22 | 343:10,14 | 359:2 |
| 291:2 | 291:19 | 324:22 | 343:22,23 | creation |
| 292:13 | 292:18 | 335:7,9 | 347:12 | 164:4 |
| 319:25 | 296:6 | 338:13 | 350:23,25 | 172:5 |
| 335:13 | 315:14 | 341:23 | 351:1 | 186:16 |
| 336:11 | 316:3,10 | 342:8,10 | 365:11 | 213:17 |
| 338:9 | cover 4:7 | 343:21 | COVID-re... | 320:25 |
| 351:25 | 207:23 | 355:8,14 | 251:17 | crises 335:2 |
| 375:13,17 | 282:25 | 355:17 | coy 91:12 | crisis |
| counsel's | covered | 357:18 | CQ 4:7 | 332:24 |
| 260:14 | 65:18 | 359:9 | crack 53:9 | critical |
| Counter | 77:11 | 365:15 | craft 100:14 | 261:6 |
| 45:12 | 310:24 | 366:8,16 | 161:21 | 311:12 |
| Countering | 338:5 | 367:22 | crafted | criticizing |
| 44:25 | covering | 370:20 | 306:3,7 | 302:6 |
| 45:12 | 221:4 | 371:1,10 | crafting | cross 152:18 |
| 192:25 | COVID 96:16 | COVID-19 | 303:17 | cross-fu... |
| counting | 126:12 | 13:13,15 | Craig 260:23 | 52:17 |
| 335:15 | 127:3,3,12 | 13:16 18:5 | 261:4,5,16 | cross-po... |
| country | 135:19 | 24:17 | 262:12 | 152:9 |
| 17:25 | 139:15,25 | 45:23 | 263:8 | crossed |
| 24:16 | 140:13 | 129:4,10 | crashing | 288:15 |
| 27:22 | 141:19 | 130:1 | 314:9 | crowd-so... |
| 303:13 | 143:3,15 | 132:5 | Crawford | 54:4 |
| counts | 143:21 | 135:15 | 190:11 | crowdsou... |
| 206:20 | 154:17 | 145:20 | crazy 370:12 | 340:22 |
| couple 44:16 | 155:5,8 | 166:11 | create 48:12 | 342:12,15 |
| 76:15,17 | 156:7 | 183:23 | 100:21 | 342:19 |
| 97:8 | 157:10,15 | 185:3,8,15 | 107:1 | CrowdTangle |
| 154:19 | 159:10,14 | 185:21 | 168:24 | 158:6,11 |
| 248:10 | 231:3 | 229:1,21 | 176:10 | 158:13,16 |
| 353:24 | 232:10 | 231:4,6,11 | 192:1 | 159:2,9,14 |
| 355:2 | 233:21 | 231:19 | 203:23,23 | 159:22 |
| course 266:1 | 262:1,22 | 262:12 | 229:2,5 | 160:2 |
| 333:2,14 | 262:24 | 267:20 | 350:18 | 221:13,15 |
| 334:2 | 263:1,4 | 268:1 | 355:23 | 226:23 |
| court 1:1 | 265:17 | 284:23 | 356:16,17 | 227:15,20 |
| 5:1,19 | 266:10 | 291:8,21 | 356:25 | 227:24 |
| 8:16 9:15 | 273:7,25 | 292:25 | 358:5 | 228:1,4,5 |

**ERIC WALDO  12/22/2022**

| | | | | |
|---|---|---|---|---|
| 228:9,13 | 117:15 | 111:1,2 | 319:15 | 298:5 |
| 233:17,18 | **dangerous** | 112:3,7 | 371:13 | 308:4 |
| 237:8 | 327:20 | 158:7,17 | **day** 5:14 | 318:23 |
| **CSR** 8:4 | **dangers** | 159:6,23 | 19:1 33:17 | 346:10 |
| 375:22 | 162:7 | 174:17 | 33:19 | 349:16 |
| 376:21 | **Daniel** 14:14 | 210:19,25 | 34:13,21 | 356:21 |
| **CSR(IL)** 7:9 | 15:2,18 | 210:25 | 36:20,21 | 357:3,4 |
| **Culbertson** | 37:1,6 | 211:6 | 38:6,10 | 376:19 |
| 85:12 | 39:3 47:17 | 220:5,11 | 90:21,24 | **dazzling** |
| 144:4 | 47:19,20 | 220:21 | 90:24 91:1 | 354:20 |
| **cull** 335:19 | 48:8 53:9 | 221:6,15 | 91:1 105:2 | **DC** 19:1 |
| **culminating** | 53:21 | 226:23 | 122:22 | 125:5 |
| 234:18 | 54:11 | 227:20 | 127:25 | 190:18 |
| **cultural** | 59:10,12 | 228:17 | 136:1 | 373:3 |
| 198:20 | 64:1,1 | 233:18 | 151:14 | **de** 60:23 |
| **culture** | 89:4 | 242:11,14 | 206:19,20 | **deal** 22:16 |
| 356:17,25 | 116:19 | 242:15 | 206:25 | 126:23 |
| 358:5,11 | 152:20 | 251:22 | 219:2 | 203:24 |
| **cure** 102:18 | 164:10 | 252:15 | 238:5 | **dealing** |
| **current** | 187:11,13 | 258:25 | 244:15 | 60:21 |
| 11:15 | 187:15,18 | 336:25 | 263:17 | **deamplif...** |
| 60:18 | 187:19 | 337:6,8 | 295:2 | 177:18 |
| 198:23 | 289:3,10 | 342:22 | 306:12 | 203:13 |
| 205:11 | 289:14 | 343:4,6 | 309:14 | **Dear** 234:15 |
| 317:5 | 290:10 | 344:21 | 310:5 | 242:24 |
| 318:16 | **data** 35:22 | 345:4,9,18 | 318:6,6,13 | 243:1,6 |
| **currently** | 37:5 56:10 | 347:11 | 318:18 | 270:15 |
| 36:16 | 56:13 | 374:5 | 322:23 | 376:11 |
| 118:19 | 59:18,19 | **data-rel...** | 335:3 | **death** 100:16 |
| 121:9 | 60:10 | 374:4 | 347:10 | 254:23 |
| 204:1 | 79:12,25 | **data-type** | 351:20 | 335:8 |
| 372:12 | 80:1,9,9 | 144:21 | 360:18 | **deaths** |
| **cursor** 358:2 | 80:15,18 | **date** 8:10 | 377:14 | 175:23,25 |
| 360:24 | 81:10 82:6 | 38:16 84:4 | **days** 53:8,11 | 360:19,21 |
| **cursory** | 82:14,15 | 192:9 | 75:9 76:17 | **debate** |
| 140:2 | 82:17,25 | 213:5 | 86:12 | 309:21 |
| **customers** | 83:2,9,11 | 318:10,11 | 89:10,10 | **debrief** |
| 328:8,19 | 83:20 86:1 | 352:11 | 128:21 | 137:10 |
| **Cut** 229:14 | 100:8 | **dated** 135:1 | 135:4 | **debriefed** |
| **cuts** 327:16 | 101:10 | 238:1,10 | 138:3,6 | 137:7,16 |
| **Cybersec...** | 102:2,9 | 315:17 | 143:14 | **debunks** |
| 68:25 | 103:11 | 350:1 | 193:24 | 317:21 |
| **czar** 185:19 | 105:1 | 351:9 | 194:22 | **December** |
|  | 106:17 | 352:10 | 226:8 | 1:15 5:12 |
| **———— D ————** | 107:7 | **dates** 75:10 | 234:17 | 8:10 |
| **D** 2:1 6:4 | 109:24 | 150:10 | 238:13 | 320:19 |
| **D.C** 6:17,23 | 110:3,5,5 | 244:18 | 260:16 | 323:1,6,11 |
| 376:8 | 110:13,14 | **David** 7:9 | 281:19,23 | 376:5,13 |
| **damage** | 110:21 | 8:20 | 295:21 | **decide** |

**ERIC WALDO  12/22/2022**

```
167:10            224:6,16          dem- 275:10       239:10            describing
239:6,8           define 13:4       demand 303:8      256:19            84:5 105:7
decided           defining          305:19            327:13            150:9
115:7,9           280:17,18         347:25            372:5             198:22
254:8             definitely        demanding         374:17            223:21
decision          20:7 43:8         305:15            375:9,15          277:3
16:15             59:6 92:25        347:19            376:12            290:6
54:20             95:22             demands           377:5,7,10        description
115:2             96:14             347:11,16         378:2,6           63:16
188:24            112:8             Democratic        depositions       78:16
decisions         181:19            261:21            10:8              88:16
165:16,23         206:10            demoted           depriori...       221:10
declare           295:9             275:16            26:10             222:15,19
377:11            299:20            demotion          depth 36:1        223:8
dedicated         341:20            276:3             80:14,18          225:10
231:3             350:12            demotions         83:6,13           246:22
deep 47:9         definition        275:10            173:16            251:3
54:23             163:19,23         denominator       355:12            332:8
110:16            164:1,5,7         111:10,12         deputy            347:16,25
deeper 100:4      164:17,21         Department        143:18            design 24:22
155:8             165:3,12          6:22 7:4          235:15            50:8 57:19
156:7             165:13            9:6,7             296:18            57:24
157:10,15         168:15            26:23             describe          59:13
251:16            170:2             68:19             18:11             149:18
deeply 16:2       280:21            376:7,18          24:13             290:13
40:5              281:1             376:24            27:11             designed
146:12            341:6             departure         87:17 91:9        50:11
147:14            342:15            297:17            117:20            325:16
190:6             343:25            depending         141:20            designer
302:20,23         347:21            115:24            169:16            59:17
374:10            366:1             deplatform        219:17            designing
deescalate        definitions       178:2             268:7             24:15
34:10,14          212:20            355:7             313:25            58:11
95:4,5            deleted           deplatfo...       described         desire
239:17,25         245:24            205:9             29:22 35:8        173:12
240:17            deliberate        355:18            91:4              desired
deescala...       115:2             deponent          106:12            376:16
239:12            delibera...        378:1,6,24        220:18            desires
defend 223:3      303:20            deposed           221:1,3           329:22
223:19            delibera...        23:25             226:9,14          desk 288:15
Defendant's       338:11            deposes 9:19      247:17            despite
2:8 73:5          delibera...       deposition        286:20            192:15
Defendants        338:6             1:14 4:11         290:11            destigma...
1:8 5:8           delivery          5:10 8:3          332:5             22:24
6:20 7:3          65:18             8:13,18           333:24            detail 267:9
8:3 9:5           delve 139:19      9:25 10:4         describes         detailed
defensive         155:7             23:22             162:18            39:9
225:5             156:7             76:24 77:2        219:10            details
defensively       157:10,15         77:9              286:20            89:12
```

**ERIC WALDO  12/22/2022**

| | | | | |
|---|---|---|---|---|
| 267:9 | 164:6 | 85:23 86:1 | 189:23 | disconti... |
| detect 202:1 | devising | 132:4 | 260:21 | 368:13 |
| 202:23 | 71:17 | 144:10,12 | 261:10 | discourage |
| detecting | devoutly | 144:14,21 | 290:18,19 | 261:20 |
| 204:2 | 254:14,18 | 189:23 | 290:21 | discover |
| detection | 254:21 | 192:25 | 296:18 | 102:20 |
| 204:6 | difference | 261:10 | 301:15 | discovered |
| determin... | 21:20 | 325:25 | 325:21,22 | 124:17,19 |
| 113:5 | different | 336:15 | 325:25 | 128:1,5 |
| 142:3 | 5:14 16:3 | 340:3 | 357:23 | discuss 41:3 |
| 165:25 | 21:23 | 373:11 | directs | 96:18 |
| determine | 31:19 | direct 15:14 | 58:13 | 108:5 |
| 167:7 | 50:13 51:3 | 32:1 39:12 | 63:14 | 124:12 |
| 168:13 | 54:1 91:3 | 68:6 71:22 | DiResta | 129:2 |
| 169:3 | 99:6 100:5 | 75:12 | 36:22 | 130:10 |
| determined | 100:15 | 84:14 | 37:14,16 | 146:14 |
| 239:11 | 116:24,24 | 125:6 | 37:25 | 147:19 |
| 337:18 | 116:25 | 161:4 | 38:17,24 | 153:15,17 |
| determining | 119:6 | 217:7,9,11 | 40:2,11 | 156:24 |
| 266:1 | 159:10,13 | 217:15 | 41:3 42:1 | 157:5 |
| develop | 159:17,19 | 326:5 | 42:16 | 169:18 |
| 52:23 | 199:1 | directing | 48:22,25 | 237:16 |
| developed | 237:1 | 15:12 | 62:22 | 239:7 |
| 14:7 19:12 | 245:18 | 363:12 | 188:18 | 291:21 |
| 37:20 | 293:23 | direction | 207:5,7 | 298:18 |
| 164:3 | 303:25 | 59:1 99:3 | 212:4,15 | 299:1 |
| developing | 304:1 | 272:25 | 212:18 | discussed |
| 14:11 37:9 | 307:6,18 | 375:13 | 213:8 | 33:11 |
| 59:25 | 341:10 | directly | 339:2 | 40:21 41:7 |
| 60:12 | 358:14 | 15:12 59:1 | dis 261:25 | 46:17 47:1 |
| 115:15 | differently | 60:17 61:9 | disagrees | 56:11 80:1 |
| development | 91:4 | 62:23 | 307:25 | 84:19 85:1 |
| 13:22 14:8 | difficult | 70:14 72:7 | disappoi... | 85:3,6 |
| 14:16 | 10:12 | 78:3 94:24 | 302:20,23 | 86:14 |
| 17:11 | 36:16 | 95:18 | disappoi... | 90:14 91:8 |
| 37:17 | 203:5,21 | 103:25 | 305:6 | 91:10 |
| 289:13 | 246:10 | 207:19 | disbelieve | 108:22 |
| developm... | difficulty | 215:5 | 351:22 | 112:4 |
| 122:3 | 10:25 | 237:16 | disclose | 118:6 |
| device 74:20 | 336:11 | 240:20,23 | 76:19 | 123:12 |
| 74:25 | 337:21 | 241:2 | disclosed | 124:5 |
| devices | dig 74:7 | 251:16 | 223:13 | 139:8 |
| 74:13,16 | digital 45:1 | 309:16 | 225:10 | 145:14 |
| devise | 45:12 | 323:2 | 309:22 | 148:4,10 |
| 101:12 | 57:22 58:4 | 349:21 | disclosing | 148:23 |
| 102:11 | 58:4 64:17 | director | 66:5 | 157:19 |
| 103:5 | 64:17,18 | 14:19 | discontinue | 164:2,9 |
| devised | 64:19 | 64:18 | 368:5,22 | 184:25 |
| 117:19 | 85:14,22 | 143:16 | 369:16,17 | 187:23 |

**ERIC WALDO  12/22/2022**

| | | | | |
|---|---|---|---|---|
| 191:19 | 269:10 | 104:12,18 | **district** 1:1 | 49:9,14 |
| 209:4 | 272:16 | 104:20 | 1:1 5:1,1 | 72:22,23 |
| 218:23 | 281:15 | 105:8 | 5:19 8:16 | 75:13 |
| 221:2,23 | 286:12,14 | 111:16 | 8:16 51:8 | 77:24 |
| 227:11 | 286:17 | 118:9 | **dive** 251:16 | 84:15 87:3 |
| 228:20 | 292:7 | 141:22 | **Division** 1:2 | 128:16 |
| 232:19 | 334:6 | 168:18 | 5:2,20,20 | 134:14 |
| 239:9,13 | 340:25 | 172:11,17 | **DJ** 81:6,9,10 | 137:25 |
| 241:17 | 341:22 | 172:25 | 81:24 | 138:15 |
| 242:12,16 | **Disease** | 173:4 | 82:10,13 | 144:25 |
| 242:18 | 190:8 | 174:23 | 82:15,23 | 145:21 |
| 250:11 | **Disinfo** | 186:7,12 | 83:8,10,19 | 151:17 |
| 251:20 | 244:13 | 186:19,21 | 94:13 | 152:19,23 |
| 258:11,14 | 245:11,14 | 188:6 | 98:12 | 153:10,11 |
| 291:24 | 245:22 | 192:21 | 106:6,15 | 155:10 |
| 301:18,21 | 247:8 | 193:1,6,13 | 109:21,23 | 156:9 |
| 314:6,24 | 267:4,10 | 195:11 | 112:3,6 | 161:11 |
| 317:1,1,11 | 267:14 | 196:10 | 116:18 | 162:5,13 |
| 331:21 | 268:15,20 | 245:10 | 241:13,24 | 173:23 |
| 369:15 | 268:25 | 247:18,25 | 242:13,15 | 182:25 |
| 372:18 | 269:11,13 | 248:2,13 | 251:16,22 | 191:15 |
| **discussing** | 269:17 | 249:15 | 252:1,8,11 | 193:18,25 |
| 11:11 | 276:22 | 251:12 | 252:13,14 | 195:4,5 |
| 143:2 | 277:7 | 261:19 | 252:16,19 | 197:4,18 |
| 239:3 | **disinfor...** | 262:16,21 | 252:22 | 201:13,24 |
| 317:14 | 39:25 40:2 | 263:4 | 255:14 | 204:17 |
| **discussion** | 41:13 | 289:19 | 258:23,25 | 208:8 |
| 65:14 91:3 | 42:17 43:6 | 299:6,18 | 259:3,6,18 | 215:8 |
| 92:2 95:15 | 43:7,18 | 300:4 | 259:22,23 | 216:6,14 |
| 105:19 | 45:5,20 | 313:5,9 | 260:5 | 216:22 |
| 160:21 | 46:3,4,8 | 330:18 | 267:3,7 | 273:8 |
| 166:25 | 46:12 47:2 | 342:4 | 270:4 | 277:10 |
| 182:3 | 47:25 | **dismissed** | 292:18 | 291:2 |
| 198:15 | 56:17 57:5 | 221:18 | 296:6 | 309:13 |
| 240:14 | 58:14,23 | **dispropo...** | **DNC** 261:16 | 313:19 |
| 253:14 | 59:2,7 | 202:11,25 | **DNC's** 261:6 | 340:11,14 |
| 256:18 | 60:9,22 | **dispute** | 261:21 | 342:20 |
| 320:9 | 63:15,21 | 273:17 | **doctor** 27:20 | 344:15,22 |
| 328:1 | 64:8,23 | **disputes** | 29:15 | 345:3,13 |
| 330:24 | 67:1 68:10 | 267:13 | **doctors** | **documents** |
| 336:23 | 68:16 70:3 | **dissemin...** | 132:13 | 73:16 74:7 |
| 337:23 | 71:14 | 29:25 30:6 | 287:25 | 77:2,4,8 |
| **discussions** | 74:25 92:5 | 30:7 358:6 | 288:3 | 169:7 |
| 68:15 | 96:15,16 | **distinctive** | **doctrine** | 293:6 |
| 69:14,18 | 97:18,21 | 282:25 | 77:12 | 294:13 |
| 171:25 | 98:21,25 | **distribu...** | **document** | 309:22 |
| 215:1 | 99:11 | 273:6 | 2:15,20 | **Doell** 7:9 |
| 226:20 | 101:4,13 | **distribu...** | 3:17,18,19 | 8:20 |
| 252:20 | 102:14 | 271:3,14 | 3:21 21:5 | **doing** 17:17 |

**ERIC WALDO  12/22/2022**

| | | | | |
|---|---|---|---|---|
| 23:22 26:9 | 353:16 | 69:21,22 | 164:12 | 270:3 |
| 31:14 33:6 | 357:10 | 70:7,13,14 | 168:20 | 287:7,9 |
| 51:3 58:2 | 373:23 | 70:17,20 | 169:23 | 288:20 |
| 59:5,8,9 | **DOJ** 73:16 | 71:2,5,9,9 | 176:18 | 289:4 |
| 60:25 | 74:15 | 71:16,16 | 178:6 | 290:9,14 |
| 66:18 | **domains** | 71:22,22 | 182:6 | 302:1,19 |
| 82:15 83:9 | 276:25 | 71:23 72:4 | 183:1,6 | 303:5,16 |
| 96:5,7,10 | **Door** 182:7 | 72:4,6,8,8 | 184:12 | 303:18,21 |
| 96:15 97:3 | **Dori** 363:14 | 77:22 | 187:24 | 304:2,14 |
| 97:3,10 | 367:9 | 78:18 | 198:22 | 305:6 |
| 98:6 109:3 | **Dory** 261:2 | 79:12,20 | 207:1,25 | 307:12 |
| 109:7 | **doubt** 327:3 | 80:16,21 | 208:6,20 | 309:16,18 |
| 113:5,17 | **doubtful** | 80:25 81:4 | 210:15 | 310:7,10 |
| 115:16 | 188:19 | 81:24 82:6 | 217:22 | 312:3 |
| 117:11 | 223:22 | 84:19,24 | 218:16,22 | 316:23 |
| 118:9 | 357:14 | 94:13,24 | 219:19 | 322:11 |
| 119:3,8,12 | **dozen** 44:24 | 95:18 | 222:1,8,21 | 326:6 |
| 119:21 | 45:5,20 | 98:11,16 | 223:1,16 | 327:3,13 |
| 120:12,15 | 46:3,8,12 | 98:19 | 223:21,23 | 328:3 |
| 121:10,12 | 47:3,25 | 106:5,14 | 224:6,20 | 329:17,24 |
| 121:14,14 | 192:21 | 107:10 | 224:21,23 | 330:17,25 |
| 122:16 | 193:1,6 | 109:10 | 234:5,12 | 332:25 |
| 123:24 | 195:12 | 111:21 | 234:14 | 334:10 |
| 128:2 | 196:11 | 113:7,13 | 236:19 | 339:12,15 |
| 129:9,22 | 244:13 | 115:1 | 237:19,20 | 339:18,23 |
| 130:5 | 245:11,14 | 122:10 | 237:23 | 358:22 |
| 131:9 | 245:22 | 126:16 | 238:1,10 | **draft** 188:3 |
| 132:5,9,10 | 247:8,18 | 133:25 | 239:1,2,20 | 304:8,8,10 |
| 133:6 | 248:2 | 135:1 | 240:3,11 | **drafting** |
| 154:8 | 249:15 | 136:9,20 | 240:19 | 187:20 |
| 161:18 | 267:4,10 | 137:5,7 | 241:13,24 | 290:5 |
| 170:12,16 | 267:14,22 | 138:4,9 | 242:7,8,22 | 304:3 |
| 182:19 | 268:3,9,15 | 139:3,14 | 243:13,15 | 351:5,10 |
| 211:8 | 268:20,25 | 142:6,23 | 246:1,5,20 | **drafts** 15:18 |
| 229:4,8 | 269:11,13 | 142:25 | 247:10 | 16:10 |
| 236:10,11 | 269:17 | 143:9,12 | 248:10 | 188:2 |
| 249:3 | 276:22 | 143:13,20 | 249:17,23 | 303:25 |
| 263:3 | 277:7 | 145:18 | 250:2,15 | 304:1 |
| 264:8,20 | **Dr** 6:14,14 | 146:4 | 250:18 | **Dress** 348:5 |
| 279:19 | 6:14 14:21 | 147:6 | 251:9 | **drink** 162:24 |
| 293:21 | 15:11 16:4 | 149:25 | 253:12,18 | **drive** 27:4 |
| 301:25 | 25:23 | 153:12 | 256:10,15 | 27:12 |
| 305:9 | 34:19 | 154:13,24 | 256:21,22 | 29:23 |
| 312:14 | 35:14,16 | 155:4 | 256:24 | 153:3 |
| 316:23 | 38:5 53:17 | 156:2 | 260:18,19 | 358:20 |
| 320:21 | 56:5 57:10 | 157:3 | 260:21 | 361:6 |
| 322:3 | 67:14,16 | 159:12 | 261:5,9 | **driver** |
| 333:23 | 67:21 | 161:9 | 262:3,8 | 338:22 |
| 340:8 | 69:13,17 | 162:10 | 264:8,9 | **drivers** |

| | | | |
|---|---|---|---|
| 187:20 | 126:15 | 269:1,9,25 | 214:13 |
| **driving** | 134:15,18 | 270:1,3,10 | 240:11 |
| 230:19 | 134:24 | 270:18 | 306:14 |
| 321:14 | 135:15,25 | 274:4,7,15 | 307:22 |
| 344:13 | 139:13 | 278:5,12 | 309:15 |
| **dropped** | 143:8,10 | 279:17 | 336:11 |
| 134:14 | 144:3,8,23 | 291:3 | 347:5 |
| **dropping** | 145:6,16 | 292:15 | 349:20 |
| 53:14 | 147:18 | 294:3,24 | 350:2 |
| **drug** 166:23 | 151:8,18 | 295:7 | **e-mailing** |
| 168:6 | 151:19,20 | 296:10,14 | 126:11 |
| **due** 203:6 | 154:13,20 | 296:24 | 159:12 |
| 360:22 | 155:3,4,19 | 297:5,6,10 | 160:8 |
| **duly** 375:6 | 156:20,22 | 297:21 | **e-mails** 15:8 |
| 375:10 | 157:1 | 298:2 | 45:8 64:10 |
| **duties** 12:10 | 195:19 | 300:6 | 74:10,13 |
| 21:21 23:2 | 215:9 | 306:18,20 | 97:6 248:9 |
| 24:14 | 226:4 | 306:24 | 310:24 |
| 58:24 | 227:1,24 | 307:4,19 | 315:12 |
| 110:10 | 229:11 | 308:3 | 318:14 |
| **duty** 22:14 | 231:7,12 | 309:8,13 | 363:24 |
| 175:20 | 231:21 | 309:17 | 365:10 |
| **dying** 335:3 | 233:3,14 | 310:4,5,7 | **earlier** 29:6 |
| 360:18 | 234:4,7,11 | 311:19 | 31:6 53:1 |
| | 234:14 | 314:4 | 62:20 |
| ———— E ———— | 236:5,19 | 315:13,20 | 84:18 |
| **E** 2:1 | 237:14,21 | 315:21 | 85:18 |
| **e-commerce** | 237:25 | 316:25 | 99:21 |
| 340:22 | 238:14 | 317:9 | 100:2 |
| 341:15,18 | 239:4,7,16 | 318:5,11 | 104:22 |
| 341:24 | 240:19 | 319:6 | 122:17 |
| **e-mail** 2:12 | 241:6,8 | 330:21 | 135:20 |
| 2:13,14,16 | 242:20 | 349:2,6,23 | 144:11 |
| 2:17,22,23 | 243:5,12 | 351:25 | 151:13 |
| 3:3,4,5,6 | 245:25 | 363:11 | 163:3 |
| 3:7,8,10 | 249:23 | 364:16,25 | 169:15 |
| 3:11,12,14 | 250:13 | 366:23,24 | 173:8,19 |
| 3:15,16,23 | 252:10 | 367:18,19 | 174:25 |
| 4:8,9 19:3 | 253:12 | 369:5 | 192:23 |
| 20:20,24 | 255:3,5,8 | 370:19,23 | 203:12 |
| 54:8,8 | 255:22 | 373:12,12 | 227:10 |
| 74:8,20 | 258:22 | **e-mail's** | 239:13 |
| 78:12 | 259:13 | 259:2 | 241:11 |
| 82:12 86:7 | 260:7,17 | **e-mailed** | 243:3,7 |
| 95:8,23 | 261:8 | 47:24 | 254:7 |
| 96:14 97:7 | 262:2,14 | 49:10 | 256:18,19 |
| 98:3,4,7 | 266:25 | 72:21 | 261:13 |
| 112:2,9 | 267:3 | 94:24 | 271:5 |
| 125:17 | 268:17 | 95:17 | 282:19 |

| | |
|---|---|
| 293:10 | |
| 297:11 | |
| 344:20 | |
| 357:8 | |
| 359:8 | |
| 363:24 | |
| 364:22 | |
| **early** 61:21 | |
| 143:14 | |
| 204:6 | |
| 211:14 | |
| 290:20 | |
| 293:13,15 | |
| 323:19 | |
| 364:18,23 | |
| 372:7 | |
| **easier** | |
| 199:25 | |
| 200:22 | |
| 275:14,15 | |
| **Easterly** | |
| 69:8 | |
| **eat** 162:24 | |
| **eating** 99:5 | |
| 99:5 | |
| 104:21,24 | |
| **eBay** 341:19 | |
| **echo** 303:3 | |
| 358:25 | |
| **echoes** | |
| 191:17 | |
| **ecosystem** | |
| 303:9 | |
| 305:20 | |
| **ed** 302:10 | |
| **edit** 15:22 | |
| **edited** | |
| 329:21 | |
| **edits** 304:13 | |
| 304:15 | |
| **educate** | |
| 13:14 | |
| **educated** | |
| 213:18 | |
| 289:20 | |
| 291:14 | |
| **education** | |
| 26:23 | |
| 50:16 | |

**ERIC WALDO  12/22/2022**

| | | | | |
|---|---|---|---|---|
| 364:2 | 188:23 | 375:14,17 | **energy** | 183:13 |
| **effect** 171:3 | 210:19 | **employee** | 115:13 | 304:23 |
| **effective** | 230:16 | 39:6 42:6 | **enforcement** | 345:17 |
| 166:23 | 252:5 | 81:12 | 192:2,4 | 364:17 |
| 168:7 | **election** | 124:24 | 193:9 | **ensured** |
| 295:15 | 55:16 | 132:3,3 | **engage** 59:15 | 366:14 |
| **effectiv...** | 219:2 | 255:19 | **engaged** 13:3 | **entire** 166:1 |
| 167:1 | **electronic** | 309:23 | 13:4,5,12 | 216:1,25 |
| 351:1 | 152:24 | 340:4 | 22:2 140:7 | **entirely** |
| **effects** 43:7 | **electron...** | 372:16 | 140:9,15 | 60:5 |
| 217:25 | 4:11 | 375:16 | 141:11 | 330:16 |
| 219:6,13 | **elevate** 26:3 | **employment** | 218:6 | **entirety** |
| **efficacy** | 26:13 | 39:10 | **engagement** | 216:6,13 |
| 297:3 | **elevating** | 42:12 54:2 | 12:2,4,11 | 216:21 |
| **effort** 10:17 | 272:5 | **enable** 271:2 | 13:7,14 | **entities** |
| 350:18 | **elevator** | 271:13 | 21:11,22 | 42:25 |
| **efforts** | 314:1 | **enabled** | 21:24 23:9 | 275:21,22 |
| 13:14,16 | **else's** | 169:11 | 32:10,11 | 283:9 |
| 129:4,25 | 358:21 | 179:24 | 32:16 | **entitled** |
| 130:2 | 361:7 | 331:17 | 41:16,20 | 347:11 |
| 131:14 | **emailing** | **enclosed** | 48:11 49:5 | **entity** 43:1 |
| 154:20 | 291:5 | 376:12,13 | 49:18,22 | 128:2 |
| 155:8 | **embargo** | **Enclosures** | 50:10,12 | **entry** 21:10 |
| 156:8 | 206:21 | 376:22 | 51:6,13 | **environment** |
| 157:11,16 | **embargoed** | **encourage** | 52:8,11 | 169:12 |
| 157:25 | 32:25 87:3 | 87:5 | 58:14 59:2 | 209:16 |
| 172:24 | 88:23 | 114:22 | 60:25 | 210:6 |
| 220:7,9,13 | 89:11 | 181:9 | 63:15,17 | 334:15 |
| 220:22 | **emcee** 92:12 | 223:2 | 103:25 | 336:16 |
| 223:2 | **emergency** | 348:18 | 134:6 | 350:19 |
| 224:7,17 | 175:11 | 350:6 | 141:19 | 355:24 |
| **eight** 5:12 | 317:3 | **encouraged** | 197:23 | 356:16 |
| 356:21 | 365:16 | 181:11,13 | 198:1 | **Eric** 1:14 |
| 357:3,4 | **empathize** | **encouraging** | 296:19 | 2:4 5:11 |
| **eight-mi...** | 106:25 | 181:7 | 301:10 | 8:13 9:17 |
| 282:7 | **emphasis** | 350:10 | 312:20 | 9:24 |
| **either** 16:19 | 310:17 | 352:17 | **engagements** | 226:18 |
| 32:21 | 321:18 | **ended** 24:3 | 32:2 52:4 | 259:20 |
| 33:22,23 | **emphasize** | 33:6,17 | 134:8 | 263:14 |
| 38:12 54:4 | 320:13 | 90:17,21 | 140:12 | 267:7 |
| 66:22 | **emphasized** | 113:5 | 183:21 | 281:10 |
| 71:17 | 107:16,17 | 128:1 | 184:4 | 292:16,17 |
| 82:21 | 108:3 | 142:20 | **engaging** | 294:3 |
| 89:21 90:3 | **emphasizes** | 145:11 | 24:24 | 312:2 |
| 93:1 94:25 | 334:23 | 150:7 | 302:2 | 374:17 |
| 101:11 | **employed** | 151:13 | **engines** | 376:13 |
| 112:1 | 39:16 | 237:23 | 340:21 | 377:4,18 |
| 122:13 | 42:11 | 301:25 | 341:1 | 378:1 |
| 160:18 | 340:7 | 304:2 | **ensure** | **errata** |

**ERIC WALDO  12/22/2022**

| | | | | |
|---|---|---|---|---|
| 376:14,16 | 284:1 | 99:17 | 3:19,20,22 | 347:4 |
| 376:17 | 302:1 | 121:1 | 3:23,24 | 348:16 |
| **especially** | **events** 40:15 | 150:15 | 4:2,3,4,5 | 349:1,24 |
| 70:11 | 40:16,24 | 163:4,6 | 4:6,7,8,9 | 352:8,13 |
| 132:11 | 206:24 | 197:8 | 20:22 21:5 | 353:2,10 |
| 305:12 | 283:18 | 229:18 | 49:10,15 | 353:20 |
| **Esq** 6:4,4,5 | 292:2 | 279:21 | 57:18 | 354:19 |
| 6:10,16,21 | **eventually** | 320:18 | 72:14,14 | 361:14,15 |
| 6:21 7:4 | 147:2 | 349:1 | 72:19,20 | 363:9 |
| 376:6 | 234:5 | **examples** | 106:8 | 367:17,21 |
| **essentially** | 240:4 | 104:14,14 | 117:25 | 369:20,21 |
| 30:15 | **everybody** | 104:16 | 134:21 | **exhibits** 2:5 |
| 86:22 | 88:10 | 169:8 | 135:6 | 3:1 4:1,11 |
| 176:25 | 89:14 | 177:9 | 139:10 | 20:20 |
| 290:1 | 107:12 | 203:15 | 144:2 | 134:16,18 |
| **establish** | **everyone's** | 205:11 | 149:7,8 | 160:9 |
| 86:23 | 322:8 | **Excel** 54:5 | 151:3 | 161:4 |
| 243:10 | **Everythi...** | **exception** | 154:12 | 214:13 |
| **established** | 356:4 | 365:14 | 160:10 | 255:5 |
| 251:6 | **evidence** | **excerpts** | 161:7 | 335:21 |
| **et** 1:4,7 5:4 | 105:10 | 208:2 | 178:18 | 347:7 |
| 5:7,21,22 | 163:17 | **exchange** | 196:21 | 351:16 |
| 8:14,15 | 164:22,24 | 368:16 | 206:12 | **exist** 153:2 |
| 19:17 28:4 | 224:9 | **excise** 99:15 | 207:22 | **existing** |
| 50:18 | **evidence...** | **excited** 90:2 | 214:15 | 270:16 |
| 74:11 | 103:18 | **excuses** | 225:21 | 276:3 |
| 114:19 | **exact** 88:23 | 303:11 | 234:2 | **exists** |
| 170:20 | 124:25 | 305:24 | 238:9 | 152:24 |
| 238:19 | **exactly** 23:9 | **Executed** | 240:10 | 220:6,12 |
| 312:6 | 23:14 29:6 | 377:14 | 242:19 | 220:22 |
| 376:9,10 | 39:22 42:5 | **executive** | 254:25 | **expand** |
| 378:3,4 | 81:19 | 364:10 | 260:13 | 317:15 |
| **ethnicity** | 158:14,15 | **exert** 62:25 | 266:16,20 | **expanded** |
| 198:14,18 | 200:24 | **exhaustive** | 269:20 | 246:13 |
| **EUA** 317:2 | 270:9 | 14:24 | 278:4 | 366:12 |
| **event** 19:5,6 | 276:19 | 140:23 | 282:17 | **expanding** |
| 36:20 | 291:9 | **exhausti...** | 290:24 | 138:17 |
| 38:15,24 | 306:5 | 98:18 | 296:9 | 248:14 |
| 39:4 48:12 | 342:24 | **exhibit** 2:6 | 297:23 | 249:18 |
| 48:22 49:2 | 352:22 | 2:7,8,12 | 302:4 | 273:25 |
| 49:4,6 | 364:23 | 2:13,14,15 | 306:11 | 281:21 |
| 51:4 52:1 | **Examination** | 2:16,17,18 | 309:12 | **expansion** |
| 181:3 | 2:4 9:20 | 2:19,20,21 | 314:5 | 366:7,20 |
| 206:15,17 | **examined** | 2:22,23 | 315:8 | **expect** 113:8 |
| 207:8 | 5:11 9:18 | 3:2,3,4,5 | 319:13,20 | 174:3 |
| 209:7 | **example** 28:7 | 3:6,7,8,9 | 319:25 | 175:6,13 |
| 212:19,21 | 61:10 | 3:10,11,12 | 324:20 | 349:15 |
| 213:6 | 62:21 74:9 | 3:13,14,15 | 330:19 | **expects** |
| 251:8 | 76:11 | 3:16,17,18 | 336:10 | 236:16,23 |

| | | | | |
|---|---|---|---|---|
| 2:10 73:7 | 198:11 | **extraord...** | 112:7 | 219:11 |
| **experience** | 342:25 | 172:12 | 113:9 | 220:5,20 |
| 18:16 | 345:7,10 | 173:4 | 115:20 | 221:16,17 |
| **experienced** | 353:23 | 277:18 | 116:5,8,12 | 222:2 |
| 121:11 | **exposure** | 322:2 | 118:22 | 223:17 |
| **experiences** | 23:24 24:2 | **eyes** 103:3 | 122:18,20 | 224:5,15 |
| 65:5 | 343:15,18 | 164:12 | 122:24 | 224:24 |
| **expert** 39:1 | 343:24 | | 123:3,8 | 225:4,15 |
| 39:2,6,22 | 344:5,14 | **F** | 124:5,6,15 | 226:5,10 |
| 39:23,25 | **express** | **F** 288:4,5 | 124:25 | 226:15 |
| 40:6 58:22 | 95:19 | **F-O-R-S** | 125:22 | 227:19 |
| 60:6 86:25 | 223:24 | 133:2 | 126:9,13 | 228:21 |
| 92:16,17 | **expressed** | **face** 299:1 | 127:18,20 | 229:15,23 |
| 110:2,4 | 102:6 | **Facebook** | 127:20 | 230:4 |
| 262:15 | 131:10 | 20:8,9 | 128:3 | 232:23 |
| 265:11 | 159:18 | 33:7,10,14 | 134:25 | 235:7,13 |
| 289:11 | 345:20 | 33:16,21 | 135:21 | 235:24 |
| 338:23 | **expresses** | 33:25 34:2 | 136:19 | 236:23 |
| 362:16 | 156:16 | 34:8,12,20 | 138:18,23 | 237:6 |
| 374:5 | **expressing** | 35:3,10 | 139:22 | 238:21 |
| **expertise** | 123:22 | 52:6,25 | 141:9,12 | 239:21 |
| 39:19 40:8 | 305:6 | 55:6,10 | 141:19 | 242:16 |
| 41:14 47:9 | **expressions** | 56:4,10,13 | 143:3 | 243:14 |
| 110:17 | 94:6 | 63:2 64:11 | 149:14,19 | 244:21 |
| 262:17 | **expressly** | 65:6,8 | 150:13,17 | 245:18 |
| 265:25 | 8:6 | 66:1,11,16 | 151:1,21 | 246:23 |
| 339:13 | **extend** 28:7 | 66:21 | 154:24,25 | 249:2 |
| 374:7,8 | 51:12 | 77:23 | 155:13 | 251:4,22 |
| **experts** | **extensive** | 79:13,16 | 157:8 | 252:1,8,10 |
| 12:19 | 99:22 | 79:21 80:2 | 158:8,22 | 252:19,22 |
| 19:14,14 | **extent** 65:16 | 80:10,12 | 159:15,24 | 255:14 |
| 34:3 52:16 | 194:20 | 80:16,25 | 160:2 | 258:7,8,16 |
| 116:15,17 | 288:22 | 82:7,15,17 | 173:14 | 259:7 |
| 213:17 | 292:8 | 82:24 83:7 | 181:19,23 | 267:13,22 |
| **Expires** | 295:5 | 83:12,14 | 181:25 | 268:4,13 |
| 377:20 | 338:4 | 90:9,10,17 | 182:2 | 269:10,13 |
| **explain** 83:8 | 350:23 | 92:22 93:4 | 188:5,8,12 | 269:14 |
| 312:21 | 362:13 | 93:6,19 | 188:15 | 270:16 |
| **explanation** | **external** | 94:16 | 189:4,10 | 274:3 |
| 210:24 | 22:21 | 95:11,20 | 189:22 | 277:23 |
| **explicitly** | 35:24 36:3 | 95:20 | 190:2,23 | 279:11 |
| 107:23 | 36:10 37:2 | 96:11 | 191:4,23 | 280:1,11 |
| 168:20 | 37:8 43:5 | 98:14 | 192:15,16 | 293:2,11 |
| 204:25 | 47:6 62:21 | 106:6 | 193:21 | 294:7,11 |
| 205:1 | 103:3 | 107:19 | 194:2 | 294:19 |
| 239:3 | 133:5,6 | 108:19 | 195:18 | 296:5 |
| 247:20 | **externally** | 109:1 | 196:1,4 | 297:12 |
| **expose** 24:9 | 36:23 | 111:3,5,7 | 214:20 | 298:3,17 |
| **exposed** | **extra** 216:15 | 111:22 | 218:8,13 | 302:7 |

ERIC WALDO  12/22/2022

| | | | |
|---|---|---|---|
| 305:15,20 | 270:14 | 246:13 | 70:14 |
| 307:4,16 | 279:6,12 | 248:14 | 71:16 72:6 |
| 307:17 | 308:25 | 249:19 | 72:8 |
| 310:12 | 331:17 | 296:22 | **fault** 175:18 |
| 314:20 | 352:21 | 366:14,15 | **favorable** |
| 318:2,14 | **fact-che...** | 366:20 | 182:8 |
| 324:9 | 229:16 | **familiar** | **FDA** 278:23 |
| 337:14 | 276:4 | 37:19 40:5 | 279:12 |
| 343:5 | **facto** 60:23 | 45:3,7 | 280:5,18 |
| 348:23 | **factors** | 75:14 | 281:16 |
| 349:3,20 | 198:18 | 156:3 | 318:23 |
| 350:6,10 | **facts** 105:9 | 186:17 | 365:15 |
| 354:5 | 198:13 | 190:13,17 | **FDA-appr...** |
| 361:21 | **factual** | 217:18 | 280:4 |
| 363:12 | 342:1 | 218:18,20 | **features** |
| 365:13 | **fair** 30:8,10 | 219:14 | 197:6,15 |
| 366:25 | 31:7,8 | 222:25 | 198:7 |
| 369:2 | 60:1 102:7 | 224:5,15 | **February** |
| 370:7 | 107:4 | 225:16 | 213:3,7 |
| 371:9 | 164:20 | 278:21 | 330:24 |
| **Facebook's** | 165:1,2 | 283:22 | 355:6 |
| 107:3 | 166:2,8,20 | 284:5,9 | 358:25 |
| 110:22 | 171:7,19 | 285:3,8,14 | 359:7 |
| 156:1,6 | 172:17 | 285:17,24 | 367:20,22 |
| 157:15,25 | 201:4 | 287:8,9,13 | **federal** 7:5 |
| 158:19 | 210:1 | 288:24 | 46:11 64:6 |
| 194:9 | 220:2 | 371:12 | 66:24 |
| 220:12 | 227:23 | 374:10 | 67:23 |
| 226:14,24 | 229:11 | **familiarize** | 68:22 |
| 227:21 | 230:18 | 225:22 | 83:24 86:3 |
| 230:14 | 234:1,23 | **family** 22:1 | 86:4 |
| 233:20 | 234:25 | 23:2,19 | 132:17 |
| 277:5 | 246:21 | 24:2 | 140:22 |
| 299:19 | 247:13 | **famously** | 141:10,14 |
| **faces** 226:16 | 251:3 | 27:6 | 144:20 |
| **facial** 94:6 | 272:18 | **fan** 254:15 | 183:13 |
| **facie** 85:8 | 292:19,23 | **far** 56:18 | 189:2 |
| **fact** 21:15 | 347:2 | 245:24 | 191:3,7 |
| 23:21 | 365:4 | 327:10 | 192:7 |
| 29:10 | 366:10,11 | **fast** 358:20 | 193:3 |
| 108:2 | 370:14,17 | 361:6 | 285:4 |
| 121:23 | **fall** 52:4,11 | **faster** | 345:15 |
| 122:2 | **falls** 275:11 | 193:16 | 349:15 |
| 138:23 | 295:3 | 194:13,20 | 371:8 |
| 169:16 | **false** 138:14 | 195:9,13 | **feed** 277:1 |
| 181:5 | 163:15 | 196:6 | 299:6,18 |
| 240:9 | 217:24 | **Fauci** 69:13 | 300:4 |
| 247:13 | 219:5,12 | 69:13,17 | **feedback** |
| 257:10 | 231:6,16 | 69:22 70:7 | 50:21 88:1 |

| | |
|---|---|
| **feeds** 204:3 | |
| 344:4,8 | |
| **feel** 121:22 | |
| 308:16 | |
| **feeling** | |
| 95:12,12 | |
| 96:3,4 | |
| 131:10 | |
| 238:20 | |
| **feelings** | |
| 95:11 | |
| 107:2 | |
| **Felicia** | |
| 300:18 | |
| **felt** 97:25 | |
| 239:21 | |
| 314:25 | |
| **fewer** 175:22 | |
| **field** 27:21 | |
| 28:3 36:1 | |
| 114:22 | |
| **fifth** 178:17 | |
| 178:19 | |
| **fight** 129:22 | |
| **Figueroa** | |
| 43:23 | |
| **Figueroa's** | |
| 46:16 | |
| **figure** | |
| 101:21 | |
| **figures** | |
| 179:2 | |
| **filled** 61:3 | |
| 273:15 | |
| **final** 15:19 | |
| 16:10 | |
| 188:2 | |
| 304:15 | |
| **finalized** | |
| 164:4 | |
| **finally** | |
| 353:20 | |
| **financially** | |
| 375:18 | |
| **find** 15:9,9 | |
| 34:11,14 | |
| 76:11,19 | |
| 136:10 | |
| 202:12 | |

**ERIC WALDO  12/22/2022**

239:16
246:10
376:12
**finds** 277:13
**fine** 72:16
100:19,19
160:18,18
160:19
368:13
**finish** 22:8
72:18
167:21
216:8,10
240:24
**finishes**
10:14
**firm** 57:25
**Firms** 347:12
**first** 2:10
10:3,10
18:15  53:7
53:8  73:7
77:20
78:24
81:13,15
87:21
91:18
104:25
110:19,19
119:17,17
119:22
124:22
128:21
129:13
135:5
145:6
147:7,24
151:23
152:20
183:20
186:6
187:11
191:12
196:2
199:12
226:17
231:2
233:13,14
234:10,11

243:2
248:11
250:13
263:11
267:25
270:1,2
273:18,24
274:15
277:9
290:23
298:6
309:17
310:4
316:25
353:24,25
364:21
368:18
**fit** 255:3
**five** 226:8
260:16
273:11,18
282:4
288:20
362:2
371:15
**five-minute**
371:21
**flag** 201:1
281:11
**flagged**
53:17
124:15
189:4,10
285:1
**flagging**
188:5,8,11
188:14
190:2,9
267:7
**flagpole**
114:14
**flags** 203:20
**Flaherty**
64:10,13
65:15,25
66:9  67:2
124:4
125:25
126:3,10

184:19
189:21
190:1
260:17
262:10
263:3
278:13,13
278:22
292:18
294:23
296:6
298:1
306:13
307:3
309:14
315:14
316:3
363:12
367:8
369:13,25
**flip** 178:11
277:9
331:11
**focus** 115:1
115:8,20
122:18,24
150:13
**focused** 92:2
130:25
226:23
233:17
289:1
296:1
323:23
**focusing**
227:20
347:15
**FOIA** 346:18
**folks** 19:14
25:7  26:9
32:23  34:2
37:2  47:4
48:7  52:18
53:14  56:3
67:3
108:11
117:3
152:11
168:25

226:15
258:1
279:7
314:20
316:11
329:22
360:5
**follow** 25:2
41:5  60:25
149:1
226:21
227:19
318:19,22
**follow-up**
25:3,11,14
39:4  40:24
59:17  61:6
82:12  97:7
108:12,15
112:24
113:1
118:22
120:5
123:13
181:16
183:2
195:8,14
252:9
259:6
263:6
266:2
283:18
**followed**
129:19
239:1
**following**
75:16
118:7
129:8
131:1
228:17
233:15
234:17
267:12
293:9
320:3
364:18
378:6
**foregoing**

375:9
377:5,12
**foreign**
128:2
**forenoon**
5:13
**forget**
132:18
**form** 63:17
152:24
353:17
377:6
**formal** 39:14
42:2,13
340:5
**formatting**
273:13
**former**
152:11,12
152:12
235:23
286:6
309:22
**formulated**
164:7
**formulating**
303:23
321:5
336:20
338:17,20
339:2,6
**formulation**
339:24
**Fors** 133:1,8
**forth** 31:25
139:14
203:13
237:9
249:25
275:17
277:2
309:20
310:25
317:23
320:6
332:15
351:2
**fortuito...**
239:14

**ERIC WALDO  12/22/2022**

forty 371:16
371:17,18
371:19
forward
10:15
41:19
114:22
142:24
229:14
236:16,24
237:16
240:21
241:2
277:16,17
277:20
282:3
337:19,21
338:1
forward-...
299:13
forwarded
47:16
281:7
forwards
308:3,7
found 66:22
Foundation
331:7
foundations
50:18
four 190:24
195:20
246:8
253:7,14
253:19,21
253:22,24
273:19,21
Fourth 175:6
frame 55:19
81:14
115:21
130:6
191:2
293:2
322:25
323:23
338:14
340:2
371:9

Frances
302:9,11
309:14
318:7
319:8
Francis
70:20
frankly
223:21
free 358:16
freedom
165:16,22
165:23
285:12,13
285:15
friction
199:23
229:2,5,9
229:22
230:4,10
frictions
200:21
Friday
149:15
150:7
155:18
243:6
315:17,20
319:1
front 72:23
144:25
149:9
151:5
161:12
215:21
274:12
291:2
351:16
356:5
Frontline
287:25
288:3
fruitful
113:20
frustration
223:25
full 9:23
75:21
326:12,23

365:15
full-time
372:16
Fullenwider
39:1  40:19
41:2,23
47:21
63:24
85:17
144:7
164:11
174:19
187:8
226:6
338:24
339:23
362:9
372:4
Fullenwi...
58:20  59:4
59:25  62:1
62:19
85:13  90:8
289:3
290:12
functional
143:18
353:6
function...
125:7
290:19
further
131:17
139:20
244:13
245:11
252:7
268:23
269:10,12
271:1,11
273:25
343:25
374:12
375:16
_____
G
_____
G-mail
255:16
gamut 103:22

gap 61:3
Gardner 6:21
9:5
Gateway
286:19,20
286:23
gears 20:19
gender
198:19
general 9:11
11:17
12:18
13:13
16:18,24
18:16,24
21:11,22
22:12,13
24:13
26:13,17
26:19
27:18
28:10
29:15,24
30:11,11
30:24
31:14
33:20  35:3
35:6,7
36:7  42:11
51:22  55:9
56:12  58:7
58:9  61:5
67:7  68:5
69:20  70:6
70:25
73:12  75:5
76:3  78:2
79:5  87:12
87:20  88:5
96:2  99:1
99:20,25
102:13
105:6
106:22
108:9
116:11
120:11
123:18
131:7

133:18
147:9
161:16
162:11
165:14
166:2,5
168:9
169:2
174:1,2
176:24
179:1
187:25
191:18
212:25,25
215:6
217:22
218:6,12
220:10
221:22
240:13
250:19
251:25
252:7
262:11
263:7
267:8
270:15
284:11,24
291:20
298:13
299:22
301:8
306:12
313:2
318:8
319:21
320:5,19
324:5,21
325:11
329:9
330:7
331:6
333:25
340:9,20
340:25
345:14
347:11
349:4,9,21
349:25

| | | | | |
|---|---|---|---|---|
| 352:9 | 188:11,14 | 187:7 | 43:15 | 62:11 71:7 |
| 354:15,20 | 188:21 | **getting** | 44:14 | 73:3 78:9 |
| 355:5,20 | 189:3,9,12 | 101:9 | 51:20 | 83:3 87:16 |
| **General'** | 189:16 | 108:11 | 87:24 | 87:17 89:6 |
| 12:4 | 198:6 | 111:3 | 89:14 | 90:6 98:7 |
| **general's** | 206:8 | 134:18 | 107:2 | 119:15 |
| 6:5,10 9:3 | 207:19 | 141:5,8 | 109:25 | 127:9,10 |
| 11:24 | 212:15 | 185:19 | 110:16 | 147:19 |
| 12:15 13:9 | 213:9 | 195:11 | 147:9 | 151:16 |
| 26:2,4 | 226:20 | 223:17 | 168:10 | 155:22 |
| 27:7,8,14 | 265:2,12 | 278:4 | 186:24 | 160:17 |
| 28:6 29:5 | 265:17 | 293:22 | 189:23 | 162:4 |
| 29:21 | 269:11,14 | 294:1 | 254:11 | 167:23,24 |
| 31:11 32:8 | 272:20 | 339:12 | 279:6 | 167:24,25 |
| 35:2 36:6 | 283:3,6,13 | 356:23 | 280:7 | 185:11 |
| 36:11 | 288:18,21 | 368:12 | 288:25,25 | 197:10 |
| 37:16 39:7 | 288:22 | **getting-...** | 296:1 | 198:9 |
| 39:14 | 290:3 | 264:7 | 310:16 | 205:20 |
| 41:24 42:3 | 308:10 | **give** 10:18 | 324:7 | 210:14 |
| 42:23 43:3 | 314:24 | 10:20 | 337:13,13 | 214:4,5 |
| 47:13 | 320:11 | 18:19 | 350:14 | 215:21 |
| 49:19 50:9 | 323:21 | 26:21 | **gives** 155:5 | 216:4,15 |
| 52:9 55:5 | 324:12 | 32:23,25 | 228:24 | 216:18 |
| 57:9,15 | 329:7,15 | 46:22 | **giving** 27:1 | 221:25 |
| 58:2 59:18 | 334:6 | 66:17 | 46:20 65:4 | 227:13 |
| 60:7 64:6 | 336:5 | 75:19 | 93:13 | 230:6 |
| 69:19 | 337:21 | 86:18 87:7 | 145:7 | 234:9 |
| 85:20 | 338:2,12 | 88:21,21 | 146:9 | 236:12 |
| 102:5 | 340:2,4 | 114:22 | 148:5 | 247:15 |
| 103:13,20 | 345:20 | 118:23 | 153:24 | 265:16 |
| 109:13 | 346:1,23 | 121:5 | 207:1 | 271:5 |
| 113:2 | 347:18,23 | 140:2 | 317:22 | 274:18 |
| 114:8 | 348:17 | 144:25 | 319:9 | 278:11 |
| 126:20 | 349:19 | 145:8 | 354:23 | 282:5 |
| 129:21 | 362:6 | 146:21 | **glad** 264:16 | 304:20 |
| 134:10 | 364:5,6 | 168:13 | **glance** 140:2 | 311:2,9 |
| 135:10 | 367:13 | 169:2 | **Gleicher** | 313:15 |
| 146:24,25 | 369:10 | 179:19 | 349:7 | 329:25 |
| 155:13 | 372:6,24 | 197:11 | **global** | 367:20 |
| 162:6 | 373:6,8,21 | 201:10 | 235:24 | 369:17 |
| 163:21 | 373:24 | 211:25 | **gmail.com** | **goal** 30:5 |
| 165:21 | **generally** | 216:14 | 260:23 | 88:24 |
| 167:3,5 | 15:21 | 256:25 | **go** 10:6,15 | 168:23 |
| 168:10,12 | 22:19 | 314:13 | 22:6,7,8 | **goals** 199:2 |
| 169:21 | 120:18 | 335:19,20 | 23:15 | **goes** 75:20 |
| 170:6 | 170:9 | 356:6 | 30:17 | 84:25 |
| 171:11 | 195:24 | **given** 9:25 | 34:21 36:8 | 136:12,12 |
| 173:21 | 241:16 | 19:24 | 47:18 | 137:22 |
| 186:8,13 | **gentleman** | 34:12,21 | 55:23 62:3 | 162:10 |

**ERIC WALDO  12/22/2022**

163:14
165:14
166:10
169:10
172:9
173:7
174:3
179:16
186:5
188:4
191:25
192:11
193:15
195:12
209:10
211:16
222:24,25
224:3
229:22
235:1
239:15
243:15
250:24
251:15
253:6
268:7
305:23
320:24
328:5,24
333:2
335:5
341:14
344:10
356:11
358:13,16
366:12
**going** 14:9
  16:7 18:19
  20:20 33:1
  53:11
  72:10,13
  72:16 83:8
  87:4 89:11
  103:17
  104:24
  108:13,17
  108:19
  114:1,3,4
  115:4,5

119:1
121:18
127:24
131:17
133:25
134:13,15
142:17
147:2
149:7
150:24
153:25
155:17
156:7,12
156:18
157:18,20
157:21
160:9,13
160:18
170:14
177:6,7,8
178:11
195:22,23
215:24
216:3,4,5
216:11,14
216:15,16
230:12,25
234:2,10
236:16,24
251:20,21
264:18
266:2
273:1
276:17
282:3,5
290:24
291:3
292:1,4
299:1
311:16,20
312:7
317:15
318:15
326:11,23
330:13
331:11
335:14
337:6,12
337:12

351:24
357:24
358:2
361:9
367:10
**good** 72:12
  80:18 96:6
  96:9 113:6
  168:22
  254:9
  334:17,18
  335:16
  358:18
  360:3,23
  361:1,4
  369:17
**good-bye**
  112:15
**Google** 3:24
  54:1,5
  118:15
  130:5,19
  151:9
  152:13,16
  153:3,11
  153:17
  154:8
  181:20
  258:9
  341:1
  351:18
  352:9
  354:8
**Google/Y...**
  20:8 55:7
  88:14
  118:3
  128:15
  181:24
  296:10
**gosh** 51:5
**gotcha** 41:22
  52:3 76:1
  90:20 91:2
  98:9
  100:23
  105:5
  109:5
  111:14

113:16
115:19
144:22
145:10
150:11
163:14
219:16
230:12
261:3
295:11
361:23
368:15
**gotten**
  152:10
**gov** 86:7
**gov-** 269:23
**government**
  17:14,16
  18:17
  19:16
  32:22
  46:12 54:2
  67:23
  72:24
  81:12
  83:24 86:1
  86:4,5
  89:1
  100:25,25
  101:11
  119:8
  125:1,4,9
  132:17
  140:22
  152:15
  153:5
  183:13
  191:3,8
  192:8
  209:11,13
  209:20
  235:12,23
  255:19
  269:23
  284:20
  285:8,21
  285:24
  291:2
  312:13

333:3,11
334:7
345:15
346:8
359:1,8,13
359:21
371:9
374:14
**governme...**
  153:7
**governors**
  50:17
**GQ** 354:15,24
  357:15,24
  358:1
**granted**
  318:24
**grants** 26:21
  27:1
**Graphika**
  284:3,4,5
**great** 51:1
  89:15
  132:16
  210:14
  211:25
  214:1
  230:23
  238:21
  262:5
  282:1
**greater**
  103:11
  111:20
  174:7,16
  175:8
  208:21
**greet** 131:8
**greeting**
  123:19
**grew** 16:3
**ground** 10:7
**group** 19:18
  43:5,9,12
  44:5,23
  45:16,17
  46:10
  47:10
  133:2,5

**ERIC WALDO  12/22/2022**

246:13
248:14
249:18
318:14
347:7
**groups** 12:13
49:22 50:1
50:5,14,16
50:16,20
86:23
182:11
231:10,16
231:25
232:1,16
233:2
245:13,21
245:24
246:3
248:1
258:6
267:22
268:3,9,24
275:15
276:11
299:7,18
300:4
**grown** 325:24
**guardrails**
359:13,22
**guess** 11:3
25:6 47:18
55:16 63:9
99:24
135:24
147:13
167:4
181:20,25
185:13,18
188:25
189:25
200:15
213:15,18
220:2
230:19
234:25
245:5
250:11,21
258:3
261:17

263:25
270:19
286:12
289:24
291:14
292:19
304:9
318:6
319:7
344:1
357:25
**guessing**
300:20
**guests**
355:16
**guidance**
168:13
**guide** 92:13
**guiding**
362:16
**gum** 30:21
**guy** 235:25
280:2
**guys** 91:17
119:3
128:7
195:12
239:6
254:8
264:4,16
268:13
275:7
277:5
279:2
293:3
294:20
296:25
297:8
307:11
318:6
343:5
366:24

——————
H
——————
**H-O-F-T**
287:1,4
**half** 45:13
223:23
**half-mea...**

303:11
305:24
**halfway**
178:23
270:2
**hall** 38:3
51:23
134:1
**halls** 132:9
**Hamlet**
254:17,22
**hand** 216:22
**handle**
122:12
326:12,24
**handling**
117:2
**Hang** 72:25
**happen**
156:12
183:22
241:4
300:23
**happened**
44:11
76:17
78:19 79:4
85:9 104:5
112:5
122:6
137:14
139:21
149:14,21
206:17
221:2
225:17,19
226:12
259:11
265:21
293:15
307:10
316:14
321:2
330:25
352:5
365:2
**happening**
33:17 87:1
90:18

121:25
124:20
145:11
175:20
184:4
337:17
**happy** 54:25
87:25
139:18
195:6
240:20,22
241:1
282:2
295:12
309:8
314:17
345:13
**hard** 34:20
62:10
106:23,24
146:12
147:14
188:25
202:16
**harm** 30:16
36:14 99:2
99:3,11,11
100:4,5,10
101:7,15
101:19,22
102:12,16
170:12
171:16
173:7,11
173:16,22
176:8
177:11
202:12
322:2
330:2
360:17
365:12
**harmed**
202:11,25
**harmful**
101:23,25
121:6
129:4,10
130:1

131:15
193:17,22
194:3,6,7
194:8,14
195:1,10
196:1
232:15
272:11
273:2,5
274:1
284:22
297:2
**harms** 199:13
199:15
217:25
219:6,13
231:5
335:6
**Hate** 45:1,12
193:1
**Haugen**
302:10,12
309:14
318:7
319:9
**hazard** 27:25
**hazardous**
28:1
**head** 10:19
14:25
20:11
38:16
57:19
64:18
70:21
100:7
141:2
190:12
235:24
**headline**
214:21,23
**heads-up**
18:19
32:23 65:5
88:21
127:24
145:7
146:9,21
148:5,7

**ERIC WALDO  12/22/2022**

| | | | | |
|---|---|---|---|---|
| **headwinds** | 122:4 | 280:19 | 252:11 | 263:3 |
| 298:25 | 123:14 | 285:12,13 | 282:20,21 | 266:9 |
| 299:23 | 129:9 | 285:15 | 286:6 | 299:25 |
| **health** 2:19 | 130:20 | 286:17,21 | 287:6,17 | 300:19 |
| 3:20 7:4 | 131:1 | 289:17,18 | 287:22,23 | 301:16,16 |
| 9:7 12:15 | 134:3 | 289:25 | 288:5,7 | 332:12 |
| 12:17,24 | 145:19,25 | 290:5 | 308:5 | 333:25 |
| 13:18,20 | 146:19 | 297:13 | **hearing** | 361:11 |
| 13:21,23 | 147:3,3,4 | 302:25 | 10:25 | 369:18 |
| 15:12 16:1 | 147:16 | 303:2,10 | **Heet** 5:15 | **helped** 19:12 |
| 16:13,16 | 148:1,19 | 303:13 | 7:9 8:4,19 | 48:12 |
| 17:2 18:6 | 149:4 | 305:12,17 | 375:3,22 | 60:24,24 |
| 22:3,17,23 | 153:14,19 | 305:21 | 376:21 | 70:9 92:12 |
| 22:24,25 | 154:9 | 310:17 | **height** | 92:13 |
| 24:17,22 | 156:24 | 311:11,12 | 251:12 | 304:1 |
| 24:25 25:8 | 157:4,25 | 311:17 | **heightened** | **helpful** |
| 25:11,24 | 161:6,9 | 312:4,5,6 | 171:1 | 243:9 |
| 26:3,14 | 162:7,12 | 313:4,6,6 | **held** 8:18 | 265:1 |
| 27:10,19 | 162:14,15 | 313:9 | 11:18 | 271:25 |
| 28:1,8,14 | 162:20 | 319:23,24 | 105:19 | 349:13 |
| 29:17,19 | 163:1,3,15 | 320:6,13 | 160:21 | **helping** |
| 29:25 30:3 | 163:16,19 | 321:19 | 179:4 | 12:12,18 |
| 30:4,7,8 | 163:21 | 322:8,21 | 198:15 | 16:5 22:24 |
| 30:11 | 165:17,17 | 324:22 | 240:14 | 22:25 36:1 |
| 31:11,16 | 165:21,23 | 330:17 | 250:17 | 49:3 50:24 |
| 31:18,20 | 166:11,17 | 332:19,24 | 337:23 | 52:19 |
| 35:15 | 167:2,7 | 334:1,23 | **hello** 123:18 | 60:14 61:4 |
| 36:13 37:9 | 168:11 | 335:2 | **help** 19:20 | 61:4 |
| 39:25 40:1 | 171:3 | 336:15 | 22:22 27:4 | 110:19 |
| 42:17 | 173:1,20 | 342:3 | 51:10 | 132:4,13 |
| 43:17 | 174:22 | 350:15 | 52:14,21 | 148:1 |
| 44:17 | 175:11 | 358:21 | 59:14 | 174:20 |
| 45:23 51:4 | 180:3 | 360:13,16 | 100:14 | 179:3 |
| 53:3 68:19 | 182:18 | 361:7 | 132:7,8 | 261:25 |
| 71:17 | 191:8,18 | **healthier** | 145:19 | 262:25 |
| 86:11 | 194:13 | 350:18 | 147:15 | 337:16 |
| 87:20 | 196:22 | **healthy** | 148:18 | 362:14 |
| 91:18 | 197:5 | 209:16 | 153:13 | **helps** 10:21 |
| 99:11 | 200:13 | 210:5 | 157:3 | 17:24 |
| 100:11 | 206:13 | 355:23 | 158:17,17 | 27:19 28:3 |
| 101:7,24 | 221:6 | 356:16 | 158:18 | 85:25,25 |
| 102:6 | 242:11 | **hear** 29:18 | 175:21,21 | 86:1 |
| 104:5,18 | 244:17 | 87:19 | 176:4,4,5 | 144:19,20 |
| 104:20 | 246:22 | 89:17 | 176:6 | 167:6 |
| 105:16 | 250:7 | 182:23 | 209:20 | **hesitancy** |
| 113:18 | 251:3,11 | 246:18 | 227:17 | 279:14 |
| 115:17 | 256:12 | 250:25 | 252:16 | 299:7 |
| 118:9,24 | 257:1,12 | 368:22 | 253:3 | **hesitanc...** |
| 119:3 | 270:12 | **heard** 207:13 | 262:11 | 300:11 |

**ERIC WALDO  12/22/2022**

| | | | | |
|---|---|---|---|---|
| **hey** 35:14,17 | 168:5 | 198:21 | 248:6,8,18 | 104:22 |
| 54:2 | **highest** | **Hoft** 286:25 | 248:22 | |
| 103:20 | 140:6 | 287:1,4,5 | 249:1 | **I** |
| 111:8 | 141:19,24 | 287:6 | **House** 50:11 | **idea** 16:13 |
| 118:16 | 142:1 | **hold** 12:7 | 64:13,19 | 17:8  29:21 |
| 119:10,19 | **highlight** | 298:9 | 67:17,25 | 35:8  83:3 |
| 120:18 | 117:10 | 321:13 | 68:5,13,14 | 83:10 |
| 121:17 | 137:23 | 356:5,9 | 81:12,16 | 102:8 |
| 147:9 | 236:9,10 | **holding** | 82:2,24 | 170:21 |
| 170:13 | 355:25 | 169:23 | 83:11,12 | 172:20 |
| 175:16 | 357:17,18 | 321:20 | 84:6  110:8 | 201:25 |
| 195:9 | **highlighted** | **holiday** | 110:11 | 202:17,22 |
| 257:11 | 197:5 | 254:13 | 122:23 | 329:7,16 |
| **HHS** 17:14 | 208:19 | **home** 373:1 | 124:4 | 357:11 |
| 26:18  43:4 | 215:4,7,13 | **honest** | 126:20 | **ideas** 339:11 |
| 43:13,13 | 215:25 | 297:17 | 127:5,12 | **identically** |
| 43:19 | 217:5 | **honestly** | 135:22 | 351:18 |
| 45:11 | 344:21 | 35:15 | 206:14,25 | **identified** |
| 46:15  48:3 | 356:5 | 133:7 | 217:21 | 45:5  97:2 |
| 132:20 | **highligh...** | 140:14 | 218:5 | 131:25 |
| 297:21 | 45:22  46:1 | 141:23 | 220:4,20 | 222:20 |
| 298:13,14 | 46:2 | 316:20 | 236:15,23 | 253:7,18 |
| 301:4,10 | 182:10 | **hope** 89:16 | 261:11 | 276:21 |
| 340:7 | 216:19 | 277:13 | 263:3 | **identifies** |
| 363:20,22 | 356:3 | 299:11 | 266:9,14 | 77:21 |
| 364:4,10 | **highlights** | **hopefully** | 291:5,6 | **identify** |
| 364:12 | 154:19 | 29:18 | 292:6 | 76:8,11 |
| 369:10 | 209:14 | 114:15 | 302:3 | 81:4 |
| **HHS.gov** | **highly-f...** | 117:4 | 363:13 | 202:19 |
| 373:12 | 229:14 | 181:4 | 365:21 | 204:11 |
| **Hi** 145:16 | **highway** | **hoping** 150:3 | 367:8 | 211:13 |
| 226:18 | 170:13 | 277:23 | **how'd** 52:24 | **identifying** |
| 238:16 | **Hill** 347:10 | **horizon** | **HSS** 132:2 | 76:2  99:10 |
| **high** 34:1 | **Hines** 6:15 | 146:14,18 | **huh-uh** 10:20 | **identity** |
| 86:25  87:4 | **hire** 39:12 | 146:24 | **human** 7:4 | 198:20 |
| 89:12 | **historic** | 147:20,21 | 68:19 | **IDO** 57:25 |
| 91:14 | 170:24 | 147:25 | 184:7 | **IG** 245:24 |
| 147:5 | 175:23,25 | 148:12,20 | **hundred** | **Iheme** 90:8 |
| **high-level** | 251:12 | 153:15,18 | 363:1 | 226:5 |
| 49:15 | 335:3 | 157:5 | **hurt** 99:12 | 237:5 |
| 50:19 | **history** | **host** 326:7 | 99:13 | **Illinois** |
| 86:16,19 | 107:13 | **hosted** 38:4 | 107:2 | 5:18  375:5 |
| 86:21  87:7 | **hit** 214:14 | 283:12 | **hybrid** | 375:8 |
| 87:18 | 307:17 | 331:6 | 372:25 | **illness** |
| 88:22 | **hitting** | **hour** 72:11 | 373:9 | 335:7 |
| 153:24 | 307:16 | 160:14,17 | **hypothet...** | **illnesses** |
| **high-risk** | **HIV/AIDS** | 335:15 | 104:9 | 24:10 |
| 166:12,19 | 27:8 | **hours** 5:12 | 167:5 | **imagination** |
| 167:18 | **hobbies** | 21:25 | **hypothet...** | 37:2 |

**ERIC WALDO  12/22/2022**

| | | | | |
|---|---|---|---|---|
| **imagine** 49:1 | 120:20 | **include** | 19:13 | 376:15 |
| 71:1 | 160:20 | 96:10,21 | 29:11 30:4 | **indicated** |
| 238:19 | 168:17 | 97:13 | 30:14 | 378:6 |
| **immediately** | 179:12,13 | 117:7 | 117:15 | **indicates** |
| 166:10 | 185:21 | 138:12 | 174:18 | 232:9 |
| 224:19 | 193:16 | 171:4 | 190:23 | 317:11 |
| 237:21 | 209:11 | 175:1 | 191:4 | 349:8 |
| 246:17 | 210:17 | 177:14,17 | 192:16 | **indicating** |
| 318:13 | 232:24 | 194:25 | 194:18 | 262:15 |
| **imminent** | 247:23 | 209:25 | 199:19 | **indication** |
| 162:19,25 | 305:10 | 249:8 | 217:22 | 121:5 |
| 163:13 | **impose** | 266:4 | 218:5 | 262:19 |
| 231:5 | 204:14,20 | 275:9 | 231:5 | **indicator** |
| **immoral** | 205:4 | 283:9 | 232:10 | 345:5 |
| 328:25 | **imposing** | 300:3 | 247:2 | **individual** |
| **impact** 3:20 | 268:8 | 317:6,16 | 251:10 | 79:16 |
| 36:14 | **impossible** | 325:19 | 268:5 | 116:7 |
| 109:24 | 233:9 | 348:23 | 284:20 | 138:18 |
| 158:8 | **impression** | 360:22 | 306:6 | 340:20 |
| 174:22 | 120:13,14 | 366:4,9 | 319:4 | 342:23 |
| 191:13 | 237:7 | **included** | 332:22 | 361:20 |
| 210:21 | **improve** | 13:13 | 340:20 | **individuals** |
| 211:3 | 28:14 | 97:19 | 342:24 | 117:16 |
| 242:11 | 29:19,20 | 118:6 | 363:13 | 158:23 |
| 336:15 | 30:3 31:16 | 171:9 | 369:3 | 349:18 |
| 358:20 | 117:2 | 233:10 | **incorpor...** | **inducing** |
| 361:6 | 144:20 | 247:6 | 284:12 | 299:7 |
| **impacted** | 175:18,21 | 268:19 | **incorrect** | **ineffective** |
| 147:8 | 273:3 | 300:24 | 15:8 | 166:18 |
| 258:4 | 274:24 | 301:1 | **increase** | **infants** |
| **imperative** | 303:2 | 366:14 | 100:14 | 365:6 |
| 172:22 | **improvement** | **includes** | 186:11,18 | **inference** |
| **implemen...** | 253:8,15 | 28:16 | 186:21 | 370:14 |
| 295:15 | 253:19 | 31:23 | 201:22 | **influencers** |
| **implication** | **inaccurate** | 107:19 | 203:25 | 50:2,6 |
| 54:22 | 140:10 | 136:14 | 229:8 | 222:2,10 |
| **implies** | 198:8 | 147:20 | 272:21 | **infomateur** |
| 204:19,24 | **inapprop...** | 182:1 | **increased** | 27:18 |
| **import** 334:1 | 171:6 | 205:7 | 186:7 | **information** |
| **importance** | **inaudible** | 207:23 | **increasing** | 30:8 46:21 |
| 12:14 | 328:6 | 211:19 | 272:14,17 | 47:12 |
| 89:16 | **inaugura...** | 229:13 | 275:9 | 52:22 |
| 114:14 | 55:12 | 248:13 | **independent** | 53:19 |
| 312:1 | **inbox** 20:24 | 262:24 | 309:13 | 65:18 |
| **important** | 134:19 | 280:10 | **indicate** | 73:20 74:6 |
| 90:1 | 214:14 | 297:2 | 109:18 | 76:8,11,23 |
| 102:21 | 260:14 | 350:16 | 111:23 | 77:11 |
| 114:24 | **incentivize** | **including** | 112:20 | 96:14 |
| 118:16 | 197:21 | 13:13,15 | 164:23 | 100:13 |

**ERIC WALDO  12/22/2022**

| | | | | |
|---|---|---|---|---|
| 102:19,22 | 345:11,15 | 213:20 | 42:21 | 375:18 |
| 102:22 | 345:22 | 339:1,9,12 | **institut...** | **interesting** |
| 103:7 | 347:19,22 | 339:19 | 37:3 | 78:14 |
| 110:3 | 348:1 | **inputting** | 205:15,24 | **interests** |
| 111:14,15 | 349:14 | 325:14 | **instruct** | 22:22 |
| 111:24 | 350:19 | **inquiring** | 65:19 | 198:21 |
| 121:7 | 355:24 | 107:7 | 77:12 | **internal** |
| 130:21 | 356:16,18 | 111:11 | 292:10 | 66:18 |
| 140:5,10 | 356:24 | 196:2 | 338:6 | 124:16 |
| 140:13,17 | 357:1,18 | **inquiry** | **integrity** | 211:8 |
| 141:18 | 358:6 | 148:11 | 304:24 | **Internet** |
| 152:6 | 367:14 | **Ins-** 245:16 | **intended** | 36:22 38:4 |
| 154:24,25 | 368:23 | **inside** 189:3 | 90:18 | 48:13 |
| 159:9,10 | 371:10 | 292:22 | 114:7 | 207:2,4,10 |
| 159:18 | **Informat...** | **insidious** | 171:10 | 207:24 |
| 163:16 | 229:21 | 162:19 | 235:7 | 213:8 |
| 165:6 | **informed** | 163:1,13 | 305:2 | 251:8 |
| 167:16 | 165:16,23 | **insight** | 320:1 | 283:10,14 |
| 168:22,24 | 225:14 | 154:17 | 359:20 | **interpret** |
| 169:1,12 | 253:9 | 159:14 | **intends** | 159:6 |
| 177:18 | 283:20 | 371:1 | 170:6 | **interpre...** |
| 179:9,24 | 324:1,3 | **insights** | **intense** | 94:5 |
| 193:20 | **informing** | 159:11 | 309:21 | 157:12 |
| 196:5 | 118:19 | 315:21 | **intention** | 195:3 |
| 198:8 | 352:18 | 367:22 | 168:22 | **interpre...** |
| 209:16,18 | 353:18 | **insights...** | **intentio...** | 165:13 |
| 210:6 | **Infrastr...** | 135:15 | 172:10 | **interrog...** |
| 211:2 | 68:25 | **Instagram** | 322:15 | 2:11 73:8 |
| 223:4,19 | **ingredients** | 182:1,2 | **intentions** | 73:12,18 |
| 229:2,9 | 297:4 | 229:23 | 34:10 | 73:21 74:6 |
| 231:18 | **initial** | 245:14,17 | **interact** | 75:3 76:23 |
| 271:3,18 | 145:15 | 245:21 | 291:15 | 135:5 |
| 272:2,5,11 | 149:20 | 246:4 | **interaction** | 157:21 |
| 273:3,7 | 151:17 | 248:1 | 37:15 | 223:13 |
| 292:10 | 298:2 | 258:8 | 84:17 | **interrog...** |
| 297:15 | **initiated** | 267:23 | 308:8 | 84:23 85:5 |
| 303:2 | 95:15 | 268:4 | **interact...** | 118:5 |
| 319:24 | **initiates** | 274:3 | 158:20 | 133:11,20 |
| 335:7,9 | 298:16 | 365:13 | **interest** | 136:6 |
| 336:6,16 | **Injuncti...** | **instance** | 27:10 | 222:21 |
| 336:18 | 2:10 73:8 | 19:15 | 131:11 | 225:11 |
| 338:5,18 | **innovation** | 132:7 | **interested** | **interrupt** |
| 338:21 | 57:19 | 133:25 | 11:10 | 10:11 |
| 339:9,20 | **inperson** | **instances** | 18:18 | 208:8 |
| 340:12,16 | 373:4 | 342:25 | 19:19,21 | **interrup...** |
| 340:18 | **input** 154:3 | **instant** | 37:5 111:2 | 62:9 |
| 343:10,13 | 162:1 | 340:23 | 266:6 | **interven...** |
| 343:21,22 | 164:5 | **institution** | 295:13 | 210:20 |
| 344:7,17 | 187:19 | 38:18 | 313:2 | 211:2 |

**ERIC WALDO  12/22/2022**

226:24
227:21,25
228:18,20
228:25
233:19,20
**interview**
354:15,24
355:2,4,20
357:3,5,10
357:12,16
358:1
**interviews**
331:24
**intro** 147:7
**introduce**
8:23 84:24
145:16
**introduced**
92:13
**introducing**
84:20
108:10
297:1
**introduc...**
149:13
181:6
218:21
219:18
**investig...**
276:21
**investments**
199:18
**invite**
263:11,24
**invited**
43:21 48:8
48:10,15
62:24 64:2
85:14 87:9
**inviting**
156:21
**involve**
58:16
150:12
232:13
**involved**
12:22 13:8
14:11
15:20 16:2

22:4 25:4
55:23
60:11 61:8
62:22 66:4
68:14
71:10,24
72:3,7
73:19 76:7
76:12 78:3
82:5
131:20,21
163:25
171:25
187:8,16
190:9
207:19
250:1
251:25
252:20
255:13
259:5
285:22,25
288:23
290:4
303:17,19
303:23
316:4
321:4
325:13
331:6
336:20,22
338:16,20
339:24
348:4,7
351:5,10
**involvement**
18:5 62:15
252:6
283:3,5
288:18
290:3
**involves**
203:11
255:9
**involving**
77:21
79:12 82:6
82:10
144:3

161:8
220:10
222:21
234:4
330:24
**IPA** 39:12
372:21
**iPad** 178:15
234:4
**Isola** 90:9
**isolation**
13:23
147:4
313:7
**issuance**
248:25
249:1
**issue** 16:7
16:13,24
26:14 27:5
27:19,23
28:13 29:8
29:16
30:12,13
36:13 40:7
40:17
56:16
89:15 96:5
98:19
111:4
114:9,14
117:2,3,17
117:18
118:17
120:12,20
121:17
122:2
126:7
146:13
147:15
149:5
172:21
187:3,5
205:16,24
228:1
238:19
252:21
259:1
266:14

292:4
307:16
311:10,12
311:17,20
312:9
313:4
314:25
320:13
324:8
357:18
**issued** 90:14
91:8 119:3
162:6
173:20
196:25
238:18
311:21
313:3
317:2
336:6
354:14
356:22
**issues** 12:14
12:20,21
12:25 13:2
13:6,10
18:5 22:17
22:23 23:2
26:3 27:9
30:2 41:3
44:20
45:17
50:21
60:22 61:6
67:24
73:15
86:17
115:1,8
120:8
126:4
145:18
147:2
254:4
291:16
311:25
312:4,7
324:6
333:25
334:8

338:13
**issuing**
27:16
205:8
**item** 176:23
**items** 46:7
83:20,21
83:24
93:15
112:22
123:23
200:3
**iterate**
243:17,21
**IX** 26:24

────────
          **J**
────────
**Jan** 88:13
128:15
**January**
55:17
61:21
213:1,4
217:21
218:4,13
218:23
219:2
221:9
323:11,18
324:17
325:1
326:6
**Jay** 287:7,9
**Jayanta** 6:14
**Jeff** 185:18
185:20,24
**Jefferson**
6:6
**Jen** 33:20
69:8 84:2
150:16
161:9
183:2,24
188:4
190:21
193:15
215:6
217:5,9
233:6

**ERIC WALDO  12/22/2022**

| | | | | |
|---|---|---|---|---|
| 247:12 | 9:5 | 222:19 | 363:16 | **kept** 142:17 |
| **Jenin** 6:16 | **joshua.e...** | 223:10 | 364:25 | 370:20 |
| 9:13 | 6:24 | 226:4,10 | 365:3,11 | **Kevin** 88:13 |
| **jeninyou...** | **jotted** | 227:3 | 367:18 | 128:14 |
| 6:18 | 166:21 | 228:20 | 368:4,17 | 151:24,25 |
| **Jennifer** | **Journal** | 231:23 | 369:13,21 | **key** 19:8 |
| 122:19 | 294:5,9 | 232:20 | 369:23 | 49:22 50:2 |
| **Jill** 6:14 | 302:5 | 233:25 | 372:9 | 50:5 58:10 |
| **Jim** 286:25 | **JR** 1:7 5:7 | 234:20 | **Junior** 8:14 | 138:10 |
| 287:4,6 | 5:22 | 235:3 | 288:4,6 | 139:4 |
| **Jiore** 260:22 | 376:10 | 237:6 | **Justice** 6:22 | 187:12,12 |
| 260:24,25 | 378:4 | 238:1,10 | 9:6 376:7 | 190:24 |
| 261:4,5,16 | **July** 17:4 | 238:14 | **justify** | **Kheriaty** |
| 262:12 | 37:17 | 242:21 | 307:24 | 6:14 |
| 263:7,14 | 38:11 | 243:6 | **Justine** 90:8 | 287:19,21 |
| 264:5 | 42:18 | 244:15,15 | | **kids** 298:10 |
| **job** 11:15 | 44:17 | 244:17 | **K** | **kids'** 298:19 |
| 12:10 | 45:13 | 247:5,22 | **k** 284:4 | 302:3 |
| 41:15 44:2 | 71:18 | 248:9,18 | **K-H-E-R-...** | 315:22 |
| 63:15 | 85:10 | 248:22 | 287:20 | 316:7,23 |
| 114:20 | 88:12,17 | 249:5 | **K-U-L-L-...** | **kill** 328:8 |
| 117:3 | 90:7 94:12 | 250:1 | 287:12 | 328:19 |
| 373:20 | 94:20 | 256:2,16 | **Kane** 88:13 | **killing** |
| **jobs** 53:24 | 96:24 97:4 | 260:15 | 128:15 | 33:25 93:4 |
| **Joe** 287:1,4 | 97:4,25 | 263:17 | 151:25 | 122:22 |
| 287:6 | 106:5 | 268:13,18 | **Kate** 90:9 | 150:25 |
| 355:5,7,10 | 115:7,20 | 269:18 | 283:23 | 214:20,22 |
| 355:14 | 118:1 | 274:7 | **keen** 239:16 | 234:21 |
| **jog** 228:8 | 122:18 | 277:5 | 239:24 | 238:22 |
| 230:8 | 123:12 | 311:6 | **keep** 72:16 | 239:23 |
| 269:9 | 129:14 | 330:14 | 113:13 | 244:16 |
| 354:20 | 144:23 | 367:18,18 | 122:7 | 260:16 |
| **John** 6:4 | 145:11 | 370:23 | 177:12 | **Kim** 57:19 |
| 8:25 | 150:6,17 | **jump** 139:18 | 246:14 | 58:21,25 |
| **john.sau...** | 151:14 | 139:21 | 248:15 | 290:13 |
| 6:7 | 155:20 | 197:3 | 253:9 | **Kim's** 63:15 |
| **join** 17:10 | 157:14 | **juncture** | 279:24 | **kind** 10:6 |
| 89:4 264:1 | 158:10 | 162:2 | 293:12 | 16:11,15 |
| 350:17 | 161:5 | **June** 11:20 | 312:7 | 18:12 23:1 |
| **joined** 9:1,5 | 184:16 | 12:5,6 | 368:13 | 25:3 27:12 |
| 63:1,2,3 | 192:9 | 14:6 17:10 | **keeping** | 28:21 29:7 |
| 263:21 | 193:4 | 17:13 | 142:21 | 29:8 30:6 |
| **joining** 82:1 | 196:25 | 21:16 | 166:24 | 30:8 31:25 |
| **joint** 250:17 | 212:24 | 22:14 23:4 | 168:7 | 32:1,15 |
| **Joseph** 1:7 | 213:7,10 | 23:6,13 | 211:21 | 36:18 |
| 5:7,21 | 214:18 | 24:7 54:16 | **Ken** 6:5 9:2 | 38:22 |
| 8:14 376:9 | 218:3,13 | 54:16 55:4 | **Kennedy** | 40:10 |
| 378:3 | 220:10 | 57:13 | 288:4,5 | 42:15 |
| **Josh** 6:21 | 221:9 | 139:15 | 373:22 | 44:19 47:7 |

**ERIC WALDO  12/22/2022**

| | | | | |
|---|---|---|---|---|
| 52:3,8 | 325:14 | 35:17,24 | 78:11,11 | 117:1,4,10 |
| 68:5 69:15 | 330:12 | 36:11,13 | 78:19,21 | 117:16 |
| 74:8 85:19 | 338:17,17 | 36:17,19 | 78:22 | 118:23 |
| 92:2 95:15 | 338:20 | 36:23 37:3 | 79:15,16 | 119:10,11 |
| 95:16 | 339:20 | 37:6,8,13 | 79:19,23 | 119:17,20 |
| 111:1,2 | 341:8,11 | 37:14,21 | 79:24,25 | 120:19,20 |
| 121:6,16 | 343:4 | 37:23 38:1 | 80:5,8,11 | 120:24,25 |
| 123:8 | 347:16 | 38:21 | 80:13,21 | 121:11,13 |
| 129:8,20 | 352:21 | 39:10,11 | 80:23 81:2 | 121:16 |
| 129:25 | 355:6 | 40:4,12,14 | 81:3,6,19 | 122:2,23 |
| 130:6 | 362:7 | 40:15 | 81:22 | 123:2,5,6 |
| 134:7 | 366:7 | 41:18 42:5 | 82:19 | 123:10,17 |
| 140:4,13 | 372:23 | 42:12 43:9 | 83:19,19 | 123:19,22 |
| 142:12 | 374:5 | 44:2,10,13 | 83:23 | 124:17,22 |
| 148:13 | **kinds** 19:9 | 46:10,25 | 84:16,19 | 124:25 |
| 149:19,21 | 37:8 | 51:4,5,22 | 85:2,5,7 | 125:5,6,24 |
| 150:12,16 | 103:14 | 52:1,5,19 | 85:23 86:4 | 126:1,3,9 |
| 151:7 | 191:9 | 52:24,25 | 86:6,8 | 126:13 |
| 153:3 | 249:24 | 53:2,3,8 | 87:23 88:2 | 127:6,6,14 |
| 154:3,25 | 332:1 | 53:14,16 | 89:15,25 | 127:15 |
| 163:2 | **Kingdom** | 53:25 | 92:13 93:1 | 128:3,5,6 |
| 174:11,17 | 235:16,24 | 54:12,14 | 93:4,15,20 | 128:11 |
| 191:17 | **knew** 53:14 | 54:18,25 | 93:25 96:3 | 129:20,24 |
| 195:10 | 53:24 | 55:3,4,16 | 96:4,7,13 | 130:2,13 |
| 206:6 | 73:17 | 55:18 56:1 | 96:22 97:1 | 130:24 |
| 207:23 | 147:1,6 | 56:11,18 | 97:2 98:5 | 131:9,10 |
| 208:6 | 255:23 | 56:20,20 | 98:24 99:7 | 131:22 |
| 210:25 | 291:11 | 56:25 57:3 | 99:9,12,14 | 132:6,6,9 |
| 211:7 | 321:1 | 57:8,23 | 99:21 | 132:23,25 |
| 227:17 | **know** 10:18 | 58:1 59:10 | 100:17 | 133:8,12 |
| 239:16 | 10:20 | 59:16 60:8 | 101:17,18 | 134:1 |
| 252:21 | 15:22,25 | 60:9,11,25 | 101:18,23 | 136:18,21 |
| 268:12 | 16:6,9,16 | 61:18 | 102:17,18 | 136:22,25 |
| 279:11 | 16:24 17:1 | 63:14,23 | 103:1,25 | 137:4,4,5 |
| 282:24 | 17:7 19:11 | 64:17 | 104:10,23 | 137:6,14 |
| 289:20 | 22:22 | 66:23 | 105:3 | 137:20 |
| 291:23 | 23:24 | 67:11,14 | 107:11,14 | 139:2,7,20 |
| 293:11 | 25:19,21 | 67:20 68:1 | 108:10,18 | 140:13,24 |
| 294:19 | 26:1,7,8 | 68:2 69:5 | 110:9,10 | 141:10,14 |
| 297:7 | 26:16,18 | 69:18,23 | 110:15 | 142:8,14 |
| 307:6,23 | 26:20,22 | 70:1,5 | 111:8,10 | 142:21,25 |
| 310:6 | 27:22 28:3 | 71:3,13,20 | 111:13,19 | 143:7,23 |
| 312:25 | 29:8,12,14 | 71:23 72:3 | 112:3,9,12 | 143:24 |
| 313:23 | 29:17,23 | 72:7 73:14 | 112:15,22 | 144:1 |
| 314:12 | 30:15,17 | 73:17,19 | 113:13 | 145:17 |
| 315:12 | 30:19,21 | 73:25 74:4 | 114:11 | 146:11 |
| 321:4 | 32:5,13 | 74:6,7 | 115:13,16 | 147:3,12 |
| 322:19,20 | 33:5 34:23 | 76:14,16 | 115:19 | 148:18,22 |
| 324:17 | 35:2,8,15 | 76:20,22 | 116:24,24 | 148:23,24 |

**ERIC WALDO  12/22/2022**

| | | | | |
|---|---|---|---|---|
| 148:25 | 202:12 | 277:24 | 346:13,22 | 137:18 |
| 149:3,19 | 203:12 | 279:12,20 | 347:3,24 | 139:24 |
| 150:5,11 | 204:2 | 280:14,24 | 348:3,6 | 141:16 |
| 150:20,23 | 205:9 | 281:11 | 349:13 | 182:15,16 |
| 151:2,24 | 207:7 | 282:5 | 351:21 | 184:17,18 |
| 152:4,11 | 209:10,12 | 286:4,5,9 | 354:3,4,5 | 186:3 |
| 152:23 | 210:16 | 286:12,15 | 354:9,11 | 189:11 |
| 154:8,23 | 212:11,11 | 287:21 | 354:13 | 195:4 |
| 155:2,12 | 212:17,23 | 288:8,19 | 355:3 | 196:13 |
| 156:1,17 | 213:11,12 | 288:21 | 357:4,8,9 | 284:15,17 |
| 157:3 | 213:15,19 | 289:2,21 | 357:11,14 | 311:8 |
| 158:18,25 | 215:20 | 290:2,17 | 358:19 | 323:8 |
| 159:11,17 | 216:4,20 | 290:20 | 359:17,18 | 324:15 |
| 159:20,21 | 217:9,13 | 293:16,20 | 359:19,20 | 334:9 |
| 159:21 | 218:25 | 293:23,24 | 359:21,24 | 338:15 |
| 164:6,11 | 222:7,12 | 296:2,5,6 | 361:5,16 | 339:25 |
| 167:14 | 224:7,16 | 297:8,11 | 361:19,22 | 347:20 |
| 168:8 | 224:17 | 300:14 | 362:20,21 | 348:2 |
| 169:25 | 225:18 | 301:6 | 362:23,24 | 355:12 |
| 170:5,10 | 228:11,19 | 304:6,24 | 363:1,2,5 | 361:25 |
| 170:11,16 | 230:24 | 306:9 | 364:13 | 367:16 |
| 170:21 | 234:23,24 | 307:22 | 367:5,6,7 | 369:12 |
| 171:18 | 235:2,14 | 308:21 | 367:12 | 372:15 |
| 176:11 | 235:22 | 312:13,15 | 369:20,21 | **knows** 106:23 |
| 178:2 | 236:5,14 | 312:20 | 370:16 | **Kristina** |
| 180:6,25 | 237:2,21 | 313:5 | 372:5,10 | 132:4 |
| 181:2 | 241:3 | 314:5,24 | 372:13,17 | 298:10,12 |
| 182:1,3 | 243:23 | 315:2,3 | 372:19,22 | 301:4,5,9 |
| 184:1,7,19 | 250:4 | 320:1,20 | 373:13,14 | 301:13 |
| 184:22,24 | 252:13,14 | 323:3 | 373:19 | 364:3 |
| 184:25 | 252:15,21 | 327:24 | 374:2 | **Kulldorff** |
| 185:4,11 | 253:2,17 | 328:6,16 | **knowledge** | 6:14 |
| 185:18,24 | 253:21,24 | 329:6,13 | 14:12,13 | 287:11,14 |
| 186:1,4,9 | 254:17 | 329:19 | 15:14 18:7 | **Kumar** 7:4 |
| 186:20 | 255:1,17 | 331:5 | 37:11 59:3 | 9:6 |
| 187:2 | 256:1,9 | 333:19 | 60:4,21 | **Ky-** 229:7 |
| 188:7,9 | 257:17 | 334:10 | 61:11,25 | **Kyla** 39:1 |
| 189:1,5,6 | 259:11,23 | 335:7,11 | 62:5,18 | 47:17,19 |
| 189:8,9,10 | 261:15 | 335:12 | 63:8,11,22 | 47:20 48:8 |
| 189:11,13 | 262:10,18 | 337:12 | 64:20 | 58:20,21 |
| 189:16,21 | 263:2 | 338:17 | 67:10 70:8 | 59:4,6,10 |
| 190:3,3,5 | 264:17 | 339:1,5,5 | 70:15,19 | 59:14,16 |
| 190:11,15 | 265:9,21 | 339:8,10 | 72:2 81:1 | 59:20,24 |
| 192:4,7 | 266:4 | 339:18,22 | 84:10,12 | 60:14 61:4 |
| 194:21 | 270:15 | 340:8 | 84:13 | 62:1,19,24 |
| 195:9,10 | 271:22 | 341:8,12 | 91:24 | 85:13 |
| 196:3,18 | 273:13 | 342:4,16 | 99:25 | 86:20 87:7 |
| 198:10 | 274:11,13 | 342:18 | 105:11 | 89:4 90:8 |
| 201:15 | 275:3 | 346:4,7,9 | 110:1 | 91:14,23 |

**ERIC WALDO  12/22/2022**

| | | | | |
|---|---|---|---|---|
| 92:18 | 194:19 | layperson's | 73:23 | 352:14,18 |
| 116:18,20 | 202:10 | 167:15 | 376:1,18 | 353:2,6,10 |
| 144:7 | 279:20 | lead 49:21 | lengthy | 353:11,14 |
| 149:13 | languages | 51:24 | 282:17 | 353:17,21 |
| 151:8 | 202:13,15 | 60:23 | Lesko 60:13 | 353:25 |
| 153:23 | laptop | 167:12,17 | 60:16 61:8 | 354:3 |
| 157:18,21 | 178:15 | 168:4 | 61:22 | 376:19 |
| 159:1,21 | large 16:8 | 199:1 | 62:15 | letters |
| 160:6 | 350:14 | 291:11,13 | 63:24 | 351:12 |
| 164:11 | largely | leader 49:18 | 137:6,10 | 352:21,24 |
| 174:18 | 294:12 | 51:13 | 289:4 | letting |
| 187:8,13 | lastly 276:2 | 261:6 | 290:9,13 | 66:23 |
| 188:16,20 | late 11:20 | leading | 339:11,23 | 128:4 |
| 226:5,18 | 140:20 | 37:17 | 348:21 | 148:23,24 |
| 227:14,24 | 224:4,14 | 67:17 | 349:2,6 | level 33:15 |
| 228:8,11 | 224:24 | 172:25 | 350:2 | 34:1 86:25 |
| 229:6,7 | 225:1 | 173:10 | 351:12 | 87:4 89:12 |
| 230:2,16 | 290:20 | 298:11 | lessen | 91:15 |
| 230:19 | 293:18 | leaked | 117:14 | 125:3 |
| 232:8,12 | 365:3 | 294:12 | let's 11:14 | 140:6 |
| 232:25 | latest | leaker | 26:18 | 147:5 |
| 233:4,10 | 136:13 | 302:10,18 | 72:18,18 | 194:15,22 |
| 233:25 | launch 38:2 | learn 30:18 | 77:17 | Lexitas 7:10 |
| 235:6 | 38:6,10,15 | 41:15 | 94:11 | 8:21 376:1 |
| 237:8 | 38:24 | 101:16 | 112:16 | 376:18 |
| 263:19,21 | 48:14,22 | 173:12 | 196:21 | liaison |
| 289:3 | 206:19,20 | 176:9 | 210:9 | 12:12 |
| 290:12 | 206:20,23 | 264:10 | 214:2 | 50:24 |
| 338:22,24 | 212:19,21 | 265:7 | 225:21 | 125:3 |
| 339:8,10 | 266:3 | leave 61:1 | 234:2 | Liberties |
| 339:23 | 316:22 | 61:14,16 | 260:13 | 6:16 9:14 |
| 342:1 | launched | 112:21 | 297:23 | lies 328:7 |
| 362:9,15 | 17:4 59:22 | 296:13 | 302:4 | 328:18 |
| 372:3 | 86:12 | 298:6,7 | 309:12 | 329:1 |
| 373:2 | 122:11 | 323:18,25 | 319:13,19 | lieu 264:8 |
| Kyla's 93:14 | 206:13 | 324:18 | 330:19 | life 24:8 |
| 340:1 | launching | 325:3 | 331:10 | 26:23 |
| | 309:19 | 331:1,3 | 343:24 | 346:7 |
| **L** | Lauren 69:11 | 348:10,13 | 347:4 | light 256:13 |
| L 6:22 376:7 | 85:12 | 351:7,9 | 351:24 | 257:2,13 |
| label 177:9 | 144:3 | led 166:12 | letter 3:24 | 270:12 |
| 203:12 | 145:16 | 297:19 | 4:2,3,4,5 | lightly |
| labels | law 346:9 | 301:13 | 4:6 349:4 | 14:19 |
| 177:15 | lawful 9:18 | left 43:22 | 349:9,21 | 70:12,12 |
| 229:16,21 | lawsuits | 61:2 68:4 | 349:25 | likelihood |
| Lambert | 73:25 | 183:1 | 350:5,21 | 47:15 |
| 132:1 | lawyer 49:11 | 364:11,11 | 351:4,6,8 | 170:17 |
| language | 255:2 | legal 7:10 | 351:11,18 | likening |
| 156:23 | lawyers 74:4 | 8:20 73:15 | 352:8,11 | 163:2,3 |

**ERIC WALDO  12/22/2022**

| | | | | |
|---|---|---|---|---|
| **likes** 197:22 | 24:14 | 30:17 | 199:18 | 119:19,19 |
| **limit** 101:12 | 182:12,15 | 49:11 | **longer** 21:24 | 127:4 |
| 101:15 | 258:10,12 | 50:11 | 72:14 | 135:6 |
| 102:12,16 | 351:18 | 75:22 | 180:10 | 164:13 |
| 103:6 | 352:16 | 92:14  93:6 | 280:6 | 303:25 |
| 170:18 | **links** 306:20 | 96:8  98:12 | 282:5 | 308:12 |
| 273:5 | **list** 14:24 | 98:12 | 308:22 | 359:7 |
| 358:24 | 19:13 | 99:15 | **look** 23:15 | **looking** 21:2 |
| **limited** | 22:12 | 100:18 | 36:8  75:21 | 24:12 |
| 150:1 | 50:19 | 119:6 | 87:6  88:1 | 78:15  94:3 |
| 296:22 | 53:12 | 124:10 | 89:16  90:2 | 140:19 |
| 315:4 | 58:12,24 | 131:17 | 93:2  98:7 | 142:22 |
| **limiting** | 126:12,12 | 143:19 | 103:17 | 188:23 |
| 101:22 | 140:24 | 157:18 | 119:10 | 190:6 |
| 272:10 | 141:24 | 169:12 | 121:23 | 215:12 |
| 273:2 | 296:22 | 183:8 | 142:24 | 228:16 |
| **limits** | 300:25 | 197:12 | 148:25 | 240:10 |
| 170:14 | **listed** 49:17 | 238:20 | 154:1 | 295:10 |
| 229:14 | 57:18 | 256:1 | 167:9 | 298:9 |
| 358:19 | 78:23,24 | 271:5 | 195:6 | 314:19 |
| 359:11,20 | 79:2  85:11 | 321:9 | 201:14 | 315:19 |
| 361:5 | 85:11 | 322:3,3 | 206:12 | 353:14 |
| **line** 60:18 | 88:11 | 344:10 | 212:3 | 363:9 |
| 90:6 | 133:20 | **live** 162:24 | 214:16 | 367:21 |
| 136:14 | 134:8 | 203:5,18 | 215:22 | **looks** 143:8 |
| 179:11 | 135:17 | 203:20,24 | 216:18 | 143:10 |
| 224:13 | 163:24 | 358:17 | 225:21 | 240:18 |
| 250:15,19 | **listen** 11:7 | 361:9 | 234:2,4 | 263:18 |
| 265:8 | 29:18 | **lives** 180:12 | 236:4 | 276:8,18 |
| 306:1,15 | **listened** | 251:13 | 247:15 | 280:17 |
| 306:21,25 | 43:16 | **living** | 260:13 | 298:5 |
| 378:8,10 | 327:5 | 190:18 | 267:2 | 316:8 |
| 378:12,14 | **listening** | **located** | 277:16 | 331:23 |
| 378:16,18 | 41:12,21 | 364:9 | 280:6 | 353:22,24 |
| 378:20,22 | 46:19 | **locations** | 292:20 | 367:19 |
| **lined** 272:9 | 123:20 | 5:15 | 297:23 | 370:20 |
| **lines** 170:18 | 241:23 | **loneliness** | 302:4 | **loop** 51:24 |
| 353:24 | **lists** 85:22 | 13:23 | 309:8,12 | 53:2  112:8 |
| **link** 11:1 | 186:7 | 147:4 | 315:8 | 252:14 |
| 261:5 | **Listserv** | 313:7 | 319:13,19 | 255:14 |
| 306:14 | 132:11 | **long** 11:18 | 330:19 | **looped** 43:15 |
| 349:20 | **litany** 50:17 | 12:3  72:14 | 331:10 | 44:15  53:8 |
| **linked** | **literal** | 216:14 | 333:15 | 67:21,21 |
| 102:13 | 313:14 | 261:7 | 344:3 | 125:13 |
| 267:23 | **literally** | 295:13 | 345:14 | 241:5 |
| 268:4,5,10 | 23:14 | 302:4 | 347:4 | 252:10,12 |
| 275:22 | **little** 16:3 | 303:11 | **looked** 74:14 | 301:14 |
| **LinkedIn** 4:3 | 20:19 | 305:24 | 74:16  93:6 | **looping** |
| 21:6,19 | 26:16 | **long-term** | 93:10 | 126:10,17 |

**ERIC WALDO  12/22/2022**

| | | | | |
|---|---|---|---|---|
| **lot** 47:5 | 49:5 50:23 | 351:9,20 | 116:15,17 | 300:25 |
| 48:7 53:6 | 58:21 | 352:10 | 137:9 | 305:4 |
| 70:10,11 | 125:2 | 354:24 | 213:16 | 324:5 |
| 96:5 | 143:15 | 367:24,25 | 224:5,15 | 333:10 |
| 115:13 | **maintain** | **marching** | 262:15,17 | 337:8,9,10 |
| 127:4,5 | 52:14 | 301:11 | 265:11,25 | 343:19 |
| 140:19 | **maintaining** | **mark** 335:14 | 362:16 | 344:11 |
| 168:10,11 | 51:14 | 349:9,22 | **matters** | 351:15 |
| 169:21 | **major** 324:6 | 350:1 | 73:23 | 372:22 |
| 172:2 | 343:14,23 | **marked** 20:22 | 128:23 | 373:7 |
| 183:15 | 347:12 | 21:5 49:10 | **Max** 60:13,23 | **meaning** 11:3 |
| 195:11 | **majority** | 49:15 | 61:3,8,11 | 370:1 |
| 241:16 | 373:9 | 178:12 | 62:13 | **meaningful** |
| 306:4 | **making** 62:9 | 205:19 | 63:10 | 199:18 |
| 307:15 | 100:6 | **Marsh** 133:1 | 137:6,10 | 272:21 |
| 316:24 | 103:9 | 133:2,8 | 137:13 | **means** 46:2 |
| 324:9,16 | 108:11 | **Martin** 6:14 | 289:4 | 57:23 |
| **lots** 306:8 | 143:22 | 287:11,13 | 290:9,13 | 63:17 |
| **Louis** 7:11 | 210:20 | **Marvin** 43:23 | 339:11,14 | 175:16 |
| 376:2,18 | 211:2,13 | 43:25 44:1 | 339:23 | 177:5 |
| **Louisiana** | 254:9,19 | **mask** 24:1 | 348:21 | 209:20 |
| 1:1 5:1,20 | 275:14,15 | 166:22 | 349:2,6,17 | 277:24 |
| 6:9,10,11 | 275:21 | 167:1 | 350:2 | 278:1 |
| 8:17 9:12 | 279:1 | 168:6 | 351:12 | 306:9 |
| **love** 88:1 | 281:10 | **masked** 24:5 | 362:13 | 327:23,24 |
| 89:17,17 | 328:6,17 | **masks** 166:12 | **mayors** 50:17 | 333:19 |
| 146:13 | 346:9,11 | 166:17,22 | **mean** 13:5 | 342:19 |
| 153:14 | 359:6 | 167:17 | 16:13 17:2 | 358:17 |
| **loved** 165:17 | **man** 15:1 | 168:4 | 19:23 | 360:25 |
| **lower** 201:6 | **manage** 52:19 | **match** 221:10 | 26:15 | 370:4,12 |
| 277:1 | **managed** | **matchmaking** | 28:21 | 370:17 |
| 332:10 | 187:18 | 82:15 | 29:10 | **meant** 25:16 |
| **luck** 115:24 | **management** | **material** | 36:10 41:4 | 25:19 34:9 |
| 115:24 | 50:1,5 | 166:25 | 45:4,21 | 170:1 |
| **lunch** 160:18 | 51:10 | **materially** | 50:4 78:15 | 171:10 |
| 213:24 | 228:5 | 159:17 | 101:15 | 174:1 |
| 214:9 | **managing** | **matter** 8:13 | 104:6 | 248:22 |
| **lying** 244:3 | 21:24 | 12:19 | 108:14 | 258:1 |
| 271:21 | **Manning** | 19:13 34:3 | 112:14 | 266:20,20 |
| ————— | 363:14 | 39:1,2,6 | 123:17 | 278:3 |
| **M** | 367:9 | 39:19,22 | 131:7 | **measure** |
| **magazine** | **March** 59:22 | 39:23,24 | 159:16 | 191:13 |
| 284:7 | 61:21 | 40:6 41:14 | 170:6 | 251:17 |
| 354:15,24 | 71:18 | 52:16 | 175:9,15 | **measures** |
| 357:6,15 | 323:19 | 58:22 60:6 | 241:10 | 273:4 |
| **magnitude** | 324:14,17 | 62:25 | 252:3,4 | 274:25 |
| 99:3,6 | 336:5 | 86:25 | 265:13 | 275:2,9 |
| **main** 45:22 | 348:11 | 92:15,17 | 277:20 | **measuring** |
| 46:1,3 | 350:1 | 110:2,4 | 293:22 | 35:23 |

**ERIC WALDO  12/22/2022**

| | | | | |
|---|---|---|---|---|
| 36:14 47:3 | 134:11 | 323:22 | 123:12,13 | 237:7,24 |
| **mechanism** | 150:24 | 324:10,13 | 123:16 | 238:1,4 |
| 340:7 | 169:24 | 327:21 | 127:21 | 239:10 |
| **media** 20:1,2 | 170:8,22 | 330:8 | 128:14,18 | 240:5,8,12 |
| 20:5,13,16 | 171:12 | 336:7 | 129:2,14 | 240:17 |
| 28:7,17,18 | 172:9 | 340:22 | 130:10 | 241:9,12 |
| 29:1,2 | 173:3 | 341:10,14 | 131:18,20 | 241:17 |
| 31:2,5,12 | 174:11 | 344:18 | 131:21,24 | 242:4,6,18 |
| 32:2,6,10 | 175:1 | 347:17 | 132:24 | 243:22 |
| 32:17 | 176:24 | 348:18,22 | 133:11,13 | 244:1 |
| 33:24 | 178:5,6 | 351:13 | 136:5,8,19 | 247:6,23 |
| 35:11 46:4 | 179:25 | 355:22 | 137:2,4 | 248:6,9,18 |
| 51:12,16 | 180:15,24 | 356:15,24 | 142:5,6,11 | 248:23 |
| 51:19,21 | 181:23 | 358:11 | 142:15 | 249:2,5 |
| 52:10,11 | 182:7,13 | 359:3,10 | 153:16 | 250:1,6,14 |
| 52:24 | 183:21 | 361:17 | 155:7,12 | 268:14 |
| 54:17 55:6 | 184:3,9,16 | **medical** | 155:16,17 | 298:16 |
| 57:15 61:9 | 184:20 | 132:12 | 156:1,4,6 | 299:16 |
| 61:23 | 185:10,25 | 182:22 | 156:13,18 | 300:14,21 |
| 62:16,23 | 190:23 | **Mediverse** | 156:22 | 300:24 |
| 63:7,20 | 191:4,10 | 309:20 | 157:14,20 | 301:1,18 |
| 64:7,22 | 192:5,14 | **meet** 113:12 | 158:11 | 308:20,23 |
| 66:25 | 193:5 | 146:21 | 159:3 | 309:4 |
| 67:12 68:9 | 197:20 | 222:15,18 | 160:3,6 | 311:24 |
| 68:15 | 198:6 | 225:9,15 | 195:16,17 | 312:15,22 |
| 74:19 | 201:7 | 239:8,11 | 195:17 | 314:7,13 |
| 75:16 76:4 | 202:18 | 243:3,7 | 218:16,21 | 314:17 |
| 78:25 79:6 | 204:10 | 264:9 | 219:24,25 | 316:2,11 |
| 81:23 | 205:12 | 308:25 | 220:24 | 316:14,19 |
| 82:10 | 206:6 | 311:23 | 221:4,21 | 317:2,12 |
| 83:25 88:6 | 209:25 | 315:25 | 222:1,7,12 | 317:18 |
| 91:20 92:4 | 211:20 | **meeting** | 222:15,19 | 320:14 |
| 92:20,21 | 215:2 | 43:20 | 223:1,7,12 | **meetings** |
| 93:3,15 | 217:8,12 | 44:10 | 223:18 | 74:10 |
| 98:22 | 217:17,23 | 46:15 48:3 | 224:4,13 | 75:16 76:2 |
| 101:5,10 | 218:7,7 | 77:21,22 | 224:21,24 | 76:8,12,15 |
| 102:10,11 | 219:11,11 | 78:3,6,12 | 225:5,10 | 76:19 |
| 102:15 | 246:23 | 78:16,17 | 225:15 | 77:18 |
| 103:15,25 | 247:2 | 78:20,24 | 226:10,11 | 78:22,23 |
| 104:7 | 251:10 | 79:8,9,11 | 226:22 | 79:3 91:5 |
| 105:8 | 264:19 | 79:17,20 | 227:4,5,7 | 133:17,17 |
| 107:23 | 276:22 | 84:16 | 227:11 | 133:22 |
| 110:3 | 279:11 | 85:10,11 | 228:21 | 134:8 |
| 115:21 | 285:2 | 86:9,13 | 231:23 | 157:9 |
| 116:22 | 294:18 | 88:11,12 | 232:20 | 215:1 |
| 117:7,18 | 303:9 | 88:17 89:2 | 233:4,16 | 218:11 |
| 120:3 | 305:13,20 | 90:7,13,16 | 233:24 | 221:8 |
| 123:4,7 | 313:16 | 91:8 106:5 | 235:5,8,9 | 241:16 |
| 133:19 | 323:2,13 | 118:1 | 236:7,22 | 254:2,6 |

**ERIC WALDO  12/22/2022**

264:2
300:23
312:16,24
313:15,16
313:17
324:1,3,9
324:11
332:2,6,9
336:22
343:5
373:4
**meets** 223:8
**member** 16:20
18:1 48:11
49:3 185:2
185:21
291:7
364:1
**members** 22:1
23:19 24:2
47:16 51:3
51:25 58:1
164:14
183:22,23
184:4,23
185:7,14
185:15
209:19
291:21
362:22
**membership**
19:17
**memory** 228:8
241:15
269:9,19
354:21
**mental** 12:17
12:24
13:18,21
13:23 16:1
22:3,17,23
22:24,25
31:18 51:4
134:3
147:3,3,4
149:4
312:5,6
313:6,6
324:22

**mention**
24:17 88:4
290:22
310:9
**mentioned**
12:23 15:1
17:9 18:8
19:8,22,25
20:4,12
26:12 29:5
29:12
32:18
37:14,19
38:9 39:21
40:9 48:20
53:1 54:11
56:3,5
60:16
76:16 88:8
103:4
106:11
112:25
119:23
122:19,20
124:13
126:5
141:4,4
149:12
176:12
187:7,22
187:23
227:14
239:2
255:16
256:10,17
283:15
289:9
290:8,10
293:10
312:13
315:1
317:17
318:2
323:16
351:8
357:9
368:10
**mentioning**
289:8

**mentions**
84:22
85:13 90:9
131:19
132:22
**merit** 273:17
**merits** 253:1
**mess** 294:6
**message** 3:2
32:5,9
65:11
107:18,22
108:3,5
161:21
162:14
176:7
180:23
181:4
238:9
239:1,15
305:2
306:4
322:21
325:14
331:23
332:19,21
334:24
**messages**
229:15
327:12
330:17
332:2
**messaging**
176:8
322:23
330:13
331:20
332:25
334:23
340:23
347:24
**met** 235:2
236:6,14
237:7
246:9
252:15
**metaphor**
360:1
**metastases**

99:16
**method**
200:25
**methods**
100:5
**Mexico**
149:25
**mic** 92:15
**Microsoft**
4:6 153:9
182:13,15
351:19
353:10,21
353:22
354:12
**middle**
210:15
269:25
**mighty** 315:3
**Milano's**
324:22
**million**
276:9
**mind** 128:23
175:15
215:14
236:4
**mine** 152:12
309:11
**Minister**
235:16
**minute** 78:6
255:13
**minutes**
72:15
282:4
**mis** 261:25
**mis-** 39:25
40:1 41:13
42:16 43:6
43:7,17
56:17 57:5
58:13,23
59:1,6
60:9,22
63:14,21
64:8 68:10
96:15,16
97:17,20

98:21,24
99:10
104:18,20
118:9
168:18
242:11
251:11
262:16,20
263:4
289:18
299:6,17
300:3
313:5,9
330:18
342:3
**MIS-C** 366:16
**mis/dis**
263:1
**Mischara...**
328:12
**Mischara...**
224:9
360:11
**misinfo**
261:6,15
296:21
317:5
318:16
**misinfor...**
3:21 13:16
13:25
15:13
16:14,17
17:3 18:6
18:10
24:18,22
24:25 25:8
25:24
26:14
27:15 28:9
28:23
29:25 30:4
30:7,12,12
31:7,10,12
31:22 32:7
35:5,22,25
37:18 41:3
41:6 44:20
44:24

**ERIC WALDO  12/22/2022**

| | | | | |
|---|---|---|---|---|
| 45:23 47:5 | 156:8,24 | 230:3 | 321:21 | 275:12 |
| 47:7 59:19 | 157:4,10 | 231:11 | 322:15 | **Missouri** 1:4 |
| 61:6 64:23 | 157:15 | 234:18 | 323:5 | 5:4,18,21 |
| 67:1,23 | 158:1,9 | 236:16,23 | 326:11,13 | 6:3,5,6 |
| 68:2,16 | 159:24 | 242:12 | 326:22,24 | 7:11 8:14 |
| 70:2 71:14 | 162:7,15 | 244:8,12 | 327:20 | 9:1,2 |
| 73:15,24 | 162:25 | 246:15 | 328:7,18 | 375:6,7 |
| 74:24 | 163:3,12 | 248:15 | 329:1,12 | 376:2,9,18 |
| 75:17 76:5 | 163:15,20 | 249:10,19 | 330:1,10 | 378:3 |
| 80:1,9,9 | 164:18,24 | 254:4 | 331:13 | **mitigating** |
| 80:15,19 | 165:5,15 | 256:12 | 332:13,14 | 172:24 |
| 81:23 83:2 | 165:22 | 257:2,14 | 333:13 | **mix** 44:8 |
| 83:7,13,21 | 166:11,17 | 262:13 | 334:8 | **mode** 41:21 |
| 84:1,25 | 167:2,8,13 | 265:3,18 | 336:7,15 | 123:20 |
| 85:2 86:11 | 168:3,12 | 266:10 | 338:1,14 | 241:23 |
| 87:20 92:5 | 168:14 | 267:15,20 | 340:19 | **moderate** |
| 96:11 | 169:11,17 | 271:15 | 341:23 | 203:5,22 |
| 97:14,20 | 169:25 | 274:8 | 342:23 | **moderating** |
| 101:5,13 | 171:16 | 275:17 | 343:1,11 | 203:10 |
| 102:14 | 172:11,25 | 276:5,12 | 343:14,22 | **moderation** |
| 105:7 | 174:23 | 280:3,19 | 343:23 | 201:23 |
| 106:18 | 176:3,15 | 280:22 | 344:12,14 | 202:6,8 |
| 107:8,24 | 176:20 | 281:1,16 | 344:18 | 203:17,24 |
| 110:22 | 177:1,11 | 281:22 | 345:1,7 | 204:1 |
| 115:4,7,17 | 178:7 | 284:13,23 | 347:12 | **modern** |
| 116:11,23 | 179:3 | 285:7,13 | 350:15,24 | 169:10 |
| 117:15 | 180:7,16 | 285:16,20 | 350:25 | 171:7,20 |
| 121:3 | 182:17,21 | 286:14,17 | 351:1 | **modulation** |
| 123:3,25 | 183:10 | 286:21 | 355:8,15 | 201:2 |
| 124:7,20 | 190:4 | 288:10 | 355:17 | 202:1,2,6 |
| 126:4,24 | 191:14 | 289:1 | 357:19,25 | **moment** 14:14 |
| 128:4 | 192:13 | 291:22,23 | 358:7 | 135:6 |
| 129:5,10 | 197:8,17 | 294:6,11 | 359:2,10 | 145:1 |
| 129:22 | 198:12 | 294:19 | 359:22 | 197:11 |
| 130:1,7,14 | 199:19,23 | 297:3 | 360:9,16 | 205:17 |
| 131:1,15 | 199:25 | 299:24 | 360:19,22 | 208:12 |
| 133:12,13 | 200:1,5,22 | 302:7,25 | 365:12,22 | 210:11 |
| 133:24 | 201:9,18 | 303:10 | 366:2,8 | 211:25 |
| 137:24 | 202:2,9,19 | 305:12,17 | 370:8 | 251:2 |
| 138:19 | 203:4,10 | 305:22 | **misinfor...** | 264:2 |
| 139:5 | 204:1,6 | 310:13,17 | 291:16 | 287:24 |
| 141:11,21 | 205:25 | 311:7,11 | **misleading** | 297:19 |
| 142:2 | 208:23 | 311:17 | 163:15 | 327:7 |
| 145:19,25 | 210:18 | 312:5 | 165:9 | 332:23 |
| 147:16 | 211:9,14 | 317:15 | 231:18 | 356:6 |
| 148:2,19 | 220:6,12 | 318:3 | 232:2 | **momentarily** |
| 153:14,19 | 220:21 | 319:2,10 | 273:6 | 20:25 |
| 154:10 | 221:6,17 | 320:7,13 | **missing** | 134:18 |
| 155:8 | 222:4 | 321:12,15 | 255:22 | **Monday** 150:3 |

| | | | | |
|---|---|---|---|---|
| 150:5 | 202:8 | 107:10 | 223:21,23 | 339:18,23 |
| 315:25 | multiple | 109:10 | 224:6,20 | 349:9,22 |
| 316:15 | 18:2 30:16 | 111:21 | 224:21,23 | 350:1 |
| money 328:7 | 40:7 73:25 | 113:13 | 234:5,12 | 352:9 |
| 328:17 | 102:24 | 115:1 | 234:14 | 354:20 |
| monitor | 103:3 | 126:16 | 236:19 | 355:21 |
| 176:14 | 116:16 | 133:25 | 237:19,20 | 358:22 |
| monitoring | 117:14 | 135:1 | 237:23 | Murthy's |
| 201:8,17 | 161:17 | 136:9,20 | 238:10 | 113:7 |
| Monroe 1:2 | 165:12 | 137:5,7 | 239:1,2,20 | 122:10 |
| 5:2,20 | 202:13,15 | 138:4,9 | 240:3,11 | 142:23 |
| month 61:18 | 264:2 | 139:3,14 | 240:19 | 153:12 |
| months 81:15 | 288:17 | 142:6,25 | 241:13,24 | 156:2 |
| 81:17 | 319:5 | 143:9,12 | 242:7,8,22 | 166:5 |
| 212:12,16 | 325:7 | 143:13,20 | 243:13 | 183:6 |
| 212:22 | 372:4 | 145:18 | 246:1,5,20 | 207:25 |
| 213:10,14 | multipro... | 146:4 | 247:10 | 260:19,21 |
| 228:4 | 262:23 | 147:6 | 248:10 | 318:8 |
| 346:19 | multitiered | 149:25 | 249:17,23 | 326:6 |
| 365:13 | 206:22 | 154:13,24 | 250:2,15 | 328:3 |
| moral 205:25 | Murthy 14:21 | 155:4 | 250:18 | 329:9,17 |
| morning | 15:11 16:4 | 157:3 | 251:9 | 330:7 |
| 206:21 | 25:23 | 159:12 | 253:12,18 | 332:25 |
| 313:13 | 26:13 | 161:9 | 256:10,15 | 334:10 |
| mouth 78:15 | 34:19 | 162:10 | 256:21,22 | 339:12,15 |
| move 41:18 | 35:14,16 | 164:12 | 256:24 | 355:5 |
| 94:11 | 38:5 53:17 | 168:20 | 260:18 | muted 319:16 |
| 114:10,22 | 56:5,12 | 169:23 | 261:5,9 | |
| 193:21 | 57:10 | 176:18 | 262:3,8 | **N** |
| 194:2,20 | 67:14,16 | 178:6 | 264:8,9 | N 2:1 376:18 |
| 240:20 | 67:21 68:6 | 179:1 | 267:8 | name 8:19,20 |
| 241:2 | 69:20,21 | 182:6 | 270:3 | 9:23,24 |
| 277:16,24 | 70:13,17 | 183:1 | 288:20 | 15:3,5 |
| 299:2 | 71:2,5,9 | 184:12 | 289:4 | 37:7 43:22 |
| 315:3,6 | 71:22,22 | 187:24 | 290:9,14 | 47:20 |
| 357:24 | 72:4,8 | 191:18 | 302:19 | 48:17 69:9 |
| moved 41:19 | 77:22 | 198:22 | 303:5,16 | 79:16 |
| 228:5 | 78:18 | 207:1 | 303:18,21 | 82:18 |
| 277:1 | 79:12,20 | 208:6,20 | 304:2,14 | 152:2 |
| movement | 80:16,21 | 210:15 | 305:6 | 187:7 |
| 264:18 | 80:25 81:4 | 212:25 | 307:12 | 190:13,17 |
| moves 272:25 | 81:24 82:6 | 215:6 | 309:16,18 | 286:13,16 |
| moving | 84:19,24 | 217:22 | 310:7,10 | 287:1,2,8 |
| 194:25 | 94:13,24 | 218:12,16 | 312:3 | 287:18,22 |
| 268:19 | 95:18 | 218:22 | 322:11 | 287:23 |
| 277:20 | 98:11,16 | 219:19 | 324:21 | 288:9,15 |
| 352:24 | 98:19 | 220:10 | 327:3,13 | 372:4 |
| multilin... | 105:6 | 222:1,8,21 | 329:24 | 377:10 |
| 201:22 | 106:5,14 | 223:1,16 | 330:17,25 | 378:1 |

**ERIC WALDO  12/22/2022**

| | | | | |
|---|---|---|---|---|
| named 15:2 | 30:18 | 96:21  97:2 | 97:9  98:10 | 309:15,17 |
| names 53:14 | 53:10 | 97:23 | 106:6,15 | 310:6 |
| 190:19 | 99:14 | 120:13 | 112:17,25 | 349:2,7 |
| 287:15 | 100:20 | 121:2,8,16 | 125:14,16 | Nick's |
| 289:6,22 | 101:17,20 | 121:21,24 | 125:17 | 235:14 |
| Nancy 296:15 | 104:25 | 129:2 | 126:16 | 277:4 |
| 296:18 | 122:15 | 130:10,13 | 134:25 | Nicorette |
| 297:19,20 | 198:24 | 130:14,16 | 136:9 | 30:21 |
| nanny 348:12 | 201:12 | 131:14 | 137:22 | NIH 70:21 |
| Nathaniel | 205:24 | 149:25 | 138:8 | nine 76:1,2 |
| 349:7 | 216:2,19 | 214:18 | 139:2,14 | 133:16 |
| nation's | 303:12 | 218:9 | 142:6,16 | 273:9 |
| 29:15 | 332:11 | 219:9 | 143:11 | nodding |
| 162:19 | 334:14 | 221:11,19 | 154:13 | 10:19 |
| 163:1 | 358:17 | 223:5 | 155:4 | nominated |
| national | 360:3,13 | 225:7 | 156:21 | 344:9 |
| 261:21 | 360:25 | 256:11,25 | 159:11 | nominator |
| 334:1 | needed 52:20 | 257:12 | 185:2 | 111:8 |
| NATO 284:8 | 61:7 | 270:16 | 218:17,22 | non 275:23 |
| natural | 139:20 | 274:5,20 | 219:19 | non-Engl... |
| 160:15 | 198:11 | 274:23 | 221:1 | 202:19 |
| nature 17:21 | 199:4 | 275:9 | 234:5,11 | nonmedical |
| 40:12  44:4 | 279:20 | 276:14 | 234:14,15 | 50:1,5 |
| 57:4  65:3 | 315:2 | 286:6 | 234:24 | nonprofit |
| 65:13 | needs 180:19 | 297:1 | 235:11,12 | 17:18,22 |
| 66:15 | 193:21 | 321:13 | 236:18 | 17:24  18:4 |
| 69:23  74:3 | negative | 366:9 | 238:1,9,24 | 27:20 |
| 74:5  83:2 | 140:18 | newly 90:14 | 238:25 | nonprofits |
| 86:7  100:3 | 175:2 | 91:8 | 239:12,19 | 19:17 |
| 111:18 | 176:8 | news 170:23 | 240:3,6 | 102:25 |
| 148:9,9 | Negron | 277:1 | 241:13,18 | 114:15 |
| 173:15 | 296:15,16 | 307:14 | 241:24 | nonpublic |
| 174:21,22 | 296:18 | 344:4,8 | 242:15,21 | 312:24 |
| 203:6 | neither 89:4 | Nick 34:8 | 243:5,12 | nonwritten |
| 247:17 | 375:13 | 35:7,17 | 243:15,19 | 58:6 |
| 292:7 | Nemo 261:3 | 53:18  56:3 | 244:3 | normally |
| 372:19 | net 198:21 | 56:7  62:13 | 246:1,5,11 | 369:1 |
| 374:2 | never 158:16 | 65:1  67:16 | 247:23 | North 6:11 |
| NCLA 9:14 | 207:13 | 67:18,19 | 248:9 | 7:10  376:1 |
| NEA 51:1 | 223:24 | 67:19,21 | 250:2 | Northwest |
| nearly 268:9 | 236:4 | 67:22  68:6 | 253:6,11 | 6:17,22 |
| necessarily | 282:20 | 77:23 | 255:10 | 376:7 |
| 326:17 | 286:6 | 78:18 | 256:5,6,24 | NOTARIAL |
| necessary | 287:17 | 81:25 | 258:18,23 | 375:1 |
| 216:1 | new 2:21 | 82:13,21 | 268:17 | notarized |
| 308:16 | 6:16  7:5,5 | 84:18 | 270:3,14 | 376:17 |
| 377:8 | 9:14  21:16 | 94:15,24 | 270:25 | notary 5:17 |
| need 15:9 | 76:15,19 | 95:14 | 277:3,10 | 8:5  375:7 |
| 28:2  30:13 | 76:23 | 96:13  97:9 | 281:20 | 376:16 |

**ERIC WALDO  12/22/2022**

| | | | | |
|---|---|---|---|---|
| 377:21 | 105:9 | 300:15,21 | 26:19 27:2 | 207:19 |
| note 264:7 | 126:25 | occurred | 27:12,14 | 212:15 |
| 276:13 | 128:9 | 33:3 38:10 | 32:8 35:2 | 213:9 |
| 278:19 | 167:19 | 105:13,17 | 36:6,11 | 251:24 |
| 297:25 | 220:14 | 148:4 | 37:16 39:7 | 252:7 |
| 310:10 | 224:8 | 195:18 | 39:9,15 | 262:11 |
| noted 222:2 | 232:5 | 218:12 | 41:24 42:3 | 263:7 |
| notice 86:10 | 248:3 | 219:1 | 42:11,23 | 265:2,12 |
| noticeable | 292:8 | 222:8,13 | 43:3,22 | 265:17,25 |
| 224:1 | 326:15 | 323:25 | 46:16 | 269:11,14 |
| noticing | 328:11 | 324:25 | 47:14 | 272:20 |
| 346:8 | 338:4 | occurs | 49:19 | 283:3,6,13 |
| notifica... | 346:25 | 341:18 | 50:12 52:9 | 284:11,24 |
| 138:22 | 359:15,23 | October | 55:5 59:19 | 288:19,21 |
| notion 36:9 | 360:10 | 61:20 | 64:6 67:6 | 288:22 |
| 50:7 51:9 | 370:9 | 302:16,20 | 69:19 70:6 | 290:16 |
| 107:10 | Objections | 306:12 | 70:24 | 291:20 |
| 170:9 | 2:9 73:6 | 308:13 | 73:11 75:4 | 298:12,13 |
| November | obligation | 309:15,18 | 76:3 78:2 | 301:7 |
| 55:15,17 | 170:11 | 310:5 | 79:5 85:20 | 304:9 |
| 131:19 | 171:1 | 311:6 | 102:5 | 307:2 |
| 219:2 | 172:21 | 315:17,18 | 103:13,20 | 312:22 |
| 293:25 | Observatory | 315:20 | 110:18 | 313:25 |
| 318:21 | 36:23 38:5 | 317:12 | 113:2 | 314:25 |
| number 8:15 | 48:13 | 318:10,11 | 116:10 | 320:11 |
| 113:21,24 | 207:2,5,10 | 319:21 | 126:20 | 323:22 |
| 114:3,6 | 207:24 | 320:4,10 | 129:21 | 324:12 |
| 321:11 | 213:9 | 320:14,15 | 133:18 | 327:14 |
| 340:15,18 | 251:8 | 323:10 | 134:10 | 333:21,23 |
| 343:9 | 283:10,14 | 324:13 | 135:11,13 | 334:6 |
| numerous | observe 24:8 | off-cited | 147:11 | 336:6 |
| 231:5 | 361:11 | 279:6 | 148:8 | 337:22 |
| NYU 100:7 | observing | offenders | 163:21 | 338:2,12 |
| 103:5 | 24:5 | 204:7,12 | 164:3 | 340:2,4 |
| 104:9 | obviously | offending | 165:21 | 345:21 |
| ————————— | 58:18 | 205:3 | 166:1,3 | 346:2,23 |
| O | 63:13 | offer 112:1 | 167:3,6 | 347:18,23 |
| O'Boyle | 78:23 | offered 68:5 | 168:10,12 | 348:17 |
| 85:12 | 112:14 | 150:3 | 169:21 | 349:19 |
| 144:4 | 150:23 | 242:15 | 170:6 | 362:6 |
| o'clock 5:13 | 186:14 | office 6:5 | 171:11 | 364:5,6,10 |
| 5:13 | 233:7 | 6:10 9:3 | 186:9,13 | 367:14 |
| Obama 81:11 | 362:2 | 9:11 11:24 | 187:17 | 369:10 |
| 110:6 | 369:25 | 12:4,15 | 188:1,11 | 372:6,9,11 |
| 291:12 | occasion | 13:9,11 | 188:14,22 | 372:14,24 |
| 373:25 | 140:3 | 14:4 16:8 | 189:4,9,12 | 372:25 |
| objection | occur 100:12 | 16:18 | 189:16 | 373:5,6,8 |
| 65:16 77:6 | 149:20 | 18:24 25:5 | 196:3 | 373:18,21 |
| 77:10 | 202:14 | 26:3,4,17 | 198:6 | 373:24 |

**ERIC WALDO  12/22/2022**

office's
 329:7,15
officer 12:2
 12:4,11
 13:7 21:11
 21:22,24
 23:9
official
 44:2 48:3
 81:16 82:2
 224:6,15
 225:4
 235:23
 285:5,9
 288:14
 312:20
officials
 45:11
 46:16 64:7
 66:25
 141:10,14
 189:3
 193:4
 215:2
 217:21
 218:5
 221:14,17
 222:1
 224:22
 225:16
 285:22,25
 363:13
oftentimes
 168:21
oh 27:22
 78:14
 143:12
 145:3
 154:7
 162:21
 163:10
 201:15
 208:10
 255:1
 266:21
 273:22
 278:15
 280:15
 337:8

okay 10:8
 15:20
 20:23 22:4
 22:10,11
 23:8 24:3
 24:12
 39:18 42:5
 42:9 44:16
 56:1 58:12
 61:22 62:6
 63:12
 70:20
 72:20
 75:24
 76:22
 78:14 82:1
 82:4 85:10
 86:16
 87:13
 89:20 90:3
 97:6 101:3
 106:11,16
 109:9,12
 110:13
 111:13
 112:5,11
 113:8
 119:2
 120:6
 125:21
 127:15
 131:12
 133:10
 135:14,25
 136:12,25
 141:17
 156:5
 161:15
 162:4
 178:19
 179:21,22
 181:11
 183:5
 185:14
 186:5
 194:24
 197:14
 201:16

205:22
 208:16,18
 212:2
 214:2
 215:23
 217:1
 221:7
 224:3
 225:18
 227:9
 230:25
 236:11
 237:1
 242:19
 245:20
 260:13
 269:4
 271:8
 275:25
 277:9
 278:19
 282:23
 283:8
 285:11
 287:19
 290:24
 296:14
 298:15
 301:17
 302:13
 304:4
 313:22
 314:15
 316:2,21
 317:13
 318:12
 319:19
 320:9,18
 321:8
 322:19
 325:5,8
 326:4
 331:5,10
 333:19
 337:20
 342:12
 344:6
 345:5
 348:14,14

352:12
 353:13
 356:4,12
 364:4
older 365:14
omitting
 310:6
on-the-r...
 319:16
once 88:2
 314:8
one's 99:7
one-way
 148:13
ones 20:10
 45:5 52:18
 63:4,23
 72:7
 103:18
 165:17
 180:25
 192:16
 218:14
 220:25
 273:15
 274:6
ongoing
 226:20
 310:18
online 18:1
 21:6 46:3
 47:5,8
 58:3 152:3
 226:23
 227:21
 228:17,19
 233:18
 284:22
 285:7,20
 288:10
op 302:10
open 312:14
 362:2
opened
 106:22
operate
 125:9
 174:7
 175:7

208:21
operated
 125:8
operation
 66:20
 124:6,16
operations
 206:17
opinion
 160:19
opportunity
 117:1
 215:10
 237:15
 300:18
 353:7
 358:4
opposed
 26:17
 115:21
 170:12
 176:10
 206:20
optimistic
 212:8
optional
 64:2
 263:20
options
 59:17 60:7
order 78:24
 100:20
 206:16
 315:13
orders
 301:11
org 2:7
 49:15
 58:18
 60:17
 63:13
 290:12
organiza...
 47:10 48:7
 85:25 86:3
 144:19
 284:3
 287:3
 288:1

**ERIC WALDO  12/22/2022**

| | | | | |
|---|---|---|---|---|
| 361:20 | 16:22 | 129:4,25 | 205:14,18 | 245:13,21 |
| **organiza...** | 198:7 | 131:14 | 205:23 | 245:23 |
| 50:20 | 214:14 | 148:5,24 | 207:23 | 246:3,8 |
| **organiza...** | **out-of-o...** | 194:17 | 208:5,13 | 247:7 |
| 19:16,16 | 295:7 | 216:24 | 208:15,15 | 248:1 |
| 19:23 | 297:18 | 280:25 | 208:16,17 | 267:22 |
| 20:17 | **outcome** | 291:25 | 210:9,12 | 268:3,9,24 |
| 22:21 | 103:11,17 | 312:22 | 210:15 | 275:15 |
| 31:19 | 375:19 | 336:24 | 211:24,24 | 276:10 |
| 50:18 | **outcomes** | 337:2,2 | 212:3,3,8 | 334:13 |
| 53:20 | 28:14 | 353:8,25 | 214:25 | **palsy** 317:23 |
| 54:21 | 29:19 30:3 | **overlap** | 215:3 | 319:4 |
| 74:11 | 31:17 | 274:13 | 217:4 | **pandemic** |
| 116:7 | 100:11,15 | **oversight** | 231:2 | 87:24 |
| 126:18,19 | 175:21,22 | 114:18 | 234:9,10 | 89:15 |
| 132:12 | 360:14 | **overview** | 234:11 | 107:13 |
| 209:17 | **outlining** | 87:12,19 | 253:6 | 166:11 |
| 285:12,14 | 259:16 | 88:22 | 263:11 | 170:25 |
| 285:15 | 260:2,5,10 | 91:18 | 270:2 | 175:23 |
| 305:13 | **outreach** | **owned** 221:16 | 272:12 | 243:17,21 |
| 348:22 | 12:17 | **owns** 192:16 | 277:10 | 251:13 |
| **orientation** | 43:16 | | 278:11 | 276:18 |
| 198:19 | 49:21 | ——————— | 309:13 | 332:24 |
| **original** | 54:21 | **P** | 310:4 | 335:4 |
| 4:11 33:3 | 132:10,10 | **p-h** 284:4 | 329:23 | 336:17 |
| 33:13 | 145:4 | **p.m** 88:12 | 331:11 | 360:17 |
| 376:14 | 182:11,14 | 214:8,11 | 332:10 | **panel** 38:3,8 |
| **originally** | 298:11,18 | 268:18 | 333:1,1 | 311:23 |
| 17:8 34:1 | 321:1 | 282:11,14 | 340:11,13 | 312:14 |
| 125:11 | **outside** 36:5 | 335:24 | 340:14 | 330:24 |
| 152:21 | 36:10 | 336:2 | 355:4 | 331:4,6,9 |
| **originate** | 41:25 42:6 | 371:23 | 358:1,2,10 | **panelist** |
| 16:14 | 42:20,24 | 372:1 | 368:18 | 284:1 |
| **osdp.gov** | 43:11 44:4 | 374:16 | 376:14,16 | **Parag** 353:3 |
| 255:22 | 64:5 67:6 | **P.O** 6:6 | 376:18 | **paragraph** |
| **OSG** 49:14 | 100:25 | **page** 2:3 | 377:22 | 75:22 |
| 70:18 | 101:11 | 75:13,18 | 378:8,10 | 171:24 |
| 75:14,15 | 102:11 | 75:21,23 | 378:12,14 | 176:13 |
| 78:25 | 188:17 | 77:17 | 378:16,18 | 179:19,23 |
| 86:10,17 | 189:3,13 | 145:15 | 378:20,22 | 186:6 |
| 90:14 91:8 | 189:17 | 151:16 | **pages** 21:10 | 203:2,3 |
| 118:8 | 211:7 | 162:5 | 75:21,24 | 217:20 |
| 131:20 | 364:4,6 | 174:2 | 138:13 | 220:3,19 |
| 132:3 | **outsized** | 178:12,16 | 178:11 | 226:17 |
| 139:21 | 360:17 | 178:19,25 | 211:23 | 233:14 |
| 148:14 | **overall** | 182:24 | 231:10,15 | 267:19 |
| 172:2 | 45:21 | 190:20 | 231:25 | 270:25 |
| 262:6 | 89:24 | 197:3,12 | 232:2,15 | 271:6 |
| **ought** 16:21 | 110:5 | 199:8 | 233:1,2 | 309:24 |
| | | 201:7,11 | | |

**ERIC WALDO  12/22/2022**

| | | | | |
|---|---|---|---|---|
| 343:3 | 107:4 | 351:7,9 | **penalty** | 228:4,12 |
| **paraphra...** | 122:18,24 | **path** 237:16 | 377:11 | 229:2 |
| 111:6 | 155:1 | 265:8 | **pending** 5:19 | 234:21 |
| **Pardon** 22:7 | 199:17 | 337:19 | **people** 24:4 | 238:22 |
| 67:8 | 203:18 | **paths** 337:20 | 24:9 27:1 | 239:23 |
| **parents** 51:5 | 222:18 | 338:1 | 27:4 29:13 | 243:14 |
| **parlance** | 251:14 | **Patil** 81:6,9 | 29:17 | 244:16 |
| 18:25 | 262:22 | 82:10,24 | 33:25 35:1 | 260:16 |
| 143:17 | **particul...** | 94:13 | 36:4,5 | 267:23 |
| **part** 14:7 | 12:21 31:3 | 98:12 | 52:21 | 268:5,6,10 |
| 17:11 38:6 | 116:12 | 106:6 | 53:13 | 276:11,21 |
| 74:17 | 179:13 | 109:21 | 63:12 67:4 | 279:14 |
| 81:12 | 333:5 | 116:18 | 69:19 72:3 | 280:12 |
| 86:22 | **parties** 8:24 | 252:8 | 76:3 92:22 | 281:4 |
| 110:20 | 18:21 19:2 | 255:14 | 93:4 | 289:2 |
| 114:11 | 92:13 | 267:3 | 102:10 | 290:2,4 |
| 118:21 | 104:15 | 292:18 | 107:3 | 291:5 |
| 126:14 | 156:23 | 296:6 | 109:6 | 292:6 |
| 161:20 | 209:23 | **Patil's** | 111:7,9 | 298:23 |
| 164:4 | 375:14,17 | 255:19 | 112:21,21 | 306:4 |
| 173:13 | **partly** 54:24 | **pay** 181:11 | 116:18 | 307:15 |
| 179:24 | 275:11 | **Payton** 90:8 | 119:9 | 311:22 |
| 206:18 | **partner** | 93:20,22 | 122:22 | 312:24 |
| 207:7,11 | 147:8,8 | 125:13 | 124:5 | 322:1,14 |
| 212:18 | 312:18 | 195:18,19 | 127:4,5,12 | 323:4,21 |
| 214:24 | **partnered** | 226:5,18 | 135:21 | 325:10 |
| 259:12 | 212:11,15 | 229:19 | 139:21 | 329:25 |
| 315:4 | 213:13 | 230:10,13 | 150:25 | 335:1,3 |
| 320:22 | **partners** | 233:3 | 151:9 | 344:25 |
| 322:13 | 19:4,19 | 235:6 | 152:5 | 345:6,6 |
| 324:18 | 37:4 | 237:5 | 164:10,13 | 355:11 |
| 352:5 | 152:14 | 250:12 | 166:12 | 359:14 |
| 353:14 | **partnership** | 255:9 | 167:17 | 360:18 |
| **participant** | 18:22 22:2 | 258:23 | 168:4,21 | 361:11 |
| 263:20 | 212:20 | **Payton's** | 168:25 | 365:13 |
| **particip...** | 213:7 | 229:25 | 169:9 | 367:8 |
| 237:6 | **partners...** | **pdf** 178:18 | 170:15,23 | 370:6 |
| **participate** | 228:6 | 178:19 | 171:17 | 373:18 |
| 241:19 | **pass** 166:24 | **pedally** | 172:10 | **people's** |
| 350:6 | **passing** | 328:18 | 173:1 | 107:2 |
| 352:17,19 | 289:10 | **peddling** | 174:20 | **percent** |
| 353:9,19 | **paternity** | 328:7 | 176:5 | 100:11 |
| 354:1,3 | 61:1,14,15 | **pen** 15:17 | 180:12 | 115:18 |
| **particip...** | 296:12 | 152:20 | 192:12 | 192:13 |
| 57:8 172:5 | 298:6,6 | 187:11 | 197:21 | 229:15 |
| 187:14 | 323:18 | **penalties** | 198:11 | **perception** |
| **particip...** | 324:18 | 138:17 | 210:19 | 272:19 |
| 285:5,9 | 331:1,3 | 268:8 | 211:7 | **performing** |
| **particular** | 348:10 | 276:3,24 | 214:20,22 | 136:14 |

**ERIC WALDO  12/22/2022**

| | | | | |
|---|---|---|---|---|
| period 311:6 | 264:16 | 299:2 | 301:12 | 98:22 |
| 323:10 | 265:24 | philanth... | pill 100:19 | 129:5 |
| 372:7 | 266:5 | 50:18 | Pinterest | 130:2 |
| perjury | 287:2,4 | Phillips | 182:5 | 133:19 |
| 377:11 | 290:22 | 260:18,20 | pitch 314:1 | 134:5 |
| permanent | 326:2 | 263:23 | place 42:13 | 139:5 |
| 205:9 | 373:1 | 301:14 | 75:16 | 170:22 |
| permanently | person's | 320:23 | 142:3 | 175:20,22 |
| 231:9,25 | 167:9 | 325:19,20 | 203:20 | 178:5 |
| 232:15,25 | personal | 357:22 | 205:12 | 191:10,14 |
| permission | 24:8 74:13 | philosophy | 228:25 | 201:8 |
| 114:23 | 74:13,19 | 312:19 | 294:14 | 202:18 |
| persistence | 74:20,25 | phone 32:23 | 372:24 | 204:10,16 |
| 271:3,14 | 198:21 | 118:13 | 373:2 | 205:5 |
| person 8:23 | 288:12 | 128:19 | places | 217:8,12 |
| 12:18 | 296:1 | 135:4 | 341:17,19 | 217:17 |
| 36:23 | personally | 376:3 | plain 142:8 | 246:10 |
| 43:21 | 179:2 | phonetic | Plaintiff | 274:2 |
| 48:21 49:5 | personnel | 32:22 | 6:3,9 9:1 | 276:6 |
| 50:24 | 78:25 | photos 58:6 | Plaintiffs | 281:4 |
| 53:24 54:3 | 127:19,20 | phrase 25:15 | 1:5 5:5,22 | 299:8 |
| 56:6,7,10 | 131:19 | 95:5 | 6:14 8:2 | 300:12 |
| 56:13 | 132:23 | 117:19 | 9:19 | 307:21 |
| 57:18 | perspective | 342:17 | Plaintiffs' | 341:3,8 |
| 61:11 | 25:24 | phrased | 2:9 73:7 | 342:15 |
| 67:20 | 41:17 | 123:9 | plan 49:3 | 355:21,22 |
| 79:20 | 43:18 | 351:18 | 116:8 | 356:14,15 |
| 80:25 82:6 | 99:10 | phrasing | 120:8 | 358:3 |
| 82:14,16 | 115:11,12 | 277:22 | 203:23 | platforms |
| 82:17,22 | 115:16,25 | physical | 238:18 | 28:17,19 |
| 82:25 83:8 | 119:9 | 231:5 | 315:21 | 28:23 31:5 |
| 83:12 | 126:22 | 373:5 | 345:20 | 31:7,12 |
| 100:6 | 338:23 | physically | 351:23 | 32:2,6,8 |
| 112:3,7 | 339:12,13 | 372:23 | 352:3 | 32:10,17 |
| 125:2,5,9 | 342:2 | Pichai 352:8 | 368:5,21 | 35:5 51:12 |
| 132:4 | perspect... | picture | planning | 51:16 |
| 143:15 | 284:13 | 16:12 | 212:18,21 | 52:10,11 |
| 152:16 | persuading | 215:6 | 279:2 | 52:24 |
| 187:12 | 28:7 | 354:20 | 299:1 | 54:17 55:6 |
| 189:23 | persuasive | piece 80:11 | 352:6 | 57:15,23 |
| 190:5 | 99:21 | 83:5 99:6 | plans 148:14 | 61:9,23 |
| 222:24 | Pfizer | 100:1 | 228:3 | 62:16,23 |
| 224:5,14 | 278:23,23 | pieces 25:22 | 280:12 | 63:7,21 |
| 224:20 | 279:13 | 63:9 83:16 | 300:1 | 64:7,23 |
| 235:13 | 280:5 | 83:17 | platform | 66:25 |
| 242:15 | 281:17 | 115:14 | 74:19 79:6 | 67:13 |
| 251:22 | Pfizer's | 124:20 | 80:19 | 68:10,15 |
| 252:1,15 | 280:18 | 272:4 | 96:17 | 75:17 76:4 |
| 260:19 | phase 186:12 | 276:9 | 97:18 | 78:25 |

**ERIC WALDO  12/22/2022**

| | | | | |
|---|---|---|---|---|
| 81:23 | 206:6 | **Plaza** 7:5 | 137:11 | 193:23 |
| 82:10 | 208:24 | **please** 8:23 | 139:19 | 194:9 |
| 83:25 84:1 | 209:25 | 9:16,22 | 141:8,9 | 202:3 |
| 88:6 91:20 | 211:20 | 11:2 145:1 | 142:17 | 204:16,23 |
| 92:4,6,20 | 215:2 | 145:2 | 152:25 | 205:5,7,12 |
| 92:21 | 246:23 | 214:6 | 153:4 | 211:9 |
| 93:16 | 247:2 | 215:19 | 160:16 | 226:25 |
| 96:12 | 257:7,10 | 293:12 | 163:8 | 227:22,25 |
| 97:15 | 257:23,25 | 308:21 | 191:12 | 230:15,22 |
| 101:5,10 | 258:5 | 319:18 | 199:7 | 231:3,17 |
| 102:10,11 | 279:2,11 | 355:25 | 213:22 | 231:24 |
| 102:15 | 280:12 | 376:12,15 | 272:16 | 232:10,13 |
| 103:15 | 285:2 | 376:17 | 279:13 | 233:21,22 |
| 104:1,8 | 299:19 | **pleased** | 281:25 | 237:9 |
| 105:8 | 303:1,10 | 182:23 | 283:16 | 244:7,11 |
| 106:18 | 305:16,17 | **plenty** 177:9 | 284:10 | 244:24 |
| 107:23,25 | 305:22 | **plus** 116:3 | 290:15 | 245:6,10 |
| 115:22 | 313:16 | **POCs** 126:17 | 291:19 | 247:24 |
| 116:13,16 | 321:13,14 | 126:23 | 293:10 | 248:12 |
| 117:7 | 321:21,25 | **podcast** 3:18 | 306:16,22 | 249:9,25 |
| 123:4,7 | 322:13 | 58:10 | 314:5 | 267:21 |
| 134:11 | 323:2,13 | 320:18,21 | 335:20 | 268:2,6 |
| 169:24,25 | 323:23 | 320:22,22 | 341:25 | 273:25 |
| 170:8 | 324:13 | 321:1,5 | 348:10 | 280:3,20 |
| 171:12 | 326:9,21 | 322:18 | 359:6 | 281:21 |
| 172:10 | 331:17 | 324:22,24 | 360:1 | 317:6,16 |
| 173:3,5 | 333:5 | 324:25 | 362:10 | 318:16 |
| 174:12 | 334:14,16 | 325:4,15 | **points** 76:2 | 319:2,11 |
| 175:2 | 340:12,16 | 326:7 | 108:10 | 350:24 |
| 176:21,24 | 340:20,21 | 327:4,6,16 | 133:16 | 365:12,22 |
| 178:7 | 340:22,22 | 328:2 | 138:10 | 366:13,20 |
| 179:25,25 | 340:23 | 329:18,22 | 139:4 | **policing** |
| 180:15,16 | 341:11,15 | 355:9,11 | 228:2,7,24 | 183:10 |
| 180:24 | 341:15,24 | 359:1,7 | 272:7 | **policy** 14:15 |
| 181:23 | 342:13,16 | **podcasts** | 273:9 | 14:16,18 |
| 183:16,21 | 342:19,24 | 319:22 | 281:9 | 14:23 |
| 184:3,9,16 | 344:13,18 | 320:6 | 313:10,12 | 18:23 |
| 184:21 | 348:19 | 329:20 | 313:14,20 | 19:11,14 |
| 185:11,25 | 350:16,24 | **point** 14:17 | 321:18 | 32:22 37:1 |
| 190:23 | 351:13 | 48:21 | 327:7 | 37:7 47:17 |
| 191:4 | 356:24 | 50:25 | **poison** 105:4 | 52:16 |
| 192:5,14 | 358:11 | 72:12 | 105:5,13 | 100:22 |
| 192:16 | 359:3,10 | 77:20 | 169:11,16 | 102:20,24 |
| 197:7,16 | 361:17 | 94:11 | 169:19 | 103:9,14 |
| 197:21 | 365:23 | 118:1 | 208:23 | 103:18,21 |
| 199:8,14 | **play** 28:14 | 124:2 | 209:2 | 110:19 |
| 200:6,8 | 179:12 | 128:13 | **policies** | 122:12 |
| 201:21 | 209:11 | 131:18 | 121:2,17 | 125:1 |
| 203:4,17 | 210:17 | 135:5 | 182:9 | 129:2 |

**ERIC WALDO  12/22/2022**

| | | | | |
|---|---|---|---|---|
| 130:10,14 | portion | 363:7 | 196:7 | practice |
| 130:16 | 326:16 | possibly | 201:1 | 187:3 |
| 131:14 | 345:13 | 99:24 | 204:20 | 188:1 |
| 137:23 | 350:21 | 136:4 | 229:21,23 | practices |
| 138:3 | 351:4 | 184:11 | 231:15 | 198:20 |
| 143:15,16 | poses 162:25 | 273:12 | 232:1,14 | 307:25 |
| 164:15,16 | position | 301:13 | 232:15,25 | pre-rollout |
| 167:11 | 367:10 | 362:15 | 233:2 | 20:7 |
| 186:15 | positive | post 19:3 | 238:19 | precall |
| 187:12,15 | 44:9 45:3 | 140:12 | 243:24 | 145:8 |
| 188:24 | 48:5 56:15 | 141:19 | 277:1 | preceding |
| 194:7 | 81:8 86:6 | 195:12 | 294:15 | 224:19 |
| 199:1 | 122:3 | 203:13 | potential | precisely |
| 201:2 | 140:17 | 205:3 | 29:1 30:24 | 39:10 |
| 202:14 | 144:18 | 207:23 | 40:14 | 88:20 |
| 244:23 | 158:12,15 | 235:8 | 101:7 | 247:16 |
| 248:20 | 176:7 | 238:17 | 119:24 | 289:12 |
| 271:2,13 | 185:17 | 267:5,8,12 | 134:5 | predates |
| 274:6 | 197:22 | 267:19 | 147:8 | 142:11 |
| 280:25 | 207:9 | 280:12 | 177:13,23 | preexisted |
| 281:3 | 262:19 | 281:4 | 177:25 | 142:10 |
| 289:11,11 | 291:10 | 302:6 | 178:1,4 | prefaces |
| 290:8,11 | 297:9,22 | 306:13 | 199:2 | 99:18 |
| 290:18,19 | 354:7 | 308:6 | 218:24 | Preliminary |
| 290:21 | positives | 310:1 | 283:18 | 2:10 73:7 |
| 296:21 | 29:24 | 319:20 | 370:1 | prep 182:19 |
| 297:1 | possibility | 320:4,15 | potentially | preparation |
| 304:22 | 104:3 | 345:22 | 93:5 95:11 | 186:25 |
| 315:5 | 359:21 | 346:2 | 133:25 | 225:15 |
| 346:5 | possible | posters | 137:5 | 320:25 |
| 364:18 | 63:9 81:6 | 344:17 | 143:9 | prepare 77:2 |
| 366:8 | 85:8 | posting | 149:6 | 77:8 |
| polite | 103:10 | 370:6 | 182:10 | prepared |
| 148:15 | 104:2 | posts 136:14 | 198:25 | 152:17 |
| political | 105:17 | 140:9,16 | 232:14 | prerelease |
| 372:17 | 132:18 | 141:24 | 272:10 | 90:19 |
| 373:14,17 | 133:22 | 142:1 | 273:2,5 | prerollout |
| poor 173:1 | 136:7,10 | 158:19 | 274:1 | 86:15 |
| pop 172:2 | 152:11 | 177:22 | power 27:2 | 88:20 |
| popping | 184:13 | 188:5,8,12 | 27:12,13 | prescrip... |
| 20:24 | 187:18 | 188:15 | 28:6 29:22 | 102:20 |
| popular | 190:18 | 189:4,10 | 30:6 99:21 | prescrip... |
| 307:14 | 196:14 | 190:2,4,6 | 209:22 | 176:11 |
| population | 237:5,10 | 190:9 | powerful | present |
| 198:25 | 237:13 | 193:17,22 | 115:6 | 65:11 |
| port 158:7 | 260:12 | 193:22 | PowerPoint | 80:14 |
| 158:17 | 301:24 | 194:4,6,7 | 46:22,25 | 231:17 |
| portfolio | 323:24 | 194:9,14 | 47:16,24 | presenta... |
| 48:15 | 342:3 | 195:1,10 | PR 113:12 | 46:20 47:2 |

**ERIC WALDO  12/22/2022**

| | | | | |
|---|---|---|---|---|
| 47:25 92:2 | 233:6,12 | 54:1,5 | 213:10 | 176:2 |
| 92:9 93:14 | 233:16 | 89:9 91:4 | 220:10 | 320:11 |
| **presented** | 239:22 | 163:11,11 | 222:19 | **probably** |
| 221:14 | 244:22 | 200:10 | 223:8 | 14:22 |
| 274:23 | 247:13 | 321:23 | 271:7 | 44:12,14 |
| 334:21 | 250:17 | 331:24 | 330:7,13 | 44:16 |
| **presenters** | 311:23 | 358:10 | 331:20 | 47:15,17 |
| 48:4 | 312:15 | **previously** | 366:23,25 | 48:6 53:21 |
| **president** | 320:24 | 49:10 | 369:20,21 | 59:11 |
| 33:23 | 325:24 | 72:21 | **priorities** | 72:15 |
| 34:22 | **press-re...** | 76:16 | 12:19 26:4 | 73:24 |
| 55:13 | 292:3 | 145:5,14 | 114:11 | 108:9 |
| 90:25 93:3 | **pressed** | 157:19 | 254:12 | 109:23 |
| 95:1 96:23 | 188:25 | 164:2 | 314:3 | 121:22 |
| 116:3 | **pressure** | 187:10 | 315:2 | 123:20 |
| 122:21 | 29:8 | 221:2 | **prioritize** | 142:2 |
| 150:24 | **presumably** | 250:11 | 204:6 | 143:8,22 |
| 214:19 | 244:4 | 258:11,14 | **prioriti...** | 161:18 |
| 235:19 | 308:11 | 290:11 | 86:17 | 164:14 |
| 250:18 | 310:1 | 291:12 | **priority** | 185:13 |
| 327:17 | 370:4 | 333:24 | 12:25 | 187:14 |
| 328:2,5,16 | **presume** | 336:10 | 115:5 | 257:19 |
| 328:21 | 181:2 | 347:3 | 204:10 | 298:5,8 |
| 329:8,16 | 341:17 | 372:18 | 311:21 | 300:1,22 |
| **President's** | **presuming** | **prima** 85:8 | 312:17 | 304:8,12 |
| 234:19 | 278:23 | **primarily** | 315:6 | 309:5 |
| 244:16,22 | **presumption** | 12:12 | **private** 32:1 | 316:9 |
| **press** 2:18 | 173:10 | 27:16 47:4 | 32:9,9,15 | 321:1 |
| 19:5,6 | **pretend** | **primary** 27:2 | 86:2 123:7 | 351:6 |
| 29:12 | 278:2 | 338:22 | 174:18 | **problem** 36:2 |
| 33:19 | **pretty** 35:15 | **Prime** 235:15 | 311:11,15 | 83:4 99:22 |
| 34:22 52:1 | 59:12 | **principal** | 311:25 | 100:20 |
| 84:3,6 | 251:3 | 15:2 27:12 | 312:10,10 | 101:20 |
| 96:24 | 264:1 | 59:17 | 313:11 | 116:11,16 |
| 115:10 | 326:12,23 | 372:23 | 323:3 | 123:3 |
| 116:1,2 | 344:22 | **principally** | 330:7 | 202:13 |
| 122:20 | 345:2,14 | 304:5 | 332:2,5,6 | 251:11 |
| 133:24 | **prevalence** | **printing** 8:6 | **privately** | 294:13 |
| 134:3,5,7 | 342:23 | 375:12 | 32:14 | 295:14 |
| 150:18 | **prevalent** | **prior** 11:23 | 103:24 | **problematic** |
| 161:8,13 | 99:13 | 17:13 49:4 | **privilege** | 188:5,8,11 |
| 161:22,23 | **prevent** | 54:15 55:3 | 65:19 | 188:15 |
| 165:18 | 172:16 | 55:12 | 338:6 | 189:4 |
| 166:6 | 360:9 | 57:13 | **privileged** | 190:2,9 |
| 181:1,10 | **preventable** | 67:24 97:3 | 65:17 | 201:1 |
| 183:1 | 175:25 | 151:18 | 292:9 | 243:23 |
| 193:4 | 360:18,21 | 191:8 | **pro-** 247:17 | 247:17 |
| 206:10,14 | **previous** | 192:9 | **proactive** | **problems** |
| 206:18,25 | 22:5 26:23 | 193:4 | 28:8 97:14 | 278:2,3 |

| | | | | |
|---|---|---|---|---|
| proceed 9:16 | 245:23 | proportion | 226:19 | 162:12,15 |
| process | 246:8 | 350:10 | 229:19 | 175:11,11 |
| 17:11 | progress | proposal | 269:23 | 175:12 |
| 65:19 | 212:9 | 103:21 | 344:12 | 176:5 |
| 120:24 | 254:3,9 | 193:8 | 345:11 | 179:2,2 |
| 187:20 | progresses | 198:5 | Psaki 33:20 | 180:23 |
| 212:19 | 243:17,21 | proposals | 84:2,9 | 206:8 |
| 304:7 | 279:24 | 35:16 | 122:20 | 207:25 |
| 338:6 | prohibits | 100:22 | 150:16 | 238:19 |
| 339:11 | 297:2 | 102:25 | 161:9 | 283:20 |
| 352:6 | Project | 103:18 | 183:2,18 | 301:10 |
| 362:14,17 | 207:12,15 | propose 46:6 | 183:24 | 307:21 |
| process-... | 207:20 | proposed | 188:4 | 310:12 |
| 60:14 | 282:19,20 | 83:19 | 190:21 | 311:11,12 |
| processes | 283:4,7 | 93:15 | 193:15 | 312:20 |
| 362:7 | 284:22,25 | 112:21 | 215:7 | 313:10 |
| produced | 285:6,9,19 | 190:22 | 217:6 | 319:22 |
| 5:11 9:18 | 285:22,25 | 192:5,8 | 233:6,8 | 320:5 |
| produces | 288:19,23 | proposing | 247:12,16 | 322:24 |
| 58:5 | 288:25 | 83:24 | Psaki's | 327:9 |
| producing | 290:2,4 | 191:3,23 | 196:14 | 330:7 |
| 192:12 | Project's | protect | 217:10 | 331:24 |
| product | 284:12 | 361:11 | 250:14,16 | 332:14,24 |
| 25:21 77:6 | promised | Protentis | 253:24 | 334:1 |
| 77:12 | 67:19,19 | 69:11 | PTA 50:25 | 335:2 |
| 197:6,15 | 136:13,17 | provide | 51:7 | 344:11,24 |
| 198:7,23 | 136:18,23 | 16:11 | 312:25 | 345:10,22 |
| 199:2,5,19 | 137:1,1 | 31:16 | public 5:17 | 346:10,11 |
| 200:11,14 | promote 30:7 | 129:3 | 8:5 12:13 | 346:24 |
| 200:18 | 103:7 | 238:18 | 12:15,18 | 347:24 |
| Production | 222:3,11 | 258:16 | 13:14,15 | 360:6,8,13 |
| 376:18,24 | 279:3,12 | 345:1 | 14:10 18:9 | 362:2 |
| productive | 342:5 | provided | 24:25 26:3 | 364:2 |
| 34:6 | 356:25 | 4:12 75:8 | 26:5 27:9 | 375:7 |
| 299:12,24 | promoted | 75:9 86:10 | 27:10,10 | 376:16 |
| products | 223:2 | 87:12 | 27:13,19 | 377:21 |
| 199:14 | promotes | 129:13 | 29:7,8,13 | public-f... |
| Professi... | 356:17 | 221:11 | 29:16 | 24:15,21 |
| 5:16 375:3 | promoting | 227:4 | 31:11,16 | 40:15,16 |
| professor | 342:6 | 230:11 | 31:24 | 266:5 |
| 37:16,24 | promotion | 339:18 | 32:11,22 | 292:2 |
| 38:17,23 | 342:4 | provides | 36:13 38:3 | 301:12 |
| 40:2,11,19 | prompted | 104:16 | 41:16,20 | publication |
| 41:2 42:1 | 309:21 | 158:23 | 43:14 44:1 | 234:17 |
| 42:15 | pronounced | 192:3 | 50:12 52:9 | publicly |
| 48:22,25 | 260:24 | 210:24 | 94:9 | 31:24 |
| 62:21 | proper 266:3 | providing | 114:14 | 32:13 |
| 283:23 | properties | 171:22 | 119:9 | 103:24 |
| profiles | 192:2 | 172:19 | 125:1 | 158:21,24 |

**ERIC WALDO  12/22/2022**

| | | | | |
|---|---|---|---|---|
| 191:13 | 279:5 | 179:1,6 | quick 282:2 | 114:9 |
| 345:22 | 333:4 | 183:5,17 | 282:3 | 117:3 |
| 346:2 | pushed | 212:4 | 352:1 | 230:16 |
| published | 155:17 | 216:20 | quicker | 247:24 |
| 346:15 | pushing 52:9 | 219:8 | 216:18 | 312:11 |
| 357:4 | put 15:18 | 220:16 | quickly | raised 57:5 |
| pull 160:9 | 19:12 | 228:15 | 102:23 | 98:19 |
| 196:21 | 25:22 29:8 | 229:6,12 | 193:21,22 | 114:13 |
| 214:15 | 34:1 44:15 | 230:9,23 | 194:3,10 | 115:25 |
| 234:3 | 58:24 | 236:3 | 195:1 | 120:8 |
| 242:19 | 59:19 | 242:2,8,13 | 324:21 | 121:17 |
| 255:6 | 78:15 | 242:17 | 331:10 | 174:17 |
| 306:11 | 121:23 | 248:7,17 | 335:22 | 217:6 |
| 320:2 | 139:10 | 251:23 | 352:25 | 230:20 |
| 335:22 | 170:14 | 259:11 | quite 104:8 | 233:24 |
| 351:25 | 177:8 | 274:11 | 197:2 | 250:10 |
| pulled | 228:25 | 285:18 | quote 24:14 | 269:17 |
| 134:21 | 260:14 | 290:23 | 122:13 | 307:5 |
| pulpit 25:25 | 290:24 | 292:9,13 | 124:5 | 311:20 |
| 26:13 29:5 | 294:14 | 311:4 | 157:10 | 314:25 |
| 29:9,22 | 314:12 | 329:14 | 214:20 | 321:19 |
| 99:20 | 350:4 | 337:11 | 217:5 | raising 28:2 |
| 103:24 | 351:15 | 338:5,9 | 219:5 | 30:2 123:8 |
| 209:22 | putting | 345:25 | 261:24 | 130:20 |
| 320:12 | 20:15 | 356:6 | 327:17 | 159:22 |
| pun 254:19 | 106:8 | 357:11,22 | 328:1,15 | 311:10,17 |
| Pundit | 201:25 | 358:23 | 328:24 | ramp 369:19 |
| 286:19,21 | 238:8 | 359:4 | 329:14,16 | ran 13:1 |
| 286:23 | 322:8 | 361:19 | 358:14 | 185:20 |
| purpose | | questions | quotes | 301:9,9 |
| 82:23 | _____Q_____ | 9:21 10:18 | 277:14 | 339:14 |
| 84:23 | quasi-go... | 11:8,13 | | random |
| 98:23 | 85:25 | 34:4,23 | _____R_____ | 115:24 |
| 99:18,25 | 144:19 | 35:21 | R 1:7 5:7,22 | range 29:3 |
| 101:9 | question | 109:24 | 8:14 376:9 | 81:14 |
| 129:1 | 11:1,4,9 | 157:23,24 | 378:3 | 335:8 |
| 144:23 | 32:4,4 | 158:4,5 | R-A-F-A-E-L | ranking |
| 148:22 | 65:17,24 | 183:2 | 48:18 | 116:21 |
| 211:6 | 66:3 72:6 | 215:24 | race 114:12 | rapport |
| 350:5 | 77:11,15 | 216:3,5 | 198:14,18 | 148:16 |
| 357:15 | 99:18 | 226:22 | 315:5 | rates 138:24 |
| purposes | 111:5,12 | 227:15,18 | rack 133:9 | re- 274:21 |
| 170:3 | 111:19 | 227:20,24 | radiation | re-empha... |
| purveyor | 127:23 | 230:14 | 100:18 | 322:20 |
| 286:21 | 132:16 | 233:16,24 | Rafael 48:10 | re:THE 378:3 |
| purveyors | 144:17 | 242:10,14 | 48:12,16 | reach 18:17 |
| 329:1 | 150:25 | 281:12,13 | 48:18,23 | 50:20 |
| push 99:22 | 168:2 | 337:12 | 49:2 289:4 | 52:20 |
| 222:4 | 170:4 | 374:12 | raise 22:25 | 53:10,15 |

| | | | | |
|---|---|---|---|---|
| 53:18 | 139:25 | 329:5 | 173:24 | 112:16 |
| 56:17 57:4 | 175:5,5,9 | 333:8,17 | 189:19 | 120:10 |
| 80:14,18 | 179:18 | 334:20 | 244:3 | 121:4,8,9 |
| 83:2,6,6 | 181:13 | 350:21 | 257:5 | 121:20 |
| 83:13 | 197:12 | 351:3 | 327:3 | 122:8 |
| 86:23 | 201:10,13 | 356:19 | 351:22 | 123:21 |
| 98:20,24 | 202:4 | 364:20 | 352:25 | 124:1 |
| 99:19 | 205:18 | 365:18 | 353:8 | 125:12 |
| 106:17 | 208:13,14 | 366:11 | 378:8,10 | 128:18 |
| 107:8,24 | 210:12 | 370:18 | 378:12,14 | 130:3,8,18 |
| 111:15,16 | 216:1,2,5 | 378:6 | 378:16,18 | 130:23 |
| 152:14 | 216:11,21 | **ready** 201:16 | 378:20,22 | 131:2 |
| 158:19 | 216:25 | 205:22 | **reasonable** | 133:7 |
| 169:9 | 220:8 | 212:1 | 10:16 | 141:1,23 |
| 172:12,16 | 224:13 | **real** 113:17 | 103:16 | 144:22 |
| 173:4,10 | 225:23 | 278:1 | 165:12 | 148:16 |
| 173:15 | 233:14 | 321:8 | 167:9 | 153:20 |
| 174:21 | 245:3 | 324:20 | 171:22 | 154:5,11 |
| 182:4 | 288:12 | 352:1 | 174:25 | 158:6 |
| 202:16 | 302:21,23 | **reality** | **reasons** | 159:8,25 |
| 221:5,6 | 327:6 | 265:24 | 23:18 | 160:4 |
| 231:15 | 332:17 | **really** 24:23 | **Rebecca** | 169:5 |
| 232:1,11 | 356:6 | 29:10 34:5 | 363:19,21 | 194:15 |
| 232:14 | 360:2 | 34:17 | 364:1 | 196:8,12 |
| 233:1 | 365:24 | 35:18 44:8 | **recall** 20:18 | 206:16 |
| 242:10 | 376:15 | 53:8,20 | 25:12 31:4 | 213:5 |
| 251:16 | 377:5 | 54:4,22 | 33:9 38:16 | 218:17 |
| 258:12,15 | 378:8,10 | 66:20 | 40:22 44:8 | 223:16 |
| 299:7 | 378:12,14 | 80:18 92:7 | 46:9,18 | 228:10 |
| 300:11 | 378:16,18 | 92:24 99:8 | 48:5 53:20 | 230:18 |
| **reached** 20:2 | 378:20,22 | 99:8 103:6 | 54:4 63:1 | 232:8 |
| 20:18 53:1 | **reading** | 108:8 | 64:4 66:20 | 237:22,22 |
| 141:11 | 102:7 | 118:15,16 | 69:2 79:18 | 239:3,3 |
| 182:21 | 142:9 | 120:17 | 79:22 | 241:21 |
| 252:11,12 | 164:20 | 125:20 | 82:18 | 242:20 |
| 297:12 | 165:2 | 128:20 | 87:10 88:7 | 244:2 |
| **reaching** | 166:20 | 142:22 | 91:21 92:7 | 247:19,19 |
| 20:4 32:21 | 171:23 | 158:25 | 93:17,21 | 256:20 |
| 50:14 | 201:4 | 166:23 | 93:21,24 | 257:3,15 |
| 226:19 | 219:9 | 168:6 | 95:7,24 | 257:20 |
| 234:16 | 227:23 | 210:16 | 96:20,25 | 258:18 |
| 259:3 | 229:3,11 | 244:2 | 97:5 98:18 | 259:5 |
| **reaction** | 229:18 | 264:9 | 104:6 | 263:21 |
| 93:14 | 231:20 | 272:21 | 105:12,14 | 286:16 |
| 308:10 | 234:1,24 | 305:8 | 106:22 | 298:9 |
| **read** 9:9 | 238:23 | 328:23 | 107:9 | 301:1,2,19 |
| 75:19 | 271:7 | **realm** 104:3 | 109:11,20 | 301:19 |
| 120:6 | 275:24 | **reason** 15:16 | 110:24 | 302:17 |
| 121:11 | 279:17 | 153:1 | 111:25 | 304:9,22 |

**ERIC WALDO  12/22/2022**

| | | | | |
|---|---|---|---|---|
| 309:1 | **recognize** | 200:19 | 138:22 | 308:11 |
| 314:13 | 114:23 | 201:19 | 199:21 | 309:25 |
| 316:20 | 117:12,13 | 204:9 | 200:20 | 358:24 |
| 317:18 | 168:16,17 | **recommen...** | **reduce** 24:1 | 359:19 |
| 320:17 | 205:24 | 30:25 31:4 | 30:6,16 | **referenced** |
| 323:12 | **recognizing** | 91:15,19 | 31:6 32:7 | 95:2 305:8 |
| 328:1 | 88:22 | 92:3 104:7 | 96:11,15 | **references** |
| 331:8 | 95:10 | 104:9,13 | 100:10 | 163:7 |
| 332:6,7 | 203:21 | 117:23 | 104:17 | 185:20 |
| 336:7 | 205:16 | 119:24 | 130:6 | 286:3,22 |
| 341:25 | **recollec...** | 120:1,3 | 170:17 | 288:17,20 |
| 342:11 | 20:6 35:20 | 191:9 | 172:22,23 | **referencing** |
| 344:1 | 41:1,8,9 | 194:17 | 172:23 | 305:8 |
| 346:5 | 42:19 | 253:8,14 | 177:11 | **referred** |
| 347:16 | 43:24 | 253:19 | 199:24 | 293:6 |
| 354:23 | 45:14,24 | **recommen...** | 231:15 | 313:13 |
| 355:18 | 62:14 90:5 | 192:1 | 273:4,25 | 342:17 |
| 363:4,8 | 93:9,23 | **recommends** | 274:8 | 368:10 |
| 368:16 | 98:15 | 169:9 | 326:10,22 | **referring** |
| 373:25 | 112:23 | 199:21 | 329:11 | 17:5 |
| **recalled** | 113:3 | **record** 8:10 | 332:12 | 146:19 |
| 332:8 | 122:16 | 9:23 10:22 | **reduced** | 155:16 |
| **recapture** | 145:12 | 15:9 | 21:25 | 184:2 |
| 274:21 | 148:6 | 105:20,23 | 375:12 | 185:5 |
| **receipt** | 157:17,22 | 106:2 | **reduces** | 186:3,9 |
| 376:19 | 158:3 | 160:22,24 | 358:7 | 188:7 |
| **receive** 19:3 | 162:3 | 161:2 | **reducing** | 209:13 |
| 170:23 | 223:20 | 198:16 | 30:20 | 213:12 |
| 293:19 | 230:8 | 214:5,8,11 | 232:1,11 | 217:10,13 |
| 349:15 | 250:10,23 | 240:15 | 232:14 | 217:19 |
| **received** | 256:22 | 282:9,11 | 233:1 | 218:8 |
| 75:2 76:14 | 264:24 | 282:15 | **refer** 151:23 | 227:3 |
| 140:24 | 265:4 | 328:12 | 211:16 | 233:23 |
| 143:6 | 269:15 | 335:24 | 344:25 | 234:21,25 |
| 181:4 | 281:14 | 336:3 | 345:9 | 253:17 |
| 345:21 | 288:2 | 337:24 | 359:20 | 269:1 |
| 346:3,14 | 309:10 | 371:14,23 | **reference** | 271:7 |
| 346:19,24 | 364:12,15 | 372:2 | 124:3 | 292:24 |
| 362:25 | 364:25 | 374:16 | 128:13 | 294:18 |
| 363:3 | 367:15 | **recorded** | 136:4 | 313:22 |
| **receives** | **recommend** | 357:5 | 163:5 | 341:12 |
| 362:7 | 103:22,23 | **records** | 174:16 | 360:2 |
| **receiving** | 200:20 | 74:15 | 192:11,20 | **refers** 86:13 |
| 142:15 | 265:21 | **Reddit** | 205:15 | 131:18 |
| 180:24 | **recommen...** | 182:12,16 | 221:13 | 183:6 |
| **recipients** | 275:23 | 182:19,21 | 235:5 | 184:23 |
| 300:25 | **recommen...** | 258:13,15 | 254:19 | 211:12 |
| **recognition** | 16:23 | 341:4 | 285:11 | 224:20 |
| 113:22,25 | 199:13,22 | **redesigning** | 286:2,18 | 302:24 |

ERIC WALDO  12/22/2022

| | | | | |
|---|---|---|---|---|
| 346:12 | reiterated | relative | 94:1,3 | 302:1,8 |
| refine 273:4 | 35:12 | 114:16 | 95:22,25 | 309:9 |
| 274:25 | 240:13 | 375:16 | 104:25 | 314:18 |
| reflect | relate 68:15 | relay 47:13 | 105:15 | 316:2 |
| 322:19,20 | 75:4 | 114:12 | 108:8 | 317:10,14 |
| 347:25 | 215:24 | 315:5 | 110:23 | 318:1 |
| refresh 58:2 | 323:3 | release 84:4 | 111:2 | 320:9 |
| 241:15 | related 18:5 | 90:16,18 | 118:12 | 323:9 |
| 309:10 | 24:22 | 90:22 | 120:17 | 325:3 |
| 364:25 | 25:11  70:2 | relevant | 121:15,21 | 328:21 |
| refreshing | 71:13 | 18:21 | 122:5,9 | 340:2 |
| 134:19 | 74:24 | 28:11,16 | 123:11,22 | 355:6,10 |
| refused | 91:19 | 74:16 | 124:11,18 | 355:13 |
| 220:20 | 110:4,13 | 295:5 | 125:20 | 363:6,24 |
| refusing | 124:6 | reliable | 128:22 | 364:23 |
| 65:23 | 130:14,16 | 164:25 | 130:4,11 | 367:17 |
| refute | 157:25 | relied | 130:19 | remind |
| 294:20 | 162:23 | 143:20 | 131:3,12 | 323:16 |
| regard 14:3 | 205:25 | religious | 131:21 | remote 5:14 |
| regarding | 236:22 | 198:20 | 133:3 | 6:1  7:1 |
| 65:25 | 270:21 | remain | 140:14 | 11:1 78:17 |
| 137:24 | 275:11 | 192:14 | 143:2 | remotely |
| 221:22 | 281:16 | 193:24 | 154:2,6 | 8:22 77:22 |
| 269:13 | 285:20 | 299:5 | 159:1 | 373:6,10 |
| 308:5 | 355:14 | remarks | 160:1,5 | removal |
| 337:3 | 365:12 | 33:20,24 | 182:19 | 97:17,19 |
| Register | 366:21 | 95:1,2 | 192:23 | 193:23 |
| 349:15 | 371:10 | 116:3,3 | 227:10,17 | 231:24 |
| Registered | 375:13 | 172:6 | 229:7,10 | 232:10 |
| 5:15 375:3 | relating | 206:8 | 230:1,1 | 233:9 |
| regular | 42:16 | 207:1,25 | 232:12,19 | 246:3,9 |
| 183:20 | 75:17 76:4 | 208:2 | 232:22 | 247:21 |
| 184:2,15 | 83:21 | 234:19 | 234:7 | 285:1 |
| 184:20 | 110:3 | 250:14,16 | 249:24 | remove 97:14 |
| 254:2,5 | 141:19 | 251:7 | 253:13 | 121:6 |
| regularly | relation | 321:5 | 256:15 | 130:6 |
| 184:8 | 39:13 | remember | 264:22 | 176:25 |
| 255:21 | relation... | 20:10 | 265:5 | 177:5 |
| regulate | 39:14 50:1 | 33:10 | 266:24 | 193:22 |
| 26:25 | 50:4 51:2 | 35:14 | 278:4,9 | 194:3,3,5 |
| regulatory | 51:10 | 40:22,23 | 281:15 | 195:1,10 |
| 26:21 | 86:24 | 43:19 | 286:11,13 | 196:6 |
| 114:18 | 314:21 | 44:22 | 286:22 | 231:4 |
| reinforce | 372:20 | 46:14 | 287:15 | 245:10 |
| 94:8 | relation... | 54:22  62:8 | 288:1 | 246:14 |
| reinforces | 51:15 | 62:12 | 289:7 | 247:25 |
| 330:12 | 52:15,19 | 77:19 92:1 | 292:16 | 248:14 |
| reiterate | relationsy | 92:8,24 | 296:9 | 249:19 |
| 35:8 | 32:22 | 93:13,18 | 298:1,3,7 | 268:24 |

ERIC WALDO  12/22/2022

| | | | | |
|---|---|---|---|---|
| 280:3,12 | 267:17 | 281:20 | **reporting** | 118:2 |
| 280:14,16 | 311:3 | 282:18,24 | 214:19 | 153:17 |
| 280:20 | 329:14 | 284:10,19 | 218:10 | 235:7 |
| 281:3,22 | 345:24 | 286:3,18 | 219:23 | **represented** |
| 296:22 | **repeated** | 286:20 | 221:19 | 188:20 |
| 317:21 | 209:1 | 288:18 | 222:14 | **represen...** |
| 365:22 | 220:4,19 | 289:15,16 | 224:2 | 249:7 |
| **removed** | 329:13 | 289:25 | 225:6,19 | **reputati...** |
| 66:22 | 347:17 | 291:18 | 232:24 | 27:3 |
| 228:12 | **repeatedly** | 292:22,22 | 245:8 | **request** 34:9 |
| 245:13 | 138:13 | 296:15,20 | 249:12,17 | 74:17 |
| 267:22 | 204:15 | 296:25 | 249:23 | 183:9 |
| 268:3 | 205:5 | 367:22 | 268:14 | 220:11 |
| 275:22 | 206:7 | **reported** | 274:5 | 240:13,17 |
| **removing** | 231:10 | 14:17 | 275:6 | 257:17,24 |
| 203:13 | 276:4 | 58:20 89:3 | 364:13 | 270:20,20 |
| 204:20 | **rephrase** | 123:24 | 365:20 | 297:8,15 |
| 232:14,25 | 32:3 | 139:2 | **reports** | 309:3 |
| 244:7,11 | **reply** 229:25 | 248:6,20 | 27:17 | 336:6,17 |
| 247:6 | 295:7 | 249:2 | 138:8 | 346:18 |
| 248:13 | **report** 3:9 | 268:18 | 139:23 | 347:21 |
| 249:9 | 16:22 27:7 | 274:7,14 | 140:1,19 | 349:14 |
| 276:9,10 | 27:8 60:17 | 281:8 | 140:22,24 | 350:9 |
| 281:16 | 118:23 | 289:10,13 | 141:5,9,15 | 353:17 |
| **render** | 119:13,18 | 348:5 | 142:4 | **requested** |
| 345:21 | 119:18 | 364:14 | 143:3,25 | 4:12 43:14 |
| 377:8 | 120:16 | 378:5 | 154:17 | 66:11,17 |
| **Rendered** | 121:1,24 | **Reported...** | 159:11,14 | 74:15 |
| 275:25 | 126:12,13 | 7:8 | 218:3 | 124:14 |
| **Renee** 36:22 | 127:3,12 | **reporter** | 222:5 | **requesting** |
| 37:14 39:4 | 135:19 | 4:11 5:16 | 225:8 | 237:25 |
| 188:18 | 136:13 | 5:16 9:15 | 231:9,14 | 352:19 |
| 207:5,7 | 139:15 | 10:12 | 248:10,11 | 353:9,18 |
| 212:4,10 | 140:11 | 56:23 | 290:12 | 353:19 |
| 212:15,17 | 141:17 | 62:10 | 293:1 | 354:1 |
| 213:8,16 | 142:9 | 113:23 | 310:12 | **requests** |
| 283:16 | 155:5 | 144:14 | 318:15 | 73:23 |
| 339:2 | 196:5,9 | 178:25 | 326:20 | 220:4,19 |
| **repeat** 32:4 | 200:1,22 | 183:8 | 329:24 | 240:5 |
| 52:7 | 220:1 | 208:2 | 366:19 | 308:23 |
| 137:24 | 223:5 | 219:10 | 368:21 | 337:6,9 |
| 139:4 | 250:5 | 286:7 | 369:7,11 | 345:15 |
| 168:1 | 258:2 | 321:10 | 370:21 | 350:22 |
| 178:14 | 268:12,23 | 375:4,4,5 | 371:2 | **requirem...** |
| 204:7,11 | 270:19,20 | **reporter's** | **represent** | 346:10 |
| 205:6 | 272:4 | 8:19 | 8:24 | **rescheduled** |
| 219:8 | 276:9 | **reporters** | 294:13 | 325:7,8 |
| 236:2 | 277:5 | 206:22 | **represen...** | **research** |
| 248:7 | 280:11 | 348:4,8 | 51:15 | 36:18 37:3 |

ERIC WALDO  12/22/2022

| | | | | |
|---|---|---|---|---|
| 42:25 43:5 | 16:16 22:2 | 179:7 | 361:24 | 216:17 |
| 82:14 | 22:20 | 183:19 | 362:1,5,7 | 278:6 |
| 99:10 | 25:20 30:1 | 294:24,25 | 362:19,22 | 347:19 |
| 100:1,7,14 | 32:16 38:2 | 310:3 | 362:25 | 353:7,15 |
| 101:17 | 38:8 59:18 | 314:6 | responsi... | 368:21 |
| 103:11 | 60:10 | **response** | 52:12 | **reviewed** |
| 133:6 | 73:24 | 74:6 75:15 | responsi... | 75:24 |
| 158:5,8 | 140:9,12 | 75:20 | 175:13 | 142:25 |
| 176:6 | 143:21 | 84:23 | 199:14 | 143:24 |
| 186:8,12 | 171:11 | 85:14,23 | 206:1 | 201:2 |
| 186:15,17 | 244:8,12 | 85:23 | 303:2,9 | 304:23 |
| 186:22 | 248:12 | 89:21 | 305:16,21 | 322:23 |
| 187:1,2,4 | 249:9 | 109:3,14 | 358:4 | **reviewing** |
| 187:6,9 | 256:12 | 111:22 | **responsible** | 140:21 |
| 198:10 | 257:1,14 | 114:2 | 47:4 175:3 | 142:24 |
| 199:4 | 262:22 | 118:24 | 179:8 | 188:23 |
| 200:4 | 270:21 | 120:8 | 267:14 | 303:19 |
| 221:5 | 349:13 | 131:13 | 320:25 | 345:6 |
| 242:9 | **respective** | 133:11,20 | 327:18 | 362:22 |
| 284:12 | 126:18 | 142:24 | **responsive** | **reviews** |
| 289:15 | **respond** | 144:10,12 | 309:6 | 362:19 |
| **researcher** | 73:20 | 144:15 | **rest** 115:5,8 | **rewards** |
| 40:2 41:25 | 121:19 | 150:25 | 303:8 | 198:1 |
| **researchers** | 237:20 | 181:17 | 305:20 | **RFI** 59:19,21 |
| 35:24 36:3 | 277:10 | 223:13 | **restart** 96:3 | 60:12 |
| 36:10 37:4 | 309:3 | 229:6,13 | **restrict...** | 61:12 63:9 |
| 37:9 42:21 | 348:19 | 231:1 | 24:8 | 63:25 |
| 42:24 44:6 | 362:3 | 232:9 | **result** 370:6 | 71:18 |
| 47:7 62:21 | **responded** | 240:5 | 370:19 | 336:12,21 |
| 101:12 | 73:12 | 269:7 | **results** | 336:24 |
| 114:15 | 195:21 | 277:14 | 173:1 | 337:3,5,18 |
| 158:18 | 224:6,16 | 280:10 | 344:8 | 338:13,18 |
| 188:17 | 237:23 | 293:12 | **resume** 2:6 | 338:23 |
| 210:20 | 240:19 | 297:15 | 21:6 | 339:3,19 |
| 211:1 | 269:5 | 307:24 | **retreat** | 339:24 |
| 228:13 | 279:18 | 340:3 | 107:21 | 340:10 |
| 337:16 | 314:8 | 345:21 | **return** | 343:2 |
| **reserve** 9:9 | 361:17,20 | 346:3,14 | 376:17 | 344:16 |
| **reserved** 8:7 | 361:21 | 373:12 | **returned** | 346:3,14 |
| 162:11 | **responding** | **responses** | 324:2 | 347:10,21 |
| **reset** 95:9 | 73:23 | 2:9 73:6 | **retweeted** | 347:25 |
| **resist** | 97:11,13 | 75:4,7,9 | 122:13 | 348:19,21 |
| 166:12 | 98:6 212:4 | 75:11 85:6 | 177:8 | 349:20 |
| 167:17 | 230:21 | 118:5 | 302:19 | 350:6,9,11 |
| 168:4 | 237:23 | 222:21 | **reup** 367:25 | 352:9,17 |
| **resources** | 295:9 | 225:11 | **review** 16:10 | 352:20 |
| 201:25 | 297:7 | 229:4 | 77:1,5,8 | 353:9,18 |
| 343:21 | **responds** | 230:10 | 88:2 145:1 | 354:1,14 |
| **respect** | 75:15 | 350:22 | 215:10 | 356:22,23 |

**ERIC WALDO  12/22/2022**

| | | | | |
|---|---|---|---|---|
| 357:13,20 | 99:4 | 194:8,10 | 260:3,11 | 307:12,18 |
| 360:4 | 101:22 | 196:23,24 | 260:19,23 | 308:1,4,6 |
| 361:17 | 102:15,19 | 198:2 | 261:7,11 | 308:12,17 |
| 362:2,16 | 102:20,22 | 200:6,7,23 | 261:22 | 308:22 |
| 372:7 | 104:6 | 201:3 | 262:1,6 | 309:16,23 |
| **RFIs** 346:12 | 105:6 | 202:4 | 264:20 | 310:1,7,13 |
| **rhymes** 261:1 | 107:19 | 203:7,14 | 267:5,24 | 310:20 |
| **Rice** 66:11 | 108:3 | 204:3,7,12 | 268:10 | 311:13 |
| 66:16 | 109:22 | 204:16,23 | 269:2,6 | 314:10 |
| 82:21 | 119:16,25 | 205:1,3 | 270:17,22 | 315:18,25 |
| 90:10 | 129:5 | 206:2,8,15 | 271:7,15 | 316:15,16 |
| 94:16 | 135:11 | 207:2,12 | 271:19 | 316:19 |
| 98:13 | 136:2 | 208:24 | 272:6,7,12 | 317:7 |
| 124:13,23 | 138:5,10 | 209:3,25 | 272:17,22 | 318:8,17 |
| 124:24 | 138:14,24 | 210:6,21 | 273:10,19 | 318:24 |
| 127:19 | 142:19 | 211:3,10 | 273:22 | 319:5,11 |
| 154:14 | 145:12,23 | 211:14,17 | 274:3,9,24 | 321:2,16 |
| 234:12,13 | 149:16 | 211:20 | 274:25 | 321:19 |
| 241:7,18 | 151:14,19 | 212:5 | 275:5,5,7 | 322:4,10 |
| 252:9 | 152:1 | 217:4 | 275:12,18 | 322:16 |
| 255:9 | 154:21 | 218:22 | 275:23 | 324:18 |
| 256:6 | 155:21 | 221:11 | 276:6,15 | 326:14 |
| 266:25 | 156:13 | 224:20 | 276:22 | 328:10 |
| 270:4 | 157:6,11 | 226:6,13 | 277:7,10 | 330:10,14 |
| 278:5,12 | 162:8 | 229:17 | 277:18 | 331:14,17 |
| 278:16,22 | 163:5,8,9 | 234:12 | 279:7,21 | 332:16,20 |
| 291:4 | 163:17,22 | 235:2,4,9 | 279:24 | 333:6,18 |
| 292:16 | 165:6,8,10 | 235:16,20 | 280:13,15 | 336:14,18 |
| 298:2 | 165:17 | 238:2,6,14 | 281:2,4,8 | 340:15 |
| 306:14 | 166:6,13 | 239:15,18 | 281:22 | 341:1 |
| 307:10 | 166:19 | 240:1,6,21 | 282:20 | 343:1 |
| 310:6 | 169:17 | 243:4,4,11 | 290:5,9 | 344:19 |
| 315:14 | 173:9,10 | 243:18 | 291:5 | 345:6,7,22 |
| 318:21 | 174:12,13 | 244:8,17 | 293:4,9,14 | 347:6 |
| 349:3,7 | 176:12,15 | 244:25 | 294:7,20 | 348:24 |
| 363:12 | 177:1,24 | 245:11,24 | 294:24 | 349:10,22 |
| 364:16 | 178:2,3,8 | 246:3,4,15 | 295:3,16 | 350:7,11 |
| 370:20 | 178:13 | 246:18,24 | 295:19,22 | 350:19 |
| **rid** 54:9 | 179:5,9,14 | 247:13 | 296:23 | 351:2,7 |
| **right** 9:9 | 179:17 | 248:6,23 | 297:4 | 352:3,22 |
| 14:1  22:13 | 180:4,8,12 | 249:5 | 298:17,21 | 353:3,16 |
| 22:16 | 180:16,21 | 250:24 | 299:2,8,13 | 353:23 |
| 23:19  31:3 | 180:24 | 251:1,4,5 | 299:19 | 354:16 |
| 49:18  52:6 | 181:8,12 | 251:18 | 300:7,12 | 357:1 |
| 52:21  54:8 | 181:17 | 255:14,25 | 300:19 | 358:11,16 |
| 60:18  62:5 | 191:20 | 256:2,7,13 | 302:7,21 | 358:21 |
| 67:5  85:20 | 192:21 | 257:8 | 303:4 | 359:3,14 |
| 91:22  93:5 | 193:1,17 | 259:1,17 | 305:18,25 | 360:9,20 |
| 94:21  99:3 | 193:24 | 259:21 | 306:6,23 | 360:23 |

**ERIC WALDO  12/22/2022**

| | | | | |
|---|---|---|---|---|
| 361:7,12 | 262:7,10 | 14:3 15:22 | 88:17 | 356:17,25 |
| 363:20 | 263:3 | 18:8 23:9 | 90:21 | 358:5,10 |
| 365:8,23 | 264:7 | 26:2 28:13 | 94:20 | 358:18 |
| 366:5 | 278:13,13 | 42:2 60:3 | 132:14 | 360:3,8,21 |
| 367:21 | 279:9,18 | 60:20 | 145:9 | 360:23 |
| 368:6,8,18 | 279:25 | 64:15,18 | 146:8 | 361:1,4,11 |
| 368:24 | 280:9,10 | 71:17 | 149:14,21 | **run** 329:21 |
| 369:3,13 | 292:18 | 81:20 | 150:8,12 | **run-up** 49:2 |
| 369:23 | 294:23,25 | 85:18,19 | 151:10,14 | **running** |
| 370:2,8,21 | 295:12,17 | 86:21 | 152:9,21 | 152:21 |
| 370:24 | 295:19,20 | 110:8 | 155:17,18 | 339:10 |
| 371:2,5 | 295:24 | 114:8 | 155:23 | 355:21 |
| 372:14 | 296:6 | 179:12,14 | 156:12 | 362:10 |
| **rights** 50:16 | 298:1,15 | 189:23 | 161:5 | **Russian** 15:5 |
| **ring** 45:6 | 299:3,5,9 | 209:11,12 | 225:13 | 37:7 47:20 |
| 69:6,9 | 299:15 | 210:17 | 226:11,12 | 185:19 |
| 207:16 | 300:7,8,17 | 265:16 | 235:8 | 187:7 |
| 228:23 | 300:17 | 266:3,13 | 258:2 | |
| 278:17 | 306:13 | 289:12 | 300:2 | ——————— |
| 283:21 | 307:3,9,19 | 291:9 | 302:1,3 | **S** |
| 302:14 | 307:22 | 293:23 | 314:9 | **S** 296:15 |
| 317:12,24 | 308:2,5 | 320:11 | 316:7 | **sad** 93:6,10 |
| 320:20 | 309:14 | 333:3,11 | 322:24 | 94:3,8 |
| 325:1 | 315:14 | 333:24 | 341:25 | 226:16 |
| 354:16 | 316:3,6,10 | 340:1,5 | **Rolodex** 51:6 | **sad-faced** |
| **rings** 278:10 | 363:12 | 359:9 | **Room** 7:5 | 226:9 |
| 317:19 | 364:17 | **roll** 301:16 | **Rouge** 6:11 | **safer** 294:15 |
| **risk** 231:5 | 367:8 | **rolled** 42:17 | **rough** 32:25 | 326:10,21 |
| 322:9 | 368:7,9,9 | 142:20 | **roughly** | 329:11 |
| **road** 170:19 | 368:12,25 | **rolling** 52:5 | 55:18 | 350:18 |
| 358:19 | 369:1,2,13 | **rollout** | 362:24 | **safety** 297:3 |
| 359:12 | 369:16 | 13:16,25 | 363:2 | 333:4,12 |
| 361:5 | 370:3,7,11 | 14:9 18:24 | **round** 290:23 | 333:20 |
| **roads** 359:14 | 370:17 | 19:7 24:23 | **rounds** 61:15 | 334:5,7 |
| **Rob** 64:10,12 | **Rob's** 262:2 | 32:13,19 | 279:1 | **Salcido** |
| 64:24 65:2 | 279:10 | 33:5,8,13 | **routine** | 363:14 |
| 65:14,25 | 299:16 | 33:13,16 | 137:9 | 367:9 |
| 66:12 | 306:18 | 33:18 | **Rowe** 291:6 | **salutations** |
| 124:4,14 | **Robert** 288:4 | 34:13,21 | 292:18 | 112:15 |
| 125:25 | 288:5 | 36:20 | 315:14 | **Sanford** 38:4 |
| 126:2,6,7 | **robust** 19:18 | 44:13,17 | 316:4 | 48:13 |
| 126:12 | 192:1,4 | 49:3,5 | **RPR** 7:9 8:4 | **sat** 43:8,16 |
| 127:7 | 193:9 | 53:5,7,10 | 375:22 | **Saturday** |
| 140:24 | **Rockefeller** | 54:19 56:4 | 376:21 | 295:1,3 |
| 184:19 | 331:7 | 61:1 62:25 | **rule** 346:9 | **Sauer** 2:4 |
| 189:21 | **Rogan** 355:5 | 63:5 64:3 | **rules** 10:7 | 6:4 8:25 |
| 190:1 | 355:8,10 | 64:25 | 192:3 | 8:25 9:21 |
| 260:17 | 355:14 | 86:14,22 | 231:11 | 20:23 21:3 |
| 261:8,10 | **role** 13:24 | 87:2,15 | 276:11 | 56:25 |
| | | | | 65:23 |

ERIC WALDO  12/22/2022

| | | | | |
|---|---|---|---|---|
| 72:13,20 | **saying** 10:13 | **says** 9:19 | 192:18 | 263:20 |
| 77:7,16 | 10:19,20 | 21:14 | 193:18,25 | 267:7,25 |
| 105:11 | 27:18 | 28:24,25 | 194:11,20 | 270:14,18 |
| 106:3 | 30:11 | 29:16 | 197:6,15 | 271:9 |
| 127:8 | 31:14 | 49:21 | 197:18,20 | 273:3,8 |
| 128:12 | 32:12 | 57:22  58:5 | 197:24 | 274:4,24 |
| 134:17,20 | 35:14  88:5 | 58:13 | 198:4,10 | 275:14 |
| 144:16 | 95:24,25 | 73:10 | 199:17 | 276:20 |
| 160:15 | 106:12,23 | 75:15 | 200:16,24 | 279:5,23 |
| 161:3 | 113:13 | 77:24  86:9 | 201:21,24 | 280:14,15 |
| 167:21,23 | 118:15 | 86:16  87:9 | 203:4,8,22 | 281:5,10 |
| 199:3 | 120:18,24 | 90:13  91:8 | 204:17,19 | 284:11 |
| 208:10,11 | 122:2 | 94:16 | 204:25 | 289:25 |
| 213:22 | 131:12 | 127:19 | 205:1,4,23 | 292:16 |
| 214:2,5,12 | 136:22 | 128:16 | 206:3 | 294:3 |
| 220:17 | 146:3 | 129:1,6,24 | 208:6,20 | 295:12,19 |
| 224:10 | 154:6 | 130:9 | 210:16,22 | 296:24 |
| 232:7 | 159:2 | 133:11 | 211:4,15 | 297:5 |
| 240:16 | 170:13 | 135:25 | 212:7 | 298:24 |
| 248:5 | 174:3 | 136:3,17 | 217:6,20 | 299:5,11 |
| 255:4,8 | 175:6 | 137:25 | 218:1 | 299:20 |
| 266:19,22 | 179:7 | 138:15,20 | 220:3 | 300:5,17 |
| 266:24 | 186:21 | 138:25 | 221:14,20 | 302:23 |
| 282:9,16 | 190:16 | 139:18 | 223:6 | 303:7 |
| 292:14 | 194:5 | 141:18 | 224:11,13 | 306:19,20 |
| 319:15,19 | 195:19 | 145:21 | 226:18 | 306:24 |
| 320:3 | 196:19 | 146:11 | 227:1,18 | 308:9,15 |
| 326:19 | 198:23 | 155:6,10 | 229:1,25 | 308:21 |
| 328:13 | 199:4,4,5 | 156:9 | 231:3,8,12 | 313:1 |
| 330:20,23 | 202:7 | 162:13,17 | 233:15 | 315:23,24 |
| 335:18 | 239:24 | 162:22 | 234:15 | 317:11 |
| 336:4 | 245:2,7 | 163:11 | 235:2 | 318:21 |
| 337:25 | 247:11 | 166:5,14 | 236:5 | 319:1,6 |
| 338:10 | 260:7 | 166:22 | 237:15 | 321:10,25 |
| 347:2,5,9 | 264:16 | 172:13 | 238:16 | 322:5,7,11 |
| 359:17 | 275:3 | 173:24 | 240:22 | 322:12,17 |
| 360:7,20 | 276:15 | 174:6 | 241:1 | 326:8,17 |
| 370:13 | 302:20 | 175:6 | 243:1,2,6 | 328:14,16 |
| 371:13,20 | 308:4 | 176:14,16 | 243:13,19 | 328:17 |
| 372:3 | 327:18 | 176:22 | 244:5,9 | 330:4 |
| 374:12 | 328:22 | 177:2,3 | 246:1,5,7 | 332:10 |
| 376:23 | 334:16 | 178:9 | 246:11,12 | 333:14 |
| **saved** 251:13 | 344:6 | 179:11,15 | 246:18 | 334:2,13 |
| **saw** 15:25 | 356:21 | 179:22 | 253:18 | 343:2,10 |
| 244:6,10 | 360:13 | 180:2,5,6 | 256:9 | 343:16,20 |
| 294:4,9 | 365:24 | 180:9,10 | 258:23 | 343:21 |
| 308:9 | 368:16 | 183:7,8 | 259:23 | 344:2,15 |
| 313:3,4,5 | 369:2 | 190:21 | 261:4,24 | 349:12,12 |
| 342:24 | 370:12,14 | 191:15 | 262:2,4,25 | 349:23 |

**ERIC WALDO  12/22/2022**

| | | | | |
|---|---|---|---|---|
| 350:8,14 | **scientist** | 215:18,20 | 309:12 | 179:6 |
| 355:21 | 81:10 | 318:20 | 319:10,14 | 183:3 |
| 358:3 | 82:24 | 321:9 | 319:17 | 190:24 |
| 360:25 | 83:11 | **scrolled** | 324:18 | 196:4 |
| 361:9 | 110:5,14 | 240:23 | 333:15 | 197:4 |
| 364:17 | **sclerosis** | **scrolling** | 340:11,14 | 199:6,9,12 |
| 365:10 | 319:5 | 117:25 | 356:10 | 199:16 |
| 368:5,7,20 | **scope** 16:4 | 124:2 | **Second-A...** | 208:3,4,11 |
| 369:16,25 | 105:4 | 128:12 | 2:8  73:6 | 208:19,25 |
| **scale** 179:23 | 236:15 | 215:14 | **secretary** | 212:12 |
| 331:12 | **Scott** 6:4 | 310:4 | 26:18 | 213:23 |
| **scenes** 14:16 | 9:2 | 315:11 | 33:19 | 214:17,21 |
| **Schake** | **screen** 20:21 | 338:16 | 34:23  84:7 | 214:23 |
| 298:11,12 | 21:4,8 | 343:9 | 161:24 | 215:5,7,9 |
| 301:4,9 | 73:2  106:9 | **scrutiny** | 325:25 | 215:15 |
| 364:3,9,11 | 134:14,21 | 324:7 | 364:10,14 | 225:25 |
| 364:14 | 149:8 | **Scully** 69:5 | **section** | 226:1,2 |
| **Schake's** | 151:4 | **se** 133:24 | 28:25 | 229:3 |
| 132:5 | 160:10 | 159:16 | 91:16 | 238:11,12 |
| **schedule** | 161:10 | 257:3,16 | 200:8,9,10 | 249:21 |
| 33:15,16 | 197:5 | **search** 74:7 | 200:12,13 | 269:21,22 |
| 90:16 | 199:9,11 | 74:12 | 231:2 | 272:3 |
| 150:2 | 208:9,20 | 340:21 | 272:8,11 | 273:21 |
| 241:3 | 214:17 | 341:1 | 272:14 | 275:25 |
| 251:16 | 215:10 | 344:8 | **Security** | 278:10,19 |
| 254:1 | 226:1,2 | 348:15 | 69:1 | 290:25 |
| 325:4 | 234:3 | **searched** | **see** 21:1,4,7 | 295:13 |
| 372:21 | 238:8 | 76:10 | 25:17  26:9 | 297:14,24 |
| 373:18 | 240:9 | **searching** | 35:4,18 | 297:25 |
| **scheduled** | 255:7 | 74:9,10 | 49:11,14 | 311:10 |
| 90:21 | 260:15 | **second** 45:13 | 49:16  54:7 | 312:2 |
| 149:15 | 290:25 | 62:7  72:25 | 57:20 | 315:15 |
| 151:13 | 292:15 | 75:19 | 58:14 | 321:17 |
| 241:10 | 297:24 | 129:8 | 72:22  73:1 | 324:21,24 |
| **schedulers** | 314:4 | 145:15 | 76:1,6 | 326:19,24 |
| 300:23 | 315:9 | 162:5 | 77:19 | 327:1,17 |
| **scheduling** | 320:1,2 | 179:19 | 103:18 | 328:13,15 |
| 149:22,23 | 333:9 | 191:25 | 106:9,10 | 335:21,22 |
| 325:9 | 334:21 | 201:10 | 134:21,24 | 343:11,12 |
| **school** 51:8 | 350:4 | 209:7 | 136:15 | 343:24 |
| 346:10 | 352:7 | 214:25 | 139:10 | 347:13 |
| 373:22 | 354:19 | 215:3 | 140:16 | 355:2 |
| **science** | 363:10 | 217:4 | 141:3,25 | 356:4 |
| 14:14,22 | **screens** | 228:16 | 149:8 | 358:2 |
| 19:11 | 161:17 | 234:9,11 | 151:4 | 366:16,18 |
| 110:18 | 336:9 | 267:19 | 161:10,15 | 371:21 |
| 164:15 | **scroll** 21:9 | 268:12 | 162:22 | **seeing** 96:4 |
| **scientific** | 190:20 | 272:11 | 169:13,14 | 111:9 |
| 304:24 | 208:3 | 278:6 | 178:21 | 189:24 |

ERIC WALDO  12/22/2022

| | | | | |
|---|---|---|---|---|
| 246:15 | 293:3,12 | 264:7 | 61:19 75:8 | 254:15 |
| 256:10 | 370:20 | 267:3 | 128:14 | 277:14 |
| 271:22 | **sends** 243:5 | 268:13 | 129:20 | **shaking** |
| 278:18 | **senior** 9:7 | 270:6 | 131:4 | 10:19 |
| 295:9 | 11:16 | 281:19,21 | 290:21 | **share** 19:20 |
| 298:25 | 14:18 | 295:2 | 291:4 | 20:21 21:4 |
| 310:16 | 21:17,21 | 307:23 | 295:1,6 | 33:1 52:21 |
| 335:5 | 22:11,12 | 318:5 | 296:11 | 87:3 88:3 |
| 344:4,7 | 24:12 44:1 | 330:21 | **series** | 89:12,17 |
| **seeking** | 115:3 | 348:21 | 319:21 | 96:13 |
| 344:16 | 183:22 | 349:14 | 320:5 | 106:9 |
| **seen** 15:18 | 184:5,23 | 351:17 | **seriously** | 108:19 |
| 159:11 | 185:2,15 | 363:16 | 29:14 | 109:1,3,7 |
| 183:14 | 185:22 | 366:24 | 277:25 | 109:14,17 |
| 188:1 | 217:21 | 367:4 | **Services** 7:4 | 109:19 |
| 223:24 | 218:5 | 377:22 | 9:7 68:19 | 111:23 |
| 238:17 | 235:12,22 | **sentence** | **session** | 118:8 |
| 257:11 | 235:23 | 100:16 | 46:19,21 | 119:7 |
| 282:24 | 293:23 | 138:20,25 | **set** 2:10 | 121:14 |
| 310:11 | **sensatio...** | 166:14,21 | 44:5 73:7 | 131:11,13 |
| 324:7 | 231:18 | 167:1,10 | 73:17 | 138:14,18 |
| 327:9 | 232:2 | 172:13 | 94:23 | 138:23 |
| 331:24 | **sense** 32:25 | 175:5,9 | 132:7,8 | 144:2 |
| 361:23 | 34:16 | 176:16 | 145:3,4,8 | 149:1 |
| 362:15 | 103:19 | 177:2 | 188:22 | 152:25 |
| 373:2,3 | 110:16 | 178:9 | 237:24 | 153:4 |
| **select** 127:7 | 116:10 | 197:24 | 240:5 | 169:1 |
| 158:23 | 157:13 | 198:4 | 263:9 | 179:9 |
| **selected** | 171:1 | 201:5 | 297:21 | 191:13 |
| 127:7 | 216:24 | 203:8 | 333:3 | 197:21 |
| **send** 135:21 | 237:12 | 206:3 | 359:9,13 | 210:4 |
| 151:17 | 279:1 | 208:19 | **sets** 359:13 | 220:20 |
| 154:24 | 289:24 | 210:22 | **setting** | 226:1,2 |
| 176:7 | 330:12 | 211:4 | 18:20 56:2 | 229:22 |
| 256:11 | **sent** 4:11 | 224:20 | 107:6 | 231:16 |
| 257:24 | 53:25 | 235:1 | 195:16 | 232:2 |
| 258:21 | 61:12 | 236:5 | 252:3 | 234:3 |
| 260:7 | 127:4 | 240:24 | 333:12 | 238:9 |
| 307:10 | 142:5,12 | 259:23 | 334:5,7 | 240:10 |
| 310:5 | 151:18 | 267:25 | 359:21 | 254:25 |
| 351:12 | 157:1,2 | 333:20 | **settings** | 260:15 |
| **sending** | 181:2 | 364:21 | 166:13,19 | 273:6 |
| 127:8,12 | 206:22 | 365:19 | 167:18 | 290:25 |
| 136:13 | 239:4 | **separate** | 168:5 | 297:24 |
| 142:18 | 252:9 | 43:13 | **several-...** | 300:1 |
| 154:16 | 255:2 | **separately** | 303:6 | 318:22 |
| 155:19 | 257:17 | 65:7 | **sexual** | 336:9 |
| 255:4 | 258:18,19 | 191:23 | 198:19 | 350:5 |
| 266:25 | 260:6 | **September** | **Shakespeare** | 352:7 |

ERIC WALDO  12/22/2022

354:19
363:10
shared 67:14
73:1 97:9
121:22
149:8
152:19
181:14
182:6
197:5
199:9
208:20
214:17
220:5
229:9
255:7
261:19
274:22
276:5
292:15
341:24
363:7
SharePoint
153:6,7,10
sharing
66:19
83:20
111:5,7
161:7
174:17
199:24
208:24
210:19,25
210:25
211:6
259:1
269:6
275:16
330:17
340:21
341:3
342:1
353:14
sharply
123:9
sheet 121:23
125:18
378:2
sheets 122:2

376:14,16
376:17
shepherd
362:14
shifted
60:24
shilled
327:23
shop 43:14
short 6:10
9:10,10
14:23
72:12
105:24
160:16,25
164:16
187:15
282:12
289:4,8
335:25
356:7
371:24
shorthand
5:16 8:4
375:4
shortly
38:13
76:24
250:6
273:24
354:14
369:22
shortt@a...
6:12
show 114:21
149:7
151:3
154:12
195:5
314:16
354:19
showed
151:19
156:21
218:15
221:16
showing
26:25 49:9
72:25

240:9
282:17
336:10
352:7
shown 220:25
333:9
shulled
327:19,24
sic 216:4
327:20
361:3
364:5
side 70:18
79:13 89:1
93:19
98:14
109:6,13
140:22
158:5
186:17
195:15
202:18
217:25
219:6,13
221:6
242:14
262:1
263:1,4
Siegel
315:15
316:4
363:19,21
364:1
sign 9:9
170:18
376:16
signals
197:22
signature
8:6 93:2
376:14,16
376:18
377:22
378:24
signed 188:2
signed-off
165:25
signing 16:6
signoff

15:19
16:10
signs 170:15
similar 89:8
110:7
163:8
351:12,17
352:8,13
353:2,20
358:9
359:6
similarly
123:8
Sincerely
376:20
single 216:6
216:13,22
singled
239:22
sir 10:23
11:13 12:6
12:9 13:5
14:25 15:4
15:10 17:5
17:16 18:7
20:11 21:7
21:13 22:7
23:3,7
32:4,19
37:12
39:17 42:4
44:8 45:2
45:18 47:1
49:16 52:7
59:23 60:2
62:2,9,18
64:14 67:8
68:7,17,20
69:7,10,12
69:17 73:4
73:10
74:22 75:1
75:19,24
78:10,21
79:2,8,18
82:8,18
84:13 86:6
86:13
87:16 89:5

93:12
96:25
100:2
106:10
109:2
127:10,23
132:19,24
133:8
135:24
143:13
144:18,25
145:5,13
152:8
158:15
162:21
167:24,24
179:19,21
197:11
199:6
201:11,16
202:6
205:17,22
208:13,16
210:12
211:25
215:15,18
215:19,21
216:9,12
216:23,25
217:14,19
218:1,10
218:15,24
220:16
236:10
239:9
248:7,17
248:19
249:22
252:4
254:15
265:13
267:17
272:3
276:19
278:7
284:5,7
286:10,24
287:18
289:23

| | | | | |
|---|---|---|---|---|
| 293:5 | **skipped** | **soc-** 217:17 | 134:10 | 327:21 |
| 294:2 | 259:14 | **social** 13:23 | 147:4 | 330:8 |
| 295:4 | 266:22 | 20:1,2,5 | 169:24 | 336:7 |
| 311:3 | **Skipping** | 20:13,16 | 170:7,22 | 340:21 |
| 312:13 | 205:14 | 28:7,16,18 | 171:11 | 341:10,14 |
| 323:15 | **slash** 151:9 | 28:25,25 | 172:9 | 344:18 |
| 329:13 | 256:25 | 29:2 31:5 | 173:3 | 348:18,22 |
| 340:13 | 261:25 | 31:12 32:2 | 174:11 | 351:13 |
| 345:8 | **Slavitt** | 32:6,10,16 | 175:1 | 355:22 |
| 348:10 | 67:11,24 | 33:24 | 176:24 | 356:14,24 |
| 352:12 | 68:4,8 | 35:10 46:4 | 178:5,6 | 358:11 |
| 353:13 | 77:22 | 51:12,16 | 179:25 | 359:2,10 |
| 356:1 | 78:18 | 51:19,21 | 180:15,24 | 361:16 |
| 357:2 | 134:25 | 52:10,11 | 181:23 | **society** 31:1 |
| 359:4,18 | 136:9,19 | 52:24 | 182:7 | 334:18 |
| 361:19 | 138:4,9 | 54:17 55:6 | 183:20 | 358:17 |
| 364:7 | 139:3 | 57:15 61:9 | 184:3,9,16 | 360:2 |
| 366:18 | 142:7 | 61:23 | 184:20 | 361:10 |
| 367:21 | 154:14,23 | 62:16,23 | 185:10,25 | **socioeco...** |
| 368:10 | 155:5 | 63:7,20 | 190:23 | 198:14,18 |
| 371:12 | 185:1,13 | 64:7,22 | 191:4,9 | **soft** 145:9 |
| **sit** 25:1 | 218:16,22 | 66:25 | 192:5,13 | **Solicitor** |
| **site** 182:7 | 219:19 | 67:12 68:9 | 193:5 | 364:5 |
| 326:11,23 | **slightly** | 68:15 | 197:20 | **soliloquy** |
| **sites** 210:18 | 92:25 | 74:19 | 198:6 | 254:18 |
| 329:12 | **slot** 150:3 | 75:16 76:4 | 201:7 | **solutions** |
| 330:1 | **slow** 96:10 | 78:25 79:6 | 202:18 | 101:12 |
| 332:15 | 113:22 | 81:23 | 204:9 | 102:12,17 |
| 342:2 | 198:8 | 82:10 | 205:12 | 103:10 |
| **situation** | 200:5 | 83:25 88:6 | 206:6 | 277:17,21 |
| 117:5 | 210:17 | 91:20 92:3 | 209:25 | 277:25 |
| 296:1 | 211:14 | 92:20,21 | 211:19 | 278:1 |
| **six** 5:13 | 230:3 | 93:3,15 | 215:2 | 294:14 |
| 81:15,17 | **small** 99:14 | 98:21 | 217:8,12 | 295:14 |
| 351:16 | 137:12 | 99:11 | 217:17,23 | **solve** 278:2 |
| 365:13 | 166:24 | 101:5,10 | 218:6,7 | **somebody** |
| 371:17,18 | 315:3 | 102:10,11 | 219:11,11 | 109:12 |
| 371:19 | **smart** 103:20 | 102:14 | 246:23 | 358:21 |
| **six-hour** | **smoke** 162:24 | 103:14,25 | 247:2 | **somebody's** |
| 335:14 | **smoking** 27:7 | 104:7 | 251:10 | 63:16 |
| **size** 16:4 | 27:24,25 | 105:8 | 264:19 | **someone's** |
| 105:4 | 30:18,20 | 107:23 | 279:11 | 54:8 |
| **skeptic** | 163:5,7,12 | 110:3 | 285:2 | **soon** 214:14 |
| 286:7 | **SNAP** 134:2 | 115:21 | 303:8 | 313:6 |
| 288:8 | **so-called** | 116:22 | 305:13,20 | 317:2,21 |
| **skeptical** | 46:2 | 117:7,18 | 313:7,16 | **sophisti...** |
| 224:1 | 192:20 | 120:3 | 323:2,13 | 331:13 |
| **skip** 208:5 | **soaring** | 123:4,7 | 323:22 | **sorry** 13:20 |
| 211:23 | 221:17 | 133:19 | 324:10,13 | 20:8,9 |

**ERIC WALDO  12/22/2022**

| | | | | |
|---|---|---|---|---|
| 32:3 35:13 | 12:24 | 231:2 | 351:1 | 253:19 |
| 42:23 52:7 | 13:20 | 242:9 | **space** 133:2 | 264:22 |
| 54:9 56:23 | 14:19 | 243:23 | 154:9 | 280:3,16 |
| 62:2,5 | 25:21 26:1 | 261:18 | 373:7 | 281:3 |
| 67:8 71:6 | 26:10 | 276:15 | **spaces** | 338:21 |
| 71:8 78:14 | 34:10 36:4 | 292:2,3 | 326:10,21 | 344:11,13 |
| 83:3 84:11 | 37:3 38:3 | 301:11 | 329:11 | 344:17,24 |
| 87:16 89:6 | 40:23 | 302:2 | **Spain** 254:13 | 344:25 |
| 127:9 | 43:13,16 | 323:18 | 254:20,24 | 355:13 |
| 129:19 | 47:3 48:14 | 325:13 | **speak** 15:24 | **specific...** |
| 140:8 | 50:17,19 | 326:1 | 29:12,12 | 33:21 |
| 143:12 | 51:9 52:18 | 345:3 | 57:10 | 73:17 88:4 |
| 144:15,24 | 61:3 64:16 | 365:6,25 | 107:22 | 88:8 102:5 |
| 146:24 | 66:18,19 | **sorts** 176:9 | 156:15 | 107:9 |
| 168:1 | 70:10 | 199:1 | 161:16 | 109:5 |
| 178:14 | 74:19 77:4 | **sotto** 271:8 | 237:15 | 116:9 |
| 208:8,10 | 77:7 80:12 | 275:24 | 240:20,22 | 120:10 |
| 214:3,7 | 85:24 | **sought** | 241:2 | 122:20 |
| 215:18,20 | 87:14 | 357:19 | 320:12 | 123:21 |
| 216:12 | 89:24 | **sound** 167:13 | **speakers** | 150:17 |
| 219:7 | 92:13 96:6 | 190:19 | 344:17 | 161:5 |
| 222:25 | 96:7 102:2 | 370:12 | **speaking** | 165:22 |
| 236:1 | 106:23,25 | **sounded** | 22:19 | 190:24 |
| 240:23,25 | 106:25 | 345:25 | 241:17 | 227:10 |
| 265:13 | 107:2,11 | **sounds** 10:16 | **speaks** 305:5 | 229:1 |
| 266:19,19 | 108:20 | 30:10 45:3 | **special** | 232:19 |
| 267:17 | 110:7 | 45:3,7,9 | 81:11 | 276:20 |
| 271:5,20 | 111:4,6 | 59:23 | 255:19 | 313:15 |
| 272:1 | 112:15 | 91:22 | **specific** | **specificity** |
| 275:24 | 113:12 | 106:7 | 16:25 | 109:25 |
| 278:18 | 114:20 | 145:13 | 25:13 31:4 | 111:20 |
| 279:9 | 123:19 | 190:17 | 35:13,16 | 194:16,22 |
| 287:2 | 124:15,16 | 214:1 | 35:18,19 | **specify** |
| 289:18 | 125:2 | 254:24 | 35:21 | 180:18 |
| 294:10 | 126:13 | 280:20 | 37:11 | **spectrum** |
| 300:8,8 | 127:25 | 293:5,7 | 54:20 91:9 | 168:19 |
| 304:19 | 131:10 | 306:4 | 92:8 104:8 | **speculation** |
| 311:3 | 133:6 | 316:3,16 | 104:16 | 127:1 |
| 315:19 | 143:15,16 | 318:9 | 109:13 | 128:10 |
| 324:23,23 | 143:19 | 323:17 | 111:1 | 167:20 |
| 326:8 | 147:7 | 368:9 | 130:4 | 232:6 |
| 337:4 | 157:18 | 369:24 | 131:3 | 248:4 |
| 344:3 | 158:17 | **source** 45:22 | 176:23 | 289:21 |
| 345:8 | 167:14,16 | 46:1,3 | 195:2 | 329:20 |
| 352:12 | 168:3 | 344:11 | 196:10 | 359:16 |
| 353:11 | 172:24 | **sources** | 234:24 | 370:10 |
| 359:4 | 194:19 | 169:8 | 247:7,25 | **speech** 326:1 |
| 364:8 | 195:25 | 343:10,14 | 249:14 | 358:16 |
| **sort** 10:14 | 209:21 | 343:23 | 253:7,14 | **speeches** |

**ERIC WALDO  12/22/2022**

29:7 31:25
319:23
**speed** 170:14
170:18
179:23
243:16,20
243:23,25
331:12
358:18,24
359:11,20
361:4
**spell** 15:3
48:17
**spend** 140:18
216:17
314:19
**spending**
115:12
**spilling**
75:22
**spoke** 38:5
68:1 93:18
93:20,21
93:25
98:11,11
98:16
106:15,15
106:15,15
108:7
**spoken**
241:14,23
**spokes-** 54:6
**spokespe...**
250:18
**spot** 326:9
Spotify
355:5,7,22
356:14
**spread** 31:6
32:7 35:5
35:22,25
92:4 96:11
101:13,15
101:16,19
101:23,25
102:13,18
102:23
103:6
104:11,17

104:20
117:15
130:7
145:19,25
146:5
147:15
148:1,19
153:13,19
154:9
157:4
166:18
168:23
171:16
172:11,17
173:21
176:3,25
179:3
188:5
195:11
197:7,17
198:8
200:5
202:9,23
210:18
211:9,14
217:24
219:5,12
220:7,13
220:22
230:3
273:4
274:1
285:13
294:5,10
321:15,20
326:12,24
332:12
342:3
344:18,25
350:15,23
358:7
360:9
**spreading**
56:19
128:3
155:1
168:22
177:12
179:23

267:15
285:16
322:15
323:4
331:14
355:8
360:15,16
**spreadsheet**
53:21 54:5
54:11
152:8,13
152:17
**spring** 224:4
224:14,24
225:1
293:18
**square** 360:6
360:8
**St** 7:11
376:2,18
**staff** 16:15
16:20
21:25
33:15
60:14
125:3
143:18
183:22
184:5,24
185:15
202:17
221:22
325:25
348:20
**staffed**
14:19
70:12
**staffer**
185:23
**staffers**
14:22
326:3
**staffing**
115:12
149:25
201:22
**stage** 62:23
157:9
164:23

310:23
314:22
**stake** 303:13
**stakeholder**
12:13
18:20
88:21
311:24
**stakehol...**
18:17 19:2
19:8,9
28:12,16
31:19
41:18
49:22
114:16
209:15,21
209:24
210:2,7
258:4
284:20,20
312:15
313:10
**stand** 132:15
312:3
**standard**
8:12
105:22
106:1
167:9
187:3
282:14
336:2
359:12
372:1
**standards**
267:21
268:2
333:4,12
333:20
334:5,7
359:2,9
**stands**
182:20
**Stanford**
36:22
38:21
40:11,19
42:16

48:21,25
206:15,17
207:2,4,10
207:24
208:6
213:8
251:8
283:9,12
283:14
284:1
**Starbird**
283:23
**start** 142:5
142:14
161:7
183:14
190:19
215:12
216:16
369:19
**started**
11:14 14:5
16:1 23:4
23:6,12
78:2
127:16
135:10
219:15
367:19
372:11
**starting**
54:15 55:3
57:13
234:10
242:21
295:8
323:17
356:9
**starts**
278:12
292:21,21
356:8
367:21
**state** 1:4
5:4,21 6:3
6:9 8:13
9:1,11,22
375:5,6
376:9

| | | | | |
|---|---|---|---|---|
| 378:3 | **steer** 92:14 | **stint** 298:6 | 326:2 | 30:15 |
| **stated** 81:5 | **step** 23:1 | **STIPULATED** | **strategies** | **stuff** 74:8 |
| 165:12 | 104:10 | 8:1 | 176:11 | 129:9 |
| 303:1 | 179:17 | **stipulat...** | **strategy** | **stunt** 113:12 |
| 347:3 | 180:3 | 345:16 | 192:2,5 | **sub** 273:12 |
| **statement** | 210:17 | **stock** 243:10 | 193:9 | 273:16,19 |
| 63:14 | 326:9,21 | **stop** 117:14 | 284:14 | 273:20 |
| 90:25 | 329:10 | 142:18 | 336:24 | 343:16 |
| 115:6 | 332:11 | 145:19,25 | 337:2,3,4 | **Subhan** |
| 168:5 | **steps** 29:1 | 146:4 | 337:5 | 363:14 |
| 192:18 | 29:19,20 | 147:15 | **stream** | 367:9 |
| 198:3 | 30:15,19 | 148:1,18 | 203:18 | **subject** |
| 284:16,18 | 31:4 32:7 | 153:13 | **streams** | 12:19 |
| 327:7 | 96:10,21 | 157:3 | 203:5,24 | 19:13 34:3 |
| 329:8 | 97:14,17 | 170:15,18 | **Street** 6:11 | 38:25 39:1 |
| 345:25 | 97:20,23 | 171:16 | 6:17,22 | 39:5,18,21 |
| 358:25 | 108:21,22 | 172:16,23 | 7:10 294:5 | 39:22,24 |
| **statements** | 117:4,6 | 173:4,6,22 | 294:9 | 40:6 41:6 |
| 33:6 84:3 | 118:19,23 | 176:2 | 302:5 | 41:14 |
| 94:9 | 120:7 | 193:9 | 376:1,7,18 | 52:16 |
| 168:11 | 121:6 | 202:23 | **strength** | 58:22 60:6 |
| 196:15 | 148:18 | 215:17,19 | 275:10 | 62:25 |
| 319:22 | 173:3 | 217:24 | **strengthen** | 86:24 |
| 320:5 | 176:2 | 219:5,12 | 201:8,17 | 92:15,17 |
| 321:23 | 180:7 | 220:7,13 | **strength...** | 110:1,2,4 |
| 322:24 | 190:24 | 220:22 | 276:3 | 116:15,17 |
| 327:9 | 211:17 | 293:11 | **strengths** | 213:16 |
| 330:8 | 233:6 | 329:1,2 | 116:25 | 262:15,17 |
| 331:24 | 243:10 | 360:21 | **strikes** | 265:11,25 |
| **states** 1:1 | 244:6,10 | **stopped** | 205:8 | 299:22 |
| 5:1,17,19 | 244:12,21 | 368:11 | **strong** | 306:15,21 |
| 8:16 | 245:2,11 | **stopping** | 263:25 | 306:25 |
| 235:20 | 246:2 | 30:20 | 329:19 | 362:16 |
| 250:20 | 249:8 | 72:12 | **stronger** | **subjecting** |
| 280:2 | 256:11,25 | 154:9 | 271:2,13 | 322:1 |
| 302:25 | 257:13 | 166:18 | **strongly** | **submissions** |
| 322:1 | 259:15,25 | 173:7,21 | 308:16 | 349:15 |
| 336:16 | 260:11 | 303:9 | 329:16 | **submit** |
| 375:7 | 262:6 | 305:17,21 | **structure** | 284:21 |
| **status** 39:10 | 268:19 | **store** 166:23 | 42:13 | 334:14 |
| 42:12 | 270:16 | 168:6 | 114:23 | 345:4 |
| 198:14,19 | 272:21 | **stories** | 364:13 | **submitted** |
| 255:19 | 297:14 | 217:24 | **students** | 346:18 |
| **stay** 86:25 | 318:22 | 219:5,12 | 17:24 | 354:5 |
| 108:4 | 347:24 | **story** 294:5 | **studies** | **submitting** |
| **staying** | 348:18 | 294:9,12 | 100:8 | 284:25 |
| 108:9 | 361:10 | 302:21 | **study** 114:24 | 285:6 |
| **steams** | **sticking** | 308:6,17 | 173:12 | **subpopul...** |
| 203:20 | 272:16 | **story-bank** | **studying** | 198:13,17 |

**ERIC WALDO  12/22/2022**

| | | | | |
|---|---|---|---|---|
| subscribe | support | 215:16 | 28:6,10 | 169:2,21 |
| 377:10 | 122:9 | 225:17 | 29:4,5,15 | 170:5 |
| subscribing | supporters | 230:23 | 29:21,23 | 171:11 |
| 378:6 | 328:9,20 | 237:11 | 30:11,24 | 173:21 |
| subsequent | supporting | 244:5,9 | 31:10,14 | 174:1,2 |
| 112:2 | 209:17 | 245:1 | 32:8 35:1 | 176:24 |
| substance | supports | 253:9,23 | 35:3,6,7 | 179:1 |
| 240:8 | 358:5 | 255:18,20 | 36:5,11 | 186:8,13 |
| 252:21 | suppose | 255:23 | 37:15 39:7 | 188:11,14 |
| 307:21 | 184:14 | 274:17,19 | 39:14 | 188:21 |
| 377:7 | supposed | 274:20 | 41:23 42:2 | 189:3,9,12 |
| substantial | 90:20 | 278:8 | 42:11,23 | 189:16 |
| 28:22 | supposing | 281:10 | 43:2 47:13 | 191:17 |
| 304:15 | 177:5 | 289:12 | 49:19 50:9 | 198:6 |
| Suffice | suppression | 294:4,8 | 51:22 52:9 | 206:8 |
| 274:16 | 261:18 | 299:20 | 55:5,9 | 207:18 |
| sugar 105:3 | sure 11:5 | 301:23 | 56:12 57:9 | 212:14,24 |
| suggest | 15:8 21:20 | 306:15,21 | 57:15 58:2 | 212:25 |
| 63:16 | 26:5 27:9 | 308:15 | 58:7,9 | 213:9 |
| suggestion | 34:16 | 309:6,7 | 59:18 60:7 | 215:6 |
| 16:21 | 39:11,17 | 314:16 | 61:5 64:5 | 217:22 |
| 152:14 | 41:16 | 315:10 | 67:6 68:5 | 218:5,12 |
| 198:5 | 45:15 | 316:8,12 | 69:19,20 | 220:10 |
| suggestions | 46:13 | 316:18 | 70:6,25 | 221:22 |
| 199:24 | 47:10 49:1 | 317:17 | 73:12 75:5 | 226:20 |
| suggests | 49:8 57:7 | 320:8 | 76:3 78:2 | 240:12 |
| 200:17 | 57:11 | 326:19 | 79:5 85:19 | 250:19 |
| Suite 6:17 | 58:17 | 333:16,17 | 87:19 88:5 | 251:25 |
| summary | 59:12 | 335:18 | 99:1,19 | 252:7 |
| 200:9 | 60:13 63:3 | 341:6 | 102:5,13 | 262:11 |
| summation | 63:8 74:1 | 342:14 | 103:12,19 | 263:7 |
| 276:14 | 75:6,20 | 343:20 | 105:6 | 265:2,12 |
| summer 293:9 | 98:2 102:1 | 344:20,22 | 109:12 | 265:17 |
| 293:14 | 108:11 | 345:2,12 | 113:2 | 267:8 |
| 365:2 | 130:15 | 345:14 | 114:8 | 269:11,14 |
| sums 305:15 | 141:6,7,13 | 346:9,11 | 116:11 | 270:15 |
| Sundar 352:8 | 143:5,22 | 357:2 | 126:20 | 272:20 |
| superspr... | 165:24 | 360:14 | 129:21 | 283:3,6,13 |
| 177:11 | 170:11 | 370:11 | 133:18 | 284:11,24 |
| superspr... | 171:1 | **Surgeon** | 134:10 | 288:18,21 |
| 176:20 | 175:21 | 11:16,24 | 135:10 | 288:22 |
| 177:1,19 | 179:20 | 12:4,14 | 146:24 | 290:3 |
| 177:24 | 183:19 | 13:8 16:23 | 155:13 | 291:20 |
| 178:8 | 197:13 | 21:11,22 | 162:6,11 | 298:13 |
| 204:7,11 | 202:11 | 22:13 | 163:21 | 301:7 |
| 329:25 | 205:19 | 24:13 26:2 | 165:14,21 | 306:12 |
| 330:9 | 208:14 | 26:4,12,17 | 166:2,4 | 308:10 |
| supplied | 210:13 | 26:19 27:7 | 167:2,5 | 313:1 |
| 118:6 | 213:19 | 27:8,14,18 | 168:9,9,12 | 314:24 |

**ERIC WALDO  12/22/2022**

318:7
319:21
320:5,11
320:19
323:21
324:12,21
325:10
329:7,9,15
330:6
331:5
333:25
334:6
336:5
337:21
338:2,12
340:1,4,8
345:20
346:1,22
347:11,18
347:23
348:17
349:4,9,19
349:21,25
352:9
354:15,20
355:4,20
362:6
364:6
367:13
369:9
372:6,24
373:6,8,21
373:23
**surprised**
150:15,19
307:15
373:16
**suspect**
189:20
**suspensions**
205:8
**swear** 9:16
**switch** 20:19
**sworn** 5:11
9:18
375:10
**system**
188:22
303:3

**systems**
340:23
_____

**T**
_____
**T-A-R-T-...**
15:7
**table** 173:17
173:19
**tackle**
145:20
147:2
**tackling**
147:11
**tactic**
176:12
**tactics**
176:10,13
**TAH** 378:5
**take** 10:12
17:2 21:15
22:13 23:4
23:17
28:21 29:2
29:13,18
29:20
30:19 31:6
32:6 41:22
51:11,24
72:19 78:1
86:11 87:6
88:1,25
89:16 90:2
91:2 92:1
92:21
99:18
100:19
101:9
102:8
114:17
115:18
117:4
120:8
129:7
135:9
138:2
141:17
148:24
150:4,6
151:24

154:1
166:16
172:24
176:2,19
176:25
177:3,10
177:14,24
178:5,7
180:11
182:9
183:13
193:5,16
194:14
195:6
199:14
209:8
211:17
213:23
214:15
215:22
216:14
230:2
233:5
234:20
236:7
243:10
272:15
277:25
282:2,6
285:18
303:9
305:16,21
316:13
317:3
320:11
322:14
324:16,25
330:9,25
331:19
332:18
333:15
335:16
345:13
347:23
348:17
361:10
368:15
371:20
**taken** 8:4

46:7 53:9
97:24
105:24
124:20
160:25
173:3
177:22
180:7
181:17
194:10
195:12
196:10
214:9
228:13
243:24
244:12,21
245:10,20
246:2
268:15,19
268:24
277:6,6
282:12
318:23
335:25
338:12
339:16
371:24
375:11,15
376:13
**takes** 115:13
165:15,22
**talk** 25:24
28:11
40:16
41:11 51:5
52:25 53:4
60:9 64:24
67:20,23
83:11
92:11 98:9
106:20
111:7
115:10
139:22
169:23
183:8
195:22,23
243:22
253:3

264:4
291:25
292:4
295:12
298:24
299:17,23
311:20,22
313:16
314:17
316:7
358:15
361:14
**talked** 40:23
62:20 67:4
67:18
71:19 79:7
79:11
84:15
85:18
91:18
94:21
99:20
100:1
106:13
109:2,21
112:17
122:17
124:10
126:6
129:14
145:5
157:19
173:14
182:10
197:2
200:11
203:11
212:5
218:15
222:10,16
240:8
241:10,16
241:21
242:5
243:16,19
243:25
252:25
258:2,7
261:13

| | | | | |
|---|---|---|---|---|
| 283:10 | 78:16 | **tasks** 112:22 | 290:8,11 | 184:13 |
| 296:5 | 118:1 | **TBD** 149:2 | 290:13 | 185:19 |
| 313:10 | 156:5 | **teacher** | 291:8,21 | 290:12 |
| 319:22,23 | 168:21 | 19:17 51:8 | 292:17,17 | 343:20 |
| 327:12 | 169:7,20 | **team** 14:9,15 | 292:25 | **technology** |
| 332:3 | 184:2 | 14:23 16:3 | 294:3 | 17:24 |
| 343:6 | 193:20 | 16:5 18:23 | 296:10 | 19:15,22 |
| 359:1,8 | 201:7 | 18:23 19:5 | 303:21 | 20:1,2,12 |
| **talking** | 204:5 | 19:12 | 304:11,22 | 20:17 |
| 10:15 17:3 | 217:23 | 34:20 37:1 | 315:4 | 35:10 |
| 18:10 | 218:6 | 37:7 47:17 | 320:23,24 | 53:13 |
| 19:10 36:4 | 219:10 | 48:11,15 | 320:25 | 91:16 |
| 36:5 41:17 | 220:9,18 | 49:3,18 | 324:6,8 | 104:16 |
| 44:23,23 | 220:19 | 50:9,10,23 | 325:17,23 | 110:18 |
| 54:19 | 228:24 | 51:3,6,13 | 325:24 | 117:17 |
| 64:22 67:5 | 233:18,19 | 51:23,25 | 337:1 | 133:23 |
| 87:20 | 233:21 | 52:14,16 | 348:4 | 134:4 |
| 105:16 | 243:9 | 52:17 | 362:21 | 169:10 |
| 106:4 | 254:1,18 | 55:15 | 364:2,17 | 172:19 |
| 108:10 | 267:13,19 | 56:10,13 | 373:9 | 174:4 |
| 135:20 | 270:25 | 57:9,15,20 | **teams** 60:24 | 175:7 |
| 157:2 | 271:1,17 | 58:1,3,10 | 60:24 | 179:13 |
| 161:6 | 272:6 | 64:19 93:6 | 118:15 | 194:18 |
| 184:8,11 | 273:2 | 95:12,20 | 146:12,14 | 197:6,16 |
| 185:25 | 275:21 | 115:3 | 147:12,13 | 199:8 |
| 190:21 | 276:24 | 120:19 | 147:20 | 200:8 |
| 196:23 | 284:19 | 132:5 | 148:12 | 208:21 |
| 202:5 | 294:4 | 133:24 | 153:10,15 | 210:16 |
| 219:23 | 309:19,20 | 134:3 | 153:18 | 264:18 |
| 223:17 | 331:12,16 | 137:12 | 155:14 | 321:13 |
| 235:25 | 333:21 | 139:19 | 157:5 | 329:10 |
| 245:17 | 344:21,22 | 146:18,25 | 201:23 | 331:17 |
| 254:22 | 356:13 | 147:21,25 | 202:1,8 | 332:11,23 |
| 262:12 | **Tammie** 5:15 | 155:7 | 235:2 | 340:12,16 |
| 279:18 | 7:9 8:4,19 | 156:2,2 | 236:6,14 | 340:20 |
| 305:7 | 375:3,22 | 161:21 | 259:14,24 | 350:16,17 |
| 310:24 | 376:21 | 164:15 | 310:18,23 | **technolo...** |
| 312:4,8 | **Tammie's** | 167:6 | 311:7 | 31:2 |
| 313:8,9,12 | 160:19 | 183:23 | **tech** 61:12 | **tell** 11:15 |
| 313:14,20 | **tamp** 97:17 | 185:3,8,15 | 64:3 183:9 | 87:14 |
| 326:7 | 97:20 | 185:21,22 | 303:1 | 119:20 |
| 327:7 | **tank** 38:18 | 186:15 | 347:12 | 120:11 |
| 334:11 | 44:5 | 187:1,16 | **technical** | 150:24 |
| 335:11 | **Tartakovsky** | 195:17 | 336:11 | 181:7 |
| 348:4 | 14:14 15:5 | 212:9 | 337:21 | 235:21 |
| 355:17 | 64:2 | 228:5,6 | 341:6 | 257:12 |
| 356:22 | 164:10 | 238:20,21 | 342:14 | **telling** |
| 359:11 | 187:13 | 254:2 | **technically** | 121:9 |
| **talks** 49:25 | 289:3,10 | 289:11 | 136:10 | 129:21 |

**ERIC WALDO  12/22/2022**

| | | | | |
|---|---|---|---|---|
| 223:18 | **texted** | 35:19 89:8 | 317:1 | 58:17,19 |
| 312:24 | 240:12,17 | 133:21 | 318:16 | 58:21,25 |
| **template** | **thank** 11:14 | 216:25 | 326:8 | 59:4,11,14 |
| 18:16 | 62:12 67:8 | 225:23 | 342:21 | 59:14,16 |
| **temporary** | 67:9 | 228:16 | 355:2 | 59:18,20 |
| 203:6 | 112:16 | 231:14 | 370:7 | 60:5,13,23 |
| **tended** | 123:18 | 243:2 | **think** 11:4 | 61:2,3 |
| 304:10 | 139:12 | 264:20 | 14:15,18 | 62:17,20 |
| **tense** 224:4 | 143:12 | 267:15 | 16:21 | 63:10,13 |
| 224:13,24 | 160:12 | 272:6 | 20:16 | 64:16 65:1 |
| 314:21 | 162:22 | 274:10 | 23:15 | 65:4 66:13 |
| **Tericka** | 178:19 | 276:15 | 24:23 26:2 | 66:19 67:5 |
| 132:1,2 | 179:21 | 339:20 | 26:6,8,12 | 69:2,10,12 |
| **term** 175:1 | 197:14,14 | **things** 30:21 | 27:2,6,16 | 70:13 71:1 |
| 200:16 | 205:21 | 44:8 70:11 | 27:17,17 | 71:21 75:6 |
| 207:14 | 208:12 | 87:5,13,14 | 28:3,10,13 | 78:5,10 |
| **terms** 14:15 | 215:17,18 | 87:23 99:4 | 29:9,13,14 | 79:7,8 |
| 26:20,22 | 226:3,18 | 112:12 | 29:14,17 | 80:11 81:7 |
| 48:6 | 236:11,13 | 113:14,21 | 30:10,13 | 81:15 82:4 |
| 116:22 | 249:22 | 118:17 | 30:16 31:8 | 82:14,21 |
| 186:6 | 269:5 | 119:11 | 32:12,18 | 83:1,4,8 |
| 233:8 | 271:24 | 120:13 | 33:4,5,7 | 83:15 84:2 |
| 242:11 | 272:3 | 121:13,18 | 33:12,14 | 84:4 85:24 |
| 335:6 | 273:23 | 121:24 | 33:17 34:3 | 86:7 87:16 |
| **testified** | 276:1 | 138:12 | 34:9,10,18 | 87:23 88:8 |
| 78:5 84:17 | 310:10 | 143:21 | 34:19 35:7 | 89:18,23 |
| 151:13 | 352:15 | 147:10 | 35:9,11,20 | 90:23,25 |
| 173:19 | **thanking** | 148:8 | 36:7,9,13 | 91:1 92:25 |
| 174:25 | 316:10 | 149:6 | 36:15,21 | 93:2 94:25 |
| 227:9 | **thanks** | 159:13,17 | 37:14 38:9 | 95:3,7,8 |
| 254:7,10 | 121:13 | 173:18 | 38:18,25 | 96:2,4 |
| 255:12 | 136:1 | 174:12,15 | 39:8 41:12 | 97:7,16 |
| 282:19 | 243:2,7 | 176:9 | 41:17 43:2 | 98:3,12,19 |
| 364:22 | 300:17 | 196:19 | 43:3,12 | 99:1,17 |
| **testimony** | 315:23,24 | 200:17 | 44:5,7,7 | 100:25 |
| 310:25 | **theme** 31:9 | 205:7 | 44:14,14 | 101:19,21 |
| 360:11 | 335:1 | 228:2 | 44:22 | 101:25 |
| 375:9,10 | **themes** 147:5 | 229:16 | 45:21 | 102:1,7,16 |
| **text** 3:2 | **theories** | 233:7 | 46:18 47:1 | 103:2,16 |
| 197:4 | 342:7,8,9 | 237:8 | 48:6,8,9 | 103:19,20 |
| 215:7,13 | **thereon** | 248:11 | 48:20 50:7 | 104:13 |
| 215:25 | 377:9 | 251:15 | 50:13,15 | 106:11,16 |
| 217:5 | **thereto** | 268:7 | 51:19 | 106:25 |
| 236:10 | 375:18 | 270:24 | 52:13 53:1 | 107:10,15 |
| 238:9,24 | 378:6 | 271:1,18 | 53:9,12,16 | 108:2,4,8 |
| 239:1,14 | **they'd** 96:22 | 274:14 | 54:10,18 | 108:16,24 |
| 352:22 | 250:7 | 276:16 | 54:24,24 | 109:1,16 |
| 353:8 | 268:19 | 292:3 | 55:8 57:25 | 109:21,23 |
| 355:25 | **thing** 35:18 | 305:8 | 58:3,9,10 | 109:23 |

**ERIC WALDO  12/22/2022**

| | | | | |
|---|---|---|---|---|
| 110:17 | 144:18 | 192:24 | 258:17,19 | 322:12,22 |
| 111:4,5,11 | 145:10 | 194:5,18 | 258:24 | 323:15 |
| 111:17,18 | 147:1 | 194:21 | 259:22 | 324:6,8 |
| 111:19,25 | 148:3,3,21 | 195:2,3,16 | 260:18 | 325:6 |
| 112:1,6,16 | 149:12 | 195:18 | 261:13,25 | 327:23 |
| 112:17,18 | 152:7,10 | 196:1,12 | 262:23,24 | 330:15,16 |
| 113:3,4,5 | 152:18,19 | 198:9,22 | 263:1,3,10 | 331:22 |
| 113:6,10 | 152:19 | 199:3 | 264:6,15 | 332:4,21 |
| 113:11,16 | 153:9,10 | 200:8 | 264:17 | 333:23,24 |
| 113:19,19 | 153:22 | 201:5,12 | 265:7,23 | 334:15,25 |
| 113:21,21 | 155:15,15 | 202:6 | 265:24 | 334:25 |
| 113:24,25 | 155:25 | 203:1,22 | 266:3,10 | 335:13,14 |
| 114:4,6 | 156:20,25 | 204:22,24 | 266:17 | 337:11 |
| 115:3,9,23 | 157:21 | 204:25 | 267:13 | 338:22 |
| 115:25 | 158:4,5,10 | 206:19 | 271:21 | 339:14 |
| 116:2,14 | 158:12,24 | 207:8 | 272:18,23 | 340:10 |
| 116:14,19 | 161:17 | 209:14 | 272:24 | 341:20,20 |
| 116:21 | 164:8,20 | 210:1,1 | 273:11,15 | 342:5,10 |
| 117:10 | 165:2,4,9 | 213:2,2,3 | 277:23 | 344:24 |
| 118:14 | 165:11,11 | 215:23,25 | 278:3 | 351:6,14 |
| 119:5,8,14 | 165:11 | 216:17,19 | 280:25 | 352:4 |
| 119:16,23 | 166:2,8,20 | 217:2,2 | 282:19 | 354:7 |
| 120:2,17 | 167:8 | 219:22 | 283:15,16 | 355:16,23 |
| 120:23 | 168:15,16 | 221:3 | 283:17,25 | 356:15 |
| 121:20 | 168:20 | 225:13 | 288:25 | 357:21,23 |
| 122:5,12 | 169:5,6,15 | 226:9 | 289:6,9 | 358:3 |
| 122:19 | 169:21,22 | 227:9,14 | 290:20 | 360:5,12 |
| 124:9,10 | 170:9,21 | 227:14,23 | 291:4,10 | 360:12 |
| 124:13 | 170:25 | 228:10,14 | 292:20,23 | 361:18 |
| 125:2,12 | 171:22 | 228:14 | 293:5,8,16 | 362:9,13 |
| 125:16,17 | 172:4,18 | 229:10 | 294:1 | 364:2,11 |
| 125:19 | 173:6,9,9 | 230:5,7,18 | 297:18,20 | 364:13,14 |
| 126:5,11 | 173:11,16 | 233:4 | 298:4,4,15 | 364:22 |
| 126:16 | 173:16,19 | 239:9,13 | 298:18 | 365:5 |
| 127:2,22 | 173:23 | 240:7 | 299:25 | 366:10 |
| 127:22 | 174:20,24 | 241:20,20 | 302:9 | 367:4 |
| 128:1 | 181:18,19 | 241:23 | 303:20 | 368:9,17 |
| 129:14 | 181:19 | 242:7,13 | 304:6,7 | 370:17 |
| 131:23 | 182:1,3,4 | 244:3 | 305:4,4,7 | 371:17 |
| 132:2,3 | 182:6,7 | 247:9 | 307:13 | 372:11,18 |
| 133:7,16 | 183:6 | 250:11 | 309:2 | 373:22,24 |
| 133:21,21 | 184:14,25 | 251:2,6 | 311:19 | 374:4,6 |
| 135:3,20 | 185:12 | 252:9,10 | 312:12 | **thinking** |
| 137:11 | 186:14 | 252:11,12 | 313:12,24 | 108:12,14 |
| 140:6,9,15 | 187:6,19 | 254:7,9,11 | 314:7,14 | 120:21 |
| 141:7,23 | 187:22 | 254:22 | 314:18,23 | 126:17 |
| 142:19,20 | 188:20 | 255:1,12 | 314:24,25 | 145:18 |
| 143:11,14 | 190:1 | 256:17 | 316:5 | 146:4,12 |
| 144:11,17 | 191:19 | 258:1,11 | 321:11 | 147:14,14 |

**ERIC WALDO  12/22/2022**

| | | | | |
|---|---|---|---|---|
| 153:13 | **threats** | 113:7,20 | 331:4 | 222:16 |
| 157:1 | 162:12,23 | 115:17,18 | 335:2,16 | 234:18 |
| 160:14 | 163:12 | 115:21 | 335:23 | 235:2 |
| 264:12,14 | **three** 66:14 | 122:6 | 336:1,2 | 236:6,14 |
| **thinks** | 86:12 | 128:24 | 338:3,14 | 238:17 |
| 156:18 | 135:4 | 130:6 | 340:2 | 239:13 |
| 273:14 | 138:12 | 135:13 | 351:7 | 243:3,8 |
| **third** 6:11 | 139:4 | 136:1 | 360:17 | 280:7 |
| 151:16 | 160:8 | 140:19 | 371:9,13 | 289:7 |
| 193:16 | 181:6 | 146:18,25 | 371:22,25 | 310:25 |
| 230:13 | 267:22 | 150:12 | 372:1,7,11 | 322:23 |
| 231:1,14 | 268:3 | 160:23 | 374:15 | 327:13 |
| 272:13 | 273:20,22 | 161:1 | **times** 2:21 | 331:21 |
| 277:5 | 281:19,23 | 163:17 | 141:5 | 332:3 |
| 330:21 | **thresholds** | 164:19 | 214:18 | 350:8 |
| **Thornton** | 246:9 | 170:24 | 218:9 | 365:11 |
| 90:10 | **thumbs** | 187:17 | 219:10 | 372:12,14 |
| **thought** | 213:24 | 191:2 | 221:11,20 | **Today's** 8:10 |
| 25:15  62:6 | **Thursday** | 214:7,10 | 223:6 | **Todd** 6:4  9:2 |
| 113:11 | 308:5 | 216:15,15 | 225:7 | 85:12 |
| 122:24 | 318:20 | 216:17 | 277:18 | 144:4 |
| 123:2 | **Thursday's** | 239:4,7 | 286:7 | 145:16 |
| 128:6 | 308:6 | 241:3,21 | 325:7 | **told** 74:4 |
| 167:11 | **tick-tock** | 242:8,13 | 372:4 | 80:16 |
| 186:24 | 18:25 | 242:16 | **timing** | 324:8 |
| 232:23,24 | 53:10 | 243:3,7 | 216:16 | **tolerate** |
| 247:23 | **tickets** | 254:11 | **tips** 284:21 | 334:15 |
| 250:5 | 285:19,19 | 259:10 | 284:25 | **tone** 95:9 |
| 262:5,10 | 285:23 | 261:7 | 285:6 | 96:3 107:7 |
| 264:11,17 | 286:1 | 264:3 | **title** 11:15 | 120:11 |
| 272:24 | **tied** 245:14 | 282:10,13 | 11:19  12:1 | **tool** 221:15 |
| 284:22 | 245:22 | 282:14 | 21:17 | **toolkit** 25:7 |
| 306:5 | 249:15 | 290:17 | 26:24  44:2 | 117:12 |
| 361:21 | **tier** 37:3 | 293:2 | 64:15,17 | 122:8 |
| **thoughtful** | **Tim** 363:13 | 296:1,13 | 110:9 | 169:7 |
| 28:2 | 367:8 | 301:25 | 124:25 | **top** 14:25 |
| **thousand** | **time** 8:11,12 | 303:10 | 125:6 | 20:10 |
| 363:1 | 10:24 | 305:23 | 185:17 | 38:16 |
| **thread** 98:4 | 16:18  18:3 | 308:22,24 | 235:12,14 | 77:17 |
| 303:7,22 | 55:18 | 309:11 | 261:12 | 136:14 |
| 304:11 | 58:19 | 312:23 | **titled** 73:9 | 141:1,18 |
| 305:3,5,7 | 81:14  84:7 | 314:20 | **titles** 12:7 | 190:12 |
| 305:10 | 93:2  95:18 | 315:25 | **tobacco** | 215:15 |
| 306:2,6 | 105:21,22 | 316:7,24 | 163:4 | 225:25 |
| 307:11,18 | 105:25 | 319:16 | **today** 10:7 | 234:6 |
| 308:12 | 106:1 | 322:25 | 10:15 | 323:16 |
| **threat** | 107:12 | 323:23 | 23:22 | **topic** 11:10 |
| 162:15,19 | 108:12 | 324:17 | 162:6,24 | 16:25 80:3 |
| 163:1,13 | 110:8,11 | 325:22 | 180:3 | 370:5 |

**ERIC WALDO  12/22/2022**

| | | | | |
|---|---|---|---|---|
| **topics** 80:5 | 329:5,23 | 150:1 | 216:25 | 319:8 |
| 118:6 | 330:4 | 222:2 | 228:10 | **Twitter** 4:4 |
| 130:25 | 331:12 | 252:24 | 254:1 | 20:8,9 |
| 182:18 | 333:2,8 | 309:6 | 255:13,24 | 51:23 52:6 |
| **total** 111:15 | 334:21 | **tries** 31:15 | 258:25 | 52:25 |
| 245:23 | 356:20 | 307:24 | 264:9 | 53:23 55:6 |
| 276:15 | 376:15 | **trip** 149:24 | 294:19,22 | 63:2 85:12 |
| **touch** 183:11 | **transcri...** | 356:7 | 306:10 | 88:17 |
| 183:20 | 208:1 | **trouble** | 309:9 | 89:21 |
| 184:3,8,15 | 326:18 | 356:2 | 311:19 | 115:22 |
| 184:20 | **transition** | **true** 125:15 | 313:24 | 122:9,12 |
| 185:10 | 55:10,11 | 332:1 | 315:6 | 134:1 |
| 189:21 | 55:15 56:6 | 361:12 | 325:3 | 144:4,4 |
| 255:24 | 56:14 79:9 | 377:8,12 | 334:16 | 147:13,21 |
| 277:16 | 80:17 81:8 | **truly** 342:11 | 344:3 | 151:18 |
| 355:1 | 82:5 | **trusted** | 356:23 | 157:2 |
| **touched** | 218:24,24 | 169:8 | 359:25 | 181:20,24 |
| 133:12,13 | 221:3,4 | **truth** 165:15 | 360:5 | 182:2 |
| 249:25 | **transpar...** | **try** 10:13,20 | **Tuesday** 75:3 | 257:18 |
| **touching** | 102:9 | 15:4 22:22 | **tumor** 99:14 | 258:7,8 |
| 54:16 | 159:23 | 83:8 | **turn** 77:16 | 297:12 |
| **tough** 326:12 | 174:7,16 | 132:18 | 103:13 | 303:22 |
| 326:23 | 175:8 | 170:11 | 164:25 | 304:16 |
| **town** 38:3 | 192:3 | 175:20 | 165:5,9 | 305:9 |
| 51:23 | 208:22 | 252:16 | 170:15 | 308:10,12 |
| 132:9 | 272:14,17 | 253:3 | 182:24 | 351:19 |
| 134:1 | 272:22 | 255:6 | 210:9 | 353:3,4 |
| **track** 141:10 | 303:12 | 348:18 | 326:4 | 354:10 |
| 285:20 | 305:11 | 357:24 | **turning** | **two** 12:8 |
| 321:11 | 322:4 | 359:13 | 57:17 | 33:12 |
| **tracking** | 333:4 | **trying** 11:3 | 92:15 | 44:12 |
| 47:7 186:8 | 343:6 | 18:17 | **TV** 327:20 | 47:19 |
| 186:12,18 | **transparent** | 20:16 30:2 | **tweak** 100:9 | 51:20 53:8 |
| 186:22 | 114:4 | 33:15 | 103:5 | 53:25 |
| 321:2 | 332:13 | 41:15 | **tweet** 19:4 | 61:15 |
| **Tracy** 6:10 | **transpired** | 52:13 | 302:22 | 75:21 |
| 9:10 | 234:16 | 56:16 62:8 | 304:11 | 89:10 90:4 |
| **traffic** | **travel** 150:1 | 62:12 99:2 | 305:3,5,14 | 91:1,4 |
| 170:19 | **travels** | 101:7 | 306:2,5 | 99:4 |
| **transacted** | 193:21 | 106:25 | 307:11,18 | 113:21 |
| 332:15 | **treated** | 113:22 | 318:8,14 | 114:6 |
| **transcribed** | 34:12 | 114:21 | **tweeted** | 126:23,24 |
| 8:5 321:10 | **treatment** | 119:10 | 122:9,13 | 130:21 |
| **transcript** | 100:18 | 123:19 | 303:16 | 138:3,6 |
| 2:18 161:8 | **trends** | 133:3,9 | 306:13 | 142:12 |
| 322:6 | 246:14 | 146:21 | **tweets** 140:7 | 159:13 |
| 326:5,16 | 248:15 | 203:2 | 140:8 | 176:13 |
| 326:20 | **tried** 90:15 | 209:18 | 303:5,18 | 206:24,24 |
| 327:6 | 131:8 | 216:7,24 | 307:3 | 209:1 |

**ERIC WALDO  12/22/2022**

| | | | | |
|---|---|---|---|---|
| 211:23 | 162:4 | 83:5 98:20 | united 1:1 | 365:21 |
| 238:13 | ultimately | 99:19 | 5:1,19 | updates |
| 256:1 | 101:22 | 100:3,4 | 8:15 65:11 | 137:23 |
| 258:21 | 198:23 | 144:12 | 235:16,19 | 138:3 |
| 259:16 | 304:1,14 | 156:6,11 | 235:23 | 154:25 |
| 260:1,8,10 | 337:18 | 157:8 | 250:20 | 364:18 |
| 268:8,9 | un- 80:13 | 171:20 | 322:1 | updating |
| 270:9,11 | unable 33:16 | 173:15 | 336:16 | 280:2,15 |
| 270:21 | 80:13 | 174:25 | universe | 280:24 |
| 272:4 | 90:17 | 187:11 | 111:10 | 281:3 |
| 273:22 | uncovered | 195:20 | University | 366:3 |
| 293:3 | 124:6 | 219:18 | 283:19,24 | uplaid 142:1 |
| 308:8 | under- | 221:5 | unlock | upset 33:8 |
| 334:13 | 236:21 | 232:23 | 178:15 | 94:8 95:20 |
| 371:1 | 237:1 | 236:22 | unreason... | uranium 99:6 |
| Tyiesha | underneath | 237:3 | 217:3 | 104:21 |
| 14:23 | 204:5 | 242:10 | unrelated | 105:3 |
| 164:15 | understa... | 265:10 | 130:17,20 | urged 176:24 |
| 187:15 | 264:1 | 266:12 | unsolicited | urgency |
| 289:3,8,9 | understand | 301:17 | 297:6,10 | 209:15 |
| 290:10 | 11:1 16:5 | 304:18 | 367:5 | 210:5 |
| Tyiesha's | 28:4 36:1 | 305:1 | unusual | 277:17,21 |
| 289:12 | 56:17 78:7 | 333:11 | 277:21 | 277:24 |
| type 25:14 | 83:1,13 | 337:16 | unvaccin... | urgent |
| 88:20 | 96:6 99:2 | 352:23 | 327:18 | 162:12,15 |
| 125:2 | 100:20,21 | understood | upcoming | USDR 86:7 |
| 128:4 | 101:20 | 111:20 | 86:10 | use 29:21 |
| 153:9 | 103:1 | 156:15 | update 66:17 | 30:5 95:5 |
| 257:7,11 | 105:1 | 231:22 | 129:3,8,13 | 99:20 |
| types 164:13 | 155:6 | 295:20 | 129:20,25 | 113:6,20 |
| 338:21 | 158:8,18 | undertaking | 131:14 | 134:5 |
| typical | 173:15 | 16:8 | 153:24 | 159:2 |
| 166:22 | 174:21 | undo 176:8 | 254:3 | 169:16,19 |
| 168:5 | 176:5,6 | unfair 96:8 | 256:11,20 | 171:8 |
| typically | 198:11,24 | unfortun... | 256:25 | 172:1 |
| 16:4 | 201:16 | 277:15 | 257:7,11 | 203:6 |
| 183:2 | 216:23 | unidenti... | 258:16 | 228:13 |
| 184:4 | 236:15 | 80:25 | 270:11,16 | 317:3 |
| 357:6 | 251:23 | unintell... | 279:19,20 | 329:7,16 |
| typing 54:7 | 271:6 | 280:16 | 281:2 | 359:25 |
| 54:8 | 321:12 | union 51:8 | 319:10 | 365:16 |
| ─────── | understa... | unions 19:17 | 332:5,9 | 373:8 |
| **U** | 35:21 40:3 | unique 50:10 | 365:25 | user 171:20 |
| U.S 6:22 7:4 | 42:2,4 | 107:12 | 367:4 | users 158:18 |
| 21:11 | 56:18 | 150:13 | updated | 169:13 |
| 349:4 | 59:24 60:2 | uniquely | 21:18 | 199:25 |
| 376:7 | 68:7 78:6 | 95:13,21 | 76:15 | 200:22,25 |
| uh-huh 10:20 | 80:17 | 96:22 | 279:24 | 342:24 |
| 29:4 107:3 | 81:18 82:3 | 97:25 | 319:1 | 345:10 |

**ERIC WALDO  12/22/2022**

| | | | | |
|---|---|---|---|---|
| **uses** 169:21 | 285:7 | **validate** | 216:16 | 276:11 |
| 170:6 | 286:7 | 35:25 | 282:10,13 | **violations** |
| 361:8 | 288:8 | **validation** | 319:17 | 201:2 |
| **usually** | 293:13 | 103:3 | 335:23 | **violative** |
| 63:17 | 296:21 | **valuable** | 336:1 | 193:22 |
| 203:10 | 298:20 | 368:23 | 371:15,18 | 194:7,9 |
| 205:7 | 301:16 | **various** | 371:22,25 | 195:1 |
| 264:2 | 302:3 | 13:10 | 374:15 | **violator** |
| 300:23 | 316:7,23 | 42:10 | **videorec...** | 205:7 |
| 357:7 | 364:19,24 | 73:15 | 1:14  5:10 | **viral** 195:12 |
| | 365:11 | 279:2 | 8:12 | **Virality** 3:9 |
| **V** | **vaccine-...** | 345:16 | **videos** 58:7 | 207:12,15 |
| **v** 376:9 | 154:20 | 348:21 | **view** 52:14 | 207:20 |
| 378:3 | 275:11,17 | **vary** 198:13 | 86:16,19 | 282:18,20 |
| **V-I-R-A-...** | **vaccines** | **Veitch** | 86:21  87:8 | 283:4,6 |
| 207:15 | 24:17 | 151:25 | 102:3,4 | 284:12,21 |
| **Va-** 278:21 | 45:24 | **venues** 307:6 | 116:15,23 | 284:25 |
| **vacationing** | 142:20 | **verb** 105:16 | 165:20 | 285:6,9,19 |
| 254:20 | 155:1 | **verbal** 10:18 | 166:1,5,9 | 285:22,25 |
| **vaccination** | 229:22 | **verified** | 166:16 | 288:19,23 |
| 13:15 | 231:19 | 296:22 | 167:2,15 | 288:24 |
| 217:24 | 280:4 | **Verizon** | 169:6 | 290:1,3 |
| 219:6,12 | 284:23 | 182:13 | 172:7 | **Virginia** |
| 222:3,11 | 285:21 | **versa** 165:7 | 173:6,21 | 373:3 |
| 223:3 | 288:11 | **version** 50:8 | 180:20 | **virtual** 38:3 |
| 317:16 | 294:15 | 58:18 | 260:4 | 132:8 |
| 318:17 | 296:23 | 76:15 | 347:18 | **virtually** |
| 319:11 | 297:4 | 304:12,13 | **viewed** | 313:23 |
| 370:5 | 298:10,19 | 343:7 | 113:14 | 353:1 |
| **vaccinat...** | 298:22 | **versions** | 140:8,16 | **virus** 166:18 |
| 317:7 | 301:10 | 51:20 | 250:16 | 166:24 |
| **vaccine** | 314:9 | **versus** 8:14 | **viewing** | 168:7 |
| 124:7 | 315:22 | 274:21 | 250:12,14 | **vis-a-vis** |
| 126:23 | 317:4,6,22 | 365:6 | 258:3 | 26:6  114:7 |
| 132:5,10 | 319:2 | **vice** 165:7 | **views** 29:24 | 173:14 |
| 132:14 | 365:15 | 235:19 | 43:6 | 305:9,12 |
| 179:4 | 366:4,16 | **video** 8:19 | 264:10 | **visibility** |
| 220:6,11 | 366:21 | 203:7,18 | 370:7 | 29:7 |
| 220:21 | 367:1 | 204:3 | **violate** | **vision** |
| 221:16 | 369:19,22 | 207:24 | 194:9 | 209:16 |
| 231:6 | 370:1 | **VIDEOCON...** | 204:16,23 | 210:5 |
| 271:3,14 | 371:11 | 1:14  5:10 | 205:5 | **visited** |
| 273:7 | **vagary** | **videogra...** | 231:17 | 335:6 |
| 276:5,12 | 149:21,23 | 8:9,21 | **violates** | **Vivek** 217:22 |
| 278:24 | **vague** 194:19 | 9:15 | 267:20 | 234:15 |
| 279:13,14 | **vaguely** | 105:21,25 | 268:1 | 238:16 |
| 280:5 | 128:22 | 160:23 | **violating** | 242:24 |
| 281:17 | 190:14,17 | 161:1 | 194:6 | 243:1,6 |
| 284:13 | 278:21 | 214:3,7,10 | 268:6 | **voce** 271:8 |

**ERIC WALDO  12/22/2022**

275:25
**volume**
  362:24
  363:2
**voluntary**
  347:21
**voter** 261:18
**voters**
  261:19
**voting**
  261:20
**vs** 1:6 5:6
  5:21

_____
     **W**
**wait** 10:14
  160:10
  180:10
**waiting**
  160:13
  215:8
**Waldo** 1:14
  2:4 5:11
  8:13 9:17
  9:22,24
  21:3 106:3
  134:20
  161:3
  214:12
  263:14
  282:16
  312:2
  336:4
  372:3
  374:17
  376:13
  377:4,18
  378:1
**walk** 77:18
  91:15
**walked** 86:20
**Wall** 294:5,9
  302:5
**want** 16:24
  26:5 28:3
  28:4,12
  36:10
  45:15 46:7
  50:20 51:5

72:16 74:3
74:4 75:12
77:18 99:7
99:12
104:10
105:3
111:1
114:24,25
115:17
119:11
120:24
137:23
147:19
148:25
149:3,19
154:1
160:16
161:4,7
167:11
170:16,18
173:9
197:3
201:15
202:7,11
208:5
210:2,4,7
213:23
214:4,24
215:12
244:9
253:8
271:21
282:6
292:6
293:11
299:22,24
308:15
310:11
312:17
314:1,2
323:15
333:17
351:15
360:14
**wanted** 24:1
  25:1,18
  95:2,4,9
  108:18
  114:10

115:1
131:11
145:24
146:6
147:6
149:4,12
157:4
182:4
226:21
233:5
244:5
250:20
255:23
261:5
262:4
265:7
285:1
301:15
304:16
318:22
364:17
368:13
**wanting** 96:3
  98:20,23
  112:17,25
**wants** 157:3
  227:19
  299:17
**warn** 170:15
**warning**
  177:9,15
  229:16
**warnings**
  199:24
**Washington**
  6:17,23
  125:5
  143:17
  283:24
  302:6
  306:13
  308:6
  310:1
  319:20
  320:4,15
  376:8
**Washingt...**
  283:20
**wasn't** 34:4

52:5,8
59:11
64:25
114:20
117:17
136:21
250:22
255:18,20
259:12
316:8
320:25
321:2
331:8
352:5
**watch** 161:15
  181:8,9
**watching**
  181:1
**way** 13:12
  16:20 29:9
  110:14
  125:8
  160:19
  173:22
  176:7
  188:24
  223:25
  235:11
  239:16
  241:3
  266:4
  279:3
  293:9
  309:4
  325:18
  353:15
  360:3,15
  360:16
**ways** 30:17
  31:16
  34:11,14
  34:24,25
  42:10
  59:15
  89:19
  115:23
  117:14
  158:7
  168:25

170:25
230:3
264:15
274:21
307:18
314:2
**we'll** 72:19
  88:3
  100:10
  147:10
  156:24
  241:4
  260:9
  279:23
  280:5
  309:11
  368:5
**we're** 10:13
  10:25 17:3
  18:10 19:1
  23:21 24:4
  26:8,25
  27:1 32:12
  32:13
  36:14 51:3
  52:17
  53:11 87:4
  87:14,21
  87:24,25
  88:8 89:10
  89:10,12
  89:13,14
  90:1 96:7
  97:10,11
  99:10
  102:22
  103:17
  107:11,11
  107:13
  114:17
  119:12,20
  120:12,20
  120:21,21
  121:13,14
  121:18
  122:15
  145:7
  153:24
  155:16

**ERIC WALDO  12/22/2022**

160:13
165:11
174:6,12
175:6,7,15
176:1,14
176:19
177:3,6,7
177:8
179:16
180:3
188:4
195:19
202:12
208:20
212:9
215:8
216:15
235:25
244:14
246:15
249:9
280:2,15
298:25,25
310:15
311:20
312:4
313:3
314:9
315:5,12
322:25
323:17
329:24
334:16
335:1,5,13
353:16
360:15
361:9
372:25
we've 67:3,4
72:10
105:16
119:2,19
120:6
133:15
148:3,22
159:11
160:13
161:6
164:8

165:24
173:13
183:14
196:15,16
196:22
209:4
212:11
217:6
222:16
239:9
240:7,7
241:13,15
250:11
251:6
268:2
276:16,20
283:10
311:20
314:23
318:22
322:23
327:9,12
331:23
332:3
333:23
335:14
361:10
372:18
weaknesses
116:25
wearing
166:12
167:1,17
168:4
website 58:2
276:25
286:19
websites
276:4
week 14:6
36:21
38:10,12
38:14 75:3
87:19 89:9
94:19
97:24
155:7
156:2
241:3

244:6,10
244:14,20
246:3,13
248:24,25
249:4
250:7
307:14
308:22
314:8
319:8
348:13
weeks 44:13
44:17 97:8
136:14
142:12
256:1
258:21
259:16
260:1,8,10
270:9,11
270:21
293:3
357:8
welcome
225:22
300:18
well-cov...
181:3
well-known
286:7
went 61:1
137:15
257:6
306:8
329:21
347:10
weren't 78:3
114:17
133:10
137:18
195:25,25
252:25
272:20
348:11
354:18
Western 1:1
5:1,20
8:16
WhatsApp

229:14
wheelhouse
52:4
whip 335:21
White 50:11
64:13,19
67:17,24
68:5,12,13
81:12,16
82:2,24
83:10,12
84:6 110:8
110:11
122:23
124:4
126:20
127:5,12
135:21
206:14,25
217:21
218:5
220:4,20
236:15,23
261:11
263:3
266:9,14
291:5,6
292:5
302:3
363:13
365:21
367:8
wide 299:7
300:11
widespread
340:19
William 9:24
willingness
111:23
win 309:11
wind 228:3
windows
150:1
wished 41:19
254:14,19
254:21
witness 8:6
9:16 65:19
65:21

72:18
77:12,14
127:2
128:11
167:22
198:17
213:25
220:15
292:10,12
338:7,8
359:24
360:12
370:11
371:17
375:8,11
376:15
Witnesses
2:2,3
wondering
335:16
word 105:5,6
105:12
169:16,19
169:20,22
170:7
171:8,10
171:20,23
172:1,8
206:7,9
312:10
347:15
worded
329:16
words 78:15
97:1
107:17
126:2
164:22
166:4
173:2
174:10
175:24
176:1
180:14
203:25
209:1,4,6
235:18
272:19
294:17

**ERIC WALDO  12/22/2022**

360:7,21
366:3
370:13
work 11:23
12:24
13:18,19
13:22,22
15:16
19:19 22:2
28:4 34:11
34:15,17
34:24 35:1
53:6 58:22
77:6,11
96:6,9
97:10,12
114:7,25
115:13,17
117:11
118:8,8
120:14
128:2
132:6,11
144:21
147:6,8
149:4,5
150:4
161:18
239:17,17
239:25
240:17
253:9
259:24
261:7,15
265:9
266:6
271:2,13
304:10
306:8
312:21
313:25
315:5
340:8
368:14
372:23,24
373:1,24
374:3,4
work-rel...
74:23

worked 14:8
14:21
15:11,15
25:5 26:22
37:8 39:2
43:23
53:23
59:20,25
125:19
126:3,7
152:12
161:21,24
164:10
187:15
223:22
313:25
339:6
373:21
worker 13:20
31:20
147:3
working
12:12
13:11
17:14,18
22:21 40:7
48:21 49:5
51:21 59:6
59:9,11,12
90:1
106:24
115:14
118:18
129:3
130:10
146:12
147:13
187:12
212:10
220:7,13
220:23
224:7,17
259:15,25
264:16
265:9
312:21
313:2,3
314:2
346:8

364:2
workplace
13:20,22
16:2 312:5
313:6
works 120:19
373:9
world 24:16
162:24
322:2
worried
23:24
worst 116:22
worth 232:24
254:11
worths
198:21
wouldn't
15:17 34:5
137:14
143:11
153:1
255:2
wow 27:22
wrap 335:22
371:21
write 311:14
writer 326:1
writes
259:18
279:25
295:17,23
305:19
308:2
369:1
writing
253:11
292:16
304:2,6
350:8
written
174:1
261:9
262:7
275:19
279:8,9
280:8
299:3,9,15
300:9

307:11
308:18
317:8
349:17
370:3
wrong 171:5
326:9
328:9,20
328:25
wrote 145:23
146:3,16
236:18
237:19
239:19
240:3
246:19
257:4,9
277:19
309:5,7
WSJ 294:10

_____
**X**
**X** 2:1 100:10
111:9

_____
**Y**
**Yea** 136:4
**yeah** 13:10
15:6 21:15
21:20
23:21 24:3
24:20
25:18,18
26:12
28:20,20
35:11 36:7
38:12
40:20
44:18 45:4
51:18 54:9
58:8 59:24
64:15 67:5
70:19 71:7
75:20 77:4
78:14
81:19
84:13
88:19 89:3
90:13,25

91:1,7,11
102:4,8
103:23
105:18
106:20
107:6
108:6
109:17,18
109:23
110:17
112:17
117:6
121:12
128:18
136:17
143:13
145:3
146:2,11
146:17,20
147:18
149:11,24
150:5,11
151:22,22
155:15
162:10,18
163:7
165:8,20
166:16
173:2,18
174:10,15
174:20
175:24
176:1,18
177:17
179:7
180:6,18
181:21
184:1
185:9
200:16,20
201:6,12
201:15,15
202:22
203:3,16
203:25
205:21
207:4
208:17
209:6,10

**ERIC WALDO  12/22/2022**

| | | | | |
|---|---|---|---|---|
| 210:4 | 310:9 | 214:18 | **Zoom** 8:19 | 376:1,18 |
| 211:21,23 | 311:5,15 | 218:9 | 23:22,23 | **12** 2:20 |
| 212:7 | 313:24 | 219:10 | 24:4  93:11 | 139:15 |
| 215:16 | 317:19 | 221:11,20 | 93:19 | 160:9 |
| 220:3 | 318:6,10 | 223:6 | 118:13,14 | 192:12 |
| 226:17 | 318:13,19 | 225:7 | 146:13 | 199:8 |
| 227:16 | 323:7 | 286:6 | **Zooms** 373:2 | 206:12 |
| 230:6 | 325:20 | **you-all** | **Zuckerberg** | 267:23 |
| 235:1 | 327:2,25 | 299:1 | 349:10,22 | 268:4,6,10 |
| 236:12,20 | 332:18 | **Younes** 6:16 | 350:1 | **12:19** 214:8 |
| 238:8 | 335:18 | 9:13,13 | | **12:59** 214:10 |
| 239:14 | 336:9,14 | **young** 298:23 | **0** | **1225** 6:17 |
| 241:5 | 341:11,21 | **youth** 12:17 | | **12th** 85:10 |
| 242:3,5 | 344:6 | 12:24 | **1** | 88:17 |
| 244:20 | 348:12 | 13:18 | **1** 2:6  20:22 | 145:11 |
| 245:4,5,6 | 350:4 | 15:25  22:3 | 21:5 | 150:6 |
| 245:6,8,25 | 351:8,15 | 22:17,23 | 321:11 | **134** 2:12 |
| 248:24 | 352:13 | 22:24,25 | **1/3/22** 3:18 | **139** 2:13 |
| 249:13,21 | 356:2,9 | 31:18  51:4 | **1:15** 213:23 | **13th** 368:17 |
| 253:2,22 | 361:3 | 147:2 | **10** 2:18 | 369:14,21 |
| 256:4 | 363:23 | 149:4 | 115:18 | **14** 2:21 |
| 257:3 | 364:8 | 312:5 | 124:3 | 190:18 |
| 260:12,12 | 365:3,5,7 | 313:6 | 160:10 | 214:13,15 |
| 260:22 | 368:2,7,15 | **YouTube** 4:5 | 161:7 | **144** 2:14 |
| 261:24 | **year** 12:6 | 115:22 | 182:24 | **149** 2:15 |
| 262:4,9 | 22:14  23:9 | 118:15 | 212:3 | **14th** 88:12 |
| 269:2,4,16 | 23:16 | 119:2 | 331:11 | 128:14 |
| 271:11,24 | 81:13 | 121:3,7 | **10:05** 105:25 | 129:20 |
| 272:1,3,8 | 110:20 | 123:13 | **10278** 7:5 | 131:4 |
| 272:10,15 | 115:5,8 | 129:10 | **10th** 125:22 | 151:14 |
| 273:1,16 | 148:8 | 130:5,19 | 145:11 | 330:24 |
| 275:1,5 | 223:23 | 151:9 | 155:20 | 359:7 |
| 276:17,20 | **years** 100:17 | 152:16 | **11** 2:19 | **15** 72:15 |
| 278:8 | 147:11 | 157:2 | 160:9 | **151** 2:16 |
| 280:17 | 190:18 | 207:24 | 196:21 | **154** 2:17 |
| 281:5,7 | **yep** 60:19 | 258:8 | 211:24 | **15th** 17:4 |
| 282:6,8 | 86:15 | 297:12 | 212:8 | 37:17 |
| 289:18,24 | 178:22,24 | 351:19 | 298:20,21 | 44:17 |
| 291:23 | 225:24 | 353:11,12 | 298:23 | 96:24  97:4 |
| 293:17 | 241:1 | **YouTube/...** | 300:2 | 97:25 |
| 294:8,17 | 271:12 | 20:9  89:22 | 317:4 | 122:12,18 |
| 295:25 | **yesterday** | 118:7 | 333:1 | 149:20 |
| 296:17 | 137:24 | 257:21 | 365:6 | 150:17 |
| 298:8,20 | **yesterday's** | | **11:07** 160:23 | 161:5 |
| 300:10,20 | 294:9 | **Z** | **11:19** 161:1 | 184:16 |
| 305:14 | **yesterda...** | **Z** 100:12 | **1100** 6:22 | 192:9 |
| 306:19 | 294:4 | **Zients** | 376:7 | 193:4 |
| 308:9 | **York** 2:21 | 185:18,20 | **11th** 7:10 | 196:25 |
| 309:25 | 7:5,5 | 185:24 | 354:24 | 212:24 |

**ERIC WALDO  12/22/2022**

| | | | | |
|---|---|---|---|---|
| 213:10 | 259:3 | 45:13 | 350:1 | **232-page** |
| 239:22 | 295:6 | 54:16 55:4 | 351:20 | 282:18 |
| 244:17 | 370:23 | 66:13 | 354:24 | **234** 2:23 |
| 330:14 | **18** 3:2 | 71:18 | 355:7 | **238** 3:2 |
| **16** 2:22 | 214:13 | 77:21 79:1 | 363:17 | **23rd** 94:12 |
| 205:14,23 | 238:9 | 79:4 90:7 | 365:2,4 | 106:5 |
| 214:13 | **1885** 6:11 | 94:12 | 367:18,23 | 241:10 |
| 225:21 | **18th** 238:10 | 118:1 | 367:24 | 242:21 |
| 231:23 | 240:12,16 | 131:19 | 368:1,17 | 243:4,6 |
| **160** 2:18 | 266:25 | 135:1,4 | 369:23 | 244:15 |
| **16th** 61:19 | 267:4 | 184:16 | 370:24 | 247:5,22 |
| 61:20 90:7 | 268:22 | 196:25 | 372:8 | 248:22 |
| 94:20 97:4 | 291:4 | 212:24 | 376:5,13 | 249:5 |
| 98:1 | 295:1 | 213:1,10 | **206** 2:20 | 250:1 |
| 122:12,19 | **19** 3:3 | 214:18 | **20th** 12:5,6 | 256:2,16 |
| 149:15,20 | 214:14 | 218:4,4,13 | 14:6 23:6 | 268:14,18 |
| 150:7 | 242:19 | 218:13,21 | 23:13 | 269:18 |
| 155:16,24 | **19-300** 7:5 | 219:3,20 | 54:16 55:4 | 274:7 |
| 157:14 | **196** 2:19 | 219:24 | 57:13 | 278:5 |
| 158:10 | **19th** 6:17 | 220:11 | 219:2 | 281:23 |
| 214:18 | 240:19 | 221:9,10 | 221:9 | **243** 3:6 255:5 |
| 218:3 | | 222:20 | 270:6 | 266:20,23 |
| 220:10 | **2** | 223:10 | 281:20,24 | **242** 3:3 |
| 221:10 | **2** 2:7 49:10 | 225:2,10 | **213** 3:4 57:13 | **25** 3:7 255:5 |
| 222:20 | 49:15 | 226:4 | 254:25 | 269:20 |
| 223:10 | 57:18 | 238:10 | 255:5 | **254** 3:4 |
| 226:10 | 340:15 | 270:7 | 266:18 | **25th** 77:21 |
| 227:3,5,8 | **2/14/22** 3:19 | 302:16 | **214** 2:21 | 78:17 79:1 |
| 228:21 | **2:14** 282:10 | 311:7 | **21st** 226:4 | 79:4 84:15 |
| 232:20 | **2:28** 282:14 | 320:20 | 227:6 | 135:4 |
| 233:25 | **20** 2:6 72:15 | 323:1,6,10 | 260:15 | 136:5,19 |
| 234:20 | 276:9 | 323:11 | 292:22 | 137:1 |
| 235:3 | 377:15 | 324:13 | 320:19 | 138:4 |
| 237:6 | **2003** 66:17 | 343:6 | **22** 1:15 3:5 | 142:5,6 |
| 238:2,14 | **202/514-...** | 364:12 | 5:12 255:5 | 218:21 |
| 239:22 | 6:23 | 372:7,10 | 260:13 | 219:20,24 |
| 240:11 | **202/597-...** | **2022** 1:15 | 266:18 | 225:10 |
| 244:15 | 7:6 | 5:12 8:10 | 376:13 | 316:15 |
| 248:9,18 | **202/918-...** | 11:22 12:6 | **225** 2:22 | 317:12 |
| 277:5 | 6:18 | 23:7 59:22 | **225/326-...** | **26** 7:5 |
| 295:8 | **2020** 55:17 | 71:18 | 6:12 | **260** 3:5 |
| **17** 2:23 | 219:2 | 293:9,14 | **22nd** 8:10 | **266** 3:6 |
| 214:13 | **2021** 12:5 | 293:25 | 131:19 | **269** 3:7 |
| 234:2 | 14:6 17:4 | 323:11,18 | 263:16 | **27** 3:8 138:3 |
| 240:10 | 17:10,13 | 323:19 | 363:16 | 255:5 |
| 245:13,21 | 23:13 | 324:14 | 364:25 | 278:4 |
| 246:3 | 32:16 | 325:1 | 365:11 | **279** 3:8 |
| 248:1 | 38:11 | 326:6 | **23** 266:16,18 | **27th** 75:8 |
| **17th** 61:20 | 42:18 | 330:24 | 266:22 | **28** 3:9 135:1 |

**ERIC WALDO  12/22/2022**

282:17
376:5
**282** 3:9
**28th** 302:16
302:20
306:12
308:13
309:15,18
318:10
319:21
320:4,10
320:14,15
**290** 3:10
**29530** 6:23
376:8
**296** 3:11
**297** 3:12
**29th** 296:11
310:5
315:18,21
316:14
318:11

--- **3** ---

**3** 2:8  72:21
106:8
117:6
135:6
340:18
**3,000** 276:10
**3/3/22** 3:24
4:2,3,4,5
4:6
**3:00** 88:12
**3:22-cv-...**
8:15
**3:22-cv-...**
1:6  5:6
**3:29** 335:24
**3:41** 336:1
**30** 3:10
290:25
298:5
376:19
**302** 3:13
**306** 3:14
**309** 3:15
**30th** 118:1
123:12

129:14
**31** 3:11
296:9
**314/644-...**
7:11  376:3
**315** 3:16
**319** 3:17
**32** 3:12
75:13,22
75:24
77:17
297:23
**324** 3:18
**33** 3:13
75:22,25
302:4
**330** 3:19
**336** 3:21
**34** 75:23
**347** 3:22
**349** 3:23,24
**35** 3:14
306:11
**352** 4:2,3
**353** 4:4,5,6
**354** 4:7
**36** 3:15
309:12
314:5
**361** 4:8
**367** 4:9
**37** 3:16
315:8
**38** 3:17
319:20
**39** 3:18
245:23
324:20
**3rd** 59:22
136:15
325:1
336:5
348:11
350:1
351:9,20
352:10

--- **4** ---

**4** 2:12

134:18,21
**4:22** 371:22
**4:27** 371:25
**4:30** 374:15
**40** 100:17
**41** 3:19
330:19
**42** 3:20
336:10
**44** 3:22
347:4
**45** 3:23
349:1
**45.5** 178:12
178:17
**450** 6:17
**4510** 182:25
**46** 3:24
349:24
**47** 4:2  352:8
**48** 4:3
352:13
**49** 2:7  4:4
286:3
353:2
**4th** 318:21

--- **5** ---

**5** 2:13
139:10
142:19
197:3
208:5
298:20,21
298:23
300:1
317:4
343:9,16
365:5,7,8
366:5
367:1,3
368:14
369:19,22
370:1,6
371:10
**5-11** 314:10
**5/28** 135:15
**5/28/21** 2:12
**5:00** 88:12

**5:42** 319:18
**50** 4:5
353:10
**51** 4:6
353:20
**52** 4:7
354:19
**53** 4:8
361:14
363:9
**54** 4:9
367:17
**573/751-...**
6:7

--- **6** ---

**6** 2:14  144:2
208:15,17
355:4
**6/12/21** 2:13
**63101** 7:11
376:2,19
**65** 192:12
**65102** 6:6
**6th** 145:6
255:25
270:10

--- **7** ---

**7** 2:15  149:7
358:2
**7/16/21** 2:21
**7/18/21** 3:2
**7/21/21** 2:22
**7:30** 268:18
**70** 229:15
**70802** 6:11
**711** 7:10
376:1,18
**72** 2:11
**7th** 292:23

--- **8** ---

**8** 2:16  151:3
**8/18/21** 3:6
**8:08** 8:11
**899** 6:6
**8th** 55:17

--- **9** ---

**9** 2:17
134:18
154:12
210:9
**9/18/21** 3:10
**9/29/21** 3:11
**9:51** 105:22
**900** 17:25
**9th** 136:15

Case 3:22-cv-01213-TAD-KDM    Document 214-1    Filed 03/07/23    Page 1 of 364 PageID #: 16437

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF LOUISIANA**
**MONROE DIVISION**

| | |
|---|---|
| STATE OF LOUISIANA, STATE OF MISSOURI, *et al*., <br><br> *Plaintiffs*, <br><br> v. <br><br> JOSEPH R. BIDEN, JR., in his official capacity as President of the United States, *et al*., <br><br> *Defendants*. | Case No. 3:22-cv-01213 |

**PLAINTIFFS' PROPOSED FINDINGS OF FACT IN SUPPORT**
**OF THEIR MOTION FOR PRELIMINARY INJUNCTION**

## PLAINTIFFS' PROPOSED FINDINGS OF FACT

Plaintiffs respectfully submit the following Proposed Findings of Fact as Exhibit 1 to their supplemental brief in support of a preliminary injunction.  Plaintiffs incorporate by reference the evidence, documents, and exhibits previously filed in this case; where cited herein, they are cited by docket number (e.g. "Doc. 174-1, at 31" is page 31 of ECF No. 174-1).  The deposition transcripts and exhibits to depositions are filed separately; they are cited herein as "[Witness Last Name] Dep. Page:Line," *e.g.*, "Fauci Dep. 1:3-5" is lines 3-5 of page 1 of Dr. Fauci's deposition, and "Scully Dep. 10:22-11:5" is page 10, line 22 through page 11, line 5 of Brian Scully's deposition.  Plaintiffs are also filing the video recordings of the depositions with the Court so that the Court may view the testimony of the Government's witnesses and assess the witnesses' credibility for itself.  The Declaration of Jasimiel Jones, submitting supplemental exhibits in addition to the deposition and transcript and attached as Exhibit 2, is cited herein as "Jones Decl. Ex. __, at __" *e.g.*, pages 1-3 of Exhibit A to the Jones Declaration is "Jones Decl. Ex. A, at 1-3." Plaintiffs' previously filed exhibits attached to the Declaration of Tammy Glenn, Doc. 10-1, are cited as "Glenn Decl. Ex. __, at __; Doc. 10-1, at __."  In addition, these Findings regularly refer to the company formerly known as Facebook, now known as Meta, which owns Facebook, Instagram, WhatsApp, and other platforms, as "Facebook," consistent with common usage in documents.

## I.      The Campaign Of Public Threats Against Social-Media Platforms To Pressure Them To Censor More Speech on Social Media.

1.    Federal officials, including Defendants, have made a long series of public statements since at least 2018 demanding that social-media platforms increase their censorship of speech and speakers disfavored by these officials, and threatening adverse consequences – such as repeal or

reform of Section 230 immunity under the Communications Decency Act, antitrust scrutiny or enforcement, increased regulation, and other measures – if the platforms do not increase censorship. The private communications between government officials and social-media platforms addressing disinformation, misinformation, and censorship set forth herein were made against the backdrop of these public threats.

2.    The immunity provided by Section 230 of the Communications Decency Act is extremely valuable for social-media platforms, so threatening to amend or repeal that immunity is highly motivating to them. One commentator has aptly described Section 230 immunity as "a hidden subsidy worth billions of dollars," stating: "Digital platforms enjoy a hidden subsidy worth billions of dollars by being exempted from any liability for most of the speech on their platforms (Section 230)." Glenn Decl. Ex. 11, Doc. 10-1 at 140. Another commentator has observed, "imperiling Section 230 is a fearsome cudgel against ever untouchable companies." Glenn Decl. Ex. 13, Doc. 10-1 at 206.

3.    The threat of antitrust scrutiny or enforcement is also a major motivator to social-media platforms. For example, Facebook CEO Mark Zuckerberg has stated that the threat of antitrust enforcement is "an 'existential' threat" to his platform. Glenn Decl. Ex. 12, Doc. 10-1 at 202.

**A. Threats From Federal Elected Officials Pressuring Platforms to Censor Speech.**

4.    Then-Speaker of the House Nancy Pelosi stated on April 12, 2019: "I do think that for the privilege of 230, there has to be a bigger sense of responsibility on it. And it is not out of the question that that could be removed." Glenn Decl. Ex. 13, Doc. 10-1, at 205 ("When asked about Section 230, Pelosi referred to the law as a 'gift' to tech companies that have leaned heavily on the law to grow their business…. 'It is a gift to them and I don't think that they are treating it with the respect that they should, and so I think that that could be a question mark and in jeopardy… I

do think that for the privilege of 230, there has to be a bigger sense of responsibility on it. And it is not out of the question that that could be removed.'").

5. Senator Richard Blumenthal stated on Nov. 17, 2020: "I have urged, in fact, a breakup of tech giants. Because they've misused their bigness and power. … And indeed Section 230 reform, meaningful reform, including even possible repeal in large part because their immunity is way too broad and victims of their harms deserve a day in court." Glenn Decl. Ex. 16, at 1; Doc. 10-1, at 225.

6. Senator Mazie Hirono tweeted on Feb. 5, 2021: "Sec 230 was supposed to incentivize internet platforms to police harmful content by users. Instead, the law acts as a shield allowing them to turn a blind eye. The SAFE TECH ACT brings 230 into the modern age and makes platforms accountable for the harm they cause." Glenn Decl. Ex. 55, at 1; Doc. 10-1, at 723.

7. Defendants' political allies have repeatedly used congressional hearings as forums to advance these threats of adverse legislation if social-media platforms do not increase censorship of speakers, speech, content, and viewpoints they disfavor. They have repeatedly used such hearings to berate social-media firm leaders, such as Mark Zuckerberg of Facebook, Jack Dorsey of Twitter, and Sundar Pichai of Google and YouTube, and to make threats of adverse legal consequences if censorship is not increased. Such hearings include, but are not limited to, an antitrust hearing before the House Judiciary Committee on July 29, 2020; a Senate Judiciary Committee hearing on November 17, 2020; and a House Energy and Commerce Hearing on March 25, 2021.

8. The March 25, 2021 Joint Hearing of the Communications and Technology Subcommittee with the Subcommittee on Consumer Protection and Commerce, the Joint Statement of Democratic Committee Chairs stated: "This hearing will continue the Committee's work of holding online

platforms accountable for the growing rise of misinformation and disinformation. ... For far too long, big tech has failed to acknowledge the role they've played in fomenting and elevating blatantly false information to its online audiences.  Industry self-regulation has failed.  We must begin the work of changing incentives driving social media companies to allow and even promote misinformation and disinformation."  Glenn Decl. Ex. 17, at 1-2; Doc. 10-1, at 228-29.

9.   At the same hearing, entitled "Disinformation Nation: Social Media's Role in Promoting Extremism and Misinformation," Representative Schakowsky stated: "[S]elf-regulation has come to the end of its road…. [Congress] is preparing to move forward with regulation and legislation. The regulation we seek … must hold platforms accountable when they are used to … spread misinformation….  All three of the companies that are here today run platforms that are hotbeds of misinformation and disinformation."  Jones Decl., Ex. A, at 1, 5.  She also stated: "Self-regulation has not worked.  They must be held accountable for allowing misinformation and disinformation to spread."  *Id.* at 7.

10. At the same hearing, Representative Doyle stated: "despite repeated promises to tackle this crisis, Facebook, Google, and Twitter instead routinely make minor changes in response to the public relations crisis of the day. … It is now painfully clear that neither the market nor public pressure will force these social media companies to take the aggressive action they need to take to eliminate disinformation and extremism from their platforms.  And therefore, it is time for Congress and this committee to legislate and realign these companies' incentives. … I question whether existing liability protections [*i.e.*, Section 230] should apply … That is why you are here today, Mr. Zuckerberg, Mr. Pichai, and Mr. Dorsey…. Your business model itself has become the problem."  *Id.* at 10-11.

11. At the same hearing, Representative Rush accused the platforms of allowing "[m]isinformation, outlandish conspiracy theories, and incendiary content" to spread, and stated to the three CEOs of Google, Facebook, and Twitter: "There is only one comparison that remotely approaches the avarice and moral discrepancy of your companies, and that is the slavetocracy burden of our Nation's shameful and inhumane and most difficult dark days in the past." *Id.* at 13. He also stated to Jack Dorsey, "I can't wait until we come up with legislation that will deal with you and your cohorts in a very, very effective way." *Id.* at 14.

12. At the same hearing, Representative Upton stated: "we are going to see some changes in Section 230." *Id.* at 15.

13. At the same hearing, Representative Eshoo demanded of Jack Dorsey, "why haven't you banned the 12 accounts that are spewing its deadly COVID misinformation?" *Id.* at 17.

14. At a hearing of the Antitrust subcommittee of the House Judiciary Committee on July 29, 2020, Representative Cicilline said to Mark Zuckerberg: "Mr. Zuckerberg. When a television station runs a false political advertisement, they're held liable for that. Why should Facebook or any other platform be different? … It's hard to understand why Facebook shouldn't be responsible for those business decisions. … Facebook gets away with it because you're the only game in town. There's no competition forcing you to police your own platform. Allowing this misinformation to spread can lead to violence. And frankly, I believe it strikes at the very heart of American democracy. … American democracy has always been at war against monopoly power. … These companies, as exist today, have monopoly power. Some need to be broken up, all need to be properly regulated and held accountable. … The names have changed, but the story is the same. Today, the men are named Zuckerberg, Pichai, Cook, and Bezos." Jones Decl., Ex. B, at 9-11.

15. On November 17, 2020, at a hearing of the Senate Judiciary Committee, Senator Blumenthal stated: "Now, Mr. Zuckerberg and Mr. Dorsey, you have built terrifying tools of persuasion and manipulation with power far exceeding the robber barons of the last Gilded Age. You have profited hugely by … promoting hate speech and voter suppression.  … The destructive incendiary misinformation is still a scourge on both your platforms and on others. … [W]hat appears on your platform … is voter suppression and incendiary malicious misinformation. … [A] series of hearings on big tech is long overdue on antitrust issues … and Section 230.  I have urged, in fact, a breakup of the tech giants because they've misused their bigness and power.  Breaking off, for example, WhatsApp and Instagram [both Meta platforms]…. And indeed Section 230 reform, meaningful reform, including even possible repeal in large part because their immunity is way too broad…. [F]oreign disinformation campaigns intended to interfere in our democracy…. What we've seen here are fighting words and hate speech that certainly deserve no free expression protection. … Change is going to come, no question.  Change is on the way and I intend to bring aggressive and targeted reform to Section 230."   Jones Decl., Ex. C, at 2-3.  Soon thereafter, he demanded that Mark Zuckerberg (who was testifying before the committee) "commit to … robust contend modification playbook in this coming election, including fact-checking, labelling, reducing the spread of misinformation" to "tak[e] action against dangerous disinformation" and "malign tactics."  *Id.* at 4; *see also, e.g., id.* at 9 (Senator Coons demanding that Jack Dorsey explain why "you don't have a standalone climate change misinformation policy")

16. On March 11, 2022, Representative Ro Khanna, the Chairman of the House Oversight and Reform Committee who is leading "an investigation of oil industry 'misinformation' and held two days of hearings on the oil industry, tweeted: "Facebook is preventing us from taking action on climate change by allowing climate misinformation to spread. Congress must step up and hold

them accountable." Jones Decl., Ex. D.  He also tweeted: "Misinformation being spread on social
media is undermining our efforts to tackle climate change.  As chair of the House Oversight
Environment Subcommittee, I will be holding a hearing to hold social media companies
accountable." *Id.*

17. On April 20, 2022, twenty-two Democratic members of Congress sent a letter to Mark
Zuckerberg of Facebook (n/k/a "Meta Platforms, Inc."), demanding that Facebook increase
censorship of "Spanish-language disinformation across its platforms" and threatening
Congressional action if Facebook did not do so.  The letter claimed that "disinformation" was a
threat to democracy, and it made explicit threats of adverse legislative action if Facebook/Meta
did not increase censorship: "The spread of these narratives demonstrate that Meta does not see
the problem of Spanish-language disinformation in the United States as a critical priority for the
health of our democracy.  The lack of Meta's action to swiftly address Spanish-language
misinformation globally demonstrates the need for Congress to act to ensure Spanish-speaking
communities have fair access to trustworthy information." Glenn Decl. Ex. 18; Doc. 10-1, at 244-
46.

18. Comments from two Members of the House of Representatives summarize this campaign
of pressure and threats: "In April 2019, Louisiana Rep. Cedric Richmond warned Facebook and
Google that they had 'better' restrict what he and his colleagues saw as harmful content or face
regulation: 'We're going to make it swift, we're going to make it strong, and we're going to hold
them very accountable.' New York Rep. Jerrold Nadler added: 'Let's see what happens by just
pressuring them.'" Glenn Decl. Ex. 14, at 2-3; Doc. 10-1, at 218-19.

**B.  Public Threats from President Biden and His Aides Pressuring Platforms to Censor.**

19. Then-candidate and now-President Biden has led this charge. He has tripled down on these threats of adverse official action from his colleagues and allies in senior federal-government positions. His threats of adverse government action have been among the most vociferous, and among the most clearly linked to calls for more aggressive censorship of disfavored speakers and speech by social-media companies.

20. For example, on January 17, 2020, then-candidate Biden stated, in an interview with the New York Times editorial board, that Section 230 of the CDA should be "revoked" because social-media companies like Facebook did not do enough to censor supposedly false information in the form of political ads criticizing him—*i.e.*, core political speech. He stated: "The idea that it's a tech company is that Section 230 should be revoked, immediately should be revoked, number one. For Zuckerberg and other platforms." He also stated, "And it should be revoked. It should be revoked because it is not merely an internet company. It is propagating falsehoods they know to be false.... There is no editorial impact at all on Facebook. None. None whatsoever. It's irresponsible. It's totally irresponsible." Glenn Decl. Ex. 19, at 27; Doc. 10-1, at 275.

21. Candidate Biden also threatened that Facebook CEO Mark Zuckerberg should be subject to civil liability and even *criminal prosecution* for not censoring such core political speech: "He should be submitted to civil liability and his company to civil liability…. Whether he engaged in something and amounted to collusion that in fact caused harm that would in fact be equal to a criminal offense, that's a different issue. That's possible. That's possible it could happen." *Id.* In other words, Biden's message—not long before he became President of the United States—was that if Facebook did not censor political ads against him, Zuckerberg should go to prison. These two threats echoed the same threats made by numerous political allies of the President since 2019, cited above.

22. During the presidential campaign, now-Vice President Harris made similar threats against social-media firms to pressure them to engage in more aggressive censorship of speakers, content, and viewpoints she disfavors.  For example, in addition to the statements cited above, she stated in 2019: "We will hold social media platforms responsible for the hate infiltrating their platforms, because they have a responsibility to help fight against this threat to our democracy. And if you profit off of hate—if you act as a megaphone for misinformation or cyberwarfare, if you don't police your platforms—we are going to hold you accountable as a community."  Glenn Decl. Ex. 20, at 1; Doc. 10-1, at 284.

23. In or around June 2020, the Biden campaign published an open letter and online petition (ironically, on Facebook) calling for Facebook to engage in more aggressive censorship of core political speech and viewpoints that then-Candidate Biden disfavored.  The open letter complained that Facebook "continues to allow Donald Trump to say anything — and to pay to ensure that his wild claims reach millions of voters.  Super PACs and other dark money groups are following his example.  Trump and his allies have used Facebook to spread fear and misleading information about voting….  We call for Facebook to proactively stem the tide of false information by no longer amplifying untrustworthy content and promptly fact-checking election-related material that goes viral.  We call for Facebook to stop allowing politicians to hide behind paid misinformation in the hope that the truth will catch up only after Election Day.  There should be a two-week pre-election period during which **all** political advertisements must be fact-checked before they are permitted to run on Facebook. … Anything less will render Facebook a tool of misinformation that corrodes our democracy."  Glenn Decl. Ex. 23, at 1; Doc. 10-1, at 299.

24. The online petition demanded that Facebook "[p]romote real news, not fake news," "[q]uickly remove viral misinformation," and "[e]nforce voter suppression rules against

everyone—even the President [Trump]." Glenn Decl. Ex. 24, at 2; Doc. 10-1, at 304. The petition complained that Facebook "continues to amplify misinformation and lets candidates pay to target and confuse voters with lies." *Id.* at 304. It demanded that Facebook "promote authoritative and trustworthy sources of election information, rather than rants of bad actors and conspiracy theorists," "promptly remove false, viral information," and "prevent political candidates and PACs from using paid advertising to spread lies and misinformation – especially within two weeks of election day." *Id.* at 305.

25. On September 28, 2020, the Biden-Harris campaign sent a letter to Facebook accusing it of propagating a "storm of disinformation" by failing to censor the Trump campaign's political speech, including social-media political ads. Glenn Decl. Ex. 25, at 3; Doc. 10-1, at 312. The letter accused Facebook of allowing "hyper-partisan" and "fantastical" speech to reach millions of people, and it demanded "more aggressive" censorship of Trump. *Id.*

26. On December 2, 2020—during the presidential transition—Biden's former chief of staff and top technical advisor, Bruce Reed, publicly stated that "it's long past time to hold the social media companies accountable for what's published on their platforms." Glenn Decl. Ex. 26, at 1; Doc. 10-1, at 314-15. This comment specifically referred to the amendment or repeal of Section 230 of the Communications Decency Act. *See id.* He also wrote: "Washington would be better off throwing out Section 230 and starting over." *Id.*

27. On July 16, 2021, President Biden stated that social-media companies are "killing people" by not censoring enough misinformation. Waldo Ex. 14, at 1.

28. On January 3, 2022, an audio clip of President Biden played on Alyssa Milano's podcast stated: "The unvaccinated are responsible for their own choices, but those choices had been shulled [sic] by dangerous misinformation on cable TV and social media. You know, these companies …

are making money by ped[dling] lies and allowing misinformation that can kill their own customers and their own supporters. It's wrong. It's immoral. I call on the purveyors of these lies and misinformation to stop it. Stop it now." Waldo Ex. 39, at 5 (Audio Tr. 4).

29. In September of 2022, the White House convened the "United We Stand" summit at which the President put social media companies on notice that Section 230 protections were at risk. "Tech platforms currently have special legal protections under Section 230 of the Communications Decency Act that broadly shield them from liability. This immunity extends beyond what the First Amendment requires and what newspapers and other media receive. It also effectively permits hate-fueled content mobilizing users to violence to be amplified on large tech platforms.  President Biden has long urged fundamental reforms to Section 230, and …he reiterates his call for Congress to fundamentally reform Section 230." Jones Decl., Ex. E, at 9.

30. President Biden also stated in the same document: "Americans deserve to know how the algorithms that drive large tech platforms may amplify divisions and contribute to hate-fueled violence, among other critical harms.  Consistent with those same principles for accountability, President Biden supports *requiring* platform transparency sufficient to allow the public and researchers to understand how and why such decisions are made, their potential effects on users, and the very real dangers these decisions may pose."  *Id.* (emphasis added).

## II.    The White House's Public and Private Pressure Campaign on Platforms.

31.    Many White House officials are involved in communicating with social-media platforms about misinformation, disinformation, and censorship.  In response to a third-party subpoena, Facebook/Meta identified at least the following White House officials as engaged in such communications: Special Assistant to the President Laura Rosenberger, White House Partnerships Manager Aisha Shah, White House Counsel Dana Remus, and White House officials

Andy Slavitt, Rob Flaherty, and Clarke Humphrey. Doc. 84, ¶ 379. Defendants' discovery reveals many others. *See infra.*

32. In response to a third-party subpoena, YouTube identified White House officials Benjamin Wakana and Rob Flaherty as engaged in such communications, and Defendants' discovery reveals others. Doc. 84, ¶ 380. Defendants' discovery reveals others. *See infra.*

33. In response to a third-party subpoena, Twitter has disclosed the following White House officials as engaged in such communications: Deputy Assistant to the President and Director of Digital Strategy Rob Flaherty, White House Senior Advisor Andrew Slavitt, NSC staffer Katy E. Colas, Deputy Assistant to the President Joshua Geltzer, White House Digital Director Clarke Humphrey, Deputy Director of the Office of Digital Strategy Tericka Lambert, Press Secretary for the First Lady Michael LaRosa, NSC Director of Counterterrorism John Picarelli, Chief of Staff for the Office of Digital Strategy Hoor Qureshi, Director of Strategic Communications and Engagement Courtney Rowe, White House Associate Counsel Michael Posada, Associate Director for Communications Marissa Sanchez-Velasco, Deputy Director of Digital Strategy Christian Tom, and Strategic Director of Digital Communications Benjamin Wakana. Jones Decl., Ex. F, at 1. Defendants' discovery has revealed others. *See infra.*

**A. Pressure in Private from Rob Flaherty, Andy Slavitt, and White House Officials.**

34. The Biden White House's demands for censorship began almost immediately upon taking office. On January 23, 2021, three days after Inauguration Day, at 1:04 a.m., Clarke Humphrey of the White House emailed Twitter, copying Rob Flaherty, with the subject line: "Flagging Hank Aaron misinfo." Doc. 174-1, at 1. The email stated: "Hey folks – Wanted to flag the below tweet and am wondering if we can get moving on the process for having it removed ASAP." *Id.* Humphrey then linked to a Tweet by anti-vaccine activist Robert F. Kennedy Jr., who

is also a principal target of the Virality Project and a member of the so-called "Disinformation Dozen." *Id.* Humphrey added: "And then if we can keep an eye out for tweets that fall in this same ~genre that would be great." *Id.*

35.    "Flagging Hank Aaron misinfo" refers to the claim by anti-vaccine speakers that COVID-19 vaccines may have contributed to baseball legend Hank Aaron's death.  *See, e.g.,* https://www.usatoday.com/story/news/factcheck/2021/01/26/fact-check-hank-aaron-death-unlikely-result-covid-19-vaccine/6699577002/.

36.    Twitter responded to Humphrey within 4 minutes, at 1:08 a.m. on January 23, 2021, stating: "Thanks.  We recently escalated this."  Doc. 174-1, at 2.

37.    The White House's demands for censorship continued relentlessly, and their tone was arrogant, demanding, and peremptory.  On Saturday night, February 6, 2021, at 9:45 p.m., Rob Flaherty emailed Twitter to demand the immediate removal of a parody or impostor account linked to Finnegan Biden, Hunter Biden's adult daughter.  Doc. 174-1, at 4.  He stated: "Please remove this account immediately."  *Id.*  He also stated: "I have tried using your form three times and it won't work—it is also ridiculous that I need to upload my id to a form [to] prove that I am an authorized representative of Finnegan Biden."  *Id.*

38.    Two minutes later, at 9:47 p.m., Twitter responded, "Thanks for sending this over. We'll escalate for further review from here."  *Id.*  Flaherty shot back, the same minute, "Cannot stress the degree to which this needs to be resolved immediately."  *Id.*  Forty-five minutes later, at 10:32 p.m., Twitter responded, "Update for you – account is now suspended."  *Id.* at 3-4.

39.    The next day, Sunday, Feb. 7, 2021, Twitter emailed Flaherty and described steps he could take to "streamline the process" for the White House's demands for Twitter censorship. *Id.* at 3.  Twitter offered to enroll White House officials in Twitter's Partner Support Portal for

expedited review of flagging content for censorship, recommending that Flaherty "**Designate a list of authorized White House staff for Twitter's Partner Support Portal**." *Id.* (bold in original).  Twitter stated: "We sent over instructions about this on January 28th and also discussed this with Christian [Tom] during our call on February 4th. This is the same system we had in place for the previous two administrations for their support issues, *as well as the transition and campaign teams*.  Once you assign and we enroll these authorized reporters, whenever they submit a ticket through the Help Center it will be prioritized automatically, without having to contact our team, and you won't need to add your personal information. To enroll your designated reporters to the Partner Support Portal, we simply need the list of @usernames (up to 10) that are registered with a White House email address." *Id.* at 3 (italics added; underlines omitted).

40.     Twitter noted that it had been recently bombarded with such requests for censorship from the White House: "we would prefer to have a streamlined process strictly with your team as the internal liaison. That is the most efficient and effective way to ensure we are prioritizing requests.  In a given day last week for example, we had more than four different people within the White House reaching out for issues." *Id.* at 3.

41.     The next day, Monday, February 8, 2021, Facebook emailed Rob Flaherty, Courtney Rowe, and Clarke Humphrey of the White House to explain how it had recently expanded its COVID-19 censorship policies. Doc. 174-1, at 7-8.  Facebook stated: "We wanted to make sure you saw our announcements today about running the largest worldwide campaign to promote authoritative COVID-19 vaccine information and expanding our efforts to remove false claims on Facebook and Instagram about COVID-19, COVID-19 vaccines and vaccines in general during the pandemic." *Id.*

42.     Under the heading "**Combating Vaccine Misinformation**," Facebook provided a detailed list of expanded censorship policies: "We are expanding our efforts to remove false claims on Facebook and Instagram about COVID-19, COVID-19 vaccines and vaccines in general during the pandemic. Since December [*i.e.* during the Biden transition], we've removed false claims about COVID-19 vaccines that have been debunked by public health experts. … [W]e are expanding the list of false claims we will remove to include additional debunked claims about the coronavirus and vaccines. … Groups, Pages and accounts on Facebook and Instagram that repeatedly share these debunked claims may be removed altogether. We are also requiring some admins for groups with admins or members who have violated our COVID-19 policies to temporarily approve all posts within their group. …. On Instagram, in addition to surfacing authoritative results in Search, in the coming weeks we're making it harder to find accounts in search that discourage people from getting vaccinated…." *Id.* at 7-8 (bold in original).

43.     This was not nearly enough for the White House.  Within 19 minutes of receiving this email, Flaherty responded, pressing Facebook for more information about how strict the new policies are.  *Id.* at 7.  Quoting Facebook's email in italics, he wrote: "This line, of course, stands out: *that repeatedly share these debunked claims may be removed altogether*. Can you share more about your framework here? May, of course, is very different than 'will.'  Is there a strike policy, ala Youtube? Does the severity of the claims matter?" *Id.* at 7.  He also asked for specific data on the application of the censorship policies: "And as far as your removal of claims, do you have data on the actual number of claims - related posts you've removed?  Do you have a sense of how many are being flagged versus how many are being removed? Are there actions (downranking, etc) that sit before removal? How are you handling things that are dubious, but not provably false?" *Id.*

44.     The next day, February 9, 2021, Flaherty followed up with Facebook with a demand for more information and an accusation (to be repeated) that Facebook's failure to censor speech on its platforms causes "political violence": "All, especially given the Journal's reporting on your internal work on political violence spurred by Facebook groups, I am also curious about the new rules as part of the 'overhaul.'  I am seeing that you will no longer promote civic and health related groups, but I am wondering if the reforms here extend further? Are there other growth vectors you are controlling for?"  *Id.* at 6.  Flaherty suggested an oral meeting to discuss: "Happy to put time on the calendar to discuss further."  *Id.*

45.     Facebook responded on February 9, 2021, with a detailed answer to each of Flaherty's questions about the enforcement of its new policies.  *Id.* at 5-6.  Facebook also noted that "We are happy to discuss these and additional questions as per your recent note."  *Id.* at 5.  Among other things, Facebook reported that it would "suspend the entire Page, Group, or account" in case of repeat violations; that it "will begin enforcing this policy immediately," *id.* at 5; that for vaccine-skeptical content that does not violate Facebook's policies, Facebook will "reduce its distribution and add strong warning labels with more context, so fewer people see the post," *id.* at 6; and that Facebook was working to censor content that does not violate its policies in other ways by "prevent[ing] posts discouraging vaccines from going viral on our platforms; address[ing] content that experts believe dissuades people from getting the vaccine, but does not violate our misinformation policies, through the use of information labels; and prevent[ing] recommendations for Groups, Pages, and Instagram accounts that repeatedly push content discouraging vaccines," *id.* at 6.

46.     Facebook advised Flaherty that it was relying on advice of "public health authorities" to determine its censorship policies: "In consultation with leading health

organizations, we continuously expand the list of false claims that we remove about COVID-19 and vaccines during the pandemic. We remove claims *public health authorities* tell us have been debunked or are unsupported by evidence." *Id.* at 6 (emphasis added).

47.    Facebook also promised Flaherty that it would aggressively enforce the new censorship policies: "We will begin enforcing this policy immediately, with a particular focus on Pages, Groups and accounts that violate these rules, and we'll continue to expand our enforcement over the coming weeks." *Id.* at 5.

48.    Facebook then followed up to "see when you would like to have a meeting arranged to speak to our misinformation team reps about the latest updates. They also have a more detailed misinformation analysis prepared based on the discussions/questions from the previous meetings during the transition time period." *Id.* at 5.

49.    This email makes clear that Flaherty, as part of the Biden transition team, had already engaged in "previous meetings" and "discussions/questions" with Facebook about censorship of COVID-19 misinformation on its platforms during the Presidential transition period from November 2020 to January 2021. *Id.*

50.    On February 24, 2021, Facebook emailed Rob Flaherty with the subject "Misinfo Themes," stating: "Following up on your request for COVID-19 misinfo themes we are seeing. All the below claims violate our updated Covid and vaccine misinformation policies that we announced earlier this month, and we are removing these claims from our platforms," and she identified "Vaccine Toxicity," "False Claims About Side Effects of Vaccines," "Comparing the Covid Vaccine to the Flu Vaccine," and "Downplaying Severity of COVID-19." Jones Decl. Ex. G, at 1-2.  Flaherty responded by inquiring for details about Facebook's actual enforcement practices and for a report on misinformation that was not censored: "Can you give us a sense of

volume on these, and some metrics around the scale of removal for each?  Can you also give us a sense of misinformation that might be falling outside your removal policies?  Goes without saying, just because it's on your list for removal hasn't historically meant that it was removed, so I want to get a sense of the state of play here!"  *Id.* at 1.  Facebook promised to discuss this at an upcoming oral meeting: "Hope to cover a lot of that on Monday … Can definitely go into detail on content that doesn't violate like below but could contribute to vaccine hesitancy."  *Id.*

51.    On March 1, 2021, White House officials Rob Flaherty and Clarke Humphrey, along with Joshua Peck of HHS, participated in a meeting with Twitter about misinformation. Jones Decl., Ex. H, at 1.  The same day, after the meeting, Twitter emailed these officials and assured the White House that it would increase censorship of "misleading information" on Twitter: "Thanks again for meeting with us today.  As we discussed, we are building on our continued efforts to remove the most harmful COVID-19 misleading information from the service …. We have also introduced a strike system that determines when further enforcement is necessary. … As we said, we are committed to working with stakeholders in the public, private and non-profit sectors to address the reliability of covid information online and look forward to continued dialogue about joint efforts."  *Id.* at 1.

52.    From at least May 28, 2021 to July 10, 2021, a senior Meta executive repeatedly copied Slavitt on his emails to Surgeon General Murthy in which he assured the Surgeon General and the White House that Meta was engaging in censorship of COVID-19 misinformation according to the White House's demands. Doc. 71-4. Among other things, the Meta executive insisted that "We've expanded penalties for individual Facebook accounts that share misinformation."  *Id.* at 9.

53.    On March 12, 2021, referring to previous oral communications with the White House and HHS, Facebook emailed Flaherty "[f]ollowing up on our commitment to share our survey data on vaccine uptake." Doc. 174-1, at 9.  Facebook provided the White House with a detailed report and summary on the topic, and noted that the information had evidently been requested by or on behalf of "White House / HHS" officials: "Hopefully, this format works for the various teams and audiences within the White House / HHS that may find this data valuable."  *Id.*

54.    On March 15, 2021, at 3:20 a.m., Flaherty sent an email to Facebook acknowledging, "[g]ood insights here," but then immediately pivoted to demand more and different data, linking a recent Washington Post article accusing Facebook of allowing the spread of information about vaccine hesitancy and QAnon, stating: "I'm more interested in the data that was         outlined         in         the         Washington         Post (https//www.washingtonpost.com/technology/202l/03/l4/facebook-vaccine-hesitancy-qanon) And what interventions you are testing/their effectiveness."  *Id.* at 9.  This would become a standard tactic of the White House – linking to articles critical of Facebook in the press, and then demanding more information or actions based on those articles.

55.    The day before, Sunday, March 14, 2021, at 11:13 p.m., Flaherty had emailed a link to the same article to Facebook ("https://www.washingtonpost.com/technology/2021/03/14/face book-vaccine-hesitancy-qanon"), copying White House COVID-19 official Andrew Slavitt, with no more text in the email and the subject line: "You are hiding the ball."  *Id.* at 12.

56.    The next morning, Facebook responded by stating, "there is a misunderstanding on what this story is covering with respect to research that's happening – I will call to clear up. Certainly not hiding the ball."  *Id.* at 11-12.

57.     Flaherty responded in accusatory fashion, referring to a series of at least three previous oral conversations in which the White House had demanded more information from Facebook about its censorship policies. *Id.* at 11. Flaherty made clear that the White House was seeking more aggressive action on "borderline" content—*i.e.*, content that *does not clearly violate Facebook's own censorship policies* but the White House demands action against anyway. Flaherty wrote: "I don't think this is a misunderstanding … I've been asking you guys pretty directly, over a series of conversations, for a clear accounting of the biggest issues you are seeing on your platform when it comes to vaccine hesitancy, and the degree to which borderline content--as you define it-- is playing a role." *Id.* at 11. Flaherty also referred to a series of meetings, including one-on-one meetings with Facebook ("1:1"): "I've also been asking for what actions you have been taking to mitigate it as part of your 'lockdown' - which in our first conversation, was said to be in response to concerns over borderline content, in our 1:1 convo you said was not out of any kind of concern over borderline content, and in our third conversation never even came up." *Id.*

58.     Flaherty followed with a series of accusations that Facebook was deceiving and prevaricating with the White House about its "borderline" (*i.e. not* violative) content: "You said you would commit to us that you'd level with us. I am seeing in the press that you have data on the impact of borderline content, and its overlap with various communities. I have asked for this point blank, and got, instead, an overview of how the algorithm works, with a pivot to a conversation about profile frames, and a 45-minute meeting that seemed to provide you with more insights than it provided us." *Id.* He accused Facebook of being the "top driver[] of vaccine hesitancy," demanded action against "borderline" content, and stated that the White House wanted to be directly involved in those efforts: "I am not trying to play 'gotcha' with you. We are gravely

concerned that your service is one of the top drivers of vaccine hesitancy- period.  I will also be

the first to acknowledge that borderline content offers no easy solutions. But we want to know that

you're trying, we want to know how we can help, and we want to know that you're not playing a

shell game with us when we ask you what is going on. This would all be a lot easier if you would

just be straight with us." *Id.*

59.     Facebook responded on March 15, respectfully disputing the Washington Post's

reporting, but then saying to Flaherty: "We obviously have work to do to gain your trust. You

mention that you are not trying to play 'gotcha' with us—I appreciate the approach you are taking

to continued discussions. We are also working to get you useful information that's on the level.

That's my job and I take it seriously--I'll continue to do it to the best of my ability, and I'll expect

you to hold me accountable." *Id.* at 10-11.

60.     The same day, March 15, 2021, Andrew Slavitt (who was copied on these

exchanges between Facebook and Flaherty) weighed in, once again accusing Facebook of

dishonesty in a series of oral meetings: "It would [be] nice to establish trust. I do feel like relative

to others, interactions with Facebook are not straightforward and the problems are worse – like

you are trying to meet a minimum hurdle instead of trying to solve the problem and we have to

ask you precise questions and even then we get highly scrubbed party line answers. We have

urgency and don't sense it from you all.  100% of the questions I asked have never been answered

and weeks have gone by." *Id.* at 10.

61.     Slavitt then made an ominous statement threatening unspecified Executive action

against Facebook in retaliation for Facebook's perceived lack of cooperation with the White

House's demands on censorship of "borderline" (*non-violative*) content: "*Internally we have been

considering our options on what to do about it.*"  *Id.* at 10 (emphasis added).

62.    On March 16, 2021, Facebook responded to Slavitt, again disputing the Washington Post's reporting and respectfully explaining its position, but also promising to share information about vaccine hesitancy in "real time": "We are absolutely invested in getting you the specific information needed to successfully manage the vaccine roll out." *Id.* Facebook promised to increase information-sharing and proposed a detailed oral meeting on the topic: "But I understand your point regarding how we communicate, and that we need to share information with you in a way that prioritizes what we are seeing in as close to real time as possible. I'd like to set up a conversation with our research leads to walk your team through ongoing research we are currently conducting and our approach; and then we can prioritize sharing results as quickly as possible." *Id.* Facebook also offered to speak to Slavitt by phone at any time. *Id.*

63.    On March 19, 2021, Facebook had an oral meeting with White House officials, including Flaherty and Slavitt. Doc. 174-1, at 15. On Sunday, Facebook sent a follow-up summary of the meeting to Andrew Slavitt ("Thanks for taking the time to connect on Friday"), which noted that the White House (1) demanded a "Consistent Product Team [Point of Contact]" at Facebook, (2) demanded "Sharing Additional Data" from Facebook, (3) had asked about "Levers for Tackling Vaccine Hesitancy Content," and (4) asked about censorship policies for the Meta platform WhatsApp. *Id.*.

64.    In the follow-up email, Facebook noted that, in direct response to White House demands, it was censoring, removing, and reducing the spread of content that did not violate its policies: "You also asked us about our levers for reducing virality of vaccine hesitancy content. In addition to policies previously discussed, these include *the additional changes that were approved late last week* and that we'll be implementing over the coming weeks. As you know, in addition to removing vaccine misinformation, we have been focused on reducing the virality of content

discouraging vaccines *that does not contain actionable misinformation*. This is *often-true content* … but it can be framed as sensation, alarmist, or shocking. *We'll remove these Groups, Pages, and Accounts when they are disproportionately promoting this sensationalized content*." *Id.* at 15 (emphases added).

65.　Facebook also provided the White House with a detailed report on its censorship policies on WhatsApp: "WhatsApp's approach to misinformation focuses on limiting the virality of messages, preventing coordinated abuse, and empowering users to seek out reliable sources of information both in and out of the product. Our product includes features to limit the spread of viral content, such as forward limits and labels, privacy settings to help users decide who can add them to groups, and simple ways for users to block accounts and make reports to WhatsApp if they encounter problematic messages. Additional limitations we placed in April 2020 on forwarding of messages that have been forwarded many times reduced these kinds of messages by over 70%." *Id.*

66.　On March 22, 2021, Flaherty responded to Facebook, demanding much more detailed information and action about "sensationalized" content on its platforms. *Id.* at 14. Flaherty noted that White House officials were demanding a plan from Facebook to censor non-violative content, *i.e.*, "looking out for your game plan on tackling vaccine hesitancy spread on your platform." *Id.*

67.　In this email, Flaherty badgered Facebook with a series of detailed requests for information about this issue of censoring vaccine-skeptical content that does not violate Facebook's content-moderation policies, such as truthful but "sensational" content: "Again, as I've said, what we are looking for is the universe and scale of the problem. You noted that there is a level below sensational stories that get down-ranked, which took the form of general skepticism.

… [T]he problem does not sit in 'microchips'-land, and … it seems plausible that the things that drive the most actual hesitancy sit in 'sensational' and 'skeptical.'" *Id.*.  Flaherty demanded more information and greater censorship of such non-violative "sensational" and "skeptical" content: "If you're down ranking sensational stuff—great—but I want to know how effective you've seen that be from a market research perspective.  And then, what interventions are being taken on 'skepticism?' … [W]hat are you trying here, and again, how effective have you seen it be. And *critically*, what amount of content is falling into all of these buckets? Is there wider scale of skepticism than sensationalism? I assume given the Carnegie data and the studies I've seen in the press that you have this. … As I've said: this is not to play gotcha. It is to get a sense of what you are doing to manage this." *Id.* (italics in original).

68.    Flaherty also badgered Facebook for more information on Meta's censorship policies on the WhatsApp platform, pushing for greater censorship there: "On whatsapp, which I may seem like I'm playing gotcha, but I guess I'm confused about how you're measuring reduction of harm. If you can't see the message, I'm genuinely curious—how do you know what kinds of messages you've cut down on? Assuming you've got a good mousetrap here, that's the kind of info we're looking for above: what interventions you've taken, and what you've found to work and not work? And how effective are you seeing the good information on Whatapp be? Are you doing cross platform campaign work to try to reduce people's exposure on whatsapp?" *Id.* at 14.

69.    Flaherty concluded with an accusation of past dishonesty against Facebook and proposed frequent oral meetings to address the White House's issues: "You've given us a commitment to honest, transparent conversations about this. We're looking for that, and hoping we can be partners here, even if it hasn't worked so far. I know Andy [Slavitt] is willing to get on

the phone with [a Facebook official] a couple of times per week if its necessary to get all of this." *Id.*

70.     Flaherty's statement that the White House is "hoping we can be partners here, even if it hasn't worked so far," reinforced Slavitt's previous implied threat that the White House would take some unspecified action against Facebook if it did not cooperate with the White House's demands on censorship of vaccine-hesitant content, especially *non-violative* content, on Facebook's platforms. *Id.*

71.     Facebook then agreed with Flaherty and Slavitt to schedule a meeting that Wednesday at 4:00 pm to discuss these issues. *Id.* at 13.

72.     On April 9, 2021, Facebook sent Flaherty an email to respond to a long series of detailed questions from Flaherty about how the Meta platform WhatsApp was censoring COVID-19 misinformation. Doc. 174-1, at 17-21. All Flaherty's questions were designed to probe and pressure Facebook toward more aggressive censorship. *See id.* Facebook began by "noting some of the key differences between a private messaging app like WhatsApp, and social media like Facebook and Instagram. Approximately 90 percent of the messages sent on WhatsApp are one-to-one, and the majority of group chats include fewer than ten people. WhatsApp does not promote content, and users do not build audiences or discover new people as they would on social media." *Id.* at 18. Flaherty responded to this: "Very aware. [Smiley face]." In other words, the White House was demanding information about speech on a *private* messaging app used for one-to-one private communication, and demanding greater censorship of speech on that app—and it was "very aware" that it was doing so. *Id.*

73.     Facebook noted that "WhatsApp seeks to control the spread of misinformation and inform users through deliberate, content-agnostic product interventions -- things like labeling and

limiting message forwards." *Id.* at 18. Facebook noted that the message-forwarding limits are

"intended" to censor COVID misinformation, and that they actually reduced such speech by 70

percent, and Facebook admitted that these are "somewhat blunt tools" that prevent its users from

sending many other forms of speech as well: "The forward limits … are intended to reduce their

spread. As mentioned in my earlier note, when WhatsApp rolled out the limitation for highly

forwarded messages to one chat at a time in April 2020, this resulted in a 70% reduction of those

messages globally. Of course, not all forwards are misinformation, so these are by nature

somewhat blunt tools, but they are important ones -- and ones that many other messaging services

don't provide." *Id.*

74. After presenting Facebook with a series of questions (presented in bold and in red

type in the email, *see id.* at 18-20), Flaherty summed up by demanding insight into Facebook's

internal information: "I guess I have the same question here as I do on Facebook on Instagram. Do

you guys think you have this under control? You're obviously going to say yes to that, so I guess

the real question is, as ever: how are you measuring success? Reduction in forwarding? Measured

impact across Facebook properties?" *Id.* at 20.

75. Facebook responded by emphasizing that it was "reducing viral activity on our

platform" through message-forward limits and other speech-blocking techniques as well: "On

WhatsApp, reduction in forwards is just one of the signals that we use to measure how well we are

doing in reducing viral activity on our platform. We also ban accounts that engage in mass

marketing or scam behaviors - including those that seek to exploit COVID-19 misinformation. Our

efforts in this space are more comprehensive than anything that our peers in private messaging or

SMS do, and we are constantly innovating to stay ahead of future challenges." *Id.* at 20.

76.     Facebook also offered to meet with the White House "Monday or anytime next week" to discuss its censorship efforts, to which Flaherty responded, "Hoor should be trying to land a time." *Id.* at 17.

77.     Flaherty responded to Facebook's long, detailed account of its censorship efforts on WhatsApp by expressing dissatisfaction with the response and demanding ever-more detailed information, stating that he "couldn't care less" about Facebook's "product safari": "Will say I'm really mostly interested in what effects the interventions and products you've tested have had on increasing vaccine interest within hesitant communities, and which ones have shown promise. Really couldn't care less about products unless they're having measurable impact. And while the product safari has been interesting, at the end of the day, *I care mostly about what actions and changes you're making to ensure sure you're not making our country's vaccine hesitancy problem worse*. I definitely have what I believe to be a non-comprehensive list of products you're building but I still don't have a good, empirical answer on how effective you've been at reducing the spread of vaccine-skeptical content and misinformation to vaccine fence sitters in the now-folded 'lockdown.'" *Id.* at 17 (emphasis added).

78.     Flaherty then accused Facebook of being responsible for the riot at the Capitol on January 6, 2021, by not censoring enough speech online, and suggested that Facebook would be similarly responsible for COVID-related deaths if it did not engage in more online censorship here: "In the electoral context, you tested and deployed an algorithmic shift that promoted quality news and information about the election. This was reported in the New York Times and also readily apparent to anyone with cursory social listening tools. You only did this, however, after *an election that you helped increase skepticism in, and an insurrection which was plotted, in large part, on*

27

*your platform*. And then you turned it back off.  *I want some assurances, based in data, that you are not doing the same thing again here*." *Id.* (emphases added).

79.     Facebook responded by promising ever-more-detailed information to the White House's demands: "Understood. I thought we were doing a better job [of] responding to this – and we are working to get the data that will more clearly show the universe of the Covid content that's highest in distribution with a clear picture of what percentage of that content is vax hesitancy content, and how we are addressing it. I know [a Facebook official] told Andy [Slavitt] that would take a bit of time to nail down and we are working on that universe of data. I will make sure we're more clearly responding to your questions below." *Id.* at 17.

80.     The meeting that Facebook offered with the White House on Monday, April 12 or thereafter occurred on Wednesday, April 14, because Flaherty emailed Facebook that day stating: "Since we've been on the phone…" *Id.* at 22.

81.     In this Wednesday, April 14, 2021 email, with the subject line "tucker," Flaherty noted that the White House was tracking COVID-related content in real time, and he demanded the censorship of currently-trending posts of content from two prominent Fox News hosts, Tucker Carlson and Tomi Lahren: "Since we've been on the phone – the top post about vaccines today is tucker Carlson saying they don't work. Yesterday was Tomi Lehren [*sic*] saying she won't take one.  This is exactly why I want to know what 'Reduction' actually looks like – if 'reduction' means 'pumping our most vaccine hesitant audience with tucker Carlson saying it doesn't work' then … I'm not sure it's reduction!" *Id.* at 22.  Facebook responded: "Thanks—I saw the same thing when we hung up.  Running this down now." *Id.*  In a separate email chain to Flaherty and Courtney Rowe the same day, Facebook also assured the White House, "running down the question on Tucker and working on getting you report by end of week." *Id.* at 23.

82.     Tucker Carlson has 1.2 million followers on his personal Facebook account and 3.8

million followers on his show's account, Jones Decl., Ex. I, at 1-2, so censoring Carlson's content

would affect the free-speech rights of millions of people in a single stroke.

83.     In the meantime, Facebook was offering to cooperate closely with the White House

to "amplify" its preferred messages.  On April 13, 2021, Facebook emailed Andy Slavitt about the

temporary halt of the Johnson & Johnson vaccine, stating: "Re the J+J [*i.e.*, Johnson & Johnson]

news, we're keen to amplify any messaging you want us to project about what this means for people

– it obviously has the risk of exacerbating vaccine hesitancy, so we're keen to get ahead of the

knock-on effect.  Don't hesitate to tell me – or via your teams – how we can help to provide

clarity/reassurance via Facebook."  Doc. 174-1, at 31-32.  Facebook then forwarded the same offer

to Courtney Rowe and Rob Flaherty of the White House digital communications team.  *Id.* at 31.

84.     Flaherty responded the same day, April 13, with a series of detailed requests about

how Facebook could amplify the White House's preferred messages, including: "Some kind of

thing that puts the news in context if folks have seen it (like your current 'COVID news' panel)

that has 3-4 pieces of info (eg: Adverse events are very rare – 6 cases out of nearly 7 million, the

FDA and CDC are reviewing so it health care providers know how to treat any of the rare events,

this does not affect pfzier or moderna, which vaccinate via a different mechanism)"; "CDC is

working through an FAQ that we'd love to have amplified in whatever way possible – maybe

through the COVID info panel"; and "[a] commitment from you guys to make sure that a favorable

review reaches as many people as the pause, either through hard product interventions or

algorithmic amplification."  *Id.* at 30-31.  Flaherty also block-quoted a White-House-approved

message on the vaccine pause for Facebook to amplify.  *Id.* at 31.

85.    Flaherty then concluded by demanding that Facebook monitor any "misinformation" relating to the Johnson & Johnson vaccine pause, and asking Facebook to provide a detailed report to the White House within 24 hours of how it was doing so: "More broadly: we share [Facebook's] concern about knock-on effects and are curious to get a read from your CMU data about what you're seeing and with whom. *Moreover, I want to make sure you have eyes on what might be spinning off the back end of this – that the news about J&J doesn't spin off misinformation. Would be great to get a 24 hour report-back on what behavior you're seeing*." *Id.* at 31 (emphasis added).

86.    The same day, April 13, 2021, Facebook responded with a detailed report on misinformation on its platforms about this issue.  Doc. 174-1, at 24-30.  Facebook noted that there was an oral meeting about misinformation with the White House scheduled the next day: "I'm looking forward to the meeting tomorrow [*i.e.*, Wednesday, April 14] and hoping we can spend some time responding to Rob's feedback from last week as well as further discussing the J&J news and how we can hopefully partner together." *Id.* at 24.

87.    Facebook also noted that it had recently had a telephone call with Courtney Rowe about how it was censoring misinformation, and had agreed to provide a detailed report on its relevant censorship enforcement policies: "Courtney – as we discussed, we also wanted to send over some examples of content we see on our platform that we remove (misinformation & harm) as well as content we take other actions on, but do not remove (vaccine hesitancy). I have included some examples at the bottom of this email and happy to setup time to talk through this more with you as well, if helpful." *Id.* at 24.  Facebook then provided a six-page report on censorship with explanations and screen shots of sample posts of content that it censors and does not censor. *Id.* at 24-30.

88.    First, Facebook responded to Flaherty's request for government-message-amplification by agreeing to cooperate with the White House on those demands.  *Id.* at 24. Regarding Flaherty's demand that Facebook monitor and report on "misinformation" related to the Johnson & Johnson vaccine pause, Facebook agreed to both monitor and report to the White House: "We will look to get you insights as soon as we have them. We are going to be watching to see how this plays out over the next couple of days. [A Facebook official] is joining [the call] tomorrow and plans to share a couple things we are seeing emerge from the CMU survey and what we are going to be watching over the next few days. Also, we are proactively monitoring and seeing what themes emerge from content on-platform and happy to share out when we have stuff collected." *Id.* at 24-25.

89.    Facebook then provided a detailed report to Courtney Rowe's request for specific examples of posts that are censored on its platforms.  First, as to "VACCINE HESITANCY" content, Facebook explained that this content does not violate Facebook's content-moderation policies, but Facebook assured the White House that Facebook still censors such non-violative content by suppressing it in news feeds and algorithms.  *Id.* at 25.  Facebook admitted that such content is often "true" and sometimes involves core political speech or advocacy (*e.g.*, "discussing choice to vaccinate in terms of personal and civil liberties"): "The following examples of content are those that *do not violate our Misinformation and Harm policy*, but may contribute to vaccine hesitancy or present a barrier to vaccination. This includes, for example, content that contains sensational or alarmist vaccine misrepresentation, disparaging others based on the choice to or to not vaccinate, *true but shocking claims or personal anecdotes*, or *discussing the choice to vaccinate in terms of personal and civil liberties* or concerns related to mistrust in institutions or individuals." *Id.* at 25 (emphases added).

90.     Facebook assured the White House that it censors such true, political, non-violative content through "a spectrum of levers" that includes concealing the content from other users, deboosting the content, and preventing sharing through "friction": "We utilize a spectrum of levers for this kind of content…. Actions may include reducing the posts' distribution, not suggesting the posts to users, limiting their discoverability in Search, and applying Inform Labels and/or reshare friction to the posts." *Id.* Facebook then provided the White House with a series of sample posts, all of which content originated from Children's Health Defense, the anti-vaccine organization headed by Robert F. Kennedy Jr. (who would soon be identified as one of the so-called "Disinformation Dozen"). *Id.* at 25-27.

91.     Next, under the heading "Examples of Content Removed for Violating our Misinformation & Harm Policy," Facebook provided the White House with "examples of posts we have removed for violation of our Misinformation & Harm Policy." *Id.* at 27. Facebook then provided a list of screen shots of posts it had removed from the platform entirely, again all of which originated from Children's Health Defense, Robert F. Kennedy Jr.'s group. *Id.* at 28-30.

92.     As noted below, Facebook's explanation that it was removing violative posts by Children's Health Defense and censoring even its posts that did not violate Facebook's policies turned out to be not nearly enough to satisfy the White House.

93.     Separately from Flaherty's demands about Tucker Carlson, on April 14, 2021, Andy Slavitt also emailed a high-level Facebook executive—Facebook's President of Global Affairs, former Deputy Prime Minister of the United Kingdom Nick Clegg—with a sarcastic message expressing the White House's displeasure both with Facebook's failure to censor Tucker Carlson and with Facebook's perceived failure to allow the White House to micromanage its censorship policies: "Number one of Facebook. Sigh. Big reveal call with FB and WH today. No

progress since we spoke. Sigh." Doc. 174-1, at 35. Clegg promptly responded to Slavitt with an

apology and promise to immediately address the censorship of Tucker Carlson: "OK – sorry to

hear about call today, will dig in now." *Id.* The subject line of Slavitt's email, reproduced in the

"Re:" line of later messages, was "Tucker Carlson anti-vax message." *Id.* at 34.

94.     Late evening of the same day, April 14, 2021, at 10:51 p.m., Nick Clegg provided

Slavitt with a detailed report about the Tucker Carlson post, explaining that Tucker Carlson's

content did not violate Facebook policies (due to the federal government's own information about

its accuracy) but assuring the White House that Facebook would censor it anyway. *Id.* at 34. Clegg

denied that Carlson's content was the top post on Facebook, but then stated, "Regardless of

popularity, the Tucker Carlson video does not qualify for removal under our policies. Following

the government's decision yesterday, we are allowing claims that the Johnson and Johnson vaccine

causes blood clots…. That said, the video is being labeled with a pointer to authoritative COVID

information, it's not being recommended to people, and it is being demoted." *Id.* at 34.

95.     Clegg also stated that Facebook was "v[ery] keen" to provide a more detailed report

on its censorship practices in response to White House demands: "I'm v keen that we follow up as

we'd agreed, and I can assure you the teams here are on it." *Id.*

96.     Brian Rice of Facebook then forwarded the same report on the Tucker Carlson post

to Rob Flaherty. *Id.* ("Making sure you receive--").

97.     Less than twenty minutes later, at 11:29 p.m. on April 14, 2021, Flaherty responded

to Rice with a sarcastic response badgering Facebook for a more detailed explanation of why it

had not removed Tucker Carlson's content outright, demanding greater censorship, and accusing

Facebook of causing an "insurrection" by not censoring enough speech on its platforms: "I guess

this is a good example of your rules in practice then – and  a chance to dive in on questions as

they're applied. How was this [*i.e.* Tucker Carlson' post] not violative?  The second half of the segment is raising conspiracy theories about the government hiding that all vaccines aren't effective. It's not about just J&J. What exactly is the rule for removal vs demoting? Moreover: you say reduced and demoted. What does that mean? There's 40,000 shares on the video. Who is seeing it now? How many? How effective is that? And we've gone a million rounds on this in other contexts so pardon what may seem like deja vu – but on what basis is 'visit the covid-19 information center for vaccine resources' the best thing to tag to a video that says the vaccine doesn't work?"  Doc. 174-1, at 33.  Flaherty concluded ominously by reiterating his accusation that Facebook had caused the January 6 riot by not censoring enough speech on its platforms: "Not for nothing but last time we did this dance, it ended in an insurrection."  *Id.* at 34.

98.    Six minutes later, at 11:35 p.m. on April 14, Flaherty followed up with another email accusing Facebook of providing incorrect information through CrowdTangle and demanding an explanation: "And sorry – if this was not one of the most popular posts about the vaccine on Facebook today, then what good is crowdtangle? [A Facebook official] said that Tomis [*i.e.*, Tomi Lahren's] video was the most popular yesterday based on your data, which reflected what CT [*i.e.*, CrowdTangle] was showing. Tuckers video was top on CT today. What is different about this video, then?" *Id.* at 33.

99.    On Friday, April 16, Flaherty then sent an email expressing his displeasure with the timing of Facebook's response and demanding immediate answers, snapping at Rice: "These questions weren't rhetorical."  *Id.* at 33.  Facebook apologized and promised an immediate response: "Hey Rob – understood and sorry for the delay.  The team has been heads-down since our conversation to produce the report we discussed on Wednesday afternoon. We are aiming to

get you something tonight ahead of the weekend." *Id.* Facebook then proposed another oral meeting: "schedule a call to discuss. Would that work?" *Id.*

100. On Tuesday, April 21, 2021, Facebook sent an additional response to the same email chain, indicating that there had been a phone call with Flaherty ("thanks for catching up earlier") and providing another, more detailed report on its censorship of Tucker Carlson in response to each of Flaherty's queries question-by-question. *Id.* at 36. Facebook again reported that Tucker Carlson's content had not violated its policies, stating that "we reviewed this content in detail and it does not violate those policies," but reported that Facebook had been censoring it anyway and would continue to censor it even though no fact-check had reported it false: "The video received 50% demotion for seven days while in the queue to be fact checked, and *will continue to be demoted even though it was not ultimately fact checked*." *Id.* (emphasis added). These circumstances raise a compelling inference that Facebook continued to demote Tucker Carlson' content, in violation of its own policies and practices, due to the White House's pressure.

101. In the same time frame, the White House was exerting similar pressure on other major social-media platforms. It had meetings with YouTube and Twitter about misinformation on April 21, 2021 as well.

102. On April 21, Rob Flaherty, Andy Slavitt, and Kelsey Fitzpatrick of the White House, along with an official at HHS, participated in a meeting with several Twitter officials. Doc. 71-7, at 86. The meeting's subject was "Twitter Vaccine Misinfo Briefing." *Id.* The meeting invite noted: "White House Staff will be briefed by Twitter on vaccine misinfo. Twitter to cover trends seen generally around vaccine misinformation, *the tangible effects seen from recent policy changes*, what interventions are currently being implemented *in addition to previous policy*

*changes*, and ways the White House (and our COVID experts) can *partner* in product work." *Id.* (emphases added).

103.    The next day, April 22, Twitter employees noted in internal communications that the White House officials, during this meeting, had posed "one really tough question about why Alex Berenson hasn't been kicked off the platform." Jones Decl., Ex. J, at 2-3. The Twitter employee noted that the White House's questions were "pointed" and "mercifully we had answers." *Id.* Another internal Twitter communication noted that the White House "really wanted to know about Alex Berenson. Andy Slavitt suggested they had seen data viz that had showed he was the epicenter of disinfo that radiated outwards to the persuadable public." *Id.*

104.    Later, on July 16, 2021, Twitter suspended Alex Berenson for the first time. *Id.* On August 28, 2021, Twitter permanently deplatformed Berenson. *Id.*

105.    On April 21, 2021, Flaherty, Andy Slavitt, Kelsey Fitzpatrick of the White House, and Jessica Scruggs of HHS had a similar meeting with YouTube, to which at least six YouTube officials were invited. Jones Decl., Ex. K, at 1. The calendar invite stated that the purpose of the meeting was: "White House staff to get briefed by YouTube on general trends seen around vaccine misinformation. As well as, the empirical effects of YouTube's efforts to combat misinfo, what interventions YouTube is currently trying, and ways the White House (and or COVID experts) can partner in product work." *Id.*

106.    Just after midnight on April 22, 2021, Rob Flaherty emailed a list of Google officials about YouTube, copying Andy Slavitt, Clarke Humphrey, and Kelsey Fitzpatrick of the White House. Doc. 174-1, at 39. He began by referring to the oral meeting with Google/YouTube officials on April 21: "Thanks again for the conversation today." *Id.* Flaherty also referred to an earlier, "first conversation," indicating that there had been multiple meetings with YouTube. *Id.*

107.   Flaherty then noted that the White House had asked YouTube (like Facebook) to monitor and report on the speech on its platforms, stating that the White House expected a report from them: "We'll look out for the top trends that you've seen in terms of misinformation around the vaccine." *Id.*

108.   Flaherty then provided a "recap" of their oral conversation, stating that concern about misinformation on YouTube was "shared at the highest (and I mean highest) levels of the [White House]": "To recap: … we remain concerned that Youtube is 'funneling' people into hesitance and intensifying people's hesitancy…. we want to be sure that you have a handle on vaccine hesitancy generally and are working toward making the problem better. *This is a concern that is shared at the highest (and I mean highest) levels of the WH*, so we'd like to continue a good-faith dialogue about what is going on under the hood here. I'm the on the hook for reporting out." *Id.* (emphasis added).

109.   Citing an article "highlighting the Youtube misinformation that is spreading through the Vietnamese community," Flaherty stated: "Clearly, more work to be done here. Would love to get some insights from you on how you are tackling this problem across all languages." *Id.*

110.   Flaherty then stated, "A couple of other things it would be good to have from you all," and provided a five-bullet list of detailed demands for YouTube's internal data about the spread of misinformation on its platform, including: "the top trends that you're seeing in terms of misinformation/hesitance inducing content," and "[a] deeper dive on reduction and its effectiveness," among others.  *Id.*

111.   Flaherty indicated that the White House was coordinating with the Stanford Internet Observatory, which was then operating the Virality Project, discussed in detail below, noting in

the first bullet point: "Stanford has mentioned that it's recently Vaccine Passports and J&J pause-related stuff, but I'm not sure if that reflects what you' re seeing." *Id.*  This reference raises the inference that the White House's "COVID experts" ("our COVID experts") mentioned in the calendar invite for the meeting, Jones Decl., Ex. K, at 1, are, in fact, "Stanford" personnel associated with the Virality Project, and that the White House was working with "Stanford" to "partner with" platforms "on product work."

112.    As with Facebook, many of Flaherty's demands related to so-called "borderline" content, *i.e.*, often-truthful content that does not violate platform policies but that the White House disfavors.  *See* Doc. 174-1, at 39.  Among other things, he praised YouTube for reducing distribution of such content: "I believe you said you reduced watch time by 70% on 'borderline' content, which is impressive." *Id.*  But then, again, he followed up with a long series of demands for more information: "How does that track with vaccine-related content specifically…? What has the comparative reduction in watch time on 'borderline' vaccine topics been after your interventions? And what has the increase in watch time been on authoritative information?... Related to the second bullet: to what extent have your ranking interventions been effective there? And, perhaps more critically, to what degree is content from people who have been given a 'strike' still being recommended and shown in prominent search positions? … [H]ow did you arrive on info-panels as the best intervention? And to what extent are people clicking through after exposure to vaccine-hesitant content? …  What are the general vectors by which people see the 'borderline' content – or really just vaccine-skeptical content? Is it largely through recommendations? Search?" *Id.*  Notably, Flaherty's "most critical[]" question implied that YouTube should be censoring more content from disfavored *speakers*, *i.e.*, those who have been given a "strike" for previous anti-vaccine content.  *Id.*

113.    Flaherty emphasized that the White House wanted to make sure YouTube's "work extends to the broader problem" of people viewing vaccine-hesitant content.  *Id.* at 39-40.  And he proposed regular meetings to push YouTube to disclose its "internal data" to the White House: "We've worked with a number of platform partners to track down similar information based on internal data, including partners of similar scale. I am feeling a bit like I don't have a full sense of the picture here. We speak with other platforms on a semi-regular basis. We'd love to get in this habit with you. Perhaps bi-weekly? Looking forward to more conversation."  *Id.* at 40.

114.    On April 23, 2021, Flaherty sent Facebook an email that included a document entitled "Facebook COVID-19 Vaccine Misinformation Brief" prepared by an unidentified third party.  Jones Decl., Ex. L, at 1.  The "Brief" had two major headings with several bullet points under each: "Facebook plays a major role in the spread of COVID vaccine misinformation," and "Facebook's policy and enforcement gaps enable misinformation's spread."  *Id.*  The "Brief" recommended much more aggressive censorship of Facebook's platforms, calling for "progressively severe penalties … and comprehensive enforcement for pages, accounts, and groups that repeatedly post COVID vaccine misinformation," and stating that "[b]ans for COVID-19 misinformation should be cross-platform and enforced at the entity-level, not the account level." *Id.*  It called for Facebook to stop distributing even non-violative anti-vaccine content "in News Feed or in group recommendations" to "significantly reduce the reach of low-quality domains," and it stated that "[v]accine misinformation monitoring and enforcement must adjust as disinformers evade enforcement…."  *Id.* at 1-2.  And it called for specific censorship of disfavored speakers: "Warning screens before linking to domains known to promote vaccine misinformation would dissuade users from following links to of-platform misinformation and hurt the vaccine-misinformation business model Facebook enables."  *Id.* at 2.

115.    Reproducing this pro-censorship "Brief" in the text of his email to Facebook, Flaherty wrote: "Here's the crux of their recs.  Don't read this as White House endorsement of these suggestions (or, also, as the upper bound of what our thoughts may be).  But – spirit of transparency – this is circulating around the building and informing thinking." *Id.* at 1.

116.    On May 1, 2021, Nick Clegg of Facebook sent an email to Andy Slavitt indicating that the White House had recently met with Facebook to "share research work" and make more demands, stating: "Thanks to your team for sharing the research work with us…." *Id.* at 41.  At the beginning of the email, Clegg apologized to the White House for not catching and censoring three pieces of vaccine content that went viral, even though the content did not violate Facebook's policies, and promising to censor such non-violative content more aggressively in the future: "I wanted to send you a quick note on the three pieces of vaccine content that were seen by a high number of people before we demoted them. Although they don't violate our community standards, we should have demoted them before they went viral and this has exposed gaps in our operational and technical process." *Id.* at 42.

117.    Clegg then promised to be more vigilant and censor such non-violative content to prevent it from going viral in the future, and offered to report back to the White House in detail about its efforts to do so: "The teams have spent the last 24 hrs analysing these gaps and are making a number of changes starting next week, including setting up more dedicated monitoring for Covid vaccine content on the cusp of going viral, applying stronger demotions to a broader set of content, and setting up daily review and analysis so that we have a better real-time view of what is being seen by lots of people. I will be checking on this closely to make sure that these additional steps show results - the stronger demotions in particular should deliver real impact.  Please let me know if you'd like to discuss any of this in more detail." *Id.*

118.    Clegg then listed in bold the demands that the White House had made in its recent

meeting, with a detailed response to each.  *Id.* at 42.  First, the White House had demanded that

Facebook address "**Non-English mis/disinformation circulating without moderation**," and

Facebook promised to take steps to do so.  *Id.* (bold in original).

119.    Second, the White House had commanded Facebook: "**Do not distribute or

amplify vaccine hesitancy, and Facebook should end group recommendations for groups

with a history of COVID-19 or vaccine misinformation**."  *Id.* (bold in original).  Facebook

assured the White House that it was taking strong steps to censor such content, and promised to

increase its efforts to do so in the future: "Much of the research you shared called on us to ensure

that our systems don't amplify vaccine hesitancy content and this is top of mind for us. In addition

to the changes I mentioned above, we have already removed all health groups from our

recommendation feature on Facebook, and on Instagram we filter vaccine-related accounts from

our 'accounts you may follow feature'. We also remove accounts that may discourage vaccination

from search features. We currently enforce on hash tags we know are shared to promote vaccine

hesitancy content and are working to improve our automated systems here."  *Id.*

120.    Third, the White House had demanded that Facebook "**Monitor[] events that host**

**anti-vaccine and COVID disinformation**."  *Id.* (bold in original).  Facebook promised to monitor

social-media "events" on its platforms more closely and take more aggressive action to censor

them: "we are working to improve automatic detection for events hosting anti-vaccine and COVID

content. Our viral monitoring efforts will also help us detect events that are gaining views on

Facebook, and we do remove events coordinating in-person gatherings that involve or encourage

people who have COVID-19 to join."  *Id.*

121.    Fourth, the White House had demanded censorship of the so-called "Disinformation Dozen" in the private meeting with Facebook, raising the concern that "**12 accounts are responsible for 73% of vaccine misinformation**." *Id.* (bold in original). Facebook responded that it was scrutinizing those speakers and censoring them whenever it could, but that most if their content did not violate Facebook's policies: "we continue to review accounts associated with the 12 individuals identified in the CCDH 'Disinformation Dozen' report, but many of those either do not violate our policies or have ceased posting violating content.  Our 'Dedicated Vaccine Discouraging Entity' policy is designed to remove groups and pages that are dedicated to sharing vaccine discouraging content and we continue to review and enforce on these where we become aware of them." *Id.*

122.    Clegg then noted that he realized the White House would not be satisfied with these answers and was demanding greater censorship: "I realise that our position on this continues to be a particular concern for you." *Id.*  Clegg then suggested that too much censorship might be counterproductive and might drive vaccine hesitancy: "Among experts we have consulted, there is a general sense that deleting more expressions of vaccine hesitancy might be more counterproductive to the goal of vaccine uptake because it could prevent hesitant people from talking through their concerns and potentially reinforce the notion that there's a cover-up." *Id.* Brian Rice also forwarded Nick Clegg's email to Rob Flaherty.  *Id.* at 41.

### B.    Public Pressure and Threats From Press Secretary Jennifer Psaki.

123.    The White House was evidently quite unhappy with this response and the results of its pressure campaign behind closed doors.  A few days later, the White House took its pressure campaign public.  On May 5, 2021, Jen Psaki publicly reminded Facebook and the other platforms of the threat of legal consequences hanging over its head if it did not censor misinformation more

aggressively.  At the May 5, 2021 White House Press Briefing, Jen Psaki stated about social-media censorship: "The President's view is that the major platforms have a responsibility related to the health and safety of all Americans to stop amplifying untrustworthy content, disinformation, and misinformation, especially related to COVID-19, vaccinations, and elections. And we've seen that over the past several months, broadly speaking."  Glenn Decl. Ex. 29, at 15, Doc. 10-1, at 353.

124.    Psaki also stated that President Biden "also supports better privacy protections and a robust anti-trust program.  So his view is that there's more that needs to be done to ensure that this type of misinformation; disinformation; damaging, sometimes life-threatening information is not going out to the American public."  *Id.*  She thus linked the threat of a "robust anti-trust program" to the White House's demand that "more … needs to be done" by "the major platforms" to prevent "misinformation" and "disinformation" from "going out to the American public," *i.e.*, its demand for censorship.  *Id.*

125.    The next day, May 6, 2021, Flaherty privately responded to Facebook's most recent email, badgering Facebook again for more explanations about why it was not censoring more aggressively.  Regarding Nick Clegg's apology for not catching and censoring three viral posts earlier, Flaherty linked to one and noted: "For one, it's still up and seems to have gotten pretty far. And it's got 365k shares with four comments. We've talked about this in a different context, but how does something like that happen? The top post, the one from the Wisconsin news station, has 2.1 million comments."  Doc. 174-1, at 41.

126.    Flaherty also demanded more information about Facebook's efforts to demote "borderline" content: "Won't come as a shock to you that we're particularly interested in your demotion efforts, which I don't think we have a good handle on (and, based on the below, it doesn't

seem like you do either). Not to sound like a broken record, but how much content is being demoted, and how effective are you at mitigating reach, and how quickly?" *Id.*

127.    Flaherty then criticized Facebook's censorship efforts for vaccine-related posts in Facebook groups related to other topics: "Also, health groups: sure. But it seems more likely that anti-vax stuff is moving in groups that are not about health but are ... mom centric, or other spaces. Strikes me as the issue here is less from single-use anti-vaccine accounts and more about people who ... do other things and are also vaccine hesitant." *Id.* (ellipses in original).

128.    Flaherty tied this criticism to his criticism of Facebook's failure to censor the "Disinformation Dozen": "Seems like your 'dedicated vaccine hesitancy' policy isn't stopping the disinfo dozen - they're being deemed as not dedicated – so it feels like that problem likely carries over to groups." *Id.*

129.    On May 10, 2021, Facebook sent an email to Rob Flaherty and Courtney Rowe of the White House digital team, touting its efforts to promote vaccination on its platforms.  Doc. 174-1, at 46.  Among other things, Facebook reported that "Since January, we've provided more than $30 million in ad credits to help governments, NGOs and other organizations reach people with COVID-19 vaccine information and other important messages." *Id.*

130.    The next day, May 11, 2021, Flaherty responded with a one-line, snarky email stating: "Hard to take any of this seriously when you're actively promoting anti-vaccine pages in search." *Id.*  He included a link to a news report about this topic on Twitter.  *Id.*

131.    The next day, May 12, 2021, Facebook responded, assuring Flaherty that it had censored the accounts mentioned in the news reports: "Thanks Rob - both of the accounts featured in the tweet have been removed from Instagram entirely…. We're looking into what happened." *Id.* at 45.

132.    Facebook then assured Flaherty it was working on processes to suppress disfavored speech from search results on its platforms and remove anti-vaccine accounts: "We are continuing to develop technology to improve the quality of search results at scale across Instagram - this is a continual process built on new technology to address adversarial accounts…. We also remove accounts that may discourage vaccination from search by developing and using this new technology to find accounts on Instagram that discourage vaccines, and remove these accounts from search altogether. We've also removed accounts that primarily discourage vaccination from appearing where we recommend new accounts to follow, such as accounts you may like, and suggested accounts." *Id.*

133.    Facebook acknowledged that its censorship efforts were not enough and promised the White House they would increase them: "We clearly still have work to do to [sic], but wanted to ensure you were aware of the authoritative resources we're pointing people to first as we continue investing in removing accounts from search that may discourage vaccination." *Id.*

134.    The same day, May 12, 2021, Flaherty responded sarcastically, indicating that promoting pro-vaccine speech was not enough for the White House, which demanded the removal or deboosting of anti-vaccine speech: "Sure. They're first connected to authoritative information, but then you, as of last night, were presenting an anti-vaccine account with less than 1000 followers alongside, at level, with those pinned accounts!" *Id.* at 45.

135.    Flaherty then accused Facebook of not doing enough to censor anti-vaccine content in search results and dissembling to deceive the White House: "'[R]emoving bad information from search' is one of the easy, low-bar things you guys do to make people like me think you're taking action.  If you're not getting *that* right, it raises even more questions about the higher bar stuff." *Id.* at 45.  Flaherty continued, accusing Facebook of dishonesty: "You say in your note that you

remove accounts that discourage vaccination from appearing in recommendations (even though you're using 'primarily' to give yourself wiggle room). You also said you don't promote those accounts in search. Not sure what else there is to say." *Id.*

136.    Flaherty then compared Facebook unfavorably to other platforms to pressure them to suppress anti-vaccine content in search results: "Youtube, for their warts, has done pretty well at promoting authoritative info in search results while keeping the bad stuff off of those surfaces. Pinterest doesn't even show you any results other than official information when you search for 'vaccines.' I don't know why you guys can't figure this out." *Id.*

137.    On May 28, 2021, a senior executive of Meta sent an email to Slavitt and Murthy reporting that Facebook had expanded its censorship policies, evidently to satisfy federal officials' demands made at a recent oral meeting.  The email stated that a "key point" was that "We're expanding penalties for individual Facebook accounts that share misinformation."  Doc. 71-4, at 9.

### C. Flaherty's Profane Attack: "Are You Guys F**king Serious?"

138.    At some time prior to July 15, 2021, the White House's Facebook account experienced an issue that slowed its growth in followers.  Doc. 174-1, at 56.  On July 15, 2021, Facebook emailed a White House staffer and reported that "the technical issues that had been affecting follower growth on @potus have been resolved…. you should start to see your numbers trend back upwards…. Thanks for your patience as we investigated this." *Id.*  The White House staffer asked Facebook, "Could you tell me more about the technical issues affecting audience growth?" *Id.* at 55.  Facebook responded, "from what we understand it was an internal technical issue that we can't get into, but it's now resolved and should not happen again." *Id.*  The White House staffer then simply added Rob Flaherty to the email chain without further comment. *Id.*

139.    The same minute he was added to the email chain, 3:29 p.m. on July 15, 2021, Flaherty exploded at Facebook: "Are you guys fucking serious? I want an answer on what happened here and I want it today." *Id.* at 55.

140.    Facebook immediately raced to placate Flaherty, assuring him that the problem was from a "bug in our recommendation surface" that had been resolved two months earlier. *Id.* at 55. Facebook followed up with a longer explanation stating that the President's account had been affected because Facebook "take[s] aggressive steps to reduce the spread of vaccine hesitancy and vaccine misinformation on our platforms and we deploy technology to do so. As part of our efforts on Instagram, we have measures to help ensure we don't recommend people follow accounts that promote vaccine hesitancy at scale. For two weeks in April (April 14-28) this measure was impacted by over-enforcement on a signal we used …." *Id.* at 54. In other words, the White House's Instagram account had been inadvertently swept into the net of censorship that it had insisted that Facebook impose on private speakers' accounts. Evidently the White House is not amused when its own accounts are subject to the same treatment that it demands the platforms impose on thousands of ordinary Americans whose viewpoint the White House disfavors.

**D.    President Biden on Social-Media Platforms: "They're Killing People."**

141.    That same day, July 15, 2021, the White House held a joint press conference with Jen Psaki and Surgeon General Murthy. Dr. Murthy participated in the White House press conference with White House Press Secretary Jennifer Psaki to announce the Surgeon General's Health Advisory on Misinformation. Waldo Ex. 10. Psaki announced of Dr. Murthy that "[t]oday, he published an advisory on health misinformation as an urgent public health crisis." *Id.* at 1.

142.   Among other things, Dr. Murthy stated that "Modern technology companies have enabled misinformation to poison our information environment with little accountability to their users." *Id.* at 2.

143.   Dr. Murthy announced: "we expect more from our technology companies. We're asking them to operate with greater transparency and accountability. We're asking them to monitor misinformation more closely. We're asking them to consistently take action against misinformation super-spreaders on their platforms." *Id.* at 3.

144.   At the July 15 press conference, Dr. Murthy also demanded that the platforms do "much, much more" and "take aggressive action" against misinformation. Waldo Ex. 10, at 5.

145.   Dr. Murthy also stated that platforms "have to do more to reduce the misinformation that's out there …." *Id.* at 6.

146.   At the same press conference on July 15, 2021, Jennifer Psaki stated: "we are in regular touch with these social media platforms, and those engagements typically happen through members of our senior staff, but also members of our COVID-19 team." Waldo Ex. 10, at 10.

147.   Psaki stated: "We've increased disinformation research and tracking within the Surgeon General's office. We're flagging problematic posts for Facebook that spread disinformation." *Id.* at 10.

148.   Regarding the Administration's "asks" to social-media platforms, Psaki stated: "There are also proposed changes that we have made to social media platforms, including Facebook, and those specifically are four key steps: One, that they measure and publicly share the impact of misinformation on their platform. Facebook should provide, publicly and transparently, data on the reach of COVID-19 — COVID vaccine misinformation. Not just engagement, but the reach of the misinformation and the audience that it's reaching." *Id.* at 11.

149.    Psaki also stated: "Second, that we have recommended — proposed that they create a robust enforcement strategy that bridges their properties and provides transparency about the rules. So, about — I think this was a question asked before — there's about 12 people who are producing 65 percent of anti-vaccine misinformation on social media platforms. All of them remain active on Facebook, despite some even being banned on other platforms, including Facebook — ones that Facebook owns."  Waldo Ex. 10, at 11.

150.    Psaki stated: "Third, it's important to take faster action against harmful posts. As you all know, information travels quite quickly on social media platforms; sometimes it's not accurate. And Facebook needs to move more quickly to remove harmful, violative posts — posts that will be within their policies for removal often remain up for days. That's too long. The information spreads too quickly."  *Id.* at 11.

151.    And Psaki stated, publicly criticizing Facebook: "Finally, we have proposed they promote quality information sources in their feed algorithm. Facebook has repeatedly shown that they have the levers to promote quality information. We've seen them effectively do this in their algorithm over low-quality information and they've chosen not to use it in this case. And that's certainly an area that would have an impact."  Waldo Ex. 10, at 11.

152.    Psaki concluded: "So, these are certainly the proposals. We engage with them regularly and they certainly understand what our asks are."  *Id.* at 11.

153.    The next day, July 16, 2021, President Biden stated of Facebook and other platforms that "they're killing people" by failing to censor enough misinformation: "Mr. Biden was asked what his message was to social media platforms when it came to Covid-19 disinformation. 'They're killing people,' he said. 'Look, the only pandemic we have is among the

49

unvaccinated, and that — and they're killing people.'"  Glenn Decl. Ex. 33, at 1; Doc. 10-1, at 436.

154.    President Biden's statement came after "weeks" of pressuring Facebook to give federal officials access to Facebook's internal data: "White House officials … singled out social media companies for allowing false information to proliferate. That came after weeks of failed attempts to get Facebook to turn over information detailing what mechanisms were in place to combat misinformation about the vaccine, according to a person familiar with the matter."  *Id.*

155.    Surgeon General Murthy had been directly involved in those meetings with Facebook, including "tense" meetings and a meeting where he "angrily" demanded that Facebook do more to censor misinformation.  *Id.* at 437.

156.    When the President stated, "They're killing people," Psaki reinforced the same message: "'Our point is that there is information that is leading to people not taking the vaccine, and people are dying as a result,' Jen Psaki, the White House press secretary, said before Mr. Biden made his comments. 'And we have responsibility as a public health matter to raise that issue.'"  *Id.* at 436.

157.    That same day, July 16, 2021, at a White House press conference, Psaki stated that "we're in regular touch with social media platforms … about areas where we have concern. … [W]e are … regularly making sure social media platforms are aware of the latest narratives dangerous to public health that we and many other Americans seeing — are seeing across all of social and traditional media.  And we work to engage with them to better understand the enforcement of social media platform policies."  Glenn Decl. Ex. 34, at 6; Doc. 10-1, at 444.

158.    Psaki then described a "false narrative that remains active  … flowing on the internet quite a bit, in other places as well," and stated, "we want to know that the social media

platforms are taking steps to address it. That is inaccurate, false information… And that is an example of the kind of information that we are flagging or raising." Glenn Decl. Ex. 34, at 7; Doc. 10-1, at 445.

159.    Psaki also demanded additional "steps" "for Facebook or other platforms," including "to measure and publicly share the impact of misinformation on their platform and the audience it's reaching, also with the public." *Id*.

160.    She called on the platforms "to create robust enforcement strategies that bridge their properties and provide transparency about rules." *Id*. She stated that platforms should coordinate on censoring disfavored speakers: "You shouldn't be banned from one platform and not others if you — for providing misinformation out there." *Id.*

161.    Psaki also stated that the platforms should be "[t]aking faster action against harmful posts. As you all know, information travels quite quickly. If it's up there for days and days and days when people see it, you know, there's — it's hard to put that back in a box." Glenn Decl. Ex. 34, at 8; Doc. 10-1, at 446.

162.    Psaki was asked whether the censorship Facebook was already doing, which included "remov[ing] 18 million pieces of COVID misinformation" and "connect[ing] more than 2 billion people to reliable information," was "sufficient," and she responded, "Clearly not, because we're talking about additional steps that should be taken." *Id*.

163.    "[A] few hours after Biden's comment" that social-media platforms are "killing people" by not censoring misinformation, "Twitter suspended [Alex Berenson's] account for the first time." Jones Decl., Ex. J, at 3. Later, on August 28, 2021, Twitter permanently deplatformed Berenson. *Id.*

164.    Four days later, July 20, 2021, the White House explicitly threatened to amend or repeal the liability protections of § 230 of the Communications Decency Act if social-media companies did not increase censorship of disfavored speakers and viewpoints.  Glenn Decl. Ex. 35; Doc. 10-1, at 474-75  -  *'They Should Be Held Accountable': White House Reviews Platforms' Misinformation       Liability*,     USA     TODAY     (July     20,     2021),     *at* https://www.usatoday.com/story/news/politics/2021/07/20/white-house-reviews-section-230-protections-covid-misinformation/8024210002/.   The White House communications director, Kate Bedingfield, announced that "[t]he White House is assessing whether social media platforms are legally liable for misinformation spread on their platforms."  *Id.*  "We're reviewing that, and certainly, they should be held accountable," she said.  *Id.*

165.    The White House communications director "specified the White House is examining how misinformation fits into the liability protections granted by Section 230 of the Communications Decency Act, which shields online platforms from being responsible for what is posted by third parties on their sites."  *Id.*

166.    Media reported that, in connection with this threat, "Relations are tense between the Biden administration and social media platforms, specifically Facebook, over the spread of misinformation online."  *Id.*; *see also, e.g.,* Glenn Decl. Ex. 36; Doc. 10-1, at 477-81: *White House says social media networks should be held accountable for spreading misinformation*, CNBC.com (July 20, 2021), *at* https://www.cnbc.com/2021/07/20/white-house-social-networks-should-be-held-accountable-for-spreading-misinfo.html.

167.    When "asked … whether these companies should be held liable for publishing false information that causes people harm, Kate Bedingfield said the administration is reviewing policies. That could include amending the Communications Decency Act, or Section 230 of the

act.  'We're reviewing that and certainly they should be held accountable,' Bedingfield said.  'And I think you heard the president speak very aggressively about this.  He understands that this is an important piece of the ecosystem.'"  *Id.* at 478.

168.    The same day, Tuesday, July 20, 2021, Clarke Humphrey of the White House communications office emailed Facebook asking for the removal of an Instagram account associated with Dr. Fauci, saying it "is not actually one of ours."  Fauci Ex. 57, at 1-2.  Facebook responded one minute later, stating, "Yep, on it!"  Fauci Ex. 57, at 1.  The next day, Facebook responded again, stating, "This account has been removed.  Thank you for flagging!"  *Id.*

**E. The Social-Media Platforms Are Cowed into Collusion on Censorship.**

169.    The threats and public pressure on July 15 and 16—including the President's comment, "they're killing people"—got immediate results, as Facebook scrambled to assuage the White House's wrath and accede to all its censorship demands.

170.    After this series of public statements, responding to "White House pressure," Facebook censored the accounts of the 12 specific disfavored speakers whom Psaki accused of spreading health misinformation.  Glenn Decl. Ex. 37; Doc. 10-1, at 483-85: *Facebook takes action against 'disinformation dozen' after White House pressure*, CNN.com (Aug. 18, 2021), *at* https://www.cnn.com/2021/08/18/tech/facebook-disinformation-dozen/index.html.    Psaki had "hammered the platform in July for allowing the people identified in the report to remain on its platform."  *Id.* at 483.  After they were singled out for censorship by the White House, Facebook "removed over three dozen Pages, groups and Facebook or Instagram accounts linked to these 12 people, including at least one linked to each of the 12 people, for violating our policies."  *Id.*

171.    Other platforms responded to the pressure as well, as Twitter suspended Alex Berenson within a few hours of President Biden's July 16 comments and deplatformed him Berenson on August 28, 2021.  Jones Decl., Ex. J, at 3.

172.    On July 17, 2021, another Facebook official sent an email to Anita B. Dunn, the political strategist and Senior Advisor to the President in the White House, begging for assistance in getting back into the White House's good graces.  Doc. 174-1, at 49.  The Facebook official, who evidently had a prior relationship with Dunn, wrote: "Would love to connect with you on the President's comments on Covid misinfo and our work there. Really could use your advice and counsel on how we get back to a good place here. … As I hope you know, we've been doing a significant amount of work to … fight the misinfo … Obviously, yesterday things were pretty heated, and I'd love to find a way to get back to pushing together on this - we are 100% on the same team here in fighting this and I could really use your advice."  *Id.*  Dunn looped in Rob Flaherty to schedule a call.  *Id.* at 48.  Facebook then wrote: "Thanks Anita, and thanks Rob. I appreciate the willingness to discuss. We'd love to find a way to get things back to a productive conversation."  *Id.*  Facebook also noted, with a similarly conciliatory tone: "We had a conversation with the Surgeon General's office yesterday to discuss the advisory in more detail and hope to continue to work to address concerns."  *Id.*

173.    The next Monday, July 19, 2021, YouTube emailed Flaherty to announce "a few new ways in which we are making it easier for people to find authoritative information on health topics on YouTube."  *Id.* at 51-2.  On July 20, 2021, Flaherty responded, linking to a Tweet of "borderline" content and stating, "I'm curious: Saw this tweet. [Linking the Tweet].  I think we had a pretty extensive back and forth about the degree to which you all are recommending anti-

vaccination content. You were pretty emphatic that you are not. This seems to indicate that you are. What is going on here?"  *Id.* at 51.

174.    YouTube responded by assuring Flaherty that it "reduce[s]" the recommendation of anti-vaccine speech even when it does not violate YouTube's policies: "it is important to keep in mind that borderline content accounts for a fraction of 1% of what is watched on YouTube in the United States. We use machine learning to reduce the recommendations of this type of content, including potentially harmful misinformation. In January 2019, we announced changes to our recommendations systems to limit the spread of this type of content which resulted in a 70% drop in watchtime on non-subscribed recommended content in the U.S. and our goal is to have views of nonsubscribed, recommended borderline content below 0.5%."  *Id.* at 51.

175.    This was not enough for Flaherty, who demanded more information: "I see that's your goal - what is the actual number right now?"  *Id.* at 50.  YouTube responded that it would check for more information, and stated: "Per our COVID-19 medical misinformation policy, we will remove any content that contradicts local health authorities' or the World Health Organization's (WHO) medical information about COVID-19. To date, approximately 89% of videos removed for violations of this policy were removed with 100 views or less. With regards to the specific videos you referenced, the content was not in violation of our community guidelines."  *Id.* at 50.

176.    Flaherty responded, expressing surprise that YouTube was not censoring the disfavored content: "So this actually gets at a good question - the content [that the Tweet] points out isn't defined as 'borderline' and therefore isn't subject to recommendation limitations?"  *Id.*

177.    YouTube, like Facebook before it, assured Flaherty that it would "limit the visibility" and "reduce the spread" such content, even though it does not violate YouTube's

policies: "the content was not in violation of our policies and therefore not subject to removal. But for all content on YouTube, we apply our 4R framework we have previously described to raise authoritative voices while reducing visibility on borderline content. External evaluators use these guidelines which are then used to inform our machine learning systems that limits the spread of borderline content." *Id.* at 50.

178.    On October 28, 2021, the same day as a Washington Post article about Facebook employee Frances Haugen's allegations about misinformation on Facebook, Rob Flaherty emailed Brian Rice of Facebook a hyperlink to the article.  The only text in the email was the subject line, which stated: "not even sure what to say at this point."  Waldo Ex. 35, at 1-2; *see also infra.*

179.    On November 4, 2021, Meta reported to Rowe, Flaherty, and other White House officials that "we updated our misinformation policies for COVID-19 vaccines to make clear that they apply to claims about children…."  Doc. 71-3, at 15.

180.    On November 30, 2021, Christian Tom of the White House emailed Twitter stating, "Would you mind looking at this video and helping us with next steps to put a label or remove it?" Doc. 174-1, at 65.  He included a link to a Tweet of an unflattering, comedic video of First Lady Jill Biden reading to children, which had been clearly edited to make it sound as if she was profanely heckled while reading to them.  *Id.*  The subject line of the message was "Doctored video on Twitter of the First Lady."  *Id.*  Twitter responded within six minutes: "Happy to escalate with the team for further review from here."  *Id.*

181.    That evening, Twitter emailed back, stating, "Update for you - The team was able to create this event page for more context and details."  *Id.* at 64.  The "event page" explained the context of the parody video but did not censor it; it alerted users that the video had been edited for "comedic" effect.  *See A video of first lady Jill Biden reading to children was manipulated to*

*include    profanity,    according    to    fact-checkers*, Twitter    (Nov.    30,    2021),
https://twitter.com/i/events/1465769009073123330.

182.    Christian Tom promptly emailed back, asking that Twitter actually censor the
comedic video, not just provide an event page explaining that it was comedic: "Will you apply the
'Manipulated Media' disclaimer to the video asset itself?"  Doc. 174-1, at 64.

183.    The next morning, December 1, 2021, Tom emailed Twitter again, arguing that
Twitter should apply a label to the video under its content-moderation policies: "Just wanted to
follow-up here.  It looks like from the rubric that this fits the first two criteria, which means it is
'likely' to be labeled:" and linking Twitter's "manipulated media" policy.  *Id.* at 63-4.

184.    Twitter wrote back the same morning, explaining that the comic, parody video of
Jill Biden was not subject to labeling under its policy because it was not likely to cause harm, but
noting again that Twitter had created a special page to explain that the video was edited: "After
escalating this to our team, the Tweet and video referenced will not be labeled under our synthetic
and manipulated media policy. Although it has been significantly altered, the team has not found
it to cause harm or impact public safety.  The team was able to create this Twitter Moment (here)
and event page for more context and details."  *Id.* at 63.

185.    The same day, Christian Tom emailed back, disputing Twitter's interpretation of
its own content-moderation policy and looping in Michael DeRosa, the First Lady's press
secretary.  *Id.*  Michael DeRosa then emailed as well, disputing and demanding information about
Twitter's application of its own policy.  *Id.* at 62.  Tom and DeRosa continued to press Twitter for
further explanation and action on December 9, 13, and 17.  *Id.* at 60-61.  Twitter provided another,
more detailed explanation of its decision on December 17.  *Id.* at 59-60.  Tom emailed back the

same day, again disputing Twitter's application of its own policy and pressing Twitter again on the issue. *Id.* at 58-59. He added Rob Flaherty to the email chain for the first time. *Id.* at 58.

186.    Nine minutes later, on December 17, 2021, Flaherty wrote to Twitter, angrily accusing Twitter of dishonestly misapplying its own policies: "New to the thread here, but this all reads to me like you all are bending over backwards to say that this isn't causing confusion on public issues. If the AP deems it confusing enough to write a fact check, and you deem it confusing enough to create an event for it, how on earth is it not confusing enough for it to at least have a label? Total Calvinball." *Id.* at 58. ("Calvinball" refers to a game in the cartoon "Calvin and Hobbes" where the participants make up the rules of the game as they go along.)

187.    A senior-level Twitter executive then emailed Flaherty proposing to resolve the matter by phone. *Id.* After that phone conversation, it appears that the Tweet that prompted the exchange is no longer available. *See id.* at 65 (linking to https://twitter.com/ArtValley818_/status/1465442266810486787?s=20, which is no longer available).

**F.    White House Pressure and Collusion Continue Throughout 2022.**

188.    During January 2022, Facebook reported to Rowe, Manning, Flaherty, and Slavitt that it has "labeled and demoted" "vaccine humor posts whose content could discourage vaccination." It also reported to the White House that it "labeled and demoted" posts "suggesting natural immunity to COVID-19 infection is superior to immunity by the COVID-19 vaccine." Doc. 71-3, at 10-11.

189.    Twitter emailed back within an hour and offered to discuss, to which Flaherty responded: "Happy to talk through it but if your product is appending misinformation to our tweets that seems like a pretty fundamental issue." *Id.*

190.     Separately, Jesse Lee of the White House emailed Twitter in response to the same report, accusing Twitter of "calling the President a liar" and offering to talk by phone to resolve the complaint: "this note is factually inaccurate. This is a very technical question but you don't have it right, and you are in effect calling the President a liar when his tweet is actually accurate. I'm happy to discuss this with whoever is the right person," and providing his cell phone number. *Id.* at 69.  Twitter then reached out by phone to resolve it.  *Id.*

191.     On September 18, 2021, regarding a story in the Wall Street Journal about COVID-19 "misinformation" circulating on Facebook, Flaherty demanded that Meta provide an explanation "as we have long asked for, [of] how big the problem is, what solutions you're implementing, and how effective they've been."  Doc. 71-3, at 24.

192.     On February 1, 2022, Psaki was asked at a White House press conference whether the Administration was satisfied with Spotify's decision to affix advisory warnings to Joe Rogan's immensely popular podcast, which featured speakers that contradicted the Administration's messaging about COVID-19 and vaccines, or whether the government "think[s] that companies like Spotify should go further than just, you know, putting a label on" disfavored viewpoints and speakers.  Psaki responded by demanding that Spotify and other platforms "do[] more" to block disfavored speech: "[O]ur hope is that all major tech platforms … be vigilant to ensure the American people have access to accurate information on something as significant as COVID-19…. So, this disclaimer – it's a positive step.  But we want every platform to continue *doing more* to call out … mis- and disinformation while also uplifting accurate information."  Glenn Decl. Ex. 38, at 15-16; Doc. 10-1, at 501-2 (emphasis added). She stated that Spotify's advisory warnings are "a good step, it's a positive step, but *there's more that can be done*."  *Id.* at 502 (emphasis added).

193.     On April 25, 2022, Psaki was asked at a White House press briefing to respond to the news that Elon Musk would acquire Twitter, and asked "does the White House have any concern that this new agreement might have President Trump back on the platform?"  Glenn Decl. Ex. 40; Doc. 10-1, at 528.

194.     Psaki responded by reiterating the threats of adverse legal consequences to Twitter and other social media platforms, specifically referencing antitrust enforcement and Section 230 repeal: "No matter who owns or runs Twitter, the President has long been concerned about the power of large social media platforms … [and] has long argued that tech platforms must be held accountable for the harms they cause.  He has been a strong supporter of fundamental reforms to achieve that goal, including reforms to Section 230, enacting antitrust reforms, requiring more transparency, and more.  And he's encouraged that there's bipartisan interest in Congress."  *Id.* at 528-29.

195.     At the same press briefing, Psaki was asked: "Are you concerned about the kind of purveyors of election misinformation, disinformation, health falsehoods, sort of, having more of an opportunity to speak there on Twitter?"  She responded by specifically linking the legal threats to the social-media platforms' failure to more aggressively censor free speech: "I would say our concerns are not new.  We've long talked about and the President has long talked about his concerns about the power of social media platforms, including Twitter and others, to spread misinformation, disinformation; the need for these platforms to be held accountable."  *Id.* at 534.

196.     Psaki was then asked a question that noted that "the Surgeon General has said that misinformation about COVID amounts to a public health crisis," and then queried, "would the White House be interested in working with Twitter like it has in the past to continue to combat this

kind of misinformation?  Or are we in a different part of the pandemic where that kind of partnership is no longer necessary?"  *Id.* at 549.

197.    Psaki responded by reaffirming that senior officials within the White House and/or the Administration are continuing to coordinate directly with social-media platforms to censor disfavored speakers and content on social media, and directly linking these efforts to the repeated threat of adverse legal action: "we engage regularly with all social media platforms about steps that can be taken that has continued, and I'm sure it will continue.  But there are also reforms that we think Congress could take and we would support taking, including reforming Section 230, enacting antitrust reforms, requiring more transparency.  And the President is encouraged by the bipartisan support for — or engagement in those efforts."  *Id.*

198.    On June 13, 2022, Flaherty demanded that Meta continue to produce periodic "COVID-19 insights reports" to track so-called "misinformation" regarding COVID-19 on Meta's social-media platforms, expressing the specific concern that COVID vaccines for children under 5 would soon be authorized.  Doc. 71-3, at 6.

199.    Meta got the message.  It agreed to continue sending its censorship-tracking reports, and on June 22, 2022, Meta assured Flaherty that it was expanding its censorship of COVID-19 "misinformation" to ensure that speech critical or skeptical of COVID-19 vaccines for children under 5 years old—a highly controversial topic—would be censored.  Doc. 71-3, at 5.

**G.    Pressure to Expand the Topics of Social-Media Censorship.**

200.    Since this lawsuit was filed, Defendants have expanded their social-media censorship activities and pressured social-media platforms for censorship in new areas of online discourse, including areas such as climate change, gender, abortion, and economic policy.

201.    For example, on June 14, 2022, White House National Climate Advisor Gina McCarthy spoke at an Axios event titled "A conversation on battling misinformation." Jones Decl. Ex. M, at 1.

202.    During the event, "McCarthy skewered Big Tech companies for 'allowing' disinformation and cheered Congress for 'taking action' to enact more censorship last Thursday." *Id.* at 2.  "Axios political reporter Alexi McCammond asked McCarthy how so-called 'rampant mis-and-disinformation around climate change online and in other platforms' has 'made your job harder?'"  *Id.*  "McCarthy responded by slamming social media companies: 'We have to get tighter, we have to get better at communicating, and frankly, *the tech companies have to stop allowing specific individuals over and over again to spread disinformation*.'"  *Id.* (emphasis added).  "She suggested further that 'we have to be smarter than that and *we need the tech companies to really jump in*.'"  *Id.* at 3 (emphasis added).  "McCammond responded by asking: 'Isn't misinformation and disinfo around climate a threat to public health itself?'  McCarthy asserted that it 'absolutely' is: 'Oh, absolutely.'"  *Id.*

203.    Like Psaki and others, McCarthy explicitly tied these demands for censorship of climate-change-related speech to threats of adverse legislation: "McCarthy also praised Congress directly for pushing social media companies to censor Americans: 'We do see Congress taking action on these issues, we do see them trying to tackle the misinformation that's out there, trying to hold companies accountable.'"  *Id.* at 4.

204.    On June 16, 2022, the White House announced a new task force to address, among other things, "gendered disinformation" and "disinformation campaigns targeting women and LGBTQI+ individuals who are public and political figures, government and civic leaders, activists, and journalists."  Jones Decl., Ex. N, at 1.

205.    The June 16 Memorandum decries "online harassment and abuse"—vague terms that, on information and belief, are deliberately adopted to sweep in constitutionally protected speech.  *Id.*  In particular, the Memorandum defines "online harassment and abuse" to include "gendered disinformation," a deliberately broad and open-ended term.  *Id.* § 1.  The Memorandum announces plans to target such "gendered disinformation" directed at public officials and public figures, including "women and LGBTQI+ political leaders, public figures, activists, and journalists."  *Id.*  The Memorandum creates a Task Force co-chaired by the Assistant to the President for National Security Affairs, which includes the Secretary of Defense, the Attorney General, and the Secretary of Homeland Security, among others.  *Id.*

206.    The Task Force is charged with "developing programs and policies to address … *disinformation campaigns* targeting women and LGBTQI+ individuals who are public and political figures, government and civic leaders, activists, and journalists in the United States and globally."  *Id.* § 4(a)(iv) (emphasis added).  The Memorandum calls for the Task Force to consult and coordinate with "technology experts" and "industry stakeholders," *i.e.*, social-media firms, to achieve "the objectives of this memorandum," *id.* § 4(b).  Those "objectives," of course, include suppressing so-called "disinformation campaigns" against "public and political figures."  *Id.* § 4(a)(iv).

207.    The Memorandum again threatens social-media platforms with adverse legal consequences if they do not censor aggressively enough to suit federal officials: "the Task Force shall … submit periodic recommendations to the President on *policies, regulatory actions, and legislation on technology sector accountability* to address systemic harms to people affected by online harassment and abuse."  *Id.* § 5(c) (emphasis added).

208.    Relatedly, on May 27, 2022, HHS Assistant Secretary Rachel Levine demanded that social-media platforms censor "misinformation" about "gender-affirming care."  Jones Decl., Ex. O, at 1.  In a public address to health officials, Levine "spoke about the need for government to 'address health information directly' and specified that includes encouraging Big Tech to combat health misinformation 'beyond COVID-19.'"  *Id.*  Levine stated: "So I'd like to just talk briefly about another area of substantial misinformation that is directly impacting health equity in our nation, and that is the health equity of sexual and gender minorities. There is substantial misinformation about gender-affirming care for transgender and gender diverse individuals… The positive value of gender-affirming care for youth and adults is not in scientific or medical dispute … And we need to use our clinicians' voice to collectively advocate for our tech companies to create a healthier, cleaner information environment."  *Id.* at 1-2.

209.    On July 8, 2022, the President signed an Executive Order on protecting access to abortion.  Jones Decl., Ex. P, at 1.

210.    Section 4(b)(iv) of the order states: "The Secretary of Health and Human Services shall, in consultation with the Attorney General and the Chair of the FTC, consider options to address deceptive or fraudulent practices related to reproductive healthcare services, including online, and to protect access to accurate information."  *Id.*  This is a plain reference to the online advertising practices of pro-life pregnancy resources centers, which the President's political allies were then attacking.  Jones Decl., Ex. Q, at 1-2.

211.    On August 11, 2022, Flaherty emailed Twitter to dispute a note added by Twitter to one of President Biden's tweets.  Doc. 174-1, at 68.  The subject line of Flaherty's email was a link to a Tweet criticizing Twitter's note: "Joe Weisenthal on Twitter: 'Wow, this note that twitter added to Biden's tweet is pure gibberish. Imagine adding this, and thinking this is helpful to the

public's understanding in any way.'" *Id.* Linking to a tweet about gas prices, Flaherty wrote: "Happy to connect you with some economists who can explain the basics to you guys." *Id.* Flaherty copied Jesse Lee, Senior Advisor to the National Economic Council at the White House, on the email. *Id.*

## III. The Pressure Campaign from Surgeon General Murthy and His Office.

212.    Throughout 2021 and 2022, Surgeon General Vivek Murthy and his Office engaged in a pressure campaign in parallel with, and often overlapping with, the White House's pressure campaign on social-media platforms. Surgeon General Murthy and his staff were often included in the same meetings and communications with White House officials and social-media platforms, and joined White House officials pressuring them to increase censorship in public and in private.

### A. The Surgeon General: Using the "Bully Pulpit" to Pressure Platforms.

213.    Eric Waldo is the Senior Advisor to the Surgeon General of the United States, Vivek Murthy, and was formerly a Chief Engagement Officer in the Office of the Surgeon General ("OSG"). Waldo Dep. 11:15-12:2.

214.    As "the engagement team leader" for OSG, Waldo was "the one in charge of maintaining the contacts and the relationships with representatives of social media platforms." *Id.* at 51:11-17.

215.    Dr. Murthy was directly involved in editing and approving the final work product of the Surgeon General's Office, including the Surgeon General's July 15, 2021 health advisory on misinformation and the Surgeon General's March 3, 2022 RFI to social-media platforms. *Id.* at 14:20-22, 15:16-19, 16:9-10, 17:1-6, 187:24-188:3.

216.    Calling for an "all-of-society approach" to misinformation was a pervasive theme of the Surgeon General's communications, including the health advisory and the RFI. *Id.* at 19:25,

26:8, 88:9, 89:13, 101:2, 117:13, 122:15, 211:22, 246:25, 251:9, 332:22.  This theme echoes the

repeated call for an "all-of-society approach" in the Virality Project's public report.  *See infra.*

217.    Before the Surgeon General's health advisory on misinformation was published on

July 15, 2021, OSG and Waldo "did pre-rollout calls with Twitter, Facebook, [and]

Google/YouTube." *Id.* at 20:7-11.

218.    The Surgeon General uses his "bully pulpit" to call for censorship of health

misinformation: "Dr. Murthy continued from a communications perspective to talk about health

misinformation using his bully pulpit." *Id.* at 25:23-25.

219.    Waldo admits that the Surgeon General is directly advocating to social-media

platforms to take stronger actions against health "misinformation": "[T]he Surgeon General has

the ability … to talk to the relevant stakeholders and say we want you to be aware of this issue and

that we think you have a role to play to improve the health outcomes, yes." *Id.* 28:10-14.  As part

of this role, the Surgeon General "call[s] out social media platforms in the [health] advisory." *Id.*

at 28:18-19.

220.    The Surgeon General's "bully pulpit," Waldo agrees, involves putting public

pressure on social-media platforms: "I think the bully pulpit … is really the fact that he commands

attention, including being able to …  speak with the press, speak with the public, and … we think

of the Surgeon General as the nation's doctor." *Id.* at 29:9-15.

221.    A goal of the Surgeon General's use of the "bully pulpit" includes to "reduce the

dissemination of health misinformation." *Id.* at 30:5-10.  This includes making "recommendations

of specific steps the social media platforms are … called out to take to reduce the spread of

misinformation on the platforms." *Id.* at 31:3-8.

-PA04224-

222.    OSG reinforces its public "message of calling out the social media platforms to take steps to reduce the spread of misinformation on their platforms" through private communications with platforms: "[W]hat we're saying publicly, we're also … said that privately to them as well." *Id.* at 32:5-8, 12-14.  This includes during "rollout calls."  *Id.* at 32:19-20.

**B. Surgeon General Works in Tandem with the White House and Virality Project.**

223.    On the day of the health misinformation advisory rollout, July 15, 2021, "Press Secretary … Jen Psaki had already made remarks specifically about Facebook, and then," the next day, "President Biden made his remarks that social media and Facebook were killing people." *Id.* at 33:19-25.  "Facebook … was upset about how the rollout had gone." *Id.* at 33:6-8.  Waldo's initial rollout call with Facebook, as a result, was affected by the Administration's public attacks on Facebook: "I wouldn't call it the most productive call." *Id.* at 34:4-6.

224.    After this public pressure, Facebook's senior executive, Nick Clegg, reached out to request "deescalat[ion]" and "work[ing] together" as a direct result of that public pressure on Facebook: "Then later, with our call, we had a call with Nick Clegg from Facebook, and at his request, and … his intentions were to sort of I think deescalate and just find ways that we could work together, given how Facebook … was treated in that rollout day." *Id.* at 34:7-13.

225.    In the call with Nick Clegg, Surgeon General Murthy reiterated his demand for Facebook to do more to censor "misinformation" on its platforms: "[O] n the call with Nick Clegg, the Surgeon General did … reiterate the idea that, you know, as we described in the advisory, that we think there's more … that Facebook and other social media companies can do, and … we reiterated that." *Id.* at 35:7-12.

226.    Murthy also asked Clegg and Facebook specific questions about requiring Facebook to share data with outside researchers about the scope and reach of misinformation on

its platforms, again echoing the key recommendation of the Virality Project: "[T]he most specific questions were about understanding the data around the spread of misinformation and how we were measuring that, and … how we could have external researchers validate the spread of misinformation and -- and helping us as a field understand the depth of the problem." *Id.* at 35:20-36:2.

227.    One such "external researcher" that OSG had in mind was "Renee DiResta, from the Stanford Internet Observatory," a leading organization of the Virality Project, which hosted a "rollout event" for the advisory featuring Dr. Murthy on the day the advisory was announced. *Id.* at 36:19-23.

228.    Waldo admits that there was "coordination" between OSG and Renee DiResta of the Virality Project on the launch of the Surgeon General's health advisory: "I know there was coordination with [DiResta] with respect to the launch … there was a panel, a public sort of virtual town hall that we hosted -- with the Sanford [sic] Internet Observatory that Dr. Murthy spoke at, and that was part of the launch day. So certainly there would have been coordination … with her." *Id.* at 38:1-7.

229.    Kyla Fullenwider is the OSG's key "subject matter expert" who "worked on the advisory" and had significant substantive input on both the Surgeon General's July 15, 2021 health advisory on misinformation, and the Surgeon General's March 3, 2022 RFI to social-media platforms on the spread of misinformation. *Id.* at 39:1-4, 59:16-23. Kyla Fullenwider is not a direct employee of the OSG, but works for a non-profit contractor named "US Digital Response," Waldo Dep. 85:13-15.

230.    Kyla Fullenwider "did a follow-up call with Renee DiResta" about the health advisory. *Id.* at 38:25-39:4.

231.    After the launch of the health advisory, Waldo and Fullenwider "did a call" with Renee DiResta "that was more of a brainstorm around … public-facing events that we could do to talk about this issue" of stopping health misinformation.  *Id.* at 40:13-17.

232.    Fullenwider and DiResta "most likely" discussed misinformation in these calls. *Id.* at 41:4-6.

233.    Waldo and OSG also received a briefing from the Center for Countering Digital Hate about the so-called "Disinformation Dozen."  *Id.* at 43:1-48:1.  CCDH gave "a presentation about the Disinformation Dozen and sort of how they were measuring … that those were the folks primarily responsible for a lot of misinformation online."  *Id.* at 47:2-5.

234.    Rafael Campos of OSG "helped create the event with … the Stanford Internet Observatory for the launch," and likely had communications with Stanford and Professor DiResta in the lead-up to the event.  *Id.* at 48:12-14, 49:1-2.

235.    The OSG anticipated that the social-media platforms would feel pressured by the advisory: "we didn't think they would be happy about this -- you know, the content of the advisory."  *Id.* at 54:24-55:1.

236.    Waldo is aware of "at least one call … that the Surgeon General [Murthy] had with Facebook during the transition," i.e., between President Biden's election and his assuming office. *Id.* at 55:8-10.  The call involved a "Facebook individual": "Dr. Murthy had mentioned that he had been on a call with that person [from Facebook] during the transition."  *Id.* at 79:11-18, 56:5-6. Waldo identified the individual as "a data person from the Facebook team."  *Id.* at 56:10.  The purpose of that call was "again, about that issue of trying to understand the reach of the mis- and disinformation and understanding … how far it was spreading."  *Id.* at 56:15-19.

237.    "Data about misinformation" was "a topic of conversation" in that call, and the participants discussed "Facebook" being "un[]clear" or "unable to present … the depth or reach of the misinformation, that they didn't have that data." *Id.* at 80:1-15.

238.    DJ Patil may have participated in that transitional call. Patil was the "chief data scientist in the Obama administration, and he was a special government employee at the White House for part of the first year" of the Biden Administration. *Id.* at 81:6-13. Patil was also "on the call with Dr. Murthy and [Waldo] and Nick Clegg … in his capacity as a White House official." *Id.* at 81:24-82:3.

239.    Waldo "connected [Patil] to another research data person … a Facebook data person." *Id.* at 82:13-16.

240.    The purpose of this follow-up was to demand more information from Facebook about monitoring the spread of misinformation on its platforms: "[T]he problem was we were still in this piece of not understanding the reach and depth … of the misinformation … on Facebook. And … this person was going to try to explain to [Patil] the data challenges in doing so." *Id.* at 83:4-9.

241.    Kyla Fullenwider is the "main" or key staffer for the OSG on misinformation and disinformation. *Id.* at 58:21-24. Ann Kim is listed on the OSG's org chart, Waldo Ex. 2, as the person who "[d]irects mis- and dis-information engagement," Waldo Ex. 2, but that is solely "because Kyla Fullenwider reported up to Ann Kim. And since Kyla, I think, was our main subject matter expert or continued to do work on mis- and disinformation, maybe that was why that was put under Anne's list of duties." Waldo Dep. 58:20-24. Fullenwider, therefore, is the OSG's "main subject matter expert" on "mis- and disinformation," who "directs mis- and dis-information engagement" for the OSG. *Id.* at 58:13-59:7.

242. Fullenwider works for the nonprofit U.S. Digital Response, and is not directly employed by the OSG, though she was acting in an official capacity on behalf of OSG.  Waldo Ex. 3, at 32; Waldo Dep. 85:10-86:8.

243. U.S. Digital Response is not a government agency but a non-profit organization: "U.S. Digital Response (USDR) is a nonprofit, nonpartisan organization that helps governments, nonprofits, and public entities respond quickly to critical public needs."  *About U.S. Digital Response*, U.S. Digital Response (last visited Feb. 17, 2023), https://www.usdigitalresponse.org/about.

244. Ann Kim has no direct involvement in mis- and disinformation.  Waldo Dep. 58:25-59:3.  But Kyla Fullenwider "was definitely working on mis- and disinformation."  *Id.* at 59:6-7. Fullenwider "was working with Daniel [Tartakovsky] on the design of … the advisory.  And then … Kyla was continuing to help us think about were there additional ways we might engage."  *Id.* at 59:12-15.  Further, "Kyla … was the principal designer of options around follow-up with respect to data."  *Id.* at 59:16-18.  And when "the Surgeon General's office put out an RFI around misinformation data" on March 3, 2022, "Kyla worked on that."  *Id.* at 59:18-22.  Kyla "was the subject matter expert who was chiefly creating options for the Surgeon General …  to consider how we would continue to … talk about mis- and disinformation with respect to data."  *Id.* at 60:6-10.

245. Kyla Fullenwider also participated in the "rollout calls" to the social-media platforms announcing the Surgeon General's health advisory on misinformation.  *Id.* at 62:24-63:4.

246. Waldo was also "on some e-mails and at least one call with Rob Flaherty" when he "would communicate with Facebook."  *Id.* at 64:9-11.  This included a call with Rob Flaherty and

the OSG: "[B]efore our call with Nick Clegg, … I had a call with Rob." *Id.* at 65:1-2.  By then, Flaherty had been "separately communicating with Facebook," and he was "giving us a heads-up on his experiences … in communicating with … Facebook." *Id.* at 65:4-9.

247.   In August 2021, Waldo joined a call with Rob Flaherty and Brian Rice of Facebook, who was in charge of Facebook's relationship with federal officials. *Id.* at 66:10-14, 124:24-125:2.

248.   In that August 2021 call, "Brian Rice from Facebook had requested a call to give us an update on some sort of internal action they were doing. … Facebook had either found something or removed something and was letting us know about it." *Id.* at 66:16-23.

249.   Andy Slavitt of the White House also communicated with Nick Clegg. *Id.* at 67:14-21.  When Andy Slavitt left the White House, he offered Surgeon General Murthy as a direct contact for Nick Clegg. *Id.* at 68:4-7.

250.   In addition, "Dr. Murthy has certainly had conversations with Dr. Fauci." *Id.* at 69:21-22.  Waldo claims that he does not know the nature of those conversations. *Id.* at 69:23-25. "Dr. Murthy would have directly communicated with Dr. Fauci, to my knowledge." *Id.* at 70:13-15.

251.   Waldo is "certain that Dr. Murthy has connected" with Dr. Francis Collins. *Id.* at 71:2-9.

252.   Waldo was involved in collecting information to respond to Plaintiffs' interrogatories on behalf of OSG. *Id.* at 73:19-74:11.

**C.      The Surgeon General Pressures Social-Media Platforms in Private.**

253.   The first meeting with social-media platforms relating to misinformation that OSG identified in response to interrogatories was a brief introductory call with Nick Clegg on May 25, 2021: "On May 25, 2021, from 4:30 to 5:00 pm ET, Dr. Vivek Murthy from OSG and Andy Slavitt

from the White House met remotely with Nick Clegg from Facebook. The purpose of the call was to introduce Dr. Murthy to Mr. Clegg." Waldo Ex. 3, at 32; *see also* Waldo Dep. 78:24-79:10. The next meeting disclosed was the first "rollout call" relating to the advisory on July 12, 2021. Waldo Ex. 3, at 32. As noted below, this interrogatory response failed to disclose several previous meetings between Dr. Murthy and Facebook.

254.    OSG had pre-rollout calls with Twitter and YouTube on July 12 and July 14, 2021, and a rollout call with Facebook the day after the rollout on July 16, 2021. *Id.* at 32; Waldo Dep. 85:10-90:5.

255.    Kyla Fullenwider handled the substantive communications with the social-media platforms in the rollout calls; Waldo's role was to "connect them to our subject matter expert." Waldo Dep. 86:24-25.

256.    The July 16 call with Facebook was "the same day" that President Biden stated of Facebook that "They're killing people" by not censoring enough misinformation. *Id.* at 90:24, 93:3-5.

257.    At that July 16 call, Kyla Fullenwider "was able, at a high level, to walk over the … recommendations section for … technology companies," which demand greater censorship of misinformation. *Id.* at 91:14-16.

258.    The Facebook call "was definitely a slightly awkward call" because "President Biden made his comment about social media companies and Facebook killing people … right before, or even potentially during the call," and Waldo observed that "the Facebook team looked a little sad." *Id.* at 92:24-93:6.

259.    On July 23, 2021, Waldo, Dr. Murthy, and DJ Patil of the White House had a call with Nick Clegg and Brian Rice of Facebook. Waldo Ex. 3, at 32-33. Nick Clegg requested the

meeting "to deescalate" and "reset the tone" because the "Facebook team were feeling … that they had been uniquely called out."  Waldo Dep. 95:4-13.

260.    After the meeting, Nick Clegg "did share definitely over e-mail more information about what they were doing to reduce mis- and disinformation, COVID mis- and disinformation on the platform."  *Id.* at 96:13-17.

261.    There was also "a follow-up e-mail sometime the next couple of weeks where … Nick or Brian shared … here's additional work we're doing, here's how we're responding to the advisory."  *Id.* at 97:7-11.

262.    This follow-up email provided "a catalog of … both removal of misinformation and other steps to tamp down mis- and disinformation."  *Id.* at 97:16-22.

263.    Waldo believes that these were "new steps that they had taken in the week or so since … they felt uniquely called out on July 15th and 16th."  *Id.* at 97:23-98:3.  The email was in response to a request from OSG "asking for, can you let us know, like, what you're doing in addition" to combat misinformation, "and so this was responding to that."  *Id.* at 98:5-7.

264.    On the July 23 call with Facebook, "Dr. Murthy raised the issue of wanting to have a better understanding of the reach of the mis- and disinformation on … the social media platform."  *Id.* at 98:19-22.

265.    Waldo likens the problem of mis- and disinformation on social media to "eating, like, a piece of uranium," and compares misinformation to "cancer."  *Id.* at 99:1-101:8.

266.    The OSG's health advisory advances the view that the spread of misinformation is "very harmful."  *Id.* at 101:24-102:7.

267.   Waldo agrees that the health advisory "provides specific examples to technology companies what they could do more of to reduce the spread of health mis- and disinformation." *Id.* at 104:16-18.

268.   Waldo uses the word "poison" to describe health misinformation, as did Dr. Murthy in announcing the Health Advisory.  *Id.* at 105:4; Waldo Ex. 10, at 2.

269.   In the July 23, 2021 call with Nick Clegg, Dr. Murthy "didn't retreat … from the message of the advisory, which explicitly calls for social media platforms to do more to control the reach of misinformation on their platforms," and "continued … to discuss that message." Waldo Dep. 107:21-108:5.

270.   In addition, in that call, the OSG asked Facebook to report back on "what they were doing in response to the advisory, if they were taking any actions."  *Id.* at 109:2-4.

271.   In addition, Patil was "also asking the data impact questions."  *Id.* at 109:24.

272.   OSG perceived that OSG's and the White House's public statements criticizing Facebook put economic pressure on Facebook, and that Facebook was engaging with Dr. Murthy to "keep Dr. Murthy from saying … any other things that might be viewed as bad for their business."  *Id.* at 113:13-15.

273.   Waldo agrees that the events of July 15 and July 16 put unique pressure on Facebook: "when you add the press conference remarks plus President Biden's remarks, it made it seem as though … there was more attention on Facebook."  *Id.* at 116:2-5.

274.   The OSG's "subject matter experts" – Kyla Fullenwider, Daniel Tartakovsky, and DJ Patil of the White House – believed that misinformation "was a problem across multiple platforms."  *Id.* at 116:15-16.

275.    On July 30, 2022, Waldo had a meeting with Google and YouTube representatives, in which the representatives reported to OSG on what actions they were taking that were consistent with or in response to the health advisory: "The topics discussed included YouTube/Google following up on the announcement of the OSG Advisory to share more of the work it was doing around health mis- and disinformation."  Waldo Ex. 3, at 33.

276.    When the OSG's health advisory issued, Twitter's policy handle publicly endorsed the OSG's call for greater censorship of health misinformation: "[T]he Twitter policy handle … either retweeted or quote tweeted and said something like, we agree. … [W]e do need an all-society approach, and here's what we're doing."  Waldo Dep. 122:11-16.

277.    On August 10, 2021, Waldo and Rob Flaherty had a call with Facebook in which Facebook reported back to federal officials on its actions to remove misinformation, including the details of "an operation [Facebook] uncovered that is related to vaccine misinformation."  Waldo Ex. 3, at 33 (alteration in original).  According to Waldo, "Brian Rice had requested a call with me and Rob [Flaherty] and, during the call, flagged that Facebook … had done some sort of internal operation where … they discovered some misinformation pieces happening and had taken some corrective action."  Waldo Dep. 124:13-21.

278.    Brian Rice was Facebook's "main … staff level liaison" with the federal officials. *Id.* at 125:2-3.

279.    Facebook emailed Waldo and Flaherty "a COVID report list that had … some sort of report from Facebook on a biweekly basis."  *Id.* at 126:11-16.

280.    On September 14, 2021, Waldo had another meeting with Google/YouTube representatives, "to discuss a new policy we [YouTube] are working on as well as provide an update on our overall efforts to combat harmful COVID-19 misinformation on the platform."

Waldo Ex. 3, at 33.  This was the "second update by [Google/Youtube] to [OSG] following the health advisory of stuff they're doing to combat harmful COVID-19 misinformation through YouTube."  Waldo Dep. 129:7-12.

281.    On May 28, 2021, a few days after meeting with Andy Slavitt and Dr. Murthy for the first time (and almost two months before OSG issued the Health Advisory and had the related meetings with Waldo and others), Nick Clegg emailed Dr. Murthy and stated that, "[a]s promised," he was sending a report of misinformation on Facebook.  Waldo Ex. 4, at 1.  Clegg also "highlighted a few policy updates we announced yesterday regarding repeat misinformation," including "expand[ing] penalties for individual Facebook accounts that share misinformation," "add[ing] more context about pages that repeatedly share false claims," and "redesign[ing] notifications when they share content that a fact-checker later rates."  *Id.*

282.    These "policy updates" about increasing censorship were announced on May 27, 2021, two days after Nick Clegg's meeting with Dr. Murthy and Andy Slavitt on May 25, 2021.  Waldo Dep. 138:2-7.

283.    Clegg plainly indicated that there had been prior conversations in which Slavitt and Dr. Murthy had demanded "defensive work" to remove misinformation: "We're . . . committed to addressing the defensive work around misinformation that you've called on us to address."  Waldo Ex. 4, at 2.  These prior conversations were not disclosed in OSG's responses to interrogatories, which noted the first meeting with Dr. Murthy was a mere introductory meeting with Clegg on May 25, 2021.  Waldo Ex. 3, at 32.

284.    On June 14, 2021, Nick Clegg emailed Dr. Murthy another ("the latest") "Facebook bi-weekly covid content report," which he indicated was "as promised/discussed," and offered

"[a]s always" to "jump on a call at any point … to delve into any further details as needed." Waldo Ex. 5, at 1.

285.    The "Facebook bi-weekly covid content report," *id.*, contained a report of "the most engaged posts … with respect to both accurate and inaccurate information." Waldo Dep. 140:8-10. Rob Flaherty of the White House also received these reports. *Id.* at 140:21-24.

286.    Waldo admits that Facebook sending these biweekly reports to Dr. Murthy and Flaherty "had preexisted" and "predates the meeting" on May 25, 2021 – further indicating that OSG failed to disclose key meetings between Dr. Murthy and social media platforms in its interrogatory responses. *Id.* at 142:10-11.

287.    On July 6, 2021, Waldo emailed contacts at Twitter to set up the "rollout call" before the health advisory and stated: "As you know, one of the issues Dr. Murthy has been thinking about is how to help stop the spread of health misinformation as we continue to tackle COVID19 and beyond. I know you and your teams are working hard and thinking deeply about this issue. We'd love to chat over zoom to connect and discuss what's on the horizon for our teams." Waldo Ex. 6, at 2; Waldo Dep. 145:15-146:22.

288.    On July 6, 2021, Waldo sent an identical email to Facebook. Waldo Ex. 7, at 3-4. The purpose of these emails was to set up calls to announce the Surgeon General's forthcoming health advisory on misinformation. Waldo Dep. 149:11-16. Because of scheduling conflicts, the "rollout call" with Facebook was not scheduled until July 16, the day after the advisory was announced and the same day President Biden stated of Facebook that "they're killing people." *Id.* at 149:11-17.

289.    On July 6, 2021, Waldo also sent an email to YouTube with a similar statement to set up a rollout call with YouTube.  Waldo Ex. 8, at 3.  Waldo's emails make clear that OSG's message and purpose was to "stop the spread of misinformation" on social-media platforms.  *Id.*

290.    In these calls, "we had Kyla [Fullenwider] on the call and giving them a high-level update that we're going to have this advisory come out and that we want them to take a look at it."  Waldo Dep. 153:23-154:1.

291.    On July 10, 2021, Nick Clegg emailed Dr. Murthy, attaching another bi-weekly Covid content report, and stated, "I understand ... that my team is meeting with yours next week to delve deeper into our [C]ovid misinformation efforts."  Waldo Ex. 9, at 1.  Waldo understands that this refers to the July 16 rollout meeting.  Waldo Dep. 155:12-18.

292.    In the July 16, 2021 meeting with Facebook, Kyla Fullenwider went over the advisory, and then "asked additional questions … related to Facebook's efforts to combat health misinformation," including "some questions about, again, the research side.… [S]ome questions came up about CrowdTangle, if I recall correctly which was a … data port for … some ways to understand the Facebook, again, impact and research of the misinformation."  *Id.* at 157:21-159:9.

**D.    The Surgeon General's Public Pressure Campaign.**

293.    On July 15, 2021, Dr. Murthy participated in a White House press conference with White House Press Secretary Jennifer Psaki to announce the Surgeon General's Health Advisory on Misinformation.  Waldo Ex. 10.  Psaki announced of Dr. Murthy that "[t]oday, he published an advisory on health misinformation as an urgent public health crisis."  *Id.* at 1.

294.    At the press conference, Dr. Murthy described misinformation as "one of the biggest obstacles that's preventing us from ending this pandemic," and stated: "Today, I issued a Surgeon General's Advisory on the dangers of health misinformation.  Surgeon General

Advisories are reserved for urgent public health threats…. [T]oday we live in a world where misinformation poses an imminent and insidious threat to our nation's health." *Id.* at 2. He stated that "misinformation takes away our freedom to make informed decisions about our health and the health of our loved ones." *Id.* at 2.

295.    Dr. Murthy's definition of "misinformation" incorporates the notion that the definition changes over time: "Health misinformation is false, inaccurate, or misleading information about health, according to the best evidence at the time." *Id.* at 2. Waldo agrees that this definition "contemplate[s] that what constitutes misinformation might change over time," and that "something that we now think is misinformation may later turn out to be accurate information … [a]nd vice versa." Waldo Dep. 164:17-165:7.

296.    Dr. Murthy stated that those who question mask mandates and decline vaccination are following misinformation: "During the COVID 19 pandemic, health misinformation has led people to resist wearing masks in high-risk settings. It's led them to turn down proven treatments and to choose not to get vaccinated. This has led to avoidable illnesses and death. Simply put, health [mis]information has cost us lives." Waldo Ex. 10, at 2.

297.    Dr. Murthy placed specific blame on social-media platforms for the spread of misinformation: "Now, health misinformation didn't start with COVID-19. What's different now, though, is the speed and scale at which health misinformation is spreading. Modern technology companies have enabled misinformation to poison our information environment with little accountability to their users. They've allowed people who intentionally spread misinformation — what we call 'disinformation' — to have extraordinary reach." *Id.* at 2. Dr. Murthy described social-media companies as enabling the spread of "poison" in our "information environment." *Id.*

298.    He blamed the platforms' algorithms and features for the spread as well: "They've designed product features, such as 'Like' buttons, that reward us for sharing emotionally charged content, not accurate content.  And their algorithms tend to give us more of what we click on, pulling us deeper and deeper into a well of misinformation." *Id.*

299.     Echoing the language of the Virality Project, Dr. Murthy stated, "we need an all-of-society approach to fight misinformation." *Id.* at 2.

300.    Dr. Murthy announced: "we're saying we expect more from our technology companies. We're asking them to operate with greater transparency and accountability. We're asking them to monitor misinformation more closely. We're asking them to consistently take action against misinformation super-spreaders on their platforms." *Id.* at 3.  Both the call for "transparency and accountability" and the request for increased monitoring and greater censorship of "super-spreaders" mirror the Virality Project report.  *See infra.*

301.    Both Dr. Murthy's public statements and his health advisory repeatedly use the word "accountable" and "accountability" to refer to the social-media platforms—again, echoing the Virality Project report.  *See id.* at 2, 3, 5; Waldo Ex. 11, at 14, 16.

302.    Waldo agrees that the word "accountable" carries with it the threat of consequences; he concedes that "accountability includes accepting the consequences for when you do something wrong … or inappropriate."  Waldo Dep. 171:4-8.  Thus, the OSG's repeated reference to holding social-media platforms "accountable" entails an implied threat of adverse consequences if the platforms do not censor more health misinformation.  *See id.*

303.    The Surgeon General's use of the word "accountable" also echoes the repeated use of the word "accountable" by elected federal officials, including President Biden and his political allies, to threaten adverse legal consequences against social-media platforms if they do not increase

censorship of disfavored speakers, speech, and viewpoints.  *See, e.g.,* Jones Decl., Ex. R (quoting White House Communications Director Kate Bedingfield: "We're reviewing [amending Section 230 of the Communications Decency Act], and certainly [the social media companies] should be held accountable.  I think you've heard the president speak very aggressively about this.").

304.    Waldo agrees that Murthy's comments entail that "there's an obligation … or certainly an imperative to do more.  So … not only stop but reduce or take some sort of mitigating efforts so that the misinformation and disinformation is not leading to poor health results for people."  Waldo Dep. 172:21-173:1.

305.    Dr. Murthy's call for greater "transparency" is a call for platforms to engage in the kind of data-sharing that Dr. Murthy, Rob Flaherty, DJ Patil, and Kyla Fullenwider, among others, demanded in private meetings with Facebook.  *Id.* at 174:15-23.  Again, this echoes the key recommendation of the Virality Project.

306.    Waldo agrees that Dr. Murthy's call for greater "accountability" includes a demand to "take more proactive steps to stop the spread of misinformation."  *Id.* at 176:1-4.

307.    Dr. Murthy also demanded that the platforms do "much, much more" and "take aggressive action" against misinformation: "We know that the dramatic increase in the speed — speed and scale of spreading misinformation has, in part, been enabled by these platforms. So that's why in this advisory today, we are asking them to step up. We know they have taken some steps to address misinformation, but much, much more has to be done. And we can't wait longer for them to take aggressive action because it's costing people their lives."  Waldo Ex. 10, at 5.

308.    Dr. Murthy also stated that platforms "have to do more to reduce the misinformation that's out there so that the true voices of experts can shine through."  *Id.* at 6.

309.     After the advisory, OSG asked Facebook, Google/YouTube, and Twitter "as a follow-up what actions they might have taken in response to the advisory." Waldo Dep. 181:15-21.

310.     At the same press conference on July 15, 2021, Jennifer Psaki stated: "we are in regular touch with these social media platforms, and those engagements typically happen through members of our senior staff, but also members of our COVID-19 team." Waldo Ex. 10, at 10.

311.     Psaki stated: "We've increased disinformation research and tracking within the Surgeon General's office. We're flagging problematic posts for Facebook that spread disinformation." *Id.*

312.     "Regarding the Administration's "asks" to social-media platforms, Psaki stated: "There are also proposed changes that we have made to social media platforms, including Facebook, and those specifically are four key steps: One, that they measure and publicly share the impact of misinformation on their platform. Facebook should provide, publicly and transparently, data on the reach of COVID-19 — COVID vaccine misinformation. Not just engagement, but the reach of the misinformation and the audience that it's reaching." *Id.* at 11. Again, this echoes the key recommendation of the Virality Project report. It also echoes Dr. Murthy's call for "transparency" and the repeated private demands that Facebook give external researchers like Renee DiResta of the Virality Project access to its internal data. Waldo Dep. 191:17-21.

313.     Psaki also stated: "Second, that we have recommended — proposed that they create a robust enforcement strategy that bridges their properties and provides transparency about the rules. So, about — I think this was a question asked before — there's about 12 people who are producing 65 percent of anti-vaccine misinformation on social media platforms All of them remain

active on Facebook, despite some even being banned on other platforms, including Facebook — ones that Facebook owns." Waldo Ex. 10, at 11.

314. Psaki stated: "Third, it's important to take faster action against harmful posts. As you all know, information travels quite quickly on social media platforms; sometimes it's not accurate. And Facebook needs to move more quickly to remove harmful, violative posts — posts that will be within their policies for removal often remain up for days. That's too long. The information spreads too quickly." *Id.*

315. Waldo agrees that the Surgeon General's advisory calls for platforms to "move faster" and take "more aggressive" action against supposed misinformation. Waldo Dep. 194:20-21.

316. And Psaki stated, publicly criticizing Facebook: "Finally, we have proposed they promote quality information sources in their feed algorithm. Facebook has repeatedly shown that they have the levers to promote quality information. We've seen them effectively do this in their algorithm over low-quality information and they've chosen not to use it in this case. And that's certainly an area that would have an impact." Waldo Ex. 10, at 11.

317. Psaki concluded: "So, these are certainly the proposals. We engage with them regularly and they certainly understand what our asks are." *Id.*

318. On the same day, July 15, 2021, Surgeon General Murthy issued his advisory, "Confronting Health Misinformation: The U.S. Surgeon General's Advisory on Building a Healthy Information Environment." Waldo Ex. 11, at 1 (the "Health Advisory"); Waldo Dep. 196:21-197:1.

319. The Health Advisory describes censorship of health misinformation as a "moral and civic imperative": "Health misinformation is a serious threat to public health. … Limiting the

spread of health misinformation is a moral and civic imperative that will require a whole-of-society effort." Waldo Ex. 11, at 2. The "whole-of-society effort" echoes the language of the Virality Project.

320. The Health Advisory states: "Misinformation has caused confusion and led people to decline COVID-19 vaccines, reject public health measures such as masking and physical distancing, and use unproven treatments." *Id.* at 4.

321. The Health Advisory specifically blames social-media platforms for the spread of misinformation: "In recent years, the rapidly changing information environment has made it easier for misinformation to spread at unprecedented speed and scale, especially on social media and online retail sites, as well as via search engines." *Id.* at 5. According to the Advisory, "misinformation is often framed in a sensational and emotional manner that can connect viscerally, distort memory, align with cognitive biases, and heighten psychological responses such as anxiety. People can feel a sense of urgency to react to and share emotionally charged misinformation with others, enabling it to spread quickly and go 'viral.'" *Id.*

322. In addition, the Advisory blames "product features" of platforms: "[P]roduct features built into technology platforms have contributed to the spread of misinformation. For example, social media platforms incentivize people to share content to get likes, comments, and other positive signals of engagement. These features help connect and inform people but reward engagement rather than accuracy, allowing emotionally charged misinformation to spread more easily than emotionally neutral content." *Id.*

323. The Advisory also faults platforms' "algorithms": "algorithms that determine what users see online often prioritize content based on its popularity or similarity to previously seen

content. As a result, a user exposed to misinformation once could see more and more of it over time, further reinforcing one's misunderstanding." *Id.*

324.     The Health Advisory specifically called for platforms to enact "policy changes" to reduce the spread of misinformation: "**Implement product design and policy changes on technology platforms** to slow the spread of misinformation." *Id.* at 7 (bold in original).

325.     The Health Advisory also explicitly threatened future "legal and regulatory measures" to combat misinformation: "**Convene federal, state, local, territorial, tribal, private, nonprofit, and research partners** to explore the impact of health misinformation, identify best practices  to prevent and address it, issue recommendations, and find common ground on  difficult questions, including *appropriate legal and regulatory measures that address health misinformation* …." *Id.* at 7 (bold in original, italics added).

326.     Under the heading "What Technology Platforms Can Do," the Health Advisory called for platforms to take a series of steps to increase and enable greater social-media censorship of "misinformation," including the following: "[M]ake meaningful long-term investments to address misinformation, including product changes. Redesign recommendation algorithms to avoid amplifying misinformation, build in "frictions" … to reduce the sharing of misinformation, and make it easier for users to report misinformation. Give researchers access to useful data to properly analyze the spread and impact of misinformation. Strengthen the monitoring of misinformation. … [A]ddress misinformation in live streams, which are more difficult to moderate due to their temporary nature and use of audio and video. Prioritize early detection of misinformation 'super-spreaders' and repeat offenders. Impose clear consequences for accounts that repeatedly violate platform policies. Evaluate the effectiveness of internal policies and practices in addressing misinformation and be transparent with findings. Publish standardized

measures of how often users are exposed to misinformation and through what channels, what kinds of misinformation are most prevalent, and what share of misinformation is addressed in a timely manner. Communicate why certain content is flagged, removed, downranked, or left alone." *Id.* at 12.

327.    Waldo agrees that the Advisory calls for platforms to provide "a method for users to flag problematic posts so that they could be reviewed for content modulation, policy violations." Waldo Dep. 200:25-201:5.

328.    Waldo agrees that "clear consequences" for repeat violators include "things like issuing strikes against them, suspensions … and sometimes permanent deplatforming." *Id.* at 205:6-13.

329.    In its conclusion, the Health Advisory states: "We need institutions to recognize that this issue is their moral and civic responsibility, too, and that they are accountable." Waldo Ex. 11, at 16. Waldo agrees that the word "accountable" is repeated in the Surgeon General's remarks and the Advisory itself. Waldo Dep. 206:3-11.

**F. The Surgeon General's Collaboration with the Virality Project.**

330.    Also on January 15, 2021, Surgeon General Murthy participated in a separate launch event hosted by Stanford Internet Observatory, which was then operating the Virality Project. Waldo Ex. 12, at 1; Waldo Dep. 206:12-207:9.

331.    In his public comments with Stanford Internet Observatory, Dr. Murthy stated: "We're asking technology companies to operate with greater transparency and accountability so that misinformation doesn't continue to poison our sharing platforms, and we know the government can play an important role, too." Waldo Ex. 12, at 8 (Audio Tr. 6). This reiterates the key words "poison" and "accountability."

332.    Waldo describes government's "important role" as including "bringing stakeholders … together with urgency around a common vision for a healthy information environment … the government can help bring together stakeholders … what I would call the convening power of a bully pulpit." Waldo Dep. 209:15-22.  This would include bringing social-media platforms around to the government's "common vision" for censorship. *Id.* at 209:24-210:8.

333.    Dr. Murthy was asked, "do you believe a rapid response initiative like the Virality Project could be implemented at the federal level to combat health misinformation on a national scale from the top down?" and he answered that "having a federal organized effort to combat misinformation" is "a really, really interesting idea."  Waldo Ex. 12, at 10 (Audio Tr. 8).

334.    Dr. Murthy stated: "[T]echnology companies have a really important role.  They must step up and play to slow the spread of misinformation on their sites wh[ether] that's by either sharing data with people and researchers about what interventions they're making and the impact that's having or whether it's by changing their algorithms and making other alterations to their platform to identify misinformation early and slow its spread and avoid sending more information of misinformation to people who are consuming it."  *Id.* at 11 (Audio Tr. 9).

335.    Waldo agrees that "the purpose of the data sharing is so that outside people come in and … assess how well they're doing with their own internal policies to combat the spread of misinformation."  Waldo Dep. 211:6-11.

336.    Dr. Murthy expressly stated that he had been coordinating with Renee DiResta and the Virality Project and planned to continue to do so: "Well, thank you, Renee, for those kind words. … I do want to say thank you to you personally because you have been a leader in this effort long before many people recognize[d] what was happening with COVID misinformation. You were there looking at the data, looking at the numbers, speaking out, raising the flags, saying

there's something here we've got to address and do so urgently. I have personally learned a lot from your work and from our conversations together, and so I just want to say thank you to you for everything you've done for being such a great partner for moderating our event today, and just for being a partner in the future, because I know we have lots and lots more that we've got to do together." Waldo Ex. 12, at 12 (Audio Tr. 10).

337.    Dr. Murthy also stated that his team had been "partnered with" the Stanford Internet Observatory over "many months": "myself, my team, we're committed to working with you, Renee, with others … who we've been … partnered with over the last many months…." *Id.* at 13 (Audio Tr. 11).

**G. The Surgeon General's "Angry" and "Tense" Meetings With Platforms.**

338.    On July 16, 2021, the New York Times reported that President Biden publicly stated about Facebook, "They're killing people" by allowing misinformation to spread on its platforms. Waldo Ex. 14, at 1.

339.    The article reported that "this week, White House officials went further and singled out social media companies for allowing false information to proliferate. That came after weeks of failed attempts to get Facebook to turn over information detailing what mechanisms were in place to combat misinformation about the vaccine, according to a person familiar with the matter." *Id.*

340.    The same article reported that Jennifer Psaki stated, "We raised for them in our direct channels, of which every administration has always had with every social media platform, that we're seeing this trend." *Id.* at 2.

341.    The article reported that there had been a series of "talks" between Surgeon General Murthy and Facebook "since January" of 2021—none of which were disclosed in OSG's

89

interrogatory responses: "Since January, senior White House officials, including the surgeon general, Dr. Vivek Murthy, have been in talks with the social media company to stop the spread of false stories about vaccination side effects and other harms." *Id.* at 2. In these "talks," federal officials demanded Facebook's internal data on misinformation on its platforms: "Despite repeated requests by the White House, Facebook has not shared even basic data on how much vaccine misinformation exists and if the company's efforts to stop its spread are working, according to the person familiar with the talks." *Id.* at 2.

342.    "When administration officials presented data from CrowdTangle, a content tracking tool owned by Facebook, that showed vaccine misinformation was soaring, company officials dismissed its accuracy." *Id.* at 2.

343.    In one meeting, Dr. Murthy "angrily" demanded that Facebook censor misinformation instead of just promoting reliable information: "In another meeting with Dr. Murthy, … Dr. Murthy angrily said that while the company [Facebook] promoted its efforts to encourage vaccination, it did not do enough to defend against bad information." *Id.* at 2.

344.    In another "tense" meeting in "late spring," Dr. Murthy repeated similar demands: "In one tense meeting in the late spring, according to the person familiar with the matter, a Facebook official responded defensively, 'How do you know if your efforts are working?'" *Id.* at 2.

345.    Waldo agrees that this news report "does not accurately describe … that introductory call between Nick Clegg, Andy Slavitt, and Dr. Murthy on May 25th of 2021," which is the only meeting involving Dr. Murthy disclosed in OSG's interrogatory responses. Waldo Dep. 219:17-21; 222:14-23. In those responses, OSG did not disclose Dr. Murthy's "tense" and "angry" meetings with Facebook during the spring of 2021.

**H.     The Surgeon General Leverages Public Pressure to Increase Censorship.**

346.     On July 21, 2021, five days after the July 16 meeting where "the Facebook folks … had sad faces," *id.* at 226:15-16, Facebook emailed Waldo and Kyla Fullenwider, stating: "We wanted to follow up with you on a few questions you asked in the meeting focused on CrowdTangle, data on the online interventions, and Facebook's borderline content policies," Waldo Ex. 16, at 1.  This referred to the July 16 meeting with Waldo and Fullenwider.  Waldo Dep. 227:3-8.

347.     In the email, Facebook reported back to OSG on "interventions that the team mentioned, some of which specifically create frictions in how people consume information." Waldo Ex. 16, at 1.  These include limiting forwarded WhatsApp messages, placing "warning labels on fact checked content," and creating "friction when someone goes to share these posts on Facebook." *Id.*

348.     Facebook also reported to OSG a series of censorship policies and actions, including the following: "We remove COVID-19 content that contributes to the risk of imminent physical harms, including numerous false claims about the COVID-19 vaccine.  We permanently ban pages, groups, and accounts that repeatedly break our rules on COVID-19 misinformation. We also reduce the reach of posts, pages, groups, and accounts that share other false claims that do not violate our policies but may present misleading or sensationalized information about COVID-19 and vaccines." *Id.* at 1.  Evidently, OSG's inquiry at the July 16 meeting about "borderline content" related to the censorship of such content.  *See id.*  Waldo agrees that Fullenwider asked Facebook to report back about censorship at the July 16 meeting: "The response indicates that it's about COVID policies including removal, banning and reducing the reach." Waldo Dep. 232:9-11, 233:12-234:1.

349.    On July 16, 2021, Nick Clegg emailed Dr. Murthy and stated, "Dear Vivek, Reaching out after what has transpired over the past few days following the publication of the misinformation advisory and culminating today in the President's remarks about us." Waldo Ex. 17, at 1-2.  He then stated, "I know our teams met today to better understand the scope of *what the White House expects of us on misinformation* going forward." *Id.* at 2 (emphasis added).  Facebook understood the purpose of the meetings was to understand the White House's expectations on misinformation.  *See id.*

350.    Clegg indicated that there had been a history of prior discussions with Dr. Murthy and the White House in which federal officials demanded greater censorship—both more stringent policies and greater enforcement—which were not disclosed in OSG's interrogatory responses: "Certainly we understand (and have understood for some time) that there is disagreement on some of the policies governing our approach and how they are being enforced." *Id.* at 2.  Clegg asked for a meeting with Dr. Murthy, who did not immediately respond.  *Id.* at 1-2.

351.    On July 18, 2021, having received no response to his email requesting a meeting, Clegg texted Dr. Murthy stating, "I imagine you and your team are feeling a little aggrieved – as is the FB team, it's not great to be accused of killing people – but as I said by email I'm keen to find a way to deescalate and work together collaboratively.  I am available to meet/speak whenever suits."  Waldo Ex. 18, at 1.

352.    On July 19, Dr. Murthy responded by email and agreed to a meeting, which was scheduled for July 23, 2021.  Waldo Ex. 17, at 1; Waldo Dep. 241:1-14.

353.    At the July 23, 2021 meeting, "Dr. Murthy asked Mr. Clegg about … the research questions about understanding the reach of the data in terms the impact of the … health

misinformation. And … DJ [Patil] had some questions about also on the data side and Nick [Clegg]

offered to connect DJ with a data person from Facebook."  Waldo Dep. 242:8-16.

354.   Later on June 23, 2021, after the meeting between Dr. Murthy and Nick Clegg,

Clegg sent a follow-up email to Dr. Murthy stating: "Dear Vivek, if I may, thanks again for taking

the time to meet earlier today….. I wanted to make sure you saw the steps we took just this past

week to adjust policies on what we are removing with respect to misinformation as well as steps

taken to further address the 'disinfo dozen'…." Waldo Ex. 19, at 1.

355.   Clegg's reference to "just this past week" refers to the one-week period between

this July 23 email and rollout of the Advisory on July 15 and the President's comment "They're

killing people" on July 16.  *Id.*; Waldo Dep. 244:14-19.

356.   It is evident that Dr. Murthy and federal officials pressured Facebook for specific

censorship actions in the July 23 meeting, because the same day as the meeting, Clegg reported

back to them a series of new censorship actions and policies.  First, Clegg reported enforcement

actions against the "Disinfo Dozen" whom Jennifer Psaki had publicly demanded censorship: "We

removed 17 additional Pages, Groups, and Instagram accounts tied to the disinfo dozen (so a total

of 39 Profiles, Pages, Groups, and IG accounts deleted thus far, resulting in every member of the

disinfo dozen having had at least one such entity removed)."  Waldo Ex. 19, at 1.  Clegg reported

that Facebook was secretly censoring accounts associated with the Disinfo Dozen even if they had

not violated Facebook's policies: "We are also continuing to make 4 other Pages and Profiles,

which have not yet met their removal thresholds, more difficult to find on our platform."  *Id.*

357.   Clegg also reported that Facebook had amended its censorship policies to make

them more restrictive: "We also expanded the group of false claims that we remove, to keep up

with recent trends of misinformation that we are seeing."  *Id.*

358.    Clegg also committed to "do more" to censor misinformation in response to federal officials' demands: "We hear your call for us to do more and, as I said on the call, we're committed to working toward our shared goal of helping America get on top of this pandemic." *Id.*  Dr. Murthy, evidently, demanded that Facebook "do more" against misinformation on it platforms in the July 23 phone call.  *See id.*

359.    Clegg further agreed to accede to federal officials' demands that Facebook make its internal data on misinformation available to federal officials and researchers like Renee DiResta of the Virality Project: "We will reach out directly to DJ to schedule a deeper dive on how to best measure Covid related content and how to proceed with respect to the question around data."  *Id.* at 1-2.

360.    Clegg also pledged to report back to Dr. Murthy repeatedly so that federal officials could monitor Facebook's "progress" on censoring misinformation: "We'd also like to begin a regular cadence of meetings with your team so that we can continue to update you on our progress. You have identified 4 specific recommendations for improvement and we want to make sure to keep you informed of our work on each."  *Id.* at 2.  Clegg also promised to continue sending federal officials regular updated reports on the spread of misinformation on Facebook's platforms.  *Id.*

361.    Clegg concluded by promising that Facebook would "strive" to meet federal officials' expectations on censorship: "we will strive to do all we can to meet our shared goals." *Id.*; *see also* Waldo Dep. 245:6-247:4.

362.    Waldo agrees that Clegg's statement "We hear your call for us to do more" in the July 23 email is an accurate understanding of the Surgeon General's message from the July 15 press conference, the Health Advisory, and the July 15 rollout at Stanford Internet Observatory: "Yes. I think, as we've established, the advisory and … the remarks, and the event with the Stanford

Internet Observatory, Dr. Murthy is calling on … social media companies to do more to address the problem of health mis- and disinformation."  Waldo Dep. 251:6-12.

363.    After the July 23 email, Waldo connected Brian Rice of Facebook with DJ Patil to discuss data-sharing to monitor social-media misinformation between Facebook and federal officials.  *Id.* at 252:9-19.

364.    Additionally, on the July 23 call with Nick Clegg, the OSG specifically asked Facebook to report back on any additional steps they were taking in response to the Health Advisory to increase censorship of misinformation on their platforms.  Waldo Ex. 21, at 1.  On August 6, 2021, Waldo emailed Brian Rice and Nick Clegg of Facebook and stated, "I know on the call with Dr. Murthy he'd mentioned seeing if you were able to send an update of any new/additional steps you are taking with respect to health misinformation in light of the advisory." *Id.*  Waldo noted that "we are asking all platforms for this type of update." *Id.*  Waldo asked for a report from Facebook within two weeks: "Would you be able to send something over within two weeks?" *Id.*

365.    In the same email, Waldo connected Facebook with DJ Patil of the White House "on next steps for connecting on data."  *Id.*

366.    Facebook responded that it was planning "additional steps" to increase censorship of misinformation, and promised to report back to the Surgeon General in 2 weeks: "Our teams have been working on additional steps—we will have something back to you within two weeks outlining our approach."  *Id.*  Facebook also followed up with Patil to schedule the meeting about using Facebook's internal data to monitor speech on its platforms.  *Id.*

367.    Waldo admits that, during the July 23 call, "we asked for an update," and that it was probably Dr. Murthy who asked for it.  Waldo Dep. 256:20-23.

368.   Waldo does not dispute that he asked "all platforms" to provide a similar "update" on new or additional steps to censor misinformation in light of the Advisory, and that "all platforms" means "Facebook, Twitter, Instagram, and YouTube, and Google." *Id.* at 257:10-258:9.

369.   On July 19, 2021, a few days after the President's "They're killing people" comments, Rob Flaherty of the White House emailed Dr. Murthy to put him in touch with an operative for the Democratic National Committee who works on misinformation and disinformation issues. Waldo Ex. 22, at 3. Flaherty wrote: "Vivek – wanted to link you with Jiore Craig, who's been a critical leader of the DNC's misinfo work for a long time, but also has been helping us think through mis/dis on the COVID side. I thought it would be great for you both to connect as OSG charts out next steps." *Id.* Eric Waldo followed up to schedule a Zoom meeting on July 22 between Ms. Craig of the DNC and key members of the OSG's staff. *Id.* at 1.

370.   On August 18, 2021, Facebook again reported back to OSG about additional censorship actions against misinformation "superspreaders." Waldo Ex. 24, at 1. Facebook stated, "Eric and DJ – flagging this post for you and for Surgeon General Murthy. This details how we are approaching content from the disinfo dozen." *Id.* Facebook sent the same update to Rob Flaherty of the White House on the same day. *Id.* at 2.

371.   The post was entitled, "How We're Taking Action Against Vaccine Misinformation Superspreaders." *Id.* at 1. The post detailed a long list of censorship actions taken against the "Disinfo Dozen," including removing over three dozen pages, groups and accounts linked with them; imposing additional penalties on another two dozen pages, groups, and accounts linked with them; applying penalties to some of their website domains so that third parties posting their content will be deamplified; and removing the remaining violating content. *Id.* at 1.

372.     As Waldo acknowledges, this was the "second report that Facebook has sent [OSG] after that July 23rd meeting where they're reporting back about actions taken against the Disinfo Dozen."  Waldo Dep. 268:12-16.

373.     On August 20, 2021—two weeks after the August 6 email in which Waldo had requested a report within two weeks on Facebook's new or additional steps to remove misinformation in light of the Health Advisory—Nick Clegg sent a long, detailed email to Dr. Murthy, Waldo, and DJ Patil, detailing Facebook's additional censorship actions taken as a result of the Advisory.  Waldo Ex. 25, at 1-3.

374.     In the August 20 email, Clegg noted that Dr. Murthy had "asked for an update on existing and new steps that Facebook is taking."  *Id.* at 1.  Clegg noted that Facebook was taking new steps in response to the pressure from the White House and Surgeon General since July 15 and 16: "In this update, we describe … further policy work to enable stronger action against persistent distributors of vaccine misinformation."  *Id.*

375.     In a lengthy section headed "Limiting Potentially Harmful Misinformation," Clegg provided five bullet points and four sub-bullet points detailing expanded efforts of censorship by Facebook taken in response to the Advisory.  *Id.* at 2.  These included, among others, " expanding our COVID policies to further reduce the spread of potentially harmful content"; "increasing the strength of our demotions for COVID and vaccine-related content that third-party fact-checkers rate as 'Partly False' or 'Missing Context'"; "making it easier to have Pages/Groups/Accounts demoted for sharing COVID and vaccine-related misinformation"; and "strengthening our existing demotion penalties for websites that are repeatedly fact-checked for COVID or vaccine misinformation content shared on our platform."  *Id.* at 2.  Clegg also included a report of additional actions taken against the Disinfo Dozen.  *Id.*  Clegg also reported that Facebook

"continue[s] to experiment with signals that we can use … to demote content that we predict will contain low quality information." *Id.*

376.    In another long section entitled "Increasing Transparency," Clegg detailed a list of actions taken by Facebook to share data about the reach of misinformation on its platforms, per federal demands.  *Id.* at 2-3; *see also* Waldo Dep. 269:20-277:8 (reviewing the content of the August 20 email in detail).

377.    Waldo agrees that this email is "a report back to [OSG's] request for report in two weeks related to actions they took in respect to the advisory."  Waldo Dep. 270:19-23.

378.    Waldo responded to Clegg by stating that "we look forward to continuing to move forward together with urgency and solutions during these extraordinary times."  Waldo Ex. 25, at 1. The phrase "urgency and solutions" was intended to push Facebook to increase its anti-misinformation efforts: "I was hoping that Facebook would continue to move. Urgency means, you know, that they would take this seriously, and solutions means that they would also come with real solutions to the problems and not just pretend to solve problems."  Waldo Dep. 277:23-278:3.

379.    Three days later, on August 23, 2021, Rob Flaherty of the White House emailed Facebook, asking for a report on how they intended "to promote" the FDA's approval of the Pfizer vaccine and noting that the White House "[would] appreciate a push" of the vaccine information using specific "suggested language from [the White House]."  Waldo Ex. 27, at 2.  Facebook responded the same day with an additional report on new steps to remove vaccine misinformation: "We're … updating our misinformation policies to remove the specific claims that 'there are no FDA-approved vaccines' and 'the Pfizer vaccine is not FDA-approved.'  We'll also continue to look for claims that are no longer accurate given the approval today."  *Id.* at 1.  Facebook forwarded

this report on increasing censorship to Waldo at OSG as well.  *Id.*; *see also* Waldo Dep. 280:1-281:24.

380.    On September 18, 2021, Facebook sent Eric Waldo and Rob Flaherty another bi-weekly report, and also noted that "I'm sure you also saw yesterday's story in the WSJ about the spread of COVID-19 misinformation in comments on Facebook," which Facebook disagreed with and offered to discuss.  Waldo Ex. 30, at 1.   Flaherty responded, "Happy to talk about it, Brian. Would be interested to see, as we have long asked for, how big the problem is, what solutions you're implementing, and how effective they've been." *Id.*  Facebook promised, "we will circle back over the next few days to brief." *Id.*

381.    On September 29, 2021, Google emailed Eric Waldo to "share an update we recently made to YouTube's policies pertaining to vaccine-related misinformation."  Google reported: "We just announced that we will be introducing a new policy that prohibits content that includes harmful misinformation about the safety, efficacy, or ingredients for currently administered vaccines…" Waldo Ex. 31, at 1.

382.    On October 19, 2021, Rob Flaherty emailed Facebook, copying several White House officials and Eric Waldo, and asked Facebook to "connect on what the admin's plans are for the 5-11 vaccine rollout."  Waldo Ex. 32, at 1.  The "5-11 vaccine rollout" refers to the approval of vaccines for children ages 5 to 11 years old. Waldo Dep. 298:20-23.

383.    Flaherty requested that Facebook report on its censorship plans for claims on social media about the authorization of vaccines for children ages 5 to 11: "We'd like to talk about what we're seeing as the biggest headwinds we're going to face, and discuss what you all are planning as we move into this next phase.  We remain concerned about mis- and disinformation on feed and

groups, and the wide reach of hesitancy-inducing content across your platform." Waldo Ex. 32, at 1.

384.    Facebook responded, agreeing to the meeting: "we'd welcome the opportunity. Adding Felicia on our end to help coordinate." Waldo Ex. 32, at 1.

385.    Waldo states that he does not recall whether this meeting occurred or if he participated, but he agrees that the meeting probably occurred: "Probably.   If they added schedulers, usually those meetings happen." Waldo Dep. 300:14-23.

**I. The Surgeon General and White House Hammer Facebook.**

386.    On October 28, 2021, the Washington Post ran a story based on information from Frances Haugen reporting that "Facebook researchers had deep knowledge of how coronavirus and vaccine misinformation moved through the company's apps, according to documents disclosed by Facebook whistleblower Frances Haugen." Waldo Ex. 33, at 1.

387.    In response to the article, on October 29, Surgeon General Murthy issued a series of Tweets from his official Twitter account demanding that Facebook increase censorship and give outside researchers access to its data. Waldo Ex. 33, at 1. In the Tweet thread, Dr. Murthy stated: "I was deeply disappointed to read this story. Health misinformation has harmed people's health and cost lives. In the Surgeon General's Advisory on Health Misinformation, I stated clearly that tech platforms have a responsibility to improve our health information ecosystem. What continues to be lacking from Facebook and other tech companies is transparency and accountability. Only the companies understand the full extent of misinformation's spread and impact – yet they have not yet shared this data with independent researchers and the public. Without this critical data, it is much harder to design the right interventions or hold the platforms accountable. … We must demand Facebook and the rest of the social media ecosystem take responsibility for stopping health

misinformation on their platforms. The time for excuses and half measures is long past. We need transparency and accountability now. The health of our country is at stake." *Id.* Dr. Murthy repeated the mantras "transparency" and "accountability," threatening that the federal government would "hold the platforms accountable" for misinformation. *Id.*

388.    This Tweet thread reflects Dr. Murthy's own words, as he "made the final and substantial edits" to the Tweets. Waldo Dep. 303:25-304:17.

389.    Waldo agrees that the Twitter thread demands "transparency and accountability around health misinformation, especially vis-à-vis the social media organizations," and "demands that Facebook and the other platforms do more" to "stop[] health misinformation." *Id.* at 305:6-22. "Lots of work went into" crafting that message, according to Waldo. *Id.* at 306:7-8.

390.    On October 28, 2021, the same day as the Washington Post article, Rob Flaherty emailed Brian Rice of Facebook a hyperlink to the article. The only text in the email was the subject line, which stated: "not even sure what to say at this point." Waldo Ex. 35, at 1-2.

391.    Facebook responded to Flaherty by stating, "nothing in the story is inconsistent with what we briefed on," and providing its account of the facts underlying the story. *Id.* at 1. Facebook then forwarded this response to Waldo and the OSG, noting that "I saw the Surgeon General's reaction on Twitter," and asking for "a longer conversation next week" about the issue. *Id.*

392.    Waldo describes both the Surgeon General's public Tweet threat, and Rob Flaherty's private email to Facebook, as different ways of "hitting up Facebook" about the Frances Haugen article: "this was one of the most popular articles in all of news that week, so I'm not surprised that people who care a lot about this issue were certainly hitting up Facebook about it." Waldo Dep. 307:13-22.

393.    On October 28, 2021, Nick Clegg also emailed Dr. Murthy and asked for a meeting to discuss the "intense debate that's been prompted by the documents disclosed by a former employee."  Waldo Ex. 36, at 2.  Waldo responded on behalf of the OSG, stating that "we have seen the recent public reports around Facebook and misinformation.  We are certainly concerned about what we are seeing, given our emphasis on health misinformation in our advisory and the ongoing conversations our teams have been having.  As has been the case, you'll continue to see us raising the issue of health misinformation in public and in private as a critical public health issue." *Id.* at 1.

394.    Regarding his reference to "in private," Waldo admits that this refers to "closed-door meetings" with platforms like Facebook: "in the government, you're not always just doing a panel that's open press, you're meeting with stakeholders … in closed-door meetings…."  Waldo Dep. 312:13-16.  The Surgeon General's Office was continuously pushing for action against health misinformation "in public and private" meetings with stakeholders: "talking about health mis- and disinformation was in our talking points of when we talked to stakeholders in public and private." *Id.* at 313:8-11.

395.    The next day, October 29, 2021, Facebook sent a long email to Rob Flaherty, Eric Waldo, and several other White House officials referring back to an October 25 meeting about vaccines for children ages 5-11.  Waldo Ex. 37, at 3-4; Waldo Dep. 315:8-316:15.  The email reported to the White House and OSG a "detailed description of [Facebook's] plans" for the approval of vaccines for children.  *Id.* at 4.  The plans included immediately updating policies to censor claims relating to vaccination of children: "As discussed, soon as the EUA is issued, we will also be able to apply claims from our current misinfo policies for COVID-19 vaccines to include claims about child vaccinations."  *Id.*

396.    Facebook also noted that it was relying directly on the CDC to decide what to censor: "We were able to make this change based on the conversation we had last week with the CDC…. There are several claims we will be able to remove as soon as the CDC debunks them." *Id.*

397.    Facebook then asked federal officials to provide a federal health authority to dictate what content would be censored on Facebook's platforms: "We expect the approval of COVID vaccines for kids aged 5-11 will be another significant peak of new misinformation claims.  Our policy allows us to take action against this content once those claims have been debunked and confirmed harmful by a public health authority.  We're committing to addressing these quickly; to do so effectively, we will need a channel to a health expert with whom we can discuss these claims in real time.  Is this something we could partner on, and if so, would your team be able to connect us with a point person?" *Id.*

398.    On November 4, 2021, Facebook followed up again to OSG and the White House with additional reports of censoring misinformation: "Last Friday, we updated our misinformation policies for COVID-19 vaccines to make clear they apply to claim about children," identifying a list of specific claims. *Id.* at 1.

399.    Facebook made clear that the CDC was serving as the "health expert" who was dictating what could be said on Facebook's platforms "in real time": "We're grateful to our partners at the CDC for helping get these debunked in advance of the announcement, and we look forward to staying connected on emerging COVID misinformation trends." *Id.* at 1, 3.

**J.      The Surgeon General Threatens Regulation to Increase Censorship.**

400.    On December 21, 2021, Dr. Murthy gave a podcast on the Omicron variant in which he again publicly threatened to hold the social-media platforms "accountable" for not censoring

misinformation: "number one, we have to track down where this misinformation is coming from

and understand how to hold platforms accountable, new technology platforms that are driving so

much of the misinformation spread…. [B]y allowing this misinformation to proliferate on their

sites, they're subjecting people in the United States and around the world to extraordinary harm,

and they're doing so with little accountability at this moment and really with very little

transparency. That can't be allowed to continue because it's putting everyone's health at risk."

Waldo Ex. 38, at 4 (Audio Tr. 7).

401.    Dr. Murthy demanded "aggressive action" from the platforms to censor speech: "I

do think that part of what they have to do, the platforms is take aggressive action against people

who are intentionally spreading misinformation." *Id.*

402.    Waldo agrees that this message is "consistent with his previous statements as well

as the content within the advisory itself." Waldo Dep. 321:22-24.

403.    As Waldo concedes, Dr. Murthy's threat to hold platforms "accountable" and his

demand for "aggressive action" to censor misinformation "is consistent with the messaging we've

reviewed all day today of the advisory, the rollout, the public statements" by OSG.  *Id.* at 322:22-

24.

404.    On January 3, 2022, Dr. Murthy participated in Alyssa Milano's podcast.  Waldo

Ex. 39, at 1.  In the podcast, Dr. Murthy stated that the "sophistication with which this

misinformation is spreading is truly unprecedented, and a lot of has been enabled by technology

platforms in the social media which enable the spread, and … the platforms need to do a lot more

is step up, to be accountable for making their spaces safer."  *Id.* at 3 (Audio Tr. 2).  He also stated,

"finally, I just want to come back to the technology companies for a moment here, because unless

those platforms step up and make their spaces safer and reduce the amount of misinformation on

their site, it's going to be pretty tough to get a full handle on this spread of misinformation." *Id.* at

5 (Audio Tr. 4).

405.    Immediately after these comments, the podcast broadcast public comments by

President Biden, stating: "Joe Biden: The unvaccinated are responsible for their own choices, but

those choices had been shulled [*sic*] by dangerous misinformation on cable TV and social media.

You know, these companies … are making money by ped[dling] lies and allowing misinformation

that can kill their own customers and their own supporters. It's wrong. It's immoral. I call on the

purveyors of these lies and misinformation to stop it. Stop it now." *Id.*

406.    Waldo agrees that this podcast is "aligned with … the advisory and the other public

statements we've seen so far." Waldo Dep. 327:8-10.

407.    Dr. Murthy also called for the platforms to "go after people who are superspreaders

of misinformation on these sites," which Waldo agrees is "entirely consistent … with the messages

that Dr. Murthy was sharing about health mis- and disinformation." *Id.* at 329:23-330:18.

408.    On February 14, 2021, Dr. Murthy participated in a panel discussion hosted by the

Rockefeller Foundation.  Waldo Ex. 41.  Dr. Murthy stated, "what feels different in this moment

compared to ten years ago or [twenty] years ago is this speed, scale, and sophistication with which

this misinformation is spreading and much of it has been enabled, in fact, by technology platforms,

and we talk to people about where they're encountering misinformation. It's off and on social media

channels and other tech platforms. … We need certainly technology companies to step up and do

more, to help reduce this spread of misinformation, and to be transparent with the public about

how much misinformation is being transacted on their sites and whether their methods of

addressing it are working or not. We do not have enough transparency on that front and that is

hindering us in our response of misinformation." *Id.* a 6-7 (Audio Tr. 9-10).

409.    Waldo agrees that this is "a consistent message with what we've seen in previous public statements, interviews, as well as the advisory itself."  Waldo Dep. 331:23-25.

410.    In the same panel, Dr. Murthy stated that there is a role for government to set "safety standards" when it comes to misinformation, which directly suggests government regulation and foreshadowed the OSG's forthcoming Request for Information (RFI): "And, of course, there's a role for government here as well to set safety standards, to push for transparency and accountability, particularly from platforms."  Waldo Ex. 41, at 8 (Audio Tr. 11).  Dr. Murthy then immediately foreshadowed the OSG's forthcoming Request for Information (RFI) as a step toward government "setting safety standards": "There are steps we are working now that we will be -- you know, have more to say about it in the … coming weeks and months ahead, to try to, in fact, gather even more information about the impact of health misinformation on health professionals of the public and also in the role that technology companies may be playing on that on that front."  *Id.* Less than a month later, the OSG issued a formal RFI for information about misinformation on social media platforms.

411.    On March 3, 2021, the OSG issued a formal RFI in the Federal Register, seeking information from social-media platforms and others about the spread of misinformation on social media.  Waldo Ex. 42 (87 Fed. Reg. 12712).  The RFI is entitled, "Impact of Health Misinformation in the Digital Information Environment in the United States Throughout the COVID–19 Pandemic Request for Information (RFI)."  *Id.* at 1.

412.    "Kyla [Fullenwider] was the primary driver on the RFI from a content expert perspective."  Waldo Dep. 338:22-23.  Though she was employed at U.S. Digital Response, "she was doing work on behalf of the Surgeon General." *Id.* at 340:8-9.  Kyla Fullenwider is also

responsible for receiving and reviewing the responses to the RFI. *Id.* at 362:6-10. "Kyla was the subject matter expert who was guiding this RFI process." *Id.* at 362:15-17.

413.    The RFI defines "technology platforms" very broadly, indicating that the Surgeon General is expanding its attempts to control the spread of so-called "misinformation": "Technology platforms include the following: General search engines, content sharing platforms, social media platforms, e-commerce platforms, crowd sourced platforms, and instant messaging systems." Waldo Ex. 42, at 2; *see also* Waldo Dep. 341:14-342:7.

414.    Under the heading "Information About Technology Platforms," the RFI seeks a long series of detailed information about misinformation on such platforms, including "Information about how widespread COVID–19 misinformation is on individual technology platforms," Waldo Ex. 42, at 2; "any aggregate data and analysis on the prevalence of COVID–19 misinformation on individual platforms including exactly how many users saw or may have been exposed to instances of COVID–19 misinformation," *id.* at 2-3; and "[a]ny aggregate data and analysis on how many users were exposed, were potentially exposed, or otherwise engaged with COVID–19 misinformation," *id.* at 3.

415.    The RFI also seeks detailed information about censorship policies and how they are enforced: "Information about COVID–19 misinformation policies on individual technology platforms," and "[a]ny aggregate data and analysis of technology platform COVID–19 misinformation policies including implementation of those policies and evaluations of their effectiveness." *Id.* at 3.

416.    The RFI also seeks detailed information about disfavored *speakers* on social-media platforms, requesting "[i]nformation about sources of COVID–19 misinformation," including "[i]nformation about the major sources of COVID–19 misinformation associated with exposure."

*Id.* at 3. The RFI makes clear that "source" refers to *speakers* on platforms: "By source we mean both specific, public actors that are providing misinformation, as well as components of specific platforms that are driving exposure to information." *Id.* at 3.

417.    Especially in light of Dr. Murthy's prior public statements about the government "setting safety standards" for misinformation, Waldo Ex. 41, at 8 (Audio Tr. 11), the RFI carries a clear implied threat of future regulation against the social-media and other technology platforms.

418.    Contemporaneous media coverage portrayed the RFI as a "demand" for information from platforms. *See, e.g.,* Waldo Ex. 44, at 1 (Brad Dress, *Surgeon General Demands Data on COVID-19 Misinformation from Major Tech Firms*, The Hill (Mar. 3, 2022, 11:24 am)).

419.    Max Lesko, the Surgeon General's Chief of Staff, also sent the RFI to several major tech platforms with a formal letter requesting that they respond. Waldo Dep. 348:20-22. He sent nearly identical letters to Facebook, Google, LinkedIn, Twitter, YouTube, and Microsoft. Waldo Exs. 46, 47, 48, 49, 50, 51. Each letter was directed to the CEO of the platform over General Murthy's signature. *Id.*

420.    Each letter stated, "The proliferation of health misinformation during the pandemic has been both extensive and dangerous. … It is clear that we must do everything we can to address this threat." *Id.* Each letter referred to the July 15, 2021 Health Advisory, noting that "a large proportion of health misinformation is spread through technology platforms," and "my Advisory includes a call for technology companies to join this broader effort to create a safer, healthier information environment." *Id.* Each letter advised the social-media platforms of the RFI, and formally "request[ed] that your company contribute to the RFI…. Specifically, I am requesting responses from companies about the extent and spread of COVID-19 misinformation on their

technology platforms, policies to address COVID-19 misinformation and their effectiveness, [and] sources of COVID-19 misinformation….” *Id.*

421.    On May 3, 2022, Facebook notified the White House and OSG that it had “filed a response to the Surgeon General’s rfi on Covid misinformation and would be happy to discuss at the appropriate time.” Waldo Ex. 54, at 2.  To date, the OSG has never made this or any other the responses to its RFI public.

422.    Shortly after the RFI was issued, on March 11, 2022, GQ magazine published an interview with Dr. Murthy.  Waldo Ex. 52.  In this interview, Dr. Murthy stated, “we all have a responsibility to do everything we can to reduce the spread of misinformation… Whether you have one million followers on social media, or you’ve got 10 followers, we all have platforms and people in our lives who trust us.” *Id.* at 6.  He called on platforms like Spotify (which was then being criticized for hosting Joe Rogan’s podcast) to censor health misinformation: “If you’re running a platform, whether it’s a Spotify or another social media platform, you’ve got to think about, how do I create a healthy information environment here? How do I create rules and a culture that promotes accurate information?”  *Id.*  He emphasized that “a platform has the ability, the opportunity, and the responsibility to create rules and a culture that supports the dissemination of accurate information and that reduces the spread of misinformation.”  *Id.* at 7.

423.    Echoing his prior comments about “setting safety standards” by government, Dr. Murthy compared censorship “rules” for misinformation to speed limits: “We have speed limits on the road because we know that sometimes if you drive too fast, that can have an impact on somebody else’s health and wellbeing. If we’re going to live together in a society, we’ve got to take steps and observe certain rules to help protect other people. That’s true here as well. Platforms

have an opportunity to help shape that environment in their own way. We all do. That's our responsibility at a time like this." *Id.*

### K. The White House and Surgeon General Continue Oversight of Censorship.

424.    On June 22, 2022, Facebook again emailed Waldo, Rob Flaherty, and other White House officials with an update on Facebook's increased censorship.  Waldo Ex. 53, at 1.  In the email, Facebook stated that it "[w]anted to ensure that you were aware of our policy updates following the early childhood vaccine approvals.  As of today, all COVID-19 vaccine related misinformation and harm policies on Facebook and Instagram apply to people 6 months or older…." *Id.*  Facebook indicated that it had again relied on the CDC to dictate what claims people can post on Facebook: "We expanded these policies in coordination with the CDC and ensured that we also included false claims that might be connected to children…." *Id.*

425.    Throughout this period, at the federal officials' request, Facebook continued to send bi-weekly "Covid Insights Reports" reporting on COVID-19 related misinformation on its platforms to the White House and OSG.  *See, e.g.,* Waldo Ex. 54, at 2-4.  In the spring of 2022, Facebook repeatedly asked the federal officials if it could discontinue or reduce the frequency of these reports, which it had been sending for over a year.  *Id.* at 2.  Finally, on June 13, 2022, Facebook notified the White House and OSG that "we will plan to discontinue these unless we hear from you that this information continues to be valuable." *Id.* at 1.  Rob Flaherty responded the same day, requesting that Facebook continue to send the reports and further asking Facebook to report on how it would handle misinformation for early-childhood (under age 5) vaccines: "It would be helpful to continue to get these as we start to ramp up under 5 vaccines.  Obviously, that has a potential to be just as charged.  Would love to get a sense of what you all are planning here."

*Id.* Facebook continued to send the reports as requested, including two reports on July 17, 2022, and promised to continue sending them. *Id.*

## IV.　The CDC and the Census Bureau: BOLO and Authoritative Fact-Checking.

426.　In addition to the public and private pressure campaigns from the White House and the Surgeon General's Office, the CDC and the Census Bureau have engaged in a long censorship campaign together, enabled by the White House's pressure on platforms to cooperate with the federal government. Working closely with Census, the CDC flags supposed "misinformation" for censorship on platforms (sometimes using the acronym "BOLO," "Be On the Lookout"), and exercises full authority to dictate what health claims will be censored on social media platforms.

### A.　The CDC's Regular Communication with Social Media Platforms.

427.　Carol Crawford is the division director for the division of Digital Media within the CDC Office of the Associate Director for Communication. Crawford Depo. 11:7-9.

428.　According to Crawford, her "division provides leadership for CDC's web presence. We provide leadership for CDC's social media presence." *Id.* 11:14-16. Crawford is "the director of that work. I determine strategy, objectives, oversee work." *Id.* 11:21-22.

429.　Before April 2022, Crawford was "the branch chief of the Digital Media Branch within the Division of Public Affairs, and most of the roles that our division currently performs, web and social media, were in that branch." *Id.* 15:3-6.

430.　Crawford is "the main person that was the CDC point of contact to talk to Facebook, Twitter and the platforms since our job was to lead digital media." *Id.* 249:1-4.

431.　Crawford has regular contact with social-media platforms, especially about COVID-19 issues: "We started regular contact with the [platforms] at the beginning of the COVID

outbreak to exchange information about COVID, and most of the contact since then has been around COVID or other high-priority things, but mostly COVID." *Id.* 16:13-17.

432.     Crawford had only "very occasional" contacts with the platforms before COVID-19, *id.* 17:8-9; but then she and the CDC "started talking to some of them in February and March of 2020," at the beginning of the pandemic.  *Id.* 18:5-6.

433.     At this time, CDC leaders were asking Crawford's group if they were in contact with the platforms: "there were a lot of people asking staff, or other staff, are we -- were we in contact with the groups, and do we have any arrangements."  *Id.* 18:19-23.

434.     Crawford communicated with platforms by email, phone, and in meetings and calls. *Id.* 20:1-19.  She "had points of contact at several of them, and we would have meetings when we needed to talk.  So we arranged calls."  *Id.* 20:17-19.

**B.      CDC's and Census's Pressure and Collusion With Facebook/Meta.**

435.     On February 6, 2020, Facebook emailed State Department officials, noting that "Facebook has taken proactive as well as reactive steps to control information and misinformation related to Corona virus which includes … removal of misinformation."  Crawford Ex. 2, at 4.  The email was forwarded to Crawford, who reforwarded to her contacts at Facebook.  *Id.* at 3. Facebook proposed to Crawford that "Facebook team would create a Coronavirus Page serving up content that exists on other organizations' FB pages including the CDC," and would direct users to "curated content from trusted sources."  *Id.* at 3.

436.     On February 7, 2020, Crawford agreed to the proposals, and she also proposed that "There could be times we might want to address widespread myths like mask use or new issues." *Id.* at 2.  She discussed with Facebook the same day.  *Id.* at 1.

437.    On March 3, 2020, Facebook emailed Crawford and noted that Facebook intended to "support governments … with their response efforts on COVID-19," including the "goal" to "remove misinformation."  Crawford Ex. 3, at 1.

438.    Crawford "talked pretty regularly" with Facebook "around this time," *i.e.*, March 2020.  37:7-9.

439.    Crawford recalls having discussions of misinformation with Facebook "in the fall of 2020."  Crawford Dep. 38:7-8.  These included discussions of how to combat "growing" misinformation about COVID-19: "I can recall us generally saying things to the effect of … misinformation is really growing, or … what do you think we could be doing to address it? That kind of conversation."  *Id.* 38:11-15.

440.    On January 25, 2021, Facebook emailed Crawford the first of an ongoing, biweekly series of CrowdTangle reports, which report on "top engaged COVID and vaccine-related content overall across Pages and Groups."  Crawford Ex. 6, at 2.  The email emphasized in bold the anti-vaccine content listed in the report, including "Reports of healthcare workers refusing the vaccine," "Posts about alleged vaccine-related deaths," and "News and reports of severe vaccine side effects."  *Id.*  Facebook indicated that it was sending this report in response to a prior conversation with Crawford in which such data was requested: "I am following up on our conversation several weeks ago about providing more detailed reporting from our CrowdTangle team."  *Id.*

441.    Crawford responded that the report "looks wonderful and much appreciated."  *Id.* at 1.  She said that she "will be extending our distribution list" for the report.  *Id.* at 1.  She also noted, "One group we'll be adding" to the distribution list for the CrowdTangle reports "is the Census group who hopefully will soon start their project with us."  *Id.*  And she stated, "the wide group of those looking at misinfo will want this."  *Id.*

442.    CrowdTangle is "a social media listening tool for Meta properties … [l]ike Instagram and Facebook." Crawford Dep. 50:3-6. "[S]ocial media listening reports show themes … of discussion on social media channels." *Id.* 52:10-12. The CrowdTangle report is "a search of content on social media, and a summary of the higher volume conversations." *Id.* 53:8-10. It is "a report of the most talked about topics on social media during this time period." *Id.* 54:13-15.

443.    The CrowdTangle reports that Facebook regularly emailed to CDC were only one of two forms of access to CrowdTangle. Since "March or April 2020," Facebook had also allowed CDC to "directly log into CrowdTangle and run our own reports or searches." *Id.* 77:9-13.

444.    According to Crawford, the CrowdTangle reports "would help us understand what was being discussed on social media about COVID, which helps us look for gaps in information, confusion about facts, things that we might need to adjust our communication materials for." *Id.* 57:24-58:3.

445.    Crawford confirms that the CDC had privileged access to CrowdTangle from early 2020, and government officials used the non-public "social media listening tool" to monitor and track private speech about COVID-19 on social media: "we had access to go in directly to CrowdTangle and run in reports … from early 2020. … And I mentioned that our research team … searched in it and looked in it to create their reports, and I believe other teams did too." *Id.* 147:12-18.

446.    The CDC also used other "social media and listening tools" to monitor Americans' speech on social media: "we did searches in CrowdTangle, the same way we do searches in other social media and listening tools that we have to create, to understand what's being discussed in the environment, to update our communication material." *Id.* 148:11-15.

447.    The CDC's "listening tools" included "Meltwater reports," where "Meltwater is sort of like CrowdTangle but for all the platforms." *Id.* 154:13-16.  But CrowdTangle is superior to Meltwater for monitoring Facebook and Instagram because it provides privileged access to some online speech: "CrowdTangle can see more on the Meta properties.  So it's nicer if you're just looking at Meta properties.  Meltwater gives you social media at large." *Id.* 154:24-155:2.

448.    Related to the bolded categories of supposed misinformation in Facebook's CrowdTangle report, Crawford claims that she does not have specific recollection about the issues, but she admits that "I do recall generally discussing misinformation with Facebook around this time." *Id.* 58:11-13.

449.    Crawford added Census Bureau officials to the distribution list for the CrowdTangle reports because "[t]hey were going to start working with the CDC regarding misinformation." *Id.* 58:19-20; *see also id.* 61:11-12 ("At some point I recall adding Census to the distr[ibution]").

450.    From then on, Facebook regularly sent Crawford biweekly "CrowdTangle content insights report[s]." Crawford Ex. 7, at 1-4.  With each report, Facebook would highlight in bold the high-engagement misinformation-related issues for the CDC from the two-week period.  *Id.* In each email, Facebook would introduce these misinformation-related posts by noting something like, "However, posts falling into the following themes also garnered high engagement." *Id.*

451.    The CrowdTangle reports survey content that is not publicly available, such as "personal Group posts." *Id.* at 2.

452.    Crawford is "sure that general discussions" with Facebook addressed "that there was a lot of information on vaccines, which is one of the bolded words [in the CrowdTangle Reports], for example. I am sure that did occur." Crawford Dep. 64:19-22.

453.    On January 27, 2021, Facebook sent Crawford a recurring invite to a "Facebook weekly sync with CDC (CDC to invite other agencies as needed)."  Crawford Ex. 36, at 1.  A large number of Facebook and CDC officials were included on the invite, including Liz Lagone, Facebook's content-moderation officer who communicated with the CDC.  *See Id.*  The agenda for the recurring meeting included "Misinfo collab status."  *Id.*  It also included "CDC needs/questions."  *Id.*

454.    Crawford confirms that CDC frequently had weekly meetings with Facebook: "There were definitely times that we were talking weekly."  Crawford Dep. 226:20-21; *see also, e.g.,* Crawford Ex. 39, at 1 (recurring calendar invite for a meeting with the same agenda and participants on May 6, 2021).

455.    On March 10, 2021, Crawford sent Facebook an email seeking information about "Themes that have been removed for misinfo."  Crawford Ex. 44, at 3.  She stated, "We mentioned this on the call last week and you said you'd be sending something as other had asked – is that available yet by chance?"  *Id.* She clarified: "You mentioned that WH and HHS had asked so you'd get it to us," and responded "Yes" to Facebook's question, "Are you looking for types of COVID-19 misinfo we remove?"  *Id.*

456.    Facebook noted, that "[w]e are setting up a meeting with WH/HHS to discuss more likely later this week or early next.  Perhaps a CDC rep could participate…."  Crawford Ex. 44, at 2.  Crawford noted, "They want to see what you guys proactively have removed that might not be in those [CrowdTangle] reports….  My guess is a short meeting with Lis Wilhelm['s] vaccine confidence team is what is needed if FB is willing to do it."  Crawford Ex. 44, at 2.

457.    In this exchange, CDC was "wondering if [Facebook] had info on the types of posts that were removed and the themes because they were worried that we could only see the live posts

and so we wouldn't know if there was also confusion about other areas that had been removed." Crawford Dep. 258:6-11.  CDC had "asked on the meeting if they had this data, like, because we wanted it. And I think she said, Oh, we did something like this for the White House or HHS."  *Id.* 260:6-9.

458.    From this, Crawford understood that HHS and the White House were having similar meetings with Facebook: "I do think that they did have meetings with the agencies."  *Id.* 261:10-11.

459.    On March 25, 2021, Crawford and other CDC officials met with Facebook.  Ex. S, at 1.  The day before the meeting, March 24, 2021, Facebook emailed Crawford and noted, "[a]s we discussed last week, we will present on COVID-19 misinformation on this session/meeting and have some of our team that is focused on that workstream provide a briefing on the current policies and approach as well as the current trends we are identifying."  *Id.* at 2.  The official also noted that Facebook would have a "Misinformation Manager" and Liz Lagone, a content-moderation official for Facebook who "will be leading from our side on misinformation briefing for your team. They all work on our COVID-19 policies."  *Id.* at 1.  Crawford responded, attaching a Powerpoint slide deck and stating, "This is a deck Census would like to discuss and we'd also like to fit in a discussion of topic types removed from Facebook."  *Id.*  She also noted that two Census Bureau officials (Zack Schwartz and Jennifer Shopkorn) and two Census Bureau contractors (Sam Huxley and Christopher Lewitzke) would attend the meeting.  *Id.*

460.    The "deck Census would like to discuss" was attached to the email, *id.* at 3-16, and it contained an overview of "Misinformation Topics" including "concerns about infertility, misinformation about side effects, and claims about vaccines leading to deaths."  *Id.* at 4.  "These topics were selected due to high volume, continued public discussion, and high-profile coverage,"

according to the slide deck.  *Id.*  For each topic, the deck included sample slides and a statement from the CDC debunking the supposedly erroneous claim.  *Id.* at 6-14.  The slides were clearly designed to convince Facebook that such content should be censored.  For example, with respect to claims of infertility, the deck provided screen shots of six specific posts on Facebook and Instagram, summarized similar claims, and stated: "According to CDC there is no evidence that fertility problems are a side effect of any vaccine, including COVID-19 vaccines."  *Id.* at 6-8.  It also noted that "Several of Facebook's fact check partners have covered this claim."  *Id.* at 6.  The deck provided a similar debunking treatment for claims about other side effects from COVID vaccines, *id.* at 9-11, and claims about vaccines leading to deaths, *id.* at 12-14—in each case, providing six sample posts from real Facebook users as examples of the type of claim, and providing information designed to ensure that the claim would be censored.  *Id.*

461.   On March 30, 2021, Facebook sent Crawford an email with the subject line, "This week's meeting."  Crawford Ex. 8, at 3.  Crawford confirms that she was engaging in weekly meetings with Facebook during this time period, as well as other time periods during the COVID-19 pandemic: "we were meeting weekly during parts, so I imagine we were."  Crawford Dep. 68:9-10.

462.   The email indicates that CDC and Facebook were repeatedly discussing misinformation during these weekly meetings, as Facebook stated to Crawford: "I wanted to surface any misinfo questions your team may have for the team that I had briefing last time.  They are available to attend again, but also want to make sure we are answering any of your team's questions."  Crawford Ex. 8, at 3.

463.   Crawford admits that these weekly meetings involved CDC meeting with Facebook's *content-moderation* teams: "I do recall [Facebook] bringing in people from their Trust

and Safety or Misinformation teams … to talk to us about misinformation at some weekly meetings." Crawford Dep. 68:24-69:3.

464.    Crawford admits that, in these meetings with Facebook content-moderation team, CDC inquired about how Facebook was censoring COVID-19 misinformation: "we had asked questions about what they were seeing in terms of misinformation and inquired about any activities they were undertaking. And I believe this was an offer to sort of get back to us on any of those questions." *Id.* 69:9-13.

465.    In response, Crawford noted that she was also communicating with Facebook through an alternative channel.  Crawford Ex. 8, at 2 ("I added this part in yellow to our chain on turn.io").  She asked Facebook if they "have thoughts on how we can meet regularly with Census? … am I correct that your team is going to consider how you might want to engage with the CDC/Census team routinely and get back to us?" *Id.* at 2-3.  She noted to Facebook: "I know you all have experience with Census already." *Id.* at 3.

466.    At this time, CDC had recently executed an Interagency Agreement with the Census Bureau to assist the CDC in addressing misinformation: "We had entered an IAA with Census to help advise on misinformation." Crawford Dep. 71:3-4.  Pursuant to this agreement, the Census Bureau provided reports to the CDC on misinformation that the Census Bureau tracked on social media: "they provided reports on misinformation that they were seeing to us." *Id.* 71:15-17. "Census did provide [CDC] with the key themes they were seeing around misinformation during the times that they were looking at it." *Id.* 72:16-19.

467.    An IAA is "an agreement between two agencies to conduct some kind of work between them." *Id.* 109:23-24.  Under this IAA, CDC was "only engaging" with Census "on COVID misinformation." *Id.* 110:12-13.  CDC was "learning about how [Census] operated a

general misinformation team." *Id.* 110:13-14.  The IAA "let [CDC] partner with Census to learn

how they handled misinformation and help us with the COVID misinformation. … They seemed

to have more knowledge than we did." *Id.* 111:3-6.

468.    Facebook replied that "it would be great to have questions that may not have been

answered from your team on misinfo.  That team is very busy so it's a good opportunity to di[g]

deeper on that topic and especially if there are areas that are still unclear or the teams have concerns

about." Crawford Ex. 8, at 2.

469.    Crawford responded that CDC "would like to have more info … about what is being

done on the amplification-side," and that CDC "is still interested in more info on how you analyze

the data on removals, etc." *Id.* at 2.  She also noted that Census Bureau was "hoping to go over

the deck they had and discuss how to engage on a more regular basis." *Id.*

470.    Following up, Crawford noted that Census would like to discuss the following

topics: "It looks like the posts from last week's deck about infertility and side effects have all been

removed.  Were those re-evaluated by the moderation team or taken down for another reason?"

*Id.* at 1.  This remark plainly indicates that, in the last week of March 2021, the Census Bureau

was sharing "decks" of posts about COVID-19 misinformation with Facebook, which Facebook

then "removed," and CDC was following up to inquire whether the censorship occurred because

those posts were "re-evaluated by [Facebook's] moderation team" because of Census's flagging,

or for another reason.  Crawford testified that she "cut and pasted" the Census Bureau's inquiries

on these points.  Crawford Dep. 76:10.

471.    Crawford also asked Facebook to give the Census Bureau direct access to log in to

Facebook's CrowdTangle tool: "Can we add the Census Team to CrowdTangle?"  Crawford Ex.

8, at 1.  As Crawford noted, Facebook had "allowed [CDC] to directly log into CrowdTangle and

run our own reports or searches," and she was asking Facebook to let Census "log in to CrowdTangle" as well.  Crawford Dep. 77:4-14.

472.    In the same email, Crawford inquired of Facebook, "One of the main themes we're seeing and from the CrowdTangle report is local news coverage of deaths after receiving the vaccine.  What's the approach for adding labels to those stories?"  Crawford Ex. 8, at 1.  Thus, the CDC inquired of Facebook what its "approach" was to censoring local news stories about vaccine-related deaths.  *Id.*

473.    Crawford asked Facebook "[h]ow should we best engage regularly going forward on the Census/CDC reports."  Crawford Ex. 8, at 1. Crawford notes that Census had already been working with Facebook to address census-related misinformation: "we generally discussed, you know, how we should talk about misinformation because they had already been working with Census, on their own Census misinformation, and I wanted to know what was best for them for engaging on any topics that we might want to discuss."  Crawford Dep. 77:19-24.

474.    Facebook answered that "[w]e are working on a proposal of how to set up a sharing partnership on the misinform[ation] items."  Crawford Ex. 8, at 1.

475.    Crawford also had three-way meetings with Facebook, CDC, and Census about misinformation: "there were meetings where Census, myself and Facebook were on calls," in which they "had general conversations about what were opportunities to address misinformation." Crawford Dep. 83:6-12.  In those conversations, specific topics like the removal of specific posts discussed in Exhibit 8 "were probably discussed," but Crawford claims she does not "have specific memory of it."  *Id.* 83:12-14.

476.    On April 13, 2021, Facebook followed up by emailing Crawford and proposing to enroll CDC and Census Bureau officials in a special misinformation reporting channel to

Facebook.  Crawford Ex. 10, at 2.  With a subject line "CV19 misinfo reporting channel," Facebook wrote, "We're working to get our COVID-19 misinfo channel up for CDC and Census colleagues," and asked Crawford to confirm "if the below emails are correct for onboarding to the reporting channel and if there are others you'd like to include."  *Id.*  Facebook provided nine emails, including five CDC officials and four Census officials or contractors, to "onboard" into the COVID-19 "misinfo reporting channel."  *Id.*

477.    The officials who work for Reingold, including Christopher Lewitzke, "were contractors working with Census."  Crawford Dep. 101:10.

478.    Crawford states that this email refers to the fact that Facebook "has a portal or reporting channel where you can report misinformation or threats or things from a specific log-in that I believe they only provide to … federal agencies."  *Id.* 91:23-92:2.  The portal allows federal officials to "log onto Facebook as an administrator, and it's something that they make available to you as a federal agency."  *Id.* 95:17-19.  Crawford understands that this "wasn't something that was generally available" to the public but was only provided to federal officials.  *Id.* 96:15-16.

479.    Crawford recalls that a CDC official logged into this portal and used it to report "two or three posts."  *Id.* 92:17.

480.    On April 23, 2021, Crawford emailed Facebook and stated that the Wyoming Department of Health had "mentioned … that the algorithms that Facebook and other social media networks are apparently using to screen out postings by sources of vaccine misinformation are also apparently screening out valid public health messaging, including WY Health communications."  Crawford Ex. 38, at 2.  When she did not hear back, on April 28, she emailed Facebook again, "Anything you all can do to help on this?"  *Id.*  Facebook then responded and addressed the

problem.  *Id.* at 1-2.  The government is not amused when government-induced censorship sweeps
in the government's own speech.

481.   On May 6, 2021, Crawford emailed Facebook a table containing a list of 16 specific
postings on Facebook and Instagram, with a link and the text of each post. Crawford Ex. 9, at 1-3.
Crawford wrote, "As mentioned, here are two issues that we are seeing a great deal of misinfo on
that we wanted to flag for you all … These are just some example posts. … Our census team is
copied here, has much more info on it if needed."  Crawford Ex. 9, at 1.  Crawford copied Jennifer
Shopkorn of the Census Bureau and Christopher Lewitzke, a Census Bureau contractor, on the
email.  *Id.*

482.   Crawford "flag[ged]" these posts for Facebook "[b]ecause we had had
conversations with Facebook about ways that we could address misinformation, and … one
suggestion … that came up in that conversation was to let them know if we were seeing major
themes that CDC had scientific information on, or had web content that would address."  Crawford
Dep. 87:15-21.

483.   When Crawford would "flag" such content for Facebook and other platforms, she
knew that they would evaluate and possibly censor the content under the content-moderation
policies: "I do know that the platforms have a variety of ways to address misinformation. They
might tag it as something that people should look more into.  I think … that they have the ability
to control how often some of these things show up in peoples' feeds. And I do know that removing
them is an option that they could consider."  *Id.* 88:7-14.

484.   CDC's "goal" in flagging misinformation for possible removal from Facebook "is
to be sure that people have credible health information so that they can make the correct health
decisions…. There were a lot of things circulating that were not accurate information about

COVID. And so we were trying to point out and make the credible information more available to users." *Id.* 88:25-89:6.

485.    CDC and Census used "the social [media] listening tools," such as CrowdTangle, to identify misinformation that was "flagged" to Facebook for possible censorship. *Id.* 90:18-23. Regarding the table of 16 posts she "flagged" in her May 6, 2021 email, she stated, "these probably came from the social listening tools … that can consolidate examples.  And we provided some examples of what we meant." *Id.* 90:18-23.

486.    On May 10, 2021, Crawford emailed Facebook with the subject line, "COVID BOLO Misinformation meetings."  Crawford Ex. 40, at 3.  She wrote: "We would like to establish COVID BOLO meetings on misinformation and invite all platforms to join the meetings.  We are aiming for our first one on Friday at noon. … Are there direct POCs on your end I should include on the invite?  Happy to chat if better.  THANKS!"  *Id.*

487.    On May 18, 2021, Facebook emailed Crawford noting that a Facebook official "has an agenda item" for the "CDC call this week."  Crawford Ex. 11, at 2.  This official, according to Crawford, is a member of Facebook's "Trust and Safety team, or the Misinformation team."  Crawford Dep. 103:9.

488.    The Facebook official noted that Facebook's "Content Policies … determine what we may remove or reduce and inform."  Crawford Ex. 11, at 2.  She noted that "we currently remove false claims about face masks," and wanted to discuss "whether there is still a high risk of harm from mask misinformation," as well as "false claims about the efficacy of social distancing or the existence of COVID-19."  *Id.*

489.    Crawford admits that the CDC provided "scientific information" that Facebook would use to decide whether to "remove" or "reduce and inform," *id.*, content under its policies:

"What we did provide was scientific information that I did assume that they might use to do those things," *i.e.*, "remove or reduce and inform." Crawford Dep. 105:17-19.

490.    The next day, May 19, 2021, Facebook emailed Crawford and noted that, for the weekly call that week, "here are some of the COVID content items that [Facebook's content-moderation official] will be flagging for you/CDC team." Crawford Ex. 11, at 1. She then provided a list of twelve specific claims, including such claims as "COVID-19 has a 99.96% survival rate," "COVID-19 vaccines cause bell's palsy," and "[p]eople who are receiving COVID-19 vaccines are subject to medical experiments." Crawford Ex. 11, at 1-2.

491.    Facebook raised these twelve claims to get CDC's guidance on whether they violated Facebook's policies: "They were wanting our feedback on whether these things were true or false statements that they were seeing. Did the CDC have science around this, did we have content on our website." Crawford Dep. 106:10-13. CDC would respond to debunk such claims if it had information: "[I]f we knew, if we had something or we had science on these items, we would point to it or provide them an answer." *Id.* 106:19-21.

492.    In response, Crawford indicated that "Census team members" would join the call, and that she might not be able to address or debunk all 12 claims on the call, because "[t]here may be some facts we have to get back to the group on after the meeting." Crawford Ex. 11, at 1.

493.    On the call referred to in the email, CDC discussed with Facebook these twelve claims and who at CDC might be able to address their veracity. Crawford Dep. 106:23-107-3.

494.    According to Crawford, "Sometimes in these meetings they would ask do we know if this is true or false, which is what they were doing [in Exhibit 11]. And then if we knew, the communicators knew the answer, we would provide it. If not, I would say, we would say, I'll have to get back to you later, we'll talk to our SMEs," *i.e.* subject-matter experts. *Id.* 116:7-12.

495.     Census Bureau officials would follow up to monitor whether Facebook was actually removing the content that federal officials had flagged as misinformation: "Census was at least periodically checking on things that they had flagged, or they had seen come up." *Id.* 117:19-21.

496.     After the meeting, on May 24, Facebook's content-moderation official emailed Crawford, stating, "Thanks so much again for you and team's help in debunking a few COVID-19 and vaccine misinformation claims for us." Crawford Ex. 15, at 2.  She then provided a list of the twelve claims with CDC's input on each, noting "Debunked" for each claim that the CDC had debunked in the meeting. *Id.* at 2-3.  Among other things, she noted that CDC "[d]ebunked" claims like "Face masks contain … harmful particles," and even plainly evaluative statements like "People who are receiving COVID-19 vaccines are subject to medical experiments." *Id.* at 2-3.

497.     On June 2, 2021, Crawford emailed the Facebook content-moderation official back with further input on the claims from CDC's subject-matter experts.  Crawford Ex. 16, at 2.  She noted several times that CDC's "web content to debunk is in clearance," meaning that CDC was preparing web content that would debunk those claims.  *Id.*

498.     The next day, on June 3, 2021, the Facebook content-moderation official emailed Crawford to clarify that "web content to debunk is in clearance" means that "we should consider these debunked by the CDC now," and Crawford answered that "Yes they are debunked and we will also have content on it soon."  Crawford Ex. 16, at 1.  As Crawford stated, "We reported to Facebook that they were debunked at this time."  Crawford Dep. 135:2-3.

499.     Crawford knew that Facebook would apply its content-moderation policies to claims that the CDC debunked: "I knew that they had options … which is to inform people, to maybe reduce it in the algorithm, or to remove it…. [T]hey probably had other options, but I knew of at least those." *Id.* 138:18-22.

500.    On July 26, 2021, the same Facebook content-moderation official emailed Crawford, asking for CDC to debunk three more COVID-related claims.  The subject line of the email was, "FB Misinformation Claims Help Debuning."  Crawford Ex. 17, at 1.  Crawford understood that "Debuning" was "Debunking" misspelled.  Crawford Dep. 139:1-2.

501.    In this email, Facebook's content moderator wrote to Crawford: "Our Misinformation Policy Team has identified some claims that we were hoping your team could **help us understand if they are false and can lead to harm**?"  Crawford Ex. 17, at 1 (bold in original).

502.    Facebook's content-moderation policy called for it to remove claims that are false and can lead to harm.  *See, e.g.,* Crawford Ex. 26, at 4 (Facebook's content-moderation official, Liz Lagone, noting that "We remove … posts on the grounds that the claim is false and that it is harmful," where "harmful" includes cases where "if people believed it, it might make them less likely to get vaccinated.").  So it was clear that Facebook's "Misinformation Policy Team" was asking CDC to advise whether these claims should be removed under Facebook's content-moderation policy.  Crawford admits that she understood that CDC's guidance would "benefit" Facebook's expansion and application of its censorship "policy" to these claims, acknowledging that Facebook was asking her about these claims "[b]ecause CDC would have credible health information about the claims or scientific information that would benefit their policy making."  Crawford Dep. 140:1-3.

503.    The three claims included: "Spike protein in COVID-19 vaccines is dangerous/cytotoxic," "Guillain-Barre Syndrome (GBS) is a possible side effect of the COVID vaccine," and "Heart inflammation is a possible side effect of all COVID-19 vaccines."  Crawford Ex. 17, at 1.

504.    Facebook also asked Crawford if "your team was aware of any global source of truth/database for vaccine adverse effects including possibly vaccine-related deaths." Crawford Ex. 17, at 1.

505.    Crawford responded, "Got it, let me get back to you shortly and thank you much for asking!" Crawford Ex. 17, at 1.

506.    Crawford does not recall her specific response to this inquiry, but she admits that "generally" she referred them to the CDC's subject-matter experts and responded to Facebook with the CDC's view on the scientific questions, as she did with similar requests. Crawford Dep. 140:16-141:4.

507.    On July 20, 2021, Facebook emailed Crawford another biweekly "CrowdTangle content insights report" on COVID-19. Crawford Ex. 18, at 1. One of the misinformation-trending topics that Facebook flagged in bold in the email was "**Door-to-Door Vaccines**," which stated that "The highest interaction Page posts for this topic convey concern from political opponents about the Biden Administration's strategy to ramp up vaccination efforts in communities with low vaccination rates by going 'door-to-door' to educate and encourage more Americans to get vaccinated." *Id.* The same topic, in the same time frame, was emphasized in the Virality Project report as a prime example of viral vaccine-related "misinformation," when in fact it involved only expressions of political opinion. Scully Ex. 2, at 39, 54-55.

508.    The same email also noted posts "expressing skepticism about vaccinating children." Crawford Ex. 18, at 1. Earlier CrowdTangle reports in the same email chain had flagged for the CDC highly engaged content about "**Vaccine Side Effects** ... especially for children and pregnant women," "**Vaccine Refusal**," and "**Vaccination Lawsuits** ... lawsuits over compulsory vaccination related to employment." *Id.* at 2-3 (bold in original).

128

509.    Facebook noted that the CrowdTangle reports were confidential and not to be disclosed further: "As always, please do not share." *Id.* at 1.

510.    Facebook continued to send biweekly CrowdTangle reports, which flagged in bold high-engagement topics such as "**Proof of Vaccination Requirement**," "**COVID-19 and Unvaccinated Individuals**" (addressing "concerns that the recent uptick in hospitalizations and deaths is being driven up by unvaccinated individuals"), and "**COVID-19 Mandates**," as well as "allowing people to return to … religious services." Crawford Ex. 19, at 1-3 (bolds in original).

511.    On August 19, 2021, Facebook asked Crawford for a "VAERS Policy Consultation" meeting for the CDC to give Facebook guidance on how to address VAERS-related misinformation: "Our Health Policy folks would like to meet with your VAERS experts for a consultation meeting regarding VAERS and misinformation." Crawford Ex. 20, at 1. Crawford responded, "I'm sure we can do this, and I'm glad you're asking." Crawford Ex. 20, at 1.

512.    "VAERS" is the HHS's Vaccine Adverse Event Reporting System, *see* https://vaers.hhs.gov/. At that time, the CDC was greatly concerned about VAERS-related "misinformation" on social-media, because users cited and discussed VAERS data and reports to raise concerns about the safety of vaccines in ways that the CDC thought misleading, as Crawford recounted: "the topic of VAERS was an area that was widely discussed on social media, and there was a lot of areas of confusion about what VAERS data was. There was myths about VAERS data, and there was misinformation about VAERS data. So it was always one of the things that rose to the top in terms of volume of discussion of people were very confused about VAERS." Crawford Dep. 150:21-151:3. So it is not surprising that Crawford was "glad" Facebook was "asking" for a meeting in which the CDC would give Facebook guidance on how to censor "misinformation" about VAERS. Crawford Ex. 20, at 1.

513.    Crawford also followed up with Facebook by providing written CDC-provided materials for Facebook to use in addressing VAERS-related "misinformation" on its platforms: "If of use, we just published a new video and I've attached some recent talking points that may also inform your efforts."  Crawford Ex. 20, at 1.  Plainly, the "efforts" Crawford wished to "inform" were Facebook's efforts to remove VAERS-related "misinformation" from its platforms.

514.    The CDC also had a meeting with Facebook about VAERS-related misinformation: "We did have a session with the VAERS experts with Facebook."  Crawford Dep. 151:8-9.  In the meeting, the CDC had "two experts for VAERS and a couple of their communication experts on the line with Facebook's team," which consisted of "their misinformation and policy type team" that the content-moderation official "was part of."  *Id.* 151:20-24.  In the meeting, the CDC "offered the [subject-matter expert] just to answer their questions about what VAERS was and what it wasn't.  And my recollection is [Facebook] asked a lot of questions like ... who can report something on VAERS and things like that during the session."  *Id.* 152:1-6.

515.    On September 1, 2021, Crawford emailed Facebook and stated: "BOLO for a small but growing area of misinfo.  One of our lab alerts ... was misinterpreted and was shared via social media." Crawford Ex. 21, at 1.  ("BOLO" stands for "Be on the lookout."  Crawford Dep. 153:21.).  She explained what the CDC viewed was misinformation, and then stated, "I've attached some example Facebook posts and another document with the facts around the issue."   Crawford Ex. 21, at 1.

516.    Plainly, Crawford was flagging these posts and related posts for possible censorship under Facebook's content-moderation policy.  She admits that the CDC's "BOLO" alerts were provided to "assist" the platforms with their enforcement decisions under their policies: "Similar to all the other BOLOs, we still thought it was good to point out if we had facts around something

that was widely circulating as a cause of misinformation to the platforms to assist them in whatever they were going to do with their policy or not do." Crawford Dep. 153:23-154:3.

517.    When asked what she "expected [Facebook] to do once they were on the lookout" for the supposed misinformation that the CDC had flagged, Crawford responded: "I knew that they had various options. They could have just used it to inform people. They could have considered it in their algorithm, I believe. I did understand that potentially removing posts was something that they might do." Crawford Dep. 155:15-20.  So she provided the information knowing it would happen and wanting it to happen.

518.    On November 2, 2021, Facebook's content-moderation official sent Crawford and other CDC officials an email stating, "thanks so much for confirming the ability for the claims in question last week having the risk of causing vaccine refusals."  Crawford Ex. 22, at 1.  Again, that is one of the criteria Facebook used to justify removal of content from its platforms.  Crawford Ex. 26, at 4 ("We remove … posts on the grounds that the claim is false and that it is harmful because if people believed it, it might make them less likely to get vaccinated.").  The content-moderation official also stated, "thank you all so much for your input over the last week on our many questions about vaccine misinformation relative to the EUA."  Crawford Ex. 22, at 1. ("EUA" refers to the FDA's "emergency use authorization to the Pfizer vaccine for children." *Id.*)

519.    The content-moderation official also stated: "I wanted to share that as a result of our work together, when the FDA gave emergency use authorization to the Pfizer vaccine for children last week, we immediately updated our policies globally to remove additional false claims about the COVID-19 vaccine for children (e.g. 'the COVID vaccine is not safe for kids')." Crawford Ex. 22, at 1.  She also noted, "We also launched a new feature on Instagram, where accounts that repeatedly post content that violates our policies on COVID-19 or vaccine

misinformation may now lose the ability to be tagged or mentioned or may see pop-ups asking if they'd like to delete certain posts that may violate our policies." Crawford Ex. 22, at 1. Thus, Facebook noted that, "as a result of our work together" with the CDC, Facebook had updated its content-moderation policies to increase censorship of vaccine-related claims in significant ways. *Id.*

520.    The content-moderation official went on to ask the CDC to debunk additional claims: "**we have identified a number of additional claims we would like to get your team's assessment on … <u>Would it at all be possible to get input by Monday, November 8th?</u>**" Crawford Ex. 22, at 1 (bold and underline in original). She requested, "For each of the following new claims, which we've recently identified on the platform, **can you please tell us if: 1. The claim is false; and 2. If believed, could this contribute to vaccine refusals?**" *Id.* (bold in original). Again, these are the two precise criteria that Facebook relied on to remove content from its platforms. Crawford Ex. 26, at 4 ("We remove … posts on the grounds that the claim is false and that it is harmful because if people believed it, it might make them less likely to get vaccinated."). She then included a new list of ten specific claims about the COVID-19 vaccines for the CDC to debunk. Crawford Ex. 22, at 1-2.

521.    Crawford understood, again, that this request was made to "inform their policies," *i.e.*, inform Facebook's application of its content-moderation policies to these claims: "It was still my interpretation that she was asking to inform their policies." Crawford Dep. 159:7-8.

522.    Crawford also admits that she was "happy" when the CDC's information to Facebook caused "less spread of misinformation" on Facebook and other platforms, *i.e.*, that she desired that outcome: "I'm happy that providing the scientific information led to less spread of misinformation." *Id.* 161:23-25.

523.    Crawford also understood that Facebook was, in fact, removing content from its platforms based on the CDC's information: "I understand that she's removing claims … that are not scientifically accurate." *Id.* 162:21-22.

524.    Crawford responded to Facebook, "Thank you so much for the feedback on what you've been able to do.  This is very good to know."  Crawford Ex. 22, at 1.  She also stated, regarding Facebook's request that the CDC debunk the ten new claims, that "I'm going to work on this one …. I hope we can do it by Monday, I will keep you posted."  *Id.*

525.    The following Monday, November 8, 2021, Crawford followed up with a response from the CDC addressing seven of the ten claims Facebook had asked CDC to evaluate.  Crawford Ex. 23, at 1-2.  The CDC rated six of the seven claims "**False**."  *Id.* (bold in original).  Crawford also noted in the response email, without citing any support, that "It appears that any of these could potentially cause vaccine refusal."  Crawford Ex. 23, at 1. Under Facebook's policies, a claim that is both false and could contribute to vaccine refusal was subject to removal.  Crawford Ex. 26, at 4 ("We remove … posts on the grounds that the claim is false and that it is harmful because if people believed it, it might make them less likely to get vaccinated.").

526.    On February 3, 2022, Facebook's content-moderation official sent Crawford another email, stating that she "wanted to **share updates we made as a result of our work together**" and "**ask for your assessment on a few things**."  Crawford Ex. 26, at 1 (bold in original). She described the "updates" as follows: "On February 2nd, we launched several updates to our COVID-19 Misinformation and Harm Policy based on your [*i.e.* CDC's] inputs."  *Id.*  These "updates" included "[r]emoving claims that COVID-19 vaccines cause heart attacks," and "[t]aking steps to reduce the distribution of content that our systems predict likely violates our COVID-19 and vaccine misinformation policies, but has not yet been reviewed by a human; if at

133

any point this content is confirmed to violate the policy then it will be removed from the platform."
Crawford Ex. 26, at 1.  Crawford responded, "the update is very helpful, thank you for including
that!" *Id.*

527.    Facebook's content-moderation official also included, under the heading "**<u>NEW:</u>**
**<u>For CDC Input</u>**," another request that "For each of the following new claims, **can you please tell**
**us if: 1. The claim is false; and 2. If believed, could this claim contribute to vaccine refusals**?"
Crawford Ex. 26, at 1 (bold and underline in original).  She then provided a long, detailed list of
claims and sub-claims about COVID-19 for CDC's input.  *Id.* at 2-4.

528.    Among other things, Facebook asked the CDC to pre-refute claims based on events
that had not occurred yet.  Facebook asked Crawford to address "How FDA EUA authorization
for children under 5 might impact our policies."  Crawford Ex. 26, at 1.  Facebook noted, "We
understand that the FDA is considering giving emergency use authorization for the COVID-19
vaccine for children under five in the coming weeks.  We are considering how our existing policies
on COVID-19 vaccines … should apply to claims about children 6 months to 4 years once the
vaccine is approved for use.  Can you please assess for each claim whether it is false for children
in this age range and if believed, likely to contribute to vaccine hesitancy or refusals?  *Please let*
*us know if it is easiest to set up a time to meet and discuss each one.*"  Crawford Ex. 26, at 2 (italics
in original).  There followed a long, detailed list of claims about the vaccines, for which Facebook
sought CDC's input on their falsity as to children under 5.  *Id.* at 2-3.

529.    For this long list of claims, Crawford understood that Facebook would use the
CDC's input to "determine" Facebook's censorship policy for such claims: "I know that they're
using our scientific information to determine their policy."  Crawford Dep. 170:19-20.

530.    Regarding Facebook's request for CDC's input on these many new claims, Crawford responded, "I will talk to the Vaccine program and see what we can do."  Crawford Ex. 27, at 1.  The next day, February 4, 2022, she followed up, stating, "I'm heading out today but do you have a minute to discuss this by chance?  Call anytime," and provided her phone number. Crawford Ex. 27, at 1.  Crawford also changed the subject line of the email to state, "Have 5 minutes to chat? [re]: Vaccine Misinformation Questions for CDC."  *Id.*

**C.    CDC's and Census's Pressure and Collusion with Google/YouTube.**

531.     On March 18, 2021, Crawford emailed contacts at Google, stating: "As I believe we discussed previously, CDC is now working with Census to leverage some of their infrastructure to help identify and address COVID vaccine mis-info."  Crawford Ex. 28, at 1.  She went on, "As I understand it from the Census team … when they were doing this for the Census project last year, they meet regularly with a Google/YouTube Trust team."  *Id.*  A "Trust team" is a content-moderation team.  Crawford then asked, "Is it possible for us to start up regular meetings on this topic or maybe use our existing meeting time."  *Id.*  The subject line of this email was "COVID Misinfo Project."  *Id.*  Google and Crawford then set up a time to talk and discuss the project.  *Id.*

532.    Crawford states that this email refers to "the work of the IAA with Census to help consult and work with us on the COVID misinformation…"  Crawford Dep. 175:6-8.  Her reference to Census's infrastructure referred to "the fact that Christopher [Lewitzke, the Census contractor] ran those reports and looked for misinformation on those areas for us."  *Id.* 175:11-13.

533.    Crawford's reference to Census's previous project referred to their work on combating misinformation about the 2020 Census.  *Id.* 175:18-19.

534.     Crawford does not remember the specific call referenced in this email, but she admits that, "This was in 2021.  So we had been meeting pretty regularly with Google by this time." *Id.* 179:5-6.

535.     On March 23, 2021, Crawford sent a calendar invite for a meeting on March 24 that included herself and five other CDC employees, four Census Bureau employees and contractors (including Zachary Schwartz, Christopher Lewitzke, and Jennifer Shopkorn), and six Google/YouTube officials.  Jones Decl., Ex. T, at 1-2.  The subject of the meeting was "COVID Misinformation: CDC/Census/Google." *Id.* at 1.  The invite stated: "CDC/Census to meet with Google regarding our misinformation efforts." *Id.*

536.     At the meeting, CDC and Census presented a slide deck similar to the one that Census prepared for the meeting with Facebook on March 25, 2021, discussed above. *See id.* 3-16.  The slide deck was entitled, "COVID Vaccine Misinformation: Issue Overview." *Id.* at 3.  As with the Facebook slide decks, this one stated of "Misinformation Topics" that "[t]hese topics were selected due to high volume, continued public discussion, and high-profile coverage." *Id.* at 4.  It noted that these topics included "infertility, misinformation about side effects, and claims of vaccines leading to deaths." *Id.*

537.     For each topic, the slide deck included a description of a common claim, specific examples of videos on YouTube and social-media postings making the disfavored claim, and a putative refutation by the CDC. *Id.* at 6-14.  For infertility, the slide deck stated that "[c]ommon claims about the COVID vaccine's side effects include that it causes infertility in women and men, miscarriages, and stillbirth," and it provide screen shots of specific videos on YouTube and social-media posts making this claim. *Id.* at 6-8.  The deck asserted that "[a]ccording to CDC there is no evidence that fertility problems are a side effect of any vaccine, including COVID-19 vaccines."

*Id.* at 6.  Regarding supposed misinformation about side effects, the deck stated, "speculation and misinformation about side effects after taking the COVID vaccine have been prevalent on social media since the first vaccines were approved," and it provided screen shots of an example video on YouTube and social-media posts making such claims, along with a putative refutation by the CDC.  *Id.* at 9-11.  Regarding the topic "Death from Vaccines," the slide deck stated that "[v]accine-hesitant groups spreading misinformation and conspiracy theories about alleged vaccine-related deaths erode trust in the COVID-19 vaccine and the public health system," and it provided a sample video on YouTube and social-media posts linking the vaccines to deaths, along with a putative refutation by the CDC: "According to CDC, VAERS has not detected patterns in cause of death that would indicate a safety problem with COVID-19 vaccines."  *Id.* at 12-14.  As with the similar Facebook slide deck, the evident purpose of this presentation was to induce YouTube to censor these claims on its platform.

538.    On March 25, 2021, Kate Galatas of the CDC emailed the group attending the meeting and stated: "Many thanks, again, for the time yesterday.  This is such important shared work we are doing in the mis/dis information space, and we deeply appreciate your contributions.  Please find attached the slide deck referenced during the meeting, and we ask that you treat it close hold and not for further distribution.  We are looking forward to our future collaboration efforts!"  *Id.* at 1.

539.    On March 29, 2021, Crawford followed up with Google, inquiring "Are you all open to using our regular 4pm meetings to go over things with Census or what is preferred?"  Crawford Ex. 29, at 2.  Google responded: "We would like to follow up on our discussion with your colleague, Cynthia, on vaccine information a few months ago.  Specifically, we plan to share a new list of common vaccine misinformation claims and would love it if Cynthia or other vaccine

experts could join." *Id.* He also stated that "we can save a few minutes … to discuss potential next steps regarding the Census…" *Id.* The subject line of this email was "Follow up on mis-info conversation." *Id.*

540. Crawford recalls that Census was asking for regular meetings with platforms specifically focused on misinformation: the statement "is in reference to discussing how to engage on an ongoing basis about misinformation and the Census suggestion that we have regular meetings with them just on that topic." Crawford Dep. 184:14-18. The exchange was "about how to engage more regularly about misinformation, or … whatever Census had done with Google and YouTube, should we have a similar structure with CDC." *Id.* 185:11-14.

541. Regarding the request for input on the "new list of common vaccine misinformation claims," Crawford responded, "I've arranged for a few SMEs [subject-matter experts] to join the call, including Cynthia." Crawford Ex. 29, at 2.

542. A few days later, on April 2, 2021, Google emailed Crawford stating, "Thanks again for your time this week. Attached are some of the claims we discussed for your reference." Crawford Ex. 29, at 1.

543. Crawford's reference to the "4pm meeting" refers to a regular biweekly meeting with Google, which still continues to the present day: "I still have a 4:00 p.m. meeting every other Monday with Google." Crawford Dep. 180:6-7.

544. Crawford also has "similar regular meetings with … Meta and Twitter." *Id.* 180:11-16. She admits that she has ongoing meetings with Google and Facebook/Meta that continue to the present: "we had regular meetings with Google, and we had regular meetings with Meta…. you know, the frequency changed…. I mean, Google we meet every other week. Right now with Meta it's more ad hoc." *Id.* 180:16-21.

545.     Crawford also "had a regular meeting with Pinterest for a short period of time, and we had … just more ad hoc meetings on occasion with Twitter." *Id.* 180:23-181:1.

546.     Crawford states that these meetings "were mostly about things other than misinformation; though misinformation was discussed in the meetings." *Id.* 181:22-24.

547.     On April 12, 2021, Google/YouTube followed up with an email to Crawford, stating, "For tomorrow's call, would it be possible to include Cynthia or other COVID-19 treatment SMEs [subject-matter experts] to follow up on some additional questions?"  Crawford Ex. 30, at 1.  Crawford responded, "Can you give me an idea of what topics we'll be covering?  But yes, I'll ask them to attend." *Id.*

548.     Crawford notes that it "wasn't uncommon" for Google/YouTube to ask her to bring subject-matter experts to meetings to go over such topics.  Crawford Dep. 188:19-22.

549.     On May 10, 2021, Crawford emailed her Google contacts and invited them to attend in the BOLO meetings: "We would like to establish COVID BOLO meetings on misinformation and invite all platforms to join the meetings.  We are aiming for our first one on Friday at noon.  We have heard through the grapevine that [an official] at YouTube would want to join.  Are there other POCs on your end I should include on the invite?"  Crawford Ex. 40, at 1.  The subject of the email was "COVID BOLO meetings on misinformation." *Id.*

**D.     CDC's and Census's "BOLO Meetings."**

550.     On May 11, 2021, Crawford followed up with an email stating, "We would like to invite digital platforms to attend a short 'Be On The Lookout' meeting on COVID.  Please let us know if you have questions and feel free to forward this message to anyone in your organization that should attend."  Crawford Ex. 40, at 2.  Google responded by asking that Crawford include

the YouTube official in the meeting, and Crawford noted that she "was going to ask about" him at the 4:00pm recurring meeting.  *Id.*

551.    Crawford testified that she wanted to include YouTube on the BOLO meetings because they hosted the most content: "people from YouTube would occasionally be on our regular meetings, depending on what we talked about. And because YouTube has the most content, like, hosting, … they were a part of the BOLO meetings…"  Crawford  Dep. 244:21-245:1.

552.    The Census officials "were arranging" the BOLO meetings, and "they drafted the slides" for the meetings.  *Id.* 246:12-20.

553.    Crawford ran the BOLO meetings.  *Id.* 265:13.  She "opened up the meeting, introduced myself, gave context for why we were doing the BOLO meeting in brief. And then I believe that Christopher [Lewitzke] went through the slide decks, and I occasionally piped in on them."  *Id.* 265:15-19.

554.    The "slide decks" shown at the meetings were "similar to the table" of 16 Facebook posts that Crawford previously emailed to Facebook, but "they were more like this is a theme, and then there'd be maybe a little info about what the theme was and then maybe a couple of example posts. And then there would be a slide maybe with CDC links or information related to that theme." *Id.* 266:1-6.

555.    The first BOLO meeting was held on May 14, 2021.  Jones Decl., Ex. U, at 1.  The slide deck for that meeting was entitled "COVID Vaccine Misinformation: Hot Topics."  *Id.* at 2-10.  It contained a list of five "Hot Topics" with an "ADVISORY" in red noting that platforms should "**Be On the Lookout**" for "**Potential Misinformation**" on each topic, and provided specific examples of social-media posts for each topic, "Associated Link(s) and Hashtag(s)" for each topic, and the CDC's position on each topic (listed as "**The Facts**").  *Id.* at 4-8.

556.    Crawford also emailed similar slide decks for BOLO meetings scheduled for May 28 and June 18, 2021, though the latter was canceled due to the new Juneteenth holiday.   Jones Decl., Exs. V and W.  In the cover email to the May 28 slides, Crawford requested secrecy: "Please do not share outside your trust and safety teams."  Jones Decl., Ex. V, at 1.  Just like the May 14 BOLO slides, these slides contained lists of "Hot Topics" with an "ADVISORY" in red noting that platforms should "**Be On the Lookout**" for "**Potential Misinformation**" on each topic, and provided specific examples of social-media posts for each topic, "Associated Link(s) and Hashtag(s)" for each topic, and the CDC's position on each topic (listed as "**The Facts**").  Jones Decl., Ex. V, at 4-6; *id.* Ex. W, at 4-6.

557.    In conducting the BOLO meetings, Crawford described CDC's goal as follows: "our goal is to be sure that credible information about COVID was out there. A lot of people seek information on platforms. We thought that by giving the platform scientific information it might help in our goals to being sure that credible information could be found."  Crawford Dep. 266:16-21.   Of course, the BOLO meetings did not address identifying and promoting "credible information," but flagging information that the CDC thinks is *not* credible for potential removal. Crawford effectively admits this; when asked if CDC's goal includes that "incredible information would not be found," she agreed that "I did want the credible information to be found in advance of the uncredible information."  *Id.* 266:22-267:4.

558.    Crawford believes that the third BOLO meeting was cancelled because Juneteenth was declared a new federal holiday, and "that is why we didn't end up having it and we sent the materials out via email."  *Id.* 248:17-22.

559.    On October 28, 2021, Google emailed Crawford stating, "do you have time to connect early next week on anticipated guidance on vaccines for [children ages] 5-11?  It would

be great to connect as the CDC plans communications on authoritative information for pediatric

vaccines." Crawford Ex. 42, at 2.

560.    Crawford responded: "Yes, we can discuss pediatric vaccines early next week but

let me give you some general info: ACIP is likely to vote on this on Nov 2.  CDC is likely to start

posting final information on Nov 3 (possibly late Nov 2), if that helps to know.  There will be

many updates so the changes might span over a few days.  We are also looking ahead and

misinformation and hope to have a BOLO type meeting later that week with platforms that are

interested."  Crawford Ex. 42, at 1.  ("ACIP" is the "Advisory Council for Immunization

Practices."  253:21-22.)

561.    On June 29, 2022, Google/YouTube emailed Crawford and her deputy, stating:

"The YouTube Policy team is requesting evidence-based input on the claims below.  In the past,

the CDC has reviewed COVID information claims and commented TRUE or FALSE + add any

additional context needed."  Crawford Ex. 43, at 1.  YouTube then presented two claims, relating

to the safety and effectiveness of administering progesterone to reverse chemical abortion.  *Id.*

("**CLAIM**: High doses of progesterone is a **safe** method of reversing chemical abortion …

**CLAIM**: High doses of progesterone is an **effective** method of reversing chemical abortion….")

(bold in original).  Crawford responded, "I'll check on this but I think I'll probably end up needing

to refer you to another agency.  I'll get back to you."  *Id.*

562.    Regarding this exchange, Crawford notes that the CDC's "focus is not solely on

COVID.  We're focusing on other topics.  I think [YouTube] thought that we might be able to help

with this topic as well."  Crawford Dep. 256:5-8.  Thus, Crawford admits that the CDC is

continuing to engage with social-media platforms to provide information that will lead to the

censorship of health-related claims on social media, and that it is willing to expand its focus to other health topics beyond COVID-19.

**E. CDC's and Census's Pressure and Collusion with Twitter.**

563.    On April 8, 2021, Twitter emailed Crawford stating, "I'm looking forward to setting up regular chats; my team has asked for examples of problematic content so we can examine trends.  All examples of misinformation are helpful…."  Crawford Ex. 32, at 1.  The subject line of this email was "Request for problem accounts."  *Id.*  Crawford responded, "Yes, we'll get that to you early next week."  *Id.*

564.    Crawford believes that Twitter sent this email in response to her inquiry, "Is there a good way that we should start engaging on misinformation?"  197:19-20.

565.    Crawford responded on April 14, 2021, "The Census team put this spreadsheet together with four example areas," which included the topics, "Vaccines aren't FDA approved," "Fraudulent cures," "VAERS data taken out of context," and "Infertility."  Crawford Ex. 33, at 1.  The attachment was called, "Twitter CDC Examples 4-13-21.xlsx."  *Id.*  The spreadsheet contained a "list [of] things that [Census] saw that were being stated as misinformation."  Crawford Dep. 203:24-204:1.  "Infertility" referred to "people claiming that getting the vaccines led to infertility."  *Id.* 204:17-18.

566.    Crawford believes that Twitter "was asking for these examples in this email because he was wondering … what would come up in BOLO meetings, or what we would be discussing."  *Id.* 204:22-24.

567.    On May 10, 2021, Crawford emailed Twitter, stating "We wanted to point out two issues we are seeing a great deal of misinfo about…."  Crawford Ex. 34, at 4.  She then provided

a list of "sample posts" that included 12 Tweets reproduced verbatim. She stated, "Our census team is copied here, has much more info on it if needed." *Id.*

568.    In the same email on May 10, 2021, Crawford wrote, "Also, we are standing up a BOLO COVID misinformation meeting and inviting all tech platforms. We are shooting for 12pm EST on Friday for our first meeting. I'll include you on the invite…." Crawford Ex. 34, at 4.

569.    Crawford agrees that she was "sending this to [Twitter] so that he would be on the lookout for those things appearing on Twitter." Crawford Dep. 208:25-209:3.

570.    Crawford notes that "the BOLO format … was used previously," *id.* 209:12-13, because Census had done "BOLO meetings … for their own work," *id.* 209:23-24. The platforms had done BOLO meetings for Census "in relation to the 2020 census." *Id.* 210:5-9.

571.    Regarding the BOLO meetings, Census officials "explained" to Crawford "how they did it." *Id.* 210: 16. "In fact, they drafted the slide deck" for the CDC BOLO meetings with social-media platforms. *Id.* 210:16-17. Census "drafted it and showed me how they thought that we should do it, and that … we would give examples, we would give the science, and then … people could follow up separately." *Id.* 210:18-22.

572.    Crawford believes that regular meetings with Twitter were not set up, but that "I know they participated in the BOLO meetings." *Id.* 198:15-16.

573.    Regarding the BOLO meetings, Crawford remembers that two occurred and a third one was scheduled but cancelled due to a holiday, and "in lieu of a meeting" she sent "a Powerpoint." *Id.* 198:24-199:1.

574.    Twitter responded to Crawford's May 10, 2021 email flagging 12 specific Twitter posts as examples of trending misinformation, stating: "Thanks for sharing this – agree these are important trends to note; a quick scan shows that at least some of these have been previously

reviewed and actioned." Crawford Ex. 34, at 3. He then stated: "I will now ask the team to review the others." *Id.*

575. Crawford understood that "asking the team to review the others" meant referring Crawford's flagged posts and issues to Twitter's content-moderation team for possible censorship: "I interpreted it as Twitter made decisions about the areas of misinformation based on whatever policy they had." Crawford Dep. 211:17-19.

576. As with Facebook, Crawford understood that her flagging of posts would result in Twitter censoring at least some of these materials in different ways, including removing posts: "similar to Meta that they probably had multiple options. I am sure some were removed. I am sure some … were flagged. I see flags all the time on the Twitter posts. I am sure some were just maybe … maybe they weren't distributed as much on peoples' feeds." *Id.* 212:10-16.

577. In the same email, Twitter offered to enroll CDC officials in its "Partner Support Portal" to provide expedited review of content flagged for censorship: "Carol, remind me: did you have a chance to enroll in our Partner Support Portal? In the future, that's the best way to get a spreadsheet like this reviewed." Crawford Ex. 34, at 3.

578. Crawford understood that Twitter's Partner Support Portal was "similar to what I described for Meta. It's an offering where you log in and you can report misinformation or threats or problematic posted content in this portal, and it puts it in a system for review." Crawford Dep. 212:3-7.

579. On May 10, 2021, Twitter noted to Crawford, "I'd be glad to enroll you in our Partner Support Portal, which allows you a special, expedited reporting flow in the Twitter Help Center. It worked very well with Census colleagues last year." Crawford Ex. 34, at 3.

580.     Crawford responded by asking for instructions on how to enroll in the Partner Support Portal, and Twitter offered to enroll any Twitter accounts she identified.  Crawford Ex. 34, at 3.  Crawford provided her personal Twitter account to enroll.  *Id.*

581.     Then, on May 24, Census Bureau contractor Christopher Lewitzke followed on the same email chain with Twitter, asking about "the partner support portal enrollment for CDC." Crawford Ex. 34, at 2.  Lewitzke indicated that they planned to report COVID misinformation to Twitter using existing Census accounts already enrolled in the portal, not CDC accounts, stating: "would there be any issues or complications stemming from flagging COVID misinformation on the portal using the existing census.gov accounts that have access?  We'll want to have at least some CDC accounts whitelisted, but that backup may be helpful short-term."  *Id.*  He then stated: "Let us know any next steps we can take to make sure CDC is all set with the portal."  *Id.*

582.     Crawford confirms that Census had used similar portals to report misinformation to platforms in the past: "I did know from discussions with them that one technique I think that they used was using portals … for their work to report [mis]information."  Crawford Dep. 213:16-19.

583.     Twitter emailed Crawford on May 27, 2021, noting that she should be fully enrolled.  Crawford Ex. 34, at 1.  A screen shot of the portal proclaims, in very large, bolded type, "**Report any issue to get priority service**."  *Id.* (bold in original, font greatly reduced).

584.     Crawford believes that she attempted to use Twitter's Partner Support Portal "every now and then," but that she never solved technical issues that prevented her from reporting anything.  Crawford Dep. 215:9-22.

585.     Christopher Lewitzke is "a Census contractor."  *Id.* 217:5-6.

586.　　On September 2, 2021, Crawford emailed Twitter, stating, "A quick BOLO for a small but growing area of misinfo."  Crawford Ex. 35, at 1.  To Twitter, she claimed that "one of our Lab alerts … was misinterpreted and was shared via social media."  Crawford Ex. 35, at 1.  She stated, "I've attached some example Twitter posts and another document with the facts around the issue."  *Id.*  The subject line of the email was "BOLO: CDC lab alert & misinformation."  *Id.*

587.　　This report was very similar to the report Crawford provided Facebook the day before, September 1, 2021.  Crawford Ex. 21, at 1.  "The only difference is this email is going to Twitter."  Crawford Dep. 220:7-8.

588.　　By sending these emails to Facebook and Twitter flagging what the CDC believed was a misinterpretation of a CDC lab alert on social media, CDC intended to prevent the disfavored message from spreading on social media: "We saw this confusion about this alert brewing and more posts were going up with confusion, and we thought it would be a good idea to provide the platforms with the facts *before it became something bigger*."  *Id.* 220:13-17 (emphasis added).  In other words, CDC wished to cause the disfavored viewpoint to be censored before it could be viewed or repeated by others—a quintessential prior restraint.

589.　　CDC specifically flagged this information to the platforms, knowing that they would evaluate it for potential censorship under their content-moderation policies: Crawford "knew their policy teams or their trust teams or misinfo teams … would evaluate it."  *Id.* 220:21-23.  And Crawford "knew that removal was one of the options that they had, yes."  *Id.* 220:25-221:1.

**F.　　CDC Endorses the States' Theory of Standing.**

590.    Crawford admits that government communicators have a strong interest in tracking what their constituents are saying on social media: "It's helpful for communicators to know what is being discussed because it helps improve our communication materials." *Id.* 53:10-12.

591.    Crawford emphasized this point multiple times: "as I mentioned before, it does help … for communicators to know what conversations occurs on social media because it helps us identify gaps in knowledge, or confusion, or things that we're not communicating effectively that we need to adjust." *Id.* 54:15-20.

592.    CrowdTangle reports "would help us understand what was being discussed on social media about COVID, which helps us look for gaps in information, confusion about facts, things that we might need to adjust our communication materials for." *Id.* 57:24-58:3.

593.    Crawford specifically expressed the concern that, if content was censored or removed from social-media platforms, government communicators would not know what the citizens' true concerns were: She "was wondering if they delete the info will we know those myths or information so we could update communication activity. So if they were deleting content would we know what the themes were." *Id.* 75:14-18.   Thus, Crawford was concerned that, if the platforms "were deleting content," she might not know "what the themes were" of "myths or [mis]information," which would prevent her from "updat[ing the CDC's] communication activity" to address those myths and misinformation. *Id.*   Accordingly, Crawford wanted to know, "would [CDC] be able to see in CrowdTangle or other reports … what kind of themes were removed so we would still have the full picture of areas of confusion." *Id.* 75:21-76:1.

594.    Crawford inquired of Facebook "about the data that we could get so we had a full picture on confusion so that we could adjust communication materials, or ways that we were communicating" about COVID-19. *Id.* 81:10-13.   In other words, Crawford wanted to know about

speech that was censored, as well as speech that was left up, on social-media platforms so CDC could get "a full picture" and "adjust communication materials" to address people's actual concerns. *Id.*

595.    The CDC "did searches in CrowdTangle, the same way we do searches in other social media and listening tools that we have to create, to understand what's being discussed in the environment, to update our communication material." *Id.* 148:11-15.

## V.    Dr. Fauci's Campaigns to Censor Disfavored Viewpoints on Social Media.

596.    Dr. Fauci, cooperating frequently with NIH Director Dr. Francis Collins, engaged in a series of campaigns to discredit and procure the censorship of viewpoints he disfavored on social media, beginning at least in early 2020. Once he became Chief Medical Advisor in the Biden Administration in early 2021, his censorship efforts coordinated with and reinforced those of federal officials in the White House, the Office of the Surgeon General, the CDC, and elsewhere.

597.    Until his recent retirement, Dr. Anthony S. Fauci was the director of the National Institute for Allergy and Infectious Diseases at the National Institutes of Health and the Chief Medical Advisor to President Biden. Fauci Dep. 10:8-16. At the time of his deposition, Dr. Fauci had been the director of NIAID for over 38 years. *Id.* at 10:25-11:1.

### A.    Dr. Fauci's Conspiracy and Campaign to Suppress the Lab-Leak Theory.

598.    First, in early months of 2020, Dr. Fauci worked closely with Dr. Francis Collins and Jeremy Farrar to orchestrate a campaign to discredit and suppress the opinion that SARS-CoV-2, the virus that causes COVID-19, leaked from a laboratory at the Wuhan Institute of Virology—an opinion that has recently been confirmed as likely true. Early in the pandemic, Dr. Fauci was aware that NIAID, under his direction, had funded dangerous gain-of-function research on coronaviruses at that laboratory, and he sought to discredit and suppress the lab-leak theory to

deflect the scandal and blame associated with potential responsibility for the deaths of millions in the ensuing pandemic. He engaged in a campaign of deception to discredit the theory, and as a result of his efforts, the lab-leak theory was heavily censored on social media.

599. On December 30, 2011, Dr. Fauci co-authored an op-ed with Dr. Francis S. Collins in the Washington Post entitled *A Flu Virus Risk Worth Taking*. Fauci Ex. 1, Fauci Dep. 13:13-20.

600. In this op-ed, Dr. Fauci and Dr. Collins advocated for creating potentially dangerous viruses in laboratories, writing that "important information and insights can come from generating a potentially dangerous virus in a laboratory." Fauci Ex. 1, at 1. According to Fauci and Collins, "[u]nderstanding the biology of … virus transmission has implications for outbreak prediction, prevention and treatment," and "[i]dentifying threatening viruses can also facilitate the early stages of manufacturing vaccines that protect against such a virus in advance of an outbreak." *Id.* at 2. They further argued that "identifying the molecular Achilles heel of these viruses can allow scientists to identify novel antiviral drug targets that could be used to prevent infection … or better treat those who become infected." *Id.*

601. Dr. Fauci and Dr. Collins acknowledged the significant risks associated with such research, writing that "[s]afeguarding against the potential accidental release or deliberate misuse of laboratory pathogens is imperative." *Id.* But they believed that those risks were contained, writing that "engineered viruses … are maintained in high-security laboratories." They further state that "scientists, journal editors, and funding agencies involved are working together to ensure that access to specific information that could be used to create dangerous pathogens is limited to those with an established and legitimate need to know." *Id.*

602.    Thus, long before the COVID-19 pandemic, Dr. Fauci and Dr. Collins were highly visible, public advocates for laboratory experiments that involve "generating a potentially dangerous virus in a laboratory." *Id.* at 1.

603.    Such research of "generating a potentially dangerous virus in a laboratory" is commonly called "gain-of-function" research. Dr. Fauci testified that "[g]ain of function is a very potentially misleading terminology, and that was one of the reasons why several years ago outside groups, not the NIH … did away with the terminology 'gain of function' because it can often be very confusing and misleading." Fauci Dep. 16:3-10. But Dr. Fauci confirms that "the NIH" did not "d[o] away" with that terminology, *id.*, and Dr. Fauci's own internal email uses the phrase "SARS Gain of Function" to describe the research on bat coronaviruses that was conducted by Dr. Shi Zhengli and others at the Wuhan Institute of Virology, partly funded by Dr. Fauci's NIAID through the subgrants from the EcoHealth Alliance, discussed below, *see* Fauci Ex. 6, at 8.

604.    On June 1, 2014, Dr. Fauci's NIAID funded a grant to the EcoHealth Alliance for the five-year period June 1, 2014, to May 31, 2019. Fauci Ex. 2, at 2. The title of the project was "Understanding the Risk of Bat Coronavirus Emergence." *Id.* at 1. The project's Abstract stated, "This project will examine the risk of future coronavirus (CoV) emergence from wildlife using in-depth field investigations across the human-wildlife interface in China, molecular characterization of novel CoVs and host receptor binding domain genes, mathematical models of transmission and evolution, and in vitro and in vivo laboratory studies of host range." *Id.*

605.    The Abstract noted that one of the project's "three specific aims" would be to "[t]est predictions of CoV inter-species transmission" by engaging in two forms of research to enhance the bat coronaviruses' transmissibility to humans: "reverse genetics," *i.e.*, genetic manipulation of the viruses to render them more transmissible; and "virus infection experiments"

using "humanized mice," *i.e.*, repeatedly infecting humanized mice with bat coronaviruses to provoke mutations that render them more infectious to human cells (a process known as "serial passage," *see* https://en.wikipedia.org/wiki/Serial_passage). *Id.* at 1. Specifically, the Abstract stated: "Predictive models of host range (i.e.[,] emergence potential) will be tested experimentally using *reverse genetics*, pseudovirus and receptor binding assays, and *virus infection experiments across a range of cell cultures* from different species and humanized mice." *Id.* (emphases added).

606. Dr. Fauci attempted to argue that "reverse genetics" is so vague that it might not refer to gain-of-function research. *See* Fauci Dep. 23:18-20 ("I'm not really quite sure what they're referring to. Reverse genetics can mean many things."). But Dr. Fauci admits that "reverse genetics" means "[m]anipulation of a virus, recombination, things like that." *Id.* at 23:19-21. In 2015, in an article reporting on research performed pursuant to this grant, Dr. Ralph Baric and Dr. Shi Zhengli wrote that they used "reverse genetics" to "generate[] and characterize[] a chimeric virus" that was more infectious and more virulent in humans. Fauci Ex. 4, at 1. Dr. Fauci's own internal email describes that article as addressing "SARS Gain of Function." Fauci Ex. 6, at 8.

607. Dr. Fauci admits that "EcoHealth has a subaward from their original grant that goes to Shi Zhengli at the Wuhan Institute of Virology." Fauci Dep. 36:4-6. He agrees that EcoHealth and Shi Zhengli of the Wuhan Institute of Virology "work together on research that's directly funded by NIAID." Fauci Dep. 36:7-13.

608. Dr. Fauci also attests that Dr. Peter Daszak likely has access to the genetic sequences of chimeric viruses that Shi Zhengli created during her research funded by EcoHealth using NIAID funds: "I don't know absolutely for sure, but I would imagine that if Peter Daszak is collaborating scientifically with Shi Zhengli, that it is likely, given the norms of scientific

collaboration, that he would have access to data," and "they are collaborators, since he has a subaward to the Wuhan Institute that I believe goes to Dr. Shi." Fauci Dep. 37:1-13. Daszak, therefore, is likely in possession of genetic evidence demonstrating whether SARS-CoV-2 originated from NIAID-funded research at the Wuhan Institute of Virology.

609.    Dr. Fauci claimed that he had never seen this grant award before his deposition, and that he was only "vaguely" aware of NIAID's funding of EcoHealth Alliance. *Id.* at 18:10-12 ("I'm vaguely familiar with the fact that EcoHealth Alliance has been doing research on trying to understand the bat coronavirus emergence."); *id.* at 19:7-8 ("I have no recollection of the initiation of this grant."). Dr. Fauci admits that "NIAID has funded EcoHealth Alliance," 20:5-6, but he contends that he is completely unfamiliar with this project. *Id.* at 20:8-9 ("[T]his is the first time that I have seen this piece of paper."). But this very grant project was flagged for Dr. Fauci in an email from his subordinate on January 27, 2020, at the beginning of the pandemic. Fauci Ex. 5. Given the public and Congressional scrutiny of this particular project and its relation to the origins of the COVID-19 pandemic, Dr. Fauci's testimony on these points is not credible.

610.    Peter Daszak is listed as the "Contact PI/Project Leader" for the grant award "Understanding the Risk of Bat Coronavirus Emergence." Fauci Ex. 2, at 1. The "Awardee Organization" is the EcoHealth Alliance. *Id.*

611.    Dr. Fauci claims that he is not acquainted with Peter Daszak and does not know how to pronounce Daszak's name, Fauci Dep. 20:13 ("I'm not sure"), and that he "do[es]n't even remember meeting him," *id.* at 21:1-2, but that he has seen a photo of himself with Daszak at a public event as the only evidence that they have met. *Id.* at 21:2-8.

612.    In fact, Dr. Fauci has exchanged cordial emails with Daszak on a first-name basis, and he participated in a podcast with him on February 9, 2020, in which they both sought to

discredit the lab-leak theory of COVID's origins.  Fauci Ex. 15, 16, 30.  Dr. Fauci's attempt to deny or downplay his acquaintance and familiarity with Daszak is not credible.

613.    On October 17, 2014, the U.S. Government entered a "research funding pause" on gain-of-function research on coronaviruses, in a document entitled "U.S. Government Gain-of-Function Deliberative Process and Research Funding Pause on Selected Gain-of-Function Research Involving Influenza, MERS, and SARS Viruses."  Fauci Ex. 3, at 1 (the "GoF Pause" or "Pause").

614.    Contrary to Dr. Fauci's testimony that the "pause" was an occasion to jettison the term "gain-of-function," the Pause provided a simple and clear definition of "gain of function" research, defining "Gain-of-function studies" as "research that improves the ability of a pathogen to cause disease."  Fauci Ex. 3, at 2.  The research on bat coronaviruses described in Fauci Ex. 2 meets this simple definition.

615.    The Pause applied to funding for all "research such as this until a new U.S. Government research policy could be adopted."  Fauci Dep. 27:17-19; Fauci Ex. 3, at 2-3.

616.    The Pause provided an exception in Footnote 1, which stated: "An exception from the research pause may be obtained if the head of the USG funding agency determines that the research is urgently necessary to protect the public health or national security."  Fauci Ex. 3, at 2 n.1.

617.    Dr. Fauci testified that he does not recall whether NIAID ever invoked that exception during the years that the Pause was in place (2014-2017).  Fauci Dep. 28:22-29:3.  He testified that authorization for funding under the exception would "not usually rise up to the office of the director, but is handled at the level of staff and deputy."  *Id.* at 29:1-2.  He testified that such approval for projects "urgently necessary to protect the public health or national security" could

have come from "any of a number of people. It could have been people at the program level. It
could have been my deputy. It could have been program managers and division directors."  *Id.* at
30:16-19.

618.     This testimony contradicts the plain language of the exception, which states that
"*the head of the USG funding agency*" must "determine[] that the research is urgently necessary
to protect the public health and national security" to allow continued funding for gain-of-function
research on coronaviruses.  Fauci Ex. 3, at 2 n.1.  At all relevant times, Dr. Fauci was the "head of
the USG funding agency," *i.e.*, the Director of NIAID, and he was responsible for authorizing
funding for gain-of-function research on the ground that it was "urgently necessary to protect the
public health or national security."

619.     Dr. Fauci states that he does not recall whether NIAID ever authorized continued
funding for Peter Daszak or EcoHealth Alliance pursuant to the exception to the Pause in footnote
1.  Fauci Dep. 30:3-12.

620.     In fact, Dr. Fauci testified that "I don't recall" or "I do not recall" 174 times in his
deposition, and testified that he could not recall or remember using variations on that phrase 212
times.  *See* Fauci Dep. 22:21-352:17-18.  This contrasts sharply with his public statements about
the very same issues that, during his deposition, he professed near-complete loss of memory.  *See,
e.g.,* Jones Decl., Ex. X, at 1 ("I remember it very well").  It also contrasts sharply with his clear,
specific recollection of unrelated events from the same time frame.  *See, e.g.,* Fauci Dep. 353:20-
354:16.  Dr. Fauci's repeated claims to not remember or not recall key events and people are not
credible.

621.     Dr. Fauci's chief deputy is Dr. Hugh Auchincloss, who is the Principal Deputy
Director of NIAID.  *Id.* at 30:20-25.

622.    In December 2015, during the research "Pause" on gain-of-function funding, Nature Medicine published an article entitled, "A SARS-like cluster of circulating bat coronaviruses shows potential for human emergence."  Fauci Ex. 4, at 1.  Dr. Ralph Baric of the University of North Carolina was listed as the corresponding author, and Dr. Shi Zhengli of the Wuhan Institute of Virology was listed as a co-author.  *Id.* at 1 & n.8.

623.    The 2015 Nature Medicine article clearly described gain-of-function research on bat coronaviruses.  The Abstract states: "Here we examine the disease potential of a SARS-like virus, SHC014-CoV, which is currently circulating in Chinese horseshoe bat populations. Using the SARS-CoV reverse genetics system, we generated and characterized a chimeric virus expressing the spike of bat coronavirus SHC014 in a mouse-adapted SARS-CoV backbone."  Fauci Ex. 4, at 1.  Notably, the article uses the same phrase as the EcoHealth grant, "reverse genetics," to describe creating "a chimeric virus."  *Id.*

624.    The article reports that the "chimeric virus" created from a "SARS-like" bat coronavirus had become highly transmissible in human tissue: it could "replicate efficiently in primary human airway cells and achieve *in vitro* titers equivalent to epidemic strains of SARS-CoV."  *Id.* It had also become more virulent: "Additionally, *in vivo* experiments demonstrate replication of the chimeric virus in mouse lung with notable pathogenesis."  *Id.*  There were no available treatments for this lab-created "chimeric" virus: "Evaluation of available SARS-based immune-therapeutic and prophylactic modalities revealed poor efficacy; both monoclonal antibody and vaccine approaches failed to neutralize and protect from infection with CoVs using the novel spike protein."  *Id.*

625.    The article noted that the authors had then "synthetically re-derived an infectious full-length SHC014 recombinant virus and demonstrate robust viral replication both in vitro and

in vivo." *Id.* The article concluded that "[o]ur work suggests a potential risk of SARS-CoV re-emergence from viruses currently circulating in bat populations" – and this conclusion was based on creating a more transmissible (to humans) and more virulent (to humans) SARS-like coronavirus in a lab. *Id.*

626.     The article acknowledged that NIAID was the principal funder of this research, and that it had received funding from the EcoHealth Alliance, Daszak's group: "Research in this manuscript was supported by grants from the National Institute of Allergy & Infectious Disease and the National Institute of Aging of the US National Institutes of Health (NIH) … and by USAID-EPT-PREDICT funding from EcoHealth Alliance." *Id.* at 5.

627.     The article also noted that the NIH had reviewed and approved the research under the GoF Pause: "Experiments with the full-length and chimeric SHC014 recombinant viruses were initiated and performed before the GOF research funding pause and have since been reviewed and approved for continued study by the NIH." *Id.*  "GOF" is short for "gain-of-function."

628.     Dr. Fauci testified that he first became aware of this Nature Medicine article "likely … several months" after the outbreak of the COVID-19 pandemic, and that "it was brought to my attention in the context of questions that were raised by members of Congress about experiments that were funded by the NIAID."  Fauci Dep. 31:17-20, 32:7-9.  In fact, Dr. Fauci attached this article to a confidential midnight email to his principal deputy, Hugh Auchincloss, on January 31, 2020, and directed Auchincloss to read it immediately and take unspecified actions on it on a Saturday morning.  Fauci Ex. 6, at 8.  Dr. Fauci's testimony on this point is not credible.

629.     Dr. Fauci testified that he does not believe he has ever met Dr. Ralph Baric, the corresponding author of the 2015 Nature Medicine article.  Fauci Dep. 32:16-19 ("I know who he is, I doubt I've ever met him.  I may have met him at one of the meetings where there are thousands

of scientists saying hi to each other…"); *see also id.* at 33:25-34:1.  In fact, Dr. Fauci's official calendar shows a one-on-one meeting with Dr. Ralph Baric on February 11, 2020, during the events described herein.  Fauci Ex. 17, at 1.  A contemporaneous Slack message on February 18, 2020 reports that Dr. Baric "sat in Fauci's office talking about the outbreak and chimeras," *i.e.*, lab-created chimeric viruses.  Jones Decl., Ex. Y, at 1.  And Dr. Fauci testified that Dr. Baric may be the source of the phrase "SARS Gain of Function" in the attachment to his midnight email to Hugh Auchincloss.  Fauci Dep. 57:11-12. Dr. Fauci's testimony on this point is not credible.

630.   Dr. Fauci professed to be ignorant of the identity of Dr. Shi Zhengli, the notorious "Bat Woman" of the Wuhan Institute of Virology.  When asked if he knows who she is, he stated, "I'm not a hundred percent certain. I get sometimes confused with Asian names."  *Id.* at 33:9-10, 18-19.  Yet Dr. Shi Zhengli, the so-called "bat woman," is world-renowned as the researcher who may have caused the COVID-19 pandemic, and has been so since the beginning of the pandemic, *see, e.g.,* Jones Decl., Ex. Z, at 1, and the name "Shi" is included in the title of the article that Dr. Fauci forwarded to Dr. Hugh Auchincloss after midnight on February 1, 2020.  Fauci Ex. 6, at 8. Dr. Fauci's testimony is not credible on this point.

631.   Dr. Fauci testified that he first became aware of the outbreak of COVID-19 either December 31, 2019 or "the first couple days of 2022."  Fauci Dep. 34:8-11.

632.   Dr. Fauci recounts that he first became aware of concerns that the SARS-CoV-2 virus that causes COVID-19 "might have been genetically engineered or originated in a laboratory" when "[t]here was a phone call in late January of 2020, I believe, from Jeremy Farrar. There was one other person on the phone. I believe it was [K]ristian [Andersen], who piped me in on a three-way call, saying that they looked at the virus and there was some concern about the

molecular configuration or makeup of the virus that made them think there was a possibility that there could have been a manipulation of the virus." *Id.* at 34:12-35:1.

633.    Dr. Fauci states that he does not believe that anyone ever raised the concern to him before that late January call, and he specifically attests that he does not recall Dr. Robert Redfield, then-Director of the CDC, raising the concern to him in mid-January 2020. *Id.* at 35:2-15. Dr. Fauci's recollection conflicts with that of Dr. Redfield, who specifically recalls raising this issue to Dr. Fauci earlier in January 2020, and having his concerns fall on deaf ears: "Dr. Robert Redfield, a virologist and the director of the Centers for Disease Control and Prevention (CDC), had urged Fauci privately to vigorously investigate both the lab and natural hypotheses. He was then excluded from the ensuing discussions—learning only later that they'd even occurred. 'Their goal was to have a single narrative,' Redfield [said]." Jones Decl., Ex. AA, at 7.

634.    "In mid-January of 2020, … Redfield expressed his concerns in separate phone conversations with three scientific leaders: Fauci; Jeremy Farrar, the director of the U.K.'s Wellcome Trust; and Tedros Adhanom Ghebreyesus, director general of the World Health Organization (WHO). Redfield's message, he says, was simple: 'We had to take the lab-leak hypothesis with extreme seriousness.'" *Id.* at 23. Dr. Fauci disputes this account and states that this conversation did not happen: "To my recollection, no." Fauci Dep. 35:9-12.

635.    On January 27, 2020, Dr. Fauci and several other senior NIAID officials received an email from Greg Folkers, who is his "immediate chief of staff in my office group," *id.* at 38:2-4; the email provided "Talking Points for NIAID Director Dr. Fauci." Fauci Ex. 5. The email stated that "when talking about CoV … we have on our team (Vincent and folks we fund, Peter Daszak, Ralph Baric, Ian Lipkin, etc.) probably the world's experts on non-human coronaviruses. … EcoHealth group (Peter Daszak et al) has for years been among the biggest players in

coronavirus work, also in collaboration Ralph Baric, Ian Lipkin, and others." *Id.* at 1. It also flagged the ongoing NIAID grant to Daszak and its work with Wuhan Institute of Virology: "NIAID has funded Peter's group for coronavirus work in China for the past five years through R01 1R01AI110964: 'Understanding the Risk of Bat Coronavirus Emergence.' That's now been renewed." *Id.* It noted that "[t]he results of the work to date include … Found SARS-related CoVs that can bind to human cells (published in *Nature*) and that cause SARS-like disease in humanized mouse models"—a clear reference to the 2015 *Nature Medicine* article. *Id.* Three days later, Dr. Fauci would attach that *Nature Medicine* article to a midnight email to Hugh Auchincloss. Fauci Ex. 6, at 8.

636. Like so many other things, Dr. Fauci testifies that he does not recall receiving this email. Fauci Dep. 40:5-6.

637. Dr. Fauci states that he first became aware of the concern that the virus might be bioengineered and lab-created in a call with Dr. Kristian Andersen of Scripps and Jeremy Farrar of the Wellcome Trust on January 31, 2020. Fauci Dep. 43:17-25. In that call, according to Dr. Fauci, "Jeremy and [K]ristian said they had looked at -- or at least [K]ristian did, possibly Jeremy -- and maybe one other scientist -- and said that it is possible that there may have been a manipulation because it was an unusual virus." Fauci Dep. 44:3-9. A phone call was arranged for the next day, Saturday, February 1, 2020, to discuss the possibility. *Id.* at 44:15-17.

638. According to contemporaneous emails, Eddie Holmes and Bob Garry were involved in this call with Dr. Fauci and Kristian Andersen as well. Fauci Ex. 7, at 2. Eddie Holmes, who was then raising serious concerns that the virus had leaked from a lab, would go on to be the lead drafter of a key article discrediting the lab-leak theory.

639.    After the January 31 call with Farrar and Andersen, in the evening of the same day, Dr. Fauci forwarded them an article that was skeptical of the lab-leak theory, stating that "it is of interest to the current discussion."  Ex. 6, at 1.  Andersen responded, stating that he was not convinced by the article because "one has to look really closely at all the sequences to see that some of the features look (potentially) engineered," and that "after discussion earlier today, Eddie [Holmes], Bob [Garry], Mike [Laribee], and myself *all find the genome inconsistent with expectations from evolutionary theory*." *Id.* (emphasis added); *see also* Fauci Dep. 51:3-8.

640.    A few hours later, shortly after midnight, at 12:29 a.m. on February 1, 2020, Dr. Fauci sent an email to his principal deputy, Hugh Auchincloss.  Fauci Ex. 6, at 8.  The subject line of the email said "IMPORTANT."  *Id.*  The email stated: "Hugh: It is essential that we speak this AM.  Keep your cell phone on. … Read this paper as well as the e-mail that I will forward to you now.  You will have tasks today that must be done.  Thanks, Tony." *Id.*

641.    The "this paper" that was attached to the email was the 2015 *Nature Medicine* article entitled "A SARS-like cluster of circulating bat coronaviruses shows potential for human emergence," Fauci Ex. 4, co-authored by Dr. Ralph Baric and Dr. Shi Zhengli and funded by NIAID and the EcoHealth Alliance.  Fauci Ex. 6, at 8; Fauci Dep. 55:23-56:25.  As an attachment to Dr. Fauci's email, this article was called "Baric, Shi et al – Nature Medicine – SARS Gain of Function.pdf."  Fauci Ex. 6, at 8.

642.    Dr. Fauci claims that he can recall virtually nothing about sending this urgent, confidential email to his principal deputy in the middle of the night of the day when he found out that highly qualified researchers were concerned that SARS-CoV-2 might have leaked from a laboratory.  *See* Fauci Dep. 55:15-63:21 ("I don't recall … I don't know for sure … I can't say that I recall that in particular … I don't recall.  I'm not sure exactly why those words got in there

… I don't recall … I don't recall … I don't precisely recall … I don't recall if I did … I might have, but I don't recall. … I don't recall. … I don't recall … I don't recall. … I don't recall … I really don't recall … I actually don't recall why I forwarded it to him … I don't recall why I did that … I don't remember … I don't recall speaking to him."). This contrasts starkly with Dr. Fauci's public claim to "remember … very well" key events of the same day. Jones Decl., Ex. X, at 1. Dr. Fauci's claim to an amazing loss of memory about this urgent clandestine email to his confidential deputy is not credible.

643.    Dr. Fauci admits, however, that he wanted Auchincloss to find out what coronavirus research NIAID was funding in China before his call later that afternoon with scientists about the lab-leak concerns raised by Andersen and Farrar: "And at my recollection, I brought to Hugh's attention, saying, 'We have to speak in the morning, because I want to find out what the scope of what it is that we are funding so I'll know what we're talking about.'" Fauci Dep. 58:1-5. In particular, Dr. Fauci wanted to find out what EcoHealth Alliance was doing: "this was the first that I had heard about specifics of what EcoHealth and what other people were doing, and I wanted my staff to say get me up to date. So that's what I meant by you have work to do." *Id.* at 58:6-12.

644.    Regarding the "tasks that must be done," Dr. Fauci admits that "I wanted to be briefed on the scope of what our collaborations were and the kind of work that we were funding in China. I wanted to know what the nature of that work was." *Id.* at 59:12-15.

645.    The tone of the email and Dr. Fauci's own testimony strongly support the inference that Dr. Fauci sent the email to Auchincloss because he was concerned that NIAID, under his leadership, was funding research in China that might have led to the creation and leak of SARS-CoV-2, and he wanted to know the full extent of NIAID's exposure before his call later that day with scientists and funding authorities. *See also* Fauci Dep. 58:18-25. If it became public that

NIAID had funded the creation of SARS-CoV-2, Dr. Fauci and his agency potentially faced an enormous crisis of public credibility and accountability.

646.    Immediately after sending Auchincloss the 2015 *Nature Medicine* article, Dr. Fauci also forwarded Auchincloss another article about the possibility that SARS-CoV-2 had leaked from a lab—the Jon Cohen article that he had sent to Kristian Andersen and Jeremy Farrar earlier that evening.  Fauci Ex. 6, at 9.  This email confirms that Dr. Fauci was deeply concerned about the prospect that NIAID, under his watch, might have funded the creation of the virus causing the global pandemic.

647.    Dr. Fauci denies that, when he sent this email to Auchincloss, he was then concerned that NIAID might have funded the creation of the virus that caused the COVID-19 pandemic.  When asked, "Were you concerned at that time that the work that you had funded in China might have led to the creation of the coronavirus?"  Dr. Fauci responded: "I wasn't concerned that it might have."  Fauci Dep. 59:16-19.  In light of the tone and content of his emails at the time, and Dr. Fauci's other testimony, this statement is plainly not credible.

648.    According to Dr. Fauci, when he participated in the secret call with the scientists and funding authorities later that afternoon on Saturday, Feb. 1, 2020, he did not share with them that NIAID had been funding "SARS Gain of Function" research in China leading to the outbreak of COVID-19.  Fauci Dep. 63:22 ("I don't believe I did.").

649.    In fact, once again, Dr. Fauci claims that he does not recall what he said on the clandestine February 1, 2020 phone call.  *Id.* at 64:17 ("I don't recall").

650.    At 1:19 p.m. on Saturday, Feb. 1 – about forty minutes before the secret conference call to discuss the lab-leak concern – Dr. Fauci also forwarded the "Baric, Shi et al – Nature Medicine – SARS Gain of Function" article to Lawrence Tabak of the NIH, saying only "Here it

is." Fauci Ex. 6, at 15. Lawrence Tabak was then "the deputy director of the National Institutes of Health," the principal deputy to then-NIH Director Dr. Francis Collins. Fauci Dep. 65:8-11.

651.    Dr. Fauci testified that "I don't recall why" he sent the 2015 *Nature Medicine* article to Lawrence Tabak, but he admits that it was likely to get it into the hands of Dr. Francis Collins, who was about to participate in the 2:00 p.m. secret conference call with Dr. Fauci and the other scientists. *Id.* at 66:15-17. Dr. Fauci claims that this was "to make sure *everyone* was aware of what the discussions were," *id.* at 66:13-15, but that is not credible in light of his testimony that he did not alert any of the *other* scientists on the call to the concern that NIAID was funding "SARS Gain of Function" research in China. *Id.* at 63:22.

652.    The more compelling inference is that Dr. Fauci wanted Dr. Collins to know that NIAID and NIH faced enormous exposure if the lab-leak theory turned out to be true or publicly accepted. Dr. Collins, along with Dr. Fauci, had publicly championed gain-of-function research since at least 2011, and NIH had jointly funded Dr. Shi Zhengli's work at the Wuhan Institute of Virology through NIAID and the National Institute of Aging. Fauci Ex. 4, at 5 (referring to "grants from the National Institute of Allergy & Infectious Disease and the National Institute of Aging of the US National Institutes of Health (NIH)").

653.    On Saturday, Feb. 1, 2020, at 11:47 a.m., Hugh Auchincloss emailed Dr. Fauci in response to his 12:29 a.m. email. The subject line stated only "Continued." Auchincloss stated: "The paper you sent me [*i.e.*, the 2015 *Nature Medicine* article on 'SARS Gain of Function'] says the experiments were performed before the gain of function pause but have since been reviewed and approved by NIH. Not sure what this means since Emily is sure that no Coronavirus work has gone through the P3 framework. She will try to determine if we have any distant ties to this work abroad." Fauci Ex. 6, at 16. At 5:51 p.m., Dr. Fauci responded: "OK. Stay tuned." *Id.*

654.   "Emily" in Auchincloss's email "is Emily Erbelding, the Director of the Division of Microbiology and Infectious Diseases at NIAID," who "would have been the one who was closest to the ground in understanding what we were doing in funding China." Fauci Dep. 70:14-18.  The "P3 framework" refers to the special approval process required for funding of gain-of-function research on coronaviruses that may cause pandemics, as "P3" stands for "potential pandemic pathogens."  *See* National Institutes of Health, Office of Science Policy, *Gain of Function Research*, at https://osp.od.nih.gov/policies/national-science-advisory-board-for-biosecurity-nsabb/gain-of-function-research/ ("Certain gain-of-function studies with the potential to enhance the pathogenicity or transmissibility of potential pandemic pathogens (PPPs) have raised biosafety and biosecurity concerns…").  Thus, Auchincloss and Dr. Fauci had evidently discussed the concern that NIAID had funded the creation of "potential pandemic pathogens" at the Wuhan Institute of Virology, and Dr. Fauci was concerned about NIAID's "ties to this work abroad."  Fauci Ex. 6, at 16.

655.   Dr. Fauci admits that this email confirms that he "wanted to be briefed as to the extent of our involvement with funding in China," Fauci Dep. 71:2-4—in particular, NIAID's funding of the Wuhan Institute of Virology, as a global SARS-like pandemic emerged from Wuhan.

656.   Dr. Fauci also admits that he may have raised the concern with Auchincloss that Dr. Baric's and Dr. Shi Zhengli's research reflected in the 2015 *Nature Medicine* article may have been illegally funded in violation of the GoF Pause in effect from 2014 to 2017.  Fauci Dep. 71:14-20 ("Q: Did you raise a specific concern with Hugh that the research reflected in the Baric, Shi Nature Medicine paper may have been inconsistent with the pause on -- gain-of-function funding research?  A. That is possible.").

657.    On Saturday, Feb. 1, 2020, Jeremy Farrar sent an email organizing a secret conference call at 2:00 pm EST to a group of scientists and science-funding authorities.  Fauci Ex. 6, at 17-18.  The first thing that Farrar noted in the email, in bold, was "**Information and discussion is shared in total confidence and not to be shared until agreement on next steps.**" *Id.* at 17 (bold in original).

658.    Separately, Farrar sent just Dr. Fauci an email on the morning of Feb. 1 to ensure that he could join the call, stating "Could you join?"  Fauci Ex. 7, at 12.  In that email, Farrar listed the participants and stated, "My preference is to keep this a really tight group. … Obviously ask everyone to treat in total confidence." *Id.*  He also stated that the purpose of the call was "To listen to the work of Eddie, Bob and Kristian have done.  Question it.  And think through next steps." *Id.*

659.    Dr. Fauci described the call as an open debate about the lab-leak theory among "a larger group of evolutionary virologists," Fauci Dep. 58:19-20, but in fact the call included a heavy representation of international government and science-funding authorities—including Dr. Fauci, Director of NIAID; Dr. Francis Collins, Director of NIH; Jeremy Farrar, head of the Wellcome Trust, the United Kingdom's "predominant" science-funding authority; Paul Schreier, the Chief Operating Officer of the Wellcome Trust who is responsible for "research funding" there; and Sir Patrick Vallance, the chief medical advisor to the U.K. government.  Fauci Ex. 6, at 18; *see also* Fauci Dep. 75:11-76:15.  All these people had a strong vested interest in avoiding a major scandal about international science-funding practices—such as the concern that Western governments may have funded the creation of a deadly virus that escaped from a lab and infected millions of people.  As funding authorities who control the distribution of massive amounts of research funding, they also had powerful influence over the research scientists on the call.

660.   Dr. Fauci took steps to ensure that Dr. Francis Collins would be included on the
call "since he's the director of NIH."  Fauci Dep. 75:4-6.  Dr. Fauci evidently spoke with Dr.
Collins before the call, as he emailed Farrar before the call stating, "Jeremy: Francis will be on the
call.  He is trying to phone you."  Fauci Ex. 7, at 17.  Farrar then emailed Dr. Collins stating,
"Francis Call me on [redacted]."  Fauci Ex. 7, at 19.

661.   Like the 12:29 a.m. email to Auchincloss, Dr. Fauci repeatedly claimed that he
could not recall virtually any details about the 2:00 p.m. secret conference call with scientists and
funding authorities about the lab-leak theory.  Fauci Dep. 63:19-67:11 ("I don't recall bringing
this up … I don't recall … I don't recall … I don't recall when it was … I don't recall … I don't
believe that Larry was, but he could have been … I don't recall"); Fauci Dep. 73:20-74:14 ("I
don't recall a discussion about confidentiality or not … I may have. I don't recall."); Fauci Dep.
77:13-15 ("Do you remember anything that anybody said on the call?  A: No."); Fauci Dep. 78:10-
83:10 ("I don't recall whether that was discussed … I don't recall anything from that phone call
that said that … I'm not sure if I discussed it … I have a vague recollection that there was a concern
… It is certainly possible, but I don't specifically remember … I don't specifically recall.").

662.   This testimony to near-complete lack of memory about the call stands in stark
contrast to Dr. Fauci's public statements a year and a half after the call occurred, when FOIA
releases of Dr. Fauci's emails finally revealed to the public that this secret call had occurred.  Then,
Dr. Fauci stated, "I remember it very well."  Jones Decl., Ex. X, at 1.  Dr. Fauci's testimony about
lack of recall is not credible.

663.   Notwithstanding his repeated testimony that he cannot recall specifically what was
said on the call, Dr. Fauci provided a self-justifying and innocent account of the call, describing it
as a good-faith discussion among scientists trying to get to the truth without any preconceived

biases.  *See, e.g.,* Fauci Dep. 77:16-18 ("[T]here was what appeared to me to be good faith discussion back and forth between people who knew each other"); Fauci Dep. 79:23-80:1 ("I think the general feeling among the participants on the call is that they wanted to get down to the truth and not wild speculation about things."); Fauci Dep. 80:9-10 ("I don't think there was any other concern than sticking with the truth and sticking with data").

664.    Dr. Fauci thus seeks to have his cake and eat it too—he claims both to remember little or nothing of what was said on the call, and to clearly remember that the entire discussion was done in good faith and without any bias.  In any event, subsequent communications and events make clear that Dr. Fauci's testimony on this point is not credible, as discussed in detail below, as an aggressive plot to discredit the lab-leak theory commenced immediately after the call.

665.    Almost an hour into the 2:00 pm call, at 2:56 p.m., Jeremy Farrar sent a cryptic email to Fauci, Collins, Vallance (all science funders) and Mike Ferguson, stating, "Can I suggest we shut down the call and then redial in?  Just for 5-10 mins?"  Dr. Fauci responded, "Yes."  Fauci Ex. 7, at 26.  Dr. Fauci claims he cannot recall whether this occurred.  Fauci Dep. 92:1-93:6.

666.    Dr. Fauci testified that the call participants concluded that they needed more time to take a much closer look at the biology of the virus and genetic sequences before coming to a conclusion about the virus's origins, and they planned to take more time to continue their inquiry afterward.  *See* Fauci Dep. 78:3-9 ("The ten[or] of it ended that we need more time … they said we need some time to more carefully look at this to see if we can come to a sound conclusion based on further examination of the sequences."); Fauci Dep. 80:24-25 ("The plan was to go and spend more time carefully looking at it.").  In fact, Eddie Holmes and Kristian Andersen began drafting an article concluding that the lab-leak hypothesis was baseless and rooted in animus

immediately after the call ended, and Dr. Fauci received an initial draft of this article by the next Tuesday morning. *See infra*. Dr. Fauci's testimony on this point is not credible.

667.  Dr. Fauci testified that his next interaction with the call's participants was when Kristian Andersen sent him a preprint of that article attacking the lab-leak theory. Fauci Dep. 82:19-83:1. In fact, before the preprint, Holmes and Farrar had sent Dr. Fauci at least *four* drafts of the article to review. *See infra*. Dr. Fauci's testimony is not credible on this point.

668.  Dr. Fauci states that he cannot remember if he had further discussions with Jeremy Farrar, Francis Collins, and Patrick Vallance surrounding this call on Feb. 1, 2020. Fauci Dep. 83:2-10; 85:8-23, 90:25-91:15, 92:1-21. In fact, Dr. Fauci sent Jeremy Farrar a lengthy email that is entirely redacted at 12:38 a.m. on Saturday, Feb. 1, 2020, Fauci Ex. 7, at 1; Farrar emailed Fauci on Jan. 30 stating "Tony Perfect timing – thank you. Great to catch up," and provided Sir Patrick Vallance's phone number, Fauci Ex. 7, at 4; Fauci emailed Farrar and Vallance on Jan. 30, stating "Thanks, Jeremy. Great chatting with you and Patrick. Will stay in close touch," Fauci Ex. 7, at 4; Jeremy Farrar sent Dr. Fauci an email on Friday, Jan. 31, stating "Tony  Really would like to speak with you this evening  It is 10pm now UK  Can you phone me on [redacted]," Fauci Ex. 7, at 3; Farrar and Sir Patrick Vallance had a three-way call with Dr. Fauci on Jan. 30, 2020, Fauci Ex. 7, at 4; Farrar emailed Fauci and Collins after the call referring to "Conversations with you and Tony, and Patrick and others," Fauci Ex. 7, at 34; among others. Dr. Fauci had extensive discussions with Jeremy Farrar, Francis Collins, and Patrick Vallance surrounding the 2:00 p.m. February 1, 2020 secret conference call, and his testimony to the contrary is not credible.

669.  After the call, Francis Collins emailed Farrar and stated, "Hi Jeremy, I can make myself available at any time 24/7 for the call with Tedros. Just let me know. Thanks for your leadership on this critical and sensitive issue." Fauci Ex. 7, at 34. Farrar responded, "We are

altogether as you know!"  Fauci then chimed it: "Thanks, Jeremy.  We really appreciate what you are doing here."  Fauci Ex. 7, at 34.  "Tedros" refers to the director of the World Health Organization.  Fauci Dep. 95:6-7.

670.    After the call, Dr. Fauci described the scientists as engaging in a careful investigation of the virus: "[K]ristian and a few of the others carefully got together and looked at it and examined the pros and the cons and the ups and downs, and came to the conclusion that their initial concern about the molecular basis of the concern was unwarranted and that what they saw was quite compatible and, in fact, suggestive of a natural evolution."  Fauci Dep. 81:8-15.  In fact, Eddie Holmes and Kristian Andersen immediately began drafting an article attacking the lab-leak theory with no further investigation, which was sent to Dr. Fauci in less than three days.  *See infra.* Dr. Fauci's testimony on this point is not credible.

671.    Farrar emailed Dr. Tedros of the World Health Organization and two senior WHO officials, along with Dr. Fauci and Dr. Collins, indicating that he had just spoken to the senior WHO officials and "[f]ully agree with your summary."  Fauci Ex. 8, at 1.  Farrar emphasized the "urgency and importance" of the lab-leak question because of the "[g]athering interest evident in the scientific literature and in mainstream and social media to the question of the origin of this virus," and thus it was "[c]ritical" to "get ahead of the science and the narrative of this" instead of "reacting to reports which could be very damaging."  Fauci Ex. 8, at 1.  He also wrote, "I am sure I speak for Francis [Collins] and Tony [Fauci] when I say we are here and ready to play any constructive role in this," as they "[d]o think this is an urgent matter to address."  *Id.*

672.    Thus, Farrar, joined by Fauci and Collins, sent a message to the WHO that they wanted to "get ahead" of potentially damaging "narrative[s]" that might emerge "in mainstream and social media" about the origins of the virus.  *Id.*

673.     Later that day, on Feb. 2, Farrar separately emailed Fauci and Collins, stating "Tedros and Bernhard have apparently gone into conclave…they need to decide today in my view. If they do prevaricate, I would appreciate a call with you later tonight or tomorrow to think how we might take forward."  Fauci. Ex. 8, at 2.  He also stated, "Meanwhile…." and linked to an online article speculating about the lab-leak origins of the virus—again indicating that Fauci, Farrar, and Collins were concerned about controlling online discourse about the lab-leak theory. *Id.*

674.     The day after the conference all, Sunday, Feb. 2, Dr. Fauci, Jeremy Farrar, and Dr. Collins shared a series of emails (1) acknowledging that there were very serious arguments in favor of the lab-leak theory, and (2) repeatedly expressing concern about the lab-leak theory's involvement on "social media."  The group, including Dr. Fauci, repeatedly expressed concern about postings about the lab-leak theory on social media.  *See* Fauci Ex. 8.

675.     First, after the Feb. 1 call, still on Feb. 1, Farrar sent an email to the group expressing concern that "[t]here will be media interest and there is already chat on Twitter/WeChat" about the lab-leak theory, and stating: "In order to stay ahead of the conspiracy theories and social media I do think there is an urgency for a body to convene" to address the lab-leak question.  Fauci Ex. 8, at 9.

676.     The next day, Feb. 2, Farrar then expressed concern that "these questions are being asked by politicians, starting in the scientific literature, [and] certainly on social and main stream media.  If, and I stress if, this does spread further, pressure and tensions will rise.  [I] fear these questions will get louder and more polarised and people will start to look to who to blame. … I am concerned if this is not done quite quickly it will be reacting to what may be lurid claims."  Fauci Ex. 8, at 7.

677.    Another call participant then agreed that "this needs to be discussed urgently," in part "because of the lurid claims on Twitter."  Fauci Ex. 8, at 6.  He also noted that "if the evolutionary origins of the epidemic were to be discussed, I think the only people with sufficient information or access to samples to address it would be the teams working in Wuhan."  *Id.*

678.    The same day, Farrar acknowledged "this is a very complex issue," and again expressed concern about "social and main stream media": "As discussed on the phone this discussion is not limited to those on this email, it is happening wider in the scientific, social and main stream media."  Fauci Ex. 8, at 5.

679.    Dr. Collins then responded to Farrar and Dr. Fauci only, stating that "a confidence-inspiring framework … is needed, or the voices of conspiracy will quickly dominate, doing great potential harm to science and international harmony."  Fauci Ex. 8, at 5.

680.    Farrar then shared notes with Fauci, Collins and Tabak (Collins' deputy) from "Mike Farzan (discoverer of SARS receptor)," which stated that Farzan "is bothered by the furin cleavage site [a virus feature that looks bioengineered] and has a hard time explaining that as an event outside the lab," and that "acquisition of the furin site would be highly compatible with the idea of continued passage of virus in tissue culture," *i.e.*, serial passage.  Fauci Ex. 8, at 4.  Farzan suggested that "a likely explanation" of the virus was serial passage of SARS-like coronaviruses in human cell lines, and he stated that "I am 70:30 or 60:40" in favor of laboratory origins.  Fauci Ex. 8, at 3-4.

681.    Farrar also shared notes from "Bob" [Garry] that he had "aligned" the new virus "with the 96% bat CoV sequenced at WIV [Wuhan Institute of Virology]," and viewed the lab-origin theory as highly likely: "I really can't think of a plausible natural scenario … I just can't

figure out how this gets accomplished in nature.  Do the alignment of the spikes at the amino acid level – it's stunning."  Fauci Ex. 8, at 4.

682.    Having shared these notes, Farrar noted, "On a spectrum if 0 is nature and 100 is release – I am honestly at 50!  My guess is that this will remain grey, unless there is access to the Wuhan lab – and I suspect that is unlikely!"  Fauci Ex. 8, at 3.  Both Farrar and Collins expressed concerns that the WHO might move too slowly for their liking.  *Id.*

683.    Then, still on February 2, 2020, Dr. Fauci wrote to Farrar, Collins, and Lawrence Tabak (Dr. Collins' principal deputy), stating: "Like all of us, I do not know how this evolved, but given the concerns of so many people and *the threat of further distortions on social media*, it is essential that we move quickly.  Hopefully, we can get the WHO to convene."  Fauci Ex. 8, at 2 (emphasis added).

684.    Dr. Fauci claimed that he is completely dissociated from social media, stating: "I don't do social media so I'm not familiar with them," Fauci Dep. 98:15-16; and "You know, I'm so dissociated from social media. I don't have a Twitter account. I don't do Facebook. I don't do any of that, so I'm not familiar with that," Fauci Dep. 99:5-8; *see also, e.g.,* Fauci Dep. 103:12-14; 210:3-8; 213:10-16; 241:6-9; 241:21-242:1; 301:10-11 ("I don't pay attention to things related to social media accounts."); *id.* at 312:7-9 ("I can repeat it for the hundredth time, I really don't get involved in social media issues."); *id.* at 356:15-16 ("I'm not a social media person.").

685.    In fact, Dr. Fauci's daughter was then a software engineer at Twitter, Fauci Dep. 99:23-100:15; Dr. Fauci has done numerous podcasts and interviews on social media, including with Mark Zuckerberg, Fauci Dep. 99:16-19, 101:1-6; Dr. Fauci had specifically expressed concern about "the threat of further distortions on social media" about the lab-leak theory in his contemporaneous email, Fauci Ex. 8, at 2; and Dr. Fauci's communications staff had repeatedly

emailed Twitter to try to remove postings critical of Dr. Fauci, *see infra*. Dr. Fauci's professed ignorance of social media is not credible. His communications and conduct make clear that he is keenly aware and deeply concerned about what he believes are "distortions on social media." Fauci Ex. 8, at 2.

686.    Dr. Fauci also testified that "I don't recall anything about social media" in his discussions with Farrar about the origins of the virus. Fauci Dep. 102:17-18. In light of the contemporaneous emails repeatedly raising concerns about discussions of the lab-leak theory on social media, this claim is not credible.

687.    Dr. Fauci admits that he was "concerned about … there being misinformation or disinformation that would interfere with our trying to save the lives of people throughout the world, which happens when people spread false claims." Fauci Dep. 103:18-22. He states that "misinformation and/or disinformation can lead to loss of life … and that troubles me." Fauci Dep. 104:15-17. This includes the spread of misinformation and disinformation on social media, because "that's part of the way information is disseminated." Fauci Dep. 104:22-23.

688.    After Dr. Fauci's email about "the threat of further distortions on social media," Farrar emailed back indicating that the WHO might not move quickly to address the lab-leak theory, and stating to Fauci and Collins: "they need to decide today in my view. If they do prevaricate, I would appreciate a call with you later tonight or tomorrow to think how we might take forward." Fauci Ex. 8, at 2. He also stated: "Meanwhile…." and linked to an online posting expressing concerns about the lab-leak theory – indicating his dominant concern about online speech discussing the lab-leak theory. *Id.*

689.    Soon thereafter, Farrar emailed Dr. Tedros of the WHO and two senior WHO officials, copying Fauci and Collins. Fauci Ex. 8, at 1. Farrar urged the WHO to quickly establish

a working group to address the lab-leak theory, and reiterated that they should "[a]ppreciate the urgency and importance of this issue," given the "[g]athering interest evident in the science literature and in mainstream and social media to the question of the origin of this virus," and pressing them to "get ahead of … the narrative of this and not reacting to reports which could be very damaging." Fauci Ex. 8, at 1.

690.    Fauci claims that he does not believe there was any further communication between him and Farrar about this issue, despite Farrar's urgent request for a follow-up call if the WHO did not act immediately. Fauci Ex. 8, at 2; Fauci Dep. 109:22-110:7. In light of their subsequent communications, this testimony is not credible.

691.    By the early morning of February 4, 2020, Eddie Holmes had already sent a draft research paper attacking the lab-leak theory to Jeremy Farrar. Fauci Ex. 9, at 1. Holmes noted to Farrar that, in the draft, he "[d]id not mention [the virus's] other anomalies as this will make us look like loons." Fauci Ex. 9, at 1. To complete the draft between the afternoon of Saturday, Feb. 1, and the early morning of Tuesday, Feb. 4, Holmes must have started working on it almost immediately after the Feb. 1 conference call.

692.    Farrar forwarded this draft to Fauci and Collins at 2:01 a.m. on Tuesday morning, February 4, 2020, in an attachment called "Summary." Fauci Ex. 10, at 3. He noted, "Please treat in confidence – a very rough first draft from Eddie and team – they will send on the edited, cleaner version later." *Id.*; *see also* Fauci Ex. 12, at 1.

693.    Dr. Collins responded: "I note that Eddie is now arguing against the idea that this is the product of intentional human engineering," Fauci Ex. 10, at 3, a dramatic reversal of Holmes's position a few days earlier that Holmes and Andersen "find the genome inconsistent with expectations from evolutionary theory." Fauci Ex. 6, at 1. The paper's conclusion was also

profoundly at odds with Holmes's statement, in the email sending the draft paper itself, that they would "look like loons" if the paper discussed the virus's other "anomalies" that strongly suggested a lab origin.  Fauci Ex. 9, at 1.

694.    Collins also noted that Holmes had not ruled out the possibility of a lab-created virus through serial passage.  Fauci Ex. 10, at 3.  Farrar responded, stating "Eddie would be 60:40 lab side.  I remain 50:50."  *Id.*  Eddie, however, had already drafted a paper that *refuted* the lab-leak theory, even though he evidently still believed was the better explanation.  *See id.*

695.    Regarding the possibility of serial passage, Dr. Fauci noted that "Serial passage in ACE2-transgenic mice" was a possibility for the virus's origin, Fauci Ex. 10, at 2— notably, serial passage in humanized mice as was used in the 2015 *Nature Medicine* study.  (Like so many other things, Dr. Fauci claims he does not recall this statement that he wrote.  Fauci Dep. 115:22-116:12.) Collins responded, "Surely that wouldn't be done in a BSL-2 lab?" and Farrar answered, "Wild West…."  Fauci Ex. 10, at 2.  This exchange indicates that that Fauci, Farrar, and Collins were concerned that the coronavirus had been created in Wuhan by serial passage through humanized mice in a low-security [BSL-2] lab and then escaped from that low-security lab—*i.e.*, the precise concerns surrounding the NIAID-funded research at WIV.  *Id.*; *see also, e.g.,* Jones Decl., Ex. BB< at 14 ("In the above exchange, the health officials [Fauci, Farrar, and Collins] seem to be contemplating the possibility that the repeated passage of a coronavirus through genetically modified mice in an insufficiently secure lab could have resulted in the accidental emergence and release of SARS-CoV-2.").

696.    Later in the evening of the same day, Tuesday, Feb. 4, Farrar sent Fauci and Collins a second version of draft, entitled "Summary," with the note "Tidied up."  Fauci Ex. 12, at 7.  Dr. Fauci claims he does not remember receiving these drafts.  Fauci Dep. 127:4-10.

697.    The next day, February 5, 2020, Farrar sent Fauci and Collins a third version of the draft, still entitled "Summary," with a note: "Tony and Francis The revised draft from Eddie, copied here." Fauci Ex. 12, at 8.

698.    Two days later, on February 7, 2020, Farrar sent Fauci and Collins a fourth version of the same draft, entitled "Summary.Feb7.pdf," with the note in the subject line, "Revised draft." Fauci Ex. 11, at 2. This draft made clear that Holmes and his co-authors planned to aggressively discredit the lab-leak theory. It stated in bold in the beginning "Overview" section: "**Analysis of the virus genome sequences clearly demonstrates that the virus is not a laboratory construct or experimentally manipulated virus**." Fauci Ex. 11, at 3 (bold in original).

699.    This was the *fourth* updated draft that Farrar sent to Fauci and Collins of the paper discrediting the lab-leak theory in the first week since the Feb. 1 secret conference call. The draft advocated that genetic evidence "clearly demonstrates" that the lab-leak theory is false. *Id.*

700.    Dr. Fauci claims that he did not have any involvement in Farrar's efforts to push the WHO to assemble a working group to address the lab-leak theory. Fauci Dep. 110:4-7 ("So I really would doubt that there was any further communication between me and the WHO about this. This was fundamentally Jeremy's lane, if you want to call it that."); *id.* at 125:17-19 ("I didn't have any direct involvement with the WHO, not to my recollection."); *id.* at 131:14-15 ("This was mostly a Jeremy-led thing"). But in fact, Dr. Fauci sent multiple emails to Farrar urging for the inclusion of a long list of specific scientists in the WHO's working group. Fauci Ex. 13, at 1-2, 6.

701.    On Feb. 5, 2020, Farrar emailed Fauci and Collins, stating that he believed that the WHO would assemble a working group to address the lab-leak theory, and urging Fauci and Collins to provide names of scientists to participate in the group. Fauci Ex. 13, at 7. Farrar stated that the WHO "have asked for names to sit on that Group – please do send any names." *Id.* He

then stated, "We can have a call this week with a core group of that *to frame the work of the Group* including – if you could join?"  *Id.* (emphasis added).  And then he stated, "With names to be put forward into the Group from us and *pressure on this group from your and our teams* next week." *Id.* (emphasis added).  Plainly, Farrar intended, with Fauci and Collins' assistance, to stack the WHO's group with their hand-picked scientists, have an advance call "to frame the work of the Group," and to put "pressure on this group from [Fauci's and Collins'] and our teams next week," *id.*—to influence and control the outcome of the WHO Group's deliberations.

702.    Fauci and Collins did not dispute this plan.  On the contrary, Fauci responded by providing Farrar with a detailed list of eight scientists to include in the WHO's group "in addition to the individuals who were on the call with us last Saturday."  Fauci Ex. 13, at 2, 6.  Fauci then followed up to his own email with an additional scientist, stating she is "an important name for the coronavirus evolution working group.  Please include her."  *Id.* at 1.  Fauci's attempts to downplay his involvement with the plan to create and control a WHO working group on COVID-19's origins to discredit the lab-leak theory, therefore, are not credible.

703.    Dr. Fauci testified that he, Farrar, and Collins "wanted to get them [the WHO] involved because we wanted to make sure that this was an open and transparent discussion," Fauci Dep. 126:9-12, is not credible in light of the contemporaneous email from Farrar to Fauci and Collins plotting to "frame the work of the Group" and put "pressure on this group from your and our teams next week."  Fauci Ex. 13, at 3.

704.    Dr. Fauci claims he does not recall any discussions about framing the work of the Group, or putting pressure on the Group.  Fauci Dep. 137:1-21.

705.    On February 9, 2020, Dr. Fauci participated in a joint podcast with Dr. Peter Daszak of the EcoHealth Alliance to discuss the outbreak of COVID-19.  Fauci Ex. 15, at 1.

706.    Peter Daszak was then involved in organizing a statement for the Lancet seeking to
discredit the lab-leak theory, similar to the article then being drafted by Eddie Holmes, of which
Dr. Fauci had received four drafts the previous week.  *See* Jones Decl., Ex. CC, at 1.  Just a few
days later, The Lancet would publish a statement of scientists organized and co-signed by Daszak
and Jeremy Farrar, which stated: "We stand together to strongly condemn conspiracy theories
suggesting that COVID-19 does not have a natural origin."  *Id.*  Thus, at that time, Daszak was
working in parallel with Dr. Fauci, and together with Jeremy Farrar, to produce a published article
discrediting the lab-leak theory.  *Id.*

707.    During the podcast, both Dr. Fauci and Daszak made comments seeking to discredit
the lab-leak theory.  Fauci Ex. 16, at 1.  Fauci, when asked "Do you have any sense of where [the
virus] probably came from?" answered, "Well I think ultimately we know that these things come
from an animal reservoir.  I heard these conspiracy theories and like all conspiracy theories … they
[are] just conspiracy theories….  I think the things you are hearing are still in the realm of
conspiracy theories without any scientific basis for it."  *Id.*  Daszak was asked, "Is it your sense
that it's almost certain it came from an animal-to-human transmission?" and he responded: "All
the evidence says that is what happened. … It looks to me and to most scientists like it's a bat virus
that got into people either in the market or in rural China and just unfortunately has the capacity
to spread."  *Id.*

708.    On February 11, 2020, Dr. Fauci had a meeting at NIAID with Dr. Ralph Baric, the
corresponding author of the 2015 *Nature Medicine* article about NIAID-funded gain-of-function
research in Wuhan that Dr. Fauci sent to Hugh Auchincloss after midnight on Feb. 1.  Fauci Ex.
17, at 1 (Dr. Fauci's official calendar, Feb. 11, 2020, at 2:30 p.m. – "Meeting with Dr. Ralph
Baric").  Dr. Fauci does not dispute that he met with Dr. Ralph Baric that day, but (like so many

other things) he claims that he does not recall the meeting or what they discussed.  Fauci Dep.
149:9-10, 149:21-23.  As noted above, given that Dr. Fauci was deeply concerned about Baric's
research at the time, Dr. Fauci's testimony on this point is not credible.

709.    On Feb. 11, 2020, Ian Lipkin wrote an email referring to the draft paper about the
origins of COVID-19 stating that, while the paper was "well-reasoned and provides a plausible
argument against genetic engineering," it "does not eliminate the possibility of an inadvertent
release following adaptation through selection in culture at the institute in Wuhan.  Given the scale
of the bat CoV research pursued there and the site emergence of the first human cases we have a
nightmare of circumstantial evidence to assess."  Fauci Ex. 18, at 1.  Dr. Fauci states that he does
not recall this email but that "it's entirely possible that Ian wrote this to me," because "Ian
communicates with me."  Fauci Dep. 153:15-17.

710.    Dr. Fauci testified that it is "molecularly" impossible that SARS-CoV-2 originated
from NIAID-funded research: "molecularly, that could not have happened."  *Id.* at 157:21-22.  But
separately, he repeatedly testified that molecular virology is not his field, so his certainty on this
one key point is not credible.  *Id.* at 64:8-9 ("that's not my field, evolutionary virology"); *id.* at
117:19-20 ("I'm hesitant to go there because that's not my area of expertise"); *id.* at 127:12-13 ("it
was an area that was not my area of expertise"); *id.* at 160:7-9 ("Did I fully understand the
molecular virology of it?  Unlikely, because I'm not an evolutionary virologist.").

711.    On February 17, 2020, the preprint version of the paper drafted by Eddie Holmes
attacking the lab-leak theory was released.  Fauci Ex. 19.  The paper was entitled, "The Proximal
Origins of SARS-CoV-2."  *Id.* at 12.  Its listed authors were Kristian Andersen, Andrew Rambaut,
Ian Lipkin, Edward Holmes, and Robert Garry.  *Id.*  All these authors, except possibly Ian Lipkin,

had been participants in the secret phone conference at 2:00 p.m. on Saturday, Feb. 1, 2020.  Fauci Dep. 161:7-10.

712.    These authors had a financial interest in supporting NIH's preferred narrative.  "Garry and Andersen have both been recipients of large grants from NIH in recent years, as has another 'Proximal Origin' author, W. Ian Lipkin of Columbia University."  Jones Decl., Ex. BB.

713.    These authors were stunningly recent converts to the theory of natural origin.  On February 11, Ian Lipkin had sent an email about the same paper stating that "we have a nightmare of circumstantial evidence to assess."  Fauci Ex. 18, at 1.  On February 4, Holmes had written to Farrar that he avoided discussing the virus's "other anomalies as this will make us look like loons."  Fauci Ex. 9, at 1.

714.    On February 2, Bob Garry had written to Farrar, "I really can't think of a plausible natural scenario … I just can't figure out how this gets accomplished in nature.  Do the alignment of the spikes at the amino acid level – it's stunning."  Fauci Ex. 8, at 4.  On January 31, Andersen had written to Dr. Fauci that the virus's "features (potentially) look  engineered," and that "after discussion earlier today, Eddie [Holmes], Bob [Garry], … and myself all find the genome inconsistent with expectations from evolutionary theory."  Fauci Ex. 6, at 1.

715.    The preprint version of "The Proximal Origin of SARS-CoV-2" asserted a very different conclusion.  It stated that "this analysis provides evidence that SARS-CoV-2 is not a laboratory construct nor a purposefully manipulated virus."  Fauci Ex. 19, at 2.  It stated that "genomic evidence does not support the idea that SARS-CoV-2 is a laboratory construct."  *Id.* at 6.

716.    Dr. Fauci does not dispute that this preprint was sent to him.  Fauci Dep. 160:3-4 ("It is likely that this was sent to me").  Dr. Fauci admits that he reviewed the preprint when it was

sent to him. *Id.* at 160:7 ("Did I look through it? Yes."). And Dr. Fauci admits that he was aware of what their conclusion was about the lab-leak theory. *Id.* at 162:13-15 ("I am certain that having looked at it, I was aware of what their conclusion was.").

717. This was the *fifth* version of the paper that was sent to Dr. Fauci to review, after four drafts sent to him on Feb. 4, 5, and 7. *Id.* at 160:13-16.

718. On March 6, 2020, Kristian Andersen emailed Dr. Fauci, Dr. Collins, and Jeremy Farrar, stating, "Dear Jeremy, Tony, and Francis, Thanks again for your advice and leadership as we have been working through the SARS-CoV-2 'origins' paper. We are happy to say that the paper was just accepted by Nature Medicine and should be published shortly .... To keep you in the loop, I just wanted to share the accepted version with you, as well as a draft press release. We're still waiting for proofs, so please let me know if you have any comments, suggestions, or questions about the paper or the press release." Fauci Ex. 22, at 1. He also wrote: "Tony, thank you for your straight talk on CNN last night – it's being noticed." *Id.*

719. Thus, Andersen thanked Dr. Fauci, Collins, and Farrar for their "advice and leadership" about the paper, sent them the final draft, and asked for their input both on the draft and on their public messaging about the draft. *Id.*

720. This was the *sixth* version of the paper that was forwarded to Dr. Fauci for review and input. *Id.*

721. Dr. Fauci responded: "Kristian: Thanks for your note. Nice job on the paper. Tony." *Id.*

722. Dr. Fauci denies that he provided "advice and leadership" in the preparation of the paper. Fauci Dep. 171:11-13. In light of the extensive meetings and correspondence detailed above, that testimony is not credible.

723.    On March 17, 2020, *Nature Medicine* published the online version of *The Proximal Origin of COVID-19*.  Fauci Ex. 24, at 3.  The print version appeared in the April 2020 volume of the journal.  *Id.*

724.    The final, published version of the article makes even stronger claims attacking the lab-leak theory than the preprint version.  In its opening, the article states: "Our analyses *clearly show* that SARS-CoV-2 is not a laboratory construct or a purposefully manipulated virus."  Fauci Ex 24, at 1 (emphasis added).  Similarly strong language, leaving no room for doubt, occurs throughout the article: "the genetic data *irrefutably show* that SARS-CoV-2 is not derived from any previously used viral backbone," *id.* at 1 (emphasis added).  "This *clearly shows* that the SARS-CoV-2 spike protein optimized for binding to human-like ACE2 is the result of natural selection," *id.* at 2 (emphasis added).  "[T]he evidence shows that SARS-CoV-2 is not a purposefully manipulated virus," *id.* at 3.  "[W]e do not believe that any type of laboratory-based scenario is plausible."  *Id.* at 3.  "SARS-CoV-2 originated via natural selection."  *Id.* at 3.

725.    Thus, between the preprint version and final version of the article, the article substantially beefed up its conclusion that the lab-leak theory is implausible and should be discredited.  Dr. Fauci claims he does not "recall specific conversations" about that conclusion with the authors, but he admits that he is "sure" that he discussed that conclusion with them: "we read the preprint and, therefore, we knew what the conclusion was, and I'm sure that that conclusion was discussed. So I would not be surprised at all following the initial preprint that I discussed the conclusion of these authors that this is not a laboratory construct or a purposely manipulated virus."  Fauci Dep. 181:3-10; *see also id.* at 181:18-22.  Based on all these circumstances, it is likely that Dr. Fauci encouraged the authors to express a stronger and more unequivocal conclusion against the lab-leak theory than reflected in the preprint.

726.    Once the article "The Proximal Origin of SARS-CoV-2" was released, both Dr. Fauci and Dr. Collins took steps to push it into prominence.  First, on March 26, 2020, Dr. Collins published a blog post on the article on the "NIH Director's Blog" entitled "Genomic Study Points to Natural Origin of COVID-19."  Fauci Ex. 25, at 1.

727.    Dr. Collins used strong language relying on the study to attack and discredit the lab-leak theory as "outrageous" and "debunk[ed]": "Some folks are even making outrageous claims that the new coronavirus causing the pandemic was engineered in a lab and deliberately released to make people sick.  A new study debunks such claims by providing scientific evidence that this novel coronavirus arose naturally."  Fauci Ex. 25, at 2.  Dr. Collins stated that the study shows that "the coronavirus that causes COVID-19 almost certainly originated in nature," and that "this study leaves little room to refute a natural origin for COVID-19."  Fauci Ex. 25, at 3.

728.    In his blog post, Dr. Collins did not disclose that he and Dr. Fauci had been part of the group that organized the study, nor that he and Dr. Fauci had reviewed six versions of the study before it was published.  Fauci Ex. 25.

729.    As was evidently intended, Dr. Collins's blog post immediately fueled media coverage attacking the lab-leak theory as a "conspiracy theory."  For example, the next day, March 27, 2020, ABC News ran a story entitled, "Sorry, conspiracy theorists.  Study concludes COVID-19 'is not a laboratory construct.'"  Fauci Ex. 26.  The article quoted Bob Garry—who on January 31 had found "the genome inconsistent with the expectations of evolutionary theory," Fauci Ex. 6, at 1, and on February 1 had told Farrar that "I just can't figure out how this gets accomplished in nature … it's stunning," Fauci Ex. 8, at 4—as stating that "[t]his study leaves little room to refute a natural origin for COVID-19."  Fauci Ex. 26, at 3-4.

730.     Dr. Fauci testified that he could not remember any contact from Dr. Collins about "The Proximal Origin of SARS-CoV-2" after Dr. Collins' blog post on March 26, 2020.  Fauci Dep. 186:19-187:6.  In light of their subsequent communications and Dr. Fauci's actions, this testimony is not credible.

731.     In fact, Dr. Collins emailed Dr. Fauci about the article on Thursday, April 16, 2020. Fauci Ex. 27.  The email linked to a Fox News piece by Bret Baier alleging that sources were "increasingly confident" that SARS-CoV-2 originated in a lab, and it stated: "Wondering if there is something NIH can do to help put down this very destructive conspiracy, with what seems to be growing momentum."  Fauci Ex. 27, at 1.  Dr. Collins stated, "I hoped the Nature Medicine article on the genomic sequence of SARS-CoV-2 [*i.e.*, "The Proximal Origin of COVID-19] would settle this. … Anything more we can do?"  Fauci Ex. 27, at 1.

732.     Dr. Fauci responded to Dr. Collins at 2:45 a.m. the next day, Friday, April 17, stating only: "Francis: I would not do anything about this right now.  It is a shiny object that will go away in times.  Best, Tony."  Fauci Ex. 27, at 2.

733.     Dr. Fauci testified that he did not take "any steps to increase the visibility of the article after this" email exchange with Dr. Collins.  191:21-22; *see also* 195:10-17.  That testimony is incorrect and not credible.

734.     In fact, that same day, Dr. Fauci took matters into his own hands to make the lab-leak theory "go away."  At the joint press conference on April 17, 2020, with President Trump, Vice President Pence, and Dr. Fauci, a reporter asked, "Mr. President, I wanted to ask Dr. Fauci: Could you address the suggestions or concerns that this virus was somehow manmade, possibly came out of a laboratory in China?"  Fauci Ex. 28, at 2.  Dr. Fauci responded: "There was a study recently that we can make available to you, where a group of highly qualified evolutionary

virologists looked at the sequences there and the sequences in bats as they evolve.  And the mutations that it took to get to the point where it is now is [pause for emphasis] *totally consistent* with a jump of a species from an animal to a human." *Id.*; *see also id.* 199:18-25 (Dr. Fauci conceding that, "when you said that sentence about totally consistent, you pause and use that phrase, 'totally consistent' with emphasis" – "Right."); *see also* Video of April 17, 2020 White House Coronavirus Task Force Briefing, *at* https://www.youtube.com/watch?v=brbArpX8t6I (exchange starting at 1:38:32 of video).

735.    Dr. Fauci then feigned ignorance and unfamiliarity with the authors of the study: "the paper will be available – I don't have the authors right now, but we can make that available to you." Fauci Ex. 28, at 2.  Presenting himself as unconnected with the paper, Dr. Fauci did not reveal (1) that he was part of a group that had launched the paper in a clandestine phone call on Saturday, Feb. 1; (2) that he had extensively corresponded with Jeremy Farrar about the paper and its conclusions; (3) that the authors of the paper had sent six versions to him, Jeremy Farrar, and Dr. Collins to review; (4) that he had likely urged the authors to beef up their conclusion attacking the lab-leak theory between the preprint and published versions of the paper; (5) that the authors had personally thanked him for his "advice and leadership" in drafting the paper; or (6) that Dr. Collins had emailed him the day before to ask him to push the paper publicly or take other steps to discredit the lab-leak theory.

736.    Dr. Fauci does not dispute that he was referring to "The Proximal Origin of SARS-CoV-2" in his public remarks at the April 17, 2020, White House press briefing. Fauci Dep. 201:2-6 ("I assume it was the Nature Medicine paper…. I think it was.").

737.    Dr. Fauci testified that he did not make that paper available to any reporters after the press conference. *Id.* at 201:7-9 ("Not to my knowledge.).  That testimony is not credible.

738.    In fact, over the weekend following the press conference, Dr. Fauci personally responded to an inquiry from a reporter specifically asking for the study he had referred to at the April 17, 2020 press conference, and provided a link to "The Proximal Origin of SARS-CoV-2." Fauci Ex. 29, at 1.  On Sunday, April 19, a reporter emailed the White House press office asking, "Dr. Fauci said on Friday he would share a scientific paper with the press on the origin of the coronavirus.  Can you please help me get a copy of that paper?"  *Id.*

739.    Dr. Fauci personally responded to this reporter, stating, "Bill: Here are the links to the scientific papers and a commentary about the scientific basis of the origins of SARS-CoV-2." Fauci Ex. 29, at 1.  He then provided three links.  The first was a link to the online version of "The Proximal Origin of SARS-CoV-2."  The second and third were links to a paper and an online statement by Eddie Holmes, whom Dr. Fauci knew had begun secretly drafting the paper that became "The Proximal Origin of SARS-CoV-2" immediately after the clandestine Feb. 1 conference call with Dr. Fauci, Jeremy Farrar, and others.  Fauci Ex. 29, at 1.  The second link to a paper authored by Holmes was "a commentary on [The Proximal Origin of SARS-CoV-2] in the journal *Cell*."  Fauci Dep. 202:25-203:1; *see also id.* at 203:2-16.

740.    On April 18 and 19, 2020, Dr. Fauci exchange cordial emails with Peter Daszak of the EcoHealth Alliance, who steers NIAID funds to finance bat coronavirus research with Dr. Shi Zhengli at the Wuhan Institute of Virology.   On Saturday, April 18, Daszak emailed Dr. Fauci, calling him "Tony," and stating: "As the PI of the R01 grant publicly targeted by Fox News reporters at the Presidential press briefing last night, I just wanted to say a personal thank you … for standing up and stating that the scientific evidence supports a natural origin for COVID-19 … not a lab release from the Wuhan Institute of Virology."  Fauci Ex. 30, at 1.  Daszak also wrote: "Once this pandemic's over I look forward to thanking you in person and let you know how

important your comments are to us all." *Id.* Dr. Fauci responded on April 19: "Peter: Many thanks for your kind note." *Id.*

741. Dr. Fauci's and Dr. Collins's efforts to orchestrate and publicize "The Proximal Origin of SARS-CoV-2" as a method of discrediting the lab-leak theory were highly effective. "The Proximal Origin of SARS-CoV-2" became one of the most widely read and most publicized scientific papers in history, with pervasive media coverage using it to discredit the lab-leak theory. "The paper has been accessed online more than 5.7 million times and has been cited by more than 2,000 media outlets. … It became one of the best-read papers in the history of science." Jones Decl., Ex. BB, at 3.

742. As a direct result of these efforts, speech and speakers advocating for the lab-leak theory of COVID-19's origins were extensively censored on social media platforms.

743. Twitter took aggressive censorship action against such speech and speakers. For example, on September 16, 2020, Twitter suspended the account of a Chinese virologist who claimed coronavirus was made in a lab. Fauci Ex. 31, at 1. "Twitter has suspended the account of a Chinese scientist who suggested that the novel coronavirus was created in a lab … despite inconclusive evidence." Fauci Ex. 31 at 2.

744. Facebook, likewise, took aggressive steps to censor the lab-leak theory on social media, even going so far as to formalize this policy as part of its official content-moderation policy. Fauci Ex. 32, at 3 (Facebook announcing that "we are expanding the list of false claims we will remove to include additional debunked claims about the coronavirus and vaccines," including "COVID-19 is man-made or manufactured"). Facebook noted that "we already prohibit these claims in ads," and promised "to take aggressive action against misinformation about COVID-19 and vaccines." *Id.* Facebook promised to "begin enforcing this policy immediately, with a

particular focus on Pages, groups or accounts that violate these rules …. Groups, Pages, and accounts on Facebook that repeatedly share these debunked claims may be removed altogether." *Id.*

745.    Like Twitter, Facebook censored even high-profile speakers who raised questions about the origins of COVID-19 or advanced the lab-leak hypothesis.  For example, Facebook censored an article by award-winning British journalist Ian Birrell who raised "the question of the origins of the Covid-19 virus within Wuhan" and criticized the natural-origin theory of the virus. Fauci Ex. 33, at 1.

746.    Dr. Fauci claims that he is not aware of any suppression of speech about the lab-leak theory on social media: "I'm not aware of suppression of speech on social media to my knowledge…. I don't recall being aware of suppression of anything."  Fauci Dep. 208:10-14.  He claims that this ignorance is because he does not pay any attention to anything said on social media: "This is not something that would be catching my attention because, you know, the social media and Twitter, I told you, I don't have a Twitter account. I don't tweet. I don't do Facebook. I don't do anything. So social media stuff, I don't really pay that much attention to."  *Id.* at 210:3-8.  As noted above, Dr. Fauci's emails and actions reflect extensive concern about what is said on social media, and his attempt to cast himself as someone with no knowledge of social media is not credible.

747.    Further, Dr. Fauci's emails and interrogatory responses show a close relationship with the CEO and founder of Meta (Facebook/Instagram), Mark Zuckerberg.

748.    On February 27, 2020, Mark Zuckerberg emailed Dr. Fauci directly to inquire about the development of the COVID-19 vaccine and offer the assistance of the Chan-Zuckerberg foundation.  Fauci Ex. 23, 1.  Zuckerberg already had Dr. Fauci's email, called Dr. Fauci by his

first name "Tony," and wrote as if he had a preexisting acquaintance with Dr. Fauci.  *Id.*  Dr. Fauci, likewise, responded to Zuckerberg on a first-name basis and with the familiar tone of an acquaintance.  Fauci Ex. 23, at 2.

749.    Dr. Fauci claims that he does not recall whether he had already met Mark Zuckerberg.  Fauci Dep. 173:17-174:5 ("I meet thousands of people.  I'm not sure I ever met him in person.").  But in fact, Dr. Fauci still refers to Mark Zuckerberg by his first name.  *Id.* at 289:9-16.

750.    On March 15, 2020, Mark Zuckerberg sent Dr. Fauci a lengthy email to offer close coordination between Dr. Fauci and Facebook on COVID-19 messaging.  In the email, Zuckerberg thanked Dr. Fauci for his leadership, and "share[d] a few ideas of ways to help you get your message out."  Fauci Ex. 23, at 3.  Zuckerberg made three proposals: (1) Facebook was about to launch a "Coronavirus Information Hub" visible at the top of the page to all Facebook users to "get authoritative information from reliable sources," and Zuckerberg offered to include "a video from you" as a "central part of the hub," *id.*; (2) Zuckerberg was "doing a series of livestreamed Q&As from health experts" for his 100 million followers and wanted Dr. Fauci to do one of these videos, *id.*; and (3) Zuckerberg advised Dr. Fauci that Facebook had "allocated technical resources and millions of dollars of ad credits for the US government to use for PSAs to get its message out over the platform," and he wanted Dr. Fauci to recommend "a point person for the government response," *id.*

751.    Dr. Fauci responded the next day, telling "Mark" that "[y]our idea and proposal sound terrific," that he "would be happy to do a video for your hub," and that "your idea about PSAs is very exciting."  Fauci Ex. 23, at 4.  He copied his Special Assistant to put Zuckerberg in

touch with the right point person for the government to arrange specially subsidized government messaging about COVID-19 on Facebook.  *Id.*

752.    Zuckerberg replied the same day, stating "[w]e'd love to move quickly to help the effort and support getting these messages out."  Fauci Ex. 23, at 6.

753.    Dr. Fauci claims that the U.S. Government did not accept Facebook's offer of free ad credits to support the Government's COVID-19 messaging.  Fauci Dep. 177:22-178:4 ("I don't believe that there was any money that was given from the Zuckerberg to the United States government to do PSAs. It's possible, but it certainly didn't happen to my knowledge. I don't recall money being given for PSAs.").  But at the time, Dr. Fauci described the proposal as "very exciting" and immediately followed up on Zuckerberg's offer.  Fauci Ex. 23, at 4.  Separate emails from Facebook to the White House corroborate these ad credits.  *See, e.g.,* Doc. 174-1, at 46.   Dr. Fauci's testimony on this point is not credible.

754.    Dr. Fauci and Zuckerberg have "interacted on Facebook Zoom-type podcasts." Fauci Dep. 175:17-18.  Dr. Fauci did "[t]hree live stream Facebook-type Q and As" about COVID-19 with Zuckerberg.  Fauci Dep. 177:2-4.

755.    Dr. Fauci's interrogatory responses reveal extensive direct communications between Dr. Fauci and Zuckerberg.  *See* Scully Ex. 12, at 33, 53-54 (identifying 13 communications between Dr. Fauci and Zuckerberg, including emails, phone calls, virtual meetings, and live broadcasts, over a nine-month period in 2020).

756.    Reviewing the foregoing facts about Dr. Fauci's communications with Farrar, Eddie Holmes, and others, former Director of the CDC Robert Redfield "had a dawning realization. He concluded there'd been a concerted effort not just to suppress the lab-leak theory but to manufacture the appearance of a scientific consensus in favor of a natural origin. 'They

made a decision, almost a P.R. decision, that they were going to push one point of view only' and suppress rigorous debate, said Redfield. 'They argued they did it in defense of science, but it was antithetical to science.'"  Jones Decl., Ex. AA.

**B.    Dr. Fauci's Efforts to Suppress Speech on Hydroxychloroquine.**

757.    On May 22, 2020, The Lancet published an online article entitled "Hydroxychloroquine or chloroquine with or without a macrolide for treatment of COVID-19: a multinational registry analysis."  Fauci Ex. 35, at 1.  The article purported to analyze 96,032 patients to compare cohorts who did and did not receive hydroxychloroquine or chloroquine to treat COVID-19.  *Id.*  The study concluded that hydroxychloroquine and chloroquine were "associated with decreased in-hospital survival and an increased frequency of ventricular arrhythmias when used for COVID-19."  *Id.*

758.    On May 27, 2020, Dr. Fauci publicly cited this study to claim that hydroxychloroquine is "not effective against coronavirus."  Fauci Ex. 34, at 1.  Dr. Fauci "became the first Trump administration official to say definitively that hydroxychloroquine is not an effective treatment for the coronavirus." *Id.* at 2.  "'The scientific data is really quite evident now about the lack of efficacy,' Fauci … said on CNN."  *Id.*

759.    Dr. Fauci's comments were based on the May 22 Lancet study.  *Id.* at 3 ("Fauci's comments come days after the Lancet published a 96,000-patient observational study that concluded that hydroxychloroquine had no effect on Covid-19 and may even have caused some harm.").

760.    The Lancet article was an observational study, not a randomized trial.  At the time, "[t]here [wa]s no data yet from randomized, controlled clinical trials of hydroxychloroquine – the

gold standard for evaluating potential treatments." Fauci Ex. 34, at 4. "But Fauci was unequivocal on [May 27, 2022], saying that 'the data are clear right now.'" *Id.*

761.    Just a few days later, The Lancet retracted the May 22, 2022 study. Fauci Ex. 35, at 1. An article reporting on the retraction noted that the study's authors "were unable to confirm that the data set was accurate," that "several concerns were raised with respect to the veracity of the data," the study may have "include[ed] more cases than possible," and that "[a] first-year statistics major could tell you about major flaws in the design of the analysis." Jones Decl., Ex. DD, at 2-3.

762.    Thus, Dr. Fauci's initial dismissal of hydroxychloroquine was based on a purely *observational* study – not a randomized, controlled trial – and one that was retracted for glaring errors just days later.

763.    Dr. Fauci testified that he did not recall that The Lancet study he cited to discredit the efficacy of hydroxychloroquine had been retracted. Fauci Dep. 223:7 ("I don't recall it being retracted.").

764.    Dr. Fauci stepped up his public campaign to discredit hydroxychloroquine by insisting that its effectiveness could only be judged by undergoing rigorous, randomized, double-blind, placebo-based studies, notwithstanding his previous reliance on the less-than-rigorous observational study in The Lancet that was subsequently retracted. On July 31, 2020, Dr. Fauci testified before the House Select Subcommittee on Coronavirus Crisis, during which he stated: "The point that I think is important, because we all want to keep an open mind, any and all of the randomized placebo-controlled trials, which is the gold standard of determining if something is effective, none of them had shown any efficacy by hydroxychloroquine. Having said that, I will state, when I do see a randomized placebo-controlled trial that looks at any aspect of

hydroxychloroquine, either early study, middle study, or late, if that randomized placebo-controlled trial shows efficacy, I would be the first one to admit it and to promote it. But I have not seen yet a randomized placebo-controlled trial that's done that. And in fact, every randomized placebo-controlled trial that has looked at it, has shown no efficacy. So, I just have to go with the data. I don't have any horse in the game one way or the other, I just look at the data." *See* https://www.youtube.com/watch?v=RkNC5OQD2UE.

765.    Despite his insistence before a congressional committee that randomized, placebo-controlled trials were the determining factor for his opinion regarding the effectiveness of hydroxychloroquine in the treatment of COVID-19, Dr. Fauci quietly admitted that such rigorous studies are not actually required to determine the efficacy of a therapeutic drug.  Dr. Fauci was asked, "Do you recall saying in connection with the discussion of hydroxychloroquine that a randomized double blind placebo based study is the gold standard?"  Fauci Dep. 244:8-11.  He replied, "That is the gold standard for everything.  *It isn't always needed*, but for the most part, it's the gold standard." *Id.* at 244:12-14 (emphasis added).

766.    Dr. Fauci's sudden reversal concerning the critical standards for scientific studies to determine the effectiveness of hydroxychloroquine demonstrated a lack of candor to the House Select Subcommittee on Coronavirus Crisis.  Indeed, Dr. Fauci misled the Committee when he failed to disclose that randomized, double-blind, placebo-based studies are not always needed and that he previously relied on the *observational,* i.e., non-randomized, non-double-blind, non-placebo-based study in The Lancet to form an opinion about that drug's efficacy in the first place. Dr. Fauci lacks credibility on this point.

767.    Despite mounting evidence against his position, Dr. Fauci testified that his opinion against hydroxychloroquine was based on other studies as well as the retracted article in The

Lancet, but he could not identify any of those studies.  Fauci Dep. 223:12-18 ("I don't recall specifically what those studies are now.").

768.     Dr. Fauci did not retreat from his hard public stance against hydroxychloroquine.  On July 26, 2020, a group called "America's Frontline Doctors" held a press conference at the U.S. Capitol criticizing the government's response to the COVID-19 pandemic and touting the benefits of hydroxychloroquine in treating the coronavirus.  Fauci Ex. 38, at 5.

769.     Dr. Fauci responded to this event with highly visible public statements condemning the use of hydroxychloroquine.  For example, he stated on "Good Morning America," that "[t]he overwhelming prevailing clinical trials that have looked at the efficacy of hydroxychloroquine have indicated that it is not effective in coronavirus disease."  Fauci Ex. 36, at 5.  Dr. Fauci made these comments in direct response to the public claims of America's Frontline Doctors.  Fauci Dep. 227:7-228:13.  He also stated on MSNBC's "Andrea Mitchell Reports" that the video of the press conference by America's Frontline Doctors constituted "a video out there from a bunch of people spouting something that isn't true."  Fauci Ex. 37, at 3.

770.     Dr. Fauci also stated that "the cumulative data on trials, clinical trials that were valid, namely clinical trials that were randomized and controlled in a proper way, … showed consistently that Hydroxychloroquine is not effective in the treatment of coronavirus disease or COVID-19."  Fauci Ex. 37, at 3.  But two months earlier, he had said "the data are clear right now" when no such studies existed.  Fauci Ex. 34, at 4.

771.     Social-media platforms reacted by aggressively censoring the video of America's Frontline Doctors.  Facebook removed the video when it was "the top-performing Facebook post in the world," and "had accumulated over 17 million views by the time of its censorship by Facebook."  Fauci Ex. 38, at 3, 4.  Further, "Facebook's decision to censor the livestream was

quickly followed by YouTube, the Google-owned video-sharing platform." *Id.* at 6. "The video had 80,000 views on YouTube prior to its removal." *Id.* "Following Facebook and YouTube's removal of the video, Twitter followed suit…." *Id.*; *see also* Fauci Ex. 36, at 3 (noting that "Twitter … removed the video, saying it was 'in violation of our COVID-19 misinformation policy'").

772.     Dr. Fauci professed to be unaware of whether 17 million views of a video on Facebook are a large number of views: "I don't know what 17 million views means. What's the denominator? Is 17 million a large amount? Is it a small amount? I don't go on social media, so I don't know what 17 million views means." Fauci Dep. 236:7-11. It is common sense that 17 million views are a large number of views. Dr. Fauci's testimony on this point is not credible.

773.     Dr. Fauci does not deny that he or his staff at NIAID may have communicated with Facebook regarding the censorship of the America's Frontline Doctors video. Instead, he claims that he does not recall whether they communicated with Facebook about it, and that it is possible that they did so. Fauci Dep. 238:2-5 ("I don't recall anybody communicating with them about that. Could have been, but I don't recall anybody -- I don't recall anybody communicating with the social media people."); *see also id.* at 238:6-10. He also does not deny that other federal officials may do so, but he claims that "I don't recall any of that" and "it just doesn't ring a bell to me right now." *Id.* at 238:21-239:7. He claims he doesn't "pay attention" to whether his staff or other federal officials communicate with social-media platforms about censorship because "I have a really important day job that I work at." *Id.* at 238:19-20.

774.     Nevertheless, regarding the decision by YouTube and Twitter to follow Facebook in censoring the video, Dr. Fauci admits that "Yes, I knew of that." *Id.* at 239:8-13.

775.     A few days later, on August 1, 2020, the web host provider for America's Frontline

Doctors shut down their website.  *Id.* at 242:14-243:8; Fauci Ex. 39.  Dr. Fauci testifies that he

does not recall this occurrence.  Fauci Dep. 243:13-18.

776.     On November 18, 2022, a meta-analysis of 449 studies on the efficacy of

hydroxychloroquine considered "449 HCQ COVID-19 studies, 351 peer reviewed, 371 comparing

treatment and control groups."  Fauci Ex. 40, at 1.  The meta-analysis concluded that "[l]ate

treatment and high dosages may be harmful, while early treatment consistently shows positive

results."  *Id.*  It also noted that "[n]egative evaluations" of hydroxychloroquine "typically ignore

treatment delay."  *Id.*  And it noted that "HCQ/CQ was adopted for early treatment in all or part of

41 countries."  *Id.*

### C.     Dr. Fauci's "Devastating Takedown" of the Great Barrington Declaration.

777.     Dr. Fauci recommended Dr. Clifford Lane of NIAID to participate in a WHO

mission to China in February 2020.  Fauci Dep. 139:15.

778.     On April 3, 2020, the NIH Record wrote a report on Lane's trip entitled "NIAID's

Lane Discusses WHO COVID-19 Mission to China.  Fauci Ex. 20, at 1.  Lane praised China's

response to the pandemic, especially their reliance on lockdowns and "extreme … social

distancing": "The Chinese were managing this in a very structured, organized way,' he explained.

'When we got there, the outbreak was already coming under control in China.  The measures they

put in place appeared to be working…. It demonstrated their successful response…. From what I

saw in China, we may have to go to as extreme a degree of social distancing to help bring our

outbreak under control."  *Id.* at 5-6.

779.     Dr. Fauci discussed this conclusion with Lane when he returned from China: "Dr.

Lane was very impressed about how from a clinical public health standpoint, the Chinese were

handling the isolation, the contact tracing, the building of facilities to take care of people, and that's what I believed he meant when he said were managing this in a very structured, organized way." Fauci Dep. 165:4-11.

780.   Dr. Fauci admits that Lane "did discuss with me that the Chinese had a very organized way of trying to contain the spread in Wuhan and elsewhere. … he mentioned that they had a very organized, well-regimented way of handling the outbreak." *Id.* at 166:1-7.

781.   Dr. Fauci came to agree with Dr. Lane's rosy assessment of China's draconian response to the outbreak: "Dr. Lane is a very astute clinician, and I have every reason to believe that his evaluation of the situation was accurate and correct." *Id.* at 166:24-167:1.

782.   On Feb. 22, 2020, Dr. Lane sent an email stating, "China has demonstrated that this infection can be controlled, albeit at great cost." Fauci Ex. 21, at 1.

783.   On October 4, 2020, Plaintiffs Dr. Jay Bhattacharya of Stanford and Dr. Martin Kulldorff of Harvard, along with Dr. Sunetra Gupta of Oxford, published online the "Great Barrington Declaration," which was one-page treatise opposing reliance on lockdowns and advocating for an approach to COVID-19 called "focused protection." Fauci Ex. 41.

784.   The Great Barrington Declaration criticized the social-distancing and lockdown approaches to the pandemic endorsed by government experts such as Dr. Fauci and Cliff Lane: "As infectious disease epidemiologists and public health scientists we have grave concerns about the damaging physical and mental health impacts of the prevailing COVID-19 policies, and recommend an approach we call Focused Protection." *Id.*  It was very critical of such government policies: "Current lockdown policies are producing devastating effects on short and long-term public health. The results (to name a few) include lower childhood vaccination rates, worsening cardiovascular disease outcomes, fewer cancer screenings and deteriorating mental health –

leading to greater excess mortality in years to come, with the working class and younger members of society carrying the heaviest burden. Keeping students out of school is a grave injustice. Keeping these measures in place until a vaccine is available will cause irreparable damage, with the underprivileged disproportionately harmed." *Id.* It called for an end to lockdowns: "The most compassionate approach that balances the risks and benefits of reaching herd immunity, is to allow those who are at minimal risk of death to live their lives normally to build up immunity to the virus through natural infection, while better protecting those who are at highest risk. We call this Focused Protection." *Id.*

785.    The Declaration called for an end of government-imposed lockdowns and an immediate return to normal life for those who are low-risk: "Those who are not vulnerable should immediately be allowed to resume life as normal. Simple hygiene measures, such as hand washing and staying home when sick should be practiced by everyone to reduce the herd immunity threshold. Schools and universities should be open for in-person teaching. Extracurricular activities, such as sports, should be resumed. Young low-risk adults should work normally, rather than from home. Restaurants and other businesses should open. Arts, music, sport and other cultural activities should resume. People who are more at risk may participate if they wish, while society as a whole enjoys the protection conferred upon the vulnerable by those who have built up herd immunity." *Id.*

786.    The Declaration was thus highly critical of the lockdown policies defended by Dr. Fauci and Dr. Cliff Lane of NIAID since Dr. Lane's trip to China at the beginning of the pandemic. The Declaration was "going against the global political consensus, which holds that lockdowns are key to minimising mortality to Covid-19." Fauci Ex. 48, at 3. After it was posted online, it rapidly gathered signatures from doctors and scientists, as well as members of the public.

787.     Four days later, on October 4, 2020, Dr. Francis Collins emailed Dr. Fauci and Cliff Lane, citing the Great Barrington Declaration.  Fauci Ex. 42, at 1.  Dr. Collins stated: "Hi Tony and Cliff, See https://gbdeclaration.org.  This proposal from the three fringe epidemiologists who met with the Secretary seems to be getting a lot of attention – and even a co-signature from Nobel Prize winner Mike Leavitt at Stanford.  There needs to be a quick and devastating published take down of its premises.  I don't see anything like that on line yet – is it underway?  Francis."  *Id.*

788.     This email seeking Dr. Fauci's assistance in a "quick and devastating … take down" of the Great Barrington Declaration" is strikingly similar to Dr. Collins' email to Dr. Fauci on April 16, 2020, asking Dr. Fauci's "help [to] put down this very destructive conspiracy," *i.e.*, the lab-leak hypothesis.  Fauci Ex. 27, at 1.  In both cases, Dr. Collins sought Dr. Fauci's aid in discrediting and silencing an online narrative that federal officials disfavored, and in both cases, Dr. Fauci promptly and effectively complied.

789.     Dr. Collins' question to Dr. Fauci in the email, "Is it underway?" implies that Dr. Collins expected Dr. Fauci to be already working on a "quick and devastating … take down" of the Declaration, or to be aware of others working on one.  Fauci Ex. 42, at 1.  Dr. Fauci denies that Dr. Collins had any reason to think that Dr. Fauci might be working on a refutation of the Great Barrington Declaration, because "[t]his is not something I would be involved in," because "I have a very important day job that is running a $6.4 billion institute."  Fauci Dep. 260:11-20.  Given Dr. Fauci's immediately subsequent attempts to refute and discredit the Great Barrington Declaration, this testimony is not credible.

790.     The same day as Dr. Collins' email, October 8, 2020, Dr. Fauci wrote back to Dr. Collins, stating "Francis: I am pasting in below a piece from *Wired* that debunks this theory.  Best, Tony."  Fauci Ex. 43, at 1.  Dr. Fauci followed up the same day with an email to Dr. Collins linking

to an article by Gregg Gonsalves which Dr. Fauci called "[a]nother refutation of the herd immunity approach."  Fauci Ex. 44, at 1.

791.    Dr. Fauci has known Gregg Gonsalves for decades, since the 1980s.  Fauci Dep. 265:16-19.  Dr. Fauci does not deny that he may have contacted Gregg Gonsalves before Gonsalves wrote this piece attacking the Great Barrington Declaration, but claims he does not recall.  *Id.* at 268:8-19 ("I don't recall.  I might have.").

792.    Dr. Fauci and Dr. Collins followed up with a series of public media statements attacking the Great Barrington Declaration.  On October 14, 2020, the Washington Post ran a story entitled, "Proposal to hasten herd immunity to the coronavirus grabs White House attention but appalls top scientists."  Fauci Ex. 45, at 1.  In the article, Dr. Collins described the Great Barrington Declaration and its authors as "fringe" and "dangerous": "This is a fringe component of epidemiology.  This is not mainstream science.  It's dangerous."  *Id.* at 3.

793.    Dr. Fauci consulted with Dr. Collins before he told the Washington Post that the Great Barrington Declaration represented a "fringe" and "dangerous" idea.  Fauci Dep. 272:4-7.

794.    Dr. Fauci endorsed these comments in an email to Dr. Collins on October 13, 2020, stating, "[w]hat you said was entirely correct."  Fauci Ex. 46, at 1.

795.    Dr. Fauci admits that Dr. Collins could have been concerned about the spread of the ideas in the Declaration on social media when he called it "fringe" and "dangerous."  Fauci Dep. 274:19-20.

796.    The next day, October 15, 2020, Dr. Fauci echoed Dr. Collins' comments, calling the Declaration "nonsense" and "dangerous."  Fauci Ex. 47, at 1.  Describing the proposal as "letting infections rip as it were," Dr. Fauci stated: "Quite frankly that is nonsense, and anybody

who knows anything about epidemiology will tell that that is nonsense and very dangerous." *Id.* at 3.

797.    Dr. Fauci testified that "it's possible that" he coordinated with Dr. Collins on their public statements attacking the Great Barrington Declaration.  Fauci Dep. 279:23-24.

798.    Dr. Fauci also testified of himself and Dr. Collins that "that's not our style to be coordinating things." *Id.* at 279:22-23.  In light of the extensive coordination with Dr. Collins about the lab-leak theory, and the coordination about the Great Barrington Declaration, that testimony is not credible.

799.    Shortly after Dr. Collins' email to Dr. Fauci seeking a "quick and devastating … take down" of the Great Barrington Declaration, the Declaration and its authors, Drs. Bhattacharya and Kulldorff, experienced extensive censorship on social media. *See infra.*  In October 2020, Google deboosted the search results for the Declaration, so that "most users in English-speaking countries, when they google 'Great Barrington Declaration,' will not be directed to the declaration itself but to articles that are critical of the declaration."  Fauci Ex. 48, at 4.

800.    In the same time, "[c]ensorship of the declaration … also spread to Reddit. The two most popular subreddits for discussion of the coronavirus – r/COVID-19 and r/coronavirus – have both removed links to the Great Barrington Declaration. The moderators of r/coronavirus, a forum with 2.3million members, have declared it to be 'spam'."  Fauci Ex. 48, at 4-5.

801.    In October 2020, YouTube updated its terms of service regarding medical "misinformation," reporting "COVID-19 medical misinformation policy updated to prohibit content about vaccines contradicting consensus from health authorities."  Fauci Ex. 49, at 3. "Health authorities" include federal officials like Dr. Fauci and Dr. Collins.  *See id.*  This October 2020 update specifically stated that claims which are "not allowed on YouTube" include "[c]laims

that achieving herd immunity through natural infection is safer than vaccinating the population,"

which is listed on the same footing as "[c]laims that COVID-19 vaccines contain a microchip or

tracking device." Fauci Ex. 50, at 3-4.

802.    Pursuant to this censorship policy of YouTube, the authors of the Great Barrington

Declaration had content removed from YouTube, including a video of a roundtable discussion with

Governor Ron DeSantis of Florida. *See infra.*

803.    Facebook, likewise, adopted censorship policies against the Great Barrington

Declaration. Meta's policy on "Misinformation about vaccines" states that: "We remove

misinformation primarily about vaccines when *public health authorities* conclude that the

information is false and likely to directly contribute to imminent vaccine refusals." Fauci Ex. 51,

at 4 (emphasis added).

804.    Facebook/Meta views Dr. Fauci as a "public health authority" who may dictate

what people may post about COVID-19 on its platforms (Facebook and Instagram, among others),

because Mark Zuckerberg and Dr. Fauci were collaborating on multiple public appearances and

videos for Facebook. *See supra*; Scully Ex. 12, at 33, 53-54 (identifying 13 communications

between Dr. Fauci and Zuckerberg, including emails, phone calls, virtual meetings, and live

broadcasts, over a nine-month period in 2020). Indeed, in his March 15, 2020 email to Dr. Fauci,

Mark Zuckerberg described Dr. Fauci as an "expert[]," a "health expert[]" and "reliable source[]"

for "authoritative information" about fighting COVID-19. Fauci Ex. 23, at 3.

805.    Dr. Fauci claims that he would not have paid any attention to the Great Barrington

Declaration because he is too busy and important to pay attention to such matters: "this is not

something that I would have been paying a lot of attention to. I was knee deep in trying to do

things like develop a vaccine that wound up saving the lives of millions of people. That's what I

was doing at the time." Fauci Dep. 256:13-17.  Given Dr. Fauci's direct involvement in publicly attacking the Great Barrington Declaration and collecting sources for Dr. Collins to "take [it] down," this statement is not credible.  In fact, on November 1, 2020, Greg Folkers, Dr. Fauci's staffer at NIAID, sent Dr. Fauci a list of articles attacking the Great Barrington Declaration—including one co-authored by Gregg Gonsalves—with the statement "As discussed. I have highlighted the three I found the most useful."  Fauci Ex. 52, at 1.  The list of articles were all harshly critical of the Declaration—using phrases like "dangerous," "false promise," "ethical nightmare," and "could kill millions."  *Id.*  Thus, four weeks after the Declaration was published, Dr. Fauci and his staffers were still "discuss[ing]" and looking up articles on ways to attack it.  *Id.*

806.    Dr. Kulldorff points out that, regardless of disagreements over the policy, describing the Declaration as "fringe" and "nonsense" is fundamentally dishonest, as the Declaration reflects principles of pandemic preparedness that were widely accepted before COVID-19: "the Great Barrington Declaration is merely a restatement of the principles of public health. Lockdown … is a 'terrible experiment' that throws those principles 'out of the window' by focusing solely on one disease at the expense of all other health problems. 'Most countries in Europe had a pandemic-preparedness plan that did not recommend lockdowns, but instead proposed a risk-based strategy to protect those at high risk, which is actually the same as the focused protection we put forward in the Great Barrington Declaration. What we are proposing is, therefore, nothing revolutionary', [Kulldorff] said."  Fauci Ex. 48, at 6.

807.    Regarding the censorship of the Great Barrington Declaration on social media, Dr. Fauci repeatedly testified that he was oblivious to it: "I don't pay much attention to what goes on in social media … it is highly unlikely that … I paid any attention to this thing of Google censoring the Great Barrington Declaration … I would not have paid much attention to it."  Fauci Dep.

204

281:15-282:2, 283:7-10.  In light of his contemporaneous statements and emails, this statement is not credible.

808.   Like so many other topics, Dr. Fauci repeatedly testified that he could not recall virtually anything about his involvement in seeking to squelch the Great Barrington Declaration. He testified at least 33 times that he could not recall his involvement in this matter.  *See* Fauci Dep. 251:11, 252:20, 255:6, 255:9, 256:3, 257:5, 258:12, 263:1, 263:15, 263:21, 264:17, 264:20, 264:22, 265:2, 265:6, 268:10, 268:18, 270:24, 282:19-20, 284:22-23, 290:13, 290:21, 291:13, 291:16, 292:15, 292:24, 293:15, 293:24, 295:9, 295:25, 296:21, 297:2-3, 297:14.  For the reasons discussed above, these claims to almost total loss of memory are not credible.

### D.     NIAID Flags Social-Media Accounts for Censorship Under Dr. Fauci.

809.   As noted above, Dr. Fauci testified that he is not aware of any NIAID or NIH staff contacting social media platforms to ask them to remove content.  In fact, NIAID and NIH staff—including staffers in Dr. Fauci's senior circle—sent several messages to social-media platforms asking them to remove content lampooning or criticizing Dr. Fauci.  Dr. Fauci's testimony to the contrary is not credible.

810.   On March 14, 2020, a Twitter employee reached out to CDC officials, including Carol Crawford, and asked if a particular account associated with Dr. Fauci is "real or not."  Fauci Ex. 53, at 2.  Scott Prince of NIH responded, "Fake/Impostor handle.  PLEASE REMOVE!!!"  *Id.* Twitter responded that it would take action promptly and "circle back ASAP."  *Id.*  An HHS official then asked if Twitter could pre-block similar parody accounts: "Is there anything else that you can also do to block other variations of [Dr. Fauci's] name from impersonation so we don't have this happen again?"  *Id.* at 1.  Twitter replied: "We'll freeze this @handle and some other variations so no one can hop on them."  *Id.*

811.    Likewise, on April 21, 2020, Judith Lavelle of NIAID emailed Facebook, copying Scott Prince of NIH and Jennifer Routh of Dr. Fauci's communications team, and stated: "We wanted to flag a few more fake Dr. Fauci accounts on FB and IG for you.  I have also reported them from @niaid and my personal FB account."  Fauci Ex. 55, at 3.  She listed eight accounts that she considered fake.  One of these was called "Dr.FauciTheHero," and she stated, "I think this one may be fine as a fan page but could use a reminder to be a bit more clear," *id.* at 4—thus noting that she was seeking the censorship only of speech about Dr. Fauci that the government disfavors, while "a fan page" was fine.

812.    Both Jennifer Routh and Judith Lavelle are members of Dr. Fauci's communications staff.  Fauci Dep. 308:14-21.

813.    The fact that Lavelle stated they were flagging "a few *more*" accounts indicates that NIAID's flagging social-media accounts for censorship was not an isolated incident but an ongoing practice.  Fauci Ex. 55, at 3.

814.    Lavell then followed up flagging yet another account, saying "Apologies one more," and adding Greg Folkers of Dr. Fauci's personal staff to the email chain reporting these accounts to Facebook for censorship.  Fauci Ex. 55, at 3.

815.    The same day, Facebook responded, "Flagged this for the fake accounts team and they have confirmed that all but two accounts were removed for impersonation of Dr. Fauci.  I guess two of the accounts are fan accounts."  Fauci Ex. 55, at 3.

816.    The Facebook employee then added, "Also want to intro you all to [two more Facebook employees] who have been working hard to manage any fake accounts for NIH across the board.  She can work with you directly if anything like this comes up."  Fauci Ex. 55, at 2. Lavelle responded that "our team will be sure to reach out if we identify any more impersonations,"

*id.*, and Facebook answered that Lavelle of NIAID should "feel [free] to flag to us the various imposter accounts," Fauci Ex. 55, at 1. Again, this response indicates an ongoing and widespread practice of NIH reporting supposedly "fake" accounts for censorship. *Id.*

817.    Dr. Fauci testifies that he does not remember for certain, but he "likely" asked his communications staff to do something about these impersonation or parody accounts. Fauci Dep. 302:6-10 ("I vaguely remember somebody mentioning something about an imposter account. … And I likely would have said, 'Well, how can they do that?'"). He also agrees that his communications staff would do so on their own. *Id.* at 301:1-4 ("I have a communication staff that I'm sure, if they found out it was a false and misleading account, that they would want it to be removed."); *see also id.* at 301:23-25; 304:19-21.

818.    Dr. Fauci believes it is "totally appropriate" for his communications staff to contact social-media platforms and seek the removal of such accounts. *Id.* at 312:19-21; *see also id.* at 310:14-16.

819.    He thinks so because "impersonating me is a bad thing." *Id.* at 303:20; *see also id.* at 304:11-13; 309:23-310:1 ("fake accounts are bad things, I believe"); 311:20-21. Dr. Fauci specifically believes that removing accounts associated with him is "a good thing" because "those accounts are bad." *Id.* at 329:12-16.

820.    Dr. Fauci does not know whether some of the so-called "fake accounts," which he calls "bad things," that his staff flagged for censorship may actually be parody accounts. *Id.* at 311:7-9.

821.    Moreover, it was not just NIAID staff, but also White House staff, who flagged content about Dr. Fauci for removal from social-media platforms. As noted above on Tuesday, July 20, 2021, Clarke Humphrey of the White House communications office emailed Facebook

asking for the removal of an Instagram account associated with Dr. Fauci, saying it "is not actually one of ours." Fauci Ex. 57, at 1-2. Facebook responded one minute later, stating, "Yep, on it!" Fauci Ex. 57, at 1. Courtney Billet, Dr. Fauci's communications director at NIAID, then weighed in, asking Facebook to disclose whether "there's a federal email address attached to whomever set this account up," so that she could ascertain whether the account was set up by "some federal employee outside our official comms offices." Fauci Ex. 57, at 1. The next day, Facebook responded, stating, "This account has been removed. Thank you for flagging!" Fauci Ex. 57, at 1.

822.    NIAID's communications with social-media platforms were not limited to flagging impostor or parody accounts. On October 30, 2020, for example, a NIAID staffer wrote an email connecting Google/YouTube with Jennifer Routh of NIAID's "Office of Communications and Government Relations," so that NIAID and the "Google team" could "connect on vaccine communications – specifically misinformation…." Fauci Ex. 56, at 2. Routh then added Courtney Billet ("director of the Office of Communications and Government Relations at NIAID") and two other senior NIAID officials to the communications chain with YouTube. Fauci Ex. 56, at 1.

823.    Likewise, in response to a third-party subpoena, Twitter has disclosed that Dina Perry, a Public Affairs Specialist for NIAID, communicates or has communicated with Twitter about misinformation and censorship. Jones Decl., Ex. F, at 1.

824.    NIAID did not disclose Dina Perry in response to interrogatories seeking the identities of NIAID officials who communicate with social-media platforms about misinformation, disinformation, and censorship. Scully Ex. 12, at 17-18.

825.    Dr. Fauci testified that he has never "contacted a social media company and asked them to remove misinformation from one of their platforms." Fauci Dep. 151:21-24 ("No, I have

not."). He also testified that no one on his staff at NIAID has "ever reached out to a social media

platform to ask them to take content down or to block content in any way. *Id.* at 152:7-15 ("To

my knowledge, no."). In light of the repeated attempts of Dr. Fauci's staff to have content related

to Dr. Fauci removed from social media, Dr. Fauci's testimony on this point is not credible.

### E.     CDC and NIH Procure the Censorship of Speech on Ivermectin.

826.    On September 13, 2021, Facebook emailed Carol Crawford of the CDC to ask the

CDC to identify whether the claim that "Ivermectin is effective in treating COVID" is "false, and

if believed, could contribute to people refusing the vaccine or self-medicating," which were the

qualifications for censoring that claim on Facebook's platforms. Fauci Ex. 58, at 2. Facebook

noted that it was currently rating this claim as "*not false*," *i.e.*, Facebook was *not* censoring the

claim that Ivermectin is effective in treating COVID-19, because there was "no consensus" of its

efficacy for treatment. *Id.* at 3.

827.    The next day, the CDC responded, advising Facebook that the claim that

"Ivermectin is effective in treating COVID" is "                    " (bold and italics in original)

and thus should be censored on Facebook's platforms. Fauci Ex. 58, at 1. To support this claim,

the CDC cited NIH's "Ivermectin | COVID-19 Treatment Guidelines." *Id.* Thus, the CDC cited

the NIH's treatment guidelines for Ivermectin as authority to urge Facebook to censor claims about

using Ivermectin to treat COVID-19. *Id.* CDC also cited NIH to call for the censorship of two

related claims about Ivermectin, and noted that "[t]hese responses are based on the independent

advice of … NIH," which had "opined that there are not data that indicate ivermectin is effective

in the ways described above." *Id.*

### F.     Dr. Fauci's Double Standard on Acceptable Speech: Mask Mandates.

828.   "Sylvia Burwell is the former Secretary of the Department of Health and Human Services [under President Obama] and the current president of American University."  Fauci Dep. 313:9-11.  "Sylvia has, over the past couple of years, asked [Dr. Fauci] advice about personal safety during the COVID-19 pandemic."  *Id.* at 313:17-19.

829.   On February 4, 2020, Sylvia Burwell wrote Dr. Fauci an email stating that she was traveling and wondering if she should wear a mask in the airport.  Fauci Dep. 313:21-314:5; *see also* Jones Decl., Ex. EE, at 1.  Dr. Fauci responded, stating: "Masks are really for infected people to prevent them from spreading infection to people who are not infected, rather than protecting uninfected people from acquiring infection.  The typical mask you buy in the drugstore is not really effective in keeping out virus, which is small enough to pass through material. … I do not recommend that you wear a mask…."  Fauci Dep. 314:9-19; *see also* Jones Decl., Ex. EE, at 1.

830.   Dr. Fauci agrees that he "made several statements that are similar to that at that time frame."  Fauci Dep. 315:12-14.

831.   He states that, at that time, there were "no studies" on the efficacy of masking to stop the spread of COVID-19.  *Id.* at 316:8-13.

832.   In fact, on March 31, 2020, Dr. Fauci forwarded studies showing that masking is ineffective.  Fauci Dep. 318:24-319:7.

833.   Dr. Fauci's position on masking dramatically changed by April 3, 2020, when he became an advocate for universal mask mandates.  *Id.* at 317:14-20.

834.   Dr. Fauci states that his position on masking changed in part because "[e]vidence began accumulating that masks actually work in preventing acquisition and transmission."  Fauci Dep. 317:5-6.

835.     Dr. Fauci was asked to identify any studies that were done between February 2020 and April 3, 2020, that supported his change of position on the efficacy of masking, and he could not identify any.  *Id.* at 318:8-10.

836.     Dr. Fauci was asked if there were any "placebo-based, double-blind, randomized studies of the efficacy of masking that were done between February and April 2020," and he could not identify any.  *Id.* at 322:1-5.  In fact, it is obvious that there were none.

837.     Dr. Fauci's position on masking, therefore, directly contradicts his insistence on randomized, double-blind, placebo-based clinical trials for alternative COVID-19 treatments like hydroxychloroquine and ivermectin.  At best, Dr. Fauci's dramatic change in position on masking was based on observational studies—the same kind of studies that he dismissed, in the very same time frame, as inadequate to support the use of hydroxychloroquine to treat COVID-19.  At worst, it was based on no evidence at all—and Dr. Fauci identified none.

838.     Dr. Fauci believes it can be dangerous to give ordinary people access to scientific information: "If information is clearly inadequate and statistically not sound, there can be a danger in people who don't have the ability or the experience of being able to understand that it's a flawed study."  *Id.* at 323:5-9.

839.     Dr. Fauci believes that it is "disturbing" when "unwitting" people believe what he thinks is misinformation: "I think honest debate is important, but when it goes beyond debate and leads people who are unwitting about these things to do things that are clearly detrimental to their life and their safety, I find that disturbing."  *Id.* at 358:13-17.

**G.     Dr. Fauci and the White House Cause the Censorship of Alex Berenson.**

840.     Alex Berenson is a former New York Times science reporter and prominent critic of government messaging about COVID-19 vaccines who was deplatformed from Twitter on

August 28, 2021, after months of pressure from White House and federal officials.   Fauci Ex. 59, at 4.

841.    As Berenson notes: "On July 16, 2021, President Biden complained publicly that social media companies were 'killing people' by encouraging vaccine hesitancy.   A few hours after Biden's comment, Twitter suspended by account for the first time." Fauci Ex. 59, at 4.

842.    Dr. Fauci, who was then Chief Medical Advisor to President Biden, played a key role in procuring the censorship of Alex Berenson.   Shortly before President Biden's comments, Dr. Fauci engaged in public attacks on Alex Berenson in attempt to discredit him and silence his government-skeptical opinions.

843.    On July 11, 2021, appearing on CNN's "State of the Union," Dr. Fauci described Alex Berenson's comments on vaccine skepticism as "horrifying." Fauci Ex. 60, at 1.  Responding to applause for a speech given by Berenson at a conference, Dr. Fauci stated: "It's horrifying.  I mean, they are cheering about someone saying that it's a good thing for people not to try and save their lives." *Id.*  In response to Berenson's views, Dr. Fauci stated, "it's almost frightening to say, … we don't want you to do something to save your life." *Id.*  Dr. Fauci also stated, "I don't think that anybody who is thinking clearly can get that." *Id.*

844.    Dr. Fauci's public comments as the President's Chief Medical Advisor specifically criticizing Alex Berenson were made at a time when other White House officials like Andrew Slavitt were *privately* pressuring Twitter to deplatform Berenson since April 21, 2020.  *See, e.g.,* Fauci Ex, 58, at 7 (internal Twitter communications on April 22, 2020, indicating that White House officials "had one really tough question about why Alex Berenson hasn't been kicked off from the platform," and "yes, they really wanted to know about Alex Berenson.  Andy Slavitt suggested

they had seen data vis that had showed he was the epicenter of disinfo that radiated outwards to the persuadable public.").

845.    Dr. Fauci does not deny that he may have discussed Alex Berenson with other White House or federal officials, but claims he does not recall whether he did so.  Fauci Dep. 343:16-23.

846.    Dr. Fauci believes that misinformation and disinformation "contribute to the deaths" of people: "misinformation and disinformation, particularly that encourages people to avoid lifesaving interventions, can certainly result in the unnecessary death of people whose lives would have been saved. So when misinformation and disinformation leads people to avoid a lifesaving intervention, that is equivalent to contributing to the death of that person." *Id.* at 345:8-15.  "I do feel strongly that misinformation and disinformation, when it leads to people avoiding lifesaving interventions, can be deadly. *Id.* at 346:1-3.

847.    Dr. Fauci also believes that misinformation and disinformation on social media are "contrary to public health" and "the enemy of public health": "If social media is propagating disinformation that leads to the death of people by encouraging them to avoid lifesaving interventions, I believe that's contrary to public health." *Id.* at 346:5-7, 346:10-13.

848.    Dr. Fauci admits that it is "certainly possible" that he discussed the view that "disinformation or misinformation on social media platforms are killing people" with others in the federal government, but claims he cannot remember whether he did so. *Id.* at 345:3-25.

849.    Dr. Fauci testified that the first time he heard of Alex Berenson was when Berenson publicly claimed that the White House demanded that Twitter deplatform him in 2022: "it's the person who says that the White House demanded Twitter ban me months before the company did so. I had never heard of who Alex Berenson was before this … I don't even know who he is." *Id.*

at 335:1-7.  In light of Dr. Fauci's public attacks on Alex Berenson in 2021, this testimony is not credible.

850.     Former FDA Commissioner Scott Gottlieb also emailed Twitter to pressure them to remove Alex Berenson's content, invoking Dr. Fauci in his email.  Sending Twitter a link to a post by Berenson entitled "The Arrogance of Dr. Fauci," Gottlieb wrote: "This is why Tony needs a security detail," Fauci Ex. 62, at 1—thus implying that Berenson's criticism of Dr. Fauci was endangering Dr. Fauci's life.

851.     Dr. Fauci does not deny that he may have discussed this issue with Gottlieb before Gottlieb sent this email to Twitter, but he claims he does not recall whether he did so.  Fauci Dep. 349:7-19, 352:12-18.

852.     After testifying over 200 times during his deposition that he could not remember or could not recall events related to the case, Dr. Fauci was shown an email chain between him and Dr. Ezekial Emanuel from May 2, 2020 that had no direct connection to issues in the case.  Fauci Ex 63.  Unlike his convenient lack of memory as to case-related communications, Dr. Fauci was immediately able to provide a detailed, specific account of the context and communications with Dr. Emanuel relating to that email chain.  Fauci Dep. 353:20-354:16.

**VI.     The FBI's Censorship Campaign of Pressure and Deception.**

853.     In parallel with the censorship of health "misinformation" and related issues achieved by the White House, the CDC, Surgeon General Murthy, Dr. Fauci, and others, *see supra* Parts I-V, federal national-security and law-enforcement agencies flex their considerable muscle to pressure and induce social-media platforms to censor disfavored speech and viewpoints about elections and other topics.  The FBI's Foreign Influence Task Force (FITF) and the Cybersecurity and Infrastructure Security Agency's (CISA) "Mis, Dis, and Malinformation Team" play key roles

in this efforts – in cooperation with non-profit agencies working in close collaboration with the government, such as the CISA-funded "Center for Internet Security" and the formidable censorship cartel calling itself the "Election Integrity Partnership" and the "Virality Project."

854.   Elvis Chan is the Assistant Special Agent in Charge of the Cyber Branch for the San Francisco Division of the Federal Bureau of Investigation.  Chan Dep. 8:11-13.

855.   In this role, Chan is "one of the primary people" who communicates with social-media platforms about disinformation on behalf of the FBI.  *Id.* 105:3-4 ("I would say I'm one of the primary people with pass-through information" for platforms).  There are many other points of contact between the FBI and social-media platforms, however.  *Id.* 105:3-7 ("[W]e have agents on the different cyber squads and our private sector engagement squad who also relay information to the companies.").

856.   Chan graduated from the Naval Postgraduate School in 2021 with an M.A. in Homeland Security Studies.  *Id.* 10:16-17.  In connection with his master's degree, Chan authored a publicly available thesis entitled, "Fighting Bears and Trolls: An Analysis of Social Media Companies and U.S. Government Efforts to Combat Russian Influence Campaigns During the 2020 U.S. Elections."  *Id.* 11:3-16; Chan Ex. 1, at 1.  This thesis overtly relied only on publicly available documents, but it also reflected Chan's personal knowledge and experience of working with social-media platforms during the 2020 elections.  *See id.*

857.   Chan's thesis discussed "hack-and-dump activity," also known as "hack-and-leak" operations, as well as "Russian malign influence … on the social media platforms and on fake news websites that the Russians have created."  Chan Dep. 13:7-21.

858.   Chan's thesis relied on research performed by persons and entities comprising the Election Integrity Partnership, including Graphika, *id.* 145:1-6; and Renee DiResta of the Stanford

Internet Observatory, *id.* 51:20-52:7, 85:4-12.  Chan communicated directly with DiResta "about Russian disinformation," and had "[a] lot of conversations about Russian disinformation" with DiResta.  *Id.* 52:5-7, 52:24-25.

859.    Chan also knows Alex Stamos, the head of the Stanford Internet Observatory, from the time when Stamos participated on behalf of Facebook in the USG-Industry meetings.  *Id.* 54:2-19.  Chan and Stamos were involved in meetings about "malign-foreign-influence activities" on Facebook while Stamos was the chief security officer for Facebook.  *Id.*  Chan has also discussed "protecting platforms from hacking" with Stamos.  *Id.* 55:12-13.  And Chan's "colleagues at FBI headquarters regularly meet with researchers much more frequently than I do."  *Id.* 57:15-18.

860.    According to Chan, the FBI engages in "information sharing" with social-media platforms about content posted on their platforms, which includes both "strategic-level information" and "tactical information."  *Id.* 16:16-19.

## A. FBI's and CISA's Regular "USG-Industry" Disinformation Meetings

861.    The FBI participates in a CISA-organized "industry working group" with Facebook, Twitter, and Google/YouTube, as well other social-media platforms.  *Id.* 18:21-24.  The social-media platforms that participate are Facebook, Microsoft, Google, Twitter, Yahoo! (a.k.a. Verizon Media), Wikimedia Foundation, and Reddit.  *Id.* 23:24-24:3.  On the U.S. Government side, the meetings are attended by representatives of CISA, the Department of Homeland Security's Intelligence & Analysis division ("I&A"), the Office of the Director of National Intelligence (ODNI), the FBI's Foreign Influence Task Force (FITF), and Elvis Chan on behalf of FBI-San Francisco when he is available.  *Id.* 24:9-19; *see also* Chan Ex. 6, at 37.  Chan later confirmed that "DOJ National Security Division" attends these "USG-Industry" meetings as well. Chan Dep. 171:6-8.

862.    Chan participates in the meetings because most social-media platforms are headquartered in San Francisco, and "FBI field offices are responsible for maintaining day-to-day relationships with the companies that are headquartered in their area of responsibility." *Id.* 24:21-25:4. As a result, Chan serves as a frequent conduit for communication between federal officials, especially FBI officials but also others, and social-media platforms. *See id.*

863.    Matt Masterson attended, and Brian Scully attends, the USG-Industry meetings on behalf of CISA. They are "regular attendees" and "one of them is usually emceeing the meeting." *Id.* 25:15-18. "For the 2020 election cycle, Mr. Masterson was … primarily the facilitator. Ahead of the 2022 midterm elections, Mr. Scully has been the primary facilitator." *Id.* 26:19-22.

864.    Chan also "participate[s] in the preparation meetings" for the USG-Industry meetings. *Id.* 27:24-25.

865.    At these CISA-led "USG-Industry" meetings, "the disinformation content was shared by the social media companies. They would provide a strategic overview of the type of disinformation they were seeing on their respective platforms," and the FBI "provided strategic unclassified overviews of the activities that we saw [Russian actors] doing." *Id.* 156:9-157:1.

866.    The "USG-Industry" meetings "are continuing" at the time of Chan's deposition on November 23, 2022, and Chan assumes that they will continue through the 2024 election cycle. Chan Dep. 284:23-285:6. Online "disinformation" continues to be discussed between the federal agencies and the social-media platforms at these meetings. Chan Dep. 285:7-286:16.

**B. The FBI's Regular Bilateral Meetings with Social-Media Platforms.**

867.    The USG-Industry group meetings are not the only censorship-related meetings between the FBI and social-media platforms. Chan also "hosted … bilateral meetings between each of the companies I mentioned"—*i.e.*, Meta/Facebook, Twitter, Google/YouTube,

Yahoo!/Verizon Media, Microsoft/LinkedIn, Wikimedia Foundation, and Reddit, *see id.* 23:24-24:3—"and the Foreign Influence Task Force." *Id.* 39:4-8.

868.    During these bilateral meetings, the FBI's FITF would also "bring in field offices that had cyber investigations" of "state-sponsored actors that the FBI was investigating that we believe were capable of hack-and-dump campaigns" during the 2020 election cycle. *Id.* 39:10-16. In other words, in the bilateral meetings, the FBI repeatedly raised the concern about the possibility of "hack and dump" operations during the 2020 election cycle during FITF's bilateral meetings with each of at least seven major social-media platforms. *Id.*

869.    These bilateral meetings between FBI and social-media platforms are continuing—they occurred during the 2020 election cycle, and they continued during the 2022 election cycle. *Id.* 39:18-40:1. "They occur at roughly a quarterly cadence," but "the cadence increase[s] as elections get close," so that the meetings "become monthly as the election nears and then weekly very close to the elections." *Id.* 40:2-20. These meetings will continue quarterly, monthly, and then weekly leading up to the 2024 election as well. *Id.* 41:5-15. The meetings also occurred "[o]n a quarterly cadence" during the 2018 election cycle. *Id.* 42:18-24.

870.    The companies with which FITF conducts these regular bilateral meetings include "Facebook, Google, Twitter, Yahoo!, Reddit, and LinkedIn," as well as "Apple and Wikimedia Foundation." *Id.* 41:24-42:7. Apple was "added because they are a cloud infrastructure company; and we believe that tactical information, specifically indicates that we shared with them related to foreign-state-sponsored actors, might pop up on … any screening they do on iCloud." *Id.* 42:12-17.

871.    In these meetings, FBI officials meet with senior social-media platform officials in the "trust and safety or site integrity" role, *i.e.*, those in charge of enforcing terms of service and

content-moderation policies for the platforms.  *Id.* 43:5-44:1.  In other words, the FBI meets with the officials responsible for censoring speakers and content on the platforms—those "directly involved in the enforcement of terms of service for these various platforms," which "includes … content modulation of content on the platforms." *Id.* 49:19-50:2.

872.    The FBI's "quarterly meetings" with social media platforms to "probe" questions about censorship of disinformation began as early as "in the 2017 time frame." *Id.* 87:24-88:14, 89:19-20.

873.    A large number of FBI officials attend each regular bilateral meeting about disinformation with each of those seven social-media platforms.  In addition to Chan and Laura Dehmlow, who is the head of FBI's Foreign Influence Task Force (FITF), "between three to ten" FITF officials attend each meeting, as well as "one field office comprised of two representatives" from each of "one to three field offices." *Id.* 109:21-22, 110:7-14.  Frequently the number of FBI agents attending each meeting "could be as high as a dozen." *Id.* 110:17-18.

874.    Likewise, large numbers of officials from the social-media platforms attend these regular bilateral meetings with the FBI about disinformation.  "[A] similar amount" of people attend each meeting from the platforms, and "for the three larger companies – specifically Google/YouTube, Facebook, and Twitter – it would be equal numbers or higher numbers than the FBI." *Id.* 110:21-25.

875.    In addition to all these meetings, on February 4, 2019, there was a meeting between Facebook, Google, Microsoft, and Twitter and the FBI's FITF, ODNI, and CISA to discuss election issues.  Elvis Chan attended, as did Director Krebs, Matt Masterson, and possibly Brian Scully of CISA.  Representatives of the social-media companies at the meeting included those

from the "trust and safety" or content-modulation teams, and "the social media companies were focused on discussing disinformation." *Id.* 151:9-154:6.

876.　Discovery obtained from LinkedIn contains 121 pages of emails between Elvis Chan and other FBI officials and LinkedIn officials setting up numerous meetings to discuss disinformation issues during the 2020 and 2022 election cycles. Chan Ex. 2. Chan confirms that he has a similar set of communications setting up a similar series of meetings with each of "six or seven other social-media platforms as well"—he has "similar types of correspondence" with the others, including Facebook, Twitter, Google/YouTube, etc. Chan. Dep. 288:4-17.

877.　These emails confirm that Chan and the other FBI officials regularly met with senior officials at social-media platforms with responsibility for *content moderation*. *See* Chan Ex. 2, at 3; Chan Dep. 292:7-293:8. The FBI meets with "director level and … their direct reports" from the "trust and safety and site integrity" teams. Chan Dep. 293:4-8.

878.　The FBI communicates with social-media platforms using two alternative, encrypted channels—the self-deleting messaging app Signal, and the encrypted messaging service Teleporter. Chan Dep. 295:7-296:9.

879.　For each election cycle, during the days immediately preceding and through election day, the FBI maintains a command center around the clock to receive and forward reports of "disinformation" and "misinformation," and the FBI requests that the platforms have people available to receive and process those reports at all times: "FBI headquarters, they just ran 24 hours a day for their command post, I believe from Friday to Tuesday. FBI San Francisco ran from, I believe, 8:00 o'clock in the morning to perhaps 10:00 o'clock at night every day except the election, when we ran until midnight." Chan Dep. 301:14-20. In advance of the elections, the FBI "ask[ed]

the companies when they intended to have personnel on what days monitoring their platform for any threats that they saw." Chan Dep. 301:21-24.

    **C.**    **The FBI's Deceptive Information Censors the Hunter Biden Laptop Story.**

    880.    Elvis Chan, other FBI officials, and other federal officials repeatedly warned industry participants to be alert for "hack and dump" or "hack and leak" operations prior to the 2020 election, even though they had no investigative basis to issue such warnings. These warnings provided the justification for the platforms to censor the Hunter Biden laptop story that the New York Post broke on October 14, 2020. *See id.* at 232:1-234:3. These "hack and leak" or "hack and dump" warnings were issued many times, both in the "USG-Industry" meetings and in the FBI's bilateral meetings with social-media platforms.

    881.    Hack and leak operations were discussed at the USG-Industry meetings. *Id.* 172:3-5. At the USG-Industry meetings, Elvis Chan and other FBI officials "warned the social media companies about the potential for a 2016-style DNC hack-and-dump operation." *Id.* 172:23-173:1.

    882.    During these meetings, Chan "warned the companies about a potential for hack-and-dump operations from the Russians and the Iranians on more than one occasion." *Id.* 175:10-13. Laura Dehmlow, the head of FITF, also "mentioned the possibility of hack-and-dump operations." *Id.* 175:17-20.

    883.    The prospect of hack-and-leak operations was also repeatedly raised "[a]t the FBI-led meetings with FITF and the social-media companies." *Id.* 177:24-25. It was also raised at the "CISA-hosted USG-industry" meetings. *Id.* 178:1-6, 180:24-25. "[T]he risk of hack-and-leak operations were raised at both sets of meetings, both at CISA-organized USG-industry meetings and the FITF-organized direct meetings between the FBI and social media platforms." *Id.* 181:6-11. Chan himself raised the warnings "regularly" at the bilateral FITF-platform meetings. *Id.*

185:16-18.  Laura Dehmlow raised the warning at the USG-Industry meetings "that the FBI is concerned about the potential for hack-and-leak or hack-and-dump operations from foreign state-sponsored actors." *Id.* 187:1-4.  And Chan himself "recollect[s] mentioning the potential for hack-and-dump operations during the CISA-hosted USG-industry meetings." *Id.* 189:4-7.  Chan confirms that he raised these concerns "to the social media platforms on multiple occasions in two sets of meetings in 2020," including "the USG-industry meetings organized by CISA" and "the FITF organized meetings with the individual social media platforms." *Id.* 204:2-12.

884.    In the same time frame in 2020, as federal officials were repeatedly raising these concerns about hack-and-leak operations, some social media platforms updated their policies to provide that posting hacked materials would violate their policies and could result in censorship: "some social media companies adjusted or updated their terms of service or their community standards to say that they would not post any hacked materials." *Id.* 205:6-9. According to Chan, the "impetus" for these more restrictive censorship policies was the repeated concern raised by Chan, the FBI, and federal national-security officials about the risk of "a 2016-style hack-and-leak operation: "the impetus was in case there was a 2016-style hack-and-leak operation." *Id.* 205:14-21.  The FBI's repeated warnings, therefore, induced social-media platforms to adopt more restrictive censorship policies on hacked materials, *see id.*, which would then be used to censor the Hunter Biden laptop story.

885.    Chan denies that the FBI urged the platforms to change their terms of service to address hacked materials, but he admits that the FBI repeatedly inquired of the social-media platforms *whether* their policies would allow for or require the censorship of hacked materials. The FBI "wanted to know if they had changed their terms of service or modified it, and we wanted to know what they had changed," and thus the platforms "advise[d]" the FBI that "they had

changed" their policies "to reflect the ability to pull down content that results from hack operations." *Id.* 206:5-13.

886.    Again, Chan testified that, in meeting with platforms like Facebook, the FBI "asked, 'If you receive a whole -- if you see a trove of potentially hacked materials, what are you going to do about it?' Which would be our way of asking them how their terms of service would handle a situation like that." Chan Dep. 247:25-248:4. The FBI "ask[ed] how they would handle it if potentially hacked materials appeared." Chan Dep. 248:5-8. Chan believes they asked that question of Twitter, Facebook, and YouTube, and the social-media platforms responded, as he "remember[s] the social media companies having terms-of-service policies to handle this sort of situation." Chan Dep. 248:14-16. Both Facebook and Twitter, for example, "said that they would remove hacked materials if they were able to validate that it was hacked." Chan Dep. 252:24-253:4. These conversations happened "ahead of the 2020 elections." Chan Dep. 253:6-7.

887.    The FBI asked the platforms how their policies would handle a hack-and-leak operation at the same time as repeatedly warning them about such operations—thus effectively inducing them to adopt such policies. Chan Dep. 248:23-249:2.

888.    The FBI inquired about the platforms' hacked-materials policies because "internally we wanted to know what actions that we would need to take, whether we would need to take a legal remedy such as like a seizure warrant" to remove supposedly hacked materials. Chan Dep. 249:17-20.

889.    Chan was not the only FBI official to ask the platforms about their censorship policies for hacked materials. Instead, this question was posed repeatedly by multiple FBI officials: "I would say we take turns asking. When I say 'we,' I mean either myself or the members of the Foreign Influence Task Force …. Wherever it seemed like an organic follow-up question,

we would ask 'How would your terms of service apply to this situation or that situation?'"  Chan

Dep. 250:14-20.

890.    When asked, "did anyone within the FBI discuss or suggest with you that you

should raise the prospect of Russian hack-and-leak operations with social media platforms in

2020?" Chan repeatedly responded with a stock answer, "I do not recollect."  *Id.* 189:14-23; 189:8-

191:21, 203:13-15 ("I cannot recollect." … "I do not recollect." … "I do not recollect." … "I don't

recollect." … "I don't recollect." … "I do not recollect.").

891.    These responses are not credible because they are stock responses, and it is facially

implausible that Chan does not recall whether other federal officials discussed warning platforms

about "hack-and-leak" operations during 2020, especially after the fiasco of censorship of the

Hunter Biden laptop story.  These "I do not recollect" responses also contradict Chan's testimony

later in the deposition that he "regularly" communicated with FITF and FBI's cyber division about

the possibility of a hack-and-leak operation: "I believe that we internally discussed the potential

for hack-and-leak operations, and so I regularly was in communication with the cyber division of

the FBI as well as with the Foreign Influence Task Force to see if they had heard of anything that

I had not heard of.  So I would say that the people that I communicate with, everyone was vigilant,

but no one -- I believe that in general people at the FBI were concerned about the potential for

hack-and-leak operations, but that we had not seen any investigations that led in that direction or

that would lead us in that direction."  *Id.* 206:23-207:10.  He specifically admitted that he recalls

discussing hack-and-leak operations with FITF officials "Ms. Dehmlow, Mr. Olson, Mr. Cone,

and Mr. Giannini."  *Id.* 207:19-23.  It is not credible that the *only* aspect of his internal discussions

with the FBI about hack-and-leak operations that he does not recall is whether someone from the

FBI suggested or directed him to raise the issue with social-media platforms.

892.    Further, as revealed on the video of Chan's deposition, his demeanor in answering questions on this point changes and becomes evasive.  Chan's demeanor when testifying on this point undermines his credibility.

893.    The FBI and other federal officials had no specific investigative basis for these repeated warnings about possible "hack-and-dump" operations. As Chan admits, "[t]hrough our investigations, we did not see any similar competing intrusions to what had happened in 2016. So although from our standpoint we had not seen anything, we specifically, in an abundance of caution, warned the companies in case they saw something that we did not." *Id.* 174:7-13.  As Chan admits, "we were not aware of any hack-and-leak operations that were forthcoming or impending" when he and other federal officials warned about the "risk of hack-and-leak operations, especially before the general election."  *Id.* 192:19-24.

894.    Matt Masterson and Brian Scully of CISA also raised the concern about the threat of hack-and-leak operations in the 2020 election cycle to the social-media platforms during the "USG-Industry" meetings that occurred quarterly, then monthly, then weekly leading up to the 2020 election.  *Id.* 212:3-22.

895.    Yoel Roth, then-Head of Site Integrity at Twitter, provided a formal declaration to the Federal Election Commission containing a contemporaneous account of the discussion of the threat of "hack-and-leak operations" at the meetings between the FBI, other federal law-enforcement and national-security agencies, and the social-media platforms.  His declaration states: "Since 2018, I have had regular meetings with the Office of the Director of National Intelligence, the Department of Homeland Security, the FBI, and industry peers regarding election security.  During these weekly meetings, the federal law enforcement agencies communicated that they expected 'hack-and-leak operations' by state actors [*i.e.*, Russians or other foreign

governments] might occur in the period shortly before the 2020 presidential election, likely in October.  I was told in these meetings that the intelligence community expected that individuals associated with political campaigns would be subject to hacking attacks and that material obtained through those hacking attacks would likely be disseminated over social media platforms, including Twitter. These expectations of hack-and-leak operations were discussed throughout 2020. *I also learned in these meetings that there were rumors that a hack-and-leak operation would involve Hunter Biden*."  Chan. Ex. 8, ¶¶ 10-11, at 2-3 (emphasis added).  Yoel Roth executed this declaration on December 17, 2020, shortly after the events described, and submitted it to the Federal Election Commission in a formal enforcement proceeding, so it has the force of a statement under oath. *Id.* at 4.

896.    Chan's account of these meetings largely matches Roth's account, *see, e.g.,* Chan Dep. 218:5-220:15, but there are two key discrepancies between Roth's and Chan's accounts.  First, Roth recounts that the FBI and national-security officials communicated to Twitter that they "*expected*" that there would be one or more hack-and-leak operations by Russia or other "state actors." *Id.* at 2.  Chan testified that he believed they used words like "concern" instead of "expected." Chan. Dep. 220:20-24, 224:5-17, 226:5-12, 227:3-6.  Second, Roth specifically recalls that federal officials told him that "there were rumors that a hack-and-leak operation would involve Hunter Biden." Chan Ex. 8, ¶ 11, at 3.  Chan testified that "in my recollection, Hunter Biden was not referred to in any of the CISA USG-Industry meetings." Chan Dep. 213:8-10; *see also id.* 227:24-228:1, 228:21-23, 229:9-11 229:15-20.

897.    On these points, Roth's declaration is more credible than Chan's testimony, for at least four reasons.  First, Roth's declaration was executed much closer in time to the events described—just two months later—while Chan's testimony occurred over two years later.  Indeed,

as noted above, Chan himself admitted that he "could not recollect" key details about the federal officials' course of conduct in warning social-media platforms about a supposed "hack and dump" operation, so there is no reason to think that Chan's recollection is more reliable on these similarly specific details.

898.    Second, Roth had no incentive to color or shade his account of communications from federal officials when he submitted this Declaration to the FEC, while Chan has strong incentives to shade his testimony on these points to deemphasize the FBI's involvement in censoring the Hunter Biden laptop story.  Indeed, if the FBI and other federal officials warned social-media platforms about a hack-and-leak operation *involving Hunter Biden*—when the FBI had received Hunter Biden's laptop from the Delaware repair-shop owner and thus *knew* that it was not hacked, *see* Doc. 106-3, at 5-11 —that raises a compelling inference that the FBI deliberately gave misleading information to social-media platforms to induce them to wrongfully censor the Hunter Biden laptop story.

899.    Third, Chan's testimony on a closely related point—whether Chan was instructed by an FBI official to warn social-media platforms about "hack and leak" operations—is not credible.  Chan's minor disagreements with Roth's account are not credible for similar reasons. For example, Chan claims to have extremely specific recollection of the FBI's word-choice in meetings that occurred over two years earlier—disputing that the FBI used the word "expected," *id.* 220:20-24, 223:12-22, 224:5-17, 226:5-12, 227:3-6, and affirmatively asserting with confidence that "Hunter Biden" was never mentioned, *id.* 213:8-10, 227:24-228:1, 228:21-23, 229:9-11 229:15-20—while at the same time claiming that he could not recollect whether he discussed the same issues with the FBI internally *at all*, *Id.* 189:14-23; 189:8-191:21, 203:13-15.

900.    Fourth, Chan's demeanor while testifying by videotape on this point is evasive and undermines his credibility.

901.    Two additional points support the credibility of Roth's account over Chan's.  First, Brian Scully's testimony, unlike Chan's, did not dispute or quibble with any aspect of Roth's near-contemporaneous account of these conversations—Scully merely contended that he could not remember.  Scully Dep. 247:18-248:2.

902.    Second, Roth's account directly matches the less detailed but even more contemporaneous account provided by Mark Zuckerberg in his testimony before Congress on October 28, 2020.  Zuckerberg's testimony confirms that, as Yoel Roth recounted, the FBI conveyed a strong risk or expectation of a foreign hack-and-leak operation shortly before the 2020 election: "So you had both the public testimony from the FBI and in private meetings alerts that were given to at least our company … that suggested that we be on *high alert and sensitivity* that if a trove of documents appeared that we should view that with suspicion, that it might be part of a foreign manipulation attempt." Chan Ex. 9, at 56 (emphasis added).  Indeed, Chan did not dispute Zuckerberg's account: "I don't remember the exact framing of our discussions with them [*i.e.*, Facebook]." Chan Dep. 247:14-15.  And again, Chan did not dispute the fundamental details of Zuckerberg's account; he admitted that he "hosted several private meetings with Facebook where the concern about a hack-and-leak operation was raised" in 2020.  Chan Dep. 246:17-20.  Though Chan did state that "I would not have framed it like Mr. Zuckerberg did," Chan essentially concedes the accuracy of Zuckerberg's account.  Chan Dep. 255:14-15.

903.    After the Hunter Biden story broke on October 14, 2020, Laura Dehmlow of the FBI refused to comment on the status of the Hunter Biden laptop in response to a direct inquiry

from Facebook, even though the FBI had the laptop in its possession since late 2019 and knew that its contents were not hacked.  Chan Dep. 213:11-215:5.

904.    When the Hunter Biden laptop story broke on October 14, 2020, it was widely censored on social media, including by Twitter and Facebook, pursuant to their hacked-materials policies.  For example, Twitter's Site Integrity Team "blocked Twitter users from sharing links over Twitter to the applicable New York Post articles and prevented users who had previously sent Tweets sharing those articles from sending new Tweets until they deleted the Tweets" sharing the Hunter Biden laptop story.  Chan Ex. 8, at 3.  "Facebook, according to its policy communications manager began 'reducing its distribution on the platform,' pending … a third-party fact check. Twitter went beyond that, blocking all users, including the House Judiciary Committee, from sharing the article on feeds and through direct messages.  Twitter even locked the New York Post account entirely, claiming the story included hacked materials and was potentially harmful."  Chan Ex. 9, at 2.

**D.    The FBI Routinely Flags Speakers and Content for Censorship.**

905.    According to Chan, during the 2020 election cycle, "the U.S. government and social media companies effectively impeded [foreign] influence campaigns primarily through information sharing and *account takedowns*, respectively."  Chan Ex. 1, at i (emphasis added).

906.    According to Chan, the FBI's "information sharing" includes both "strategic information," which "discusses the tools, tactics or processes" used by foreign-influence campaigns, and "tactical information," which means identifying specific "indicators or selectors," which are both "a term of art" that refers to "IP addresses, email accounts, social media accounts, … website domain names, and … file hash values."  Chan Dep. 29:15-30:7.

907.    In other words, according to Chan, the FBI "shares information" with social-media platforms that includes information about specific IP addresses, email accounts, social-media accounts, and website domain names that the FBI believes should be censored, and this sharing of information leads social-media platforms to engage in "account takedowns" based on the FBI's information. *See id.* According to Chan, this combination of "information sharing" and "account takedowns" "effectively impeded [foreign] influence campaigns" during the 2020 election cycle. Chan Ex. 1, at i.

908.    Chan testified that the FBI shares this information with social-media platforms so that they can "protect their platforms"—indeed, "protect their platforms" was a stock phrase in Chan's testimony.  Chan Dep. 32:19, 34:7-12, 35:8-10, 36:25, 87:22-23, 274:14.  As Chan's testimony makes clear, however, the phrase "protecting their platforms" is a euphemism for "censoring speech that federal officials disfavor."  For example, Chan admits that "protect their platforms" means "knocking down accounts or knocking down misinformation content."  Chan Dep. 273:12-17.  Chan's thesis and testimony make clear that the FBI's purpose in "information sharing" with social-media platforms is to induce them to censor speech that the FBI dislikes and wants to see censored.   For example, Chan testified that "my purpose is to share the information with them so they can protect their platforms as they deem appropriate," but he immediately admitted that "one way to protect their platforms is to take down these accounts." *Id.* 35:9-14. Thus, Chan admits that the FBI's "purpose" in "information-sharing" includes "to take down these accounts" that the FBI believes are Russian-influenced.  *Id.*

909.    Chan admits that the purpose and predictable effect of "tactical" information-sharing—*i.e.*, the FBI flagging specific accounts, websites, URLs, IP addresses, web domain names, etc., to social-media platforms for censorship—is that the platforms will take action against

such specific content and accounts under their content-moderation policies: "from what I have observed and what they have told me when we have provided them with high confidence of Russian selectors, that they have been able to discover fake Russian accounts and take them down." *Id.* 32:20-24.

910.    According to Chan, the social-media platforms "take the information that we share, they validate it through their own means. And then if they determine that these are accounts being operated by Russian state-sponsored actors, then they have taken them down." *Id.* 33: 12-17.

911.    Chan admits that, during the 2020 election cycle, the U.S. Government engaged in "information sharing with the social media companies to expose Russia's different operations and shut down its accounts." Chan Ex. 1, at xvii. In other words, Chan admits that the purpose of federal officials' "information sharing" was to "shut down … accounts" on social media that the Government disfavored. *Id.*; *see also* Chan Dep. 37:17-38:2.

912.    In addition to social-media platforms, Chan and the FBI also "share indicators" with state and local government election officials, such as "county registrars or county clerk's offices"—who are also state actors subject to the First Amendment. Chan "would share indicators with them," and "share the same type of information that I shared with social media companies," including "IP addresses and domain names, so that they could see if they were popping up anywhere on their networks." *Id.* 50:11-51:6. In other words, the FBI feeds information to state and local election officials so that they can make their own reports of supposed "misinformation" and "disinformation" to social-media platforms, creating a First Amendment feedback loop. The FBI seeds concerns with the state and local election officials, who then identify supposed "disinformation" and "misinformation" based on the FBI's information, and then report it to the social-media platforms through CISA and the FBI.

913.   Chan contends that Russian "state-sponsored actors … have created fake social media accounts," which "have either generated disinformation themselves or they have amplified existing content from current users of social media platforms." *Id.* 60:1-7.

914.   These supposedly Russian-controlled accounts "make their own content," such as "mak[ing] their own Facebook postings," and they "try to find what are the hot-button or current issues in the news … and then they will try to either generate content themselves related to that or they will amplify existing content." *Id.* 60:13-22. This is supposedly done with the goal to "sow discord in the American online environment." *Id.* 61:12-13.

915.   Chan agrees that "the goal there is … they post messages that they anticipate will be divisive and try and get Americans to engage with them." *Id.* 61:14-18.

916.   As Chan agrees, "engagement" with a social-media posting includes viewing the content, liking or disliking it, reposting it, commenting on it, and/or reposting it with commentary. *Id.* 61:19-63:13.  All of these are First Amendment-protected activities.  In this way, according to Chan, "the Russians are trying to get people to engage on their divisive content." *Id.* 63:19-64:1.

917.   According to Chan, over 126 million Americans "engaged" with Russian-originated content on Facebook, and 1.4 million Americans engaged with such content on Twitter, during the 2016 election cycle. *Id.* 66:2-25.  All of this was First Amendment-protected activity.  Chan credits federal government efforts during the 2020 election cycle with preventing the vast majority of such "engagement" by American citizens with Russian-originate content on social media during the 2020 election cycle.  Chan Ex. 1, at v ("This thesis finds that the Russians shifted their tactics from 2016 to 2020. Still, the U.S. government and social media companies effectively impeded their influence campaigns primarily through information sharing and account takedowns,

respectively.").   Thus, the federal officials' "information sharing" activities prevented an enormous amount of First Amendment-protected activity from occurring.

918.   Chan's thesis and testimony provide clear examples of how supposedly Russian-originated "disinformation" on social media becomes intertwined with, and inseparable from, First Amendment-protected forms of expression by American citizens.   Chan identifies a supposedly Russian-originated political ad on Facebook that features a picture of Hillary Clinton with a black X painted over her face, advertising an event called "Down with Hillary!" and stating, "Hillary Clinton is the co-author of Obama's anti-police and anti-Constitutional propaganda."   Chan Ex. 1, at 29.   None of this is "disinformation" in any meaningful sense—it is actually expression of political opinions.   The posting notes that it received 763 reactions and 78 comments on Facebook, which Chan agrees are "engagements by users."   *See id.*; *see also* Chan Dep. 67:1-68:20.   Chan contends that the underlying ad was "Russian-originated content masquerading as something posted by an American," *id.* 67:6-10—*i.e.*, just the sort of content that the FBI would flag for censorship to social-media platforms through "tactical information-sharing."   But once the FBI induces Facebook to pull down the ad from the platform, the First Amendment-protected "engagements" by Americans—likes, dislikes, re-posts, comments, etc.—are all obliterated as well.   This is the collateral damage to *Americans'* freedom of speech in the FBI's war on so-called Russian "disinformation."

919.   Chan's thesis provides similar examples of supposedly Russian-originated content with heavy engagement by Americans.   For example, it reproduces two supposedly Russian-originated political ads containing a secure-borders message ("Secured Borders: Every man should stand for our borders! Join!") and a pro-Second Amendment message ("Defend the 2nd: The community of 2nd Amendment supporters, gun-lovers & patriots").   Chan Ex. 1, at 32.   Again,

these are expressions of political opinion, not "disinformation" in any meaningful sense.  The former posting garnered 134,943 "likes," and the latter posting garnered 96,678 "likes"—each of which is a First Amendment-protected expression of support for the underlying, supposedly Russian-originated, political message.  *See id.*  Another similar ad, targeting black voters, simply stated "Black Matters: Join us because we care. Black matters!" and it drew 223,799 "likes" from ordinary users.  *Id.* at 32; Chan Dep. 80:12-20.  Chan admits that these are "high" levels of "engagement" from ordinary users.  Chan Dep. 83:21.

920.    Chan also reports that "IRA employees used social media bots, i.e., computer programs which control social media accounts, to amplify existing content."  Chan Ex. 1, at 30.  To "amplify existing content" means to do "things like liking it or reposting it."  Chan Dep. 71:20-24.

921.    Based on research, Chan estimates that "over 100,000 real people had their postings amplified by [Russian]-controlled social media bots."  *Id.* 87:2-6.

922.    In addition, the "indicators" that the FBI targeted for censorship included supposedly Russian-aligned websites that hosted First Amendment-protected content posted by Americans.  For example, Chan identified a supposedly Russia-generated website called "PeaceData," which "hire[d] unwitting freelance journalists, including Americans, to write articles for the site."  *Id.* 141:24-142:3.  "[A]t least 20 freelance journalists, which includes Americans, had been duped into writing articles for the site."  *Id.* 142:4-9.  The FBI identified this site as Russia-generated to the social-media platforms, and as a result, the platforms "identified accounts that were foreign-associated … that were directing users to those platforms" and "t[ook] actions against those accounts."  *Id.* 143:10-20.  The speech of the American freelance journalists was thus suppressed due to FBI inducement.

923.    Similarly, Chan identified a website called "NAEBC" as a Russia-generated website. According to Chan, the Russians "used various social media accounts to engage with real users and convince them to post on the NAEBC site, which met with some success." *Id.* 144:13-145:2.  Thus, "the NAEBC site also included content drafted and written by real users that had posted on that site." *Id.* 145:3-6.  "The FBI flagged the NAEBC site to social-media platforms as a … Russian-originated source." *Id.* 146:12-15.  On that basis, "the companies were able to discover Russian-controlled accounts that were used to try to redirect users to those websites," and the platforms "said they had taken down those accounts." *Id.* 146:16-147:7.  The FBI thus induced the platforms to censor the speech of "real users" on a supposedly fake Russian website.

924.    Chan admits that "Russia's influence operations" are deeply intertwined with First-Amendment-protected speech by ordinary social-media users, as he describes: "Many factors are at play when trying to measure the effects of Russia's influence operations. First-order effects include real users interacting with inauthentic content, Russian-bot amplification of divisive organic content, and IRA-controlled accounts communicating directly with real users."  Chan Ex. 1, at 94.

925.    During the days surrounding the 2020 election, the FBI's command post also routed reports of domestic "disinformation" to social-media platforms for censorship to social-media. "During FBI San Francisco's 2020 election command post, which I believe was held from the Friday before the election through election night, that Tuesday at midnight, information would be provided by other field offices and FBI headquarters about disinformation …. These were passed to FBI San Francisco's command post, which I mentioned to you before I was the daytime shift commander, and we would relay this information to the social media platforms where these accounts were detected."  Chan Dep. 162:12-24.

926.    The FBI made no attempt to distinguish whether these reports of "election disinformation" "whether they were American or foreign." *Id.* 163:1-3. "[M]any field offices" of the FBI "relayed this information to us." *Id.* 163:7-11.

927.    "[T]hose reports would come to FBI San Francisco … and then FBI San Francisco would relay them to the various social media platforms where the problematic posts had been made," in order "to alert the social media companies to see if they violated their terms of service…. which may include taking down accounts." *Id.* 165:3-17.

928.    The FBI has about a "50 percent success rate" in getting reported disinformation taken down or censored by the platforms, *i.e.*, "that some action had been taken because it was a terms-of-service violation." *Id.* 167:7-14.

**E.    The FBI Demands Information on Censorship from the Platforms.**

929.    Regarding the algorithms that platforms use to detect inauthentic activity and to censor content, the FBI has "probed them to ask for details" about those algorithms, "so that we could make sure we were sharing the most effective and actionable type of information with them," *id.* 88:5-7, 20-22—in other words, to maximize the chances that disfavored speech would be censored as a result of the FBI's "information sharing."

930.    The FBI "would … ask them what their terms of service or community standards were." *Id.* 90:21-23.  But Chan contends that "we never told the companies to modify their terms of service or community standards." *Id.* 92:5-7.

**F.    The FBI Flags Accounts and URLs for Censorship on a Monthly Basis**

931.    The FBI gives "tactical information" to social-media platforms, where "tactical information includes identifying specific social media accounts and URLs" to be evaluated for censorship.  *Id.* 96:24-97:2.  Chan estimates that this occurs "one to five times per month."  *Id.*

97:17-18. This includes such "tactical" information-sharing at most quarterly meetings. *Id.* 98:18-19.

932.     To flag such specific accounts, URLs, and content to the platforms, Chan "would typically … send an email to the recipients at the companies" notifying them that he would be using "a secure file transfer application within the FBI that is called Teleporter," and "the Teleporter email contains a link for them to securely download the files from the FBI." *Id.* 98:20-11. The Teleporter files contain "different types of indicators," *i.e.*, specific social-media accounts, web sites, URLs, email accounts, etc. that the FBI wants the platforms to evaluate under their content-moderation policies. *Id.* 99:15.

933.     Each such communication may contain any number of such "indicators," ranging "from one account or one selector to many, like a whole spreadsheet full of them." *Id.* 100:16-17.

934.     Chan "estimate[s] that during 2020 [he] shared information with the companies between one to five or one to six times per month." *Id.* 100:21-24. Each such incident of information-sharing included flagging a number of specific "indicators" that ranged anywhere from one to "hundreds" of specific accounts, web sites, URLs, etc... *Id.* 101:4-7.

935.     During the 2022 election cycle, Chan shared such information with the platforms "one to four times per month." *Id.* 101:13-14. Each such incident involved flagging a number of specific "indicators" that ranged anywhere from one to "in the tens, in the dozens" of specific accounts, web sites, URLs, etc. *Id.* 101:17-19.

936.     "[I]n general" these flagging communications would go to all seven social-media platforms identified above, but sometimes there would be "company-specific information" that would go to a particular company. *Id.* 102:3-9. "[M]ost of the time we would share with that list of [seven] companies." *Id.* 102:14-15.

937. When it made such communications, the FBI would request that the platforms report back to the FBI their specific actions taken toward the accounts that the FBI specifically flagged for possible censorship. *Id.* 102:18-25. "[A]t every quarterly meeting we try to follow up to ask if information we shared has been relevant if we have not received a response yet." *Id.* 103:5-9. Sometimes, but not always, the platforms report back to the FBI on what accounts they have removed based on the FBI's information, in which case the FBI documents the report to "help[] us fine-tune the information we're sharing." *Id.* 103:14-22.

938. Including Chan, at least *eight* FBI agents in the San Francisco field office are involved in reporting disinformation to social-media platforms—Chan himself, two GS-14 supervisors who report to Chan, and roughly five FBI field agents in two different squads within the office. *Id.* 105:19-108:18. All these agents share both "strategic" and "tactical" information with social-media platforms about supposed malign-foreign-influence content on platforms, and they are "involved in following up to find out if their tactical information was acted on." *Id.* 108:8-10.

939. In addition, a significant number of FBI officials from FBI's Foreign Influence Task Force (FITF) also participate in regular meetings with social-media platforms about supposed disinformation. *Id.* 108:19-110:14. These include "three to ten" FITF officials at bilateral meetings with social-media platforms. *Id.* 110:7-8.

940. The FBI uses both its criminal-investigation authority and its national-security authority to gather information about supposed malign-foreign-influence activities and content on social-media platforms. This specifically includes using "the Foreign Intelligence Surveillance Act … the PATRIOT Act, [and] Executive Order 12333 that allows us to gather national security intelligence" to investigate content on social media. *Id.* 111:13-112:8.

941.    In one case in 2020, for example, a single "Teleporter message was sent" to platform(s) "with a spreadsheet with hundreds of accounts," all of which the FBI was flagging for the platforms as supposed malign-foreign-influence accounts.  *Id.* 112:9-14.

942.    Chan expressed a high degree of confidence that the FBI's identification of "tactical information" (*i.e.*, specific accounts, URLs, sites, etc.) to social-media platforms was always accurate, and that the FBI never misidentified accounts, content, web sites etc. as operated by malign foreign actors when in fact they were operated by American citizens.  He testified that "we only share information that we have a high confidence that is attributed to a foreign-state actor," and that "[i]n my experience, it has always been correct."  *Id.* 112:15-113:16.

943.    But there are substantial reasons to think that Chan is wrong. For example, Chan reports that the FBI induced Twitter to remove accounts and Tweets related to the #ReleaseTheMemo hashtag in 2019, which supported Congressman Devin Nunes' investigation regarding Russia collusion.  *Id.* 149:13-21; Chan Ex. 1, at 71 (noting that 929,000 Tweets removed by Twitter as supposedly Russian disinformation included thousands of Tweets amplifying the #ReleaseTheMemo hashtag).  In fact, recent reporting indicates that Twitter was aware that the accounts pushing #ReleaseTheMemo were *not* Russian-controlled inauthentic accounts, but core political speech by ordinary American citizens that the FBI conspired to suppress.

944.    The FBI's flagging accounts for censorship often leads to the censorship of additional accounts.  According to Chan, the FBI "may share, for example, one account with them, but then they may find ten connected accounts and take all of them down."  *Id.* 113:23-114:1.

### G.    Pressure from Congress Induces Platforms to Increase Censorship.

945.    According to Chan, the social-media platforms were far more aggressive in taking down disfavored accounts and content in the 2018 and 2020 election cycles than they were in the 2016 cycle.  *Id.* 115:18-116:6.

946.    Based on his personal observation, experience, and research, Chan concludes that "pressure from Congress, specifically HPSCI and SSCI," induced the social-media platforms to adopt more aggressive censorship policies in 2018 and 2020.  *Id.* 116:1-3.  "HPSCI" stands for the House Permanent Select Committee on Intelligence, and "SSCI" stands for the Senate Select Committee on Intelligence.  *Id.* 116:11-14.

947.    This "pressure from Congress" took multiple forms.  First, those Congressional committees called "the CEOs for the companies … to testify in front of their committees," including "Mark Zuckerberg and Jack Dorsey and Sundar Pichai."  *Id.* 116:20-117:2.  These CEOs were called to testify about disinformation on their platforms "more than once."  *Id.* 117:5-6.  Chan believes that "that kind of scrutiny and public pressure from Congress … motivated them to be more aggressive in the account takedowns."  *Id.* 117:7-14.  Chan believes this based on conversations with social-media platform employees.  *Id.* 117:15-118:2.

948.    Chan identifies specific congressional hearings that placed such pressure on social-media platforms to adopt more restrictive censorship policies: "On April 10–11, 2018, the Senate Commerce Committee and Senate Judiciary Committee held hearings on consecutive days with Mark Zuckerberg to discuss Russia's influence campaigns on Facebook and its countermeasures to combat them…. The Senate committees also used this as an opportunity to hold Facebook accountable for its actions and *exert pressure for positive change*."  Chan Ex. 1, at 50 (emphasis added).  "On July 17, 2018, the House Judiciary Committee held a hearing with senior executives from Facebook, Google, and Twitter so they could provide updates on their companies' efforts for

content filtering to stop foreign influence campaigns on their platforms." *Id.* On September 5, 2018, the Senate Intelligence Committee held a hearing with senior executives from Facebook and Twitter to discuss their companies' efforts to stop foreign influence campaigns and illegal transactions on their platforms." *Id.*

949.    Chan links these Congressional hearings to "constructive change," *i.e.*, more aggressive censorship policies by the platforms: "On October 31, 2017, the Senate Judiciary Committee held a hearing with senior executives from Facebook, Google, and Twitter to discuss the extent of the Russian disinformation campaigns on their respective platforms." Chan Ex. 1, at 48. "This public hearing … provided politicians with the occasion to exert pressure on the companies to make constructive changes to their platforms." *Id.* at 48-49. According to Chan, this "constructive change" means the adoption of more restrictive censorship policies. Chan Dep. 133:9-23.

950.    In addition, Congress put pressure on the platforms to adopt and enforce more aggressive censorship policies and practices by sending high-level congressional staff from HPSCI and SSCI to meet with the social-media platforms directly and threaten them with adverse legislation.   According to Chan, "staffers from both of those committees have visited with … those [social-media] companies," and after these meetings with congressional staffers, employees of the social-media platforms "would indicate that they had to prepare very thoroughly for these types of meetings … and they indicated that it felt like a lot of pressure." *Id.* 117:19-119:2.

951.    The Congressional staffers had such meetings with "Facebook, Google, and Twitter."   Employees from those three companies "experienced these visits from congressional staffers as exercising a lot of pressure on them." *Id.* 118:12-16.

952.    In those meetings, the Congressional staffers discussed potential legislation with the social-media platforms, and before or after they met with those three companies, the Congressional staffers "discussed with [Chan] … legislation that they were thinking about doing." *Id.* 118:17-120:3.

953.    It is Chan's opinion that the social-media platforms' "changes in takedown policies" to make them more restrictive "resulted from that kind of pressure from Congress." *Id.* 118:17-20.

954.    Chan's opinion is the result of discussing these meetings with participants on both sides—both the Congressional staffers and employees of Facebook, Twitter, and Google.  Chan "and FBI San Francisco personnel would meet with the congressional staffers, typically before they met or after they met with the social media companies," because "they wanted an FBI opinion about what they had heard from the social media companies." *Id.* 119:23-120:3.

955.    To the best of Chan's recollection, these meetings between Congressional staffers and social-media platforms were an "annual occurrence" that began in 2017 and recurred annually after 2017. *Id.* 120:7-8.  "The staffers had separate meetings with each of the companies." *Id.* 121:4-5.  "[A]fter those meetings, the staffers would come to [Chan] and ask [his] opinion of potential legislation." *Id.* 121:6-9.

956.    Chan also discussed these meetings with the social-media platform employees who participated, as he "talk[s] with the social media platform personnel regularly," and he understood from them that "the congressional staffers put a lot of pressure on them" in the meetings. *Id.* 122:18-25.  He spoke directly to the personnel who participated in the meetings. *Id.* 123:21-24. Senior officials from the social-media platforms, including Yoel Roth of Twitter, Steven Siegel of

Facebook, and Richard Salgado of Google, participated in the meetings with Congressional

staffers. *Id.* 123:25-125:7.

957.    The Congressional staffers involved in the meetings were "senior-level staffers,"

including "a director-level" staffer, "the committee counsel or a senior counsel for the committee,"

and "one or two other … line-level staffers." *Id.* 123:6-13.

958.    According to Chan, "intense pressure from U.S. lawmakers and the media …

eventually force[d] the social media companies to examine what had taken place on their platforms

[in 2016] and strive to ensure that it did not happen in the future." *Id.* 127:3-23; Chan Ex. 1, at 42.

959.    These steps included actions by the social-media platforms to take more aggressive

enforcement against violations of their terms of service, but also policy changes to the terms of

service themselves to make their policies more restrictive: "the policy changes specifically to their

terms of service or community standards." Chan Dep. 129:17-19. These involved "more robust or

more aggressive content-modulation policies," that "clarify that certain things actually violate their

policies and can be taken down." *Id.* 130:4-18.

960.    Chan notes that "Facebook and Twitter faced more Congressional scrutiny … as

their senior executives testified before Congress on three separate occasions before the midterm

elections," Chan Ex. 1, at 46, and he concludes that "political pressure from Congress was a

contributing factor" leading social-media platforms to adopt more restrictive content-moderation

policies.  Chan Dep. 132:7-9.  Chan believes that these more restrictive censorship policies that

include "account takedowns" are "constructive change," *id.* 133:2-23.

961.    These policy changes, induced by "political pressure from Congress," resulted in a

dramatic increase in censorship on social-media platforms, including for example that "zero

[Twitter] accounts were taken down during the 2016 cycle but 3,613 Twitter accounts were taken

down during the 2018 cycle." *Id.* 133:24-134:5.  Likewise, 825 accounts were removed from Facebook and Instagram based on publicly available reports, but according to Chan, the actual number was much higher. *Id.* 147:8-148:18.  In 2019, Twitter announced the takedown of "422 accounts which made 929,000 tweets." *Id.* 149:9-12.  "[S]ome subset of that amount was due to information [the FBI] provided." *Id.* 150:12-14.

962.    When meeting with social-media platforms, Chan "typically meet[s] with the trust and safety individuals and then their associated attorneys." *Id.* 135:16-18.

963.    Samaruddin K. Stewart ("Sam") of the State Department's Global Engagement Center "would meet with social media companies … primarily with policy individuals." *Id.* 135:2-15.

964.    Sam Stewart would offer "different types of software made by vendors that they would pilot to see if they could detect malign foreign influence on social media platforms." *Id.* 135:25-136:3.  Chan believed that the Global Engagement Center's products "might accidently pick up U.S. people information." *Id.* 138:10-12.

965.    Elvis Chan knows and has worked with Peter Strzok and Lisa Page. *Id.* 234:19-240:5.  He also knows and has worked with James Baker, the former general counsel of the FBI who went on to become deputy general counsel of Twitter and encouraged Twitter to keep censoring the Hunter Biden laptop story. *Id.* 239:13-16.

**H.    The FBI's Censorship Activities Are Ongoing.**

966.    Chan urges the public to report supposed misinformation on social media directly to the platforms, or else report it to the FBI or DOJ so that they can report it to the platforms, and boasts that the platforms are "very aggressive" in taking down misinformation.  As he stated in a public podcast just before the 2020 election: "If you're also seeing something related to the election

on your social media platform, all of them have portals where you can report that sort of information. They're being very aggressive in trying to take down any disinformation or misinformation, and then, lastly, if they see anything on election day or before election day, you can always report it to FBI.gov or justice.gov … We take all of these very seriously." Chan Ex. 13, at 3, 9:9-19. FBI San Francisco, when it receives such reports, "would then relay those to social media platforms," so that "the social media platforms will assess those in connection with their terms of service." Chan Dep. 267:13-23. Chan characterizes the platforms as "very aggressive" in taking down disinformation because they "[adjusted] their policies to be able to handle foreign-malign-influence operations." *Id.* 270:23-25.

967.   The FBI continues the same efforts in 2022 and later election cycles that it pursued in 2020. As Chan publicly stated, "post 2020, we've never stopped … as soon as November 3rd happened in 2020, we just pretty much rolled into preparing for 2022." Chan Ex. 15, at 2, 8:2-4. Chan stated: "[W]e are also really engaged with the technology companies that are out here … We're also working with the social media companies to make sure that any foreign disinformation that's coming out … if we can identify them, we can share that information with them so they can knock down accounts, knock down disinformation content," and he noted that they are "having conversations with all of those organizations as they're building up to November of [2022]." Chan Ex. 15, at 2-3, 8:15-9:4.

**VII.   CISA's Censorship: Pressure, "Switchboarding," and Working Through Nonprofits.**

968.   CISA, the Cybersecurity and Infrastructure Security Agency within the Department of Homeland Security, serves as a "nerve center" for federal censorship efforts. CISA meets routinely with social-media platforms about censorship in at least five different sets of standing meetings, CISA pressures platforms to increase censorship of speech that federal officials disfavor,

and CISA serves as a "switchboard" by "routing disinformation concerns to social-media platforms" for censorship. CISA also seeks to evade the First Amendment by outsourcing many of its censorship activities to nonprofit agencies that it collaborates closely with, including the CISA-funded Center for Internet Security and its "EI-ISAC" ("Election Infrastructure – Information Sharing & Analysis Center") for state officials, and the massive censorship cartel calling itself the "Election Integrity Partnership."

969.   Brian Scully is the chief of the so-called "Mis, Dis, and Malinformation Team" or "MDM Team" within the Cybersecurity and Infrastructure Security Agency (CISA) in the Department of Homeland Security (DHS). Scully Depo. 15:14-20. Before the Biden Administration, the MDM Team was known as the "Countering Foreign Influence Task Force," or CFITF.

970.   Lauren Protentis is the "Engagements Lead" for the MDM Team, and she is in charge of "outreach and engagement to key stakeholders, interagency partners, [and] private sector partners," including "social media platforms." Scully Depo. 18:2-18. During relevant periods in both 2020 and 2022, however, Protentis was on maternity leave, and during those times, Scully performs her role as chief engagement officer for communicating with other federal agencies, private-sector entities, and social-media platforms about misinformation and disinformation. Scully Depo. 18:19-20:10.

971.   Both Scully and Protentis have done or are doing extended details at the National Security Council where they work on misinformation and disinformation issues. Protentis began a one-year detail at the NSC in January 2023, as soon as she came back from maternity leave, and she will deal with mis- and disinformation issues for the NSC as part of her detail. Scully Depo. 19:15:20:5.

A.    **CISA "Switchboards" by Flagging Government-Reported "Misinformation."**

972.    Scully admits that, during 2020, the MDM team "did some switchboard work on behalf of election officials." Scully Depo. 16:23-25. "Switchboard work" or "switchboarding" is a disinformation-reporting system that CISA provides that allows state and local election officials (who are government officials subject to the First Amendment) "to identify something on social media they deemed to be disinformation aimed at their jurisdiction. They could forward that to CISA and CISA would share that with the appropriate social media companies." Scully Depo. 17:3-8.

973.    In reporting perceived misinformation to the platforms, CISA and the state and local officials have "an understanding that if the social media platforms were aware of disinformation that they might apply their content moderation policies to it," and "the idea was that they would make decisions on the content that was forwarded to them based on their policies." Scully Depo. 17:15-21.

974.    CISA's "switchboarding" activity causes social-media speech to be censored that otherwise would not have been censored: Scully agrees that "if it hadn't been brought to their attention then they obviously wouldn't have moderated it." Scully Depo. 17:22-18:1.

975.    Scully contends that "we didn't do switchboarding in 2022." Scully Depo. 21:24-25. But he admits that this decision was made in late April or early May 2022. Scully Depo. 22:15-23. This lawsuit was filed, specifically challenging CISA's "switchboarding" activity, on May 5, 2022. Doc. 1.

976.    Throughout the 2022 election cycle and through the present date, CISA continues to publicly state on its website that the MDM Team "serves as a switchboard for routing disinformation concerns to appropriate social media platforms": "The MDM team serves as a

switchboard for routing disinformation concerns to appropriate social media platforms and law enforcement. This activity began in 2018, supporting state and local election officials to mitigate disinformation about the time, place, and manner of voting. For the 2020 election, CISA expanded the breadth of reporting to include other state and local officials and more social media platforms." Scully Ex. 24, at 3; *see also* Cybersecurity and Infrastructure Security Agency, "Mis, Dis, Malinformation," https://www.cisa.gov/mdm (visited Feb. 4, 2023).

977.    According to Scully, "switchboarding is CISA's role in forwarding reporting received from election officials, state/local election officials, to social media platforms."  Scully Depo. 23:24-24:2.

**B.    CISA Organizes the "USG-Industry Meetings" on Misinformation.**

978.    The MDM Team continues to communicate regularly and extensively with social-media platforms about misinformation and disinformation, including during the 2022 election cycle.  These communications include at least "two general types of communications, one, we did regular sync meetings between government and industry, so federal partners and different social media platforms."  Scully Depo. 21:2-6.  This is "a coordinated meeting.  Facebook was the industry lead, so [Scully] would have coordination calls with them prior to the meetings, just to set the agenda for meetings…"  Scully Depo. 21:6-10.  These meetings are described in CISA's interrogatory responses as "USG-Industry" meetings.  Scully Ex. 12, at 38-40.

979.    In addition, the MDM Team received regular reports from social-media platforms about any changes to their censorship policies or their enforcement actions on censorship: "if a platform was putting out a … public report on policies or activities" relating to disinformation and censorship," CISA would "get a briefing on that or at least get an awareness that it was going out." Scully Depo. 21:11-16.

980.    The USG-Industry meetings increase in frequency as each election nears.  In 2022, they were "monthly" as the election approached, and then in October, they became "biweekly," so that there were two "biweekly meetings … prior to the [2022] election."  Scully Depo. 24:16-21.

981.    "DOJ, FBI, ODNI, and … DHS" participate in these meetings on the federal government's side.  Scully Depo. 25:23. DHS's participation includes at least two components: CISA, typically represented by Scully and Geoff Hale, Scully's supervisor; and the Office of Intelligence and Analysis ("I&A").  Scully Depo. 25:11-26:13. Scully's role is to "oversee" and "facilitate the meetings."  Scully Depo. 25:14-16.  On behalf of CISA, Kim Wyman, Allison Snell, and Lauren Protentis also participate in the meetings. Scully Depo. 28:4-13.

982.    On behalf of FBI, FITF Chief Laura Dehmlow and Elvis Chan participate in these "USG-Industry" meetings, and "periodically other people would be on from different parts of FBI," while "Laura [Dehmlow] was usually who [CISA] coordinated through."  Scully Depo. 29:14-30:12.

983.    These "USG-Industry" meetings have been occurring "for years," and "the first meeting we had … between federal and … industry was in 2018."  Scully Depo. 31:10-16.

984.    In addition, prior to each "USG-Industry" meeting, CISA hosts at least two planning meetings before the main meeting: a bilateral planning meeting between CISA and Facebook, and an interagency meeting with the federal agencies that participate.  Scully Depo. 36:21-37:13.

985.    Even though the 2022 meetings were still quite recent at the time of his deposition, Scully professed that "I don't recall specifics, so I'll just say that upfront" about the discussions at these meetings.  Scully Depo. 37:19-20; *see also* Scully Depo. 39:23-25.

986.    The social-media platforms attending these meetings include "Facebook, Twitter, Microsoft, Google, Reddit, … [and] LinkedIn," as well as "others."  Scully Depo. 38:15-20.  For example, Wikimedia Foundation participated in "some."  Scully Depo. 39:2-6.

987.    Scully agrees that "concerns about misinformation and disinformation on social media platforms [were] discussed in these meetings in the 2022 timeframe."  Scully Depo. 39:7-11.  This includes federal officials reporting on disinformation concerns that they believe will affect speech on social media; for example, the "intelligence community" would report on "information operations": "the intelligence community, if their reporting included foreign actors who were potentially going to use information operations, they might mention that in their briefings."  Scully Depo. 39:19-23.

988.    The social-media platforms, likewise, would report back to federal officials about disinformation "trends" on their platforms, and provide additional information to the federal government not included in their public reports about such trends: "the platforms, they might share some high-level trend information from public reporting that they put out.  So a lot of the platforms do their own regular reports on what they're seeing on their platforms and … what actions they're taking. And so the platforms, themselves, would share that type of information…. they would share essentially what they were getting ready to make public or what they had already made public… and then potentially provide some additional context around that."  Scully Depo. 40:4-22.  The government would ask for additional information about their observations of disinformation trends on social media, and the platforms would provide it: "they would share that, and if the government had questions or was looking for additional context they would often talk about that, they would generally talk about any new tactics that they were seeing."  Scully Depo. 41:1-5.

989.    Scully admits that the discussion of foreign-originated misinformation is ultimately targeted at preventing domestic actors' from engaging in certain government-disfavored speech. He states that "my recollections for the time period we're talking about here, from September 2022 to the election in 2022, I recall most of it was foreign based.  But … often what you see overseas essentially makes its way to the United States."  Scully Depo. 41:6-12.

990.    At the various meetings, the platforms discuss misinformation and disinformation as "coordinated inauthentic behavior," which is subject to removal under their terms of service, but Scully admits that "coordinated inauthentic behavior" concerns CISA because it "could lead to mis and disinformation, for sure."  Scully Depo. 42:12-14.

### C.    CISA Is Deeply Embedded in the Election Integrity Partnership.

991.    Scully admits that CISA has established relationships with researchers at "Stanford" and the "University of Washington," as well as "Graphika."  Scully Depo. 46:23, 48:1-4.  CISA's coordination with these researchers has continued since before the 2020 election cycle. Scully Depo. 47:22-25.  Detailed additional information about these entities and their collaboration with CISA in the "Election Integrity Partnership" (or "EIP") is provided below.  *See infra*.

992.    Stanford Internet Observatory, University of Washington, the Atlantic Council, and Graphika are all involved in the EIP.  Scully Depo. 48:1-22.

993.    When EIP was starting up, Scully admits that CISA's "involvement" with the EIP included at least the following collaborations: (1) "a couple of our [CISA] interns came up with the idea and … [CISA] had some communications with" the EIP.  Scully Depo. 49:8-10.  (2) CISA "received some briefings on the work that they were doing."  Scully Depo. 49:13-14.  (3)  CISA "had some communications early on in the process, when they were making decisions, when Stanford was trying to figure out what the gap was."  Scully Depo. 49:18-21.  (4) CISA "connected

them [EIP] with the Center For Internet Security," which is a CISA-funded nonprofit that channels reports of disinformation from state and local government officials to social-media platforms. Scully Depo. 50:5-6.   (5) CISA also "connected them [EIP] with some of the election official groups," *i.e.*, "the National Association of Secretaries of State [NASS] and the National Association of State Election Directors [NASED]," both of which are groups of state and local government officials.  Scully Depo. 50:6-10.   (6) And CISA "facilitated some meetings between those three."  Scully Depo. 50:10-11.

994.    The CISA interns who originated the idea of the EIP "worked for the Stanford Internet Observatory, as well … which was part of the [Election Integrity] Partnership."  Scully Depo.  51:7-8, 22-24.

995.    According to Scully, the "gap" that the EIP was designed to fill, was that state and local election officials lack the resources to monitor and report on disinformation that affects their jurisdictions: "One of the gaps that we identified from 2018 is, as you know, most election officials their offices are fairly low staff, low resourced, and so there was no – they didn't have capabilities to try to identify disinformation targeting their jurisdictions, and so was essentially the gap is that most election offices throughout the country just didn't have that capacity or capability to be monitoring so that they could identify anything that would be potentially target their jurisdictions, so that was the gap."  Scully Depo. 57:6-17.

996.    Scully and other CISA officials identified the "gap" as a problem to CISA interns who were simultaneously working for the Stanford Internet Observatory: "So we had a conversation with the interns, and they were asking questions about kind of needs that the election officials have, generally.  One of the gaps that we identified from 2018 is, as you know, most

election officials their offices are fairly low staff, low resourced, and so … they didn't have the capabilities to try to identify disinformation targeting their jurisdictions." Scully Depo. 57:2-11.

997.    Thus, Scully and other CISA officials were involved in originating and brainstorming about the creation of the EIP in the first place, as they "had some initial conversation with the interns" about this "gap," and then they also "had a conversation with the Stanford Internet Observatory folks about the gap."  Scully Depo. 52:3-6.  Then, CISA "received a briefing from them [EIP], or two, on kind of what they were putting together." Scully Depo. 52:7-9.  Scully and other CISA officials then "facilitated some meetings between Stanford folks, the Center For Internet Security, and election officials, where they had discussions about how they would work together." Scully Depo. 52:10-13.  And CISA's involvement did not end there, as Scully admits that "we had some conversations, kind of throughout, when they were -- particularly when they were putting out public reporting about what they were seeing." Scully Depo. 52:14-17.  In addition, Scully "wouldn't be surprised if there were some other kind of brief conversations in there." Scully Depo. 52:18-20.

998.    The EIP continued to operate during the 2022 election cycle. Scully Depo. 53:4-5.  At the beginning of the 2022 election cycle, the EIP "gave us [CISA] a briefing, early on, about what they were thinking about," which occurred in "May/June of 2022." Scully Depo. 53:14-19.  Scully and Geoff Hale of CISA received the briefing from Renee DiResta and another EIP official. Scully Depo. 53:22-54:7.  In that briefing, the EIP officials "walked through what their plans were for 2022, [and] some of the lessons learned from 2020." Scully Depo. 54:11-13.  Their plans for 2022 were that "they were going to do something similar to what they did in 2020 in terms of trying to support election officials." Scully Depo. 54:16-18.  They planned to "work with state and local election officials." Scully Depo. 54:22-25.

999.   CISA followed EIP's public reporting during the 2022 election cycle, and in particular, Scully relied on "at least one public report … that I thought was pretty good," which was "about specific disinformation" and "was basically how to think about whether or not a narrative poses risks." Scully Depo. 56:12-17.

1000.   Scully admits that CISA has "an established relationship" with the EIP and the Stanford Internet Observatory personnel who lead it. Scully Depo. 55:24-25.

1001.   The Center for Internet Security is a "non-profit that oversees the multi-state ISAC and the election infrastructure subsector information sharing and analysis center, that's what ISAC stands for." Scully Depo. 59:13-16. In other words, CIS oversees the "Multi-State Information Sharing and Analysis Center," or "MS-ISAC," and the "Election Infrastructure Information Sharing and Analysis Center," or "EI-ISAC." Scully Depo. 60:9-20. Both of these are organizations of state and/or local government officials, organized for information sharing. Scully Depo. 60:3-11, 60:25-61:6.

1002.   CISA funds the Center for Internet Security in its activity of overseeing the EI-ISAC, which is an organization for information-sharing among state and local government election officials. Scully Depo. 61:9-10, 62:1 ("CISA provides funding for the EI-ISAC").

1003.   CISA directed election officials to the Center for Internet Security, which CISA funds, as an alternative route for reporting misinformation to social-media platforms, because CISA found the "switchboarding" role to be resource-intensive. Scully Depo. 62:16-24.

1004.   CISA connected the Center for Internet Security with the EIP because "the EIP was working on the same mission," so "we wanted to make sure that they were all connected." Scully Depo. 62:24-63:1. Thus, CISA originated and set up the collaborations between local government officials and the CIS, and between the EIP and the CIS. *Id.*

1005.   The Center for Internet Security worked closely with CISA in reporting misinformation to social-media platforms, as CISA served as a pass-through for reports from CIS to the platforms: CIS officials "were receiving reporting directly from election officials. In the early part of 2020, they would forward what they were receiving election officials to us at CISA, and then we would push that to the social media platform; as 2021 moved along, CIS more frequently provided that directly to the platforms, themselves.  And so I would say early on in the process, the switchboarding generally came through CISA. Later on in the process, it was more of a mixed bag of how the switchboarding worked."  Scully Depo. 63:23-64:10.

1006.   In addition to CIS and CISA, EIP also reported supposed misinformation to social-media platforms.  Scully Depo. 64:13-14.  CISA and CIS coordinated directly with each other on reporting misinformation.  Scully Depo. 64:18-20.

1007.   CISA served a mediating role between CIS and the EIP, and the platforms, to coordinate their efforts in reporting misinformation to the platforms: "There was a point where one of the platforms was concerned about too much kind of duplicate reporting coming in, and so we did have some conversations with EIP and CIS on how to kind of better manage that activity to make sure we weren't overwhelming the platforms."  Scully Depo. 64:21-65:1.

1008.   There was also direct email communication between EIP and CISA about misinformation reporting.  Scully Depo. 66:9-12.

1009.   When CISA reported misinformation to platforms, CISA would "generally copy the Center for Internet Security," which was coordinating with EIP.  Scully Depo. 67:20-68:6.

1010.   Alex Stamos and Renee DiResta of the Stanford Internet Observatory briefed Scully about the EIP's report, "The Long Fuse," in "late spring, early summer 2021."  Scully Depo. 70:1-10.  Scully also reviewed portions of the report.  *See id.*; Scully Ex. 1 (EIP Report).

1011.   Dr. Kate Starbird of the University of Washington, who works with the EIP, is also on the MDM Subcommittee for CISA.  Scully Depo. 72:19-73:4.  Kate Starbird of the University of Washington serves on CISA's CSAC MDM Subcommittee, as well as working with the EIP. Scully Ex. 59, at 1.

1012.   Alex Stamos and Renee DiResta, who quarterback the EIP, also have roles in CISA. Renee DiResta of the Stanford Internet Observatory—a key player in the EIP—also serves as a "Subject Matter Expert (SME)" for the CISA's Cybersecurity Advisory Committee's MDM Subcommittee.  *Id.*; Scully Depo. 361:19-362:6.  Alex Stamos, the director of the Stanford Internet Observatory who launched the EIP, serves on the CISA Cybersecurity Advisory Committee, along with Kate Starbird.  Jones Decl., Ex. FF, at 3, 12-13.

1013.   CISA had extensive communications to coordinate with the EIP when it was starting up during the 2020 election cycle: "we had conversations with Stanford about the gap. They gave us some briefings on what they were doing, how they were doing it.  Prior to the election, we had some conversations with them to facilitate and coordinate meetings, as I mentioned. And then when they put public reporting out, if we had questions about it, we would probably have conversations with them around that, as well."  Scully Depo. 74:17-75:1.

1014.   In addition to Scully, Matt Masterson was involved in communicating with the EIP. Scully Depo. 75:6-11.  In addition, Scully "wouldn't be surprised" if Geoff Hale participated in some conversations with EIP.  Scully Depo. 76:1-2.

1015.   The then-Director of CISA, Director Krebs, "had a relationship with Alex Stamos," the head of the Stanford Internet Observatory, while CISA was coordinating with the EIP, and Director Krebs "may have had conversations in that context" about the EIP.  Scully Depo. 76:8-

10.   In fact, when he left CISA in late 2020, Director Krebs "joined Alex Stamos," and "they started a business together," called the "Krebs/Stamos Group."  Scully Depo. 76:5-23.

1016.   Scully believes that "Director Krebs may have participated in a couple of meetings that I'm aware of, that Stamos was also in."  Scully Depo. 77:20-22, 78:3-11.

1017.   According to Scully, "generally speaking, the reporting that CISA received came through the Center for Internet Security."  Scully Depo. 79:19-21.

1018.   Matt Masterson and Scully presented questions to the EIP about their "public reporting," which consisted of "regular blog posts on what they were seeing" about supposed election-related misinformation.  Scully Depo. 81:19-82:16.  Masterson was also involved in at least one of the initial discussions with the Stanford Internet Observatory about starting up the EIP. Scully Depo. 81:24-82:4.  Masterson spoke to Stanford about "clarifying the gap that election officials faced for the folks at the Stanford Internet Observatory early on in the process."  Scully Depo. 83:22-25.

1019.   The idea of the "gap" came from Scully and CISA, which he "shared with the interns."  Scully Depo. 84:8-22.

1020.   Matt Masterson "was in the meeting where we talked about the gap with [Alex] Stamos, in particular.  And I believe Stamos mentioned that [*i.e.*, the collaboration that became the Election Integrity Partnership] as an option during that call."  Scully Depo. 85:21-24.

1021.   Matt Masterson left CISA in January 2021.  He started at Microsoft in early 2022. In the intervening year, immediately after leaving CISA, Masterson "was a fellow at the Stanford Internet Observatory."  Scully Depo. 88:21-89:8.  Thus, both the CISA Director (Krebs) and the political appointee directly involved in the establishment of the EIP (Masterson) went to work with Alex Stamos of Stanford Internet Observatory immediately after the 2020 election cycle.

1022.   Alex Stamos consulted with CISA in part because "he knew he would need us helping him connect with election officials."  Scully Depo. 100:17-18.

1023.   Scully believes that there was at least "a fifth call" between CISA and Alex Stamos in 2020.  Scully Depo. 101:4.

1024.   Scully put Stamos in touch with NASED and NASS, and "facilitated some meetings between … them [EIP] and election officials."  Scully Depo. 101:15-102:10.  Scully "facilitated meetings … some meetings between EIP and CIS" because "they didn't have relationship" and "didn't know each other.  So [CISA] just facilitated getting them together to talk and figure out how they were going to work together."  Scully Depo. 102:14-20.  The purpose of these meetings was "to set up a direct line of communication between CIS and EIP."  Scully Depo. 103:7-10.

1025.   Scully also put EIP in contact and facilitated meetings between EIP (*i.e.*, folks at the Stanford Internet Observatory, which organized EIP) and representatives of NASED and NASS, the organizations of state and local election officials.  Scully Depo. 103:11-104:19.  These occurred in July or August 2020.  Scully Depo. 104:24-25.

1026.   Scully believes that the Center for Internet Security, which CISA funds, "forward[ed] messages that election officials sent them" reporting misinformation "to EIP."  Scully Depo. 106:10-16.

1027.   Scully agrees that "EI-ISAC is a part of CIS and we do fund the EI-ISAC."  Scully Depo. 110:20-23.

1028.   Scully agrees that CISA collaborated with the EIP.  Scully Depo. 111:15-18.

1029.   CISA probably had "between two and four" conversations with the EIP about its public reports on disinformation trends on social media.  Scully Depo. 113:20-24.  "[I]f we had a question about jurisdiction[s] being targeted or a new [disinformation] tactic or things like that,

we would just ask them … questions about that sort of thing." Scully Depo. 114:17-21. Scully "was following the public reports" from the EIP during 2020. Scully Depo. 115:16-17.

1030. CISA received misinformation reports principally from three sources: first, from the Center for Internet Security; and second, "sometimes election officials would send them in to CISA central, which is CISA's kind of ops center block room type setup. And then the third way was they would just send direct to a CISA employee, … often Matt Masterson, who had relationships with many of the election officials." Scully Depo 119:7-11, 119:22-120:5.

1031. CISA coordinated with the Center for Internet Security on reporting misinformation to platforms: "we would let them know when we reported something to a platform … to avoid duplication," and "most of the reporting that I recall in 2020 came through CIS. And so we just wanted to let them know that we were acting on what they sent us. For reporting that didn't come through CIS, we would often let them know after we had shared it with the platforms that we had shared something with the platforms for their arrangement." Scully Depo. 120:23-121:9.

1032. CIS and EIP also "had a relationship. They shared information." Scully Depo. 121:20-21.

1033. According to Scully, "CISA does not do attribution. We didn't do analysis of what we received from election officials. So we would not know what percentage" of misinformation reports "were foreign derived." Scully Depo. 122:25-123:3. CISA thus forwards reports of "misinformation" to social-media platforms "without assessing whether they were originated from foreign or domestics sources." CISA would not "take steps to see whether this came from foreign or domestic sources," but "would just pass it along to the social-media platforms." Scully Depo. 123:4-18.

1034.   Scully was aware that social-media platforms changed their content-moderation policies to be more restrictive of election-related "misinformation" during the 2020 election cycle, because the platforms reported on those changes to federal officials "in our regular sync meetings," *i.e.*, the "USG-Industry" meetings.  Scully Depo. 127:18-19.  In those meetings, "that would be one of their briefing points, that they were making significant changes" to policies for censoring election-related speech.  Scully Depo. 128:4-6.

1035.   During 2020, Matt Masterson was "a senior election security person at CISA," and he was a "political appointee."  Scully Depo. 129:23-130:4.  Masterson was "familiar with the switchboarding work that we were doing."  Scully Depo. 131:8-10.  And "when he would receive emails" reporting misinformation, "he forwarded them to us."  Scully Depo. 131:13-14.

1036.   Scully understands that the Virality Project was "Stanford's attempt to mimic the EIP for COVID."  Scully Depo. 134:10-11.

1037.   The Virality Project "sent [Scully] some of their public reports."  Scully Depo. 134:13-14.

1038.   Scully was aware that Alex Stamos and Renee DiResta of the Stanford Internet Observatory were involved in the Virality Project.  Scully Depo. 134:21-22.

1039.   Scully "did have some conversations where they were … asking me … for any connections I had with HHS or CDC."  Scully Depo. 135:10-12.

1040.   In addition, Scully recalls "some informal … conversations that I may have had with Alex, in particular, and maybe Renée, as well," about the Virality Project. Scully Depo. 136:3-6.

1041.   Alex Stamos gave Scully an "overview what they planned to do in the Virality Project" that "was similar to what they did … with the EIP."  Scully Depo. 136:19-22.

1042.   Scully also had conversations with Renee DiResta about commencing the Virality

Project.  Scully Depo. 139:5-14.

1043.   With respect to the EIP, Alex Stamos and Renee DiResta "shared … lessons

learned," and "what some of their big takeaways were" with Scully.  Scully Depo. 141:6-8.

1044.   CrowdTangle is a "Facebook-owned social media monitoring service."  Scully

Depo. 144:23-24.

1045.   According to the Virality Project report, "as voting-related mis-and disinformation

arose in the 2020 presidential election, the Election Infrastructure Information Sharing and

Analysis Center (EI-ISAC) served a critical role in sharing information with the Election Integrity

Partnership and pushing its rapid response analysis back out to election stakeholders across all

states."  Scully Ex. 2, at 150.  Scully understands that this refers to the Center for Internet Security,

which operates the EI-ISAC through CISA-provided funding, and that "it was Center for Internet

Security" that engaged in direct communications with the EIP and played a critical role in sharing

information with the EIP.  Scully Depo. 147:17-25.

1046.   During the summer of 2020, CISA was "piloting a capability that would allow us

to monitor narratives online," Scully Depo. 151:13-15—*i.e.*, the work that the EIP eventually did

and does.

1047.   In his public statements, Alex Stamos has identified the EIP's "partners in

government" as "most particularly those in CISA and DHS, but also in all of the local and state

governments with whom we operated with."  Scully Ex. 6, at 4.  Scully agrees that "CISA and

DHS were partners of the EIP."  Scully Depo. 369:1-11.

1048.   According to Stamos, "[t]he Election Integrity Partnership started with our team in

Stanford sending a group of interns to go work with the cyber security and infrastructure security

agency at the DHS to work election security. And what these interns found is, there's a lot of opportunity for them to contribute to the technical components of election security. They also found that there was a lack of capability around election disinformation. This is not because CISA didn't care about disinformation, but at the time they lacked both kind of the funding and the legal authorizations to go do the kinds of work that would be necessary to truly understand how election disinformation was operated." Scully Ex. 6, at 4.

1049.   Stamos says that the EIP is "a project between four different institutions to try to fill the gap of the things that the government cannot do themselves." Scully Ex. 6, at 4.

1050.   Stamos states that CISA was one of "four major stakeholders" in the EIP: "There are kind of four major stakeholders that we operated with that we worked beside at EIP. Our partners in government, most particularly those in CISA and DHS, but also in all of the local and state governments with whom we operated with." Scully Ex. 6, at 4.

1051.   EIP had access to data for monitoring social-media speech that the federal government does not have:  The EIP "also worked with the major platforms, Facebook, Twitter, YouTube, TikTok, Reddit, NextDoor and the like. … [S]ome of those cases we had agreements for access of data. In other cases, we had to have individual analysts go work with them."  Scully Ex. 6, at 5.

1052.   According to Stamos, there was very little foreign disinformation in 2020: "We find very little evidence that there's any foreign involvement at all. In fact, the vast majority of election disinformation in 2020 came from Americans who had verified accounts and very large follower accounts."  Scully Ex. 6, at 6.

1053.   According to Stamos, its founder, the EIP targeted "large follower account political partisans who are spreading misinformation intentionally, doing so in a multi-media context. So

they're doing so online, on social media, but they're also doing so on cable news, doing so on the

radio, through a variety of different outlets and are able to amplify their message and to motivate

their followers to go try find evidence of the incorrect claims that they're making."  Scully Ex. 6,

at 7.

1054.   According to Renee DiResta, "in August 2020, students from the Stanford Internet

Observatory were doing an internship with CISA and they identified a massive gap in the

capability of federal, state, and local governments to become aware of, to analyze, and to rapidly

respond to mis and disinformation, both foreign and domestic, targeting the 2020 election."  Scully

Ex. 7, at 4.  The EIP was designed to fill that "gap" in the governments' capability to "rapidly

respond to mis- and disinformation … targeting the 2020 election."  *Id.*

1055.   As DiResta notes, the EIP was designed to get around "unclear legal authorities,

including very real First Amendment questions," that would arise if CISA or other government

agencies were to monitor and flag misinformation for censorship on social media.  Scully Ex. 7,

at 4.  As she states, "that gap had several components. The federal government wasn't prepared to

identify and analyze election mis- and disinfo. …There were unclear legal authorities, including

very real First Amendment questions."  *Id.*

1056.   DiResta agrees that "the vast majority of voting related misinformation in the 2020

election was domestic."  Scully Ex. 7, at 6.

1057.   The Virality Project was immediately established on the heels of the EIP:

"Following the success of EIP and the certification of the 2020 election, SIO [Stanford Internet

Observatory] … almost immediately we recognized the need to ramp back up. This time to support

government health officials' efforts to combat misinformation and targeting the COVID-19

vaccines. In February 2021, we formally established the Virality Project drawing on the same

partners from EIP and adding a few more, and much like EIP, it focused on realtime observation,
analysis, and understanding of cross platform vaccine-related misinformation."  Scully Ex. 7, at 7.

1058.   The CISA-funded Center for Internet Security coordinated with EIP regarding
online misinformation and reported it to CISA.  For example, on October 1, 2020, CIS emailed
Scully about alleged misinformation, noting that "the impact seems to be escalating.  Our hope is
the platforms can do more to take down the misinformation.  The EIP has been tracking this spread
under ticket EIP-243 and has more examples."  Scully Ex. 9, at 1.  Scully forwarded this report to
social media platforms.  *Id.*

1059.   EIP had advised Scully that it was using a ticketing system to track misinformation
narratives.  Scully Depo. 159:1-5.

1060.   Scully forwarded this report tracked under EIP-243 to Twitter, as well as Facebook
and YouTube, because "people generate traffic … by posting it across platforms," and he "would
sometimes share across other platforms that we thought there might be … relevant content showing
up on their platforms."  Scully Depo. 160:2-5; Scully Ex. 9, at 1, 7, 12.

1061.   Scully asked social-media platforms to report back how they were handling reports
of misinformation and disinformation received from CISA.  *See* Scully Ex. 9, at 11 (asking Twitter
"to see if there's anything you can share about how you're approaching" misinformation reported
by CISA).  According to Scully, "periodically … we would ask if the decision was made and if
we can share back."  Scully Depo. 164:15-17.

1062.   CISA maintained a "tracking spreadsheet" of its misinformation reports to social-
media platforms during the 2020 election cycle.  Scully Depo. 165:14-166:13.  After Scully's
deposition, CISA produced this "tracking spreadsheet" in response to Plaintiffs' Motion to
Compel.  Jones Decl., Ex. GG.

1063.   At least six members of the MDM team "took shifts" in reporting supposed misinformation to social-media platforms, including Scully, Chad Josiah, Rob Schaul, Alex Zaheer, John Stafford, and Pierce Lowary.  Scully Depo. 166:9-168:11, 183:14-16.

1064.   At the time, Pierce Lowary and Alex Zaheer were simultaneously serving as interns for CISA and working for the Stanford Internet Observatory, which was then operating the Election Integrity Partnership.  Scully Depo. 168:22-171:16, 183:20-22.  Thus, Zaheer and Lowary were simultaneously engaged in reporting misinformation to social-media platforms on behalf of CISA, and in reporting misinformation to social-media platforms on behalf of the EIP.  *Id.*

1065.   Zaheer and Lowary were also two of the four Stanford interns who originated the idea of the EIP.  Scully Depo. 171:14-16, 184:22-24, 185:12-14.

1066.   Zaheer "was one of the people that were working the ticketing system" for EIP.  Scully Depo. 181:21-23.  Likewise, Lowary "did both SIO and CISA push forwarding" at the same time during the fall of 2020.  Scully Depo. 183:14-16.

1067.   CISA's misinformation reporting to platforms "ramped up as we got closer to the election."  Scully Depo. 174:1-2.  On election night, they "were up until at least midnight," and "if we received anything we would push it forward."  Scully Depo. 175:12-14.  Close to the election, they would "monitor their phones" for disinformation reports even during "off hours."  Scully Depo. 175:16-17.  "[T]he expectation [was] … that they would be responsible for forwarding something" to the platforms. Scully Depo. 175:19-21.

1068.  Alex Zaheer, when switchboarding for CISA, forwarded detailed a report of supposed "misinformation" from the Election Integrity Partnership (EIP) to CISA's reporting system, which called for "swift removal of … posts and continued monitoring of the user's account" because that user had "claimed (1) that mail-in voting is insecure, [and] (2) conspiracy

theories about election fraud are hard to discount." Scully Ex. 9, at 62. Scully forwarded this report to Twitter, which reported back that it had taken action pursuant to its civic integrity policy. *Id.* at 61; *see also* Scully Depo. 199:6-200:17.

1069.  According to Scully, forwarding such reports of misinformation from the EIP to social-media platforms "was our standard practice." Scully Depo. 200:25. In fact, CISA's tracking spreadsheet contains at least eleven entries of "switchboarded" reports of misinformation that CISA received directly from "EIP" and forwarded to social-media platforms for review under their policies. Jones Decl., Ex. GG, at 4-5, Column C ("From"), Lines 86-96, 115, 123 (all listing "EIP"). CISA also used EIP tracking numbers for those reports. *See id.* Column D. One of these notes that content was reported to Twitter for censorship because "EIP … saw article on The Gateway Pundit." *Id.* at 4 (Column F, Line 94).

1070.  CIS routinely reported misinformation by sending the notice simultaneously to both CISA and to the EIP, using the EIP's misinformation-reporting email "tips@2020partnership.atlassian.net." Scully Ex. 9, at 33, 52, 58; Scully Ex. 10, at 1. Scully Ex. 11, at 1-2 (indicating that "tips@2020partnership.atlassian.net" is the reporting email for the EIP); Scully Depo. 229:18-230:25 (Scully admitting that this email is the EIP reporting email).

1071.  State officials, likewise, simultaneously reported supposed "misinformation" to CISA, CIS, and the EIP. *See, e.g.,* Scully Ex. 9, at 59 (Colorado state official reporting misinformation to "EI-ISAC, CISA and Stanford Partners").

1072.  State officials sometimes indicated that they were reporting misinformation to platforms for censorship precisely *because* federal officials at FBI and CISA had warned them about it. *See, e.g.,* Scully Ex. 9, at 59 (noting that Colorado was reporting two Twitter accounts, one with 14 followers and one with 2 followers, because "[t]hese are concerning to us here in

Colorado because of recent FBI/CISA warnings about impersonation accounts spreading false information about the election").

1073.   One platform complained to Scully that it was receiving duplicate reports of misinformation from the EIP and Center for Internet Security, and asked if CISA could be designated reporter for the group: "Hey Brian, can we talk about CIS Misinformation reporting duplicate reports to EIP?  Possible to have just you escalate?"  Scully Ex. 9, at 63.  Scully coordinated with CIS and EIP to set forth a coordinated reporting process involving agreed roles for all three of them—CISA, CIS, and EIP.  *Id.*; Scully Depo. 209:14-212:12.  Scully admits that there was "an agreement for EIP and CIS and CISA to coordinate and let each other know what they were reporting to platforms like Twitter."  Scully Depo. 212:7-12.

1074.   State and local officials reported misinformation to the FBI in parallel with their reports to CIS and CISA.  *See, e.g.,* Scully Ex. 10, at 10.  This is because CISA "tell[s] election officials to report what they saw to either DHS or the FBI, and it would end up where it needed to be."  Scully Depo. 215:8-14.

1075.   The Center for Internet Security, likewise, sometimes used EIP ticket numbers on the misinformation reports it sent to CISA for forwarding to platforms. *See, e.g.*, Scully Ex. 10, at 27 (reporting supposed misinformation in Pennsylvania under ticket number "EIP-664"); Scully Depo. 217:16-218:19.  As noted, CISA's "tracking spreadsheet" used similar EIP ticket numbers at least 13 times for misinformation reports sent to platforms.  Jones Decl., Ex. GG, at 4-5.

**D.     CISA Uses Switchboarding to Pressure Platforms to Censor Speech.**

1076.   CISA and Scully did not just forward misinformation reports to platforms; in addition, they also engaged in fact-checking for the platforms.  For example, regarding a report about election security in Pennsylvania, Facebook asked Scully if he could please "confirm" two

factual aspects of the report, and Scully responded with an explanation of why the government believed that the report was misinformation violating Facebook's terms of service.  Scully Depo. 218:22-219:24; Scully Ex. 10, at 25-27; Scully Depo. 222:20-224:20; Scully Ex. 10, at 35-37 (Scully engaging in his own research to debunk an election-integrity claim on Twitter and reporting to Twitter, which relied on his research to label the Tweet).

1077.   Scully admits that CISA commonly engaged in such informal fact-checking for the platforms: "if social media platforms needed additional information from an election official we would try to support that. … "[G]enerally speaking, we would do what we did here, which is if the -- if the jurisdiction made a public statement or if there was additional information the jurisdiction could provide, and the platforms asked for it, that we would try to facilitate getting the information they asked for."  Scully Depo. 220:6-20.  CISA would do its own research as well as relaying statements from public officials to help debunk postings for social-media platforms.  Scully Depo. 221:1-4 ("If it was a public statement, I'm sure we pulled it ourselves. If there was not a public statement, I would imagine we would go back to the election official."); Scully Depo. 221:23-222:19.

1078.   In presenting such "debunking" information to platforms to urge them to remove content, CISA always assumed—without any independent research—that the *government* official was a reliable source, and that the social-media user was unreliable, even for first-hand accounts: "if there was a public statement that was put out by the jurisdiction, we would … defer to that."  Scully Depo. 221:9-12.  CISA would not "take any steps to find out" if the private citizen's account might actually be truthful, and CISA would not "do further research to figure out who was telling the truth," but would simply "relay … the official statement from the jurisdiction" to the platforms for censorship.  Scully Depo. 221:13-22.

1079.   CISA's fact-checking activity included both relaying "debunking" information from state and local officials—always assuming without question that the state and local officials were truthful, not the social-media speakers—and performing its own fact-checking when the claim related to federal activities.  For example, "[t]here was also one time when I believe it was Facebook had a question about DHS immigration and customs enforcement having agents going places where we also provided a response back on a specific piece."  Scully Depo. 220:8-13.

1080.   CIS and CISA's "switchboarding" activities reached, not just public postings, but private postings on social-media platforms.  *See, e.g.,* Scully Ex. 10, at 45-46 (reporting a "post on a private FB page," *i.e.*, a "(private) Facebook post that Trump already won AZ").

1081.   Social-media platforms treated CISA as a privileged reporter of misinformation, frequently responding with great promptness to CISA's reports of misinformation, immediately "escalating" the content for moderation, and reporting back the censorship action taken.  For example, on November 10, 2020, at 7:23 pm, Scully reported offending Tweets, and Twitter responded within two minutes, "Thanks Brian.  We will escalate."  Shortly after midnight the same night, at 12:11 a.m., Twitter followed up with a report on censoring the Tweets.  Scully Ex. 10, at 59.  On November 13, 2020, Scully reported an offending tweet at 11:20 pm, and Twitter responded at 11:21 pm, "Thanks Brian.  We will escalate."  Scully Ex. 18, at 26; Scully Depo. 291:15-294:3.

1082.   CISA's censorship partners also originated their own reports for censorship.  CIS and the EIP sometimes reached out to state and local officials to invite them to debunk and report speech that CIS and EIP had observed on social media.  For example, on December 1, 2020, the Center for Internet Security emailed local government officials stating, "The EI-ISAC, and our partners at the Election Integrity Partnership (EIP), are tracking a social-media post that is gaining

traction very quickly." Scully Ex. 11, at 4. The CIS asked the local officials to debunk the post so
that "we can work with the social media platforms to have the posts removed as misinformation.
Please let us know as soon as possible." *Id.* The local officials responded with information
disputing the posts, and CIS promptly forwarded the dispute to CISA and EIP: "Brian [Scully] and
EIP, misinformation tweet … a [local official] confirmed the misinformation." *Id.* at 2. Scully
then forwarded the report to Twitter, which responded within three hours, "We have labeled the
tweet and are taking steps to limit trending on this." *Id.* at 1; Scully Depo. 228:5-231:7.

**E.    CISA's Many Misinformation Meetings with Platforms.**

1083.   In its interrogatory responses, CISA disclosed five sets of recurring meetings with
social-media platforms that involve discussions of misinformation, disinformation, and/or
censorship of speech on social media. Scully Ex. 12, at 38-40.

1084.   Scully provided the information in the interrogatory responses regarding CISA's
meetings with social-media platforms regarding misinformation and censorship. Scully Depo.
232:24-233:3. In doing so, Scully failed to disclose a long series of *bilateral* meetings between
CISA and social-media platforms. *See, e.g.,* Scully Depo. 238:11-13 ("we had some Twitter-only
calls, as well, that [Yoel Roth] participated in"); Scully Depo. 238:21-22 ("we had some briefings
from [Twitter] on some of their public reports" about misinformation); Scully Depo. 239:8-12
(agreeing that there were "briefings in those bilateral meetings with Twitter as relating to
misinformation and disinformation on social media"); Scully Depo. 239:20-240:3 (admitting that
CISA conducted "bilateral meetings with other social media platforms, like this, where
misinformation was discussed"); Scully Depo. 241:4-22 (admitting to a series of bilateral meetings
with social-media platforms beginning in 2018 and continuing through 2020); Scully Depo. 241:7-
14 (testifying that "in 2018 … in our initial stages of trying to build those relationships, we would

go meet with each platform one-on-one"); Scully Depo. 241:20-22 (admitting that, "prior to starting the switchboarding work, in 2020, we had conversations with each platform individually").

1085.  None of these many bilateral meetings with social-media platforms about misinformation was disclosed in CISA's interrogatory responses.  Scully Ex. 12, at 38-40; Scully Depo. 243:6-21.

1086.  In its interrogatory responses, CISA describes the "USG-Industry" meetings as follows: "A recurring meeting usually entitled USG – Industry meeting, which has generally had a monthly cadence, and is between government agencies and private industry. Government participants have included CISA's Election Security and Resilience subdivision, DHS's Office of Intelligence and Analysis, the FBI's foreign influence task force, the Justice Department's national security division, and the Office of the Director of National Intelligence. Industry participants generally include Google, Facebook, Twitter, Reddit, [and] Microsoft but, have also included Verizon Media, Pinterest, LinkedIn, and the Wikimedia Foundation as well. The topics discussed include, but are not limited to: information sharing around elections risk, briefs from industry, threat updates, and highlights and upcoming watch outs."  Scully Ex. 12, at 38-39.

1087.  In fact, the CISA's description of the "USG-Industry" meeting as having "a monthly cadence" is misleading.  The meetings became biweekly and weekly close to elections, when they were most needed: "from summer of 2018 … to early 2020 they were quarterly. Sometime in 2020 they became monthly and then as we got closer to the election in 2020 they became weekly."  Scully Depo. 234:7-11.

### F.    CISA Worked with FBI to Suppress the Hunter Biden Laptop Story.

1088.  Scully claims that he does not recall whether or not "hack and leak" or "hack and dump" operations were raised at the USG-Industry meetings, but he does not dispute that they may

have been raised: "I don't recall a specific incident of that [*i.e.*, discussions of "hack and dump" or "hack and leak" operations], but it's definitely possible. It's a tactic that had been used in the past." Scully Depo. 236:6-12. Scully does not dispute that he may have raised it: "Me, personally, I don't recall myself raising that, but it's possible." Scully Depo. 236:15-16. He does not dispute that Laura Dehmlow of FBI's FITF may have raised the concern: "Again, I don't know. It was a tactic that had been used globally, previously. So it wouldn't surprise me if there was some discussion of that somewhere in these meetings." Scully Depo. 236:20-23. He does not dispute that Elvis Chan and/or Matt Masterson may have raised the concern. Scully Depo. 237:10-22.

1089. Scully also does not dispute Yoel Roth's account of the communications to social-media platforms from federal officials about hack-and-leak operations and the possibility of a hack-and-leak operation involving Hunter Biden in Paragraphs 10-11 of Yoel Roth's Declaration dated December 17, 2020. Scully Ex. 13, at 2-3; Scully Depo. 245:23-248:11. Scully does not dispute that federal officials repeatedly raised the concern that they "expected hack and leak operations by state actors" in the USG-Industry meetings, Scully Depo. 245:23-247:17 ("it's certainly possible, because it was a common tactic … I would definitely not be surprised if these were included in the conversations"); and Scully does not dispute Roth's statement that Roth learned in these meetings that "there were rumors that a hack and leak operation would involve Hunter Biden," Scully Depo. 247:18-248:7.

1090. Contemporaneous emails confirm that CISA officials were warning of "hack and leak" operations during the USG-Industry and other meetings with social-media platforms during 2020. For example, on September 16, 2020, Facebook employees emailed Scully and other CISA officials a draft of a joint industry statement, which stated: "For several years, tech companies have worked together with … U.S. government agencies … to counter election threats across our

platforms…. At today's meeting, we specifically discussed: … (2) Ways to counter targeted attempts to undermine the election conversation before, during, and after the election. This includes *preparing for so-called 'hack and leak' operations* attempting to use platforms and traditional media for unauthorized information drops." Scully Ex. 16, at 1 (emphasis added). This email confirms that "preparing for so-called 'hack and leak' operations" was discussed at the USG-Industry meeting on Sept. 16, 2020, which included CISA, FBI's FITF, DOJ's National Security Division, ODNI, and Google, Microsoft, Facebook, Twitter, Reddit, Verizon Media, Pinterest, LinkedIn, and Wikimedia Foundation. Scully Ex. 16, at 1; *see also* Scully Depo. 253:14-255:13.

1091. Likewise, the agenda for the July 15, 2020 USG-Industry meeting included, as a "Deep Dive Topic," a 40-minute discussion of "Hack/Leak and USG Attribution Speed/Process." Scully Ex. 17, at 16. According to Scully, "attribution" in this context means identifying the hacker and leaker, and "USG" means "United States Government." Scully Depo. 274:4-275:10.

1092. Like Elvis Chan, Scully was not aware of any "pending investigations, at that time, into possible hack and leak operations." Scully Depo. 255:9-13.

1093. At the USG-Industry meeting, CISA asked platforms to report back on "Themes / narratives / approaches you anticipate for races you think will be targeted." Scully Ex. 15, at 1.

### G.   CISA's Ongoing and Expanding Censorship Efforts.

1094. In the spring and summer of 2022, Lauren Protentis requested the social-media platforms to prepare "one-pagers" for state and local election officials to address their content moderation rules. *See* Scully Ex. 17, at 1 (including "One-Pager Reminder" on the agenda for the April 2020 USG-Industry meeting); Scully Depo. 260:3-261:11 ("we had asked industry to provide a one-page summary of their content moderation rules that we could share with election officials").

1095.   The purpose of these "one-pagers" was to provide a summary of the platforms' content moderation rules to state and local government officials who would be reporting misinformation to the platforms.  Scully Depo. 260:3-261:11.

1096.   Lauren Protentis of CISA repeatedly lobbied the social-media platforms to include in their "one-pagers" for state and local officials a description of how to report perceived misinformation to the platform for censorship.  *See, e.g.,* Scully Ex. 18, at 41 (Protentis requesting that Facebook update its one-pager to include its "steps for flagging or escalating MDM content" to "make this a comprehensive product on both the critical needs for officials—account security and MDM concerns"); *id.* at 44 (Protentis asking Microsoft to create a one-pager for election officials to "provide steps to … report MDM"); *id.* at 45 (Protentis requesting that Twitter update its one-pager for government officials to include information about "how to report disinformation").  Scully agrees that Protentis was "trying to make sure that election officials have the information they need if they want to report" disinformation.  Scully Depo. 300:23-25.

1097.   CISA also set up an "operation center" on and around Election Day that engaged in "switchboarding" reports of election-day misinformation to platforms: "CISA regularly set up an operation center on election day, around the election.  And the platforms and some of the other agencies do the same."  Scully Depo. 262:16-19.  This "operation center" received "switchboard reporting" in 2018 and 2020.  Scully Depo. 263:15-18.  It was also communicating with platforms and other federal agencies, including "connectivity with FBI, DOJ, NEI, I&A."  Scully Depo. 264:18.  When these reports came in, CISA would "perform the same misinformation routing function and pass that along to the platforms."  Scully Depo. 265:1-7.

1098.   The CISA-funded Center for Internet Security continued to report misinformation and disinformation to platforms for censorship in 2022: "CIS was up and running [in 2022]."

Scully Depo. 266:2. Scully understands that "CIS continued to receive disinformation/misinformation reports from state and local election officials during the 2022 election cycle, and relay them directly to social media platforms." Scully Depo. 266:5-13.

1099. Scully also believes that NASS and NASED routed disinformation concerns directly to social-media platforms in 2022. Scully Depo. 268:25-269:3.

1100. Scully agrees that foreign-originated social-media content typically becomes repeated from domestic sources: "We often see what happens overseas send up showing up domestically." Scully Depo. 279:9-11.

1101. CISA has also teamed up directly with the State Department's Global Engagement Center (GEC) to seek removal of social-media content; for example, on one occasion, the GEC enlisted CISA's aid to seek the removal of "a YouTube channel run by Americans falsely claiming" that a certain State Department special envoy was "Patient Zero" for COVID-19. Scully Ex. 18, at 2. Scully forwarded the report to Facebook, which reported within minutes that it had "flagged for our internal teams." Scully Ex. 18, at 1.

1102. CISA flagged obvious parody and joke accounts for censorship, including a Colorado parody account with 56 followers whose handle stated, "dm us your weed store location (hoes be mad, but this is a parody account)," and one with 27 followers whose handle stated, "Smoke weed erry day." Scully Ex. 18, at 11-12. The government official who reported these stated that "these are concerning to us … because of recent FBI/CISA warnings about impersonation accounts spreading false information about the election." Scully Ex. 18, at 11. In other words, the government official sought to censor these accounts *before* they posted any election-related speech, because (according to "FBI/CISA"), they *might* engage in misleading

election-related speech.  *See id.*  Scully forwarded these reports to Twitter for censorship.  Scully Ex. 18, at 10.

1103.  Platforms report to CISA when they update their content-moderation policies to make them more restrictive.  On September 10, 2020, for example, Twitter reported to Masterson and Scully that it was "updating our Civic Integrity Policy" to "label or remove false or misleading information intended to undermine public confidence in an election or other civic process."  Scully Ex. 18, at 9.  This includes censorship of "Disputed claims that could undermine faith in the process itself, e.g. unverified information about election rigging, ballot tampering, vote tallying, or certification of election results."  Scully Ex. 18, at 9.  The EIP had successfully lobbied platforms to adopt such changes ahead of the 2020 election.  *See infra.*

1104.  CISA pushed for the censorship of content that CISA's Director particularly disfavored, including supposed disinformation about CISA itself, and about the so-called "Hammer and Scorecard" narrative that attributed election interference to federal intelligence agencies.  For example, Scully requested censorship of a "disinfo report about CISA and Director Krebs."  Scully Ex. 18, at 19.  And on November 10, 2022, Scully reported to platforms that "Director Krebs is particularly concerned about the hammer and scorecard narrative that is making the rounds," and asked for information about their tracking and "amplification" of the narrative.  Scully Ex. 18, at 22, 24.  Twitter and Facebook promptly reported back on their efforts to censor the narrative.  Scully Ex. 18, at 21 (Facebook reporting that "our teams are labelling and downranking the content as identified"); *id.* at 24 (Yoel Roth of Twitter explaining Twitter's attempts to censor the narrative, and asking CISA "Let us know if there are especially high-profile examples of tweets sharing the conspiracy that *haven't* been labeled" so Twitter can censor them). *See also* Scully Depo. 286:3-289:25.

1105.   CISA also purposely debunks online narratives, knowing that the social-media platforms will use its debunks as censorship.  For example, Yoel Roth emailed CISA about the Hammer and Scorecard narrative stating: "We've tracking the Hammer/Scorecard issue closely, particularly since Director Krebs' tweet on the subject (which was pretty unambiguous as far as debunks go)."  Scully Ex. 18, at 24.  Scully admits that CISA was aware that "social-media platforms were following the rumor page posted by CISA and using that as a debunking method for content on their platforms."  Scully Depo. 290:13-17 ("We had a sense they were doing that, yeah.").

1106.   CISA publicly states that it is expanding its efforts to fight disinformation heading into the 2024 election cycle.  Scully Ex. 27, at 1.  On August 12, 2022, Director Easterly was reported to be "beef[ing] up [CISA's] efforts to fight falsehoods," and "has taken several specific steps to fight the problem."  *Id.*

1107.   In January 2022, Director Easterly asked Facebook for a "briefing from us on 2022 election approach."  Scully Ex. 28, at 2.  Easterly responded to an email by Facebook and directed her staff to set up the meeting.  *Id.*  Scully does not know what was discussed at the meeting. Scully Depo. 309:12-19.

1108.   Director Easterly also exchanged text messages with Matt Masterson on February 26, 2022, when he was recently employed by Microsoft.  Scully Ex. 29, at 2-3.  In those texts, referring to a previous unidentified group call, Easterly told Masterson that she is "Just trying to get us in a place where Fed can work with platforms to better understand the mis/dis trends so relevant agencies can try to prebunk/debunk as useful."  Scully Ex. 29, at 2.  She stated that CISA is "looking to play a coord role so not every D/A [*i.e.*, department and agency] is independently reaching out to platforms which could cause a lot of chaos."  Scully Ex. 29, at 2.  Masterson

responded, agreeing with Easterly, and stating, "Platforms have got to get comfortable with gov't. It's really interesting how hesitant they remain." Scully Ex. 29, at 3. (Scully notes that "D/A" is "one of our common abbreviations for department and agency." Scully Depo. 316:23-24.)

1109. Scully agrees with Director Easterly that, when multiple federal agencies contact platforms independently, "it does create challenges and provides the platforms opportunities to play departments off each other." Scully Depo. 317:6-9. For CISA to play a "coordinating" role among the agencies, therefore, allows federal officials to keep better influence and control over the platforms.

1110. According to a September 2022 leaked draft copy of DHS's "Quadrennial Homeland Security Review, DHS's capstone report outlining the department's strategy and priorities in the coming years, the department plans to target 'inaccurate information' on a wide range of topics, including "the origins of the COVID-19 pandemic and the efficacy of COVID-19 vaccines, racial justice, U.S. withdrawal from Afghanistan, and the nature of U.S. support to Ukraine." Scully Ex. 30, at 4.

1111. Scully agrees that DHS has discussions about targeting misinformation regarding the efficacy of COVID-19 vaccines, Scully Depo. 322:9-21 ("our building critical infrastructure help in public health is one of the sectors of critical infrastructure, so we engage with CDC and HHS to help them"); about the origins of the COVID-19 pandemic, Scully Depo. 323:16-17 ("We did some work on the … bio-lab narratives"); and regarding Ukraine, Scully Depo. 324:5-10 ("We saw this with COVID. … We saw this around Ukraine. And so, again, just helping people understand … these disinformation narratives…."). In particular, CISA participated in a "Unified Coordination Group" regarding Russia's invasion of Ukraine, which addressed misinformation: "there was a … Unified Coordination Group, when Russia invaded Ukraine, to coordinate DHS

activities related to the crisis.  As a part of that there was an MDM component, and a member of the MDM team was detailed to lead the MDM component of the Russian/Ukraine work."  Scully Depo. 325:5-12.  Scully believes that this group communicated with social-media platforms as well (again, not disclosed in CISA's interrogatory responses).  Scully Depo. 327:1-18.

1112.  As of August 12, 2022, DHS's Office of Inspector General continued to call for a more aggressive, not less aggressive, approach to combating disinformation.  Scully Ex. 31, at 1 (OIG calling for DHS to adopt a "Unified Strategy to Counter Disinformation Campaigns").

1113.  DHS's OIG reports that CISA is expanding, not contracting, its efforts to fight disinformation.  OIG reports that CISA's "MDM team focuses on disinformation activities targeting elections and critical infrastructure. According to a CISA official, the MDM team counters all types of disinformation, to be responsive to current events."  Scully Ex. 31, at 9.  "An official from the MDM team stated that, through this work, CISA is building national resilience to MDM, such as COVID-19 vaccine hesitancy and foreign influence activities."  *Id.* at 10.  OIG further reports that, "[a]ccording to selected Intelligence Community officials, the Office of the Director of National Intelligence and the U.S. Department of Justice worked with CISA and I&A to counter disinformation related to the November 2020 elections. For example, according to an Office of the Director of National Intelligence official, prior to the November 2020 elections, CISA and I&A joined in weekly teleconferences to coordinate Intelligence Community activities to counter election-related disinformation. The Office of the Director of National Intelligence official stated the teleconferences continued to occur every 2 weeks after the 2020 elections and were still taking place as of the time of this audit."  *Id.* at 11.  Further, OIG reports that "CISA and I&A also work with the U.S. Department of State's (State Department) Global Engagement Center on countering disinformation."  *Id.* at 11.

1114.  On November 21, 2021, Director Easterly reported that CISA is "beefing up its misinformation and disinformation team in the wake of a divisive presidential election that saw a proliferation of misleading information online."  Scully Ex. 23, at 1.  "I am actually going to grow and strengthen my misinformation and disinformation team," Easterly stated publicly.  *Id.*  She stated that she "had a meeting with 'six of the nation's experts' in the misinformation and disinformation space."  *Id.*  And she "stressed her concerns around this being a top threat for CISA … to confront."  *Id.*  "One could argue that we're in the business of protecting critical infrastructure, and the most critical infrastructure is our cognitive infrastructure," Easterly said. *Id.*  "We now live in a world where people talk about alternative facts, post-truth, which I think is really, really dangerous if people get to pick their own facts," Easterly said.  *Id.* at 2.  Evidently, Easterly thinks that *government officials* should help Americans "pick their own facts" for them. *Id.*

1115.  According to Scully, CISA has an expansive mandate to address all kinds of misinformation that may affect "critical infrastructure" indirectly: "mis, mal-information threatens critical infrastructure in a number of ways, it could be operational impact, so in the case of the elections, disrupting election operations …. So a multitude of ways that disinformation could impact critical infrastructure, like I said … there's financial, there's reputational, there's just a multitude of ways that this disinformation could affect critical infrastructure."  Scully Depo. 340:10-341:1.  This could include, for example, "misinformation" that undermines confidence in any kind of national institution, including banks and financial services industry: "from mis, dis and mal-information, a reputational risk could come about if the integrity or the public confidence in a particular sector was critical to that sector's functioning.  So I think the financial services would probably be a good example. So if there's a loss of confidence by the American public in

financial services, financial systems of the United States, that could create national security concerns." Scully Depo. 341:17-342:2. This is a breathtakingly broad—even limitless—interpretation of CISA's mandate to protect "critical infrastructure," which would allow CISA to target virtually any kind of core political speech as "mis, dis and mal-information" that "create national security concerns" by undermining "public confidence in a particular sector." *Id.*

1116. In fact, CISA is "working with Treasury to develop a product to help the financial services sector understand MDM risks to the sector." Scully Depo. 355:22-24.

1117. Scully has publicly stated that CISA is "trying to reduce the amount that Americans engage with disinformation," where "engaging with disinformation" means "amplifying it, re-tweeting it, resending it, things like that." Scully Depo. 346:7-24; Scully Ex. 49.

1118. On June 22, 2022, CISA's Cybersecurity Advisory Committee issued a "Draft Report to the Director" calling for an extremely broad view of CISA's mandate. The report states that "[t]he spread of false and misleading information poses a significant risk to critical functions like elections, public health, financial services, and emergency response." Scully Ex. 46, at 1. "Pervasive MDM diminishes trust in information, in government, and in democratic processes more generally." *Id.* The report states that "CISA should consider MD across the information ecosystem," including "social media platforms of all sizes, mainstream media, cable news, hyper partisan media, talk radio, and other online resources." *Id.* at 2. Scully agrees with this report that CISA is trying to make its "resilience activity … as broad as possible so it's applicable anywhere that someone may come across MDM." Scully Depo. 358:7-11.

1119. In September 2022, the Center for Internet Security is still working on a "portal" for government officials to report election-related misinformation to social-media platforms. Scully Ex. 19, 21. "[W]ork on the online 'portal' for election officials to flag misinformation to

social-media platforms … continues today." Scully Ex. 21, at 4. Scully states that "my understanding is that [CIS] did do something along those lines, I just don't know the extent of it." Scully Depo. 365: 3-6.

1120. As of January 2023 and today, CISA's website continues to proclaim, "[t]he MDM team serves as a switchboard for routing disinformation concerns to appropriate social media platforms and law enforcement. This activity began in 2018, supporting state and local election officials to mitigate disinformation about the time, place, and manner of voting. For the 2020 election, CISA expanded the breadth of reporting to include other state and local officials and more social media platforms. This activity leverages the rapport the MDM team has with the social media platforms to enable shared situational awareness." Scully Ex. 24, at 3; *see also* www.cisa.gov/mdm (visited Feb. 10, 2023). CISA thus proclaims that it is "expand[ing] the breadth of reporting," not retreating from it. *Id.*

1121. Regarding misinformation reports, CISA "would generally share whatever we received from the election officials with the FBI, in case there was an ongoing investigation related to whatever it was that we forwarded to them." Scully Depo. 366:17-20.

1122. CISA engaged in switchboarding and colluding with social-media platforms to promote censorship in other ways as well.

**VIII. The State Department's Global Engagement Center's Censorship Efforts.**

1123. The State Department's Global Engagement Center ("GEC") also conducts numerous meetings with social-media platforms about disinformation.

1124. The GEC's "front office and senior leadership engage with social media companies." Kimmage Dep. 29:12-13. These senior leadership meet with social-media platforms "[e]very few months, can be quarterly, but sometimes less than quarterly." *Id.* at 32:9-10.

According to Daniel Kimmage, Principal Deputy Coordinator of the GEC, these meetings focus on the "tools and techniques" of spreading disinformation on social media, and it "would be rare" for them to discuss specific "content that's posted on social media that might be of concern to the GEC." *Id.* at 30:9-31:3.

1125.  In addition, the GEC's "Technology Engagement Team does engage with social media companies" as well. *Id.* at 29:11-12.  The Technology Engagement Team meets with social media companies "[m]ore frequently" than the senior leadership, which meets with them "every few months." *Id.* at 37:9-15.

1126.  Kimmage recalls at least two meetings with Twitter.  *Id.* at 129:22-25.  At such meetings, the GEC would bring "between five and ten" people, including "the acting coordinator, me, in that capacity, then one or more of the deputy coordinators, team chiefs from the Global Engagement Center, and working-level staff with relevant subject matter expertise." *Id.* 130:24-131:13.  These GEC staff meet with the platforms' content-moderation teams, *i.e.*, the people responsible for censorship on the platforms. *Id.* at 133:1-20, 135:1-11.

1127.  In such a meeting, "the GEC would provide an overview of what it was seeing in terms of foreign propaganda and disinformation. And Twitter would, to the extent that they felt comfortable sharing information, would discuss similar topics." 136:8-13.

1128.  In addition to meeting with Twitter, the GEC's senior leadership had similar meetings with Facebook and Google as well during the same time frames. *Id.* at 139:22-140:6. These meetings were also with Facebook and Google's content-moderation or trust and safety teams, *i.e.*, the people responsible for censoring content on their platforms. *Id.* at 141:17-143:3.

1129.  The GEC brought similar numbers of people to the meetings with Facebook and Google. *Id.* at 143:16-17 ("I believe the lineup would have been similar.").

1130.   In addition to the senior-leadership and TET meetings, the GEC also maintained a Senior Advisor as a permanent liaison in Silicon Valley, Samaruddin K. Stewart, for the purpose of meeting with social-media platforms about disinformation.  *Id.* at 159:24-160:13; Kimmage Ex. 9, at 2.  Stewart set up a series of meetings with LinkedIn to discuss "countering disinformation" and to "explore shared interests and alignment of mutual goals regarding the challenge."  Kimmage Ex. 9, at 2.  Like the senior-leadership meetings, Stewart scheduled these meetings with the head of the trust and safety team, *i.e.*, the person responsible for censorship on the platform.  *See id.* at 7 (meeting with the "Head of Threat Prevention, Trust & Safety" at LinkedIn).  Kimmage confirms that Stewart set up similar meetings with other social-media platforms.  Kimmage Dep. 160:12-13.

1131.   On March 25, 2021, the GEC set an email to Rob Schaul of CISA flagging "a disinfo campaign on YouTube targeting a [diplomatic security] officer" on a "Youtube channel run by Americans."  Kimmage Ex. 11, at 2.  Brian Scully of CISA forwarded the disinformation report to Twitter, Facebook, and YouTube.  *Id.* at 1, 3, 7.  Facebook responded, "Thank you so much for this!  Have flagged for our internal teams."  *Id.* at 1.

1132.   The GEC also coordinated with the Election Integrity Partnership.  George Beebe of the GEC was in contact with the EIP.  Kimmage Dep. 202:10-24.  Kimmage admits that the GEC had "a general engagement with the EIP. … the GEC was engaging with the partnership."  *Id.* at 214:11-19.  In addition to Mr. Beebe, Adele Ruppe, who "liaised on election-related issues," may have engaged with the EIP.  *Id.* 214:23-215:5.

1133.   Kimmage states that the GEC's work against disinformation "equips … technology companies to better understand" disinformation "so that they can take whatever actions they would take to stop the spread."  *Id.* 280:24-281:3.

1134.   On October 17, 2022, at an event at Stanford University, Secretary of State Blinken was asked, "Stanford is one of the leading institutions to combat misinformation research and pointing out propaganda narratives and how they spread. How do you envision the cooperation between the State Department and institutions like Stanford in combatting the spread of propaganda?"  Kimmage Ex. 16, at 5.  Secretary Blinken responded, mentioning the GEC and noting that State is engaging in "collaborations" and "build[ing] out … partnerships" with Stanford: "Stanford is doing remarkable work on that, and it's one of the things that we want to make sure that we're benefitting from, because this is a day-in, day-out battle for us, combating misinformation and disinformation around the world. We have at the State Department itself a big focus on this. We have something called the Global Engagement Center that's working on this every single day. But that work is both inspired by work that's being done in academia, including here at Stanford, as well as where appropriate collaborations. …So we're trying to build out these kinds of partnerships to make sure that we're looking at every place that is actually developing answers, including Stanford, and then integrating that into what we do."  *Id.*

## IX.     The Election Integrity Partnership and Virality Project – Federal Collaborators.

1135.   Federal officials also work through nonprofit organizations to achieve their censorship goals.  Most notably, federal officials at CISA and the GEC, and state officials through the CISA-funded EI-ISAC, work in close collaboration with the Stanford Internet Observatory and other nonprofit organizations to achieve censorship and attempt to evade the First Amendment. Moreover, the Surgeon General's Office and other federal officials collaborate closely with the Stanford Internet Observatory and the same entities under the aegis of the "Virality Project."

### A.     The Election Integrity Project Is a Formidable Censorship Cartel.

1136.   According to its website, "[t]he Election Integrity Partnership (EIP) was formed in July 2020 as a coalition of research entities focused on supporting real-time information exchange between the research community, election officials, *government agencies*, civil society organizations, and *social media platforms*."   *The 2020 Election Integrity Partnership*, Election Integrity Partnership (last visited Feb. 22, 2023) (emphasis added), https://www.eipartnership.net/2020.  The EIP's "objective was to detect and *mitigate the impact* of attempts to prevent or deter people from voting or to delegitimize election results."   *Id.* (emphasis added).  As discussed further herein, "mitigate[ing] the impact" means pushing social-media platforms to censor supposed "misinformation."

1137.   "In March 2021 [the EIP] published [its] final report. This page displays an archive of the work carried out by the EIP and its partners during the 2020 U.S. election."  *Id.*  The EIP report is publicly available, it provides a detailed account of the EIP's activities in the 2020 election, and it is Exhibit 1 to the deposition of Brian Scully.  Scully Ex. 1 (containing Stanford Internet Observatory et al., Election Integrity P'Ship, *The Long Fuse: Misinformation and the 2020 Election* (v1.3.0 2021), https://www.eipartnership.net/report [https://purl.stanford.edu/tr171zs0069]).

1138.   The EIP was created "in consultation with CISA [the Cybersecurity and Infrastructure Security Agency at the Department of Homeland Security] and other stakeholders."  *Id.* at 20 (2).[1]  After "consultation with CISA," the EIP "assembled" a "coalition … with like-minded partner institutions."  *Id.*

1139.   CISA interns originated the EIP: "The initial idea for the Partnership came from four students that the Stanford Internet Observatory (SIO) funded to complete volunteer

---

[1] Citations of this exhibit are formatted "Scully Ex. 1, at [page of exhibit] ([page of report])."

internships at the Cybersecurity and Infrastructure Security Agency (CISA) at the Department of Homeland Security." *Id.*

1140.   The EIP agrees with Scully that the EIP was formed to fill in a perceived "gap" in the ability of the government to "monitor and correct" misinformation: "Responsibility for election information security is divided across government offices: CISA has authority to coordinate on cybersecurity issues related to the election, the FBI to investigate cyber incidents and enforce election laws, and intelligence agencies to monitor for foreign interference. Yet, no government agency in the United States has the explicit mandate to monitor and correct election mis- and disinformation." *Id.*

1141.   The EIP acknowledges that the federal government directly targeting misinformation posted Americans would "likely" violate the First Amendment and exceed agencies' lawful authority: "This is especially true for election disinformation that originates from within the United States, which would likely be excluded from law enforcement action under the First Amendment and not appropriate for study by intelligence agencies restricted from operating inside the United States." *Id.*  As noted below, the EIP's founders publicly admit that virtually all the misinformation targeted by the EIP was domestic in origin, not foreign, and thus subject to the First Amendment.

1142.   The EIP specifically notes CISA and the FBI in discussing the need to fill this "gap" in their ability to police "election misinformation originating from domestic sources": "none of these federal agencies has a focus on, or authority regarding, election misinformation originating from domestic sources within the United States. This limited federal role reveals a critical gap for non-governmental entities to fill. Increasingly pervasive mis- and disinformation, both foreign and

domestic, creates an urgent need for collaboration across government, civil society, media, and social media platforms." *Id.* at 9 (v).

1143.   "As a result" of the First Amendment and lack of legal authority, according to the EIP, "during the 2020 election, local and state election officials, who had a strong partner on election-system and overall cybersecurity efforts in CISA, were without a clearinghouse for assessing mis- and disinformation targeting their voting operations." *Id.* at 20 (2).  The EIP was deliberately formed to fill this "gap."

1144.   The EIP "was formed between four of the nation's leading institutions focused on understanding misinformation and disinformation in the social media landscape: the Stanford Internet Observatory, the University of Washington's Center for an Informed Public, Graphika, and the Atlantic Council's Digital Forensic Research Lab." *Id.*

1145.   The EIP makes clear that its "aim" was not just to observe but to "defend[]" the public from misinformation: "With the narrow aim of defending the 2020 election against voting-related mis- and disinformation, it bridged the gap between government and civil society, helped to strengthen platform standards for combating election-related misinformation, and shared its findings with its stakeholders, media, and the American public." *Id.* at 9 (v).

1146.   The EIP's statement that it "helped to strengthen platform standards for combating election-related misinformation" refers to the fact that the EIP successfully pushed virtually all major social-media platforms to adopt or increase censorship policies targeted at election-related "misinformation" during the 2020 election cycle.  *See id.*

1147.   The EIP notes that its efforts to push social-media platforms to adopt more restrictive censorship policies were highly effective, both in procuring changes in policies and censoring speech: "Many platforms expanded their election-related policies during the 2020

election cycle. … Platforms took action against policy violations by suspending users or removing content, downranking or preventing content sharing, and applying informational labels." *Id.* at 12 (viii).

1148. Alex Stamos, the director of the Stanford Internet Observatory who founded the EIP, has publicly stated that the EIP successfully pushed social-media platforms to adopt more restrictive policies about election-related speech in 2020: "My suggestion, if people want to get the platforms to do stuff is, first, you've got to push for written policies that are specific and that give you predictability; right? And so this is something we started in the summer, in August, is as Kate [Starbird] talked about Carly Miller led a team from all four institutions to look at the detailed policies of the big platforms and to measure them against situations that we expected to happen. Now we're not going to take credit for all of the changes they made, but there -- we had to update this thing, like, eight or nine times; right? And so like putting these people in a grid to say, you're not handling this, you're not handling this, you're not handling this, creates a lot of pressure inside of the companies and forces them to kind of grapple with these issues, because you want specific policies that you can hold them accountable for." Scully Ex. 4, at 7 (Audio Tr. 4).

1149. Alex Stamos notes that the EIP then pressured the platforms to aggressively enforce the new policies that the EIP had pushed them to adopt: "The second is, when you report stuff to them, report how it's violating those written policies; right? So there's two steps here. Get good policies, and then say, this is how it's violated it." *Id.*

1150. Other EIP participants have also publicly stated that the EIP induced social-media platforms to adopt much more aggressive censorship policies on election-related speech. On March 3, 2021, at an EIP-hosted conference on the release of the EIP report, Emerson Brooking of the Atlantic Council's DRFLab, an EIP participant, stated: "I think the EIP really helped push

the envelope with things like just the notion that … this delegitimization of electoral processes that we were seeing in the summer and early fall that this should be against content moderation policies on these platforms, and begin to take proactive steps there…."  Scully Ex. 5, at 6 (Audio Tr. 2). He also stated, "after November 3rd, we saw that market shift where content moderation actions that … we could hardly contemplate a few weeks before began to be taken. There was a much stronger emphasis on cracking down on the sort of content we've been tracking from the beginning." *Id.*

1151.   The EIP treats "Government" and Social-Media "Platforms" as two of its "Four Major Stakeholders," providing input to the EIP and receiving feedback from the EIP.  Scully Ex. 1, at 26 (8) & fig.1.2 (graphic showing "Government" as the EIP's first "Major Stakeholder," submitting information to EIP's "Intake Queue" and receiving feedback on the EIP's "Mitigation"—*i.e.*, censorship—efforts).

1152.   The EIP organizes its misinformation reports under groups called "tickets," and it notes that "[t]ickets were submitted by … trusted external stakeholders…" *Id.* at 26 (8). "Trusted external stakeholders" include "government": "External stakeholders included government, civil society, social media companies, and news media entities." *Id.* at 30 (12). Thus, it is clear that "government" submitted "tickets," *i.e.*, reports of misinformation to be processed for censorship on social media, to the EIP. *See id.* at 26, 30 (8, 12).

1153.   And it is clear that the "government" partners who submit tips to the EIP are CISA, the State Department's Global Engagement Center (GEC), and the Elections Infrastructure Information Sharing & Analysis Center (EI-ISAC), an organization of state and local government officials coordinated by the Center for Internet Security (CIS) pursuant to funding from CISA, *see EI-SAC*, Center for Internet Security (last visited Feb. 22, 2023)

("The EI-ISAC is federally funded by CISA."), https://www.cisecurity.org/ei-isac.   Specifically, the "Government" "stakeholders" listed under the EIP's "Four Major Stakeholder Groups" are CISA, GEC, and the EI-ISAC. Scully Ex. 1, at 30 (12).

1154.   These "Government" stakeholders report misinformation to the EIP: "Government and civil society partners could create tickets or send notes to EIP analysts, and they used these procedures to flag incidents or emerging narratives to be assessed by EIP analysts." *Id.*

1155.   The CISA-funded EI-ISAC and CISA itself worked in collaboration with the EIP to report misinformation to social-media platforms: "[T]he EI-ISAC served as a singular conduit for election officials to report false or misleading information to platforms. By serving as a one-stop reporting interface, the EI-ISAC allowed election officials to focus on detecting and countering election misinformation while CIS and its partners reported content to the proper social media platforms. Additionally, the Countering Foreign Influence Task Force (CFITF), a subcomponent of CISA, aided in the reporting process and in implementing resilience efforts to counter election misinformation." *Id.* at 31 (13).

1156.   The EIP report mentions *The Gateway Pundit*, the website operated by Plaintiff Jim Hoft, 47 times. *See id.* at 51, 74, 76, 101, 103, 110, 112, 145, 150-51, 153, 155-56, 172, 175, 183, 194-95, 206-09, 211-12, 214-16, 226-27.[2]

1157.   The EIP boasts that it "used an innovative internal research structure that leveraged the capabilities of the partner organizations through a tiered analysis model based on 'tickets' collected internally and from our external stakeholders. Of the tickets we processed, 72% were related to delegitimization of the election," *i.e.*, core political speech. *Id.* at 10 (vi).

---

[2] Report pages 33, 56, 58, 83, 85, 92, 94, 127, 132-33, 135, 137-38, 154, 157, 165, 176-77, 188-91, 193-94, 196-98, 208-09.

1158.   The EIP admits that the speech it targets for censorship is domestic, grassroots speech by American citizens: "The production and spread of misinformation was multidirectional and participatory. Individuals participated in the creation and spread of narratives. Bottom-up false and misleading narratives started with individuals identifying real-world or one-off incidents and posting them to social media. Influencers and hyperpartisan media leveraged this grassroots content, assembling it into overarching narratives about fraud, and disseminating it across platforms to their large audiences. Mass media often picked up these stories after they had reached a critical mass of engagement. Top-down mis- and disinformation moved in the opposite direction, with claims first made by prominent political operatives and influencers, often on mass media, which were then discussed and shared by people across social media properties." *Id.* at 11 (vii). In other words, virtually everything it targets is quintessential First Amendment-protected political speech.

1159.   This included censorship of highly visible political figures: "The primary repeat spreaders of false and misleading narratives were verified, blue-check accounts belonging to partisan media outlets, social media influencers, and political figures, including President Trump and his family." *Id.* at 12 (viii).

1160.   One key point that the EIP emphasizes is that it wants greater "access" to platforms' internal data to achieve greater monitoring of Americans' speech on social media.   The EIP complains that "


." *Id.* (emphasis added).   "API" stands for "Application Programming Interface," so the EIP wants greater direct access to platforms' internal data about so-called "misinformation" on their platforms.   *See id.*   This directly echoes the repeated demands from the White House and the Surgeon General that social-media platforms

provide access to their internal data about misinformation on their platforms, both to government and "researchers."  The relevant "researchers" include Stanford Internet Observatory and the other constituents of the EIP and the Virality Project, who are working hand-in-glove with federal officials.

1161.   The EIP contends that not enough censorship was achieved during 2020 as a result of their lack of direct access to platforms' APIs: "Many platforms expanded their election-related policies during the 2020 election cycle. However, application of moderation policies was inconsistent or unclear."  *Id.*

1162.   The EIP recommends that platforms increase enforcement of censorship policies: "Impose clear consequences for accounts that repeatedly violate platform policies. These accounts could be placed on explicit probationary status, facing a mixture of monitoring and sanctions."  *Id.* at 14 (x).

1163.   The EIP report acknowledges the contributions of Alex Stamos, Renee DiResta, Kate Starbird, Matt Masterson, Pierce Lowary, and Alex Zaheer.  *Id.* at 16 (xii).  All of these individuals have or had formal roles in CISA.

1164.   The EIP is partially funded by the federal government: "Researchers who contributed to the EIP … receive partial support from the U.S. National Science Foundation (grants 1749815 and 1616720)."  *Id.* at 17 (xiii).

1165.   In addition, the Atlantic Council, one of the four nonprofit organizations in the EIP, is partially government-funded.  Kimmage Dep. 294:8-18.

1166.   "The initial idea for the Partnership came from four students that the Stanford Internet Observatory (SIO) funded to complete volunteer internships at the Cybersecurity and

Infrastructure Security Agency (CISA) at the Department of Homeland Security."  Scully Ex. 1, at 20 (2).

1167.   "The students approached SIO leadership in the early summer, and, in consultation with CISA and other stakeholders, a coalition was assembled with like-minded partner institutions."  *Id.*

1168.   "The Election Integrity Partnership (EIP) was officially formed on July 26, 2020—100 days before the November election—as a coalition of research entities who would focus on supporting real-time information exchange between the research community, election officials, government agencies, civil society organizations, and social media platforms."  *Id.*

1169.   As a key point in its "Operational Timeline," the EIP lists a July 9, 2020, "Meeting with CISA to present EIP concept."  *Id.* at 21 (3).  In other words, the Stanford Internet Observatory "present[ed]" the "EIP concept" to CISA two weeks before the EIP was formed.  *Id.*

1170.   The SIO's EIP team was "led by … Research Manager Renee DiResta … and Director Alex Stamos."  *Id.* at 22 (4).  The University of Washington's "contributing team" was "led by … Kate Starbird."  *Id.*

*1171.*   Alex Stamos and Kate Starbird are members of CISA's Cybersecurity Advisory Committee.  *See CISA Cybersecurity Advisory Committee*, Cybersecurity & Infrastructure Security Agency (last visited Feb. 24, 2023), https://www.cisa.gov/resources-tools/groups/cisa-cybersecurity-advisory-committee. Starbird chairs CISA's Subcommittee on "Protecting Critical Infrastructure from Misinformation and Disinformation."  *See* CISA Cybersecurity Advisory Committee, Subcommittee Factsheet 1 (April 13, 2022), https://www.cisa.gov/sites/default/files/publications/CSAC%20Subcommittee%20Factsheet_April%2013%202022.pdf. Renee DiResta gives lectures on behalf of CISA.  *See* CISA, *Cybersecurity*

*Summit 2021: Responding to Mis, Dis, and Malinformation*, YouTube (Oct. 27, 2021), https://www.youtube.com/watch?v=yNe4MJ351wU.

1172.   One of the EIP's goals was to "flag policy violations to platforms." Scully Ex. 1, at 24 (6).

1173.   As noted above, the EIP describes "Government" as one of "four major stakeholders," who both provided input into the "intake queue" for "tickets" (*i.e.*, reporting misinformation) and received feedback on "mitigation" (*i.e.*, censorship). *Id.* at 26 (8).

1174.   The EIP tracked misinformation using "tickets," which tracked "informational event[s]" that could encompass many social-media postings: "The EIP tracked its analysis topics and engaged with outside stakeholder organizations using an internal ticketing workflow management system. Each identified informational event was filed as a unique ticket in the system." *Id.*

1175.   "Tickets were submitted by both trusted external stakeholders (detailed in Section 1.4 on page 11) and internal EIP analysts." *Id.* "Section 1.4" on pages 11-12 of the report identifies government as a trusted external stakeholder: "Trusted external stakeholders" include "government, civil society, social media companies, and news media entities." *Id.* at 29-30 (11-12). Page 12 specifically identifies CISA, the EI-ISAC, and the State Department's GEC as the EIP's "Government" stakeholders. *Id.* at 30 (12) fig.1.3.

1176.   A "ticket" could encompass many individual postings: "A single ticket could map to one piece of content, an idea or narrative, or hundreds of URLs pulled in a data dump." *Id.* at 27 (9).

1177.   The EIP's managers both report misinformation to platforms and communicate with government partners about their misinformation reports: "The manager had the ability to tag

295

platform partners on a ticket for action. They also communicated with the EIP's partners in government, and could request further information from election officials if necessary," thus serving as a conduit for a back-and-forth about misinformation reports between government officials and platforms. *Id.* at 27-28 (9-10).

1178.   The scope of the EIP's monitoring of Americans' speech on social media is enormous: "Team members from each of these tiers were divided into on-call shifts. Each shift was four hours long and led by one on-call manager. It was staffed by a mix of Tier 1 and Tier 2 analysts in a 3:1 ratio, ranging from five to 20 people. Analysts were expected to complete between two to five shifts per week. The scheduled shifts ran from 8:00 am to 8:00 pm PT for most of the nine weeks of the partnership, ramping up only in the last week before the election from 12-hour to 16- to 20-hour days with all 120 analysts on deck." *Id.* at 28 (10).

1179.   The "Government" stakeholders flag misinformation to the EIP for censorship: "Government and civil society partners could create tickets or send notes to EIP analysts, and they used these procedures to flag incidents or emerging narratives to be assessed by EIP analysts." *Id.* at 30 (12).

1180.   Of the "Four Major Stakeholder Groups" who participated in the EIP, the first listed is "Government," which includes three government entities: the Elections Infrastructure ISAC, CISA, and the State Department's GEC. *Id.*

1181.   The EIP reports that CISA, CIS, and the EI-ISAC collaborated with the EIP in reporting misinformation: "In this election cycle, the EI-ISAC served as a singular conduit for election officials to report false or misleading information to platforms. By serving as a one-stop reporting interface, the EI-ISAC allowed election officials to focus on detecting and countering election misinformation while CIS and its partners reported content to the proper social media

platforms. Additionally, the Countering Foreign Influence Task Force (CFITF), a subcomponent of CISA, aided in the reporting process and in implementing resilience efforts to counter election misinformation." *Id.* at 31 (13).

1182.   The EI-ISAC jointly reports misinformation flagged by state and local election officials to CISA and to the EIP: "Content reported by election officials to the EI-ISAC was also routed to the EIP ticketing system. This allowed analysts to find similar content, ascribe individual content pieces to broader narratives, and determine virality and cross-platform spread if applicable. This analysis was then passed back to election officials via the EI-ISAC for their situational awareness, as well as to inform potential counter-narratives. Additionally, if an internally generated EIP ticket targeted a particular region, analysts sent a short write-up to the EI-ISAC to share with the relevant election official. This allowed the state or local official to verify or refute the claim, and enabled analysts to properly assess whether or not the content violated a platform's civic integrity policies. In this way, the EIP demonstrated the upside of using the EI-ISAC coordinating body to connect platforms with authoritative voices to determine truth on the ground and help election officials effectively counter viral falsehoods about election infrastructure." *Id.*

1183.   The EIP created established channels for reporting misinformation to platforms for censorship: "The EIP established relationships with social media platforms to facilitate flagging of incidents for evaluation when content or behavior appeared to violate platform policies." *Id.* at 35 (17).

1184.   The EIP receives real-time reports on censorship actions from the platforms, who communicate directly with EIP managers about censorship through the EIP's system: "Analysts conducted their initial assessment on all tickets, and, if content in a ticket appeared to be a violation of a platform's published content policies, an analyst or manager added the platform representative

to the ticket. If questions arose, a manager communicated with the platform representative in the ticket comments. Analysts put the ticket back in the queue and updated the ticket to note if the content in question received a moderation action." *Id.*

1185.   Virtually all major social-media platforms participate directly in the EIP: "The EIP onboarded the following social media companies: Facebook and Instagram, Google and YouTube, Twitter, TikTok, Reddit, Nextdoor, Discord, and Pinterest." *Id.*

1186.   In the 2020 election cycle, the EIP "processed 639 in-scope tickets. 72% of these tickets were related to delegitimizing the election results." *Id.* at 45 (27).

1187.   The EIP had a high level of success in pushing the platforms to censor speech: "35% of the URLs we shared with Facebook, Instagram, Twitter, TikTok, and YouTube were either labeled, removed, or soft blocked." *Id.*  "In total, we believe the four major platforms we worked with all had high response rates to our tickets." *Id.* at 55 (37).  "We find, overall, that platforms took action on 35% of URLs that we reported to them." *Id.* at 58 (40).

1188.   The Center for Internet Security, which runs the EI-ISAC using funding from CISA, is a major reporter of misinformation to the EIP: "16% of tickets were filed by the Center for Internet Security (CIS), an election official community partner, in the form of tips." *Id.* at 46 (28); *see also* Center for Internet Security, *EI-ISAC* (last visited Feb. 24, 2023), https://www.cisecurity.org/ei-isac.

1189.   The EIP "prioritize[es] … swing states over non-swing states."  Scully Ex. 1, at 46 (28).

1190.   The EIP's "dataset included 639 distinct, in-scope tickets."  *Id.*  A "ticket" could be extremely broad, "map[ping] to" and entire "idea or narrative."  *Id.* at 27 (9).  For example, the "SHARPIEGATE" ticket was submitted on November 4, 2020, to "try and consolidate all the

content" regarding the Sharpiegate story from "a variety of different states across Twitter, FB, TikTok, and Youtube." *Id.* at 47 (29) fig.2.1.

1191.   The EIP includes extensive collaboration with a "government partner" in its Sharpiegate ticket. *Id.* at 48 (30).  Its internal ticket-management software ("Jira") simultaneously allowed the "government partner" to communicate directly with the "platform partner" to debunk the online claim. *Id.* at 48 (30) fig.2.2.

1192.   The EIP reports that it repeatedly flagged *The Gateway Pundit*, Plaintiff Jim Hoft's website, as a purveyor of social-media misinformation: "The top misinformation-spreading websites in our dataset were … thegatewaypundit[.]com, a far-right news website.  65% of these tickets involved an exaggeration of the impact of an issue within the election process." *Id.* at 51 (33) (alteration in original).

1193.   The EIP does not claim that most of *The Gateway Pundit*'s content was false, only that it involved the "exaggeration of the impact of an issue within the election process." *Id.*

1194.   As noted above, the EIP Report cites *The Gateway Pundit* 47 times. *See supra* paragraph 1156 and accompanying citation.

1195.   The EIP "coded tickets based on whether they … had an element of foreign interference. Interestingly … less than 1% related to foreign interference." Scully Ex. 1, at 53 (35).  Thus, virtually all the speech targeted for censorship comes from American speakers.

1196.   The EIP targeted speech for censorship or debunking in most tickets: "Of our 639 tickets, 363 tickets tagged an external partner organization to either report the content, provide situational awareness, or suggest a possible need for fact-checking or a counter-narrative." *Id.* at 55 (37).

1197.   "[G]roups that reported tickets include the State Department's Global Engagement Center…" *Id.* at 60 (42).  Daniel Kimmage testified that George Beebe of the GEC was in contact with the EIP.  Kimmage Dep. 202:10-24.  Kimmage attests that the GEC had "a general engagement with the EIP. … the GEC was engaging with the partnership." *Id.* at 214:11-19.  In addition to Mr. Beebe, Adele Ruppe, who "liaised on election-related issues," may have engaged with the EIP. *Id.* 214:23-215:5.

1198.   In addition, left-wing advocacy groups like "MITRE, Common Cause, the DNC, the Defending Digital Democracy Project, and the NAACP" submitted tickets to the EIP.  Scully Ex. 1, at 60 (42).

1199.   The EIP indicates that the "misinformation" it targeted during the 2020 election cycle was core political speech of American citizens protected by the First Amendment: "Our analysis demonstrates that the production and spread of misinformation and disinformation about Election 2020 … was participatory. In other words, these dynamics were not simply top-down from elites to their audiences, but were bottom-up as well, with members of the 'crowd' contributing in diverse ways—from posting raw content, to providing frames for that content, to amplifying aligned messages from both everyday members of the crowd and media (including social media) elites. Repeatedly, our data reveal politically motivated people sincerely introducing content they mistakenly believed demonstrated real issues with election integrity…" *Id.* at 181 (163).  "Well-meaning, though often politically motivated, individuals repeatedly introduced this content into the broader information sphere, often via social media…" *Id.* at 182 (164).

1200.   EIP analysts collected data from Twitter "contemporaneously," and they also have access to "CrowdTangle and Facebook search functionality." *Id.* at 199-200 (181-82).

1201.   The EIP's tickets encompassed almost 5,000 URLs: "Through our live ticketing process, analysts identified social media posts and other web-based content related to each ticket, capturing original URLs (as well as screenshots and URLs to archived content). In total, the EIP processed 639 unique tickets and recorded 4,784 unique original URLs." *Id.* at 200 (182).

1202.   These tickets and URLs encompass millions of social media posts, including almost 22 million posts on Twitter alone: "In total, our incident-related tweet data included 5,888,771 tweets and retweets from ticket status IDs directly, 1,094,115 tweets and retweets collected first from ticket URLs, and 14,914,478 from keyword searches, for a total of 21,897,364 tweets." *Id.* at 201 (183).

1203.   The EIP "collected data from Twitter in real time from August 15 through December 12, 2020," and did so "[u]sing the Twitter Streaming API" to "track[] a variety of election-related terms …. The collection resulted in 859 million total tweets." *Id.* at 200-01 (182-83).  Thus, the EIP had privileged access to Twitter's internal data about speech on its own platform.

1204.   The EIP did not have privileged access to Facebook's internal data, however: "To understand how the information ecosystem looks from the perspective of Facebook and Instagram, we collected public posts through the CrowdTangle API from Facebook Groups, Facebook Pages, Facebook verified profiles and public Instagram accounts." *Id.* at 201 (183).  This explains the White House's and Surgeon General's insistence in 2021 that Facebook grant "researchers" such as Renee Diresta access to Facebook's internal data.

1205.   The EIP treats as "misinformation" truthful reports that the EIP believes "lack[] broader context." *Id.* at 203 (185).

1206.   The EIP admits that it focuses on speech from the "political right" because it believes that the right spreads misinformation: "Influential accounts on the political right … were responsible for the most widely spread of false or misleading information in our dataset. Right-leaning accounts also more frequently augmented their misinformation posts with narrative-related hashtags … which persisted across multiple incidents and were shared millions of times in our dataset." *Id.* at 204-05 (186-87).

**B.     The EIP Targets Plaintiff Jim Hoft and                    .**

1207.   According to the EIP, "[t]he 21 most prominent repeat spreaders on Twitter … include political figures and organizations, partisan media outlets, and social media all-stars. … [A]ll 21 of the repeat spreaders were associated with conservative or right-wing political views and support of President Trump." *Id.* at 205 (187).

1208.   The EIP lists *The Gateway Pundit* as the second-ranked "Repeat Spreader[] of Election Misinformation" on Twitter, ranking it above Donald Trump, Eric Trump, Breitbart News, and Sean Hannity. *Id.* at 206 (188) tbl.5.2.  In the 2020 election cycle, the EIP flagged *The Gateway Pundit*'s speech in 25 incidents with over 200,000 retweets.  *Id.*

1209.   The EIP claims that "[f]ar-right hyperpartisan media outlets also participated in a wide range of [Twitter] incidents, including The Gateway Pundit, which ranked #2 in the dataset." *Id.* at 206 (188).

1210.   In addition, the EIP lists *The Gateway Pundit*'s website as the domain cited in the most "incidents"—its website content was tweeted by others in 29,207 original tweets and 840,740 retweets.  *Id.* at 207 (189) tbl.5.3.  *The Gateway Pundit* ranks above Fox News, the New York Post, the New York Times, and the Washington Post on this list.  *Id.*

1211.   In fact, the EIP dedicates an entire subsection of its report to *The Gateway Pundit*. *Id.* at 214-16 (196-98).   The EIP reports that "The Gateway Pundit was among the most active spreaders of election-related misinformation in our analyses. … It appeared as a top repeat spreader through its website, its Twitter account, its YouTube channel, and its Instagram account."  *Id.* at 214 (196).

1212.   The EIP report notes that "Twitter suspended [*The Gateway Pundit*'s] account on February 6, 2021," indicating that *The Gateway Pundit*'s deplatforming on Twitter was the result of the EIP's efforts.  *Id.*

1213.   The EIP states that "The Gateway Pundit was highly active throughout the election lifecycle, including during the weeks leading up to the election, when it repeatedly spread content—in distinct information incidents—that sought to undermine trust in mail-in voting specifically and the eventual election results more generally."  *Id.*

1214.   According to the EIP, "[o]n Twitter, The Gateway Pundit's account was highly retweeted across 26 different incidents (#2 among repeat spreaders). Evidence from our data suggest that its prominence was due both to production of its own material and to amplification (via original and quote tweets) of other partisan content."  *Id.* at 215 (197).

1215.   According to the EIP, "[o]f all the domains linked to in our Twitter data, The Gateway Pundit's website was connected to the largest number of incidents (46) while also garnering the most related original tweets (29,207) and retweets (840,750). Their YouTube channel appeared in five incidents, and their 13 incident-related videos had more than 4 million views on YouTube."  *Id.* at 215-16 (197-98).

1216.   According to the EIP, "[t]he Gateway Pundit['s] … Instagram account was tied for #2 among repeat spreaders, appearing in 10 incidents for 20 posts that received more than 132,000 engagements." *Id.* at 216 (198).

### C.     The EIP Induces Major Changes in Platform Censorship Policies.

1217.   The EIP notes that "during the 2020 election, all of the major platforms made significant changes to election integrity policies, both as the campaigns kicked off and through the weeks after Election Day—policies that attempted to slow the spread of specific narratives and tactics that could potentially mislead or deceive the public…." *Id.* at 229 (211).

1218.   The EIP notes that "[m]ajor social media platforms such as Facebook, Twitter, YouTube, Pinterest, and TikTok introduced changes to their community standards in the months leading up to the election and in the aftermath." *Id.* at 230 (212).

1219.   In particular, starting just over a month after the EIP launched, in "September 2020," "[a] number of platforms announced the first updates to election-specific policies: making large additions; adding more clarity and specificity; or stating clearly that they will label or remove content that delegitimizes the integrity of the election." *Id.*

1220.   The policy changes reflected that the EIP and the platforms anticipated that they would have to target speech by *domestic* speakers, not supposed "foreign disinformation," during the 2020 election: "[M]uch of the misinformation in the 2020 election was pushed by authentic, domestic actors, and platforms shifted their focus to address downstream harms related to the content itself. As a result, most subsequent updates introduced policies related to specific content categories." *Id.* at 231 (213).

1221.   The EIP lobbies platforms to "remove" so-called "repeat spreaders" like *The Gateway Pundit*, and complains that they are not removed often enough: "Despite what appeared

to be clear policy to penalize or remove repeat spreaders and high-profile disinformation actors, platforms appeared to shy away from using this particular intervention. In some cases, this was a result of a variety of 'newsworthiness' exceptions, which allowed some high-profile repeat spreaders, including politicians, to evade bans. Yet many of the repeat spreaders we saw were not politicians"—including *The Gateway Pundit*, among many others. *Id.* at 233 (215).

1222. The EIP indicates that it will continue its censorship activities in future elections: "The next election will have its own unique set of misinformation narratives, yet many of the tactics, dynamics, and basic structures of these narratives will likely remain the same." *Id.* at 243-44 (225-26).

1223. The EIP reinforces this intention by calling for even more aggressive, more expansive censorship of social-media speech, including into other areas such as "public health": "Doing nothing is not an option. … Not pursuing structural policy change will accelerate our country's slide toward extremism, erode our shared national and inclusive identity, and propel yet more individuals toward radicalization via mis- and disinformation. The problem is larger than elections: it spans politics, self-governance, and critical policy areas, including public health." *Id.* at 251 (233). The EIP acted on this statement promptly by forming the "Virality Project" in 2021. *See infra*.

1224. The EIP proclaims that the "EIP's novel structure, enabling rapid-response analysis and a multistakeholder reporting infrastructure, could prove effective to many information spaces blighted by pervasive misinformation," in addition to election-related speech. *Id.* at 259 (241).

1225. The EIP calls for more aggressive penalties to enforce censorship on social media, in language that was copied and parroted by the demands of Jen Psaki and the Surgeon General: "Establish clear consequences for accounts that repeatedly violate platform policies." *Id.* at 256

(238). "Prioritize quicker action on verified or influential accounts if they have already violated platform policies in the past." *Id.* at 257 (239).

1226.   The EIP even advocates for an express system of pre-publication approval for disfavored speakers—the ultimate prior restraint: "Consider implementing holding areas for content from high-visibility repeat spreaders, where content can be evaluated against policy before posting." *Id.*

1227.   The EIP proclaims that it offers "a whole-of-society response," in words parroted by the Surgeon General's Health Advisory. *Id.* at 259 (241).

1228.   The EIP boasts that "[t]he EIP, in its structure and its operations … *united government, academia, civil society, and industry*, analyzing across platforms, to address misinformation in real time." *Id.* (emphasis added).

1229.   The EIP states that "[t]he lessons from EIP should be both learned and applied. The fight against misinformation is only beginning. The collective effort must continue." *Id.* at 259-60 (241-42).

1230.   The EIP specifically advocates for a broader role for CISA in federal efforts to combat election-related "misinformation." *Id.* at 252-53 (234-35).

1231.   Alex Stamos, the director of the Stanford Internet Observatory who launched the EIP, publicly states that virtually all the speech targeted by the EIP is by domestic speakers engaging in core political speech.  He has publicly stated: "almost all of this is domestic: right? … It is all domestic, and the second point on the domestic, a huge part of the problem is well-known influencers …. you have … a relatively small number of people with very large followings who have the ability to go and find a narrative somewhere, pick it out of obscurity and … harden it into these narratives."  Scully Ex. 4, at 5 (Audio Tr. 2).

1232.   Likewise, on October 3, 2020, at a CISA-hosted cybersecurity conference, Clint Watts of the EIP stated that election misinformation "is overwhelmingly more domestic than foreign this time around in 2020." Scully Ex. 3, at 4 (Audio Tr. 2).

1233.   At the same conference, Alex Stamos stated: "The bigger issue in 2020, is going to be domestic … we have set up this thing called the [E]lection [I]ntegrity [P]artnership, so we went and hired a bunch of students. We're working with the University of Washington, Graphika, and DFRLab, and the vast, vast majority of the contact we see we believe is domestic. You know, some of it you can't tell, but a lot of it is coming from domestic blue checkmark verified elites; right? And so I think a much bigger issue for the platforms is elite disinformation. The stuff that is being driven by people who are verified that are Americans who are using their real identities." *Id.* at 5 (Audio Tr. 3).  He also stated, "the truth is, that the vast majority of these problems or the kind of problems in the information environment are domestic problems." *Id.* at 6 (Audio Tr. 4).

1234.   Alex Stamos has noted that the fear of government regulation pushes the platforms to respond to government pressure and increase censorship. On November 10, 2020, at a conference hosted by the Atlantic Council, Alex Stamos stated: "So, you know, on effectively pushing the platforms to do stuff … they will always be more responsive in the places that are both economically highly important and that have *huge potential regulatory impact*, most notably right now that would be the United States and Europe." Scully Ex. 4, at 6 (Audio Tr. 3) (emphasis added).

1235.   On November 17, 2021, at a conference hosted by the Digital Publics Symposium, Kate Starbird of CISA's Subcommittee and the University of Washington's Center for an Informed Public, an EIP participant, stated: "Now fast forward to 2020, we saw a very different story around disinformation in the U.S. election. It was largely domestic coming from inside the United States.

… Most of the accounts perpetrating this … they're authentic accounts. They were often blue check and verified accounts. They were pundits on cable television shows that were who they said they were … a lot of the major spreaders were blue check accounts, and it wasn't entirely coordinated, but instead, it was largely sort of cultivated and even organic in places with everyday people creating and spreading disinformation about the election." Scully Ex. 8, at 4 (Audio Tr. 2). She also stated: "So we see this – the disinformation campaign was top down … but this campaign was also bottom up with everyday people sharing their own experiences, their own misperceptions of being disenfranchised or finding what they thought to be evidence of voter fraud." *Id.* at 5 (Audio Tr. 3). These are the voices that the EIP silenced.

### D.     The Virality Project Expands EIP's Censorship Work with Federal Officials.

1236.   Soon after the 2020 election cycle, beginning in early 2021, the same four entities that launched the Election Integrity Partnership established a similar program to address COVID-19-vaccine-related "misinformation" on social media, which they called the "Virality Project." *See* Scully Ex. 2 (containing Stanford Internet Observatory, et al., The Virality Project, *Memes, Magnets, and Microchips: Narrative Dynamics Around COVID-19 Vaccines* (v.1.0.1 2022), https://purl.stanford.edu/mx395xj8490).

1237.   The Virality Project's final report, dated April 26, 2022, lists Renee DiResta as the principal Executive Editor, and lists Renee DiResta, Kate Starbird, and Matt Masterson as contributors.  Scully Ex. 2, at 4 (i).[3]  Current and former CISA interns Jack Cable, Isabella Garcia-Camargo, Pierce Lowary, and Alex Zaheer are listed as "researchers and analysts" who participated in social-media "monitoring" for the project.  *Id.*

---

[3] Citations of this exhibit are formatted "Scully Ex. 2, at [page of exhibit] ([page of report]).

1238.   The same four entities that operated the EIP launched the Virality Project ("VP") in 2021: Stanford Internet Observatory, University of Washington's Center for an Informed Public, Graphika, and the Atlantic Council's Digital Forensics Research lab.  *Id.* at 8-9 (1-2).  Three new nonprofit entities were added as well.  *Id.*

1239.   According to its report, "[t]he VP team developed technology to identify emerging narratives, to understand what communities they appeared within, and to gauge their scope, speed, and spread. In addition, the analysts assessed social media platforms' published policies to understand how (if at all) platforms might limit or action the spread of misleading vaccine-related content."  *Id.* at 9 (2).  As discussed below, like the EIP, the VP took action to push "platforms [to] limit or action the spread of misleading vaccine-related content."  *Id.*

1240.   According to the VP, "[v]accine mis- and disinformation was largely driven by a cast of recurring actors," including "long-standing anti-vaccine influencers and activists, wellness and lifestyle influencers, pseudomedical influencers, conspiracy theory influencers, right-leaning political influencers, and medical freedom influencers."  *Id.*

1241.   Like the EIP, the VP admits that the speech it targets is heavily speech by "domestic actors," *i.e.*, American citizens: "Foreign … actors' reach appeared to be far less than that of domestic actors."  *Id.*

1242.   Like the EIP, the VP indicates that it pushes platforms to adopt more aggressive censorship policies on COVID vaccine-related content: "While online platforms have made progress in creating and enforcing vaccine related policies, gaps still exist."  *Id.* at 10 (3).

1243.   Like the EIP, the VP notes that it did not only observe and report on misinformation but took action to stop the spread of misinformation: "Detection, however, was only part of the

work. The Virality Project also sought to relate its findings to the public and to stakeholders in public health, government, and civil society." *Id.*

1244.   The VP indicates that it should increase the efficiency of having "government partners" share "tips" of misinformation with entities like the VP, stating that "[r]esearch institutions" should "[s]treamline a tip line process to make it easy for civil society and government partners to share observations.  Establish a feedback loop to discuss what types of analysis or tips are most relevant." *Id.*

1245.   The VP strives to "[d]evelop and maintain clear channels of communication that enable federal, state, and local agencies to understand and learn from what might be happening in other regions. Federal Information Sharing and Analysis Centers (ISAC) are one path forward." *Id.* at 11 (4).

1246.   The VP recommends that the federal government "[i]mplement a Misinformation and Disinformation Center of Excellence housed within the Cybersecurity and Infrastructure Security Agency." *Id.*

1247.   The VP states that social-media "[p]latforms owe the public *transparency and accountability* as they face the challenges of deciding what to surface, what to curate, and how to minimize the virality of harmful false claims. Tech platform policies against public health misinformation should be clear and precise, and their enforcement should be consistently applied." *Id.* (emphasis added).   The Surgeon General copied this messaging verbatim in his Health Advisory, which he launched at the VP.

1248.   The VP calls for more aggressive censorship of COVID-19 "misinformation," stating: "To these ends, platforms should: Consistently enforce policies, particularly against recurring actors," and "Continue to improve data sharing relationships with researchers." *Id.*  The

emphasis on "data sharing relationships" is directly echoed in the White House's and the Surgeon General's demands that platforms share their internal data with researchers.

1249.   The VP boasts that the "Office of the Surgeon General incorporated VP's research and perspectives into its own vaccine misinformation strategy," and specifically cites the Surgeon General's Health Advisory on this point.  *Id.* at 11 (4) & 13 (6) n.5 (citing Off. U.S. Surgeon Gen., *Confronting Health Misinformation: The U.S. Surgeon General's Advisory on Building a Healthy Information Environment* (July 15, 2021), https://hhs.gov.sites.default.files.surgeon.general-misinformation-advisory.pdf).

1250.   "Over the course of its seven months of work, the Virality Project observed narratives that questioned the safety, distribution, and effectiveness of the vaccines."  *Id.* at 11 (4).

1251.   Like the EIP, the VP states that "[t]he enormity of the challenge demands a *whole-of-society response*," *id.* at 12 (5) (emphasis added), and calls for more federal agencies to be involved through "cross-agency collaboration," *id.*  The Surgeon General adopted and echoed the VP's call for a "whole-of-society" response.

1252.   The VP admits that "it was not always clear what *was* misinformation; in the case of the novel coronavirus, it was often simply not yet clear what was true or where scientific consensus lay," *id.* at 14 (7), and that "[g]round truth about COVID-19 was rapidly evolving, and even institutional experts were not always aligned on the facts," *id.* at 15 (8).

1253.   According to the VP, "[v]iral posts that claimed to have the answers to the public's most pressing questions appeared online; fact-checkers struggled to evaluate them, and platforms wrestled with whether to leave them up or take them down. Social media influencers of varying backgrounds debated the merits and efficacy of masking, providing detailed breakdowns of their analyses in public posts."  *Id.*

1254.   The VP attributes opposition to mask mandates and lockdowns to right-wing political ideology: "In the months before vaccines or treatments emerged, governments worldwide turned to preventative measures such as masking requirements and lockdowns. In the US, these measures were quickly framed as affronts to liberty by facets of the US right-wing political spectrum, turning individual responses to the virus into a function of political identity." *Id.*

1255.   The VP suggests that it flagged for censorship COVID-related posts with enormous engagement on social media, reporting for example that "[b]efore the major social media platforms began to take down [one] video—which was in violation of their COVID-19 misinformation policies—[it] amassed tens of millions of views and was shared into a wide variety of communities." *Id.* at 16 (9).

1256.   The speech that the VP decries is all quintessential First Amendment–protected speech. *See, e.g., id.* ("Several prominent anti-vaccine activists began to post regularly about COVID-19; their followings began to increase, despite prior platform efforts to reduce the spread of false and misleading claims from anti-vaccine figures. As the possibility of a vaccine became more of a reality as 2020 progressed, anti-vaccine activists focused on preemptively undermining uptake. Several of the vaccines in development used relatively novel mRNA technology, which afforded an opportunity to present them as untested, unsafe, rushed, or risky, even to audiences who had taken all previously recommended vaccines.").

1257.   "It was against this backdrop" of widespread First Amendment–protected speech on social media "that the Virality Project (VP) came together. A collection of research institutions had previously collaborated through the Election Integrity Partnership (EIP) to identify and understand the spread of election mis- and disinformation in the US during the 2020 presidential campaign. In December 2020, these partners jointly observed that the same tactics used to great

effect during the 2020 election were already in use to expand the spread of COVID-19 vaccine mis- and disinformation." *Id.*.  The VP used the same tactics as the EIP to engage in "rapid response" to misinformation: "The Project's broad array of institutions enabled information sharing and *rapid response* when false and misleading information percolated across social platforms." *Id.* (emphasis added).

1258.   The VP was overtly biased against "anti-vaccine" viewpoints from the beginning: "The Project's original framing document articulated the threat: **A surge of anti-vaccine disinformation will pose significant challenges to the rollout and public adoption of COVID-19 vaccines in the United States**." *Id.*  (bold in original).

1259.   Just like the EIP, the VP boasts that it is a "multistakeholder collaboration" that includes "government entities" among its key stakeholders: "The Virality Project adopted *a multistakeholder collaboration with civil society organizations, social media platforms, and government entities* to respond to misand disinformation around the novel vaccines."  *Id.* at 17 (10) (emphasis added).

1260.   "The research institutions that comprised the Election Integrity Partnership—the Stanford Internet Observatory, the University of Washington's Center for an Informed Public, the Atlantic Council's Digital Forensic Research Lab, and Graphika—along with new partners the National Conference on Citizenship (NCoC)'s Algorithmic Transparency Institute and New York University's Center for Social Media and Politics and Tandon School of Engineering—all elected to participate in this new initiative: the Virality Project."  *Id.*

1261.   The VP report complains that "the internet has no editorial gatekeepers."  *Id.* at 18 (11).

1262.   The VP decries the influence of "social media influencers" such as "Doctors" and "Mommy Bloggers." *Id.* at 19 (12).

1263.   According to the VP, "[t]hese influencers have adopted the best practices of communication in the internet age, and their effectiveness in drawing in online users is made evident by the mass followings they have acquired across social media sites: platforms as varied as Pinterest, Instagram, and YouTube…" *Id.*

1264.   The VP targets misinformation "tactics" that involve speech that the VP does not contend is false or even falsifiable.  It states that speakers "use tactics that have persisted over time, many of which have been used in service of spreading mis- and disinformation in contexts beyond the vaccine conversation; for example, the Election Integrity Partnership observed several of these tactics during the lead-up to the 2020 US election." *Id.*

1265.   These "tactics" include such things as "**Hard-to-Verify Content:** Using content that is difficult to fact-check or verify, such as personal anecdotes"; "**Alleged Authoritative Sources:** Using or pointing to information from an alleged public health official, doctor, or other authoritative source"; "**Organized Outrage:** Creating events or in-person gatherings, or using or co-opting hashtags"; and "**Sensationalized/Misleading Headlines:** Using exaggerated, attention-grabbing, or emotionally charged headlines or click-bait." *Id.* (bold in original). Notably, none of these "tactics" involves false speech, and all are protected by the First Amendment.

**E.     The Virality Project Targets Plaintiff Jill Hines and Health-Freedom Groups.**

1266.   According to the VP report's taxonomy, Plaintiff Jill Hines, the founder of Health Freedom Louisiana, constitutes a "medical freedom influencer[]" who engages in the "tactic" of "**Organized Outrage**" simply because she "create[ed] events or in-person gatherings" to oppose

314

mask and vaccine mandates in Louisiana. *See id.* at 9, 19 (2, 12) (bold in original). But this "tactic" is First Amendment–protected activity.

1267. Another "tactic" decried by the VP is "**Group super-spreader:** An individual account sharing posts into multiple online groups." Id. at 20 (13) (bold in original). This is also quintessential First Amendment expression.

1268. The VP report repeatedly emphasizes the problem of "health freedom" or "medical freedom influencers" like Plaintiff Jill Hines. It identifies "Liberty" as a "trope" of social-media disinformation: "*Liberty*: Individuals have the right to '**health freedom**'; no government or employer should be able to tell people what to put in their bodies." *Id.* (italics in original) (bold added).

1269. The VP also identifies political and religious opinions—including well-established and widespread views—as "themes" and "tropes" of anti-vaccine "misinformation," such as: "*Distrust of industry*: Vaccines are produced by profit-motivated pharmaceutical companies that have repeatedly concealed harm in pursuit of profit"; "*Religiosity*: Vaccines contain materials that are objectionable on religious grounds"; and "*Conspiracy*: … Governments have covered up information proving vaccines are dangerous, [and] Doctors and politicians who advocate for vaccines have been bought off by 'Big Pharma.'" *Id.*

1270. Like the EIP, the VP agrees that government pressure pushes social-media platforms to adopt more aggressive censorship policies: "Platforms had started adapting their policies to address vaccine misinformation in early 2019, spurred by public outcry, negative press coverage, and *government inquiries*…" *Id.* at 21 (14) (emphasis added).

1271.   The VP boasts that its "analysts had to develop a nuanced and nimble understanding of what content constituted policy violations"—evidently because it was flagging content to platforms for censorship in real time.  *Id.* at 21-22 (14-15).

1272.   The VP extensively monitored and tracked Americans' speech about COVID-19 and vaccines on social media: "To surface in-scope content, VP's team of analysts were divided into topical detection teams, referred to as pods…. These pods … enabled analysts to develop and ensure sustained familiarity with how the COVID-19 vaccine conversation was evolving within particular communities on public platforms." *Id.* at 22 (15).

1273.   This monitoring involved VP analysts reading and searching Americans' social-media accounts in real time: "Analysts in each pod assessed emerging narratives that were within scope … , surfacing content both via qualitative observation of the pages and accounts, and by using lists of common terms associated with vaccine hesitancy and long-standing anti-vaccine rhetoric." *Id.*

1274.   The VP states that "Anti-vaccine activists and influencers, including those discussed in the Center for Countering Digital Hate's 'Disinformation Dozen' Report … surfaced the greatest amount of content …" *Id.* at 23 (16).

1275.   This covert monitoring of Americans' online speech about vaccine was extensive, sophisticated, and adaptive: "At the beginning of the project, analysts used broad search terms ("vaccine," "jab") to surface relevant content and incidents (specific events or stories), but gradually began to incorporate a combination of machine learning and hand coding to identify additional recurring narratives relevant to the four in-scope categories. This included terms related to medical freedom under "Vaccine Distribution," or severe adverse effects and death under

"Vaccine Safety," among others. As narratives and new keywords emerged throughout the analysis period, analysts continually refined their searches." *Id.*

1276.   This mass-social-media-surveillance project included federal agencies as key "stakeholders": "The Virality Project established a nonpartisan, multi-stakeholder model consisting of health sector leaders, federal health agencies, state and local public health officials, social media platforms, and civil society organizations. These stakeholders provided tips, feedback, and requests to assess specific incidents and narratives, and each entity type brought specific expertise to bear on understanding COVID-19 vaccine hesitancy." *Id.* at 24 (17).

1277.   Thus, the VP's "multi-stakeholder model" included government agencies and officials, including "federal health agencies" and "state and local public health officials," working alongside "social media platforms" to combat vaccine-related "misinformation." *Id.*

1278.   The government "stakeholders" such as "federal health agencies" and "state and local public health officials" were among those who "provided tips" and "requests to assess specific incidents and narratives," *i.e.*, flagging content for social-media censorship. *Id.*

1279.   The VP emphasizes the role of "Federal government agencies" in the VP, including the CDC and the Office of Surgeon General: "**Federal government agencies** served as coordinators for national efforts. The Virality Project built strong ties with several federal government agencies, most notably the Office of the Surgeon General (OSG) and the CDC, to facilitate bidirectional situational awareness around emerging narratives. The CDC's biweekly "COVID-19 State of Vaccine Confidence Insights" reports provided visibility into widespread anti-vaccine and vaccine hesitancy narratives observed by other research efforts." *Id.* (bold in original).

1280.   Social media platforms served as stakeholders alongside federal and state officials:

"**Platforms** were the final stakeholders in the VP effort. Six social media platforms engaged with

VP tickets—Facebook (including Instagram), Twitter, Google (including YouTube), TikTok,

Medium, and Pinterest—*acknowledging content flagged for review and acting on it in accordance*

*with their policies*. On occasion, platforms also provided information on the reach of *narratives*

*previously flagged by VP*, which provided a feedback loop leveraged to inform the Project's

understanding of policies and ongoing research." *Id.* at 25 (18) (bold in original) (italics added).

1281.   Thus, the VP openly proclaims that it "flagged" "content … for review" to

platforms to "act[] on it in accordance with their policies." *Id.* Government officials provided

"tips" to the VP about misinformation on social media, and the VP flagged it for platforms for

censorship.

1282.   The VP emphasizes the importance of federal officials and social-media platforms

in its collaboration on censorship: "As the effort progressed, *input from these partners was crucial*

in defining the VP's output formats and in surfacing where the impacts of vaccine mis- and

disinformation were being felt offline." *Id.*

1283.   The VP engaged in continuous, ongoing communication with federal officials,

platforms, and other stakeholders: "The Virality Project delivered 31 weekly briefings focused on

increasing situational awareness and enabling the stakeholders working on countering vaccine mis-

and disinformation to develop the most effective possible response." *Id.*

1284.   The VP boasts that it "provided strategic insights" to federal officials in combating

misinformation: "Briefings directly informed counter-messaging efforts by public health

stakeholders … and public health officials (for example, the CDPH), and *provided strategic*

*insights to government entities such as the OSG, CDC, and the Department of Health and Human Services.*" *Id.* (emphasis added).

1285. Further, the "Stanford Internet Observatory and the Virality Project also hosted Surgeon General Vivek Murthy for a seminar on vaccine mis- and disinformation, including the rollout of the Surgeon General's advisory on health misinformation." *Id.* at 27 (20).

1286. Like the EIP, the VP used "tickets" to track social-media narratives, where each "ticket" could encompass many postings: "As part of the Virality Project, analysts created tickets documenting URLs of in-scope content. In total, 911 tickets were created, tracking both specific pieces of misinformation and broader narratives. At the end of the monitoring period, analysts had created 845 tickets tracking specific vaccine misinformation incidents (events or pieces of content) and 66 tickets tracking broad narratives." *Id.* at 34 (27).

1287. The VP aimed, not just to track, but to "respond to" misinformation: "The Virality Project operated with a team of analysts drawn from across the partner organizations. Workflows were designed to detect, analyze, and *respond to* incidents of COVID-19 vaccine-related disinformation in online ecosystems." *Id.* (emphasis added).

1288. "From February to August 2021, VP analysts *systematically monitored activity across social media platforms* to document emerging narratives and trends in public discourse while also tracking the popularity and spread of older content." *Id.* (emphasis added).

1289. "The [VP] used the Jira Service Desk software to log mis- and disinformation incidents that were determined to be in scope for specific areas of the public COVID-19-related conversation. For each single incident of anti-vaccine mis- or disinformation surfaced during monitoring, an analyst filed a ticket that provided a brief description of the incident, including

engagement numbers at the time of creation and links to relevant social media posts." *Id*. at 35
(28).

1290.   The VP boasts that it targeted online speech for censorship before it could go viral,
thus imposing massive prior restraints on the amplification of targeted content: "Tickets also
enabled analysts to quickly tag platform or health sector partners to ensure their situational
awareness of high-engagement material that appeared to be going viral, so that *these partners
could determine whether something might merit a rapid public or on-platform response* (such as
a label)." *Id.* at 37 (30) (emphasis added).

1291.   The VP reported the content in 174 "tickets" to social-media platforms for
censorship: "Managers gave all incident analyses a final review for quality-control purposes, to
determine appropriate next steps and to make a final decision about whether tickets should be
shared with external stakeholders. *Of the 911 incidents monitored, 174 were referred to platforms
for potential action*." *Id.* (emphasis added).

1292.   Like the EIP, the VP appears to have had direct access to Twitter's and YouTube's
internal data about speech spreading on its platform, but not Facebook's: "The engagement data
or video view data for links associated with each ticket was collected differently depending on the
social media platform in question: Facebook and Instagram: CrowdTangle API; Twitter: Twitter
API…" *Id.* at 38 (31).

1293.   Like the Surgeon General and the White House, the VP complains that the
platforms must make their internal data more available to VP: "Due to limited transparency from
social media platforms, engagement is the closest proxy researchers can use to understand what
content users are seeing on social media platforms. Metrics such as impression counts are generally
unavailable to outside researchers." *Id.*

1294.   The VP's monitoring tracked content with about 6.7 million engagements on social media per week, or over 200 million over the seven months of the reported project: "Average weekly engagement with content tracked across all Virality Project tickets was 6.7 million." *Id.* at 39 (32).

1295.   The vast majority of speech flagged and tracked by the VP was not false or incorrect speech: "The most commonly employed tactics were Hard-to-Verify Content and Alleged Authoritative Source." *Id.* at 41 (34); *see also id.* at 42 (35) fig.2.6 (showing predominance of these two "tactics").

1296.   According to the VP, "[o]f the engagement captured by tickets, more than a third came from content primarily spread by accounts that demonstrated recurring success making content go viral; we refer to them here as 'recurring actors.'" *Id.* at 41 (34).

1297.   The VP boasts that it induced "platform action" against such "recurring actors" in 2021: "Recurring actors drove a majority of engagement in the first half of the study period, but fell off in importance after that, most likely due to platform action against certain users beginning in the late spring of 2021." *Id.* at 43 (36).

1298.   Like Jennifer Psaki at the White House, the VP repeatedly cites the Center for Countering Digital Hate's report on the "Disinformation Dozen." *Id.* at 23 & 32 n.43, 43 & 48 n.7, 111 & 129 n.179.[4]

1299.   "Four distinct weeks during the monitoring period had incidents observed by Virality Project analysts that generated more than 10 million engagements." *Id.* at 43 (36).

1300.   One of these "Viral Incidents" tracked by the VP was: "In July, posts went viral expressing outrage at attempts by the Biden administration to engage in vaccine outreach." *Id.* at

---

[4] Report pages 16 & 25 n.43, 36 & 41 n.7, 104 & 122 n.179.

45 (38).  This incident did not involve any vaccine-related misinformation at all, but core political speech: "the Biden administration used the phrase 'door-to-door' to describe a push for on-the-ground community-led efforts to persuade more Americans to get vaccinated. Prominent Republican politicians miscast this as a forced vaccination campaign by 'Needle Nazis' and a prelude to the government knocking on the door to take away guns."  *Id.* at 46 (39).

1301.   The VP boasts that censorship enforcement was effective, especially in "deplatforming" key actors: "The decline of content from recurring actors midway through the monitoring period potentially reflects a policy impact, as deplatforming these actors led to an apparent reduction in false or misleading content."  *Id.* at 47 (40).

1302.   The VP tracked and flagged "Claims that [supposedly] misrepresent … vaccine mandates," not just misinformation about the vaccines.  *Id.* at 50 (43).

1303.   According to the VP, "content" that "leveraged decontextualized statistics from the US Department of Health and Human Services' Vaccine Adverse Event Reporting System (VAERS) database" is misinformation.  *Id.* at 51 (44).

1304.   According to VP, it was also misinformation when true adverse health events from vaccines were "shared absent context": "Rare incidents documenting verified adverse health events, including blood clotting and heart inflammation, were shared absent context, often in an effort to present them as common and significant risks."  *Id.*

1305.   According to the VP, discussing "breakthrough" cases and "natural immunity" was also misinformation: "False and misleading narratives related to efficacy sought to undermine the perceived benefits of vaccines. These narratives included stories of people diagnosed with COVID-19 after being vaccinated—"breakthrough" cases, particularly in the time of the Delta variant—to promote the idea that the vaccines aren't effective. Later, the idea that natural

immunity from infection is superior to immunity from vaccination became a political talking point raised repeatedly by right-leaning political influencers, despite inconclusive scientific evidence." *Id.*

1306.   According to VP, misinformation also included "discussions of vaccine passports and mandates (including months before any state or federal officials began advocating for them)." *Id.*

1307.   The VP also counts as misinformation "claims that the government was headed toward mandating an unsafe vaccine." *Id.*  The government did, of course, eventually mandate the vaccines for most Americans.

1308.   The VP also treated Americans' "long-standing mistrust of pharmaceutical companies' profit motives" as part of anti-vaccine misinformation.  *Id.*

1309.   "Conspiracy Theories" that "assign blame to … government" are also misinformation to be tracked and censored, according to VP.  *Id.*

1310.   According to VP, "personal anecdotes" about "vaccine injuries and severe side effects—ranging from rashes, to blood clots, to death" are also misinformation."  *Id.* at 52 (45).

1311.   "Personal anecdotes often made their way into mainstream media coverage after gaining traction online. Distortions of official government statistics—most often from VAERS, described in more depth later in this section—were used both to reinforce the personal anecdotes and for focused misinformation solely discussing the statistics."  *Id.*

1312.   According to VP, "stripp[ing] both individual stories and official statistics of important context" is misinformation.  *Id.*

1313.   According to VP, "adverse event stories" were objectionable because they were "employed to push back against vaccine mandates."  *Id.* at 52-53 (45-46).

1314.  Like the White House and Dr. Fauci, the VP treats Alex Berenson as a major malefactor in spreading COVID-19 vaccine "misinformation."  *See id.* at 54, 57 (47, 50).

1315.  Like the White House and Rob Flaherty, the VP flagged and tracked Fox News host Tucker Carlson as a spreader of vaccine misinformation: "*In May 2021, Tucker Carlson misrepresented VAERS data on his talk show*, decontextualizing it while claiming that 3,362 Americans had died following COVID-19 vaccinations between December 2020 and April 2021, equating to roughly 30 people every day."  *Id.* at 57 (50) (emphasis added).

1316.  Health Freedom groups, like Plaintiff Jill Hines's group Health Freedom Louisiana, are particular targets of the VP's tracking and censorship activities.

1317.  The VP report includes an entire section on such groups: "Section 3.2.2 – Government Overreach and Medical Freedom Narratives."  *Id.* at 59 (52).

1318.  According to the VP, "[o]ne of the primary long-standing themes of anti-vaccine distribution narratives is that mass vaccine distribution constitutes a government overreach. The movement sees vaccine mandates, including, historically, school vaccine requirements, as an assault on 'health freedom' or 'medical freedom.'"  *Id.*

1319.  According to the VP, "[i]n 2020, following the emergence of COVID-19, these same health freedom groups expanded their vaccine protests to social distancing, masks, and other prevention measures."  *Id.*  This includes Plaintiff Jill Hines.

1320.  The VP describes the role of Facebook groups—also employed by Jill Hines—in organizing health freedom groups to oppose vaccine mandates: "groups emerged on platforms such as Facebook during the pandemic, with names specifically related to COVID-19 or mRNA vaccines, to assist in discoverability; some grew their numbers into the tens of thousands."  *Id.*

1321.  The VP focused, not just on misinformation about vaccines, but political speech and political organizing against "vaccine passports and vaccine mandates": "During the VP's period of analysis, narratives about government overreach and medical freedom focused on two areas of controversy: vaccine passports and vaccine mandates." *Id.*

1322.  The VP treats as misinformation political speech and political opinions on these topics: "This amplification hinged upon misleading framing that suggested the implementation of any form of vaccine passport would be compulsory.  In reality, the plans for many programs were entirely optional. Other framing from domestic right-leaning political actors created a portrait of governments as prying or snooping into citizens' private matters." *Id.* at (60) 53.

1323.  The VP views virtually all conservative speech opposing government-imposed COVID mandates as misinformation: "Activists pushed the idea that through a passport system, governments and 'Big Tech' were limiting the public's freedoms—situating the conversation within a larger set of narratives surrounding pandemic public health regulations like mask mandates, lockdowns, and social distancing." *Id.*

1324.  Like the EIP, the VP specifically flagged Jim Hoft's *The Gateway Pundit* as a purveyor of misinformation and COVID "conspiracy theories: "Headlines sometimes hawked conspiracy theories: one Gateway Pundit headline, "The Great Reset: Big Tech and Big Pharma Join Forces to Build Digital COVID Vaccination Passport," was a nod to groups such as QAnon…. The article alleged collusion between Big Tech and Big Pharma that would threaten 'individual rights.'" *Id.* at 60-61 (53-54) & 68 (75) n.49 (citing Joe Hoft, *The Great Reset: Big Tech and Big Pharma Join Forces to Build Digital COVID Vaccination Passport*, Gateway Pundit (January 17, 2021), https://thegatewaypundit.com/great-reset-big-tech-big-pharma-joining-forces-build-digital-covid-vaccination-passport).

1325.   Other right-leaning speakers flagged by the VP include One America News Network, Breitbart News, and others.  *Id.* at 60 (53).

1326.   The VP attributes political successes such as state-level bans on vaccine passports to such supposed misinformation.  *Id.* at 61 (54).

1327.   The VP attributes opposition to vaccine mandates by employers to such supposed misinformation: "The backlash to COVID-19 vaccine requirements for employment and other activities parallels the conversation about vaccine passports. It, too, relies on and attempts to exacerbate distrust in public health officials and government institutions."  *Id.*

1328.   According to VP, even truthful information about vaccine effects on health that are still being studied constitutes misinformation: "In early 2021, users on Twitter, Facebook, and Reddit reported unverified reproductive side effects, ranging from abnormal menstrual cycles to miscarriages and infertility. … At the time there was no medical consensus on the vaccine's effect on reproductive health, yet anti-vaccine activists presented the theory as fact and evidence of harm. Research is ongoing…."  *Id.* at 66-67 (59-60).

1329.   According to VP, even "videos that appeared to be created satirically" are misinformation when they "were taken seriously."  *Id.* at 68 (61).

1330.   Alex Berenson is mentioned 49 times in the Virality Project report.  *Id.* at 54, 57, 71, 73, 96-97, 122-23, 188-90, 195, 207-08.[5]

1331.   "Health freedom" or "medical freedom" groups are discussed dozens of times in the VP report.  The word "freedom" occurs 100 times, almost always in direct connection with a discussion of "health freedom" or "medical freedom" groups, influencers, or content.  *See id.* at 6,

---

[5] Report pages 47, 50, 64, 66, 89-90, 115-16, 181-83, 188, 200-01.

9, 20, 23, 59-62, 66, 70, 74, 77, 82, 84-86, 93-96, 105, 117-18, 121-22, 130-31, 137-38, 141, 143,
187, 197-98, 201, 204, 210, 220-22.[6]

1332.   The VP defines "Medical freedom influencers" as actors who "are averse to
government interference in individuals' personal lives. While they explicitly advocate for "health
freedom" or "vaccine choice," these actors often propagate vaccine doubt by contextualizing the
choice with misleading claims of vaccines' adverse medical consequences." *Id.* at 82 (75).

1333.   Fox News host Tucker Carlson, who has wide audiences in Missouri and Louisiana,
is cited 42 times in the Virality Project report. *See id.* at 57, 73, 87, 91-92, 98, 115, 119-20, 122-
23, 193, 201, 208, 215-16, 218.[7]

1334.   In fact, the VP report cites the entire Fox News channel as a source of vaccine
misinformation: "Fox News has played a particularly pivotal role in spreading vaccine
misinformation and anti-vaccine beliefs during the COVID-19 pandemic…. [B]etween June 28
and July 11, 2021, Fox News ran 129 segments about the COVID-19 vaccine on its cable
broadcast; more than half of those segments included unverified claims that undermined
vaccination efforts." *Id.* at 91 (84).

1335.   According to VP, "Fox News television host Tucker Carlson has been one of the
most prominent and sensationalist spreaders of false or misleading information about vaccines
throughout the COVID-19 pandemic." *Id.*; *see also id.* at 91 (describing "Right-wing media
personality Tucker Carlson" as part of a "cast of recurring characters" that influenced vaccine
hesitancy in Spanish- and Chinese-speaking communities).

---

[6] Report pages iii, 2, 13, 16, 52-55, 59, 63, 67, 70, 75, 77-79, 86-89, 98, 110-11, 114-115, 123-24,
130-31, 134, 136, 180, 190-91, 194, 197, 203, 213-15.

[7] Report pages 50, 66, 80, 84-85, 91, 108, 112-13, 115-16, 186, 194, 201, 208-09, 211.

1336.   The VP also cites Candace Owens and The Daily Wire as purveyors of vaccine misinformation. *See, e.g., id.* at 86, 92 (79, 85).

1337.   The VP cites Robert F. Kennedy, Jr., a well-known anti-vaccine activist with wide followings in Missouri and Louisiana, as one of the most influential purveyors of vaccine misinformation.  *Id.* at 83 (76).  The VP describes Kennedy as "especially pernicious" because he has a large audience: "RFK Jr.'s activism is especially pernicious because, like other long-standing influencers, he has a large and committed following and has become somewhat of a household name in the US."  *Id.*

1338.   The VP also cites America's Frontline Doctors and its founder, Dr. Simone Gold, as a source of vaccine misinformation.  *Id.* at 87-88 (80-81).

1339.   The VP notes that "Simone Gold, a licensed emergency room physician, was the second most prominent PMI across Virality Project's tickets. Gold is the leader of America's Frontline Doctors…. Gold has been influential since the summer of 2020, when the White Coat Summit, an event broadcast online in which members of America's Frontline Doctors spoke on the steps of the Supreme Court. The White Coat Summit promoted hydroxychloroquine both as a preventative measure and as a cure for COVID-19."  *Id.*

1340.   The VP treats Dr. Joseph Mercola, another anti-vaccine speaker with wide audiences in Missouri and Louisiana, as a purveyor of vaccine misinformation.  *Id.* at 87 (80).  Again, the VP criticizes Mercola precisely because his speech reaches wide audiences.  *Id.*

1341.   The VP asserts that Gold's "false and misleading claims about the COVID-19 vaccine" include core political speech like "encouraging her followers to boycott companies for their vaccine protocols" and "organizing a cross-country tour to fight back against 'censorship, chaos, and the undeniable slide towards communism that lurks beneath the tyrannical lockdowns

for governmental 'public health' policy'." *Id.* at 88 (81).  To the VP, political "organizing" to oppose vaccine mandates and lockdowns constitutes a "false and misleading claim[]." *Id.*

1342.   The VP asserts that "the right-leaning media ecosystem differs from the rest of the media environment in ways that make it especially vulnerable to the spread of mis- and disinformation." *Id.* at 91 (84).

1343.   The VP states that "[t]he newest iteration of medical freedom, adapted for COVID-19, challenges the legitimacy of government or corporate vaccine mandates and public health interventions specific to COVID-19, including vaccine passport systems and masking requirements." *Id.* at 93 (86).

1344.   The VP states that "medical freedom" groups spread misinformation "across all 50 states": "Medical freedom influencers (MFIs) active in the anti-COVID-19-vaccine movement were fairly distinct from other categories of influencer in that rather than hinging on a handful of key (and often celebrity-status) individuals, they spread their narratives via a franchise model *across all 50 states*." *Id.* (emphasis added).

1345.   The VP indicates that it tracked and flagged "medical freedom" groups "at a messaging and organizing level," *i.e.*, the level where Jill Hines was targeted: "As medical freedom activists have fought requirements imposed by states, cities, or private employers, they have learned from each others' successes and failures—at a messaging and an organizing level—and have brought those lessons to their local communities. What one state does, another state will often echo." *Id.* at 94 (87).

1346.   Like Andrew Slavitt, the VP treats Alex Berenson as one of the "most significant influencer[s]" who opposes vaccines: "Alex Berenson is perhaps the most significant influencer who defies categorization. A former New York Times reporter and a bestselling novelist with no

specific anti-vaccine background …, Berenson … over time evolved into a key player in repeatedly spreading false and misleading information about the COVID-19 pandemic and vaccines. He underplayed the danger of the virus and challenged the efficacy of vaccines and masks, even as evidence supported their value as life-saving public health measures." *Id.* at 96 (89) (providing an image of Berenson's tweets).

1347.   The VP disfavors Berenson because he reaches wide audiences and criticizes the government: "Berenson's popular posts on Twitter notably claimed to be "digging up" or "uncovering" information that was hidden from the public about vaccine safety or effectiveness. In one incident in July 2021, Berenson amplified a conspiracy theory from a statement filed with a lawsuit from America's Frontline Doctors stating that the government was covering up more than 45,000 vaccine-related deaths.  Berenson's 17-tweet thread, which received over 16,000 interactions on July 21, 2021, claimed that the CDC had "quietly more than DOUBLED" the number of deaths reported in VAERS, suggesting the CDC had misled the public." *Id.* at 96-97 (89-90).

1348.   The VP notes that Berenson had wide audiences nationwide when he was censored: "Twitter permanently deplatformed Berenson in August 2021 for repeated violations of Twitter's COVID-19 falsehoods policy.  At the time he lost his account, he had more than 200,000 followers." *Id.* at 97 (90).

1349.   The VP states that the government pushed for "accountability" from platforms in successfully pressuring them to adopt vaccine-related censorship policies in the years leading up to COVID-19: "During and after the [2018-19 measles] outbreaks, scientists and congressional leaders sought accountability from the platforms, inquiring about the extent to which vaccine

hesitancy among impacted communities had been exacerbated by misinformation on their products." *Id.* at 131 (124).

1350.   The VP provides a timeline of policy changes becoming more restrictive of vaccine-related misinformation that shows repeated tightening of policies by Facebook, Twitter, and YouTube once President Biden had been elected.  *Id.* at 133 (126) fig.5.1.

1351.   The VP calls for more aggressive censorship policies to target speech that is not false or incorrect and that constitutes core political speech: "While progress has been made since platforms first developed vaccine-related policies in 2019, clear gaps in platform policy exist with respect to moderating vaccine-related content, including posts that employ personalized stories, medical freedom claims, and misleading headlines and statistics." *Id.* at 143 (136).

1352.   The VP also calls for more aggressive action to "suppress content" and "deplatform accounts": "In addition, policies about the actions platforms can take to suppress content, promote trusted voices, and deplatform accounts vary widely from platform to platform and are still not enforced consistently, both within and across platforms." *Id.*

1353.   Just like the Surgeon General, the VP demands "more transparency" for "external researchers" (like those at the VP, working closely with government) to oversee the platforms' censorship efforts: "It should be noted that understanding the impact of platform policy is limited by what information is publicly available. It is crucial that platforms provide more transparency on each moderation approach and allow external researchers the ability to independently verify the success and impacts of these interventions."  *Id.*

1354.   Like the Surgeon General, the VP argues that "a whole-of-society effort is needed" to stop the spread of so-called misinformation: "[A] whole-of-society effort is needed in which

stakeholders build robust and persistent partnerships to ensure that significant high-harm claims can be addressed as they arise." *Id.* 147 (140).

1355.   This "whole-of-society" effort includes an active role for the government in censoring disfavored speech: "The Virality Project sought to do just that by bringing together four types of stakeholders: (1) research institutions, (2) public health partners, (3) government partners, and (4) platforms. Our recommendations recognize the collective responsibility that all stakeholders have in mitigating the spread of mis- and disinformation…" *Id.*

1356.   According to the VP, "The Virality Project offers an early template for structuring interaction between research institutions and nonacademic stakeholders (including government entities, health practitioners, and private companies)." *Id.*

1357.   According to the VP, it used "ingenuity" to facilitate "the *intake* of tips from … government partners": "An area that required ingenuity was creating a framework for facilitating the *intake* of tips from civil society and government partners…. However, their tips are often highly valuable, so overcoming this challenge is a priority for future efforts." *Id.* at 148 (141) (emphasis added).

1358.   The VP recommends an even more "streamlined" process for "government partners" to provide "tips" of misinformation to be reported for censorship, and it notes that it received tips through "informal exchanges, such as Zoom meetings or calls with our partners": "Streamline tip line processes for civil society and government partners. Set up an efficient channel for intaking external tips…. The Virality Project often had to leverage informal exchanges, such as Zoom meetings or calls with our partners, to receive the tips verbally or encourage additional reporting. In future projects, external reporting channels should be strengthened via an easier

means of reporting and increased access to the reporting channels, especially for partners on the ground (such as health practitioners or government health officials)." *Id.*

1359.    The VP repeatedly cites the work of Surgeon General Murthy, noting that "[d]uring a July 15, 2021, panel with the Virality Project, US Surgeon General Vivek Murthy discussed the importance of vaccination by sharing his own story about COVID-19 … alongside data around the effectiveness of the vaccines." *Id.* at 149 (142). "In the context of vaccine misinformation specifically, some examples of engagement best practices can be found in the Virality Project's July 15, 2021, hosted discussion with Surgeon General Vivek Murthy…" *Id.* at 150 (143).

1360.    According to VP, "While the federal government (through DHHS, the CDC, and the Surgeon General) has ramped up its engagement and communications, more can be done moving forward. There are several areas where government officials can focus to improve their ongoing response to mis- and disinformation surrounding the COVID-19 vaccines." Id. at 149-50 (142-43).

1361.    These include "real-time response" to misinformation on the model provided by CIS and the EI-ISAC for election speech: "Federal, state, and local government officials should coordinate real-time response to emerging mis- and disinformation. … For example, as voting-related mis- and disinformation arose in the 2020 presidential election, the Election Infrastructure Information Sharing and Analysis Center (EI-ISAC) served a critical role in sharing information with the Election Integrity Partnership and pushing its rapid response analysis back out to election stakeholders across all states… Moving forward, the government should support the establishment of such an information-sharing mechanism." *Id.* at 150 (143).

1362.    The VP recommends that the federal government "[i]mplement a Misinformation and Disinformation Center of Excellence (CoE) housed within the federal government," which

"would centralize expertise on mis- and disinformation within the federal government at the Cybersecurity & Infrastructure Security Agency (CISA) with its existing mis- and disinformation team," *i.e.*, Brian Scully's group.  *Id.*

1363.   The VP's "Recommendations to Platforms" reflect near-verbatim language used by the Surgeon General's Health Advisory: "Consistently enforce policies against recurrent actors. … While many platforms have improved transparency around content moderation, there is still inconsistent enforcement of policies, notably in the case of recurring actors. More consistency and transparency is needed around enforcement practices, particularly when prominent or verified accounts are involved.  While past policy environments have been slower to enforce policies against prominent accounts, these are the accounts with the greatest potential for impact. If anything, they may merit closer scrutiny."  *Id.* at 152 (145).

1364.   Likewise, the VP recommends that platforms "[c]ontinue to prioritize and improve data sharing. The Virality Project's research would not have been possible without access to public platform data. For privacy reasons, some data understandably may be limited, but in general, establishing standardized guidelines about how platforms can share data with research institutions is needed."  *Id.* at 153 (146).

1365.   "Notably, engagement numbers are the closest proxy that researchers have to understand what content users see on social media platforms. However, engagement is not the same thing as impressions, or user views—how many times a piece of content is seen by users. Ideally, access to user impression data would be available, allowing researchers to directly measure when and how content is surfaced to users by social media platforms. Unfortunately, social media platforms often do not make impression data available to researchers; as a result of this chronic

gap, assessing impact and reach, or the dynamics of platform curation, remains a significant challenge." *Id.*

## X.    Federal Censorship Inflicts Grave, Imminent, and Ongoing Injuries on Plaintiffs.

1366.    The foregoing conduct has inflicted and continues to inflict ongoing and imminent injuries on both the private Plaintiffs and the States of Louisiana and Missouri.

### A.    Defendants Gravely Injure the Individual Plaintiffs.

1367.    The individual Plaintiffs provide undisputed evidence of how they have suffered from federally-induced censorship.  Docs. 10-3 (Declaration of Dr. Jayanta Bhattacharya), 10-4 (Declaration of Dr. Martin Kulldorff), 10-5 (Declaration of Jim Hoft), 10-7 (Declaration of Dr. Aaron Kheriaty), 10-12 (Declaration of Jill Hines).  The Government does not dispute this evidence.

1368.    Dr. Bhattacharya attests that, "Because of my views on COVID-19 restrictions, I have been specifically targeted for censorship by federal government officials."  Doc. 10-3, ¶ 5. He notes that "[t]he Great Barrington Declaration received an immediate backlash from senior government officials who were the architects of the lockdown policies, such as Dr. Anthony Fauci…" *Id.* ¶ 13.  "Because it contradicted the government's preferred response to COVID-19, the Great Barrington Declaration was immediately targeted for suppression by federal officials." *Id.* ¶ 14. "Instead, what followed was a relentless *covert* campaign of social-media censorship of our dissenting view from the government's preferred message."  *Id.* ¶ 15.

1369.    As a result of this "covert campaign," Dr. Bhattacharya experiences ongoing injuries, including the de-boosting of search results in Google, *id.* ¶16; the removal of links to the Great Barrington Declaration in Reddit discussions, *id.*; the ongoing removal of a YouTube video discussing the Great Barrington Declaration and related issues with Governor DeSantis, *id.* ¶¶ 17-

18; the removal of personal Tweets, *id.* ¶¶ 25-26; the removal of LinkedIn posts, *id.* ¶¶ 28-29; and

account termination by LinkedIn, *id.* ¶ 30.

1370.  Dr. Bhattacharya observes that he lacks access to his colleagues' speech and

viewpoints as well, because "social-media censorship has not focused solely on the co-authors of

the Great Barrington Declaration, but has swept in many other scientists as well: Twitter, LinkedIn,

YouTube, Facebook, they have permanently suspended many accounts—including scientists." *Id.*

¶ 31.

*1371.*  As Dr. Bhattacharya observers, "[t]hese censorship policies have driven scientists

and others to self-censorship, as scientists … restrict what they say on social-media platforms to

avoid suspension and other penalties.*" Id.* ¶ *31.*

*1372.*  Dr. Bhattacharya attests based on personal experience: "Having observed and lived

through the government-driven censorship of the Great Barrington Declaration and its co-authors,

it is clear to me that these attacks were politically driven by government actors. … One of the

motivations for that was a motivation to create … an illusion of consensus within the public that

there was no scientific dissent against lockdowns. [T]he Great Barrington Declaration … posed a

political problem for them because they wanted to tell the public that there was no dissent. And

so, they had to destroy us. They had to do a devastating takedown.*" Id.* ¶ 32.

*1373.*  Dr. Kulldorff likewise attests that there is "an organized campaign against the Great

Barrington Declaration," Doc. 10-4, ¶ 14.  He notes that the GBD "was censored on social media

in an apparent attempt to prevent it from … 'getting a lot of attention,'" *id*. ¶ 15; including Google

deboosting search results, *id*., and Facebook removing content related to it, *id.* ¶ *16.*

1374. Dr. Kulldorff also identifies an ongoing campaign of censorship against his

personal social-media accounts, including censored personal Tweets on Twitter*, id.* ¶¶ *17-18;*

censored posts criticizing mask mandates, *id.* ¶ *19;* ongoing self-censorship to avoid further censorship penalties, *id.* ¶¶ 20, 27; removal of YouTube content, *id.* ¶ 21; removal of LinkedIn posts, *id.* ¶¶ 22-25; and the ongoing permanent suspension of his LinkedIn account, *id.* ¶ 26.

1375.   Dr. Kulldorff has experienced direct censorship of his social-media speech in addition to the Great Barrington Declaration.  For example, his Tweets questioning the efficacy of masking and criticizing government mask mandates have been censored and caused him to be suspended from Twitter.  *Id.* ¶¶ 18-19.

1376.   Dr. Kulldorff has also engaged in self-censorship to avoid being suspended or removed from social media: "Twitter is an important venue for communicating accurate public health information to the public. Because of the censoring, and the suspension of other scientists, I have had to self-censor myself on the platform." *Id.* ¶ 20.

1377.   Dr. Bhattacharya and Dr. Kulldorff's roundtable discussion with Governor Ron DeSantis—which featured all three co-authors of the Great Barrington Declaration—was removed from YouTube.  The roundtable discussion addressed the Great Barrington Declaration and its premises in detail.  As Dr. Kulldorff recounts, "On March 18, 2021, I participated in a two-hour roundtable discussion with Governor Ron DeSantis in Florida, along with Dr. Sunetra Gupta at Oxford, Dr. Jay Bhattacharya at Stanford and Dr. Scott Atlas at Stanford. In this discussion, we made remarks critical of COVID-19 restrictions, including mask mandates on children. I stated that 'children should not wear face masks, no. They don't need it for their own protection, and they don't need it for protecting other people either.' … Dr. Gupta stated that "to force [children] to wear masks and distance socially, all of that to me is in direct violation of our social contract.' In the same roundtable, we also argued against vaccine passports. 'Let's try to argue against that

from the very beginning before it sort of takes off.' Unfortunately, the video of the roundtable was removed by YouTube, which is owned by Google." *Id.* ¶ 21.

1378.   Dr. Kulldorff also experiences ongoing censorship on "LinkedIn, which is a popular communications platform among scientists and other professionals." *Id.* ¶ 22-26.  LinkedIn has blocked and removed his posts opposing vaccine mandates and promoting the benefits of natural immunity.  *Id.*  These included posts in which he and Dr. Bhattacharya "criticized the official Covid-19 response as formulated by Dr. Anthony Fauci." *Id.* ¶ 25.

1379.   Dr. Kulldorff states that he and other scientists engage in self-censorship to avoid being terminated from social-media platforms: "Twitter and LinkedIn are important venues for communicating accurate public health information to other scientists and to the public. Because of the censoring, and the suspension of other scientists, I have had to self-censor myself on both platforms.  Sometimes by not posting important public health information." *Id.* ¶ 27.

1380.   Dr. Kulldorff notes that social-media censorship directly affects him as a *reader* of other scientists' speech on social media, on an ongoing basis, by reducing his access to the thoughts and views of scientists who dissent from the government-mandated orthodoxy: "Social-media censorship has not focused solely on the co-authors of the Great Barrington Declaration but has swept in many other scientists as well. These censorship policies have driven scientists and others to self-censor, as scientists like me restrict what we say on social-media platforms to avoid suspension and other penalties. In fact, the most devastating consequence of censoring is not the actual posts or accounts that are censored or suspended, but the reluctance of scientists to openly express and debate scientific questions using their varied scientific expertise. Without scientific debate, science cannot survive." *Id.* ¶ 28.

1381.  Dr. Kheriaty, also, describes ongoing injuries from social-media censorship of views dissenting from the government-preferred narratives about COVID-19.  He experiences an ongoing pattern of censorship and removals lasting over years: "I have always shared peer-reviewed research findings as well as my own opinions and perspectives on Twitter and LinkedIn. It was not until I began posting information about covid and our covid response policies, however, that I encountered censorship on the Twitter platform. This began in 2020 when I published an article on the adverse mental health consequences of lockdowns. The problem became more pronounced in 2021 when I shared my Wall Street Journal article and other information on ethical issues related to vaccine mandates."  Doc. 10-7, ¶ 11.

1382.  As Dr. Kheriaty notes, "[t]he Twitter censorship took several forms."  *Id.*  He describes suffering artificial limitations on the number of followers on his social-media accounts, *id.* ¶¶ 12-13; "shadow banning" of social-media posts that "challenge[] the federal government's preferred covid policies," *id.* ¶¶ 14-15; self-censorship to avoid further adverse consequences or permanent bans, *id.* ¶ 16; and removal of content from YouTube, *id.* ¶ 17.  Dr. Kheriaty specifically notes that the problem of "shadow banning" his social-media posts is ongoing and increasing, as it "intensified in 2022."  *Id.* ¶ 15.  Further, he notes that "[t]he pattern of content censored on these social media platforms mirrors closely the CDC and Biden administration policies."  *Id.* ¶ 18.

1383.  Dr. Kheriaty describes the ongoing experience of shadow-banning: "I encountered evidence of this shadow-banning in 2021 before I was let go from the University after I started posting on covid topics, and the problem intensified in 2022 following my dismissal, as I continued to post frequently on the ethics of vaccine mandates for competent adults."  *Id.* ¶ 15.

1384.  Dr. Kheriaty also experiences ongoing injury as a *reader* of other speakers' content on social media, as government policies cause censorship and self-censorship of their content as

well: "I have several of my friends and colleagues—including Dr. Peter McCollough and Dr. Robert Malone—who were temporarily (McCollough) or permanently (Malone) banned from Twitter for posing peer-reviewed scientific findings regarding the covid vaccines." *Id.* ¶ 16.

1385.  Dr. Kheriaty also engages in self-censorship to avoid more severe penalties from the platforms: "Even though the ethics of vaccine mandates is among my areas of expertise, and an area that has impacted me personally and professionally, I am extremely careful when posting any information on Twitter related to the vaccines, to avoid getting banned. This self-censorship has limited what I can say publicly on topics where I have specific scientific and ethical expertise and professional experience." *Id.* ¶ 16.

1386.  Dr. Kheriaty observes a close link between this ongoing pattern of social-media censorship and speech that criticizes government policies: "The pattern of content censored on these social media platforms mirrors closely the CDC and Biden administration policies. In my experience using these platforms to discuss covid topics, any content that challenges those federal policies is subject to severe censorship, without explanation, on Twitter and YouTube—even when the information shared is taken straight from peer-reviewed scientific literature." *Id.* ¶ 18.

1387.  Plaintiff Jim Hoft attests both ongoing injuries and the imminent expectation of future injuries. Doc. 10-5.  Hoft is the "founder, owner, and operator of the popular news website The Gateway Pundit ('GP'), gatewaypundit.com. … Since its founding in 2004, the Gateway Pundit has grown from a one-man blog to one of the internet's largest destinations for conservative news and commentary. In 2021, The Gateway Pundit was ranked fourth on a list of top ten conservative news websites, ranked by monthly web searches, with over 2 million searches per month." *Id.* ¶ 2.  The Gateway Pundit has large social-media followings on multiple platforms: "In particular, GP's Twitter account had over 400,000 followers before it was suspended.  GP's

Facebook account has over 650,000 followers. GP's Instagram account has over 205,000 followers. GP's YouTube account has over 98,000 followers." *Id.* ¶ 3.

1388.   Hoft notes that The Gateway Pundit's "social media accounts have experienced censorship on all major social-media platforms," which "has followed and reflected the calls for censorship from federal government officials, including in the Biden Administration." *Id.* ¶ 4. These acts of censorship include suspensions from his Twitter account and another personal Twitter account, *id.* ¶¶ 6-7, 10; a permanent ban from his Twitter account, *id.* ¶ 8; labels applied to Twitter posts on personal accounts, *id.* ¶ 9; warning labels imposed on Facebook posts and other restrictions on his Facebook account, *id.* ¶ 12; permanent removal of content posted on Facebook, *id.* ¶ 13; prevention of sharing of Facebook-posted content, *id.*; removal of content from YouTube, *id.* ¶ 14; imposition of sanctions on Mr. Hoft's followers for re-posting or amplifying his speech, *id.* ¶ 15; engaging in self-censorship to avoid permanent bans or other more serious sanctions from the social-media platforms, *id.* ¶ 16; and demonetization by Google, *id.* ¶ 19; *see also id.* ¶¶ 18-20.

1389.   Hoft observers that "GP's social media accounts have experienced censorship on all major social-media platforms, including its speech regarding COVID-19 issues and election security. In many instances, we have noticed that this censorship has followed and reflected the calls for censorship from federal government officials, including in the Biden Administration." *Id.* ¶ 4. "For example, the current Administration has repeatedly called for censorship of social media speech regarding election integrity and so-called 'COVID-19 misinformation.' GP has experienced significant social-media censorship regarding its speech on both of those issues, including on Twitter, Facebook, and YouTube." *Id.* ¶ 5.

1390.  Hoft has experienced censorship for COVID speech that is now widely acknowledged to be true, such as a suspension from Twitter for claiming that the vaccines do not prevent infection, and the claim that COVID deaths are overcounted by including deaths from other causes: "On or about January 2, 2021, Twitter suspended GP's Twitter account (@gatewaypundit) after it posted a tweet that stated, "Then It's Not a Vaccine: Crazy Dr. Fauci Says Early COVID Vaccines Will Only Prevent Symptoms and NOT Block the Infection …What?"  *Id.* ¶ 6; *see also id.* ¶ 9.

1391.  The Gateway Pundit also experienced censorship under Twitter's "hacked materials" policy by retweeting the contents of Hunter Biden's laptop.  After a GP blogger "tweeted content related to Hunter Biden's laptop," "Twitter suspended the account on the ground that he 'Violat[ed] our rules against posting or sharing privately produced/ distributed intimate media of someone without their express consent.'"  *Id.* ¶ 10.

1392.   Hoft also experiences a long list of acts of censorship from Facebook: "Facebook frequently imposed warning labels and other restrictions on our content, particularly content related to election integrity and COVID-19. Facebook's censorship was so aggressive that I was forced to hire an assistant to monitor and address censorship on Facebook."  *Id.* ¶ 11; *see also id.* ¶ 12.  Facebook imposes labels on Hoft's content that require the reader, before viewing Hoft's content, to click-through a Facebook-imposed screen that states: "The Gateway Pundit is an American far-right news and opinion website.  The website is known for publishing falsehoods, hoaxes, and conspiracy theories."  *Id.* at 12.  It also labels Hoft's postings as "Missing Context" even when their truth is undisputed.  *Id.* at 20-23.  And it labels expressions of core political opinion as "Partly False."  *Id.* at 28; *see also id.* 29-58 (many other examples of such labeling and blocking from reposting on Facebook and Twitter).

1393.  As Hoft notes, Facebook also prevents Hoft's audiences from reposting or amplifying his content: "Facebook also [dis]courages (or otherwise outright prohibits) the public from sharing our content with their social networks." *Id.* ¶ 13.  Hoft describes this second-order censorship in detail: "The social-media platforms have extended their censorship policies to our followers as well. We have received numerous reports from followers that they have received temporary suspensions or other adverse actions from social-media platforms (such as seven-day suspensions of their Facebook accounts) for re-posting or amplifying our content. This chills our followers from re-posting, re-tweeting, or otherwise amplifying our content. The risk of being locked out of Facebook for seven days, or suffering other forms of censorship, deters our followers from amplifying our content on social media platforms, which reduces the reach of our message." *Id.* ¶ 15.

1394.  Hoft also describes ongoing self-censorship to avoid more severe penalties on social media: "These social-media censorship policies chill GP's freedom of expression on social media platforms as well. To avoid suspension and other forms of censorship, we frequently avoid posting content that we would otherwise post on social-media platforms, and we frequently alter content to make it less likely to trigger censorship policies." *Id.* ¶ 16.

1395.  Hoft observes that the censorship of his content on social media closely tracks the censorship preferences of federal officials: "Based on my close observation of the patterns of censorship of GP's social-media accounts and related accounts in recent years, I have strong reason to infer that federal government officials are directly involved in the censorship of our speech and content." *Id.* ¶ 17.  Hoft's posts that have faced censorship include posts criticizing the FBI, *id.* at 9; and criticizing the administration of the 2020 election, *id.* at 11;

1396.   Hoft continues to experience censorship, including up to the date he executed his declaration.   For example, he received a strike on YouTube on May 14, 2022, and YouTube removed the video he had posted, for speech regarding election integrity that discussed the problem of election fraud and raised questions about the outcome of the 2020 Presidential election, including money Idaho illegally received from Mark Zuckerberg and other problems relating to voter fraud.  *Id.* ¶ 14.

1397.   Plaintiff Jill Hines is the "Co-Director of Health Freedom Louisiana, a consumer and human rights advocacy organization." Doc. 10-12, ¶ 2.   Hines's "organization engages in public advocacy on behalf of Louisiana citizens on issues of health freedom and fundamental human rights. [Hines] ha[s] testified before the Louisiana legislature approximately 20 times on such issues." *Id.* ¶ 3.  Hines attests that, "Because our organization recognizes the need to educate and inform the public of their rights regarding state and federal laws concerning vaccinations, we have experienced social media censorship of our speech regarding vaccine information."  *Id.* ¶ 2. Hines has "approximately 13,000 followers each on Health Freedom Louisiana and Reopen Louisiana."  *Id.* ¶ 2.  Among other things, Hines' organization "advocate[s] against the imposition of mask mandates on children, especially during prolonged periods, as in schools." *Id.* ¶ 4.  Hines also "launched a grassroots effort called Reopen Louisiana on April 16, 2020 to help expand our reach on social media and take on the issues surrounding the continued government shutdown." *Id.* ¶ 6.

1398.   Hines describes continuous and ongoing censorship on social media from pressure wielded by federal officials: "In the last two years, any information that was not positive in nature or conveyed adverse events associated with shutdown or mitigation efforts was deemed 'misinformation.'  Dr. Anthony Fauci has used the term repeatedly and it has been adopted by the

press and media." *Id.* ¶ 5.  Hines continues to suffer ongoing social-media censorship, and the acts of censorship include application of warnings on Facebook content, *id.* ¶ 8; the reduction of her reach to audiences on Facebook, *id.*; removal of content and sanctions, including 30-day suspensions, from Facebook, *id.* ¶ 9; 24-hour suspensions that prevented her from organizing people to advocate to the Louisiana legislature, *id.* ¶ 10; shadow-banning and dramatically restricting the reach of her speech to its audiences, id. ¶ 10; and the complete de-platforming of Facebook groups intended to organize Louisianans to petition their government, id. ¶¶ 13-14.  Ms. Hines states that "[r]emoving our closed group at such a crucial time effectively stopped our ability to communicate with our representatives in the state legislature."  Id. ¶ 14.  "To say the cards are stacked against me is an understatement."  Id. ¶ 16.

1399.  Hines attests that the censorship campaign against her social-media speech is ongoing, noting that "[p]osts pointing to lack of safety of masking were and are targeted, as well as articles that mention adverse events of vaccinations, including VAERS data."  Id. ¶ 9.  She continues to suffer specific, new acts of censorship, including right up to the time when she executed her Declaration on June 9, 2022: "The most recent restriction [was] in late May 2022." *Id.*  Ms. Hines notes that "[m]y personal Facebook page, and the Facebook pages of both Health Freedom Louisiana and Reopen Louisiana, are all under constant threat of being completely deplatformed.  My personal account is currently restricted for 90 days."  Id. ¶ 12.

1400.  Hines reports that acts of censorship of her COVID-19-related speech have occurred continuously up to the present: "Over the last year and a half since we noticed social-media censorship beginning in October 2020, my pages have been hit with numerous 'fact checks' and 'community standards' violations."  *Id.* ¶ 11.

1401. Hines has observed a link between the censorship that her groups have experienced and the public demands for censorship from federal officials: "Many similar threats from federal officials followed … especially as covid became a public concern. In the last two years, any information that was not positive in nature or conveyed adverse events associated with shutdown or mitigation efforts was deemed 'misinformation.' Dr. Anthony Fauci has used the term repeatedly and it has been adopted by the press and media." *Id.* ¶ 5.

1402. Social-media censorship dramatically reduces the reach of Hines's speech: "our analytics showed that we were reaching approximately 1.4 million people in a month's time on one of our Facebook pages, but after sharing photos of the mouths of children suffering from impetigo from long-term mask use, our page received a warning and our reach was reduced to thousands." *Id.* ¶ 8.

1403. Hines experiences an ongoing campaign of social-media censorship that extends to the present, the date she executed her declaration: "This began a long series of attempts to censor our posts on Facebook and other social-media platforms. Posts pointing to lack of safety of masking were and are targeted, as well as articles that mention adverse events of vaccinations, including VAERS data. I was completely restricted from Facebook for 30 days starting in January 2022 for sharing the image of a display board used in a legislative hearing that had Pfizer's preclinical trial data on it. The most recent restriction, in late May 2022, was for re-posting an Epoch Times article that discussed a pre-print study detailing increased emergency calls for teens with myocarditis following covid vaccination." *Id.* ¶ 9.

1404. Censorship of Hines's social-media speech directly impairs her efforts to engage in political organization to petition her government to change its policies: "One post in particular that was hit with a 'community standards' warning on October 6, 2020, was a 'call to action' asking

people to contact their legislators to end the governor's mask mandate. On the same day, we were asking people to testify during the Legislature's Second Extraordinary Session regarding a bill … that would prohibit a covid vaccine employee mandate. I was prohibited from posting for 24 hours on all pages, including my own. When I was finally able to post again, our reach was significantly diminished, compared with our 1.4 million per month rate beforehand. Our page engagement was almost non-existent for months. It felt like I was posting in a black hole. Each time you build viewership up, it is knocked back down with each violation. Our current analytics show Reopen Louisiana is reaching around 98,000 in the last month and Health Freedom Louisiana is only reaching 19,000. There are warnings when you search for Health Freedom Louisiana. People that regularly interacted with our page were never heard from again. Some people who did find the page later on, asked us where we went." *Id.* ¶ 10.

1405.  Hines suffers repeated censorship on individual posts as well, including undisputedly truthful information: "Over the last year and a half since we noticed social-media censorship beginning in October 2020, my pages have been hit with numerous 'fact checks' and 'community standards' violations. Articles with health concerns related to mask wearing have been targeted … as well as articles relating to pregnant women being vaccinated. … Data taken directly from VAERS was flagged as misinformation and we received 'fact checks' for that as well, even if it contained a disclaimer about causation." *Id.* ¶ 11.

1406.  Hines attests that she is under current and constant threat of more severe censorship penalties, including deplatforming: "My personal Facebook page, and the Facebook pages of both Health Freedom Louisiana and Reopen Louisiana, are all under constant threat of being completely deplatformed. My personal account is currently restricted for 90 days." *Id.* ¶12.

1407.   Hines engages in self-censorship to avoid more severe penalties: "On many occasions, I have altered the spelling of words, used emoji's, or placed links in comments to avoid censorship." *Id.* ¶ 12.

1408.   Hines's health-freedom groups were completely deplatformed, inflicting a severe and direct injury on her ability to engage in political organization to amplify her message and petition the government: "two of our Facebook groups were completely deplatformed, effectively disbanding a group of more than two thousand people who were organized to engage in direct advocacy to our state legislature, on two separate occasions. There were two groups that were deplatformed: HFL Group and North Shore HFL. … HFL Group had almost 2,000 people, and North Shore HFL had less than 500 before it was taken down." *Id.* ¶ 13.

1409.   This censorship directly interfered with the core political speech and advocacy of Hines and thousands of Louisianans: "The last post I made in our HFL Group on July 13, 2021, was a 'call to action' for the upcoming Veto Session, asking people to contact legislators regarding health freedom legislation. During the regular legislative session, we had two bills that were passed successfully, but both were vetoed by the governor, including a hugely popular bill that prohibited the addition of vaccine information on a state issued driver's license. The other bill provided immunity from liability for businesses that did not impose a covid vaccine mandate. Removing our closed group at such a crucial time effectively stopped our ability to communicate with our representatives in the state legislature." *Id.* ¶ 14.

1410.   To this day, Hines's political message, and those of thousands of Louisianans, is greatly diminished from this censorship: "After North Shore was deplatformed, we looked for alternatives for daily communication. We were to the point of speaking in code on Facebook, so

moving away from traditional social media was the only option. We currently have 80 members in a chat app called GroupMe. We have no statewide reach with that tool." *Id.* ¶ 15.

1411.   Censorship undercuts Hines's ability to "effectively communicate with people," including Louisiana state officials, about her political views: "It has been incredibly frustrating knowing that the government's narrative is going unchallenged and that we have not been able to effectively communicate with people. Knowing that government agencies colluded with Facebook to suppress the messaging of groups like mine while paying exorbitant amounts to promote vaccinations and covid policies has been especially disheartening. To say the cards are stacked against me is an understatement." *Id.*¶ 16.

### B.    Defendants Gravely Injure Similarly Situated Speakers and Listeners.

1412.   Plaintiffs' unrebutted evidence demonstrates that other similarly situated speakers have suffered and are suffering similar, ongoing, and imminent injuries from government-induced censorship on social media.

1413.   For example, Michael Senger had over 112,000 followers on Twitter, including in Missouri and Louisiana; he attests that he was twice suspended from Twitter and then permanently banned for posting Tweets critical of government policies for responding to COVID-19. Doc. 10-2, ¶¶ 4-8.   He was temporarily suspended twice for tweets criticizing the FDA's emergency approval of COVID vaccines and for posting a video document public officials' statements on vaccine effectiveness. *Id.*¶ 4-6.   On March 8, 2022, he was permanently suspended from Twitter for posting a statement of core political opinion criticizing government policy, stating that "every COVID policy—from the lockdowns and masks to the tests, death coding, and vaccine passes—has been one, giant fraud." *Id.*¶ 7-8.   This permanent suspension was inconsistent with Twitter's own policies. *Id.*¶ 10.   Senger attests that the censorship inflicts ongoing harm on him, both

"personally and professionally": "I discovered a gift that I had for writing and developed a network of thousands of intelligent people from all over the world with whom I had a close relationship discussing these and other issues. Now I have been silenced and cut off from all of them, with no viable way of getting that network back or promoting my work, seemingly for the sole crime of being too articulate in vocalizing my beliefs." *Id.* ¶ 13.

1414.   Jeff Allen is the proprietor of "NewsTalkSTL, a popular news talk radio station in the St. Louis, Missouri region," which "enjoys a substantial Missouri audience." Doc. 10-8, ¶¶ 2-3.  His station posts content on YouTube, and he describes how the station "has been targeted by YouTube from the moment of its launch in July 2021" through the present, including flagging the station's first promotional video, and issuing "strikes" for "COVID-related and election-related 'misinformation.'" *Id.* ¶¶ 4-6.  These include removing a video of a show that "featured discussion of timely COVID issues, including testing and vaccines and treatments," and issuing a strike for that posting. *Id.* ¶¶ 9-10.  His station "continued to receive strikes" from YouTube "in the first week of January and into February, 2022" for COVID-related content, *id.* ¶ 12.  On March 14, 2022, Allen's station aired a show on "election integrity" that did not claim any election was stolen, but discussed polling data indicating that many Americans have grave concerns about election integrity. *Id.* ¶¶ 13-14.  On March 21, 2022, YouTube permanently removed the station's channel as a result of that posting. *Id.*¶ 15.  "In so doing, YouTube deleted all of our content and prevented any more posts, silencing our voice and our expression from the platform entirely." *Id.*¶ 16.

1415.   Allen has also experienced significant and ongoing censorship from Facebook: "Facebook has also targeted our content, pulling advertisements and issuing temporary suspensions, also for COVID and election-related 'misinformation.'" *Id.* ¶ 18.

1416.   Mark Changizi is a commentator on Twitter with 37,000 followers, including many in Missouri and Louisiana.  Doc. 10-9, ¶ 7, 38.  Changizi experiences longstanding and ongoing censorship on Twitter, including a first suspension on April 20, 2021 "for linking to an article on the safety and efficacy of face masks," *id.* ¶ 18; additional suspension on June 25, 2021, *id.*¶ 19; having his account secretly "heavily censored and deboosted," meaning that "the user's tweets are de-platformed—they appear in Twitter feeds much less frequently and replies to other posts may be hidden," *id.* ¶ 20; covert loss of followers, much like Dr. Kheriaty, ¶ 21; and a permanent Twitter suspension on December 18, 2021, for tweets comparing the danger of COVID-19 to the flu and promoting the benefits of natural immunity, *id.* ¶ 23.  He experiences similar shadow-banning by YouTube, as his "follower-ships at YouTube also plateaued and reversed despite the fact that [he] was very active," *id.* ¶ 31.  He observes that Twitter is also censoring his *private* direct messages to other Twitter users, *id.* ¶¶ 32-35.  And two of his YouTube videos are also censored with their content removed from YouTube.  *Id.* ¶ 36.

1417.   Changizi engages in self-censorship on social media to avoid more severe penalties, *id.* ¶¶ 39-42, and he has "become very careful about what I say on Twitter and YouTube (and Facebook and Instagram) to avoid suspension."  *Id.* ¶ 39.

1418.   Changizi perceives a link between the censorship he experiences and pressure from federal officials, *id.*¶¶ 43-47.  He observes: "Twitter notoriously suspends only those who question the wisdom and efficacy of government restrictions, or who cast doubt on the safety or efficacy of the vaccines."  *Id.*¶ 50.  He also observes the pro-government bias in social-media censorship decisions: "there are no examples of Twitter suspending individuals who have spread misinformation from the other side—by, for example, exaggerating the efficacy of masks or the threat the virus poses to children."  *Id.*¶ 51.

1419.   Daniel Kotzin observes that his censorship at Twitter began in September 2021, after which he was suspended by Twitter four times, including a 24-hour suspension, two seven-day suspensions, and a permanent ban.  Doc. 10-10, ¶¶ 11-12.  He received these penalties for tweets questioning whether COVID vaccines reduce infection and transmission, referring to natural immunity, and criticizing government policies on lockdowns and mask mandates.  *Id.* ¶¶ 13, 15, 17.  He was permanently suspended on April 29, 2022, for a truthful tweet stating: "Myocarditis, pericarditis, blood clots, and strokes are known potential side effects of covid vaccination.  That is not my idea of safe."  *Id.* ¶ 19.

1420.   Kotzin attests that "[p]ermanent expulsion from Twitter has been devastating for me.  I had spent 2 years building my Twitter following. Two years ago, I had fewer than 100 followers, and at the time of my permanent suspension I had nearly 32,000.  When my account is suspended, I am unable to communicate with my followers."  *Id.* ¶¶ 21-23.

1421.   Kotzin observes an increase in censorship on Twitter after the Surgeon General's Request for Information issued on March 3, 2022.  "Based on my observations and extensive Twitter use, many more accounts than usual have been suspended since the Surgeon General's RFI on March 3."  *Id.* ¶ 25.  This increase in censorship affected Kotzin directly: "Since the Surgeon General's Request for "health misinformation" in March [2022] I have been suspended four times by Twitter, and have now been permanently banned."  *Id.* ¶ 35.

1422.   Kotzin notes that suspension results in loss of one's own prior expression: "When an account is permanently suspended, everything the person ever wrote is erased and cannot be accessed by anyone."  *Id.* ¶ 27.

1423.  Kotzin describes that he "methodically self-censored" to avoid permanent suspension: "Since the [Surgeon General's] RFI, many of us who are critical of government covid

policies have been regulating our speech more carefully than ever, because we have noticed that more of us are getting suspended than ever before, and we don't want to risk losing our audience. I considered the possibility of 'permanent suspension' to be such a devastating prospect that I methodically self-censored." *Id.* ¶¶ 28-29; *see also id.* ¶¶ 31-32.

1424.   Kotzin observes a close link between social-media censorship and the federal government's policies and preferred narratives: "Twitter suspends only those who question the wisdom and efficacy of government restrictions, or those who cast doubt on the necessity, safety or efficacy of the vaccines.  If all or almost all suspensions are targeted at critics of the government and government policies, and no or almost no suspensions are targeted at purveyors of factually incorrect information, then it is not 'misinformation' that is being censored, but criticism of the government." *Id.* ¶¶ 34-35.

1425.   Joshua McCollum is a concerned parent in a school district in Missouri.  Doc. 10-14, ¶¶ 1-4.  Like Hines, he has experienced censorship that directly interferes with his ability to organize, associate with like-minded people, and petition his local government: "On or about July 28, 2021, in the midst of discussing with others a recent school board meeting related to masks, and whether FHSD would keep its policy of optional masking versus change their policy to mandatory masking, [McCollum] decided to launch an online petition to encourage the board members to keep their optional masking policy and *not* change to mandatory masking." *Id.* ¶ 9. Through his account on Nextdoor (a Meta/Facebook platform), he posted this petition on change.org, and "[t]he posting of this petition on change.org was the beginning of the shadow-banning and blocking of my Nextdoor account." *Id.* ¶ 11.  Comments were blocked from his Nextdoor account, and then his Nextdoor account was suspended for one month for "spreading misinformation." *Id.*¶¶ 12-14.  This censorship prevented him from organizing, associating with

others, and petitioning his local government, when those on the other side of the issue were allowed to do so: "Subsequently, on August 12, 2021, FHSD decided to reinstate their mandatory masking policy, shortly after the voice of myself and the 280 fellow petition signers was suppressed. There were petitions encouraging reinstatement of mandatory masking, but our contrary petition was suppressed by Nextdoor. I am a parent simply trying to have a voice in my local school district and its policies regarding my own children, but social media has stooped down to censor even my voice within my local community." *Id.*¶¶ 15-17.

1426. Jessica Marie Gulmire is a freelance journalist for the Epoch Times who resides in Missouri, and has readership in Missouri and Louisiana. Doc. 10-15, ¶¶ 1-3. Gulmire has "been censored numerous times by Facebook and Twitter even before I joined The Epoch Times in the summer of 2021," as her "personal posts regarding excessive COVID-19 measures and regarding the election were repeatedly flagged and taken down by Facebook and Twitter." *Id.* ¶¶ 7-8. Her journalism for the Epoch Times has also been censored by Facebook, including an article questioning the evidence for vaccinating pregnant women with COVID-19 vaccines that was later validated by Pfizer documents, *id.* ¶¶ 10-13; and an article in March 2022 for The Federalist about the People's Convoy of truckers in the United States supporting their Canadian counterparts, *id.* 18-19. She has also had eleven articles about "mask mandates, vaccines, lockdowns and mental health" censored on Pinterest, *id.* ¶ 17.

**C.     Defendants Gravely Injure the State Plaintiffs, Louisiana and Missouri.**

**1.     Fundamental policies favoring freedom of speech for their citizens.**

1427. Both Louisiana and Missouri have adopted fundamental policies favoring freedom of speech, without government-induced censorship, for their citizens. LA. CONST. art. I, § 7; MO. CONST. art. I, § 8.

**2.      Direct censorship of the States and their political subdivisions.**

1428.   Both Louisiana and Missouri, and their political subdivisions, have experienced direct social-media censorship on COVID and related issues.   For example, Louisiana's Department of Justice—the office of its Attorney General—was directly censored on YouTube for posting video footage of Louisianans criticizing mask mandates and COVID-19 lockdown measures on August 18, 2021—on August 18, 2021, just after the federal Defendants' most vociferous calls for censorship of COVID "misinformation."  Bosch Decl., Doc. 10-13, ¶ 7.

1429.   In addition, a Louisiana state legislator was censored by Facebook when he posted content addressing vaccinating children against COVID-19.  Bosch Decl., Doc. 10-13, ¶ 9.

1430.   St. Louis County, a political subdivision of Missouri, conducted public meetings regarding proposed county-wide mask mandates, at which some citizens made public comments opposing mask mandates. Flesh Decl., Doc. 10-6, ¶ 7.  Missouri's open-meetings law required St. Louis County to post publicly the videos of those meetings, but YouTube censored the entire videos of four public meetings, removing the content, because some citizens publicly expressed views that masks are ineffective.  *Id.*

**3. The States' interest in following the uncensored discourse of their citizens.**

1431.   Patrick Flesch, Director of Constituent Services for the Missouri Attorney General's Office, explains that he is "personally involved in, receiving, reviewing, and responding to thousands of communications from Missouri constituents per year." Doc. 10-6, ¶ 3.  He explains that being able to follow Missourians' uncensored speech on social media is essential for him to do his job effectively, as understanding Missourians' true thoughts and concerns on policy matters like election integrity and COVID-19 is necessary to craft policies and messages that are responsive to constituents' actual concerns.  Doc. 10-6, ¶ 3-4.  This "includes monitoring activity

and mentions on multiple social media platforms, including Facebook, Twitter, and YouTube." *Id.* "I monitor these sorts of trends *on a daily or even hourly basis* when needed on behalf of the Office." *Id.* (emphasis added). For example, regarding the censorship of St. Louis County's video of its public meeting where citizens opposed mask mandates, Flesch notes: "This video is just the sort of information that is important for me to review, and yet it was unavailable for a critical period of time due to online censorship of speech questioning the efficacy of mask mandates." *Id.*¶ 7. Likewise, regarding YouTube censoring Jeff Allen's radio station NewsTalkSTL, and Nextdoor censoring Joshua McCollum's online petition, Flesch observes: "These examples are just the sort of online speech by Missourians that it is important for me and the Missouri Attorney General's Office to be aware of." *Id.* ¶¶ 9.

1432. As Flesch attests, "The kinds of speech discussed above and in the Complaint in this case—such as speech about the efficacy of COVID-19 restrictions, and speech about issues of election security and election integrity—are matters of core interest and high importance to me in my work on behalf of the AGO. When such speech is censored on social media, it makes it much harder for me to do my job and to understand what Missourians really are concerned about." *Id.*¶ 10.

1433. As Mr. Flesch explains in detail: "Issues regarding COVID-19 responses (such as mask mandates imposed by municipalities and school districts on schoolchildren) and election security and integrity have been of critical importance to Missourians in recent months and years. … It is very important for me to have access to free public discourse on social media on these issues so I can understand what Missourians are actually thinking, feeling, and expressing about such issues, and so I can communicate effectively with them." *Id.* ¶ 5. "[O]nline censorship of

free public discourse on social-media companies has hampered my ability to follow Missourians' speech on these issues." *Id.* ¶ 6.

1434.   Ashley Bosch, Communications Officer for the Louisiana Department of Justice, attests on behalf of the State of Louisiana: "Part of my job is to gather and synthesize topical subject matters that are important to Louisiana citizens, on behalf of the Department." Doc. 10-13, ¶ 4.  "Understanding what subject matters and issues are important to Louisianans is critical for the Department to formulate policies and messaging that will address the concerns expressed by our constituents." *Id.*  This "includes monitoring activity and mentions on social media platforms, including Facebook, Instagram, Twitter, and YouTube." *Id.*  Doc. 10-13, ¶ 4.  "It is very important for me to have access to free public discourse on social media on these issues so I can understand what our constituents are actually thinking, feeling, and expressing about such issues, and so I can communicate properly with them." *Id.* ¶ 5.  "Online censorship of Louisiana citizens by social media companies interferes with my ability to follow Louisianans' speech on these issues." *Id.* ¶ 6.  Bosch notes that it is particularly important for her to follow Louisianan's speech on topics of federally-induced censorship: "For example, mask and vaccine mandates for students have been a very important source of concern and public discussion by Louisiana citizens over the last year."  Doc. 10-13, ¶ 5.  "Louisianans' speech about the efficacy of COVID-19 restrictions, and speech about issues of election security and election integrity are matters of great interest and importance to me in my work on behalf of the Louisiana Department of Justice." Doc. 10-13, ¶ 10.

1435.   As noted above, Defendants' witness from the CDC, Carol Crawford, attests to exactly the same government interest in being able to read and follow the true, uncensored opinions of the government's constituents.

1436.   Crawford admits that government communicators have a strong interest in tracking what their constituents are saying on social media: "It's helpful for communicators to know what is being discussed because it helps improve our communication materials." Crawford Dep. 53:10-12.  Crawford emphasized this point multiple times: "as I mentioned before, it does help … for communicators to know what conversations occurs on social media because it helps us identify gaps in knowledge, or confusion, or things that we're not communicating effectively that we need to adjust." *Id.* 54:15-20.

1437.   Crawford said that CrowdTangle reports "would help us understand what was being discussed on social media about COVID, which helps us look for gaps in information, confusion about facts, things that we might need to adjust our communication materials for." *Id.* 57:24-58:3. Crawford specifically expressed the concern that, if content was censored or removed from social-media platforms, government communicators would not know what the citizens' true concerns were: She "was wondering if they delete the info will we know those myths or information so we could update communication activity. So if they were deleting content would we know what the themes were." *Id.* 75:14-18.  Accordingly, Crawford wanted to know, "would [CDC] be able to see in CrowdTangle or other reports … what kind of themes were removed so we would still have the full picture of areas of confusion." *Id.* 75:23-76:1.

**4.      States' interest in fair, unbiased, open processes to petition state government.**

1438.   Social-media censorship directly interferes with the States' interest maintaining fair, even-handed, and open processes for petitioning their own governments and political subdivisions.  When one side of a debate can organize on Facebook or Nextdoor and petition the government, and the other side cannot because of social-media censorship, that means that state officials never receive a fair, unbiased presentation of their constituents' views.

*1439.*   As noted above, social-media censorship has perverted state and local political processes by artificially restricting access to the channels of advocacy to one side of various issues. For example, social-media censorship prevented Louisiana advocacy groups from organizing effectively to advocate in favor of legislative action on issues of great public import.  Hines Decl., Doc. 10-12, ¶¶ 13-14.   Likewise, social-media censorship prevented a Missouri parent from circulating an online petition to advocate against mandatory masking at his local school district, a political subdivision of the State.  McCollum Decl., Doc. 10-14, ¶¶ 9-17; *see also* Doc. 10-12, ¶¶ 13-14; Doc. 10-14, ¶¶ 9-17; Doc. 10-15, ¶¶ 11-16, 18-19.

*1440.*   Plaintiff Jill Hines explains that "two of our Facebook groups were completely deplatformed, effectively disbanding a group of more than two thousand people who were organized to engage in direct advocacy to our state legislature, on two separate occasions."  Doc. 10-12, ¶ 13.  She attests that "[t]he last post I made in our HFL Group on July 13, 2021, was a 'call to action' for the upcoming Veto Session, asking people to contact legislators regarding health freedom legislation.."  *Id.* ¶ 14.  Suppressing these Facebook groups directly interfered with state officials' ability to receive free and fair communications of their constituents' concerns: "Removing our closed group at such crucial time effectively stopped our ability to communicate with our representatives in the state legislature."  *Id.*

**5. State quasi-sovereign interests.**

*1441.*   The States also assert quasi-sovereign interests in protecting the freedom of speech of a substantial segment of their population—*i.e.*, their citizens who are both speakers and audiences of speech on social media; and in ensuring that their citizens receive the full benefit of participation in the federal system—which includes, among other benefits, the full protection of the First Amendment.

1442.  Based on the foregoing evidence, social-media censorship afflicts a substantial segment of the populations of both Missouri and Louisiana.

Dated: March 6, 2023

**ANDREW BAILEY**
**Attorney General of Missouri**

*/s/ Charles F. Capps*
Joshua M. Divine, Mo. Bar No. 69875*
  *Solicitor General*
Charles F. Capps, Mo. Bar No. 72734*
  *Deputy Solicitor General*
Todd A. Scott, Mo. Bar No. 56614*
  *Senior Counsel*
Kenneth C. Capps, Mo. Bar No. 70908*
  *Assistant Attorney General*
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
Tel: (573) 751-8870
charles.capps@ago.mo.gov
*Counsel for State of Missouri*


*/s/ Jenin Younes*
Jenin Younes *
John J. Vecchione *
New Civil Liberties Alliance
1225 19th Street N.W., Suite 450
Washington, DC 20036
Direct: (202) 918-6905
E-mail: jenin.younes@ncla.legal
*Counsel for Plaintiffs Dr. Jayanta*
*Bhattacharya, Dr. Martin Kulldorff, Dr.*
*Aaron Kheriaty, and Jill Hines*



*  admitted pro hac vice*

Respectfully submitted,

**JEFFREY M. LANDRY**
**Attorney General of Louisiana**

*/s/ D. John Sauer*
Elizabeth B. Murrill (La #20685)
  *Solicitor General*
Tracy Short (La #23940)
  *Assistant Attorney General*
D. John Sauer, Mo. Bar No. 58721*
  *Special Assistant Attorney General*
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, Louisiana
Tel: (225) 326-6766
murrille@ag.louisiana.gov
*Counsel for State of Louisiana*


*/s/ John C. Burns*
John C. Burns
Burns Law Firm
P.O. Box 191250
St. Louis, Missouri 63119
P: 314-329-5040
E-mail: john@burns-law-firm.com
*Counsel for Plaintiff Jim Hoft*

## CERTIFICATE OF SERVICE

I hereby certify that, on March 6, 2023, I caused a true and correct copy of the foregoing to be filed by the Court's electronic filing system, to be served by operation of the Court's electronic filing system on counsel for all parties who have entered in the case.

*/s/ D. John Sauer*

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION**

|  |  |
|---|---|
| STATE OF LOUISIANA, STATE OF MISSOURI, *et al*., <br><br>        *Plaintiffs*, <br><br>    v. <br><br> JOSEPH R. BIDEN, JR., in his official capacity as President of the United States, *et al.*, <br><br>        *Defendants*. | Case No. 3:22-cv-01213-TAD |

### SUPPLEMENTAL DECLARATION OF DR. JAYANTA BHATTACHARYA

1.     My name is Dr. Jayanta Bhattacharya. I am over the age of 18 years and competent to testify to the matters expressed herein.

2.     I have previously submitted a Declaration in this case, which is filed with the Court as Doc. 10-3 and Doc. 45-3. That prior Declaration is incorporated by reference herein.

3.     In addition to my own experience with federally-induced censorship on social media, I am also a frequent reader and listener of content others post on social media platforms, including others who have suffered federally-induced social-media censorship.

4.     I have a strong interest in being able to read and follow the speech and writings that others post on social media. My main goal is to understand the landscape of opinions expressed by influential people in this setting, whether I agree or disagree with them. I need to know this to perform my job, which is to research public health policies that will improve the health of the American public. Without understanding the full range of

opinions Americans hold about these topics, I cannot know what ideas will be acceptable to the American public, nor can I fully understand the constraints preventing Americans from being as healthy as they deserve to be. Doing this task has been challenging during the pandemic because government censorship of prominent voices on social media has driven many prominent figures to engage in their advocacy in other less accessible venues. There, they continue to exert influence and disseminate their ideas to the public, but in ways that are not easily visible to me. Having access to the uncensored views, speech, and opinions of others is thus central to my work.

5.      I frequently read and listen to the speech and writings on social media of other speakers and writers whom federal officials may have explicitly targeted for censorship such as: Alex Berenson, Robert F. Kennedy, Jr., Peter McCoullough, Robert Malone, Alex Washburne, Alina Chan, Simone Gold, Jan Jekielek, John Ioannidis, Michael Levitt, Scott Atlas, Mark Changizi, Michael Senger, Daniel Kotzin, Tucker Carlson, Laura Ingraham, A.J. Kitchen, Craig Wax, Tracy Beth Hoeg, Cristine Stabel Benn, Joseph Fraiman, Joe Ladapo, Dr. Drew, and anonymous accounts like @boriquagato, @contrarian4data.

6.      As I explained in my prior Declaration, I am often forced to engage in self-censorship on social media to avoid severe consequences like de-platforming, suspension, and receiving strikes. I am aware of others I follow on social media engaging in self-censorship out of fear of more severe penalties. I have heard from prominent signatories of the Great Barrington Declaration, including tenured professors of epidemiology and other relevant disciplines, who have described retaliation they have experienced at work for signing the document, including up to the point of losing their jobs. I have also received

messages from junior and senior professors who have told me they are hesitant to state publicly views that oppose government policy. They fear the social stigma that comes from being censored on social media or from prominent government figures labeling them as "fringe" thinkers, as former NIH director Francis Collins did in my case. I am confident that there are many others who react similarly, though they do not contact me to tell me. Federally induced censorship thus prevents me from having access to those speakers' and writers' frank and uncensored speech, thoughts, opinions, and ideas.

7.      This case is of great interest to me.  I have been closely monitoring it since my involvement with it began. I am familiar with the facts and legal theories in the case and communicate regularly with my counsel about the case.

I declare under penalty of perjury that the foregoing is true and correct.

Executed On:  March 15, 2023                    */s/ Jayanta Bhattacharya*
                                                Dr. Jayanta Bhattacharya

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION**

| | |
|---|---|
| STATE OF LOUISIANA, STATE OF MISSOURI, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> JOSEPH R. BIDEN, JR., in his official capacity as President of the United States, *et al.*, <br><br> *Defendants*. | Case No. 3:22-cv-01213-TAD |

## SUPPLEMENTAL DECLARATION OF DR. MARTIN KULLDORFF

1.      My name is Martin Kulldorff.  I am a biostatistician and epidemiologist, a professor of medicine at Harvard University (on leave), over the age of 18 years and competent to testify to the matters expressed herein.

2.      I have previously submitted a Declaration in this case, which is filed with the Court as Doc. 10-4 and Doc. 45-4.  That prior Declaration is incorporated by reference herein.

3.      In addition to my own experience with censorship on social media, I am also a frequent reader and listener of content that others post on social-media platforms, including others who have suffered social-media censorship.

4.      I have a strong interest in being able to read and follow the speech and writings that others post on social media, to quickly learn about the work of other scientists, and to engage in important scientific discussions.  Having access to the uncensored views about science is central to my work as a scientist. Science cannot thrive without open

scientific discourse and the public cannot trust the scientific community if such discourse is hampered. Even inaccurate information must be openly available to be properly refuted with evidence based scientific arguments rather than censored and hidden as if it there are no available counter arguments.

5.     I frequently read the writings and/or listen to the speech of others who have been targeted for censorship on social media, such as Dr. Jay Bhattacharya, Dr. Craig Wax, Dr. Scott Atlas, Dr. Robert Malone, Dr. Sunetra Gupta, Dr. Peter McCoullough, Dr. Mark Changizi, Dr. David Thunder, Dr. Roberto Strongman, and Robin Monotti, among many others.

6.     I have been forced to engage in self-censorship on social media to avoid severe consequences like de-platforming, suspension, and receiving strikes, and I am also aware of other scientists on social media that are also engaging in self-censorship out of fear of such penalties.  Social media censorship thus prevents me from having access to their frank and uncensored speech, thoughts, opinions, and ideas.

7.     This case is of critical importance to the future of scientific discoveries and trust in the scientific community. I have been closely monitoring it since my involvement with it began.

I declare under penalty of perjury that the foregoing is true and correct.

Executed On:  March 15, 2023          /s/ Martin Kulldorff
                                                        Dr. Martin Kulldorff

Page 2

Case 3:22-cv-01213-TAD-KDM   Document 227-7   Filed 03/20/23   Page 1 of 4 PageID #: 17658

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION**

| | |
|---|---|
| STATE OF LOUISIANA, STATE OF MISSOURI, *et al.*, <br><br>    *Plaintiffs*, <br><br>  v. <br><br> JOSEPH R. BIDEN, JR., in his official capacity as President of the United States, *et al.*, <br><br>    *Defendants*. | <br><br><br><br> Case No. 3:22-cv-01213-TAD |

**SUPPLEMENTAL DECLARATION OF DR. AARON KHERIATY**

1. My name is Dr. Aaron Kheriaty.  I am over the age of 18 years and competent to testify to the matters expressed herein.

2. I have previously submitted a Declaration in this case, which is filed with the Court as Doc. 10-7 and Doc. 45-7.  That prior Declaration is incorporated by reference herein.

3. In addition to my own experience with censorship on social media, I am also a frequent reader and listener of content that others post on social-media platforms, including others who have suffered federally-induced social-media censorship.

4. I have a strong interest in being able to read and follow the speech and writings that others post on social media.  For example, Twitter is an important platform where I connect and stay up-to-date on the work of other scientists, physicians, public health professionals, journalists, and policy experts. This is a forum for sharing studies and other relevant sources of information, engaging in scientific and policy debates, disseminating my

Page 1

own work and commentary through reposting retweeting, or commenting on the contributions of others. This ongoing open conversation and debate on Twitter and other social media platforms is characteristic of good science and public policy work. Having access to the uncensored views, speech, and opinions of others – both those with whom I agree and others with whom I disagree – is central to my work because it allows my own views to be challenged, augmented, corrected or revised based upon the best available information, analysis, and arguments.

5.      I frequently read and listen to the speech and writings on social media of other speakers, writers, and policy analysts whom federal officials have specifically targeted for censorship on social media, such as: Dr. Jay Bhattacharya, Dr. Martin Kulldorff, Alex Berenson, Tucker Carlson, Robert F. Kennedy, Jr., Rizza Islam, Dr. Robert Malone, the New York Post, Michael Yeadon, James O'Keefe, James Woods, Dr. Pierre Kory, Dr. Harvey Risch, Dr. Paul Marik, the Epoch Times, the Great Barrington Declaration, Del Bigtree, Children's Health Defense, Naomi Wolf, Mark Changizi, Michael Senger, Daniel Kotzin, A.J. Kitchen, and Dr. Andrew Bostrom.

6.      I also frequently read and listen to the speech and writings on social media of other speakers and writers who speak and write on matters relating to COVID-19 and elections with viewpoints disfavored by federal officials, and have experienced censorship, such as Justin Hart, Dr. Lynn Fynn, Dr. Aseem Malholtra, Dr. Drew Pinsky, Dr. Ryan Cole, Dr. Mary Makary, Dr. Gabe Vorobiof, Dr. Tracy Hoeg, Paul Thacker, The Unity Project, The Brownstone Institute, Bret Weinstein, and Jeffrey Tucker, among others.

7.      As I explained in my prior Declaration, I am often forced to engage in self-censorship on social media to avoid severe consequences like de-platforming, suspension,

and receiving strikes.  I am aware of others whom I follow on social media engaging in self-censorship out of fear of more severe penalties as well. We discuss this problem frequently when not on social media.  For example, many of the above authors resorted routinely to speaking in "code words" or utilizing vague, allusive phrases when referring to topics like covid vaccine-related injuries or side-effects, for fear that these posts would be flagged for censorship. This included highly qualified physicians and scientists speaking from their clinical experience or commenting on published data.  Federally induced censorship thus prevents me from having access to those speakers' and writers' frank and uncensored speech, thoughts, opinions, and ideas.

8.    Among the adverse effects of this pervasive censorship of covid topics and other topics on social media, the government was able to project the false impression of a scientific consensus on favored covid policies – from lockdowns and school closures to vaccine mandates and vaccine passports, among others – where in fact no such consensus existed. Instead, one side of the debate on these policies was suppressed by aggressive government-sponsored censorship. When challenging some of these policies on social media, I and other doctors, scientists, and policy analysts were then falsely characterized as holding a minority opinion that few others shared. This was said in attempts to discredit our opinions, even when those opinions managed to make it through the censorship "filters".

9.    Widespread social media censorship thus created a self-reinforcing feedback loop – an echo chamber that failed to accurately represent the opinions and judgments of highly credible and qualified voices on issues of enormous public consequence.

10.     This case is of great interest to me.  I have been closely monitoring it since my involvement with it began, I am familiar with the facts and legal theories in the case, and I communicate regularly with my counsel about the case.

I declare under penalty of perjury that the foregoing is true and correct.

Executed On:  March 9, 2023                           /s/ Aaron Kheriaty
                                                             Dr. Aaron Kheriaty

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION**

| | |
|---|---|
| STATE OF LOUISIANA, STATE OF MISSOURI, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> JOSEPH R. BIDEN, JR., in his official capacity as President of the United States, *et al.*, <br><br> *Defendants*. | Case No. 3:22-cv-01213-TAD |

**<u>SUPPLEMENTAL DECLARATION OF JIM HOFT</u>**

1.      My name is Jim Hoft.  I am over the age of 18 years and competent to testify to the matters expressed herein.

2.      I have previously submitted a Declaration in this case, which is filed with the Court as Doc. 10-12 and Doc. 45-12.  That prior Declaration is incorporated by reference herein.

3.      I am the founder and publisher of www.TheGatewayPundit.com, a political news and opinion blog visited nearly three million times per day by readers.

4.      In addition to my own experience with censorship on social media, I am also a frequent reader and listener of content that others post on social-media platforms, including others who have suffered federally induced social-media censorship.

5.      I have a strong interest in being able to read and follow the speech and writings that others post on social media.  As the publisher and editor of The Gateway Pundit, I write dozens of articles per day and edit many others.  For the blog that I founded and which constitutes my livelihood, it is essential that I be able to engaging in scientific debate, be exposed to news and

1

ideas, generate for myself and my site, our own content by reposting, retweeting, or reposting with comments the content that others post, and have access to the uncensored views, speech, and opinions of others.  Simply put my life's work consists of publicly sharing and discussing ideas, opinions, facts, and theories about events and issues that affect the United States, but also the world.

6.    I frequently read and listen to the speech and writings on social media of other speakers and writers whom federal officials have specifically targeted for censorship on social media, such as (but not limited to): Tucker Carlson, Alex Berenson, Robert F. Kennedy, Jr., Fox News, Candace Owens, Dr. Robert Malone, Rogan O'Handley (aka "DC Drano"), the New York Post, Dr. Simone Gold, Dr. Stella Immanuel, Dr. Peter McCullough, America's Frontline Doctors, Charlie Kirk, Breitbart News, Donald Trump Jr., James O'Keefe, James Woods, the Epoch Times, Right Side Broadcasting Network, the Great Barrington Declaration, Children's Health Defense, Dr. Naomi Wolf, Robert Malone, Liz Wheeler, and many others.

7.    I also frequently read and listen to the speech and writings on social media of other speakers and writers who speak and write on matters relating to COVID-19 and elections with viewpoints disfavored by federal officials, and have experienced censorship, such as my brother, Joseph Hoft, Mike Lindell, President Donald J. Trump, Sidney Powell, One America News Network, Chanel Rion, Eric Metaxas, Christina Bobb, Stephen Miller, Dr. Peter Navarro, Gen. Michael Flynn, among many others.

8.    As I explained in my prior Declaration, I am often forced to engage in self-censorship on social media to avoid severe consequences like de-platforming, suspension, and receiving strikes.  I am aware of others whom I follow on social media engaging in self-censorship out of fear of more severe penalties as well, such as Patty McMurray, Christina Laila, Alicia Powe,

2

Cassandra McDonald, Jordan Conradson, Cara Castronuova, Kari Lake, Breitbart News, @Catturd2, Rogan O'Handley (aka "DC Drano"), Emerald Robinson, @Kanekoa.substack.com (aka "Kanekoa the Great").  Federally induced censorship thus prevents me from having access to those speakers' and writers' frank and uncensored speech, thoughts, opinions, and ideas.  The reality is that so many conservative thinkers have been censored in recent years, it's hard to think of anyone who doesn't self-censor online, out of fear of deplatforming.  Moreover, readers are often afraid to retweet and share my/ Gateway Pundit content for fear of having their own account suspended.

9.      Considered as a whole, the effect of all of the mass censorship has led me to deeply distrust all aspects of every branch of the federal government.  I am firmly convinced that our Republic is severely damaged.  Lacking actual free speech, I don't feel like a free citizen. I feel like a second class citizen in the so-called "land of the free."  I feel oppressed by my own government.  The Gateway Pundit and I each live under constant threat of deplatforming and censorship – and by extension, the death of the publication.  If I cannot receive and share information, I can't publish – or, perhaps I can publish, but no one could read – and the result is the prospective destruction of my website. This is no way to live – not in a country that supposedly has the Constitution and the protection of the First Amendment.

I declare under penalty of perjury that the foregoing is true and correct.

Executed On:  March 20, 2023                    */s/ Jim Hoft*
                                                Jim Hoft

3

-PA04532-

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF LOUISIANA**
**MONROE DIVISION**

| | |
|---|---|
| STATE OF LOUISIANA, STATE OF MISSOURI, *et al.*, <br><br>        *Plaintiffs*, <br><br> v. <br><br> JOSEPH R. BIDEN, JR., in his official capacity as President of the United States, *et al.*, <br><br>        *Defendants*. | Case No. 3:22-cv-01213-TAD |

**SUPPLEMENTAL DECLARATION OF JILL HINES**

1.      My name is Jill Hines.  I am over the age of 18 years and competent to testify to the matters expressed herein.

2.      I have previously submitted a Declaration in this case, which is filed with the Court as Doc. 10-12 and Doc. 45-12.  That prior Declaration is incorporated by reference herein.

3.      In addition to my own experience with censorship on social media, I am also a frequent reader and listener of content that others post on social-media platforms, including others who have suffered federally-induced social-media censorship.

4.      I have a strong interest in being able to read and follow the speech and writings that others post on social media.  I have a vested interest through my work as a consumer and human rights advocate to ensure that information that the government provides to the public is accurate and, if not, I have the ability to provide a counter argument.  The ability to re-share scientific articles, commentaries, videos, and legislative testimonies

Page 1

is vital to our goal of educating the public and those individuals in the legislature that represent us.

5.    I frequently read and listen to the speech and writings on social media of other speakers and writers whom federal officials have specifically targeted for censorship on social media, such as Del Bigtree, The Highwire, Toby Rogers Phd., Dr. Robert Malone, Knut Wittkowski, Robert F. Kennedy Jr., Children's Health Defense, Dr Peter McCullough, Candace Owens, Tucker Carlson, Breitbart, Georgia Coalition for Vaccine Choice, Informed Choice Maryland, Tennessee Coalition for Vaccine Choice, Your Health Freedom, Stand for Health Freedom, Leah Wilson, Sandi Marcus, Mississippi Parents for Vaccine Rights, Texans for Vaccine Choice, Health Freedom Pennsylvania, Health Freedom Alabama, Sayer Ji, Ginger Taylor, Angelia Desselle, Health Freedom South Dakota, Health Choice Maine, Kristen Meghan Kelly, Tammy Clark, Health Freedom Florida, Michigan for Vaccine Choice, Oklahomans for Health and Parental Rights, Informed Health Choice Missouri, South Carolina Health Coalition, Epoch Times, Jennifer Margulis, Jeff Childers, Dr. Pierre Kory, Front Line Covid-19 Critical Care Alliance, Dr. Ryan Cole, Donald Trump, Alex Berenson, Peggy Hall, Aaron Siri, Denis Rancourt, Mark Changizi, The Babylon Bee, Mary Holland, Turning Point USA, Charlie Kirk, J B Handley, Michael Lunsford, Citizens for a New Louisiana, Dr. Scott Atlas, The Great Barrington Declaration, Sharyl Attkisson, Michael Senger, Daniel Kotzin, American Institute for Economic Research, Barry Brownstein, Brownstone Institute, Jeffrey Tucker, Paul Alexander, Tracy Beanz, Dr. Mary Talley Bowden, Ed Dowd, Project Veritas, James O'Keefe, Dr. Mollie James, Dr. Tracy Beth Hoeg, Dr Joseph Ladapo, Simon Goddek, Ben Tapper, Rizza Islam, Kevin Jenkins, Dr Stella Immanuel, Michael Yeadon, Geert Vanden

Bossch, James Woods, Adam Gaertner, Steve Bannon, Dr. Aaron Kheriarty, Dr. Jay Bhattacharya, Dr. Martin Kulldorff, Jim Hoft, Gateway Pundit, Dr. Jessica Rose, and Dr. Meryl Nass.

6.      I also frequently read and listen to the speech and writings on social media of other speakers and writers who speak and write on matters relating to COVID-19 and elections with viewpoints disfavored by federal officials, and have experienced censorship, such as Dr. James Lyons-Weiler, Melissa Floyd, Nic James, Daniel Horowitz, Steve Deace, Ty Bollinger, Sherri Tenpenny, Ohio Advocates for Medical Freedom, Health Freedom Defense Fund, Leslie Manookian, Dr Paul Thomas, Leigh Dundas, Tom Fitton, and Dr. Naomi Wolf.

7.      As I explained in my prior Declaration, I often feel forced to engage in self-censorship on social media to avoid severe consequences like de-platforming, suspension, and receiving strikes.  I am aware of others whom I follow on social media engaging in self-censorship out of fear of more severe penalties as well. Many of the people I follow on social media use code words or emojis to avoid censorship, others post pictures or article headlines upside down. Brett Wilcox often resorts to posting headlines upside down or very small print. Author Jennifer Margulis PhD refers to covid vaccines as carrots or cupcakes on Facebook. Mississippi Parents for Vaccine Rights places stickers or emojis over controversial words like ivermectin, vaccines, or masks in headlines.  Federally induced censorship thus prevents me from having access to those speakers' and writers' frank and uncensored speech, thoughts, opinions, and ideas.

8.      In the spring of 2020, two doctors from California posted a video detailing disease progression and severity of covid-19. The video was shared many times from our

social media until it was taken down completely. There was another video of a New York physician detailing covid treatment in his hospital - his video was removed and scrubbed from the internet. These stories were vital to share with my community of followers, which includes medical professionals, and yet these physicians were not allowed to provide first-hand accounts of successful covid treatment or protocols. When I shared the White Coat presentation on the steps of the Supreme Court in the fall of 2020, and the physicians advocated for early treatment with hydroxychloroquine, Facebook censors took down the video and our page viewership was reduced immensely.

     9.     This case is of great interest to me.  I have been closely monitoring it since my involvement with it began, I am familiar with the facts and legal theories in the case, and I communicate regularly with my counsel about the case.

I declare under penalty of perjury that the foregoing is true and correct.

Executed On:  March 16, 2023       */s/ Jill Hines*

             Jill Hines

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA
## MONROE DIVISION

STATE OF MISSOURI, STATE OF
LOUISIANA, *et al*.,

   *Plaintiffs*,

  v.

JOSEPH R. BIDEN, JR., in his official
capacity as President of the United States,
*et al.*,

   *Defendants*.

Case No. 3:22-cv-01213-TAD

---

### SECOND SUPPLEMENTAL DECLARATION OF JILL HINES

 1. My name is Jill Hines.  I am over the age of 18 years and competent to testify to the matters expressed herein.

 2. I have previously submitted two Declarations in this case, filed with the Court as Doc. 10-12 (45-12) and Doc. 227-9.  Those prior Declarations are incorporated by reference herein.

 3. My previous two Declarations detailed some examples of injury I have experienced due to censorship of speech, both from censorship of my own speech and of speech of others with which I would otherwise have been able to engage.  They even detail self-censorship I have felt compelled to do to avoid further harm.

 4. As described in my previous Declarations, my advocacy work through Health Freedom Louisiana and Reopen Louisiana includes work to educate and inform the public of their rights regarding certain state and federal laws, and work to coordinate rallies, protests, and testimonies at legislative hearings to seek legislative change for the people of Louisiana.  The

-PA04537-

platform of social media has been essential to complete this work and to effectively communicate with our state representatives.

5.    The harms I experience due to censorship of speech on social media are ongoing.

6.    Leading up to the Louisiana legislative session in April 2023, I received a series of troubling penalties on Facebook that caused my personal page and public pages, Health Freedom Louisiana and Reopen Louisiana, to be restricted.

7.    The penalties included downgrading the visibility of my posts in Facebook's News Feed (thereby limiting its reach to other users), downgrading the visibility of my posts in my Facebook Groups, and an approximately 24-hour moratorium on my ability to create Facebook Events.

8.    On February 8, 2023, my Health Freedom Louisiana page received a violation for simply sharing a Tweet from attorney Aaron Siri regarding the amount of money vaccine manufacturers grossed while setting no money aside for Covid vaccine injury victims. No one else was permitted to view or engage with the post.



-PA04538-

9.     On March 28, 2023, the page received another violation for sharing a Tweet regarding the amount of money that had been paid out of the U.S. Countermeasures Injury Compensation Program (CICP).  No one else was permitted to view or engage with the post.



10.     On April 3, 2023, the page received another violation for sharing a Fox News Tweet regarding the World Health Organization's latest Covid vaccine recommendations for children.

11.     On April 18, 2023, a post on Health Freedom Louisiana's Facebook page linking to a piece entitled "Some Americans Shouldn't Get Another COVID-19 Vaccine Shot, FDA Says," and commenting on how children factor into the business model of the pharmaceutical industry was issued a violation.  No one else was permitted to view or engage with the post.



12.     On April 26, 2023, one of my posts with a screenshot of a Daily Mail headline about the dangers of masks had a "missing context" banner placed on it, and my page received a warning.  As a result, I removed the post from other pages I had shared it to.



13.    On April 28, 2023, I received a warning for a screenshot of a Robert F. Kennedy, Jr. Tweet, and I removed the post because of the warning.  I further removed the post from other pages that I had shared it to in an effort to avoid any more violations.  No one else was permitted to view or engage with the post.



14.    All of these examples pertain to speech of public interest.  This censorship of my speech interrupts my ability, and the ability of Health Freedom Louisiana, to reach the public during the Louisiana legislative session on issues of public concern.  It is truly demoralizing, and it suppresses speech and engagement in the political process.

15.     This ongoing harm I experience is one reason this case is "of great interest to me" (Hines Suppl. Decl., ¶9).  The injuries I have experienced are imminent and ongoing.  The injuries stem from the category of speech disfavored by and targeted by Defendants in this case.  Consider, as a prime example, the evidence showing the Surgeon General's office collaborating with the Virality Project to target "health freedom" groups, such as my group Health Freedom Louisiana. I anticipate an order putting a halt to the Federal Defendants' contribution to the censorship enterprise of social media speech would, accordingly, bring me immediate and noticeable relief.


I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.


Executed On:  May 17, 2023                    */s/ Jill Hines*

                                              Jill Hines

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION**

| | |
|---|---|
| STATE OF MISSOURI, STATE OF LOUISIANA, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> JOSEPH R. BIDEN, JR., in his official capacity as President of the United States, *et al.*, <br><br> *Defendants*. | Case No. 3:22-cv-01213-TAD |

**<u>SECOND SUPPLEMENTAL DECLARATION OF JIM HOFT</u>**

1. My name is Jim Hoft.  I am over the age of 18 years and competent to testify to the matters expressed herein.

2. I have previously submitted two Declarations in this case, filed with the Court as Doc. 10-5 (45-5) and Doc. 227-8.  Those prior Declarations are incorporated by reference herein.

3. My previous two Declarations detailed some examples of injury I have experienced due to censorship of speech, both from censorship of my own speech, the speech of others with which I would otherwise have been able to engage, and the self-censorship of readers of my blog, The Gateway Pundit, for fear of retaliation from social media companies.  They even detail self-censorship I have felt compelled to do to avoid further harm.

4. As described in my previous Declarations, my online publication, The Gateway Pundit, is a news and opinion blog seen by readers millions of times every day.  The Gateway Pundit is my sole means of earning a living.  Social media platforms can be a very important means of gaining exposure to Gateway Pundit articles and engaging in public debate.  However, Gateway

Page 1

-PA04543-

Pundit has been the victim of a federal-private organized and targeted censorship campaign that has lasted several years, and this campaign has regularly interfered with and interrupted my ability to communicate with my readers.

5.      The harms I experience due to censorship of speech on social media are ongoing.

6.      For example, to avoid being permanently banned by Facebook and other platforms, I have self-censored the Gateway Pundit articles that are posted there.  Rather than freely posting my site's content on these platforms, to this day I have and continue to deliberately withhold content – particularly on matters relating to COVID-19, vaccination for the same, and the 2020 election.  I continue to do this out of fear of reprisals from social media.  In fact, Facebook continuously warns me and Gateway Pundit that we should be careful to toe their narrative line or else we will be permanently banned.  See screenshots below, taken May 19, 2023.





7.      And not only have I withheld content, I have deliberately reduced *and continue to reduce* the volume of overall content posted to social media for the very same reasons.

8.      As seen from the screenshots above, Facebook and other social media sites are reducing the visibility of Gateway Pundit's Facebook posts, reducing distribution, and imposing other restrictions as well, on an ongoing basis.

9.      As only one example, Facebook restricts Gateway Pundit's ability to monetize its posts, restricts its ability to tag partners in posts, and restricts content due to "false news" allegations.



Page 3



10.    The past reprisals have included downgrading the visibility of my posts in Facebook's News Feed (thereby limiting its reach to other users), downgrading the visibility of my posts in my Facebook Groups, temporary banning, permanent banning (in the case of Twitter), flagging, and a wide variety of other forms of censorship.

11.    Despite my efforts at self-censorship, Gateway Pundit is also besieged by malicious government-funded propaganda outfits that style themselves "fact-checkers."  As one recent example, Gateway Pundit published an article detailing the federal government provisioning thousands of illegal immigrants with taxpayer-funded smart phones.  See https://www.thegatewaypundit.com/2023/05/member-trusted-news-initiative-currently-being-

sued-collusively/?utm_source=rss&utm_medium=rss&utm_campaign=member-trusted-news-initiative-currently-being-sued-collusively.   The article was "fact-checked" by Agence France Presse Fact Check (AFP).   Despite AFP learning that what we reported was true – illegal immigrants were, in fact, gifted smart phones bought and continually paid for by the federal government – AFP still reported that our article was false.

12.    I also know from communications with readers that there are many readers who refuse to post Gateway Pundit articles to their social media accounts out of fear of social media reprisals.   The readers self-censor because either they or their family members or friends have been previously banned or shadow-banned, or otherwise attacked and censored by social media companies after posting articles which were against the federal government's preferred narrative.

13.    As a further example of ongoing social media censorship, Facebook continues to attach a defamatory smear against Gateway Pundit to each and every Gateway Pundit Facebook post.   The most recent example is from May 17, 2023; see below:





14.     All of these examples censored speech pertain to speech of public interest.  This censorship interrupts the ability of The Gateway Pundit to reach its readers.  It is not only demoralizing, but it prevents me – and my readers – from engaging in public debate on public issues, and it erodes the democratic process.  When the government limits the range of thought and permitted viewpoints, one cannot say they live in a functioning republic, and cannot honestly say they possess freedom.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.


Executed On:  May 19, 2023                    */s/ Jim Hoft*

                                             Jim Hoft

1

```
 1                    UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF LOUISIANA
 2                          MONROE DIVISION

 3
      THE STATE OF MISSOURI,                    :NO. 3:22CV01213
 4    by and through its Attorney General,
      ERIC C. SCHMITT;                          :
 5
      THE STATE OF LOUISIANA,                   :
 6    by and through its Attorney General,
      JEFF LANDRY                               :
 7
                            PLAINTIFFS,         :
 8
      VERSUS                                    :
 9
      JOSEPH R. BIDEN,JR., in his official      :
10    capacity as President of the United States;

                                                :
11    JENNIFER RENE PSAKI, in her official
      capacity as White House Press Secretary;  :
12
      VIVEK H. MURTHY, in his official          :
13    capacity of Surgeon General of the
      United States                             :
14
      XAVIER BECERRA, in his official           :
15    capacity as Secretary of the Department of
      Health and Human Services;                :
16
      DEPARTMENT OF HEALTH AND HUMAN SERVICES;  :
17
      DR. ANTHONY FAUCI, in his official        :
18    capacity as Director of the National
      Institute of Allergy and Infectious Diseases :
19    and as Chief Medical Advisor to the President;

                                                :
20    NATIONAL INSTITUTE OF ALLERGY AND
      INFECTIOUS DISEASES;                      :
21
      CENTER FOR DISEASE CONTROL AND            :
22    PREVENTION;

                                                :
23    ALEJANDRO MAYORKAS, in his official
      capacity as Secretary of the Department   :
24    of Homeland Security;

                                                :
25
```

```
1    DEPARTMENT OF HOMELAND SECURITY;                :

2    JEN EASTERLY, in her official capacity as       :
     Director of the Cybersecurity and
3    Infrastructure Security Agency;                 :

4    CYBERSECURITY AND INFRASTRUCTURE                :
     SECURITY AGENCY; and
5                                                    :
     NINA JANKOWICZ, in her official capacity
6    as director of the so-called                    :
     "Disinformation Governance Board"
7    within the Department of Homeland Security      :

8                       DEFENDANTS.                  :

9         REPORTER'S OFFICIAL TRANSCRIPT OF  THE MOTION HEARING
               BEFORE THE HONORABLE TERRY A. DOUGHTY
10              UNITED STATES DISTRICT CHIEF JUDGE
                        MAY 26, 2023
11

12   APPEARANCES:

13   FOR THE PLAINTIFFS: MR. DEAN JOHN SAUER
     STATE OF MISSOURI   SPECIAL ASSISTANT ATTORNEY GENERAL
14   STATE OF LOUISIANA  STATE OF MISSOURI AND STATE OF LOUISIANA
                         231 South Bemiston Avenue, #800
15                       St. Louis, Missouri

16
     FOR THE PLAINTIFF:  MR. KENNETH C. CAPPS
17   STATE OF MISSOURI   JAMES OTIS LAW GROUP
                         13321 North Outer Forty Road, Suite 300
18                       St. Louis, Missouri

19
     FOR THE PLAINTIFF:  MR. JOSHUA M. DIVINE
20   STATE OF MISSOURI   MISSOURI SOLICITOR GENERAL
                         207 West High Street
21                       Jefferson City, Missouri

22                     DEBBIE LOWERY, RPR CCR
                    FEDERAL OFFICIAL COURT REPORTER
23                 201 Jackson Street, Suite 312
                     Monroe, Louisiana 71201
24
     Proceedings recorded by mechanical stenography, transcript
25   produced by computer-aided transcription
```

```
 1   FOR THE PLAINTIFF:  MR. TODD SCOTT
     STATE OF MISSOURI   MISSOURI ATTORNEY GENERAL'S OFFICE
 2                       207 West High Street
                         Jefferson City, Missouri
 3

 4   FOR THE PLAINTIFF:  MR. TRACY L. SHORT
     STATE OF LOUISIANA  LOUISIANA ATTORNEY GENERAL'S OFFICE
 5                       1885 North Third Street
                         Baton Rouge, Louisiana
 6

 7   FOR THE PLAINTIFF:  MS. ELIZABETH BAKER MURRILL
     STATE OF LOUISIANA  LOUISIANA ATTORNEY GENERAL'S OFFICE
 8                       SOLICITOR GENERAL
                         1885 North Third Street
 9                       Baton Rouge, Louisiana

10
     FOR THE PLAINTIFFS: MS. ZHONETTE M. BROWN
11   AARON KHERIATY      NEW CIVIL LIBERTIES ALLIANCE
     JAYONTA             1225 19th SN W Suite 450
12   BHATTACHARYA        Washington, DC
     JILL HINES
13   MARTIN KULLDORF

14
     FOR THE DEFENDANTS: MR. JOSHUA E. GARDNER
15                       UNITED STATES DEPARTMENT OF JUSTICE
                         SPECIAL COUNSEL
16                       1100 L Street NW
                         Washington, DC
17

18                       MS. KYLA SNOW
                         UNITED STATES DEPARTMENT OF JUSTICE
19                       1100 L Street NW
                         Washington, DC
20

21                       MR. INDRANEEL SUR
                         UNITED STATES DEPARTMENT OF JUSTICE
22                       1100 L Street NW
                         Washington, DC
23

24

25
```

4

```
 1                    MS. KUNTAL CHOLERA
                      UNITED STATES DEPARTMENT OF JUSTICE
 2                    1100 L STREET NW
                      Washington, DC
 3

 4
                      MS. AMANDA CHUZI
 5                    UNITED STATES DEPARTMENT OF JUSTICE
                      1100 L Street NW
 6                    Washinton, DC

 7
                      MR. BRIAN NETTER
 8                    UNITED STATES DEPARTMENT OF JUSTICE
                      1100 L Street NW
 9                    Washington, DC

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P-R-O-C-E-E-D-I-N-G-S
 2    (Court Called to Order)
 3              THE COURT:  Good morning, everybody.  Be seated.
 4    Welcome to Monroe if you haven't ever been here before.  Thank
 5    you for coming.
 6         This is the case of Missouri versus Biden, 3:22-1213.
 7    First of all, I'd like to ask that -- starting with the
 8    plaintiffs, I'd like the attorneys for each side to identify
 9    themselves for the record, please.
10              MR. SAUER:  Thank you, Your Honor.  John Sauer,
11    Special Assistant Attorney General for the State of Louisiana,
12              MS. MURRILL:  Your Honor, Liz Murrill, Solicitor
13    General for the State of Louisiana.
14              MR. DIVINE:  Your Honor, Joshua Divine, Solicitor
15    General for the State of Missouri.
16              MS. BROWN:  Your Honor, Zhonette Brown.  I am
17    representing four of the individual plaintiffs.
18              MR. SHORT:  Good morning, Judge.  Tracy Short on
19    behalf of the State of Louisiana Attorney General Jeff Landry.
20              THE COURT:  Okay.
21              MR. SCOTT:  Your Honor, Todd Scott with the Missouri
22    Attorney General's Office.
23              MR. CAPPS:  Kenneth Capps for the State of Missouri.
24              THE COURT:  Is that all of you?  Just that few?  I'm
25    kidding.  Go ahead.  All right.  How about the defendants?
```

```
1            MR. GARDNER:  Good morning, Your Honor, Josh Gardner
2    with the United States Department of Justice Special Counsel.
3    With me today is Amanda Chuzi, Kyla Snow, Indraneel Sur, Kuntal
4    Cholera, our Deputy Assistant Attorney General Brian Netter and
5    then an AUSA Shannon Brown.
6            THE COURT:  I think they've got you outnumbered,
7    though.
8            MR. GARDNER:  Always, Your Honor.
9            THE COURT:  Okay.  And our rules prohibit recording
10   or taking a photograph during the session.  I told the CSOs,
11   they came in, no problem bringing your phones; even have it on
12   silent.  I don't care.  Just don't take video or anything
13   during the session or take photographs.
14       Our court reporter down here is Debbie Lowery.  The
15   courtroom deputy here is Amy Crawford.  Over here is law clerks
16   Dakota Stephens and Stephanie Stone and we've got Caitlin
17   Huettemann remotely if she can hear.  And we've also got Mary
18   Kyle Allen interning with us today.
19       So just to let you know, the court reporter is going on a
20   vacation after today.  And so if you need a transcript of
21   today's proceedings, she won't be able to get that done until
22   about three weeks, something like that, depending on how long
23   y'all talk today, but something like that.
24       So and kind of the way I was going to proceed, I know I
25   gave everybody -- each side an hour.  And I'm going to try to
```

1    refrain from asking questions during the time you're doing it,

2    but I may not be able to do that.  I may -- you know, something

3    you say I might need to ask you.  I'm not going to take any

4    time you take to answer questions against your time.

5        So and then at the end, and if plaintiff wants to reserve

6    some time, you can do that of your hour for rebuttal.  And,

7    after the hour, I'll, you know, ask you some more questions so

8    -- after that.  Okay.

9        Everybody ready to proceed?

10           MR. SAUER:  Yes, Your Honor.

11           MR. GARDNER:  (Affirmative nod.)

12           THE COURT:  Okay.  Let's go begin with the

13   plaintiffs.  Thank you.

14           MR. SAUER:  Thank you, Your Honor.  May it please the

15   Court, Special Assistant Attorney General for Louisiana John

16   Sauer appearing on behalf of the plaintiffs.

17       On August 2nd, 2021, Secretary Mayorkas of DHS stated that

18   the efforts to combat disinformation on social media are

19   occurring, quote, "across the federal enterprise."  And that's

20   exactly what the evidence in this case shows.

21       It shows efforts by senior federal officials to get

22   control, to get the social media platforms to knuckle under and

23   essentially to kind of take over what the social media

24   platforms are letting Americans say about core topics of great

25   political sensitivity, like, elections, COVID and various other

1  topics like that.

2     This is a systemic and systematic campaign.  It began

3  seven years ago in 2017, at least, based on testimony of Elvis

4  Chan.  It has proceeded relentlessly since then.  It has

5  radically expanded over time, including steady expansions over

6  the years, and then two quantum leaps that occur in the

7  beginning of 2020 and then, again, in 2021 as it expands to new

8  federal officials and  agencies getting involved in these

9  social media censorship activities, new topics of censorship

10 that are being demanded, new techniques and ways of influencing

11 what the social media platforms are doing and pressuring them.

12 And then just a sort of radical expansion over time and a kind

13 of a cone shape until we get to the current day where we have

14 67 defendants and federal officials and agencies in this case

15 alone.

16     This relentless expansion shows no signs of stopping on

17 its own.  In fact, every objective indicator, both in their

18 private communications, their public statements, and in their

19 conduct, shows that the federal defendants in this case have

20 every intention of continuing to engage in these

21 unconstitutional activities and continuing to expand them at

22 every opportunity absent court intervention.

23     And, for that reason, we're here today to ask the Court to

24 enter the preliminary injunction that we propose that will go a

25 long way towards putting a stop to what is really the most

1   systematic and likely the most egregious violations of the

2   First Amendment in the history of the United States of America.

3        So, Judge, as I talk today, what I'd like to do is go

4   through a kind of chronological presentation of the evidence

5   starting back in 2017 when this starts ramping up.

6        Yes, Your Honor.

7             THE COURT:  I don't want to mess you up.  Did you

8   want to reserve any time for rebuttal?

9             MR. SAUER:  I'd like to reserve 15 minutes.

10            THE COURT:  Okay.

11            MR. SAUER:  I figured I'd go for about 45 now.

12            THE COURT:  Okay.  Thank you.  I just wanted to make

13  sure.

14            MR. SAUER:  And, Judge, we've submitted, both to

15  opposing counsel and Court, a binder that the Court may want to

16  consult while I'm talking.  There's about 34 tabs in there.  32

17  of them are excerpts from the evidence.  They're the same as

18  what's filed with the Court, but there's some yellow

19  highlighting we added just to sort of call the Court's

20  attention to particular key phrases and so forth.

21       Tab 1 is a -- actually a statute.  It's not evidence.  And

22  Tab 17 is a summary of a bunch of evidence about the Election

23  Integrity Partnership that's essentially copied from pages 51

24  and 52 of our reply brief.  So that's what's before the Court

25  there.

1    And, as I said, I'd like to start -- I said I wanted to

2    start in 2017, but I actually go back further to 1998.  1998,

3    this is where the roots of all this start when Congress enacts

4    the Section 230 of the Communications Decency Act.

5    Section 230 does at least three relevant things:  It

6    immunizes the social media platforms for speech that other

7    people post on their platforms.  They can't be held liable if

8    something (sic) posts something -- even something egregious.

9    If they leave it up, they're not liable for that; the speaker

10   is liable.

11   But it also immunizes them for taking stuff down.  It says

12   anything you take down in good faith, for whatever reason, is

13   itself also immunized under Section 230 of the CDA.  So the

14   platforms have the best of both worlds.  And there's a third

15   provision which is they preempt state law to the contrary.

16   So the federal government, when it passes this statute

17   essentially creates the conditions that, you know, 19 years

18   later in 2017 make the social media platforms particularly

19   vulnerable to the campaign of threats and coercion,

20   intimidation and pressure that we see in the evidence in this

21   case.  And it does it in at least two ways.

22   Number 1, as Justice Thomas said in his separate opinion

23   for the Court in Knight versus First Amendment -- or *Biden*

24   *versus Knight First Amendment Center,* it creates a

25   concentration of sort of power in the platforms where this sort

```
1    of platform industry is concentrated in a tiny number of key
2    players.  And those key players are not really just
3    corporations, it's individuals.
4        If you want to control what people say on social media,
5    you know right where to go if you're a federal official.  You
6    go to the same three people every time:  Mark Zuckerberg, Jack
7    Dorsey, Sunder Pichai.  That's an exaggeration.  There's a few
8    more, but there's this tight concentration.  So it's really
9    easy to find who you need to pressure to get control of what
10   Americans can say on social media.
11       And, also, you've created two huge potential liabilities
12   for the platforms.  You've given this -- this immunity that's
13   been aptly described as a hidden subsidy worth billions of
14   dollars.  And the federal government has created the conditions
15   for what is something like where they have vulnerability, at
16   least, to antitrust enforcement.  And those are the threats
17   that get raised and raised again and again in the evidence in
18   this case.
19       Then fast forward to 2017, something happens seismic in
20   2017 politically in --
21           COURT REPORTER:  I'm sorry.  Can you slow down.
22           MR. SAUER:  I'm sorry.  Fast forward to 2017,
23   something seismic politically happens in 2016, President Trump
24   is elected to the White House using social media very
25   effectively in his own campaign.  And there are allegations of
```

1    foreign interference where foreign nationals are supposedly

2    supposed to be putting a lot of disinformation on social media

3    during that campaign.

4        And, as a reaction to that, very senior federal officials

5    immediately commence a pressure campaign to get control of what

6    people can say about election-related speech on social media.

7    This begins, based on the testimony of Elvis Chan, in 2017, and

8    it's a three-pronged pressure campaign.

9        So one prong is there's a whole series of public

10    statements.  And we've put, like, 30 of these in evidence in

11    the Court in our first 30 paragraphs of our proposed findings

12    of fact, where senior federal officials are saying again and

13    again they're making explicit threats.  They're linking the

14    threat of we are going to take away things that are very

15    valuable to you:  Antitrust enforcement, CDA 230 immunity.

16    We're going to go after those things unless you censor more.

17        So it isn't just sort of your standard public statement

18    like I think this statute should be repealed.  It's, like if,

19    the platforms don't step up to the plate and take down the

20    disfavored viewpoints that we don't like, then there's going to

21    be these adverse legal consequences.

22        So it's that linking of a demand with a threat, a demand

23    for something that would be unconstitutional if the government

24    did it itself, which is take down speech that we don't like,

25    link to a threat of adverse legal consequences.  You get that

1  in the public statements.

2      And you also get it in these congressional hearings.

3  That's the second prong.  They call in the same CEOs again and

4  again and again in 2017 and 2018.  Elvis Chan refers, like,

5  four or five of these in hearings in his master's thesis.  And,

6  again, we have more of them that go on in '20 and 2021 and so

7  forth.

8      So, for a period of years, the CEOs of key tech companies

9  are called in to Congress.  They are raked over the coals, and

10  they're put under public pressure.  And these same threats are

11  made, "We're going to go after these things that are very

12  valuable to you legally unless you knuckle under to the federal

13  demands for greater censorship."

14      And then there's a third prong to this which is happening

15  in secret at the time.  Senior federal congressional officials,

16  senior staffers from HPSCI and SSCI, the committees that

17  oversee the national security apparatus in the United States,

18  are flying out to Silicon Valley every year bringing adverse

19  proposed legislation in their hands to sit down with senior

20  representatives from the platforms and say, "These are the

21  bills that we're going to try to pass if you guys don't do more

22  to censor the speech that we don't like."

23      So this three-pronged campaign starts in 2017, and it does

24  nothing but accelerate as the years go by if you look at the

25  evidence in this case.

1        Well, that's what's going on on kind of the threat side.

2    Now, leveraging these threats, you have executive officials

3    almost immediately working with these threats in the background

4    going to the platforms with specific demands to have content

5    taken down.  And in 2018, this includes at least CISA and the

6    FBI.  CISA said on its website until March of this year that we

7    started switchboarding in 2018 and we expanded it in 2020.

8        So in the midterm election cycle of 2018, CISA is going to

9    the platforms and saying, "Take down this speech we don't

10    like."  In the background, they've already been under a couple

11    years of pressure from very senior people in Congress to make

12    sure that they're going to be knuckling under.

13        At the same time, the FBI is starting its campaign of just

14    relentless flagging.  The FBI insists they're having meeting

15    after meeting after meeting.  They're countless, incessant

16    meetings with the platforms to talk about disinformation.

17        And at the same time, --

18            THE COURT REPORTER:  I'm sorry.  You're going to

19    fast.  You need to slow down.

20            MR. SAUER:  Sorry.  To talk about disinformation.

21    And then, in addition to that, the FBI starts sending them one

22    to five times per month, list after list after list of specific

23    speakers, accounts and content, URLs, websites, posts on social

24    media saying, "We want you to take this stuff down."

25        So, in 2018, they take the position, "This was all

1    foreign.  We're not really going after domestic speech at all."

2       Now, by 2020, that's completely thrown out the window, but

3    even in 2018 that's wrong.  How do we know that?  CISA -- Brian

4    Scully testified CISA does not do attribution.  It makes no

5    effort -- when it reports disinformation to a platform, it

6    doesn't even try to determine whether or not that came from a

7    domestic American speaker, as protected by the First Amendment,

8    or a foreign national who might be outside the First Amendment,

9    makes no effort, just reporting it, please take it down.

10       And the FBI, in a sense, is even worse.  Elvis Chan says,

11    "The FBI is as infallible as the Pope."  He says, "We never got

12    it wrong."  Hundreds and hundreds and hundreds of speakers that

13    we flagged, he said, "Every single one was a foreign national."

14       The problem with that is they submitted in their response

15    briefings Exhibit 2 is the congressional testimony from

16    February of this year of Yole Roth, who is the senior content

17    moderation person at Twitter at the time.  And he was asked by

18    Congress, "Hey, was the FBI getting it right when they said all

19    these accounts come from foreign nationals?"  And he said, "It

20    was a bit of a mixed bag."  Right?  Actually the question was,

21    "Isn't it true the FBI always got it wrong?"  And he said, "No,

22    sometimes they did get it right."

23       So what you're looking at is the FBI is secretly sending

24    these encrypted lists to the platforms saying, "We've

25    identified with a high degree of" content -- or "confidence

1   that all this content comes from maligned foreign actors, and

2   we want you to take it down from social media."  When, in fact,

3   what's actually going on is they've got a mix.

4       In that list, there's tons and tons of domestic foreign

5   speech that's completely protected by the First Amendment.  If

6   the FBI is giving false information to the platforms saying,

7   "Hey, that's Russia, that's Iran, that's China," when really

8   it's, you know, maybe, you know, a trucker in Nebraska or a

9   housewife in Ohio who just has political opinions.

10      In addition to that, when the FBI -- even when the FBI got

11  it right, they're going after First Amendment-protected speech.

12  And there's great examples of this.  They're actually in, I

13  think, Tab 3 of the binder, sorry, Tab 2 of the binder.  Elvis

14  Chan --

15          THE COURT:  10 or 2?

16          MR. SAUER:  I'm sorry.  It's Tab 2 of the binder.  I

17  apologize.

18          THE COURT:  2.  Okay.

19          MR. SAUER:  Elvis Chan gives examples in his master's

20  thesis of here's stuff that the FBI flagged and got taken down

21  because it was foreign, Russian originated.  One example is,

22  like, an ad that says, "Boo, to Hillary" you know, Hillary

23  Clinton with a black slash over her face.  Another one is

24  "Secure the borders," right, just kind of standard, very simple

25  red meat messages.  "Defend the Second Amendment."

1    And the FBI determined these all came from Russians, and
2    we went to the platforms and got them taken down.  But if you
3    look at their own exhibits, in the bottom left corner of each
4    one, it says, oh, look, a Hillary one had already been reacted
5    to 763 times by American citizens.  The secure the borders one
6    134,943 Americans had liked that, which means they've taken
7    that -- when you click, "like," it's posted in your own news
8    feed.  It kind of becomes your own message.  And that's a First
9    Amendment-protected activity.
10   The FBI says, "Oh, that secure borders message, that came
11   from the Russians.  You've got to take that down."  And they
12   bragged that 50 percent of the time they do get stuff taken
13   down when, in fact, there's talking about stuff that Americans
14   have interacted with exercising their own First Amendment right
15   to like, to comment, to repost or reply on literally hundreds
16   of thousands of occasions.
17   The FBI in this case says, "We're in an information war
18   with Russia and with China and with maligned foreign actors."
19   But it's perfectly clear, in the FBI's view, hundreds of
20   thousands of acts of First Amendment protected activity are
21   acceptable collateral damage in that information war.  And
22   that's what that, I think, vividly shows.
23   So that's where we are in 2018.  We already have the FBI
24   and CISA actively involved in targeting First Amendment
25   protected speech on a very large scale against the backdrop of

1   these powerful threats from the congressional staffers that
2   oversee the FBI and CISA saying, "We want you to take down this
3   stuff.  Take down the stuff that the federal government doesn't
4   like."  And this radically expands when we get to the 2020
5   election cycle.
6       So in that particular cycle, there's at least five things
7   going on in 2020.
8       So CISA switchboarding expands.  We've already talked
9   about that.  And there's this -- in the 2020 cycle, we've got
10  dozens and dozens of emails and spreadsheet of all their
11  flagging operations and so forth.  CISA is very active directly
12  in switchboarding.
13      In addition to that, the FBI is continuing, and probably
14  accelerating its own flagging activity that it had done in
15  2018.  Again, Elvis Chan is saying "We're sending these things
16  one to five times per month, one to six times per month."  And
17  they're just having endless meetings, big group meetings with
18  all the platforms, one on one bilateral meetings out in
19  Silicone Valley where you get a whole crew of FBI agents
20  sitting down with a whole crew of, you know, Twitter and
21  Facebook and Google and YouTube, and so forth, again and again
22  with seven or eight platforms.
23      But, in addition to that, three new things happen.  One,
24  of course, is COVID-19 breaks out in the beginning of 2020.
25  And there's immediately an aggressive move by federal officials

1    to get control of what Americans and others are allowed to say

2    on social media about COVID-19.

3         And, now, in 2021, this goes all the way up to the top of

4    the White House.  But in 2020, what we see is senior federal

5    officials operating essentially independently and at odds with

6    the White House engaging in deceptive techniques to try and get

7    control of what the platforms are actually censoring.

8         So the matter obviously circulates the evidence, in this

9    case, around Dr. Fauci and Dr. Collins' multiple campaigns in

10   2020.  I think the crown jewel of them, so to speak, is their

11   deceptive campaign to get the lab leak hypothesis censored,

12   which was so effective, I think, that they just decided to do

13   the same thing again and again.

14        You know, and you get to October of 2020 when they're

15   going after the Great Barrington Declaration, getting that

16   pulled down from social media.

17        So you have COVID becoming a new, hot topic in the

18   censorship space.  And you have Dr. Fauci and Dr. Collins, in

19   particular NIAD and NIH, very actively involved.  And there's a

20   new technique there because what they're doing is they're

21   engaging in deception.

22        Previously FBI and CISA had been involved in pressure.

23   But what Dr. Fauci and Dr. Collins do is they engage in

24   deliberately sowing, laying out false and misleading

25   information with the intent of inducing the platforms to censor

1    stuff.

2        And there's -- there's a series of tabs, you know, that --

3    Tab 6 to Tab 13, the binder, are all bits of evidence from that

4    particular campaign.  There's obviously dozens and dozens of

5    exhibits in the record relating to that.

6        One really interesting is in Tab 7 where there's an

7    internal email where Dr. Fauci, who said in his deposition, you

8    know, kind of probably a dozen times, "I don't know anything

9    about social medial.  I don't follow social media.  I don't

10    have an account.  I don't pay attention to it," and so forth.

11    But what he's saying in early 2020 in internal emails is, "We

12    have got to stop further distortions on social media about the

13    origins of COVID-19 from a lab."  So his internal

14    communications at the time speak much louder.

15        There's multiple other emails in there with him and

16    Dr. Collins and Jeremy Farrar, who are all kind of

17    collaborating to get the lab leak hypothesis squelched, where

18    they talk about, "What we really want is to control what's

19    being said on," quote, "mainstream and social media."

20        But, in addition to that -- so there's two other really

21    kind of just watershed events in 2020 in this censorship space.

22    In addition to the COVID stuff, you also have CISA and the GEC

23    collaborating, especially CISA, collaborating to set up the

24    Election Integrity Partnership.  And the Election Integrity

25    Partnership is in many ways the most jaw dropping of the

1  federal censorship activities in this case.

2      In addition to that, you also have the FBI engaging in its

3  particular campaign of deception, you know, quite similar in

4  many ways to what Dr. Fauci and Dr. Collins do in the lab leak

5  theory to seed, to plant false and misleading information with

6  the platforms to induce them to censor the Hunter Biden laptop

7  story.

8      So there's tabs about -- in our binder about all of those.

9  I'm going to focus particularly on the Election Integrity

10 Partnership, which is just in many ways, shocking in its scope.

11 It is a mass surveillance operation that involves 120 analysts

12 in 2020 alone, serving 16 hours a day using machine learning

13 and artificial intelligence to surveil the literally hundreds

14 of millions, possibly billions of electronic communications in

15 real time.

16     Their report talks about how we surveiled 859,000,000

17 tweets during the four-month period in the 2020 election cycle.

18 And that's just one platform.  Right.  859,000,000 tweets were

19 surveiled and reviewed.  21 were classified as involved in

20 their tickets potentially involving misinformation and tracked.

21 And some very large subset of that, probably in the millions,

22 is flagged and removed from social media as a result of their

23 activity.

24     From the very beginning, the Election Integrity

25 Partnership is a federal project.  It is a CISA project.  The

1   very idea from the project is placed in the minds of CISA

2   interns who are simultaneously working for the Stanford

3   Internet Observatory by Brian Scully.

4       He says, "I told the interns about the gap, the gap that

5   this, you know, EIP is designed to fill."  And then they say,

6   "Well, why don't we do this about the gap?" and so forth.

7       So what is that gap?  Well, it's got two elements.  One

8   element that Brian Scully emphasizes is we, the federal

9   government, and the state and local government officers, don't

10  have the resources to police all the misinformation that's on

11  the social media and identify it for the platforms.  So he

12  said, "We lack the resources."  But also they candidly admit,

13  "We don't have the legal authority to do it.  We can't do that

14  under the First Amendment, and there is no statute that

15  authorizes us to do that.

16      So if you look at their internal documents or their public

17  documents, the public EIP report is quite explicit about this.

18  They said, "Well, one of the reasons we set up the EIP is

19  because CISA and the other national security agencies and

20  intelligence agencies lack the legal authority.  And if these

21  activities were directed to American citizens, they would

22  likely violate the First Amendment."

23      So the whole idea of the EIP is to kind of bring in the

24  nonprofits:  Stanford, Graphika, Atlanta Counsel and University

25  of Washington, to bring them in and kind of do the dirty work

1    that the federal government is not willing to do.

2         And if you look at Tab 14 in your binder is the

3    operational time line from the CISA report where right there at

4    the top they say what's one of the first key dates in their

5    operational time line?  Number 2 is meeting with CISA to

6    present the EIP concept.  It's almost like they're meeting with

7    their shareholders, right, or their investors.  Hey, here's

8    something we'd really like to do.  We're going to go and get

9    your approval for it.

10        And the evidence strongly indicates that CISA is right

11   there at the beginning directly involved in launching this

12   thing.  That's reflected in the testimony of Brian Scully and

13   actually they go on to say in the report, once we had that

14   meeting to present the concept, in consultation with CISA, we

15   launched the Election Integrity Partnership.

16        And the Election Integrity Partnership isn't just -- CISA

17   is not involved just in the launch, but they have ongoing

18   collaboration in its operations.  And, in fact, at Tab 15 in

19   your binder, they have like a handy dandy flow chart where they

20   say we formalize the role of government, government there they

21   identify in a later page as CISA, the GEC, the Global

22   Engagement Center, also a defendant in this case, and the

23   EI-ISAC, which is a kind of clearing house of state and local

24   officials also subject to the First Amendment that is funded by

25   CISA.  Right?

1        So you see the government is there, and the platforms are
2    there and everyone has got their role in the flow chart.  It's
3    like a nice, you know, encapsulation of ongoing collaboration
4    involved in Election Integrity Partnership.
5        And, of course, if you flip to the next tab in your
6    binder, Tab 17, we highlighted that statement right at the
7    beginning of the Election Integrity Partnership report about
8    why do we stand this up?  That sentence says, "This is
9    especially true for election disinformation that originates
10   from within the United States which would likely be excluded
11   from law enforcement action under the First Amendment and not
12   appropriate for study by intelligence agencies restricted from
13   operating inside the United States.
14       Renee DiResta, who is one of the key, you know,
15   implementers Election Integrity Partnership at the same time
16   said publicly, you know, if the federal government did this,
17   there would be very real First Amendment questions.
18       The whole idea of the EIP is to evade the First Amendment
19   and have private parties team up with the government to do what
20   the government cannot do.
21       And the platforms who, by now, have been subjected to four
22   years of continuous pressure to do what the national security
23   agencies want on election-related speech, they play ball too.
24   So even the EIP is conducted.
25       One of the really important reasons why Stanford needs

1    CISA and that's what Scully -- Brian Scully said in his

2    deposition, that Alex Stamos who's organizing this for Stanford

3    realizes he needs CISA's involvement is when they go to the

4    platforms with CISA behind them, behind all that is all those

5    threats that have come out since 2017 and will continue.

6    So -- and, of course, this is just -- I just did a couple,

7    touch base.

8        The next tab in your binder, Tab 17, is actually based in

9    the evidence 15 points of significant collaboration between

10   federal officials and the Election Integrity Partnership,

11   almost all CISA.  CISA's main defense in their briefs is,

12   "Well, we didn't flag any disinformation for them."  Well,

13   actually, they're cross-pollinating their disinformation

14   reports because they're both -- they're the same human beings

15   at CISA who are -- who are flagging -- they basically work for

16   -- you know, they've got the CISA hat on during the day.  So

17   they're a federal national security agent during the day.  And

18   then at night, they put on their Stanford hat.

19       And during the 2020 election cycle, they are flagging this

20   information for both of them.  They are crossing over in their

21   emails.  And an email they flag for the EIP turns up in the

22   CISA inbox.  You have a spreadsheet where CISA is reporting

23   misinformation to platforms under EIP tracking numbers.  And,

24   of course, CISA now says, "Well, we never actually flagged

25   anything directly to the EIP."

1    CISA is actually funding the EI-ISAC.  CISA has put the

2    EIP in connection with NASS and NASED and the various state

3    officials who are making the reports.  CISA is coordinating

4    with the platforms on how to have CISA and the EIP report at

5    the same time and again and again and again.

6        And, of course, their main defense is we never flagged

7    anything directly to the EIP.  But in the affidavit from

8    Ms. Bray that they submitted with their response brief, they

9    admit that the GEC did, which we did not elicit from Daniel

10   Kimmage in his deposition because he professed no knowledge of

11   it.

12       But what she says on 21 occasions that GEC, which is also

13   federal officials, directly was flagging in 2020

14   misinformation, but not just posts but also narratives she says

15   to the EIP for censorship.

16       So you're looking at this sort of highly integrated,

17   interconnected, interwoven system of federal officials and

18   social media platforms linked by these -- by the Stanford

19   Internet Observatory and similar entities.  And this, the scope

20   of the surveillance and censorship is absolutely staggering.

21       I mentioned before, and this is Tab 19 in the binder, that

22   they say they had -- looks like they had quite privileged

23   access.  They said we had access to Twitter Streaming API.  In

24   context, it appears that the Election Integrity Partnership had

25   kind of the same access that internal Twitter people would do

1    to read people's tweets and to read -- in some cases it looks

2    like they're reading DMs and so forth.

3       And they said they collected over a four-month period

4    859,000,000 tweets, almost a billion social media posts on one

5    platform alone.  If you multiply that by Facebook, they were

6    looking at Facebook and Instagram and Tik Tok and YouTube.

7    We're looking at surveillance of literally billions of realtime

8    electronic communications by Americans on core political

9    speech.

10       And they say on Twitter alone, if you go down in there,

11    the other highlighted thing says we tracked in our tickets.

12    The tickets are their organization of narratives that they

13    think are misinformation.  They bundle into them these 21

14    million tweets.  And some significant subset of that they're

15    going to the platforms and getting it taken down.

16       Keep in mind that they also brag that back in the early

17    summer and late summer of 2020 they went to the platforms and

18    pressured them to change their policies to make their policies

19    more stringent and more restrictive so they could get more core

20    political speech censored.

21       And so that -- in addition to that, Your Honor, because of

22    constraints of time, I'll touch briefly on the fifth major

23    thing that's going on in our evidence in 2020, which is the

24    Hunter Biden laptop story.

25       We've submitted I think overwhelming evidence that there

1    was a deliberate campaign of deception similar to the -- as I

2    said before, the campaign by Dr. Fauci and Dr. Collins to plant

3    with the platforms deceptive information.

4         What did the FBI do?  They're having these endless

5    meetings again and again and again in the 2020 election cycle

6    with the platforms.  And again and again they say, "You guys

7    watch out for a hack-and-leak operation."

8         They've admitted in testimony there was no investigative

9    basis for that.  They had no actual reason to think that there

10   might be a hack-and-leak operation based on any active

11   investigation.  But they kept warning it again and again.

12        Those warnings come from Brian Scully, Matt Masterson at

13   CISA.  They also come from Laura Dehmlow who is the head of

14   FITF, the Foreign Influence Task Force at the FBI; Elvis Chan,

15   other FBI agents.  They come in the big group meetings, the USG

16   industry meetings.  They also come in the bilateral meetings

17   with the platforms.

18        And, in fact, Tab 21 is just a couple of the internal

19   emails that reflect that.  You've got an email from September

20   where the platforms are saying, "Hey, we talked about, quote,

21   "preparing for a so-called hack-and-leak operation.

22        And from July of 2020, a deep dive topic for 40 minutes at

23   one of these meetings was hack/leak in U.S.G. attribution

24   speed/process.

25        So you've got the testimony of Elvis Chan and Brian Scully

1   admitting to this.  And you also have the contemporaneous

2   emails that corroborate it.

3       What's the result of that?  This misleading information it

4   seeded?  And, Judge, there's, like, an evidentiary dispute that

5   I've included here as Tab 22 paragraph 11 of your Yoel Roth's

6   contemporaneous declaration which appears to provide the best

7   and clearest accurate account of what happens in those

8   meetings.

9       So, in that, he says during these weekly meetings, the

10  federal law enforcement agencies communicated that they

11  expected hack-and-leak operations and that he was told that the

12  intelligence community expected they would try hacking attacks

13  and that it would -- it would -- these would likely occur in

14  October when magically it actually happened, right.

15      The *New York Post* ran the Hunter Biden's story in October.

16  And the kicker at the end, as I also learned in these meetings,

17  that there were rumors that a hack-and-leak operation would

18  involve Hunter Biden.

19      Now, more recently, a couple months ago, Mr. Roth, who

20  filed this with the FEC in December 2020, tried to retreat from

21  a that in his congressional testimony.  And he said, "Well,

22  might have been the platforms, not the federal law enforcement

23  agencies who said that it would come -- involve Hunter Biden.

24      That facially doesn't make a lot of sense.  I mean,

25  obviously it's the federal law enforcement agents who know what

1   hack-and-leak might be done by foreign agents.  But, in any

2   event, when he was pressed in his congressional testimony by

3   Representative Jordan, he said, "Who actually said this?"  He

4   admitted, "I truly don't recall."  So his attempt to kind of,

5   like, spin that in 2023 fell through.

6        And if you look back to the contemporaneous documents in

7   2020, this declaration that's excerpted here at Tab 22 of the

8   binder, actually was filed by lawyers from Covington & Burling,

9   the whitest of white shoe firms in Washington D.C.  And they

10  said in their cover letter that included these declarations

11  exhibit at the time, that, quote, "These reports from law

12  enforcement agencies, not from other platforms, suggested that

13  the rumor would involve Hunter Biden."

14       So I think the only possible inference from that evidence

15  is that when Yole Roth said in December of 2020, it's true; and

16  that it was federal law enforcement agencies who were saying,

17  "Hey, there's going to be a hack and leak, you should expect it

18  likely in October, and, you know what, we are hearing rumors it

19  might involve Hunter Biden."

20       So, of course, the FBI at this time has been in possession

21  of the Hunter Biden laptop since 2019.  They know it wasn't

22  hacked.  They got it from the store owner.  Right?  So they

23  know that they're laying the foundation, deceptively laying the

24  foundation for the future censorship of that story, which was a

25  politically seismic event in the history of censorship in the

1    United States.

2        So that gets us to -- that's a summary of the sort of five

3    main pillars we see of federal social media censorship

4    activities in 2020.  And that is, like, the first of what I

5    call the two quantum leaps.  In the 2020 election cycle, you've

6    got, you know, a huge flurry or expansion of activity.

7        And then when President Biden enters the White House, you

8    get a second quantum leap.  All of a sudden what was being done

9    kind under the nose of the White House, you know, through the

10   FBI -- The FBI, keep in mind, you know, by suppressing the

11   Hunter Biden laptop story is acting directly against the

12   interest of the president at that time.

13       But then you have in 2021 President Biden enters the White

14   House.  President Biden, who, while he was a candidate, said,

15   Mark Zuckerberg should face not just civil liability but

16   possible criminal prosecution for colluding with people to

17   allow them to post stuff on his website that President Biden

18   doesn't like.  And that's one of dozens of threats like that

19   that come, not just from him, but from others.

20       And when he enters the White House, then all of a sudden

21   that notion that the platforms had better fall in line or

22   they're going to endure serious legal pressure, that becomes

23   not just the statement of the candidate, but the official

24   policy of the White House.

25       And you see in 2021 threat after threat after threat.  At

1    least six occasions in '21 and '22, from Jen Psaki where she's

2    making these public statements where again and again she's

3    closely linking the threat of adverse legal consequences,

4    robust antitrust program.

5         You know, a great example of this is in the binder.  It's

6    the May 5th, 2021, comment where she says, "The president

7    supports a robust antitrust program for social media

8    platforms."  That's sandwiched between two statements that are

9    demanding more censorship.  "They're not doing enough to take

10   down the censorship.  Hey, the President supports a robust

11   antitrust program."

12        We have statements like that in May of 2021, on July 15th

13   and July 16th of 2022 -- or 2021 from Ms. Psaki, October 6th of

14   2021, February of 2022, April of 2022.  It's this constant

15   theme.

16        And also there's similar statements from Kate Bedingfield,

17   the White House communications director.  And also in private

18   now you're getting threats from senior White House Officials

19   that are communicating in private, like, Rob Flaherty, Andy

20   Slavitt, and so forth.  They're now making these ominous

21   communications in their emails to the platform.

22        There's a very clear message coming out of the

23   administration, play ball with us on censorship or you're going

24   to pay some serious consequences.

25        And, of course, what we see in the evidence is the social

1  media platforms falling in line.  And what is most vividly

2  displayed I think in the sort of joint pressure campaign from

3  the Surgeon General's Office and the White House, Rob Flaherty

4  and Surgeon General Murthy, Andy Slavitt, Eric Wall, they're

5  all involved in these -- this sort of ongoing private campaign

6  of communications against the backdrop of two big public

7  statements on May 5th of 2021 and July 15th and 16th of 2021

8  from the White House.

9       And we see the platforms' kind of resistance to some of

10  the White House demands essentially collapse.  By late July of

11  2021, you have Nick Clegg who is the senior C-suite of Facebook

12  emailing Surgeon General Murthy and saying, "We hear your call

13  for us to do more, and here are all the new censorship actions

14  we're going to take."

15       In addition to that, we see not just Nick Clegg -- not

16  just that, you see Twitter all of a sudden holding off for

17  several months to White House pressure to deplatform Alex

18  Berenson.  And, all of a sudden, they just collapse.  They

19  suspend him within hours of July 16th, the President's

20  comments, "They're killing people," on July 16th.

21       The exact same thing happens with -- to other specific

22  speakers Facebook, for example, the disinformation dozen

23  Facebook was saying in emails in May to Andy Slavitt, "I know

24  you're not going to be happy with our position, but we really

25  can't take him down.  They don't violate our policies.  Then

1   after July 16th, boom, they're immediately deplatformed.

2       And there's a series of three or four different emails

3   where Facebook is going back to the surgeon general's office

4   and the White House saying, "Look at all the stuff we did to

5   take down the disinformation dozen.  Look at all the stuff we

6   did."

7       And this brings us to two additional points I want to

8   emphasize for the Court.  One is if -- one of the things they

9   say in their response brief is really the White House is just

10  going after parity accounts and impersonation accounts.

11      Absolutely not.  What you see is the White House going

12  after and trying to procure, and successfully procuring, the

13  censorship of those speakers that the White House believes are

14  the most persuasive and influential in contradicting the

15  viewpoints that the White House wants to push.

16      So they're going after the disinformation dozen who they

17  think are responsible for 73 percent of the vaccine-related

18  speech that they don't like.  They're going after Alex

19  Berenson.  And the documents say that the White House said that

20  they think Alex Berenson is the epicenter of disinformation

21  that radiates out to the persuadable public.  So they're going

22  after the key strategic speakers.

23      Tucker Carlson, the journalist who's probably the most

24  prominent critic of the Biden administration, they're secretly

25  emailing Facebook saying, "Take down his content from" -- you

know, "from social media."  So they're going after the most

persuasive and powerful voices expressing the very viewpoints

that most disfavor.  So it is a sort of like really core

violation of the First Amendment.

In addition to that, in addition to that, another comment

I want to point out is one of the tabs in the binder is

actually -- I think it's Tab 24, is actually a document

received from Twitter in February of this year.  It's a

supplement.

Last -- last September Twitter, under its prior

management, under our subpoena, we said, "Please disclose

federal officials who communicate with you about

disinformation, misinformation and censorship."

Twitter, under its prior leadership, disclosed 11 names.

After the change of ownership of Twitter, we went back to them

in December and said, "We think that this is understated

because we got 45 names from Facebook and we don't think that

your 11 names is plausible in light of the fact that we got 45

names from Facebook.

Under its new leadership, Twitter put together a new list

and that has 83 names on it.  Now, the names we've highlighted

on this list include 15 names who are senior White House

officials.  Those are the highlighted names.  There's an open

source review.  Those are the ones.  There could be more on

here because some of these names we don't know who they are.

```
1    Right?

2         There's at least 15 here, and there's more on the Facebook

3    list that are not on the Twitter's list.  So we're looking at

4    something that's at least 20 White House officials who are

5    communicating with platforms about misinformation,

6    disinformation and censorship.

7         And so far in this case, we've actually received written

8    documentary discovery from one of them, just Rob Flaherty.

9    We've never gotten -- now, some of these people are copied on

10   Rob Flaherty's emails, you know, and copied on emails with HHS.

11   But for a lot of these, you know, I just want to emphasize to

12   the Court, we're at the preliminary injunction stage.  We're

13   just scratching the surface.  We're just looking at the tip of

14   the censorship iceberg here.

15        So, anyway, moving on, I have a limited amount of time.  I

16   do want to emphasize a few other points.

17        So if you look at this White House campaign, what -- and,

18   again, it's a multipronged campaign, just like back in 2017

19   you've got the multiprongs of federal pressure coming from --

20   then coming from congressional hearings, coming from public

21   statements from senior federal officials, and then you've got

22   these private meetings.  You see the same dynamic with this

23   White House campaign of pressure.

24        You've got basically the public statements, the public

25   threats coming from Jennifer Psaki, coming from Kate
```

1    Bedingfield and so forth.  And then you've got these private
2    threats.  And the private threats are really an abusive
3    campaign of demand after demand after demand from Rob Flaherty.
4        And, again, he's the only White House official that we've
5    got documents from directly so far in this case.  But if he's
6    any example of what's going on, we're talking about levels of
7    censorship that should make your eyeballs burn.
8        So, for example, Tab 25 of your binder is just a selection
9    of the Rob Flaherty emails we received in discovery in lieu of
10   his deposition rather late in the case.  And just highlighting
11   in there just gives you a flavor of what he's saying in these
12   communications.
13       He's making, for example, implied threats like, you know,
14   "Hey, here's a document that's informing our thinking
15   internally and is not necessarily the lower bounds of what
16   we're expecting.  Or, again, Andy Slavitt in one of these
17   emails saying internally we don't like how you have not been
18   giving us all the information we're demanding and not censoring
19   what we're asking for internally.  Quote, "We're considering
20   our options what to do about it."
21       So when you juxtapose these, I think the Court really very
22   very aptly summarized these in your motion to dismiss order
23   when you said, "We've alleged threats, some implied and some
24   quite blatant."  And you see that here in the Flaherty emails.
25   You also see it in the public statements from senior White

1    House officials.

2        And then what you see is essentially a kind of collapse of

3    resistance.  The platforms are really brought to heel by mid

4    2021.  And they appear to be essentially, you know, falling

5    over themselves to do whatever the White House demands.  As

6    Nick Clegg says, we want to do -- "We hear your call for us to

7    do more.  We want to meet with you and understand what the

8    White House expects from us on disinformation going forward.

9        And then you see these emails, for example.  Some of these

10   are tabbed in the binder where the Surgeon General's Office

11   says, "Hey, please report back in 14 days about what new or

12   additional steps you've taken to go after disinformation in

13   your platform."  And, sure enough, 14 days later you have an

14   email back from Nick Clegg from Facebook.  And he's saying,

15   "Oh, here's all the new and additional steps we've taken."

16   They said, "No, it's all only old stuff," that directly

17   contradicts the text of the email.

18       That email says, here's a long list.  He's got five bullet

19   points with four sub bullet points of here's all the new --

20   here's the new stuff we've done to go after the disinformation

21   dozen.  We've expanded the list of claims we're going after.

22   We expanded penalties for repeat spreaders, etcetera etcetera,

23   etcetera.

24       And you see this also reflected in the CDC's documents

25   because the CDC at this time, after that July 2021 exchange

1    where Facebook who had been kind of resisting some of the White

2    House's demands, is now kind of saying, "We'll do whatever you

3    want."  What you see is the CDC -- you see the Facebook content

4    moderation officer reaching out to the CDC again and again with

5    long list of claims of supposed misinformation saying -- and

6    first they say, hey, CDC our content moderation policy says

7    we'll take down stuff that's false and could lead to vaccine

8    hesitancy.

9        And then they email and they say, here's a long list of

10   claims for each one of these.  Could you please tell us whether

11   or not it's false and leads to vaccine hesitancy?  And the CDC

12   is delighted to oblige.  They say, yes, we'll be happy to do

13   it, you know.  And we'll go through the list and this is false

14   and this is false, and this is false.

15       And the response, you know, Carol Crawford discloses stock

16   statement one sentence, no support, "All this could lead to

17   vaccine hesitancy."  And then Facebook reports back and says,

18   "As a result of our work together, we're taking down all those

19   claims that you guys have debunked.

20       So essentially Facebook is outsourcing.  And they're doing

21   this for prospective claims as well.  So when you get to the

22   vaccines are approved for late childhood, the vaccines are

23   approved for early childhood, you get Facebook going back to

24   the CDC and saying, "We're anticipating that people are going

25   to say a bunch of stuff when this happens.  Could you please

1  prebunk them for us.  Tell us whether they're false or

2  misleading, and then we're just going to do whatever you tell

3  us.

4      So you almost have an outsourcing of content moderation

5  from Facebook to the CDC that goes on in late 2021 and going on

6  into 2022.  And some of those are tabbed in the binder.

7      I want to jump forward a little bit, Judge.  There's other

8  tabs in the binder.  But in the last few minutes of my time I

9  just want to emphasize that I take the principal defense in

10  this case is we're not doing it anymore.  Right?  Their

11  argument is they say our evidence is stale.  Right?  They say,

12  "Well, you're evidence is old.  Well, we got documents from you

13  a year ago.  And the censorship activities go right up to the

14  time you produced your documents.

15      And you're saying, you know, you don't have any documents

16  since, you know, August or September of 2020 when we made our

17  major document production.  That should be no surprise to

18  anyone.

19      As I said at the beginning, what you actually see is every

20  objective indicator, both in their private emails, their

21  private text messages between Jen Easterly and Matt Masterson,

22  their public statements, their leaked documents, and in their

23  conduct, shows a firm commitment to this censorship enterprise,

24  a firm commitment to continue engaging in these censorship

25  activities.

1      And I'm just going to highlight just a few examples of

2   this.  For example, you've got a long series of public

3   statements from the White House saying we want to have the

4   social media platform start censoring on new topics we're

5   concerned about.

6      For example, in the summer of 2020, gender information,

7   disinformation campaigns against female and LGBDQ plus

8   journalists, whatever that means.  Right?  Abortion-related

9   speech.  Climate change is a big one.  Actually it's very

10  timely.  If you were on Twitter yesterday, you may have seen a

11  republican presidential candidate reporting that Linkedin had

12  booted him off Linkedin for saying climate disinformation.

13     That's something that the White House and other senior

14  federal officials in the record have been hammering and

15  demanding more censorship of going back at least to Gina

16  McCarthy's public comments in the summer of 2022.

17     You see this in CISA.  And CISA last -- late last fall --

18  there's a -- or early last fall, there's a leaked document that

19  says that CISA wants to expand its disinformation efforts to

20  address things like the war in Ukraine, racial justice, the

21  U.S. withdrawal from Afghanistan.  Why does CISA want to pull

22  down misinformation about that, I wonder, you know, financial

23  services and so forth.

24     If that was a leaked document report, when Brian Scully

25  was asked about those in his deposition, he confirmed almost

1  every single one of them.  He said, "Yeah, we've got a program

2  with treasury to go after disinformation about the financial

3  services industry.  Yes, we have people detached to a task

4  force to talk about mis and disinformation relating to the war

5  in Ukraine, and so forth.

6      The FBI.  Elvis Chan did a wonderful public statement at

7  the end of the 2020 election cycle.  He said, "As soon as 2020

8  was over, we jumped right in 2022."  There's no indication the

9  FBI has ever stopped in its flagging activities.  In fact, it

10  shows every indication that it's ongoing.

11      The Election Integrity Partnership.  The Election

12  Integrity Partnership posted 14 updates on its website about

13  its activity last year in the 2022 election cycle.  So it's

14  humming along strong.  They set it up in 2020 and it's going

15  on.

16      I didn't talk about the Virality Project.  There's some

17  tabs about that.  So it calls itself the Election Integrity

18  Partnership through 2020; then in early 2021, starts calling

19  itself the Virality Project.  It's the same people using the

20  same techniques interfacing with the same partners and federal

21  agencies and platforms, and so forth, doing the same kind of

22  surveillance; and engaging in the same kind of censorship

23  activities.

24      They gave it a new name.  Now we're the Virality Project.

25  Then fast forward a year, you know, we're the Election

1    Integrity Partnership again are we're still doing it all
2    throughout 2020.  And you have public statements from Renee
3    DiResta that say this problem is not going away and we've got
4    to keep doing it.  So there's a firm expression of commitment
5    that it's going to keep going on in the next election cycle
6    that's coming at us next year and so forth.
7        I think two facts here are extremely telling.  Eight days
8    before we filed this lawsuit, DHS announced the Disinformation
9    Governance Board, Exhibit 1 to Glenn declaration that's filed
10   way back last summer when we first moved for PI doc 10-1
11   Exhibit 1 are the leaked documents from DHS that relate to the
12   Disinformation Governance Board.
13       And what they show, what they show is that the DGB was not
14   a new censorship program.  It was created to impose a
15   bureaucratic structure on the censorship that was already going
16   on that was so big and so extensive it needed to create another
17   whole new federal agency within DHS to oversee it essentially.
18       So the DGB itself that they then retreated from after the
19   public backlash was evidence of this firm commitment and the
20   fact that the censorship activities are expanding relentlessly.
21       And then, finally, you have from February of 2022, again,
22   two months before the lawsuit, you have the text messages from
23   Jen Easterly -- this is last tab in your binder -- from Jen
24   Easterly to Matt Masterson where she's saying, "You know, on
25   this call we're having the platforms, I'm looking to play a

1     coordination role, a coord role, a coordination role because it

2     would cause a lot of chaos if every department and agency is

3     independently communicating with the platforms."

4        So what does that reflect?  She knows there is -- this is

5     going on in Mayorkis' words, "across the federal enterprise,"

6     and that it's so big that DHS wants to, kind of like, come in

7     and take control of it all because censorship activities are

8     going on throughout the federal government.

9        So, Your Honor, that's 45 minutes by my watch.  So I'll

10    stop there and just invite the Court's questions.

11           THE COURT:  You reserve 15 minutes after that.  So

12   I'm going to wait on my questions until everybody finishes and

13   try to do it that way.  I'm going to try to lay off the

14   questions, but I'm not going to promise.  Okay.

15           MR. SAUER:  Thank you, Your Honor.

16           THE COURT:  Go ahead.  Anybody need a break or are

17   you ready to go?  Y'all ready to proceed?

18           MR. GARDNER:  We're ready, Your Honor.

19           THE COURT:  Okay.  Go ahead and proceed.

20           MR. GARDNER:  Unless -- if anyone else needs a break.

21           THE COURT:  Ma'am?  Sir?  Oh, you need one?  If you

22   need one.  Okay.  Go ahead and proceed.  Thank you.  My

23   understanding is you're going to break it up.  However you want

24   to do it, that's fine.

25           MR. GARDNER:  Yes, Your Honor.  Just so you're aware.

1    We're going to break it three ways.  My colleague Kyla Snow is

2    going to begin.  Then my colleague Indraneel Sur will go, and

3    then I will finish up.

4                THE COURT:  Sure that's fine.

5                MR. GARDNER:  Thank you.

6                THE COURT:  Go ahead.  Good morning.

7                MS. SNOW:  Good morning, Your Honor.  And may it

8    please the Court, I'm Kyla Snow on behalf of the federal

9    defendants.

10        In today's hearing, as in plaintiffs' briefing, you've

11    been presented with an assortment of out-of-context quotes and

12    select portions of documents that distort the record to build a

13    narrative that the bare facts simply do not support.

14        What you haven't heard today, but which defendants'

15    briefing lays out in detail, is all of the context and

16    additional evidence contradicting plaintiffs' narrative that

17    plaintiffs either mischaracterize or ignore.  For instance, in

18    response to defendants' paragraph by paragraph refutation of

19    plaintiffs' proposed findings of fact which illustrate the vast

20    deficiencies in the evidence, plaintiffs largely say nothing.

21        And, in response to defendants' proposed findings of fact

22    in our PI opposition brief, plaintiffs refuse to give the

23    paragraph by paragraph answers that parties typically provide.

24    Instead they simply restate their narrative, obfuscating the

25    facts and repeating the word "censor."

1          But stripped of plaintiffs' labels and hyperbole, the

2     record does not show the First Amendment violations they ask

3     the Court to read into it.  Instead what it shows, in the face

4     -- is that in the face of urgent crises, a once-in-a-generation

5     pandemic and bipartisan findings of foreign interference with

6     U.S. elections, the government responsibly exercised its

7     prerogative to speak on matters of public concern.

8          It promoted accurate information to protect the public and

9     our democracy from these threats.  And it used the bully pulpit

10    to call on various sectors of society, including social media

11    companies, to make efforts to reduce the spread of

12    misinformation.

13         It is that legitimate, government speech that plaintiffs

14    seek to silence in a sweeping preliminary injunction that would

15    effectively preclude the government from taking action in the

16    public interest, including as relates to matters of national

17    security.

18         The evidence here is far from sufficient to justify that

19    preliminary relief, and plaintiffs do not even -- counsel on

20    the other side does not even mention the preliminary injunction

21    factors, which is why we are here today to determine whether

22    they are entitled to a preliminary injunction.  But as my

23    colleagues and I will discuss today, plaintiffs fail to carry

24    their burden on any of the PI factors.

25         I will begin by discussing irreparable harm.  And my

1    colleague, Mr. Sur, will address the merits of plaintiffs'

2    First Amendment claims, and my colleague Mr. Gardner will

3    address the bounds of harm and scope of relief.  And he will

4    also address some issues relating to plaintiffs' motion for

5    class certification.

6        So turning to irreparable harm, and before jumping into my

7    main points about the evidence on irreparable harm, I want to

8    emphasize that to obtain the extraordinary remedy of a

9    preliminary injunction, plaintiffs bear the burden of pointing

10   to evidence making a clear showing of imminent, irreparable

11   harm.  And that is critical to the question of whether they're

12   entitled to a PI because a PI is -- the purpose of a PI is to

13   preserve the status quo and to prevent further harm before the

14   Court can rule on the merits.

15       As the Fifth Circuit said in *Google versus Hood,* this

16   principle applies in First Amendment cases as well.  It said,

17   "Invocation of the First Amendment cannot substitute for the

18   presence of an imminent, nonspeculative, irreparable injury.

19       And here when you're before the Court in PI proceedings,

20   unlike the motion to dismiss proceedings, plaintiffs cannot

21   simply rely on the allegations in their complaint, and their

22   allegations are not entitled to a presumption of truth.  They

23   must substantiate their assertions with evidence.  And that

24   evidence must show that the harms purportedly caused by

25   defendants are of such an immediate nature that a PI is

1    necessary to preserve the status quo.  And plaintiffs fail to

2    make that showing.

3        They attempt to substantiate their claims of irreparable

4    harm in the briefing by submitting several declarations from

5    the plaintiffs.  But the declarations set forth only past

6    content moderation decisions by social media companies and fail

7    to link any of those decisions to the conduct of the defendant.

8        And, in fact, the record shows that much of the conduct of

9    defendants that plaintiffs challenge here is not currently

10   ongoing or likely to occur during the pendency of the lawsuit.

11       Considering all of that, plaintiffs' asserted harms caused

12   by allegedly caused by defendants' lawful conduct are not

13   actual or imminent.  They are speculative and hypothetical and

14   are insufficient to support a preliminary injunction.

15       So as to the declarations, plaintiffs rely primarily on

16   declarations that were submitted one year ago with their

17   initial motion for -- nearly one year ago with their

18   preliminary injunction motions submitted in June of last year.

19   These declarations are stale.

20       Despite having the opportunity to supplement them and

21   having access to voluminous discovery, many documents and

22   testimony, plaintiffs have largely not supplemented them.  They

23   have submitted two additional declarations.  I will discuss

24   those in a moment.

25       But as to the remainder of the nearly year old

1   declarations, these are -- point to conduct that occurred far

2   in the past.  Social media company content moderation decisions

3   that occurred a long time ago, many of them point to decisions

4   occurring in 2020 and in 2021.  The most recent decision,

5   content moderation decision that Dr. Bhattacharyna points to,

6   for instance, is in March of 2021, more than two years ago; and

7   Mr. Kulldorff says -- points to conduct occurring up to January

8   of 2022.  The same is true of Mr. Kheriaty who asserts that

9   content moderation became, quote, "more pronounced in 2022."

10       And the same is true also for the States of Missouri and

11  Louisiana who submitted declarations that included instances of

12  YouTube moderating videos that they've asserted that they've

13  posted to YouTube in the fall of 2021.  And they don't point to

14  anything affecting their own speech since then.

15       And this is important because, in the absence of any

16  social media content moderation decisions affecting the

17  plaintiffs, much less any that can be traced to the conduct of

18  the defendant, occurring in the last year or more, there is

19  insufficient evidence to sustain a finding that a preliminary

20  injunction is necessary now to preserve the status quo while

21  the Court considers the case on the merits.  And, again, that

22  is the central purpose of a preliminary injunction.

23       The plaintiffs implicitly acknowledge the deficiencies in

24  the evidence and try to rectify it by submitting the two new

25  declarations that I referenced earlier.  Those come from

1    Mr. Hoft and Ms. Hines.

2        And I want to note the fact that the fact that they have

3    only submitted two new declarations is telling about the

4    -- their ability to point to any more recent conduct as to the

5    other declarants.  It suggests that the evidence is simply not

6    there.

7        Even so, these two declarations, like all the others, are

8    insufficient to show irreparable harm for another reason that I

9    mentioned earlier, and that is that they fail to link any of

10   the asserted instances of content moderation affecting their

11   speech to any conduct of a particular defendant.  And that

12   makes their assertions of irreparable harm even more

13   speculative.

14       So take, for instance, Ms. Hines' supplemental

15   declaration.  She is one of the only declarants who points to

16   particular conduct of the defendant.  And she says in her

17   declaration at paragraph 15 that, according to her, the

18   evidence shows that the Surgeon General's Office cooperated

19   with the Virality Project to target health freedom groups such

20   as hers.

21       But, in fact, as outlined in defendants' responses to

22   plaintiffs' proposed findings of fact at paragraphs 330 through

23   337, and 1,266 through 1,323, which plaintiffs ignore, there's

24   no evidence that the surgeon general collaborated with the

25   Virality Project.

1       The Virality Project does not mention Health Freedom

2   Louisiana or Ms. Hines.  And, most importantly, the Virality

3   Project has not been active since 2022, with its final report

4   being issued in February of that year.  And the Surgeon

5   General's Office does not currently have any contact with the

6   Virality Project, as is documented in defendants' declaration

7   from Mr. Max Lesko at Exhibit 63 paragraph 14.

8       Any content moderation decisions of which Ms. Hines

9   complains from Facebook in 2023 in her declaration cannot

10   possibly be liked to any alleged involvement of the Surgeon

11   General's Office with the Virality Project.

12       And, as to the remainder of the declarations, again, none

13   of them link any of the conduct -- the content moderation

14   decisions at issue to any conduct of defendants.  The only

15   other one that points to any conduct of a defendant comes

16   -- well, there's two of them, Doctors Bhattacharya and

17   Dr. Kulldorff.  They both discuss the same conduct.

18       And they say in their declarations that in October of

19   2020, there was an internal email between Doctors Fauci and

20   Collins that referenced the Barrington Declaration that they

21   coauthored.  And they attribute that internal email to content

22   moderation decisions that companies took concerning the

23   Barrington Declaration.

24       But that internal email is not evidence of a communication

25   with a social media company.  And that was -- that internal

1    email was from October of 2020, more than two and a half years

2    ago.  And Dr. Fauci is no longer in government.  And there is

3    no assertion that Mr. Auchincloss's successor was in any way

4    involved with that communication.

5        These assertions of eminent harm based on content

6    moderation decisions occurring long in the past are -- do not

7    show any imminent harm today that can be traced to the conduct

8    of any ongoing conduct by a defendant in this case.  And,

9    otherwise, the declarations are purely speculative.

10       And plaintiffs' fear of imminent, irreparable harm is even

11   more speculative given that the record shows that much of what

12   plaintiffs challenge is past government speech and action that

13   is not ongoing and is unlikely to recur during the pendency of

14   the lawsuit.

15       And in enjoining past conduct is not necessary to preserve

16   the status quo while the Court considers the case on the

17   merits.  Instead enjoining past conduct would amount to an

18   advisory opinion that courts lack power to issue under Article

19   III as the Supreme Court said in *Transunion*.

20       But plaintiffs spend a substantial portion of their

21   discussion on conduct occurring -- occurring long in the past

22   in the 2022 -- 2020 election cycle and in 2021 and 2022

23   relating to COVID-19.

24       And I'll just point out just a couple examples.

25   Plaintiffs again reference conduct of Dr. Fauci in 2020.  They

1    basically acknowledge in their briefing that the only reason

2    that NIAID is in this case relates to conduct by Dr. Fauci.

3    Again, Dr. Fauci is no longer in government.  They assert that

4    they are still irreparably harmed because his -- Dr. Fauci's

5    successor received an email, again, an internal email in 2020.

6         But receiving an email, an internal email, three years ago

7    has nothing to do with content moderation decisions that social

8    media companies are taking today, and is not the basis for any

9    irreparable harm or a preliminary injunction.

10        And, as to CISA, plaintiffs, again, reference conduct

11   occurring long in the past.  They reference switchboarding in

12   the 2020 election cycle.  Again, conduct occurring in 2020

13   cannot be the basis for finding irreparable harm or enjoining

14   the CISA today.

15        As the evidence shows, and plaintiffs do not really

16   dispute, CISA has not been engaged in switchboarding since

17   2020.  Regardless of whether -- you know, when CISA made a

18   decision about whether to engage in switchboarding in the

19   future, the fact is that that conduct has not occurred since

20   2020.  And that is enough to conclude that there is no

21   irreparable harm here.

22        But, in any event, the government has submitted a sworn

23   declaration from CISA stating that it does not plan to engage

24   in further switchboarding in the 2020 election cycle.

25        Again, this conduct was lawful and responsible and helpful

```
1    to the public to protect against threats to national security
2    and to election infrastructure.  But the fact is when the Court
3    is considering whether to enter a preliminary injunction,
4    regardless of what the Court concludes about the merits of the
5    case, the question is whether it is necessary to enjoin conduct
6    that is -- has any likelihood of causing ongoing or eminent
7    harm to plaintiffs at this time.  And it does not show that.
8         In the absence of that evidence, plaintiffs say that
9    defendants have decided to expand the -- into other realms.
10   And they suggest that if they had more discovery, they could
11   show more.  But the record that the Court has now, and the
12   sworn testimony from the defendants shows the contrary.  And
13   all of the, you know, additional or, quote, "additional
14   conduct" that plaintiffs refer to does not have any link to the
15   activities of social media companies today.
16        For instance, plaintiffs point to a memorandum on the
17   establishment of the White House Task Force to address on line
18   harassment and abuse.  And they, you know, pull the phrase
19   "gender misinformation" from this.  But they do not assert that
20   this memorandum imposes any requirements on social media
21   companies or that social media companies have taken any action
22   against particular content because of this memorandum.
23        And plaintiffs have not drawn that link with respect to
24   any of the other subjects of which the government has spoken
25   about generally using the bully pulpit or exercising its
```

1   executive authority to take, you know, policy actions or make

2   policy decisions, they have not linked it to particular actions

3   of social media companies.  And that just underscores the fact

4   that plaintiffs here seek to challenge of government speech in

5   the abstract with which they disagree.  But neither Article

6   III, nor the First Amendment, opens the door to this

7   unprecedented challenge to government speech to which they

8   disagree.

9       Again, they must show irreparable harm that stems from the

10  conduct of social media companies that can be traced directly

11  to the conduct of a defendant, and they cannot do so.

12      Finally, Your Honor, I will just mention -- I just want to

13  touch on one more thing that was an issue in the briefing that

14  I wanted to make sure that defendants have an opportunity to

15  address today.  And that is the evidence submitted by

16  Dr. Gurrea and other evidence that illustrates the myriad

17  factors that social media companies are considering when they

18  make content moderation decisions on their platforms.

19      Plaintiffs' theory of causation in this case essentially

20  requires assuming that all content moderation decisions made by

21  separate, private social media companies in the past and in the

22  future can necessarily be traced to the conduct of 67 different

23  federal defendants.  And, on that basis, they have shown

24  imminent, irreparable harm.

25      But that fails for several -- for much of the evidence

1    that defendants have presented, including an expert report by

2    Dr. Gurrea, who is an economist, who shows that companies are

3    -- the social media companies are intrinsically economically

4    incentivised to moderate content on their platforms.  They have

5    done so since their existence.

6        And they have moderated or modified their content

7    moderation policies in response to current events.  And that

8    includes, you know, bipartisan findings of interference with

9    the 2016 U.S.  elections when social media companies responded

10   by modifying their content moderation policies to focus on

11   election-related misinformation.

12       That also includes at the start of COVID-19 when social

13   media companies took their existing public health

14   misinformation policies, many of the social media companies

15   already moderated content relating to public health, as

16   defendants' briefing and evidence submitted shows, well before

17   COVID-19.  But during COVID-19, social media companies modified

18   their content moderation decisions, their policies to apply

19   those public health misinformation policies to COVID-19.

20       And plaintiffs have not rebutted this evidence.  They

21   attribute instead to Dr. Gurrea an opinion that he did not

22   reach.  And the Court should disregard plaintiffs' assertions

23   on that score.  Dr. Gurrea, contrary to what plaintiffs have

24   asserted in the briefing, Dr. Gurrea did not conclude that

25   platforms would have moderated all the content the federal

1    officials flagged or demanded because of economic incentives,

2    as plaintiffs argue.

3        Dr. Gurrea opined instead, quote, "Social media platforms

4    have strong market-based economic incentives to moderate the

5    content on their platforms," unquote, at paragraph 12.

6        And that plaintiffs have not rebutted the economic

7    incentives that exist with any particular evidence showing

8    that, despite these other factors, that social media companies

9    consider the economic concerns or, you know, public calls for

10   social media companies to do more, that -- that in spite of all

11   these other factors that they have considered, that they have

12   taken particular content moderation decisions or that they will

13   do so in the future that affects any particular plaintiff here

14   because of defendants.

15       And in the absence of their ability to do that, they have

16   not shown any irreparable harm that warrants a preliminary

17   injunction here.

18       Again, plaintiffs bear the burden of submitting evidence

19   making a clear showing that they are suffering or will suffer

20   irreparable harm before the Court can rule on the merits, and

21   they have not done so.

22       And so I will turn it over to my colleague Mr. Sur to

23   address the merits.

24           THE COURT:  Okay.  Thank you, Ms. Snow.  Okay.  Go

25   ahead.

1      Good morning.

2           MR. INDRANEEL:  Good morning, Your Honor.  I will

3      address the merits of the First Amendment arguments.

4           THE COURT:  Okay.

5           MR. INDRANEEL:  And I'll begin with the Free Speech

6      Clause, of course, which concerns how the government may

7      respond to private speech.  But that clause does not limit the

8      government's own speech.

9      And, under the Government Speech Doctrine, there's a

10     recognition that it is the very business of government to favor

11     and disfavor points of view.  As the Supreme Court explained in

12     *Pleasant Grove City, Utah versus Summun*, that was a 2009 case,

13     where the Court was quoting Justice Scalia's opinion from

14     *National Endowment For The Arts versus Finley,* which was a 1998

15     case.

16     And what this means is that when the government is the

17     speaker, it is entitled to say what it wishes.  That's a phrase

18     from *Rosenberger versus the University of Virginia* from 1995.

19     So bearing that in mind, and consistent with that

20     doctrine, the free speech clause does not preclude the

21     government from, for example, making information available to

22     platforms on topics such as scientific and medical information

23     about a deadly virus and the vaccines that counter that virus;

24     or about -- again, just as another example -- the government's

25     views about what might be covert, foreign, malign efforts to

1    influence American elections and other American discussions

2    about major problems.

3        And that's essentially what the plaintiffs are arguing for

4    here on the merits.  They would have this Court reduce the

5    Government Speech Doctrine to what would essentially be a

6    triviality.  And, instead, they've seemed to argue that the 67

7    defendants here embarked on a monolithic, quote, "censorship

8    enterprise," closed quote, across two administrations.  But the

9    plaintiffs lack evidence sufficient to support a finding that

10   would give them likelihood of success on the merits of that

11   sprawling claim.

12       Instead the conduct of each defendant is properly examined

13   on its own.  And, under the State Action Doctrine, it's also

14   appropriate to keep in mind the need to maintain the essential

15   dichotomy between private conduct and public conduct, which is

16   subject to the Constitution.

17       The plaintiffs simply lack evidence as to any agency

18   demonstrating the type of significant encouragement or coercion

19   or joint action or pervasive entwinement that turns private

20   decisions into state action under the established Supreme Court

21   precedent.

22       Rather, what we have here in the record is evidence that

23   each platform made its own decisions under the terms of its own

24   content moderation policies and using its own independent

25   judgment.  And for similar analysis, we've relied on our brief

1    in the analysis of the Ninth Circuit in the *O'Handley* case from
2    2023.

3        Importantly the platforms are very large, independent
4    corporations.  And they decided for themselves what content to
5    allow and what not to allow through their terms of service.
6    The major platforms, including Facebook Google and Twitter,
7    have long imposed content moderation measures through those
8    user terms of service because they depend on advertising
9    revenue.  This is explained well by Dr. Gurrea.  And major
10   companies do not want their brand names to be tarnished by
11   appearing next to objectionable, user-generated content.

12       I might add, Your Honor, that we did hear this morning
13   about some of the submissions that the plaintiffs made along
14   with their reply brief.  And one of those submissions was, as
15   counsel for the plaintiffs mentioned, a letter that the law
16   firm of Covington and Burling put in in addition to the
17   declaration of Mr. Roth before the Federal Election Commission.

18       In that letter, Twitter explained some of its business
19   imperatives for its policies for content moderation including
20   the content moderation policy from 2018 on hacked materials
21   that Twitter applied to some *New York Post* coverage which
22   Twitter then within 24 hours decided was a mistake.

23       So that letter from Covington and Burling, considered as a
24   whole, confirms this point that the platforms have their own
25   terms of service on users for content moderation.  And there

1    are business imperatives for the platforms to moderate content

2    in quite that fashion.

3        And that's exactly what we saw the platforms do, according

4    to the evidence.  For example, when the health experts around

5    the world, including the World Health Organization, pointed out

6    that misinformation concerning the COVID-19 pandemic threatened

7    to become a danger on its own terms, the platforms quickly

8    turned to moderating user-generated posts that contained what

9    the platforms viewed as misinformation about the virus and then

10   about the vaccines.

11       So what we submit the record will show is a lack of

12   sufficient evidence for this assertion that the government

13   communications in the record was what spurred the platforms to

14   somehow meaningfully alter the content moderation policies, be

15   it against misinformation concerning COVID-19, or the U.S.

16   elections or other topics.

17       The plaintiffs also lack factual support for this notion

18   that they've met the stringent requirements of the State Action

19   Doctrine by somehow pointing to legislative proposals and other

20   discussions about possible amendments to Section 230 of the

21   Communications Decency Act and antitrust enforcement actions

22   which, you know, at various points have been discussed as a

23   potentially appropriate response to the rising economic power

24   of the major platforms.

25       To begin with, the representatives and senators who made

1    those proposals are not parties here.  And, even apart from

2    that, there's insufficient evidence to support a finding that

3    any defendant warned of any platform that if the platform

4    failed to moderate certain user-generated content or if the

5    platform failed to change a policy that the result would be

6    some concrete change to Section 230, or some actual antitrust

7    proceeding.

8        Statutes such as Section 230 are always susceptible to

9    amendment.  And the mere possibility of reform of a statute

10   couldn't be enough to turn the conduct of private firms

11   affected by a statute into state affection.  If that -- if it

12   were the case that mere possibility of statutory change were

13   sufficient, practically every business would become a state

14   actor.  And that undermines, if not eliminate, the essential

15   dichotomy between the private and public entities.

16       So I would turn briefly to the merits, as I said.  But I

17   just want to simply reiterate the point that the plaintiffs put

18   in approximately 1,440 proposed findings of fact, counting each

19   paragraph separately.  And, in response, the defendants did

20   provide a response to each of those.

21       The plaintiffs' presentation this morning essentially

22   assumed or proceeded as though the defendants had not put in

23   the opposition paragraph by paragraph.  And so many of the

24   assertions that we did hear on the merits this morning, the

25   defendants' response to the proposed findings of fact by the

1    plaintiffs do explain why the record does not support the kinds

2    of characterizations that the plaintiffs are relying on.

3        And so, with that observation, I will try to give a

4    -- some of the high points of the defendants' views on the lack

5    of merits on the First Amendment point.

6        So we heard, for example, about some of Mr. Flaherty's

7    communications.  He was the White House digital director.  And

8    there's insufficient evidence that his comments coerced

9    platform.

10       Now, Mr. Flaherty was asking questions about the content

11   moderation policies and how they worked in practice.  And those

12   questions did not become demands for adverse action, whether it

13   was removal or demotion or labeling.  He was trying to

14   understand how those different kinds of content moderation are

15   actually working in practice.

16       So he asked such questions as, "Can you share more about

17   your framework here?"  At one point, he asks Facebook, as we

18   have long asked for, how big the problem is, what solutions

19   you're implementing and how effective they've been.  And that

20   was consistent, as an aside, with the administration's public

21   statements of where, for example, the press secretary had

22   called for companies to measure and publicly share the impact

23   of the misinformation on their platforms.

24       And one of the reasons that it's helpful to think about

25   the inquiry that was at issue here is that the platforms

1    themselves were saying that there were content moderations,

2    other than removal, that would apply to certain kinds of

3    content.

4         So some things were essentially so dangerous, in the

5    platform's view, that that would be appropriate for removal.

6    But other kinds of content, which goes by the umbrella term

7    "borderline content," was subjected by the platforms to other

8    types of content moderation measures, such as reducing the

9    distribution of a post or applying a fact check label to it.

10        And the plaintiffs seem to assume that anything that isn't

11   removed must therefore be permissible and allowed.  And that's

12   simply not the case because the platforms, clearly on the

13   borderline content area, reserved under their own terms of

14   service the right to apply other kinds of moderation measures

15   short of removal to various posts.

16        But the trouble is that the platforms were never exactly

17   clear about what moderation, short of removal, exactly meant

18   and where it was being applied.

19        So, for example, the Defense Exhibit 20 is -- has a

20   statement from Facebook in February of 2021, this is February

21   8th.  And Facebook announced that the claims about COVID-19 or

22   vaccines that do not violate these policies, will still be

23   eligible for review by our third-party fact checkers.  And if

24   they are rated false, they will be labeled and demoted.

25        So there was what Facebook calls at another point, a

1    spectrum of content moderation measures that they would apply.

2    And it was not clear which measure applied, where and for what

3    reason.  And that's what Mr. Flaherty, among others, were

4    asking questions about.

5        I will offer just one more illustration of the open

6    endedness of some of the terms of these policies where Facebook

7    said that it would focus on content that does not violate the

8    misinformation and harm policy, but may contribute to vaccine

9    hesitancy or present a barrier to vaccination.  And this

10    includes, for example, content that contains sensational or

11    alarmist vaccine misrepresentation.  So that kind of content

12    would be subject to some of their content moderation measures

13    possibly short of removal.

14        And, as I say, and I think what's clear is, terms like

15    "sensational" or "alarmist" are obviously open ended ones.  And

16    it was legitimate and appropriate for government officials to

17    ask exactly what platforms meant by terms of that sort.

18        The platforms themselves said that they were interested in

19    combating the problem of vaccine hesitancy.  The White House

20    shared that broad policy preference.  But sharing that broad

21    policy preference is a far cry from the conclusion that the

22    particular content moderation decisions that the platforms were

23    making were at the behest of the White House or did not reflect

24    the independent judgment of the platforms.

25        As one example that I -- that I will point to there where,

```
 1    you know, there were questions for Mr. Flaherty.  But when the
 2    platform gave an answer and there wasn't -- there's no record
 3    evidence of retributive action against the platform for not
 4    answering the questions, let alone for not applying any
 5    particular content moderation decision, is the Mr. Tucker
 6    Carlson example that plaintiffs raised this morning that arises
 7    in an April 14, 2021 exchange.  And after the White House
 8    officials, you know, ask questions about a Tucker Carlson post
 9    about vaccines, Facebook's response was clear.  Facebook said,
10    "Regardless of popularity, the Tucker Carlson video does not
11    qualify for removal under Facebook's policies."  And that's
12    docket 174-1 at 34.
13             THE COURT:  Didn't they say, though, that they were
14    going to reduce it?
15             MR. INDRANEEL:  It prompted further questions from
16    Mr. Flaherty.  How was this Tucker Carlson video not violative?
17    What exactly is the rule for removal verses demoting, moreover,
18    you say reduced and demoted.  What does that mean?
19         So to Your Honor's point, I think that was part of the
20    discussion, you know, what is -- what is reduction and what is
21    demotion?
22         But if what the plaintiffs are saying is that anything
23    that was not removed was something that the platforms were
24    somehow required to keep up in the way that the -- you know,
25    the poster wanted, I don't think that this exchange supports
```

1   that view because qualify for removal is a judgment that

2   Facebook made, but it could have made other judgments about,

3   you know, the distribution.

4        And there's no technical means that the government had to

5   influence that.  And there's also, you know, nothing in the

6   record that even -- even suggests that, you know -- Again, the

7   government's reasons for asking these questions was that the

8   levers, the spectrum of responses were the platform's spectrum

9   of responses and not the government's.

10       Related to the White House correspondence, we also heard

11  this morning about the surgeon general's advisory.  And I just

12  want to note there that Facebook made what we think is quite a

13  telling response in the public setting in July of 17 -- July

14  17th of 2021.  This was after the rollout of the surgeon

15  general's advisory.

16       Facebook announced that it was already taking on the eight

17  recommendations from the surgeon general.  And Facebook then

18  -- it's a four-page document at Exhibit 71.  Facebook is

19  pointing to measures that it had in place since April 2020,

20  more than a year prior to the advisory.

21       And in that document, Facebook is not listing a single new

22  action that the company said it was taking in response to the

23  advisory.  Again, what it was describing was conduct that it

24  was already doing to address the recommendations.

25       So that shows that the decisions that the platform was

1    making was not significantly encouraged.  It wasn't a change in

2    policy that resulted from the advisory, because it had already

3    been working on the problems that it felt the surgeon general

4    was, you know, issuing these recommendations for; let alone

5    that those eight resulted from the government's coercive power.

6        I'll turn briefly, then, to some of the other defendants.

7    We did hear about the CDC.  The CDC was not a joint participant

8    in platform decisions.  Rather the platform is voluntarily

9    elected to treat CDC as one of several authoritative sources of

10   scientific information when the platforms were evaluating the

11   user posts containing potential COVID-19 misinformation.

12       The plaintiffs have assigned to this the label of CDC

13   dictating platform content moderation decisions.  That does not

14   align with the evidence that's in this record.  We have

15   Facebook asking questions to the CDC about whether certain

16   claims in the abstract, for example, the claims that the

17   vaccines cause magnetism had been debunked by the scientific

18   sources or were false and could lead to harm or were false and

19   can lead to vaccine hesitancy.

20       But when CDC gave its responses, CDC was transparent about

21   whether the existing research that CDC had access to answered

22   that question, or whether there was just insufficient

23   information to give a response to Facebook's question.  And CDC

24   was not asking the platform in response to take any particular

25   action against any particular content.  CDC was providing

1    factual information.  And an example of that is the exchange

2    that's an exhibit to the Crawford deposition at Exhibit 26.

3        I'll turn also then to the Cyber Security and

4    Infrastructure Security Agency also not a joint participant in

5    the platform's decisions.

6        The switchboarding operations in 2020 had a particular

7    focus, which was to relay election-related potential

8    misinformation that had been identified by state and local

9    election officials; or other stakeholders, including the

10   National Association of the Secretaries of State, across the 50

11   states, and the National Association of Election Directors,

12   also at the state level.  And it was up to the platforms to

13   decide how to handle that forwarded content based on their own

14   policies.

15       So CISA made that clear at the outset that its position

16   was to never ask the companies to take any specific actions.

17   And that was in Mr. Scully's deposition made clear.

18       And then the communications themselves, Your Honor, bear,

19   according to CISA's protocol, a very clear -- I don't know if

20   it's -- if we should call it a statement or a disclaimer, but

21   it's very clear notice provided to anyone who reads CISA's

22   correspondence that CISA is not making any recommendations,

23   "about how the information it is sharing should be handled or

24   used by social media companies."

25       "Additionally, CISA will not take any action, favorable or

1    unfavorable, toward social media companies based on decisions

2    about how whether to use this information."  One example is

3    Exhibit 106 at 1, also discussed in the Hale declaration at

4    paragraph 72.

5        And the record, consistent with that representation,

6    contains numerous examples of posts where CISA conveyed it to

7    the platform on behalf of the election officials who raised the

8    concern, and the platforms declined to act.  So just one

9    example, Exhibit 108 at 1, is a Twitter email where Twitter is

10   stating that the tweet was not in violation of our civic

11   integrity policy.  And there are many more such in the record.

12   So, again, illustrating that the platforms were using their

13   independent judgment.

14       We did also hear this morning about the EIP at great

15   length.  So I do think it is worth mentioning to the Court

16   CISA's involvement with the EIP did not include founding the

17   EIP.  CISA did not fund the EIP.  And CISA did not have a role

18   in the management or operation of the EIP.  That's explained in

19   the Hale declaration in particular at paragraph 52.

20       The EIP's researchers made clear they were making, quote.

21   "Independent decisions about what to pass on to platforms, just

22   as the platforms made their own decisions about what to do with

23   our tips."  That's a statement from the University of

24   Washington, which is one of the academic institutions that's

25   part of the EIP.  And that's at Exhibit 122 at 6.

1          Indeed only 35 percent of the time that EIP shared

2    potential misinformation with the companies was the

3    misinformation, quote, "labeled removed or soft blocked."

4    That's explained at Scully Exhibit 1 at 27 and 40.  Apparently

5    no action was taken on the other 65 percent.

6          So the record is clear that CISA did not send content to

7    the EIP to analyze, and the EIP did not flag content to social

8    media platforms on behalf of CISA.  Again, that's Exhibit 122.

9          We did hear about the GEC's declaration that makes clear

10   that the GEC did put in 21 tickets.  But, again, because of the

11   EIP's own process for operating, it was entirely up to the EIP;

12   and then at a next step entirely up to the platform what to do

13   with those tickets.

14         Taken as a whole, we understand that plaintiffs have

15   various characterizations of the communications that were here

16   at issue.  But when applying the State Action Doctrine, the

17   courts have traditionally taken these kinds of

18   characterizations and, to use the DC Circuit's language in the

19   *Penthouse* case, which we relied on for its discussion of

20   coercion, drawn out the rhetoric.

21         And what the plaintiffs characterize as demands or

22   threats, in our respectful view, when the rhetoric is drawn

23   out, will show questions, you know, sometimes frustrated

24   language on both sides possibly.  But that with the rhetoric

25   drawn out, does not amount to coercion.  It does not amount to

1    significant encouragement or to joint action or persuasive

2    entwinement of the kind that the Supreme Court has made clear

3    has a very high bar for a plaintiff to turn private action into

4    action that's constrained by the Constitution.

5              THE COURT:  Okay.  Thank you.

6              MR. INDRANEEL:  Thank you, Your Honor.

7              THE COURT:  Thank you.

8              MR. GARDNER:  Good morning, Your Honor.

9              THE COURT:  Good morning.

10             MR. GARDNER:  Let me reintroduce myself, Josh Gardner

11   on behalf of the United States.

12       One of the overarching defects that pervades this case is

13   the incredible breadth and lack of specificity as to the First

14   Amendment violations by each defendant that is currently

15   causing harm to each plaintiff.

16       And while these defects are fatal to the first two

17   preliminary injunction factors, as my colleagues explained this

18   morning, it is particularly acute with respect to the bounds of

19   the harms, the scope of the injunction and plaintiffs' motion

20   for class certification.

21       With that, I want to start with the bounds of the harms.

22   As we explained in detail in our opposition and through the

23   submission of five detailed declarations, from the FBI, from

24   CISA, from the GEC, from the Office of the Surgeon General and

25   from the CDC, the harms to national security, law enforcement,

1    public health and election integrity that would result if

2    plaintiffs' injunction were to issue.

3        Plaintiffs' reply brief and their presentation today do

4    not even address the bounds of the harms, let alone dispute any

5    of the evidence presented by the defendants.  And because

6    plaintiffs bear the burden to show that the bounds of the harms

7    justifies the extraordinary remedy of a preliminary injunction,

8    their failure to even address the government's arguments should

9    alone justify denial of the preliminary injunction.

10       Nevertheless, I do want to address a few additional points

11   about the bounds of the harm.

12       First, as my colleague Ms. Snow explained earlier this

13   morning, much of the defendants' conduct, the plaintiffs'

14   challenge, is no longer ongoing.  But there are a few discreet

15   categories of conduct that are still occurring by certain

16   defendants.  And those defendants have identified significant

17   harm to the United States's national security, law enforcement,

18   public health and election integrity interests if they were to

19   be enjoined in engaging in that conduct.

20       The second bucket, Your Honor, and, frankly, the bigger

21   bucket results from the extreme overbreadth of plaintiffs'

22   proposed injunction, which would capture completely legitimate

23   conduct by the defendants that do not appear to relate to any

24   of plaintiffs' claims and, if enjoined, would significantly

25   harm the interest of the United States.

1    I will address the first bucket in the context of the
2    bounds of the harms.  And then I'm going to address the second
3    bucket when we talk about the problems of overbreadth with the
4    scope of the injunction.

5    But before I get into this first bucket, just a few brief
6    additional points.  First, both the Supreme Court in *Winter* and
7    the Fifth Circuit in *Defense Distributed* have held that a
8    preliminary injunction may be denied based exclusively on the
9    bounds of the harms.  And the Fifth Circuit decision in *Defense*
10   *Distributed* explained that even where First Amendment speech
11   rights are at issue, a district court does not err in
12   concluding that the public interest may weigh against the
13   imposition of a preliminary injunction.

14   The *Defense Distributed* case I think is particularly
15   instructive here.  In that case, the plaintiffs sought to
16   enjoin enforcement of certain laws governing the export of
17   unclassified technical data related to prohibited munitions
18   claiming that the state department's regulations constituted an
19   impermissible prior restraint.

20   The Fifth Circuit in that case said that ordinarily the
21   protection of constitutional rights would be the highest public
22   interest at issue in a case.  Nevertheless, the state
23   department had, quote, "asserted a very strong interest in
24   national defense and national security," unquote and,
25   therefore, based on the bounds of the interests, the denial of

1    the preliminary injunction was affirmed.

2        The same is true in this case.  Like in *Defense*

3    *Distributed*, the harms identified by the United States would be

4    irreversible if the Court issued a preliminary injunction;

5    whereas, any harm to plaintiffs if a PI did not issue would be

6    temporary at best.

7        For example, Larissa Napp, the FBI's executive director,

8    explained in paragraph 15 of her declaration, which is Exhibit

9    157, Your Honor, that plaintiffs' proposed injunction would

10   prohibit the FBI from identifying for social media companies

11   covert foreign malign influence operations.

12       Now, importantly here, Your Honor, former President Trump

13   issued an executive order, E013848, that was then reissued by

14   President Biden expressing the United States's strong interest

15   in preventing the ability of persons located outside the United

16   States to interfere or undermine confidence in U.S. elections

17   and recognize that this would threaten both national security

18   and foreign affairs.

19       And, as reflected in EAD Knapp's declaration, covert

20   foreign malign actors operating under a false identity may be a

21   violation of criminal law, including the Foreign Agents

22   Registration Act or FARA, as well as other federal laws.

23   That's her declaration at paragraph 15 note 9.

24       Despite plaintiffs' acknowledgment that, quote, "content

25   that itself constitutes criminal activity not protected by the

1    First Amendment," unquote, should be exempted from the scope of

2    the injunction, they nevertheless directly challenged the FBI's

3    efforts to combat covert, foreign, malign influence.

4        But plaintiffs fail to explain how any potential First

5    Amendment interest that they might have in liking or commenting

6    on posts by foreign malign actors outweighs the United States's

7    substantial national security and foreign affairs interests in

8    combating such influence operations.

9        Accordingly, Your Honor, the balance of the harms with

10   respect to the FBI's interactions with social media companies

11   to combat foreign maligned influence tip sharply against the

12   imposition of an injunction.

13       Similarly, Your Honor, as explained in the declaration of

14   Office of Surgeon General's Chief of Staff Mark Lesko, that's

15   Exhibit 63, plaintiffs' proposed injunction could be construed

16   to limit the core public health mission of the office by

17   preventing the surgeon general from issuing public statements

18   encouraging social media companies to take steps to address the

19   adverse effects of, for example, children and the use of social

20   media.    Indeed, as Your Honor may be aware, just this week

21   the surgeon general issued a new advisory on this precise

22   topic.  And, in that advisory, made recommendations to social

23   media companies about steps they could take to reduce those

24   harms to children.

25       Plaintiffs cannot show how they have a First Amendment

1    interest in curtailing what is paradigmatic government speech.

2    And any possible First Amendment interest plaintiffs may have

3    is greatly outweighed by the United States's interest in using

4    the bully pulpit to advance critical public health messages.

5    Plaintiffs' proposed injunction would substantially harm those

6    interests.

7        The third area, Your Honor, of ongoing agency action, the

8    plaintiffs appear to challenge, relates to the GEC's meetings

9    with social media companies where the topic of foreign malign

10   influence may be raised.

11       As Leah Bray, the GEC's deputy coordinator, explained in

12   her declaration, which is Exhibit 142, the GEC has a statutory

13   mandate to, quote, "direct, lead, synchronize, integrate and

14   coordinate the efforts of the federal government to recognize

15   and expose foreign states and nonstate propaganda and

16   disinformation."

17       The GEC effectuates this mission by, among other things,

18   meeting with social media companies where foreign malign

19   influence concerns may be broadly addressed.

20       Now, plaintiffs appear to challenge the GEC's

21   participation in these meetings despite the fact that they

22   cannot identify any specific action taken by a social company

23   resulting from these meetings, let alone any coercion from the

24   GEC during these meetings to take any particular action, let

25   alone any harm to the plaintiffs themselves as a result of

1   these meetings.

2        Yet, any First Amendment interest plaintiffs may have, if

3   any, again, is greatly outweighed by the GEC's substantial

4   interest in performing its critical, statutorily-mandated

5   national security mission.

6        Accordingly, Your Honor, the Court should conclude that

7   the bounds of the harms tip sharply in favor of the defendants.

8   And, for that reason alone, the motion for preliminary

9   injunction should be denied.

10       With that, I'd like to turn to the scope of the

11  injunction.  And for many of the same reasons that the bounds

12  of the harms tip sharply in favor of the United States, so too

13  is plaintiffs' injunction defective, both because it is

14  overbroad and because it lacks the specificity required by Rule

15  65(d).  And I want to turn to overbreadth first.

16       Again, as reflected in the five detailed declarations from

17  the various agencies, the proposed injunction would preclude

18  the United States from engaging in plainly lawful conduct that

19  plaintiffs may or may not be challenging.  Again, it is

20  somewhat unclear from their allegations.

21       But just as an example, in the FBI's declaration, again,

22  that's Exhibit 157, EAD Napp explains that the plaintiffs'

23  professed injunction could be rigged to bar, among other

24  things, the following conduct:  One, the FBI's ability to

25  notify social media companies of objectively false

1  election-related time, place and manner disinformation crimes;

2      Two, the FBI's ability to notify social media companies of

3  classified information posted on their accounts;

4      Three, the FBI's ability to notify social media companies,

5  including by working with the National Center for Missing and

6  Exploited Children concerning crimes against children;

7      Four, the FBI's ability to notify social media companies

8  of terrorist organizations using social media platforms to

9  spread propaganda; and,

10      Five, the FBI's ability to notify social media companies

11  of threats against federal officials such as FBI agents and

12  federal judges.

13      Now, with respect to the FBI in particular, plaintiffs

14  seem to concede in their reply that the injunction should have

15  a carve-out for, and I'm reading this here, "content that

16  itself constitutes criminal activity not protected by the First

17  Amendment."  That's found in their reply brief on pages 116 and

18  117.

19      But this does not go nearly far enough to protect the

20  United States's legitimate law enforcement and national

21  security interests.

22      As EAD Napp explains in here declaration, paragraph 7,

23  "Criminal prosecution is just one of several means the FBI uses

24  to protect national security.  It also uses investigative and

25  intelligence capabilities to neutralize terrorist cells and

1    operatives in the U.S., to help dismantle extremist networks

2    worldwide, and to cut off financing and other forms of support

3    provided by terrorist sympathizers."

4        For example, in EAD Napp's declaration in paragraph 30,

5    she explains that the use of social media activity by foreign

6    terrorist organizations may or may not constitute a crime.

7        Nevertheless, the FBI has a strong interest in informing

8    social media companies of the use of their platforms by foreign

9    terrorist organizations.  And plaintiffs fail to explain how

10    such notifications by the FBI harm any interests that they may

11    have.

12        Another example.  In paragraph 46 of the Napp declaration,

13    she explains that there are circumstances where the FBI has

14    asked platforms to remove personal information about FBI

15    personnel and federal judges where it appears the purpose is to

16    encourage violence against those individuals.  Depending on the

17    circumstances, this may not necessarily amount to a violation

18    of criminal law.  Nevertheless, the FBI has an obvious interest

19    in protecting the safety of federal officials.   And there may

20    be circumstances where the posting of classified information is

21    not necessarily a criminal offense, for example, when posted by

22    a journalist who received the information unsolicited.

23    Nevertheless, I don't understand plaintiffs to be suggesting

24    that the FBI doesn't have obvious national security interests

25    in preventing the spread of such classified information.

1      More generally, Your Honor, it may not be apparent at the

2    beginning of a law enforcement investigation whether certain

3    conduct constitutes criminal activity.  So, in short, while

4    accepting -- exempting criminal activity from the preliminary

5    injunction is a step in the right direction, it does not go

6    nearly far enough to address the defendants' legitimate

7    overbreadth concerns.

8      Second, Your Honor, plaintiffs contend that our concerns

9    about the scope of the injunction are misplaced because we have

10    identified activities that are not covered by the injunction.

11    This contention is at war with plaintiffs' legal theory.

12      For example, as explained in the declaration of Carol

13    Crawford, the CDC's director for the Division of Digital

14    Management, that's Exhibit 80, the proposed injunction could be

15    construed to prevent the CDC from publishing accurate health

16    information on its website to the extent the CDC is aware that

17    social media companies rely upon that information in applying

18    their terms of service.

19      And, as reflected in the declaration of Brandon Wells from

20    CISA and Leah Bray of the GEC, those agencies also publish

21    accurate information on their websites that may be used by

22    social media companies when they apply their terms of service.

23      Plaintiffs cannot square why this conduct would be

24    permissible under the injunction while at the same time

25    alleging that the CDC acting as a, quote, "privileged fact

1    checker," is violative of the First Amendment.

2         Now, plaintiffs contend that the actions identified in the

3    agency declarations would not violate plaintiffs' proposed

4    injunction despite its plain terms because, and I'm quoting

5    here, "a federal agency that makes a public statement on a

6    policy issue without directing the statement to platforms or

7    crafting the statement to influence the removal of disfavored

8    viewpoints from social media would not violate the proposed

9    injunction."  They make this statement on page 115 of their

10   reply brief.

11        But why not?  Why wouldn't that violate the injunction

12   when plaintiffs' entire theory is that otherwise lawful

13   statements or actions made under the alleged backdrop of

14   statements early in this administration concerning Section 230

15   reform of antitrust liability somehow take on a coercive

16   character?

17        Given plaintiffs' novel and legally unsupported legal

18   theory, it is entirely unclear what types of conduct would be

19   swept under the proposed injunction.

20        And let me give you an example that came up this morning.

21   I heard my colleague on the other side argue that CISA's work

22   with the Treasury Department to create publicly available

23   pamphlets for the financial sector somehow shows an expansion

24   of a censorship enterprise.  It is absolutely unclear, Your

25   Honor, how CISA's development of public pamphlets that could be

```
1    shared with the financial industry could possibly violate the
2    First Amendment.  But, yet, as plaintiffs' identify their
3    theory of the case is that is an expansion of censorship and
4    just highlights why their proposed injunction is so unworkable.
5         Your Honor, I recognize that I am running out of time.  So
6    I want to highlight just a very few quick things if I may.
7         One, I think it's useful analytically to consider
8    plaintiffs' proposed injunction in comparison to the cases they
9    cite to where injunctions have issued to show the complete
10   overbreadth and lack of proportionality.
11        So, for example, in Bantam Books, one of the seminal cases
12   they rely upon, the injunction precluded the commission to
13   encourage morality in youth from issuing notifications to book
14   distributors.
15        In Brentwood Academy, the injunction sought to enjoin
16   enforcement of a rule.  In Backpages.com, which I think is fair
17   to characterize as the central case plaintiffs rely upon, the
18   conduct enjoined involved a sheriff sending letters to credits
19   card companies.
20        And then in the Fifth Circuit's Texans For Free Enterprise
21   case, the junction was against portions of Texas's -- Texas's,
22   pardon me, election code.
23        Plaintiffs have not identified a single case imposing such
24   a broad, amorphising injunction in the context of First
25   Amendment speech claims.
```

1      Now, Your Honor, may I have just a minute to address the
2  class certification arguments?
3          THE COURT:  Yeah, I'll go ahead and give you that.
4  And I'll give the -- whatever extra time you have, I'm going to
5  also add that to the plaintiffs' rebuttal time.  So go ahead.
6          MR. GARDNER:  I appreciate the indulgence, Your
7  Honor.
8      With plaintiffs' class certification motion, I want to
9  address it here because they contend in their reply brief on
10  page 81 that any defects in their irreparable harm and standing
11  could somehow be cured by a certified class, which they claim
12  will result in their classwide representation of all current
13  and future speakers allegedly targeted by defendants.  But
14  plaintiffs cannot establish a viable class.
15      Plaintiffs' challenge differing actions by 67 separate
16  different defendants spanning multiple administrations over the
17  course of three years.  And, as I heard my colleague on the
18  other side say today, or as they admitted today, there are
19  different techniques used, different actors used, different
20  topics addressed and different alleged threats by different
21  congressional executive officials over the course of a
22  three-year period.
23      There is simply no combination that can be resolved in the
24  stroke of a pen that would materially advance the resolution of
25  this case.  In fact, this case reflects a much less cohesive

1    class than the one rejected by Justice Scalia in *Wal-Mart*.

2    Remember in *Wal-Mart*, the plaintiffs contended that even

3    promotion decisions were made at the local level and were

4    inherently subjective, the discrimination to which they were

5    subjected was common to all female Wal-Mart employees, and that

6    a uniform corporate culture permitted bias to infect all

7    promotion decisions of women, which tied the class together.

8         The Court rejected that argument and noted it wasn't

9    enough to simply claim that each plaintiff suffered from a

10   Title VII violation or even a Title VII injury.  Rather, the

11   plaintiffs had to show a common contention that was capable of

12   classwide resolution such as discriminatory bias by the same

13   supervisor.

14        And this had to be based on more than contentions.  It had

15   to be based on evidence.  The only evidence plaintiffs

16   presented in *Wal-Mart* was a policy of discretion by local

17   managers, which was the antithesis of a common, uniform

18   employment practice to satisfy commonality under Rule 23.

19        These shortcoming are even more apparent here.  Plaintiffs

20   contend that there is class cohesiveness because the classes

21   include audience members rather than just speakers.  But just

22   as in *Wal-Mart* rejecting the contention that alleging a Title

23   VII injury was sufficient to establish commonality, the Court

24   here would still need to make an individualized determination

25   of whether a particular defendants' conduct violated the First

1    Amendment under a particular level of constitutional scrutiny,
2    and that the alleged conduct actually harmed a class member
3    either as a speaker or as a receiver.

4        And just briefly, Your Honor, let me give you a very
5    concrete example of how this would work.  Plaintiffs are
6    challenging, among other things, the CDC's holding of several
7    be-on-the-lookout meetings.  Those be-on-the-lookout meetings
8    have nothing to do with Dr. Fauci's attempts to address the
9    pandemic, or CISA's switchboarding efforts in service of the
10   2020 election cycle, switchboarding efforts, which I may add,
11   plaintiffs were direct participants in which they never
12   acknowledge throughout their briefing or their presentation
13   today; or it has anything to do with the FBI's flagging of
14   potential covert malign influence narratives for social media
15   companies.

16       So, simply put, concluding that the CDC's actions may have
17   violated the First Amendment would tell the Court nothing about
18   whether another agency's separate actions also violated the
19   First Amendment.

20       And the final here, Your Honor, is, and I think this is
21   worth emphasizing, the sheer size of plaintiffs' proposed class
22   highlights the lack of commonality.  For example, the Supreme
23   Court last week in *Twitter versus Taamneh* held, or recognized,
24   I should say, that Facebook, YouTube and Twitter combined have
25   over 3 billion active users each month.  And some public

1   sources report that there are approximately 300 million

2   Americans that use social media.  Under plaintiffs' broad class

3   definitions, these would all be class members.

4       In contrast, in Wal-Mart, the Supreme Court noted, and I'm

5   quoting here, "that this was one of the most expansive class

6   actions ever, which was comprised of 1.5 million current and

7   former female Wal-Mart -- Wal-Mart employees."

8       It is telling that neither plaintiffs' class certification

9   motion, nor their reply brief, cite to a single case, not one

10  case in which a class was certified for a First Amendment

11  speech challenge.  And I think the likely reason for that, Your

12  Honor, is that courts rarely certify class actions in this

13  context because the claims are inherently individualized; and a

14  class action is rarely superior to individualized

15  adjudications.

16      For that reason, or for those reasons, I should say, the

17  Court should deny plaintiffs' motion for class certification.

18  In addition, the Court should deny the plaintiffs' motion for a

19  preliminary injunction.

20      And the very last thing I just wanted to say or

21  reemphasize, Your Honor, as we mention in our brief in the

22  conclusion, to the extent the Court is inclined to issue a

23  preliminary injunction, we respectfully request that the Court

24  administratively stay the injunction for seven days to provide

25  the United States time to consider moving for a stay pending

1   appeal.

2        Thank you, Your Honor.

3             THE COURT:  Thank you.  Madam clerk, how much -- how

4   many minutes was the other one roughly?

5             COURT CLERK:  He's keeping the time.  I'm not keeping

6   it.

7             THE COURT:  Okay.  I'll give you five more minutes.

8   I'm not sure.  It's five extra minutes if you need --

9             MR. SAUER:  Sure.  Thank you, Your Honor.

10            THE COURT:  -- for the rebuttal.

11            MR. SAUER:  May it please the Court.

12       There's a lot of points there that I'd like to address.

13   It might be easier if I just start addressing Mr. Gardner's

14   comments at the end.

15       Very briefly on the class certification.  I think we'd

16   stand on our briefing on that.  I think we explained very

17   clearly how there clearly are common questions here.  This case

18   is radically different from *Wal-Mart* against *Dukes*, which is

19   essentially a whole bunch of individualized damages, actions,

20   against -- challenging discreet individual acts of

21   discrimination.

22       Paragraphs 1 to 30 of our proposed findings of fact set

23   forth a campaign of threats that overarches every single one of

24   our claims.  That alone is a common question, and so forth.

25   And then when you look at each kind of federal agency, each one

1    raises a whole host of common questions for everyone who is

2    affected by that federal agency.  So you've got one huge

3    overarching common question; then a whole bunch of other common

4    questions that is set for each agency, the White House Surgeon

5    General's office and so forth.  And then we briefed that, and I

6    think I'll just stand on that for now.

7        I do want to address what Mr. Gardner said about the

8    alleged overbreadth and vagueness of the injunction and the

9    notion that it's going to sweep in what they contend is lawful

10   and important conduct.

11       Mr. Garner didn't actually address the actual language of

12   our injunction in his comments, so I'll read the key part to

13   the Court.  We've got a series of verbs that we're asking the

14   Court to enjoin the defendants from doing.  And that is to stop

15   them from, quote, "demand, urge, encourage, pressure, coerce,

16   deceive, collude or induce."  Those are the verbs.  That's the

17   conduct we're asking the Court to enjoin, federal officials who

18   use those verbs to get platforms to take down disfavored

19   content and speakers from social media.

20       Where did we get those verbs?  Well, Mr. Gardner cited the

21   *Backpage* decision.  If you read to the bottom of that decision,

22   Judge Posner actually directs the district court to enter an

23   injunction.  At the end of that decision, he uses two of our

24   verbs.  He doesn't stay, don't send letters, as

25   Mr. Gardner said.  He says, they're under -- Sheriff Dart is

1   under an injunction not to, quote, "coerce or threaten."

2       Likewise, the *Norwood* decision that this Court quoted in

3   its motion to dismiss order says that it violates the First

4   Amendment to induce, encourage or promote.  *Adickes* against

5   *S.H. Kress,* one of the seminal cases on state action, says that

6   it plainly constitutes state action to engage in a conspiracy

7   and reach an understanding.  And that's what we're doing with

8   collude.

9       So if you look at the verbs in our injunction, they're the

10  very verbs that courts like the U.S. Supreme Court, the Seventh

11  Circuit and others have used to describe what conduct actually

12  violates the First Amendment.

13      So I don't know if they're claiming that the U.S. Supreme

14  Court is unconstitutionally vague when it writes its opinions

15  to give people guidance as to what does violate the First

16  Amendment.

17      So we tried to hue closely and have verbs, conduct that's

18  described be specific to be clear.  These are all verbs that

19  are clearly understandable from the dictionary and tracks the

20  actual guidance we've been given by the U.S. Supreme Court and

21  other decisions.

22      They claim, however, well, this is -- you know, it's too

23  vague.  Again, I think that the dictionary refutes that

24  question.  And so their main argument is this is every

25  overbroad.  And they say we didn't address this in our brief.

1    Then he admits that we talk about it in detail in pages 113 to

2    117 of our reply brief.

3        They put in five declarations from -- from federal

4    officials from the FBI, CISA, the GEC, CDC and OSG.  And all of

5    these declarations say two things.  First they say -- or most

6    of them say, we don't actually ask them to take down anything.

7    And they go on to say, but please don't enjoin us from telling

8    them to take anything down because then the world will end.

9    Right?  It's a parade of horribles that they say.

10        If you actually pick apart what they're -- what they're

11   doing is that all their complaints really fall into two

12   buckets.

13        One bucket is we want to be allowed to make public policy

14   statements, like on our website or in a press release, that

15   aren't directed toward social media platforms, that aren't, you

16   know, calculated to get content taken down.  We just want to be

17   able to engage in what we think of as garden variety government

18   speech.  And we concede that is not covered by these verbs.

19   Each one of these verbs denotes an intentional action to get

20   speech taken down from social media.

21        So if the CDC, you know, or the Surgeon General's Office

22   puts a health advisory on their website that says the vaccines

23   work; or, you know, smoking is dangerous or whatever it is,

24   just that act of posting on their website and making a public

25   statement about an important issue does not in itself

1    constitute demanding, encouraging, pressuring, coercing,

2    deceiving, colluding and inducing, you know, within the meaning

3    of our objections.

4        We say, they're kind of creating a problem that doesn't

5    exist.  They're allowed to do that.  And I don't think anyone

6    -- any fair reader of what we're asking the injunction to do

7    would say they can't make public statements.

8        So they pivot heavily to their second bucket.  And their

9    second bucket is there's a lot of stuff we do want them to take

10   down.  And there's two subsets.  There's stuff that's First

11   Amendment protected; which, you know what, some of it may be

12   bad, but under the First Amendment, they really shouldn't be

13   asking to take it down.  Right?  So the injunction should cover

14   that.  Right?

15       And then, on the other side of that, you have stuff that's

16   not protected by the First Amendment.  And almost all -- they

17   have basically two buckets there.  There's true threats, right,

18   or incitement to true threats.  And then there is -- there is

19   speech that itself constitutes criminal activity, so malicious

20   cyber activity set forth in the CISA injunction, you know,

21   spear fishing attacks, you know, infiltrating someone's

22   computer and issuing command control directions and stuff like

23   that, live streaming of the abuse of children.  That's not

24   protected by the First Amendment, right, you know, and various

25   other arguments like that.

 1          So and we, again, concede in the reply brief that this

 2     injunction is defending the First Amendment.  And if you want

 3     to look at what the exceptions are in the First Amendment,

 4     they're really clearly spelled out in Justice Kennedy's opinion

 5     in *Alverez*.  And conduct that is integral to criminal activity,

 6     that's a well-established First Amendment exception.  So we

 7     agree that the injunction does not stop them from going to the

 8     platforms and saying take down stuff that is unprotected by the

 9     First Amendment because the speech itself is criminal conduct,

10     like, livestreaming abuse of children, you know, and the

11     various other things, malicious cyber activity, the various

12     other things listed in their brief.

13          But what you heard Mr. Gardner do is trying to blur the

14     lines a little.  Right?  So he wants to say, "Well, here's

15     stuff -- here's some things that we're a little worried about

16     because it might be on the borderline.  And what he's actually

17     pivoting to is at the very beginning of his presentation, is

18     "We've got to be allowed to go to the platforms and flag malign

19     foreign influence actions."

20          But that's refuted by Tab 2.  What they actually mean by

21     that in practice, based on the evidence in this case, is, you

22     know, a Russian speaker has posted, "Hooray for the Second

23     Amendment."  And 96,000 Americans say, "We agree with that.

24     We're reposting that."  And they go, "Take it down."  That's a

25     First Amendment problem.  Right?

1      So what you have is they're trying to take this concern

2   about actual criminal activity that's not protected by the

3   First Amendment.  It raises no First Amendment problem for

4   federal officials to say, "Hey, we're flagging that for you,"

5   you know.  "Turn off that livestreaming of child abuse."

6   Right?  Versus stuff that clearly does raise a First Amendment

7   problem.  They're trying to blur those categories.  It's very

8   kind of artfully presented.

9      But the Court's injunction, the language we proposed to

10  the Court clearly delineates those, can clearly delineate them.

11  So essentially you have you saying, "Please don't do this."

12  First of all, they say -- most of their declarants say, "We

13  don't do this.  We don't ever ask them to take anything down."

14      It's actually kind of surprised me they say that the FBI

15  doesn't go and ask them to take down child pornography, which

16  is a First Amendment exception.  Right?  And they say actually

17  don't ask them to take stuff down.  But don't stop us from

18  doing it because then there'll be this parade raid of

19  horribles.  There's an inconsistency there.

20      And all their complaints can be addressed by observing

21  that, number 1, those verbs that we recite in there do not

22  direct them not to make public statements on important issues.

23  And the scope of the injunction does not affect stuff that

24  clearly falls within established First Amendment exceptions

25  which is not First Amendment protected speech.  And that

1    includes, among other things, in *Alverez*, there's a specific

2    list provided by the Supreme Court.

3        The Supreme Court says, contrary to the arguments you

4    heard today, the Court's lack freewheeling authority to

5    recognize new First Amendment exceptions and they're clearly

6    out of an *Alverez* decision.  That includes speech integral to

7    criminal conduct, in other words, where the speaking itself is

8    part of them perpetrating the crime, and true threats.

9        So that's our response to the questions about both the

10   vagueness and the overbreadth -- supposed overbreadth of the

11   injunction.  It's really they're trying to create problems.

12       There's something really telling here.  Right?  We have

13   evidence of just astonishing, sweeping violations to the First

14   Amendment.  And the government's response to that is

15   essentially too bad.  Anything you might do to stop us from

16   doing that is going to cause us some problems at the margin,

17   and, therefore, you can never enjoin us at all.  That's an

18   astonishing proposition.

19       That, like their argument about government speech that Mr.

20   Sur presented, and as the Court has said, flips the First

21   Amendment on its head, they're saying you've got to let us

22   destroy all these First Amendment interests of private American

23   citizens posting about COVID-19 and elections and the whole

24   panoply of other topics.

25       Destroy their First Amendment rights so that we can keep

1    doing these tiny, little things that are at the margin that

2    aren't really concerns on the thing.  And that is the proper

3    balancing of harms that the Court should engage in here.

4        The First Amendment interests of private American citizens

5    to speak freely on social media on questions of core political

6    significance with our viewpoint discrimination overwhelms the

7    interest that they're asserting on margins of potential

8    confusion about marginal applications that lie in the shadow of

9    the borderlines between what constitutes criminal activity.

10        So having addressed that, I want to pivot back to just

11    discuss some things that Ms. Snow and Mr. Sur said.

12        Ms. Snow argues that our declarations are stale.  Actually

13    we've submitted now three rounds of declarations from the

14    private plaintiffs.  Every time they've submitted a

15    declaration, their injuries have continued up to the time of

16    the declaration.  This includes the declaration we filed last

17    week with our reply brief of Ms. Hines and Ms. Hoft.

18        Ms. Hines is present in the courtroom today, you know,

19    lives down the street, attests how she was having the continued

20    censorship on social media on the very topics that the Virality

21    Project has called out her type of group for as recently as a

22    few days before the declaration was executed.

23        So, in other words, the notion that, oh, this is stale.

24    It all ended a year ago.  Okay.  Here's a declaration in

25    support of our reply brief that shows that our private

1  plaintiffs continue to experience these same kinds of
2  censorship right up until the date they executed their latest
3  round of declarations.
4       And they completely ignore their second round of
5  declarations, which is the one we submitted in support of class
6  certification.
7       And what those say is those private plaintiffs have
8  interests as audience members in listening to and reading the
9  speech of all the other private speakers that federal officials
10  and their partners have targeted in this case.
11      So you go through and you read those declarations.  And
12  they're saying all these people that the White House is
13  targeting, that the Election Integrity Partnership is
14  targeting, you know, the disinformation dozen that the Virality
15  Project is targeting, we listen to and read all those people,
16  not literally all, but, like, dozens of them.
17      If you read -- again, you read Ms. Hines' second
18  declaration and she talks about following all of the
19  disinformation dozen, all of them.
20      So the notion that, like, oh, we don't have any current
21  censorship injuries, these censorship injuries are clearly
22  ongoing.
23      And I would add what -- something that really ties all
24  this notion of imminent harm all together, in my mind, is what
25  the Court said at page 37 of the motion to dismiss order, "They

1    history of past censorship" -- which, based on the evidence

2    here is enormous -- "The history of past censorship is strong

3    evidence of the threat of future censorship."  And so that is

4    exactly what the evidence shows here.

5        Secondly, Ms. Snow said we failed to link the instances of

6    particular censorship conduct to -- sorry -- instances of acts

7    of censorship to the censorship injuries to the conduct of the

8    defendants.

9        We addressed this in the reply brief.  We identify five

10   ways that that's not correct.  First, there's direct censorship

11   injuries where it says experienced by the private plaintiffs,

12   you know, where the Great Barrington Declaration gets

13   deplatformed right after the campaign from Dr. Fauci and so

14   forth.  You have Mr. Hoft attesting, who's been flagged again

15   and again and again by CISA's partners in the Election

16   Integrity Partnership, experiencing censorship up to -- you

17   know, as the declaration we filed last week and so forth.

18       So there's the direct censorship injuries that the private

19   plaintiffs have continued to experience at the hands of federal

20   censors.

21       Then there's the interests of the private plaintiffs to --

22   as audience members.  I referred to that a minute ago in their

23   second round of declarations in support of class certification.

24   They read and follow -- all these people are -- large numbers

25   of these people are being targeted for federal censorship.

1      Third, the Court recognized, as upheld multiple times, the

2   state's standing to represent the millions of Missourians and

3   Louisianians who are not hearing speech on social media because

4   there's an active campaign by federal officials to censor it.

5      Finally, the states have their own direct interests here

6   to uphold their -- you know, their policy, their fundamental

7   policy set forth in their state constitutions that promote

8   freedom of speech, as well as their interest in hearing what

9   their constituents actually have to say, what they actually

10  think, on social media.  And that's reinforced by Carrol

11  Crawford's declaration.

12     And then, fifth, and I think that's why Mr. Gardener

13  brought it up, we pointed out that also the private plaintiffs

14  are seeking class certification to represent a class of all the

15  people who are affected by these censorship activities.

16     So for all those five reasons, this notion that there's no

17  link between the federal censorship and the injuries to the

18  plaintiffs is -- is indefensible.

19     Ms. Snow said a few other things.  She said there's no

20  evidence that the Surgeon General's Office collaborated with

21  the Virality Project.  That's refuted at the highlighted text

22  in Tab 33 of your binder, among other things.  She said,

23  "There's no evidence that the Virality Project targeted

24  Ms. Hines' group, Health Freedom Louisiana."

25     The Virality Project report talks about health freedom

1    groups which it said it targeted on a, quote, "nationwide

2    basis."  And it mentions them 100 times as, you know, the sort

3    of information they're citing.  So that inference is compelling

4    that Ms. Hines has been targeted by it.

5         Ms. Snow made a comment that Dr. Fauci's successor,

6    Dr. Auchincloss or Auchincloss, all he did was receive a email

7    in 2020.  That email is in Tab 6 of your binder.  That's an

8    email that says at 12:30 in the morning on February 1st, 2020,

9    "important."  And then it attaches the article, *The Nature*

10   *Medicine* article about the gain of function research that NIAD

11   had financed at the Woohan Institute of Virology.  And says,

12   "You keep your cell phone on.  You will have tasks to do

13   today."  That -- that email speaks volumes about the

14   involvement of Dr. Auchincloss and Dr. Fauci's campaign to

15   censor the lab leak theory.

16        They rely in their papers and Ms. Snow's presentation in

17   their representation that CISA stopped its switchboarding

18   activities after the 2020 election cycle.  They neglect to

19   mention that Brian Scully's testimony, which they had the

20   opportunity to contradict or explain, and did not do so, when

21   they submitted the CISA declaration.

22        Brian Scully said -- I said, "When did you make that

23   decision?"  He said, "Late April or May of 2022."  "Oh, really.

24   Right after you got sued by us?  Right?"  And, of course, the

25   standard there is set forth in the Supreme Court's decision in

1    *Already, Inc. versus NIKE,* which is voluntary cessation of

2    challenged conduct after you got sued is viewed with extreme

3    skepticism.

4        The person that, here CISA, engaging in voluntary

5    cessation has a formidable burden to establish that it's

6    absolutely clear that there's no reasonable prospect of that

7    conduct to recur.

8        And, in fact, you see the exact opposite.  What you see is

9    Lauren Protentis, as they're terminating their own

10   switchboarding activity, aggressively lobbying the platforms to

11   create an alternative channel for the exact same switchboarding

12   to go, just bypassing CISA.  So the notion that, we're getting

13   out of this business, that's old news is just directly

14   contradicted why the evidence.

15       They refer to Dr. Gurrea's declaration.  I think we refute

16   that in great detail in the reply brief.  I just want to quote

17   the Northern District, the fact that Dr. Gurrea apparently

18   didn't even read all the emails and other communications the

19   defendants produced in evidence that show social media

20   platforms again and again and again caving to federal demands

21   for greater censorship, as the Northern District of Texas says,

22   his failure to look at -- even look at the relevant evidence,

23   quote, "The gap is an abyss when it comes to his analysis."

24       Mr. Sur made a series of questions -- or made a series of

25   comments.  He started his presentation by invoking the

1    Government Speech Doctrine.  And that's exactly what the

2    government gets dead wrong in this case.

3        They say, we have to be able to say whatever we want, even

4    when what we're saying is, for example, you know, -- Tab 23,

5    for example, is the first flagging email we have from the White

6    House 1:04 a.m. on January 23rd, 2021, you know, just basically

7    two days and a few minutes after inauguration day, you have

8    Clark Humphrey emailing Twitter linking a tweet by Robert F.

9    Kennedy, Jr., discussing the death of Hank Aaron after taking a

10   vaccine.

11       And there this White House official is saying, "Hey, can

12   we have this removed ASAP?"  Right?  That's the Government

13   Speech Doctrine that they want to invoke.  We've got to be free

14   to say that, hey, we dislike this viewpoint that's being

15   expressed on social media.  Will you please take it down right

16   away?  And, by the way, it would be nice if you kept monitoring

17   these and take down other ones as well.

18       That is totally -- we're right in the heartland of the

19   concern expressed in Metal against Tam, an opinion that you

20   quoted at length in your motion to dismiss saying that it says

21   the Government Speech Doctrine is subject to dangerous misuse.

22   And, in fact, it can be used to suppress disfavored viewpoints.

23   It should not be used that way.

24       That's exactly -- that's essentially the government's

25   playbook in this case, say no, no, we -- And it expresses

1  itself again in Mr. Gardner's presentation where he says, "No,
2  no, there's a lot speech that we've got to be able to engage
3  in."

4      And what the Supreme Court says is you've got that
5  completely upside down.  The private First Amendment protected
6  speech, ordinary American citizens, is much more important than
7  the government's assertion of its right to say whatever it
8  wants, even if what it wants to say is a whole bunch of threats
9  and pressure and collusion and deception to go after disfavored
10  speech on social media.

11      They said each platform -- I think Mr. Sur said the record
12  shows that each platform made its own decisions.  Just to
13  refute that, I'd direct the Court's attention to Tabs 28 and 30
14  of the binder.  Those are the emails from Nick Clegg right
15  after the White House's pressure campaign where he says things
16  like, "We hear your call for us to do more."  And, "We've got
17  to meet with you to understand what the White House expects of
18  us as censorship going forward."  I mean, the internal
19  communications here directly contradict that narrative.

20      You have the same thing when you talk about Facebook
21  entering a public -- making a public statement saying, "We're
22  already doing the things that the White House calls us to do.
23  And he says, "Aha, they would have done it anyway.  If we
24  actually look at the private communications, those emails from
25  Nick Clegg say, "Here's the new and additional things we're

1    doing, you know, in response to what you've told us to do.  We

2    hear your call for us to do more."  So and that's the probative

3    evidence here.

4        Mr. Sur said, "The mere prospect of a statutory change

5    cannot create state action."  That just mischaracterizes the

6    evidence here.  We don't have here just, hey, we might change a

7    statute.  What we have here is take down disfavored viewpoints

8    or else we'll make a statutory change that you don't like.

9        And, again, that's not the only threat.  We've identified

10   that the Court said in again doc 224 that's there's a long

11   theory -- series of threats, you know, thinly veiled and some

12   quite blatant.  These are threats of antitrust enforcement, for

13   example, and then other threats as well.  For example, the

14   Court -- as the Court noted in that order the RFI from the

15   surgeon general as well as the health advisory previously are

16   both freighted with the threat of regulation.  And there's

17   others threats as well, as well as internal and applied threats

18   as well.

19       Mr. Sur said that the -- Facebook said Tucker Carlson's

20   post didn't qualify removal.  You asked him, "Well, didn't they

21   deboost it?"  That's at Tab 26 where you have Nick Clegg

22   emailing, or Brian Rice, one of the Facebook officials,

23   emailing back to the White House saying, "This was deboosted

24   for seven days to be fact checked and we will continue to

25   deboost it even though it was not ultimately fact checked.

1  In other words, they had no reason to remove it all.  But

2 since the White House wants it deboosted -- here deboosted

3 means they've reduced its circulation by 50 percent.

4  Just imagine if that was a senior official in the Trump

5 administration who had sent that email to, you know, Twitter

6 saying, Hey, you know, here Rachel Maddow, the most prominent

7 -- whoever the most prominent journalist then criticizing the

8 Biden administration was, and they were saying to Facebook, "We

9 don't like this video from this person.  Take it down."  And

10 Facebook responds and says, "Well, we can't really take it

11 down.  And, in fact, it doesn't violate any of our polices.

12 But, at your request, we will deboost it and reduce his

13 circulation by 50 percent," what's being viewed by tens of

14 thousands or hundreds of thousands of people.  That violates

15 the First Amendment.

16  And I'm at my allotted time.  And so I'll stand down and

17 invite the Court's questions.

18    THE COURT:  Thank you.  Debbie, do you need a break?

19    COURT REPORTER:  Yes, sir.

20    THE COURT:  You need a break.  Okay.  Let's take a

21 little, quick break, about a ten-minute recess on that clock.

22 I think it's a little fast.  But it says 11:20.  But we'll take

23 about a ten-minute recess, come back.  I'll ask some questions.

24 We're not going to go to 12:00 and I'm going to take a lunch

25 break and come back.  We're going to finish.

1       So, you know, I have a fair number of questions, but I
2    don't know how long your answer is going to be.  But, you know,
3    I don't anticipate it's going to be, you know, just
4    tremendously long.  So let's take a quick break.  We'll start
5    back at 11:30.  We may go to 12:30 or so to finish.  Okay.
6    (Recess)
7            THE COURT:  I was a state court judge.  We didn't do
8    that.  So I keep forgetting.  So anyway.
9       All right.  Let me start my questions, and some of them
10   I'll address to both; some of them I'll address to one person,
11   I mean, one side.
12      Let me make sure -- I want to make sure what the -- we're
13   on the same page with regard to what's protected free speech.
14   And I'm primarily going to ask this to the defendants.  Whoever
15   wants to answer it, you know, feel free to do that.
16      The United States Supreme Court has recognized some
17   well-known exceptions to free speech:  Incitement, which
18   includes, you know, clear and present danger, fighting words.
19   They've been modified to some extent:  Threats, obscenity,
20   child pornography, defamation, criminal conspiracy, criminal
21   solicitation.  Those are not protected.
22      But I'm going to make some statements and you tell me
23   whether you think it's protected free speech or not.  The COVID
24   vaccine does not work.  Is that -- I'm asking defendant.  Is
25   that protected free speech?

1          MR. GARDNER:  I'm happy -- Do you want me to approach

2     the podium, Your Honor or should I do it --

3          THE COURT:  You can stay right there.

4          COURT CLERK:  Speak into the mic.

5          THE COURT:  Yeah.  Depends on if you're mad at me or

6     not with these questions.

7          MR. GARDNER:  Yeah.

8          THE COURT:  Is that protected free speech?

9          MR. GARDNER:  Thank you, Your Honor.  Josh Gardener

10    for the defendants.

11         THE COURT:  Yeah.

12         MR. GARDNER:  So, again, I'm going to try and answer

13    your question as directly as possible.  But the whole question

14    here is whether there was undue coercion or significant

15    encouragement such that the government's relationships with

16    social media companies resulted in a First Amendment violation.

17         THE COURT:  And I do understand that y'all are not --

18    I'm going to ask some questions about that.  I'm not at all

19    saying -- I'm not asking you to admit you did that and are

20    these free speech?  I'm asking you just that.  Is this

21    protected free speech, that statement?

22         MR. GARDNER:  Well, understood, Your Honor.  That

23    statement standing alone, depending on who the speaker is,

24    could be protected by the First Amendment.

25         THE COURT:  Could be?

```
1              MR. GARDNER:  Yeah.  So, for example, --
2              THE COURT:  Could it not be?  Is there any --
3    anything you could see at all that, the COVID vaccine does not
4    work, that that's not protected free speech?  Any --
5              MR. GARDNER:  Yeah, absolutely, Your Honor.  Let's
6    say it was spoken by a covert Russian operative, that would not
7    be protected by free speech.  And plaintiffs acknowledge that.
8    Now, what plaintiffs say is that liking that statement may have
9    First Amendment implications.
10             THE COURT:  Okay.  And this was, like, during COVID.
11   I don't know if the Russians were involved in that or not.  But
12   I know y'all said in the elections --
13        All right.  Well, how about this:  Masks don't work to
14   stop COVID from spreading.
15             MR. GARDNER:  Same response, Your Honor.  It could be
16   protected speech depending on who the speaker is.
17             THE COURT:  Okay.  And let me just assume they're
18   American citizens making these statements.  Okay.  The 2020
19   election was stolen.
20             MR. GARDNER:  So, again, if it came from a American
21   citizen, then that speech itself could be protected, but,
22   again, it doesn't answer the question whether there's a First
23   Amendment violation.
24             THE COURT:  Okay.  Tell me how that statement could
25   not be protected.  What possibly could go wrong with that
```

1    statement that it's not free speech?

2                MR. GARDNER:  If it came from a -- for example, a

3    Russian -- a covert foreign operative like a Russian

4    government.

5                THE COURT:  Okay.

6                MR. GARDNER:  And plaintiffs concede that.

7                THE COURT:  All right.  Climate change is a hoax.

8                MR. GARDNER:  Same response.

9                THE COURT:  Okay.

10               MR. GARDNER:  President Biden is responsible for

11   inflation and high gas prices.

12               MR. GARDNER:  Same response.

13               THE COURT:  Okay.  All right.  Okay.  And I just

14   wanted to kind of, you know, go through what free speech was.

15   And I'm not -- like I say, I'm not, you know, assuming that you

16   admit that there's significant encouragement or coercion, but I

17   did want to ask the question to both sides.  Do you agree that

18   the test for determining whether a government is responsible

19   for private -- another private company's decisions is whether

20   there's coercion and/or significant encouragement?

21               MR. GARDNER:  Yes, Your Honor, that is the test the

22   Supreme Court has recognized.

23               THE COURT:  Okay.

24               MR. SAUER:  Actually, that's one of multiple tests

25   because there's also joint participation and conspiracy or

1    collusion.  So and I would point out that that test is actually

2    two different things because the case laws makes clear that

3    there's coercion.  And then significant encouragement that

4    falls short of coercion still counts.

5              THE COURT:  Okay.

6              MR. SAUER:  So we've presented five tests to the

7    Court.  And we think they're all supported in the case law.

8              THE COURT:  Okay.  All right.  And there's -- you

9    know, we had an issue that we ruled on before, I think in the

10   motion to dismiss, about there's no longer a preliminary

11   injunction against President Biden.  I understand that.  I

12   think we all are on the same page on that part.

13       Is there any constitutional or separation of powers issues

14   that would prohibit a preliminary injunction against White

15   House officials other than President Biden?  Okay.  I'll let

16   both sides respond to that.

17             MR. GARDNER:  Would you like me to go first, Your

18   Honor?

19             THE COURT:  Sure.  Well, sure, it's fine.  It doesn't

20   matter.

21             MR. GARDNER:  So we have not directly briefed that

22   issue, Your Honor.  We would be happy to do so.  I do think

23   there is some significant constitutional questions with

24   enjoining senior advisers to the president to provide advice

25   and information to the president so that he can make decisions

1   under, you know, the Take Care Clause of the Constitution.

2   But we have not directly addressed that.

3       But what we do address in our opposition is that any

4   injunction in this case should not run against individuals in

5   their official capacity.  It should run against the agencies

6   because, again, those claims merge against the agencies.

7           THE COURT:  Okay.  All right.

8           MR. SAUER:  My response to that is the only concern

9   -- they've never raised this, so it's waived.  And the only

10  concern he just raised is the concern that an injunction that

11  would interfere with the kind of advice that the senior

12  advisors could give the President might raise separations of

13  powers concerns.

14      But going all the way to doc 34, the Court's order grants

15  a preliminary injunction related to discovery.  This injunction

16  is targeted at White House officials' communications with

17  external third parties, the social media platforms.  And

18  there's absolutely no reason they can't be enjoined there.  If

19  they're violating the First Amendment, they fall within

20  *Armstrong* and the longstanding case law that says they can be

21  enjoined from violating the Constitution.

22          THE COURT:  All right.  And the next question is

23  going to be -- and let me just say this first:  I do want to

24  complement both sides.  I don't want any more briefs, you know.

25  I don't know why they call it -- why it's called a brief or why

1   this was called a brief, you know.  I'm going to call it -- I

2   don't know what I'm going to call it, but I won't call it that.

3   But because, you know, they were all -- everybody's was long, I

4   mean, and I've read it all.  I mean, I'm not just, "Law clerks,

5   y'all tell me what it says."  You know, I mean, they look at it

6   too.  But I've spent a lot of time reading it, so I'm pretty up

7   on it.

8        But there's a lot that, you know, I have to look at again,

9   and things, because I think -- I know, it's several thousand

10  pages, you know, or something like that.  But, anyway, the

11  -- you covered pretty well irreparable harm issue.

12       But I did want to ask how a -- both sides, if a

13  preliminary injunction is issued -- Now, I'm not saying I'm

14  going to issue one.  I'm just asking these questions.  If a

15  preliminary injunction is issued of any type, how would you

16  avoid the government speech problem?  I see that as the biggest

17  part of what Mr. Gardner talked -- we talked about the

18  government speech issue.  Like, can the government get up and

19  say -- you know, get up and make some speech, you know, if he's

20  -- you know, I mean, there was a lot of questions -- President

21  Biden said, "They're killing people."

22       Surgeon General Murthy said -- you know, he gave his

23  advisory and, you know, social media Jen Psaki said, "The

24  social media companies need to do a whole lot better," and gave

25  a specific, quote, "ask," A-S-K-S, ask about what they were

1   wanting them to do.  So it was a lot of government speech

2   there.  But it was other things too more than that.

3       So how do you avoid the government speech issue, like, if

4   there is something that the government needs to say, how would

5   you avoid that?  I'll let the plaintiffs go first on this one.

6           MR. SAUER:  Yeah, and I'd say in the language of the

7   injunction we proposed, we try to do that in two ways.  First,

8   in that list of verbs.  That's really the operative portion of

9   the injunction.  We're asking the Court to enjoin them from

10  taking very specifically defined actions.  There's a specific

11  list of verbs there.

12      Again, it's -- well, I don't have it right -- demand,

13  urge, encourage, pressure, coerce, deceive collude, induce.

14  And craft from that list of verbs, we try to hue to the very

15  verbs that, as I said before, in opinions like *Norwood* and

16  opinions like *Backpage*, those are the very verbs that the

17  courts have said this is what violates the injunction.  Verbs

18  like:  Coerce, you know, encourage induce are right there in

19  *Norwood*.  They're right there in *Backpage*.

20      So, in other words, we want the scope of the conduct

21  that's enjoined to reflect what courts have already held is

22  what the First Amendment doesn't let you do.  And if the First

23  Amendment doesn't let you do it, it doesn't fall within the

24  Government Speech Doctrine.  That's *Metal*.

25      And then, in addition to that, later in the injunction we

1  say it's whether -- deceive, encourage, induce, so forth, to do

2  what?  To take private American speech down from social media.

3      So the government can say lots and lots of things.  But

4  what it can't do is engage in communications with platforms

5  that are deliberately calculated to get disfavored speech,

6  disfavored viewpoints taken down.  So those are the two

7  elements.  That's how we tried to craft it in the proposed

8  injunction.

9           THE COURT:  Okay.  Defendants.

10          MR. GARDNER:  Thank you, Your Honor.

11      So a few things.  First, I do have the language of

12  plaintiffs' injunction in front of me.  And some of the verbs

13  they use are inherently not violative of the First Amendment.

14  For example, there's nothing constitutionally inappropriate

15  about urging a private entity to do something or to encourage a

16  private entity to do something.  And that is one of the precise

17  concerns the United States has here.

18      Plaintiffs' entire theory of the case is so at odds with

19  the previous case law.  So, for example, in the previous cases

20  or the other cases plaintiffs have cited to, the one who made

21  the alleged threat is the one who actually took the coercive

22  action.  Right?

23      So in *Backpages*, the sheriff is the one who made the

24  threat, and he did it in a letter.  That letter was enjoined

25  despite the broader language of the injunction.

1    What plaintiffs are arguing here is that CISA, in

2 switchboarding in 2020, despite no coercion whatsoever, in

3 fact, it's the opposite, as my colleague said, there are

4 statements in all those emails, that say, "We're not asking you

5 to do anything."

6    But what plaintiffs argue is those actions somehow take on

7 a coercive effect, almost like the Mosaic Theory of the First

8 Amendment.  That is the exact problem we had.  And if I'm not

9 answering your question directly, it's because I can't answer a

10 question directly because of the nature of plaintiffs' broad

11 and amorphous claims paired with its even broader injunction.

12    THE COURT:  My question may have been a little

13 overbroad.  But go ahead.  Go ahead, Mr. Sauer.

14    MR. SAUER:  May I just briefly reply to that.  Three

15 points.  One is Mr. Gardner said to urge or encourage doesn't

16 violate the Constitution.  Here's what the Supreme Court said

17 about that in Norwood.  "It is axiomatic that the state may not

18 induce, encourage or promote private parties to engage in

19 contact that would be unconstitutional if the government did

20 it.  The adverb "encourage" we've lifted right out of *Norwood*.

21 That does violate the Constitution.

22    THE COURT:  Well, let me ask you this question on

23 that:  Is -- All right.  So an injunction was issued.  And it

24 says you cannot, you know, meet and send emails and meet and go

25 over content and flag these posts; you can't do that.  And you

1    can't meet with the election -- can't work with the Election

2    Integrity Partnership or the Virality, Project if it ever comes

3    up again, or you can't work with these ones who are -- don't

4    have First Amendment concerns.

5        All right.  And then the government wants to -- you know,

6    at a press conference, the press secretary says, you know,

7    something like these social media companies are just -- these

8    social media companies are just -- they just keep on at it.

9    Something needs to change.  We need to amend Section 230 of the

10   Communications Decency Act, you know, and that's all they do.

11   They say that.

12       Would that be a -- would that elicit a motion for contempt

13   by the plaintiffs in that case?  They didn't meet with them;

14   they just said that.

15           MR. SAUER:  Yeah.  It would depend on the nature and

16   content of the statement.  And I think the way we describe it

17   at the very end of the reply brief, we talk about public

18   statements that are not sort of directed to platforms, that are

19   not deliberately intended to induce platforms to take action is

20   not violating the First Amendment.

21       So if they just made a statement saying, "Hey, Section 230

22   is really bad.  We need to amend it."  They can even say, "Hey,

23   COVID misinformation is bad.  But if they're taking that

24   additional step of having a statement that's deliberately

25   crafted to pressure or induce the platforms to take down social

1  media speech, that's where you get into the First Amendment

2  problem.

3       And, again, we've tried to craft the injunction so it

4  exactly mirrors what courts have said, you know, what really

5  does violate the First Amendment.

6            THE COURT:  Okay.

7            MR. GARDNER:  And, Your Honor, if I may.

8            THE COURT:  Mr. Gardner.  Yeah.

9            MR. GARDNER:  If I may just briefly respond.

10           THE COURT:  No, that's fine.

11           MR. GARDNER:  My colleague --

12           THE COURT:  I asked a different question, so go

13  ahead.

14           MR. GARDNER:  I understood.  I just want to be

15  totally clear about this.

16      To the extent that plaintiffs are suggesting that the

17  encouragement of a social media company to take action violates

18  the First Amendment without state action, plaintiffs cannot

19  establish an injury to themselves from that conduct.  It may be

20  the social media company can argue that it's violated their

21  First Amendment rights.  But plaintiffs have to establish state

22  action here, which is why they spend, I think you acknowledge,

23  many many pages of briefing arguing for state action because

24  they recognize that merely asking a social media company to do

25  something standing alone can't violate the plaintiffs' rights.

1    So I just wanted to be clear about that.

2        But their *Norwood* discussion is really no bearing on their

3    theory of the case here.

4            THE COURT:  Okay.  All right.  I'm going to go to

5    something a little less catchy, standing.  I hate to bring up

6    standing again.  The only question I have is:  There is a

7    discussion in the briefs -- not briefs, sorry.  I wish I could

8    think of another word to call them.  I don't want to call them

9    briefs.  But, anyway, whatever it was that y'all filed, the

10   long, long documents with all these attachments that you filed,

11   that's what they are.  No, I'm kidding.  It's a detailed case.

12   I really do complement the attorneys on the job done by both

13   sides.  Really interesting case to me, really interesting.  And

14   y'all did a great job on it.

15       But my question is this:  There's a question about whether

16   there's a different standard for standing in a motion to

17   dismiss, which I've ruled on, versus a preliminary injunction.

18   And I think the -- I'll let the defendants go first because

19   they brought that up.  They said there's a different standard.

20   But you didn't really say what it was, that I remember.  But so

21   is there a different standard?  Does it just have to have

22   evidence backing it up, or what's the standard?

23       Ms. Snow.

24           MS. SNOW:  Yes, Your Honor.  The difference at this

25   stage in evaluating the preliminary injunction motion versus

1    evaluating the motion to dismiss is that when the Court was

2    evaluating the motion to dismiss, it's taking the allegations

3    as a stand.  And the Court gave the allegations a presumption

4    of truth and was determining whether the allegations in the

5    compliant plausibly alleged that the plaintiffs had standing.

6        And the Supreme Court has said in *Lujan v. Defenders of*

7    *Wildlife* that the evidence, that the standard of review for the

8    issue of standing, as with all other issues in the case, varies

9    depending on the proceedings and which part of the case you are

10   in.

11       And so, you know, there the Court was considering on

12   motion for summary judgment whether the evidence then at that

13   point, as distinct from earlier in the case when, you know,

14   plaintiffs only have to plausibly allege standing, whether they

15   had presented sufficient evidence to establish standing

16   according to the standards that would apply in summary

17   judgment.

18       Here at the preliminary injunction stage, courts also

19   evaluate whether plaintiffs have actually presented evidence

20   that make a, quote, "clear showing."  And the Supreme Court

21   said in *Winters* that the plaintiffs bear the burden of

22   providing -- of making a clear showing that they meet all the

23   standards for obtaining preliminary relief, and that would

24   apply to the irreparable portion which does overlap

25   substantially with standing.

1    And, in the Fifth Circuit, I believe it is *Stringer V*
2    *Whitley*.  We cited the case in our brief which I had written
3    down and now I am not seeing it.  But we had -- that case also
4    echoed the clear standing language -- or, sorry, clear showing
5    language.  And it reviewed whether the plaintiffs had actually
6    presented evidence that showed whether they were eminently
7    harmed, whether they'd be eminently harmed absent a preliminary
8    injunction.  I believe that case is *Barber*.
9        THE COURT:  Well, that's kind of what I was -- my
10   thoughts were kind of that what you're talking about in that
11   was that -- you got evidence backing it up.  That's kind of
12   what I thought --
13       MS. SNOW:  Yes.
14       THE COURT:  -- the standard would be.  Basically the
15   legal standard is the same except, you know, you're not doing
16   the -- just basing it on the pleadings anymore.  You've got to
17   have evidence backing it up.
18       MS. SNOW:  Right --
19       THE COURT:  That's kind of what I thought, but I was
20   just going to ask that and see.  Go ahead, Ms. Snow.  I'll let
21   you finish and then Mr. Sauer.
22       MS. SNOW:  Yes.  Thank you.  Sorry.  I just wanted to
23   add one more thing that in this case in particular where we
24   have a -- almost a year in between when the plaintiffs had
25   submitted their initial motion for preliminary injunction and

1    where we are now, where the Court is considering all the
2    evidence that has been presented to it and where plaintiffs
3    have access to thousands of pages of documents, testimony from
4    multiple officials, the requirement that they make a clear
5    showing that they are imminently harmed and that -- and that
6    they will be irreparably harmed without a preliminary
7    injunction, you know, the Court should hold them to -- it
8    shouldn't be hard for them to point to evidence --
9              THE COURT:  Right.
10             MS. SNOW:  -- if they -- if it's true.
11             THE COURT:  And let me ask you this -- and, Mr. Saur,
12   I'm not trying to keep you -- I'll let you answer two -- both
13   questions at the same time.  But I went to Del Rio recently,
14   Del Rio, Mexico.  I volunteered to kind of go down there and
15   help out some of the judges down there.  I had, like, 200
16   sentencings in four days.  And every one of them told me, every
17   one of them told me -- they're mostly border crossing cases.
18   They did something.  Every one of them told me, "I apologize to
19   you, to the United States Government.  I'm never going to do it
20   again," every one of them.  I felt like I'd kind of solved the
21   border crisis after I got back.  But, unfortunately, some of
22   them, you know, even now, still getting rearrested.
23        So the government is saying, "Don't worry.  We're not
24   going to ever do any of this again."  You've got a 2024
25   election that's going to be a hotly contested election coming

1    up.  So how can I be sure that this is not going to happen

2    again, that the government is not going to tie up with the

3    Election Integrity Project again and start suppressing or

4    asking this stuff to be suppressed?

5         Y'all are telling me it's not going to happen.

6              MS. SNOW:  Your Honor, two responses to that.  And,

7    first of all, it is not the government's argument that, you

8    know, this, you know, will never happen again.  It is the

9    government's position that the conduct here, everything that

10   plaintiffs are challenging, they haven't shown a violation of

11   the First Amendment.  They haven't shown state action to even

12   get to the question of whether there's been a First Amendment

13   violation.  There's nothing unlawful about the government's use

14   of the bully pulpit or these communications with social media

15   companies.

16        But the question for the Court is whether plaintiffs have

17   presented evidence that they will be irreparably harmed.  And

18   they bear the burden of showing that the conduct is ongoing in

19   such a way that they will be irreparably harmed.

20        And they haven't shown that.  The record shows that much

21   of the conduct that they're challenging isn't currently

22   ongoing, and that's a critical question for the preliminary

23   injunction.  That's all the Court needs to determine at this

24   stage.

25              THE COURT:  Okay.  All right.  Mr. -- You can go

1    ahead now.

2            MR. SAUER:  Your Honor, I think she just conceded

3    that they are going to do it again.  I heard her say --

4            THE COURT:  She didn't say no, did she?  She didn't

5    say no, but she might want to say that.  Go ahead.

6            MR. SAUER:  I think she just said that, you know

7    what, there's nothing unlawful about this.  This is all A-OK.

8    And as soon as it makes sense to us, we will do it again.  And

9    that's a really important concession.

10            THE COURT:  And I'm -- if you want -- do you want to

11    say anything else?  I'll let Ms. Snow reply.  I'm not saying

12    she conceded that, but I'm just -- you know, I don't feel real

13    confident that the government won't do that again, I'll just

14    say that.

15            MR. GARDNER:  Your Honor, sorry.  Let me see if I can

16    address this directly.

17            THE COURT:  Okay.

18            MR. GARDNER:  The issue with a preliminary injunction

19    is:  Is there harm during the pendency of the lawsuit that we

20    need to stop to protect the status quo?  What my colleague was

21    saying is --

22            THE COURT:  Well, or that it's likely to occur.

23            MR. GARDNER:  Correct.  So, and again, we've got to

24    go defendant by defendant to think about this conduct.  But

25    what do we have in the record?  What we have in the record is a

1    declaration from Geoff Hale from CISA who says, "We won't be

2    switchboarding in 2024."  That's an unequivocal statement.

3    Plaintiffs don't challenge that statement.

4        And I think the more fundamental point to your example

5    about election issues, the election is, what, November of 2024?

6    The question then becomes is:  Is there conduct that may occur

7    between now, what is it, May of 2023, and the resolution of

8    this lawsuit that is likely to occur that will harm plaintiffs?

9        And we have put forth evidence that that challenged

10    action, which, by the way, mostly relates to COVID with a

11    pandemic that is now past us, is unlikely to occur during the

12    pendency of this lawsuit.  That's the -- that's the point.

13            THE COURT:  Okay.  My next question is going to be,

14    you know, one thing I noticed that, you know, -- y'all feel

15    free to point out something different -- is that, for example,

16    in the election issues, with the Election Integrity Project,

17    CISA, all those involved in that, every bit of postings and

18    things that they had, dealt with conservative speech.  I could

19    not -- I didn't see one post that -- you know, in fact, the

20    Election Integrity Project, EIP, said that almost all of the

21    information that they flagged or reported dealt with -- I think

22    they were, like, they worded it conservative, right-wing

23    followers of Donald Trump.  That's what they said.

24        And so I guess my question is:  Can y'all point to me some

25    posts that were flagged and/or removed, you know, by EIP

1    involving liberal left-wing supporters of Biden?

2              MR. GARDNER:  Thank you, Your Honor.  I don't have

3    the EIP Report immediately in front of me.  But we do note in

4    our response to plaintiffs' proposed findings of fact that the

5    EIP made several conclusions.

6         One of those conclusions was that the vast majority of mis

7    and disinformation that they were seeing did happen to come

8    from conservative sources.  That's just a fact.  But they also

9    say, and we note this in our response to proposed findings of

10   fact, that they did identify left-leaning posts as well for

11   targeting or flagging.

12        And, in fact, I mean, I would note this, you know, you

13   have another lawsuit in front of you right now by RFK, Jr. who

14   is running for the democratic nomination for president, who

15   claims that his materials were flagged by the EIP in connection

16   with the 2020 election.

17        So I think that's all the evidence you need, Your Honor,

18   to conclude that it wasn't necessarily viewpoint discrimination

19   at all.  And, of course, the EIP as a private entity can't

20   engage in --

21             THE COURT:  Well, his was not alleged to be election

22   because he wasn't running 'til I guess just recently.  But his

23   was COVID information.

24             MR. GARDNER:  No, that's correct.  But I think I took

25   your question to be were there, you know, liberal posters as

1    well as conservative posters whose information was flagged by

2    the EIP?  The EIP reports that, again, while I think there was

3    a significantly more flagging or tagging by conservatives

4    because conservatives were promulgating the most

5    disinformation, that they did also tag liberal information as

6    well.

7            THE COURT:  Do you know of any, any one single one

8    out of the millions or thousands, whatever it was they flagged?

9            MR. GARDNER:  Well, so to be clear, --

10           THE COURT:  Even one?

11           MR. GARDNER:  Yeah.  And I'm trying to be very direct

12   with you.  Neither party has taken any discovery from the EIP.

13   So we don't have the universe of what the EIP may have flagged

14   for social media companies, let alone what social media

15   companies may have done --

16           THE COURT:  Okay.

17           MR. GARDNER:  -- with that information.  But what we

18   do have, Your Honor, is a textual description in the EIP report

19   that explains they did in fact flag materials from liberal

20   viewpoints as well as conservative viewpoints.  What that

21   breakdown is, we don't know because we haven't taken that

22   discovery.

23           THE COURT:  And the viewpoints themselves that were

24   flagged, my understanding was from reading the EIC, whatever

25   that was, theirs wasn't brief either, but that their document

1    that they concluded, you know, what all happened, what all they

2    did and kind of patting themselves on the back and everything

3    about it, that what they were doing, they called it election

4    disinformation, which I understood to be people saying the

5    election was stolen or the democrats stole the election or

6    something happened like that.  That's what I understand that

7    they were talking about.

8        So getting back to is that protected free speech?  If I

9    put something on Facebook -- and I'm not even on Facebook or

10   any -- well, hardly anything.  I'm not going to put anything on

11   there, I promise.  I'm just giving you -- I'll put somebody

12   else.

13       If my law clerk Dakota Stephens puts something on there on

14   social media and he says the 20 -- and I'm not telling you his

15   political views or anything.  I'm just giving him as an

16   example.  But if he puts something on there that says, the 2020

17   election was stolen, is that -- it's coming directly from him.

18   It's not the Russians.  It's not Chinese, is that -- is that

19   protected free speech?

20          MR. GARDNER:  Well, if it is being flagged by the

21   EIP, a nongovernmental organization, then there's no First

22   Amendment violation.  And I think beyond that, Your Honor, as

23   my colleague Mr. Sur said, there's two steps here.  Right?

24   That someone has to flag or the EIP has to identify

25   information, and then they have to make a decision whether to

1    send it to a social media company.  And then the social media

2    company has to make a separate decision what to do with that.

3       And, again, as the plaintiffs concede, only 35 percent of

4    the time did the social media companies do anything with that

5    information.  That's exactly what *O'Handley v. Weber* was

6    talking about when they talked about the fact that social media

7    companies use their own independent judgment.

8            THE COURT:  Well, my question was:  Is that protected

9    free speech?

10           MR. GARDNER:  Yeah.  And my answer is the content

11   itself standing alone may be.  But if it's by a nonstate actor,

12   there's no First Amendment.

13           THE COURT:  Okay.  You said, "maybe."  Is there any

14   way -- if it comes directly from him.  He's an American

15   citizen.  I'll just tell you that.  Assume he is American.  He

16   is an American citizen.  He was born in Baskin.  So if -- home

17   of what's her name?  Lainey Wilson, Lainey Wilson.

18      But, anyway, if it turns out that he says that, didn't

19   come from the Russians, didn't come from the Chinese, didn't

20   come from Iran, is that protected free speech?

21           MR. GARDNER:  Sure.

22           THE COURT:  How could it not be?

23           MR. GARDNER:  Well, I know --

24           THE COURT:  Well, under what circumstance would that

25   not be protected free speech?

1          MR. GARDNER:  Well, again, not trying to be coy with

2    you.  The speech itself may be protected by the First

3    Amendment.  But when it comes or is used by a nongovernmental

4    actor, it doesn't violate the First Amendment.  And the EIP --

5          THE COURT:  And I do understand that.

6          MR. GARDNER:  Yes.

7          THE COURT:  My next question is going to be:  What do

8    you understand the relationship between CISA and the EIP to be?

9          MR. GARDNER:  I'd be happy to --

10          THE COURT:  Okay.  Good.

11          MR. GARDNER:  -- address that, Your Honor.  So CISA's

12    role, as explained in the documents -- and I wrote this down.

13    Just give me one second here.

14          THE COURT:  And I'm pronouncing it CISA.

15          MR. GARDNER:  That's okay.

16          THE COURT:  So it's pronounced CISA?  That's the way

17    y'all pronounce it in D.C.?

18          MR. GARDNER:  Yes, sir.  Yeah, I refer you, Your

19    Honor, to Exhibits 74, 122 and 125, as well as the declaration

20    of Mr. Hale from CISA.

21       And what those are, they're statements from the Stanford

22    Internet Observatory, the University of Washington and the EIP

23    itself.  And what those statements say to a person is that CISA

24    did not found, did not fund, did not control and did not manage

25    the EIP.

```
1        What did CISA do with respect to the EIP?  Well, as the --
2    I think, I hope undisputed evidence shows there were Stanford
3    interns who spoke to Mr. Scully, a CISA employee.  Mr. Scully
4    identified an issue.  And that issue is there is a lack of
5    resources by states to identify misinformation for social media
6    companies.
7              THE COURT:  Which turns out to be conservative
8    speech?
9              MR. GARDNER:  I resist that, Your Honor.  That's not
10   the case.
11             THE COURT:  Okay.
12             MR. GARDNER:  If it happens to be the case that more
13   conservatives are disclosing disinformation, that may be the
14   case.  But there is no, as I understand the EIP report, I think
15   that's what we have right now, there's no intention to target
16   conservatives.
17             THE COURT:  Okay.
18             MR. GARDNER:  But, in any event, so what the evidence
19   shows is that Stanford interns went to Mr. Scully and said,
20   "You know, are there issues that can be addressed?"  Mr. Scully
21   identified that there was a lack of resources by states, states
22   like Missouri and Louisiana, who asked CISA to provide
23   disinformation to social media companies.
24        Mr. Scully identified that.  The interns then went back to
25   the Stanford Internet Observatory, shared that with Alex
```

```
1    Stamos.  And Alex Stamos said, "Hey, why don't we create an
2    organization that does this because there is a lack of
3    resources?"  The EIP then shared what they were going to do
4    with CISA, as they would with any partner.  Because, remember,
5    CISA's statutory mission is to partner.  I mean, it is in the
6    statute.
7         So they shared that information with CISA.  And then EIP,
8    without any funding from CISA, that's undisputed, created the
9    Election Integrity Project.
10        Now, did the EIP share what it was doing with CISA?  Of
11   course, but that doesn't create joint action.
12              THE COURT:  Well, is that significant encouragement?
13              MR. GARDNER:  No.  No.  Not -- not constitutionally.
14              THE COURT:  I knew you would say that, but I was
15   going to ask you anyway.
16              MR. GARDNER:  Yeah.  Yeah.  Yeah.  No, not for
17   constitutional purposes.  Absolutely.  The question is did CISA
18   somehow break the will of a private entity, the EIP?  No,
19   certainly not.  And, by the way, we know that because we know
20   that not everything flagged by states, the EIP even sent to
21   social media companies.
22        What do we also know?  We also know that CISA never
23   flagged posts for the EIP.  They had no involvement in what the
24   EIP was actually doing, which was flagging things for social
25   media companies.
```

```
1        So then what are we left with?  We're left with the notion

2   that former employees of CISA at one time then went to work for

3   the Stanford Internet Observatory?  Well, that tells the Court

4   nothing about control or dominion of the EIP by CISA.  And then

5   so what are we left with?  Nothing, Your Honor.

6        The fact is that EIP, on its own, created a process to

7   flag, you know, misinformation for social media companies that

8   they were then given the complete responsibility, the social

9   media companies, to decide what to do with that information.

10             THE COURT:  Why was CISA even involved in it?

11             MR. GARDNER:  Because CISA has a mission, Your Honor,

12   to protect critical infrastructure.

13             THE COURT:  And I'm going to ask about that, --

14             MR. GARDNER:  I know you are.

15             THE COURT:  -- but not right now.

16             MR. GARDNER:  And one aspect of critical

17   infrastructure is cyber security and, you know, cyber

18   infrastructure.  So CISA has been in the space --

19             THE COURT:  And cognitive -- don't forget that,

20   cognitive infrastructure.  But we'll talk about that in a

21   minute.

22             MR. GARDNER:  And then, by the way, again, Missouri

23   and Louisiana asked CISA to play this role.  They don't dispute

24   that.  And what CISA concluded after the 2020 election was,

25   this was a really resource intensive project.
```

1      Now, my colleague here says, well, that was then because

2   of the lawsuit.  I think we need to be a little clearer about

3   this.  What Mr. Scully said was two things, the decision

4   happened in either April or May.  Of course, the lawsuit was

5   filed in May, not April.  And, two, it was done, at least in

6   part, because of the resource intensive nature of the

7   switchboarding efforts which CIS and EIP were, you know,

8   performing.

9      So I think that is the most direct answer I have to the

10  question of why CISA's minimal involvement could possibly lead

11  to joint participation under the Constitution such that CISA

12  would be responsible for the actions of the EIP.

13          THE COURT:  Okay.  Mr. Sauer, you look like you're

14  ready to say something, so I'm going to let you say something.

15  I've been avoiding you -- I've been asking so many questions, I

16  didn't get -- let you in.  But you look like you're just about

17  to say something.  If you want to say something, so go ahead.

18          MR. SAUER:  Judge, I cannot leave unaddressed the

19  federal government's insinuation that conservatives are the

20  source of disinformation.  I heard Mr. Gardner parroting that

21  point that is made in the EIP report that, well, we end up

22  overwhelmingly targeting conservative speech.  But, of course,

23  that's because conservatives are liars, and liberals are not

24  liars.  I mean, that reeks of bias and viewpoint discrimination

25  right there.

1          And on your question about whether or not, you know, the

2     EIP overwhelmingly targeted conservative speech, there's a

3     really telling graphic where they list the top 22 super

4     spreaders of disinformation on Twitter.  And that list there,

5     you know, President Trump is number 3, his sons are number 5

6     and 6.  Our plaintiff Jim Hoft is number 2.  And then on the

7     right side of that chart, they list the political orientation

8     of everyone and every single one of them is conservative

9          Then on the question of whether or not CISA's involvement

10    in the EIP is minimal, I just refer you to Tab 17.  Tab 17 is

11    basically a cut and paste from pages 51 and 52 of our reply

12    brief where we point to 15 significant points of contact and

13    collaboration between CISA and EIP.

14         On the notion of funding, they say CISA did not fund the

15    EIP.  CISA funded the EI-ISAC, which is the clearing house

16    through which misinformation was reported to the EIP.  And

17    other federal agencies did directly fund the EIP.

18         The EIP report itself says it received funding for this

19    very project from the National Science Foundation.  EIP is

20    federally funded.  It's working closely with partners, the CIS

21    and the EI-ISAC that CISA directly funds.  And, in fact,

22    federal officials are flagging misinformation.

23         The GEC, you know, and the kind of stunning development in

24    their response brief, they submitted Leah Bray's declaration

25    where she admits there were 21 narratives flagged by -- by the

1    GEC, information that we somehow didn't manage to elicit from

2    Daniel Kimmage because he denied all knowledge of it in his

3    deposition, 21 narratives flagged by federal officials at the

4    GEC.

5          THE COURT:  Well, one thing that caught my attention

6    with the Election Integrity Project was that the one who was

7    running that, Renee DiResta, I may be pronouncing that wrong,

8    but, you know, that she stated in one of the statements that I

9    read that -- that the purpose of that and the Virality Project

10   was to get around First Amendment concerns that would tie up

11   government agencies.  That's the first thing -- first time I

12   ever have seen anybody even mention free speech in all this.

13   And I guess I was kind of, like, does the government have

14   somebody that talks to them about this?  Do they ask anybody?

15   I never saw Rob Flaherty, Andy Slavitt, anybody from these

16   agencies ever even mention any possibility that they could be

17   violating the Free Speech Clause.

18        So I guess -- I guess why in the world would the

19   government, CISA, collaborate?  And that's the word used by

20   Mr. -- Is it Stamy?

21          MR. GARDNER:  Scully?

22          THE COURT:  Scully.  I'm sorry.  In his deposition,

23   he said they collaborated.

24        Now, I know that can mean a lot of different things.  But

25   why would the government collaborate, or whatever they're

```
1    doing, with an organization whose goal is to get around First
2    Amendment concerns?
3               MR. GARDNER:  So, well, I'll say this, Mr. Scully
4    said in his deposition -- and we cite to this again in the
5    response to the proposed findings of fact, that collaboration
6    to him just means the partnership that they are, again,
7    statutorily obligated to engage in.  They partner with the
8    private sector.
9         So there's nothing, I think, untoward or problematic about
10   the use of the term "collaborated" in that context.  And,
11   again, in one of the 1,442 responses, we explain --
12              THE COURT:  Okay.
13              MR. GARDNER:  -- exactly what he meant there.
14              THE COURT:  Okay.  All right.  Are the defendants
15   arguing for a pandemic/emergency exception to free speech?
16              MR. GARDNER:  No.
17              THE COURT:  Okay.  Okay.  Thank you.  That's the
18   shortest answer you've given so far.  That's good.
19              MR. GARDNER:  It's getting late in the day.  The
20   longer we go, the shorter they are.
21              THE COURT:  I'm joking.  All right.  I'm really
22   interested in knowing why Rob Flaherty of the White House was
23   so interested and so concerned about the Tucker Carlson video.
24   It had Tomi Lahren on it.  And it was Tucker Carlson and Tomi
25   Lahren.
```

1       And Tucker Carlson basically said the vaccines don't work.
2   Then Tomi Lahren said, "I'm not taking it."  That's what it was
3   about.  And he was really concerned about that.
4       If, you know, I don't think you admitted that was
5   protected free speech.  But I don't see how it wouldn't be.  I
6   think somebody has got -- a United States citizen has got the
7   right to say something like that if they want to say it, you
8   know.
9       It turned out he was right.  When I took the vaccine, I
10  was told it was 80 -- no, 80 to 90 percent chance it was going
11  to prevent it.  I've had COVID three times, you know, since.
12  And I know -- you know, I know that's just me.  But all over
13  the nation people kept getting it and they're saying, "Well, I
14  don't know why they're getting it."  And then all of a sudden
15  -- then later they say, "I don't know why they're getting it,
16  but it does keep you from going in the hospital."  I don't know
17  if it did or not.  I haven't had to go in the hospital, but I
18  got it three times.
19      But why was Rob Flaherty so concerned about something that
20  I think is protected free speech spreading on the Internet?  I
21  don't understand -- on social media, I mean.  Why?
22      Okay.  You going to punt this time?  Okay.
23           MR. INDRANEEL:  Your Honor, if I may.
24           MR. GARDNER:  I'm done with the --
25           THE COURT:  I'm joking.  I'm joking.  I know he does

1    the merits part.

2          MR. INDRANEEL:  It's Mr. Sur for the United States,

3    Your Honor, if I may.  Thank you.

4          THE COURT:  Thank you.

5          MR. INDRANEEL:  So I think because this

6    presupposition all along has been that the contents of what

7    appears on social media platforms are subject to the terms of

8    service that the users of the platforms agree upon with the

9    platforms, the Court noted that absence of discussion about

10   free speech.  I think it's explained by the understanding of

11   everyone involved that it was ultimately the platform's

12   decisions about that control about what would be removed, and

13   then what would be subject to these other various measures that

14   the platforms came up with using their technology.

15       They have so many posts that they have to deal with that

16   many of the posts are handled algorithmically.  And some of

17   them are then, from what I understand, reviewed also by humans.

18   But the point is that they have such a high volume, that they

19   have different measures that they apply.  So removal might be

20   one measure.  But others might be, as the Court suggested in

21   the exchange earlier with me when I was at the podium, noting

22   the reduction of the circulation.

23       And the -- before this administration began, the platforms

24   announced that they were going to use moderation measures short

25   of removal for claims that did -- their fact checkers did not

1   find to be true.  So that included removal of posts when the

2   posts also had a harm component.

3           THE COURT:  You're talked about Facebook's, that if

4   it caused vaccine hesitancy and was false.

5           MR. INDRANEEL:  Yes, that's right.  So they applied a

6   range of measures.  And one of the categories that Facebook

7   said that they were going to reduce the distribution of were

8   the posts that encouraged vaccine hesitancy.  And so --

9           THE COURT:  Who determines if it's true or false?

10          MR. INDRANEEL:  So, from my understanding, the

11  platforms had these third-party fact checkers.  And they also

12  were working with, for example, the World Health Organization,

13  other governmental and nongovernmental health organizations.

14      In some cases it's true the platforms in the domestic

15  setting did go to federal agencies.

16          THE COURT:  So the government decided, determined if

17  it was true or false?

18          MR. INDRANEEL:  I think if it was a particular claim

19  about a scientific -- if it was a scientific statement, then

20  they might ask CDC, among other entities.  But I think the

21  Court's question is pointing to this whole problem of

22  borderline content because a particular individual's experience

23  with the vaccine would -- that individual probably knows best

24  what their own symptoms were; but the platform may,

25  nevertheless, conclude that the particular post would promote

1    vaccine hesitancy and might be alarmist because it might

2    represent a side effect that only a small percentage of people

3    would have experienced.

4          THE COURT:  I think that one we talked about.  All

5    Tucker Carlson said -- he went through, you know, some

6    different scientific things.  And he said that the vaccines

7    don't work basically is what he's saying.  And Tomi Lahren

8    threw in there, "I'm not going to take it."  And that's what it

9    was about.  It wasn't about any adverse effects, I don't think.

10   I could be wrong, point it out if I'm wrong.

11         MR. INDRANEEL:  I haven't seen the video myself, Your

12   Honor.

13         THE COURT:  Okay.

14         MR. INDRANEEL:  But I think what I'm just trying to

15   provide as the important context here, is that both, in this

16   case, Facebook and the government, had a shared policy

17   preference that, you know, the vaccine hesitancy be controlled.

18   And the questions that Mr. Flaherty were asking were about sort

19   of the scope and the nature of Facebook's content moderation

20   that was, as we discussed, short of removal when Facebook was

21   addressing posts that Facebook thought might encourage vaccine

22   hesitancy.

23         THE COURT:  Okay.  And let me ask you about -- Did

24   you want to say something, Mr. Sauer?  You look like you want

25   to.

1          MR. SAUER:  Can't resist.

2          THE COURT:  You're kind of wiggling around over there

3     so I didn't know.

4          MR. SAUER:  I think Mr. Sur's comment raised a really

5     interesting, important point, which is that when you look at

6     the CDC communications, the CDC is saying this is false and it

7     could lead to vaccine hesitancy, therefore, it must be taken

8     down.

9          What you have from the White House or what you have from

10    the Rob Flaherty emails and other places insistence that

11    truthful content that could lead to vaccine hesitancy must be

12    taken down.

13         What Rob Flaherty really cares about is not false speech,

14    like, you know, there's magnetism or there's microchips in the

15    vaccine.  What he cares about is the truthful, but

16    sensationless, as he calls it -- sensationless is a synonym

17    here for effective in contradicting the proposed narratives.

18    The truthful speech needs to be taken down.

19         And that's what set the White House really on a hard core,

20    campaign against truthful content that contradicts their

21    narratives.

22         MR. INDRANEEL:  Well, if I may, Your Honor.  I think

23    that the whole point of trying to provide the context for this

24    discussion between Facebook and the White House and the

25    platforms generally in the White House is that it was not the

1    White House that was trying to impose on the platforms any one

2    definition of the truth or the falsity of whatever speech that

3    they were going to have on their platforms.  They were -- it

4    was the platforms that consulted these third-party fact

5    checkers.

6         And, as we pointed out in the brief, there were many

7    instances where, you know, the government asked a question

8    about whether a particular platform -- what approach they were

9    taking to certain kinds of posts.

10        And once the platform looked at the post and said that's

11   not a violation of our policies, that was essentially the end

12   of the discussion.

13             THE COURT:  Do you remember when Facebook changed

14   that policy to -- because they didn't have it at first.  Then

15   they changed it where it said, we're taking down things that

16   are -- that are -- cause vaccine hesitancy and/or not true or

17   something like that?  And then they talked -- asked the CDC

18   whether it was true or not.

19        So do you know when they did that?  Do you remember when

20   that was changed or what time?

21             MR. INDRANEEL:  So --

22             THE COURT:  I just can't remember.  I mean, I've gone

23   through so many things I can't remember when.  But it was

24   during that time sometime, and I was thinking it had not been

25   changed at that time, but I don't know if that's true or not.

1           MR. INDRANEEL:  So in March of 2020.

2           THE COURT:  Okay.

3           MR. INDRANEEL:  This is Exhibit 18.  It's Defense

4    Exhibit 18.  It's a statement from Facebook where they say

5    that, quote, "We have removed harmful" -- and then, from the

6    context, it's clear they mean health related, so that was our

7    bracketed addition in the brief -- "misinformation since 2018

8    including false information about the measles and Samoa where

9    it could have furthered an outbreak.  And rumors about the

10   polio vaccine in Pakistan where it risked harmed to health and

11   aid workers."

12       And then they go on in the same document to say, beginning

13   in January 2020, quote, "Applied this policy to misinformation

14   about COVID-19 to remove posts that made false claims about

15   cures, treatments, the availability of essential services or

16   the location and severity of the outbreak."

17       So there was this category that they said, you know, based

18   on its falsity they would address.

19           THE COURT:  Yeah.

20           MR. INDRANEEL:  And then there were other posts that

21   essentially, even if they had not reached a determination about

22   truth or falsity, they would apply content moderation measures

23   to --

24           THE COURT:  Who did they ask for the truth or falsity

25   of it?  Who's the ministry of truth?  Have you ever read George

1    Orwell's *1984*?

2             MR. INDRANEEL:  We did have it as a required text in

3    high school, Your Honor.

4             THE COURT:  Good.  Good.  That's great.  Because, you

5    know, I just think that it applies here because, you know, the

6    whole -- to me, the whole purpose of the First -- not the whole

7    purpose, but a big part of the First Amendment, Free Speech

8    Clause, is that the government can't tell us what's true or

9    false.  We've got the right to make our own decisions.  And,

10   you know, here they're asking the government is this true or

11   false?

12            MR. INDRANEEL:  Your Honor, to that point, my

13   understanding is that the platforms had -- they refer in the

14   discussions to third-party fact checkers.  I'm not certain what

15   the total, you know, list might be of those entities or what

16   resources they have for that.

17       Among the sources that they do consult are, on occasion,

18   you know, across the world, the recognized local government or,

19   you know, national government health authorities.

20            THE COURT:  Okay.  Okay.  All right.  All right.  And

21   I promise I'm going to ask plaintiff some questions too.  I'm

22   not just picking on the defendants, but I've got more questions

23   for y'all, for some reason.  But I think it's just the nature

24   of it.

25       But all over the place it was talking about

1    misinformation, misinformation.  How do you define

2    misinformation, or how does the government define

3    misinformation?

4             MR. GARDNER:  So, thank you, Your Honor.  I mean, I

5    think there's a couple ways it could be done.  But certainly

6    CISA has definitions for misinformation, disinformation and

7    malinformation.  Plaintiffs cite to those definitions in their

8    brief.  We don't dispute that those are the definitions CISA

9    has identified.  But -- or if you're asking me is there a

10   uniform definition across the federal government, I don't think

11   the record supports that.

12            THE COURT:  Okay.  All right.  Mr. Sauer, you're not

13   wiggling this time so I don't guess you want to say something.

14   So I'll ask you -- I'll go to something else and ask you

15   something else.  You can comment on that too.

16        I guess the disinformation question is, like, you know,

17   because disinformation is, like, what the government says it is

18   basically.  And, you know, it could be something that's true or

19   false.  And there's a lot of things that the government -- you

20   know, I've never understood why the government was so deadset

21   on everybody taking this vaccine and everybody putting masks on

22   after they first told us not to.

23        First press conference Dr. Fauci said, "Don't take masks.

24   They don't work" when it was President Trump.  And then -- you

25   know, then later he said, "Well, I was just trying to do that

1   so everybody wouldn't get all the masks that the hospitals

2   need."

3        After that, it's kind of downhill from there.  Nobody is

4   going to believe anything you say when you start off doing

5   that.

6        Why was the government so keen on just everybody has got

7   to take this vaccine and not listening to alternative views and

8   calling alternative views disinformation?  I don't understand.

9   You know, I just -- I think a lot of the Free Speech Clause, I

10  think that's one of the most important rights we have in the

11  United States.  And I just don't understand why you say, well,

12  my way or no way.

13           MR. GARDNER:  Your Honor, the government shares your

14  view that the First Amendment is one of the most important

15  constitutional protections.  So I don't think there's any

16  dispute between the parties there.

17           THE COURT:  Okay.

18           MR. GARDNER:  I deeply disagree with the notion that

19  we are telling social media companies what to do, that we have

20  somehow broken their will and told them how they need to apply

21  their terms of service.  The evidence just does not support

22  that.  There is simply nothing, Your Honor, violative of the

23  Constitution with flagging information for social media

24  companies and allowing them to apply their terms of service.

25           THE COURT:  But let me ask you about that since you

```
1   pointed that out there's no evidence of it.  But, and I'm going
2   to ask you about coercion in a minute, and some things Rob
3   Flaherty did.  I mean, it's pretty obvious he was wanting them
4   to take it down.  I mean, I don't see how anybody could read
5   all those texts and things and say, "Well, you know, the
6   government, I don't know what they want me to do."  They wanted
7   them to take them down.  And most of it was protected free
8   speech, if not all of it.  And I don't understand -- you know,
9   I noticed a big change.
10      I was kind of surprised because I thought that when some
11  of the stuff was kind of revealed, that the social media
12  companies were always, you know, liberal and they're kind of in
13  with the -- in with the government's view, or whatever -- not
14  the government, depends on who the government is.  But with
15  that view, and they kind of were on the same side.  But it
16  looked like they kind of fought back a little bit and said, no,
17  these don't violate our policies.
18      And then President Biden got on there in July, the middle
19  of July of 2020 or '21 -- '21, I think it's '21, is when it all
20  changed.  It was, like, they had this Jen Psaki got up there
21  and said here's the -- you know, "They've got to do better."
22  You know, all these problems, social media companies have got
23  to do, "Here's our ask.  We're in constant contact with them
24  telling them what our asks are."  And then President Biden
25  said, "They're killing people."
```

1    And they thought -- I know he tried to clarify that later

2    to say, "Well, I'm not talking about -- I'm talking about all

3    the disinformation does and not the media companies."  But I

4    think they took it as -- I think it's pretty clear they took it

5    as he was talking about them because they were upset about it.

6    And then the surgeon general did his -- I forget what it's

7    was called, some kind of advisory.  But it was the advisory

8    that said, oh, you've got -- you know, "We've got to do

9    something.  You've to -- we're going to have to change the

10   laws."

11   And then Kate, I forgot her last name.

12   MR. GARDNER:  Bedingfield, Your Honor.

13   THE COURT:  Yeah.  She said, you know, "We're going

14   to have" -- because every time they start doing this they pound

15   it in, "Oh, yeah, we've got to change this, you know.  We're

16   going to change Section 230.  We're looking at our options what

17   we can do to change all this."

18   So it looks like after all that, and that was all right

19   there two days -- within two days the middle of July.  And

20   after that, everything changed.  These social media companies

21   started falling in line like the Pied Piper.  And it just

22   -- they just all started, "What can we do -- what can we do to

23   help?  What can we do to get in your good graces?  What can we

24   do?"  You know, that's the way I saw it from looking at it.

25   Tell me if you think something different.  They started

1    doing everything the government asked them to do after that.

2         MR. INDRANEEL:  Your Honor, if I may.  So on the

3    disinformation dozen, as the Court pointed out, the President

4    did clarify his remarks.

5         And the Facebook response around that time that, you know,

6    we think it is probative is Exhibit 71 where Facebook publicly

7    announces that it has already been doing everything that the

8    surgeon general's advisory was recommending.

9         In addition, Exhibit 145 is a statement in August of 2021

10   where Facebook says that it did address some accounts and some

11   posts or pages that were linked to the disinformation dozen.

12   But it also made clear there that having reviewed the content,

13   as well as its own policies, that there were some -- you know,

14   there were posts and pages that did not violate its policies

15   and so it left those up.

16        So the -- that Exhibit 145, which it's, again, when I say

17   "exhibit," I just mean to the defense preliminary injunction

18   opposition brief.  That Exhibit 145 is a statement by Facebook

19   that confirms their independent judgment about what the

20   disinformation does and was posting and what it was not.

21        The other thing I will add that may help in the context

22   because of the volume of information that is posted on these

23   platforms, a point that was actually mentioned somewhat as part

24   of the background in the *Twitter* against *Taamneh* case the

25   Supreme Court handed down, the sheer volume is so high that

1    even a matter of days means that there are a lot of posts that

2    may be at issue.

3         And, from Exhibit 145, or from the rest of the record, we

4    don't actually know which are the posts that led to Exhibit

5    145, you know, led to Facebook's statement on that date in

6    August that the disinformation dozen had some of their, yo

7    know, content removed or otherwise subject to moderation, and

8    which ones, you know, they, you know left up and why, but we do

9    know it's a very high volume.

10         And so to infer just from sort of the timing that there

11   was some kind of relationship, I think would, you know, sort of

12   be contrary to that, that just the reality of the sheer number

13   of posts that these platforms are dealing with.

14         I think the Court may also have been suggesting or

15   inquiring about the discussions about Twitter and Alex

16   Berenson.  The record on that does not support the plaintiffs'

17   theories.  We have the interrogatory responses for Mr. Flaherty

18   clarify that, you know, as of the April 2021 meeting, Twitter

19   had concluded that at that time Mr. Berenson's posts hadn't

20   been, you know, something that Twitter was going to take action

21   on because it didn't violate the policies.  And that was the

22   end of that discussion.

23         Mr. Berenson was then later on suspended.  And that, I

24   think, came in July or August of 2021.  But it wasn't

25   permanent.  The documents that plaintiffs themselves have put

1    into the record show that, as of December, he was then back on.

2        And, again, we don't know what particular posts led to

3    Twitter's content moderation decisions in either July or August

4    of 2021.  But Mr. Berenson was not mentioned by the President.

5    Mr. Berenson was not mentioned by the surgeon general.

6        So all of that requires leaping into speculation.

7            THE COURT:  They kicked them all off, though, after

8    that July thing.  They kicked everybody off, disinformation

9    dozen, Great-- All of that stuff they just got rid of them, is

10   the way I understand.  But, anyway, well, I'll look at it

11   closer though and make sure.

12       Did you want to say anything?

13           MR. SAUER:  I was just going to address the

14   chronology of Alex Berenson.  There's an April 21st meeting

15   with the White House where the White House pushes Twitter to

16   deplat for him.  They resist.  They say, "Well, he's not really

17   violating our policies."

18       Then there's a pressure campaign from Dr. Fauci in early

19   July of 2021 where he's publicly attacking him and saying he's

20   risking people's lives.  Then July 16th, as the Court said,

21   2021, President Biden says, "They're killing people."  And Alex

22   Berenson is suspended by Twitter within a few hours after that

23   comment on the same day.

24       Later in August he's permanently deplatformed by Twitter.

25   And he gets back on after Elon Musk acquires the platform.

1          THE COURT:  Okay.  All right.  And I'm going to ask

2     the government some questions now, so I'll quit picking on

3     y'all for a minute and ask the government some questions.

4          When I reviewed a lot of this, things that NIAID -- I'm

5     just going to go by the initials.  I can't remember what it all

6     stands for now, but I know it's infectious diseases.  But

7     Dr. Fauci and that NIAID, they made -- there was very little

8     communication with Dr. Fauci's office, you know, saying -- you

9     know, there was a lot of meetings and things like that between

10    these other agencies.

11         But I didn't see that with the HSS -- HHS or the NAIAD.  I

12    didn't see a lot of that.  I just saw they were making public

13    statements.  You know, Dr. Fauci made videos and he'd be on,

14    you know, different news channels and things, you know, saying,

15    "Wear your mask; stay six feet away from everybody; take your

16    vaccine," that kind of stuff.

17         So I guess what I'm getting at is:  How is there -- you

18    know, is this government speech, first of all?  And, like,

19    Dr. Fauci and them were -- it was different than some of the

20    other agencies.  You know, you'd have thought it would have

21    been similar, but it didn't appear to be, at least what

22    evidence you've got right now.

23         But it shows that they were making public statements,

24    which, you know, I kind of tend to think would be government

25    speech.  So how do you show significant encouragement and/or

1    coercion with regard to those defendants?

2              MR. SAUER:  Two responses to that.  First on your

3    first question, the factual question about the communications.

4    I agree with that to an extent.  You don't see anything like

5    from NIAID the constant meetings between the FBI and CISA.  You

6    do in their interrogatory responses, however, see under oath an

7    identification of 13 communications between Dr. Fauci and Mark

8    Zuckerberg in 2020 alone.  So there is communication with the

9    platforms, but there isn't communication, like, in the sheer

10   volume.

11       You also have Dr. Fauci repeatedly appearing with Mark

12   Zuckerberg in at least, I think, three different occasions -- I

13   want to say three different occasions, where they're on joint,

14   you know, Facebook Live chats to talk about COVID and so

15   forth.

16              THE COURT:  That's kind of government speech there,

17   isn't it?

18              MR. SAUER:  I agree.  We don't challenge anything in

19   the Facebook Live.  He's totally entitled allowed to,  do that.

20       Now, on the question of what's he allowed to say?  When

21   does the government speech cross the line?  For those 2020

22   communications involving Dr. Fauci and Dr. Collins, we have

23   argued that those violate -- fall into the deception bucket.

24   Right?

25       So I mention we have five tests here:  Deception.  We

1   relied on the case for *George* against *Edholm* from the 9th

2   Circuit that has two elements where a state official or a

3   federal official knowingly provides false information and does

4   so with the intent of inducing a private party to take an

5   action that the government would not be allowed to take.  That

6   violates the First Amendment.

7       So the *Edholm* case, for example, is a police officer

8   giving a doctor false information about a patient's medical

9   condition.  Oh, he's having some kind of, you know, septic

10  seizure to induce the doctor to engage an anal cavity search to

11  locate a baggy of crack cocaine, basically.

12      The fact the police officer knowingly gives false

13  information to induce the doctor to do something that would

14  violate the Constitution if the government did it itself, that

15  is state action.

16      And there's another opinion by Judge Posner *Jones* against

17  *City of Chicago* we discussed in our briefs that that really

18  powerfully reinforces this.  And they say they can't hide

19  behind the people they've defrauded.

20      So that -- and I'll focus my comments now on the largest

21  sort of chunk of evidence we have with respect to Dr. Fauci is

22  that campaign to discredit and get censored the lab leak

23  hypothesis that was enormously successful.

24      We contend Dr. Fauci is entitled to get on TV and give his

25  opinions about the lab leak hypothesis.  But we contend that if

1    you look at all that evidence and look at some highlights we've
2    included in Tab 6 to Tab 13 in your binder, that it was much
3    more than government speech.  It was a calculated campaign to
4    deceive the platforms, and in deceiving them, to induce them to
5    censor speech.  So we think that there's a compelling inference
6    to be drawn from those.

7        That is a very unique; it's very detailed.  That's why we
8    -- you know, there's hundreds of paragraphs in our proposed
9    finding of fact about it.  Because ordinarily those kind of
10   comments absolutely would be government speech.  It would be no
11   problem.  You know, ordinarily a government official can say,
12   "I don't think it came from the lab.  I think it came from
13   nature," or "I think it did."

14       But if you actually look at that entire course of conduct,
15   the contemporaneous communications, the ginning up of -- you
16   know, the *Nature of Medicine* article, Dr. Fauci's comments at
17   the April 17th press conference where he pretends to not know
18   who the authors are after they send him seven drafts to review
19   and thanked him for his advice and leadership and so forth.  We
20   say that all adds up to a campaign of deception.  And that
21   campaign of deception was intended to induce the platforms to
22   prevent what Dr. Fauci calls in his emails further distortions
23   on social media, to induce the censorship of that and it
24   succeeded.  We think that's state action on that theory.
25           THE COURT:  Okay.

1          MR. SAUER:  To be clear, we do not contend that it's
2     -- you know, that it's principally a coercion and compulsion
3     issue or a joint participation, which doesn't require coercion.
4     But because there isn't that same course of kind of
5     communications about it.  It's a form of deception.
6          THE COURT:  Okay.  And I've got -- I know in the
7     Third Amended Complaint, in the first ones too, it talks about
8     the Disinformation Governance Board and Nina Jankowicz.  And I
9     know -- I understand the defendants' brief indicated that had
10    it had been disbanded, or something to that effect, and
11    attached something that said disbanded.
12        Is there any contention at all about that at all?  Do I
13    need to address any of that at all I guess what I'm trying to
14    figure out?
15         MR. SAUER:  Yeah, I believe that what's principally
16    relevant about the Disinformation Governance Board, keep in
17    mind that was announced, And the enormous public blowback eight
18    days before we filed this lawsuit.  The Disinformation
19    Governance Board, the fact that DHS was doing that right up to
20    the moment it got sued is powerful evidence of their intent to
21    continue these censorship activities.
22        The fact that right up to the moment they got sued they
23    were creating a whole bureaucracy to engage in this flagging
24    and taking down disinformation activities, I think it's the
25    most relevant --

```
1               THE COURT:  Yeah, I understand the relevance to that.
2               MR. SAUER:  Yeah.
3               THE COURT:  I guess I'm getting at:  Is there any
4       request for an injunction against them since they're disbanded,
5       I guess, you know?
6               MR. SAUER:  The government represents that
7       essentially Ms. Jankowicz no longer works there and the entity
8       doesn't exist anymore.  So we've sought an injunction against
9       the DHS defendants who are -- you know, who are named.  But we
10      don't have evidence to contradict the representation that it's
11      gone.
12              THE COURT:  That's what I'm trying to get at is I do
13      understand what you're saying about the relevance of that part
14      of it.
15          Okay.  In the Third Amended Complaint, I tried to go
16      through all these defendants.  And now it's complicated a
17      little more because some of them have left and been replaced
18      and some of them have not been replaced, you know, trying to
19      get them all straight.
20          But it listed the -- and I apologize this is taking so
21      long, but I'm going to finish the questions before I break for
22      lunch.  I'm not going to do break -- I'm not going to do
23      anybody like that, break for lunch and then come back.  I know
24      y'all probably have got flights out and things.  So we'll
25      finish and be done.
```

1      All right.  But the U.S. Food and Drug Administration was

2   a defendant; U.S. Department of Treasury; U.S. Election

3   Assistance Commission, and Department of Commerce and several

4   employees that worked for them.  I didn't see a lot in

5   anybody's novel -- I'm going to start calling it a novel --

6   about that, about those entities.  So I don't know -- I guess

7   what I'm getting at is:  Are you requesting any injunction to

8   those?  Do you have evidence of those?

9           MR. SAUER:  We do have evidence, but we haven't

10  sought an injunction as to those.  The evidence that we have is

11  set forth in the compliant.  But in our preliminary injunction

12  papers, we have not sought an injunction against those

13  particular defendants.

14      So, yeah, if you want to know the defendants we are

15  seeking, we have in page 66 and 67 of our supplemental brief

16  doc 214.  We have specified the exact defendants we're seeking.

17  So it's the White House defendants as defined include these

18  people.

19           THE COURT:  I'll look at that.  I missed that.  I

20  guess I went to the end of the novel.  I read it all, I really

21  did, but sometimes it gets mixed up.

22      Let's see.  All right.  Okay.  And I'm going to go back to

23  the defendants.  You know, basically bottom line, most of these

24  agencies and the White House parties, employees, they were

25  flagging posts for social media platforms, emailing the flagged

1    posts to social media companies.

2        They were sending them emails saying, you know, "Why

3    hasn't this been removed?" things like that.  You all know what

4    all was said.  I'm not trying to go through the details, but

5    that's just -- I'm just generalizing.  And they even followed

6    up with them, to follow up with them to say, "What did you do

7    about that post we notified you about?"

8        I guess what I'm getting at is how can you say that's not

9    significant encouragement?  Explain to me how that wouldn't be

10   significant encouragement.

11              MR. INDRANEEL:  Your Honor, if I may, --

12              THE COURT:  You're giving him all the hard questions.

13   Okay.  Go ahead.

14              MR. GARDNER:  That's exactly right.

15              THE COURT:  I'm kidding.  I'm joking.

16              MR. INDRANEEL:  There are two points.  Just on the

17   first point, there were many instances were the platforms

18   didn't even get back to the government about what particular

19   action they took.  And I think sometimes there were just

20   follow-up questions to find out what the outcome was, not with

21   an objective of, you know, or an effect really of changing the

22   outcome, but just to learn if the platform had taken any

23   action, and sometimes to learn about the platform's application

24   of its policies.

25        So one instance that comes to mind of that is that it was

1    helpful for some of the agencies to understand how the terms of

2    service were being applied so they could -- you know, they

3    could figure out whether something, you know, was something

4    that the platform would, you know, use or consider relevant

5    when it was making its own content moderation decisions.  I

6    think that's where you saw some of the follow-up questions.

7        To a larger part of that significant encouragement, I

8    think what's challenging is that there are not large numbers of

9    cases that have focused on significant encouragement as a

10   distinctive prong of the State Action Doctrine.

11       And, in fact, when the opinion from the Court in *Bloom*

12   against *Yeretsky* 1982, announces the significant encouragement

13   or coercion formulation, it has a bunch of cases that it cites,

14   you know, previous instances.  But it doesn't break them down

15   or classify them as one or the other.

16       What I do think we know from the precedent is that in the

17   context of the state action requirement, right, which is the

18   threshold inquiry to decide and to preserve the line between

19   private conduct and public conduct that significant really

20   means significant.

21       So in *American Manufacturer's Insurance Company* against

22   *Sullivan*, which was a 1999 State Action Doctrine case, there

23   the Pennsylvania legislature had amended the workmen's

24   compensation statute to give the medical insurance companies a

25   remedy, right, that they didn't -- that they were foreclosed

1    necessarily from exercising before.

2         And the challenger was saying, well, look, the statute was

3    changed to give this new legal option of withholding these

4    disputed payments; therefore, that's encouragement.  That's

5    significant.

6         And the Court says, it may be encouragement in some sense,

7    but it's not significant encouragement consistent with our case

8    law that would be so significant as to turn the private

9    decision, in that case withholding the pending payments pending

10   further review, into the state action.

11        So I would offer that as one example of a reminder that

12   this -- although ordinarily we might say that something is

13   encouraging in a casual way, when the Court in the state action

14   context is using the phrase "significant encouragement,"

15   they're putting a lot of weight on it.  And they're saying even

16   enactment of a statute that might incentivize something to

17   happen, is not significant encouragement.

18        And I think *Sullivan* is a very useful case.

19             THE COURT:  Yeah, I read your cases.  You had some

20   good cases, and I read them.  One of them was -- one of them

21   was a very, you know, close factual case, the one in California

22   that they flagged, one flagging of a post was not enough for a

23   significant encouragement to send it to them.  I think it's one

24   time they flagged it, sent it to them and they deleted it or

25   something.  That wasn't enough.

1       And so it was a very close factual case, but all they said

2   was that wasn't enough.  And then the situation about, you

3   know, they said it was enough where they amended a statute to

4   allow -- I think they said it was --

5       Anyway, it looks like to me there's a whole lot more that

6   went on here than went on in those cases is the difference.  So

7   I just don't understand how -- It looks like to me, you know, I

8   didn't -- most of the cases you cited and, you know, I'm sure

9   you cited, did a excellent job on it, I mean, really very good

10  cases, very, you know, close.

11      But I didn't -- it didn't seem to me that they were -- the

12  cases were anything near what's happening here.  It didn't have

13  any -- just had just a couple of things.  It was just -- and

14  they said it was not enough for significant encouragement.  And

15  I agree with all those cases that you cited that said that.

16  They probably wouldn't have been enough, but there's a whole

17  lot more here.

18      So, I guess, why is there not, you know, all these

19  meetings, all these emails, all this pressure?  It was

20  pressure.  I mean, I don't see how anybody could read these

21  emails and come up with anything but the government was putting

22  pressure on them to do something about these emails.  I mean,

23  how do you see it?

24          MR. INDRANEEL:  Thank you, Your Honor.  So another

25  one of the cases that I think may be helpful here is *Bloom*

1    against *Yeretsky* itself where there were regulations about the

2    nursing homes that governed whether they were shift -- whether

3    the patients were shifted to higher levels of care or lower

4    levels of care.

5        And that was what the challenger was saying was the

6    relevant state action.  And then Justice Rehnquist in his

7    opinion clarifies that the ultimate judgment about whether the

8    patient would be moved from a higher level of care to a lower

9    level of care or vice versa was a private medical judgment that

10   was being done by private medical standards.

11       And I think the analogy here that's quite natural is the

12   analogy to the private platforms' content moderation which

13   remained firmly up to them to decide how to compose and how to

14   apply.

15       I think there may be instances where there were, you know,

16   repeated questions; but that did not turn the questions or, at

17   times, -- you know, at most, the efforts to persuade into, you

18   know, coercion of or significant encouragement that's required

19   for state action.  And, again, that's because it's a very high

20   bar to preserve that line between private and public conduct.

21           THE COURT:  And I apologize this is taking so long.

22   I just had a lot questions.  I mean, I really tried to read

23   through all this and I had a lot of questions I wanted to ask

24   you.

25       I don't normally do oral arguments on a lot of things I

1   decide unless I really need, you know, people to say; and I did

2   here so that's why I did.

3       But I know there in the response, 723 or whatever page it

4   was, response, you know, to all the 1,440 different, you know,

5   topics or whatever, paragraphs, it -- you know, it contested

6   basically some of the interpretations.  But is there any

7   contest of validity in any of these emails, like, Rob

8   Flaherty's emails?  I was a little confused about that.  I want

9   to make sure.

10      Is there any dispute that these emails, the contacts were

11  valid?  Is it just interpretation of it that you're contesting?

12          MR. GARDNER:  Sorry, I didn't mean to interrupt, Your

13  Honor.

14          THE COURT:  No, that's fine.

15          MR. GARDNER:  Okay.  Let me say up front we

16  appreciate your questions.  We are not troubled at all to stay

17  longer if it assists you.

18          THE COURT:  Okay.

19          MR. GARDNER:  If your question is do we dispute the

20  authenticity of any email?  No, they're genuine emails.  Do the

21  emails say what they say?  They absolutely do.  But to your

22  point, I think the largest dispute in the 1,442 proposed

23  findings of fact the plaintiffs submitted is that it isn't just

24  their quotation of these documents, it is their

25  characterizations, more importantly, their mischaracterizations

1   of what these emails say.

2       I hope that was responsive.

3       THE COURT:  Okay.  Yeah, basically you're arguing the

4   interpretation of it is what I understood.  Basically you're

5   not disputing that these emails are valid or authentic or they

6   say what you they said.  But you're saying that they're a

7   different interpretation?

8       MR. GARDNER:  That's right, Your Honor.  I mean, and

9   that's for the emails.  There are other proposed findings of

10  fact where they just simply have no evidence or they have

11  completely mischaracterized the evidence.  But with respect to

12  the emails, generally that's correct.

13      THE COURT:  Okay.  I just wanted to make sure.  And

14  then -- All right.

15      I know that the defendants filed -- and I forget what it

16  was called, but it was, like, a motion that kind of listed who

17  had left, was no longer working there anymore.  These are all

18  -- all the employees were sued in their official capacities.

19      So were they -- they were substituted -- you substituted,

20  like, for example, Dr. Fauci retired and Doctor something -- I

21  forgot his -- Hughes something took his place.  So you put that

22  in there.  And, you know, in different capacity.  Some of them

23  left and had been replaced; some of them hadn't been replaced.

24      So, as far as procedurally, would those be -- I'm going to

25  ask both sides this -- would those be the correct -- the ones

1    that have been substituted, are they the correct defendants

2    now; or, like, people like Jen Psaki that were alleged to have

3    done things or said things, but they're no longer there

4    anymore.  You know, I guess that's what I'm getting at.

5         Procedurally are they even involved in this suit?  I

6    understand you can use what they did.  I'm not questioning

7    that.

8              MR. GARDNER:  Thank you for your question, Your

9    Honor.  So, yes, we did file a notice of substitution, which of

10   course, we don't even have to do.  The Court can automatically

11   substitute, as you know.

12        The issue here is there are no individual capacity

13   allegations.  There are only official capacity claims against

14   individuals.  And, therefore, we thought it appropriate to

15   identify for the Court those individuals in their official

16   capacity who are either no longer employed by the federal

17   government at all or no longer employed by the agency for whom

18   they're alleged to be engaged in misconduct, or don't hold, you

19   know, those job responsibilities anymore.

20        And because plaintiffs are seeking an injunction against

21   individuals in their official capacity, it's even more

22   important that we identify that for the Court.  But, of course,

23   as you know, we don't believe it's appropriate to enjoin

24   individuals in their official capacity in the first place.

25              THE COURT:  Okay.  Mr. Sauer.

1          MR. SAUER:  Judge, we don't dispute that there should

2     be a substitution of, for example, federal officials who have

3     left and been replaced in their jobs.  So Jen Psaki left.  She

4     gets replaced by Kerine Jean-Pierre.  And that substitution, we

5     think, should occur.

6          The one quibble we have with the notice of substitution

7     that they filed is they contend that White Officials who have

8     been moved to slightly different roles are no longer proper

9     defendants.  They're still in the White House.  They're an

10    unspecified different job that may a be more senior job, more

11    influential job.  We think those are all absolutely still

12    proper defendants.

13         MR. GARDNER:  And if I could, Your Honor, just for

14    clarification.  It's not just that they changed jobs, they

15    changed responsibilities.  Let me give you an example.  Where

16    this typically comes up is with local sheriffs.  Right?

17              THE COURT:  The what?

18              MR. GARDNER:  Local sheriffs.

19              THE COURT:  Okay.  Yeah.

20              MR. GARDNER:  You sue a local sheriff in their

21    capacity, sheriff retires, new sheriff comes in, new sheriff in

22    town.  There's no dispute that that sheriff has the same

23    responsibilities as the old sheriff.  But, as you can imagine

24    in the White House, different people hold different

25    responsibilities and jobs.

1        And so when someone left the White House or took a

2    different job with different responsibilities, that's why it

3    was appropriate to substitute because that person does not have

4    the same responsibilities that are the subject of the

5    litigation.

6            THE COURT:  They're still in the lawsuit, though.

7    You're talking about the ones that are still in the lawsuit but

8    they were moved to a different capacity or something.  Is that

9    what you're --

10           MR. SAUER:  We think they are definitely still proper

11   defendants.  And they haven't even given any explanation what

12   the new job is.

13           THE COURT:  Okay.

14           MR. SAUER:  Rob Flaherty has been promoted from

15   deputy assistant to the President to, you know, digital

16   director.  That guy is still a threat to the First Amendment.

17   He is still a proper defendant.  The mere fact that he's got a

18   slightly different job title or description, which they haven't

19   even disclosed what it is, just an example.

20       You know, those people who are still in the White House,

21   still there, still capable of communicating with platforms,

22   with the full authority of the White House behind them, they

23   are proper defendants.  They should not be substituted.

24           MR. GARDNER:  And, Your Honor, I don't want to take a

25   lot of your time.  Mr. Flaherty is a terrible example.  We have

1    not identified Mr. Flaherty as someone who should be

2    substituted.  He's still at the White House.

3         But to say that someone was in the digital communications

4    department when the lawsuit was filed, and they have a

5    completely different job now, and because they're being sued in

6    their official capacity because of that job, it is completely

7    appropriate to substitute them out for someone else.

8              THE COURT:  Well, so, that clears that up.  Anyway,

9    I'm just kidding.  But that's a little confusing.  But I just

10   wanted to make sure what everybody's understanding of that was.

11        Okay.  Now, I was a little confused about -- and I'm

12   confused about a lot of things sometimes.  But the claim that

13   the previous administration did it.

14        First of all, you know, well, that was thrown in there,

15   the previous administration did it; so Trump did it kind of,

16   you know, defense.

17        First of all, is that -- are you saying that's a defense

18   even if they did?  I'm not even saying that it happened.  But

19   is that a defense?

20             MR. GARDNER:  No.  No.  It's not a defense, Your

21   Honor.  It's just to point out the plaintiffs' allegation of

22   coercion really makes no sense because this backdrop of

23   concerns about 230 have been going on virtually as long as

24   there's been Section 230.

25        And it's plaintiffs that say that somehow this

1    administration has, you know, entered into some censorship

2    enterprise when much of the conduct that they claim is part of

3    that enterprise in this administration were statements made in

4    previous administrations.  That's the point.

5              THE COURT:  Okay.  Well, but I also was saying that

6    -- Okay.  I didn't know if you were just saying that -- I think

7    both parties have said we want to repeal it or do something to

8    it.  They've said that.  But only one party has tied it to

9    threats to take stuff off social media or suggesting that, I'll

10   put it that way, suggesting.  I don't think they threatened.

11   Well, I don't know.  I don't know how you interpret it.

12      Anyway, they said -- they made it clear they wanted them

13   off, you know.  That was their -- They wanted them.  They're

14   not demanding it but they would like them off is what I --

15             MR. INDRANEEL:  If I may, Your Honor.

16             THE COURT:  Yeah.

17             MR. INDRANEEL:  The problem with the plaintiffs'

18   approach on the Section 230 question is that if it were the

19   case that, you know, repeal of the statute or substantially

20   narrowing it were as easy as the plaintiffs appear to suppose,

21   then logically if you added up their suggestion that, for

22   example, democrats -- some democratic legislators were calling

23   for Section 230 reform during the previous administration, if

24   you added that with the republicans who supported repealing

25   Section 230 with, for example, President Trump's preference for

1    revocation of Section 230, then you would get to revocation of

2    Section 230.

3        And the fact that that didn't turn out, I think not only

4    -- you know, it reinforces that statutory amendment,

5    particularly in this area, which has proven, you know, somewhat

6    controversial, is not as quick and easy as the plaintiffs'

7    theory seems to suppose.  And the platforms would have drawn

8    the same conclusion that there is no instant, you know, Section

9    230 repeal or narrowing that is kind of lurking and that would

10   be imposed if the platforms didn't somehow, you know, moderate

11   certain content one way or the other or change a policy.

12       So it's just an unrealistic depiction of how very dynamic

13   legislative process works.

14           THE COURT:  And how is *Google versus Gonzalez* going

15   to affect anything?  Does it affect anything?  I know, you

16   know, basically that case just came out with last week I think.

17           MR. INDRANEEL:  So, as I understand it, Your Honor,

18   in *Twitter* against *Taamen* the Court addressed the antiterrorism

19   statute and focused on that question.  And so it remanded the

20   Section 230 question *Google* against *Gonzalez* to the Ninth

21   Circuit.  So --

22           THE COURT:  Yeah.  And I haven't read it.  I just

23   kind of read the blurb.  And I thought that -- I thought it

24   kind of upheld that the 230 was valid, you know, in other

25   words, kind of what I thought, that it really is -- you know,

1   that makes it even more valuable, I would think, to the social
2   media companies to have it.
3       Repealing it may be the only thing Congress can agree on.
4   I don't know.  A lot of them call for that, so I don't know the
5   answer to that.
6       All right.  Great Barrington Declaration.  That was a
7   couple of the plaintiffs in the case, you know, were involved
8   in that.  It's a one-page treatise that says it opposed
9   reliance on lockdowns and advocated for a kind of focused
10  protection.  You know, I think the people that are most
11  vulnerable, the older ones that have diseases, kind of focus on
12  them.  That's kind of what that was, the way I read it.  And
13  it's a one-page document.
14      What was wrong with that?  I guess why would the
15  government want that taken down?  Why would they want to -- why
16  would they want to -- I guess all the government is saying is
17  they were kind of helping these social media companies to catch
18  this stuff that violated their policies, I guess.
19      But why did they want that down?  What did that do?
20  What's wrong with somebody saying that?
21          MR. INDRANEEL:  Your Honor, if I may.  I don't think
22  -- we didn't address that at great length in the brief, but it
23  is addressed in the response to the proposed findings of fact.
24  I believe it begins at 788.
25          THE COURT:  Okay.

1         MR. INDRANEEL:  And the phrase that I think is most

2    important is that in plaintiffs' selective recitation of the

3    facts in this area, they seem to be -- they seem to accuse

4    Dr. Collins of seeking the prompt publication of a takedown of

5    the Great Barrington Declaration, and the actual language

6    that's in the communications, again, this is from my

7    recollection, is the takedown of the premises.

8         So what he was calling for, as a scientist would, is that,

9    you know, if someone makes a scientifically questionable

10   assertion that there be a response in the scientific literature

11   that addresses, you know, why that -- why the initial assertion

12   might have incorrect premises.  So it's a takedown of a

13   premises and not a takedown of the Great Barrington Declaration

14   that I think plaintiffs seem to be taking it as a demand for --

15        THE COURT:  Any question that these men had the right

16   to say that as protected free speech?

17        MR. INDRANEEL:  I mean, I think that that question

18   was for the -- as we've tried to explain, that question was for

19   the platforms.  And, there isn't -- to our knowledge, there

20   isn't a communication, you know, that we have between, like,

21   NIAID and the platforms about that subject.

22        THE COURT:  All right.  And Health Freedom Louisiana,

23   that's one of the plaintiffs, Ms. Hines.  And it says that --

24   it didn't really say what she did.  Basically it was a

25   grassroot -- my understanding it was a grassroots effort to

1    reopen Louisiana, is what I understood it to be.  Kind of like

2    reopen the schools and reopen, you know, different things what

3    I understood it to be.

4        I guess what I was getting at is she was kind of -- the

5    government suggested this kind of -- this information be taken

6    down too.  I guess what I'm getting at was wrong was the --what

7    was wrong with that?  What was wrong with somebody saying that?

8              MR. GARDNER:  Your Honor, I can address that one.

9              THE COURT:  Okay.

10             MR. GARDNER:  There's no evidence whatsoever that the

11   government had any involvement in any of her posts.

12       Now, what plaintiffs say is her kinds of posts are a type

13   that the Virality Project may have flagged.  But they have no

14   evidence at all, out of 1,442 proposed findings of fact, the

15   government had anything to do with any of her speech.

16             THE COURT:  Did the Virality Project flag it?  I

17   can't remember.

18             MR. GARDNER:  All the Virality Project says is that

19   it flagged in general that type of information.  But it doesn't

20   say that it flagged anything that's in her declaration.  And I

21   would urge the Court to look at her declaration closely because

22   her declaration also doesn't say that the government was

23   directly involved, or even indirectly involved, in identifying

24   her information for a social media company.

25             THE COURT:  All right.  And EIP flagged Gateway

1    Pundit.  I think it was like, number 2 or 1, or something like
2    that, way up there of things.  And, you know, I can't remember
3    exact words that the Gateway Pundit said.  But it was more or
4    less aimed at the 2020 election was stolen, or something
5    happened, or something like that.  That's what it looked
6    -- appeared to be.    So I guess what I'm getting at, again,
7    like, you know,  what's protected free speech and what's not?
8    What was wrong with that?
9             MR. GARDNER:  Well, I think you'd have to ask the EIP
10    that question.  They're not a government entity.
11             THE COURT:  Well, you've got to admit there's a big
12    question of whether the government was involved in that.
13             MR. GARDNER:  I don't admit that, Your Honor.  I
14    actually think there's no question that CISA did not have
15    involvement sufficient to convert EIP's actions in a joint
16    action.
17        But, having said that, you would have to ask EIP why they
18    flagged the information they flagged.  And then you would have
19    to ask the social media companies if they did anything with the
20    information flagged in order to show harm to the plaintiffs.
21             THE COURT:  Okay.  Let me see.  I'm trying to get
22    through it.  Anybody knows, you know, the law viewpoint
23    discrimination is, you know, really looked at hard, strictly,
24    viewpoint discrimination, which is, more or less, a certain
25    point of view.

1      And I guess what I'm getting at -- and I'm conservative,

2   and I'm not standing up just for conservative speech.  I would

3   be the same way -- I mean, this could turn around in one

4   election.  You could have a republican president and a

5   republican congress, and they could be doing -- say, well, we

6   got away with it.  We're going to do the same thing.  They

7   could, you know, trying to do the same thing.  It could turn

8   around.

9      So, to me, all speech, it's important to protect all

10  speech wherever it -- You know, if it's protected free speech,

11  it should be protected whether it's liberal, whether it's

12  conservative, whatever.  I am conservative, but I'm, you know,

13  not looking at this so hard because I'm conservative.  I'm

14  looking at it because it's free -- you know, the old saying

15  that I don't agree with what you say, but I'll stand for your

16  right to say it, you know.  I don't know where that went, but

17  that went out the window a long time ago somewhere.

18      But viewpoint discrimination, why would it not be

19  viewpoint -- I mean, isn't it evidence of viewpoint

20  discrimination the fact that -- and I know I'll ask the EIP

21  this too, but that the EIP flagged pretty much all conservative

22  election speech posts?

23          MR. GARDNER:  Well, I mean, again, not to repeat

24  myself, Your Honor, but I think if you read the EIP report, it

25  didn't just flag conservative speech.  It happened to conclude

1    there was more conservative speech that identified

2    misinformation than nonconservative speech.  But I'll give you

3    an example:  You have a bag of marbles.  You've got nine black

4    marbles, one red marble.  The fact the EIP may have identified

5    nine black marbles doesn't necessarily mean that it's only

6    focused on black marbles.  It just happens to be more of them.

7              THE COURT:  All right.  Okay.  Cognitive

8    infrastructure.  Let me ask about that a minute.

9         Jen Easterly of CISA, now that I know how to pronounce it,

10   she said she -- who's the director of CISA, said she views the

11   word infrastructure, which is I in that acronym, to include

12   "cognitive infrastructure."  You know, cognitive means in the

13   mind and the way you -- knowledge and understanding.  Any idea

14   what that means by that?

15             MR. GARDNER:  Your Honor, I don't know that the

16   record has anything more than what her statement says.  But I

17   would refer the Court to the declarations of both Mr. Wails and

18   Mr. Hale who articulate the statutory basis for CISA's actions.

19             THE COURT:  Okay.  Well, I mean, I just wonder does

20   that mean, like, the government is going to try to control

21   mental process of acquiring knowledge, that type thing?  It's

22   just --

23             MR. GARDNER:  Your Honor, look, I'm not going to give

24   the answer that that doesn't appear in the record.  I feel

25   pretty confident the answer -- no, I feel 100 percent confident

1    the answer to that question is no.

2              THE COURT:  Okay.  Good.  I feel good now just like

3    when I went to Del Rio, you know, I felt like --

4              MR.  GARDNER:  As you should, Your Honor.

5              THE COURT:  -- I solved it.

6              MR. GARDNER:  I'm with the government.  I'm here to

7    help.

8         But in seriousness, Your Honor, whatever Director Easterly

9    may or may not have said two years ago, the fact is the

10   declarations explain exactly what CISA is doing right now and

11   exactly the statutory authority to support those actions.

12             THE COURT:  Okay.  And I realize that.  And I'm not

13   looking at the statutory authority, but I'd be very surprised

14   if Congress stated, you know, in their -- when they created

15   CISA that it would cover cognitive infrastructure.  I'd be very

16   surprised.  But, anyway, that's another day -- that's another

17   fight for another day.  Maybe it will be fought somewhere else,

18   but probably not now that I said that.  But, anyway, let's see.

19   All right.  Redressability.  There wasn't much talked about on

20   redressability too much in there.  It may not be a big issue,

21   but I think that's kind of what -- the standing part of

22   redressability.  If you'd kind of address that, the government

23   -- I mean, I'm sorry, the plaintiffs.  Would it be redressable?

24             MR. SAUER:  Yes, sure, Your Honor.  Redressability,

25   as the Court knows, tracability tend to be viewed very similar.

1    So where there is causation, usually an order stopping the

2    misconduct that's causing it will redress that injury.

3        So if you look at our injuries, we're alleging both

4    ongoing injuries where we have ongoing loss of access to speech

5    on social media and speech that's been taken down, remains

6    taken down and so forth, and imminent future injuries.

7        On the ongoing piece of that in the redressability

8    context, we only need to show the likelihood or possibility

9    that removing the government pressure will give us a chance --

10   you know, a fair shake at getting our speech back up on social

11   media.

12       And then as to the imminent future injuries.  As the Court

13   stated in its prior order, the evidence of prior acts of

14   censorship shows a strong -- a strong evidence of the risk of

15   future acts of censorship.  If they're stopped from engaging in

16   the future acts of censorship, that will redress the threat of

17   imminent future harms as well.

18       So the injunction would redress it both as to the -- both

19   as the ongoing harms and as the imminent future harms.

20           THE COURT:  Last set of questions I have.  I know it

21   will get somebody's attention when the preacher says the last

22   point is this.  This is kind of the last thing.  It's kind of

23   the most boring, but I feel like I need to ask it.

24       On the request for a class certification under Rule 23(b),

25   explain to me the class definitions that are proposed like how

1  that would work.

2       MR. SAUER:  Yeah.  And, Judge, I apologize, I didn't

3  carefully review that in preparation for this hearing.

4       THE COURT:  That's all right.

5       MR. SAUER:  But I'll address it from memory.  We've

6  proposed two class definitions that are really kind of

7  subclasses.  And each definition includes both, basically class

8  members as audience members, people who listen to other people

9  speaking on social media, and speakers.  Right?

10     And then the other division we've drawn in our class

11 definition is between people whose speech was censored because

12 it was directly flagged where there were some direct

13 communications saying, hey, take that down and take this down.

14     And then people who suffered censorship as a result of

15 more general, in other words hey, -- one great example of this,

16 for example, is the President says, "They're killing people;

17 you've got to do more."  So Facebook comes back.  That's

18 different than saying, "Hey, take down Tucker Carlson."  It's,

19 "Do more to go after the vaccine misinformation" generally.

20     And Facebook comes back in, you know, Tab 30, and your

21 email saying, "Here's all the new and additional actions we're

22 taking to go after this.  We've amended our policies to add a

23 new list of claims."  So that's the second aspect of the class

24 definition.

25     So we've done that to address the very concerns that they

1  raised in the *Wal-Mart* against *Dukes* case which talks about

2  making sure you've got commonality.  We kind of erred on the

3  side of caution by slicing it up along those two axes.

4         THE COURT:  In the first class, one in flagged.  I

5  see how you could find that out if somebody fit in that class

6  or not.  But the one about people who are -- didn't get to read

7  something, for example, the people -- the voters who didn't get

8  to read the Hunter Biden laptop story because it was suppressed

9  and didn't see it before the election, they voted, didn't know

10  about that.  How are you possibly going to determine who's in

11  that class?

12         MR. SAUER:  You don't have to do that because only a

13  23(b)(2) class.  Right?  So we're only seeking injunctive

14  relief.  We're not seeking damages.  So, in other words, as

15  long as the class definition is sufficiently precise, the Court

16  never has to go down there and figure out every human being in

17  the United States of American who was actually adversely

18  affected  --

19         THE COURT:  I mean, pretty much would be everybody in

20  the United States, wouldn't it?  Or American citizens in other

21  countries.  It would be everybody.

22         MR. SAUER:  We're talking about --

23         THE COURT:  A pretty big class.

24         MR. SAUER:  It would reach --

25         THE COURT:  I have the biggest class action in the

1    world.

2            MR. SAUER:  Millions upon millions of people, yeah.

3        And, of course, that's -- But, again, we have not sought

4    individualized determinations, which you had in *Wal-Mart*

5    against *Dukes*.  We're seeking classwide injunctive relief only.

6    And there's good case law for the Fifth Circuit we cite in our

7    papers that discuss how you don't have to figure out every

8    human being that's a member of the class.  You've just got to

9    enjoin the bad misconduct that's injuring those people.

10            THE COURT:  It's kind of like a nationwide

11   injunction, more or less, that covers everybody.  But I know

12   it's different.

13            MR. SAUER:  There is a difference, but it's in the

14   same -- it's in the same --

15            THE COURT:  It covers everybody?

16            MR. SAUER:  Yeah, yeah.

17            THE COURT:  Even nonparties?

18            MR. SAUER:  Right.  In other words, it would protect

19   -- and this is true of all 23(b) classes, they would protect

20   all the members of the class.  The injunction runs not just

21   against, say, listeners and speakers in Missouri or listeners

22   and speakers in Louisiana or just Mr. Hoft or Ms. Hines.  It

23   protects everyone else who is similarly situated to them.

24            THE COURT:  Okay.  And there's got to be a common

25   behavior or wrongful policy in each class.  So, like, what

1    would be the wrongful behavior?  And I realize you're going

2    from your memory.  I'm not trying to --

3              MR. SAUER:  Sure.

4              THE COURT:  What's the wrongful behavior in each

5    class?

6              MR. SAUER:  For all of the class members, for all the

7    classes, there's one common question that relates to whether or

8    not, you know, both factual and legal, about we allege that

9    there's this long campaign of threatening statements coming

10   from senior members of Congress, senior members of the White

11   House, senior members of the executive branch.  Do those rise

12   to the level of coercion?  That's common to everybody.  Right?

13       Then if you look at each of the silos, so to speak, that

14   the government has put forward where there's all this White

15   House communication that's inducing some censorship.  And

16   there's all this surgeon general communications that's inducing

17   more censorship.  There's all this CISA.  There's all this FBI

18   communications.  Each one of those is affecting virtually all

19   the members as well, and each one of those is involving a whole

20   host of common questions whose resolution are going to

21   determine whether or not there's a First Amendment violation.

22       So this is, like, right in the heartland of what *Wal-Mart*

23   and Justice Scalia is talking about in the *Wal-Mart* case which

24   is where we have the ability to achieve common answers at a

25   single stroke.  Here it's not one single stroke.  The case is

1    very complex.  It's a series of single strokes.  We have more

2    common questions.

3         What they say in their briefing is you can only have one

4    common question.  If you have more than that, then you're

5    violating *Wal-Mart* against *Dukes*.  That is not right.

6                   THE COURT:  Okay.

7                   MR. GARDNER:  Your Honor, --

8                   THE COURT:  You can go ahead, yeah, sure.

9                   MR. GARDNER:  That grossly misrepresents the

10   government's position.

11                  THE COURT:  Okay.

12                  MR. GARDNER:  And let me just be clear.  I have the

13   class action briefing.  And what plaintiffs contend is the

14   common question, and I'm just going to read it, "Whether the

15   government is responsible for social media company censorship

16   of content that the government flags."  That is not possibly

17   capable of resolution in a single stroke given their theories

18   in this case.

19        And it isn't just a matter of multiple common questions.

20   It would be an individualized determination defended by

21   defendant and conduct by conduct in order to answer that

22   question.

23        Justice Scalia's decision in *Wal-Mart* expressly rejects

24   precisely that analysis.

25                  THE COURT:  Okay.

1          MR. SAUER:  And, Judge, I refer you to our reply

2     brief where we address that and discuss the common questions in

3     detail.

4          THE COURT:  Okay.  I'll look at it more.

5       Geographic scope.  Rule 65 doesn't absolutely require it.

6     It says "scope."  It doesn't say geographic scope.  I usually

7     put geographic scope in there.  But is there any need even to

8     discuss geographic scope?

9       Now, I understand if I granted the class, that that

10    wouldn't be a need to.  But I'm just asking in the event I

11    don't, and assuming I grant the injunction itself, would that

12    be any need to address geographic scope since you're -- would

13    it be limited to these plaintiffs and these states or would it

14    be --

15         MR. SAUER:  I refer the Court to the Fifth Circuit's

16    case law on injunctions in the context of the immigration

17    context.

18      There the Fifth Circuit has said, look, for this to be

19    fully effective, it is not going to work for just enjoining it

20    in this state or that state or doing it parcelwise.

21         THE COURT:  That's the one that allowed -- that was

22    Judge Tipton's case, I think, that allowed a nationwide

23    injunction.

24         MR. SAUER:  Yeah, exactly right.  And that was

25    affirmed by the Fifth Circuit.  And the Fifth Circuit has the

1    power.  They say in many cases nationwide injunctions may be

2    deeply problematic.  But we have a situation where less than

3    nationwide relief would obviously defeat the purpose of

4    injunctive relief.

5              THE COURT:  All right.

6              MR. SAUER:  That's the heartland we're in now.

7              THE COURT:  So you're saying -- are you saying that

8    if I did grant -- and I'm not telling anybody I'm going to do

9    anything specific; I'm just asking these questions.

10        If there is a injunction issued, to some extent, and the

11   class action is not -- certification is not done, you're asking

12   for a nationwide injunction?

13             MR. SAUER:  I think so.  Now, in the alternative, if

14   the Court is more comfortable with a narrower injunction, but,

15   from our perspective, it's like if you say, "Hey, federal

16   government, you can't interfere with social media speech from

17   people in Missouri and Louisiana," that doesn't work.  Social

18   media is completely interconnected, you know.

19        If they're allowed to censor people in California and

20   Arizona, and Missourians and Louisianians are following them

21   and talking to them and interacting with them, they're just as

22   badly affected.  Given the incredibly interconnected nature of

23   social media, we don't see how a geographically limited

24   injunction is workable in this case.

25        And that's why I analogize to those --

1           THE COURT:  Right.

2           MR. SAUER:  -- Fifth Circuit decisions.

3       And, again, if class certification is granted, then we're

4   right in the heartland of 23(b)(2).

5           THE COURT:  And if a class certification was granted,

6   you know, -- and I'm not sure how this ties in with the laws on

7   MDLs, you know, multidistrict litigation, but I know that they

8   assign those to -- we were wanting one at one time 'til we got

9   all these hurricane cases.  Now we don't want one anymore.  But

10  we don't know if -- you know, could be -- I don't know if it

11  would go to a MDL or not.

12          MR. SAUER:  I think this is the only case pending

13  that presents these or maybe one of the very few cases, so I'd

14  be surprised.  I know there was a follow-up lawsuit that was

15  filed that was sought to be consolidated with this case.  But,

16  other than that, I'm not aware of other cases --

17          THE COURT:  And I know there's no judge -- judge

18  shopping involved here, but it may be sent off to some liberal

19  judge in California, you know.  You don't know.

20          MR. GARDNER:  Well, Your Honor, for everyone's

21  awareness, just so everyone is aware, there are multiple cases

22  raising similar concerns.  Just this week another lawsuit was

23  filed in the Southern District of Texas raising very similar

24  claims against similar defendants.

25      There's also a case in the Southern District of New York

1    brought by Mr. Berenson raising the exact same -- or not the

2    exact same, many of the same claims.

3         And then, of course, there's the case brought by R.F.K.,

4    Jr., who is before you; as well as the case brought by my

5    colleague, Mr. Sauer, against the EIP.  So there are a number

6    of cases.  And so I just wanted to be clear with the Court

7    about that.  This is not the only one.  It's not only one of

8    two.

9              THE COURT:  Okay.  And last question on

10   certification, and it's the last set of questions, so I'm going

11   to be done after this.

12        If they -- gosh, I went totally blank on what I was going

13   to ask.  Sorry.  I've been reading too many novels, these

14   novels.  I don't read other novels.

15        What was I going to ask?  Oh, is there any other case like

16   this that First Amendment, Second Amendment, you know, Fifth,

17   anything, Fourth Amendment, anything that's been certified like

18   Bill of Rights like this, like, free speech, gun right,

19   anything that's been certified as a class action that you're

20   aware of in the United States?

21             MR. SAUER:  I'd have to pull our briefs on that,

22   again.  I haven't read them recently.  But I would point out

23   what I rely on is that comment in the advisory committee notes

24   on Rule 23(b)(2) that says this is exactly what the purpose of

25   the amendments that enacted 23(b)(2) was.  Civil rights actions

1    where there's systematic government conduct that affects -- you

2    know, here millions of people or large numbers of people, all

3    of the diffuse injury and not enough incentive to sue the

4    government on their own.  This is exactly what that's all

5    about.

6              THE COURT:  All right.  And I think I misjudged how

7    long my questions were going to take because we're about an

8    hour -- well, 50 minutes over what I thought it was going to

9    take.

10        So that's all the questions I have.  Do you have any

11    questions for me?  I'm going to refer you to the EIP if you ask

12    me anything, but go ahead -- no, I'm joking.

13              MR. GARDNER:  Just on behalf of the United States, we

14    just thank you for your time and for holding this hearing and

15    for listening to us.  Thank you, Your Honor.

16              THE COURT:  Thank you.

17              MR. SAUER:  Thank you, Your Honor.

18              THE COURT:  Thank you.  And I know a lot of you have

19    got flights.  Most of you probably stayed the weekend, Memorial

20    Day weekend in Monroe.  There's nothing like it.  But, anyway,

21    I'm sure we'll have some activities going on.  But, anyway,

22    have a good trip back.  And, by the way, the LSU Lady Tigers

23    are in Washington D.C. right now, so you better get back, I

24    think for winning the National Championship in women's

25    basketball.  So they're there now, so y'all better get on back

```
 1    to see them.   All right.  Thank you all.  Enjoyed it.
 2    Everybody did a good job on the briefs -- not briefs, novels.
 3    Thank you.
 4    (Court adjourned at 1:25 p.m.)
 5
 6
 7                              *  *  *  *  *
 8
 9                            CERTIFICATE
10          I, Debbie Lowery, Certified Court Reporter, do certify
11    that the foregoing is, to the best of my ability and
12    understanding, a true and correct transcript from the
13    proceedings of this matter.
14
15
16                              _____
17                              /s/Debbie Lowery
18                              6/21/2023
19
20
21
22
23
24
25
```

Dated: July 17, 2023

Respectfully Submitted,

**ANDREW BAILEY**
**Attorney General of Missouri**
*/s/ Joshua M. Divine*
Joshua M. Divine
*Solicitor General*
Todd A. Scott
*Senior Counsel*
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
(573) 751-8870
josh.divine@ago.mo.gov
*Counsel for State of Missouri*


*/s/ John J. Vecchione*
John J. Vecchione
New Civil Liberties Alliance
1225 19th Street N.W., Suite 450
Washington, DC 20036
(202) 918-6905
john.vecchione@ncla.legal
*Counsel for Plaintiffs Dr. Jayanta*
*Bhattacharya, Dr. Martin*
*Kulldorff, Dr. Aaron Kheriaty,*
*and Jill Hines*

**JEFFREY M. LANDRY**
**Attorney General of Louisiana**
*/s/ D. John Sauer*
Elizabeth B. Murrill
*Solicitor General*
Tracy Short
*Assistant Attorney General*
D. John Sauer
*Special Assistant Attorney General*
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, LA 70802
(225) 326-6766
murrille@ag.louisiana.gov
*Counsel for State of Louisiana*


*/s/ John C. Burns*
John C. Burns
Burns Law Firm
P.O. Box 191250
St. Louis, MO 63119
(314) 329-5040
john@burns-law-firm.com
*Counsel for Plaintiff Jim Hoft*

## **CERTIFICATE OF SERVICE**

I hereby certify that, on July 17, 2023, I caused a true and correct copy of the foregoing to be filed by the Court's electronic filing system, to be served by operation of the Court's electronic filing system on counsel for all parties who have entered in the case.

*/s/ D. John Sauer*