No. 23-30445

# IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

STATE OF MISSOURI; STATE OF LOUISIANA; AARON KHERIATY; MARTIN KULLDORFF; JIM HOFT; JAYANTA BHATTACHARYA; JILL HINES,

Plaintiffs-Appellees,

v.

JOSEPH R. BIDEN, JR.; VIVEK H. MURTHY; XAVIER BECERRA; DEPARTMENT OF HEALTH & HUMAN SERVICES; ANTHONY FAUCI, et al.,

Defendants-Appellants.

On Appeal from the United States District Court
for the Western District of Louisiana

## REPLY IN SUPPORT OF MOTION FOR A STAY PENDING APPEAL

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney General*

BRANDON BONAPARTE BROWN
  *United States Attorney*

DANIEL TENNY
DANIEL WINIK
SIMON BREWER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7245*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-8849*

**TABLE OF CONTENTS**

**Page**

INTRODUCTION AND SUMMARY ............................................................................1

ARGUMENT ...................................................................................................................3

    I.       Plaintiffs' Claims Should Fail.................................................................................3

    II.      Principles of Equity Support A Stay ......................................................................7

CONCLUSION ............................................................................................................. 11

CERTIFICATE OF COMPLIANCE

## INTRODUCTION AND SUMMARY

Plaintiffs' opposition to the stay motion underscores why the injunction should remain stayed pending the resolution of this highly expedited appeal.

*First*, plaintiffs make little effort to defend the district court's primary theory of standing for the State plaintiffs—a *parens patriae* theory that the Supreme Court has recently and repeatedly rejected. And plaintiffs ignore the bedrock principle that a past injury is insufficient to establish the imminent threat of future injury required for jurisdiction over a claim for prospective relief. Plaintiffs invoke the novel theory that they established a sufficient injury because they want to "listen" to all speech, anywhere, on any platform, on any subject. But the district court declined to rely on that argument, for good reason: If it were right, then a court could entertain *any* First Amendment claim at the behest of a single plaintiff whose only connection to it was the desire to hear the relevant speech.

*Second*, on the merits, plaintiffs' repetition of the supposedly "overwhelming evidence" of coercion (Opp. 15) that the district court identified fails to remedy the factual and legal deficiencies of the district court's analysis. Like the district court, plaintiffs err by confusing persuasion with coercion and making factual assertions that are unmoored from the record.

*Third*, plaintiffs' efforts to defend the injunction's breadth only underscore its deficiencies. Plaintiffs' "right to listen" theory is (as noted above) insufficient to support jurisdiction, much less broad relief. And plaintiffs tie themselves in knots trying

to maintain the false distinction between "the government's right to speak freely" (Opp. 11 (emphasis omitted)), which they purport to respect, and the conduct forbidden by the injunction. Plaintiffs insist, for example, that the injunction "clear[ly]" permits the government to "respond to a false story on influential social-media accounts with a public statement … refuting the story" and to "urge the public to trust neither the story nor the platforms that disseminate it." Opp. 23 (quotation marks omitted). Yet plaintiffs approvingly cite (Opp. 7) a holding that the National Institute of Allergy and Infectious Diseases (NIAID) defendants likely violated the Constitution by doing exactly that.

*Finally*, plaintiffs' effort (Opp. 22) to defend the injunction's specificity fails to address the fundamental concerns identified in our motion. The problem with terms like "permissible public government speech," ROA.26615, is not that dictionaries fail to define those words; it is that a government official would have no clue what speech qualifies as "permissible."

This injunction should not be permitted to take effect again. If the Court declines to maintain its stay of the injunction, it should extend the current administrative stay for ten days to permit the Supreme Court to consider any application for a stay that the Solicitor General may elect to file.

## ARGUMENT

I.   **Plaintiffs' Claims Should Fail**

1.   Our motion pointed out (at 7) that the Supreme Court reaffirmed this past June that "[a] State does not have standing as *parens patriae* to bring an action against the Federal Government"—a principle derived from the very case on which the district court relied to conclude the opposite. *Haaland v. Brackeen*, 143 S. Ct. 1609, 1640 (2023) (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 610 n.16 (1982)). Plaintiffs assert (Opp. 10-11) that this rule does not apply to "quasi-sovereign" injuries, but precisely the opposite is true: The Supreme Court held that a State "must" assert a quasi-sovereign injury to have *parens patriae* standing in the first place, *Snapp*, 458 U.S. at 601, and clarified that *even then* it cannot sue the federal government, *id.* at 610 n.16. And although plaintiffs again cite (Opp. 6-7, 9) alleged instances of content moderation in 2020 and 2021, they fail to address our point that past injuries cannot support jurisdiction over a request for sweeping prospective relief.

Plaintiffs try to bolster the district court's analysis by invoking a theory the district court never adopted, based on an alleged "'right to listen.'" Opp. 7; *see* Opp. 7-10. This Court, however, has cautioned against the application of such a theory to allow litigation based on "a generalized grievance common to all members of the public," emphasizing the need for a particularized showing of the harm caused by the inability to hear particular speech. *Cramer v. Skinner*, 931 F.2d 1020, 1026-1027 (5th Cir. 1991). Plaintiffs make no such showing.

2. On the merits, plaintiffs' recitation of the district court's litany of supposedly coercive threats (Opp. 12-13) does nothing to explain why the cited statements qualify as coercion or significant encouragement under the settled understanding of those terms: an attempt to induce a private party to undertake "the specific conduct of which the plaintiff complains," either by threatening sanctions or offering positive incentives, *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982). But plaintiffs' defense of the injunction does highlight the glaring holes in their case.

*First*, plaintiffs' theory fails as a matter of simple chronology. All of plaintiffs' examples of supposed "express and implied threats" (Opp. 12-13) came from the current White House, but their declarations contain allegations of widespread content moderation before President Biden took office, *see, e.g.*, ROA.1187-1211. And plaintiffs do not even advance a theory that agencies other than the White House made threats: They do not refute our contention that "some agencies … did not directly threaten," instead asserting that "when platforms are under pressure from the *White House*, there is no need for lower-level agencies … to pile on." Opp. 14. Plaintiffs' entire case thus rests on the illogical assertion that social-media platforms felt obliged to alter their content-moderation policies beginning in 2020 (or earlier) based on a supposed pressure campaign from the White House that began in 2021.

*Second*, plaintiffs make clear (Opp. 13-14) that their theory is that the White House defendants threatened "adverse legal consequences" against platforms if they did not accede to the supposed pressure for content-moderation actions. But as our

- 4 -

motion explains (at 12), general statements about potential actions that might affect companies do not transform every request that any government actor makes into a coercive threat. The government is entitled to propose government actions to address societal harms while also communicating with companies to encourage them to voluntarily mitigate such harms, without being held responsible for actions the companies might subsequently take. The communications that plaintiffs regard as coercive here bear no resemblance to those in the cases on which plaintiffs rely. *See, e.g.*, *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 62-63 & n.5 (1963) (threatening "prosecution" and dispatching police officers to confirm compliance); *Backpage.com, LLC v. Dart*, 807 F.3d 229, 231 (7th Cir. 2015) ("threat[s] that legal sanctions will … be imposed").

*Finally*, plaintiffs invoke the "significant encouragement" and "joint participation" theories (Opp. 16-17) to compensate for the lack of evidence of coercion. But neither theory is apposite here. Our motion did not "argue[] that 'significant encouragement' is just coercion by another name" (Opp. 16); we noted—as the Ninth Circuit has held—that "significant encouragement" refers to offers of "positive incentives" of such magnitude that they overwhelm a private party's independent judgment to the same degree as a threat of sanctions (coercion). *O'Handley v. Weber*, 62 F.4th 1145, 1157-1158 (9th Cir. 2023), *pet. for cert. filed*, No. 22-1199 (Jun. 8, 2023). It is plaintiffs who fail to explain why the Supreme Court would have referred separately to "significant encouragement" and "coercion" if all "coercion" would also constitute "significant encouragement."

The "joint participation" doctrine is equally irrelevant here. That doctrine provides that nominally private entities may be considered state actors when they are in effect run by the government, *see, e.g., Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296-297 (2001), or when the government "provide[s] a mantle of authority that enhance[s] the[ir] power," *NCAA v. Tarkanian*, 488 U.S. 179, 192 (1988). The doctrine does not suggest that the government can be held responsible for private parties' exercise of their own powers when in some *non-coercive* fashion the government seeks to persuade or coordinate with the private parties.

Plaintiffs' reliance on these doctrines also underscores the startling consequence of their position: that platforms themselves would be state actors subject to First Amendment constraints (and concomitant limits on their own free-speech rights). As we observed (Mot. 15), the Supreme Court has cautioned against such expansive state-action theories, which are "especially problematic in the speech context." *Manhattan Community Access Corp. v. Halleck*, 139 S. Ct. 1921, 1932 (2019). Plaintiffs do not even address that point.

3.   Plaintiffs' recitation of the facts as articulated by the district court fails to grapple with the voluminous factual record, which in many instances refutes plaintiffs' claims. Plaintiffs cite, for example, a harshly worded email from the then-White House Digital Director, but that email had nothing to do with misinformation concerns; it was addressing a "technical issue" that had been "affecting follower growth" on the President's Instagram account. ROA.9409-9410. Plaintiffs assert that "[t]he NIAID

defendants orchestrated a 'quick and devastating … take down' of the Great Barrington Declaration," (Opp. 7), but the email ostensibly proving this point (quoted in full elsewhere in the district court's opinion) referred to a "quick and devastating *published* take down" of the Declaration's "premises," ROA.26508 (emphasis added). In other words, the email suggested that the Declaration should be publicly debated through the publication of a counterargument, not that it should be suppressed. Plaintiffs suggest the opposite only by replacing the word "published" with an ellipsis and failing to mention that it was the Declaration's "premises," not the Declaration itself, that were to be "take[n] down." (The district court did not even include the ellipsis. ROA.26560.)

## II.   Principles of Equity Support A Stay

1.   Just as plaintiffs' reliance on past injuries is insufficient to establish standing for prospective relief, it is insufficient to establish irreparable harm. Plaintiffs largely rely (Opp. 18-19) on the assertion that various government meetings are ongoing, but they fail to explain how such meetings cause them ongoing injury.

The only recent declarations plaintiffs cite (Opp. 20), from plaintiffs Hines and Hoft, merely assert that plaintiffs continue to face content moderation from social-media platforms, without identifying any ongoing conduct by defendants. ROA.25726-25737. Neither declaration provides any basis for plaintiffs' assertion (Opp. 20) that the "ongoing acts of" content moderation are "traceable to federal officials."

Plaintiffs' other conclusory assertions of ongoing harm—which rely on two pages of the district court's opinion—fail to substantiate their assertion that they face

"[f]urther injuries" while this case is pending (Opp. 19 (citing ROA.26581-26582)). The district court's finding that plaintiff Bhattacharya "is the apparent victim of an ongoing 'campaign' of social-media censorship," ROA.26581, rested on an October 2020 email and a year-old declaration that says nothing—not a single word, anywhere—about any *ongoing* restriction of Bhattacharya's content on social media. ROA.26581 n.648 (quoting ROA.12255 and citing plaintiffs' findings of fact, ROA.16753-16754, which in turn cite ROA.1187-1197). The same is true for the other plaintiffs. *See* ROA.1198-1206 (Kulldorff declaration not referring to any content moderation after March 2022); ROA.1273-1278 (Kheriaty declaration containing only a brief and unexplained allusion to any content moderation postdating 2021); ROA.26581 & nn.648-651 (relying on plaintiffs' proposed findings, ROA.16754-16758 ¶¶ 1373-1380, 1383-1386, which in turn rely on these declarations).

Finally—and critically, with respect to the scope of the injunction—plaintiffs say not a word to suggest that the plaintiff States face irreparable injury in the absence of an injunction.

2.   Plaintiffs likewise offer no response to most of our arguments concerning the injunction's breadth. They point out (Opp. 21) that a court can sometimes enjoin entire agencies, but they make no effort to defend the district court's assertion that it was appropriate to apply the injunction here to agency subcomponents having nothing to do with the challenged conduct because agencies could otherwise "avoid the consequences of an injunction" by "instruct[ing] a sub-agency to perform the prohibited

acts," ROA.26658. And they virtually ignore the fact that the injunction governs communications by a wide range of government agencies (including those having no interest in the subjects about which plaintiffs sought to speak) with a wide range of platforms (including those on which plaintiffs do not participate) about a wide range of topics (including speakers and subject matter other than plaintiffs and their speech).

Plaintiffs' only response, as noted above, is to suggest (Opp. 21-22) that the injunction's scope is appropriate on the theory that plaintiffs want to "listen[]" to all speech, anywhere, on any platform, on any subject. Unsurprisingly, they cite no authority for the radical proposition that such an amorphous interest, on the part of a single individual or group of individuals, could justify an injunction of this substantive breadth and geographic scope. The district court declined to accept that theory for good reason.

3.  Plaintiffs' effort to defend the injunction's lack of specificity is equally weak. Their focus (Opp. 22) on the definition of "criminal," for example, fails to address the salient question: whether a law-enforcement agency could inform a platform about a post that appears to rise to the level of "criminal" conduct before reaching a definitive conclusion to that effect. And plaintiffs offer no defense at all of the many other points of manifest ambiguity identified in our motion (at 18-19), like what constitutes "inducing" a platform to moderate content, or how to square the injunction's purported exemptions for certain conduct with the district court's condemnation of

exactly that conduct, or what constitutes "permissible" government speech (which is, after all, the entire subject of this hotly contested litigation).

4.      Finally, plaintiffs fail to show that the injunction will not "interfere with legitimate government speech" (Opp. 22). There is nothing illegitimate about the FBI's calling platforms' attention to posts that it thinks might constitute criminal activity—while leaving to the platforms' discretion what actions, if any, to take. Yet plaintiffs assert that such conduct would violate the injunction unless the FBI has completed enough of an investigation to be "[]*certain* that" the "speech is criminal." Opp. 23. Nor would there be anything illegitimate about the White House Press Secretary's calling on platforms, in the wake of a natural disaster, to stop spreading false information about the disaster, so long as neither she nor any government official coerced the platforms to act as she requested. Yet plaintiffs seem to think such a statement could properly subject the Press Secretary to contempt. Opp. 24.

In protecting the Nation's security, in responding to a natural disaster, and in a thousand other scenarios, government leaders must be able to provide accurate and timely information to the public, to dispel false rumors, and to explain what actions citizens and businesses can and should take to advance the public good. The government certainly cannot punish people for holding or disseminating different views. Nor can it achieve the same objective indirectly, by threatening the media with punishment if it disseminates those views. But there is a categorical, well-settled difference between persuasion and coercion. By equating the government's effort to persuade people of

its views with the creation of an official orthodoxy from which deviations are punished, plaintiffs cheapen the foundational principles distinguishing the former from the latter.

## CONCLUSION

The preliminary injunction should remain stayed pending the Court's resolution of this appeal. At a minimum, the Court should stay the injunction to the extent it prohibits actions not specifically targeting content posted by plaintiffs. If this Court denies a stay, it should extend the current administrative stay for ten days to permit the Supreme Court to consider an application for a stay, should the Solicitor General elect to file one.

        Respectfully submitted,

        BRIAN M. BOYNTON
          *Principal Deputy Assistant Attorney*
            *General*

        BRANDON BONAPARTE BROWN
          *United States Attorney*

        DANIEL TENNY

        */s/ Daniel Winik*
        DANIEL WINIK
        SIMON BREWER
          *Attorneys, Appellate Staff*
          *Civil Division, Room 7245*
          *U.S. Department of Justice*
          *950 Pennsylvania Avenue NW*
          *Washington, DC 20530*
          *(202) 305-8849*
          *Daniel.L.Winik@usdoj.gov*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 32(g), I certify that this reply complies with Federal Rule of Appellate Procedure 27(d)(1)(E) because it has been prepared in 14-point Garamond, a proportionally spaced font, and that it complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(C) because it contains 2,595 words, according to Microsoft Word.

*/s/ Daniel Winik*
Daniel Winik