No. 23-30445

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

STATE OF MISSOURI; STATE OF LOUISIANA; AARON KHERIATY;
MARTIN KULLDORFF; JIM HOFT; JAYANTA BHATTACHARYA; JILL HINES,

Plaintiffs-Appellees,

v.

JOSEPH R. BIDEN, JR.; VIVEK H. MURTHY; XAVIER BECERRA;
DEPARTMENT OF HEALTH & HUMAN SERVICES; ANTHONY FAUCI, et al.,

Defendants-Appellants.

On Appeal from the United States District Court
for the Western District of Louisiana

## BRIEF FOR APPELLANTS

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney
  General*

BRANDON BONAPARTE BROWN
  *United States Attorney*

DANIEL TENNY
DANIEL WINIK
SIMON BREWER
  *Attorneys, Appellate Staff
  Civil Division, Room 7245
  U.S. Department of Justice
  950 Pennsylvania Avenue NW
  Washington, DC 20530
  (202) 305-8849*

## CERTIFICATE OF INTERESTED PERSONS

*Missouri v. Biden*

A certificate of interested persons is not required under Fifth Circuit Rule 28.2.1 as appellants are all governmental parties.

/s/ Daniel Winik
Daniel Winik

## STATEMENT REGARDING ORAL ARGUMENT

The Court has set oral argument for August 10, 2023.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ..................................................i

STATEMENT REGARDING ORAL ARGUMENT ......................................ii

TABLE OF AUTHORITIES ...............................................................v

INTRODUCTION ...........................................................................1

STATEMENT OF JURISDICTION......................................................3

STATEMENT OF ISSUES .................................................................3

STATEMENT OF THE CASE .............................................................3

SUMMARY OF ARGUMENT .............................................................9

STANDARD OF REVIEW................................................................ 12

ARGUMENT ............................................................................... 12

I.   The District Court Erred In Concluding That Plaintiffs Are Likely To Succeed On The Merits .......................................................... 13

     A.   Plaintiffs Lack Standing ....................................................13

     B.   Plaintiffs Failed To Show A First Amendment Violation ........................20

II.  The District Court Abused Its Discretion In Applying The Equitable Factors ......................................................................... 42

     A.   The Injunction Is Unnecessary To Prevent Irreparable Harm To Plaintiffs...............................................................42

     B.   The Injunction Sweeps More Broadly Than Necessary To Remedy Plaintiffs' Asserted Injuries ...........................................45

     C.   The Injunction Will Significantly Harm The Government And The Public Interest.................................................................47

III.    The Injunction Lacks The Required Specificity......................................................... 50

CONCLUSION ............................................................................................................... 54

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:**                                                                  **Page(s)**

*Abdullah v. Paxton,*
   65 F.4th 204 (5th Cir. 2023) ...........................................................................19

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,*
   458 U.S. 592 (1982) .......................................................................................13

*Atchafalaya Basinkeeper v. U.S. Army Corps of Engineers,*
   894 F.3d 692 (5th Cir. 2018) ................................................................. 12, 47

*Backpage.com, LLC v. Dart,*
   807 F.3d 229 (7th Cir. 2015) ........................................................................22

*Bantam Books, Inc. v. Sullivan,*
   372 U.S. 58 (1963) .........................................................................................22

*Blum v. Yaretsky,*
   457 U.S. 991 (1982) ...................................................21-22, 22, 24, 25

*Board of Regents of the University of Wisconsin System v. Southworth,*
   529 U.S. 217 (2000) .......................................................................................21

*Brentwood Academy v. Tennessee Secondary School Athletic Association,*
   531 U.S. 288 (2001) .......................................................................................26

*Burton v. Wilmington Parking Authority,*
   365 U.S. 715 (1961) .......................................................................................26

*Califano v. Yamasaki,*
   442 U.S. 682 (1979) .......................................................................................45

*Center for Biological Diversity v. EPA,*
   937 F.3d 533 (5th Cir. 2019) ........................................................................17

*City of Los Angeles v. Lyons,*
   461 U.S. 95 (1983) .........................................................................................17

*Counterman v. Colorado,*
   143 S. Ct. 2106 (2023) ..................................................................................52

*Cramer v. Skinner,*
   931 F.2d 1020 (5th Cir. 1991) ......................................................................18

*Defense Distributed v. U.S. Department of State,*
  838 F.3d 451 (5th Cir. 2016) ............................................................... 50

*Elrod v. Burns,*
  427 U.S. 347 (1976) ............................................................................ 42

*Estiverne v. Louisiana State Bar Association,*
  863 F.2d 371 (5th Cir. 1989) ............................................................... 18

*Geier v. Sundquist,*
  372 F.3d 784 (6th Cir. 2004) ............................................................... 46

*Gill v. Whitford,*
  138 S. Ct. 1916 (2018) .................................................................... 19, 45

*Google, Inc. v. Hood,*
  822 F.3d 212 (5th Cir. 2016) ............................................................... 43

*Haaland v. Brackeen,*
  143 S. Ct. 1609 (2023) ...........................................................13, 14, 18

*Hobbs v. Hawkins,*
  968 F.2d 471 (5th Cir. 1992) ............................................................... 27

*John Doe #1 v. Veneman,*
  380 F.3d 807 (5th Cir. 2004) ............................................................... 52

*Kennedy v. Warren,*
  66 F.4th 1199 (9th Cir. 2023) .......................................................... 23, 24

*Lewis v. Casey,*
  518 U.S. 343 (1996) ............................................................................ 19

*Louisiana v. Biden,*
  45 F.4th 841 (5th Cir. 2022) .......................................................... 12, 50

*Louisiana Division Sons of Confederate Veterans v. City of Natchitoches,*
  821 F. App'x 317 (5th Cir. 2020) ......................................................... 23

*Louisiana ex. rel. Louisiana Department of Wildlife & Fisheries v. National
Oceanic & Atmospheric Administration,*
  70 F.4th 872 (5th Cir. 2023) ............................................................... 15

*Lugar v. Edmondson Oil Co.,*
  457 U.S. 922 (1982) ............................................................................ 26

*Manhattan Community Access Corp. v. Halleck*,
   139 S. Ct. 1921 (2019) ................................................................29

*Massachusetts v. EPA*,
   549 U.S. 497 (2007).....................................................................15

*NCAA v. Tarkanian*,
   488 U.S. 179 (1988) ............................................................. 26, 27

*Nken v. Holder*,
   556 U.S. 418 (2009)......................................................................47

*O'Handley v. Weber*,
   62 F.4th 1145 (9th Cir. 2023) ......................... 23, 25, 26, 41

*O'Shea v. Littleton*,
   414 U.S. 488 (1974)......................................................................17

*PCI Transportation, Inc. v. Fort Worth & Western Railroad Co.*,
   418 F.3d 535 (5th Cir. 2005) .....................................................44

*Peery v. Chicago Housing Authority*,
   791 F.3d 788 (7th Cir. 2015) .....................................................23

*Penthouse International, Ltd. v. Meese*,
   939 F.2d 1011 (D.C. Cir. 1991)..................................................24

*Rawson v. Recovery Innovations, Inc.*,
   975 F.3d 742 (9th Cir. 2020) .....................................................27

*Schmidt v. Lessard*,
   414 U.S. 473 (1974).....................................................................54

*Scott v. Schedler*,
   826 F.3d 207 (5th Cir. 2016) .....................................................51

*South Dakota v. Dole*,
   483 U.S. 203 (1987)......................................................................25

*TransUnion LLC v. Ramirez*,
   141 S. Ct. 2190 (2021) ................................................................16

*United States v. Texas*,
   143 S. Ct. 1964 (2023) .............................................. 14, 15, 45

*VDARE Foundation v. City of Colorado Springs*,
   11 F.4th 1151 (10th Cir. 2021) ....................................................24

*Walker v. Texas Division, Sons of Confederate Veterans, Inc.*,
   576 U.S. 200 (2015) ........................................................... 21, 38

*West v. Atkins*,
   487 U.S. 42 (1988) ............................................................. 26, 27

*Winter v. Natural Resources Defense Council, Inc.*,
   555 U.S. 7 (2008) ............................................................... 44, 50

*X-Men Security, Inc. v. Pataki*,
   196 F.3d 56 (2d Cir. 1999) .........................................................24

**Statutes:**

28 U.S.C. § 1292(a)(1) ...................................................................3

28 U.S.C. § 1331 ............................................................................3

47 U.S.C. § 230...........................................................................31

**Rules:**

Fed. R. App. P. 4(a)(1)(B) ..............................................................3

Fed. R. Civ. P. 65(d) .....................................................3, 11, 12, 50

**Legislative Materials:**

*Disinformation Nation: Social Media's Role in Promoting Extremism and*
   *Misinformation: Virtual Joint Hearing Before the Subcomm. on Commc'ns*
   *& Tech. and the Subcomm. on Consumer Prot. & Commerce of the H.*
   *Comm. on Energy & Commerce*, 117th Cong. (2021) ........................4

*Protecting Our Children Online: Hearing Before the S. Comm. on the Judiciary*,
   118th Cong. (2023) ....................................................................4

*Radicalization: Social Media and the Rise of Terrorism: Hearing Before the*
   *Subcomm. on Nat'l Sec. of the H. Comm. on Oversight and Gov't Reform*,
   114th Cong. (2015) ....................................................................4

S. Rep. No. 116-290, vol. II (2020)..................................................................4

**Other Authorities:**

Harlan M. Blake & William K. Jones, *In Defense of Antitrust*,
65 Colum. L. Rev. 377 (1965) .............................................................20

CISA, *Election Security Rumor vs. Reality*, https://perma.cc/36FV-AFFL ........49

Jeff Horwitz, *Facebook Tightens Control of 'Groups,'* Wall St. J., Feb. 1, 2021....................35

John F. Kennedy Presidential Library & Museum, *News Conference 30*
(Apr. 11, 1962), https://perma.cc/M7DL-LZ7N ...................................20

Emma-Jo Morris & Gabrielle Fonrouge, *Smoking-Gun Email Reveals*
*How Hunter Biden Introduced Ukrainian Businessman to VP Dad*,
N.Y. Post (Oct. 14, 2020), https://perma.cc/9UPS-FBTV .......................40

Connor O'Brien & Cristiano Lima, *Trump Threatens to Veto Defense*
*Bill Over Social Media Rule*, Politico (Dec. 1, 2020),
https://perma.cc/4LWU-DMZ6.......................................................30

Order, *In re Murthy*, No. 22-30697 (5th Cir. Nov. 21, 2022)..............................7

Order, *In re Murthy*, No. 22-30697 (5th Cir. Jan. 5, 2023) ....................................7

Roberta Rampton, *Trump Pushes Drugmakers for Lower Prices, More U.S.*
*Production*, Reuters (Jan. 31, 2017), https://perma.cc/C66W-PXLT .........20

Nick Statt, *Trump Says Amazon, Facebook, and Google Represent A*
*'Very Antitrust Situation,'* The Verge (Aug. 30, 2018),
https://perma.cc/5Y8A-QKBX .......................................................30

The White House, *President Bush Discusses Homeownership Financing*
(Aug. 31, 2007), https://perma.cc/DQ8B-JWN4.....................................20

Twitter, *Updating Our Approach to Misleading Information* (May 11, 2020),
https://perma.cc/LSM4-3AAA ..........................................................5

Twitter Safety, *COVID-19: Our Approach to Misleading Vaccine Information*,
Twitter (Dec. 16, 2020), https://perma.cc/8FXZ-EC2K ...........................5

Graham J. White, *FDR and the Press* (Univ. of Chicago Press 1979) ..............20

# INTRODUCTION

One of the central obligations of government leaders, at any level, is to protect the public against innumerable threats: natural disasters, outbreaks of disease, crime, economic turmoil, and much more. Governments have concrete tools to address some of these challenges. But often, one of the government's key roles is simply to provide the public with accurate and timely information, to dispel false rumors, and to explain what actions citizens and businesses can and should take to advance the public good.

After an earthquake, for example, the public might panic about the stability of buildings, the safety of the water supply, and the potential for aftershocks. Profiteers might seek to exploit the public's uncertainty—for example, by sowing rumors that the water is unsafe in order to sell bottled water at extortionate prices. And malign foreign states or terrorist groups might seek to exacerbate panic, and undermine trust in the government, by spreading false information through social media.

It is critical—in crises and also in ordinary circumstances—that government leaders be able to disseminate accurate information and encourage actions that support the public good. The government cannot punish people for expressing different views. Nor can it achieve the same objective indirectly, by threatening the media with punishment if it disseminates those views. But there is a categorical, well-settled distinction between *persuasion* and *coercion*. The government must be allowed to seek to persuade people of its views, even where those views are the subject of controversy.

The district court's ruling ignored that fundamental distinction. The court equated the government's legitimate efforts to identify truthful information with illicit efforts to "'silenc[e] the voice of opposition,'" ROA.26607, and equated legitimate efforts at persuasion with illicit efforts to coerce. On the basis of those false equivalencies, the court issued an injunction with sweeping language that could be read to prohibit (among other things) virtually any government communication directed at social-media platforms regarding content moderation. The court's effort to tailor the injunction through a series of carveouts failed to cure the injunction's overbreadth and compounded its vagueness.

The injunction is improper in virtually every dimension. The district court found Article III jurisdiction based on a theory of state *parens patriae* standing that the Supreme Court has repeatedly rejected, including as recently as June, and on past actions by private companies that do not establish a concrete prospect of forward-looking injury caused by the government. On the merits, the court compounded its misunderstanding of the First Amendment by badly misconstruing the factual record. The court's remedial choices were equally flawed: The injunction forbids conduct having nothing to do with plaintiffs, in a manner unnecessary to prevent irreparable harm to them. It raises grave separation-of-powers concerns by installing a federal court as superintendent of communications between the Executive Branch and the public. It would, as discussed above, undermine the government's ability to serve the public interest. And it is replete

with ambiguous terms that lack the specificity required by Federal Rule of Civil Procedure 65(d). It should be reversed.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. § 1331, ROA.25119, though Article III standing is contested, *see infra* pt. I.A. The district court entered a preliminary injunction on July 4, 2023. ROA.26610-26616. The federal government timely appealed on July 5, 2023. ROA.26618; *see* Fed. R. App. P. 4(a)(1)(B). This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF ISSUES

1.    Whether the district court erred in concluding that it had jurisdiction to enter a broad injunction on the basis of the plaintiff States' "quasi-sovereign interests," ROA.26577, and past actions by private companies.

2.    Whether the district court erred in concluding that plaintiffs had shown a likelihood of success on the merits.

3.    Whether the district court abused its discretion in applying the equitable factors of the preliminary-injunction standard.

4.    Whether the injunction lacks the requisite specificity.

## STATEMENT OF THE CASE

1.    Social-media platforms allow billions of people to share content instantaneously around the globe. The unprecedented scope and speed of social-media communications has afforded many benefits. It has also presented significant hazards—

including, for example, the use of platforms to recruit terrorists or to harm children. *See, e.g.*, *Radicalization: Social Media and the Rise of Terrorism: Hearing Before the Subcomm. on Nat'l Sec. of the H. Comm. on Oversight and Gov't Reform*, 114th Cong. (2015); *Protecting Our Children Online: Hearing Before the S. Comm. on the Judiciary*, 118th Cong. (2023).

One of those hazards is the potential to facilitate the rapid spread of harmful misinformation and disinformation. *See, e.g.*, *Disinformation Nation: Social Media's Role in Promoting Extremism and Misinformation: Virtual Joint Hearing Before the Subcomm. on Commc'ns & Tech. and the Subcomm. on Consumer Prot. & Commerce of the H. Comm. on Energy & Commerce*, 117th Cong. (2021). Russia, for example, has used "internet-based social media platforms" to disseminate falsehoods, corrode trust in information sources, and "exploit societal divisions." S. Rep. No. 116-290, vol. II, at 85, 91-92 (2020). Misinformation and disinformation are not new threats—during the Cold War, for example, "Soviet active measures pushed conspiratorial and disinformation narratives about the United States around the world," *id.* at 82—but the rise of social media has compounded these threats.

a.    Platforms have long sought to address the hazards associated with their products, and preserve those products' value, by maintaining and enforcing content-moderation policies. *See, e.g.*, ROA.21943-21961.

In response to the onset of the COVID-19 pandemic, platforms amended their policies to address misinformation harmful to public health. In March 2020, for example, Twitter amended its policies "to address content that goes directly against guidance

from authoritative sources of global and local public health information." ROA.22539.
Twitter expressed the intention to "enforce" that policy "in close coordination with
trusted partners, including public health authorities and governments, and continue to
use and consult with information from those sources when reviewing content."
ROA.22539. Later, Twitter stated that it would "take action" against "statements or
assertions that have been confirmed to be false or misleading by subject-matter experts,
such as public health authorities." Twitter, *Updating Our Approach to Misleading Information*
(May 11, 2020), https://perma.cc/LSM4-3AAA. And as vaccines against COVID-19
became available in late 2020, Twitter broadened its policy to provide for the removal
of a variety of vaccine-related misinformation, such as "[f]alse claims that COVID-19
is not real or not serious, and therefore that vaccinations are unnecessary," Twitter
Safety, *COVID-19: Our Approach to Misleading Vaccine Information* (Dec. 16, 2020), https://
perma.cc/8FXZ-EC2K.

Even before the end of the COVID-19 public health emergency in May 2023,
however, Twitter (under new management) altered its policies to allow COVID-related
content that might contradict the views of public health authorities. Twitter "is no
longer enforcing" its "COVID-19 misleading information policy" as of November
2022. ROA.22536. The record does not reflect any effort by the federal government
to prevent Twitter from altering its policy or any retaliatory action taken against Twitter
for doing so.

b.    The federal government also has sought to mitigate the hazards of online misinformation in various ways.  One means by which federal agencies do so is by calling platforms' attention to content that may violate platforms' policies, so that the platforms can apply their policies as they deem appropriate.  For example, the FBI routinely shares with platforms intelligence regarding accounts that appear to be used by foreign malign actors to influence the American public or by terrorist organizations to recruit supporters.  ROA.23859-23860; ROA.23866.  And during the acute phase of the pandemic, the Centers for Disease Control and Prevention (CDC) alerted platforms to "COVID-19 misinformation narratives that CDC had identified" as "prevalent" online.  ROA.23097.

Senior government officials have spoken publicly about the harms that can arise from the rapid spread of falsehoods through social media.  In May 2021, for example, the White House Press Secretary expressed the President's view regarding social-media platforms' "responsibility" to "stop amplifying untrustworthy content, disinformation, and misinformation, especially related to COVID-19, vaccinations, and elections."  ROA.23778.  But she emphasized that the President "believe[s] in First Amendment rights" and that "social media platforms need to make" "the decisions" regarding "how they address … disinformation" and "misinformation."  ROA.23778.  The Surgeon General has likewise offered "recommendations" for social-media platforms to address harms caused by online misinformation on social media, without purporting to impose any requirements.  ROA.15271-15286.

2.     Plaintiffs—Missouri, Louisiana, and several individuals—claim that the government violated their First Amendment rights by undertaking these efforts to mitigate harms perpetuated online.  Their operative complaint names as defendants 67 federal agencies and officials, ranging from the FBI to the State Department to the Census Bureau, characterizing the conduct of these defendants, spanning multiple Administrations, as "a massive, sprawling federal 'Censorship Enterprise.'"  ROA.25119.

The district court allowed plaintiffs to take extensive discovery in support of their preliminary-injunction motion.  When the government sought mandamus relief, this Court twice intervened to stay depositions of high-level officials that the district court had authorized without the requisite showing of necessity.  Order, *In re Murthy*, No. 22-30697 (5th Cir. Jan. 5, 2023); Order, *In re Murthy*, No. 22-30697 (5th Cir. Nov. 21, 2022).

3.     On July 4, the district court entered a preliminary injunction, concluding that seven groups of defendants had coerced or significantly encouraged social-media platforms to suppress speech, or "jointly participated" in the suppression of speech, in violation of the First Amendment.  ROA.26549-26570.

The court held that the plaintiff States have standing principally on a *parens patriae* theory, predicated on the States' assertion of "two quasi-sovereign interests." ROA.26576-26577.  The court additionally relied on the platforms' application of con-

tent-moderation policies to a handful of posts made (or ostensibly made) by state enti-ties. ROA.26579. The court held that the individual plaintiffs have standing because they had been subject to content moderation by platforms. ROA.26581-26582.

The court determined that plaintiffs had satisfied the irreparable-injury require-ment, largely on the basis of its conclusion that plaintiffs had demonstrated standing and their claims were not moot. ROA.26593-26598. It devoted just two paragraphs to the balance-of-equities and public-interest factors and concluded, without discussing the injunction's terms, that its injunction could be sufficiently specific and tailored. ROA.26598-26599.

The court enjoined defendants (other than a handful against whom plaintiffs declined to seek preliminary relief) from engaging in ten types of actions directed at social-media companies. ROA.26613-26614. The injunction prohibits defendants from, among other things, "engaging in any communication of any kind with social-media companies urging, encouraging, pressuring, or inducing in any manner" the "re-moval, deletion, suppression, or reduction of content"; "urging" those companies "to change their guidelines for removing" content; "flagging content or posts" for potential removal or reduction; and "requesting content reports" from those companies. ROA.26613-26614. These prohibitions apply to "protected free speech." ROA.26613.

The order states that the injunction does not prohibit defendants from informing social-media companies of postings involving criminal activity or conspiracies; "na-

tional security threats, extortion, or other threats posted on [their] platform[s]"; or certain other categories of content. ROA.26614-26615. The order also states that the injunction does not prohibit "exercising permissible public government speech promoting government policies or views on matters of public concern," without defining those terms. ROA.26615. The order and opinion do not explain these carveouts.

The government appealed. On July 10, the district court denied the government's motion for a stay pending appeal, ROA.26647-26659, and stated that the injunction was revised to redefine "protected free speech" as "speech which is protected by the Free Speech Clause … in accordance with the jurisprudence of the United States Supreme Court," ROA.26660. On July 14, a motions panel of this Court administratively stayed the injunction, while deferring consideration of the government's motion for a stay pending appeal to the merits panel.

## SUMMARY OF ARGUMENT

The unprecedented injunction at issue here installs the district court as the arbiter of which government communications are permissible. It does so with no basis in law or fact and in contravention of fundamental principles of equity and the requirement of specificity for injunctive relief. The injunction should be reversed.

I.A.  The district court's conclusion that the plaintiff States had standing rested primarily on a theory that States can bring *parens patriae* suits against the federal government. The Supreme Court has repeatedly (and as recently as June) rejected that theory, including in the very case on which the district court primarily relied.

The district court's other theories of standing rested on injuries caused by social-media platforms' content-moderation decisions made before much of the government conduct at issue here. The district court ignored this fundamental chronological flaw—along with other record evidence—in concluding that plaintiffs were likely to suffer harm caused by defendants and redressable by an injunction against them. Nor did plaintiffs show that they face an imminent threat of harm. And the theory that plaintiffs had themselves suffered content moderation in the past could not, in any event, justify the sweeping breadth of the district court's injunction. The district court rightly declined to accept plaintiffs' "right to listen" theory, which this Court has cabined to harms far more particularized than theirs.

B.     On the merits, the district court misapplied the law and misconstrued the facts. On the law, the court essentially treated any act or omission by the government that made a social-media platform more likely to take measures to moderate content as sufficient to convert the platform's action into government action. The case law sets a significantly higher standard, both to preserve the government's prerogative to seek to persuade members of the public and to prevent private companies' conduct from routinely being subject to First Amendment scrutiny.

On the facts, the district court identified no concrete demands backed by a threat of sanctions—much less demands to take particular actions by which plaintiffs claim to have been harmed—and no retaliatory actions taken on the frequent occasions when

social-media platforms declined to moderate content identified by the government. Instead, the court characterized as nefarious a course of conduct by the government and social-media companies that reflects each entity's properly attempting to achieve its objectives, sometimes seeing eye-to-eye and sometimes disagreeing in good faith. The district court could cobble together evidence of what it called "the most massive attack against free speech in United States[] history," ROA.26456, only by equating requests with demands, persuasion with coercion, and agreement with the surrender of independent judgment.

II.    The injunction also flouts fundamental principles of equity. The injunction covers government conduct having no evident connection to plaintiffs' claims of harm. It would stymie the government's legitimate and crucial efforts to address threats to the public welfare. And by intruding on the Executive Branch's ability to communicate regarding matters of public concern, the injunction threatens the separation of powers. The district court appeared to recognize the overbreadth of its injunction when it adopted a series of carveouts, but those carveouts are inadequate to preserve the government's ability to engage in vital functions in service of the American people.

III.    Finally, the injunction is independently impermissible as a matter of law because it lacks the specificity required by Federal Rule of Civil Procedure 65(d). It is improper for a court to issue a sweeping prohibition against a broad swath of government communication and then state, without elaboration, that the government is nonetheless permitted to engage in "permissible public government speech," ROA.26615.

The other carveouts are likewise riddled with ambiguous terms, subjecting the Executive Branch to grave uncertainty about which of its otherwise lawful functions it can continue to carry out.

## STANDARD OF REVIEW

This Court "'review[s] a preliminary injunction for abuse of discretion, reviewing findings of fact for clear error and conclusions of law *de novo*.'" *Louisiana v. Biden*, 45 F.4th 841, 845 (5th Cir. 2022). "Whether an injunction fulfills the mandates of Fed. R. Civ. P. 65(d) is a question of law [the Court] review[s] *de novo*." *Id.*

## ARGUMENT

"A preliminary injunction is an extraordinary remedy," requiring movants to establish not only "a likelihood of prevailing on the merits" but also that they face "a substantial threat of irreparable injury if the injunction is not granted," that "the threatened injury outweighs any harm that will result to the non-movant if the injunction is granted," and that "the injunction will not disserve the public interest." *Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*, 894 F.3d 692, 696 (5th Cir. 2018). Plaintiffs established none of those prerequisites. The injunction is also invalid on the independent ground that it lacks the specificity required by Federal Rule of Civil Procedure 65(d).

## I.    The District Court Erred In Concluding That Plaintiffs Are Likely To Succeed On The Merits

### A.    Plaintiffs Lack Standing

The district court's standing analysis rests on theories that the Supreme Court has repeatedly disapproved and on plaintiffs' unadorned speculation.

1.    The district court determined that the plaintiff States have standing principally on a *parens patriae* theory. ROA.26576-26577. The court asserted that in *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592 (1982), the "Supreme Court determined that Puerto Rico had *parens patriae* standing to sue the federal government to safeguard its quasi-sovereign interests." ROA.26576. But *Snapp* stands for the opposite proposition. The Court there explained that "[a] State does not have standing as *parens patriae* to bring an action against the Federal Government," a principle inapplicable in *Snapp* only because that case was brought "against private defendants." 458 U.S. at 610 n.16. The Supreme Court recently reaffirmed that States cannot bring *parens patriae* actions against the federal government. *Haaland v. Brackeen*, 143 S. Ct. 1609, 1640 (2023).

The district court reasoned that that rule applies to "'third-party *parens patriae* suits,'" not to "'quasi-sovereign-interest suits'" such as this one. ROA.26591. But again, *Snapp* says the opposite: The Court held that a State "must" assert a quasi-sovereign injury to have *parens patriae* standing in the first place, 458 U.S. at 601, and then clarified that *even then* it cannot sue the federal government, *id.* at 610 n.16. And more generally,

the Supreme Court has rejected the kind of "quasi-sovereign interests" on which the district court relied here.  ROA.26577.

The States' asserted "interest in safeguarding the free-speech rights of a significant portion of their respective populations," ROA.26577, resembles the interest held insufficient in *Brackeen*—a State's interest in safeguarding the constitutional rights of "non-Indian families," 143 S. Ct. at 1640 n.11.  The Supreme Court described reliance on that interest as "a thinly veiled attempt to circumvent the limits on *parens patriae* standing."  *Id.*  The district court attempted to distinguish *Brackeen* by stating that, there, Texas "asserted the equal protection rights of only a small minority of its population." ROA.26591.  But *Brackeen* did not mention or rely on how many citizens were affected; it reaffirmed a categorical prohibition on a State's attempting to circumvent the limits on *parens patriae* standing by asserting the individual constitutional rights of its citizens. *See* 143 S. Ct. at 1640.

The States' asserted "interest in ensuring that they receive the benefits from participating in the federal system," ROA.26577, equally conflicts with the Supreme Court's decisions in *Brackeen* and in *United States v. Texas*, 143 S. Ct. 1964 (2023).  In *Brackeen*, the Court rejected Texas's reliance on a perceived threat to its "'promise to its citizens,'" embodied in its state constitution, "'that it will be colorblind in child-custody proceedings.'"  143 S. Ct. at 1640.  And in *Texas*, the Court rejected Texas's similar theory that it could bring suit "'to assure [its] residents that they [would] have the full benefit of federal laws designed to address' the problems caused by criminal aliens that Congress

has ordered detained," Brief for Respondents at 23, *United States v. Texas*, No. 22-58, 2022 WL 12591050 (U.S. Oct. 18, 2022).  In any event, the plaintiff States here never explain how the conduct they challenge—federal government communications with private parties—even implicates their "participati[on] in the federal system."  To the extent that their asserted interest merely repackages their assertion of individual citizens' First Amendment rights, as the district court appeared to assume, *see* ROA.26577-26579, the plaintiff States are precluded from asserting those rights for the reasons already discussed.

The district court reached its contrary conclusion in part by relying on *Massachusetts v. EPA*, 549 U.S. 497 (2007), but that decision is inapposite.  In *Massachusetts*, the Supreme Court explained that a State has standing "to assert its rights under federal law," 549 U.S. at 520 n.17—there, by "challeng[ing] … the denial of a statutorily authorized petition for rulemaking," *Texas*, 143 S. Ct. at 1975 n.6.  There are no analogous statutorily authorized procedures at issue here, so as in *Texas*, the *Massachusetts* standing analysis "does not control."  *Id.*  And even assuming the "special solicitude" described in *Massachusetts*, 549 U.S. at 520, remains relevant despite the Supreme Court's omission of that concept in recent decisions, *see Texas*, 143 S. Ct. at 1977 (Gorsuch, J., concurring in the judgment), it "merely changes the normal standards for redressability and immediacy" and "does not absolve States from substantiating a cognizable injury," *Louisiana ex rel. La. Dep't of Wildlife & Fisheries v. National Oceanic & Atmospheric Admin.*, 70 F.4th 872, 882 (5th Cir. 2023) (quotation marks omitted).

- 15 -

2.    The district court likewise erred in holding that the individual plaintiffs established standing by showing "a combination of past and ongoing censorship," ROA.26581, and that the States established standing based on the treatment of their own content.  The evidence does not demonstrate that any ongoing or future government action will cause any plaintiff harm that "is sufficiently imminent and substantial" to seek injunctive relief, *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2210 (2021).

The individual plaintiffs' declarations rely heavily on past content-moderation episodes dating back to 2020.  *See, e.g.,* ROA.1187-1213, ROA.25726-25737.  These declarations fall far short of demonstrating injury that is traceable to the government conduct that plaintiffs seek to challenge and would be redressable by a favorable decision, as opposed to injury arising from independent decisions of social-media companies.  Twitter, for example, adopted a policy in March 2020 of moderating "content that goes directly against guidance from authoritative sources of global and local public health information," ROA.22536-22543, and plaintiffs make no allegation—nor could they— that Twitter created this policy due to government pressure.  Indeed, much of the conduct plaintiffs challenge (including all challenged conduct for certain defendants, like the White House defendants), came after that policy change and the resulting content moderation.

Plaintiffs' reliance on assertions that "Democratic public officials and the Biden Administration" coordinated with a private group, and on statements to the press in "the summer of 2021," ROA.1212, underscore the fundamental weaknesses in their

arguments. The Biden Administration could not be responsible for content moderation that began in 2020, and this case is not against Democratic officials in general, but rather against a specific set of Executive Branch defendants as to each of whom plaintiffs must specifically establish the causation and redressability elements of standing. Plaintiffs cannot satisfy that burden through "conclusory assertions," *Center for Biological Diversity v. EPA*, 937 F.3d 533, 545 (5th Cir. 2019), such as one plaintiff's unexplained assertion that she "[k]now[s] that government agencies colluded with Facebook to suppress the messaging of groups like" hers, ROA.1316.

In any event, "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief"; a plaintiff must show a "real and immediate threat of repeated injury" to establish jurisdiction. *O'Shea v. Littleton*, 414 U.S. 488, 495-496 (1974); *see City of Los Angeles v. Lyons*, 461 U.S. 95, 101-108 (1983). The district court identified no such threat here. Twitter has stopped enforcing its COVID-related misinformation policy, *see* ROA.22536, and all three plaintiffs who suggested that their social-media accounts had been permanently suspended in the past now appear to have active accounts, *see* ROA.23513-23514, in each case with no evidence of government retaliation. Plaintiffs have not shown that defendants' future conduct is likely to cause them harm redressable by an injunction, much less carried that burden as to each of the many defendants.

The States' assertions of standing based on content-moderation decisions regarding several individual posts—one by a state agency and several (allegedly) by a sub-

State entity in 2021, and another by an individual state legislator at some unspecified time—are likewise meritless. ROA.26579. In addition to sharing flaws of the individual plaintiffs' standing theory, the States' theory fails because the First Amendment does not confer rights on States. *See Estiverne v. Louisiana State Bar Ass'n*, 863 F.2d 371, 379 (5th Cir. 1989); *see also Brackeen*, 143 S. Ct. at 1640 (Texas lacked standing because it had "no equal protection rights of its own"). And the States adduced no evidence about their intention to post again, *see* ROA.1268-1272; ROA.1317-1320, so the district court cited no evidence that they are likely to be subject to content moderation—much less content moderation at the federal government's behest—in the future. *See* ROA.26587-26588. To the extent the States suffered a handful of years-old injuries, such past injuries cannot confer standing to seek prospective relief, let alone the sweeping injunction entered by the district court.

3.    The district court properly did not endorse plaintiffs' alternative theory that they have been injured as listeners to speech on social media. This Court has cautioned against expansion of such a theory to allow litigation based on "a generalized grievance common to all members of the public." *Cramer v. Skinner*, 931 F.2d 1020, 1026-1027 (5th Cir. 1991). The Court thus held that a frequent traveler had standing to challenge a restriction on the dissemination of airline-route information that "ma[de] planning his trips more difficult," but explained that standing might be lacking for a plaintiff who "had not suffered personally the inconveniences associated with the … restrictions on commercial speech." *Id.* That principle ensures that plaintiffs cannot

evade the Article III prohibition against asserting others' speech rights, *see Abdullah v. Paxton*, 65 F.4th 204, 210 (5th Cir. 2023) (per curiam), merely by expressing a general desire to hear others' speech on a given topic. Plaintiffs' theory—which would afford standing to any putative listener who expresses a generalized desire to hear speech on social media—ignores these bedrock principles.

4. Even if one or more plaintiffs could demonstrate standing, moreover, the prospect of future content-moderation actions against them could not support jurisdiction for the district court to forbid a wide range of government agencies (including those having no interest in the subjects about which plaintiffs sought to speak) from communicating with a wide range of platforms (including those on which plaintiffs do not participate) about a wide range of topics (including speakers and subject matter other than plaintiffs and their speech). Because "'standing is not dispensed in gross,'" "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018). As explained below (at 45-47), the district court's injunction sweeps well beyond what would be necessary to remedy any conceivable harm to plaintiffs. At a minimum, any injunction should extend no further than prohibiting government communications with social-media platforms concerning the social-media accounts and posts of those plaintiffs who can demonstrate Article III standing. *See Lewis v. Casey*, 518 U.S. 343, 357 (1996) ("The remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established.").

**B.    Plaintiffs Failed To Show A First Amendment Violation**

The district court likewise erred in holding that plaintiffs are likely to succeed on the merits of their First Amendment claim.

1.    A central dimension of presidential power in the modern age is the use of the office's so-called "bully pulpit" to seek to persuade Americans, and American companies, to act in ways that in the President's view advance the public interest. President Kennedy, for example, successfully persuaded steel companies to rescind a price increase through a famous press conference at which he accused them of "ruthless[ly] disregard[ing] … their public responsibilities." John F. Kennedy Presidential Library & Museum, *News Conference 30* (Apr. 11, 1962), https://perma.cc/M7DL-LZ7N; *see, e.g.,* Harlan M. Blake & William K. Jones, *In Defense of Antitrust*, 65 Colum. L. Rev. 377, 383 n.24 (1965) (discussing the episode). President Trump likewise urged drug manufacturers to lower prices and keep jobs in the United States. Roberta Rampton, *Trump Pushes Drugmakers for Lower Prices, More U.S. Production*, Reuters (Jan. 31, 2017), https://perma.cc/C66W-PXLT. During the subprime mortgage crisis, President George W. Bush called out "irresponsible" mortgage lenders and explained that they had "a responsibility to help" affected homeowners "renegotiate" their mortgages. The White House, *President Bush Discusses Homeownership Financing* (Aug. 31, 2007), https://perma.cc/DQ8B-JWN4. And many presidents have sought, successfully or unsuccessfully, to shape coverage of their administrations by the press. *See generally, e.g.,* Graham J. White, *FDR and the Press* (Univ. of Chicago Press 1979).

Courts have recognized that "the government can speak for itself," including to "advocate and defend its own policies." *Board of Regents of the Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 229 (2000). When it does so, "it is not barred by the Free Speech Clause from determining the content of what it says." *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015). That principle "reflects the fact that it is the democratic electoral process that first and foremost provides a check on government speech." *Id.* Without it, government at any level "would not work." *Id.* "How could a state government effectively develop programs designed to encourage and provide vaccinations," the Supreme Court rhetorically asked, "if officials also had to voice the perspective of those who oppose this type of immunization?" *Id.* at 207-208. Restricting the government's expression of its views—whether about the veracity of assertions of fact or about what sorts of conduct by Americans will advance the public good—not only would undermine the separation of powers but would impede First Amendment values by removing the government's voice from the "marketplace of ideas," *id.* at 207.

Of course, the government cannot punish people for disagreeing with its views, or suppress contrary views. Nor can it achieve the same result indirectly, by "exercis[ing] coercive power" to cause a private party to suppress disfavored expression, or "provid[ing] such significant encouragement" of that conduct that the private party's "choice must in law be deemed to be that of the [government]." *Blum v. Yaretsky*, 457

U.S. 991, 1004 (1982). That may happen, as the district court recognized, if "the comments of a governmental official can reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request." ROA.26544. For example, the Supreme Court held in *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963), that an agency could not identify certain books as "objectionable" in a notice to distributors that emphasized the agency's "duty to recommend … prosecution of purveyors of obscenity" and then follow up by having a police officer visit to see what action was taken. *Id.* at 61-63. And the Seventh Circuit held in *Backpage.com, LLC v. Dart*, 807 F.3d 229 (7th Cir. 2015), that a sheriff violated the First Amendment by "using the power of his office to threaten legal sanctions against [certain] credit-card companies for facilitating" disfavored speech. *Id.* at 231.

But generalized pressure is insufficient; the government must compel "the *specific* conduct of which the plaintiff complains" in order for that conduct to be treated as the government's own. *Blum*, 457 U.S. at 1004 (emphasis added). Thus, in *Blum*, even though "nursing homes in [the State were] extensively regulated," *id.*, and even though state regulations placed pressure on nursing homes to discharge patients or transfer them to lower levels of care, the Supreme Court declined to hold the State responsible for nursing homes' specific "decision[s] to discharge or transfer particular patients" because those decisions "ultimately turn[ed] on medical judgments made by private parties." *Id.* at 1008.

And even where the government expresses a desire for a private party to take or refrain from specific actions, courts have "drawn a sharp distinction" between illegitimate "attempts to coerce" and legitimate "attempts to convince." *O'Handley v. Weber*, 62 F.4th 1145, 1158 (9th Cir. 2023), *petition for cert. filed*, No. 22-1199 (June 8, 2023). Courts have recognized, in particular, "that government officials do not violate the First Amendment when they request that a private intermediary not carry a third party's speech so long as the officials do not threaten adverse consequences if the intermediary refuses to comply." *Id.* This Court thus upheld a grant of summary judgment against a claim premised on a letter from a mayor requesting that a private committee prohibit the display of a Confederate battle flag in a parade, noting that "[r]esponding agreeably to a request" is "different" from "being all but forced by the coercive power of a governmental official." *Louisiana Div. Sons of Confederate Veterans v. City of Natchitoches*, 821 F. App'x 317, 320 (5th Cir. 2020) (per curiam); *see also, e.g.*, *Peery v. Chicago Hous. Auth.*, 791 F.3d 788, 790 (7th Cir. 2015) ("Government officials and agencies spend a great deal of time urging private persons and firms and other institutions to change their behavior … without backing up their urging with coercion or the threat of it.").

Legitimate attempts to persuade can include "forceful[]" criticism using "strong rhetoric." *Kennedy v. Warren*, 66 F.4th 1199, 1208 (9th Cir. 2023). Thus, for example, the Ninth Circuit held that a Senator did "not cross the constitutional line between persuasion and coercion" when she sent a letter to Amazon "denounc[ing]" a particular book "and chastis[ing] Amazon for 'peddling misinformation about COVID-19 vaccines and

treatments.'" *Id.* at 1207-1208.  The Tenth Circuit held that a mayor did not violate the Constitution when, in advance of a conference to be held in his city by a group he regarded as engaging in hate speech, he issued a message "'encourag[ing] local businesses to be attentive to the types of events they accept and the groups that they invite'" and stating that the city would "'not provide any support or resources to'" the planned conference "'and does not condone hate speech in any fashion.'"  *VDARE Found. v. City of Colorado Springs*, 11 F.4th 1151, 1157, 1164 (10th Cir. 2021).  The Second Circuit held that a Member of Congress and a former state legislator did not violate the Constitution when they accused a security contractor in a publicly financed housing complex "of being part of a 'hate group' that practiced racism, gender discrimination, anti-semitism, and other religious discrimination" and "urged" on that basis among others that the contractor "not be retained."  *X-Men Sec., Inc. v. Pataki*, 196 F.3d 56, 68-72 (2d Cir. 1999).  And the D.C. Circuit held that the Attorney General and a Department of Justice commission did not violate the Constitution when they sent companies a letter stating that they had "received testimony alleging that" the companies were "involved in the sale or distribution of pornography."  *Penthouse Int'l, Ltd. v. Meese*, 939 F.2d 1011, 1013, 1015-1016 (D.C. Cir. 1991).

2.     Seizing on *Blum*'s reference to "significant encouragement," 457 U.S. at 1004, the district court largely relied on a series of government statements and emails that it viewed as significantly encouraging social-media platforms to regulate content,

even if those communications fell short of the high standard for coercion. But "significant encouragement" does not mean any action by the government that makes a private entity more likely to do something. Such an interpretation would essentially prohibit all efforts by the government to persuade. Rather, by stating that private action becomes government action whether brought about by "coerci[on]" or by "significant encouragement," *id.*, the Supreme Court simply recognized that sufficiently significant offers of "positive incentives" (significant encouragement), just like threats of negative consequences (coercion), could in some circumstances overwhelm a private party's independent judgment. *O'Handley*, 62 F.4th at 1157-1158; *cf. South Dakota v. Dole*, 483 U.S. 203, 211 (1987) (recognizing that "financial inducement offered" to States can "be so coercive as to pass the point at which 'pressure turns into compulsion'"). Absent encouragement rising to such a level that the private party's "choice must in law be deemed to be that of the [government]," *Blum*, 457 U.S. at 1004, government efforts at persuasion raise no First Amendment concerns.

*Blum*'s reference to "significant encouragement" thus does not mean that the government becomes responsible for private conduct when it provides minor incentives (positive or negative)—let alone when it simply provides information. In a particularly apposite application of this principle, the Ninth Circuit held in *O'Handley* that it was neither coercion nor significant encouragement for California to use a "Partner Support Portal" to "flag[]" for Twitter's review posts that potentially violated the company's content-moderation policy." 62 F.4th at 1160. As the court explained, the State merely

"suppl[ied] Twitter with information," which Twitter could "decide[] how to utilize." *Id.*

The district court also misunderstood what it referred to as the doctrine of joint participation, ROA.26569-26571. That doctrine attributes private conduct to the government if nominally private entities are in effect run by the government, *see Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296-297 (2001), or if the government "provide[s] a mantle of authority that enhance[s] the[ir] power," *NCAA v. Tarkanian*, 488 U.S. 179, 192 (1988). In the former category, for example, the Supreme Court held that a school athletic association, though "nominally private," should be considered a state actor because of "the pervasive entwinement of public institutions and public officials in its composition and workings." *Brentwood Acad.*, 531 U.S. at 298. And in the latter, the Court held that a corporation was a state actor when, exercising authority conferred on it by state law and in conjunction with state officials, it obtained a prejudgment attachment of property to satisfy what it claimed was a debt. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982).

The "joint participation" cases on which the district court relied, to the extent they found state action to be present, all involved either or both of those features. In *Burton v. Wilmington Parking Authority*, 365 U.S. 715 (1961), the Supreme Court held that a restaurant was a state actor when its landlord was a state agency and it was "operated as an integral part of a public building devoted to a public parking service." *Id.* at 724. In *West v. Atkins*, 487 U.S. 42 (1988), the Supreme Court reached the straightforward

conclusion that "a physician employed by North Carolina to provide medical services to state prison inmates[] acted under color of state law for purposes of § 1983." *Id.* at 52 n.10, 54. In *Hobbs v. Hawkins*, 968 F.2d 471 (5th Cir. 1992), this Court held that the plaintiffs had stated a claim under Section 1983 against a corporation that had, jointly with a city, organized a meeting "in a city-owned facility" that plaintiffs alleged "'was characterized and in fact conducted as an official function of the City.'" *Id.* at 480; *see id.* at 474. And in *Rawson v. Recovery Innovations, Inc.*, 975 F.3d 742 (9th Cir. 2020), the Ninth Circuit held that a private psychiatric treatment facility and its employees engaged in state action when a county prosecutor "was heavily involved in the[ir] decisionmaking process regarding" the "detention, diagnosis, and treatment" of a criminal suspect. *Id.* at 753-754.

This case, by contrast, involves none of those features even on the district court's account of the facts. The application of content-moderation policies by social-media platforms is an exercise of purely private authority; the platforms did not need the "mantle of" governmental "power," *Tarkanian*, 488 U.S. at 192. Nor is there any argument that the platforms were effectively managed or operated by the government.

Finally, the district court's analysis reflected the profoundly misguided view that government officials engage in impermissible "content and/or viewpoint discrimination" when they take positions on such topics as "whether COVID-19 vaccines worked" or were "safe." ROA.26556. The government's articulation of its own posi-

tions need not be viewpoint-neutral. *See supra* p. 21. Government officials can permissibly try to persuade social-media platforms that COVID-19 vaccines work, that they are safe, or that claims circulating on social media about these and other subjects are false and harmful. Nor is there anything problematic about encouraging platforms to "uplift accurate information," ROA.26552. The government could not punish citizens for adopting or expressing a contrary view—*that* would be "'silencing the voice of opposition,'" ROA.26607. But there is a categorical difference between the exercise of such "'repressive measures,'" ROA.26607, on the one hand, and efforts by the government to persuade others of its own views, on the other. The district court's failure to appreciate or even acknowledge that distinction is fatal to its reasoning.

Moreover, the broader implications of the district court's analysis are startling. Although the court purported not to decide "whether the social-media platforms are government actors," ROA.26542, its decision was premised on the notion that the platforms' content-moderation decisions were coerced or significantly encouraged by the government, which would mean they qualify as state action. *See* ROA.26542-26547 (relying on decisions involving suits brought against private entities alleged to have been state actors). Were that true, plaintiffs could have secured injunctions compelling platforms to restore misinformation or other content that the platforms chose to delete. The Supreme Court recently warned against expansive state-action theories that would "eviscerate certain private entities' rights to exercise editorial control over speech and

speakers on their properties or platforms" by subjecting those choices "to the constraints of the First Amendment." *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1932-1933 (2019). But the district court did not even acknowledge, much less attempt to justify, the profoundly disruptive implications of its holding.

3. The district court's analysis is not only legally unsound; it is unsupported by the facts, which the court repeatedly misstated or misconstrued, causing the court to draw unsupported inferences and render clearly erroneous findings.

Despite months of discovery, during which the government produced thousands of pages of documents and federal officials sat for six depositions, the evidence that plaintiffs marshaled in support of their request for a preliminary injunction was exceedingly thin. Plaintiffs identified no demand placed on social-media platforms that was backed by a threat of sanction if the platforms refused to comply, or by any comparably compelling incentive offered to induce compliance. Nor did plaintiffs allege, much less prove, that any government official imposed any sanction in retaliation for platforms' refusal to act as the government wished, even though platforms regularly declined to remove content that the government regarded as harmful. *See, e.g.*, ROA.23234-23235; ROA.23240-23243; ROA.23245-23256 (emails from platforms declining to moderate content).

To the extent the district court even tried to identify potential government actions as transforming questions and requests into coercive threats, it focused on poten-

tial efforts to amend Section 230 of the Communications Decency Act or to take anti-trust action against social-media companies. But the potential for the government to take measures that might harm social-media companies' interests is unremarkable: Virtually every company in America could be benefited or harmed by actions the government might take. And the discussion of the particular matters cited by the district court—potential reforms to Section 230 and potential antitrust investigations of social-media companies—is longstanding and bipartisan. *See, e.g.*, Connor O'Brien & Cristiano Lima, *Trump Threatens to Veto Defense Bill Over Social Media Rule*, Politico (Dec. 1, 2020), https://perma.cc/4LWU-DMZ6; Nick Statt, *Trump Says Amazon, Facebook, and Google Represent A 'Very Antitrust Situation,'* The Verge (Aug. 30, 2018), https://perma.cc/5Y8A-QKBX. General statements about potential actions that might affect companies do not transform every request that a government actor makes into a coercive threat.

Such statements were all the district court identified. Although the court asserted that at a 2021 briefing the White House Press Secretary "publicly reminded Facebook and other social-media platforms of the threat of 'legal consequences' if they [did] not censor misinformation more aggressively," ROA.26476, the Press Secretary made no such threat; the phrase "legal consequences" does not even appear in the transcript of that briefing. *See* ROA.23764-23791. All the Press Secretary did was mention concerns about misinformation among a series of other topics related to social media, including

the President's support for "'better privacy protections and a robust anti-trust program,'" ROA.26476.  To the extent the Press Secretary addressed whether the government should dictate content-moderation policies, she repeatedly emphasized that it should not—that content-moderation decisions were the prerogative of the platforms themselves.  ROA.23778; *see also, e.g.*, ROA.22747 (July 16, 2021 briefing) (platforms themselves, as "private-sector compan[ies]," "make[] decisions about what information" they should disseminate).

The district court similarly cited no evidence that any defendant threatened a company with amendment of Section 230—a legislative change that the Executive Branch could not unilaterally make in any event—if it failed to take particular actions. The court merely referred to general discussions of possible changes to Section 230, which provides immunity in certain circumstances for platforms' content-moderation decisions.  ROA.26478; ROA.26480; *see* 47 U.S.C. § 230.  It is unremarkable that such discussions related to the platforms' accountability for their content-moderation decisions, because that is the entire subject of Section 230.

As noted above (at 29), moreover, platforms routinely declined to moderate content flagged by the government that they regarded as consistent with their policies.  Indeed, the district court cited testimony that platforms rejected *half* of the FBI's suggestions.  ROA.26561.  The court did not explain why an allegedly coerced party could feel free to ignore the alleged coercion half the time, or why, if the government was coercing platforms, there is no evidence it took any adverse action in retaliation when platforms

declined to act as the government supposedly wanted. Nor did the court explain how, if the government coerced Twitter into adopting and enforcing a policy against COVID-related misinformation, Twitter could have felt free to abandon that policy, *see supra* p. 5.

Rather than any pattern of threats backed by sanctions, the record reflects a back-and-forth in which the government and platforms often shared goals and worked together, sometimes disagreed, and occasionally became frustrated with one another, as all sides of the conversation articulated their own interests and attempted to act in accordance with those interests. That is the sort of interaction between the government and private entities that has occurred since the dawn of the Republic, the constitutionality of which has never previously been subject to serious question. *See supra* p. 20.

4.     The district court's assessment of each defendant agency reflected both the flaws of its overall approach and the particular errors discussed below.

a.     *White House.* The district court's decision rested largely on the premise that intense pressure from the White House caused the platforms to surrender their independent judgment and accede to the White House's preferred content-moderation policies. That claim fails in every respect. As an initial matter, plaintiffs complain of widespread content moderation before President Biden took office and before any of the White House actions challenged here took place. *See, e.g.*, ROA.1187-1213 (plaintiffs' declarations). Those actions obviously could not be the product of White House

pressure. And even as to later actions, it is illogical to attribute to White House pressure the same sorts of actions that were taken before the alleged pressure campaign began.

The district court identified various statements from White House officials as "examples of coercion." ROA.26551-26553. But even as lifted out of context in the district court's opinion, none of those statements constitutes a request for action backed by a threat of sanctions or a comparably compelling incentive. Some were simply questions about how the platforms were applying their content-moderation policies (such as, "how much content is being demoted, and how effective are you at mitigating reach and how quickly?"). Others (such as recommending that platforms "create a robust enforcement strategy") generally encouraged platforms to address misinformation without suggesting, much less dictating, particular policies or the application of those policies to particular posts. Others simply informed companies of the government's view that content on their platforms was causing harm (for example, "We are gravely concerned that your service is one of the top drivers of vaccine hesitancy[.]").

The district court also identified as problematic the fact that White House employees "'flagged'" certain posts that they "considered misinformation," that Twitter gave the White House access to "a 'Partner Support Portal'" for flagging posts, and that White House employees communicated with platforms about their shared objective of mitigating misinformation and its harms. ROA.26554. But none of that is constitutionally problematic. As discussed above (at 25-26), there is nothing wrong with the government's "flagging" for platforms—that is, calling to their attention—content that

in the government's view may violate the platforms' own content-moderation policies, provided that the requests are not backed by threats of sanctions or comparably compelling incentives.

It is also wholly appropriate for the White House (or other parts of the government) to speak with platforms when they take issue with the accuracy of content that affects their interests, just as it is appropriate for the White House press office (like the public-relations staff of any private corporation) to call a newspaper or television network to question the accuracy of a story. Absent a threat of sanctions for noncompliance or a comparably compelling incentive—and there is no evidence of either here—the White House can, for example, permissibly call a social-media company's attention to a doctored video "mak[ing] it sound as if the First Lady were profanely heckling children," ROA.26479, or "dispute a note added by Twitter to one of President Biden's tweets about gas prices," ROA.26481. It would be extraordinary to suggest that the government is uniquely powerless to call a platform's attention to issues of this kind.

Nor is it constitutionally problematic for the government to discuss with social-media platforms the government's views on appropriate content-moderation practices, provided that the platforms remain free to determine their own practices. As discussed above (at 20), it is routine for the President and other senior government officials to encourage Americans, and in particular American companies, to act in ways that the government believes will advance the public good.

The district court's characterization of the facts related to the White House defendants was as mistaken as its understanding of the law. In many places—too numerous to catalog exhaustively—the record simply does not support the court's assertions. For example, the court asserted that the White House "[a]ccused Facebook of causing 'political violence' by failing to censor false COVID-19 claims." ROA.26551. It did not. The email in question—from now-former Digital Director Rob Flaherty to various Facebook officials—referred to "political violence" only in a sentence that read: "[E]specially given the [Wall Street] Journal's reporting on your internal work on political violence spurred by Facebook groups, I am also curious about the new rules as part of the 'overhaul.'" ROA.9360. And the *Wall Street Journal* article mentioned in the reference to "political violence" did not concern COVID-related misinformation. It described how Facebook was reexamining its content-moderation policies for Facebook Groups after finding that "Groups became a vector for the rabid partisanship and even calls for violence that inflamed the country after the [2020] election." Jeff Horwitz, *Facebook Tightens Control of 'Groups,'* Wall St. J., Feb. 1, 2021, at A1.

To take another example, the district court cited as evidence of coercion a harshly worded email from the then-White House Digital Director to Facebook, demanding "'an answer'" by "'today'" on "'what happened here,'" ROA.26552. But the email had nothing to do with Facebook's moderation of misinformation. It came in response to a Facebook employee's explanation that "an internal technical issue" had been "affecting follower growth" on the President's own official Instagram account.

ROA.9409-9410.  That fact is not apparent from the district court's opinion, which quoted the email (without describing its topic) as evidence of "tens[ion] between the White House and Facebook" in the wake of White House "critici[sm]" over "Facebook's efforts to" restrict content from the so-called "'Disinformation Dozen.'" ROA.26476-26477.

The district court equally misconstrued the record when it saw something nefarious in Facebook's informing the White House that it was reducing the distribution of content that "did not violate Facebook's policy."  ROA.26465.  Facebook explained in the cited email that content that "does not violate [its] misinformation policies," and thus does "not qualify for removal," may nonetheless be subject to other measures to "reduce its distribution."  ROA.9360.  As the government explained in detail to the district court, that practice reflects longstanding Facebook policies, not special rules devised at the government's behest.  *See* ROA.21646-21650 (citing ROA.22566-22567 (2018 Facebook presentation about efforts to reduce distribution of content that comes close to, but does not cross, the line of what policies prohibit)).  The district court ignored this evidence, as it did nearly all of the voluminous evidence proffered by the government, much of which was unrefuted.  *See generally* ROA.24383-25105 (proposed findings of fact and responses to plaintiffs' proposed findings, with record citations).

b.    *Office of the Surgeon General.*  The district court's analysis as to the Office of the Surgeon General was equally faulty.

- 36 -

As with the White House, the district court failed to identify any threat (or comparably compelling incentive) made by the Office. The Surgeon General has no regulatory authority; his work to provide the public with accurate health information is purely informational and persuasive. ROA.22976. And the district court cited no evidence that any government actor stated or implied that failure to accede to the Surgeon General's wishes would result in the exercise of some other (unspecified) entity's regulatory authority.

The district court's examples of supposed coercion (ROA.26556) underscore the point. The Surgeon General's "Health Advisory on Misinformation," as its name suggests, merely offered "recommendations" for platforms to address harms caused by online misinformation, without purporting to impose obligations or dictate policies. ROA.15271-15286. The court identified no basis to conclude that any calls or meetings concerning the Advisory were any more coercive than the Advisory itself. And the Surgeon General's Request for Information simply solicited "input from interested parties on the impact and prevalence of health misinformation in the digital information environment during the COVID-19 pandemic." ROA.15612; *see* ROA.15612-15614. Like the Advisory, it imposed no obligations; responses were purely voluntary.

The district court's analysis appears largely to have been driven by the view that government officials engage in impermissible "content and/or viewpoint discrimination" when they take positions on such topics as "whether COVID-19 vaccines worked" or were "safe." ROA.26556. But as discussed above, that understanding of

the First Amendment is profoundly mistaken. If the government could not communicate its views, about matters of policy or about what it understands to be empirically accurate facts, "government would not work." *Walker*, 576 U.S. at 207.

     c.    *Centers for Disease Control and Prevention.* The district court did not determine that the CDC defendants coerced platforms—only that their actions "likely resulted in 'significant encouragement' by the government to suppress free speech." ROA.26559. The court's reasoning underscores the absurd consequences of its interpretation of "significant encouragement." The court described meetings and other communications that all took essentially the same form: The CDC provided platforms, often in response to inquiries from the platforms, with scientific analysis of particular claims circulating on social media. *See* ROA.26497-26503. For example, the CDC communicated its view that it was false to assert that "COVID-19 vaccines cause acquired immunodeficiency syndrome (AIDS)." ROA.26499. It is astonishing to assert that an expert government agency violated the Constitution by stating that this claim was false, or that private entities became state actors subject to the First Amendment simply because they found the agency's views persuasive.

     d.    *National Institute of Allergy and Infectious Diseases (NIAID).* The district court's analysis of the NIAID defendants is equally flawed. The court did not cite any interactions between NIAID and social-media companies, instead relying on NIAID's public statements about scientific matters as evidence of significant coercion. That

analysis underscores the court's general failure to distinguish between coercion and persuasion.

The court rightly recognized that "much of what the NIAID Defendants did was government speech." ROA.26560. The sole basis for its conclusion that the NIAID defendants likely violated the Constitution was its perception that their "motivation" was "a 'take down' of protected free speech." ROA.26560. That is wrong on its own terms: The government does not violate the Constitution by expressing its opinion on a matter of public concern, regardless of its motivation.

To make matters worse, the record does not support the district court's factual conclusion. The court based that conclusion on a single piece of evidence: an email from Francis Collins (then-Director of the National Institutes of Health) to, among others, Anthony Fauci (then-Director of NIAID), stating that "[t]here need[ed] to be a quick and devastating published take down of" the "premises" of the Great Barrington Declaration, ROA.12255—a document critical of "lockdown policies," ROA.26458. As the email on its face makes clear, though, Dr. Collins was not suggesting that *social-media platforms* should "take down" posts about the Declaration; he was suggesting that scientists should issue a "*published* take down of" the Declaration's "premises"—that is, a published refutation of its premises. ROA.12255 (emphasis added). Although the court at times correctly quoted the email, *see, e.g.*, ROA.26508, in the discussion accompanying its conclusion that NIAID had likely violated the Constitution, it omitted the word "published," without ellipsis, ROA.26560.

e.   *Federal Bureau of Investigation.*   The district court's analysis of the FBI re-

flects similar errors.  Having identified no coercion, the court based its finding of "'sig-

nificant encouragement,'" ROA.26562, chiefly on two facts, neither of which remotely

sufficed.  First, the FBI's "warn[ing]" to social-media companies "to be alert for 'hack

and dump' or 'hack and leak' operations," ROA.26515—that is, operations in which

malign actors "hack[]" into servers and "leak[] or dump[]" the stolen information "on

the Internet," ROA.10162—simply stated the FBI's expert assessment of risks in the

world.  Second, the FBI's "refus[al] to comment," ROA.26517, on the current status of

any law-enforcement investigation of Hunter Biden, *see* ROA.10363-10364 (cited in

ROA.26517 n.412)—in the wake of a *New York Post* story purporting to disclose emails

between Hunter Biden and a Ukrainian executive, Emma-Jo Morris & Gabrielle

Fonrouge, *Smoking-Gun Email Reveals How Hunter Biden Introduced Ukrainian Businessman

to VP Dad*, N.Y. Post (Oct. 14, 2020), https://perma.cc/9UPS-FBTV—did not consti-

tute "deception," ROA.26562, even if there were any basis for the district court's view

that "deception" would be "another form of coercion," ROA.26562.  The FBI did not

violate the First Amendment by refusing to comment on a pending investigation.

f.   *Cybersecurity and Infrastructure Security Agency (CISA).*   The district court as-

serted, without citation, that "the evidence shows that the CISA Defendants met with

social-media companies to both inform and pressure them to censor content protected

by the First Amendment."  ROA.26564.  Neither in that analysis nor elsewhere in the

opinion, however, did the district court cite any evidence that CISA "pressure[d]" any-one. Its lengthy recitation of CISA-related facts described only efforts to flag poten-tially problematic posts for social-media companies, as well as election-security meet-ings at which general efforts to stem the tide of disinformation were discussed. ROA.26522-26532. Flagging posts for platforms' consideration is not coercion. *See supra* pp. 25-26; *O'Handley*, 62 F.4th at 1160. Plaintiffs' contrary contention is difficult to square with the fact that officials in both plaintiff States submitted reports of elec-tion-related disinformation that CISA conveyed to social-media companies. ROA.23217-23227.

The district court's extensive discussion of the asserted connection between CISA and two private entities—the Election Integrity Partnership and the Virality Pro-ject—is therefore beside the point. Those private entities simply engaged in the same sort of flagging discussed above. That conduct is *a fortiori* unproblematic when under-taken by private entities, even if those entities are in some loose sense associated or coordinating with the government. And the lack of coercion is particularly clear given the district court's finding that "social-media platforms took action on" just "35% of the [content] reported to them" by the Election Integrity Partnership. ROA.26535.

The district court's conclusion that plaintiffs are likely to show "the CISA De-fendants believe they had a mandate to control the process of acquiring knowledge," ROA.26564, is equally groundless. The court based that extraordinary assertion on the CISA Director's comment that the agency's mandate to protect the Nation's "critical

infrastructure" extended to its "cognitive infrastructure," *see* ROA.14553-14555.  Read in context, the Director's comment plainly meant that she regarded efforts by malign actors to influence the views of the American public through the dissemination of misinformation as a threat to national security.  Her comment cannot plausibly be read to suggest that CISA believes it has "a mandate to control the process of acquiring knowledge," ROA.26564.

g.     *State Department*.  For similar reasons, the district court's finding of "significant encouragement" by the State Department, ROA.26567-26568, was mistaken.  The court's reasoning appears to rest largely on the theory that the State Department coordinated with the Election Integrity Partnership and the Virality Project—conduct that, as discussed above, was unproblematic to the extent it occurred at all.  Nor was there anything constitutionally problematic about communications between platforms and the State Department's Global Engagement Center; as noted, agencies may permissibly share information with private parties.

## II.    The District Court Abused Its Discretion In Applying The Equitable Factors

Independent of the merits, the district court abused its equitable discretion in several respects.

### A.     The Injunction Is Unnecessary To Prevent Irreparable Harm To Plaintiffs

Although First Amendment injuries may be irreparable when they occur, *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion), the "invocation of the First

Amendment cannot substitute for the presence of an imminent, non-speculative irreparable injury," *Google, Inc. v. Hood*, 822 F.3d 212, 228 (5th Cir. 2016). "A preliminary injunction is not appropriate … 'unless the party seeking it can demonstrate'" what the Supreme Court found in *Elrod* itself: "that First Amendment interests are either threatened or in fact being impaired at the time relief is sought." *Id.* at 227-228 (quotation marks omitted).

The district court failed to substantiate any finding that plaintiffs face ongoing or imminent injury. As noted above (at 16-17), plaintiffs largely assert harm from content-moderation actions taken by social-media platforms based on policies that predated most of the government actions at issue here, and all three plaintiffs who suggested that their social-media accounts had been suspended now appear to have active accounts. And in light of the new phase of the national response to the pandemic—including the termination of the national and public-health emergencies—many of the government practices that plaintiffs identify as having allegedly transformed platforms' private content-moderation decisions into government action have now changed. *See, e.g.*, ROA.22979 (Surgeon General's Office); ROA.23094 (CDC); ROA.23197 (CISA); ROA.23199 (CISA).

The district court's discussion of irreparable harm focused on whether the government's changed practices had mooted this dispute (or whether the voluntary-cessation exception to mootness applied) and on two cases addressing Article III standing. ROA.26594-26596. But the government has not argued that this case is moot. And

even if the district court were correct that plaintiffs' fear of future injury is "not imaginary or speculative," ROA.26596—*i.e.*, that plaintiffs have injuries sufficient for standing—that would not satisfy the more stringent irreparable-harm standard for a preliminary injunction, which requires a *likelihood* of future injury, rather than merely a non-speculative risk of one, *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Otherwise, plaintiffs could satisfy the irreparable-harm element of the preliminary-injunction standard in *any* live case raising a claim for forward-looking relief.

The court compounded these errors by relying on "allegations" in "[t]he Complaint (and its amendments)," ROA.26597-26598, rather than requiring plaintiffs to make the evidentiary showing required at the preliminary-injunction stage, *see PCI Transp., Inc. v. Fort Worth & W. R.R. Co.*, 418 F.3d 535, 546 (5th Cir. 2005). And even considering those allegations, the court identified no evidence to support a finding that plaintiffs are likely to face irreparable harm in the absence of an injunction, nor did it render such a finding. Instead, the court merely opined that, although "some of the alleged conduct" has "stop[ped]" in light of the new phase of the national response to the pandemic, ROA.26594, the government would "likely" continue to seek to influence social-media companies on other subjects. ROA.26597-26598. That is not a finding that *these plaintiffs* are likely to suffer harm: There is no reason to believe that plaintiffs face a threat of imminent injury from any effort the government might hypothetically make to address social-media content concerning "gas prices," "climate change," "gender," or "abortion," ROA.26597-26598.

## B.      The Injunction Sweeps More Broadly Than Necessary To Remedy Plaintiffs' Asserted Injuries

Even if plaintiffs had demonstrated a need for some equitable relief, the injunction the district court issued was plainly unnecessary to remedy plaintiffs' harms, and the court never even tried to demonstrate otherwise.

Because a federal court's "constitutionally prescribed role is to vindicate the individual rights of the people appearing before it," "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill*, 138 S. Ct. at 1933-1934. Principles of equity reinforce that jurisdictional limitation: Injunctive relief may "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see Texas*, 143 S. Ct. at 1985-1986 (Gorsuch, J., concurring in the judgment).

The injunction here flouts these principles. Indeed, the injunction goes well beyond remedying even plaintiffs' *asserted* harms. Although its terms are confusing and vague, it appears to prohibit the government from seeking to persuade social-media companies to moderate a wide range of content, not just content in which plaintiffs assert an interest. It applies to all social-media platforms, not just those on which the individual plaintiffs have accounts. It indiscriminately targets defendant agencies and their employees; for example, it covers the entire Department of Homeland Security (DHS) and Department of Health and Human Services (HHS) even though the court found a constitutional violation only with respect to one DHS component (CISA) and

purported to deny the injunction as to the Food and Drug Administration within HHS, ROA.26615.

Even if an individual plaintiff had proven that past government wrongdoing had caused him or her to suffer concrete harm, that could not come close to justifying the district court's installing itself as the arbiter of a wide swath of government communications. The States' involvement as plaintiffs does nothing more to justify the injunction; as discussed above, States cannot bring *parens patriae* claims against the federal government, and the district court's contrary view highlights the flaws in its conception of its institutional role. The district court's abuse of discretion is compounded by the fact that much of what the government supposedly did wrong—pressuring non-party social-media companies to restrict content posted by non-parties—had no evident connection to plaintiffs at all.

The district court's 155-page opinion contained not a word of justification for the breathtaking scope of relief. Even in response to the government's motion for a stay pending appeal, the district court's only comment on the injunction's scope was to suggest that including entire agencies was appropriate, even if some subcomponents had nothing to do with the challenged conduct, because agencies could otherwise "simply instruct a sub-agency to perform the prohibited acts and avoid the consequences of an injunction." ROA.26658. It is not possible for this Court to defer to the district court's exercise of its equitable discretion absent an explanation of the court's reasoning. *See, e.g., Geier v. Sundquist*, 372 F.3d 784, 792 (6th Cir. 2004) ("Absent some

indication of how the district court's discretion was exercised, we have no way of knowing whether that discretion was abused."). In any event, there is nothing the district court could have said to justify an injunction so manifestly disconnected from any harm (much less any forward-looking harm) to plaintiffs.

At a minimum, therefore, this Court should vacate the injunction to the extent it restricts government communications not specifically targeted to particular content posted by plaintiffs themselves. Such an injunction—which would leave the government free to communicate with platforms about specific posts by others or about any general category of content—would avoid burdening a vast universe of government actions lacking any connection to plaintiffs in particular.

### C. The Injunction Will Significantly Harm The Government And The Public Interest

Finally, the district court failed to justify, and barely attempted to explain, its apparent conclusion that "the threatened injury" to plaintiffs "outweighs any harm that" the injunction will cause to the government and to the public interest, *Atchafalaya Basinkeeper*, 894 F.3d at 696; *see Nken v. Holder*, 556 U.S. 418, 435 (2009) (harms to government and public "merge").

As discussed above, one of the central constitutional duties and prerogatives of the President and his senior officials is to speak about harms in the world and ways of addressing those harms, and Executive Branch officials must have latitude to do so forcefully at times. But the injunction subjects many such communications to a risk of

contempt. Consider, for example, a hypothetical statement from the White House podium that the President denounces misinformation about a recent natural disaster circulating online and urges platforms not to disseminate those falsehoods. In opposing a stay pending appeal, plaintiffs were admirably forthright in explaining that they would regard such a statement as violating the injunction. Opp. 24. But the prospect of contempt for such a statement flies in the face of a long history of presidential attempts to persuade members of the American public, including American companies, to act in the national interest. *See supra* p. 20. Even the potential for the injunction to be construed as limiting the communication of the President's views regarding issues of public consequence—and for a federal district court to superintend those communications—raises grave separation-of-powers concerns.

The record supplies numerous examples, moreover, of critically important government functions that the injunction could be read to prohibit. In the public-health area, for example, it would be typical for the Surgeon General to express publicly the view that "social media companies should label online advertisements for cigarettes and alcohol in order to discourage youth addiction" or should "tak[e] action on suicide prevention, including by curtailing features that feed suicide-promoting content to persons struggling with suicidal ideation." ROA.22981. Such statements have not a whiff of coercion. But they could be regarded as "urging" or "encouraging … social-media companies to change their guidelines for removing, deleting, suppressing, or reducing content containing protected free speech," ROA.26613. And if a social-media company

is persuaded by the Surgeon General's statements, the statements could be regarded as "inducing," ROA.26613, any content moderation that follows.

Or consider CISA's practice of "publish[ing] accurate information" on a host of topics, such as a "Rumor vs. Reality" website on matters of election security, ROA.23967. That website, which links to resources from the nonpartisan National Association of Secretaries of State and National Association of State Election Directors, provides information on such subjects as voting and vote-counting procedures. CISA, *Election Security Rumor vs. Reality*, https://perma.cc/36FV-AFFL. There is nothing wrong with the government's serving as a trusted source of information, even if (and perhaps especially if) platforms that choose to adopt a policy against the dissemination of election-related falsehoods might look to the information on CISA's website for assistance in identifying such falsehoods. Yet, if platforms adopt such policies for removing falsehoods, the agencies' public identification of truths and falsehoods could be regarded as "encouraging" or "inducing" the suppression of the latter, ROA.26613-26614.

Such communications do not obviously fall within any of the carveouts listed in the injunction. One such carveout covers "informing social-media companies of postings intending to mislead voters about voting requirements and procedures," ROA.26615, but CISA's "Rumor vs. Reality" website does not call attention to specific "postings," and it is not limited to information about "voting requirements and proce-

dures." Another carveout is for "exercising permissible public government speech promoting government policies or views on matters of public concern," ROA.26615—but the district court evidently did not regard government agencies' identification of truthful or false claims as "permissible public government speech," because it castigated such efforts as "similar to" those of "an Orwellian 'Ministry of Truth,'" ROA.26608.

Even when a district court has concluded that plaintiffs are likely to establish a constitutional violation, it cannot enjoin governmental conduct without considering the injunction's countervailing harms to the public interest. *Winter*, 555 U.S. at 32; *see Defense Distributed v. U.S. Dep't of State*, 838 F.3d 451 (5th Cir. 2016) (affirming denial of a preliminary injunction based on balance of harms). The court abused its discretion by failing to conduct that balancing, and it would equally have abused its discretion had it determined that the profound harms this injunction will cause to the government and the public interest would be outweighed by its benefit to plaintiffs.

## III.   The Injunction Lacks The Required Specificity

Finally, the injunction fails to satisfy Federal Rule of Civil Procedure 65(d)'s requirement that an injunctive order "state its terms specifically" and "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Rule 65(d) "means 'that an ordinary person reading the court's order should be able to ascertain from the document itself exactly what conduct is proscribed.'" *Louisiana v. Biden*, 45 F.4th 841, 846 (5th Cir. 2022).

This injunction fails the specificity test in numerous respects. To be sufficiently precise, an injunction cannot "contain broad generalities." *Scott v. Schedler*, 826 F.3d 207, 213 (5th Cir. 2016) (per curiam). But generalities abound here. Start with the injunction's broad and overlapping prohibitions, which are replete with ambiguous terms. Several of the provisions, for example, forbid the government from "urging, encouraging, pressuring, or inducing" the moderation of speech. What if—as occurred here—a platform adopts a policy of removing false claims related to the COVID-19 vaccines, and then asks the CDC whether a particular claim is false. Would an affirmative response constitute "urging, encouraging, pressuring, or inducing" the moderation of that claim, even if it says nothing to encourage the platform to take action? It would be impossible for a CDC official to know the answer.

The district court's attempt to save the injunction from overbreadth through a series of exemptions only compounds the injunction's vagueness. For example, the district court stated that the injunction does not prevent the government from "exercising permissible public government speech promoting government policies or views on matters of public concern." ROA.26615. But this whole case is about what constitutes permissible government speech and in what circumstances such speech crosses the line into coercion of private actors. Stating that the government is entitled to engage in "permissible" speech provides no guidance about which specific acts are prohibited and which are "permissible."

Nor does the carveout for "informing social-media companies of postings involving criminal activity or criminal conspiracies," ROA.26614, which leaves unanswered whether a law-enforcement agency could inform a platform about a post that appears to rise to the level of "criminal" conduct before having completed an investigation that would support a definitive conclusion to that effect.

Nor does the carveout for "informing social-media companies of threats" to "the public safety or security of the United States," ROA.26615. The CDC would likely consider vaccine-related misinformation a "threat[]" to "public safety," but the district court's opinion strongly suggests that it would not. CDC officials cannot be made to guess about how to avoid contempt. *See John Doe #1 v. Veneman*, 380 F.3d 807, 819-820 (5th Cir. 2004) (reversing as vague a portion of an injunction that prohibited disclosure of "personal information" but left defendants to determine what combination of information would constitute "personal information").

The carveout for communications regarding the moderation of content that is not "protected … by the Free Speech Clause," ROA.26615, as construed by the Supreme Court, ROA.26660, is equally ambiguous. Just recently, for example, the Justices of the Supreme Court issued four separate opinions about whether certain types of threats—in that case, threats communicated through social media—fall beyond constitutional protection. *Counterman v. Colorado*, 143 S. Ct. 2106 (2023). On the day before *Counterman* was decided, a law-enforcement officer could not possibly have known whether this injunction left her free to report those threats to the platform in question.

The district court further muddied the waters through its opinion. Suppose, for example, that the CDC wishes to refute a false statement, spreading on influential social-media accounts, that the measles vaccine causes cancer. It might seem self-evident that, at a minimum, a public statement refuting the falsehood on the merits would constitute "permissible public government speech" and thus would not violate the district court's injunction. But the district court's opinion faulted the NIAID defendants for making exactly that sort of statement. *See supra* pp. 38-39. If an on-the-merits response to a social-media falsehood is not "permissible public government speech," then there is no way for a defendant subject to the injunction to have any idea what the district court meant by that term.

Or consider the carveout for communications "informing social-media companies of postings intending to mislead voters about voting requirements and procedures." ROA.26615. One would surely think that carveout allowed CISA to convey to platforms reports that it had received from state and local election officials, flagging "disinformation aimed at their jurisdiction[s]," ROA.26522. Yet in its opinion, the district court opined that CISA acted unconstitutionally in doing just that. An official subject to the injunction could not possibly reconcile those statements.

Rule 65(d)'s demand for specificity is "no mere technical requirement[]"; it serves "to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be

understood." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) (per curiam).  "Since an injunctive order prohibits conduct under threat of judicial punishment, basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed." *Id.* Those concerns are heightened in the context of an injunction against the government, which raises the prospect of the Judicial Branch imposing punishment on the Executive.  They are an independent reason this injunction is invalid.

## CONCLUSION

The preliminary injunction should be reversed.

Respectfully submitted,

BRIAN M. BOYNTON
   *Principal Deputy Assistant Attorney*
     *General*

BRANDON BONAPARTE BROWN
   *United States Attorney*

DANIEL TENNY

 /s/ Daniel Winik
DANIEL WINIK
SIMON BREWER
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7245*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *(202) 305-8849*
   *Daniel.L.Winik@usdoj.gov*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,990 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in 14-point Garamond, a proportionally spaced typeface.

*/s/ Daniel Winik*
Daniel Winik