No. 23-30445

# In the United States Court of Appeals for the Fifth Circuit

STATE OF MISSOURI; STATE OF LOUISIANA;
AARON KHERIATY; MARTIN KULLDORFF; JIM HOFT;
JAYANTA BHATTACHARYA; JILL HINES,
*Plaintiffs-Appellees*,

*v.*

JOSEPH R. BIDEN, JR.; VIVEK H. MURTHY;
XAVIER BECERRA; DEPARTMENT OF HEALTH &
HUMAN SERVICES; ANTHONY FAUCI, *et al.*,
*Defendants-Appellants*,

On Appeal from the United States District Court
for the Western District of Louisiana
No. 3:22-cv-1213 (Hon. Terry A. Doughty)

**BRIEF OF *AMICI CURIAE* STANFORD UNIVERSITY,
ALEX STAMOS, AND RENÉE DIRESTA
IN SUPPORT OF APPELLANTS**

JOHN B. BELLINGER III
ELISABETH S. THEODORE
R. STANTON JONES
STEPHEN K. WIRTH
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
(202) 942-5000
john.bellinger@arnoldporter.com

## SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS

Pursuant to Fifth Circuit Rule 29.2, the undersigned counsel of record for *amici curiae* Leland Stanford Junior University, Alex Stamos, and Renée DiResta certifies that the following listed persons and entities, in addition to those listed in Appellants' and Appellees' Certificates of Interested Persons, have an interest in this brief. These representations are made in order that judges of this Court may evaluate possible disqualification or recusal.

***Parent of Amici Curiae***: *Amicus* Leland Stanford Junior University is a private, nonprofit research university. It has no parent corporation, nor is there any publicly held company that owns 10% of its stock.

*Amici* Alex Stamos and Renée DiResta are natural persons.

***Counsel for Amici Curiae***: John B. Bellinger III, Elisabeth S. Theodore, R. Stanton Jones, and Stephen K. Wirth.

*/s/ John B. Bellinger III*
John B. Bellinger III

*Counsel for Amici Curiae*

i

**TABLE OF CONTENTS**

SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS ..........i

TABLE OF AUTHORITIES .................................................................. iii

INTERESTS OF *AMICI CURIAE* ................................................... 1

INTRODUCTION ............................................................................... 3

BACKGROUND .................................................................................. 5

ARGUMENT ..................................................................................... 11

    I.    The District Court's Injunction Burdens *Amici*'s First
         Amendment Rights .............................................................. 11

    II.   The District Court's Factual Findings Concerning *Amici* Are
         Not Supported by the Record ............................................. 17

CONCLUSION .................................................................................. 29

CERTIFICATE OF SERVICE ........................................................ 30

CERTIFICATE OF COMPLIANCE ............................................... 31

# TABLE OF AUTHORITIES

**Cases**                                                                    Page(s)

*Barnes Found. v. Township of Lower Merion,*
    242 F.3d 151 (3d Cir. 2001) ..............................................................14

*Bernard v. Gulf Oil Co.,*
    619 F.2d 459 (5th Cir. 1980) ............................................................16

*Gulf Oil Co. v. Bernard,*
    452 U.S. 89 (1981) ............................................................................16

*Snyder v. Phelps,*
    562 U.S. 443 (2011) ..............................................................14, 15, 16

*Video Int'l Prod., Inc. v. Warner-Amex Cable Comm'ns, Inc.,*
    858 F.2d 1075 (5th Cir. 1988) ..........................................................14

*Wiggins v. Lowndes Cnty.,*
    363 F.3d 387 (5th Cir. 2004) ............................................................15

**Other Authorities**

Oxford English Dictionary ......................................................................22

Pursuant to Federal Rule of Appellate Procedure 29, Leland Stanford Junior University, Alex Stamos, and Renée DiResta respectfully submit this brief as *amici curiae* in support of Appellants. All parties have consented to this filing.[1]

## INTERESTS OF *AMICI CURIAE*

Leland Stanford Junior University (Stanford) is a private research university located in Stanford, California, that enrolls over 17,000 students in a broad array of undergraduate and graduate programs. Stanford is home to the Stanford Internet Observatory (SIO), a cross-disciplinary program that studies abuse in information technologies, especially potentially harmful information on social media. SIO was a founding member of the Election Integrity Partnership (EIP) and the Virality Project (VP), organizations that tracked and studied misinformation, disinformation, and rumors concerning U.S. elections and COVID-19 vaccines, respectively. SIO's director is Alex Stamos, and its research manager is Renée DiResta.

---

[1] No party's counsel authored this brief in whole or in part. Nor did any party or party's counsel, or any other person other than *amici curiae* or their counsel, contribute money that was intended to fund preparing or submitting this brief.

*Amici* were not named as defendants in this lawsuit, but assertions about their conduct appear throughout the underlying complaint, which alleges that *amici* conspired with federal officials to censor speech on social media. *Amici* also feature prominently in the district court's preliminary injunction decision below. The court found that SIO's, EIP's, and VP's "actions are relevant" to this lawsuit, despite not being parties, "because government agencies have chosen to associate, collaborate, and partner with these organizations." ROA.26568. And the district court enjoined the government from "collaborating, coordinating, partnering, switchboarding, and/or jointly working with the Election Integrity Partnership, the Virality Project, [or] the Stanford Internet Observatory … for the purpose of urging, encouraging, pressuring, or inducing in any manner removal, deletion, suppression, or reduction of content posted with social-media companies containing protected free speech." ROA.26613.

Moreover, *amici* have been named as defendants in a separate lawsuit brought by two of the plaintiffs here, Jill Hines and Jim Hoft, which is pending before the same district court. *See Hines v. Stamos*, No. 3:23-cv-571 (W.D. La.). That lawsuit seeks to hold *amici* liable for violating the plaintiffs' First and Fourteenth Amendment rights (notwithstanding the fact that *amici* are

not state actors), and it seeks to enjoin *amici* from communicating with the government and with social media platforms about mis- and disinformation on the Internet.

## INTRODUCTION

In participating in the Election Integrity Partnership and Virality Project, *amici* were primarily engaged in academic research concerning the spread of misinformation, disinformation, and rumors about U.S. elections and the COVID-19 vaccines on social media. But they also exercised their own right to speak about their research findings on these matters of great public concern. There is no question that the First Amendment protects *amici*'s right to collect data about, and to study, informational trends, and to alert the public, social media platforms, and government officials to their findings—including their view that particular posts on social media platforms are false or misleading or violate platform policies. There is likewise no disputing that the First Amendment protects *amici*'s right to make public policy recommendations to social media platforms and to government actors concerning how to address the challenges to our democracy and to public health presented by the spread of rumors, false narratives, and propaganda online. These are core rights—to

speech, to academic freedom, to petition—all protected by the First Amendment.

The district court ignored *amici*'s rights, instead repeatedly characterizing their speech as censorship. That is a remarkable inversion of the First Amendment, and it is fundamentally wrong. *Amici*—a private research university and two academics—have neither the legal nor practical ability to censor anyone's speech. They are not government actors, and they have no power to unilaterally change social media platforms' policies, to take down posts, or to suspend users. And even in the limited cases where *amici* recommended policy changes or identified instances of potentially violative content to platforms (just as other individuals do on a daily basis), the platforms always exercised ultimate decisionmaking authority.

Beyond that, the district court's findings of censorship—and its injunction against the federal government defendants—rest on numerous factual errors about basic details of *amici*'s work and *amici*'s relationships with the government and social media platforms. The court's findings are not merely erroneous but fundamentally undermine the decision below. The preliminary injunction should be reversed.

## BACKGROUND

Founded at Stanford in 2019, the Stanford Internet Observatory (SIO) is a non-partisan, cross-disciplinary program of research, teaching, and policy engagement that studies abuse in current information technologies, with a focus on potentially harmful information on social media. Under the program direction of Alex Stamos and research manager Renée DiResta, SIO was created to learn about the abuse of the Internet in real time, to develop the premier curriculum on trust and safety, and to translate research discoveries into training and policy innovations for the public good. SIO studies and publishes research on, among other subjects, the prevalence of online child sexual abuse, promotion of self-harm, and influence campaigns by foreign state and non-state actors.

In 2020, 2021, and 2022, SIO partnered with other academic and civic organizations to convene the Election Integrity Partnership (EIP) and Virality Project (VP). The primary purpose of these programs was to conduct academic research about informational trends on the Internet, specifically related to U.S. elections and the COVID-19 vaccines. These programs operated transparently and publicly, publishing blogposts, weekly briefings, academic

papers, and investigative reports related to election and vaccine misinformation, disinformation, rumors, and propaganda.

EIP was founded in 2020 as a non-partisan research project to document the most widespread online narratives about the 2020 election, to provide a basis for further academic research about online misinformation dynamics and responses, and to provide election officials with reports about what was happening online in their jurisdictions. EIP's analysis relating to the 2020 election was focused on demonstrable falsehoods about the time, place, and manner of voting; threats intended to deter voting; incitement to tamper with or disrupt election processes, such as through the impersonation of an election official; and efforts to delegitimize valid election results without evidence. For example, EIP analyzed false reports about poll closures, procedures for online voting, discarded ballots, and bomb threats. EIP did not study alleged falsehoods about specific candidates, parties, or political topics.

VP was established in 2021 for the primary purpose of studying the most widespread narratives regarding the effectiveness and safety of the COVID-19 vaccines. VP collected data between February and August 2021, during the initial rollout of the COVID-19 vaccine. VP's work focused on tracking narratives related to the COVID-19 vaccines' safety, efficacy and necessity, and

development and distribution, as well as conspiracy theories surrounding the vaccines. VP's goal was to facilitate awareness for public health officials and medical professionals seeking to communicate accurate information to the public in a way that was responsive to online conversations.

EIP and VP were expressly non-partisan; and neither EIP nor VP received any government funding for their activities involving the 2020 election or the COVID-19 vaccines. EIP cooperated with the Elections Infrastructure Information Sharing & Analysis Center (EI-ISAC), a non-partisan nonprofit organization that worked with state and local election officials from both major political parties. And EIP's final report on the 2020 election explained how "partisans on both sides" spread the "popular misinformation narrative[]" that "the election had been 'stolen' before it even took place." ROA.13726. Although EIP collected more instances of mis- and disinformation from right-leaning social-media accounts, especially claims that the election was rigged or stolen (*see* ROA.13863-81), its final report also documented instances of "misinformation originating and spreading almost solely via left-leaning accounts" (ROA.13862). *See, e.g.*, ROA.13726, 13730-31, 13749-50, 13866, 13870-71. Likewise, VP communicated its findings in public blogposts and reports, which were made available to federal, state, and local public health officials without

regard to politics or party. And VP documented vaccine-related narratives from across the political spectrum. ROA.13973, 14004, 14032-33. Both projects were academic research projects, not political advocacy projects.

EIP and VP instituted numerous safeguards to ensure that their work was carried out according to the highest academic standards and in an unbiased manner so that their research findings would be valid and useful. Student researchers received extensive training on how to apply objective criteria for evaluating claims or narratives and were clearly instructed that partisan political issues or candidates were outside the scope of the projects. EIP and VP also used recognized academic techniques to minimize potential researcher-bias, including applying multiple tiers of analyst review and comparing results of different student analysts to ensure reliability.

EIP and VP used an internal ticketing system to identify and analyze potential instances of false information. EIP tickets were primarily created by undergraduate students at Stanford and the University of Washington, but certain external organizations, including EI-ISAC, could submit potential mis- and disinformation to EIP for review. ROA.13687-94, 13704. No government entity submitted EIP tickets involving or suggesting censorship of purely domestic speech; the State Department's Global Engagement Center submitted

a small number of tickets involving suspected foreign misinformation. *See* ROA.13718. VP tickets functioned similarly, but were created exclusively internally; no outside organization or government entity created tickets. *See* ROA.13985-87. Both EIP and VP tickets could be shared externally—including with social media platforms or with groups like EI-ISAC (in EIP's case)—by "tagging" the outside organization in the ticket (thereby sharing public information on the ticket with the tagged organization). ROA.13695, 13703, 13987.

EIP and VP did not censor or target anyone's speech. The vast majority of EIP's and VP's work consisted of researching and analyzing online information and publishing interim reports and a final report about this research. In limited cases, EIP and VP escalated some instances of potentially violative content to the platforms, so that the platforms could take appropriate action according to their own policies. But the social media platforms were the ultimate decisionmakers. EIP and VP had no power to change platforms' policies, take down posts, or suspend users.

Of the 639 tickets in EIP's final dataset, "363 tickets tagged an external partner organization to either report the content, provide situational awareness, or suggest a possible need for fact-checking or a counter-narrative."

ROA.13713. When tickets tagged a social media platform, they "contained a list of URLs containing the potentially violative content being spread—for example, the URL for a Facebook post or YouTube video." ROA.13715. "[P]latforms took action on 35% of URLs that [EIP] reported to them. 21% of URLs were labeled, 13% were removed, and 1% were soft blocked. No action was taken on 65%." ROA.13716. And even when the platforms did take some action, they most often simply affixed labels to posts—like "Get the facts about mail-in ballots," or "Learn how voting by mail is safe and secure"—with links to trusted sources of information. ROA.13893.

Likewise, only a small number of VP tickets were ever flagged to any platform. Of the 911 tickets in VP's final dataset, only "174 were referred to platforms for potential action." ROA.13987. This process enabled VP to give platforms "situational awareness of high-engagement material that appeared to be going viral, so that these partners could determine whether something might merit a rapid public or on-platform response (such as a label)." ROA.13987. In other words, EIP and VP merely alerted platforms to instances of viral claims that potentially violated their policies; the platforms always had the final say about if or how to respond.

## ARGUMENT

### I.    The District Court's Injunction Burdens *Amici*'s First Amendment Rights

The district court enjoined the government from "collaborating, coordinating, partnering, switchboarding, and/or jointly working with the Election Integrity Partnership, the Virality Project, [or] the Stanford Internet Observatory … for the purpose of urging, encouraging, pressuring, or inducing in any manner removal, deletion, suppression, or reduction of content posted with social-media companies containing protected free speech." ROA.26613. Although it binds only the named federal agencies and officials, the injunction—and the mistakes of law and fact that it is based on—significantly burdens *amici*'s ability to communicate with the government on matters of exceptional public concern and threatens *amici* with civil liability for their own constitutionally protected speech.

**A.** *Amici* are deeply committed to contributing to the public good and addressing today's most pressing societal challenges, including the integrity of U.S. elections and public-health responses to the COVID-19 pandemic. The ability of academic research programs like SIO, EIP, and VP to speak freely with government actors about their research findings is vital to their work. It allows them to disseminate valuable research findings to policymakers and

11

apply academic expertise to real-world problems, and they can learn from election and public-health officials with boots-on-the-ground experience. Moreover, non-governmental institutions like SIO, EIP, and VP are often best able to apply cutting-edge research and technology to respond to emergent challenges. The open exchange of ideas between academic institutions and government (whether relating to elections, COVID-19 vaccines, foreign interference, or any other subject of national importance) allows for a diversity of perspectives and approaches in addressing monumentally complex challenges like mis- and disinformation regarding elections and vaccines. It produces effective and evidence-based policymaking. And it provides unique educational opportunities for students to gain valuable practical experience and prepare for future careers in these areas of critical importance.

The district court's injunction not only limits SIO's, EIP's, and VP's ability to speak freely to the government (by prohibiting the government from engaging with them), it hinders their ability to fulfill their core mission of advancing knowledge, educating students, and serving the public good. It limits universities', students', and faculty's ability to participate in the democratic processes by speaking with government representatives. It limits government actors from leveraging private resources and expertise to address today's

greatest societal challenges. It limits the input of subject-matter experts and researchers into matters of undeniable public concern, leading to less-informed and less-effective policymaking. And it limits students' access to valuable pedagogic, academic, and career opportunities. These are all values and freedoms the First Amendment protects.

Throughout its decision, the district court ignored SIO's, EIP's, and VP's First Amendment rights, instead characterizing their speech as "censorship" (*e.g.*, ROA.26529, 26534, 26538-39)—even though they are not government actors—and their policy recommendations as "call[s] for expansive censorship of social-media speech" (ROA.26537). That characterization is fundamentally wrong. At no time did EIP or VP ever censor speech or call for the censorship of speech. Nor did EIP or VP ever take down social-media posts or apply labels to posts or have any power to do so. Instead, EIP's and VP's work was overwhelmingly devoted to researching and analyzing online information and publishing reports about their research; very little of their time was spent interacting with social media platforms or the government in any capacity. And even when EIP and VP referred content to the platforms, in the overwhelming majority of cases, the platforms either did nothing (65%) or simply applied a label to the post (21%). ROA.12939. Crucially, the platforms—not

EIP or VP—*always* exercised ultimate control over their policies and content-moderation decisions. EIP's and VP's speech to social media platforms about content on those platforms is not censorship; it is protected speech.

**B.** Aside from the injunction's significant burdens on *amici*'s ability to speak to and engage with the government freely, the district court's decision also threatens *amici* with civil liability for their own constitutionally protected speech. Although the preliminary injunction runs only against the named federal agencies and officials, the district court's reasoning is not so limited. The court's reasoning—which is legally erroneous for the reasons explained in the government's brief—could empower plaintiffs, like those who have sued *amici*, to hold academic institutions liable for speaking or petitioning, or to enjoin them from speaking or petitioning, about matters of public concern on the basis of the content of their speech, contrary to long-established First Amendment precedents. *See Snyder v. Phelps*, 562 U.S. 443, 451, 458 (2011) (holding that "the First Amendment prohibits holding [defendant] liable for its speech" in state tort lawsuit); *Video Int'l Prod., Inc. v. Warner-Amex Cable Comm'ns, Inc.*, 858 F.2d 1075, 1083-84 (5th Cir. 1988) (holding that the First Amendment barred § 1983 lawsuit); *Barnes Found. v. Township of Lower*

*Merion*, 242 F.3d 151, 160-61 (3d Cir. 2001) (collecting cases in which the First Amendment barred § 1983, and § 1985 claims).[2]

It is well settled that speech concerning public affairs "occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Snyder*, 562 U.S. at 452 (cleaned up). *Amici*'s speech about mis- and disinformation related to elections and COVID-19 vaccines falls squarely within this category of specially protected speech. "Political speech regarding a public election lies at the core of matters of public concern protected by the First Amendment." *Wiggins v. Lowndes Cnty.*, 363 F.3d 387, 390 (5th Cir. 2004). And speech about COVID-19 vaccines is part of "an ongoing public debate" regarding safe and effective responses to the COVID-19 pandemic. *Snyder*, 562 U.S. at 458. As Appellees themselves acknowledge, these are "matters of overwhelming public importance." Appellees' Opp. to Mot. for Stay Pending Appeal 10. Accordingly, *amici*'s speech—to the public, to social media platforms, and to the government—concerning mis- and disinformation related to elections and COVID-19 vaccines "is entitled to special protection."

---

[2] *Amici* have numerous additional defenses to the lawsuit pending against them (*Hines v. Stamos*) that were not addressed by the preliminary injunction in this case and that *amici* intend to raise in the district court in forthcoming motions.

*Snyder*, 562 U.S. at 452 (cleaned up). The district court's decision entirely ignores *amici*'s First Amendment rights to free speech and academic freedom. Instead, the court mischaracterized *amici*'s work with EIP and VP as "censorship" (ROA.26529, 26534, 26538-39)—which, as explained, these organizations had no power to do—rather than constitutionally protected speech on matters of public concern.

Moreover, if the district court were to enter an injunction against *amici* like the injunction here, it would constitute an unconstitutional prior restraint. That is not a hypothetical threat: The plaintiffs in the parallel litigation against *amici* seek to permanently enjoin *amici* from speaking on matters of public concern based on the content and viewpoint of their speech. *See* Compl., Prayer for Relief C, *Hines v. Stamos*, No. 3:23-cv-571 (W.D. La.). A "predetermined judicial prohibition restraining specified expression" of this nature is a presumptively unconstitutional prior restraint. *Bernard v. Gulf Oil Co.*, 619 F.2d 459, 466 (5th Cir. 1980), *aff'd*, 452 U.S. 89 (1981) (quotation marks omitted).

The speech that the plaintiffs here and in *Hines v. Stamos* seek to enjoin—*amici*'s speech on matters of public concern—enjoys "special" First Amendment protection. *Snyder*, 562 U.S. at 452. The Court should make clear,

in reversing the decision and injunction entered by the district court, that *amici* enjoy their own First Amendment rights and that they cannot be punished for, or enjoined from, speaking to the public, to social media platforms, or to the government about mis- and disinformation on the Internet.

## II.   The District Court's Factual Findings Concerning *Amici* Are Not Supported by the Record

The district court's erroneous legal conclusions flow, in part, from plaintiffs' inaccurate and mistaken characterizations of the facts, many of which directly concern *amici*'s work and conduct. While *amici* lack space in this brief to highlight them all, *amici* submit that the following misstatements, misquotations, misattributions, and mischaracterizations of the record are most concerning and merit correction by this Court, especially in light of the parallel litigation against *amici* pending in the same court.

**Plaintiff Jill Hines.** The court made specific (and erroneous) factual findings about plaintiff Jill Hines that are not supported by the record. The court stated that "Plaintiff Hines of the Health Freedom Louisiana was flagged by the Virality Project to be a 'medical freedom influencer' who engages in the 'tactic' of 'organized outrage' because she created events or in-person gatherings to oppose mask and vaccine mandates in Louisiana." ROA.26539.

17

That statement is false. There is no evidence—not in the record, not anywhere—that anyone involved with VP ever "flagged" Jill Hines or Health Freedom Louisiana, ever shared any of their posts with a social media platform, or even read their posts. The only source the court cited for this finding, VP's final report (*see* ROA.26539 n.584), identifies the *concept* of "health freedom" as "[o]ne of the primary long-standing themes of anti-vaccine distribution narratives." ROA.14009. But nowhere does it mention Hines or Health Freedom Louisiana or any of their posts, much less describe them as "medical freedom influencers" who engaged in any particular tactics. Nor do any of the numerous briefings, blog posts, reports, and other materials published by VP. Indeed, even Hines herself does not claim that VP flagged her or her organizations' posts. *See* ROA.1311-16. The district court's finding is without any factual support and clearly erroneous.

This erroneous finding is especially concerning to *amici* because Hines is a plaintiff in the parallel lawsuit pending against them, despite the fact that her posts were never flagged by VP.

**EIP's design and purpose.** *Four times* in its opinion, the district court claimed that SIO research manager Renée DiResta stated that "the EIP was designed to 'get around unclear legal authorities, including very real First

Amendment questions' that would arise if CISA or other government agencies were to monitor and flag information for censorship on social media." ROA.26527; *see* ROA.26534, 26565, 26568. But DiResta did not state that EIP was designed to "get around" anything; these are words the district court attributed to her without any basis in the record at all. The transcript that the district court cited to support its repeated misquotation contains no such language. DiResta did observe: "*There were* unclear legal authorities, including very real First Amendment questions" related to the government's interaction with online speech. ROA.14196. She merely acknowledged the uncontroversial proposition that *private* institutions and persons (like *amici*) can take actions that the government would not have the capacity or, in some cases, legal authority to take.

The district court's repeated misquotation of DiResta's statement is particularly material because it was a key basis for the court's finding that EIP was "designed" to "get around" the First Amendment. That finding is categorically false. EIP was *designed* as a nonpartisan, nonpolitical academic research project. And its *purpose* was to research and analyze mis- and disinformation regarding U.S. elections and to make its findings widely available through reports and peer-reviewed academic articles. Private institutions routinely carry

out research projects and countless other activities that the government does not have the capacity to engage in; that is a feature, not a bug, of our democracy.

**Flagging "millions of social-media posts" and "almost twenty-two million" tweets.** The court fundamentally misunderstood the number of social-media posts EIP flagged as misinformation to social media platforms. The court stated that "[t]he tickets and URLs encompassed millions of social-media posts, with almost twenty-two million posts on Twitter alone." ROA.26536. That is false. EIP shared a mere 4,832 URLs with *all* social media platforms. ROA.13715. The 22 million tweet number was EIP's estimate, calculated *after* the project completed, of how many total tweets across all of Twitter even *mentioned* one of the narratives EIP studied—for example, how many total tweets mentioned "Dominion," a popular false narrative. ROA.13859. These 22 million tweets could have been supportive of the narrative, a refutation, or just a discussion. *See* ROA.13859. Only a tiny fraction (~0.01%) of these total tweets were part of a ticket or were flagged as containing prospective misinformation in the leadup to the election. ROA.13715. And, as described above, only a fraction of the URLs EIP shared with social media platforms resulted in any action being taken at all. ROA.13716.

**Flagging "truthful reports" and "exaggeration."** The court funda-
mentally misunderstood what EIP classified as mis- and disinformation. The
court stated that "EIP sometimes treats as 'misinformation' truthful reports
that the EIP believes 'lack broader context.'" ROA.26536. That is incorrect.
EIP defined misinformation as "information that is false"—*i.e.*, not truthful—
"but not necessarily intentionally false," whereas disinformation is "false or
misleading information that is purposefully seeded and/or spread for an objec-
tive." ROA.13921. The phrase "lack broader context" appeared once in EIP's
final report, not in a general description of what EIP considered misinfor-
mation but in a single incident involving a "poll watcher [who] was wrongfully
denied entry to a Pennsylvania polling station." ROA.13861. EIP described
that incident as misinformation in its final report because it was used by par-
tisan actors to "falsely claim that this was evidence of illegal actions taking
place in the polling station" that were "politically motivated," when in fact the
poll watcher was not denied entry for political reasons. ROA.13861. Although
EIP noted that a video of the incident "lacked broader context," what made it
misinformation was its use to support "false" claims. ROA.13861.

The court also pointed to the Gateway Pundit, "one of the top misinfor-
mation websites" identified by EIP. ROA.26535. The court stated that "EIP

21

did not say that the information [shared by Gateway Pundit] was false," only that Gateway Pundit engaged in "exaggeration." ROA.26535. That is plainly incorrect. For one, exaggeration—especially intentional exaggeration to create a false narrative—is a type of falsehood. *See Exaggerate*, Oxford English Dictionary, www.oed.com ("To magnify *beyond the limits of truth*; to represent something as greater *than it really is*." (emphasis added)). In any event, EIP in fact identified many instances of "false" information published and shared by Gateway Pundit. *E.g.*, ROA.13734, 13768, 13770, 13830. EIP's assessment was clear: "[Gateway Pundit] spread *false* narratives of election fraud built upon *misinterpretations* of statistics and was active in spreading the *false* Dominion conspiracy theory." ROA.13872-73 (emphasis added). The court did not identify a single piece of evidence supporting its erroneous finding that EIP flagged posts that EIP regarded as "truthful." ROA.26536.

**"Targeting … domestic speakers."** The court asserted that EIP stated that it was "not targeting foreign disinformation, but rather 'domestic speakers.'" ROA.26537. This is yet another invented quotation. The source the court purports to quote (EIP's final report) does not use the term "domestic speakers," not on the page the court cited, not anywhere.

More fundamentally, neither EIP nor VP "target[ed]" "speakers" of any sort. EIP and VP collected and analyzed instances of misinformation, disinformation, and rumors from across the Internet regardless of the source or speaker. Once it concluded its data collection (*after* the 2020 election), EIP performed an aggregate analysis of the sources of the mis- and disinformation narratives it identified. Through that analysis, EIP concluded that "much of the misinformation in the 2020 election was pushed by authentic, domestic actors," as opposed to anonymous, fictitious, or foreign actors. ROA 13889, 13911. Likewise, VP determined, after concluding its data collection, that foreign actors' reach "appeared to be far less than that of domestic actors." ROA.13959. But that *post hoc* analysis does not mean that EIP or VP was "targeting … domestic speakers." All it shows is that, based on the projects' subsequent analysis, domestic actors spread most of the instances of mis- and disinformation EIP and VP catalogued. And there is nothing nefarious about a domestic research organization studying domestic speech about matters of public concern.

**SIO's and EIP's contacts with CISA and CIS.** The district court put great emphasis on CISA's "relationships" with SIO, EIP, and *amici*. ROA.26524. But its findings are not supported by the record and rely on

23

mischaracterizations of key facts. CISA did not "c[ome] up with the idea of having some communications with the EIP." ROA.26524. Prior to EIP's founding, CISA interns had noted to SIO's director, Alex Stamos, that there were gaps in the government's ability to respond to election-related mis- and disinformation. ROA.13678. Stamos then developed the idea for the EIP and briefed CISA about it. ROA.13288; *contra* ROA.26524. CISA referred SIO to the nonprofit Center for Internet Security (CIS), which received reports of mis-information from state and local election officials. ROA.13264. And SIO and CISA had "some conversations" during the leadup to the 2020 and 2022 elections "particularly when [SIO and EIP] were putting out public reporting about what they were seeing." ROA.13254.

But there is no basis for the court's finding that "CISA and the EIP were completely intertwined." ROA.26567. That finding is based primarily on the fact that a few Stanford student researchers had internships at CISA, and one intern sent a few emails to social media platforms "directly flagging posted content" from a CISA email address while identifying himself as "working for CISA." *See* ROA.26528, 26567. But if a few student internships were enough to support finding "complete[] intertwine[ment]" (ROA.26567), then every academic institution would qualify. The University of Texas Law School is not

"completely intertwined" with the Department of Justice because it provides numerous legal interns and externs who may work on matters of interest to both DOJ and legal scholars at UT.

As to the court's other findings—that "CISA served as a mediating role between CIS and EIP to coordinate their efforts in reporting misinformation to [social media] platforms" (ROA.26526), that CISA "shared information" about instances of misinformation "with the EIP" (ROA.26527), and that CISA "submit[ted] alleged disinformation to the EIP" (ROA.26534)—the very sources the court cited refute them. CISA official Brian Scully (cited throughout the court's decision) testified that CISA did not share tips about instances of mis- or disinformation with EIP, did not have general access to EIP tickets identifying instances of mis- and disinformation, and did not "coordinate" EIP's contacts with social media platforms. *See* ROA.13320-24.[3]

Far from being "completely intertwined" (ROA.26567), the record demonstrates that CISA's *actual* arms-length relationship with SIO—which

---

[3] The district court claimed that DiResta "ha[s] [a] role[] in CISA" because "she serves as 'Subject Matter Expert' for CISA's Cybersecurity Advisory Committee." ROA.26526. That is inaccurate and misleading. DiResta does not have a role in CISA. She is simply listed, among many others, as an independent expert who may be available to brief one of CISA's advisory committees on subjects within her expertise.

was similar to CISA's relationships with many academic institutions (ROA.13248-49)—was entirely normal and entirely above board. As Scully explained, "if there's an academic research [institution] that puts out a report that we think is of interest, … we try to have conversations with them to try to understand what their research findings are." ROA.13249. Such conversations, like those reflected in the record here, are neither uncommon nor untoward.[4]

**VP's contacts with the federal government.** In determining that VP was closely intertwined with federal government actors, the court put great weight on the fact that SIO and the Office of the Surgeon General (OSG)

---

[4] The district court's finding that EIP was "partially-funded by the United States National Science Foundation [NSF] through grants" also does not support a finding of intertwinement. RAO.26534. In fact, EIP did not receive any government grants for its work in the 2020 election, nor did VP. The SIO was awarded one five-year grant from NSF totaling $748,437 to support research into the spread of misinformation online during real-time events, but SIO did not receive any grant money until 2022, long after the 2020 election and after VP concluded its work. More importantly, NSF is not CISA. It is a nonpartisan, independent agency that gives around $8 billion in grants to 2,000 research institutions each year, representing 24% of federal funding of academic research. The NSF grant process is transparent and gives the government no capability to direct research results, so even if EIP 2020 or VP had received NSF funding, that funding would not support a finding that EIP or VP is intertwined with the government. Nor does NSF funding reduce the First Amendment rights of Stanford's researchers to publish their results, brief government agencies, or refer policy violations to platforms.

cohosted a "virtual townhall event" regarding the launch of OSG's COVID-19 health advisory. But the court's key findings lack support in the record. Most fundamentally, the court got the very purpose of this townhall wrong. It was not the "launch of the Virality Project" (ROA.26488), which had launched months earlier (without OSG involvement), but a virtual town hall announcing OSG's health advisory. Indeed, the event did not occur on "January 15, 2021" (ROA.26488) but on July 15, 2021—well after VP's launch. Senior advisor to the Surgeon General Eric Waldo (whom the court cited) expressed skepticism that planning the event amounted to any *meaningful* "partnership." *See* ROA.14863 ("Renee DiResta would have been part of the planning process for the launch event. So that's—that might be one of the definitions of partnership."). And he disclaimed any knowledge about whether the event had taken "many months" to plan. ROA.14863; *contra* ROA.26524.

The problem with the court's discussion of the launch event is not just that it contains numerous factual errors. The problem is that the court placed such emphasis on one public event—which SIO simply cohosted—that had nothing to do with the "censorship" plaintiffs complain about.[5] It is a red

---

[5] SIO research manager Renée DiResta spoke for only a few minutes to introduce and thank Surgeon General Murthy. Surgeon General Murthy moderated the panel discussion, which featured doctors and volunteers for civil

herring. The court failed to recognize evidence that VP operated independently from the government. VP was not funded by the government; outside entities did not create VP tickets, nor did VP convey to social media platforms any requests from federal government agencies or officials. Rather, the overwhelming majority of VP's interactions with entities outside the project, including at social media companies and in the government, was through the distribution of VP's *publicly available* weekly reports, which are freely available to this day through its website.

**EIP's and VP's contacts with GEC.** The district court similarly mischaracterized SIO's, EIP's, and VP's contacts with the Department of State's Global Engagement Center (GEC). According to the district court, "GEC works through the CISA-funded EI-ISAC and works closely with the Stanford Internet Observatory and the Virality Project." ROA.26533. That is wrong. GEC did not "work[] closely with the Stanford Internet Observatory and the Virality Project" (ROA.26533), nor was it "intertwined with the VP, EIP, and Stanford Internet Observatory" (ROA.26568). In fact, GEC sent EIP only 17

society organizations whose communities had been impacted by COVID-19. *See* Stanford Cyber Policy Center, *Confronting Health Misinformation: A Discussion with the Surgeon General*, *available at* https://www.youtube.com/watch?v=GUCdoXapOl0.

tickets over the course of the entire 2020 election. And GEC sent *zero* tickets to VP. More broadly, the record simply does not support the court's conclusion that GEC "work[ed] closely" with either project, much less that "GEC w[as] intertwined with the VP, EIP, and Stanford Internet Observatory." ROA.26568.

## CONCLUSION

The district court's findings are based upon conjecture, misunderstandings, and, in at least two instances, invented quotations never uttered by *amici*. The injunction violates the First Amendment rights of Stanford University and its researchers, and has cast a chill across academia as an example of political targeting of disfavored speech by state governments and the federal judiciary. The Court should reverse the decision below.

Dated: July 28, 2023

Respectfully submitted,

*/s/ John B. Bellinger III*
JOHN B. BELLINGER III
ELISABETH S. THEODORE
R. STANTON JONES
STEPHEN K. WIRTH
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
(202) 942-5000
john.bellinger@arnoldporter.com

## CERTIFICATE OF SERVICE

I hereby certify that, on July 28, 2023, I electronically filed the foregoing brief with the Clerk of the Court by using the appellate CM/ECF system. I further certify that the participants in this case are CM/ECF users and that service will be accomplished by using the appellate CM/ECF system.

Dated: July 28, 2023                                    */s/ John B. Bellinger III*
                                                        John B. Bellinger III

                                                        *Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

This brief contains 5,852 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Century font) using Microsoft Word.


Dated: July 28, 2023                    */s/ John B. Bellinger III*
                                        John B. Bellinger III

                                        *Counsel for Amici Curiae*

31