No. 23-30445

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

STATE OF MISSOURI; STATE OF LOUISIANA; AARON KHERIATY;
MARTIN KULLDORFF; JIM HOFT; JAYANTA BHATTACHARYA; JILL
HINES,

*Plaintiffs-Appellees*,

v.

JOSEPH R. BIDEN, JR.; VIVEK H. MURTHY; XAVIER BECERRA;
DEPARTMENT OF HEALTH & HUMAN SERVICES; ANTHONY
FAUCI; et al.

*Defendants-Appellants*,

On Appeal from the United States District Court
for the Western District of Louisiana (No. 3:22-cv-1213)
The Honorable Terry A. Doughty, Chief Judge

## BRIEF OF AMICI CURIAE LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW, BRENNAN CENTER FOR JUSTICE AT NYU LAW, AND COMMON CAUSE IN SUPPORT OF DEFENDANT-APPELLANTS AND VACATUR

Jon Greenbaum
Ezra Rosenberg
David Brody
Sanaa Ansari
Pooja Chaudhuri
Marc Epstein
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW
1500 K St. NW, Suite 900
Washington, DC 20016

Scott L. Winkelman
Michael H. Pine
Samuel Ruddy
CROWELL & MORING LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004
(202) 624-2972
swinkelman@crowell.com

*[Additional Counsel Listed Inside Cover]*

Gowri Ramachandran
Mekela Panditharatne
Robyn N. Sanders
BRENNAN CENTER FOR
JUSTICE AT NYU SCHOOL OF
LAW
120 Broadway, Suite 1750
New York, NY 10271

Leah J. Tulin
BRENNAN CENTER FOR
JUSTICE AT NYU SCHOOL OF
LAW
1140 Connecticut Avenue NW,
Suite 1150
Washington, DC 20036

Alexander J. Urbelis
CROWELL & MORING LLP
590 Madison Ave.
20th Floor
New York, New York 10022

Anna Z. Saber
CROWELL & MORING LLP
3 Embarcadero Center
26th Floor
San Francisco, CA 94111

*Counsel for Amici Curiae*

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

/s/ Scott L. Winkelman
Scott L. Winkelman
CROWELL & MORING LLP
1001 Pennsylvania Ave., N.W.
Washington, DC 20004
(202) 624-2972
swinkelman@crowell.com

*Counsel for Amicus Curiae*

Amici:

The Lawyers' Committee for Civil Rights Under Law
Brennan Center for Justice at NYU School of Law
Common Cause

Counsel:

For Amici:
   Scott L. Winkelman, Alexander J. Urbelis, Michael H. Pine, Anna Z. Saber, Samuel Ruddy of Crowell & Moring LLP for all amici curiae on this brief
   Jon Greenbaum, Ezra Rosenberg, David Brody, Sanaa Ansari, Pooja Chaudhuri, Marc Epstein of the Lawyers' Committee for Civil Rights Under Law
   Gowri Ramachandran, Leah Tulin, Mekela Panditharatne, and Robyn Sanders of Brennan Center for Justice at NYU School of Law

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................i

INTERESTS OF AMICI CURIAE ........................................................ 1

INTRODUCTION ............................................................................... 4

FACTUAL BACKGROUND ................................................................ 6

I.    MALICIOUS ACTORS ATTACK ELECTION
      INTEGRITY BY PROMULGATING
      DISINFORMATION AND INTIMIDATION ONLINE. ............... 6

      A.    Election Mis- and Disinformation on Social Media ............. 7

      B.    Intimidation of Election Officials ........................................ 12

II.   SOCIAL MEDIA COMPANIES, GOVERNMENTS,
      AND CIVIL SOCIETY ALL HAVE A ROLE IN
      PROTECTING VOTING RIGHTS ONLINE. .............................. 14

III.  ELECTION PROTECTION WORKS WITH
      GOVERNMENT OFFICIALS AND SOCIAL MEDIA
      COMPANIES TO DEFEND ELECTION INTEGRITY.............. 18

ARGUMENT ...................................................................................... 21

I.    THE INJUNCTION VIOLATES THE FIRST
      AMENDMENT RIGHTS OF AMICI AND OTHER
      CIVIL SOCIETY ORGANIZATIONS DEDICATED TO
      ENSURING FREE AND FAIR ELECTIONS. ............................. 21

      A.    The Injunction Is a Prior Restraint on Amici's
            Free Speech. ...................................................................... 22

      B.    The Injunction Infringes Amici's Right to Petition
            the Government.................................................................. 24

      C.    The Injunction Fails Strict Scrutiny. ................................. 26

      D.    The Injunction Inhibits Amici's Ability to Discuss
            Election Protection Matters with the
            Government. ....................................................................... 32

II.   THE INJUNCTION'S VAGUENESS AND
      OVERBREADTH VIOLATE FEDERAL RULE 65. ...................34

      A.   The Injunction is Unspecific and Undefined. ....................35

      B.   The Injunction is Overbroad................................................36

CONCLUSION ........................................................................................38

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arizona v. Inter-Tribal Council of Ariz., Inc.,*
   570 U.S. 1 (2013) ................................................................ 1

*B. H. Bunn Co. v. AAA Replacement Parts Co.,*
   451 F.2d 1254 (5th Cir. 1971) ........................................... 36

*Bantam Books, Inc. v. Sullivan,*
   372 U.S. 58 (1963) ............................................................. 22

*Barbee v. Collier,*
   2022 WL 16860944 (5th Cir. Nov. 11, 2022), *cert. denied,*
   143 S. Ct. 440 (2022) ........................................................ 36

*BE & K Constr. Co. v. NLRB,*
   536 U.S. 516 (2002) ........................................................... 24

*Bernstein v. Sims,*
   __F Supp. 3d __, 2022 WL 17365233 (E.D.N.C. Dec. 1,
   2022) ............................................................................ 25, 26

*Borough of Duryea v. Guarnieri,*
   564 U.S. 379 (2011) ........................................................... 24

*Califano v. Yamasaki,*
   442 U.S. 682 (1979) ........................................................... 36

*Carroll v. President & Comm'rs of Princess Anne,*
   393 U.S. 175 (1968) ........................................................... 26

*Consolidation Coal Co. v. Disabled Miners of S. W. Va.,*
   442 F.2d 1261 (4th Cir. 1971) ...................................... 35, 37

*Counterman v. Colorado,*
   143 S. Ct. 2106 (2023) ........................................................ 1

*Dumpson v. Ade,*
   2019 WL 3767171 (D.D.C. Aug. 9, 2019) ............................................ 12

*E.T. v. Paxton,*
   19 F.4th 760 (5th Cir. 2021) ...................................................... 37

*Fed. Election Comm'n v. Wisc. Right to Life,*
   551 U.S. 449 (2007) ................................................................ 27

*Francisco Sanchez v. Esso Standard Oil Co.,*
   572 F.3d 1 (1st Cir. 2009) ........................................................ 35

*Gates v. City of Dallas,*
   729 F.2d 343 (5th Cir. 1984) ..................................................... 24

*Gonzalez v. Google LLC,*
   143 S. Ct. 1191 (2023) ............................................................. 1

*John Doe #1 v. Veneman,*
   380 F.3d 807 (5th Cir. 2004) ................................................ 35, 36

*Lozman v. City of Riviera Beach,*
   138 S. Ct. 1945 (2018) ............................................................ 24

*Metro. Opera Ass'n, Inc. v. Local 100, Hotel Emps. & Rest.*
   *Emps. Int'l Union,*
   239 F.3d 172 (2d Cir. 2001) .............................. 27, 28, 29, 30

*N.L.R.B. v. Express Pub. Co.,*
   312 U.S. 426 (1941) ................................................................ 37

*Nat'l Coal. on Black Civic Participation v. Wohl,*
   __F.Supp.3d__, 2023 WL 2403012 (S.D.N.Y Mar. 8, 2023)............ 1, 28

*Org. for a Better Austin v. Keefe,*
   402 U.S. 415 (1971) ................................................................ 22

*Payne v. Travenol Lab'ys, Inc.,*
   565 F.2d 895 (5th Cir. 1978) ..................................................... 37

*Reed v. Town of Gilbert, Ariz.,*
   576 U.S. 155 (2015) ............................................................ 23, 26

*Schmidt v. Lessard,*
　414 U.S. 473 (1974) ................................................................ 35

*Scott v. Schedler,*
　826 F.3d 207 (5th Cir. 2016) ......................................... 34, 35

*Se. Promotions, Ltd. v. Conrad,*
　420 U.S. 546 (1975) ................................................................ 31

*Shelby County v. Holder,*
　570 U.S. 529 (2013) .................................................................. 1

*Test Masters Educ. Servs., Inc. v. Singh,*
　428 F.3d 559 (5th Cir. 2005) .................................. 22, 26, 29

*U. S. Steel Corp. v. United Mine Workers of Am.,*
　519 F.2d 1236 (5th Cir. 1975) ........................................... 35

*Union Pac. R.R. Co. v. City of Palestine,*
　2021 WL 1164396 (E.D. Tex. Mar. 25, 2021) ................... 35

*United States v. Cruikshank,*
　92 U.S. 542 (1875) ................................................................... 6

*United States v. Young,*
　231 F. Supp. 3d 33 (M.D. La. 2017) ................................... 24

*Wayte v. United States,*
　470 U.S. 598 (1985) ............................................................... 26

**Agency Decisions**

*In re Burkman,*
　Forfeiture Order, FCC 23-44, No. EB-TCD-21-00032652
　(FCC June 6, 2023) ................................................................ 20

**Statutes**

42 U.S.C. § 1985(3) .................................................................... 28

52 U.S.C. § 10308(d)-(e) ............................................................ 28

## Rules

Fed. R. Civ. P. 65 ................................................................. 6, 34, 35, 36, 37

Fed. R. Civ. P. 65(d)(1) ......................................................... 34

## Other Authorities

63 Fed. Reg. 41804 (Aug. 5, 1998) ......................................... 16

Blake Peterson, *ICE, Dispelling Rumors, Says It Won't Patrol Polling Places*, ProPublica (Nov. 2, 2019)................... 8

Brennan Ctr. for Just. & Bipartisan Pol'y Ctr., *Election Officials Under Attack: How to Protect Administrators and Safeguard Democracy* (June 2021) .............................. 19

Brennan Ctr. for Just., *Local Election Officials Survey* (June 2021; March 2022; April 2023) ............................................. 19

Carnegie Endowment for Int'l Peace, *How Social Media Platforms' Community Standards Address Influence Operations* (Apr. 1, 2021)........................................................ 14

David Ingram & Kevin Collier, *Big Tech met with govt to discuss how to handle election results*, NBC News (Aug. 12, 2020) ................................................................................ 16

DHS Off. of Inspector Gen., *DHS Needs a Unified Strategy to Counter Disinformation Campaigns* (Aug. 10, 2022) ........ 16

Election Integrity Partnership, *The Long Fuse: Misinformation and the 2020 Election* (June 15, 2021) ..................... 17

Elizabeth Dwoskin & Ellen Nakashima, *Tech didn't spot Russian interference during the last election. Now it's asking law enforcement for help*, Wash. Post (Jun. 26, 2018) ................................................................................ 17

Free Press, *Empty Promises: Inside Big Tech's Weak Effort to Fight Hate and Lies in 2022* (Oct. 2022)........................ 14

Ian Vandewalker, *Digital Disinformation and Voter Suppression*, Brennan Ctr. for Just. (Sept. 2, 2020) ........................... 7

Jerry Iannelli, *Far-Right Groups Just Doxxed Elections Supervisors Brenda Snipes and Susan Bucher*, Mia. New Times (Nov. 14, 2018) ........................................................ 12

Joseph Menn et al., *State Dept. cancels Facebook meetings after judge's 'censorship' ruling*, Wash. Post (Jul. 5, 2023) ............... 33

Kimmy Yam, *Right-Wing Disinformation Ramps Up on WeChat Ahead of Midterms, Report Finds*, NBC News (Oct. 3, 2022) ...................................................... 11

Linda So, *Trump-Inspired Death Threats Are Terrorizing Election Workers*, Reuters (June 11, 2021) ........................................ 13

Marina Villeneuve, *Justice Department details threats against election workers* (Aug. 3, 2022) ................................................ 13

Olivia Ma, *How Google and YouTube are investing in fact-checking*, Keyword (Nov. 29, 2022) ...................................... 15

Press Release, *Social Media Influencer Douglass Mackey Convicted of Election Interference in 2016 Presidential Race,* U.S. Att'ys Off. E.D.N.Y. (Mar. 31, 2023) ................................... 9

Richard Fausset, *'It Has to Stop': Georgia Election Official Lashes Trump*, N.Y. Times (Dec. 1, 2020) ........................................ 13

S. Rep. No. 42-193, 116th Cong., 1st Sess., (Nov. 10, 2020) ......... 9, 10, 11

Statement by Secretary Jeh Johnson on the Designation of Election Infrastructure as a Critical Infrastructure Subsector (Jan 6, 2017) ...................................................... 16

Sylvia Albert et al., *As a Matter of Fact: The Harms Caused by Election Disinformation Report*, Common Cause Educ. Fund (Oct. 2021) ...................................................... 7

Tiffany Hsu, *Misinformation Swirls in Non-English Languages Ahead of Midterms*, N.Y. Times (Oct. 12, 2022) ..............11

## INTERESTS OF AMICI CURIAE[1]

Formed in 1963, the Lawyers' Committee for Civil Rights Under Law is a nonpartisan, nonprofit organization that uses legal advocacy to achieve racial justice, fighting inside and outside the courts to ensure that Black people and other people of color have the voice, opportunity, and power to make the promises of our democracy real. It has a national voting rights litigation practice, *see, e.g.*, *Arizona v. Inter-Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013); *Shelby County v. Holder*, 570 U.S. 529 (2013), and it routinely participates in cases concerning online speech and voter intimidation, *see, e.g.*, *Gonzalez v. Google LLC*, 143 S. Ct. 1191 (2023); *Counterman v. Colorado*, 143 S. Ct. 2106 (2023); *Nat'l Coal. on Black Civic Participation v. Wohl*, __F.Supp.3d__, 2023 WL 2403012 (S.D.N.Y Mar. 8, 2023).

The Brennan Center for Justice at NYU School of Law[2] is an independent, nonpartisan law and policy organization that works to strengthen, revitalize, and when necessary, defend our country's

---

[1] No counsel for any party authored this brief in whole or in part, and no person or entity other than *amici* or their counsel made a monetary contribution for preparation or submission of this brief. Pursuant to Fed. R. App. Proc. 29(a), all parties have consented to the filing of this brief.

[2] This brief does not purport to convey the position, if any, of NYU School of Law.

systems of democracy and justice. Protecting free and fair elections against threats, including from disinformation campaigns about their integrity, is central to the mission of the Brennan Center. As part of that work, the Brennan Center engages with election administrators and community groups nationwide to help safeguard equal access to voting. The Brennan Center regularly participates as counsel or amicus curiae in federal and state litigation related to voting rights and election integrity and security.

Common Cause was founded as a nonpartisan "citizens lobby" whose primary mission is to protect and defend the democratic process and make government accountable to the interests of ordinary people. Common Cause is one of the nation's leading democracy organizations and currently has over 1.5 million members nationwide. Common Cause promotes, on a nonpartisan basis, its members' interest in open, honest, and accountable government and political representation. Common Cause has participated as a party or amicus curiae in numerous Supreme Court, lower court, and state court actions related to voting rights.

Amici are leading members of Election Protection, a nationwide, nonpartisan coalition consisting of over 300 national, state, and local partners working to ensure everyone has an equal access to vote, have their vote count, and participate in democracy. In addition to providing comprehensive information about voting, Election Protection also operates a hotline that helps voters if they experience problems at the polls or have questions about voting. During the 2020 election cycle, the hotline fielded approximately 246,000 calls. Sometimes, Election Protection may escalate a call to election officials, law enforcement, or social media companies. Election Protection also shares aggregated statistics obtained from these calls with election officials to further election integrity.

Amici and their ability to protect and defend the right to vote will be affected by the outcome of this appeal. Amici respectfully submit this brief to highlight the harm they will likely suffer if the district court's preliminary injunction is upheld and to urge the Court to vacate that decision.

## INTRODUCTION

The district court's injunction is an unconstitutional prior restraint on the rights of amici curiae and similar organizations to speak freely and petition the government for a redress of grievances. The injunction restricts Defendants, including the President, the Executive Office of the President, the DOJ, the FBI, CISA, and other executive agencies and their employees, from collaborating with the Election Integrity Partnership, the Virality Project, the Stanford Internet Observatory, "or any like project or group" for the purpose of "urging, encouraging, pressuring, or inducing in any manner removal, deletion, suppression, or reduction of content posted with social-media companies containing protected free speech." ROA.26613. The injunction also restricts "all acting in concert" with Defendants. ROA.26614. Amici are civil rights organizations engaged in voter protection activities, including convening Election Protection, the largest nonpartisan nonprofit voter protection operation in the nation. Core to this work, amici communicate with social media companies and local, state, and federal officials about election disinformation.

Disinformation is a major threat to the fabric of democracy. It can be used to deceive or intimidate voters into not voting, generate violent hostility toward election workers, and undermine trust in election outcomes. Some forms of disinformation are illegal and can be litigated. But often litigation is infeasible due to the scale of disinformation, difficulty of identifying perpetrators, and limited resources of prosecutors and civil society. It is also often too slow to address exigent circumstances. Other times, disinformation may not be illegal but is nonetheless harmful. Social media companies with content policies that prohibit disinformation therefore play a vital role in preserving free and fair elections. Government agencies and civil society can support those efforts by sharing information on emerging threats and vulnerable communities.

Despite not being parties to the case, the injunction appears to significantly undermine amici's and an undefined but large number of other groups' right to communicate with federal, state, and local officials about online disinformation that threatens the communities they serve. Even if Defendants listened to amici, their inability to respond would vitiate amici's right to seek redress based on the content of the grievance

being voiced. "The very idea of a government, republican in form, implies a right on the part of its citizens to meet peaceably for consultation in respect to public affairs and to petition for a redress of grievances." *United States v. Cruikshank*, 92 U.S. 542, 552 (1875). The injunction is an unlawful infringement of that right. It is a content-based speech and petition restriction that fails strict scrutiny. It also contravenes Federal Rule of Civil Procedure 65. If affirmed, it would substantially undermine the ability of amici to advocate for and protect the voting rights of all Americans.

## FACTUAL BACKGROUND

### I.    MALICIOUS ACTORS ATTACK ELECTION INTEGRITY BY PROMULGATING DISINFORMATION AND INTIMIDATION ONLINE.

The use of social media to disseminate false information— whether directly by malicious actors (disinformation) or by those unaware that the information is false (misinformation)—threatens free and fair elections. Such actions not only destabilize the election process itself, but also enable intimidation of voters and election officials and undermine the public's trust in the outcome of elections. The vast online landscape, especially social media, offers ideal conditions for

6

those hostile to voting rights to reach broad audiences while also targeting specific individuals or communities.

## A.     Election Mis- and Disinformation on Social Media

The spread of misinformation and disinformation online to influence elections and disenfranchise voters is commonplace. Sylvia Albert et al., *As a Matter of Fact: The Harms Caused by Election Disinformation Report*, Common Cause Educ. Fund, at 12 (Oct. 2021) ("*Matter of Fact*"), https://www.commoncause.org/wp-content/uploads/2021/10/CC_AsaMatterofFact_FINAL_10.27.21.pdf. Traditionally, deceptive practices often involved narrow targeting by geography, such as distributing flyers in certain neighborhoods. Ian Vandewalker, *Digital Disinformation and Voter Suppression*, Brennan Ctr. for Just. (Sept. 2, 2020). https://www.brennancenter.org/our-work/research-reports/digital-disinformation-and-vote-suppression ("*Digital Disinformation*"). Today, disinformation is spread through online platforms. *Matter of Fact* at 12. Malicious actors use "sophisticated microtargeting to surgically focus on certain demographics" and can direct disinformation toward a specific local election or a national audience. *Digital Disinformation*.

In the United States, malicious actors have repeatedly deployed election falsehoods to confuse and deter voters. This threat persists as a new presidential election approaches. Common forms of disinformation include posting incorrect election dates or bogus election rules, often targeted towards one demographic or political group; voter intimidation targeted at communities of color; untrue claims about election security; and untrue claims about postelection results. *Matter of Fact* at 15. For example, in the leadup to the 2016 and 2018 elections, the false claim that Immigration and Customs Enforcement ("ICE") officers would be patrolling the polls spread on social media. Blake Peterson, *ICE, Dispelling Rumors, Says It Won't Patrol Polling Places*, ProPublica (Nov. 2, 2019), https://www.propublica.org/article/ice-dispelling-rumors-says-it-wont-patrol-polling-places. Social media posts about ICE presence at polls are intended to chill participation in elections by those fearful of and disproportionately impacted by ICE enforcement, particularly communities of color. Even though only U.S. citizens can vote, naturalized citizens may fear being mistaken for a non-citizen and unduly harassed, and voters with non-citizen family members may fear

their relatives will be unfairly targeted if they are perceived to be supporting an unpopular candidate.

Similarly, false information has been disseminated during past election cycles via social media to deter Black voter participation or trick such voters out of casting a lawful ballot. In 2016, for example, a prominent social media personality fraudulently promoted images and tweets encouraging voters to cast their ballots online or via text message, such as a fake advertisement purportedly on behalf of the Hillary Clinton campaign showing a Black woman holding an "African Americans for Hillary" sign and encouraging voters to "Avoid the Line" and "Vote from Home." Press Release, *Social Media Influencer Douglass Mackey Convicted of Election Interference in 2016 Presidential Race,* U.S. Att'ys Off. E.D.N.Y. (Mar. 31, 2023), https://www.justice.gov/usao-edny/pr/social-media-influencer-douglass-mackey-convicted-election-interference-2016. While this instance of election interference resulted in a conviction (*id.*), this is exceptionally rare. Prosecutors do not have the resources to combat the huge scale of voter intimidation online.

Likewise, in 2016, the Russian government used social media to attempt to suppress Black turnout. *See* S. Rep. No. 42-193, 116th Cong.,

9

1st Sess., *Russian Active Measures Campaigns and Interference in the 2016 U.S. Election*, Sen. Comm. on Intelligence, Vol. II at 35, 38-39 (Nov. 10, 2020), https://www.intelligence.senate.gov/publications/report-select-committee-intelligence-united-states-senate-russian-active-measures.

The Senate Select Committee on Intelligence found that the Kremlin used a private company, the Internet Research Agency ("IRA"), which operated over 50,000 "troll" accounts on social media to influence the public's perception of the 2016 election. *See id.* at 18, 23-27. Much of this content targeted Black audiences on Instagram, Twitter, and Facebook. *Id.* at 49. For example, twelve IRA Instagram accounts with names like @Blackstagram gained over 100,000 followers each. *Id.* These accounts then disseminated narratives to discourage voting—like "Don't Vote at All," "Why Would We Be Voting," or "Our Votes Don't Matter." *Id.* at 35. The Senate Intelligence Committee found that the IRA's

> overwhelming operational emphasis on race was apparent on its Facebook advertisement content (over 66 percent contained a term related to race) and targeting (locational targeting was principally aimed at "African-Americans in key metropolitan areas with well-established black communities and flashpoints in the Black Lives Matter movement"), as well as its Facebook pages (one of the IRA's top-performing pages, "Blacktivist," generated 11.2 million engagements with Facebook users), its Instagram content (five of the top 10 Instagram accounts were focused on African-American issues

> and audiences), its Twitter content (heavily focused on hot-button issues with racial undertones such as the NFL kneeling protests), and its YouTube activity (96 percent of the IRA's YouTube content was targeted at racial issues and police brutality).

*Id.* at 38–39.

Disinformation on social media in non-English languages, particularly Spanish, was also rampant in the 2020 and 2022 elections. Tiffany Hsu, *Misinformation Swirls in Non-English Languages Ahead of Midterms*, N.Y. Times (Oct. 12, 2022), https://www.nytimes.com/2022/10/12/business/media/midterms-foreign-language-misinformation.html. And ahead of the 2022 midterm elections, disinformation about election fraud, anti-discrimination policies, and reproductive rights saturated WeChat, a social media platform used by an estimated 60% of the Chinese American community. Kimmy Yam, *Right-Wing Disinformation Ramps Up on WeChat Ahead of Midterms, Report Finds*, NBC News (Oct. 3, 2022), https://www.nbcnews.com/news/asian-america/right-wing-disinformation-ramps-wechat-ahead-midterms-report-finds-rcna50539.

When such falsehoods are spread at scale on the internet, even a low rate of impact may disenfranchise significant numbers of voters and threaten free and fair elections.

## B.    Intimidation of Election Officials

Those who want to disrupt elections use social media to harass or intimidate election officials. One common tactic is doxxing, which involves publishing individuals' personal information online so that others can attack and harass them and their families. *Matter of Fact*, at 15-16; *see Dumpson v. Ade*, 2019 WL 3767171 (D.D.C. Aug. 9, 2019) (neo-Nazi doxxed Black woman to cause coordinated harassment). Election officials have experienced doxxing in recent elections. For example, ahead of the 2018 midterms, the home addresses and phone numbers of two Black women election officials in Florida were posted to Facebook groups such as "Confederate Resistance." Jerry Iannelli, *Far-Right Groups Just Doxxed Elections Supervisors Brenda Snipes and Susan Bucher*, Mia. New Times (Nov. 14, 2018), https://www.miaminewtimes.com/news/broward-countys-brenda-snipes-was-doxxed-online-10911462.

Election officials also experience intimidation as a result of doxxing and disinformation amplified on social media. Georgia Republican election official Gabriel Sterling lamented the threats workers in his office received after the 2020 election: "Someone's going to get hurt, someone's going to get shot, someone's going to get killed." Richard Fausset, *'It Has to Stop': Georgia Election Official Lashes Trump*, N.Y. Times (Dec. 1, 2020), https://www.nytimes.com/2020/12/01/us/politics/georgia-election-trump.html. Both Democratic and Republican secretaries of state and other election workers have been targeted by death threats and violent intimidation. [3] Doxxing and other harassment on social media can intimidate election officials and undermine election security.

---

[3] Linda So, *Trump-Inspired Death Threats Are Terrorizing Election Workers*, Reuters (June 11, 2021), https://www.reuters.com/investigates/special-report/usa-trump-georgia-threats/; *see also* Marina Villeneuve, *Justice Department details threats against election workers*, AP (Aug. 3, 2022), https://apnews.com/article/2022-midterm-elections-violence-presidential-judiciary-5125682e179ac1234a97756a644e353c (DOJ task force investigated over "1,000 harassing and threatening messages directed at election workers. Roughly 100 of those have risen to the level of potential prosecution.").

## II.    SOCIAL MEDIA COMPANIES, GOVERNMENTS, AND CIVIL SOCIETY ALL HAVE A ROLE IN PROTECTING VOTING RIGHTS ONLINE.

Civil society and government officials provide valuable information to social media companies to help them design their policies and practices to protect elections.

Most major online platforms prohibit misrepresentations about when, where, or how to vote; doxxing; threats; harassment; and—to varying degrees—disinformation. [4] However, even when social media companies have explicit policies, their enforcement varies significantly and is often lacking. *See, e.g.*, Free Press, *Empty Promises: Inside Big Tech's Weak Effort to Fight Hate and Lies in 2022* at 8 (Oct. 2022), https://www.freepress.net/sites/default/files/2022-10/empty_promises_inside_big_techs_weak_effort_to_fight_hate_and_lies_in_2022_free_press_final.pdf (rating efforts of Meta, TikTok, Twitter,

---

[4] *See Facebook's Policies for Elections and Voting: What You Need to Know*, Meta, https://scontent-lga3-2.xx.fbcdn.net/v/t39.8562-6/161983912_3722038201247705_6469333522919503736_n.pdf (last visited Jul. 27, 2023); *Community Guidelines*, YouTube, https://www.youtube.com/howyoutubeworks/policies/community-guidelines/ (last visited Jul. 27. 2023); *Community Guidelines*, TikTok, https://www.tiktok.com/community-guidelines/en/overview/ (last visited Jul. 27. 2023); *see also* Carnegie Endowment for Int'l Peace, *How Social Media Platforms' Community Standards Address Influence Operations* (Apr. 1, 2021), https://carnegieendowment.org/2021/04/01/how-social-media-platforms-community-standards-address-influence-operations-pub-84201.

and YouTube "insufficient" at combatting hateful content and disinformation).

Social media companies rely on external engagement with civil society to help develop their policies and obtain information about ongoing threats. For example, Meta's policies prohibiting voter disinformation were developed in part through its civil rights audit, which collected external feedback on voter suppression and election disinformation on Facebook. *See* Meta, *Facebook's Civil Rights Audit – Final Report* at 6 (Jul. 8, 2020), https://about.fb.com/wp-content/uploads/2020/07/Civil-Rights-Audit-Final-Report.pdf. Some platforms have "trusted partner" programs for civil society organizations to flag harmful content for expedited review and to augment the companies' competency with different cultures and communities—such as understanding regional slang.[5] Social media companies also partner with media organizations to help fact-check false information.[6]

_____

[5] *About the YouTube Priority Flagger program*, YouTube Help https://support.google.com/youtube/answer/7554338?hl=en (last visited Jul. 27, 2023); *Bringing local context to our global standards*, Meta, https://transparency.fb.com/policies/improving/bringing-local-context (last visited Jul. 27, 2023).

[6] *See* Olivia Ma, *How Google and YouTube are investing in fact-checking*, Keyword (Nov. 29, 2022), https://blog.google/outreach-initiatives/google-news-initiative/how-

Information sharing between the federal government, state and local governments, and the private sector, including social media companies and nonprofit organizations, protects election integrity.[7] Some government programs counter election disinformation with accurate information, CISA, *Election Security Rumor vs. Reality* https://www.cisa.gov/rumor-vs-reality (last visited Jul. 27, 2023), while others communicate with social media companies about disinformation trends that harm vulnerable communities, *see* DHS Off. of Inspector Gen., *DHS Needs a Unified Strategy to Counter Disinformation Campaigns* (Aug. 10, 2022), at 5-6 & n.22 https://www.oig.dhs.gov/sites/default/files/assets/2022-08/OIG-22-58-Aug22.pdf. In 2020, Facebook, Twitter, and Reddit had monthly meetings with DHS and CISA to discuss security threats and how to address election misinformation. *See* David Ingram & Kevin Collier, *Big Tech met with govt to discuss how to handle election results*, NBC News (Aug. 12,

---

google-and-youtube-are-investing-in-fact-checking/; *Meta's Third-Party Fact-Checking Program*, Meta, https://www.facebook.com/formedia/mjp/programs/third-party-fact-checking (last visited Jul. 27, 2023).

[7] Presidential Decision Directive 63 on Critical Infrastructure Protection: Sector Coordinators, 63 Fed. Reg. 41804 (Aug. 5, 1998); Statement by Secretary Jeh Johnson on the Designation of Election Infrastructure as a Critical Infrastructure Subsector (Jan 6, 2017), https://www.dhs.gov/news/2017/01/06/statement-secretary-johnson-designation-election-infrastructure-critical.

2020), https://www.nbcnews.com/tech/tech-news/big-tech-met-gov-t-discuss-how-handle-election-results-n1236555. The companies said these meetings were "necessary to protect the integrity" of the upcoming elections, given the companies' failures to prevent disinformation in the 2016 elections. *See* Elizabeth Dwoskin & Ellen Nakashima, *Tech didn't spot Russian interference during the last election. Now it's asking law enforcement for help*, Wash. Post (Jun. 26, 2018), https://www.washingtonpost.com/technology/2018/06/26/tech-didnt-spot-russian-meddling-during-last-election-now-its-asking-law-enforcement-help/.

Voting rights experts recommend that state and local election officials establish contacts at social media platforms to directly report disinformation or hacking of official channels. *See* Election Integrity Partnership, *The Long Fuse: Misinformation and the 2020 Election*, at 236 (June 15, 2021), https://stacks.stanford.edu/file/druid:tr171zs0069/EIP-Final-Report.pdf. Voters who see false information online often call local officials to clear up their confusion, so these officials can be the first to know when disinformation is spreading and can alert platforms. *See* Brief of *Amicus*

17

*Curiae* Brennan Center ISO Defendants, *Ayyadurai v. Galvin*, No. 1:20-cv-11889 (D. Mass. May 19, 2021), ECF No. 105-1 at 5.

## III. ELECTION PROTECTION WORKS WITH GOVERNMENT OFFICIALS AND SOCIAL MEDIA COMPANIES TO DEFEND ELECTION INTEGRITY.

Countering election disinformation—including monitoring online platforms, identifying disinformation and misinformation, pinpointing responsible parties, and implementing solutions—requires a wide range of actors. The national, nonpartisan Election Protection coalition routinely engages with federal officials, local election officials, and social media companies to address the proliferation of false information related to voting and elections. While litigation may be able to redress some instances of misinformation and disinformation, it is not expedient enough to combat the volume and velocity of social media content, nor is litigation always economically prudent—the tremendous amount of time and resources required makes it crucial that governmental and private entities continue to work together to identify and mitigate these threats.

Election Protection engages hundreds of volunteers who provide voters with information, document problems voters encounter, host

voter protection field programs, and work on the ground to identify and remove barriers to voting. Election Protection is focused on defending the right to vote and providing information to help all voters. Through the 866-OUR-VOTE hotline, Election Protection helps voters find information about registration and voting procedures, as well as address problems at the polls, including intimidation. Members of the coalition also periodically survey and speak with election officials, gathering reports of harassment, threats, and intimidation that they face online and in person. *See* Brennan Ctr. for Just. & Bipartisan Pol'y Ctr., *Election Officials Under Attack: How to Protect Administrators and Safeguard Democracy* (June 2021), https://www.brennancenter.org/our-work/policy-solutions/election-officials-under-attack; Brennan Ctr. for Just., *Local Election Officials Survey* (June 2021; March 2022; April 2023). Election Protection has a team that monitors social media and other online platforms for election disinformation, voter intimidation, and other threats to election integrity.

Amici have met with officials from DOJ, DHS, CISA, and other federal agencies, as well as state and local officials, to relay information

gathered from community partners, election officials, online monitoring, and the hotline. The Lawyers' Committee has submitted complaints concerning online election disinformation, violent threats against voters and officials, and other forms of voter suppression to federal agencies such as the FBI and FCC. *See, e.g.*, *In re Burkman*, Forfeiture Order, FCC 23-44, No. EB-TCD-21-00032652 (FCC June 6, 2023) (voter intimidation robocalls). Before elections, DOJ asks Election Protection about concerns being reported to the hotline and for recommendations about where to send poll observers. The availability of these communication channels fosters collaboration and enables federal agencies to use the information to protect the safety and integrity of elections, including by better allocating limited resources to protect the security of election officials and voters.

Election Protection also works with major social media companies to alert them to polling place disruptions, evolving threats to voters and election officials, and disinformation that violates platforms' rules. Like government officials, social media companies rely on Election Protection to give them insight into the experiences of users so that the

companies can better understand the threat landscape on their platforms.

## ARGUMENT

## I.   THE INJUNCTION VIOLATES THE FIRST AMENDMENT RIGHTS OF AMICI AND OTHER CIVIL SOCIETY ORGANIZATIONS DEDICATED TO ENSURING FREE AND FAIR ELECTIONS.

Defendants correctly note that the district court's injunction suffers from numerous legal errors related to the merits of the case and the court's equitable authority, including vagueness and overbreadth, uncertainty as to who is bound by the injunction and what is proscribed, and exceptions that contradict the proscribed conduct. But those are not the only fundamental defects plaguing the injunction. It also violates the First Amendment rights of a wide swath of nonparty individuals and organizations.

The injunction is an unconstitutional, content-based prior restraint on free speech and the First Amendment right to petition the government because it prohibits the government from communicating with civil society organizations, including amici, regarding particular subjects. These prohibitions fail strict scrutiny, as they sweepingly prohibit, without justification, speaking and petitioning regarding

election disinformation and are so vague that they fail to provide adequate notice of what is prohibited. As a result, critical efforts to promote election integrity and address voter intimidation will be chilled.

### A.    The Injunction Is a Prior Restraint on Amici's Free Speech.

The injunction is a content-based prior restraint on amici's right to speak to government officials.

It is well settled in this Circuit that injunctions prohibiting future communication between specified persons are prior restraints on free speech. *See Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 579 (5th Cir. 2005) (citing *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963)); *see also Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971) (treating temporary injunction as a prior restraint on free speech). And that is precisely what the injunction in this case does. As relevant to amici's work through Election Protection—and to other organizations dedicated to ensuring free and fair elections—the injunction prohibits the federal government officials from:

> collaborating, coordinating, partnering, switchboarding, and/or jointly working with the Election Integrity Partnership, the Virality Project, the Stanford Internet

Observatory, or any like project or group for the purpose of urging, encouraging, pressuring, or inducing in any manner removal, deletion, suppression, or reduction of content posted with social media companies.

ROA.26613.

Each of these actions necessarily requires communication with organizations, including amici, dedicated to protecting voters and ensuring access to accurate information. Indeed, banning "switchboarding" prohibits communication between Defendants and organizations like amici, as the district court defines switchboarding as "forward[ing] information to [Defendants]" to "in turn share . . . with the social-media companies." ROA.26522.

The injunction's ban on collaboration and information sharing for certain purposes is also indisputably content-based. The ban explicitly turns on the purpose and substance of communications with organizations like amici, so plainly "applies to particular speech because of the topic discussed or the idea expressed." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015).

This content-based speech ban is not just a restraint on Defendants' speech; it also restrains the voter protection organizations that would otherwise speak with Defendants. Specifically, the

injunction purports to prohibit "all acting in concert with" Defendants related to the injunction's prohibited conduct. ROA.26614. While the district court did not define what constitutes "acting in concert with" Defendants, the implication of this pronouncement is clear: Nonparties beware; this injunction may apply to you.

**B.    The Injunction Infringes Amici's Right to Petition the Government.**

Separate and apart from whether the injunction chills amici's free speech, the content-based speech ban also infringes amici's First Amendment right to petition the government for a redress of grievances.

The right to petition is "one of the most precious of the liberties safeguarded by the Bill of Rights." *Lozman v. City of Riviera Beach*, 138 S. Ct. 1945, 1954-55 (2018) (cleaned up). It "allows citizens to express their ideas, hopes and concerns to their government and their elected representatives." *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 388 (2011).

The right to petition "extends to all departments of the Government." *BE & K Constr. Co. v. NLRB*, 536 U.S. 516, 525 (2002); *see also Gates v. City of Dallas*, 729 F.2d 343, 345 (5th Cir. 1984); *United*

*States v. Young*, 231 F. Supp. 3d 33, 104 (M.D. La. 2017) (right to petition extends to lobbying). This right, central to the nation's founding, encompasses citizens communicating concerns to federal and state government bodies tasked with protecting the right to vote. *See Bernstein v. Sims*, __F Supp. 3d __, 2022 WL 17365233, at *5 (E.D.N.C. Dec. 1, 2022) (issuing preliminary injunction against county board of elections, which had barred plaintiff from attending public board meetings).

Section five of the injunction guts amici's and other voter protection organizations' right to petition the government about vitally important election security issues. As discussed above, the injunction, in all its opacity, could be read to prohibit the very federal agencies tasked with protecting the right to vote—DOJ, the FBI, and CISA—from receiving and sharing information from amici about election disinformation or voter intimidation. ROA.26613.

The injunction's broader ban on government agencies collaborating or coordinating "in any way" with amici and other voter protection organizations regarding broad swaths of election disinformation, misinformation, and voter intimidation on social media

prohibits two-way communication necessary for a redress of grievances. *See id.* Even if there was no limit on amici's ability to talk to Defendants about disinformation or misinformation on social media, the agencies would be legally precluded from listening, much less taking any constitutionally valid action in response. This renders amici's petition rights illusory.

### C.    The Injunction Fails Strict Scrutiny.

As a content-based prior restraint on free speech and the right to petition, the injunction is subject to strict scrutiny. *See Reed*, 576 U.S. at 163-64; *Wayte v. United States*, 470 U.S. 598, 610 n.11 (1985) (speech and petition are "generally subject to the same constitutional analysis"). Accordingly, the injunction is "presumptively unconstitutional and may be justified only if the government proves that [it is] narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163; *see also Carroll v. President & Comm'rs of Princess Anne*, 393 U.S. 175, 183 (1968) (an injunction "must be couched in the narrowest terms that will accomplish the pin-pointed objective").

An injunction cannot satisfy this test where its scope exceeds its purpose. *See Test Masters*, 428 F.3d at 570 (prohibition on

"communicating directly with, threatening, or harassing Test Masters Educational Services, Inc., its employees, staff, counsel, counsel's employees, or counsel's staff" was an unconstitutional prior restraint because it prohibited "all communication" and not just unprotected harassment); *cf. Fed. Election Comm'n v. Wisc. Right to Life*, 551 U.S. 449, 478 (2007) ("A court applying strict scrutiny must ensure that a compelling interest supports *each application* of a statute restricting speech." (emphasis in original)). Even an injunction that seeks to limit only unprotected speech or conduct cannot withstand scrutiny if its guardrails are so vague that parties cannot fairly determine what speech is permitted or prohibited. *Metro. Opera Ass'n, Inc. v. Local 100, Hotel Emps. & Rest. Emps. Int'l Union*, 239 F.3d 172, 176 (2d Cir. 2001).

The injunction here fails the narrow tailoring requirement on both overbreadth and vagueness grounds.

*First*, the injunction is not narrowly tailored to the asserted interest of halting unconstitutional government coercion. For example, the injunction against switchboarding prohibits merely communicating information for disfavored purposes, even when that communication does not amount to coercion. *See* ROA.26613. Moreover, the injunction

restrains an untold number of non-governmental entities from communicating with the government—potentially including amici—regardless of whether they were involved in the alleged wrongs or underlying facts. By resort to language such as "and like companies" and "or any like project or group," the injunction appears to be limitless in application. *Id.* This sweeps far broader than any alleged constitutional violation the injunction seeks to remedy.

The injunction's exceptions further confirm its lack of tailoring. For example, by carving out only "*criminal* efforts to suppress voting," ROA.26614 (emphasis added), the injunction still prohibits amici from reporting to Defendants voter intimidation that can only be challenged civilly. *See, e.g.*, 52 U.S.C. § 10308(d)-(e); 42 U.S.C. § 1985(3). By the injunction's terms, then, amici cannot even report to DOJ's Civil Rights Division the doxxing of minority voters or voters affiliated with a particular religion or political party, as doxxing may not always be criminal but may still cause civilly actionable voter intimidation. *Cf. Wohl*, 2023 WL 2403012, at *22 (robocall that deceptively threatened "that a voter's private information will become exposed if that person votes by mail" violated Voting Rights Act). Moreover, it may be unclear

28

at the outset whether an act is a crime (covered by the exception) or non-criminal (protected by the injunction), exacerbating the risk of violating the injunction. By inhibiting voter protection organizations from reporting grave civil rights concerns to the proper agency, the injunction strikes at the very core of the First Amendment's free speech and petition protections. The injunction should be vacated as insufficiently tailored. *See Test Masters*, 428 F.3d at 570 (injunction held overbroad where court did not identify circumstances justifying prohibition on "all communication" between specified parties).

*Second*, the injunction's vague text fails to provide organizations like amici with adequate guidance as to what speech is prohibited.

Injunctions do not provide adequate guidance where they proscribe vast swaths of expressive conduct without defining what conduct crosses the line. Illustrative is *Metropolitan Opera*, where the Second Circuit vacated an injunction prohibiting various types of speech that generally are unprotected by the First Amendment, including "engaging in fraudulent or defamatory representations" and "threatening or harassing" the plaintiff. 239 F.3d at 176. Noting that the district court held the defendant in contempt under the injunction

for chanting "Shame on You" and "No More Lies," the Second Circuit held the injunction was an unconstitutional prior restraint that "fr[o]ze" legitimate, protected speech because the injunction was "so vague and imprecise that the [defendant] cannot fairly determine what future speech is permitted and what speech might place it in contempt." *Id.* at 176, 178-79.

The injunction here suffers from the same lack of definition. In shaping its prohibitions, the injunction merely incants general principles—which is platitude, not guidance. For example, carving out "threats that threaten the public safety or security of the United States" is no more informative than the enjoined "threatening or harassing" of plaintiff in *Metropolitan Opera. Compare* ROA.26615, *with Metro. Opera*, 239 F.3d at 176. No more illuminating is basing the injunction's prohibitions on whether a social media post is "protected free speech" or "protected by the Free Speech Clause of the First Amendment to the United States Constitution in accordance with the jurisprudence of the United States Supreme Court." ROA.26660; ROA.26613-14. Indeed, it is precisely because "the line between legitimate and illegitimate speech is often so finely drawn" that "a free society prefers to punish

the few who abuse rights of speech after they break the law than to throttle them and all others beforehand." *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559 (1975).

The other enumerated carveouts fare no better. The injunction time and again resorts to conclusory terms like "criminal activity," "criminal conspiracies," "national security threats," "criminal efforts to suppress voting," "threats that threaten the public safety or security of the United States," and "postings intending to mislead voters about voting requirements and procedures." A government official may well not know at the outset whether online conduct fits into one of those categories absent further investigation and discussion with social media companies or until the culmination of a lawsuit. Where investigation crosses into final determination—of "criminal efforts," say—is often not binary. And if investigation alone is a sufficient purpose to meet an exception, then the exceptions swallow the rule and the injunction is meaningless—it serves no purpose other than to paralyze those charged with protecting elections.

Indeed, the injunction is even vague about which entities are prohibited from collaborating with the government. An injunction can

hardly get vaguer than "and like companies" (ROA.26612, defining "social media companies") and "or any like project or group" (ROA.26613, identifying organizations with whom Defendants may not collaborate, coordinate, partner, or switchboard). Rather than specifically enumerating subject entities, the injunction leaves it to the reader to predict the roster—at their peril.

The resulting opaqueness leaves amici and comparable private actors, as well as Defendants, helpless to divine the injunction's dividing line between permitted and prohibited. Social media posts about the security of mail-in voting could well come within exceptions for "informing social-media companies of postings intending to mislead voters about voting requirements and procedures" (ROA.26615)—or not, since they could equally fall within proscribed conduct. Obeying the law is not supposed to be a guessing game, particularly where constitutional rights are concerned.

### D.    The Injunction Inhibits Amici's Ability to Discuss Election Protection Matters with the Government.

The injunction's crippling overbreadth and vagueness will chill critical information-sharing between organizations like Election Protection, local election officials, federal agencies, and social media

companies. This in turn will hobble citizens from making informed decisions and participating in elections.

The immediate chilling effects are obvious: government will cease engaging with social media companies and voter protection organizations to avoid the risk of contempt. This has already happened. One day after the injunction's issuance, the State Department cancelled its regular monthly meetings with Facebook "pending further guidance." Joseph Menn et al., *State Dept. cancels Facebook meetings after judge's 'censorship' ruling*, Wash. Post (Jul. 5, 2023), https://www.washingtonpost.com/technology/2023/07/05/missouri-biden-judge-censorship-ruling-analysis/. Facebook's spokesperson anticipated that Facebook's regular meetings with other executive agencies, such as CISA, were also likely to be cancelled given the injunction. *Id.* Just as the State Department cancelled meetings with Facebook, other enjoined government agencies and officials will be chilled from meeting with amici to discuss Election Protection priorities. *See* Factual Background, § III, *supra*. This will undermine amici's critical voter protection missions.

The injunction will likewise chill communications between Election Protection and state and local election officials. Election officials must be

able to combat disinformation to administer free and fair elections,
including by reporting falsehoods they learn about from voters and civil
society groups such as Election Protection to those who host social media
platforms. But there is no limiting principle in this injunction to prevent
a similar injunction being issued against state actors beyond the federal
Defendants. Consequently, state and local election officials could be
intimidated from working with Election Protection or from directly or
indirectly combatting disinformation.

The injunction's chilling effects imperil Election Protection's core
mission.

## II.  THE INJUNCTION'S VAGUENESS AND OVERBREADTH VIOLATE FEDERAL RULE 65.

In addition to violating the Constitution, the injunction runs afoul
of the Federal Rules of Civil Procedure.

Rule 65(d)(1) commands that a preliminary injunction order "state
its terms specifically" and "describe in reasonable detail" the conduct to
be enjoined. Fed. R. Civ. Proc. 65. This Court has cautioned against
injunctions containing "broad generalities" rather than describing
enjoined conduct in sufficient detail. *Scott v. Schedler*, 826 F.3d 207, 213-
14 (5th Cir. 2016). These requirements are not simply "technical,"

*Schmidt v. Lessard*, 414 U.S. 473, 476 (1974), and a vague injunction can result in "deadly" consequences. *U. S. Steel Corp. v. United Mine Workers of Am.*, 519 F.2d 1236, 1246 (5th Cir. 1975). "An overbroad injunction is subject to vacatur." *Union Pac. R.R. Co. v. City of Palestine*, 2021 WL 1164396, at *1 (E.D. Tex. Mar. 25, 2021); *Francisco Sanchez v. Esso Standard Oil Co.*, 572 F.3d 1, 15 (1st Cir. 2009) (order that fails to comply with these requirements "should be set aside on appeal") (internal quotations omitted). The district court's injunction violates both Rule 65 and the prohibition on overbroad injunctions.

## A.    The Injunction is Unspecific and Undefined.

An injunction is sufficiently defined where "an ordinary person reading the court's order should be able to ascertain from the document itself exactly what conduct is proscribed." *U.S. Steel Corp.*, 519 F.2d at 1246 n.20. The instant injunction fails this test. As described above, the injunction leaves key terms undefined. *See Scott*, 826 F.3d at 207 (vague injunction found impermissible under Rule 65 where key terms and policies remained undefined); *John Doe #1 v. Veneman*, 380 F.3d 807, 820 (5th Cir. 2004) (same). It requires amici to guess the proscribed conduct. *See Consolidation Coal Co. v. Disabled Miners of S. W. Va.*, 442 F.2d

1261, 1267 (4th Cir. 1971) (holding the term "any other manner" rendered injunction indefinite). And its confusing and contradictory carveouts create additional ambiguity. For these reasons, the injunction violates Rule 65.

### B.    The Injunction is Overbroad.

Because "[t]he scope of injunctive relief is dictated by the extent of the violation established . . . the district court must narrowly tailor an injunction to remedy the specific action which gives rise to the order." *John Doe #1*, 380 F.3d at 818 (cleaned up). An injunction is overbroad where it exceeds the legal basis of the lawsuit and the "extent of the violation established." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). It is within the power of the court to "mould each decree to the necessities of the particular case." *B. H. Bunn Co. v. AAA Replacement Parts Co.*, 451 F.2d 1254, 1269 (5th Cir. 1971); *Barbee v. Collier*, 2022 WL 16860944, at *2 (5th Cir. Nov. 11, 2022), *cert. denied*, 143 S. Ct. 440 (2022) ("A district court abuses its discretion if it issues an injunction that 'is not narrowly tailored to remedy the specific action which gives rise to the order as determined by the substantive law at issue.'") (internal citations omitted).

The injunction exudes overbreadth. It restrains an untold number of individuals and entities regardless of their involvement in the alleged wrongs and uses language like "and like companies" and "or any like project or group." *See E.T. v. Paxton*, 19 F.4th 760, 769 (5th Cir. 2021) (injunction overbroad where it was not limited to the parties in the case); *Consolidation Coal*, 442 F.2d at 1267 (holding the term "any other manner" was overbroad because order could apply to conduct far beyond the complained-of violations). Indeed, the injunction's sweeping proscription is akin to an "Obey the Law" order, which courts regularly deem violative of Rule 65. *N.L.R.B. v. Express Pub. Co.*, 312 U.S. 426, 435 (1941); *see also Payne v. Travenol Lab'ys, Inc.*, 565 F.2d 895, 898 (5th Cir. 1978).

Not only is the injunction substantively violative, it is also procedurally improper. These defects are no small matter. They strike at core First Amendment tenets, and will have grave consequences on amici's ability to carry out their missions to protect the right to vote.

## CONCLUSION

The Court should vacate the district court's injunction.

<table>
<tr><td></td><td>/s/ Scott L. Winkelman</td></tr>
<tr><td>Dated: July 28, 2023</td><td>Scott L. Winkelman</td></tr>
</table>

Dated: July 28, 2023

/s/ Scott L. Winkelman
Scott L. Winkelman
Michael H. Pine
Samuel Ruddy
CROWELL & MORING LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004
(202) 624-2972
swinkelman@crowell.com

Alexander J. Urbelis
CROWELL & MORING LLP
590 Madison Ave.
20th Floor
New York, New York 10022

Anna Z. Saber
CROWELL & MORING LLP
3 Embarcadero Center
26th Floor
San Francisco, CA 94111

Jon Greenbaum
Ezra Rosenberg
David Brody
Sanaa Ansari
Pooja Chaudhuri
Marc Epstein
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW
1500 K St. NW, Suite 900
Washington, DC 20016

Gowri Ramachandran
Mekela Panditharatne
Robyn N. Sanders
BRENNAN CENTER FOR
JUSTICE AT NYU SCHOOL OF
LAW
120 Broadway, Suite 1750
New York, NY 10271

Leah J. Tulin
BRENNAN CENTER FOR
JUSTICE AT NYU SCHOOL OF
LAW
1140 Connecticut Avenue NW,
Suite 1150
Washington, DC 20036

*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on July 28, 2023, I electronically filed the foregoing brief with the Clerk of the Court of the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. I certify that all other participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Scott L. Winkelman
Scott L. Winkelman

# CERTIFICATE OF COMPLIANCE

The undersigned counsel certifies that this brief:

(i) complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,479 words, including footnotes and excluding the parts of the brief exempted by Rule 32(f);

(ii) complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 point Century Schoolbook;

(iii) all required privacy redactions have been made;

(iv) the hardcopies submitted to the Clerk are exact copies of the ECF submission; and

(v) the digital submission has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.

Dated: July 28, 2023                    /s/ Scott L. Winkelman
                                        Scott L. Winkelman