**Case No. 23-30445**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

State of Missouri; State of Louisiana; Aaron Kheriaty; Martin
Kulldorff; Jim Hoft; Jayanta Bhattacharya; Jill Hines,

*Plaintiffs – Appellees*

v.

Joseph R. Biden, Jr.; Vivek H. Murthy; Xavier Becerra;
Department of Health & Human Services; Anthony Fauci; *Et al*.,

*Defendants – Appellants*

On Appeal from the United States District Court for the
Western District of Louisiana

**AMICUS CURIAE BRIEF OF THE AMERICAN CENTER FOR LAW
AND JUSTICE IN SUPPORT OF PLAINTIFFS-APPELLEES FOR
AFFIRMANCE OF THE DISTRICT COURT'S PRELIMINARY
INJUNCTION, AND OPPOSITION TO MOTION FOR STAY**

Jay Alan Sekulow
*Counsel of Record*
Craig L. Parshall*
Stuart J. Roth*
Jordan Sekulow*
Olivia F. Summers*
*American Center for Law & Justice*
201 Maryland Ave., NE
Washington, DC 20001
Telephone: (202) 546-8890
Facsimile: (202) 546-9309
* Not active Fifth Circuit Bar
  Members

Geoffrey Surtees,
American Center for Law & Justice
3001 Plymouth Road, Suite 203
Ann Arbor, Michigan 48105
Telephone: (734) 680-8007
Facsimile: (734) 680-8006


Dated: August 4, 2023

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons

and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the

outcome of this case. These representations are made in order that the judges of this

court may evaluate possible disqualification or recusal. In addition to the persons or

entities listed by the parties and other amici:

American Center for Law and Justice

Jay Alan Sekulow
Craig L. Parshall
Stuart J. Roth
Jordan Sekulow
Olivia F. Summers
Geoffrey Surtees

/s/Jay A. Sekulow
Jay A. Sekulow
*Chief Counsel*
American Center for Law & Justice
201 Maryland Ave., NE
Washington, DC 20001
Telephone: (202) 546-8890
Facsimile: (202) 546- 9309
Email: sekulow@aclj.org

**TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS ……………….…………………. i

TABLE OF AUTHORITIES …………………………….…………….….. iii

INTEREST OF THE AMICUS …………………………………………… 1

ARGUMENT……………………………………………….……………1

I.      The Plaintiffs-Appellees Have Standing…………………………….1

    A.    The States Have Standing to Ensure an Informed Electorate ………. 1
    B.    The Individual Appellees Have Standing ……………………….... 10

II.     Appellants Turned Dominant Online Platforms into State Actors ……... 11

III.    The Injunction is Proper ………………………...……………………12

    A.    The Appellees Show Substantial Likelihood of
          Success on the Merits……………………………….…………….13

        1.    A Finding of State Action Here is
              Uniquely Appropriate…………………………….…….. 13
        2.    Government Speech Cannot Not Suffer from
              a "Chilling Effect" ……………………………….…….. 17
        3.    State Action is Heightened by the Ultra Vires Conduct
              of the Agencies ………………………….……………………. 20

    B.    The Harm Is Certain to Continue Without an Injunction ………..…. 24

        1.    Signposts that Free Speech Harm Will Continue………….…. 25
        2.    Social Media Dominance Increases the Threat …..……….. 27

CONCLUSION……………………………………….…………………… 28

CERTIFICATE OF SERVICE …………………….………………...…………….... 29

CERTIFICATE OF COMPLIANCE ……………………...……………… 29

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Celbrezze*,
  460 U.S. 780 (1983)......................................................................4, 11

*Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*,
  894 F.3d 692 (5th Cir. 2018) .................................................14

*Baggett v. Bullitt*,
  377 U.S. 360 (1964)...............................................................21

*Baird v. State Bar of Arizona*,
  401 U.S. 1 (1971).................................................................21

*Bantam Books, Inc. v. Sullivan*,
  372 U.S. 58 (1963)................................................... 13, 23-24

*Biden v. Nebraska*,
  143 S. Ct. 2355, 216 L. Ed. 2d 1063 (2023)....................... 3-4

*Board of Regents of Univ. of Wis. System v. Southworth*,
  529 U.S. 217 (2000)...............................................................22

*Brentwood Academy v. Tenn. Secondary School Athletic Assn.*,
  531 U.S. 288 (2001)...............................................................19

*Brown v. Hartlage*,
  465 U.S. 45 (1945)............................................................. 5-6

*Buckley v. Valeo*,
  424 U.S. 1 (1976)....................................................................5

*Burton v. Wilmington Parking*,
  365 U.S. 715 (1961)......................................................... 15-16

*CBS, Inc. v. Democratic Nat'l Comm.*,
  412 U.S. 94 (1973)................................................................19

*Georgia v. McCollum*,
    505 U.S. 42 (1992)............................................................................... 2-3

*Haaland v. Brackeen*,
    143 S. Ct. 1609, 216 L. Ed. 2d 254 (2023)..........................................2

*Katzenbach v. Morgan*,
    384 U.S. 641 (1966)..............................................................................5

*Keyishian v. Board of Regents*,
    385 U.S. 589 (1967)............................................................................18

*Laird v. Tatum*,
    408 U.S. 1 (1972)................................................................................18

*Lamont v. Postmaster General*,
    381 U.S. 301 (1965)............................................................................18

*Lebron v. Nat'l Railroad Passenger Corp.*,
    513 U. S. 374 (1995)...........................................................................11

*Lugar v. Edmonson Oil Co.*,
    457 U.S. 922 (1982)............................................................................16

*Netchoice¸ L.L.C. v. Paxton*,
    49 F.4th 439 (5th Cir. 2022) ..............................................................28

*Norwood v. Harrison*,
    413 U.S. 455 (1973).......................................................................14-15

*O'Shea v. Littleton*,
    414 U.S. 488 (1974).......................................................................24-25

*Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*,
    268 U.S. 510 (1925)............................................................................12

*Roth v. United States*,
    354 U.S. 476 (1957)..............................................................................5

iv

*Republican Party v. White,*
536 U.S. 768 (2002) ........................................................................... 5-6

*San Antonio Indep. Sch. Dist. v. Rodriguez,*
411 U.S. 1 (1973) ............................................................................. 5, 10

*Skinner v. Railway Lab. Execs. Ass'n,*
489 U.S. 602 (1989) .............................................................................15

*Town of Chester v. Laroe Ests., Inc.,*
581 U.S. 433 (2017) .......................................................................... 1-2

*West Virginia State Board of Education v. Barnette,*
319 U.S. 624 (1943) .............................................................................28

## STATUTES

Cybersecurity and Infrastructure Security Agency Act of 201, Pub. Law 115-278 (2018) ....................................................................................24

Homeland Security Act of 2002, Pub. Law 107-296, Title I, section 101 (b)(1)(A)-(G) ...................................................................................23

National Defense Authorization Act for Fiscal Year 2017, 114 Pub. L. 328 § 1287 (2016) ....................................................................................22

U.S. Constitution, Art III, § 2, cl. 1 .......................................................12

## OTHER AUTHORITIES

Cybersecurity & Infrastructure Security Agency,
*About CISA* ........................................................................................24

David Byler, Serio Pecanha,
*Biden's voter margin in key states wouldn't fill the Rose Bowl. That will affect how he governs,* The Washington Post (2020) .......................................9

Derek B. Johnson,
  *CISA shakes up election security leadership ahead of 2024 election*, SC
  Media.com (2023) .................................................................................25

Hannah Macready,
  *LinkedIn Statistics You Need To Know In 2023,* Hootsuite.com (2023) ..............22

Joe Biden,
  *I don't know what [Hunter] was doing" in his foreign dealings: Axios
  interview*, Axios News Facebook (2019) ................................................8

Kari Paul,
  *Facebook and Twitter restrict controversial New York Post story on Joe
  Biden,* The Guardian (2020) ...................................................................8

Lee Brown,
  *Some early voters want to change their votes after Hunter Biden exposé*, New
  York Post (2020) ....................................................................................8

Michael Goodwin,
  *Hey Joe Biden, what did you know about Hunter's dirty deals?: Goodwin*,
  New York Post (2020) ...........................................................................8

Office of the Director of National Intelligence,
  *Digital Authoritarianism: A Growng Threat* (2023) ............................................27

Santi Ruiz,
  *Poll: Majority of Americans Say Big Tech Censorship of Hunter Biden
  Laptop Story Interfered With Election*, The Washington Free Beacon (2021) .. 8-9

Thomas Fujiwara, Karsten Muller, Carlo Schwarz,
  *The Effect of Social Media on Elections: Evidence from the United States,*
  Abstract (2022) ................................................................................. 9-10

U.S. Department of State,
  *Private Sector Commitments to Advance Demoracy*, Fact Sheet (2023) ..............25

**INTEREST OF THE AMICUS**

The American Center for Law and Justice (ACLJ) is an organization dedicated to the defense of civil liberties secured by law and to the advancement of constitutional governance. The ACLJ has submitted amicus briefs, *inter alia*, in a variety of cases, including in the U.S. Supreme Court and the Fifth Circuit Court of Appeals. The ACLJ offers this brief to add perspective on the standing of states to oppose federal overreach that suppresses election-related political speech, and to clarify the unique dangers of the federal government using market dominant social media platforms to act as its deputized censors of citizen expression.[1]

**ARGUMENT**

**I.    The Plaintiffs-Appellees Have Standing**

**A.    <u>The States Have Standing to Ensure an Informed Electorate.</u>**

Because all Plaintiffs-Appellees, comprised of the two States and the private individuals, seek the same relief, only one of them needs to establish standing. "[E]ach form of relief requested in the complaint" must be supported by "[a]t least one plaintiff" with standing. *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439

---

[1] No counsel for any party authored this brief in whole or in part. No person or entity aside from amicus, its members, or its counsel made a monetary contribution intended to fund the preparation or submission of this brief. All parties consented to the filing of this brief.

(2017). As we explain, both of the States and at least one of the private individuals have clearly established standing.

The Government has wrongly suggested that in *Haaland v. Brackeen* the Supreme Court decided a *parens patriae* issue that contradicted the position of the U.S. District Court here. Brief, 13-14.

The Supreme Court addressed two cases with standing issues in June 2023. *Haaland v. Brackeen*, 143 S. Ct. 1609, 216 L. Ed. 2d 254 (2023), the opinion cited by the Government, is easily distinguishable. There, the State of Texas had attempted to challenge, under an equal protection analysis, federal mandates to place Indian children in homes under a congressional statute that allegedly conflicted with state placement preferences. But as the majority held, Texas "cannot assert equal protection claims" belonging to its citizens, calling it a "thinly veiled attempt to circumvent the limits on *parens patriae* standing." *Haaland*, 143 S. Ct. 1640, n.11 (italics in the text).[2] The majority contrasted that case from the finding of standing in the race-based peremptory jury strike case brought by a state in *Georgia v. McCollum*, 505 U.S. 42 (1992). The Court pointed out that *McCollum* involved a "concrete injury" to the State itself. *Haaland*, 143 S. Ct. 1640, n.11.

---

[2] However, the majority did hold that Texas had sufficient standing for its anticommandeering claim against the federal government. *Haaland,* 143 S. Ct. 1632, n.5.

A review of *McCollum* shows that the injury striking at the sovereign interest of Georgia there was a loss of "public confidence" in the state jury system if it were to allow jury strikes based on race, which would create a situation where "the fairness and integrity of its own judicial process is undermined" because of racial discrimination. 505 U.S. at 50, 56.

Missouri and Louisiana have a similar sovereign interest, namely, "the fairness and integrity" of its participation in the federal system of elections if the federal government discriminatorily interferes with political speech; that interest of the States fully blooms when "public confidence" in our election systems "is undermined," *McCollum*, *supra*, by a federal partnership with dominant social media platforms for the purpose of another type of discrimination; namely, enforcing viewpoint censorship of citizens and citizen groups, particularly during election cycles.

In *Biden v. Nebraska*, also decided in June of 2023 though not cited in the Government's brief, the Supreme Court upheld a state's standing to successfully mount an attack against the Biden Administration's student loan forgiveness program, holding that the state had standing through the injury caused to a corporate third-party entity created by the state. *Biden v. Nebraska*, 143 S. Ct. 2355, 216 L. Ed. 2d 1063 (2023).

3

This case is slightly distinct from *Biden v. Nebraska* in two respects, although both distinctions strongly counsel in favor of standing here: First, the States do not sue because of injuries to an instrumentality created by them as in *Nebraska*, but instead, assert claims predicated on harm caused directly to them in their own right as state sovereigns.

Second, the injuries to the States' sovereign interests here transcend the kind of indirect economic harm that was found sufficient for standing in *Biden*. Indeed, an even more ominous injury is shown here: a dagger to the heart of the States' governance under a constitutional scheme based on public elections which in turn are wholly depend on an informed electorate. The agenda by the Government to suppress online political opinions and information during election cycles is the tip of that dagger.

"There can be no question about the legitimacy of the State's interest in fostering informed and educated expressions of the popular will in a general election" and "in voter education," *Anderson v. Celbrezze*, 460 U.S. 780, 796, n. 21 (1983) (reflecting on the relevance of voter information to the Founders' rejection of a popular vote process for the presidency, choosing the electoral college system instead, a factor that elevates the standing interests of the States in our case).

The four justices dissenting in *Andersen*, while disagreeing on the substantive issue, did not dispute the legitimacy of that state interest, and went further, quoting

from *Buckley v. Valeo*, 424 U.S. 1, 14-15 (1976) (per curiam), that "the ability of the citizenry to make informed choices among candidates for office is essential …" adding "[t]his is especially true in the context of candidates for President." *Andersen*, 460 U.S. 819, Rehnquist, C.J., dissenting.

Thus, states possess an "entirely legitimate interest in assuring the 'intelligent exercise of the [voting and election] franchise.'" *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 36 n.79 (1973) (quoting *Katzenbach v. Morgan*, 384 U.S. 641, 654-55 (1966)).

> Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution. The First Amendment affords the broadest protection to such political expression in order 'to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people.

*Buckley* v. *Valeo*, 424 U.S. 1, 14-15, (1976) (per curium) (quoting *Roth v. United States*, 354 U.S. 476, 484 (1957)).

A federal campaign that deliberately sequesters certain citizen ideas from public consumption directly undermines the goal of an informed electorate, a goal that is an "entirely legitimate" state interest. *San Antonio Indep. Sch. Dist. v. Rodriguez, supra.* That is a constitutional harm to the state Appellees because, "[i]t is simply not the function of government to select which issues are worth discussing or debating in the course of a political

campaign." *Republican Party v. White*, 536 U.S. 768, 782 (2002) (quoting *Brown v. Hartlage*, 465 U.S. 45, 60 (1945)).

The District Court found that the Government had suppressed an extensive amount of election-related speech. The District Court determined that the Government agencies were aiming at wholesale online speech suppression during elections, a goal that undeniably implicates the legitimate interests of the States.

As the White House demanded "changes" from Facebook about its content decisions regarding disinformation on its platform, it also accused it of having "increase[d] skepticism" among the public regarding the 2020 election and blamed it for a post-election Capitol *insurrection.* Mem. Ruling, ROA.26806; ROA.26807. The White House Press Secretary also publicly demanded on behalf of the President that social media companies stop "disinformation, and misinformation, especially related to … elections," and coupled that demand with an implied threat of "robust" anti-trust enforcement. Id., ROA.26813.

As of September, 2019, meetings were conducted between social media giants Facebook, Google, Microsoft and Twitter, and the Government agencies including the Office of the Director of National Intelligence (ODNI) and Homeland Security's CISA office; the agenda was "election issues" and "disinformation." Id., ROA.26852.

6

The FBI was an active player in online suppression during elections and attended those meetings. "For each election cycle, during the days immediately preceding and through election days, the FBI maintains a command center around the clock to receive and forward reports of 'disinformation' and 'misinformation.' The FBI requests that social-media platforms have people available to receive and process the reports at all times." Id., ROA.26852.

Yoel Roth, the head of Site Integrity at Twitter, provided a formal declaration on December 17, 2020, to the Federal Election Commission containing a contemporaneous account of the "hack-leak-operations" mentioned by the FBI at the meetings held between the FBI, other national-security agencies, and social-media platforms. Id., ROA.26853. Roth stated that one meeting occurred

> shortly before the 2020 presidential election, likely in October. I was told in these meetings that the intelligence community expected that individuals associated with political campaigns would be subject to hacking attacks and that material obtained through those hacking attacks would likely be disseminated over social-media platforms, including Twitter … I also learned in these meetings that there were rumors that a *hack-and-leak operation would involve Hunter Biden*.

Id., (emphasis added) ROA.26853; ROA.26854.

But the FBI already had the Hunter Biden laptop since December of 2019 and "knew that the later-released story about Hunter Biden's laptop was not Russian disinformation." Id., ROA.26854. Despite that, it avoided responding to questions from social media companies about whether the Hunter Biden hack-and-leak theory

7

was true. Id., ROA.26854. The result is that in the weeks before the national election in 2020, both Twitter and Facebook blocked the New York Post's coverage of what the laptop emails showed about Hunter's international dealings when Joe Biden was Vice-President, emails which suggested the Vice-President's possible involvement;[3] a potential problem for his campaign because candidate Biden had denied knowledge of his son's foreign business work.[4]

The upshot of that sweeping act of censorship was a potential impact on the presidential election in 2020 and a loss of public confidence in the election process. Some polls indicate that had the story been widely circulated rather than being suppressed, it may have changed voters' minds; an even larger number polled believe it constituted election interference.[5] The power of dominant social media platforms

---

[3] Kari Paul, "Facebook and Twitter restrict controversial New York Post story on Joe Biden," The Guardian (October 14, 2020).

[4] Joe Biden, "I don't know what [Hunter] was doing" in his foreign dealings: Axios interview, December 8, 2019, accessed at: https://www.facebook.com/axiosnews/videos/joe-biden-i-dont-know-what-hunter-was-doing-for-burisma/530590790790857379/; See also, Michael Goodwin, "Hey Joe Biden, what did you know about Hunter's dirty deals?: Goodwin," New York Post (October 17, 2020). Accessed at https://nypost.com/2020/10/17/what-did-joe-biden-know-about-hunters-crook-emails-goodwin/.

[5] By October 26, twelve days after the New York Post's exposé and the Facebook/Twitter news ban, more than 58 million voters had already cast their early ballots, but some apparently were regretting it; Google trends data revealed that "change my vote" was spiking on Google's search engine and that it was "linked to searches for 'Hunter Biden." See: Lee Brown, "Some early voters want to change their votes after Hunter Biden exposé," New York Post (October 26, 2020), accessed at: https://nypost.com/2020/10/26/early-voters-want-to-change-vote-after-hunter-

to impact public political perception and thus voting behavior, positively by amplification or negatively by suppression, is clear. A Princeton research study determined the difference that one social media platform alone can make: "Twitter lowered the Republican vote share in the 2016 and 2020 presidential elections," though having a less dramatic impact on congressional seats.[6]

Manipulation of online public opinion can erode public confidence in our election system, particularly in close elections. From an electoral college standpoint, Joe Biden secured his victory in a handful of battleground states by winning a slim margin of votes which, as one commentator noted, would not fill the Rose Bowl.[7] Again, the point is not about any particular election outcome, but the integrity of the process ungirding elections so that the public remains confident and civically engaged. That includes the kind of unfettered, public political debate that ensures a fully informed electorate, something in which the States have a "entirely legitimate

biden-exposes/.   See also: Santi Ruiz, "Poll: Majority of Americans Say Big Tech Censorship of Hunter Biden Laptop Story Interfered With Election," The Washington Free Beacon, October 27, 2021, accessed at: https://freebeacon.com/biden-administration/poll-majority-of-americans-say-big-tech-censorship-of-hunter-laptop-story-interfered-with-election/.

[6] Thomas Fujiwara, Karsten Muller, Carlo Schwarz, "The Effect of Social Media on Elections: Evidence from the United States," Abstract, October 25, 2022, accessed at: https://www.princeton.edu/~fujiwara/papers/SocialMediaAndElections.pdf.

[7] David Byler, Serio Pecanha, "Biden's voter margin in key states wouldn't fill the Rose Bowl. That will affect how he governs," The Washington Post (November 23, 2020),  accessed at:  https://www.washingtonpost.com/opinions/2020/11/23/bidens-voter-margin-key-states-wouldnt-fill-rose-bowl-that-will-affect-how-he-governs/.

interest," *San Antonio Indep. Sch. Dist.*, and which presupposes "the ability of the citizenry to make informed choices," *Andersen*, *supra*.

### B.    <u>The Individual Appellees Have Standing</u>

Election-related information suppression by the Government against the individual Plaintiffs-Appellees illustrates the informed-electorate standing of the States. It also establishes the separate standing of the individuals.

Missouri-based Gateway Pundit's owner Hoft had his Twitter account suspended for commenting on Virginia election law, and was later banned for commenting on Michigan vote counting activities, all regarding the 2020 election. Mem. Ruling., ROA.26797; ROA 26798. Hoft was eventually banned on Facebook, Twitter, Instagram and YouTube, Id., ROA.26918. Those tech platforms had all been barraged with take-down demands from the Government's agencies.

The agencies also sought censorship of viewpoints in an ever-widening range of politically sensitive subjects like "gas prices, parody speech, calling the President a liar, climate change, gender, and abortion," (footnotes omitted). Id., ROA.26934. The censoring of Hoft's Gateway Pundit, to name just one, is concretely traced to the effects of the Department of Homeland Security's Cybersecurity and Infrastructure Security Agency (CISA) participating in the Election Integrity Project (EIP)'s "switch-boarding" system of routing federal agency complaints about supposed disinformation through a special portal directly to social media companies.

10

As elections neared, that effort was "ramped up." Id., ROA.26865. Complaints were registered to Twitter by a coordinated Government and EIP effort against Gateway Pundit/Hoft's online comments. Id., ROA.26866. The suppressive outcome was predictable.

## II.     Appellants Turned Dominant Online Platforms into State Actors

In *Lebron v. National Railroad Passenger Corporation*, 513 U. S. 374, 397 (1995), the Court held that Amtrak had to comply with the First Amendment, ruling that as a government-created state actor, its status as a mere *instrumentality* of the government should not permit it to "evade the most solemn obligations imposed in the Constitution by simply resorting to the corporate form."

In this case, the facts show a different kind of state-actor instrumentality; not one formed by corporate formalities, but even more troublesome: an informal instrumentality created through quiet, under-radar meetings, strategies and consistently coordinated efforts. The Executive Branch and its many agencies provided ongoing and substantial encouragement, motivation, and direction to mammoth Silicon Valley platforms to perform the kind of free-speech suppression against citizens, organizations, and disfavored media groups that the government could not perform on its own, and certainly not in the daylight. The Government has been effectively using those internet information platforms as its *de facto* instrument for public censorship. That, the Constitution does not permit.

In *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963) the Supreme Court addressed such a scenario. It noted that a finding of state action in an appropriate case can provide the "adequate bulwarks" necessary to stop state officials' "barely visible" suppression of private citizens' speech through informal schemes or a "system of informal censorship." 372 U.S. at 66, 69, 71. The injunction here provides that kind of *bulwark,* and, as discussed below, is particularly appropriate in addressing the massive scope of citizen speech that is jeopardized when the power of the federal government enlists market-dominating social media platforms to enforce the Administration's speech policies against unsuspecting citizens.

## III.    The Injunction is Proper

There is nothing exotic about the District Court's exercise of equitable relief here. The Constitution gives federal courts judicial power to decide cases "in Law and Equity." U.S. Constitution, Art III, § 2, cl. 1. "Prevention of impending injury by unlawful action is a well-recognized function of courts of equity." *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 536 (1925).

The District Court's preliminary injunction is reviewed under the abuse of discretion standard. *Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*, 894 F.3d 692, 696 (5th Cir. 2018). "A district court abuses its discretion if it grants an injunction based on clearly erroneous factual findings or erroneous conclusions of law." Id. Neither of those grounds are present in the District Court's ruling.

**A.**     <u>**The Appellees Show Substantial Likelihood of Success on the Merits**</u>

     **1.**     *A Finding of State Action Here is Uniquely Appropriate*

The cases that the District Court properly relied upon and in which the Supreme Court has found state action, involved the presence of certain factual markers in terms of the objective relationship, or functional interactions, between government and private or quasi-private entities. The legal violations caused there by the private entities were imputed to government by reason of those functional markers.

Here, the relationship between the Biden Administration agencies and the tech platforms that caused the District Court to impute a First Amendment violation to the Government was even more extreme. That relationship presents more than state action merely arising from abstract interrelations between government and private entities. Rather, the suppression of citizen free speech under the guise of disinformation *was the very reason for the Government's insinuation of itself* into the inner workings of vast social media platforms. It was, in effect, state action created to accomplish the very First Amendment illegality that the agency staff knew or had reason to know that they could not freely execute by themselves. In such cases, that alone should constitute a sufficient basis to find state action even though under different fact patterns that element would not be required.

This knowing use of private intermediators to effect censorship is clear from the intimate working relationship of DHS's CISA and subagencies like the State Department's Global Engagement Center (GEC), with the private EIP that was partially funded by grants from the U.S. Government, Mem. Ruling, ROA.26871. The point of this partnership was to accomplish what the Government could not do directly or publicly.

According to DiResta of the Sanford Internet Observatory (SIO) that helped to operate the EIP, the "EIP was designed "to *get around* unclear legal authorities, including *very real First Amendment questions* that would arise if CISA or the other Government agencies were to monitor and flag information for censorship on social media." Id. (emphasis added). ROA.26871.

Contrast the audacity of this knowing creation of state action as a First Amendment *workaround* with the prior cases cited by the District Court where the Supreme Court found state action in cases with much less, if any, evidence of overt governmental intention to avoid constitutional or legal constraints.

In *Norwood v. Harrison*, 413 U.S. 455, 465-66 (1973) the Court found a violation of Equal Protection in a state practice of providing textbooks to private schools without regard to whether they practiced racial discrimination, resulting in increased segregation in schools. Lacking was evidence of any direct intention to assist racial discrimination. In fact, though the Court was willing to assume "good

14

intentions," it recognized that the state could not do through encouragement of private entities what it was forbidden to do itself.

In *Skinner v. Railway Lab. Execs. Ass'n*, 489 U.S. 602 (1989), the government's arrangement with the private railroads that encouraged them to perform tests on employees for drugs and alcohol was sufficient for the application of the Fourth Amendment, despite the lack of suggestion of any improper motive on the part of the government or the railroad.

Parking space leased by a government unit to a restaurant that practiced discrimination in *Burton v. Wilmington Parking*, 365 U.S. 715, 724 (1961), was found to create a merely passive form of "state participation and involvement in discriminatory action" sufficient for state action, but with no evidence that the government parking authority had willfully established the relationship with the restaurant for discriminatory reasons.

Nevertheless, as we have argued, deliberate (or even reckless) acts by federal agencies that violate the free speech rights of U.S. citizens by enlisting the actions of deputized social media platforms should provide a *sufficient* cause for the finding of state action, even if not a *necessary* element in other types of state action cases. This fact-based framework is confirmed by close analysis of the opinion cited by the Government: *Lugar v. Edmonson Oil Co*., 457 U.S. 922 (1982), Brief, 26.

It would be a mistake to force-fit the *Lugar* two-step state action analysis into the case at hand. In *Lugar*, the Court reviewed its prior state action doctrinal landscape, and decided that certain legal questions were unnecessary "to be resolved" in the narrow context of that case:

> … the Court has articulated a number of different factors or tests in different contexts: *e.g.,* the "public function" test, *see Terry v. Adams, 345 U.S. 461* (1953); *Marsh v. Alabama,* 326 U.S. 501 (1946); the "state compulsion" test, *see Adickes v. S. H. Kress & Co.,* 398 U.S. at 398 U.S. 170; the "nexus" test, *see Jackson v. Metropolitan Edison Co.,* 419 U.S. 345 (1974); *Burton v. Wilmington Parking Authority, 365 U.S. 715 (1961)*; and, in the case of prejudgment attachments, a "joint action test," *Flagg Brothers,* 436 U.S. at 436 U.S. 157.[21] Whether these different tests are actually different in operation or simply different ways of characterizing the necessarily fact-bound inquiry that confronts the Court in such a situation *need not be resolved here. See Burton, supra,* at 365 U.S. 722 ("Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance.")

*Lugar,* 457 U.S. 939 (footnote included) (emphasis added).

The facts before the *Lugar* Court involved the pre-judgement attachment of property, something far afield from the facts in this case and from most of the other cases listed above by the Court. The majority also noted, that, "The holding today, as the above analysis makes clear, is limited to the particular context of prejudgment attachment." Id., n.21. Thus, what the Court did not resolve, was the broader application of its particular state action analysis to future unanticipated fact patterns, as here.

16

In *Brentwood Academy v. Tenn. Secondary School Athletic Assn.,* 531 U.S. 288, 300 (2001), the Court found state action where, among other factors, "the State of Tennessee has provided for entwinement from top down" into the affairs of the private athletic association. Here, the Government orchestrated constant meetings with and provided leadership to private tech companies regarding content moderation of "disinformation." Of course, in *Brentwood*, the Court did not have to explore whether the state induced the alleged First and Fourteenth Amendment violations that were pleaded in the Academy's suit against the Association, because another factual matrix there showed state action by sufficient "entwinement" between the state and the Association.

In this case, in addition to the other facts in this case that show state action under other legal formulations, it can be most clearly seen in the Government's plan to use private social media platforms to silence public dissent, a plan that it then carried out.

## 2. *Government Speech Cannot Not Suffer from a "Chilling Effect"*

Before the District Court, the Government, in its Memorandum in Support of Defendants' Motion to Stay Preliminary Injunction Pending Appeal and, Alternatively, for Administrative Stay, argued for a stay of the injunction in part because it would allegedly "chill" its ability to speak. ROA.26961. Likewise, a similar argument was made to this Court in its Emergency Motion Under Circuit

Rule 27.3 For A Stay Pending Appeal, that the injunction would "chill" the Government's expression to the public. Dkt. 11, pg. 3.

While the Government's opening brief refrains from explicit reference to a "chilling effect," it is clear this argument is still in play. In its opening volley, it notes that "one of the government's key roles is simply to provide the public with accurate and timely information, to dispel false rumors, and to explain what actions citizens and businesses can and should take to advance the public good," Brief, 1.

The generous carve-outs in the injunction, if coupled with good faith by the Government agencies, will provide them ample room to communicate with the public. Yet, from a doctrinal standpoint, this "chilling effect" fog needs to be cleared up. It is meritless for several reasons.

First, the Supreme Court has not applied the First Amendment "chilling effect" doctrine to governmental expression. In *Laird v. Tatum*, 408 U.S. 1, 11 (1972), where the Supreme Court reviewed the "chilling effect" doctrine, every case that it mentioned involved the protection of private speech, not government speech.[8] In subsequent cases, it has not embraced the idea advanced by the Government that, rather than a sword for the citizenry, the First Amendment should be a shield for the Government. As Justice Stewart put it, "The First Amendment protects the press

---

[8] The Court referenced *Baird v. State Bar of Arizona*, 401 U.S. 1 (1971), *Keyishian v. Board of Regents*, 385 U.S. 589 (1967), *Lamont v. Postmaster General*, 381 U.S. 301 (1965), and *Baggett v. Bullitt*, 377 U.S. 360 (1964).

from governmental interference; it confers no analogous protection on the Government." *CBS, Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94, 139 (1973) (Stewart, J., concurring).

Second, there are good reasons why that doctrine cannot be applied to the speech of the Government and their officials. When governmental speech is implicated, it is judged by different rules altogether. For instance, the usual First Amendment analysis that would apply to the infringement of the free speech rights of college students by a public university does not apply to government speakers who speak on behalf of the university. As a result, when "the University speaks … the analysis likely would be altogether different." *Board of Regents of Univ. of Wis. System v. Southworth*, 529 U.S. 217, 235 (2000).

Third, as a practical matter, the Government's chilling effect approach is a strange one to apply here. That doctrine was created to vindicate the free expression rights of citizens, rights that are infinitely vulnerable compared to the vast power of federal agencies with huge budgets, extensive staff, national reach, and intimidating enforcement authority. Further, unlike the average citizen, the federal government can command the attention of the nation instantly by messaging their policies through a network of media organizations which regularly cover their activities, meetings, press conferences and rule-making processes.

Pronouncements by the Government's agencies cannot be "chilled." The preliminary injunction entered by the District Court is a balanced, constitutional constraint on the operations of the Government's agencies.

### 3.     *State Action is Heightened by the Ultra Vires Conduct of the Agencies*

Although the States and the private plaintiffs pleaded, among other claims, a cause of action under the Administrative Procedure Act (APA), the District Court's ruling that granted the preliminary injunction was based on constitutional considerations, without deciding issues under the APA.

However, when a federal agency exceeds its express authority or violates limits established by Congress, and that conduct is intricately involved in the same nexus of conduct for scrutiny and analysis under both the state action doctrine as well as the First Amendment, that agency *ultra vires* activity becomes relevant. If nothing else, it helps to put a spotlight on what would otherwise be a "barely visible" scheme perpetuating a "system of informal censorship" spearheaded by the government. *Bantam Books, Inc.* v. *Sullivan*, *supra*.

Two examples illustrate how the Government's agencies have exceeded the guard rails established by Congress.

One is the activity of the State Department and its Global Engagement Center (GEC), labeled by the District Court as "State Department Defendants." The evidence showed that the GEC, along with the DHS' CISA, "were intertwined with

the … EIP (Election Integrity Project), and Stanford Internet Observatory" in pursuing the end of online disinformation. Mem. Ruling, ROA.26905. More specifically, the District Court found that:

> The State Department Defendants and CISA Defendants both partnered with organizations whose goals were to "get around" First Amendment issues … the State Department Defendants flagged and reported postings of protected free speech to the social-media companies for suppression.

Id., (footnote omitted), ROA.26905. This coordination was achieved through GEC, along with CISA, meeting regularly and working closely with social media companies. Id., ROA.26867. GEC had a permanent liaison to Silicon Valley. Id., ROA.26870. GEC, according to its own official, executed a "general engagement" (along with CISA) with the private EIP. Id., ROA.26870. The GEC "work[ed] closely" with the Stanford Internet Observatory (SIO). Id., ROA.26870. The SIO, of course, had helped to establish the EIP.

The EIP was created just 100 days before the 2020 national election. Id., ROA.26872. The SIO's DiResta admitted that the EIP was designed to "get around unclear legal authorities, including very real First Amendment questions" that would arise if CISA or other Government agencies were to monitor and flag information for censorship on social media. Id., ROA.26864.

21

Yet, the GEC ended up doing exactly that, meeting directly with Microsoft's U.S.-based and American-user saturated business platform LinkedIn[9] to "counter disinformation." Id., ROA.26870. Along with CISA, the GEC submitted censorship tickets through the EIP portal. Id., ROA.26873. That portal was established in part with Government funding, Id., ROA.26871. Those special complaints were delivered to U.S. social media platforms. Id., ROA.26871. The complaint "tickets" were "related to domestic speech by American citizens." Id., ROA.26871. Even "truthful" social media messages were subject to censorship, if deemed to be "misinformation." Id., ROA.26873.

This conduct by GEC, attacking domestic speech and sending ticketed censorship demands during the election cycle through the EIP (founded shortly before the 2020 election) leaped over the constraints imposed on it by Congress through its governing statute.[10]

The purpose of the GEC was to "lead, synchronize, and coordinate efforts of the Federal Government to recognize, understand, expose, and counter *foreign* state and non-state propaganda and disinformation efforts aimed at undermining United

---

[9] "[T]he US is LinkedIn's biggest market with over 194 million users. . . ." Hannah Macready, "LinkedIn Statistics You Need To Know In 2023," HOOTSUITE (February 22, 2023), accessed at: https://blog.hootsuite.com/linkedin-statistics-business/.

[10] National Defense Authorization Act for Fiscal Year 2017, 114 Pub. L. 328 § 1287(b)(3) (2016).

States national security interests." [11] (Emphasis added). The GEC has strict statutory prohibitions against using any of its funding for domestic "misinformation" campaigns: "LIMITATION. - None of the funds authorized to be appropriated or otherwise made available to carry out this section shall be used for purposes other than countering *foreign* propaganda and misinformation that threatens United States national security." [12] (Emphasis added). Its data collection, research and analysis activities are limited to "foreign" disinformation "intended for *foreign* audiences." [13] (Emphasis added).

CISA is a government entity within the Department of Homeland Security. DHS was created primarily to prevent terrorism aimed at the U.S. and to monitor connections between terror groups and drug trafficking and to disrupt those connections.[14] The governing statute for DHS' CISA contains no mention of "disinformation" or "misinformation" or any mission or authority to disrupt it domestically.[15] CISA's website describes its mission as one "to understand, manage, and reduce risk to our cyber and physical infrastructure."[16]

---

[11] Id. section 1287 (a)(2).

[12] Id. section 1287 (h).

[13] Id. section 1287 (b)(10).

[14] Homeland Security Act of 2002, Pub. Law 107-296, Title I, section 101 (b)(1)(A)-(G).

[15] Cybersecurity and Infrastructure Security Agency Act of 201, Pub. Law 115-278 (2018).

[16] "About CISA," Cybersecurity & Infrastructure Security Agency, accessed at: https://www.cisa.gov/about.

The efforts of the GEC and CISA to monitor and suppress the online expression of U.S. citizens is a radical leap over the boundaries of their congressional authority. That suggests that their conduct was anything but inadvertent.

### B.    The Harm Is Certain to Continue Without an Injunction

Past conduct is probative of continuing behavior for purposes of injunctive relief if the conduct predicted is not conjectural. "Of course, past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury." *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974) (injunction denied because of the lack of a "likelihood that respondents will again be arrested for and charged with violations of the criminal law and will again be subjected to bond proceedings, trial, or sentencing before petitioners").

In *O'Shea*, because the alleged threat required several steps of speculative prediction, it was not imminent. Here, by contrast, the Government has already exhibited a steady pattern of encouraging tech platforms to suppress citizen online expression; and not just any speech, but viewpoint specific speech: namely, regularly targeting the "political right," "conservative or right-wing political views." Mem. Ruling, ROA.26873; ROA.26885; ROA.26905; and ROA.26945.

Further evidence, explained below, shows that this conduct is part of a larger pattern of similar censorship activities of the Biden Administration that will continue unabated unless restrained by this Court.

### 1.    *Signposts that Free Speech Harm Will Continue*

DHS's CISA acknowledges that it planned its anti-disinformation campaign to continue into the 2024 election. Mem. Ruling, ROA.26867. Media reports show that election effort to block alleged "disinformation" from now until the 2024 election remains in full swing.[17]

On March 29, 2023, in the lead-up to its Summit for Democracy, the State Department announced its work with the White House's effort to fight "malign actors" who use technology to "undermine democracy." The State Department promoted Google's new "prebunking" campaign ("Jigsaw" project) against disinformation, an extension of its partnership with large tech platforms;[18] yet, the effort to prebunk ideas online, i.e. discrediting certain ideas in the mind of the public to inoculate citizens against them before they gain traction, would appear to be just another version of either free speech prior restraint, or indoctrination.[19]

---

[17] "The Cybersecurity and Infrastructure Security Agency will have a new lead official charged with coordinating the agency's election security efforts," which include responding to "disinformation campaigns." Derek B. Johnson, "CISA shakes up election security leadership ahead of 2024 election," SC Media.com (June 30, 2023),   accessed at: https://www.scmagazine.com/news/cisa-election-security-leadership-2024-elections

[18] U.S. Department of State, "Private Sector Commitments to Advance Democracy," Fact Sheet (March 29, 2023), accessed at:  https://www.state.gov/private-sector-committments-to-advance-democracy."

[19] "Prebunking" is opinion "inoculation" to immunize people against certain ideas before either being exposed to, or buying into, those ideas or beliefs. Google published this expert commentary: "Audience receptivity is key when designing a prebunking intervention. Ideally, the intervention will reach audiences before they

Other statements from the Biden Administration show this disinformation agenda is entrenched. A comment recently from the Office of the Director of National Intelligence (ODNI) which was a participant in working groups meetings fomenting domestic censorship of U.S. citizens on social media platforms, suggests the campaign is continuing, despite this lawsuit.

On April 24, 2023 the U.S. Director of National Intelligence, Avril Haines, reaffirmed the Biden Administration's commitment to ridding America of "disinformation," suggesting that the problem was not just abroad, but also "at home," stating that "the Intelligence Community" is seen as "a critical ally in the fight against authoritarianism and should contribute to the promotion of norms that help to protect against *the primary tools of digital authoritarianism* which are censorship, *misinformation and disinformation* …";[20] Director Haines elaborated

---

buy-in to misinformation. While there is some evidence to suggest that prebunking can still work after exposure to misinformation (known as "therapeutic inoculation"), it is more effective when audiences have not yet been fully convinced of the claim or narrative." "A Practical Guide to Prebunking *Misinformation,*" University of Cambridge, BBC Media Action, and Jigsaw (undated research paper), page 19, accessed at A_Practical_Guide_to_Prebunking_Misinformation.pdf (interventions.withgoogle.com).

[20] "Digital Authoritarianism: A Growing Threat," Office of the Director of National Intelligence, Director's comments delivered at the Carnegie Endowment for International Peace (April 25, 2023), accessed at: https://www.dni.gov/index.php/newsroom/speeches-interviews/speeches-interviews-2023/item/2375-digital-authoritarianism-a-growing-threat-at-the-carnegie-endowment-for-international-peace.

that the ODNI's "focus[]" on those issues is an adjunct to what "the President often says": "the struggle to bolster democratic governance *at home* and abroad is the defining challenge of our time." (Emphasis added).

The past censorship collaborations between the Biden Administration and tech giants will continue if not enjoined. The "industry working group" meetings conducted from 2019 to the present with social media giants and headed by DHS's CISA unit and that included the ODNI and the FBI, among other agencies, pursued an agenda on "election issues" and "disinformation" that likely "will continue through the 2024 election cycle" according to the FBI's Chan. Id., ROA.26851; ROA.26852.

## 2. *Social Media Dominance Increases the Threat*

The dangers of public free speech infringement here are multiplied by the full might of the federal government having been used to motivate and encourage giant digital platforms to do its bidding, creating a *duopoly* of immense censorship power comprised of the Executive Branch in Washington and Silicon Valley. The Fifth Circuit, in another context, has recognized that social media companies like Facebook, Twitter, and Google's YouTube, the same entities used by the Government's agencies to effect censorship, enjoy more than 50 million active monthly users, have an increasingly "entrenched" position as the "modern public

square," and possess "market dominance." *Netchoice¸ L.L.C. v. Paxton*, 49 F.4th 439, 445, 475, 477 (5th Cir. 2022).

That dominance, joined at the hip with the power of the Government, has created an existential threat to freedom of speech. It has constructed a complex joint venture of censorship to "proscribe what shall be orthodox in politics, nationalism, religion or other matters of opinion" - an unconstitutional venture expressly forbidden in *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 642 (1943), and one that was properly enjoined by the District Court.

## CONCLUSION

The Court should deny Appellants' motion for a stay pending appeal and affirm the District Court's preliminary injunction ruling.

/s/Jay A. Sekulow                    
Jay Alan Sekulow
*Counsel of Record*
Craig L. Parshall*
Stuart J. Roth*
Jordan Sekulow*
Olivia F. Summers*
*American Center for Law & Justice*
201 Maryland Ave., NE
Washington, DC 20001
Telephone: (202) 546-8890
Facsimile: (202) 546-9309
* Not active Fifth Circuit Bar
   Members

Geoffrey Surtees,
American Center for Law & Justice
3001 Plymouth Road, Suite 203
Ann Arbor, Michigan 48105
Telephone: (734) 680-8007
Facsimile: (734) 680-8006

Dated: August 4, 2023

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 4, 2023, the above amicus curiae brief was filed with this Court via the CM/ECF system, which will send notice of said filing to all counsel of record.

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that, pursuant to Rules 27, 29, and 32 of the Federal Rules of Appellate Procedure, the brief was prepared in Times New Roman 14-point font and its word count is less than half of the allotted 13,000 words for Appellees' brief.

/s/Jay A. Sekulow
*Counsel of Record,*
American Center for Law & Justice
American Center for Law & Justice
201 Maryland Ave., NE
Washington, DC 20002
Telephone: (202) 546-8890
Facsimile: (202) 546-9309
Email: sekulow@aclj.org