No. 23-30445

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

State of Missouri; State of Louisiana; Aaron Kheriaty; Martin Kulldorff; Jim Hoft; Jayanta Bhattacharya; Jill Hines,

Plaintiffs-Appellees,

v.

Joseph R. Biden, Jr.; Vivek H. Murthy; Xavier Becerra; Department of Health & Human Services; Anthony Fauci; et al.,

Defendants-Appellants.

_____

On Appeal from the United States District Court
for the Western District of Louisiana

BRIEF FOR PLAINTIFFS-APPELLEES

**JEFFREY M. LANDRY**
**Attorney General of Louisiana**
Elizabeth B. Murrill
*Solicitor General*
Tracy Short
*Assistant Attorney General*
D. John Sauer
*Special Assistant Attorney General*
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, LA 70802
(225) 326-6766
*Counsel for State of Louisiana*

**ANDREW BAILEY**
**Attorney General of Missouri**
Joshua M. Divine
*Solicitor General*
Todd A. Scott
*Senior Counsel*
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
(573) 751-8870
*Counsel for State of Missouri*

**(Continued on Inside Cover)**

John J. Vecchione
New Civil Liberties Alliance
1225 19th Street N.W., Suite 450
Washington, DC 20036
(202) 918-6905
*Counsel for Plaintiffs Dr. Jayanta Bhattacharya, Dr. Martin Kulldorff, Dr. Aaron Kheriaty, and Jill Hines*

John C. Burns
Burns Law Firm
P.O. Box 191250
St. Louis, MO 63119
(314) 329-5040
*Counsel for Plaintiff Jim Hoft*

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

No. 23-30445 – *Missouri, et al., v. Biden, et al.*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the Judges of this Court may evaluate possible disqualification or recusal.

Plaintiffs Dr. Jayanta Bhattacharya, Dr. Martin Kulldorff, Dr. Aaron Kheriaty, Ms. Jill Hines, Mr. Jim Hoft

Mr. John Vecchione – New Civil Liberties Alliance (Counsel for Plaintiffs Bhattacharya, Kulldorff, Kheriaty, and Hines)

New Civil Liberties Alliance, 1225 19th St. N.W., Suite 450, Washington, DC 20036

Mr. John Burns – Burns Law Firm (Counsel for Plaintiff Hoft)

Burns Law Firm, P.O. Box 191250, St. Louis, MO 63119

*/s/ D. John Sauer*
D. John Sauer
Counsel for State of Louisiana

## STATEMENT REGARDING ORAL ARGUMENT

The Court has set Oral Argument for August 10, 2023.

## **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS.......................................................... i

STATEMENT REGARDING ORAL ARGUMENT............................................... ii

TABLE OF CONTENTS ......................................................................................... iii

TABLE OF AUTHORITIES.................................................................................... iv

INTRODUCTION .....................................................................................................1

STATEMENT OF ISSUES .......................................................................................3

STATEMENT OF THE CASE ..................................................................................3

SUMMARY OF ARGUMENT.................................................................................18

ARGUMENT ...........................................................................................................22

I.     Plaintiffs Are Likely to Succeed on the Merits.........................................22

       A.  All Plaintiffs Have Standing..............................................................22

       B.  Plaintiffs Are Likely to Prevail on the First Amendment Claim.................33

       C.  Defendants' Factual Arguments Lack Merit. ..............................42

II.    Plaintiffs Face Irreparable Harm, and the Equities Favor an Injunction. ........49

III.   The Injunction Is Clear and Properly Tailored.................................................55

       A.  The Injunction Is Not Overbroad. ...............................................................55

       B.  The Injunction Is Not Vague. ......................................................................57

CONCLUSION ........................................................................................................60

CERTIFICATE OF SERVICE ................................................................................62

CERTIFICATE OF COMPLIANCE .......................................................................63

# <u>TABLE OF AUTHORITIES</u>

**Cases** **Page(s)**

*1A Auto, Inc. v. Dir. of Off. of Campaign & Pol. Fin.*,
  105 N.E.3d 1175 (Mass. 2018) ........................................................... 31

*Adickes v. S.H. Kress & Co.*,
  398 U.S. 144 (1970) ........................................................................... 39

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*,
  458 U.S. 592 (1982) ........................................................................... 31

*Already, LLC v. Nike*,
  568 U.S. 85 (2013) ....................................................................... 51, 52

*Anibowei v. Morgan*,
  70 F.4th 898 (5th Cir. 2023) ......................................................... 22, 50

*Application of Dow Jones & Co.*,
  842 F.2d 603 (2d Cir. 1988) .............................................................. 25

*Backpage.com, LLC v. Dart*,
  807 F.3d 229 (7th Cir. 2015) ...................................................... passim

*Bantam Books, Inc. v. Sullivan*,
  372 U.S. 58 (1963) ............................................................................. 37

*Blum v. Yaretsky*,
  457 U.S. 991 (1982) ............................................................. 34, 36, 38

*Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*,
  531 U.S. 288 (2001) ........................................................................... 41

*Brnovich v. CDC*,
  2022 WL 1276141 (W.D. La. Apr. 27, 2022) .................................... 57

*Burton v. Wilmington Parking Authority*,
  365 U.S. 715 (1961) ........................................................................... 39

*CAMP Legal Def. Fund v. City of Atlanta*,
  451 F.3d 1257 (11th Cir. 2006) ......................................................... 28

iv

*Charles v. Johnson*,
　18 F.4th 686 (11th Cir. 2021) ..................................................................40

*City of Fairfield v. Superior Ct.*,
　537 P.2d 375 (Cal. 1975) ........................................................................31

*Collins v. Womancare*,
　878 F.2d 1145 (9th Cir. 1989) ................................................................40

*Craig v. Boren*,
　429 U.S. 190 (1976) ................................................................................31

*Cramer v. Skinner*,
　931 F.2d 1020 (5th Cir. 1991) ........................................................... 25, 26

*Daniels Health Sciences, LLC v. Vascular Health Sciences, LLC*,
　710 F.3d 579 (5th Cir. 2013) ............................................ 54, 55, 57, 58

*Dombroski v. Pfister*,
　380 U.S. 479 (1965) ................................................................................29

*Elrod v. Burns*,
　427 U.S. 347 (1976) .......................................................................... 49, 50

*Frazier v. Bd. of Trustees of Nw. Mississippi Reg'l Med. Ctr.*,
　765 F.2d 1278 (5th Cir. 1985) .......................................................38, 40, 41

*Gallagher v. Neil Young Freedom Concert*,
　49 F.3d 1442 (10th Cir. 1995) ................................................................40

*George v. Edholm*,
　752 F.3d 1206 (9th Cir. 2014) ................................................................46

*Georgia v. Pennsylvania R. Co.*,
　324 U.S. 439 (1945) ................................................................................33

*Gulf King Shrimp Co. v. Wirtz*,
　407 F.2d 508 (5th Cir. 1969) ..................................................................57

*Haaland v. Brackeen*,
　143 S. Ct. 1609 (2023) ............................................................................32

*Jones v. City of Chicago*,
856 F.2d 985 (7th Cir. 1988)................................................................46

*Kennedy v. Warren*,
66 F.4th 1199 (9th Cir. 2023).............................................................37

*Kentucky v. Biden*,
23 F.4th 585 (6th Cir. 2022) ....................................................... 32, 33

*Kowalski v. Tesmer*,
543 U.S. 125 (2004) .................................................................... 28, 29

*Louisiana Div. Sons of Confederate Veterans v. City of Natchitoches*,
821 F. App'x 317 (5th Cir. 2020) ..........................................................37

*Louisiana v. Becerra*,
577 F.Supp.3d 483 (W.D. La. 2022).....................................................57

*Lynch v. Leis*,
382 F.3d 642 (6th Cir. 2004)...............................................................22

*Massachusetts v. EPA*,
549 U.S. 497 (2007) ..................................................................... 32, 33

*Matal v. Tam*,
582 U.S. 218 (2017) ............................................................................53

*Commonwealth of Massachusetts v. Mellon*,
262 U.S. 447 (1923) ............................................................................33

*N.J. Bankers Ass'n v. Att'y Gen.*,
49 F.4th 849 (3d Cir. 2022)..................................................................29

*NCAA v. Tarkanian*,
488 U.S. 179 (1988) ............................................................................40

*Nebraska v. Wyoming*,
515 U.S. 1 (1995) ................................................................................32

*New York v. U.S.*,
505 U.S. 144 (1992) ............................................................................31

*Norwood v. Harrison*,
  413 U.S. 455 (1973) ........................................................................ 33, 55

*NRA v. Cuomo*,
  350 F. Supp. 3d 94 (N.D.N.Y. 2018) ........................................................36

*O'Handley v. Weber*,
  62 F.4th 1145 (9th Cir. 2023).................................................................37

*Okwedy v. Molinari*,
  333 F.3d 339 (2d Cir. 2003)............................................... 34, 35, 36, 38

*Packingham v. North Carolina*,
  582 U.S. 98 (2017) ................................................................................18

*Parks Sch. of Bus., Inc. v. Symington*,
  51 F.3d 1480 (9th Cir. 1995)..................................................................40

*Penn. Family Inst. v. Black*,
  489 F.3d 156 (3d Cir. 2007)...................................................................25

*Penthouse Int'l, Ltd. v. Meese*,
  939 F.2d 1011 (D.C. Cir. 1991) .............................................................37

*Rawson v. Recovery Innovations, Inc.*,
  975 F.3d 742 (9th Cir. 2020)..................................................................39

*Regal Knitwear Co. v. NLRB*,
  324 U.S. 9 (1945) ............................................................................ 54, 57

*Roberts v. Louisiana Downs, Inc.*,
  742 F.2d 221 (5th Cir. 1984)............................................................ 40, 41

*Rumsfeld v. Forum for Acad. & Institutional Rights*,
  547 U.S. 47 (2006) ................................................................................22

*Sec'y of State of Md. v. Joseph H. Munson Co.*,
  467 U.S. 947 (1984) ..............................................................................28

*Sisney v. Kaemingk*,
  15 F.4th 1181 (8th Cir. 2021)................................................................28

*Skinner v. Ry. Lab. Execs. Ass'n*,
  489 U.S. 602 (1989) .......................................................................39

*Story v. Jersey City & B.P.P.R. Co.*,
  16 N.J. Eq. 13 (N.J. Ch. 1863) .....................................................30

*Tax Bd. of California v. Hyatt*,
  139 S. Ct. 1485 (2019)...................................................................31

*Texans for Free Enter. v. Texas Ethics Comm'n*,
  732 F.3d 535 (5th Cir. 2013)........................................................53

*Turkiye Halk Bankasi A.S. v. United States*,
  143 S. Ct. 940 (2023).....................................................................33

*United States v. Alvarez*,
  567 U.S. 709 (2012) .......................................................................59

*United States v. Mekjian*,
  505 F.2d 1320 (5th Cir. 1975).......................................................39

*United States v. Philip Morris USA Inc.*,
  566 F.3d 1095 (D.C. Cir. 2009) .................................... 21, 55, 57, 58

*United States v. Reed*,
  15 F.3d 928 (9th Cir. 1994)...........................................................39

*United States v. Sineneng-Smith*,
  140 S. Ct. 1575 (2020)...................................................................28

*United States v. Stein*,
  541 F.3d 130 (2d Cir. 2008)..........................................................41

*United States v. Stevens*,
  559 U.S. 460 (2010) .......................................................................59

*Utah Republican Party v. Cox*,
  892 F.3d 1066 (10th Cir. 2018).....................................................30

*Utah v. United States*,
  420 U.S. 304- (1975) ......................................................................57

*Va. State Bd. of Pharm. v. Va. Citizens Consumer Council*,
   425 U.S. 748 (1976) ............................................................25

*VDARE Foundation v. City of Colorado Springs*,
   11 F.4th 1151 (10th Cir. 2021)...............................................37

*X-Men Security, Inc. v. Pataki*,
   196 F.3d 56 (2d Cir. 1999)....................................................37

**Constitutional Provisions**

U.S. CONST. amend. I................................................................30

## INTRODUCTION

On July 4, 2023, the district court entered an historic injunction to prevent the White House and several federal agencies from "urging, encouraging, pressuring, or inducing … the removal, deletion, suppression, or reduction of content containing protected free speech posted on social-media platforms," in ten specific ways. ROA.26613-26614.

This injunction put a stop to an egregious campaign, lasting over five years, during which senior federal officials—using coercion, threats, deception, pressure, and collusion—insinuated themselves into the content-moderation decisions of social-media platforms to silence disfavored viewpoints. This campaign of federal censorship was so effective that it fundamentally distorted online discourse in America on great social and political questions, rendering entire viewpoints virtually unspeakable on social media:

> Opposition to COVID-19 vaccines; opposition to COVID-19 masking and lockdowns; … the lab-leak theory of COVID-19; opposition to the validity of the 2020 election; opposition to President Biden's policies; statements that the Hunter Biden laptop story was true; and opposition to policies of the government officials in power. All were suppressed.

ROA.26608.

The Court should speedily affirm the injunction. The evidence of Defendants-Appellants' ("Defendants") misconduct is overwhelming. The district court's 82 pages of detailed factual findings are effectively unrebutted. Defendants' objections

1

to Plaintiffs-Appellees' ("Plaintiffs") standing overlook extensive evidence of injury, disregard well-settled law, and ignore both the individual Plaintiffs' and States' fundamental interest in participating in the free flow of uncensored discourse on social media.

On the merits, Defendants distort state-action doctrine beyond recognition and utterly fail to refute the overwhelming evidence of coercion, significant encouragement, joint participation, and pervasive entwinement in platforms' content-moderation decisions.

Defendants' claim that Plaintiffs failed to establish irreparable injury is demonstrably false. Defendants' censorship efforts are ongoing and expanding aggressively. Defendants' concerns about the putative vagueness of the injunction are chimerical, and their objection to the breadth of the injunction is baseless—the injunction is broad precisely because Defendants' misconduct is enormous.

Finally, Defendants' much-vaunted concern about *their own* ability to speak freely—asserted after they unconstitutionally silenced millions of Americans on social media—is baseless in light of the district court's eight specific, carefully crafted exemptions for legitimate government speech.

The Court should affirm the injunction and put an end to "arguably … the most massive attack against free speech in United States' history." ROA.26456.

2

## STATEMENT OF ISSUES

I.    Whether the district court abused its discretion in entering a preliminary injunction to prevent federal officials from urging, encouraging, pressuring, or inducing social-media platforms to censor First Amendment-protected speech.

## STATEMENT OF THE CASE

On May 5, 2022, Louisiana and Missouri sued several federal officials, claiming they were violating the First Amendment by pressuring and colluding with social-media platforms to censor disfavored viewpoints on social media. ROA.99-182.    On July 12, 2022, the district court ordered limited discovery of communications between a discrete group of federal officials and platforms about disinformation, misinformation, and censorship. ROA.1581-1595.

The results were astonishing. Defendants ultimately produced almost 20,000 pages of documents reflecting federal officials' communications with platforms about censorship. Platforms disclosed the identities of nearly 100 such officials, including at least 20 White House officials. Their communications reflect endless pressure, threats, coercion, collusion, and deceit to induce platforms to remove disfavored viewpoints. Plaintiffs conducted six depositions of six officials with firsthand knowledge of the Government's censorship activities—Brian Scully of the Cybersecurity and Infrastructure Security Agency (CISA), ROA.13203-13658; Elvis Chan of the FBI, ROA.10150-10535; Eric Waldo of the Office of Surgeon

General (OSG), ROA.14652-15115; Carol Crawford of the CDC, ROA.11034-11367; Dr. Anthony Fauci of NIAID, ROA.11505-11950; and Daniel Kimmage of the State Department's Global Engagement Center (GEC), ROA.12369-12731. Plaintiffs also obtained emails between White House Digital Director Rob Flaherty and social-media platforms. ROA.9355-9424. The evidence demonstrated that federal censorship is occurring "across the federal enterprise." ROA.3225.

The district court's 82 pages of detailed factual findings, supported by 577 citations of record evidence, ROA.26458-26540, are not clearly erroneous. Plaintiffs incorporate by reference both the district court's factual findings, *id.*, and Plaintiffs' Proposed Findings of Fact, ROA.16417-16780, which quote the relevant evidence in detail, and which the court cited extensively in its own findings.

As the district court found, "Government officials began publicly threatening social-media companies with adverse legislation as early as 2018." ROA.26585. At that time, senior federal officials began making public threats to amend or repeal Section 230 immunity and impose other adverse consequences on social-media platforms if they did not censor disfavored speech. ROA.16419-16429. Congressional committees began hauling CEOs of major platforms into hearings to berate and threaten them with adverse legislation if they do not censor disfavored content. ROA.16421-16425; ROA.16658-16659; ROA.10265-10267. These

hearings routinely include threats of adverse legislation explicitly linked to demands to censor disfavored viewpoints.  ROA.16421-16425.

A pressure campaign in *secret* commenced near the same time.  In 2017, senior congressional staffers, coordinating with the FBI, began traveling regularly to Silicon Valley to meet privately with content-moderation officers of major platforms; the staffers threatened the platforms with adverse legislation to push for greater censorship.  ROA.16659-16661.  According to Chan, these meetings placed "pressure" on platforms, which responded by adopting more restrictive policies against disfavored speech and more aggressively enforcing their policies.  ROA.16661-16662.  The FBI succeeded in inducing platforms to be "far more aggressive in taking down disfavored accounts and content in the 2018 and 2020 election cycles" due to such "pressure from Congress," including the threat of "potential legislation."  ROA.26521.

"Around this same time, Defendants began having extensive contact with social-media companies via emails, phone calls, and in-person meetings."  ROA.26585.  The FBI and CISA began to conduct virtually endless meetings with platforms and bombard platforms with requests to remove disfavored content.  CISA and the FBI began hosting regular large-group meetings with DOJ, ODNI, DHS, and seven major social-media platforms to discuss censorship; these so-called "USG-Industry" meetings "began in 2018 and continue to this day."  ROA.26523.  The FBI

also began conducting regular *bilateral* meetings with the content-moderation teams of seven major platforms to discuss censorship; these meetings also continue to this day. ROA.26514. Likewise, CISA launched its own "five sets of recurring meetings with social-media platforms that involved discussions of misinformation, disinformation, and/or censorship of speech on social media." ROA.26529.

In the 2018 election cycle, CISA began "switchboarding," *i.e.*, soliciting reports of election-related "disinformation" from state and local government officials and forwarding them to platforms for censorship. ROA.26522. CISA's "switchboarding activities began in 2018," ROA.26523; continued on a large scale during the 2020 election, ROA.26528 (noting that at least six CISA employees "took shifts" in switchboarding in 2020); and stopped only just after CISA was sued in this case, ROA.26522. The FBI, likewise, began constantly submitting encrypted mass-censorship demands to platforms to remove often dozens of accounts and URLs at a time, "one to five times per month." ROA.26519-26520. The FBI boasts a "50% success rate" in getting platforms to censor disfavored speech. ROA.26519.

"CISA forwards reports of information to social-media platforms without determining whether they originated from foreign or domestic sources." ROA.26527; ROA.16677. Likewise, for some of the information it flags, "[t]he FBI made no attempt to distinguish whether those reports of election disinformation were American or foreign." ROA.26519. And, when it does try, the FBI's accuracy in

6

identifying "foreign" speech is highly dubious; in a single incident, the FBI misidentified as "foreign" "929,000 tweets [that] were political speech by American citizens."  ROA.26520.  Moreover, in targeting "foreign" speech, the FBI targets for removal posts expressing core political messages that hundreds of thousands of Americans have liked, commented on, and reposted—such as a "secure-the-border" post that 134,943 people had "liked."  ROA.26518; ROA.10588; ROA.10591.  The FBI also targets supposedly "foreign" websites on which dozens of American freelance journalists and speakers have posted content.   ROA.26518-26519; ROA.16651-16653; ROA.10620.  By 2020, the speech targeted by such efforts was "all domestic"—"the vast, vast majority … is domestic."  ROA.26519; *see also* ROA.26535;   ROA.26537-26538;   ROA.16677;   ROA.16681;   ROA.16722; ROA.16724-16725; ROA.16727.

In 2020—after years of federal pressure on platforms—CISA collaborated with the Stanford Internet Observatory to launch the so-called "Election Integrity Partnership" (EIP), a three-way collaboration among government, research agencies, and platforms to engage in mass-surveillance and mass-censorship of American citizens' election-related speech on social-media in real-time.  ROA.26524-26529; ROA.26534-26539; ROA.26565-26567; *see also* ROA.13659-13950; ROA.16669-16685, ROA.16703-16753.   Backed by the might of CISA, EIP researchers successfully pushed platforms to adopt more restrictive content-moderation policies

in the summer of 2020, and then aggressively pushed them to enforce those policies. ROA.16707-16708. Using a team of "120 analysts" putting in "12-hour to 16- to 20-hour days" and cutting-edge technology, ROA.16714, the EIP monitors hundreds of millions of social-media posts in real-time and pushes platforms to censor disfavored viewpoints on a massive scale. In four months in 2020, the EIP monitored 859 million tweets on Twitter alone and tracked 22 million tweets on "tickets" as potential misinformation. ROA.26536 ("almost twenty-two million posts on Twitter alone"); *see also* ROA.16719; ROA.13858-13859. And Twitter was just one of *nine* platforms cooperating with the federal government through the EIP, which operates in *every* election cycle. ROA.26535 (EIP/VP participants include "Facebook, Instagram, Google/YouTube, Twitter, TikTok, Reddit, Nextdoor, Discord, and Pinterest.").

The EIP targets, not just individual posts, but entire "emerging narratives" that can encompass hundreds of thousands of posts. ROA.13688. These include claims like "mail-in voting is insecure" and that "conspiracy theories about election fraud are hard to discount." ROA.26528. The EIP boasts a 35 percent success rate in getting such content removed from platforms. ROA.26535.

The EIP and its COVID-related spinoff, the "Virality Project" (VP), is an extremely close federal-private collaboration, involving literally dozens of points of contact and cooperation. ROA.26524-26529; ROA.26534-26539; ROA.26565-

8

26567.  "CISA and the EIP were completely intertwined."  ROA.26567.  Along with CISA, the State Department's Global Engagement Center (GEC) "was engaging with the EIP and submitted 'tickets'" for censorship.  ROA.26536.   The EIP "continued to operate during the 2022 election cycle," and will "continue its work in future elections."  ROA.26525, 26537.

In 2020, the FBI deceitfully induced platforms to censor the New York Post's Hunter Biden laptop story just before the 2020 election.  "[T]he FBI previously received Hunter Biden's laptop on December 9, 2019, and knew that the later-released story about Hunter Biden's laptop was not Russian disinformation."  ROA.26517; ROA.26561.  Nevertheless, "[b]efore the Hunter Biden Laptop story breaking prior to the 2020 election on October 14, 2020, the FBI and other federal officials repeatedly warned industry participants to be alert for 'hack and dump' or 'hack and leak' operations."  ROA.26515.  Senior CISA officials echoed the FBI's warnings.  ROA.16643.  The FBI had no investigative basis for these warnings.  ROA.16643; ROA.10323; ROA.10341.  Then, when the laptop story broke, the FBI refused to confirm that the laptop was *not* a Russian hack, as they had long known, which led to the story's widespread suppression on social media.  ROA.26517-26518.

During 2020, with the onset of the COVID-19 pandemic, Dr. Anthony Fauci of NIAID and Dr. Francis Collins of NIH orchestrated campaigns of deception to

censor disfavored viewpoints about the lab-leak theory of COVID's origins, the "Great Barrington Declaration" co-authored by Plaintiffs Bhattacharya and Kulldorff, and many others. ROA.26504-26512; ROA.16567-16632. The purpose of such campaigns was to suppress disfavored viewpoints on social media—what Dr. Fauci called "the threat of further distortions on social media." ROA.16591; ROA.12038. The platforms censored virtually every disfavored viewpoint that Fauci and Collins targeted. When Collins pushed Fauci to "take down" the Great Barrington Declaration, "the result was exactly that." ROA.26560. Of the opinions attacked by Dr. Fauci, "[a]ll were suppressed." ROA.26608. NIAID even successfully pushed platforms to remove parody accounts and "content lampooning or criticizing Dr. Fauci." ROA.26509-26510.

When the Biden Administration took office in 2021, censorship efforts dramatically accelerated. As a candidate, Biden called for repeal of Section 230 of the Communications Decency Act—which has been interpreted to grant platforms sweeping immunity from liability—if platforms do not censor more speech; and he threatened civil liability, and even criminal prosecution of Mark Zuckerberg personally, if Facebook did not censor more political speech. ROA.16426-16428. The incoming Biden Administration reemphasized these threats during the transition. ROA.16428. Once in power, these threats became far more ominous and coercive. ROA.26553-26554.

10

On the Administration's third day, at 1:04 a.m., the White House emailed
Twitter to demand the removal "ASAP" of an anti-vaccine post by Robert F.
Kennedy, Jr., and asked that Twitter "keep an eye out" for similar tweets to censor.
ROA.16430-16431.  Twitter soon offered to set up a special reporting channel for
the White House because it was bombarded with similar censorship requests from
four staffers in one week.  ROA.26464.

White House staffers Rob Flaherty and Andrew Slavitt led a pressure
campaign in private to censor disfavored viewpoints on COVID-19.  ROA.9355-
9424.  Flaherty demanded the removal of parody accounts and "vaccine humor
posts."  ROA.26463-26464, 26479.  He demanded that the platforms provide
detailed reports on censorship enforcement against "'dubious,' but not 'provably
false,' claims," and repeat offenders.  ROA.26464.  Touting the White House as a
"partner" who wanted to "help" platforms silence dissenting views on COVID, he
badgered the platforms for more information about censorship policies and practices,
always demanding greater censorship.  ROA.26465-26466, 26468-26469.  He and
Slavitt asked for ever-more-detailed "reports" of how they were censoring
information demanded by White House, expanding their censorship demands at
every turn.  ROA.26468, 26470-26474.

When they did not get their way, White House officials resorted to pressure,
accusations, profanity, and threats.  ROA.26467-26468, 26551-26553.  They

11

repeatedly accused Facebook of fomenting the January 6 riots and implied that Facebook was killing people by failing to censor enough disfavored viewpoints. ROA.26464, 26469-26471 ("Not for nothing but the last time we did this dance, it ended in an insurrection."). Flaherty and Slavitt also made a series of ominous statements and implied threats, even suggesting that the President himself was directly involved. ROA.26468 ("[I]nternally, we have been considering our options on what to do about it."); ROA.26473 ("This is a concern that is shared at the highest (and I mean highest) levels of the WH"); ROA.26474, 26551-26553.

The White House targeted many individual speakers. Flaherty and Slavitt demanded the censorship of Fox News hosts Tucker Carlson and Tomi Lahren, ROA.26470-26472; Alex Berenson, whom the White House viewed as "the epicenter of disinfo that radiated outwards to the persuadable public," ROA.26473; and Robert F. Kennedy Jr. and other members of the Disinformation Dozen, ROA.26471, whom the White House viewed as "responsible for 73% of vaccine misinformation" on social-media, ROA.26475. Under White House pressure, "Facebook reported the Tucker Carlson content had not violated Facebook's policy, but Facebook gave the video a 50% demotion for seven days and stated that it would continue to demote the video." ROA.26472. The White House repeatedly sought to suppress truthful content and core political speech, such as "vaccine-skeptical" content that did not violate Facebook's policies, ROA.26465, content "that does not

12

contain actionable misinformation," ROA.26468, 26470-26471; and "true but shocking claims or personal anecdotes [and] discussing the choice to vaccinate in terms of personal or civil liberties," ROA.26471.

Platforms responded by assuring the White House that they were aggressively deboosting the viewpoints the White House opposed. ROA.26468-26475. But in early May 2021, Facebook politely refused to deplatform the "Disinformation Dozen," who had not violated their policies, and even suggested that too much censorship might be counterproductive and drive vaccine hesitancy. ROA.26475-26476. The White House responded on May 5 with an overt, public threat from Press Secretary Jennifer Psaki, who raised the specter of a "robust anti-trust program" in direct connection to the White House's censorship demands. ROA.26476. Flaherty followed up on this threat with a private email the next day, demanding more censorship and the deplatforming of the Disinformation Dozen. ROA.26476-26477.

"Things apparently became tense between the White House and Facebook after that, culminating in Flaherty's July 15, 2021 email to Facebook, in which Flaherty stated: 'Are you guys fucking serious? I want an answer on what happened here and I want it today.'" ROA.26477. That same day, the White House launched a full-scale public pressure campaign, with a three-pronged public attack on platforms. First, on July 15, Psaki and Surgeon General Murthy held a joint press

conference to announce the Surgeon General's Health Advisory on Misinformation. At that conference, Psaki reinforced her threats of May 5 by demanding a long series of specific actions to increase censorship on platforms. ROA.26477-26478; ROA.16465-16467. She publicly demanded the banning of the "Disinformation Dozen" across all platforms. ROA.16467. Surgeon General Murthy described health misinformation as "poison" and demanded that platforms increase censorship, in both his public statements and the Health Advisory. ROA.26487-26488; ROA.16465-16467, 16497-16505. He repeatedly threatened to hold platforms "accountable"—a word which, OSG concedes, "carries with it the threat of consequences." ROA.26487.

The next day, President Biden stated of the platforms that "They're killing people" by not censoring health misinformation. ROA.26478. Psaki followed up these comments with a long series of demands for censorship from the platforms. ROA.16468-16469. Four days later, White House Communications Director Kate Bedingfield publicly reinforced Psaki's threats, specifically threatening to amend Section 230 and hold platforms "accountable" if they did not censor more speech. ROA.26478.

"The public and private pressure from the White House apparently had its intended effect. All twelve members of the 'Disinformation Dozen' were censored, and pages, groups, and accounts linked to the Disinformation Dozen were removed."

ROA.26478.   After months of resisting, Twitter immediately suspended Alex Berenson and banned him permanently soon thereafter.  ROA.26479.  Facebook sent a pleading email asking to "get back into the White House's good graces," stated that "we are 100% on the same team," ROA.26479, and met with the Surgeon General "to better understand the scope of *what the White House expects of us on misinformation going forward*."  ROA.26489 (emphasis added).

In subsequent meetings and emails with the Surgeon General's Office, Facebook acceded to virtually every demand the White House and OSG made on censoring COVID-related viewpoints.   ROA.26489-26490;  ROA.16509-16516. Other platforms provided detailed censorship reports as well.  ROA.26490-26491. "This seemingly unrelenting pressure by Defendants had the intended result of suppressing millions of protected free speech postings by American citizens." ROA.26548.   The White House-OSG pressure created a "report-and-censor relationship" between the federal government and the platforms.  ROA.26585.

The pressure did not relent.  Psaki followed up with public statements reinforcing the White House's demands for greater censorship and linking them to threats of adverse legal consequences if the platforms did not comply.  ROA.26480. In her public statements, Psaki "link[ed] these threats to social-media platforms' failure to censor misinformation and disinformation."  ROA.26480; *see also id.* (noting that White House Climate Advisor Gina McCarthy also "explicitly tied …

15

censorship demands with threats of adverse legislation regarding the Communications Decency Act"). "At an April 25, 2022, White House press conference, … Psaki again mentioned the threat to social-media companies to amend Section 230 of the Communications Decency Act, linking these threats to social-media platforms' failure to censor misinformation and disinformation." ROA.26480.

During this time, the Surgeon General's Office maintained a parallel pressure campaign against platforms to demand greater censorship. ROA.26482-26488. As noted above, OSG officials participated in many of the same phone calls, meetings, and emails as White House staff. OSG met with platforms and received their concessions after the July 2021 pressure campaign. ROA.26483-26486. "After the meetings with social-media platforms, the platforms seemingly fell in line with the Office of Surgeon General's and White House's requests." ROA.26486.

Two other major censorship initiatives launched in the same time frame. First, the Election Integrity Partnership rebranded itself the "Virality Project" ("VP") and continued the EIP's mass-surveillance and mass-censorship work for COVID-related speech. ROA.26567; ROA.13951-14182; ROA.16726-16753. Federal officials continued to collaborate closely with the Virality Project, and the collaboration expanded to include the White House, the Surgeon General's Office, and the CDC. ROA.26473-26474, 26483-26484, 26489; ROA.16735. Like the EIP,

the VP used a three-way real-time collaboration on Jira software between government officials, VP researchers, and platforms.    ROA.16737-16738. According to its own report, the Virality Project tracked over 200 million engagements on social media and reported 174 "tickets" to platforms for "potential action."  ROA.16738-16739.  The VP specifically targeted "health freedom" groups like Jill Hines's "Health Freedom Louisiana"; its report accuses such groups of spreading "organized outrage" and cites them almost 100 times. ROA.16742, 16744-16745, 16747; ROA.26539.

With the onset of the Biden Administration, the CDC launched a multi-prong campaign to induce the platforms to censor COVID-related "misinformation." ROA.26492-26503; ROA.16529-16567.  The CDC received biweekly reports of "misinformation" circulating on Facebook, ROA.26493, and had weekly meetings with Facebook and other platforms, where Crawford requested reports about how they were censoring misinformation.  ROA.26494-26496.  The CDC sent lists of specific posts, slide decks, and tables containing specific content that it sought to censor, ROA.26494-26496, 26500-26502; and it organized "BOLO" ("Be On the Lookout") meetings with multiple platforms to flag specific posts and themes. ROA.26501-26502.  After the White House's threats in July 2021, "Facebook content-mediation officials would contact Crawford to determine whether

17

statements made on Facebook were true or false," and "Facebook would remove and/or censor claims the CDC itself said were false."  ROA.26497-26498.

These federal censorship activities are continuing and expanding to this day, with federal officials continuously targeting new topics.  *See infra*, Part II.

## SUMMARY OF ARGUMENT

I. Plaintiffs are likely to succeed on the merits.  First, all Plaintiffs have standing.  The individual Plaintiffs suffer recent, ongoing, and imminent future injuries in having their own content stifled on social media at the instigation of federal officials.  Plaintiff Hines also suffers unique injuries in ongoing interference with her ability to use social-media groups to organize like-minded citizens to petition the government.  The individual Plaintiffs also suffer ongoing and imminent injuries from the federal censorship of speakers that they *follow* and discourse with on social media.  Plaintiffs identify dozens of such speakers specifically targeted by federal officials in all groups of Defendants.  Defendants' conduct fundamentally perverts Plaintiffs' ability to participate in online *discourse*—to "speak and listen, and then, after reflection, speak and listen once more." *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017).

Likewise, the State Plaintiffs have standing.  Their own social-media speech has been censored due to Defendants' conduct, and they have a critical sovereign interest—acknowledged by Defendants' own witness—in being able to hear the

uncensored voices of their own citizens on all manner of social and political issues. The States suffer a sovereign injury from federal interference in the ability of their citizens to petition them for redress of grievances, and they suffer a distinct quasi-sovereign injury, enforceable against the federal Government, from the silencing of the voices of millions of Louisianans and Missourians.

Plaintiffs' First Amendment claim is likely to succeed on the merits. Defendants' conduct constitutes state action on at least four theories. *First*, Defendants coerced platforms to silence disfavored viewpoints. They engaged in a years-long campaign of express and implied, public and private threats of adverse legal consequences—threats that were explicitly linked to their demands for greater censorship—in parallel with endless specific requests for censorship. "Faced with unrelenting pressure from the most powerful office in the world, the social-media companies apparently complied." ROA.26555. *Second*, Defendants significantly encouraged platforms to take action against disfavored viewpoints—which requires a lesser showing than coercion. Given the endless pressure and demands from federal officials, "If there were ever a case where the "significant encouragement" theory should apply, this is it." ROA.26548. *Third*, Defendants jointly participated with platforms in censoring disfavored viewpoints by insinuating themselves into the platforms' content-moderation decisions—which requires no showing of coercion or encouragement. Defendants deliberately made themselves "partners"

with platforms who were "on the same team" in enforcing their content-moderation policies—to the point of continuous, detailed involvement in speaker-specific and post-specific content-moderation decisions. ROA.26554. *Fourth*, Defendants were pervasively entwined in the content-moderation decisions, a particularly acute form of joint participation. Indeed, "CISA and the EIP were completely intertwined." ROA.26567.

Given state action, the substantive First Amendment violations are egregious. Defendants violated three fundamental precepts of the First Amendment at once by imposing (1) *de facto* prior restraints on (2) disfavored viewpoints expressing (3) core political speech. This hat-trick of unconstitutionality silenced "millions" of Americans. ROA.26577.

II. The other equitable factors decisively favor the injunction. Plaintiffs suffer historic, recent, ongoing, and imminent future injuries. There is overwhelming evidence that Defendants are continuing and expanding their censorship activities in ways that will inevitably interfere with Plaintiffs' rights. The public interest favors injunctions to protect First Amendment rights—especially where, as here, the case "arguably involves the most massive attack against free speech in United States' history." ROA.26456.

Defendants' concerns about the injunction's putative interference with the government's ability to speak are baseless. Defendants submitted five detailed

declarations to the district court raising such concerns, and the district court addressed all of them by providing eight specific exemptions in the injunction to allow the full range of legitimate government speech. ROA.26614-26615. On appeal, Defendants raise admittedly "hypothetical" scenarios—most of which have never happened and have no imminent likelihood of happening—and weigh those against the *actual* silencing of millions of Americans and the unconstitutional distortion of online discourse in America. And all these hypothetical concerns have the same answer—Defendants *may* speak publicly and express their views on any public-policy issue, but they *may not* demand, urge, or pressure platforms to silence the views they disagree with. This is not some radical, novel burden on the Government—it is what the First Amendment already requires.

III.    Defendants' concerns about the injunction's supposed overbreadth and vagueness are chimerical. The injunction is broad because Defendants' misconduct is enormous. The injunction provides Defendants with clear, specific, and detailed instructions in plain English. These instructions are not difficult to understand, "especially when read in the context of the district court's legal conclusions and … findings of fact." *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1137 (D.C. Cir. 2009). The injunction "may be broad, but breadth is warranted" in light of the "record of continuing and persistent violations" of the First Amendment. *Id.*

## ARGUMENT

***Standard of Review.***  The decision to grant a preliminary injunction is reviewed for abuse of discretion.  *Anibowei v. Morgan*, 70 F.4th 898, 902 (5th Cir. 2023).  The district court's factual findings are reviewed for clear error, and its legal conclusions are "subject to broad review."  *Id.*  The district court considers (1) the plaintiff's likelihood of success, (2) the threat of irreparable injury to plaintiff, (3) the balancing of harms between the parties, and (4) the public interest.  *Id.*

## I.     Plaintiffs Are Likely to Succeed on the Merits.

The first factor—likelihood of success—strongly favors Plaintiffs.

### A.     All Plaintiffs Have Standing.

Standing "is to be determined as of the time the complaint is filed," *Lynch v. Leis*, 382 F.3d 642, 647 (6th Cir. 2004)—here, May 5, 2022, for the States, and August 2, 2022, for the individual Plaintiffs.  ROA.26587.  "[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement."  *Rumsfeld v. Forum for Acad. & Institutional Rights*, 547 U.S. 47, 52 n.2 (2006).

***Individual Plaintiffs.***  The Individual Plaintiffs submitted three sets of declarations detailing censorship injuries occurring from 2020 through May 2023— including five declarations filed on March 20, 2023, and two more filed on May 20,

2023, detailing recent and ongoing censorship injuries. ROA.1187-1267, 1273-1278, 1311-1316; ROA.17506-17521; ROA.25502-25513.

The individual Plaintiffs suffer multiple injuries. First, Defendants and their partners induce platforms to remove Plaintiffs' own content. ROA.26580-26582. Hoft's content is targeted by CISA, the EIP, and the VP, encompassing hundreds of thousands of posts and re-posts of his content. ROA.26529, 26535-26536. Defendants are "currently involved in an ongoing project that encourages and engages in censorship activities specifically targeting Hoft's website." ROA.26581. Hines provides evidence of "past and ongoing censorship injuries," including ongoing restrictions on her accounts and groups, and "these restrictions can be directly traced back to federal officials." ROA.26581-26582. She was targeted by the Virality Project as well. ROA.26539. Bhattacharya and Kulldorff's speech was extensively suppressed immediately after it was targeted by federal officials, including Fauci and Collins. ROA.26562, 26581. "Each of the Private Plaintiffs" provides sworn evidence of "a combination of past, ongoing, and anticipated future censorship injuries." ROA.26582. Their declarations "provide evidence of ongoing harm and support the expectation of imminent future harm." ROA.26581.

Second, federal censorship directly interferes with Plaintiff Hines' ability to organize Louisianans to petition the Louisiana government, which injures both Hines and Louisiana. Hines' social-media groups for Health Freedom Louisiana and

23

Reopen Louisiana are extensively censored and "are constantly at risk of being completely de-platformed." ROA.26582. Censorship blocks Hines from being able to organize like-minded citizens to advocate to the government on matters of public concern. ROA.1313-1315. Her Facebook groups "were completely deplatformed, effectively disbanding a group of more than two thousand people who were organized to engage in direct advocacy to our state legislature, on two separate occasions." ROA.1315.

Third, the First Amendment protects "the right to listen," ROA.26578, and to engage with and respond to other speakers. The individual Plaintiffs follow on social media *dozens* of the speakers silenced by federal censorship. *See* ROA.17519-17520 (Hines identifying 86 speakers, including Alex Berenson, Robert F. Kennedy Jr., Candace Owens, numerous "medical freedom" speakers, and the entire "Disinformation Dozen"); *see also* ROA.17507 (Bhattacharya follows Alex Berenson, Robert F. Kennedy Jr., Robert Malone, Simone Gold, Tucker Carlson, among 26 such speakers); ROA.17510 (Kulldorff, naming 10 such speakers); ROA.17512 (Kheriaty: the New York Post, Children's Health Defense, among 24 such speakers); ROA.17516 (Hoft: 24 such speakers, including Children's Health Defense, Fox News, One America News Network). These include dozens of speakers specifically identified in the evidence and dozens that the district court specifically found that federal officials suppressed. *See, e.g.,* ROA.26471 (Robert

F. Kennedy Jr. and Children's Health Defense); ROA.26470-26472, 26583 (Tucker Carlson and Tomi Lahren); ROA.26473 (Alex Berenson); ROA.26478 (the "Disinformation Dozen"); ROA.26517-26518 (the New York Post); ROA.26538-26539 ("medical freedom" groups); ROA.26539-26540 (One America News, Breitbart News, Alex Berenson, Tucker Carlson, Fox News, Candace Owens, The Daily Wire, RFK Jr., Simone Gold, Dr. Mercola).

Defendants argue that the First Amendment's right to listen does not support standing.  App.Br. 18-19.  This is wrong.  Government "censorship equally infringe[s]" the speaker's rights and "the rights of [the audience] to whom the [speech] was addressed." *Va. State Bd. of Pharm. v. Va. Citizens Consumer Council*, 425 U.S. 748, 757 (1976).  "Therefore, where one enjoys a right to speak, others hold a 'reciprocal right to receive' that speech, which 'may be asserted' in court." *Penn. Family Inst. v. Black*, 489 F.3d 156, 165 (3d Cir. 2007) (quoting *Va. State Bd. of Pharm.*, 425 U.S. at 757).  No additional injury is required for standing. *Application of Dow Jones & Co.*, 842 F.2d 603, 608 (2d Cir. 1988) ("It is that right to receive speech that affords standing to the press to maintain this action.").

The lone case Defendants cite in response, *Cramer v. Skinner*, 931 F.2d 1020 (5th Cir. 1991), reinforces Plaintiffs' position. There, this Court distinguished between the "nonobservance of the Constitution" in the abstract, which is a "generalized grievance common to all members of the public," and a constitutional

25

violation causing "personal injury" to the plaintiff, which does support standing. *Id.* at 1026-27. Applying this distinction to the "right to hear," the Court concluded that, unlike someone with only "an abstract interest in seeing that the Government observes the Constitution," someone with an interest in *hearing* the advertisement *would* have standing to challenge the advertisement's restriction. *Id.*

Defendants argue that Plaintiffs lack standing to challenge the conduct of "a wide range of government agencies" on "a wide range of topics." App.Br. 29. But Plaintiffs' right to listen encompasses speakers silenced by every federal agency subject to the injunction. *See supra*. And Plaintiffs' right to listen encompasses *all* the topics on which such speakers happen to opine.

As the district court held, these injuries are traceable and redressable. ROA.26582-26589. Citing sources outside the record that relate to a single platform—Twitter—Defendants argue the injuries arise from "independent decisions of social-media companies." App.Br. 16. The district court considered this argument and rejected it as "wholly unpersuasive." ROA.26584. The district court repeatedly found, based on overwhelming evidence, that Defendants *cause* the censorship of which Plaintiffs complain. *See, e.g.,* ROA.26472 (Facebook suppressing Tucker Carlson's content at White House's bidding); ROA.26473 (Alex Berenson suspended and deplatformed due to federal pressure); ROA.26478 ("Disinformation Dozen" deplatformed due to federal demands); ROA.26486

("platforms … fell in line" after meetings with federal officials); ROA.26489-26490 (Facebook adopts a raft of new censorship policies after federal pressure); ROA.26497-26498 ("Facebook would remove and/or censor claims that the CDC itself said were false"); ROA.26519 (FBI has "about a 50% success rate in having alleged election disinformation taken down"); ROA.26534 (the EIP "successfully pushed social-media platforms to adopt more restrictive policies about election-related speech"); ROA.26535 ("platforms took action on 35% of the URLs reported to them" by the EIP); ROA.26555 ("Faced with unrelenting pressure from the most powerful office in the world, the social-media companies apparently complied" with White House demands); ROA.26561 ("As a result" of FBI and CISA conduct, "millions of U.S. citizens did not hear the story prior to the November 3, 2020 election."); ROA.26583 n.655 (citing several additional examples); ROA.26583-26586.

"[T]he instant case paints a full picture. A drastic increase in censorship, deboosting, shadow-banning, and account suspensions directly coincided with Defendants' public calls for censorship and private demands for censorship." ROA.26584-26585.

**State Plaintiffs.** The State Plaintiffs suffer multiple injuries as well. First, federal censorship has repeatedly suppressed the States' own speech on social media, including posts by state officials, agencies, and political subdivisions. ROA.26579.

The States "faced direct censorship … immediately following the federal Defendants strong advocacy for COVID-related 'misinformation' censorship." *Id.*

Defendants argue that "the First Amendment does not confer rights on States." App.Br. 18. This erroneously conflates Article III injury with the merits. Restricting an entity's ability to speak or listen constitutes an injury in fact even if it does not violate that entity's First Amendment rights. *Sisney v. Kaemingk*, 15 F.4th 1181, 1192–97 (8th Cir. 2021) (holding that the First Amendment permitted restriction of a prisoner's ability to read erotic literature but recognizing the restriction as an injury in fact for standing). That is why plaintiffs whose speech the First Amendment does *not* protect nonetheless have standing to bring overbreadth claims. *See id.*; *CAMP Legal Def. Fund v. City of Atlanta*, 451 F.3d 1257, 1273 (11th Cir. 2006); *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 958 (1984) (holding that "whether or not its own First Amendment rights are at stake," an overbreadth plaintiff can "satisf[y] the requirement of injury-in-fact").

Given this Article III injury, the States have third-party standing to assert the First Amendment rights of others to vindicate *their own* injuries. The Supreme Court is "quite forgiving" of third-party standing requirements "[w]ithin the context of the First Amendment." *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004). The First Amendment's overbreadth doctrine, for example, relieves the third-party plaintiff of the burden to show the usual "close relationship" and "hindrance" required by the

28

third-party standing doctrine, *id.*; instead, Article III injury is all that is required. *See id.*; *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1586 (2020) (Thomas, J., concurring) ("Litigants raising overbreadth challenges rarely satisfy either requirement ['close relationship' and 'hindrance'], but the Court nevertheless allows third-party standing…") (citing *Dombroski v. Pfister*, 380 U.S. 479, 487 (1965)); *N.J. Bankers Ass'n v. Att'y Gen.*, 49 F.4th 849, 860 (3d Cir. 2022) (noting that "the requirement that an impediment exist to the third party asserting his or own rights" does not apply when the challenged government action "substantially abridges the First Amendment rights of other parties not before the court").

In addition, third-party standing applies "when enforcement of the challenged restriction *against the litigant* would result indirectly in the violation of third parties' rights." *Kowalski*, 543 U.S. at 130. Here, censoring the *States'* speech results in "the violation of third parties' rights," *id.—i.e.*, the rights of all who would read the States' postings.

Second, federal censorship interferes with the States' sovereign interest in hearing the voices of their own citizens on social media. ROA.1268-1272; ROA.1317-1319. Federal censorship "suppress[es] millions of protected free speech postings by American citizens," including Louisianans and Missourians. ROA.26548. State officials are thus blocked from hearing their constituents' true concerns on matters of overwhelming public importance; "[a]ll were suppressed."

29

ROA.26608.  State agencies share a critical interest in being able to listen to and follow constituents' social-media speech "on a daily or even hourly basis," and it is "very important for [them] to have access to free public discourse on social media on these issues so [they] can understand what [Louisianans and] Missourians are actually thinking, feeling, and expressing about such issues, and so [they] can communicate effectively with them."  ROA.1269.  Indeed, "Crawford testified … that the CDC has a strong interest in tracking what its constituents are saying on social media…. [I]f content were censored and removed from social-media platforms, government communicators would not know what the citizen's 'true concerns' were."  ROA.26503.

Third, the States have both first-party and third-party standing to assert a sovereign interest in free, open, unbiased procedures for their citizens "to petition the Government for a redress of grievances."  U.S. CONST. amend. I.  Shutting down social-media groups (like Jill Hines') formed to organize and petition the government—only on *one side* of the issue—radically tilts the playing field against those opposing or endorsing certain policies, based solely on viewpoint.  In addition to injuring the citizens, this also injures the States.  "Every legislator has a right to be informed of the views and wishes of all parties interested in the enactment of a law," so interfering with a constituent's ability to petition the government is "an infringement of the rights of the people *and of their representatives*."  *Story v. Jersey*

*City & B.P.P.R. Co.*, 16 N.J. Eq. 13, 20-21 (N.J. Ch. 1863) (emphasis added); *see also, e.g., Utah Republican Party v. Cox*, 892 F.3d 1066, 1085 (10th Cir. 2018) (endorsing James Madison's "sound and important principle that the representative ought to be acquainted with the interests and circumstances of his constituents" (quoting THE FEDERALIST NO. 56)); *City of Fairfield v. Superior Ct.*, 537 P.2d 375, 382 (Cal. 1975); *1A Auto, Inc. v. Dir. of Off. of Campaign & Pol. Fin.*, 105 N.E.3d 1175, 1196 (Mass. 2018).

This constitutional right *of the States* flows not directly from the First Amendment (the source of an individual's petition right), but from the Tenth Amendment and the structure of the Constitution, which "leaves to the several States a residuary and inviolable sovereignty," *New York v. U.S.*, 505 U.S. 144, 188 (1992), that can only be fully exercised if States can hear their citizens. *See Fran. Tax Bd. of California v. Hyatt*, 139 S. Ct. 1485, 1499 (2019) (States enjoy constitutional rights "that are not spelled out in the Constitution but are nevertheless implicit in its structure"). Indeed, this structure means that even if States had to assert third-party standing and show a "close relationship" to individuals, they could easily do so. The States have a "close[r] relationship" to the people they represent than an alcohol vendor does to potential patrons, *Craig v. Boren*, 429 U.S. 190, 195 (1976).

Fourth, the States have a quasi-sovereign interest, enforceable against the federal government, in defending the rights of millions of their citizens.

ROA.26575-26580. Because federal censorship affects a "substantial segment" of each State's population, *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982), this injury to *millions* of each State's citizens "is really an additional injury to the state *itself*." *Kentucky v. Biden*, 23 F.4th 585, 596-601 (6th Cir. 2022). Defendants contend that States can never assert such a quasi-sovereign interest against the federal government, App.Br. 13, but the Supreme Court held the opposite in *Massachusetts v. EPA*, 549 U.S. 497, 520 & n.17 (2007). *Massachusetts* rejected the argument that cases "cast significant doubt on a State's standing to assert a quasi-sovereign interest against the Federal Government," and observed that "*Mellon* itself disavowed any such broad reading" by noting that it did not address "*quasi-sovereign rights actually invaded or threatened*." *Id.*

Defendants' confusion comes from the fact that "*parens patriae*" is an imprecise term that "really encompasses two distinct concepts": purely "third-party" suits where the State is only a "nominal party" and a "second, more modern conception" where a State "assert[s] some injury to their *own* interests"—that is, "*quasi-sovereign* interests." *Kentucky*, 23 F.4th at 596–97. *Mellon* bars only the first. 549 U.S. at 520 & n.17; *Nebraska v. Wyoming*, 515 U.S. 1, 20 (1995) (permitting a *parens patriae* claim against the federal government that asserted "'quasi-sovereign' interests," and was not "'in reality for the benefit of particular individuals'"). Both *Snapp* and *Haaland v. Brackeen*, 143 S. Ct. 1609, 1640 (2023),

merely reasserted this so-called "*Mellon* bar," which *Massachusetts* expressly held does *not* apply to the States' assertion of "quasi-sovereign rights" against the federal government.   549 U.S. at 520 n.17; *see also Turkiye Halk Bankasi A.S. v. United States*, 143 S. Ct. 940, 950 (2023).   As *Kentucky v. Biden* recently held, "no prudential bar prevents the states from suing the United States to vindicate their … quasi-sovereign interests."  23 F.4th at 601.

Furthermore, even the *Mellon* bar against purely third-party lawsuits applies only when a State challenges the constitutionality of a federal statute. *Commonwealth of Massachusetts v. Mellon*, 262 U.S. 447, 485 (1923); *see also Georgia v. Pennsylvania R. Co*., 324 U.S. 439, 446–47 (1945) ("This is not a suit like those in *Commonwealth of Massachusetts v. Mellon*, and *State of Florida v. Mellon*, *supra*, where a State sought to protect her citizens from the operation of federal statutes."). *Massachusetts* definitively announced "what *Mellon* prohibits": purely third-party suits by "a State 'to protect her citizens from the operation of federal statutes.'" 549 U.S. at 520 & n.17 (quoting *Georgia*, 324 U.S. at 447). The *Mellon* bar thus does not apply for two independent reasons: Plaintiff States assert quasi-sovereign interests and do not challenge a federal statute.

**B.    Plaintiffs Are Likely to Prevail on the First Amendment Claim.**

It is "axiomatic that a state may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish."

33

*Norwood v. Harrison*, 413 U.S. 455, 465 (1973).  Defendants have done so through coercion, significant encouragement, joint participation, and pervasive entwinement—all of which violate the First Amendment.

**Coercion.**  "[A] State normally can be held responsible for a private decision … when it has exercised coercive power" over that decision.  *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982). Thus, "[a] public-official defendant who threatens to employ coercive state power to stifle protected speech violates a plaintiff's First Amendment rights."  *Backpage.com, LLC v. Dart*, 807 F.3d 229, 230–31 (7th Cir. 2015) (quoting *Okwedy v. Molinari*, 333 F.3d 339, 344 (2d Cir. 2003)).

Here, the district court found that Defendants' communications were coercive threats.  "Government officials began publicly threatening social-media companies with adverse legislation as early as 2018.  In the wake of COVID-19 and the 2020 election, the threats intensified and became more direct."  ROA.26585.  The district court cited many examples.  *See, e.g.,* ROA.26468 (White House to Facebook: "internally, we are considering our options on what to do about" Facebook's lack of cooperation); ROA.26473 (Flaherty's concerns are "shared by the highest (and I mean highest) levels of White House"); ROA.26478, 26552 (White House threatened adverse legal actions to hold platforms "accountable" for not censoring COVID speech); ROA.26481 (White House task force "threatened social-media platforms with adverse legal consequences if the platforms did not censor

aggressively enough"); ROA.26487 (Dr. Murthy's threat to hold platforms "accountable" "carries with it the threat of consequences"); ROA.26551-26553 (22 statements from the White House expressing pressure and threats); ROA.26585 n.658 (more "examples of Government officials threatening adverse legislation against social-media companies if they do not increase censorship efforts"). "These actions are just a few examples of the unrelenting pressure the Defendants exerted against social-media companies." ROA.26553.

As the district court found, Defendants explicitly tied these threats to *demands* for greater censorship. ROA.26476 ("Psaki linked the threat of a 'robust anti-trust program' with the White House's censorship demand."); ROA.26478 (White House Communications Director tying the threat of Section 230 repeal to the White House's demands on "misinformation"); ROA.26480 (Psaki raised "the threat to social-media companies to amend Section 230," and "link[ed] these threats to social-media platforms' failure to censor misinformation"); *id.* (White House "explicitly tied these censorship demands with threats of adverse legislation").

These threats had coercive power. Section 230 provides "a hidden subsidy worth billions of dollars," and anti-trust enforcement is an "existential threat" to the platforms. ROA.26463; ROA.16420. Demonstrating their coercive power, the threats *succeeded* in motivating the platforms to censor speakers and content—often against the platforms' clear wishes. Twitter declined to deplatform Alex Berenson

35

for months but succumbed immediately after White House threats.  ROA.26473, 26479.  Facebook refused to expel the Disinformation Dozen for months until it buckled under the same pressure.  ROA.26478.  The platforms' willingness to cooperate with the FBI's demands for account takedowns is due to "pressure from Congress," including threats of adverse legislation.  ROA.26521.  Again and again, "the victims in this case yielded to the threat." *Backpage.com*, 807 F.3d at 231.

Moreover, "[e]xplicit threats are an obvious form of coercion, but not all coercion need be explicit."  ROA.26551.  Implied threats suffused Defendants' pressure campaigns. *E.g.,* ROA.26551-26553.  Defendants' incessant demands to platforms came against the backdrop of a steady drumbeat of threats of adverse legal consequences from the White House, senior federal officials, members of Congress, and key congressional staffers—made over a period of at least five years.  "All that is required is that the government's words or actions 'could reasonably be interpreted as an implied threat.'"  ROA.26554 (quoting *NRA v. Cuomo*, 350 F. Supp. 3d 94, 114 (N.D.N.Y. 2018)).  The First Amendment is violated "where comments of a government official can reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request." *Okwedy*, 333 F.3d at 342.  Here, no reasonable listener could have construed them any other way.

Defendants argue that "the government must compel 'the *specific* conduct of which the plaintiff complains.'" App.Br. 22 (quoting *Blum*, 457 U.S. at 1004). But Defendants compelled the *exact* conduct of which Plaintiffs complain—pushing platforms to silence specific speakers and content, pressuring them to adopt more restrictive policies, and suppressing entire viewpoints on social media.

These were no mere "attempts to persuade." App.Br. 23. No rational observer could view them as such, and the platforms evidently did not. *E.g.*, ROA.26551-26553. This case bears no resemblance to the cases Defendants cite—which found no coercion at all. *O'Handley v. Weber*, 62 F.4th 1145, 1157-58 (9th Cir. 2023) (government flagged "one of [plaintiff's] tweets" without "threaten[ing] adverse action to coerce"); *Louisiana Div. Sons of Confederate Veterans v. City of Natchitoches*, 821 F. App'x 317, 320 (5th Cir. 2020) (mayor's letter "was simply a request" to which parade organizer "respond[ed] agreeably"); *VDARE Foundation v. City of Colorado Springs*, 11 F.4th 1151, 1164 (10th Cir. 2021) ("[N]othing in the City's Statement plausibly threatens the Resort with legal sanctions."); *Kennedy v. Warren*, 66 F.4th 1199, 1210 (9th Cir. 2023) (Senator's letter "was intended and received as nothing more than an attempt to persuade"); *X-Men Security, Inc. v. Pataki*, 196 F.3d 56, 71 (2d Cir. 1999) (finding "advocacy without threats, intimidation, or coercion"); *Penthouse Int'l, Ltd. v. Meese*, 939 F.2d 1011, 1016

(D.C. Cir. 1991) ("[T]he government threatens no sanction—criminal or otherwise").

Instead, the threats here are far more coercive, prolonged, and explicit than in cases where coercion *was* found. *See Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 62-63 (1963) (government agency sent "notices" to distributor and sent a police officer to follow up "to learn what action [had been] taken"); *Okwedy*, 333 F.3d at 341-42 (borough president criticized a billboard and asked the billboard company for a contact person for his "legal counsel and Chair of [the] Anti-Bias Task Force"); *Backpage.com*, 807 F.3d at 231-32 (sheriff's letter to credit-card companies hinted that processing payments for website might violate federal law, which sheriff had no authority to enforce, and requested a contact person).

***Significant Encouragement.***    The government also violates the First Amendment when it "provide[s] such significant encouragement, either overt or covert, that the choice in law must be deemed to be that of the State." *Blum*, 457 U.S. at 1004. "If there were ever a case where the 'significant encouragement' theory should apply, this is it." ROA.26548.

Defendants argue that "significant encouragement" is just coercion by offering "positive incentives" instead of threatening adverse consequences. App.Br. 25-26. But this Court's caselaw holds that "encouragement *short of compulsion*" can transform private conduct into government action. *Frazier v. Bd. of Trustees of*

*Nw. Mississippi Reg'l Med. Ctr.*, 765 F.2d 1278, 1286 (5th Cir. 1985) (emphasis added). The Supreme Court instructs that "a private party should be deemed an agent or instrument of the Government" when "the Government did more than adopt a passive position toward the underlying private conduct." *Skinner v. Ry. Lab. Execs. Ass'n*, 489 U.S. 602, 614-15 (1989).

In *Adickes v. S.H. Kress & Co.*, the Supreme Court found state action where a police officer merely "communicated his disapproval to a [restaurant] employee, thereby influencing the decision not to serve." 398 U.S. 144, 152, 158 (1970). Officials who "stand by watching with approval as the search continues" may involve state action. *United States v. Mekjian*, 505 F.2d 1320, 1327 (5th Cir. 1975); *accord United States v. Reed*, 15 F.3d 928, 932-33 (9th Cir. 1994). On Defendants' view, police officers who merely "provide[] minor incentives" to a private party and "provide[] information" on exactly where to search for contraband, do not violate the Fourth Amendment unless the private party's will is completely overborne. App.Br. 35. Fortunately, that is not the law. *Mekjian*, 505 F.2d at 1327.

***Joint Participation.*** Joint participation occurs when the government "has so far insinuated itself into a position of interdependence with [the private party] that it must be recognized as a joint participant in the challenged activity." *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 725 (1961); *Rawson v. Recovery*

39

*Innovations, Inc.*, 975 F.3d 742, 748 (9th Cir. 2020).  Here, Defendants aggressively insinuated themselves into platforms' content-moderation decisions.

Defendants contend that "joint participation" includes only "nominally private entities that are in effect run by the government" and cases where the government "provides a mantle of authority that enhances their power." App.Br. 26 (cleaned up).  Not so.  "State action may manifest itself in a wide variety of forms, some of which do not fit neatly in any category." *Roberts v. Louisiana Downs, Inc.*, 742 F.2d 221, 224 (5th Cir. 1984).  Joint participation applies whenever government officials are "so intimately involved with the decision … that this action should be attributed to the state." *Id.*  This occurs when "the state plays some meaningful role in the mechanism leading to the disputed act." *Frazier*, 765 F.2d at 1288.  "Joint action … requires a substantial degree of cooperative action," not the formal mechanisms Defendants would require. *Collins v. Womancare*, 878 F.2d 1145, 1154 (9th Cir. 1989).  "[I]f there is a substantial degree of cooperative action between state and private officials, or if there is overt and significant state participation, in carrying out the deprivation of the plaintiff's constitutional rights, state action is present." *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1454 (10th Cir. 1995) (cleaned up); *see also Charles v. Johnson*, 18 F.4th 686, 696 (11th Cir. 2021).

In fact, joint participation may be found if the government "knowingly accepts the benefits derived from unconstitutional behavior," *NCAA v. Tarkanian*,

488 U.S. 179, 192 (1988); *accord Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1486 (9th Cir. 1995)—which Defendants did by silencing speech criticizing *them and their policies*.

In a similar case, the Second Circuit found state action where federal prosecutors "intervened in [the private company's] decisionmaking," "express[ed] their disappointment" with certain decisions, "'made plain' their 'strong preference' as to what the firm should do," and expressed "their 'desire to share the fruits of such intrusions.'" *United States v. Stein*, 541 F.3d 130, 148 (2d Cir. 2008). Where (as here) this was done with threats in the background, "[t]he government had [the platforms'] full attention." *Id.*

***Pervasive Entwinement.*** Joint participation particularly occurs when there is "a symbiotic relationship between the [government] and the [private party]," or when the private entity is "entwined with governmental policies." *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 294, 296 (2001). "A symbiotic relationship, where present, denotes a level of functional intertwining" that entails state action. *Frazier*, 765 F.2d at 1288. "[W]hen the state [i]s so heavily involved in an activity with a private party that it [i]s in essence a joint participant, this 'symbiotic relationship' [i]s sufficient to make the actions of the private party attributable to the state." *Roberts*, 742 F.2d at 223–24. Here, Defendants are

41

pervasively entwined in the content-moderation practices of major platforms.  And "CISA and the EIP were completely intertwined."  ROA.26567.

### C.    Defendants' Factual Arguments Lack Merit.

Without disputing any specific factual finding, Defendants claim that the "district court's analysis … is unsupported by the facts."  App.Br.29.  Not so.

Defendants argue that no "government official imposed any sanction in retaliation for platforms' refusal to act as the government wished."  App.Br. 29.  But the platforms ultimately *complied* with federal demands—which was the point of the threats, as one federal official candidly admitted.  ROA.16425 ("Let's see what happens just by pressuring them.").  In any event, "such a threat is actionable and thus can be enjoined even if it turns out to be empty—the victim ignores it, and the threatener folds his tent."  *Backpage.com*, 807 F.3d at 231.

Defendants argue "Plaintiffs identified no demand on social-media platforms that was backed by a threat of sanction…."  App.Br. 39.  But Plaintiffs identified endless "threat[s] of sanctions"—public, explicit, private, and implied—including many explicitly "linked" to specific demands.  ROA.26476, 26480, 26551-26553.  Further, the federal officials' endless *private* demands were made against the backdrop of a continuous stream of *public* threats—the "extensive contact" in private, "paired with the public threats … resulted in an efficient report-and-censor relationship…."  ROA.26585.  There was no need for federal officials to spell out

42

the threats every time they made a specific demand (though they often did so). "Explicit threats are an obvious form of coercion, but not all coercion need be explicit." ROA.26551.

Defendants argue that their threats against platforms are "unremarkable." App.Br. 30. Not so. Threatening adverse legislation against companies, without more, is "unremarkable." *Id.* But deliberately *linking* those threats to demands for unconstitutional censorship, and *leveraging* those threats to pressure the companies to suppress constitutionally protected speech, violates the First Amendment. "The First Amendment forbids a public official to attempt to suppress the protected speech of private persons by threatening that legal sanctions will at his urging be imposed unless there is compliance with his demands." *Backpage.com*, 807 F.3d at 231.

Defendants contend that Psaki merely "mention[ed] concerns about misinformation." App.Br. 30. On the contrary, on May 5, 2021, Psaki raised the threat of "a robust anti-trust program" sandwiched between adjacent demands for censorship of disfavored viewpoints. *See* ROA.16460-16461; ROA.609. Likewise, on April 25, 2022, Psaki raised "reforms to Section 230" and "antitrust reforms" in direct reference to the White House's censorship demands—*i.e.*, as methods by which platforms "must be held accountable for the harms they cause" by not censoring disfavored viewpoints. ROA.16478; ROA.784-785, 790. Moreover, these statements accompanied a long series of similar threats "of adverse legislation"

43

from the President himself, other senior White House staffers like Bedingfield and McCarthy, and many other senior federal officials, starting "as early as 2018." ROA.26585; ROA.16419-16429. And these threats both punctuated and reinforced the *private* pressure campaign from Flaherty and Slavitt.

Defendants state, "plaintiffs complain of widespread content moderation before President Biden took office." App.Br. 32. As the FBI's witness testified, the censorship of election-related speech at the FBI's and CISA's behest in 2018 and 2020 was caused by "pressure from Congress," not the White House—including secret meetings in Silicon Valley, *coordinated by the FBI*, between senior congressional staffers and the platforms' top content-moderation officers beginning in 2017. *See supra*. Such threats motivated the platforms' cooperation with the FBI/CISA demands for censorship of election-related speech. ROA.26521, 26585.

Regarding Flaherty's profane email to Facebook ("Are you guys fucking serious? I want an answer on what happened here and I want it today," ROA.26477), Defendants claim that the email merely addressed "an internal technical issue." App.Br. 35-36. But the "technical issue" was that Facebook's internal algorithm for detecting and censoring accounts that spread supposed vaccine "misinformation" had mistakenly identified *President Biden's own Instagram account* as a superspreader of vaccine misinformation, and it had quietly shadow-banned him by artificially limiting his Instagram followers without notifying the White House.

44

ROA.9408-9410.  In other words, the White House exploded in fury when it learned that *its own* speech was inadvertently snared in the very censorship net that it relentlessly pressured platforms to impose on ordinary Americans.  The very next day, President Biden publicly accused Facebook and other platforms of "killing people."  ROA.26478.

Defendants argue that there was nothing "nefarious" in the White House pressuring Facebook to suppress "borderline" (*i.e.*, truthful, non-violative) content because Facebook sometimes suppresses such content on its own.  App.Br. 46.  This misses the mark.  Defendants pressured Facebook (and other platforms) to suppress "borderline" content because they were obviously *not suppressing it aggressively enough for the White House*.  This pressure succeeded dramatically.

Defendants claim the "the district court failed to identify any threat … made by the Office" of Surgeon General.  App.Br. 36.  Not so.  The district court found— based on Waldo's sworn admission—that the Surgeon General's repeated threat to hold the platforms "'accountable' carries with it the threat of consequences." ROA.26487.  Moreover, the Surgeon General's Office was acting in tandem with the White House—participating in the same meetings, emails, and phone calls with platforms—and supported by the White House's threats.

Defendants argue that the CDC did not directly coerce platforms.  App.Br. 38.  But the CDC badgered platforms with long lists of specific posts it wished

removed—emails, slide decks, BOLO meetings, etc.—at the same time that the White House was pressuring the platforms to censor the same categories of information.  Defendants view the CDC in isolation from the White House, but the platforms obviously did not.  And the CDC's conduct plainly constitutes joint participation, as it so thoroughly insinuated itself into platforms' content-moderation policies that it was dictating what could and could not be posted on Facebook and other platforms.

Defendants argue that NIAID merely "express[ed] its opinion on matters of public concern, regardless of its motivation."  App.Br. 39.  But when government officials deliberately "g[i]ve false information … with the intent of inducing" private parties to violate another's rights, they violate the Constitution.  *George v. Edholm*, 752 F.3d 1206, 1215 (9th Cir. 2014); *see also, e.g., Jones v. City of Chicago*, 856 F.2d 985, 994 (7th Cir. 1988) (holding "officer who deliberately supplied misleading information" to induce the violation liable).  As the district court held, *deceiving* platforms into censoring others "is just another form of coercion."  ROA.26562.  Moreover, Defendants ignore the district court's undisputed findings that the NIAID Defendants successfully pushed platforms to censor content "lampooning or criticizing Dr. Fauci," including "parody accounts."  ROA.26509-26510.

Defendants argue that the FBI exercised "no coercion."  App.Br. 50.  But the FBI's demands succeeded because of "intense pressure" from Congress—which

took place, in part, through secret Silicon-Valley meetings with platforms coordinated through the FBI. ROA.26521. Further, the FBI deliberately provided misleading information to platforms to fraudulently induce them to censor the Hunter Biden laptop story, which is "just another form of coercion." ROA.26562. And the FBI's ongoing group meetings, bilateral meetings, emails, encrypted messages, and endless demands for censorship, all constitute "significant encouragement" and "joint participation" as well as coercion.

Defendants likewise contend that CISA did not "pressure" anyone. App.Br. 51. But, like the FBI, CISA benefited from, and exploited, the "pressure from Congress" that the platforms were already receiving. ROA.26521. Like the FBI, CISA engages in endless meetings with platforms about misinformation, relentlessly flags disfavored content, and requests reports on censorship actions taken—which also constitutes "pressure" by any description. This constitutes joint participation and significant encouragement as well.

As to the Election Integrity Partnership, Defendants admit CISA was "in some loose sense associated" with the EIP. App.Br. 41. This is like saying that Robespierre was "in some loose sense associated" with the Reign of Terror. CISA originated the EIP, coordinated closely with it, and remained deeply involved in its operations. ROA.26524-26529, 26534-26539, 26565-26567; ROA.16669-16685. The district court held, based on many pages of undisputed findings, *id.*, that "CISA

and the EIP were completely intertwined." ROA.26567. Defendants argue that the EIP only engaged in "flagging," which is supposedly "unproblematic." App.Br. 41. But the EIP flagged misinformation while platforms had already been under years of "intense pressure," ROA.16661, to cooperate with CISA, the EIP's "major stakeholder." ROA.13684. The EIP/VP flagged thousands or millions of posts, unlike the single post at issue in *O'Handley*. In any event, the EIP/VP is a joint collaboration among the government, the research entities, and *the platforms themselves*—so it involves "joint participation" directly between federal officials and the platforms on content-moderation decisions. ROA.26524-26525. The EIP/VP links platforms and government officials in real-time collaboration on censorship decisions. *See, e.g.,* ROA.13706 fig.2.2.[1]

---

[1] *Amici* Stanford, Stamos, and DiResta, Doc. 74-2 ("Stanford Br."), dispute some of the district court's factual findings, but their claims contradict the evidence at every point. *Amici* deny that the EIP/VP received federal funding, *id.* at 7, but the EIP's report states "Researchers who contributed to the EIP … receive partial support from the U.S. National Science Foundation (grants 1749815 and 1616720)." ROA.13675. *Amici* claim they never targeted Hines or Health Freedom Louisiana, Stanford Br. 17-18; but the VP's public report cites "health freedom" groups almost 100 times, ROA.16744-16745, including an entire section on such groups, ROA.14009, and it states that the VP tracked "misinformation" from such groups "across all 50 states." ROA.14043. *Amici* claim that DiResta did not say EIP wanted to "get around" the First Amendment, Stanford Br. 18-19; but DiResta stated that the "gap" that *the EIP was specifically designed to address* included "very real First Amendment questions" that would arise if federal officials engaged in such conduct directly, ROA.14196. *Amici* claim that they "shared a mere 4,832 URLs with *all* social media platforms," Standford Br. 20; but *amici*'s own brief demonstrates that a single "URL" includes a website or posting that can be re-posted *thousands or millions of times* when it goes viral, *id.* at 10. So their admission of flagging a "mere" ***4,832***

Contrary to Defendants, App.Br. 42, the GEC "has teamed up directly with" CISA "to seek review of social-media content," ROA.26530; "the GEC's front office and senior leadership meets with social-media platforms every few months" on disinformation, ROA.26532; the GEC has one-on-one meetings with platforms in Silicon Valley as well, ROA.26533; "[t]he GEC … coordinated with CISA and the EIP," *id.*; and "the GEC … works closely with the Stanford Internet Observatory," *id.* The GEC admits that it flagged *domestic* speech to platforms for removal if the GEC determined merely that it was "likely to be amplified" by foreign actors, and that "the GEC flagged … posts and narratives for the Election Integrity Partnership (EIP) on approximately 21 occasions." ROA.23609.

## II.    Plaintiffs Face Irreparable Harm, and the Equities Favor an Injunction.

---

URLs demonstrates the staggering scope of their mass-flagging operation. *Amici* claim that they learned only "*after* the 2020 election" that the vast majority of targeted speech was domestic, Stanford Br. at 23; but Stamos stated on October 20, 2020, that "the vast, vast majority … is domestic." ROA.25652. *Amici* claim that CISA interns did not originate the idea for the EIP, Stanford Br. 24; but the EIP's report states that "[t]he initial idea for the Partnership came from four students that the Stanford Internet Observatory … funded to complete volunteer internships at" CISA. ROA.13678. *Amici* contend they had an "arms-length" relationship with CISA, Stanford Br. 25, but the district court cited overwhelming evidence to the contrary. ROA.26524-26529, 26534-26539, 26565-26567. *Amici* dispute that the VP had close contacts with federal officials, Stanford Br. 26-27; but the VP's report states that "[t]he Virality Project built strong ties with several federal government agencies, most notably the Office of the Surgeon General (OSG) and the CDC." ROA.13974.

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). "A plaintiff seeking a preliminary injunction must demonstrate that irreparable injury is likely in the absence of an injunction." *Anibowei*, 70 F.4th at 902 (quotation omitted). "It is not necessary to demonstrate that harm is inevitable and irreparable; the plaintiff need show only a significant threat of injury from the impending action [and] that the injury is imminent…." *Id.* (cleaned up). This standard is satisfied when "First Amendment interests [a]re either threatened or in fact being impaired at the time relief [i]s sought." *Elrod*, 427 U.S. at 373.

All Plaintiffs suffer recent and ongoing injuries from prior censorship decisions and face likely future censorship. Hines and Hoft suffered new censorship injuries days before the preliminary-injunction hearing. ROA.25726-25737. "Bhattacharya … is the apparent victim of an ongoing 'campaign' of social-media censorship, which indicates that he is likely to experience future acts of censorship." ROA.26581. "Kulldorff's ongoing censorship experiences on his personal social-media accounts provide evidence of ongoing harm and support the expectation of imminent future harm." *Id.* "Kheriaty also affirms ongoing and anticipated future injuries, noting that the issue of 'shadow banning' his social-media posts has intensified since 2022." *Id.* "Hines, too, recounts past and ongoing censorship injuries," and "the evidence … strongly implies that these restrictions can be directly

50

traced back to federal officials." ROA.26581-26582. And Defendants are evidently "currently involved in an ongoing project that encourages and engages in censorship activities specifically targeting Hoft's website." ROA.26581.

Moreover, "Plaintiffs' request for an injunction is not solely aimed at addressing the initial imposition of the censorship penalties but rather at preventing any continued maintenance and enforcement of such penalties." ROA.26582.

Defendants claim to have stopped "many of the government practices that plaintiffs identify." App.Br. 43. (They don't say "all.") In related contexts, courts view such voluntary-cessation arguments with extreme skepticism. *Already, LLC v. Nike*, 568 U.S. 85, 91 (2013) (applying "the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur"). Here, there is overwhelming evidence of Defendants' ongoing and expanding censorship activities. White House officials badgered platforms on censorship throughout 2022, right up until they produced Flaherty's emails. ROA.26480. The White House identifies new topics and viewpoints to censor— such as "climate change, gender discussions, abortion, and economic policy." *Id.*

The CDC's "regular biweekly meetings with Google" on disinformation "continue[] to the present day." ROA.26500. The "USG-Industry" meetings on disinformation are "continuing" and "will continue through the 2024 election cycle." ROA.26514. The "bilateral meetings between FBI and [seven platforms] … are

continuing" and "will increase to monthly and weekly nearer the elections." *Id.* "[T]he FBI is continuing its efforts to report disinformation to social-media companies to evaluate for suppression and/or censorship." ROA.26521. According to Chan, "we've never stopped." *Id.*

CISA's "Industry" meetings with platforms "continue to this day," and "increase in frequency as each election nears." ROA.26523. CISA still conducts "five sets of recurring meetings with social-media platforms that involved discussions of misinformation, disinformation, and/or censorship of speech on social media." ROA.26529. "CISA publicly states that it is expanding its efforts to fight disinformation-hacking in the 2024 election cycle." ROA.26530. This includes expanding its censorship efforts to many new topics and viewpoints. *Id.* The EIP/VP "continued to operate during the 2022 election cycle," ROA.26525, and says it will "continue its work in future elections." ROA.26537.

In fact, when the district court asked, "how can I be sure that this is not going to happen again," Defendants' counsel answered, "*it is not the government's argument that ... this ... will never happen again*." ROA.26804:7-8 (emphasis added). And "it is certainly not imaginary or speculative to predict that Defendants could use their power over millions of people to suppress alternative views or moderate content they do not agree with in the upcoming 2024 national election." ROA.26596.

The balancing of harms and public interest decisively favor the injunction. "[I]njunctions protecting First Amendment freedoms are always in the public interest." *Texans for Free Enter. v. Texas Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013). Here, "the manifest equities weigh in favor of equitable relief." *Id.*

Having violated the First Amendment rights of millions, Defendants now bemoan "the profound harms this injunction will cause to the government." App.Br.60. This flips the equities—and the First Amendment itself—on their heads. When government officials deliberately suppress *private citizens'* freedom to speak, the government's freedom to speak takes a distant second place. "[T]he government-speech doctrine … is susceptible to dangerous misuse," and must not allow government to "silence or muffle the expression of disfavored viewpoints." *Matal v. Tam*, 582 U.S. 218, 235 (2017).

In any event, Defendants' concerns are chimerical. In their preliminary-injunction briefing, Defendants spent months attempting to identify problematic applications of the injunction and filed five declarations detailing such concerns. ROA.22981-22982, 23098-23100, 23607-23610, 23854-23874, 23958-23976. The district court addressed these concerns by providing eight specific carve-outs permitting the full range of valid government speech. ROA.26614-26615. So thoroughly did the district court address their concerns that Defendants largely ignore their own declarations on appeal.

Instead, Defendants advance a handful of mostly "hypothetical" applications, App.Br.48—such as the White House pressuring platforms to take down misinformation after a "natural disaster," App.Br.48; the Surgeon General urging platforms to apply labels to cigarette ads or de-boost "suicide-promoting content," App.Br.48; and CISA's "Rumor v. Reality" website about "election security," App.Br.49.

That these examples are admittedly "hypothetical" renders them useless in challenging the injunction. *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 15 (1945). Such "hypotheticals" provide no basis to overturn an injunction. *Daniels Health Sciences, LLC v. Vascular Health Sciences, LLC*, 710 F.3d 579, 586 (5th Cir. 2013).

In any event, all the Government's hypotheticals have the same answer: Defendants *may* express their views on all manner of policy issues without any restriction, but they *may not* demand, urge, encourage, or pressure social-media platforms to silence the views of ordinary Americans. ROA.26613-26615. In the earthquake example, the White House *may* promulgate what it thinks is truthful information about the national disaster, but it *may not* demand that platforms silence other people's speech. The Surgeon General *may* express his views on the safety of tobacco products and what constitutes "suicide-promoting content," but he *may not* demand that platforms silence protected speech on those issues that he disfavors. CISA *may* post what it views as truthful election-related information, but it *may not*

54

badger platforms to take down the information it disagrees with. This distinction is not hard to grasp, and it imposes no novel or extraordinary burden. It is what the First Amendment already requires the Government to do. *Norwood*, 413 U.S. at 465.

## III.    The Injunction Is Clear and Properly Tailored.

### A.    The Injunction Is Not Overbroad.

Defendants argue that the injunction "sweeps more broadly than necessary." App.Br. 45. Not so. The injunction addresses a great deal of unlawful conduct because Defendants are committing a great deal of unlawful conduct. ROA.26458-26540. The district court thus "tailor[ed the] injunction to remedy the specific action[s] which give[] rise to the order." *Daniels Health Sciences*, 710 F.3d at 586. As the D.C. Circuit stated, "[t]hese injunctions may be broad, but breadth is warranted to prevent further violations where, as here, a proclivity for unlawful conduct has been shown." *Philip Morris*, 566 F.3d at 1137 (cleaned up).

Defendants object that the injunction protects "a wide range of content." App.Br. 45. But Plaintiffs "assert an interest," *id.*, in speaking and listening to speech on *all* the topics Defendants have censored and plan to censor—COVID-19, elections, "gas prices, parody speech, calling the President a liar, climate change, gender, and abortion," ROA.26597; and "the efficacy of COVID-19 vaccines, racial justice, the United States' withdrawal from Afghanistan, and the nature of the United States' support of Ukraine," among others, ROA.26530. The individual Plaintiffs

express their own opinions on these topics—for example, Hoft's website, *The Gateway Pundit*, addresses all of them—and they follow dozens of speakers who post on these topics. ROA.17506-17521. The States likewise assert an interest in hearing their citizens' uncensored views on whatever "subject matters and issues [that] are important to" their constituents—not just COVID and elections. ROA.1269.

Defendants complain that the injunction "applies to all social-media platforms." App.Br. 45. But Defendants' conduct leaves no platform untouched. *See, e.g.,* ROA.26514; ROA.26524; ROA.26535 ("Facebook, Instagram, Google/YouTube, Twitter, TikTok, Reddit, Nextdoor, Discord, and Pinterest."). Moreover, Defendants' threats typically addressed *all* social-media platforms. Plaintiffs have an interest in not having their speech censored on platforms even where they lack accounts—such as when the Great Barrington Declaration's website could not be reposted across many platforms. State Plaintiffs "monitor[] activity and mentions on multiple social media platforms." ROA.1269. The individual Plaintiffs have accounts, and their speech is affected, across many platforms as well. *E.g.,* ROA.1207-1208; ROA.1191-1196.

Defendants contend that the injunction "indiscriminately targets defendant agencies and their employees." App.Br. 45. Again, this matches the breadth of misconduct; Twitter identified *eighty-three* federal officials who communicate with

it about censorship.  ROA.16860.  Agencies are routinely enjoined where their senior leaders are involved in misconduct.  *See, e.g., Utah v. United States*, 420 U.S. 304-05 (1975) (enjoining "the United States of America, its departments and agencies"); *Louisiana v. Becerra*, 577 F.Supp.3d 483 (W.D. La. 2022); *Arizona by and through Brnovich v. CDC*, 2022 WL 1276141, at *1 (W.D. La. Apr. 27, 2022).

## B.    The Injunction Is Not Vague.

Finally, the injunction is not vague.  It includes ten paragraphs specifying prohibited conduct in detail, and eight paragraphs specifying government conduct that is not prohibited.  ROA.26613-26615.  The injunction uses common words readily understandable by ordinary speakers of the English language, and whose meanings are easily ascertainable from the dictionary.  *See id.*

First, Defendants contend that they cannot understand the words "urge," "encourage," "pressure," and "induce."  App.Br. 51.  But these are common words whose ordinary meanings are found in the dictionary; they are appropriately *broad*, given the breadth of misconduct, but they are not vague.  They derive further clarity from the numerous specific examples of such conduct in the district court's findings. *Philip Morris*, 566 F.3d at 1137.  And even if they have some borderline applications, mathematical precision is not required; "it is impossible for courts to craft injunctions that address all hypotheticals." *Daniels Health Sciences*, 710 F.3d at 586. The mere *possibility* of some future marginal applications does not invalidate an

injunction. *Regal Knitwear*, 324 U.S. at 15; *Gulf King Shrimp Co. v. Wirtz*, 407 F.2d 508, 517 (5th Cir. 1969). And where Defendants do not intend to *perform* the supposedly borderline conduct, their claim of vagueness is speculative. *Daniels Health Sciences*, 710 F.3d at 586.

Next, Defendants challenge the word "permissible" in the injunction's fifth carveout. ROA.26615. There is no mystery here: "permissible government speech" is speech *not otherwise forbidden by the injunction*. *Permissible*, Dictionary.com, *at* https://www.dictionary.com/browse/permissible ("permitted, allowable"). In complex cases, it is common for the injunction's terms to be understood in "the context of the case" and the district court's findings. *Philip Morris*, 566 F.3d at 1137 (holding that "a general injunction is not too vague if it relates the enjoined violations to the context of the case," and that a broad injunction against "acts of racketeering" was not vague "when read in the context of the district court's legal conclusions and 4,088 findings of fact").

Defendants hypothesize that they might want to remove "criminal" speech without "a definitive conclusion" that the speech is criminal. App.Br.62. The district court answers: "The benefit of any doubt must go to protecting rather than stifling speech." ROA.26543.

Defendants claim that the fourth exclusion is vague because "threats that threaten the public safety," ROA.26615, might include "vaccine-related

misinformation." App.Br.62.  There is no vagueness here.  No rational reader of the

district court's opinion would conclude that pushing platforms to remove "vaccine-

related misinformation" falls within this exclusion.

Defendants complain that they cannot determine what constitutes "protected

free speech" under the Supreme Court's precedents.  App.Br.62.  But all speech is

"protected" unless it falls within "long familiar," "historic and traditional," "well-

defined and narrowly limited" exceptions, including "obscenity, defamation, fraud,

incitement, and speech integral to criminal conduct."  *United States v. Stevens*, 559

U.S. 460, 468–69 (2010) (citations, alterations, and quotation marks omitted);

*United States v. Alvarez*, 567 U.S. 709, 715–18 (2012) (plurality op.).  Outside these

longstanding exceptions, the "vast realm of free speech and thought always protected

in our tradition can still thrive." *Alvarez*, 567 U.S. at 718.

Defendants criticize the sixth exemption relating to "voting procedures and

requirements."  ROA.26615.  They don't claim to be confused by its *meaning*;

instead, they claim that its inclusion (done *at their request*) is confusing because the

district court condemned CISA's "switchboarding" activities.  App.Br.63.  The

confusion is baseless.  Few, if any, of CISA's "switchboarding" emails involved posts

"intending to mislead voters about voting requirements and procedures."

ROA.26615.  In any event, the injunction makes perfectly clear that CISA *may* flag

such posts to platforms, so there is no vagueness problem here.

In essence, because their methods of violating the First Amendment are so many and varied, Defendants contend that they can never be effectively enjoined from violating it.  The district court saw through this charade: "Just because the injunction may be difficult to tailor is not an excuse to allow potential First Amendment violations to continue."  ROA.26599.

## CONCLUSION

The district court's judgment should be affirmed.

Dated: August 4, 2023                           Respectfully Submitted,

**ANDREW BAILEY**                               **JEFFREY M. LANDRY**
**Attorney General of Missouri**                **Attorney General of Louisiana**
*/s/ Joshua M. Divine*                          */s/ D. John Sauer*
Joshua M. Divine                                Elizabeth B. Murrill
*Solicitor General*                             *Solicitor General*
Todd A. Scott                                   Tracy Short
*Senior Counsel*                                *Assistant Attorney General*
Missouri Attorney General's Office              D. John Sauer
Post Office Box 899                             *Special Assistant Attorney General*
Jefferson City, MO 65102                        Louisiana Department of Justice
(573) 751-8870                                  1885 N. Third Street
josh.divine@ago.mo.gov                          Baton Rouge, LA 70802
*Counsel for State of Missouri*                 (225) 326-6766
                                                murrille@ag.louisiana.gov
                                                *Counsel for State of Louisiana*


*/s/ John J. Vecchione*                         */s/ John C. Burns*
John J. Vecchione                               John C. Burns
New Civil Liberties Alliance                    Burns Law Firm
1225 19th Street N.W., Suite 450                P.O. Box 191250
Washington, DC 20036                            St. Louis, MO 63119
(202) 918-6905                                  (314) 329-5040
john.vecchione@ncla.legal                       john@burns-law-firm.com
*Counsel for Plaintiffs Dr. Jayanta*            *Counsel for Plaintiff Jim Hoft*
*Bhattacharya, Dr. Martin*
*Kulldorff, Dr. Aaron Kheriaty,*
*and Jill Hines*

## **CERTIFICATE OF SERVICE**

I hereby certify that, on August 4, 2023, I caused a true and correct copy of the foregoing to be filed by the Court's electronic filing system, to be served by operation of the Court's electronic filing system on counsel for all parties who have entered in the case.

*/s/ D. John Sauer*

## <u>CERTIFICATE OF COMPLIANCE</u>

This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,986 words, excluding those portions pursuant to Federal Rule of Appellate Procedure 32(f), according to Microsoft Word.

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it was prepared in a proportionally spaced typeface in Microsoft Word utilizing 14-point Times New Roman font.

*/s/ D. John Sauer*
D. John Sauer
Counsel for State of Louisiana
Dated: August 4, 2023