No. 23-30445

United States Court of Appeals
for the Fifth Circuit

———————◆———————

STATE OF MISSOURI, ET AL.,
*Plaintiffs-Appellees*,

v.

JOSEPH R. BIDEN, JR., ET AL.
*Defendants-Appellants.*

———————◆———————

On Appeal from the United States District Court
for the Western District of Louisiana

———————◆———————

**BRIEF OF AMICUS THE BUCKEYE INSTITUTE
IN SUPPORT OF APPELLEES**

———————◆———————

Jay R. Carson (0068526)
Robert Alt (0091753)
David C. Tryon (Ohio 0028954)
Alex M. Certo (Ohio 102790)
The Buckeye Institute
88 East Broad Street, Ste. 1300
Columbus, Ohio 43215
(614) 224-4422
j.carson@buckeyeinstitute.org

*Attorneys for Amicus Curiae
The Buckeye Institute*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iii

INTEREST OF AMICUS CURIAE ..................................................... 1

INTRODUCTION .................................................................................. 2

ARGUMENT........................................................................................... 3

I. Will No one Rid Me of These Turbulent Tweets? ............................... 3

II. Academic Views of Jawboning......................................................... 5

III. Jawboning's Unhappy Bipartisan History ....................................... 9

IV. Jawboning's Allure and Dangers ....................................................12

V. The Government is not omniscient. It has a poor history of identifying misinformation—and often reverses itself...............................................14
    A. The federal government's COVID misinformation .......................15
        1.   Covid 19 Origins: From bats to labs. ....................................16
        2.   Masks don't work; yes, they do; no, they don't.....................18
        3.   COVID 19 vaccines will prevent infection and transmission, no they don't..........................................................................................20
        4.   Fully vaccinated people cannot transmit the virus; actually, yes, they can. 21
    B. Other government misinformation. .............................................22
        1.   Japanese Americans are spies and must be interned...............22
        2.   Tuskegee Syphilis Study..........................................................23
        3.   Let's invade Iraq—it has weapons of mass destruction; sorry, we were wrong. .......................................................................................24

  VI. The remedy to supposed wrong speech is more speech..............25

CONCLUSION .....................................................................................30

CERTIFICATE OF COMPLIANCE ..................................................31

CERTIFICATE OF SERVICE.............................................................322

# TABLE OF AUTHORITIES

**Cases**

*Associated Press v. United States*, 326 U.S. 1 (1945) .............................27

*Abrams v. United States*, 250 U.S. 616, 40 S.Ct. 17, 63 L.Ed. 1173 (1919)...........27

*Austin* v. *Michigan Chamber of Com.*, 494 U.S. 652 (1990) ................................29

*Biden v. Knight First Amendment Inst. at Columbia Univ.*, 141 S. Ct. 1220 (2021) 4

*Changizi v. Department of Health and Human Services*, 602 F. Supp.3d 1031 (2022)..............................................................................................12

*Citizens United* v. *Fed. Election Comm'n*, 558 U.S. 310 (2010) ..........................29

*First Nat. Bank of Bos. v. Bellotti,* 435 U.S. 765 (1978) .......................................26

*First Unitarian Church of Los Angeles v. Cnty. of Los Angeles*, 357 U.S. 513, 2 L.Ed.2d 1460, 78 S.Ct. 1352 (1958) .................................................. 6

*Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525 (2001)..........................................28

*Norwood v. Harrison*, 413 U.S. 455 (1973)............................................... 4

*Stanley v. Georgia*, 394 U.S. 557 (1969) .........................................................25

*United States v. Alvarez*, 567 U.S. 709 (2012)....................................................27

*Whitney v. California*, 274 U.S. 357 (1927) ......................................................26

 **Other Authorities**

*About the USPHS Syphilis Study*, Tuskegee University. ........................................24

*Agency Threats.*  Tim Wu, *Agency Threats*, 60 Duke L. J. 1841 (2011)...............5, 7

Nsikan Akpan & Victoria Jaggard, *Fauci: No scientific evidence the coronavirus was made in a Chinese lab*, Nat'l Geographic (May 4, 2020)............................16

Bambauer, *Orwell's Armchair*, 79 U. Chi. L. Rev. 863 (2012) ..............................14

Derek E. Bambauer, *Against Jawboning*, 100 Minn. L. Rev. 51 (2015) .........*passim*

Jack Brewster, *A Timeline of The COVID-19 Wuhan Lab Origin Theory*, Forbes (May 24, 2020)..............................................................................................16

Jerry Brito, *"Agency Threats" & the Rule of Law: An Offer You Can't Refuse,* 37 Harv. J.L. & Pub. Pol'y 553 (2014) ...................................................... 8

Jeffery Burton, et al., *A Brief History of Japanese American Relocation During World War II*, Nat'l Park Serv ........................................................................23

Kari Campeau, *Who's a Vaccine Skeptic? Framing Vaccine Hesitancy in Post-Covid News Coverage*, 40 Written Commc'n 976 (2023) .................................20

Joseph Choi, *Fauci: Vaccinated people become 'dead ends' for the coronavirus*, The Hill (May 16, 2021)....................................................................................22

Robert Dodsley, *The Chronicle of the Kings of England, from William the Norman to the Death of George III* (1821), J. Fairburn. P. 27, https://archive.org/details/chroniclekingse0saddgoog ...................................... 4

Michaeleen Doucleff, *Vaccinated People Can Spread The Delta Variant, CDC Research Indicates*, NPR (July 30, 2021)...........................................................22

Jerry Dunleavy, *FBI knew the Hunter Biden laptop was real in 2019, IRS whistleblowers say*, Wash. Exam'r (June 22, 2023) ...........................................23

Brit Mccandless Farmer, *March 2020: Dr. Anthony Fauci talks with Dr Jon LaPook about COVID-19*, CBS News (Mar. 8, 2020)........................................18

*Fauci on GOP Criticism: 'Attacks on Me, Quite Frankly, Are Attacks on Science'*, Forbes (Dec. 10, 2021) ......................................................................16

*Fauci Was 'Untruthful' to Congress About Wuhan Lab Research, New Documents Appear to Show*, News Week (Sept. 9, 2021)....................................................18

Robert Justin Goldstein, *Prelude to McCarthyism: The Making of a Blacklist*, Prologue Magazine, (Fall 2006).....................................................................10

*Hearing Wrap Up: Suppression of the Lab Leak Hypothesis Was Not Based in Science*, Comm. on Oversight & Accountability (Jul. 12, 2023) .......................17

Nate Hochman, *Trust the Science?*, National Review (Nov. 29, 2021).................15

Dylan Housman, *Birx: Biden Admin Was 'Hoping,' Not Lying, When It Said Vaccines Would Stop COVID Spread*, Daily Caller (June 23, 2022)...................21

Kaia Hubbard, *These States Have COVID-19 Mask Mandates*, U.S. News (Mar. 28, 2022) .................................................................................................19

*Iraq and Weapons of Mass Destruction*, National Security Archive (Feb. 11, 2004) ....................................................................................................................25

Judges 15:15-16 (King James) ............................................................................ 2

Alexandra Kelley, *Fauci: why the public wasn't told to wear masks when the coronavirus pandemic began*, The Hill (June 16, 2020)....................................19

Kreimer, *Censorship by Proxy: The First Amendment, Internet Intermediaries, & the Problem of the Weakest Link*, 155 U. Pa. L. Rev. 11 (2006) ........................12

Youlin Long, et al., *Effectiveness of N95 respirators versus surgical masks against influenza: A systematic review and meta-analysis*, 13 J. Evid. Based Med. 93 (2020)...............................................................................................................20

Berkeley Lovelace Jr. & Noah Higgins-Dunn, *Dr. Anthony Fauci says Americans who don't wear masks may 'propagate the further spread of infection'*, CNBC (June 5, 2020)..................................................................................................19

Berkeley Lovelace Jr., *CDC study shows 74% of people infected in Massachusetts Covid outbreak were fully vaccinated*, CNBC (July 30, 2021). ..........................21

Nomaan Merchant, *Iraq WMD failures shadow US intelligence 20 years later*, AP (Mar. 23, 2023)................................................................................................25

Jack Mitchell, *20 years ago, the U.S. warned of Iraq's alleged 'weapons of mass destruction'*, NPR (Feb. 3, 2023) ....................................................................25

John Stuart Mill, *On Liberty* 37–38 (3d. ed. 1864)..............................................26

*News Conference – I'm Here To Help*, Ronald Reagan Presidential Foundation & Institute, https://www.reaganfoundation.org/ronald-reagan/reagan-quotes-speeches/news-conference-1/ (last visited Aug. 1, 2023). ..................................28

Ben Schreckinger, *Mask mystery: Why are U.S. officials dismissive of protective covering?*, Politico (Mar. 30, 2020) ...................................................................18

Nadine Strossen, *HATE: Why We Should Resist It with Free Speech, Not Censorship* 158 (2018)..........................................................................................26

*The Syphilis Study at Tuskegee Timeline*, CDC. .............................................23, 24

*To Secure These Rights: The Report of the President's Committee on Civil Rights*, No. 47 (1947), https://www.trumanlibrary.gov/library/to-secure-these-rights#47 ........................................................................................................................30

Erik Forde Ugland, *Hawkers, Thieves and Lonely Pamphleteers: Distributing Publications in the University Marketplace*, 22 J.C. & U.L. 935 (1996)............27

Brandie Weikle, *Fauci confident vaccines can 'crush' COVID — if vaccine hesitancy doesn't get in the way*, CBC (Dec. 12, 2020).....................................21

Gregg Zoroya, *Whatever happened to Iraq's weapons of mass destruction?*, USA Today (Feb. 14, 2019)........................................................................................24

## INTEREST OF AMICUS CURIAE

Amicus Curiae The Buckeye Institute[1] respectfully submits its brief in support of the Appellees. The Buckeye Institute was founded in 1989 as an independent research and educational institution—a think tank—whose mission is to advance free-market public policy in the states. The Buckeye Institute performs timely and reliable research on key issues, compiles and synthesizes data, formulates free-market policy solutions, and presents them for implementation in Ohio and replication nationwide. The Buckeye Institute is a nonpartisan, non-profit, tax-exempt organization as defined by I.R.C. § 501(c)(3). The Buckeye Institute's Legal Center files and joins amicus briefs that are consistent with its mission and frequently supports the First Amendment rights of individuals and a free press. In this case, the actions of the government a raise significant concerns that the Executive Branch has engaged in, and unless enjoined, will continue to engage in censorship in violation of the First Amendment. This censorship harms people and non-profits like The Buckeye Institute, who often assert positions that are different than those espoused by the government.

---

[1] Pursuant to Rule 29(a), The Buckeye Institute states that all parties have given consent to file this amicus brief. Further, no counsel for any party has authored this brief in whole or in part and no person other than the amicus has made any monetary contribution to this brief's preparation or submission. The Buckeye Institute has no parent corporation and no publicly held corporation owns 10% or more of its stock.

**INTRODUCTION**

And he found a new jawbone of an ass, and put forth his hand, and took it, and slew a thousand men therewith.

And Samson said, With the jawbone of an ass, heaps upon heaps, with the jaw of an ass have I slain a thousand men.

*Judges* 15:15-16 (King James).

The biblical story of Samson slaying a thousand men with the jawbone of an ass is meant to convey his divinely endowed strength. He could eviscerate an army, singlehandedly, wielding only a happenstance and improbable weapon. In the early 1960s, the term "jawboning" entered the political lexicon to describe a President's ability to accomplish similar a feat of political strength—commanding regulatory policy—through the seemingly innocuous tool of public and private statements. Derek E. Bambauer, *Against Jawboning*, 100 Minn. L. Rev. 51, 57 (2015) (defining jawboning and noting the term's biblical origin). And while Samson's prowess on the battlefield of Lehi was considerable—as the record below shows—his supernatural strength pales in comparison to the executive branch's power to smite the speech, stories, and ideas of political philistines with whom it disagrees.

As the district court's order makes clear, by jawboning—that is wheedling, cajoling, and in some cases, threatening regulated entities—the executive branch essentially commandeered private actors to censor speech on the government's behalf. Even if the government were always right, that monopoly would not justify

governmental infringement on free speech. But, as demonstrated in Section V., the government is not always right, or even consistent. And fortunately, the First Amendment precludes such infringement on our free speech.  See Section VI.

## ARGUMENT

### I. Will No one Rid Me of These Turbulent Tweets?

Had Twitter been available to Thomas à Becket—Archbishop of Canterbury and Lord Chancellor to King Henry II in the 1160s—the separation of church and state that would become a cornerstone of liberal democracies might have emerged centuries earlier. Still, limited to quill and scroll and horseback delivery, Becket and his defense of church independence against royal prerogative achieved the medieval equivalent of going viral. The King was enraged by, among things, Becket's insistence that church authorities, rather than the Crown, had exclusive jurisdiction to try criminal cases against clergy. And although the King theoretically enjoyed absolute power, because Becket was a papal legate, the King was nevertheless politically constrained in what direct action he could take against Becket. So, like a White House staffer frustrated by a stream of vaccine hesitant tweets,[2] Henry reportedly complained to four of his knights —"will no one deliver me this turbulent

---

[2] *See, e.g,* Pls.' Proposed Findings of Fact in Supp. of Their Mot. for Prelim. Inj. at 13.

priest?" *See* Robert Dodsley, *The Chronicle of the Kings of England, from William the Norman to the Death of George III* 27 (1821).[3]

The knights, eager to earn favor or avoid reprobation from their King—a man with significant power to influence their lives and fortunes—stepped in to solve Henry's problem by murdering Becket in Canterbury Cathedral. *Id*.; Lloyd de Beer & Naomi Speakman, *Who killed Thomas Becket?*, The British Museum (Apr. 22, 2021).[4] Just as Henry II was constrained in his ability to deal with Becket directly, American presidents are constrained by both the First Amendment and the political backlash that would attend any direct government action that could be viewed as an attempt to silence critics. The President might therefore instead "encourage" social media platforms to do his or her bidding under the guise of "responsible content moderation." But the government cannot censor by proxy by inducing, encouraging, or pressuring "private persons to accomplish what it is constitutionally forbidden from accomplishing." *Norwood v. Harrison*, 413 U.S. 455, 465 (1973); *see also Biden v. Knight First Amendment Inst. at Columbia Univ*., 141 S. Ct. 1220, 1226 (2021) (Thomas, J., concurring) ("The government cannot accomplish through threats of adverse government action what the Constitution prohibits it from doing directly."). The decision below—relying on a host of undisputed email

---

[3] https://archive.org/details/chroniclekingse00saddgoog.
[4] https://www.britishmuseum.org/blog/who-killed-thomas-becket.

communications from the White House—demonstrate the pressure and unsubtle threats that the White House employed to control, limit, and ban social media posts that it didn't like.

## II. Academic Views of Jawboning

Three law review articles—all written before the pandemic and the other topics at issue here—have ably presented the arguments for and against executive jawboning and merit consideration in evaluating the need for a preliminary injunction here. The consensus of these articles is that even if the use of the executive branch's threats might sometimes be appropriate—or at least constitutionally tolerable—jawboning third parties to engage in extra-constitutional action is not.

First, in 2015, Tim Wu, a senior advisor to the Federal Trade Commission and Columbia Law Professor—with a political cynicism that would make Machiavelli blush—wrote an article extolling the supposed virtues of governance though executive jawboning aptly titled *Agency Threats*. Tim Wu, *Agency Threats*, 60 Duke L. J. 1841 (2011). Professor Wu posits that "[t]he use of threats instead of law can be a useful choice—not simply a procedural end run." *Id.* at 1842. "Threat regimes," he suggests, "are important and are best justified when the industry is undergoing rapid change—under conditions of 'high uncertainty.' Highly informal regimes are most useful, that is, when the agency faces a problem in an environment in which facts are highly unclear and evolving." *Id.*

In addition to being useful when the facts are unclear, "[t]he greatest advantage of a threat regime is its speed and flexibility." *Id.* at 1851. Regulation by threat is expedient because "a threat is extant the moment it is made—its final shape, so to speak, is immediately apparent." *Id.* He downplays the obvious due process concerns, ensuring readers that "the argument that rule by threat is a means of avoiding judicial review may be overstated." *Id*. at 1843. In his view, "[t]hreats are, by their nature, just that: threats to enforce or enact a rule, not binding actions in the usual sense of that word. Regulated entities that are unhappy with a de facto regime can and do test the threats, forcing the agency to use its more formal powers and therefore invoke judicial review." *Id.*

Jawboning social media companies and the resulting social media, however, does not just affect the regulated entities. It impacts the "customers" who purchase advertising from social media who have different interests than the end-users who use the social media product to communicate. Many advertisers would likely have no qualms with social media companies removing posts with which the majority of social media users might disagree. A "stultifying conformity" of thought may be "destructive to a free society" and to the social media users with a minority view, but it is not necessarily bad for advertisers. *See First Unitarian Church of Los Angeles v. Cnty. of Los Angeles*, 357 U.S. 513, 532 (1958) (Black, J., concurring)

(discussing impact of unconstitutional loyalty oaths on free expression and civil discourse).

Professor Wu closes his defense of agency threats by noting the sound governance practices of Vito Corleone in "The Godfather," who used threats accented by the occasional enforcement action to achieve his aims. Wu, *supra*, at 1847. While the comparison is made tongue-in-cheek, it is nevertheless apt. In fairness to Professor Wu, his article focuses on encouraging private actors to accept or self-impose regulatory burdens that—unlike here—do not offend the Constitution. Professor Wu assumes, perhaps naively, that regulatory threats would be used only to accomplish legitimate regulatory goals. Yet even Professor Wu acknowledges that the Executive branch would abuse its power if an agency used "threats to take actions that Congress has specifically barred, or to accomplish objectives for which it would otherwise lack delegated authority." *Id*. at 1854. Jawboning to accomplish objectives that would facially violate the First Amendment—like content-based censorship—presents an even more egregious abuse. The practices described in the trial court's order call to mind not Vito Corleone—but his son Michael—who begins with noble intentions, but once in power, succumbs to the temptation to abuse it.

Jerry Brito, a lawyer and Senior Research Fellow at George Mason University's Mercatus Institute published a response to Professor Wu's article

arguing forcefully that jawboning third parties into submission by threats of new or greater regulation replaces the rule of law with the rule of men. Jerry Brito, *"Agency Threats" & the Rule of Law: An Offer You Can't Refuse,* 37 Harv. J.L. & Pub. Pol'y 553 (2014). The fatal flaw of governance by jawboning is human nature:

> [H]aving ejected the rule of law in an attempt to secure "speed and flexibility," [Wu] is forced to recreate a stand-in of that very same rule of law through "guidelines" and "lists" made to prevent the predictable consequences of the rule of men. As much as one would like to have omniscient, benevolent angels for regulators, unfortunately only "fallible men" are available.

*Id.* at 568. As the second section of this brief explain, government is far from omniscient.

In *Against Jawboning*, Professor Derek Bambauer directly addresses the constitutional hazards of jawboning in relation to speech regulation on internet platforms. Derek E. Bambauer, *Against Jawboning*, 100 Minn. L. Rev. 51 (2015). Using the example of a state attorney general subpoena to Google meant to lend aid to the motion picture industry's crackdown on video piracy, Professor Bambauer notes that what Professor Wu saw as the exception in executive jawboning efforts— seeking to enforce results that lie beyond an executive's legal capacity—is, in reality, the norm. The state attorney general involved "sought to coerce the company based on threatened action at the edges of or wholly outside their legal authority." *Id.* at 55. The constitutional concern "is not simply the motivation; state officials advocate for interest groups constantly," but that the attorney general "threatened Google despite lacking authority over the subject matter of his investigation." *Id.* at 55. Why

would any company accede to threats or—euphemistically, "suggestions"— from the government if it knows that the government lacks any legal authority to enforce them? "Cost and uncertainty," Professor Bambauer answers:

> As to cost, even a subpoena that was ultra vires—beyond the official's power—would cause Google to incur potentially significant expense. . . . And the potential costs were more than pecuniary—the MPAA planned to allocate budget to media outreach efforts designed to harm Google's reputation. Even false accusations can wound.

*Id.* at 56. According to Professor Bambauer, "The cost-benefit calculus is clear: it makes sense to censor anything questionable. *Id.* at 86.

## III. Jawboning's Unhappy Bipartisan History

Although the Second Amended Complaint in this case alleges a Democratic presidential administration exerting influence on social media platforms to ban or limit speech by individuals and organizations perceived to be on the right, jawboning at the expense of constitutional rights is a bipartisan activity that spans the ideological spectrum. The temptation to abuse executive power is perennial and ecumenical.

Years ago, executive-branch jawboning helped initiate industry blacklisting—most notably in Hollywood—of persons suspected of harboring communist sympathies. To be sure, legislative jawboning by members of the House Un-American Activities Committee and Senator Joseph McCarthy played significant role in feeding anticommunist paranoia. But the movements roots stem from an

executive pronouncement. With the Soviet Union's assertion of dominance over Eastern Europe and communism on the march worldwide, American policy makers became increasingly concerned over Soviet attempts to influence and subvert what they saw as American values through subtle propaganda and the infiltration of American government and private institutions. In December 1947—more than two years before Senator Joseph McCarthy made his first public allegations of widespread communist infiltration of the federal government—the U.S. Attorney General published the "Attorney General's List of Subversive Organizations" (AGLOSO). *See* Robert Justin Goldstein, *Prelude to McCarthyism: The Making of a Blacklist*, Prologue Magazine, (Fall 2006).[5] The list imposed no direct sanctions on any of the organizations named. But "as various scholars wrote contemporaneously and subsequently, AGLOSO, which was massively publicized in the media, became what amounted to "an official blacklist." In the public mind it came to have "authority as *the* definitive report on subversive organizations," understood as a "proscription of the treasonable activity of the listed organizations" and the "litmus test for distinguishing between loyalty and disloyal organizations and individuals." *Id*. Notably, the list was never accompanied by any proof that any of the organizations on it had engaged in any criminal activity or sought to "subvert" the American government.

---

[5] https://www.archives.gov/publications/prologue/2006/fall/agloso.html.

It was instead a list of the usual suspects. The list served its purpose of dissuading citizens from joining or associating with the groups on it. That same year, the House Unamerican Activities Committee ("HUAC"), which had formed in 1938, began investigating communist subversion in the motion picture industry. Like King Henry's knights, and social media executives receiving criticism from the White House, Hollywood took the hint. The studio heads agreed among themselves not to hire actors and screenwriters who exercised their constitutional rights to decline to cooperate with HUAC as well as anyone with alleged ties to "subversive organizations." Because the studios were acting as private entities, simply trying to act "responsibly," and enforcing their private preference to hire only patriotic Americans, there was no need for actual evidence of any ties to subversive groups like the one named on the AGLSO. Rumor and hearsay were sufficient.

The Red Scare of the 1950s highlights the insidious nature of government censorship by proxy. Blacklisting—like the de-platforming and shadow banning at issue here—operates in the dark. Individuals may never be aware that they have been blacklisted or their tweets shadow banned. Blacklisted screenwriters did not receive notice that they had been blacklisted or the opportunity to contest that designation in any type of hearing. They simply saw opportunities disappear. Private entities like the Hollywood studios of the 1950s and social media companies of today have no duty to explain their actions. This lack of transparency allows the censors, both

government and the private parties to engage in gaslighting—they simply deny that there are any restrictions in place or any communications between the executive branch and the private party which might disclose governmental pressure or even collusion. *See, e.g.*, *Changizi v. Department of Health and Human Services*, 602 F. Supp.3d 1031, 1046 (2022) ("HHS contends that Plaintiffs' complaint is 'bereft of factual support for the conclusory allegation that any remedial actions that Twitter has taken (or may again take) against Plaintiffs were (or will be) attributable to Defendants, rather than the "independent" and "legitimate discretion" of Twitter.'").

## IV. Jawboning's Allure and Dangers

Jawboning on internet speech issues by "recruiting proxy censors" is particularly effective—and thus particularly dangerous—because it targets the "weakest link in the chain of communication." Seth F. Kreimer, *Censorship by Proxy: The First Amendment, Internet Intermediaries, & the Problem of the Weakest Link*, 155 U. Pa. L. Rev. 11, 27 (2006). Targeting social media platforms works because, "[i]t provides a mechanism for the exercise of authority over otherwise ungovernable conduct. . . . [The practical] cost of monitoring and sanctioning disfavored communications is largely externalized onto the intermediaries who are the subjects of direct regulation." *Id.* As Professor Bambauer explains, "[I]t is far easier and more effective to impose controls upon an intermediary than upon a host

of dispersed speakers who may be difficult to identify, located outside the regulators' jurisdiction, or judgment-proof." Bambauer, *supra*, at 85–86.

Jawboning targeting intermediaries is especially pernicious here because "platforms such as Google, Twitter, Facebook, and Instagram are the new gatekeepers for online content." *Id*. Because those entities serve both as gatekeepers and repositories of online activity, they can consign unwanted information or unfavored options to the Orwellian "memory hole." For all practical purposes, "Material de-listed from Google's search results or deleted from a Twitter feed simply disappears . . . ." *Id.* at 60.

Jawboning for "moderation" of internet speech, when coupled with human nature and the natural incentives of power, creates a perilously slippery slope. Plainly, the executive branch is tasked with protecting the nation's security and by extension its health. An administration may see an urgent need to take action and engage in some benign jawboning to get assistance from social media platforms. The executive branch may grow to see its policies relating to the crisis as not only correct, but essential. Proceeding from the messianic notion that its policies are the only hope for the nation, the executive may come to the conclusion that its re-election as similarly crucial.

Jawboning is also insidious because the more it is practiced, the easier it becomes. Like a paperclip that is repeatedly bent, gaining the acquiescence of the

regulated parties becomes easier and easier until finally, no resistance is offered. Indeed, the frequent meetings and familiarity documented in the trial court's order points to a kind of regulatory Stockholm Syndrome. The social media platforms often *want* to cooperate—or at least avoid unnecessary conflict—with the White House.

From the government's viewpoint, third parties' willingness to assist provides political cover. Even in the 1950s, an act of Congress or Executive Order banning potential communist subversives from working in certain private industries where they could implant Marxist or other "unamerican" ideas in the national psyche would have faced legal challenges and been seen as politically heavy-handedness. But if government simply provided information, industry leaders who wished to appear responsible or patriotic might act on their own initiative. Simply put, "When the government can indirectly threaten or compel private actors to fall in line with its preferences, there is a threat to the constitutionally protected liberty to exchange information that is checked poorly, if at all, by standard First Amendment doctrine." Derek E. Bambauer, *Orwell's Armchair*, 79 U. Chi. L. Rev. 863, 898–99 (2012).

## V. The Government is not omniscient. It has a poor history of identifying misinformation—and often reverses itself.

**"When I want your opinion I'll give it to you."**
**-- Laurence J. Peter[6]**

---

[6] Author of *The Peter Principal* where he observes that people in a hierarchy tend to rise to "a level of respective incompetence."

Throughout the COVID-19 pandemic and the instant litigation, the government has portrayed itself as the guardian of scientific truth. Nate Hochman, *Trust the Science?*, National Review (Nov. 29, 2021) ("[T]hey're really criticizing science because I[, Anthony Facui,] represent science.").[7] A regrettable history of errors—see *infra* at V., A.—should give the reader pause in accepting such claims. Even more disturbingly, the government now wishes to label, suppress, ban, eliminate and censor divergent views as misinformation, disinformation or mal-information.

But no government, scientist, doctor, expert, or organization has a monopoly on knowledge. In fact, the government has a long history, and more importantly, a recent history of disseminating inaccurate or misleading information.

## A. The federal government's COVID misinformation

The CDC has long been considered a source of unbiased and legitimate source of medical information. The federal government used the public's trust in the CDC to impose strong, and even draconian, restrictions on the American public—and even worldwide. Those who disagreed with the CDC were often vilified as purveyors of "misinformation" and generally denounced. Dr. Anthony Fauci, the director of the U.S. National Institute of Allergy and Infectious Diseases was similarly held up as

---

[7] https://www.nationalreview.com/corner/trust-the-science/.

the ultimate expert. He even tried to refute criticisms by proclaiming that "attacks

on me . . . are attacks on science." Carlie Porterfield, *Dr. Fauci on GOP Criticism:*

*'Attacks on Me, Quite Frankly, Are Attacks on Science'*, Forbes (Dec. 10, 2021).[8]

But as it relates to to Covid 19, Anthony Fauci and the CDC have a poor record. The

government has changed its "facts" and even been deceptive—at the same time it

deprecated any who disagreed. Here are a few examples.

1. <u>Covid 19 Origins: From bats to labs</u>. The CDC and Dr. Fauci initially—in

   2020—insisted that "[the scientific evidence] is very, very strongly leaning

   toward [the fact that COVID 19] could not have been artificially or

   deliberately manipulated . . . . Everything about the stepwise evolution over

   time strongly indicates that [this virus] evolved in nature and then jumped

   species . . . ." Nsikan Akpan & Victoria Jaggard, *Fauci: No scientific evidence*

   *the coronavirus was made in a Chinese lab*, Nat'l Geographic (May 4, 2020).[9]

   Others claimed it originated in a lab in China. Jack Brewster, *A Timeline of*

   *The COVID-19 Wuhan Lab Origin Theory*, Forbes (May 24, 2020).[10] Around

   the same time as Dr. Fauci's claims, President Trump stated that "he has a

   'high degree of confidence' the virus came from a lab in Wuhan." *Id.* Indeed,

---

[8] https://www.forbes.com/sites/carlieporterfield/2021/06/09/fauci-on-gop-criticism-attacks-on-me-quite-frankly-are-attacks-on-science/?sh=717612345429.

[9] https://www.nationalgeographic.com/science/article/anthony-fauci-no-scientific-evidence-the-coronavirus-was-made-in-a-chinese-lab-cvd.

[10] https://www.forbes.com/sites/jackbrewster/2020/05/10/a-timeline-of-the-covid-19-wuhan-lab-origin-theory/?sh=58800c455aba.

the Select Subcommittee on the Coronavirus Pandemic found that Dr. Fauci and "[f]ormer NIH Director Dr. Francis Collins were directly involved in the drafting, publication, and public promotion of Proximal Origin — a paper written to suppress the COVID-19 lab-leak hypothesis." *Hearing Wrap Up: Suppression of the Lab Leak Hypothesis Was Not Based in Science*, Comm. on Oversight & Accountability (Jul. 12, 2023).[11] According to the Select Subcommittee, the paper's conclusions "rest on insufficient evidence, draw inaccurate assumptions, and have never been proven or verified by the wider scientific community," in order to "advance the preferred narrative of senior government officials . . . ." *Id.* Eventually the government agencies conceded that COVID 19 might have originated in a China virus lab. Julian Barnes, *Lab Leak Most Likely Caused Pandemic, Energy Dept. Says*, N.Y. Times (Feb. 26, 2023).[12]

Fauci and Collins even denied that the government funded gain of function research at the Wuhan, China lab. Ed Browne, *Fauci Was 'Untruthful' to Congress About Wuhan Lab Research, New Documents Appear to Show*, News Week (Sept. 9, 2021).[13] However, documents obtained via FOIA requests showed "that NIH grants supported the construction of mutant

---

[11] https://oversight.house.gov/release/hearing-wrap-up-suppression-of-the-lab-leak-hypothesis-was-not-based-in-science/.

[12] https://www.nytimes.com/2023/02/26/us/politics/china-lab-leak-coronavirus-pandemic.html.

[13] https://www.congress.gov/117/meeting/house/114270/documents/HHRG-117-GO24-20211201-SD004.pdf.

SARS-related coronaviruses that involved blending different types together. The result was a lab-generated virus that could infect human cells . . . . *Id.*

2. <u>Masks don't work; yes, they do; no, they don't.</u> On March 8, 2020, it was reported: "When it comes to preventing coronavirus, public health officials have been clear: Healthy people do not need to wear a face mask to protect themselves from COVID-19." Brit Mccandless Farmer, *March 2020: Dr. Anthony Fauci talks with Dr Jon LaPook about COVID-19*, CBS News (Mar. 8, 2020).[14] Anthony Fauci asserted: "'There's no reason to be walking around with a mask' . . . ." *Id.* "While masks may block some droplets, Fauci said, they do not provide the level of protection people think they do." *Id.* U.S. Surgeon General Jerome Adams similarly asserted "[y]ou can increase your risk of getting it by wearing a mask if you are not a health care provider . . . ." Ben Schreckinger, *Mask mystery: Why are U.S. officials dismissive of protective covering?*, Politico (Mar. 30, 2020).[15] Adams even tweeted: "Seriously people — STOP BUYING MASKS!" . . . "They are NOT effective in preventing general public from catching #Coronavirus . . . ." *Id.* Then, in June 2020, Fauci reversed himself. He said he has 'no doubt' that Americans who aren't wearing face masks, especially in large crowds, are increasing the

---

[14] https://www.cbsnews.com/news/preventing-coronavirus-facemask-60-minutes-2020-03-08/.
[15] https://www.politico.com/news/2020/03/30/coronavirus-masks-trump-administration-156327.

risk of spreading the coronavirus." Berkeley Lovelace Jr. & Noah Higgins-Dunn, *Dr. Anthony Fauci says Americans who don't wear masks may 'propagate the further spread of infection'*, CNBC (June 5, 2020).[16] He later admitted that he was spreading misinformation when he said masks don't work, but he justified his deception, not because he was wrong on the science, but because "[h]e [] acknowledged that masks were initially not recommended to the general public *so that first responders wouldn't feel the strain of a shortage of PPE.*" Alexandra Kelley, *Fauci: why the public wasn't told to wear masks when the coronavirus pandemic began*, The Hill (June 16, 2020) (emphasis added).[17] The federal government then demanded that everyone wear masks and some state governments required it. Kaia Hubbard, *These States Have COVID-19 Mask Mandates*, U.S. News (Mar. 28, 2022).[18] It turns out that scientists have long disputed masks effectiveness. *See, e.g.,* Youlin Long, et al., *Effectiveness of N95 respirators versus surgical masks against influenza: A systematic review and meta-analysis*, 13 J. Evid. Based Med. 93, 96 (2020)[19] (finding "no statistically significant differences in preventing laboratory-confirmed influenza, laboratory-confirmed respiratory viral

---

[16] https://www.cnbc.com/2020/06/05/dr-anthony-fauci-says-americans-who-dont-wear-masks-may-propagate-the-spread-of-infection.html.
[17] https://thehill.com/changing-america/well-being/prevention-cures/502890-fauci-why-the-public-wasnt-told-to-wear-masks/.
[18] https://www.usnews.com/news/best-states/articles/these-are-the-states-with-mask-mandates.
[19] https://onlinelibrary.wiley.com/doi/epdf/10.1111/jebm.12381.

infections, laboratory-confirmed respiratory infection, and influenza-like illness using N95 respirators and surgical masks").

3. <u>COVID 19 vaccines will prevent infection and transmission, no they don't.</u>

The official narrative from November 2020, until at least May of 2021, was that the new COVID-19 vaccines would prevent infection and transmission. Skeptics were blocked, banned, silenced and attacked in media outlets. *See, e.g.,* Kari Campeau, *Who's a Vaccine Skeptic? Framing Vaccine Hesitancy in Post-Covid News Coverage*, 40 Written Commc'n 976 (2023) (finding New York Times articles "established nonvaccination as a product of individual wrong belief, portrayed vaccine skeptics as gullible, ignorant, and/or selfish, and framed nonvaccination as a problem of individuals' wrong beliefs"). Fauci assured the public that the release of the vaccines would mark the end of the pandemic. Dr. Fauci proclaimed that "the Pfizer-BioNTech and Moderna vaccines are so effective they could 'crush' the COVID-19 pandemic" and explained that he's "'very encouraged . . . by the extraordinary level of efficacy' of the two vaccines [and] . . . they've been found to be up to 95 per cent effective in preventing the COVID-19 . . . and almost 100 per cent effective in preventing the serious form of the disease . . . ." Brandie Weikle, *Fauci confident vaccines can 'crush' COVID — if vaccine hesitancy doesn't*

*get in the way*, CBC (Dec. 12, 2020).[20] Those who questioned this assessment were labeled "anti-vaxers" or vaccine skeptics." Fauci's statements later proved false. For example, "[a]bout three-fourths of people infected in a Massachusetts Covid-19 outbreak [in July 2021] were fully vaccinated . . ." per the CDC. Berkeley Lovelace Jr., *CDC study shows 74% of people infected in Massachusetts Covid outbreak were fully vaccinated*, CNBC (July 30, 2021).[21] Indeed, in testimony before the House Select Subcommittee on the Coronavirus Crisis, Dr. Deborah Birx, who had served as the White House COVID-19 coordinator, revealed how flimsy those early statements of "fact" were. They were not facts. They were, at best, hopes. Dylan Housman, *Birx: Biden Admin Was 'Hoping,' Not Lying, When It Said Vaccines Would Stop COVID Spread*, Daily Caller (June 23, 2022).[22]

4. Fully vaccinated people cannot transmit the virus; actually, they can. The government initially insisted that everyone should be vaccinated, and in May 2021 Dr. Fauci explained that "fully vaccinated people can go without masks even if they have an asymptomatic case of COVID-19 *because the level of virus is much lower in their nasopharynx, the top part of their throat that lies*

---

[20] https://www.cbc.ca/radio/whitecoat/fauci-confident-vaccines-can-crush-covid-if-vaccine-hesitancy-doesn-t-get-in-the-way-1.5832956.
[21] https://www.cnbc.com/2021/07/30/cdc-study-shows-74percent-of-people-infected-in-massachusetts-covid-outbreak-were-fully-vaccinated.html.
[22] https://dailycaller.com/2022/06/23/deborah-birx-joe-biden-covid-coronavirus-vaccine/.

*behind the nose, than it is in someone who is unvaccinated*" and promised that for vaccinated people, "it [is] extremely unlikely — not impossible but very, very low likelihood — that they're going to transmit it . . . ." Joseph Choi, *Fauci: Vaccinated people become 'dead ends' for the coronavirus*, The Hill (May 16, 2021) (emphasis added).[23] But just two months later, the CDC contradicted Dr. Fauci on both accounts, explaining that "the people who were vaccinated *were growing just as much virus in their noses as those who weren't vaccinated*. So what this study shows is that *people who are immunized can transmit the virus and possibly just as much as those who aren't immunized*." Michaeleen Doucleff, *Vaccinated People Can Spread The Delta Variant, CDC Research Indicates*, NPR (July 30, 2021) (emphasis added).[24]

## B. Other government misinformation.

The instances of governmental mis- or disinformation could fill volumes, but here are a few that—at least arguably—changed the course of history.

1. <u>Japanese Americans are spies and must be interned.</u> In one of the most stunning and impactful examples of government disinformation, immediately after the Japanese attack on Pearl Harbor, the United States Government

---

[23] https://thehill.com/homenews/sunday-talk-shows/553773-fauci-vaccinated-people-become-dead-ends-for-the-coronavirus/.
[24] https://www.npr.org/2021/07/30/1022909546/vaccinated-people-can-spread-the-delta-variant-cdc-research-indicates.

forced millions of Japanese-Americans into internment camps. President Roosevelt's executive order 9066 authorizing this regrettable action was based, at least in part, on statements by Frank Knox, Roosevelt's Secretary of the Navy. He blamed Pearl Harbor on "effective fifth column work, scapegoating Japanese-Americans. But the U.S. Government now admits this was disinformation—it "had no factual basis, but fed the growing suspicions about Japanese Americans." Jeffery Burton, et al., *A Brief History of Japanese American Relocation During World War II*, Nat'l Park Serv.[25]

2. Tuskegee Syphilis Study. In 1932, the U.S. Public Health Service and the Tuskegee Institute began a study involving "600 Black men – 399 with syphilis, 201 who did not have the disease." *The Syphilis Study at Tuskegee Timeline*, CDC.[26] The men were promised medical treatment for "bad blood," though the men were never told what disease the government was testing. *Id.* The men's "informed consent was not collected." *Id.* "Researchers had not informed the men of the actual name of the study, i.e. 'Tuskegee Study of Untreated Syphilis in the Negro Male,' its purpose, and potential consequences of the treatment or non-treatment that they would receive during the study." *About the USPHS Syphilis Study*, Tuskegee University.[27]

---

[25] https://www.nps.gov/articles/historyinternment.htm, (last visited Aug. 1, 2023).
[26] https://www.cdc.gov/tuskegee/timeline.htm, (last visited Aug. 7, 2023).
[27] https://www.tuskegee.edu/about-us/centers-of-excellence/bioethics-center/about-the-usphs-syphilis-study, (last visited Aug. 7, 2023).

By "1943, penicillin was the treatment of choice for syphilis and becoming widely available, but the participants in the study were not offered treatment." *The Syphilis Study at Tuskegee Timeline*, *supra*.

3. Let's invade Iraq—it has weapons of mass destruction; sorry, we were wrong. On September 9, 2002, the International Institute for Strategic Studies released a report concluding "that Saddam Hussein could build a nuclear bomb within months if he were able to obtain fissile material." *Saddam Hussein's Development of Weapons of Mass Destruction*, The White House.[28] Just a day prior, "national security adviser Condoleezza Rice told CNN: 'We don't want the smoking gun (of Iraq's weapons of mass destruction or WMD) to be a mushroom cloud.'" Gregg Zoroya, *Whatever happened to Iraq's weapons of mass destruction?*, USA Today (Feb. 14, 2019).[29]  On Feb. 5, 2003, U.S. Secretary of State Colin Powell told members of the U.N. Security Council that "Saddam Hussein has chemical weapons," he "has used such weapons," and he "has no compunction about using them again — against his neighbors, and against his own people." Jack Mitchell, *20 years ago, the U.S. warned of Iraq's alleged 'weapons of mass destruction'*, NPR (Feb. 3, 2023).[30] Powell stated that these "facts and conclusions [are] based on solid

---

[28] https://georgewbush-whitehouse.archives.gov/infocus/iraq/decade/sect3.html, (last visited Aug. 2, 2023).
[29] https://www.usatoday.com/story/opinion/2019/02/14/iraq-war-weapons-of-mass-destruction-saddam-hussein-ask-usa-today/2871170002/.
[30] https://www.npr.org/2023/02/03/1151160567/colin-powell-iraq-un-weapons-mass-destruction.

intelligence," and "backed up by sources — solid sources." *Id.* Believing that Iraq was hiding these weapons of mass destruction, on March 19, 2003, the United States and its allies, launched Operation Iraqi Freedom. *Iraq and Weapons of Mass Destruction*, National Security Archive (Feb. 11, 2004).[31] Yet, the United States never found those weapons of mass destruction. Nomaan Merchant, *Iraq WMD failures shadow US intelligence 20 years later*, AP (Mar. 23, 2023).[32] This government misinformation led to the deaths of thousands of individuals. *Id.*

## VI. The remedy to supposed wrong speech is more speech.

Free speech includes the right to hear speech—even wrong speech. "It is now well established that the Constitution protects the right to receive information and ideas. 'This freedom [of speech and press] . . . necessarily protects the right to receive . . . .' This right to receive information and ideas, regardless of their social worth . . . is fundamental to our free society." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) (internal citations omitted). Moreover, insisting one's own views are correct without exposing them to contrary views is both arrogant and fruitless.

Rather, allowing others the "liberty of contradicting and disproving our opinion, is the very condition which justifies us in assuming [the truth of our view]

---

[31] https://nsarchive2.gwu.edu/NSAEBB/NSAEBB80/.
[32] https://apnews.com/article/iraq-war-wmds-us-intelligence-f9e21ac59d3a0470d9bfcc83544d706e.

and on no other terms [can we] have any rational assurance of being right." John Stuart Mill, *On Liberty* 37–38 (3d. ed. 1864). The free exchange of ideas—or even assertions of facts—promotes verifiable truth finding. "In the realm of protected speech, the [government] is constitutionally disqualified from dictating the subjects about which persons may speak and the speakers who may address a public issue." *First Nat. Bank of Bos. v. Bellotti,* 435 U.S. 765, 784–85 (1978).

The "counterspeech doctrine" holds that the best response to allegedly harmful or misleading speech is not suppression, but more speech that counters and challenges it. "Counterspeech" refers to any form of speech that opposes or challenges a message that one does not agree with. Nadine Strossen, *HATE: Why We Should Resist It with Free Speech, Not Censorship* 158 (2018). Justice Brandeis famously said, "If there be time to expose through discussion, the falsehoods and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence." *Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring). Indeed, the First Amendment "rests on the assumption that the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public." *Associated Press v. United States*, 326 U.S. 1, 20 (1945). "The core of the marketplace of ideas concept is the notion that truth more easily is discovered when ideas are allowed to be freely expressed."

Erik Forde Ugland, *Hawkers, Thieves and Lonely Pamphleteers: Distributing Publications in the University Marketplace*, 22 J.C. & U.L. 935, 940 (1996).

In 2012, the Court again referenced the counterspeech doctrine when it held unconstitutional the Stolen Valor Act, a law which Congress had found profoundly important to protect our veterans' honor by making it a federal crime to lie about receiving military decorations or medals. *United States v. Alvarez*, 567 U.S. 709 (2012). The Court noted that "suppression of speech by the government can make exposure of falsity more difficult, not less so. Society has the right and civic duty to engage in open, dynamic, rational discourse." *Id.* at 728. Thus, the First Amendment's protection of even false speech "comports with the common understanding that some false statements are inevitable if there is to be an open and vigorous expression of views in public and private conversation, expression the First Amendment seeks to guarantee." *Id.* at 718.

> The theory of our Constitution is "that the best test of truth is the power of the thought to get itself accepted in the competition of the market," *Abrams v. United States*, 250 U.S. 616, 630, 40 S.Ct. 17, 63 L.Ed. 1173 (1919) (Holmes, J., dissenting). The First Amendment itself ensures the right to respond to speech we do not like, and for good reason. Freedom of speech and thought flows not from the beneficence of the state but from the inalienable rights of the person. And suppression of speech by

the government can make exposure of falsity more difficult, not less so.

Society has the right and civic duty to engage in open, dynamic, rational

discourse. These ends are not well served when the government seeks

to orchestrate public discussion through content-based mandates.

*Id.* at 728.

Even if the government believes that the "misinformation" is harmful to

public health, the government should not suppress it. In *Lorillard Tobacco Co. v.

Reilly*, 533 U.S. 525 (2001) Justice Thomas affirmed that if the government is

concerned that information spread by private parties is harmful, it should counteract

that speech with "more speech, not enforced silence." *Id.* at 586 (Thomas, J.,

concurring).

Despite the strong First Amendment protections for free speech, the

government now seeks to return to a variance of the discredited speech equalization

doctrine, with the twist of eliminating—instead of equalizing—speech. Rather than

"we are from the government and we are here to help,"[33] the new mantra is "we are

from the government and for your own good," the following [] persons [are banned]

from speaking . . . ." *Austin* v. *Michigan Chamber of Com.*, 494 U.S. 652, 679 (1990)

---

[33] See *News Conference – I'm Here To Help*, Ronald Reagan Presidential Foundation & Institute,
https://www.reaganfoundation.org/ronald-reagan/reagan-quotes-speeches/news-conference-1/ (last visited Aug. 1,
2023).

(Scalia, J., dissenting), *overruled by Citizens United* v. *Fed. Election Comm'n*, 558 U.S. 310 (2010).

The government has argues that social media has "presented significant hazards, including the spread of harmful misinformation." Mot. to Stay at 4. "The federal government [ ] has sought to mitigate these hazards, including by calling [social media companies'] attention to them . . . ." *Id.* But, "the interest touted by the [government] is the impermissible one of altering political debate by muting the impact of certain speakers." *Austin*, 494 U.S. at 703–04 (Kennedy, J., dissenting). Indeed, "[t]he premise of our Bill of Rights, [ ], is that there are some things—even some seemingly desirable things—that government cannot be trusted to do." *Id.* at 692-93.

Fortunately, the Supreme Court rejected *Austin*'s short-lived theory that government should be in business of equalizing speech. But the government's position here is far more egregious than the *Austin* equalization doctrine, because the government is the powerful entity speaking and wishes to suppress the speech of far less powerful persons. The First Amendment stands as a bulwark against the government's position that it can squelch public discourse, whether through direct influence or less obvious methods such as jawboning.

## CONCLUSION

As President Truman's Committee on Civil Rights explained decades ago, "[i]f the people are to govern themselves their only hope of doing so wisely lies in the collective wisdom derived from the fullest possible information, and in the fair presentation of differing opinions." President's Committee on Civil Rights, *To Secure These Rights: The Report of the President's Committee on Civil Rights* 47 (1947).[34]

Accordingly, , amicus curiae The Buckeye Institute urges the Court to affirm the trial court's Order.

Respectfully submitted,

*/s/ Jay R. Carson*
Jay R. Carson (0068526)
Robert Alt (0091753)
David C. Tryon (Ohio 0028954)
Alex M. Certo (Ohio 102790)
The Buckeye Institute
88 East Broad Street, Ste. 1300
Columbus, Ohio 43215
(614) 224-4422
j.carson@buckeyeinstitute.org

*Attorneys for Amicus Curiae The Buckeye Institute*

---

[34] https://www.trumanlibrary.gov/library/to-secure-these-rights#47.

**CERTIFICATE OF COMPLIANCE**
Federal Rules of Appellate Procedure
Appendix 6

1. This document complies with the word limit of Fed. R. App. Rule 29(a)(2) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

   X      this document contains 6,487 words, or

   ☐     this brief uses a monospaced typeface and contains [state the number of] lines of text.

2. This document complies with the typeface requirements of Fed. R. App. R. 32(a)(5) and the type-style requirements of Fed. R. App. R. 32(a)(6) because:

   X      this document has been prepared in a proportionally spaced typeface using Microsoft Word for the most current version of Office 365 in 14-point type, Times New Roman, or

   ☐     this document has been prepared in a monospaced typeface using [state name and version of word-processing program] with [state number of characters per inch and name of type style].

*/s/ Jay R. Carson*
Jay R. Carson
  *Counsel of Record*
Robert Alt
THE BUCKEYE INSTITUTE
88 East Broad Street, Suite 1300
Columbus, Ohio 43215
(614) 224-4422
j.carson@buckeyeinstitute.org
robert@buckeyeinstitute.org

*Counsel for Amicus Curiae,*
*The Buckeye Institute*

August 7, 2023

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing Amicus Brief was served on all counsel of record via the Court's electronic filing system this 7th day of August, 2023.

*/s/ Jay R. Carson*
Jay R. Carson
*Counsel of Record for The Buckeye Institute*