No. 23-30445

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

STATE OF MISSOURI; STATE OF LOUISIANA; AARON KHERIATY; MARTIN
KULLDORFF; JIM HOFT; JAYANTA BHATTACHARYA; JILL HINES,

*Plaintiffs-Appellees,*

v.

JOSEPH R. BIDEN, JR.; VIVEK H. MURTHY; XAVIER BECERRA;
DEPARTMENT OF HEALTH & HUMAN SERVICES; ANTHONY FAUCI, ET AL.

*Defendants-Appellants.*

———————————————

On Appeal from the United States District Court
For the Western District of Louisiana
Case No. 3:22-cv-01213
District Judge Terry A. Doughty

———————————————

**BRIEF OF AMICUS CURIAE STATE OF MONTANA AND
6 OTHER STATES SUPPORTING PLAINTIFFS-APPELLEES
AND AFFIRMANCE**

AUSTIN KNUDSEN
  *Montana Attorney General*

MONTANA DEPARTMENT OF JUSTICE
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
Phone: (406) 444-2026
christian.corrigan@mt.gov
peter.torstensen@mt.gov

CHRISTIAN B. CORRIGAN
  *Solicitor General*

PETER M. TORSTENSEN, JR.
  *Assistant Solicitor General*

TANNER BAIRD*
  *Solicitor's Fellow*

*Counsel for Amicus Curiae
State of Montana*

———————————

* Admitted in Texas only.  Supervised by members of the Montana bar.

### SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS

As required by Fifth Circuit Rule 29.2, the undersigned counsel of record certifies that, in addition to the persons and entities listed in Appellants', Appellees', and other *amici*'s Certificates of Interested Persons, the following listed persons and entities described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

***Amici Curiae***

Alan Wilson, Attorney General of South Carolina

Austin Knudsen, Attorney General of Montana

Brenna Bird, Attorney General of Iowa

Kris Kobach, Attorney General of Kansas

Michael T. Hilgers, Attorney General of Nebraska

Raúl R. Labrador, Attorney General of Idaho

Sean D. Reyes, Attorney General of Utah

***<u>Attorneys for Amici Curiae</u>***
Christian B. Corrigan

Peter M. Torstensen, Jr.

Tanner Baird

*<u>/s/ Peter M. Torstensen, Jr.</u>*
Peter M. Torstensen, Jr.
*Counsel of Record for Amici Curiae*

# TABLE OF CONTENTS

SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS ............................. ii

TABLE OF AUTHORITIES ........................................................................ v

INTERESTS OF AMICI CURIAE .............................................................. 1

SUMMARY OF ARGUMENT ................................................................... 2

ARGUMENT ........................................................................................ 4

I. The States suffered direct and redressable Article III injuries. ........... 5

II. The States may sue to defend the First Amendment rights of their citizens ............................................................................................ 9

    A. Injured parties face practical obstacles to sue because each party has a small financial stake in the outcome and many are unaware of the extent of their injury ................................. 10

    B. The States are uniquely qualified here to litigate the constitutionality of the rights of their citizens. ......................... 13

III. The States have standing to defend their quasi-sovereign interests ........................................................................................ 16

    A. The *Mellon* bar does not apply to quasi-sovereign interest suits against the federal government. ............................................... 16

    B. The States assert a quasi-sovereign interest in hearing and engaging with the views of their citizens on matters of public concern. ................................................................................. 20

CONCLUSION .................................................................................... 26

CERTIFICATE OF COMPLIANCE ............................................................ 28

CERTIFICATE OF SERVICE .................................................................. 28

# TABLE OF AUTHORITIES

## Cases

*Alfred L. Snapp & Son*, Inc. *v. Puerto Rico ex rel. Barez*,
  458 U.S. 592 (1982) ................................................................ *passim*

*Bantam Books, Inc. v. Sullivan*,
  372 U.S. 58 (1963) ................................................................. 11

*Barrows v. Jackson*,
  346 U.S. 249 (1953) ........................................................... 12, 13

*Borough of Duryea*, Pa. *v. Guarnieri*,
  564 U.S. 379 (2011) ............................................................ 1, 15

*Broadrick v. Oklahoma*,
  413 U.S. 601 (1973) ............................................................ 9-10

*Carey v. Population Servs. Int'l*,
  431 U.S. 678 (1977) ................................................................ 8

*Chapman v. Tristar Prods., Inc.*,
  940 F.3d 299 (6th Cir. 2019) .......................................... 16, 17

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ................................................................ 5

*Craig v. Boren*,
  429 U.S. 190 (1976) ................................................... *passim*

*Georgia v. Penn. R.R. Co.*,
  324 U.S. 439 (1945) .............................................................. 18

*Georgia v. Tenn. Copper Co.*,
  206 U.S. 230 (1907) .............................................................. 17

*Gov't of Manitoba v. Bernhardt*,
  923 F.3d 173 (D.C. Cir. 2019) ............................................ 17

*Griswold v. Connecticut*,
  381 U.S. 479 (1965) ................................................................ 8

*Haaland v. Brackeen,*
    143 S. Ct. 1609 (2023) ........................................................ 4, 7, 19, 23

*Kentucky v. Biden,*
    23 F.4th 585 (6th Cir. 2022) ...................................... *passim*

*Kowalski v. Tesmer,*
    543 U.S. 125 (2004) ........................................................... 3, 9

*Mallory v. Norfolk S. Ry. Co.,*
    143 S. Ct. 2028 (2023) .................................................... 19, 23

*Massachusetts v. EPA,*
    549 U.S. 497 (2007) ........................................... 4, 10, 18, 20

*Massachusetts v. Mellon,*
    262 U.S. 447 (1923) ............................................................... 4

*McDonald v. Smith,*
    472 U.S. 479 (1985) ............................................................. 14

*Miller v. Albright,*
    523 U.S. 420 (1998) ............................................................... 8

*NetChoice, LLC v. AG, Fla.,*
    34 F.4th 1196 (11th Cir. 2022) ....................................... 25

*NetChoice, LLC v. Paxton,*
    142 S. Ct. 1715 (2022) ...................................................... 25

*Packingham v. North Carolina,*
    582 U.S. 98 (2017) ......................................................... 1, 15

*Pennsylvania v. West Virginia,*
    262 U.S. 553 (1923) ............................................... 17, 18, 20

*Pierce v. Society of Sisters,*
    268 U.S. 510 (1925) ............................................... 13, 15-16

*Powers v. Ohio,*
    499 U.S. 400 (1991) .................................................. *passim*

*Prison Legal News v. Livingston,*
    683 F.3d 201 (5th Cir. 2012) ............................................ 7

*Sec'y of Md. v. Joseph H. Munson Co.,*
467 U.S. 947 (1984) ............................................................ 2, 3, 9, 10

*Shalala v. Ill. Council on Long Term Care,*
529 U.S. 1 (2000) ...................................................................... 19

*Singleton v. Wulff,*
428 U.S. 106 (1976) ........................................................ 8, 13-14, 14

*South Carolina v. Katzenbach,*
383 U.S. 301 (1966) ...................................................................... 18

*Texas v. Biden,*
20 F.4th 928 (5th Cir. 2021) ........................................................ 20

*Texas v. Biden,*
142 S. Ct. 2528 (2022) ................................................................... 20

*Texas v. United States,*
809 F.3d 134 (5th Cir. 2015) ........................................................ 10

*Thole v. U. S. Bank N.A,*
140 S. Ct. 1615 (2020) .................................................................... 8

*United States v. Texas,*
143 S. Ct. 1964 (2023) ............................................................. 19, 25

## Other Authorities

### Publications

Arek Sarkissian, *DeSantis Tears into YouTube, Claiming Censorship*,
Politico (Apr. 12, 2021)) ................................................................. 6

*Stop Social Media Censorship Act: Hearing on S.B. 214 Before the S. Judiciary Standing Comm.*, 32nd Leg., 2021-2022 Sess. (Alaska Mar. 28, 2022) ..................................................................................... 6

*Regards Interactive Computer Services and Social Media Censorship: Hearing on H.B. 441 Before the H. Civil Justice Comm.*, 134th Gen. Assemb. (Ohio Nov. 9, 2021)................................................................ 6

## INTERESTS OF AMICI CURIAE

Social media platforms "provide perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard," and they enable citizens to "petition their elected representatives and otherwise engage with them in a direct manner." *Packingham v. North Carolina*, 582 U.S. 98, 104–05, 107 (2017). The rights of speech and petition are vital to the democratic process—for citizens and government officials alike—because they "foster[] the public exchange of ideas that is integral to deliberative democracy." *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 388 (2011). Without that robust exchange of ideas, deliberative democracy, and all its attendant benefits, will wither and die.

The extensive federal censorship campaign outlined in the district court's thorough opinion, distorted—and still distorts—the nature of that "public exchange of ideas" and undermines "deliberative democracy." *Id.* Because this federal censorship causes separate and unique injury to our sister states, Missouri and Louisiana ("States"), the States of Montana, Idaho, Iowa, Kansas, Nebraska, South Carolina, and Utah ("Amici States") submit this amicus brief to safeguard their right to sue the federal government when they seek "to vindicate [their] *own* sovereign and

quasi-sovereign interests." *Kentucky v. Biden*, 23 F.4th 585, 596 (6th Cir. 2022). Amici States urge this Court to affirm the decision below.

## SUMMARY OF ARGUMENT

The district court found that federal officials engaged in a years-long campaign to influence the content-moderation decisions of social media platforms by applying "unrelenting pressure" to those platforms to change content-moderation policies to allow easier suppression of disfavored speech. *See* ROA.26458–540, 26548. That campaign targeted *disfavored* speakers (those critical of the Administration's policies), *see* ROA.26539–40, and *disfavored* viewpoints on hotly debated issues (COVID vaccines, mask mandates, election-integrity issues, and more), *see* ROA.26608. This federal censorship distorts the "public exchange of ideas" necessary to our democracy by silencing only disfavored speech and disfavored speakers. The result: "Society as a whole [is] the loser." *Sec'y of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 956 (1984).

This extensive censorship campaign injured the States in at least two ways. *First*, their own social-media posts were censored due to federal pressure on social media platforms. *Second*, the censorship campaign directly interferes with the States' quasi-sovereign interest in

hearing and engaging with their citizens' views on matters of enormous public importance. And in light of these injuries, the States have standing under either of two theories: third-party standing or quasi-sovereign interest standing.

As a general matter, the Supreme Court has "not looked favorably upon third-party standing." *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004). But in the First Amendment context, "the Court has enunciated other concerns that justify a lessening of prudential limitations on standing." *Joseph H. Munson*, 467 U.S. at 956. And because the censorship of the States' social-media posts is an Article III injury—an injury shared by "millions" of their citizens, *see* ROA.26548—the States may assert those concomitant rights of third parties that would be diluted or adversely affected should [their] constitutional challenge fail." *Craig v. Boren*, 429 U.S. 190, 194–94 (1976) (internal quotations omitted). The States satisfy the prudential criteria for third-party standing. *See Powers v. Ohio*, 499 U.S. 400, 411 (1991) (must be a "hindrance the third party's ability to protect his or her interests" and a close relationship between the litigant and third party).

The States also have standing to defend their quasi-sovereign interest in hearing and engaging with their citizens' views on issues of public importance from federal encroachments. Defendants claim, however, that such suits against the federal government are barred by the Supreme Court's decision in *Massachusetts v. Mellon*, 262 U.S. 447 (1923), and, they claim, this was reaffirmed in the Court's recent decision in *Haaland v. Brackeen*, 143 S. Ct. 1609, 1640 (2023). But *Brackeen* did not define the scope of the "*Mellon* bar," and this broad reading of *Brackeen* ignores the Court's decision in *Massachusetts v. EPA*, 549 U.S. 497 (2007), which permits suits against the federal government asserting quasi-sovereign interests. This Court should instead adopt the Sixth Circuit's reasoning in *Kentucky* and hold that States may sue the federal government to defend their quasi-sovereign interests.

## ARGUMENT

The States have standing to challenge Defendants' federal censorship campaign because they suffered Article III injuries and injuries to their quasi-sovereign interests. The district court found both injuries sufficient to establish standing, and Amici States believe, for slightly different reasons, that either theory establishes standing.

## I. The States suffered direct and redressable Article III injuries.

Article III empowers federal courts to decide only "Cases" and "Controversies," which "serves to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). It does so by ensuring that courts review the legality of federal action only when presented with a dispute when a party suffers concrete harm from that conduct. *Id.* at 409.

This is such a case. The States suffered concrete and particularized Article III injuries when their own social-media posts were censored due to federal pressure on social media platforms. In one instance, the Louisiana Department of Justice shared video footage on YouTube that criticized mask mandates and COVID-19 measures, and the video was removed in August 2021 immediately following Defendants' "advocacy for COVID-related 'misinformation' censorship." ROA.26579. In another, a Louisiana state legislator's Facebook post addressing the vaccination of children against COVID-19 was censored. *Id.* . And in another, YouTube removed videos of four public meetings held in St. Louis County, Missouri, regarding county-wide mask mandates because some citizens contended that masks were ineffective. *Id.*

Defendants suggest that these instances are too diffuse to support standing. Appellants' Br. at 17–18. Yet, as the district court rightly observed, the fact that such instances were "uncovered through limited discovery suggests that th[is] censorship … could merely be a representative sample of more extensive suppressions … by Defendants." ROA.25677–78. Even so, state government officials in Alaska,[1] Florida,[2] and Ohio[3] have alleged various instances of their social-media posts being removed, restricted, shadow-banned, or deplatformed around the time of the Defendants' campaign against COVID-related misinformation. Contrary to

---

[1] *Stop Social Media Censorship Act: Hearing on S.B. 214 Before the S. Judiciary Standing Comm.*, 32nd Leg., 2021-2022 Sess. (Alaska Mar. 28, 2022) (statement of Sen. Reinbold) ("Many of us have known or have actually been restricted, shadow-banned, deplatformed, had lots of misinformation stickers slapped on our user area where we have pages.").

[2] *See* Arek Sarkissian, *DeSantis Tears into YouTube, Claiming Censorship*, POLITICO (Apr. 12, 2021) (observing that YouTube removed a video of a roundtable discussion with Governor DeSantis because the experts said face masks were unnecessary for children), https://www.politico.com/states/florida/story/2021/04/12/desantis-tears-into-youtube-over-claims-of-censorship-1373586.

[3] *Regards Interactive Computer Services and Social Media Censorship: Hearing on H.B. 441 Before the H. Civil Justice Comm.*, 134th Gen. Assemb. (Ohio Nov. 9, 2021) (statement of Rep. Wiggam) (explaining that social-media "censorship has had a direct impact on Ohioans as one of our committees, State and Local Government[,] had public testimony that was removed from YouTube, despite the individual who provided testimony being questioned from both sides of the aisle").

Defendants' efforts to minimize the breadth of their censorship campaign, their efforts to silence disfavored viewpoints was both far-reaching and intentional.

Defendants also contend that Plaintiff States lack standing because "the First Amendment does not confer rights on States." Appellants' Br. at 18. But even if the States don't have First Amendment rights vis-à-vis the federal government, they have asserted an Article III injury. *See, e.g.*, *Prison Legal News v. Livingston*, 683 F.3d 201, 212–13 (5th Cir. 2012) (stating that "it is well recognized" that government "censorship" satisfies "Article III's injury-in-fact requirement"). And the States may, at times like those present here, rely on that injury to defend the First Amendment rights of their citizens, even if they have "no [First Amendment] rights of their own." Appellant's Br. at 18 (quoting *Brackeen*, 143 S. Ct. at 1640).

The Supreme Court's decision in *Craig* is instructive. *See* 429 U.S. 190 (1976). *Craig* involved a challenge to two provisions in an Oklahoma statute that prohibited the sale of 3.2% beer to males under 21 and females under 18. *Id.* at 191–92. Craig, a male between 18 and 20, challenged the statute, arguing that this gender-based differential violated

the equal protection rights of 18-20-year-old-males, but he turned 21 before the Court resolved his claim, rendering his claim moot. *Id.* at 192–93. So the Court considered whether a vendor of 3.2% beer could rely on the equal protection interests of 18-20-year-old-males. *Id.* Finding that the statutes "plainly inflicted 'injury in fact' on the [vendor]" sufficient satisfy Article III standing requirements, *Craig* held that the vendor was "entitled to assert those concomitant rights of third parties that would be 'diluted or adversely affected' should her constitutional challenge fail." *Id.* at 194–95 (quoting *Griswold v. Connecticut*, 381 U.S. 479, 481 (1965)).

A year later, in *Carey v. Population Servs. Int'l*, 431 U.S. 678 (1977), the Court relied on *Craig* to find that vendors of contraceptive devices who challenged a New York statute that, among other things, prohibited the sale of nonprescription contraceptives, could rely on the constitutional objections of their potential customers to support standing.[4] *See id.* at 681–84. Because the States have shown an Article III injury—a

---

[4] *Craig* and *Carey* are not outliers. *See, e.g.*, *Singleton v. Wulff*, 428 U.S. 106, 113 (1976) (plurality op.) (finding third-party standing where plaintiff "suffer[ed] concrete injury from the operation of the challenged statute"); *Miller v. Albright*, 523 U.S. 420, 433 (1998) (requiring injury-in-fact to assert a constitutional right on behalf of a parent); *cf. Thole v. U. S. Bank N.A*, 140 S. Ct. 1615, 1621 (2020) (denying third-party standing because of the absence of Article III injury).

widespread federal censorship campaign against so-called "disinfor-
mation," "misinformation," and "malinformation," that was directed at
their social-media posts, in addition to those of private citizens, *see*
ROA.26456–57—they may to sue to defend the First Amendment rights
of their citizens if they satisfy the prudential requirements for third-
party standing. *See, e.g.*, *Joseph H. Munson*, 467 U.S. at 956.

## II. The States may sue to defend the First Amendment rights of their citizens.

Parties must generally assert their own legal rights and interests,
but this prudential limitation gives way in "circumstances where it is
necessary to grant a third party standing to assert the rights of another."
*Kowalski*, 543 U.S. at 129–30. But the Court has been "quite forgiving"
in the First Amendment context. *Id.*; *see also Joseph H. Munson*,
467 U.S. at 956 ("Within the context of the First Amendment, the Court
has enunciated other concerns that justify a lessening of prudential lim-
itations on standing."). When, as here, there is a danger that the chal-
lenged conduct will chill protected speech, the Court has relaxed tradi-
tional standing requirements because of "society's interest in having the
[conduct] challenged." *Joseph H. Munson*, 467 U.S. at 956; *see also
Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973) (permitting third

parties to sue because of the danger of a chilling effect on "constitutionally protected speech or expression").  Given Defendants' widespread campaign to target disfavored viewpoints from disfavored speakers on social media platforms, *see* ROA.26459, 26482, 26504, 26506, some relaxation of third-party standing requirements is warranted here. [5]

Once a plaintiff establishes an "injury in fact," as the States do here, standing requires two more criteria.  *See Powers*, 499 U.S. at 411.  First, "there must exist some hindrance to the third party's ability to protect his or her interests." *Id.*  Second, the litigant must have a close relationship with the third party.  *Id.*  The States satisfy both criteria.

### A. Injured parties face practical obstacles to sue because each party has a small financial stake in the outcome and many are unaware of the extent of their injury.

When parties face "practical obstacles" to asserting their own rights and a third party can effectively represent their interests, the Court has permitted third-party standing.  *Joseph H. Munson*, 467 U.S. at 956.

---

[5] The States' standing in this unique context is underscored by the fact that they "'are not normal litigants for the purposes of invoking federal jurisdiction.'" *Texas v. United States*, 809 F.3d 134, 151 (5th Cir. 2015) (quoting *Massachusetts*, 549 U.S. at 518, 520).  As such, this Court may appropriately limit consideration of third-party standing to States in the First Amendment context.

Such "practical obstacles" need not be legal barriers to suit—rather, it's enough of a barrier to suit when there is "a small financial stake involved [compared to] the economic burdens of litigation." *Powers*, 499 U.S. at 414–15; *see also Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 64 n.6 (1963) (book publishers allowed to stand in for their distributors who were unlikely "to sustain sufficient economic injury to induce [them] to seek judicial vindication of [their] rights"). And it is enough that, as a practical matter, the number of lawsuits brought are rare compared to the frequency of the constitutional abuse. *Powers*, 499 U.S. at 414.

The States satisfy these criteria in at least two ways. *First*, while the overarching effects of Defendants censorship regime were substantial, most individual users experienced only minimal harm—rarely enough to warrant individual litigation. The district court found that Defendants engaged in a widespread operation to censor protected speech from a range of users on specific topics, which included targeting specific ideas for censorship and limiting the ability of users to share those posts. *See, e.g.*, ROA.26459–61, 26464–81. But the average social media user was either unaware of this or experienced minimal disruptions to their social media use. So as the Defendants sought to squelch politically

disfavored viewpoints in the aggregate, each censored user shared in a small part of that constitutional deprivation and had "little incentive to set in motion the arduous process needed to vindicate his own rights." *Powers*, 499 U.S. at 415 (citing *Barrows v. Jackson*, 346 U.S. 249, 257 (1953)).

*Second*, because individual users were often unaware that their speech was being artificially suppressed by Defendants, lawsuits to vindicate their interests will be rare. The district court found the social media companies, at the behest of the federal government, used "spectrum of levers" to conceal their censorship efforts, including "de-boosting" and preventing content sharing through "friction." ROA.26471. Defendants used two veils of secrecy to conceal their actions. First, government actors directed social media employees to silence protected expression through private channels. *See, e.g.*, ROA.26463–81, 26554. Second, social media companies artificially limited the reach of protected expression in manners that hid the censorship. ROA.26459 (reducing account reach); ROA.26469 (message-forward limits); ROA.26470 (using "reduction" techniques). Because of the hidden nature of these requests and the enigmatic nature of social media algorithms, "it would be difficult if not

impossible for the persons whose rights are asserted to present their grievance before any court." *Barrows*, 346 U.S. at 257.

Given these "practical obstacles" that individual social media users face in defending their constitutional interests and the States' ability to represent those interests, allowing the States to defend their citizens' First Amendment interests is warranted here.

## B. The States are uniquely qualified here to litigate the constitutionality of the rights of their citizens.

The touchstone of third-party standing centers on whether the relationship between the litigant and the third party is one where "the former is … as effective a proponent of the right as the latter." *Powers*, 499 U.S. at 413 (internal quotations omitted). For that to be the case, both the litigant and the third party must have a common interest in safeguarding the asserted right. *See id.* at 413–14.

To assert the constitutional rights of another party, the litigant must be a part of, or intimately involved with, the constitutional right asserted. *See, e.g.*, *Pierce v. Society of Sisters*, 268 U.S. 510, 534–35 (1925) (allowing parochial school to assert fundamental rights of parents); *Singleton v. Wulff*, 428 U.S. 106, 113 (1976) (plurality op.) (allowing abortion provider to assert rights of patients given the then-

constitutionally protected right to an abortion); *Craig*, 429 U.S. at 195 (allowing beer vendor to assert constitutional rights on behalf of customers). In those scenarios, and scenarios like them, the litigant "is uniquely qualified to litigate the constitutionality" of the right asserted. *Singleton*, 428 U.S. at 117 (plurality op.).

The States assert that Defendants interfered with their constituents' First Amendment rights to speak and listen freely, *see* ROA.26575, as well as the right to petition their governments for redress, *see, e.g.*, ROA26549 (describing efforts to censor "Reopen Louisiana," which "encourage[ed] people to contact their legislature to end the Government's mask mandate"). The right to petition is "cut from the same cloth" as other First Amendment guarantees and protects the right of individuals to "communicate their will" to their elected representatives. *McDonald v. Smith*, 472 U.S. 479, 482 (1985) (quoting 1 Annals of Cong. 738 (1789)). And that right—similar to the right to speak—"allows citizens to express

their ideas, hopes, and concerns to their elected representatives."[6] *Guarnieri*, 564 U.S. at 388. Since "the right to petition is generally concerned with expression *directed to the government* seeking redress of a grievance," governments are a part of, or involved with, the assertion of that right. *See id.*

And here, the States are in a better position to vindicate their citizens First Amendment rights—including their right to speak, listen, and petition—than the citizens themselves. *See Powers*, 499 U.S. at 413. Defendants' conduct has interfered with, and in some cases precluded, the meaningful engagement between the States and their constituents, and the States share a common interest in challenging the Defendants' conduct. Not only that, but the relationship between the States and their citizens concerning the right to petition is as close as other relationships that have warranted third-party standing. *See, e.g., Pierce*, 268 U.S. at

---

[6] Social media platforms provide an easy forum for "users [to] petition their elected representatives and otherwise engage with them in a direct manner." *Packingham*, 582 U.S. at 104–05. Indeed, the governors in every state have set up Twitter accounts for this very purpose, and undoubtedly many other state government officials have as well. *See Id.* Because of this, social media is among "the most important places" where First Amendment activity occurs today. *Id.*

534–35 (school-parent relationship); *Craig*, 429 U.S. at 195 (vendor-customer relationship).

## III. The States have standing to defend their quasi-sovereign interests.

Even if this Court finds that the States lack third-party standing to defend the First Amendment rights of their citizens, it should find that the States have standing to defend their *own* quasi-sovereign interests.

### A. The *Mellon* bar does not apply to quasi-sovereign interest suits against the federal government.

In the standing context, *parens patriae*—or "parent of the country"—captures two distinct concepts. *See Kentucky*, 23 F.4th at 596. The first conception is a form of third-party standing that existed at common law and permitted the King to litigate on behalf of those incapable to represent their own interests, not to redress his own injuries. *See Chapman v. Tristar Prods., Inc.*, 940 F.3d 299, 305 (6th Cir. 2019) (citing *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 600 (1982)). Under the second conception, "states sometimes purport to sue in a '*parens patriae*' capacity, yet what they are really doing is asserting some injury to their *own* interests separate and apart from their citizens' interests." *Kentucky*, 23 F.4th at 596 (citing *Chapman*, 940 F.3d at 305).

16

States in these cases sued to prevent conduct that both injured its citizens *and* invaded their sovereign or quasi-sovereign interests—for example, state suits to prevent pollution that harmed citizens and interfered with the state's prerogative to safeguard public health. *See id.* (citing *Georgia v. Tenn. Copper Co.*, 206 U.S. 230, 237 (1907) and *Pennsylvania v. West Virginia*, 262 U.S. 553, 592 (1923)).

The distinction between these two conceptions of *parens patriae* standing is most acute when a state sues the United States and its officers. *See id.* at 597. A state cannot sue the federal government when it seeks to represent its citizens in a purely third-party *parens patriae* capacity. This prudential constraint is often referred as the "*Mellon* bar," *see Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 179 (D.C. Cir. 2019), from the Supreme Court's decision in *Mellon*. In *Mellon*, which did *not* involve "quasi sovereign rights actually invaded or threatened," the Court explained that states may not sue "as parens patriae … to protect citizens of the United States from the operation of the statutes thereof," nor is it part of a state's "power or duty to enforce [its citizens'] rights in respect of their relations with the federal government." 262 U.S. at 485–86. So, without sovereign or quasi-sovereign interests on the line, states

cannot litigate in a third-party capacity as *parens patriae* against the United States because the United States has the superior claim to *parens patriae* status in that context. *See, e.g.*, *Kentucky*, 23 F.4th at 597 (quoting *Georgia v. Penn. R.R. Co.*, 324 U.S. 439, 446 (1945) and *South Carolina v. Katzenbach*, 383 U.S. 301, 324 (1966)).

But *Mellon* did not bar state suits against the federal government asserting sovereign or quasi-sovereign interests—indeed, it expressly disclaimed that any "quasi sovereign rights" were at issue. The Supreme Court later made that point explicitly in *Massachusetts v. EPA*. *See* 549 U.S. at 520 n.17 (observing that in *Mellon* "the Court had been 'called upon to adjudicate, not rights of person or property, not rights of dominion over physical domain, [and] *not quasi sovereign rights actually invaded or threatened*" (quoting 262 U.S. at 484–85)). And it further elaborated that "there is a critical difference between allowing a State 'to protect her citizens from the operation of federal statutes' (which is what *Mellon* prohibits) and allowing a State to assert its rights under federal law (which it has standing to do)." *Id.*

Defendants argue that *Brackeen* discredited this theory of standing, which they claim traces all the way back to *Alfred L. Snapp*. Appellant's

Br. at 13–14. Yet that requires either ignoring *Massachusetts v. EPA* entirely or assuming that it has been quietly interred.[7] *See Shalala v. Ill. Council on Long Term Care*, 529 U.S. 1, 18 (2000) ("This Court does not normally overturn, or so dramatically limit, earlier authority *sub silentio*."). But there's a better way to harmonize these cases. Both *Brackeen* and *Alfred L. Snapp* simply reassert unadorned formulations of the so-called "*Mellon* bar." *See Brackeen*, 143 S. Ct. at 1640 (stating that Texas couldn't "assert equal protection claims on behalf of its citizens" because "[a] State does not have standing as *parens patriae* to bring an action against the Federal Government" (quoting *Alfred L. Snapp*, 458 U.S. at 610 n.16)). Neither clarify the scope of the *Mellon* bar, and *Mellon* itself made it clear that it was not addressing "quasi sovereign

---

[7] To be sure, in *United States v. Texas*, 143 S. Ct. 1964 (2023), Justices Gorsuch and Alito both suggested in separate opinions that *Massachusetts* may very well have been quietly overruled or neutered at the very least. *Id.* at 1977 (Gorsuch, J., concurring in the judgment) (suggesting that *Massachusetts*' standing analysis hasn't "played a meaningful role in this Court's decisions in [recent] years" and hinting that "lower courts should just leave [it] on the shelf in future [cases]"); *Id.* at 1997 (Alito, J., dissenting) (asking, of Massachusetts v. EPA, "has this monumental decision been quietly interred?"). Because *Massachusetts* "has direct application in [this] case," this Court should follow it and "leave to the Supreme Court the prerogative of overruling its own decisions." *See, e.g.*, M*allory v. Norfolk S. Ry. Co.,* 143 S. Ct. 2028, 2038 (2023) (cleaned up).

rights actually invaded or threatened." *See* 262 U.S. at 484–85.  But *Massachusetts* and *Kentucky* clarify that *Mellon* bars "third-party *parens patriae*" suits, not "quasi-sovereign interest" suits.  *See Massachusetts*, 549 U.S. at 520 n.17; *Kentucky*, 23 F.4th at 598; *see also Texas v. Biden*, 20 F.4th 928, 969 (5th Cir. 2021) (finding Texas has standing because its "challenge involved an agency's alleged failure to protect certain formerly sovereign prerogatives [that] are now lodged in the Federal Government" (internal quotations omitted)), *reversed and remanded on other grounds*, 142 S. Ct. 2528 (2022).  The distinction drawn in *Massachusetts* and *Kentucky* between "third-party parens patriae" and "quasi-sovereign interest" lawsuits should control.

### B. The States assert a quasi-sovereign interest in hearing and engaging with the views of their citizens on matters of public concern.

*Alfred L. Snapp* sets the boundaries for viable "quasi-sovereign interests."  *See* 458 U.S. at 607.  Recognizing that "exhaustive formal definition[s]" or "definitive list[s] of qualifying interests" were impossible to present "in the abstract," the Court identified two categories of qualifying interests: (1) "the health and well-being—both physical and economic—of its residents"; and (2) "not being discriminatorily denied its rightful

status within the federal system."[8]  *Id.*  Neither of those interests rely on "impermissible notions of third-party standing in which a state asserts *in a purely vicarious manner* the interests of its citizens."  *Kentucky*, 23 F.4th at 599.  Rather, they involve "interest[s] apart from the interests of particular private parties."  *Alfred L. Snapp*, 458 U.S. at 607.

Beyond the qualifying interests, *Alfred L. Snapp* makes clear that the injury to the "quasi-sovereign interest" must extend to a "sufficiently substantial segment" of the States' population.  *See id.*  And one indication that the "injury … suffices to give the State standing to sue as *parens patriae* is whether the injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking powers."  *Id.*

The States have a quasi-sovereign interest in hearing their citizens' views on matters of overwhelming public importance.  State officials labor to keep a finger on the pulse of the issues that are most important to their constituents.  *See* ROA.1317–18; ROA.1268–69.  While they gather this information from traditional means of communication (letters, phone calls), they also "monitor[] activity and mentions on social media

---

[8] The district court found this interest sufficient to support standing, but the Amici States will focus only on the first *Alfred L. Snapp* interest.

platforms, including Facebook, Instagram, Twitter, and YouTube." ROA.1318; *see also* ROA.1269.  And this information is vital to the States' ability to meaningfully respond to and address their citizens' *actual* views on all manner of public issues, including COVID-19 vaccination policies, mask mandates, and election integrity issues.  *See* ROA.1318; ROA.1269–70.  Even the CDC's witness, Carol Crawford, agreed that state agencies have a strong interest in tracking what its constituents are saying on social media.  *See* ROA.11086 (53:10–12).  After all, "if content were censored and removed from social-media platforms, government communicators would not know what the citizen's 'true concerns' were."  ROA.26503.  And that distorting effect on public discourse severely hampers the States' ability to respond to their citizens' concerns.  *See* ROA.1270 (explaining that censorship interferes with the States' "ability to follow, measure, and understand the nature and degree of [citizens]' concerns about mask mandates, and forces me to rely on other, less reliable proxies").

Defendants argue that the States' interest "resembles the interest held insufficient in *Brackeen*—a State's interest in safeguarding the

22

constitutional rights of 'non-Indian families.'"[9]  Appellants' Br. at 14 (quoting *Brackeen*, 143 S. Ct. at 1640 n.11).  But the injury Texas asserted in *Brackeen*—injury to rights of non-Indian families seeking to foster and adopt Indian children over objections from the relevant tribes—affected only a tiny minority of the Texas population.  *See* 143 S. Ct. at 1625–26 (listing the three families in the suit).  By contrast, the district court found that Defendants' social-media censorship regime affects "millions" of Louisianans and Missourians—unquestionably a "substantial segment" of each State's population.  ROA.26536 ("millions of social-media posts" flagged as "misinformation," including "twenty-two million posts on Twitter alone"); ROA.26548 ("unrelenting pressure by Defendants" resulted in "suppressing millions of protected free speech postings"); ROA.26577 ("extensive federal censorship" restricted "free flow of

---

[9] Defendants characterize the States' interest as an "interest in safeguarding the free-speech rights of a significant portion of their respective populations." Appellants' Br. at 14. That's only partially correct. The States undoubtedly have an interest in safeguarding their citizens' free speech rights, but their primary interest is in ensuring a robust forum for public discourse on social media platforms that allows them to hear their citizens' *actual* views on relevant public issues. Defendants' censorship campaign injures both the citizens' *and* the States' interests.

information on social-media platforms used by millions of Missourians and Louisianans").

Roughly two dozen states have sought to address social-media censorship "through [their] sovereign lawmaking powers."[10] *Alfred L. Snapp*, 458 U.S. at 607; *see* Rebecca Kern, *Push to Rein in Social Media Companies Sweeps the States*, POLITICO (July 1, 2022) ("More than two dozen [bills]" were introduced "seek[ing] to prevent companies from censoring content or blocking users"), https://www.politico.com/news/2022/07/01/social-media-sweeps-the-states-00043229.

Only Texas and Florida managed to pass laws banning social-media

---

[10] At least 26 states introduced bills seeking to prevent or limit social media censorship. *See* H.B. 213, Reg. Sess. (Ala. 2021); S.B. 214, 32nd Leg., 2021-2022 Sess. (Alaska 2022); S.B. 7072, Reg. Sess. (Fla. 2021); S.B. 393, Reg. Sess. (Ga. 2022); H.B. 323, 66th Leg., First Reg. Sess. (Idaho 2021); S.B. 274, 122nd Gen. Assemb., Second Reg. Sess. (Ind. 2022); S.B. 580, 89th Gen. Assemb., (Iowa 2021); S.B. 187, Leg. Sess. (Kan. 2021); S.B. 111, Reg. Sess. (Ky. 2021); S.B. 196, Reg. Sess. (La. 2021); H.B. 5973, 101st Leg. (Mich. 2022); H.B. 1231, 101st Gen. Assemb., First Reg. Sess. (Mo. 2021); H.B. 770, Reg. Sess. (Mont. 2023); L.B. 621, 108th Leg., First Sess. (Neb. 2021); S.B. 497, Sess. (N.C. 2021); H.B. 1144, 67th Leg. Assemb., Reg. Sess. (N.D. 2021); H.B. 441, 134th Gen. Assemb., Reg. Sess. (Ohio 2021); S.B. 383, 58th Leg., First Sess. (Okla. 2021); H.B. 3102, Gen. Assemb., 125th Sess. (S.C. 2023);, H.B. 1223, 96th Leg. Sess. (S.D. 2021); H.B. 682, 113th Gen. Assemb. (Tenn. 2023); H.B. 20, 87th Leg., First Special Sess. (Tex. 2021); S.B. 228, Gen. Sess. (Utah 2021); H.B. 3307, Reg. Sess. (W. Va. 2021); A.B. 530, Leg. Sess. (Wis. 2021); A.B. 589, Leg. Sess. (Wis. 2021); S.F. 100, Leg. Sess. (Wyo. 2021).

censorship,[11] but the push to enact similar legislation in so many other states strongly supports finding that the States' interest here extends to a "substantial segment" of their population and thus qualifies as a "quasi-sovereign interest." *See Alfred L. Snapp*, 458 U.S. at 607. Allowing the States to "protect [their] sovereign interests through litigation compensate[s] for [their] inability to protect those interests by the means that would have been available had [they] not entered the Union." *Texas*, 143 S. Ct. at 1997 (Alito, J., dissenting) (observing that even if states receive no "special solicitude" in the standing analysis, they shouldn't be treated with "special hostility").

Because *Mellon* does not bar the States' claims "to the extent they assert … quasi-sovereign interests," and because their asserted interest—hearing their citizens' views on matters of overwhelming public importance—"involves interest[s] apart from the interests of particular private parties," *Kentucky*, 23 F.4th at 598, 599 (internal quotations omitted), this Court should find that the States have standing.

---

[11] Both Texas' law (HB 20) and Florida's law (S.B. 7702) are currently enjoined. *See NetChoice, LLC v. Paxton*, 142 S. Ct. 1715 (2022) (vacating the Fifth Circuit's stay of the district court's preliminary injunction); *NetChoice, LLC v. AG, Fla.*, 34 F.4th 1196, 1203 (11th Cir. 2022) (affirming the district court's grant of a preliminary injunction).

## CONCLUSION

For the reasons above, this Court should affirm the district court's grant of a preliminary injunction.

DATED this 7th day of August, 2023.

AUSTIN KNUDSEN
*Montana Attorney General*

CHRISTIAN B. CORRIGAN
*Solicitor General*

*s/Peter M. Torstensen, Jr.*
PETER M. TORSTENSEN, JR.
*Assistant Solicitor General*
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
Phone: (406) 444-2026
Fax: (406) 444-3549

*Counsel for Amicus Curiae
State of Montana*

## Additional Counsel

RAÚL R. LABRADOR
*Attorney General of
Idaho*

BRENNA BIRD
*Attorney General of
Iowa*

KRIS KOBACH
*Attorney General of
Kansas*

MICHAEL T. HILGERS
*Attorney General of
Nebraska*

ALAN WILSON
*Attorney General of
South Carolina*

SEAN D. REYES
*Attorney General of
Utah*

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 5,284 words.

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Fifth Cir. R. 32.1 and the type-style requirements of Fed. R. App. P 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font and is double-spaced except for footnotes and for quoted and indented material.

/s/    *Peter M. Torstensen, Jr.*
PETER M. TORSTENSEN, JR.


## CERTIFICATE OF SERVICE

I certify that on this date, an accurate copy of the foregoing document was served electronically through the Court's CM/ECF system on registered counsel.

Dated: August 7, 2023          /s/    *Peter M. Torstensen, Jr.*
PETER M. TORSTENSEN, JR.