No. 23-30445

UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

STATE OF MISSOURI; STATE OF LOUISIANA; AARON KHERIATY;
MARTIN KULLDORFF; JIM HOFT; JAYANTA BHATTACHARYA; JILL HINES,

Plaintiffs-Appellees

v.

JOSEPH R. BIDEN, JR.; VIVEK H. MURTHY; XAVIER BECERRA;
DEPARTMENT OF HEALTH & HUMAN SERVICES; ANTHONY FAUCI, *et al.*,

Defendants-Appellants.

Appeal from the
United States District Court for the Western District of Louisiana
Case No. 3:22-cv-01213-TAD
The Honorable Terry A. Doughty

**BRIEF OF *AMICUS CURIAE* ALLIANCE DEFENDING FREEDOM
IN SUPPORT OF PLAINTIFFS-APPELLEES AND URGING AFFIRMANCE**

DAVID A. CORTMAN
TRAVIS C. BARHAM
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Road N.E.,
Ste. D-1100
Lawrenceville, Georgia 30043
(770) 339–0774

BRIAN W. ARABIE
SIGLER ARABIE & CANNON, LLC
630 Kirby Street (70601)
P.O. Box 1550 (70602)
Lake Charles, Louisiana
(337) 439–2033

JAMES A. CAMPBELL
TYSON C. LANGHOFER
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway
Lansdowne, Virginia 20176
(571) 707–4655

JOHN J. BURSCH
ALLIANCE DEFENDING FREEDOM
440 1st Street, NW, Ste. 600
Washington, D.C. 20001
(202) 393–8690

*Attorneys for Amicus Curiae*

## Certificate of Interested Persons

Pursuant to Fed. R. App. P. 26.1(a) and Fifth Circuit Rules 26.1.1 and 28.2.1, the undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentences of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

- *Amicus curiae* incorporate by reference the certificate of interested persons set forth in Defendants-Appellants' Opening Brief and Plaintiffs-Appellees' Response Brief.

- Alliance Defending Freedom ("ADF") is a tax-exempt non-profit corporation that has no parent corporation or other corporation that owns more than 10% of its stock.

- Sigler, Arabie, & Cannon, LLC is a Louisiana limited liability company that has no parent company or other company that holds more than 10% of its membership interest.

- Mr. James A. Campbell is an attorney with ADF and represents *amicus curiae* in this matter.

- Mr. John J. Bursch is an attorney with ADF and represents *amicus curiae* in this matter.

- Mr. David A. Cortman is an attorney with ADF and represents *amicus curiae* in this matter.

- Mr. Tyson C. Langhofer is an attorney with ADF and represents

*amicus curiae* in this matter.

- Mr. Travis C. Barham is an attorney with ADF and represents *amicus curiae* in this matter.

- Mr. Brian W. Arabie is an attorney with Sigler Arabie & Cannon, LLC and represents *amicus curiae* in this matter.

*Amicus curiae* is not aware of any other person or entity that has an interest in the outcome of this case or appeal.

Respectfully submitted this the 7th day of August, 2023.

/s/ *Travis C. Barham*
TRAVIS C. BARHAM
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Road N.E.,
Ste. D-1100
Lawrenceville, Georgia 30043
Telephone: (770) 339–0774
Facsimile: (770) 339–6744
tbarham@ADFlegal.org

*Attorney for Amicus Curiae*

### TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................................ii

TABLE OF AUTHORITIES ................................................................................ v

AMICUS CURIAE'S IDENTITY, INTEREST, AND AUTHORITY TO FILE ............... 1

INTRODUCTION ............................................................................................ 3

ARGUMENT ................................................................................................. 4

    I.    The government should be held responsible when it censors speech using private parties, like social media companies. ....... 4

        A. Government cannot induce—much less compel—private parties to take actions that violate citizens' constitutional freedoms. ................................................................................... 4

        B. More and more, government officials cooperate with private parties to silence speech. ........................................... 5

            1. Government officials frequently effectuate the heckler's vetoes of upset third parties. ............................................. 5

            2. Government officials frequently silence speech citing complaints from private parties......................................... 8

            3. Government officials brag openly about inducing social media companies to suppress pro-life speech.................... 11

        C. Social media companies eagerly silence views they dislike, giving government a ready source of accomplices. ............... 13

            1. Many social media companies have speech-threatening policies, setting the stage for unlawful censorship. ......... 14

            2. Social media companies have repeatedly demonstrated their willingness to censor the speech of Americans. ...... 19

            3. The government teaming up with "big tech" to censor speech poses severe and pervasive threats to the free exchange of ideas.......................................................... 21

    II.    The government has no business determining which views are right or wrong, let alone which should be silenced. ................... 23

CONCLUSION .............................................................................................. 27

RULE 32(G)(1) CERTIFICATE OF COMPLIANCE............................................. 29

CERTIFICATE OF SERVICE ........................................................................... 30

APPENDIX .................................................................................................. 31

TABLE OF AUTHORITIES

## CASES

*303 Creative, LLC v. Elenis,*
  143 S. Ct. 2298 (2023) ............................................................. 1

*Abrams v. United States,*
  250 U.S. 616 (1919) ................................................................ 23

*Bair v. Shippensburg University,*
  280 F. Supp. 2d 357 (M.D. Pa. 2003) .................................... 16

*Biden v. Knight First Amendment Institute at Columbia University,*
  141 S. Ct. 1220 (2021) ........................................................... 13

*Blum v. Yaretsky,*
  457 U.S. 991 (1982) ................................................................. 4

*Brentwood Academy v. Tennessee Secondary School Athletic Association,*
  531 U.S. 288 (2001) ............................................................. 4, 5

*Brown v. Board of Education of Topeka,*
  374 U.S. 483 (1954) ............................................................... 24

*Brown v. City of Pittsburgh,*
  586 F.3d 263 (3d Cir. 2009) ..................................................... 1

*Bruni v. City of Pittsburgh,*
  941 F.3d 73 (3rd Cir. 2019) ..................................................... 1

*City of Lakewood v. Plain Dealer Publishing Company,*
  486 U.S. 750 (1988) ......................................................... 17, 18

*Davis v. Monroe County Board of Education,*
  526 U.S. 629 (1999) ............................................................... 16

*DeJohn v. Temple University,*
  537 F.3d 301 (3d Cir. 2008) ..................................................... 1

*Dobbs v. Jackson Women's Health Organization,*
  142 S. Ct. 2228 (2022) ........................................................... 11

*Doe v. University of Michigan,*
  721 F. Supp. 852 (E.D. Mich. 1989) ...................................... 16

*Gonzales v. Trevino,*
   60 F.4th 906 (5th Cir. 2023) .................................................. 1

*Keyishian v. Board of Regents of the University of the State of New York,*
   385 U.S. 589 (1967) ..................................................... 26, 27

*Korematsu v. United States,*
   323 U.S. 214 (1944) ............................................................ 24

*Meriwether v. Hartop,*
   992 F.3d 492 (6th Cir. 2021) ................................................ 1

*Norwood v. Harrison,*
   413 U.S. 455 (1973) .............................................................. 4

*Nuxoll ex rel. Nuxoll v. Indian Prairie School District #204,*
   523 F.3d 668 (7th Cir. 2008) .............................................. 16

*OSU Student Alliance v. Ray,*
   699 F.3d 1053 (9th Cir. 2012) .............................................. 1

*Packingham v. North Carolina,*
   582 U.S. 98 (2017). ...................................................... 13, 18

*Plessy v. Ferguson,*
   163 U.S. 537 (1896) ............................................................ 24

*R.A.V. v. City of St. Paul,*
   505 U.S. 377 (1992). .......................................................... 15

*Roberts v. Haragan,*
   346 F. Supp. 2d 853 (N.D. Tex. 2004) ................................ 16

*Roe v. Wade,*
   410 U.S. 113 (1973) ............................................................ 11

*Saxe v. State College Area School District,*
   240 F.3d 200 (3d Cir. 2001) ......................................... 15, 16

*Tinker v. Des Moines Independent Community School District,*
   393 U.S. 503 (1969) ............................................................ 26

*Trump v. Hawaii,*
   138 S. Ct. 2392 (2018) ........................................................ 24

*United States v. Alvarez,*
   567 U.S. 709 (2012) .................................................... 25, 26

*United States v. Stevens,*
   559 U.S. 460 (2010) ........................................................ 17

*Uzuegbunam v. Preczewski,*
   141 S. Ct. 792 (2021) ..................................................... 1, 9

*Watts v. Northside Independent School District,*
   37 F.4th 1094 (5th Cir. 2022) ............................................ 5

*West Virginia State Board of Education v. Barnette,*
   319 U.S. 624 (1943) ........................................................ 26

## RULES

FED. R. APP. P. 26.1(a) .......................................................... ii

FED. R. APP. P. 29(a)(2) .......................................................... 2

FED. R. APP. P. 29(a)(4)(E) ...................................................... 2

FED. R. APP. P. 29(a)(5) ......................................................... 29

FED. R. APP. P. 31 ............................................................... 30

FED. R. APP. P. 32(a)(5) ......................................................... 29

FED. R. APP. P. 32(a)(6) ......................................................... 29

FED. R. APP. P. 32(a)(7)(B) ...................................................... 29

FED. R. APP. P. 32(f) ............................................................ 29

Fifth Circuit Rule 31.1 .......................................................... 30

Fifth Circuit Rule 32.1 .......................................................... 29

Fifth Circuit Rules 26.1.1 ....................................................... ii

Fifth Circuit Rules 28.2.1 ....................................................... ii

## HISTORICAL DOCUMENTS

THE DECLARATION OF INDEPENDENCE (U.S. 1776) ..................................... 3

THE FEDERALIST NO. 51 (James Madison)
(George W. Carey & James McClelland ed., 2001) .............................. 3

## LEGISLATIVE MATERIALS

*The Cover Up: Big Tech, the Swamp, and Mainstream Media
Coordinated to Censor American's Free Speech*,
U.S. HOUSE COMM. ON OVERSIGHT & ACCOUNTABILITY (Feb. 8, 2023),
https://bit.ly/3MFJqV6 ........................................................................ 22

## JOURNAL ARTICLES

Eugene Volokh, *Treating Social Media Platforms Like Common
Carriers?*,
1 J. FREE SPEECH L. 377 (2021) .......................................................... 18

## LITIGATION DOCUMENTS

Compl., *DeJong v. Pembrook*,
No. 3:22-cv-01124 (S.D. Ill. May 31, 2022), ECF No. 1,
https://bit.ly/3KX28pW ...................................................................... 9

Compl., *Young Am.'s Found. v. Covino*,
No. 2:16-cv-03474 (C.D. Cal. May 19, 2016), ECF No. 1,
https://bit.ly/3Utz1he. ...................................................................... 5

Compl., *Young Am.'s Found. v. Stenger*,
No. 3:20-cv-00822 (N.D.N.Y. Jul. 22, 2020),
https://bit.ly/3mxpc5q ................................................................... 6, 7

## OTHER AUTHORITIES

@MarkWarner, TWITTER
(Aug. 25, 2022, 1:23 PM), https://bit.ly/3GFK8hp. ............................ 12

@MarkWarner, TWITTER
(Aug. 25, 2022, 1:23 PM), https://bit.ly/3zZo2m9. ............................ 12

@TheDailyCitizen, TWITTER
(May 18, 2021), https://bit.ly/3UvZOti. ............................................. 19

Aaron Sibarium, *Hundreds of Yale Law Student Disrupt Bipartisan Free Speech Event*,
WASH. FREE BEACON (Mar. 16, 2022), https://bit.ly/3xRf89n ............... 8

Adam Feldman, *Supreme Court All-Stars 2013–2017*,
EMPIRICAL SCOTUS (Sept. 13, 2018), https://bit.ly/2pm2NXn. ........... 1

Alliance Defending Freedom,
*Pitt Officials Violate First Amendment Rights of Conservative Student Groups* (Jun. 6, 2023), https://bit.ly/452FG5Z. ...................... 8

Brooke Auxier & Monica Anderson, *Social Media Use in 2021*,
PEW RESEARCH CTR. (Apr. 7, 2021), https://pewrsr.ch/3zZLtvL ......... 13

Clare Duffy & Brian Fung, *Lawmakers Urge Google to Remove Misleading Results in Searches for Abortion Clinics*,
CNN BUSINESS (Jun. 17, 2022), https://cnn.it/3L2xJqv. ................... 11

David Lat, *Is Free Speech in American Law Schools a Lost Cause?*,
ORIGINAL JURIS. (Mar. 17, 2022), https://bit.ly/3m2FhiQ .................... 8

David Sacks, *Get Ready for the 'No-Buy' List*,
THE FREE PRESS (July 30, 2021), https://bit.ly/3o6on3L .............. 21, 22

Dennis Shaul, *There's No Downplaying the Impact of Operation Choke Point*,
AM. BANKER (Nov. 28, 2018), https://bit.ly/2TYnIxH. ........................ 22

Emily Jashinsky, *Exclusive: Man Tried to Share His Regrets About Transgender Life. YouTube Censored It*,
THE FEDERALIST (June 19, 2020), https://bit.ly/43w6XxJ. ................ 20

Emma Colton, *Violence Follows after Suspected Antifa Members Disrupt Pro-Life Campus Event: "Fascists,"*
FOX NEWS (Mar. 30, 2023), https://fxn.ws/414YUX9. .......................... 7

Ethan Siegel, *The Wuhan Lab Leak Hypothesis Is a Conspiracy Theory, Not Science*,
FORBES (June 3, 2021), https://bit.ly/3GJ34vI. .................................. 24

Gabe Kaminsky, *Twitter Locked Focus on the Family's Account Because the Christian Group Said Boys and Girls Are Different*,
THE FEDERALIST (Feb. 22, 2021), https://bit.ly/417qkvB ................... 19

Jennifer Korn, *Yelp to Begin Prominently Labeling Crisis Pregnancy Centers to Avoid Confusion*,
CNN BUSINESS (Aug. 23, 2022), https://cnn.it/40bDuq7. ................... 12

Jeremy Herb & Natasha Bertrand, *US Energy Department Assesses Covid-19 Likely Resulted from Lab Leak, Furthering US Intel Divide over Virus Origin*,
CNN (Feb. 27, 2023), https://cnn.it/3KI9dJU .................................... 25

Jeremy Tedesco, *Cancel Culture Targets Charity*,
WALL ST. J. (Jan. 18, 2022), https://on.wsj.com/3MFnbyu. ............... 22

Jessica Chasmar, *Google to Crack Down on Search Results for Crisis Pregnancy Centers after Dem Pressure*,
FOX BUSINESS (Aug. 25, 2022), https://fxn.ws/41tmLj3. .................... 11

Joseph A. Wulfsohn, *What Elon Musk's Twitter Files Have Uncovered About the Tech Giant So Far*,
FOX NEWS (Jan. 22, 2023), https://fxn.ws/41jtsEs. ........................... 22

Karl, *Top 10 Social Networking Sites by Market Share Statistics [2023]*,
DREAMGROW (Mar. 12, 2023), https://bit.ly/41p3KhG........................ 13

Katelynn Richardson, *Overwhelming Majority of College Students Say Shouting Down a Speaker Is Acceptable: Survey*,
COLL. FIX (Sept. 23, 2021), https://bit.ly/3q0OURA............................. 7

Lisa Gutierrez, *Online Search for Abortion Can Take You to Anti-Abortion Center. Websites Take* Action,
KANSAS CITY STAR (Sept. 1, 2022), https://bit.ly/40pGb7H. .............. 12

Mason Walker & Katerina Eva Matsa, *News Consumption Across Social Media in 2021*,
PEW RESEARCH CTR. (Sept. 20, 2021), https://pewrsr.ch/3MN0rwL. . 13

Meta, *Hate Speech*,
https://bit.ly/3GJ2L3X ...................................................................... 15

Princetonians for Free Speech & College Pulse,
*Princeton's Free Speech Campus Culture* (May 2023),
https://bit.ly/3Khx0Rl........................................................................ 7

Richard Allan, *Hard Questions: Who Should Decide What Is Hate Speech in an Online Global Community?*,
META (Jun. 27, 2017), https://bit.ly/3odlw9q ..................................... 17

Robby Soave, *U.S. State Department Funds a Disinformation Index That Warns Advertisers to Avoid Reason*, REASON (Feb. 14, 2023), https://bit.ly/3o9Y8cL. ................................21

Rod Dreher, *The Tyranny of Tech and Trans*, THE AM. CONSERVATIVE (Jan. 27, 2021), https://bit.ly/3zYhynM. ......20

Stephen M. LePore, *"I Was Assaulted": Incredulous Riley Gaines Slams Statement from SF State PRAISING Students for "Peaceful" Protests after She Was "Attacked" and Forced to High Inside Room when Trans-Rights Protestors Stormed Her Speech about Women's Sport*, DAILY MAIL (Apr. 9, 2023), https://bit.ly/3GHweeq...............................8

Stuart Kyle Duncan, *My Struggle Session at Stanford Law School*, WALL ST. J (Mar. 17, 2023), https://on.wsj.com/41lg7ey......................8

Twitter, *Hateful Conduct*, https://bit.ly/3o5m29b ..........................................................................15

Viewpoint Diversity Score, *2022 Business Index* (May 2022) .........................................................14

Viewpoint Diversity Score, *2023 Business Index*, https://bit.ly/3MDe2qb ....................................14

Viewpoint Diversity Score, *About Us*, https://bit.ly/40jg3LH ....................................................2, 14

Viewpoint Diversity Score, *FAQs*, https://bit.ly/3UtxUy1................................................................2

Viewpoint Diversity Score, *Statement on Debanking and Free Speech*, (Nov. 10, 2022), https://bit.ly/3L0whoA. ......................................................................22

YouTube, *How Does You Tube Protect the Community from Hate and Harassment?*, https://bit.ly/3zZYSE5. .................................................15

Zachary Mettler, *Biden to Nominate Controversial Transgender Doctor for Assistant Health and Human Services Secretary*, DAILY CITIZEN (Jan. 19, 2021), https://bit.ly/417rEP5........................19

***Amicus Curiae's* Identity, Interest, and Authority to File**

Alliance Defending Freedom (ADF) is the world's largest law firm dedicated to protecting religious freedom, free speech, the sanctity of life, parental rights, and marriage and family. ADF has contributed to 74 Supreme Court victories and represented parties in 15.[1] In 2018, *Empirical SCOTUS* ranked ADF first among "the top performing firms" litigating First Amendment cases.[2]

A "nationally respected civil rights organization," *Gonzales v. Trevino*, 60 F.4th 906, 913 n.4 (5th Cir. 2023) (Ho, J., dissenting from denial of rehearing *en banc*), ADF represents clients who seek to exercise their free speech rights and to challenge government policies that seek to curtail this freedom, such as students, student organizations, and faculty silenced on campus. *E.g.*, *DeJohn v. Temple Univ.*, 537 F.3d 301 (3d Cir. 2008); *OSU Student All. v. Ray*, 699 F.3d 1053 (9th Cir. 2012); *Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021). It also represents pro-life advocates who face punishments for seeking to protect unborn life. *E.g.*, *Brown v. City of Pittsburgh*, 586 F.3d 263 (3d Cir. 2009); *Bruni v. City of Pittsburgh*, 941 F.3d 73 (3rd Cir. 2019).

In the private sector, ADF seeks "to encourage businesses to respect customers and external stakeholders who hold diverse viewpoints, [to]

---

[1]    *E.g.*, *303 Creative, LLC v. Elenis*, 143 S. Ct. 2298 (2023); *Uzuegbunam v. Preczewski*, 141 S. Ct. 792 (2021).

[2]    Adam Feldman, *Supreme Court All-Stars 2013–2017*, Empirical SCOTUS (Sept. 13, 2018), https://bit.ly/2pm2NXn. (All links in this brief were last visited on August 7, 2023).

1

promote freedom of thought in their workplaces, and [to] support a public culture of trust and tolerance in their giving and political activities."[3] ADF urges companies to resist "demands that they cancel, deplatform, or deny service to individuals or groups because of their religious or ideological beliefs" and to foster "workplace environments where team members can be honest about their views and learn from each other's differences."[4]

The prospect of government officials and private businesses cooperating to silence the free speech of American citizens is alarming. When government officials enlist the aid of private actors to censor, those officials should be held accountable and stopped from masking their speech suppression behind the guise of private action.

Pursuant to FED. R. APP. P. 29(a)(2), *amicus* files this brief with the consent of all parties.

Pursuant to FED. R. APP. P. 29(a)(4)(E), *amicus* states that no counsel for any party authored this brief in whole or in part, that no party or counsel for any party contributed money intended to fund the preparation or submission of this brief, and that no person—other than *amicus*, its members, or its counsel—contributed money intended to fund the preparation or submission of this brief.

---

[3]    Viewpoint Diversity Score, *About Us*, https://bit.ly/40jg3LH.

[4]    Viewpoint Diversity Score, *FAQs*, https://bit.ly/3UtxUy1.

## INTRODUCTION

Our nation has long prided herself on her system of limited government, where the people delegate only certain powers to their leaders, and where checks and balances prevent those powers from being abused. As our Founders noted, this is because government is "but the greatest of all reflections on human nature." THE FEDERALIST NO. 51 at 269 (James Madison) (George W. Carey & James McClelland ed., 2001). As men are not angels, government is necessary. As our leaders are not angels, external and internal controls on government are essential. *Id.*

Our Founders quickly saw that we needed the First Amendment's protections to prevent the government from controlling public opinion. To them, a "dependence on the people is, no doubt, the primary control on the government." *Id.* They had seen how government officials are far from infallible, as our history since has oft confirmed. If government could manipulate public opinion, the "consent of the governed"—the only source of government's "just powers"—would be a farce and our liberties jeopardized. THE DECLARATION OF INDEPENDENCE para. 2 (U.S. 1776).

Still, the urge to censor disfavored ideas remains, especially among government officials who fancy themselves on the "right side of history" or the living embodiment of "science." These officials often chafe at the First Amendment's restrictions and seek to sidestep them, finding willing partners in the private sector. Big tech companies—especially social media ones—are all too willing to help censorious government officials. For

officials, this provides an alluring temptation: the ability to censor speech they dislike while evading the First Amendment.

Here, that temptation led to "arguably the most massive attack against free speech in [our] history." ROA.26572. If our liberties are to remain secure, and if debate on public issues is to remain free and unfettered, courts cannot tolerate or turn a blind eye to this end-run around the Constitution. This Court should affirm the district court's preliminary injunction and reject the motion to stay it.

## ARGUMENT

## I. The government should be held responsible when it censors speech using private parties, like social media companies.

### A. Government cannot induce—much less compel—private parties to take actions that violate citizens' constitutional freedoms.

As the district court rightly ruled, twice, the government may not use private parties as proxies to violate Americans' constitutional rights. ROA.17348–50, 26543–45. Indeed, it is "axiomatic that a state may not induce, encourage, or promote private persons to accomplish what it is constitutionally forbidden to accomplish." *Norwood v. Harrison*, 413 U.S. 455, 465 (1973) (citations omitted). When the government "has provided such significant encouragement, *either overt or covert*, [the private party's] choice must in law be deemed to be that of the [government]." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982) (emphasis added); *accord Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288,

296 (2001). Thus, this Court held a football coach liable when his players attacked a referee on his orders because "any reasonable football coach would have known he was engaged in state action when instructing his players that Friday night." *Watts v. Northside Indep. Sch. Dist.*, 37 F.4th 1094 (5th Cir. 2022). When a government official uses covert inducement to silence speech, he likewise crosses the line and assaults speech the First Amendment protects.

### B. More and more, government officials cooperate with private parties to silence speech.

Sadly, the government often ignores this fundamental principle, cooperating with private parties to silence disfavored speech. Sometimes, as here, government officials prompt private parties to silence speech. Other times, officials silence speech at the behest of private parties. Either way, as many ADF clients can attest, free speech loses.

### 1. Government officials frequently effectuate the heckler's vetoes of upset third parties.

Often, government officials enforce a heckler's veto. For example, Young Americans for Freedom at California State University-Los Angeles invited conservative commentator Ben Shapiro to lecture on diversity. Compl., *Young Am.'s Found. v. Covino*, No. 2:16-cv-03474 (C.D. Cal. May 19, 2016), ECF No. 1, https://bit.ly/3Utz1he. Once this student group started promoting the event on Facebook, it began receiving angry and threatening comments from students and faculty. University officials used this reaction to declare Mr. Shapiro's views "controversial" and to

impose additional security fees. Next, the University president used the reaction as an excuse to cancel the event. Both gambits failed, the first because the fees were unconstitutional, the latter because the group and Mr. Shapiro refused to be silenced.

Then the mob stepped in—with the University's tacit blessing. The night before the lecture, protestors camped out in front of the Student Union, where the lecture would occur. Already, these groups had blanketed the campus with flyers urging students to rally to stop Mr. Shapiro from speaking. Four hours before the lecture, protestors assembled inside and outside the Student Union, filling its lobby. Then they linked arms and physically blocked access to the lecture hall, preventing entry. University police did nothing to stop this blockade.

Young Americans for Freedom tried to circumvent this blockade by escorting people through a back door. But the mob soon formed *another* human wall to block it. Again, University police did nothing.

Why did the police stand idly by? Because the University president and others *ordered* them to effectuate this heckler's veto. So the lecture hall was only half full when Mr. Shapiro spoke, with over 100 people who wanted to hear him stranded outside. Government officials stymied free speech, letting a mob do what they wanted to do all along: silence Mr. Shapiro and the students who invited him.

Economist and presidential advisor Dr. Arthur Laffer suffered the same mistreatment at Binghamton University. Compl., *Young Am.'s*

*Found. v. Stenger*, No. 3:20-cv-00822 (N.D.N.Y. Jul. 22, 2020), https://bit.ly/3mxpc5q. When mobs attacked College Republicans for inviting him, University officials blamed the victims, gave the mob space near the lecture hall to plan more disruptions, and tried to cancel the lecture. Then they stood by while disruptors blocked attendees from open seats, interrupted the lecture by shouting through a bullhorn, and stymied the token efforts police made to restore order before ordering Dr. Lafer to leave. Days later, officials suspended College Republicans for violating a policy applied to no one else.

Sadly, these shout-downs are far from isolated. Studies from 2021 reveal that 66% of university students think shouting down a speaker is a proper response to ideas one does not like, and almost 23% think violence is.[5] At Princeton, 76% of students approve of shout-downs, 44% approve of blockading events, and 16% approve of violence.[6]

Little wonder then that these incidents multiply. Kristan Hawkins of Students for Life of America faced a similar experience at Virginia Commonwealth University.[7] Riley Gaines, a female athlete speaking at

---

[5]    Katelynn Richardson, *Overwhelming Majority of College Students Say Shouting Down a Speaker Is Acceptable: Survey*, COLL. FIX (Sept. 23, 2021), https://bit.ly/3q0OURA.

[6]    Princetonians for Free Speech & College Pulse, *Princeton's Free Speech Campus Culture* at Highlight 7 (May 2023), https://bit.ly/3Khx0Rl.

[7]    Emma Colton, *Violence Follows after Suspected Antifa Members Disrupt Pro-Life Campus Event: "Fascists,"* FOX NEWS (Mar. 30, 2023), https://fxn.ws/414YUX9.

San Francisco State University on who should compete in women's sports, had to barricade herself in a room for almost three hours to avoid a violent mob that the University president defended.[8] The University of Pittsburgh incited a mob to shut down Michael Knowles' speech on transgenderism.[9] Over 100 students at Yale Law School shouted down ADF's CEO, Kristen Waggoner.[10] Obscenity-yelling students at Stanford Law School did the same to Judge Duncan from this Court, with officials intervening only to rebuke *the Judge* for his conservative views.[11]

### 2. Government officials frequently silence speech citing complaints from private parties.

Government also silences speech based on third-party complaints. Chike Uzuegbunam began sharing his faith with fellow Georgia Gwin-

---

[8]    Stephen M. LePore, *"I Was Assaulted": Incredulous Riley Gaines Slams Statement from SF State PRAISING Students for "Peaceful" Protests after She Was "Attacked" and Forced to High Inside Room when Trans-Rights Protestors Stormed Her Speech about Women's Sport*, DAILY MAIL (Apr. 9, 2023), https://bit.ly/3GHweeq.

[9]    Alliance Defending Freedom, *Pitt Officials Violate First Amendment Rights of Conservative Student Groups* (Jun. 6, 2023), https://bit.ly/452FG5Z.

[10]    Aaron Sibarium, *Hundreds of Yale Law Student Disrupt Bipartisan Free Speech Event*, WASH. FREE BEACON (Mar. 16, 2022), https://bit.ly/3xRf89n; David Lat, *Is Free Speech in American Law Schools a Lost Cause?*, ORIGINAL JURIS. (Mar. 17, 2022), https://bit.ly/3m2FhiQ.

[11]    Stuart Kyle Duncan, *My Struggle Session at Stanford Law School*, WALL ST. J (Mar. 17, 2023), https://on.wsj.com/41lg7ey; Aaron Sibarium, *"Dogs-t": Federal Judge Decries Disruption of His Remarks by Stanford Law Students and Calls for Termination of the Stanford Dean Who Joined the Mob*, WASH. FREE BEACON (Mar. 10, 2023), https://bit.ly/3KAogVJ.

nett College students in a plaza "where students often gather." *Uzueg-bunam*, 141 S. Ct. at 796. Officials stopped him, saying he "could speak about his religion . . . only in two" tiny speech zones. *Id.* at 796–97.

So Chike reserved one and, on the appointed day, began sharing how Jesus died and rose again to provide eternal life to all. After about 20 minutes, "a campus police officer again told him to stop, this time saying that people had complained about his speech." *Id.* at 794. Per the officer, Chike's speech violated a policy "because it had led to complaints." *Id.* Sure enough, the College's speech code prohibited "anything that 'disturbs the peace and/or comfort of person(s).'" *Id.* So officers threatened Chike with punishment if he continued speaking in the speech zone.

To defend this unconstitutional policy, the College invoked "fighting words." To its officials—including the Office of the Attorney General of Georgia—Chike's presentation of the Christian Gospel "arguably rose to the level of 'fighting words'" because a few people complained. *Id.* at 797.

The situation escalated even faster for Maggie DeJong, a master's degree student at Southern Illinois University, Edwardsville. Compl., *DeJong v. Pembrook*, No. 3:22-cv-01124 (S.D. Ill. May 31, 2022), ECF No. 1, https://bit.ly/3KX28pW. While counting down to graduation, she was shocked to receive three no-contact orders from the University. The orders banned her from having "any contact" or "indirect communication" with three students, two from her graduating class of ten. If she violated these orders, officials threatened her with "disciplinary consequences,"

and they copied a University police officer on each to drive that threat home. Before issuing these orders, no official had informed Maggie she was under investigation. No one allowed her to tell her side of the story. No one even told her what she had done to merit this punishment.

One month later, after Maggie was forced to retain legal counsel, the picture became clearer. Three students complained because Maggie expressed her Christian and conservative views on current events. These students found her views offensive, as was their right, but they also claimed that her speech itself had threatened them.

On social media, Maggie frequently expressed her religious beliefs. One student claimed this content "directly attacks and belittles my own religious beliefs." This student denounced Maggie because Maggie "claims to have 'objective truth.'" Naturally, the student omitted how this conversation occurred over a year before and how the two were joking with each other. Instead, the student claimed she felt "unable to speak about my own belief system" in Maggie's presence, and that Maggie's mere words represented discrimination, harassment, or retaliation.

To another student, Maggie explained she "refuse[d] to succumb to critical race theory" because she considered it "divisive and racist in its essence." That student omitted how this exchange occurred ten months earlier, and how Maggie followed up by saying "how much I value you" and how she saw in this student "a beautiful heart," a "compassion for

10

children," and a "strong warrior." The student just told officials she "perceived" this spoken message "as threatening."

Based on these incomplete complaints about speech, University officials issued the three no-contact orders, and they accused Maggie of committing "oppressive acts" and "misconduct." Eventually, she was accused of "creat[ing] a toxic and harmful learning environment."

Thus, university officials, who should know the First Amendment's protections for speech, often use the listener complaints to silence speech.

### 3. Government officials brag openly about inducing social media companies to suppress pro-life speech.

As illustrated here, government officials often urge private actors to silence views they dislike. ROA.26549–69 (detailing how Defendants urged censorship with "unrelenting pressure"). Some even brag publicly about it. After a draft of *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022), foreshadowed the demise of *Roe v. Wade*, 410 U.S. 113 (1973), more than 20 members of Congress urged Google to limit the ways people might find pregnancy centers that do not perform or refer for abortions.[12] Senator Mark Warner publicly boasted that he and Representative Elissa Slotkin persuaded Google to alter search results to minimize the likelihood that queries would return results listing these centers:[13]

---

[12]    Clare Duffy & Brian Fung, *Lawmakers Urge Google to Remove Misleading Results in Searches for Abortion Clinics*, CNN BUSINESS (Jun. 17, 2022), https://cnn.it/3L2xJqv.

[13]    Jessica Chasmar, *Google to Crack Down on Search Results for Crisis Pregnancy Centers after Dem Pressure*, FOX BUSINESS (Aug. 25, 2022), https://fxn.ws/41tmLj3.

> Back in June @RepSlotkin and I wrote to @Google urging them to improve their search results and prevent users that search for abortion clinics and services from being misled. Today I received a response from Google and am happy to report that they're taking action.[14]

He added that as a result of Google's responses to his requests, users "will only see facilities that have been verified to provide abortions in the local search box on Google."[15] After these two legislators' requests, Google announced it would flag pregnancy centers with a "might not provide abortions" label.[16] Tech company Yelp also announced it would single out these centers with a negative label, stating they "provide limited medical services and may not have licensed medical professionals onsite."[17]

Legislators spoke, and social media jumped, censoring pro-life centers in ways the government never could do directly.

---

[14]    @MarkWarner, TWITTER (Aug. 25, 2022, 1:23 PM), https://bit.ly/3zZo2m9.

[15]    @MarkWarner, TWITTER (Aug. 25, 2022, 1:23 PM), https://bit.ly/3GFK8hp.

[16]    Lisa Gutierrez, *Online Search for Abortion Can Take You to Anti-Abortion Center. Websites Take* Action, KANSAS CITY STAR (Sept. 1, 2022), https://bit.ly/40pGb7H.

[17]    Jennifer Korn, *Yelp to Begin Prominently Labeling Crisis Pregnancy Centers to Avoid Confusion*, CNN BUSINESS (Aug. 23, 2022), https://cnn.it/40bDuq7.

### C. Social media companies eagerly silence views they dislike, giving government a ready source of accomplices.

Social media is the "modern public square." *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017). As of 2021, 81% of Americans use YouTube, 69% use Facebook, and 48% get their news from social media.[18] These highly centralized companies[19] "derive much of their value from network size." *Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220, 1224 (2021) (Thomas, J., concurring). So a small number of private corporations possess vast control over large amounts of speech.

The social media companies here "cooperated due to coercion," ROA.26571, to stifle free speech. They restricted it using ill-defined, subjective terms like "hate speech," which empowers them to censor disfavored content or viewpoints. Courts regularly strike down these policies when used by the government, but these companies generally are not subject to the First Amendment. And they have repeatedly shown they will enforce these policies against views government officials dislike.

Such policies are rife for abuse—by the companies, activists, or government officials seeking an end-run around the First Amendment. *E.g.*, ROA.26564–65 (describing how government interns created the Election

---

[18]    Brooke Auxier & Monica Anderson, *Social Media Use in 2021*, PEW RESEARCH CTR. (Apr. 7, 2021), https://pewrsr.ch/3zZLtvL; Mason Walker & Katerina Eva Matsa, *News Consumption Across Social Media in 2021*, PEW RESEARCH CTR. (Sept. 20, 2021), https://pewrsr.ch/3MN0rwL.

[19]    Facebook and YouTube receive 63% of all social media site visits. The top 10 companies, 3 of which Meta owns, receive over 85%. Karl, *Top 10 Social Networking Sites by Market Share Statistics [2023]*, DREAMGROW (Mar. 12, 2023), https://bit.ly/41p3KhG.

Integrity Partnership, how it influenced social media companies, and how it "was designed 'to get around . . . the very real First Amendment questions that would arise if . . . government agencies were to monitor and flag information for censorship on social media'"); ROA.26568 (noting how State Department officials and others "partnered with organizations whose goals were to 'get around' First Amendment issues"). This presents an existential threat to free speech, and courts should review most stringently any government influence in social media censorship.

### 1. Many social media companies have speech-threatening policies, setting the stage for unlawful censorship.

According to the Viewpoint Diversity Score Business Index,[20] most of the largest social media companies have unclear or imprecise speech restrictions that permit invidious and veiled viewpoint- and content-discrimination. These companies purport to prohibit "hateful," "intolerant," or "offensive" speech, and "harassment,"[21] euphemisms for ideas the companies do not like or wish to censor. These policies mirror policies that would violate the First Amendment if enforced by the government.

For example, the Supreme Court invalidated an anti-bias ordinance barring speech that would "arouse[] anger, alarm or resentment in others

---

[20]    The Index is the first comprehensive benchmark designed to measure corporate respect for religious and ideological diversity in the market, workplace, and public square. Viewpoint Diversity Score, *About Us*, https://bit.ly/40jg3LH.

[21]    App.10–11 (providing Viewpoint Diversity Score, *2022 Business Index* 10–11 (May 2022)); *see also* Viewpoint Diversity Score, *2023 Business Index*, https://bit.ly/3MDe2qb.

on the basis of race, color, creed, religion or gender." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 380 (1992). The law prohibited a person from making forbidden statements about race, religion, gender, and color, yet allowed them to make similar statements about other ideas, like political affiliation or union membership. The law applied only if the speech was "addressed to one of the specified disfavored topics." *Id.* at 391. Thus, it imposed "special prohibitions on those speakers who express views on disfavored subjects," the essence of content-based discrimination. *Id.*

Social media companies restrict speech using identical terms. YouTube prohibits "hate speech," defined as speech that "incites hatred . . . against groups based on protected attributes such as age, gender, race, caste, religion, sexual orientation, or veteran status."[22] Meta (*a.k.a.*, Facebook)[23] and Twitter[24] echo this.

If government-enforced, these policies would violate the Constitution, no questions asked. *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 217–19 (3d Cir. 2001) (invalidating harassment policy that restricted

---

[22]    YouTube, *How Does You Tube Protect the Community from Hate and Harassment?*, https://bit.ly/3zZYSE5.

[23]    Meta, *Hate Speech*, https://bit.ly/3GJ2L3X ("We define hate speech as a direct attack against people . . . on the basis of . . . race, ethnicity, national origin, disability, religious affiliation, caste, sexual orientation, sex, gender identity and serious disease.").

[24]    Twitter, *Hateful Conduct*, https://bit.ly/3o5m29b ("You may not directly attack other people on the basis of race, ethnicity, national origin, caste, sexual orientation, gender, gender identity, religious affiliation, age, disability, or serious disease.").

speech that "offends, denigrates, or belittles an individual" based on various characteristics). Nevertheless, social media companies use the same terms for their censorship:

| Social Media Speech Restrictions[25] | Unconstitutional Speech Restrictions |
|---|---|
| • "targets, insults and abuses" <br> • "incites hatred" <br> • "promote hostility and malice" | • "threats, insults, epithets, ridicule, or personal attacks"[26] <br> • "stigmatize or victimize"[27] <br> • "derogatory comments"[28] <br> • "offends, denigrates or belittles"[29] <br> • "acts of intolerance which demonstrate malicious intent toward others"[30] |

There is no meaningful distinction between the two lists. Social media companies' policies are littered with vague, subjective terms that decades of First Amendment cases recognize as posing real, substantial threats to free speech. Nor do they remotely resemble the constitutionally permissible definition of harassment or any category of unprotected speech. *E.g.*, *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 651 (1999) (defining "harassment" as conduct that is "so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victims' educational experience, that the victim-students are effectively denied

---

[25]     All terms appear in the policies cited in footnotes 22–24.

[26]     *Roberts v. Haragan*, 346 F. Supp. 2d 853, 872 (N.D. Tex. 2004).

[27]     *Doe v. Univ. of Mich.*, 721 F. Supp. 852, 853 (E.D. Mich. 1989).

[28]     *Nuxoll ex rel. Nuxoll v. Indian Prairie Sch. Dist. #204*, 523 F.3d 668, 670 (7th Cir. 2008).

[29]     *Saxe*, 240 F.3d at 215.

[30]     *Bair v. Shippensburg Univ.*, 280 F. Supp. 2d 357, 370 (M.D. Pa. 2003) (cleaned up).

equal access to an institution's resources and opportunities"); *United States v. Stevens*, 559 U.S. 460, 468–69 (2010) (listing "well-defined and narrowly limited classes of speech" beyond First Amendment protection).

Meta has candidly admitted that "there is no universally accepted answer for when something crosses the [hate speech] line" and that people have "very different levels of tolerance for speech about protected characteristics."[31] This concession confirms a disturbing truth—our freedom to express our views is subject to the caprice, whim, and subjective judgments of social media employees and algorithms and the government officials who direct them. This admission is symptomatic of the larger problem: "hate speech" is not a workable standard. It is vague, subjective, and invites the censorship of views that either the company or some disgruntled user may find offensive. Such arbitrary censorship is precisely what the First Amendment was designed to stop.

What's worse, social media companies do not have to be transparent, allowing them to discriminate covertly without accountability. The absence of standards is troubling because "[s]tandards provide the guideposts that . . . allow courts quickly and easily to determine whether the [censoring party] is discriminating against disfavored speech. Without guideposts, *post hoc* rationalizations . . . and the use of shifting or illegitimate criteria are far too easy[.]" *City of Lakewood v. Plain Dealer*

---

[31]     Richard Allan, *Hard Questions: Who Should Decide What Is Hate Speech in an Online Global Community?*, Meta (Jun. 27, 2017), https://bit.ly/3odlw9q.

*Publ'g Co.*, 486 U.S. 750, 758 (1988).

But as social media companies are not subject to these standards, content- and viewpoint-based discrimination can fester under their ill-defined censorship policies. This makes them enticing targets for government actors who want "to get around . . . the very real First Amendment questions that would arise if . . . government agencies were to monitor and flag information for censorship on social media." ROA.26564–65. This, in turn, creates the opportunity for what Professor Eugene Volokh calls "censorship creep." Eugene Volokh, *Treating Social Media Platforms Like Common Carriers?*, 1 J. FREE SPEECH L. 377, 395–400 (2021). That is, not only will the social media companies be increasingly inclined to exercise more censorial power over time, but also third parties will subject them to ever increasing public pressure "to suppress . . . supposedly dangerous speech." *Id.* at 399. "People will demand: If you blocked *A*, why aren't you blocking *B*? Aren't you being hypocritical or discriminatory?" *Id.* Given their vague and subjective standards, "there is little reason to think that the platforms will enforce the rules in any generally politically neutral way." *Id.* at 400. As this happens, the "modern public square" will cease to ensure, protect, or respect genuine free speech. *Packingham*, 582 U.S. at 107.

### 2. Social media companies have repeatedly demonstrated their willingness to censor the speech of Americans.

Social media companies have shown a willingness to shut down broad swaths of speech coming from conservatives, as most vividly illustrated in their reaction to speech questioning gender identity ideology.

In January 2021, Twitter locked Focus on the Family out of the Twitter account of its news platform (*The Daily Citizen*) for tweeting:

> On Tuesday, President-elect Joe Biden announced that he had chosen Dr. Rachel Levine to serve as Assistant Secretary for Health at the Department of HHS. Dr. Levine is a transgender woman, that is, a man who believes he is a woman.[32]

The tweet linked to an article on *The Daily Citizen's* website and repeated the first two sentences of that article.[33] Twitter told Focus on the Family that the post violated its "rules against hateful conduct" and "promoted violence, threatened, or harassed" Dr. Levine.[34] So to Twitter, defining the term "transgender woman" using basic biological terms is "hateful," "harassing," and even violent. Twitter denied Focus on the Family's appeal and lifted the ban only after four long months.[35]

The Heritage Foundation, a conservative think tank, also had its gender identity content censored. YouTube removed its video featuring

---

[32]    Gabe Kaminsky, *Twitter Locked Focus on the Family's Account Because the Christian Group Said Boys and Girls Are Different*, THE FEDERALIST (Feb. 22, 2021), https://bit.ly/417qkvB.

[33]    Zachary Mettler, *Biden to Nominate Controversial Transgender Doctor for Assistant Health and Human Services Secretary*, DAILY CITIZEN (Jan. 19, 2021), https://bit.ly/417rEP5.

[34]    Kaminsky, *supra* note 32.

[35]    @TheDailyCitizen, TWITTER (May 18, 2021), https://bit.ly/3UvZOti.

Walt Heyer, a male who once identified as female but who has since "detrasitioned" and now identifies as male. Heyer explained that individuals are "not born transgender," gender dysphoria "is a childhood developmental disorder," and "our schools are complicit" in encouraging children experiencing gender dysphoria to present as the opposite sex.[36] YouTube removed the video, claiming Heyer's remarks violated its "hate speech" policy,[37] and denied Heritage's appeal.[38] That is, "YouTube . . . decided, under the guise of 'hate speech,' to censor the viewpoint that it doesn't like. This won't help children and families struggling with [gender dysphoria] who want information from both sides of the debate."[39]

Facebook similarly banned Robert Gagnon—Professor of New Testament Theology at Houston Baptist University and renowned expert on what the Bible teaches on sexuality—for 24 hours after he criticized the Biden Administration's gender identity executive order for, among other things, violating female military personnel's dignity and privacy by forcing them to shower with men who identify as women.[40] To Facebook, this criticism violated Facebook's policy against "violence and incitement."[41]

---

[36]    Emily Jashinsky, *Exclusive: Man Tried to Share His Regrets About Transgender Life. YouTube Censored It*, THE FEDERALIST (June 19, 2020), https://bit.ly/43w6XxJ.

[37]    *Id.*

[38]    *Id.*

[39]    *Id.*

[40]    Rod Dreher, *The Tyranny of Tech and Trans*, THE AM. CONSERVATIVE (Jan. 27, 2021), https://bit.ly/3zYhynM.

[41]    *Id.*

In each situation, social media companies picked which ideological views they prefer and silenced those with differing views. They have opted for suppression and censorship over dialog and debate.

### 3. The government teaming up with "big tech" to censor speech poses severe and pervasive threats to the free exchange of ideas.

Because social media is the modern public square and is concentrated in a few big companies, it is disturbing that these companies censor mainstream political and religious views. That concern grows exponentially when the government enlists these companies as censors of disfavored views. Allowing this to happen gives government officials *carte blanche* to circumvent the First Amendment.

All signs point to a growing government influence over social media. The Biden Administration admitted as early as 2021 that it was flagging and reporting posts on Facebook, YouTube, and other platforms as Covid-19-related "misinformation."[42] The U.S. State Department sent $330 million to a non-profit that then funded The Global Disinformation Index, a British organization that is attempting to discredit and blacklist many conservative news outlets for peddling "disinformation."[43] Twitter worked with various federal agencies, including the FBI, for years to tar-

---

[42]    David Sacks, *Get Ready for the 'No-Buy' List*, THE FREE PRESS (July 30, 2021), https://bit.ly/3o6on3L.

[43]    Robby Soave, *U.S. State Department Funds a Disinformation Index That Warns Advertisers to Avoid Reason*, REASON (Feb. 14, 2023), https://bit.ly/3o9Y8cL.

get Republican leaders, conservative activists, and certain media outlets.[44]

The danger of social media companies and the government teaming up to censor the speech of everyday Americans presents an existential threat to our ability to have reasoned, unmanipulated discourse. The First Amendment should provide the strongest protection against it.

Sadly, the financial sector is also joining the fray. One of PayPal's founders warned of this when he highlighted how "the ever-increasing list of suspects" whose speech is censored "has grown from unquestionable hate groups, like neo-nazis and the KKK, to organizations who espouse socially conservative views, like the Family Research Council, religious liberty advocates, and even groups concerned with election integrity."[45] Activists are calling on the financial industry to stop donations to these so-called "hate groups."[46] Many financial institutions have started de-banking conservative and religious groups.[47] Worse, the government has often prodded them to do so, as it did in Operation Chokepoint.[48]

[44]    *The Cover Up: Big Tech, the Swamp, and Mainstream Media Coordinated to Censor American's Free Speech*, U.S. HOUSE COMM. ON OVERSIGHT & ACCOUNTABILITY (Feb. 8, 2023), https://bit.ly/3MFJqV6; Joseph A. Wulfsohn, *What Elon Musk's Twitter Files Have Uncovered About the Tech Giant So Far*, FOX NEWS (Jan. 22, 2023), https://fxn.ws/41jtsEs.

[45]    Sacks, *supra* note 42.

[46]    Jeremy Tedesco, *Cancel Culture Targets Charity*, WALL ST. J. (Jan. 18, 2022), https://on.wsj.com/3MFnbyu.

[47]    Viewpoint Diversity Score, *Statement on Debanking and Free Speech*, (Nov. 10, 2022), https://bit.ly/3L0whoA.

[48]    Dennis Shaul, *There's No Downplaying the Impact of Operation Choke Point*, AM. BANKER (Nov. 28, 2018), https://bit.ly/2TYnIxH.

## II.    The government has no business determining which views are right or wrong, let alone which should be silenced.

For far too many—from the heads of government bureaucracies, to scions of business, to agitators in a mob—"[p]ersecution for the expression of opinions seems . . . perfectly logical." *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting). They "have no doubt of [their] premises or [their] power and want a certain result with all [their] heart." *Id.* So they seek to "express [their] wishes in law and sweep away all opposition." *Id.*

That's unconstitutional. "Government . . . does not have the right to determine the truth," ROA.26557, let alone which can be expressed. As Justice Holmes observed over a century ago:

> [W]hen men have realized that time has upset many fighting faiths, they may come to believe even more than they believe the very foundations of their own conduct that the ultimate good desired is better reached by free trade in ideas—that the best test of truth is the power of the thought to get itself accepted in the competition of the market, and that truth is the only ground upon which their wishes safely can be carried out. That at any rate is the theory of our Constitution.

*Abrams*, 250 U.S. 630 (Holmes, J., dissenting). Both history and precedent confirm the wisdom of his observation.

Our history is full of examples of once-dominant opinions being challenged and later discarded thanks to vigorous societal debate. Slavery once held such sway that Congress imposed a gag-order on the subject. The government declared that debate over and the issue settled—until John Quincy Adams defied the gag order, much to our nation's

23

credit and benefit. At one time Congress created a statutory basis for internment camps, President Roosevelt consigned Japanese-Americans to them, and the Supreme Court affirmed these actions. *See Korematsu v. United States*, 323 U.S. 214 (1944). In other words, all three branches of the federal government declared the issue settled. Of course, the "court of history"—thanks to the benefit of unfettered debate in a free society—had a very different verdict. *Trump v. Hawaii*, 138 S. Ct. 2392, 2423 (2018) (noting *Korematsu* "was gravely wrong the day it was decided, has been overruled in the court of history, and . . . has no place in law under the Constitution" (cleaned up)). Racial segregation also once held such societal sway that the Supreme Court affirmed it. *See Plessy v. Ferguson*, 163 U.S. 537 (1896). Yet again, the unfettered debate that is the hallmark of our nation led to this odious notion rightfully being discarded. *See Brown v. Bd. of Educ. of Topeka*, 374 U.S. 483 (1954).

The facts of this case illustrate a similar change in how the government views "facts." Just three years ago, the government declared the idea that Covid-19 leaked from a lab in Wuhan to be dangerous misinformation that needed to be suppressed.[49] Dr. Collins declared it "outrageous," "debunk[ed]," and a "very destructive conspiracy." ROA.15918–21. Dr. Fauci dubbed it a "conspiracy theory" and a "shining . . . object that will go away in time." ROA.26505, 15919. Both tried to suppress it

---

[49]    *E.g.*, Ethan Siegel, *The Wuhan Lab Leak Hypothesis Is a Conspiracy Theory, Not Science*, FORBES (June 3, 2021), https://bit.ly/3GJ34vI.

in both "main stream and social media," with Dr. Fauci describing these efforts as suppressing "the threat of further distortions on social media." ROA.15904–07. The government declared the debate over and the science settled. But it wasn't. The U.S. Department of Energy has now concluded that the lab-leak theory is the most likely explanation for the pandemic.[50]

*Amicus* takes no position on the accuracy of the lab-leak theory. But something a few government officials declared outlandish a few years ago has now been determined credible by a respected government agency. This example illustrates vividly why we refuse to give government officials the power to end debate by silencing views they deem misguided.

Decades of First Amendment precedent confirm that the government has no power to declare certain views "right" by silencing others. Our "constitutional tradition stands against the idea that we need Oceania's Ministry of Truth." *United States v. Alvarez*, 567 U.S. 709, 723 (2012). Sadly, Defendants here sought to create this very monstrosity. *E.g.*, ROA.26529 n.502 ("[CISA] became the 'ministry of truth'"); ROA.26556 ("[T]he government's view . . . became labeled as 'the truth.'"); ROA.26559 ("The CDC became the 'determiner of truth[.]'"); ROA.26608 (noting the government "assumed a role similar to an Orwellian 'Ministry of Truth'"). But under our Constitution, the "remedy for

---

[50]    *E.g.*, Jeremy Herb & Natasha Bertrand, *US Energy Department Assesses Covid-19 Likely Resulted from Lab Leak, Furthering US Intel Divide over Virus Origin*, CNN (Feb. 27, 2023), https://cnn.it/3KI9dJU.

speech that is false is speech that is true. . . . The response to the un-reasoned is the rational; to the uninformed, the enlightened; to the straightout lie, the simple truth." *Alvarez*, 567 U.S. at 727. This "is the ordinary course in a free society" that recognizes that "[f]reedom of speech and thought flows not from the beneficence of the state but from the inalienable rights of the person." *Id.* at 727–28. This includes debates over pandemics and public health measures.

Even in the throes of World War II, the need for national unity bowed to the "fixed star in our constitutional constellation"—that "no of-ficial, high or petty, can prescribe what shall be orthodox in politics, na-tionalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 640–42 (1943). Why? Because we "set up government by the consent of the governed, and the Bill of Rights denies those in power any legal opportunity to coerce that consent. Authority here is to be con-trolled by public opinion, not public opinion by authority." *Id.* at 641. And our Constitution protects the "right to differ as to things that touch the heart of the existing order." *Id.* at 642.

Even in K–12 schools, and more so at universities, "students may not be regarded as closed-circuit recipients of only that which the State chooses to communicate" or of only "those sentiments that are officially approved." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511 (1969); *Keyishian v. Bd. of Regents of Univ. of N.Y.*, 385 U.S. 589, 603

(1967). For "[n]o field of education is so thoroughly comprehended by man that new discoveries cannot yet be made." *Keyishian*, 385 U.S. at 603. Thus, "[t]eachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Id.*

This is also true for the rest of us. We all must remain free to debate issues of national and even international import. And the government has no business casting "a pall of orthodoxy" over those debates, *id.*, including by enlisting the aid of large social media companies.

## CONCLUSION

History shows that government leaders—whether hereditary like King George III, elected like presidents and congressmen, or appointed like judges and heads of bureaucracies—are fallible. That's the nature of the human condition. Hence, we have not given our leaders power to declare which views are true or false, which should be voiced or silenced. Government officials should not be allowed to sidestep these protections by using private-sector actors to do the censoring. This Court should end "arguably the most massive attack against free speech in [our] history," ROA.26572, by affirming the district court's preliminary injunction and rejecting the government's motion to stay it.

Respectfully submitted this the 7th day of August, 2023.

/s/ Travis C. Barham

DAVID A. CORTMAN
TRAVIS C. BARHAM
**ALLIANCE DEFENDING FREEDOM**
1000 Hurricane Shoals Road N.E.,
Ste. D-1100
Lawrenceville, Georgia 30043
Telephone: (770) 339–0774
Facsimile: (770) 339–6744
dcortman@ADFlegal.org
tbarham@ADFlegal.org

BRIAN W. ARABIE
Louisiana Bar No. 27359
**SIGLER ARABIE & CANNON, LLC**
630 Kirby Street (70601)
P.O. Box 1550 (70602)
Lake Charles, Louisiana
Telephone: (337) 439–2033
Facsimile: (337) 439–7837
brian@siglerlaw.com

JAMES A. CAMPBELL
TYSON C. LANGHOFER
**ALLIANCE DEFENDING FREEDOM**
44180 Riverside Parkway
Lansdowne, Virginia 20176
Telephone: (571) 707–4655
Facsimile: (571) 707–4656
jcampbell@ADFlegal.org
tlanghofer@ADFlegal.org

JOHN J. BURSCH
**ALLIANCE DEFENDING FREEDOM**
440 1st Street, NW, Ste. 600
Washington, D.C. 20001
Telephone: (202) 393–8690
Facsimile: (202) 347–3622
jbursch@ADFlegal.org

*Attorneys for Amicus Curiae*

## RULE 32(G)(1) CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of FED. R. APP. P. 32(a)(7)(B) and FED. R. APP. P. 29(a)(5) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f) this document contains 6,456 words according to the word count function of Microsoft Word 365.

2. This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and Fifth Circuit Rule 32.1 and the type-style requirements of FED. R. APP. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in fourteen point Century Schoolbook font.

Respectfully submitted this the 7th day of August, 2023.

*/s/ Travis C. Barham*
TRAVIS C. BARHAM
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Road N.E., Ste. D-1100
Lawrenceville, Georgia 30043
Telephone: (770) 339–0774
Facsimile: (770) 339–6744
tbarham@ADFlegal.org

*Attorney for Amicus Curiae*

Date:  7 August 2023

## CERTIFICATE OF SERVICE

Pursuant to FED. R. APP. P. 31 and Fifth Circuit Rule 31.1, I hereby certify that on August 7, 2023, a digital copy of the foregoing brief was filed electronically with the Court using its electronic filing system, which automatically sends an electronic notification to all attorneys of record. These attorneys of record have waived service of paper copies of the brief and have agreed to be served with an electronic copy only.

Respectfully submitted this the 7th day of August, 2023.

/s/ Travis C. Barham
TRAVIS C. BARHAM
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Road N.E., Ste. D-1100
Lawrenceville, Georgia 30043
Telephone: (770) 339–0774
Facsimile: (770) 339–6744
tbarham@ADFlegal.org

*Attorney for Amicus Curiae*

Date: 7 August 2023

# APPENDIX



# VIEWPOINT DIVERSITY SCORE

## 2022 Business Index

Findings and Recommendations



# Table of Contents

| | |
|---|---|
| **About the Viewpoint Diversity Score Business Index** | **Page 3** |
| **Executive Summary** | **Page 4** |
| **Criteria 1: Market** | **Page 8** |
| Market: Overview | Page 9 |
| Market: Findings and Recommendations 1.1 | Page 10 |
| Market: Findings and Recommendations 1.2 | Page 14 |
| **Criteria 2: Workplace** | **Page 18** |
| Workplace: Overview | Page 19 |
| Workplace: Findings and Recommendations 2.1 | Page 20 |
| Workplace: Findings and Recommendations 2.2 | Page 24 |
| **Criteria 3: Public Square** | **Page 28** |
| Public Square: Overview | Page 29 |
| Public Square: Findings and Recommendations 3.1 | Page 30 |
| Public Square: Findings and Recommendations 3.2 | Page 34 |
| **Appendix** | **Page 37** |
| Rankings Overall | Page 37 |
| Rankings by Industry | Page 40 |

© 2022 Viewpoint Diversity Score. All Rights Reserved.

Appendix 002

# About The Viewpoint Diversity Score Business Index

**Viewpoint Diversity Score** is a project of **Alliance Defending Freedom**, one of the nation's most respected and successful Supreme Court advocates, working to preserve the fundamental freedoms of speech and religion for all Americans. Collaborating is **Inspire Insight**, a Christian financial technology firm informing investment decisions on billions of dollars around the globe.

  

## Viewpoint Diversity Score Advisory Council:
- Andrew Abela, Dean of The Bush School of Business at Catholic University of America
- David Bahnsen, Founder, Managing Partner, and Chief Investment Officer of The Bahnsen Group
- Jerry Bowyer, Forbes contributor, contributing editor of AffluentInvestor.com, and Senior Fellow in Business Economics at The Center for Cultural Leadership
- Bob Doll, Chief Investment Officer for Crossmark Global Investments
- Robert P. George, McCormick Professor of Jurisprudence and Director of the James Madison Program in American Ideals & Institutions, Princeton University
- Matt Monson, Partner and Portfolio Manager at Sovereign's Capital
- Andrew Olivastro, Vice President for Outreach at The Heritage Foundation
- Robert Netzly, CEO of Inspire Investing
- Mike Sharrow, President & CEO for The C12 Group
- John Siverling, Director of Private Markets and Impact Advocacy for OneAscent, and President of OneAscent Capital LLC

## Authors:
- Jeremy Tedesco, Sr. Counsel, SVP of Corporate Engagement
- Daniel Cochrane, Corporate Engagement & Strategic Initiatives Specialist

## Team:
- Georgia-Cline Miller, Research Analyst
- Jay Hobbs, Strategic Campaigns & Initiatives Director
- Bob Pruitt, Sr. Counsel, Corporate Affairs Director
- John Delaney, Corporate Affairs Specialist
- Madeleine Kennedy, Research Analyst
- Hope Turner, Research Intern
- Marina Moreira, Corporate Engagement Program Administrator
- Caroline Roberts, Strategic Communications Writer

Special thanks to the many allies and former team members who provided helpful assistance and advice over the course of this project. Robert Netzly and his team at **Inspire Insight** have been key partners from the beginning, providing counsel and facilitating access to publicly listed companies. Stephanie Holmes at **BrighterSideHR** provided invaluable recommendations on workplace best practices. Christos Makridis provided helpful feedback on research design and scoring. And Keith Zimmerman was a crucial sounding board and researcher during the early stages of this project. Thanks also to Brian Walsh, Josiah Dalke, and Kaitlan Michels for their tireless work conducting research and ensuring the integrity of the evaluation process.

Appendix 003

# Executive Summary



**Jeremy Tedesco**
Senior Counsel, Senior Vice President for Corporate Engagement
**Alliance Defending Freedom**

Viewpoint Diversity Score's annual Business Index is the first comprehensive benchmark designed to measure corporate respect for religious and ideological diversity in the market, workplace, and public square. True diversity requires protecting freedom of expression and belief for employees, customers, shareholders, and other stakeholders. Accordingly, the Business Index evaluates a wide range of corporate policies, practices, and activities to determine whether companies respect these fundamental freedoms as a standard part of doing business.

Respecting everyone, regardless of their religious or ideological beliefs, is good for business and society. Companies that respect viewpoint diversity are better equipped to serve people and communities with diverse values, recruit and retain top talent, build trust with key stakeholders, and contribute to a public culture that supports liberal democracy and open markets.

Many businesses emphasize diversity based on race, gender, ethnicity, and other characteristics, but largely fail to prioritize viewpoint diversity. This is a significant blind spot in Corporate America. To effectively navigate an increasingly complex and polarized social environment, companies need to consider how actions that politicize their services, workplaces, and public advocacy jeopardize their fiduciary interests and harm society. Taking steps to address the most egregious risks highlighted in this report is a good first step to reduce potential harms to business, public trust, and the democratic norms of free speech and religious freedom. But companies should also go further by using the Business Index as a guide to proactively safeguard these fundamental freedoms throughout every aspect of their operations and activities. This isn't just good business sense; it's the right thing for every company to do.

## Index Methodology

The Business Index evaluates companies' social footprints within three categories of activity – **market, workplace**, and **public square** – to determine each firm's score.

 **Market**

The Market section evaluates whether companies' policies and practices respect the freedom of expression and belief of customers, users, sellers, creators, and other external stakeholders.

 **Workplace**

The Workplace section measures corporate respect for freedom of thought and religious diversity in their workforces, and whether companies proactively prohibit religious discrimination.

 **Public Square**

The Public Square section evaluates whether corporate giving practices and public advocacy broadly respect free speech, religious tolerance, and open discourse.

## Data Collection

Data was acquired from two primary sources for this project: First, from voluntary disclosures made by individual companies that participated in Inspire Insight's Viewpoint Diversity Survey in late 2021. Second, from publicly available information, including reports, filings, press releases, third-party statements, terms of service, community standards, and general use policies.

## How Companies were Selected

While viewpoint diversity matters for any company, the Business Index focuses on industries that have the greatest potential to impact free speech and religious freedom. These include industries that provide essential banking, payment processing, and cloud services, or that serve as platforms for third-party expression in the digital space. For the 2022 edition, the index specifically focused on **commercial banks**, as well as providers of **computer software, computers and office equipment, diversified outsourcing services, financial data services**, and **internet services and retailing**.

For the purposes of the 2022 Business Index, only Fortune 1000 companies in specific sectors of concern were considered for inclusion in the rankings. We scored 50 companies for this inaugural edition of the index, but plan to increase that number each year. While we did not proactively score non-Fortune 1000 companies or firms in sectors outside of tech, banking, finance, and business services, companies of various sizes in other sectors may request to participate.

## Findings

Benchmarked companies scored an **average of 12% overall** on respecting religious and ideological diversity in the market, workplace, and public square. This poor performance is cause for concern, especially because these companies represent some of the largest businesses in America and provide essential services to millions of people and organizations every day. While no industry exhibited strong performance, there were a handful that scored particularly poorly. The two industries with the lowest overall scores were **computer software** at **6%**, and **internet services and retailing** at **8%**. The **financial and data services** industry also came in at a low **overall average score of 11%.** These subpar results paint a grim picture of Corporate America's respect for religious and ideological diversity.

> Average overall score across 50 companies
>
> **12%**

6

## Executive Summary

One finding of particular concern is that social media companies, which provide services critical to the freedom of individuals and groups to participate equally in the digital public square, are concentrated in an industry (**internet services and retailing**) with one of the lowest average overall scores. Not surprisingly, nearly all of those companies are also among the lowest performers across industries.



**6%**
Average overall score for **computer software.**

**8%**
Average overall score for **internet services and retailing.**

**11%**
Average overall score for **financial and data services.**

One of the reasons for poor performance on the Business Index was a lack of responsiveness to the Viewpoint Diversity Survey conducted in partnership with Inspire Insight during late 2021. Seventeen questions spanning all three sections of the Business Index were scored solely based on company responses to the survey. Companies that declined to provide substantive responses to the survey earned zero points on those questions. In addition, many other questions were scored partially based on company-provided disclosures. Thus, low response rates to the survey also had a broader, negative impact on companies' performance overall. For the 2022 Business Index, only two out of 50 companies—Paychex and Truist—provided substantive responses. Although neither company earned a particularly high score, both outperformed their peers due to greater transparency.

Low scores also resulted from a significant number of red flags identified in corporate policies and practices. The following highlights the primary factors driving low performance on each section of the Business Index:

### Market

1. Terms of service and content policies that pose serious risks to stakeholders' freedom of expression and belief.

2. Insufficient action to prevent viewpoint discrimination in services, protect vendor freedom, and ensure transparency.

### Workplace

1. A widespread failure to address key risk factors that chill employees' exercise of their civil rights off the job, undermine religious freedom, and create division at work.

2. Insufficient action to proactively ensure that freedom of thought and belief are respected at work

### Public Square

1. Use of company resources to engage in political and social activism damaging to stakeholders' fundamental freedoms and harmful to companies' public reputations.

2. Religious discrimination in charitable giving, as well as a widespread failure to proactively support free speech and religious freedom in the public square.

**Appendix 006**

## Taking Action to Respect Viewpoint Diversity

While the results of the inaugural Business Index are disconcerting, there is cause for some optimism. Several companies demonstrated a particularly strong commitment to viewpoint diversity in specific areas that they and others can build on. For example, Truist affirms that it "respects the constitutional and civil rights of all individuals and the companies they own or represent, including the freedom of speech and freedom of religion" and that it "will not discriminate against any supplier or service provider based upon the exercise of these rights and expects its suppliers and service providers to select subcontractors on a nondiscriminatory basis as well." This language earned Truist full points on respecting supplier and vendor freedom in their hiring and operations. It also exemplifies a crucial way companies can respect the diverse views of their stakeholders—a broader theme that the Business Index seeks to inspire companies to adopt across their enterprises.

More importantly, the Business Index provides a roadmap for companies to better respect customers and other stakeholders who hold a diversity of beliefs, foster viewpoint diversity in their workplaces, and uphold the underlying principles of American democracy through their giving and political engagement. By using this benchmark as a guide for corporate conduct and best practices, companies can build strong cultures and contribute to a healthy society.

Specific model policies and best practices are available at www.ViewpointDiversityScore.org.



Criteria 1:
**Market**

Appendix 008

# **Market**:
## Overview of Findings and Recommendations



Viewpoint diversity is good for businesses and society. Companies that respect the diverse religious and ideological views of their customers, users, sellers, creators, and other external stakeholders[1] are better equipped to serve people and communities with diverse values, build lasting trust, and contribute to a public culture of tolerance and openness. When businesses do their part to respect diverse religious and ideological views, people have greater freedom to voice their beliefs, give back, and participate equally in the marketplace.

Benchmarked companies earned a remarkably low **average score of 8%** on this section, indicating significant shortcomings in terms of their respect for viewpoint diversity. This dramatically low average is mainly due to:

1. Terms of service and content policies that pose **serious risks to stakeholders' freedom of expression and belief.**

2. **Insufficient action to prevent viewpoint discrimination** in services, protect vendor freedom, and ensure transparency.



Benchmarked companies averaged a **failing grade of 8%** on respecting viewpoint diversity in their market-based activities.

---

(1) We collectively refer to this group as "stakeholders" for the purposes of this report.

Appendix 009

Market

# FINDINGS AND RECOMMENDATIONS 1.1
## Companies Should *Avoid* These Key Risk Factors

 **1** **Unclear or imprecise policy terms used to regulate third-party content or access to services.**

Amid growing public concerns with political bias in Corporate America, it's important for companies to avoid even the appearance of religious or ideological discrimination. Despite this social risk, many businesses maintain broad, undefined terms of service and content polices that afford them wide discretion to deny service or censor content for biased, arbitrary, or unknown reasons.

While private businesses are free to establish reasonable requirements for accessing and using their services, it's important to minimize the potential for censorship or discrimination by avoiding vague, sweeping restrictions on third-party speech and conduct. Doing so reduces the risk of unduly burdening expressive freedoms, while also protecting against potential damage to brand trust.

**48%** of companies specify **unclear** or **imprecise** restrictions on expression.

- **32%** prohibit speech deemed **"hateful."**
- **18%** prohibit speech deemed **"intolerant."**
- **18%** prohibit speech deemed **"offensive."**

|  ! **Watch out for** | ✓ **Take action to** |
|---|---|
| **Unclear or imprecise terms** in product and service policies that restrict stakeholders' speech, defined as any term: | ✓ **Identify all policies** that may be used to restrict stakeholders' expression. (E.g., terms of service, content/acceptable use policies, and "social risk" frameworks). |
| ✗ So vague that a person of ordinary intelligence is forced to guess at its meaning.<br>✗ That invites arbitrary or discriminatory enforcement due to a grant of unfettered discretion or lack of objective standards.<br>✗ That fails to narrowly target the specific harmful activity that it is intended to prohibit. | ✓ Eliminate provisions that could be used to condition/restrict use of a product or service based on stakeholders' religious or ideological views, or for unspecified reasons.<br>✓ Ensure that any new terms/policies avoid unclear or imprecise terms. |

See detailed scoring criteria for index [Marketplace question(s) A.1] used to source these findings and recommendations, here.

**Appendix 010**

Market



**2**  **Harmful behavior policies that don't protect everyone or risk discriminating against stakeholders based on their religious or ideological views.**

While companies have an interest in protecting customers against legitimate harms like bullying and harassment when interfacing with their services, they should guard against two common shortcomings: (1) failure to protect everyone from harmful behavior that is a legitimate target of restriction, and (2) risk of enforcement in a manner that undermines stakeholders' freedom of expression.


**26% of companies**
disclose harmful behavior policies that either fail to protect everyone or risk restricting expression.



Harmful behavior policies, like those barring the incitement of violence, should protect everyone. Yet too often companies limit these protections to members of protected groups. Worse, these policies sometimes risk chilling speech by using language that permits the restriction of views based on subjective judgments about whether some members of a protected group may find an idea offensive, hurtful, misguided, or otherwise objectionable. Companies should take a balanced approach that prevents legitimate abuse against everyone while respecting stakeholders' freedom of expression and belief.


**!  Watch out for**

Harmful behavior policies that:

✗  Limit protection against legitimately harmful conduct based on membership in a protected group.
✗  Include unclear and imprecise terms that could treat mere expressions of political, religious, or social views on matters of public concern as "harassing," "hateful," "threatening," "violent," "discriminatory," or otherwise objectionable.

**✓  Take action to**

✓  Identify product and service policies that reference personal identifiers.
✓  Specify that restrictions on legitimately harmful behavior apply equally to everyone, irrespective of their personal traits or identifiers.
✓  Clarify that any restrictions on legitimately harmful behavior will not be used to chill religious or ideological expression. (See Finding 1.2.1).

See detailed scoring criteria for index [Marketplace question(s) A.2] used to source these findings and recommendations, here.



Market

## 3 Restricting content or access to services based on a stakeholder's specific views, opinions, or perspectives.

In order to build and maintain public trust, companies should avoid politicizing their services. Corporations put their reputations at risk when their terms of service and content policies facially prohibit the expression of certain views on topics like climate change, sexuality, and other hot-button issues. This jeopardizes trust and is inconsistent with democratic norms of free speech.

**20%**

At least 20% of companies impose viewpoint-based restrictions on third party speech.

Companies should take steps to rein in terms of service/use and content policies that enable overt viewpoint-based discrimination and censorship.



TERMS AND CONDITIONS



### ! Watch out for

Policies, such as the following, that target expression because of its specific motivating ideology, opinion, or perspective:

- ✗ Prohibiting "[u]nreliable claims… related to politics, social issues, or matters of public concern… [including] claims that contradict authoritative, scientific consensus on climate change."
- ✗ Prohibiting "religious or belief organizations, except when the activities being sponsored are non-sectarian."



### ✓ Take action to

Identify and eliminate all viewpoint-based restrictions on customer/user expression in product and service policies, and:

- ✓ Don't censor or slow the distribution of content deemed "misinformation" or "disinformation."
- ✓ Don't censor or slow the distribution of content that expresses certain views on matters of public concern (e.g., climate change, elections, social issues, religion, etc.).

See detailed scoring criteria for index [Marketplace question(s) A.3] used to source these findings and recommendations, here.

**Appendix 012**



Companies should minimize the
potential for bias and viewpoint-based
discrimination in their terms of service
and content policies.

Appendix 019

Market

# FINDINGS AND RECOMMENDATIONS 1.2
## Companies Should *Implement* These Best Practices

 **1** **Prohibit viewpoint discriminatory barriers to accessing services or sharing content.**

Companies have long recognized the economic, legal, and ethical importance of respecting customers' civil rights by ensuring equal access to products and services irrespective of race, sex, or other immutable characteristics. Such practices are considered hallmarks of responsible business. Yet comparatively few companies protect customers against discrimination based on their religious or idealogical beliefs.

Viewpoint discrimination poses significant risks to companies' brand trust, heightens the potential for blowback from public sector stakeholders, and imperils equal participation in the marketplace and public square. In order to safeguard core business interests and rebuild a public culture of trust and tolerance, companies should proactively commit to respecting viewpoint diversity.



**Only 26%** of companies publicly ban discrimination against customers based on **religion** or **ideology**.

**Take action to**

Implement an Anti-Viewpoint Discrimination Policy that covers all core products and services.

**For Digital Service Providers:**
- ✔ Prohibit discrimination or censorship of any kind based on the viewpoint of the user (whether or not such views are expressed through the service/platform).
- ✔ Clarify that the expression of viewpoints on matters of public concern will not be treated as "discriminatory" or "harmful" even if some people find them offensive.

**For Non-Digital Service Providers:**
- ✔ Prohibit discrimination based on a customer's religious or ideological viewpoints.
- ✔ Clarify that the expression of viewpoints on matters of public concern will not treated as "discriminatory" or "harmful" even if some people find them offensive.

See detailed scoring criteria for index [Marketplace question(s) A.4] used to source these findings and recommendations, here.



**Appendix 014**



Market

## 2 Respect the freedom of vendors, suppliers, and contractors to do business consistent with their values.

Ongoing conversations about race, sexuality, and other controversial issues have prompted many large corporations to require vendors, suppliers, and contractors to take sides in their own workforces, under the banner of "diversity," "equity," and "inclusion" (DE&I).

While it is reasonable to expect third parties to comply with laws and act ethically, mandatory DE&I requirements go too far by forcing stakeholders to embrace a one size fits all approach to politicized social topics that may be incompatible with their diverse values, needs, missions, and philosophies. This top-down approach risks limiting the pool of potential vendors, suppliers, and contractors able to meet the needs of large corporate clients, hinders the equal opportunity of some third-party businesses to compete for corporate contracts, and undermines democratic pluralism in the wider marketplace.

Instead of compelling vendors, suppliers, and contractors to adopt any one particular view or approach to "diversity" in the workforce, companies should respect the freedom of third parties to make these important decisions consistent with their values and cultures.



**0 out of 50** companies confirm a third-party workforce freedom policy.

**30%**

At least 30% of companies impose DE&I requirements on third-party vendors, suppliers, and contractors.

**12%**

Only 12% of companies publicly say they **won't discriminate** against vendors, suppliers, and contractors based on **religion** or **ideology**.



## Take action to

✔ Implement a Third-Party Workforce Freedom Policy that assures vendors, contractors, and suppliers the freedom to determine hiring and employment policies based on their diverse values and cultures consistent with applicable laws.
✔ Prohibit discrimination against vendors, suppliers and contractors on the basis of **religion** or **ideology**.
✔ Discontinue any workplace DE&I requirements for third parties.

See detailed scoring criteria for index [Marketplace question(s) B.1, B.2, B.3] used to source these findings and recommendations, here.

Appendix 015

Market

 **3** **Provide appropriate notice and transparency around decisions to restrict content or access to services.**

## 0 out of 50
companies confirm that they publicly disclose requests by governments or NGOs to restrict content or access to services.

 **38%**

38% of companies provide minimally acceptable notice when service or content is restricted.

Companies overwhelmingly commit to transparency on an increasingly wide array of issues, including environmental stewardship, diversity practices, and supply chain sustainability. But few have made equivalent efforts to disclose internal processes that impact the freedom of individuals and groups to participate in the digital public square and access essential services.

Companies can make significant strides in protecting freedom of expression and building trust with public and private stakeholders by providing notice when restricting service or content.

### Take action to

- ✔ **Provide the following notifications to customers or users within 24 hours of restricting content or access to services:**
  - Notice of any content/service affected.
  - The specific reason for any restriction/ sanction imposed.
  - The duration of the imposed restriction/ sanction.
- ✔ **Publicly disclose any list or database used to restrict certain individuals or groups from posting content or accessing services.**
- ✔ **Publicly disclose any request/ recommendation made by governments or NGOs to restrict content or access to services, including:**
  - The name of any government entity or NGO making such requests/ recommendations.
  - Any action requested.
  - The rationale for any request/ recommendation.
  - The company's response.



See detailed scoring criteria for index [Marketplace question(s) A.5, C.2, C.3, C.4] used to source these findings and recommendations, here.

**Appendix 016**



Companies should provide viewpoint-neutral services to everyone, regardless of their customer's religious or ideological beliefs.



Criteria 2:
# Workplace

Appendix 018

# Workplace:
## Overview of Findings and Recommendations

Strong workplace cultures require a robust commitment to freedom of thought. When businesses cultivate a culture of respect for diverse viewpoints, employees can be themselves, fully contribute, and bring their unique perspectives to the table without fear.



Benchmarked companies averaged a critically low **score of 10%** on this section, demonstrating a significant lack of respect for religious and ideological diversity within their workforces. Companies' dramatic underperformance is largely due to:

1. **A widespread failure to address key risk factors** that chill employees' exercise of their civil rights, undermine religious freedom, and create division at work.

2. **Insufficient action** to proactively ensure that freedom of thought and belief are respected at work.



Benchmarked companies averaged a **failing grade of 10%** on respecting viewpoint diversity in their workforces.

Appendix 019

# FINDINGS AND RECOMMENDATIONS  2.1
## Companies Should *Avoid* These Key Risk Factors



**1** **Workplace conduct or social media policies that could burden employees' lawful exercise of their civil rights off the job.**

**Only 1 out of 50** benchmarked companies confirms that it respects employees' civil rights outside of work.

Respecting the civil rights of all employees is essential to a healthy economy and strong democracy. That's why businesses should avoid placing restrictions on what employees do or say outside the workplace – except where such activity is illegal, violent, or falls within other reasonable limitations.

### Watch out for

✕ Broad, unqualified prohibitions on employees' conduct or expression that may be interpreted to apply outside of work hours. (E.g., "do not make abusive, objectionable, or inflammatory posts.")

### Take action to

✓ Clarify which conduct and speech restrictions apply during work hours, and which apply outside of work.
✓ Ensure that restrictions that apply to employee conduct and expression outside of work are objective and do not exceed these reasonable limitations.
✓ Implement an Off-Duty Civil Rights Policy, affirming that the company respects employees' exercise of their constitutional rights off the job.

See detailed scoring criteria for index [Workplace question(s) B.1] used to source these findings and recommendations, here.

Workplace

 **2**   **Promoting divisive concepts in the workforce.**

Unity in the workforce requires each individual to consciously choose to value others and treat everyone with dignity and respect. Companies undermine trust, respect, and openness in the workplace when they conduct trainings or recommend resources that divide people based on categories, such as race, sex, ideology, and religion.

**At least 78%**
of benchmarked companies promote *divisive concepts* in their workplaces.

### Watch out for

- ✗ Use of "divisive concepts" in  employee training materials.
- ✗ "Divisive concepts" are those that disparage or classify a person or group of persons as superior/inferior, oppressors/ oppressed, unconsciously biased, or inherently discriminatory because of their religion, race, ideology, or sex.

### Take action to

- ✔ Audit all workplace-related trainings, programming, and resources to ensure they are avoiding divisive concepts.
- ✔ Remove resources or avoid training facilitators known to advocate divisive concepts.
- ✔ For recommended diversity training alternatives, see our resources.



See detailed scoring criteria for index [Workplace question(s) B.6] used to source these findings and recommendations, here.

**Appendix 021**



**3**    **Restricting employee-matching gifts to faith-based non-profits because of religious status, practices, or beliefs.**

Workforce matching gift programs are a cornerstone of employee-directed giving to a wide range of charities and causes. However, **40%** of benchmarked companies' matching gift policies prohibit or threaten to prohibit employees from making matching-gift contributions to non-profits based solely on religious status or practices. And at least **34%** restrict or threaten to restrict employee gifts based on charities' faith-based issue advocacy. This overt discrimination restricts charitable choice and forces religious employees to leave their faith at the door when it comes to giving back.



**40%**

40% of companies have policies that exclude or threaten to exclude charities based solely on their religious status or practices.



**34%**

34% of companies have policies that exclude or threaten to exclude charities based on their faith-based issue advocacy.

### Watch out for

Policies that restrict employee-matching gifts to religious charities based on:

✗ Non-profits' religious status.
✗ Charities' use of funds for "religious purposes/uses."
✗ Religious-based employment/hiring practices.
✗ Administering programs and services in accordance with charities' religious values.
✗ Charities' faith-based public advocacy on matters of public concern.

### Take action to

✓ Review all eligibility requirements and participation criteria for employee-matching gift programs and eliminate any restrictions based on religious status, practices, or beliefs.
✓ Ensure that any third-party administrator of your program (e.g., **Benevity**) does not have policies that restrict or risk preventing donations to non-profits based on religious status, practices, or beliefs.
✓ Do not restrict charitable participation based on discriminatory and discredited sources like the Southern Poverty Law Center.
✓ Make sure employees know that their religious beliefs and values are welcome in corporate workforce charity program(s).



**Businesses must address practices** that undermine employees' civil rights off the job, harm their religious freedom, and create disunity.

Appendix 023

Workplace

# FINDINGS AND RECOMMENDATIONS 2.2

## Companies Should *Implement* These Best Practices



**1** **Actively foster workplace environments where people who hold diverse religious and ideological views are valued and respected.**

Trust, openness, and diversity of thought are essential drivers of innovation, engagement, and ethical accountability in every business. Despite this fact, no benchmarked companies disclose any specific policies to promote tolerance for diverse views in their workplaces.



**Take action to**

Adopt a Workplace Viewpoint Diversity Policy affirming that the company:

- ✔ Respects each employee's personal religious and ideological beliefs and will not require employees to affirm or accept any viewpoint.
- ✔ Fosters a workplace culture that values civil disagreement and encourages mutual understanding and respect across ideological and religious differences.
- ✔ Believes that respecting the free exchange of ideas leads to a better, stronger company.

**0 out of 50**
companies confirm that they have a workforce viewpoint diversity policy.

* Workforce Viewpoint Diversity Policy/Statement could be adopted as a stand-alone document, or integrated as a separate section in an existing policy or statement (e.g., code of ethics, human rights policy, DE&I statement, etc.). Standard nondiscrimination policies or EEO statements are NOT equivalent to a Workplace Viewpoint Diversity Policy.

See detailed scoring criteria for index [Workplace question(s) A.1] used to source these findings and recommendations, here.

**Appendix 024**

Workplace

 **Cultivate workplaces that welcome and respect religious diversity.**

Benchmarked companies overwhelmingly commit to celebrating various types of diversity – including, race, sex, sexual orientation, and gender identity – but almost none demonstrate an equivalent commitment to respecting and valuing employees of faith.



**24%**

Only 24% of benchmarked companies indicate that they currently recognize, or would recognize, a faith-based employee resource group.

**4%**

Only 4% of benchmarked companies confirm that they have a written workplace **religious accommodation policy.**

Businesses thrive when employees know that their fundamental beliefs matter and are respected. Many employees consider faith central to their purpose, ethical values, and identity. Yet few benchmarked companies disclose specific steps they have taken to ensure that religious workers can bring their whole selves – including their faith and values – to work.

 **Take action to**

**Permit employees to form religious employee resource groups (ERGs), and ensure that such groups:**
- ✔ May be organized around one or more specific faith traditions (e.g., Christianity, Islam, Hinduism, Sikhism, Judaism, Mormonism, Jehovah's Witness, etc.).
- ✔ Have at least one executive sponsor.
- ✔ Are encouraged to speak into company policies, decisions, and other practices.
- ✔ Are listed on the company's website.
- ✔ Enjoy equal access to all company resources provided to non-religious ERGs.

**Adopt a Workplace Religious Accommodation Policy that includes:**
- ✔ A stated commitment to respect faith diversity in the workplace.
- ✔ A precise definition of "undue hardship."
- ✔ The precise factors considered in determining "undue hardship."
- ✔ General types/examples of religious accommodations offered under the policy.
- ✔ The process for requesting a religious accommodation.

See detailed scoring criteria for index [Workplace question(s) C.1, C.2, C.3, C.4, C.5, C.6] used to source these findings and recommendations, here.



Workplace

**3** **Integrate respect for viewpoint diversity into workforce trainings.**

## Only 2 out of 50
companies confirm that new employee training covers religious discrimination and accommodation policies.

Employee trainings often set the tone for respect and equal treatment in the workplace. That's why it's essential for HR-related resources, instruction, and programming to provide practical guidance on how to respect, trust, and collaborate with others who hold different values and beliefs.

**2%**

Only 2% of companies confirm that their workforce training covers **respect for religious or ideological differences.**



**Take action to**

**Ensure employee training specifies how to respect and learn from:**
- ✔ Different ideological viewpoints.
- ✔ Different religious beliefs and faith traditions.
- ✔ For recommended diversity training alternatives, see resources.

**Require new hires and supervisors to attend training that:**
- ✔ Clearly states that religion is covered by the workplace nondiscrimination policy.
- ✔ Includes specific guidelines/examples for avoiding religious harassment at work.
- ✔ Covers company's religious accommodation policies (and relevant procedures).



See detailed scoring criteria for index [Workplace question(s) C.7, C.8] used to source these findings and recommendations, here.

Appendix 026



Businesses have an opportunity to **foster trust, respect, unity, and excellence** by embracing the **freedom of thought and belief in their workforces.**



Criteria 3:
# Public Square

# Public Square:
## Overview of Findings and Recommendations

Companies aren't just economic actors; many have emerged as social activists on a variety of causes and provide funding and essential services to countless non-profits. Increasingly, however, companies are wielding their political and economic power to enable cancel culture and erode fundamental freedoms, like free speech and religious liberty in the public square. Companies that trade in the suppression of free speech and religious freedom will eventually fall victim to the illiberalism they fund and enable. Complicity in cancel culture is not only harmful to companies' workforces, brand integrity, and bottom lines – it also poses a serious threat to open markets and liberal democracy.

It's time for businesses to recommit to respect the diverse religious and ideological views of their employees, customers, shareholders, and the broader public. Practically, this means avoiding charitable giving and public advocacy that drive narrow political agendas corrosive to free speech and religious freedom. At minimum, corporations should ensure that their activities have no impact on



Benchmarked companies averaged a **failing grade of 21%** on respecting viewpoint diversity in their giving practices and public advocacy.

these fundamental rights. However, beyond a mere commitment to do no harm, businesses should use their unique platforms to work for a society marked by tolerance and civil discourse.

Benchmarked companies earned a remarkably low average score of **21%** on this section, indicating significant shortcomings in ensuring that their giving practices and public advocacy are compatible with the democratic norms of free speech and religious freedom. This dramatically low average is mainly due to:

1. Use of company resources to engage in political and social activism **damaging to stakeholders' fundamental freedoms** and **harmful to companies' public reputations.**

2. Religious discrimination in charitable giving, as well as a widespread **failure to proactively support free speech and religious freedom** in the public square.

**Appendix 029**

Public Square

# FINDINGS AND RECOMMENDATIONS  3.1
## Companies Should *Avoid* These Key Risk Factors

 **1**  **Support for political candidates, legal action, or legislation that would undermine free speech or religious freedom.**

While large corporations once confined political activity to safeguarding their economic interests, many are abandoning this limited scope of engagement in favor of taking stands on a wide array of social issues not germane to their business.

**64% of companies**
supported legislation or legal action to rollback protections for free speech and religious freedom.

**46% of companies**
directed **45%** or more of their political spending to candidates with **negative track records** on respecting fundamental freedoms, while only **10%** directed **30%** or more to candidates with **positive track records.**

This presents a host of new risks for companies that serve, employ, and rely on capital from people and organizations with diverse religious and ideological beliefs. At a minimum, corporate political activism risks alienating employees, customers, shareholders, and other stakeholders. Companies should resist lending support to any action that could undermine protections for the fundamental human rights of free speech and religious freedom.

Practically, this means corporations should avoid using their political clout to threaten these basic freedoms in courts or legislatures.

 **Watch out for**

**Use of corporate resources or advocacy to:**

✗ Direct over 45% of political spending to U.S. Senate or House candidates with negative track records on free speech and religious freedom.
✗ Support laws or litigation that would undermine First Amendment freedoms.
✗ Oppose state-based Religious Freedom Restoration Acts, or similar legislation.

**Take action to**

✔ Balance political giving by avoiding disproportionate support for political candidates with negative track records on respecting fundamental freedoms, and direct at least 30% of contributions to support candidates with positive track records.
✔ Commit to avoid supporting laws or litigation that threaten fundamental freedoms. (See Finding 3.2.2).

See detailed scoring criteria for index [Public Square question(s) A.1, A.2, A.3, A.4] used to source these findings and recommendations, here.

**2** **Use of corporate resources to back or partner with illiberal groups that advocate for censorship, deplatforming, or the rollback of fundamental freedoms.**

**Spotlight:** Risky Causes

**1** **Southern Poverty Law Center**

Labels organizations that hold traditional views on marriage and sexuality "hate groups," and actively seeks to exclude them from essential services and the public square.

**2** **Change the Terms**

Actively pressures internet service providers to broadly restrict speech on their platforms in an arbitrary and ideologically biased manner.

**3** **Human Rights Campaign**

Primary sponsor of legislation that would drastically curtail the freedom of religious people and organizations to live out their beliefs in the public square.

In addition to corporate support for harmful litigation and legislation, these findings raise significant concerns about the number of companies using business resources to support illiberal causes hostile to the values and rights of many stakeholders.



**42% of companies** are publicly known to support illiberal causes.

A growing number of companies are known to financially support or partner with organizations actively working to censor or deplatform users for their expression and rollback legal protections for First Amendment freedoms. This exposes businesses to significant brand and reputational risks, and enables anti-religious bigotry and illiberal suppression of speech.

Businesses should avoid supporting causes or organizations that seek to limit access to information, undermine free speech, or curtail religious freedom

**!** **Watch out for**

✕ Use of company resources to financially support or collaborate with illiberal groups/causes that actively work to undermine freedom of expression and belief.

**✓** **Take action to**

✓ Identify use of corporate resources to fund illiberal causes that burden freedom of expression or belief, and discontinue any current or future support.
✓ Commit to avoid supporting causes that threaten free speech or religious freedom. (See Finding 3.2.2.)

See detailed scoring criteria for index [Public Square question(s) C.2] used to source these findings and recommendations, here.



Public Square

---

  **Restricting corporate charitable contributions to faith-based non-profits because of religious status, practices, or beliefs.**

**24%**

24% of companies have policies that exclude or threaten to exclude charities based on their religious status or practices.

**44%**

44% of companies have policies that exclude or threaten to exclude charities based on their religious advocacy.

Corporate-directed charity is a primary way companies give back to their communities and strengthen civil society. While corporations often use business resources to back secular causes – including those associated with controversial issues – many companies restrict faith-based organizations from accessing grants, funding, and discounted services because of what they believe. This is contrary to true "diversity" which many companies purport to value, undermines their ability to give back to the diverse religious and ideological communities they serve, and imposes a discriminatory barrier that prevents religious charities from accessing resources to provide social services and advocate for justice.

If companies choose to use business resources to engage in charitable giving, they should respect the religious diversity of their stakeholders by making such resources available to non-profits, irrespective of religious status, practices, or advocacy.

| **! Watch out for** | **✓ Take action to** |
|---|---|
| Policies that restrict corporate-directed charitable giving to religious non-profits based on:<br><br>✗ Non-profit's religious status.<br>✗ Charities' use of funds for religious purposes/uses.<br>✗ Religious-based employment/hiring practices.<br>✗ Administering programs and services in accordance with charities' religious values.<br>✗ Charities' faith-based public advocacy. | ✓ Review all eligibility requirements and participation criteria for corporate-directed charitable giving programs and eliminate any restrictions based on religious status, practices, or beliefs.<br>✓ Ensure that any third-party administrator of your program (e.g., Benevity) do not have policies that restrict, or risk banning non-profits' participation based on religious status, practices, or beliefs.<br>✓ Do not restrict charitable participation based on discriminatory and discredited sources like the Southern Poverty Law Center.<br>✓ Make sure that the faith-based charities in the communities you serve know that they are welcome to apply for resources. |

See detailed scoring criteria for index [Public Square question(s) C.3, C.4] used to source these findings and recommendations, here.

**Appendix 032**



Businesses should avoid undermining the freedom of expression or belief in their political engagement and charitable giving.

Appendix 033

Public Square

# FINDINGS AND RECOMMENDATIONS 3.2

## Companies Should *Implement* These Best Practices

 **1**   **Support fundamental freedoms in the marketplace and public square.**



**0 out of 50**
companies disclosed any recent action to publicly support fundamental freedoms.

Many corporations are national and often multinational entities that interface with a multitude of public and private stakeholders, including governments, suppliers, non-profits, and other enterprises. This provides companies with a powerful and unique platform to stand-up for fundamental freedoms integral to both their business success, and the wellbeing of the communities they serve and employ.

Companies already use their brands and influence to advocate on a wide range of issues. Businesses that engage in the public square should lend their voices to protect the fundamental human rights of free speech and religious freedom – both domestically and around the world.

 **Take action to**

Engage in direct advocacy, partner with, or financially support campaigns, organizations, or initiatives working to protect free speech and religious freedom in the U.S. or in other parts of the world. Such actions of support could include:

- ✓ Sponsoring or facilitating research that demonstrates the connection between strong protections for free speech and religious freedom and social/economic wellbeing.
- ✓ Issuing public letters or statements supporting religious freedom in a domestic or international context.
- ✓ Direct engagement with government officials, advocating on behalf of religious minorities, or opposing government restrictions on the freedom of expression.
- ✓ Joining an amicus brief supporting free speech or religious freedom claims under federal or state law in the U.S.
- ✓ Public engagement with colleges and universities to cultivate campus environments that promote viewpoint diversity as a crucial aspect of job-readiness.
- ✓ Providing financial support to one or more organizations that advance free speech or religious freedom as a substantial part of their mission(s).

See detailed scoring criteria for index [Public Square question(s) C.1] used to source these findings and recommendations, here.

**Appendix 034**



Public Square

**2** **Publicly commit to never support advocacy or causes that threaten to undermine free speech or religious freedom.**



With fundamental freedoms at stake, companies should publicly signal their commitment to avoid supporting causes, political engagement, or legal action aimed at curtailing freedom of expression or the exercise of First Amendment rights. This is ethically responsible and makes good business sense for every company – eespecially in core sectors like internet communications, software, banking, and financial services.

Publicly committing to respect the freedom of expression and belief in approaching social and political issues is essential for mitigating risk and operating ethically within an increasingly diverse, pluralistic society.



### Take action to

Pledge to respect freedom of expression and belief throughout corporate advocacy and political engagement, by publicly committing to:

- ✓ Recognize the religious and ideological diversity of stakeholders.
- ✓ Never support any political or legal action that would harm First Amendment freedoms.
- ✓ Never support illiberal causes or organizations hostile to free speech and religious freedom.



See detailed scoring criteria for index [Public Square question(s) A.1, A.2, A.3, A.4] used to source these findings and recommendations, here.



Businesses should use their unique positions to safeguard free speech and religious freedom, which are integral to their success and the wellbeing of the communities they serve and employ.



## Average Scores: All Industries

| **Market**: 8% | **Workplace**: 10% | **Public Square**: 21% | **Overall**: 12% |

**Ranked by Score**

| Company | Sector | Market | Workplace | Public Square | Overall Score |
|---|---|---|---|---|---|
| Paychex | Diversified Outsourcing Services | 20% | 39% | 50% | 35% |
| Truist Financial | Commercial Banks | 15% | 24% | 38% | 24% |
| BOK Financial | Commercial Banks | 13% | 13% | 50% | 20% |
| Fidelity National Information Services | Financial Data Services | 10% | 10% | 50% | 18% |
| First Horizon National | Commercial Banks | 13% | 7% | 50% | 17% |
| Comerica | Commercial Banks | 5% | 15% | 38% | 16% |
| Huntington Bancshares | Commercial Banks | 10% | 12% | 38% | 16% |
| Fifth Third Bancorp | Commercial Banks | 10% | 10% | 38% | 15% |
| JPMorgan Chase | Commercial Banks | 15% | 10% | 25% | 15% |
| M&T Bank | Commercial Banks | 15% | 8% | 25% | 14% |
| Regions Financial | Commercial Banks | 8% | 13% | 25% | 14% |
| Rackspace | Internet Services and Retailing | 13% | 8% | 33% | 14% |
| Bank of New York Mellon | Commercial Banks | 10% | 10% | 25% | 13% |
| Capital One Financial | Commercial Banks | 10% | 15% | 13% | 13% |
| Discover Financial Services | Commercial Banks | 10% | 10% | 25% | 13% |
| Wells Fargo | Commercial Banks | 5% | 13% | 25% | 13% |
| PNC Financial Services Group | Commercial Banks | 5% | 12% | 25% | 12% |
| SVB Financial Group | Commercial Banks | 8% | 10% | 25% | 12% |
| US Bancorp | Commercial Banks | 8% | 10% | 25% | 12% |

**Appendix 037**

*Scores appear as percentages based on the total number of points each company earned out of the total number of points possible.



## 2022 Business Rankings
### All Industries

| Company | Sector | Market | Workplace | Public Square | Overall Score |
|---------|--------|--------|-----------|---------------|---------------|
| First Republic Bank | Commercial Banks | 8% | 8% | 33% | 12% |
| Bread Financial | Financial Data Services | 10% | 8% | 25% | 12% |
| Fiserv | Financial Data Services | 10% | 8% | 25% | 12% |
| Global Payments | Financial Data Services | 10% | 13% | 13% | 12% |
| Zions Bancorp. | Commercial Banks | 10% | 8% | 25% | 12% |
| KeyCorp | Commercial Banks | 5% | 10% | 25% | 11% |
| Visa | Financial Data Services | 8% | 13% | 13% | 11% |
| Western Union | Financial Data Services | 8% | 7% | 33% | 11% |
| Citizens Financial Group | Commercial Banks | 8% | 5% | 25% | 10% |
| State Street | Commercial Banks | 5% | 12% | 13% | 10% |
| Bank of America | Commercial Banks | 8% | 10% | 11% | 10% |
| Goldman Sachs Group | Commercial Banks | 5% | 12% | 11% | 10% |
| Euronet Worldwide | Financial Data Services | 8% | 5% | 33% | 10% |
| Snap, Inc. | Internet Services and Retailing | 0% | 10% | 33% | 10% |
| Mastercard | Financial Data Services | 8% | 10% | 13% | 10% |
| Morgan Stanley | Commercial Banks | 5% | 10% | 13% | 9% |
| Oracle | Computer Software | 5% | 10% | 13% | 9% |
| Block, Inc. | Financial Data Services | 5% | 10% | 17% | 9% |
| Akamai Technologies | Internet Services and Retailing | 5% | 10% | 17% | 9% |
| Alphabet | Internet Services and Retailing | 8% | 13% | 0% | 9% |
| Meta | Internet Services and Retailing | 3% | 12% | 13% | 9% |
| Citigroup | Commercial Banks | 10% | 10% | 0% | 8% |
| Apple | Computers, Office Equipment | 8% | 10% | 0% | 8% |
| PayPal Holdings | Financial Data Services | 5% | 12% | 0% | 7% |

Appendix 038

*Scores appear as percentages based on the total number of points each company earned out of the total number of points possible.



**2022 Business Rankings**
All Industries

| Company | Sector | Market | Workplace | Public Square | Overall Score |
|---|---|---|---|---|---|
| eBay | Internet Services and Retailing | 3% | 7% | 13% | 7% |
| Twitter | Internet Services and Retailing | 8% | 7% | 0% | 6% |
| Amazon.com | Internet Services and Retailing | 3% | 10% | 0% | 6% |
| Adobe | Computer Software | 0% | 5% | 17% | 5% |
| Microsoft | Computer Software | 8% | 5% | 0% | 5% |
| Airbnb, Inc. | Internet Services and Retailing | 0% | 5% | 13% | 5% |
| GoDaddy | Internet Services and Retailing | 5% | 0% | 0% | 2% |

**Appendix 039**

*Scores appear as percentages based on the total number of points each company earned out of the total number of points possible.



**2022 Business Rankings**
Commercial Banks

## Average Scores: Commercial Banks

| **Market**: 9% | **Workplace**: 11% | **Public Square**: 25% | **Overall**: 13% |
|---|---|---|---|

**Ranked by Score**

| Company | Market | Workplace | Public Square | Overall Score |
|---|---|---|---|---|
| Truist Financial | 15% | 24% | 38% | 24% |
| BOK Financial | 13% | 13% | 50% | 20% |
| First Horizon National | 13% | 7% | 50% | 17% |
| Comerica | 5% | 15% | 38% | 16% |
| Huntington Bancshares | 10% | 12% | 38% | 16% |
| Fifth Third Bancorp | 10% | 10% | 38% | 15% |
| JPMorgan Chase | 15% | 10% | 25% | 15% |
| M&T Bank | 15% | 8% | 25% | 14% |
| Regions Financial | 8% | 13% | 25% | 14% |
| Bank of New York Mellon | 10% | 10% | 25% | 13% |
| Capital One Financial | 10% | 15% | 13% | 13% |
| Discover Financial Services | 10% | 10% | 25% | 13% |
| Wells Fargo | 5% | 13% | 25% | 13% |
| PNC Financial Services Group | 5% | 12% | 25% | 12% |
| SVB Financial Group | 8% | 10% | 25% | 12% |
| US Bancorp | 8% | 10% | 25% | 12% |
| First Republic Bank | 8% | 8% | 33% | 12% |
| Zions Bancorp. | 10% | 8% | 25% | 12% |
| KeyCorp | 5% | 10% | 25% | 11% |

**Appendix 040**

*Scores appear as percentages based on the total number of points each company earned out of the total number of points possible.



**2022 Business Rankings**
Commercial Banks

| Company | Market | Workplace | Public Square | Overall Score |
|---|---|---|---|---|
| Citizens Financial Group | 8% | 5% | 25% | 10% |
| State Street | 5% | 12% | 13% | 10% |
| Bank of America | 8% | 10% | 11% | 10% |
| Goldman Sachs Group | 5% | 12% | 11% | 10% |
| Morgan Stanley | 5% | 10% | 13% | 9% |
| Citigroup | 10% | 10% | 0% | 8% |

**Appendix 041**



## Average Scores: Computer Software

| | | | |
|---|---|---|---|
| **Market**: 4% | **Workplace**: 7% | **Public Square**: 9% | **Overall**: 6% |

**Ranked by Score**

| Company | Market | Workplace | Public Square | Overall Score |
|---|---|---|---|---|
| Oracle | 5% | 10% | 13% | 9% |
| Adobe | 0% | 5% | 17% | 5% |
| Microsoft | 8% | 5% | 0% | 5% |

## Average Scores: Computers, Office Equipment

| | | | |
|---|---|---|---|
| **Market**: 8% | **Workplace**: 10% | **Public Square**: 0% | **Overall**: 8% |

**Ranked by Score**

| Company | Market | Workplace | Public Square | Overall Score |
|---|---|---|---|---|
| Apple | 8% | 10% | 0% | 8% |

*Scores appear as percentages based on the total number of points each company earned out of the total number of points possible.

**Appendix 042**



**2022 Business Rankings**
Misc.

## **Average Scores**: Diversified Outsourcing Services

| **Market**: 20% | **Workplace**: 39% | **Public Square**: 50% | **Overall**: 35% |

**Ranked by Score**

| Company | Market | Workplace | Public Square | Overall Score |
|---------|--------|-----------|---------------|---------------|
| Paychex | 20% | 39% | 50% | 35% |

## **Average Scores**: Financial Data Services

| **Market**: 8% | **Workplace**: 10% | **Public Square**: 22% | **Overall**: 11% |

**Ranked by Score**

| Company | Market | Workplace | Public Square | Overall Score |
|---------|--------|-----------|---------------|---------------|
| Fidelity National Information Services | 10% | 10% | 50% | 18% |
| Bread Financial | 10% | 8% | 25% | 12% |
| Fiserv | 10% | 8% | 25% | 12% |
| Global Payments | 10% | 13% | 13% | 12% |
| Visa | 8% | 13% | 13% | 11% |
| Western Union | 8% | 7% | 33% | 11% |
| Euronet Worldwide | 8% | 5% | 33% | 10% |
| Mastercard | 8% | 10% | 13% | 10% |
| Block, Inc. | 5% | 10% | 17% | 9% |
| PayPal Holdings | 5% | 12% | 0% | 7% |

**Appendix 043**



## Average Scores: Internet Services and Retailing

| Market: 5% | Workplace: 8% | Public Square: 11% | Overall: 8% |

**Ranked by Score**

| Company | Market | Workplace | Public Square | Overall Score |
|---|---|---|---|---|
| Rackspace | 13% | 8% | 33% | 14% |
| Snap, Inc. | 0% | 10% | 33% | 10% |
| Akamai Technologies | 5% | 10% | 17% | 9% |
| Alphabet | 8% | 13% | 0% | 9% |
| Meta | 3% | 12% | 13% | 9% |
| eBay | 3% | 7% | 13% | 7% |
| Airbnb, Inc. | 0% | 5% | 13% | 5% |
| Twitter | 8% | 7% | 0% | 6% |
| Amazon.com | 3% | 10% | 0% | 6% |
| GoDaddy | 5% | 0% | 0% | 2% |

*Scores appear as percentages based on the total number of points each company earned out of the total number of points possible.

**Appendix 044**

**Disclaimer:** The information contained in this document is general in nature and is not intended to provide, or be a substitute for, legal analysis, legal advice, or consultation with appropriate legal counsel. You should not act or rely on information contained in this document without seeking appropriate professional advice. By printing and distributing this document, Alliance Defending Freedom, Inc. is not providing legal advice, and the use of this document is not intended to constitute advertising or solicitation and does not create an attorney-client relationship between you and Alliance Defending Freedom or between you and any Alliance Defending Freedom employee.

For additional questions, call Alliance Defending Freedom at (800) 835-5233.

