No. 23-30445

# In the United States Court of Appeals for the Fifth Circuit

STATE OF MISSOURI, ET AL.,

*Plaintiffs-Appellees,*

v.

JOSEPH R. BIDEN, JR., ET AL.,

*Defendants-Appellants.*

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
No. 3:22-cv-1213

**BRIEF OF STATE OF FLORIDA AS
AMICUS CURIAE IN SUPPORT OF APPELLEES
AND AFFIRMANCE**

Office of the Attorney General
PL-01, The Capitol
Tallahassee, FL 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
*henry.whitaker@myfloridalegal.com*

ASHLEY MOODY
  *Attorney General of Florida*

HENRY C. WHITAKER
  *Solicitor General*
DANIEL W. BELL
  *Chief Deputy Solicitor General*
DARRICK W. MONSON
  *Assistant Solicitor General*

# SUPPLEMENTAL STATEMENT OF INTERESTED PARTIES

*Missouri v. Biden*
No. 23-30445

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

Counsel for Amicus Curiae State of Florida:

    Ashley Moody, Attorney General

    Henry C. Whitaker, Solicitor General

    Daniel W. Bell, Chief Deputy Solicitor General

    Darrick W. Monson, Assistant Solicitor General

                        */s/ Henry C. Whitaker*
                          Attorney of record for Amicus
                          Curiae State of Florida

**TABLE OF CONTENTS**

Table of Authorities ................................................................................................ ii

Introduction and Interest of Amicus Curiae ........................................................... 1

Argument ................................................................................................................ 7

    States have standing to assert quasi-sovereign interests against the federal government. ........................................................................................ 7

Conclusion ............................................................................................................ 12

Certificate of Compliance ..................................................................................... 13

Certificate of Service ............................................................................................ 14

# TABLE OF AUTHORITIES

**Cases**

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*,
   458 U.S. 592 (1982) ............................................................................. 7, 8, 9
*Barr v. Am. Ass'n of Pol. Consultants*,
   140 S. Ct. 2335 (2020) ................................................................................ 11
*Biden v. Knight First Amend. Inst. at Columbia Univ.*,
   141 S. Ct. 1220 (2021) .................................................................................. 1
*Gen. Land Off. v. Biden*,
   71 F.4th 264 (5th Cir. 2023) .............................................................. 8, 10, 11
*Haaland v. Brackeen*,
   143 S. Ct. 1609 (2023) .................................................................................. 9
*Kentucky v. Biden*,
   23 F.4th 585 (6th Cir. 2022) ................................................................. 10, 11
*Massachusetts v. EPA*,
   549 U.S. 497 (2007) ........................................................................ 7, 8, 9, 10
*Massachusetts v. Mellon*,
   262 U.S. 447 (1923) ...................................................................................... 9
*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n*,
   475 U.S. 1 (1986) ........................................................................................ 10
*Packingham v. North Carolina*,
   582 U.S. 98 (2017) ........................................................................................ 1
*Terminiello v. Chicago*,
   337 U.S. 1 (1949) ............................................................................... 1, 6, 11
*Texas v. United States*,
   50 F.4th 498 (5th Cir. 2022) .............................................................. 7, 8, 10
*West Virginia v. U.S. Dep't of Treasury*,
   59 F.4th 1124 (11th Cir. 2023) .......................................................... 7, 8, 10

**Statutes**

Fla. Stat. § 106.072 .............................................................................................. 3
Fla. Stat. § 112.23 ................................................................................................ 3
Fla. Stat. § 501.2041 ............................................................................................ 3
Fla. Stat. § 501.701 .............................................................................................. 3
Fla. Stat. § 501.71 ................................................................................................ 3

**Other Authorities**

Eugene Volokh, *Treating Social Media Platforms Like Common Carriers?*, 1 J. Free Speech L. 377 (2021) .............................................. 2
Petition for Writ of Certiorari, *Moody v. NetChoice, LLC*, No. 22-277 (U.S. Sept. 21, 2022) ......................................................... 3
*United States et al. v. Google LLC*, No. 1:20-cv-3010 (D.D.C. Oct. 20, 2020), Doc. 1 .................................... 4
*Utah et al. v. Google LLC et al.*, No. 3:21-cv-5227 (N.D. Cal. July 7, 2021), Doc. 1 ................................. 4
*Texas et al. v. Google LLC*, No. 4:20-cv-957 (E.D. Tex. Mar. 15, 2021), Doc. 77 ............................. 4

**INTRODUCTION AND INTEREST OF AMICUS CURIAE**

Because "it is only through free debate and free exchange of ideas that government remains responsive to the will of the people," *Terminiello v. Chicago*, 337 U.S. 1, 4 (1949), democratic governments require a free marketplace of ideas. Historically, the free exchange of ideas largely occurred in traditional public fora. But in the digital age, much of that exchange has shifted to social-media platforms owned and operated by private companies. *See Packingham v. North Carolina*, 582 U.S. 98, 107 (2017). These platforms have become "the modern public square" and "the principal sources for knowing current events" and "otherwise exploring the vast realms of human thought and knowledge." *Id.*

Control of social media platforms "is highly concentrated," and "this concentration gives some digital platforms enormous control over speech." *Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220, 1221, 1224 (2021) (Thomas, J., concurring). They act as "gatekeeper[s]" of speech and can "greatly narrow a person's information flow" by "suppress[ing] content." *Id.* at 1224–25. Unfortunately, social-media companies have in recent years done exactly that, "using their enormous power to suppress particular views" and "restrict opinions that are well

1

within the American political mainstream." Eugene Volokh, *Treating Social Media Platforms Like Common Carriers?*, 1 J. Free Speech L. 377, 394–95 (2021). Examples include blocking the *New York Post*'s reporting on material discovered on Hunter Biden's abandoned laptop; removing reports that COVID-19 possibly originated in a Chinese lab; blocking a *New York Post* story about a Black Lives Matter co-founder's expensive real-estate purchase; suspending a former Speaker of the U.S. House of Representatives for suggesting that increases in migrants illegally crossing the southern border could lead to additional COVID surges; and removing a video of Florida's governor discussing with scientists the wisdom of requiring children to wear masks. *Id.* at 395–97. Those are just a few examples of practices that have deprived the public of robust debate, and worse—restrained citizens from interacting with, and understanding the views of, their government officials—a critical feature of democratic governance.

That is why Florida has pioneered legislation restricting social-media companies from abusing their power over the marketplace of ideas. That legislation requires social-media platforms to publish the standards they use to determine what content to allow, apply those standards

consistently, and provide notice and a basis before restricting a user's content. Fla. Stat. § 501.2041(2)(a)–(b), (2)(d)1., (3)(c). The law also preserves the free exchange of ideas in Florida by prohibiting companies from deplatforming candidates for public office and journalistic enterprises based on the content of their reporting. *Id.* §§ 106.072(2), 501.2041(2)(j). And although social-media companies have sued Florida to entrench their practices and obtained an injunction preventing enforcement of those laws, Florida has taken the fight to the U.S. Supreme Court. *See* Petition for Writ of Certiorari, *Moody v. NetChoice, LLC*, No. 22-277 (U.S. Sept. 21, 2022).

Since enacting that legislation, Florida has remained at the forefront of protecting free expression from public and private censorship. Just this year, Florida passed additional legislation forbidding state officials from requesting that social-media companies remove user content. Fla. Stat. § 112.23. Florida has also enacted a "Digital Bill of Rights," effective July 1, 2024, which will, among other things, protect consumer rights in personal data collected by tech companies and require search engines to disclose how they prioritize search results, including whether political ideology or partisanship is a factor. *Id.* §§ 501.701, 501.71(1)–(2),

3

(4). In addition to legislative action, Florida has worked with other states and the federal government to bring enforcement suits to protect consumers from tech companies' abuses of their market power. *See, e.g.*, *United States et al. v. Google LLC*, No. 1:20-cv-3010 (D.D.C. Oct. 20, 2020), Doc. 1; *Utah et al. v. Google LLC et al.*, No. 3:21-cv-5227 (N.D. Cal. July 7, 2021), Doc. 1; *Texas et al. v. Google LLC*, No. 4:20-cv-957 (E.D. Tex. Mar. 15, 2021), Doc. 77.

By leading the charge against social-media censorship, Florida has demonstrated its commitment to preserving a robust marketplace of ideas in the digital public square. But this case has revealed that social-media companies are not the only obstacle to that effort. The record here presents an astonishing reality: since taking office, the Biden Administration has secretly engaged in a relentless crusade to meddle in social-media companies' content-moderation practices and suppress views the Administration does not like.

The Administration did so by "partner[ing]" with social-media companies to identify and suppress speech on their platforms. ROA.26469. This "partnership" consisted of Administration officials' regularly contacting social-media companies to identify content the Administration

wanted suppressed. *See* ROA.26463–81. Some of the Administration's disfavored content included parody accounts referencing members of President Joe Biden's family, satirical videos of First Lady Jill Biden that had been "edited for comedic effect," and posts critical or skeptical of COVID-19 vaccines. ROA.26463, 26465, 26479. Content that the Administration deemed "vaccine hesitan[t]" and thus impermissible was not limited to alleged misinformation but included a person's "stating she won't take a vaccine," "true but shocking claims or personal anecdotes," posts "discussing the choice to vaccinate in terms of personal or civil liberties," and posts expressing "mistrust in institutions or individuals." ROA.26470–71.

At the direction of the White House, social-media companies removed some content—like satire related to the President's family—from their platforms entirely. ROA.26463, 26479. At other times, the platforms found it difficult to justify outright removing content that violated none of their standards, so to appease the White House, they instead "demoted" or "de-boost[ed]" such content so that hardly anyone would see it. *See* ROA.26471–72.

White House officials demanded regular reports from social-media companies demonstrating the companies' compliance with the White House's demands. *See* ROA.26470–74. When White House officials felt that the companies failed to adequately censor speech that the Administration did not like, they became increasingly angry and threatened "legal consequences," including a "robust anti-trust program." ROA.26476, 26481.

The findings of the district court reflect a disturbing reality: the United States government has for years sought to control public thought by stifling dissent on social media. That campaign has undermined Florida and other states' efforts to use their sovereign authority to maintain a robust marketplace of ideas in the digital public square. Without the free exchange of ideas, Florida and other states cannot effectively run democratic governments accountable to their citizens. *See Terminiello*, 337 U.S. at 4.

Louisiana and Missouri have well explained why that course of conduct is not only outrageous, but also unlawful. Florida submits this brief to emphasize one discrete, but important, point. Faced with the fact that it has undermined the states' quasi-sovereign interests in maintaining a

free marketplace of ideas, the federal government responds: "So what?" According to the government (at 13), a state never has standing to assert a quasi-sovereign interest against the United States. That position is plainly wrong under both the Supreme Court and this Court's precedents. And Florida has a significant interest in resisting the assertion that states have no recourse when the government runs roughshod over state sovereignty.

## ARGUMENT

**States have standing to assert quasi-sovereign interests against the federal government.**

"States are not normal litigants for the purposes of invoking federal jurisdiction . . . ." *Texas v. United States*, 50 F.4th 498, 514 (5th Cir. 2022) (quoting *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007)). While states sometimes come to court to vindicate proprietary interests like any private litigant, they can also suffer harms to their sovereign or quasi-sovereign interests in their capacity as sovereigns. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601–02 (1982). And although those harms are often intangible, they are "nonetheless concrete" and thus judicially cognizable. *West Virginia v. U.S. Dep't of Treasury*, 59 F.4th 1124, 1136 (11th Cir. 2023).

7

A state's sovereign interests include the enforcement of its laws and the recognition of its borders by other sovereigns. *Snapp*, 458 U.S. at 601. Quasi-sovereign interests include a state's interest "in the well-being of its populace," which allows the state under certain circumstances to institute a *parens patriae* action to vindicate its citizens' rights. *Id.* at 602. Quasi-sovereign interests also include a state's interest in the size and environmental health of its territory, *Massachusetts*, 549 U.S. at 519, and a state's interest in traditional sovereign prerogatives that the states ceded to the federal government by joining the union, *see Texas*, 50 F.4th at 515. For that reason, this Court has held that a state has a quasi-sovereign interest in the federal government's failure to comply with certain immigration laws. *See id.* And a state has quasi-sovereign interests at stake when the federal government impedes the functioning of its government, such as by forcing the state to spend resources or change its laws. *See Gen. Land Off. v. Biden*, 71 F.4th 264, 274 (5th Cir. 2023); *West Virgina*, 59 F.4th at 1136.

The federal government contends (at 13) that states may never assert quasi-sovereign interests in suits against the federal government. That is wrong. States have many quasi-sovereign interests, and the

Supreme Court has held only that one of them—the state's interest in the rights of its citizens—cannot be asserted against the federal government, *Haaland v. Brackeen*, 143 S. Ct. 1609, 1640 (2023) (quoting *Snapp*, 458 U.S. at 610 n.16). That narrow bar exists because states' citizens are also the federal government's citizens. *Massachusetts v. Mellon*, 262 U.S. 447, 485 (1923). Thus, in a dispute between a state and the federal government over their citizens' federal rights, the federal government also has a *parens patriae* interest. *Id.* at 485–86. But states also have other quasi-sovereign interests in their own right, and there is nothing to suggest states may not assert *those* interests against the federal government. After all, when a state seeks redress against the federal government for an independent quasi-sovereign injury, it is vindicating its own rights, and the federal government is not the *parens patriae* of a state.

In *Massachusetts v. EPA*, for example, the Supreme Court held that a state may sue the federal government for unlawfully failing to slow climate change, explaining that the bar to *parens patriae* suits against the federal government *does not* extend to cases where a state asserts a quasi-sovereign interest independent of protecting its citizens' rights. 549 U.S. at 520 n.17. The Supreme Court explained that Massachusetts could

9

assert against the federal government a quasi-sovereign interest in preventing its territory from shrinking because of climate change. *Id.* at 519. Many courts have followed the Supreme Court's lead, allowing states to sue the federal government when they assert a quasi-sovereign interest apart from protecting the rights of their populace. *See Texas*, 50 F.4th at 515 (quasi-sovereign interest in federal government's unlawful immigration policies); *Gen. Land Off.*, 71 F.4th at 274 (quasi-sovereign interest in federal government's failure to allocate funds, forcing state to allocate funds and "alter its laws"); *Kentucky v. Biden*, 23 F.4th 585, 599 (6th Cir. 2022) (quasi-sovereign interest in federal policy overriding state policy in area of traditional state regulation); *West Virginia*, 59 F.4th at 1136 (quasi-sovereign interest in federal government's constraining state's ability to establish preferred tax schemes).

In this case, Missouri and Louisiana sue to vindicate their own quasi-sovereign interests. The First Amendment "serves significant societal interests wholly apart from" citizens' interests in speaking. *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n*, 475 U.S. 1, 8 (1986) (quotation omitted). Indeed, the very "vitality" of governmental "institutions" depends on the open exchange of ideas that the First Amendment guarantees.

*Terminiello*, 337 U.S. at 4. States cannot govern effectively as representative democracies without it. *See Barr v. Am. Ass'n of Pol. Consultants*, 140 S. Ct. 2335, 2358 (2020) (Breyer, J., concurring in the judgment in part and dissenting in part) ("The representative democracy that 'We the People' have created" requires "the free marketplace of ideas . . . ."). By "partnering" with the gatekeepers of the most prolific form of modern communication to suppress the speech of the American people, the Biden Administration harmed the ability of states to govern their citizens through learning their views and exchanging information with them.

Having suffered an injury independent of the harm inflicted on their citizens' right to speak—an injury to their quasi-sovereign interests in operating democratic governments—Missouri and Louisiana have suffered an injury sufficient to establish Article III standing in a suit against the federal government. *See Gen. Land Off.*, 71 F.4th at 274 (federal government impeding the functionality of state government is a cognizable quasi-sovereign interest); *Kentucky*, 23 F.4th at 599 (state can assert a quasi-sovereign injury against the federal government even if the injury "overlap[s] with individual citizens' injuries"). They may vindicate that injury in federal court.

## CONCLUSION

The Court should affirm the preliminary injunction.

Dated: August 7, 2023

Respectfully submitted,

ASHLEY MOODY
  *Attorney General of Florida*

*/s/ Henry C. Whitaker*
HENRY C. WHITAKER
  *Solicitor General*
DANIEL W. BELL
  *Chief Deputy Solicitor General*
DARRICK W. MONSON
  *Assistant Solicitor General*

Office of the Attorney General
The Capitol, PL-01
Tallahassee, Florida 32399
(850) 414-3300
*henry.whitaker@myfloridalegal.com*

*Counsel for Amicus Curiae State of Florida*

# CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limits of Federal Rule of Appellate Procedure 29(a)(5) and Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 2,137 words.

2. This document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

*/s/ Henry C. Whitaker*
Solicitor General

## CERTIFICATE OF SERVICE

I certify that on August 7, 2023, I electronically filed this document with the Clerk of Court using the Court's CM/ECF system, which will send a notice of docketing activity to all parties who are registered through CM/ECF.

*/s/ Henry C. Whitaker*
Solicitor General
