No. 23-30445

## IN THE
# United States Court of Appeals
# for the Fifth Circuit

STATE OF MISSOURI; STATE OF LOUISIANA; AARON KHERIATY; MARTIN
KULLDORFF; JIM HOFT; JAYANTA BHATTACHARYA; JILL HINES,
PLAINTIFFS - APPELLEES

V.

JOSEPH R. BIDEN, JR.; VIVEK H. MURTHY; XAVIER BECERRA;
DEPARTMENT OF HEALTH & HUMAN SERVICES; ANTHONY FAUCI; ET AL.,
DEFENDANTS – APPELLANTS

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF LOUISIANA

## BRIEF *AMICUS CURIAE* OF CENTER FOR AMERICAN LIBERTY
## IN SUPPORT OF AFFIRMANCE FOR APPELLEES

MARK TRAMMELL
JOSH DIXON
CENTER FOR AMERICAN LIBERTY

HARMEET K. DHILLON
KARIN M. SWEIGART
MARK P. MEUSER
DHILLON LAW GROUP, INC.
177 Post Street, Suite 700
San Francisco, CA 94108

ERIC A. SELL
*COUNSEL OF RECORD*
CENTER FOR AMERICAN LIBERTY
1311 SOUTH MAIN ST., STE 207
MOUNT AIRY, MD 21771
ESELL@LIBERTYCENTER.ORG

COUNSEL FOR AMICUS CURIAE CENTER FOR AMERICAN LIBERTY

## SUPPLEMENTAL STATEMENT OF INTEREST

Pursuant to Court Rule 29.2, the undersigned counsel of record for *amicus curiae* certifies that the following additional persons and entities have an interest in the outcome of this case:

1. Center for American Liberty, *amicus curiae. Amicus curiae* is a nonprofit organization recognized as tax exempt under Internal Revenue Code § 501(c)(3). It has no parent corporation and no publicly held corporation owns 10 percent or more of their stock.

2. Eric A. Sell, attorney for *amicus curiae.*

Dated: August 7, 2023

/s/ *Eric A. Sell*
Eric A. Sell
*Counsel for Amicus Curiae*
*Center for American Liberty*

i

# TABLE OF CONTENTS

**Page**

SUPPLEMENTAL STATEMENT OF INTEREST ...................................i

TABLE OF AUTHORITIES.....................................................................iii

IDENTITY AND INTEREST OF AMICUS CURIAE ............................1

SUMMARY OF THE ARGUMENT ..........................................................2

ARGUMENT ...............................................................................................6

    I.    THE GOVERNMENT MAY NOT SIGNIFICANTLY
        ENCOURAGE PRIVATE ACTORS TO CENSOR
        PROTECTED SPEECH .........................................................7

        A.    The Government Speech Doctrine does not
            permit regulation of protected speech. ..........................8

        B.    Significant encouragement transforms
            government speech into government regulation.........12

    II.    THE GOVERNMENT REGULATED PROTECTED
        SPEECH HERE ..................................................................19

CONCLUSION ........................................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Adickes v. S. H. Kress & Co.*,
   398 U.S. 144 (1970) ..................................................................... 12

*Air Line Pilots Ass'n, Intern. v. Dep't of Aviation of City of
   Chicago*,
   45 F.3d 1144 (7th Cir. 1995) ....................................................... 14

*Am. Freedom Def. Initiative v. Suburban Mobility Auth. For
   Reg'l Transp.*,
   978 F.3d 481 (6th Cir. 2020) ....................................................... 10

*Bantam Books, Inc. v. Sullivan*,
   372 U.S. 58 (1963) ......................................................................... 9

*Barrows v. Becerra*,
   24 F.4th 116 (2d Cir. 2022) ......................................................... 22

*Bd. of Regents of Univ. of Wis. Sys. v. Southworth*,
   529 U.S. 217 (2000) ....................................................................... 8

*Blum v. Yaretsky*,
   457 U.S. 991 (1982) .............................................................. *passim*

*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*,
   531 U.S. 288 (2001) ......................................................... 12, 13, 19

*Ciraci v. J.M. Smucker Co.*,
   62 F.4th 278 (6th Cir. 2023) ....................................................... 18

*Cummings v. Missouri*,
   71 U.S. (4 Wall.) 277 (1867) .................................................... 7, 25

*Dennis v. Sparks*,
   449 U.S. 24 (1980) ....................................................................... 12

*Edmonson v. Leesville Concrete Co.*,
   500 U.S. 614 (1991) ..................................................................... 12

*Franz v. United States*,
   707 F.2d 582 (D.C. Cir. 1983) ..................................................... 14

*Gundy v. City of Jacksonville Fla.*,
  50 F.4th 60 (11th Cir. 2022) .......................................................... 7

*Hart v. Facebook, Inc.*,
  No. 22-cv-737-CRB, 2023 WL 3362592 (N.D. Cal. May 9,
  2023), *appeal filed,* No. 23-15858 (9th Cir.) .................................... 6

*Jackson v. Metro. Edison Co.*,
  419 U.S. 345 (1974) ...................................................................... 12

*Janny v. Gamez*,
  8 F.4th 883 (10th Cir. 2021) ......................................... 13, 14, 15, 18

*Johanns v. Livestock Mktg. Ass'n*,
  544 U.S. 550 (2005) ........................................................................ 8

*La. Div. Sons of Confederate. Vet. v. City of Natchitoches*,
  821 F. App'x 317 (5th Cir. 2020) .................................................. 15

*Marsh v. Alabama.*,
  326 U.S. 501 (1946) ...................................................................... 13

*Matal v. Tam*,
  582 U.S. 218 (2017) ..................................................................... 8, 9

*Nat'l Rifle Ass'n of Am. v. Vullo*,
  49 F.4th 700 (2d Cir. 2022), *cert. pending*,
  No. 22-842 (filed on Feb. 7, 2023) ................................................ 17

*NetChoice, L.L.C. v. Paxton*,
  49 F.4th 439 (5th Cir. 2022) .......................................................... 23

*Norwood v. Harrison*,
  413 U.S. 455 (1973) ...................................................................... 24

*O'Handley v. Weber*,
  62 F.4th 1145 (9th Cir. 2023), *cert. pending*,
  No 22-1199 (filed on June 8, 2023) ........................................ *passim*

*Otto v. City of Boca Raton, Fla.*,
  981 F.3d 854 (11th Cir. 2020) ....................................................... 10

*Paige v. Coyer*,
  614 F.3d 273 (6th Cir. 2010) .................................................. 16, 17

*Peltier v. Charter Day Sch., Inc.*,
    37 F.4th 104 (4th Cir. 2022), *cert. denied*,
    No. 22-238, 2023 WL 4163208 (U.S. June 26, 2023) .............. 13, 19

*Pleasant Grove City, Utah v. Summum*,
    555 U.S. 460 (2009) ....................................................... 8, 9

*Reading v. North Hanover Twp., N.J., et al.*,
    No. 1:23-cv-01469-KMW-SAK (D.N.J.)
    (filed March 15, 2023) ..................................................... 6

*Reitman v. Mulkey*,
    387 U.S. 369 (1967) ......................................... 12, 13, 17

*Rust v. Sullivan*,
    500 U.S. 173 (1991) ......................................................... 9

*Sanchez v. Pereira-Castillo*,
    590 F.3d 31 (1st Cir. 2009) ....................................... 14, 18

*Shurtleff v. City of Bos., Massachusetts*,
    142 S. Ct. 1583 (2022) ........................................... *passim*

*Siefert v. Hamilton Cnty.*,
    951 F.3d 753 (6th Cir. 2020) ................................... 14, 18

*Students for Fair Admissions, Inc. v. President & Fellows of
    Harvard Coll.*,
    143 S. Ct. 2141 (2023) ............................................. 7, 26

*United States v. Stein*,
    541 F.3d 130 (2d Cir. 2008) ............................. 14, 15, 16

*VDARE Found. v. City of Colorado Springs*,
    11 F.4th 1151 (10th Cir. 2021) ................................. 16-17

*Walker v. Sons of Confederate Veterans, Inc.*,
    576 U.S. 200 (2015) ................................................... 9, 11

*Wandering Dago, Inc. v. Destito*,
    879 F.3d 20 (2d Cir. 2018).............................................. 10

*Watts v. Northside Indep. Sch. Dist.*,
    37 F.4th 1094 (5th Cir. 2022)............................... 14, 17-18

*Zhou v. Breed,*
    No. 21-15554, 2022 WL 135815 (9th Cir. Jan. 14, 2022) .............. 15

## Statutes & Other Authorities:

U.S. Const. amend. I ...................................................................... *passim*

Fed. R. App. P. 29(a)(4)(E) ........................................................... 1

Internal Revenue Code § 501(c)(3) .............................................. 1

## IDENTITY AND INTEREST OF AMICUS CURIAE

Center for American Liberty ("CAL") is a 501(c)(3) nonprofit law firm dedicated to protecting civil liberties and enforcing constitutional limitations on government power.[1] CAL has represented litigants in state and federal courts across the country and has an interest in ensuring application of the correct legal standard in First Amendment cases.

CAL is also one of plaintiff's counsel in *O'Handley v. Weber*, 62 F.4th 1145, 1158 (9th Cir. 2023), *cert. pending*, No 22-1199 (filed on June 8, 2023), a case involving claims against the state of California that are similar to those here. In *O'Handley*, the Ninth Circuit rejected plaintiff's argument that the state of California "significantly encouraged" Twitter to censor his protected speech on its platform. *Id.* at 1158. The Ninth Circuit reached this conclusion based on its erroneous holding that the government must offer a private party "positive incentives" for that party's conduct to be fairly attributable to the state absent some form of

---

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E), amicus curiae states that no counsel for a party authored this brief in whole or in part, and no party or counsel for a party contributed money intended to fund the preparation or submission of this brief. No person other than amicus curiae, its members, or its counsel contributed money intended to fund the preparation or submission of this brief. The parties have consented to the filing of this brief.

coercion. *Id.* Appellants make the same argument here. *See* Appellants' Br. (ECF No. 60-1) at 25. CAL submits this brief to rebut this incorrect interpretation of the "significant encouragement" test.

CAL urges the Court to affirm the preliminary injunction entered below.

## SUMMARY OF THE ARGUMENT

Government censorship of private speech is one of the core evils the First Amendment was designed to protect against. The thorough opinion and extensive factual findings by the court below make one thing abundantly clear: this evil flourishes. The government censorship efforts laid bare in the record are of startling magnitude. And while Appellants may have acted under the auspices of national interest and public safety, the record plainly shows that silencing constitutionally protected speech was their ultimate objective.

Appellants do not, and cannot, contend otherwise. Instead, they try to pass their conduct off as mere expression of government opinion—as if pressuring social media companies to engage in censorship is constitutionally permissible because it is both necessary for the government to do its job and is an acceptable method of advancing the

President's agenda. But constitutional constraints on government power cannot be brushed aside so easily.

The government speech doctrine is narrow. It only gives state actors breathing room to administer day-to-day government functions and make the government's official position known. It was never intended, as Appellants argue, to be a license for the government to police private speech. When the purpose of the government speech is to abridge private speech, the government is no longer just expressing an opinion or asserting a position. It is instead engaged in regulation of private actors.

The government crosses this line when it "significantly encourages" a social media platform to censor one of its users. In that situation, the government is not merely engaging in a public explication of its position or values, but rather attempting to silence private voices or opinions. Appellants argue that significant encouragement can only occur when the government offers "positive incentives" to the private party who committed the offending action. This cramped view of significant encouragement, based on an overbroad view of the government speech doctrine, would allow unconstitutional conduct to go unchecked.

3

Instead, significant encouragement should be viewed through the proper inquiry for state action: whether the private act can be reasonably attributable to the government. Appellants' conduct satisfies this test:

*First,* the court below found Appellants engaged in regular direct communication with the social media companies that censored Appellees. These communications were extensive, including thousands of emails, phone calls, Zoom meetings, and old-fashioned face-to-face conversations. The primary purpose of it all was to censor certain content, much of which is protected by the First Amendment.

*Second,* Appellants conduct was reasonably likely to induce the social media companies into censoring protected speech, including that of Appellees. When the government defines the guidelines for what should and should not be allowed on a social media platform, it is reasonable to expect that the platform will enforce its guidelines against its users, even if it includes removing protected speech. This is even more probable when, like here, the government was regularly pressuring the platforms to censor the specific content it disliked.

*Third*, the acts underlying the claims in this case were both regulatory and punitive. Appellants intended social media companies

remove certain content and speakers from their platforms—an act directly impacting third parties. By prohibiting certain opinions from the modern public square based on the government's pre-defined criteria, social media-companies are performing a regulatory function for the government. And by removing certain speakers from platforms based on the government's wishes, social media companies served as the government's lackeys.

Appellants' arguments to the contrary are unconvincing. Their contention that the government can only significantly encourage a private actor by offering "positive incentives" would allow a vast amount of government censorship efforts to go unchecked. According to Appellants, so long as the government was not using a stick—which could give rise to state action under the coercion test—or a carrot in the form of "positive incentives," it would be free to encourage, goad, or pressure a private actor to perform unconstitutional acts that the government could never lawfully achieve on its own. Such a result is in plain tension with what the state-action doctrine is designed to protected against.

Government-induced censorship of protected speech is constitutionally suspect in all situations, even when the government

claims it is merely expressing its own opinion. And when the government induces censorship through significant encouragement, it crosses the line from speaking to regulating. Because Appellants did that here, the Court should affirm the injunction entered below.

## ARGUMENT

This case reflects a growing trend of government actors using the pretext of "government speech" as an excuse to regulate and censor private expression online. App.Br. at 20–21. *See also O'Handley*, 62 F.4th 1145, *cert. pending*, No 22-1199 (filed on June 8, 2023), (response requested July 26, 2023) ("Flagging a post that potentially violates a private company's content-moderation . . . is a form of government speech. . . ."); *Hart v. Facebook, Inc.*, No. 22-cv-737-CRB, 2023 WL 3362592 (N.D. Cal. May 9, 2023), *appeal filed,* No. 23-15858 (9th Cir.); *Reading v. North Hanover Twp., N.J., et al.*, No. 1:23-cv-01469-KMW-SAK (D.N.J.) (filed March 15, 2023). Like the government defendants in other cases involving censorship of private online speech, Appellants here claim they are merely communicating the government's opinion when they encourage social media companies to suppress certain content. App.Br. at 21. Whatever label Appellants attach to their conduct, the

ultimate goal is clear: remove disfavored opinions from public discourse. This is quintessential government censorship.

Appellants' argument to the contrary stretches the government speech doctrine well beyond its limits. "The Constitution deals with substance, not shadows, and [its] prohibition[s] [are] levelled at the thing, not the name." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 143 S. Ct. 2141, 2176 (2023) (quotation marks omitted) (quoting *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 325 (1867)). Government speech may not induce a private intermediary to regulate speech protected by the First Amendment. This includes when the government induces censorship by significantly encouraging it, as happened here.

## I.    THE GOVERNMENT MAY NOT SIGNIFICANTLY ENCOURAGE PRIVATE ACTORS TO CENSOR PROTECTED SPEECH

Government defendants routinely raise the "government speech" doctrine as a defense to First Amendment claims. *E.g.,* App.Br. at 21; *O'Handley,* 62 F.4th at 1163 (government communication seeking removal of content on social media website); *Gundy v. City of Jacksonville Fla.*, 50 F.4th 60 (11th Cir. 2022) (pastor's invocation at government

meeting). Indeed, the government's own speech "is exempt from First Amendment scrutiny." *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 553 (2005). But while the government speech doctrine provides some cover for government officials to implement policy and convey the government's position, it may not serve as an excuse to "regulate private expression." *Shurtleff v. City of Bos., Massachusetts*, 142 S. Ct. 1583, 1589 (2022). This prohibition includes significantly encouraging private actors to censor private speech.

### A. The Government Speech Doctrine does not permit regulation of protected speech.

The government speech doctrine reflects an understanding that, to function properly, the government must adopt and express positions on a wide array of issues. *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 468 (2009); *see also Matal v. Tam*, 582 U.S. 218, 234 (2017) ("The Free Speech Clause does not require government to maintain viewpoint neutrality when its officers and employees speak about [government programs]."). The government must have some latitude to "speak for itself," even when private citizens may find its opinions controversial. *Bd. of Regents of Univ. of Wis. Sys. v. Southworth,* 529 U.S. 217, 229 (2000).

Since its inception, however, the doctrine has been used sparingly, *Tam*, 582 U.S. at 235 (observing the government speech doctrine "is susceptible to dangerous misuse"), and almost exclusively as a shield against liability for First Amendment violations committed during the administration of routine government functions. The Supreme Court's government-speech cases illustrate this point, as they focus on protecting the government from claims of viewpoint discrimination based on things like how the government chooses to appropriate funds, *Rust v. Sullivan*, 500 U.S. 173, 178–83 (1991), which official monuments and statues the government chooses to display on its property, *Summum*, 555 U.S. at 467, and governmental expression on specialty license plates, *Walker v. Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 208 (2015). Underlying each of these cases is the general understanding that "the government must be able to 'promote a program' or 'espouse a policy' in order to function." *Shurtleff*, 142 S. Ct. at 1587 (quoting *Walker*, 576 U.S. at 208)).

But "government speech" has its limits. While the government may advocate for its policy preferences, it may not use its own speech to indirectly regulate *private speech* that it could not regulate directly. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963) (holding government

9

may not influence distribution of books by private booksellers); *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018) (observing "government speech" is often more "properly characterized as viewpoint-based regulation of private speech"); *Am. Freedom Def. Initiative v. Suburban Mobility Auth. For Reg'l Transp.*, 978 F.3d 481, 489 (6th Cir. 2020) ("The Supreme Court has long followed different rules for state actions that merely fail to promote speech as compared to those that affirmatively regulate it.") (emphasis deleted); The "real question in government-speech cases [is often] whether the government is speaking instead of regulating private expression." *Shurtleff*, 142 S. Ct. at 1595 (Alito, J. concurring); *see also Otto v. City of Boca Raton, Fla.*, 981 F.3d 854, 864 (11th Cir. 2020) (holding the government speech doctrine does not shield against claims based on "bias, censorship or preference regarding [another] speaker's point of view") (citation omitted).

The Supreme Court has yet to announce a definitive test to determine when government speech becomes government regulation. *Shurtleff*, 142 S. Ct. at 1589 ("Our review [for government speech] is not mechanical; it is driven by a case's context rather than the rote application of rigid factors."). One important factor, however, is the

"identity of the speaker." *Id.* at 1595–96 (Alito, J., concurring); *see also id.* at 1589 (identifying "the public's likely perception as to who (the government or a private person) is speaking"). The key question is "whether the government is actually expressing its own views" or whether it is surreptitiously "regulat[ing the] private speech" of others. *Id.* (Alito, J., concurring). And if the government actor relies "on a means that abridges private speech" when conveying a governmental opinion, the government speech turns into regulation. *Id.* at 1598 (Alito, J., concurring). In that situation, the real speaker is a private party the government has censored, not the government, and the "government speech" is really the "regulation of private speech." *Id.* at 1596 (Alito, J. concurring).

If government speech merely advocates for an official position, view, or value, it is not subject to First Amendment scrutiny. *Walker*, 576 U.S. at 208. But if it is intended to silence or suppress private speech, it is regulation, and the government speech doctrine has no application. Such regulation—like any other—triggers First Amendment scrutiny.

## B. Significant encouragement transforms government speech into government regulation.

The government regulates speech when it significantly encourages a private actor to engage in censorship. *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982). Like coercive conduct, significant encouragement by the government renders it responsible for the otherwise private regulatory acts. *Reitman v. Mulkey*, 387 U.S. 369, 375 (1967) (holding "prohibited state involvement could be found even where the state can be charged with only encouraging, rather than commanding") (cleaned up).

A constitutional violation generally requires some form of state action. *See Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001). Despite this requirement, the Supreme Court's description of what constitutes state action has "not been a model of consistency." *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 632 (1991) (O'Connor, J., dissenting).

The Supreme Court recognizes various "tests" to help determine whether state action exists. *See, e.g., Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982) (significant encouragement); *Dennis v. Sparks*, 449 U.S. 24, 27 (1980) (joint action); *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974) (nexus); *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 171 (1970)

(compulsion); *Marsh v. Alabama.,* 326 U.S. 501, 507 (1946) (public function). But "each test really gets at the same issue," *Janny v. Gamez,* 8 F.4th 883, 919 (10th Cir. 2021)—namely, whether the offending action can be "fairly attributable" to the government, *Brentwood Acad.*, 531 U.S. at 295. Failure to satisfy one of the "tests" does not preclude finding state action so long as the "fairly attributable" standard is met. *Id.*

Under the significant encouragement test, private action can be attributable to the government when the government "provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Blum*, 457 U.S. at 1004. Government conduct can satisfy this test even if it is not "threatening" or "coercive" in nature. *See id.* (describing coercion test and significant encouragement test in disjunctive)*; see also Reitman*, 387 U.S. at 381 (holding state constitutional amendment was state action because it "significantly encourage[d] and involve[d] the State in private discriminations"); *Peltier v. Charter Day Sch., Inc.*, 37 F.4th 104, 115 n.11 (4th Cir. 2022) (*en banc*) (Milano Keenan, J, concurring), *cert. denied*, No. 22-238, 2023 WL 4163208 (U.S. June 26, 2023) ("[A] state's exercise of

coercive power or compulsion is not a requirement for a finding of state action.").[2]

The Supreme Court has yet to identify definitive factors for significant encouragement. But this test is well-recognized among the circuits, including this one. *Watts v. Northside Indep. Sch. Dist.*, 37 F.4th 1094, 1097–1098 (5th Cir. 2022); *see also Janny*, 8 F.4th 883, 926; *Siefert v. Hamilton Cnty.*, 951 F.3d 753, 760 (6th Cir. 2020); *Sanchez v. Pereira-Castillo*, 590 F.3d 31, 52 (1st Cir. 2009); *United States v. Stein*, 541 F.3d 130, 147 (2d Cir. 2008); *Air Line Pilots Ass'n, Intern. v. Dep't of Aviation of City of Chicago*, 45 F.3d 1144, 1150 (7th Cir. 1995); *Franz v. United States*, 707 F.2d 582, 592 (D.C. Cir. 1983). These cases recognize that, under the significant encouragement test, the government can be liable for a private actor's conduct when (1) the government directly expressed to the private party a desire that the private party take some action; (2) the circumstances surrounding the communication are such that it was

---

[2] The Circuits are split on whether the "significant encouragement" test is best viewed under the rubric of the compulsion test or the nexus test. *Compare Sanchez v. Pereira-Castillo*, 590 F.3d 31, 52 (1st Cir. 2009) (compulsion) with *United States v. Stein*, 541 F.3d 130, 147 (2d Cir. 2008) (nexus). This dispute is mere semantics. Either way, the inquiry is the same: did the government induce the private actor to commit the offending action through significant encouragement?

reasonably likely the communication would induce the private party to commit the offending action; and (3) the offending action is regulatory or punitive in nature.

**1.** For the government to "significantly encourage" a private actor, there must first be some direct communication between the two parties in which the government expresses the desire that the private actor take some action. The communication can take many forms. *See, e.g., La. Div. Sons of Confederate. Vet. V. City of Natchitoches*, 821 F. App'x 317, 322 (5th Cir. 2020) (Elrod J., concurring) (letter from city mayor); *Stein*, 541 F.3d at 147 (memo from U.S. Attorney's office); *Janny*, 8 F.4th at 926 (spoken communication between parole officer and head of private rehabilitation group). For purposes of this test, there is no direct communication when the government exclusively makes *public* comments expressing a desire that a private actor take some action, even if those public comments prompt the private actor to take the offending conduct. *Zhou v. Breed,* No. 21-15554, 2022 WL 135815, *1 (9th Cir. Jan. 14, 2022) (holding no state action when "public officials criticized a billboard or called for its removal").

**2.** Next, the circumstances surrounding the governmental communication must be such that it was reasonably likely the communication would induce the private party to commit "the specific conduct of which the plaintiff complains." *Blum*, 457 U.S. at 1004; *see also Paige v. Coyer*, 614 F.3d 273, 280 (6th Cir. 2010) (holding government actor may be liable if private conduct was "reasonably foreseeable consequence" of government action). This factor is assessed on a case-by-case basis and can include the content of the communication, the authority of the person making the communication, the regularity of the communication, the circumstances under which the communication was made, and other facts relevant to inducement. *See, e.g., Stein*, 541 F.3d at 148 (holding significant encouragement occurred when the government "knew full well" that its conduct would induce the private party to commit the offending action).

In evaluating this factor, it is important to remember that "[m]ere [government] approval of or acquiescence in the initiatives of a private party is not sufficient." *Blum*, 457 U.S. 1004 (citation omitted). Nor will it usually be enough for the government to merely express a desire or hope that the private actor commit the action. *See VDARE Found. V. City*

*of Colorado Springs*, 11 F.4th 1151, 1164 (10th Cir. 2021 (holding that letter from mayor expressly disclaiming any regulatory authority was not significant encouragement).

Some courts have suggested that communications by government actors may only give rise to liability when they cross the line between "an attempt to *convince* and an attempt to *coerce.*" *Nat'l Rifle Ass'n of Am. v. Vullo*, 49 F.4th 700, 717 (2d Cir. 2022) (emphases added), *cert. pending*, No. 22-842 (filed on Feb. 7, 2023); *see also O'Handley*, 62 F.4th at 1163 (drawing distinction between governmental "coercion and persuasion"). This approach, however, impermissibly collapses the significant encouragement test into the coercion test, which the Supreme Court has explicitly recognized as a separate test for state action. *Blum*, 457 U.S. at 1004; *Reitman*, 387 U.S. at 375. And under the significant encouragement test, efforts to convince may give rise to state action so long as they are of the type that are reasonably likely to induce the offending act. *Paige*, 614 F.3d at 280.

**3.** Finally, the offending act induced by the government must be one that is regulatory or punitive in nature. This means the private actor must direct its conduct toward a third party. *See, e.g., Watts*, 37 F.4th at

1097-1098 (football coach ordering players to tackle referee); *Sanchez,* 590 F.3d at 52 (corrections officers encouraging doctor to perform procedure); *Janny,* 8 F.4th at 925–26 (parole officer encouraging private program to enroll parolee). It is not enough for the government to induce a private party to engage in conduct that directly affects only the party itself. For example, encouragement from the government for the private party to adopt a corporate energy efficiency policy would not constitute significant encouragement for purposes of a state action analysis. While such a policy may have some *impact* on third parties, it is not *directed at* third parties in a way that regulates their activity or penalizes them for engaging in it. *Ciraci v. J.M. Smucker Co.*, 62 F.4th 278, 284 (6th Cir. 2023) (concluding private company that adopted federally mandated employee vaccination requirement did not engage in state action where there was no allegation that the government induced the company to deny plaintiffs' request for a religious accommodation). Unless the government is inducing the private party to direct conduct toward a third party, the conduct at issue cannot be considered indirect regulation by the government. *See., e.g., Siefert,* 951 F.3d at 760 (encouraging hospital not to release minor patent).

Each state-action inquiry will require its own fact-bound analysis. *Brentwood Acad.*, 531 U.S. at 932. The three factors discussed above distinguish legitimate government speech from impermissible government regulation, which can result from significant encouragement even when there is no indication of government threats or other forms of coercion. *Peltier*, 37 F.4th at 115.

## II.    THE GOVERNMENT REGULATED PROTECTED SPEECH HERE

Setting aside the numerous examples of Appellants' *coercive* conduct, the federal actors here engaged in a sustained campaign to *encourage* social media companies to silence protected speech. ROA.26463–26540. Appellants cast their conduct as mere expression of the federal government's position, which, they claim, is necessary to administrator the day-to-day functions of government and advance the President's policy agenda. App.Br. at 21, 25. But while expressing government opinion, Appellants relied "on a means that abridges private speech" to advance their goals. *Shurtleff*, 142 S. Ct. at 1598. Appellants therefore crossed the line separating speaking from regulating by significantly encouraging private social media companies to censor protected speech—including that of Appellees. *Id.*

*First,* Appellants engaged in substantial direct communications—over months and years—with social media companies, repeatedly requesting that they engage in censorship and take other measures to combat the dissemination of "disinformation." *See, e.g.,* ROA.26554 ("White House Defendants constantly 'flagged' for Facebook and other social media platforms posts the White House Defendants considered misinformation."); ROA.26554 ("The White House scheduled numerous Zoom and in-person meetings with social-media officials to keep each other informed about the companies' efforts to suppress disinformation."); ROA.26556 ("Numerous calls and meetings took place between Surgeon General Defendants and private social media companies.").

*Second*, the circumstances surrounding the governmental communications are such that it was reasonably likely they would induce social media and other tech companies to commit the actions they did. The communications at issue are far more sustained than a mere passing comment or series of public statements. ROA.26549 ("As exhaustedly listed [in the injunction opinion], Defendants 'significantly encouraged' the social-media companies to such extent that the decision should be

deemed to be the decisions of the Government."). They included meetings between high-ranking government officials and social media executives and engineers in which social media companies were pressured to "do more." *E.g.,* ROA.26556 ("[Surgeon General] Advisory publicly called on social-media companies 'to do more' against COVID misinformation Superspreaders.") And they included a barrage of behind-the-scenes requests from powerful government officials, including requests to censor specific content. ROA.26549–26569.

The substantial fact findings by the court below makes clear that the government intended private actors to take the specific act of censoring protected speech on their platforms. ROA.26549–26569. Obtaining the removal of disfavored opinions from social media platforms was the *primary reason* for Appellants' regular communication with the social media companies. *E.g.,* ROA.26568 ("In partnership with these non-governmental organizations, the State Department Defendants flagged and reported postings of protected free speech to the social-media companies for suppression."). The federal actors were aware of the substantial influence they had over social media companies to combat "misinformation." *E.g.,* ROA.26559 ("By telling social-media companies

that posted content was false, the CDC Defendants knew the social-media company was going to suppress the posted content."); ROA.26562 ("Through meetings, emails, and in-person contacts, the FBI intrinsically involved itself in requesting social-media companies to take action regarding content the FBI considered to be misinformation."). And these communications triggered the offending conduct complained of here, including the changing of social media company guidelines, the removal of specific posts or categories of posts, and the banning of specific speakers. ROA.26549–26569.

It does not matter that the government did not always target specific speakers when it encouraged social media companies to censor users. *See, e.g., Barrows v. Becerra*, 24 F.4th 116, 139 (2d Cir. 2022) (state action that affected Medicaid recipients generally.) The objective was the censorship that the government could not achieve directly, which is the precise conduct that caused Appellees' harm.

*Third,* the actions complained of by Appellees were regulatory and punitive in nature. The overall objective driving Appellants' communication with social media companies was censorship of third-party speech and removal of certain speakers from these platforms. The

government was inducing private actors into performing these regulatory and punitive functions for it. ROA.26559 ("The CDC became the 'determiner of truth' for social-media platforms, deciding whether COVID-19 statements made on social media were true or false."); ROA.26564 (observing Appellant CISA "apparently encouraged and pressured social-media companies to change their content-moderation policies and flag disfavored content"); ROA.26568 ("The State Department Defendants and CISA Defendants both partnered with organizations whose goals were to 'get around' First Amendment issues."); ROA.26564 ("[T]he evidence shows that the CISA Defendants met with social-media companies to both inform and pressure them to censor content protected by the First Amendment."). Censoring speech on a specific platform based on its failure to conform with certain standards or criteria is fundamentally "regulatory" in nature. And the platforms' removal of specific speakers for expressing disfavored opinions is punitive in nature. *See NetChoice, L.L.C. v. Paxton*, 49 F.4th 439, 445 (5th Cir. 2022) (discussing punitive nature of social media de-platforming). Appellants' plain regulatory objective shows that this was more than government speech.

Appellants' arguments contort the significant encouragement test to suit their aims, asserting it only applies in situations where the government offers "positive incentives." App.Br. at 25 (quoting *O'Handley,* 62 F.4th at 1157–58). In their view, "legitimate attempts to convince" are, in all cases, merely government speech that cannot trigger First Amendment scrutiny. *Id.* at 23.

But this formulation of significant encouragement allows the government to engage in unfettered regulation of private speech so long as a private actor is the direct censor. If the government is not acting in a coercive manner or does not offer the private party "positive incentives," the government can effectively "induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish." *Norwood v. Harrison*, 413 U.S. 455, 465 (1973). This view of significant encouragement would create a gap in the state-action doctrine where the government would be free to pressure or "convince" private parties to do its bidding with no fear of consequence. Private speakers who are victims of the government's regulatory efforts would enjoy no constitutional protection absent any coercive or threatening conduct by the government. Such obfuscation of the state action doctrine allows the

24

government's unconstitutional conduct to hide in the "shadows." *Cummings*, 71 U.S. (4 Wall.) at 325.

Indeed, it is worth noting that, in *O'Handley*, the Ninth Circuit did not cite a single case in support of its pronouncement that significant encouragement requires the existence of "positive incentives." 62 F.4th at 1158. The state of California created an entire agency with the sole purpose of monitoring online speech, and yet the Ninth Circuit still resisted the obvious: this was constitutionally impermissible regulation of protected speech. *O'Handley v. Weber, cert. pending*, No 22-1199, Pet. at 31 ("The Ninth Circuit's decision is a blueprint for state officials who wish to suppress or retaliate against views they disfavor.").

The parade of horribles Appellants caution against are strawmen. Under the formulation of significant encouragement discussed in this brief, government actors would not be prohibited from publicly "denounc[ing] a particular book and chastis[ing] Amazon for 'peddling misinformation about COVID-19 vaccines and treatments.'" App.Br. at 23–24. Nor would the president be precluded generally from using the "'bully pulpit' to seek to persuade Americans, and American companies, to act in ways that in the President's view advance the public interest."

*Id.* at 20. Instead, only direct communication from the government to private actors with the intent to induce censorship would be prohibited. Absent a regulatory or punitive objective, no "significant encouragement" can occur.

Appellants cannot hide behind the pretext of "government speech" to indirectly accomplish something that they could not accomplish directly. *See Students for Fair Admissions, Inc.*, 143 S. Ct. at 2176. And speech by government actors becomes regulation of speech when it turns into "significant encouragement." *Blum*, 457 U.S. at 1004. Appellants repeatedly crossed this line here by inducing censorship. The government's conduct was impermissible regulation of speech, plain and simple.

# CONCLUSION

The District Court correctly observed that if "there were ever a case where the 'significant encouragement' theory should apply, this is it." ROA.26548. This Court should affirm the District Court's grant of a preliminary injunction.

Respectfully submitted,

By: /s/ Eric A. Sell
    *Counsel of Record*
CENTER FOR AMERICAN LIBERTY
1311 S. Main Street, Suite 207
Mount Airy, MD 21771
Esell@LibertyCenter.org

MARK TRAMMELL
JOSH DIXON
CENTER FOR AMERICAN LIBERTY
1311 S. Main Street, Suite 207
Mount Airy, Md 21771

HARMEET K. DHILLON
KARIN M. SWEIGART
MARK P. MEUSER
DHILLON LAW GROUP, INC.
177 Post Street, Suite 700
San Francisco, CA 94108

*Attorneys for Amicus Curiae*
*Center for American Liberty*

August 7, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on August 7, 2023, a true and correct copy of the foregoing **Brief *Amicus Curiae*** were served via electronic filing with the Clerk of Court and all registered ECF users.

Upon acceptance by the Court of the e-filed document, 7 paper copies will be filed with the Court within the time provided in the Court's rules via Federal Express.

Dated: August 7, 2023                    By: /s/ Eric A. Sell
                                                    *Counsel of Record*

## CERTIFICATE OF COMPLIANCE

This brief has been prepared using 14-point, proportionately spaced, serif typeface, in Microsoft Word.  Excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), this brief contains 4,929 words.

By: /s/ Eric A. Sell
*Counsel of Record*