**No. 23-30445**

In the United States Court of Appeals for the Fifth Circuit

STATE OF MISSOURI; STATE OF LOUISIANA, AARON KHERIATY; MARTIN KULLDORFF; JIM HOFT; JAYANTA BHATTACHARYA; JILL HINES,

Plaintiffs – Appellees,

*v.*

JOSEPH R. BIDEN, JR.; VIVEK H. MURTHY; XAVIER BECERRA; DEPARTMENT OF HEALTH & HUMAN SERVICES; ANTHONY FAUCI; ET AL.,

Defendants – Appellants.

———————————

On Appeal from the United States District Court
For the Northern Western District of Louisiana (No. 3:22-cv-1213)
The Honorable Terry A. Doughty, Chief Judge

———————————

**BRIEF OF ANGELA READING AS *AMICA CURIAE* IN SUPPORT OF APPELLEES AND AFFIRMANCE**

———————————

Thomas Brejcha
Christopher A. Ferrara
Michael G. McHale[†]
B. Tyler Brooks
THOMAS MORE SOCIETY
309 W. Washington Street
Suite 1250
Chicago, IL 60606
Telephone: (336) 707-8855

Date: August 7, 2023

Adam S. Hoschild[†]
Hochschild Law Firm, LLC
THOMAS MORE SOCIETY – Special Counsel
P.O. Box 401
Plainfield, VT 05667
Telephone: (314) 503-0326
adam@hochschildlaw.com

[†] *application for admission forthcoming.*

*Counsel for Amica Curiae*

## SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS

*State of Missouri et al. v. Joseph R. Biden, Jr. et al.*
Case No. 23-30445

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. Pursuant to 5th Cir. R. 29.2, the undersigned counsel of record hereby certifies these persons and entities, in addition to the persons and entities listed in the Certificates of Interested Persons filed to date by the parties and *amici*, which are incorporated herein by reference; thus, the following additional listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

ANGELA READING – AMICA CURIAE
    Counsel for *Amica Curiae* Angela Reading
    THOMAS MORE SOCIETY
        Thomas Brejcha
        Christopher A. Ferrara
        Michael McHale
        B. Tyler Brooks
    HOCHSCHILD LAW FIRM, LLC
        Adam S. Hochschild

In accordance with Federal Rule of Appellate Procedure 26.1, *amica curiae* states that she is an individual, natural person; thus, she is not a publicly traded entity, she has no parent corporations, and necessarily no public traded company owns 10% or more of *amica*.

Date: August 7, 2023                    /s/Christopher A. Ferrara
                                        *Counsel for Amica Curiae*
                                        *Angela Reading*

# TABLE OF CONTENTS

SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS........ i

TABLE OF AUTHORITIES ...................................................... v

INTEREST OF *AMICA CURIAE* ............................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................... 3

ARGUMENT ...................................................... 8

I.   **MRS. READING'S EXPERIENCE SHOWS THE READINESS AND ABILITY OF GOVERNMENT ACTORS TO CENSOR AS WELL AS THE REAL AND LASTING HARM THAT RESULTS FROM GOVERNMENT CENSORSHIP** .............................. 8

    A. **Federal and State Government Actors Targeted Mrs. Reading's Protected Speech** ..................…................. 8

    B. **Government Officials Coerced a Private Citizen to Remove Mrs. Reading's Facebook Post** ....….............10

    C. **Mrs. Reading and Her Family Suffered Due to Government Censorship and Retaliation for Her Protected Speech** ................................................... 13

II.  **THE DISTRICT COURT PROPERLY RULED TO PROTECT POLITICAL DISCOURSE** ….........…...................…....15

    A. **The District Court's Injunction Appropriately Protects Free Speech** ….............................…..................15

**B.** **Injunctive Relief is Needed Because the Government Has Disregarded the Most Basic Protections of the First Amendment** ...................................…..................18

**C.** **Speech Deemed "Controversial" is Entitled to the Same, if Not Greater, Constitutional Protections as Conventional Speech** ................................…..........21

CONCLUSION ........................................................... 24

CERTIFICATE OF COMPLIANCE ...............................…... 26

CERTIFICATE OF SERVICE ....................................... 28

# TABLE OF AUTHORITIES

## Cases

*Abrams v. United States,*
250 U.S. 616, 630 (1919) (Holmes, J., dissenting) ...........................19

*Ariz. Free Enterprise Club's Freedom Club PAC v. Bennett,*
564 U.S. 721, 754 (2011) ...................................................... 22-23

*Bible Believers v. Wayne County,*
805 F.3d 228, 248 (6th Cir. 2015) (*en banc*) ...............................20, 21

*Brandenburg v. Ohio,*
395 U.S. 444, 447 (1969) ...................................................21

*Buckley v. Valeo,*
424 U.S. 1, 14 (1976) ........................................................23

*Chiu v. Plano Indep. Sch. Dist.,*
260 F.3d 330, 347 (5th Cir. 2001) ..........................................15

*Citizens United v. FEC,*
558 U.S. 310, 361 (2009) ..............................................18, 22

*Connick v. Myers,*
461 U.S. 138, 156 (1983) (Brennan, J., dissenting) ........................16

*Cowley v. Pulsifer,*
137 Mass. 392, 394 (1884) ..................................................23

*Cox v. Louisiana,*
379 U.S. 536, 551 (1965) ...................................................20

*Freedom From Religion Found. v. Abbott,*
955 F.3d 417, 428 (5th Cir. 2020) .........................................15

*Gerber v. Herskovitz,*
14 F.4th 500, 519-20 (6th Cir. 2021)......................................22

*Janus v. Am. Fed'n of State, Cnty. & Mun. Emps., Council 31,*
138 S. Ct. 2448, 2464 (2018) ..............................................19

*Lamont v. Postmaster General,*
381 U.S. 301, 308 (1965) (Brennan, J., concurring).........................17

*Mahanoy Area Sch. Dist. v. B.L.,* 141 S. Ct. 2038, 2055 (2021) (Alito, J., concurring) ....................................................................20

*Martin v. Struthers,*
    319 U.S. 141, 143 (1943) ................................................17

*Martin v. U.S. EPA,*
    271 F. Supp. 2d 38, 47 (D.D.C. 2002) ............................17

*Meriwether v. Hartop,*
    992 F.3d 492, 503 (6th Cir. 2021) (Thapar, J.)...............19

*Mills v. Alabama,*
    384 U.S. 214, 218 (1966) ................................................17

*Missouri v. Biden,*
    No. 3:22-CV-01213, 2023 WL 4335270, at *13 (W.D. La. July 4, 2023) ...............................................................1, 2, 15, 18

*Moore v. City of Kilgore,*
    877 F.2d 364, 370 (5th Cir. 1989) ..................................16

*New York Times Co. v. Sullivan,*
    376 U.S. 254, 279 n.19 (1964) ...................................20, 22

*Packingham v. North Carolina,*
    137 S. Ct. 1730, 1735 (2017) ..........................................17

*Publicker Indus., Inc. v. Cohen,*
    733 F.2d 1059, 1069 (3d Cir. 1984)..................................23

*Red Lion Broadcasting Co. v. FCC,*
    395 U.S. 367, 390, (1969) ...............................................19

*Schacht v. United States,*
    398 U.S. 58, 63 (1970) ....................................................22

*Smith v. City of Cumming,*
    212 F.3d 1332, 1333 (11th Cir. 2000) .............................23

*Snyder v. Phelps,*
    562 U.S. 443, 460-61 (2011) ...........................................21

*Sorrell v. IMS Health Inc.,*
    564 U.S. 552, 583 (2011) ................................................19

*Stanley v. Georgia,*
　394 U.S. 557, 564 (1969) ....................................................17

*Terminiello v. Chicago,*
　337 U.S. 1, 4 (1949) ...........................................................21

*Texas v. Johnson,*
　491 U.S. 397, 408-09 (1989) ..............................................21

*Va. State Bd. of Pharm. v. Va. Citizens Consumer Council,*
　425 U.S. 748, 756 (1976) ....................................................17

*Watson v. Memphis,*
　373 U.S. 526, 535 (1963) ....................................................20

*Whitney v. California,*
　274 U.S. 357, 375 (1927) (Brandeis, J., concurring) .........19

**Constitutional Provisions & Statutes**

U.S. Const. amend. I ................................................................18

## INTEREST OF THE *AMICA CURIAE*[1]

*Amica Curiae* **Angela Reading**, a mother and former school board member, is the victim of government censorship. She is the plaintiff in a pending civil rights case, *Reading v. Duff et al.*, Case No. 1:23-cv-01469-KWM-EAP (D.N.J.), that involves issues directly related to those implicated here. Mrs. Reading has personally experienced government censorship of her protected speech on social media and faces the ongoing threat of future censorship. She has an interest in ensuring U.S. courts recognize and protect First Amendment rights.

This case involves precisely the type of censorship at issue in *Reading v. Duff*: federal government censorship on social media of opinions disfavored by certain government officials on various topics, including gender ideology. *See Missouri v. Biden*, No. 3:22-CV-01213, 2023 WL 4335270, at *13 (W.D. La. July 4, 2023) ("In addition to misinformation regarding COVID-19, the White House also asked social-media companies to censor misinformation regarding climate change,

---

[1] All parties have consented to the filing of this *amica* brief. No party's counsel authored the brief in whole or part; no party or party's counsel contributed money intended to fund the brief; and no person other than this *amica* or her counsel contributed money intended to fund the brief.

**gender** discussions, abortion, and economic policy.") (emphasis added); *id.* at \*68 ("Plaintiffs have shown that not only have the Defendants shown willingness to coerce and/or to give significant encouragement to social-media platforms to suppress free speech with regard to the COVID-19 pandemic and national elections, they have also shown a willingness to do it with regard to other issues, such as gas prices, parody speech, calling the President a liar, climate change, **gender**, and abortion.") (emphasis added). Government censorship silences myriad speakers on social media, such as Mrs. Reading, to whom Plaintiffs and others are entitled to listen and respond.

As set forth below, and as detailed at length in *Reading v. Duff*, military officials at a local military base, incensed by Mrs. Reading's views, used a local police chief to obtain the removal of her Facebook post on a matter of public concern—gender ideology being taught in public schools—in violation of her First Amendment rights, causing ongoing harm to her and her family. Like the government officials in this case, the government officials in *Reading* continue to defend their actions as supposedly necessary in the interests of public "safety," based on the recently popularized theory, wholly contrary to First Amendment law,

that speech viewed as disturbing by government officials could "inspire" someone to commit violence and therefore must be suppressed. Mrs. Reading submits this brief to relate her experience as another egregious example of the government unlawfully censoring opinions on important social and political issues that citizens of this country are entitled to hear.

## INTRODUCTION AND SUMMARY OF ARGUMENT

*Amica Curiae* submits this brief in support of the District Court's granting of an injunction against the government.

Beginning in November 2022, Mrs. Reading became the target of coordinated efforts by government officials, including high ranking United States military officers and the chief of her local police department, to silence her speech. Why? Mrs. Reading and her children saw posters in a public school favorably referencing the terms "polysexual," "genderfluid," "bi," "LGBT Pride," "pansexual," and "genderqueer," and she reasonably, in a non-threatening manner, expressed concern about this on social media. Specifically, on November 22, 2022, after she privately asked school authorities to address her concerns and they refused, she posted this to a public Facebook group named "NJ Fresh Faced Schools":

** I welcome respectful debate if you read my entire post. Also, the below statements are made in my capacity as a private citizen/mother.** Last night, I attended an elementary "Math Night" My 7 YO daughter, while reading posters at the school's main entrance, asked me what "polysexual" means. To say the least, I was livid.

Why are elementary schools promoting/allowing elementary KIDS to research topics of sexuality and create posters? This is not in the state elementary standards (law) nor in the BOE-approved curriculum. It's perverse and should be illegal to expose my kids to sexual content. Look up the terms, and you will see they are sexual in nature.

Also, how can my young children be accepting of people "who are sexually attracted to multiple genders"? They don't know what sex is! Are adults talking about their sexual life with my kids and looking for affirmation? Are there elementary students engaged in polyamorous or multi-gender sexual activity who need my kids to know about it and cheer them on? I am very confused and very angry.

Kids should respect differences. Kids should show kindness to all. Kids should respect and understand there are various family structures. However, kids should not be forced to learn about and accept concepts of sexuality in elementary school.

Below are some additional points:

(1) My concerns do not come from a religious perspective. They are rooted in long-standing scientific principles of age-appropriateness, parental rights, and the health and safety of elementary children (key word - children).

(2) My concerns do not come from my personal views about individual sexual identities. I don't care what anyone does in their personal life. All people are deserving of respect and dignity. I don't care who you marry or who you love. I have instilled in my children

a respect for differences without having to talk about sex. It's possible.

(3) I have been told (by parents and a current NH Board member) that I should accept this because my kids will see it on social media and hear it on the playground. My kids are not on social media. And kids are only talking about it on the playground because it's being forced on them by teachers, at home, and by unsupervised social media time. With that said, it does not mean it should be endorsed by the public school system. It also does not mean I should accept it.

(4) Parents have been told that they can opt out of the health curriculum. North Hanover has done an exceptional job of modifying the health curriculum to make it as appropriate as possible. Why go through all that trouble? Clearly, there is never going to be an opt-out. Our elementary children will be exposed to sexual content without consent, even if we opt out.

(5) There is no way elementary students knew the spelling and flags for each of these identities. This means the school had open internet, which exposed them to these concepts. That's very concerning. There are supposed to be online search protections.

The above statements are made in my capacity as a private citizen and not in my capacity as a board member. These statements are also not representative of the board or its individual members and solely represent my personal opinions. My statements are not authorized by or written on behalf of the board. This matter involves the local public school district, I do not serve on the board.

Government officials mobilized to suppress this opinion. With no basis in law or fact they claimed—and continue to claim—that they needed to censor it in the interests of public "safety" because her Facebook post could somehow inspire third parties to commit acts of

violence. They coerced the Facebook group administrator to take down the post, which did not identify any student or staffer, name the school, call for anyone to take action, or violate Facebook community standards.

Through open-records requests, Mrs. Reading, then a law school student and now a graduate, obtained definitive proof of the coordinated, unlawful efforts by government officials to censor her. She then promptly filed her lawsuit against them in the United States District Court for the District of New Jersey. That lawsuit and Mrs. Reading's motion for preliminary injunction remain pending. In the defendants' recently filed oppositions to her motion for preliminary injunction, they continue to defend their conduct as supposedly necessary to protect the "safety" of the community.

The alarming recent trend of government actors censoring non-threatening statements on matters of public concern based on a vague incantation of "safety"—often presented as a need to thwart "stochastic

terrorism"[2]—is wholly antithetical to the First Amendment and must be decisively arrested and rejected by the courts.  The record here demonstrates, as in Mrs. Reading's case, that the government has abandoned its commitment to the most basic constitutional protections for free speech.  The injunction here was warranted to protect precisely that speech the government doesn't want the people to hear because it questions official narratives or offends official sensibilities. Government officials operating in the shadows and shielded from public scrutiny and criticism is not what our Constitution permits. Therefore, the District Court's injunction was appropriately granted and must be upheld for the sake of our nation's perennial commitment to robust public debate without government interference.

---

[2] Meaning controversial but fully protected speech that might "inspire" some random (hence the term "stochastic") individual to act violently. A body of supposed scholarship on this novel notion, which represents an attempt to create a new category of proscribable speech, routinely describes it as a "growing threat to public security."  *See e.g.*, "**Philosophical and Public Security Law Implications of 'Stochastic Terrorism,'**" Max Planck Institute for the Study of Crime, Security and Law, https://csl.mpg.de/en/projects/philosophical-and-public-security-law-implications-of-stochastic-terrorism.

# ARGUMENT

I. **MRS. READING'S EXPERIENCE SHOWS THE READINESS AND ABILITY OF GOVERNMENT ACTORS TO CENSOR AS WELL AS THE REAL AND LASTING HARM THAT RESULTS FROM GOVERNMENT CENSORSHIP.**

The undisputed facts of Mrs. Reading's case, consistent with the facts in this case, emphasize the need for judicial action to stop the government from violating the First Amendment right to free speech.

## A. Federal and State Government Actors Targeted Mrs. Reading's Protected Speech.

After Mrs. Reading made her November 22 Facebook post, government officials launched a coordinated attack on her protected speech. United States Army Major Christopher Schilling worked with his fellow military personnel at Joint Base McGuire-Dix-Lakehurst (some of whom have children in the North Hanover Township Schools—the system whose school had allowed the posters with sexual terminology).

For example, on November 29, 2022, Schilling sent an official military email, including to local school leadership, complaining about Mrs. Reading's speech as if it were unlawful incitement to violence: "In the current political climate and recent hate crimes across the country [*sic*] it goes without saying that it takes only one person to be move [*sic*]

8

to violent action by her post." Schilling demanded "action each of you can take to insure [*sic*] the continued safety of students until someone can put a stop to her actions."

On the same date, Major Nathaniel Lesher, head of the Joint Base's Security Forces, working with Schilling, "pushed" the idea of censoring Mrs. Reading's post to the local North Hanover Township Police Chief, Robert Duff. Schilling informed a group of parents and school staffers that he was "actively working with the base leadership . . . and they are working to support us in our efforts"—meaning the official censorship of Mrs. Reading's First Amendment-protected views.

The Joint Base Installation Antiterrorism Program Manager, referred Mrs. Reading to the New Jersey Office of Homeland Security and Preparedness as well as to the New Jersey State Police Regional Operations Intelligence Center because "[b]oth agencies['] analysts keep an eye on far right/hate groups." No such vigilance was evident as to "far left/hate groups"—an indication of the same pervasive viewpoint discrimination evident in this case on a massive scale.

Meanwhile, another Joint Base leader, Lt. Col. Megan Hall, Deputy Commander of the 87th Mission Support Group's Security

Squadron, joined in the growing conspiracy to censor Mrs. Reading. Following a phone call with the Superintendent of the school district, Hall emailed local school leaders to condemn Mrs. Reading's protected speech at length, copying other military personnel.  She presented the Superintendent with several posts supporting Mrs. Reading and fretted that "Ms. Angela Reading encouraged people of like mindedness to attend the monthly BOE [Board of Education] meetings and express the same view point [*sic*]"—as if encouraging people to attend a board meeting (which in fact Mrs. Reading had not done) were actionable wrongdoing warranting intervention by public officials. The school superintendent forwarded Hall's implicit request for censorship of Mrs. Reading to the local police chief.

### B. Government Officials Coerced a Private Citizen to Remove Mrs. Reading's Facebook Post.

On November 30, 2022, Police Chief Robert Duff, at the behest of the aforesaid federal military officials, coerced the removal of Mrs. Reading's Facebook post. Duff told the Facebook group administrator (a private citizen) that local police were working in cooperation with Homeland Security and Joint Base officials concerning Mrs. Reading, that her post could provoke a school shooting, and that the administrator

should take it down. The administrator was so intimidated by Duff that she removed Mrs. Reading's post while still on the phone with him.

After Duff thus coerced the group administrator to remove the post, he reported on his success by email to the Joint Base officials via their military email accounts, stating "the North Hanover Township Police takes this issue very seriously" and "I will continue to see if I can get additional posts removed from other social media posts. I will keep you advised." In the same email, Duff claims he acted to censor the post because "the Town and Location of the school was listed in the post." That claim was false, but even if it were true, no such official concern about identifying the school was ever evinced as to constant criticism of the school and its officials *by name* coming from the "JB MDL Vent Away" Facebook group, consisting of (ironically enough) Joint Base residents.

After she had learned of Chief Duff's actions from the Facebook group administrator, Mrs. Reading sent him an email protesting his censorship of her speech. On December 1, 2022, he telephoned Mrs. Reading to admit that he did have the Facebook post taken down and further revealed he was working with the Joint Base officials who had identified her as an "extremist."

In a social media post, Schilling depicted Mrs. Reading as a security threat to "many families" which the Joint Base leadership was taking "very seriously." It was with this public post that Mrs. Reading first suspected the full extent of military involvement in the conspiracy to punish her speech. The Joint Base officials continued a frenzy of communications with numerous law enforcement agencies so as to "threat-tag" Mrs. Reading's speech.  On December 5, the New Jersey Office of Homeland Security and Preparedness, in response to the Joint Base's "threat-tagging" of Mrs. Reading's already-censored speech, advised that it would "loop in the Burlington County Prosecutor's Office Counter-Terrorism Coordinator for situational awareness."

On the same date, the Joint Base's Manager of the Antiterrorism Program emailed Chief Duff, informing him of work being done by "our installation Threat Working Group" concerning Mrs. Reading.  In that regard, this manager stated his desire to "get[] an IDR [Incident Detection and Response] sent to schools and police departments." That is, in furtherance of the continuing conspiracy, Joint Base leadership contrived to trigger a widespread law enforcement investigation and

state of alarm over Mrs. Reading's protected speech by "threat-tagging" it as an "incident" of potential (or even actual) criminality.

### C. Mrs. Reading and Her Family Suffered Due to Government Censorship and Retaliation for Her Protected Speech.

The public furor against Mrs. Reading orchestrated by federal and state officials made untenable her elected position as Vice President of the Northern Burlington County Regional School Board. On December 7, 2022, she resigned that position. Placed in the same position as his wife by the government's actions, Mrs. Reading's husband resigned as President of North Hanover Township's school board. On December 8, 2022, upon hearing this news, Lt. Col. Hall sent an email to the Joint Base officials, stating: "Team, Thank you. Please note we appreciate everything you do for you [*sic*] kids and families here at JB MDL." The retaliation against Mrs. Reading and her family continued, as detailed at length in her lawsuit.

The government's actions have rendered Mrs. Reading, the mother of two children, a prospective lawyer, and a highly credentialed education professional, a pariah in her own community. In March 2023, a job offer to Mrs. Reading by the education law group of a prominent local law firm

was withdrawn, and Mrs. Reading is now unemployable in the field of education law to which she has devoted her training and entire career. She and her husband have had to withdraw their children from the North Hanover Township public school system and enroll them in private school at great expense.

All of this harm befell Mrs. Reading because of a single social media post, no part of which was threatening violence to anyone and which contained speech fully protected by the First Amendment. The protections of the United States Constitution notwithstanding, agents of the federal, state, and local government—acting in their official capacities—censored Mrs. Reading and radically altered her life. Her case, like this one, demonstrates that government—especially, the federal government—needs to be emphatically reacquainted with the safeguards for free speech enshrined in our law. Only the federal judiciary is capable of providing that lesson. The District Court's injunction is an urgently needed first step in rolling back government's alarming encroachments on First Amendment liberty over the past few years .

## II.    THE DISTRICT COURT PROPERLY RULED TO PROTECT POLITICAL DISCOURSE.

### A. The District Court's Injunction Appropriately Protects Free Speech.

The protection of public discourse on important social and political issues is at the core of the First Amendment. *See Freedom From Religion Found. v. Abbott*, 955 F.3d 417, 428 (5th Cir. 2020) (recognizing "broad First Amendment policy of encouraging public discourse on issues of community interest") (quoting *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 347 (5th Cir. 2001)). Mrs. Reading, along with Plaintiffs here and many others, is in the crosshairs of the government's ongoing efforts to suppress public discourse on important issues of community interest. The District Court here found that "millions of protected free speech postings" have been suppressed by the government and that "hundreds of thousands or millions of citizens who are potential audience members [were] affected by federal social-media speech suppression." *Missouri v. Biden*, 2023 WL 4335270, at *44, *65.

Mrs. Reading's Facebook post is but one notable example of the millions of protected speech postings federal actors have recently

suppressed with their increasingly cavalier approach to free speech, which, until this case, had been completely unrestrained. The government's censorship of Mrs. Reading affected an untold number of potential audience members who were denied her point of view. Mrs. Reading herself is a potential audience member affected by suppression of *others'* social media posts, including those at issue here. The government suppressed her right to voice her opinion, suppressed the rights of others to hear that opinion, and suppressed her right to hear the opinions of others. *See, e.g.*, *Moore v. City of Kilgore*, 877 F.2d 364, 370 (5th Cir. 1989) ("Freedom of speech presupposes both a willing speaker and a willing listener. A listener's interest enjoys protection just as the speaker's interest finds refuge behind the shield of the First Amendment."). As in this case, the government officials in *Reading v. Duff* continue to defend their unlawful censorship, insist that it was necessary and appropriate in the interests of safety, and have given no indication they intend to cease it.

Receiving information about one's government, especially criticism of official government narratives, is what distinguishes a healthy civic society from a police state. *See, e.g., Connick v. Myers*, 461 U.S. 138, 156

(1983) (Brennan, J., dissenting) ("It is hornbook law . . . that speech about 'the manner in which government is operated or should be operated' is an essential part of the communications necessary for self-governance the protection of which was a central purpose of the First Amendment.") (quoting *Mills v. Alabama*, 384 U.S. 214, 218 (1966)).  The Constitution therefore prevents the government from interfering with "the right to receive information and ideas." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969); *see, e.g., Martin v. Struthers*, 319 U.S. 141, 143 (1943).  "The dissemination of ideas can accomplish nothing if otherwise willing addressees are not free to receive and consider them.  It would be a barren marketplace of ideas that had only sellers and no buyer." *Lamont v. Postmaster General*, 381 U.S. 301, 308 (1965) (Brennan, J., concurring) (citations omitted).  And, "[a] fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017); *see Martin v. U.S. EPA*, 271 F. Supp. 2d 38, 47 (D.D.C. 2002) (quoting *Va. State Bd. of Pharm. v. Va. Citizens Consumer Council*, 425 U.S. 748, 756 (1976)

("[W]here a speaker exists . . . the protection afforded is to the communication, to its source and to its recipients both.")).

The District Court's injunction in this case appropriately protects the right to engage in free public discourse against what had become an out-of-control government censorship complex. Affirmance by this Court would help Mrs. Reading and millions of other Americans by restoring the unfettered operation of the marketplace of ideas.[3]

### B. Injunctive Relief is Needed Because the Government Has Disregarded the Most Basic Protections of the First Amendment.

Despite the manner in which the government has treated the Plaintiffs and Mrs. Reading, "it is our law and our tradition that more speech, not less, is the governing rule." *Citizens United v. FEC*, 558 U.S. 310, 361 (2009); *see* U.S. Const. amend. I (prohibiting the government

---

[3] Even as this appeal proceeds, revelations about federal government censorship of social media companies continue. *See, e.g.,* Brad Polumbo, "Leaked emails expose Biden White House's attacks on the First Amendment," WASH. EXAMINER, Jul. 29, 2023, available at https://www.washingtonexaminer.com/restoring-america/faith-freedom-self-reliance/leaked-emails-expose-biden-white-houses-attacks-on-the-first-amendment (last visited Aug. 6, 2023) ("On Thursday, Rep. Jim Jordan (R-OH), who leads the House Judiciary Committee, released internal Facebook emails that show the Big Tech platform was *explicitly pressured* by the Biden administration to take down specific posts that the president's allies disliked.") (emphasis added).

from making laws "abridging the freedom of speech"). The constitutional protection of free speech is not merely intended to encourage self-expression. "[F]ree speech is 'essential to our democratic form of government.' Without genuine freedom of speech, the search for truth is stymied, and the ideas and debates necessary for the continuous improvement of our republic cannot flourish." *Meriwether v. Hartop*, 992 F.3d 492, 503 (6th Cir. 2021) (Thapar, J.) (quoting and citing *Janus v. Am. Fed'n of State, Cnty. & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2464 (2018)).

Our Founders were confident in their belief "that freedom to think as you will and to speak as you think are means indispensable to the discovery and spread of political truth[.]" *Whitney v. California*, 274 U.S. 357, 375 (1927) (Brandeis, J., concurring). The Constitution accordingly seeks to "maintain a free marketplace of ideas, a marketplace that provides access to 'social, political, esthetic, moral, and other ideas and experiences.'" *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 583 (2011) (quoting *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 390, (1969) and citing *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting)). "Even a false statement may be deemed to make a valuable

contribution to public debate, since it brings about the clearer perception and livelier impression of truth, produced by its collision with error." *New York Times Co. v. Sullivan*, 376 U.S. 254, 279 n.19 (1964) (citations omitted and cleaned up).

As Justice Alito recently explained with his concurring opinion in *Mahanoy Area School District v. B.L.*, "[I]t is a 'bedrock principle' that speech may not be suppressed simply because it expresses ideas that are 'offensive or disagreeable.'" 141 S. Ct. 2038, 2055 (2021) (Alito, J., concurring) (citations omitted). Other decisions have similarly recognized that Supreme Court precedent makes it indisputable that "the First Amendment does not countenance a heckler's veto." *Bible Believers v. Wayne County*, 805 F.3d 228, 248 (6th Cir. 2015) (*en banc*); *see Watson v. Memphis*, 373 U.S. 526, 535 (1963) ("[C]onstitutional rights may not be denied simply because of hostility to their assertion or exercise."); *see also Cox v. Louisiana*, 379 U.S. 536, 551 (1965). "When a peaceful speaker, whose message is constitutionally protected, is confronted by a hostile crowd, the state may not silence the speaker as an expedient alternative to containing or snuffing out the lawless behavior of the rioting individuals." *Bible Believers*, 805 F.3d at 252.

The Constitution forbids government from treating politically engaged citizens like domestic enemies.  While speech that is directed to inciting imminent lawless action and is likely to produce it enjoys no First Amendment protection,[4] the rule of law is not advanced by government censorship of speech that is constitutionally protected.

## C. Speech Deemed "Controversial" is Entitled to the Same, if Not Greater, Constitutional Protections as Conventional Speech.

Anodyne speech does not need the Constitution to protect it.  It is precisely controversial speech that must be shielded from government by the impenetrable armor of First Amendment protection. "The right to speak freely and to promote diversity of ideas and programs . . . may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." *Terminiello v. Chicago*, 337 U.S. 1, 4 (1949); *see Snyder v. Phelps*, 562 U.S. 443, 460-61 (2011) ("As a Nation we have chosen . . . to protect even hurtful speech on public issues to ensure that we do not stifle public debate."); *Texas v. Johnson*, 491 U.S. 397, 408-09 (1989) ("[A] principal

---

[4] *See Bible Believers*, 805 F.3d at 244 (quoting *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969)).

function of free speech under our system of government is to invite dispute.") (internal quotation marks and citations omitted); *see also Gerber v. Herskovitz*, 14 F.4th 500, 519-20 (6th Cir. 2021) ("[F]reedom of speech is protected against censorship or punishment, unless likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest.") (internal quotation marks and citations omitted).

Speaking on matters of public concern, as Mrs. Reading and the millions of individuals whose speech is at issue here have done, is not a threat to public safety.  It is, rather, the first line of defense against tyranny, as our nation's history demonstrates. *See, e.g., Citizens United*, 558 U.S. at 339 ("The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it.").  Undoubtedly, the public has an interest in knowing how its officials are discharging their duties.  "The right of free public discussion of the stewardship of public officials . . . [is] a fundamental principle of the American form of government." *New York Times*, 376 U.S. at 275; *see Schacht v. United States*, 398 U.S. 58, 63 (1970) (commenting that all persons "in our

country, enjoy[] a constitutional right to freedom of speech, including the right openly to criticize the Government"); *see also Ariz. Free Enterprise Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 754 (2011) ("'[T]here is practically universal agreement that a major purpose of the First Amendment 'was to protect the free discussion of governmental affairs[.]'") (quoting *Buckley v. Valeo*, 424 U.S. 1, 14 (1976)); *see Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000) ("The First Amendment protects the right to gather information about what public officials do on public property[.]"). "[T]hose who administer justice should always act under the sense of public responsibility, and . . . every citizen should be able to satisfy himself with his own eyes as to the mode in which a public duty is performed.'" *Publicker Indus., Inc. v. Cohen*, 733 F.2d 1059, 1069 (3d Cir. 1984) (quoting *Cowley v. Pulsifer*, 137 Mass. 392, 394 (1884)).

As the District Court in this case has recognized, in recent years government officials have been abusing their authority on a scale never before seen in order to undermine our nation's bedrock commitment to freedom of speech. For too long they have been able to operate away from the light of public scrutiny demanded by the First Amendment in order

silence critics of their policies and actions.  Government officials may desire freedom from all criticism, but the First Amendment does not permit them to seek that illicit luxury.  The District Court's injunction restores the protection of the First Amendment to its rightful place in American life. For the sake of our hard-won heritage of freedom, it must be affirmed.

## CONCLUSION

For these reasons, *amica curiae* Angela Reading respectfully asks the Court to affirm the decision of the District Court.

Respectfully submitted, this <u>7th</u> day of August, 2023.

<u>/s/Christopher A. Ferrara</u>
Thomas Brejcha
Christopher A. Ferrara
Michael G. McHale[†]
B. Tyler Brooks
THOMAS MORE SOCIETY
309 W. Washington St.
Suite 1250
Chicago, IL 60606
Telephone: (312) 782-1680
tbrejcha@thomasmoresociety.org
cferrara@thomasmoresocity.org
mmchale@thomasmoresocity.org
tbrooks@thomasmoresociety.org

Adam S. Hochschild[†]
HOCHSCHILD LAW FIRM, LLC
P.O. Box 401

Plainfield, VT 05667
Telephone: (314) 503-0326
adam@hochschildlaw.com

*Counsel for Amica Curiae*

† *application for admission
forthcoming.*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limits of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), it contains 4,830 words. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it was prepared using Microsoft Word 2022 in 14-point Century Schoolbook, a proportionally spaced typeface.

Dated: <u>August 7, 2023</u>

<u>/s/Christopher A. Ferrara</u>
Christopher A. Ferrara
THOMAS MORE SOCIETY
309 W. Washington St.
Suite 1250
Chicago, IL 60606
cferrara@thomasmoresociety.org

*Counsel for Amica Curiae*

## <u>STATEMENT UNDER FED. R. APP. P. 29(a)(4)(E)</u>

No counsel for a party authored this brief in whole or in part; no party or a party's counsel contributed money that was intended to fund preparation or submission of the brief; and no person other than *amica* curiae or her counsel contributed money that was intended to fund preparing or submitting the brief.

## **CERTIFICATE OF SERVICE**

I certify that on August 7, 2023, the foregoing document was filed with the Clerk of the Court using the CM/ECF system, causing it to be served on all counsel of record.

Dated: <u>August 7, 2023</u>

<u>/s/Christopher A. Ferrara</u>
Christopher A. Ferrara
THOMAS MORE SOCIETY
309 W. Washington St.
Suite 1250
Chicago, IL 60606
cferrara@thomasmoresociety.org

*Counsel for Amica Curiae*