**Case No. 23-30445**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

State of Missouri; State of Louisiana; Aaron Kheriaty;
Martin Kulldorff; Jim Hoft; Jayanta Bhattacharya; and Jill Hines,

*Plaintiffs – Appellees*

v.

Joseph R. Biden, Jr.; Vivek H. Murthy; Xavier Becerra;
Department of Health & Human Services; Anthony Fauci; et al.,

*Defendants – Appellants*

On Appeal from the United States District Court
for the Western District of Louisiana

**BRIEF *AMICUS CURIAE***
**SUBMITTED BY *KENNEDY v. BIDEN* PLAINTIFFS**
**IN SUPPORT OF AFFIRMANCE**

G. SHELLY MATURIN, II (#26994)
WELBORN & HARGETT, LLC
1540 W. Pinhook Road
Lafayette, LA 70503
Telephone: (337) 234-5533
Facsimile: (337) 769-3173
shelly@wandhlawfirm.com
Attorney for Plaintiffs

JED RUBENFELD
NY Bar # 2214104
(not active 5th Cir. bar member)
1031 Forest Rd.
New Haven CT 06515
Tel.: 203-432-7631
E-mail: jed.rubenfeld@yale.edu

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of rule 28.2.1 have an interest in the outcome of this case. This representation is made in order that the judges of this court may evaluate possible disqualification or recusal:

Children's Health Defense

Dated: August 7, 2023

    /s/ G. Shelly Maturin, II
G. SHELLY MATURIN, II (#26994)
WELBORN & HARGETT, LLC
1540 W. Pinhook Road
Lafayette, LA 70503
Telephone: (337) 234-5533
Facsimile: (337) 769-3173
shelly@wandhlawfirm.com

i

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS …………………………………… i

TABLE OF AUTHORITIES ………………………………………………......... iii

INTRODUCTION ……………………………..…………………….………… 1

INTEREST OF AMICI…………………………..…………………….……….. 4

ARGUMENT…………………………..……………………….………… 5

I. Under *Skinner*, the government's censorship campaign
turns social media censorship into state action…………………………..… 5

II. *Skinner* also supports the conclusion that even if—or to
the extent that—the government's social media censorship
campaign does not satisfy one or more of the familiar state
action tests, it is still unconstitutional…..………………………………… 9

CONCLUSION………………..……………………..………………..... 12

# TABLE OF AUTHORITIES

## Cases

*Biden v. Knight First Amendment Institute at Columbia Univ.*, 141 S. Ct. 1220 (2021)..................................................................................................1

*Norwood v. Harrison*, 413 U.S. 455 (1973) ...............................................4

*O'Handley v. Weber*, 62 F.4th 1145 (9th. Cir. 2023) ...............................10

*Packingham v. North Carolina*, 137 S. Ct. 1730 (2017) ...........................1

*Rendell-Baker v. Kohn*, 457 U.S. 830 (1982) ..........................................10

*Reno v. Am. Civil Liberties Union,* 521 U.S. 844 (1997) ...........................1

*Skinner v. Ry. Lab. Executives' Ass'n,*
    489 U.S. 602 (1989) .............................................................................2

*United States v. Davis*, 482 F.2d 893 (9th Cir. 1973)................................11

*Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,*
    425 U.S. 748 (1976) .............................................................................5

*Watts v. Northside Indep. Sch. Dist.*, 37 F.4th 1094 (5th Cir. 2022)..........4

## Statutes

47 U.S.C. § 230(c)(2)(A) .............................................................................3

## Other Authorities

UNITED STATES HOUSE OF REPRESENTATIVES, SUBCOMMITTEE ON ANTITRUST, INVESTIGATION OF COMPETITION IN DIGITAL MARKETS (2020) ............................1

**BRIEF *AMICUS CURIAE***
**SUBMITTED BY *KENNEDY v. BIDEN* PLAINTIFFS**
**IN SUPPORT OF AFFIRMANCE**

### INTRODUCTION

Litigants naturally exaggerate. Nonetheless, it may actually be true that the

fate of the freedom of speech in America depends on what this Court does with this

case.

Social media is "the modern public square."[1] But today's public square has

gatekeepers—"platform gatekeepers"[2]—a handful of behemoth private companies

with unprecedented control over the content of public discourse.[3] Companies like

Facebook and Google decide every day for hundreds of millions of Americans what

---

[1] *Packingham v. North Carolina*, 137 S. Ct. 1730, 1737 (2017) (referring to "[s]ocial media" as the "modern public square"). "These websites can provide perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard. They allow a person with an Internet connection to 'become a town crier with a voice that resonates farther than it could from any soapbox.'" *Id.* (quoting *Reno v. Am. Civil Liberties Union,* 521 U.S. 844, 870 (1997)).

[2] UNITED STATES HOUSE OF REPRESENTATIVES, SUBCOMMITTEE ON ANTITRUST, INVESTIGATION OF COMPETITION IN DIGITAL MARKETS 57 (2020).

[3] *See Biden v. Knight First Amendment Institute at Columbia Univ.*, 141 S. Ct. 1220, 1221 (2021) (Thomas, J., concurring) ("Today's digital platforms provide avenues for historically unprecedented amounts of speech. . . Also unprecedented, however, is the concentrated control of so much speech in the hands of a few private parties."). The Internet's "platform gatekeepers" exercise control over speech content both directly and indirectly. They do so directly though content-based blocking of posts and videos on their social media platforms and by de-platforming (terminating the accounts of) individuals who are said to violate their terms of service. They do so indirectly through content-based "shadow-banning," "de-boosting," "demoting" or otherwise restricting (often without notifying the speaker) the reach of disfavored speech.

they are allowed to say, see, and hear. Because these are private companies, the Constitution ordinarily would not apply to their "content moderation" decisions. But as we now know, the federal government has for several years been waging a systematic and highly successful—though often clandestine—campaign to get these companies to do what the government itself cannot: censor protected speech on the basis of its content and viewpoint. Thus has arisen a new and revolutionary First Amendment constellation: the "vast democratic forums of the Internet,"[4] the likes of which America has never seen, paired with—and in danger of becoming—"the most massive system of censorship in the nation's history."[5] The burden of deciding what to do with this new First Amendment constellation rests on the shoulders of this Court.

This amicus brief is respectfully submitted to assist the Court by foregrounding a single point that may otherwise be overlooked: the critical importance to this case of *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602 (1989), and, under *Skinner*, of the famous Section 230 of the Communications Decency Act of 1996.

---

[4] *Packingham v. North Carolina*, 137 S. Ct. at 1735 (quoting *Reno*, 521 U.S. at 868).

[5] Philip Hamburger, *Is Social-Media Censorship a Crime?*, WALL ST. J., Dec. 13, 2022, https://www.wsj.com/articles/is-social-media-censorship-a-crime-section-241-us-code-government-private-conspiracy-civil-rights-speech-11670934266. Mr. Hamburger is the Maurice & Hilda Friedman Professor of Law at Columbia Law School.

In *Skinner*, as explained more fully below, the Court ruled that certain breath and urine tests conducted by private railways on their own employees constituted state action where a federal regulation, which did not require those tests, immunized the railway companies from state law liability if they conducted them. *Skinner*, 489 U.S. at 615. Decisive to the state action ruling in *Skinner* was the Court's finding that, in addition to this immunity, the government had "made plain" its "strong preference" that the tests be conducted. *Id*. The government could not, held the *Skinner* Court, evade constitutional scrutiny through the expedient of inducing private companies, through a combination of immunity plus "encouragement," to conduct searches the government could not. *Id*. at 615-16.

The very same combination exists here. As in *Skinner*, Section 230 immunizes social media companies from state law liability if they censor "constitutionally protected" speech the companies deem "objectionable." 47 U.S.C. § 230(c)(2)(A). As in *Skinner*, the government is making plain to social media companies its strong preference that certain government-identified speech and speakers be suppressed. Indeed, through the innumerable communications with social media companies detailed by the court below, the government seeks not only to immunize and encourage, but to *participate* in social media censorship—another factor the Court found important in *Skinner*. *Id.* at 616. Accordingly, *Skinner* powerfully supports affirmance here.

And *Skinner* in turn rests on a more fundamental constitutional principle, which fully decides this case. As the Supreme Court held in *Norwood v. Harrison*, 413 U.S. 455 (1973), it is "axiomatic that [the] state may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish." *Id*. at 465. For several years now, the federal government's social media censorship campaign has been violating this principle with abandon. To affirm in the instant case, this Court need only reaffirm *Norwood*'s "axiomatic" principle—a principle quoted approvingly by the Fifth Circuit as recently as last year. *See Watts v. Northside Indep. Sch. Dist*., 37 F.4th 1094, 1097 (5th Cir. 2022)).

### INTERESTS OF AMICI

This amicus brief is respectfully submitted by the named plaintiffs in *Kennedy et al. v. Biden et al.*, No. 3:23-cv-00381 (W.D. La.), a related case pending in the court below, which has been consolidated for all purposes with the instant case. (ECF No. 27.) In *Kennedy*, plaintiffs have sued substantially the same defendants as here on the basis of substantially the same facts. The difference is that plaintiffs in *Kennedy* do not sue as *speakers* alleging that their speech has been censored online (although in fact it has); they sue as and on behalf of social media *users*, whose right to receive information and ideas is being violated by the government's social media censorship campaign. Amici therefore have a direct interest in this case.

One of the named *Kennedy* plaintiffs is Mr. Robert F. Kennedy, Jr., who as much as anyone in the country has been singled out and targeted by the government's censorship campaign. Mr. Kennedy therefore has a profound, personal interest in halting the government's censorship-by-proxy efforts. Another of the named *Kenned* plaintiffs is Children's Health Defense (CHD), a nonprofit organization with over 70,000 members across the country, most of whom are avid consumers of online health and politics news. Under *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 757 (1976), an organization like CHD has the strongest possible standing to assert and vindicate the First Amendment rights of social media viewers and listeners—rights the government's censorship campaign directly threatens.

## ARGUMENT

*Skinner* dictates affirmance here for two distinct reasons.  First, under *Skinner*, the government's social media censorship campaign *crosses the state action threshold*—i.e., it turns social media censorship into state action, and as such into a violation of the First Amendment. Second, *Skinner* also powerfully supports the conclusion that even if—or to the extent that—the government's social media censorship efforts *do not cross the state action line,* they are *still* unconstitutional.

### I. *Under* **Skinner***, the government's censorship campaign turns social media censorship into state action*.

In *Skinner*, the Court ruled on the constitutionality under the Fourth

5

Amendment of newly enacted regulations dealing with urine and breath testing of railway employees. *See Skinner*, 489 U.S. at 614-15. One section of the regulations mandated certain tests, and all parties agreed that the mandatory tests were subject to constitutional scrutiny. *See id*. at 614. But Subpart D of the regulations was permissive. *Id*. Subpart D did not require the railway companies to conduct the tests laid out in that section of the regulations; instead it immunized from state law liability any railway companies that did perform those tests. *Id*. The government argued that the Subpart D tests were not subject to Fourth Amendment scrutiny because there was no coercion, with the ultimate decision about whether to perform the tests left to the railway companies, making the tests private action, not state action (*see id*. at 614-15)—essentially the same argument made by the government here, about social media companies' censorship decisions. The Supreme Court rejected this argument.

"The fact that the Government has not compelled a private party to perform a search," the Court stated, "does not, by itself, establish that the search is a private one. Here, specific features of the regulations combine to convince us that the Government did more than adopt a passive position toward the underlying private conduct." *Id.* at 615. Specifically, the government: (1) had "removed all legal barriers to the testing;" (2) had "made plain … its strong preference for [the] testing;" and (3) had also "made plain . . . its desire to share in the fruits" of such testing. *Id*.

6

"These are clear indices of the Government's encouragement, endorsement, and participation, and suffice to implicate the Fourth Amendment." *Id*. at 615-16.

All three of these features are equally present here. First, Section 230(c) of the Communications Decency Act "remove[s] all legal barriers" in exactly the same way the regulations in *Skinner* did. Subpart D of the *Skinner* regulations immunized railroads from state law liability if they conducted the designated tests. *See Skinner*, 489 U.S. at 615. Section 230(c) immunizes social media companies from state law liability if they censor "constitutionally protected" speech they deem objectionable. 47 U.S.C. § 230(c)(2)(A).

Second, the federal government has repeatedly "made plain . . . its strong preference" for the censorship it seeks. This *Skinner* factor is not open to serious dispute given the torrent of censorship demands and requests documented below.

Finally, the government is also making plain "its desire to share in the fruits" of social media censorship. As detailed comprehensively by the district court, the government seeks to use social media censorship to further contested policies (for example, by suppressing accurate content questioning the government's COVID vaccine policy), to stifle criticism, and to suppress potentially damaging information. Indeed, the governmental "participation" here is far greater, closer, more direct, and more systematic than anything presented in *Skinner*.

Thus *Skinner* powerfully supports affirmance. And *Skinner* is crucial to protecting every constitutional liberty, all of which would be at risk if the government could evade the Bill of Rights through the simple expedient of immunizing and encouraging private parties to do what the government cannot. The Second Amendment, for example, bars the federal government from disarming the citizenry. But suppose the government, to achieve that very result, (1) passed a statute immunizing certain private companies from legal liability if they break into people's homes and take their guns, and (2) followed up on this immunity by communicating (secretly) with those companies urging them to take such action and providing them with information about which people owned guns, where those people lived, and which of those people the government most wanted to be disarmed. Without *Skinner*, all that would be perfectly constitutional. But under *Skinner*, this blatant effort to circumvent the Second Amendment by proxy is unconstitutional.

And that is exactly what the government is doing here. It has passed a statute expressly immunizing the gatekeepers of the modern public square if they censor "constitutionally protected" speech they deem "objectionable." It has then followed up on this immunity by communicating (secretly) with these companies urging them to take such action and providing them with information about which "objectionable" speech and speakers the government most wants to be censored.

8

Under *Skinner*, this blatant effort to circumvent the First Amendment by proxy is unconstitutional.

> II. **Skinner *also supports the conclusion that even if—or to the extent that— the government's social media censorship campaign does not satisfy one or more of the familiar state action tests, it is still unconstitutional.***

Much of the argumentation presented to this Court will focus on whether the innumerable communications (detailed by the court below) between federal actors and social media companies satisfy one or more of the familiar state action tests— coercion, joint action, entwinement, nexus, and so on. While some of those communications undoubtedly satisfy one or more of those tests (and this Court can uphold the injunction on that ground alone), *Skinner* also supports the conclusion that even if—or to the extent that—those communications do not satisfy any of the familiar state action tests, they are still unconstitutional.

The reason is that *Skinner* rests on and exemplifies the "axiomatic" principle set forth in *Norwood*—that government "may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish," 413 U.S. at 465—and *Norwood* was ***not*** a state action case.

In *Norwood*, the Court enjoined Mississippi's policy of providing free textbooks to whites-only private schools. *See Norwood*, 413 U.S. at 466. The phrase "state action" does not appear in the case. No claim was made (or could have been made), for example, that Mississippi was *coercing* private schools to discriminate;

there was no requirement that any school discriminate. Similarly, no claim was or could have been made that the textbook-provision program turned the private schools into "*joint actors*" with the government. Providing textbooks to a school is not nearly enough entwinement to meet that test. *See, e.g.*, *Rendell-Baker v. Kohn*, 457 U.S. 830 (1982) (holding that a private school's receipt of over 90% of its funding from government did not make private school a state actor).

Thus *Norwood* was not tethered to a state action finding. Its axiomatic principle uses language markedly different from the language of state action doctrine ("induce, encourage, or promote" as opposed to "coerce," "conspire," "nexus," "entwinement," "public function," and so on), because *Norwood* is addressed to different circumstances and to a different category of cases.

Where plaintiffs *sue a private party* and allege that its conduct violated the Constitution, a court must decide if it is dealing with "one of the exceptional cases" in which the state action doctrine is satisfied. *See, e.g.*, *O'Handley v. Weber*, 62 F.4th 1145, 1156 (9th. Cir. 2023) ("Determining whether this is one of the exceptional cases in which a private entity will be treated as a state actor for constitutional purposes requires us to grapple with the state action doctrine."). Such a determination typically turns on satisfaction of one or more of the familiar state action tests, such as coercion, joint action, nexus, or public function. *See id*. at 1157-58.

By contrast, *Norwood*'s axiomatic principle applies to cases where, as here (and as in *Skinner*), suit is brought *against governmental defendants*, especially where government agents are deliberately evading constitutional rights by asking private parties to do a job that the Constitution prohibits the government from doing directly. In such cases, familiar state action tests like coercion and conspiracy do not set the limits of what the government is barred from doing. Rather, under the express language of *Norwood*, plaintiffs need only show that the government is deliberately seeking to "*induce, encourage or promote*" private parties "to accomplish what it is constitutionally forbidden to accomplish." 413 U.S. at 465 (emphasis added).

Again, without this principle, all constitutional rights would be in jeopardy. If, for example, the police know that a vehicle search they want to conduct would violate the Fourth Amendment, they can't evade the Constitution through the simple expedient of asking a bystander to do the search for them. As the Ninth Circuit put it in a case involving airport searches, "Constitutional limitations on governmental action would be severely undercut if the government were allowed to actively encourage conduct by 'private' persons or entities that is prohibited to the government itself." *United States v. Davis*, 482 F.2d 893, 904 (9th Cir. 1973).

That is exactly the vice of the federal government's social media censorship campaign. That campaign "actively encourage[s] conduct by 'private' persons or entities that is prohibited to the government itself." *Id*. When in a given case the

evidence before the Court demonstrates a deliberate governmental effort to circumvent the Constitution by "induc[ing], encourag[ing], or promot[ing] private persons to accomplish what [the state] is constitutionally forbidden to accomplish," *Norwood*, 489 U.S. at 465, no further satisfaction of any state action tests need be proved. Indeed, against a background of government-enacted immunity for private companies if they engage in the conduct the government asks them to perform, nothing more need be shown at all. In such a case, under the clear authority of *Skinner* and *Norwood*, an injunction must issue.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully ask the Court to affirm the preliminary injunction.

Dated: August 7, 2023

| | |
|---|---|
| _____/s/ G. Shelly Maturin, II_____ | |
| G. SHELLY MATURIN, II (#26994) | JED RUBENFELD |
| WELBORN & HARGETT, LLC | NY Bar # 2214104 |
| 1540 W. Pinhook Road | (Pro Hac Vice) |
| Lafayette, LA 70503 | 1031 Forest Rd. |
| Telephone: (337) 234-5533 | New Haven CT 06515 |
| Facsimile: (337) 769-3173 | Tel.: 203-432-7631 |
| shelly@wandhlawfirm.com | E-mail: jed.rubenfeld@yale.edu |
| Attorney for Plaintiffs | |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 7, 2023, the above amicus curiae brief was filed with this Court via the CM/ECF system, which will send notice of said filing to all counsel of record.

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that, pursuant to Rules 27, 29, and 32 of the Federal Rules of Appellate Procedure, the brief was prepared in Times New Roman 14-point font and its word count is less than half of the allotted 13,000 words for Appellees' brief.

Dated: August 7, 2023

_____/s/ G. Shelly Maturin, II_____
G. SHELLY MATURIN, II (#26994)
WELBORN & HARGETT, LLC
1540 W. Pinhook Road
Lafayette, LA 70503
Telephone: (337) 234-5533
Facsimile: (337) 769-3173
shelly@wandhlawfirm.com