No. 23-30445

# United States Court of Appeals for the Fifth Circuit

---

STATE OF MISSOURI; STATE OF LOUISIANA; AARON KHERIATY; MARTIN KULL-
DORFF; JAYANTA BHATTACHARYA; JILL HINES,
PLAINTIFFS-APPELLEES,

*v.*

JOSEPH R. BIDEN, JR.; VIVEK H. MURTHY; XAVIER BECERRA; DEPARTMENT OF
HEALTH & HUMAN SERVICES; ANTHONY FAUCI, ET AL.,
DEFENDANTS-APPELLANTS.

---

*APPEAL FROM THE U.S. DISTRICT COURT FOR THE WESTERN DISTRICT OF LOUISIANA,
NO. 22-CV-1213, HON. TERRY A. DOUGHTY, PRESIDING*

---

**BRIEF OF REPRESENTATIVES JIM JORDAN, KELLY ARMSTRONG,
ANDY BIGGS, DAN BISHOP, KAT CAMMACK, RUSSELL FRY, LANCE
GOODEN, HARRIET HAGEMAN, MIKE JOHNSON, THOMAS MASSIE,
BARRY MOORE, AND ELISE STEFANIK AS *AMICI CURIAE*
SUPPORTING PLAINTIFFS-APPELLEES AND AFFIRMANCE**

---

GENE P. HAMILTON
*America First Legal Foundation*
*611 Pennsylvania Ave. SE #231*
*Washington, D.C. 20003*
*(202)964-3721*
*gene.hamilton@aflegal.org*

CHRISTOPHER MILLS
*Spero Law LLC*
*557 East Bay Street*
*#22251*
*Charleston, SC 29413*
*(843) 606-0640*
*cmills@spero.law*

Counsel for *Amici Curiae*

## CERTIFICATE OF INTERESTED PARTIES

*State of Missouri, et al. v. Joseph R. Biden, Jr., et al.*, No. 23-30445:

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1, in addition to those listed in the briefs of the parties, have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

*Amicus*: Jim Jordan is a Member of Congress who represents the Fourth District of Ohio in the United States House of Representatives.

*Amicus*: Kelly Armstrong is a Member of Congress who represents North Dakota in the United States House of Representatives.

*Amicus*: Andy Biggs is a Member of Congress who represents the Fifth District of Arizona in the United States House of Representatives.

*Amicus*: Dan Bishop is a Member of Congress who represents the Eighth District of North Carolina in the United States House of Representatives.

*Amicus*: Kat Cammack is a Member of Congress who represents the Third District of Florida in the United States House of Representatives.

*Amicus*: Russell Fry is a Member of Congress who represents the Seventh District of South Carolina in the United States House of Representatives.

*Amicus*: Lance Gooden is a Member of Congress who represents the Fifth District of Texas in the United States House of Representatives.

*Amicus*: Harriet Hageman is a Member of Congress who represents Wyoming in the United States House of Representatives.

*Amicus*: Mike Johnson is a Member of Congress who represents the Fourth District of Louisiana in the United States House of Representatives.

*Amicus*: Thomas Massie is a Member of Congress who represents the Fourth District of Kentucky in the United States House of Representatives.

*Amicus*: Barry Moore is a Member of Congress who represents the Second District of Alabama in the United States House of Representatives.

*Amicus*: Elise Stefanik is a Member of Congress who represents the Twenty-First District of New York in the United States House of Representatives.

*Counsel for Amici*: Christopher E. Mills of Spero Law LLC; Gene P. Hamilton of America First Legal Foundation.

*/s Christopher Mills*
Christopher Mills

Counsel for *Amici Curiae*

August 7, 2023

## TABLE OF CONTENTS

**Page**

Certificate of Interested Parties ................................................................i

Table of Authorities ......................................................................... iv

Interest of *Amici Curiae* .....................................................................1

Introduction ...................................................................................3

Argument .....................................................................................6

    I.     The United States has coerced speech about COVID. ........................6

    II.    The United States has coerced speech about Biden Family
            influence peddling. ............................................................14

    III.   The United States has coerced speech about elections. ......................22

           A.    Cybersecurity and Infrastructure Security Agency (CISA) ......23

           B.    The Election Integrity Partnership (EIP) .................................26

Conclusion ...................................................................................31

# TABLE OF AUTHORITIES

**CASES**                                                                 **Page(s)**

*Anderson v. Bessemer City*,
    470 U.S. 564 (1985) ......................................................................4

*Arizona Free Enter. Club's Freedom Club PAC v. Bennett*,
    564 U.S. 721 (2011) ...................................................................4, 5

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*,
    140 S. Ct. 2335 (2020) ..................................................................5

*Dennis v. United States*,
    341 U.S. 494 (1951) ......................................................................4

*Direct Biologics, LLC v. McQueen*,
    63 F.4th 1015 (5th Cir. 2023) .......................................................4

*Kennedy v. Warren*,
    66 F.4th 1199 (9th Cir. 2023) .......................................................4

*McIntyre v. Ohio Elections Comm'n*,
    514 U.S. 334 (1995) ....................................................................22

*Missouri v. Biden*,
    2023 WL 4335270 (W.D. La. July 4, 2023) .............................. 4, 6, 13, 13, 14

*Norwood v. Harrison*,
    413 U.S. 455 (1973) ....................................................................31

*Snyder v. Phelps*,
    562 U.S. 443 (2011) ...................................................................3, 5

*Texas v. Johnson*,
    491 U.S. 397 (1989) ......................................................................3

**STATUTES**

6 U.S.C. § 652 .........................................................................................23

**OTHER AUTHORITIES**

Betsy Klein, *White House Reviewing Section 230 Amid Efforts to Push Social Media Giants to Crack Down on Misinformation*, CNN (Jul. 20, 2021)
 ............................................................................................................13

Bruce Golding, *Zuckerberg Says Facebook Censored the Post's Hunter Biden Stories Because FBI Warned of Russian Misinfo 'Dump,'* NEW YORK POST (Aug. 26, 2022)
 ............................................................................................................16

CENTER FOR INTERNET SEC., *EI-ISAC*
 ..................................................................................................... 25, 25

CYBERSECURITY AND INFRASTRUCTURE SEC. AGENCY, MIS-, DIS-, AND MALIN-FORMATION
 ............................................................................................................23

Declaration of Yoel Roth
 ............................................................................................................17

Deposition of Brian Scully
 ............................................................................................................24

Deposition of Elvis Chan
 .................................................................................. 17, 19, 20, 21

DEP'T OF HOMELAND SEC., DEPARTMENT OF HOMELAND SECURITY CYBERSECU-RITY AND INFRASTRUCTURE SECURITY AGENCY OPERATIONS AND SUPPORT FIS-CAL YEAR 2024 CONGRESSIONAL JUSTIFICATION (2023)
 ............................................................................................................25

ELECTION INTEGRITY P'SHIP, *The Long Fuse: Misinformation and the 2020 Election* (2021)
 .................................................................................. 26, 27, 30

Emma-Jo Morris & Gabrielle Fonrouge, *Smoking-gun Email Reveals how Hunter Biden Introduced Ukrainian Businessman to VP Dad*, NEW YORK POST (Oct. 14, 2020)
...............................................................................................15

Letter from John B. Bellinger III to Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary (July 27, 2023)
.................................................................................. 28, 29, 30

Letter from Rep. Jordan, Chairman, House Comm on the Jud., to the Hon. Christopher Wray, Director, FBI (July 20, 2023)
.................................................................. 14, 15, 16, 17, 18, 20, 21

Matt Taibbi (@mtaibbi), TWITTER (Mar. 2, 2023, 12:00 PM)
...............................................................................................29

Miranda Devine, *Media Helped Hide the Real Joe Biden by Censoring Hunter Stories*, NEW YORK POST (Nov. 28, 2021)
...............................................................................................22

Nandita Bose and Elizabeth Culliford, *Biden Says Facebook, Others 'Killing People' by Carrying COVID Misinformation*, REUTERS (Jul. 16, 2021)
...............................................................................................10

OFFICE OF INSPECTOR GEN., DEP'T OF HOMELAND SEC., OIG-22-58, DHS NEEDS A UNIFIED STRATEGY TO COUNTER DISINFORMATION CAMPAIGNS, (Aug. 10, 2022)
...............................................................................................23

Press Release, Dep't of Homeland Sec., Statement by Secretary Jeh Johnson on the Designation of Election Infrastructure as a Critical Infrastructure Subsector (Jan. 6, 2017)
...............................................................................................23

Rep. Jim Jordan (@Jim_Jordan), TWITTER (July 27, 2023, 12:03 PM)
.................................................................................................7

Rep. Jim Jordan (@Jim_Jordan), TWITTER (July 28, 2023, 12:03 PM)
.................................................................................................7

Rep. Jim Jordan (@Jim_Jordan), TWITTER (Aug. 3, 2023, 11:00 AM)
................................................................................7

Rep. Jim Jordan (@Jim_Jordan), TWITTER (Aug. 7, 2023, 10:11 AM)
................................................................................7

Ryan Tracy, *Facebook Bowed to White House Pressure, Removed Covid Posts*,
THE WALL STREET JOURNAL (July 28, 2023)
................................................................................14

Sen. Ted Cruz (@tedcruz), TWITTER (Oct. 27, 2022, 12:34 PM)
................................................................................26

STAFF OF THE H. COMM. ON THE JUD., 118TH CONG., INTERIM STAFF REPORT: THE
WEAPONIZATION OF CISA
................................................................................22

STAFF OF H. COMM. ON THE JUD., SELECT SUBCOMM. ON THE WEAPONIZATION OF
THE FED. GOV'T, & PERMANENT SELECT COMM. ON INTEL., 118TH CONG., THE
HUNTER BIDEN STATEMENT: HOW SENIOR INTELLIGENCE COMMUNITY OFFICIALS
AND THE BIDEN CAMPAIGN WORKED TO MISLEAD AMERICAN VOTERS (2023)
................................................................................15

STANFORD INTERNET OBSERVATORY, *Background on the SIO's Projects on So-
cial Media* (Mar. 17, 2023)
................................................................................30

Steven Nelson, *The Post's FB Traffic Tanked After WH Aide's False Claim of
'Churning Out Articles Every Day About People Dying' From COVID Vax*,
NEW YORK POST (Aug. 4, 2023)
................................................................................9

U.S. DEP'T OF STATE, *About Us—Global Engagement Center*
................................................................................29

## INTEREST OF *AMICI CURIAE*

Representatives Jim Jordan, Kelly Armstrong, Andy Biggs, Dan Bishop, Kat Cammack, Russell Fry, Lance Gooden, Harriet Hageman, Mike Johnson, Thomas Massie, Barry Moore, and Elise Stefanik are Members of the United States House of Representatives and Members of the House Judiciary Committee and/or the Select Subcommittee on the Weaponization of the Federal Government. The Judiciary Committee is authorized by the House to conduct oversight and legislate on matters concerning civil liberties, the separation of powers, and the judiciary. Each Member of Congress has taken an oath to uphold the Constitution and laws of the United States. As Members of the House Judiciary Committee and/or the Weaponization Subcommittee, each Member has an institutional interest in protecting First Amendment rights from encroachment by the executive branch, protecting the rule of law, and holding the executive branch accountable when it overreaches. This interest also includes ensuring that the courts police those constitutional boundaries.

Each Member signatory is concerned that the Biden Administration has violated the Constitution and abridged Americans' civil liberties. The House Judiciary Committee and the Weaponization Subcommittee have been conducting an ongoing investigation into how and to what extent the executive branch has coerced or colluded with social media companies to censor speech. Very recent evidence, obtained in said investigation in the weeks after the district court's preliminary injunction

ruling, further corroborates the district court's findings. Thus, each Member signatory has a substantial interest in this case and offers a unique perspective by virtue of his or her role in Congress.[1]

---

[1] All parties consented to the filing of this brief. Pursuant to Fed. R. App. P. 29(a)(4)(E), no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and, no person—other than the *amici curiae*, its members, or its counsel—contributed money that was intended to fund preparing or submitting the brief.

**INTRODUCTION**

Wielding threats of intervention, the executive branch of the federal government has engaged in a sustained effort to coerce private parties into censoring speech on matters of public concern. On issue after issue, the Biden Administration has distorted the free marketplace of ideas promised by the First Amendment, bringing the weight of federal authority to bear on any speech it dislikes—including memes and jokes. Of course, Big Tech companies often required little coercion to do the Administration's bidding on some issues. Generally eager to please their ideological allies and overseers in the federal government, these companies and other private entities have repeatedly censored accurate speech on important public issues. When the censors were too slow to suppress speech that the partisans in the Administration disliked, the federal government prodded them back into action with continual and increasing pressure.

Official pressure to suppress speech violates the First Amendment. "[A] principal function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." *Texas v. Johnson*, 491 U.S. 397, 408–09 (1989) (cleaned up). No doubt, the government may find some individuals' speech "misguided, or even hurtful," but "the point of all speech protection is to shield just those choices of content." *Snyder v. Phelps*, 562

3

U.S. 443, 458 (2011) (cleaned up). "The First Amendment embodies our choice as a Nation that, when it comes to such speech, the guiding principle is freedom—the unfettered interchange of ideas—not whatever the State may view as fair." *Arizona Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 750 (2011) (cleaned up). The First Amendment is founded on "the hypothesis that speech can rebut speech, propaganda will answer propaganda, [and] free debate of ideas will result in the wisest governmental policies." *Dennis v. United States*, 341 U.S. 494, 503 (1951). Thus, the First Amendment stands against any governmental effort to coerce or otherwise burden the free speech of private entities—even if that action falls short of outright suppression. *Cf. Kennedy v. Warren*, 66 F.4th 1199, 1213 (9th Cir. 2023) (Bennett, J., concurring) ("[W]e do not require a government official to list specific consequences in order to find a constitutional violation.").

The district court found, as a matter of fact, that "the United States Government, through the White House and numerous federal agencies, pressured and encouraged social-media companies to suppress free speech." *Missouri v. Biden*, 2023 WL 4335270, at *44 (W.D. La. July 4, 2023). These factual findings "must be left undisturbed unless clearly erroneous." *Direct Biologics, LLC v. McQueen*, 63 F.4th 1015, 1020 (5th Cir. 2023) (cleaned up). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985).

The district court's findings are easily "permissible"; they are clearly correct. Beyond the ample evidence cited by the district court and the Plaintiffs, even more recent evidence obtained by the House Judiciary Committee and the Weaponization Subcommittee confirms the district court's conclusions.

That evidence shows that the Biden Administration has relentlessly pressured private entities—sometimes in cooperation with other private entities—to censor speech that the Administration disliked. As detailed below, this official coercion has undermined the marketplace of ideas on issues of public importance ranging from COVID to federal elections to Biden family misdeeds. And the suppression "does not simply have an effect on speech, but is directed at certain content and is aimed at particular speakers": conservative voices opposed to the current Administration. *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2347 (2020). "This sort of 'beggar thy neighbor' approach to free speech—restricting the speech of some elements of our society in order to enhance the relative voice of others—is wholly foreign to the First Amendment." *Bennett*, 564 U.S. at 741 (cleaned up). Likewise foreign to the First Amendment are governmental efforts to coerce the speech of private Americans. "As a Nation we have chosen a different course—to protect even hurtful speech on public issues to ensure that we do not stifle public debate." *Snyder*, 562 U.S. at 461.

Because the Biden Administration has repeatedly used government coercion to stifle public debate—and the district court's injunction rightfully halts the Administration's unlawful conduct—the Court should affirm.

## ARGUMENT

### I.    The United States has coerced speech about COVID.

As the district court found, the federal government "suppressed alternative views" about COVID-related matters, including the origination of the virus, the efficacy of vaccines and masks, and the adverse effects of lockdowns, effectively forcing social media companies to enforce the government's view as "the truth." *Biden*, 2023 WL 4335270, at *49–50. The district court listed over twenty examples of the government engaging in coercive acts directed toward social media companies to bring about censorship. *Id.* at *45–47. And the government's pressure campaign worked. Facebook agreed to moderate certain COVID-related speech in response to pressure from the Biden Administration, telling the government that Facebook would rely on their "authorities" to determine what content to censor. *Id.* at *5, *6, *50. The district court described the government's direction of Facebook's content choices as a "partner[ship]." *Id.* at *47.

Very recent evidence corroborates the district court's findings. The House Judiciary Committee subpoenaed internal documents from Meta, the parent entity of Facebook and Instagram. The documents obtained thus far confirm that the

companies censored information and altered their content moderation policies because of pressure from the Biden Administration to rid their platforms of purported "misinformation."[2]

This pressure was direct and coercive. For example, the Administration tried to suppress discussion of COVID's origins: when a Facebook executive asked in July 2021 why the company censored the COVID lab leak theory, an executive in charge of content policy development said, "[b]ecause we were under pressure from the [A]dministration" to do so.[3] The same Facebook executive confessed that the company "shouldn't have done it."[4]

Yet Facebook continued to do the Administration's bidding, repeatedly removing and reducing content the federal government disfavored. The Biden White House's successful months-long campaign to censor views expressing or supporting vaccine hesitancy is the clearest example of how the government coerced social

---

[2] Rep. Jim Jordan (@Jim_Jordan), TWITTER (July 27, 2023, 12:03 PM), https://tinyurl.com/5nz8sn3b ("THE FACEBOOK FILES PART 1"); Rep. Jim Jordan (@Jim_Jordan), TWITTER (July 28, 2023, 12:03 PM), https://tinyurl.com/3z5npf92 ("THE FACEBOOK FILES PART 2"); Rep. Jim Jordan (@Jim_Jordan), TWITTER (Aug. 3, 2023, 11:00 AM), https://tinyurl.com/4kjvehbb ("THE FACEBOOK FILES PART 3"); Rep. Jim Jordan (@Jim_Jordan), TWITTER (Aug. 7, 2023, 10:11 AM), https://tinyurl.com/yebawzjr ("THE FACEBOOK FILES PART 4").

[3] Ex. 1 (E-mail from Nick Clegg to Facebook employees (July 14, 2021, 11:46 AM)). All Exhibit cites are to this brief's Appendix.

[4] *Id.*

media companies to change the scope and enforcement of their content moderation policies.

In an internal email, a Facebook employee explained to CEO Mark Zuckerberg and COO Sheryl Sandberg: "We are facing continued pressure from external stakeholders, including the [Biden] White House and the press, to *remove* more COVID-19 vaccine discouraging content."[5]



Mark, Sheryl:

We are seeking your guidance on whether to take more aggressive action against certain vaccine discouraging content.

We are facing continued pressure from external stakeholders, including the White House and the press, to *remove* more COVID-19 vaccine discouraging content. For example, we recently shared with the White House a list of the top 100 vaccine-related posts on FB in the U.S. for the week of 4/5-4/11. While authoritative information dominated the list, the White House was concerned that the #3 post was a vaccine discouraging humorous meme, and they called on us to delete the meme.

Another Facebook executive notified his team that a senior advisor to President Biden was "outraged" "that [Facebook] did not remove" a meme that bothered the Administration.[6] Likewise, to appease the Administration, Facebook demoted a Tucker Carlson video critical of the COVID vaccine, even though Facebook admitted that the video did not violate company policy.[7]

---

[5] Ex. 2 (E-mail from Facebook employee to Facebook employees (Apr. 27, 2021, 11:58 AM)) (emphasis in original).
[6] Ex. 3 (E-mail from Nick Clegg to Facebook employees (Apr. 19, 2021, 9:40 AM)).
[7] *Id.*

Tucker Carlson was not the only prominent critic of President Biden to be targeted by the Administration's censorship efforts. According to Facebook's internal notes of meetings with White House senior advisors, White House officials questioned whether Facebook's enforcement of its content moderation policies against the *New York Post* was aggressive enough.[8] Similarly, in April 2021, a White House official questioned whether Facebook could "change [its] algorithm so that people were more likely to see [the *New York Times*], [the *Wall Street Journal*], any authoritative news source over [the] Daily Wire, Tomi Lahren, polarizing people."[9] The White House's requests were rooted in the paternalistic notion that Americans cannot decide for themselves what information should or should not be believed. As a White House staffer condescendingly remarked in a meeting with Facebook in April 2021, "[i]f someone in rural Arkansas sees something on [Facebook], it's the

---

[8] Ex. 4 (Facebook employee's notes of a call between White House personnel and Facebook employees on March 26, 2021). The *New York Post*'s traffic on Facebook subsequently plummeted by over 50 percent before rebounding to "normal levels" by fall 2021. Steven Nelson, *The Post's FB Traffic Tanked After WH Aide's False Claim of 'Churning Out Articles Every Day About People Dying' From COVID Vax*, NEW YORK POST (Aug. 4, 2023), https://tinyurl.com/rrmtzkk.

[9] Ex. 5 (Facebook employee's notes of a call between White House personnel and Facebook employees on April 14, 2021).

truth."[10] In a June 2021 meeting, the White House pushed Facebook to "reduce the spread of bad information," *i.e.*, "bad" information according to the White House.[11]

Not only did the Biden Administration privately coerce Facebook and other companies into censoring information, it also engaged in a public relations campaign against the companies to pressure them into submission. In July 2021, President Biden publicly denounced these companies, particularly Facebook, claiming they were "killing people" by not censoring alleged "misinformation" to the government's satisfaction.[12] Facebook employees internally lamented that the Biden White House's "definition of 'misinfo' is completely unclear."[13] Following the White House's pressure, Facebook leadership—internally admitting that the move was "stemming from the continued criticism of our approach from the [Biden] administration"—directed employees to "brainstorm some additional policy levers we can

---

[10] Ex. 6 (Facebook employee's notes of a call between White House personnel and Facebook employees on April 5, 2021).

[11] Ex. 7 (Facebook employee's notes of a call between White House personnel and Facebook employees on June 15, 2021).

[12] Nandita Bose and Elizabeth Culliford, *Biden Says Facebook, Others 'Killing People' by Carrying COVID Misinformation*, REUTERS (Jul. 16, 2021), https://tinyurl.com/zpt53rna.

[13] Ex. 8 (E-mail from Facebook employee to Facebook employees (July 16, 2021, 8:14 PM)).

pull to be more aggressive against . . . misinformation."[14] Ultimately, the company

decided to adopt four new, more aggressive policy options one month later.[15]

Likewise, before meeting with the Biden Administration's Office of the Surgeon General (OSG), a Facebook employee said that Sheryl Sandberg "is keen that we continue to explore some moves that we can make to show that we are trying to be responsive to the [White House]."[16] The email continued: "My sense is that our current course—in effect explaining ourselves more fully, but not shifting on where we draw the lines . . . is a recipe for protracted and increasing acrimony with the [White House]."[17] Internal documents obtained by the House Judiciary Committee and the Weaponization Subcommittee show that the Biden Administration pressured Facebook to censor information about the COVID vaccine's side effects, even if the information was true.[18] In a July 2021 meeting with OSG, a Facebook employee confirmed that Facebook was demoting content that questioned whether vaccine

---

[14] Ex. 9 (E-mail from Facebook employee to Facebook employees (Aug. 6, 2021, 7:13 PM)).

[15] Ex. 10 (E-mail from Nick Clegg to Facebook employees (Aug. 19, 2021, 5:25 PM)).

[16] Ex. 11 (E-mail from Facebook employee to Facebook employees (July 22, 2021, 12:17 PM)).

[17] *Id.*

[18] Ex. 12 (E-mail from Sheryl Sandberg to Nick Clegg (Jul. 21, 2021, 4:49 PM)) ("The Surgeon General wants us to remove true information about side effects.").

mandates constituted "government overreach," despite acknowledging "[t]hat's not false information."[19]

Worse still, when Facebook questioned censoring information, the Biden Administration showed disdain and contempt for the First Amendment. For example, when the Administration flagged satirical content about the COVID vaccine, a Facebook executive first warned that removing satirical content would "represent a significant incursion into traditional boundaries of free expression in the US."[20] But the Biden Administration was unpersuaded, insisting that the content "inhibits confidence" in the COVID vaccine.[21]

A Facebook vice president warned internally that the company was at "a crossroads" with the Administration over its censorship efforts.[22] Facebook executives grasped the connection between the company's business prospects and staying in the Administration's good graces. One executive, recommending that the company consider bending to the Administration's censorship requests, cautioned COO Sheryl Sandberg that Facebook had "bigger fish we have to fry with the Administration — data flows etc."[23]

---

[19] Ex. 13 (Facebook employee's notes of a call between OSG personnel and Facebook employees on July 16, 2021).

[20] Ex. 3 (E-mail from Nick Clegg to Facebook employees).

[21] *Id.*

[22] *Id.*

[23] Ex. 11 (E-mail from Facebook employee to Facebook employees).

Another looming issue was—and still is—reform of Section 230. As the district court explained, Section 230 of the Communications Decency Act is "valuable" to Big Tech because of its legal protections. *Biden*, 2023 WL 4335270, at *47. And the district court found that the federal government "threat[ened]" Big Tech with the repeal of Section 230 to induce compliance with its censorship campaign. *Id.* Mark Zuckerberg has referred to the possibility of antitrust enforcement as an "existential threat" to his empire. *Id.* at *4. Four days after President Biden publicly accused Facebook of "killing people," the White House Communications Director publicly said the Administration was "reviewing" Section 230 reform as an option because the social media companies "should be held accountable."[24] Internal documents show that Facebook executives feared that the Biden Administration would retaliate against the company for not censoring enough: one executive commented that the dispute over content was not "a great place for us to be," and he would be "grateful for any further creative thinking on how we can be responsive to their [content] concerns."[25] In response to mounting pressure, Facebook capitulated: "By August 2021,

---

[24] Betsy Klein, *White House Reviewing Section 230 Amid Efforts to Push Social Media Giants to Crack Down on Misinformation*, CNN (Jul. 20, 2021), https://tinyurl.com/73hnfk3h.

[25] Ex. 11 (E-mail from Facebook employee to Facebook employees).

Facebook executives were emailing each other about new planned changes to their Covid content policies," including increased punishments for violators.[26]

In short, the Biden Administration used its power to commandeer the apparatuses of social media companies to affect their COVID-related content policies. And out of self-interest, the companies complied and censored content beyond what it otherwise would have. This government coercion violates the First Amendment.

## II.    The United States has coerced speech about Biden Family influence peddling.

The federal government, specifically the FBI's Foreign Influence Task Force (FITF), also used its power and influence to deceive and coerce social media companies into suppressing factual information during the 2020 election about the Biden family that the FBI knew to be true.[27] The district court rightly labeled "[t]he FBI's failure to alert social-media companies that the Hunter Biden laptop story was real, and not mere Russian disinformation," as "particularly troubling." *Biden*, 2023 WL 4335270 *50. The laptop contained documents and emails with incriminating details

---

[26] Ryan Tracy, *Facebook Bowed to White House Pressure, Removed Covid Posts*, The Wall Street Journal (July 28, 2023), https://tinyurl.com/2bepvs5t; *see also* Ex. 10 (E-mail from Nick Clegg to Facebook employees).
[27] Letter from Rep. Jordan, Chairman, House Comm on the Jud., to the Hon. Christopher Wray, Director, FBI, at 1 (July 20, 2023), https://tinyurl.com/3m7a6wsa.

about foreign business dealings that also implicated Hunter Biden's father—then-presidential candidate, Joe Biden.[28]

In a recent transcribed interview before the House Judiciary Committee and Weaponization Subcommittee, current Section Chief of FITF, Laura Dehmlow, testified that (1) FBI agents who knew the laptop was real were some of the same FBI agents who repeatedly warned social media companies about a potential "hack-and-leak" likely to occur in October 2020; and (2) despite direct requests from Twitter and Facebook for information on the day the *New York Post* story was published, the FBI decided to deliberately withhold critical information from the social media companies.[29]

Although the FBI had the authenticated laptop in its possession since December 2019, it did not publicly acknowledge that it was real until after the November 3, 2020, election.[30] Rather than acknowledge the truth, the FBI actively influenced and deceived the social media companies to censor the story when it inevitably came

---

[28] Emma-Jo Morris & Gabrielle Fonrouge, *Smoking-gun Email Reveals how Hunter Biden Introduced Ukrainian Businessman to VP Dad*, NEW YORK POST (Oct. 14, 2020), https://tinyurl.com/v7maymv8; STAFF OF H. COMM. ON THE JUD., SELECT SUBCOMM. ON THE WEAPONIZATION OF THE FED. GOV'T, & PERMANENT SELECT COMM. ON INTEL., 118TH CONG., THE HUNTER BIDEN STATEMENT: HOW SENIOR INTELLIGENCE COMMUNITY OFFICIALS AND THE BIDEN CAMPAIGN WORKED TO MISLEAD AMERICAN VOTERS 1, 6 (2023), https://tinyurl.com/47v4fxb8.

[29] Ex. 14 (Excerpts of Transcribed Interview of Laura Dehmlow before the House Committee on the Judiciary and the Select Subcommittee on the Weaponization of the Federal Government (July 17, 2023)), at 29–37, 173–174.

[30] Jordan, *supra* note 27, at 5.

out.[31] In a well-executed, months-long plan, the FBI primed the narrative, telling social media companies to "look for a 'hack and dump' operation by the Russians prior to the 2020 election."[32] Then, as soon as the laptop's contents were exposed, the FBI refused to answer questions and let the narrative it had constructed do its work of distracting from and minimizing the truth. Mark Zuckerburg's justification for censoring the story illustrates the effectiveness of this plan: "the FBI basically came to us" and said, "'you should be on high alert.'" Facebook censored the story because when "[the FBI] come[s] to us and tell[s] us that we need to be on guard about something, then I want to take that seriously," and the story "basically fit the pattern" the FBI warned about.[33] This federal coercion led to the censorship of accurate information.

In "the nine months leading up to the 2020 election, the FBI met over 30 times with social media platforms—all while in possession of Hunter Biden's laptop."[34] The FBI had "at least five meetings with Facebook, Google, Microsoft, [and] Yahoo!, in addition to multiple meetings with Twitter and Reddit."[35] Yoel Roth, former Head of Site Integrity at Twitter, confirmed in a sworn declaration that he had regular

---

[31] *Id.* at 1.

[32] *Id.* at 4.

[33] Bruce Golding, *Zuckerberg Says Facebook Censored the Post's Hunter Biden Stories Because FBI Warned of Russian Misinfo 'Dump,'* New York Post (Aug. 26, 2022), https://tinyurl.com/5n8xz6xd.

[34] Jordan, *supra* note 27, at 1.

[35] *Id.*

meetings in 2020 with different federal agencies, including the FBI, where they "communicated that they expected 'hack-and-leak operations'" against those associated with political campaigns "shortly before the 2020 presidential election, likely in October."[36] "These expectations of hack-and-leak operations were discussed throughout 2020."[37] He was also told "that material obtained through those hacking attacks would likely be disseminated over social media platforms, including Twitter" and even that there were rumors the materials could involve Hunter Biden.[38]

The companies also participated together in regular "USG-Industry" meetings, including four in October 2020, with representatives from federal agencies, including the FBI.[39] During these meetings, the FBI asked social media companies what their "hack and leak" policies were, how the companies would handle a potential "hack and leak," and whether the companies would remove hacked materials from their platforms.[40] In response, some companies without a specific "hack and

---

[36] Declaration of Yoel Roth, ¶¶ 10–11, Federal Elections Commission MUR 7821, (Dec. 17, 2020), https://tinyurl.com/3mmzx2bk [hereinafter Roth Decl.].

[37] *Id*.

[38] *Id.*

[39] Jordan, *supra* note 27, at 1.

[40] Deposition of Elvis Chan at 248:5–250:21 (filed below as ECF No. 204-1) [hereinafter Chan Dep.]; *see also* Roth Decl., *supra* note 36, ¶ 11.

leak" policy, such as Facebook, developed and adopted a new policy during summer 2020.[41]

Dehmlow confirmed that "the FBI could—and did—share information with companies regarding foreign malign influence operations, like hack-and-leak operations, including those conducted by Russia-aligned actors."[42] For example, the agenda for the October 7, 2020 "USG-Industry" meeting—one week before the October 14 *New York Post* story—lists "Hack/Leak Concerns" as a topic.[43]

On the day the article was published, FBI met with Twitter, and a company representative asked if the laptop was real.[44] In testimony to the House Judiciary Committee and Weaponization Subcommittee, Dehmlow stated that, in response, "one of the FBI folks who was on the call" confirmed that the laptop was real before "another participant jumped in and said, 'no further comment.'"[45] After the meeting, FBI personnel "deliberated internally" and determined that—even though they knew

---

[41] Ex. 15 (Excerpts of Transcribed Interview of David Agranovich before the House Committee on the Judiciary and the Select Subcommittee on the Weaponization of the Federal Government (May 16, 2023)); Ex. 16 (Excerpts of Transcribed Interview of Nathaniel Gleicher before the House Committee on the Judiciary and the Select Subcommittee on the Weaponization of the Federal Government (June 21, 2023)).

[42] Jordan, *supra* note 27, at 2; Ex. 14 (Laura Dehmlow Transcribed Interview), at 173–174.

[43] Ex. 17 (E-mail from Facebook employee to Matthew Masterson and Brian Scully (Sept. 29, 2020, 11:41 AM).

[44] Ex. 14 (Laura Dehmlow Transcribed Interview), at 29.

[45] *Id.*

the laptop was not Russian disinformation—in all further communications with social media companies the FBI would reply with "no comment."[46]

Later that same day, the FBI met with Facebook. This time the FBI had its story straight. When Facebook asked whether the laptop was real, Dehmlow, on behalf of the FBI, said, "no comment."[47] Despite requests made during Dehmlow's interview and subsequently to Director Wray by letter, the FBI has thus far refused to reveal to the House Judiciary Committee and Weaponization Subcommittee the identities of the FBI official who told Twitter that the laptop was real, the FBI lawyer who instructed "no further comment" during the call with Twitter, or the FBI official who determined that the agency would respond only "no comment" when asked about Hunter Biden laptop's authenticity going forward.[48]

Facebook followed up again the next day, October 15.[49] According to an internal Facebook document recently obtained by the House Judiciary Committee and the Weaponization Subcommittee, a Facebook employee (and former FBI official) "spoke with SSA Elvis Chan (FBI San Francisco) on 15 October 2020, as a follow up to the call with the Foreign Influence Task Force on 14 October."[50] Facebook

---

[46] *Id*. at 33.

[47] *Id*. at 33; *see also* Chan Dep., *supra* note 400, at 215.

[48] *See* Ex. 14 (Laura Dehmlow Transcribed Interview), at 29–31; Jordan, *supra* note 27, at 5–6 (requesting a response by August 3, 2023).

[49] Ex. 18 (Entry on internal Facebook case file by Facebook employee (Oct. 15, 2020)).

[50] *Id*.

again asked if the FBI had any new information, to which "Chan advised that he was up to speed on the current state of the matter within the FBI and that there was no current evidence to suggest any foreign connection or direction of the leak."[51] But of course, the FBI knew not just of the *absence* of evidence suggesting any foreign connection; the FBI knew the laptop was real.[52]



I spoke with SSA Elvis Chan (FBI San Francisco) on 15 October 2020, as a follow up to the call with the Foreign Influence Task Force on 14 October. I asked SSA Chan whether there was any update or change since the discussion on 14 October 2020 as to whether the FBI saw any evidence suggesting foreign sponsorship or direction of the leak of information related to Hunter Biden as published in the New York Post story on 14 October. SSA Chan advised that he was up to speed on the current state of the matter within the FBI and that there was no current evidence to suggest any foreign connection or direction of the leak. SSA Chan assured that the FBI would be in contact if any additional information on this was developed through further investigation.

October 15, 2020 · Like · Reply

This internal Facebook document directly conflicts with the deposition testimony FBI Special Agent Elvis Chan provided in this case. Chan testified that he was "confident" that he "was not a party to any meeting with social media companies where Hunter Biden was discussed outside of the [October 14 FITF-Facebook meeting where Laura Dehmlow responded 'no comment']."[53] Later, when asked if, other than the October 14 FITF-Facebook meeting, he was "aware of any communications

---

[51] *Id.* Chan testified in his deposition that, unlike Dehmlow, FITF Section Chief Bradley Benavides, the Russia Unit Chief of FITF, and other FITF personnel, he did not know prior to October 14 that the FBI had the laptop. *Cf.* Chan Deposition, *supra* note 40, at 230:7–19; Ex. 14 (Laura Dehmlow Transcribed Interview), at 37.

[52] Jordan, *supra* note 27; Ex. 14 (Laura Dehmlow Transcribed Interview), at 37.

[53] *Cf.* Chan Dep., *supra* note 40, at 215:22–216:16; Ex. 18 (Entry on internal Facebook case file by Facebook employee (Oct. 15, 2020)).

between anyone at Facebook and anyone at the FBI related to the Hunter Biden lap-

top story," Chan responded, "No."[54]

As a result of the FBI's withholding critical information the day of (and the

days after) the *New York Post*'s article was published, the social media companies

began to do precisely what the FBI intended: suppress truthful First Amendment-

protected speech less than three weeks before the presidential election.[55] The story

implicating one of the two major party candidates was blocked by Twitter and de-

amplified by Facebook, "significantly reducing its circulation and prevalence in us-

ers' newsfeeds."[56] All because the FBI—an organization that the companies felt

compelled to follow—had led them to believe the laptop story was Russian disinfor-

mation.[57] The story was not Russian disinformation, and FBI personnel meeting with

Twitter and Facebook knew *at the time* that it was not Russian disinformation.[58] This

government coercion of the marketplace of ideas undoubtedly affected the 2020

---

[54] Chan Dep., *supra* note 400, at 233:22–234:3.

[55] Jordan, *supra* note 27.

[56] *Id.*

[57] FBI Director Wray testified that "the FBI is not in the business of moderating content or causing any social media company to suppress or censor" speech. Oversight of the Federal Bureau of Investigation: Hearing Before the H. Comm. on the Judiciary, 118th Cong. (July 12, 2023). On July 18, Chairman Jordan and Representative Mike Johnson, Chairman of the Subcommittee on the Constitution and Limited Government, wrote a letter to Director Wray providing him the opportunity to amend his testimony. Director Wray has not responded.

[58] Jordan, *supra* note 27.

election.[59] The district court's findings that the federal government unlawfully co-erced private speech are amply supported by the evidence.

## III.   The United States has coerced speech about elections.

The United States also flouted the First Amendment by coercing election-related speech. This coercion is especially troubling because speech pertaining to elections "occupies the core of the protection afforded by the First Amendment." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346 (1995). Yet the federal government has repeatedly coerced social media companies to censor election-related speech. It has done so directly, through DHS's Cybersecurity and Infrastructure Security Agency (CISA), and indirectly, through the private-sector Election Integrity Partnership (EIP). Following revelations from this lawsuit and the ongoing investigation by the House Judiciary Committee and Weaponization Subcommittee, CISA has taken steps to cover-up and hide its efforts to surveil and censor domestic speech.[60]

---

[59] *See* Miranda Devine, *Media Helped Hide the Real Joe Biden by Censoring Hunter Stories*, NEW YORK POST (Nov. 28, 2021), https://tinyurl.com/mvp474ba.

[60] STAFF OF THE H. COMM. ON THE JUD., 118TH CONG., INTERIM STAFF REPORT: THE WEAPONIZATION OF CISA, (available at https://bit.ly/45jYPke) [hereinafter Interim Staff Report] (filed below as ECF 291-2).

### A.     Cybersecurity and Infrastructure Security Agency (CISA)

Congress established CISA in 2018 to "lead cybersecurity and critical infrastructure security programs, operations, and associated policy."[61] Shortly after the 2016 election, DHS Secretary Jeh Johnson designated "election infrastructure" as a "critical infrastructure subsector."[62] CISA's "Countering Foreign Influence Task Force" (CFITF) focuses "on election infrastructure disinformation."[63] But in an effort to expand its focus on foreign misinformation to domestic misinformation, "CISA transitioned its [CFITF] to promote more flexibility to focus on general MDM," or so-called "Mis-, Dis-, and Malinformation."[64]

CISA's focus on so-called "malinformation" is particularly alarming. According to CISA, "[m]alinformation is based on fact, but used out of context to mislead, harm, or manipulate."[65] Put more plainly, "malinformation is *factual* information

---

[61] 6 U.S.C. § 652.

[62] Press Release, Dep't of Homeland Sec., Statement by Secretary Jeh Johnson on the Designation of Election Infrastructure as a Critical Infrastructure Subsector (Jan. 6, 2017), https://tinyurl.com/2xt3twjd.

[63] OFFICE OF INSPECTOR GEN., DEP'T OF HOMELAND SEC., OIG-22-58, DHS NEEDS A UNIFIED STRATEGY TO COUNTER DISINFORMATION CAMPAIGNS 5 (Aug. 10, 2022), https://tinyurl.com/2p9h2p75.

[64] *Id*. at 7.

[65] CYBERSECURITY AND INFRASTRUCTURE SEC. AGENCY, MIS-, DIS-, AND MALINFORMATION PLANNING AND INCIDENT RESPONSE GUIDE FOR ELECTION OFFICIALS 1 (2022), https://tinyurl.com/52pvpn5d.

that is objectionable not because it is false or untruthful, but because it is provided without adequate 'context'—context as determined by the government."[66]

In his deposition, Brian Scully, the first head of the CFITF and later the head of the MDM team at CISA,[67] said that CISA engaged in "switchboarding," where CISA would flag alleged disinformation to social media platforms.[68] According to Scully, "switchboarding" involves CISA officials first receiving alleged "misinformation" reports from election officials and then forwarding those reports to social media companies so that they could take enforcement measures against the reported content.[69] Scully admitted that CISA was aware that its outreach to social media companies about alleged misinformation would trigger content moderation.[70]

CISA also funded and utilized third parties, such as the Center for Internet Security (CIS), to achieve these aims. CIS is the nonprofit entity responsible for operating the Multi-State Information Sharing and Analysis Center (MS-ISAC) and

---

[66] INTERIM STAFF REPORT, *supra* note 600, at 10.

[67] Deposition of Brian Scully, 11:19–12:6, (available at https://tinyurl.com/2epb2mw9) (filed below as ECF No. 209-1).

[68] *Id*. at 23:16–24:2.

[69] *Id*. at 17:1–18:1.

[70] *Id*. at 17:15–18:1. In response to a question from Representative Dan Bishop, DHS Secretary Mayorkas testified that he believed that "it is true" that "CISA does not flag anything to social media organizations at all," but that he would "verify that." Oversight of the Department of Homeland Security: Hearing Before the H. Comm. on the Judiciary, 118th Cong. (July 26, 2023). Secretary Mayorkas has failed to provide the Judiciary Committee with any information to verify his testimony.

Elections Infrastructure Information Sharing and Analysis Center (EI-ISAC).[71] The EI-ISAC allows election officials around the country to send alleged "misinformation" to CIS, which CIS then forwards to the relevant social media platforms.[72]

As illustrated by the diagram below from CIS's website, the "EI-ISAC is federally funded by CISA and a division of the Center for Internet Security."[73] CISA requested $27 million in FY 2024 funding CIS to operate the EI-ISAC and the MS-ISAC.[74]



Illustrating that claims of "misinformation" are inherently political, the CISA-funded EI-ISAC facilitated attempts to censor core political speech. For example, a state government official working for Pennsylvania's Secretary of State, a Democrat, reported to the EI-ISAC posts on Twitter and Facebook from Senator Ted Cruz's

---

[71] CENTER FOR INTERNET SEC., *EI-ISAC*, https://tinyurl.com/36cny5pu (last visited Aug. 7, 2023).

[72] *Id.*

[73] *Id.*

[74] DEP'T OF HOMELAND SEC., DEPARTMENT OF HOMELAND SECURITY CYBERSECURITY AND INFRASTRUCTURE SECURITY AGENCY OPERATIONS AND SUPPORT FISCAL YEAR 2024 CONGRESSIONAL JUSTIFICATION 73 (2023) (available at https://tinyurl.com/5n72k25h); *see also* INTERIM STAFF REPORT, *supra* note 60, at 7–8.

accounts.[75] In the offending post, Senator Cruz, a Republican, asked: "Why is it only Democrat blue cities that take 'days' to count their votes? The rest of the country manages to get it done on election night."[76] Emblematic of this "switchboarding," the federally funded EI-ISAC forwarded the report to Facebook.[77]

## B.     The Election Integrity Partnership (EIP)

The United States, primarily CISA, also coerced social media companies into censoring speech about the 2020 election through the private-sector Election Integrity Partnership (EIP), led by Stanford University. Formed in the summer of 2020, EIP was a coalition of research entities created "in consultation with CISA and other stakeholders"[78] and "united government, academia, civil society, and industry, analyzing across platforms, to address misinformation in real time."[79] Emails obtained by the House Judiciary Committee and Weaponization Subcommittee confirm that CISA officials were involved with EIP from the very beginning.[80]

---

[75] Ex. 19 (E-mail from misinformation@cisecurity.org to Facebook employees (Oct. 27, 2022, 5:06 PM)).

[76] Sen. Ted Cruz (@tedcruz), TWITTER (Oct. 27, 2022, 12:34 PM), https://tinyurl.com/2s9dce95.

[77] Ex. 19 (E-mail from misinformation@cisecurity.org to Facebook employees).

[78] ELECTION INTEGRITY P'SHIP, *The Long Fuse: Misinformation and the 2020 Election* 2 (2021), https://tinyurl.com/4frucxab [hereinafter EIP].

[79] *Id.* at 241.

[80] Ex. 20 (E-mail from Kate Starbird to Alex Stamos (July 8, 2020, 10:26 AM)).

Because the four entities comprising EIP were not government entities,[81] the United States sought to use EIP to do things that the government could never do without violating the First Amendment—namely, directly monitoring and censoring speech. By its own account, EIP filled the "gap" in the government's ability to police so-called "misinformation" and "disinformation" about elections on social media because "no government agency in the United States has the explicit mandate to monitor and correct election mis- and disinformation."[82]

EIP used the Jira Service Desk, a ticketing software to allow approved entities (government agencies, EI-ISAC, and others) to submit "misinformation" reports, creating a "Jira ticket."[83] From there, EIP personnel analyzed the submission and could comment on the ticket, before a manager would assess whether to forward the ticket to the relevant social media platform(s).[84] EIP's final report illustrates this workflow[85]:

---

[81] Stanford Internet Observatory, the University of Washington's Center for an Informed Public, the Atlantic Council's Digital Forensics Research Lab, and Graphika.
[82] EIP, *supra* note 78, at v, 2.
[83] *Id.*
[84] *Id.*
[85] *Id.*



Figure 1.2: The EIP internal workflow. Filed tickets moved through the listed queues per the directional arrows.

EIP was thoroughly intertwined with CISA, which aided EIP in the process of reporting undesirable election-related speech to social media platforms.[86] Stanford confirmed in a recent letter to Chairman Jordan that CISA was directly "tagged" in a number of Jira tickets "rather than or in addition to" the CISA-funded EI-ISAC.[87] Other documents obtained by the House Judiciary Committee and Weaponization Subcommittee confirm CISA's involvement.[88]

The FBI, the National Security Agency (NSA), and the Global Engagement Center (GEC) were also involved. The GEC is a federal government interagency organization housed at the State Department with the stated mission of countering

---

[86] *Id.* at 13.

[87] Letter from John B. Bellinger III to Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary (July 27, 2023) (on file with the H. Comm. on the Judiciary).

[88] Ex. 21 (E-mail from Elena Cryst to TikTok employee (Nov. 4, 2020, 7:41 PM)); Ex. 22 (E-mail from Reddit employee to Alex Stamos (Nov. 3, 2020, 12:36 PM)).

foreign "propaganda and disinformation efforts."[89] Most notably, the GEC submitted tickets to EIP through Jira.[90] Stanford recently confirmed to the Committee that social media platforms could see which entity submitted a ticket, including federal government entities.[91] In addition, before the 2020 election, EIP briefed the NSA, and sent one Jira ticket to the FBI.[92]

The EI-ISAC, federally funded and operated by CIS and CISA, also submitted tickets.[93] CISA even coordinated "an agreement" between CIS and EIP to avoid double reporting.[94] The two admittedly became "partners, "[95] sharing personnel.[96] Information obtained to date during the House Judiciary Committee and

---

[89] U.S. DEP'T OF STATE, *About Us—Global Engagement Center*, https://tinyurl.com/43dmawd9 (last visited Aug. 4, 2023); *see also* Matt Taibbi (@mtaibbi), TWITTER (Mar. 2, 2023, 12:00 PM), https://tinyurl.com/3pmhu8j6 ("GEC's 'Chinese' list included multiple Western government accounts and at least three CNN employees based abroad.").

[90] *See, e.g.*, Ex. 23 (E-mail from Elena Cryst to Google employee (Nov. 2, 2020, 7:03 PM)).

[91] Letter from John B. Bellinger III to the Hon. Jim Jordan, Chairman, H. Comm. on the Judiciary (July 7, 2023) (on file with the H. Comm. on the Judiciary).

[92] Ex. 24 (Excerpts of Transcribed Interview of Alex Stamos before the House Committee on the Judiciary and the Select Subcommittee on the Weaponization of the Federal Government (June 23, 2023)).

[93] *Id*. at 114–115.

[94] *Id.* at 212:07–12.

[95] *Id.* at 369:01–11.

[96] *Id.* at 168:22–171:16, 183:20–22.

Weaponization Subcommittee's investigation confirms that the government-funded EI-ISAC submitted over 100 Jira tickets in the lead-up to the 2020 election.[97]

This close affiliation with the federal government heightened the coerciveness of EIP's interactions with social media platforms. EIP onboarded major social media platforms, gaining privileged access to some of these platforms' data and the ability to collect such data in real-time.[98] EIP's direct recommendations for censorship resulted in the suppression of disfavored speech about the 2020 election.[99] Thirty-five percent of the URLs EIP "shared with Facebook, Instagram, Twitter, TikTok, and YouTube were either labeled, removed, or soft-blocked."[100] Every Twitter account holder EIP identified as a "Repeat Spreader" of election-related "disinformation" expressed "conservative or right-wing political views."[101]

EIP's election-speech monitoring did not end with the 2020 election. EIP recreated itself for the 2022 election and may again for the 2024 election.[102]

---

[97] Letter from John B. Bellinger III to the Hon. Jim Jordan, Chairman, H. Comm. on the Judiciary (June 14, 2023) (on file with the H. Comm. on the Judiciary).

[98] EIP, *supra* note 78, at 17, 181–82; *see* Ex. 22 (E-mail from Reddit employee to Alex Stamos).

[99] *Cf.* Ex. 22 (E-mail from Reddit employee to Alex Stamos); STANFORD INTERNET OBSERVATORY, *Background on the SIO's Projects on Social Media* (Mar. 17, 2023), https://tinyurl.com/3x4ys8me ("EIP did not make recommendations to the platforms about what actions they should take.").

[100] EIP, *supra* note 78, at 27.

[101] *Id.* at 187–88.

[102] Ex. 24 (Alex Stamos Transcribed Interview).

The United States' coercive tactics with social media platforms to quell election-related messages it finds undesirable are unconstitutional—even when funneled through a private-sector entity. *See Norwood v. Harrison*, 413 U.S. 455, 465 (1973) ("[A] state may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish." (cleaned up)).

## CONCLUSION

For these reasons, and to vindicate the First Amendment's promise of a marketplace of ideas free from government meddling, the Court should affirm the preliminary injunction.

Respectfully submitted,

s/ Christopher Mills

GENE P. HAMILTON
*America First Legal Foundation*
*611 Pennsylvania Ave. SE #231*
*Washington, D.C. 20003*
*(202)964-3721*
*gene.hamilton@aflegal.org*

CHRISTOPHER MILLS
*Spero Law LLC*
*557 East Bay Street #22251*
*Charleston, SC 29413*
*(843) 606-0640*
*cmills@spero.law*

Counsel for *Amici Curiae*

AUGUST 7, 2023

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this brief contains 6,496 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman font.

3. This document has been scanned for viruses and is virus-free.

Dated:  August 7, 2023

/s Christopher Mills
Christopher Mills

## CERTIFICATE OF SERVICE

I, Christopher Mills, an attorney, certify that on this day the foregoing Brief was served electronically on all parties via CM/ECF.

Dated: August 7, 2023

s/ Christopher Mills
Christopher Mills

APPENDIX

**INDEX OF EXHIBITS**

| EXHIBIT NUMBER | TITLE |
|---|---|
| 1 | E-mail from Nick Clegg to Facebook employees (July 14, 2021, 11:46 AM) |
| 2 | E-mail from Facebook employee to Facebook employees (Apr. 27, 2021, 11:58 AM) |
| 3 | E-mail from Nick Clegg to Facebook employees (Apr. 19, 2021, 9:40 AM) |
| 4 | Facebook employee's notes of a call between White House personnel and Facebook employees on March 26, 2021 |
| 5 | Facebook employee's notes of a call between White House personnel and Facebook employees on April 14, 2021 |
| 6 | Facebook employee's notes of a call between White House personnel and Facebook employees on April 5, 2021 |
| 7 | Facebook employee's notes of a call between White House personnel and Facebook employees on June 15, 2021 |
| 8 | E-mail from Facebook employee to Facebook employees (July 16, 2021, 8:14 PM) |
| 9 | E-mail from Facebook employee to Facebook employees (Aug. 6, 2021, 7:13 PM) |
| 10 | E-mail from Nick Clegg to Facebook employees (Aug. 19, 2021, 5:25 PM) |
| 11 | E-mail from Facebook employee to Facebook employees (July 22, 2021, 12:17 PM) |
| 12 | E-mail from Sheryl Sandberg to Nick Clegg (July 21, 2021, 4:49 PM) |
| 13 | Facebook employee's notes of a call between Office of the Surgeon General personnel and Facebook employees on July 16, 2021 |

| | |
|---|---|
| 14 | Excerpts of Transcribed Interview of Laura Dehmlow before the House Committee on the Judiciary and the Select Subcommittee on the Weaponization of the Federal Government (July 17, 2023) |
| 15 | Excerpts of Transcribed Interview of David Agranovich before the House Committee on the Judiciary and the Select Subcommittee on the Weaponization of the Federal Government (May 16, 2023) |
| 16 | Excerpts of Transcribed Interview of Nathaniel Gleicher before the House Committee on the Judiciary and the Select Subcommittee on the Weaponization of the Federal Government (June 21, 2023) |
| 17 | E-mail from Facebook employee to Matthew Masterson and Brian Scully (Sept. 29, 2020, 11:41 AM) |
| 18 | Entry on internal Facebook case file by Facebook employee (Oct. 15, 2020) |
| 19 | E-mail from misinformation@cisecurity.org to Facebook employees (Oct. 27, 2022, 5:06 PM) |
| 20 | E-mail from Kate Starbird to Alex Stamos (July 8, 2020, 10:26 AM) |
| 21 | E-mail from Elena Cryst to TikTok employee (Nov. 4, 2020, 7:41 PM) |
| 22 | E-mail from Reddit employee to Alex Stamos (Nov. 3, 2020, 12:36 PM) |
| 23 | E-mail from Elena Cryst to Google employee (Nov. 2, 2020, 7:03 PM) |
| 24 | Excerpts of Transcribed Interview of Alex Stamos before the House Committee on the Judiciary and the Select Subcommittee on the Weaponization of the Federal Government (June 23, 2023) |

EXHIBIT 1

| **From:** | Nick Clegg █████████████ |
| **To:** | ████████████████████████████████████████ |
| **CC:** | Brian Rice; ███████████████████████████████ |
| **Sent:** | 7/14/2021 11:46:33 AM |
| **Subject:** | Re: Brief: 07.14.21 - Andy Slavitt Podcast |

thx

---

**From:** ██████████ < ████████fb.com>
**Date:** Wednesday, July 14, 2021 at 7:44 PM
**To:** Nick Clegg < ██████fb.com>, ████████ < ██████████fb.com>,
< ████████fb.com>, ████████ < ████████fb.com>
**Cc:** Brian Rice < ██████████ < ████████fb.com>, < ████████ < ████████fb.com>, ████████ < ████████fb.com>, ████████████
< ████████fb.com>
**Subject:** Re: Brief: 07.14.21 - Andy Slavitt Podcast

Because we were under pressure from the administration and others to do more and it was part of the "more" package. We removed four claims that multiple fact checkers had labeled false even though we didn't have a harm assessment. We shouldn't have done it. We stopped removing the man made claim in May and now we're moving the other three claims (covid is new/patented) from remove to reduce and inform.

---

**From:** Nick Clegg < ████████fb.com>
**Sent:** Wednesday, July 14, 2021 11:41:56 AM
**To:** ████████ < ████████fb.com>; ████████████ < ████████fb.com>; ████ < ████fb.com>
**Cc:** ████████ < ████fb.com>; Brian Rice < ████████fb.com>; ████ < ████fb.com>;
< ████ < ████████fb.com>; ████████ < ████████fb.com>; ████ < ████fb.com>;
████fb.com>
**Subject:** Re: Brief: 07.14.21 - Andy Slavitt Podcast

Can someone quickly remind me why we were removing – rather than demoting/labeling – claims that Covid is man made before May?

---

**From:** ████████████ < ████████fb.com>
**Date:** Wednesday, July 14, 2021 at 5:32 PM
**To:** ████████ < ████████fb.com>, Nick Clegg < ████████fb.com>, ████ < ████████fb.com>
**Cc:** ████████████ < ████████fb.com>, Brian Rice < ████████fb.com>,
< ████████fb.com>, ████ < ████████fb.com>, ████ < ████████fb.com>,
< ████████fb.com>, ████ < ████████fb.com>
**Subject:** Re: Brief: 07.14.21 - Andy Slavitt Podcast

Following up here (and replying on behalf of ████████ as well who is presenting in another meeting): We worked to further streamline and simplify the talking point around the 12 people identified by the CCDH ('disinfo dozen'). We'd recommend using the following:

"People on the Center for Countering Digital Hate's list show up in multiple places across Facebook products: Facebook pages, Facebook groups, and IG accounts for example. If they repeatedly break our rules, we permanently remove that page, group, or account from our services, and we've done that in more than a dozen instances."

In case it's helpful for further context, the break-down of the entities we've removed associated with people

CONFIDENTIAL TREATMENT REQUESTED
NOT FOR DISTRIBUTION
MEMBERS & STAFF ONLY

identified by the CCDH is: IG Profile = 9; FB Page = 4; FB Group = 1.

---

**From:** ████████ <████████fb.com>
**Date:** Wednesday, July 14, 2021 at 8:04 AM
**To:** Nick Clegg <████████fb.com>, ████ <████fb.com>
**Cc:** ████████ ████████ <████fb.com>, ████ ████████ <████fb.com>, Brian Rice ████fb.com>, ████
████fb.com>, ████ ████fb.com>, ████ ████fb.com>,
████████ ████fb.com>, ████ ████fb.com>, ████ ████fb.com>
**Subject:** Re: Brief: 07.14.21 - Andy Slavitt Podcast

Yes, we have said that publicly.

---

**From:** Nick Clegg <████fb.com>
**Date:** Wednesday, July 14, 2021 at 7:50 AM
**To:** ████ <████fb.com>, ████ <████fb.com>
**Cc:** ████ ████fb.com>, ████ ████fb.com>, Brian Rice
████fb.com>, ████ ████fb.com>, ████ ████fb.com>, ████
████fb.com>, ████fb.com>, ████ ████fb.com>
**Subject:** Re: Brief: 07.14.21 - Andy Slavitt Podcast

Ok – got it (I think) – can I cite your bullet point in blue on this ("entirely removed… more than a dozen" etc)? N

---

**From:** ████████ <████████fb.com>
**Date:** Wednesday, July 14, 2021 at 3:42 PM
**To:** Nick Clegg <████fb.com>, ████ <████fb.com>
**Cc:** ████ ████fb.com>, ████ ████fb.com>, Brian Rice
████fb.com>, ████ ████fb.com>, ████ ████fb.com>, ████
████fb.com>, ████fb.com>, ████ ████fb.com>
**Subject:** Re: Brief: 07.14.21 - Andy Slavitt Podcast

That is a good question. The "disinfo dozen" refers to 12 people. Many of those people have multiple presences on FB/IG. For example, RFK Jr. had a FB Page and IG account. We have removed the IG account but not FB Page, as he posts different content across those two presences and only the IG account has reached our threshold for removal.

---

**From:** Nick Clegg <████fb.com>
**Date:** Wednesday, July 14, 2021 at 7:35 AM
**To:** ████ <████fb.com>, ████ <████fb.com>
**Cc:** ████ ████fb.com>, ████ ████fb.com>, Brian Rice
████fb.com>, ████ ████fb.com>, ████ ████fb.com>, ████
████fb.com>, ████fb.com>, ████ ████fb.com>
**Subject:** Re: Brief: 07.14.21 - Andy Slavitt Podcast

Thx - now, for truly the most simplistic question…: if we've removed pages/accounts of a dozen individuals what's left on FB of the "disinfo dozen"?

N

Get Outlook for iOS

---

**From:** ████████ <████████fb.com>

CONFIDENTIAL TREATMENT REQUESTED
NOT FOR DISTRIBUTION
MEMBERS & STAFF ONLY

**Sent:** Wednesday, July 14, 2021 3:29:38 PM
**To:** Nick Clegg < ███████ fb.com>; █████ < █████ fb.com>
**Cc:** ████████ < ███████ fb.com>; ██████████ < █████ fb.com>; Brian Rice < ██████ fb.com>; ████████ < ███████ fb.com>; ███████████ < ███████ fb.com>; ██████ fb.com>; ████████████
**Subject:** Re: Brief: 07.14.21 - Andy Slavitt Podcast

Thanks, Nick. See responses below in blue.

---

**From:** Nick Clegg < ███████ fb.com>
**Date:** Wednesday, July 14, 2021 at 4:38 AM
**To:** ██████ < ███ fb.com>
**Cc:** ████████ < ████ fb.com>, ████████████ < ██████ fb.com>, Brian Rice < ████████ fb.com>, ██████ < ████████ fb.com>, ██████ fb.com>, ████████ < ██████ fb.com>, ████████
**Subject:** Re: Brief: 07.14.21 - Andy Slavitt Podcast

Thx, Just a few Qs:

- I don't understand the eg of "shedding" that we took action on?
  Vaccine shedding is the term used to describe the release or discharge of any of the vaccine components in or outside of the body. We've seen people closing down their shops to people who have been vaccinated because of fears of shedding, to give just one example of how this claim is causing confusion and could contribute to hesitancy. Vaccine shedding can only occur when a vaccine contains a weakened version of the virus and occurs when a virus is released from an infected person. None of the Covid-19 vaccines cause any kind of shedding. None include living Covid-19 so it is impossible for vaccinated people to shed Covid-19 from the vaccine itself.

- The Q&A has Qs asking why we only took action on covid vaccine misinfo in Dec last year and Feb this year. Why these dates?

  December 2020 is when we first announced we would be removing some false claims about Covid vaccines given the news the vaccines would soon be rolling out around the world. Before that we did not know what would be true or false about the vaccines. February 2021 is when we announced we would remove general vaccine misinformation (8 widely debunked claims, including vaccines cause autism).

- I find what we've actually done re the "disinfo dozen" v hard to follow. Any way to simplify that for me?

Center for Countering Hate's (CDDH) Disinformation Dozen
  - We have removed violating content that these accounts have posted.
  - We have entirely removed the Facebook Pages or Groups or Instagram accounts of more than a dozen of these individuals for repeatedly violating our misinformation policies. In other cases, we have restricted their activity (e.g. by not recommending their content).

N

---

**From:** ██████ < ██████ fb.com>
**Date:** Wednesday, July 14, 2021 at 7:17 AM
**To:** Nick Clegg < ████████ fb.com>
**Cc:** ████████ < ████ fb.com>, ██████ < █████████ fb.com>, ████████ < ████████ fb.com>, Brian Rice < ████████ fb.com>, ██████ < █████████ fb.com>, ████████ < ████████ fb.com>, ████████ < █████████ fb.com>, ████████ < ████ fb.com>

CONFIDENTIAL TREATMENT REQUESTED
NOT FOR DISTRIBUTION
MEMBERS & STAFF ONLY

**Subject:** Brief: 07.14.21 - Andy Slavitt Podcast

Nick: Attached is an updated briefing for Wednesday's podcast interview. It now includes an overarching narrative and specific content examples you can cite. Please let us know if you have additional questions – the folks on this email can help to track down additional info.

Thanks,



CONFIDENTIAL TREATMENT REQUESTED
NOT FOR DISTRIBUTION
MEMBERS & STAFF ONLY

META-118HJC-0053387

EXHIBIT 2

**From:** ▮▮▮▮ < ▮▮▮ fb.com>
**Date:** Tuesday, April 27, 2021 at 11:58 AM
**To:** ▮▮▮ < ▮▮▮ fb.com>, ▮▮▮ < ▮▮▮ fb.com>, ▮▮▮▮ < ▮▮▮▮ fb.com>, ▮▮▮▮ < ▮▮▮ fb.com>, ▮▮▮ < ▮▮▮ fb.com>, Nick Clegg < ▮▮▮ fb.com>, ▮▮▮▮ < ▮▮▮ fb.com>
**Cc:** ▮▮▮ < ▮▮▮ fb.com>, ▮▮▮ < ▮▮▮ fb.com>, ▮▮▮ < ▮▮▮ fb.com>, ▮▮▮ < ▮▮▮ fb.com>, Brian Rice ▮▮▮ < ▮▮▮ fb.com>, ▮▮▮ < ▮▮▮ fb.com>
**Subject:** Re: Vaccine Policy



+ Nick, ▮▮▮

Please see a draft note for Mark and Sheryl with 3 stronger enforcement options against vaccine discouraging content <u>here</u> (and copied below as well) further to the discussion with Mark last week. Let us know if any feedback or if there's anything missing here.


Thanks so much,


**Subject: [For Decision] Vaccine discouraging content**


Mark, Sheryl:


We are seeking your guidance on whether to take more aggressive action against certain vaccine discouraging content.


We are facing continued pressure from external stakeholders, including the White House and the press, to *remove* more COVID-19 vaccine discouraging content. For example, we recently shared with the White House a list of the <u>top 100 vaccine-related posts on FB in the U.S. for the week of 4/5-4/11</u>. While authoritative information dominated the list, the White House was concerned that the #3 post was a <u>vaccine discouraging humorous meme</u>, and they called on us to delete the meme.


We currently *remove* content that includes certain misinformation about covid and vaccinations (e.g., the covid vaccine has microchips) and content that explicitly discourages vaccination (e.g., the COVID-19 vaccine is too dangerous - don't get it!).  Under our policies, this meme should not be removed.


Instead, we aim to *reduce* this sort of vaccine discouraging content, namely 'sensational or alarmist content' (e.g., there's no point vaccines are useless!; vaccines are the work of the devil; these vaxx are so bad for your body!) and 'criticism of personal vaccine choices' (e.g., it's child abuse to give your kid the vaccine; you'd have to be a complete moron to get vaccinated).

CONFIDENTIAL TREATMENT REQUESTED
NOT FOR DISTRIBUTION
MEMBERS & STAFF ONLY

To reduce this content, we are currently building systems to review & demote on escalation, and over time hope to have demotions at scale through classifiers (although that kind of scaled enforcement is likely to be challenging). We are not convinced we'll be able to catch all kinds of this content quickly enough before it gains some distribution. Additionally, given people's interest in the topic, weaker demotions may not be sufficient to meaningfully limit the distribution of posts.

Based on consultations with vaccination communication experts and other health partners, we worry that removing (as opposed to demoting) more expressions of vaccine hesitancy might be counterproductive to the goal of vaccine uptake, because it would: 1/ prevent hesitant people from talking through their concerns online and 2/ reinforce the notion that there's a cover-up (a key prong of anti-vaccine narratives). Details of feedback from external experts and research are below.

We seek your guidance on how to treat this vaccine discouraging content.  Here are the options:

1. 25% demotion (current plan, execution under way)
2. ~50% demotion, or even stronger (e.g., 80%) if we find that 50% isn't sufficient to keep such content out of top vaccine posts
3. Remove this content

Details below.

Thanks,

-----------------------------------------

A. Definitions of the Vaccine Discouraging Content in Question

1. Sensational or Alarmist Vaccine Content: Content that otherwise does not violate our COVID-19 or vaccine policies above but that suggests that vaccines are unsafe, ineffective, sacrilegious or irrelevant, in exaggerated, conspiratorial, or sensational terms. This includes content that makes generalizations about vaccine harms or utility in hyperbolic terms or without providing context, or which connects vaccination to a conspiratorial narrative about a purposely hidden widespread health harm, secret, or truth.
   a. Ex: "They're coming with these dangerous shots for you next -- the sheep of the world need to wake up."
   b. Ex: "Vaccines are the work of the Devil"
   c. Ex: "These VAXX are so bad for your body!"
   d. Ex: "Vaccines are so useless, what's the point!"
   e. Ex: "I need to detox my kid to get these vaccine toxins out...Any ideas?"
2. Criticizing the Choice to Receive/Provide Vaccines: Content that otherwise does not violate our COVID-19 or vaccine policies above but that disparages others on the basis of their choice to get vaccinated, or on their choice to vaccinate others, including attacking language used towards vaccinated people or those administering vaccinations, or blaming people for misfortune after vaccination.

CONFIDENTIAL TREATMENT REQUESTED
NOT FOR DISTRIBUTION
MEMBERS & STAFF ONLY

REPRODUCED TO HJC

a. Ex: "You're committing child abuse for giving this vaccine."
b. Ex: "Only someone clinically insane would get this vaccine!"
c. Ex: "Any extreme pro-vaxers unfriend me. You are a danger to public health you thick, unscientific twats"
d. Ex: "I can't believe they got vaccinated, what idiot sheeple"
e. Ex: "Take a look around people -- anyone who gets these experimental vaccines is just a guinea pig."

## B. Options for Addressing Severe Vaccine Discouraging Content

1. **25% demotion** ← *plan of record, still need to execute* - consistent with the <u>Integrity Ranking Guidelines</u> (IRGs), we can demote by 25%. We are just beginning to do this.
   a. *Pros*: slows distribution of such content; consistent with normal practice for demoting problematic content without specific user notice/appeals
   b. *Cons*: unsatisfactory to certain critics who want us to take even stronger action; some demoted content may still go viral
2. **~50% demotion**, or even stronger (e.g., 80%) if we find that 50% isn't sufficient to keep such content out of top vaccine posts
   a. *Pros*: may satisfy some critics who want more aggressive action; significantly reduces virality of vaccine discouraging content
   b. *Cons*: inconsistent with normal practice for demoting problematic content without specific user notice/appeals; could be seen as shadowbanning
3. **Remove**
   a. *Pros*: may satisfy certain vocal critics; best option to reduce virality
   b. *Cons*: removes true content and personal opinions; reduces public conversation on important issue; provides "evidence" to people who believe FB is overly censorious or participating in vaccine cover-ups

## C. External Perspectives on Removing More Vax Hesitancy Content

Since 2018, we have consulted extensively with external experts about our approach to vaccine content on Facebook and our engagement has stepped up significantly during the COVID pandemic. We have received varied responses on what the right approach is when it comes to removal and have modest confidence in our current approach. Some key health partners, including the WHO, continue to advocate for removing much more content. **The WHO has communicated to us that they think our current policies are not comprehensive enough** especially when it comes to takedowns of entities that they believe we should be removing due to the harmful impact they have on vaccine confidence (and, in turn, ending the pandemic). As mentioned above, the White House also continues to put significant pressure on removing more.

However, many vaccine communication experts seem to think we are now in the right place in terms of policy-writing about what content we remove vs. reduce. **Among these experts, there is a general sense that deleting more expressions of vaccine hesitancy might be counterproductive to the goal of vaccine uptake, because it would: 1/ prevent hesitant people from talking through their concerns and 2/ reinforce the notion that there's a cover-up (a key prong of anti-vax narratives).** These risks seem particularly acute now in the US, because we are quickly approaching the point of supply exceeding demand and <u>remaining vaccine holdouts being due to genuine hesitancy</u>. Some experts have voiced the value in hesitant people being able to seek answers to their questions and having their concerns addressed. There may be risk of pushing them further toward hesitancy by suppressing their speech and making them feel marginalized by large institutions.

Prior external research on effective interventions to address vaccine hesitancy highlights the critical <u>importance of facilitating open dialogue</u>, especially dialogue that is or that can be tailored to the individual or their communities. Research suggests that attitude change happens when people get a chance for productive discourse and addressing people's concerns head on (<u>rather than reducing chances for conversation</u>) can lead to positive change. **Opening up a chance for people to express their hesitancy, criticism and concerns can serve as an important way for them to access information.** Moreover, past on-platform network research has suggested that there is likely to be a backlash from taking down conspiracy-oriented networks' content, though in light of lessons learned we may be better equipped to handle it with our tools than we have previously.

CONFIDENTIAL TREATMENT REQUESTED
NOT FOR DISTRIBUTION
MEMBERS & STAFF ONLY

META-118HJC-0053367

Consistent with this reasoning, in March, the Washington Post Editorial Board published a piece titled, "Banning vaccine-hesitant posts is not the way to ease people's fears" which made the case that removals (and broad, strong demotions) would be counterproductive: "sweeping takedowns or down-rankings of all borderline content could foster more misgiving, and deprive people of the opportunity to discuss and learn."

Our conversations with experts informed the creation of the "Barriers to Vaccination (B2V): Vaccine Content Quality Integrity Framework" (from which we excerpted the definitions above), and we've since vetted this framework with outside experts.  Of note, in early March, we discussed our planned approach with members of the "High Level Panel on Vaccine Confidence & Misinformation" (organized by London School of Hygiene and Tropical Medicine and the Center for Strategic and International Studies).  Key take-aways:

- **The panel had very positive feedback for our framework, calling it "sophisticated and nuanced."** They appreciated that the B2V work addresses a critical gray zone of content that may contribute to vaccine hesitancy.
- **The Panelists highlighted the importance of avoiding unintended consequences that may be associated with squashing expression on the platform.**
- **Experts underscored that they would be very hesitant about removing content that leads users to discuss vaccines.** They expressed concern around stifling healthy debate about the vaccines, especially with regard to the sharing of personal vaccine anecdotes or other vaccine discussion and debate. For example, some pointed to the importance of facilitating open conversation online between parents whose children experienced adverse effects from the COVID vaccine.

While thinking through our policies, we also recently met with **Heidi Larson, the head of the Vaccine Confidence Project**. Heidi's general **view is that we need to create an open and safe space for people to have vaccine-related conversations**. She believes we need to hear about people's fears and anxieties related to the vaccine and respond appropriately (not just throw facts at people but understand there is an emotion behind people's claims and questions). We met with Heidi again on 4/26 to check in on whether our approach to content expressing vaccine hesitancy was still in the right place. While acknowledging that it's a complicated time due to recent discouraging safety events, **she continues to support not removing this content** due to the aforementioned potential inadvertent effects of removing this kind of content and is happy to be a spokesperson for us.

**D. Content Examples**

A.       _**Content we REMOVE**_

_Violating Misinformation & Harm_ ← REMOVE

PRODUCED TO HJC

META-118HJC-0053368

EXHIBIT 3

**To:** ████████ [fb.com]; Brian Rice ████████ [fb.com]; ████████ [fb.com];
**Cc:** ████████ [fb.com]; ████████ [fb.com]; ████████ [fb.com]; ████████ [fb.com];
████████ [fb.com]; ████████ [fb.com]
**From:** Nick Clegg [ ]
**Sent:** Mon 4/19/2021 9:40:45 AM (UTC-07:00)
**Subject:** Re: A/C PRIV White House/Covid

Yep that is of course right: identify the gaps in their views and our policies (incl via feedback from the researchers they've been listening to); identify whether there really are such significant gaps between our approach and YT's; see what further steps we can take.

N

**From:** ████████ <████████ fb.com>
**Date:** Sunday, April 18, 2021 at 7:30 PM
**To:** Brian Rice <████████ fb.com>, Nick Clegg <████████ fb.com>, ████████ <████████ fb.com>
**Cc:** ████████ <████████ fb.com>, ████████ <████████ fb.com>, ████████ <████████ fb.com>, ████████ <████████ fb.com>, ████████ <████████ fb.com>
**Subject:** RE: A/C PRIV White House/Covid

AC PRIV:

As frustrating as these fake leaks and innuendo are (and they are!), my thoughts are that we should not let that distract us from the real issues here, which are the substance. Clearly we have a policy viewpoint gap with them we need to figure out perspectives on – what we believe violates and what they think does... and the belief that YT is doing better than us, which I find so hard to believe. Probably best to spend our effort here and not get sucked into this other thread.

At the end of the day, unless we get to a common ground on what we're doing on substance, the rest doesn't really matter.

**From:** Brian Rice <████████ fb.com>
**Sent:** Sunday, April 18, 2021 7:05 PM
**To:** Nick Clegg <████████ fb.com>; ████████ <████████ fb.com>
**Cc:** ████████ <████████ fb.com>; ████████ <████████ fb.com>; ████████ <████████ fb.com>; ████████ <████████ fb.com>; ████████ <████████ fb.com>
**Subject:** Re: A/C PRIV White House/Covid

Thanks Nick. This is obviously very disheartening to read. Rob made an offhand comment about conversations with "other people from Facebook" during a recent conversation, this is clearly what he was referencing. Because of his history in the digital campaign world, it's not surprising that he'd have relationships with some of our employees. It's disheartening and unfortunately no longer surprising to read that our colleagues would portray our conversations this way. I haven't been part of any conversation that includes disparaging remarks made about Andy, or about any strategy to snow the White House — the only disparaging remarks I've heard people make on our calls have been in reference to the disrespectful tone Rob uses with employees at Facebook.

All of that said—Andy's challenge feels very much like a crossroads for us with the White House in these early days.

Get Outlook for iOS

**From:** Nick Clegg <████████ fb.com>
**Sent:** Sunday, April 18, 2021 9:07:34 PM
**To:** Brian Rice <████████ fb.com>; ████████ <████████ fb.com>
**Cc:** ████████ <████████ fb.com>; ████████ <████████ fb.com>; ████████ <████████ fb.com>; ████████ <████████ fb.com>; ████████ <████████ fb.com>
**Subject:** A/C PRIV White House/Covid

Just got off hour long call with Andy Slavitt. There are some pretty serious – and sensitive (see last point) - issues we need to address. A summary:

CONFIDENTIAL TREATMENT REQUESTED
NOT FOR DISTRIBUTION
MEMBERS & STAFF ONLY

META-118HJC-0053332

PRODUCED TO HJC

• He was appreciative of the data we sent thru on Friday, and confirmed that Rob F had said that they had never received so much data from us before.

BUT:

• Andy attended a meeting of misinfo researchers (didn't provide names) organized by Rob F on Friday in which the consensus was that FB is a "disinformation factory", and that YT has made significant advances to remove content leading to vaccine hesitancy whilst we have lagged behind.

• Whilst appreciative of our emphasis on authoritative vaccine, the principal focus for Andy S and his team in the coming weeks is to reach the "hardest to reach" people who have a propensity to consume vaccine hesitant related content and who are not swayed by official/authoritative sources of content. Our systems, he believes – as confirmed by the researchers – feed vaccine hesitant related content to pockets of the population and that's the problem he wants our help to resolve.

• As an eg, he was outraged – not too strong a word to describe his reaction – that we did not remove this post which was third most highly ranked post in the data set we sent to him:
https://www.facebook.com/td.mccomas/posts/4106421952731017 I countered that removing content like that would represent a significant incursion into traditional boundaries of free expression in the US but he replied that the post was directly comparing Covid vaccines to asbestos poisoning in a way which demonstrably inhibits confidence in Covid vaccines amongst those the Biden Administration is trying to reach. [It would be very helpful if someone could plse check whether this content was also available on YT – Andy's assumption is that YT would never accept something like this]

• V worryingly, towards the end of the conversation, Andy told me in confidence – so please treat it as such – that internal FB employees are leaking to his team (I assume via Rob F) accounts of disobliging remarks made about both Andy and Rob by FB decision makers. Further, that those remarks are coupled with suggestions about how FB should "snow" the White House with info/data about authoritative Covid info in order not to share the most telling/helpful data about content which contributes to vaccine hesitancy. We then discussed the wider issue of trust – or the lack of it – between FB and the Biden team related to the events during the election and beyond, but needless to say I was shocked and embarrassed that somehow we are perceived to be behaving so unprofessionally.

We concluded that he would ask Rob F to share the data and policy recommendations from the researchers with us asap so that we could give a considered reply on further steps we may/may not be able to take. We agreed to speak again once that assessment has been made.

Given what is at stake here, it would also be a good idea if we could regroup to take stock of where we are in our relations with the WH, and our internal methods too.

Thx

N



**From:** Brian Rice <█████████fb.com>
**Date:** Saturday, April 17, 2021 at 6:37 PM
**To:** Nick Clegg <█████████fb.com>, ████████ <████████fb.com>
**Cc:** ████████ <████████fb.com>, ████████ <████████fb.com>, ████████ <████████fb.com>, ████████ <████████fb.com>
**Subject:** Re: Email to Andy with report

Thanks Nick—here are some talking points that you can use if Andy raises Rob's questions:

How was this [Tucker Carlson] post not violative?
• while we remove content that explicitly directs people not to get the vaccine, as well as content that contains explicit misrepresentations about vaccines, we reviewed this content in detail and it does not violate those policies.

Moreover: you say reduced and demoted. What does that mean? There's 40,000 shares on the video. Who is seeing it now? How many? How effective is that?
• The video is receiving 50% demotion for seven days as it is in the queue to be fact checked

CONFIDENTIAL TREATMENT REQUESTED
NOT FOR DISTRIBUTION
MEMBERS & STAFF ONLY

Why does CT tell a different story than our internal number?
- Crowdtangle shows engagement not views, and a simple text search for "vaccine" in Crowdtangle doesn't have the same recall as our classifiers, i.e., doesn't include all of the posts about vaccines. The data that we provided doesn't include the Tucker Carlson video because our data pipelines don't populate that quickly – we provided data for the week before.

Why label this content with a generic "visit the covid information center" message?
- Our more granular label about vaccine safety says "COVID-19 vaccines go through many test for safety and effectively before they're approved". In light of the decision to pause the J&J vaccine, vaccine safety discussion evolved past "approval," and we were concerned that this was a confusing/irrelevant message to be applying to content discussion the decision to pause J&J without revoking approval. We temporarily reverted to a more generic message and are updating the more specific label for posts about vaccine safety to say "COVID-19 vaccines go through many tests for safety and effectiveness and then are monitored closely" to try to adapt to the changing factual situation and evolving discussion.



**From:** Nick Clegg <███████ fb.com>
**Date:** Saturday, April 17, 2021 at 3:30 PM
**To:** Brian Rice <███████ fb.com>, ███████ <███████ fb.com>
**Cc:** ███████ <███████ fb.com>, ███████ <███████ fb.com>, ███████ <███████ fb.com>, ███████ <███████ fb.com>
**Subject:** Re: Email to Andy with report

No time yet - I asked him to ping me when he wants to spk. If you want to jot down a few thoughts we Rob's Qs that's great but don't disturb your weekend unduly, I'm sure I can manage without too.

Get Outlook for iOS

**From:** Brian Rice <███████ fb.com>
**Sent:** Saturday, April 17, 2021 12:05:37 PM
**To:** Nick Clegg <███████ fb.com>; ███████ <███████ fb.com>
**Cc:** ███████ <███████ fb.com>; ███████ <███████ fb.com>; ███████ <███████ fb.com>; ███████ <███████ fb.com>
**Subject:** Re: Email to Andy with report

Nick—let us know if your call with Andy lands for a specific time this weekend? We aren't responding to Rob's questions over email but we can still get you some info in case Andy brings these up.

**From:** Nick Clegg <███████ fb.com>
**Date:** Friday, April 16, 2021 at 9:07 PM
**To:** Brian Rice <███████ fb.com>, ███████ <███████ fb.com>
**Cc:** ███████ <███████ fb.com>, ███████ <███████ fb.com>, ███████ <███████ fb.com>, ███████ <███████ fb.com>
**Subject:** Re: Email to Andy with report

Done – thx so much. N

**From:** Brian Rice <███████ fb.com>
**Date:** Friday, April 16, 2021 at 5:53 PM
**To:** ███████ <███████ fb.com>, Nick Clegg <███████ fb.com>
**Cc:** ███████ <███████ fb.com>, ███████ <███████ fb.com>, ███████ <███████ fb.com>, ███████ <███████ fb.com>
**Subject:** Re: Email to Andy with report

Nick—attached is the report to send with the email.

CONFIDENTIAL INFORMATION REQUESTED
NOT FOR DISTRIBUTION
MEMBERS & STAFF ONLY

PRODUCED TO H

META-118HJC-0053334

**Date:** Friday, April 16, 2021 at 8:12 PM
**To:** Nick Clegg < ▮▮▮▮▮▮ fb.com>, Brian Rice < ▮▮▮▮ fb com>
**Cc:** ▮▮▮▮ < ▮▮▮▮▮ fb.com>, ▮▮▮▮ < ▮▮▮▮▮▮ fb.com>, ▮▮▮▮▮▮ < ▮▮▮▮▮▮▮ fb.com>, ▮▮▮▮▮ < ▮▮▮▮ fb.com>
**Subject:** Re: Email to Andy with report

Suggested update below to reflect that you said this to him in your last note: "I realize it may be of limited comfort at this moment, but this [Tucker Carlson post] was not the most popular post about vaccines on Facebook today. Our data is slightly lagging, and we'll get back to you with more detail on this specific post tomorrow. Right now, it appears that it probably was among the top 100 most-viewed vaccine posts. I'm including a few examples of posts that were more popular today at the end of this note."


**From:** Nick Clegg < ▮▮▮▮ fb.com>
**Date:** Friday, April 16, 2021 at 4:42 PM
**To:** Brian Rice < ▮▮▮▮ fb.com>
**Cc:** ▮▮▮▮ < ▮▮▮▮▮ fb.com>, ▮▮▮▮ < ▮▮▮▮▮ fb.com>, ▮▮▮▮ < ▮▮▮▮ fb.com>, ▮▮▮▮ < ▮▮▮▮▮ fb.com>, ▮▮▮▮ < ▮▮▮▮ fb.com>
**Subject:** Re: Email to Andy with report

And you'll be answering the other points on the other thread with Flaherty? Would be good for me to have those for my call with Slavitt

Get Outlook for iOS


**From:** Nick Clegg < ▮▮▮▮ fb.com>
**Sent:** Friday, April 16, 2021 4:40:40 PM
**To:** Brian Rice < ▮▮▮▮ fb.com>
**Cc:** ▮▮▮▮ < ▮▮▮▮ fb.com>; ▮▮▮▮ < ▮▮▮▮ fb.com>; ▮▮▮▮ < ▮▮▮▮ fb.com>; ▮▮▮▮ fb.com>; ▮▮▮▮ < ▮▮▮▮ fb.com>
**Subject:** Re: Email to Andy with report

Yep fine - looking forward to getting the attachment  I should send. N

Get Outlook for iOS


**From:** Brian Rice < ▮▮▮▮ fb.com>
**Sent:** Friday, April 16, 2021 4:34:31 PM
**To:** Nick Clegg < ▮▮▮▮ fb.com>
**Cc:** ▮▮▮▮ < ▮▮▮▮ fb.com>; ▮▮▮▮ < ▮▮▮▮ fb.com>; ▮▮▮▮ < ▮▮▮▮ fb.com>; ▮▮▮▮ fb.com>; ▮▮▮▮ < ▮▮▮▮ fb.com>
**Subject:** Email to Andy with report

Nick—

We are in final stages of approval for the report that will go to the WH tonight.  Think best if you send to Andy with an email confirming you can talk this weekend—and I can forward to Rob.

Draft email below:

Andy,

Wanted to make sure to get this to you ahead of the weekend.  We believe this is responsive to what you have asked us to do – namely to provide information on what we are seeing on the platform with respect to vaccine content, as well as the interventions we are deploying to counter misinformation. As I mentioned yesterday, our data is lagging and this covers the period 4/5 to 4/11. I don't yet have a more specific answer on the Tucker Carlson post.

PRODUCED TO HJC

CONFIDENTIAL - PRODUCED TO

NOT FOR DISTRIBUTION
MEMBERS & STAFF ONLY

This probably goes without saying, but I want to make sure to convey that this is not information we normally share, and this data set is not cleanly vetted according to an integrity process that would take much longer to conduct. We took your cue the other day that it was important to get this to you quickly even if not polished. We have not made this information public and we hope to continue to be able to share with you and the team under confidence.

We hope we can continue to engage on the content provided here, and we're happy to schedule time next week to discuss with the team.

Look forward to talking this weekend.



CONFIDENTIAL TREATMENT REQUESTED
NOT FOR DISTRIBUTION
MEMBERS & STAFF ONLY

Sign Up

Email or phone        Password

Forgot account?        Log In

**Timothy McComas**
April 4, 2021 ·

UH OH !!!!

# 10 years from now you will be watching TV and hear....



"Did you or a loved one take the covid vaccine? You may be entitled...."

19K                    2 comments  385K shares

Share

English (US) · Español ·
Português (Brasil) · Français (France) ·
Deutsch

Privacy · Terms · Advertising · Ad Choices  ·
Cookies · More
Meta © 2023

**See more of Timothy McComas on Facebook**

Log In        or        Create new account

CONFIDENTIAL TREATMENT REQUESTED                    META-118HJC-0053337
https://www.facebook.com/timothy.mccomas/posts/4106421952731017    1/1
MEMBERS & STAFF ONLY

EXHIBIT 4

**3/26 White House Call Notes**

Attendees: Roby Flaherty
Attendees (FB): Brian Rice, ████████████  ████████████

- Brian – wanted to make sure we had time, we have a few things coming to you.  We have an update to the symptom survey in a week.  We could set up time to walk through the one you have, the new info.  It's a different look, but useful, want to talk through
- Rob – useful, especially from comms folks
- Brian – will have more detail on demographics, should be improved.  We also have data stuff from last week, want to center our work on universe of content.  Nick told Andy that it will take some time to build, will have that ASAP.  Today, wanted you to meet ████████ our Product lead across all COVID defensive work.  When Nick was talking to Andy about areas where we were unable to provide answers, ████████ should be able to provide more information. She'll do an overview.  We'll make sure to follow up on any questions.
- ████████ – Hopeful for open confirmation, my job is focus on responding to immediate issues. I report to Guy.  I'm jumping in midstream, may have some questions, I want to understand where we've been missing the mark, addressing gaps, see areas where we may not have direct answers but could look at proxies, other solutions.  Want to understand problems, priorities going forward.
- Rob – sounds great.  Maybe helpful to hear where we're coming from – we're concerned about FB impact on vaccine hesitancy, we see so often in data that people who are vaccine hesitant see on FB.  Our theory is that content is harder to remove is doing the most harm, people are setting on the fence.  We understand taking down that content is not best solution, for us, we want to understand if our theory is right, where you see what's driving vaccine hesitancy, what you are doingm how we can plug in and get you things.  If you find things that are working, want to hear that.  That's what we care about.  We're not trying to screw you guys, we want to solve this problem.  In 3 months, when there's a demand problem, we'll be in the barrel
- ████████ – similar strategies –
  - Inform
  - Remove what's actually harmful
  - Reduce where there is hesitancy
- ████████ – I know you want numbers, I don't have numbers yet on how interventions are working on, looking at proxies.  Today – can sepak to levers, where are we reducing content, introducing reshare friction, have some things we can dig into.  Nick mentioned we're looking at viral content, that's a metric we want to get you, but centralizing work – also looking at large entities, big groups, pages, big IG accounts.  Last one is comments.  One thing that's difficult – good post, bad comments, we see

that quite often.  We see authoritative info from WHO having a lot of hesitancy comments.  Top skepticism comments on those posts, don't

- Rob – so you're focused on virality, big entities like pages/groups, less on comments/posts between friends
- ▓▓▓▓ – for the most part, right – the way we think about – head problem – where do we see hot spots – minority individuals/entities producing content that then gets resdistributed.  From prioritization perspective, that's how we know content will be redistributed/upranked/reshared.  This is for hesitancy (not misinfo, which gets different treatment).  We want to know overall hesitancy content, what are interventions.  Detection methodology is dependent on topical conversations – that will take weeks, if not months.  So in the interim, focused on the hot spots.  Does that make sense?
- Rob – yes, makes sense.  Do you have a tangible example? Done or seen is helpful.
- ▓▓▓▓ – I asked the teams this morning – overall viral pieces of content – anecdotally, they've shared
  - Topics trending towards uncertainty – FDA approval v. authorization – general confusion about that
  - Another one – concerns about vaccinated people shedding the virus to non-vaccinated people nearby – indirect
  - Have seen a lot of groups sharing individual stories about side effects or death after vaccination
  - If we're taking authoritative information – we could detect outright discouragement based on a reliable link, but it's harder to detect skeptical comments like "Oh, isn't that interesting." – we are working to be able to detect that, but we can't yet
- Rob – that makes sense.  Fascinating.  I'm curious – NY Post churning out articles every day about people dying.  What is supposed to happen to that from Policy perspective.  Does that article get a reduction, labels?
- ▓▓▓▓ – Let's go back to remove (outright misinfo), reduce (not benign, more sensationalism, eg claim vaccines create miscarriages, indirect discouragement), inform – levers are contingent on content type, who posted it.  We look at removing from recommendations, explorer, we want to take all this content out of that.  E.g. Health Groups are non-recommendable, want to get them out of areas where we recommend or amplification systems.  What we're prioritizing in feed – want to make sure that anything we suspect is hitting skepticism, harmful topically but we can't remove, we reduce.  I don't have those numbers today.
- ▓▓▓▓ – a lot of things get viral copy-pasted.  We have a concept of introducing an inform interstitial – if I go to reshare post like that, have an interstitial noting that a post has been rated false by 3PFC.  We can also do fwd limits.  These are are all methods we've used where there's not super clear lines in the sand.  That's a suite of tools we're trying to apply right now.
- Rob – The question I have, if you're applying these methodologies, where is it still breaking through?  And to whom?  If it's still there, where is next whack a mole?

CONFIDENTIAL TREATMENT REQUESTED
NOT FOR DISTRIBUTION
MEMBERS & STAFF ONLY

META-118HJC-0053282

- ███████ – big whackamole is that this all depends on our ability to detect. We're getting better at detecting things like the microchip thing and delete that. We're getting better at detecting (human, natural language processing) discouragement. We find COVID posts, then we identify posts that are explicit discouragement, or this is bullying for choosing to get vaccinated. What's hard right now, we haven't completed full detection path. We need to close gaps, that's what we're doing. The comments thing isn't solved, that's the big thing keeping me up at night, that I'm most worried about from an implementation perspective.
- Rob – so substantive problem is not that there are holes in the policy, it's more that the detection of things that needs more work
- ███████ – the hard part is that what could be applicable to policy is moving, the timeline takes some time. Things are evolving on a discussion basis. This also gets harder as events evolve. For example, recent charges in Italy against two doctors and a nurse for administering Astra Zeneca vaccine. That creates a net new topic for our systems to need to be able to identify and get to intervention. That's why inform – driving to authoritative sources, CIC – that's why it's so important. Best way to resolve/educate individuals who aren't adversarially minded – compared to every real world event. Trying to get to fastest real solution v managing symptoms of having right information. I want to get a few minutes at the end to talk about next touch point. A lot of what I just said – there are also individuals that are adversarial, very good at following rules, know where the lines are, driving things off platform.
- Rob – I can go over 12:30 if you can. My question on inform – intellectually my bias is to kick people off. Inform, intellectually, maybe path of most impact. How are you measuring impact when you do inform? Is there secret sauce targeting that we can use? Stanford has suggested building targeting tools of people that engage with antivax content.
- ███████ – This is where it gets into Offense side, this is what Emily was talking about. How do we measure success – are we getting people vaccinated. We have metrics around how many people we're informing, how quickly, how thorough. Are we identifying right content. Best directional metric is that symptom survey. We don't have a strong causative way of saying because integrity did X, we now see preventing growth – we don't see that. That's why we end up in education. If we're getting at do people have more information, are they better educated, that symptom survey is best we have right now.
- Rob – that survey, you are doing treatment survey
- ███████ – real measure of success – did people go to center, did they read content, did that change perspective – broader integrity – unless someone tells us, hard to measure if we're changing hearts and minds, unless we do survey
- Rob – what are most successful inform interventions?
- ███████ – only a few that are very topical based right now, don't have metrics now. People have concers about methodology or safety on vaccines. We're in a test phase on broad COVID inform treatment that drives to FB/IG. There's a post, we put inform treatment driving directly to CIC. Not even about violating content – just broad swath.

CONFIDENTIAL TREATMENT REQUESTED
NOT FOR DISTRIBUTION
MEMBERS & STAFF ONLY

That's the next big push of what we think might be a good inform treatment. In an ideal state, we want to get as precise as possible. The north star would be addressing each topic, but that degree of specificity might not be something we can ever get to. So trying to go broad and wide, with a big focus on the US. Trying to push out much more information given trends we're seeing.

- Rob – our public campaign, largely grants, fed govt not most trustworthy actor on vaccines – how can community organizations plug into FB in a way that will be maximally effective. Is there tooling that's coming online?
- ▮▮▮ – I'd love to continue this conversation – I'm not a lawyer, know we have to be sensitive to personal information, targeting. In terms of targeting, one of the interesting trends we've seen in my own experience – local FB Groups – city, council, regional groups giving info about when new appts are available. I'm personally seeing local group community organizing. Might be an interesting thing to look at – how are communities having those conversations – something to explore further.
- Rob – to Brian's point, that's the next question – how can we plug in, how can we help. We're going to be a clearinghouse for ad campaigns, what can we bring to bear.
- ▮▮▮ – Action items:
  - Chat more about how to do more targeted communication to vulnerable communities
  - Symptom survey
- Brian – we'll put a briefing on with Curtiss, our research director.
- ▮▮▮ – we owe you a WA follow up
- Brian – we'll send that over – we'll take your queues – weekly, biweekly checkin makes sense, if you want to communicate on the fly with me and ▮▮▮ we're open
- Rob – probably both – let's put check in on calendar
- Brian – ok great, we'll put on the calendar

PRODUCED TO HJC

CONFIDENTIAL TREATMENT REQUESTED
NOT FOR DISTRIBUTION
MEMBERS & STAFF ONLY

EXHIBIT 5

**4/14 Notes on Call with White House**

WH Attendees: Rob Flaherty, Clarke Humphrey, Andy Slavitt (joined at 30 min mark)
FB Attendees: Brian Rice, ▮▮▮▮▮▮ ▮▮▮▮▮▮ ▮▮▮▮▮▮ ▮▮▮▮▮▮ ▮▮
▮▮▮▮

- Brian: Idea today was to follow up based on meeting next week, we have ▮▮▮ on to talk to approach to getting authoritative information, ▮▮▮ has some info from survey, then will go through metrics.  Also want to be very clear, know you are interested in empirical information regarding success of interventions.  Obviously want to get you what's helpful for you to do your job.
- ▮▮▮▮ I need to understand a little bit.  How I've interpreted – you're trying to find a causal link between someone not being exposed to vaccine hesitancy content, and therefore went out and got a vaccine.  From a behavioral perspective, we don't see that.  I want to make sure I understand what you're looking for.  We can pull click through rates, other numbers, but want to confirm.
- Rob: Three things.  We have to explain to President, Ron, people, why there is misinfo on the internet, bigger problem than FB.  Where issues are, what interventions are, how well they are working, for products, want to engage in things that you know to be effective.  I don't even care about specific methodology, you have better, richer data than we'll ever have.  What are the things driving hesitancy on your platform?  What is it? How big is the problem?  When you are intervening, how are you measuring success?  I say these things because candidly there is not a lot of trust towards FB, I need to know what theory of the case is, where we can be most effective.  I am, personally, nervous, reported that there are interventions that have been done in other contexts, like NEQ score, that have been pulled back.  Want to make sure that you're not finding things that are effective that you aren't doing.
- ▮▮▮▮ That's helpful.  In terms of what we're doing, we look at overall universe of content on FB, 1% is related to vaccines.  Some subset of that is hesitancy, some is misinfo.  We know as of March, 900,000 pieces of content was misinfo, 150,000 was US.  Outside of that, numbers are really hard for us because hard to identify definitive vaccine hesitancy content.  Very explicit example – 40% of Marines not taking vaccine – that's being presented as fact.  People are questioning government.  We're struggling to identify within hesitancy content, the stuff that's nefarious, the stuff that isn't.   We don't know that if we removed everything, that it would alleviate external factors.
- Rob: The 40% of Marines, vaccine passports, good examples. J&J.  To me, the one view I have – total interactions on CrowdTangle – you have more data about who is seeing it, where's it going.  We don't want to be in a position where we take down bad news.  But if your goal as a company is to make it more likely that people will get the vaccine.  People don't see this in only one way.  Is your presupposition to do these broad things without any sense.  If you're seeing something that is factual that is that kind of news, it will have a negative way in a way that it wouldn't on other platforms.

META-118HJC-0053291

- ▮▮▮ We are thinking about it the same way, we have the same challenge. We can't ask news outlets to take down bad news. That's why flooding with good information is so important. There are people that might see NYT, other trusted sources, have hesitancy. Then there's the actual trusted communities – health agencies/government/experts/FB, family/friends/community. In my own life, hard to get my mom to take vaccine because she thinks she already had COVID and someone else should get it. That's a weird example, removing the content prohibits discussion. How do we tone down the fervor?

- Rob: Good question to be asking, you are a fervor machine.

- ▮▮▮ In terms of interventions, know that there are groups that are hot spots – mandatory post approvals – admins have to approve posts. If violating content approved, gives the group a strike. I'm uncovering new examples on comments – public figures on comments might be contributing more. Tomi Lahren post on how she's not getting the vaccine. Even with comment reduction, still struggling if we reduce comments from public figures, Tomi Lahren makes a post.

- Rob: On what basis are you finding that the public figure comments have impact?

- ▮▮▮ We don't have that causal link – we'd have to do a controlled study to expose people to misinformation or hesitancy content and study it. That's unethical. We can't measure that. I'd love to understand how you all are measuring that.

- Rob: I don't work at a company that profits on data. Hard for me to say. This is the whole problem. You guys are grading your own homework.

- Brian: No, working with Carnegie Mellon, we aren't seeing that.

- Rob: As a general practice on Facebook, you don't have a mechanism to test attitudinal impact?

- ▮▮▮ The impact assessment is the survey data.

- ▮▮▮ There's a difference between being able to set up a causal type test on our proactive measures to try to encourage vaccine uptake. The information we're putting out – we can roll out slowly and have some sense on whether it's having an impact on attitudinal measures and we do some of those tests. On the side of stuff that's misinfo, negative things propagating throughout the network. We don't have as easy an opportunity way to set up tests to determine whether people were a priori hesitant or not. We can do that for proactive work, we do research before we throw it out. For example, things we are sharing with communities of color, making sure not culturally insensitive. Work with organizations on brand lift tests. It's harder on the side of harmful content.

- Rob: If you were to change the algorithm so that people were more likely to see NYT, WSJ, any authoritative news source over Daily Wire, Tomi Lahren, polarizing people. You wouldn't have a mechanism to check the material impact?

- ▮▮▮ That would require people being comfortable self-reporting change in intent to FB. One of the reasons the symptom survey is set up separately with Carnegie Mellon, UMD, because we're not under the impression that people

- Rob: But you cannot link product to that.

CONFIDENTIAL TREATMENT REQUESTED
NOT FOR DISTRIBUTION
MEMBERS & STAFF ONLY

- ███████ No, because the privacy rules in place, communicated to govt regulators, is that FB can't have the identifiable data to tie it back.
- Rob: If concern is measurable attitudinal effect, there's nothing to test persuasive material on FB. Brand Lift surveys are what you sell people.
- ███████ We have the ability to do that for what FB or partners are communicating. Those are interventions that we can roll out, randomize through. When you're talking about content issues, there isn't independence of observation, material spreading through the network. SUTFA (?) violations there. Difficult to estimate causal effect. Ranking changes, given the small set of the population that we don't know ahead of time, means there is a lot of dilution, takes a lot of time to pick up that effect. Attitudes don't change immediately because of a ranking change. Have to allow time to take effect. If we made a change today, even with perfect experiment, would take a long time. And in pandemic time, we don't have that time.
- ███████ That's why from product perspective, it's so important to look at mechanisms – if we can't remove it, at least we need to contain it.
- ███████ one piece of circumstantial evidence – we're seeing declines in vaccine hesitancy in the US similar to the decline that Census/Pulsar data is seeing. Trying to serve best data possible with others making decisions based on it. The problem is not stagnant as far as hesitancy among US FB population. It's going down. Is it going down as fast as it could? I don't have an answer.
- Rob: Is it going down universally?
- ███████ we have seen it go down among subpopulations. Are seeing a
- [Andy Slavitt is on the call at this point – 11:30 AM]
- ███████ In Georgia, started talking about J&J halting earlier, we picked up an angle change there. Even across subpopulations, we aren't seeing it. We aren't measuring conservatives. We do look at counties and states, that are good proxies. We've been seeing things go down until recently.
- Andy: Apologize I missed some of the beginning. A few questions on the pieces I've seen so far- is there any spillover effect on attitudes from Pfizer or Moderna vaccines? What can you tell us about what people are saying about J&J? If people are spooked by the fact that there is a pause, I don't consider that misinfo, disinfo, or problematic. The vaccines are working on 9 figures of Americans. What bothers us is when data is obscured by people that mispresent it, knowingly or unknowingly. If people have legitimate concerns and questions, we want to be able to answer them. People are within their rights to react to news. We want to know the most effective way to respond to that. More broadly, feels like we're having a surprisingly tough time pinning down a plan of action of limiting the effects of people spreading misinfo on FB or WA. Question I asked 6 or 8 weeks ago – do we have or are we measuring the top, most shared negative sentiments? Are we measuring those over time? Are we taking the time to measure the impact of them? We've heard lots of conversation about other initiatives, a little bit of we can't do this, we can't do that. I just want to make sure that when we're frustrated, we're frustrated because we can't seem to get a straight answer to what feels like a very simple question.

CONFIDENTIAL TREATMENT REQUESTED
NOT FOR DISTRIBUTION
MEMBERS & STAFF ONLY

- ▬▬▬ Andy, nice to meet you, I'm the product lead. Going to try and work through your questions. ▬▬▬ could you speak to J&J effects? I don't know that we have spillover measurements on Moderna and Pfizer?
- Andy: Perfectly reasonable you wouldn't have, if you could monitor over next few days, would be great.
- ▬▬▬ On Moderna and Pfizer, based on guidance from Rob, trying to promote as much good as we can in CIC. ▬▬▬ can speak to J&J.
- ▬▬▬ Just quickly, because I think more important piece Andy is asking about is info diffusion on the platform. We are seeing an increase in vaccine hesitancy early states where media had more attention, e.g., Georgia shutting down J&J earlier, so far increase in hesitancy only in Georgia. People are giving more reasons about why they are hesitant – lack of trust in govt, not sure vaccine will work, people more interested in waiting to see if vaccine is safe. We're looking to see if we can match messaging to users to some of these concerns. For example, decline in trust in government – opportunity to push more local, authoritative people as spokespeople for information. Encouraging people not to wait and see. That doesn't answer spillover question, we'll get back to you if we have something reasonable to share that's good information.
- Andy: Don't wait to report to us to address spillover issues. Thank you for focusing on that. You can go onto the larger question.
- ▬▬▬ Want to reanchor on where we seem three biggest forms of problems:
  - Minority - disinfo dozen – actively pushing to remove – their patterns of behaviors have started to shift to avoid policies – for example, they are using bitly links off platform. We're looking at all their identities and removing. Are they going to make mistakes so we can take them down? Vast minority of entities are actually maliciously intended.
- Andy: Clarifying q on that group. Have you limited ability to share?
- ▬▬▬ Yes – we haven't explained that they are feature limited to them. Hard to detect content if not outright misinfo. We've taken other steps – removing amplification for Health Pages and Groups, but we don't want to remove good content or downrank re-education opportunities. Push and pull to calibrate.
- Andy: You don't have algorithms that can tell the difference?
- ▬▬▬ Our detection classifiers can find outright misinformation
- Andy: Those are not shareable?
- ▬▬▬ if we are able to identify and remove misinformation, if we can't remove, we reduce wherever we can.
- Andy: middle ground – how do you put caps on it.
- ▬▬▬ three mechanisms
  - Where to put hard product features in place – e.g., mandatory post approval by admins – slows down
- Andy: Has that been done?
- ▬▬▬ yes. Another example, want to slow down the rate at which content can be produced. Good posts have bad comments. We've rate limited the amount of comments to slow that down. Goes back to containing when we can't remove.

CONFIDENTIAL TREATMENT REQUESTED
NOT FOR DISTRIBUTION
MEMBERS & STAFF ONLY

- Rob: This is a place where it's worth zooming in, where the rubber is meeting the road. What are you trying?  How is it working?
- Andy: If you've done those things, can you measure the amount of shares of negative dis- or misinformation?  Can you show us what those are?  Last week it was 4%, this week it's 2%?  That gives us a baseline.  We recognize this is an ongoing battle.  We don't know right now how big the battle is, whether we're winning or losing.  Then we're able to not flail around and begin to focus with you on how to make it better. Is that possible to produce some kind of report?
- ███████ Before you got here – we can pull raw numbers.  Those will not necessarily correlate with attitudinal changes.  Because this is real world, we will see the numbers fluctuate.  For example, with J&J, may see spikes.
- Andy: So if you told me, we've gone from 3% to 2% but it hasn't changed attitudes.  That's all we want; you control what you can control.  Someday, there could be bad info about Pfizer, we have to answer honestly. FB isn't accountable for that. FB is accountable for people getting truthful, reliable information, not content that subtly changes.  I just want to reinforce a lot of what Rob has been saying.
- ███████ It would make a lot of our lives easier if when we delete content, we change minds.  When we talk about constraint, that's the best thing we can measure.  We've had a lot of policy conversations, don't want to go back to that.  This is hard from technical and policy perspective.  How to get the right information to the right people to get people vaccinated.
- Andy: Happy to think through challenges with you.  Depends on who is sending message – in mainstream newspaper that's reliable, one thing, if comments that aren't, someone with a misleading story.  Drudge report had a headline yesterday – 6/7 million cases of J&J have problem- total disaster.  Together, someone coming on that news for the first time gets the intended effect.
- ███████ In terms of scale, that would make me nervous too.  The technical challenge, building
- Andy: We care about posts shared the most.
- ███████ Can ask one question – what I'm hearing is – give us a better sense of raw numbers – those might flip and won't show sentiment.  We want to hear what we can do better – for J&J – communities in rural areas, MI, potentially more likely to take J&J.  I don't know the best way to go about reaching them.  Would love to hear from your side how your campaign is reaching people so we can build into product.
- Andy: over long term, if you believe govt/expert agencies put transparency and safety first, will pay off. If people get accurate information, feel comfortable that someone watching backs.  Worries about being rushed are not as true.  Black community – got very good feedback from black physicians, black activists.  At the same time, people in conservative community, just as we were getting people off the edge, now people more likely to say right all along.  If people do their own homework, we ought to trust them.  Not everyone will choose to get a vaccine.  If people can make own decisions, we'll get over 80%.  But worried about people being unduly influenced.
- ███████ I just want to be clear that attitudinal shift data on misinfo doesn't exist.

CONFIDENTIAL TREATMENT REQUESTED
NOT FOR DISTRIBUTION
MEMBERS & STAFF ONLY

- ▉▉▉ With inform strategy, on J&J side, we tried to put risks in context. If there are other things you want to get out, we'd love to see that to help inform people.
- Rob: I obviously care about attitudinal shifts, matters to me. I still feel like I don't know what you are doing, what the metrics of success are. What are the 10 things you've tried?
- ▉▉▉ to be fair, we are tracking that. Reduced VPVs, reduced ranking. What I can't give is attitudinal shift. That's the first time I'm hearing in those terms. That would be great for us to provide. We have hard policy constraints – things like Tomi Lahren's post. Just want to be clear we haven't declared victory.
- Andy: If you added to that policy changes you are considering, that would be helpful as well. I will tell you this just to have Rob's back, he gets asked this, it's becoming the number one question. I would just ask you not to put him in a position where he says he doesn't know. Better if he can say here's what the data says, here's what they're doing, this is what they are working on.
- ▉▉▉ Completely hear that. If I'm frustrated, it's because we want to achieve the same things. What we can give you is data.
- Andy: ▉▉▉ I appreciate you being honest. I think it will be challenging for Rob to say that FB team is frustrated too. That kind of reaction would not go over well. We have to get past that.
- ▉▉▉ To be extremely clear, reason I'm frustrated is not because it's a big problem, it's because it's moving so fast. The 40% Marines – that's coming from a community already hesitant. Comes from care.
- Rob: Maybe I haven't been able to articulate – what do you need from me to get the information you need?
- Brian: We'll develop a report, get you data. We don't want to send something that will be frustrating. We've got a good sense, from what Andy has told us on this call would be most helpful – data picture. We will and can get you a report, Andy. We've been struggling to get you a usable dataset.
- Rob: Can we drill down on that. I don't need we saw 5% lift over X. I need – we tried XYZ, this is what seems to be working. What did you try? What is scaling? What was ineffective or political bullshit. Then a sense of what now.
- Andy: What Rob just asked for, complements the data. Do get the sense that this isn't a social media wide problem, it's unique to FB and WA. Conversations are not as challenging – we have much more straightforward conversations with others. I think people believe you can solve it. Simplify to here's what's going on, here's what's working.
- ▉▉▉ this is my third meeting – Rob, we can pull that on the interventions. A lot of it will look like what we discussed two meetings ago. Product measures will look like what we've talked about. Haven't thrown away a lot. Just want to manage expectations. Want to understand how we're working with you in a different way than others.
- Rob: I feel like we're running around in circles. Some partners give us lots of information, some partners tell us to fuck right off. This feels like we're chasing our tails. If you don't want to give information, just say that. I don't want to feel like I'm

CONFIDENTIAL TREATMENT REQUESTED
NOT FOR DISTRIBUTION
MEMBERS & STAFF ONLY

PRODUCED TO HJC

going to a dog and pony show.  My dream for FB to play ball.  It's about will we get out of this fucking mess.  I'm not doubting that you are sincerely trying to solve this problem in good faith.  I'm doubting that you are telling us everything or that you ███ aren't getting the resources you need to tackle this.  Of 1% of vaccine info, this is what's concerning, this is who is seeing it, this is what we're doing.

- ███ Super helpful, appreciate the feedback.  When I say want things from you all, just to improve our process.  One example – we can't do race targeting.  Using SVI.
- Andy: I've jumped into 3 or 4 FB conversations; each one has been almost exactly the same.  I've asked the same questions with Rob.  They all finish the same way.  Good promise at the end.  This is a new set of people; you're hearing the questions for the first time.  I can't call Nick back and say that something is different now.  Feels like we're in the same place.
- Brian: It's been 2-3 weeks, know Nick told you we'd be working on reporting. We'll get that to you ASAP.  I think Nick said at the time it would take some time to figure out.
- ███ What helps me is understanding is it doesn't have to be qualitative.  On the metrics – the most viral content is the authoritative content – I thought that wouldn't be useful.  We'll look for faster qualitative bunch along with product info.
- Rob: Two reasons why not useful – we see it in CrowdTangle.  I don't know if widest reach stuff is the problem, or stuff that's in groups, private.
- ███ Answer hasn't changed
  - o Disinfo dozen style people staying under policy limits
  - o Authoritative posts with comments and dialogues
- Rob: What that implies to me that you think there's not a problem.  So, tell me what is.  If it's far reaching authoritative but bad news.
- ███ That's why we didn't send it.  I don't have the numbers on comments but pulling.  The last thing that's evolving – public figures
- Rob: concept of disinfo dozen is concerning – is it impact or subjective?
- ███ subjective – reason it makes me nervous – how do we stay below these lines.  Maybe misspoke when I said frustration – relates to nuance and extent of the problem.  I want to work with you on these things – scrappier faster data
- Brian: Thanks Rob.  We don't want to be running in circles.  We'll get you something to react to. That will inform next steps.

CONFIDENTIAL TREATMENT REQUESTED
NOT FOR DISTRIBUTION
MEMBERS & STAFF ONLY

EXHIBIT 6

**4-5 Notes on Call with White House re Symptom Survey**

WH attendees: Rob Flaherty, Courtney Rowe, Clark
FB attendees: Brian Rice, ████████ ████████ ████████

- Brian: Want to introduce ████ he leads our work on the COVID survey that we're sending regularly to you. Want to walk through how we use it, how we approach it, how we think it will be useful in the work you're doing to identify pockets of the country where vaccine hesitancy is more of a problem. ████ will give an update at the end. Will turn it over to ████ let us know if you have questions.
- ████ Hi Rob and Courtney, nice to meet you. Please interrupt with any questions, see this as a conversation. I lead a special methodology team – Demography and Survey Science. I'm a sociologist by training. The survey that we're running with CMU and UMD – using FB's superpower in combination with superpower of public health community to understand at a granular level issues. We rely on public health experts to help with what goes into survey, we aren't public health experts. In the US alone, we collect about 40,000 responses per day. Next largest – 75,000 responses every two weeks – the Household Pulse Data. Temporal and granularity make valuable instrument. We don't have access to individual responses, but we use data internally to help inform messaging campaigns, understand in the US, the world, where different messages might resonate. I can go into high level insights by race/ethnicity/age etc., real time info on preventative health behavior. But want to address what you want to hear about. High level things most pertinent:
  - We've all heard in the media and other data sources about disparities among people of color versus whites with respect to hesitancy. This survey points out that vaccine accepting black and LatinX adults are less likely to have attempted to make an appointment. In LatinX community, highest gap in MD, NY, VA. MD – disparity between LatinX and white adults is largest – interesting because MD is one of the least hesitant states. State like NM, much older Latino population, actual parity between white population and Latino population there.
  - States where most hesitant – MI, Indiana, Ohio – reasons people are giving – side effects, waiting to see what happens, lack of trust. In other states, a lot of diversity across the US. Nice thing about this data is you can dive in at a county level to see how the numbers are changing over time so you can think about potential interventions.
  - Another highlight – looking at real time preventative health behaviors. E.g., Texas with no mask mandate – we can look before and after lifting mask mandate on March 10. 3% decrease in people reporting wearing masks. We see heterogeneity across counties. Travis county kept mask mandate, saw very little change. Harris county, saw a 5-point change. We can understand microinterventions, how they are affecting behaviors. Can also look at interest in vaccine, what concerns people are having.

CONFIDENTIAL TREATMENT REQUESTED
NOT FOR DISTRIBUTION
MEMBERS & STAFF ONLY

- ○ This is just some of the ability that we have. The results are usually available about a day after collected. If we collect today, can see estimates tomorrow. That allows us to be able to understand the changes occurring as pandemic is unfolding.
  - ○ Change instrument frequently, in 7 languages.
  - ○ Would love to answer questions, what you'd like to see.
- Brian: Rob, you heard from ▌▌▌ that we're using survey to get feedback and see in the real world how people are responding. View it as a valuable tool. Would love feedback on how could use it. We have a new version coming to you next week.
- ▌▌▌ Have collaborated with CDC, gotten a lot of good feedback, a lot of interest from academic community. Zeke Emmanuel just co-published an article looking at self-modulated behaviors in response to rising case rates.
- Rob: In terms of the survey, when gleaning things from it, how do you compare population on FB against general population?
- ▌▌▌ About 93% of adults in the US use the internet, about 83, 84% on FB. We have more data about people on FB than people on survey panels. People don't join FB to take surveys, orthogonal w/r/t bias. Some slight skews, but we think we do pretty well. The value of the data isn't that there isn't bias, it's that the bias is consistent over time. If you want to understand over time across geographies, we can offer that better than anyone else.
- Rob: First packet I got in mid-March, was results from February, was useful. I'm curious, what are messaging things that are most useful. What are you finding that has worked?
- ▌▌▌ We haven't engaged with our own interventions, we're rolling that out, it's early to say.
- ▌▌▌ You'll recall, we're doing a lot of broad inform, we felt we didn't have the right targeting in place to go deep. One thing I want to make sure we're not losing, any subtext – how do we enable you to find the communities that need the more targeted messaging?
- Rob: we want to find where is the biggest problem, what has been materially useful.
- ▌▌▌ Survey itself can tell you the reasons that hesitant but persuadable are being influenced by norms and expectations of people around them in their lives. You can see at a geographic level the differences. But you can also see who they trust. Those also vary by geography and population. If you take that – can explore local messengers in one community, friends and family in another, more elite spokesperson is another. It can help you with the messaging, but you have to try it to see if works.
- ▌▌▌ It's hard for us to prove out that an informative piece of content changes hearts and minds outside of survey. Social norms, like profile frames, seeing friends and family and public figures, could help.
- ▌▌▌ So when 28% people of NH saying they are waiting because other people need it more, then maybe you need to match message to not to wait. Almost like political microtargeting.
- Rob: How do we make that operationally useful for us and track it?

CONFIDENTIAL TREATMENT REQUESTED
NOT FOR DISTRIBUTION
MEMBERS & STAFF ONLY

- ████ Because of privacy reasons, we work through academic partners. You could work through academic partners, or there is a public API. We can talk about the cadence you might want to receive the information.
  - For example, prime minister's office in UK want to access data to build out a dashboard.
  - We can help get in format that's the easiest way for you to consume.
- Rob: Format like the document you sent, the high-level takeaways, that's helpful. With API, might need Cyrus or HHS. I probably won't be using the API.
- Courtney: Would be great to follow up with Cyrus. Love that broken down by region and demographics. But equally important, how do we work with you all to push back on it. If someone in rural Arkansas sees something on FB, it's the truth.
- ████ OK – so in terms of action items
  - Find ways to reduce delay
  - Maybe there is a future opportunity to bring in my counterpart Katie who is working on roll out of info on state sides
- Courtney: That would be great. But we want to understand how to counter and correct myths. That piece of it is equally important. Seeing counternarrative on FB will be much more effective.
- Brian: We will push to get more frequent versions of this, can also look for red alert, COVID survey concierge service, will look at what we can provide. ████ want to see what survey can tell WH about where people are hesitant and how we get messages to them. Then also on FB to counter misinfo through labeling, pushing authoritative info to people. That's something we're making a priority.
- Courtney: Super helpful to get this information, this is what we need. What we need is help pushing back on the myths.
- ████ Doesn't just help us understand how and where to intervene, but it also tells us if the interventions are working. We can see overtime if hesitancy is decreasing where we are doing interventions.
- Rob: Rather than chasing individual narratives/demographics, know you've said that broad access is more of philosophical approach.
- ████ Don't think that targeting is the wrong way to do it, it's a sequencing thing. Remove harm, reduce hesitant, inform good. In an ideal state, we inform, but we can also identify and reduce hesitant. But since the detection still isn't quite there for hesitancy, we are starting with inform. Maturity of our detection is the core of challenge for identifying and removing and also means harder to do more targeted interventions.
- Rob: Question I have – if we focus on broad stuff next – if we are to take things from more targeted info, we run targeted ads and local media. You can look at what's showing promise, what's in the lab.
- ████ Yes – right now, it's all broad. Wondering if there is a way to combine vast majority of fastest groups about how to find appointments, discussing side effects. Do we leverage this kind of activity – we know from human patterns of behavior that people are trying to do X, can we build a better data set.

CONFIDENTIAL TREATMENT REQUESTED
NOT FOR DISTRIBUTION
MEMBERS & STAFF ONLY

META-118HJC-0053287

- ████ That's where a lot of our efforts are trying to go. We are looking at using CDC SVI to see if we're having a more or less positive effects on those counties that are considered as vulnerable by CDC. Can we bring together behavioral aspects of what we see. Not building two different tools, building one, market the same one to different people.

- ████ Can we bring Katie next time, Brian? This is at the heart of biggest opportunity to work together.

- Brian: Yes.

- Rob: Is the problem that there isn't a tool? Or the more someone uses FB, the more likely to be vaccine hesitant?

- ████ Don't think we have data that suggests that. Literature on vaccine hesitancy – people bring hesitancy to the groups that they are in. They aren't more hesitant as a result of social media campaigns. Do think that for some populations – not knowing how to get an appointment is actually a barrier. FB can help meet that need. For other populations, might have a more effective message. Vaccine hesitant, anti-vaxxers. We can address concerns of vaccine hesitant by understanding concerns and address.

- ████ Remove harm – about trying to actively do harm – that's the vast minority but we want to remove. Hesitancy – want to keep getting as much information as I can to you. Vast majority of overall widely distributed content, authoritative and good – from CDC, etc. Hesitancy themes around side effects – is vaccine causing nose bleeds, enlarged lymph nodes. We still have a gap in understanding or managing expectations as to what experience could be like. Another thing – lots of questions over finding appointment. Seeing a trend in memes and satire making fun of individuals that don't want to get vaccine. Political themes: video of Biden speaking, reactions. Still small group of adversarial people, large group who are hesitant and have concerns about side effects, finding appointments.

- Rob: Are you able to provide resources?

- ████ This is why on broad inform – we tag anything with COVID-19 vaccine, it directs you to the COVID information center. Ideal state – I have a concern about a nosebleed, here's a resource exactly about that. That from a technical perspective is really hard, which is why it's broader.

- ████ It's hard, and it may not be effective. Some research shows that allowing people to express experience and concerns might be a more effective path to having a conversation with them. Have to be careful in how we approach.

- Rob: If people are having the conversation, is the presumption that we let people have it. Direct them to CDC. What then?

- ████ I think it's an and. We all know people that have had the experience that think that FB is listening to them. The more general stuff, connection to CDC, pops up as very predictable, that's fine, people don't have issues with that. You have the opportunity to go back later, to surface information. At the immediate moment, have the big brother feel. We should pay attention to those conversations, make sure that people see information, even if it's not right then. Have easy access to information.

CONFIDENTIAL TREATMENT REQUESTED
NOT FOR DISTRIBUTION
MEMBERS & STAFF ONLY

META-118HJC-0053288

- █████ Also need to be honest here, deficit of trust in the government, deficit of trust in FB. Figuring out the right interventions that doesn't reinforce some of those concerns around trust is really critical. Who are your trusted sources? Friends and family? Community figure? In areas where we or you aren't the right voice, where we can find the right voice to address concerns>

- Rob: how do we get that stuff to people?

- █████ there are a number of public health agencies we're working with to do campaigns on FB – make use of ability to understand population and target messages appropriately.

- Brian: Some of this is actually targeting. █████ and our ads team know more – a lot can be accomplished through targeting, third parties can definitely target – there will be demographic information that will be able to be used as well.

- Rob: There are ways we can target around it. Since it's a global pandemic, can we give agencies access to targeting parameters that they normally wouldn't be able to?

… (missed 1 Q)

- Courtney: Have other issues – for example, women of childbearing age worried about fertility. Can we adjust survey on a dime? Pregnancy is another one but I'm less worried about it. Conservative circles. Can we send stuff your way to look at?

- █████ Yes you can definitely share information with us, we can look at what we're seeing, look at modifications to survey. CDC weighs in on questions. We do have questions, for example on pregnancy, we can look at whether it corroborates what you're seeing. We have other things like job occupations that we're looking at.

- █████ Want to be mindful of time,
  - In March took down 700,000 pieces of content globally, 150,000 in the US – this is a drop because we took down a lot and then were cleaning up
  - For full transparency and honesty, have moved out of a sprint that the teams have been in for the last 8 weeks, achieved goals, made progress – closed out foundational understanding work, early virality detection. Now focus for teams will be expediting execution.
  - Don't want to seem like we've changed teams or priority, we're just shifting focus

- Rob: Team that had been focused on vaccine hesitancy is moving to execution phase, figured out what you need to do

- █████ That's right, but just within moving target, we've now identified the head of the problem, know what we're doing, overall priority, teams, resources, hasn't changed.

- Brian: We described this as a lockdown earlier. Wanted to hear from us, as things push out of Facebook and into the Washington Post. Want to communicate clearly with you.

- Rob: I appreciate that, am not 100% understanding it but probably more me than you. What are the things that you found?

- █████ What I don't want you to think is that we've declared victory and on vacation. What we found – had some improvements on misinfo accuracy, adjusting policies (e.g., removing 2 million pieces of content). Vaccine hesitancy – what we talked about last

CONFIDENTIAL TREATMENT REQUESTED
NOT FOR DISTRIBUTION
MEMBERS & STAFF ONLY

time – it's around topics – symptoms/appointments/memes/political themes, less about small group of adversaries.  Now we're focused on executing.

- Rob: Execute is trying out new interventions?
- ▮▮▮▮▮ Great question – when I say execute – we've already been deploying interventions in a first version way.  Now we're expanding and improving the quality of those.
- Courtney: What are you qualifying as misinformation versus politically charged?  What does that universe of stuff look like overall?
- Brian: The way that you describe it probably isn't the way we think about it – misinfo v. politically charged.  We have a policy definition of misinformation, then we have gradations of what we take down, versus reduce/inform.  Might be easier to send some examples.
- Courtney: What are all the narratives that are out there?  Would be interesting to see what's misinformation versus something we'd flag.
- Brian: That's what ▮▮▮▮▮ getting into with respect to the themes.  We'll update you on the major themes that we're seeing each week.  Flat out, adversarial misinfo versus vaccine hesitancy content.
- Courtney: E.g., in last seven days, have seen claims about people playing God, etc. Is that misinformation?
- ▮▮▮▮▮ Maybe we can get some visual examples and send over.  We'll pull Katie in around messaging channels.  What am I missing Brian?
- Brian: Going to look at different ways to share survey information with Rob.  Don't want to just link API to you, want to be topline.  We'll take that back with ▮▮▮▮▮ team too.
- Courtney: super helpful.
- Rob: We can offline about specific format.  We're most interested in what's keeping you up at night.
- ▮▮▮▮▮ We can do that, raise up to you quite frequently.  Have a number of epidemiologists looking at this internally and externally.
- Courtney: I pinged the team about vaccine passports, can get you some examples.
- ▮▮▮▮▮ Religious thing – survey lets us know if concerns are religious.
- Courtney: OK great.
- ▮▮▮▮▮ we'll meet again in a week?  Can move to Mondays going forward.

PRODUCED TO HJC

EXHIBIT 7

6/15 Meeting with White House

FB Attendees: Brian Rice, ████████████    ██    ████████████    ████████████
WH Attendees: Rob Flaherty

Brian – Rob, I know we have a lot to cover.  Want to respond to conversation from a little while back.  Start off with the Policy changes we made on May 26.  Then we'll walk through content demotion where we hopefully explain in a way where you're comfortable with it.  And hopefully our colleague ██ will join to provide more context around the statistics we sent over on vaccine sentiment.  Wanted to make sure we gave you clarity there.
Rob – sounds great.
████████ – I'm ████████████ – I lead the product teams working on integrity within FB App.
Around the distribution of reducing problematic content, inform treatments.  I'll touch on 3 new misinfo experiences related to reducing distro of misinfo, touch briefly on how ranking works, I know we've discussed in the past, demotions are anchored in ranking, so will gloss over that, then go to details of demotions.
Rob – great
████ – 3 new misinfo tools announced at end of May.  Leveraged a few of them in election period.
New approach – give people more info about Pages that have shared misinformation or have content that has been repeatedly fact checked.  So now where there's the case, you can get more information about what fact checkers said about content on that page.  Part of overall inform strategy to give people more information.
More aggressive approach to entities that have repeatedly shared misinfo – Pages or Groups – it's typically the same sets of Pages/Groups.  We've introduced logic so that we increase demotion strength/amount of demotion that we apply to those entities.  This is one I was especially excited about.  We know it's the same set of entities that are repeatedly sharing.  This one is key.
Last one- improvement in way we notify people that they've shared content that fact-checkers later rate.  We've redesigned notifications that the person gets to make it easier to understand.  Additional info we're adding in – fact checker's article debunking the claim, prompt to share additional context with other people.
████ – those are the three main new misinfo levers we've introduced.  Any questions.
Rob – biggest question is related to how demotion works.  But to make sure I have it right – first one is a pop up when you go to like a page that tells you it's repeatedly shared misinfo?
████ – yes. And includes substantive information about the fact checker.  We can send you an example of what it looks like.
Rob – how many times does the Page have to share to trigger treatment?
████ – It varies across experiences.  In this case, I think it's 5.  Let me follow up specifically.  Want to make sure you have the most accurate information.
Rob – I'm curious about notifications after sharing something fact-checked.  In many different worlds ago, Brian and I talked about – the CW said it hardens people.  What changed?  What research have you done?

PRODUCED TO HJC

███ – I can't speak to what was discussed earlier.  These experiences have been being built for quite some time, have evolved.  We've refined user research that told us that people do pay attention, there is value in providing this information, even if it's after the fact.  Brian, any other context?

Brian – was this around the election?

Rob – this is when we first talked on Beto stuff – badging, notifying people.  Research said counterproductive.  I think this is a good thing.

Brian – I do remember that was our sense at the time – going back after the time.  Let me go back to the teams and see.

███ – We have pivoted substantially in the couple years I've been here towards a much more inform-centric approach.  Another experience we launched last year – when a person goes to share an out-of-date piece of content or one likely to have misinfo in it, we surface what we call a reshare interstitial that informs people at time of sharing that content might be out of date.  We found that as classifiers have improved over time, we've been able to be more targeted in approach, that type of information has quite materially slowed the spread of viral misinformation.  A lot of this was over time improving our ability to classify, getting the copy and experience right – informative but not judgmental. Saying likely to be problematic in XYZ ways, you choose if you reshare.  We notify you there might be some issues.

███ – external studies in this space are heterogenous in their effects.  Quality of classifier really matters in prompts, even if after the fact.  Also, nature of the topic itself.  Tone in which you approach it matters quite a bit. One of those situations where it works sometimes, it's not going to work all the time.  You have to test and adjust it.  I'm sure that improving classifier over time is what's making this work.

███ – and getting the tone right is also a key factor. Can influence whether pause before sharing.

Rob – Tone is way copy is written?

███ – right.  We spent months of time landing the precise copy where we wouldn't be perceived as being paternalistic.  Landing the words was really important.  We launched the first ones in March/April last year, have now used during election periods, other scenarios.  It's a powerful lever against misinformation.

Rob – Cool, awesome

███ – I love this approach specifically because we are transparent with users.  Demotion work – it is difficult to be transparent, give people a sense of how their content is being enforced on.  In this case, able to be transparent and clear about the fact that the content will get less distribution, fewer people are going to see it.

Rob – that makes sense.

███ – Ok, I'll just cover context-setting COVID approach.  We remove content that clearly violates our policies.  Then there is a set of content that doesn't violate but could be harmful, and so important to reduce the amount of times content is seen.  Won't spend much more time on that if that works for you.

Rob – OK

███ – I can spend a minute on how ranking works.  Demotions, in their simplest form, is a discount to a ranking score that we assign to a piece of content.  Zooming out a bit – there is so much content out there – each person has more inventory than they could possibly ever go

PRODUCED TO HJC

through.  Ranking is important because it's important to order what people see.  Rank based on user value – determined by signals.  What you might want to see most versus what I might want to see most.  What we do is take all these different signals, assign a ranking score to a piece of content.  Say there is a piece of sensationalist content, vaccine related.  We assign a value – say it's 10 – given all the different things we incorporate into ranking score.  Our integrity system then calculates an integrity score or multiplier.  In the case of sensationalist content – we're certain that this piece of content is correctly classified as such – sensationalist content gets a demotion strength or discount of 40%/0.4. – we subtract 4 from 10.  Piece of content that would have otherwise had a ranking score of 10 now has a rank of 6.  So, when we stack rank or order the content after applying integrity score determines where it goes.  Tricky piece is that ranking systems are deeply personalized.  Difficult to say that a piece of content will rank in X position in everyone's feed universally.  Not how it works.  But I can say this piece of content would be seen by roughly 40% fewer people based on demotion.  That's one way to think about the "under the hood" of demotion works.

Rob – this is interesting. If seen by 40% fewer people, who are the remaining 60%?  What are the audience differentiations?  What kind of person can see it?

▓▓▓ – this is where the personalized nature of news feed comes in (and note I'm talking conceptually, it may not be precisely 60/40).  One example is a low inventory user.  So, if my dad only has 4 friends, there's limited content for him to see.  Another reason – connected to a page or group.  Or if someone is scrolling deeper into feed than you or I might do.

Rob – Reason I ask – seems plausible that 40% that are no longer seeing it are less susceptible to it and 60% are more open to it.  Attitudinal difference.

▓▓▓ – I think that's right – although we can't say who it's bad for, or whether their attitudes are antecedent.

Brian – Thinking about that population – I've been asking the same questions – you'd have the 40% might be the fence sitters.  The remainder may have signal that they want to see it – they're not fence sitters.  They are the folks that won't be convinced.  There's an argument that you're removing it from fence sitter.  I don't think we have data to show it.

Rob – Devil in the details.  It's hard for me to make a personal evaluation of whether it's making a difference.

▓▓▓ – If we wanted to understand if it's making a difference, we'd have to randomly assign who gets demotion and who doesn't and have some sense of prior attitudes.  Given that this is a rare event.  That random assignment becomes harder when you're talking about content that others inject into the system versus our ability to inject content.  With vaccines, it's probably not exposure to one thing or exposure over a short time.  At the point of the pandemic where we're talking about vaccines, people have hardened/crystalized their attitudes.  Hard to study.  On integrity – we hope they are effective, taking steps because we don't want the content up.  And then there are times where we are actively putting things at the top of people's feed.  In that case, we control random assignments and can look at differences.

▓▓▓ – two other things.

60/40 – don't want to anchor in them, they are arbitrary.  Could have used X and Y.

This is where inform treatments become important. People who might want to see that content will continue to see it.  With overlay of authoritative content pinned to the top – embedded

PRODUCED TO HJC

authoritative information – becomes very important. People can choose to engage. But in parallel, we're providing a counter to that misinformation. Does that make sense?

Rob – It makes sense. You guys are much longer on inform, we're much longer on reduce.

███ – what do you mean by that?

Rob – we're keen on what platforms are doing to reduce the spread of bad information, that platforms are not funneling people towards bad content. That's our primary concern. If you guys have data that show that inform counteracts the spread of bad information, great.

███ – it does. The value of inform is that we know that it does have an impact on distribution.

Rob – I'd love to see that.

███ – particularly important for borderline content where difficult for classifiers.

███ – a couple data points that have been really helpful for me. Search interstitial. I think we have data that interstitials do reduce borderline and misinfo shares. It's a clear example of interstitial having a meaningful impact. Other data we have goes one step further – proactive campaigns with CDC and so on. Able to measure causal and in some cases positive impact on vaccine attitudes. Another example of value of inform.

Rob – I haven't seen that data.

███ – as with all marketing campaigns, depends on targeting and copy. More than happy to share.

███ – some of them were in Nick's email.

Rob – that was my last thing I wanted to get at with Brian. We came away that you weren't measuring, then we saw that you were. Was that brand lift? How are you measuring?

███ – Measured in a few ways. A lot of the ones in Nick's note were brand lift or analogous (compare people exposed to content to random control group and survey). That's one of the techniques we've used. In addition to that, have done additional studies to try to attribute to real world uptake. Those take longer. Blood donations is a good example – when we rolled out in the US worked closely with American Red Cross – we were able to see with their data – increase of 19% increase nationwide of new donors. Using same techniques in this space. Direct brand lift, then broader body of work that goes all the way to attribution in the physical world.

███ – I have to hop, Rob, happy to follow up with whatever details might be helpful. There is some upcoming work on increased transparency that would love to chat with you about sometime in the future.

Rob – Great, thank you.

███ – We are able to do causal inference/impact analyses. The conversation we had previously was how can we understand impact of misinfo on people's attitudes. That's where we have a hard time studying.

Rob – that makes sense. I actually do have to run also. I still have more questions, can email them to you Brian.

Brian – great. As ███ mentioned, we are doing more as a Company to try and make this easier to understand. Coming in the next couple weeks. We can follow up with you then. But send questions, we'll do our best.

Rob – also interested outside of COVID in promotion of good information – NEQ score stuff rings a lot of alarm bells. Would like to dive in next time we talk.

CONFIDENTIAL TREATMENT REQUESTED
NOT FOR DISTRIBUTION
MEMBERS & STAFF ONLY

EXHIBIT 8

| | |
|---|---|
| **From:** | |
| **To:** | MisinfoPolicyTeam |
| **Sent:** | 7/16/2021 8:14:12 PM |
| **Subject:** | Re: Biden Admin Health Misinfo Advisory |

I agree. This seems like a political battle that's not fully grounded in facts, and it's frustrating. That said, there's good momentum internally right now to get even deeper on the data so we can push back more directly, so hopefully we'll have a bit more to say on this soon.

---

**From:** ▇▇▇▇▇▇ <▇▇▇▇▇▇fb.com>
**Date:** Friday, July 16, 2021 at 7:32 PM
**To:** ▇▇▇▇ <▇▇▇▇▇fb.com>, MisinfoPolicyTeam <▇▇▇▇▇@fb.com>
**Subject:** Re: Biden Admin Health Misinfo Advisory

Thanks for sharing. There are so many untested assumptions in what the administration is saying recently—social media misinfo is increasing, it's leading to death, it has an impact different from misinfo other places—not to mention how their definition of "misinfo" is completely unclear. As fair as it is to say we need to do better about reporting numbers that mean something, it also just seems like when the vaccination campaign isn't going as hoped, it's convenient for them to blame us....

Get Outlook for iOS

---

**From:** ▇▇▇▇▇ <▇▇▇▇fb.com>
**Sent:** Friday, July 16, 2021 5:07:38 PM
**To:** MisinfoPolicyTeam <▇▇▇▇@fb.com>
**Subject:** FW: Biden Admin Health Misinfo Advisory

FYI

---

**From:** ▇▇▇▇▇▇ <▇▇▇@fb.com>
**Date:** Friday, July 16, 2021 at 4:51 PM
**To:** Nick Clegg <▇▇@fb.com>, ▇▇▇ <▇▇▇fb.com>, ▇▇▇▇ <▇▇@fb.com>, ▇ <▇▇@fb.com>, ▇▇ <▇▇@fb.com>, ▇▇ <▇▇@fb.com>, Brian Rice <▇▇@fb.com>
**Cc:** ▇▇▇ <▇@fb.com>, ▇▇ <▇fb.com>, ▇ <▇@fb.com>, ▇ <▇@fb.com>, ▇ <▇fb.com>, ▇▇ <▇@fb.com>, ▇ <▇@fb.com>, ▇▇ (Policy Comms) <▇@fb.com>, (SR Comms) ▇ <▇@fb.com>, ▇▇ <▇@fb.com>, ▇▇ <▇@fb.com>, ▇ <▇fb.com>
**Subject:** Re: Biden Admin Health Misinfo Advisory

+ @Brian Rice

---

**From:** ▇▇▇▇▇ <▇▇@fb.com>
**Date:** Friday, July 16, 2021 at 4:33 PM
**To:** Nick Clegg <▇▇@fb.com>, ▇▇ <▇▇fb.com>, ▇▇ <▇▇@fb.com>, ▇ <▇▇@fb.com>, ▇▇ <▇▇@fb.com>,

CONFIDENTIAL TREATMENT REQUESTED
NOT FOR DISTRIBUTION
MEMBERS & STAFF ONLY

EXHIBIT 9

| | |
|---|---|
| **From:** |  |
| **To:** | |
| | |
| **Cc:** | |
| **Subject:** | Re: Urgent help assessing misinfo/misinfo adjacent Policy options |
| **Date:** | Friday, August 6, 2021 7:13:48 PM |

+ @████ <mailto:████████fb.com> and @████ <mailto:████████fb.com> for Comms visibility; @████ <mailto:████████fb.com> for Legal

Hi all,



Thanks so much again for the sprint on this. Leadership met today and decided we should move forward on our 4 recommendations (pasted below and also in our team's working doc here <https://docs.google.com/████████████████████████████ > ) and scope the exact product work needed to implement and then execute on the ones that are relatively easy to do.



████ ████ ████ and ████████ will be driving next steps on this overall while I'm out on PTO next week, coordinating with ████ and will reach out to our Product counterparts on Options 2a, 2b, and 2c. @████ <mailto:████████fb.com> could you be on point to further scope Option 1a with your Recs Product counterparts?



@████ <mailto:████████fb.com> and @████ <mailto:████████fb.com> , please let us know if there's additional feedback you got on the Product side for how to best scope these options and whom to involve. I appreciate you flagging earlier today that we'll have to make some prioritization calls as we scope each of these options further.



@████ <mailto:████████fb.com> , @████████ <mailto:████████fb.com> and @████ <mailto:████████fb.com> , please let us know if you have any immediate thoughts on deadline to turn v2 of these options around. We'll move fast but aren't aware of a specific moment when we need to commit to any of these privately or publicly with external stakeholders.

████

Recommendations to further scope:

CONFIDENTIAL TREATMENT REQUESTED
NOT FOR DISTRIBUTION
MEMBERS & STAFF ONLY

Option 1a. Designate linked assets as non-recommendable

*   Impact: Any assets linked to Groups/Pages/Profiles/Accounts that have been removed for COVID misinfo violations would not be recommended to users. E.g., RFK Jr.'s IG Account is removed, so his FB Page will be non-recommendable.
*   Recommendation: We recommend this as a stop-gap measure specifically targeting Disinfo Dozen assets. Per the recent Avaaz <https://secure.avaaz.org/campaign/en/fb_algorithm_antivaxx/> report, some entities affiliated with removed Disinfo Dozen Pages are still being recommended because they do not have recent violations.
*   Difficulty: Low (1-6 weeks)

   1.

Option 2a. Count COVID M&H, Vaccine WDH, & COVID RFH toward misinfo Repeat Offender Status

*   Impact: Currently, strikes for COVID Misinfo & Harm, Vaccine Widely Debunked Hoaxes, and COVID Repeatedly Fact-Checked Hoaxes receive Community Standards strikes, but they do not count towards Misinformation Repeat Offender (RO) Status.  If we count those strikes towards Misinfo RO Status, entities spreading COVID or vaccine misinfo would more quickly receive related penalties, such as content demotion or an advertising ban, on top of normal CS penalties.
*   Recommendation: We recommend this because the Misinfo RO system is meant to penalize misinfo actors and therefore should count this content,which is more egregious than false information fact-checked by a 3PFC.
*   Difficulty: Low (1-6 weeks)

Option 2b. Develop a strike system for health-related Partly False and Missing Context ratings that could trigger domain/Page/Group/account Repeat Offender (RO) status in more instances [Note: leadership feedback is to develop this for DOMAINS only]

*   Impact: Our latest analysis of URLs directing to Disinfo Dozen webpages found that a significant percentage of the most viewed URLs have Partly False or Missing Context 3PFC ratings. Counting health-related Partly False and Missing Context ratings toward entity-level penalties could allow us to take stronger action to reduce the distribution of the domains and associated entities themselves.
*   Recommendation: We recommend this as it is consistent with the precedent of taking stronger measures against Covid-related fact-checked content. However, this requires considerable lift for just a small set of bad actors.
*   Difficulty: High (6+ weeks)
*   In the interim, we could demote in-Feed domains associated with removed entities (note: three Disinfo Dozen domains are already experiencing demotion under Misinfo RO penalties).

Option 2c. Demote Partly False rated Covid or vaccine misinformation more strongly

*   Demote Partly False rated Covid or vaccine misinformation more strongly (up to 80% from 50% today) (Recommended)
*   Impact: COVID or vaccine misinfo that we don't remove would appear lower in people's News Feed.
*   Recommendation: We are already demoting COVID content rated Missing Context as a BTG and see this as consistent with that precedent.
*   Difficulty: Low (1-6 weeks)

CONFIDENTIAL TREATMENT REQUESTED
NOT FOR DISTRIBUTION
MEMBERS & STAFF ONLY

From:  █████ < ███████ fb.com>
Date: Tuesday, August 3, 2021 at 7:46 PM
To: ████████ < ████████ fb.com>, █████ < ████████ fb.com>,
< ████████ fb.com>, ████████ < ████████ fb.com>,
< ████████ fb.com>, █████ < ████████ fb.com>,
< ████████ fb.com>, ████ < ████████ fb.com>,
< ████████ fb.com>, ████ ████ < ████████ fb.com>,
< ████████ fb.com>
Cc: ████ < ████████ fb.com>, █████ < ████████ fb.com>,
< ████████ fb.com>, ████ < ████████ fb.com>,
< ████████ fb.com>, ████ < ████████ fb.com>,
< ████ fb.com>
Subject: Re: Urgent help assessing misinfo/misinfo adjacent Policy options

+  █████

From: █████ < ████████ fb.com>
Date: Tuesday, August 3, 2021 at 11:11 AM
To: █ ███ < ████████ fb.com>, █████ < ████████ fb.com>, █████
< ████████ fb.com>, ████ < ████████ fb.com>, ████ < ████████ fb.com>,
< ████████ fb.com>, ████ < ████████ fb.com>,
< ████████ fb.com>, ████ < ████████ fb.com>,
Cc: ████ < ████████ fb.com>, █████ < ████████ fb.com>,
< ████████ fb.com>, ████ < ████████ fb.com>,
< ████████ fb.com>, ████ < ████████ fb.com>,
< ████ fb.com>
Subject: Re: Urgent help assessing misinfo/misinfo adjacent Policy options



Thank you SO much to everyone who's already chimed in on the doc. We just learned the leadership meeting has been postponed until Friday, so we have another 24 hours to get any additional Product input. █████ I will also side-ping a couple of you today to resolve open comments from overnight.

From: █████ < ████████ fb.com>
Date: Tuesday, August 3, 2021 at 11:01 AM
To: █████ < ████████ fb.com>, ████ < ████████ fb.com>,
< ████████ fb.com>, █████ < ████████ fb.com>, █████ < ████████ fb.com>,
< ████████ fb.com>, ████ < ████████ fb.com>, ████ < ████████ fb.com>,
< ████████ fb.com>
Cc: ████ < ████████ fb.com>, █████ < ████████ fb.com>,
< ████████ fb.com>, ████ < ████████ fb.com>,
< ████ fb.com>
Subject: Re: Urgent help assessing misinfo/misinfo adjacent Policy options

+  █████

From: ████████ < █████ fb.com>



CONFIDENTIAL TREATMENT REQUESTED
NOT FOR DISTRIBUTION
MEMBERS & STAFF ONLY

Date: Tuesday, August 3, 2021 at 11:39 AM



Subject: Re: Urgent help assessing misinfo/misinfo adjacent Policy options

+ @ ████████ <mailto ████ fb.com>

From: ████████ < ████ fb.com>
Date: Tuesday, August 3, 2021 at 6:00 AM



Subject: Re: Urgent help assessing misinfo/misinfo adjacent Policy options

+ @ ████████ <mailto ████ fb.com> +@ ████ <mailto ████ fb.com>

Feedback from Health Integrity London

1. RFH strikes for demotion are not in production. We had strikes for RFH deletes and plan to enable strikes for demotions as a P2 for Q3 when we onboard responses to Misinformation's infra. RFH has ~40 new content enforcements per day (excluding banking which is ~550/day).
2. RE Section 3 "Demote more content" - As we plan to integrate with misinfo's infra for all responses (P1 Q3) these features could be prioritised for launch at that time. @ ████████ <mailto ████ fb.com> to comment on feasibility/timelines.
3. I have added another section with additional BTGs measures for consideration. One of which is automated Feed demotions on Covid posts by Health Misinfo Ros which was a BTG lever that we launched during the lockdown with Feed Integrity. At that time it was developed with ████████ , but while she's out I believe @ ████ <mailto ████ fb.com> is covering here.

Thanks

From: ████ < ████ fb.com>
Date: Tuesday, 3 August 2021 at 01:43
To: ████ < ████ fb.com>, ████ < ████ fb.com>,

CONFIDENTIAL TREATMENT REQUESTED
NOT FOR DISTRIBUTION
MEMBERS & STAFF ONLY



Subject: Re: Urgent help assessing misinfo/misinfo adjacent Policy options

Links Integrity will own section "2. Off platform links enforcement" for your requested ETA of Tues 8/3 @ 1pm.

Happy to provide input elsewhere in the doc where offsite content is discussed (will read through, and please tag me if I miss anything).

_____



Subject: Urgent help assessing misinfo/misinfo adjacent Policy options

Hi PMs in the To line,

With apologies in advance for the short notice, could we please ask for a quick gut check by 1 pm PT tomorrow (Tuesday) on the implementation feasibility of this list <https://docs.google.com/document/d▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮> of policy options to be more aggressive against Covid and vaccine misinformation, to inform a leadership conversation happening Wednesday?

Context: Leadership asked Misinfo Policy and a couple of teams on Product Policy to brainstorm some additional policy levers we can pull to be more aggressive against Covid and vaccine misinformation. This is stemming from the continued criticism of our approach from the US administration and a desire to kick the tires further internally on creative options. (We know there's also a parallel effort to brainstorm Product/BTG levers we can pull.)

We've been sprinting over the past several days and have both dusted off some ideas we'd previously discussed with our Product counterparts (ie you), and come up with some net new ideas.

CONFIDENTIAL TREATMENT REQUESTED
NOT FOR DISTRIBUTION
MEMBERS & STAFF ONLY

We need to send these to leadership by EOD Tuesday, in advance of a Wednesday meeting with ██████████, ██████████, ████████, and others, where they'll discuss.

Questions for you are:

1.     Are any of these ideas definitely not feasible from a Product POV?
2.     For all the ideas that are feasible, could you indicate in our doc whether they are a light (1-6 weeks to implement) or heavy lift (> 6 weeks)?

Thanks so much,

████████ ████ and ███



CONFIDENTIAL TREATMENT REQUESTED
NOT FOR DISTRIBUTION
MEMBERS & STAFF ONLY

EXHIBIT 10

**From:** Nick Clegg < ████ fb.com>
**Sent:** Thursday, August 19, 2021 5:25 PM
**To:** ████ < ████ fb.com>; ████ < ████ fb.com>; ████ < ████ fb.com>
**Cc:** ████ < ████ fb.com>; ████ < ████ fb.com>; ████ < ████ fb.com>; Brian Rice < ████ fb.com>; ████ < ████ fb.com>; ████ fb.com>; ████ < ████ fb.com>; ████ < ████ fb.com>; ████ fb.com>
**Subject:** Re: [A/C PRIV] Enforcement Update re COVID-19

Yep this looks good thx. N

Get Outlook for iOS

---

**From:** ████ < ████ fb.com>
**Sent:** Thursday, August 19, 2021 4:24:53 PM
**To:** Nick Clegg < ████ fb.com>; ████ < ████ fb.com>; ████ < ████ fb.com>
**Cc:** ████ < ████ fb.com>; ████ < ████ fb.com>; ████ < ████ fb.com>; Brian Rice < ████ fb.com>; ████ < ████ fb.com>; ████ fb.com>; ████ < ████ fb.com>; ████ < ████ fb.com>; ████ fb.com>
**Subject:** [A/C PRIV] Enforcement Update re COVID-19

Nick, ████

This email provides a follow-up to our August 6th discussion regarding our response to the Surgeon General on COVID-19 misinformation. During that discussion, we agreed to further explore four discreet policy options for reducing the prevalence of COVID-19 misinformation on our platforms. Since then, teams have scoped the requirements for executing those options. As discussed further below, we plan to roll-out the first three options over the next coming weeks, and will roll-out the fourth option as an escalation only policy.

**Please let us know if you have any concerns with the following plan by 9 am ET tomorrow;** otherwise, we plan to provide an update to the Surgeon General and start executing against these tomorrow.

Thank you,

████

1. Option 1: **Designate any assets linked to Groups/Pages/Profiles/Accounts, which have been removed for COVID misinfo violations, as non-recommendable to users.**
   a. **Impact:** Any asset linked to Groups/Pages/Profiles/Accounts that have been removed for COVID misinfo violations would not be recommended to users (e.g., RFK Jr.'s IG Account is removed, so his FB Page will be non-recommendable).
   b. **Status: By the end of this week, we will enforce on approximately 60 linked assets related to the Disinfo Dozen that have been removed for COVID misinfo violations.** Over the next three weeks, we will engage in further work to understand how to mitigate the risk of over-enforcement here. We will then return with a further recommendation on a broader policy change that will affect more than just the 60 Disinfo Dozen-linked assets.

2. Option 2: **Count COVID Misinformation & Harm (M&H), Vaccine Widely Debunked Hoaxes (WDH), & COVID Repeatedly Fact-Checked Hoaxes (RFH) toward Misinformation Repeat Offender status.**
   a. **Impact:** Currently, only 3PFC-rated False/Altered content counts toward misinfo repeat offender status, which results in demotions and demonetization for entities. Counting COVID M&H, Vaccine WDH, and COVID RFH strikes towards misinfo repeat offender status would more quickly penalize entities spreading COVID or vaccine misinfo on top of our normal Community Standards penalties.
   b. **Status: We are targeting the end of September for launch.** This includes updating language on existing transparency surfaces to notify affected entities how content we remove for COVID/Vaccine violations factors into their Repeat Offender status.

CONFIDENTIAL TREATMENT REQUESTED
NOT FOR DISTRIBUTION
MEMBERS & STAFF ONLY

3. <u>Option 3</u>: **Demote COVID or vaccine misinformation rated Partly False more strongly.**
   a. **Impact:** We currently demote content rated Partly False at 50%. We will increase that demotion level to 80% for COVID and vaccine misinfo. Note: In the last month, fact-checkers applied "Partly False" ratings to at least 1k COVID-19/vaccine content.
   b. **Status: We are targeting the end of next week for launch.** This includes transparency updates in an existing NewsRoom Post (link).

4. <u>Option 4</u>: **Count COVID or vaccine-related URLs that are rated Partly False or Missing Context towards "domain" Repeat Offender (RO) status (i.e., penalize the URL domains from which the content was shared).**
   a. **Impact:** The Disinfo Dozen report faulted FB for allowing users to share URLs linked to the Disinfo Dozen. Misinfo Policy found that, for the most viral Disinfo Dozen URLs rated by third-party fact checkers, 85% of those ratings were either Partly False or Missing Context. However, only False ratings count towards misinfo repeat offender status, which means, for those URLs rated False, all user shares of that URL's domain will be demoted.
   b. **Status:**
      i. **Change:** This is a heavy lift to integrate into our existing repeat offender system. Instead, we will approach this as an on-escalation break-the-glass measure. We will periodically manually review domains that had a high number of third-party fact check ratings to see if enough of them were COVID or vaccine related. We will enforce on domains that meet that threshold manually for 90-day domain demotion (note: threshold is still TBD). Misinfo Policy and Product are aligned on this modification of the option as a BTG solution.
      ii. **Caveats:** This will not flow through the normal repeat offender process, so will not have messaging that domain repeat offender status has been met. However, many of our domain repeat offender demotions do not give notification unless the domain is explicitly tied to a page. We will need to have a reactive comms plan for partners that may experience these demotions.

PRODUCED TO HJC

EXHIBIT 11



| From: | |
| To: | |
| CC: | Brian Rice; |
| Sent: | 7/22/2021 12:17:53 PM |
| Subject: | RE: Surgeon General |

Thanks.  I'm sharing this with Nick and the status on the label of the IG video.  He's calling Andy shortly.  Thank you!



**From:** [redacted] <[redacted]fb.com>
**Sent:** Thursday, July 22, 2021 12:13 PM
**To:** [redacted] <[redacted]fb.com>; [redacted] <[redacted]fb.com>; [redacted] <[redacted]fb.com>; [redacted] <[redacted]fb.com>; [redacted] <[redacted]fb.com>
**Cc:** [redacted] <[redacted]fb.com>; [redacted] <[redacted]fb.com>; [redacted] <[redacted]fb.com>; Brian Rice <[redacted]fb.com>; [redacted] <[redacted]fb.com>; [redacted] <[redacted]fb.com>; [redacted] <[redacted]fb.com>
**Subject:** Re: Surgeon General

All --

To follow-up on #2 below, we were able to evaluate the groups closer.  Based on the evidence of the post showing an intent to evade enforcement, and the presence of strikes in the group, PLUS evidence that they have a back-up group ready to go if their larger group is removed, we are comfortable removing both groups.



**From:** [redacted] <[redacted]fb.com>
**Sent:** Thursday, July 22, 2021 2:37 PM
**To:** [redacted] <[redacted]fb.com>; [redacted] <[redacted]fb.com>; [redacted] <[redacted]fb.com>; [redacted] <[redacted]@fb.com>; [redacted] <[redacted]fb.com>; [redacted] <[redacted]fb.com>
**Cc:** [redacted] <[redacted]fb.com>; [redacted] <[redacted]fb.com>; [redacted] <[redacted]fb.com>; Brian Rice <[redacted]fb.com>; [redacted] <[redacted]fb.com>; [redacted] <[redacted]fb.com>
**Subject:** Re: Surgeon General

On #2, we discovered this content in two groups.  Both groups are using coded language to discuss COVID and vaccines.  We don't have a policy prohibiting people from using coded language if their content otherwise does not violate our policies.  One group had only 6 posts and no violations; the other had 3,600 posts and 2 violations.  I am asking PREsc to continue reviewing those groups to

CONFIDENTIAL TREATMENT REQUESTED
NOT FOR DISTRIBUTION
MEMBERS & STAFF ONLY

make sure there are no violations. **We could amend our Help Center to prohibit Groups and Pages from using coded language to discuss COVID and vaccines if there is evidence that they intend to avoid detection (we believe there is such evidence here -- see post below where they are teaching members how to use code words).**



On #3, we reviewed 28 websites linked to the "Disinfo Dozen" and found that 15 prominently feature content that would violate our COVID/vaccine misinfo policies, or would be borderline vaccine discouraging, if they were on our platform.

Of those 15, >50% of the recent shares of 2 of those domains would violate our policies if on platform; 25-50% of the recent shares of 6 of those domains would violate our policies; and <25% of the recent share of 7 of those domains would violate our policies.

- If we were to blackhole all 28 websites, that would remove approximately **500 million** pieces of content.
- If we were to blackhole only the 15 websites, that would remove approximately **252 million**

CONFIDENTIAL TREATMENT REQUESTED
NOT FOR DISTRIBUTION
MEMBERS & STAFF ONLY

META-118HJC-0053640

pieces of content.

- If we were to backhole only the 2 domains where >50% of the recent shares contain violating content (i.e., childrenshealthdefense.org and vaccines.mercola.com), **>66 million** pieces of content would be removed.



**From:** ▇▇▇▇ < ▇▇▇▇ fb.com>
**Sent:** Thursday, July 22, 2021 1:58 PM
**To:** ▇▇▇ < ▇▇▇▇ fb.com>; ▇ < ▇▇▇ fb.com>; ▇ < ▇▇▇ fb.com>; ▇▇
▇▇▇▇▇▇▇ < ▇▇▇ fb.com>; ▇▇▇▇▇ < ▇▇▇ fb.com>; ▇▇▇▇ < ▇▇ fb.com>;
▇ < ▇▇ fb.com>
**Cc:** ▇▇ < ▇▇▇ fb.com>; ▇▇▇▇ < ▇▇▇ fb.com>; ▇▇▇ < ▇▇ fb.com>; ▇▇
▇ < ▇▇▇ fb.com>; ▇▇▇ < ▇▇▇ fb.com>; Brian Rice < ▇▇ fb.com>
**Subject:** RE: Surgeon General

Nick is pinging about this. Looks like the content in #1 still isn't labeled. Can we get the label applied, content demoted, and tell him what he can say about why the label/demotion didn't happen in the ordinary course? @▇▇
▇▇▇▇ it looks in the case like it's assigned to someone off-duty in Dublin. Can someone take the enforcement action?

**From:** ▇▇▇▇ < ▇▇▇▇ fb.com>
**Sent:** Thursday, July 22, 2021 8:21 AM
**To:** ▇▇ < ▇▇▇ fb.com>; ▇ < ▇▇▇ fb.com>; ▇ < ▇▇▇ fb.com>; ▇▇
▇▇▇▇ < ▇▇▇ fb.com>; ▇ < ▇▇▇ fb.com>; ▇▇▇ < ▇▇ fb.com>
**Cc:** ▇▇ < ▇▇▇ fb.com>; ▇▇▇ < ▇▇▇ fb.com>; ▇▇ < ▇▇ fb.com>; ▇▇
▇ < ▇▇▇ fb.com>; ▇▇▇ < ▇▇▇ fb.com>; Brian Rice < ▇▇ fb.com>
**Subject:** Re: Surgeon General

Just confirmed with Mia that (1) below is Tier 2 Borderline Vaccine content and should be labeled and demoted. I'll comment in the Case ▇▇ started.

Will also ask Presc to look into (2).

**From:** ▇▇▇▇ < ▇▇▇▇ fb.com>
**Date:** Thursday, July 22, 2021 at 8:19 AM
**To:** ▇▇▇ < ▇▇▇ fb.com>, ▇▇▇▇ < ▇▇▇ fb.com>,
▇ < ▇▇▇ fb.com>, ▇▇▇▇ < ▇▇▇ fb.com>, ▇ < ▇▇ fb.com>,
▇ < ▇▇ fb.com>
**Cc:** ▇▇ < ▇▇▇ fb.com>, ▇▇▇ < ▇▇▇ fb.com>, ▇▇
▇ < ▇▇▇ fb.com>, ▇▇ < ▇▇▇ fb.com>, ▇▇▇▇▇
▇ < ▇▇▇ fb.com>, Brian Rice < ▇▇ fb.com>
**Subject:** Re: Surgeon General

fyi I sent the first IG link to PRESC a bit earlier. Being looked at in C#1001299.

**From:** ▇▇▇▇ < ▇▇▇▇ fb.com>
**Sent:** Thursday, July 22, 2021 7:59 AM
**To:** ▇▇ < ▇▇▇ fb.com>; ▇ < ▇▇▇ fb.com>; ▇ < ▇▇▇ fb.com>; ▇▇
▇▇▇▇ < ▇▇▇ fb.com>; ▇▇ < ▇▇▇ fb.com>; ▇▇▇ < ▇▇ fb.com>
**Cc:** ▇▇ < ▇▇▇ fb.com>; ▇▇ < ▇▇▇ fb.com>; ▇▇ < ▇▇ fb.com>; ▇▇
▇ < ▇▇▇ fb.com>; ▇▇▇ < ▇▇▇ fb.com>; Brian Rice < ▇▇ fb.com>
**Subject:** FW: Surgeon General

On the do-outs from Nick's email below:

CONFIDENTIAL TREATMENT REQUESTED
NOT FOR DISTRIBUTION
MEMBERS & STAFF ONLY

1. https://www.instagram.com/p/CRbw8NEsOc6/?utm_medium=share_sheet   Grateful if someone could explain why this wasn't labeled?
   · I think this should be labeled per policy but can policy @███████ confirm?  And then product @███████ can follow up on why it didn't happen and add the label?

2. He also shared this which I think rather proves our point – are we supposed to remove "gibberish"?  - but grateful for views since I'd like to get back to Andy on it (he claims he is trying to be helpful by passing on our POV to the Surgeon General before the Fri meeting):  https://twitter.com/oneunderscore__/status/1418016654580199427?s=10
   ○ I can't imagine we can find this stuff at scale, but is it possible to find this specific group so that we can review the content?  And then maybe fan out via admins?  One of the posts indicates that they consider themselves part of the disinfo dozen.  I'm not sure who should own this – is there an ops partner running these reviews or is this product?

3. Sheryl is keen that we continue to explore some moves that we can make to show that we are trying to be responsive to the WH.  ███ – I have explained to her that you think the blackholing idea doesn't work after all.
   ○ I think we can go back to Nick in a matter of hours with more details on blackholing.  We're trying to figure out if we can scope it to minimize removing benign content, but it's not promising.  @███████ and ███ are running that review.

**From:** Nick Clegg <██████fb.com>
**Sent:** Thursday, July 22, 2021 12:20 AM
**To:** Brian Rice <██████fb.com>
**Cc:** ████ <██████fb.com>; ██████████ <██████fb.com>; ████ <██████fb.com>; ████ <████fb.com>; ██████████ <██████fb.com>; ██████████ <██████fb.com>; ██████ <██████fb.com>; ██████ <██████fb.com>
**Subject:** Surgeon General

Brian + smaller group

A few follow ups to our prep call yesterday plse following various threads:

1. I think ████ and I should primarily be in listening mode at the outset of the meeting with the SG not diving immediately into a back and forth on whose data is better, as per ██████'s suggestion: "Look, we thought we were working well with you. Clearly, you believe something different. We hear you that you believe we are not doing enough. We'd love to better understand – specifically – where you think we are falling down, what specific types of misinfo we are missing (and the more specific examples they can give us the better we can go take it on), and we are here to listen, so we can move forward productively". (I will probably also add a sharper tone to the way they have chosen to single us out over the last week!)

By way of context, this is Andy Slavitt's overnight advice on how to understand where the WH is coming from:

"Their logic trail that you should try to connect to is:

-people deciding not to get vaccinated
-what portion is due to misinfo?
-what portion of them get that on FB?

Millions of persuadable people getting bad info. All the good info seen by vaccinated people— not relevant. Other countries— not relevant.

So they want to know how much misinfo is being seen by people. Until they can answer that they will be frustrated.

Making a pledge to reduce the amount of misinfo unvaccinated people is all they care about.

CONFIDENTIAL TREATMENT REQUESTED
NOT FOR DISTRIBUTION
MEMBERS & STAFF ONLY

Whether you think this is the right approach or no, this is a reasonable way to look at things"

2. Andy S has also provided this as an eg of unlabeled content which he says is doing the rounds and is being cited by a clinic in LA as one of the reasons why many people are not getting their second jab:

https://www.instagram.com/p/CRbw8NEsOc6/?utm_medium=share_sheet

Grateful if someone could explain why this wasn't labeled?

He also shared this which I think rather proves our point – are we supposed to remove "gibberish"?  - but grateful for views since I'd like to get back to Andy on it (he claims he is trying to be helpful by passing on our POV to the Surgeon General before the Fri meeting):

https://twitter.com/oneunderscore__/status/1418016654580199427?s=10

3. Sheryl is keen that we continue to explore some moves that we can make to show that we are trying to be responsive to the WH. ███████ – I have explained to her that you think the blackholing idea doesn't work after all.

We should take stock after the Fri meeting, but my sense is that our current course – in effect explaining ourselves more fully, but not shifting on where we draw the lines or on the data we provide (subject to the agreement last night that we'd offer up VPVs of content we've removed but only if demanded from other platforms on the same basis) is a recipe for protracted and increasing acrimony with the WH as the vaccine roll out continues to stutter through the Fall and the Winter. Given the bigger fish we have to fry with the Administration – data flows etc – that doesn't seem a great place for us to be, so grateful for any further creative thinking on how we can be responsive to their concerns.

THx

N

PRODUCED TO H

EXHIBIT 12

| | |
|---|---|
| **From:** | Sheryl Sandberg ██████████████████████████ |
| **To:** | Nick Clegg |
| **Sent:** | 7/21/2021 4:49:24 PM |
| **Subject:** | Re: Covid misinfo: Delta assessment + Mitigations |

Sounds good

**From:** Nick Clegg <█████@fb.com>
**Sent:** Wednesday, July 21, 2021 2:13:45 PM
**To:** Sheryl Sandberg <█████@fb.com>
**Subject:** Re: Covid misinfo: Delta assessment + Mitigations

Well, I'm pushing ██ ██ et al to see what more data we can share with them which is a big ask from the WH – the problem is they disregard the "reach" data (vs engagement) that we already share with them, and they don't ask the same of other cos (YT et al) so I'm going to propose to Surgeon Gen on Fri that he asks for comparative data from all the cos not just us which should move things along on that front.

Re misinfo itself it's worth reading the email from ██ in detail – what the WH appears to want us to remove ranges from humor to totally non violating chatter about vaccines. I can't see Mark in a million years being comfortable with removing that – and I wouldn't recommend it.

We don't need to decide everything at once – we should wait to see what Surgeon Gen tells me on Fri before deciding how/whether we need to make any bigger moves.

██████ now tells me that she's sceptical that the "blackholing" of links actually works in practice – frustrating – so if you answer to the wider thread be aware that it's not yet clear whether it's workable.

N

**From:** Sheryl Sandberg <█████@fb.com>
**Date:** Wednesday, July 21, 2021 at 11:01 PM
**To:** Nick Clegg <█████@fb.com>
**Subject:** RE: Covid misinfo: Delta assessment + Mitigations

I am for this – should I reply to the broader thread?

And you sure we should not do more?

**From:** Nick Clegg <█████@fb.com>
**Sent:** Wednesday, July 21, 2021 1:58 PM
**To:** Sheryl Sandberg <█████@fb.com>
**Subject:** Re: Covid misinfo: Delta assessment + Mitigations

Possibly the highlighted bit – the team still needs to bottom out details – keen to know whether you and Mark would be supportive. N

**From:** Sheryl Sandberg <█████@fb.com>
**Date:** Wednesday, July 21, 2021 at 10:47 PM
**To:** Nick Clegg <█████@fb.com>
**Subject:** RE: Covid misinfo: Delta assessment + Mitigations

CONFIDENTIAL TREATMENT REQUESTED
NOT FOR DISTRIBUTION
MEMBERS & STAFF ONLY

META-118HJC-0053712

Is there anything here we recommend changing?

**From:** Nick Clegg <████@fb.com>
**Sent:** Wednesday, July 21, 2021 12:01 PM
**To:** ████████ <████@fb.com>; ███████ <████@fb.com>; █████ <████@fb.com>; ████████ <████@fb.com>; Brian Rice <████@fb.com>; ████████ <████@fb.com>; ████████ <████fb.com>; █████ <████@fb.com>; ████████ <████@fb.com>; █████ <████@fb.com>; Mark Zuckerberg <████b.com>; Sheryl Sandberg <████@fb.com>; ████████ <████@fb.com>; ████████ <████@fb.com>; █████ <████@fb.com>; ████fb.com>
**Cc:** ████████ <████@fb.com>
**Subject:** Re: Covid misinfo: Delta assessment + Mitigations

Now with highlighted bit – last ping! N

---

**From:** Nick Clegg <nclegg@fb.com>
**Date:** Wednesday, July 21, 2021 at 8:54 PM
**To:** ████████ <████@fb.com>, ████████ <████@fb.com>, █████ <████fb.com>, ████████ <████@fb.com>, ████████ <████@fb.com>, Brian Rice <████b.com>, ████████ <████fb.com>, █████ <████@fb.com>, ████████ <████@fb.com>, █████ <████@fb.com>, █████ <████fb.com>, █████ <████@fb.com>, Mark Zuckerberg <████@fb.com>, Sheryl Sandberg <████@fb.com>, ████████ <████fb.com>, ████████ <████@fb.com>, █████ <████@fb.com>, ████████ <████@fb.com>, █████ <████fb.com>
**Cc:** ████████ <████@fb.com>
**Subject:** Re: Covid misinfo: Delta assessment + Mitigations

+ ████ and ████ apols

---

**From:** Nick Clegg <████@fb.com>
**Date:** Wednesday, July 21, 2021 at 8:54 PM
**To:** ████████ <████@fb.com>, ████████ <████@fb.com>, █████ <████@fb.com>, ████████ <████fb.com>, █████ <████fb.com>, Brian Rice <████@fb.com>, ████████ <████fb.com>, █████ <████@fb.com>, ████████ <aschultz@fb.com>, █████ <████@fb.com>, ████████ <████@fb.com>, Mark Zuckerberg <████@fb.com>, Sheryl Sandberg <████@fb.com>, ████████ <████fb.com>, ████████ <████@fb.com>
**Cc:** ████████ <████@fb.com>
**Subject:** Re: Covid misinfo: Delta assessment + Mitigations

Thx ████ – hugely helpful, am grateful for the rapid work by the team on this.

Adding Mark and Sheryl (and others for info): ████ and I are meeting the US Surgeon General on Friday for an initial "reset" conversation. I doubt we'll get into many of these specifics – that will likely follow – but having discussed with ████ and ████ I think we should let the team complete the policy work on the highlighted option below before we decide whether to pursue, but not reopen the other avenues (as per the team's recommendation). Do shout if you disagree.

CONFIDENTIAL TREATMENT REQUESTED
NOT FOR DISTRIBUTION
MEMBERS & STAFF ONLY

There is separate, ongoing work on publishing wider transparency reports incorporating the "top 100 posts" reports which we have provided in recent weeks to the WH.

N



**From:** [redacted] [redacted] @fb.com>
**Date:** Wednesday, July 21, 2021 at 8:35 PM
**To:** Nick Clegg < [redacted] @fb.com>, [redacted] < [redacted] @fb.com>, < [redacted] @fb.com>, < [redacted] @fb.com>, < [redacted] @fb.com>, Brian Rice < [redacted] @fb.com>, < [redacted] @fb.com>, < [redacted] @fb.com>
**Cc:** [redacted] < [redacted] @fb.com>
**Subject:** Covid misinfo: Delta assessment + Mitigations

Nick,

TLDR:  There is likely a significant gap between what the WH would like us to remove and what we are comfortable removing.  There are some policy mitigations that could get the two parties closer, but Content Policy does not recommend pursuing them.

You asked for information about the delta between content that Facebook is removing and the White House wants us to remove and mitigation options.  The White House rarely provides any specificity about what it wants removed, but it routinely complains to us about content identified in critical media reports.  We've compiled specific criticisms and extrapolated from more general complaints below:

1. **Cross-platform disables**:
   a. Delta:  The WH wants cross-platform disables.  We only do cross-platform disables for child safety and dangerous organization violations.
   b. Mitigation (not recommended):  We could remove all of a person's groups/pages/accounts once they have had a single group/page/account removed for covid misinfo violations. This would remove approximately 50 non-violating entities associated with the Disinfo Dozen, including many entities that have nothing to do with COVID or vaccines. We are continuing to research what other entities might be affected.
   c. Background:
      i.      Jen Psaki said that if you're banned on one platform, you should be banned on all platforms.  We do not and should not ban users from FB or IG because they've been banned by competitors. We assess FB pages and profiles and IG accounts based on the content they post and do not typically enforce against a non-violating page/profile/account if a connected entity is removed (we only enforce cross-platform on DOI and Child Safety violations).  This practice has been a point of contention around the "Disinfo Dozen" because we have removed their violating entities (23 entities from 11 of the 12 people) but continued to allow their non-violating entities (53 entities - this set is under constant review and number changes often).

2. **Off-Platform Links**:
   a. Delta:  The WH wants all links to the Disinfo Dozen's off-platform domains removed.  We only remove links to off-platform content if the content violates child safety or dangerous organizations violations.
   b. Mitigation (not recommended):  We could remove all posts from FB/IG if the posts contain a link to domains associated with covid misinfo violators, but it would likely remove significant amounts of benign content posted by regular users, such as their posts about person experiences or government criticism that also include a link to a website. Some of the off-FB/IG websites also have non-covid-related content, so we could be removing posts that are not about COVID and link to the websites for non-COVID reasons.  It is unlikely that we have capacity to review individual off-platform links, so we would likely have to execute at a domain level.
   c. Background:
      i. To get to the claim that 65% of covid misinfo comes from the Disinfo Dozen, we assume the WH

CONFIDENTIAL TREATMENT REQUESTED
NOT FOR DISTRIBUTION
MEMBERS & STAFF ONLY

is complaining about non-violating content on FB that includes links to content off FB that would violate if posted on FB.

    ii. We could blackhole links to any domain or sub-domain associated with pages, groups, or accounts removed for violating our covid misinfo policies. We are currently investigating the impact that this change would have, including both scope of removals and how much of the content would be benign. Given resource constraints, we do not think it is feasible to review all pages before removal.

    iii. We are still collecting information on how much content this would remove and a rough estimate of what percentage of that content links to benign versus violating content.

1. **True information**:
   a. Delta: The Surgeon General wants us to remove true information about side effects if the user does not provide complete information about whether the side effect is rare and treatable. We do not recommend pursuing this practice.
   b. Mitigation (not recommended): We currently label all of this content and demote some of it. We could remove the content or increase the demotion strength.
   c. Background:
      i. The Surgeon General's report on misinformation defines misinformation as including: "An anecdote about someone experiencing a rare side effect after a routine surgery. The specific anecdote may be true but hide the fact that the side effect is very rare and treatable. By misinforming people about the benefits and risks of the surgery, the anecdote can be highly misleading and harmful to public health."
      ii. Experts have advised us that it's important to allow people to ask questions and allow open discussion of vaccine safety and efficacy to overcome vaccine hesitancy. For content that is presented in a sensational or shocking way or promotes vaccine refusal, we demote the content and apply a label with a link to accurate, authoritative information. We believe the information push partially combats the incomplete information while giving users space to express their views and share their personal experiences.

1. **Other Vaccine Hesitant Content**:
   a. Delta: The WH generally objects to content that appears in media criticism of our covid misinfo efforts. While we don't have specifics, we can extrapolate that they would like us to remove content that provides any negative information on or opinions about the vaccine without concluding that the benefits of the vaccine outweigh that information or opinion; humorous or satirical content that suggests the vaccine isn't safe
   b. Mitigation: Similar to true information, we recommend adhering to expert advice that we allow open discussion of vaccine safety and efficacy and do not recommend removing this content. We could consider increasing the demotion strength on content being demoted that is still breaking through into top posts.
   c. Background:
      i. We reviewed a recent report, titled Facebook has a vaccine misinfo problem, that concluded 12 of the top 15 vaccine-related posts on Facebook in a one-month period were "negative." We replicated the report's Crowdtangle search to review the content. None of the content or users relate to the "Disinfo Dozen." Of note, in order to maintain the narrative of FB's failure, our critics remove UNICEF content from their analysis because it effectively dominates covid content -- an accurate report on covid content from this Crowdtangle search would show that 5 of the top 15 posts were authoritative, pro-vaccine posts from UNICEF.
      ii. None of the content should have been removed. Five pieces of content labeled "negative" are being demoted for being vaccine hesitant. Six pieces of content labeled "negative" are non-violating -- one is an ABC News report; two are personal opinions opposing mask and vaccine mandates; and two are personal opinions about the speaker's decision not to get vaccinated. Four pieces of content are labeled "positive" or "neutral." There is a full content assessment below.

**Detailed Assessment of Other Vaccine Hesitant Content:**
1. The #2 ranked content is an ABC News report about side effects. It is deemed "negative."
   a. Delta assessment: We don't know whether the WH would propose that this reporting from network news should be removed for accurately reporting on side effects. We do not recommend doing so.

CONFIDENTIAL TREATMENT REQUESTED
NOT FOR DISTRIBUTION
MEMBERS & STAFF ONLY

1. Five pieces of content (ranking 1, 5, 7, 13, 14) were borderline content and were demoted and labeled, but the demotion strength did not remove them from the top 100 FB posts for the relevant time period.  All received the label: "COVID-19 vaccines go through many tests for safety and effectiveness and are then monitored closely" with a link to FB's COVID-19 Information Center.

    a. <u>Delta assessment</u> (content assessment below):  We suspect the WH believes this content should be removed.  We demote and label this content because we find it irresponsible in its sensationalism and lack of context; however, it is a mix of true content and criticism of the government, both of which are appropriate to allow on platform.

    b. #1, 5, and 7 are from Candace Owens and suggest that the vaccine is experimental or has side effects, including death, and are critical of the government.  #5 was also fact-checked by a 3PFC.

    c. #13 is from Tucker Carlson and offers sensationalized reporting on a true incident of a 12 year old suffering a rare side effect and and reporting on a study published in the *Journal of the American Medical Association (JAMA) Pediatrics* about the dangers of wearing masks to children.  The content was posted the day after the JAMA study was published.  JAMA retracted the study two weeks after publication.

    d. #15 is from Turning Point USA and suggests that the government has no authority to mandate taking an experimental vaccine.

1. Five pieces of content (ranking 4, 6, 8, 11, 12) were labeled negative.

    a. <u>Delta assessment</u> (content assessment below):  The WH has previously indicated that it thinks humor should be removed if it is premised on the vaccine having side effects, so we expect it would similarly want to see humor about vaccine hesitancy removed.  We don't have insight into whether the WH wants personal opinions about government mandates or explanations of personal choices not to get the vaccine removed.  We believe there is a strong interest in protecting the expression of personal opinion and personal choice.

    b. #4 is a cartoon attempt at humor, suggesting that door-to-door vaccinators would be tied to trees.

    c. The other four pieces of content all offer personal opinions about mask or vaccine mandates or the decision to be vaccinated.

1. Four pieces of content (ranking 3, 9, 10, 15) were labeled positive or neutral.

**Disinfo Dozen Status On Platform:**

1. We have been aware of the Disinfo Dozen back in March.  We took very aggressive actions based on them, and other entities we flagged, by expanding the amount of Misindo that we remove and by giving the "Worst of the Worst" entities 48 hours to remove all violating misinformation or otherwise they would be removed.  As a result of that, we removed known anti-vaxxers such as RFK Jr.'s IG Account.
2. This resulted in behavior modification by these actors -- RFK stopped posting anti-vax content on his FB page, and some other members of the Disinfo Dozen also stopped posting violating content.
3. We have continued to monitor these accounts and have found the following:

    a. 91 entities are tied to the Disinfo Dozen (however, the majority of these entities do not share anti-vax content and some post infrequently or stopped posting altogether).

    b. 23 of those entities have been removed.

    c. We are confirming additional entities (approx. 15) that may be removed under our "Single Use Multiple Account" and Recidivism policies (we are aiming to have these results by EOD).

    d. 11 of the 12 Disinfo Dozen members have had one entity removed by us.  The 12th posts mainly about internet censorship now.  We are watching his profile closely.

CONFIDENTIAL TREATMENT REQUESTED
NOT FOR DISTRIBUTION
MEMBERS & STAFF ONLY

# EXHIBIT 13

**7/16 Call with SG's Office**

Attendees (SG's Office): Eric Waldo, Kyla Fullenwider
Attendees (FB): ████████ , ████████ , ████████████ , ████████ , ██ , ██
████

- ████ Good to see you Eric, Kyla.  Long time no see.
- Eric: Great to see you.
- ████ I'll run point for a little bit and then will pass it over to you. I have a few of our team members on the call.  Won't do full intros, they'll introduce themselves as we go.  We do have ██ our Head of Health, on the line.  What we were initially going to do was some intros to some of our work.  But given the announcement, wanted to focus a bit more on that.  Understanding information sources you're using, understanding the advisory, and discuss next steps to move forward.  Would love to hear from you Eric.
- Eric: I'm Eric Waldo, Director of Engagement for Surgeon General Murthy.  Spent all 8 years in the Obama Administration.  Week 4 for me, really excited to be part of Dr. Murthy's team.  You obviously heard the remarks from Dr. Murthy and Jen Psaki.  Dr. Murthy has been clear that we're really calling for an all-society approach – individuals, organizations, technology can do, especially with respect to misinformation.  We know this is a broader issue for society.  Health Advisory is one of the tools for SG's office.  We have commitments from Rockefeller Foundation, other organizations, in response to SG's call for action.  Before we go further, want introduce Kyla.
- Kyla: I'm leading SG's work on health misinformation, including the Advisory.  We're excited to walk through some pieces of it today.  I was previously CIO for US Census Bureau, stood up work on misinformation there.  Nice to meet you all, good to be here.  We set up calls with as many stakeholders as possible who were mentioned in the Advisory.  Want to go through at a high level.
  - To reiterate – Advisory is one of three tools that SG has to call public attention to an issue of concern.  A report is longer, multi-year effort, hundreds of pages, on a topic with a lot of literature and substantial evidence base – for well-established health issues.  Then you also have a call to action, 20–50-page document, around a topic.  In the middle.  Advisory is a shorter document – calling attention to an emergent issue for public health.  Just adding some context, most folks, including myself a year ago, might not be familiar.
  - As Eric mentioned earlier, wanted to be very intentional about a whole of society approach.  Called out stakeholder groups of particular importance, individuals/families, educators, health professionals, technology platforms, researchers, government (list incomplete, see advisory for full list).
  - First parts of the document set the stage – lay the groundwork for how we got here.  Second page – unique to SG Advisory – we call out specific actions and recommendations.  Let me move through and skip forward to tech platforms.
  - If you hadn't had a chance to review the section on tech platforms, would be great to do so.  Everything rooted in evidence-base, in conjunction with experts we consulted.  Wanted to find middle ground of interventions and solutions that are doable but meaningful.  What we wanted to address here are not just the low-hanging fruit but things that could create systemic impact over the long term.  But not so visionary that are not able to be implemented.  Happy to talk through any of those pieces.

CONFIDENTIAL TREATMENT REQUESTED
NOT FOR DISTRIBUTION
MEMBERS & STAFF ONLY

- ○ Just jumping to conclusion – message that we really wanted to drive home – speed and scale at which misinformation is spreading is truly unprecedented and it's having quantifiable impacts on COVID response.  Wanted to make that clear.  We do think we're in a unique circumstance – what WHO calls infodemic – that needs to be addressed.
- ▉ let's recircle back on questions but would love to hear more about specifics.
- Kyla: sounds good.
- Eric: ▉ I know you flagged the 4 action items from Jen Psaki's remarks.  I don't know if you want to walk through those, what your current stance is on those, anything you might be doing in response to call to action, we'd love to hear that.
- ▉ Great, that would be a helpful discussion.  Will turn it over to ▉ and our team.
- ▉ Happy to discuss and start with the four points.  The overall recommendations on what technology platforms can do – we're broadly aligned, make a lot of sense.  We'd love to work together.  Excited about that as one area of discussion, anticipate it will be ongoing, working to build shared understanding of solution space.  Would also be helpful to get to a shared understanding on the scope of the program – it would be quite helpful for us to learn some of the specific data points and research you're seeing, maybe even connect our research teams.  We also obviously partner with academics, others.  But quite helpful if we have a shared understanding of the problem grounds solutions.  In an ideal world – how do we align on solutions, how do we align on shared understanding of most concerning things you are seeing.
- Eric: That absolutely makes sense.
- ▉ So, on aligning on solutions –
  - ○ More transparency – in general, we agree here.  You're probably familiar with our tool called CrowdTangle.  It's currently just showing engagement not just reach.  We've been working to share reach with government partners since January.  We've made substantial investments in this tool that's open to researchers and academics.  We agree that reach better contextualizes things.  Open to feedback on how reports could be more useful, other thoughts
- Kyla: Are you planning to continue having CrowdTangle available going forward?
- ▉ Not my specific product area, but it's been available for many years.  It's available to government partners by exception – CDC, WH, and others do have access.
- <mark>Kyla: CrowdTangle – that will continue to be a tool that's available for use?</mark>
- ▉ We can confirm that but I'm not aware of any plans to change that.
- Kyla: If there's an update on CT, that would be great if you could provide that.
- ▉ That's initial steps and thinking on measuring.  Related to this point and the fourth point about amplifying trusted sources.  We are very focused on understanding the impact of interventions.  We've partnered with organizations – funding RFPs to understand impact of misinformation and RFPs on effectiveness of educational information.  One of the more recent things we did – Alliance for Advancing Health Online.  Working with Merck, WHO, others, working to foster a better understanding of interventions and how they are improving outcomes.  We're providing a substantial amount of funding.  We're very invested and want more research, more RFP submissions.  That could be an area to go deeper in the future.
- ▉ To second point on enforcement strategy, maybe best to have ▉ discuss.
- ▉ On this question – the way we enforce on content – what's being posted on a Page or Group.  People post different content on a Page than for instance on an IG account.  On RFK, Jr., for example, was using IG account to spread anti-vax account. It reached the threshold of strikes and was removed.  He then stopped posting on FB about vaccines at all.

- ██ On the third point – one of the reasons we were reporting on top engaged posts and top reach posts- wanted to see what kind of content was in there.  We've been sharing reports with the White House on this.
  - The top posts on our platform are mostly not about COVID or vaccines.  Among the subset of posts that are about COVID and vaccines- the top 100 posts on COVID/vaccines, there are a few more on the potentially inducing hesitancy side.  But if you zoom out, those are fewer than the ones coming from credible, authoritative sources.  We have more work to do, but that's what we're seeing and what we are sharing.  Replicable from CrowdTangle.  We're very open to if there are things that we're missing, would love to engage on the specifics.
  - I'll also say in the SG's Advisory around designing systems in such a way that you can slow down the spread of misinformation.  That's a promising approach we are committed to.  For example, last year, in WA, we removed the ability to forward a link to many people at once.  There were good use cases, like sharing a link to a birthday party, but took action to limit misinformation spread.
  - When people share content that could be misinformation, have an interstitial that links to the COVID Information Center.
  - Just some examples of the changes we've already made that are aligned with this approach.  The WA one in particular was a big system change.
- Kyla: The piece we talk about specifically about adding friction – ==do you have anywhere publicly where you share the impact of those interventions?==
- ██ I know these have all been shared publicly, not sure how deep we got into the data, but we can follow up.
- ██ On this question – policy side and enforcement side.  We've been working hard over the last year and a half to keep up, have been working with CDC and others to update our policies as things evolve.  The enforcement piece is also difficult, training classifiers.  We also have partnership with third party fact checkers – for things that don't meet removal threshold, get sent to third party fact checkers.  Content is temporarily demoted pending fact check.  We have shared that about 95% of the time when people see those screens/interstitials, they didn't go on to post the content.
- Kyla: Size of fact checking team?
- ██ We partner with 80 organizations in over 60 languages.
- ██ And we attack virality aspect through feed demotions.  We remove content that can lead to imminent physical harm.  For content that doesn't meet that threshold, we instituted borderline demotions.  For example, someone sharing negative side effect posts.  Similarly, posts questioning whether you should get a vaccine under a mandate, whether it's government overreach.  We demote those.  That's not false information, but it leads to a vaccine negative environment.  When it comes to looking at COVID misinformation, it's a different approach.  What we normally do is just remove or leave to fact checkers.  Here, we introduced a middle ground.
- ██ There's a lot on educational, amplifying credible sources I want to touch upon briefly before we break as well.
- ==Kyla: ██ do you have anywhere this borderline policy?==
- ██ Yes, it's all public in our Community Standards.  There is a link that details all of this, we can send it to you.
- ██ Last point – helping get people access to credible information.  Will be a huge part of solution.  This is an area we've invested a lot in, have commitment to.  A lot of our efforts are

around helping organizations meet people where they are with information.  And then there is social norming work.  A lot of research shows that if you know someone who has gotten vaccinated, it can make you more likely to do get it.  We worked with USG on profile frames.  At this point, I think 50% of users in the US have seen a friend or family member use a COVID vaccine profile frame.  KFF study also shows that friends/family can be very influential.  We've also delivered 10 billion ads impressions through partner channels, working to publish data on the impact.  There's a lot to build on.

- o On Amplification, changing how we amplify within core product, making sure that trusted/credible sources are getting more distribution.

- Eric: Thank you, this is super, super helpful.  I know we weren't going to get all the way home.  Let me just say two things as we wrap up.  1- thank you for jumping on the call, we're getting comfortable with being uncomfortable.  Want to be honest, appreciate courage having this conversation.  I think you'll continue to hear the White House and leaders say they want to move forward with solutions.  You'll hear that from Dr. Murthy.  Want to be super straight with you.  Kyla and I can offline with the team and circle back on solutions.  I want to say thank you, can be uncomfortable, really appreciate it.

- ████ I'm very conscious you need to jump, we'll stand by.  Again, we're looking to understand what you're seeing, understand next steps and how to partner moving forward.  We'll be in touch on email.

PRODUCED TO HJC

CONFIDENTIAL TREATMENT REQUESTED
NOT FOR DISTRIBUTION
MEMBERS & STAFF ONLY

EXHIBIT 14

1

2

3

4

5          COMMITTEE ON THE JUDICIARY,

6          U.S. HOUSE OF REPRESENTATIVES,

7          WASHINGTON, D.C.

8

9

10

11

12          INTERVIEW OF:    LAURA DEHMLOW

13

14

15

16

17                                          Monday, July 17, 2023

18

19                                          Washington, D.C.

20

21

22                  The interview in the above matter was held in room 164, Cannon House Office

23          Building, commencing at 10:03 a.m.

24                  Present:    Representative Jordan.

1     Appearances:

2

3

4     For the COMMITTEE ON THE JUDICIARY:

5

6     ███████████, LAW CLERK

7     ███████████, INTERN

8     ███████████, CHIEF COUNSEL FOR OVERSIGHT

9     ████████████████, PROFESSIONAL STAFF MEMBER

10    ██████████, SENIOR SPECIAL COUNSEL

11    █████████, COUNSEL

12    ███████████, MINORITY CHIEF OVERSIGHT COUNSEL

13    ██████████, MINORITY INTERN

14    ████████████, MINORITY OVERSIGHT COUNSEL

15

16    For the U.S. DEPARTMENT OF JUSTICE:

17

18    MATTHEW HANSON, SPECIAL COUNSEL,

19    OFFICE OF LEGISLATIVE AFFAIRS

20

21    For the FEDERAL BUREAU OF INVESTIGATION:

22

23    MARY DOOCY, ASSISTANT GENERAL COUNSEL,

24    OFFICE OF GENERAL COUNSEL

1

2          MAJORITY COUNSEL 1.    This is the transcribed interview of Laura Dehmlow.

3          Chairman Jordan has requested this interview as part of the committee's oversight

4    of the Federal Bureau of Investigation.

5          Would the witness please state your name for the record?

6          Ms. Dehmlow.    Laura Dehmlow.

7          MAJORITY COUNSEL 1.    Could agency counsel please state your name for the record?

8          Ms. Doocy.    Mary Doocy, FBI.

9          Mr. Hanson.    Matthew Hanson, Department of Justice.

10         MAJORITY COUNSEL 1.    And, Ms. Dehmlow, you understand agency counsel has the

11    primary fiduciary duty to the Bureau and not to you individually?

12         Ms. Dehmlow.    I do.

13         MAJORITY COUNSEL 1.    And so you would like to continue with agency counsel today?

14         Ms. Dehmlow.    Yes.

15         MAJORITY COUNSEL 1.    On behalf of the committee, I want to thank you for appearing

16    here today to answer our questions.

17         The chairman also appreciates your willingness to appear voluntarily.

18         My name is ███████████, and I'm with Chairman Jordan's staff.

19         I'll now have everyone else from the committee who is here in the room introduce

20    themselves, as well.

21         ██████  ███████ with Chairman Jordan's staff.

22         ██████████  ███████████ with Chairman Jordan's staff.

23         ██████████  ████████████ Chairman Jordan's staff.

24         ██████████  █████████████, Chairman Jordan's staff.

25         ██████████. ███████████████, Chairman Jordan's staff.

1        <u>MINORITY COUNSEL 2.</u> ███████████, oversight counsel for the Democrats

2    and Judiciary Committee.

3        <u>MINORITY COUNSEL 1.</u> ███████████, chief oversight counsel for the House

4    Judiciary Committee.

5        ███████<u>.</u> ███████████, Democratic staff and intern.

6        <u>MAJORITY COUNSEL 1.</u>    Thank you.

7        I would like to now go over the ground rules and guidelines that we will follow

8    during today's interview.

9        Our questioning will proceed in rounds.    The majority will ask questions for 1

10   hour, and the minority will then have an opportunity ask questions for an equal period of

11   time if they so choose.

12       We'll alternate back and forth until there are no more questions and the interview

13   is over.

14       Typically, we take a short break at the end of each hour, but if you would like to

15   take a break apart from that, please just let us know.   We're happy to accommodate

16   that.

17       As you can see, there's an official court reporter taking down everything we say to

18   make a written record.

19       So we ask that you give verbal responses to all questions.

20       Do you understand?

21       Ms. <u>Dehmlow.</u>   I do.

22       <u>MAJORITY COUNSEL 1.</u>   So the court reporter can take down a clear record, we will

23   do our best to limit the number of people directing questions at you during any given

24   hour to just those people on the staff whose turn it is.

25       Please try and speak clearly so the court reporter can understand and the folks

1    down at the end of the table can hear you, as well.

2        It is important that we don't talk over one another or interrupt each other if we

3    can help it, and that goes for everyone present at today's interview.

4        We want you to answer our questions in the most complete and truthful manner

5    possible.    So we'll take our time.    If you have any questions or if you do not understand

6    one of our questions, please just let us know.

7        Our questions will cover a wide range of topics.    So, if you need clarification at

8    any point, please just say so.    If you honestly don't know the answer to a question or do

9    not remember, it's best not to guess.    Please give us your best recollection.    It's okay to

10   tell us if you learned information from someone else.    Just indicate how you came to

11   know that information.

12       If there are things you don't know or can't remember, just say so and please

13   inform us who to the best of your knowledge might be able to provide a more complete

14   answer to our question.

15       You should also understand that by law you are required to answer questions

16   from Congress truthfully.

17       Do you understand that?

18       Ms. Dehmlow.    I do.

19       MAJORITY COUNSEL 1.    This also applies to questions posed by

20       congressional staff in an interview.

21       Do you understand this?

22       Ms. Dehmlow.    I do.

23       MAJORITY COUNSEL 1.    Witnesses that knowingly provide false testimony

24    could be subject to criminal prosecution for making false statements under 18, U.S.C.,

25   United States Code, section 1001.

1          Do you understand this?

2          Ms. Dehmlow.    Uh-huh.

3          MAJORITY COUNSEL 1.    Is there any reason you are unable to provide truthful

4          answers to today's questions?

5          Ms. Dehmlow.    No.

6     MAJORITY COUNSEL 1.    Finally, I'd like to make note that the content of what we

7     discuss here today is confidential.    We ask that you not speak about what we discuss

8     in this interview to any outside individuals to preserve the integrity of our investigation.

9          For the same reason, the marked exhibits that we will use today will remain

10    with the court reporter so they can go in the official transcripts.    And any copies of

11    those exhibits will be collected at the end of the interview.

12         All right.    That's the end of my preamble.

13         Is there anything my colleagues from minority would like to add?

14         MINORITY COUNSEL 1.    Just thank the witness for taking time out of your

15         schedule to join us today.

16         MAJORITY COUNSEL 1.    Mary or Matthew, do you have anything for the record?

17         Ms. Doocy.    No.

18         Mr. Hanson.    No.

19         MAJORITY COUNSEL 1.    Okay.    Well, the clock now reads 10:06 a.m.

20         We'll get started with our first hour of questioning.

21         Ms. Dehmlow.    Okay.

22              EXAMINATION BY MAJORITY COUNSEL 2:

23    Q     Good morning.

24    A     Good morning.

25

1          Q     Could you state your full name for the record?

2          A     Laura Dehmlow.

3          Q     Okay.    And where do you currently work?

4          A     The Federal Bureau of Investigation.

5          Q     And what is your current title?

6          A     I'm the section chief of the Foreign Influence Task Force.

7          Q     And what is the Foreign Influence Task Force?

8          A     The Foreign Influence Task Force is a component part in Counterintelligence

9   Division that is charged with understanding and mitigating foreign malign influence

10   operations targeting the United States.

11          Q     And how long have you been in that role for?

12          A     A bit over 2 years.

13          Q     

14          A

15

16

17          Q

18          A

19

20          Q

21          A

22          Q

23          A

24          Q

25          A

1      A      There were -- as I mentioned earlier, we aimed to get together with most of

2  the companies within the couple of weeks in the immediate -- in the immediate weeks

3  preceding the election.

4      Q      Are you familiar with the October 2020 New York Post story on Hunter

5  Biden's laptop?

6      A      I am.

7      Q      Do you recall whether any of these social media companies you were

8  meeting with asked you any questions about it?

9      A      I do.

10      Q      And what is your recollection?    Who --

11      A      So I remember having a conversation with or being involved in a

12  conversation with Twitter, and I honestly can't recall if this was repeated to me -- I might

13  have been a few minutes late to the meeting -- or if -- or if I was -- I actually overheard it.

14      But it was -- it was relayed to me later that somebody from Twitter -- I don't recall

15  who.    I'm not sure who.    Somebody from Twitter essentially asked whether the laptop

16  was real.    And one of the FBI folks who was on the call did confirm that, yes, it was

17  before another participant jumped in and said no further comment.

18      Q      Do you recall who from the FBI said it was real?

19      A      I do.

20      Q      And who was that?

21      A      It's a non-SES employee.    I'd have to take that back.

22      MAJORITY COUNSEL 1.    What's their title?

23      Ms. Dehmlow.    An analyst.

24      MAJORITY COUNSEL 1.    What field office are they out of?

25      Ms. Dehmlow.    Again, I'm not sure that I'm allowed to provide details here

1    because it was a non-SES employee.

2        Ms. <u>Doocy.</u>    We'll take it back.

3    <u>MAJORITY COUNSEL 1.</u>    Can we not know about this, just not the name of the individual?

4        Ms. <u>Doocy.</u>    They're in the Criminal Investigative Division.    We can tell you that

5    and then get back to you if we can provide a non-SES name.

6    <u>MAJORITY COUNSEL 1.</u>    I think the committee would like to know the name of the individual

7    but also their title.

8        Ms. <u>Doocy.</u>    Sure.

9            BY MAJORITY COUNSEL 2:

10        Q    Was this individual affiliated with FITF?

11        A    Again, it was somebody from the Criminal Investigative Division who is

12    embedded with us.

13        Q    So yes?

14        A    Yes.

15        Q    And did this question occur in the context of a bilateral meeting?

16        A    It did.

17        Q    Do you recall how soon after the story broke that this meeting occurred?

18        A    I don't remember.    I believe it was the same week, but I don't remember

19    the specific day.

20            BY MAJORITY COUNSEL 1:

21        Q    On that call with that IA who's in the Criminal Investigative Division, that was

22    the individual who said, "yes, the laptop is authentic"?    Is that correct?

23        A    I don't believe it was that specific.    Again, I don't recall hearing the

24    conversation itself.    I know it was relayed to me afterwards.    But my understanding is

25    that we confirmed that, yes, the laptop was a real laptop.

1     Q     And then you said another FBI individual came on and said, "No further

2     comment."

3     A     Yes.

4     Q     Is that correct?

5     A     That's correct.

6     Q     Who was that individual?

7     A     It was some -- it was one of our lawyers who was on the call.

8     Q     And who was that individual?

9     A     Again --

10         Ms. Doocy.   We'll take that request back.    They're not SES.

11     MAJORITY COUNSEL 1.    Do they work out of the General Counsel's Office or a specific field

12     office?

13         Ms. Doocy.   They're in the Office of the General Counsel.    But, again, we'll take

14     that request back.   We don't have authorization to speak to their specific name in this

15     context.

16     MAJORITY COUNSEL 1.    Okay.   I think the committee would like to know the individual's

17     name, as well as their title.

18         Thank you.

19     MAJORITY COUNSEL 3    Just to clarify, when you say the laptop was real, you mean it

20     was, like, a real laptop or that it belonged to Hunter Biden or what exactly?

21         Ms. Dehmlow.   Since I wasn't -- I don't recall the specifics.    I think my

22     understanding is generally we confirmed the existence of the laptop.

23                   BY MAJORITY COUNSEL 2:

24     Q     Who relayed this information to you?

25     A     I don't recall.   The reason that I remember it specifically is that we had a

1     conversation afterwards, talking, deliberating on how we would answer the question if

2     another company asked.

3     Q    And did this deliberation occur immediately following --

4     A    I would say within, yeah, within the next couple of hours.

5     Q    During this time period, October 2020, does FITF have its own in-person

6     office?   Or is this conversation over Zoom?

7     A    Which -- which part of the conversation, the conversation with the

8     companies or the conversation, the deliberations?

9     Q    The deliberations.

10    A    I believe it happened over our -- our -- our chat function.

11    Q    Do you recall how many FBI personnel were part of this deliberation?

12    A    I don't.

13    Q    Do you have a ballpark sense?

14    A    Just a handful probably.

15    Q    Do you recall why you were not in attendance at this part of the bilateral

16    meeting?

17    A    Again, it's possible that I was.   I just don't recall the part.   The part that I

18    remember with clarity is the part immediately after that.   It's a very busy time.   I might

19    have just been running late, a couple of minutes late, you know.   It was a very busy time

20    for the FITF.

21    Q    Do you know how Twitter reacted when the first agent said that the laptop

22    was real?

23    A    No recollection.

24    Q    Did you receive any followup requests for information from Twitter?

25    A    Not that I recall, not that came to me.

1          Q     So you said he was one example.

2                Do you recall other social media companies?

3          A     I believe Facebook -- we met with Facebook soon thereafter.    Can't

4    remember if it was the same day or within a couple of days.    And they also asked, and I

5    said, "No comment."    That was the -- that was the decision we made in those

6    post-meeting deliberations, which is pretty typical.    It was an ongoing investigation, and

7    we don't generally comment on ongoing investigative matters when asked.

8          Q     Okay.

9    MAJORITY COUNSEL 1.    Who made the decision that the FBI would have no comment

10   to the social media companies going forward?

11               Mr. Hanson.    So I want to be clear.

12               Ms. Dehmlow, obviously, can answer the question as long as it doesn't get into

13   internal deliberations or advice from a lawyer or anything.

14               Ms. Dehmlow.    Yeah, and, unfortunately I can't answer that with any further

15   detail on that advice.

16   MAJORITY COUNSEL 1.    So you can't tell us who made the decision?

17               Ms. Dehmlow.    I can say there were internal deliberations with a number of

18   parties, and then -- but I can't get into that further.

19   MAJORITY COUNSEL 1.    So then, Counsel, are you instructing her not to answer the question

20        any further?

21               Ms. Doocy.    We'll take the request for the non-SES back and get back to you as

22   soon as possible.

23   MAJORITY COUNSEL 1.    And the content of the discussion?

24               Ms. Doocy.    So, in this context, she's not authorized to speak to internal

25   deliberations which may implicate attorney-client or other legal privileges today, but we'll

1    take your request back.

2    MAJORITY COUNSEL 1.    But you're instructing her not to answer today.    Is that accurate?

3    Ms. Doocy.    To the specifics of the conversation she received related to whether or not she

4    was deliberating about the veracity of the laptop, in this context, yes.

5    MAJORITY COUNSEL 1.    Okay.

6    BY MAJORITY COUNSEL 2:

7    Q    With respect to the internal deliberations, were there individuals who

8    participated other than members of FITF?

9    A    Yes.    Again, I can't get into more specifics because of the deliberative

10    process privilege they're articulating.

11    Q    Were there members participating in these deliberations other than

12    members of FITF and other than members of OGC?

13    A    I can't recall specifics.

14    Q    Do you recall who from Facebook asked the question?

15    A    I don't.

16    Q    Was the laptop on the agenda for either of these bilateral meetings with

17    Twitter or Facebook?

18    A    No.    It came as a surprise to us that there was questions.    At least it came

19    as a surprise to me.    I wasn't tracking the news story until that moment.

20    Q    And who else was on the call with Facebook?

21    A    It would have been essentially the same -- same folks, probably the unit

22    chiefs from FITF and some range of other folks.    But I don't recall specifics.

23    Q    You said that you were the one that said "no comment"?

24    A    Uh-huh.

25    Q    Had it been decided in advance that you'd be the one to answer that

1    question?

2        A        No, not that I recall.

3        Q        Who was the section chief of FITF at the time?

4        A        Bradley Benavides.

5        Q        Was he on the call?

6        A        Not to my recollection, no.

7        Q        Was he on the Twitter call?

8        A        Not to my recollection, no.

9        Q        Did he usually attend these calls?

10        A        He did not.

11        Q        Was Elvis Chan on the call with Facebook?

12        A        It's likely, but I don't recall specifically.

13        Q        Was Elvis Chan on the call with Twitter?

14        A        It's likely, but I don't recall specifically.

15        Mr. Jordan.    You acknowledged, back to the meeting with Twitter, when the first

16    FBI official acknowledged that the FBI -- that the -- excuse me -- that the laptop was real,

17    how long had you -- how long you had known that information?

18        Ms. Dehmlow.    I don't remember.    I really can't recall.

19        Mr. Jordan.    Did you learn that it week you?    Learn it months before?    When

20    did you know that the laptop was real?

21        Ms. Dehmlow.    I really don't remember.

22        Mr. Jordan.    You said -- that's the word you used.    You said the agent said the

23    laptop was real.    Is that right?

24        Ms. Dehmlow.    He confirmed at some point that the laptop existed, yes.    But,

25    again, I don't recall the specific language, and I wasn't there.

1          Ms. Doocy.    Can I confer with the client for a moment?

2          MAJORITY COUNSEL 1.    Yeah, we'll go off the record.

3          [Discussion off the record.]

4          MAJORITY COUNSEL 1.    We'll go back on the record.

5                    BY MAJORITY COUNSEL 2:

6          Q     When the Facebook employee asked the question, do you recall exactly

7     what they asked?

8          A     I don't.

9          Q     Do you know if it was about the laptop?

10         A     Yes.    It was essentially whether or not we -- yes, it was something about the

11    laptop.    I don't remember -- I know that my answer was "no comment" because -- and

12    the question doesn't stick in my mind because it was something about the laptop.    And I

13    said, "No comment."

14         Again, that was not my decision.    It wasn't my final call.    There were other

15    agency, other departments, other FBI equities at stake, investigative equities, and so

16    pretty typical for us to come to that conclusion.

17         Q     Were you aware if Twitter or Facebook were taking steps to censor the

18    story?

19         A     I was not.

20         Q     Did you ever become aware?

21         A     Eventually, when the -- when there was extensive news coverage about it

22    ultimately, but I don't know if I knew it that week, within a couple of months.

23         Q     Do you think it was the right decision to say "no comment"?

24         A     Not here to -- again, it wasn't my call and it's pretty typical for us to not

25    comment on ongoing investigative equities.

1      Q     When the information was relayed to you following the Twitter call that the

2 first agent had said the laptop was real, just to clarify, you knew prior to that

3 conversation that the laptop was real.    Is that correct?

4      A     I did, yes.

5      Q     But you don't recall when approximately you learned.

6      A     I don't, sorry.

7      Q     Sitting here today, do you know when the FBI first determined that the

8 laptop was real?

9      A     I don't.    I know that there is some information in the public record

10 regarding when the FBI acquired the laptop, but I don't, sitting here, remember that date.

11      Q     Do you know who else at FITF knew that the laptop was real?

12      A     I don't actually.    I would assume both my -- yes, I would certainly say that

13 Brad Benavides was aware.

14      Q     What about the individuals on the Russia unit?

15      A     I would assume the unit chief was also aware.    I'm pretty certain of that

16 fact.

17      Q     For the individual --

18      Mr. Hanson.    Just to clarify, do you know to a certainty that they were aware, or

19 are you just making deductions?

20      Ms. Dehmlow.    I'm pretty certain that they were aware.

21      Mr. Hanson.    Okay.

22          BY MAJORITY COUNSEL 2:

23      Q     In advance of the bilateral meeting, would the FITF team discuss internally

24 about what to cover in a meeting?

25      A     We would, yes.

1       Q    -- that very frequently it wasn't a FITF-owned investigation or equity.    Is

2  that right?

3       A    I don't think that's what I testified, no.

4       Q    Okay.

5       A    I said FITF is focused on those actors and those activities, and those activities

6  are inclusive of the information that we're passing to -- to -- to the social media

7  companies.    So that was very much a FITF equity.    We're program managing those

8  cases.

9            BY MAJORITY COUNSEL 1:

10      Q    When you say that the Hunter Biden wasn't a FITF-owned equity --

11      A    Uh-huh.

12      Q    -- did it have any equities in the FBI investigation of Hunter Biden?

13      A    Did what have any equities?

14      Q    FITF.

15      A    Again, I can't speak to that ongoing investigative action.    That's an ongoing

16  investigation.    I can't speak to any details regarding it.

17      Q    Is that an instruction from counsel?

18      A    I think, yes, but they can confirm it.

19      Mr. Hanson.    I'd ask you to not respond to any information regarding ongoing

20  investigations.

21      Ms. Dehmlow.    I can't speak to ongoing investigations, ongoing investigative

22  activity.

23            BY MAJORITY COUNSEL 2:

24      Q    If the ongoing investigation had FITF equities in it, then FITF would be able to

25  share information?

1    A    Not broadly.    The FITF can only share information in the context of the

2    Justice Manual provision regarding details of foreign malign influence operations.    So it's

3    not that we can just broadly share anything regarding an ongoing investigative equity.

4    There's specific provisions of the Justice Manual that govern what we can and cannot

5    share.

6        Q    Okay.    But, if the Hunter Biden laptop were part of a foreign malign

7    influence operation, that is something that FITF would be able to share information on.

8        A    Yeah, I don't want to speak to a hypothetical.    But if there is a foreign

9    malign influence operation and we've got specific details about how those actors are

10    propagating information operations, influence operations on platforms, that's something

11    that we could share the specific details of.

12        Q    Okay.    I mean, that sounds like a "yes" to my previous question but --

13        A    I want to be really specific about what we do and don't do because we don't

14    just comment broadly on investigative activity.

15    MAJORITY COUNSEL 1.    So did FITF share any information with social media companies

16    regarding the Hunter Biden investigation as it relates to foreign malign activity?

17        Ms. Doocy.    Same instruction.

18        Ms. Dehmlow.    Yeah.

19    MAJORITY COUNSEL 1.    What's the instruction, Mary?

20        Ms. Doocy.    Not to comment on ongoing investigations.

21    MAJORITY COUNSEL 1.    Thanks.

22            BY MAJORITY COUNSEL 2:

23        Q    So, in these bilateral FITF meetings, social media companies, is it fair to say it

24    was routine that they would be receiving information related to foreign malign influence

25    operations that related to investigations of the FBI?

EXHIBIT 15

COMMITTEE ON THE JUDICIARY,

U.S. HOUSE OF REPRESENTATIVES,

WASHINGTON, D.C.

INTERVIEW OF:    DAVID AGRANOVICH

Tuesday, May 16, 2023

Washington, D.C.

The interview in the above matter was held in room 2237, Rayburn House Office

Building, commencing at 9:59 a.m.

Present:    Representatives Jordan and Gaetz.

Appearances:

For the COMMITTEE ON THE JUDICIARY:

 COUNSEL

PRESS ASSISTANT

CHIEF COUNSEL FOR ADMINISTRATIVE LAW

CHIEF COUNSEL FOR POLICY AND STRATEGY

CHIEF COUNSEL FOR OVERSIGHT

RESEARCH ASSISTANT

DIGITAL DIRECTOR

SENIOR SPECIAL COUNSEL

COUNSEL

MINORITY INTERN

MINORITY FELLOW

MINORITY DEPUTY CHIEF COUNSEL FOR THE SUBCOMMITTEE ON CRIME

AND FEDERAL GOVERNMENT SURVEILLANCE

MINORITY CHIEF COUNSEL FOR THE SUBCOMMITTEE ON CRIME AND

FEDERAL GOVERNMENT SURVEILLANCE

MINORITY STAFF ASSISTANT

For DAVID AGRANOVICH:

RIDGE BLANCHARD

REGINALD BROWN

Kirkland & Ellis

1301 Pennsylvania Avenue, N.W.

Washington, D.C. 20004

MAJORITY COUNSEL 1.    We'll go on the record.

This is a transcribed interview of David Agranovich.    Chairman Jordan has requested this interview as part of the committee's investigation of how and the extent to which the executive branch has coerced and colluded with companies and other intermediaries to censor speech.

Would the witness please state his name for the record.

Mr. Agranovich.    David Agranovich.

MAJORITY COUNSEL 1.    On behalf of the committee, I want to thank you for appearing here today to answer our questions.    The chairman also appreciates your willingness to appear voluntarily.

My name is ████  ████ and I'm with Chairman Jordan's staff.

I will now have everyone else from the committee who is here at the table introduce themselves as well.

MAJORITY COUNSEL 2.    ████████    counsel for Chairman Jordan's staff.

MAJORITY COUNSEL 3.    ██████████    with Chairman Jordan's staff.

MINORITY COUNSEL 1.    ████████    with Chair Nadler's staff.

MINORITY COUNSEL 2.    ████████    with Mr. Nadler's staff.

██ ██  ████████    with Ranking Member Nadler.

██ ██  ████████    Jim Jordan's staff.

██ ██  ██████████    with Chairman Jordan's staff.

██ ██  ████████    Chairman Jordan's staff.

██ ██  ████████    majority.

Mr. Blanchard.    I'm Ridge Blanchard with Kirkland & Ellis.

Mr. Brown.    Reg Brown -- Reginald Brown for Kirkland & Ellis for the witness and

Meta.



And I also noticed a couple of additional people came in the room.

    MAJORITY COUNSEL 1.    Yeah.    If the folks who came in would state their name for the record.

    Mr. Gaetz.    Matt Gaetz, majority member of the House Judiciary Committee.

██ ██  ███    majority.

    MAJORITY COUNSEL 1.    Thank you.    I'd like to --

    MINORITY COUNSEL 2.    If I can ask for you all to speak up a little bit.    I'm having

a little bit of trouble hearing you.

MAJORITY COUNSEL 1.    Sure.

I'd like to now go over the ground rules and guidelines that we'll follow during today's interview.

Our questioning will proceed in rounds.    The majority will ask questions first for 1 hour, and then the minority will have an opportunity to ask questions for an equal period of time if they choose.    We will alternate back and forth until there are no more questions and the interview is over.

Typically, we take a short break at the end of each hour, but if you would like to take a break apart from that, please just let us know.

As you can see, there are official court reporters taking down everything we say to make a written record, so we ask that you give verbal responses to all questions.

Do you understand?

Mr. Agranovich.    Yes.

MAJORITY COUNSEL 1.    So the court reporters can take down a clear record, we will do our best to limit the number of people directing questions at you during any given hour to just those people on the staff whose turn it is.    Please try and speak clearly so the court reporter can understand and so the folks down at the end of the table can hear you.

It's important that we don't talk over one another or interrupt each other if we can help it, and that goes for everybody present at today's interview.

We encourage witnesses who appear before the committee to freely consult with counsel if they so choose.    It is my understanding that you are appearing today with counsel.    Is that correct?

Mr. Agranovich.    That is correct.

MAJORITY COUNSEL 1.    Could counsel please state your name for the record.

Mr. Brown.    We have already done that.    Reginald Brown, Kirkland & Ellis.

Mr. Blanchard.    Ridge Blanchard, Kirkland & Ellis.

MAJORITY COUNSEL 1.    Thank you.

We want you to answer our questions in the most complete and truthful manner as possible, so we will take our time.    If you have any questions or if you do not understand one of our questions, please let us know.

Our questions will cover a wide range of topics, so if you need clarification at any point, just say so.    If you honestly don't know the answer to a question or do not remember, it's best not to guess.    Please give us your best recollection, and it's okay to tell us if you learned information from someone else.    Just indicate how you came to know the information.

If there are things you don't know or can't remember, just say so, and please inform us who, to the best of your knowledge, might be able to provide a more complete answer to the question.

You should also understand that although this interview is not under oath, by law, you are required to answer questions from Congress truthfully.

Do you understand that?

Mr. Agranovich.    Yes.

MAJORITY COUNSEL 1.    This also applies to questions posed by congressional staff in an interview.

Do you understand that as well?

Mr. Agranovich.    I do.

MAJORITY COUNSEL 1.    Witnesses that knowingly provide false testimony could be subject to criminal prosecution for perjury or for making false statements under 18

U.S.C., section 1001.

        Do you understand this?

        Mr. <u>Agranovich.</u>   I do.

        <u>MAJORITY COUNSEL 1.</u>   Is there any reason you are unable to provide truthful answers to today's questions?

        Mr. <u>Agranovich.</u>   No.

        <u>MAJORITY COUNSEL 1.</u>   Finally, I'd like to make note that the content of what we discuss here today is confidential.   We ask that you not speak about what we discuss in this interview to any outside individuals to preserve the integrity of our investigation.

        For the same reason, the marked exhibits that we will use today will remain with the court reporters so that they can go in the official transcript, and any copies of those exhibits will be returned to us when we wrap up.

        All right.   That's the end of my preamble.   Is there anything that my colleagues --

        Mr. <u>Brown.</u>   █████   someone else came into the room.   I just want to make sure we get names.

        ███ █████   Hi.   I'm ██████████   I'm with the House Judiciary minority.

        Mr. <u>Brown.</u>   I'm sorry?

        ███ █████ ██████████

        Mr. <u>Brown.</u>   ██████████

        <u>MAJORITY COUNSEL 1.</u>   Is there anything my colleagues from the minority would like to add?

        <u>MINORITY COUNSEL 2.</u>   No, thank you.

        <u>MAJORITY COUNSEL 1.</u>   Okay.   The clock now reads 10:06.   We'll start the first hour of questioning.

MAJORITY COUNSEL 2.   Great.

EXAMINATION

BY MAJORITY COUNSEL 2:

Q     Thank you, Mr. Agranovich.

Could you state your full name, please.

A     Yes.    My full name is David Jacob Agranovich.

Q     And where's your current place of employment?

A     I currently work at Meta.

Q     Okay.   What's your current title?

A     I'm Meta's director for global threat disruption.

Q     ████████████████████████████████████████████████

████████████████

MINORITY COUNSEL 1.   I'm sorry.    We can't hear you.

MINORITY COUNSEL 2.   We can't hear you.

MAJORITY COUNSEL 2:

Q     ██████████████████████████████████████████

A     ███████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████

Q     Okay.    Great.    Your counsel started to provide some of this.    At a high

level, could you provide your employment history?

A     Yes.    So I currently work at Meta as Meta's Director for Global Threat

Disruption.    And I joined the company as Meta's Global Threat Disruption Lead.

████████████████████████████████████████████████████████

█████████████████████████████████████████████████

condensing that down to coordinated inauthentic behavior.

A       Uh-huh.

Q       Were there other policies that you consulted with the government on?

A       Not that I can recall.    Yeah, not that I can recall.

Q       You said that hack-and-leak concerns, hack-and-leak operations, that would fall under your team's purview.

A       The hack-and-leak policy specifically would fall under our team's purview.

Q       Is that a policy you worked on directly?

A       Yes.

Q       How has it changed since you first joined Meta?

A       The hack-and-leak, as you can imagine, hack-and-leak has been an issue that security teams, not just ours but across industry and government, have been focused on for several years now.

There were hack-and-leak operations that were identified going back to 2016, linked to Russian military intelligence services.    There were hack-and-leak operations targeting the Macron election in France after that.    And then there have been a number of hack-and-leak operations linked to a number of different foreign intelligence actors in countries all over the world since then.

So, naturally, hack-and-leak was one of the various threat factors that we were focused on and wanted to make sure that we were both keeping abreast of and being cautious to make sure we weren't allowing the platform to be manipulated in any way.

And so the hack-and-leak policy which we had developed functionally focused on three main areas.

So, first, determining whether the material that we were evaluating was obtained by a hacked, from a hacked source; i.e., was it obtained by someone without

authorization to access that material?

Second was the material being disseminated with an intent to deceive?    And that functionally on our platform, what that would mean is, is there indicia of deception, is there fake account usage or fake accounts being used to disseminate the material?

And then, third, was the material being disseminated on behalf of or at the direction of a foreign government influence operation?

And so that's the three-part test of the hack-and-leak policy, and that's functionally what the policy was in my time at Meta.

Q    And was that -- so that was the case when you first started back in 2018 to today?   When did this three-part test come into being?

A    To the best of my recollection, the policy was developed in early to mid-2020.

Q    And what was --

MINORITY COUNSEL 2.    I'm sorry?    When?

Mr. Agranovich.    In early to mid-2020?

BY MAJORITY COUNSEL 2:

Q    And what was the policy before then?

A    I understand there are other policies at the company that can apply to hacked materials.    They're not policies that I work on, but I know that those existed prior to the hack-and-leak policy being developed.

Q    And did you ever consult with the government regarding your -- or regarding Meta's hack-and-leak policy?

A    I recollect that we discussed the fact of us working on hack-and-leak issues in meetings with the government, but I don't believe we consulted with the government on the policy itself.

Q     Okay.     Did the government ever contact you to comment on your hack-and-leak policy?

A     Not to my recollection.

MAJORITY COUNSEL 2.     Do you know where we are on time?

MAJORITY COUNSEL 3.     You have about a minute.

Mr. Brown.     You have about a minute and 37 seconds left.

BY MAJORITY COUNSEL 1:

Q     When did those meetings occur?

A     Which meetings?

Q     The meetings you just referenced where there was a discussion of Meta's hack-and-leak policy with the government?

A     I believe the summer of 2020.

Q     And which entities were those discussions happening with?

A     That would be the Foreign Influence Task Force, DHS, CISA, and ODNI.

MAJORITY COUNSEL 2.     Were these one-on-one meetings or were other companies invited as well?

Mr. Agranovich.     These meetings, these were multiple companies, and then the government agencies I mentioned.

MAJORITY COUNSEL 2.     Do you remember who instigated these meetings?     Was it on the government end, or was it from industry's end?

Mr. Agranovich.     I don't know who instigated the meetings.

Mr. Brown.     We're at time.     I was wondering if we could take a break off the record.     Thanks.

[Recess.]

MINORITY COUNSEL 2.     We're ready to go back on the record.

EXHIBIT 16

1

2

3

4

5      COMMITTEE ON THE JUDICIARY,

6      U.S. HOUSE OF REPRESENTATIVES,

7      WASHINGTON, D.C.

8

9

10

11

12

13      INTERVIEW OF:     NATHANIEL GLEICHER

14

15

16

17

18                                          Wednesday, June 21, 2023

19

20                                          Washington, D.C.

21

22

23              The interview in the above matter was held in room 164, Cannon House Office

24      Building, commencing at 10:05 a.m.

25

| | |
|---|---|
| 1 | <u>Appearances:</u> |
| 2 | |
| 3 | |
| 4 | For the COMMITTEE ON THE JUDICIARY: |
| 5 | |
| 6 | ██████████ COUNSEL |
| 7 | ██████████ DIGITAL ASSISTANT |
| 8 | ██████████ PROFESSIONAL STAFF MEMBER |
| 9 | ██████████ SENIOR SPECIAL COUNSEL |
| 10 | ██████████ COUNSEL |
| 11 | ██████████ MINORITY INTERN |
| 12 | |
| 13 | |
| 14 | |
| 15 | For the SUBCOMMITTEE ON CRIME AND |
| 16 | FEDERAL GOVERNMENT SURVEILLANCE: |
| 17 | |
| 18 | ██████████ MINORITY DETAILEE |
| 19 | |
| 20 | For NATHANIEL GLEICHER: |
| 21 | REGINALD BROWN, ESQ. |
| 22 | JORDAN GREENE |
| 23 | Kirkland Ellis |

1

2    <u>MAJORITY COUNSEL 1.</u>    We can go on the record.

3    <u>MAJORITY COUNSEL 2.</u>    This is a transcribed interview of Nathaniel Gleicher.

4    Is that how you pronounced it?

5    Mr. <u>Gleicher.</u>    Gleicher.

6    <u>MAJORITY COUNSEL 2.</u>    Chairman Jordan has requested this interview as part of

7    the committee's investigation of how and the extent to which the executive branch has

8    coerced and colluded with companies and other intermediaries to censor speech.

9    Would the witness please state your name for the record?

10    Mr. <u>Gleicher.</u>    Nathaniel Jurist Gleicher.

11    <u>MAJORITY COUNSEL 2.</u>    On behalf of the committee, I want to thank you for

12    appearing here today to answer our questions.    The chairman also appreciates your

13    willingness to appear voluntarily.

14    My name is ███████ and I'm with Chairman Jordan's staff.

15    We'll now have everyone else from the committee who is here at the table to

16    introduce themselves, as well.

17    <u>MAJORITY COUNSEL 1.</u>    ███████ Chairman Jordan's staff.

18    ███████ ███████ Chairman Jordan's staff.

19    ███████ ███████, Chairman Jordan's staff.

20    ███████ ███████ Chairman Jordan's staff.

21    <u>MINORITY COUNSEL 1.</u>    ███████ Chairman Nadler's staff.

22    ███████ ███████ Legal Intern, House Judiciary, Democratic staff.

23    <u>MAJORITY COUNSEL 2.</u>    I would like to now go over the ground rules and

24    guidelines that we will follow during today's interview.

25    Our questioning will proceed in rounds.    The majority will ask questions first for 1

1    hour, and then the minority will have an opportunity to ask questions for an equal period

2    of time if they choose.    We will alternate back and forth until there are no more

3    questions, and then our interview is over.

4        Typically, we take a short break at the end of each hour.    But if you would like to

5    take a break apart from that, please just let us know.

6        As you can see, there's an official court reporter taking down everything you say

7    to make a written record.    So we ask you give verbal responses to all questions.

8        Do you understand?

9        Mr. Gleicher.    Yes.

10       MAJORITY COUNSEL 2.    So the court reporter can take down a clear record, we

11    will do our best to limit the number of people directing questions at you during any given

12    hour to just those people on the staff whose turn it is.

13       Please try and speak clearly so the court reporter can understand and so the folks

14    down at the end of the table can hear you.    It's important that we don't talk over one

15    another or interrupt each other if we can help it, and that goes for everybody present at

16    today's interview.

17       We encourage witnesses who appear before the committee to freely consult with

18    counsel if they so choose, and it's my understanding you are appearing today with

19    counsel.    Is that correct?

20       Mr. Gleicher.    Correct.

21       MAJORITY COUNSEL 2.    Could counsel please state your name for the record?

22       Mr. Brown.    Reg Brown, Kirkland & Ellis.

23       Mr. Greene.    Jordan Greene, Kirkland & Ellis.

24       MAJORITY COUNSEL 2.    Thank you.

25       We want you to answer our questions in the most complete and truthful manner

1    as possible.    So we will take our time.    If you have any questions or if you don't

2    understand one of our questions, please let us know.

3            Our questions will cover a wide range of topics.    So if you need clarification at

4    any point, just say so.    If you honestly don't know the answer to a question or don't

5    remember, it's best not to guess.    Please give us your best recollection, and it's okay to

6    tell us if you learn information from someone else.    Just indicate how you came to know

7    the information.

8            If there are things you don't know or can't remember, just say so and please

9    inform us who, to the best of your knowledge, might be able to provide a more complete

10   answer to the question.

11           You should also understand that, although this interview isn't under oath, by law,

12   you are required to answer questions from Congress truthfully.

13           Do you understand?

14           Mr. Gleicher.    Yes.

15           MAJORITY COUNSEL 2.    This also applies to questions posed by congressional

16   staff in an interview.

17           Do you understand?

18           Mr. Gleicher.    Yes.

19           MAJORITY COUNSEL 2.    Witnesses who knowingly provide false testimony could

20   be subject to criminal prosecution for perjury, or making false statements under 18

21   United States Code 1001.

22           Do you understand?

23           Mr. Gleicher.    Yes.

24           MAJORITY COUNSEL 2.    Is there any reason you are unable to provide truthful

25   answers to today's questions?

1          Mr. Gleicher.    No.

2          MAJORITY COUNSEL 2.    Finally, I would like to note that the content of what we

3    discuss here today is confidential.    We ask that you not speak about what we discuss in

4    this interview to any outside individuals to preserve the integrity of our investigation.

5          For the same reason, the marked exhibits that we use today will remain with the

6    court reporter so that they can go in the official transcript.    And any copies of those

7    exhibits will be returned to us when we wrap up.

8          All right.    That's the end of my preamble.

9          Is there anything my colleagues from the minority would like to add?

10          MINORITY COUNSEL 1.    Not at this time, no.

11          I will -- I just want to alert everybody one of my colleagues will coming in to hand

12    me something, ██████████.    And then she'll just be leaving.

13          MAJORITY COUNSEL 2.    Okay.

14          MINORITY COUNSEL 1.    Thanks.

15          MAJORITY COUNSEL 2.    The clock now reads 10:05 a.m.    We will start the first

16    hour of questioning.

17                                    EXAMINATION

18                          BY MAJORITY COUNSEL 1:

19    Q    Mr. Gleicher, what's your current place of employment?

20    A    I work at Meta.

21    Q    And what's your current title?

22    A    I am head of security policy.

23    Q    ████████████████████████████████████████████

24    A    ███████████████████████████████████

25    Q    ██████████████████

1    Q    You mentioned the community standards.    Is the hack-and-leak policy

2    separate from the CIB policy?

3    A    Yes.

4    Q    Can you state again if you team has primary responsibility for the

5    enforcement of the hack and leak policy?

6    A    Yes.

7    Q    Do you know when that policy was first adopted?

8    A    I believe it was adopted -- I don't remember the exact date but it was sort of

9    mid-2020.

10    Q    Did you work on the development of that policy?

11    A    Yes.

12    Q    And do you recall which other teams, if any, from Facebook were involved in

13    the development of that policy?

14    A    I don't know about specific teams.    But within ██████████'s org, there

15    were a number of people thinking about issues around the 2020 elections at that time.

16    Q    So is it concern about the 2020 elections that led Facebook to adopt a

17    hack-and-leak policy?

18    A    In part, yes.

19    Q    What specifically about the 2020 election?

20    A    As we were preparing for the 2020 elections, we identified that one of the

21    likely risks it was important to prepare for was a hack-and-leak campaign from a foreign

22    threat actor like Russia.

23    Q    And by "we," do you mean Facebook?

24    [Discussion off the record.]

25    Mr. Gleicher.    My apologies.    Could you say that again?

EXHIBIT 17

Message

| | |
|---|---|
| **From**: | █████████ [████████@fb.com] |
| **Sent**: | 9/29/2020 11:41:42 AM |
| **To**: | Matthew Masterson [██████████@hq.dhs.gov]; Brian Scully [█████████@cisa.dhs.gov] |
| **CC**: | ████████cisa.dhs.gov; ██████@cisa.dhs.gov; ████████ ████████@fb.com] |
| **BCC**: | ████████ [████████@fb.com] |
| **Subject**: | October 2020 USG/Industry Meeting (Draft Agenda) |

Gents,

We wanted to share the draft/proposed agenda in advance of our USG/Industry meeting scheduled from 2:00-3:30 PM EST on Wednesday, October 7th. Additionally, to facilitate the logistics for the call, we have included the dial-in information below.

Please let us know if you have any additions or concerns.

Thanks!

█████



## *******DRAFT AGENDA**********

- **10 minutes: Dial In/Opening**
- **30 minutes: Threat Updates (Including Pre/Post Presidential Debates)**
  - Threat update from USG -- Foreign Actor/Activity & Non-IO Cyber Threats
  - Threat update from industry (FB, Twitter, GOOG)
- **40 minutes: Deep Dive Topics (Industry/USG Moderated Discussion)**
  - Updates on USG Election Process
  - Election Day Virtual Coordination Center Update
  - Top 5 Delegitimization Claims To Counter
  - Hack/Leak Concerns
- **10 minutes: Highlights & Upcoming Watch Outs & Wrap (Moderated)**

## Meeting Dial-In Information:

- To join the meeting on a computer or mobile phone: https://bluejeans.com/███████████
- One-Touch: ████████████████████
- Meeting ID: ██████████
- Participant Passcode: ████
- To join via phone:
- 1) Dial: ████████████
- 2) Enter Conference ID: ██████████
- 3) Enter Participant Passcode: ████
- Want to test your video connection?
- https://bluejeans.com/111

CONFIDENTIAL TREATMENT REQUESTED -
NOT FOR DISTRIBUTION - MEMBERS & STAFF ONLY

EXHIBIT 18



**Hack/Leak Investigation (AC/PRIV)**

Encrypted     C#215252     Info Operations Investigation (i3)     M Matt Richard     Unpublished     **High**     Created Oct 15, 2020     More

Overview     Timeline     Assets     Actions     **Discussion**     Files     Access Requests 1     Intelligence Notes     Providence     Searchlight

**Discussion**                                                          Add Work Chat Thread     Activity & Comments



CONFIDENTIAL TREATMENT REQUESTED -
NOT FOR DISTRIBUTION - MEMBERS & STAFF ONLY



I spoke with SSA Elvis Chan (FBI San Francisco) on 15 October 2020, as a follow up to the call with the Foreign Influence Task Force on 14 October. I asked SSA Chan whether there was any update or change since the discussion on 14 October 2020 as to whether the FBI saw any evidence suggesting foreign sponsorship or direction of the leak of information related to Hunter Biden as published in the New York Post story on 14 October. SSA Chan advised that he was up to speed on the current state of the matter within the FBI and that there was no current evidence to suggest any foreign connection or direction of the leak. SSA Chan assured that the FBI would be in contact if any additional information on this was developed through further investigation.

October 15, 2020 · Like · Reply

subscribed
October 15, 2020 · Like

Here is where I will be working through the various hack/leak policy factors: https://fb.quip.com

October 15, 2020 · Like · Reply

CONFIDENTIAL TREATMENT REQUESTED -
NOT FOR DISTRIBUTION - MEMBERS & STAFF ONLY



CONFIDENTIAL TREATMENT REQUESTED -
NOT FOR DISTRIBUTION - MEMBERS & STAFF ONLY

META-118HJC-0055261

EXHIBIT 19

**From:**      Misinformation Reports [/O=EXCHANGE/OU=EXCHANGE ADMINISTRATIVE GROUP
             (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=093D02C79B0F4DBA805C5322CD750647-MISINFORMATION]
**Sent:**      10/27/2022 5:06:15 PM
**To:**        ▮▮▮@fb.com' [▮▮▮@fb.com]; 'reports@content.facebook.com' [reports@content.facebook.com]
**CC:**        ▮▮@pa.gov' [▮▮@pa.gov]; ▮▮@pa.gov' [▮▮@pa.gov]
**Subject:**   FW: Misleading Post about Election Results Timing (Ticket 1027-02)


Please see below report submitted to the EI-ISAC.

**EI-ISAC**
31 Tech Valley Drive
East Greenbush, NY 12061

elections@cisecurity.org


Report an incident





---

**From:** ▮▮▮ <▮▮@pa.gov>
**Sent:** Thursday, October 27, 2022 4:55 PM
**To:** Misinformation Reports <misinformation@cisecurity.org>
**Cc:** ▮▮▮ <▮▮@pa.gov>
**Subject:** [External] Misleading Post about Election Results Timing


Summary: Misleading Post about Election Results Timing
Description: This post is misleading to voters. It is insinuating that because election results are not available on election night, something nefarious is happening in the counting process.
Name and Title: Scott Parker, Digital Director of the PA Department of State
Jurisdiction: Pennsylvania

Platform: Twitter and Facebook
URL: https://twitter.com/tedcruz/status/1585671399133282304
https://www.facebook.com/tedcruzpage/posts/pfbid0hGVnZAx6uqspQuAVCRSeDszwyVabVJBUVuxd7mmKhrspvF9yRn3Tr7ViapH2j74ul
Seen on: 10/27/2022
Screenshot:





| Digital Director (he/him/his)
Office of Press and Communications
Department of State
401 North Street, Harrisburg, PA 17120
Office:
Are you ready to vote on November 8, 2022?
dos.pa.gov | vote.pa.gov | Facebook | Twitter

.....

CONFIDENTIAL-NON-PUBLIC INFORMATION-PROVIDED TO
CONGRESS IN RESPONSE TO SUBPOENA

EXHIBIT 20

**From:** Kate Starbird <█████@uw.edu>
**To:** Alex Stamos <█████@stanford.edu>
**Subject:** Re: Election research collaboration - chat this afternoon?
**Date:** Wed, 8 Jul 2020 10:26:21 -0700

---

Hi Alex,

Happy to chat. I'm booked solid this afternoon. Could we do something tomorrow afternoon? I could do something between 2 and 3pm tomorrow or after 5pm…

Kate

> On Jul 8, 2020, at 9:41 AM, Alex Stamos <█████@stanford.edu> wrote:
>
> Hey, Kate-
>
> Do you have any time this afternoon to chat? We are working on some election monitoring ideas with CISA and I would love your informal feedback before we go too far down this road.
>
> Sorry for the last minute ask, but things that should have been assembled a year ago are coming together quickly this week.
>
> Alex
>
> --
> **Alex Stamos**
> Director, Stanford Internet Observatory
> █████@stanford.edu

# EXHIBIT 21

## [External] EIP-833 Case #CIS-MIS000164: inaccurate number of rejected absentee ballots in DeKalb County, GA

| | |
|---|---|
| **From:** | Elena Cryst <span style="background:black">Redacted - Personal Information</span> |
| **To:** | <span style="background:black">Redacted - Personal Information</span> |
| **Bcc:** | |
| **Date:** | Wed, 04 Nov 2020 19:41:38 -0600 |

_____

Reply above this line.


Elena Cryst shared this with your organization.

View the request and select **Get notifications** to follow along.


View request · Turn off this request's notifications

This is shared with TikTok, Facebook, EI-ISAC, Twitter, CIS Misinformation Reporting, and CISA CFITF.

Powered by Jira Service Desk

Contains Business Confidential Information. Confidential Treatment Requested

EXHIBIT 22

 

---

### Re: EIP-651 Livestream of "riots" between Trump and Biden supporters
1 message

████████ <████ reddit.com>                                          Tue, Nov 3, 2020 at 12:36 PM
To: Alex Stamos <████ @stanford.edu>

Thanks. Unfortunately as we mentioned at the beginning of this project we are unable to participate in external jiras, but we are happy to receive info over email.

On Tue, Nov 3, 2020 at 12:35 PM Alex Stamos <████ @stanford.edu> wrote:

There is a widely watched YouTube livestream replaying old videos and claiming they are of live violence in the streets between Biden and Trump supporters. YouTube is looking into it, but here are the Reddit links we found:

https://www.reddit.com/r/Bad_Cop_No_Donut/comments/jnfn w/ ive_us_e ection_protests_riots_trump_vs_biden/
https://www.reddit.com/r/ThatsInsane/comments/jnfo0a/ive_us_e ection_protests_riots_trump_vs_biden/

It would be great if we could get somebody from Reddit on the JIRA, just like Facebook, Google, Twitter, TikTok, Instagram, CISA, EI-ISAC…

---

**From:** ████████ <████ reddit.com>
**Date:** Tuesday, November 3, 2020 at 12:31 PM
**To:** Alex Stamos <████ @stanford.edu>
**Subject:** Re: EIP-651 Livestream of "riots" between Trump and Biden supporters

Me again. :) Tl;DR please?

On Tue, Nov 3, 2020 at 12:29 PM Alex Stamos <jira@2020partnership.atlassian.net> wrote:

_____

Reply above this line.

Alex Stamos shared this with your organization.

View the request and select **Get notifications** to follow along.

View request · Turn off this request's notifications

This is shared wi h Reddit, Google, Twitter, and ████████.

Powered by Jira Service Desk

--
████████
Director of Policy
Reddit
████████ reddit.com

--
████████
Director of Policy
Reddit
████████ reddit.com

EXHIBIT 23

Message

| | |
|---|---|
| **From:** | Elena Cryst [jira@2020partnership.atlassian.net] |
| **Sent:** | 11/2/2020 7:03:06 PM |
| **To:** | ▇▇▇▇▇@google.com |
| **Subject:** | EIP-556 Tweets and edited recordings of Zoom call(s) claim to show federal employees and contractors conspiring to leak info, shutdown DC, and label results as a coup after election |

Reply above this line.

Elena Cryst shared this with your organization.

View the request and select **Get notifications** to follow along.

View request · Turn off this request's notifications

This is shared with Reddit, GEC, Facebook, 2 other organizations, and William Beebe.

Powered by Jira Service Desk

HIGHLY CONFIDENTIAL

HJC-GOOG-00030491

# EXHIBIT 24

1

2

3

4

5          COMMITTEE ON THE JUDICIARY,

6          U.S. HOUSE OF REPRESENTATIVES,

7          WASHINGTON, D.C.

8

9

10

11

12

13          INTERVIEW OF:    ALEXANDER STAMOS

14

15

16

17

18                                             June 23, 2023

19

20                                             Washington, D.C.

21

22

23          The interview in the above matter was held in room 2237, Rayburn House Office

24     Building, commencing at 9:30 a.m.

25          Present:    Representative Jordan

1

2    Appearances:

3

4

5    For the COMMITTEE ON THE JUDICIARY:

6

7    ███████████        LAW CLERK

8    ███████████        DIGITAL ASSISTANT

9    ███████████        CHIEF COUNSEL FOR OVERSIGHT

10   ███████████        SENIOR SPECIAL COUNSEL

11   ███████████        DIGITAL DIRECTOR

12   ███████████        SENIOR SPECIAL COUNSEL

13   ████████           COUNSEL

14   ███████████        MINORITY OVERSIGHT COUNSEL

15   ███████████        MINORITY INTERN

16   ███████████        MINORITY CHIEF OVERSIGHT COUNSEL

17   ███████████████    MINORITY PROFESSIONAL STAFF MEMBER

18

19

20   For the SUBCOMMITTEE ON THE CONSTITUTION AND LIMITED GOVERNMENT:

21

22   ███████████        MINORITY DEPUTY CHIEF COUNSEL

1

2    For ALEXANDER STAMOS:

3

4    JOHN B. BELLINGER, III, ESQ.

5    CALEB THOMPSON, ESQ.

6    ARNOLD & PORTER KAYE SCHOLER, LLP

7    601 Massachusetts Ave, NW

8    Washington, DC 20001

1

2     MAJORITY COUNSEL 1.   We'll go on the record.

3         Good morning.   This is a transcribed interview of Mr. Alex Stamos.   Chairman

4     Jordan has requested this interview as part of the committee's investigation of how and

5     the extent to which the executive branch has coerced and colluded with companies and

6     other intermediaries to censor speech.

7         Would the witness please state your name for the record?

8         Mr. Stamos.   Alexander Stamos.

9         MAJORITY COUNSEL 1.   We encourage witnesses who appear before the

10    committee to freely consult with counsel if they so choose, and it is my understanding

11    that you are appearing today with counsel.   Is that correct?

12        Mr. Stamos.   Yes.

13        MAJORITY COUNSEL 1.   Could counsel please state your name for the record?

14        Mr. Bellinger.   John Bellinger, Arnold & Porter.

15        Mr. Thompson.   Caleb Thompson, Arnold & Porter.

16        MAJORITY COUNSEL 1.   Thank you.

17        On behalf of the committee, I want to thank you for appearing here today to

18    answer our questions.   The chairman also appreciates your willingness to appear

19    voluntarily.

20        My name is ███████████ and I am with Chairman Jordan's staff.

21        I will now have everyone else in the room who is with the committee introduce

22    themselves as well.

23        MAJORITY COUNSEL 2.   ████████ with Chairman Jordan's staff.

24        MAJORITY COUNSEL 3.   █████████ Chairman Jordan's staff.

25        MINORITY COUNSEL 1.   █████████ chief oversight counsel for the House

1    Judiciary Democratic staff.

2    ██████████ ██████████ House Judiciary Democratic staff.

3    ██████████ ██████ House Judiciary Democratic staff.

4    ████████████████ ██████████████ House Judiciary Democratic staff.

5    ██████████ ██████████ House Judiciary Democratic staff.

6    ██████████ ██████████ Mr. Jordan's staff.

7    ██████████ ██████████ Chairman Jordan's staff.

8    <u>MAJORITY COUNSEL 1.</u>    Thank you.

9    I would now like to go over the ground rules and guidelines that we will follow

10    during today's interview.    Our questioning will proceed in rounds.    The majority will ask

11    questions first for 1 hour, and then the minority will have an opportunity to ask questions

12    for an equal period of time if they so choose.

13    We will alternate back and forth until there are no more questions and the

14    interview is over.    Typically we take a break at the end of each hour, but if you would

15    like to take a break apart from that, please just let us know.

16    As you can see, there's an official court reporter taking down everything we say to

17    make a written record, so we ask that you give verbal responses to all questions.

18    Do you understand that?

19    Mr. <u>Stamos.</u>    I do.

20    <u>MAJORITY COUNSEL 1.</u>    So the court reporter can take down a clear record, we

21    will do our best to limit the number of people directing questions at you during any given

22    hour to just those people on the staff whose turn it is.

23    Please try and speak clearly so the court reporter can understand and so the folks

24    down at the end of the cable can hear you as well.    It is important that we don't talk

25    over one another or interrupt each other if we can help that, and that goes for everybody

1    present at today's interview.

2        We want you to answer our questions in the most complete and truthful manner

3    as possible, so we'll take our time.    If you have any questions or if you do not understand

4    one of our questions, please just let us know.    Our questions will cover a wide range of

5    topics so if you need clarification at any point just ask.

6        If you honestly don't know the answer to a question or do not remember, it is best

7    not to guess.    Please give us your best recollection, and it is okay to tell us if you learned

8    information from someone else.    Just indicate how you came to know the information.

9    If there are things you don't know or can't remember, just say so and please inform us

10    who, to the best of your knowledge, might be able to article.

11        You should also understand that by law you are required to answer questions

12    from Congress truthfully.

13        Do you understand that?

14        Mr. Stamos.    Yes.

15        MAJORITY COUNSEL 1.    This also applies to questions posed by congressional

16    staff in an interview.

17        Do you understand this?

18        Mr. Stamos.    Yes.

19        MAJORITY COUNSEL 1.    Witnesses that knowing provide false testimony could be

20    subject to criminal prosecution for making false statements under 18, U.S.C., Section

21    1001.

22        Do you understand this?

23        Mr. Stamos.    Yes.

24        MAJORITY COUNSEL 1.    Is there any reason you are unable to provide truthful

25    answers to today's questions?

1        Mr. <u>Stamos.</u>    No.

2        <u>MAJORITY COUNSEL 1.</u>    Finally, I would like to make note that the content of

3    what we discuss here today is confidential.    We ask that you not speak about what we

4    discuss in this interview to any outside individuals to preserve the integrity of our

5    investigation.

6        For that same reason, the marked exhibits that we will use today will remain with

7    the court reporters, and we will collect any copies of the exhibits at the end of the

8    interview.

9        Okay.    That's the end of my preamble.

10        Do my colleagues from the minority have anything?

11        <u>MINORITY COUNSEL 1.</u>    We would just like to thank the witness for flying out

12    from California to join us today.

13        <u>MAJORITY COUNSEL 1.</u>    Thank you.

14        Mr. Stamos I understand you have an opening statement.    You may proceed.

15        Mr. <u>Stamos.</u>    I do.    Thank you.

16        Good morning.    I'm glad to have this opportunity to describe the work of the

17    Stanford Internet Observatory and to address misperceptions about its participation in

18    the Election Integrity Partnership and the Virality Project.

19        The Stanford Internet Observatory studies misuses of the internet with the goals

20    of publishing research, suggesting technical and policy mitigations, and educating the

21    next generation of cyber specialists.    I'm the founder and the director of the observatory

22    and a lecturer in the computer science department at Stanford.

23        To that end, I teach courses in cybersecurity and online safety at Stanford, along

24    with supervising our research efforts.    Our research includes work on child safety, online

25    promotion of self-harm, generative AI, and influence campaigns by China, Iran, Russia,

1       Q    You mentioned that the Global Engagement Center was one of the entities

2  that can submit reports, tickets as well?

3       A    Yes.   They could send -- they could send emails in to us for us to open and

4  to look into, yes.

5       Q    Do you recall who at the GEC you interacted with?

6       A    I don't- -- I mean, personally I had -- there was a meeting in which I believe

7  the director of the GEC was at here in D.C.   I don't recall her name.   I -- I didn't have

8  most of those conversations.

9       Q    The meeting in D.C. that you just referenced, what was the purpose of that

10  meeting?

11       A    I believe it was to tell them about what EIP was doing and telling them that

12  they could send into us reports of foreign influence that they saw, potential foreign

13  influence.

14       Q    Do you know who first connected GEC and EIP together?

15       A    I believe that we had already had preexisting relationships with GEC because

16  they had published in this area before the EIP.

17       Q    In addition to CISA and GEC, do you recall any other Federal agencies that

18  played either informal, like, external stakeholder role or otherwise consulted EIP?

19       A    So the only groups that could and did report from the Federal Government

20  report anything to us was the GEC, which is actually part of the government and then the

21  EI-ISAC external, you know.   And you'd have to give it your own determination of how

22  much of the government that is.   But those are the only two groups that did send

23  anything in to us.   We did do briefings for several other agencies and we had one ticket

24  that we then sent out to the FBI.

25       Q    Which other Federal agencies did EIP briefly?

1          A      I did a briefing for General Nakasone then the director of NSA and Cyber

2     Command.

3          Q      And did these briefings -- when did they occur in the process?    Is it

4     pre-election?

5          A      Pre-election, yes.    Like in the late summer, early fall we did a briefing.    He

6     had come to campus and had heard us talk about our foreign work.    And he asked me to

7     brief his executive staff on our concerns and what kind of foreign influence who happen

8     during the election.

9          Q      And the FBI mentioned -- received the ticket.    Did the FBI also receive

10    briefings for the election?

11         A      The FBI was part of that briefing, so I did it from the FBI office in -- in San

12    Francisco because I just can't Zoom in to the NSA.

13         Q      Do you recall who set up the meeting between you and the NSA?

14         A      Elvis Chan had set up the -- so the meeting was set up because Nakasone

15    had come to campus.    Elvis was the facilitator who provided the space and participated,

16    listened to the briefing in San Francisco.

17         Q      Yeah.    Did you know Mr. Chan before this meeting had occurred?

18         A      I did.

19         Q      And how did you know special agent Chan?

20         A      Yeah, he runs the group in the San Francisco office of the FBI that handles

21    high profile national security cyber attacks and so had I worked with him both at Yahoo.

22    At Yahoo we had been attacked by the -- by contractors working for the Russian FSB.

23            And then at Facebook we had a number of attempted attacks, as well as

24    manipulations of the platform to cause attacks by a variety of government agencies,

25    foreign government agencies.    And so Elvis was the primary contact for all of that

1    because he ran the group that would investigate those kinds of foreign actions.

2    Q    Do you recall anyone else from the FBI attending this meeting?

3    A    There were some other people from his squad.    I don't recall their names.

4    Q    And so in addition to the NSA, FBI, do you recall any other entities that were

5    present at the meeting?

6    A    The -- it was a video conference.    In the room were only FBI agents.    The

7    only people I knew of who were on the other link were NSA.

8    Q    So you mentioned FBI, NSA, GEC and CISA.    Were there any other

9    government agencies that received a briefing from EIP?

10    A    Not to my knowledge.

11    Q    Did you -- in addition to this briefing that the FBI helped facilitate between

12    EIP and NSA, did you have any other interactions with the FBI as a function of EIP's work?

13    A    We did the preemptive briefing and we sent them one report related to

14    Arabian action in the election and I believe that was our only interaction with them.

15    Q    When EIP was organized, were there new EIP email addresses created for

16    folks?

17    A    No.    We have a domain that has one working email address info@, which

18    was a mailing list that went to three or four different people.

19    Q    Okay.    Do you know who those three or four people are?

20    A    It was me, probably Elena Cryst or deputy director of SIO, Kate Starbird and I

21    believe there's a comms person at UW, I forgot his name, who'd receive those emails.

22    Because often that would be media requests and he would be the one who handled

23    those.

24    Q    So I think we started to touch upon this, but how would members of EIP

25    communicate with one another?

1

2    [4:42 p.m.]

3              BY MAJORITY COUNSEL 2:

4       Q    Who was the EIP's primary point of contact at Reddit?

5       A    I've forgotten her name.    There was a woman in the policy team.    We can

6    come back to you.

7       Q    Do you recall with respect to Alphabet if there was different points of

8    contact for Google as opposed to YouTube or if it was the same point of contact?

9       A    I believe it was the same.    For these purposes, the central Google team was

10   the one who was coordinating on their election policies.

11      Q    In 2020, who was EIP's primary former contact with Discord?

12      A    I don't recall with Discord.

13      Q    What about with respect to Wikimedia?

14      A    Yes.    There's a -- I don't remember what the name is of the person at

15   Wikimedia.    I wasn't a part of those meetings.

16      Q    Who would have been part of those meetings?

17      A    Probably ███ or some of the students who were doing onboarding.

18      Q    Who is EIP's primary point of contact with Pinterest?

19      A    I don't recall.

20      Q    Are there plans to -- you mentioned that EIP -- obviously, this is the 2020

21   iteration.    In 2022, you said there were some differences.    Are there any plans to have

22   some continuation of the partnership for the 2024 election?

23      A    That's an interesting question.    I'm going to have to have a discussion with

24   Stanford's leadership.    Since this investigation has cost the university now approaching

25   seven figures legal fees, it's been pretty successful I think in discouraging us from making

1    it worthwhile for us to do a study in 2024.

2    <u>MAJORITY COUNSEL 2.</u>    Do you recall which exhibit we're on?

3    ███████████<u>.</u>    21 -- 22.

4    <u>MAJORITY COUNSEL 2.</u>    22.    All right.

5                                            [Stamos Exhibit No. 22

6                                            Was marked for identification.]

7                        BY MAJORITY COUNSEL 2:

8        Q    Do you know who ██████████ is?    I don't know if I'm pronouncing her

9    name right.

10        A    Yeah.    She was the woman I was thinking of, the head of policy for Reddit.

11        Q    Great.    And at her email at the top of the page, she says that

12    "We" -- assuming referring to Reddit -- "are unable to participate in Jiras, but we are

13    happy to receive info over email."

14            Do you recall that Reddit didn't respond in Jira directly?

15        A    Right.    They did not -- for whatever reason, did not want to have something

16    they had to log into.    They wanted things to be put in the email and sent directly to

17    them.

18        Q    Okay.    And then there's an email below from you.    You explain the

19    situation.    There are a couple of links.    And then below you say:    "It would be great if

20    we could get somebody from Reddit on the Jira, just like Facebook, Google, Twitter,

21    TikTok, Instagram, CISA, EI-ISAC."

22            Were you referring to CISA, the government agency?

23        A    I was probably making a mistake there talking about CISA because EI-ISAC

24    were the people who had access to the Jira.

25        Q    But you list both EI-ISAC and CISA.    Is that right?