No. 23-30445

## In the United States Court of Appeals for the Fifth Circuit

State of Missouri; State of Louisiana; Aaron Kheriaty; Martin Kulldorff; Jim Hoft; Jayanta Bhattacharya; Jill Hines,

Plaintiffs-Appellees,

v.

Joseph R. Biden, Jr.; Vivek H. Murthy; Xavier Becerra; Department of Health & Human Services; Anthony Fauci; Et al.,

Defendants-Appellants.

On Appeal from the United States District Court for the Western District of Louisiana

*AMICUS Leonid Goldstein, pro se*

**BRIEF IN SUPPORT OF PLAINTIFFS-APPELLEES' OPPOSITION**

**TO DEFENDANTS-APPELLANTS' EMERGENCY MOTION**

1

## STATEMENT OF IDENTITY, INTEREST, AND DISCLOSURE

Amicus Leonid Goldstein is an individual US citizen. No party's counsel authored this brief, in whole or in part. No person other than Amicus contributed money to fund the preparation or submission of this brief.

Amicus has an M.Sc. in Mathematics and 20+ years of technical and business experience working in software development and the Internet technology industry, including social media. Considering his expertise and knowledge of the Platforms' business models and history, Amicus is qualified to provide an expert opinion on some subjects in this lawsuit.

Amicus submits this brief on behalf of self and the "silent majority" of Americans, who are denied a voice and essential information by the Defendants' conduct.

Amicus is also a witness and a victim of the Platforms' misconduct, allegedly coerced, significantly encouraged, and/or jointly conducted with the Defendants. Amicus has been repeatedly silenced, de-platformed, banned, doxed, defamed, defrauded, and threatened by them. Amicus has also witnessed such Platform misconduct toward others.

**Amicus is shocked to discover that this misconduct was directed by federal government officials, acting or purporting to act under the color of official capacity ("the government").**

# Table of Contents

| | |
|---|---|
| STATEMENT OF IDENTITY, INTEREST, AND DISCLOSURE | 2 |
| Table of Contents | 3 |
| Table of Authorities | 4 |
| ARGUMENT | 4 |
|    Definitions | 4 |
|    The Defendants' Theories are Compatible with the Injunction | 4 |
|       "Providing Information" | 5 |
|       Foreign-based threats must be stopped at the border | 5 |
|    Coercion by threats of adverse legislation and regulation; Sen. Mark Warner | 6 |
|       Senate Bill S.1989 Honest Ads Act | 7 |
|       Oral Threats and Draft Policy Proposals by Senator Warner | 7 |
|    Public Function Test for State Action | 9 |
|       "Securing Elections" | 9 |
|       The National Security | 10 |
|    Joint Participation and Pervasive Entwinement | 11 |
|    The Platforms are vulnerable to government regulations | 11 |
|    Notes | 12 |
|       A) | 12 |
|       B) | 12 |
|       C) | 13 |
|       D) | 13 |
| CONCLUSION | 14 |

# Table of Authorities

**Cases**

*Brentwood Acad. v. Tennessee Secondary School Athletic Ass'n,* 531 U.S. 288, 298 (2001) .......................... 11

*In re Cincinnati Radiation Litigation,* 874 F. Supp. 796, 804-805, 816-817 Dist. Court, SD Ohio 1995 .......... 13

*New York Times Co. v. U.S.,* 403 US 713 (1971) .......................... 13

*Terry v. Adams,* 345 U.S. 461, 482 (1953) .......................... 4, 10

*U.S. v. 12 200-ft. Reels of Super 8MM. Film,* 413 US 123, 126 (1973) .......................... 4, 6

*U.S. v. Flores-Montano,* 541 U.S. 149, 153 (2004) .......................... 4, 6

*U.S. v. Montoya De Hernandez,* 473, U.S. 531, 563-564 (1985) .......................... 4, 6

*US v. Ramsey,* 431 U. S. 606, 616 (1977) .......................... 4, 6

# ARGUMENT

## Definitions

The term "Platforms" refers to social media and search platforms and the corporations who own them, mentioned in the District Court Order, except Wikipedia and its owner, Wikimedia Foundation. This includes Apple, Alphabet (including Google, including YouTube), Facebook aka Meta (including Instagram and WhatsApp), Microsoft (including LinkedIn), Yahoo, and Reddit.

## The Defendants' Theories are Compatible with the Injunction

In essence, the Defendants simultaneously claim two things: a) that the government only provides the Platforms with information but does not instruct the Platforms on how to use that information, and b) that the inability to conduct censorship through the Platforms

would cause irreparable harm to them and the public, specifically from foreign-based threats. These two claims are difficult to reconcile with each other, but both are compatible with the injunction.

*"Providing Information"*

If the government only provides the Platforms with information without coercing or significantly encouraging action, as it claims, it should not limit this information provision to only a few companies. The government must give information equally to all interactive computer services providers, especially to the Platforms' smaller competitors, when they exist. In other words, the government should publish this information, which the injunction allows.

*Foreign-based threats must be stopped at the border*

The Defendants insinuate that they need to engage in the injuncted conduct to fight foreign governments' misinformation and/or foreign election interference in the US. But it is well established that before seeking a compromise between a compelling government interest and the rights of its citizens, the government must first exhaust measures that do not violate citizens' rights. This is especially pronounced in the case of the First Amendment.

The proper place to fight foreign misinformation and foreign interference is at the border. The government's powers are at a maximum at the border: *U.S. v. Flores-Montano*, 541 U.S. 149, 153 (2004); *U.S. v. Montoya De Hernandez*, 473, U.S. 531, 563-564 (1985); *U.S. v.*

5

*12 200-ft. Reels of Super 8MM. Film*, 413 US 123, 126 (1973) explicitly affirming the government's right to block content-based materials from entering the US at the border.

It is sometimes said that the internet has no boundaries. But this is also true of the land, ocean, and air. While not necessarily visible, the US has determined borders on land as well as in water and air. Internet packets from abroad cross the US border when they move from a router abroad to a router in the US. The US government may demand to inspect such internet packets upon arrival, for example. The US government can even block internet packets (and/or social media posts) that contain foreign government misinformation, involved in foreign election interference, or carry malware. "searches made at the border, pursuant to the longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border." (*U.S. v. Flores-Montano*, citing *US v. Ramsey*, 431 U. S. 606, 616 (1977))

But instead of using these obvious measures to defend against foreign threats, the Defendants have used foreign threats as a pretext to silence the speech of US citizens who oppose or criticize the current administration.

Coercion by threats of adverse legislation and regulation; Sen. Mark Warner Democratic Congresspersons have been pressuring and threatening the Platforms to censor conservatives since at least 2017. Senator Mark Warner (D-VI), ranking member of the Senate Sub Committee on Intelligence, apparently led this coercion campaign. The pressure

was supported by the proposed legislation and threats of additional legislation, adverse and dangerous to the Platforms, as is shown by the following examples:

*Senate Bill S.1989 Honest Ads Act*

Senate Bill S.1989 Honest Ads Act was introduced on 10/19/2017[1] by Sen. Amy Klobuchar (D-MN) and 32 co-sponsors, 31 of whom were Democrats, including Senator Mark Warner. The Bill would subject the Platforms to regulating electoral advertising, similar to the regulations of such advertising on TV and radio. This would pierce Section 230, sharply increase the Platforms' costs, and decrease the amount of advertising, including non-electoral advertising, due to the need to verify each advertiser and each ad. The Platforms thrive on many small advertisers (starting at less than $30), each placing many ads, sometimes auto-created.

On 05/07/2019, Sen. Klobuchar introduced a similar The HONEST Ads Act.[2]

*Oral Threats and Draft Policy Proposals by Senator Warner*

*Potential Policy Proposals for Regulation of Social Media and Technology Firms (Draft White Paper)*,[3] by Senator Mark Warner (D-VI),[4] contains a list of threatening legislation and regulations. Here are some proposals from this document:

---

[1] https://www.congress.gov/bill/115th-congress/senate-bill/1989

[2] https://www.congress.gov/bill/116th-congress/senate-bill/1356

[3] https://www.warner.senate.gov/public/_cache/files/d/3/d32c2f17-cc76-4e11-8aa9-897eb3c90d16/65A7C5D983F899DAAE5AA21F57BAD944.social-media-regulation-proposals.pdf

[4] https://defyccc.com/how-senator-mark-warner-coerced-big-tech/,

7

*"Make platforms liable for state-law torts (defamation, false light, public disclosure of private facts)..."* – this would be a kiss of death for the Platforms due to the billions of messages sent through them daily, many of which publicly disclose private facts or appear defamatory.

*"Duty to identify inauthentic accounts ... A law could be crafted imposing an affirmative, ongoing duty on platforms to identify and curtail inauthentic accounts..."* – this would be prohibitively expensive for the Platforms.

*"Data Transparency Bill ... One of the major problems identified among dominant platforms, for instance, is that the terms of the bargain – free services in exchange for access to consumer data – continue to be amended in favor of the platform. ... Lastly, data transparency would also assist antitrust enforcement agencies like the FTC and DOJ ..."* – bona fide antitrust enforcement would be the end of at least Google, Microsoft, and Meta.

The proposal also contained many other suggestions, including common sense ones, which would have adversely impacted the Platforms and decimated their market capitalization:

*"Essential Facilities Determinations"*

*"Privacy rulemaking authority at FTC"*

*"Comprehensive (GDPR-like) data protection legislation"*

---

https://defyccc.com/wp-content/uploads/Mark-Warner-Coercing-BigTech-since-2018.pdf,
https://www.axios.com/2018/07/30/mark-warner-google-facebook-regulation-policy-paper

*"Data Portability Bill"*

*"Interoperability – Imposing an interoperability requirement on dominant platforms"*

Following oral threats, this draft was "leaked" in July 2018, leading to significant changes in how the Platforms operate, subsequently stiffening conservative and Republican speech. After the Platforms yielded to the Senators' pressures, Bill S.1989 did not go forward, and none of the proposals from the draft have been implemented by either legislative or executive actions. In fact, instead of implementing any of the actions mentioned above adverse to the Platforms, the Democratic lawmakers started advocating for the Platforms. Some of them advocated protecting the Platforms from any consumer protection laws, claiming that Platforms' services of passing electronic messages between their customers are not subject to contract and consumer protection laws. Instead, they likened the Platforms to major newspapers, fancying that their consumers are their writers submitting their posts to the Platforms for editorial decision-making.

Public Function Test for State Action

*"Securing Elections"*

The Defendants admit that they employ the Platforms to secure elections. Securing elections is part of conducting elections, a classic example of applying the public function test – the state delegating traditionally exclusive state functions to putatively private parties. *Terry v. Adams*, 345 U.S. 461, 482 (1953): "an organization that took the form of

'voluntary association'... functioned as a part of the state's electoral machinery, we held it controlled by the same constitutional limitations."

Under this test, the Defendants would be violating the First Amendment by merely being aware of and allowing content-based speech discrimination by the Platforms, which they acknowledge.

*The National Security*

The most traditionally exclusive state function is national security. The Defendants admit that some of them (including the FBI, DHS, and CISA) delegated this function to the Platforms, at least partially. Controversies that shaped the public function and joint participation tests were about parks and universities. Here, the Defendants pervasively entwined with and/or delegated to the Platforms functions of national security, law enforcement, and, possibly, defense! Undoubtedly, the Defendants violate the First Amendment, using putatively private Platforms as a cover.

There is also an element of significant encouragement for the Platforms to act together with the FBI, DHS, and CISA, in providing services to their customers. The Platforms can and do deplatform their critics, disgruntled customers, and whistleblowers and use the pretext of national security protection, implicitly smearing their opponents as potential criminals or foreign actors. This allows the Platforms to mistreat their customers and even commit fraud.

Joint Participation and Pervasive Entwinement

Only due to the recent details obtained in this litigation can one understand how the Platforms have received a pass from the public, courts, and juries for so long. The Platforms have been pervasively entwined with the government, including the Department of Justice and the Department of Homeland Security. Thus, the Platforms' victims and critics have been perceived as enemies of the state.

This is pervasive entwinement (as in *Brentwood Acad. v. Tennessee Secondary School Athletic Ass'n,* 531 U.S. 288, 298 (2001)) on steroids.

The Platforms are vulnerable to government regulations

The Platforms are subject to regulations by multiple government agencies, including FTC, FCC, SEC, etc. For example, breaking up the Platforms due to antitrust concerns is always on the agenda. The Platforms' use of third parties' intellectual property also continues to be a contentious issue. This makes the Platforms uniquely vulnerable to government coercion and significant encouragement.

Further, the Platforms operate worldwide and derive most of their revenues abroad. The US government can choose to protect or not to protect Platforms from foreign governments' attempts to harm them directly or through their advertisers.

Foreign governments' regulation of the Platforms, which influences the Platform's conduct in the US, is a subject that is out of this litigation's scope.

Notes

A)

Many legal professionals, including judges, regularly use Platform services, sometimes even unwarily. For example, almost all smartphones use Google search. Most smartphones use Google Android OS with many other Google services. Nearly all smartphones use either Google Android or Apple iOS.

Even if these professionals are aware of their Platform use, they are unaware of the extent of covert manipulations to which the Platforms subject the information displayed. For example, all information on the legal subjects of interest to the leading Platforms are especially carefully curated to benefit the Platforms. Similarly, most news media receive their information from the Platforms as well, sometimes in parallel with cash or in-kind funding by the Platforms.[5]

B)

Unlike almost all precedents from the last hundred years, in this case, the government agencies censor political speech (the top tier of speech), truthful speech (which has higher First Amendment protection than untruthful speech), and medical information from licensed physicians (possibly without precedent). Further, the Defendants' actions are a prior restraint on speech, as in New York Times Co. v. U.S., 403 US 713 (1971) but without legitimate purposes. Further, Defendants demand and obtain extrajudicial punishment of

---

[5] https://defyccc.com/how-google-funds-fake-news-media2/ | https://archive.is/ZuJrp

the unfavored speakers by de-platforming, i.e., eliminating the speaker from the Platform. The de-platformed speaker loses his/her audience, which is an interest or goodwill possibly worth millions of dollars, copyright interest in his/her content on the Platform, and suffers from defamation and other deprivations.

C)

In July 2021, the media reported that the Biden administration was attempting or carrying out censorship of SMS / text messages sent through wireless carriers. It used groups affiliated with the Democratic party, including the Democratic National Committee.[6] The DNC acknowledged its participation but claimed that the conduct was directed only at text messages sent "in masse". The DNC also denied the connection to the Biden administration.[7]

D)

Pervasive government censorship of COVID-19 vaccine information has broader consequences than violating the First Amendment. The COVID-19 vaccination is sponsored or entirely conducted by the government. Government-sponsored medical procedures can be performed only with the patient's informed consent, per *In re Cincinnati Radiation Litigation*, 874 F. Supp. 796, 804-805, 816-817 Dist. Court, SD Ohio 1995. This requirement

---

[6] https://legalinsurrection.com/2021/07/report-biden-dnc-want-sms-carriers-to-monitor-private-text-messages-for-vaccine-lies/ | https://archive.is/zhDdG,
https://www.politico.com/news/2021/07/12/biden-covid-vaccination-campaign-499278 | https://archive.is/Cz3Cx

[7] https://www.usatoday.com/story/news/factcheck/2021/07/15/fact-check-biden-doesnt-want-monitor-texts-vaccine-misinfo/7970807002/ | https://archive.is/ZXsL6

derives from the Due Process Clause of the Constitution and cannot be bypassed by an EUA or any other document.

Pervasive censorship of vaccine information makes giving informed consent impossible.

This is a rights violation for which government officials cannot assert qualified immunity (*In re Cincinnati Radiation Litigation*, 820-822). They can be sued and criminally charged (*In re Cincinnati Radiation Litigation*, 820-822) in an individual capacity.

The Defendants' attorneys might want to advise their clients about the law rather than possibly conspiring with them to violate it.

## CONCLUSION

The heart of this case is not the government's communication with the Platforms, but the government coercion, significant encouragement, and joint participation with the Platforms in illegal censorship and other Constitutional violations. The injunction on some communications from the Defendants to the Platforms is a means to minimize this unlawful activity. Thus, the injunction entered by the District Court is proper and necessary to protect the First Amendment rights of the Plaintiffs and other persons represented by the Plaintiffs.

**August 2, 2023**

Respectfully submitted,



---

Leonid Goldstein, *pro se*

4400 Troup Hwy, #508

Tyler, TX 75703

Leo5533@att.net

(408) 921-1110

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the typeface requirements of Rule 32(a)(5) and the typestyle requirements of Rule 32(a)(6) because this brief was prepared in proportionally spaced typeface using Microsoft Word in 14-point font. This brief complies with the type-volume limitation of Rule 32(g) because it contains 2,300 words, excluding the parts exempted under Rule 32(f).



_____

Leonid Goldstein

## CERTIFICATE OF SERVICE

I certify that I served all participants in this case by email on August 3, 2023. Additionally, all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.



_____

Leonid Goldstein



FedEx Express

XN NEWA
70130 MSY LA-US

TRK# 7820 0317 5499  1020

PRIORITY OVERNIGHT
FRI – 04 AUG 10:30A

REF: 378534G

To: CLERK OF THE COURT
600 S MAESTRI PLACE
SUITE 115
NEW ORLEANS LA 70130
(504) 310-7700

ORIGIN ID:TYRA  (408) 921-1110
LEONID GOLDSTEIN
4400 TROUP HWY APT 508
TYLER, TX 75703
UNITED STATES US

SHIP DATE: 03AUG23
ACTWGT: 3.00 LB
CAD: 8997767/SSF02422

BILL CREDIT CARD

RT 117    4    B
FZ 119  10:30
        5499
        08.04

Align top of FedEx Express® shipping label here.