No. 23-30445

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

STATE OF MISSOURI; STATE OF LOUISIANA; AARON KHERIATY;
MARTIN KULLDORFF; JIM HOFT; JAYANTA BHATTACHARYA; JILL HINES,

Plaintiffs-Appellees,

v.

JOSEPH R. BIDEN, JR.; VIVEK H. MURTHY; XAVIER BECERRA;
DEPARTMENT OF HEALTH & HUMAN SERVICES; ANTHONY FAUCI, et al.,

Defendants-Appellants.

On Appeal from the United States District Court
for the Western District of Louisiana

## REPLY BRIEF FOR APPELLANTS

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney*
  *General*

BRANDON BONAPARTE BROWN
  *United States Attorney*

DANIEL TENNY
DANIEL WINIK
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7245*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-8849*

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ...........................................................................ii

INTRODUCTION AND SUMMARY ...........................................................1

ARGUMENT ..............................................................................................2

I. Plaintiffs Fail To Show They Are Likely To Succeed On The Merits ...................2

    A. Plaintiffs Lack Standing ..........................................................................2

    B. Plaintiffs Fail To Show A First Amendment Violation...............................6

II. Plaintiffs Fail To Rehabilitate The District Court's Abuse Of Its Equitable Discretion.............................................................................................. 20

    A. Plaintiffs Fail To Substantiate Their Assertion Of Irreparable Harm........................................................................................20

    B. Plaintiffs Fail To Justify The Injunction's Breadth....................................22

    C. The Injunction Will Significantly Harm The Government And The Public Interest................................................................................23

III. The Injunction Lacks The Required Specificity.................................... 24

CONCLUSION ......................................................................................... 27

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Adickes v. S. H. Kress & Co.*,
 398 U.S. 144 (1970) ............................................................ 15, 16

*Already, LLC v. Nike, Inc.*,
 568 U.S. 85 (2013) ....................................................................5

*Backpage.com, LLC v. Dart*,
 807 F.3d 229 (7th Cir. 2015) .................................................13

*Bantam Books, Inc. v. Sullivan*,
 372 U.S. 58 (1963) .................................................................13

*Blum v. Yaretsky*,
 457 U.S. 991 (1982) ............................................................ 8, 15

*Brentwood Academy v. Tennessee Secondary School Athletic Association*,
 531 U.S. 288 (2001) ......................................................16-17, 19

*Charles v. Johnson*,
 18 F.4th 686 (11th Cir. 2021) .............................................. 17, 18

*Collins v. Womancare*,
 878 F.2d 1145 (9th Cir. 1989) ...............................................17

*Cramer v. Skinner*,
 931 F.2d 1020 (5th Cir. 1991) ..................................................5

*Dow Jones & Co., In re*,
 842 F.2d 603 (2d Cir. 1988) ......................................................5

*Frazier v. Board of Trustees of Northwest Mississippi Regional Medical Center*,
 765 F.2d 1278 (5th Cir. 1985) ........................................14, 15, 17

*Gallagher v. Neil Young Freedom Concert*,
 49 F.3d 1442 (10th Cir. 1995) ................................................17

*Georgia v. Pennsylvania Railroad Co.*,
 324 U.S. 439 (1945) ..................................................................4

*Gill v. Whitford*,
 138 S. Ct. 1916 (2018) ..............................................................2

*Haaland v. Brackeen,*
 143 S. Ct. 1609 (2023) ...........................................................................3

*Kowalski v. Tesmer,*
 543 U.S. 125 (2004)...............................................................................3

*Louisiana v. Biden,*
 45 F.4th 841 (5th Cir. 2022) .........................................................25, 26

*Lugar v. Edmondson Oil Co.,*
 457 U.S. 922 (1982)..............................................................................16

*Manhattan Community Access Corp. v. Halleck,*
 139 S. Ct. 1921 (2019) ........................................................................18

*Massachusetts v. EPA,*
 549 U.S. 497 & n.17 (2007) ...................................................................4

*Moose Lodge No. 107 v. Irvis,*
 407 U.S. 163 (1972)..............................................................................15

*NCAA v. Tarkanian,*
 488 U.S. 179 (1988)..............................................................................17

*Nebraska v. Wyoming,*
 515 U.S. 1 (1995)....................................................................................4

*Okwedy v. Molinari,*
 333 F.3d 339 (2d Cir. 2003) ................................................................13

*O'Handley v. Weber,*
 62 F.4th 1145 (9th Cir. 2023) ..............................................................14

*Parks School of Business, Inc. v. Symington,*
 51 F.3d 1480 (9th Cir. 1995) ...............................................................18

*Pennsylvania Family Institute, Inc. v. Black,*
 489 F.3d 156 (3d Cir. 2007) ..................................................................5

*Roberts v. Louisiana Downs, Inc.,*
 742 F.2d 221 (5th Cir. 1984) ...............................................................19

*Sisney v. Kaemingk,*
 15 F. 4th 1181 (8th Cir. 2021) ...............................................................5

*Skinner v. Railway Labor Executives' Association,*
    489 U.S. 602 (1989) ...................................................................................16

*TransUnion LLC v. Ramirez,*
    141 S. Ct. 2190 (2021) ..............................................................................3

*United States v. Mekjian,*
    505 F.2d 1320 (5th Cir. 1975) ...................................................................16

*United States v. Reed,*
    15 F.3d 928 (9th Cir. 1994) .......................................................................16

*United States v. Stein,*
    541 F.3d 130 (2d Cir. 2008) ......................................................................19

*Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,*
    425 U.S. 748 (1976) ...................................................................................5

## INTRODUCTION AND SUMMARY

Plaintiffs' efforts to defend the district court's injunction only underscore its deficiencies. Plaintiffs, like the district court, fail to identify any concrete and specific threats by defendants that were directed toward particular actions by social-media companies. Instead, in effect, they ask the Court to treat all content moderation by those private entities as government action subject to the First Amendment.

Their argument is factually and legally baseless. Plaintiffs' theories of Article III standing would install the district court as the general arbiter of government interactions with social-media platforms—a role beyond the federal courts' constitutional bounds. On the merits, plaintiffs cannot overcome a basic problem: While plaintiffs focus on events since President Biden's inauguration in 2021, much of the challenged content moderation by platforms occurred before then. Plaintiffs are thus forced to allege that content-moderation actions before 2021 were infected by a *congressional* pressure campaign. But this is not a lawsuit against Members of Congress, who in any event would be entitled (just as Executive Branch officials are) to consider and discuss legislation concerning social-media companies based on perceived inadequacies in their self-regulation.

Plaintiffs also refuse to grapple with the legal and practical consequences of their position. They do not acknowledge that their capacious understanding of state action would subject a wide range of actions by private companies to First Amendment scrutiny. They dismiss the separation-of-powers concerns raised by the district court's effort

to superintend communications on behalf of the President. And they attempt to give the injunction greater specificity largely by urging implausibly narrow interpretations of its exemptions, exacerbating its profound overbreadth problem.

The preliminary injunction should be reversed.

## ARGUMENT

### I.     Plaintiffs Fail To Show They Are Likely To Succeed On The Merits

#### A.     Plaintiffs Lack Standing

To demonstrate standing, plaintiffs must show that they face a threat of imminent injury that is traceable to defendants' conduct and redressable by a favorable decision. But they largely ignore those requirements in favor of general allegations that private companies' past content-moderation decisions have affected them, paired with legal arguments that they are therefore entitled to challenge any government action, by any agency, relating to or responding to speech on that general subject. "'[S]tanding is not dispensed in gross,'" *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018), so plaintiffs must show that a remedy against each defendant would redress an imminent and nonspeculative future injury. And plaintiffs cannot demonstrate standing at all based on past injuries or injuries attributable to the independent decisions of third parties not before the Court, such as social-media platforms or Members of Congress.

1.     The plaintiff States relegate to the end of their discussion of standing the *parens patriae* rationale on which the district court primarily relied. They instead emphasize two novel theories of standing, both mistaken.

First, the plaintiff States advance (Br. 28-29) a theory of "third-party standing." This argument defies the Supreme Court's recent rejection of a State's effort to "assert third-party standing" as a "thinly veiled attempt to circumvent the limits on *parens patriae* standing," *Haaland v. Brackeen*, 143 S. Ct. 1609, 1640 n.11 (2023).

It is also mistaken on its own terms. Plaintiffs rightly acknowledge that third-party standing—even for entities, unlike the States, that have First Amendment rights—only allows parties "to assert the First Amendment rights of others to vindicate *their own* injuries." Br. 28; *see Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) (courts have "'allowed standing to litigate the rights of third parties when enforcement of the challenged restriction *against the litigant* would result indirectly in the violation of third parties' rights'"). Thus, at most, the doctrine allows the plaintiff States to assert their citizens' First Amendment rights in the course of challenging government actions that lead to platforms' moderation of *the States' own* social-media posts. It therefore fails to address the flaw noted in the opening brief (at 18): The States have not even alleged that they intend to make future posts that might be subject to content moderation (much less content moderation at the federal government's behest).

Second, the plaintiff States assert an injury to their right to "hear their citizens," a right they derive from the "Tenth Amendment and the structure of the Constitution." Br. 31. But any such injury cannot support their request for relief on a *First Amendment* claim. *See, e.g., TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021) ("[P]laintiffs

must demonstrate standing for each claim that they press and for each form of relief that they seek.").

When they finally turn to the district court's theory of *parens patriae* standing, the States assert (Br. 31) a "quasi-sovereign interest, enforceable against the federal government, in defending the rights of millions of their citizens." But although States can assert their own sovereign interests—such as interests in their own land or water, *Nebraska v. Wyoming*, 515 U.S. 1, 20 (1995), or their own federal statutory rights, *Massachusetts v. EPA*, 549 U.S. 497, 520 & n.17 (2007)—they cannot assert their citizens' constitutional rights against the federal government (*see* Opening Br. 13-15). That is because "the United States, not [a] State, represents [its] citizens as *parens patriae* in their relations to the federal government." *Georgia v. Pennsylvania R. Co.*, 324 U.S. 439, 446 (1945). This rule is not limited to challenges to federal statutes, as plaintiffs suggest (Br. 33); the Supreme Court in *Georgia* referred to "federal statutes" only in discussing the facts of two prior cases that presented challenges to federal statutes. *Id.* at 446-447.

2.    Both the individual plaintiffs and the States also rely heavily on a "right to listen" theory. But the district court declined to adopt that theory and rejected its premise: In denying class certification, the court stated that "[w]hile the Individual Plaintiffs detail at length their own censorship, they do not clarify how they have been harmed by the censorship of other users." ROA.26606.

The district court was correct not to adopt the theory, which lacks any limiting principle; it would allow any alleged First Amendment violation to be litigated by anyone who asserted an intention to listen to the allegedly suppressed speech. That is the sort of "boundless theory of standing" that the Supreme Court has consistently rejected. *Already, LLC* v. *Nike, Inc.*, 568 U.S. 85, 99 (2013). The cases on which plaintiffs rely involve a much tighter connection between the challenged conduct and the alleged injury: In each, a court held that when the government prohibits a particular type of communication, the intended recipient of the communication can challenge the prohibition so long as the speaker would speak but for the prohibition and the inability to hear the message causes identifiable harm. *See Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976) (prohibition on advertising the price of prescription drugs, challenged by consumers); *Cramer v. Skinner*, 931 F.2d 1020 (5th Cir. 1991) (prohibition on certain advertising for air travel, challenged by traveler); *Sisney v. Kaemingk*, 15 F. 4th 1181 (8th Cir. 2021) (prohibition on prisoner's receipt of erotic material, challenged by prisoner); *Pennsylvania Family Inst., Inc. v. Black*, 489 F.3d 156 (3d Cir. 2007) (per curiam) (alleged prohibition on responding to questionnaire for judicial candidates, challenged by questionnaire's proponent); *In re Dow Jones & Co.*, 842 F.2d 603 (2d Cir. 1988) (prohibition on trial participants communicating with the press, challenged by the press). Plaintiffs identify no case holding that a party can challenge any

government action that allegedly restricts information to which the party would otherwise be exposed, much less that such a suit may be brought where, as here, the effect of any challenged action on any particular communication is speculative at best.

The individual plaintiffs also cannot support even their narrower theory of standing based on their own speech (which, in any event, would not justify the broad injunction the district court issued).  As we explained in the opening brief (at 16-17), the past content moderation of which plaintiffs complain was premised on policies developed by platforms before much of the alleged government conduct that plaintiffs seek to challenge (including all the alleged White House conduct), and plaintiffs offered only conclusory assertions of ongoing and future harm caused by the government. Plaintiffs recite the district court's findings without attempting to rebut our explanation of their factual and legal deficiencies.

### B.    Plaintiffs Fail To Show A First Amendment Violation

Plaintiffs equally fail to rehabilitate the district court's analysis of the merits.

1.    Plaintiffs recite (Br. 34-36) the district court's findings that various governmental "communications were coercive threats," but they make virtually no attempt to rectify the numerous legal and factual deficiencies identified by our opening brief. Instead, plaintiffs double down on the theory that the government's communications were coercive based on the background potential for "'legislation'"—namely, repeal or modification of Section 230 of the Communications Decency Act—that would "'adverse[ly]'" affect platforms (Br. 34).

In so doing, plaintiffs do not address our discussion of how radically this argument would expand the coercion doctrine. Plaintiffs make much of the fact that government officials sometimes mentioned potential legislative changes to Section 230 when discussing the problem of online misinformation. But of course they did—the point of Section 230 is to shield platforms from liability for hosting user-created content, so the concern that this liability shield promotes the dissemination of harmful content would naturally motivate discussion of potential changes to the law's scope. To say that government officials cannot discuss legislative changes to Section 230 if they do so in the context of addressing harmful online content is like saying government officials cannot talk about increasing the minimum wage if they do so in the context of addressing poverty. Plaintiffs' challenge to discussions of potential legislation is particularly odd because it is aimed at Executive Branch officials, who cannot unilaterally enact legislation.

Plaintiffs also pitch their argument at far too high a level of generality, treating virtually any discussion with social-media companies as a demand for "censorship." Plaintiffs now admit, for example, that an email from the then-White House Digital Director addressed President Biden's own Instagram account, not content by any other speaker—yet they continue to treat the email as an example of coercion. Br. 44. They likewise treat as coercive statements that merely sought information from platforms, *see* Br. 11, or that explicitly disclaimed any effort to encourage the removal of content, *see* ROA.9393 ("We certainly recognize that removing content that is unfavorable to the

cause of increasing vaccine adoption is not a realistic—or even good—solution."), *cited in* ROA.26473.

The Supreme Court has rejected this sort of broad-brush theory of coercion, instead requiring plaintiffs to show that coercion was tied to "the specific conduct of which" they "complain[]." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982). The Court held, in particular, that state regulation of nursing homes was insufficient to make the State "responsible for the decision to discharge or transfer particular patients," *id.* at 1008, even though the regulations exerted more generalized pressure on the nursing homes' transfer decisions (*see* Opening Br. 22). If plaintiffs' theory were the law, the Court would have reached the opposite conclusion.

Resisting the rule that a request must be backed by a specific threat in order to be coercive, plaintiffs argue that a "backdrop" of supposed threats meant that "[t]here was no need for federal officials to spell out the threats every time they made a specific demand." Br. 42-43. But that theory has no logical endpoint; according to plaintiffs, any effort by a government official to persuade a private entity is coercive if, in the past, *other* government officials have made what plaintiffs label "threats." There is a reason plaintiffs cite no case adopting this theory.

Finally, plaintiffs' sweeping approach is not limited to the particular defendants here, or even to the Executive Branch. As we explained (Opening Br. 32), plaintiffs' theory has a glaring chronological flaw: In plaintiffs' telling, the Biden Administration was the predominant if not exclusive source of allegedly coercive communications, yet

much of the content moderation of which plaintiffs complain took place before the Administration began. Plaintiffs' response is to suggest, repeatedly, that pre-2021 statements by "members of Congress[] and key congressional staffers" transformed communications from various Executive Branch officials into coercive threats. Br. 36; *see* Br. 44, 46-47. But plaintiffs identify no basis for holding that a government official or agency violated the Constitution as a result of some prior communication or set of prior communications by an official (or even a "key … staffer[]") of a different branch of government.

2.    Plaintiffs likewise make little effort to address the district court's factual inaccuracies. Indeed, they go so far as to state on the first page of their brief that "[t]he district court's 82 pages of detailed factual findings are effectively unrebutted," notwithstanding the many rebuttals both in our opening brief and in our district-court filings (*e.g.*, ROA.24383-25105).

Plaintiffs cite, for example, the district court's various findings that government officials "explicitly tied … threats to demands for greater censorship" (Br. 35 (emphasis omitted)). But as we pointed out in our opening brief (at 30-31), the cited paragraph attributes to the White House Press Secretary words that she simply did not utter in the cited briefing. *Compare* ROA.26476 ("Psaki publicly reminded … social-media platforms of the threat of 'legal consequences' if they do not censor misinformation more aggressively."), *with* ROA.23764-23791 (no such threat and no use of the words "legal consequences"). Plaintiffs do not dispute the inaccuracy. They nonetheless urge this

Court to accept uncritically the district court's characterization of the briefing, as well as numerous other similarly unfounded characterizations.

Plaintiffs invoke, for example, the district court's finding that "then-White House Press Secretary Jen Psaki … linked the threat of a 'robust anti-trust program' with" a "demand" for "censorship," ROA.26476. She did nothing of the sort. What actually happened is that she was asked to respond to Senator Ted Cruz's criticism of Facebook's decision to deplatform former President Trump—in particular, Senator Cruz's view that "'if the Big Tech oligarchs [could] muzzle the former President,'" they could "'silenc[e]'" other citizens as well. ROA.23778. The Press Secretary made several points in response—one of which was that Facebook's decision was made by "an independent board[]," another of which was that the President believes "major platforms have a responsibility … to stop amplifying untrustworthy content," and another of which was that the President "supports better privacy protections and a robust anti-trust program." ROA.23778. In that context, the Press Secretary's references to "better privacy protections and a robust anti-trust program" did not suggest that she was threatening consequences in the event that platforms chose to "amplify[] untrustworthy content." Rather, the context makes clear that the Press Secretary mentioned antitrust law— which ensures that platforms continue to compete with each other along numerous dimensions, including content-moderation practices—in response to Senator Cruz's observation that "Big Tech oligarchs" could sufficiently dominate the online marketplace of ideas that they could "silenc[e]" views they disfavored.

Much the same is true of the district court's finding (ROA.26480, *cited in* Plaintiffs' Br. 35) that, at a later press briefing, "Psaki again … link[ed]" a "threat … to amend Section 230" with "platforms' failure to censor misinformation and disinformation." In that briefing, the Press Secretary was asked to comment on Elon Musk's acquisition of Twitter and the potential that former President Trump's Twitter account might be restored as a result.  ROA.784.  She responded that "[n]o matter who owns or runs Twitter, the President has long been concerned about the power of large social media platforms, … has long argued that tech platforms must be held accountable for the harms they cause," and "has been a strong supporter of fundamental reforms to achieve that goal, including reforms to Section 230, enacting antitrust reforms, requiring more transparency, and more."  ROA.784-785.  The district court's treatment of this discussion of the President's views on policies affecting social-media platforms as a "threat" of adverse consequences for "failure to censor" reflects a fundamental misreading of the factual record, a fundamental misunderstanding of the President's authority to express his views on policy matters, or both.

Plaintiffs' other examples similarly lack record support.  Take their invocation (Br. 34-35) of the district court's finding that a presidential memorandum "threatened social-media platforms with adverse legal consequences if the platforms did not censor aggressively enough," ROA.26481.  It is difficult even to guess what the district court meant by that characterization.  Nothing in the memorandum—which established the White House Task Force to Address Online Harassment and Abuse (ROA.16889-

16893)—could be regarded as "threaten[ing] social-media platforms with adverse legal consequences" for "not censor[ing] aggressively enough," ROA.26481. The memorandum mentions potential changes to the legal regime only in charging the task force with "examining existing Federal laws, regulations, and policies to evaluate the adequacy of the current legal framework to address technology-facilitated gender-based violence." ROA.16892. And even that line—which did not "threaten[]" changes to existing laws (ROA.26481), let alone condition such a threat on the platforms' actions—encompassed potential changes to increase accountability for the *perpetrators* of online gender-based violence.

In a similar vein, plaintiffs insist that "Twitter declined to deplatform Alex Berenson for months but succumbed immediately after White House threats"—a statement they base on two passages from the district court's opinion, neither of which supports it. Br. 35-36. The first (ROA.26473 & n.78) cites an article by Berenson (ROA.16181-16184) entitled "The White House privately demanded Twitter ban me months before the company did so." As its title makes clear, Berenson's account (even if credited) undermines plaintiffs' contention that Twitter "succumbed immediately." The second (ROA.26479) refers to a July 16, 2021, statement by President Biden (ROA.22889) that concerned Facebook, not Twitter, and never mentioned Berenson.

Plaintiffs' resort to a string of out-of-context quotations and bald assertions is most telling because it highlights what is *missing* from the record. Plaintiffs do not marshal record evidence of even a single instance in which a government official threatened

a platform with prosecution, a regulatory sanction, or any other legal consequence if it refused to remove content. Nor do they identify any evidence that a government official imposed such a sanction in retaliation for a platform's refusal to act as the government supposedly wished. Plaintiffs do not dispute the absence of any such evidence; they simply chalk it up (Br. 42) to the supposed fact that "the platforms ultimately *complied* with federal demands." But plaintiffs make no effort to square that reasoning with the evidence (discussed in our opening brief, at 29-30 and 31-32) that platforms routinely declined to take content-moderation actions suggested by the government.

This case thus starkly contrasts with the others on which plaintiffs rely. In *Backpage.com, LLC v. Dart*, 807 F.3d 229 (7th Cir. 2015), for example, a law-enforcement officer sent a letter requesting that a private company "cease and desist" from engaging in certain conduct and implying that the conduct could be criminal. *Id.* at 231-232. In *Okwedy v. Molinari*, 333 F.3d 339 (2d Cir. 2003) (per curiam), a government official identified two billboards as offensive, noted that the billboard company "derive[d] substantial economic benefits from" its billboards in his jurisdiction, and asked the company to contact his legal counsel. *Id.* at 341-342. And in *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963), a state agency identified particular books as "objectionable" in a notice to distributors that emphasized the agency's "duty to recommend … prosecution of purveyors of obscenity" and then followed up by having a police officer visit to see what action was taken. *Id.* at 61-63. In each case, the government directly urged a private entity to take a particular action, and the court determined (or, in *Okwedy*, found

plausible at the motion-to-dismiss stage) that the government was threatening to take regulatory or enforcement action if a private entity did not accede to its request. Plaintiffs identify no evidence of that here.

3.      Plaintiffs do not salvage their First Amendment claim by invoking (Br. 38-42) other branches of state-action doctrine.

As our opening brief explains (at 25), "significant encouragement" does not mean any action by the government that makes a private entity more likely to do something; it simply refers to the government's dictating a private party's choices through "positive incentives" as opposed to threats of negative consequences. *O'Handley v. Weber*, 62 F.4th 1145, 1158 (9th Cir. 2023), *petition for cert. filed*, No. 22-1199 (June 8, 2023). It would otherwise be difficult to see why the Supreme Court established a "coercion" standard for state action at all; as understood by plaintiffs and the district court, a "significant encouragement" threshold would always be lower and easier to satisfy on the same facts. *See* Opening Br. 25. Nothing in the record (or even plaintiffs' characterization of it) suggests any attempt by government officials to give platforms "positive incentives" for content moderation, so the significant-encouragement doctrine is irrelevant here.

Plaintiffs' contrary argument (Br. 38-39) does not identify any case that has found "significant encouragement" in circumstances like those here. In *Frazier v. Board of Trustees of Northwest Mississippi Regional Medical Center*, 765 F.2d 1278 (5th Cir. 1985), this

Court rejected the argument that "by virtue of their contractual and operational relations with a county hospital, a private employer and some of its employees acted 'under color of state law' within the meaning of 42 U.S.C. § 1983." *Id.* at 1280. The Court observed that "private conduct is fairly attributable" to a State "only when the state has had some affirmative role, albeit one of encouragement short of compulsion, in the particular conduct underlying a claimant's civil rights grievance," *id.* at 1286 (footnote omitted). Plaintiffs seize on a clause of that passage to suggest that "encouragement short of compulsion" suffices to show state action. But that language was simply accommodating civil-rights cases like *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163 (1972)—cited in a footnote appended to the relevant clause—that had recognized that "the application of state sanctions to enforce [a discriminatory private rule] would violate the Fourteenth Amendment," *id.* at 179, because it would "foster or encourage racial discrimination," *id.* at 176-177. It did not purport to read *Blum*'s reference to a government's having "exercised coercive power or … provided … significant encouragement," 457 U.S. at 1004, to mean "exercised coercive power or [something short of coercive power]"—which would be nonsensical.

The Supreme Court's decision in *Adickes v. S. H. Kress & Co.*, 398 U.S. 144 (1970), likewise deals with completely distinct theories of state action. The question there was whether the summary-judgment record created a genuine issue of fact as to whether a restaurant's refusal to serve a customer on the basis of her race was state action because

an employee of the restaurant entered into "a conspiracy" with a police officer. *Id.* at 152. The case has nothing to do with "significant encouragement."

Plaintiffs also invoke a series of cases—*Skinner v. Railway Labor Executives' Association*, 489 U.S. 602 (1989), *United States v. Mekjian*, 505 F.2d 1320 (5th Cir. 1975), and *United States v. Reed*, 15 F.3d 928 (9th Cir. 1994)—involving the distinct question of when a private party's search should be attributed to the government and thus subject to the Fourth Amendment. Courts have recognized that, "to insure that" the "safeguards" of the Fourth Amendment "are not evaded by circuities," a private search can be attributed to the government under circumstances that would not cause the government to be responsible for other types of private action—for example, where law-enforcement officers merely "stand by watching" a search "with approval." *Mekjian*, 505 F.2d at 1327. But state-action standards depend on "context[]," *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 939 (1982), and there is no support for plaintiffs' apparent view that the standards applicable to a search apply here. Indeed, in many cases in which a state-action theory has been rejected, the government could be described as "stand[ing] by watching with approval," *Mekjian*, 505 F.2d at 1327.

Plaintiffs equally err in invoking the "joint participation" and "pervasive entwinement" theories (variations on the same theme). As our opening brief explained (at 26-27), those theories can support treating private entities as governmental actors if they are in effect run by the government, *see Brentwood Acad. v. Tennessee Secondary Sch. Athletic*

*Ass'n*, 531 U.S. 288, 296-297 (2001), or the government "provide[s] a mantle of authority that enhance[s] the[ir] power," *NCAA v. Tarkanian*, 488 U.S. 179, 192 (1988), but neither is true here.

In most of the cases on which plaintiffs rely, courts applied these principles to *reject* the argument that private action should be attributed to the government. In *Frazier*, discussed above, this Court rejected a joint-participation argument because a private employer "retained ultimate control over its own personnel" notwithstanding its broader contractual and operational relationship with a state entity. 765 F.2d at 1287-1288. In *Tarkanian*, the Supreme Court held that the NCAA was not a state actor in promulgating standards of conduct and investigating violations, even though a state entity had adopted the standards and played a "role in their formulation." 488 U.S. at 193-199. In *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442 (10th Cir. 1995), the Tenth Circuit rejected various theories that a private security contractor had engaged in state action when it conducted pat-down searches of concert attendees, even though the state entity "established general obligations to provide security," the state entity and the security contractor "shared [a] common goal," and the state entity's own security officers "observed the searches." *Id.* at 1455. In *Collins v. Womancare*, 878 F.2d 1145 (9th Cir. 1989), the Ninth Circuit held that employees of a reproductive health clinic did not engage in joint action with the State even when a police officer issued "citations based on the citizen's arrests" they had conducted. *Id.* at 1156. In *Charles v. Johnson*, 18 F.4th 686 (11th Cir. 2021), the Eleventh Circuit held that a bystander to an arrest did not act

- 17 -

jointly with the State when he asked a police officer whether the officer could "'get a cuff on'" an arrestee. *Id.* at 697. And in *Parks School of Business, Inc. v. Symington*, 51 F.3d 1480 (9th Cir. 1995), the Ninth Circuit held that a State's "designated guarantor of student loan programs" did not engage in state action, even though its "activities benefit[ed] … the State's residents," because it had no "sovereign powers" and did not "derive its authority from the State." *Id.* at 1483, 1486. Plaintiffs seize on snippets of language from these decisions (Br. 40-42), but the language is meaningful only once placed in context—a context in which, in each of these cases, courts rejected arguments like plaintiffs'.

And there is good reason the courts rejected those arguments. As our opening brief explained (at 28-29), treating private conduct as state action means subjecting the private entity to the constitutional constraints placed on government behavior. Here, that would mean private social-media companies would need to conform their conduct to the First Amendment and could otherwise be subject to injunctions. As our opening brief noted (*id.*), the Supreme Court has admonished courts against "eviscerat[ing] certain private entities' rights to exercise editorial control over speech and speakers on their properties or platforms" by subjecting those choices "to the constraints of the First Amendment." *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1932-1933 (2019). Plaintiffs have no response.

Against this great weight of authority, plaintiffs muster only a handful of cases where courts *did* find state action on a joint-participation theory, and all involved one

of the key features lacking here—effective operation by the government or the exercise of governmental power. In *Roberts v. Louisiana Downs, Inc.*, 742 F.2d 221 (5th Cir. 1984), this Court found state action where "[a]n official in a position created by statute [was] required to perform a duty … under the supervision of state officials who [were] continuously on the situs of the regulated business[] and ha[d] the power to override decisions of the management of the regulated business." *Id.* at 228. The government wields no such power here. In *Brentwood Academy*, the Supreme Court held that a school athletic association, though "nominally private," was a state actor because, among other things, it was "not an organization of natural persons acting on their own, but of schools," mostly "public schools." 531 U.S. at 298. The government does not constitute any part of any private organization in this case. And in *United States v. Stein*, 541 F.3d 130 (2d Cir. 2008), the Second Circuit held that federal prosecutors had effectively forced a private company to engage in "a joint project with the government to advance government prosecutions" by restricting the circumstances in which it would pay its employees' legal fees, *id.* at 147, where the company, "faced with the fatal prospect of indictment," "could be expected to do all it could … to placate and appease the government," *id.* at 142. No comparable circumstances exist here.

## II.    Plaintiffs Fail To Rehabilitate The District Court's Abuse Of Its Equitable Discretion

Aside from their failure to show a likelihood of success on the merits, plaintiffs fail to persuasively respond to our arguments about the profound flaws in the district court's equitable analysis.

### A.    Plaintiffs Fail To Substantiate Their Assertion Of Irreparable Harm

As our opening brief explained (at 43-44), the district court conflated the injury-in-fact required for Article III standing with the irreparable injury required for a preliminary injunction, ignoring the heightened standard of proof for the latter.  Plaintiffs yet again respond by doubling down on the district court's error.  Their irreparable-injury argument repeatedly cites the district court's standing analysis (Br. 50-51 (citing ROA.26581-26582)), without addressing the flaws in that analysis.  As our opening brief explained (at 43-44), we do not contend that this case is moot, rendering plaintiffs' argument against the voluntary-cessation exception to mootness (Br. 51-52) nonresponsive.  And plaintiffs make no argument that the States, as opposed to the individual plaintiffs, face irreparable harm absent an injunction.

As the reply in support of our stay motion pointed out (at 7-8), the only recent declarations that plaintiffs cite (Br. 50), from plaintiffs Hines and Hoft, merely assert that plaintiffs continue to face content moderation by social-media platforms, without identifying any basis to believe that it reflects ongoing conduct by defendants (such that an injunction against defendants would be needed to avoid irreparable harm).

ROA.25726-25737.   As to the other individuals, plaintiffs simply recite the district court's unsubstantiated findings.   The finding that plaintiff Bhattacharya "is the apparent victim of an ongoing 'campaign' of social-media censorship" rested on an October 2020 email and a year-old declaration that says not a word about any *ongoing* restriction of Bhattacharya's content on social media.   ROA.26581 & n.648 (quoting ROA.12255 and citing plaintiffs' findings of fact, ROA.16753-16754, which in turn cite ROA.1187-1197).   The same is true for the other plaintiffs.   *See* ROA.1198-1206 (Kulldorff declaration not referring to any content moderation after March 2022); ROA.1273-1278 (Kheriaty declaration containing only a brief and unexplained allusion to any content moderation postdating 2021); ROA.26581 & nn.648-651 (relying on plaintiffs' proposed findings, ROA.16754-16758 ¶¶ 1373-1380, 1383-1386, which in turn rely on these declarations).

Aside from plaintiffs' broader failure to establish that they suffer irreparable harm when the government discusses misinformation and disinformation with social-media platforms, plaintiffs (like the district court) misstate the government's ongoing activities in that regard.   For example, they claim that "[t]he CDC's 'regular biweekly meetings with Google' on disinformation 'continue[] to the present day'" (Br. 51 (quoting ROA.26500))—but their insertion of the words "on disinformation" ignores the fact that, according to the CDC declarant on whose account the district court relied (ROA.26500), "the last time a meeting with Google touched on misinformation was in

- 21 -

March 2022" (ROA.23096).  And although plaintiffs twice cite the district court's opinion for the proposition that CISA's "'USG-Industry' meetings" are continuing (Br. 51-52 (citing ROA.26514; ROA.26523)), they fail to address the declaration, cited in our opening brief (at 43), explaining that "CISA has not participated in the USG-Industry meetings since the 2022 general election" (ROA.23197).  Plaintiffs do not explain why it is appropriate to ignore that declaration in favor of the district court's reliance on deposition testimony from an FBI agent, who candidly admitted that he did not "know" and was merely making an "assum[ption]" about the future plans of a different agency. ROA.10434 (cited in ROA.26514).

### B.    Plaintiffs Fail To Justify The Injunction's Breadth

Plaintiffs equally fail to show how an injunction of this extraordinary breadth could be appropriate to prevent harm to five individuals—which is the relevant question, since (as noted above) plaintiffs make no argument that the States face irreparable harm.  Plaintiffs' sole theory (Br. 55-56) appears to be that if an individual would like to "speak[]" or "listen[] to speech" on any of a huge range of topics, then it is proper for the district court to enjoin the government from taking any action that might cause third parties to restrict such speech.

This theory of equitable authority combines plaintiffs' broad theory of standing with their erroneous view that irreparable-harm and standing inquiries are coterminous. Injunctions are not a matter of right; the relevant question, on which neither the district court nor plaintiffs meaningfully engage, is whether the threat of irreparable harm to

the plaintiffs outweighs the harms that an injunction would inflict on the federal government.  These equitable principles help to explain why courts do not regularly confront First Amendment challenges by a roving band of "listeners" to government conduct that they do not like when that conduct primarily affects different parties who are not plaintiffs.

In any event, even if this Court were to accept plaintiffs' listener-standing theory, the district court did not, so the theory cannot be a basis for affirming the district court's exercise of its equitable discretion.  The injunction here was premised on the district court's erroneous view that plaintiffs could assert the interests of would-be speakers, not would-be listeners.

### C.    The Injunction Will Significantly Harm The Government And The Public Interest

Finally, plaintiffs seriously err in belittling our showing of the significant harm that the injunction would cause if it were allowed to regain effect.  They accuse us of "ignor[ing our] own declarations" (Br. 53), but our opening brief drew from the declarations illustrative examples of the essential government practices that the injunction could be read to forbid, *see* Opening Br. 48-49 (citing ROA.22981; ROA.23967).  These concerns are not, as plaintiffs suggest (Br. 54), "'hypothetical.'"  They are genuine and serious.

In a breezy paragraph (Br. 54-55), plaintiffs dismiss these concerns.  They contend, for example, that a government official may not urge platforms not to disseminate

falsehoods that threaten to undermine public safety in the wake of an earthquake, and that the Surgeon General may not seek to persuade platforms to "curtail[] features that feed suicide-promoting content to persons struggling with suicidal ideation," ROA.22981. In short, plaintiffs dismiss the harms caused by this injunction only by treating as illegitimate any attempt by the government to persuade members of the public to take actions that in the government's view would advance the public good. As our opening brief explains, that is a profoundly cramped understanding of the government's role, at odds with government-speech precedents and with how governments at every level have long sought to serve the public.

## III. The Injunction Lacks The Required Specificity

We pointed out (Opening Br. 51-54) that the district court's attempt to save the injunction from overbreadth by creating a series of carveouts only compounded the injunction's vagueness. Plaintiffs' primary response is to embrace the overbreadth through implausibly narrow constructions of the carveouts. For example, plaintiffs interpret the injunction's statement that it does not prohibit "permissible public government speech promoting government policies or views on matters of public concern" (ROA.26615) to mean only that the government may engage in "speech not otherwise forbidden by the injunction." Br. 58 (emphasis omitted). That interpretation is implausible—there is no need to clarify that the government can engage in conduct that an injunction does not prohibit—and even if it were plausible, it would hardly cure the

grievous ambiguity about what, exactly, the injunction "forbid[s]" (*id.*). For an injunction to be sufficiently specific, "'an ordinary person reading'" it must "'be able to ascertain from the document itself exactly what conduct is proscribed.'" *Louisiana v. Biden*, 45 F.4th 841, 846 (5th Cir. 2022). It is at a minimum *unclear* whether this clause should be read, as plaintiffs suggest, to accomplish literally nothing.

Plaintiffs invoke the district court's opinion to suggest that other exceptions to the injunction should likewise be given implausibly narrow readings. Br. 58-59. For example, they contend that a government official clearly could not rely on the carveout for "informing social-media companies of threats that threaten the public safety or security of the United States," ROA.26615, if she believed in good faith that false information circulating on a social-media platform during a public-health emergency was a threat to public safety. And they contend that a law-enforcement officer clearly could not rely on the carveout for "informing social-media companies of postings involving criminal activity or criminal conspiracies," ROA.26614, if she believed in good faith (but without certainty) that a crime was being committed. But whether or not plaintiffs accurately understand what the district court intended to do, their interpretations of the injunction cannot be considered clear from its face.

Plaintiffs downplay the tension between the district court's condemnation of CISA's conduct and the associated carveout by asserting, without citation, that "[f]ew, if any, of CISA's 'switchboarding' emails involved posts 'intending to mislead voters about voting requirements and procedures.'" Br. 59 (quoting ROA.26615). But even

the few such emails that plaintiffs introduced into the record as deposition exhibits make clear that such posts were indeed included in CISA's efforts. *See, e.g.*, ROA.14224 (post misstating deadline for requesting absentee ballot). As to such posts, plaintiffs claim that the carveout clearly governs notwithstanding the opinion—even though, as discussed above, they read other carveouts narrowly in light of the opinion. If *plaintiffs* cannot decide how to resolve these conflicts, government officials surely cannot be expected to do so on pain of contempt if they guess wrong. In any event, the parameters of an injunction must be clear "'from the document itself,'" *Louisiana*, 45 F.4th at 846; the tens of thousands of people subject to this injunction cannot be required to digest a 155-page opinion to understand what it means.

The fundamental problem is that, unable to identify any discrete conduct in which the government engaged that violated the First Amendment, the district court prohibited all manner of innocuous conduct and then tried to salvage its order with a series of unexplained carveouts in an effort to accommodate the government's legitimate interests (which were amply demonstrated in the record). The injunction is fundamentally flawed and should be reversed.

## CONCLUSION

The preliminary injunction should be reversed.

Respectfully submitted,

BRIAN M. BOYNTON
 *Principal Deputy Assistant Attorney*
 *General*

BRANDON BONAPARTE BROWN
 *United States Attorney*

DANIEL TENNY

 */s/ Daniel Winik*
DANIEL WINIK
 *Attorneys, Appellate Staff*
 *Civil Division, Room 7245*
 *U.S. Department of Justice*
 *950 Pennsylvania Avenue NW*
 *Washington, DC 20530*
 *(202) 305-8849*
 *Daniel.L.Winik@usdoj.gov*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,476 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in 14-point Garamond, a proportionally spaced typeface.

*/s/ Daniel Winik*
Daniel Winik